MBHHNunC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   MARK NUNEZ, et al.,

4                    Plaintiffs,

5            v.                          11 Civ. 5845 (LTS)

6   CITY OF NEW YORK, et al.,

7                    Defendants.         Conference

8   ------------------------------x

9

10                                      November 17, 2022
                                        2:30 p.m.
11

12  Before:

13
                        HON. LAURA TAYLOR SWAIN,
14
                                        Chief District Judge
15
                            APPEARANCES
16
    THE LEGAL AID SOCIETY
17       Attorneys for Plaintiff Class
    BY:  MARY LYNNE WERLWAS
18       KAYLA SIMPSON
         -and-
19  EMERY CELLI BRINCKERHOFF ABADY WARD & MAAZEL, LLP
    BY:  DEBRA L. GREENBERGER
20

21  DAMIAN WILLIAMS
         United States Attorney for the
22       Southern District of New York
    JEFFREY K. POWELL
23  LARA K. ESHKENAZI
         Assistant United States Attorneys
24

25


                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

MBHHNunC

1                         APPEARANCES (Continued)

2    New York City Law Department
     BY:  KIMBERLY JOYCE
3         SHERYL NEUFELD
          Assistants Corporation Counsel
4
     STEVE J. MARTIN
5         Court Monitor

6    ANNA E. FRIEDBERG
          Deputy Court Monitor
7

8    Also Present:

9    Louis Molina, Commissioner DOC
     Christina Vanderveer, Deputy Associate Monitor
10   Alycia Karlovich, Analyst
     Dennis Gonzalez, Associate Director
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (Case called)

 2              THE COURT:  Again, good afternoon.  We're here today

 3    for a status conference, and I would first ask that the

 4    participants in the conference introduce theirselves,

 5    themselves, and state their appearances, beginning with the

 6    monitor and the monitoring team.

 7              MR. MARTIN:  Your Honor, my name is Steve Martin,

 8    federal court monitor.

 9              THE COURT:  Good afternoon, Mr. Martin.

10              I'm going to ask that each of you, when you do speak,

11    do your best to speak up.  You can tip the microphones up, and

12    you can also take mask off when you speak.

13              MR. MARTIN:  Thank you, your Honor.

14              Steve Martin, federal court monitor in the Nunez

15    matter.

16              THE COURT:  Good afternoon, Mr. Martin.  You can be

17    seated.  As you introduce yourself, you can be seated.

18              MR. MARTIN:  Thank you, your Honor.

19              MS. FRIEDBERG:  Good afternoon, your Honor.  My name

20    is Anna Friedberg.  I'm a deputy monitor.

21              THE COURT:  Good afternoon, Ms. Friedberg.

22              MS. VANDERVEER:  Christina Vanderveer, associate

23    deputy monitor.

24              THE COURT:  Good afternoon, Ms. Vanderveer.

25              MS. KARLOVICH:  Good afternoon.  I'm Alycia Karlovich,
```

MBHHNunC

1    and I'm an analyst.

2              THE COURT:  Good afternoon, Ms. Karlovich.

3              MR. GONZALEZ:  Dennis Gonzalez, and I'm the associate

4    director.

5              THE COURT:  Good afternoon, Mr. Gonzalez.

6              MS. GREENBERGER:  Good afternoon, your Honor.  Debra

7    Greenberger from Emery Celli Brinckerhoff Abady Ward & Maazel

8    for the plaintiff class.

9              THE COURT:  Good afternoon, Ms. Greenberger.

10             MS. WERLWAS:  Good afternoon, your Honor.  Mary Lynne

11   Werlwas, the Legal Aid Society, Prisoners' Rights Project, for

12   the plaintiff class.

13             THE COURT:  Good afternoon, Ms. Werlwas.

14             MS. SIMPSON:  Kayla Simpson, Legal Aid Society,

15   Prisoners' Rights Project, for the plaintiff class.  Good

16   afternoon.

17             THE COURT:  Good afternoon, Ms. Simpson.

18             MS. ESHKENAZI:  Good afternoon.  Lara Eshkenazi from

19   the U.S. Attorney's Office on behalf the government.

20             THE COURT:  Good afternoon, Ms. Eshkenazi.

21             MR. POWELL:  Good afternoon.  Jeffrey Powell from the

22   U.S. Attorney's Office on behalf the government.

23             THE COURT:  Good afternoon, Mr. Powell.

24             MS. JOYCE:  Good afternoon, your Honor.  Kimberly

25   Joyce, from the New York City Law Department, for the city

MBHHNunC

1    defendants.

2              THE COURT:  Good morning, Ms. Joyce.

3              MR. POWELL:  Good afternoon, your Honor.  Also from

4    the City Law Department, Sheryl Neufeld, for defendants.

5              THE COURT:  Good afternoon, Ms. Neufeld.

6              MR. MOLINA:  Good afternoon, your Honor.  Louis

7    Molina, commissioner, New York City Department of Correction.

8              THE COURT:  Good afternoon, Commissioner Molina.

9              And greetings to all of those who are here as

10   spectators today.  Thank you all for coming to court.

11             As I said, we're here today for a status conference.

12   This conference was scheduled to discuss the city and the

13   Department of Correction's implementation of the action plan

14   that was approved and entered by the Court on June 14 of this

15   year, that's at docket entry No. 465, including a review of

16   whether meaningful progress has been made in achieving the

17   reforms specified in the action plan and for consideration of

18   whether additional remedial relief is warranted at this

19   juncture.

20             I also greet those who are observing from the overflow

21   courtrooms.

22             I remind everyone that as provided in the Court's

23   January 19, 2021, standing order, neither recording nor

24   retransmission of any part of this proceeding is permitted.

25   All attending who have been permitted to keep electronic

MBHHNunC

1    devices on entering the courtroom must keep those devices on

2    silent and must not use them without -- unless I have given you

3    specific permission to do that.  And once again, all recording,

4    photography, and retransmission are strictly prohibited.

5        We're here today to discuss a matter of great

6    importance to all in this community, ensuring that the city and

7    the department are tying the most efficient and effective path

8    to reform to effectuate the safety-related measures that the

9    parties agreed to in the 2015 consent decree and in subsequent

10   remedial orders.  This case and those measures --

11       Those who have come in who are standing, we're not

12   having standees who are not court personnel.  So if you're not

13   court personnel, please go to an overflow courtroom.

14       Are you court personnel?

15       A VOICE:  Yes, your Honor.

16       THE COURT:  All right.  Thank you.

17       All right.  Chambers/court personnel who are not from

18   my chambers should be going to the overflow as well, and I'll

19   leave it at that.

20       This case and those measures are focused on the

21   reduction of violence at Rikers.  Safe conditions for the

22   people held at Rikers and the people who work there are the

23   essential goal, and the need is more pressing than ever.  The

24   Court held a conference with the parties and the monitor last

25   spring on May 24, 2022, to discuss the development of an action

MBHHNunC

1    plan incorporating specific and concrete steps that the city

2    and the department need to take to address the unsafe

3    conditions at Rikers Island.  And after meaningful discussion

4    among all parties about the contours of the necessary reforms

5    and timelines, the monitoring team and the city submitted a

6    proposed action plan for the Court's review on June 10, 2022.

7         The Court entered and approved the action plan with

8    minor modifications, recognizing that while further remedial

9    relief may be necessary should defendants not fulfill their

10   commitments and demonstrate their ability to make urgently

11   needed changes, the plan represented a way to move forward with

12   concrete measures immediately to address the ongoing crisis at

13   Rikers Island.

14        It has now been approximately five months since the

15   Court approved the action plan.  Since that time, the Court has

16   watched the reports of conditions at Rikers closely, has

17   received and reviewed two status reports from the monitoring

18   team, and has met with the monitoring team to keep abreast of

19   developments.

20        Today's conference represents a critical juncture.  It

21   is a moment to closely examine whether the action plan remains

22   a viable way forward or whether the Court should consider

23   potential alternative forms of relief.

24        The monitoring team was appointed to assess compliance

25   with the consent decree, which was an agreement entered into by

MBHHNunC

1     the parties in 2015 setting forth the reforms the city and the

2     department need to take to improve conditions at Rikers.  Since

3     that time, the monitoring team has set up detailed analytical

4     and reporting methods and assembled a group of experts that

5     have advised the team and the department as to steps that

6     should be taken to address ongoing serious problems.

7          The monitoring team's most recent status report issued

8     on October 28, 2022, provides an updated overview of the

9     conditions at Rikers which remain deeply disturbing.

10    Incarcerated individuals and staff members face an unacceptably

11    high risk of harm.  This year has seen the highest number of

12    in-custody deaths since 2013, and the GRVC, or the George R.

13    Vierno Center facility, in particular, has seen skyrocketing

14    monthly rates of uses of force, stabbings, slashings, and

15    fights.

16         The monitoring team has explained that these extremely

17    grave conditions have a myriad of root causes, all of which are

18    complex and which stem from a lack of foundational good

19    practices.  The monitoring team has explained in its most

20    recent report that the complexity of the underlying issues at

21    Rikers means that there is no quick fix or easy solution to

22    these severe problems, and that they cannot be resolved at a

23    rate that the gravity of the conditions demands.  The reality

24    that there is no one quick fix means that the need for prompt,

25    effective, and targeted work on key foundational and day-to-day

MBHHNunC

1    issues is all the more urgent.

2           The Court was encouraged to learn from the most recent

3    monitoring reports that the monitoring team, based on its

4    observations over the last five months, has some degree of

5    confidence that the department is now, in the monitoring team's

6    words, poised to begin to build the foundation on which future

7    improvements will rest and that the commissioner has infused

8    the department with a new leadership team that not only

9    understands the issues at hand but also has a sense of the

10   practical steps necessary to achieve reform.

11          At today's conference, the Court looks forward to

12   learning more about the city and the department's

13   implementation of the action plan, including the views of the

14   monitor and the parties as to whether sufficient meaningful

15   progress has been made or whether further remedial relief is

16   necessary.

17          Now we'll turn to the monitoring team and the parties

18   for their views on the lessons learned from the past few

19   months, what next steps can be taken, and the quickest and most

20   effective way forward to ensure better protection of those at

21   Rikers.  I'll begin by calling on the monitor and deputy

22   monitor.

23          MR. MARTIN:  Thank you, your Honor.

24          THE COURT:  Would you pull the microphone over so that

25   it's directly in front of and tipped up, please, Mr. Martin.

MBHHNunC

1    Thank you.

2              MR. MARTIN:  Yes, I will.  Receiving all right?

3              THE COURT:  I think so.

4              Can those who are in the audience hear?  OK.  I'm

5    seeing thumbs up.  Please go on.  Thank you.

6              MR. MARTIN:  Your Honor, counsel, commissioner:  As

7    you noted, my office filed a second status report on the DOC's

8    action play on October the 28th.  I trust it was received by

9    the Court and the parties as a comprehensive, neutral, and

10   detailed report that has materially informed us all so the

11   course may be charted toward -- forward to advance the aims of

12   the Court's orders and thus make safe and secure the operation

13   of the DOC.

14             THE COURT:  Mr. Martin, I think that I'm going to have

15   to ask you to go to the podium.

16             MR. MARTIN:  Podium?

17             THE COURT:  Because I'm seeing some cupping of ears in

18   the back.

19             MR. MARTIN:  I will be glad to do so, your Honor.

20             THE COURT:  Thank you.

21             MR. MARTIN:  Do you want me to start anew?  My opening

22   statement is not that long.  I'd be more than happy.

23             THE COURT:  I think you might as well start from the

24   beginning.  Tip the microphone up just a bit more and pretend

25   you're at the opera so that I have to hear you without the

MBHHNunC

1    microphone.

2            MR. MARTIN:  I'm kind of a test case here.

3            THE COURT:  Yes, you are.  You can do testing one,

4    two, three.  But it's very important that everybody hear

5    everyone who's going to speak today.  So thank you for bearing

6    with the movement around the courtroom.

7            MR. MARTIN:  As your Honor noted, my office filed the

8    second status report on the DOC's action plan on October the

9    28th.  I trust it was received by the Court and the parties as

10    a comprehensive, neutral, and detailed report that has

11    materially informed us all so that a course may be charted

12    forward to advance the aims of the Court's orders and thus make

13    safe and secure the operation of the DOC.

14            Because the deputy court monitor, Ms. Friedberg, took

15    the lead on developing today's agenda and, I might add, did a

16    very admirable job in doing so, and she has had innumerable

17    conferences, meetings to set a functional agenda for us to work

18    through, I would ask the Court's leave to allow Ms. Friedberg

19    to somewhat detail the agenda.

20            THE COURT:  Yes, sir.  Thank you.

21            Just one moment.  We're trying to make the audio

22    optimal here.

23            THE LAW CLERK:  Sorry, Judge.

24            THE COURT:  Thank you.  May we proceed now?

25            So, Ms. Friedberg, you might as well go to the podium.

MBHHNunC

1    Thank you.

2              MS. FRIEDBERG:  I am Anna Friedberg, the deputy

3    monitor in this case.  Good afternoon, your Honor, and the

4    parties.

5              We worked extensively with the parties over the last

6    few weeks in multiple meetings, numerous phone calls, and

7    countless emails have been shared.  We have worked through and

8    discussed a number of items, including operational issues and

9    steps the department is taking to address those issues, along

10   with the recommendations in the monitor's October 28 report.

11             We have also discussed report scheduling and

12   information sharing, along with addressing the monitoring

13   team's long-standing recommendation to allow the department to

14   select the most qualified individuals to serve in the position

15   of warden, be it a uniform staff member or a civilian.  And

16   finally, we have discussed plaintiff's motion for contempt and

17   potential appointment for a receiver.

18             We appreciate the efforts of all parties to marshal

19   through these issues.  We believe the agenda for today's

20   conference will allow the parties and the Court to address

21   these important issues and chart a path forward.

22             With that, we turn the conference to the Court and the

23   parties to proceed through the various agenda items.  It will

24   allow the city and the commissioner to provide an update on the

25   current state of affairs, as well as to address the potential

MBHHNunC

