

**THE
LEGAL AID
SOCIETY
CRIMINAL
DEFENSE**

199 Water Street
New York, NY 10038
(212) 577-3300
https://www.legalaidnyc.org/

*Via ECF*

December 9, 2022

The Honorable Laura Taylor Swain
United States District Court for the Southern District of New York
500 Pearl Street
New York, NY 10038

Alan Levine
*President*

Twyla Carter
*Attorney-in-Chief*
*Chief Executive Officer*

Justine M. Luongo
*Chief Attorney*
Criminal Practice

Mary Lynne Werlwas
*Director*
Prisoners' Rights Project

Re:     *Nunez v. City of New York,* 11 Civ. 5845 (LTS)

Your Honor:

Pursuant to the Court's instruction at the November 17, 2022 conference in the above-captioned matter, we write to provide the Court with a status update on the parties' meetings with respect to potential violations of the intake-related provisions of Court's Second Remedial Order ¶ 1(i)(c) (Dkt. 398) and Action Plan section E(3)(a) (Dkt. 465).  Defendants have provided the Plaintiffs with their position, which we set forth below.

The parties conferred on December 1, 2022, and in writing.  As a result of those conferences, Plaintiffs believe Defendants are in contempt of the Court's order requiring them to maintain a reliable tracking system for intake overstays, Dkt. 398, and seek to file a motion for civil contempt as outlined below.  The parties continue to negotiate in good faith about compliance with the Court's order limiting stays in intake to 24 hours, but Plaintiffs find that resolution of the tracking system must be resolved first, as a reliable tracking system is necessary even to determine whether overstays are occurring.

**<u>Plaintiffs' Position</u>**

Plaintiffs set forth below a summary of the basis for our anticipated motion, which we propose to file by December 15, 2022.  Defendants' request for 45 days to respond is an extraordinary length of time for such a discrete motion, and we respectfully request that their response be due no later than January 4, 2023.

*Basis for Contempt Motion*

Plaintiffs believe that the Department is in contempt of this Court's order dated September 29, 2021 that provides:

By November 15, 2021, the Department shall develop and implement a reliable system to track and record the amount of time any incarcerated individual is held in Intake and any instance when an individual remains in Intake for more than 24 hours.

**Justice in Every Borough.**

Second Remedial Order ¶ 1(i)(c). This order was reiterated in the Court's order dated June 14, 2022, which provided "The Department shall implement the requirements of r ¶ 1(i)(c) of the Second Remedial Order." Action Plan, E(3)(a), Dkt. 465. Over a year after this Court's November 15, 2021 deadline, Defendants are not complying.

A. *Factual Summary of Development of Intake Overstay Tracking System and Parties' Negotiations*

Intake units are holding areas primarily for admission and discharge to facilities. *See* Twelfth Report of the Nunez Independent Monitor**,** at 43-44 (Dkt. 431). They are not fit for overnight stays: individuals are in communal pens with no furniture beyond benches, and no showers or access to ordinary jail services. The Monitor has repeatedly detailed that the Department makes excessive use of the intake area for purposes other than processing entry and discharge, noting "individuals often languish in the intake area and that likely contributes to the uses of force in intake (e.g., refusal to obey orders)." Twelfth Report of the Nunez Independent Monitor**,** at 43-44 (Dkt. 431); see also Ninth Report of the Nunez Independent Monitor**,** at 21 (Dkt. 341)**.** In September 2021, the Monitor reported an alarming rise in use of force incidents in intake areas, and recommended the 24 hour cap and tracking system. Letter, September 23, 2021, Dkt. 387, at 3, 6. Numerous public reports detailed the squalid and filthy conditions in the intake areas, including vermin, feces and overflowing toilets. *See, e.g.,* Reuven Blau, *Rikers Detainee Endured 'Horrible Conditions' Before Dying in Cell, Jail Overseer Finds,* The City, Aug. 1, 2021, *available at* https://www.thecity.nyc/2021/8/1/22605140/rikers-island-horrible-conditions-jail-deaths. The Court's order followed, capping stays in these areas to 24 hours and requiring DOC to track overstays. DOC agreed to the entry of the Second Remedial Order, effectively promising the parties and this Court that it could meet the November 15, 2021 deadline.

On November 17, 2021, the Monitor reported on compliance with the tracking requirement. It differentiated between two different populations in intake: people *newly admitted* to DOC custody who are in intake (principally at the Eric M. Taylor Center or "EMTC") for their initial jail processing ("New Admissions"), and people already in custody who are being transferred between jails ("Intra-facility Transfers"). For New Admissions, the Monitor relayed the Department's assurances that it was using a tracking system, and that there had been zero intake overstays. *Id.* at iii-iv. Plaintiffs' counsel were troubled by this assertion, as we were receiving consistent reports from our clients who had been held in intake for more than 24 hours. We provided this information to the Monitor and Defendants in November and December 2021, noting that it appeared DOC was not compliant with the Second Remedial Order's reliable tracking system requirement.

For Intra-facility Transfers, the Monitor determined that an existing DOC program called ITS was "in place and capable of tracking movement, [but] it is not consistently utilized by staff as data is not promptly entered and/or the incarcerated individual's bracelets are not scanned." Status Report, November 17, 2021 (Dkt. 420) at 4. In other words, DOC had a system but did not use it.

In their response, Defendants conceded that ITS data is not reliable for tracking Intra-Facility Transfers. Letter from Law Dept., Dec. 15, 2021, at 2 (attached as Exhibit A). It stated that while the ITS system had the "potential" to be used for intake tracking, the Department has had "challenges" with tracking movement. The Department stated it  was "actively working with the

Monitor to address issues regarding ITS and its use to ensure that DOC has solid data regarding the time spent in intake by individuals undergoing inter-facility transfers (i.e., non-new-admissions)." *Id.*

The Monitor's reports of March and June 2022 both detailed continued dire conditions in intake pens and numerous overstays. Special Report, March 16, 2022 (Dkt. No. 438), 22-23, 46-49; Status Report, June 30, 2022 (Dkt. No. 467), xii. It found that "some incarcerated individuals remained in intake for days, if not weeks, in horrifying conditions . . . . result[ing] in harm to incarcerated individuals." March 16 Report at 23. The March 16 Report again observed that "[w]hile the Department also has the Inmate Tracking System that would allow for tracking of inter and intra-facility transfers of incarcerated individuals, it is not being used. It is the Monitoring Team's understanding that individual facilities maintain individual tracking forms, but the information gleaned from them suggests that they are not updated regularly and/or are not being used to manage the units effectively." *Id.* at 47. This lack of a tracking tool allowed several individuals to "languish" in intake for up to two weeks. *Id.*

Following the March Special Report, the Court so-ordered the City's proposed Action Plan that required the City to "implement the requirements of ¶ 1(i)(c) of the Second Remedial Order." Order: Action Plan, June 14, 2022 (Dkt. 465), ¶ E(3)(a).

