**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Mark Nunez, et al., | |
| Plaintiffs, | |
| -against- | Case No. 11-cv-5845 (LTS)(JCF) |
| The City of New York, et al., | |
| Defendants. | |

## TABLE OF CONTENTS

PAGE NO.

PRELIMINARY STATEMENT ...................................................................................1

STATEMENT OF FACTS ..........................................................................................2

    I.      Intake units have long been a primary driver of use of force at Rikers. .................2

    II.     The Court imposed a 24-hour limit on intake stays and required the Department to reliably track all individuals in intake. ......................................3

    III.    The Department concedes after the implementation deadline that it was not using a readily available system to track Intra-Facility Transfers. ...................4

    IV.    Following continued reports of overstay, unreliable tracking, and inhumane conditions, the so-ordered Action Plan reiterated the requirements of the Second Remedial Order ¶ 1(i)(c) without modification. ........................................5

    V.     The Board of Correction discovers that Department staff tampered with data to conceal 24-hour rule violations for New Admissions at EMTC, among ongoing intake overstays and inhumane conditions across various facilities...........................................................................................................6

    VI.    Intake tracking for New Admissions and Intra-Facility transfers remained unreliable by the end of 2022, with the Department making little progress on the New Admissions system, and none at all on Intra-Facility Transfers. .......................................................................................................8

    VII.    As of January 2023, the Department has made insufficient progress on Intra-Facility Transfers, has not yet established the reliability of its New Admissions tracking system, and has not explained or even fully investigated the data manipulation uncovered by the Board of Correction. ....................................................................................................10

    VIII.   The Department's failure to comply with the Second Remedial Order has caused significant harm. .................................................................11

    IX.    These matters are ripe for a motion on contempt. .................................................12

ARGUMENT ...........................................................................................................12

    I.      The Department is in contempt of Second Remedial Order ¶ 1(i)(c). ...................12

            A.      Legal Standard ............................................................................12

B. The Second Remedial Order clearly and unambiguously required the Department to implement reliable tracking systems for New Admissions and Intra-Facility Transfers.....................................14

C. The Department's failure to implement reliable tracking systems is clear. ............................................................................................15

D. After over a year and counting, the Department has not been reasonably diligent in reaching compliance..............................................17

   1. Intra-Facility Transfers .............................................................17

   2. Tracking New Admissions...........................................................19

II. Remedies..........................................................................................................21

CONCLUSION..............................................................................................................25

## PRELIMINARY STATEMENT

Court orders have meaning. Parties are obligated to comply with them—or at least act diligently to attempt to comply. The City of New York has failed to comply with this Court's requirement that it ensures it houses incarcerated people within 24 hours. On September 29, 2021 this Court issued a clear order that the City must track by November 15, 2021 whether it was housing people within 24 hours. For well over a year, even after Plaintiffs repeatedly raised this issue with the City, the City ignored its Court-ordered obligation. The Monitor recently concluded the City's tracking data is "unreliable" and whether the City is processing people within 24 hours is "simply unknown."

Intake cells are not meant for longer-term stays. They lack beds. The conditions are squalid. Meals are irregular. When incarcerated people languish in intake, uses of force increase, as the Monitor has noted. It is for this reason that the parties and the Monitor all agreed—and the Court ordered—that the City must ensure that people leave intake after no more than 24 hours. There is ongoing harm from the City's failure to comply with this requirement.

Only when Plaintiffs raised the specter of contempt did the City belatedly address the fundamental issues that rendered the tracking system for new admissions unreliable, claiming to implement an usable system earlier this month, and now states it will implement a tracking system for intra-facility transfers in two months. And the City has still done little to address the apparent data tampering found by the City's oversight body (BOC). Contempt is necessary to continue to hold the City accountable and ensure people are promptly processed from intake.

Given the long-term non-compliance, Plaintiffs ask the Court to hold the Defendants in civil contempt and order, as a remedy, enhanced auditing and reporting, as detailed further below.

1

## STATEMENT OF FACTS

The Department is in contempt of this Court's order dated September 29, 2021, which provides that the Department shall:

> Process all incarcerated individuals, including but not limited to new admissions and intra-facility transfers, through Intake and place them in an assigned housing unit within 24 hours… By November 15, 2021, the Department shall develop and implement a reliable system to track and record the amount of time any incarcerated individual is held in Intake and any instance when an individual remains in Intake for more than 24 hours.

Second Remedial Order, Dkt. 398, ¶ 1(i)(c). This order was reiterated in the Action Plan endorsed by the Court on June 14, 2022: "The Department shall implement the requirements of ¶ 1(i)(c) of the Second Remedial Order." Order: Action Plan, Dkt. 465, ¶ E(3)(a). The Action Plan did not modify Second Remedial Order ¶ 1(i)(c) in any way. Over a year after this Court's November 15, 2021 deadline, Defendants are not in compliance.

## I.   Intake units have long been a primary driver of use of force at Rikers.

Intake units are holding areas, primarily used for admission and discharge to facilities. *See* Twelfth Report of the Nunez Independent Monitor ("Twelfth Report")**,** Dkt. 431**,** at 43-44. They are not fit for long-term stays: basic services such as food and medical attention are significantly delayed or not provided; and conditions are frequently overcrowded and unsanitary, with overflowing toilets and individuals forced to sleep on the floor. October 28, 2022 Report of Independent Monitor ("Oct. 28, 2022 Report"), Dkt. 472, at 82; March 16, 2022 Report of the Independent Monitor ("March 16, 2022 Report"), Dkt. 438, at 22-23. The Monitor has described conditions in the intake units as "concerning and inhumane." Twelfth Report, Dkt. 431, at 43. Unsurprisingly, holding people in these conditions for long periods is not conducive to the goal of reducing violence on Rikers Island. To the contrary, intake units consistently generate high use-of-force rates. Eighth Report of the Independent Monitor ("Eighth Report"), Dkt. 332, at 28 (second largest area for use of force incidents is intake); Ninth Report of the Independent

Monitor ("Ninth Report"), Dkt. 341 at 18). The Monitor has specifically identified the fact that

"individuals often languish in the intake area" as a factor "that likely contributes to the uses of

force in intake (*e.g.*, refusal to obey orders)." Twelfth Report, Dkt. 431, at 43-44. In October

2020, the Monitor specifically expressed concern about "the number of suicide attempts

occurring in Facility Intake units, particularly those with an attachment point in the ceiling."

