# Special Report on Intake by the *Nunez* Independent Monitor

**February 3, 2023**

**THE NUNEZ MONITORING TEAM**

Steve J. Martin
*Monitor*

Kelly Dedel, Ph.D.
*Subject Matter Expert*

Anna E. Friedberg
*Deputy Monitor*

Dennis O. Gonzalez
*Associate Director*

Patrick Hurley
*Subject Matter Expert*

Alycia M. Karlovich
*Analyst*

Emmitt Sparkman
*Subject Matter Expert*

Christina Bucci Vanderveer
*Associate Deputy Monitor*

i

**Table of Contents**

**Current State of Affairs Within Intake Units** ............................................................... 2

**Background** ............................................................................................................ 7

-   Intake Provisions of the Court's Orders.......................................................... 7
-   Summary of Monitoring Team's Findings Related to Intake That Serve as the Basis for the Court's Orders Regarding Intake ................................................... 8

**Current Status of New Admission Intake Processing** ...................................... 11

-   New Admission Intake Processing .............................................................. 11
-   Background on the Department's Efforts to Track Length of Stay in New Admission Intake Units ........................................................................................... 13
-   Department's Steps to Improve the New Admission Intake Process ............... 14
-   Assessing Compliance with Tracking Requirements .................................... 18
-   NCU's Audits of New Admissions Processing Data...................................... 20
-   Conclusion .............................................................................................. 25

**Inter/Intra Facility Transfers** ............................................................................... 26

-   Use of Force Incidents in Intake Areas....................................................... 27
-   Intake Data Tracking & NCU Audits of Individuals in Intake .......................... 28
-   Reduced Reliance on Intake & De-Escalation.............................................. 30
-   Conclusion Regarding Reliance on Intake ................................................... 31
-   Plan for Improved Tracking of Inter/Intra Facility Transfers .......................... 31

**Conclusion** ........................................................................................................ 36

**Appendix A: New Admissions Intake Procedures** .................................................. i

Per the Court's December 13, 2022 Order (dkt. 494), the Monitoring Team files this report on the status of Defendants' compliance with the intake provisions of various Court's orders. Intake is the processing center for people entering, exiting, and moving within the jails. The use of intake falls into two categories. First, individuals newly admitted to DOC custody ("new admissions") must be processed through intake before they are assigned to a housing unit. Second, individuals may be brought to an intake unit within each individual jail either for the purpose of exiting the facility (*e.g.*, to go to Court, the hospital, or another facility) or to be transferred within the facility (*e.g.*, to the clinic following a use of force or to another housing unit) ("inter/intra facility transfers").

## CURRENT STATE OF AFFAIRS WITHIN INTAKE UNITS

In response to concerning reports about poor conditions and excessive lengths of stay in intake units in the summer of 2021, the Department's use of intake units became a central area of focus for the Monitoring Team, the Department, and the Parties to the *Nunez* litigation. Recently, especially in the last six months, the Department has made some long overdue progress in managing and operating intake processing, although more work remains. Progress is most evident in the new admissions intake units, where a revamped tracking process was recently implemented, and a plan for improving practice and tracking the length of stay for inter/intra-facility transfers has now been established. As an initial matter, the Monitoring Team's recent routine site visits to intake areas (at both EMTC for new admissions and those used for inter/intra facility transfers at other facilities from November 2022 through January 2023) revealed that the Department has maintained the progress described in the Monitoring Team's October 28, 2022 report (dkt. 472) at pgs. 82 to 84, and 109 to 110. Most of the time, intake units were observed to be less chaotic, less frequently overcrowded, and more sanitary than the conditions observed

between summer 2021 and early 2022. The Department has also reduced its reliance on intake units as a post-incident management tool (discussed in more detail later in this report) meaning that individuals are not being brought to intake following a use of force with the same frequency as in the past. Further, while the Monitoring Team has observed (and also received a few reports from third parties) instances of individuals remaining in intake beyond 24 hours,[1] the frequency of such allegations and observations has decreased from what was observed and alleged in winter 2021 and the first half of 2022.

Most notably, the frequency of uses of force in intake areas has decreased. Overall, the number of uses of force occurring in intake units Department-wide dropped 65%, from 190 uses of force in the intake areas in August 2021 (which are the conditions that gave rise to the Second Remedial Order) to 67 uses of force in intake areas Department-wide in December 2022. A significant decrease in the number of uses of force in the new admissions intake area has also been observed—from 83 uses of force in August 2021 (at OBCC[2]) to 17 uses of force (at EMTC) in December 2022 (an 80% decrease). While intake areas continue to be the second most frequent location for uses of force behind housing areas (which is intuitive given the high

---

[1] The Monitoring Team requested that the Plaintiffs class counsel provide the Monitoring Team with any allegations it receives regarding potential overstays (*i.e.*, longer than 24 hours) in intake. Plaintiffs' class counsel provided the Monitoring Team with four allegations of potential intake overstays that occurred between August 2022 and December 2022. The allegations ranged from overstays in intake lasting between 3 days and 5 weeks. The Monitoring Team requested the Department review the Genetec video of intake for all four cases and report the lengths of stay in intake for each individual. In two cases, the Department reported that Genetec video revealed the individuals were in intake for over 24 hours, specifically, one individual was in intake for 38 hours and other individual was in intake for 52 hours. In another case, the Department reported that Genetec video showed the individual was housed within 24 hours and not the 5 weeks alleged. In the final case, the video was not available and so the time the individual remained in intake could not be determined.

[2] In 2020, following the onset of the COVID-19 pandemic, the Department elected to centralize male new admission intake in one facility, the Otis Bantum Correctional Center ("OBCC," now closed) in order to consolidate its health care operations (*i.e.,* testing and quarantine). In September 2021, EMTC, a facility that had been closed, was re-opened to process newly admitted males, and remains in operation today.

volume of traffic and dynamic nature of intake units), these uses of force remain a much smaller proportion of the total number of uses of force. While more work is necessary to reduce the use of force in intake (and system-wide), the primary driver of uses of force in the agency is *not* incidents that occur in intake. Efforts to address the primary drivers of use of force (which are operational in nature and not location-specific) must remain the core focus for the Department and to the extent that progress is made system-wide, use of force in the intake units will be further reduced. That said, the specific efforts related to improving the operations of intake, discussed throughout this report, have had an impact on reducing use of force in the intake units.

A number of critical markers reveal that the Department is finally making progress in reducing its overreliance on intake and also that intake units are being operated more efficiently, which results in less of the chaos that leads to violence and uses of force. While concrete, aggregate data regarding individual lengths of stay in intake is still not available (and was not available at the time the Monitoring Team initially raised concerns about the issues related to intake), there is no question that the environments in the intake units have improved and are not in the same deplorable condition that gave rise to the requirements of the First and Second Remedial Orders (and which were subsequently reiterated in the Action Plan).

The issues related to intake are a microcosm of the many issues facing this agency in that they are polycentric, require various actors to work in concert, and yet also require straightforward, reasonable solutions. The problems themselves are not complicated, but the solutions require coordinated focus and deliberate efforts of many individuals and leaders. Significant time, attention, and resources from the Department have been dedicated to addressing the issues related to intake, particularly since fall 2022. Leaders at the highest levels have made this issue a priority, including the First Deputy Commissioner, the Deputy Commissioner of

Custody Management, Classification & Facility Operations (who is also the Classification Manager), the two Associate Commissioners of Facility Operations, the Department's General Counsel, as well as Facility Leadership and a variety of other members of the Department's team. The issues related to intake have been the focus of extensive discussions of the Parties as well, with numerous meetings and phone calls convened to address the concerns raised by Plaintiffs' counsel.

