Index No.11 Civ. 5845 (LTS)(JCF)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MARK NUNEZ, et al.,

Plaintiffs,

-against-

CITY OF NEW YORK, et al.,

Defendants.

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR CIVIL CONTEMPT

**HON. SYLVIA O. HINDS-RADIX**
*Corporation Counsel of the City of New York*
*Attorney for Defendants*
*100 Church Street*
*New York, N.Y. 10007*

*Of Counsel: Alan Scheiner*
*Tel: (212) 356-2344*
*Matter #: 2012-025069*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................ ii

PRELIMINARY STATEMENT ................................................................... 1

STATEMENT OF FACTS ........................................................................ 3

      I.      The Second Remedial Order ...................................................... 3

      II.     Adoption of the June 14, 2022 Action Plan ............................... 4

      III.    Plaintiffs' Continued Efforts to Pursue Contempt ..................... 6

      IV.    Department Efforts Following the Action Plan .......................... 7

ARGUMENT

               PLAINTIFFS FAIL TO MEET THEIR BURDEN OF PROVING THAT EACH ELEMENT OF CONTEMPT HAS BEEN MET .................................................. 11

         A.   The Remedial Order and June Action Plan, As Construed by Plaintiffs, are not Clear and Unambiguous. ....................................................... 12

         B.   Plaintiffs Fail to Demonstrate by Clear and Convincing Evidence that Defendants are not in Compliance with the Intake Clause and the Action Plan. ..................................................... 13

         C.   The Record Shows the Department's Reasonable Diligence in Attempting to Comply with the June Action Plan and the Intake Clause of the Second Remedial Order .......................... 19

         D.   Even if Civil Contempt Were Appropriate in this Case, the Remedies Requested by Plaintiffs are Inappropriate. .................................................. 21

CONCLUSION ...................................................................................... 23

## **TABLE OF AUTHORITIES**

<u>**Cases**</u>                                                                                                                <u>**Pages**</u>

*Aspira of New York, Inc. v. Bd. of Educ. of the City of New York*,
  423 F. Su647 (S.D.N.Y. 1976)...........................................................................19

*Cal. Artificial Stone Paving Co. v. Molitor*,
  113 U.S. 609 (1885)...........................................................................................11

*Chao v. Gotham Registry, Inc.*,
  514 F.3d 280 (2d Cir. 2008)..............................................................................19

*Dunn v. N.Y.S. Dept. of Labor*,
  47 F.3d 485 (2d Cir. 1995)................................................................................19

*Int'l Longshoremen's Ass'n v. Phila. Marine Trade Ass'n*,
  389 U.S. 64 (1967).............................................................................................11

*Juan F. By & Through Lynch v. Weicker*,
  37 F.3d 874 (2d Cir. 1994)................................................................................19

*King v. Allied Vision, Ltd.*,
  65 F.3d 1051 (2d Cir. 1995)....................................................................1, 11, 12

*Latino Officers Ass'n City of N.Y. Inc. v. City of New York*,
  558 F.3d 159 (2d Cir. 2009)..............................................................................11

*Latino Officers Ass'n of the City of New York v. City of New York*,
  519 F. Supp. 2d 438, 446 (S.D.N.Y. 2007)...................................................19, 20

*Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc.*,
  369 F.3d 645 (2d Cir. 2004)..............................................................................11

*Perez v. Danbury Hosp.*,
  347 F.3d 419 (2d Cir. 2003)..............................................................................12

*United States v. United Mine Workers of Am.*,
  330 U.S. 258 (1947)...........................................................................................21

*Yurman Studio, Inc. v. Castaneda*,
  2009 U.S. Dist. LEXIS 13870 (S.D.N.Y. Feb. 23, 2009)...................................19

*Zino Davidoff SA v. CVS Corp.*,
  2008 U.S. Dist. LEXIS 36548 (S.D.N.Y. Apr. 17, 2008)................................19, 20

## PRELIMINARY STATEMENT

Defendants City of New York (the "City") and the New York City Department of Correction (the "Department")[1] respectfully submit this Memorandum of Law in opposition to Plaintiffs' Motion for Contempt[2] for alleged violations of the Second Remedial Order, September 29, 2021 (DE 398), ¶ 1(i)(c)[3] and the City's Action Plan, so ordered by the Court on June 14, 2022 (DE 465), ¶ 3(a). As set forth below, Plaintiffs' motion is without merit because Plaintiffs have failed to meet their burden of proving civil contempt. Most significantly, Plaintiffs have failed to show (i) that there is clear and convincing evidence that Defendants violated a court order; and (ii) that Defendants did not make reasonably diligent efforts to comply with the order. *See King v. Allied Vision, Ltd.*, 65 F.3d 1051, 1058 (2d Cir. 1995).

Civil contempt is a forward looking remedy, and it is concerned with correcting an ongoing violation of a court order, not the punishment of past violations. Yet Plaintiffs' focus on irrelevant past events pre-dating the Action Plan because the current state of affairs demonstrates that the Department is complying with the Intake Clause, and certainly does not support a conclusion that there is 'clear and convincing' evidence of a violation. As set forth at length in this Memorandum, the Department and the City are in substantial compliance with the Intake Clause.

Even if the Court were to find clear and convincing evidence of current non-compliance— and it should not—there is undisputed evidence of the Department's strenuous efforts to comply

---

[1] For brevity, the defendants may be referred to herein as the "Defendants," the "Department," or the "City," depending on context.

[2] Plaintiffs' Memorandum of Law in Support of their Motion for Contempt (DE 500) is referred to herein as "Contempt Mem." As used in this Memorandum of Law, For the purposes of this motion "Plaintiffs" does not include the United States, as they have not joined the motion for contempt as of this writing.

