UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x

MARK NUNEZ, et al.,

                                   Plaintiffs,

-against-

CITY OF NEW YORK, et al.,

                                   Defendants.

**DECLARATION OF
CHRISTOPHER MILLER**

11 Civ. 5845 (LTS)(JCF)

------------------------------------------------------------------ x

UNITED STATES OF AMERICA,

                                   Plaintiff-Intervenor,

-against-

CITY OF NEW YORK and NEW YORK CITY
DEPARTMENT OF CORRECTION,

                                   Defendants.

------------------------------------------------------------------ x

**CHRISTOPHER MILLER**, declares pursuant to 28 U.S. Code § 1746 under penalty of perjury that the following is true and correct:

1.     I am the Deputy Commissioner of Classification, Custody Management and Facility Operations with the New York City Department of Correction ("DOC"), a position that I have held since July 25, 2022. Among my responsibilities is oversight of the Intake processes at DOC.

2.     I submit this declaration to set forth the steps that DOC has taken under my leadership to improve the operations of (i) the new admission intake process at the Eric M. Taylor Center

1

("EMTC") and (ii) the intra-facility intake process – i.e., the transfer of incarcerated individuals from one facility on Rikers Island to another or between housing units in the same facility.

A.      New Admissions Intake

1.      Since September 2022, intake for all male incarcerated individuals has taken place at the EMTC. On an average day, approximately 55 individuals are admitted to the facility. The number, however, can be as high as 100.[1]

2.      The intake process involves numerous steps. On arriving at EMTC from a courthouse, the individual is searched, fingerprinted, photographed, and issued DOC clothing. (Personal property is retained until they leave our custody.) Certain required forms are completed, including a Prison Rape Elimination Act ("PREA") form. The next step involves the individual being brought to the clinic in EMTC, where nursing and medical staff conduct medical and mental health screening. Individuals may also be referred for mental health evaluation or other services. From the clinic, the individual is body scanned and transported to a housing unit in EMTC, where they are quarantined for 10 days. (Before entering the clinic, the individual takes a COVID test; anyone who tests positive is placed in dedicated housing.)

3.      It has always been DOC's understanding that an incarcerated individual must be housed within 24 hours of coming into our custody at the courthouse, typically after their arraignment in criminal court. I am told that the 24-hour requirement stems from an Order in Benjamin v. Sieleff, 752 F.Supp 140 (S.D.N.Y. 1990). At the time the Order was entered, individuals were processed through borough-based facilities nearby the courthouses. With the intake process now centralized on Rikers Island, the time for transportation is a factor (on average in January 2023, it was 3.5 hours and can, at times, be double that), but the 24-hour requirement has not been adjusted. When

---

[1] DOC has considered having more than one intake facility but determined that it would be inefficient.

the Second Remedial Order was entered, the Department's policy was to start the clock at the courthouse, but allow for certain stoppages as discussed in paragraph 6 below. Notably, in its Special Report on Intake, the Monitor takes the position that, for purposes of the Nunez case, the 24-hour requirement begins when a newly admitted person reaches EMTC, and not at the courthouse. Rpt. at 8 ("the Monitoring Team will assess the time each person arrives in the intake unit … compared with the time the individual [reaches] their assigned housing unit (emphasis added)). In this declaration, I use as the starting point the time DOC takes custody in the courthouse.

4.  The length of time in Intake is tracked through the New Admissions Tracking System (colloquially called the "Dashboard"), in which the individual's time at the various stages of the process is recorded.

5.  As Plaintiffs note, the Monitoring Team concluded in its October 28, 2022 Report that the tracking data at the time was "unreliable." DOC does not disagree with that assessment. At that time, the 24-hour "clock" was stopped when it should not have been and sometimes not stopped when it should have been.

6.  Currently, DOC stops the 24-hour clock when it is impossible to continue to process an individual for reasons outside our control. DOC currently recognizes four such reasons: (i) the individual is returned to court before completing the intake process;[2] (ii) they are sent to the hospital or urgent care before completing the intake process; (iii) they refuse to participate at any stage in intake processing; or (iv) they make bail and are released before the process is completed. Until recently, however, DOC also stopped the clock during the time an individual spent with a

---

[2] A court may arraign a defendant and set bail and order him to return the next day to resolve another open matter (or for some other reason) in the same borough or elsewhere. We stop the clock when the individual leaves for court and restart it when he returns.

mental health clinician in the clinic. Some forty percent of newly admitted individuals are referred for mental health evaluation, and we treated it like an urgent care visit, even though it took place in the Intake clinic. On reviewing intake procedures, we decided that time spent to see the mental health clinician should be charged to DOC (i.e, to the City).[3]

7. In June 2022, DOC became aware of an allegation that officers were "manipulating" the dashboard data to falsely show compliance with the 24-hour requirement. Our own internal investigation concluded that the problem resulted from lack of training, and not intentional misconduct. We have since referred the matter to the Department of Investigation ("DOI") for further investigation.

