**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

Mark Nunez, et al.,

Plaintiffs,

-against-

The City of New York, et al.,

Defendants.

Case No. 11-cv-5845 (LTS)(JCF)

**PLAINTIFFS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF MOTION FOR CONTEMPT**

TABLE OF CONTENTS

PAGE NO.

I. PRELIMINARY STATEMENT ....................1

II. THE LONGSTANDING PROBLEM OF USE OF FORCE IN INTAKE HAS NOT BEEN RESOLVED ....................1

III. THE ORDER CLEARLY AND UNAMBIGUOUSLY REQUIRES RELIABLE INTAKE TRACKING ....................2

IV. DEFENDANTS ARE IN CONTEMPT WITH REGARD TO INTRA-FACILITY TRANSFERS ....................4

A. The Department is Not in Compliance with the Second Remedial Order's Requirement to Track Intra-Facility Transfers' Time in Intake ....................4

B. The Department Has Not Been Reasonably Diligent in Its Efforts to Comply ....................5

V. DEFENDANTS ARE IN CONTEMPT WITH REGARD TO NEW ADMISSIONS ....................6

A. The Department is Not in Compliance with the Second Remedial Order's Requirement to Reliably Track the Time New Admissions Spend in Intake ....................6

B. The Department Has Not Been Reasonably Diligent as to New Admissions ....................8

VI. THE RELIEF SOUGHT BY PLAINTIFFS IS APPROPRIATE AND NECESSARY ....................10

VII. CONCLUSION ....................10

## I. Preliminary Statement

The narrow inquiry before the Court is whether Defendants have complied with a clear and unambiguous order to implement a reliable tracking system for intake. Today, nearly fifteen months after the Order's November 2021 deadline, all the Parties and the Monitor are in agreement that there is currently no reliable tracking system at all for people in intra-facility intake. The Monitor's most recent report likewise indicates that there is currently no reliable information for new admissions. These failures clearly constitute contempt, and Defendants' efforts in response to the threat of legal action are not enough to shield them.

## II. The Longstanding Problem of Use of Force in Intake Has Not Been Resolved

To distract from their failure to comply with this Court's order, Defendants attempt to minimize both the problem intake poses in contributing to extraordinary levels of use of force and the role of the Second Remedial Order in addressing it. But the record and the Court's prior orders make clear that the management of intake, including the amount of time people are held there, drives the high levels of force used in that area of the jails.

The nexus between intake and the use of force was reflected in the Consent Judgment, which explicitly targeted intake via body-worn camera and training provisions. ECF No. 249 §§ IX ¶ 2(a), § XIII ¶ 1(c). The First Remedial Order also included an intake-specific provision, "given the high frequency of Use of Force Incidents in [intake] areas during prior Reporting Periods." ECF No. 350 § A ¶ 3. Use of force in Intake has reliably been "the second highest number for any location in the jails." ECF No. 472 at 110. The nexus between lengths of stay in intake and the use of force is reflected in Department's own 2021 analysis that "individuals often

languish in the intake area and that likely contributes to uses of force in intake," an emphasis on lengths of stay echoed recently by the Monitor. ECF No. 431 at 43; ECF No. 504 at 27.[1]

The most recent data confirms that the use of force problem in intake persists. The Monitor's February 2023 report shows that for the last *five years*, the proportion of use of force incidents in intake has remained close to 15%. ECF No. 504 at 28. Indeed, the Monitor expressed concern in 2021 that the proportion ranged between "14 and 17%. . . for the past several years." ECF No. 368 at 36. The most recent data reflects the same alarming proportion level, with intake representing 14% of all use of force incidents in 2022. ECF No. 504 at 28.[2]

Defendants now argue that they should avoid accountability because the proportion of incidents in intake has returned from an extraordinarily high 18% in 2021 to a historically alarming 14% in 2022. The Court should reject this attempt to move the baseline. These levels of force were sufficiently troubling to necessitate successive remedial actions targeting intake, and they have not meaningfully improved. Ensuring that the intake process consistently takes less than 24 hours remains a critical component to the overall goals of the Consent Judgment.

