UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

MARK NUNEZ, et al.,

        Plaintiffs,

    -v-                                  No.  11-CV-5845-LTS

NEW YORK CITY DEPARTMENT OF
CORRECTION et al.,

        Defendants.

--------------------------------------------------------x

### MEMORANDUM OPINION AND ORDER ON MOTION FOR CONTEMPT

        Before the Court is a motion brought on behalf of the Plaintiff class to hold Defendant New York City Department of Correction (the "Department" or "DOC") in civil contempt of the Second Remedial Order, as issued on September 29, 2021 (docket entry no. 398), and the Action Plan, as issued on June 14, 2022 (docket entry no. 465). Specifically, Plaintiffs seek injunctive relief in response to the Department's alleged non-compliance with paragraph 1(i)(c) of the Second Remedial Order, which was incorporated into the Action Plan at Section E, paragraph 3(a). The City of New York and the Department (together, "Defendants") have opposed the motion.

        The Court has reviewed carefully all of the parties' written submissions and evidentiary proffers. For the reasons stated below, the Court denies Plaintiffs' motion for contempt, without prejudice.

F<small>ACTS</small>

This recitation of facts is drawn from the court record and the parties' material proffers in connection with Plaintiffs' contempt motion.  The Court assumes the parties' familiarity with the facts and history of the case.

This case arose in 2011 amidst allegations that the Department engaged in a pattern and practice of using unnecessary and excessive force against incarcerated individuals. On behalf of a class of present and future incarcerated individuals confined in jails operated by the Department, Plaintiffs sought injunctive and declaratory relief, in addition to monetary damages related to specific incidents in which the named Plaintiffs alleged they were victims of excessive force.  In October 2015, the parties entered into a settlement (docket entry no. 249, the "Consent Judgment"), the purpose of which was to protect the Constitutional rights of incarcerated individuals.  The Consent Judgment, comprising twenty-five sections and hundreds of provisions, required the Defendants to take specific actions to remedy a pattern and practice of violence by staff against incarcerated individuals, and to develop and implement new policies and procedures to ensure the safety and wellbeing of incarcerated individuals.  The parties also stipulated to the appointment of a Monitor, as an agent of the Court, to oversee and assess the Department's compliance with the Consent Judgment.  (Consent Judgment § XX.)  Pursuant to its obligations, the Monitor, together with his team of subject matter experts (the "Monitoring Team"), has filed numerous reports on the public docket describing "the efforts the Department has taken to implement the requirements" of the Consent Judgment and "evaluating the extent to which the Department has complied."  (Id. § XX ¶ 16.)

In its periodic reports assessing compliance with the Consent Judgment, the Monitoring Team repeatedly reported that the Defendants were non-compliant with several

sections of the Consent Judgment.  Based on the Monitoring Team's findings that additional

remedial measures were necessary in order to remedy the Department's pattern and practice of

using excessive force, the parties stipulated to further measures of relief designed to increase the

safety of incarcerated individuals.  The First Remedial Order, entered in August 2020, set forth

specific initiatives to reduce the use of unnecessary force, improve staff supervision, enhance the

safe management of persons in custody, and promote prompt investigations and timely

accountability for use of force incidents.  (See docket entry no. 350 ("First Remedial Order").)

The Second Remedial Order, entered in September 2021, focused, in large part, on the

implementation of immediate security initiatives to increase the safety of persons in custody,

including the development of a Security Plan to address poor practices by the Department.

(Docket entry no. 398 ("Second Remedial Order").)  The Third Remedial Order, entered in

November 2021, set forth specific measures of relief to address delays in the imposition of

timely discipline for instances of misconduct related to the use of excessive and unnecessary

force.  (Docket entry no. 424 ("Third Remedial Order").)

The Second Remedial Order, which is pertinent to the instant motion practice,

was entered in September 2021 after reports from the Monitoring Team revealed that the

conditions in the New York City jails had deteriorated to such an extent that they posed "nothing

short of an emergency."  (Docket entry no. 387 at 2.)  The Monitoring Team filed several

special reports in August and September 2021 to bring to the Court and the parties' attention the

"troubling and accelerated pace of mismanagement of the security operations in the jails" that

presented "an immediate threat to the safety and well-being" of the incarcerated individuals and

staff.  (Docket entry no. 387 at 2; see also docket entry nos. 378, 380, 399.)  The Monitoring

Team reported that, although the "Department has a long history of systemic mismanagement

and dysfunction that has been documented" in preceding Monitor's Reports, "the conditions in the jails [had] significantly deteriorated in the past few months" to a level that warranted increased reporting to the Court and additional recommendations from the Monitoring Team. (Docket entry no. 387 at 2; <u>see</u> <u>also</u> docket entry no. 380 (setting forth the Monitoring Team's "recommended steps that the City and Department can and should take *immediately* to address the ongoing dangerous and unsafe conditions in the New York City jails").)

In particular, the Monitoring Team reported that the summer months of 2021 saw a "steady increase in serious use of force incidents, a disturbing rise in the level of security lapses and unchecked breaches and failures of basic security protocols, and instances of inadequate supervision, all of which [were] compounded by staffing challenges." (Docket entry no. 378 at 1.) One of the areas of concern for the Monitoring Team was a "disturbing pattern" that had been observed within the Intake[1] units at the City's jails "in which individuals [had] languished in Intake well beyond 24 hours (the timeframe within which they should have been assigned to a housing unit)." (<u>Id.</u> at 2.) The prolonged stays in Intake – and the corresponding delay in assigning incarcerated individuals to housing units – resulted, based on the Monitoring Team's observations, in the delayed provision of food, medical care, and other basic services. (<u>Id.</u>) The number of use-of-force ("UOF") incidents in Intake areas rose 170% in August 2021 compared to August 2020. (Docket entry no. 387 at 3.) Noting that the "Department [had] . . . failed to effectively address the unsafe conditions that [were] posing an imminent risk of harm to those in custody and Department Staff" by the time the Monitoring Team issued its September 23, 2021 report (<u>see</u> <u>id.</u>), the Monitoring Team recommended that the Department implement

---

[1]      Intake "is the processing center for people entering, exiting, and moving within the jails." (Docket entry no. 504 at 2.)

"[i]mmediate security initiatives" to "address the current lapses in security management"
including "[p]rocess[ing] new admissions through Intake and to an assigned housing unit within
24 hours." (Id. at 6.)

