# Status Report on DOC's Action Plan
# by the
# *Nunez* Independent Monitor

**April 3, 2023**

### THE NUNEZ MONITORING TEAM

Steve J. Martin
*Monitor*

Kelly Dedel, Ph.D.
*Subject Matter Expert*

Anna E. Friedberg
*Deputy Monitor*

Dennis O. Gonzalez
*Associate Director*

Patrick Hurley
*Subject Matter Expert*

Alycia M. Karlovich
*Analyst*

Emmitt Sparkman
*Subject Matter Expert*

Christina Bucci Vanderveer
*Associate Deputy Monitor*

**Introduction** ................................................................................................................ 1
  Background ................................................................................................................ 1
  Current State of Affairs ............................................................................................ 3
  Role of the Monitor .................................................................................................. 6
  Assessment of Progress ........................................................................................... 7
  Structure of the Report ............................................................................................ 9

**Progress Update on the Action Plan** ...................................................................... 11
  *Uniform Staffing Practices* ..................................................................................... 11
    Background ............................................................................................................ 11
    Efforts to Ensure a Workforce of an Appropriate Size ........................................ 13
    Status of Efforts to Improve Availability of Staff ............................................... 14
    Staff Assignment in the Jails ............................................................................... 17
    Initiatives to Manage Staff on Sick Leave and Modified Duty ........................... 23
    Accountability for Abuse of Leave & Modified Duty .......................................... 30
    Summary & Next Steps ......................................................................................... 34
  *Security Practices & Indicators* ............................................................................. 36
    Security and UOF Practices .................................................................................. 37
    Staff Supervision ................................................................................................... 39
    Security Initiatives ................................................................................................ 44
    Security Indicators ................................................................................................ 47
    Facility Specific Initiatives .................................................................................. 52
    Current State of Affairs & Moving Forward ........................................................ 62
  *Deaths of Individuals in Custody* ........................................................................... 64
  *Intake* ...................................................................................................................... 73
    Intake for People Newly Admitted to the Department ......................................... 74
    Intake for those Transferred Within and Between Facilities ................................ 81
    Quality Assurance of Department's Tracking Efforts .......................................... 84
    Conclusion & Next Steps ...................................................................................... 87
  *Classification of Individuals in Custody* ............................................................... 89
    Classification Process ........................................................................................... 89
    Blending of Housing for Security Risk Groups .................................................... 92
  *Managing Incarcerated Individuals Following Serious Incidents of Violence* ...... 95
  *Staff Accountability* ............................................................................................... 100
    Investigations ...................................................................................................... 100
    Discipline ............................................................................................................. 102
    Looking Ahead ..................................................................................................... 106
  *Overarching Initiatives Related to Reforms* ......................................................... 110
    Recruitment Efforts ............................................................................................. 110
    Department's Engagement, Focus, and Collaboration Related to the Court's Orders ...... 113
    Training Initiatives .............................................................................................. 115
    City-Wide Support of Reform Efforts ................................................................ 116
    Reducing the Population & Addressing Increasing Lengths of Stay in Custody ............. 117

**15th Monitoring Period Compliance Assessment for Select Provisions of the Consent
Judgment and First Remedial Order** ...................................................................... 122
    Initiatives to Enhance Safe Custody Management, Improve Staff Supervision, and
    Reduce Unnecessary Use of Force (Remedial Order § A) ......................... 124
    Use of Force Policy (Consent Judgment § IV) ............................................. 144
    Use of Force Reporting and Tracking (Consent Judgment § V) .................. 146
    Use of Force Investigations (Consent Judgment § VII) ............................... 155

Risk Management (Consent Judgment § X) ............................................................ 172
Staff Discipline and Accountability
(Consent Judgment § VIII & Remedial Order § C) ............................................ 176
Screening & Assignment of Staff (Consent Judgment § XII) ................................ 210
Safety and Supervision of Inmates Under the Age of 19  (Consent Judgment § XV) 217

**Conclusion** ......................................................................................................... **220**
*Immediate Next Steps & Future Reporting* ........................................................ 222

**Appendix A: Additional Data** ............................................................................ **i**
Installation of Cell Doors ...................................................................................... ii
Facility Searches & Contraband Recovery ........................................................... iii
Data Regarding Unmanned Posts & Triple Tours ................................................ iv
Use of Force Involving Unmanned Posts ............................................................. vi
Sick Leave, Medically Monitored/Restricted, and AWOL Data .......................... vii
Staff Suspensions ................................................................................................... x
OATH Pre-Trial Conferences ................................................................................ xi
Individuals Who Died While in the Custody of the New York City DOC ............ xii

**Appendix B:  Definitions** ................................................................................... **xiv**

**Appendix C:  Flowchart of Promotions Process** ............................................. **xix**

# INTRODUCTION

This report is the fourth filed by the Monitoring Team since the Action Plan was ordered by the Court on June 14, 2022 (dkt. 465). Throughout this time, the Monitoring Team has been actively monitoring and engaged with the Department, has consulted with the Parties, and has met with the Court. The purpose of this report is to provide a neutral and independent assessment of the Department's efforts to achieve compliance with the Action Plan's requirements, and other relevant orders, and to inform the Court and Parties about the current state of affairs.

As in all complex institutional reform cases, time is of the essence when issues of constitutional dimension are at play. That said, changes of the magnitude necessary to transform the jails simply cannot be accomplished quickly or by large leaps and bounds. The Monitoring Team's experience suggests that progress toward safe facilities becomes evident via small improvements that accumulate over a long period of time. The pace of reform, to date, has been unquestionably slow and must be accelerated. Nonetheless, there have been improvements in addressing core foundational issues and in remediating the dangerous conditions in the jails—but the current state of affairs remains deeply troubling. Recent signs indicate the Department is beginning to reverse the spiral of chaos and disorder of the last few years and that the reforms are gaining momentum.

## *Background*

The Consent Judgment put into effect in 2015 did not anticipate the depth of dysfunction in staffing and basic security operations in the jails and thus, the reforms required by that document presupposed a foundational layer that did not, in fact, exist. The perfect storm presented by the COVID pandemic, the ensuing staffing crisis, and a revolving door of leadership (three different Commissioners in nine months, May 2021 to January 2022)

threatened to collapse a system that was already reeling from a poor foundation weakened by decades of neglect and both internal and external mismanagement. Thus, the Department has been trapped in a state of persistent dysfunction, where even the first step to improve practice has been undercut by the absence of elementary skills and basic correctional practices and systems. The creation of the Action Plan in June 2022 provided a roadmap for building the necessary foundations of proper staff management, security practices, safe management of people in custody and discipline for staff misconduct—upon which future improvements to the practices outlined in the Consent Judgment could be built upon. The Monitoring Team has often warned that addressing these complicated problems will take significant time, and certainly longer than the inherent danger of the jails should afford, because the solutions are every bit as complex as the problems.

      The Monitoring Team has provided a significant volume of reporting on the conditions of the jails. What must not be lost in this maze of documentation is the fact that real harm to both people in custody and staff continues to occur at unacceptable levels. The unacceptable rates of use of force, fights, assaults on staff and stabbing and slashings cause both physical and emotional harm. The sheer number of incidents cannot begin to capture the real abject harm that occurs in this setting. These incidents can be described and reported in words, but it is almost impossible to understand how the current "predatory environment" is experienced by the typical person in custody or staff member. The harm can be witnessed directly in the images from inside the jails— images of chaos, disorder, and sometimes serious injuries—which still belie the real fear felt by the participants, witnesses, and bystanders in real time.

      Managing this Department requires a strong command of and ability to articulate a wide array of interconnected initiatives with an ever-demanding group of stakeholders, each with

often contradictory agendas and priorities. In the midst of such a challenging setting, the focus

must be to advance those management choices that foster sound correctional practices among the

people closest to the day-to-day operation of the jails, practices that have not been embraced

fully by either facility leadership or line staff. Consequently, the success or failure of the reform

effort depends heavily on recruiting competent individuals to manage and operate the jails. In

other words, ensuring the acumen of those who work in the jails each and every day is the most

daunting, and yet the most critical, task that lies ahead.

*Current State of Affairs*

The Department has taken some important initial steps in building each area of this

desperately needed foundation, as the rest of this report details. The Department's headquarters

and the jails' conditions of confinement may be best described as in a state of flux, as both begin

to gradually transition away from deep dysfunction towards the beginnings of improved

management. To be sure, the overall number of use of force incidents remains too high as do the

instances of unnecessary and excessive force. Further, assaults on staff and violence among

people in custody also remain at unacceptable levels and the number of recent in-custody deaths

is alarming.

In each of the four main areas of the Action Plan (Staffing, Security, Discipline, and

Management of Individuals in Custody), the Department has developed insight into the nuances

of the problems and has crafted a logical, orderly plan for how to address them. In many cases,

the initial steps have been taken and the impact on intermediate outcomes appears to be

promising. This is not to suggest that the problems are anywhere near close to being resolved,

but rather that the Department has made some important changes to its foundational practices

that are well-grounded in sound correctional practice and that hold promise for catalyzing the

necessary reforms. If successful, this transition will begin to stabilize what has been for decades an unsafe setting for both detainees and staff.

The four new Deputy Commissioners for (1) Classification, Custody Management and Facility Operations; (2) Administration; (3) Security; and (4) Training and Development and the two new Associate Commissioners of Operations are making administrative gains that have catalyzed some positive organizational momentum. There are:

- Identifiable improvements in staff deployment and increasing numbers of staff who are available to work with the incarcerated population.

- Definitive steps have been taken to improve security practices, most evident at RNDC and GRVC.

- Initiatives to improve the Department's practices related to preventing self-harm and evaluating the circumstances surrounding deaths in custody so that future tragedies may be avoided.

- Intake processing has become more orderly and efficient.

- Classification processes are being refined to properly address both risk and gang affiliation, and efforts are underway to implement an appropriate housing strategy for those individuals who engage in serious acts of violence.

- The Trials and OATH Divisions have made positive gains in improving the disciplinary process and imposing discipline in response to staff misconduct.

- In April 2023, five Assistant Commissioners of Operations are slated to begin serving as the Wardens in the facilities.

In the Monitoring Team's experience, these small changes often allow bigger, more pronounced changes to become possible. The Monitoring Team is particularly focused on

4

necessary changes in the day-to-day management and operation of the facilities (including response teams) and on shoring up elements of the investigation and disciplinary processing that have recently lost ground or otherwise become more salient.

While clear progress is being made at the executive level of the agency, the tangible difference made by those with experience external to this Department underscores the importance of infusing the facilities themselves with this same level of competence and commitment to better practice. Ensuring that the four levels of managers/supervisors (Warden, Deputy Warden ("DW"), Assistant Deputy Warden "(ADW"), and Captain) in each jail have the skill and willingness to guide better practice among line staff is the next major challenge that lies ahead, and arguably the one that will make the biggest impact on the conditions in the jails. For example, the Monitoring Team recently identified some questionable promotions of ADWs who did not appear to have the requisite level of competence in this critical echelon of uniformed security. These concerning promotions are partly a reflection of the fact that staff competency in basic supervision is limited. The rank of ADW is ripe for intensive mentoring to help them to develop the skills they will need, and the infusion of correctional expertise in the facilities, especially, the new Assistant Commissioners of Operations (who will serve as the Wardens of the facility) are expected to support this improvement. Further, the Monitoring Team's survey of personnel permitted to occupy positions on the Emergency Services Unit ("ESU"), the Department's elite tactical squad, gives rise to questions about the leadership of this division and the fidelity to which individuals are selected to serve on this team that should be models of de-escalation rather than continually exacerbates problems.

Finally, the most disturbing pattern that emerged during this reporting period is the decline in performance of the Investigations Division ("ID"), which is the *sine qua non* of

accountability for adherence to the Use of Force Directive. Much progress had been made with respect to the operations of the ID during the previous seven years. Unfortunately, the new leadership of ID was unable to sustain this momentum, which resulted in a measurable diminution of ID's performance such that misconduct is not currently subject to the investigative necessary to identify *all* staff who engage in unnecessary and excessive force. A very recent change in ID's leadership (at the end of March 2023) creates an opportunity for the Department to prevent further deterioration and to regain the ground that has been lost, assuming the selection of an appropriately skilled individual who is committed to fulfilling the requirements of the Consent Judgment.

Moving forward, the Department's continued progress will operate on many planes. For new practices recently implemented, the Department must focus on the fidelity of the implementation, on the quality of practice, and on the choices that staff make moment-to-moment. At the same time, Department leaders must prepare to layer on the next sets of procedural and practice enhancements and must begin to assess whether those appear to be achieving the intended intermediate outcomes. Obviously, a major task will be appropriately sequencing and prioritizing so that the many layers of reform occur in a coherent and organized manner. This is no small undertaking, and the Monitoring Team stands at the ready to provide any assistance necessary to facilitate the positive changes that are beginning to occur.

*Role of the Monitor*

The Monitoring Team has several key responsibilities. Chief among them is providing transparency about the Department's progress towards achieving compliance with the various court orders. This has been particularly crucial in dealing with such a dysfunctional system. In its role, the Monitoring Team provides a description of what is currently occurring, obstacles to

6

reform, and how the Department's practices comport with sound correctional practice. As long

noted, simply requiring the Department to do something and reporting on whether it has been

done is insufficient to actually catalyze the magnitude of change that is needed in this system.

This is why the Monitoring Team has endeavored to provide the Court and the Parties to the

*Nunez* litigation with the information necessary to understand **why** the current state of affairs is

what it is, how it compares to sound correctional practice, and, when appropriate, to advise how

practice and procedures can be improved. As part of this work, the Monitoring Team has

provided extensive recommendations and technical assistance on how to build many of the

foundational systems discussed in this report that are necessary to support the reform. However,

to be certain, the Monitoring Team does not act in the Department's place, nor can it insist that

the Department proceed in a certain way. Ultimately, it is the City and the Department that must

guide, direct and implement the requirements of the Court's orders. The ultimate goal of any

type of institutional reform is for the system to develop an internal capacity to identify and solve

its own problems, without the need for external oversight to untangle the problems or instigate

the motivation to address them.

*Assessment of Progress*

The Monitoring Team's assessment of progress requires evaluation of multiple measures

in each key area of the Consent Judgment, Remedial Orders, and Action Plan (*e.g.*, staffing,

safety and security, staff discipline) because no one metric adequately represents the multi-

faceted nature of these requirements. While quantitative data is a necessary component of any

analysis, relegating a nuanced, complex, qualitative assessment of progress towards achieving

compliance with these requirements into a single, one-dimensional, quantitative metric is not

practical or advisable. Data—whether qualitative or quantitative—cannot be interpreted in a

vacuum to determine whether progress has been made or compliance has been achieved. For example, meeting the requirements of the Staffing section of the Action Plan relies on a series of closely related and interdependent requirements (*e.g.*, unpacking the source of the dysfunction regarding abuse of leave, modernizing systems for scheduling staff, and teaching facility leaders how to properly deploy staff to meet the Department's core responsibilities) working in tandem to ultimately increase the number of staff who are available to work directly with incarcerated individuals. As such, there is no single number that could determine whether the Staffing section of the Action Plan has been properly implemented. Analogous situations appear throughout this report, whether focused on discussions about improving safety in the facilities or making the process for imposing staff discipline timelier and more effective. The Monitoring Team therefore uses a combination of quantitative data, qualitative data, contextual factors, and the standard of practice to assess progress with each of the Action Plan's requirements.

Further, two cautions are needed about the use of quantitative metrics. First, the use of numerical data suggests that there is a line in the sand that specifies a certain point at which the Department passes or fails. There are no national standards regarding a "safe" use of force rate, a reasonable number of "unnecessary or excessive uses of force" nor an "appropriate" rate at which staff are held accountable.[1] The Monitoring Team's multi-faceted strategy for assessing compliance requires an assessment of all inter-related issues, because each of the main Action Plan requirements is more than simply the sum of its parts. For this type of analysis, the experience and subject matter expertise of the Monitoring Team is critical, to not only

---

[1] Notably, this is why the Consent Judgment, the underlying *Nunez* litigation, CRIPA investigation the Remedial Orders, nor the Action Plan include specific metrics the Department must meet with respect to operational and security standards that must be achieved.

contextualize the information, but also to compare the Department's performance to their decades-long, deep experience with the operation of other jail systems.

Second, there are infinite options for quantifying the many aspects of the Departments' approach and results. Just because something *can* be quantified, does not mean it is useful for understanding or assessing progress. The task is to identify those metrics that actually provide insight into the Department's processes and outcomes and are useful to the task of problem solving. If not anchored to a commitment to advance and improve the way the Department is doing something or to the results it is trying to achieve, the development of metrics merely becomes a burdensome and bureaucratic task that distracts from the qualitative assessments needed to understand and more importantly, improve, the processes and outcomes that underpin the requirements of the Consent Judgment and Remedial Order. Poorly conceptualized metrics create an unnecessary focus on "counting" instead of solving the actual problems at hand. In short, while there are certain *ad hoc* requirements that are amenable to the development of metrics, overall, the Monitoring Team strongly discourages a strategy that relies on a single metric against which progress is measured. As a cautionary observation, it should be noted that solutions which are overly encumbered by legalese, or are hyper-technical or arbitrary, often imposed under the guise of problem-solving, can sometimes have the unintended effect of undermining the reform effort rather than strengthening it.

## _Structure of the Report_

This report has three sections. The first section focuses on the work related to the Action Plan and the current state of affairs, including: Uniform Staffing Practices, Security Practices & Indicators, Deaths of Individuals in Custody, Intake, Classification of Individuals in Custody, Managing Incarcerated Individuals Following Serious Incidents of Violence, Staff

Accountability, and Overarching Initiatives Related to Reform. When applicable, the Monitoring

Team offers concrete recommendations for the Department's focus in the near term. The second

part of the report is the 15th Monitoring Period Compliance Assessment for Select Provisions of

the Consent Judgment and First Remedial Order ("Compliance Assessment section").[2] The final

section of the report is the first Appendix A: Additional Data containing additional information

and data not otherwise provided in body of this report.

---

[2] § G., ¶ 5 of the Action Plan requires the Monitoring Team to assess compliance with the following
provisions for the period covering January 1 – June 30, 2022: Consent Judgment § IV., ¶ 1 (Use of Force
Policy); § V., ¶¶ 2 & 22 (Use of Force Reporting and Tracking); § VII., ¶¶ 1 & 9(a) (Use of Force
Investigations); § VIII., ¶¶ 1, 3(c) and 4 (Staff Discipline and Accountability); § X., ¶ 1 (Risk
Management); § XII., ¶¶ 1, 2 and 3 (Screening and Assignment of Staff); § XV., ¶¶ 1, 12 and 17 (Safety
and Supervision of Inmates Under the Age of 19); as well as First Remedial Order § A., ¶¶ 1 to 4 and 6
(Initiatives to Enhance Safe Custody Management, Improve Staff Supervision and Reduce Unnecessary
Use of Force) and § C., ¶¶ 1, 2, 4 and 5 (Timely, Appropriate and Meaningful Staff Accountability).

# PROGRESS UPDATE ON THE ACTION PLAN

## UNIFORM STAFFING PRACTICES

The Department has made appreciable progress in managing its uniform staff and untangling the dysfunctional staffing practices that have been entrenched for decades. To be certain, significant work remains for the Department to properly manage its staff and to instill new practices consistently over time. Given the complexity of the task and the sheer number of staff that must be managed, this process will take considerable time. That said, the Department's efforts to date have already begun to improve practice and certainly suggest the Department is in a position to reverse the poor practices of the past and to create a sustainable process going forward should it maintain the same level of focus and dedication that has been expended since the Action Plan was put in place.

### *Background*

The Monitoring Team has long been concerned about the way staff are assigned within the jails. Not only are practices inefficient, but also misaligned with the values that undergird the reform effort, such as de-escalation and reliable service provision on the housing units. These concerns and findings long pre-date the staffing crisis in 2021 in which a different, but corresponding, staff management issue was exposed with respect to the lack of controls to manage staff who may not be available to work. The Department's staffing model was dysfunctional, antiquated, deeply entrenched, and mainly paper-based with no overarching staffing plan, built-in controls, or oversight. The convergence of the Department's poor staff assignment practices, and the lack of adequate control and enforcement of leave and modified duty procedures left the facilities without sufficient staff to provide adequate safety and access to

11

services. It is for these reasons that the Action Plan (§ C., ¶ 1) required the appointment of a

Staffing Manager with external expertise in sound correctional management, who would be

charged with overhauling the Department's staffing tools and protocols in order to maximize the

assignment of staff within the jails pursuant to Action Plan § C., ¶ 3. Simultaneously, the Action

Plan (§ A., ¶ 2(d) to (g)) also requires the Department to implement adequate controls to

eliminate the abuse of sick leave and other problems that permitted such high numbers of staff to

be unavailable to work in the jails.

 The Department has long had, and continues to have, a large workforce. As the various

staffing problems have slowly become untangled, it is clear that properly assigning staff would

provide sufficient coverage to enhance safety in the jails, even with a reasonable number of staff

on sick leave/modified duty and even though the size of the Department's workforce has

decreased over time. Since the Action Plan went into effect, the Department has developed some

new resources and tools that should facilitate the necessary improvements to its staffing

practices. These include the appointment of a Staffing Manager with significant expertise in

sound correctional practices for managing Staff, the use of automated workforce

management/scheduling software (*i.e.,* InTime) for roster management, sorely needed updates to

antiquated staffing conventions, and a new focus by the Department (including new protocols

and enforcement strategies) on properly managing staff on leave and modified duty. These

advances are described in detail below, and are already having an impact as staff appear to be

assigned to posts within facilities more appropriately with a corresponding reduction in the

number of unstaffed posts, and a significant decrease in the number of staff who are unavailable

to work. These are important improvements to a system that, until very recently, appeared to be

on the brink of a staffing collapse.

12

*Efforts to Ensure a Workforce of an Appropriate Size*

The current size of the workforce (approximately 6,600 uniform staff) is about 35% smaller than it was at its peak five years ago. Prior to 2019, the Department had a larger workforce (10,000+ uniform staff) than any jurisdiction with which the Monitoring Team is familiar. This provided a functional margin that allowed the Department to continue to staff the jails even with large numbers of staff on sick leave or modified duty for extended periods of time, and even with a multitude of scheduling inefficiencies and poor management practices. While the smaller workforce of recent times does not provide the extremely generous margin that allowed the Department to remain functional despite deep problems with its staff management practices, this smaller workforce it is still sufficient to provide adequate supervision of people in custody *if* efforts to efficiently schedule and properly deploy staff are implemented across all facilities, and *if* abuses of staff leave and modified duty are effectively curtailed.

The Staffing Manager's work to maximize staff deployment efficiencies and the Department's efforts to ensure that only a reasonable number of staff are on leave at a given time (versus the excessive number of staff on leave currently) will provide a well-grounded approach to determining staffing needs. In other words, this foundation will create an ability to properly ascertain the number of staff needed to manage the jails. To date, the Department has been unable to do so with any sort of data-driven rationale.

Of course, the Department cannot withstand a continuous reduction in the size of its workforce via attrition without backfilling at least *some* of the vacant positions with new recruits. The Department must ensure that hiring efforts mitigate rising attrition rates, but this is not to say that the Department's staffing level needs to return to its apex of over 10,500 staff. Therefore, recruiting new staff is also necessary. To that end, the Department has a recruitment target of 500

13

officers for 2023.[3] The ongoing staffing crisis, the conditions in the jails, and overall tenor of the public discourse make it particularly difficult to both retain and attract staff. This is compounded by the fact that all correctional systems with which the Monitoring Team is familiar are struggling to attract new staff and to retain existing staff during the post-COVID era, a trend that is evident within other New York City agencies as well.

_Status of Efforts to Improve Availability of Staff_

The improvements in the Department's staffing practices are most evident in the decreases in the number of unstaffed posts, the decrease in staff working triple shifts, as well as the increase in the number and proportion of staff available to work with the incarcerated population, as discussed in more detail below.

Important decreases in the number of unstaffed posts[4] and staff working triple shifts have occurred. As shown in the table below, the number of unstaffed posts decreased 99%, from an average of 68.27 per day (July to December, 2021) to an average of just 0.65 per day (July to December, 2022). In addition, the number of staff required to work triple shifts decreased 78%, from an average of 20.65 staff per day (July to December, 2021) to 4.48 staff per day (July to December, 2022).

---

[3] Approximately 610 officers were hired between 2019 and 2022 (380 new officers were hired and onboarded in 2019, none were hired in 2020 or 2021, and 230 new officers were hired and onboarded in 2022). Between 2015 and 2018, the Department engaged in a significant recruitment effort when over 5,600 officers were hired and onboarded during that four-year period.

[4] Note, this does not include a post in which a staff member, after being assigned, may abandon that post.

| Unstaffed Posts and Triple Shifts, July 2021 to December 2022 | | | | |
|---|---|---|---|---|
| Monitoring Period | Unstaffed Posts | | Triple Shifts | |
| | Total # Unstaffed Posts | Daily Average # Unstaffed Posts | Total # Triple Shifts | Daily Average # Triple Shifts |
| July to December, 2021 | 8,192* | 68.27 | 3,717 | 20.65 |
| January to June, 2022 | 5,490 | 30.50 | 1,950 | 10.83 |
| July to December, 2022 | 118 | 0.65 | 808 | 4.48 |
| *Note: The Department did not begin tracking unstaffed posts until September 2021, so data for this period does not include July or August, 2021.* | | | | |

It must be emphasized that *any* unstaffed post and *any* need for staff to work multiple shifts are antithetical to a healthy and safe correctional operation.

Problems related to sick leave and modified duty have also shown encouraging improvements. As shown in the table below, the *number* of staff in each category has substantially decreased. For example, the average number of staff out sick decreased 66% between January 2022 (when the new Commissioner was appointed) and February 2023. The number of staff on MMR[5] decreased 38% (from 685 to 422) and the number of staff who were AWOL decreased 79% (from 42 to 9) during this same time period. Decreases in the *proportion* of staff on these three statuses are of a similar magnitude (proportion out sick decreased 66%, MMR decreased 33%, AWOL is too small for meaningful calculation).

---

[5] Medically Modified/Restricted Duty Status in which staff may not have direct contact with incarcerated individuals.

| Sick Leave, Medically Modified Duty and AWOL, January 2019 to February 2023 | | | | |
|---|---|---|---|---|
| Month | Total Headcount | Avg. # Sick (%) | Avg. # MMR (%) | Avg. # AWOL (%) |
| January 2019<br>*Pre-COVID-19* | 10,577 | 621 (6%) | 459 (4%) | Not Available |
| April 2020<br>*Apex of COVID-19* | 9,481 | 3,059 (32%) | 278 (3%) | Not Available |
| September 2021<br>*Apex of Staffing Crisis* | 8,081 | 1,703 (21%) | 744 (9%) | 77 (1%) |
| January 2022<br>*New Commissioner* | 7,668 | 2,005 (26%) | 685 (9%) | 42 (1%) |
| June 2022<br>*Action Plan Effective Date* | 7,150 | 951 (13%) | 624 (9%) | 16 (<1%) |
| December 2022<br>*End of 15th Monitoring Period* | 6,777 | 754 (11%) | 452 (7%) | 7 (<1%) |
| February 2023<br>*Most Recent Data* | 6,632 | 680 (10%) | 421 (6%) | 9 (<1%) |

The Department's data also reflect a significant decrease in the number of staff on indefinite sick leave (*i.e.,* staff on sick leave for 30 or more days). The number of staff on indefinite sick leave decreased 54% between February 2022 (n=978) and December 2022 (n=450). Combined, these decreases translate to an increasing proportion of staff who are able to work directly with the incarcerated population, which is particularly essential given that the overall size of the workforce decreased 14% during this same time (from 7,668 to 6,625).

While the situation has recently improved, the proportion of staff who are unavailable to work is still high. More specifically, at least 10% of the workforce is not available to work with the incarcerated population on any given day, which is higher than the proportion of staff out sick or on MMR status prior to the COVID-19 pandemic. [6]

---

[6] The number of staff on sick leave and MMR cannot be combined because staff on MMR may also be out sick.

While the *actual number* of staff on sick leave and MMR duty are very similar to the number of staff in these categories prior to the onset of the COVID-19 pandemic, given the significant rate of attrition of staff at DOC since the pandemic, the *proportion* of the workforce represented by those out sick or on MMR is slightly higher. Higher rates of absenteeism post-COVID have been seen in correctional systems throughout the country as well as in other large uniform agencies in the City (*e.g.*, the Fire Department and the Department of Sanitation).[7] It is therefore difficult to ascertain what *reasonable* absenteeism rates may be under these circumstances. Further reductions are necessary, and the Department is now in a position to continue working toward that goal.

_Staff Assignment in the Jails_

The Department has lacked an appropriate framework and basic tools to properly administer staff assignments, particularly because of poor scheduling and deployment practices. As an initial matter, all staff *scheduling* was paper-based, with a small subset of information that was manually inputted into a computer for tracking purposes.[8] Problems included indecipherable facility schedules to identify who was expected and who actually reported to work on a given day, and a lack of fair and consistent mechanisms for assigning staff to work overtime. In addition, the Department's *staff deployment practices* did not make the best use of its workforce because uniformed staff were routinely utilized for job duties that did not prioritize work with the incarcerated population, priority posts were not identified for mandatory coverage, the use of

---

[7] The Comptroller's most recent Agency Watch List report notes that the proportion of staff out sick for the Fire Department and Department of Sanitation are both higher than it was prior to the COVID pandemic. *See* Lander, B. (2022). *Agency Watch List: Department of Correction, FY2023.* New York City Bureau of Budget: New York, NY, pg. 10. Available at: https://comptroller.nyc.gov/reports/agency-watch-list/fy-2023/department-of-correction-fy-2023/.

[8] This is the predominant reason that historical data regarding staff assignment are not readily available.

awarded posts limited flexibility in deploying staff to places where they were most needed, and work schedules (*e.g.*, days on/off, split shifts) were often illogical. Further, some uniform staff were temporarily deployed to various locations outside of the jails, and others performed tasks that could be done by civilians. In addition, both scheduling and deployment practices were often unfairly administered and poorly monitored by facility supervisors and leadership.

The well-qualified Deputy Commissioner for Administration ("Staffing Manager") [9] who began his tenure in September 2022 continues to untangle the Department's complex staffing problems in order to develop and implement multi-faceted solutions. The Staffing Manager oversees the Office of Administration which includes the roster management unit, called the Schedule Management and Redeployment Team ("SMART").[10] SMART includes one supervisor, eight officers, and a civilian administrative assistant. The officers were previously assigned to scheduling duties in the jails but were reassigned to SMART to ensure consistency and accountability. Offers have been extended to qualified candidates for various civilian positions but to date all offers have been declined, reportedly because SMART candidates are unwilling to commute to Rikers Island (the location of the unit is essential so that SMART staff remain in close contact with the jails). The Staffing Manager reported that filling the vacant manager position for the SMART unit is a key priority.

The Staffing Manager has taken meaningful action to improve how staff are scheduled and deployed within the jails. Not only has the Staffing Manager brought the Department current with scheduling innovations (*e.g.*, rolling out software for roster management) and aligned core

---

[9] As required by Action Plan § C, ¶ 1.

[10] As required by § C, ¶ 2.

pillars of roster management with best practice (*e.g.*, maximizing hours available via work schedules, focusing on increasing the size of the pool that is capable of fulfilling a variety of job duties), but he is also focused on identifying and rectifying the many places and ways in which uniformed staff resources were previously wasted. The planning work that began in summer 2022 has recently culminated in implementing these initiatives. Beginning in January 2023, a combination of initiatives were rolled out Department-wide, while others will be rolled out sequentially in the facilities, as outlined in more detail below.

- **Modern Tools for Staff Schedules & Tracking Attendance**
  - <u>Implementing InTime Scheduling Software</u>: The Department has procured and customized a cloud-based, single source tracking system, InTime.[11] In recent months, SMART and facility staff were trained to use the system, and InTime replaced the legacy paper-based system at RNDC in January 2023, GRVC in February 2023, and EMTC and VCBC in March 2023. A rolling schedule of implementation for the remaining facilities has been established to meet the June 1, 2023 timeline in the Action Plan.[12]
  - <u>Improving Staff Scheduling</u>: Prior to implementing the InTime system at a given facility, several analyses are conducted. These actions address multiple requirements of the Action Plan. A facility-specific *staffing analysis* is conducted to identify the number of people (and their assigned shift) on the facility's staffing roster and a *post analysis* is conducted to examine the number and job responsibilities of each post in the facility. Further, a list of uniformed staff assigned to each command is created, along with a post assignment classification system for every command.[13]

---

[11] As required by Action Plan § A, ¶ 5.

[12] As required by § C, ¶ 5 and § C, ¶ 3(i).

[13] As required by § C, ¶¶ 3(i), 3(viii) and ¶ 5.

o <u>Prioritizing Posts</u>: In each facility, posts in the housing units, central control, intake and program-related are prioritized to ensure these take precedence on all daily rosters. The job responsibilities of all facility posts are also analyzed to maximize efficient deployment. Procedures are put in place to ensure that priority posts are filled before non-priority posts.[14]

▪ SMART staff provide real-time assistance to the facilities to ensure all priority posts have a staff assigned per the schedule and that schedules are accurate (including properly documenting reasons staff may be out such as training, leave, FMLA, etc.). SMART staff also assess the accuracy of the daily line up (*i.e.*, daily roster) by verifying post manning within each facility using the staff attendance scanning system described below.

o <u>Attendance Scanning System</u>: The Department has begun to utilize a staff scanning system wherein each staff scans their ID card upon facility entry/exit and arrival/departure at their assigned post to ensure timekeeping integrity. This was rolled out at RNDC in September 2022, EMTC in December 2022, and GRVC in January 2023. The Department plans to expand its use to the remaining facilities by June 2023.[15]

o <u>Next Steps</u>: Once the efficiencies and mechanics of the new scheduling software have become more routine, SMART will work toward ensuring that other requirements of the Action Plan are consistently implemented, such as ensuring that more experienced staff are tapped to work in the housing areas.[16] All of this work will also support the efforts underway to develop an accurate relief factor for *each facility*.[17]

• **Reconstituting Wasteful Practices & Increasing Flexibility in Staff Assignments**

o <u>Maximizing Staff Schedules</u>: Several changes to staff schedules have been imposed to maximize staff deployment. First, given the increases in staff

---

[14] As required by Action Plan § C, ¶ 3(i).

[15] As required by § A, ¶ 2(c).

[16] As required by Action Plan § C, ¶ 3(i) and § C, ¶ 3(iv).

[17] As required by Action Plan § C, ¶ 3(ix).

availability discussed above, as of early 2023, all facilities now operate using three 8-hour shifts rather than two 12-hour shifts.[18] Further, the majority of posts in the facilities now operate according to these same three shifts, in contrast to the dizzying array of split shifts that characterized previous conventions. In addition, the Department is working to convert more staff to a 5x2 schedule (5 days on, 2 days off) from a 4x2 schedule, which increases the proportion of the workforce who is at work on any given day from one-half to two-thirds and thus provides greater flexibility for coverage.[19] Since fall 2022, the number of staff on 4x2 schedules has decreased by 15% (4,132 staff [20] compared to 4,863 staff) and so 62% of the workforce is now on the 4x2 schedule compared to 70%. Finally, the number of "squads" (*i.e.*, groups with the same days off) was also reduced from six to three.[21]

o   <u>Staffing Flexibility</u>: The practice of awarding posts has been suspended (meaning that no additional posts will be awarded) in fall 2022.[22] In March 2023, the number of staff on awarded posts was essentially the same as September 2022 (1,663[23] versus 1,661, respectively).[24] The Department reports that they have recently initiated a review of each individual staff on awarded posts to determine whether those posts are still appropriate. Another strategy to provide greater flexibility in staff scheduling is

---

[18] Beginning in 2021, at the apex of the staffing crisis, the Department switched to a 12-hour work shift because this convention requires few staff.

[19] Many systems utilize a 5x2 schedule where staff work five consecutive 8.5-hour workdays, followed by 2 consecutive days off. Staff on 4x2 schedules work four consecutive 8.5-hour workdays, followed by 2 consecutive days off. By way of illustration, not accounting for staff on leave, 300 staff working 4x2 schedules are able to fill 2,800 posts over the course of 2 weeks, but 300 staff working 5x2 schedules are able to fill 3,000 posts over 2 weeks. This difference is solely due to the differing work schedules and assigned days off.

[20] As of March 2023, 3,801 Officers, 282 Captains, and 49 ADWs are on 4x2 schedule.

[21] As required by Action Plan § C, ¶ 3(vi).

[22] As required by Action Plan § C, ¶ 3(v).

[23] In total, 11 ADWs, 220 Captains and 1,432 Officers have awarded posts as of March 2023.

[24] The Department reports that 1,661 staff had awarded posts in September 2022 (this is a slightly higher figure than what was reported in the Monitor's October 28, 2022 Report, because, after the report was filed, the Department identified some errors with the data).

the conversion of a variety of positions currently filled by uniformed staff to civilian positions.[25] As an initial matter, the Department's staffing assessment identified certain administrative posts (that have historically been filled by uniform staff) to be altogether superfluous. In other words, not every administrative post currently held by a uniform staff member needs to be converted to a civilian post—the post can simply be eliminated. For example, the consolidation of roster management duties in the SMART unit reduced the need for staff in each facility to manage schedules. Another example is that officers assigned to ADWs as an assistant are in the process of being reassigned, and the assistant positions were determined to be superfluous. The effort to identify posts for potential conversion is continuing. Further, the Department reports that the Department's Chief of Staff, as well as representatives from the HR and Administrative Divisions, are meeting with the leadership of each Facility to identify posts that can be filled by civilians. Finally, the Department reports that HMD will utilize civilian staff to conduct the work of the HMD sick desk and is working with HR to advertise for these positions.

o   <u>Temporary Duty</u>: DOC has reduced its reliance on Captains utilizing the Temporary Duty status ("TDY") and at least 20 Captains previously on TDY status have been returned to posts in the jails.[26] About 30 Captains remain on long-term TDY status, which is about 5% of all Captains in the Department. TDY status is used sparingly and the circumstances in which the Department has reported using it appear appropriate given certain budgetary factors and, in some cases, where specific expertise is needed for a position. The Monitoring Team has evaluated the post assignments of Captains who remain on long term TDY status, and the post assignments appear reasonable.

- **Increased Supervision in the Facilities**

   o   <u>Deputy Warden Schedules</u>: At the beginning of 2023, the Deputy Wardens' schedules were reorganized using staggered start times to provide better coverage throughout the day (Deputy Wardens previously all worked on the same tour). Each Deputy

---

[25] As required by Action Plan § C, ¶ 3(vii).

[26] As required by Action Plan § A, ¶ 3(a)

Warden is now also required to work one weekend day each week. This approach to scheduling is consistent with sound correctional practice in which a Deputy Warden is available for a large portion of each day.

o   Reassignment of ADWs and Captains: A Department-wide evaluation has begun to assess ADW[27] and Captain[28] assignments across facilities, to broaden the presence of supervisors throughout evenings and weekends, and to ensure that Captains have an appropriate span of control (meaning, how many staff they supervise). This evaluation is expected to be completed and implemented by mid- to late April 2023.

The positive impact of the Staffing Manager, his team, and other leaders in the agency who have supported this effort (especially the Deputy Commissioner of IT and her team) is clearly evident. Facility leadership reported close collaboration with their SMART liaisons, and appreciated the simplicity, clarity, efficiency, and organization that InTime delivers. They also recognized the important connection between effective staffing conventions and facility safety and thus appear to be enthusiastic partners in this work. While several key steps remain, important progress has been made to date and the subsequent tasks are being appropriately managed and properly sequenced. The portion of the Department's foundation that is comprised of staffing practices is unquestionably taking shape, and will bring additional elements of the Action Plan, Remedial Orders, and Consent Judgment within reach.

*Initiatives to Manage Staff on Sick Leave and Modified Duty*

The Department has made significant strides in appropriately managing staff on leave and modified duty since the staffing crisis revealed that the Department has never had durable protocols for this purpose. Historically, as discussed above, the large size of the workforce

---

[27] As required by Action Plan § C, ¶ 3(iii)

[28] As required by Action Plan § C, ¶ 3(ii)

essentially obscured how poorly the Department managed these important benefits and statuses.

However, in recent years, the size and scope of the problem increased exponentially when the

decrease in the size of the workforce combined with the onslaught of the COVID-19 pandemic.

As shown in the table in the introduction to this section, in 2020 and 2021, the Department was

crippled by the large number of staff out sick (20-30% of the workforce) and the large number of

staff with a restricted medical status (3-9% of the workforce).[29] Thus, what began as a long

history of mismanagement escalated to a crisis, one that threatened to fully collapse the system

given the corresponding issues with staff assignment discussed above, hence the Action Plan's

emphasis on this issue.

Sick leave benefits are provided to staff as an essential component of staff wellness—

particularly in an agency where job responsibilities are inherently dangerous and stressful—but

the Department's practices were ripe for abuse given how poorly the benefit had been managed.

The Department's generous sick leave benefits have been characterized as "unlimited sick

leave," but as outlined in the Monitor's October 28, 2022 Report, **staff sick leave benefits are**

**not actually unlimited**, although mismanagement and a lack of policy enforcement resulted in

staff *obtaining* unlimited sick leave benefits. The staff leave benefit is not, itself, the cause of the

staffing crisis (*see* pg. 44-45 of the Monitor's October 28, 2022 Report). Proper management and

enforcement of existing constraints on these benefits as imposed by New York Civil Service

Laws §§ 71, 72, and 73 and Department policy (with appropriate revisions) *would* put

appropriate constraints on these benefits. This is why the Department needed to develop new

practices that are capable of identifying those who need and use the benefit for a legitimate

---

[29] Sick leave and restricted medical statuses are utilized for both work-related and non-work-related illnesses and injuries.

reason and those whose use of the benefit is unnecessary or excessive. As discussed below, current efforts to strengthen protocols have put the Department on the proper trajectory for properly discriminating between legitimate uses and potential abuses, but more work remains.

The Department, under the leadership of the First Deputy Commissioner, has worked to reform the Health Management Division ("HMD"), which is charged with addressing all of the requirements of the Action Plan in this area. Under the direction of the First Deputy Commissioner's team, a thoughtful and thorough assessment of HMD was conducted during summer 2022 to identify deficiencies and inefficiencies.[30] The results of the evaluation revealed significant mismanagement and corruption, as reported in the Monitor's October 28, 2022 Report (*see* pgs. 46-47). In short, poor supervision and staff practices, staff shortages, lack of collaboration among HMD units, and a disconnect between the division and the facilities were all impeding the management of staff leave benefits and modified duty statuses. These findings led HMD to engage in a significant overhaul to improve practices. HMD has continued to refine its practices. Outlined below are the steps HMD has reported it has taken since the reform effort began:

- **HMD's Organization and Staffing**
  - HMD Leadership: HMD is closely supervised by the First Deputy Commissioner. An Executive Officer (who holds the rank of Assistant Deputy Warden) was appointed in spring 2022 to manage the unit and reports directly to the First Deputy Commissioner.[31] The Department has selected and hired a Chief Surgeon who is scheduled to begin in April 2023. The Department is continuing to recruit for an Assistant Commissioner of HMD.

---

[30] As required by the Action Plan § A, ¶ 2(e).

[31] As required by the Action Plan § A, ¶ 3(b)(iii).

o <u>HMD Staffing</u>: HMD has almost 100 staff, about half of which are uniform staff, working across 15 units within the Division.[32] HMD reports it is working to reduce its reliance on uniformed staff. First, HMD intends to utilize civilian staff for the Sick Desk and is working with HR to advertise and fill those positions. HMD has also hired some new personnel including two nurses for the Case Management Unit (now fully staffed with four nurses), a supervisor for the Workers' Compensation unit, and has extended an offer to a Chief Surgeon to oversee HMD operations. Further, HMD continues to rotate uniformed staff assigned to HMD out of the division every 90 days to reduce undue familiarity that can lead to dishonest practices.

o <u>Ongoing Evaluations of Practice</u>: In order to ascertain its progress regarding improved practices within the division, HMD conducted a subsequent evaluation in January 2023 to ensure the new practices in place were having the intended outcomes. The January 2023 evaluation found that the new practices have had the desired impact on the way staff on leave and modified duty are managed and on reducing the number of abuses previously seen, although more work remains. This type of internal assessment is critical to maintaining the integrity of HMD.

- **Improving HMD's Processes and Efficacy**

o <u>Improved Coordination Across HMD Units</u>: The Department reports that automated tools were created to allow certain processes to be completed within a single module (rather than multiple manual steps) and that automatically distribute information to the next HMD unit in the workflow (rather than manual request/transmission of information). The use of technology also guards against unauthorized manipulation of subsequent appointment dates or specific dispositions.

o <u>Reorganization</u>: Units with complementary tasks (*e.g.*, Investigations, Absence Control Unit, Home Visitation Group and Disciplinary Units) will be reorganized

---

[32] These 15 Divisions are Worker's Compensation, Case Management, Absence Control, Home Visit Group, Disciplinary, COVID-19, Investigative, Sick Desk, Medical Incompetence, Medical Records, Toxicology, Clinic, F.I.S., Administrative/Personnel, and Security. Note, the Trials Division maintains a separate group of staff responsible for adjudicating any disciplinary cases.

into functional units to promote timely communication and swift action when necessary.

- o <u>Restrictions on Access to Information</u>: The Department reports that access to HMD's information management system was restricted and fortified to limit the number of staff who are granted access and to ensure that only those staff who need the information have access to it. These procedures are intended to prevent the impropriety in record keeping that was found to have occurred in the past.

- **Initiatives to Reduce the Number of Unavailable Staff**

  - o <u>Preventing and Deterring Abuse of Leave</u>: The various layers of scrutiny described below provide additional safeguards to both prevent and deter staff from taking unnecessary or excessive leave or remaining on modified duty when they are able to return to full duty. Together, this scrutiny makes it more difficult for staff to provide false information and creates more certainty that any abuse of leave or modified duty will be detected.

  - o <u>Increasing Scrutiny of Documentation and Medical Records</u>: HMD has increased scrutiny of those on sick leave and modified duty to ensure that staff provide timely documentation and attend all scheduled medical appointments. In addition, HMD proactively and routinely assesses staff on these statuses to ensure they are appropriately applied.[33] As a result of these record reviews, staff who are no longer qualified for a benefit were returned to full duty or their MMR level was downgraded, which may allow them to work directly with incarcerated people. As noted above, the ability to reschedule appointments to delay review has also been curtailed through automation.

  - o <u>Increasing Home Confinement Visits</u>: The purpose of home confinement visit protocols is to ensure that staff who report they are home sick are, in fact, at home. The protocol for conducting home confinement visits has been streamlined, which allows for more frequent visits, and more staff are now authorized to conduct Home Confinement Visits.[34] Priority for visits is applied to staff who are

---

[33] As required by the Action Plan § A, ¶ 2(f).

[34] As required by the Action Plan § A, ¶ 2(d)(i).

out sick for nine consecutive days, those with "chronic absence" designations and those on "indefinite sick leave." Violations are more frequently identified and addressed, as discussed in more detail below.

o   <u>Increasing Referrals for Discipline of Staff Violating Protocols</u>: HMD's now frequent scrutiny of medical documentation has exponentially increased its ability to detect potential abuses and cases that may merit medical separation. Until 2022, the number of disciplinary actions brought to address potential violations was minimal. As discussed more below, the Department's efforts to hold staff accountable for potential violations have increased exponentially. To support this work, as noted in the Compliance Assessment (Staff Discipline & Accountability) section of this report Disciplinary section of this report, the Trials Division has doubled the number of staff assigned to work on these types of cases.

o   <u>Referrals to DOI</u>: HMD's increased vigilance about the quality of the documentation has identified several instances of potentially fraudulent documentation that may rise to the level of criminal misconduct. These cases have been referred to DOI for investigation, as discussed further below.[35]

o   <u>Identifying Staff with Consecutive AWOL</u>: Beginning in 2022, HMD now identifies staff who have been AWOL for 5 days or more so that they may be separated pursuant to New York City Administrative Code § 9-113. Prior to 2022, despite repeated inquiries from the Monitoring Team and for unknown reasons, the Department had previously reported that separation under this law was not possible.

o   <u>Identifying Staff with Chronic Absences</u>: In order to discourage staff from utilizing an unreasonable number of sick days, staff may be designated "chronic absent" (*i.e.*, those out sick for 12 days or more in a rolling 12-month period). This designation triggers limits on various discretionary benefits and privileges and impacts the staff's ability to be promoted, thus serving as a deterrent to excessive sick leave. The Department's efforts to identify and manage staff so designated has traditionally been poor. Case in point, only 100 staff were so

---

[35] As required by the Action Plan § A, ¶ 2(g).

designated in 2021, which is not credible given the volume of staff who were out sick at the time. The number of staff placed on this status increased exponentially in 2022, with over 1,000 staff now identified as chronically absent. This is a result of HMD's increased focus on staff who may meet this threshold. HMD has also taken steps to ensure that the facilities are processing staff on these designations properly. HMD reports that the identification staff who may be meet the chronic sick leave standard has decreased toward the end of 2022, commensurate with the reduction in the number of staff on sick leave.

  o  <u>Evaluating Medical Facilities</u>: HMD has started to visit medical facilities frequented by staff to verify the documentation provided by the staff member (*e.g.*, confirming the date/time stamp) and to ensure that dispositions include a signature from a licensed provider in order to be considered valid. This process has identified that certain documentation may be fraudulent and cases have been referred to DOI for investigation.

- **Policy Revisions**

  o  <u>Home Confinement Visits</u>.[36] A revised policy was implemented in May 2022 and is intended to deter the abuse of sick leave benefits by requiring staff to self-confine at home and by providing for random visits to ensure staff are complying with the policy. The protocols were revised to set more sensible requirements for determining whether someone was home (*e.g.,* fewer door knocks and fewer phone calls) to increase the efficiency of the process.

  o  <u>Sick Leave and Absence Control</u>.[37] As noted above, many controls, if appropriately deployed, are available to support adequate management of staff on sick leave. The Department has taken the variety of steps described above under the current *22-year-old* policies. While demonstrable progress has been made in practice, the Department must also update its policies on reporting sick leave and absence control to codify improved practices and adequate controls. Policy revisions have been slow despite the Monitoring Team's repeated and consistent

---

[36] As required by the Action Plan § A, ¶ 2(d)(i).

[37] As required by the Action Plan § A, ¶ 2(d)(iii).

prompting to stakeholders at all levels of the Department about the need to revise this policy (and the Action Plan's requirement). The Monitoring Team has reviewed and provided comment on both policies. The policy needs to be finalized and implemented in short order.

o   <u>Medically Modified/Restricted Status</u>.[38] As above, progress has been made in managing staff on MMR, but improved guidance and clarity about how and when this status may be utilized is needed. The Monitoring Team has been briefed on the proposed revision designed to reduce the use of MMR. Written procedures need to be produced, finalized, and implemented in short order.

*Accountability for Abuse of Leave & Modified Duty*

The Department has several options for addressing staff who are chronically absent or who have abused sick leave policies, including placing staff on unpaid leave,[39] non-disciplinary separation proceedings,[40] disciplinary proceedings (known as Medical Incompetence),[41] and suspensions. Further, the Department may refer staff to the Department of Investigations ("DOI") to investigate cases of suspected staff abuse of sick time or restricted status when the conduct of the staff member appears to be criminal in nature.[42] The First Deputy Commissioner routinely meets with DOI about the status of these cases to ensure that they are addressed.

---

[38] As required by the Action Plan § A, ¶ 2(d)(ii).

[39] Pursuant to New York Civil Service Law 72, a staff member may be placed on unpaid leave if they are on "indefinite sick" or MMR status for a year or more for non-work-related reasons.

[40] Medical and AWOL Separation is a non-disciplinary action (pursuant to Civil Service Laws §§ 71 to 73 and New York City Administrative Code § 9-113) to separate an employee who has been cumulatively/continually out sick, unavailable to work, AWOL 5 days or more, or unable to fulfill work duties for a significant period of time, generally one or two years.

[41] Medical Incompetence is a disciplinary action in response to a variety of patterns of behaviors related to the abuse of the sick leave benefit.

[42] As required by the Action Plan, § A, ¶ 2(g).

As outlined in more detail below, the Department has made significant efforts to reduce staff absenteeism through increased accountability measures. Given the rarity of enforcement historically, the Department's current efforts reflect significant progress in holding staff accountable for coming to work.

The outcome of the Department's accountability efforts to address staff absenteeism are listed below[43]:

- *Medical Incompetence*: 460 charges were brought for Medical Incompetence in 2022. This reflects a 120% increase in cases from 2021.

  - 476 Medical Incompetence cases were resolved from January 2022 through February 2023 (the outcomes of these cases are subsumed in the bullets below).

  - 461 Medical Incompetence cases are pending as of the end of February 2023 (this includes the 288 cases that were pending as of October 2022 and is discussed more below).

- *Suspensions*: 402 staff were suspended for abuse of the sick leave/absence control policies or for being AWOL (305 staff for home confinement violations and 97 staff for being AWOL[44]).

The 583 cases resolved between January 2022 and February 2023 were closed in the following manner:

---

[43] This also includes the cases required to be addressed by Action Plan, § A, ¶ 2, (f)(i).

[44] In 2021, a total of 165 staff were suspended for being AWOL. The reduction in suspensions for AWOL is likely due in part to fewer staff being AWOL.

- o <u>Separations, Terminations, Resignations & Retirement</u>: 244 staff were medically separated, terminated, resigned, or retired from the Department.[45]

- o <u>*NPAs*</u>: 265 Medical incompetence cases resulted in an NPA, distributed as follows:

  - 1 reprimand/return to command;

  - 43 cases settled with a term of limited or full probation for subsequent violations, with no compensatory days deducted;

  - 222 cases for compensatory time deducted and, in most cases, a term of limited or full probation for subsequent violations including:

    - 154 cases settled for compensatory time deductions of 5-15 days (147 of the 154 cases also included a term of limited or full probation for subsequent violations).

    - 32 cases settled for compensatory time deductions of 15-30 days (30 of the 32 cases also included a term of limited or full probation for subsequent violations).

    - 36 NPAs settled for compensatory time deductions of 31-80 days deducted (32 of the 36 cases also included a term of limited or full probation for subsequent violations).

- o <u>*Return to Full Duty*</u>: 30 staff returned to full duty.

---

[45] This includes staff who were separated pursuant to Civil Service Law §§ 71 or 73 (*i.e.*, Medical Separation); staff who were Medically Separated, and their Medical Incompetence disciplinary action was put in abeyance should they return to the Department; staff who were separated pursuant to New York City Administrative Code § 9-113 because they have been AWOL for 5 days or more; staff who were terminated following a trial at OATH; staff who resigned; staff who retired in the midst of separation proceedings, and staff who are deceased.

- o *Administratively Filed Cases*: 44 Medical Incompetence cases were dismissed.

- *Department of Investigation Referrals*: Over 30 staff were referred to the Department of Investigation for suspected abuse of sick leave or restricted status since 2022.

  - o **3** staff have pled guilty on federal charges of abuse of sick leave.

- *Chronic Absenteeism*: 1,029 staff were identified as chronic absentees (compared to only 100 staff who were so identified at the beginning of 2022).

- *Status of Addressing Medical Incompetence Cases Pending as of October 2022*: In the Monitor's October 28, 2022 Report, the Monitoring Team recommended that by April 30, 2023, the Department resolve the 386 Medical Incompetence cases that were pending as of October 2022. The Department is on track to the vast majority of these cases by April 2023. The status of these cases as of the end of *February 2023* (with two more months to go to meet the deadline) is below:

  - o 187 (48%) cases have closed.

  - o 85 (22%) cases are in the process of closing.

  - o 67 (18%) are scheduled for a trial.

  - o 45 (12%) cases are pending, including 17 cases involving staff on approved leave (*e.g.,* military leave or maternity leave).

  - o 2 (>1%) cases are under an independent medical review to determine whether a disciplinary case may be merited.

Maximizing the number of available staff is an essential support for the overall goal that all posts are covered, overtime is limited, units are properly supervised, and people in custody have access to essential services. To that end, HMD and the Trials Division in particular, have made significant progress in holding staff accountable for abuses of sick leave and modified

duty, which has had the corresponding result that more staff are available to work than at any time since the staffing crisis began in 2021. While the Trials Division is addressing more of these cases than ever before, the closure rate is not keeping pace with the influx of new cases. The number of pending Medical Incompetence cases has continued to grow and is larger now than in October 2022. Accordingly, the pace of case closure must accelerate to ensure that all cases are addressed in a timely manner. Further, given the increased number of cases pending, the Trials Division tracking of these cases must be improved. To that end, the Monitoring Team has been working with the Trials Division on a process for more reliable and consistent tracking of Medical Incompetence cases.

*Summary & Next Steps*

The Department has made some important progress addressing the foundational problems underlying its ability to properly staff its facilities so that it can provide for both safety and the routine delivery of services. The addition of leaders from outside the Department has brought sorely needed expertise in staff scheduling and deployment, and their efforts have already begun to pay dividends. Coupled with the efforts of HMD to better manage staff absences and to hold staff accountable when they abuse already generous leave benefits, the Department appears to be on a trajectory capable of reversing the decades-old problems with managing its workforce. This has resulted in improved working conditions for staff and reductions in the most concerning staffing practices that left the Department operating as if it was understaffed, despite the large number of staff on the payroll. This progress is extremely encouraging, but in several ways, only represents the *initial* steps needed to fully remediate the deeply entrenched practice with staff management and deployment. Current momentum must be maintained in order to fully

implement and *sustain* the strategies that have recently been launched and those that must build upon the steps taken to date.

To continue the positive trajectory, the Monitoring Team recommends the following short-term priorities:

- Recruit and hire a manager of the SMART unit.

- Complete efforts to redeploy supervisors to the facilities and to ensure their presence throughout evenings and weekends to properly oversee staff assignments and to provide much needed on-the-ground coaching and guidance to officers.

- Revise and implement the Sick Leave and Absence Control and the Medically Modified/Restricted policies by May 15, 2023.

- Upon resolving the pending Medical Incompetence cases identified in the October 2022 report by April 30, 2023, the Trials Division must then resolve the approximately 175 cases that were brought *since* October 2022 and that are still *pending*. These 175 cases should be closed no later than August 31, 2023.

# SECURITY PRACTICES & INDICATORS

The overall goal of the Consent Judgment is to eliminate the use of unnecessary and excessive force and reduce the risk of harm in the jails. For this reason, the Department's security practices and indicators are at the heart of the reform effort. Monitoring this system over the last seven years has revealed a system so dysfunctional that it is impossible to address the specific security practices at issue in isolation. The issues underpinning the Department's ability to reform have created a polycentric problem, with a number of interrelated "problem centers" for which the solution to each is dependent upon finding the solution to some, if not all, of the others. Therefore, in order to achieve the goals of the Consent Judgment, changes across the entire system are necessary, and are discussed in the various sections of this report. There is no question that improved security practices and resulting improvement in facility safety is undoubtedly the most important aspect of this work, but it is also the most elusive and will only occur when each of the components discussed in this report come together. This particular section addresses security and UOF practices, staff supervision, security initiatives, and an analysis of trends in security indicators/outcomes for the Department as a whole and for individual facilities. However, the many other issues discussed in the report also underpin this work.

Significant work is underway to provide the necessary foundation to improve the Department's security practices. In particular, the infusion of external correctional expertise has helped to identify priorities, guide practice, and address many of the dysfunctional foundational issues. In the Monitoring Team's experience, change will be gradual, and so it is not surprising that even with this infusion of expertise various metrics regarding facility safety reveal mixed results to date. For example, the average monthly UOF rate decreased for the first time in many

36

years, staff were assaulted less often, and a small decrease in the rate of fights was evident in

2022. Further, the Department's focus on two specific facilities, RNDC and GRVC, appear to be

yielding encouraging results. That said, the rate of UOF remains far too high (and higher than

when the Consent Judgment went into effect), the rate of stabbings and slashings is exorbitant,

and its contribution to an increase in the proportion of incidents involving serious injuries is

concerning.

The increasingly disordered environment and compounding staffing problems beginning

in 2020 further exacerbated existing poor practice and resulted in the constant disruption of even

the most basic services (*e.g.*, recreation, laundry, commissary, barbershop), which created

additional frustration among the people in custody who were already stressed by the level of

facility violence, separation from their loved ones, and uncertainty in their court proceedings to

name a few. As the system begins to stabilize these issues have started to abate slightly. As

discussed throughout this report, while conditions in the Department have improved compared

with the very depths of the crisis in 2021, significant work remains as the conditions are

demonstrably worse than they were at the time the Consent Judgment went into effect.

The improvements witnessed in 2022 are encouraging given the long period of stagnation

and/or worsening conditions in this Department, but significant reductions in UOF and all forms

of violence must be achieved and sustained across time to fully address the conditions that gave

rise to the Consent Judgment.

*Security and UOF Practices*

Although some progress has been made in improving the operations of the jails and

reducing the rate of UOF from its apex in 2021, the work completed to date has not appreciably

improved the Department's security practices and the Department's problematic approach to

using force Department-wide. For example, during the Monitoring Team's routine site visits, it was not uncommon for the Monitoring Team to enter a housing area with clear security lapses—for example door manipulations and obstructions, and individuals congregated in unauthorized areas—while a review of logbook entries revealed a recent supervisor's tour that noted "no issues." Further, in 2022, facility leadership (via Rapid Reviews) identified that 48% of use of force incidents involved procedural errors (*e.g.*, failure to secure doors, failure to apply restraints properly), some of which directly contributed to the circumstances that facilitated the incident. This, coupled with the 16% of incidents that were determined to be "avoidable," demonstrates that even the Department's internal analysis (which has some room for improvement) shows that staff are not applying the requisite skill set and decision-making needed to decrease the use of force rate. This is not to say that the initiatives discussed in this section will not ultimately support improved practice, in fact, many are expected to do so and, in some cases, already have improved practice.

There is much work to do in this area. This includes addressing poorly executed physical restraints, a lackadaisical approach to basic security measures like securing doors and dispersing crowds, and a general lack of situational awareness. Staff's often hyper-confrontational demeanor contributes to incidents spiraling out of control. Responses to events by the Emergency Services Unit and an overabundance of staff means that force is often precipitated by staff's own behavior. These issues have been discussed in great detail in all Monitor's Reports to date and little improvement in overall staff conduct regarding the use of force has been identified. The Monitoring Team's extensive findings regarding poor security practices and troubling use of force practices are essentially unchanged Department-wide, despite some pockets of progress on individual initiatives and at individual jails as discussed further below.

The reader is referred to prior Monitoring Team reports for more detail (*see* the Monitor's March 16, 2022 Special Report at pgs. 7 to 24; the Monitor's June 30, 2022 Report at pgs. 13 to 26; and the October 28, 2023 Report at pgs. 56 to 81).

If, and only if, the various staff supervision and security initiatives discussed below are properly implemented, the expected improvements should result in significantly lower levels of violence and use of force, which in turn, should provide the space and time for staff to hone their skills regarding de-escalating interpersonal conflict and dependable service provision.

<u>*Staff Supervision*</u>

The Department's *security* failures are not generally centered on poor policy (although improvements to policy and procedure are also necessary) but rather poorly informed habits and the behavioral choices that staff make moment-to-moment. For this reason, strong leaders who instantly recognize and are able to correct poor practice are needed. Supervisory failures at multiple levels of uniform leadership have been and remain a consistent and pervasive malfunction within the Department. An improvement in the quality of supervision at all levels of the chain of command is imperative to elevate practice. Supervision is not simply advising staff what to do, but also requires consistent expectations, frequent drill and practice, reinforcement and recognition of improved practice, and accountability and discipline for those whose practice does not evolve as required.

In this system, this goal is particularly difficult to achieve because the number of supervisors is limited and because the supervisors generally lack the requisite perspective and experience to guide their subordinates toward better practice. The Monitoring Team's observations over the past seven years indicate that supervisors at all levels have a limited command of the restrictions and prohibitions of the Use of Force Directive, appear to act

precipitously, and many ultimately end up contributing to or catalyzing the poor outcomes that are of concern. They also fail to detect and fail to correct sloppy security practices that contribute to many incidents. Their skill deficits are exacerbated by the fact that DOC has fewer levels of supervisors in its chain of command than is seen in most correctional systems (*see* discussion in the Monitor's October 28, 2022 Report, at pgs. 78-80). Most areas in need of skill development are basic correctional practices but infusing them to the point that they become reflexive practice among thousands of staff and hundreds of supervisors is a monumental undertaking. It is why embedding external correction expertise into this agency is so essential— the requisite expertise does not exist at sufficient levels among veteran staff nor the many staff with only a few years of service.

Progress has been made on this front since the Monitor's October 28, 2022 Report. First, the three well-qualified Deputy Commissioners of Staffing, Security, and Classification/Operations and two Associate Commissioners of Operations have been hard at work addressing these polycentric issues since the last report. The impact that these few individuals have already had on practice confirms that the Department's efforts to install Assistant Commissioners of Operations (five individuals are scheduled to begin work in April 2023.) to serve as the commander of each of the individual jails (to essentially serve as the Warden)[46] is a crucial next step and is expected to further improve practice.

---

[46] As discussed in more detail in the compliance assessment of the First Remedial Order § A., ¶ 2., in December 2022, the Court issued an order (dkt. 492) that permitted the Department to expand the pool of candidates that may be considered to serve as Facility Wardens given the current compliment of staff available to serve in the role was not sufficient and the Department's attempts to develop alternative leadership structures in the command were not workable.

Below is a table of organization that depicts the new leadership structure.



Since the Monitor's October 28, 2022 Report, notable progress has been made in overall staff assignment and deployment. Untangling poor conventions and replacing them with better systems and routines has begun to alleviate the staffing crisis (evidence of improvement is discussed in the Uniform Staffing Practices section of this report). The resulting expanded pool of staff who can be assigned to facility posts and the reduced reliance on excessive overtime should improve staff's morale, reduce the level of chaos in the jails, and allow for improved

service. These improvements to staff management and assignment will reportedly be followed in

short order by improvements to the assignment and span of control of Captains and ADWs in the

jails, which are essential steps toward improving staff's security habits and moment-to-moment

choices. Naturally, Captains and ADWs will also require intensive coaching and guidance to

elevate their skills in staff supervision. Wardens and DWs are now receiving consistent guidance

and support from the two Associate Commissioners of Operations who were hired from outside

the DOC system and who possess years of experience in systems that have the sound

correctional practices that this Department so sorely needs. The *future* appointment of Assistant

Commissioners of Operations for each individual jail (who will report to the Associate

Commissioners of Operations) should further increase the network of support and guidance

available to uniform leadership in the jails. The extent to which these supervisory relationships

develop in a manner that supports improved practice down the chain of command remains to be

seen.

Another tangible step toward improved staff supervision is the efforts by the Staffing

Manager to alter the schedules of the Deputy Wardens and ADWs so there are more supervisors

available across shifts and throughout the week (including weekends). Another recent initiative

has started to better ensure that Tour Commanders (ADWs who are responsible for the on-the-

ground supervision of each shift) more directly supervise their subordinates. Tour Commanders

have traditionally been stationed in an office in the administrative corridor of the jails. They were

supported by at least one uniformed assistant who was frequently tasked with touring the jail

while the Tour Commander remained in the office. In order to ensure that the Tour Commander

is physically located within and integrated into the operations of the jails, Tour Commanders will

be required to work from inside each facility's control center (the central hub of the jail) instead

of from an administrative office. Further, the assistants assigned to the Tour Commander will be reassigned to posts working with incarcerated individuals. This transition has begun, and completion is expected in April 2023.

Repositioning the ADWs to supervise each shift more closely is intended to support the Department's efforts to ensure that officers and supervisors are regularly touring their assigned housing units.[47] Tours by line staff are essential for verifying the welfare of people in custody and for addressing their concerns and service needs. Similarly, Captains' tours are important for detecting and correcting poor staff practice, for providing support to line officers and for resolving any remaining concerns among people in custody. The initial step toward this goal is to ensure that staff and Captains are conducting tours at the required intervals (30-minute intervals for staff and multiple times per shift for Captains). Toward this end, the Department has procured tour wands which, when tapped on a sensor affixed to the wall outside key locations in the housing units, provide a record of the frequency of tours. A description of the efforts to implement the use of tour wands was provided in the Monitor's October 28, 2022 Report on pgs. 72 to 74. Since then, the policy was updated in early 2023 to expand the use of tour wands to Captains assigned to celled housing areas and to staff within de-escalation units. The policy also assigned the daily review of tour wand data to the Tour Commanders, who use this data to assign discipline to staff when appropriate, but can also use this data as a means of more direct supervision and oversight of their own staff's touring practices. These enhancements, along with improved oversight by facility leadership and routine audits by the Classification Manager's office, will be implemented in spring 2023.

---

[47] As required by the Action Plan § A, ¶ 1(d).

It must be emphasized that the tour wands are simply a *tool* to verify whether the required tours are occurring, but they do not and cannot assess whether tours are of adequate quality. RNDC has made some progress toward this goal, as the Warden reports regular reviews of Genetec footage to determine whether staff actions during the tours suggest genuine efforts to verify welfare and address concerns among people in custody. This illustrates why supervision is so important and the requirement cannot be assessed by simply counting whether staff tapped the sensors at the required intervals. Tours at the required intervals are, of course, an essential first step, but are not sufficient for assessing whether staff are adequately addressing the needs of the incarcerated population, utilizing sound security practices and mitigating the risk of harm to people in custody. The Monitoring Team intends to scrutinize the use of the tour wands more closely going forward and additional information will be included in future reports.

Overall, tangible and concrete steps have been taken to improve the supervision in the jails. The most critical next step related to supervision is to hire and install the Assistant Commissioners of Operations (five are scheduled to begin work in April 2023.) to lead each of the individual jails.

<u>Security Initiatives</u>

The Deputy Commissioner of Facility Operations (who also serves as the Classification Manager), the Deputy Commissioner of Security Operations (who also serves as the Security Operations Manager), and the two Associate Commissioners of Operations, along with many other individuals in the Department, have begun focusing directly on improving certain security practices, using a two-pronged effort.[48] First, given their historically high rates of violence and

---

[48]As required by Action Plan § D., ¶ 2(a).

44

use of force, certain facilities (RNDC and GRVC) have been subject to a series of initiatives to address the overall state of affairs (*e.g.* supplemental staffing, new tools for assigning and deploying staff, increased supervision, increased focus on specific security practices, etc.). Second, Department wide, there has been an increased focus on specific security practices, including securing doors, removing obstructions, and preventing people in custody from congregating around secure ingress/egress doors. Primarily this occurs via Wardens, DWs and ADWs issuing clear expectations for Captains to focus on these issues, traveling to the housing units themselves to verify that Captains identified and addressed any problems during their own tours, and providing coaching, guidance and accountability if Captains have failed to do so. The Department has also taken other steps to address problems regarding the use of the Emergency Response Teams[49] (discussed in more detail in the Compliance Assessment (First Remedial Order, § A. ¶ 6) section of this report and increased the number of searches[50] to obtain dangerous contraband (data regarding searches and the volume of contraband seized is included in the Appendix A of this report). Correctional Intelligence Bureau ("CIB") has also been proactively managing its intelligence sources to identify when an issue may arise, in an attempt to proactively neutralize a situation. To that end, CIB has reported that it has convened meetings with incarcerated individuals to identify points of tension that could lead to interpersonal conflict and discussed how they may be best resolved.

---

[49] As required by Action Plan § D., ¶ 2(c).

[50] Searches are an essential component of any security operation to stem the flow of dangerous contraband into a facility. In 2021, the Monitoring Team advised the Department to refine its practices to reduce the level of confrontation, provide greater controls and to increase the effectiveness of search procedures. These recommendations and a requirement to improve search procedures are included in the Action Plan § D., ¶ 2(d).

The Monitoring Team's routine interactions with the Department's new leadership team reveal that they, through their own intuition and experience, have developed sound approaches for addressing staff skill deficits and regularly identify the same deficiencies noted by the Monitoring Team during their incident reviews and tours of the jails. There is certainly much more work to do, but the areas of focus and initiatives that have been implemented are reasonable first steps toward infusing the security focus that is the heart of a safe jail operation.

A critical area that has not yet been adequately addressed is the management of the Emergency Services Unit, which continues to utilize problematic security practices that catalyze, rather than prevent, a use of force and is staffed with individuals who may not be suited for the position. These issues are long standing and with no appreciable change in practice. Leadership of the division is lacking and requires oversight by an individual with a strong command of sound correctional practice. Further, all staff currently assigned to the unit must be reevaluated for fitness to serve in the unit, and those that remain must be re-trained promptly. Anything less will continue to perpetuate the cycle of misconduct and problematic use of force by this unit. These issues are further explored later in this report in the Compliance Assessment (First Remedial Order, § A. ¶ 6) section of this report.

The Nunez Compliance Unit ("NCU") has continued to develop critical and reliable information about the Department's efforts to address its security problems. Since December 2021 NCU has conducted nearly 100 security audits in the jails, a majority of which have identified staff being off post, unsecured or manipulated cell door locking mechanisms, failure to conduct timely tours of the housing units, poorly managed lock-ins, and people in custody in unauthorized areas and crowded in vestibules. The Monitoring Team continues to encourage the Department to utilize the information produced by NCU and to ensure NCU has sufficient

staffing to conduct the broad range of audits required to fully support the Department's efforts.[51]
The Classification Manager and the Security Operations Manager are also recruiting staff for
their units to conduct direct, contemporaneous assessments of whether staff are adhering to the
various security-related initiatives currently underway. These undertakings should support the
overall effort to guide and advise staff on appropriate security practices.

*Security Indicators*

As noted in the introduction to this section, substantial changes to the use of force rate
and level of facility violence will occur only through the culmination and accumulation of the
many practices discussed throughout this report. The Monitoring Team, like all stakeholders, is
vigilant about detecting any changes to historical trends and whether they appear to be reversing
in a meaningful way or not. As discussed in more detail below, there are a few indicators that
suggest some progress may be occurring. In the Monitoring Team's experience, institutional
reform is comprised of incremental improvements that combine to produce significant changes in
facility conditions over time, and thus this indicator of improvement is noteworthy. However, as
encouraging as it is to see certain decreases, the level of improvement is nowhere near the
magnitude required by the Consent Judgment, particularly as the level of stabbings and slashings
has reached an all-time high, and UOF remains at a level more than double the rate at the time
the Consent Judgment went into effect.

---

[51] As required by the Action Plan § D, ¶ 4.

- <u>Use of Force</u>

The chart below shows that the total number of UOF (blue bars) and average monthly UOF rate (yellow line) increased significantly between 2016 and 2021.[52] In 2022, for the first time since the Consent Judgement went into effect, the average monthly UOF rate declined 15% compared to the year prior (from 12.23 to 10.34) and is also lower than the average monthly use of force rate in 2020. However, it remains more than double the rate at the time the Consent Judgment went into effect.



In addition to the frequency with which force is used, another key metric regarding facility safety is the frequency of serious injuries during incidents that involve a use of force. A use of force's injury classification is derived from the most serious injury sustained by anyone

---

[52] Given the fluctuation in the size of the incarcerated population, *rates* are the most useful metric because they neutralize these changes. Throughout this document, average monthly rates per 100 people in custody were calculated using the following formula: *average monthly rate* = ((total # events in the time period/number of months in time period)/average ADP for the time period) *100.

involved in the incident (person in custody or staff). In other words, it does not count all injuries sustained in an incident but rather classifies the incident by the most serious one. The chart below shows that the proportion of UOF with no injury (Class C; blue bar) has sustained an increase since 2016 (from about 63% in 2016 to about 82-83% in 2021 and 2022). This is undoubtedly positive. However, the chart also shows that the proportion and number of UOF with the most serious injuries (Class A; grey bar/red text) has increased during this same time period (from about 2% in 2016 to 6% in 2021 and 2022). This translates to an increase of at least 350 additional serious injuries (because a single incident may involve multiple serious injuries) in 2021 and 2022 compared to 2016.



- <u>Stabbings and Slashings</u>

The number and rate of stabbings and slashings have increased exponentially over the past two years. The chart below shows the alarming increase in the total number and average monthly rate of stabbings and slashings in 2021 and 2022 compared to previous years.



Within 2022, the rate of stabbings and slashings was even higher during the first part of the year (0.77 in January-June 2022), but the annual rate was tempered by a decrease in the second part of the year (0.62 in July-December 2022). These rates remain about five times higher than the rate in 2016 and are simply exorbitant.

- <u>Fights Among Incarcerated People</u>

The average monthly rate of fights (yellow line in the chart below) has also been significantly higher in recent years. Since 2020, the average monthly rate of fights has fluctuated but has not meaningfully changed. It still remains almost 70% higher than the average monthly rate of fights in 2016 (8.62 versus 5.11).



- <u>Assaults on Staff</u>

The average monthly rate of assaults on staff decreased significantly during 2022 as shown in the chart below. The Department has always collected data on assaults on staff that occur during incidents *involving a use of force* (blue bar). The green line in the chart below shows that in 2022, the average monthly rate of assaults on staff with a UOF decreased 30% from its level in 2021 (1.18 versus 1.67), though it remains higher than 2016. In 2020, the Department began collecting data on assaults on staff that occur *without a use of force* (orange bar). The yellow line in the chart shows an even larger decrease in the average monthly rate of this type of assault (46%, from 2.26 to 1.22). In the Monitoring Team's experience, decreases in the rate at which staff are assaulted can serve as a motivating factor for bringing staff back to work who had previously been out on sick leave or on modified duty.

51



The analysis of Department-wide statistics continues to show rates of use of force and violence at much higher rates than in 2016, but also revealed some very modest but long-awaited decreases in 2022 after a long period of stagnation.

*Facility Specific Initiatives*

Throughout its seven-year history monitoring the conditions of this Department, the Monitoring Team has given increased scrutiny to certain facilities with exceptionally high rates of violence and uses of force. The Department has likewise taken this approach, focusing on RNDC (where the majority of people aged 21 and younger are housed) and GRVC (where the Department houses the largest proportion of individuals with the highest propensity for violence). As discussed below, one of the facilities (RNDC) has recently showed some improvement in safety and GRVC has received some additional targeted support in an effort to address its unsafe conditions.

- **RNDC**

RNDC has housed about 75% of those aged 21 and younger who are committed to the Department's custody since GMDC closed and "Raise the Age"[53] went into effect in late 2018. This age cohort has particularly high rates of violence and uses of force when compared to their older counterparts. While the age composition has varied significantly over the years, currently, RNDC's average daily population of about 800 people is about half those aged 22 and older and half those aged 21 and younger. The quantitative data discussed in this section clearly illustrates the reason that RNDC has received increased scrutiny over the years and was often the first of the jails to roll out various initiatives designed to improve staff practice, reduce violence and increase safety. These initiatives include:

- *Commissioner's Violence Reduction Plan.* RNDC was the first facility targeted by the Commissioner's Violence Reduction Plan in early 2022.[54] This included, among other things, supplementary staffing to support housing unit officers, redistributing those affiliated with SRGs to prevent their concentration in individual housing units, and utilizing special teams to increase the frequency of searches for dangerous contraband. These practices have been sustained and/or adopted by RNDC's own security teams.

- *New Tools for Staff Assignment and Deployment.* As discussed in the Uniform Staffing Practices section of this report, RNDC is also the first site to implement many of the Department's new staffing innovations and protocols. Implementation is far too recent to assess the impact, but the fact that the new strategies have been put into practice is encouraging given the previous decades of convoluted and often self-defeating staffing practices.

---

[53] In 2017, New York State passed the "Raise the Age" (RTA) law that raised the age of criminal responsibility to 18-years-old and created a new legal status for youth called "Adolescent Offenders," (AOs), which is defined as 16- and 17-year-olds who are charged with a felony-level offense. RTA was implemented in stages, with the AO category applying to any 16-year-old charged on or after October 1, 2018, and any 17-year-old charged on or after October 1, 2019. RTA also prohibited housing 16- and 17-year-olds on Rikers Island as of October 1, 2018.

[54] As required by Action Plan § A, ¶ 1(a).

- *Cell Door Replacement*. A total of 850 new cell doors have been installed at RNDC as of March 31, 2023[55] and additional information regarding the installation of cell doors is provided in the Appendix A to this report.

- *Post-Incident Management.*[56] The Department developed a post-incident management protocol for RNDC to better isolate the perpetrators of acts of violence, limit the potential to exchange/abandon contraband, efficiently search the individuals involved, and transfer those involved to more secure locations as appropriate. While the facility has begun to better structure its response, NCU's audits suggest these improvements are often offset by the failure to follow the basic steps of the policy, as discussed in more detail below.

While there is clearly more work to be done, both the Monitoring Team's site visit assessments and NCU's audits suggest that RNDC has begun to stabilize, with noticeably improved practice and a more orderly environment. In particular, NCU's audits of RNDC have found fewer staff off-post, more structured and controlled responses following violent events, more frequent searches with better management of individuals, more expeditious processing of perpetrators of violence through intake for body scans and medical assessments. That said, NCU also identified several areas in need of improvement including more meticulous search protocols given the frequency with which weapons are not recovered following a stabbing/slashing; ensuring that perpetrators from the same incident remain separated (*i.e.*, are not placed in the same intake pen); and improved situational awareness to ensure staff are present and cognizant of all acts of violence that may occur.

These initial practice improvements have begun to make an impact on facility safety, as shown in the metrics discussed below. On each metric (use of force, stabbings/slashings, and

---

[55] As required by the Action Plan § A, ¶ 1(c) and § D, ¶ 5.

[56] As required by the Action Plan § D, ¶ 2(h).

fights), RNDC's annual average monthly rates decreased in 2022 and in all cases, these annual

rates obscure even further decreases when comparing the first half of the year to the latter half.

    With regard to the use of force, the average monthly rate decreased 7% from 2021 to

2022 (13.5 to 12.5), but this annual data point obscures a more substantial change as illustrated

in the table below the chart.



    In the first part of 2022, the facility's average monthly UOF rate increased significantly

as the facility initiated its strategy to disperse those affiliated with Security Risk Groups ("SRG")

across a larger number of housing units such that no one group dominated a single unit, along

with deploying more frequent searches to detect and seize dangerous contraband. As the facility

stabilized, use of force decreased in the latter part of the year. The average monthly use of force

rate from July-December 2022 was 35% lower than in January-June 2022 (9.8 versus 15.1). Thus

far in 2023, this lower use of force rate has been sustained (January-February 2023 average

monthly rate is 8.2).

| Use of Force at RNDC January 2022 to February 2023 | | | | |
|---|---|---|---|---|
| Months | Total # UOF | Average/month | ADP | Rate |
| January-June 2022 | 653 | 108.8 | 727 | 15.0 |
| July-December 2022 | 478 | 79.7 | 812 | 9.8 |
| January-February 2023 | 128 | 64 | 783 | 8.2 |

The rate of serious interpersonal violence in the form of stabbings or slashings followed a similar pattern. Compared to 2021, the average monthly rate of stabbings/slashings decreased 18% in 2022 (from 1.41 to 1.16).



As shown in the table below, the rate of stabbing/slashing in the first part of the year remained high as the Commissioner's Violence Reduction Strategy was implemented. The impact of these strategies became apparent in the latter part of the year, with the rate of stabbings/slashings decreasing 53%, from 1.6 to 0.76. Although a spike in stabbings/slashings occurred in December 2022, it was fortunately short-lived, and even further reductions in the rate were witnessed in January-February 2023 (down to 0.51).

| Stabbings/Slashings at RNDC January 2022 to February 2023 | | | | |
|---|---|---|---|---|
| Months | Total # S/S | Average/month | ADP | Rate |
| January-June 2022 | 70 | 11.7 | 727 | 1.6 |
| July-December 2022 | 37 | 6.2 | 812 | 0.76 |
| January-February 2023 | 8 | 4.0 | 783 | 0.51 |

The rate of fights at RNDC is also on a downward trend. The average monthly rate in 2022 was 17% lower than 2021 (9.82 versus 11.8) and was the lowest it has been since 2018 when this population was first moved to RNDC.



As shown in the table below, the average monthly rate has decreased further since the beginning of 2022, from 10.43 to 9.26 and to 6.96 during the first two months of 2023.

| Fights at RNDC January 2022 to February 2023 | | | | |
|---|---|---|---|---|
| Months | Total # Fights | Average/month | ADP | Rate |
| January-June 2022 | 455 | 75.83 | 727 | 10.43 |
| July-December 2022 | 451 | 75.17 | 812 | 9.26 |
| January-February 2023 | 109 | 54.5 | 783 | 6.96 |

The short-term results following the careful implementation of the Commissioner's Violence Reduction Plan by RNDC's leadership suggest that the Plan and other security related

initiatives are beginning to accomplish the long-term goal of reducing violence and disorder. The Compliance Assessment (First Remedial Order § A.) section of this report discusses RNDC's progress toward addressing ¶ 1 of § XV. Safety and Supervision for Inmates Under Age 19, and finds that the facility's progress, if sustained, may soon warrant removal from Non-Compliance.

- **GRVC**

Like RNDC, GRVC has received special attention from the Monitoring Team (and therefore, by the Department) because of its high rates of use of force and violence and, relatedly, because the largest number of individuals who engage in serious violent behavior are housed in this facility. For these same reasons, the Commissioner expanded the Violence Reduction Plan to GRVC during late summer 2022.[57] This included the SRG blending strategy and increased tactical search operations, although GRVC did not receive the same supplement to its housing unit staffing levels. GRVC's incarcerated population responded to these changes with more violence and for a more sustained period of time than was observed at RNDC. As a result of the continued level of violence and disorder, a new leadership team was installed toward the end of 2022. An Associate Commissioner of Operations was also assigned to guide and support the facility's new Warden.

Improvement in facility conditions did not occur as quickly at GRVC as it did at RNDC. A comparison of outcomes from early and late 2022 suggest that conditions worsened during the latter part of 2022 as the general state of instability continued. However, as discussed in detail below, improvements in facility operations and key metrics were observed during the early part of 2023.

---

[57] As required by Action Plan § A, ¶ 1(b).

First, GRVC's average monthly use of force rate reached an all-time high in 2022 (17.8; yellow line in the chart below) and was nearly three times as high as the use of force rate in 2016 (6.91).



The table below shows that the average monthly use of force rate has varied a bit over the past 14 months, increasing a bit in the second part of 2022 (from 16.7 to 18.5) and then decreasing about 35% thus far in 2023 (to 12.0). The facility population has also increased considerably during this time, with the average daily population increasing about 30% (from 622 to 816).

| Use of Force at GRVC January 2022 to February 2023 | | | | |
|---|---|---|---|---|
| Months | Total # UOF | Average/month | ADP | Rate |
| January-June 2022 | 621 | 103.5 | 622 | 16.7 |
| July-December 2022 | 824 | 137.3 | 743 | 18.5 |
| January-February 2023 | 196 | 98 | 816 | 12.0 |

Similarly, GRVC's rate of serious violence in the form of stabbings and slashings reached its highest point in 2022 and was about 13 times higher than the rate in 2016 (1.92 versus 0.15) and was 85% higher than the 2021 rate (19.2 versus 1.04).



The annual rate obscures the fact that the rate in the latter part of the year was significantly higher than the early part of 2022 (2.22 versus 1.55, or an increase of 43%). The rate dropped significantly in early 2023, but with only two months of data to assess, the extent to which this will be the beginning of a downward trend is not yet known.

| Stabbing/Sashing at GRVC January 2022 to February 2023 | | | | |
|---|---|---|---|---|
| Months | Total # S/S | Average/month | ADP | Rate |
| January-June 2022 | 58 | 9.7 | 622 | 1.55 |
| July-December 2022 | 99 | 16.5 | 743 | 2.22 |
| January-February 2023 | 20 | 10 | 816 | 1.23 |

Finally, GRVC's rate of fights was slightly higher (8%) than 2021, with no major differences between the first part of the year and the latter part. The average monthly rate of fights decreased about 15% in early 2023—while the number of fights per month was similar, the increase in the size of the facility's population means the *rate* was lower.



| Fights at GRVC January 2022 to February 2023 | | | | |
|---|---|---|---|---|
| Months | Total # Fights | Average/month | ADP | Rate |
| January-June 2022 | 275 | 45.8 | 622 | 7.37 |
| July-December 2022 | 330 | 55.0 | 743 | 7.40 |
| January-February 2023 | 102 | 51.0 | 816 | 6.25 |

The Monitoring Team remains concerned about the level of violence at GRVC and is closely watching the implementation of various violence reduction tactics and the early pilot-testing of the revised restrictive housing model (which is housed at GRVC, and discussed further in the Managing Incarcerated Individuals Following Serious Incidents of Violence section of this report). However, the Monitoring Team's recent site visits identified noticeable improvements, including fewer individuals in corridors and unauthorized areas, improved sanitation and building conditions (*e.g.*, power washed and painted areas, refinished floors), less tension in general population housing areas, and higher staff morale and buy-in for recent security initiatives. Further, given the concerning conditions at GRVC, the Monitor has personally reviewed *all* reported incidents (*e.g.* use of force, stabbing and slashings, assaults, log book entries, etc.) at GRVC that are reported via the Central Operations Desk from October 2022 to

date. The Monitor has observed a steady and substantial improvement in the GRVC staff's ability to stabilize the facility and reduce the overall disorder seen during 2022, which appears to be a direct result of the guidance of the Deputy Commissioner of Facility Operations, Classification and Custody Management and his team. Most importantly, as of the filing of this report, overall incidents of disorder have been greatly reduced at GRVC, including the number of slashings and stabbings. Notably, since the revised restrictive housing model pilot program was initiated in February 2023, there have been no reported slashings or stabbings in the ESH housing units for either level.

### _Current State of Affairs & Moving Forward_

The Department has a dedicated focus on security matters and a new cadre of well-qualified leaders with a frequent presence in the jails to develop the skill set of uniformed staff at all levels. This type of eyes-on, hands-on supervision is what is needed to develop the skill mastery, situational awareness, and workplace culture that is necessary to meet the requirements of the Consent Judgment. For this reason, the rapid recruitment and hiring of additional Assistant Commissioners of Operations is essential to accelerate progress in all jails, particularly GRVC and AMKC. This will enable the Department to leverage the advancements slowly being made in other areas (_e.g._, staffing, classification, restrictive housing). Further, dedicated focus to reforming the ESU is needed with a change in direct leadership of the unit, assessment of all staff assigned to the unit (in either a permanent or temporary capacity), and re-training to ensure the practices utilized by ESU align with the requirements of the Court's Orders and sound correctional practice.

In short, granules of progress are evident, but the levels of use of force and facility violence remain exorbitant and facility environments remain volatile and deeply dysfunctional.

The Monitoring Team remains very concerned about the continuing risk of harm which will only abate via a sustained and deepened effort.

## DEATHS OF INDIVIDUALS IN CUSTODY

Calendar year 2022 marked the highest rate of deaths in custody at the Department in at least the past ten years. The Monitoring Team is alarmed by the number of deaths among individuals in custody, particularly those due to suicide and drug overdoses. Since the Monitor's October 28, 2022 report, three individuals have died in custody (one of whom died in 2023). In this section of the report, the number and rate of in-custody deaths is examined, followed by a discussion of investigations of in-custody deaths, and finally an update on the work the Department has been engaged in to address the Monitoring Team's recommendations[58] regarding self-harm and addressing in-custody deaths.

### In-Custody Deaths & Causes

Concerningly, deaths in custody have increased in jail systems across the country, especially since the COVID-19 pandemic in 2020.[59] This is certainly true in the New York City jails which have seen an exponential increase in in-custody deaths during the last few years. The chart below compares the rate of death in New York City, San Diego County, and Los Angeles County jails, which demonstrates an overall increase in the rate of death in a few large metropolitan jails.[60]

---

[58] *See* Monitor's October 28, 2022 report at pgs. 29 to 31.

[59] *See* Monitor's October 28, 2022 report at pgs. 17 to 20. *See also* Maher, K., & Frosch, D. (2022, October 18). *Inmate suicides rose sharply in U.S. prisons, jails during pandemic*. The Wall Street Journal. Retrieved October 25, 2022, from https://www.wsj.com/articles/u-s-prisons-jails-see-jump-in-suicides-11666098966?st=4ylpfw6it2so528&reflink=desktopwebshare_permalink.

[60] Sources: *Interim Monitor Report in the matter U.S. v. Miami Dade, et. al.,* 13-cv-21570 (S.D.Fla.) dated August 12, 2022 (dkt. 246) pg. 7; Los Angeles County Office of Inspector General. (2022). *Reform and Oversight Efforts: Los Angeles County Sheriff's Department, April to June 2022,* pgs. 14-17; Los



The Department's data on the number and causes of deaths from January 2015 to March 31, 2023, is presented below and shows that the number and rate of in-custody deaths by suicide, overdose, and a variety of physical health problems has increased significantly during the past few years. In 2022, the number of individuals who died in custody (n=19[61]) was the highest since 2013, when 24 individuals died in custody. Of particular note, the number of deaths by suicide and drug overdose have increased during the past two years. In 2022, 5 committed suicide and 6 died via overdose and 1 suspected overdose (pending confirmation from the OCME). A summary of the practice failures across the agencies involved in managing incarcerated

Angeles County Sheriff's Department. (2022) *Custody Division Population Quarterly Report, April-June 2022*. pg.3; San Diego County's Sheriff's Department (2022). *San Diego County Sheriff's Department Daily Population Report, 10/28/2022;* and Davis, K. And J. McDonald. (2022). "Fight among detainees at Otay Mesa jail results in 19th death this year, marking grim record." *The San Diego Union-Tribune,* October 6, 2022.

[61] This includes two individuals who died after they had been compassionately released.

individuals that likely contributed to the high rate of death in custody can be found in the

Monitor's October 28, 2022 report at pgs. 21 to 22.

Thus far in 2023, one person has died while in New York City jails. Appendix A of this

report lists the name and date of death for each individual who has died in custody since

November 2015.[62]

| NYC DOC Causes of Death, 2015 to March 31, 2022 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | Total |
| Accidental | | | | | | | | 1 | | 1 |
| COVID-19 | | | | | | 3 | 2 | | | 5 |
| Medical Condition | 9 | 11 | 4 | 7 | 3 | 2 | 4 | 3 | | 43 |
| Overdose | | 2 | 1 | | | | 4 | 6 | | 13 |
| Suicide | 2 | 2 | | 1 | | 1 | 4 | 5 | | 15 |
| Drowned | | | | | | | | 1 | | 1 |
| Pending OCME Confirmation | | | | | | | | 1 | 1 | 2 |
| Undetermined Due to Death Outside DOC Custody | | | | | | 4[63] | 2 | 2 | | 8 |
| Undetermined by OCME | | | 1 | | | 1 | | | | 2 |
| Total | 11 | 15 | 6 | 8 | 3 | 11 | 16 | 19 | 1 | 90 |

The table below shows DOC's mortality rate from January 2010 to March 31, 2023. The

sharp increase in the mortality rate between 2020 and 2022, is troubling. The mortality rate in

2022 was the highest in over a decade and more than double the rate in 2016, at the inception of

[62] This list also includes any individual who was compassionately released and then died in 2021 or 2022.

[63] 4 of the 11 individuals who passed away in 2020 were not technically in DOC custody at the time they passed away as they were participating in programs in the community and were not under the supervision of DOC staff at the time of their death and were not physically in the Department's custody (*i.e.*, they were participating in Brooklyn Justice Initiatives, Specialized Model for Adult Reentry and Training (SMART), and Work release programs). The cause of death for each of these individuals is not known and categorized as "Undetermined."

the Consent Judgment. So far in 2023, one person has died in custody and the mortality rate has

decreased accordingly. This does not mean that the risk has fully abated—the Department still

must take a number of steps to prevent the situations leading to deaths in custody over the past

several years.

| Mortality Rate | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **2010** | **2011** | **2012** | **2013** | **2014** | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** |
| **Annual ADP** | 13,026 | 12,421 | 12,083 | 11,692 | 10,913 | 9,890 | 9,802 | 9,224 | 8,397 | 7,388 | 4,543 | 5,574 | 5,639 | 5,912 |
| **Number of Deaths** | 17 | 12 | 21 | 24 | 10 | 11 | 15 | 6 | 8 | 3 | 11 | 16 | 19 | 1 |
| **Mortality Rate** | 1.31 | 0.97 | 1.74 | 2.05 | 0.92 | 1.11 | 1.53 | 0.65 | 0.95 | 0.41 | 2.42 | 2.87 | 3.37 | 0.17 |
| *Note: Mortality Rate per 1000 people in custody uses the following formula: Rate = (# of deaths/# of people in custody)\*1000* | | | | | | | | | | | | | | |

### *Investigations of In-Custody Deaths*

A key component to understanding the causes of death in custody and ensuring adequate

accountability for lapses and/or failures in practice is a thorough assessment of each occurrence.

As with most issues related to this agency, oversight with respect to in-custody deaths is

complicated and convoluted. Investigations of in-custody deaths are disjointed, untimely and/or

unavailable and therefore do not help to identify systemic failures that, if addressed, could reduce

the risk of future in-custody deaths. Each agency's review has different parameters and scope of

inquiry. For instance, some investigations only assess whether criminal conduct occurred, while

others assess whether practices conformed to applicable policy. A complete discussion of this

web of responsibility is provided in the Monitor's October 28, 2022 report at pages 22 to 26.

The current status of the investigations across the relevant agencies is shown in the table below. As shown below, many investigations of deaths that occurred in 2021 and 2022 are still pending. With respect to DOC's internal investigations of the deaths in 2021 and 2022, ID has completed 11 investigations (8 from 2021 and 3 from 2022). The majority of investigations remain pending because ID is awaiting clearance for completion until after the external investigations are complete).[64]

| Status of Investigations by External Agencies *January 2020 to March 2023* | | | | | |
|---|---|---|---|---|---|
| Year | Total Deaths | SCOC Completed Investigations | AG Completed Investigations | Office of Chief Medical Examiner | BOC Completed Investigations |
| 2023 | 1 | 0 | 0 | 0 | 0 |
| 2022 | 17 | 1 | 2 | 16[65] | 12 |
| 2021 | 16 | 4 | 10[66] | 14[67] | 10 |
| 2020 | 11 | 3 | | 7[68] | 1 |

One criminal prosecution related to an in-custody death in 2020 concluded during the current Monitoring Period. On March 14, 2023, a (now former) Captain was found guilty of one count of negligent homicide for preventing officers from saving the life of an incarcerated person who died by suicide in November 2020.

[64] ID reported that they must receive clearance from the AG's office, as well as the relevant District Attorney's Office and the Department of Investigation before proceeding with an internal investigation.

[65] 2 individuals that died were not in physical DOC custody at the time of their death so the OCME will not determine the official cause of death in those cases.

[66] The Attorney General's Office only began investigating in-custody deaths on April 1, 2021, so the Attorney General's office would only investigate 13 of the 16 deaths that occurred in 2021.

[67] 2 individuals that died were not in physical DOC custody at the time of their death so the OCME will not determine the official cause of death in those cases.

[68] 4 individuals that died were not in physical DOC custody at the time of their death so the OCME will not determine the official cause of death in those cases.

Unfortunately, none of the agencies responsible for investigating the causes of in-custody

death in New York City jails has a record of producing close-in-time analyses of contributing

factors which means that the jails and people in custody have yet to benefit from this oversight.

In fact, the diffusion of responsibility may contribute to the apparent lack of urgency felt by any

single agency. This makes the Department's efforts to address the gaps in understanding of

contributing factors and to enact practice improvements that much more important.

*DOC's Efforts to Address the Monitoring Team's Recommendations to Prevent Self-Harm and In-Custody Deaths*

The Department has taken a number of important steps to improve its practices regarding

managing people at risk of engaging in self-harm and to prevent in-custody deaths. The

Department reports the following:

- **Retained an External Consultant**: The Department retained a well-regarded expert to provide consultation on these matters, with a particular focus on mortality reviews.

- **Appointed a Deputy Commissioner of Health Affairs**: The Commissioner appointed a well-qualified individual to serve in the role of Deputy Commissioner of Health Affairs in February 2023.

- **Developed and Convened a Mortality Review Committee**: With the guidance of the external consultant, the Department, Correctional Health Services, and counsel from the Law Department will conduct In-Custody Death Joint Assessment and Reviews ("JARs") following all in-custody deaths. The new process fortifies the previously utilized JAR process.

  - *Membership of the JAR Committee*: The JAR Committee's membership includes representatives from the Department, Correctional Health Services, and a representative of the Corporation Counsel's office. This brings a much-needed multi-disciplinary perspective to the process.

  - *Structure of Review*: The JAR Committee will meet at least three times following an in-custody death. This will include:

    - *Two-Day Executive Review* (to be held within two business days following an in-custody death): The goal of this initial review is to share immediate factual information and to review the circumstances surrounding the person's death as known at that time. Immediate remedial action or preventive action will be taken at that time for identified critical issues.

> ▪ *Seven-Day and Thirty-Day Executive Review* (to be held within seven and thirty business days following an in-custody death): The goal of these reviews is to share and discuss additional findings and discuss the status of any previously identified remedial or preventive measures taken since the previous review. Some longer-term corrective actions may require the JAR Committee to create a separate working group to assess complex issues, develop remedial measures and oversee implementation, all of which will be reported back to the full committee.

> o *JAR Implementation*: The JAR has convened to review the in-custody death that occurred in early 2023. The Monitoring Team intends to evaluate the JAR's functioning and outcomes and will report those findings in subsequent reports.

- **Convened Suicide Prevention Task Force**: the Department developed a Suicide Prevention Task Force in fall 2022 to begin evaluating these issues. The Task Force was originally chaired by the Deputy Commissioner of Administration, who has expertise in suicide prevention (and is also the Staffing Manager). Effective March 2023, the Task Force is now chaired by the newly-appointed Deputy Commissioner of Health Affairs. Task Force members include the Deputy Commissioner of Administration, Deputy Commissioner of Security, Deputy Commissioner of Adult Programming & Community Partnerships, Assistant Commissioner of Operations, Assistant Commissioner of Strategic Initiatives, an Executive Director of Health Affairs, Director of Data Management for Health Affair, uniform staff representatives, and representatives from H+H.

  - The Task Force has undertaken the following tasks:

    o *Provided suicide prevention training for staff working with the incarcerated population*: The Department reports that as of March 20, 2023, approximately 78% of staff who work with incarcerated population have received a refresher training on suicide prevention.

    o *Began developing a tracking system for self-injurious behavior:* The Task Force is actively working with the Office of Management Analysis and Planning ("OMAP" team to develop an application to track all incidents involving self-injurious behaviors and to identify key trends.

    o *Planned routine assessments of suicidal gestures*: The Task Force will review suicide attempts via medication overdose and the use of ligatures (*e.g.*, sheet, shirt, pants, sweater, T-shirt, shoestring, or other clothing or bedding). The Task Force is seeking to produce a heat map to identify facility spaces where these events occur most often, which will enable the Department to conduct targeted reviews to flag environmental risks for self-harm so they can be remediated.

    o *Developed new refresher training curriculum*: The Department created an online learning course outline and video vignettes to update the "Crisis Intervention and De-escalation" curriculum for all departmental staff.

    o *Evaluated suicide risk screening process for New Admissions:* The Task Force evaluated the suicide risk screening process for new admissions and found

that every new admission receives a suicide risk screening by DOC using the Suicide Prevention Screening form and also by H+H as part of its clinical intake.

- Among others, the Task Force plans to address the following priority issues:

  o *Review Policy and Procedures*: DOC, H+H and the Department's external consultant will review the Suicide Prevention and Intervention Directive. This review will serve as the basis for developing a joint policy and procedure for screening, preventing, and responding to self-harming behaviors.

  o *Evaluate and review training*: Review and update all DOC training previously developed for suicide prevention and crisis intervention.

  o *Create consistent data with H+H*: DOC reports it will be working with H+H to develop common data points for tracking individuals on suicide precautions.

  o *Improve follow-up for mental health referrals*: DOC is evaluating how it can ensure prompt clinic follow-up following a mental health referral.

  o *Improve Information Sharing During New Admissions Process*: Ensure that Court-ordered suicide precautions are flagged during New Admissions intake and shared with the H+H Intake Medical Team and H+H Operations to be addressed as part of their clinical assessments.

  o *Increase Video Surveillance Coverage*: Consider installing additional stationary cameras to support observation of those on enhanced suicide precautions.

  o *Improved tracking for 15-minute tour*s: Investigate the use of automated or technical operational controls to ensure 15-minute tours are conducted in all Mental Observation units in every facility.

  o *Improved staffing for suicide watch*: Rotate the officers assigned to Suicide Watch Officer duty every 2 hours.

- **Addressing Barriers to Sharing information**: The Law Department conducted an analysis of the many laws, rules, and regulations governing the protection of health information as it relates to sharing information between H+H and DOC.[69] The City reported that the protection of health information is governed not only by HIPPA, but that, in New York, the Public Health Law, the Mental Hygiene Law, the Correction Law and regulations of the State Commission on Correction collectively establish a greater degree of protection than HIPAA. The City further reports that DOC and H+H are in agreement that DOC currently receives enough information from H+H to carry out its

---

[69] This list includes 42 CFR § 2.15; 45 CFR §§ 160 and 164; Public Health Law §§ 18(6); Mental Hygiene Law § 33.13(c)(10), (f); Correction Law § 601(a); (f); 9 NYCRR § 7064.8(15); 9 NYCRR § 7013.10 (c); and Correction Law § 601(f).

responsibilities with respect to injuries, suicides, and other types of self-harming behaviors. This will continue to receive close scrutiny from the Monitoring Team given that the work to date suggests that barriers to information sharing do exist and impede the ability or willingness to share information across and within agencies.

The Monitoring Team continues to engage with the Department on these efforts to ensure all appropriate steps are taken to address the issues and poor practices previously identified. As part of this work, the Monitoring Team will identify reasonable time frames for task completion and will provide input and feedback as appropriate.

*Looking Ahead & Next Steps*

Deaths in custody remain a top priority given the rise in the mortality rate over the past few years and the various common preventative measures that simply have not been in place for too long. The Department has taken some important and concrete first steps and has crafted a workplan and committed resources to improve practice in this area. In light of the Department's retention of a qualified expert in these matters and initial steps to address these issues, the Monitoring Team has chosen not to retain a similarly-situated expert to do this work at this time. The Monitoring Team will work closely with the Department to ensure that this work remains a priority and remains on task to develop, implement, and sustain these critical prevention measures.

# INTAKE

The Monitoring Team submitted a report to the Court on the status of the Department's compliance with the intake provisions of the Court's orders[70] on February 3, 2023 (dkt. 504). Intake is the processing center for people entering, exiting, and moving within the jails, and the Department uses two types of intake units. First, individuals newly admitted to DOC custody ("new admissions") must be processed through intake before they are assigned to a housing unit. Second, individuals may be brought to an intake unit within each individual jail either for the purpose of exiting the facility (*e.g.*, to go to Court, the hospital, or another facility) or to be transferred within the facility (*e.g.*, to the clinic following a use of force or to another housing unit) ("inter/intra facility transfers").

In the Monitoring Team's February 3, 2023 report, the Monitoring Team found that the Department has made tangible progress in its efforts to properly manage its intake units—uses of force in intake units have decreased, the physical conditions of the units have improved, more efficient procedures have been implemented to process people who are newly admitted to DOC custody, and facility staff are relying on intake units less often following a use of force. The chaotic environment and inefficient processes that first raised concerns for the Monitoring Team appear to be waning. That said, some additional steps were needed to improve intake processing, and the Department's efforts since the February 2023 report are discussed below.[71] The

---

[70] *See* First Remedial Order, ¶ A(3) (Revised De-Escalation Protocol) (dkt. 350), Second Remedial Order, ¶ 1(i)(c) (dkt. 398), Action Plan, § D, ¶ 2(b) and § E, ¶ (3)(a)-(b) (dkt. 465).

[71] This update is also provided pursuant to the Court's March 13, 2023 Order (dkt. 511) seeking a brief update in the March 31, 2023 report detailing any developments that have occurred since the February 3, 2023 Special Report pertaining to Intake.

Department's efforts to reduce its reliance on the use of intake following a use of force incident (First Remedial Order, ¶ A(3)) are discussed in the Compliance Assessment section of this report.

The overarching goal of the provisions related to processing individuals in intake is to ensure that people do not languish in intake units beyond a 24-hour period. Limiting the length of stay in an intake unit is important because the physical plant of an intake unit (typically, congregate pens with benches (no bunks) and shared toilets) means it is not a suitable housing location. Intake units are intended to be processing hubs, and thus the efficiency of that processing is the central concern. To that end, the Department's quality assurance protocols to support this goal are essential for good practice. Not only can quality assurance identify whether broad goals, professional standards, or court-ordered requirements are being met consistently, but it can also identify systemic problems and flaws in practice that obstruct an agency's ability to do so.

An update regarding the Department's efforts to process people who are newly admitted to the Department through intake within 24 hours is provided below, followed by an update on the Department's tracking processes for inter/intra facility transfers. The final section discusses quality assurance and is applicable to both new admissions processing and inter/intra facility transfers.

### _Intake for People Newly Admitted to the Department_

The Monitoring Team's February 2023 Report describes the procedures in place for processing people who are newly admitted to the Department (_see_ pgs. 15 to 18_)._ These include several notable components that should increase the efficiency of intake processing and the accuracy of the data entered into the New Admission Dashboard. Since the Monitor's last report,

the Dashboard has been updated so that any "clock stoppages" (periods of time when the new

admission process is suspended, discussed in more detail below) are verified by the ADW on

duty, who now has an assigned office space in the intake unit. Most importantly, the efficiencies

created in intake processing address the primary goal of limiting the amount of time that

individuals spend in intake units before being transferred to an assigned housing unit. These

efficiencies include retraining and then consistently assigning staff, restructuring the division of

labor within intake, physical plant changes, transportation upgrades and improved interagency

collaboration. The new procedures implemented for time entries promote the development of

reliable data and should mitigate the possibility that data could be intentionally manipulated.

Consistently assigning specially trained staff in sufficient numbers to the intake area will help to

ensure that each staff member is aware of the required procedures and how to properly execute

and document them and is held accountable for any issues with the accuracy of the data. Also,

the division of labor between staff whose primary task is managing the individuals in intake and

those whose primary task is inputting data into the tracking database will help to ensure that both

tasks are prioritized and neither task is neglected. Thus far, the Monitoring Team has reported

only on intake processing at EMTC for males who are newly admitted to the Department. The

Department recently implemented a similar protocol at RMSC for newly admitted females,

which the Monitoring Team will review and discuss in future reports to the Court.

- **Length of Stay in Intake**

The Monitoring Team analyzed new admissions processing data for January and

February 2023 (the first two months following the new procedures' implementation) to

determine the proportion of people who were processed through new admission intake within the

24-hour timeline. Two different data points can be utilized as the "start time" when tracking

length of stay: the time that an individual is transferred from NYPD to NYC DOC custody, which typically occurs in a court setting (custody time) *or* the time that an individual arrives at the intake unit (arrival time). Both are considered separately in the analysis below.[72] The "end time" at which intake processing is considered complete is the time that the individual is either transferred to a housing unit or discharged from custody (for those who make bail or are not returned to custody following a return to court or trip to a hospital).

As shown in the section under the orange bar in the table below, whether using custody time or arrival time as the starting point, nearly all individuals were processed within a 24-hour period (95% using custody time, and 97% using arrival time) *without deducting any clock stoppages* (discussed in more detail in the next section). In other words, the data presented in the chart below is based on actual time between custody time/arrival time and processing end time, without deductions for clock stoppages.

The area under the green bar in the table below shows the total length of stay for the small proportion of individuals whose processing did not meet the 24-hour timeline (5% using custody time, and 3% using arrival time). Of the small number of individuals who remained in intake beyond 24 hours (n=136 using custody time and n=72 using arrival time), most were housed within 30 hours.

---

[72] As noted in the Monitor's February 3, 2023 Special Report on Intake (dkt. 504), the Monitoring Team assess the time each person arrives in the intake unit (*i.e.*, "arrival time") compared to the time the individual is transported to their assigned housing unit when calculating whether the 24-hour requirement has been met. Counsel for the Plaintiff Class have advised the Monitoring Team that it believes that the assessment of compliance should be based on the time an individual is taken into custody (*i.e.*, "custody time"). Discussions about the appropriate compliance standard are ongoing. Given that, this report provides outcomes using both data points for the Court's consideration.

| Intake Processing Times for New Admissions Arriving at EMTC Intake January 5 to February 28, 2023 | | | | |
|---|---|---|---|---|
| Outcome | Per Custody Time | | Per Arrival Time | |
| | n=2,816 | % | n=2,816 | % |
| Housed/Discharged within 24 hours | 2,680 | 95% | 2,744 | 97% |
| Housed/Discharged beyond 24 hours | 136 | 5% | 72 | 3% |
| Length of Stay ("LOS") Beyond 24 Hours | | | | |
| LOS (# hrs. overdue) | n=136 | % | n=72 | % |
| 24-27 hours (≤ 3 hrs.) | 57 | 2.0% | 31 | 1.1% |
| 27-30 hours (3-6 hrs.) | 28 | 1.0% | 14 | 0.5% |
| 30-33 hours (6-9 hrs.) | 17 | 0.6% | 9 | 0.3% |
| 33-36 hours (9-12 hrs.) | 7 | 0.2% | 2 | 0.1% |
| 36-48 hours (12-24 hrs.) | 10 | 0.4% | 10 | 0.4% |
| More than 48 hours (≥24 hrs.) | 17 | 0.6% | 6 | 0.2% |

No patterns regarding overstays were detected among those who exited intake to a housing unit versus those who were discharged from the Department. However, the Monitoring Team found that a significant proportion of the individuals whose processing did not meet the 24-hour timeline had to return to court shortly after they arrived at the intake unit (discussed in more detail below). The Department's General Counsel has begun to consult leadership in the Criminal Courts to identify potential changes to the appearance process for these individuals that would allow them to be transferred to a proper housing unit, shower and change clothes before having to present for another court appearance.

In summary, the data currently available indicate that the Department processed nearly all people through new admissions intake at EMTC within 24 hours (by both custody and arrival time) and that most of those who overstayed the 24-hour timeline were housed within 6 hours thereafter.

- **NCU's Audits to Verify Data Entry**

Concurrent with the implementation of the improved New Admission Dashboard, NCU initiated an audit strategy to corroborate time entries using Genetec footage, as discussed in the Monitoring Team's February 2023 Report (*see* pgs. 20-22). Given its short tenure, the audit process has been dynamic and continually refined. For instance, originally, NCU attempted to conduct weekly audits but subsequently determined that this cadence was not useful to the task of improving practice because the results of one weekly audit would be in the evaluation process as the next audit began, thus impeding the development and implementation of any corrective action plans or practice change. A bi-weekly cadence is currently being tested to ascertain whether the flow of audit findings is conducive to practice improvements.

Audit results from January to and March 2023 are summarized for the 57 people who were newly admitted[73] during the audits' sampling frame.

- 54 of 57 people (95%) arrived in intake and were processed and transferred to a housing unit within the 24-hour timeline (confirmed via Genetec review);

- 50 of 57 arrival time entries (88%) were generally accurate (*i.e.*, within 20 minutes of the time shown on Genetec). Among the seven inaccuracies, four incorrect entries were for times *before* the person actually arrived, and three were for times *after* the person actually arrived; and

- 46 of 57 housing time entries (81%) were generally accurate (*i.e.*, within 20 minutes of the time shown on Genetec). Among the eleven inaccuracies, seven incorrect entries

---

[73] NCU confirms the status of all individuals in the intake to determine whether they are a new admission or if the individual may already have been in custody and is therefore in intake as an inter/intra facility transfer. Upon confirmation of the new admissions, the audit is limited to those individuals.

were for times *before* the person was actually transferred to a housing unit, and four were for times *after* the person was actually transferred to a housing unit.

- 6 of the 57 people (11%) had "clock stoppages" during the intake process. Of these, three were housed within 24 hours of their arrival time in intake and three were not.

These audit results demonstrate that the Department still has work to do to ensure that staff are accurately entering data regarding the person's arrival time in intake and the time the person was transferred to a housing unit. The Department reports that the staff involved were counseled regarding their errors, which is a positive first step. The NCU staff's time required to complete these audits has also made it abundantly clear that an audit methodology relying on retroactive confirmation via Genetec footage is likely the least effective (in terms of improving practice) and most inefficient strategy for the task. NCU's audit methodology is simply not practical or, indeed, sustainable as a long-term strategy for ensuring data accuracy, though it serves an important role as a temporary strategy until a more effective and practical quality assurance process is put in place. Therefore, NCU's methodology (a passable assessment of small samples of cases) is reasonable *only until* other modes of quality assurance are fully operational.

- **Temporarily Suspending New Admission Processing, a.k.a. Clock-Stoppage**

Historically, the Department has identified circumstances in which new admission intake processing is interrupted and has tolled its accounting of the processing time (*i.e.*, "stopped the clock") until the circumstance is resolved and processing can resume, as discussed in the Monitoring Team's February 2023 Report (*see* pgs. 17 and 19-20). The situations in which the Department temporarily suspends its intake processing clock include: when an individual is

returned to court before the intake process is completed, an individual refuses to participate in intake processing, an individual is transferred to a hospital or Urgi-Care (a clinic in another facility on Rikers Island) before the intake process is complete, or an individual makes bail and must be released from custody before the intake process is complete. Suspending the processing of an individual through the intake process appears to have a logical element (*e.g.*, processing cannot occur if the person is not physically present) and may also be functional (*e.g.*, Department or CHS staff need to know that an individual will not be presented for a certain procedure). Although the Department tracks all clock stoppages, data presented above regarding the 24-hour timeline utilized a continuously running clock, *without deducting any time when processing was suspended.*

Going forward, the Department would like to exclude these clock stoppages from the calculations when determining compliance with the 24-hour requirement. The parameters and appropriateness of this proposal requires discussion among the Parties and the Monitoring Team. Because only two months' data currently exists, decisions about how to proceed are premature.

That said, data from January and February 2023 provide some insight into this practice. First, nearly all individuals (91%; 2,574 of 2,816) were processed through intake without any suspension of the process. Further, the fact that the process was suspended in some cases did not necessarily mean that the individual was not processed within 24 hours. In fact, among the 242 individuals whose intake process was suspended for some period of time, most were housed within 24 hours (50% using custody time, 71% using arrival time). Among those whose intake process was temporarily suspended and whose processing lasted more than 24 hours (n=120 using custody time, n=71 using arrival time), the largest category of suspensions occurred because the individual was required to return to court (58% of those in intake longer than 24

hours per custody time; 69% of those in intake longer than 24 hours per arrival time). The next largest category of suspensions occurred because the individual refused to participate in the intake process (21% of those in intake longer than 24 hours per custody time; 20% of those in intake longer than 24 hours per arrival time). Suspensions for hospital transfer, Urgi-Care and bail payment comprised much smaller proportions.[74]

The Monitoring Team intends to provide the Parties with recommendations for addressing the issue of clock stoppages once more data from at least a few more months becomes available and has been evaluated.

*Intake for those Transferred Within and Between Facilities*

This section of the report discusses a different type of intake that does not relate to new admission processing. Each facility has an intake unit that is used for a variety of purposes (*e.g.* transporting individuals in/out of the facilities). As with new admissions, the Department is required to process individuals through these intake units within 24 hours as the physical plant of these units is not suitable for housing. While progress is evident in that the number of individuals who remain in intake *beyond* 24 hours is decreasing, it does still occur.[75]

In order to assess the amount of time individuals remain in intake, the Department must track inter/intra facility transfers pursuant to ¶ 1(c) of the Second Remedial Order. To date, the Department has not maintained valid system-wide intake length of stay data for inter/intra facility transfers. The Monitoring Team has long encouraged the Department to address this

---

[74] Note, these proportions do not total 100% because an individual's intake processing may be suspended more than once.

[75] For instance, the Department recently reported a particularly egregious case to the Monitoring Team in which an individual spent approximately 138 hours in intake over a 7- day period.

issue, and in January 2023, a reasonable plan was developed. The Classification Manager, the

Staffing Manager, and members of their teams recently implemented this plan, which uses the

Department's legacy Inmate Tracking System ("ITS") and incarcerated individuals'

"accompanying card" or "Housing Locator Card" (which reliably establish the individual's

identity) to track the times at which various events occur.[76] Further, specific staffing,

supervision, procedural and quality-assurance components were put in place, as described in the

February 3, 2023 report at pgs. 32 to 35.

     ITS is a straightforward and intuitive data interface that requires minimal training in

order to utilize the system. When an individual arrives in or departs from an intake unit, staff

scan the unique bar code on an "accompanying card" or "Housing Locator card" and the

incarcerated individual's profile appears on the computer. Intake staff must then select a reason

for the individual's arrival or departure from a drop-down box. At this point, the individual's

entry appears on the "Inmate Tracking Dashboard." The staff responsible for scanning and

entering the intake data varies from facility to facility, but is typically the A station officer

assigned to the computer/desk in the intake unit.

     Separate from ITS, the Inmate Tracking Dashboard lists all individuals in a facility's

intake. At any time, staff may view the Inmate Tracking Dashboard to see who is in their intake

unit, the reason, the time they were scanned in and the time elapsed. The Dashboard also

---

[76] The Department previously used RFID bracelets for this purpose but found them to be unreliable because people in custody would sometimes destroy their bracelet or swap them with other individuals. Utilizing the accompanying card, which remains in the Department's possession at all times, should be less susceptible to such problems.

includes individuals who are expected to arrive in their intake from another area, such as court or another facility.

The Captain assigned to the intake unit is responsible for the direct oversight of the Dashboard. The on-duty Tour Commander is also required to review the Dashboard periodically to ensure individuals are properly tracked in ITS and that no one remains in intake for a protracted period. Facility Wardens have the ultimate responsibility to ensure compliance with intake tracking and the timely processing of all individuals in their facilities' intake units.

Recently, staff from the Deputy Commissioner of Facility Operations' office began reviewing Genetec Video, ITS and the Dashboard across all facilities. In the near future, a protocol will be developed to reach out directly to facilities when any issues, discrepancies, or intake overstays are identified. If the issue is not resolved by the facility, the staff from the Operations Office will elevate the issue to the assigned Associate Commissioner. This quality assurance monitoring was implemented only recently so the process and frequency have yet to be finalized and remain subject to change.

The Department reported that the ITS tracking for inter/intra facility transfers would occur by March 15, 2023. As of that date, the Department reported that ITS tracking was being utilized at RNDC and RMSC, but not yet at the other facilities. On March 27, 2023, the Department shared a memorandum with all facilities indicating that effective that date, facilities were required to track individuals in intake using the Inmate Tracking System.

Following the March 27, 2023 rollout, the Monitoring Team conducted a site visit to every facility's intake to determine whether ITS and the Dashboard were being utilized. In every intake visited, ITS was being utilized and nearly all individuals in the intake pens had been entered into the system. The intake staff reported to the Monitoring Team that any individual

who was not yet scanned into ITS arrived moments ago as the staff were attending to other

priorities that did not allow them to immediately scan the person into ITS. The reliability of ITS

data depends on intake staff's diligence and organizational skill, which leads the Monitoring

Team to recommend that each facility develop clear procedures and appropriate working space

to ensure staff can accurately enter data into ITS, regardless of competing priorities. Overall, all

intake staff showed a clear understanding of the ITS, Dashboard, and transfer process. However,

efficient processing and accurate tracking data will depend on staff having access to appropriate

workspace and focusing on the task at hand, and also on the multiple levels of oversight to

identify and correct errors in order to elevate staff skill.

*Quality Assurance of Department's Tracking Efforts*

The Second Remedial Order and the Action Plan require the Department to "implement a

reliable system to track and record the amount of time any incarcerated individual is held in

Intake and any instance when an individual remains in Intake for more than 24 hours."[77] An

accurate tracking system is an important tool for identifying the extent to which this requirement

is met, but the mere presence of the tracking system does not connote compliance with the

requirement to expeditiously process incarcerated individuals within 24 hours. Similarly, a

quality assurance process to identify where problems may exist in intake processing, to ensure

the integrity of the data, and to assess whether strategies have successfully remediated problems

is also an important part of good practice. But it is important to note that these components

should not be so onerous that they detract from the primary goal of expeditiously processing

---

[77] *See* Second Remedial Order, ¶ 1(i)(c) (dkt. 398), Action Plan, § E, ¶ (3)(a) (dkt. 465).

individuals through intake. The efforts to create accurate tracking information and quality assurance measures should play *supporting* roles.

Quality assurance strategies must be diversified—looking at different parts of an issue or process—and must be capable of producing feedback expeditiously so that any needed practice changes can occur swiftly. To date, the Monitoring Team has advised the Court about the Department's first quality assurance strategy developed for the purpose of supporting good intake practice, namely NCU's audits to verify time entries utilizing Genetec footage (also discussed above regarding length of stay in intake). The focus during the past two months has revolved around quality assurance efforts for new admission intake but this will also be relevant to inter/intra transfers as this process comes online.

Given the concerns about the utility of NCU's audit methodology discussed above, the Monitoring Team has been contemplating and consulting with various actors in the Department to determine whether more reasonable, operationally feasible quality assurance tools can be devised. The Monitoring Team's current thinking about a practical approach to promoting efficient intake processing and minimizing data entry errors is summarized below:

- **On-the-Ground Oversight**: The quickest and most effective way to ensure good practice is to closely oversee the practice, provide guidance, and take corrective action contemporaneously as necessary. Toward this end, oversight could be simultaneously provided by: (1) consistently-assigned Captains who could supervise the work of intake officers, verify the accuracy of data entry, trouble-shoot problems with individuals' processing on a daily basis, and (2) staff from the Classification Manager's office who could routinely inspect the work of the intake staff, assess the efficiency of the intake units' various functions, and verify information entered into the tracking systems multiple

times per week. The key strength of this type of contemporaneous oversight is the ability to improve and/or correct staff practice as it occurs, thereby preventing problems from becoming entrenched in practice. Staff from the Deputy Commissioner of Facility Operations' office have already begun this type of oversight of intra/inter facility transfers.

Another important example of this type of close-in-time oversight is the Department's daily "New Admission Reports" that show the number of people who flow through new admission intake each day, the minimum/maximum/average time of processing and the number of people who remained in intake longer than 24 hours. The report also shows the number and type of "clock stops." Daily reports allow managers to quickly scan a subset of data and inquire about any obvious anomalies (*e.g.*, particularly long or short processing times) close-in-time to the event to determine whether processing problems or data entry errors are responsible for the anomalies.

- **Monthly Analysis of Intake Data**: As discussed above, the Department implemented the New Admission Dashboard to track the processing of all people newly admitted to the jails. This system is capable of generating reports with individual level data, but the data cannot analyze or interpret itself. The New Admission Report discussed above provides daily aggregate data which provides an opportunity to quickly investigate the source of individual anomalies—this is a useful tool. From there, good quality-assurance practice requires an examination of aggregate data for longer periods of time, commonly monthly, because daily reports will not show the emergence of trends over time. The Department has conducted an initial assessment of aggregate data, but the Monitoring Team encourages the Department to establish this analysis as a routine function with skilled

staff that can conduct a more detailed analysis on a regular monthly cadence and provide
this information directly to the practitioners in the jails. This type of analysis is essential
for detecting anomalies, interpret key trends regarding length of stay, and directing the
effort for data-driven process improvements. For example, a scan of monthly data may
reveal intake stays of unusual duration (either very short or very long) that need to be
evaluated to ascertain whether the odd duration is related to an error in computation, a
legitimate delay in processing efficiency, or a delay in processing related to capacity or
workload, et cetera. The overall goal is to scrutinize the Dashboard data on a frequent
basis to identify anomalies and to utilize the data to identify areas where improved
practice is needed. The Monitoring Team has shared its own analytical approach with the
Department, which is working on a strategy to develop an internal capability for this type
of analysis.

*Conclusion & Next Steps*

The Department, finally, has made tangible progress in its efforts to properly manage its
intake units as outlined in this report and the February 3, 2023 report. The chaotic environment
and inefficient processes that first raised concerns for the Monitoring Team appear to be waning
from their height in the summer of 2021. That said, there is certainly more work to be done. As
this work continues, the Monitoring Team recommends that in the near term the following three
things occur:

- **Implementation of ITS to Track Intra/Inter-Facility Transfers**: Support the roll-out
  of ITS tracking and the Dashboard at all facilities to ensure they are incorporated into
  practice.

- **Appoint Dedicated Leadership of Intake Department-Wide**: A specific leader of Intake is needed to properly manage this issue. The leader must have the proper authority and the necessary time to dedicate exclusively to managing the operational issues related to intake. Intake units need to be monitored on a daily basis to ensure appropriate staffing levels and to verify that staff are properly addressing their responsibilities for efficient processing and accurate data entry. The leadership role will also require significant problem solving abilities in order to address the multitude of issues that impact the Department's ability to process individuals in intake units within 24 hours. Given the competing demands for facility leadership's attention, a dedicated leader to support Intake will ensure the issue receives the scrutiny required for compliance with the various requirements. The Monitoring Team recommends the appointment of an Assistant Commissioner of Operations or an individual of similar rank to exclusively manage the intake units across the Department.

- **Improve Quality Assurance Process for New Admissions and Inter/Intra Facility Intake Data.** As explained in detail above, the Department must identify *practical* strategies for ensuring efficient intake processing and accurate data entry in intake units.

# CLASSIFICATION OF INDIVIDUALS IN CUSTODY

The Department has been working to address several recommendations for managing and housing those affiliated with gangs (security risk groups; "SRG") and to repair its fragmented classification process as required by the Second Remedial Order and the Action Plan.[78] As discussed in the Monitor's October 28, 2022 Report, the Department consulted with Dr. James Austin, a nationally recognized expert on classification and safe housing of incarcerated persons, on this work. The Deputy Commissioner of Classification, Custody Management and Facility Operations,[79] hired by the Department in July 2022, serves as the Classification Manager and oversees the centralized Custody Management Unit ("CMU").[80] An ADW with appropriate subject matter expertise oversees the day-to-day operation of the unit and supervises the CMU staff dedicated to the classification and SRG blending functions. These individuals have regular contact with staff assigned to the classification task in each facility as well as the security teams who help to inform the SRG blending, as discussed in more detail below.

## *Classification Process*

The CMU has several responsibilities, one of which is ensuring that people are housed in units that are commensurate with their custody level.[81] Meeting this responsibility requires all

---

[78] As required by the Second Remedial Order ¶ 1(f)(i) and Action Plan § E, ¶ 1 and 2.

[79] As required by the Action Plan § A, ¶ 3(b)(ii)(2).

[80] As required by the Action Plan § E, ¶ 1 and § E, ¶ 2.a.

[81] A person's custody level refers to their level of risk of institutional misconduct, which translates to the level of security needed in their housing unit assignment to mitigate this risk. For example, someone who is classified as "maximum custody" poses a high risk of institutional misconduct and should be housed in a more secure setting than someone who is classified as "minimum custody" who poses a lower risk of institutional conduct and therefore can be safely housed in a less secure setting.

people to be properly classified upon admission ("initial classification") and reclassified at the 60-day intervals required by policy ("reclassification").[82] Once the classification instrument has been completed, CMU must ensure that each individual is housed in a unit of the appropriate type (*i.e.*, dormitory housing for those classified as minimum custody, celled housing for those classified as maximum custody) and must devise a mechanism to track whether the appropriate housing assignment is maintained over time.[83] The Department is on a trajectory to meet each of these responsibilities in short order.

As reported in the Monitor's October 28, 2022 Report (*see* pgs. 90-91), the Department took steps to clarify expectations, train staff, and reassign responsibilities to bring the necessary integrity to the classification process. CMU staff are responsible for completing the initial classification of a newly admitted person within 24 hours of the individual's admission. Under COVID-19 protocols, all new admissions are placed in quarantine housing for 10 days before placement in a regular housing unit. Trained facility staff reclassify individuals at each facility at 60-day intervals. In October 2022, CMU created a set of weekly audit reports to monitor each facility's performance level regarding initial and reclassification functions and to take appropriate steps to remedy any identified problems. This audit/performance enhancement process appears to have been effective. In contrast to the large proportion of individuals with outdated/incomplete reclassification identified by Dr. Austin in mid-2022, by early 2023, only a very small number of people (less than 2%) had an overdue initial classification or reclassification Department-wide. More specifically, of approximately 6,600 people in custody

---

[82] As required by the Action Plan, § E, ¶ 2(a) and (b).

[83] As required by the Action Plan, § E, ¶ 2(a) and (c).

on any given day, an average of 51 individuals had incomplete initial classification and an average of 45 individuals had incomplete reclassifications per week in January, and an average of 37 individuals had incomplete initial classification and an average of 20 individuals had incomplete reclassifications per week in February.[84] The Department's efforts to reorganize responsibilities, clarify expectations, train staff and conduct weekly audits appear to have produced a system that produces *timely* initial classification and reclassification for people in custody, as required by the Action Plan. Timely classification should lead to people being housed in an appropriate housing unit, that is, higher-security units for those at higher risk of misconduct and less restrictive units for those at low risk of institutional misconduct.

That said, the Department has identified a few threats to the validity of the system that need to be corrected in order for the classification system to do its job, which is to *accurately* categorize people according to their risk of institutional misconduct and then house them appropriately. Echoing an issue discussed in previous Monitor's Reports,[85] CMU identified that some of the information captured by the classification process is not always accurate. Classification forms involve a variety of risk factors. Some are related to a person's current charge and legal history, but the most powerful risk factors are those that are related to a person's behavior while in custody (*i.e.*, the number of infractions they have accrued). The infraction process, and its use as a risk factor, provides an incentivizing pathway for those who refrain from assaultive conduct to be housed in a less-restrictive setting. The data must be accurate in order to

---

[84] CMU also tracks a third type of classification, "Legal Reclassification," which becomes necessary when an individual's legal status changes. These are not part of the Action Plan requirements and thus are not discussed here.

[85] *See*, for example, the Monitoring Team's Eleventh Report, pgs. 319-320.

produce a classification level that correctly categorizes people according to their risk of misconduct and in order for the classification process to function as an incentive. In other words, the classification level must accurately separate those who have been involved in assaultive behavior from those who have not. CMU has identified problems with the reliability of infractions (*i.e.,* staff do not always issue an infraction when assaultive misconduct occurs), which means the classification process will misidentify those individuals as lower risk on this particular factor which in turn may result in their being inappropriately placed in a less restrictive unit. CMU reports it is working to improve staff practice regarding issuing infractions for assaultive behavior to ensure that the information used to derive a person's classification level is accurate.

*Blending of Housing for Security Risk Groups*

The Action Plan also requires the Department to eliminate the high concentrations of people with the same SRG affiliation in the same housing units.[86] CMU manages this function by assigning people to specific housing units to ensure that no single unit has a high concentration of people with the same SRG affiliation. This process requires daily oversight from CMU and extensive coordination with the DW for Security and the security teams at each facility. Previously, facilities functioned largely autonomously in this regard, but now, housing unit assignments are made by CMU and the facility must notify CMU of all housing changes using an Internal Change Form. ITS reports are used to identify when a person is "mishoused," meaning that their housing unit is misaligned with CMU's original assignment. Further, each

---

[86] As required by the Action Plan, § E, ¶ 2(d).

facility's blending is monitored using an SRG dashboard (a "heat map") which has useful visual cues when a housing unit has become imbalanced.

The Department began its SRG blending strategy at RNDC in February 2022, followed by GRVC in summer 2022, and reports that all facilities except for AMKC are now appropriately blended. The Monitoring Team reviewed weekly heat maps from February 2023 and found that the mechanics of the system to rebalance units as individuals from a single SRG begin to predominate appears to be functional.

In its effort to maintain proper housing according to classification/custody level and SRG blend, CMU identified problems with "mishousing" (*i.e.*, that people were sometimes not assigned to a housing unit type commensurate with their custody level), which is an essential precursor to having an appropriate SRG blend. [These housing assignments also have obvious implications to the integrity of the classification system discussed above.] Problems arise when facilities transfer individuals to new housing units without verifying appropriate placement with CMU. CMU has a daily mishoused oversight process that identifies instances when an individual's housing unit is not commensurate with their custody level and/or throws off the proper SRG blend. The number of people who are mishoused/improperly blended has decreased since CMU placed renewed emphasis on the daily mishoused oversight process, but CMU has indicated that oversight of mishousing and the facilities' use of the Internal Change From remains necessary to ensure the veracity of both the classification process and SRG blending strategy.

Overall, the Department has implemented robust processes for ensuring timely initial classification/reclassification and to decrease the concentration of people with the same SRG affiliations in the same housing unit but has also identified various areas of practice that must be

shored up to ensure the integrity of both functions. The Monitoring Team will continue to consult with the Department to identify progress in the underlying procedures and to monitor performance with regard to classification timeliness and proper housing assignments for people in custody, as well as SRG blending.

# MANAGING INCARCERATED INDIVIDUALS FOLLOWING SERIOUS INCIDENTS OF VIOLENCE

An essential component of safety for people and staff in correctional facilities is a reliable, safe, and effective response to serious interpersonal violence. The Monitoring Team is alarmed and troubled by the level of violence in the jails and has found that there is a compelling need to control and extinguish gratuitous and predatory acts of serious violence committed by a relatively small number of incarcerated individuals. The violence perpetuated by this small group of individuals results in frightening levels of harm to other incarcerated individuals and staff. The details of this violence are repugnant—examples include an individual with head to foot injuries from a stabbing/slashing incident, an individual scalded with hot water, and an individual so bloodied that a trail of blood was left across the floor of the housing unit following a violent attack. This risk of harm is real and life threatening. The immediate need to control individuals who engage in such violence is compelling and must be addressed by a restrictive housing model that is designed to neutralize the behavior of those who choose to engage in unbridled predatory violence. In particular, a restrictive housing model must effectively separate those who have engaged in serious acts of violence from potential victims, provide the necessary structure and supervision to provide safety to the individuals housed in the unit, and should provide rehabilitative services that decrease the likelihood of subsequent violent acts.

The Department has long struggled to adequately manage this group of individuals and to implement an appropriate restrictive housing model. For this reason the Action Plan (§ E, ¶ 4) requires the Department to implement a restrictive housing program that will safely and adequately manage those incarcerated individuals who have engaged in serious acts of violence and therefore pose a heightened risk to the safety of other incarcerated individuals and staff. Developing such a program requires consideration of a number of different factors. First, the

program must comport with New York State law, Humane Alternatives to Long-Term Solitary Confinement ("HALT") and is subject to the approval of the Monitor. A number of other considerations are also present. This includes the development and implementation of a program model that avoids the many pitfalls the Department has experienced when implementing other iterations of restrictive housing. Further, a significant number of local regulations and dynamics must be considered. Additionally, the program must ensure that the various harmful practices that are emblematic of solitary confinement are not replicated. A system can and must be developed, but addressing the multitude of laws, regulations, issues and concerns (some of which are conflicting) is challenging and finding a path forward must be done with care. Finally, programming and services must be provided that reduce the risk of subsequent violence, which requires collaboration among multiple divisions and agencies. All of this to say, the complexity of the task cannot be overstated—programs for people with known propensities for serious violence who are concentrated in a specific location have unique and essential security requirements, particularly during time spent out-of-cell in congregate activities. This is why the Department's effort to develop an adequate program has languished for *over* 5 years and is still not complete.

The Department has been working with Dr. James Austin, a nationally recognized expert in the design and development of restricted housing programs,[87] and the Monitoring Team to develop a program that meets the requirements of the Action Plan. An effective restrictive

---

[87] Dr. Austin has designed and evaluated restrictive housing programs in many correctional systems across the country, including the Federal Bureau of Prisons, the states of Ohio, Illinois, Mississippi, Colorado, California, New Mexico, Kentucky, and the local California jails of Sacramento, Santa Clara, and Alameda counties. The goal of Dr. Austin's work has been to increase out-of-cell time, increase access to rehabilitative programs, reduce the number of people assigned to restrictive housing, and reduce the level of violence in these systems.

housing model should: (1) limit placement to individuals whose violent behavior indicates that they require such restrictions, (2) balance the need for heightened security and supervision given the individuals' demonstrated propensity for serious violence, while also providing appropriate out-of-cell time, (3) provide a legitimate opportunity and incentive for individuals to participate in rehabilitative programming designed to address the underlying causes of violent behavior, (4) provide access to medical care, and (5) be vigilant about the risk of decompensation.

The Department's existing restrictive housing model, ESH, has many of these components including those that would meet the requirements of the Action Plan and reflect sound correctional practice, but has long faltered in its implementation. More specifically, the Department has not utilized a properly trained complement of staff, has been unable to ensure access to required out-of-cell time, has been unable to control violence in the units, has not provided dependable programming services, and has not provided transparent, objective criteria for advancement and return to the general population. That said, certain components of the Department's legacy restrictive housing program's *design* are not inherently problematic, and therefore it is reasonable that Department is seeking to refine ESH versus developing an entirely new model. The goal is to improve upon the program design (efforts to date have had a variety of problems[88]), while also attempting to safeguard against the implementation failures of the past.

Given the compelling need to have a program that provides sensible restrictions for those with a known propensity for serious violence, the Department is currently pilot testing a *refined* version of the ESH program. The proposed revisions to the ESH policy, reflected in the pilot,

---

[88] *See* the Monitor's June 30, 2022 Report where the design flaws of the RMAS program model are outlined, along with concerns about the Department's readiness for implementation.

includes creating two levels of supervision, both of which permit 7 hours out-of-cell (this will include a period of time for out-door recreation) and require the individual to engage in program offerings during this time. In order to be placed in the unit, the individual must first be found guilty of a certain set of infractions and a multi-disciplinary committee must then determine placement is appropriate for the individual. The incarcerated individual may request a facilitator at the adjudication hearing and is also present at the placement meeting with the ESH committee. Fixed mechanical restraints (*i.e.*, restraint desks) are utilized in Level 1 during congregate programming time to ensure the safety of both peers and staff. When an individual in ESH refrains from major misconduct and engages in programming as required, they are promoted from Level 1 to Level 2, which does not utilize fixed mechanical restraints and includes additional privileges (*e.*g., higher commissary spending limits). Safe access to programming in congregate settings, as well as programming requirements that appropriately incentivize engagement are important core components of this program.

The Monitoring Team supports the Department's efforts to pilot the refined version of ESH, but the Monitor has not approved this program. Approval has been withheld because the program is still in the development stage, and requires further consideration, an assessment of the effectiveness of certain components, and an evaluation of the quality of implementation to determine whether additional revisions may be needed. Indeed, some components of the program require considerable scrutiny, including the out-of-cell time (*e.g*., the amount permitted in Level 2, and the dependability of implementation for both levels), the use of fixed mechanical restraints, the development of behavior support plans, the availability of programming, and the work of the ESH Committee (to which Dr. Austin will provide technical assistance) and its decision-making regarding placement and the transparency of program progression.

Implementation of this program will require strong leadership and vigilant supervision, as well as sufficient numbers of staff who have the necessary skills and a strong understanding of the program's goals, protections, and required procedures.

The refined ESH pilot is located at GRVC,[89] but the Department intends to utilize RMSC for this program, and so construction is currently underway to provide improved housing unit layout and functionality so that all program components can be properly implemented. The RMSC facility will be split in order to maximize bed space for the general population (incarcerated females) and to provide dedicated space for the restrictive housing program. Specially trained staff will be assigned specifically to work in the restrictive housing units with dedicated leadership.

Only with strong adherence to the protocols for ensuring appropriate placement, adequate and durable safety protocols and legitimate opportunities for programming and advancement to less restrictive settings will the Department succeed in providing a safe housing strategy to manage those who have engaged in serious acts of violence. The Monitoring Team, in collaboration with Dr. Austin, is working with the Department to develop an appropriate monitoring strategy to assess the quality of implementation, including specific data that must be tracked, and the impact on the level of safety in the jails. This, along with other input, will support the assessment of the pilot to determine whether revisions or enhancements to the program are necessary.

---

[89] The overall conditions of GRVC are discussed in detail in the Security Practices & Indicators section of this report.

## STAFF ACCOUNTABILITY

### Investigations

Accountability for staff misconduct is a critical tool to address the patterns and practices of excessive, unnecessary, and avoidable uses of force that continue unabated in this system. Timely detection of misconduct and adequate and timely responses to those identified issues are essential for the Department to successfully reduce its use of unnecessary and excessive force and to encourage the safe and proportional use of force. The Monitoring Team's analysis of nearly all UOF incidents (via CODs, Rapid Reviews, and ID Investigations) continues to reveal that misconduct is prevalent and there is no evidence to suggest that practices have materially improved since the inception of the Consent Judgment. Effectively responding to the misuse of force requires reliably *identifying* misconduct that occurs, **and** *addressing* that identified misconduct throughout appropriate corrective action.

The Department has a reasonable framework for identifying misconduct through a combination of Rapid Reviews[90], *ad hoc* review by Agency officials of use of force incidents, Intake Investigations, and Full ID Investigations. The Department's use of Rapid Reviews is generally reasonable (although more work must be done to make the findings reliable consistently) as discussed in the Compliance Assessment (First Remedial Order § A., ¶ 1) section of this report.

While staff practice regarding use of force may not have appreciably improved to the extent necessary for sustainable compliance, the Department's ability to properly investigate use

---

[90] Rapid Reviews are also referred to as "Use of Force Reviews" by the Department, but the moniker Rapid Reviews will continue to be used in this report.

of force incidents advanced significantly since the effective date of the Consent Judgment. All use of force investigations are conducted through the Investigation Division ("ID") via an Intake Investigation conducted within 30 business days of an incident (with referrals, as necessary, for further investigation). The Department's investigators were conducting generally reliable investigations, particularly within the Intake Squad (although there was still room for improvement). Beginning in summer 2022, a discernable deterioration in the quality of investigations conducted by ID was identified and there was evidence that ID was not consistently addressing or analyzing the available evidence and their conclusions did not appear to be objective. That is, beginning midway through 2022, a greater number of Intake Investigations were being closed with no action, a significantly smaller number of cases were being referred for further investigation via a Full ID Investigation, and misconduct was being identified much less frequently than in the past. This deterioration in the quality of investigations does not appear to be the result of less skilled investigators or supervisors nor does the deterioration appear to be determined by the type of investigation (*e.g.*, Intake Investigations versus Full ID Investigations). The Monitoring Team observed a disturbing trend that suggested under the new leadership of the Deputy Commissioner of ID, appointed in summer 2022, staff had been influenced or prompted, either overtly or implicitly, to adopt a more lenient approach when assessing cases and to change their practice in ways that compromised the quality of the investigations.

The Department has recently taken some important steps to address these concerns. Most importantly, a very recent change in ID's leadership (at the end of March 2023), is expected to mitigate any further decline in the quality of investigations and to restore the division's previous

progress towards achieving compliance. These issues are discussed in further detail in the

Compliance Assessment (Investigations) section of this report.

The rest of this section will depict the Department's efforts to *address* those cases

identified as requiring informal or formal discipline, including addressing the backlog of

disciplinary cases and efforts to more efficiently process those cases that are referred for

discipline.

*Discipline*

The City and the Department have made significant strides in 2022 in addressing the

*formal* disciplinary process and reducing the backlog of discipline cases for use of force related

misconduct. The confluence of efforts to achieve compliance with the First Remedial Order,

Third Remedial Order, and the Action Plan have demonstrated that many of the convoluted and

dysfunctional components of the disciplinary system are in the process of being corrected. This

is significant as it will allow the Department to be in a position to apply more timely, reasonable

and reliable discipline. A summary of this work is outlined in this section. A more detailed

compliance assessment of the Department's efforts to achieve compliance with relevant

provisions of the Consent Judgment and Remedial Orders is provided in the Compliance

Assessment section of this report.

The backlog of use of force cases pending with the Trials Division is the continuation of

the Department's efforts to address a backlog of cases that originated in the Investigation

Division. The ID backlog began *over 4 years ago*. This situation is finally beginning to be

resolved as discipline for the misconduct identified by these backlogged investigations is being

imposed. As the Monitoring Team has reported for years, the backlog of investigations and the

subsequent backlog of disciplinary cases creates an untenable delay in accountability. This is

why the Department could not continue with the status quo and had to make a concerted effort to close the backlog cases as quickly as possible, while still imposing meaningful and proportional discipline. It is for this reason that cases were not just summarily closed; instead, deadlines were set to balance the need to address the backlog, and that provided sufficient time to close the cases as meaningfully as possible. This approach ensured that proportional discipline was generally not sacrificed for the sake of expediency, as that would undermine the larger objective of appropriate discipline. Ultimately, the Trials Division struck that balance as it worked to close the backlog of cases pending from December 31, 2020, and earlier. The same approach will be necessary to address the remaining backlog (that is, cases pending more than a year from the date of the incident), which is much smaller, but continues to drain the Trials Division's ability to close more recent cases in a timely manner.

The significant gains made in 2022 must certainly be acknowledged, but much more work remains in order to achieve the ultimate goal of the reform effort, which is to impose timely and meaningful discipline. For more recent cases, the Department still does not reliably or consistently impose timely and meaningful discipline and so the same concerted efforts demonstrated by the Department and the Trials Division in 2022 must continue. To that end, the Monitoring Team provides recommendations at the end of this section on steps the Department must take in order to continue its progress towards achieving Substantial Compliance with the relevant disciplinary provisions of the Court's Orders.

A summary of the current status of staff accountability is outlined below:

- **Case Closures**: The Trials Division closed 2,163 use for force related disciplinary cases in 2022, which is more than were closed in any other *year* of monitoring since the effective date of the Consent Judgment and almost as many disciplinary cases closed in than the previous 5 years ***combined*** (n= 2,225 cases were closed between 2017 to 2021).

- o Even with this accelerated rate of closure, the Monitoring Team has not identified an overall negative impact on the appropriateness of the dispositions. The Monitoring Team found that most of the discipline imposed (whether through NPAs or OATH) was meaningful and proportional to the misconduct identified. That said, the Monitoring Team found the use of lower-level sanctions (*e.g.*, 10 days or less) and cases in which the disposition only remains on the staff's member's record for one year for *formal* discipline must be reduced and encourages prudent limitations on the use of this strategy going forward.

- **Pending Cases**: As of the end of 2022, the number of pending cases continued to decrease, to a total of 409 pending cases, with the vast majority of cases pending occurring between January 1, 2021, and the present. This is the fewest number of pending cases since June 2019 (n=407). The number of pending cases will, of course, often ebb and flow. It is expected that more cases will be referred for discipline with the improvements to the investigation division, but the Trials Division should be in a position to better withstand an influx of new cases given the reduction in the backlog, improved processes, and improved staffing.

- **Eliminating the Backlog**: The Department has essentially eliminated the backlog of use of force related disciplinary cases for incidents that occurred prior to December 31, 2020 ("the 2020 Backlog"). As of the end of February 2023, only 65 (6%) of the 1,110 cases that were pending from this group in spring 2022 remained pending.[91] However, eliminating the 2020 backlog ***does not mean*** that all cases are now closed timely. In particular, a lag to close cases within one year from incidents occurring after December 31, 2020, continues to exist and must be addressed expeditiously. The Monitoring Team provides recommendations regarding the closure of these cases pursuant to the Third Remedial Order and the Action Plan at the end of this section.[92]

---

[91] The Department reports that the majority of cases that remain pending are with staff members on excused leave (*e.g.* military or maternity leave). In some other cases, the Department is awaiting a decision from OATH.

[92] As required by the Action Plan, § F, ¶ 4.

- **Staffing**: The Trials Division has recruited and retained additional staff for the division as required by the Action Plan.[93] That said, the City and Department must remain vigilant in ensuring that the Trials Division maintains adequate staffing levels. Given that the Trials Division is still not timely addressing disciplinary matters, additional staff are necessary to meet the demands of the workload and must be brought on board as quickly as possible.

- **Pre-Trial Conferences**: OATH scheduled more pre-trial conferences in 2022 than ever before (n=1900 compared with n=920 in 2021).[94] The availability of pre-trial conferences has facilitated more timely resolution of matters because the ALJ can facilitate a settlement (or schedule a trial) when the cases cannot be resolved between the Department and the staff member directly.

- **Trials at OATH**: Trials at OATH are occurring closer in time to the pre-trial conference and are conducted more efficiently when they are convened.[95] The Report and Recommendations from the ALJs are completed in a timelier fashion and generally reflect an appropriate assessment and analysis of the Department's disciplinary guidelines. OATH has recommended termination for 12 staff for UOF related misconduct in 2022, double the number recommended for this reason in 2021. This is particularly noteworthy as OATH failed to recommend termination for any staff for UOF related misconduct for the first 5 years of the Consent Judgment, despite circumstances that merited such a recommendation.

- **Appeals**: The increased amount of discipline imposed following a trial by OATH and written Report & Recommendation by an ALJ has resulted in an increased number of appeals to the Civil Service Commission. While the majority of appeals are affirmed, a recent reversal of the Commissioner's determination to terminate a staff member for unnecessary and excessive force raises concerns about the City's and Department's

---

[93] The requirements pursuant to Action Plan, § F, ¶ 1 are discussed in more detail in the Compliance Assessment section of this report in conjunction with the compliance assessment for Consent Judgment, § VIII., ¶ 4.

[94] As required by the Action Plan § F, ¶ 10 (c)

[95] As required by the Action Plan § F, ¶ 10 (d)

ability to impose the requirements of the Consent Judgment. A motion for reconsideration regarding this decision is pending.

- **Expedited Case Closures**: Between mid-June and February 2023, a total of 31 cases covering the conduct of 30 unique staff members, involved in 23 unique use of force incidents, have been identified for expedited closure pursuant to § F., ¶ 2 of the Action Plan. 25 of the 31 cases have been resolved with *close-in-time discipline*, which was generally found to be reasonable. Of six cases that remain pending, two were just recently identified for expedited closure, two are pending potential criminal prosecution, one was Administratively Filed, and one case is now moot following the termination of the staff member for another case. The specifics of these cases are discussed in the Compliance Assessment (First Remedial Order § C, ¶ 2) section of this report.

- **Command Disciplines**: The Department has implemented a revised Command Discipline Policy to expand the use of Command Disciplines and provide a much-needed path toward increased close-in-time discipline for lower-level use of force violations.[96] While the CD process is reasonable, the adjudication of CDs necessarily requires appropriate management. The Department has long struggled to reliably and consistently adjudicate CDs, and additional oversight and quality assurance is needed to ensure that CDs are adjudicated as required by policy.

- **Addressing Unavailable Staff**: The Department, including the Trials Division, has been more vigilant than ever before in addressing staff unavailable to work by strengthening procedures to ensure staff adhere to requirements regarding leave policies, identifying staff for separation pursuant to local laws, utilizing suspensions, and bringing charges and imposing more discipline than ever before.[97] This is described in more detail in the Uniform Staffing Practices section of this report.

*Looking Ahead*

The Department has made a number of notable strides in its efforts to eliminate the use of force disciplinary backlog and create a system that will support timely accountability. These

---

[96] As required by the Action Plan § F, ¶ 3.

[97] As required by the Action Plan, § F., ¶ 7.

elements of progress were sorely needed in a system that for too long allowed disciplinary cases to languish. The various strategies in place and rate of progress must continue with the same level of focus and attention until timely, meaningful discipline is applied in *all* instances of identified misconduct. To that end, the Monitoring Team makes the following recommendations with respect to the Department's efforts to achieve Substantial Compliance with the relevant provisions of the Court's orders:

- **<u>Eliminating the Backlog of Cases Pending 1 Year or More From the Incident Date</u>**: The Monitoring Team recommends that all pending use of force disciplinary cases that occurred between January 1, 2021 and June 30, 2022 must be closed by July 14, 2023.

- **<u>Evaluating the Use of Lower-Level Sanctions & Expungement</u>**: The Trials Division uses of a range of sanctions, including a broad range of compensatory days from 1 to 60 days, to address the range of misconduct. This is necessary, as not all misconduct requires the same level of sanction. In particular, some misconduct stemming from the ID backlog warranted low-level sanctions. Further, in an attempt to expeditiously manage cases, the Trials Division introduced an option for a disciplinary event to only remain on the staff member's record for one year[98] instead of five years, known as "expungement." Both of these strategies have been supported by the Monitoring Team as part of the overall effort to efficiently process disciplinary cases, which was sorely needed given the backlog. As the Department has made significant headway in clearing the backlog and now that other avenues exist to address lower-level misconduct (*e.g.* the expansion of

---

[98] The case will not be removed from the staff member's file if during this one-year period, the staff member is served with new charges on a Use of Force incident occurring after the date of signature on the Negotiated Plea Agreement.

Command Disciplines), the Trials Division must curtail its use of low-level sanctions and expungement given that the cases referred to the Trials Division are generally now reflecting mid-level to egregious misconduct and the sanctions must be proportional. Accordingly, the Monitoring Team recommends that the Trials Division revise its protocols, in consultation with the Monitoring Team, to limit the circumstances in which low-level sanctions and expungement may be utilized, to be implemented no later than July 14, 2023. This date should coincide with the elimination of the backlog.

- **<u>Command Discipline</u>**: Expanded use of Command Disciplines necessitates vigilance by the Department to ensure this process has integrity and is not abused. This includes appropriate oversight of the revised Command Discipline process to ensure cases are processed and not dismissed due to procedural errors. Further, oversight of the outcome of CDs is necessary to ensure that they reach appropriate outcomes and do not simply default to the lowest level sanction (despite evidence to the contrary). Appropriate mechanisms must be in place to ensure that cases that require formal discipline are referred. There must be sufficient oversight to ensure that *if* a staff member has exceeded the number of allowable CDs in a given time period that the cases are referred for MOCs. Finally, an appropriate tracking system for CD appeals must also be developed by the Legal Division.

- **<u>Staffing</u>**: The City and Department must continue to vigorously recruit necessary staff for the Trials Division. While progress has been made, the number of staff is still not sufficient to manage the caseload and process cases in a timely manner. As part of this effort, the Monitoring Team also continues to strongly recommend that the City and Department afford staffing in the Trials Division an opportunity to work remotely. Even

if permitted for only a few days per week, this benefit would support the overall recruitment efforts of qualified candidates.

A more detailed discussion of the Department and OATH's efforts to achieve compliance in the Fifteenth Monitoring Period (which covers July to December 2022) with the relevant provisions of the Consent Judgment and Remedial Orders is outlined in the Compliance Assessment section of the report.

# OVERARCHING INITIATIVES RELATED TO REFORMS

A number of overarching initiatives are necessary to support the reform efforts underway. These include efforts to recruit various staff for the Department, efforts to manage the requirements of the Consent Judgment, training staff on the many initiatives underway, the work of the City's Task force, and addressing the protracted length of stay among individuals in custody. Each is taken in turn below.

*Recruitment Efforts*

The Department needs a strong recruitment and efficient hiring process to support the reform effort given the need for additional support in many areas. Recruiting qualified candidates to work in this Department is particularly challenging given its location in a residential area in Queens (with its attendant transportation and parking issues), the disparaging public discourse about the agency, and general constraints of City employment (including the lengthy onboarding process, few options for remote work, residency requirements, etc.). Quite simply, recruiting individuals to work at the Department of Correction is incredibly challenging. It is for these reasons that creative recruitment efforts for positions with attractive benefits are needed to attract qualified candidates.

Of greatest importance in the recruitment effort is for the Department to attract individuals with correctional expertise from other jurisdictions to serve in leadership positions, staff for the Trials Division, Investigations Division and Legal Division, as well as civilian staff to backfill positions previously held by uniform staff.[99] The recruitment effort is supported by

---

[99] As required by the Action Plan, § B ¶ 2.

the HR Division in addition to a couple executive search firms to identify qualified candidates. The HR Division has also advertised positions via job fairs and online marketing. Finally, the Department, working with the Task Force, has also obtained a waiver of residency requirements from DCAS for most new hires effective June 9, 2022. All of these should increase the pool of candidates to fill the wide variety of positions that are critical to actualizing the vision for reform.

The table below identifies the leadership positions that have been filled, the date of appointment, and the departure date, if applicable.

| Title | Division | Date of Appointment | Date of Departure (if applicable) |
|-------|----------|---------------------|-----------------------------------|
| Chief of Staff | Commissioner's Office | 2/14/22 | |
| Assistant Commissioner | Programs | 3/14/22 | |
| Associate Commissioner | Program & Community Partnership | 3/14/22 | |
| Assistant Commissioner | Program Operations | 3/18/22 | |
| Associate Commissioner | Human Resources | 4/7/22 | |
| Assistant Commissioner | Advancement and Enrichment Program | 4/7/22 | |
| Deputy Chief of Staff | Commissioner's Office | 4/11/22 | |
| Assistant Commissioner | Preparedness and Resilience | 4/11/22 | |
| Deputy Commissioner | Management Analysis & Planning | 4/18/22 | |
| Deputy Commissioner | Investigation Division | 5/9/22 | |
| Deputy Commissioner | Security Operations | 5/16/22 | |
| Deputy Commissioner | Trials | 5/31/22 | |
| Assistant Commissioner | AIU | 6/16/22 | |
| Assistant Commissioner | Human Resources | 6/16/22 | |
| Deputy Commissioner | DCPI | 7/1/22 | |
| Associate Commissioner | Data Quality & Metrics | 7/3/22 | |
| Assistant Commissioner | CIB | 7/11/22 | |
| Deputy Commissioner | Classification & Population Management | 7/25/22 | |
| Associate Commissioner | Trials | 8/8/22 | |
| Deputy Commissioner/ General Counsel | Legal Division | 8/8/22 | |
| Assistant Commissioner | Human Resources | 8/8/22 | |

| Title | Division | Date of Appointment | Date of Departure (if applicable) |
|-------|----------|--------------------|-----------------------------------|
| Executive Director | Intergovernmental & Policy | 8/8/22 | |
| Associate Commissioner | IT | 8/8/22 | |
| Associate Commissioner | Operations | 8/22/22 | |
| Assistant Commissioner | Data Analytics and Research | 8/29/22 | |
| Deputy Commissioner | Administration | 9/6/22 | |
| Assistant Commissioner | Training/Academy | 9/6/22 | 9/17/22 |
| Assistant Commissioner | Operations Research | 9/12/22 | |
| Sr. Deputy Commissioner | Operations | 10/31/22 | 2/3/23 |
| Associate Commissioner | Operations | 11/9/22 | |
| Deputy Commissioner | Training | 12/5/22 | |
| Assistant Commissioner | Investigations | 12/11/22 | 3/1/23 |
| Assistant Commissioner | Investigations – PREA | 12/19/22 | |
| Assistant Commissioner | Management Analysis and Planning | 1/17/23 | |
| Assistant Commissioner | Training Academy | 1/30/23 | |
| Deputy Commissioner | Health Affairs | 1/30/23 | |
| Assistant Commissioner | Public Information | 1/30/23 | |
| Assistant Commissioner | Security Operations | | Pending Start Date |
| Assistant Commissioner | Operations | | Pending Start Date |
| Assistant Commissioner | Operations | | Pending OMB Approval |
| Assistant Commissioner | Operations | | Pending OMB Approval |
| Assistant Commissioner | Operations | | Pending Approval |
| Assistant Commissioner | Operations | | Pending Approval |
| City Medical Director | Chief Surgeon, HMD | | Pending OMB Approval |

Despite the many challenges to recruiting for positions within DOC, the Department has successfully hired a number of qualified individuals as shown in the table above. As discussed throughout this report, newly hired individuals with significant correctional expertise have already positively impacted the jails' operations. Broadening and deepening these improvements demands even greater urgency in identifying candidates, especially critical leadership positions

within the jails which are sorely needed given that the volume of work still required easily exceeds the capacity of those currently on staff.

_Department's Engagement, Focus, and Collaboration Related to the Court's Orders_

Collectively, the Action Plan, Remedial Orders, and Consent Judgment include hundreds of provisions, covering multiple facets of the jails' operation and multiple divisions across the agency. The number of provisions is only exceeded by their complexity, given that the problems are interrelated and polycentric. Furthermore, multiple problems require the same set of individuals to find solutions, and their attention cannot be dedicated to everything all at once. Tasks must be appropriately synchronized, which requires a command of how issues are interrelated and a clear sense of how things must be prioritized. Because implementation never occurs without a glitch, properly managing the many _Nunez_ initiatives also requires the ability to pivot, re-prioritize and yet still ensure that all initiatives stay on track.

Although it increases the already high level of complexity, one benefit of the Action Plan is that it has rallied multiple stakeholders to assist the agency and has catalyzed various Department leaders to take ownership of protocols within their span of control. In an effort to create a unified vision, in early 2023, the Commissioner convened a meeting with his executive staff to outline the priorities to further advance the work under the Action Plan. The Deputy Commissioner of Management, Analysis and Planning provides leadership and oversees the project management support given to the leaders of key initiatives to ensure essential tasks are enumerated, potential barriers are identified and addressed, and to ensure set timelines are both ambitious and achievable. Further, teams dedicated to compliance with the Court's orders within the Legal Division and the Nunez Compliance Unit continue to competently manage many

aspects of this work, including providing a considerable volume of information to the Monitoring Team.

The fresh engagement of multiple stakeholders to address the requirements of the Action Plan is a welcomed improvement to the initially narrow approach to the Consent Judgment that did not attend sufficiently to the foundational issues which, left unaddressed, stymied progress in achieving compliance. However, with this shift, the Department's approach at times lacks a through-line and is without an organizing thread for the robust efforts of multiple leaders in various disciplines. This lack of a central organizing force means that at times, initiatives continue forward even when a refocus to an adjacent issue is needed. Discussions with the Monitoring Team to provide advanced notice of certain plans, to consult on certain initiatives in progress, or to digest and respond to feedback also suffer from this lack of a unified vantage point. Simultaneously, although the Department continues to provide all requested information, the decrease in the number of individuals dedicated to facilitating the flow of information to the Monitoring Team has led to delays in receiving requested information.

To facilitate continued progress toward the requirements of the Action Plan, Remedial Orders and Consent Judgment, the Monitoring Team recommends that the Department:

1. Dedicate additional resources to supporting the work of the Monitoring Team to ensure information is provided in a timely manner; and

2. Identify an individual to manage the Department's overall compliance efforts with the Court's orders. An incredibly unique skill set is required. This individual must have appropriate and recognized authority, a command of the Department's entire operation, and a nuanced understanding of the requirements in the various Court orders in this matter. Their core tasks are to set priorities and resolve conflicts within those priorities

that may demand the same resources; anticipate potential barriers to implementation; communicate proactively with the Monitoring Team regarding upcoming initiatives, progress and obstacles encountered; and respond to the Monitoring Team's feedback and ensure it is incorporated into practice.

_Training Initiatives_

A new Deputy Commissioner of Training was appointed in December 2022 (following the appointment and very short tenure of an individual in September 2022). The new Deputy Commissioner holds a doctorate in educational leadership, is well-qualified and also has demonstrated skill, strong command of the issues, and has taken the _pro-active_ initiative to be transparent and collaborative with the Monitoring Team during his short tenure. Initiatives undertaken by the Training Academy under his leadership include an entirely re-vamped Captains' Promotions program (which includes a shift to a two-week field training component), a streamlined Recruit curriculum and handbook, improved Defensive Tactics training and manual (which had been under development for some time), as well as a number of initiatives to meet emergent needs such as training facility staff to use the New Admissions Dashboard and in Suicide Prevention, improving processing of re-training requests,[100] and facilitating the use of NYPD's state-of-the-art Training Academy to house the January 2023 DOC recruit class. The Monitoring Team has been invited to review and share feedback for new curricula, even those that fall outside of the _Nunez_ Consent Judgment's training requirements. The Monitoring Team looks forward to continuing to work with the Academy staff and its new leadership.

---

[100] Through these efforts, the Department significantly reduced the re-training backlog and has been providing re-training more timely.

In 2022, the Department also began recruiting, training, and onboarding new correction officers for the first time in three years, as depicted in the chart below:

| Number of Correction Officers who Graduated from Training Academy by Graduation Year | |
| --- | --- |
| Academy Class Graduation Date | Total |
| 2009 | 212 |
| 2010 | 0 |
| 2011 | 398 |
| 2012 | 863 |
| 2013 | 645 |
| 2014 | 485 |
| 2015 | 1,099 |
| 2016 | 1,329 |
| 2017 | 2,044 |
| 2018 | 1,213 |
| 2019 | 382 |
| 2020 | 0 |
| 2021 | 0 |
| 2022 | 230 |
| 2023 | 97* |
| *Current Academy Class, not yet graduated. | |

*City-Wide Support of Reform Efforts*

The City reports that the Rikers Island Interagency Task Force ("City Task Force"), comprised of representatives from key City agencies, continues to meet weekly to address issues related to the reform effort and to ensure they are supporting the work by eliminating obstacles to implementation. The City reports that the City Task Force has addressed the following issues since October 2022: Body scanners and drug-sniffing dogs for staff, adjusting college credit requirements for new officers, Fentanyl/harm reduction in housing units, evaluating need for continued use of the Emergency Executive Order, addressing construction needs, and addressing funding and vetting timelines for new hires.

The Monitoring Team continues to recommend certain issues to the City Task Force. In particular, the Monitoring Team encourages the City strengthen recruiting efforts by offering remote work options in order to better recruit certain positions, in particular, for the Trials and Legal Division staff. Unfortunately, the City reports that any potential remote work option is currently limited to those covered by the City's agreement with DC37 union, where a pilot is to be developed by June 2023. It is the Monitoring Team's understanding that the staff in the Trials Division and Legal Division are not a part of this union and thus are not eligible for participation in this pilot program. The Monitoring Team continues to strongly encourage the Department to develop a remote work option, even for a few days per week, for staff with amenable job responsibilities as it would greatly enhance the Department's ability to attract qualified candidates.

*Reducing the Population & Addressing Increasing Lengths of Stay in Custody*

The type and number of individuals in DOC's custody has evolved over the course of the Consent Judgment. The vast majority of individuals incarcerated at Rikers Island are held pre-trial (a small proportion of individuals in custody are sentenced to a year or less). For many years, New York City has engaged in an exceptional effort to reduce its incarcerated population. Since the Consent Judgment went into effect in 2016, the average daily population has decreased 40% (n=9,802 in 2016 compared with n=5,913 in 2023). However, the jails' lowest population was achieved during the initial stages of the COVID pandemic (in May 2020, the average daily population was 3,927) and has since increased. As a result of bail reforms, the characteristics of those who are incarcerated have become increasingly serious and complex. As of March 2023, almost 70% of individuals in the Department's custody have a violent felony as their most serious current offense, compared to about 40% in August of 2017. Further, the proportion of

people in custody with mental health challenges has increased as well. There is no question that any personal challenges an individual may have faced prior to incarceration are only exacerbated by exposure to a correctional environment. This change in population also changes the dynamics of the nature of the work of the Department's staff as well, requiring greater mastery of crisis intervention and skills to resolve interpersonal conflict.

Reducing the overall jail population is necessary to support the overall reform efforts and, in particular, because it would reduce the number of people exposed to the dangerous conditions in the facilities. Given the imminent risk of harm to those incarcerated in New York City's jails, all stakeholders must continue to maximize every possible avenue to reduce the population, by reducing the number of people sent to jail, expeditiously processing court cases, or via release to the community.[101]

Unfortunately, efforts to reduce the number of people in custody have been undercut by the number of people with extraordinarily long lengths of stay who are languishing in the Department's custody, as discussed in the Monitor's October 28, 2022 Report (at pgs. 4-5). Nationally, the average length of stay ("ALOS") among people in pre-trial custody is approximately 30 days. The Department's ALOS is *significantly* longer which contributes not only to the size of the population in the jails, but also to the stress and frustration experienced by people in custody and presents challenges for providing rehabilitative programming in a setting designed to address the short-term needs of people pending trial. Given the current level of

---

[101] New York State Correction Law 6-a affords the City the power to release incarcerated individuals, who have been sentenced to under one year behind bars, into a work release program. Since 2020, the City has released 327 incarcerated individuals to work release programs (297 in 2020, 13 in 2021, and 62 in 2022). As of March 28, 2023, there are approximately 460 incarcerated individuals with a sentence of a year or less in the Department's custody.

violence in the jails, longer lengths of stay also mean that these individuals are at risk of harm for longer periods of time. Conversely, these dynamics can also compound to produce high levels of violence among some who are languishing in the jails and contribute to concerns about safety for both people in custody and staff. For all these reasons, the work of reforming the jail system would benefit from long-term efforts to shorten the length of stay among people in custody whenever possible, and in the short-term, from expediting the cases of those who have been in custody for particularly long periods of time.

Historical length of stay data can be understood in two ways. First, the chart below shows the average length of stay across all people in custody since 2016. Between 2016 and 2022, the ALOS increased 89%, from 61.1 days to 115.3 days. The ALOS in 2022 was nearly four times the national average.



Second, as shown in the table below, the number of people who have been in custody for more than one year has increased as a proportion of the total population. This proportion increased significantly with the onset of the COVID pandemic when the number of people in custody decreased but court processing slowed, and cases began to take longer to be processed.

| Proportion of People In Custody for More than One Year, 2016-2022 | | | | | | | |
|---|---|---|---|---|---|---|---|
| | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** | **2022** |
| # > 1 year | 1,335 | 1,213 | 1,218 | 971 | 1,360 | 1,666 | 1,382 |
| ADP | 9,454 | 8,944 | 7,960 | 6,341 | 4,855 | 5,258 | 5,816 |
| % >1 year | 14% | 14% | 15% | 15% | 28% | 32% | 24% |
| *Note: Number of people in custody for more than one year is as of the end of each calendar year. ADP is the average daily population in December of each calendar year.* | | | | | | | |

The City reports that the Mayor's Office of Criminal Justice ("MOCJ") has taken the following steps to reduce the lengths of stay in the jails:

*Coordination with District Attorneys in Each Borough*

- **List of Individuals in Custody More than One Year.** At regular intervals, MOCJ compiles a list of "long stayers" that includes the individual's name, length of stay, pending charges, along with other information.[102] People with charges in multiple boroughs are also identified. In October 2022, MOCJ sent initial borough-specific lists to each District Attorney's office and routine updates have continued to be shared.

- **Regular Meetings with/Updates from District Attorneys to Prioritize and Expedite Cases.** In January 2023, MOCJ convened a meeting with DAs from all boroughs to discuss a process for collaborating with defense counsel and the courts to expedite cases. Every few weeks, each borough updates MOCJ on the status of each case that was prioritized for expedited processing.

*Coordination with Other Stakeholders*

- **Coordinating with the Center for Justice Innovation ("CJI")**. Since October 2022, MOCJ has worked with the CJI (formerly the Center for Court Innovation, or CCI) to identify any overlap in target populations. Specifically, MOCJ's focus on long lengths of stay intersects with some of CJI's projects involving specialty courts as well as CJI's Population Review project.

- **Coordinating with the Office of Court Administration ("OCA")**. OCA reports it has launched its own initiative to expedite cases of people who have been in custody for two years or more. MOCJ has provided OCA with its list of individuals in custody for more than one year, along with other information, in order to coordinate efforts.

---

[102] As required by the Action Plan § B, ¶ 4.

These steps appear to be useful to the overarching effort to expedite cases for individuals with long lengths of stays in the jails. Between June 14, 2022 and February 23, 2023, the City reports that a total of 584 cases involving people with lengths of stay longer than one year were processed. In 4% of these cases, the defendant was found guilty at trial; in 81%, the defendant pled guilty; in <1%, the defendant was acquitted at trial; in 12%, the case was dismissed; and 3% had other dispositions. However, more work remains to be done.

The Monitoring Team recognizes that reducing length of stay is only one component of broader reforms to reduce the number of people in custody, and as noted above, other initiatives must complement this work. Court processing is a complex endeavor involving many actors beyond the Department, which can sometimes lead to a diffusion of responsibility such that no one agency takes responsibility for the outcome. An individual's length of stay in jail is the product of actions by a variety of stakeholders—the courts, prosecutors, and defense counsel. With so many agencies and individual actors involved, all too often, the responsibility for addressing delays and other structural problems becomes diffuse and uncoordinated. It is imperative for these stakeholders to collaborate to quickly and creatively find ways to process cases more expeditiously through the court system and to otherwise limit the use of secure detention (*e.g.*, via joint action review committees, jail diversion programs, etc.). This group of stakeholders collaborated effectively at the onset of COVID-19 to significantly reduce the jails' populations, so such actions are clearly possible. A comparable level of haste is required to limit exposure to and relieve pressure on the jails.

# 15ᵀᴴ MONITORING PERIOD COMPLIANCE ASSESSMENT FOR SELECT PROVISIONS OF THE CONSENT JUDGMENT AND FIRST REMEDIAL ORDER

This section of the report assesses compliance with a *select group* of provisions from the Consent Judgment and First Remedial Order as required in the Action Plan § G: Assessment of Compliance & Reporting in 2022, ¶ 5(b). This compliance assessment is for the period covering July 1, 2022 to December 31, 2022 ("Fifteenth Monitoring Period").[103] The following standards were applied: (a) Substantial Compliance,[104] (b) Partial Compliance,[105] and (c) Non-Compliance.[106] It is worth noting that "Non-Compliance with mere technicalities, or temporary failure to comply during a period of otherwise sustained compliance, will not constitute failure to maintain Substantial Compliance. At the same time, temporary compliance during a period of sustained Non-Compliance shall not constitute Substantial Compliance."[107]

---

[103] The Monitoring Team did not assess compliance with any provisions of the Consent Judgment or Remedial Orders for the period between July 1, 2021 and December 31, 2021 (the "Thirteenth Monitoring Period"). The Court suspended the Monitoring Team's compliance assessment during the Thirteenth Monitoring Period because the conditions in the jails during that time were detailed to the Court in seven status reports (filed between August and December 2021), a Remedial Order Report (filed on December 22, 2022) as well as in the Special Report filed on March 16, 2022 (dkt. 441). The basis for the suspension of compliance ratings was also outlined in pgs. 73 to 74 of the March 16, 2022 Special Report (dkt. 438).

[104] "Substantial Compliance" is defined in the Consent Judgment to mean that the Department has achieved a level of compliance that does not deviate significantly from the terms of the relevant provision. *See* § XX (Monitoring), ¶ 18, fn. 2. If the Monitoring Team determined that the Department is in Substantial Compliance with a provision, it should be presumed that the Department must maintain its current practices to maintain Substantial Compliance going forward.

[105] "Partial Compliance" is defined in the Consent Judgment to mean that the Department has achieved compliance on some components of the relevant provision of the Consent Judgment, but significant work remains. *See* § XX (Monitoring), ¶ 18, fn. 3.

[106] "Non-Compliance" is defined in the Consent Judgment to mean that the Department has not met most or all of the components of the relevant provision of the Consent Judgment. *See* § XX (Monitoring), ¶ 18, fn. 4.

[107] § XX (Monitoring), ¶ 18.

The Monitoring Team's assessment of compliance for all other provisions of the Consent Judgment (required by § XX, ¶ 18 of the Consent Judgment) and the First Remedial Order that are not outlined below are suspended for the time period covering January 1, 2022 to December 31, 2022. While compliance assessments for these provisions are not included in this report, the Monitoring Team continues to collect and analyze relevant information regarding the Department's obligations under the Consent Judgment and the Remedial Orders on a routine basis. The current conditions suggest that the Department's compliance with these provisions of the Consent Judgment and First Remedial Order, at best, have remained the same and in some cases may have gotten worse.

- **INITIATIVES TO ENHANCE SAFE CUSTODY MANAGEMENT, IMPROVE STAFF SUPERVISION, AND REDUCE UNNECESSARY USE OF FORCE (REMEDIAL ORDER § A)**

## REMEDIAL ORDER § A., ¶ 1 (USE OF FORCE REVIEWS)

§ A., ¶ 1. _Use of Force Reviews_. Each Facility Warden (or designated Deputy Warden) shall promptly review all Use of Force Incidents occurring in the Facility to conduct an initial assessment of the incident and to determine whether any corrective action may be merited ("Use of Force Review"). The Department shall implement appropriate corrective action when the Facility Warden (or designated Deputy Warden) determines that corrective action is merited.

    i. The Department, in consultation with the Monitor, shall implement a process whereby the Use of Force Reviews are timely assessed by the Department's leadership in order to determine whether they are unbiased, reasonable, and adequate.

    ii. If a Facility Warden (or Deputy Warden) is found to have conducted a biased, unreasonable, or inadequate Use of Force Review, they shall be subject to either appropriate instruction or counseling, or the Department shall seek to impose appropriate discipline.

    This provision requires facility leadership to conduct a close-in-time review of all use of force incidents ("Rapid Reviews" or "Use of Force Reviews"). Further, this provision requires the Department to routinely assess Rapid Reviews to identify any completed reviews that may be biased, unreasonable, or inadequate and address with appropriate corrective action.

### Use of Force Reviews – Assessments of Incidents

    During this Monitoring Period, Rapid Reviews assessed 3,183 (98%) of the actual uses of force. The chart below shows the Rapid Review findings from January 2018 to December 2022 (covering the past ten Monitoring Periods).

| Rapid Review Outcomes, 2018 to December 2022 | | | | | | | |
|---|---|---|---|---|---|---|---|
| | **2018** | **2019** | **2020** | **2021** | **2022** | **Jan-June 2022** | **July-Dec. 2022** |
| **Incidents Identified as Avoidable, Unnecessary, or with Procedural Violations** | | | | | | | |
| **Number of Rapid Reviews** | 4,257 (95% of all UOF) | 6,899 (97% of all UOF) | 6,067 (98% of all UOF) | 7,972 (98% of all UOF) | 6,889 (98% of all UOF) | 3,183 (98% of all UOF) | 3,706 (98% of all UOF) |
| **Avoidable** | 965 (23%) | 815 (12%) | 799 (13%) | 1,733 (22%) | 1,135 (16%) | 549 (17%) | 586 (16%) |
| **Violation of UOF or Chemical Agent Policy** | | | *345 (11%) (July-December 2020 Only)* | 1,233 (16%) | 835 (12%) | 515 (16%) | 320 (9%) |
| **Procedural Violations**[108] | 1,644 (39%) | 1,666 (24%) | 1,835 (30%) | 3,829 (48%) | 3,296 (48%) | 1,686 (53%) | 1,610 (43%) |
| **Corrective Action Imposed by Staff Member** | | | | | | | |
| **Number of Staff with Recommended Corrective Action** | 3,595 | 3,969 | 2,966 | 5,748 | 3,071 | 1,748 | 1,323 |

The data above reveals that in 43% of the incidents that occurred during the current Monitoring Period, that facility leadership identified that staff made procedural errors (*e.g.*, failure to secure doors, failure to apply restraints properly), some of which directly contributed to the circumstances that facilitated the incident. This, in addition to the 17% of incidents that were determined to be "avoidable" demonstrates that even the Department's internal analysis (which still requires refinement) shows that staff are not applying the requisite skill set and decision-making needed to decrease the use of force rate. There is much work to do in this area.

## Quality of Use of Force Review Assessments

Rapid Reviews identify procedural violations, recommend corrective action for staff misconduct, and also identify incidents that are avoidable. These findings are relied upon by both the Department and Monitoring Team to identify patterns and trends. That said, Rapid Reviews do not always reliably and consistently identify *all* issues that would reasonably be expected to be identified through a close-in-time assessment of the incident videos.

---

[108] Procedural errors include a variety of instances in which staff fail to comply with applicable rules or policies generally relating to operational functions, such as failure to don equipment properly (such as utilizing personal protective equipment), failure to secure cell doors, control rooms, or "bubbles," and/or the failure to apply restraints correctly.

Beginning in May 2022, the Deputy Commissioner of Security Operations (also the Security Operations Managers as required by Action Plan § D., ¶ 1) has taken steps to improve the reliability of the Rapid Reviews by overseeing the Rapid Review process. Since then, the Monitoring Team has noted improvement in leadership's ability to identify and address violations, specifically those related to factors that contributed to an incident (*e.g.* unsecured cell doors; off-post staff). The Security Operations Manager holds routine meetings with facility leadership who conduct the Rapid Reviews, and one-on-one meetings with ESU leadership to work through the Rapid Reviews involving ESU staff. The Security Operations Manager often addresses specific themes of operational failures with those who conduct the Rapid Reviews to encourage greater vigilance, which appears to be bearing fruit.

That said, some Rapid Reviews are *patently* biased, unreasonable, or inadequate. The Security Operations Manager has taken steps to address these failures through informal counseling of staff who conduct Rapid Reviews. In one particular case, the Security Manager recommended formal charges for an individual who conducted an egregiously inadequate Rapid Review.

**Recommended Corrective Action**

In response to identified problems with staff practice, Rapid Reviews can recommend various types of corrective action, including counseling (either 5003 or corrective interviews), re-training, suspension, referral to Early Intervention, Support and Supervision Unit ("E.I.S.S."), Correction Assistance Responses for Employees[109] ("C.A.R.E."), Command Discipline ("CD," as further discussed in the Compliance Assessment (Staff Accountability & Discipline) section of this report, and a Memorandum of Complaint ("MOC"). The Monitoring Team has found that corrective actions are generally imposed when recommended and NCU also collects proof of practice to demonstrate that corrective actions have occurred.

The most frequent corrective action recommended is a Command Discipline. In fact, the recommendation for a Command Discipline increased during this Monitoring Period compared to the last (1,216 compared with 902 respectively, an increase of 35%). Rapid Reviews referred staff for re-training more often during this Monitoring Period compared to the last (171 compared with 99 respectively, an increase of 73%). At the same time, significantly fewer 5003 counseling and corrective

---

[109] C.A.R.E. serves as the Department's Wellness and Employment Assistance Program. C.A.R.E. employs two social workers and two psychologists as well as a chaplain and peer counselors who provide peer support to staff. The services of C.A.R.E. are available to all employees of the Department. The Department reports that the members of the unit are tasked with responding to and supporting staff generally in the day-to-day aspects of their work life as well as when unexpected situations including injuries or serious emergencies occur. C.A.R.E. also works with staff to address morale, productivity, and stress management, and provide support to staff experiencing a range of personal or family issues (*e.g.* domestic violence, anxiety, family crisis, PTSD), job-related stressors, terminal illness, financial difficulties, and substance abuse issues. The C.A.R.E. Unit also regularly provides referrals to community resources as an additional source of support for employees. Staff may be referred to the C.A.R.E. use by a colleague or supervisor or may independently seek assistance support from the unit.

interviews were recommended via Rapid Reviews compared to the previous Monitoring Period (1,004 versus 1,935, a decrease of 48%). The Monitoring Team has not determined the reason for this decline but will continue to evaluate the situation.

**Conclusion**

While the Rapid Reviews do identify a significant volume of problems with staff practice, they do not reliably identify all issues. Further, to date, they have not proven to be an effective tool for preventing similar misconduct from re-occurring. Rapid Reviews identify and recommend corrective action for a wide array of security lapses, yet the same problems persist Monitoring Period after Monitoring Period. There is no question that utilizing Rapid Reviews is grounded in sound correctional practice and is an appropriate tool. However, the use of Rapid Reviews to catalyze improved practice will likely only occur when facility leadership, especially the direct supervisors of Correction Officers, gain a stronger command of the security protocols and procedures that must be utilized on a daily basis, develop skills to guide and coach their staff toward sound correctional practice, and are actively engaged in supervising staff in a manner that allows them to address these issues in real time. That said, Rapid Reviews continue to be valuable tool and the improvements in identification of issues in this Monitoring Period is encouraging.

| COMPLIANCE RATING | **§ A., ¶ 1.** Partial Compliance |
|---|---|

## REMEDIAL ORDER § A., ¶ 2 (FACILITY LEADERSHIP RESPONSIBILITIES)

§ A., ¶ 2. Each Facility Warden (or designated Deputy Warden) shall routinely analyze the Use of Force Reviews, the Department leadership's assessments of the Use of Force Reviews referenced in Paragraph A.1(i) above, and other available data and information relating to Use of Force Incidents occurring in the Facility in order to determine whether there are any operational changes or corrective action plans that should be implemented at the Facility to reduce the use of excessive or unnecessary force, the frequency of Use of Force Incidents, or the severity of injuries or other harm to Incarcerated Individuals or Staff resulting from Use of Force Incidents. Each Facility Warden shall confer on a routine basis with the Department's leadership to discuss any planned operational changes or corrective action plans, as well as the impact of any operational changes or corrective action plans previously implemented. The results of these meetings, as well as the operational changes or corrective action plans discussed or implemented by the Facility Warden (or designated Deputy Warden), shall be documented.

The goal of this provision is to ensure that the leadership of each facility is consistently and reliably identifying operational deficiencies, poor security practices, and problematic uses of force and that they address these issues so that supervisors and staff alike receive the guidance and advice necessary to improve their practices. Facility leadership is required to routinely analyze available data and information regarding uses of force, including the daily Rapid Reviews, to determine whether any operational changes or corrective action plans may be needed to reduce the use of excessive or unnecessary force, the frequency of use of force incidents, or the severity of injuries or other harm to incarcerated individuals or staff resulting from use of force incidents.

As discussed throughout this report, the current on-going harm to people in custody and staff cannot be overstated, and the factors contributing to the Department's inability to properly infuse an

appropriate skillset to minimize this risk of harm has been discussed in each of the Monitoring Team's reports to date. It is for this reason that the Monitoring Team recommended that the Department broaden the criteria of candidates who may serve as facility Wardens, to allow for the selection of individuals based on their breadth of experience and demonstrated effectiveness as leaders.[110] Having more skilled facility leaders should create new potential for developing the skill set of their subordinates, and thus it is an essential starting point for the culture change required.

To support facility leadership's ability to do so, Action Plan § A., ¶ 3(b) requires a new agency leadership structure which, through the oversight and guidance of Deputy Commissioners and Associate Commissioners, should help to develop the quality of facility leaders so they can meet the expectations above. Further, in December 2022, the Court issued an order that permitted the Department to expand the pool of candidates that may be considered to serve as Facility Wardens given the current compliment of staff available to serve in the role was not sufficient and the Department's attempts to develop alternative leadership structures in the command were not workable.

**New Agency Leadership Structure**

Throughout 2022, the Commissioner brought in a new executive leadership team to direct the agency's efforts regarding security, staffing, classification and operations and *to work alongside facility leadership*. This action was strongly supported by the Monitoring Team and was a necessary first step toward meeting the requirements of this provision. The three well-qualified Deputy Commissioners of Staffing, Security, and Classification/Operations and two Associate Commissioners of Operations have made notable progress in identifying problems and making plans to address them and have already demonstrated a positive impact on the jails' operations. The essential next step for ensuring that facility leaders are capable of meeting their responsibility under this provision is to address the skill and leadership deficits among existing Wardens.

**Facility Leadership**

The Department's leadership (both uniform and civilian) routinely meet to discuss the various issues facing the agency, and facility leadership consistently conducts Rapid Reviews for every use of force incident (*see* the Compliance Assessment (First Remedial Order ¶ 1) section of this report). However, to date, facility leaders have simply been unable to abate the persistent issues contributing to the risk of harm, including the use of inadequate or unreasonable security protocols, the use of excessive or unnecessary force, and the frequency of use of force incidents. The Department attempted to create a parallel supervisory structure in order to provide more direct support to Wardens, but could not find candidates with the appropriate skill set and/or the willingness to work within a parallel supervisory structure. The City's and Commissioner's declarations in this matter (dkt. 485 and 488,

---

[110] *See e.g*. Eleventh Monitor's Report at pg. 15, Monitor's Twelfth Report at pg. 13, Monitor's September 23, 2021 Status Letter to the Court at pg. 7.

respectively) conceded the lack of success in creating a parallel supervisory structure capable of improving facility leadership and stated that supplementing Wardens with civilian leaders was the only viable course of action to meet the requirements of this provision.

The Court's December 6, 2022 Order regarding Facility Supervisors (dkt. 492) created new positions (*i.e.,* Assistant Commissioners of Operations)[111] to replace those currently in Warden positions. When filling these positions, the order permits the Department to look beyond uniformed staff to the broader corrections community to ensure the candidates have the breadth of experience and demonstrated effectiveness as leaders to accomplish the requirements of this provision. This expansion to hiring criteria was only granted at the end of the Monitoring Period and the Department began to recruit for the positions at the very end of 2022. Assistant Commissioners of Operations will be installed to oversee each facility, essentially replacing the Wardens with individuals with the requisite expertise and leadership ability to facilitate the culture change required to meet the requirements of the Court's orders. Five such individuals have are scheduled to begin work in April 2023.

**Conclusion**

The impact that the agency's new leadership—hired from outside the uniform ranks—has already had on practice suggests that the Department's efforts to push this strategy further down the chain of command and into the facilities is a promising path toward reforming the agency. As the Department conceded in its supporting declarations for the Court's December 2022 Order, its efforts in this Monitoring Period were insufficient to achieve compliance with the requirements of this provision. That being said, it is expected that the ability to achieve compliance with this provision is now within reach with the ability to recruit and hire from a broader pool of candidates to lead the facilities. The new Assistant Commissioners of Operations must be brought on board with all due haste. It remains to be seen whether these individuals will be able to succeed in their core task of raising the quality of staff practice among all ranks, including the quality of staff supervision afforded by DW, ADWs, and Captains and the quality of security practices, crisis management and service provision delivered by line staff. The Monitoring Team will closely monitor the continued progress toward onboarding the new Associate Commissioners or Operations and evaluate their impact going forward.

| COMPLIANCE RATING | § A., ¶ 2. Non-Compliance |
| --- | --- |

| Remedial Order § A., ¶ 3 (Revised De-escalation Protocol) |
| --- |

§ A., ¶ 3. Within 90 days of the date this Order is approved and entered by the Court ("Order Date"), the Department shall, in consultation with the Monitor, develop, adopt, and implement a revised de-escalation protocol to be followed after Use of Force Incidents. The revised de-escalation protocol shall be designed to

---

[111] The Court Order titles these positions "Facility Supervisor," but the Department's title "Assistant Commissioner of Operations" is used in this report for clarity.

minimize the use of intake areas to hold Incarcerated Individuals following a Use of Force Incident given the high frequency of Use of Force Incidents in these areas during prior Reporting Periods. The revised de-escalation protocol shall address: (i) when and where Incarcerated Individuals are to be transported after a Use of Force Incident; (ii) the need to regularly observe Incarcerated Individuals who are awaiting medical treatment or confined in cells after a Use of Force Incident, and (iii) limitations on how long Incarcerated Individuals may be held in cells after a Use of Force Incident. The revised de-escalation protocol shall be subject to the approval of the Monitor.

This box provides a compliance assessment on the Department's efforts to reduce the reliance on the use of intake in general operations pursuant to the requirements of the First Remedial Order § A., ¶ 3. This assessment also includes references to Action Plan § (E) ¶ (3)(a) (which adopts ¶1(c) of the Second Remedial Order regarding tracking of inter/intra facility transfers), and Action Plan § (E) ¶ (3)(b) (which requires the new leadership to address these requirements) given the interplay with the First Remedial Order § A., ¶ 3. These provisions require the various processes that are negatively impacting intake's orderly operation to be identified and addressed with new procedures. The information in this compliance assesment was also provided in the Monitor's most recent February 3, 2023 report pgs. 26 to 35.

The Classification Manager, as required by Action Plan § (E) ¶ (3)(b), has taken the lead on addressing the matters related to intake. The plans that have been developed in coordination and collaboration with the Security Manager, Staffing Manager, and various leadership in each of the Facilities and other divisions are reasonable, rooted in sound correctional practice, and incorporate facets that make these plans feasible and sustainable.

To ascertain the Department's progress in minimizing the use of intake, the Monitoring Team assesses the use of force in intake, available data regarding the time individuals stay in intake areas, and the Department's implementation of De-escalation Units to manage individuals *outside* of intake. The Monitoring Team also makes observations from site visits of intake areas and its assesments of use of force incidents. The Department has made progress on this provision and beginning in 2022, the Department is no longer in non-compliance with the First Remedial Order § A., ¶ 3.[112]

**Use of Force Incident in Intake Areas**

The Monitoring Team continues to evaluate the frequency with which use of force occurs in the intake as the Monitoring Team has long noted that a chaotic environment and longer processing times (which are often mutually reinforcing) within intake can result in a greater frequency of the use of force. This is why efficient processing of individuals within intake and reducing reliance on intake

---

[112] The Department was in non-compliance with this provision in the Eleventh and Twelfth Monitoring Periods. A compliance assessment was not provided for the Thirteenth Monitoring Period. The Monitoring Team found that the Department was in Partial Compliance with this provision in the Fourteenth Monitoring Period in the October 28, 2022 Report.

following a use of force are so critical. While the number of uses of force within the Department is still too high, there is at least some evidence that the improved conditions within intake have resulted in a reduced number of uses of force. The total number of uses of force in intake in 2022 (963) is 54% lower than the total number of uses of force in intake in 2021 (1483). Further, the proportion of uses of force in intake has decreased instead of increased for the first time.

| Use of Force in Intake | | | | | |
|---|---|---|---|---|---|
| | 2018 Total | 2019 Total | 2020 Total | 2021 Total | 2022 Total |
| # of Use of Force Incidents in Intake | 913 | 1123 | 992 | 1483 | 963 |
| Total UOF | 5901 | 7169 | 6467 | 8194 | 7005 |
| % of UOF in Intake | *15%* | *16%* | *15%* | *18%* | *14%* |

**Intake Data Tracking & NCU Audits of Individuals in Intake**

Inter/intra facility transfers are required to be tracked pursuant to ¶ 1(c) of the Second Remedial Order. As noted in the Intake section of the report, the Department has the Inmate Tracking System which can be utilized to track inter/intra facility transfers, but facility compliance has been inconsistent. Instead, each facility maintains a different manual tracking mechanism that does not produce aggregate data for analysis. The Monitoring Team's routine site visits to intake areas reveal that intake staff are generally aware of the reasons an individual was in intake, where the individual was waiting to go to, and the overall time they were in intake. However, the lack of a centrally managed tracking tool limits the problem-solving effects to those *within* a facility, making it difficult to promote the overall goal of ensuring that system-wide, individuals are not left in intake for long periods of time.

Given that the Department was unable to provide valid system-wide data for individual stays in intake in 2022, the Monitoring Team asked NCU to conduct audits of intake units across a number of facilities beginning in January 2022 to better understand the scope of the issue for intake stays for non-new admissions. Such audits were conducted in January and February 2022, August 2022, October 2022, November 2022, and December 2022 of Intake Areas at AMKC, GRVC, RNDC, and NIC for non-new admissions.

As noted in the Monitor's June 30, 2022 Report, NCU conducted 4 audits of intake areas in three different facilities in January 2022 and February 2022 and found that 33% of individuals (15 of 45) had stays in intake longer than 24 hours. Almost half of these (7 of 15) extended beyond 72 hours.

In August 2022 NCU found that 13% of individuals (4 of 30) were held for more than 24 hours (but all 4 were held in intake less than 48 hours); 3 of the 4 individuals were held in intake awaiting Mental Health Housing, and one for issues with disrupting his housing unit.

NCU conducted six audits of intake areas in four different facilities (RNDC, AMKC, NIC, and GRVC) between October and December 2022. These audits found that 8% of individuals (4 of 53) had stays in intake longer than 24 hours (3 of the 4 individuals were held in intake less than 48 hours and the final individual was in intake less than 72 hours). All 4 individuals were held in intake awaiting assignment to a housing unit.

NCU's audits for the second half of 2022 are consistent with the Monitoring Team's site work and other information available to the Monitoring Team that suggest there is improvement in reducing the length and number of overstays in intake for inter/intra facility transfers.

**Reduced Reliance on Intake & De-Escalation**

The Monitoring Team's routine site visits as well as assessments of use of force incidents has continued to reveal that staff's reliance on intake following a use of force incident has decreased. As part of this effort, de-escalation units were opened in each Facility by July 2022. De-escalation units are in unoccupied housing units in each facility and have cells with secured doors, a bed, toilet, and sink. The housing units also contain a shower. While the First Remedial Order does not require the use of de-escalation units, the Department opened these units as one alternative for staff to use instead of intake. The Department promulgated Directive 5016 "De-escalation Unit," which establishes the Department's policy and procedures for conducting de-escalation outside of facility intakes. The policy indicates that intake should only be used for facility transfers, court processing, discharges, and transfers to medical appointments, cadre searches, body-scans and new admissions.

NCU conducted audits between May 2022 to December 2022 to determine how facilities are managing individuals in custody following a use of force incident and to assess every facility's adherence to the de-escalation policy. Specifically, NCU reviewed Genetec video to track the movement of individuals after a use of force incident to determine if staff is following the policy on de-escalation protocol (*i.e.*, not placing individuals in intake pens after incidents).

The NCU audits covering July to December 2022 (the Fifteenth Monitoring Period) revealed that 88 of 124 individuals (71%) (compared with 54% in May and June 2022) were not taken to intake and instead were taken back to their assigned cell to de-escalate, immediately rehoused, taken directly to the clinic for medical care, or were placed in a de-escalation unit. Only 36 of 124 individuals (29%) were brought to intake areas. This audit, in conjunction with the Monitoring Team's own observations from site work and evaluation of relevant information, revealed improvement in reducing the number of individuals taken to intake pens. It also revealed that facilities are moving a greater proportion of individuals directly back to their assigned cells, to de-escalation units or the clinic, or immediately re-housing individuals than they have in the past. It is worth noting that moving individuals back to their assigned cell or utilizing an adequate alternative to intake is an acceptable and important component to reducing the reliance on intake.

**Conclusion**

The Department has taken important steps to reduce reliance on the use of intake after a use of force. NCU audits, and the Monitoring Team's work, demonstrate that the Department has made progress in utilizing intake less for post-incident management. Further, the number of uses of force within intake has decreased. Additional work remains as continued efforts are needed to reduce the utilization of intake after a use of force and as described at length in the Intake section of this report, the Department must be able to track individual stays in intake. The Monitoring Team found the Department was in Partial Compliance with the First Remedial Order § A., ¶ 3 in the Fourteenth Monitoring Period and given the findings above, the Department has sustained Partial Compliance in the Fifteenth Monitoring Period,

| COMPLIANCE RATING | § A., ¶ 3. Partial Compliance |
|---|---|

## REMEDIAL ORDER § A., ¶ 4 (SUPERVISION OF CAPTAINS)

¶ 4. *Supervision of Captains*. The Department, in consultation with the Monitor, shall improve the level of supervision of Captains by substantially increasing the number of Assistant Deputy Wardens ("ADWs") currently assigned to the Facilities. The increased number of ADWs assigned to each Facility shall be sufficient to adequately supervise the Housing Area Captains in each Facility and the housing units to which those Captains are assigned, and shall be subject to the approval of the Monitor.

This provision requires the Department to improve staff supervision by hiring and deploying additional ADWs within the facilities to better supervise Captains. The goal of this provision is to help compensate for the more compact chain of command in the Department (discussed in more detail in the October 28, 2022 report at pgs. 78 to 80) by ensuring that Captains are properly supervised, coached, and guided in order to elevate the skill sets of Captains, who in turn will better supervise the officers on the housing unit. Since this provision went into effect in August 2020, the overall number of staff at all ranks have declined, as demonstrated in the data provided below and discussed in the Uniform Staffing Practices section of this report. Therefore, compliance is not simply achieved by having a certain number of individuals in these positions. The "adequate number of ADWs" required by this provision is a dynamic target given that the number of Correction Officers and the number of Captains change constantly, along with the number of facilities that must be staffed and the number of people in custody. Further, the number of COs and supervisors needed will depend on the type of housing unit. For instance, a general population housing unit with minimum custody individuals will require different supervision levels than a housing unit with maximum custody individuals.

**ADW Assignments in the Department**

The table below identifies the number and assignment of ADWs from July 2020 to December 2022. As demonstrated in the data below, the overall number of ADWs has fluctuated as has the number of ADWs that are assigned to the Facilities or Court Commands, which require the most engagement with the incarcerated population. It is notable that the overall number of ADWs within the

133

Department and assigned to the Facilities and Court Commands has increased and that the majority (80%) of ADWs are assigned to work in the Facilities and Court Commands. As noted above, the total number of ADWs is important, but must be analyzed in the context of the number of Captains being supervised by each to ascertain whether there has been improvement in the overall level of supervision. Therefore, an analysis of the number of Captains follows.

| | Number of ADWs & Assignments in the Department[113] | | | | | |
|---|---|---|---|---|---|---|
| Facility | # of ADWs As of July 18, 2020 | # of ADWs As of Jan. 2, 2021 | # of ADWs As of June 26, 2021 | # of ADWs As of Jan. 1, 2022 | # of ADWs As of June 18, 2022 | # of ADWs As of Dec. 31, 2022 |
| AMKC | 9 | 21 | 13 | 12 | 9 | 12 |
| EMTC[114] | 0 | 0 | 0 | 0 | 0 | 8 |
| GRVC | 6 | 10 | 11 | 9 | 8 | 12 |
| MDC[115] | 6 | 2 | 1 | 1 | 0 | 1 |
| NIC | 6 | 8 | 8 | 5 | 7 | 8 |
| OBCC[116] | 6 | 8 | 8 | 14 | 7 | 0 |
| RMSC | 5 | 6 | 6 | 5 | 4 | 5 |
| RNDC | 7 | 15 | 15 | 10 | 7 | 12 |
| VCBC | 4 | 6 | 5 | 5 | 4 | 5 |
| Court Commands (BKDC, BXDC, QDC) | 3 | 4 | 3 | 3 | 3 | 3 |
| Total # of ADWs in Facilities & Court Commands | 52 | 80 | 70 | 64 | 49 | 66 |
| Total # of ADWs Available Department-wide | 55 | 95 | 88 | 80 | 67 | 82 |
| % of ADWs in Facilities & Court Commands | 79% | 84% | 80% | 80% | 73% | 80% |

---

[113] As of the end of the Monitoring Period, the assignment of ADWs within the Facility is not available so this data simply demonstrates the number of ADWs per facility.

[114] EMTC has been closed and opened in these Monitoring Periods. Until late 2022, staff that work at EMTC were technically assigned to AMKC.

[115] MDC was utilized in a limited capacity at the end of the Twelfth Monitoring Period and was closed by June 2021.

[116] OBCC was slated for closure in the Fourteenth Monitoring Period and had an ADP of 81 in the month of June 2022. OBCC was closed by July 2022. Staff were then reassigned to other commands.

**Captain Assignments in the Department**

     The table below identifies the number and assignment of ADWs from July 2020 to December 2022. As discussed above, the overall number of Captains in the Department and assigned to the Facilities and the Court Commands has decreased. However, the Department has made progress on maximizing the number of Captains assigned to the Facilities and Court Commands. In fact, in this Monitoring Period, the proportion of Captains (75%) assigned to work in the Facilities and Court Commands is the highest it has been since this work began and reflects the efforts to ensure more Captains are assigned to the Facilities and Court Commands.

| Number of Captains & Assignments in the Department[117] | | | | | | |
|---|---|---|---|---|---|---|
| **Facility** | **# of Captains As of July 18, 2020** | **# of Captains As of Jan. 2, 2021** | **# of Captains As of June 26, 2021** | **# of Captains As of Jan. 1, 2022** | **# of Captains As of June 18, 2022** | **# of Captains As of Dec. 31, 2022** |
| AMKC | 91 | 111 | 97 | 87 | 81 | 80 |
| EMTC[118] | 0 | 0 | 0 | 0 | 0 | 38 |
| GRVC | 75 | 72 | 86 | 86 | 81 | 90 |
| MDC[119] | 72 | 39 | 15 | 12 | 11 | 11 |
| NIC | 51 | 45 | 45 | 56 | 45 | 50 |
| OBCC[120] | 85 | 81 | 78 | 77 | 38 | 7 |
| RMSC | 51 | 50 | 49 | 36 | 34 | 31 |
| RNDC | 58 | 56 | 60 | 63 | 70 | 70 |
| VCBC | 27 | 25 | 27 | 25 | 23 | 22 |
| Court Commands (BKDC, BXDC, QDC) | 39 | 37 | 35 | 32 | 33 | 28 |
| **Total # of Captains in Facilities and Court Commands** | **558** | **523** | **499** | **474** | **416** | **427** |
| **Total # of Captains Available Department-wide** | **810** | **765** | **751** | **670** | **607** | **573** |
| **% of Captains in Facilities and Court Commands** | **69%** | **68%** | **66%** | **71%** | **69%** | **75%** |

---

[117] As of the end of the Monitoring Period, the assignment of ADWs within the Facility is not available so this data simply demonstrates the number of ADWs per facility.

[118] EMTC has been closed and opened in these Monitoring Periods. Until late 2022, staff that work at EMTC were technically assigned to AMKC.

[119] MDC was utilized in a limited capacity at the end of the Twelfth Monitoring Period and was closed by June 2021.

[120] OBCC was slated for closure in the Fourteenth Monitoring Period and had an ADP of 81 in the month of June 2022. OBCC was closed by July 2022. Staff were then reassigned to other commands.

## Assessment of Supervisor Assignments

The data above reflects that some of the steps the Department has taken to increase the level of supervision in the jails (as discussed in the Staffing and Security Practices & Indicators section of this report) appears to be taking shape. Further, while it is impossible to set an ideal ratio of the number of Captains to ADWs given the issues identified above, assessing the overall ratio of Captains and ADWs assigned to the Facilities and Court Commands is informative. To that end, the ratio of ADWs to Captains in Facilities and Court Commands was 1 to 6.5 at the end of December 2022. This is a significant decrease from the ratio in the last Monitoring Period which was 1 to 8.5, and an even greater decrease from the ratio of 1 to 10.7 in July 2020 right before the Court ordered the First Remedial Order.

It must be emphasized that the quality of the individuals who *serve* in these supervisory positions is also critical to *the quality of supervision provided*. Increased supervision is inherently complex and is not simply solved by increasing the *number* of ADWs assigned to a particular Facility. The Monitoring Team's findings regarding poor incident management and supervision by Captains is what led to the recommendation to increase the deployment of ADWs throughout the Facilities. Given that the newly promoted ADWs are drawn from the same corps of Captains who have generally struggled with these essential skills, simply promoting additional ADWs does not solve the problem in its entirety. Further, the Monitoring Team has raised concerns about the fitness of certain individuals who were promoted to ADW during this Monitoring Period. More information regarding these concerns is available in the Compliance Assessment (Screening & Assignment of Staff § XII ¶¶ 1-3) section of this report.

The ADWs will also need substantial and quality coaching, supervision, and mentoring from their superiors to develop into the types of supervisors that are so desperately needed in this Department. The task of cultivating the ADWs will largely fall to the Deputy Wardens and Wardens in each command, which brings yet another layer of complexity to the task of reforming the Department's practices given the issues discussed in the Security Practices & Indicators section of this report. Going forward, the Department must make it a high priority for the Deputy Wardens and Wardens to actively supervise and provide in-service training to these newly promoted ADWs to ensure that the *quality* of the supervision improves as well. Overall, the Department has made progress in increasing the number of supervisors available in facilities and therefore is in Partial Compliance with this Provision.

| COMPLIANCE RATING | § A., ¶ 4. Partial Compliance |
|---|---|

| REMEDIAL ORDER § A., ¶ 6 (FACILITY EMERGENCY RESPONSE TEAMS) |
|---|
| § A., ¶ 6. Within 90 days of the Order Date, the Department shall, in consultation with the Monitor, develop, adopt, and implement a protocol governing the appropriate composition and deployment of the Facility Emergency Response Teams (i.e., probe teams) in order to minimize unnecessary or avoidable Uses of Force. The new protocol shall address: (i) the selection of Staff assigned to Facility Emergency Response Teams; (ii) the number of Staff assigned to each Facility Emergency Response Team; (iii) the circumstances under which a Facility Emergency Response Team may be deployed and the Tour Commander's role in making the deployment decision; and (iv) de-escalation tactics designed to reduce violence during a Facility Emergency Response Team response. The Department leadership shall regularly review a sample of instances in which Facility Emergency Response Teams are deployed at each Facility to assess compliance with this protocol. If any Staff are found to have violated the protocol, they shall be subject to either appropriate instruction or counseling, or the Department shall seek to impose appropriate discipline. The results of such reviews shall be documented. |

This provision requires the Department to minimize unnecessary or avoidable uses of force by Emergency Response Teams. There are a few types of Emergency Response Teams: a Probe Team, which is a team of facility-based staff; the Emergency Services Unit ("ESU"), an "elite" team of staff specifically dedicated and trained to respond to emergencies across the Department; and Security Response Teams ("SRT") and Special Search Team ("SST"), which function similarly to ESU and are deployed to facilities as part of operational security efforts. This box addresses the Monitoring Team's overarching concerns regarding Emergency Response Teams, provides data on the use of these teams via facility-alarm responses, outlines steps the Department has taken to reduce reliance on these teams, and, finally, addresses specific concerns regarding ESU.

**Concerns Regarding Emergency Response Teams**

The Monitoring Team has long raised concerns about the Department's overreliance on and conduct of Emergency Response Teams—both at the Facility-level through the use of "Probe Teams" and ESU (including SRT and SST which are now being used akin to ESU).[121] These concerns fall into the following categories for all Emergency Response Teams:

- Overreliance on these specialized teams to address issues that could and should be addressed by either uniform staff on the housing unit or facility-level supervisors.

- Overabundance of staff on these teams so that an excessive number of staff arrive on-scene which often raises tensions (including chaotic nature of fielding Probe Teams using an "all call for assistance.").

- Hyper-confrontational nature of these teams which often exacerbate conflict and lead to unnecessary and/or excessive use of force.

- Composition of these teams to ensure only those who are qualified, and do not have a history of unnecessary and/or excessive force serve on these teams.

---

[121] These concerns have been extensively laid out in the Eleventh Monitor's Report at pgs. 38 to 50 and 116 to 120, Twelfth Monitor's Report at pgs. 49-51, and the Second Remedial Order Report at pgs. 3-4.

- Concerning security procedures – these teams often utilize concerning security practices such as painful escort holds.
- These teams (and others) are also often relied upon to conduct searches, which are completed in a manner that are inefficient and chaotic and can result in unnecessary use of force.

The concerning practices of Emergency Response Teams remain static. However, the *reliance* on these teams has begun to diminish, as discussed below, which is an important first step.

**Overview of Alarm Data**

The table below presents the number and rate of Level A and Level B alarms for 2020, 2021, and 2022. Level B alarm responses involve the deployment of an Emergency Response Team, while Level A responses involve supervisors and/or de-escalation teams not suited in tactical gear. Over the course of this three-year period, the number of Level A alarms increased while Level B alarms decreased, **and** the overall rate of alarm responses declined in 2022 (a rate of 7.0 in 2022 compared with 10.3 and 16,8 in 2021 and 2020, respectively).

| Alarms Department-Wide *2020-2022* | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **2020** | | | **2021** | | | **2022** | |
| | **#** | **ADP** | **Rate** | **#** | **ADP** | **Rate** | **#** | **ADP** | **Rate** |
| **Total Alarms** | 9,145 | 4,544 | 16.8 | 6,860 | 5,574 | 10.3 | 4,763 | 5,639 | 7.0 |
| | **#** | **% total** | | **#** | **% total** | | **#** | **% total** | |
| *Level A* | 1,894 | 21% | | 2,264 | 33% | | 2,128 | 45% | |
| *Level B* | 7,249 | 79% | | 4,597 | 67% | | 2,635 | 55% | |

As noted in the second chart below, in 2022, a significant change occurred in this Monitoring Period in which ***more Level As were utilized than Level Bs*** in the second half of 2022.

| Alarms Department-Wide *2022* | | | | | | |
|---|---|---|---|---|---|---|
| | **Jan.-June 2022 (14th MP)** | | | **July-Dec. 2022 (15th MP)** | | |
| | **#** | **ADP** | **Rate** | **#** | **ADP** | **Rate** |
| **Total Alarms** | 2,254 | 5,491 | 6.8 | 2,509 | 5,787 | 7.2 |
| | **#** | **% total** | | **#** | **% total** | |
| *Level A* | 753 | 33% | | 1,375 | 55% | |
| *Level B* | 1,501 | 67% | | 1,134 | 45% | |

The trend toward relying less on Level B responses is very positive as the Monitoring Team continues to find that most incidents could be resolved either by the staff on the unit (no alarm response needed) and/or their Supervisor or by calling other staff to the location in an effort to resolve issues without using physical force (a Level A alarm).

**Steps to Reduce Reliance on Emergency Response Teams**

As demonstrated in the data above, there has been a decline in overall alarms and reduced reliance on Level B alarms this Monitoring Period. A number of steps were taken this Monitoring Period to reduce reliance on Emergency Response Teams and address other concerns with how staff members are assigned to facility Probe Teams. The Monitoring Team's review of all incidents through CODs and a large proportion of Intake Investigations identifies the same reduction demonstrated in the data. This is a significant step in the right direction, and is likely the result of work that has been conducted by the Security Operations Manager since he started in May 2022 to better align alarm responses with the needs of the facility. The reduced reliance on Level B alarms and alarms in general appears to mark the beginning of a cultural shift in the jails—a shift to problem solving by on-unit staff and supervisors, versus simply outsourcing incident response to Emergency Response Teams as has been the historical practice. The Monitoring Team and Security Operations Manager meet bi-monthly to discuss a range of relevant security topics and initiatives. The Security Operations Manager's focus on reducing Level B responses has been a constant theme—as he reports he is reinforcing to facility leadership on a routine basis the need for more supervisory and de-escalation responses and less use of Level B alarms. The mentorship and leadership exhibited in this area is promising.

Additionally, the work of the Staffing Manager is also expected to improve how staff are assigned to facility Probe Teams. The new staff assignment system will create specific staff assignments for Probe Teams on each shift and is intended to eliminate the use of an "all hands" call for assistance when a Level B alarm is called. As facilities operationalize the new staff assignment system, the over-abundance of staff on these teams should be reduced. The Monitoring Team intends to scrutinize this process as it is rolled out.

While significant concerns remain about the conduct of the members of Emergency Response Teams, efforts to reduce the reliance on their use and limit those individuals who may serve on the Probe Team are important foundational steps to improving practice in this area. As discussed in more detail below, one area of significant concern remains regarding the Emergency Services Unit.

**ESU**

The Monitoring Team recognizes the need for and supports the utilization of a specialized and highly trained tactical squad within the Department. ESU serves this function—ESU is located centrally outside of any specific facility, and serves all facilities. When properly utilized and deployed, such teams can neutralize serious risks of harm to both staff and incarcerated individuals. The practices

of ESU have been a long-standing concern of the Monitoring Team—the "Concerns Regarding Emergency Response Teams" listed above are particularly applicable to the conduct and management of ESU. These issues have been raised repeatedly and consistently with Department leadership since the inception of the Consent Judgment. Unfortunately, the Monitoring Team's numerous feedbacks to the Department over the years have yet to catalyze the necessary change in practice within ESU.[122] This raises significant concerns about the adequacy of the leadership within ESU.

An overarching concern regarding the management of ESU has been the selection of staff for the team, particularly the retention of staff members in the unit after cases of misconduct have been identified. The Department's own policy regarding ESU requires routine screening of staff on ESU to prevent this situation. However, this screening was not historically done despite the Department's own policy requirements. Based on prompting from the Monitoring Team, an assessment was done in 2021 to screen all staff on both the ESU permanent and support team (approximately 200 staff total) and remove those staff that were not appropriately suited for the unit. Based on this screening, over 50 staff were removed from the ESU Team as they met the criteria for removal pursuant to Operations Order 24/16 "Special Unit Assignment" because they either had certain pending charges or had discipline imposed as a result of utilizing excessive force and/or failing to report a use of force incident. However, this cleansing of the roster did not catalyze the necessary change in practice for those remaining in the unit, and the Monitoring Team continues to find that ESU staff exhibit problematic behavior that should have either prevented their appointment to ESU in the first place or triggered their removal. Further, as discussed in more detail below, the current screening process has significant flaws and has further undermined ESU. This cycle is unacceptable.

Finally, continued vigilance in regard to the use of the taser is necessary as ESU Captains are the only staff authorized to use the taser in the Department. The inherent danger of the taser, coupled with ESU's history of excessive and unnecessary use of force, in general, warrants heightened scrutiny of any taser use. As discussed in more detail below, the use of the taser has been curtailed significantly.

- ***Screening and Assignment of Staff on ESU***

The Monitoring Team has long found[123] that a concerning number of ESU staff have exhibited problematic behavior that should have either prevented their appointment to ESU in the first place or triggered their removal from the ESU Team pursuant to Operations Order 24/16 "Special Unit Assignment." This policy governs both the screening of staff for placement on ESU, and post-assignment review which requires the removal of staff from the ESU Team, when, among other things, disciplinary charges have been served and/or sustained related to excessive force and failure to report. The Department has not taken sufficient steps to curtail the problematic use of force tactics utilized by

---

[122] *See* Eleventh Monitor's Report at pg. 44-51.

[123] *See* Eleventh Monitor's Report at pg. 45.

ESU as demonstrated by the selection of staff for ESU who have a documented history of bad conduct and by allowing staff who have a documented history of bad conduct while serving on ESU to remain in the division. Staff who are assigned to this unit require deep expertise in constructive problem solving and tactical finesse, necessitating the careful selection and ongoing evaluation of individuals who serve in this unit. The Monitoring Team remains concerned that staff that do not uphold the necessary characteristics for the role remain in these positions.

The Department has generally failed to implement the screening requirements for ESU as required by its own policy. During the 15th Monitoring Period, the Department began to routinely screen the staff on ESU—both on a rolling basis (monthly) and on a quarterly basis to identify staff for removal as required by the policy (with the idea that the quarterly screenings are merely needed to catch any issues that slipped through the cracks from the monthly screenings). A recent quarterly screening (the first to take place since the first such screening which occurred in 2021) took many months to complete, and only after prompting from the Monitoring Team, did result in some staff being removed from the permanent and support roster for ESU. As this process rolled out, the Monitoring Team closely monitored these screenings and shared multiple requests and feedbacks to ensure that the screening was conducted with fidelity. However, despite significant feedback from the Monitoring Team, the monthly and quarterly screening of ESU staff under this policy during this Monitoring Period raised a number of concerns as many staff who do not appear to embody the necessary qualifications for the unit are either permitted to remain on the unit or have been appointed to the unit despite objective evidence that they are not suited for the position. In particular, the following issues were noted:

- **The Results of the Screening Process Are not Being Implemented Reliably**: The screening process does not appear to have adequate oversight to ensure that the findings are appropriately considered and implemented. In a recent screening, five staff recommended for removal were not, in fact, removed and no explanation was given as to why they were not removed.
- **Integrity of Underlying Screening Considerations is Compromised:** The Monitoring Team has concerns that the screening process itself has a number of issues that compromise its effectiveness, including:
    - *ESU Misconduct Goes Unidentified by ID*: ID does not consistently or reliably identify misconduct by ESU staff. The proportion of incidents that ID identifies as *not requiring charges* is questionable, at best. For example, in a recent screening it was identified that 64 staff were involved in 141 use of force incidents. ID only anticipated charges for 2 staff out of this group. ID's failure to reliably identify misconduct by ESU staff allows staff to act with impunity.
    - *Assessment of Staff with Pending or Substantiated Charges Seeks to Excuse Misconduct In Assessing Fitness of Staff Member's Placement on ESU*: The Department's reported evaluation of pending/substantiated charges pursuant to Operations Order 24/16 appears to be completed in a manner that, at least in some cases, avoids having to remove staff from ESU even when the available circumstances would require removal by policy. In particular, the Department has reported that removal of certain staff is not necessary due

to semantic loopholes. For instance, one staff was not removed due to the Department's own delay in timely screening of that staff and contention that misconduct that had been "expunged" could not be considered. Further, the Department, for the first time, relies on a "new" definition of misconduct – "impermissible force" – which it claims does not trigger removal because "impermissible force" is not unnecessary or excessive force.

- *Staff Removed from ESU due to Misconduct have been Inappropriately Reinstated*: In early 2023, 16 staff were reinstated to ESU that were removed in 2021 following the Department's initial screening of ESU staff pursuant to Operations Order 24/16. The screening in 2021 was discussed in detail in the Eleventh Monitor's Report at pgs. 45 to 46. All 16 staff that have been reinstated also had signed NPAs in late 2021 or 2022 which appear to preclude them from being appointed to the unit.

- **ESU Taser Use**

    The use of tasers has been significantly curtailed since September 2022 when the Monitoring Team raised concerns about a surge in its usage beginning in December 2021.[124] The taser has been used only once between September 2022 and March 2023 (the writing of this report)—the usage occurred in January 2023 and was a taser display. The taser has not been used in drive or stun mode at all since September 2022. Given the concerns raised, the Monitoring Team believes it is appropriate that taser use has been curtailed, and that there was only a single taser display, and no uses in drive or stun mode, in over a 6-month period. The Monitoring Team will continue to closely scrutinize any case where the taser is displayed or used.

- **ESU Next Steps**

    Overall, the Monitoring Team's findings suggest that the Department's efforts to assign and manage ESU staff are wholly inadequate. The findings above suggest that the Department's screening efforts, rather than improving the quality of ESU staff, are in fact serving to obscure problematic cases or evade the removal of staff who would otherwise be ineligible to serve as required by policy. Similarly, reinstatement of staff who were previously removed and who have recent NPAs that should preclude re-assignment, sends a troubling message about the conduct that will be tolerated in this unit. The Monitoring Team has recommended that the procedures in the Operations Order 24/16 must be revised to eliminate the loopholes identified. The Monitoring Team also recommends that the processes for screening and the individuals appointed to conduct said screenings must be improved and have adequate oversight to ensure that the screenings are appropriate and reliable and are not susceptible to potential malfeasance.

---

[124] As noted in the Monitor's October 28, 2022 Report at pg. 118, ESU began using and displaying the taser again in December 2021 after a long hiatus, which raised serious concerns for the Monitoring Team. However, at the behest of the Monitoring Team, significant intervention and individualized training for ESU by the Commissioner and Security Operations Manager in August 2022 swiftly put a stop to the increased taser use and displays. At these meetings, the proper circumstances of when a taser may be used was discussed and it was reiterated that tasers should never be used for the purpose of pain compliance.

**Conclusion**

      Some progress has been made in regard to facility-based Probe Teams and reduced reliance on Level B alarms, which should have the positive impact of reducing the overall chaos in the jails often caused by overreliance on these tactical teams to address issues better served through de-escalation and strong supervision. That said, work remains to address long-standing concerns with the conduct of Emergency Response Teams. As noted above, the assignment and management of ESU requires significant improvement to gain fidelity, and is a critical part of setting the right tone in the entire agency relating to unnecessary and excessive force—that is, a zero tolerance approach. The Department is therefore in Non-Compliance with § A., ¶ 6 of the First Remedial Order.

| COMPLIANCE RATING | § A., ¶ 6. Non-Compliance |
| --- | --- |

- **USE OF FORCE POLICY (CONSENT JUDGMENT § IV)**

| IV. USE OF FORCE POLICY ¶ 1 (NEW USE OF FORCE DIRECTIVE) |
|---|
| ¶ 1. Within 30 days of the Effective Date, in consultation with the Monitor, the Department shall develop, adopt, and implement a new comprehensive use of force policy with particular emphasis on permissible and impermissible uses of force ("New Use of Force Directive"). The New Use of Force Directive shall be subject to the approval of the Monitor. |

This provision of the Consent Judgment requires the Department to develop, adopt, and implement a comprehensive Use of Force Policy with particular emphasis on permissible and impermissible uses of force. The Department previously achieved Substantial Compliance with the development and adoption of the Use of Force Policy, which received the Monitor's approval prior to the Effective Date of the Consent Judgment in 2015.

<u>Standalone Policies</u>

The Department maintains a number of standalone policies, along with the UOF policy, regarding the proper use of security and therapeutic restraints, spit masks, hands-on-techniques, chemical agents, electronic immobilizing devices, kinetic energy devices used by the Department, batons, lethal force, and canines. ESU also maintains about 10 Command Level Orders ("CLOs"), including two which govern the use of specialized chemical agent tools (*i.e.*, Pepperball system and the Sabre Phantom Fog Aerosol Grenades). In at least some cases, these CLOs lack sufficient guidance on the tools' place in the use of force continuum, and need to be updated to address feedback from the Monitoring Team. The Monitoring Team has brought the issue of these outdated CLOs to the Security Operations Manager's attention for revisions.

<u>Implementation of UOF Policy</u>

A comprehensive overview of the Department's use of force is examined in the Security Practices and Indicators Section of the report. The information and findings in that section inform this compliance assessment.

As noted in the Security Practices & Indicators section of this report, there has been some progress made in improving the operations of the jails and the rate of UOF has decreased from its apex in 2021. However, the work completed to date has not appreciably improved the Department's security practices and the Department's problematic approach to using force Department-wide. For example, in 2022, facility leadership (via Rapid Reviews) identified that 48% of use of force incidents involved procedural errors (*e.g.*, failure to secure doors, failure to apply restraints properly), some of which directly contributed to the circumstances that facilitated the incident. This, coupled with the 16% of incidents that were determined to be "avoidable," demonstrates that even the Department's internal analysis shows that staff are not applying the requisite skill set and decision-making needed to decrease the use of force rate.

Elements of the Action Plan, including the various staff supervision and security initiatives described throughout this report, should result in significantly lower levels of violence and use of force

*if properly implemented.* It remains to be seen if the Department can successfully improve the quality of its security practices and reduce the overall frequency with which force is used to meet the overarching goals of the Consent Judgment. In the meantime, the Department remains in Non-Compliance with the implementation of the Use of Force Policy.

| | |
|---|---|
| **COMPLIANCE RATING** | ¶ **1. (Develop)** Substantial Compliance<br>¶ **1. (Adopt)** Substantial Compliance<br>¶ **1. (Implement)** Non-Compliance<br>¶ **1. (Monitor Approval)** Substantial Compliance |

- **USE OF FORCE REPORTING AND TRACKING (CONSENT JUDGMENT § V)**

| |
|---|
| **V. USE OF FORCE REPORTING AND TRACKING ¶ 2 (INDEPENDENT STAFF REPORTS)** |

¶ 2. *Every Staff Member who engages in the Use of Force, is alleged to have engaged in the Use of Force, or witnesses a Use of Force Incident, shall independently prepare and submit a complete and accurate written report ("Use of Force Report") to his or her Supervisor.*

The Department is required to report when force is used accurately and timely as part of their overall goal to manage use of force effectively. The assessment below covers five critical areas related to reporting force: notifying Supervisors that a use of force occurred, submission of complete, independent and timely reports, the classification of UOF incidents, allegations of use of force, and reporting of use of force by non-DOC staff who either witnessed the incident and/or are relaying reports from incarcerated individuals.

**Notifying Supervisor of UOF**

From July to December 2022, 3,883 use of force incidents were reported by supervisors to the Central Operations Desk and slightly over 7,700 use of force or use of force witness reports were submitted for incidents occurring in this Monitoring Period. To assess whether staff are timely and reliably notifying a supervisor of a UOF, the Monitoring Team considers whether there is evidence that staff are not reporting force as required. This includes consideration of allegations as well as reports from outside stakeholders (*e.g.*, H+H and LAS) about potential unreported UOF. These sources suggest that unreported uses of force are an infrequent occurrence. In this Monitoring Period, 22 out of the 23 reports from H+H staff alleging UOF were already under investigation by ID before H+H's reports were submitted. In prior Monitoring Periods, the Monitoring Team has also routinely reviewed allegations by LAS and found that most of those allegations were previously reported before the allegation was submitted. This further reinforces that staff are routinely and consistently reporting UOF and there are only a small number of incidents that appear to go unreported. Of those incidents that have gone unreported, many appear to be minor UOF incidents, and instances of unreported excessive or unnecessary force are rare.

**Independent, Complete, and Timely Staff Reports**

Staff members are required to submit independent and complete UOF reports. The Department's Use of Force Directive requires staff to independently prepare a staff report or Use of Force Witness Report if they employ, witness, or are alleged to have employed or witnessed force. The total volume of reports submitted (over 7,700 reports in this Monitoring Period) indicate that rare reporting as required. Further, the Monitoring Team's review of a large sample of reports demonstrates that staff reports are generally independently prepared. However, the quality of reports has long varied, and staff's practices are consistent with those from prior Monitoring Periods (*see e.g.*, Ninth Monitor's Report at pgs. 89-91). The Monitoring Team continues to read reports that are incomplete, inconsistent

with other evidence, or too vague. Of the 3,878 Intake Investigations closed in this Monitoring Period (covering incidents occurring between April 2022 and December 2022), ID identified 437 incidents (11%) to have report writing issues. This is a reduction in the proportion of cases found with reporting issues in prior Monitoring Period. However, as noted in other sections of this report, ID's ability to identify potential violations has decreased, and therefore it is likely that additional cases with reporting violations may be present but were not identified. This may indicate ID is not identifying all reporting issues and thus, the issue may be underreported. Staff reports are an integral part of a use of force investigations, and it is therefore important that staff describe their recollection of events in their own words and specify the exact tactics used (*e.g.*, where on the incarcerated individual's body the staff member's hands or arms were placed).

Staff members are also required to submit their reports as soon as practicable after the use of force incident, or the allegation of the use of force unless the staff member is unable to prepare a report within this timeframe due to injury or other exceptional circumstances. The table below demonstrates the number and timeliness of staff reports for actual and alleged UOF from 2018 to December 2022.

| Timeliness of Staff Report | | | | | | |
|---|---|---|---|---|---|---|
| | Actual UOF | | | Alleged UOF | | |
| *Year* | *Total Staff Reports Expected* | *Reports Uploaded Timely* | *% Uploaded within 24 Hours* | *Total Staff Reports Expected* | *Reports Uploaded Timely* | *% Uploaded within 72 Hours of the Allegation* |
| **Jan. to Dec. 2018** | 15,172 | 12,709[125] | 83.77% | 139 | 125[126] | 89.93% |
| **Jan. to Dec. 2019** | 21,595 | 20,302 | 94.01% | 190 | 134 | 70.53% |
| **Jan. to Dec. 2020** | 19,272 | 17,634 | 91.50% | 136 | 94 | 69.12% |
| **Jan to Dec. 2021** | 22,103 | 17,064 | 77.20% | 111 | 45 | 40.54% |
| **Jan to Dec. 2022** | 17,700 | 14,776 | 83.48% | 93 | 42 | 45.16% |

[125] NCU began the process of auditing actual UOF reports in February 2018.

[126] NCU began collecting data for UOF allegations in May 2018.

| Jan to June 2022 | 8,472 | 6,992 | 82.53% | 45 | 19 | 42.22% |
| July to Dec. 2022 | 9,228 | 7,784 | 84.35% | 48 | 23 | 47.92% |

As the chart above demonstrates, 2022 saw an increase in the number of reports submitted timely, though the number of cases submitted within 24 hours has not gone back to the levels prior to the onslaught of the staffing crisis in 2021. Specifically, in this Monitoring Period, 7,784 (84%) of the expected 9,227 reports for actual UOF incidents were submitted within 24 hours. Further, the Department reports that 88% of all reports were submitted within 2 days of the incident.

As for the reports for allegations of uses of force, fewer reports are being submitted within 72 hours of the allegation as required. 23 (48%) of the 48 reports for alleged UOF incidents were submitted within 72 hours. Obtaining reports for allegations does take more time as the alleged staff members involved must be identified and advised that a report is necessary and then the report must be produced. The staff member may or may not be working on the day in which the allegation is received and reviewed, so it generally takes longer to obtain reports of allegations. That said, the time to obtain reports for allegations must improve.

The Department has continued to maintain a centralized, reliable, and consistent process for submitting and tracking UOF Reports, which has also supported the Department's ability to consistently report out on its progress with respect to submission of UOF reports. The number of reports submitted by staff is tremendous and the majority of those reports are submitted and uploaded in a timely fashion. Overall, the Intake Investigations of UOF incidents appeared to generally have access to staff and witness reports with enough time to conduct the investigations.

## Classification of UOF Incidents

The Department is required to immediately classify all use of force incidents as Class A, B, C, or P when an incident is reported to the Central Operations Desk ("COD"). Class P is a temporary classification used to describe use of force incidents where there is not enough information available at the time of the report to COD to receive an injury classification of Class A, B, or C.

The chart below identifies the Monitoring Team's assessment of a sample of the Department's incident classifications from March 2016 to December 2022.

| COD Sets[127] Reviewed | Mar. 2016 to July 2017 *2nd to 4th MP* | Jan. to Dec. 2018 *6th & 7th MP* | Jan. to Dec. 2019 *8th & 9th MP* | Jan. to Dec. 2020 *10th & 11th MP* | Jan. to Dec. 2021 *12th & 13th MP* | Jan. to Dec. 2022 *14th & 15th MP* | Jan. to June 2022 *14th MP* | July to Dec. 2022 *15th MP* |
|---|---|---|---|---|---|---|---|---|
| Total Incidents Reviewed | 2,764 | 929 | 1,052 | 1,094 | 1,644 | 1,585 | 709 | 876 |
| Total Incidents Classified Within COD Period[128] | 3,036 (97%) | 909 (98%) | 1,023 (97%) | 1,079 (99%) | 1,226 (75%) | 1,238 (78%) | 504 (71%) | 734 (84%) |
| Number of Incidents that were not classified within the COD Period | 88 (3%) | 20 (2%) | 29 (3%) | 15 (1%) | 418 (25%) | 347 (22%) | 205 (29%) | 142 (16%) |

The Department has continued to improve its ability to classify incidents in a timely manner following a significant backslide in 2021. The Department reported that the delays in classifying incidents were due to delays by H+H in updating injury reports and facilities failing to obtain these updates within the prescribed five-day time frame. These delays also resulted in delays in the production of information to the Monitoring Team as certain reports could not be finalized until the incidents were fully classified. These delays, seen mainly in 2021 and early 2022, have generally been abated and most, if not all, reports are now provided in a timely manner and the Monitoring Team is no longer waiting for final UOF classifications cases as much as it did in the past.

As demonstrated in the chart above, in July to December 2022, 84% of all incidents were classified within the COD period. This reflects improvement compared with the last Monitoring Period in which 71% of incidents were classified within the COD period. While incidents were classified in a timely manner compared to the previous Monitoring Period, the classification timing is not yet consistent with the timeliness of classification seen prior to 2021. The Monitoring Team is cautiously optimistic about the improvement and believes that the Department is in a position to classify incidents in a timely manner at the rate it had in the past. However, this will require the Department to continue to scrutinize all incidents not yet classified and ensure stakeholders are working to address deficiencies

---

[127] This audit was not conducted in the First or Fifth Monitoring Periods.

[128] The data is maintained in a manner that is most reasonably assessed in a two-week period ("COD Period"). The Monitoring Team did not conduct an analysis on the specific date of reclassification because the overall finding of reclassification within two weeks or less is sufficient to demonstrate compliance.

where they are found. The Monitoring Team will continue to closely evaluate the classification of UOF incidents.

**Alleged Use of Force**

Understanding the scope of the force utilized within the Department requires consideration of all force reported by staff and any substantiated allegations of use of force. Therefore, the Department separately tracks all allegations of uses of force, which are claims that staff used force against an incarcerated individual and the force was not previously reported by staff. An allegation that a use of force occurred does not always mean that force was actually used—that is determined through the investigations process.

The number of allegations has declined since 2016, however, there was a minor uptick in 2021 (n=210) and 2022 (n=233) from the all-time low in 2020 (n=208) as demonstrated in the chart below.



Overall, the number of allegations of force is small compared to the total number of uses of force reported by staff. In 2022, there were 233 allegations of force while 7,234 uses of force were reported by staff. The Monitoring Team has found that generally, of the small group of allegations, only a fraction is substantiated, and they are typically for failing to report minor uses of force, and instances of excessive or unnecessary unreported uses of force are rare. That said, all allegations of use of force can and must be appropriately investigated.

**Non-DOC Staff Reporting**

Non-DOC staff members who witness a use of force incident are required to report the incident in writing directly to a supervisor and medical staff are required to report to a supervisor when they

have reason to suspect that an Inmate has sustained injuries due to a use of force, but the injury was not identified as such to the medical staff.

*DOE Staff Reporting:* In-person school resumed in the jail after being suspended due to COVID-19 on April 19, 2021. The Department of Education ("DOE") previously developed staff training and reporting procedures, in consultation with the Monitoring Team, to address the requirements of this provision and the December 4, 2019, Court Order (dkt. entry 334) clarifying the requirement for DOE to submit reports. The Monitoring Team has not received any reports from DOE staff that may have witnessed a UOF since school resumed in April 2021. In this Monitoring Period there were 3 use of force incidents in the school and a total of 8 incidents in all of 2022 that occurred in school areas. Although a very small number, it does suggest that at least some reports by DOE staff would be expected. The Monitoring Team intends to evaluate whether DOE staff are reporting as required in the subsequent Monitoring Period.

*H+H Reporting*: New York City Health + Hospitals ("H+H") (the healthcare provider for incarcerated individuals in DOC custody) has maintained a process for staff reporting. H+H staff submitted a total of 23 reports in this Monitoring Period; 16 reports were H+H witness reports of UOF incidents and 7 reports relayed UOF allegations from an incarcerated individual. The chart provides an overview of the reports provided by H+H staff since July of 2017.

| Submission of H+H Staff Reports | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | July to Dec. 2017 (5th MP) | 2018 (6th & 7th MP) | 2019 (8th & 9th MP) | 2020 (10th & 11th MP) | 2021 (12th & 13th MP) | 2022 (14th & 15th MP) | Jan to June 2022 (14th MP) | July to Dec 2022 (15th MP) |
| *Grand Totals* | | | | | | | | |
| **Total Reports Submitted** | 2 | 53 | 39 | 56 | 97 | 52 | *29* | *23* |
| **Total UOF Incidents Covered** | 2 | 53 | 38 | 46 | 85 | 42 | *21* | *21* |
| *Witness Reports* | | | | | | | | |
| **Number of witness reports submitted** | 0 | 29 | 18 | 45 | 70 | 36 | 20 | 16 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Number of actual or alleged UOF incidents covered by submitted reports** | 0 | 31 | 15 | 36 | 64[129] | 25[130] | 11[131] | 14 |
| *Relayed Allegations from Incarcerated Individuals* | | | | | | | | |
| **Number of reports of allegations of UOF relayed from an Incarcerated Individuals** | 2 | 24 | 21 | 11 | 27 | 16 | 9 | 7 |
| **Number of actual or alleged UOF incidents covered by submitted reports** | 2 | 22 | 23 | 10 | 22[132] | 19[133] | 12[134] | 7 |

It is difficult to know whether H+H staff submitted reports in every incident witnessed. First, in this Monitoring Period, 225 incidents occurred in clinic areas and 7 of those incidents had a corresponding H+H report. However, just because an incident occurred in the clinic area does not mean H+H staff witnessed the incident. That said, the reduction in the number of reports submitted in 2022 (n=52) compared to 2021 (n=97) further suggests that there is room for improvement in the submission of reports. Further, it is worth noting that H+H submitted reports for 14 incidents that were categorized as occurring in other parts of the jail where a participant was later taken to the clinic and additional force was witnessed or relayed. Still, it would be expected that at least some H+H staff observed more force than what has been reported.

## Conclusion

The requirements related to reporting use of force are multi-faceted. Overall, use of force incidents that occur are being reported as required, but the time to classify incidents still needs to be

---

[129] On one occasion for one use of force incident, we received both a witness report and a relayed allegation report for the same incident.

[130] On two separate occasions for two separate use of force incidents, we received both a witness report and a relayed allegation report for the same incident.

[131] *See id.*

[132] *See id.*

[133] *See id.*

[134] *See id.*

improved. Further, thousands of individual staff reports are submitted, most of which are submitted in a timely manner, but improvement is needed in the substance of these to reliably and consistently report what occurred. The Department is therefore in Partial Compliance with this requirement.

| COMPLIANCE RATING | ¶ 2. Partial Compliance |
|---|---|

## V. USE OF FORCE REPORTING AND TRACKING ¶ 22 (PROVIDING MEDICAL ATTENTION FOLLOWING USE OF FORCE INCIDENT)

¶ 22. All Staff Members and Inmates upon whom force is used, or who used force, shall receive medical attention by medical staff as soon as practicable following a Use of Force Incident. If the Inmate or Staff Member refuses medical care, the Inmate or Staff Member shall be asked to sign a form in the presence of medical staff documenting that medical care was offered to the individual, that the individual refused the care, and the reason given for refusing, if any.

Staff members and incarcerated individuals upon whom force is used, or who used force, are required to receive medical attention by medical staff as soon as practicable following a Use of Force Incident. The Department's progress in providing timely medical care from January 2018 to December 2022 following a UOF are outlined in the table below.

| Wait Times for Medical Treatment Following a UOF | | | | | | |
|---|---|---|---|---|---|---|
| | # of Medical Encounters Analyzed | 2 hours or less | Between 2 and 4 hours | % Seen within 4 hours | Between 4 and 6 hours | 6 hours or more |
| 2018 | 9,345 | 37% | 36% | 73% | 16% | 13% |
| 2019 | 11,809 | 43% | 38% | 81% | 11% | 9% |
| 2020 | 10,812 | 46% | 36% | 82% | 10% | 9% |
| 2021 | 14,745 | 39% | 30% | 70% | 11% | 20% |
| 2022 | 12,696 | 51% | 23% | 74% | 9% | 19% |
| 2022 (Jan. to June) | 5,986 | 46% | 25% | 71% | 10% | 20% |
| 2022 (Jul. to Dec.) | 6,710 | 56% | 20% | 76% | 8% | 17% |

During the current Monitoring Period, there were 6,710 medical encounters related to a UOF. The time to provide medical treatment has improved in this Monitoring Period where 76% of all cases were seen within 4 hours of the incident compared with the last Monitoring Period in which 71% of all cases were seen within 4 hours of the incident. As a result, the proportion of cases in which an individual was seen beyond 4 hours of the incident has decreased with 8% of medical encounters occurring between 4 and 6 hours of the incident, and 17% of medical encounters occurring beyond 6 hours. While the time to provide medical treatment has improved in 2022 compared to 2021, the overall provision of medical treatment within 4 hours has decreased since the peak in 2020 where 82% of medical encounters were completed within 4 hours of the incident. The Department has reported that staffing issues, which increased exponentially in 2021, are to blame for some of these issues. This is yet another reason why addressing the staffing issues should produce a corresponding improvement in operations including ensuring that individuals receive prompt medical treatment. Provision of prompt

medical treatment is critical and so the Department must continue to work to ensure staff members and incarcerated individuals receive prompt medical attention.

| COMPLIANCE RATING | ¶ 22. Partial Compliance |
|---|---|

- **USE OF FORCE INVESTIGATIONS (CONSENT JUDGMENT § VII)**

The Investigation Division ("ID") plays a crucial role in the reform effort. Investigations by ID must be able to assess use of force incidents and identify violations of the Use of Force Directive (and other relevant policies underlying the Court orders in this case) consistently and reliably. This is critical to ensuring that staff are held accountable for misconduct. Upon a finding of potential misconduct, a range of accountability options may be utilized with staff including corrective interviews and counseling, retraining, and more traditional forms of discipline (such as relinquishing compensatory days). Further, ID's role is crucial in identifying those cases where immediate action must be taken, and identifying when staff's contact with persons in custody should be limited. Because discipline is still generally protracted, the need for identifying those cases that require immediate corrective action is particularly important.

As noted in the Introduction to the report, there was a marked decline in quality in investigations in 2022. The Department's ability to investigate use of force incidents is one area where there *had* been significant improvement since the effective date of the Consent Judgment. ID is responsible for investigating all use of force incidents.[135] Every use of force incident undergoes an initial assessment, called an Intake Investigation, to determine whether any indicators of misconduct are present that require additional investigation.[136] Within ID, an entire unit of investigators (the Intake Squad) is dedicated to conducting Intake Investigations as required by the First Remedial Order. If the Intake Investigation is of reasonable quality, most

---

[135] The Consent Judgment originally envisioned a role for facilities in conducting certain investigations, but that no longer occurs.

[136] As described in the Ninth Monitor's Report at pgs. 41-47. Intake Investigations are a more streamlined approach to the initial assessment that their predecessor, "Preliminary Reviews."

incidents can and should be resolved at this stage with only a subset requiring referral for further

investigation ("Full ID investigation"). The creation of and proper deployment of the Intake

Squad was one of the tools that helped to address the massive backlog[137] of investigations of use

of force incidents that hampered ID and delayed accountability for staff misconduct. The backlog

was resolved in May 2021.[138]

The elimination of the backlog, in combination with the structural changes made to the

way investigations were conducted and the creation of the Intake Squad, had an immediate

positive impact on ID's work. The quality of Intake Investigations and Full ID Investigations

began to improve, and cases were no longer lost to the statute of limitations.[139] Along with these

practice improvements, ID's compliance with the requirements of the Consent Judgment also

improved. First, in 2020, during the 10th Monitoring Period, ID moved out of Non-Compliance

and was found to be in Partial Compliance with the requirement to conduct thorough, timely, and

objective investigations of use of force incidents (Consent Judgment §VII., ¶ 1). ID maintained

Partial Compliance through the 14th Monitoring Period.[140] During the second half of 2020, ID

---

[137] The backlog of ID investigation was defined as any investigation of an incident that occurred on or before April 16, 2020. *See* Remedial Order, § B., ¶ 1.

[138] As described in the Monitor's Second Remedial Order Report filed with the Court on June 3, 2021, (dkt. 373).

[139] As described in the Eighth Monitor's Report at pgs. 131-134, due to the backlog, approximately 2,000 investigations of use of force incidents were still pending when the statute of limitations for any misconduct stemming from the incident had expired. Therefore, to the extent that these cases involved misconduct, that misconduct went unaddressed.

[140] A compliance rating for this provision was suspended in the 13th Monitoring Period and provided in the 14th Monitoring Period. The Monitoring Team did not assess compliance with any provisions of the Consent Judgment or Remedial Orders for the period between July 1, 2021 and December 31, 2021 (the "Thirteenth Monitoring Period"). The Court suspended the Monitoring Team's compliance assessment during the Thirteenth Monitoring Period because the conditions in the jails during that time were detailed to the Court in seven status reports (filed between August and December 2021), a Remedial Order Report

further leveraged these improvements and was found in Substantial Compliance with the requirements regarding Intake Investigations (née Preliminary Reviews) (Consent Judgment §VII., ¶ 7) in the 11th and 12th Monitoring Periods. Finally, from the inception of the Consent Judgment, ID consistently referred cases for Full ID investigations as required (Consent Judgment §VII., ¶ 8) and was found in Substantial Compliance with this requirement from the 2nd Monitoring Period through the 12th Monitoring Period.[141]

Unfortunately, during the current Monitoring Period a marked shift in the quality of investigations occurred. The Monitoring Team observed that a substandard approach was often taken in assessing evidence such that the ultimate quality of the investigations was compromised. The Monitoring Team was very concerned that ID's previously documented progress had degraded. Issues identified included a greater number of Intake Investigations that were closed with no action, a significantly smaller number of cases were referred for further investigation via a Full ID Investigation, and misconduct was identified much less frequently than in the past.

As discussed in more detail below, the proportion of use of force related misconduct identified by ID during the past year (in particular, during the second half of 2022) decreased from prior years. However, the Monitoring Team did not identify a corresponding change in staff practices that would warrant or explain the decrease in the volume of use of force related misconduct identified by ID. The Monitoring Team's assessment of thousands of UOF incidents

---

(filed on December 22, 2022) as well as in the Special Report filed on March 16, 2022 (dkt. 441). The basis for the suspension of compliance ratings was also outlined in pgs. 73 to 74 of the March 16, 2022 Special Report (dkt. 438).

[141] Compliance ratings for these provisions were suspended in the 13th to 15th Monitoring Periods. 13th Monitoring Period compliance ratings were suspended as noted in the footnote above. Regarding the 14th and 15th Monitoring Periods, § G., ¶ 5 of the Action Plan suspended the Monitoring Team's assignment of compliance ratings for Consent Judgment § VII., ¶¶ 7 and 8 (and all other provisions not specifically enumerated) from January 1 – December 31, 2022.

in 2022 continues to demonstrate that the well-documented patterns and practices of use of force related misconduct continues without any appreciable improvement. Therefore, ID's failure to adequately identify and address such issues simply undermines the Department's ability to hold staff accountable and inhibits efforts to address and improve poor practice.

The Monitoring Team's assessment of the new leadership in ID (the Deputy Commissioner of Investigations)—installed in summer 2022—revealed a basis for significant concern. The Monitoring Team observed a shift in practice that suggested that staff may have been influenced or prompted, either overtly or implicitly, to adopt a more lenient approach when assessing certain cases and to change their practices in ways that compromised the quality of the investigations. The Monitoring Team also observed that oversight of investigations and supervisors was not as rigorous as it should be and that morale within the Investigation Division deteriorated with a large number of staff recently leaving the Division (particularly in early 2023). Of serious concern to the Monitoring Team is that some staff reported that they did not feel comfortable speaking openly and candidly with the Monitor because of fear of reprisal by the Deputy Commissioner of Investigations were he to learn of such communications.

In response to the Monitoring Team's findings (more detail and information is provided in the compliance discussion below), the Department has recently taken a number of steps. First, the Deputy Commissioner of ID has resigned, and the Commissioner has appointed a new interim Deputy Commissioner of ID.[142] Recruiting for a new permanent Deputy Commissioner of ID has begun. Second, a group of well-qualified ID supervisors conducted a re-assessment of

---

[142] The Monitoring Team has worked with the interim Acting Deputy Commissioner of ID over the last year in various capacities. She has proactively engaged with the Monitoring Team on numerous issues. It is expected that this leadership change will result in a more collaborative and transparent relationship between the Monitoring Team and ID's staff.

certain cases to identify any that may merit additional scrutiny. Those cases were re-opened for investigations. Third, the Associate Commissioner of ID, a well-respected and seasoned investigator and supervisor, will be directly overseeing use of force investigations going forward. Further, training will be revised, and a quality assurance division has been created to assess those use of force investigations that are closed with no action. The Department is currently collaborating with the Monitoring Team to refine these initiatives. The Department also reports that it is working with the City to improve its ability to recruit new investigators for the Division by seeking to provide more competitive benefits. The Monitoring Team strongly encourages the Rikers City Task force to support these efforts with all necessary resources and all due haste. The Monitoring Team also recommends that the Department provide in a timely manner appropriate communications directing investigators and supervisors that investigations are to be conducted without fear or favor, that the requirements of the Consent Judgment are to be adhered to, and that all staff within ID are encouraged to work collaboratively with the Monitoring Team.

The decline in the quality of ID's investigations was alarming. However, the Monitoring Team is encouraged that the Department has taken steps to mitigate any further decline in the quality of investigations and to restore the Division's previous progress towards achieving compliance. In particular, the Commissioner's decision and action to change leadership within ID is expected to convey an important message about the expectations for the ID staff going forward, including adherence to the requirements of the Court's orders. The steps being taken are concrete and appropriate. The Monitoring Team intends to work closely with the new leadership in ID to collaborate on the initiatives to reinstate past practices and will continue to closely scrutinize the work of ID. As this work is ongoing, the Monitoring Team intends to share further updates with the Court in its April 25, 2023 status report and subsequent reports.

## VII. USE OF FORCE INVESTIGATIONS ¶ 1 (THOROUGH, TIMELY, OBJECTIVE INVESTIGATIONS) & ¶ 9 (A) (TIMING OF FULL ID INVESTIGATIONS)

¶ 1. As set forth below, the Department shall conduct thorough, timely, and objective investigations of all Use of Force Incidents to determine whether Staff engaged in the excessive or unnecessary Use of Force or otherwise failed to comply with the New Use of Force Directive. At the conclusion of the investigation, the Department shall prepare complete and detailed reports summarizing the findings of the investigation, the basis for these findings, and any recommended disciplinary actions or other remedial measures. All investigative steps shall be documented.

¶ 9. All Full ID Investigations shall satisfy the following criteria [. . . as enumerated in the following provisions]:

    a.    *Timeliness* [. . .]

        ii.    Beginning on October 1, 2018, or three years after the Effective Date, whichever is earlier, and for the duration of the Agreement:

            1.    ID shall complete all Full ID Investigations by no later than 120 days from the Referral Date, absent extenuating circumstances outside the Department's control that warrant an extension of this deadline. Any extension of the 120-day deadline shall be documented and subject to approval by the DCID or a designated Assistant Commissioner. Any Full ID Investigation that is open for more than 120 days shall be subject to monthly reviews by the DCID or a designated Assistant Commissioner to determine the status of the investigation and ensure that all reasonable efforts are being made to expeditiously complete the investigation.

            2.    The Department shall make every effort to complete Full ID Investigations of less complex cases within a significantly shorter period than the 120-day time frame set forth in the preceding subparagraph.

This compliance assessment provides an overview of the status of investigations for all UOF incidents through December 31, 2022. This includes an assessment of the quality and timing of Intake Investigations and Full ID Investigations, the status of ID staffing, the status of law enforcement referrals for potential criminal misconduct, and details about the Use of Force Priority Squad.

### Status of Investigations

The table below provides, *as of January 15, 2023*, the investigation status of all UOF incidents that occurred between January 2018 and December 2022.[143] ID continues to investigate an enormous volume of cases. All use of force cases receive an Intake Investigation (formerly called Preliminary Reviews) and a subset of those cases are then referred for Full ID Investigations where a more in-depth investigation occurs. The timing to complete investigations, the quality of investigations, and their outcomes are discussed in more detail below.

---

[143] All investigations of incidents that occurred prior to 2018 have been closed.

| Investigation Status of UOF Incidents Occurring Between January 2018 and December 2022<br>*as of January 15, 2023* | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Incident Date** | **2018** | | **2019** | | **2020** | | **2021** | | **2022** | | **Jan. to June 2022**<br>**(14th MP)** | | **July to Dec. 2022**<br>**(15th MP)** | |
| **Total UOF Incidents**[144] | **6,302** | | **7,494** | | **6,399** | | **8,413** | | **7,226** | | *3,349* | | *3,877* | |
| **Pending Intake Invest.** | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 440 | 6% | *1* | *<1%* | *439* | *11%* |
| **Pending Full ID Invest.** | **0** | **0%** | **0** | **0%** | **0** | **0%** | 1 | <1% | 359 | **5%** | *204* | *6%* | *155* | *4%* |
| **Total Closed Invest.** | 6,302 | **100%** | 7,494 | **100%** | 6,399 | **100%** | 8,412 | ~100% | 6,427 | **89%** | *3,144* | *94%* | *3,283* | *85%* |

## Intake Investigations

All use of force incidents that occurred during this Monitoring Period received an Intake Investigation. Outlined below is an assessment of those Intake Investigations.

- *Timing to Close Intake Investigations*: Intake Investigations are required to be completed within 25 business days of the incident date. During this Monitoring Period, all but a handful of cases were closed within 30 business days of the incident, which is beyond the deadline, but is only a minor deviation from the 25-business day deadline, so it is not cause for concern. Less than 1% of all Intake Investigations were closed beyond 30 business days.

- *Outcome of Intake Investigations*: Intake Investigations can be closed with no action, by referring the case for further investigation via a Full ID investigation, or by referring the case for some type of action (*e.g.*, MOC, PDR, Re-Training, Facility Referral). With respect to cases closed with no action, in some, the violation identified by ID had already been identified by the Facility via Rapid Review and ID determined that the recommended action by the Rapid Review was sufficient to address the violation. Therefore, "no action" cases are better understood as cases in which *ID took no action*. [145] As discussed further below, the proportion of incidents with certain outcomes changed sharply during the 15th Monitoring Period, compared to all prior Monitoring

---

[144] Incidents are categorized by the date they occurred, or date they were alleged to have occurred, therefore these numbers fluctuate very slightly across Monitoring Periods as allegations may be made many months after they were alleged to have occurred and totals are updated later.

[145] Cases that close with no action may have been addressed by the Facility through Rapid Reviews. ID analyzed almost 1,000 Intake Investigations closed with no action this Monitoring Period and determined that the facilities took action in 46% of them, including 5003 counseling, verbal counseling, corrective interviews, or Command Disciplines.

Periods since the inception of the Intake Squad. More specifically, significantly more cases were closed with no action (56% during the current Monitoring Period, compared to an average of 42% in prior Monitoring Periods), and significantly fewer cases were referred for Full ID Investigations (only 2% in the current Monitoring period, compared to an average of 15% in prior Monitoring Periods).

| Outcome of Intake Investigations[146] as of January 31, 2023[147] | | | | | | |
|---|---|---|---|---|---|---|
| **Incident Date** | *Feb. 3[148] to June 2020* **(10th MP)** | *July to Dec. 2020* **(11th MP)** | *Jan. to June 2021* **(12th MP)** | *July to Dec. 2021* **(13th MP)** | *Jan. to June 2022* **(14th MP)** | *July to Dec. 2022* **(15th MP)** |
| Pending Intake Investigation | 0 | 0 | 0 | 0 | 0 | 352 |
| **Closed Intake Investigation** | **2,492** | **3,272** | **4,468** | **3,916** | **3,352** | **3,550** |
| *No Action* | *1,060 43%* | *1,279 39%* | *1,386 31%* | *947 24%* | *1,249 37%* | *1,984 56%* |
| *MOC* | *47 2%* | *28 1%* | *48 1%* | *36 1%* | *22 1%* | *54 2%* |
| *PDR* | *6* | *2* | *0* | *0* | *1* | *3* |
| *Re-Training* | *148 6%* | *226 7%* | *342 8%* | *91 2%* | *35 1%* | *36 1%* |
| *Facility Referrals* | *820 33%* | *1,159 35%* | *1,903 43%* | *2,208 56%* | *1,637 49%* | *1,389 39%* |
| *Referred for Full ID* | *411 12%* | *567 17%* | *781 17%* | *634 16%* | *360 11%* | *84 2%* |
| *Data Entry Errors* | | | | | *48[149]* | |
| **Total Intake Investigations** | **2,492** | **3,272** | **4,468** | **3,916** | **3,352** | **3,902** |

[146] It is important to note that the results of the Intake Investigations, for the purpose of this chart, only identify the highest level of recommended action for each investigation. For example, while a case may be closed with an MOC *and* a Facility Referral, the result of the investigation will be classified as "Closed with an MOC" in the chart below.

[147] Other investigation data is this report is reported *as of* January 15, 2023 while the Intake Investigation data is also reported *as of* January31, 2023 because the data is maintained in two different trackers that were produced on two different dates. The number of pending Intake cases therefore varies between data provided "as of January 15, 2023" and "as of January 31, 2023," depending on which tracker was utilized to develop the necessary data.

[148] Incidents beginning February 3, 2020 received Intake Investigations, so those incidents from the early part of the Tenth Monitoring Period are not included in this data.

[149] These investigations had data entry errors in the Intake Squad Tracker. The Monitoring Team is unable to determine the outcome for these cases but is working with the Department to fix these errors.

- *Action Taken Following Close of Intake Investigations*: While the number of referrals for formal discipline (via an MOC) by the Intake Investigation increased during this Monitoring Period and almost doubled from the previous Monitoring Period (54 versus 22), this does not reflect an overall increase in the number of disciplinary referrals from ID. The increase in referrals for formal discipline via Intake Investigations does not offset the significant decrease in referrals for formal discipline following the conclusion of Full ID cases—as discussed in more detail later in this section of the report. There was a significant decrease in the number of referrals for Full ID investigations (where most formal discipline is identified and addressed through charges), which likely compounded the lack of overall formal disciplinary referrals from ID. Finally, the number of cases referred for re-training has steadily decreased to less than 5% of all cases.

- *Referral for Full ID Investigations*: Nearly all (98%) of the 3,550 Intake Investigations of incidents from this Monitoring Period were closed following the completion of the Intake Investigations, *while only 2%* of cases were referred for a Full ID Investigation. As shown in the table above, this is a sharp decline from prior Monitoring Periods. Importantly, incidents involving Head Strikes and Class A incidents *must* be referred for Full ID investigations per the terms of the Consent Judgment, and the Monitoring Team's review of Intake Investigations revealed that did not occur consistently or reliably during this Monitoring Period. Other cases that should have been referred for further investigation also were not, including cases where the evidence suggested further investigation was necessary to reach a determination about the appropriateness of the force used.

- *Findings of Intake Investigations Not Referred for Full ID Investigations*: The table below depicts the findings of Intake Investigations that were closed as of January 31, 2023 and were not referred for a Full ID Investigation. Intake Investigation findings included a statement of whether the incident was "unnecessary," "excessive," and "avoidable."[150] Given the Monitoring Team's concern about the decline in the detection of and accountability for misconduct by Intake Investigations discussed above, changes in the percentage identified as excessive, unnecessary or avoidable are also viewed with skepticism and concern.

---

[150] The Department and the Monitoring Team have not finalized an agreed upon definition of these categories. The definition of these findings and the development of corresponding data is complex, especially because it requires quantifying subjective information where even slight factual variations can impact an incident's categorization. A concrete, shared understanding of what these categories are intended to capture is necessary to ensure consistent assessment across the board. While efforts were made in summer 2021 to finalize common definitions, they were never finalized, and has since languished. The effort has not been reinvigorated given the focus on higher priority items this year. This categorization process has also not been expanded to Full ID Investigations.

| Investigations Status<br>*As of January 31, 2023* | | | | | | |
|---|---|---|---|---|---|---|
| **Incident Date** | *Feb. 3[151] to June 2020* (10th MP) | *July to Dec. 2020* (11th MP) | *Jan. to June 2021* (12th MP) | *July to Dec. 2021* (13th MP) | *Jan. to June 2022* (14th MP) | *July to Dec. 2022* (15th MP) |
| **Closed Intake Investigations** | **2,492** | **3,272** | **4,468** | **3,916** | **3,352** | **3,550** |
| - *Referred for Full ID* | 411 | 567 | 781 | 634 | 360 | 84 |
| - *Investigations Closed at Intake* | 2,081 | 2,700 | 3,687 | 3,285 | 2,992 | 3,466 |
| *Findings of Investigations Closed at Intake* | | | | | | |
| Investigations Closed at Intake | 2,081 | 2,700 | 3,687 | 3,285 | 2,992 | 3,466 |
| • *Excessive, and/or Unnecessary, and/or Avoidable* | *180 (9%)* | *477 (18%)* | *734 (20%)* | *737 (22%)* | *531 (18%)* | *485 (14%)* |
| • *Chemical Agent Violation* | *164 (8%)* | *163 (6%)* | *260 (7%)* | *324 (10%)* | *287 (10%)* | *225 (7%)* |

## *Overall Assessment of Intake Investigations*

The Monitoring Team reviews thousands of Intake Investigations each Monitoring Period. The quality and outcomes of Intake Investigations noticeably and dramatically declined during this Monitoring Period. A critical purpose of the Intake Investigation is to determine whether misconduct occurred such that it can be addressed immediately or whether the facts of a case warrant additional scrutiny through a Full ID Investigation. The Intake Investigations completed during this Monitoring Period simply failed to do so appropriately. Even objective criteria for referring a case for a Full ID investigation, such as whether the case involved a head strike or a Class A injury, did not occur reliably or consistently. Most concerningly, Intake Investigations generally failed to identify operational and security failures that led to an unnecessary use of force. This was particularly true when the Emergency Services Unit ("ESU") was involved—it appeared that misconduct by members of ESU teams was often simply overlooked or ignored. Staff failures in preventing and responding to self-harm events were similarly overlooked. In short, too many Intake Investigations that ignored objective evidence of misconduct were closed and failed to refer cases for Full ID Investigations when required.

---

[151] Incidents beginning February 3, 2020 received Intake Investigations, so those incidents from the early part of the Tenth Monitoring Period are not included in this data.

**Full ID Investigations**

When a case merits additional investigation beyond the Intake Investigation, a Full ID Investigation must be conducted. ID has long struggled to complete Full ID Investigations in a timely manner, although the number of pending cases has decreased steadily over time. At the end of the current Monitoring Period, ID had only 360 pending Full ID cases, compared to a pending caseload of over 1,000 cases in the last three Monitoring Periods (n=1,026, 1,194 and 1,182, respectively). This low caseload is the direct result of two things, both of which are concerning: (1) fewer Full ID referrals from the Intake Squad, as discussed above and (2) increased closure of Full ID investigations during this Monitoring Period (907 cases closed compared to 522 closed during last Monitoring Period, an increase of 74%). Unfortunately, the accelerated case closure rate has occurred at the expense of preserving the quality of the investigations.

- *Timeliness*: ID is required to complete Full ID Investigations within 120 days of an incident. The table below shows the status of Full ID investigations for all incidents that occurred between January 2021 and December 2022. Only 16% (n=336) were closed (or remained pending) within the 120-day timeline, within the remaining 84% outside the required time frame. During this Monitoring Period, ID closed 907 Full ID Investigations—92% (n=831) of which were closed outside the required 120-day timeline. Therefore, the Department remains in Non-Compliance with the timing requirement for Full ID Investigations.

| Status of Full ID Investigations for incidents that *occurred* between January 2021-December 2022 *As of January 15, 2023* | | | | |
|---|---|---|---|---|
| *Pending* less than 120 Days | *Closed* within 120 Days | *Closed* Beyond 120 Days | *Pending* Beyond 120 Days | Total |
| 118 6% | 218 10% | 1,515 72% | 242 12% | 2,093 |

- *Quality of Full ID Investigations*: The progress ID investigators made during previous Monitoring Periods in conducting quality investigations ceased, and in fact, reflected a notable decline. Previously, the Monitoring Team found the quality of investigations to be mixed: some were thorough and complete, though some were inadequate. In contrast, the Monitoring Team found the investigations closed during this Monitoring Period to be **often** incomplete, inadequate, and unreasonable. Investigators failed to complete necessary interviews with staff or persons in custody, did not identify all salient issues, disregarded objective evidence of misconduct, discredited allegations from people in custody without evidence, and recommended insufficient employee corrective action. This was a disturbing decline in investigative integrity and quality, given the slow but steady progress that had been observed in prior Monitoring Periods.

*Overall Assessment of Full ID Investigations*

In summary, the Department's level of compliance with the requirements for Full ID Investigations took a significant step backwards during the current Monitoring Period. Although ID may have closed a larger number of cases compared to the previous Monitoring Period, nearly all cases were closed outside the 120-day timeline (perpetuating the Non-Compliance rating in timing), the quality of

many of the investigations was often substandard, and the findings could easily be discredited. Given the prominence of Full ID Investigations among the Department's tools for ensuring accountability for staff misconduct, this level of performance is extremely concerning.

## Referrals for Discipline

Nearly all referrals to the Trials Division for formal discipline for use of force related misconduct are made following the completion of a Full ID Investigation. This is unsurprising given that the more egregious and complex cases are referred for Full ID Investigations. That said, with sufficient evidence, Intake Investigations can also result in formal disciplinary referrals to the Trials Division (although not likely at the same rate as the completion of a Full ID Investigation). In fact, the number of referrals for formal discipline from Intake Investigations increased this Monitoring Period (despite the overall decrease in referrals). While the Monitoring Team's review of use of force incidents continues to identify a significant number of cases where referrals for formal discipline appear to be appropriate, incongruously, in 2022, the overall proportion of cases referred for formal discipline (from any type of UOF investigation) significantly decreased.

From 2016 to 2021, the average proportion of use of force incidents in which at least one staff member was referred for formal discipline was 7%. However, in 2022, the proportion of use of force incidents in which at least one staff member was referred for formal discipline decreased to only 3%. Some investigations (~200) of 2022 incidents remain pending as of mid-February 2023 when the charges data below was developed, so some additional referrals for discipline may be forthcoming, but the resolution of these cases is not expected to alter this proportion significantly. The decline in the proportion of cases referred for formal discipline was particularly pronounced among cases closed after May 2022. As noted above, the Monitoring Team has not identified a contemporaneous change in the pattern and practice of unnecessary and excessive force that would account for a reduction in the number of referrals. In fact, the number of such referrals typically *increases* as the quality of investigations improves and the ability to identify misconduct is more consistent and reliable. The decline in investigation quality discussed above no doubt contributes to the decline in referrals for formal discipline.



## ID Staffing

The City is required to ensure that the Department has appropriate resources to conduct timely and quality investigations. Adequate staffing and appropriate case assignment are critical to conducting timely, quality investigations. ID's staffing levels at the end of each year since 2018 are presented in the table below, along with data from the end of June 2022 to provide for a 6-month comparison to December 2022. In 2022, the number of civilian and uniform staff serving as investigators decreased by 22 staff, from its high in 2020 (179, versus 157).

| ID Staffing Levels | | | | | | |
|---|---|---|---|---|---|---|
| Position | Dec. 2018 | Dec. 2019 | Dec. 2020 | Dec. 2021 | June 2022 | Dec. 2022 |
| *Executive Supervisors* | *12* | *16* | *15* | *15* | *13* | *15* |
| • Deputy Commissioner | 1 | 1 | 1 | 1 | 1 | 1 |
| • Associate Commissioner | 0 | 0 | 0 | 0 | 0 | 1 |
| • Assistant Commissioner | 1 | 1 | 1 | 1 | 1 | 2 |
| • Director/Acting Director | 4 | 6 | 4 | 4 | 3 | 3 |
| • Executive Director | 0 | 0 | 1 | 1 | 0 | 0 |
| • Deputy Director Investigator (DDI) | 6 | 8 | 8 | 8 | 8 | 8 |
| *Supervisors* | *30* | *41* | *38* | *36* | *35* | *32* |
| • Administrative Manager | 1 | 1 | 0 | 0 | 0 | 0 |
| • Supervising Investigator | 13 | 25 | 26 | 24 | 22 | 21 |
| • Senior Investigator | 0 | 0 | 0 | 0 | 0 | 1 |
| • Supervisor ADW | 0 | 0 | 0 | 0 | 0 | 0 |
| • Investigator Captain | 16 | 15 | 12 | 12 | 13 | 10 |

| Investigators | *148* | *178* | *179* | *158* | *157* | *157* |
|---|---|---|---|---|---|---|
| • Investigator Civilian | 77 | 89 | 91 | 80 | 83 | 77 |
| • Investigator Correction Officer | 71 | 89 | 88 | 78 | 74 | 80 |
| *Support Staff* | *12* | *10* | *10* | *9* | *8* | *8* |
| Total | 201 | 245 | 242 | 217 | 213 | 210 |

- *Staff Assignments*: Outlined below are the staff assignments within the ID Divisions.

| Facility Team Staffing & Case Breakdown for Team with UOF Caseloads *As of January 15, 2023* | | |
|---|---|---|
| Number of Assigned Staff | | |
| Team/Unit | Supervisors[152] | Investigators |
| Intake Squad | 12 | 51 |
| Full ID | 3 | 10 |
| UPS | 0 | 4 |
| Totals | 15 | 65 |
| Other Teams | | |
| PREA Caseload and Compliance | 8 | 40 |
| Intel/Arrest | 2 | 14 |
| Training | 1 | 1 |
| K-9 | 0 | 3 |
| Administration and Tracking, Misc. | 2 | 7 |

- o *Intake Investigators*: A significant number of investigators (n=51) are assigned to the Intake Squad, enabling them to investigate a large number of use of force incidents in a timely manner. The fluctuation in the number of UOF incidents means that there will always be a need to balance resources, but the current complement of Intake Squad investigators appears to reasonably accommodate the current caseloads.

- o *Full ID Investigators*: As of the end of the current Monitoring Period, there were only **10** investigators assigned to conduct Full ID Investigations (outside of the UPS) compared to 35 in June 2022 and 51 in July 2021. This significant reduction in staff assigned to Full ID Investigations suggests that ID has reduced the priority of Full ID investigations (as discussed earlier in this report). Resources appear to have been shifted to PREA investigations and compliance (40 investigators assigned as of December 2022 vs. 23 in June 2022), and Intel/Arrest (14 investigators assigned as of December 2022 vs. 9 in June 2022). At the end of December 2022, each Full ID investigator had an average caseload of

---

[152] Nine DDIs oversee the supervisors of these teams. The DDIs are not included in the count of supervisors in this chart.

27—the same average caseload of investigators in June 2022 when there were both significantly more investigators assigned to Full ID investigations *and* significantly more Full ID investigations open. Ten investigators dedicated for Full ID investigations is not sufficient to conduct thorough and timely investigations for all incidents requiring a Full ID investigation—caseloads were artificially lowered this Monitoring Period due to insufficient referrals for Full ID and inadequate closures of cases. The Division must be prepared to re-dedicate resources to conducting Full ID investigations as the referral process is improved.

o *Recruitment*: The Department reports that it continues to actively recruit and hire civilian investigators, and its recruitment efforts appear to consistently bear fruit. ID has received a significant number of applicants and interviewed 75 candidates for civilian investigator positions. A total of 31 offers were extended for civilian investigator positions during this Monitoring Period. Notably, in June 2022, the requirement for investigators to live in the five boroughs was removed from the job posting, broadening the potential pool of applicants.

*Overall Assessment of ID Staffing*

While ID staffing through the end of the Monitoring Period appeared somewhat steady, there was a mass exodus of investigators in early 2023 (about 25 investigators left the division) is extremely concerning. Further, the reduction in resources dedicated to conduct Full ID investigations will only further inhibit the quality and timeliness of those investigations. Recruitment efforts are ongoing, however, the increased rate of attrition demands that the Department's recruitment effort must continue with vigor.

**Law Enforcement Referrals**

ID is required to promptly refer to the Department of Investigation ("DOI") any staff member whose conduct in a use of force incident appears criminal in nature. The Monitoring Team has consistently found that while there is significant concern about staff conduct, most staff conduct does not appear to rise to the level of criminal in nature. This is consistent with the very small number of criminal prosecutions brought to date. In those cases that do require a referral, ID has promptly made these referrals. The Department and the relevant law enforcement agencies routinely collaborate and communicate about the status of cases that are referred for potential prosecution. In the seven years since the effective date of the Consent Judgment, 117 use of force cases have been referred to DOI or DOI has taken them over independent of a referral. Of that already small group of UOF cases, only **eight** cases have resulted in criminal charges (with another eight still being considered) over the life span of the Consent Judgment as demonstrated in the chart below.

| Law Enforcement Referrals<br>As of March 1, 2023 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Date of Incident** | **2014 & 2015** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** | **2022** | **Total** | |
| **Total** | **9** | **16** | **27** | **19** | **15** | **16** | **7** | **8** | **117** | |
| Criminal Charges Brought/ Trial Underway or Complete | 0 | 2 | 0 | 2 | 2 | 2 | 0 | 0 | **8** | **7%** |
| Pending Consideration with Law Enforcement | 0 | 0 | 0 | 0 | 0 | 1 | 2 | 5 | **8** | **7%** |
| Returned to ID for Administrative Processing | 9 | 14 | 27 | 17 | 13 | 13 | 5 | 3 | **101** | **86%** |

As of March 2023, eight cases were pending investigation with law enforcement: two with DOI, three with the Bronx District Attorney ("DA"), and three with the U.S. Attorney's Office for the Southern District of New York ("SDNY").

Most of the cases considered for criminal prosecution will not be prosecuted: 90% or more of cases referred for possible criminal prosecution are returned to the Department with no criminal charges. That said, these cases often represent very concerning conduct that can and must be addressed administratively. The Monitoring Team continues to find that a small number of cases languish as they are passed from agency to agency for consideration of potential criminal charges. Typically, no charges are brought, and, in the meantime, there is no accountability for the misconduct. A lengthy review period (with no prosecution) only compounds the delay in accountability when it is then returned to the agency. There has been some overlap in the egregious cases identified by via the Action Plan requirement § F., ¶ 2 and cases being considered for criminal prosecution. The Monitoring Team worked with law enforcement agencies during this Monitoring Period to advise them of the aggressive timelines set for investigations pursuant to the Action Plan requirement § F., ¶ 2 ("F2"), which sets aggressive timelines for the investigation and prosecution of egregious cases. Law enforcement agencies took special care to swiftly evaluate certain cases that were identified for the F2 process and referred those cases back to DOC for administrative prosecution if criminal charges were not sought.

**Use of Force Priority Squad**

The Use of Force Priority Squad ("UPS") is an important management tool to address some of the most serious and complex use of force cases. Having a dedicated squad for this purpose helps ID to ensure that these cases obtain the necessary scrutiny and attention. During this Monitoring Period, 15 cases were assigned to UPS and included a variety of egregious incidents including cases in which staff members were suspended, cases that were returned to ID following an assessment for criminal charges by law enforcement, and two recommendations from the Monitoring Team.

UPS closed 46 cases during this Monitoring Period, 34 of which (74%) were closed with charges. Seventeen of the 46 (37%) incidents were closed in under 120 days,[153] with 16 of the 17 cases resulting

---

[153] This includes nine cases identified as "F2" cases described further in the Compliance Assessment (Staff Discipline & Accountability) section of the report.

in referral for formal discipline. As of end of the current Monitoring Period, UPS had 13 pending cases, including one case that was identified for expedited closure pursuant to Action Plan, § F ¶ 2. One small bright spot in the work of ID this Monitoring Period is that the UPS has successfully closed serious cases of misconduct close-in-time to the incident via the process identified in the Action Plan, § F ¶ 2 (described in more detail in the Compliance Assessment (Staff Discipline & Accountability) section of this report).

**Conclusion**

The decline in quality of Intake Investigations and Full ID investigations during this Monitoring Period is concerning and has resulted in a Non-Compliance rating. Further, Full ID investigations are still not completed in a timely manner. It is critical that ID immediately address the issues identified in this section so that practice is aligned with the requirements of the Consent Judgment and investigations are conducted with integrity and result in reliable outcomes. To that end, following the close of the Monitoring Period, the Department has taken important steps to remediate these issues (as discussed above). The change in ID's leadership is expected to have a significant impact on altering the direction and approach of the Division going forward. Further, dedicated leadership by the Associate Commissioner of ID in conducting use of force investigations is expected to have an immediate impact on improving the quality of those investigations.

| **COMPLIANCE RATING** | ¶ **1.** Non-Compliance<br>¶ **9 (a).** Non-Compliance |
| --- | --- |

171

- **RISK MANAGEMENT (CONSENT JUDGMENT § X)**

| X. RISK MANAGEMENT ¶ 1 (EARLY WARNING SYSTEM) |
|---|
| ¶ 1. Within 150 days of the Effective Date, in consultation with the Monitor, the Department shall develop and implement an early warning system ("EWS") designed to effectively identify as soon as possible Staff Members whose conduct warrants corrective action as well as systemic policy or training deficiencies. The Department shall use the EWS as a tool for correcting inappropriate staff conduct before it escalates to more serious misconduct. The EWS shall be subject to the approval of the Monitor. |
|    a.   The EWS shall track performance data on each Staff Member that may serve as predictors of possible future misconduct. |
|    b.   ICOs and Supervisors of the rank of Assistant Deputy Warden or higher shall have access to the information on the EWS. ICOs shall review this information on a regular basis with senior Department management to evaluate staff conduct and the need for any changes to policies or training. The Department, in consultation with the Monitor, shall develop and implement appropriate interventions and services that will be provided to Staff Members identified through the EWS. |
|    c.   On an annual basis, the Department shall review the EWS to assess its effectiveness and to implement any necessary enhancements. |

This provision of the Consent Judgment requires the Department to have a system to identify and correct staff misconduct at an early stage which the Department has elected to do through the Early Intervention, Support and Supervision ("E.I.S.S.") Unit. Further, § A, ¶ (3)(c) of the Action Plan requires the expansion of E.I.S.S. to support any staff on disciplinary probation and supervisors during their probationary period, and requires that each facility has at least one supervisor responsible for working with the E.I.S.S. Unit to support the uniform staff that are in the E.I.S.S. program and address any deficiencies in supervision of those staff that are identified.

**Overview of E.I.S.S. Program**

The goal of E.I.S.S. is to identify and support staff whose use of force practices would benefit from additional guidance and mentorship in order to improve practice and minimize the possibility that staff's behavior escalates to more serious misconduct. The table below depicts the work of E.I.S.S. between January 2020 and December 2022, the last six Monitoring Periods, and the last column in the table depicts the overall caseload of the program since its inception in August 2017. Most of the 49 staff selected for monitoring during the 15th Monitoring Period were identified due to placement on disciplinary probation (n=37)[154], while a small number of staff were screened and selected for monitoring based on referrals from the Trials Division, ID, or the individual facilities.

---

[154] As required by § A, ¶ (3)(c) of the Action Plan.

| Overview of E.I.S.S. Program | | | | | | | |
|---|---|---|---|---|---|---|---|
| | **Jan. to June 2020 (10th MP)** | **July to Dec. 2020 (11th MP)** | **Jan. to June 2021 (12th MP)** | **July to Dec. 2021 (13th MP)** | **Jan. to June 2022 (14th MP)** | **July to Dec. 2022 (15th MP)** | **Program to Date – August 2017 to December 2022** |
| ***Screening*** | | | | | | | |
| Staff Screened[155] | 158 | 60 | 82 | 35 | 64 | 53 | 976 |
| Staff Selected for Monitoring[156] | 38 | 35 | 53 | 24 | 50 | 49 | 446 |
| ***Monitoring*** | | | | | | | |
| Staff Began Monitoring Term | 50 | 36 | 38 | 8 | 35 | 34 | 315 |
| Staff Actively Monitored[157] | 96 | 106 | 91 | 37 | 80 | 97 | |
| Staff Completed Monitoring | 9 | 29 | 17 | 4 | 12 | 13 | 173 |

### E.I.S.S. Monitoring Program

- *Monitoring Plans*: As part of placement in the E.I.S.S. program, monitoring plans are developed for each staff member by E.I.S.S. staff with input from the staff member. The monitoring plans are designed to guide and track the staff member's progress in achieving their goals for improved practice. Leveraging these monitoring plans as a guide, E.I.S.S. conducted bi-monthly meetings with all staff in the monitoring program. These monitoring plans are also designed to help guide facility leadership in their mentorship and discussions with the staff members in the program.

- *Engagement by Facility Leadership*: The E.I.S.S. program necessarily requires facility-level mentorship and guidance to support staff while they conduct their regular duties. The engagement of facility leadership (in particular the Wardens) has been lacking since the program was developed. E.I.S.S.

---

[155] The number of staff screened for each Monitoring Period may include some staff who were screened in prior Monitoring Periods and were re-screened in the identified Monitoring Period. The "Program to Date" column reflects the total number of individual staff screened. Staff are only counted once in the "Program to Date" column, even if the staff member was screened in multiple Monitoring Periods.

[156] Not all staff selected for monitoring have been enrolled in the program. Certain staff left the Department before monitoring began. Other staff have not yet been placed on monitoring because they are on extended leaves of absence (*e.g.*, sick or military leave) or are serving a suspension. Finally, E.I.S.S. does not initiate a staff's monitoring term if the staff member has subsequently been placed on a no-inmate contact post due to the limited opportunity for mentorship and guidance.

[157] The total number of Actively Monitored Staff for each Monitoring Period includes all staff who began monitoring during the period, remained in monitoring throughout the Monitoring Period, completed monitoring, or had been enrolled in monitoring (but not yet started).

leadership reported it has made renewed efforts to engage the facility leadership in the last year which has led to more engagement from the Wardens with the staff in the program. Monthly meetings between E.I.S.S. and the Wardens at each facility continued this Monitoring Period. That said, the Wardens have many other competing priorities, so their bandwidth to provide individual mentorship to staff in E.I.S.S. remains limited. Involvement of ADWs assigned to E.I.S.S. is designed to bridge this gap as discussed further below.

**Expansion of E.I.S.S. Under the Action Plan**

- *Staff on Disciplinary Probation and Probationary Supervisors*

The E.I.S.S. unit continued to expand the monitoring program to include any staff on disciplinary probation and supervisors during their probationary period as required by the Action Plan. As noted above, most staff selected for monitoring in the 15th Monitoring Period were due to their status on disciplinary probation. E.I.S.S. also reported it is beginning to onboard the newly promoted class of ADWs into the program as required by the Action Plan. After that is complete, E.I.S.S. staff will work to onboard the newly promoted *Captains* (promoted in March 2023). E.I.S.S. staff continue to coordinate with various stakeholders in the agency to gain access to the necessary information on staff backgrounds so that they can obtain a complete understanding of the staff's practices prior to placement in E.I.S.S., and to ensure that the monitoring plans are tailored to address the underlying conduct that may have resulted in the staff's placement on probation or any issues raised during the screening of newly promoted staff. The Monitoring Team recommends this coordination is prioritized and information is shared with E.I.S.S. as efficiently as possible—including materials which identify concerns raised during the screening process for newly promoted supervisors. As noted in the assessment of compliance with Consent Judgment § XII., Screening & Assignment of Staff, ¶¶ 1-3 (Promotions) of this report, the Monitoring Team has serious concerns regarding the promotion of certain ADWs, and E.I.S.S. monitoring will hopefully serve as useful support to these newly appointed supervisors and elevate their ability to fulfill the mandates of the role.

- *Assignment of ADW Liaisons*

During this Monitoring Period, E.I.S.S. also worked to expand the number of uniform staff that can support the work of the unit. The unit developed a job description and recruited ADWs who will serve as facility-based liaisons between the E.I.S.S. unit and the uniform staff that are in the E.I.S.S. program. The goal is that these ADWs will provide on the ground support to those staff members. The Action Plan requires such facility liaisons at *each* facility; however, the Monitoring Team has recommended that this program is rolled out in phases. First, this will allow E.I.S.S. to determine how best this process will work. Further, due to the limited pool of available ADWs, and the significant need to prioritize the placement of ADWs in the jails to directly supervise staff and incarcerated individuals, deployment of ADWs to E.I.S.S. has been limited in the near term.

Two ADWs have been selected and appointed as facility liaisons for E.I.S.S. and will work at AMKC and GRVC. These facilities were selected because those two facilities were identified as having the most staff in the E.I.S.S. monitoring program that could benefit from additional support. They will receive training from

174

E.I.S.S. leadership and help establish procedures to ensure the efficient use of these roles going forward if and when more ADWs are available. One outstanding issue is to ensure that the ADW liaisons have dedicated space that is conducive to meeting with the staff in the jails so that the ADWs may be based in the jails and not at headquarters. GRVC has dedicated space for the ADW liaison, but AMKC has not yet identified space for this purpose. The Monitoring Team recommends that accommodations be made for the ADW liaison to maximize the efficacy of this role and provide staff the support they need.

**<u>Staffing for E.I.S.S. Unit</u>**

While the new ADW positions will add significant support to the E.I.S.S. program, the unit will ultimately require additional staff and resources as the program expands. The unit currently consists of three civilian staff and two uniform staff (in prior Monitoring Periods there were four uniform staff supporting the unit), and two ADW liaisons. The unit currently has three open positions for civilian employees, but progress towards filling these roles has been on pause as the ADW positions were filled. The Monitoring Team strongly recommends that recruiting additional civilians to support this work should resume given the current strain on uniformed resources.

**<u>Conclusion</u>**

The work of E.I.S.S. continues and is expanding as required under the Action Plan and is in Partial Compliance with this requirement. The expansion of this division must be appropriately synchronized with the various other initiatives underway to ensure that resources are adequately allocated. The Monitoring Team intends to continue to closely collaborate with E.I.S.S. on this process.

| **COMPLIANCE RATING** | **¶ 1.** Partial Compliance |
|---|---|

- **STAFF DISCIPLINE AND ACCOUNTABILITY (CONSENT JUDGMENT § VIII & REMEDIAL ORDER § C)**

**VIII. STAFF DISCIPLINE AND ACCOUNTABILITY ¶ 1**
**(TIMELY, APPROPRIATE AND MEANINGFUL ACCOUNTABILITY)**

**REMEDIAL ORDER § C. (TIMELY, APPROPRIATE, AND MEANINGFUL STAFF ACCOUNTABILITY) ¶ 1 (IMMEDIATE CORRECTIVE ACTION)**

**VIII. STAFF DISCIPLINE AND ACCOUNTABILITY ¶ 3 (C) (USE OF FORCE VIOLATIONS)**

Consent Judgment, § VIII. ¶ 1. The Department shall take all necessary steps to impose appropriate and meaningful discipline, up to and including termination, for any Staff Member who violates Department policies, procedures, rules, and directives relating to the Use of Force, including but not limited to the New Use of Force Directive and any policies, procedures, rules, and directives relating to the reporting and investigation of Use of Force Incidents and video retention ("UOF Violations").

First Remedial Order, § C. ¶ 1. *Immediate Corrective Action*. Following a Use of Force Incident, the Department shall determine whether any involved Staff Member(s) should be subject to immediate corrective action pending the completion of the Use of Force investigation, which may include counseling or re-training, reassignment to a different position with limited or no contact with Incarcerated Individuals, placement on administrative leave with pay, or immediate suspension (collectively, "immediate corrective action"). The Department shall impose immediate corrective action on Staff Members when appropriate and as close in time to the incident as practicable. The Department shall document and track any immediate corrective action taken, the nature of the initial corrective action recommended, the nature of the corrective action imposed, the basis for the corrective action, the date the corrective action is imposed, and the date of the Use of Force Incident resulting in the immediate corrective action. The requirements in this provision are not intended to alter the rights of Staff or the burden of proof in employee disciplinary proceedings under applicable laws and regulations.

Consent Judgment, § VIII. ¶ 3. In the event an investigation related to the Use of Force finds that a Staff Member committed a UOF Violation:

. . .

    c.   The Trials Division shall prepare and serve charges that the Trials Division determines are supported by the evidence within a reasonable period of the date on which it receives a recommendation from the DCID (or a designated Assistant Commissioner) or a Facility, and shall make best efforts to prepare and serve such charges within 30 days of receiving such recommendation. The Trials Division shall bring charges unless the Assistant Commissioner of the Trials Division determines that the evidence does not support the findings of the investigation and no discipline is warranted, or determines that command discipline or other alternative remedial measures are appropriate instead. If the Assistant Commissioner of the Trials Division declines to bring charges, he or she shall document the basis for this decision in the Trials Division file and forward the declination to the Commissioner or designated Deputy Commissioner for review, as well as to the Monitor. The Trials Division shall prosecute disciplinary cases as expeditiously as possible, under the circumstances.

This compliance assessment evaluates the provision that requires the Department to impose timely, appropriate, and meaningful accountability for use of force related violations (Consent Judgment § VIII., ¶ 1), the Department's use of immediate corrective action (First Remedial Order § C., ¶ 1), as well as the expeditious prosecution of cases for formal discipline by the Trials Division (Consent Judgment § VIII., ¶3(c) together. This compliance assessment only covers the Fifteenth Monitoring Period, which covers July through December 2022.

Staff discipline comes in many forms and can be imposed by a variety of different actors within the Department, at various stages. The Department has made considerable progress in clearing a backlog of

languishing disciplinary cases but overall, still does not hold staff accountable in a timely manner, which inherently undermines the meaningfulness of the discipline and ability to impact future behavior.

## **Accountability**

The Department ***identifies*** misconduct via Rapid Reviews, ad hoc review of incidents by civilian and uniform leadership, Intake Investigations (formerly Preliminary Reviews), and through Full ID investigations. The Department has various structures to ***respond*** to misconduct, including: corrective interviews, 5003 counseling, re-training, Command Disciplines ("CD"), suspensions, and placing an individual on modified duty. PDRs are utilized to address misconduct of *probationary* staff. For *tenured* staff, formal discipline is imposed through the Department's Trials Division, generally via a Negotiated Plea Agreement ("NPA").[158]

*Overview of Accountability*: The table below provides an overview of the accountability for use of force related misconduct imposed between January 1, 2019 and December 31, 2022. Overall, the Department imposed more use of force related accountability (n=2,772) in 2022 than in any prior year. The combination of corrective interviews, Command Discipline and formal discipline means that staff are being held accountable more often when their conduct violates the Use of Force policy. That said, as discussed throughout this section, much of the accountability is being issued for incidents that occurred in the past (*e.g.* a year ago or more). Furthermore, as discussed in detail below, a significant number of Command Disciplines are still not being issued due to technical/clerical errors. Finally, the Monitoring Team's review of incidents continues to find an increase in misconduct that goes undetected by the various investigatory structures. Thus, while many accountability actions were taken during the current Monitoring Period, additional accountability was also warranted in a significant number of cases and was not effectuated. A summary of the accountability measures imposed is provided in the chart below.

---

[158] A Negotiated Plea Agreement is an agreed upon settlement between the Respondent uniform staff and the Trials Division attorneys.

| Staff Accountability for Use of Force Related Misconduct Imposed, 2019 to 2022 | | | | | | |
|---|---|---|---|---|---|---|
| | **2019**[159] | **2020** | **2021** | **2022** | **Jan.–June 2022 14th MP** | **July-Dec. 2022 15th MP** |
| **Support and Guidance Provided to Staff** | | | | | | |
| Corrective interviews and 5003 counseling | 2,700[160] | 1,378[161] | 3,205 | 2,532 | 1,631 | 901 |
| Corrective interviews (resulting from CDs) | 53 | 32 | 35 | 50 | 22 | 28 |
| **Corrective Action—Command Discipline & Suspensions** | | | | | | |
| CD – Reprimand | *156* | *126* | *270* | *298* | 133 | 165 |
| CDs (resulting in 1-5[162] days deducted) | *879* | *673* | *794* | *634* | 285 | 349 |
| Suspensions by date imposed | *48* | *80* | *83* | *66* | 36 | 30 |
| *Total* | *1083* | *879* | *1147* | *998* | *454* | *544* |
| **Formal Discipline** | | | | | | |
| PDRs | 81 | 49 | 2 | 1 | 0 | 1 |
| NPAs | 220 | 327 | 441 | 1773 | 888 | 885 |
| *Total* | *301* | *376* | *443* | *1774* | *888* | *886* |
| **All Staff Accountability** | | | | | | |
| *Total* | *1384* | *1255* | *1590* | *2772* | *1342* | *1430* |

[159] Counseling that occurred in the Eighth Period was focused on a more holistic assessment of the staff member's conduct pursuant to specific standards set by § X (Risk Management), ¶ 2 that has been subsequently revised. *See* Eighth Monitor's Report at pgs. 172-173.

[160] The identification of staff for counseling was in transition in the Ninth Monitoring Period as a result of a recommendation by the Monitoring Team. *See* Ninth Monitor's Report at pgs. 194-196.

[161] The Department transitioned the process for identifying staff for counseling during this Monitoring Period. *See* Tenth Monitor's Report at pgs. 168 to 170.

[162] Beginning in October 2022, CDs could be adjudicated for up to 10 compensatory days, but only a very small number of CDs (~20 CDs in total) were adjudicated for 5-10 days in November 2022 and December 2022.

- *Immediate Corrective Action*

The need for immediate corrective action is essential for ensuring that blatant misconduct is addressed swiftly. Rapid Reviews, *ad hoc* reviews by uniform or civilian leadership through routine assessment of incidents, and Intake Investigations are responsible for identifying misconduct for immediate corrective action. Immediate corrective action (suspension, re-assignment, counseling, and Command Disciplines) is a necessary tool for addressing misconduct because it allows the Department, close-in-time to the incident, to hold staff to a common standard for utilizing force, particularly when deviations from that standard are immediately obvious upon the incident's review. The Department utilized the following immediate corrective actions during this Monitoring Period:

| Immediate Corrective Action Imposed for UOF Related Misconduct by Incident Date | | | | | | |
|---|---|---|---|---|---|---|
| **Type** | **Jan.-June 2020** | **July-Dec. 2020** | **Jan.-June 2021** | **July-Dec. 2021** | **Jan.-June 2022** | **July-Dec. 2022** |
| Counseling and Corrective Interviews | N/A | 1,337 | 1,509 | 1,733 | *1,653* | *929* |
| CD – Reprimand | 37 | 89 | 150 | 120 | *133* | *165* |
| CDs (resulting in 1-5 days deducted) | 263 | 410 | 511 | 283 | *285* | *349* |
| Suspension | 38 | 42 | 58 | 25 | *34* | *39* |
| Non-Inmate Contact Post or Modified Duty | 4 | 1 | 3 | 3 | *12* | *4* |
| *Suspensions & Non-Inmate Contact Post or Modified Duty* | *42* | *43* | *55* | *26* | *39* | *43* |
| **Grand Total Immediate Action** | **342** | **1,879** | **2,231** | **2,161** | **2,042** | **1,345** |

The Department identifies a significant number of instances that merit immediate corrective action. Counseling or corrective interviews are the most recommended immediate action response (via Rapid Reviews) to identified misconduct. This is reasonable as they are an opportunity for supervisors to provide feedback and guidance, which is a key component of effective and good leadership. A more detailed discussion regarding the corrective action recommended from Rapid Reviews is discussed in the Compliance Assessment (First Remedial Order § A., ¶ 1) section of this report. As discussed in previous reports, the quality of a counseling session is nearly impossible to effectively measure or quantify. Based on the current state of affairs at DOC, and the Monitoring Team's overall assessment of supervision in the Department, there remains a dearth of strong and effective leadership at DOC at the facility-level, which means the quality of the counseling sessions are not currently expected to be particularly effective. That said, the fact that the Department is identifying staff that require counseling, and that these meetings are happening, is a critical *first* step in improving the management of staff. As noted further below, the use of CDs can and should be expanded, including improvement in ensuring that CDs are processed as required.

Finally, the Department's use of suspension and/or non-inmate contact/modified duty as an immediate corrective action is critical given the importance of a timely response to misconduct and the otherwise protracted disciplinary process. Understandably, the Department wants to ensure that the use of suspensions is utilized in cases where it is merited given it occurs before a full investigation is complete. That said, the presence of objective evidence (mainly video) does identify certain cases where such a close-in-time response is merited. In the summer of 2022, the Monitoring Team found that ID's recommendations for suspensions began to wane. The Deputy Commissioner of Investigations reported a preference for utilizing Memorandums of Complaint in lieu of suspensions. It is unclear why ID elected to limit its use of suspensions but given the current level of misconduct and the need for swift and immediate accountability, this position is concerning (as discussed in more detail in the Compliance Assessment (Investigations) section of this report). In response to feedback from the Monitoring Team, the use of suspensions increased towards the end of the Monitoring Period. While the Department's use of suspensions began to decline in the summer of 2021 during the staffing crisis, the number of Use of Force related suspensions began to increase again in 2022. From January to June 2022 (14th Monitoring Period), the Department suspended 34 staff and from July to December 2022 (15th Monitoring Period) the Department suspended 39 staff. The number of suspensions in 2022 is now consistent with levels prior to the 2021 staffing crisis. That said, the Monitoring Team has long noted that given the protracted delays in imposing discipline suspensions can and must be used in cases with objective evidence of wrongdoing, especially in more egregious instances. As discussed in the Compliance Assessment (Investigations) section of this report, instances still remain in which immediate action should have been taken and it was not. Further, the number of individuals placed on posts in which they do not interface with persons in custody is utilized sporadically (with a slight increase in the use of this tool in the 14th Monitoring Period in response to feedback from the Monitoring Team). While the Monitoring Team fully appreciates that placing staff in positions that do not have contact with persons in custody is a challenging management issue and could create perverse incentives for certain staff, there are certain staff who are in a position where placement on posts with contact with persons in custody is simply unreasonable and creates a known risk of harm. To that end, the consideration of placing individuals in non-contact posts should be utilized more frequently given the type of misconduct that continues to be identified by the Monitoring Team.

- *Command Discipline*

A Command Discipline ("CD") is a significant corrective action that can be imposed at the facility-level (in addition to counseling). It is a necessary accountability tool because it can be completed closer-in-time to when an incident occurs (compared to formal discipline) and result in either days deducted, corrective interviews, or reprimands. Most importantly, a Command Discipline allows facility leadership to directly address misconduct occurring in their facility and respond to certain staff misconduct in a fair and timely manner. This is a critical component to the accountability process and necessarily supports the much needed culture change in the jails.

The Department promulgated a revised Command Discipline Policy in October 2022.[163] The revised policy expands the potential penalty of a Command Discipline from 5-days to 10 days, provides more specific penalty guidelines for specific types of violations, and expands the pool of supervisors who may serve as hearing officers. Under the revised CD Policy, the command now also has 60 days to initiate a CD in CMS, compared with only 30 days in the previous policy. The goal of this change is to ensure there is sufficient time to process CDs and minimize dismissals due to processing delays. This additional time balances the need for close in time accountability while providing some necessary time for processing of CDs. Prior to these revisions, the Department had filled the limitations and gaps in the CD policy with an initiative in the Trials Division. The Trials Division created a mechanism to essentially mimic and expand the use of Command Disciplines so it could more appropriately address certain lower-level misconduct using a Command Discipline via a Negotiated Plea Agreement (which can impose a sanction of up to five compensatory days) or offering that the imposed discipline (generally between five and 20 days) will only remain on the staff member's record for one year[164] instead of five years.[165] Under the expanded revised Command Discipline Policy, utilizing CDs for those cases that merit it will reduce the stress on the Trials Division so the focus of the Trials Division can remain on the imposition of formal discipline for those cases that merit greater scrutiny, focus, and resources to address.

The CD policy revisions are expected to provide a useful path toward increased close-in-time discipline for lower-level use of force violations. Overall, the Monitoring Team has long supported the use of Command Discipline to address lower level operational and procedural errors as it is consistent with sound correctional practice. The revisions to the Command Discipline policy are appropriate and necessary to ensure that the Department has a practical, effective mechanism to respond to the variety of use of force misconduct. That said, while the procedures themselves are reasonable, the Department must also adjudicate the CDs appropriately and reasonably. As demonstrated in the data below, the Department has long struggled with appropriately and reliably adjudicating CDs, and must fortify the CD process to ensure that recommended CDs are in fact adjudicated and imposed.

The table below summarizes the results of all CDs referred from Rapid Reviews since 2019 based on an analysis conducted by NCU. The 15th Monitoring Period was a transition period for CDs. As discussed above, the CD policy was promulgated in October 2022, but the corresponding updates to CMS did not occur until February 2023 so most CDs processed in the 15th Monitoring Period were processed under the previous policy. For the Fifteenth Monitoring Period, the overall number of recommended CDs was the second highest number recommended since the tracking began. In particular, it appears that an increase in the number of recommended

---

[163] As required by the Action Plan § F, ¶ 3.

[164] The case will not be removed from the staff member's file if during this one-year period, the staff member is served with new charges on a Use of Force incident occurring after the date of signature on the Negotiated Plea Agreement.

[165] Cases are generally considered for this type of resolution when the proposed discipline is for approximately 6 to 15 compensatory days and it is the staff member's first offense.

CDs began in November 2022 after the new CD policy was promulgated. In terms of the status of CDs recommended in the Fifteenth Monitoring Period, **592** of 1,216 recommended CDs (49% of all referrals) have been adjudicated and resulted in substantive outcome (*e.g.* days deducted, a reprimand, a corrective interview, or a MOC), while **390** (32%) were dismissed or not processed, and **349** (19%) are still pending. As discussed in more detail below, **270** (22%) cases (this is a subset of the 390 cases discussed in the preceding sentence) were dismissed due to failures in processing, all of which is in the Department's control that could have been avoided.

| Status and Outcome of Command Disciplines Recommended by Rapid Reviews *As of December 2022 NCU Report* | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Month of Incident/Rapid Review | Total # of CDs Recommended | | Still Pending in CMS | | Resulted in 1-5 Days Deducted | | Resulted in MOC | | Resulted in Reprimand | | Resulted in Corrective Interview | | Dismissed at Hearing or Closed Administratively in CMS | | Never Entered into CMS | |
| *Jan.-June 2019 (8th MP)* | 757 | | 5 | 1% | 390 | 52% | 50 | 7% | 66 | 9% | 42 | 6% | 180 | 24% | 15 | 2% |
| *July-Dec. 2029 (9th MP)* | 878 | | 2 | 0% | 489 | 56% | 72 | 8% | 90 | 10% | 11 | 1% | 180 | 21% | 26 | 3% |
| *Jan.-June 2020 (10th MP)* | 492 | | 3 | 1% | 263 | 53% | 30 | 6% | 37 | 8% | 10 | 2% | 110 | 22% | 39 | 8% |
| *July-Dec. 2020 (11th MP)* | 948 | | 12 | 1% | 410 | 43% | 78 | 8% | 89 | 9% | 22 | 2% | 289 | 30% | 43 | 5% |
| *Jan.-June 2021 (12th MP)* | 1229 | | 41 | 3% | 511 | 42% | 131 | 11% | 150 | 12% | 15 | 1% | 318 | 26% | 65 | 5% |
| *July-Dec. 2021 (13th MP)* | 1126 | | 24 | 2% | 283 | 25% | 150 | 13% | 120 | 11% | 23 | 2% | 426 | 38% | 97 | 9% |
| *Jan.-June 2022 (14th MP)* | 907 | | 36 | 4% | 285 | 31% | 58 | 6% | 133 | 15% | 28 | 3% | 282 | 31% | 84 | 9% |
| *July-Dec. 2022 (15th MP)* | 1216 | | 234 | 19% | 349 | 29% | 50 | 4% | 165 | 14% | 28 | 2% | 285 | 23% | 105 | 9% |
| *Jul-22* | 152 | | 8 | 5% | 41 | 27% | 6 | 4% | 17 | 11% | 4 | 3% | 54 | 36% | 22 | 14% |
| *Aug-22* | 173 | | 12 | 7% | 47 | 27% | 18 | 10% | 27 | 16% | 2 | 1% | 46 | 27% | 21 | 12% |
| *Sep-22* | 160 | | 18 | 11% | 48 | 30% | 6 | 4% | 24 | 15% | 6 | 4% | 36 | 23% | 22 | 14% |
| *Oct-22* | 176 | | 24 | 14% | 49 | 28% | 5 | 3% | 27 | 15% | 3 | 2% | 60 | 34% | 8 | 5% |
| *Nov-22* | 267 | | 66 | 25% | 81 | 30% | 7 | 3% | 39 | 15% | 9 | 3% | 45 | 17% | 20 | 7% |
| *Dec-22* | 288 | | 106 | 37% | 83 | 29% | 8 | 3% | 31 | 11% | 4 | 1% | 44 | 15% | 12 | 4% |
| *CDs pending more than a year are not tracked in the CD reports analyzed for this chart and therefore may still appear pending although it is likely they have since been dismissed.* | | | | | | | | | | | | | | | | |

These data highlight a number of issues that must be addressed. First, CDs are not reliably adjudicated. While the facilities have improved in appropriately recommending CDs for adjudication, about one-third of those cases are subsequently dismissed.[166] While a dismissal of a CD may be appropriate at times, the high dismissal rate demonstrates that the process is not working as intended. Of the 390 cases dismissed or not processed during the current Monitoring Period:

o   31% (n=120) were dismissed for factual reasons including in response to a hearing on the merits, or because a staff member resigned/retired/was terminated.

o   69% (n=270) were dismissed because of due process violations (meaning the hearing did not occur within the required timeframes outlined in policy), because of a clerical error which invalidated the CD, or because

---

[166] It must be noted that given the large proportion of cases still pending, the full number of cases that may be dismissed from this Monitoring Period is not yet known, but the number of cases dismissed are expected to increase as these cases are resolved in the system.

the CD was not entered into CMS at all or not drafted within the required timeframe. It is this almost 70% of dismissals that are of concern to the Monitoring Team because they reflect a lack of proper management of an essential accountability tool.

Second, it must be noted that those cases that are adjudicated must be scrutinized to ensure the outcome is reasonable. Facility leadership have long exhibited an over reliance on the use of a reprimand and corrective interview (on average about 15% of closed CDs are resolved with either a reprimand or corrective interview) or imposed the lowest possible number of days. While these responses are certainly appropriate in some cases, it must be reasonable under the circumstances of each case. Improved and more robust oversight of the adjudication of CDs must occur to ensure that even those cases that are addressed with a CD are appropriate and consistent with the policy.

The Command Discipline process is a necessary accountability tool, and the appropriate revisions to the policy reflect a balanced and improved approach to address less serious misconduct at the facility level. Further, facilities are generally recommending a Command Disciplines appropriately as a corrective action for a violation identified in the Rapid Reviews. However, CDs must be reliably adjudicated. NCU has consistently audited CDs for years, and these audits provide valuable information regarding the current status of CD processing. However, the Department is not effectively analyzing and applying what is learned in these NCU audits to improve the CD process. Therefore, significant improvement in *practice* is needed to minimize administrative errors and management failures in processing CDs. This also includes improved oversight of the determination of CDs. The Monitoring Team has long recommended that the Department improve its practice and these recommendations have gone unaddressed.

- *Status of Cases Referred for Formal Discipline*

Overall, between November 1, 2015 and December 31, 2022, formal discipline has been imposed on tenured staff in at least 4,764 *cases* (involving approximately 2,780 individual staff members).[167] It is important to note that the number of disciplinary cases relate to individual staff actions versus use of force incidents. For instance, in 2020, 690 individual cases were referred for discipline from 447 use of force incidents. With respect to cases related to incidents from 2021, 669 individual cases were referred for discipline from 533 unique use-of-force incidents. For incidents that occurred 2022, 233 individual cases have been referred from 177 unique incidents, with 799 investigations still pending (about 360 are Full ID investigations in which a referral for discipline is more likely) which may identify more cases when the investigations are closed. Investigations remain pending, so more case referrals related to 2022 cases are expected. As discussed in other sections of this report, the Monitoring Team has found that ID is not referring cases for discipline at the same rate it has in the past.

---

[167] The tracking of disciplinary data was not routinely kept until 2017 so additional discipline may have been imposed between November 1, 2015 and January 2017, but was not formally accounted for.

The table below presents the status of all cases referred for formal discipline (by *incident date*). These data illustrate that about 275 cases with incident dates over a year ago (*i.e.*, 2021 or earlier) remain pending, and thus the opportunity for *timely* discipline has clearly been lost.

| Status of Cases of Disciplinary Cases & Pending Investigations by Date of Incident *As of December 2022,* | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2016 | | 2017 | | 2018 | | 2019 | | 2020 | | 2021 | | 2022 | | Total | |
| Total Individual Cases | 471 | | 620 | | 783 | | 1025 | | 690 | | 669 | | 233 | | **4,491** | |
| Closed Cases | 470 | 99% | 612 | 99% | 767 | 98% | 994 | 97% | 662 | 96% | 478 | 71% | 99 | 42% | **4,082** | **91%** |
| Pending Cases | 4 | 1% | 8 | 1% | 16 | 2% | 31 | 3% | 28 | 4% | 191 | 29% | 134 | 58% | **409** | **9%** |
| | | | | | | | | | | | | | | | | |
| Unique UOF Incidents | | | | | 458 | | 606 | | 447 | | 533 | | 177 | | | |
| Pending Invests. | 0 | | 0 | | 0 | | 0 | | 0 | | 1 | | 799 | | **800** | |

The Trials Division now has the opportunity to address cases closer in time to when the incident occurs. The cases being referred to Trials are more contemporaneous (and the previous ID backlog has been resolved), but the speed with which cases are investigated and referred must still be improved. The reduction in the number of cases pending with Trials is presented in the chart below. As of the end of December 2022, the number of cases pending has decreased almost 80% from the number pending at the end of 2021. This marks an enormous accomplishment for the Trials Division in which the number of pending cases has not only decreased for the first time in years, but is the lowest since June of 2019. This reduction in pending cases is a direct reflection of the significant number of cases closed in the last year (n=2,163). As discussed in more detail in other sections of this report, the number of pending cases has also been impacted by a reduction in the number of referrals for discipline by the Investigation Division.

| Disciplinary Cases Pending *as of December 2022,* | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| As of the last day of… | June 2018 (6th MP) | Dec. 2018 (7th MP) | June 2019 (8th MP) | Dec. 2019 (9th MP) | June 2020 (10th MP) | Dec. 2020 (11th MP) | June 2021 (12th MP) | Dec. 2021 (13th MP) | June 2022 (14th MP) | Dec. 2022 (15th MP) |
| Pending Cases | *146* | *172* | *407* | *633* | *1,050* | *1,445* | *1,917* | *1,911* | *1,129* | *409* |

- *Discipline Imposed*

The table below shows the number of disciplinary cases closed by the Department every year since 2017 and the type of disposition. The Trials Division closed more cases in 2022 (n=2,163) than in any other ***full year*** of monitoring and almost as many disciplinary cases closed in than the previous 5 years ***combined*** (n= 2,225 for

cases closed in 2017 to 2021). In fact, the number of NPAs imposed in 2022 (n=1,773) is more than the number of NPAs imposed in the last 4 years ***combined*** (n=1,481).

| Disciplinary Cases Closed by Department<br>By Date of Ultimate Case Closure | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Date of Formal Closure | 2017 | | 2018 | | 2019 | | 2020 | | 2021 | | 2022 | | Jan to Jun.2022 | | July. To Dec, 2022 | |
| Total Cases Resolved | 487 | | 513 | | 268 | | 382 | | 575 | | 2,163 | | 1,101 | | 1,062 | |
| NPA | 395 | 81% | 483 | 94% | 221 | 82% | 327 | 86% | 450 | 78% | 1,773 | 82% | 888 | 81% | 885 | 83% |
| Adjudicated/Guilty | 4 | 1% | 3 | 1% | 0 | 0% | 4 | 1% | 16 | 3% | 42 | 2% | 21 | 2% | 21 | 2% |
| | | | | | | | | | | | | | | | | |
| Administratively Filed | 68 | 14% | 18 | 4% | 33 | 12% | 31 | 8% | 33 | 6% | 145 | 7% | 60 | 5% | 85 | 8% |
| Deferred Prosecution | 20 | 4% | 7 | 1% | 12 | 4% | 16 | 4% | 75 | 13% | 199 | 9% | 131 | 12% | 68 | 6% |
| Not Guilty | 0 | 0% | 2 | 0% | 2 | 1% | 4 | 1% | 1 | 0% | 4 | 0% | 1 | 0% | 3 | 0% |

Among the 1,773 NPAs imposed during in 2022, 288 (13%) addressed misconduct that occurred within one year of case closure, 515 (24%) addressed misconduct that occurred between 1 and 2 years prior, 657 (30%) addressed misconduct that occurred 2 to 3 years prior, and 703 (33%) addressed misconduct that occurred more than three years before the case was ultimately resolved. Given the presence of a backlog, the ability to address cases closer in time to the incident is hampered. Accordingly, when the discipline imposed is divorced in time from the time the misconduct occurred, it detracts from the meaningfulness of the discipline and the ability to intervene timely and prevent subsequent misconduct. The significant reduction in the number of pending cases means the Department can improve its ability to address cases closer in time going forward.

| Time Between Incident Date and Case Closure or Pending as of December 31, 2022 | | | | | | |
|---|---|---|---|---|---|---|
| | Closed Discipline | | Pending Discipline | | Total | |
| 0 to 1 year from incident date | 288 | 13% | 134 | 33% | 422 | 16% |
| 1 to 2 years from incident date | 515 | 24% | 191 | 47% | 706 | 27% |
| 2 to 3 years from incident date | 657 | 30% | 28 | 7% | 685 | 27% |
| More than 3 years from incident date | 703 | 33% | 56 | 14% | 759 | 30% |
| Total | 2,163 | | 409 | | 2,572 | |

- *Disciplinary Continuum*

It is critical for the Department to have a continuum of disciplinary options because the severity of misconduct varies, and so that discipline can become progressively more severe for subsequent misconduct by an individual. As shown in the table below, the Department imposes a broad spectrum of sanctions from Command

Disciplines of up to a maximum of 5-day penalty,[168] to more significant penalty days via formal discipline, to termination.

During this Monitoring Period, the discipline imposed via NPA was for lesser compensatory days. For instance, 40% of cases closed with a sanction of 1 to 9 days compared with 27% in the last Monitoring Period. Further, a sanction or 30 days or more was utilized in 21% of cases in this Monitoring Period compared with 30% in the previous Monitoring Period. As demonstrated in the chart below the proportion of sanctions imposed have fluctuated across the years. Of course, the underlying misconduct must drive the sanction imposed and so these data does not necessarily mean the discipline is unreasonable. Further, given the need and focus on eliminating the backlog, some cases may be resolved with lesser sanctions. That said, given the reduction in the number of pending cases, and the expansion of CD Directive, the frequency with which the Trials Division utilized Lowe level sanctions and expungement (discussed in more detail below) must be closely scrutinized and presumptively should be reduced going forward.

With respect to termination of staff for use of force misconduct, more tenured staff have been terminated this year (n=10) than in the last five years combined (in which 5 staff were terminated between 2017 and 2021). These terminations occur after a trial and, as discussed in more detail below, this is likely a reflection that the Report & Recommendations from OATH ALJ's more closely align with the disciplinary guidelines.

---

[168] Trials no longer settles a case for an undetermined number of Command Discipline days, which would require a hearing at the facility for the reasons discussed in the Seventh Monitor's Report at pgs. 42-44.

| Date of Formal Closure | 2017 | | 2018 | | 2019 | | 2020 | | 2021 | | 2022 | | Jan to Jun. 2022 | | Jul to Dec. 2022 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Penalty Imposed for UOF Related Misconduct NPAs** | | | | | | | | | | | | | | | | |
| **Total** | 395 | | 483 | | 221 | | 327 | | 450 | | 1,773 | | 1,773 | | 885 | |
| Refer for Command Discipline[169] | 71 | 18% | 66 | 14% | 3 | 1% | 79 | >1% | 4 | 1% | 79 | 4% | 12 | 1% | 67 | 8% |
| 1-5 days | 31 | 8% | 147 | 30% | 53 | 24% | 438 | 24% | 64 | 14% | 438 | 25% | 189 | 21% | 249 | 28% |
| 6-9 days | 14 | 4% | 19 | 4% | 6 | 3% | 163 | 4% | 29 | 6% | 163 | 9% | 51 | 6% | 112 | 13% |
| 10-19 days | 62 | 16% | 100 | 21% | 57 | 26% | 445 | 25% | 109 | 24% | 445 | 25% | 259 | 29% | 186 | 21% |
| 20-29 days | 74 | 19% | 58 | 12% | 42 | 19% | 158 | 14% | 64 | 15% | 158 | 9% | 95 | 11% | 62 | 7% |
| 30-39 days | 42 | 11% | 42 | 9% | 21 | 10% | 168 | 10% | 43 | 10% | 168 | 9% | 97 | 11% | 72 | 8% |
| 40-49 days | 27 | 7% | 30 | 6% | 4 | 1% | 96 | 5% | 53 | 11% | 96 | 5% | 69 | 8% | 27 | 3% |
| 50-59 days | 14 | 4% | 4 | 1% | 17 | 8% | 80 | 5% | 18 | 4% | 80 | 5% | 40 | 5% | 40 | 5% |
| 60 days + | 48 | 12% | 12 | 2% | 11 | 5% | 118 | 9% | 42 | 9% | 118 | 7% | 72 | 8% | 46 | 5% |
| Demotion | | | | | | | | | | | 5 | 6% | 0 | 0% | 5 | 1% |
| Retirement/Resignation | 12 | 3% | 5 | 1% | 7 | 3% | 23 | 3% | 24 | 6% | 23 | 1% | 4 | 0% | 19 | 2% |
| Termination | 0 | | 1 | | 0 | | 0 | | 4 | | 10 | | 6 | | 4 | |

In order to evaluate the Department's overall efforts to impose appropriate discipline that it is consistent with the Disciplinary Guidelines, the Monitoring Team considers: (1) the specific facts of the case (including the aggravating and mitigating factors, the staff's prior history, and other circumstances as appropriate), (2) the time taken to impose discipline (discussed throughout the report), and (3) the proportionality of the sanctions imposed.

In 2022, the Monitoring Team assessed almost 800 of the cases closed with discipline that occurred after October 27, 2017, to determine whether the discipline imposed was reasonable and appeared consistent with the Disciplinary Guidelines (note, additional cases were closed in this Monitoring Period that occurred prior to October 27, 2017, but were not considered as part of this assessment).

Overall, the Monitoring Team has found that the majority of discipline imposed was reasonable (albeit delayed). In this Monitoring Period, the Monitoring Team evaluated 397 incidents and found that the discipline imposed was reasonable in about 73% of cases and was questionable for 23% of cases. This is not to say that the discipline in these cases was blatantly disproportional, but rather that a more severe penalty may have been appropriate, but mitigating factors may have favored closure of the case with a lower sanction. Finally, about 4% of the cases reviewed found that the discipline imposed may have been unreasonable. While most of the discipline was found to be reasonable, it is worth noting the Monitoring Team found a slight increase in the number of cases in which the closure was questionable and potentially unreasonable. This will be an area of focus going forward to ensure that this group of cases does not increase further.

---

[169] As discussed in the Seventh Monitor's Report (at pgs. 42-44), NPAs referred for CDs were previously adjudicated at the Facilities after being referred from the Trials Division which was rife with implementation issues. This problem has been corrected and now the Trials Division will negotiate a specific number of days (1 to 5) to be imposed and those specific days will be treated as a CD, rather than an NPA (the main difference is the case remains on the staff member's record for one year instead of five years).

- *Discipline Not Imposed*

At times, cases referred for discipline may not ultimately result in a sanction imposed either because the staff member resigns or retires before the prosecution is complete or because the charges are dismissed.

- Deferred Prosecution: These are cases in which the staff chose to leave the Department *with charges pending* and before the case is resolved. Such cases are categorized as "deferred prosecution" because no final determination has been rendered but the facts suggest the case should not be dismissed. This disposition has become increasingly common and appears to be related to the large number of staff who have left the Department in recent years. When this occurs, the Department defers prosecution, which would then proceed if the staff member were to return to the Department in the future. If the staff member should return to DOC, then the Department would proceed with prosecuting the case. In 2022, 9% of cases (n=199) were resolved with a deferred prosecution, which is a decrease in the proportion of cases closed with deferred prosecution in 2021 (when 13% of cases closed with a deferred prosecution), but an overall increase from the last few years where the proportion of cases closed with a deferred prosecution was about 4%.

- Administratively Filed Cases: Administrative filings occur when the Trials Division determines that the charges cannot be substantiated or pursued (*e.g.*, when the potential misconduct could not be proven by a preponderance of the evidence, or when a staff member resigns before charges are served). In other words, these cases are dismissed. During this Monitoring Period, 85 cases were closed with administrative filings, which represents about 8% of case closures. In 2022, 145 cases were closed with administrative filings, which represents about 7% of case closures. The Monitoring Team evaluated all the closing memos for the 145 administratively filed cases. Over half of the cases were dismissed on various procedural grounds (*e.g.*, the respondent retired or was already terminated, the MOC was duplicative, or the incorrect staff member was served) and the dismissal of these cases appeared reasonable. About half of the cases that were dismissed were due to a finding that they could not be proven beyond a preponderance of the evidence. Of those cases reviewed, a small handful (~5 cases) seemed unreasonable based on the available evidence reviewed by the Monitoring Team. Overall, the cases closed via administrative filing have an objectively reasonable basis with a few exceptions and so the Department has maintained Substantial Compliance with this requirement.

## Backlog of Pending Cases

The Trials Division was faced with mounting groups of pending cases, at its height in 2021, almost 2,000 cases were pending discipline. As a result, the Third Remedial Order required the Trials Division to first close a group of 400 priority cases followed by systematically closing out the rest. To facilitate this effort, the Monitoring Team was required to identify and recommend steps that the City, Department, and OATH should take to close the cases remaining in the backlog. To that end, the Monitoring Team recommended that the Department close all pending cases for incidents that had occurred as of December 31, 2020 ("the 2020 backlog")

by the end of 2022 (*see* the Monitor's June 30, 2023 Report at pgs. 35 to 37). At the time, the 2020 backlog consisted of 1,100 cases. As of the end of this Monitoring Period, and all but 87 cases had been resolved. The Trials Division reports that the remaining cases pending could not be resolved because the staff member was on long term leave or additional time was needed to close the case. As of the filing of this report, only 65 cases of the 2020 backlog remain pending.

The Trials Division has exerted significant effort and resources to resolve the 2020 backlog, which did not even seem achievable a year ago. The elimination of the 2020 backlog is an important step to moving towards imposing timely discipline, but it did not eliminate the *entire* backlog. There are still hundreds of cases pending over a year since the incident occurred. To that end, and as required by the Third Remedial Order, the Monitoring Team has recommended that the cases pending in which the incident occurred between January 1, 2021 to June 30, 2022 must be resolved by July 15, 2023. Closure of this final group of cases will eliminate the current backlog and permit the Trials Division to truly address cases that have happened closer in time.

**Expeditious Prosecution of Cases**

The Trials Division coordinates with multiple stakeholders to resolve a case, including the respondent (and their counsel) as well as OATH (to the extent a pre-trial conference or trial is needed). The Department's ability to prosecute cases expeditiously has been of significant concern for years and the slow rate of progress has resulted in requirements to address the many facets of the disciplinary process through the First Remedial Order (§ C. ¶¶ 3 to 5), the Third Remedial Order, and now the Action Plan (§ F). For purposes of this analysis, the Monitoring Team's timeliness assessment (and data in the tables below) begins *after* the investigation has been closed and referred and examines the time required to process a case from when it has been received by the Trials Division.

The Trials Division improvements of many different practices, policies, and procedures, and influx of staff, and the retooling of the disciplinary process at OATH has finally begun to bear fruit. It finally appears achievable for the Trials Division to expeditiously prosecute cases once the final group of backlogged cases has been eliminated.

Detailed below is a summary of the efforts taken in 2022 by the Trials Division.

- **Closed Cases**: The Trials Division closed 2,163 cases in 2022, which is the most closed in a year and almost as many cases closed in the last 5 years combined. This increase in the number of cases closed has had a corresponding impact on the size of the Trials backlog. The number of pending cases (n=409) as of the end of December is down 64% from the end of June (n=1,129, the end of the previous Monitoring Period).

- **Time to Close Cases**: The length of time to case closure—measured from the date the case was referred from ID—has increased every Monitoring Period since 2019 when the referral of cases from the ID backlog began and Trials Division's own backlog began to grow. It is therefore not surprising that in 2022, 61% (n=1,245) of cases were closed more than a year after referral from ID. The proportion of

cases closed beyond a year (given the magnitude of the backlog) obscures a significant improvement in the Trials Division's ability to close cases more quickly from the time of referral. In 2022, the Trials Division closed 329 cases within 6 months of referral from ID and a total of 725 cases within one year of referral. The total number of cases closed within a year of referral is the largest number of cases the Trials Division has closed within a year of referral since the effective date of the Consent Judgment (the second highest number of cases closed within a year of referral was in 2018 when 428 cases were closed within a year of referral). While closure of cases within a year of referral is still way too long, the fact that the Trials Division has been able to increase the number of cases closed in this time period reflects significant improvement which must be built upon.

| Time from Referral to Trials to Complete Closing Memo 2017 to 2022 | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2017 | | 2018[170] | | 2019[171] | | 2020 | | 2021 | | 2022 | | Jan to Jun. 2022 | | Jul to Dec. 2022 | |
| Cases Closed | 492 | | 521 | | 271 | | 387 | | 736 | | 2,040 | | 1,033 | | 1,007 | |
| 0 to 3 months | 68 | 14% | 282 | 54% | 62 | 23% | 75 | 19% | 40 | 5% | 155 | 8% | 61 | 6% | 94 | 9% |
| 3 to 6 months | 64 | 13% | 92 | 18% | 65 | 24% | 65 | 17% | 88 | 12% | 174 | 9% | 84 | 8% | 90 | 9% |
| 6 to 12 months | 124 | 25% | 54 | 10% | 89 | 33% | 121 | 31% | 210 | 29% | 396 | 19% | 224 | 22% | 172 | 17% |
| 1 to 2 years | 146 | 30% | 51 | 10% | 35 | 13% | 98 | 25% | 284 | 39% | 781 | 38% | 434 | 42% | 347 | 34% |
| 2 to 3 years | 70 | 14% | 10 | 2% | 5 | 2% | 14 | 4% | 81 | 11% | 369 | 18% | 160 | 15% | 209 | 21% |
| 3+ Years | 20 | 4% | 9 | 2% | 6 | 2% | 2 | 1% | 11 | 1% | 95 | 5% | 34 | 3% | 61 | 6% |
| Unknown | 0 | 0% | 23 | 4% | 9 | 3% | 12 | 3% | 22 | 3% | 70 | 3% | 36 | 3% | 34 | 3% |

- **<u>Pending Cases</u>**: Another way to examine timely prosecution of cases is to examine how long cases have been pending with the Trials Division. Over 1,000 cases remained opened at the end of the previous 5 Monitoring periods, with many pending for over a year. At the end of the 15th Monitoring Period, the Department had 409 cases pending with a little over a quarter pending for over a year.

---

[170] Data for 2017 and 2018 was calculated between MOC received date and date closing memo signed.

[171] Data for 2019 and 2020 was calculated between date charges were served and date closing memo signed.

| Cases pending with Trials at the end of the Monitoring Periods | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | July to Dec., 2019 | | Jan. to June, 2020 | | July to Dec. 2020 | | Jan. to June, 2021 | | July to Dec. 2021 | | Jan. to June, 2022 | | July to Dec., 2022 |
| | *9th MP* | | *10th MP* | | *11th MP* | | *12th MP* | | *13th MP* | | *14th MP* | | *15th MP* |
| *Pending service of charges* | 37 | 6% | 42 | 4% | 47 | 3% | 64 | 3% | 84 | 4% | 55 | 5% | 36 | 9% |
| *Pending 120 days or less since service of charges* | 186 | 28% | 373 | 36% | 325 | 22% | 420 | 22% | 217 | 11% | 137 | 12% | 124 | 30% |
| *Pending 121 to 180 days since service of charges* | 111 | 17% | 115 | 11% | 165 | 11% | 145 | 8% | 64 | 3% | 70 | 6% | 47 | 11% |
| *Pending 181 to 365 days since service of charges* | 202 | 30% | 278 | 26% | 467 | 32% | 511 | 27% | 501 | 26% | 182 | 16% | 77 | 19% |
| *Pending 365 days or more since service of charges* | 80 | 12% | 219 | 21% | 413 | 29% | 701 | 37% | 930 | 49% | 616 | 55% | 105 | 26% |
| *Pending Final Approvals by DC of Trials and/or Commissioner* | 30 | 5% | 9 | 1% | 15 | 1% | 66 | 3% | 109 | 6% | 66 | 6% | 10 | 2% |
| *Pending with Law Enforcement* | 17 | 3% | 14 | 1% | 13 | 1% | 10 | 1% | 6 | 0% | 3 | 0% | 10 | 2% |
| **Total** | **663** | | **1,050** | | **1,445** | | **1,917** | | **1,911** | | **1,129** | | **409** | |

- **Initiatives to achieve a prompt agreed-upon resolution of disciplinary cases when appropriate:** The Monitoring Team has long advocated that cases can and should be resolved between the Department and the staff member (and their representative, if needed) without having to proceed to a trial. As part of this effort, the number of pre-trial conferences at OATH have increased exponentially (as discussed in more detail below) so that, if a settlement could not be reached among the Parties, the Parties could address the cases with an Administrative Law Judge ("ALJ). The increased scheduling of pre-trial conferences ensures that more cases are addressed among the parties. Additionally, the Department continued to encourage cases to settle pre-trial and to expedite case closure by 1) addressing certain lower-level misconduct using a Command Discipline via a Negotiated Plea Agreement (which can impose a sanction of up to five compensatory days) or 2) offering that the imposed discipline (generally between five and 20 compensatory days) would only remain on the staff member's record for one year[172] instead of five years.[173] As the Monitoring Team has previously reported, these two options are reasonable given that the range of misconduct that is now directed through Trials varies in its severity (compared with historical practice in which ID was only investigating the most egregious cases and so only cases with egregious misconduct were referred to the Trials Division). As noted above, given the evolution of the cases pending and other dynamics (including revisions to the CD policy), the Monitoring Team has

---

[172] The case will not be removed from the staff member's file if during this one-year period, the staff member is served with new charges on a Use of Force incident occurring after the date of signature on the Negotiated Plea Agreement.

[173] Cases are generally considered for this type of resolution when the proposed discipline is for approximately 6 to 15 compensatory days and it is the staff member's first offense.

recommended these initiatives be re-evaluated and that reliance on such an approach can be reduced as it may not be necessary going forward.

## Appeals

Over the last year, there has been an increase in the number of appeals, which is not surprising given the increased number of cases resolved. The Commissioner's determination (and imposition of discipline as warranted) is subject to appeal to the Civil Service Commission[174] or as an Article 78 proceeding. According to § 3-01 to 3-04 of Title 60 of the Rules of the City of New York, any civil service employee who receives a determination of guilty and/or a penalty can file an appeal with the Civil Service Commissioner within 20 days of the date of notice of the final disciplinary action. Upon a timely appeal, DOC has 30 days to submit the complete record of the disciplinary proceedings after receiving the notice of the appeal. The Civil Service Commission then reviews the record of the disciplinary proceeding, allows the parties to submit further written arguments, and can schedule a hearing before issuing a final decision. The Civil Service Commission then issues a written decision which will affirm, modify, or reverse the determination being appealed. The Civil Service Commission may, at its discretion, direct the reinstatement of the employee or permit transfer to a vacancy in a similar position in another division or department, or direct that the employee's name be placed on a preferred list.

As a result of the increased number of appeals, the Trials Division has designated 4 attorneys (one supervisor and three attorneys) to support appeals as they are made. These four attorneys will maintain other work within the Division, but, if and when an appeal is made, they will work with the attorney who prosecuted the case to ensure timely submission of the appeal and provide support and guidance on the case law.

In 2022, 14 staff appealed the Commissioner's adoption of R&Rs filed in 2022. One staff member has appealed his termination by the Commissioner (who adopted the ALJ's R&R following an OATH trial) via an Article 78 appeal and that case is still pending. Of the 14 appeals brought before the Civil Service Commissioner, the Civil Service Commission affirmed the determination in 10 cases, 2 cases are pending, 1 case was found to be moot because of a post-appeal settlement between Commissioner Molina and COBA President Boscio, and 1 case was overturned by the Civil Service Commission.

In the most concerning decision by the Civil Service Commission, the Civil Service Commission overturned the Commissioner's adoption of the OATH R&R recommending termination of a staff member and instead imposed a penalty of 60 compensatory days. In this case, the Civil Service Commission agreed that the Respondent engaged in unnecessary and excessive force and falsified his involvement in the case, so there is no dispute about the facts. However, the Commission found that the penalty should be the maximum penalty short of termination due to mitigating factors including Respondent's "unblemished employment record over his fourteen-

---

[174] Pursuant to Section 813 of the New York City Charter, the Civil Service Commission can decide appeals from permanent civil servants who were subject to disciplinary penalties following proceedings held pursuant to section 75 of the Civil Service Law.

year tenure as a Correction Officer," and the fact that neither inmate was seriously injured. Further, the Civil Service Commission noted that since this case occurred before the effective date of the Disciplinary Guideline, October 27, 2017, the disciplinary guidelines did not apply in this case.

This determination raised a number of concerning issues. As an initial matter, it appears that another City agency has undermined the Department's efforts to take the steps required by the Consent Judgment. Further, this case sets a concerning precedent regarding the appropriate standard for assessing misconduct going forward. As the Monitoring Team has long noted, consideration of whether there was a serious injury as a result of the use of force, particularly one that was inappropriate, unnecessary, or excessive, is an inappropriate standard.[175] The misconduct must be judged based on the *risk of harm.* This is particularly true in this case where the staff member utilized deadly force in a case where it was not merited. *See* Consent Judgment, § VIII. (Staff Discipline and Accountability), ¶ 1. Further, whether or not the disciplinary guidelines were in place when the incident occurred does not absolve the City and Department from implementing a zero tolerance policy for unnecessary and excessive force, which was in effect at the time this misconduct occurred. *See* Consent Judgment, § IV. (Use of Force Policy), ¶ 3(a). Finally, in an egregious case of use of force misconduct, such as this one, the fact that the individual may not have engaged in misconduct in the past should not preclude the imposition of termination in this case. That is simply not appropriate.

The Department has filed a motion for reconsideration and the motion is pending with the Court, which recently sought clarification from the Department on a number of questions. In short, the determination of the Civil Service Commission raises serious concerns about the impact on the City and Department's ability to meet the requirements of the Consent Judgment, Remedial Orders, and the Action Plan.

**Conclusions**

*Consent Judgment § VIII., ¶ 1:* The Department has taken many steps to impose appropriate and meaningful discipline, up to and including termination. While the meaningfulness of the discipline has so far been undercut by the backlog, the significant steps taken are sufficient to keep the Department out of Non-Compliance and on a

---

[175] See, Seventh Monitor's Report at pgs. 156 to 157 (dkt. entry 327) ". . . the emphasis placed on whether the inmate sustained serious injuries . . . is misguided and fails to consider the potential *risk* of harm the staff conduct posed, or the *serious pain* that may have been inflicted on the inmate(s) but did not result in serious injury. It is unquestioned that staff actions can and do result in varying degrees of bodily pain with no visible or identifiable injury, *e.g.*, chokeholds, takedowns, wall slams, OC, painful escort holds, bodily strikes, etc. However, the risk of serious injury and the needless infliction of pain when bringing an incident under control is just as concerning as actions resulting in injuries. In fact, the risk of serious injury as well needless pain are two of the hallmarks of "excessive and unnecessary force" and thus are at the center of the concerns that gave rise to the Consent Judgment. Not only does this type of behavior contribute to a destructive culture, the gratuitous infliction of pain is every bit as actionable in class action lawsuits to address inhumane conditions and in staff disciplinary matters. Accordingly, failure to give similar weight to these two hallmarks has a direct impact on the Department's obligations to *seek* specific disciplinary sanctions pursuant to § VIII., ¶¶ 2 (c), (d), and to generally impose meaningful discipline for UOF misconduct violations pursuant to § VIII., ¶ 1."

path toward substantial compliance. Significant and sustained work is still needed to ultimately achieve substantial compliance.

*First Remedial Order § C., ¶ 1:* The Department has a number of avenues to take corrective action and does takes immediate corrective action. There is room for improvement in identifying cases for immediate action, especially by ID during the intake investigation. Additionally, it is critical that the Department provide adequate guidance to staff when misconduct is identified and ensure that Command Disciplines are processed as they should be.

*Consent Judgment § VIII., ¶ 3(c):* Trials staff continue to be both productive and efficient in addressing the backlog as the Trials Division has capitalized on the many improvements made to the system over the past two years. This year, the Trials Division has closed more cases than ever before in less time and generally the dispositions of cases are reasonable. Overall, this work has demonstrated that the initiatives prescribed by the Remedial Orders and Actions Plan are effective and progress can be achieved by working with multiple stakeholders in different roles (*e.g.* the Department, OATH, staff and their representatives). However, more work is necessary as cases are still not begin prosecuted as expeditiously as possible.

| | |
|---|---|
| **COMPLIANCE RATING** | **Consent Judgment § VIII., ¶ 1.** Partial Compliance |
| | **First Remedial Order, § C., ¶ 1.** Partial Compliance |
| | **Consent Judgment § VIII., ¶ 3(c)**<br><br>• Substantial Compliance (Charges per the 12th Monitor's Report)<br>• Substantial Compliance (Administrative Filing)<br>• Partial Compliance (Expeditiously Prosecuting Cases) |

| |
|---|
| **REMEDIAL ORDER § C. (TIMELY, APPROPRIATE, AND MEANINGFUL STAFF ACCOUNTABILITY), ¶ 2 (MONITOR RECOMMENDATIONS)** |
| § C., ¶ 2. Responding to Monitor Recommendations. Upon identification of objective evidence that a Staff Member violated the New Use of Force Directive, the Monitor may recommend that the Department take immediate corrective action, expeditiously complete the investigation, and/or otherwise address the violation by expeditiously pursuing disciplinary proceedings or other appropriate action. Within ten business days of receiving the Monitor's recommendation, absent extraordinary circumstances that must be documented, the Department shall: (i) impose immediate corrective action (if recommended), and/or (ii) provide the Monitoring Team with an expedited timeline for completing the investigation or otherwise addressing the violation (if recommended), unless the Commissioner (or a designated Assistant Commissioner) reviews the basis for the Monitor's recommendation and determines that adopting the recommendation is not appropriate, and provides a reasonable basis for any such determination in writing to the Monitor. |
| The First Remedial Order introduced a provision (§ C., ¶ 2) that requires the Department to respond within 10 business days to any recommendations from the Monitor to take immediate corrective action, expeditiously complete the investigation, and/or otherwise address the violation by expeditiously pursuing disciplinary proceedings or other appropriate action. The Action Plan, § F., ¶ 2, introduced an additional requirement for the Department to expedite egregious cases on specific |

timelines to ensure those cases are closed as quickly as possible. Given these two requirements are inextricably linked, they are addressed together herein.

**Monitor Recommendations for Immediate Action, etc. (Remedial Order § C., ¶ 2)**

The Monitoring Team is judicious in the recommendations that it makes to the Department with regard to immediate action cases and only identifies those cases where immediate action should be considered *and* the incident is not yet stale for *immediate* action to be taken. Given the Monitoring Team's role it is simply not often in a position to have contemporaneous information, and so there are inherent limitations on the scope of misconduct the Monitoring Team may identify and recommend for consideration of *immediate* action. For instance, if the Monitoring Team identifies an incident that warranted immediate corrective action (and none was taken), but the incident occurred many months prior, a recommendation is not shared because the appropriate window of opportunity for immediate action has passed. The recommendations shared herein are therefore only a subset of cases where immediate action was likely warranted but not taken. The Monitoring Team's overall goal is to mitigate lost opportunities for immediate action, but this approach is not failsafe.

Between July and December 2022 (the Fifteenth Monitoring Period), a total of **7 recommendations pursuant to § C., ¶ 2** of the First Remedial Order were submitted to the Department by the Monitoring Team, to take immediate corrective action.[176]

- In 4 of the 7 cases the Department had already filed formal charges against the staff members and declined to pursue immediate corrective action in light of the pending MOCs. As discussed in other areas of this report, the Monitoring Team has serious concerns about the Department's approach to defer the use of immediate corrective action (when warranted) and instead refer the case to the Trials Division given the protracted nature of the disciplinary process. The Monitoring Team continues to strongly recommend the use of immediate corrective action because certain misconduct must be addressed close-in-time to the incident, which is not possible under the current disciplinary process.
- In two cases, the Department imposed immediate corrective action in light of the recommendation (one suspension and one modified duty).

---

[176] With respect to recommendations to expedite the completion of investigations pursuant to the First Remedial Order § C., ¶ 2, as noted in the Monitor's October 28, 2022 Report at pg. 162, were not a fruitful avenue to ensuring those cases were addressed quickly. The Monitoring Team therefore now recommends expedited resolution of cases pursuant to the Action Plan, **§ F., ¶ 2** (the "F2" process) for cases that merit expedited completion of investigations or discipline and investigations. Accordingly, no recommendations were made this Monitoring Period to expedite cases pursuant to the First Remedial Order § C., ¶ 2.

- In one case, the Department concluded no immediate corrective action was warranted, and the completed investigation concluded that the force was necessary so the investigation was closed with no corrective action. This case is an example in which the Department not only missed the opportunity to impose *immediate* corrective action, but also failed to address the clear unnecessary and excessive use of force with any corrective action (immediate or otherwise). The investigation was unreasonable in light of the objective evidence that identified a number of serious violations. This type of flawed investigation is discussed in more detail in the Compliance Assessment (Investigations) section of this report.

### Expeditious Resolution of Egregious Misconduct (Action Plan § F., ¶ 2)

The Action Plan § F., ¶ 2 ("F2") sets aggressive timelines for the investigation and prosecution of egregious cases. This requirement went into effect in mid-June 2022. Pursuant to the Action Plan, a case identified as needing to be resolved in an expedited manner must be resolved as follows:

- *Investigations*: The investigation(s) of the matter must be completed within 30 business days of identification.
- *Referral for Discipline*: The case must be processed for discipline — including completion of the MOC, referred to the Trials Division, charges served on the Respondent, discovery produced to the Respondent, an offer for resolution must be provided to the Respondent, the case filing with OATH, and a pre-trial conference must be scheduled within 20 business days of the closure of the investigation.
- *Adjudication of Discipline*: Any and all disciplinary proceedings, including, but not limited to, convening a pre-trial conference, conducting a trial before OATH, and submission of a Report and Recommendation from the OATH ALJ must be completed within 35 business days of the case being filed with OATH.
- *Imposition of Discipline*: The Commissioner must impose the final disciplinary action within 15 business days of receiving the Report and Recommendation from OATH.

Between mid-June and February 2023, a total of 31 cases have been identified for expedited processing as outlined above. These 31 cases cover the conduct of 30 unique staff members, involved in 23 unique use of force incidents. The Monitoring Team identified 20 of the 31 cases and the Department identified the other 11. In all cases, ID closed their investigation within the prescribed timeframes. With respect to the imposition of discipline, the status of the 31 cases as of March 15, 2023, is:

- 25 cases closed with an NPA.
  - Discipline ranged from the very low end (relinquishment of 6 compensatory days) to the highest end (*e.g.* relinquishment of 60 compensatory days, plus two-year's probation; demotion; or irrevocable retirement). Most (14 out of 25) NPAs included 30 or more compensatory days. Overall, the discipline imposed in these cases was generally

196

reasonable. While some of the outcomes were questionable, the fact that the case was resolved closer in time to the incident ensures that the discipline is more meaningful. Further, the NPAs on the lower end of the disciplinary range were for staff who while involved in a serious incident, was not the primary actor and so the resolution is not inherently unreasonable.

- o 20 of these 25 NPAs were finalized within two months of identification as an "F2" case. This marks significant improvement over the average time to address identified misconduct prior to the "F2" process being in place. Five cases took longer to prosecute. In those 5 cases, the cases settled on either the eve of trial or settled following a trial but before a decision was issued, and in one case the Department could not prosecute the case until an outside law enforcement agency determined that it did not intend to seek criminal charges.

- Two cases are pending with law enforcement and the Department has been advised it cannot proceed with administrative proceedings at this time.
  - o The Monitoring Team worked with these outside agencies to ensure these cases are efficiently evaluated so that if criminal charges are not pursued, the cases are cleared back to DOC as soon as possible—that work resulted in two other cases being cleared back to ID during this Monitoring Period which were resolved with NPAs described above.

- One case was rendered moot as OATH recommended the individual for termination related to a separate case that was tried prior to the identification of the F2 case.

- Two cases are still pending as of March 2023 because they were only recently referred for F2.

- Finally, one case was Administratively Filed. While charges for other staff involved in the same incident were pursued via F2 and closed with NPAs (with penalties of 6, 18, 25 and 35 compensatory days), the charges against this staff member were Administratively Filed. In this particular case, the decision to Administratively File the case was questionable as the evidence appeared sufficient to sustain charges.

Overall, the F2 process has been fruitful. Cases that require expedited treatment are in fact being addressed in an expedited manner, especially compared to the protracted processing times that currently characterize most disciplinary matters. This approach supports the overall goal to resolve cases closer in time to the incident. As for the overall resolutions, they are generally reasonable and mark an impressive step towards imposing close-in-time meaningful discipline for the most egregious incidents.

## **Conclusion**

The impact of these two provisions is mixed. The requirements with respect to § C., ¶ 2 of the First Remedial Order may not be as fruitful, it has been a backstop to missing some cases requiring

immediate action. That said, the Department's overall position to minimize the use of immediate action is concerning. However, ID did continue to respond to Monitor Recommendations for consideration for immediate action as required by § C., ¶ 2., and took action in a few examples as noted above. Regarding Action Plan § F., ¶ 2, this process appears to be working as designed. The Department has self-identified cases for expedited treatment, and is not relying exclusively on the Monitoring Team, which is a positive step. It is clear ID, OATH, and the Trials Division are working diligently towards expediting these cases and ensuring that they are addressed as they should be.

| COMPLIANCE RATING | First Remedial Order § C., ¶ 2. Partial Compliance |
|---|---|

## FIRST REMEDIAL ORDER § C. 4/THIRD REMEDIAL ORDER ¶ 2 (EXPEDITIOUS OATH PROCEEDINGS) &

## FIRST REMEDIAL ORDER § C. (APPLICABILITY OF DISCIPLINARY GUIDELINES TO OATH PROCEEDINGS), ¶ 5

Third Remedial Order ¶ 2. *Increased Number of OATH Pre-Trial Conferences*. Paragraph C.4 of the First Remedial Order shall be modified to increase the minimum number of pre-trial conferences that OATH must conduct each month for disciplinary cases involving charges related to UOF Violations. Specifically, as of December 15, 2021, Paragraph C.4 shall be revised to read as follows: "All disciplinary cases before OATH involving charges related to UOF Violations shall proceed in an expeditious manner. During each month, Defendants shall hold pre-trial conferences before OATH for at least **150** disciplinary cases involving charges related to UOF Violations, absent extraordinary circumstances that must be documented. If there continues to be delays in conferencing cases despite this calendaring practice, OATH will assign additional resources to hear these cases. The minimum number of case conferences required to be held each month under this Paragraph may be reduced if the Monitor makes a written determination, no earlier than one year after the date of this Order, that disciplinary cases involving UOF Violations can continue to proceed expeditiously with a lower number of conferences being held each month."[177]

§ C., ¶ 5. Applicability of Disciplinary Guidelines to OATH Proceedings. The Disciplinary Guidelines developed pursuant to Section VIII, ¶ 2 of the Consent Judgment shall apply to any OATH proceeding relating to the Department's efforts to impose discipline for UOF Violations.

When the Department is unable to settle a disciplinary matter directly with the staff member, the case must be adjudicated. The Office of Administrative Trials and Hearings ("OATH"), an administrative law court, adjudicates any contested discipline for *tenured* staff, pursuant to New York State Civil Service Laws § 75. OATH is designated as the "deputy or other person" to hear disciplinary matters for the Department of Correction and stands in the shoes of the Commissioner, with the same powers and constraints as the Commissioner. Accordingly, OATH's work must comply with Consent Judgment, Remedial Orders, and Action Plan.

---

[177] The Action Plan requires a compliance assessment with First Remedial Order § C. (Timely, Appropriate, and Meaningful Staff Accountability), ¶ 4. However, this provision was modified by the Third Remedial Order, ¶ 2 so a compliance rating with Third Remedial Order, ¶ 2 is provided instead.

If a case cannot be settled between the respondent and the Department directly, an ALJ conducts a pre-trial conference in an attempt to facilitate a settlement. If a settlement still cannot be reached, then a trial is scheduled so an ALJ (and a different ALJ from the one who conducted the pre-trial conference) can assess the evidence to evaluate whether or not the staff member has violated policy. The ALJ then issues a written decision. If the ALJ determines that a violation occurred, the decision also includes a proposed penalty. The range of penalties that the ALJ may recommend are set by law and include a reprimand, a fine of up to $100, a suspension without pay of up to (but no more than) 60 days, demotion in title, or termination.[178] Accordingly, most of the discipline imposed by DOC (either through settlement or following a trial) is within this same range of penalties. The Commissioner has the authority to accept the factual findings and penalty recommendation of the ALJ or to modify them, as appropriate, in order to resolve the case. The Commissioner's determination (and imposition of discipline as warranted) is subject to appeal to the Civil Service Commission or as an Article 78 proceeding.

The Monitoring Team has raised a number of concerns in the past regarding OATH's practices, and much progress has been made by OATH to address these concerns. The practices which required improvement included:

- a lack of sufficient capacity to manage and convene the number of pre-trial conferences necessary to address the Department's caseload,
- that the pre-trial conferences were not conducted in a manner that facilitated resolution, that any subsequent proceedings were protracted, and,
- if a trial was necessary, that the trial was scheduled too far out, was conducted inefficiently (*e.g.*, a trial requiring multiple days would occur over many months),
- and the ALJ's Report and Recommendation took an unreasonably long time to be issued (*e.g.*, more than a year).

Finally, the Monitoring Team found that the Report and Recommendations issued by the ALJs as well as guidance provided by ALJ's during pre-trial conferences suggested that the application of precedent on current cases had resulted in disciplinary outcomes that were not always proportionate to staff misconduct and were not consistent with the New Use of Force Directive or the Disciplinary Guidelines.[179] As discussed in more detail below, progress has been made to address these concerns.

---

[178] New York State Civil Service Laws § 75 (removal and other disciplinary action), ¶ 3.

[179] *See*, for example, Ninth Monitor's Report at pg. 206.

The Monitoring Team's assessment of the work completed by OATH in this Monitoring Period is outlined below.[180]

## OATH Pre-Trial Conferences

Over the last few years, the need for pre-trial conferences has increased as staff were unwilling to settle cases without at least first having a pre-trial conference before OATH.[181] Given the limited availability of pre-trial conferences at OATH (previously conferences were held only 4 to 6 days per month), the resolution of cases were often delayed awaiting a pre-trial conference (and any subsequent OATH proceedings). While the resolution of cases can and should be resolved without the need for pre-trial conferences, if a pre-trial conference is needed then it should occur promptly. As a result of the First and Third Remedial Orders, the number of pre-trial conferences increased exponentially, and OATH is now required to schedule 150 UOF cases for pre-trial conferences a month. OATH now conducts pre-trial conferences *four days a week*. The increased availability of pre-trial conferences has ensured that if the Department is unable to directly settle the case with the staff member, then a pre-trial conference will occur promptly in order to facilitate resolution.

In this Monitoring Period, 1,562 disciplinary cases were scheduled for a pre-trial conference. Of those, 902 of those cases scheduled were related to use of force incidents and therefore OATH met the requirement of the Third Remedial Order. A chart with the breakdown of UOF related OATH pre-trial conferences is provided in Appendix A. As seen for the first time in the last monitoring period, the number of cases settling *before* the pre-trial conference has continued to increase. 69% of the cases (n=621) scheduled for a pre-trial conference were settled before the pre-trial conference occurred. Another 5% of cases (n=42) settled at the pre-trial conference, meaning 663 of cases scheduled for pre-trial conferences were resolved before or during the OATH pre-trial conference. Notably, the number of cases scheduled for trial has decreased with only 8% (n=74) of cases scheduled for a trial after the pre-trial conference. This is an important improvement as previously not only were a large portion of cases scheduled for trial, but they were scheduled to occur a long time after the pre-trial conference, further delaying a resolution. As discussed in more detail below, of those cases scheduled for trial, only a few actually end up requiring a trial and most settle before the trial. It is for this reason that scheduling the trial close in time to the pre-trial conference ensures that resolution is not protracted simply because there are built-in delays. It is therefore an improvement that fewer cases are being scheduled for trial given most will settle.

---

[180] This includes the requirements pursuant to Action Plan, § F, ¶ 10.

[181] *See* Ninth Monitor's Report at pgs. 205 to 206 (dkt. entry 341), Tenth Monitor's Report at pgs. 179 to 181 (dkt. entry 360), First Remedial Order Report at pg. 7 (dkt. entry 365), Eleventh Monitor's Report at pgs. 99 to 102 and 245 (dkt. entry 368).

One issue the Monitoring Team identified in the scheduling of pre-trial conferences in this Monitoring Period was an increase in the need for a second pre-trial conference. A second pre-trial conference may be needed for a number of reasons, some of which are entirely legitimate (*e.g.* review of new evidence is necessary, a staff member has an emergency and cannot attend, etc.). However, the Monitoring Team found that in about 100 cases scheduled for a pre-trial conference (about 11% of cases scheduled) a second conference was required because either the staff member was not notified that the conference was scheduled or because the staff member was unavailable (*e.g.* on vacation, etc.). The fact that a staff member was not notified or was scheduled to appear when on vacation suggests a breakdown in internal processing and is generally avoidable.

In response to the Monitoring Team's findings, the Trials Division reported that some of these notification issues appeared to be due to poor administration and issues with processing of notices at the facility. As a result of the Monitoring Team's feedback, a "point of contact" to the Trials Division for every facility was appointed to provide a more streamlined and efficient process in serving staff with notices to appear at the pre-trial conference. The Trials Division reports the point of contact at each facility establishes more effective communication within the facilities. In particular, the Trials Division has reported that the point of contact supports service of timely notices. Further, improved coordination allows for adjustments to the schedule in advance if the staff member is not available on the date of the conference, for instance, because of a previously approved vacation day or the staff member is not scheduled to work on the day of the proposed conference. The Monitoring Team intends to assess the scheduling of pre-trial conferences in the next Monitoring Period to ascertain whether this approach has reduced these scheduling issues.

Overall, in 2022, OATH scheduled more pre-trial conferences than ever before. Over 3,000 pre-conferences were scheduled for *all* DOC disciplinary matters (1,891 of them were use of force related) reflecting a 141% increase in cases scheduled in 2021 (n=1,245 total cases, which was previously the highest number of pre-trial conferences convened to date).

**<u>Trials at OATH</u>**

The overall number of use of force trials conducted by OATH has increased in the last two years since the First and Third Remedial Orders were entered. Given the focus on addressing the more egregious cases in the backlog, a significant number of trials were conducted in 2021 as those cases were prioritized. These priority cases were less likely to settle and so a trial was necessary to reach resolution. While the number of trials in 2022 has decreased (n=16) from the peak in 2021, the number of trials conducted in 2022 was almost the same number of trials conducted between 2017 and 2020 (n=17) combined.

| Number of UOF Trials Commenced | |
|---|---|
| Year | Total by First Day the Trial Commenced |
| 2017 | 8 |
| 2018 | 2 |
| 2019 | 3 |
| 2020 | 4 |
| 2021 | 26 |
| 2022 | 16 |
| Total | 59 |

Previously, trials were not only scheduled far after the pre-trial conference, but often a trial requiring a few days of hearings could occur over multiple months. In response to various recommendations from the Monitoring Team, OATH reports that it now schedules any trial for a UOF related matter within 80 days of the pre-trial conference. On average, all trials that started in 2022 occurred within 80 days of the pre-trial conference. Further, trials are now generally completed within 3 weeks of when they start. The time between a use of force incident and a trial is still incredibly lengthy given the backlog. For the 16 trials that were convened in 2022, they addressed 25 use of force incidents that occurred as follows: 1 occurred in 2017, 6 in 2018, 11 in 2019, 4 in 2020, and 3 in 2021. As discussed throughout this report, protracted discipline will continue to occur until the backlog in the Trials Division is eliminated and any referrals from ID are provided in a timelier manner.

For the 15 trials that started *and* were completed in 2022,[182] all but two R&Rs were issued within 45 days of the end of the trial (one was issued 132 after the final trial date, and the other was issued 49 days after the final trial date). This is noteworthy because in the past it has taken over a year for OATH to complete R&Rs in some use of force cases.[183] The progress with respect to UOF cases is important.

**OATH Reports and Recommendations**

OATH issued 27 R&Rs related to UOF cases in 2022 (covering trials started in 2021, 2022, and one that started in 2020). This is the highest number of UOF-related R&Rs issued since 2016. The 27 use of force R&Rs issued in 2022 provided findings and recommended penalties for 30 staff members. The ALJ found guilt and agreed with the penalty sought by DOC for 15 staff (in one of these cases, the ALJ found full guilt but did not recommend a specific penalty because the staff member was already terminated on other grounds). The ALJ suggested different penalties for the other 15 staff. For 3 staff, the ALJ recommended dismissal of charges and no penalty. For 11 staff, the ALJ dismissed some

---

[182] The final trial started in 2022 has not been completed. Additional hearing dates are necessary, but the staff member is out on maternity leave and the trial will be recommenced upon her return to work.

[183] For instance, the R&Rs issued for 6 use of force related trials that started in 2021 took at least 6 months to complete following the close of trial. 2 of the 6 R&Rs took over a year to complete.

charges, but issued findings of guilt in others and therefore, recommended a lower penalty than what DOC sought. For 1 staff, the ALJ found full guilt, but recommended a higher penalty (termination) than what was sought by DOC (60 days).

The Trials Division sought termination for 15 staff with R&Rs issued in 2022. For 11 of those 15 staff, the ALJ also recommended termination. For the other 4 staff, the ALJ substantiated at least some of the charges, but recommended suspension days instead of termination. Of those 4 staff, one resigned by the time the R&R was issued. For the other 3 staff, the Commissioner accepted the recommended penalties by the ALJ (2 staff received 60 days suspension, and 1 staff received 30 days suspension). Finally, it is worth noting that for 6 staff, the Commissioner initiated an Action of the Commissioner whereby he did not accept the proposed recommendation by the ALJs. For 2 of the 6 staff, the Commissioner imposed a penalty higher than the penalty recommended by the ALJ (for one of these staff, OATH had recommended dismissal of the charges and the commissioner substantiated the charges and imposed a penalty). For 4 of the 6 staff, the Commissioner imposed a lower penalty than the ALJ had recommended.[184]

The overall improvement in the efficiencies and outcome of R&Rs is reflected in the table below, which provides a breakdown of the use of force related R&Rs issued since 2016 and the outcomes. In some cases, an R&R can cover multiple staff members, so we broke down the ALJ's findings by staff member in the chart below.

| OATH ALJ's Report & Recommendations by Staff Member | | | | | | |
|---|---|---|---|---|---|---|
| Year R&R was Issued | Total Number of R&Rs Issued & Number of Staff | Guilt *Agreed with DOC's recommendation* | Guilt *Imposed More Than DOC Asked* | Guilt on some, but dismissed some cases *Imposed less than what DOC asked for, but found some guilt* | Acquittal | ALJ Recommended Termination |
| **2016** | 0 R&Rs covering 0 staff | 0 staff | 0 staff | 0 staff | 0 staff | 0 staff |
| **2017** | 5 R&Rs covering 5 staff | 0 staff | 0 staff | 4 staff | 1 staff | 0 staff |
| **2018** | 5 R&Rs covering 6 staff | 1 staff | 0 staff | 3 staff | 2 staff | 0 staff |
| **2019** | 2 R&Rs covering 5 staff | 0 staff | 0 staff | 0 staff | 5 staff | 0 staff |

---

[184] In one case, the Commissioner elected not to adopt the recommendation of termination and instead a penalty of 60 days, 1 year probation and an E.I.S.S. referral was imposed. In the three other cases the Commissioner reduced the penalties as follows – the recommended 42-day penalty was reduced to 28-days, a recommended penalty of 40-days was reduced to 30-days and finally a recommended penalty of 12-days was reduced to 7-days.

| | | | | | | |
|---|---|---|---|---|---|---|
| **2020** | 2 R&Rs covering 4 staff | 1 staff | 0 staff | 3 staff | 0 staff | 0 staff |
| **2021** | 16 R&Rs covering 20 staff | 15 staff | 0 staff | 4 staff | 1 staff | 6 staff |
| **2022** | 27 R&Rs covering 30 staff | 15 staff | 1 staff | 11 staff | 3 staff | 12 staff |

The table above reflects a sea change, beginning in 2021, in OATH's work related to use of force related misconduct. It is clear that the First and Third Remedial Orders have resulted in improved practices as outlined below:

- **Increased Capacity**: Beginning in 2021, the number of trials conducted has increased from an average of 4 trials per year in 2016-2020 to an average of 21 trials per year in 2021/2022.
- **Improved Findings**: OATH made a finding of guilty for 92% of staff in 2021 and 2022 (n=46 of 50 staff) compared with 60% in 2016 to 2020 (n=12 of 20 staff). There are also fewer acquittals with only 8% of staff acquitted in 2021 and 2022 (n=4) compared with 40% in 2016 to 2020 (n=8).
- **Increased Penalties Imposed**: OATH has adopted DOC's recommended penalty for 60% of staff in the last two years compared with 10% in 2016 to 2020. Finally, OATH has recommended termination for 18 staff in the last two years when it was not recommended once between 2016 and 2020 (when there certainly were cases that would merit such a finding).


**Assessment of Disciplinary Guidelines**

The Monitoring Team's general assessment of the R&Rs rendered by ALJ's during the pre-trial Conference as well as analysis in the R&Rs demonstrates that there has been improvement in the application and consideration of the disciplinary guidelines. In subsequent Monitoring Periods, the Monitoring Team will conduct a more fulsome assessment, including an assessment of all OATH R&Rs in which the case was dismissed or the recommended sanction differed from the sanction sought by DOC.

**OATH Procedures and Protocols**

The road to reforming OATH's many convoluted, inefficient, and problematic practices and procedures has taken several years to unravel and unpack. When these issues were initially identified, there was significant resistance from OATH to revising its practices and procedures — claiming either that requirements of the Consent Judgment did not apply or that practices could not be changed. It now appears that the belief that the reforms contemplated were not feasible was misguided. This resistance has clearly changed, following significant scrutiny and pressure from the Monitoring Team and the imposition of two Remedial Orders and the Action Plan.

OATH is an integral part of the Department's disciplinary process and the improvements outlined in this report are important and significant. The notable increase in the number of pre-trial conferences scheduled has supported the overarching goal of eliminating unnecessary delays in case processing, reducing the backlog of cases, and ultimately resolving more cases. Scheduling and conducting trials at OATH is also more efficient than it was before and OATH is conducting more UOF related trials. Further, as discussed in more detail above, if cases are taken to trial, they result in recommended penalties from the ALJ that are more aligned with the disciplinary guidelines than in the past. [185] This important evolution of OATH precedent not only impacts the individual case at issue, but directly impacts the settlement process both before and during any pre-trial conference. Historically, despite evidence supporting the penalties sought by the Department, OATH often afforded staff penalties that were less than what would be offered by the Department or inconsistent with the disciplinary guidelines. As a general matter, this no longer appears to be occurring.

The combined impact of all of these initiatives by OATH is reflected in the Department's ability to resolve more disciplinary cases in a shorter period of time. In particular, the increased number of cases settling *before* a pre-trial conference leads to more cases bypassing the OATH trial process. Further, the number of cases in which staff requests a trial has also decreased and appears to be limited to those cases where more severe sanctions are being sought. Attempts to delay or frustrate the disciplinary processes by invoking the need for the involvement of OATH is no longer occurring at the rate it had been, given that the drawn-out process for scheduling a pre-trial conference or conducting an OATH trial has now been reduced to a more timely process with more meaningful recommendations for discipline.

While the improvements made to OATH's procedures and practices are significant, it must be emphasized that cases requiring the intervention with OATH will still take a long time to resolve. If a case does not settle and therefore a trial is needed, it will take that case, *at a minimum*, 3 months to work its way through the OATH process. This is because a trial is scheduled 80 days after the initial pre-trial conference, a trial can take upwards of 3 weeks to complete, and then a report and recommendation is issued 45 days after the record is closed. Further, the Monitoring Team continues to find that OATH's flexibility to address cases outside of defined practices is minimal, even in cases where reasonable accommodations are necessary. While these situations are generally few in number, OATH remains rigid and wedded to bureaucratic rules with limited-to-no flexibility even when warranted.

Overall, the Monitoring Team applauds the significant changes at OATH and finds it encouraging that many of OATH's entrenched and inefficient practices and procedures are waning.

---

[185] *See* Eighth Monitor's Report at pg. 184.

Nonetheless, more work remains to be done to support the overall goal of ensuring that meaningful discipline is imposed timely.

**Conclusion**

*First Remedial Order § C., ¶ 4 & Third Remedial Order ¶ 2*: The requirement to convene 150 pre-trial conferences has been met. Proceedings are more efficient than before as subsequent proceedings (including trials) are now scheduled in a logical and efficient manner. Accordingly, Substantial Compliance has been achieved with this provision.

*First Remedial Order § C., ¶ 5*: OATH proceedings appear to be applying the Disciplinary Guidelines more appropriately than ever before. A more systematic assessment of OATH's findings is necessary before substantial compliance can be achieved.

*Third Remedial Order ¶ 3*: OATH's procedure and protocols regarding UOF related disciplinary matters are more efficient than ever before. Further enhancements to the OATH process are needed to support the overall goal of ensuring that discipline is imposed timely. In particular, the Monitoring Team recommends that OATH continues to identify efficiencies in its practices to reduce the time to schedule, conduct, and issue decisions for trials. As part of this effort, OATH must continue to evaluate its staffing needs to determine whether additional staff are necessary to support the *timely* resolution of disciplinary matters.

| | |
|---|---|
| **COMPLIANCE RATING** | **First Remedial Order § C., ¶ 4. & Third Remedial Order ¶ 2.** Substantial Compliance<br>**First Remedial Order § C., ¶ 5.** Partial Compliance<br>**Third Remedial Order ¶ 3.** Partial Compliance |

## VIII. STAFF DISCIPLINE AND ACCOUNTABILITY ¶ 4 (TRIALS DIVISION STAFFING)

¶ 4. The Department shall staff the Trials Division sufficiently to allow for the prosecution of all disciplinary cases as expeditiously as possible and shall seek funding to hire additional staff if necessary.

This provision requires the City and the Department to ensure the Trials Division has sufficient staff to expeditiously prosecute all disciplinary cases. The Department has long struggled to have a sufficient number of staff to support the caseload within the Trials Division. The Action Plan created specific requirements to hire additional staff and maintain certain staffing levels. As a result, the number of staff within the Trials Division appreciably increased in this Monitoring Period for the first time in years. At the end of December 2022 (the end of the Monitoring Period), the Trials Division had a total of 45 staff, including 6 supervisors and 27 attorneys (including one intern and five attorneys on loan from other agencies) as identified in the chart below. This staffing complement supported the

significant amount of work completed in this Monitoring Period, including efforts to essentially eliminate the 2020 Backlog.

The chart below provides an overview of the staffing for the Trials Division at the end of each Monitoring Period since the sixth Monitoring Period in June of 2018.

| Trials Division Staffing | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| As of… | June 2018 | Dec. 2018 | June 2019 | Dec. 2019 | June 2020 | Dec. 2020 | June 2021 | Dec. 2021 | June 2022 | Dec. 2022 |
| **Supervisors & Leadership** | **4** | **5** | **5** | **5** | **5** | **5** | **4** | **4** | **5** | **6** |
| - *Deputy Commissioner* | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| - *Associate Commissioner* | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| - *Deputy General Counsel* | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 0 |
| - *Executive Manager Director* | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 0 |
| - *Director* | 3 | 3 | 3 | 3 | 3 | 3 | 2 | 2 | 2 | 4 |
| **Administrative Support** | **6** | **6** | **6** | **6** | **6** | **6** | **6** | **6** | **5** | **5** |
| - *Administrative Manager* | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 |
| - *Executive Coordinator* | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 0 | 0 |
| - *Office Manager* | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| **Attorneys** | **21** | **20** | **20** | **20** | **17** | **18** | **18** | **17** | **19** | **27** |
| - *Agency Attorney* | 21 | 20 | 20 | 20 | 17 | 16 | 15 | 14 | 17 | 21 |
| - *Agency Attorney Intern* | 0 | 0 | 0 | 0 | 0 | 2 | 3 | 3 | 0 | 1 |
| - *Contract Attorney* | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 |
| - *Attorneys on Loan from Other Agencies* | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 |
| **Other Support** | **9** | **8** | **8** | **7** | **8** | **7** | **7** | **7** | **5** | **7** |
| - *Legal Coordinator* | 4 | 4 | 3 | 2 | 2 | 2 | 2 | 2 | 3 | 5 |
| - *Investigator* | 3 | 1 | 0 | 0 | 1 | 1 | 1 | 1 | 0 | 0 |
| - *Clerical Associate* | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| - *Program Specialist* | 1 | 1 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 |
| - *Intern* | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 0 | 0 |
| - *Front Desk Officer* | 0 | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| - *Community Coordinator* | 0 | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 0 | 0 |
| - *City Research Scientists* | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Grand Total** | **40** | **39** | **39** | **38** | **36** | **36** | **35** | **34** | **34** | **45** |

In this Monitoring Period, the Trials Division dedicated certain staff to address closer in time use of force incidents and appeals as well as assigned more staff to work on medical incompetence

cases. As required by the Action Plan,[186] in August 2022, the Trials Division created a team dedicated to prosecuting *new* UOF disciplinary cases to ensure their expeditious resolution.[187] As of March 2023, the team has one Director, seven attorneys, and one legal coordinator. It is worth noting that as the backlog is eliminated more attorneys (beyond those in this group) will be able to focus on more contemporaneous UOF cases. The Monitoring Team will be evaluating the processing of UOF cases by this team in future Monitor's Reports.

The Trials Division has also designated one supervisor and three attorneys to work on appeals when they arise, given the influx of appeals (especially on UOF cases). These staff will maintain other responsibilities within the Trials Division given that the number of appeals does not require *full-time* dedicated attorneys, but this assignment will ensure that appeals are managed in a timely manner by individuals with expertise in appeals.

Finally, the staff assigned to the medical incompetence team has also grown and doubled in size. As of March 2023, the team of attorneys responsible for medical incompetence cases now includes a director, six attorneys, and two legal coordinators.

The Trials Division staffing complement, and increase in the number of staff, is a welcomed improvement. The City and Department must remain vigilant in ensuring that the Trials Division maintains adequate staffing levels, and, at a minimum, those required by the Action Plan, § F, ¶ 1(a). Even with the significant reduction of the backlog, staffing levels must remain similar to those in December 2022 (or greater) because the Trials Division caseload is still high and disciplinary cases are still not being processed in a timely manner. Substantial Compliance will be achieved when the Trials Division staffing complement is in a position to expeditiously prosecute cases and there are no further backlog cases within the Trials Division.

| COMPLIANCE RATING | ¶ 4. Partial Compliance |
|---|---|

---

[186] Pursuant to Action Plan, § F, ¶ 5.

[187] As required by the Action Plan, § F ¶ 5.

- ## SCREENING & ASSIGNMENT OF STAFF (CONSENT JUDGMENT § XII)

| XII. SCREENING & ASSIGNMENT OF STAFF ¶¶ 1-3 (PROMOTIONS) |
|---|

¶ 1. Prior to promoting any Staff Member to a position of Captain or higher, a Deputy Commissioner shall review that Staff Member's history of involvement in Use of Force Incidents, including a review of the

> (a) [Use of Force history for the last 5 years]
>
> (b) [Disciplinary history for the last 5 years]
>
> (c) [ID Closing memos for incidents in the last 2 years]
>
> (d) [Results of the review are documented]

¶ 2. DOC shall not promote any Staff Member to a position of Captain or higher if he or she has been found guilty or pleaded guilty to any violation in satisfaction of the following charges on two or more occasions in the five-year period immediately preceding consideration for such promotion: (a) excessive, impermissible, or unnecessary Use of Force that resulted in a Class A or B Use of Force; (b) failure to supervise in connection with a Class A or B Use of Force; (c) false reporting or false statements in connection with a Class A or B Use of Force; (d) failure to report a Class A or Class B Use of Force; or (e) conduct unbecoming an Officer in connection with a Class A or Class B Use of Force, subject to the following exception: the Commissioner or a designated Deputy Commissioner, after reviewing the matter, determines that exceptional circumstances exist that make such promotion appropriate, and documents the basis for this decision in the Staff Member's personnel file, a copy of which shall be sent to the Monitor.

¶ 3. No Staff Member shall be promoted to a position of Captain or higher while he or she is the subject of pending Department disciplinary charges (whether or not he or she has been suspended) related to the Staff Member's Use of Force that resulted in injury to a Staff Member, Inmate, or any other person. In the event disciplinary charges are not ultimately imposed against the Staff Member, the Staff Member shall be considered for the promotion at that time.

Strong leadership is crucial to the Department's efforts to reform the agency. The Monitoring Team continues to emphasize that the staff the Department chooses to promote sends a message about the leadership's values, the culture it intends to cultivate and promote, and their behavior sets an example for Officers.[188] Given the impact that promotion selections have on the overall departmental culture, the Monitoring Team closely reviews the screening materials and scrutinizes the basis for promoting staff throughout the Department.

This compliance assessment discusses the overall number of staff promoted since 2017, a summary of the changes made to the screening policy during this Monitoring Period, assesses whether the screening materials and the executed promotions complied with the Consent Judgment provisions, and includes a discussion regarding the overarching concerns with the promotions of ADWs during this Monitoring Period.

---

[188] As discussed in detail in the Monitoring Team's Eighth Report (dkt. 332, at pg. 199).

**Overview of Staff Promotions from 2017 to 2022**

      The Department promoted the following number of Staff to each rank after conducting a screening:

|  | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|
| Captains | 181 | 97 | 0 | 0 | 0 | 0 |
| ADWs | 4 | 13 | 3 | 35 | 0 | 26 |
| Deputy Wardens | 5 | 3 | 8 | 0 | 1 | 0 |
| Wardens | 2 | 5 | 1 | 2 | 4 | 0 |
| Chiefs | 3 | 2 | 3 | 0 | 4 | 0 |

**Screening Policy**

      The Department addresses the requirements of ¶¶ 1 to 3 in Directive 2230, "Pre-Promotional Assignment Procedures." Directive 2230 was revised during this Monitoring Period and finalized in November 2022. The revisions to the policy, originally described in the Monitor's Third Report, at pgs. 190-192[189], include:

- *More Discretion Regarding the Frequency of Hiring:* The Department can now open application periods whenever the Commissioner or designee identifies a need for promotions to a Deputy Warden or above. In the past, there were only two or three application windows each year.

- *Jail Experience Requirement*: Eligibility for promotion to Deputy Wardens no longer requires at least one year working in a jail setting. The Department reports that this change allowed more ADWs who have not worked in a jail setting (e.g., serving as the Executive Director of the Classification Unit) for at least one year to be eligible for this position.

- *"Outstanding" Ranking*: A Deputy Warden candidate may now be ranked "outstanding" in the Performance Appraisal ranking, even if they were found guilty in a disciplinary proceeding in the past 6 months. Previously, such a history meant they could *not* be ranked "outstanding." The Department reports that this policy change was made erroneously and was not intended to be updated in the policy.

      The Department also made additional revisions to the policy to clarify procedures that were already in practice, but were not formally documented in the policy. These practices included that: (1) Captain positions are subject to background investigations (as stated in past Notices of Civil Service Exams), (2) candidates for Deputy Warden positions are ranked according to a weighted scale by

---

[189] The Directive was previously revised in the 8th Monitoring Period (*see* the Monitor's Eighth Report, at pg. 198).

DCAS and interviewed by the Department's Reassignment Board, (3) the rank-ordered list can be extended beyond a year by the Commissioner in accordance with DCAS processes.

The Department also revised the policy to adjust for the changes to the Department's leadership structure and the removal of the Chief positions. The Reassignment and Promotion Boards that interview candidates for DW and Warden positions used to rotate members, but now the Commissioner or designee selects the members who are consistently assigned to the Boards. The Department reports that this change was made because there are now fewer individuals with the ranks required to sit on these Boards. Additionally, Chiefs used to conduct final reviews of candidates before they were reviewed and selected by the Commissioner. The Commissioner still conducts the final review and makes the selections for promotions, but there are no longer Chief reviews.

Generally, the majority of changes to the policy are reasonable. However, two policy changes are noteworthy. First, the removal of the one-year jail experience requirement for promotion to Deputy Warden must be evaluated carefully to determine if a candidate without such experience is appropriate for promotion. While there may be candidates for which this exception is appropriate (e.g., the Executive Director of the Classification Unit), supervision experience in the jails is a key component in understanding and assessing the facility operations and practices that underpin this work. Further, the erroneous removal of the provision regarding the ranking of outstanding candidates should be reinstated.

### Overview of Promotions During the Fifteenth Monitoring Period

The Monitoring Team reviewed the screening documentation for the 35 staff screened for promotion to ADW during this Monitoring Period. Ultimately, 26 staff were promoted to ADW, while the other 9 staff were considered, but not promoted. Of the 26 staff who promoted, the Monitoring Team's review identified that 12 staff lacked an objective or sound basis for promotion based on the screening materials provided, as explained more below. In other words, almost half of the individuals recently promoted had been identified *via the Department's own screening process* as not suitable for promotion but were promoted anyway. This fact raises significant concerns about the Department's selection criteria and decision-making process for promoting staff.

A further review of those screening materials also suggested that PDRs and CDs may not be reviewed as necessary during the screening process. Two particularly concerning promotions were in stark contrast with sound promotional practices— one individual who was previously demoted from the ADW rank in 2021 was again promoted to ADW in 2022, and another individual was promoted despite not being recommended for promotion by three divisions and a concerning disciplinary history raised by a fourth division. As noted in the Introduction to this report, some of these problems may reflect the fact that the Department does not currently have a cadre of high skilled individuals to select among, rather than a concerted effort to promote subpar candidates. Certainly, the rank of ADW is ripe for intensive mentoring to help them to develop the skills they will need, and thus the infusion of

correctional expertise expected through the new Assistant of Commissioners of Operations are expected to elevate the ADW ranks.

None of the 26 staff promoted were promoted in explicit contravention of the Consent Judgment requirements. However, specific nuances in the backgrounds of a large segment of those promoted, and the process by which the promotions decisions were made, suggests that the Department's practices are not aligned with the overall goal of selecting people with the most appropriate attributes. Further work is needed to refine both policy and practice to ensure the Department is thoroughly considering the results of the screening process when deciding who to promote.

**Assessment of Screening Materials**

The screening requirements of the Consent Judgment were developed to guide the Department's identification of Supervisors with the proper attributes. In particular, the Consent Judgment requires the Department to consider a staff member's use of force and disciplinary history (¶ 1(a)-(d)). Further, the Consent Judgment mandates that staff members may not be promoted if they have guilty findings on certain violations (¶ 2) or pending UOF disciplinary charges (¶ 3). The promotion process itself is guided by multiple factors, including the screening requirements of this section of the Consent Judgment, and is depicted in *Appendix C: Flowchart of Promotions Process*.

*Review of Candidates* (¶ 1)

The Monitoring Team's review of the screening materials found that the Department's assessment of each candidate satisfied the requirements of the "Review" as defined by ¶ 1. The screening forms completed for most of these candidates revealed that they did not have extensive use of force or disciplinary histories that implicated the standards identified in this requirement. The background for each candidate was reviewed and documented on the screening forms by the relevant Divisions, with each Division providing recommendations based on holistic assessments that considered fitness for leadership even beyond the scope of these Consent Judgment provisions. There was at least some evidence that some staff with PDRs had been reviewed, but it is unclear the extent to which a candidate's PDR history is regularly considered during screening. Although the Monitoring Team's independent review of PDR histories did not reveal any PDR cases that should have been identified, but were not, it is not clear that a specific assessment for all PDRs did occur. An important aspect of assessing a person's fitness for a leadership position is an evaluation of any potential PDRs that may have been present in the last 5 years.

The Monitoring Team's core concern is that the recommendations flowing from the screening process were too often ignored. A significant number of individuals were not recommended for promotion by individual or multiple divisions but were promoted anyway and no explanation for the deviation from the recommendations was provided. The lack of a documented rationale in such cases raises concerns about oversight and ultimate decision-making. Those selecting the final candidates

need to adequately consider these reviews and recommendations. Decisions that are at odds with a recommendation not to promote should be a rare exception and should be justified in writing. Overall, the reviews completed by the Department demonstrated that the Divisions charged with screening reviewed the required information, but there were a significant number of deviations from the Divisions' recommendations with no accompanying justification or explanation. Accordingly, the Department is in Partial Compliance with this provision.

_Disciplinary History_ (¶ 2)

staff members may not be promoted if they have guilty findings on certain violations twice within 5 years unless the Commissioner finds that there are exceptional circumstances that merit promotion ("2-in-5 assessment"). In the Department's assessment of the disciplinary history of the 26 staff members promoted to ADW, 23 did not meet this threshold for exclusion. Three staff were promoted who did meet this threshold, but the Commissioner determined that exceptional circumstances existed and approved their promotions. The Department documented these exceptional circumstances in a written memo shared with the Monitoring Team. In all three instances, the Department reported that the staff members had not received use of force-related charges from the Investigation Division since 2020 and had "impeccable" attendance records throughout 2020-2021 when COVID-19 brought the Department's staffing rates to their lowest. Given their backgrounds, the typical 12-month probationary period was extended to 24-months for these 3 staff. Given that these exceptional circumstances were documented, as specified in ¶ 2, these 3 promotions meet the requirements of the Consent Judgment.

The Monitoring Team examined the Department's 2-in-5 assessment, which must consider certain violations imposed via a Negotiated Plea Agreements ("NPAs") within the past 5 years, all Personnel Determination Reviews ("PDRs") imposed within the past 5 years, and all relevant Command Disciplines ("CDs"). As noted above, this examination revealed that the Department may not be routinely considering PDRs, and may not be considering CDs as part of this assessment. The Monitoring Team previously raised this concern in 2019 (_see_ the Monitor's Seventh Report, dkt. 327, pgs. 174-175) and in response, the Legal Division agreed to assume responsibility for conducting the 2-in-5 assessment and revised the screening form accordingly (_see_ the Monitor's Eighth Report at pg. 203). However, this approach was never officially documented in policy.

It now appears that the Trials Division has resumed conducting the 2-in-5 assessment, but the Trials Division only has access to staff records for NPAs, and not for PDRs or CDs. The vast majority of violations that would meet this threshold would be imposed via an NPA. Given that NPAs are handled by the Trials Division and NPAs are an important source of formal discipline, it is appropriate for the Trials Division to consider if the NPA criterion is met. However, PDRs and CDs may also trigger the 2-in-5 requirement and so they must also be considered. Therefore, a 2-in-5 assessment conducted solely by the Trials Division is not sufficient. The Monitoring Team recommended that the

policy be revised to ensure that the 2-in-5 assessment also considers CDs and PDRs and to designate the Division or position that will be responsible for this component. That said, the Monitoring Team's evaluation of available documentation and data did not reveal any promotions during this Monitoring Period that would have been called into question because of CDs and/or PDRs. Accordingly, the Department remains in Substantial Compliance with this provision.

### _Pending Disciplinary Matters_ (¶ 3)

None of the staff members promoted during this Monitoring Period had pending disciplinary charges relating to the use of force at the time of promotion. Accordingly, the Department remains in Substantial Compliance with this provision.

### **Overarching Concerns Regarding Promotions**

As noted in the Overview above, of the 26 staff promoted to ADW, 12 of those ADW promotions concerned the Monitoring Team, including 11 staff who were not recommended for promotion by at least one Division who conducted the screening (_e.g._ Trials and Litigation Division, Investigation Division, Legal Division, Health Management Division, Equal Employment Office, Inspector General, Correction Assistance Response for Employees, Early Intervention, Support, and Supervision Unit) but were promoted anyway. Some staff may not have been recommended for promotion for reasons beyond those related to the specific requirements of the Consent Judgment. However, the veracity of the screening process is called into question when such recommendations appear to be summarily ignored or dismissed. This concern is not new. As the Monitoring Team has long noted, the Consent Judgment requirements must be considered holistically and if a staff member is not recommended for promotion based on the screening, then that recommendation should be given considerable weight (even if it does not meet one of the Consent Judgment triggers) (_see_ Monitoring Team's Eighth Report at pg. 201).

Of the 11 individuals who were not recommended for promotion on at least one screening form, 7 staff were not recommended by one Division and 3 staff were not recommended by two Divisions. These recommendations did not appear to be given due consideration. In one particularly egregious case, the staff member was not recommended for promotion by _three_ divisions (HMD, EEO, and the Trials and Litigation Division). Furthermore, while the Legal Division did not explicitly state their recommendation for this individual, they did note that the person was a named defendant in multiple lawsuits and was repeatedly disciplined for inefficient performance. Promoting an individual with objectively documented concerns is in stark contrast with sound promotional practices. None of the individual records included any explanation for the departure from the stated recommendations not to promote.

In 2020, the Department reported that it would provide the basis for the decision to promote a staff member if they had not originally been recommended for promotion. That did not occur during this Monitoring Period. To create a more durable practice, the Monitoring Team recommended that the

Pre-Promotional Screening policy be revised to specify that the Department will closely scrutinize any candidate who is not recommended for promotion by any Division and, if promotion is determined to be appropriate, the rationale for overriding the recommendations must be documented.

The Monitoring Team identified an additional and particularly egregious promotion that stands in stark contrast to sound promotional practices. The screening materials indicated that this person was previously promoted to ADW in 2020, then demoted to Captain in 2021. Following her *second* promotion to ADW in December 2022, this individual was *again* demoted to Captain in February 2023. It is noteworthy that *all of the* Divisions involved in promotional screening recommended this individual for promotion to ADW in 2022, suggesting that the substance of the individual's history was not carefully considered by any Division.

### Conclusion

While the Department's promotional screening practices include the requirements of the Consent Judgement (in addition to relevant issues that extend beyond the scope of the Consent Judgment), the poor assessment of the implications of the information and decision-making in light of recommendations *not* to promote are concerning. These findings fall into a long pattern of questionable promotion decisions reflective of the Department's longstanding culture of mismanagement. The Monitoring Team's concerns about the suitability of candidates reflects the Department's lack of a highly skilled cadre of staff from which strong leaders can be selected. While the recent infusion of outside expertise should strengthen the leadership skills amongst staff of all ranks, the Department must continue to strengthen the quality of its screening process to ensure they are *selecting* the most skilled staff available to lead other staff in the effort to reform and refine staff practice. The majority of the Monitoring Team's concerns articulated above were originally discovered and discussed during Monitoring Periods dating back several years. Despite the Monitoring Team's feedback and technical assistance to improve performance in this area, the Monitoring Team believes that improved procedures must be put in place to screen staff for promotion and the Department must ensure that appropriate judgment is being utilized when making these decisions. The Monitoring Team recommends that the Department improve the rigor of its promotion screening and explicitly revises its Pre-Promotional Screening policy to address the concerns noted above. The Monitoring Team has also requested that the Department carefully scrutinize the 12 recently promoted staff with concerning screening information, provide necessary support to these staff while they are in their 1-year probationary period, and closely review and assess any misconduct (use of force or otherwise) before their probationary period expires.

| **COMPLIANCE RATING** | ¶ **1.** Partial Compliance |
| | ¶ **2.** Substantial Compliance |
| | ¶ **3.** Substantial Compliance |

- **SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 (CONSENT JUDGMENT § XV)**

### XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 1 (PREVENT FIGHT/ASSAULT)

¶ 1. Young Inmates shall be supervised at all times in a manner that protects them from an unreasonable risk of harm. Staff shall intervene in a manner to prevent Inmate-on-Inmate fights and assaults, and to de-escalate Inmate-on-Inmate confrontations, as soon as it is practicable and reasonably safe to do so.

*The analysis and compliance rating below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old incarcerated individuals. The Monitoring Team will not assess compliance with the Nunez provisions related to 16- and 17-year-olds in this Monitoring Period pursuant to the Stipulation and Order Regarding 16- and 17-Year-Old Adolescent Offenders at Horizon Juvenile Center, ¶ 2 (dkt. 503).*

The Monitoring Team has been concerned about violence at RNDC, where the majority of young adults are held, for several years. Previous reports by the Monitoring Team have discussed RNDC's serious incidents, management problems and staffing issues (*see e.g.*, Monitor's March 2022 Report, pgs. 17-21). The Commissioner's Violence Reduction Plan and RNDC's de-escalation units, both implemented in early 2022, are discussed in the Monitoring Team's June 2022 Report (pgs. 18-20).

The continued implementation of the Violence Reduction Plan and the facility's stable leadership throughout the current Monitoring Period has led to encouraging decreases in the rates of violence at RNDC. As discussed in the Security Practices and Indicators section of this report, RNDC's rates of use of force, stabbings/slashings and fights decreased slightly in 2022 compared to prior years. The more pronounced improvements that became evident in the second half of the year have continued into 2023.

More specifically, the facility has reported consistent practices that have become more aligned with sound correctional practice including:

- RNDC was the first facility to implement the various strategies discussed in the Uniform Staffing Practices section of this report. Interviews with facility leadership confirm close collaboration with CMU and suggest that once implementation has been solidified, the new practices will help to remedy the problems with staff management that have undercut safety and programming for so long.
- Facility leaders are emphasizing the need for constructive interaction with people in custody, addressing their concerns about services and attempting to diffuse interpersonal conflict. While the Warden, DWs and some Supervisors are reportedly skilled in these areas, these core competencies need to be infused among all staff to continue to increase safety.
- The population of each unit is constantly monitored and adjusted to ensure that no one SRG has a dominant presence, and that people are assigned housing according to their

classification level. Occasional flare-ups with interpersonal violence remain, but the frequency of such events has decreased over time.

- Program counselors and community vendors have been assigned to each housing unit to reduce idle time and address rehabilitative needs. The Program Division's quality assurance efforts to ensure counselors/vendors keep to the published schedule and deliver content appropriately have great potential to improve practice. The delivery of daily recreation has improved, but challenges with several recreation spaces being inoperable remain, keeping this service from being as consistent as it should be.

- Facility staff have been supplemented with various special teams (*e.g.,* SRT, ESU) to support searches, movement, and supervision on the housing units. This support is still in place, but the facility's security team is beginning to assume these functions.

- The frequency and thoroughness of searches to detect and confiscate dangerous contraband have increased. Continued efforts to identify and address the *sources* of contraband are needed to stem the flow of dangerous items (particularly weapons and drugs) into the facility.

The recent period of improved safety is encouraging, and if this type of progress is sustained over the next Monitoring Period, the Department is on track to move out of Non-Compliance with this provision. Additional work remains as described above, but these recent changes suggest the Department is on the right trajectory for the necessary progress.

| COMPLIANCE RATING | ¶ 1. (18-year-olds) Non-Compliance |
|---|---|

| XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 12 (DIRECT SUPERVISION) |
|---|
| ¶ 12. The Department shall adopt and implement the Direct Supervision Model in all Young Inmate Housing Areas. |

*The analysis and compliance rating below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old incarcerated individuals. The Monitoring Team will not assess compliance with the Nunez provisions related to 16- and 17-year-olds in this Monitoring Period pursuant to the Stipulation and Order Regarding 16- and 17-Year-Old Adolescent Offenders at Horizon Juvenile Center, ¶ 2 (dkt. 503).*

The focus in this Monitoring Period has been on the Commissioner's Violence Reduction Plan for RNDC. Accordingly, this provision was not monitored during this Monitoring Period and so a rating is not provided.

| COMPLIANCE RATING | ¶ 12. (18-year-olds) Not Rated |
|---|---|

| **XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 17 (CONSISTENT ASSIGNMENT OF STAFF)** |
|---|
| ¶ 17. The Department shall adopt and implement a staff assignment system under which a team of Officers and a Supervisor are consistently assigned to the same Young Inmate Housing Area unit and the same tour, to the extent feasible given leave schedules and personnel changes. |
| *The analysis and compliance rating below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old incarcerated individuals. The Monitoring Team will not assess compliance with the Nunez provisions related to 16- and 17-year-olds in this Monitoring Period pursuant to the Stipulation and Order Regarding 16- and 17-Year-Old Adolescent Offenders at Horizon Juvenile Center, ¶ 2 (dkt. 503).*<br><br>Meeting the requirements of the Action Plan must precede the Department's effort to address the requirements of this provision. In early 2023, RNDC began implementing the Department's new roster management strategy that includes both a software package and clearly articulated requirements for staff assignments to facility posts (*see* the Uniform Staffing Practices section of this report for more detail). Coupled with the Department's efforts to bring staff who are out on leave back to work, this is an important first step toward being able to meet the requirements of this provision. Once this new system has been implemented for a period of time, the Monitoring Team will assess RNDC's progress toward consistently assigning officers and Captains to the same housing units day-to-day. |

| **COMPLIANCE RATING** | **¶ 17. (18-year-olds)** Non-Compliance |
|---|---|

# CONCLUSION

The foregoing report details a great volume of information about the Department's progress toward meeting the requirements of the Action Plan, Remedial Orders, and Consent Judgment. Parts of the report support cautious optimism that progress is being made, but others provide ample cause for continuing concern about the current state of affairs. Both reactions are justified and reflect the anticipated uneven pace of reform. Real change has occurred since the Action Plan was ordered by the Court. The Commissioner and his corps of well-qualified Deputy and Associate Commissioners have begun to untangle dysfunction so complex and deeply entrenched that identifying "where to start" required deep investigation and tenacity. The practice and cultural changes that are being initiated have real potential to move the Department toward reducing the imminent risk of harm faced by people in custody and staff.

However, this cautious optimism is tempered by the persistently high rates of use of force and interpersonal violence, particularly the spike in predatory violence in the form of stabbings and slashings; by the failure to provide people in custody with the most basic services; by the reversal of progress observed in the Investigation Division; and by the continued use of questionable, and sometimes abusive, practices at the hands of ESU and the Department's inadequate approach to addressing it. There is certainly progress, but there is also continued cause for alarm.

In the Monitoring Team's experience with institutional reform, once small changes start to occur, bigger changes become possible. Further, these initial changes often expose new problems or bring clarity to the fact that certain problems continue to persist. In that vein, the work discussed throughout this report highlights that the following issues need priority action:

- The **Assistant Commissioners of Operations** must be on-boarded as quickly as possible to provide the long-awaited leadership, expertise and hands-on/eyes-on supervision that the facilities need to truly begin their culture change. This mentorship and support is acutely necessary starting with the DW, ADW and Captain ranks such that they can properly motivate, guide and shape the practices of their subordinates. Five Assistant Commissioners of Operations are scheduled to begin work in April 2023.

- The **Investigations Division** must work to reverse course and reinstate past practices that brought alignment with the requirements of the Consent Judgment.

- Now that the staff disciplinary process is flowing more steadily, the Department must attend to the various forms of discipline to ensure that past problems are not recreated. In particular, the use of **Command Discipline** to address staff misconduct must be better managed to ensure that cases are adjudicated on the merits and that the corrective action is proportional to the severity of the staff's misconduct.

- As the level of chaos in certain facilities has begun to recede, the heavy-handed approach of the **Emergency Services Unit (ESU)** stands in stark contrast. ESU must be reconstituted to include leadership that embraces the goals of the Consent Judgment and that directs its staff to manage crises in ways that reduce harm rather than amplify it. This includes ensuring that each ESU staff has been assessed for fitness and temperament to skillfully manage emergency situations.

- An individual must be appointed to **manage the *Nunez* compliance effort** who has a nuanced understanding of both the jails' operation and the Consent Judgement so that priorities, conflicts, obstacles, and consultation with the Monitoring Team can benefit from a central organizing function.


Following each major section, the Monitoring Team has also listed a set of next steps to accelerate the progress that the Monitoring Team has begun to witness.

*Immediate Next Steps & Future Reporting*

In anticipation of the Court conference on April 27, 2023, the Monitoring Team has already scheduled a number of meetings with the Parties to discuss the contents of this report and potential next steps. At least one of these will involve *all* Parties and the Monitoring Team to meet and confer. The Monitoring Team will provide a status report to the Court, along with a proposed agenda for the conference, no later than April 25, 2023 at 12:00 pm (noon).

Finally, with respect to the Monitoring Team's future reports, the Monitoring Team respectfully requests a change in the due date for the next report from June 9, 2023 to July 10, 2023. The current schedule contemplates that the next Monitor's report would be provided just six weeks after the Monitor's April 25, 2023 Status Report and the April 27, 2023 court conference. Revising the schedule is necessary because six weeks is not sufficient time for any *new* actions to occur and for the Monitoring Team to collect, analyze, and interpret the information and data and then report on those efforts. The additional few weeks to prepare the report will also permit the Monitoring Team to assess a full year of the Action Plan's implementation and to make the requisite findings pursuant to Action Plan § G ¶ 6. Under the current schedule, the Monitoring Team would be limited in its ability to make the requisite finding pursuant to Action Plan § G ¶ 6. The Monitoring Team submits that this adjustment to the schedule will still provide the Court and the Parties timely information and *four* reports from the Monitoring Team during the first six months of 2023, which is far more frequent reporting than contemplated under the Consent Judgment (which only requires one report from the Monitoring Team during this same time period). For these reasons, the Monitoring Team respectfully requests that the Court revise Action Plan § G, ¶¶ 2 (iv) to require the next Monitoring Team's report to be due on July 10, 2023.

# APPENDIX A: ADDITIONAL DATA

## Installation of Cell Doors

The Action Plan requires the installation of new cell doors in order to strengthen the security hardware of the jails (§ A. ¶ 1(c) imposes a July 2022 deadline to install 75 new doors at RNDC and § D. ¶ 5 requires the overall installation of doors 950 doors by July 31, 2024). A discussion regarding the funds allocated for this project, the process for procuring cell doors, and installation of cell doors in the Department was included in the Monitor's October 28, 2022 Report at pgs. 74 to 77. It continues to appear that the City and Department have taken all available steps to maximize the procurement of new cell doors and have taken the necessary steps to complete the project as efficiently as possible.

The Department is required to install a total of 950 cell doors[190] by July 31, 2024 at RNDC and AMKC.[191] As shown in the table below, a total of 850 new cell doors were installed at RNDC between July 2019 and March 31, 2023. The pace of installation accelerated significantly in 2022,[192] when 300 new cell doors were installed and another 200 were installed in the first three months of 2023.

| RNDC Cell Door Installation—Completed | |
| --- | --- |
| **Date Installation Completed** | **Number Installed** |
| July to December 2019 | 50 |
| January to December 2020 | 100 |
| January to December 2021 | 200 |
| January to December 2022 | 300 |
| January to March 31, 2023 | 200 |
| **Total Doors Installed** | **850** |

Another 100 cell doors are scheduled to be installed at RNDC by May 2023.

---

[190] The Monitor's October 28, 2022 Report incorrectly described the requirement for the installation of the 950 cell doors at page 76. The Action Plan requires a total of 950 doors must be installed by July 31, 2024. The Monitor's October 28, 2022 Report incorrectly stated that 950 doors must be installed between July 2022 and July 2024.

[191] As required by the Action Plan § D, ¶ 5.

[192] This includes the installation of 75 cell doors at RNDC as required by the Action Plan § A, ¶ 1(c).

## Facility Searches & Contraband Recovery

In 2022, DOC conducted a total of 196,738 searches (195,348 completed by the Facility and 1,390 special searches[193]). Through February of this year, DOC has conducted a total of 27,218 searches (27,006 completed by the Facility and 212 special searches[194]). These searches have resulted in the detection and seizure of a significant volume of dangerous contraband, as shown in the table below. In 2022, the Department seized 35% more drugs, 75% more weapons, 168% more escape-related items, and 30% more "other contraband" than in 2021. Any successful effort to remove weapons from a facility is obviously positive but the relatively low rate of return (*i.e.,* contraband seized per searches conducted) and observations of videotaped footage of search technique and procedure suggests to the Monitoring Team that additional work to refine practice remains necessary.

| Contraband Recovery, 2021-2023[195] | | | |
|---|---|---|---|
| | **2021** | **2022** | **Jan.-Feb. 2023** |
| Drugs | 1,049 | 1,421 | 389 |
| Weapons | 3,144 | 5,507 | 534 |
| Escape-Related Item | 196 | 525 | 65 |
| Other | 878 | 1,145 | 169 |
| **Total** | **5,267** | **8,598** | **1,157** |

---

[193] This includes searches by the Emergency Services Unit, the Special Search Team, the Canine Use and/or Tactical Search operations.

[194] *Id.*

[195] The calculation of the data for contraband recovery varies depending on the type of contraband that is recovered. For example, drug contraband is counted by incident, not the actual number of items seized. For example, if three different types of drugs were recovered in one location, this is counted as a single seizure. In contrast, when weapons are seized, each item recovered is counted separately. For example, if three weapons were seized from a single individual, all three items are counted.

## Data Regarding Unmanned Posts & Triple Tours

The table below provides the monthly totals and daily averages from January 2021 to February 2023 of the total uniform staff headcount, unmanned posts (a post in which a staff member is not assigned), and triple tours. The total number and daily averages of unmanned posts and triple tours have both decreased since the start of January 2022 and from prior peaks in 2021. On average, there were 44 fewer unstaffed posts per day in February 2023 compared to the previous peak in January 2022. There were also 25 fewer triple tours on average in February 2023 compared to the previous peak in August 2021.

| Month | Average Headcount per Day | Average Unmanned Posts per Day | Total Unmanned Posts per Month | Average Triple Tours per Day[196] | Total Triple Tours per Month |
|---|---|---|---|---|---|
| January 2021 | 8,872 | | | 0 | 6 |
| February 2021 | 8,835 | | | 3 | 91 |
| March 2021 | 8,777 | | | 5 | 169 |
| April 2021 | 8,691 | | | 4 | 118 |
| May 2021 | 8,576 | | | 4 | 109 |
| June 2021 | 8,475 | | | 4 | 108 |
| July 2021 | 8,355 | | | 15 | 470 |
| August 2021 | 8,459 | | | 25 | 764 |
| September 2021 | 8,335 | | | 22 | 659 |
| October 2021 | 8,204 | | | 6 | 175 |
| November 2021 | 8,089 | | | 6 | 174 |
| December 2021 | 7,778 | | | 23 | 706 |
| January 2022 | 7,708 | 59 | 1825 | 24 | 756 |
| February 2022 | 7,547 | 23 | 638 | 3 | 90 |
| March 2022 | 7,457 | 29 | 888 | 1 | 41 |
| April 2022 | 7,353 | 13 | 385 | 0 | 3 |
| May 2022 | 7,233 | 31 | 972 | 1 | 33 |

---

[196] This column contains data for the number of staff who worked over 3.75 hours of their third tour. This chart does not contain data for staff who have worked 3.75 hours or less of their third tour.

| Month | Average Headcount per Day | Average Unmanned Posts per Day | Total Unmanned Posts per Month | Average Triple Tours per Day[196] | Total Triple Tours per Month |
|---|---|---|---|---|---|
| June 2022 | 7,150 | 27 | 815 | 2 | 67 |
| July 2022 | 7,138 | 20 | 615 | 2 | 58 |
| August 2022 | 7,068 | 24 | 735 | 2 | 50 |
| September 2022 | 6,994 | 22 | 649 | 4 | 105 |
| October 2022 | 6,905 | 26 | 629 | 2 | 63 |
| November 2022 | 6,837 | 16 | 486 | 2 | 50 |
| December 2022 | 6,777 | 13 | 395 | 4 | 115 |
| January 2023 | 6,700 | 13 | 391 | 1 | 38 |
| February 2023 | 6,632 | 15 | 419 | 0 | 8 |

<u>Use of Force Involving Unmanned Posts</u>

The table below provides the number and proportion of uses of force involving "unmanned posts" as identified by the Department, between January and December 2022. These incidents involve posts to which no staff member was assigned *or* instances where the assigned officer left their post without being relieved (collectively "unmanned posts"). The first two columns list the number of uses of force involving unmanned posts and the proportion of <u>all</u> uses of force that this number represents. The third and fourth columns identify the number and proportion of uses of force that involved unmanned posts **and** were avoidable (as identified by the Department) specifically due to the lack of staff on post. In other words, had a staff member been present, these incidents likely could have been avoided. While the number of incidents involving an unmanned post were relatively small (approximately 4% of all uses of force in 2022), the Department found that over half of these incidents could have been avoided had staff been present.

| Uses of Force involving Unmanned Posts: January-December 2022 | | | |
|---|---|---|---|
| Facility | # of Total UOF Incidents involving Unmanned Posts | % of Total UOF Incidents involving Unmanned Posts[197] | # of UOF Incidents that UOF incidents involving Unmanned Posts & Were Avoidable | % of Total UOF Incidents involving Unmanned Posts & Were Avoidable |
| AMKC | 99 | 1.41% | *72* | *72.73%* |
| EMTC | 46 | 0.66% | *22* | *47.83%* |
| GRVC | 48 | 0.69% | *19* | *39.58%* |
| NIC | 6 | 0.09% | *3* | *50.00%* |
| OBCC | 19 | 0.27% | *7* | *36.84%* |
| RMSC | 38 | 0.54% | *17* | *44.74%* |
| RNDC | 50 | 0.71% | *26* | *52.00%* |
| VCBC | 4 | 0.06% | *2* | *50.00%* |
| **TOTAL** | **310** | **4.43%** | ***168*** | ***54.19%*** |

---

[197] There were 7,004 total actual uses of force in 2022. This number does not include alleged uses of force because the Department does not provide avoidable reasons for alleged uses of force.

## Sick Leave, Medically Monitored/Restricted, and AWOL Data

      The tables below provide the monthly averages from January 1, 2019 to March 25, 2023 of the total staff headcount, the average number of staff out sick, the average number of staff on medically monitored/restricted duty, and the average number of staff who were AWOL.[198] The Monitoring Team's assessment of this data is included in the Uniform Staffing Practices section of this report.

| 2019 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Month** | **Head-count** | **Average Daily Sick** | **Average Daily % Sick** | **Average Daily MMR3** | **Average Daily % MMR3** | **Average Daily AWOL** | **Average Daily % AWOL** |
| January 2019 | 10577 | 621 | 5.87% | 459 | 4.34% | | |
| February 2019 | 10482 | 616 | 5.88% | 457 | 4.36% | | |
| March 2019 | 10425 | 615 | 5.90% | 441 | 4.23% | | |
| April 2019 | 10128 | 590 | 5.83% | 466 | 4.60% | | |
| May 2019 | 10041 | 544 | 5.42% | 501 | 4.99% | | |
| June 2019 | 9953 | 568 | 5.71% | 502 | 5.04% | | |
| July 2019 | 9859 | 538 | 5.46% | 496 | 5.03% | | |
| August 2019 | 10147 | 555 | 5.47% | 492 | 4.85% | | |
| September 2019 | 10063 | 557 | 5.54% | 479 | 4.76% | | |
| October 2019 | 9980 | 568 | 5.69% | 473 | 4.74% | | |
| November 2019 | 9889 | 571 | 5.77% | 476 | 4.81% | | |
| December 2019 | 9834 | 603 | 6.13% | 463 | 4.71% | | |
| **2019 Average** | **10115** | **579** | **5.72%** | **475** | **4.71%** | | |

---

[198] The AWOL data is only available for August 1, 2021-January 26, 2022 and April 2022-March 25, 2023.

| 2020 | | | | | | | |
| Month | Head-count | Average Daily Sick | Average Daily % Sick | Average Daily MMR3 | Average Daily % MMR3 | Average Daily AWOL | Average Daily % AWOL |
|---|---|---|---|---|---|---|---|
| January 2020 | 9732 | 586 | 6.02% | 367 | 3.77% | | |
| February 2020 | 9625 | 572 | 5.94% | 388 | 4.03% | | |
| March 2020 | 9548 | 1408 | 14.75% | 373 | 3.91% | | |
| April 2020 | 9481 | 3059 | 32.26% | 278 | 2.93% | | |
| May 2020 | 9380 | 1435 | 15.30% | 375 | 4.00% | | |
| June 2020 | 9302 | 807 | 8.68% | 444 | 4.77% | | |
| July 2020 | 9222 | 700 | 7.59% | 494 | 5.36% | | |
| August 2020 | 9183 | 689 | 7.50% | 548 | 5.97% | | |
| September 2020 | 9125 | 694 | 7.61% | 586 | 6.42% | | |
| October 2020 | 9079 | 738 | 8.13% | 622 | 6.85% | | |
| November 2020 | 9004 | 878 | 9.75% | 546 | 6.06% | | |
| December 2020 | 8940 | 1278 | 14.30% | 546 | 6.11% | | |
| **2020 Average** | **9302** | **1070** | **11.49%** | **464** | **5.02%** | | |

| 2021 | | | | | | | |
| Month | Head-count | Average Daily Sick | Average Daily % Sick | Average Daily MMR3 | Average Daily % MMR3 | Average Daily AWOL | Average Daily % AWOL |
|---|---|---|---|---|---|---|---|
| January 2021 | 8872 | 1393 | 15.70% | 470 | 5.30% | | |
| February 2021 | 8835 | 1347 | 15.25% | 589 | 6.67% | | |
| March 2021 | 8777 | 1249 | 14.23% | 676 | 7.70% | | |
| April 2021 | 8691 | 1412 | 16.25% | 674 | 7.76% | | |
| May 2021 | 8576 | 1406 | 16.39% | 674 | 7.86% | | |
| June 2021 | 8475 | 1480 | 17.46% | 695 | 8.20% | | |
| July 2021 | 8355 | 1488 | 17.81% | 730 | 8.74% | | |
| August 2021 | 8459 | 1416 | 17.27% | 767 | 9.36% | 90 | 1.05% |
| September 2021 | 8335 | 1703 | 21.07% | 744 | 9.21% | 77 | 0.92% |
| October 2021 | 8204 | 1558 | 19.46% | 782 | 9.77% | 30 | 0.37% |
| November 2021 | 8089 | 1498 | 19.08% | 816 | 10.39% | 42 | 0.52% |
| December 2021 | 7778 | 1689 | 21.79% | 775 | 10.00% | 42 | 0.54% |
| **2021 Average** | **8454** | **1470** | **17.46%** | **699** | **8.32%** | **56** | **0.68%** |

| 2022 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Month | Head-count | Average Daily Sick | Average Daily % Sick | Average Daily MMR3 | Average Daily % MMR3 | Average Daily AWOL | Average Daily % AWOL |
| January 1-26, 2022 | 7708 | 2005 | 26.01% | 685 | 8.89% | 42 | 0.55% |
| February 2022 | 7547 | 1457 | 19.31% | 713 | 9.45% | | |
| March 2022 | 7457 | 1402 | 18.80% | 617 | 8.27% | | |
| April 2022 | 7353 | 1255 | 17.07% | 626 | 8.51% | 23 | 0.31% |
| May 2022 | 7233 | 1074 | 14.85% | 634 | 8.77% | 24 | 0.34% |
| June 2022 | 7150 | 951 | 13.30% | 624 | 8.73% | 16 | 0.22% |
| July 2022 | 7138 | 875 | 12.26% | 608 | 8.52% | 19 | 0.26% |
| August 2022 | 7068 | 831 | 11.76% | 559 | 7.91% | 17 | 0.24% |
| September 2022 | 6994 | 819 | 11.71% | 535 | 7.65% | 6 | 0.09% |
| October 2022 | 6905 | 798 | 11.56% | 497 | 7.20% | 6 | 0.09% |
| November 2022 | 6837 | 793 | 11.60% | 476 | 6.96% | 7 | 0.09% |
| December 2022 | 6777 | 754 | 11.13% | 452 | 6.67% | 7 | 0.10% |
| 2022 Average | 7181 | 1085 | 14.95% | 586 | 8.13% | 17 | 0.23% |

| 2023 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Month | Head-count | Average Daily Sick | Average Daily % Sick | Average Daily MMR3 | Average Daily % MMR3 | Average Daily AWOL | Average Daily % AWOL |
| January 2023 | 6700 | 692 | 10.33% | 443 | 6.61% | 9 | 0.13% |
| February 2023 | 6632 | 680 | 10.25% | 421 | 6.35% | 9 | 0.14% |
| March 1-25, 2023 | 6667 | 643 | 9.64% | 402 | 6.03% | 11 | 0.16% |
| 2023 Average | 6666 | 672 | 10.08% | 422 | 6.33% | 10 | 0.15% |

ix

## Staff Suspensions

The table below identifies all staff suspensions effectuated between January 1, 2020 and December 31, 2022. The number of suspensions in 2022 is the highest number of suspensions over the last three years. Nearly half the suspension in 2022 were due to sick leave. The Department's use of suspensions is discussed throughout this report.

| Staff Suspensions *January 2020 to December 2022* | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Reason | Jan. to June 2020 | July to Dec. 2020 | Total 2020 | Jan. to June 2021 | July to Dec. 2021 | Total 2021 | Jan. to Jun 2022 | July to Dec. 2022 | Total 2022 |
| Sick Leave | 27 | 12 | 39 | 48 | 90 | 138 | 162 | 143 | 305 |
| Conduct Unbecoming | 32 | 60 | 92 | 44 | 84 | 128 | 44 | 55 | 99 |
| Use of Force | 36 | 42 | 78 | 52 | 30 | 82 | 36 | 30 | 66 |
| AWOL | 0 | 0 | 0 | 0 | 165 | 165 | 34 | 63 | 97 |
| Arrest | 21 | 39 | 60 | 38 | 32 | 70 | 19 | 13 | 32 |
| Inefficient Performance | 25 | 19 | 44 | 24 | 5 | 29 | 16 | 23 | 39 |
| Electronic Device | 4 | 14 | 18 | 2 | 2 | 4 | 5 | 5 | 10 |
| NPA | 5 | 5 | 10 | 3 | 3 | 6 | 8 | 9 | 17 |
| Other | 2 | 4 | 6 | 1 | 3 | 4 | 3 | 8 | 11 |
| Contraband | 4 | 3 | 7 | 4 | 1 | 5 | 0 | 0 | 0 |
| Erroneous Discharge | 5 | 0 | 5 | 0 | 0 | 0 | 2 | 0 | 2 |
| Abandoned Post | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| **Total** | **161** | **198** | **359** | **216** | **415** | **631** | **329** | **350** | **679** |

x

## OATH Pre-Trial Conferences

The table below presents the number of use of force related pre-trial conferences that were scheduled in each Monitoring Period since July 1, 2020 and the results of those conferences. The Monitoring Team's assessment of this information is discussed in both the Staff Accountability section and Compliance Assessment (Staff Discipline & Accountability) section of this report.

| Pre-Trial Conferences Related to UOF Violations | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Results of Pre-Trial Conferences for UOF Cases | | | | | | | UOF Matters & Staff | |
| Total Conf. Schd. | UOF # Required | UOF # Held | Settled Pre-OATH | Settled at OATH | On-Going Negotiation | Another Conference | Trial | Other | Admin Filed | # UOF Incidents | # Staff Members |
| July to December 2020 (11th MP) | | | | | | | | | | | |
| 372 | 225[199] | 303 | 0 | 111 | 10 | 44 | 124 | 12 | 2 | 274 | 198 |
| | | 100% | 0% | 37% | 3% | 15% | 41% | 4% | 1% | | |
| January to June 2021 (12th MP) | | | | | | | | | | | |
| 670 | 300 | 541 | 0 | 282 | 4 | 85 | 136 | 33 | 1 | 367 | 331 |
| | | 100% | 0% | 52% | 1% | 16% | 25% | 6% | 0% | | |
| July to December 2021 (13th MP) | | | | | | | | | | | |
| 575 | 350 | 379 | 185 | 87 | 4 | 18 | 58 | 26 | 1 | 284 | 239 |
| | | 100% | 49% | 23% | 1% | 5% | 15% | 7% | 0% | | |
| January to June 2022 (14th MP) | | | | | | | | | | | |
| 1,447 | 900 | 989 | 612 | 76 | 3 | 174 | 105 | 3 | 16 | 574 | 417 |
| | | 100% | 62% | 8% | 0% | 18% | 11% | 0% | 2% | | |
| July to December 2022 (15th MP) | | | | | | | | | | | |
| 1,562 | 900 | 902 | 621 | 42 | 0 | 153 | 74 | 0 | 12 | | |
| | | 100% | 69% | 5% | 0% | 17% | 8% | 0% | 1% | | |

[199] The Remedial Order requirement came into effect on August 14, 2020 so was applicable for four and a half months in the Monitoring Period.

## Individuals Who Died While in the Custody of the New York City DOC

The list below identifies the individuals who died (or were granted compassionate release[200]) while in DOC custody between November 1, 2015 and March 31, 2023.

| Date of Death | Name | Date of Death | Name |
|---|---|---|---|
| **2015** | | **2016** | |
| 1/1/2015 | Cruz, Fabian | 1/17/2016 | Marrero, Maria |
| 1/8/2015 | Lear, Kenneth | 1/29/2016 | Perez-Rios, Angel |
| 3/8/2015 | Cagliostro, Richard | 2/24/2016 | Adedji, Omole |
| 4/6/2015 | Nelson, Alvin | 3/14/2016 | Polanco- Munoz, Jairo |
| 5/31/2015 | Santiago, Richard | 4/16/2016 | Bryant, Kareen |
| 6/10/2015 | Davis, Kenan | 4/18/2016 | Zhang, Zhi |
| 8/17/2015 | Cruz, Yvonne | 5/19/2016 | Ruiz, Kenny |
| 10/13/2015 | Sparkes, Randolph | 5/27/2016 | Deshields, Michael |
| 10/14/2015 | Gonzalez Richard | 6/3/2016 | Tirado, Carlos |
| 11/5/2015 | Blassingame, Fred | 6/10/2016 | Jones, Clarence |
| 12/4/2015 | Migliozzi, Martin | 8/7/2016 | Quiles, Manuel |
| | | 8/17/2016 | Acosta, Martin |
| | | 8/26/2016 | Webb, Davis |
| | | 12/14/2016 | Serrano, Mark |
| | | 12/28/2016 | Castelle, Eugene |
| **2017** | | **2018** | |
| 1/26/2017 | Johnson, Richard | 1/4/2018 | Foster, Joseph |
| 3/7/2017 | Cardona, Luis | 1/30/2018 | Swanson, Grant |
| 3/8/2017 | Bachtobj, Mohamed | 3/4/2018 | Haynes, Russell |
| 3/24/2017 | Luski, Eli | 7/9/2018 | Holloway, Casey |
| 8/27/2017 | Henderson, Wayne | 8/27/2018 | McPeck, David |
| 10/19/2017 | Feratovic, Selmin | 9/18/2018 | Sanchez, Sebastian |
| | | 10/1/2018 | Johnson Jr., Maurice |
| | | 11/4/2018 | McClain, Chiki |
| **2019** | | | |
| 6/7/2019 | Cubilette-Polanco, Daniel | | |
| 6/9/2019 | Rivera, Jose | | |
| 11/23/2019 | Mcclure, Lebarnes | | |

---

[200] This list only includes individuals who were compassionately released in 2021 and 2022. The Monitoring Team does not have information about whether individuals were compassionately released prior to their death before January 1, 2021.

| Date of Death | Name | | Date of Death | Name |
|---|---|---|---|---|
| **2020** | | | **2021** | |
| 4/5/2020 | Jones, Arniel | | 1/23/2021 | Diaz-Guzman, Wilson |
| 4/5/2020 | Tyson, Michael | | 3/2/2021 | Comacho, Carlo Tomas |
| 4/11/2020 | Ance, Walter | | 3/22/2021 | Velasco, Javier |
| 4/16/2020 | Branch, Milton | | 4/19/2021 | Braunson III, Thomas |
| 4/23/2020 | Delrosario Kevin | | 5/1/2021 | Blake, Richard |
| 5/22/2020 | Kang, Scott | | 6/10/2021 | Mejia, Jose |
| 5/28/2020 | Granados, Junior | | 6/30/2021 | Jackson, Robert |
| 6/21/2020 | Rodriguez, Hector | | 8/10/2021 | Rodriguez, Brandon |
| 10/9/2020 | Cruz, Christopher | | 8/30/2021 | Guallpa, Segundo |
| 11/23/2020 | Wilson, Ryan | | 9/7/2021 | Johnson, Esias |
| 11/26/2020 | Skervchak, Esther | | 9/19/2021 | Isaabdul, Karim |
| | | | 9/22/2021 | Khadu, Stephen |
| | | | 10/15/2021 | Mercado, Victor |
| | | | 10/18/2021 | Scott, Anthony |
| | | | 12/10/2021 | Boatwright, Malcolm |
| | | | 12/14/2021 | Brown, William |
| **2022** | | | **2023** | |
| 2/27/2022 | Youngblood, Tarz | | 02/04/2023 | Pines, Mavin |
| 3/17/2022 | Pagan, George | | | |
| 3/18/2022 | Diaz, Herman | | | |
| 5/7/2022 | Carter, Dashawn | | | |
| 5/18/2022 | Yehudah, Mary | | | |
| 5/28/2022 | Sullivan, Emanuel | | | |
| 6/18/2022 | Bradley, Antonio | | | |
| 6/20/2022 | Carrasquillo, Anibal | | | |
| 6/21/2022 | Drye, Albert | | | |
| 7/11/2022 | Muhammad, Elijah | | | |
| 7/15/2022 | Lopez, Michael | | | |
| 8/15/2022 | Cruciani, Ricardo | | | |
| 8/30/2022 | Nieves, Michael | | | |
| 9/14/2022 | Bryan, Kevin | | | |
| 9/20/2022 | Acevedo, Gregory | | | |
| 9/22/2022 | Pondexter, Robert | | | |
| 10/22/2022 | Tavira, Erick | | | |
| 10/31/2022 | Garcia, Gilberto | | | |
| 12/11/2022 | Mejias, Edgardo | | | |

# APPENDIX B:
# DEFINITIONS

| Acronym or Term | Definition |
|---|---|
| A.C.T. | Advanced Correctional Techniques |
| ADP | Average Daily Population |
| ADW | Assistant Deputy Warden |
| AIU | Application Investigation Unit |
| ALJ | Administrative Law Judge |
| AMKC | Anna M. Kross Center |
| Associate Commissioner of Operations | Positions reporting to the Deputy Commissioner of Operations that oversee groupings of facilities. |
| Assistant Commissioner of Operations | New position to serve as Warden of each facility, the selection of which is **not limited** to uniform staff. This role will report to an Associate Commissioner of Operations. |
| Avoidable Incidents | Incidents that could have been avoided altogether if Staff had vigorously adhered to operational protocols, and/or committed to strategies to avoid force rather than too quickly defaulting to hands-on force (*e.g.,* ensuring doors are secured so incarcerated individuals do not pop out of their cells, or employing better communication with incarcerated individuals when certain services may not be provided in order to mitigate rising tensions). |
| AWOL | Absent without Leave |
| BHPW | Bellevue Hospital Prison Ward |
| BKDC | Brooklyn Detention Center |
| BWC | Body-worn Camera |
| CASC | Compliance and Safety Center |
| CD | Command Discipline |
| CHS | Correctional Health Services |
| CityTime | Staff Member's official time bank of compensatory/vacation days etc. |
| CMS | Case Management System |
| CO | Correction Officer |
| COD | Central Operations Desk |
| CLU | Complex Litigation Unit |
| CLO | Command Level Order |
| CMU | Custody Management Division |
| DA | District Attorney |
| DCAS | Department of Citywide Administrative Services |
| DOC or Department | New York City Department of Correction |
| DOI | Department of Investigation |
| DWIC | Deputy Warden in Command |
| EAM | Enterprise Asset Management |

| Acronym or Term | Definition |
|---|---|
| Emergency Response Teams | There are at least three types of Emergency Response Teams: (1) Probe Teams, which consist of facility-based Staff ("Facility Emergency Response Teams"); (2) the Emergency Services Unit ("ESU") which is a separate and dedicated unit outside of the facility; and (3) the Special Search Team ("SST"), a separate and dedicated unit associated with the Special Operations Division that conducts searches. |
| EMTC | Eric M. Taylor Center |
| E.I.S.S. | Early Intervention, Support, and Supervision Unit |
| ESH | Enhanced Security Housing |
| ESU | Emergency Service Unit |
| Full ID Investigations | Investigations conducted by the Investigations Division |
| GMDC | George Motchan Detention Center |
| GRVC | George R. Vierno Center |
| H+H | New York City Health and Hospitals |
| HOJC | Horizon Juvenile Center |
| HUB | Housing Unit Balancer |
| ID | Investigation Division |
| In-Service training | Training provided to current DOC Staff |
| Intake Squad | A new dedicated unit within ID to conduct intake investigations of all use of force incidents |
| IRS | Incident Reporting System |
| JARs | Joint Assessment and Reviews |
| LOS | Length of Stay |
| LMS | Learning Management System—advanced training tracking platform |
| MDC | Manhattan Detention Center |
| MMR | Medically Modified/Restricted Duty Status in which Staff may not have direct contact with incarcerated individuals. |
| MO Unit | Mental Observation Unit |
| MOC | Memorandum of Complaint |
| NCU | *Nunez* Compliance Unit |
| New Directive or New Use of Force Directive | Revised Use of Force Policy, effective September 27, 2017 |
| Non-Compliance | "Non-Compliance" is defined in the Consent Judgment to mean that the Department has not met most or all of the components of the relevant provision of the Consent Judgment. |
| NPA | Negotiated Plea Agreement |
| OATH | Office of Administrative Trials and Hearings |
| OBCC | Otis Bantum Correctional Facility |
| OC Spray | Chemical Agent |

| Acronym or Term | Definition |
|---|---|
| OMAP | Office of Management Analysis and Planning |
| OSIU | Operations Security Intelligence Unit |
| Parties to the *Nunez* Litigation | Plaintiffs' Counsel, SDNY representatives, and counsel for the City |
| Partial Compliance | "Partial Compliance" is defined in the Consent Judgment to mean that the Department has achieved compliance on some components of the relevant provision of the Consent Judgment, but significant work remains |
| PC | Protective Custody |
| PDR | Personnel Determination Review—disciplinary process for probationary Staff Members |
| PMO | Project Management Office |
| PREA | Prison Rape Elimination Act |
| Intake Investigations | All use of force incidents receive an initial investigation, or "Intake Investigation," which is a more streamlined version of the predecessor "Preliminary Review." |
| Intake Squad | ID investigators conducting Intake Investigations |
| Pre-Service or Recruit training | Mandatory Training provided by the Training Academy to new recruits |
| Rapid Review / Avoidables Process | For every actual UOF incident captured on video, the facility Warden must identify: (1) whether the incident was avoidable, and if so, why; (2) whether the force used was necessary; (3) whether Staff committed any procedural errors; and (4) for each Staff Member involved in the incident, whether any corrective action is necessary, and if so, for what reason and of what type |
| RMSC | Rose M. Singer Center |
| RNDC | Robert N. Davoren Complex |
| SCM | Safe Crisis Management |
| SDNY | Southern District of New York |
| Service Desk | Computerized re-training request system |
| S.R.G. | Security Risk Group (gang affiliation) |
| S.T.A.R.T. | Special Tactics and Responsible Techniques Training |
| Staff or Staff Member | Uniformed individuals employed by DOC |
| Substantial Compliance | "Substantial Compliance" is defined in the Consent Judgment to mean that the Department has achieved a level of compliance that does not deviate significantly from the terms of the relevant provision |
| TEAMS | Total Efficiency Accountability Management System |
| TDY | Temporary Duty |
| TRU | Transitional Restorative Unit |
| Trials Division | Department's Trials & Litigation Division |

| Acronym or Term | Definition |
|---|---|
| TTS | Training Tracking Software system |
| UOF | Use of Force |
| VCBC | Vernon C. Bain Center |
| WF | West Facility |
| Young Incarcerated Individuals | Incarcerated individuals under the age of 19 |

# APPENDIX C:
# FLOWCHART OF PROMOTIONS PROCESS

## Flowchart of Promotions Process

