# Status Report on DOC's Action Plan
# by the
# *Nunez* Independent Monitor

**April 24, 2023**

### THE NUNEZ MONITORING TEAM

Steve J. Martin
*Monitor*

Kelly Dedel, Ph.D.
*Subject Matter Expert*

Anna E. Friedberg
*Deputy Monitor*

Dennis O. Gonzalez
*Associate Director*

Patrick Hurley
*Subject Matter Expert*

Alycia M. Karlovich
*Analyst*

Emmitt Sparkman
*Subject Matter Expert*

Christina Bucci Vanderveer
*Associate Deputy Monitor*

INTRODUCTION ........................................................................................................... 1

INVESTIGATIONS ........................................................................................................ 1
- Background ........................................................................................................ 2
- Updates on ID since the April 3, 2023 Monitor's Report ............................... 3
- Next Steps and Monitor Recommendations ................................................... 9

INTAKE ....................................................................................................................... 9
- Intake for People Newly Admitted to the Department ................................. 10
- Intake for those Transferred Within and Between Facilities ....................... 11
- Next Steps and Monitor Recommendations ................................................. 13

EMERGENCY SERVICES UNIT .................................................................................. 15
- Background ...................................................................................................... 15
- Updates on ESU since the April 3, 2023 Monitor's Report ........................ 17
- Next Steps and Monitor Recommendations ................................................. 18

CLARIFICATION TO THE APRIL 3, 2023 MONITOR'S REPORT ............................. 18
- Staff Awarded Posts ....................................................................................... 19
- Command Discipline ....................................................................................... 20
- Update to Formal Disciplinary Data ............................................................. 22

MONITOR RECOMMENDATIONS TO ADVANCE CERTAIN INITIATIVES ............... 23

CONCLUSION ............................................................................................................ 27
- Parties' Positions on Next Steps .................................................................. 27
- Next Monitor's Report ................................................................................... 28
- April 27, 2023 Court Conference .................................................................. 30

Appendix A:  Monitor Recommendations ............................................................. i

Appendix B:  Proposed Agenda for  April 27, 2023 Court Conference .............. viii

## INTRODUCTION

The Monitoring Team provides this update as directed by the Court in advance of the court conference scheduled for April 27, 2023. An agenda for the conference is also provided. Three weeks have elapsed since the April 3, 2023 Monitor's Report on the Department's progress toward the requirements of the Action Plan and other Court orders. Given the short time that has elapsed, only a small number of updates are provided in this report. This report provides updated information related to the Investigation Division, Intake, and Emergency Services Unit, a few clarifications of information contained in the April 3, 2023 Monitor's Report, a compilation of the Monitoring Team's recommendations regarding the implementation of the Action Plan, a summary of the Parties' proposals for next steps, and a proposed agenda for the Court Conference on April 27, 2023.

Throughout the last three weeks since the report was filed, the Monitoring Team met with all of the parties, both separately and together, numerous times. Counsel for the Plaintiffs' Class and the Southern District of New York ("SDNY") submitted over 50 requests for information related to issues raised in the April 3, 2023 Monitor's Report. The Monitoring Team provided the Parties with information and/or documentation in response to about 30 of these requests. The City and Department also responded to numerous requests. Some of the information requested was not immediately available but will be shared with the Parties as it is assembled.

## INVESTIGATIONS

In the April 3, 2023 Monitor's Report, the Monitoring Team identified a number of serious matters regarding the Investigation Division. This section of the report summarizes those

issues and discusses the Department's recent steps to reverse the downward performance trajectory and improve investigations of use of force incidents going forward.

- **Background**

The Monitoring Team's observations about the deterioration in the quality of use of force investigations were first shared with the Commissioner in both a written feedback sent on December 21, 2022, and a telephone conversation on the same date. The feedback included the Monitoring Team's qualitative and quantitative findings and a sample of illustrative investigations. These were subsequently described in the April 3, 2023 Monitor's Report. The Monitoring Team shared this feedback in an effort to work collaboratively with the Department to catalyze improvement within ID and remedy the regression in ID's performance. Despite the significant issues raised in this feedback, the Monitoring Team did not receive a response for two months. In February 2023, the Department provided a two-page written response that was, at best, superficial and otherwise inadequate given the gravity of the issues under discussion. The Deputy Commissioner of ID at that time did not attempt to communicate with the Monitoring Team about its findings or to collaborate on potential solutions.

Although the Department's initial response was not sufficiently robust, the Department did take some initial steps to address the Monitoring Team's feedback as discussed in the April 3, 2023 Monitor's Report, including:

- tasking ID Supervisors with re-assessing certain cases to identify any that may merit additional scrutiny and re-opening those cases;

- beginning to revise the training for investigators;

- creating a quality assurance division to assess those use of force investigations that are closed with no action;

- conducting a retroactive review of Class A and head strike incidents from October 2022-February 2023 to open any cases that should have been referred for Full ID, but were not; and

- re-opening certain investigations based on the Monitoring Team's feedback.

While all solid ideas, implementation was initially lackluster. In late March 2023, the Monitor and the Deputy Monitor reiterated the Monitoring Team's concerns about ID with Commissioner Molina. Subsequently, the Deputy Commissioner of ID resigned.

- **Updates on ID since the April 3, 2023 Monitor's Report**

Following this resignation and the filing of the April 3, 2023 Monitor's Report, the Commissioner reorganized ID to create two separate and distinct units. ID now focuses solely on use of force investigations while the newly created Special Investigations Unit ("SIU") conducts all other investigations into allegations of misconduct and other special matters. An interim Deputy Commissioner of ID was appointed on April 3, 2023.[1] The Associate Commissioner of ID, a well-respected and seasoned investigator and supervisor, remains in place along with a number of other experienced supervisors. Finally, a new Director of the Intake Squad (which remains part of ID) was appointed. The Monitoring Team has observed a marked shift in the level of collaboration with the Monitoring Team and the quality of ID's efforts to address the issues raised by the Monitoring Team since these leadership changes were made. As discussed in more detail below, ID leadership has already communicated with the Monitoring Team on

---

[1] The Monitoring Team has worked with the interim Acting Deputy Commissioner of ID over the last year in various capacities. She has proactively engaged with the Monitoring Team on numerous issues. It is expected that this leadership change will result in a more collaborative and transparent relationship between the Monitoring Team and ID's staff.

numerous occasions and, over a few short weeks, has developed concrete and tangible solutions to reverse the course of declining quality and return ID to its previous level of performance.

The SIU consists of specific units which had previously existed within ID including the Intelligence Team, PREA Investigations and Compliance, the K-9 Unit, and the Body Screening Operations and Compliance Unit. The SIU is overseen by an Assistant Commissioner who reports directly to the Office of the Commissioner, and thus no longer reports to the Deputy Commissioner of ID. The SIU also includes a Director who previously served within ID. The Monitoring Team was not consulted nor advised about the reorganization of ID prior to its occurrence. In response to queries by the Monitoring Team about the rationale for creating two separate units, we have simply been advised by numerous Department executives that the Commissioner made the decision. No substantive explanation for the change has been provided.

Following the issuance of the April 3, 2023 Monitor's Report, the Monitoring Team provided a series of recommendations to the Department intended to address the Monitoring Team's concerns about the overall quality and supervision of investigations. These included: (1) developing concrete plans to improve the quality of investigations going forward; (2) reevaluating certain 2022 investigations where additional scrutiny is merited to ensure the robust identification of all staff misconduct; and (3) ensuring adequate leadership and staffing to conduct use of force investigations.

