

**THE
LEGAL AID
SOCIETY
CRIMINAL
DEFENSE**

199 Water Street
New York, NY 10038
(212) 577-3300
www.legal-aid.org

Alan Levine
*President*

Twyla Carter
*Attorney-in-Chief*
*Chief Executive Officer*

Justine M. Luongo
*Attorney-in-Charge*
Criminal Practice

Mary Lynne Werlwas
*Director*
Prisoners' Rights Project

<u>Via ECF</u>

April 25, 2023

The Honorable Laura Taylor Swain
United States District Court for the Southern District of New York
500 Pearl Street
New York, NY 10038

      Re:     *Nunez v. City of New York,* 11 Civ. 5845 (LTS)

Your Honor:

      Counsel for the Plaintiff Class writes to express our deep concern regarding the continuing constitutional violations in the New York City jails, and to explain in more detail our position on the appropriate next steps in this case. The Monitor has expressed cautious optimism that if the Department continues to slowly implement the Action Plan, it may *eventually* comply with the Consent Judgment and remedial orders. Based on a close review of the evidence as the Monitor has reported it, we must respectfully disagree with that conclusion. As explained in further detail below, the Action Plan simply has not produced the progress that the Court, the Monitor, and the Parties all hoped for.

      Disappointing recent developments, detailed further below, include:

- Use of force rates are ***twice*** what they were when the Court entered the Consent Judgment; use of force incidents resulting in the most serious injuries have ***tripled*** since 2016; and stabbings and slashings are ***five times*** higher than in 2016 .
- The quality of investigations has drastically deteriorated. Deputy Commissioner Hernandez resigned on the eve of the Monitor's public report describing his push for the Investigations Division to turn a blind eye to misconduct.  The failure of leadership has lasting consequences: severe understaffing and a lack of resources to reopen all the investigations that were compromised.
- Discipline is also deteriorating. In a significant departure, the City now allows excessive force violations to be adjudicated through an informal, ineffective system. Facility leaders imposed no sanction at all in ***more than half*** of the cases in which a command discipline was recommended. Over ***thirty percent*** of command discipline cases were dismissed for lack of processing, including cases where sanctions were recommended. The Monitor also found the outcome of formal disciplinary proceedings to be "questionable" or "unreasonable" more than a quarter of the time.
- The City has continued to fill the ranks of the Emergency Services Unit (ESU) with violent officers, even going as far as to reinstate officers who had been previously removed due to

**Justice in Every Borough.**

misconduct. And after the City was forced to acknowledge the serious concerns with ESU leadership, it may be choosing—according to recent media reports— someone with a history of excessive force to lead the unit.

- The City continues to maintain inadequate leadership in the jails. The City promoted 12 people to the position of Assistant Deputy Warden who the Monitor found were unsuitable. And despite a Court order permitting hiring outside the Department for the new position that replaced wardens (Assistant Commissioners of Operations), two of the five hires are from within, having grown up in the dysfunctional Department culture.

- Even facing a well-publicized crisis where housing units are understaffed despite a sufficient number of uniform employees, the City has dug in its heels: It has maintained the same number of "awarded posts," violating the Action Plan requirement to reduce such posts; still does not measure how many posts are abandoned; and did not make the changes to sick leave and restricted status policies ordered in the Action Plan. The number of ADWs and Captains assigned to the facilities to provide supervision has remained essentially static.

- An even greater proportion of staff are currently on sick leave and MMR compared to pre-pandemic levels; at least 10% of the total workforce are still unavailable to work on any given day.

Staying on the current remedial course means tolerating daily harm to the Plaintiff class—an outcome the Constitution forbids. Plaintiffs therefore suggest a tiered set of remedial measures, including immediate implementation of specific recommendations of the Monitor on a timeline that comports with the original intention of the Action Plan to achieve certain foundational goals by April (now June) 2023; further relief currently under negotiation by the parties; and, absent drastic improvements reported in the next Monitor's reports, the commencement of proceedings to place compliance in the hands of an independent receiver to achieve what the City is unable or unwilling to do. Accepting new and longer deadlines for implementation of items that the City already should have accomplished is an unacceptable and tacit extension of the Action Plan beyond its initial scope.

## I.     The Department Has Made No Material Progress in Reducing the Unconstitutional Use of Force, and the Human Cost of this Failure Is Extraordinarily High

There has been no meaningful improvement with regard to the unconstitutional pattern of unnecessary and excessive use of force against people in the City jails. To the contrary, since this case was initially settled in 2016, the situation has only further deteriorated. As the Monitor states plainly: despite the passage of seven years, "there is ***no evidence*** to suggest that practices have materially improved since the inception of the Consent Judgment," and in fact, "conditions are ***demonstrably worse*** than they were at the time the Consent Judgment went into effect." Monitor's April 3, 2023 Report on DOC Action Plan, ECF No. 517, at 37, 100 (emphasis added). The City's multitude of plans, policies, and promises have been an abject failure.

**Justice in Every Borough.**

The average monthly use-of-force rate is currently **_more than double_** what it was when the Consent Judgment went into effect. *Id*. at 48 (emphasis added). Uses of force have also increased in severity: the percentage of incidents that resulted in the most serious injuries has tripled since 2016. *Id*. at 49. In 2022 alone there were 434 serious injuries resulting from uses of force, compared to 74 in 2016. *Id*. On top of all this, the rate of stabbings and slashings has "increased exponentially," and is now five times higher than 2016. *Id*. at 49-50.

This information is devastating enough in the abstract; the reality of the impacts on the Plaintiff Class are even more bleak. The following incident, described based on interviews with class members, provides just one example of the systemic failures the Monitor has described for years.

According to multiple class members, in December 2022 at AMKC, an argument ensued between officers and incarcerated people regarding the provision of appropriate meals for those with allergies, resulting in a probe team storming their housing unit. Even after people in custody were secured and posed no danger of violence, the probe team continued to use force: they beat people in restraints, and targeted those restrained people with a burning spray akin to pepper spray. One class member described being punched, kneed, and having his head banged on the floor, all while he was in handcuffs. Another class member described being punched, kicked, and sprayed on his head and his body, all while in handcuffs. He further explained that officers slammed him into a gate three times, resulting in two significant lacerations to his face, one of which reopened prior stitches, and one of which had to be glued shut. His injuries were severe enough that his eye area is still visibly discolored months after the incident. This class member also witnessed an officer slamming a third class member's head to the ground, causing a wound so severe that this class member reported it required staples.

The aftermath of this incident only compounded its cruelty. After being beaten while in restraints, class members were taken to intake pens. They reported staying in these pens for at least 24 hours (with the exception of leaving to obtain medical care) and sleeping on the floor. The class member who sustained severe lacerations to his face reported he had to wait in the intake pen for around six or seven hours for medical care, his face caked with dried blood. After seeing clinicians, this class member explained he was returned to the intake pen, where he was forced to sleep on the floor despite his injuries, with no pillow or blanket, and with no meals provided to him for around 24 hours.

Multiple class members further reported that, after they left intake, they were taken to Enhanced Supervision Housing (ESH) and not allowed to leave their cells for multiple days. One class member explained that he was not even permitted to shower off the burning spray—some of which still remained on his body after a perfunctory "decontamination" immediately following the incident—for *five days*. On top of all this, when investigators came to speak with one class member about what he had experienced, they did so in the middle of an open housing unit where many others

could hear, potentially creating a dangerous situation for the class member if he told them what really happened.