```
 1    stipulation regarding facilities supervisors, the plaintiff

 2    class to speak about their position along with their proposed

 3    motion for contempt and appointment of receiver, and also allow

 4    the United States to provide an opportunity on their positions

 5    as well.

 6              Thank you.

 7              THE COURT:  Thank you.

 8              Next on the agreed agenda is counsel for the city and

 9    the commissioner.

10              MS. JOYCE:  Kimberly Joyce, for the city.  Good

11    afternoon, your Honor.

12              THE COURT:  Good afternoon.

13              MS. JOYCE:  I'm here with my cocounsel, Sheryl

14    Neufeld, and New York City of Department of Correction

15    Commissioner Louis Molina.  I will keep my remarks brief before

16    I turn to Commissioner Molina.

17              As a member of the Rikers Interagency Task Force, I am

18    proud of the work we've done collaboratively as a city to

19    support the department and the Nunez action plan.  While there

20    is still much hard work to be done, the department's efforts

21    over the past five months demonstrate the commitment to and

22    momentum for change that has been lacking for so many years.

23    The city and the task force will continue to support

24    Commissioner Molina as he makes the hard choices necessary to

25    make the city's jails safer for all.
```

MBHHNunC

1          Before I turn to Commissioner Molina, I did want to

2    address Legal Aid's request to make a motion for a receiver.

3    It's the defendants' position, as we set forth in our

4    November 14 letter, that the Court should not permit Legal Aid

5    to file its intended motion at this time because, given the

6    exacting standard under which such motions are reviewed, Legal

7    Aid's motion will not have a likelihood of success.

8          Our review of the cases cited by Legal Aid in their

9    November 14 letter to the Court and the handful of other cases

10   in which receivers were imposed demonstrates that receivers are

11   imposed as a last resort, when there are no alternative

12   remedies, when institutions are unwilling to take required

13   action or have engaged in repeated bad faith.  In one case

14   cited by plaintiffs, it took 22 years of inaction, failure, and

15   repeated contempt of judicial orders for a receiver to be

16   granted.  Here, in stark contrast, before the Court is a city

17   and a department committed to making the necessary reforms, as

18   has been demonstrated since the beginning of the Adams'

19   administration and particularly since the ordering of the

20   action plan.

21          A receiver is not a magic bullet or a quick fix,

22   especially when the department is already moving forward with

23   the work necessary to achieve lasting reform of the city's

24   jails.  At the outset, just like the city, a receiver must work

25   within the confines that exist: the consent judgment, the

MBHHNunC

1    remedial orders, and existing local, state, and federal laws

2    and regulations that are in place.  If the receiver can't work

3    within those confines, if those laws or regulations prevent

4    them from carrying out their duties and responsibilities set

5    forth by the Court, only then can the receiver petition the

6    Court for additional powers necessary to achieve compliance

7    with the Court's orders.  Notably, this is similar to what the

8    city is doing now by seeking authority from the Court to hire

9    facility leadership from outside the current uniform ranks.

10           Appointment of a receiver will set things back rather

11   than move things forward, especially when there is already the

12   leadership in place, the interagency collaboration, and the

13   focus of resources that have never been seen before that is

14   able to turn the tide now.

15           Thank you, your Honor.  And I'm going to turn now to

16   Commissioner Molina, and I'm happy to answer whatever questions

17   the Court may have.

18           THE COURT:  Thank you.  I'll hold my questions for

19   now.

20           Commissioner Molina.

21           MR. MOLINA:  Good afternoon, your Honor.

22           THE COURT:  Good afternoon.

23           MR. MOLINA:  Thank you for the opportunity to address

24   the Court again and to share with the Court the progress the

25   department has made under the action plan developed jointly

MBHHNunC

1    with the monitor.

2           The monitor has previously stated that for the

3    department to move forward with sustainable reforms, its

4    leadership must address four foundational issues:  (1) Deeply

5    flawed security practices that are inconsistent with best

6    correctional practices, (2) inadequate supervision of rank and

7    file staff and facility leadership, (3) staffing practices and

8    procedures that fail to effectively deploy staff across the

9    agency, and (4) a timely and meaningful discipline process with

10   the goals of both accountability and improved work performance.

11          Since being appointed by Mayor Adams the Department of

12   Correction leadership team has been focused on addressing these

13   four foundational issues.  The action plan approved by this

14   Court in June memorialized the pathway forward for building the

15   department's ability to reform itself.

16          I understand the public and the parties to this

17   consent judgment are frustrated with what went on for the last

18   six years, from 2015 to 2021.  However, this administration is

19   committed to resolving the long-standing systemic issues that

20   have plagued the department.

21          The challenges before us are complex and require

22   correctional and business management expertise and experience.

23   Antiquated thinking and transitioning of this city's

24   responsibility to third parties, such as a receiver, will not

25   solve these issues.  Your Honor, my team and I will.  The

MBHHNunC

complexity of the challenges before us require that numerous

nuanced issues be solved individually so that collectively the

solutions will allow for reform that is sustainable.

          A few examples for this Court:  The first is the lack

of middle management leadership at our facility in the rank of

deputy warden.  For too long this critical rank was scheduled

to work only Monday through Friday from 7 a.m. to 3 p.m., not

accounting for the fact that this is a 24-hour operation that

requires leadership on all tours.  The department will now

schedule deputy warden ranks so that there is seven-day-a-week

coverage, 24 hours a day.  This sounds simple, but the prior

leadership was unwilling to take this step.  We identified the

issue and are taking action.

          A second example involves the collection of data.  The

department collects a great deal of data but, quite frankly,

has not been very good at conducting data analysis.  We

developed an Office of Management Analysis and Planning team,

also known as OMAP, to address long-standing operational

inefficiencies and misguided management strategies.  OMAP

focuses on data analytics, operations research, strategic

planning, project management, and program evaluation.  The

department has attracted and hired experts in strategic process

design, management, and program evaluation to ensure that we

are an evidence-based correction agency.

          Good analytics are critical to good government.  Other

MBHHNunC

city agencies have similar operations, research, and data

analytics teams, but it was not until this administration that

the creation of this business unit became a reality for the

Department of Correction.

A third and final example is the city's interagency

task force created by Mayor Adams' executive order.  Never have

multiple levers of government been utilized and leveraged to

address infrastructure improvement, streamline hiring and

disciplinary processes, to support staff through organizational

health, and more generally to cut through the red tape.

Interagency cooperation is essential if we are to move the

department forward with these critical reforms.  This should

have always been an all-in city proposition, and it was not

until this administration came into place that this level of

support was provided.

We have shown our commitment by our actions over this

administration's first 11 months in office.  The mayor

appointed me to take on this very important work.  I have done

it before, successfully leading another jail out of federal

oversight, and I can do it here.

The team that I have assembled collectively has

hundreds of years of experience from around the country

combined in correction, general law enforcement, and business

management, which are required to solve these complex issues.

This team needs to be given the time required to turn this

MBHHNunC

1       department around.  We have the expertise to do it.

2               Your Honor, the tough decisions that I've had to make

3       and will have to make in the future do not come easy.  It is

4       unfortunate that after so long that the reasons we are at this

5       point is because of the intentional disinvestment in this

6       department's staff, infrastructure, and people in custody from

7       2015 to 2021.  Today we are asking for the option to select

8       highly qualified candidates from outside of the department to

9       lead our facilities.  I do not take for granted the

10      contributions of our current wardens and acting wardens.

11      Without them we would not have accomplished so much in the last

12      11 months, from turning around our young adult facility, which

13      at the start of the year was the department's most violent, and

14      bringing it to a level of calm that it has not experienced for

15      some years, to increasing court production from 60 percent in

16      January of this year to over 90 percent citywide today, to

17      implementing measures and engaging with their respective staff

18      to get officers to return to work, reducing the percentage of

19      staff out sick from 26.1 percent in January to 12.2 percent

20      today.  But we still have a great more that needs to be done.

21              Your Honor, asking for the flexibility to hire outside

22      candidates does not lessen my appreciation for the current

23      wardens and acting wardens who have stepped up to the

24      challenge.  I believe that with this infusion of talent, one

25      day in the future the department will once again have wardens

MBHHNunC

1     and chiefs from within the rank and file.  Through mentorship

2     and investment the department will bring back these honorable

3     uniform ranks.

4           What is, of course, most troubling to me is the

5     deaths.  In the past 11 months, as the Court knows, there have

6     been 18 deaths.  The monitor is correct in noting that jails

7     and prisons around the country are experiencing increased

8     deaths, but that gives me no comfort.  We must keep fentanyl

9     out of our facilities and take measures to address suicides.

10    The monitor has highlighted these issues, and with his

11    assistance, we will tackle them.  You have our commitment.

12    This -- in fact, we are hiring a consultant to enhance our

13    self-harm prevention.  This, coupled with the monitor's expert

14    and their recommendations, we will move the dial in the right

15    direction.

16          It is a shame, your Honor, that the department was

17    allowed to reach this state at the end of 2021.  You have my

18    abiding commitment to improving the quality of our jails.  Much

19    needs to be done, but we will do it.

20          Thank you, your Honor, for letting me address the

21    Court.  I'm available to answer your questions.

22          THE COURT:  Thank you, Commissioner Molina.

23          I do have a question, a specific question which is

24    legal in nature, regarding the proposed stipulation that was

25    filed last night.  It invokes a power that is granted to the

MBHHNunC

courts under Section 3626(a)(1)(B) of Title 18, which is part

of the -- pardon me, part of the Prison Litigation Reform Act.

That section requires that for prospective relief that would

permit a government official to exceed his or her authority

under state or local law or otherwise violate state or local

law, the court has to be able to find that federal law -- and

here the relevant federal law would be the Constitution --

requires that the relief be ordered in violation of state or

local law.

So the question is twofold:  Do the city and the

department agree, at least for purposes of this specific relief

in terms of hiring, that there is currently a safety situation

that is violative of the Constitution and that this relief is

required as a foundational measure and narrowly tailored to

address that violation?

MS. JOYCE:  Yes, your Honor, the city is prepared to

make those admissions and satisfy the PLRA.

THE COURT:  Thank you.

I will hear from counsel for the plaintiff class now,

Ms. Werlwas.

MS. WERLWAS:  Good afternoon, your Honor.  Under the

action plan, a thousand more class members have been subjected

to force at the hands of uniformed staff of this agency.  Since

the action plan was entered, 12 more have died, many in

circumstances directly attributable to the failures on the

MBHHNunC

1    record here.  Among those was 28-year-old Erick Tavira, whose

2    family is here today in the front row in the gallery.

3          THE COURT:  My sympathies.  And thank you for being

4    here today.

5          MS. WERLWAS:  Mr. Tavira died in defendants' custody

6    on October 22, 2022, of presumed suicide.  His family describes

7    him as big-hearted, affectionate and brave and a light to the

8    family who loved to play music.  They buried him last weekend.

9          Seven years prior to that weekend, this city promised

10   to take concrete, specific actions to end its unconstitutional

11   pattern of violence by staff against people in city custody and

12   to reduce violence in the jails and ensure the safety of people

13   held there, and they did not do so.  And as a result, the

14   violence that prevails today, even after this action plan, as

15   well as the four preceding court orders is at such an

16   astonishing rate, particularly of unnecessary, excessive, and

17   avoidable force, that it was unthinkable at the time of the

18   consent judgment that matters would be this bad.  Today the

19   jails are more violent, more deadly, and more lawless than at

20   the time this consent judgment was entered.  And the record

21   indisputably shows that the city does not have control of its

22   own jails.

23          This record is replete with facts that in any

24   functioning system would independently be a five-alarm fire,

25   yet have become to be treated as the status quo here, whether

MBHHNunC

1    that is areas of the jail left unsupervised; staff working

2    double and even triple shifts, while deputy wardens are just

3    now being put in the facility on weekends and evenings; people

4    locked and forgotten in intake cells despite a very clear

5    directive that they be held there only 24 hours; a militarized

6    emergency services unit that the leaders seem unable to

7    control.

8         The process for picking -- for fixing these and many

9    other failures described throughout the monitor's report and a

10   record that we would bring to this Court show that this process

11   has failed.  Four different commissioners of correction, four

12   different remedial orders, ink spilled on countless plans,

13   talented leaders hired and fired, progress made and undone, and

14   the undeniable facts of the last seven years through this most

15   recent report show that continuing down the same path cannot

16   and will not bring relief to the plaintiff class.

17        The patent insufficiency of the current process to

18   work is illustrated by the topic of discussion here today, that

19   is, how to redress the absence of competent uniformed

20   leadership in the facilities themselves.  The order that the

21   city is now willing to seek to allow them to fill some of their

22   eight warden positions with external hires has taken 18 months

23   of intensive negotiation, reporting, and court action just to

24   get to this point.  That cannot be scaled up.  The waste of the

25   parties' and Court's resources in entertaining what were

MBHHNunC

patently wrong solutions, such as that in the action plan,

which even the monitor at the time of the action plan and the

plaintiffs agreed would not work to solve the problem facility

leadership, it cannot continue.

　　　　And even more revealing of the lack of confidence in

this approach is what the city is not doing today.  They are

not seeking the same relief, the stipulation that is before

your Honor, to allow external hiring of deputy wardens, who are

a unionized position unlike wardens, or other leadership.  The

monitor made the recommendation that they do so, that they

allow external hiring of the deputy wardens in the initial

recommendation 18 months ago, and the record clearly supports

the need to do so.  But they have not done it; instead

counseling that we watch and wait.

　　　　This is at the same time that the October 28 report

tells us that the city has not complied with the Court's orders

to increase the presence of assistant deputy wardens in the

jails to supervise the line captains.  The Court ordered it to

increase; it has decreased.  What we have raised here today and

in our letter is just a high-level summary of an increasingly

dire factual record that we seek to present to the Court that

will powerfully and undeniably show contempt of this Court's

orders.

　　　　The complacency that has become baked into this

process whereby the city's persistent failure to meet its

MBHHNunC

1    court-ordered obligations is treated as a regrettable fact with

2    promises of better days ahead, better plans, better programs

3    cannot persist.  The record that we seek to present to your

4    Honor will show why, in addition, the remedy that's needed at

5    this point in this matter is the appointment of a receiver to

6    take the actions that the city is unwilling or unable to take

7    over the last seven years.

8           The persistence of dysfunction is across

9    administrations, it is across commissioners, and it demands a

10   structural solution that is not hostage to the political winds

11   or the desires of constituencies but rather is accountable to

12   the Court.  Receivership is an equitable remedy that the Court

13   can, upon consideration of a full record that we will present,

14   adduce to tailor to the specific needs of this case and of this

15   matter.

16          We note that the characterization of receivership in

17   the city's presentation of resetting the clock or undoing plans

18   that are underway fundamentally misunderstands the equitable

19   nature of this remedy.  It does not have to disturb the aspects

20   of the entity that are functioning and that are working, and we

21   would not want it to do so.  We need the plaintiff class to

22   maintain the benefits of any progress that has been made.

23   Rather, the Court would define a receiver's authority, whether

24   it's parallel or superseding existing governance structures of

25   the agency as appropriate to the circumstances and as the

MBHHNunC

1      record shows would be necessary.

2              This is an opportunity, actually, for the city, the

3      parties, the monitor to collaborate with a receiver, with the

4      benefit of a receiver's power and authority as defined by the

5      Court, to solve these problems before the city -- the

6      receivership terminates.

7              This can be done in many different ways.  In

8      California you can see the receiver in the *Plata* case and the

9      secretary issue memos to staff jointly.  And in fact, a

10     receiver can provide not disruption, but actually much-needed

11     stability to this process, given that commissioners in this

12     city typically have relatively short tenure, there have been

13     four of them in the course of this matter alone, and each

14     inevitably asserts a need to restart the clock afresh.

15             The record that we seek to present to the Court and

16     the briefing that -- where we would engage the law that

17     certainly governs the appointment of a receivership will set

18     forth the path towards how we believe the Court should exercise

19     its discretion to implement this remedy at a -- we'll note that

20     there is nothing in the PLRA, for example, that requires us to

21     wait 14 more years before seeking a remedy that will work in

22     this case.

23             Receivership is an extraordinary remedy, but these are

24     extraordinary facts, and the record that we seek to put before

25     the Court will show that on this record, which involves one of

MBHHNunC

```
 1   the profound failures of governance in this city's recent

 2   history and a human rights crisis in which the state continues

 3   to abuse its people behind closed doors despite seven years of

 4   court orders, demands the relief of appointment of a receiver.

 5           Thank you.

 6           THE COURT:  I just have one brief question for you

 7   before I go on to hear from the representatives of the United

 8   States Attorney's Office.

 9           You indicate that a receiver -- and you point to the

10   examples of L.A. in particular.  I think you may also have

11   mentioned Chicago -- would be able to come in and turn things

12   around.  Isn't there a learning curve for a receiver?  Doesn't

13   a -- a receiver can't do anything alone, especially in a system

14   this big.