On August 26, 2022, Plaintiffs notified Defendants pursuant to the Consent Judgment ¶ XXI(2) that we believed Defendants were non-compliant with the Intake Overstay and Intake Tracking requirements. We raised the ongoing reports of intake overstays and Board of Correction reports indicating that Department staff were entering false data into intake tracking systems to cover up 24-hour rule violations. Letter of Plaintiff's Counsel, dated Aug. 26, 2022 at 2-5 (attached as Exhibit B). The Board of Correction reports demonstrated that DOC's data on overstays was unreliable, and raised serious concerns that the Department had altered the data to falsely suggest compliance with this Court's orders. DOC provided no substantive response nor position on these matters during our meet-and-confer, stating it would defer response until after the Monitor's October 28 Report.

In its October 28 Report, the Monitor concluded that the tracking data for new admissions was "unreliable and unusable." *Id.* at 86-87. The Monitor concluded that because of Defendants' failure to maintain accurate tracking data, "the extent of the Department's adherence to processing new admissions within 24 hours is simply unknown." *Id.* at 87. It reached no conclusion on the causes of the data alteration identified by the BOC, but noted that "there was no oversight or supervision for the officers who manually entered the information." *Id.* The Monitor detailed a plan by the Department to address the issue by processing new admissions through facilities other than EMTC; seeking faster medical screening; making technical improvements to the tracking system; and changing staffing. *Id.* at 88.

At the Court conference on November 17, 2022 – now a year past the original Nov. 15, 2021 deadline – Commissioner Molina described efforts underway to create a reliable tracking system and identify staff to operate the system. Nov. 17, 2022 Conference Tr. at 72-74 (excerpt attached as Exhibit C). When asked by the Court, "what is your time frame for having good data and proper staffing in intake?" Commissioner Molina replied "That is work that is ongoing. I don't have a time

frame right now."  When pressed by the Court, the Commissioner stated "another 30, 45 days, unless there's some technology issue that needs to be addressed."  *Id.* at 73-4.

When the parties conferred on December 1, 2022, DOC stated that it did not currently have a reliable tracking system, and aimed to do so by January 2, 2023 for New Admissions.  DOC further reported that it had trained 13 staff members to operate the tracking system for New Admissions at EMTC.  It further informed us that the Department was *not* going to open New Admissions intakes in other facilities, as the Monitor had reported, but would retain New Admission processing at EMTC.

Critically, however, these plans and staffing addressed only tracking for New Admissions: the Department had *no* information on when or whether it would track Intra-Facility Transfers.  By email dated December 8, defense counsel: "the Department is presently evaluating the Inmate Tracking System, a separate database from the Inmate New Admission Dashboard, and will work with stakeholders to implement any necessary updates."  The Department further stated that it had concluded that the data tampering identified by the Board of Correction was due to inadequate training and staffing, but did not identify any disciplinary action taken against either line staff (who no longer work on the tracking system) or the supervisors or leadership who failed to train and staff and supervise the process.

The parties have thus fully discussed the Intake Tracking issues, leading Plaintiffs to believe that a contempt finding is warranted.

B.  *Civil Contempt is Warranted on These Facts*

In this circuit, "a party may be held in civil contempt for failure to comply with a court order if (1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner."  *King v. Allied Vision, Ltd.*, 65 F.3d 1051, 1058 (2d Cir. 1995).  Neither willful noncompliance nor bad faith is required to find civil contempt. *McComb v. Jacksonville Paper Co.,* 336 U.S. 187, 191 (1949) (holding that "the absence of willfulness does not relieve from civil contempt"); *Donovan v. Sovereign Sec., Ltd.*, 726 F.2d 55, 59 (2d Cir. 1984) ("Turning to the question of contempt, by introducing clear and convincing proof of noncompliance with the injunction ... the Secretary made out a prima facie case for civil contempt. ... It is not necessary to show that the noncompliance was willful."); *see e.g., Shady Recs., Inc. v. Source Enterprises, Inc.*, 351 F. Supp. 2d 64, 72-73 (S.D.N.Y. 2004) (finding civil contempt and imposing sanctions even with explicit finding that contemptuous conduct was not willful); *Weitzman v. Stein*, 98 F.3d 717, 719 (2d Cir. 1996).  *Schlaifer Nance & Co. v. Est. of Warhol,* 194 F.3d 323, 336 (2d Cir. 1999), cited by Defendants, is not to the contrary.  That case holds only that where a court imposes sanctions against a party that brought a claim "without a colorable basis" or that had "multiplies the proceedings in any case unreasonably and vexatiously," in violation of 28 U.S.C. § 1927, bad faith is required; it does not address the standard for holding in contempt a party that fails to comply with a court order.

The Court's orders to develop a "reliable tracking system" for intake overstays by November 15, 2021 were undoubtedly clear. There is also no dispute that the Defendants did not comply with this Order, as there is presently no reliable system for any individuals held in intake.

The Monitor concluded on October 28 that "the extent of the Department's adherence to processing new admissions within 24 hours is simply unknown." *Id.* at 87. This is inexcusable one year after the Court's plain order. Throughout that year, as detailed above, Plaintiffs and the jail oversight body the Board of Correction have informed the Department about the unreliability of their tracking system, but DOC inexplicably took little or no action until it faced the prospect of Court involvement. There is no evidence the Department has engaged in any diligent attempts to comply over this year-plus period. While the Department states—belatedly—that it is currently altering its software with a "expected" roll-out date of early January 2023 for New Admissions (and assigning new line staff and one captain to the New Admission processes), these matters have yet to be implemented. By the Department's own timeline, we are weeks away from even launching what DOC claims will be reliable tracking system for New Admissions. Yet there is no reason to trust that—in the absence of a contempt finding—the Department will treat the January 2023 timeline as more binding than the prior deadlines it did not meet. Moreover, once a new system is rolled out there are inevitably reliability issues—as Commissioner Molina said to the Court there may be "some technology issue that needs to be addressed" —so we are likely still months away from the requirement that DOC track New Admissions in intake. Nov. 17, 2022 Conference Tr. at 74 (Ex. C).