Tenth Report of the Independent Monitor ("Tenth Report"), Dkt. 360, at 23-24. The Department

has known for years that intake units are drivers of use of force on Rikers Island.

**II.     The Court imposed a 24-hour limit on intake stays and required the Department to
reliably track all individuals in intake.**

On August 24, 2021, the Monitor filed a report on the "state of seriously compromised

safety" in the jails, including "a steady increase in serious use of force incidents" and

"inadequate supervision." Monitor's Aug. 24, 2021 Status Report, Dkt. 378, at 1, 4. The Monitor

found a

> disturbing pattern…within Intake units in which individuals have languished in Intake
> well beyond 24 hours (the timeframe within which they should have been assigned to a
> housing unit). The delay in transferring detainees out of Intake has also resulted in
> significant delays in providing required medical services. Further, the Monitoring Team
> received reports that food and other basic services are not being routinely provided to
> detainees in Intake and that other services within the Facilities have also been
> compromised.

*Id.* at 2. The next month, the Monitor reported an alarming rise in use of force incidents in intake

and recommended a 24-hour cap and tracking system. Monitor's Sept. 23, 2021 Status Report,

Dkt. 387, at 3, 6. Numerous public reports detailed the filthy conditions in the intake areas,

including vermin, feces, and overflowing toilets. *See, e.g.,* Reuven Blau, *Rikers Detainee*

*Endured 'Horrible Conditions' Before Dying in Cell, Jail Overseer Finds*, The City, Aug. 1,

2021, *available at* https://www.thecity.nyc/2021/8/1/22605140/rikers-island-horrible-conditions-

jail-deaths.

In recognition of the need to limit intake stays, the Court's Second Remedial Order of September 29, 2021 required the Department to process "all incarcerated individuals, including but not limited to new admissions and intra-facility transfers and place them in an assigned housing unit within 24 hours." Second Remedial Order ¶ 1(i)(c). This same provision required DOC to implement "a reliable system to track and record the amount of time any incarcerated individual is held in Intake and any instance when an individual remains in Intake for more than 24 hours." *Id.* This applied to both individuals newly admitted to DOC jails ("New Admissions"), and those being transferred within or between DOC facilities ("Intra-Facility Transfers"). *Id.* The deadline imposed by the order to complete the implementation of the tracking system was November 15, 2021. *Id.*

### III.   The Department concedes after the implementation deadline that it was not using a readily available system to track Intra-Facility Transfers.

In a November 17, 2021 status report, the Monitor determined that an existing DOC program called the Inmate Tracking System (ITS) was "in place and capable of tracking movement [of intra-facility transfers], [but] it is not consistently utilized by staff as data is not promptly entered and/or the incarcerated individual's bracelets are not scanned." Monitor's Nov. 17, 2021 Status Report ("Nov. 17, 2021 Report"), Dkt. 420, at 4. The Monitor concluded: "Therefore, the data developed by this system is not reliable." *Id.* In other words, DOC had a system that could allow it to comply with this Court's order but was simply not using it appropriately.

Plaintiffs' counsel wrote to Defendants' counsel that same month raising 16 cases of intake stays exceeding 24 hours, ranging from two days to over nine days. Plaintiffs' Nov. 22, 2021 Letter (Declaration of Mary Lynne Werlwas ("Dec. Ex. A"); Plaintiffs' Dec. 10, 2021 Letter ("Dec. Ex. B"). These letters notified Defendants that the Department was not complying

with the Second Remedial Order ¶ 1(i)(c), including the reliable tracking requirement. *See* Dec. Exs. A and B at 2.

A month after the Court's November 15, 2021 deadline, DOC admitted that it had not addressed the problems with its tracking system, conceding on December 15, 2021 that the Monitor's reports of the unreliability of Intra-Facility Transfer tracking were true. Defendants' Dec. 15, 2021 Letter ("Dec. Ex. C") at 2. Defendants acknowledged that while the ITS system had the "potential" to be used for intake tracking, DOC had faced "challenges" with using it. *Id.* at 3. Defendants also claimed that, at the time, DOC was "actively working with the Monitor to address issues regarding ITS and its use to ensure that DOC has solid data regarding the time spent in intake by individuals undergoing inter-facility transfers (i.e., non-new-admissions)." *Id.*

On September 20, 2021, DOC began processing all New Admissions through a single facility, Eric M. Taylor Center ("EMTC"). Oct. 28, 2022 Report at 83. In its Nov. 17, 2021 report, the Monitor relayed DOC assurances that at EMTC, it was using a new system called the "New Admissions Tracking System," and that there had been zero intake overstays since the issuance of the Second Remedial Order. Nov. 17, 2021 Report at 3, iii-iv. Plaintiffs' counsel were troubled by this assertion, as we were receiving consistent reports from our clients who had been held in intake for more than 24 hours, including at EMTC, and we conferred extensively with Defendants about the veracity of the "zero overstay" claims. Dec. Exs. A and B.

**IV. Following continued reports of overstay, unreliable tracking, and inhumane conditions, the so-ordered Action Plan reiterated the requirements of the Second Remedial Order ¶ 1(i)(c) without modification.**

The Monitor's reports of March and June 2022 detailed continued dire conditions in intake pens and numerous overstays. March 16, 2022 Report of the Independent Monitor ("Mar. 16, 2022 Report"), Dkt. 438, at 22-23, 46-49; June 30, 2022 Report of the Independent Monitor ("June 30, 2022 Report"), Dkt. 467, at xii. It found that "some incarcerated individuals remained

in intake for days, if not weeks, in horrifying conditions … result[ing] in harm to incarcerated individuals." Mar. 16, 2022 Report at 23. The March 16 Report again observed that "[w]hile the Department also has the Inmate Tracking System that would allow for tracking of inter and intra-facility transfers of incarcerated individuals*, it is not being used.* It is the Monitoring Team's understanding that individual facilities maintain individual tracking forms, but the information gleaned from them suggests that they are not updated regularly and/or are not being used to manage the units effectively." *Id.* at 47 (emphasis added). This lack of a tracking tool allowed several people to "languish" in intake for up to two weeks. *See Id.* at 48 ("14 of the 32 incarcerated individuals surveyed were held more than 24 hours (2 were held for 5 days, 1 for 4 days, 3 for 2 days.")); June 30, 2022 Report at xii ("33% of individuals (15 of 45) had stays in intake longer than 24 hours. Almost half of these (7 of 15) extended beyond 72 hours.").