While this report is focused exclusively on the issues related to intake areas, the Monitoring Team would be remiss if it did not emphasize its strong belief that the priority operational focus in the jails must remain on enhancing basic security practices, properly managing those involved in serious violent incidents, and maximizing the number and assignment of staff to work with the incarcerated population. The Monitoring Team's highest priority is the core focus of the *Nunez* litigation, the unnecessary and excessive use of force, along with factors that contribute to it (*i.e.*, the core foundational issues regarding staffing, supervision, and security practices) and the ongoing harm that flows from it. The Monitoring Team remains deeply concerned about these issues and the need to ameliorate the risk of harm and improve facility safety. The Monitoring Team urges the Court, the Parties, and the Department to ensure that these core issues remain at the forefront of the work that must be done to reduce the imminent risk of harm faced by people in the Department's custody. As the Monitoring Team has long advised, such focus will require difficult decisions and inevitably means that certain issues and problems must be prioritized over others.

While work remains to improve conditions and reduce the length of stay in intake units, it must be appropriately balanced with the overarching efforts to address the key focus of this case so that the Department's, Monitoring Team's, and the Parties' resources are chiefly deployed

toward resolving the longstanding concerns about the safety and risk of harm to incarcerated individuals and staff at the Department.

     As directed by the Court, this report is focused on intake and is divided into three sections. The first section provides background and a summary of the Monitoring Team's findings regarding the issues that gave rise to the intake provisions in the Court's orders. The second section addresses the Department's processing and management of people who are newly admitted to DOC custody. The final section focuses on the processing and management of people who are transferred between and within facilities.

## BACKGROUND

Given the size of the Department and the frequent turnover and movement among people in custody, intake is a busy and dynamic location. All individuals who are ordered to DOC's custody are first transported from Court to intake. Currently, newly admitted males are transported to a centralized intake unit at the Eric M. Taylor Center ("EMTC") and newly admitted females are transported to the Rose M. Singer Center ("RMSC"). Processing people who are newly admitted to the jail system through intake requires a variety of specific procedures that are outlined in Appendix A: New Admissions Intake Procedures. In addition, each jail has an intake unit that is used to process people who are being transferred between facilities or within a single facility, a process which is also discussed later in this report. Throughout this report, the Monitoring Team utilizes the terms "new admissions" (those individuals newly admitted to DOC custody who are processed through EMTC's intake) and "inter/intra facility transfers" (those individuals being transferred between jails or within a jail) to distinguish between these two core purposes of intake units.

- **Intake Provisions of the Court's Orders**

The specific intake provisions contained in the Court's First Remedial Order, Second Remedial Order, and Action Plan are outlined below:

- **First Remedial Order (dkt. 350): ¶ A(3) (Revised De-Escalation Protocol).** This provision requires the Department to implement a de-escalation protocol to minimize the use of intake following use of force incidents.

- **Second Remedial Order (dkt. 398): ¶ 1(i)(c).** This provision requires the Department to process all incarcerated individuals, including new admissions and inter/intra facility transfers, through intake and place them in an assigned housing unit within 24 hours. The

Department must also develop and implement a reliable system to track and record the amount of time an individual is held in intake and any instance when an individual remains in intake for more than 24 hours.

- **Action Plan (dkt. 465): § D, ¶ 2(b) and § E, ¶ (3)(a)-(b).** These Action Plan requirements re-iterate the intake-related requirements in the First and Second Remedial Orders (described above), in addition to requiring the Classification Manager and the Security Operations Manager to collaborate to reduce the reliance on intake and to timely process individuals through intake.

- **Summary of Monitoring Team's Findings Related to Intake That Serve as the Basis for the Court's Orders Regarding Intake**

    The Department's over-reliance on intake units has long been an area of focus for the Monitoring Team which has noted that a chaotic environment and long processing times (which are often mutually reinforcing) within intake too often result in the frequent use of force in response to problems that emerge from this frustrating situation. This is why efficient intake processing and reducing the frequency with which individuals are automatically transferred to intake following a use of force are so critical. More specifically, the Department's overreliance on intake units to manage the aftermath of incidents was concerning because the units were often rife with dysfunctional outcomes and the practice created unnecessary security risks and the potential for unnecessary and excessive uses of force. The Department's overreliance on the use of intake for purposes unrelated to the task of processing people in and out of the facilities (or within the facility) created a number of problems: (1) moving people who are often agitated to intake following a use of force sometimes leads to an additional use of force during the transport and may also require halting all movement in the Facility (*i.e.*, lockdown) while the transport is

8

occurring, (2) holding these individuals in intake following a use of force diverts intake staff from their primary duty of processing facility admissions and transfers; (3) placing an agitated person in the intake pens introduces unnecessary chaos and tension to the area, which sometimes erupts into violence; and (4) the inherently chaotic environment of intake does not serve the de-escalation need of an agitated individual. *See* Ninth Monitor's Report (dkt. 341) at pgs. 17-20. Therefore, minimizing the use of intake units following use of force events was recommended by the Monitoring Team and ordered by the Court in the First Remedial Order in August 2020 to ameliorate security issues and support overall efforts to reduce the use of unnecessary and excessive force.

Beginning in summer 2021, a disturbing pattern emerged in which individuals languished in overcrowded intake units well beyond 24 hours, resulting in significant delays in providing required medical services, and other basic services given that intake units are not designed for long-term housing.[3] In addition, violence spiked in the intake units. These problems were particularly acute among newly admitted people who were being processed at OBCC. *See* the Monitoring Team's status letters on August 24, 2021 (dkt. No. 378), September 2, 2021 (dkt. No. 380), and September 23, 2021 (dkt. No. 387). For these reasons, the Monitoring Team recommended that individuals should not remain in intake units for more than 24 hours. The Second Remedial Order codified this recommendation in September 2021 and requires the Department to "*[p]rocess all incarcerated individuals*, including but not limited to new admissions and intra-facility transfers, *through Intake* and place them in an assigned housing unit

---

[3] The Monitoring Team does not actively monitor sanitation, hygiene, or the provision of food because these issues are not addressed in the Consent Judgment, Remedial Orders, or Action Plan so the issues are beyond the scope of the Monitoring Team's duties.  The Monitoring Team is therefore not in a position to make any findings regarding patterns and practices regarding deficiencies in these areas, but simply reports observations, when appropriate, to illustrate our concerns.

within 24 hours" (emphasis supplied). In addition, a tracking system must "track and record the amount of time any incarcerated individual is *held in Intake* and any instance when an individual *remains in Intake* for more than 24 hours" (emphasis supplied).

Despite these requirements related to intake in the First and Second Remedial Orders, the conditions in intake units remained dire, with some incarcerated individuals remaining in intake for days, sometimes weeks, in debilitating conditions, as outlined in the Monitor's March 16, 2022 Special Report (dkt. 438) at pg. 22. These conditions contributed to direct harm to incarcerated individuals as they created a high risk of violence to individuals housed in the intake units (*Id.,* at pg. 23). The intake units were poorly supervised spaces with unsanitary conditions. Tracking the entry and exit of individuals processed in intake units was also sporadic and unreliable.

These findings led to the inclusion of the intake-related provisions from the First and Second Remedial Orders into the Action Plan in June 2022 to ensure they remained a priority, with the additional requirement for involvement and oversight from the Classification Manager and the Security Operations Manager. The Monitoring Team has long contended that leaders with deep correctional expertise from outside the New York City DOC system were needed to address the foundational deficiencies that permeate the entire system. The Action Plan's requirement for additional oversight of the intake process by the newly created roles of Classification Manager and Security Operations Manager was designed to bring that external expertise to resolve these problems.