[3] The Second Remedial Order, ¶ 1(i)(c) is referred to herein, for brevity, as the "Intake Clause." The Action Plan, ¶ 3(a), referring to compliance with the Intake Clause, is referred to herein, for brevity as the "Action Plan." *See infra* at __ for the text of these provisions.

with the Intake Clause, and its commitment of extensive resources and attention to that effort.[4] That work has resulted in sweeping improvements to the Intake process, as well as material reductions in the time that individuals spend in Intake and the number of use of force incidents occurring while they are there. The Department's work, including the sustained attention of several high-level officials, shows why Plaintiffs cannot prove the required lack of reasonable diligence.

Moreover, even if the Court finds the City to be in non-compliance, the proposed remedies would serve merely to elevate Plaintiffs' counsel to the position of a second Monitor, and would not advance the goals of the Intake Clause or the Action Plan. Plaintiffs' counsel have not even attempted to show that the Monitoring Team is failing to perform its role under the Consent Judgment. Nor could there be any credible contention that Plaintiffs' counsel has been deprived access to information, either from the Monitor as the Consent Judgment provides (DE 249, ¶ XX.10 at 54), or from the City during the meet and confer process.

Nor would a finding of contempt or Plaintiffs' proposed remedies advance the core purpose of the Consent Judgment (DE 249 at 1-2) and the Second Remedial Order (DE 398 at 1), which is to protect individuals from violence and unnecessary force. As the Monitor notes, the Parties should ensure "that these core issues remain at the forefront of the work that must be done to reduce the imminent risk of harm faced by people in the Department's custody. . . . [S]uch focus will require difficult decisions and inevitably means that certain issues and problems must be prioritized over others." Monitor Report (Feb. 3, 2023) at 5. The Plaintiffs' Motion is a distraction and a burden detracting from that core mission of safety for incarcerated individuals, which the Monitor's Report of

---

[4] *See generally* Special Report on Intake by the *Nunez* Independent Monitor, February 3, 2023 (DE 504) (the "Monitor Report (Feb. 3, 2023),") as well as the Declaration of Christopher Miller, the Department's Deputy Commissioner for Classification, Custody Management and Facility Operations ("Miller Declaration").

February 3, 2023 demonstrates the Department is avidly pursuing in cooperation with the Monitor. Adopting the Plaintiffs' proposed remedies would only hinder that work.

Accordingly, the Court should deny Plaintiffs' motion for contempt.

## STATEMENT OF FACTS[5]

## I.   **The Second Remedial Order**

Pursuant to this Court's September 25, 2021 order, the City and Department continued to work diligently with Plaintiffs and the Monitoring Team to reach agreement on a proposed second remedial order, which was adopted by the Court on September 29, 2021. *See* Monitor Letter Motion, DE 395, at 1; Second Remedial Order, DE 398. The Second Remedial Order stated in relevant part:

> Process all incarcerated individuals, including but not limited to new admissions and intra-facility transfers, through Intake and place them in an assigned housing unit within 24 hours. The Department shall provide the necessary Intake staff and space to satisfy this requirement. By November 15, 2021, the Department shall develop and implement a reliable system to track and record the amount of time any incarcerated individual is held in Intake and any instance when an individual remains in Intake for more than 24 hours.

*Id.* at 3, ¶ 1(i)(c).

In subsequent months, the Department worked with the Monitoring Team to overhaul the intake process in accord with the mandates of the Second Remedial Order. Those efforts included: re-opening the intake at the Eric M. Taylor Center ("EMTC") to manage all new male admissions;[6] tracking new admissions via a computer program called the New Admissions Dashboard (the

---

[5] The City does not respond piecemeal to the rendition of facts in Plaintiffs' motion for contempt because much of it is not relevant to the issue before the Court. The failure to dispute any assertion by Plaintiffs is not an admission.

[6] As the Monitor noted during the conference held on December 2, 2021, "[t]his move almost immediately ameliorated the dire conditions" that had been present in previous intake facilities. Transcript of Proceedings (Conference of Dec. 2, 2021), DE 433, at 8.

"Dashboard"); working with IT to provide additional training on the data entry process for the Dashboard; tracking incarcerated individuals brought to intake who are not new admissions with a system called the Inmate Tracking System ("ITS"); consulting with the Monitoring Team to improve the ITS; and reducing redundancies in the work between the Department's Video Monitoring Unit ("VMU") and the Compliance and Safety Center ("CASC") to improve oversight. City Status Report (Oct. 14, 2021), DE 404, at 3, 6; Monitor Status Report (Nov. 17, 2021), DE 420, at 1-4; Monitor Status Report (Dec. 1, 2021), DE 429, at 2-4. Despite ongoing concerns, the Monitoring Team acknowledged the Department's efforts to address issues identified by the Monitoring Team in the months following the Second Remedial Order. Monitor Status Report (Nov. 17, 2021), 420, at 1-2; Monitor Status Report (Dec. 1, 2021), DE 429, at 2. These efforts took place against the backdrop of the ongoing COVID-19 pandemic, which further contributed to the Department's ongoing staffing difficulties. Monitor Report (Dec. 6, 2021), DE 431, at 5-6.

## II.     Adoption of the June 14, 2022 Action Plan

In light of several reports by the Monitoring Team at the end of 2021 and over the first half of 2022—and calls from the U.S. Attorney's Office and Class Counsel for the City to translate the Second Remedial Order's requirements into a specific implementation plan—Department staff and the City's attorneys began working with the Monitoring Team to develop such a plan. Letter from AUSA Jeffrey K. Powell, DE 444; Monitor Status Report (Apr. 20, 2022), DE 445, at 8-9; Letter from Kimberly M. Joyce, DE 450, at 2. Over the following months, the Department and City continued revising its plan with the Monitoring Team, incorporating input from Class Counsel and the U.S. Attorney's Office. Monitor Status Report (June 10, 2022), DE 462, at 1; Letter from Kimberly M. Joyce, DE 463, at 1. The Monitoring Team worked "extensively with all Parties, convening multiple meetings and phone calls," and received "a considerable number of substantive comments" from Class Counsel and the U.S. Attorney's Office. Monitor Status Report (June 10,

2022), DE 462, at 1. The final result was the Action Plan, which the Court ultimately adopted with minor modifications on June 14, 2022. Order: Action Plan, DE 465. The Intake Clause in the Second Remedial Order was repeated in the Action Plan:

> *Processing Incarcerated Individuals Through Intake Within 24 Hours*: The Department shall implement the requirements of ¶ 1(i)(c) of the Second Remedial Order.