8. From all of this, DOC concluded that steps needed to be taken to improve the admissions process. Beginning in October 2022, under my leadership, we took these steps:

• The New Admission Dashboard used to track individuals through the Intake process was updated and has been in full operation since January 5, 2023. Changes to the Dashboard include: (i) a new prompt for the data entry person to confirm the accuracy of the custody time, so as to avoid entry errors; (ii) a new method for recording the time individuals are "Ready for Clinic" (i.e. when they have completed fingerprinting, been searched, and received clothing); and (iii) changes to the names of certain entry prompts to increase clarity for those entering and reviewing the data. The Dashboard now turns yellow when 18 hours have elapsed (netting out stoppages) so that the Department can prioritize those individuals for processing; previously the Dashboard indicated when 20 hours had elapsed.

---

[3] When a defendant is hospitalized prior to arraignment (typically for injuries caused during the crime or arrest), his arraignment may be conducted in the hospital, and he enters DOC custody after the arraignment. Before that, he is in police custody. Until recently, we started the clock when the individual entered our custody at the hospital, even if he stayed there for days. After reviewing "clock stoppages," we concluded that the clock should not start until the individual leaves the hospital.

4

- The Dashboard can now identify basic input errors including who entered any misinformation into the system. This allows the Department to spot errors and retrain staff.

- Daily reports are now generated from the Dashboard that provide information about the Intake process, including data about any individual not housed within 24-hours and the reasons for clock stoppages.

- Intake staffing has been restructured so that: (i) an Assistant Deputy Warden and a Captain have been assigned to each shift to supervise the EMTC intake process; (ii) steady staffing has been provided so that six intake posts are filled during all tours; and (iii) 28 MMR (Medically Monitored Returned) officers have received training on using the Dashboard, and 11 other officers have received retraining.[4]

- An additional mental health housing unit has been opened in EMTC to house new admissions who have been determined to need such housing. The new unit reduces the need to move individuals to other facilities and thereby expedites the intake process.

- An additional vehicle has been assigned to EMTC to facilitate movement of individuals between facilities if required during the intake process.

- Construction has been completed to help speed the intake process and enable better monitoring of the intake holding cells.

- Individuals being transported to court have been removed from the intake area to the gym at EMTC to reduce disruptions in the intake process.

- In January 2023, the Nunez Compliance Unit ("NCU") began auditing the intake process and will continue to do so on a regular basis to ensure that data is being entered accurately and the 24-hour requirement is being met.

---

[4] An officer is on MMR status if they are limited in their ability to perform full duties because of medical issues.

9.      The updated New Admission Tracking System has been fully operational since January 5, 2023. From January 5th to January 31st, 1,275 individuals were newly admitted at EMTC and housed there. Of them, 13 (one percent) exceeded the 24-hour requirement (netting out clock stoppages) from the time they were taken into custody. One of the individuals ran over by 4 minutes and another by 17 minutes. Those times add to my confidence that the Dashboard is not being manipulated. During the month of those individuals housed, there were 53 clock stoppages for court appearances, six for hospital visits, four for urgent care visits and 24 refusals. When the clock restarts (e.g., an individual returns from court), the individual is given priority.

10.     Much of the credit for this high rate of compliance goes to the Warden of the facility and her staff, who have taken ownership of the intake process.

11.     NCU has audited the EMTC intake process twice since January 5, 2023. The first audit took place on January 9. The audit process consists of reviewing all new admissions on a particular day and comparing the Dashboard entries to Genetec surveillance. Eleven new admissions were tracked using the Genetec footage, and only one exceeded 24 hours, an individual who repeatedly refused to participate in the process. The audit provided no evidence that the Dashboard times had been manipulated to comply with the 24-hour rule. The second audit took place on January 16, 2023. Five new admissions were tracked using Genetec footage, and none exceeded 24 hours. Although there were discrepancies between the times entered on the Dashboard and those shown on the Genetec footage, the differences generally disfavored the Department: the start time on the dashboard was earlier than the Genetec time. We are reviewing the audit to determine the reason[s] for the discrepancies.

12.     The results of these audits have been shared with the Monitoring Team, which has provided extensive feedback on ways to improve the auditing methodology.

13. In their motion papers, Plaintiffs' counsel write that conditions at EMTC are "squalid" and "[m]eals are irregular." Mem 1. In support of that position, they cite to an August 1, 2021 newspaper article that reports "filthy conditions in the intake areas, including vermin, feces, and overflowing toilets." That is not an accurate description of intake conditions. The intake area is clean: there are no vermin or feces, and the toilets are not overflowing. See, Monitor Report at 38. Moreover, as individuals move through the process, they are fed the same meals at the same time as those in general population.[5]

14. Plaintiffs' counsel write that Intake is a "primary driver of use of force on Rikers Island." Mem 2. That is also untrue. In the month of January 2023, there were 21 incidents in EMTC intake involving an officer using force, almost always because an inmate refused to comply with an order or was disruptive. In 20 of the incidents, there was no injury to the inmate or staff; in one, the inmate sustained a 1.5 centimeter laceration to his elbow.