## III. The Order Clearly and Unambiguously Requires Reliable Intake Tracking

Although Defendants attempt to muddy the waters, there can be no real dispute that the Second Remedial Order clearly and unambiguously requires a reliable tracking mechanism. Because Defendants cannot argue this point, they instead attempt to insert ambiguity into the Order by mischaracterizing the ongoing dispute about their unilateral decision to implement

[1] Notably, the Monitor reported that in the six months following this analysis, the Department had not taken any steps to address its own findings. ECF No. 431 at 43.

[2] Likewise noteworthy is that the raw numbers of uses of force in intake in 2022 mirror those from 2018 and 2020, the former representing a year in which the jail population was significantly higher *Id.*; ECF No. 467 at App. ii.

"clock stoppages." ECF No. 505 at 12-13.[3] It is disingenuous to argue that such a dispute renders unclear the City's separate obligation to reliably *track* people in their custody.

Nor did the Action Plan inject any ambiguity into the Order. Defendants suggest that they are no longer subject to the Second Remedial Order's clear November 15, 2021 deadline because the Action Plan did not contain any new deadline to establish a reliable tracking mechanism. *Id.* at 6. Insofar as their brief could be interpreted to contend that the Second Remedial Order is ambiguous for that reason, that argument must be rejected.

To withstand a contempt finding, Defendants must have "act[ed] based on . . . a good faith and reasonable interpretation of (the court's order)." *Medina v. Buther*, No. 15 Civ. 1955, 2019 WL 581270, at * 25 (S.D.N.Y. 2019) (cleaned up). Defendants' belated claim that the Action Plan relieved them of the Second Remedial Order's deadline is not reasonable. Defendants submitted the Action Plan without any claim that it terminated their other obligations in this matter, *see* ECF No. 463, nor did the Action Plan modify the Second Remedial Order's deadline whatsoever. In fact, the Action Plan specifically instructed the Department to "continue to implement the requirements of ¶ 1(i)(c) of the Second Remedial Order." ECF No. 454 at 16.

Moreover, if the Department believed there was any ambiguity, it was their responsibility to seek clarification, rather than simply flout the Order. In the context of contempt, "[i]f an order is ambiguous . . . then a clarification should be sought before acts are performed in the ambiguous area." *Nat'l Rsch. Bureau, Inc. v. Kucker*, 481 F. Supp. 612, 615 (S.D.N.Y. 1979). They did not do so. The Court should reject Defendants' attempts to free themselves of the clear

[3] We note our strong objection to an interpretation of the Order, advanced for the first time in the Monitor's February 3, 2023 report and referenced by Defendants, that the 24-hour clock begins only upon a person's arrival to the intake area itself. ECF No. 504 at 18-19; ECF No. 505 at 12-13. Such an interpretation not only ignores decades of historical context and a common sense assessment of the scope of the intake process, but would also create perverse incentives given the Department's control over and obligations to persons in custody prior to their arrival at the intake area. Resolution of this issue is not necessary to the disposition of this motion, but we include it here to make the court aware of what we believe may prove an important dispute.

mandates in prior orders. If every court order in this matter is subject to revision by future orders *sub silentio*, long-term monitoring and enforcement will become impossible.

## IV. Defendants are in Contempt with Regard to Intra-Facility Transfers

Defendants' arguments as to why this Court should not hold them in contempt with regard to intra-facility transfers are unpersuasive. Regardless of what plans the Department purports to have for the future, the bottom line is that today—nearly fifteen months after the deadline to establish reliable tracking has passed—the Department simply does not track the amount of time intra-facility transfers spend in intake areas. This is a clear-cut case of contempt.

### A. The Department is Not in Compliance with the Second Remedial Order's Requirement to Track Intra-Facility Transfers' Time in Intake

As the Monitor explained in his submission of February 3, 2023, "To date, the Department has not tracked valid system-wide data for individual [intra-facility] stays in intake." ECF No. 504 at 31-32. The Department does not challenge this fact, instead explaining that it is "on track" to *begin* tracking by March 2023. ECF No. 505 at 18. The fact that a reliable tracking system is not in place *today* is a direct violation of the Second Remedial Order's requirement to "by November 15, 2021 . . . develop and implement a reliable system to track and record the amount of time any incarcerated individual is held in Intake." Second Remedial Order ¶ 1(i)(c).