        In response to the deteriorating state of conditions in the summer of 2021, as
described in the Monitoring Team's special reports, the parties and the Monitoring Team
conferred and stipulated to the immediate, concrete measures of relief that were incorporated into
the Second Remedial Order.  (See docket entry no. 397 (letter from Monitoring Team explaining
the parties had "reached a joint agreement" on remedial relief).)  Having determined that the
parties' proposed measures of injunctive relief satisfied the relevant provisions of 18 U.S.C.
section 3626(a) (the "Prison Litigation Reform Act" or "PLRA"), the Court so-ordered the relief
set forth in the Second Remedial Order.  (Docket entry no. 398.)  The Second Remedial Order
required Defendants to implement specific recommendations from the Monitoring Team
including the security initiatives, the development of an approach to expand the criteria for who
may serve on the Department's facility leadership teams, the appointment of a Security
Operations Manager with expertise in correctional security to oversee the implementation of
security protocols, and increased reporting.  (Id.)  One of the several security initiatives
specifically related to the processing of incarcerated individuals at the Department's Intake units,
which is the subject of the instant motion.  This initiative was set forth in paragraph 1(i)(c) of the
Second Remedial Order, which provides that the Department shall:

> Process all incarcerated individuals, including but not limited to new
> admissions and intra-facility transfers, through Intake and place them
> in an assigned housing unit within 24 hours.  The Department shall
> provide the necessary Intake staff and space to satisfy this
> requirement.  By November 15, 2021, the Department shall develop
> and implement a reliable system to track and record the amount of

time any incarcerated individual is held in Intake and any instance
when an individual remains in Intake for more than 24 hours.

(Second Remedial Order ¶ 1(i)(c).)

At about the time the Second Remedial Order was entered, the Monitoring Team expressed its belief that "the City and the Department have the authority and the ability to address" the dangerous conditions in the City's jails.  (Docket entry no. 380 at 1.)  As time progressed, however, it became clear to the Monitoring Team that core foundational issues underpinned the Department's mismanagement of the jails, and those "foundational patterns and practices" were "stymying compliance" with court orders, as well as any "efforts to reform the agency."   (Docket entry no. 431 at 10-11.)  Indeed, in its December 6, 2021 report, the Monitoring Team asserted that "[c]ontinuing the attempt to implement hundreds of provisions" of the Consent Judgment and the Remedial Orders "without some prioritization will simply immobilize the Department and progress will likely not be achieved no matter how many remedial orders or other potential sanctions may be imposed."  (Id. at 11; see also id. at 9 (noting that the "Department [was] in a place where many of the requirements of the Consent Judgment [were] simply unattainable, and the Consent Judgment requirements [were] unlikely to be successful in bringing about improvements because the basic foundations needed to improve practices [did] not exist").)  Accordingly, the Monitoring Team recommended a shift in focus to prioritize the key foundational issues at the core of the Department's mismanagement of the jails, which the team believed must be "addressed first, before the Department can make further progress" in achieving widescale reform. (Id. at 10.)  Those foundational issues encompassed flawed security practices and procedures, inadequate supervision of staff, ineffective staffing procedures, and limited accountability imposed for staff misconduct.   (Id. at 12.)

After a new Mayor of the City of New York and his administration assumed office in January 2022, the Monitoring Team issued another report on March 16, 2022, advising the parties that conditions in the jails remained "unstable and unsafe" and reiterating the need for the Department to prioritize the foundational issues identified by the Monitoring Team.  (Docket entry no. 438 at 1-2.)  Those issues, the Monitoring Team represented, "created a polycentric problem and represent[ed] a complicated set of dysfunctional practices unlike any jail system with which the Monitoring Team has had experience."  (Id. at 2.)  The Monitoring Team, once again, called for a "comprehensive and tangible shift in the City's and Department's focus and priorities," to an approach focused on correcting foundational issues of mismanagement and embedded with "concrete steps and timelines[.]"  (Id. at 3.)  To this end, in the Spring of 2022, the Monitoring Team and the Defendants worked together to outline an "Action Plan" tailored to those foundational issues and "provid[ing] a roadmap for addressing the . . . deficiencies that inhibit[ed] the Department's ability to build sustainable reforms" necessary for compliance with the Consent Judgment and Remedial Orders.  (Docket entry no. 462 at 2.)   The Action Plan was designed to prioritize reform efforts tailored to the four foundational areas identified by the Monitoring Team, including staffing practices, security practices, management of people in custody, and timely staff accountability.  (See docket entry no. 465.)  The Court approved and entered the Action Plan on June 14, 2022, after the Court determined it complied with all relevant provisions of the PLRA.  (Id.; see also docket entry no. 466.)  Of particular relevance to the instant motion is Section E, paragraph 3(a) of the Action Plan, which states, "The Department shall implement the requirements of ¶ 1(i)(c) of the Second Remedial Order." (Docket entry no. 465.)

In the summer and fall of 2022, Plaintiffs became increasingly focused on issues related to Intake for the reasons set forth below and requested leave to file a motion for civil contempt.  The Court granted Plaintiffs' request and set a briefing schedule in which the Court also directed the Monitoring Team to file a brief report on the status of Defendants' compliance with the Intake provisions of the Court's orders prior to the commencement of briefing of the motion.  (See docket entry no. 494.)  In the instant contempt motion, Plaintiffs assert that the Department is in contempt of its obligations set forth in the third sentence of paragraph 1(i)(c) of the Second Remedial Order, namely the requirement to "develop and implement a reliable system to track and record the amount of time any incarcerated individual is held in Intake and any instance when an individual remains in Intake for more than 24 hours[,]" which was incorporated into Section E, paragraph 3(a) of the Action Plan.  (Id., (hereinafter the "Intake Tracking Clause").)  In its special report on Intake filed pursuant to the Court's scheduling order (see docket entry nos. 494 and 504), the Monitoring Team explained that the "use of intake falls into two categories": (1) "new admissions[,]" which encompasses the Intake process for "individuals newly admitted to DOC custody[,]" who must undergo a series of procedures, including searches, fingerprinting, medical procedures, and clinical assessments before being assigned to a housing unit (id. at 2 and Appendix A); and (2) "inter/intra facility transfers[,]" in which individuals are "brought to an intake unit within each individual jail either for the purpose of exiting the facility (e.g., to go to Court, the hospital, or another facility) or to be transferred within the facility (e.g., to the clinic following a use of force [incident] or to another housing unit)" (id. at 2).