Less than a week after the recommendations were issued, ID leadership met with the Monitoring Team and presented a well-reasoned plan to address the deficiencies in investigations as outlined below:

### (1)      Improving the Quality of Investigations

The Monitoring Team recommended the Department develop a plan for improving use of force investigations going forward and provided several suggestions. ID leadership adopted the Monitoring Team's suggestions and also incorporated several additional initiatives:

a.  <u>Communicating clear expectations to investigators about the veracity of their work</u>: ID Leadership convened a Town Hall with all ID staff to discuss performance expectations, emphasizing the need to conduct investigations in a neutral manner. ID staff were provided with a copy of the most recent Monitor's Report and copies of the relevant Court Orders.

b.  <u>Identifying cases for Immediate Action</u>: A "Rapid Review" team within ID has been created with one Captain and four investigators (although one of the four is being promoted and will likely leave the team shortly) who will review incidents daily for the sole purposes of identifying those that require immediate action as well as identifying any cases involving ESU in order to raise these cases to the attention of ID leadership as soon as possible.

c.  <u>Increased scrutiny of cases involving ESU</u>: Cases involving ESU will be flagged by the Rapid Review team and the Associate Commissioner of ID will review all incidents involving ESU on a weekly basis.[2]

d.  <u>Create additional capacity for Full ID investigations and additional supervisory support</u>: An additional Deputy Director has been assigned to Full ID so there are now two Full ID

---

[2] As noted elsewhere in this report, the Deputy Commissioner of Security Operations and his Associate Commissioner will also be reviewing a random sample of incidents involving ESU staff as well.

teams. Additionally, supervisors have begun conducting reviews to prepare case plans with each investigator.

e. <u>Improving the quality assurance program</u>: One Attorney and two Supervising Investigators have been assigned to a quality assurance program. Each week, the team reviews a random sample of 30 Intake Investigations that were closed with no charges to determine whether the cases need to be re-opened. For each case selected, all evidence (*e.g.*, recordings, videos, photographs, interview reports, etc.) is reviewed, along with the Closing Report to ensure it is accurate. The quality assurance template for Intake Investigations was revised in the last few weeks and incorporated feedback from the Monitoring Team. Audit progress, conclusions, and follow-up are closely tracked using an Excel spreadsheet. All cases involving head strikes and Class A injuries will be upgraded to Full ID, and the quality assurance team will upgrade other cases as needed. The Attorney assigned to ID's quality assurance team will also meet with the relevant investigators (and Supervisors) to share feedback from the audits. Quality assurance efforts will be expanded to Full ID Investigations once additional staff are in place (staffing limitations are discussed in more detail below). In the interim, a Director of Investigations will conduct a weekly audit of at least five Full ID investigations that were closed with no charges using the same template as that used for Intake Investigations.

f. <u>Improving training for new and veteran investigators</u>: ID is revising the training curricula for new investigators and for ID refresher training to ensure they are consistent with the requirements of the Court's orders and directly address the concerning practices identified in 2022 and 2023. Training content will include case examples from the Monitoring Team's findings, with discussion points to highlight problematic practices.

Training curricula will be developed in collaboration with the Training Academy. Materials will also be updated to ensure investigators are aware of policy requirements for taser use, preventing and responding to self-harm, use of OC grenades, etc. Training materials will be provided to the Monitoring Team for review and comment.

(2)     **Revisiting 2022 Investigations that Were Closed with No Charges**

Given the findings regarding inadequate investigations and inadequate corrective action, the Monitoring Team recommended a retroactive review of certain 2022 investigations (both Intake Investigations and Full ID investigations) that were closed with no charges. The Monitoring Team *strongly* believes that the parameters for the retroactive review (*e.g.*, types of incidents and specific cases that require additional scrutiny) must be carefully selected in order to achieve an appropriate balance between the retroactive review while still maintaining focus on current cases. To that end, the Monitoring Team recommended that ID revisit the specific cases identified by the Monitoring Team and also work collaboratively with the Monitoring Team to develop appropriate criteria to guide the selection of cases for additional scrutiny (*e.g.*, specific individuals who are frequently involved in uses of force, certain types of incidents (Class A or head strikes, for example), certain facilities or locations, staff who work in certain units (such as ESU)). The development of criteria for case review has already begun via collaborative discussions between ID leadership and the Monitoring Team. The goal is for ID to review and identify a reasonable number of cases for re-evaluation.

(3)     **Ensuring Sufficient ID Staffing**

Adequate staffing and appropriate case assignment are critical to conducting timely, quality investigations. Proper leadership is an obvious necessity and thus recruiting an appropriately qualified, permanent Deputy Commissioner of ID must be a top priority. The

combination of an exodus of about 25 investigators in early 2023 and the reassignment of a large number of investigators to the SIU following the recent reorganization has left ID without sufficient staff. **This is extremely concerning to the Monitoring Team**.

As of April 2023, a total of 74 investigators and supervisors were assigned to use of force investigations compared to 142 in January 2020 (a reduction of 48%). The two charts below show the number of supervisors and investigators assigned to the various ID use of force functions between February 2020 and April 2023. **The decrease in the number of Supervisors and Investigators assigned to Full ID investigations is particularly concerning (Supervisors decreased from 15 to 3 (-80%) and Investigators decreased from 82 to 10 (-89%)).** Recruitment efforts are underway, but the current staffing levels demand proceeding with vigor.

| Supervisors in ID Assigned to UOF | | | | | |
|---|---|---|---|---|---|
| | February 2020 | January 2021 | January 2022 | January 2023 | April 2023 |
| Rapid Reviews | | | | | 1 |
| Intake Squad | 8 | 10 | 13 | 12 | 9 |
| Full ID | 15 | 10 | 7 | 3 | 3 |
| UPS | 1 | 1 | 1 | 0 | 1 |
| **Totals** | **24** | **21** | **21** | **15** | **14** |

| Investigators in ID Assigned to UOF | | | | | |
|---|---|---|---|---|---|
| | February 2020 | January 2021 | January 2022 | January 2023 | April 2023 |
| Rapid Reviews | | | | | 4 |
| Intake Squad | 32 | 51 | 51 | 51 | 42 |
| Full ID | 82 | 58 | 36 | 10 | 10 |
| UPS | 4 | 3 | 3 | 4 | 4 |
| **Totals** | **118** | **112** | **90** | **65** | **60** |

- **Next Steps and Monitor Recommendations**

Overall, the Monitoring Team is encouraged by the ID leadership team's recent efforts to reverse ID's downward performance trajectory. During the three-week period since the Monitor's April 3, 2023 Report was filed, the leadership's focus, attention and creativity have begun to return to the levels that moved ID out of Non-Compliance with some requirements of the Consent Judgment several years ago. However, their practical and appropriate solutions to identify problems must be matched by appropriate resources. This will require (1) reconsidering investigator assignments to determine whether any of those originally assigned to the SIU should be reassigned to ID and (2) aggressive recruitment efforts. In particular, to entice candidates to work at the Department, the City will likely need to further increase the salary and/or benefit package available to investigators given that initial efforts have not resulted in the number of candidates needed to fully staff ID. Further, the Department must ensure the following: (3) investigators and supervisors must be advised that investigations are to be conducted without fear or favor, that the requirements of the Consent Judgment are to be adhered to, and that all staff within ID are encouraged to work collaboratively with the Monitoring Team, (4) implement its concrete plans to improve the quality of investigations going forward and (5) re-evaluate certain 2022 investigations where additional scrutiny is merited to ensure the robust identification of all staff misconduct.

# INTAKE

The overarching goal of the provisions related to intake processing is to ensure that people do not languish in intake units because the physical plants of such units (typically, congregate pens with benches/shared toilets and no bunks) are not suitable for housing. The

Department uses two types of intake units. First, individuals newly admitted to DOC custody ("new admissions") must be processed through intake before being assigned to a housing unit. Second, individuals may be brought to an intake unit within each jail either for the purpose of exiting the facility (*e.g.*, to go to Court, the hospital, or another facility) or to be transferred within the facility (*e.g.*, to the clinic following a use of force or to another housing unit) (collectively, "inter/intra facility transfers").