This is but one incident among thousands that depicts daily life in the City jails, and the human costs of the City's intransigence in complying with this Court's orders. Indeed, these class member reports are remarkably similar to the separate incident described by the Monitor in its April 24 Report. Dkt. 520, at 16. The harm consists of the use of force itself, as well as the probe team's disturbing behavior, the improper use of intake cells following a violent incident, the prolonged isolation and lack access to basic needs like showers in ESH, and the failure of facility supervisors to recognize misconduct and hold staff accountable.

There is only one reasonable conclusion that can be drawn in the face of this quantitative *and* qualitative evidence: what has been done so far to correct the constitutional violations on Rikers Island is demonstrably insufficient.

## II.   The City Has Regressed on Critical Aspects of the Consent Judgment and Has Failed to Achieve Key Goals of the Action Plan

The Monitor opines that despite the stark data described above, the City may be on a path to eventual progress under the Action Plan. Respectfully, we cannot agree with this conclusion. As described below, the evidence supplied by the Monitor shows the City regressing on foundational elements of the Consent Judgment and failing to meet key goals of the Action Plan.

### A.   The City is Moving Backward on Limiting Use of Force, Investigating Use of Force, and Holding Staff Accountable for Misuse of Force

The Action Plan, by its own limited terms, was not intended to be a "panacea" and the Monitor recognized it "may not be sufficient to bring about the magnitude of change that is necessary to reform this agency" given the state of chaos in the Department. Dkt. 462, at 1, 2. But it certainly was not expected to derail momentum on progress in core areas of relief such as detecting misconduct and holding staff accountable. Yet in this last Monitoring Period, we have seen further deterioration and active backsliding on numerous key issues. Instead of slowly getting better, things are quickly getting worse on many important fronts.

#### 1.   The City Has Undermined Its Investigations of Use of Force

One exceptionally disturbing example of the failures of this process is the rapid and significant deterioration in the quality of investigations. Especially in an agency that has demonstrated persistent failures to reliably identify and address misconduct at all levels of uniform staff (Dkt. 517, at 39, 40; *see also* Dkt. 438, at 4, 5; Dkt. 431, at 35; Dkt. 368, at 8-10), the ability of the Investigation Division (ID) to perform that function is critical. What progress that existed within

**Justice in Every Borough.**

ID took years of painstaking pressure from the Monitor and the parties to build—far too long after the entry of the Consent Judgment and still requiring improvements in quality (Dkt. 472, at 135-137, 140). Yet the current administration eroded those gains in a matter of months.

The Monitor has identified devastating recent trends in investigations: consistent failures to address or analyze available evidence, conclusions that were not objective, misconduct identified much less frequently, and less rigorous supervision and oversight. Dkt. 517 at 101, 158. The Monitor determined that "staff may have been influenced or prompted, either overtly or implicitly, to adopt a more lenient approach…and to change their practices in ways that compromised the quality of the investigations." *Id*. at 158. Investigation outcomes reflected the pressure for leniency and deterioration in quality. Investigators recommended no action in nearly 20% more intake investigations as compared to the prior monitoring period—well over 700 cases—and recommended significantly fewer cases for Full ID investigations, where serious cases often result in formal discipline. *Id*. at 162. For many months, the City simply turned a blind eye to large swaths of use of force misconduct.

Blame for these failures has been laid squarely at the feet of the recently-resigned Deputy Commissioner for the Investigation Division, Manuel Hernandez. But bias and unprofessionalism on this scale belies the easy explanation of a lone fall guy. This was a *systemic* failure that occurred over a period of *several months*, and necessarily involved many people in ID—investigators willing to ignore available evidence and recommend no action in the face of objective misconduct, and supervisors at multiple levels willing to sign off on those outcomes. And now droves of investigators and supervisors have resigned or been reassigned—resulting in a decrease of 48% since January 2020 and *80% of supervisors and 89% of investigators in Full ID*—and ID has been mysteriously reorganized. Dkt. 520 at 7, 8. ID now has only 60 investigators assigned to use of force investigations as compared to 118 in February 2020, with only 10 investigators assigned to Full ID investigations. *Id*. at 8. This leaves ID unequipped to handle both the volume of new use of force incidents in the agency and the promised lookback into questionable investigations to remediate ID's recent failures. *See id*. at 7, 8. Marked deterioration of this sort within ID reveals what is, at best, dangerous fragility to any perceived progress, and an absence of commitment by the City to seriously investigate excessive force.

But worse still is the inexcusable inaction of the Commissioner as revealed by the Monitor's most recent report. *Id*. at 2. Last December, the Monitor relayed serious concerns about the decline within ID directly to the Commissioner . *Id*. Despite these alarming reports that indicated that the agency was violating multiple court orders—something the Commissioner should have known—the Department did not respond to the Monitoring Team for *two months*, at which time it sent a "superficial" two-page memo. *Id*. Even then, the City did not terminate former Deputy Commissioner Hernandez, but rather waited for him to resign on the eve of the filing of the

**Justice in Every Borough.**

Monitor's report in which these details would become public. *See* Graham Rayman, *NYC Rikers Island misconduct investigations boss resigns over questions about lax excessive force probes,* N.Y. Daily News (Apr. 2, 2023), https://bit.ly/3mULVsl.

The Commissioner's inaction is particularly alarming when taken with 1) evidence that Deputy Commissioner Hernandez pressured investigators to treat staff misconduct with leniency; 2) the Commissioner's firing of former Deputy Commissioner Sarena Townsend, the court-appointed and frequently-lauded Disciplinary Manager (Dkt. 435, at 8), without any bona fide reason (Dkt. 438, at 58-60) and in violation of the Third Remedial Order; and 3) Ms. Townsend's account that she was fired because she refused the Commissioner's request to leniently dispose of a large number of use-of-force misconduct cases. *See* Jan Ransom, *Jail Unions Gain a Powerful Supporter: The New Mayor*, N.Y. Times (Jan. 14, 2022), https://bit.ly/3V72f5D.

Moreover, the City's response to this "discovery" that ID's investigations are unreliable is patently insufficient. In our meet-and-confer sessions, the City and Monitor described various schemes for sampling or discerning which use of force investigations for 2022 and early 2023 should be re-opened. The Monitor's report on April 24 is vague as to how many investigations will be re-examined, stating only that the number will be "reasonable." Dkt. 520, at 7. The City repeatedly noted that resource constraints—that is, the City's longstanding failure to satisfy the Court's orders that it maintain sufficient investigative staff—will necessarily limit the number of investigations that could be re-opened. This abandonment of a commitment to investigating misuse of force is staggering, and echoes the period earlier in the Consent Judgment when the City admitted that accountability in 2,001 use of force investigations was foreclosed because ID's delay had caused it to miss the statute of limitations for filing charges. Eighth Report of the Monitor, Dkt. 332, at 131-132. It is also another instance in which the mismanagement of DOC has resulted in a clear waste of the City's and the Monitor's finite resources, as ID must now review and reopen use of force investigations that the City should have completed properly in the first instance.