15           So wouldn't a receiver have to remake and reestablish

16   relationships and face the same sorts of on-the-ground problems

17   that the current leadership is seeking to address through the

18   action plan?  Which is a sort of long way of saying, to the

19   extent there is an opportunity to build on momentum and things

20   that are being accomplished now, how is it in the interests of

21   the people who are confined day to day, the people who work

22   there day to day, to go through a lengthy and particularized

23   litigation process and then a re-invention and learning process

24   for a receiver yet to be identified if what we're trying to do

25   is be in a better place tomorrow?
```

MBHHNunC

1          MS. WERLWAS:  Your Honor, several points in response.

2     The first is that we fully expect, and I think there was no

3     dispute, that whatever actions the city is taking right now to

4     make the jails safer, they are going to continue,

5     notwithstanding motion practice that the lawyers will be here

6     in court, if necessary, undertaking; that the many efforts that

7     are underway to fix the jails right now would continue because

8     that is the right way to run an institution, and we absolutely

9     expect those to go forward notwithstanding what additional

10    relief the Court is considering.

11          I think that this view of a receiver as some --

12    upsetting an applecart or essentially restarting a clock is one

13    that I think is not rooted in what the receivership authority

14    actually means.  We go back to its roots, which were, in fact,

15    to preserve an entity that was the subject of a legal dispute

16    until that could be resolved, and that is what we expect would

17    happen here.  It's not that a receiver comes in and undoes the

18    good work that is being done.  What the receiver would do, and

19    would have to answer to the Court for doing, would take actions

20    that this city has demonstrated it lacks either the will or

21    ability to do, to take actions such as fix this profound

22    problem of facility supervision that we've identified today

23    without more years of delay and 18 months at a time to take

24    additional steps.  We expect the city to collaborate with a

25    receiver and a receiver's staff to bring them up to speed on

MBHHNunC

1   the measures they are undertaking.

2           The receiver could also vastly accelerate many of the,

3   frankly, ridiculously long processes that are set forth in the

4   action plan and in the record to date that -- and bring all

5   resources to bear in solving this crisis using New York City's

6   extraordinary economic power to procure necessary equipment

7   faster than some of the -- what we submit are patently

8   unreasonable timelines the city has pursued.

9           THE COURT:  Can you just give me examples?  Are you

10  talking about the time it has taken to achieve particular

11  things, or are you talking about particular projects or

12  processes?  I'm just trying to get a more concrete idea.

13          MS. WERLWAS:  Both, your Honor.  As to the latter,

14  which is what we should say projections or times, examples

15  would be that the action plan, even on its own terms, describes

16  a software program and procuring a software program -- that is

17  good, and a large entity needs to manage its staff -- that

18  won't be operative under these terms until July of 2023.  We

19  have seen the procurement of cell doors that actually lock has

20  been unreasonably prolonged.  The difficulties the city faced

21  in getting the emergency services unit to wear body cameras, a

22  deeply critical intervention, was delayed from the inability to

23  quickly procure vests on which those cameras could be mounted.

24  This is --

25          THE COURT:  This is in past years, correct?

MBHHNunC

1          MS. WERLWAS:  Yes.  Yes, that's what I wish to be

2     clear, that is in the past years.  The hiring of the -- the

3     hiring processes that have taken place under -- even under the

4     action plan, have us here months later with people just getting

5     started, just being hired.  There's nothing about a

6     receivership that means that excellent people who have been

7     hired are not going to continue to provide their expertise to

8     the agency.  It does not undermine that process.

9          It also further, though, allows what seems to be for

10     the first time in this case an entity to be managing the jails

11     that is also committed to and willing to take important steps

12     to discipline staff and supervisors that fail to perform the

13     duties the public has entrusted with them.  For too long there

14     has not been the discipline that is necessary for staff or

15     supervisors to achieve the results in this case.

16          THE COURT:  Some of the reporting by the monitor over

17     the past year in representations by the city have indicated

18     that in this calendar year disciplinary backlogs have moved.

19     Now, the commissioner and counsel for the city talk about prior

20     administrations, and clearly there have been starts, stops, and

21     backward regression over the past seven years -- well, I'll say

22     six given that there has been some progress shown in this year.

23     There have been different authority figures and authority

24     structures.

25          So will you tell me what a new receiver would do, in

MBHHNunC

1   plaintiff's view, or could be empowered to do consistent with

2   the requirements of the PLRA and the high standards of exercise

3   of equitable authority that is not entrained in this calendar

4   year under this administration?

5       MS. WERLWAS:  I think that the answer to that and some

6   of where points to what we would expect a receiver to do that

7   the city does not do is in looking at those facts reported for

8   this calendar year about disciplinary matters.  And there

9   remain -- the facts are, as reported in October, that there

10  remain a thousand pending cases in which the department has

11  found violations of their use-of-force policies that are still

12  waiting adjudication.

13       The city in its papers has indeed pointed to the

14  numbers of disciplinary matters that have been resolved in this

15  calendar year.  A closer examination of that, some of which is

16  in the monitor's report where it's describing the discipline

17  that was meted out in the monitoring period, which is not

18  entirely coextensive with this year shows that, I believe, and

19  counsel can correct me if I'm wrong, that the overwhelming

20  majority of these were for incidents that happened over a year

21  ago.  Is it 90 -- about 80 percent.  I'm not going to -- I

22  don't want to misstate a number, but the monitor's nodding.  He

23  knows which section of the report I'm referring to.

24       The point being that, yes, there were more

25  disciplinary adjudications and were overwhelmingly not directed

MBHHNunC

1      at the misconduct that is happening on these leaders' watch

2      right now.  It is far easier to impose a discipline for

3      something that your staff were not responsible for avoiding.

4              In any event, the -- in addition, what the monitor

5      also reports is an astonishing number of disciplinary matters

6      that are referred to the facilities for adjudication that the

7      new -- the investigations of use-of-force incidents are

8      revealing that approximately half of the use-of-force incidents

9      that were in the -- over the last few years have resulted in a

10     referral to the facility to impose discipline.  And what's

11     happening there?  What's happening is what you would expect

12     when a disciplinary matter is put in the hands of the same

13     facilities that are not working, that don't have wardens or

14     deputy wardens that are functioning.  The disciplinary cases

15     are essentially being abandoned in many -- that the monitor

16     reported one-third of the cases that were referred to the

17     facilities to impose command discipline were dismissed.  Some,

18     a small proportion, of what the monitor deemed were reasons

19     that might be plausible and about 70 percent that can't be

20     explained.

21             This black hole of discipline is a result of building

22     on bad processes, of taking discipline and putting it in the

23     hands of facilities that everyone here acknowledges do not have

24     the leadership or the ability to do the job.

25             Finally, we do note that on the issue of actions taken

MBHHNunC

1    this year, the city's letter addressed the number of times the

2    current administration has utilized the disciplinary tool of

3    suspensions.  A suspension being in this agency a 30-day

4    suspension before the person is returned to work.  And

5    notwithstanding the large number of suspensions, as the report

6    shows us, there's been a remarkable decline in the use of

7    suspensions of staff for use of force under the action plan.

8    That's in the appendix.  There were only six such suspensions

9    in the most recent three months that are reported despite

10   extraordinary use-of-force rates.  And then due to the civil

11   service laws, these people are back on the job within 30 days.

12           There's no question that discipline, both of line

13   staff, of unionized staff, and of wardens and supervisors is

14   intimately wrapped up in politics and is inhibited by the

15   city's constituencies and its political -- perceived political

16   needs.  Having an entity that is structurally, not personally

17   but structurally, independent of these vagaries and these

18   realities and is responsible for crafting relief based on what

19   this case needs are what a receivership offers and what we

20   expect a receiver would do.

21           THE COURT:  Thank you, Ms. Werlwas.  Thank you.  I

22   wanted to make sure you completed your remarks.  So I will now

23   call on Mr. Powell.

24           MR. POWELL:  Thank you, your Honor.

25           Like everyone in this courtroom today, the government

MBHHNunC

1    continues to have grave concerns about the ongoing unsafe and

2    dangerous conditions in the jails, including the

3    extraordinarily high levels of violence, the use of excessive

4    and unnecessary force against inmates, the high volume of

5    assaults by inmates against staff, the disturbing spike in

6    in-custody deaths that we've talked about today, the ongoing

7    failure to follow basic security protocols, and the deficient

8    staff deployment practices that too often leave posts unmanned

9    and disrupt and lead to a breakdown in the delivery of basic

10   service to inmates.

11          It is abundantly clear, and I don't think the monitor

12   would dispute this, that the city and the department continue

13   to be in noncompliance with core requirements of the consent

14   judgment and the prior remedial orders that your Honor has

15   entered.  And as a result of this noncompliance, it's also

16   abundantly clear that incarcerated individuals and department

17   staff continue to face an imminent risk of harm every day.

18          While the current state of affairs is alarming, based

19   on our review of the monitor's report and our extensive

20   discussions with the monitoring team over the last weeks and

21   months, there appears to be at least some glimmer of hope that

22   progress may be on the horizon due to the new leadership team

23   that has been put in place by the commissioner, which

24   Mr. Martin describes as a sea change that bodes well for the

25   development of solutions.

MBHHNunC

 1           Several of these new department leaders have

 2   substantial experience in managing corrections systems outside

 3   of New York City and achieving real reforms.  The government

 4   has consistently taken the position that the department is in

 5   desperate need and has been in desperate need for years of an

 6   infusion of outside corrections experts who are committed to

 7   addressing the culture of violence and dysfunction that have

 8   plagued this system for decades.  The newly installed

 9   leadership may, just may, be a first step to achieve this.

10           While the government supports the department's plan to

11   hire individuals outside of uniform ranks into the union, into

12   the warden positions, it is frustrating, we share Legal Aid's

13   frustration that it took this long to move forward with a

14   recommendation that the monitor made 18 months ago and has been

15   the subject of multiple discussions in this court before your

16   Honor.

17           The flaws with the commissioner's initial plan to hire

18   civilian assistant commissioners to run the jails alongside of

19   the existing wardens was flawed from the beginning, and those

20   flaws were repeatedly identified by Mr. Martin several months

21   ago when we were in court.  It is unfortunate that the city

22   took this long to act on the recommendation and seek this

23   judicial relief earlier.

24           Although the monitor speaks highly of the department's

25   new leadership personnel, it remains to be seen whether their

MBHHNunC

1    appointments will translate into real change and better

2    outcomes.  In light of the monitor's request to delay his next

3    report until March 31, 2023, which I know we haven't talked

4    about today, but we can when your Honor wishes, we have

5    asked -- if that occurs, we have asked the city and the city

6    has agreed to provide us with interim information, additional

7    information, by early February so that we, the government, the

8    United States, can assess whether true progress is actually

9    occurring.

10         Specifically, we've asked and the city has agreed to

11   provide us with updated data that are specifically referenced

12   in the action plan on a wide range of metrics concerning, among

13   other things, the level of violence in the jails, staff

14   absenteeism, the deployment of staff and facility supervisors,

15   the level of inmate supervision, and the extent to which

16   officers are being held accountable and supervisors are being

17   held accountable for their misconduct.  We need this data to

18   continue to carefully monitor this situation and quantitatively

19   evaluate whether progress is actually being made.  Indeed,

20   those metrics were included in the action plan at the

21   government's suggestion at the last conference.

22         In addition, the city has agreed to provide us by

23   early February with a description of the specific steps that