With respect to Intra-Facility Transfers, the absence of diligent efforts to comply with the Court's orders are even more stark. As detailed above, the Monitor and DOC agreed over a year ago that the ITS system was not serving the tracking purpose because staff were not able to use the system properly. The Department could not identify any material change in this tracking over the last year, and instead, by email dated December 8, stated merely that it is "presently evaluating" ITS and that it intends to "work with stakeholders to implement any necessary updates." In other words, not only has the Department failed to comply with the requirement to track Intra-Facility Transfers, but 14 months have passed without the Department even choosing an approach to compliance. A year past the deadline, the Department still has no concrete plan for reliable tracking and has no specific time frame for doing so. Grossly insufficient efforts following yearlong delays, as the Department has shown here, cannot be considered reasonable diligence.

The Department's non-compliance with the Court's orders on intake tracking have a significant downstream effect. There is no reliable means to assess compliance with the Court's order limiting stays in intake to 24 hours—for over a year the Department has not accurately tracked intake stays. This noncompliance undermines any possibility of discerning whether the Department is complying with the Court's 24-hour rule. The stakes are significant: just this week, a class member who was *on trial* was forced to spend two nights sleeping on the floor of the AMKC intake pens with several other people, after an Intra-Facility transfer on Monday, December 5 from GRVC. He faced his jury without having showered for days nor been provided a bed. He was transferred out of intake only when Plaintiffs' counsel went to the courts to interview him, and relayed the problem to defense counsel. Though the parties are continuing to confer about concerns Plaintiff has raised about the Departments' non-compliance with the Court's 24-hour rule, such discussions occur with blinders on, as Plaintiffs have only evidence from individual situations, not

comprehensive data as required by the Court's orders.  Accordingly, Plaintiffs believe that resolving the tracking issue must take precedence to resolving addition concerns about intake.

Thus, Plaintiffs believe that the Department is clearly in contempt of the Second Remedial Order, and intend to show this in a motion before this Court to be filed on December 15, 2022.

**Defendants' Position**

On December 8, 20222, plaintiffs' counsel informed defendants of their intention to move for contempt on provision 1(i)(c) of the Second Remedial Order which required, in part, that by *"November 15, 2021, the Department shall develop and implement a reliable system to track and record the amount of time any incarcerated individual is held in Intake and any instance when an individual remains in Intake for more than 24 hours."* (Dkt. 398)). For the reasons discussed below, plaintiffs' proposed motion for contempt is premature and plaintiffs should not be permitted to proceed with their motion. However, if the Court does allow plaintiffs to proceed with their motion for contempt, defendants respectfully request 45 days from the date of plaintiffs' filing their motion for defendants to respond.

Following the November 17, 2022 status conference, the parties had a productive meet and confer on Thursday, December 1, 2022. Following the meet and confer, on Tuesday, December 6, 2022, plaintiffs sent follow-up questions to defendants, and defendants provided responses to those questions on Thursday, December 8, 2022. Additionally, the Department offered, and plaintiffs accepted, a tour of EMTC intake, which has been scheduled for Friday, December 16, 2022, in the morning. The Department is taking the steps outlined below to develop and implement reliable tracking systems for those in intake as required by the Second Remedial Order, and, more recently, incorporated into the Nunez Action Plan.  The Action Plan, signed by this Court on June 14, 2022, states, in pertinent part, as follows:

- Section D, Paragraph 2(b): *Improved Security Initiatives*: The Department shall implement improved security practices and procedures, including, but not limited to, the following items outlined below: [ . . . ] reduced reliance on the use of the intake following a use of force incident as required by to § A, ¶ 3 of the First Remedial Order.  The Security Operations Manager shall also work in collaboration with the Deputy Commissioner of Classification so incarcerated individuals are processed within 24 hours in Intake, as required in § E, ¶ 4 of this Order (below);

- Section E, Paragraph 3 - Intake:
    a. *Processing Incarcerated Individuals Through Intake Within 24 Hours:* The Department shall implement the requirements of ¶ 1(i)(c) of the Second Remedial Order.
    b. *Initiatives to Reduce Reliance on Intake*: The Classification Manager and the Security Operations Manager shall collaborate on initiatives under each of their respective scopes of work to reduce the reliance on intake and ensure incarcerated individuals are processed through intake in a timely manner.

Notably, there is no time frame set forth in the Action Plan for accomplishing the requirements of Section E, Paragraph 3. Nonetheless, the Department is diligently working to address the various issues facing intake, including individuals hired pursuant to the Nunez Action Plan, including Deputy Commissioner of Classification Christopher Miller and Associate Commissioner Alison Pace, in addition to General Counsel Paul Shechtman, the Nunez Compliance Unit, and First Deputy Commissioner Lynelle Maginley-Liddie. With respect to the tracking systems:

- The Department is updating the New Admission Dashboard, with an expected completion date on or before January 2, 2023;
- The Department has assigned steady staff to EMTC intake, including a Captain, who have been trained in the current Dashboard and will receive training in January 2023 on the New Admission Dashboard once it has been updated;
- The steady staff in EMTC intake will be the only individuals permitted to input or change data in the New Admission Dashboard;
- The Nunez Compliance Unit will conduct regular audits of EMTC intake in January 2023, following the updates to the New Admission Dashboard and the re-training of the steady EMTC intake staff on the Dashboard;
- The results of the NCU audits will be shared with the parties in the Department's compliance report to be shared in early February 2023; and
- The Department is presently evaluating the Inmate Tracking System, a separate database from the Inmate New Admission Dashboard, and will work with stakeholders to implement any necessary updates.

As it is clear that the Department is taking the necessary actions to ensure that there is a reliable tracking mechanism in place as required by the Second Remedial Order and the Nunez Action Plan, any motion for contempt by Plaintiffs at this juncture is premature. As the Court recognized at the conference on November 17th, while inattention can sometimes support a contempt motion, generally bad faith is necessary:

> …although it's not necessarily required in every case -- I suppose that inattention can sometimes support a contempt application – but generally bad faith is necessary there, and I have not heard a description of a record that would lead me to believe that as a contempt application that would be likely, on the record that has been described to me now, to be one that would be successful. (November 17, 2022 transcript, pgs. 70-71)

(*See also SEC v. Rajaratnam*, 2018 U.S. Dist. LEXIS 11603, *3-4, citing Schlaifer Nance & Co. v. Estate of Warhol, 194 F.3d 323, 338 (2d Cir. 1999) before a court can making a finding of contempt under its inherent power and issue sanctions, the court must find that there was bad faith).