Following the Monitor's March and June 2022 reports, the Court so-ordered the City's proposed Action Plan that reiterated that the City was to "implement the requirements of ¶ 1(i)(c) of the Second Remedial Order." Order: Action Plan, June 14, 2022, Dkt. 465, ¶ E(3)(a).  The Action Plan was so-ordered over Plaintiffs' objection that the Action Plan was insufficient to bring the Department into compliance with this Court's orders. *See generally* Plaintiffs' November 14, 2022 Letter to the Court, Dkt. 477.

## V. The Board of Correction discovers that Department staff tampered with data to conceal 24-hour rule violations for New Admissions at EMTC, among ongoing intake overstays and inhumane conditions across various facilities.

On June 16, 2022, the Board of Correction ("BOC"), a governmental oversight body that monitors the jails, wrote to DOC officials that the BOC review of the intake tracking system for New Admissions (known as the "dashboard") had revealed serious problems. *See* Email from Board Staff to Sonya Harvey, June 16, 2022 ("Dec. Ex. D"). In particular, the BOC discovered 16 separate incidents, over the course of only two days, in which DOC employees had used the

Dashboard to change the recorded time of an incarcerated person's initial arrival in DOC custody. *Id*. In all 16 of these instances, the supposed custody start time was moved later, falsely creating the appearance that the 24-hour deadline for an individual to be housed was later than it was. *See* Board of Correction Spreadsheet ("Dec. Ex. E"); Declaration of Mary Lynne Werlwas, January 25, 2023 ("Dec.") ¶ 9. In nine instances, DOC employees changed the start time for the same individual *more than once*, repeatedly artificially extending the recorded 24-hour deadline as more time passed. *See* Dec. Exs. D and E.

As the BOC pointed out, the changes in the recorded start time "often occurred as a newly admitted person in custody approached their 24-hour clock expiration, or sometimes following the expiration." Dec. Ex. D. For example, one individual was originally listed as entering DOC custody at 12:40 on June 13, 2022. *See* Dec. Ex. E. Under the Second Remedial Order's 24-hour time limit, this gave DOC until 12:40 on June 14, 2022, to move the person out of intake and into housing. However, on June 14 at 13:24, after the original deadline of 12:40 had passed, DOC's tracking system showed a new start time for this individual of 13:30. *Id*. Although the true 24-hour deadline had passed nearly an hour earlier at 12:40, this new start time gave the impression that DOC still had several minutes before its 24 hours were up. Then, at 13:51, after the new altered deadline of 13:30 had passed, DOC employees *again* changed the custody start time, this time to 14:30, giving DOC another hour before its tracking system would show that a deadline had been missed. *Id*. Finally, at 14:16, the person's custody start time was changed *again* to 15:30, giving DOC yet another hour to house the person before the overstay would appear. *Id*. Eight other incidents followed a similar pattern of changes repeatedly extending the time to assign housing. *Id*. Given this pattern, it is unsurprising that BOC noted in a July 5, 2022, memo that the "data manipulation" it had uncovered "appears to be an effort to

obscure or 'cure' 24-hour housing violations." Memorandum from Board of Corrections Staff to Amanda Masters, July 5, 2022 ("Dec. Ex. F").

Pursuant to Consent Judgment ¶ XXI (2), on Aug. 26, 2022, Plaintiffs sent Defendants a notice of their noncompliance with tracking system requirements and the 24-hour limit, including the discovery of apparent data tampering. Plaintiffs' Aug. 26, 2022 Letter ("Dec. Ex. G") at 2, 4-5. This letter also drew attention to ongoing violations of the 24-hour rule with New Admissions at EMTC and other facilities reported by the Monitor and discovered by BOC, as well as the inhumane and deplorable conditions prevailing in those intake units. *Id.* at 2-6.

## VI.   Intake tracking for New Admissions and Intra-Facility transfers remained unreliable by the end of 2022, with the Department making little progress on the New Admissions system, and none at all on Intra-Facility Transfers.

In its October 28, 2022 Report, the Monitor concluded that the tracking data for New Admissions was "unreliable and unusable." Oct. 28, 2022 Report at 86-87. Because of Defendants' failure to maintain accurate tracking data, "the extent of the Department's adherence to processing new admissions within 24 hours is simply unknown." *Id.* at 87.[1] The "haphazard" use of the New Admissions tracking system was because of a "confluence of issues," including how the Department "systematically practiced poor record keeping because there was no oversight or supervision for the officers who manually entered the information." *Id.* at 86.

---

[1] Of significant concern is the related issue that Defendants have claimed that "Department policy creates exceptions allowing individuals to exceed the 24-hour period before being assigned a housing unit "when certain events take place, including but not limited to hospital runs, mental health referrals, and refusals for treatment." Dec. Ex. C at 2. Although Defendants noted that the Monitor's reporting made mention of this clock-stoppage practice (*id.* at 2), nowhere did Defendants claim any authority to make such exceptions to the Court's order. This policy—and that it was not explained in detail until Defendants' January 10, 2023 letter—further underscores both concerns about the reliability of the New Admissions Dashboard and the importance of robust accountability measures. It is entirely unacceptable that Defendants have unilaterally created a policy in plain contravention of the court-ordered requirement to house individuals within 24 hours rather than seeking a modification of such order from the court, with notice to Plaintiffs. This dispute is the subject of ongoing discussion among the Parties, and its resolution is not necessary to the disposition of this motion. We include it here because the issue is related to Defendants' contemptuous failure to maintain reliable tracking mechanisms, but reserve the right to raise it before the Court should ongoing discussions fail to address our significant concerns.