The conditions in EMTC's intake unit and the processing and tracking of people newly admitted to custody are discussed in the next section of this report, followed by a discussion of the conditions in intake units in other facilities and the tracking of inter/intra facility transfers.

# CURRENT STATUS OF NEW ADMISSION INTAKE PROCESSING

The Monitoring Team routinely tours EMTC,[4] meets with facility leadership and intake staff and reviews various documents and information regarding new admission intake processing at EMTC. The leadership team at EMTC has a strong command of the issues and has been proactive in identifying and addressing issues that arise in intake and trying to alleviate bottlenecks as best they can. The conditions in the intake units at EMTC, especially since July 2022, are an improvement over those observed at OBCC which gave rise to the intake requirements in the Second Remedial Order. *See* also October 28, 2022 report at pgs. 82-89.

- **New Admission Intake Processing**

In 2022, the Department processed approximately 19,000 people who were newly admitted to the Department's custody, with an average of 55 people per day, 382 people per week, and 1,600 people per month. Given the large number of individuals that are admitted on a daily basis, efficient processing with adequate supervision, is necessary for orderly operations of intake. Appendix A: New Admissions Intake Procedures provides an overview of the new admission intake process from the time an individual is taken into DOC custody at court to the time the person is transferred to their assigned housing unit.

- *Correctional Health Services Involvement in New Admissions Processing*

As depicted in Appendix A: New Admissions Intake Procedures, Correctional Health Services ("CHS") plays a central role in the new admissions process, conducting medical and mental health screenings for all newly admitted individuals, and additional mental health

---

[4] The Monitoring Team also participated in two tours of EMTC with the Parties.  First, the Monitoring Team accompanied the U.S. Attorney for the Southern District of New York touring EMTC with members of his team in the fall of 2022.  Second, the Monitoring Team accompanied representatives for Plaintiffs Class Counsel touring EMTC in the winter of 2022.

evaluations for certain individuals. Individuals must be physically present in the clinic for these evaluations to occur, and the evaluations are staff intensive.

The need for adequate mental health staff is crucial, in particular to conduct the necessary evaluations when an individual is first admitted to the jails. CHS could benefit from additional mental health staff, in particular on the overnight shift. Like other health care providers across the city and nation, CHS reports that it has been impacted by the shortage of mental health providers, exacerbated by the COVID-19 pandemic. CHS reports that it has aggressive recruitment efforts ranging from a large number of affiliations with academic and educational organizations and associations, to in-person and virtual recruitment fairs, to contracting with recruitment agencies, to an active presence on social media outlets. It is a highly competitive market and so recruitment for positions, especially those overnight and in a location that may not be desirable to many, is challenging. CHS reports they have therefore taken a number of steps to retain staff and to cover any staffing gaps through expanded use of telehealth, more coordinated scheduling, workflow changes, and use of overtime, per-diems, and temporary staff. Given the staffing challenges that CHS is experiencing, particularly during the overnight hours, the potential for people to experience long wait times for the clinic is being proactively considered. The Department is in the process of developing strategies that may reduce the harm, frustration and discomfort that arises when people remain in the intake area during these times. The extent to which CHS' potential staffing issues may impact the Department's ability to process individuals through intake within 24 hours will be a focus of monitoring going forward.

- **Background on the Department's Efforts to Track Length of Stay in New Admission Intake Units**

The capacity to accurately track the length of time individuals spend in intake units is a key component to the goal of ensuring that individuals are processed in a timely manner and promptly transferred to a housing unit. The Department tracks the time spent in intake among people newly admitted to the jail system using a live web-based program, the "New Admissions Dashboard," or "Dashboard." The system has fields that correspond to the time an individual is transferred to DOC custody at court ("custody time"), time of arrival at intake ("arrival time"), the time of various procedures (*e.g.*, searches, medical screening, mental health screening), and the time they are moved to their assigned housing unit ("housed"). The New Admissions Dashboard can be accessed in real time and can also provide routine reports for specific time periods. While the system is properly structured to capture the necessary information, the data *entered* into this system suffered from various inaccuracies and was deemed unreliable, as reported in the Monitor's October 28, 2022 Report (at pgs. 85-87).

In June 2022, the Board of Correction ("BOC"), a non-judicial oversight board that regulates, monitors, and inspects the City's correctional facilities, identified discrepancies in the data,[5] but did not investigate how or why the discrepancies occurred. Following the BOC's findings, the Department's initial review of the matter revealed that information was often not entered into the system accurately and that the information could later be altered, thereby making the data captured by the system unreliable and unusable. Consequently, available data prior to 2023 does not reliably or accurately capture the extent to which the Department adhered to the

---

[5] *See* BOC communications and memos from June and July 2022, as referenced and attached in the Declaration of Mary Lynne Werlwas (dkt. 501) (Exhibit D—BOC Email to Warden Harvey re: Intake; Exhibit E—BOC Analysis of Intake Dashboard; and Exhibit F—BOC July EMTC Memo).

processing of individuals through intake within 24 hours. The Department of Investigation[6] is currently investigating this matter. At this juncture, even with the pending investigation, it is clear that the Department needed to strengthen staff's adherence to required protocols, emphasize the importance of accurate data entry, and develop a system for supervision and quality assurance to demonstrate the accuracy and reliability of its system for tracking new admission intake processing.

- **Department's Steps to Improve the New Admission Intake Process**

    The Department's progress in tracking the flow of people through new admission intake has been protracted and frustratingly slow. However, since fall 2022, the Department has taken many steps to improve how it processes people who are newly admitted to the jails and how it tracks the length of stay in new admission intake units. The Department's initial plan to resolve the identified problems was described in the Monitoring Team's October 28, 2022 report at pgs. 87-89. Since that time, the Department refined its approach,[7] modified various procedures to include strategies that had not yet been attempted, and implemented the relevant protocols on January 4, 2023. The result of these efforts, while long overdue, is a protocol that appears to be reasonable and capable of appropriately limiting (and tracking) the length of stay in new admission intake. Furthermore, procedures for data collection, fortified by reasonable quality assurance audits, appear capable of producing valid data that can eventually be relied upon for conclusions about the speed of intake processing. The Monitoring Team's site visits in late

---

[6] The New York City Department of Investigation ("DOI") is the City's Inspector General, with independent oversight of City government. DOI investigations may involve any agency, officer, elected official or employee of the City, as well as those who do business with or receive benefits from the City.

[7] Since the Monitor's October 28, 2022 Report, the Department determined, after further consultation with CHS, that all newly admitted males can be processed efficiently through EMTC and diversion to other facilities is not necessary.

January 2023 indicated that intake staff has a strong command of the required procedures and that management in intake already appears to be more orderly and efficient. The particular strategies being deployed to improve efficiency, to track the length of stay in intake and to verify the accuracy and reliability of the data are described in detail below.

The Classification Manager, the Associate Commissioners of Facility Operations, the First Deputy Commissioner, the Department's General Counsel, and the Deputy Commissioner of Administration, and many others have been actively engaged in the process of improving the management and processing of people through new admission intake. Important improvements to various components of the new admission intake process are summarized below.

- **Consistently Assigned Staff and Division of Labor**. As of December 2022, the Department reported that it has improved practices related to staff assigned to work in intake and their duties in the following ways:

    o A group of 28 MMR staff have been designated to enter data regarding intake processing into the New Admission Dashboard and have been specifically trained in these duties. These staff are called "new admission expeditors."

    o Two MMR staff are assigned as new admission expeditors on each of the three shifts, 7 days per week.

    o In addition, six additional correction officers are assigned to the new admissions intake area on each of the three shifts, 7 days per week. These staff have different duties than the new admission expeditors in that they are responsible for facilitating the intake process (*e.g.*, searches, issuing clothing, transporting to the mental health clinic for screening).

    o In other words, the staff member assigned to work in EMTC's intake unit no longer have the dual responsibility of facilitating intake processing and entering data into the New Admission Dashboard.

    o A Captain and an Assistant Deputy Warden will be assigned to supervise intake on each of the three shifts, 7 days per week.