Order: Action Plan, DE 465, at 20.

Plaintiffs neither objected nor consented to entry of the Action Plan as a court order. Monitor Status Report (June 10, 2022), DE 462, at 4; Letter from Mary Lynne Werlwas, DE 464. But Plaintiffs sought leave to move for contempt, citing the City's alleged "continuing failure to comply with the Consent Judgment and remedial orders," and contending that "the Action Plan will not cure the unconstitutional and unsafe conditions" in City jails. Letter from Mary Lynne Werlwas, DE 464, at 4. In particular, Plaintiffs' chief complaints with the Action Plan centered around external warden hiring, lack of sufficient staffing, and staff discipline issues.[7] *See generally id.* Plaintiffs did not explicitly note timely intake processing as an area of concern at that time. *Id.*

In its Order adopting the Action Plan, the Court scheduled a conference on November 17, 2022, in order to allow the Department time to implement the Action Plan, and to determine then whether adoption of a briefing schedule for a motion for contempt was warranted. Order (June 14, 2022), DE 466, at 2. In particular, the Court noted that the November 2022 conference would look to whether the City and Department had made sufficient "progress in achieving the meaningful reform set forth in the action plan, including in meeting *the plan's deadlines* for compliance." *Id.* (emphasis added).

---

[7] At least some of these issues were later addressed in the Court's Order of December 6, 2022. Order on Facility Supervisors, DE 492.

The purpose of the Action Plan was to set a roadmap of concrete goals and benchmarks that the Department would pursue in order to address issues raised by the Monitor, Class Counsel, and Counsel for SDNY. Monitor Status Report (June 10, 2022), DE 462, at 2. The compliance date of November 15, 2021 in the Second Remedial Order had passed at the time of Action Plan's adoption. Accordingly, the Action Plan embodied the notion that substantial compliance had not been met, but that the City would be making immediate efforts towards remedying the issue pursuant to the Action Plan. *Id.* at 3. The Action Plan did not, however, set a new deadline for completion of its steps.

III.    <u>**Plaintiffs' Continued Efforts to Pursue Contempt**[8]</u>

Plaintiffs did not expressly raise the issue of intake overstays with the Court as grounds for contempt until November 14, 2022, ahead of the proceedings on November 17, 2022. *See* Letter from Kayla Simpson, DE 477; Exhibit A at 4. At that point, the City had engaged with Class Counsel regarding various areas of alleged noncompliance on October 20, 2022, November 3, 2022, and in writing following a notification of alleged noncompliance with the Consent Judgment and Second Remedial Order, including the Second Remedial Order's Intake Clause. *See* Exhibit B at 1, 6; *see also generally* Exhibit C. That notification was sent on August 26, 2022 pursuant to paragraph XXI(2) of the Consent Judgment, while further action on Plaintiffs' proposed contempt motion was suspended until the Monitor and the Court could adequately gauge compliance with the Action Plan. *See* Exhibit D.

Pursuant to the Court's instructions at the November 17, 2022 conference, the Parties subsequently met and conferred again on December 1, 2022, and in writing. *See generally* Exhibit E. The City and Plaintiffs submitted their positions in a joint letter on December 9, 2022. Letter

_____

[8] Irrelevant portions of Exhibits B and E, cited in this Section, have been redacted.

from Mary Lynne Werlwas, DE 493. During the December 1, 2022 meet and confer, the City informed Class Counsel that the Department was in the process of establishing a revised tracking system for new admissions, with a target implementation date of early January 2023, and that training for that system was already underway. The City also offered to bring Class Counsel in for a tour of EMTC, which took place on December 16, 2022. *See* Exhibit E, at 8, 12, 15. During further meet and confers on January 11, 2023, and January 19, 2023, the City provided additional details about the New Admissions Tracking System, which went live on January 5, 2023. *See id.* at 1, 5. The City also informed Class Counsel that the Department was in the process of revising the ITS to reliably track intra-facility transfers, with a target date for implementation of March 15, 2023 at the latest. The City had made Class Counsel aware the Department's review of the ITS for this purpose via writing on December 8, 2022. *See id.* at 14.

## IV.   <u>Department Efforts Following the Action Plan</u>

As detailed at length in the accompanying Declaration of Christopher Miller, and confirmed by the Monitor's Report of February 3, 2023 (DE 504), the Department has taken meaningful and significant steps to meet its obligation under the Action Plan to comply with the Second Remedial Order, ¶ 1(i)(c).

The current new admission intake process proceeds as follows: (1) An individual enters Department custody at the courthouse and then is transported to EMTC Intake; (2) The individual is searched, fingerprinted, photographed, and issued a uniform; (3) Intake staff review the individual's court paperwork and complete required forms, such as the Prison Rape Elimination Act ("PREA") form; (4) The individual is tested for COVID-19 and undergoes a urine analysis;[9] (5) The individual is seen by clinic staff, where both a medical and a mental health screening is

---

[9] If an individual tests positive for COVID-19, the individual is placed in dedicated housing.

completed;[10] and (6) Following any necessary medical or mental health care, the individual is assigned to a housing unit in EMTC. *See* Miller Dec. ¶ A.2.