B. Intra-facility Transfers

1. As I understand it, the same 24-hour rule applies to intra-facility transfers – e.g., from building A to building B.[6] Intra-facility transfers are not uncommon after a violent incident (to separate perpetrators and victims), a reclassification, or for some other sound correctional practice.[7] As a general rule, intra-facility transfers do not call for clock stoppages; there is no interruption in the process due to court appearances or hospital visits, and refusals are rare.

2. Since October 2022, NCU has conducted five intra-facility intake audits. In October, audits were conducted at the George R. Vierno Center ("GRVC"), the Robert N. Davoren Center

---

[5] Plaintiffs' counsel write that intake holding area is not "fit for long-term stays" That, of course, is true. The average time in EMTC intake in January 2023 was 16 hours.

[6] We typically refer to such transfers as "intra-facility," although transfers can take place between facilities (AMKC to GRVC) or to different housing units within a facility.

[7] Within five days of admission, an individual's gang status is determined, and he is classified based on his level of potential violence and other factors.

7

("RNDC"), and the North Infirmary Command ("NIC"). At GRVC, ten individuals were tracked using Genetec footage, and all but one was housed within 24 hours; the single overage instance took 26 hours. At RNDC, 11 individuals were tracked, and not a single one was in intake for more than 24 hours. At NIC, two individuals were tracked, and not a single one was there more than 24 hours. In November 2022, an audit was conducted at GRVC. Five individuals were tracked, and not a single one was in intake for more than 24 hours. And in December 2022, ten individuals were tracked at AMKC; two were in intake for more than 24 hours, one for 27 hours and the other for 29 hours. The results of these audits, although not perfect, gave us confidence that the intra-facility intake process was, in large measure, compliant with the 24-hour rule.

3.      The results of these audits have been shared with the Monitoring Team, which has provided extensive feedback on ways to improve the auditing methodology.

4.      Despite these audit results, DOC recognized that improvements needed to be made in the intra-facility process, most notably in tracking the time at each stage. (Because of the intra-facility audit results, we determined to work on the new admission process first.) Unlike for new admissions, there was no need to update a dashboard for intra-facility transfers or create a new one. DOC's Inmate Tracking System ("ITS") has the necessary fields; what is required is training of intake staff to properly use the ITS database. We are in the process of taking the following steps:

- When an individual is transferred from jail A to jail B, the individual will be (i) scanned into the ITS system in jail A when they arrive at intake there; (ii) scanned out when they leave jail A; (iii) scanned into ITS when they arrive at jail B and (iv) scanned out when they are housed.

- To accomplish this scanning, the Department will use the bar code on the individual's "accompanying card," which is maintained in each facility's General Office near the intake.

- Intake staff and supervisors -- Captains, ADWs, DWs and Wardens - - will receive training on operating ITS. The Department intends to begin training in mid February.

- Direct supervision of the intra-facility intake process will be the responsibility of the jail's Intake Captain.

- Any deficiencies in the intra-facility intake process will be reported to the assigned Associate Commissioner, who report to me, for the facility's Warden and staff to abate.

These changes should be fully implemented by the end of February. Making sure that we meet that deadline is principally my responsibility.

C.   Relief Sought

1.   DOC believes that the relief sought is unnecessary.

2.   DOC is committed to conducting regular audits of the new admission intake process and will submit the results to the Monitor. As noted above, two preliminary audits have already been conducted and submitted. The methodology and results have been the subject of extensive discussions with the Monitor.

3.   DOC is generating daily reports of the new admission tracking process. We have provided the results for January 2023 to the Monitoring Team and will continue to do so.

4.   The Plaintiffs request that "[b]eginning immediately and continuing until March 15, 2023, the Department shall report to the parties and the Court, every two weeks on its progress toward meeting [a] March 15 deadline" for establishing "a reliable tracking system for the amount of time intra-facility transfers spend in intake areas." As noted above, a reliable tracking system, on which officers have been trained, should be in place before then. DOC will report to the Monitor periodically on its progress.

5. As noted above, DOC intends to conduct regular audits of the intra-facility tracking system. Audits will be provided to the Monitoring Team as has been our regular practice in the past.

6. DOC intends to produce daily reports of intra-facility transfers to show whether the 24-hour requirement is being met. We will provide that information to the Monitoring team as requested.

D. Conclusion

When I began at DOC, I recognized that our new admission and intra-facility intake systems needed improvement. As described above, working with others, I have devoted considerable time to ensuring that the 24-hour requirement is adhered to and that reliable systems are in place to track our compliance. I can assure the Court that the operation of new admission and intra-facility intakes remains a priority.

Dated:   February 8, 2023
         East Elmhurst, New York

*/s/ Christopher Miller*

Christopher Miller