Defendants attempt to escape the obvious conclusion that they are not in compliance by explaining their so-called "concrete plans" as to how they will establish the required tracking in the future.[4] This argument strains credulity. A plan to comply in the future is not the same as compliance today. *See Powell v. Ward*, 487 F. Supp. 917, 934 (S.D.N.Y. 1980) ("although the defendant's efforts certainly indicate that she was concerned about the possibility of non-

[4] Defendants also argue that "there is no significant issue with overstays during inter/intra facility transfers." ECF No. 505 at 18. This assertion should not be credited. The Department cannot credibly draw any conclusions of this nature when reliable tracking of intra-facility transfers does not yet exist.

compliance, these efforts do not satisfy her responsibilities[.]"). The evidence could not be clearer that Defendants have failed to comply with this aspect of the Second Remedial Order.

**B. The Department Has Not Been Reasonably Diligent in Its Efforts to Comply**

The Department's arguments that it has been reasonably diligent are equally unavailing. The Second Remedial Order set a deadline of November 15, 2021, but the unimplemented plan the Department claims should save it from contempt was not developed until last month. ECF No. 504 at 32. In other words, Defendants waited until 14 months *after* the deadline for compliance had passed to even establish a plan for eventually complying. This obvious failure is further compounded by the fact that, as explained in Plaintiffs' opening brief, the Monitor had suggested that the Department establish this very plan as early as November 2021. ECF No. 500 at 4; ECF No. 420 at 4. This is not reasonable diligence. It is extended, unjustified inaction.

The Department cherry-picks quotations to suggest that this Court should dilute the reasonable diligence standard to the point of meaninglessness. But the caselaw is clear that only robust, consistent efforts will qualify. For example, the Department suggests that its plan constitutes a "reasonably effective method of compliance," ignoring the need to not only *create* a plan but also to *execute* it. *See Patsy's Brand, Inc., v. I.O.B. Reality, Inc.*, 2021 WL 3418475, at *5 (S.D.N.Y. 2021) (discussing "whether a party has developed *and executed* 'reasonably effective methods of compliance'" (emphasis added) (cleaned up)); *Cancer Rsch. Inst., Inc. v. Cancer Rsch. Soc., Inc.*, 744 F. Supp. 526, 530 (S.D.N.Y. 1990) (discussing failure to "develop *and implement*" a compliance plan (emphasis added)). The very case Defendants cite states that a defendant must "at a minimum . . . 'energetically police' the effectiveness of its compliance methods." *Zino Davidoff SA v. CVS Corp.*, 2008 WL 1775410, at *8 (S.D.N.Y. Apr. 17, 2008). Waiting 14 months to create a compliance plan cannot constitute such energetic efforts.

Defendants also rely on *Latino Officers Ass'n City of New York v. City of New York*, 519 F. Supp. 2d 438 (S.D.N.Y. 2007), to suggest that because they have "dedicate[ed] significant resources to the problem," they have been reasonably diligent. But in that case, the defendant was already in substantial compliance, and the delay in achieving compliance had occurred "despite" the significant resources dedicated to preventing it. *Id*. at 446. Here, the opposite is true: Defendants are not in substantial compliance, and the delay is due to their own inaction.

## V. Defendants are in Contempt with Regard to New Admissions

Defendants have also fallen well short of what the Second Remedial Order requires for new admissions. Because there is still—15 months after the Court's deadline—no reliable data regarding how often new admissions remain in intake for more than 24 hours, and because Defendants' limited progress on this issue has only been made in response to the looming possibility of this motion, contempt is appropriate.

### A. The Department is Not in Compliance with the Second Remedial Order's Requirement to Reliably Track the Time New Admissions Spend in Intake

The Department has established a tracking system for new admissions known as the "Dashboard." But, according to the Monitor, the Dashboard's "accuracy and reliability are not yet known." ECF No. 504 at 20. As a result, there is currently no reliable data on how often new admissions spend more than 24 hours in intake, a clear violation of the Second Remedial Order.