Plaintiffs assert that the Department is in civil contempt of the Intake Tracking Clause with respect to the processes for tracking both new admissions and inter/intra facility transfers.  The basic facts are undisputed.

New Admission Intake Processing

Individuals committed to DOC's custody are transported from the Court to Intake units at the jails, where they undergo a variety of standard procedures before being assigned a housing unit.[2]  (Docket entry no. 504 at 7, Appendix A.)  During the Intake process, each newly-admitted individual is searched, provided with DOC attire, fingerprinted, and photographed and also receives certain medical testing and assessments.  (Id.; see also docket entry no. 505-1 ("Miller Decl." § A, ¶ 2 (describing the "numerous steps" to the Intake process).)  The intake procedures culminate when the individual is assigned a housing unit and escorted there.  (Docket entry no. 504, Appendix A.)  In 2022, the Department processed approximately 19,000 people newly committed to DOC custody, with an average of 55 people per day.  (Id. at 11; see also Miller Decl. § A, ¶ 1)

To track the amount of time newly admitted individuals spend in Intake before being assigned a housing unit, the Department has historically used a "live web-based program" referred to as the "New Admissions Dashboard" or the "Dashboard."  (Docket entry no. 504 at 13; docket entry no. 420 at 3.)  Department staff enter data into the Dashboard that corresponds to certain fields, including the "time an individual is transferred to DOC custody at court

---

[2]     Male individuals committed to DOC custody are transported from court to an Intake unit at the Eric M. Taylor Center ("EMTC"), while female individuals are transported to the Rose M. Singer Center ("RMSC").  (Docket entry no. 504 at 7.)  The Monitoring Team outlined the various procedures that incarcerated individuals undergo throughout the Intake process in its February 3, 2023 special report.  (See id., Appendix A.)

('custody time'), time of arrival at intake ('arrival time'), the time of various procedures (*e.g.*, searches, medical screening, mental health screening), and the time they are moved to their assigned housing unit ('housed')."  (Docket entry no. 504 at 13.)  Department staff are responsible for manually entering the data that corresponds to each one of these fields to generate an assessment of how long it has taken for a given incarcerated individual to be processed through Intake.  (Docket entry no. 420 at 3.)

Although the Dashboard is capable of capturing critical information about how long an individual remains in Intake, concerns arose in 2021 and 2022 that the data was not being inputted accurately and reliably by Department staff.  In its November 17, 2021 report, the Monitoring Team reported that the Department indicated that it had processed all newly admitted individuals within the 24-hour limit in October 2021, the month after the Second Remedial Order took effect.  (Docket entry no. 420 at 3.)  That information differed from reports Plaintiffs' counsel had been receiving from their clients at New York City jails, including reports of stays in Intake over the 24-hour limit.  (See docket entry no. 501 ("Werlwas Decl.") ¶¶ 2-3.)  As a result, Plaintiffs' counsel sent two letters to counsel for the Defendants noting these potential inconsistencies (id., Exs. A, B) and emphasizing that "[t]he accuracy of the Department's self-reporting is even more critical now that the court order requiring reliable tracking mechanisms has gone into effect" (id., Ex. B at 2).  Approximately six months later, in June 2022, the Board of Correction[3] emailed the Department expressing its concern that Department staff may be manipulating the data in the Dashboard in order to achieve artificial compliance with the Second

---

[3]     The Board of Correction is "a nine-person, non-judicial oversight board that regulates, monitors, and inspects the City's correctional facilities.  The Board of Correction carries out independent oversight and enacts regulations related to minimum standards." (Docket entry no. 472 at 23.)

Remedial Order's requirement that all individuals be processed within 24 hours.  (Id., Ex. D; see also docket entry no. 504 at 13; Miller Decl. § A, ¶ 7 ("In June 2022, DOC became aware of an allegation that officers were 'manipulating' the [D]ashboard data to falsely show compliance with the 24-hour requirement.").)  The Board of Correction noted that it had "documented 17 incidents where a person in custody in the EMTC intake had their 'In Custody at Court' start time . . . changed on the [Dashboard] . . . . often . . . as a newly admitted person in custody approached their 24 hour clock expiration, or sometimes following the expiration."  (Werlwas Decl., Ex. D; see also id., Ex. E (spreadsheet form BOC analyzing the 17 incidents).)  The Board of Correction's findings spurred Plaintiffs' counsel to write a letter to Defendants, requesting that the parties meet and confer about these issues, and notifying Defendants of Plaintiffs' counsel's view that Defendants were in violation of the Second Remedial Order.  (See docket entry no. 505-2 ("Scheiner Decl.") Ex. D; Werlwas Decl., Ex. G ("The failure to maintain reliable tracking systems . . . is *in itself* a violation of the Second Remedial Order[.]").)  Defendants' counsel responded indicating their openness to dialogue on these issues but "defer[ing] answering questions relating to the City or Department's compliance with the . . . Remedial Orders, or Action Plan until after submission of the next Monitor's Report on October 28, 2022."  (Scheiner Decl., Ex. C; Werlwas Decl., Exs. H, J.)

　　　　　The Department proffers that it undertook several measures in response to the allegations that the data on the Dashboard had been manipulated and rendered unreliable.  The Department conducted its own internal investigation, ultimately concluding that "the problem resulted from lack of training, and not intentional misconduct" (Miller Decl. § A, ¶ 7), as well as "lack of staffing" (Werlwas Decl., Ex. L).  The Department "determined that staff failed to utilize the dashboard system consistently and reliably, and that EMTC systematically practiced

poor record keeping because there was no oversight or supervision for the officers who manually entered the information."  (Docket entry no. 472 at 86; see also id. (Monitoring Team's report that this appeared to be "due to a confluence of issues stemming from poor practices by staff . . . as well as poor supervision of staff").)  The Department also referred the matter to the Department of Investigation[4] for further investigation. (Miller Decl. § A, ¶ 7.)  Mr. Christopher Miller, who began his tenure as the Deputy Commissioner of Classification, Custody Management and Facility Operations with the Department in July 2022 and who oversees the Intake process, represents that this series of events led the Department to conclude "that steps needed to be taken to improve the admissions process."  (Id. § A, ¶ 8.)  Mr. Miller proffers that, under his leadership and beginning in October 2022, the Department began working to implement several measures of reform.  (Id.)  These reforms include: (1) the development of a revised dashboard, which was rolled out on or about January 5, 2023, and includes, among other features, a "new prompt" for data entry to "confirm the accuracy of the custody time, so as to avoid entry errors[,]" "changes to the names of certain entry prompts to increase clarity" for those inputting data, and the ability to identify which individual inputted data into the Dashboard to facilitate the identification of errors and provision of necessary training; (2) the generation of daily reports from the dashboard about the Intake process "including data about any individual not housed within 24-hours[;]" and (3) the assignment of specifically trained staff to the process of inputting data to the Dashboard.  (Id.; see also docket entry no. 495; docket entry no. 504 at 14-18.)