The Monitoring Team provided the Court with a summary of the current state of affairs regarding intake units within each Facility and the Department's efforts to comply with the intake provisions of the Court's orders[3] in the February 3, 2023 Monitor's Report (dkt. 504) and the April 3, 2023 Monitor's Report (dkt. 517). These reports have noted the Department's progress in managing its intake units. For example, uses of force in intake units have decreased, the physical conditions of the units have improved, more efficient procedures have been implemented to process people who are newly admitted to DOC custody, and facility staff are relying on intake units less often following a use of force. This section provides updates on the Department's work during the three weeks since the last report was filed.

- **Intake for People Newly Admitted to the Department**

The Department's data suggest that few individuals remain in new admission intake units beyond 24 hours. As discussed in the April 3, 2023 Monitor's Report (*see* pgs. 74-81), recent data indicate that the Department processes nearly all people through new admissions intake at EMTC within 24 hours (using both custody and arrival time) and that most of those who overstayed the 24-hour timeline were housed within 6 hours thereafter.

---

[3] *See* First Remedial Order, ¶ A(3) (Revised De-Escalation Protocol) (dkt. 350), Second Remedial Order, ¶ 1(i)(c) (dkt. 398), Action Plan, § D, ¶ 2(b) and § E, ¶ (3)(a)-(b) (dkt. 465).

It is encouraging that the vast majority of individuals appear to be processed through intake within 24 hours. The Monitoring Team continues to recommend that the Department consider a practical and sustainable approach to promoting efficient intake processing for new admissions by implementing on-the-ground oversight and robust monthly analysis of routine data, as discussed in detail in the April 3, 2023 Monitor's Report (*see* pgs. 85-87). The Monitoring Team's recent site visit to EMTC's intake identified a few lapses in adherence to the processes and procedures that the Department worked hard to develop. Specifically, expediter staff[4] were not in the designated area (their duties had been assumed by the A-post officer on this day), and data was not being entered into the Dashboard contemporaneously with the individuals' movement through the various required intake procedures. These observations reinforce the need for on-the-ground oversight and skilled, robust scrutiny of the Dashboard data so that such lapses can be detected and corrected immediately.

- **Intake for those Transferred Within and Between Facilities**

Beginning March 27, 2023, the Department required all facilities to track individuals in intake for the purpose of housing transfers within or between jail facilities using the Inmate Tracking System ("ITS") and incarcerated individuals' "accompanying card" or "Housing Locator Card" (which reliably establishes the individual's identity).

The Department has developed several initiatives to ensure individuals do not languish in facility intake units. First, the Department reports that a Facility Operations Team in the Deputy Commissioner of Classification's office monitors video of intake areas 24 hours per day, 7 days per week. Second, the Department directed each facility to submit a list of every individual in

---

[4] Expeditor staff are responsible for managing and inputting data into the New Admissions Dashboard and Inmate Tracking System – two systems that are used to process and track individuals in intake.

intake six times daily (*i.e.*, every four hours) to the Deputy Commissioner's office. The Facility Operations Team has begun to review these reports to determine if any individual has remained in intake for an extended period of time. Third, the Department reports that facilities have been directed to provide a copy of intake logbooks daily as evidence of the Warden, Deputy Warden, Tour Commander, and Intake Captain conducting their required tours of the intake area. These appear to be useful strategies to ensure intake units are properly managed. However, the City's April 17, 2023 update to the Court also reported that staff are not consistently tracking individuals in ITS.

During a recent site visit to multiple facilities, the Monitoring Team observed inadequate performance in the use of ITS. Specifically, the Monitoring Team identified that a significant number of individuals' arrivals in facility intake units had not been entered into ITS at all and/or entries were not being made contemporaneously. For example, in one facility, the intake arrival time of a number of individuals waiting to be taken to court had not been entered into ITS at all. Similarly, in another facility, the intake arrival time of a number of individuals awaiting discharge to a state facility had not been entered into ITS. In these instances, staff reported competing priorities when having to process nearly a hundred individuals to exit the facility and that they planned to make the required entries "eventually." These findings indicate that additional steps are needed to ensure staff complies with the tracking requirements.

As part of their effort to determine whether staff are properly utilizing ITS, the Department reports that it can generate a daily list of all individuals who are scheduled to be transferred between facilities. The goal is to then compare this list to each individuals' data within ITS to determine whether the transfers occurred and the timing of the arrival and departure from intake. Because data is not yet reliably entered into ITS, this comparison is not

yet functional or fruitful. However, this protocol appears capable of identifying whether individuals who were transferred between facilities had corresponding entries in ITS (once there is data in ITS), and thus could be used to estimate the size and scope of part of the problem with ITS data entry. To date, the Department has not developed any procedures to determine whether intake arrival/exit times are being properly entered into ITS when individuals are transferred between housing units within a single facility. Furthermore, the City's April 17, 2023 update to the Court shared numerous steps intended to assess whether staff are tracking individuals in ITS. However, these steps omit an important dynamic—understanding the reasons why staff are not complying with stated expectations. The Monitoring Team makes some recommendations below to address this gap.

- **Next Steps and Monitor Recommendations**

    While the Department has continued to make progress in managing intake, including since the Court's March 13, 2023 Order, additional work is needed to ensure that individuals do not languish in facility intake units and that data related to intake arrival/departure times are properly tracked in ITS. The Monitoring Team has several recommendations (some of which were included in the April 3, 2023 Monitor's Report and some of which are new) to ensure the Court's orders are implemented with fidelity. These recommendations are listed below.

- **Appoint Dedicated Leadership of Intake Department-Wide**. A dedicated leader should be appointed to manage the Department's intake functions (*see* pg. 88 of the April 3, 2023 Monitor's Report).

- **Implementation of ITS to Track Intra/Inter-Facility Transfers**: Support the roll-out of ITS tracking and the Dashboard at all facilities to ensure they are incorporated into practice. As part of this work, the Department should begin to assess *why* staff in each

facility are not utilizing the ITS tracking as they have been trained to do. While stating expectations and training staff are important components of implementation, they are often insufficient unless they are informed by an understanding of what gets in the way of meeting the expectations. The facilities vary in size and intake traffic and experience different obstacles and barriers to compliance. The Monitoring Team recommends that the Department assess *what* kind of operational changes are needed to respond to these barriers and *how* they may be implemented to increase compliance within each facility's intake. This should also include on-the-ground oversight described on page 85 of the April 3, 2023 report.

- **Management of the Quality Assurance Process for New Admissions and Inter/Intra Facility Intake Data**: The Department must identify *practical* quality assurance strategies, in consultation with the Monitoring Team, for assessing whether staff are following established procedures (*see* pgs. 84- to 87 of the April 3, 2023 Monitor's Report). Most recently, the Deputy Commissioner of Operations' staff has initiated a few procedures intended to assess compliance with tracking requirements. A Facility Operations Team consisting of uniformed staff from the Deputy Commissioner of Classification's office has been monitoring the operation of the intake units. They are ideally suited to the task described above. As that work unfolds, the Monitoring Team recommends that formal protocols are developed that document any findings or recommendations identified by the team and what is communicated to the facilities, along with the responses received from the facilities. Further, the Legal Division has endeavored to collect relevant data. However, neither effort has been particularly formulaic, and the results of these efforts have not been compiled in a meaningful way

14

that could establish appropriate proof of practice or be verified by the Monitoring Team. The Monitoring Team recommends that the Nunez Compliance Unit ("NCU") be engaged in collecting and managing the various data and information that is prepared by the Deputy Commissioner of Operations office and Legal Division about the various initiatives underway so the information can be consistently and routinely reviewed. NCU's specific expertise and dedicated resources are well suited for this task to obtain the relevant information, analyze it and routinely evaluate and report out findings.

- **Additional Reporting by the Department**: Given the current state of affairs, the Monitoring Team recommends that the City and Department file two additional reports on the status of intake before the next Monitor's Report, one on May 17, 2023 and another on June 16, 2023.

## EMERGENCY SERVICES UNIT

In the April 3, 2023 Monitor's Report, the Monitoring Team highlighted continued and pervasive problems with the conduct of the Emergency Services Unit ("ESU") whose approach to managing serious incidents regularly catalyzes, rather than prevents, a use of force (*see* pgs. 137-143).