The City's ability to meaningfully identify use-of-force misconduct is a pillar of the Consent Judgment. Under the Action Plan, the City has not only failed to improve this core function of the agency, it has materially regressed. Unreliable investigations coupled with the demonstrated deficiencies of supervisors in the facilities means that the culture of impunity at the heart of this case will only continue to flourish.

### 2.   The City Has Receded from Imposing Appropriate Discipline

In the unreliable instances where misconduct is properly identified by investigators, the City has drawn back from imposing meaningful accountability. The City has expanded the use of "command discipline" (informal discipline within a facility chain of command) to include excessive

**Justice in Every Borough.**

uses of force, resulting in less accountability and transparency. Even with regard to formal discipline, the general severity of sanctions has decreased without a corresponding decrease in officer misconduct, suggesting that the Department does not impose *proportional* punishments. Finally, the Department is failing to effectively use the most powerful tool for immediate accountability in its arsenal—the immediate suspension—to combat use-of-force violations. All of these developments show that the City is steadily moving *backwards* in its compliance with the key portions of the Consent Judgment and Remedial Orders relating to discipline.

### a.   The Counter-Productive Expansion of Command Discipline

The Action Plan required the City to revise its policy on command discipline—a type of informal, lower-consequence discipline—to "maximize the use of command discipline for *lower-level misconduct.*" Dkt. 465, § F, ¶ 3 (emphasis added). This provision was intended to help the City impose "increased close-in-time discipline." Dkt. 517 at 106. The idea was that non-serious violations, which did not require very heavy sanctions, would be adjudicated more quickly through informal command discipline.

Disturbingly, the City went well beyond this mandate, dramatically expanding the use of command discipline to encompass far more than "lower-level misconduct." The new policy allows numerous serious violations, including many excessive and unnecessary uses of force, to be subject to command discipline rather than the formal discipline process. This is a fundamental, counter-productive change. We strongly disagree with the Monitor's conclusion that this revised directive is "reasonable." Dkt. 51, at 108. Rather, the new policy unacceptably dilutes accountability for officers who use violence against incarcerated people.

Moreover, the rationale for the revised policy is to impose swift and meaningful discipline. But the policy is not accomplishing this goal. The data shows that command discipline often occurs slowly or not at all, and even when it does occur, is frequently so minor as to be insignificant.

### i.   Command Discipline vs. Formal Discipline

Command discipline is different from formal discipline in several ways. First, command discipline sanctions are decided by facility leaders, rather than through an independent tribunal. Second, the range of sanctions that may be imposed is limited: the highest possible sanction for command discipline is the loss of ten compensatory or vacation days, as opposed to the 60 days (or even termination) that may be imposed via formal discipline. Frequently, command discipline sanctions consist of reprimands or retraining, with no loss of days at all. Finally, command discipline is expunged from an officer's record after only one year, as opposed to five years for formal discipline. As all of this indicates, Command Discipline is overall a less serious and less strict form of accountability than formal discipline.

**Justice in Every Borough.**

> ii. *Permitting Excessive and Unnecessary Uses of Force to Be Adjudicated as Command Discipline is Unacceptable*

Prior to the issuance of the new Command Discipline directive, **all** use of force charges, including charges for unnecessary and excessive uses of force, were entirely excluded from command discipline, and thus could be adjudicated only through the formal disciplinary process. Dkt. 520, at 20-21. This was for good reason. Unnecessary and excessive uses of force are serious violations that should not be expunged from an officer's record after only one year, nor subject to a maximum sanction of only ten days.

But under the new directive, many uses of force deemed excessive and unnecessary may be adjudicated under the command discipline structure, rather than through formal discipline. Now, such charges are only excluded from command discipline when they involve a "high impact" use of force, defined as including: "1. Strikes or blows to the head, face, groin, neck, kidneys, and spinal column; 2. Kicks; and 3. Choke holds, carotid restraint holds, and other neck restraints." *Id*. There are numerous troubling uses of force that do not fall under this description, such as slamming an incarcerated person against a wall, a gate, or the floor; striking or punching an incarcerated person in the stomach, arms, or legs, particularly while that person is in restraints; spraying a person in custody unnecessarily or excessively with painful chemical agents, and more. Under the new policy, it is permissible for such non-"high impact," but still unnecessary and excessive, uses of force to be channeled through informal command discipline. And while the Investigations Division still has the power to ensure that formal discipline, rather than command discipline, is imposed in such cases, there is no requirement that they must do so. Relying on the discretion of the highly troubled Investigations Division in this context is not an adequate safeguard against the potential for abuse.

Thus, we respectfully disagree with the Monitor's recent assertions that only "*minor* use of force violations" will be subject to Command Discipline under this new policy required this change. *See* Dkt. No. 520 at 20. The Action Plan required that command discipline be expanded to encompass "lower-level *misconduct*," not lower-level *uses of force*. Plaintiffs did not until recently understand that the Monitor or the Defendants believed excessive and unnecessary use of force could constitute-level misconduct." All excessive and unnecessary uses of force are sufficiently serious to merit formal discipline. Had we understood that any Party believed otherwise when the Action Plan was entered, we would have strongly objected to this provision of the Action Plan.

This updated command discipline policy is a massive step backward for the goal of achieving meaningful accountability. No excessive or unnecessary use of force should be subject to a sanction cap of ten days, nor should such a charge be removed from an officer's record in only one year. Permitting such one-year expungements for excessive and unnecessary uses of force is a particularly

**Justice in Every Borough.**

egregious change, as it will allow officers who have engaged in excessive uses of force to pass screening processes for promotions, specialized units like ESU or areas housing vulnerable populations, and privileged posts when they otherwise would have been barred. These types of changes are wholly inappropriate in a system where, as the Monitor has found, "well-documented patterns and practices of use of force related misconduct continue *without any appreciable improvement*." ECF No. 517, at 156-7 (emphasis added). More accountability and transparency are required, not less.

### iii.  The Command Discipline System Lacks Integrity

Not only does the revised command discipline policy suffer from the fundamental flaws described above; the command discipline process also lacks integrity in its implementation.

During the Fifteenth Monitoring Period, facility leaders imposed a "substantive outcome," defined broadly as including any sanction whatsoever, no matter how mild, in *fewer than half* of the cases in which command discipline was recommended. Dkt. 517, at 182. Facility leaders imposed a loss of compensatory days in a mere 29% percent of command discipline cases. *Id*. In most of the remaining cases in which there was any "substantive outcome," facility leaders imposed exceedingly light sanctions such as "reprimands" or "corrective interviews.*" Id*. These types of sanctions are completely opaque given that, as the Monitor has noted, "the quality of a counseling session is nearly impossible to effectively measure or quantify." *Id*. at 179. As a result, these so-called sanctions are at best questionable in their utility, and at worst entirely meaningless. On top of this, facility leaders are known to impose them far too frequently: "Facility leadership have long exhibited an over reliance on the use of a reprimand and corrective interview[.]" *Id*. at 183.

Despite this known issue, the revised command discipline directive shifted significant disciplinary responsibility away from the Trials Division and OATH, and into the facility leaders' hands, where they have predictably continued to impose light, untransparent sanctions with great frequency. Indeed, the proportion of cases resulting in 1-5 days deducted has decreased from 52% in the Eighth Monitoring period to only 29% in the most recent, while the proportion that resulted in a reprimand increased from 9% to 14% in the same periods. Dkt. 517, at 182. The overreliance the Monitor has described is getting worse, not better.