24   the city and department will take over the next several weeks

25   to address many of the very specific concerns that the monitor

MBHHNunC

1    identified in this report.  The monitor's November 14

2    submission covers many of these areas that will be the subject

3    of that report, but to just name a few, it will include:

4            How are they addressing the deficiencies in the

5    supervision of uniform staff, which continues to be a problem?

6            How are they reducing the frequency of security

7    lapses, which often result in the failure to secure doors,

8    officers leaving their posts, and failure to timely intervene

9    to de-escalate incidents?

10           How are they addressing the high -- extraordinarily

11   high violence levels at GRVC?

12           How are they addressing the increasing in-custody

13   deaths, and specifically, what are they doing to implement the

14   valuable recommendations that the monitor made in his report to

15   reduce the likelihood of self-harm and the astonishing number

16   of self-harm incidents in custody?

17           There are many other areas that we've asked for

18   updated information on and the city will be providing to us.

19   Although the government, as we indicated in our -- as the

20   monitor indicated in his submission to the Court on November 14

21   conveying our position, although the government is not

22   intending at this time to join the plaintiff class' motion

23   seeking the appointment of a receiver, if that motion is made,

24   the government reserves its right to join the motion at a later

25   date or to submit a separate motion seeking other relief based

MBHHNunC

1    on the reporting, the data, and other information that the

2    government receives over the coming weeks.

3           The government will continue to have regular meetings

4    and discussions with the monitoring team, as we have over the

5    last several months and years, to obtain real time updates on

6    the department's progress in actually implementing the plans

7    and initiatives that are discussed in the monitor's report.  We

8    are particularly interested in the monitoring team's firsthand

9    observations when they go and visit the facilities and the

10   jails and what they are seeing with respect to the actual

11   practices and operations of the jails.  All of this information

12   from the monitor, the reporting and the data, will be crucial

13   to the government's decision as to whether to join plaintiff

14   class' motion, if they're allowed to make this motion, in the

15   future.

16          Finally, we would respectfully request if the Court

17   grants the monitor's request for an extension in the next

18   report to March 31, we would respectfully request that the

19   Court schedule another status conference earlier than that, in

20   February after we've received our reporting, to discuss the

21   status of the department's efforts to implement the action plan

22   and update on that, as well as what steps are being made to

23   recruit and hire the most qualified candidates into these

24   warden positions.

25          I'd be happy to answer any questions that the Court

MBHHNunC

1    has.  Thank you.

2              THE COURT:  Thank you.

3              So that we have all of the proposals described and

4    fleshed out on the table, I haven't had a complete description

5    of the proposed stipulation on hiring and also the monitor

6    hasn't spoken about the reporting cycle change.  So who is

7    prepared to present on the content of the proposed stipulation?

8              Ms. Joyce?

9              MS. JOYCE:  Yes, your Honor.  Just bear with me, your

10   Honor, I apologize.  I'm just turning to the stipulation.

11   Thank you.

12             So, your Honor, yes, as the monitoring team submitted

13   the proposed stipulation and order last night, the city, with

14   input from the parties, crafted a stipulation and order that we

15   believe meets the standards of the PLRA, and we are seeking to

16   give this commissioner the authority to hire what we would term

17   "facility supervisors," formerly wardens, from outside of the

18   current uniformed leadership, which would thereby require the

19   waiving of certain state and local laws which we set forth in

20   the stipulation and order.  I believe Mr. Martin is also

21   prepared to submit a declaration in support of the stipulation

22   and order, and the city is prepared also to craft a declaration

23   about its efforts prior to coming to the Court with this

24   proposal.

25             THE COURT:  In aid of demonstrating that it is

MBHHNunC

1    necessary and narrowly tailored and that other measures tried

2    have not worked?

3         MS. JOYCE:  Precisely, your Honor.  The monitoring

4    team indicated in their letter that the city would submit a

5    declaration by November 23.  I did not raise this with the

6    monitoring team, but I neglected Thanksgiving week and the

7    holidays, and I would ask if the Court would grant us the

8    ability to submit that declaration by November 30.  So it would

9    be the city's declaration and Mr. Martin's declaration that

10   would be submitted in support of this proposed stipulation and

11   order.

12        THE COURT:  Well, the 23rd is before Thanksgiving.  So

13   are you saying that you don't believe that between now and next

14   Wednesday you would be able to compile and proffer the

15   information that is necessary?

16        MS. JOYCE:  Correct, only because it involves a few

17   stakeholders and steps that were taken with respect to outreach

18   to the state as well as -- there's a gathering of information

19   from various stakeholders that will be needed to create the

20   declaration.  So allowing us to have until that following week

21   would just give us sufficient time to put all the evidence

22   before your Honor.

23        THE COURT:  Thank you.  I'll take that request under

24   advisement pending scheduling at the end of this conference.

25        Now, the reporting proposal.

MBHHNunC

1        MS. FRIEDBERG:  Your Honor, if you'd like --

2        THE COURT:  If you speak up, you can speak from --

3        MS. FRIEDBERG:  Sure.  Can you hear me here?

4        THE COURT:  -- the table.  Yes, I can.

5        MS. FRIEDBERG:  Sorry.

6        THE COURT:  I'll let you speak seated because that

7   brings you closer to the microphone.

8        MS. FRIEDBERG:  OK.  Thank you.

9        THE COURT:  That's Ms. Friedberg speaking.

10       MS. FRIEDBERG:  With respect to the reporting

11  proposal, the monitoring team, in our October 28 report as well

12  as our November 14 report, outlined our submission.  I will not

13  repeat it here today, but rely upon the fact that our position

14  remains the same with respect to the scheduling of our next two

15  reports to be on March 31, 2023, and the second to be on

16  June 9, 2023.  We respectfully propose that those dates are

17  changed for the reasons that we've outlined and that the status

18  reports are -- the status conferences are scheduled following

19  those reports so that the parties and the Court are best

20  positioned to have the information that's necessary for that.

21       If you should have any other questions, I'm happy to

22  address them.  I believe that the plaintiffs provided a

23  response on November 14 with respect to their position on the

24  reporting schedule, which is that they oppose it.  I will not

25  speak for them.  The government and the city have consented to

MBHHNunC

1    the monitoring team's request.  I understand that the

2    government in the conference today has raised a request that

3    was not previously raised with any of us, which is a request

4    for a status conference in February prior to the submission of

5    the monitor's report.  We would contend that that would be

6    premature and that a conference would be best situated after

7    our report is provided to the Court.  However, we would

8    ultimately be available at the Court's convenience at any time

9    to provide any information that you believe is necessary in

10   light of the various competing views here today on this

11   scheduling.

12          THE COURT:  Thank you.

13          Ms. Werlwas, I had another question I neglected to ask

14   you, which is with respect to the timing of this report and

15   your proposed motion practice and steps in advance of that.

16   Section XXI, that is XXI, of the consent judgment prescribes

17   certain procedures that the parties agreed in 2015 would be

18   undertaken before requests for Court involvement that are not

19   consensual.  Will you tell me what, if anything, has been done

20   in compliance with that provision?

21          MS. WERLWAS:  If you don't mind, if Ms. Greenberger --

22          THE COURT:  Certainly.

23          MS. GREENBERGER:  Ms. Greenberger, your Honor.

24          As the Court is aware, we've been asking to be able to

25   file our motion for contempt and receivership since the spring.

MBHHNunC

1   It was your Honor's order in, I believe it was, June that we

2   file it after this conference.  Since that time we've had

3   repeated conversations communicating with the city about our

4   need to seek contempt and seek receivership; and, obviously,

5   the parties are not going to reach agreement on that, although

6   we continue to believe it's actually in the city's interest to

7   have a receiver to avoid the political issues that continue to

8   befall this department.

9        THE COURT:  So it is your representation that you have

10  complied with the requirements of XXI?

11       MS. GREENBERGER:  It is, your Honor, and my

12  understanding is the city has never said otherwise.

13       Thank you.

14       THE COURT:  Thank you.

15       So would the city like to respond to the request by

16  the plaintiffs and proposal, respond further to the proposal

17  regarding receivership?

18       MS. JOYCE:  Your Honor, if I may, there were some

19  statements made by plaintiffs' counsel that either myself or

20  Commissioner Molina would like to respond to.  Could we do

21  that, as well as potentially further respond to the

22  receivership application?

23       THE COURT:  Yes.

24       MR. MOLINA:  Thank you, your Honor.

25       I just wanted to just respectfully remind the Court

MBHHNunC

that in 2016, when I was the chief internal monitor, I had

written a report where I had recommended doing what we are

doing today.  In fact, at that time that the rank of the

three-star chiefs and above did not have the capacity to lead

this department out of the situation we were in back in 2016.

And if I remember correctly, I think my statement read that if

we did not make this change at that time, that at minimum we

would continue to see high rates of use-of-force incidents or

exponentially higher incidents of force if this change isn't

made at that time.  So when -- if someone knew that we were

going to be in this situation, it was I in 2016 as the chief

internal monitor.

      I would also just like to tell the Court that since

our action plan was conducted, we have hired six high-level

executives with hundreds of years of correction management

experience, two associate commissioners, three deputy

commissioners to fill out the major bureaus of security,

administration and facility operations, and also a senior

deputy commissioner with significant decades of experience

managing a large jail system.  To be able to do the recruitment

vetting that's necessary in an accelerated timeline to be able

to do that from when the action plan was put in place in June

till now is a huge feat.

      When it comes to timely and meaningful discipline

process, I'd just like to remind the Court that when I took

MBHHNunC

1   over on January 1, we had 3,500 to 3,700 disciplinary cases

2   that had not been addressed going all the way back to 2017.

3   Since I've been the commissioner, I have adjudicated over 2,200

4   disciplinary cases calendar year to date.  That is more

5   disciplinary cases done by any commissioner, I believe, of any

6   city agency in New York City's entire history.

7         In addition to that -- and I'm not proud to having to

8   have done this -- I have taken action and have had to terminate

9   or forcibly separate over 180 uniform staff members.  I don't

10  take that lightly, but it was what was needed to be done in

11  order to address just a long time of no accountability being

12  done by former management.

13        In addition to that, I have in my time been very

14  action-oriented.  When we have staff that is on probation and

15  they fail to meet the standards or they repeat deficiencies of

16  the reason of their probation, I have terminated those

17  individuals.  I have removed wardens in business unit capacity

18  that didn't have the skill set or the willingness to do what

19  needed to be done.  I have demoted individuals in the rank of

20  assistant deputy warden and on occasion have removed deputy

21  wardens that were not meeting our standards.

22        So I'd just like to say in the year to date time

23  frame, I have been very action-oriented.  I've committed to

24  this Court that I would use all of the powers that I have

25  within the office of commissioner, and that power has been

MBHHNunC

strengthened by the commitment and support that I have by Mayor

Adams and the interagency task force in order to address these

systemic failures with systemic solutions so that we can have

sustainable reform finally in this department.

        Thank you, your Honor.

        THE COURT:  Thank you.

        MS. JOYCE:  Your Honor, I will just very briefly

respond to Legal Aid's request to make a motion for receiver

and to their briefing schedule.

        First, to the briefing schedule, if the Court does

grant Legal Aid's request to make a motion, I would

respectfully request that the Court endorse the briefing

schedule proposed by the city which gives more time to respond

than, I believe, less than 30 days that was given by Legal Aid

for the city to respond to the motion.

        But with respect to whether or not the Court should

even grant Legal Aid the ability to make such a motion, one

example that Ms. Werlwas gave as to why a receiver was needed

was procurement.  Procurement is a topic that is on every

weekly Rikers interagency task force agenda.  Procurement is

not an issue that is impacting reform or progress by the

department.  For example, on cell doors, cell doors we have the

funding from the Office of Management and Budget.  We have the

staffing to help support the project with the department from

the Department of Design and Construction.  It is not a city

MBHHNunC