Here, the details set forth above show that far from inaction or bad faith defendants are taking concrete steps towards improving inmate tracking systems. Having to respond to a motion for contempt, one that would likely prove unsuccessful, would be a drain on the already very limited

resources of the Department to address the many multi-faceted issues it is addressing on a daily basis. Therefore, defendants respectfully request that the Court deny plaintiffs' request to proceed with a motion for contempt. In the alternative, defendants' respectfully request that the Court allow defendants 45 days from the date plaintiffs' filing of any motion to submit a response.

*****

Respectfully submitted,

/s/                                          /s/

Mary Lynne Werlwas                           Debra L. Greenberger
David Billingsley                            Jonathan Abady
Katherine Haas                               Nairuby Beckles
                                             Sana Mayat


THE LEGAL AID SOCIETY                        EMERY CELLI BRINCKERHOFF
PRISONERS' RIGHTS PROJECT                    ABADY WARD & MAAZEL LLP

Counsel for Plaintiff Class                  Counsel for Plaintiff Class

# **<u>EXHIBITS</u>**





**THE CITY OF NEW YORK**
# LAW DEPARTMENT
100 CHURCH STREET
NEW YORK, NY 10007

**GEORGIA M. PESTANA**
*Corporation Counsel*

*(212) 356-2650*
*kjoyce@law.nyc.gov*

December 15, 2021

Kayla Simpson
David Billingsley
Mary Lynne Werlwas
The Legal Aid Society
Prisoner's Rights Project
199 Water Street
New York, NY 10038

*Via email*

  Re: Nunez, et al. v. City of New York, et al., No. 11-CV-5845 (S.D.N.Y.)

Dear All:

  On behalf of the Department, we write in response to your letters dated November 22, 2021 and December 10, 2021, questioning the veracity of representations the City has made to the Court in this matter.

**<u>Intake Process for New Admissions</u>**

  The Department has recently provided updates on the steps it has taken to make the Intake process more efficient. The first recent update, made to the Court on October 14, 2021, discussed the discontinuation of OBCC for new admission processing. As a result, EMTC was re-opened on September 20, 2021, to streamline the new admission intake process. Additionally, new admissions are tracked through a dashboard that is used for all individuals coming into our custody. Specifically, for new admissions, each person is timed from the moment they enter DOC's custody until they are assigned to a housing area (a.k.a. the "24-Hour Clock").

Department policy requires that the clock be temporarily stopped when certain events take place, including but not limited to hospital runs, mental health referrals, and refusals for treatment. Once the intervening event has concluded, the clock then resumes from where it was stopped originally. Thus, when it appears on the surface that an individual has been in the new admissions intake process for longer than 24 hours, this is largely due to clock stoppage.   Once the timing for all clock stops are deducted, the processing time falls within the Department's policy of assigning housing within 24 hours.

Collectively, both the Department's October 14, 2021 report to the Court and the Monitor's November 17, 2021 report (which reflected DOC's data) represented that, between September 23, 2021 and November 3, 2021, the "# new admissions in intake for longer than 24 hours" was zero, and that this

"24 hour period is from the time the individual was placed in DOC custody (e.g., at the courthouse) until the time the individual was placed into assigned housing. Note that DOC's 24-hour clock is put on pause for certain events, such as when the individual leaves the intake process for a scheduled court appearance, for mental health evaluations, or for hospital transfers."[1]

These reports clearly and properly explained that the Department's representations regarding 24-hour compliance for new admissions were subject to clock stoppage per policy.  The Department maintains that the information provided to the Monitor and the Court is accurate.

**Cases from November 22, 2021 Letter**

In support of your assertion that DOC's representation to the court was not credible, you provided information based on your own investigations regarding seven incarcerated individuals. The Department reviewed these cases.

First, only three of these individuals were placed in the Intake on the dates mentioned for new admission processing. As listed below, the first two were housed within 24 hours of coming into DOC custody (with clock stoppage per policy). The remaining individual, Darrieal Terry, had clock stoppages for various reasons, including his own refusal for care, while being processed as a new admission. The Department is reviewing his case.

**Keshawn Howard**
B&C: 1412103241
NYSID: 07206253L
Facility: EMTC
Date of Entry: 11/4/2021
Housed within 23:01 hours (no clock stoppage)

---

[1] In noting that you were "very surprised" that the November 17 status report stated that there were zero cases, your letter quoted language from that report but curiously omitted the report's language regarding clock stoppage.

**Jaquan Jiminez**
B&C: 1412103013
NYSID: 01745285M
Facility: EMTC
Date of Entry: 10/8/2021
Housed within 16:51 hours (with clock stoppage pursuant to policy)

The remaining four individuals from your letter were not new admissions. They were in intake because they were being re-housed via inter-facility transfers. Thus, these cases do not support the accusation that the Department's statements to the Court – which were entirely about intake for new admissions – were not credible or otherwise lacked veracity.

Incarcerated individuals who are awaiting inter-facility transfers are tracked in the Inmate Tracking System (ITS). As noted in the Monitor's November 17, 2021 report, while this system has the potential to track movement, concerns have been raised regarding the reliability of the data in ITS. The Department is actively working with the Monitor to address issues regarding ITS and its use to ensure that DOC has solid data regarding the time spent in intake by individuals undergoing inter-facility transfers (i.e., non-new-admissions). That said, the Department has been transparent about this challenge with the Monitor and does not dispute the Monitor's characterization in the November 17, 2021 report. DOC has made no misrepresentations regarding intake periods for individuals awaiting inter-facility transfers.

**December 10 Follow-Up Letter**

To the degree that your December 10, 2021 follow-up letter further posits that the Department has not submitted credible information to the Court, we refer you to the points raised above and we stand by our submissions to the Court and Monitor. We will continue to work with the Monitor on issues regarding compliance with the Second Remedial Order, including on new admissions intake and inter-facility transfers.

**Staffing**

Your November 22, 2021 letter also raised concerns with staffing at the Department. We believe that the concerns were addressed by the Monitor's December 1, 2021 report and during the December 2, 2021 Court Conference. The Department continues to make significant progress on staffing within our facilities. Since September 1, 2021, the number of triple tours, AWOLs, and unstaffed posts have all declined by 93%, 81%, and 80%, respectively. The Department's commitment to safety is evident by this progress and it continues to be a priority as the Department works hard to increase its workforce and provide efficient coverage within its jails.

In sum, we appreciate your concern and reiterate the Department's commitment to protecting the safety and security of the individuals in its custody.