Moreover, the Monitor noted that the data tampering discovered by BOC "raised questions about the veracity of th[e] tracking data" that DOC had been providing since September 2021—when it first began processing New Admissions through EMTC. *Id.*

The Monitor detailed a plan by the Department to address the issue by processing new admissions through facilities other than EMTC; seeking faster medical screening; making technical improvements to the tracking system; and changing staffing. *Id.* at 88. The report contained no description of the Department's efforts to comply with tracking requirements for Intra-Facility Transfers.

At the status conference on November 17, 2022—now over a year past the original Nov. 15, 2021 deadline to implement reliable tracking systems—Commissioner Molina described efforts underway to create a reliable tracking system and identify staff to operate the system. Nov. 17, 2022 Conference Tr. at 72-74 ("Dec. Ex. K"). When asked by the Court, "what is your time frame for having good data and proper staffing in intake?" Commissioner Molina replied "That is work that is ongoing. I don't have a time frame right now." When pressed by the Court, the Commissioner stated "another 30, 45 days, unless there's some technology issue that needs to be addressed." *Id.* at 73-74.

When the parties conferred on December 1, 2022, the Department stated that it aimed to have a reliable tracking system for New Admissions by January 2, 2023. Dec. ¶ 17. DOC further reported that it had trained 13 staff members to operate the New Admissions tracking system. *Id*.

As to Intra-Facility Transfers, on December 1 the Department still had no information on when or how it would track Intra-Facility Transfers. *Id*. By email dated December 8, 2022, defense counsel informed Plaintiffs that, almost a year after it stated that it believed ITS was capable of accurately tracking intake placements, the Department was somehow still at the stage

of "evaluating the Inmate Tracking System" and "work[ing] with stakeholders to implement any necessary updates." *See* Email from Kimberly Joyce to Debbie Greenberger, et al., Dec. 8, 2022, at 1 ("Dec. Ex. L").

The Department also claimed in its December 8 email that the data tampering discovered by BOC and highlighted in Plaintiffs' August 22, 2022 letter was due to "errors result[ing] from lack of training . . . on the dashboard" and inadequate staffing. *Id*. at 2. Although the officers who entered false data were removed from intake duties, "no disciplinary action was taken against the officers," nor was any disciplinary action identified against those responsible for training and supervision of those officers. *Id.* No explanation was offered for the pattern of alterations suggesting concealment of 24-hour violations.

**VII.   As of January 2023, the Department has made insufficient progress on Intra-Facility Transfers, has not yet established the reliability of its New Admissions tracking system, and has not explained or even fully investigated the data manipulation uncovered by the Board of Correction.**

The Department detailed its current plans for Intra-Facility Transfer tracking in its January 10, 2023 filing. Those plans were not yet close to implementation, nor substantively different than the ideas proposed by the Monitor over a year ago. The Department indicated that it was planning to train staff to use the ITS system to scan individuals as they enter and leave intake units and facilities, and generate daily reports of the associated data. Defs.' Jan. 10, 2023 Letter, Dkt. 495, at 4. In other words, their plan is essentially to use the ITS system as the Monitor indicated it could and should be used 14 months ago in its November 2021 report. Even then, the Department indicated that implementation would not be complete until March 15, 2023—16 months after the November 15, 2021 deadline. *Id*.

In this same filing, the Department represented to the Court that the New Admissions Dashboard was up and running as of January 4, 2023, following revisions to its systems that

allowed it to more accurately track the time spent in intake, better detect "basic errors" in data entry, and alert staff members of potential overstays. *Id*. at 2-4. The Department also represented that it had trained and assigned dedicated staff to operate the New Admissions Dashboard. *Id*. at 3. On January 11, 2023, during a conference between the parties, the Department stated that the Dashboard system also indicated the amount of time spent in intake, as well as the amount of time and reasons for time excluded from the calculation under purported exceptions to the 24-hour rule. Dec. ¶ 19. However, the Department also indicated that it had not yet completed its first audit of the New Admissions system, meaning that there was no proof of its reliability in the first instance, let alone consistent reliability over a period of time. *Id*.

Importantly, as described above, the reliability of intake data entered by Department personnel was called into question by the BOC June 2022 finding that data was manipulated by staff in what, in the Board's own words, "appears to be an effort to obscure or 'cure' 24-hour housing violations." Dec. Ex. F at 1. More than six months after the Board of Correction uncovered extremely concerning intake data manipulation by DOC employees, the Department has neither provided any reasonable explanation for the manipulation, nor held anyone accountable for it.

**VIII.   The Department's failure to comply with the Second Remedial Order has caused significant harm.**

The Department's non-compliance with the Court's orders on intake tracking has caused significant harm. Intake spaces lack basic services like beds, showers, and regular distribution of meals and medication—and can also prejudice a person's ability to participate in their defense. For example, in December 2022, a class member who was *on trial* was forced to spend two nights sleeping on the floor of the AMKC intake pens with several other people, after a transfer from GRVC. Dec. ¶ 24. He faced his jury without having showered for days nor being provided

a bed. *Id*. He was housed only when Plaintiffs' counsel went to the courts to interview him, and relayed the problem to defense counsel. *Id*. Without reliable tracking, there is no way to know how many similar violations have taken place.

**IX.     These matters are ripe for a motion on contempt.**

Plaintiffs have met the Consent Judgement's requirements to negotiate in good faith to reach resolution in the numerous aforementioned communications and conferences dating back to November 2021. As of January 19, 2023, the parties have been unable to reach a resolution. This motion for contempt follows.

**ARGUMENT**

**I.     The Department is in contempt of Second Remedial Order ¶ 1(i)(c).**

Well over a year past the Court's November 15, 2021 deadline, the Department has no reliable tracking system for Intra-Facility Transfers solely because it has inexplicably failed to make use of a readily available system, ITS. The Department has only in the past few weeks claimed to implement a New Admissions tracking system after its inexcusable failure to correct the haphazard, poorly supervised, inconsistent, and even fraudulent use of the system in place at EMTC for many months, and has yet to confirm the new system's reliability. For each of these reasons, the Department is in contempt of the Second Remedial Order.

**A.     Legal Standard**

In this circuit, "[a] party may be held in civil contempt for failure to comply with a court order if '(1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner.'" *Paramedics Electromedicina Comercial, Ltda v. GE Medical Systems Information Technologies., Inc.*, 369 F.3d 645, 655 (2d Cir. 2004) (citing *King v. Allied Vision, Ltd.*, 65 F.3d 1051, 1058 (2d Cir. 1995)).