- **Improved Intake Operations**. Operations and procedures have been revised for more efficient processing.

    o *Intake Office*: In December 2022, a separate office for the new admission expeditors was constructed within EMTC's intake area. The office space has live-video monitors so that the new admission expeditors can view individuals' movement and progress through intake processing and can input data accordingly.

- o *More Clinic Space*: A new area for delivering medical/mental health services to individuals housed at EMTC (*i.e.*, not new admissions) called "1 Main Mental Health" opened in January 2023. This allows the medical/mental health clinic in the intake area to be solely dedicated to processing new admissions.

- o *Improved Collaboration with CHS*: the Department has provided CHS expeditor in the clinic with access to the New Admission Dashboard so they can better anticipate the number of individuals that will be brought to the clinic and when. The Department is also exploring ways to add screens in the clinic that could display the list of individuals that are ready to be seen in the clinic.

- o *Transportation*: An additional vehicle was assigned to EMTC to facilitate movement of individuals between facilities during the intake process when required.

- o *Searches*: At the end of December 2022, the daily court production search area was moved out of the intake and into EMTC's gymnasium to decrease activity in EMTC's intake area. A Boss Chair and search area partitions were installed in the gym to facilitate the search process. The gym area is a large, open, and well-ventilated space which is a welcomed improvement from the cramped intake area. Previously, the limited space in the intake area resulted in a frenzied environment among the large number of people being produced to court, people who were newly admitted, and intake staff.

- o *Intake Privacy Wall*: The privacy wall in the intake area was built higher to provide greater privacy for people being searched as part of the new admission process.

- **Addressing Individuals Who Refuse to Participate in the New Admissions Process**. The Department is in the process of creating new procedures for managing individuals who refuse to participate in the new admissions intake process. If an individual refuses to participate in the new admissions process, the Department intends to remove the individual from the intake unit within two hours of their refusal and to house them in a different location until they agree to complete the intake process. The Department expects to utilize a housing unit within EMTC to manage those individuals who refuse to participate in the intake process.[8]

- **Improved Tracking**. On January 4, 2023, the updated New Admissions Dashboard became fully operational. Key improvements include:

- o *Training*: 39 staff (28 Medical Monitored/Restricted Duty Officers and 11 full-duty officers) were trained to input data into the Dashboard.

- o *Data Entry Accountability*: The Dashboard can now identify the individual staff who entered information into the system to ensure accountability for any potential errors.

---

[8] The Department initially planned to use cells in the Communicable Disease Unit ("CDU"), but the CDU has limited space and is not in a position to accommodate the number of people who may refuse to participate in the new admission intake process.

- o *Dashboard Prompts*: Many of the Dashboard's prompts for data entry have been clarified to more accurately reflect the relevant step in the intake process that needs to be recorded. Some additional prompts were also added (*e.g.*, "ready for clinic").

- o *Identifying Individuals Nearing Processing Deadline*: The Dashboard now turns yellow when 18 hours have elapsed since the individual was taken into custody at the Courthouse. The 18-hour warning automatically accounts for time when the individual is not physically present in the intake area (*e.g.*, is at court or at the hospital). The purpose of the warning is for intake staff to prioritize those individuals for whom the 24-hour deadline is approaching. Previously the Dashboard indicated when 20 hours had elapsed since the individual came into custody.

- o *Stopping the Clock:* In certain circumstances, staff are unable to continue the new admission intake process, and thus the individual cannot continue with the intake process in which case the Department "stops the clock" until the intake processing can resume. The parameters of these stoppages and whether they are appropriate is under discussion among the Parties and the Monitoring Team (as discussed in more detail below). Relevant circumstances being tracked are:

  - An individual is returned to court before the intake process is complete;

  - An individual is transferred to a hospital or Urgi-Care (a clinic in another facility on Rikers Island) before the intake process is complete;

  - An individual refuses to participate in intake processing; or

  - An individual makes bail and must be released from custody before the intake process is complete.

- o *Daily Reports for Additional Oversight*

  - A daily report is automatically generated and distributed to Intake supervisors and Department leadership for the prior day. The report contains: (1) the number of individuals housed, (2) the minimum, maximum and average time it took to house individuals from the time they came into DOC custody at the Courthouse, (3) the number of individuals housed beyond 24 hours, and (4) the number of "clock stops" on intake processing and the reason why the clock stopped.

  - A report is also automatically generated to Intake supervisors when individuals are deemed "Ready for Clinic" so that they can be transported to the clinic for medical and mental health screening.

- **<u>Monthly Data.</u>** Roughly 1,400 people were processed through new admission intake in January 2023. Preliminary data from the Dashboard for the month of January 2023 only just became available, so the Monitoring Team can now begin working with the Department to prepare, analyze, interpret and determine how to utilize the data to both assess the work completed in January and inform any necessary practice improvements. The Monitoring Team's next report will provide an analysis of this new data.

17

- **Quality Assurance**. The Department designed and implemented a quality assurance strategy to assess the accuracy and reliability of the data entered into the New Admissions Dashboard.

  o Just five days after the Dashboard was rolled out, NCU began conducting weekly audits of the new admission intake tracking process. The methodology currently being tested is to select a specific day/time from the previous week and to audit the data entered in the New Admissions Dashboard associated with each newly admitted person[9] observed in intake during the selected time period. The auditor reviews Genetec footage to determine whether the individual's arrival time in the intake unit and the time they were housed was entered accurately and calculates the length of stay in intake to determine the extent to which the 24-hour requirement is being met. Further, to the extent that an individual identified during the audit was marked by DOC for a clock stoppage, those entries will be audited. Over the past two weeks, NCU has consulted extensively with the Monitoring Team about the audit methodology and results.

- **Assessing Compliance with Tracking Requirements**

    With respect to the Monitoring Team's assessment of compliance with the requirements of the Second Remedial Order, the Monitoring Team must assess the extent to which all incarcerated individuals are "process[ed]. . . *through Intake* and place[d] in an assigned housing unit within 24 hours." Second Remedial Order, ¶ 1(c). In practical terms, this means the Monitoring Team must assess "the amount of time any incarcerated individual is *held in Intake* and any instance when an individual remains in Intake for more than 24 hours." Therefore, the Monitoring Team will assess the time each person arrives in the intake unit (*i.e.,* "arrival time") compared to the time the individual is transported to their assigned housing unit. The Dashboard also contains a field for each individual's "custody time," which refers to the time when the individual is transferred from NYPD to DOC custody at the courthouse, which is *prior* to the time when the individual arrives at EMTC's intake unit (*i.e.*, "arrival time"). The Department, for reasons not related to the requirements of the Second Remedial Order, assesses the time it

---

[9] EMTC's intake is also utilized for individuals already in custody (inter/intra facility transfers).  To the extent that people are identified who are in the intake unit for purposes other than new admissions processing, they will be excluded from the audit.

takes to house a new admission from the time they are taken into custody at the Courthouse. While tracking the time between when an individual is taken into DOC custody and is transported to Rikers is important and necessary to ensure prompt and efficient transportation from court to Rikers Island, "custody time" references an event that is beyond the scope of the Second Remedial Order given that the order's requirement is limited to processing individuals through intake, placing them in an assigned housing unit within 24 hours, and tracking the time the individual is in intake.[10] Accordingly, the Monitoring Team's assessment of compliance will begin at the time the individual arrives at the intake unit.