In October 2022, the Department began revising the Dashboard to track this new admission intake process. Miller Dec. ¶ A.8. Changes to the Dashboard directly addressed concerns expressed in the Monitor's October 28, 2022 report that data entered into the previous Dashboard were "unreliable and unusable."[11] Monitor Status Report (Oct. 28, 2022), DE 472, at 89-90. The revisions included: a prompt to confirm the accuracy of the custody time, so as to avoid entry errors; a method to record when an individual is ready to be seen by clinic staff ("Ready for Clinic"); and changes to the recording of other entry prompts to increase clarity for those entering and reviewing the data. *Id.* at 4-5.

The new Dashboard has been fully operational since January 5, 2023, and generates daily reports, identifying when an individual is not housed within the 24-hour timeframe, if applicable. Miller Dec. ¶ A.8. In addition, the Nunez Compliance Unit ("NCU") is conducting routine audits of the Dashboard and provides the results of those audits to the Monitor. *Id.* In its most recent report, the Monitoring Team found that the new Dashboard features and procedures, "fortified by reasonable quality assurance audits, appear capable of producing valid data that can eventually be relied upon for conclusions about the speed of intake processing." Monitor Report (Feb. 3, 2023) at 16. The Monitor further concluded that "the routine availability of data and reporting to supervisors

---

[10] Following the mental health screening, Correctional Health Services ("CHS") staff may refer the individual for a mental health evaluation or other services.

[11] Although the tracking data was not deemed reliable at the time of the October 28, 2022 report, the Monitor noted that the Team had not "identified a pattern of extreme lengths of stay in the EMTC intake." There had, however, been a few isolated cases of overstays. Monitor Status Report (Oct. 28, 2022), DE 472, at 89-90.

along with NCU's audits create close-in-time accountability measures that should emphasize the importance of accuracy and discourage manipulation." *Id.* at 27.

Faster processing and heightened security during the intake process have also been achieved through the following changes: increased and steady staffing; the designation of intake as a "priority" post, which <u>must</u> be filled before other, non-priority posts are assigned; the opening of an additional mental health housing unit in EMTC; and an additional vehicle being assigned to EMTC to better facilitate any necessary movement between facilities. *See* Miller Dec. ¶ A.8. As a result of these reforms and improved tracking, NCU audits for the first two weeks of January found that 94% of the individuals who arrived in EMTC Intake were processed and transferred to a housing unit within the 24-hour timeline. Monitor Report (Feb. 3, 2023) at 23-24. While more time will be needed to demonstrate the continued reliability of the Dashboard, the Monitor has found that overages are already less frequent than previous reports.[12] *Id.* at 3.

In addition, conditions at EMTC as a whole have improved: the intake area is clean, with functional facilities, and significantly less crowding. Miller Dec. ¶ A.13. The Department continues to ensure that individuals in EMTC are served the same meals as those provided in the general population during designated facility-wide mealtimes. *Id.* The Monitoring Team detailed a full list of these ongoing reforms to new admission intake on pages 17 through 20 of its February

---

[12] The "24 Hours" as measured by the Dashboard is subject to certain "clock stoppages" to which Plaintiffs have objected, but which are not the subject of Plaintiffs' motion. *See* Plf. Mem., DE 500, at 8 n. 1; Monitor Report (Feb. 3, 2023) at 21-22. As the Monitor's Report indicates, these "clock stoppages" occur when the individual is removed from the Intake facility or does not cooperate with intake requirements, which are matters beyond the control of the Department. Monitor Report (Feb. 3, 2023) at 21; Miller Dec. ¶ A.6. In addition, as the Monitor noted, the Dashboard begins the 24 hours earlier than is required by the intent of the Remedial Order, because it begins when the court issues a securing order and the individual is still at the courthouse. *Id.* at 20-21; Miller Dec. ¶ A.3. Therefore, a 24 hour overage on the Dashboard does not necessarily imply 24 hours at the Intake facility.

3, 2023 report, concluding that "[a]t this juncture, the Monitoring Team does not have any further recommendations or additional steps the Department should take to address the requirements of the Second Remedial Order or the Action Plan pertaining to new admission intake processing." Monitor Report (Feb. 3, 2023), at 17-20, 27.

A revised system for tracking inter/intra-facility transfers has also been developed, which will be recorded in the existing ITS. Miller Dec. ¶ B.4; s*ee infra* at 18. The Department is on-track to have this revised tracking system fully operational by the end of February, ahead of the March 15, 2023 target that was cited by the City in their January 10, 2023 update to the Court. Miller Dec. ¶ B.4; City Status Report, DE 495, at 4. The Monitor has found this plan, detailed at length in the Monitoring Team's February 3, 2023 report, to be "reasonable" and concluded that "[a]t this juncture, the Monitoring Team does not have any further recommendations for additional steps the Department should take to address the requirements of the Second Remedial Order or the Action Plan pertaining to tracking inter/intra facility transfers." Monitor Report (Feb. 3, 2023) at 33-37.

The Monitoring Team credited the sum of the Department's efforts in its October 28, 2022 report, stating that: "[The Department] clearly understand[s] their obligations and have produced impressive problem analyses that lead to reasonable solutions . . . ." Monitor Status Report (Oct. 28, 2022), DE 472, at 10-11. In its February 3, 2023 report, the Monitor noted that "the Department has maintained the progress" described in the October 28, 2022 report, stating that "[m]ost of the time, intake units were observed to be less chaotic, less frequently overcrowded, and more sanitary than the conditions observed between summer 2021 and early 2022." Monitor Report (Feb. 3, 2023), at 4-5. The Monitoring Team highlighted the Department's efforts to improve tracking as an area in which "progress was most evident," where "a revamped tracking process was recently

implemented, and a plan for improving practice and tracking the length of stay for inter/intra-facility transfers has now been established." Monitor Report (Feb. 3, 2023) at 4.