The Department emphasizes that it is auditing the Dashboard's accuracy, and claims that over time, the audits will show reliability. But the audits are fundamentally flawed such that they cannot confirm whether the Dashboard is accurate. Declaration of Leighann Starkey ("Starkey Decl.") ¶¶ 13-14. For instance, the Department's audits do not use a random, representative sample. Instead, each audit follows a group of all new admissions present in intake at a single moment. ECF No. 504 at 18. This is a foundational flaw that could make results of the audits

very different from results for the total population, because the sample "is not representative of the conditions that likely impact data entry accuracy." Starkey Decl. ¶¶ 5, 7. For example, if Department staff working at the moment captured by the audit are particularly conscientious, this could skew the results of the audit to appear far better than the system-wide reality. *Id*. ¶ 7.

In addition, the number of people in each audit sample is extremely small. In January 2023, the Department audited Dashboard entries for 16 new admissions out of roughly 1,400 that month—or only about 1.1%. *See* ECF No. 504 at 17, 21. Even if this sample were random and representative, which it is not, its small size would create a margin of error of +/- 25%, meaning that the true percentage of all Dashboard entries that are accurate could be up to 25% lower than indicated by the audit. Starkey Decl. ¶¶ 8-10. The audit reported that 63% of the 16 housing time entries were "generally accurate." ECF No. 504 at 21. But the high margin of error could make the true percentage of all accurate housing time entries as low as 38%. Starkey Decl. ¶ 11.

Plaintiffs recognize that it is not realistic to expect the Department's audits to reach the level of statistical precision typical in other contexts, such as academia. But there are minimum standards that must be met for any audit to be useful, and the Department's current process falls short of even those basic requirements. *Id*. ¶ 6. Defendants should not be permitted to avoid contempt on the basis of an audit that is grossly insufficient, especially in light of persistent oversight and data entry failures in new admissions tracking. ECF No. 472 at 86-87.

In addition to failing to establish sufficient audits, the Department has also failed to take other obvious actions needed to ensure the Dashboard's reliability. For example, when staff entered false data into the Dashboard, the Department refused to discipline them, claiming the failures were due to "lack of training." *See* ECF No. 505-1 (Miller Decl.), ¶ 7. However, as detailed in our opening brief, there are numerous signs that the data manipulation was

intentional. ECF No. 500 at 6-8, 20-21. Indeed, the Board of Correction concluded that the data manipulation appeared intended to obscure intake overstays. ECF No. 501-6 (Ex. F to Werlwas Decl.), at 1. The Department's failure to recognize this misconduct for what it is, and to punish staff appropriately, will continue to compromise the Dashboard until it is addressed.

The evidence is clear and convincing that although a tracking system for new admissions exists, Defendants have not put necessary safeguards in place to ensure its reliability. As a result, neither the Court, the Monitor, nor the parties have reliable data that can be used to assess the incidence of intake overstays. This is clear non-compliance with the Second Remedial Order.

**B. The Department Has Not Been Reasonably Diligent as to New Admissions**

Defendants have not been reasonably diligent in improving the Dashboard. Contempt is appropriate where defendants do not act of their own accord, but rather move toward compliance only in reaction to the possibility of court intervention. *See Casale v. Kelly*, 710 F. Supp. 2d 347, 350 (S.DN.Y. 2010) (finding contempt where "the Court and [P]laintiffs have pushed and prodded the City into meaningful action"). That is exactly what Defendants have done here.

A court in this District has held the Department in contempt for violations similar to those here—specifically, holding new admissions in non-housing "receiving rooms" for more than 24 hours—where "for a substantial time after learning of pervasive violations, the Department failed to take meaningful action." *Benjamin v. Sielaff*, 752 F. Supp. 140, 147 (S.D.N.Y. 1990). In like circumstances, another court held that the Department "cannot escape a finding of contempt by 'eleventh hour' or last-ditch efforts to comply." *Benjamin v. Fraser*, 2002 WL 31845111, at *11 (S.D.N.Y. Dec. 16, 2002). The same outcome is warranted here.

Plaintiffs first informed Defendants that the data they collected regarding time spent in intake was grossly inaccurate, and that they had thus failed in their duty to create a reliable

tracking system, in a letter dated November 22, 2021, and a follow-up in December 2021. *See* ECF No. 501-1 (Ex. A to Werlwas Decl.), at 2; ECF No. 501-2 (Ex. B to Werlwas Decl.).