---

[4]      "The New York City Department of Investigation ('DOI') is the City's Inspector General, with independent oversight of City government[,]" which may investigate "any agency, officer, elected official or employee of the City, as well as those who do business with or receive benefits from the City."  (Docket entry no. 504 at 14 n.6.)

The Monitoring Team reported in its February 2023 special report on Intake that, although "available data prior to 2023 [captured on the Dashboard] does not reliably or accurately capture the extent to which the Department adhered to the processing of individuals through intake within 24 hours[,]" the Department's efforts since the fall of 2022 have led to the refinement of "a protocol that appears to be reasonable and capable of appropriately limiting (and tracking) the length of stay in new admission intake."  (Docket entry no. 504 at 13-14.)  The Monitoring Team represents that, based on its careful observation, it believes that Mr. Miller (the Deputy Commissioner of Classification, Custody Management and Facility Operations), and other members of the Department leadership have "been actively engaged in the process of improving the management and processing of people through new admission intake" and "intake staff [now demonstrate] a strong command of the required procedures."  (Id. at 14-15.)  Site visits in January 2023 indicated to the Monitoring Team that "intake already appears to be more orderly and efficient."  (Id.)  To monitor the reliability of the data generated on the dashboard, the Monitoring Team submits that the Department's Nunez Compliance Unit[5] has begun auditing the data, with two audits conducted in January 2023 (id. at 20-21; Miller Decl. § A ¶ 11), and that "the Department is already considering how the data can be reported and assessed periodically to gauge the extent to which individuals are processed through intake within 24 hours, and, if they are not, why not."  (Docket entry no. 504 at 20.)   Based on these developments, the Monitoring Team stated in its February 3, 2023 report that it "does not have any further recommendations" at this time "for additional steps the Department should take to

---

[5]     The Nunez Compliance Unit is a team of individuals "that has supported the development of critical and reliable information about the Department's efforts to implement the various requirements of the Consent Judgment and Remedial Orders" issued in this case. (Docket entry no. 438 at 25.)

address the requirements of the Second Remedial Order or the Action Plan pertaining to new admission intake processing."  (Id. at 25.)

Intake Processing for Inter/Intra Facility Transfers

Inter/intra facility transfers involve "a different type of intake unit—those contained in each of the remaining facilities that are used for a variety of purposes" including "transfer to another facility or transport to Court[,]" but "not for new admission processing." (Docket entry no. 504 at 26.)  In order to track the amount of time incarcerated individuals have spent in inter/intra facility Intake units, the Department has an "Inmate Tracking System" ("ITS") (id. at 28), which historically has relied on "manual data entry by staff" noting the time of incarcerated individuals' movement in and out of Intake units through the scanning of their individual bracelets (docket entry no. 420 at 3-4).  The Monitoring Team's status updates in November 2021 and throughout 2022 noted that, although the ITS "is in place and capable of tracking movement, it is not consistently utilized by staff as data is not promptly entered and/or the incarcerated individual's bracelets are not scanned in[,]" and therefore, any "data developed by this system [has] not [been] reliable."  (Id. at 4 (Nov. 2021 Monitor's Report); see also docket entry no. 438 at 47 (Mar. 2022 Monitor's Report noting that, although the ITS "would allow for tracking of inter and intra-facility transfers of incarcerated individuals, it is not being used"); docket entry no. 467 at ECF p. 55 (June 2022 Monitor's Report noting compliance with ITS has "been inconsistent"); docket entry no. 472 at 110 (Oct. 2022 Monitor's Report noting same observations).)  Instead, each individual facility seems to "maintain[] a different manual tracking mechanism that does not produce aggregate data[,]" which makes it "difficult to promote the overall goal of ensuring that individuals are not left in intake for long periods of time."  (Docket entry no. 472 at 110; see also docket entry no. 467 at ECF p. 55.)  The Monitoring Team

observed that, although Intake staff in each facility "were generally aware of the reasons an individual was in intake, where the individual was waiting to go, and the length of time they [were] there, the lack of a centrally managed tracking tool limited the problem-solving efforts to only those *within* a specific facility[,]" creating a "silo approach[.]"  (Docket entry no. 504 at 28.)

In correspondence with Plaintiffs' counsel on this issue, the Department represented, up until recently, that it was in the process of evaluating the ITS to determine whether any updates were necessary for effective implementation.  On December 15, 2021, counsel for Defendants wrote to Plaintiffs' counsel that "concerns [had] been raised regarding the reliability of the data in ITS[,]" and the "Department [was] actively working with the Monitor to address issues regarding ITS and its use."  (Werlwas Decl., Ex. C.)  Approximately one year later, during ongoing meet and confers amongst the parties on this issue, counsel for the Defendants emailed Plaintiffs' counsel, stating that the "Department [was] presently evaluating the Inmate Tracking System, a separate database from the Inmate New Admission Dashboard, and will work with stakeholders to implement any necessary updates."  (Id., Ex. L.)  Mr. Miller, the Classifications Manager, who has "taken the lead on addressing the matters related to intake" since he assumed his current role in July 2022 (docket entry no. 504 at 27), represents that he and his team at the Department were "determined to work on the new admission process [for Intake] first" because results from five inter/intra facility Intake audits, conducted by the Nunez Compliance Unit between October and December 2022, gave them "confidence that the intra-facility intake process was, in large measure, compliant with the 24-hour rule."[6]  (Miller Decl. §

---

[6]      Mr. Miller proffers that the Nunez Compliance Unit undertook five audits of inter/intra facility Intake between October and December 2022.  (Miller Decl. § B, ¶ 2.)  The audits

B, ¶¶ 2-4.)  The Monitoring Team represents that the results of the Nunez Compliance Unit's

audits of inter/intra facility Intake over the second half of 2022 "are consistent with the

Monitoring Team's site work and other information available to the Monitoring Team that

suggests there is improvement in reducing the length of stay in intake and in reducing [the]

number of people remaining in intake for more than 24 hours awaiting an inter/intra facility

transfer."[7]  (Docket entry no. 504 at 30.)