- **Background**

The practices of ESU have long been a concern for the Monitoring Team. For instance, on February 1, 2021, the Monitor made a recommendation that the Department temporarily suspend ESU non-emergency searches, which the DOC declined to do. Almost two years later, and after subsequent reporting on a host of continuing issues with ESU, the following incident

occurred at GRVC during an ESU Tactical Search Operation (TSO) at the end of last year.[5] A
very large cadre of ESU personnel entered the housing unit and began a disorganized search
operation that quickly became chaotic. A group of incarcerated individuals were attempting to
comply with multiple and conflicting commands from the many ESU officers. With a large group
of incarcerated individuals amassed three abreast and in close quarters at the rear of the housing
unit adjacent to the stairwell, multiple officers who were positioned on the stairwell suddenly
started dispensing OC spray downward toward the incarcerated individuals who began moving in
an effort to avoid the chemical agents. Thereafter, a host of problematic actions occurred[6]:
multiple individuals were subject to painful escort holds; one individual started experiencing
severe seizures and was left unattended for a substantial period of time before he was escorted
for medical attention; a rear-cuffed individual was subject to a dangerous neck/chokehold and
takedown, landing on his head, and was harshly shoved head-first into a solid door as he was
being escorted; head-strikes were alleged by at least one individual; provision of medical
attention and decontamination were delayed; multiple officers filed incomplete reports; and a
wide array of problematic issues were not identified by either the Rapid Reviewer or the
investigator notwithstanding that the event was rife with flawed, harmful, inappropriate and
incompetent tactics. This is emblematic of the types of incidents that continue to alarm the
Monitoring Team, but, that to date, have not received meaningful action from the Department.

[5] This summary of the incident is not an exhaustive description of the myriad problems identified, but is
instead intended to be an illustrative example of various common issues occurring in a single incident.

[6] This is not intended to be an exhaustive list.

- **Updates on ESU since the April 3, 2023 Monitor's Report**

The Department has taken a few steps to address the Monitoring Team's concerns since the issuance of the April 3, 2023 report. First, the Department reported that the previous leader of ESU will be leaving in the near future. The Department has reported that it is still considering who to place in this position and that no final decision has been made on who the new leader of ESU will be (despite media reports about a potential new leader for ESU). The Monitoring Team has requested that it be advised once a new leader has been selected. Second, several staff re- assigned to ESU in 2023 had previously been removed from the team due to poor conduct— the Department is in the process of removing these staff from ESU once again. Third, the Department reported that it will cease using the term "impermissible" as it was not proper nomenclature to describe a use of force.[7] The City reported that Department Executive Staff have been advised that the proper characterization of the misuse force is either "unnecessary" or "excessive." Fourth, the Department reports that another round of ESU staff screening to assess fitness for duty has begun. Fifth, the Security Manager reported that he is reviewing the Command Level Orders for ESU related to the use of force and is updating these policies. Any proposed changes will be provided to the Monitoring Team for review before finalization. Finally, in addition to the steps being taken within ID to scrutinize cases involving ESU (discussed in the "Investigation Division" section, above), the Deputy Commissioner of Security Operations and the Assistant Commissioner of Security Operations will routinely review a

---

[7] As discussed in the April 3, 2023 Report at pgs. 141 to 142, in the fall of 2022, the Department for the first time, claimed there was a "new" definition of misconduct – "impermissible force" – which it claims does not trigger removal because "impermissible force" is not unnecessary or excessive force.

sample of ESU incidents to quickly identify and respond to any issues that arise, and will continue to oversee and review all Rapid Reviews of ESU incidents.

- **Next Steps and Monitor Recommendations**

    The Department has taken important initial steps toward addressing the Monitoring Team's recommendations related to ESU. In terms of next steps, the Monitoring Team continues to recommend the following steps are taken:[8] (1) ESU must be reconstituted to include leadership that embraces the goals of the Consent Judgment and that directs its staff to manage crises in ways that reduce harm rather than amplify it, (2) create and implement the two-day in-service refresher training for ESU (and SRT) in consultation with the Monitoring Team[9] (3) revise Operations Order 24/16 (Special Unit Assignment) to eliminate the loopholes identified in the April 3, 2023 Monitor's Report, (4) improve processes for screening, and the individuals appointed to conduct said screenings, and ensuring adequate oversight to ensure that the screenings are appropriate and reliable and are not susceptible to potential malfeasance, (5) screen all current ESU staff (both permanent and support teams) for suitability of assignment, and (6) update relevant ESU command level orders, in consultation with the Monitoring Team, related to use of force.

## CLARIFICATION TO THE APRIL 3, 2023 MONITOR'S REPORT

Since the April 3, 2023 Monitor's Report was filed, the Monitoring Team became aware of a few issues that require clarification and/or correction. These are discussed below.

---

[8] These recommendations apply to any such team that may serve the function of the Emergency Services Unit regardless of whether the team has the moniker "ESU" or a newly constructed team.

[9] Consultation with the Monitoring Team on this training has already been initiated by the Deputy Commissioner of Training.

- **Staff Awarded Posts**

The April 3, 2023 Monitor's Report (*see* page 21) discusses the Department's practice of awarding specific posts to staff. A staff with an awarded post is assigned exclusively to this post and historically has not been assigned to work elsewhere. Among other staffing-related initiatives, the Action Plan requires the Department to "reduce the use of awarded posts so they are primarily utilized for those positions in which a particular skill set is required" (§ C ¶ 3(v)). A reduction in the use of awarded posts is one of many initiatives intended to support the Department's efforts to maximize deployment of uniform staff. As the Monitor has long noted, the initiatives related to maximizing deployment of uniform staff must be appropriately sequenced and synchronized. In other words, all of the initiatives underpinning the requirements to improve and maximize the deployment of staff pursuant to § C ¶ 3(v) cannot be addressed simultaneously.

The Staffing Manager has clearly articulated a number of reasonable priorities to improve and maximize the deployment of staff since his appointment and progress has been made as described in the April 3, 2023 Monitor's Report (*see* pages 11 to 23). In Fall 2022, early in the Staffing Manager's tenure, he suspended the practice of utilizing awarded posts (meaning that no additional posts will be awarded). This is an important first step in reducing the use of awarded posts. However, the total number of staff on awarded posts has not yet been reduced (*i.e.*, the number of staff on awarded posts was essentially the same in March 2023 as in September 2022).

As the Monitoring Team began to evaluate the Department's progress (or lack thereof) in this area, it learned that the City's and Department's position on the issue—that managers had the unilateral authority to eliminate the use of awarded posts—had not been clearly articulated to the Staffing Manager and his team. Therefore, some in the Department continued to hold an

erroneous and outdated view that awarded posts could not be eliminated without implicating the collective bargaining agreement. When the Monitoring Team identified that this lapse in communication had occurred, the City and Department advised the Staffing Manager and his team of their authority to eliminate the use of awarded posts. As a result, staff in awarded posts are now being evaluated.

Given the many other actions that needed to occur *first* in the sequence of efforts to untangle the myriad staffing problems in the Department, the issue of reducing the use of awarded posts has only recently been moved to priority status. The Staffing Manager's approach to addressing the requirements of the Action Plan is not only reasonable but has also produced *significant* benefits to the Department. Thus, now that the Staffing Manager and his team have the necessary clarification and now that the beginning sequence of tasks is well underway, the Staffing Manager can begin to develop a reasonable strategy to meet the requirements of § C ¶ 3(v) of the Action Plan.