While this overuse of inadequate sanctions is highly problematic, even more troubling is the exceedingly high number of command discipline cases dismissed because the Department bungled the charges. Twenty-two percent of Command Discipline cases during this Monitoring Period were dismissed solely due to "failures in processing." Dkt. 517, at 182. In other words, hundreds of cases in which the Department alleged use of force related misconduct were dropped with no action against the officer, not because there was any good reason to dismiss the case, but because the

Department simply failed to follow through. In an additional 9% of cases, the sanction approved via command discipline was never entered into CMS. *Id*. This means that in more than 100 cases, although the facility determined that misconduct occurred and a sanction should be imposed on the officer, no one ever actually imposed it. It should go without saying that this is the opposite of meaningful accountability. Moreover, this is yet another area in which the Department's performance is getting worse. The proportion of cases in which a sanction was decided upon but never actually imposed increased from 2% during the Eighth Monitoring period, to 5% during the Eleventh and Twelfth Monitoring periods, to 9% today. *Id*. at 182.

 By relying on command discipline more frequently and for more serious misconduct, the City is funneling more and more cases through a system where meaningful accountability is the exception, rather than the rule. This de facto impunity for many use of force violations is a serious retrenchment, and is counterproductive to the goal of achieving substantial compliance with the Consent Judgment.

> b.    *Decrease in Quality of Formal Discipline*

The Monitor reports progress in the speed with which OATH and the Trials Division have resolved formal disciplinary cases. The attention to resolving a select number of "fast track" cases is indeed laudable, as prompt discipline is imperative. However, the apparent cost of this achievement is a deterioration in the quality of the formal discipline that is being imposed. This is not an acceptable trade-off. Decreasing the severity of punishments in a system that already does far too little to hold its officers accountable is a step backward. The Department must develop the ability to impose discipline that is both timely *and* proportional, not one or the other.

The Monitor has documented the decreased severity of sanctions imposed via formal discipline. The use of low-level sanctions for formal discipline has increased during this Monitoring Period, with 40% of formal discipline cases resulting in a sanction of less than 10 days, compared to only 27% during the previous period. Dkt. 517 at 186. Along the same lines, the use of severe sanctions of 30 days or more has decreased, from 30% in the prior Monitoring Period to only 21% in this one. *Id*. Such a change is deeply troubling in a system where, as the Monitor puts it, "use of force related misconduct continues ***without any appreciable improvement***." *Id*. at 156-7 (emphasis added). If misconduct has not decreased appreciably, disciplinary sanctions should not decrease either.

Moreover, the City is increasingly reaching dubious results in its formal discipline, with the Monitor finding more outcomes to be "questionable" or "unreasonable." In December 2021, the Monitor found that sanctions imposed in formal disciplinary cases were "generally reasonable," with only a "small proportion" being deemed "questionable," and "a few isolated" cases being found

"unreasonable." Dkt. 431, at 106. In October 2022, on the other hand, the Monitor found that nearly one-fifth (19%) of cases had questionable outcomes, with only 80% being reasonable, and five cases being "unreasonable." Dkt. 472, at 154. Now, in April 2023, the Monitor's review has resulted in even worse findings. Only 73% of sanctions were found to be reasonable, with 23% being questionable (more than in 2022), and 4% being unreasonable. Dkt. 517, at 187. Given that 397 incidents were reviewed during this Monitoring Period, approximately 15 cases resulted in a finding of "unreasonableness," three times the number from the Monitor's prior review.

This trend is troubling. Though a situation is qualitatively complex, quantitative data is an essential tool that cannot be ignored. In this case, the data demonstrates that the severity of formal disciplinary sanctions has decreased, even as the severity of misconduct has arguably increased over time. The fact that the speed with which discipline is imposed has increased is promising, but it does not make up for the decreasing quality of disciplinary outcomes.

> c.   *Failure to Utilize Immediate Suspensions in Use-of-Force Cases*

The Department has vastly underutilized one of its most effective disciplinary tools: the ability to immediately suspend staff who engage in misconduct for up to 30 days, without pay, pending formal disciplinary charges. The Department has always chosen to use this tool very sparingly when it comes to uses-of-force, which is a missed opportunity. This ongoing problem worsened during the most recent Monitoring Period.

While the overall number of suspensions increased this year, this is almost entirely due to a massive increase in the number of suspensions for abuse of sick leave as the City, facing intense political scrutiny of its no-show workforce, began to clear its roster of phantom employees. Use-of-force suspensions, in contrast, have notably declined: only 66 in 2022, from 78 and 82 in 2020 and 2021, respectively. Dkt. 517, Appendix A, at x. This was no accident, but reflected departmental policy, as the Deputy Commissioner of Investigations "reported a preference for utilizing a Memorandum of Complaint in lieu of suspensions." *Id*. at 180. That a leader in the Department would take this position displays a willful misunderstanding of the important role of immediate suspensions, which are designed to be used in tandem with memoranda of complaint and not "in lieu" of them.

As the Plaintiff Class and the Monitor have reiterated many times, close-in-time accountability is extremely important to the Department's overall efforts to introduce culture change and decrease violence in the jails. To help make close-in-time accountability possible, immediate suspensions should be used far more broadly than they have been historically. Instead of working toward that goal, the Department once again took a step backwards, decreasing its use of suspensions in use-of-force cases for no justifiable reason.

**Justice in Every Borough.**

### 3.   The Department Maintains Its Troubling Reliance on the Emergency Services Unit and Consistently Fails to Screen Out Violent Staff

The Department's over reliance on the hyper-confrontational Emergency Services Unit (ESU), and similar militarized teams, continues unabated. The ESU has long played an outsized role in perpetuating jail culture, and as the Monitor notes, it is "*expected* to be the most elite team of Staff in the Department." Dkt. 368, at 44 (emphasis in original).  For example, the Correction Officers Benevolent Association's Facebook page video "Thank You ESU" asserts, "ESU is the backbone of the NYC Department of Correction. When a major incident occurs on Rikers Island, ESU always answers the call.  When our department turns their back on the Bold men and women of ESU, our union will ALWAYS fight for you. Period. #WeGotYourBack #COBAEliteESU #BoldestNYC." *See* COBA NYC, *Thank You ESU*, Facebook (Mar. 4, 2021), https://bit.ly/3n44Kco. But as the Monitor notes, "despite its reputation as an elite team within the Department, ESU's pattern of unnecessary and excessive uses of force stand in obvious violation of the Use of Force Directive and the requirements of the Consent Judgment and the Remedial Order." Dkt. 368, at 45. For these reasons, the Monitoring Team has raised the ESU's problematic practices with the City since the inception of the Consent Judgment. Dkt. 517, at 138-40; *see also* Dkt. 368, at 38-50, 116-120; Dkt. 431, at 51.

Instead of working vigorously to change the abusive culture that the ESU perpetuates, the City remains non-compliant with § A., ¶ 6 of the First Remedial Order and § D., ¶ 2(c) of the Action Plan. For example, for years the City has failed to screen problematic ESU members with documented histories of excessive force and disciplinary charges, as their policy requires. Dkt. 517, at 140. Indeed, in 2023, the City *returned sixteen staff members to ESU that had previously been removed due to misconduct*. Dkt. 517, at 142. The City also created "new" definitions of misconduct ("impermissible force") to avoid removing people from ESU where their removal would otherwise be required by internal policy. *Id.* at 141-142. The City also did not remove 5 staff members that a recent screening indicated should be removed. *Id.* at 141.