```
1    issue.  It is totally wholly a supply chain issue, your Honor.

2    There are a certain amount of people that produce doors and a

3    certain amount of people that produce locking mechanisms.  And

4    we have, through the Rikers interagency task force, eliminated

5    all barriers to what we can do, and that's purely a supply

6    chain issue.  There's nothing that procurement-wise or vetting

7    or appointment-wise that a receiver could come in and do that

8    the city is not already doing and taking the actions itself.

9           There has not been an action identified by anybody

10   that -- a concrete action that a receiver could come in and do

11   that the city is not already willing to do and this

12   commissioner has already demonstrated that he's willing to do

13   itself.  It would just be a delay, and time is really of the

14   essence.  And we have momentum now for change.

15          THE COURT:  Thank you.

16          Does the monitoring team wish to be heard further,

17   either about the interpretations of the reports or its

18   assessment, as to whether progress can be accelerated at this

19   point through consideration of the plaintiffs' proposed motion

20   as opposed to where we are now?

21          MR. MARTIN:  Your Honor, may it please the Court --

22          THE COURT:  Mr. Martin, since you're soft-spoken, why

23   don't you speak from your seat as well, closer to the

24   microphone.  Thank you.

25          MR. MARTIN:  May it please the Court, your Honor, when
```

MBHHNunC

1    we collected the data when we drafted the October 28 report, we

2    made every effort to include all relevant data materials,

3    recommendations in that report, as of the 28th.  So up to the

4    28th, I would not add any comments because I am confident the

5    report, through very, very selective editing, careful review,

6    attempted to include that that the parties needed to assess the

7    actions.

8              I will add one comment.  Between October the 8th and

9    today, I continue to see similar evidence of what we included

10   in the report that gives me some confidence that gains are

11   continuing to happen.  Whether the quality of that statement is

12   what it should be because of the duration of time between

13   October the 28th and June 17, I will leave to the Court and to

14   the parties, but I would like to cite just two examples of that

15   progress between October 28 and June 17 -- between October 28

16   and November 17.

17             One is the serious levels of violence that has been

18   occurring at GRVC, slashings and stabbings.  That there has

19   been a very concentrated effort by the commissioner and a

20   number of his deputy commissioners, deputy commissioner for

21   classification, deputy commissioner for administration, and the

22   most recent data coming from those efforts is favorable.  It is

23   clearly achieving some success in reducing the numbers of

24   slashings and stabbings at GRVC.  Again, a caveat there is it's

25   a matter of weeks, but it does reflect a steadying gain in that

MBHHNunC

```
1    effort.