Sincerely,

/s/

Kimberly M. Joyce
Senior Counsel
New York City Law Department
Legal Counsel Division

B



**THE
LEGAL AID
SOCIETY
CRIMINAL
DEFENSE**

199 Water Street
New York, NY 10038
(212) 577-3300
www.legal-aid.org

John K. Carroll
*President*

Janet E. Sabel
*Attorney-in-Chief*
*Chief Executive Officer*

Justine M. Luongo
*Attorney-in-Charge*
Criminal Practice

Mary Lynne Werlwas
*Director*
Prisoners' Rights Project

*Via email*

Hon. Sylvia O. Hinds-Radix
*Attn*: Kimberly Joyce
Corporation Counsel of the City of New York
100 Church Street
New York, NY 10007

Steve J. Martin
*Nunez* Independent Monitor
135 West 41st Street, 5th Floor
New York, NY 10036

Re:      *Intake, EMTC, and Non-Compliance*
         *Nunez v. City of New York, 11-CV-5845-LTS*

Dear Counsel and Monitor Martin:

On behalf of the Plaintiff class, we write to address the disturbing reports regarding the intake facility in the New York City Department of Correction (DOC), the Eric M. Taylor Center (EMTC). These demonstrate apparent non-compliance with the Consent Judgment (Dkt. No. 249) and Second Remedial Order (Dkt. No. 398).

 The Second Remedial Order requires the Department to "[p]rocess all incarcerated individuals, including but not limited to new admissions and intra-facility transfers, through Intake and place them in an assigned housing unit within 24 hours. The Department shall provide the necessary Intake staff and space to satisfy this requirement. By November 15, 2021, the Department shall develop and implement a reliable system to track and record the amount of time any incarcerated individual is held in Intake and any instance when an individual remains in Intake for more than 24 hours." *Second Remedial Order* ¶ 1(i)(c).

In the months following this order, Plaintiffs' counsel provided Defendants and the Monitor with numerous reports of intake overstays.  The Monitor's reports in March and June 2022 both detailed continued dire conditions in intake pens and numerous overstays. *Special Report*, March 16, 2022 (Dkt. No. 438), 22-23, 46-49; *Status Report*, June 30, 2022 (Dkt. No. 467), xii.

Following the March Special Report, the Court so-ordered the City's proposed Action Plan that required the City to "implement the requirements of ¶ 1(i)(c) of the Second Remedial Order." *Order: Action Plan*, June 14, 2022 (Dkt. 465), ¶ E(3)(a).

**Justice in Every Borough.**

Now, again, there are alarming reports of regular intake overstays, improper overstay tracking and document tampering, amidst increased violence and inhumane conditions at EMTC generally.  Moreover, these reports indicate that the Department has not effectively implemented an interim Security Plan pursuant to the Second Remedial Order, as required by the Action Plan ¶ D(2)(a) and is not compliant with Second Remedial Order ¶ 1(i)(c). We write to request that the Defendants meet and confer with Plaintiffs' counsel to address these issues.

**Intake Overstays and Deficient Tracking Systems**

In November 2021, the Department reported zero intake overstays. *Status Report*, Nov. 17, 2021 (Dkt. No. 420) iii-iv.  Plaintiffs' Counsel were troubled by this assertion because we had been receiving consistent reports from our clients who had been held in intake for far longer than 24 hours. We reported these cases to the City and the Monitor. The Monitor later reported that the Department-wide tracking system was deeply flawed and many people had been subjected to extended stays in intake, finding that the Inmate Tracking System was "not being used to manage the units effectively" and that the information was "not updated regularly." *Special Report*, March 16, 2022 at 47.

Further, the Monitor found several examples of intake overstays in violation of the Second Remedial Order.  In one facility, of 20 individuals listed on the Intake Monitoring Form, which may not have been diligently updated, "18 had been in intake beyond the 24-hour threshold.  One individual had been in intake *almost two weeks* and multiple others had languished for over a week." *Id*. (emphasis in original).

The Nunez Compliance Unit (NCU) examined intake processing at three jails and found that "14 of the 32 incarcerated individuals surveyed were held more than 24 hours (2 were held for 5 days, 1 for 4 days, 3 for 2 days)." *Id* at 48.  In June 2022, the Monitor again reported that even though the Department has an Inmate Tracking System, "facility compliance has been inconsistent." *Status Report*, June 30, 2022 (Dkt. No. 467), xii. It further updated the findings of the NCU compliance audits completed in January and February 2022, noting the aggregate findings that 33% of individuals (15 of 45) had stays in intake longer than 24 hours. Almost half of these (7 of 15) extended beyond 72 hours." *Id*. These findings represent persistent violations of the Second Remedial Order requirement to process people through intake in 24 hours. *Second Remedial Order* ¶ 1(i)(c).

The most recent public reporting on intake from the Board of Correction reveals that these violations persist.  Board Member Dr. Robert Cohen visited EMTC in June and described the conditions as "frightening." BOC Meeting, June 14, 2022, 1:55:25.[1]  He detailed overcrowded intake pens with people who had been held there for many days.  He described people who were not receiving medicine, not being transported to court, not provided adequate clothing, and urinating on

---

[1] *Available at* https://www.youtube.com/watch?v=J0FJNRoy8ps&t=6925s.

**Justice in Every Borough.**

Page 3

the floor because there was no functioning toilet.  Dr. Cohen reiterated that EMTC has inadequate staff to support processing intake and providing sufficient supervision. *Id*.

The next month, during the July 12, 2022 meeting of the Board of Correction, Chair Julio Medina also reported "overly long" intake stays without medical care and with alarming levels of violence. BOC Meeting, July 12, 2022, 1:32:27; 1:33:00.[2]

We continue to receive reports about intake overstays, as recently as last week: Mr. Javon Segrede[3] reports he was held in intake at EMTC for approximately 4-5 days after his arrest on Saturday August 13, 2022, before being transferred to a mental observation unit around Thursday of the following week.  He reports he was held first in pen 9, and then in pen 5, which we understand to be a very small area unfit for living.  He says that he was unable to shower for this entire time in intake, despite the heat wave, and did not receive his daily medication or proper food.  This is precisely the kind of egregious overstay the Second Remedial Order proscribes.

We are further deeply disturbed by Mr. Segrede's reports about his confinement in pen 5 given the reports of confinement in small shower cages in intake.  As you know, intake has small shower cages that are intended to allow people to decontaminate after they are sprayed with chemical agents.  An example of such a cage is depicted below—as is clear from the image, it is an extraordinarily small space, often with a wet or dirty floor, that should only be used for the very brief period required for decontamination.   Instead, people have reportedly been held there for significant periods of time, some over 24 hours in violation of the Second Remedial Order.