12

Because the purpose of civil contempt for non-compliance with a court order is to enforce compliance and remedy the harms caused by non-compliance, bad faith is not required, nor does good faith prevent a contempt finding. *See McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949) ("Civil as distinguished from criminal contempt is a sanction to enforce compliance with an order of the court or to compensate for losses or damages sustained by reason of noncompliance. Since the purpose is remedial, it matters not with what intent the defendant did the prohibited act." (citations omitted)); *see also Powell v. Ward*, 487 F. Supp. 917, 934 (S.D.N.Y. 1980), *aff'd and modified* 643 F.2d 924 (2d Cir. 1981) (noting that the Bedford Hills Correctional Facility superintendent's good faith did not excuse non-compliance with court order to modify prison disciplinary procedures); *Patsy's Brand, Inc. v. I.O.B. Realty, Inc.,* No. 99 Civ. 10175, 2021 WL 3418475, at *5 (S.D.N.Y. Jan 16, 2002) (citing *Vuitton et Fils S.A. v. Carousel Handbags*, 592 F.2d 126, 128 n.2 (2d Cir. 1979)) ("That a prohibited act was done in good faith or inadvertently does not preclude a citation for civil contempt, because the sanction is remedial in nature."). For the same reason, the non-compliance need not be willful. *See e.g., McComb*, 336 U.S. at 191 (holding that "the absence of wilfulness does not relieve from civil contempt"); *Donovan v. Sovereign Sec., Ltd.*, 726 F.2d 55, 59 (2d Cir. 1984) ("Turning to the question of contempt, by introducing clear and convincing proof of noncompliance with the injunction ... the Secretary made out a prima facie case for civil contempt. ... It is not necessary to show that the noncompliance was willful."); *Shady Recs., Inc. v. Source Enterprises, Inc.*, 351 F. Supp. 2d 64, 72-73 (S.D.N.Y. 2004) (finding civil contempt and imposing sanctions even with explicit finding that contemptuous conduct was *not* willful).

In its pre-motion letter, the City cited cases concerning the Court's inherent power to punish vexatious conduct, which is distinct from contempt for non-compliance and is governed

by a different, independent standard. *See Really Good Stuff, LLC v. BAP Investors, L.C.*, No. 19 Civ. 2218, 2021 WL 2469707, at *3-15 (S.D.N.Y. Jun. 17, 2021) (first analyzing civil noncompliance contempt under the three-factor standard above without discussing bad faith, then analyzing inherent power sanctions separately and independently from contempt for noncompliance). Under the Court's inherent power to sanction vexatious conduct, bad faith is required, as the City's cases hold. *See Schlaifer Nance & Co. v. Estate of Warhol*, 194 F. 3d 323, 338 (2d Cir. 1999); *SEC v. Rajaratnam,* No. 13 Civ. 1894, 2018 WL 562940, at *1 (S.D.N.Y Jan. 24, 2018); *see* Dec. Ex. L at 4 (Defendants citing *Schlaifer Nance & Co.* and *Rajaratnam*). As this motion seeks only civil contempt for non-compliance, and does not seek sanctions for misconduct, Plaintiffs need not establish bad faith, though there is evidence to support that conclusion here.[2]

B.   **The Second Remedial Order clearly and unambiguously required the Department to implement reliable tracking systems for New Admissions and Intra-Facility Transfers.**

The Court's order to develop a "reliable tracking system" for intake overstays by November 15, 2021 was undoubtedly clear. An order is clear and unambiguous when it "leaves no uncertainty in the minds of those to whom it is addressed" and instead allows them "to ascertain from the four corners of the order precisely what acts are forbidden." *King*, 65 F.3d at 1058 (cleaned up); *see also Chao v. Gotham Registry, Inc.*, 514 F.3d 280, 292 (2d Cir. 2008) ("[T]he decree underlying contempt must be sufficiently clear to allow the party to whom it is addressed to ascertain precisely what it can and cannot do.").

The Second Remedial Order is perfectly unambiguous. The reliable tracking system requirement is clear. By November 15, 2021, the Department was required to "implement a

---

[2] As described elsewhere, Plaintiffs believe that the Department *has* engaged in bad faith conduct by tampering with intake tracking records. *See* Statement of Facts, section V, *supra;* Argument, section C.2, *infra.*

reliable system to track and record the amount of time any incarcerated individual is held in Intake." Second Remedial Order ¶ 1(i)(c). Clearly, "any incarcerated individual" includes Intra-Facility Transfers and New Admissions.

Defendants have suggested in their most recent submission to the Court that merely because the June 14, 2022 Action Plan, Dkt. 465, ¶ E(3)(a), provided that "[t]he Department shall implement the requirements of ¶ 1(i)(c) of the Second Remedial Order," that the November 15, 2021 deadline to implement reliable tracking systems was somehow no longer in effect. Defs' Jan. 10, 2023 Letter, Dkt. 495, at 4-5. Yet neither this provision nor any other in the Action Plan modified the Second Remedial Order in any way. Hence this provision of the Action Plan was merely a reiteration of the clear and unambiguous requirements of Second Remedial Order ¶ 1(i)(c)—which the Department was already long in violation of, as Plaintiffs had indicated in November and December 2021. *See* Dec. Exs. A and B.

### C.    The Department's failure to implement reliable tracking systems is clear.

There can be no dispute that the Defendants have utterly failed to comply with these requirements. To sustain a motion for civil contempt "[a] plaintiff must also clearly and convincingly demonstrate that 'defendants did not … comply with the order.'" *Medina v. Buther*, No. 15 Civ. 1955, 2019 WL 581270, at *25 (S.D.N.Y. Feb 13, 2019) (quoting *Latino Officers Ass'n City of N.Y., Inc. v. City of N.Y.,* 558 F.3d 159, 164 (2d Cir. 2009)). For civil contempt, "this clear and convincing standard requires 'proof adequate to demonstrate a reasonable certainty that a violation occurred.'" *Id.* (quoting *BeautyBank, Inc. v. Harvey Prince LLP*, 811 F. Supp. 2d 949, 956 (S.D.N.Y. 2011) (internal quotation omitted)).