During the Parties' discussions related to tracking requirements, the Department raised the issue that there are instances when the intake process cannot proceed because the individual is removed from the intake unit and thus "the clock must be stopped" (also discussed above). The Department reports these circumstances include when an individual leaves the intake unit for a scheduled court appearance, is transported to Urgi-Care (a clinic in another facility on Rikers Island) or to the hospital, the individual makes bail before the intake process is complete, or when an individual refuses to participate in the intake process. At this juncture, these circumstances and the frequency and duration with which these events occur is unknown but given that the tracking process is underway, additional data regarding these events will be available in the coming months and is necessary to determine how to proceed. Accordingly,

---

[10] The Monitoring Team's findings and concerns regarding processing an individual through intake, first raised in 2021, were exclusively focused on the time in which an individual was present in an intake unit. It is for this reason that the Second Remedial Order requires the Department to track the time an individual is "held in Intake." There are other processes an individual (either as a new admission or inter/intra facility transfer) may be engaged in before or after they leave an intake unit, but the scope of the Monitoring Team's findings and recommendations on this issue did not consider or contemplate addressing those processes (*e.g.,* the transfer of custody of individuals from NYPD to DOC or transportation from Court to Rikers Island) as they did not relate to the Monitoring Team's concerns about the conditions within the intake units and ensuring individuals moved through intake units as quickly as possible, so they did not languish in the intake units.

discussions among the Parties and the Monitoring Team as to the parameters and appropriateness of these stoppages are ongoing with hope that an agreement can be reached regarding any exceptions to the bright-line 24-hour deadline for intake processing.

- **NCU's Audits of New Admissions Processing Data**

Although the Dashboard tracking system is now in place, its accuracy and reliability are not yet known. Determinations of "reliable" or "unreliable" can only be made after the data has been audited over a reasonable period of time. While manual data collection is vulnerable to human error and imprecision, with properly trained staff, well-articulated procedures and proper supervision, the system described above is capable of adequately tracking the speed with which people are processed through new admission intake. However, it must be noted that some discrepancy between the time viewed on Genetec and data entries will likely occur and are not presumptively unreasonable if the times are in close proximity to one another, even if they are not exactly the same (*e.g.* within 20 minutes). Obviously, accurate data is a prerequisite to any effort to assess the quality of such systems and as such, the current focus on reliability is necessary.

Two things are occurring simultaneously with regard to the data that is now available for new admission processing. First, NCU is auditing the data to verify its accuracy and, with the support of the Monitoring Team, is also considering key methodological questions about the sampling frame, the file structure and how to best analyze it. Second, the Department is already considering how the data can be reported and assessed periodically to gauge the extent to which individuals are processed through intake within 24 hours, and, if they are not, why not. Dashboard data reports are flowing to supervisors and agency leaders on a daily basis, so that in the event that people are languishing in new admission intake, they can immediately delve into

what is causing the delays and how to solve the underlying operational problems. These practice enhancements are in fact the point of creating the tracking mechanism itself.

The Dashboard has been in place for four weeks and already two preliminary audits have been completed, but conclusions about the integrity of the Department's New Admissions Dashboard would be premature. It may be tempting to interpret week-to-week changes as being noteworthy or "proof" that problems exist or have been satisfactorily addressed. However, conclusions about the speed of intake processing and the integrity of data collected to quantify that processing must rest upon a set of observations over a longer period of time. For this reason, among others, it is encouraging that NCU began auditing this process within days of the new system being brought online. Together, the first two audits conducted in January 2023 assessed the total time in intake and the accuracy of time entries for the 16 people who were newly admitted[11] during the audits' sampling frame.

- 15 of 16 people (94%) arrived in intake and were processed and transferred to a housing unit within the 24-hour timeline (confirmed via Genetec review);

- 10 of 16 arrival time entries (63%) were generally accurate (*i.e.*, within 20 minutes of the time shown on Genetec). Among the six inaccuracies, four incorrect arrival times were *before* the person actually arrived, and two were for times *after* the person actually arrived; and

- 10 of 16 housing time entries (63%) were generally accurate (*i.e.*, within 20 minutes of the time shown on Genetec). Among the six inaccuracies, three incorrect housing times were for times *before* the person was actually transferred

---

[11] NCU confirms the status of all individuals in the intake to determine whether they are a new admission or if the individual may already have been in custody and is therefore in intake as an inter/intra facility transfer.  Upon confirmation of the new admissions, the audit is limited to those individuals.

to a housing unit, and three were for times *after* the person was actually transferred to a housing unit.

Clearly, the Department has some work to do to ensure that staff is accurately entering data regarding the person's arrival time in intake and the time the person was transferred to a housing unit. That said, it is encouraging that 94% of people processed through new admission intake were transferred to a housing unit within 24 hours, as confirmed via Genetec video.

The fact that DOC already has an audit process in place that can identify potential issues with data entry so they can be addressed in real time will help to ensure the reliability of data entry going forward. Over time, successive snapshots of data will contribute to two important findings—(1) whether the tracking system is accurate and reliable and (2) whether intake processing is efficient such that people do not languish more than 24 hours before being transferred to an appropriate housing unit. The audits are intended to assess progress toward these two goals and also, crucially, to identify the glitches, misunderstandings, or choke points that may be undermining either one. It must be emphasized that auditing Genetec footage, in particular, is a time-consuming and onerous task and thus must be deployed only as needed to accomplish the objective. Indeed, all of the methodological choices regarding new admission intake audits must be prudent and selected only after careful consideration and various test runs. If well designed and implemented, a modest sampling frame with a limited number of variables will be sufficient for the task.

Already, the NCU and Monitoring Team have identified some options to refine and strengthen the methodology of the audits by reconsidering the sampling strategy, tolerance limits (*e.g.*, Dashboard entries that are +/- *x* number of minutes from the time shown on Genetec footage), among others. In the Monitoring Team's experience, these types of modifications are

22

essential to building and maintaining a robust quality assurance strategy and often require a bit of

trial-and-error before the methodology can be finalized. Further, as time goes on, the frequency,

scope, and focus of the audits may change based on the findings and areas that require greater

scrutiny.

It must be emphasized that an audit itself does not improve practice—only the deft

interpretation and application of the information gleaned from the audit catalyzes improvement.

The purpose of more contemporaneous audits is to allow information flows to occur routinely,

but it is the accumulation of *multiple* audits that will both identify any potential patterns or issues

with data entry that may be necessary to address and then catalyze practice changes to correct

these problems. The Department should move with all due haste to address any potential issues

identified by the audits, but it is also important to ensure that corrective action plans are

appropriately targeted to address the issues identified and that sufficient time is afforded for their

implementation. As a result, a weekly audit cadence may not be the appropriate choice because

the results of one weekly audit will likely be in the process of evaluation as the next audit begins

and before any corrective action plans or changes in practice can be implemented. In other

words, any corrective action that may be necessary to address issues identified in the audits will

not be detected by an audit that is conducted the following week. As noted above, this is why the

audit process must be dynamic in this early phase so alterations can be made as necessary.

NCU has a proven track record of conducting valid audits and has a strong collaborative

relationship with the Monitoring Team.[12] As it does with audits of many other areas of the jails'

---

[12] The new Assistant Commissioner of NCU (appointed at the end of summer 2022) has demonstrated the same strong command and understanding of the issues in this case as her predecessor.  She and her team have worked tirelessly and efficiently to immediately begin the work related to assessing the data on new admissions intake processing. She has worked collaboratively and efficiently to address feedback from the Monitoring Team.

operation, the NCU works with stakeholders to share its findings and has also committed to sharing its audit results with the Monitoring Team on a routine basis. The interpretation of audit results will occur collaboratively. Importantly, both NCU and the Monitoring Team frequently adapt their strategies to fit the changing contours of the issue at hand and their work to assess the efficiency of intake processing will benefit from this same approach. This ensures that the auditing strategy will delve more deeply into problem areas while also eliminating rigorous reviews of basic tasks once the intake staff has achieved mastery.