Overall, the Monitoring Team concluded that the Department's efforts to improve issues related to intake, which Department leaders "at the highest levels have made . . . a priority," have resulted in there being "no question that the environments in the intake units have improved and are not in the same deplorable condition that gave rise to the requirements of the First and Second Remedial Orders (and which were subsequently reiterated in the Action Plan)." Monitor Report (Feb. 3, 2023) at 6.[13]

## ARGUMENT

### PLAINTIFFS FAIL TO MEET THEIR BURDEN OF PROVING THAT EACH ELEMENT OF CONTEMPT HAS BEEN MET

A contempt order is a "potent weapon" that is inappropriate if "there is a fair ground of doubt as to the wrongfulness of the defendant's conduct." *Latino Officers Ass'n City of N.Y. Inc. v. City of New York*, 558 F.3d 159, 164 (2d Cir. 2009) (quoting *Int'l Longshoremen's Ass'n v. Phila. Marine Trade Ass'n*, 389 U.S. 64, 76 (1967); *Cal. Artificial Stone Paving Co. v. Molitor*, 113 U.S. 609, 618 (1885)). The elements of civil contempt in the Second Circuit require that: "(1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner." *Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 655 (2d Cir. 2004) (quoting *King v. Allied Vision, Ltd.*, 65 F.3d 1051, 1058 (2d Cir. 1995)). The moving party bears the burden of proof as to each element,

---

[13] *See also* Monitor Report (Feb. 3, 2023) at 13 (emphasis added) ("The conditions in intake units at EMTC, *especially since July 2022*, are an improvement over those observed at OBCC which gave rise to the intake requirements in the Second Remedial Oder.").

including the burden to "establish[] by *clear and convincing evidence* that the alleged contemnor violated the district court's edict." *King*, 65 F.3d at 1058 (emphasis added). Plaintiffs have clearly failed to meet their burden.

**A.    The Remedial Order and June Action Plan, As Construed by Plaintiffs, are not Clear and Unambiguous**

"The language of a consent decree must dictate what a party is to do and what it must refrain from doing." *Perez v. Danbury Hosp.*, 347 F.3d 419, 424 (2d Cir. 2003). A court must measure the conduct in question against the language of the relevant order, and such language must be "unambiguous" and "leave no uncertainty in the minds of those to whom it is addressed." *Perez*, 347 F.3d at 424.

Plaintiffs' argument relies on a purported ambiguity in the Intake Clause, by contending that the Department's so called "clock stoppages" are improper and show that the Department's tracking system is unreliable. Contempt Mem. at 8 n. 1. The Department disagrees, because these clock stoppages account for time when individuals are outside of the Intake area, or for whom processing is otherwise impossible (*i.e.*, individuals refuse to cooperate), for reasons not under the control of the Department. *See* Monitor Report (Feb. 3, 2023) at 17-19; Miller Dec. ¶¶ A.5-A.6. As the Monitor notes, the concerns underlying the Intake Clause "were exclusively focused on the time in which an individual was present in an intake unit." Monitor Report (Feb. 3, 2023) at 19 n. 10. The text of the Intake Clause reflects this, requiring tracking of the time that the individual "is *held in Intake* and any instance when an individual *remains in Intake*" over 24 hours. Intake Clause (emphasis added). Plaintiffs' argument about clock stoppages therefore necessarily relies, at least in part, on a purported ambiguity in these provisions.

In addition, for historical reasons unrelated to *Nunez*, the Department starts the "Intake" clock at the time that a securing order is issued at the courthouse, several hours before the

individual enters the Intake area. Miller Dec. ¶ A.3. The Monitor, on the other hand, assesses compliance with the 24-hour rule beginning when the individual enters the Intake area. Monitor Report (Feb. 3, 2023) at 21. This creates further ambiguity about whether the purported overstays alleged by Plaintiffs are actual overstays in the Intake area.

As Plaintiffs concede, and Defendants agree, the Court need not decide the issues of clock stoppage to resolve the Motion. Contempt Mem., DE 500, at 8 n. 1. But Plaintiffs' own argument on that issue shows why the Intake Clause is, in part, not clear and unambiguous, at least as read by Plaintiffs.

**B.      Plaintiffs Fail to Demonstrate by Clear and Convincing Evidence that Defendants are not in Compliance with the Intake Clause and the Action Plan**

As set forth above, Plaintiffs must demonstrate by "clear and convincing" proof that Defendants are not currently in compliance with the Intake Clauses. *Supra* at _. In this they have failed.

Plaintiffs' purported basis for contempt is the alleged failure of the Department to implement a reliable tracking system for the time spent in Intake. Contempt Mem., DE 500, at 12. Thus, most of the facts recited by Plaintiffs are irrelevant to their own theory of contempt, especially because they relate to the past not the present, and, crucially, pre-date the Action Plan of June 14, 2022.

For example, Plaintiffs rely, in part, on allegations from years past about "inhumane and deplorable" (Contempt Motion at 8) conditions in the Intake area. *See* Contempt Motion, DE 500, at 3, 8. Of course, the Department is committed to – and has implemented – humane, safe, secure and sanitary conditions in the Intake unit (Miller Dec. ¶ A.13) and, indeed, the Monitor has noted the significant improvements in those conditions. Monitor Report (Feb. 3, 2023) at 4-5, 13. But conditions in general are not a subject of the Intake Clause, or of the Consent Judgment, except

13

for the condition of risks of violence and the excessive use of force. Plaintiffs' resort to stale allegations about conditions, irrelevant to the present motion, only highlight the weakness of their argument when it comes to the actually relevant, current events.

As the Monitor notes, the Department has committed numerous high-level personnel to the work of compliance with the Intake Clause. "The Classification Manager, the Associate Commissioners of Facility Operations, the First Deputy Commissioner, the Department's General Counsel, and the Deputy Commissioner of Administration, and many others have been actively engaged in the process of improving the management and processing of people through new admission intake." Monitor Report (Feb. 3, 2023) at 17. The Monitor's Report also notes the "tireless[]" efforts of NCU in pursuit of this mission:

> The new Assistant Commissioner of NCU (appointed at the end of summer 2022) has demonstrated the same strong command and understanding of the issues in this case as her predecessor. She and her team have worked tirelessly and efficiently to immediately begin the work related to assessing the data on new admissions intake processing. She has worked collaboratively and efficiently to address feedback from the Monitoring Team.