Despite Plaintiffs' repeated efforts to draw Defendants' attention to their non-compliance, things did not improve. Indeed, they arguably got worse, as the Board of Correction soon uncovered data manipulation. *See* ECF No. 500 at 6-8. Plaintiffs therefore sent yet another non-compliance letter to Defendants in August 2022. ECF No. 501-7 (Ex. G to Werlwas Decl.). In October 2022, the Monitor explicitly concluded in a public report that the Department's data tracking on new admissions was "unreliable and unusable." Dkt. No. 472 at 86-87.

Defendants admit that it was only then, in October 2022, nine months after Plaintiffs' first non-compliance letter, that they began to revise the Dashboard system. *See* ECF No. 505-1 (Miller Decl.), at ¶ 8 ("Beginning in October 2022, under my leadership, we took these steps . . ."). It thus took three separate letters from Plaintiffs invoking the possibility of Court action, as well as a public rebuke from the Monitor, before the Department even began to make improvements. Even a month later, in November 2022, Defendants were unable to provide a concrete plan or timeline for compliance when asked by the Court. ECF No. 501-11 (Ex. K to Werlwas Decl.), at 73-74. This is far from the "energetic[] polic[ing]" of their own compliance methods that reasonable diligence requires. *Davidoff*, 2008 WL 1775410, at *8. Rather, it is a "spurt of activity on the heels of plaintiffs' motion for a finding of contempt," which cannot save the Department at this late juncture. *Aspira of New York, Inc. v. Bd. of Educ. of City of New York*, 423 F. Supp. 647, 654 (S.D.N.Y. 1976) (finding failure of reasonable diligence).

In short, every step the Department has taken toward the creation of a reliable tracking system was taken in response to Plaintiffs' threats of legal action, public reporting by the Monitor, or pointed questioning by the Court. That is not reasonable diligence. Just as courts in

this District twice found when holding the Department in contempt, their efforts here have been "too little, too late." *Benjamin*, 752 F. Supp. at 147; *Benjamin*, 2002 WL 31845111, at *11.

**VI. The Relief Sought by Plaintiffs is Appropriate and Necessary**

Defendants' contention that Plaintiffs' proposed remedies are inappropriate misapprehends the relief requested in several ways. The proposed remedies are modest. Many would simply require Defendants to provide additional access to information they already collect, like the Dashboard and its audits. Others would require the collection of information that a responsible agency faithfully adhering to the Court's order should surely have, like data regarding time spent in intra-facility intake.

Plaintiffs have requested that such information be filed on the docket due to Defendants' history of inaction. Virtually all of the progress Defendants have made came only as a result of immense pressure from the Court, Plaintiffs, and the public. These limited public filings would not displace the Monitor's broad role, but rather incentivize compliance on this narrow issue. Defendants' contention that the information Plaintiffs request is "grist for the mill" of future non-compliance letters is telling. ECF No. 505 at 22. If Defendants are complying with the Order's requirements, they need not fear future enforcement actions.

**VII. Conclusion**

Defendants repeatedly characterize this motion as a distraction. But it cannot be the case that because the Department has failed to comply with so many aspects of the Consent Judgment, it is now a waste of resources to seek accountability for any single violation. Defendants are in contempt of the Second Remedial Order, and this Court should grant the relief requested.

Dated: February 15, 2023
New York, New York

THE LEGAL AID SOCIETY

*/s/ Mary Lynne Werlwas*

Mary Lynne Werlwas
David Billingsley
Katherine Haas
Kayla Simpson
199 Water Street, 6th Floor
New York, New York, 10038
Telephone: (212) 577-3530
mlwerlwas@legal-aid.org

EMERY CELLI BRINCKERHOFF
ABADY WARD & MAAZEL LLP

*/s/*

Jonathan S. Abady
Debra L. Greenberger
Sana Mayat
Nairuby L. Beckles
600 Fifth Avenue, 10th Floor
New York, New York, 10020
Telephone: (212) 763-5000
jabady@ecbawm.com