       In its January 10, 2023 status update, counsel for the Defendants represented that

Mr. Miller had completed his "review of current procedures" related to inter/intra facility Intake

tracking.  (Docket entry no. 495.)  In his declaration accompanying Defendants' brief opposing

the instant contempt motion, Mr. Miller explains that, although the ITS "has the necessary

fields[,]" and there was "no need to update" or "create a new" system, "training of intake staff to

properly use the ITS database" is required, and the Department has also recognized that

additional improvements to the process are warranted.  (Miller Decl. § B ¶ 4.)  According to Mr.

Miller, individuals in inter/intra facility Intake will be scanned using a bar code on the

individual's "'accompanying card,'[8] which is maintained in each facility's General Office" when

---

       were undertaken at several facilities, including the George R. Vierno Center, the Robert
       N. Davoren Center, and the North Infirmary Command.  (Id.)

[7]    The Monitoring Team reports that it asked the Nunez Compliance Unit "to conduct audits
       of intake units across a number of facilities beginning in January 2022," which "were
       conducted in January and February 2022, August 2022, October 2022, November 2022,
       and December 2022."  (Docket entry no. 504 at 29.)

[8]    The Monitoring Team represents that, although the Department previously used
       incarcerated individuals' bracelets to scan and track movement into and out of Intake
       units, the Department "found them to be unreliable because people in custody would
       sometimes destroy their bracelet or swap them with other individuals."  (Docket entry no.
       504 at 32 n.18.)  The use of the accompanying card which contains an individual's
       photograph and a unique barcode, in lieu of the bracelet, "should be less susceptible to

they arrive at an Intake unit at a given facility, when they leave the Intake unit at that facility, when they arrive at the next facility's Intake unit, and when they are subsequently housed at that facility.  (Id.)  Mr. Miller represents that the Department will train Intake staff and supervisors on these processes, and Defendants submit that these changes should be fully implemented by the end of February or mid-March.  (Id. (noting end of February as the planned implementation deadline); see also docket entry no. 495 (identifying March 15, 2023, as the deadline for ensuring the ITS is properly implemented).)

The Monitoring Team reports that Mr. Miller's conclusion that the ITS can be used "as-is" without "additional modifications to the system" "appears reasonable."  (Docket entry no. 504 at 32 n.17.)  Based on the Department's representations to the Monitoring Team that its plans for accompanying "staffing, supervision, [and] training" will be rolled out, with the full implementation of the ITS, by March 15, 2023, the Monitoring Team has determined that the overall plan for inter/intra facility Intake is "reasonable" and the Team "does not have any further recommendations for additional steps the Department should take to address the requirements of the Second Remedial Order or the Action Plan pertaining to tracking inter/intra facility transfers."  (Id. at 33-34.)

DISCUSSION

Plaintiffs move to hold the Department in civil contempt of the Intake Tracking Clause.  With respect to new admissions, Plaintiffs argue that a finding of contempt is warranted because the Department has only just – in January 2023 – implemented a revised tracking system after the inconsistent and erroneous use of the Dashboard rendered the Department's data from

_____

such problems" in the Monitoring Team's view because the accompanying card "[r]emains in the Department's possession at all times."  (Id.)

2022 unreliable and unusable.  (See docket entry no. 500 ("Pl. Mem.") at 16.)  Plaintiffs argue

that, although, based on the implementation of the revised Dashboard, the "Department may

claim to be complying now," the Department is and has been in civil contempt of the Intake

Tracking Clause because "the Department was inexcusably out of compliance from November

2021 almost until today" and, moreover, "the Department still has not shown that its new system

is reliable, as the [Intake Tracking Clause] requires[.]"  (Id.)  Plaintiffs also assert that the

Defendants are in civil contempt of the Intake Clause with respect to inter/intra facility transfers

because the Department has failed to consistently and reliably use an existing tool – the ITS – to

track incarcerated individuals held in inter/intra facility Intake units, and "merely hopes to begin

using ITS in March 2023, 16 months after the deadline imposed in the Second Remedial Order."

(Id. at 15-16.)

        A civil contempt order is "warranted only if the 'moving party establishes by

clear and convincing evidence that the alleged contemnor violated the district court's edict."

Mister Softee, Inc. v. Tsirkos, No. 14-CV-1975-LTS-RLE, 2014 WL 2971106, at *3 (S.D.N.Y.

July 2, 2014) (quoting King v. Allied Vision, Ltd., 65 F.3d 1051, 1058 (2d Cir. 1995)).  The

movant seeking a contempt of court order bears the burden of demonstrating that "(1) the order

the contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is

clear and convincing, and (3) the contemnor has not diligently attempted to comply in a

reasonable manner."  Id. (quoting United States v. N.Y.C. Dist. Council of N.Y.C., 229 F. App'x

14, 18 (2d Cir. 2007)).  The movant need not establish that the violation of the Court's order was

willful.  Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Techs., Inc., 369

F.3d 645, 655 (2d Cir. 2004) (citation omitted).