- **Command Discipline**

Action Plan § F, ¶ 3 requires the Department to implement a revised Command Discipline Policy to expand the use of Command Disciplines ("CD") to lower-level use of force violations _**and**_ provide a much-needed path toward increased close-in-time discipline. The Parties requested the Monitoring Team further clarify the revisions made to the CD policy. Accordingly, the Command Discipline Directive was revised to address the following:

- o Expand the potential penalty of a Command Discipline from 5-days to 10 days.
- o Provide more specific penalty guidelines for specific types of violations, including outlining penalties of at least 5-10 days for *minor* use of force violations (as required by the Action Plan). Previously a Command Discipline could not be

utilized to address use of force related misconduct at all. A Command Discipline

still may not be utilized for any excessive and unnecessary *high impact* use of

force.[10]

o   Expand the pool of supervisors who may serve as hearing officers.

o   Increase the time to initiate a CD in CMS to 60 days, compared with only 30 days

in the previous policy. The goal of this change is to ensure there is sufficient time

to process CDs and minimize dismissals due to processing delays. This additional

time balances the need for close-in-time accountability while providing some

necessary time for processing of CDs.

o   Streamline the appeals process so appeals may now be brought to the Legal

Division. Previously, a staff member had two levels of appeal. First, the

Command Discipline could be appealed to the Chief of Department and then to

the Legal Division.

Prior to the revisions to the CD policy, the Department had filled the limitations and gaps

in the CD policy related to use of force violations with an initiative in the Trials Division. The

Trials Division created a mechanism to essentially mimic and expand the use of Command

Disciplines[11] so it could more appropriately address certain lower-level misconduct using a

Command Discipline via a Negotiated Plea Agreement (which can impose a sanction of up to

five compensatory days) or offering that the imposed discipline (generally between five and 20

---

[10] A high impact use of force, defined as including: 1. Strikes or blows to the head, face, groin, neck, kidneys, and spinal column; 2. Kicks; and 3. Choke holds, carotid restraint holds, and other neck restraints.

[11] *See*, 11th Monitor's Report at pages 246 and 247, the Second Remedial Order Report at page 11, the 12th Monitor's Report at page 110, and the October 2022 Status Report at page 158.

days) will only remain on the staff member's record one year[12] instead of five years. Under the expanded revised Command Discipline Policy, utilizing CDs for those cases that merit it will reduce the stress on the Trials Division so the focus of the Trials Division can remain on the imposition of formal discipline for those cases that merit greater scrutiny, focus, and resources to address. Given the revisions to the CD Policy, the Department, in consultation with the Monitoring Team, intends to evaluate the ongoing use of lower-level sanctions and expungement cases in formal disciplinary cases.

It must be emphasized that the revisions to the CD policy, and its expanded use to certain use of force cases does not in any way preclude the ability for the Department to bring formal disciplinary charges. There is no presumption that a Command Discipline *must* be utilized to address all use of force violations outside of the exception for misconduct related to high impact force. In fact, formal discipline continues to be utilized to address the majority of use of force related misconduct identified by the ID Division. The Department continues to have the discretion to address use of force violations in a number of ways, including via a Command Discipline, but may also bring formal charges even in cases where a Command Discipline could have been initiated.

- **Update to Formal Disciplinary Data**

The Monitoring Team identified an error in one of the tables in the April 3, 2023 Monitor's Report. Specifically, the table titled "Penalty Imposed for UOF Related Misconduct

---

[12] The case will not be removed from the staff member's file if during this one-year period, the staff member is served with new charges on a Use of Force incident occurring after the date of signature on the Negotiated Plea Agreement.

NPAs" (*see* pg. 187) provided incorrect data in the "2020" column and an incorrect total number of cases in the "Jan. to Jun. 2022" column. The table below contains the corrected figures.

| Penalty Imposed for UOF Related Misconduct NPAs | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Date of Formal Closure | 2017 | | 2018 | | 2019 | | 2020 | | 2021 | | 2022 | | Jan to Jun. 2022 | | Jul to Dec. 2022 | |
| Total | 395 | | 483 | | 221 | | 327 | | 450 | | 1,773 | | 888 | | 885 | |
| Refer for Command Discipline[13] | 71 | 18% | 66 | 14% | 3 | 1% | 1 | >1% | 4 | 1% | 79 | 4% | *12* | *1%* | *67* | *8%* |
| 1-5 days | 31 | 8% | 147 | 30% | 53 | 24% | 80 | 24% | 64 | 14% | 438 | 25% | *189* | *21%* | *249* | *28%* |
| 6-9 days | 14 | 4% | 19 | 4% | 6 | 3% | 14 | 4% | 29 | 6% | 163 | 9% | *51* | *6%* | *112* | *13%* |
| 10-19 days | 62 | 16% | 100 | 21% | 57 | 26% | 83 | 25% | 109 | 24% | 445 | 25% | *259* | *29%* | *186* | *21%* |
| 20-29 days | 74 | 19% | 58 | 12% | 42 | 19% | 46 | 14% | 64 | 15% | 158 | 9% | *95* | *11%* | *62* | *7%* |
| 30-39 days | 42 | 11% | 42 | 9% | 21 | 10% | 32 | 10% | 43 | 10% | 168 | 9% | *97* | *11%* | *72* | *8%* |
| 40-49 days | 27 | 7% | 30 | 6% | 4 | 1% | 17 | 5% | 53 | 11% | 96 | 5% | *69* | *8%* | *27* | *3%* |
| 50-59 days | 14 | 4% | 4 | 1% | 17 | 8% | 17 | 5% | 18 | 4% | 80 | 5% | *40* | *5%* | *40* | *5%* |
| 60 days + | 48 | 12% | 12 | 2% | 11 | 5% | 28 | 9% | 42 | 9% | 118 | 7% | *72* | *8%* | *46* | *5%* |
| Demotion | | | | | | | | | | | 5 | 6% | *0* | *0%* | *5* | *1%* |
| Retirement/ Resignation | 12 | 3% | 5 | 1% | 7 | 3% | 9 | 3% | 24 | 6% | 23 | 1% | *4* | *0%* | *19* | *2%* |
| | | | | | | | | | | | | | | | | |
| Termination | 0 | | 1 | | 0 | | 0 | | 4 | | 10 | | *6* | | *4* | |

# MONITOR RECOMMENDATIONS TO ADVANCE CERTAIN INITIATIVES

The Monitoring Team has made a number of recommendations in both the April 3, 2023 Monitor's Report and in this report with the goal of moving the Department forward in its efforts to address the requirements of the Action Plan as a foundational step before returning to the larger effort toward achieving compliance with the Consent Judgment and related orders overall. The recommendations include areas in which the Monitoring Team requests more in-depth

---

[13] As discussed in the Seventh Monitor's Report (at pgs. 42-44), NPAs referred for CDs were previously adjudicated at the Facilities after being referred from the Trials Division which was rife with implementation issues. This problem has been corrected and now the Trials Division will negotiate a specific number of days (1 to 5) to be imposed and those specific days will be treated as a CD, rather than an NPA (the main difference is the case remains on the staff member's record for one year instead of five years).

consultation, items that should be prioritized for implementation, suggestions for on-going vigilance or internal monitoring, and a few discrete tasks with specific deadlines.

The purpose of these recommendations is to facilitate further investigation/analysis or to emphasize the importance of a certain task. In a few discrete areas, the Monitoring Team determined that specific deadlines are necessary and thus are recommending a target date for the task's completion. However, in most cases, arbitrarily identifying a deadline for completion appeared to be inappropriate or unnecessary at this time. First, given the cadence of the Monitor's Reports and the Department's goal of demonstrating continued progress in each one, all recommendations have an inherent timeline that can be tracked by the schedule of Monitor's Reports. Second, in the Monitoring Team's decades of experience in facilitating institutional reform, assigning specific deadlines to each and every task essentially sets the Defendant up for failure, rather than facilitates a thoughtfully integrated approach to meaningful change. Finally, in some cases, a Monitoring Team recommendation is simply a starting point that will be refined and more precisely targeted once discussed collaboratively with the many operators in the Department who must necessarily provide input on how a task can best be accomplished. The Monitoring Team's recommendations are based on the team's broader expertise in correctional management as well as its work with the Department, but, in many cases, consultation and collaboration with the Department is necessary to ensure appropriate implementation. Therefore, the specific tasks/requirements are inherently dynamic and fluid as the work gets underway.