Only after the Monitor filed its April 3 Report stating "significant concerns about the adequacy of the leadership within ESU," (Dkt. 517, at 140), did the City inform us they had selected a new leader of ESU but refused to identify the person in a meet-and-confer on April 20. News reports subsequently identified the new ESU leader as Assistant Deputy Warden Vaughn Grinnage. *See* Graham Rayman, *"New head of NYC Correction Department unit criticized for Rikers Island violence was accused in caught-on-video assault of Kalief Browder*, N.Y. Daily News (Apr. 20, 2023), https://bit.ly/41I4oHO;Dkt. 520, at 17. According to the news accounts, ADW Grinnage is the officer seen in this videotape beating Kalief Browder, whose hands appear cuffed behind his back:  Jennifer Gonnerman, *Exclusive Video Inside Rikers,* The New Yorker (April 23, 2015), https://bit.ly/3Loi7gZ. In response to our inquiries, the Monitor confirmed that ADW Grinnage had

**Justice in Every Borough.**

been considered for the post, and additionally, that he was one of the twelve ADWs who were promoted despite failing the Department's original screening (explained further below).

Similarly, the City reported that it would remove the improperly reinstated ESU staff, retire the "new" use of force nomenclature, and review ESU use of force policies only after the Monitor published its concerns about ESU conduct and composition in its April 3 Report. Dkt. 520, at 17.

Taken together, the Department's conduct allows ESU staff to act with impunity and sends a disturbing message about the kind of misconduct that is permitted in the ESU. The reports about ADW Grinnage, if correct, demonstrate that the City has chosen not to reform the ESU, but instead to double down on reinforcing its culture of misconduct  Finally, the Department's reversion to old practices, despite the requirements of its formal polices, wastes the Monitor's and the City's resources.

### B. The City Has Either Moved Unacceptably Slowly or Entirely Failed to Comply with Many Basic Action Plan Requirements

Even with additional time to complete the Action Plan, the Department has moved too slowly or entirely failed to tackle what the Monitor has characterized as the "core problems" preventing progress on the Consent Judgment and Remedial Orders. Dkt. 454, at 10. The Monitor grounded the Action Plan in "four foundational issues" that "provid[e] the framework upon which the larger reform effort will rest": (1) ineffective staff management, supervision, and deployment; (2) poor security practices; (3) inadequate inmate management; and (4) limited and protracted discipline for staff misconduct. *See* Dkt. 454, at 9; Dkt. 438, at 2. The Department has long been aware, since the First Remedial Order and the Consent Judgment itself, that these issues are "systemic" and must be addressed in order for any meaningful reform to occur. *See* Dkt. 373, at 3; Dkt. 429, at 6.

The Action Plan compelled the City to focus its efforts and resources on the specific tasks outlined in the plan. Yet the Department has not meaningfully addressed the four foundational issues identified by the Monitor—not only with respect to the disciplinary issues outlined above, but also failing to improve staff supervision and deployment, security, and intake issues, as described below. The consequences of these deficiencies are dire: just two weeks ago, the Board of Correction's death reports described how staff's failure to tour, and failure to be on post, contributed to 13 and 4 deaths respectively last year. Board of Correction, Third Report and Recommendations on 2022 Deaths in New York City Department of Correction Custody, April 12, 2023, https://bit.ly/43XdRfD.

### 1. The Commissioner Ignores Negative Recommendations to Promote Facility Leadership

The Commissioner promoted a dozen individuals to the position of Assistant Deputy Warden despite the Department's *own* screening process identifying them as not suitable for promotion. It has done so notwithstanding the First Remedial Order and the Action Plan's requirements for meaningful supervision. *See* Dkt. 350, ¶ A(4); Dkt. 465, ¶ G(5)(b)(i)(8). ADWs are critical not only because they supervise captains and the proper operation of housing areas, but also because they hear and issue command disciplines for use of force-related misconduct. The Monitor has noted that the "quality of the individuals who serve in these supervisory positions is also critical to the quality of supervision provided." Dkt. 517, at 136.

Of the Department's 26 promotions to ADW during the last monitoring period, 12 individuals "lacked an objective or sound basis for promotion based on the screening materials provided" and were unsuitable for promotion under the Department's own screening criteria. *See* Dkt. 517, at 212-213. Several promoted individuals were not recommended for promotion by one or multiple Divisions that conducted the screening. *Id.* at 213, 215. One promoted individual was not recommended for promotion by *three* divisions, was a defendant in multiple lawsuits, and was repeatedly disciplined for ineffective performance. *Id.* at 215. Another individual was previously promoted to ADW in 2020, demoted to Captain 2021, again promoted to ADW in December 2022, and again demoted to Captain in February 2023. *Id.* at 216. The Department did not document why it promoted these individuals notwithstanding the negative recommendations. *Id.* at 213-14. Further, in three of the promotions, the candidates failed the "2-in-5" assessment (they had guilty findings on certain violations twice in the last five years), but the Commissioner decided to promote them anyway in light of "impeccable" attendance during the COVID-19 pandemic and the lack of use-of-force charges since 2020. *Id.* at 214.

When asked why the Commissioner had promoted these individuals despite receiving negative recommendations, the City stated only that it was a decision within the "discretion" of the Commissioner, but could offer no further details about the basis for his decision-making. And, despite the Monitor's concerns, the City insisted it would adhere to 11 of the 12 promotions.

Other promotion problems persist. The Department has altered its promotion policy to remove a requirement that promotion to Deputy Warden require at least one year of experience working in the jails; and to permit a Deputy Warden candidate to be ranked "outstanding" even if they were found guilty in a disciplinary proceeding in the last six months (which the Department has claimed is an error). 4/3/2023 Monitor's Report at 211-212, Dkt. 517.

Finally, last December the Department finally agreed to consider candidates for Assistant Commissioner of Operations from outside the Department—after refusing to follow the Monitor's recommendation for well over a year. *See* Dkt. 368, at 15; Dkt. 475, at 2. Yet the Department has gone on to fill 2 out of 6 positions with staff from within the Department, indicating a continuing resistance to the Monitor's repeated observations that "embedding external correctional expertise into this agency is so essential." Dkt. 517, at 40.

**Justice in Every Borough.**

### 2.   Failure to Reduce Awarded Posts

The Department has flouted the order to reduce awarded posts within the jails and has offered no legitimate justification for doing so. The Action Plan required the Department to reduce awarded posts, in which staff may bid for an exclusive assignment within a facility. Dkt. 465, ¶ C(3)(v). The Monitor has recommended the reduction in awarded posts to ensure that adequate and experienced staff are available to supervise the housing units. Dkt. 438, at 31-32 ("the Department's staffing framework is so fundamentally flawed that it has thwarted progress time and time again"). Because posts are awarded based on seniority, the high number of awarded posts within the Department means that "the most experienced staff [are awarded] posts where they do not supervise housing units." *Id.*

***Yet ten months after the Action Plan was ordered*, *the Department has not reduced the number of awarded posts at all*.** As of March 2023, the number of staff on awarded posts was essentially the same as September 2022, and even higher than in August 2021: 1,663 staff versus 1,661 staff versus 1,650 staff respectively. Dkt. 517, at 21; Dkt. 438, at 36. The Monitor's report reflected no reason for this failure but noted only that the Department reported they had "recently initiated a review," a step that clearly should have been taken several months prior. Dkt. 517, at 21. Only after Plaintiffs raised this issue with the City has the task been moved to "priority status," but the Department still could not provide any timeline for completing this task. Dkt. 520, at 20.