2            The other example I would give, because it simply

3    occurred in my review between October 28 and November 17, I

4    review all preliminary investigations.  We divide those between

5    three teams.  What I received last week was from GRVC and RNDC.

6    I have been having continual meetings with the deputy

7    commissioner of security about directing attention to certain

8    elements of basic security.  Those primarily --

9            THE COURT:  Would you mind speaking into the

10   microphone.

11           MR. MARTIN:  Oh, I'm sorry.

12           THE COURT:  They can hear you without seeing you

13   speak.

14           MR. MARTIN:  Primarily those out of the second

15   remedial decree.  I understand the commissioner made reference

16   to -- used the word "nuanced."  He was quite correct.  This is

17   a nuanced business.  This example I'm about to present, I think

18   represents that nuance.  We had been telling the deputy

19   commissioner since June, when he kind of came on board and got

20   on track, you need to keep inmates -- excuse me, detainees,

21   that's my background, detainees.

22           THE COURT:  Detained persons.

23           MR. MARTIN:  Thank you.

24           -- out of vestibules.  You need to secure "A" post

25   doors and not let "B" post officers in the "A" post.  This is
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

MBHHNunC

1    minutia, it's nuanced, but it is hugely critical because it

2    relates directly to violence.  The most recent set of these

3    reviews I've done, we now see through the influence, I believe,

4    of the deputy commissioner for security of putting pressure on

5    his reviewers, I want you to identify every instance where

6    there is a detainee in a vestibule that shouldn't be there,

7    where an "A" post officer has let a "B" post officer in.  And

8    they are disciplining not only the "B" post officer for going

9    off duty -- going off post, thank you, but disciplining the "A"

10   post officer for allowing the "B" post officer to come in.

11   That is unprecedented in my experience with this agency.

12           So I just -- I believe it's important for the Court to

13   know that progress, once it gets underway, can get momentum.

14   I'm not going to represent that I'm seeing the momentum that

15   it's going to take to bring the agency into compliance, but I

16   do believe I'm seeing the beginnings of it.  And I would

17   warrant that the information that we have presented and have

18   collected, and so forth, reflects that.  That's my view, it's

19   the view of my monitoring team, my analysts, my SMEs, that we

20   heretofore have not seen.  Whether the commissioner can

21   continue that, I leave -- I mean, that's -- I can't answer

22   that.  I don't know.  So I hope that was helpful.

23           THE COURT:  Thank you.

24           Ms. Greenberger, did you wish to be heard?

25           MS. GREENBERGER:  I did.  Thank you, your Honor.  I

MBHHNunC

1   did want to respond to just a couple of things that the city

2   said about the receivership motion.

3           I agree with Ms. Joyce that time is of the essence.  I

4   think we can all agree with that.  The situations in the jails

5   are worse than they have ever been in the entire time of the

6   consent judgment.  Our plaintiff class is being harmed every

7   day.  There is no time to wait to see if the commissioner and

8   the city's newest hopes and plans will come to change the

9   system because the problem here is a systemic failure.  And

10  what I don't want is for us to all be in the same place a year

11  from now looking back at today and saying why didn't we move at

12  that point?

13          And how do we know that it's a systemic failure?

14  There's many pieces of evidence, but I just want to point to

15  one that we just got highlighted from the commissioner.

16          In 2016 -- he just told your Honor in 2016 he knew

17  that wardens needed to be replaced, but then when he came into

18  office, it took 11 months, 11 months, for him to come to your

19  Honor and ask for the Court to approve this change.  And he

20  only did so, the city only did so, after the plaintiff class

21  said that they were going to move -- that we were going to move

22  for a receivership motion.  And even now the relief that

23  they're asking for, not including ADWs, has no correctional

24  basis; in other words, there's no correctional reason not to

25  include ADWs.  It's a political reason.

MBHHNunC

1             So the question is how do we get around these

2      political issues?  And the answer, we would submit, is a

3      receiver.  What I was very concerned that Ms. Joyce said is

4      that your Honor should prevent us from filing a motion.  What

5      she's really asking for is for your Honor to prematurely judge

6      an incredibly complicated set of facts without having those

7      facts fully laid out before the Court, and we think that would

8      be grossly improper.

9             In addition to the information from the monitor's

10     reports which the Court has seen, we will also be presenting

11     information from class members, from the city's own data, and

12     preliminary reviews from other sources.  And so the question

13     that will ultimately be before your Honor will be based on a

14     significant and substantial record, only some of which is in

15     front of your Honor today.

16            So all that we really ask, your Honor, today is that

17     we set a briefing schedule; that it be in short order so that

18     we can try to get some relief for our plaintiff class.

19            Thank you.

20            THE COURT:  Thank you.

21            Did I see a hand at the back table?  I thought I did,

22     but perhaps I did not.

23            MS. JOYCE:  Your Honor, I'll just really briefly

24     respond.  There keeps being statements about political, that

25     there's some sort of political issue in our way that's keeping

1    the department or the city from acting.  That could not be

2    further from the truth.  Perhaps that was true in the prior

3    administration and the prior commissioners.  That is not true

4    with this administration, with this commissioner, or else we

5    would not even be coming to your Honor with a stipulation to

6    allow us to hire externally, which is not a popular move with

7    the current rank and file because it could possibly eliminate a

8    position for them to move to.

9         So we are not -- the time to be beholden to politics

10   is long gone.  That is not what this commissioner and this

11   administration is about.  So any alluding to politics being an

12   issue to keep us from making any acts couldn't be further from

13   the truth.

14        THE COURT:  Before you sit down, why is it that you

15   aren't seeking authority to hire assistant deputy wardens from

16   outside?

17        MS. JOYCE:  Yes, your Honor, I will start.  I can, of

18   course, turn to the commissioner because it is his department.

19        From the discussions that I've had with the

20   commissioner, it's my understanding that with the infusion --

21   and there are a lot of them here -- but with the infusion of

22   the external expertise -- he's hired 28 leaders from the

23   outside in the past five months, which the swiftness has never

24   been seen before in the likes of the city, I can tell you that,

25   so 28 leaders -- with the infusion of external expertise, they

MBHHNunC

1    have hundreds of years of correctional and law enforcement

2    expertise, you've already heard from the monitor that he is

3    seeing in the preliminary reviews that the deputy chief of

4    security is ensuring that people who are taking -- who are

5    allowing security lapses, such as the vestibules, that they are

6    being disciplined.  So the infusion is already making its way

7    down.

8            When you have these external wardens, facility

9    leaders, who will report -- who will be able to discipline and

10   to tell the staff in the facilities when they're doing things

11   wrong, that is huge, and it has not been done before.  So when

12   you have the external plus the professional development and the

13   training that they're going to do to strengthen those core --

14   the corrections officers, captains, ADWs, DWs, all of that

15   together shows that at this time we don't need to expand our

16   ask, and really that it's sufficient to bring in facility

17   leaders from the outside.

18           I'm not sure if Commissioner Molina has things that he

19   wants to add.

20           MR. MOLINA:  Yes.  I'll just add that, your Honor, the

21   monitor has mentioned numerous occasions that change has to

22   come from within.  The reality is the facility leader plays a

23   critical role in accountability and ensuring that the standards

24   of our expectations are met.  We have a little over 100

25   individuals that hold the rank of assistant deputy warden to

MBHHNunC

```
1   deputy warden.  The reality is a receiver, even if that person
2   so choose to want to move to outside candidates for those
3   positions, there would not be 100 people to find.  We do have
4   talent within the assistant deputy warden and deputy warden
5   position.  That talent has to be nurtured.  It has to be
6   mentored.  There has to be human capital investment in that
7   rank.  And having the flexibility to bring in outside
8   candidates that can serve in the facility leadership role of
9   warden coupled with the leadership team and cabinet that we
10  have put together from across the country to lead us out of
11  this situation is exactly the mix that is needed to move us
12  forward.
13          Thank you.
14          THE COURT:  Thank you.
15          Is there anyone else who needs to be heard?  Very well
16  then.  Give me just a moment to reflect.
17          MS. WERLWAS:  Excuse me, your Honor.
18          THE COURT:  Ms. Werlwas.
19          MS. WERLWAS:  Yes, if I may, on one additional measure
20  that we did not speak to with regards to the adjournment of a
21  reporting schedule --
22          THE COURT:  Yes.
23          MS. WERLWAS:  -- which we have not address, too, and
24  our position -- oh, excuse me -- and our position with respect
25  to that.  It's put out in our papers, and we --
```

MBHHNunC

```
 1                THE COURT:  And I have read your letter.
 2                MS. WERLWAS:  Yes.  We wanted to -- what seemed to
 3     have been, though, was not -- did not seem to be present in the
 4     discussions today was that the proposed information stream in
 5     lieu of -- that would go to the Southern District in lieu of
 6     the monitor's public report, the city insists should be
 7     private, should be confidential, and that is a matter that
 8     since we frankly do not understand why updates such as
 9     Mr. Powell described on the matters already set forth in the
10     action plan, the very matters we are discussing here today,
11     could possibly be matters that should be kept confidential or
12     secret from the parties, from the Court, we very strongly need
13     on the -- pardon me.
14                THE COURT:  I'm sorry.  You say secret from the
15     parties.  Is it your understanding --
16                MS. WERLWAS:  I misspoke.
17                THE COURT:  -- that you would not have access to this
18     same information?
19                MS. WERLWAS:  I misspoke.  My apologies.  I did
20     misspeak.  From the Court and the public.
21                THE COURT:  Am I correct in understanding that the
22     system since 2015 has been that certain preliminary figures and
23     reports would go to the parties before the filing of the --
24     would go to the parties only before the filing of the monitor's
25     report with the Court giving the Court and the public access to
```

MBHHNunC

1    the report, is that correct?

2              MS. WERLWAS:  Yes, that is correct, your Honor, that

3    prior to -- under the previous, what we would say is the

4    default reporting structure, that was the structure.

5              THE COURT:  So in your remarks, please tell me why

6    this is compellingly different from that structure that the

7    parties have followed for the past few years.

8              MS. WERLWAS:  Because the action plan at the

9    defendants' and monitor's request fundamentally changed the

10   reporting structure going forward, and it did so for the

11   reasons that were set forth therein, and it did this:  It

12   suspended the monitor's duty to report on most aspects of the

13   consent judgment and remedial orders on which it had been

14   reporting for the prior six years so that it could address

15   different issues.

16             Also in doing so, while cabining the monitor's review

17   to a much smaller range of topics specifically delineated in

18   the plan, it at the -- required quarterly reports, essentially,

19   smaller, more frequent reporting rather than longer time

20   periods with a broader scope.  And further, because the urgent

21   need, the urgent need that existed at the time the action plan

22   was put into place and that is even more dire today,

23   necessitates a more frequent provision of reliable, accurate

24   information to the parties.