Photo Credit: NBC New York[4]

---

[2] Available at https://www.youtube.com/watch?v=aIkxto4XQWM.

[3] B&C 349-22-02575.

[4] Glorioso, Chris and Courtney Cogenhagen, *I-Team: Locking Prisoners in Narrow Shower Stalls Called Inhumane at Rikers Island*, NBC New York (July 15, 2022) *available at* https://www.nbcnewyork.com/investigations/i-team-locking-prisoners-in-narrow-shower-stalls-called-inhumane-at-rikers-island/3777087/.

**Justice in Every Borough.**

One June 25, 2022 incident is particularly jarring—DOC staff reportedly used force on a person in a Mental Observation housing unit, put him in a main intake holding cell where he was involved in another incident, sprayed him with a chemical agent, and then locked him in a decontamination shower where:

> "[I]t appears that [he] might have been confined to the decontamination shower cage for more than 24 hours, without access to food or medical or mental health assistance...[p]eople in custody informed Board staff that [he] persistently engaged in self-harm during the many hours he was in the shower cage—banging his head and punching and kicking the metal cage."

Memorandum from Board Staff to Amanda Masters (July 5, 2022), at 2.  BOC staff visited him at the hospital and documented "extensive injuries," and also noted that "despite his involvement in multiple uses of force...he was not seen by CHS staff until [over 24 hours later]"—a delay in medical attention that in itself appears to be in violation of Consent Judgment Section § V.22.  *Id.*  When Board staff visited the same shower cage where the person had been confined three days later, on June 28, 2022, they "found [another] person in custody locked in the shower stall and screaming hysterically [who reported] that he had been placed in the stall by ESU officers more than two hours earlier and that there was human feces and blood...in the stall/cage," which the Board staff member documented.  Email from Bart Baily to Amanda Masters (June 28, 2022) (attached).

These reports are persistent, horrifying, and inhumane.  Indeed, they have already been connected to one death: in August 2021, Brandon Rodriguez died when he reportedly hung himself in an Otis Bantum Correctional Center intake shower cage after being confined there for hours following an incident.[5]

**Apparent Document Tampering Regarding Intake Overstays**

The above evidence of the Department's violation of the 24-hours requirement understates the grave extent of the problem because the Department's reporting is unreliable and possibly falsified.  The failure to maintain reliable tracking systems, described above, is *in itself* a violation of the Second Remedial Order, which requires the Department to have developed and implemented, by November 15, 2021, "a reliable system to track and record the amount of time any incarcerated individual is held in Intake and any instance when an individual remains in Intake for more than 24 hours."  *Second Remedial Order* ¶ 1(i)(c).

---

[5] Graham Rayman, *NYC negligent in death of man, 25, at Rikers, says mom's lawsuit; case alleges jailers ignored his mental illness*, Daily News (Aug. 10, 2022), *Available at* https://www.nydailynews.com/new-york/nyc-crime/ny-rikers-jail-deaht-lawsuit-brandon-rodriguez-20220810-eyquysuk7ngzjbnvkec3itcnx4-story.html

Even worse, evidence has emerged that the data has been purposefully manipulated. During the July 12, 2022 BOC meeting, Chair Julio Medina expressed alarm about a "troubling pattern of document alteration regarding lengths of stay at intake."  BOC Meeting, July 12, 2022, 1:32:27.[6] Details of data manipulation were recorded in a written memorandum: "Board staff observed and documented a pattern of data manipulation to DOC's Intake Dashboard. Specifically, Board staff documented 16 instances where Department staff retroactively changed a person's "In Custody Start Time," in what appears to be an effort to obscure or "cure" 24-hour housing violations." Memorandum from Board Staff to Amanda Masters (July 5, 2022), at 1.

Document alteration indicates that the Department is not only failing to abide by the Second Remedial Order and the commitment to implement it as stated in their court-ordered Action Plan, but that it is knowingly reporting false information about the length of time people in its custody are spending in Intake. This constitutes bad faith conduct in clear contempt of the Consent Judgment and Remedial Orders. We ask that the Defendants meet and confer with us immediately about these issues.

**Reports that Problems in EMTC have Resulted in Increased Violence and Inhumane Conditions**

Reports about conditions in EMTC indicate that members of the plaintiff class housed there are at serious risk.  Though many of these observations describe facility-wide issues at EMTC and therefore are not limited to intake alone, they reflect systemic failures that have led to dangerous conditions including increased violence and uses of force—issues at the heart of the Consent Judgment.

Investigations by the BOC in June and July 2022 reveal inhumane conditions and violence in EMTC which present a danger both to people who are incarcerated and to staff. BOC staff reported in June 2022 that there were insufficient DOC staff for EMTC to run as the only intake facility at Rikers and described squalid conditions, denial of necessities and mandated services such as access to the law library, recreation, and religious services—all resulting in increased risk of violence. Memorandum from Board Staff to Amanda Masters, (June 10, 2022) (attached).  In the first few months of 2022, DOC and Correctional Health Services (CHS) reported 113 serious injuries to people in custody at EMTC. *Id*. at 2.  As of May 2022, the DOC-reported rate of slashings and stabbings was higher in EMTC than the average for the Department. *Id*. at 3.  And for every month so far in 2022, DOC reported significantly more use of force (UOF) incidents in EMTC than the jail average—the monthly UOF rate in EMTC was 125.6 per 1,000 people in custody in January to May 2022, for example, as compared to 92.8 per 1,000 people Department-wide. *Id*.  BOC staff also observed unmanned "B" officer posts in housing areas—including dorm areas with capacity for 40-45 people—at least three instances in May 2022 in which people were so seriously injured in an unmanned housing unit that they had to be hospitalized.  *Id*. at 1. Oversight documents belie any

---

[6] *Available at* https://www.youtube.com/watch?v=aIkxto4XQWM

**Justice in Every Borough.**

City assurances that EMTC staffing improved following the closure of the Otis Bantum Correctional Center (OBCC) in mid-June. On June 28, 2022, for example, there were 24 unstaffed B-Post areas at EMTC.  Memorandum from Board Staff to Amanda Masters (July 5, 2022), at 1 (attached).  Even with the City's assertions that staffing levels had improved, Board staff reported observing "unsanitary and inhumane conditions in two of the main intake's holding pens." *Id*. at 2.  Findings included reports such as the below incident on June 25, 2022:

> "At 11:33PM, a still-unidentified person in custody defecated on himself and soiled his clothes and the floor in the Main Intake in Pen #9, which does not have a toilet or sink. He and others in custody spent the next 12 hours in that pen, at times sleeping on the floor in the feces. The unidentified person remained in his soiled uniform for nearly 12 hours and was able to change at approximately 11:16 AM, only after another person in custody removed the clean uniform that he had on and offered it to that still-unidentified person."