The Monitor has found—and Defendants have admitted—that for the past 14 months, the Department has not been reliably tracking Intra-Facility Transfers. As early as November 2021, the Monitor identified the ITS system as capable of doing so, if only it were used consistently

15

and appropriately by the Department. Nov. 17, 2021 Report at 3-4. The Department conceded

that the Monitor's assessment was true in December 2021. Dec. Ex. C at 2. In the intervening

time, the Department has neither begun using the ITS system as the Monitor indicated it could be

used, nor developed an alternative system; the Department at this stage merely hopes to begin

using ITS in March 2023, 16 months after the deadline imposed in the Second Remedial Order.

Defs.' Jan. 10, 2023 Letter, Dkt. 495, at 4. This is clear noncompliance with the requirement to

implement a reliable tracking system for Intra-Facility Transfers. Second Remedial Order ¶

1(i)(c).

       The Department has also failed to comply with reliable tracking for New Admissions.

While the Department initially claimed in December 2021 that there were no overstays for New

Admissions, *see* Dec. Ex. C at 2, the Monitor identified "a confluence of issues" in its October

28, 2022 report demonstrating that the Department's tracking data was completely "unreliable

and unusable," due to the Department's "haphazard" and "inconsistent" use of the system and

lack of supervision. Oct. 28, 2022 Report at 83, 86-87. The unilateral DOC creation of a clock-

stoppage policy and the BOC findings of data tampering also cast doubt on the veracity of all of

the Department's data. Oct. 28, 2022 Report at 83. The Department did not implement a new

system until January 2023, after Plaintiffs announced their intention to move for contempt.

Defs.' Jan. 10, 2023 Letter, Dkt. 495, at 2. This is 14 months after the November 15, 2021

deadline to implement a "reliable" system. Second Remedial Order ¶ 1(i)(c). While the

Department may claim to be complying now, the Department was inexcusably out of compliance

from November 2021 almost until today. Moreover, the Department still has not shown that its

new system is reliable, as the Order requires, particularly given its failure to address data

tampering by DOC employees.

**D.    After over a year and counting, the Department has not been reasonably diligent in reaching compliance.**

It has been over a year since the November 15, 2021 deadline to have implemented a reliable system of tracking for both New Admissions and Intra-Facility Transfers. The Department has unjustifiably delayed abiding by the order, to the extent it has complied at all. The Department has inexplicably failed to use an available system to track Intra-Facility Transfers, and inexcusably allowed New Admissions tracking to remain unusable for almost 14 months, even in the face of fraudulent data entry. This cannot constitute reasonable diligence.

A party fails to show reasonable diligence in complying with a court order when it ignores the order, takes only superficial actions that strain the language and intent of the order, or undertakes actions that directly contravene it. *Powell v. Ward*, 487 F. Supp. 917, 934 (S.D.N.Y. 1980), *aff'd and modified* 643 F.2d 924 (2d Cir. 1981) (internal citation omitted). *See also Medina v. Buther*, 2019 WL 581270 at *25. Inexcusable delays on the order of weeks or months also fail to show reasonable diligence. *King,* 65 F.3d at 1056 (affirming district court's finding of lack of reasonable diligence based on three-week and two-month delays to mail materials).

**1.    Intra-Facility Transfers**

The Department has shown a stark absence of diligent efforts to comply with the requirement to reliably track Intra-Facility Transfers. To satisfy reasonable diligence, the party must have at least "developed and executed 'reasonabl[y] effective methods of compliance.'" *Patsy's Brand, Inc. v. I.O.B. Realty, Inc.,* 2021 WL 3418475, at *5 (S.D.N.Y. Aug. 5, 2021), quoting *Yurman Studio, Inc. v. Castaneda*, 2009 WL 454275, at *2 (S.D.N.Y. Feb. 23, 2009). Reasonable diligence "at a minimum, requires a party 'to energetically police' the effectiveness of its compliance measures and, when advised that such measures have fallen short, to modify them accordingly." *Zino Davidoff SA v. CVS Corp.,* 2008 WL 1775410, at *8 (S.D.N.Y. Apr. 17,

2008), quoting *Manhattan Indus., Inc. v. Sweater Bee by Banff, Ltd.*, 885 F.2d 1, 5 (2d Cir. 1989). The Department has done none of this.

As detailed above, the Monitor and DOC agreed over a year ago that the ITS system was available to track Intra-Facility Transfers, but it was not serving the tracking purpose because staff were not using the system properly. Monitor's Nov. 17, 2022 Status Report, Dkt. 420, at 3-4; Defendants' Dec. 15, 2021 Letter (Dec. Ex. C) at 2. The Department claimed that it was working to put that system into use for that purpose. Defs.' Dec. 15, 2021 Letter, Dkt. at 3 (Dec. Ex. C). A year later, in December 2022, the Department could not identify any material change in this tracking system over the last year, stating merely that it is "presently evaluating" ITS and that it intends to "work with stakeholders to implement any necessary updates." Email from Kimberly Joyce to Debbie Greenberger, et al., Dec. 8, 2022 (Dec. Ex. L). In other words, not only did the Department fail to comply with the requirement to track Intra-Facility Transfers, a year passed without the Department even choosing an approach to compliance. The Department during this time in no way satisfied its responsibility to "develop[] and execute[] reasonable methods of compliance," *Patsy's Brand, Inc.*, 2021 WL 3418475, at *5, nor did it "energetically police the effectiveness of its measures." *Zino Davidoff SA*, 2008 WL 1775410, at *8. *See also Manhattan Indus. Inc.*, 885 F.2d at 4-5 (finding that reasonable diligence did not occur where contemnor's compliance efforts were "dilatory" and "failed to develop and implement a 'thorough, considered ... plan of attack on compliance' with the consent judgment "that would have prevented the problems that occurred.").