During the Meet and Confer on this issue, Plaintiffs' counsel requested access to NCU's audit results. The City reported its intention to deliver the audits results to the Monitoring Team, who could then provide them to Plaintiffs' counsel as contemplated by the Consent Judgment § XX (Monitoring), ¶ 10[13] which guides which information can be shared.[14] The Monitoring Team assured Plaintiffs' counsel that audit results would be provided routinely, but that a precise schedule for production should be developed once the audit methodology had been established to optimize meaningful interpretation and efficiency (*i.e.*, a schedule that does not unduly interfere with the Monitoring Team's work as contemplated by Consent Judgment § XX (Monitoring), ¶ 10). The Monitoring Team believes an agreeable production schedule can be developed. Finally, the Monitoring Team's reports will apprise the Court and the Parties of the Monitoring Team's assessment of compliance with the relevant provisions, overall conditions in intake, the accuracy of tracking data and the speed with which people who are newly admitted clear intake and are transported to their assigned housing unit.

---

[13] *See also*, Consent Judgment § XX (Monitoring), ¶ 25.

[14] The Monitoring Team communicates with the Parties frequently and has routinely provided information to the Parties as requested. Most recently, just two weeks ago, the Monitoring Team shared the audit results of inter/intra facility transfers for October-December 2022.

- **Conclusion**

The steps taken by the Department to improve the new admission intake process include several notable components that should increase the efficiency of intake processing and the reliability of the tracking data. Most importantly, the efficiencies created in intake processing address the primary goals of limiting the amount of time that individuals spend in intake before being transferred to an assigned housing unit. Regarding the tracking system, while the causes/motivations of the intake data problems identified by the BOC in summer 2022 are still unknown, the procedures articulated above should mitigate the possibility that data will be intentionally manipulated. More specifically, consistently assigning specially trained staff in sufficient numbers to the intake area will help to ensure that each staff is aware of the required procedures, how to properly execute and document them, and is held accountable for any issues with the accuracy of the data. Also, the division of labor between staff whose primary task is managing the individuals in intake and those whose primary task is inputting data into the tracking database will help to ensure that both tasks are prioritized and neither task is neglected. Furthermore, the routine availability of data and reporting to supervisors along with NCU's audits create close-in-time accountability measures that should emphasize the importance of accuracy and discourage manipulation. Currently, time is needed to fully implement these requirements, to ascertain the reliability of the data, and most importantly, to ensure that individuals are processed through intake as soon as possible and within 24 hours of their arrival to the intake unit.

At this juncture, the Monitoring Team does not have any further recommendations for additional steps the Department should take to address the requirements of the Second Remedial Order or the Action Plan pertaining to new admission intake processing.

# INTER/INTRA FACILITY TRANSFERS

The previous section of this report discussed procedures surrounding new admission intake processing occurring at EMTC. This section discusses a different type of intake unit—those contained in each of the remaining facilities that are used for a variety of purposes but not for new admission processing. The Department has traditionally over relied on intake units for a host of reasons, including inmate management following a use of force. While in some cases transporting a person to intake may be reasonable (*e.g.*, transfer to another facility or transport to Court), moving people to intake to await transport *within* the facility is often illogical, and using intake as a de-facto holding area for individuals following use of force is problematic. Furthermore, transporting individuals to a different location—particularly when agitated—can often compound the management problem rather than resolve it. Finally, using intake as a catch-all hub for individuals creates an unstable and potentially dangerous intake environment.

This section of the report first provides an update on the Department's compliance efforts related to reducing the reliance on the use of intake in the general operation of the jails and therefore focuses on the requirements of the First Remedial Order § A., ¶ 3 and reducing the reliance on intake. This also includes consideration of Action Plan § (D) ¶ (2)(a) (which adopts First Remedial Order § A., ¶ 3 and requires leadership to address these requirements), Action Plan § (E) ¶ (3)(a) (which adopts ¶1(c) of the Second Remedial Order regarding tracking of inter/intra facility transfers), and Action Plan § (E) ¶ (3)(b) (which requires the new leadership to address these requirements) given the interplay with the First Remedial Order § A., ¶ 3. Together, these provisions require the Department to limit an individual's stay in intake to 24 hours, to identify the various processes that are negatively impacting intake's orderly operation and to address the problems in a way that reduces its reliance on intake units, in particular with

respect to managing incarcerated individuals following a use of force incident. As discussed in more detail below, the Department has made progress with its efforts to achieve compliance with the First Remedial Order § A., ¶ 3, consequently, in the 14th Monitor's Report dated October 28, 2022, the Department was placed in Partial-Compliance with the First Remedial Order § A., ¶ 3.[15] An assessment of the Department's plans to track individuals in intake follows the discussion on reducing the reliance on intake.

As required by Action Plan § (E) ¶ (3)(b), the Classification Manager has taken the lead on addressing the matters related to intake. The plans that have been developed involve coordination and collaboration with the Classification Manager, the Staffing Manager, the Associate Commissioners of Facility Operations, and various Department leaders in each of the facilities and other divisions. As noted elsewhere in this report, the plans developed by the Classification Manager, in collaboration with this group, are reasonable, rooted in sound correctional practice, and incorporate facets that make these plans feasible and sustainable.

- **Use of Force Incidents in Intake Areas**

The Monitoring Team continues to evaluate the frequency with which the use of force occurs in intake units and has long noted that a chaotic environment and longer processing times (which are often mutually reinforcing) within intake can result in a greater frequency of the use of force. This is why efficient processing of individuals within intake units and reducing reliance on intake following a use of force are so critical. While the number of uses of force within the Department is still exceedingly high, there is at least some evidence that the improving

---

[15] The Department was in Non-Compliance with this provision in the Eleventh and Twelfth Monitoring Periods. A compliance assessment was not provided for the Thirteenth Monitoring Period. The Monitoring Team found that the Department was in Partial Compliance with this provision in the Fourteenth Monitoring Period in the October 28, 2022 Report.

27

conditions within intake units discussed in this report have resulted in a lower number of uses of force in intake areas. As discussed in the introduction, the use of force in intake department wide has decreased 65% from August 2021 (190) to December 2022 (67). The total number of uses of force in intake areas in 2022 (963) decreased 35% from the number of uses of force in intake in 2021 (1,483). Further, the number of uses of force in intake in 2022 (963) is 14% lower than 2019 (1,123), the year in which the poor conditions brought about the First Remedial Order requirement. Finally, while only a marginal decrease, the proportion of uses of force that occurred in intake units decreased for the first time in 2022.

| *Use of Force in Intake* | | | | | |
|---|---|---|---|---|---|
| | **2018 Total** | **2019 Total** | **2020 Total** | **2021 Total** | **2022 Total** |
| **# of Use of Force Incidents in Intake** | 913 | 1123 | 992 | 1483 | 963 |
| **Total UOF** | 5901 | 7169 | 6467 | 8194 | 7005 |
| **% of UOF in Intake** | *15%* | *16%* | *15%* | *18%* | *14%* |

- **Intake Data Tracking & NCU Audits of Individuals in Intake**

Inter/intra facility transfers must be tracked pursuant to ¶ 1(c) of the Second Remedial Order. As discussed later in this section of this report, the Department has an Inmate Tracking System ("ITS") which can be utilized to track inter/intra facility transfers, but facility compliance with using this centralized system has been inconsistent. Instead, each facility has maintained a different manual tracking mechanism that does not produce aggregate data for analysis. The Monitoring Team's routine site visits to intake areas in various jails revealed that while intake staff were generally aware of the reasons an individual was in intake, where the individual was waiting to go, and the length of time they there, the lack of a centrally managed tracking tool limited the problem-solving efforts to only those *within* a specific facility. This silo approach

28

makes it difficult to promote the overall goal of ensuring that individuals are not left in intake for long periods of time.