Monitor Report (Feb. 3, 2023) at 25 n. 12.

As a result of its compliance work, the Department achieved, *inter alia*, the following,:

- The New Admission Dashboard used to track individuals through the Intake process has been updated and has been in full operation since January 5, 2023. Changes to the Dashboard include: (i) a new prompt for the data entry person to confirm the accuracy of the custody time, so as to avoid entry errors; (ii) a new method for recording the time individuals are "Ready for Clinic" (i.e. when they have completed fingerprinting, been searched, and received clothing); and (iii) changes to the names of certain entry prompts to increase clarity for those entering and reviewing the data. Additionally, the Dashboard now turns yellow when 18 hours have elapsed (netting out stoppages) so that the Department can prioritize those individuals for processing; previously the dashboard indicated when 20 hours had elapsed.

- The Dashboard can now identify basic input errors and identify who entered misinformation into the system. This allows the Department to spot errors and retrain staff.

- Daily reports are now generated from the Dashboard that provide information about

the Intake process, including data about any individual not housed within 24-hours and the reasons for clock stoppages.

- Intake staffing has been restructured so that: (i) a steady Assistant Deputy Warden and Captain are assigned to each tour to supervise the EMTC intake process; (ii) steady staffing has been provided so that six intake posts are filled during all tours; and (iii) 28 steady MMR officers[14] have received training on using the Dashboard, and 11 other officers have received retraining.

- An additional mental health housing unit has been opened in EMTC to expedite the housing of new admissions who require such housing. The new unit will reduce the need to move individuals to other facilities and thereby expedite the intake process.

- An additional vehicle has been assigned to EMTC to facilitate movement of individuals between facilities if required during the intake process.

- Construction has been completed to help expedite the intake process and enable better monitoring of the intake holding areas.

- Individuals being transported to court have been removed from the intake area to the gymnasium to reduce disruptions in the intake process. In January 2023, NCU began auditing the intake process and will continue to do so on a regular basis to ensure that data is being entered accurately and the 24-hour requirement is being met.

Miller Dec. ¶ A.8. The Monitor has reported on these and other substantial improvements. Monitor Report (Feb. 3, 2023) at 17-18.

The results of the new tracking system showed that the number of individuals who "overstayed" in Intake were exceedingly low. Of 1,275 new admittees who were housed from January 5 to 31, 2023, only 13 – one percent – were in Intake more than 24 hours (after accounting for clock stoppages). [15]  Miller Dec. ¶ A.9.  Of those, one ran over by only 4 minutes and another

---

[14] "MMR officers" refers to Medically Monitored Returned officers who are on modified duty for medical-related reasons.

[15] During January 2023 there were 53 clock stoppages for court appearances, six for hospital visits, four for urgent care visits, and 24 refusals to cooperate. When the clock restarts the returning individual is given priority for further processing. *Id.* Consistent with the Department's long-standing practice, the time in the tracking system runs from the receipt of a custody order at the courthouse, so that the actual time of the individuals in the Intake area is less then indicated in the new tracking system. *Id.* ¶ 3.

by only 17 minutes. *Id.* In January 2023, NCU began auditing the intake process and will continue to do so on a regular basis to ensure that data is being entered accurately and the 24-hour requirement is being met. Miller Dec. ¶¶ A.8, A.11-A.12. NCU conducted two audits of the Dashboard so far and provided its data and results to the Monitoring Team. *Id.* As the Monitor noted, "NCU has a proven track record of conducting valid audits and has a strong collaborative relationship with the Monitoring Team." Monitor Report (Feb. 3, 2023) at 15. The audits provided no reason to believe that the Dashboard is unreliable.

In a sample of 16 new admissions, using review of Genentec video, the audit showed that 94% of the 16 spent less than 24 hours in Intake, Monitor's Report (Feb. 3, 2023) at 23. These results demonstrate that the tracking system is having its intended effect of reducing overstays in Intake to a minimum. As the Monitor notes, the Department will continue auditing the Dashboard and refining its processes. Monitor Report (Feb. 3, 2023) at 24-25; Miller Dec. ¶¶ A.8, A.11-A.12. There is no evidence of attempts to tamper with or manipulate the new Dashboard to conceal non-compliance: apparent time errors appeared equally in both directions, both lengthening and shortening the recorded time in Intake. Monitor Report at 23-24.[16] Moreover, errors are being promptly corrected through the routine audit process that is *part and parcel* of the tracking system as it is being implemented now. *Id.*

As the Monitor notes, the audits, combined with appropriate follow-up, are sufficient to continue to improve the system and ensure its reliability:

> The fact that DOC already has an audit process in place that can identify potential issues with data entry so they can be addressed in real time will help to ensure the reliability of data entry going forward. Over time, successive snapshots of data will contribute to two important findings—(1) whether the tracking system is accurate and

---

[16] Prior errors in data entry are being investigated by the City's Department of Investigation. Monitor Report (Feb. 3, 2023) at 15-16.

> reliable and (2) whether intake processing is efficient such that people do not languish more than 24 hours before being transferred to an appropriate housing unit.

Monitor Report (Feb. 3, 2023) at 24. Indeed, the Monitor concluded that "[a]t this juncture, the Monitoring Team does not have any further recommendations for additional steps the Department should take to address the requirements of the Second Remedial Order or the Action Plan pertaining to new admission intake processing." *Id.* at 27.