Should the movant establish the necessary elements, the Court may invoke its "inherent power to hold a party in contempt," which is "a necessary function for purposes of managing and maintaining order in the efficient and expeditious administration of justice." Flaherty v. Filardi, No. 03-CV-2167-LTS-HBP, 2009 WL 3762305, at *4 (S.D.N.Y. Nov. 10, 2009) (citation omitted); see also id. ("Civil contempt is appropriate to ensure parties' future compliance with court orders and to compensate a wronged party."); Paramedics, 369 F.3d at 655 (explaining "a party may be held in civil contempt" if the above three factor-test is met). The determination that a party is in civil contempt is within the district court's discretion.  See, e.g., Levin v. Tiber Holding Co., No. 98-CV-8643-SHS, 1999 WL 649002, at *2 (S.D.N.Y. 1999).  That discretion is limited, however, as "[c]ivil contempt is a 'potent weapon,'" Ecopetrol S.A. v. Offshore Exploration & Production LLC, 172 F. Supp. 3d 691, 698 (S.D.N.Y. 2016) (quoting Allied Vision, 65 F.3d at 1058), that should be reserved for "appropriate circumstances."  Latino Officers v. City of New York, 519 F. Supp. 2d 438, 443 (S.D.N.Y. Oct. 26, 2007) (explaining "contempt adjudications are not made lightly"); see also S. New England Telephone Co. v. Global NAPS Inc., 624 F.3d 123, 145 (2d Cir. 2010) ("[A] contempt order is . . . a potent weapon, to which courts should not resort where there is a fair ground of doubt as to the wrongfulness of the defendant's conduct." (internal quotation marks and citation omitted)); Miss Jones LLC v. Stiles, No. 17-CV-1450-NSR, 2020 WL 7043508, at *6 (S.D.N.Y. Dec. 1, 2020) ("Contempt is left to the discretion of the Court.").  The "primary purpose" of a finding of civil contempt, and the imposition of related remedies, is "to coerce the contemnor into future compliance and to remedy past non-compliance, rather than to punish [the contemnor]."  Matter of Dickinson, 763 F.2d 84, 87 (2d Cir. 1985) (citation omitted); see also Gucci Am., Inc. v. Weixing Li, 768 F.3d 122, 144 (2d Cir. 2014) ("It is basic law that a civil contempt sanction

must only be compensatory or coercive, and may not be punitive."); In re Chief Executive

Officers Clubs, Inc., 359 B.R. 527, 534 (S.D.N.Y. 2007) ("The purpose of civil contempt is to

compel a reluctant party to do what a court requires of him.").

        The Inmate Tracking Clause is clear and unambiguous; it is "'specific and definite

enough to apprise those within its scope of the conduct that is being proscribed' or required."

Telenor Mobile Commc'ns AS v. Storm LLC, 587 F. Supp. 2d 594, 615 (S.D.N.Y. 2008)

(quoting New York State Nat'l Org. for Women v. Terry, 886 F.2d 1339, 1352 (2d Cir. 1989)).

The clause clearly imposes the obligation on the Department "to develop and implement a

reliable system to track and record the amount of time an incarcerated individual is held in Intake

and any instance when an individual remains in Intake for more than 24 hours."  (Second

Remedial Order ¶ 1(i)(c); Action Plan § E, ¶ 3(a).)  Because Intake encompasses both the

processes that incarcerated individuals experience when they are newly admitted to the

Department's custody and also those they undergo when they move between facilities, the

obligation to develop and implement a reliable tracking system applies equally to new

admissions and inter/intra facility transfers.  Neither party argues otherwise.

        Defendants attempt to cast doubt on the clarity of the tracking requirement by

arguing that the Intake Tracking Clause is not "clear and unambiguous" "[a]s construed by

Plaintiffs."  (Def. Mem. at 12.)  They point to potential areas of contention between the parties

that remain subject to ongoing negotiation, including as to when it is appropriate to "stop the

clock" and exclude time from the 24-hour processing requirement and as to whether the 24-hour

processing time frame should start at the time the individual is committed to the Department's

custody at the courthouse or at the time the individual arrives at an Intake unit.  (Def. Mem. at

12-13.)  Defendants concede, however, that these issues are immaterial to the instant motion

practice because neither creates any ambiguity as to Defendants' Court-imposed obligation to create and implement reliable tracking systems for the Intake units.  (Id. at 13.)  Defendants' passing suggestion that the Inmate Tracking Clause is ambiguous because the Action Plan failed to "set a new deadline" for compliance with paragraph 1(i)(c) of the Second Remedial Order is similarly unavailing.  (Def. Mem. at 6.)  Although the order imposing the Action Plan was entered in June 2022, the Action Plan specifically incorporated paragraph 1(i)(c) of the Second Remedial Order by reference, and therefore also incorporated the Second Remedial Order's deadline for compliance of November 15, 2021.  The fact that the deadline included in that provision had passed does not mean it no longer applied or held legal force.  If anything, the incorporation of a past-due date for compliance indicates the urgency underlying the provision's requirements.  Plaintiffs, therefore, have met their burden of demonstrating that the Court order at issue here – the Inmate Tracking Clause – is clear and unambiguous.

Plaintiffs have proffered clear and convincing evidence that the Department has failed to comply with the Intake Tracking Clause with respect to new admissions.  Although the Department implemented and utilized the Dashboard to track new admissions beginning in the fall of 2021, the tracking system proved to be unreliable, and the data generated throughout the 2022 calendar year could not be used to accurately assess whether individuals were remaining in Intake past the 24-hour time limit.  (See, e.g., docket entry no. 504 at 13-14 (explaining the "data captured by the system" was "unreliable and unusable" and "available data prior to 2023 does not reliably or accurately capture the extent to which the Department adhered to the processing of individuals through intake within 24 hours"); docket entry no. 472 at 86-87 (explaining that because there was "no reliable data[,]" the Department's compliance with the 24-hour processing requirement was "simply unknown"); Miller Decl. § A, ¶ 5 ("DOC does not disagree

with [the] assessment" that the "data . . . was 'unreliable.'"").) Moreover, even though the Department recently rolled out the revised Dashboard, with additional technological features to increase reliability and accountability among staff (see Miller Decl. § A, ¶¶ 7-9 (noting that the system has "been in full operation since January 5, 2023"), the accuracy of the new system has yet to be determined as it must undergo monitoring and assessment by the Department, the Nunez Compliance Unit, and the Monitoring Team over time (see id. § A, ¶ 8; docket entry no. 504 at 20-25). Therefore, based on the undisputed record, Defendants have been noncompliant with the Second Remedial Order and Action Plan's requirement to implement a reliable tracking system by November 15, 2021.