It is critical for the Department to commit to working with the Monitoring Team to address the recommendations in the April 3, 2023 Monitor's Report and this report. The Monitoring Team has made a significant number of recommendations. Within that group of recommendations, there are seven that must be a high priority and addressed with all due haste:

24

1. **Improved Security Practices**: Improved security practices, reducing the use of excessive and unnecessary force, and the resulting improvement in facility safety is undoubtedly the most important aspect of advancing the reforms and achieving compliance with the Consent Judgment. It is for this reason that the requirements enumerated in the Action Plan § D. (Security Practices) must remain a top priority.

2. **Assignment of ID Investigators**: The number of ID investigators and supervisors dedicated to working on UOF investigations must be significantly increased by either: (1) re-assigning investigators from SIU to ID, and (2) through aggressive recruitment efforts. In particular, to entice candidates to work at the Department, the City will likely need to further increase the salary and/or benefit package available to investigators given that initial efforts have not resulted in the number of candidates needed to fully staff ID.

3. **Implementation of ITS to Track Intra/Inter-Facility Transfers**: Support the roll-out of ITS tracking and the Dashboard at all facilities to ensure they are incorporated into practice. As part of this work, the Department should begin to assess *why* staff in each facility are not utilizing the ITS tracking as they have been trained to do. While stating expectations and training staff are important components of implementation, they are often insufficient unless they are informed by an understanding of what gets in the way of meeting the expectations. The facilities vary in size and intake traffic and experience different obstacles and barriers to compliance. The Monitoring Team recommends that the Department assess *what* kind of operational changes are needed to respond to these barriers and *how* they may be implemented to increase compliance within each facility's intake. This should also include On-the-Ground Oversight described on page 85 of the April 3, 2023 report.

4. **Screening of Staff Assigned to ESU**: Screen all current ESU staff (both permanent and support teams) for suitability of assignment.

5. **Deployment of Supervisors**: Complete efforts to redeploy supervisors to the facilities and to ensure their presence throughout evenings and weekends to properly oversee staff assignments and to provide much needed on-the-ground coaching and guidance to officers.

6. **Scrutinize ADWs not Recommended for Promotion**: The Department should carefully scrutinize the 12 recently promoted staff with concerning screening information, provide necessary support to these staff while they are in their 1-year probationary period, and closely review and assess any misconduct (use of force or otherwise) before their probationary period expires.

7. **Management of Nunez Matters**: Identify an individual to manage the Department's overall compliance efforts with the Court's orders. An incredibly unique skill set is required. This individual must have appropriate and recognized authority, a command of the Department's entire operation, and a nuanced understanding of the requirements in the various Court orders in this matter. Their core tasks are to set priorities and resolve conflicts within those priorities that may demand the same resources; anticipate potential barriers to implementation; communicate proactively with the Monitoring Team regarding upcoming initiatives, progress and obstacles encountered; and respond to the Monitoring Team's feedback and ensure it is incorporated into practice.

As part of this work, the Monitoring Team has identified recommendations with specific deadlines, which the Department has agreed they intend to adopt. The specific recommendations with deadlines are as follows:

- Finalize Sick Leave and Absence Control Leave Policies by **May 15, 2023**.

- Status Reports to the Court on Intake Matters to be filed by the City and Department on **May 17, 2023** and **June 16, 2023**.

- Finalize MMR policies and procedures by **June 30, 2023**.

- Trials Division shall evaluate the use of lower-level sanctions and expungement cases, in consultation with the Monitoring Team, by **July 30, 2023**.

- Eliminate the backlog of disciplinary cases pending for UOF incidents occurring between January 1, 2021 to June 30, 2022 by **August 15, 2023**.

- Resolution of medical incompetence cases for active staff brought between October 1, 2022 and March 31, 2023 by **August 31, 2023**.

A complete list of the Monitoring Team's recommendations (based on recommendations outlined in the April 3, 2023 Monitor's Report and this report) is provided in Appendix A. The list should be considered the comprehensive list of recommendations made by the Monitoring Team and override any recommendations in the April 3, 2023 report.[14] The Monitoring Team intends to work closely with the Department in its efforts to address these recommendations. Finally, in its next Report to the Court, the Monitoring Team intends to utilize these recommendations as part of its framework for discussing the Department's progress toward the relevant requirement of the Action Plan.

---

[14] Certain recommendations from the April 3, 2023 Monitor's Report have been revised  because additional information has merited revisions (e.g. as discussed in this report), additional clarity was needed, or further consideration led to the need for modification or alteration to a recommendation.

## CONCLUSION

The Monitoring Team outlines below the status of the Parties positions, the Monitoring Team's request to revise the schedule for the next report, and the proposed agenda for the April 27, 2023 Court Conference.

- **Parties' Positions on Next Steps**

The Monitoring Team's consultation with the Parties since the issuance of the April 3, 2023 Monitor's Report included discussions about the appropriate next steps for advancing the reform. The Parties' positions on next steps are summarized below.

_Counsel for the Southern District of New York_: The SDNY remains deeply concerned about the ongoing unsafe conditions on Rikers Island and the Department's failure to expeditiously and effectively implement the reforms required by the Action Plan and to comply with the Consent Judgment and other prior Court orders. While we appreciate that there has been some progress due to the infusion of much needed correctional expertise into the Department's leadership and the Monitoring Team's tireless efforts, the jails continue to be plagued by an extremely high level of violence and disorder. Incarcerated people and corrections staff continue to face an imminent risk of harm on a daily basis. As the Monitoring Team bluntly states in its most recent Status Report, "while conditions in the Department have improved compared with the very depths of the crisis in 2021, significant work remains as the conditions are demonstrably worse than they were at the time the Consent Judgment went into effect." _See_ April 3 Report at page 37.

With respect to next steps, it is imperative, at a minimum, that the Department firmly commit to promptly implementing the recommendations of the Monitoring Team contained in the Status Report. The SDNY expects to highlight at the conference a few areas of particular

concern and hopes to elicit from the Department its specific plans for addressing those critical issues in a meaningful and timely manner. We will continue to regularly confer with the Monitoring Team to obtain real-time updates on the Department's progress in addressing these issues and will carefully review the compliance ratings that will be included in Monitoring Team's next status report. We will also continue to consider all available legal remedies to address the Department's continued non-compliance with key provisions of the Consent Decree and other Court Orders.

*Plaintiffs Class Counsel*: The Court should order the City to comply with specified Monitor's recommendations detailed in his April 3, 2023 report and are conferring with all parties concerning a proposed order which we hope to present to the Court in advance of the conference. While Plaintiffs do not believe these recommendations are close to sufficient to ensure the Defendants' compliance with the Consent Judgment, they are crucial steps and should be implemented promptly. Plaintiffs intend to continue to confer with the parties to agree to further relief, and will submit a letter before the conference discussing subsequent next steps.

*The City of New York and the Department of Correction*: Defendants believe that they have made considerable progress in compliance with the Action Plan and the Court's orders. The City has agreed with the Monitor's proposals for deadlines for specific tasks. The Department is actively evaluating the Monitor's other recommendations. Defendants disagree with plaintiffs that an additional Court order is called for or would be fruitful in achieving the goal of enhancing the safety of the City's jails.

- **Next Monitor's Report**

In the April 3, 2023 Monitor's Report (*see* pg. 222), the Monitoring Team requested a change in the due date for the next Monitor's Report from June 9, 2023 to July 10, 2023. The

28

original due date—just six weeks from the April 27, 2023 Court conference—does not provide
sufficient time for the Department to launch new initiatives *and* enable the Monitoring Team to
collect, analyze and interpret data that would permit fulsome reporting on those efforts. The
additional few weeks requested to prepare the report will also permit the Monitoring Team to
assess a full year of the Action Plan's implementation and to make the requisite findings pursuant
to Action Plan § G ¶ 6. Even with this extension, the Monitoring Team will have produced *four*
reports during the first half of 2023, which is far more frequent than originally contemplated by
the Consent Judgment (which requires bi-annual reports).