When questioned about this lack of progress during a meet-and-confer, Defendants' counsel indicated that a "higher up" had erroneously conveyed to the Department's Staffing Manager that collective bargaining agreements prevented him from reducing awarded posts. As Defendants now admit, the collective bargaining agreements do no such thing. Dkt. 520, at 19-20. While it may well be the case that the union and its members opposed reducing awarded posts—which are viewed as a benefit for staff—that is no basis to ignore the Court's order. The Department did not detect or rectify this misinformation—despite being under a court order—until *the Monitoring Team* inquired in March 2023 about the lack of progress in complying with the requirement to reduce awarded posts. *Id.*

That a "lapse in communication" prevented implementation of this clear Action Plan term is not only unavailing but astonishing, particularly when Your Honor directly confirmed with the Commissioner and the Law Department prior to ordering the Action Plan that there were no such barriers preventing these exact requirements. Transcript of May 24, 2022 Conference, 57:22-58:9; Dkt. 520, at 20. The City's newfound attention to awarded posts does not rectify the ongoing harm to the class from these staffing deficiencies, nor does it explain how an error of this magnitude went unchecked for many months without anyone in leadership correcting it.

**Justice in Every Borough.**

### 3.   No Movement on Civilianizing the Workforce

The Department has not made any significant moves to civilianize its workforce, as required by the Action Plan. *See* Dkt. 465, ¶ A(2)(e) (Department shall utilize civilian staff to conduct work of HMD); ¶ C(3)(vii) (Department shall reduce assignment of uniform staff to civilian posts). As an initial matter, the Department has not provided the data required by the Action Plan. *See* Dkt. 465, G(4)(b)(ii)(14). We still do not know whether the Department has reassigned any posts from uniform staff to civilian staff; how many uniform posts can be staffed by civilians; or how many uniform posts the Department has determined are unnecessary. About half of HMD's 100 staff members remain uniform staff. Dkt. 517, at 26. While HMD intends to hire civilian staff for its "Sick Desk," it has not explained why civilian staff cannot be hired for its other 14 divisions. *Id.* In sum, there appears to be no change in the Monitor's assessment that, as of March 2022, over 700 uniform staff held positions that could reasonably be undertaken by civilians. Dkt. 438, at 36-37.

The City also refuses to offer a remote work option for certain necessary civilian posts despite serious staffing needs and the Monitor's long insistence on the need for such reform. *See* Dkt. 438, at 61; Dkt. 472, at 13. Recently, the Monitor again "strongly recommend[ed]" that the City afford the option to work remotely in order to support recruitment efforts. Dkt. 517, at 108-109. Despite conveying this recommendation directly to the Citywide Task Force assembled by Action Plan ¶ B(1) specifically to overcome potential barriers to reform efforts, "[u]nfortunately, the City reports that any potential remote work option is currently limited to those covered by the City's agreement with DC37 union, where a pilot is to be developed by June 2023." *Id.* at 117. It is not clear from the City's explanation why such a pilot agreement with one particular union would preclude offering remote work options to other City employees, and we see no reason why such an agreement could be a barrier to compliance with federal court orders.

This unwillingness to address perceived legal—or more likely political—constraints is, again, the same rigidity that has produced an intolerable pattern of delay in addressing the complex web of factors that produce the constitutional violations the relief ordered in this case seeks to address.

### 4.   Meaningful Supervision in the Jails Does Not Exist

The Department has long been aware that sufficient ADWs and Captains must be present in the facilities, and specifically in positions that involve regular interaction with people in custody, in order to address the many security, behavioral, and other issues that cause use of force and violence in the jails. In August 2020, over two and a half years ago, the First Remedial Order required the Department to improve the level of supervision of Captains by substantially increasing the number of ADWs assigned to the facilities, to both adequately supervise the Housing Area Captains and the housing units to which the captains were assigned. Dkt. 350, ¶ 4. A year and a half later, the Monitor

**Justice in Every Borough.**

noted that few, if any, additional ADWs had been deployed to supervise staff on the housing units. Dkt. 438, at 4-5. The Monitor noted that ADWs and Captains were not deployed effectively, limited in number, and were either incapable or unwilling to provide adequate supervision. *Id.* That is why the Action Plan required the City to substantially increase the number of ADWs and Captains in the facilities to ensure adequate supervision of subordinates and presence on housing units. *See* Dkt. 465, ¶¶ C(3)(ii), C(3)(iii).

To date, the Action Plan's attempts to remedy these long-standing issues have not been implemented by the City in any meaningful way. Only 80% of ADWs are assigned to facilities and court commands as of December 31, 2022; there has been no significant increase since July 2020. Dkt. 517, at 134. Similarly, only 75% of Captains are assigned to facilities and court commands as of December 31, 2022; again, there has been only a slight increase in percentage since July 2020. *Id.* at 135.

Even where ADWs and Captains are assigned to facilities, the Department cannot confirm that those ADWs and Captains are actually working in posts on housing units or otherwise positioned to provide proper supervision to subordinates. Dkt. 517, at 134-135, n. 113, n. 117 (noting that the assignments of ADWs and Captains within the Facility are unavailable). Indeed, the City admitted that 7 Captains assigned to OBCC do not actually work with incarcerated individuals because they are on MMR status. In the absence of ADWs and Captains that maintain a "consistent presence on the housing units" to "ensure [that] staff are properly posted and positioned, guide and develop staff's practice, and hold staff accountable for properly executing their duties," the Department will be unable to improve its supervision and reduce use of force. Dkt. 438, at 5.

Further, the Department did not reassign "most, if not all" of the 45 Captains on Temporary Duty assignment to posts that supervise officers in housing units. Dkt. 465, ¶ A(3)(a). About 30 Captains remain on long-term TDY status, while only 20 Captains have returned to posts in the jails. Dkt. 517, at 22.

It also remains unclear whether sufficiently senior staff are present in the jails during the evenings and weekends. While Deputy Wardens are now required to work one weekend day each week and have staggered shift start times, the Department has not confirmed that a Deputy Warden is present at each facility during evening hours and on both weekend days. Dkt. 517, at 22-23. Nor in our meet and confer session on April 20, 2023 could the Department confirm whether facilities have Assistant Deputy Wardens beyond a single tour commander on nights and weekends. Similarly, the Department has only "begun" to consider ADW and Captain assignments to broaden the presence of supervisors throughout evenings and weekends. *Id.* at 23.

Even when supervisors are present, they continue to routinely demonstrate a poor command of the use of force policy, fail to identify security lapses that contribute to uses of force, and act precipitously which often contributes to concerning outcomes. Dkt. 517, at 39, 40. For example, the

Monitoring Team noted regular instances during site visits in which "clear security lapses" were apparent, yet "a review of logbook entries revealed a recent supervisor's tour that noted 'no issues.'" *Id.* at 38. The Monitor observes that supervisors' "skill deficits are exacerbated by the fact that DOC has fewer levels of supervisors in its chain of command than is seen in most correctional systems," and the requirements to increase the numbers of Captains and ADWs in the facilities were intended to address these deficiencies. *Id.* at 40. The Department continues to fail to do so. In a system where line staff routinely work double tours, posts are abandoned, and 48% of use of force investigations reveal basic correctional failures, this abdication of supervisory responsibility is objectively dangerous. *Id.* at 38.