25             The proposed -- so the analogue that in forgoing a

MBHHNunC

```
 1    monitor's report in January, close in time, you know, to the

 2    developments that the city says are underway and on which many

 3    of their promises are based, until much later in March, on

 4    these facts, with this much harm, we cannot countenance that

 5    delay.  The compromise simply was an even narrower production

 6    of information on which we can assess and the Court can assess

 7    whether some of the promises that are being made today, just

 8    some of them, are bearing fruit.  And we submit there is

 9    nothing in that information that there is any reason should be

10    kept secret from the Court and from the people.

11              THE COURT:  Thank you.

12              Does anyone wish to respond?  Ms. Joyce?

13              MS. JOYCE:  Yes, your Honor.  Just very briefly, and I

14    won't restate what Ms. Friedberg so eloquently wrote in her

15    letter, but I would refer the Court to the monitor's

16    November 14 letter.

17              THE COURT:  I think, given that we're having half a

18    conversation here, somebody, whether it's Ms. Friedberg or you,

19    needs to state before these good people who have been very

20    patient in listening to what is a somewhat technical but

21    nonetheless very important and highly charged conversation,

22    should have context and hear what the other justification is

23    that has been argued to the Court.  So you might want to defer

24    to Ms. Friedberg or you can state it.

25              MS. JOYCE:  I was going to read it.  So rather than me
```

MBHHNunC

1    state it myself, I was going to refer the Court to

2    Ms. Friedberg's letter of November 14, page 6, footnote 3,

3    which lays out why it's not necessary and actually not good

4    practice for the information to be public.  The city has told

5    the parties that they will -- that the information that they

6    are requesting from us, we will give to them like we do in our

7    compliance reports.  There is just absolutely no reason why the

8    public would need that information at that time.  So

9    specifically:

10           "This one-time report will be produced pursuant to the

11   terms of the confidentiality agreements outlined in docket

12   entries 290 and 340.  This approach ensures the monitor can

13   reasonably fulfill his obligations under the consent judgment,

14   as it allows the monitoring team the opportunity to analyze

15   data produced by the department to provide appropriate context

16   in order to avoid the misinterpretation or the dissemination of

17   incomplete or confusing information.  While the parties will

18   benefit from obtaining certain specific information in this

19   one-time confidential report, the public filing of just a

20   subset of information and without relevant context and other

21   information will result in the dissemination of incomplete or

22   confusing information to the public and to the Court."

23           And that is not helpful for anyone, your Honor.

24           THE COURT:  And there is a final sentence, and

25   Ms. Friedberg can correct me, but I understand that final

MBHHNunC

 1    sentence of that footnote to indicate that the data in order to

 2    assess progress requires measurement on a number of different

 3    points which may or may not be completely represented in the

 4    more limited report, and so the monitor is looking for an

 5    opportunity to report based on the multiple metrics and not

 6    just the narrower cut of data.

 7              Is that correct, Ms. Friedberg?

 8              MS. FRIEDBERG:  That's --

 9              THE COURT:  Please feel free to correct me because I

10    want correct information on this record.

11              MS. FRIEDBERG:  Sorry, your Honor.  You're partially

12    correct.  The other component is, as we've often discussed in

13    our report --

14              THE COURT:  Speak up louder, please.

15              MS. FRIEDBERG:  Sorry.  Can you hear me now?

16              THE COURT:  Yes.

17              MS. FRIEDBERG:  Thank you.  Sorry.

18              As we've discussed, your Honor, you're accurate in

19    what you stated.  I would just add an addendum to that in which

20    what we were describing is the assessment of compliance is not

21    simply based on certain quantitative measures, but, in fact,

22    requires a qualitative assessment.  That's why the monitoring

23    team has a set of subject matter expertise who are best

24    positioned to contextualize and provide context for what that

25    information needs.  And so that's part of that.  The sentence

MBHHNunC

1    that you were just describing is that it's not just simply

2    about the fact that certain data may be presented, but it may

3    mean what does that data mean?

4         Along with information that it cannot be quantified,

5    there is certainly a vast variety of numbers that are out

6    there, but as you've probably seen in our reports, there's

7    equally a large number of information that's shared from a

8    qualitative basis that's based on our extensive experience both

9    within monitoring the department and our experience in

10   correctional settings overall.

11        THE COURT:  Thank you.

12        Mr. Powell, was that a stand up or was that just

13   moving?

14        MR. POWELL:  It wasn't a stand up, your Honor.

15        THE COURT:  OK.  Thank you.

16        MS. FRIEDBERG:  Your Honor, can I just provide one

17   other piece of clarification?

18        THE COURT:  Yes.

19        MS. FRIEDBERG:  Because I think there might have been

20   some, whether intentional or not, misimpression about the

21   monitoring team's reporting request.

22        The monitoring team is still providing more

23   information, even under this revised schedule, than would have

24   been provided under the consent judgment.  So to the extent

25   that there's any suggestion that the monitoring team's

MBHHNunC

```
1    providing less reporting, that is, in fact, inaccurate.  The

2    monitoring team has continued to provide the Court and the

3    parties frequent information through informal phone calls,

4    email communications.  And with respect to public reporting,

5    the monitoring team has now vastly exceeded what was required

6    under the consent judgment, and this revised reporting schedule

7    would continue that same approach.

8              THE COURT:  Thank you.

9              All right.  Now, just ask you all to sit quietly with

10   me for just a couple of minutes here.

11             (Brief recess)

12             THE COURT:  Thank you all for your patience.

13             The Court has carefully and thoughtfully considered

14   the status reports diligently prepared by the monitoring team

15   and the information that the parties and the monitoring team

16   have presented today, as well as the parties' positions with

17   respect to the proposal to move ahead at this time with an

18   application for contempt and/or the appointment of a receiver

19   and the parties' positions with respect to the change in the

20   reporting schedule and access to the interim special report of

21   data.  The Court's rulings are as follows, and I share some of

22   my rationale for those rulings:

23             First, as to the request to commence motion practice

24   for contempt and/or the appointment of a receiver, under the

25   Prison Litigation Reform Act, the relevant provision being
```

MBHHNunC

1   found at Title 18 of the United States Code,

2   Section 3626(a)(1)(A), the Court is not authorized to grant any

3   prospective relief unless the Court finds that such relief is

4   narrowly drawn, extends no further than necessary to correct

5   the violation of the federal right at issue, and is the least

6   intrusive means necessary to correct the violation of the

7   federal right.

8        In its June 14, 2022, order setting this conference,

9   the Court denied plaintiff's request for the setting of a

10  briefing schedule for receivership motion practice at that time

11  but directed the parties to meet and confer in advance of this

12  conference to discuss proposed next steps, including any

13  proposed briefing schedules.

14       Plaintiffs now argue that the issue of receivership

15  must be taken up now because the city has failed to make the

16  jails safer in the seven years since the initial consent decree

17  was put in place, and plaintiffs have proposed a schedule for

18  motion practice commencing on December 15 of 2022.  The city

19  both opposes the commencement of motion practice and proposes

20  that if motion practice is to be permitted, a somewhat

21  lengthier timetable should be allowed for briefing.  And the

22  United States Attorney's Office reserves its rights but is not

23  at this point proposing to join in a motion to be made now.

24       For the following reasons, the Court concludes that

25  the plaintiff class counsel has failed to make a

MBHHNunC

1    sufficiently -- I'm going to use the word "plausible" not in

2    the pejorative sense but in terms of pointing to specific facts

3    that persuade the Court at this preliminary stage that

4    appointment of a receiver could comport with the requirements

5    of Section 3626(a)(1) of the PLRA at this time and therefore

6    denies counsel's request to set a briefing schedule for a

7    motion for contempt or appointment of a receiver.

8           To the extent plaintiffs take the position that there

9    is nothing to prevent them from filing a motion, I am putting

10   you on notice that I intend to use my inherent power to suspend

11   briefing pending further order of the Court because there are

12   important undertakings, there are important indications of

13   improvement, and there are important steps that are entrain for

14   the next few weeks and months, and so we will be in a better

15   position to determine the necessity and targeting of such a

16   further step if necessary.

17          So at this time the city and the department have

18   proffered an action plan to reform the management and oversight

19   of the facilities at Rikers Island and have taken meaningful

20   steps to implement the changes that are specified in the action

21   plan to improve the safety and conditions of the people

22   detained in the Rikers facilities.

23          The monitoring team has reported, and it's been

24   represented here in court today, that the commissioner has

25   appointed 28 department leaders, including many with experience

MBHHNunC

1    and expertise managing correctional systems in other

2    jurisdictions, bringing in fresh perspectives and additional

3    expertise.  The monitoring team has concluded that these

4    leaders have developed what the monitoring team characterizes

5    as well-informed plans that will fundamentally alter the way

6    the department operates, and that the department has taken

7    affirmative steps to effect change.  Specific steps are

8    detailed in the October 28, 2022, status report, including

9    changes going to foundational issues at the department such as

10   security, staffing, and classification of individuals in

11   custody.  And as the October 28 report explains, the

12   department's enhanced engagement with the monitoring team over

13   these past five months, the infusion of capable leadership with

14   outside expertise, and implementation of concrete reforms

15   provides a basis for expecting that with sustained commitment

16   and action at the current pace, and one hopes an even faster

17   pace, the department can begin to build a foundation on which

18   meaningful reform can be achieved in order to improve the

19   conditions of those who are held at Rikers.

20           Because the department and the city leadership

21   currently in place have so far demonstrated and acted on their

22   commitment to a sustained pace of reform and have begun to

23   effect meaningful change, the Court concludes that granting

24   plaintiffs the opportunity to pursue a receivership application

25   now would be premature and would be inconsistent with the legal

MBHHNunC

1    constraints imposed by the PLRA.

2            The Court remains deeply concerned about the safety

3    and well-being of every person held at Rikers Island, and the

4    Court is committed to seeing effective reform that improves the

5    safety and overall conditions for those in custody at Rikers

6    and the other city jails.  By virtue of the use-of-force focus

7    of this litigation and consent decree, the Court's attention

8    does center on ensuring that the city and the department

9    implement the structural changes that are necessary for the

10   defendants to be able to achieve compliance with the

11   requirements of the consent decree and the remedial orders.

12           Ensuring meaningful and effective reform at the

13   quickest pace possible means this Court has to make difficult

14   decisions about the allocation of resources.  The Court has

15   concluded that at this time diverting resources to a dispute

16   about a receivership, which would involve a potential shift of

17   leadership of at least some functions and authority from the

18   city and the department to an outside person who, in the first

19   instance at least, will face the same laws, regulations,

20   contracts, and other issues as the defendants find create

21   hindrances now, seems to the Court to be counterproductive.

22   And it is the Court's belief and intent that all of the

23   defendants' resources and focus need to be appropriately

24   directed at delivering safety and improved overall conditions

25   to the people who are held at Rikers.

MBHHNunC

1          The Court recognizes that there have been stops,

2     starts, and backward progression over the past six years.

3     However, there are concrete steps being taken now, there are

4     concrete structural changes, and there are indications of

5     progress that the Court does not find appropriate to impede or

6     further complicate at this time.

7          With the aid of meaningful and detailed continued

8     reporting from the monitor, including special reporting as may

9     be necessary, the Court will hold the defendants accountable

10    for maintaining a sustained pace of reform.  Should their

11    efforts or defendants' ability to translate their commitments

12    into meaningful change wane, the Court will be in a more

13    appropriate position to entertain a receivership application,

14    and at the conference following the next monitor report, the

15    Court will again hear the parties as to whether further

16    commencement of motion practice or other further intervention

17    is necessary.

18         So the application to commence motion practice and a

19    full briefing schedule is denied at this point without

20    prejudice to renewal after the next report.