*Id*. at 3. Violent incidents in unmanned housing units continued, some resulting in serious injury and hospitalization.  *Id*. at 2.  In one incident, a person in custody was attacked from behind, unprovoked, then went to the A officer post for help, was attacked again, and then "just left there, in a pool of his own blood, until DOC supervisors arrived about five minutes after the assaults."  Email from Bart Baily to Melissa Cintron Hernandez (July 13, 2022) (attached).

The problems in EMTC are serious and have continued to emerge over a span of months. These unacceptable conditions have led to increased violence and uses of force that run afoul of the requirements to implement the Use of Force Directive, ensure prompt medical attention following UOFs, and implementing the security initiatives required by the Second Remedial Order. *Consent Judgment* §§ IV.1, V.22; *Second Remedial Order* ¶ 1(i)(a); *See also Order: Action Plan* ¶ D(2) & E(3)(a).

**Requests**

The alarming facts described above appear to demonstrate that Defendants are not complying with their obligations under the Consent Judgment and Second Remedial Order. The Action Plan does not clearly set forth how Defendants intend to cure these grave and longstanding issues in facility intake units. Pursuant to Consent Judgment § XX1.2, we therefore request that Defendants respond in writing within 30 days setting forth their position with respect to whether they are in compliance with the sections of the orders noted above and what actions, if any, they propose to take to address the apparent lack of compliance.  We are available to meet and confer.

**Justice in Every Borough.**

Page 7

Thank you for your swift attention to this matter.

Regards,

_____/s/_____   _____/s/_____
THE LEGAL AID SOCIETY                         EMERY CELLI BRINCKERHOFF
Mary Lynne Werlwas                            ABADY WARD & MAAZEL LLP
Kayla Simpson                                 Jonathan S. Abady
David Billingsley                             Debra L. Greenberger
199 Water Street, 6th Floor                   Nairuby L. Beckles
New York, New York 10038                      600 Fifth Avenue, 10th Floor
Telephone: (212) 577-3530                     New York, NY  10020
Email:                                        Telephone: (212) 763-5000
mlwerlwas@legal-aid.org                       Email:
ksimpson@legal-aid.org                        jabady@ecbawm.com
dbillingsley@legal-aid.org                    dgreenbergerg@ecbawm.com
                                              nbeckles@ecbawm.com


*Encl.*   Memorandum from Board Staff to Amanda Masters (June 10, 2022)
          Memorandum from Board Staff to Amanda Masters (July 5, 2022)
          Email from Bart Baily to Amanda Masters (June 28, 2022)
          Email from Bart Baily to Melissa Citron Hernandez (July 13, 2022)


**Justice in Every Borough.**

C

MBHHNunC

1   conference is April 27, 2023, at 2:00.  I am denying the

2   request to set now a February conference, but if, after the

3   disclosure of the additional data, any party believes that a

4   conference earlier than the April conference would be necessary

5   or productive, the parties are instructed to meet and confer

6   and can request that the Court set a conference.

7            I am anticipating and looking forward to the receipt

8   of a more fleshed out version of the proposed stipulation that

9   would authorize the commissioner to hire outside the uniformed

10  ranks for facilities supervisors, currently known as wardens of

11  the facilities, together with supporting affidavits from the

12  monitor and -- or declarations from the monitor and from the

13  city.  And given the rationale that Ms. Joyce offered for the

14  need for further time for preparation of the declaration that

15  will detail the steps that have been attempted to either waive

16  or otherwise eliminate the impediments posed by the laws

17  specified in the draft of the stipulation, the due date for the

18  declarations and, in other words, a complete submission of the

19  proposal is November 30 of 2023.

20           I believe that that addresses all of the issues that

21  were put before me today.

22           Ms. Greenberger.

23           MS. GREENBERGER:  Thank you so much, your Honor.  I

24  just had one question about the Court's order on our requested

25  motion.

MBHHNunC

1          I understand or hear the Court on the receivership

2     request, but separate from the receivership request we had

3     asked to move for contempt because there's a lot of evidence

4     that at the moment the city is not in compliance with the

5     consent judgment and remedial orders.  Just as one example, we

6     put in our letter that there's no -- there's intake overstays

7     and data collection issues about the rule that people are

8     supposed to leave intake in 24 hours.  And so we're -- we would

9     like to have the opportunity to seek contempt, to seek a remedy

10    for the -- we can talk about what is the appropriate remedy for

11    their contempt, but at least to make a motion and a record that

12    they are in contempt with the consent judgment and remedial

13    orders.

14          THE COURT:  Well, I had heard your references to

15    contempt and receivership as being related and also as being

16    more holistic in terms of the proposition that since 2015

17    compliance hasn't been achieved with the consent decree writ

18    large.  I don't believe I missed this in the submissions, but I

19    might have.  I certainly did not hear today a particularized

20    application with respect to the overstays in intake, and I'm

21    not aware of specific consultation regarding a potential

22    contempt application on that issue.  And in general, although

23    it's not necessarily required in every case -- I suppose that

24    inattention can sometimes support a contempt application -- but

25    generally bad faith is necessary there, and I have not heard a

MBHHNunC

1    description of a record that would lead me to believe that as a

2    contempt application that would be likely, on the record that

3    has been described to me now, to be one that would be

4    successful.

5           Having said that, it is a very, very important issue,

6    and so I would urge you, if you haven't done already, to have

7    very specific discussions with the city and the commissioner.

8           MS. GREENBERGER:  No, we have, and their -- our

9    meeting and conferring has been basically them telling us if

10   you have an issue with it, go to the Court.  We're not giving

11   you any information.  We've been trying to get information

12   since this summer about this.  We fully met and conferred.

13          We saw that as subsumed within the broader contempt

14   motion, and that's why it wasn't a separate motion that we were

15   envisioning raising before your Honor, but it is certainly

16   something that we fully met and conferred with the city on, and

17   we are very concerned about.

18          And to your Honor's question about bad faith, there's

19   evidence that records were intentionally changed to make it

20   look like people were leaving within 24 hours and they weren't,

21   and nobody was ever disciplined for that, and it's not clear

22   that that ever changed.  So I do believe that meets the bad

23   faith test.