These are the very same "superficial" actions that failed the reasonable diligence test in *Powell*, 487 F. Supp. at 934. There, the Bedford Hills Correctional Institution had been given a clear order to make certain changes to facility procedures. Instead of engaging in the "active

involvement [that] was and is necessary to bring about a change in procedures," the facility superintendent instead merely held meetings with other officials and reviewed papers and materials. *Powell*, 487 F. Supp. at 934. While this "indicated she was concerned about the possibility of non-compliance," these actions "did not satisfy her responsibilities[.]" *Id.* Likewise here, the Department has been aware of its non-compliance with Intra-Facility Tracking, and correctable deficiencies in how ITS was used for well over a year, but did nothing substantive to rectify the problems or develop an alternative system.

Today the Department claims that it will use the ITS system as the Monitor indicated it should be used in November 2021, but will be unable to do so until March 2023—16 months past the deadline to reliably track Intra-Facility Transfers. Defs.' Jan. 10, 2023 Letter, Dkt. 495, at 4. Although the Department has apparently scrambled to put forth a plan in response to Plaintiffs' threats of contempt, that plan has consisted of nothing more than what could have been done over a year ago—and it is still not close to implementation. Thus, the Department has displayed "an evident sense of nonurgency bordering on indifference" contrasted later with a "spurt of activity on the heels of plaintiffs' motion for a finding of contempt." *Aspira of New York, Inc. v. Bd. of Educ. of City of New York*, 423 F. Supp. 647, 654 (S.D.N.Y. 1976) (finding failure of reasonable diligence). The Department has blatantly "allowed deadlines to pass without advance announcements or volunteered explanations." *Id.* This is a severe and continuing failure of reasonable diligence.

### 2.    Tracking New Admissions

Throughout the past year, as detailed above, Plaintiffs, BOC, and the Monitor have informed the Department about the unreliability of their tracking system for New Admissions, but DOC inexplicably took little or no action until it faced the prospect of Court involvement. While the Department states that it has altered its software for New Admissions (and assigned

new line staff and one captain to those processes), DOC knowingly allowed New Admissions
tracking to remain "unreliable and unusable" up until a few weeks ago through failures of
oversight, haphazard, and inconsistent use. Oct. 28, 2022 Report at 85-86.

The Department now claims it has finally implemented an updated New Admissions
tracking system, but this does not change that the Department for over a year patently failed to
"marshal (available resources), assert ... high authority, and demand the results needed from
subordinate persons" to effectuate the order, as it was required to do to satisfy reasonable
diligence. *Powell,* 487 F. Supp. at 934. Moreover, the Department is not simply required to
create a tracking system, but to create a *reliable* tracking system, and the Department has not
shown it has done so: as of January 19, the first audit of the new system had not yet been
completed and, as far as Plaintiffs are aware, it is still not complete today. Dec. ¶ 22. This does
not demonstrate that the new system will be implemented with fidelity and produce reliable
tracking data. Indeed, there is good reason to think the opposite.

In particular, by refusing to discipline the fraudulent misconduct of those tampering with
New Admissions data to cover up overstays, DOC has not deterred further fraudulent behavior,
undermining the reliability of the tracking system going forward. Instead of holding staff
accountable, the DOC has claimed that the data was changed due to inadequate training. But the
pattern discovered by BOC, as the Board itself indicated, does not suggest unintentional errors
due to lack of training. *See* Dec. Ex. F. Rather, the timing of the incidents around the 24-hour
mark; the fact that the start time was changed more than once for the same individual; and the
fact that the start times were always moved later, never earlier, all strongly suggest that these
changes were made intentionally to create the false appearance that 24-hour deadlines had not
been missed. Yet the Department of Correction refuses to recognize this data manipulation for

20

what it is, or to hold the individuals involved accountable. With that background, DOC's promise that new staff have been trained to make the system more reliable falls flat. Without accountability for officers who enter false information in the dashboard, there can be no reliable tracking system, regardless of how much training the staff take. Though bad faith is not required to find contempt, this is clear bad faith conduct that "directly contravenes" the order. *Powell*, 487 F. Supp. at 933.

For all these reasons, the Department is in contempt of the Second Remedial Order.

## II.   Remedies.

"There can be no question that courts have inherent power to enforce compliance with their lawful orders through civil contempt." *Shillitani v. United States*, 384 U.S. 364, 370 (1966). Courts have "'broad discretion to design a remedy that will bring about compliance.'" *Paramedics Electromedicina*, 369 F.3d at 657(quoting *Perfect Fit Indus. v. Acme Quilting Co*., 673 F.2d 53, 57 (2d Cir. 1982)). Courts should consider the "'character and magnitude of the harm threatened by continued contumacy, ... the probable effectiveness of any suggested sanction in bringing about (compliance),' and the 'amount of (the contemnor's) financial resources and the consequent seriousness of the burden to (him).'" *Perfect Fit Indus,, Inc.*, 673 F.2d at 57 (quoting *United States v. United Mine Workers of America*, 330 U.S 258, 304 (1947)).

Defendants have repeatedly failed to comply with the requirements of Second Remedial Order 1(i)(c) absent increased accountability measures, including the threat of court involvement. To remedy Defendants' ongoing contempt, Plaintiffs request that the Court order the following relief:

With respect to New Admissions:

A.   Defendants shall provide the parties with live access to the Dashboard system for new admission tracking, so the parties can independently and contemporaneously oversee the Department's compliance.

B.   Defendants shall demonstrate the reliability of the Dashboard system by conducting weekly audits which will compare a representative sample of data on the Dashboard to video evidence of incarcerated individuals' movements and other objective data. These audits will be provided to the parties and the Court (by filing on the docket) within one week of each audit's completion. Defendants may redact from the docket any identifying information for an incarcerated person.

C.   Defendants shall generate weekly reports regarding New Admissions intake which indicate: 1) the total time it took to process each new admission; 2) whether the clock was "stopped" for that new admission; 3) if so, the length of the stoppage; and 4) if so, whether the clock was stopped due to a refusal, a court appearance, a hospital visit, the posting of bail, or for another specific reason.

D.   Defendants shall provide the above-described reports to the parties and the Court (by filing on the docket) within one week of the end of the week reported on. Defendants may redact from the docket any identifying information for an incarcerated person.

With respect to Intra-Facility Transfers:

A.   Defendants must establish a reliable tracking system for the amount of time Intra-Facility Transfers spend in intake areas by March 15, 2023.