Given that the Department was unable to provide valid system-wide data for individual stays in intake in 2022, the Monitoring Team asked NCU to conduct audits of intake units across a number of facilities beginning in January 2022 to better understand the scope of the issue for intake stays for inter/intra facility transfers. Audits were conducted in January and February 2022, August 2022, October 2022, November 2022, and December 2022 covering intake areas at AMKC, GRVC, RNDC, and NIC for inter/intra facility transfers.

As noted in the Monitor's June 30, 2022 Status Report, NCU conducted four audits of intake areas in three different facilities in January 2022 and February 2022 and found that the length of stay in intake for 33% of these individuals (15 of 45) was longer than 24 hours. Almost half of these (7 of 15) extended beyond 72 hours.

In August 2022, NCU found that 13% of individuals (4 of 30) were held in intake for more than 24 hours (but less than 48 hours). Three of these four individuals were held in intake awaiting Mental Health Housing, and one was held because of issues with disrupting his housing unit.

NCU conducted six audits of intake areas in four different facilities (RNDC, AMKC, NIC, and GRVC) between October and December 2022.[16] These audits found that the length of stay for 8% of these individuals (4 of 53) was longer than 24 hours (3 of the 4 individuals were

---

[16] Given the ongoing discussions with the Parties regarding concerns about the operations of intake, the Monitoring Team provided the Parties with this information in January 2023 pursuant to Consent Judgment § XX (Monitoring), ¶ 10.

held in intake less than 48 hours and the other individual was in intake less than 72 hours). All

four individuals were held in intake awaiting assignment to a housing unit.

NCU's audits for the second half of 2022 are consistent with the Monitoring Team's site

work and other information available to the Monitoring Team that suggests there is improvement

in reducing the length of stay in intake and in reducing number of people remaining in intake for

more than 24 hours awaiting an inter/intra facility transfer.

- **Reduced Reliance on Intake & De-Escalation**

As part of the Department's effort to reduce reliance on intake, "de-escalation units" were

opened in each Facility by July 2022. While the First Remedial Order does not require the use of

de-escalation units, the Department opened these units as one alternative for staff to use instead

of intake. The Department promulgated Directive 5016 "De-escalation Unit," which establishes

policy and procedures for conducting de-escalation in locations other than facility intake units.

The policy indicates that intake should only be used for inter-facility transfers, court processing,

discharges, transfers to medical appointments, cavity searches, body-scans and new admission

processing.

NCU conducted audits of every facility's adherence to the de-escalation policy to

determine how facilities managed individuals following a use of force incident between May to

December 2022. Specifically, NCU reviewed Genetec video to track the movement of

individuals after a use of force incident to determine if staff were following the policy on de-

escalation protocol (*i.e.*, not placing individuals in intake pens after incidents).

The NCU audits covering July to December 2022 (the Fifteenth Monitoring Period)

revealed that 88 of 124 individuals (71%) (compared with 54% in May and June 2022) were not

taken to intake and instead were taken back to their assigned cell to de-escalate, immediately rehoused, taken directly to the clinic for medical care, or were placed in a de-escalation unit. Only 36 of 124 individuals (29%) were brought to intake areas. This audit, in conjunction with the Monitoring Team's own observations from site work and evaluation of relevant information, revealed improvement in reducing the number of individuals taken to intake pens. It also revealed that facilities are moving a greater proportion of individuals directly back to their own cells, to de-escalation units or the clinic, or immediately re-housing individuals than they have in the past.

- **Conclusion Regarding Reliance on Intake**

The Department has taken important steps to reduce reliance on the use of intake after a use of force. Both NCU audits and the Monitoring Team's site work demonstrate that the Department has made progress in utilizing intake less often for post-incident management. Further, the number of uses of force within intake has decreased. Additional work remains as the Department must be able to track individual stays for those who are transported to intake, and continued efforts are needed to reduce the utilization of intake after a use of force. The Monitoring Team found that the Department was in Partial Compliance with the First Remedial Order § A., ¶ 3 in the Fourteenth Monitoring Period and, in light of the findings above, expects the compliance rating to remain the same in the Fifteenth Monitoring Period (a final compliance rating will be provided in the Monitor's March 31, 2023 Report).

- **Plan for Improved Tracking of Inter/Intra Facility Transfers**

As discussed at the outset of this report, the Department must track the time an individual is brought to an intake unit for inter/intra facility transfers as required by ¶ 1(c) of the Second Remedial Order. To date, the Department has not tracked valid system-wide data for individual

stays in intake. The Monitoring Team has long encouraged the Department to address this issue, and in early January 2023, a plan was developed to track individual stays in intake. The Classification Manager, the Staffing Manager, and members of their teams have developed a plan to track time spent in intake for the purpose of transfer between and within the Department's facilities. This plan relies upon two existing tools and the addition of specific staffing, supervision, procedural and quality assurance components, as outlined below.

One of the two existing tools is the Department's legacy Inmate Tracking System ("ITS"), which has the proper file structure for tracking time spent in intake, though it has yet to be used reliably for this purpose.[17] The second legacy tool is the incarcerated individuals' "accompanying card" which will be used to reliably establish the individual's identity and the times at which various events occur.[18] The accompanying card is generated during New Admission Intake and is maintained in each facility's General Office (which is generally proximate to the intake area in each facility). The card includes a photograph of the individual and a unique barcode for each person, among other things. Upon an individual's entry to intake, the accompanying card will be obtained and provided to the Intake Officer who will scan it to ITS to indicate the individual has entered intake. Once the individual has entered intake, data is entered to note the reason the individual is in intake and the time of departure. This data will

---

[17] A review of the ITS by the Classification Manager determined that the system can function for this purpose "as-is" and that additional modifications to the system are not necessary. At this juncture, this determination appears reasonable in light of the Monitoring Team's review of ITS.

[18] The Department previously used RFID bracelets for this purpose but found them to be unreliable because people in custody would sometimes destroy their bracelet or swap them with other individuals. Utilizing the accompanying card, which remains in the Department's possession at all times, should be less susceptible to such problems.

show the number of people who enter/exit and the length of stay for each individual entering

intake (*i.e.*, time of entry and time of departure) and the reason they were in the intake unit.

The Department reports that by March 15, 2023, specific staffing, supervision, training

and procedural components for tracking transfers between and within facilities and the use of the

respective intake areas will occur as outlined below. The Department began piloting the use of

ITS at RNDC, beginning in January 2023.

*Staffing and Supervision*

- Specific staff will be assigned to each facility's intake area in order to ensure that only the staff who are trained in the relevant intake procedures are made responsible for these tasks.
- At each facility, specially trained Intake Captains will be responsible for directly supervising intake processing, conditions in the intake areas, and staff's data entry into ITS. A trained Intake Captain will be assigned to each facility's intake area during all tours.
- Intake Captains will be supervised by the on-duty Tour Commander (an Assistant Deputy Warden, or DW) who will also be trained in the required procedures so that they can properly guide and advise the Intake Captain.

*Training*

- All staff with responsibilities for intake processing related to transfers between and within facilities will be trained on the relevant procedures for processing and tracking individuals throughout the intake process. This includes intake staff, Intake Captains, and Facility leadership.