The Monitor's Report of February 3, 2023 highlights another reason why Plaintiffs cannot establish that the Dashboard system is unreliable under any standard, let alone the clear and convincing standard. As the Monitor found, "[d]eterminations of 'reliable' or 'unreliable' can only be made *after* the data has been audited over a reasonable period of time. While manual data collection is vulnerable to human error and imprecision, with properly trained staff, well-articulated procedures and proper supervision, the system described above is capable of adequately tracking the speed with which people are processed through new admission intake." Monitor Report (Feb. 3, 2023) at 22. In other words, the current data, no matter how it may be spun by Plaintiffs, is insufficient to meet the clear and convincing standard for proving non-compliance.

Regarding facility transfers, incarcerated individuals being transferred between facilities ("Inter/Intra-Facility Transfers") are placed in intake holding areas in their respective facility. Monitor Report (Feb. 3, 2023) at 34-35. There are common sense reasons why the inter/intra-facility transfers are tracked differently than new admissions, and are not placed in the Dashboard. Individuals transferred between facilities are placed in holding areas within each facility's respective intake, while they await transfer. Thus, unlike new admissions, "intake" during facility transfers occurs in many facilities, and most of the data entered in the Dashboard is inapplicable to inter/intra-facility transfers, since that process does not have the same milestones for processing as new admissions.

As a result of the Department's concrete plans to standard this process, the Department is on track to have a different reliable transfer tracking system in place by March 2023. Monitor Report (Feb. 3, 2023) at 35-37; Miller Dec. ¶ B.4. Specifically, the Department worked in consultation with the Monitoring Team to develop its new plan to track the time spent in inter/intra-facility transfer intake by using its centralized system. Monitor Report (Feb. 3, 2023) at 32-34. The Department will use ITS, with additional training to ensure that data entry into the database is complete and accurate. Miller Dec. ¶ B.4. The Department will also utilize an individual's "accompanying card," to scan the individual into ITS when they arrive at a respective facility's intake.[17] *Id.* The protocol for handling individuals being held during transfer is detailed in the Monitor's Report of February 3, 2023. Monitor Report (Feb. 3, 2023)*.* at 35-36. The Robert N. Davoren Center has already implemented the protocol, and the Department is on schedule to fully implement the changes in all facilities by March 2023. Monitor Report (Feb. 3, 2023) at 35. The Monitoring Team "finds this plan to be reasonable." *Id.* at 36. As with the new admission intake process, "conclusions about the integrity of tracking the use of intake via the ITS platform should be made only after a sufficient number of audits have accumulated." *Id.* at 37.  Moreover, it is important to note that there is no significant issue with overstays during inter/intra facility transfers. NCU conducted audits of facility transfers and found a marked reduction in the time spent in facility intake holding areas, with one-third in January and February 2022 showing more than 24 hours, but 13 percent in August 2022, and 8 percent from October through December 2022. Monitor Report (Feb. 3, 2023) at 31-32.

Accordingly, Plaintiffs have failed to establish by clear and convincing evidence non-compliance with the Intake Clause or the Action Plan.

---

[17] Past efforts to track individuals in the course of inter/intra-facility transfers were stymied by individual's non-cooperation with a wristband tracking system, where wristbands would be transferred or removed. Monitor Report (Feb. 3, 2023) at 34 n. 18.

**C.      The Record Shows the Department's Reasonable Diligence in Attempting to Comply with the June Action Plan and the Intake Clause of the Second Remedial Order**

Even if the Court were to find that Plaintiffs proved a violation of the Intake Clause and Action Plan by clear and convincing evidence, a finding of contempt is not warranted because Plaintiffs cannot prove the absence of reasonable diligence. "In evaluating the purported contemnor's conduct, '[t]he court is not empowered to command, any more than it can pretend for itself to achieve, performance approximating perfection. The court is obliged, however, to require substantial performance and due diligence.'" *Zino Davidoff SA v. CVS Corp.*, 2008 U.S. Dist. LEXIS 36548, at *16-17 (S.D.N.Y. Apr. 17, 2008) (quoting *Aspira of New York, Inc. v. Bd. of Educ. of the City of New York,* 423 F. Supp. 647, 651 (S.D.N.Y. 1976); *see also Dunn v. N.Y.S. Dept. of Labor,* 47 F.3d 485, 490 (2d Cir. 1995) ("The failure to meet the strict requirements of an order does not necessarily subject a party to a holding of contempt . . . .").

"Although the Second Circuit has not been squarely confronted with the question of what constitutes 'reasonable diligence,' it has noted that 'substantial compliance' is the appropriate standard in evaluating noncompliance in a contempt case." *Yurman Studio, Inc. v. Castaneda*, 2009 U.S. Dist. LEXIS 13870, at *2 (S.D.N.Y. Feb. 23, 2009). The "substantial performance" standard looks to whether defendants have "dedicat[ed] significant resources to the problem and its solution" *Latino Officers Ass'n of the City of New York v. City of New York,* 519 F. Supp. 2d 438, 446 (S.D.N.Y. 2007) (finding that defendants had satisfied the "substantial performance" standard (citing *Juan F. By & Through Lynch v. Weicker,* 37 F.3d 874, 879 (2d Cir. 1994) ("[S]ubstantial compliance might become relevant if ever there should be a hearing for contempt based on claimed noncompliance by defendants."))). "Reasonable diligence therefore does not require . . . [the *alleged* violator] to 'exhaust all means available' to them." *Chao v. Gotham Registry, Inc.*, 514 F.3d 280, 293 (2d Cir. 2008). "Reasonable diligence, at the very least, requires

a party to develop reasonably effective methods of compliance." *Zino Davidoff SA v. CVS Corp.*, 2008 U.S. Dist. LEXIS 36548, at *23. The City's substantial investment in time and effort indisputably demonstrates that it has "dedicat[ed] significant resources to the problem and its solution," *Latino Officers Ass'n,* 519 F. Supp. 2d at 446, and has "develop[ed] [a] reasonably effective method[] of compliance." *Zino Davidoff*, 2008 U.S. Dist. LEXIS 36548, at *23.