Plaintiffs have also met their burden to demonstrate, clearly and convincingly, that the Department is noncompliant with the Intake Tracking Clause with respect to inter/intra facility transfers. All parties agree that the Department, as of mid-February 2023 when briefing was completed on the instant motion, had not yet implemented a system-wide tracking mechanism to monitor stays in inter/intra facility Intake units. (See, e.g., docket entry no. 504 at 31-32 ("To date, the Department has not tracked valid system-wide data for individual stays in intake."); Miller Decl. § B ¶ 4 (explaining that the Department was keen "to work on the new admission process first" and plans to implement the inter/intra facility tracking system "by the end of February"); docket entry no. 507 ("Pl. Reply") at 1 ("[A]ll the Parties and the Monitor are in agreement that there is currently no reliable tracking system at all for people in intra-facility intake.").) The undisputed record indicates that, although ITS existed as an available and capable tool for tracking inter/intra facility Intake stays (see, e.g., docket entry no. 420 (Nov. 2021 Monitor's Report stating that the ITS "is in place and capable of tracking movement," yet the system "is not consistently utilized by staff" and data "developed by this system is not

reliable"); docket entry no. 438 (Mar. 2022 Monitor's Report (same)); docket entry no. 467 (June

2022 Monitor's Report (same)); docket entry no. 472 (Oct. 2022 Monitor's Report (same)),

Defendants did not finish evaluating that system or develop their plan to use it facility-wide until

January 2023.  (Docket entry no. 495 (Jan. 10, 2023 status update from Defendants noting that

Mr. Miller had completed his "review of current procedures" and concluded that the ITS "can be

used to reliably track persons in custody").)  Failure to implement a tracking system is a clear

violation of the Intake Tracking Clause included in the Second Remedial Order and Action Plan.

Defendants proffer that the Department plans to begin using the ITS by late February or mid-

March, approximately 16 months past the deadline for compliance included in the Second

Remedial Order.  (See Miller Decl. § B ¶ 4 (describing late February for likely implementation

of ITS at all facilities); Def. Mem. at 7 (explaining ITS will be rolled out by March 15, 2023 "at

the latest")).  Even if the Department succeeds in implementing the ITS by mid-March, the

reliability of the system will need to be assessed over time.

        The assessment of whether Defendants have "diligently attempted to comply"

with the Intake Tracking Clause "in a reasonable manner[,]"  Mister Softee, Inc., 2014 WL

2971106, at *3, requires an understanding of the context of this case and the recent measures the

Department has employed to achieve meaningful reform.    As explained above, the Consent

Judgment was entered in 2015 to "protect the constitutional rights" of incarcerated individuals

and protect them from "unnecessary and excessive force[.]"  (Docket entry no. 249 at 1.)

Accordingly, as Defendants note, "the Intake [Tracking] Clause is not an end in itself" (Def.

Mem. at 20), but rather its relevance to this case rests on the nexus between overstays in intake

and the use of excessive force between incarcerated individuals and staff members.  (See, e.g.,

docket entry no. 504 at 9-10 (describing "disturbing pattern" that began in summer 2021 in

which "individuals languished in overcrowded intake units well beyond 24 hours" and 'violence

spiked in the intake units"); see id. at 8 ("The Department's over-reliance on intake units has

long been an area of focus for the Monitoring Team which has noted that a chaotic environment

and long processing times . . . within intake too often result in the use of force in response to

problems that emerge from this frustrating situation.").)  The Monitoring Team represents in its

February 2023 special report on Intake that, while the conditions in Intake require further

diligence from the Department, that diligence "must be appropriately balanced with the

overarching efforts to address the key focus of this case"—"resolving the longstanding concerns

about the safety and risk of harm to incarcerated individuals and staff at the Department."  (Id. at

5-6.)

       The Intake Tracking Clause is but one clause of hundreds set forth in the Consent

Judgment and Remedial Orders that requires Defendants to undertake efforts to reduce the use of

excessive force within New York City's jails.  (See docket entry no. 504 at 4 ("The issues related

to intake are a microcosm of the many issues facing this agency in that they are polycentric,

require various actors to work in concert, and yet also require straightforward, reasonable

solutions.")  The Action Plan, incorporating the Inmate Tracking Clause, was entered in June

2022 in full recognition that the Department was not in compliance with a substantial number of

provisions of the Consent Judgment and Remedial Orders and reflected a critical pivot to focus

on four foundational issues identified by the Monitoring Team.  The Monitoring Team

recognized that the lack of foundational good practices "created a polycentric problem" that

could only be solved by a "comprehensive and tangible shift in the City's and Department's

focus and priorities" to address those core deficiencies.  (Docket entry no. 438 at 1-3.)  Only

once those core deficiencies were addressed, the Monitoring Team reasoned, could the

Department hope to achieve compliance with this Court's prior orders.  (Id.; docket entry no. 462 at 2.)  Therefore, while the Intake processing and tracking requirements represent a critical part of the Department's plans for reform, there is a risk accompanying any granular focus on the Department's compliance with any one individual provision of the Consent Judgment, Remedial Orders, and Action Plan.  Rather, as the Monitoring Team notes, the focus must remain on continued progress toward rectifying the foundational issues underpinning the Department's mismanagement and working toward meaningful structural reform.

In addition, although the Department did not achieve compliance with the requirements of the Intake Tracking Clause by the November 15, 2021, deadline in the Second Remedial Order, the Department is currently undertaking enhanced efforts to comply.  With respect to new admissions, the Department reviewed the prior Dashboard after learning the tracking data proved to be unreliable, made a series of improvements, and implemented the newly updated Dashboard on or about January 5, 2023.  (Docket entry no. 495; Miller Decl. § A ¶¶ 8-9.)  The Dashboard, as revised, now includes several features to increase reliability and accountability including a "new prompt for the data entry person to confirm the accuracy of the custody time" (the time the individual is committed to DOC custody at the court house), "a new method for recording the time individuals are 'Ready for Clinic'" after undergoing searches and fingerprinting, revised prompts "to increase clarity for those entering and reviewing the data[,]" an indicator that arises when an individual has spent 18 hours in Intake, as opposed to an indicator arising at the 20-hour mark in the previous system, and the ability to identify "basic input errors including who entered any misinformation into the system."  (Miller Decl. § A ¶ 8; see also docket entry no. 504 at 15-18 (discussing various improvements to new admissions Intake process).)  To monitor and assess the tracking tool, the Department represents that it has

also committed to regular auditing by the Nunez Compliance unit to ensure "that data is being entered accurately and the 24-hour requirement is being met" as well as the generation of daily reports from the Dashboard to inform staff of any stays in Intake beyond 24 hours.  (Miller Decl. § A ¶ 8; docket entry no. 504 at 20-22.)  Based on the revised system, and the other measures undertaken by the Department to increase staffing in Intake and reduce overcrowding (see docket entry no. 504 at 15-18), the Monitoring Team has reported that it "does not have any further recommendations for additional steps the Department should take" at this time "to address the requirements of the Second Remedial Order or the Action Plan pertaining to new admission intake processing."  (Id. at 25.)