The City and counsel for the SDNY consent to the July 10, 2023 date but Plaintiffs'
counsel does not, stating that the urgency of the conditions in the jails and lack of material
improvement in key areas require the reporting schedule to remain as-is (*i.e.*, due on June 9,
2023). The Monitoring Team recognizes the urgency of the conditions, but also believes that the
proposed extension balances the need for frequent updates with the Monitoring Team's effort to
provide the most fulsome, substantive information possible in each report. Therefore, the
Monitoring Team respectfully requests that the Court revise the reporting schedule to July 10,
2023 and amend § G ¶ 2 (iv), § G ¶ 3, and § G ¶ 6 accordingly.

The planning, meeting and conferring, and reporting over the past several months has
continued to provide both transparency and clarity on the current state of affairs. What is now
essential is the time needed for the Department to actually do the hard work required to advance
these reforms and for the Monitoring Team to support this work in any way it can. The
Monitoring Team stands at the ready to assist in whatever way needed to advance the
Department's effort to transform the jails into safe, humane spaces for both incarcerated
individuals and staff.

- **April 27, 2023 Court Conference**

The Monitoring Team and the Parties have been working together diligently to prepare for the Court's conference on April 27, 2023. To that end, the Parties and the Monitoring Team continue to share information regularly and will be meeting at least one more time before the Court Conference. A proposed agenda for the April 27, 2023 Court Conference is provided in Appendix B.

# APPENDIX A:
# MONITOR RECOMMENDATIONS

**Monitoring Team Recommendations to Address Certain Initiatives**

     The chart below provides a comprehensive list of the recommendations that the Monitoring Team has made to address certain initiatives in the Action Plan and were discussed in the April 3, 2023 and April 24, 2023 Status Reports.  Certain recommendations from the April 3, 2023 Monitor's Report have been revised because the Monitoring Team has obtained additional information that has necessitated revisions to the original recommendations (e.g. as discussed in this report), additional clarity to the recommendation was needed, or further consideration by the Monitoring Team led to the need for modification or alteration to a recommendation.  This chart is the complete and current set of recommendations from the Monitoring Team and overrides any recommendations otherwise described in the April 3, 2023 Monitor's reports.

| Recommendations | April 3 Report Page Reference | April 24 Report Page Reference |
|---|---|---|
| **Security Practices** | | |
| **Improved Security Practices**: Improved security practices, reducing the use of excessive and unnecessary force, and the resulting improvement in facility safety is undoubtedly the most important aspect of advancing the reforms and achieving compliance with the Consent Judgment.  It is for this reason that the requirements enumerated in the Action Plan § D. (Security Practices) must remain a top priority. | Pgs. 36-63 | N/A |
| **Investigations** | | |
| **Deputy Commissioner of ID**: Recruit an appropriately qualified, permanent Deputy Commissioner of ID. | N/A | Pg. 7 |
| **Improve Quality of Investigations**: ID, in consultation with the Monitoring Team, must implement a concrete plan to improve the quality of investigations going forward. | N/A | Pgs. 4-7 |
| **Re-evaluate Certain 2022 Investigations**: ID must reevaluate certain 2022 investigations where additional scrutiny is merited to ensure the robust identification of all staff misconduct.  ID, in consultation with the Monitoring Team, shall develop appropriate criteria to identify such cases. | N/A | Pg. 7 |
| **Assignment of ID Investigators**: The number of ID investigators and supervisors dedicated to working on UOF investigations must be significantly increased by either: (1) re-assigning investigators from SIU to ID, and (2) | N/A | Pg. 9 |

| Recommendations | April 3 Report Page Reference | April 24 Report Page Reference |
|---|---|---|
| through aggressive recruitment efforts. In particular, to entice candidates to work at the Department, the City will likely need to further increase the salary and/or benefit package available to investigators given that initial efforts have not resulted in the number of candidates needed to fully staff ID. | | |
| **Intake** | | |
| **Appoint Dedicated Leadership of Intake Department-Wide**: A dedicated leader should be appointed to manage the Department's intake functions (*see* pg. 88 of the April 3, 2023 Monitor's Report). | N/A | Pg. 13 |
| **Implementation of ITS to Track Intra/Inter-Facility Transfers**: Support the roll-out of ITS tracking and the Dashboard at all facilities to ensure they are incorporated into practice. As part of this work, the Department should begin to assess *why* staff in each facility are not utilizing the ITS tracking as they have been trained to do. While stating expectations and training staff are important components of implementation, they are often insufficient unless they are informed by an understanding of what gets in the way of meeting the expectations. The facilities vary in size and intake traffic and experience different obstacles and barriers to compliance. The Monitoring Team recommends that the Department assess *what* kind of operational changes are needed to respond to these barriers and *how* they may be implemented to increase compliance within each facility's intake. This should also include On-the-Ground Oversight described on page 85 of the April 3, 2023 report. | N/A | Pgs. 13-14 |
| **Management of the Quality Assurance Process for New Admissions and Inter/Intra Facility Intake Data**: The Department must identify *practical* quality assurance strategies, in consultation with the Monitoring Team, for assessing whether staff are following established procedures (*see* pgs. 84- to 87 of the April 3, 2023 Monitor's Report). Most recently, the Deputy Commissioner of Operations' staff has initiated a few procedures intended to assess compliance with tracking requirements. A Facility Operations Team consisting of uniformed staff from the Deputy Commissioner of Classification's office has been monitoring the operation of the intake units. They are ideally suited to the task described above. As that work unfolds, the Monitoring Team recommends that formal protocols are developed that document any findings or recommendations identified by the team and what is communicated to the facilities, along with the responses received from the facilities. Further, the Legal Division has endeavored to collect relevant data. However, neither effort has been particularly formulaic, and the results of these efforts have not been compiled in a meaningful way that could establish appropriate proof of practice or be verified by the Monitoring Team. The Monitoring Team recommends that the Nunez Compliance Unit ("NCU") be engaged in collecting and managing the various data and information that is prepared by the Deputy Commissioner of Operations office and Legal Division about the various initiatives underway so the information can be consistently and routinely reviewed. NCU's specific expertise and dedicated resources are well suited for this task to obtain the relevant information, analyze it and routinely evaluate and report out findings. | N/A | Pgs. 14-15 |

| Recommendations | April 3 Report Page Reference | April 24 Report Page Reference |
|---|---|---|
| **Additional Reporting by the Department**: Given the current state of affairs, the Monitoring Team recommends that the City and Department file two additional reports on the status of intake before the next Monitor's Report, one on **May 17, 2023** and another on **June 16, 2023**. | N/A | Pg. 15 |
| **ESU**[15] | | |
| **ESU Leadership and Staffing**: ESU must be reconstituted to include leadership that embraces the goals of the Consent Judgment and that directs its staff to manage crises in ways that reduce harm rather than amplify it | N/A | Pg. 18 |
| **Training ESU Staff**: Create and implement the two-day in-service refresher training for ESU (and SRT) in consultation with the Monitoring Team.[16] | N/A | Pg. 18 |
| **Revise ESU Screening Policy**: Revise Operations Order 24/16 (Special Unit Assignment) to eliminate the loopholes identified in the April 3, 2023 Monitor's Report. | N/A | Pg. 18 |
| **Screening Procedures for Assignment of ESU**: Improve processes for screening, and the individuals appointed to conduct said screenings, and ensuring adequate oversight to ensure that the screenings are appropriate and reliable and are not susceptible to potential malfeasance | N/A | Pg. 18 |
| **Screening of Staff Assigned to ESU**: Screen all current ESU staff (both permanent and support teams) for suitability of assignment. | N/A | Pg. 18 |
| **Revise ESU CLOs**: Relevant ESU's command level orders related to use of force must be updated, in consultation with the Monitoring Team. | N/A | Pg. 18 |
| **Supervision** | | |
| **Deployment of Supervisors**: Complete efforts to redeploy supervisors to the facilities and to ensure their presence throughout evenings and weekends to properly oversee staff assignments and to provide much needed on-the-ground coaching and guidance to officers. | Pg. 035 | N/A |
| **Support for Supervisors**: Department must make it a high priority for the Deputy Wardens and Wardens to actively supervise and provide in-service training to these newly promoted ADWs to ensure that the quality of the supervision improves. | Pg. 136 | N/A |
| **Facility Leadership**: The Assistant Commissioners of Operations must be on-boarded as quickly as possible to provide the long-awaited leadership, expertise and hands-on/eyes-on supervision that the facilities need to truly begin their culture change. This mentorship and support is acutely necessary starting with the DW, ADW and Captain ranks such that they can properly motivate, guide and shape the practices of their subordinates. Five Assistant Commissioners of Operations are scheduled to begin work in April 2023. | Pg. 221 | N/A |

---

[15] These recommendations apply to the Emergency Services Unit or any unit that may serve the same function, but may utilize a different name.