### 5.   Absent Staff and Abandoned Posts Persist

The Action Plan sought to ensure not only that sufficient staff are *available to work*, but also that, once assigned, staff *actually work* the posts to which they are assigned. Dkt. 465, ¶¶ A(2), C.

On the latter issue—ensuring staff do not abandon their posts—no progress has been achieved.[1] Unmanned posts are one of the "consistent contributing factors to the unnecessary and excessive use of force and violence . . . on the housing units." Dkt. 438, at 39. The Department does not even collect data on the frequency of abandoned posts, let alone which posts are abandoned. And data from use of force incidents reflect that unmanned posts persist and cause grievous harm: approximately 54% of use of force incidents involving unmanned posts could have been avoided if a staff member was present. Dkt. 517, Appendix A, at vi.

And on the former issue, the Action Plan ¶ A(2)(d)(ii), (iii) required the policies for Sick Leave and Absence Control to be revised within 90 days of the Order and implemented thereafter— **now, over ten months later, the policies are not only unimplemented, they have still not been *revised*** "despite the Monitoring Team's repeated and consistent prompting to stakeholders at all levels of the Department." Dkt. 517, at 29-30. Nor has the Department implemented a "strategic plan to significantly limit the use of [MMR] status going forward." Dkt. 465, ¶ A(2)(d)(ii). Tellingly, the Department has not identified how many staff have been newly-designated with MMR status since the Action Plan went into effect. The City has not made the fundamental changes necessary to avoid the "mismanagement and a lack of policy enforcement" that results in "staff *obtaining* unlimited sick leave benefits." Dkt. 517, at 24.

The most recent data shows that **an even greater proportion of staff are currently on sick leave and MMR compared to pre-pandemic levels**. As of February 2023, 421 staff were designated MMR (6% of the Department's headcount) and 680 staff (or 10% of the total workforce) are on sick leave. These numbers are similar to the numbers of individuals on MMR or sick leave in January

---

[1] While the Department has provided data indicating that the number of "unstaffed posts" has decreased, that term does not include a post that a staff member has been assigned to but then abandons. Dkt. 517, at 14 n. 4.

**Justice in Every Borough.**

2019 (459 staff and 621 staff, respectively). This results in absurd deployments of scarce resources, such as the assignment of seven captains on MMR status to a *closed* facility, OBCC, which, as the City explained, operates as an overflow staff locker room. Dkt. 517, at 135. In our meet and confer sessions, the City could not defend this assignment except to say it was necessary because the captains are on MMR status.

Further, while the Department has identified 1,029 staff as "chronic absentee[s]," that number appears unchanged from October 2022. *Compare* Dkt. 517, at 33 *with* Dkt. 472, at 53. During the meet-and-confer process, the Department reported that it is still backlogged in processing those designations. Most importantly, the Department has not said whether any of these individuals have, in fact, suffered limitations on "various discretionary benefits and privileges" that would serve "as a deterrent to excessive sick leave." Dkt. 517, at 28-29.

While 244 staff were medically separated, terminated, resigned, or retired from the Department, at least 10% of the total workforce (680 staff) are still unavailable to work on any given day.[2] Further, while the Department has reported in the meet-and-confer process that HMD identified over 1,700 uniform staff who were removed from MMR status and returned to full duty between February and December 2022, the Department has not stated what, if any, disciplinary measures were taken with respect to those staff members.

The Department also has inexplicably failed to transition to 5x2 shifts (5 days on, 2 days off) completely. Approximately 62% of the workforce remain on 4x2 shifts, even though this schedule reduces the proportion of the workforce at work on any given day from two-thirds to one-half and provides less flexibility for coverage. Dkt. 517, at 21.

### 6.  Intake

Intake areas continue to be the second most frequent location for uses of force. Dkt. 504, at 3-4. To address the use of force in intake, the Action Plan, which reiterated the requirements of the Second Remedial Order, required the City to process all incarcerated individuals through Intake and place them in an assigned housing unit within 24 hours and reduce the reliance on intake. Dkt. 465, ¶ E(3). The Second Remedial Order also required the City to track and record the amount of time any incarcerated individual was held in intake by November 15, 2021. Dkt. 398, ¶ 1(i)(c).

*a.*        *Overstays and Tracking*

---

[2] The percentage of the workforce unavailable to work is likely higher given the Monitor's acknowledgment that some staff on MMR may also be out sick. 4/3/23 Monitor's Report at 16 n.6.

**Justice in Every Borough.**

Over a year after the November 15, 2021 deadline and after this Court found that the City failed to implement a tracking system pursuant to its Order, Dkt. 511 at 22-23, the City is still far from compliance with the court-ordered intake provisions.

With regard to intra-facility transfer stays in intake, the City reassured the Court during the contempt briefing process that although it was not tracking such stays *yet*, its plan to do so "should be fully implemented by the end of February." Decl. of Christopher Miller, Dkt. No. 505-1, ¶ (B)(4). This did not happen. Rather, on April 17, 2023, the City admitted that "staff are still not entering data in the [Inmate Tracking System "ITS"] as consistently as they should be, so that we are not yet able to run daily reports." Declaration of Christopher Miller, Dkt. No. 519-1, ¶ 11. In other words, the City is *still* not tracking intra-facility transfer stays in intake, and can provide no meaningful data on whether it is complying with the 24-hour limit with respect to that population. The Monitoring Team has also observed inadequate performance in the use of ITS, identifying a significant number of individuals whose arrival in facility intake units were not entered into ITS at all. Dkt. 520 at 12. The City's purported next steps do not seek to understand why staff are not complying with stated expectations. *Id.* at 13.

Moreover, "the mere presence of the tracking system does not connote compliance with the requirement to expeditiously process incarcerated individuals within 24 hours." Dkt. 517, at 84. That data must also be *accurate* and include a quality assurance process. To date, the City has *no* quality assurance process for inter/intra facility transfers and facility compliance with tracking has been inconsistent. Dkt. 517, at 131.

The City's compliance with respect to new admissions fares no better. Over a year after the November 15, 2021 deadline, the City implemented a system to provide data regarding the processing of new admissions through intake. This Court already found the City non-compliant with the Second Remedial Order and the Action Plan where the accuracy of its tracking system was yet to be determined. Dkt. 511, at 21-22. Almost a month later, auditing mechanisms to ensure reliability of this data remain lacking. The City's audit strategy employs small sample sizes to assess the accuracy of its data and the Monitoring Team noted that the City still has work to do. Dkt. 517, at 78-79; Dkt. 519, at 2. Moreover, the Monitoring Team found that the City's audit strategy remains impractical and unsustainable and is at best "a passable assessment of small samples of cases." Dkt. 517, at 79.