21         I now turn to the monitoring team's request to modify

22    the reporting schedule.  The Court has carefully considered the

23    request, and the Court grants the request to modify the

24    monitoring team's reporting schedule as set forth in Section G,

25    paragraphs 2(iii) and (iv) and paragraph 5(ii)(2) of the

MBHHNunC

1    consent decree.

2            The Court grants this request in order to ensure the

3    most effective and efficient allocation of the monitoring

4    team's resources and to ensure that the reporting schedule

5    provides adequate opportunity to measure the defendants'

6    progress in implementing meaningful reform pursuant to the

7    action plan.

8            So under the new schedule, the next reports will be

9    filed March 31, 2023, and June 9, 2023.  And the city and the

10   department must also produce what will be a confidential

11   one-time supplement to their regular compliance report that

12   will be produced in early February 2023 pursuant to Section XIX

13   of the consent judgment with the data required by the action

14   plan that will not be filed publicly.  It will be subject to

15   confidentiality pursuant to the agreements that are outlined in

16   docket entries 290 and 340 for substantially the reasons that

17   are set forth in footnote 3 of docket entry No. 475, which is

18   the monitor's November 14, 2022, letter.

19           I am now setting a conference to follow the filing of

20   the March 31 report.  That conference will be -- and, Ms. Ng,

21   please make sure that this is still available -- April 27 at

22   2:00 in the afternoon.  That is a date and time that I had

23   identified, but I'm not sure I discussed it with Ms. Ng.

24           THE DEPUTY CLERK:  Yes, it's available.

25           THE COURT:  All right.  So the next scheduled

MBHHNunC

1    conference is April 27, 2023, at 2:00.  I am denying the

2    request to set now a February conference, but if, after the

3    disclosure of the additional data, any party believes that a

4    conference earlier than the April conference would be necessary

5    or productive, the parties are instructed to meet and confer

6    and can request that the Court set a conference.

7              I am anticipating and looking forward to the receipt

8    of a more fleshed out version of the proposed stipulation that

9    would authorize the commissioner to hire outside the uniformed

10   ranks for facilities supervisors, currently known as wardens of

11   the facilities, together with supporting affidavits from the

12   monitor and -- or declarations from the monitor and from the

13   city.  And given the rationale that Ms. Joyce offered for the

14   need for further time for preparation of the declaration that

15   will detail the steps that have been attempted to either waive

16   or otherwise eliminate the impediments posed by the laws

17   specified in the draft of the stipulation, the due date for the

18   declarations and, in other words, a complete submission of the

19   proposal is November 30 of 2023.

20             I believe that that addresses all of the issues that

21   were put before me today.

22             Ms. Greenberger.

23             MS. GREENBERGER:  Thank you so much, your Honor.  I

24   just had one question about the Court's order on our requested

25   motion.

MBHHNunC

1          I understand or hear the Court on the receivership

2     request, but separate from the receivership request we had

3     asked to move for contempt because there's a lot of evidence

4     that at the moment the city is not in compliance with the

5     consent judgment and remedial orders.  Just as one example, we

6     put in our letter that there's no -- there's intake overstays

7     and data collection issues about the rule that people are

8     supposed to leave intake in 24 hours.  And so we're -- we would

9     like to have the opportunity to seek contempt, to seek a remedy

10    for the -- we can talk about what is the appropriate remedy for

11    their contempt, but at least to make a motion and a record that

12    they are in contempt with the consent judgment and remedial

13    orders.

14          THE COURT:  Well, I had heard your references to

15    contempt and receivership as being related and also as being

16    more holistic in terms of the proposition that since 2015

17    compliance hasn't been achieved with the consent decree writ

18    large.  I don't believe I missed this in the submissions, but I

19    might have.  I certainly did not hear today a particularized

20    application with respect to the overstays in intake, and I'm

21    not aware of specific consultation regarding a potential

22    contempt application on that issue.  And in general, although

23    it's not necessarily required in every case -- I suppose that

24    inattention can sometimes support a contempt application -- but

25    generally bad faith is necessary there, and I have not heard a

MBHHNunC

1    description of a record that would lead me to believe that as a

2    contempt application that would be likely, on the record that

3    has been described to me now, to be one that would be

4    successful.

5         Having said that, it is a very, very important issue,

6    and so I would urge you, if you haven't done already, to have

7    very specific discussions with the city and the commissioner.

8         MS. GREENBERGER:  No, we have, and their -- our

9    meeting and conferring has been basically them telling us if

10   you have an issue with it, go to the Court.  We're not giving

11   you any information.  We've been trying to get information

12   since this summer about this.  We fully met and conferred.

13        We saw that as subsumed within the broader contempt

14   motion, and that's why it wasn't a separate motion that we were

15   envisioning raising before your Honor, but it is certainly

16   something that we fully met and conferred with the city on, and

17   we are very concerned about.

18        And to your Honor's question about bad faith, there's

19   evidence that records were intentionally changed to make it

20   look like people were leaving within 24 hours and they weren't,

21   and nobody was ever disciplined for that, and it's not clear

22   that that ever changed.  So I do believe that meets the bad

23   faith test.

24        THE COURT:  Ms. Joyce, would you like to be heard?

25        MS. JOYCE:  Very briefly, your Honor.  We have not

MBHHNunC

1    refused to provide information to the plaintiffs since the

2    summer.  They have raised this issue with us, which was a

3    self-identified issue that the department is working to

4    rectify, that the commissioner has taken steps in intake with

5    his team.  So there's not -- and I could go into some of that

6    now that has been shared with the parties.  We had multiple

7    meet and confers over the past few weeks, I think for probably

8    three to five hours.

9         So there are steps being taken by the department to

10   address the intake overstays, and we have not refused to give

11   information to the parties.  There's no evidence of bad faith

12   here.

13        So I don't know if, commissioner, if you want to talk

14   about anything related to intake, but it's an issue that has

15   been identified by both the department and the parties, and

16   it's being diligently worked on by the executive leadership

17   team to ensure that the information obtained in intake is

18   accurate and that people are not overstaying longer than 24

19   hours.

20        MR. MOLINA:  Your Honor, just to add to that, as it

21   relates to intake, we are seeking and we have been working with

22   our informational technology department in order to make

23   revisions to the dashboard application so that we make sure not

24   only we can assure proper access to that dashboard by staff,

25   but understanding what are the different additional key pieces

MBHHNunC

1      of information that are needed in that dashboard to document a

2      person's progression through the intake process and moments

3      where maybe that clock may need to stop because there are

4      things out of our control, for example, the person being

5      brought back to court, and it may appear that person is there

6      over 24 hours when, actually, they are not.

7              In addition to that, we did hire a deputy

8      commissioner, as you know, of administration who is our

9      staffing manager.  He is working along with our industrial

10     engineers for workforce optimization to assure that we have the

11     right level of staffing and that the staff is trained

12     appropriately in how to use this dashboard that was placed

13     during the prior administration, to make sure that individuals

14     are processing through as quickly as possible through their

15     intake process and placed in their housing units.

16             So we're aligning staff with the task expected of

17     managing the intake and ensuring that that staff that's

18     assigned there is consistent so that we don't have individuals

19     that have never worked intake before working in intake.

20             THE COURT:  So what is your time frame for having good

21     data and proper staffing in intake?

22             MR. MOLINA:  So our information technology unit is

23     working with that dashboard now.  That is work that is ongoing.

24     I don't have a time frame right now.

25             THE COURT:  Are you telling me you're hopeful that

MBHHNunC

1    you'll know where people are by August?

2              MR. MOLINA:  Oh, no, no, no, sooner than that.  I

3    would say another 30, 45 days, unless there's some technology

4    issue that needs to be addressed.  But we are identifying and

5    working with Correctional Health Services to identify what are

6    the appropriate times.  For example, if someone has to go to a

7    hospital, what type of medical care should stop that clock and

8    what should not.  So that's what we're working through.

9              We've also have moved the system out of intake and put

10   it in a general office so that there's only specific staff

11   that's available that can input into the dashboard to make

12   these identifications of where the person is in the process.

13             THE COURT:  Has this level of detail of information

14   been provided to plaintiffs before?

15             MS. GREENBERGER:  No.

16             MS. WERLWAS:  No, your Honor.  In response and -- when

17   we raised this issue with the city on August 26 with our

18   noncompliance notice under the consent judgment, we provided

19   much more information, much more detail than was before the

20   Court today, because that was given the breadth of today's

21   discussion.

22             The only response that we have gotten in our meet and

23   confers, which were delayed, in asking the city's position or

24   their response to the much more voluminous evidence of intake

25   overstays and tampering with the data was that they were moving

MBHHNunC

1    towards -- or planning to move towards substantial compliance.

2    We have not gotten answers nor reliable information on what

3    happened to this data and why it was altered.

4              And secondly, there appears -- we have not gotten

5    answers to their views on what the Court's order means when the

6    Court said people would be processed through intake in 24

7    hours, and we are hearing about stopping clocks, which is not

8    part of the orders, and the city's view on what it can "stop

9    the clock for" that are not part of the Court orders.  We have

10   not gotten those responses from the city.  We have been trying

11   to meet and confer with them since we sent the notice on

12   August 26 to get this information.

13             We did choose -- quite frankly, if we were not here

14   today on much broader issues, what one might say anticipating

15   and seeking the briefing schedule on contempt and receivership

16   that would be on many issues under the consent judgment, this

17   being one of them, we have a meritorious contempt motion that

18   we could make on this issue alone.  And we raised this question

19   about contempt so that we can have clarity under your Honor's

20   orders about what remedies we can pursue seeking contempt.  I'm

21   sorry, when I say "remedies," I mean how we can pursue motions

22   for contempt on an issue such as this which has already been

23   teed up and for which we have not gotten answers.

24             THE COURT:  Ms. Joyce.

25             MS. JOYCE:  Your Honor, we are happy and the city are

MBHHNunC

1    happy to have another meet and confer with plaintiffs on this

2    particular topic.  The meet and confers that we've been having

3    recently, there have been many topics to discuss, so perhaps we

4    didn't get into the details of this particular topic.  But we'd

5    be happy to have another meeting with Legal Aid to demonstrate

6    to them why a motion for contempt would not be successful

7    before your Honor because there is no basis and no record of

8    bad faith.

9              THE COURT:  That meet and confer must take place by

10   December 2, and you must come armed to that meet and confer

11   with information even more specific than the information that

12   was proffered today as to steps that are being taken as to the

13   city and the department's knowledge of and ability to determine

14   right now whether people have been in intake for more than 24

15   hours and the expected timetable for getting a handle on that

16   information.

17             Should plaintiffs still believe that contempt motion

18   practice is necessary following that meet and confer, the meet

19   and confer should include the discussion of a timetable for

20   briefing if there is still an assessment that there is a need

21   to go forward with contempt motion.  And so in the week of

22   December 5, I think it would be, at that point provide me with

23   a joint status letter.

24             Thank you, and thank you for being more specific about

25   that particular concern.

MBHHNunC

1          All right.  Is there anything else that we need to

2     address together this afternoon?

3          Thank you all very much.  Stay safe.  Work hard to

4     keep the people safe who are in Rikers.  Stay well, everyone.

5          Mr. Tavira's family, I am so sorry for your loss, and

6     we are working to make things better, and it is my intention

7     that things will be better for other families.

8          All right.  We are adjourned.  Thank you.

9          (Adjourned)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25