24          THE COURT:  Ms. Joyce, would you like to be heard?

25          MS. JOYCE:  Very briefly, your Honor.  We have not

MBHHNunC

1    refused to provide information to the plaintiffs since the

2    summer.  They have raised this issue with us, which was a

3    self-identified issue that the department is working to

4    rectify, that the commissioner has taken steps in intake with

5    his team.  So there's not -- and I could go into some of that

6    now that has been shared with the parties.  We had multiple

7    meet and confers over the past few weeks, I think for probably

8    three to five hours.

9           So there are steps being taken by the department to

10   address the intake overstays, and we have not refused to give

11   information to the parties.  There's no evidence of bad faith

12   here.

13          So I don't know if, commissioner, if you want to talk

14   about anything related to intake, but it's an issue that has

15   been identified by both the department and the parties, and

16   it's being diligently worked on by the executive leadership

17   team to ensure that the information obtained in intake is

18   accurate and that people are not overstaying longer than 24

19   hours.

20          MR. MOLINA:  Your Honor, just to add to that, as it

21   relates to intake, we are seeking and we have been working with

22   our informational technology department in order to make

23   revisions to the dashboard application so that we make sure not

24   only we can assure proper access to that dashboard by staff,

25   but understanding what are the different additional key pieces

MBHHNunC

1    of information that are needed in that dashboard to document a

2    person's progression through the intake process and moments

3    where maybe that clock may need to stop because there are

4    things out of our control, for example, the person being

5    brought back to court, and it may appear that person is there

6    over 24 hours when, actually, they are not.

7            In addition to that, we did hire a deputy

8    commissioner, as you know, of administration who is our

9    staffing manager.  He is working along with our industrial

10   engineers for workforce optimization to assure that we have the

11   right level of staffing and that the staff is trained

12   appropriately in how to use this dashboard that was placed

13   during the prior administration, to make sure that individuals

14   are processing through as quickly as possible through their

15   intake process and placed in their housing units.

16           So we're aligning staff with the task expected of

17   managing the intake and ensuring that that staff that's

18   assigned there is consistent so that we don't have individuals

19   that have never worked intake before working in intake.

20           THE COURT:  So what is your time frame for having good

21   data and proper staffing in intake?

22           MR. MOLINA:  So our information technology unit is

23   working with that dashboard now.  That is work that is ongoing.

24   I don't have a time frame right now.

25           THE COURT:  Are you telling me you're hopeful that

1   you'll know where people are by August?

2           MR. MOLINA:  Oh, no, no, no, sooner than that.  I

3   would say another 30, 45 days, unless there's some technology

4   issue that needs to be addressed.  But we are identifying and

5   working with Correctional Health Services to identify what are

6   the appropriate times.  For example, if someone has to go to a

7   hospital, what type of medical care should stop that clock and

8   what should not.  So that's what we're working through.

9           We've also have moved the system out of intake and put

10   it in a general office so that there's only specific staff

11   that's available that can input into the dashboard to make

12   these identifications of where the person is in the process.

13           THE COURT:  Has this level of detail of information

14   been provided to plaintiffs before?

15           MS. GREENBERGER:  No.

16           MS. WERLWAS:  No, your Honor.  In response and -- when

17   we raised this issue with the city on August 26 with our

18   noncompliance notice under the consent judgment, we provided

19   much more information, much more detail than was before the

20   Court today, because that was given the breadth of today's

21   discussion.

22           The only response that we have gotten in our meet and

23   confers, which were delayed, in asking the city's position or

24   their response to the much more voluminous evidence of intake

25   overstays and tampering with the data was that they were moving

MBHHNunC

1    towards -- or planning to move towards substantial compliance.

2    We have not gotten answers nor reliable information on what

3    happened to this data and why it was altered.

4            And secondly, there appears -- we have not gotten

5    answers to their views on what the Court's order means when the

6    Court said people would be processed through intake in 24

7    hours, and we are hearing about stopping clocks, which is not

8    part of the orders, and the city's view on what it can "stop

9    the clock for" that are not part of the Court orders.  We have

10   not gotten those responses from the city.  We have been trying

11   to meet and confer with them since we sent the notice on

12   August 26 to get this information.

13           We did choose -- quite frankly, if we were not here

14   today on much broader issues, what one might say anticipating

15   and seeking the briefing schedule on contempt and receivership

16   that would be on many issues under the consent judgment, this

17   being one of them, we have a meritorious contempt motion that

18   we could make on this issue alone.  And we raised this question

19   about contempt so that we can have clarity under your Honor's

20   orders about what remedies we can pursue seeking contempt.  I'm

21   sorry, when I say "remedies," I mean how we can pursue motions

22   for contempt on an issue such as this which has already been

23   teed up and for which we have not gotten answers.

24           THE COURT:  Ms. Joyce.

25           MS. JOYCE:  Your Honor, we are happy and the city are

MBHHNunC

1   happy to have another meet and confer with plaintiffs on this

2   particular topic.  The meet and confers that we've been having

3   recently, there have been many topics to discuss, so perhaps we

4   didn't get into the details of this particular topic.  But we'd

5   be happy to have another meeting with Legal Aid to demonstrate

6   to them why a motion for contempt would not be successful

7   before your Honor because there is no basis and no record of

8   bad faith.

9          THE COURT:  That meet and confer must take place by

10   December 2, and you must come armed to that meet and confer

11   with information even more specific than the information that

12   was proffered today as to steps that are being taken as to the

13   city and the department's knowledge of and ability to determine

14   right now whether people have been in intake for more than 24

15   hours and the expected timetable for getting a handle on that

16   information.

17          Should plaintiffs still believe that contempt motion

18   practice is necessary following that meet and confer, the meet

19   and confer should include the discussion of a timetable for

20   briefing if there is still an assessment that there is a need

21   to go forward with contempt motion.  And so in the week of

22   December 5, I think it would be, at that point provide me with

23   a joint status letter.

24          Thank you, and thank you for being more specific about

25   that particular concern.

MBHHNunC

1            All right.  Is there anything else that we need to

2       address together this afternoon?

3            Thank you all very much.  Stay safe.  Work hard to

4       keep the people safe who are in Rikers.  Stay well, everyone.

5            Mr. Tavira's family, I am so sorry for your loss, and

6       we are working to make things better, and it is my intention

7       that things will be better for other families.

8            All right.  We are adjourned.  Thank you.

9            (Adjourned)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25