B.   Beginning immediately and continuing until March 15, 2023, the Department shall report to the parties and the Court (by filing on the docket) every two weeks on its progress toward meeting the March 15 deadline, including but not limited to: 1) the number of personnel

trained on the ITS system; 2) a description of the content of training provided; 3) the number of personnel who still remain to be trained; 4) any technological or logistical improvements made toward a reliable ITS system; and 5) what technological or logistical improvements still remain to be made.

C.   Beginning on March 15, 2023 at the latest, Defendants must demonstrate the reliability of the ITS tracking system by conducting weekly audits that compare a representative sample of the data recorded through the system to video of incarcerated individuals' movements. The results of such audits must be provided to the parties and the Court (by filing on the docket) within one week of each audit's completion. Defendants may redact from the docket any identifying information for an incarcerated person.

D.   Beginning on March 15, 2023 at the latest, Defendants shall generate weekly reports regarding Intra-Facility Transfer stays in intake areas, which indicate: 1) the total time each person spent in any intake area during the transfer process; 2) how much of that time was spent in the intake area of the facility from which the person was moved; and 3) how much of that time was spent in the intake area of the facility to which the person was moved.

E.   Defendants shall provide the above-described reports to the parties and the Court (by filing on the docket) within one week of the end of the week reported on. Defendants may redact from the docket any identifying information for an incarcerated person.

The character and magnitude of the harm from a lack of a reliable tracking system is grave and affects all those incarcerated in Department facilities. The conditions under which the Plaintiff Class suffer are not only serious drivers of unconstitutional use of force, they are also deplorable and inhumane. It will be impossible to address these concerns if the Department cannot reliably track who is in intake and for how long.

23

The proposed remedies will be effective in ensuring that the tracking systems are actually reliable. There is no dispute that ITS can be effective in tracking Intra-Facility Transfers, if the Department properly implements it. The Department's proposed plan to use ITS for this purpose, together with sufficient auditing and reporting requirements will be effective to ensure that the system has actually been implemented properly. Likewise, with New Admissions, similar auditing and reporting requirements are necessary since New Admissions tracking was likely unreliable since the time of the Second Remedial Order—even though the Department initially believed that it was reliable. Oct. 28, 2022 Report at 89; *see* Dec. Ex. C at 2-3 (relying on the New Admissions tracking in place at that time to claim no overstays were occurring).

The additional financial burden on DOC, if any, will be minimal. Again, DOC claims that it can implement ITS to track Intra-Facility Transfers and claims that it has already implemented the New Admissions Dashboard. DOC already has the Nunez Compliance Unit (NCU), dedicated to ensuring compliance with *Nunez* orders, and which already reports on compliance efforts and has audited the tracking system. *See, e.g.*, June 30, 2022 Report at xii.

The weight of authority from courts around the country disagree as to whether the Prison Litigation Reform Act's requirements regarding prospective relief, 18 U.S.C. § 3626(a), apply to remedial contempt remedies.[3] Should this Court hold that the PLRA requirements do apply, it should also find that the proposed relief meets those requirements. The proposed relief is

---

[3] *Compare Benjamin v. Fraser*, No. 75 Civ. 3073, 2002 WL 31845111, at *12 (S.D.N.Y. Dec. 16, 2002) (holding that remedial contempt provisions are "prospective relief" subject to PLRA requirements) *with Essex Cnty. Jail Annex Inmates v. Treffinger*, 18 F. Supp. 2d 445, 461 (D.N.J. Aug 17, 1998) ("The enforcement of a valid consent decree is not the kind of 'prospective relief' considered by § 3626(a)," and thus "the PLRA does not limit the instant contempt application.") *Jones-El v. Berge*, 374 F.3d 541, 545 (7th Cir. 2004) (same, quoting *Essex Cnty.*, 18 F. Supp. 2d at 462); *Duvall v. Hogan*, No. 94 Civ. 2541, 2021 WL 2042295, at *11 (D. Md. May 21, 2021) (same, quoting *Jones*); *Hadix v. Caruso*, 465 F. Supp. 2d 776, 797 (W.D. Mich. 2006), quoting *Jones*, 374 F.3d at 545 ("The PLRA on its face and in its meaning does not apply to contempt requests."); *Ranke v. Cnty. of Saginaw*, No. 11 Civ. 15712, 2013 WL 3944472, at *3 (E.D. Mich. July 31, 2013), (same, quoting *Hadix*, 465 F. Supp. 2d at 797); *Lancaster v. Tilton*, No. 79 Civ. 1630, 2007 WL 1807825, at *4 (N.D. Cal. June 21, 2007) (quoting *Essex Cnty.* and holding that PLRA requirements were "irrelevant" when enforcing order through contempt).

narrowly tailored and the least intrusive means available because, to the extent that it requires more than DOC itself has proposed to do, it proposes only those measures needed to discern the reliability of its tracking systems. Reliable intake tracking is fundamental to the ability to enforce Court orders designed to eliminate a significant driver of unconstitutional uses of force. Thus, the proposed relief goes no further than necessary to correct Federal rights violations. Finally, there will be no adverse impact on the DOC's operations or public safety because, as stated above, the NCU can carry out the reporting and auditing requirements attaching to the DOC's own plans.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Department be held in civil contempt of Second Remedial Order ¶ 1(i)(c) and that the aforementioned remedies be granted, together with any further relief this Court deems just and proper.

Dated: January 25, 2023

      New York, New York

                                       THE LEGAL AID SOCIETY

                                       */s/ Mary Lynne Werlwas*
                                       Mary Lynne Werlwas
                                       David Billingsley
                                       Katherine Haas
                                       Kayla Simpson
                                       199 Water Street, 6th Floor
                                     New York, New York, 10038
                                     Telephone: (212) 577-3530
                                     mlwerlwas@legal-aid.org

                                     EMERY CELLI BRINCKERHOFF
                                     ABADY WARD & MAAZEL LLP

                                              */s/*
                                     Jonathan S. Abady
                                     Debra L. Greenberger
                                     Sana Mayat
                                     Nairuby L. Beckles
                                     600 Fifth Avenue, 10th Floor
                                     New York, New York, 10020
                                     Telephone: (212) 763-5000
                                     jabady@ecbawm.com