*Procedures*

- All persons in custody entering or exiting a facility's intake area for the purpose of transfer to a new facility or to a new housing unit or other location within the facility will be subject to the tracking procedure.
- Upon an individual's entry to intake for one of the reasons listed above, intake staff will procure the accompanying card from the General Office. Using a computer in the intake area, staff will then scan the card to open the person's profile in ITS, will then manually enter the time of arrival and then select the reason the individual was brought to intake from a drop-down menu. When the person exits intake to their assigned housing unit, intake staff will again scan the accompanying card and will manually enter the time of departure in ITS.

*Quality Assurance*

- The Department is developing a new daily report from ITS data that will allow senior facility leadership staff and others to better monitor the process. The daily report will be provided to each facility's Associate Commissioner, Warden and Deputy Warden.

- Staff assigned to the Classification Manager will be responsible for conducting regular audits of the intake/transfer procedures, using a standardized audit format that the Department is in the process of creating. Each facility is assigned to an Associate Commissioner who will be responsible for assessing compliance with required procedures and providing guidance and/or discipline for staff who fail to follow them.

- NCU's Inter/Intra Facility Transfer audits (discussed above) will be updated to include an assessment of the accuracy of data entry once the tracking process begins.

The Monitoring Team finds this plan to be reasonable. Standardized procedures for tracking an individual's entry and exit from a facility's intake when they are being transferred between and within facilities will create an important foundation for assessing the efficiency of intake units and ensuring that individuals do not languish. By only permitting specially trained staff to work in intake, the accuracy and reliability of the data should be safeguarded. Finally, multiple levels of supervision by those who are also specially trained should ensure appropriate guidance, direction and accountability to ensure that the required procedures are followed. At this juncture, the Monitoring Team does not have any further recommendations for additional steps the Department should take to address the requirements of the Second Remedial Order or the Action Plan pertaining to tracking inter/intra facility transfers.

The discussion in the new admissions intake section of this report regarding NCU's audit methodology, sampling frame, cadence and efforts to ensure the accuracy of data that is manually entered are equally relevant here. First and foremost, the audit strategy must be prudent and should provide sufficient time between audits so that solutions to identified problems can be implemented before another audit is conducted. While NCU already has an audit methodology in place to evaluate a sample of individuals in the intake to determine the length of stay, as with all

quality assurance efforts, the precise auditing strategy to assess the reliability of data entry will need to be tested to ensure it is capable of identifying areas in need of attention, and various options may need to be evaluated. Finally, conclusions about the integrity of tracking the use of intake via the ITS platform should be made only after a sufficient number of audits have accumulated. The discussion in the new admissions intake section regarding NCU's collaboration with the Monitoring Team and the Monitoring Team's willingness to share results with the Parties also apply here.

The Department reports that the staff/supervisor assignments, training, daily reports and audit procedures will be implemented by March 15, 2023. While it has taken far too long to get this tracking process in place, it is a reasonable plan. The Monitoring Team's March 31, 2023 report will include a discussion of whether relevant staffing and training objectives were met and may also include initial impressions of the first week of implementation. The Monitoring Team will continue to monitor this area to identify whether key objectives regarding tracking and intake processing efficiency are being achieved.

# CONCLUSION

The Department has made tangible progress in its efforts to properly manage its intake units—uses of force in intake units have decreased, the physical conditions of the units have been improved, more efficient procedures have been implemented to process people who are newly admitted to DOC custody, and facility staff are relying on intake units less often following a use of force. The chaotic environment and inefficient processes that first raised concerns for the Monitoring Team appear to be waning. That said, there is certainly more work to be done. Implementation of the processes needed to accurately track the length of stay among individuals in the Department's intake units has moved frustratingly slow, but tracking procedures are now in place for new admission processing and a reasonable strategy for tracking inter/intra facility transfers is forthcoming in about six weeks. As outlined in this report, the plans for reliably tracking intake-related data are reasonable, but the quality of implementation in both types of intake units remains an open question pending the conclusions flowing from an accumulation of audit results.

The Monitoring Team will continue to scrutinize the Department's practices regarding intake processing and its efforts to create accurate, reliable data regarding length of stay. This work will be balanced with the core focus of the Monitoring Team as discussed in the introduction of this report. The Monitor's March 31, 2023 Report to the Court will include an update on the issues related to intake and the broader issues regarding the *Nunez* Consent Judgment, Remedial Orders and Action Plan.

# APPENDIX A: NEW ADMISSIONS INTAKE PROCEDURES

1. **Enter DOC Custody & Transport to Rikers Island**

   a. The individual is transferred from NYPD to DOC custody at the courthouse and is then transported to Rikers Island

2. **Arrival at Rikers Island**

   a. The individual arrives at the Eric M. Taylor Center on Rikers Island and is brought to an Intake pen.

3. **Initial Intake Processing**

   a. After arrival at Intake, the following processes occur:

      i. The individual is stripped searched and scanned in the Boss chair.

      ii. The individual is provided DOC attire and their property is bagged.

      iii. The individual is fingerprinted and photographed.

      iv. Intake staff review the individual's court paperwork which includes information regarding the individual (*e.g.,* whether they may be high profile, require suicide watch, require protective custody, or may be an escape risk). Staff also complete paperwork, including a PREA questionnaire.

4. **Preparation for Clinic Production**

   a. Upon completion of initial processing, the individual is placed back in an intake pen to await production to the clinic.

5. **Testing Prior to Clinic Production**

   a. The individual is taken from the Intake pen to the clinic window in the corridor to get swabbed for COVID-19 and to conduct a urine analysis (in a bathroom). Upon completion of the swab and urine analysis, the individual waits on a bench in the corridor until their COVID-19 results are ready.

      i. If the individual tests positive for COVID-19, they are placed in a separate area for completion of the intake process.

      ii. If the individual tests negative for COVID-19, then the individual is brought to a medical pen in the clinic.

6. **Medical Assessment**

   a. The individual is moved from the medical pen and brought to a clinical space for a medical screening (*e.g.,* temperature check, blood pressure, heart rate, blood work, etc.) and a mental health screening by CHS staff. As part of this assessment, CHS staff may refer the individual for a mental health evaluation or other services.

7.  **Completion of Medical Assessment**

    a.  Upon completion of the medical and mental health screening, the individual is brought back to the medical pen within the clinic. If the individual does not have any medical referrals, then they are bought back to Intake after the paperwork has been completed by CHS and given to DOC (*see* step 9 below). If the individual has a medical referral, then they remain in the clinic (*see* step 8 below).

8.  **Referrals for Hospital, Urgi-Care or Mental Health Evaluations**

    a.  If the individual is referred for hospital care, the individual is moved for transfer to the hospital.

    b.  If the individual is referred to Urgi-care (a clinic on Rikers island, but not at EMTC), the individual is moved for transfer to Urgi-care.

    c.  If the individual is referred for a mental health evaluation, the individual is moved to a mental health pen in the clinic to await the mental health evaluation.

        i.  When an individual completes their mental evaluation and disposition, they are placed in a back in a mental health pen in the clinic to await a housing assignment.

9.  **Return to Intake**

    a.  Individuals return to an intake pen (if they were not otherwise referred for additional medical care – step 8 above) after the paperwork has been completed by CHS and given to DOC.

10. **Housing Assignment & Supplies**

    a.  Individuals are assigned a housing unit at EMTC (based on space availability) for 10 days as part of standard COVID-19 quarantine process.

    b.  Individuals are provided a mattress, toothbrush, toothpaste, handbook, and green cup before they are transported to their housing unit.

11. **Housed**

    a.  The individual is escorted to their assigned housing unit at EMTC.