Moreover, as the Monitor has noted, the Intake Clause is not an end in itself. Its purpose is to reduce the vulnerability of incarcerated individuals to violence and excessive force. Monitor Report (Feb. 3, 2023) at 5, 7 ("The Monitoring Team's highest priority is the core focus of the *Nunez* litigation, the unnecessary and excessive use of force, along with factors that contribute to it . . . .") The Intake system became a focus of concern of the Monitor, and the subject of the Second Remedial Order, only because conditions in Intake were perceived to give rise to an inordinate number of use of force incidents. Monitor Report (Feb. 3, 2023) at 5; *see also* Second Remedial Order, at 1; Contempt Mem. at 4. The Consent Judgment, after all, is not about conditions in Intake or how long people remain there. *See* Consent Judgment, DE 249, at 1.

The Monitor reports that the Department's efforts have led to meaningful reductions in use of force incidents: "[T]he use of force in intake department wide has decreased 65% from August 2021 (190) to December 2022 (67)." Monitor Report (Feb. 3, 2023) at 30; see also Monitor Report (Feb. 3, 2023) at 5. "A significant decrease in the number of uses of force in the new admissions intake area has also been observed—from 83 uses of force in August 2021 (at OBCC) to 17 uses of force (at EMTC) in December 2022 (an 80% decrease)." *Id.* at 5. The January 2023 experience is comparable, with only one use of force incident giving rise to any injury (a small laceration to an elbow). Miller Dec. ¶ A.14. In fact, the percentage of all use of force incidents occurring in intake has gone from a high of 18% in 2021, to 14% in 2022, which is below any share since 2018 onward. Monitor Report (Feb. 3, 2023) at 30. This is powerful evidence of substantial compliance.

**D.      Even if Civil Contempt Were Appropriate in this Case, the Remedies Requested by Plaintiffs are Inappropriate.**

"Judicial sanctions in civil contempt proceedings may, in a proper case, be employed for either or both of two purposes; to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained." *United States v. United Mine Workers of Am.*, 330 U.S. 258, 303 (1947). Plaintiffs fail to explain how any of the remedies that they propose would advance the immediate goals of the Intake Clause or advance the ultimate goal of reducing violence. Rather, the only goal that appears to be served by the requested remedies is to elevate the role of Plaintiffs to an additional Monitor. But Plaintiffs have not even attempted to demonstrate that the Monitor's work is somehow inadequate, of which there is no evidence.

The Department is committed to conducting regular audits of the new admission intake process and will submit the results to the Monitor. As previously noted, two audits have already been conducted and submitted to the Monitor. Miller Dec. ¶ A.11. In addition, the Department is already generating daily reports of the new admission tracking process, which will be provided to the Monitor upon request. *Id.* ¶¶ A.8, C.6; Monitor's Report (Feb. 3, 2023) at 17.

To the extent that Plaintiffs contend, to justify their demanded remedies, that they have had insufficient access to information, Plaintiffs are incorrect. As the Consent Judgment states: "Upon request to the Monitor, Plaintiffs' Counsel shall have access to information and other materials related to the provisions of this Agreement that have been provided to the Monitor. . . provided that the provision of this information will not interfere with the Monitor's ability to effectively Monitor this Agreement." Consent Judgment, DE 249, , at 52, ¶ XX.10. Plaintiffs do not even attempt to show that the Monitor has wrongfully withheld information from them, and the Monitor has and will share such information as needed. Monitor Report (Feb. 3, 2023) at 26 n.13, 37. In addition, Defendants have shared information with Class Counsel over the course of months, as

part of the meet and confer process on a host of issues. *Supra* at 7. There has been no attempt at stonewalling. Giving Plaintiffs direct access to the Dashboard – which the Monitor has not even requested – would add nothing.

Plaintiffs demand that "[b]eginning immediately and continuing until March 15, 2023, the Department shall report to the parties and the court, every two weeks on its progress toward meeting [a] March 15 deadline" for establishing "a reliable tracking system for the amount of time intra-facility transfers spend in intake areas." Contempt Mem., DE 500, at 25. As noted above, a reliable tracking system, on which officers have been trained, should be in place before then. The Department will report to the Monitor periodically on its progress. Miller Dec. ¶ C.4. And the Department will continue its practice of regular audits of ITS and will continue to provide the results of those audits to the Monitor. *Id.* ¶ C.5-C.6. In addition, the Department intends to produce daily reports of intra-facility transfers to demonstrate its compliance with the 24-hour requirement, and will provide that information to the Monitoring team as requested. *Id.* at C.6. The Monitor will continue to share that information with Plaintiffs as needed. Monitor Report (Feb. 3, 2023) at 35.

In any event, if NCU's audits fail to be done or reported, or they show failure to advance compliance, the Monitor can be relied upon to bring it to the Court's attention. The Monitor is, after all, an agent of the Court. Sending reports directly to Plaintiffs; giving them real time access to the Dashboard; or filing audits and reports publicly on a routine basis, only add to the Department's and the City's administrative burdens, and do not advance the core purpose of the *Nunez* Consent Judgment or even the Intake Clause. Implicitly, Plaintiffs desire this information to provide grist for the mill of even more frequent emails or letters alleging purported non-compliance, with the accompanying burden on the City, the Department, the Monitor and the Court to address those complaints. Plaintiffs have not even attempted to show why they cannot perform

their function without the remedies that they demand. In fact, nominating the Plaintiffs as a second Monitor would be a needless distraction from the Parties' shared mission of reducing violence.

## CONCLUSION

For the reasons stated above, the Plaintiffs' motion for contempt should be denied.

Dated:        New York, New York
              February 8, 2023

HON. SYLVIA O. HINDS-RADIX
Corporation Counsel of the City of New York
*Attorney for Defendants*
100 Church Street, Rm. 377
New York, New York 10007
(212) 356-2344

By:   *Alan H. Scheiner* /s/
              Alan H. Scheiner
              *Senior Counsel*