With respect to inter/intra facility transfers, the Department has also developed a concrete plan to track incarcerated individuals in Intake, and is on the brink of implementing that plan as of the issuance of this Memorandum Opinion and Order.  Mr. Miller, who assumed his role in July 2022, completed his review of the ITS, determined it was capable of tracking stays in intra/inter facility Intake units, and is overseeing the roll-out of ITS facility-wide by March 15, 2023.  (Docket entry no. 495; Def. Mem. at 7.)  Although the ITS did not require the same type of substantial updates as the Dashboard, the Department has taken additional steps to improve the efficiency of the intra/inter facility Intake process and monitor the reliability of its tracking system.  In lieu of scanning incarcerated individuals' bracelets upon their arrival and exit from the Intake units, as was done in the past, the Department has now decided to scan using an individual's accompanying card.  (Miller Decl. § B ¶ 4.; see also docket entry no. 504 at 32, 32 n.18 (Monitoring Team's report that this change should increase the tracking system's reliability because in contrast to individual bracelets, which "people in custody would sometimes destroy . . . or swap . . . with other individuals[,]" the cards are maintained in each facility's General Office

"which is generally proximate to the intake area of in each facility").  Similarly to the new admissions Intake process, the Department represents that it also "intends to conduct regular audits of the intra-facility tracking system" and to "produce daily reports . . . to show whether the 24-hour requirement is being met[,]" with information available to the Monitoring Team upon request.  (Miller Decl. § C ¶¶ 5-6.)  Based on these plans, "[a]t this juncture, the Monitoring Team does not have further recommendations for additional steps the Department should take to address the requirements of the Second Remedial Order or the Action Plan pertaining to tracking inter/intra facility transfers."  (Docket entry no. 504 at 34.)

Given the Department's recent progress in working toward compliance with the Intake Tracking Clause, while also prioritizing the larger foundational issues underpinning the Department's historic mismanagement of the City's jails, the Court declines to use its discretion to find Defendants in civil contempt at this time.  As explained above, the finding of civil contempt is a "potent weapon" meant to coerce a party into future compliance with a court order. Allied Vision, 65 F.3d at 1058; Latino Officers, 519 F. Supp. 2d at 443.  Here, although the Department's efforts to implement the requisite tracking systems were delayed, and seem to have been spurred, in part, by notification from external actors, the Department has now taken substantial steps to remedy the deficiencies of its prior approaches for tracking and to police the implementation of the revised systems proactively.  See, e.g., Zino Davidoff SA v. CVS Corp., No. 06-CV-15332-RJS, 2008 WL 1775410, at *8-9 (S.D.N.Y. Apr. 17, 2008) (finding that plaintiff "failed to demonstrate that [defendant] has not been making reasonably diligent and energetic attempts to comply with the [c]ourt's orders" where defendant took affirmative steps upon learning that its "instituted compliance measures" may not have been effective); Latino Officers, 519 F. Supp. 2d at 446 (finding that City was "reasonably diligent and energetic in

attempting to comply" with data collection and reporting obligations where it dedicated

significant resources to complying with the court order).  These efforts reflect a renewed sense of

dedication, and the Monitoring Team reports that the Department's remedial measures have led

to concrete progress within the Intake units.  (Docket entry no. 504 at 1-5.)  For example, the

Monitoring Team explained that the Department has reduced its reliance on Intake units in the

wake of violence incidents, use of force in Intake areas has decreased, and the issues involved in

safe and efficient Intake processing have been prioritized by "[l]eaders at the highest levels"

including the "First Deputy Commissioner, the Deputy Commissioner of Custody Management,

Classification & Facility Operations, the two Associate Commissioners of Facility Operations,

the Department's General Counsel . . . and a variety of other members of the Department's

team."  (Docket entry no. 504 at 1-5.)

       Moreover, the Court concludes that a finding of civil contempt related to the

Defendants' efforts to comply with one specific, court-ordered provision—among hundreds

applicable to Defendants in this litigation—would be contrary to the spirit of the Action Plan and

denigrate the importance of the Department's renewed and productive focus on the foundational

issues at the core of the Department's historic pattern of excessive use of force against persons in

custody.  As the Monitoring Team reported in late 2021, compliance with many requirements of

this Court's orders became "simply unattainable" due to the absence of the "basic foundations

needed to improve practices."  (Docket entry no. 431 at 9.)  For this reason, in June 2022, the

Defendants agreed to implement the concrete measures of relief set forth in the Action Plan that

were tailored to addressing the foundational deficiencies identified by the Monitoring Team.

Prioritization of those core issues remains necessary, as the Monitoring Team has reported, in

order for the Department to "to reduce the imminent risk of harm faced by people in the

Department's custody" and to enhance the basic security practices necessary to begin to implement the necessary reforms set forth in the Consent Judgment and Remedial Orders. (Docket entry no. 504 at 5.)

   Critical work remains, and the Court hereby directs the Department to file status reports on its progress in implementing the relief set forth in the Intake Tracking Clause on March 20, 2023, and April 17, 2023.   Only if the recent sense of urgency and dedication shown by the Department continue can the Defendants expect to implement the structural reform necessary to improve the safety of the facilities and avoid a finding of civil contempt.

CONCLUSION

   For the foregoing reasons, Plaintiffs' motion to hold Defendant the New York City Department of Correction in civil contempt is denied without prejudice to renewal following subsequent reporting by Defendants as to their progress in achieving compliance with the terms of the Intake Tracking Clause.  Defendants are hereby ordered to file status reports on the public docket regarding the status of their continued efforts to implement reliable Intake tracking systems for new admissions and inter/intra facility transfers (see Second Remedial Order ¶ 1(i)(c) and Action Plan § E ¶ 3(a)) by **March 20, 2023** and **April 17, 2023**.  The Court also requests that the Monitoring Team include a brief update in the **March 31, 2023** report detailing any developments that have occurred since the February 3, 2023, Special Report was issued (see docket entry no. 504) pertaining to Intake.

This Memorandum Opinion and Order resolves docket entry no. 499.

SO ORDERED.

Dated: New York, New York
      March 13, 2023

                                                /s/ Laura Taylor Swain
                                            LAURA TAYLOR SWAIN
                                            Chief United States District Judge