[16] Consultation with the Monitoring Team on this training has already been initiated by the Deputy Commissioner of Training.

| Recommendations | April 3 Report Page Reference | April 24 Report Page Reference |
|---|---|---|
| **Screening/Promotions** | | |
| **Evaluation of Candidates for Promotion**: Carefully evaluate candidates for Deputy Warden to determine if a candidate without one-year jail experience is appropriate for promotion. While there may be candidates for which this exception is appropriate (e.g., the Executive Director of the Classification Unit), supervision experience in the jails is a key component in understanding and assessing the facility operations and practices that underpin this work. | Pg. 212 | N/A |
| **Revise Screening Policy**: The erroneous removal of the provision regarding the ranking of outstanding candidates should be reinstated in the Department's screening policy. | Pg. 212 | N/A |
| **Scrutinize ADWs not Recommended for Promotion**: The Department should carefully scrutinize the 12 recently promoted staff with concerning screening information, provide necessary support to these staff while they are in their 1-year probationary period, and closely review and assess any misconduct (use of force or otherwise) before their probationary period expires. | Pg. 216 | N/A |
| **Revise Screening Policy**: The Monitoring Team recommends that the Department improve the rigor of its screening procedures and revise its Pre-Promotional Screening policy, in consultation with the Monitoring Team, to address the concerns identified in the April 3, 2023 Monitor's Report. | Pg. 216 | N/A |
| **Discipline** | | |
| **Eliminate the Backlog of UOF Disciplinary Cases Pending 1 Year or More from the Incident Date**: The Monitoring Team recommends that all pending use of force disciplinary cases that occurred between January 1, 2021 and June 30, 2022 must be closed **by August 15, 2023**. | Pg. 107 | N/A |
| **Evaluate the Use of Lower-Level Sanctions & Expungement**: The Monitoring Team recommends that the Trials Division revise its protocols, in consultation with the Monitoring Team, to limit the circumstances in which low-level sanctions and expungement may be utilized, to be implemented no later than **July 30, 2023**. | Pg. 107 | N/A |
| **Revise Command Discipline Procedures**: Expanded use of Command Disciplines necessitates vigilance by the Department to ensure this process has integrity and is not abused. This includes appropriate oversight of the revised Command Discipline process to ensure cases are processed and not dismissed due to procedural errors. Further, oversight of the outcome of CDs is necessary to ensure that they reach appropriate outcomes and do not simply default to the lowest level sanction (despite evidence to the contrary). Appropriate mechanisms must be in place to ensure that cases that require formal discipline are referred. There must be sufficient oversight to ensure that if a staff member has exceeded the number of allowable CDs in a given time period that the cases are referred for MOCs. Finally, an appropriate tracking system for CD appeals must also be developed by the Legal Division. | Pgs. 107-108 | N/A |
| **Resolution of Medical Incompetence Cases**: The Trials Division must resolve the medical incompetence cases brought between October 1, 2022 and March 31, 2023 for active staff and that are still pending **by August 31, 2023**. | Pg. 35 | N/A |

| Recommendations | April 3 Report Page Reference | April 24 Report Page Reference |
|---|---|---|
| **Staffing for Trials Division**: The City and Department must continue to vigorously recruit necessary staff for the Trials Division. While progress has been made, the number of staff is still not sufficient to manage the caseload and process cases in a timely manner. As part of this effort, the Monitoring Team also continues to strongly recommend that the City and Department afford staffing in the Trials Division an opportunity to work remotely. Even if permitted for only a few days per week, this benefit would support the overall recruitment efforts of qualified candidates. | Pgs. 108-109 | N/A |
| **Staffing for OATH**: OATH must continue to evaluate its staffing needs to determine whether additional staff are necessary to support the timely resolution of disciplinary matters. | Pg. 206 | N/A |
| **Management of Uniform Staffing** | | |
| **Finalization of Sick/Leave and Absence Control Policies**: Revise and implement the Sick Leave and Absence Control **by May 15, 2023**. | Pg. 35 | N/A |
| **Finalization of Medically Modified/Restricted Policies**: Revise and implement Medically Modified/Restricted procedures **by June 30, 2023**. | Pg. 35 | N/A |
| **Management of SMART Unit**: Recruit and hire a manager of the SMART unit. | Pg. 35 | N/A |
| **Overall Hiring of Staff** | | |
| **Overall Recruitment for Department**: The Monitoring Team continues to strongly encourage the Department to develop a remote work option, even for a few days per week, for staff with amenable job responsibilities as it would greatly enhance the Department's ability to attract qualified candidates. | Pg. 117 | N/A |
| **Management of Nunez Matters** | | |
| **Department Coordination with Nunez Monitor**: Dedicate additional resources to supporting the work of the Monitoring Team to ensure information is provided in a timely manner. | Pg. 114 | N/A |
| **Management of Nunez Matters**: Identify an individual to manage the Department's overall compliance efforts with the Court's orders. An incredibly unique skill set is required. This individual must have appropriate and recognized authority, a command of the Department's entire operation, and a nuanced understanding of the requirements in the various Court orders in this matter. Their core tasks are to set priorities and resolve conflicts within those priorities that may demand the same resources; anticipate potential barriers to implementation; communicate proactively with the Monitoring Team regarding upcoming initiatives, progress and obstacles encountered; and respond to the Monitoring Team's feedback and ensure it is incorporated into practice. | Pgs. 114-115 | N/A |
| **EISS** | | |
| **E.I.S.S. Access to Information**: E.I.S.S. staff continue to coordinate with various stakeholders in the agency to gain access to the necessary information on staff backgrounds so that they can obtain a complete understanding of the staff's practices prior to placement in E.I.S.S., and to ensure that the monitoring plans are tailored to address the underlying conduct that may have resulted in the staff's placement on probation or any issues raised during the | Pg. 174 | N/A |

| Recommendations | April 3 Report Page Reference | April 24 Report Page Reference |
|---|---|---|
| screening of newly promoted staff. The Monitoring Team recommends this coordination is prioritized and information is shared with E.I.S.S. as efficiently as possible—including materials which identify concerns raised during the screening process for newly promoted supervisors. | | |
| **Staffing for E.I.S.S.**: The unit currently has three open positions for civilian employees, but progress towards filling these roles has been on pause as the ADW positions were filled. The Monitoring Team strongly recommends that recruiting additional civilians to support this work should resume given the current strain on uniformed resources. | Pg. 175 | N/A |

# APPENDIX B:
# PROPOSED AGENDA FOR
# APRIL 27, 2023 COURT CONFERENCE

**Proposed Agenda for Court Conference**
*April 27, 2023 – 2:00 p.m.*

- Opening Remarks from the Monitor

- Monitor Recommendations & Priorities– Deputy Monitor

- Update from the Commissioner & City and discussion on next steps

- Counsel for the Southern District of New York and discussion on next steps

- Counsel for the Plaintiffs Class and discussion on next steps