### b. De-escalation Protocols

The First Remedial Order required the City to implement a new De-Escalation Protocol ¶ A.3 to address the City's overreliance on Intake with respect to post-use of force management. However, even now, over two years after the Order and close to one year after the Action Plan, the Monitor's

Report lists the City as only in Partial Compliance with that provision. Because the City was unable to provide data for individual stays in intake in 2022, the Monitoring Team based its findings on NCU audits from July to December 2022 covering a small sample of 124 individuals to determine compliance with de-escalation protocols, finding that 29% were brought to intake areas. Plaintiffs have no information about why de-escalation protocols were not followed with respect to 29% of even this small sample size. This is even more concerning given class member reports like the December 2022 incident relayed above, *see* Section I., *supra*, and also the most recent Board of Correction Report indicating that at least one person died by suicide after he was first taken to intake following disruptive behavior, then returned to his unit and allowed to remain in a vestibule instead of a de-escalation unit in September 2022.[3]

### III.   Additional Enforcement of the Court's Judgments and Further Relief Are Necessary to Protect the Plaintiff Class

The record makes clear that any progress made toward compliance with the Consent Judgment has only come as the result of extraordinary, continuous pressure from the Plaintiffs, the United States, the Monitor, and the Court. For example, the City reports that many initiatives will be completed or implemented by April 2023, coinciding with the pressure point of a scheduled court conference.[4] As soon as such pressure is lifted, backsliding inevitably occurs. This is not a sustainable path to protecting the Plaintiff class.

Developments in intake and investigations are instructive examples of this pattern. As we discussed above and in support of our motion for contempt (Dkt. 500), attempts to enforce the Second Remedial Order requirement that that City implement a reliable intake tracking system have been arduous. The improvements that have been made predictably followed each additional application of pressure on the City, ultimately leading to contempt proceedings which initially produced some movement, particularly with regard to new admissions. But even that progress stagnated once again when the prospect of immediate intervention was reduced, as indicated by the Department's utter failure to create a reliable intra-facility tracking system by the end of February as promised.

The swift degradation of investigations is similarly instructive. After years of pressure, interventions, and remedial orders, the Monitor found meaningful progress in investigations—but after those compliance ratings were assessed and investigations were virtually absent from the

---

[3] Board of Correction City of New York, *Third Report and Recommendations on 2022 Deaths in New York City Department of Correction Custody*, 12-14; 30-31 (April 12, 2023).
[4] The City says that by April 2023, the first Assistant Commissioners of Operations are slated to begin serving as wardens in the facilities; evaluation for the reassignment of Captains and ADWs will be "completed and implemented;" the Health Management Division's new Chief Surgeon is scheduled to begin; and changes to the location and personnel of Tour Commander will be effectuated. Dkt. 517 at 4, 23, 25, and 42-43.

**Justice in Every Borough.**

Action Plan, ID rapidly deteriorated and outcomes materially suffered for months, undetected and unresolved. Absent pressure, the City again failed to meet its obligations despite ongoing court orders.

The record is replete with examples similar to these: the City reinstating staff with records of misconduct to ESU; the City's failure to amend its sick leave and absence control policies, which the Action Plan mandated be complete in 90 days; the failure to revise its Medically Monitored review category; and the failure to reduce awarded posts, all discussed above, demonstrate the City's continued flouting of court orders where additional, extraordinary pressure is not applied.

The changes required by the Action Plan are worthwhile improvements—a City agency should, for example, have a staffing system that allows the City to know whether its employees are actually performing the work for which they are paid. But after nearly a year, it is now clear that the Action Plan, which has few if any strict deadlines or benchmarks the Department is required to meet and imposes no consequences when the Department fails, is not capable of producing the pressure that is required for this Department to abate the constitutional violations in this matter.

Moreover, the City appears patently unable to implement the Action Plan's requirements that it address supervision, promotions, facility and post assignments, changes to policies, shifts, and the use of civilian staff when those changes may be opposed by staff unions. The lack of progress on the ground belies the City's assurances in Court and to the parties that its labor agreements pose no obstacles to implementing much-needed staffing changes. *See supra, at* 15. These failures demonstrate that without a clear mandate and legal authority to take the managerial steps necessary to address the persistent staffing and supervision issues within the Department notwithstanding past labor practices, the Action Plan will continue to fail.

In our view, the current relief does not provide a sufficient path forward.  We cannot keep trying to build foundations in perpetuity, especially with the same materials. For this reason, Plaintiffs propose relief in two steps.

First, we have asked the City to consent to entry of an order requiring the City to implement specified recommendations made by the Monitor in the April 3, 2023 and April 24, 2023 reports, on a set of staggered deadlines that conclude on July 14, 2023. We believe that whatever specific steps the City can take to address constitutional violations and reduce the risk of harm to people in custody, it should take immediately. The Monitor's recommendations are specific, operational, and feasible, and can be effectuated without delay while the Parties and Monitor confer on other relief. The parties and Monitor had scheduled a meeting on Tuesday, April 25 to discuss the City's position. However, in their report to the Court on April 24, we see that the Monitor is now presenting a fraction of the recommendations it made in its April 3 Report, and has proposed deadlines running until August 31, 2023. Dkt. 520, at 24-26. It also appears the City has agreed to that plan. *Id*. at 26. While we are pleased to learn of this agreement on some of the terms we

**Justice in Every Borough.**

proposed, this retreat from the already-narrow recommendations of the April 3 Report does not sufficiently hold the City accountable and provide relief. Moreover, using the Monitor's Reports as "inherent timelines" is problematic, as the Monitor's Reports, and thus the City's deadline for compliance, has already been extended from April 2023 to June 2023, and now from June 9, 2023 to July 10, 2023 should the Court grant the Monitor's request for another extension. 4/24/2023 Monitor Report at 24, 28, Dkt. 520. We therefore will continue to discuss with the Parties our proposed order, and report back to the Court if the City does not consent.

Second, the record is clear that these specific measures, however salutary, will not and cannot be sufficient to gain compliance with the Court's orders and protect the Plaintiff class. The City will continue to make promises and announce newly-branded policies when called to task by the Monitor or Court, but the fundamental failure to *implement* court orders and take immediate action on *all fronts* will persist. The assistance and oversight of a small Monitoring team, even one as profoundly dedicated, experienced, and productive as the Court's monitor, is simply insufficient to hold this agency accountable. In our view, the April 3 Report strongly suggests that Plaintiffs' rights cannot be protected under this remedial scheme, and further relief by appointment of a receiver—someone with the power and will to make difficult decisions the City will not—is vital.

In the current posture, however, the record is particularly dynamic, as a Monitor's report and compliance finding are due in June 2023 and likely will provide material information. If the City continues to demonstrate a lack of significant, material improvement in the core requirements of the Consent Judgment and attendant outcomes—and if the Plaintiff class remains at significant risk of harm as a result—we anticipate we will seek further relief, including the possibility of receivership or other necessary remediation, in order to protect the Plaintiff class from the abuse and brutality they continue to suffer every day they are incarcerated by New York City.

Respectfully submitted,

/s/_____

Mary Lynne Werlwas
Kayla Simpson
Katherine Haas



THE LEGAL AID SOCIETY
PRISONERS' RIGHTS PROJECT

Counsel for Plaintiff Class

/s/_____

Debra L. Greenberger
Jonathan Abady
Vasudha Talla
Sana Mayat

EMERY CELLI BRINCKERHOFF
ABADY WARD & MAAZEL LLP

Counsel for Plaintiff Class

**Justice in Every Borough.**