## Monitor's Fourth Report on the Conditions of Confinement for 16- and 17-Year-Old Adolescent Offenders at the Horizon Juvenile Center

Fourth Reporting Period
July 1—December 31, 2022

## The Monitoring Team

Steve Martin, J.D.—*Monitor*

Kelly Dedel, Ph.D.—*Subject Matter Expert*

Anna Friedberg, J.D.—*Deputy Monitor*

Dennis Gonzales—*Associate Director*

Pat Hurley, LCSW—*Subject Matter Expert*

Alycia Karlovich—*Analyst*

Emmitt Sparkman—*Subject Matter Expert*

Christina Vanderveer, J.D.—*Associate Deputy Monitor*

# Table of Contents

Introduction.........................................................................................................................4

    Background ......................................................................................................................5

    The Horizon Agreements ................................................................................................7

    Summary of the Current State of Affairs .......................................................................8

Compliance Assessment ....................................................................................................19

    ¶2(a). Protection from Unreasonable Risk of Harm.....................................................19

    ¶2(b). Use of Physical Restraints ..................................................................................21

    ¶2(c). Incident Report Review and Referral .................................................................25

    ¶2(d). Programming........................................................................................................29

    ¶2(e). Behavior Management..........................................................................................32

    ¶2(f). Room Confinement...............................................................................................36

    APPENDIX A: MONTHLY DATA ON YOUTH-ON-YOUTH AND YOUTH-ON-STAFF VIOLENCE ..........39

    APPENDIX B: MONTHLY DATA ON PHYSICAL AND MECHANICAL RESTRAINTS..............................41

## Introduction

This is the Monitoring Team's fourth report on the conditions of confinement for 16- and 17-year-old Adolescent Offenders at the Horizon Juvenile Center (Horizon), as required by the Voluntary Agreements ("the Agreements") between the Monitor, the City of New York (the "City"), and the Administration of Children Services ("ACS") (dkt. entries 364 and 502 of 11-cv-5845 (LTS)). This report provides a summary and assessment of the good faith efforts and work completed by the City of New York and ACS to achieve compliance and advance the reforms required by the Agreement from July 1, 2022 through December 31, 2022 ("current Monitoring Period" or "Fourth Monitoring Period") as well as a summary of data, trends and patterns from the entire 24-month period (January 1, 2021 to December 31, 2022) during which the Agreements have been in effect.

This report has four sections. First, background on the Monitoring Team's work with respect to 16- and 17-year-old incarcerated youth is provided followed by a summary of the Horizon Agreements. Next is a summary of the current state of affairs, and the report concludes with the compliance assessment for each of the substantive provisions of the Second Voluntary Agreement.

## Background

The Monitoring Team first began to evaluate the conditions of detained 16- and 17-year-olds under the *Nunez* Consent Judgment (dkt. entry 249 of 11-cv-5845 (LTS).[1] When the Consent Judgment went into effect in November 2015, incarcerated 16- and 17-year-olds were legally classified as adults and detained in an adult jail on Rikers Island, which is managed by the New York City Department of Correction ("the Department"). The Consent Judgment included specific provisions regarding the management of this age group (§ XV ("Safety and Supervision of Inmates Under the Age of 19") and § XVI ("Inmate Discipline")) and separately required the Department to seek off-island housing for youth younger than 18 ((§XVII "Housing Plan for Inmates Under the Age of 18", ¶1-3)). In 2017, New York State passed the "Raise the Age" (RTA) law that raised the age of criminal responsibility to 18-years-old and created a new legal status for youth called "Adolescent Offenders," (AOs), which is defined as 16- and 17-year-olds who are charged with a felony-level offense. RTA was implemented in stages, with the AO category applying to any 16-year-old charged on or after October 1, 2018, and any 17-year-old charged on or after October 1, 2019. RTA also prohibited housing 16- and 17-year-olds on Rikers Island as of October 1, 2018.

By October 1, 2018, all 16- and 17-year-olds who were incarcerated on Rikers Island were transferred to Horizon, which, at the time, was jointly operated by the Department and ACS, where the Department was responsible for the care and custody of the 16- and 17- year-olds and ACS was responsible for programming and managing the provision of medical and mental health services. All 16- and 17-year-olds who were charged before the RTA effective dates for their age group were called, collectively, "Pre-Raise the Age (RTA) Youth." All Pre-RTA Youth remained at Horizon until they were sentenced, released to the community or residential programs, or they turned 18-years-old, at which time they were transferred to Rikers Island. The day-to-day management of Horizon also gradually shifted to become the sole responsibility of ACS.

By the end of 2019, ACS had assumed full operational control of Horizon, save for a small number of DOC staff who operated the front security gate and held transportation positions.[2] By July 27, 2020, the last Pre-RTA Youth was transferred out of Horizon, and the *Nunez* Monitoring

---

[1] *See* Monitor's First *Nunez* Report at pgs. 87 to 111, Second *Nunez* Report at pgs. 123 to 155, Third *Nunez* Report at pgs. 196 to 238, Fourth Nunez Report at pgs. 203 to 252, Fifth *Nunez* Report at pgs. 140 to 180, Sixth *Nunez* Report at pgs. 149 to 196, Seventh *Nunez* Report at pgs. 192 to 207, Eighth *Nunez* Report at pgs. 218 to 247, Ninth *Nunez* Report at pgs. 253 to 282, Tenth *Nunez* Report at pgs. 221 to 237.

[2] As of August 2021, no DOC staff were deployed to Horizon.

Team suspended its monitoring activities while the City, ACS, the Monitoring Team, and the Parties to the *Nunez* litigation determined the appropriate path forward given the change in circumstances. At the same time, the onslaught of the COVID-19 pandemic had begun, which significantly impacted facility operations and has yet to fully dissipate with continued struggles in hiring staff and long lengths of stay among youth detained at Horizon.

*The Horizon Agreements*

In 2021, the City and ACS voluntarily entered into an agreement with the Monitoring Team concerning the supervision of 16- and 17-year-old AOs at Horizon during an 18-month period, January 2021 through June 2022 ("First Agreement"). The First Agreement included 10 substantive areas. In late 2022, the City and ACS entered into a second agreement for an additional 12 months (through June 2023) for continued monitoring of a subset of 6 substantive areas ("Second Agreement"). While the Second Agreement is in effect (as with the First Agreement), the Monitoring Team will not assess compliance with the *Nunez* Consent Judgment's provisions pertaining to 16- and 17-year-olds and *Nunez* Plaintiffs and the United States have agreed not to seek judicial action to enforce the portions of the *Nunez* Consent Judgment pertaining to this age group (*see* dkt. entry 503).

The Second Agreement includes 6 substantive provisions, all of which are discussed in detail in the next section of this report. For each provision, the Monitoring Team provides an assessment of current practice and applies a compliance rating. During the current Monitoring Period, ACS provided all requested documents, facilitated two site visits for Monitoring Team members, and engaged in multiple collaborative discussions with the Monitoring Team to respond to questions and provide important details about their steps toward compliance and facility improvement plans.

The Monitoring Team is required to file two reports during the pendency of the Second Agreement. This report describes facility conditions during the Fourth Monitoring Period covering July 1, 2022 to December 31, 2022. The fifth Monitoring Period covers January 1, 2023 to June 30, 2023 and is scheduled to be filed on October 25, 2023.

## *Summary of the Current State of Affairs*

ACS has made important strides in reducing the rate of violence at Horizon. These safety improvements appear to be the result of incremental changes in security practices and efforts to strengthen key elements covered by the Agreements (*e.g.*, programming and behavior management) all of which have been facilitated by new agency and facility leadership. The leaders' plans to broaden and deepen these various improvements should further benefit facility safety. That said, the Monitoring Team has some remaining concerns particularly around adequate staffing levels (which is central to the ability to implement many of the leaders' thoughtful plans) and the incidence of very serious violence and youth's access to contraband weapons and drugs. Facility safety and staffing levels are mutually reinforcing, and also combine to permit (or hinder) the focus on youth development that ACS emphasizes. These dynamics are discussed in detail below, along with the various initiatives ACS is undertaking to address the root causes of the various problems.

Understanding the overall current state of affairs requires an overview of agency and facility leadership, youth violence and use of physical restraints, staffing levels, and a summary of the current compliance efforts.

- Agency and Facility Leadership

An important aspect of any reform effort is ensuring that the right leaders are in place, those who possess a safety- and youth-focused vision and those who recognize that staff wellness is an essential underpinning to achieve that vision. In early 2022, the recently appointed ACS Commissioner appointed agency and facility leaders who embody that philosophy, in both the Deputy Commissioner of Youth and Family Justice and the newly installed Assistant Commissioner of Horizon and her team. Strong leaders can only be successful when they are appropriately supported, and leaders at all levels reported that the reform effort underway at Horizon has benefitted from the Commissioner's commitment to provide concrete supports (*e.g.*, equipment, physical plant improvements) as well as human resources (*e.g.*, ACS staff, consultants and vendors) who can meaningfully contribute to the agency's mission.

An internal capacity to identify and resolve problems is an essential step toward sustaining reform and reducing the need for external oversight. ACS has expanded its internal oversight capacity by:

- considering prudent policy revisions,
- developing a Corrective Action Tracker (CAT) which serves as a quality assurance tool to track staff accountability and ensure timely, appropriate responses,

- implementing an electronic tracking system to assess whether daily programming targets are being met,
- supporting the implementation of the behavior management system (STRIVE) with daily point card audits and on-the-ground expertise so that practice enhancements can flow from identified areas of weakness, and
- creating an audit process to ensure the appropriate use of room confinement.

The Monitoring Team has worked closely with ACS leaders at all levels to assess compliance, discuss the various dynamics and potential obstacles that make reform challenging, and to supply information and examples from other jurisdictions that have confronted similar problems. ACS has worked in good faith with the Monitoring Team and there has been productive collaboration.

- **Youth Violence and the Use of Physical Restraint**
    - *Youth-on-Youth Assault and Youth-on-Staff Assault*

Significant reductions in youth violence were witnessed during the current Monitoring Period. As shown in the table below, the rate of youth-on-youth assault during the current Monitoring Period was about 40% lower than that of previous Monitoring Periods (0.64 during the current Monitoring Period, compared to rates above 1.00 in previous Monitoring Periods). Appendix A provides monthly data on the number and rate of youth-on-youth and youth-on-staff violence.

| Average Rate of Youth Violence, 2021-2022 [3] | | |
|---|---|---|
| Date | Youth-on-Youth Violence | Youth-on-Staff Violence |
| January-June 2021 | 1.06 | 1.02 |
| July-December 2021 | 1.13 | 0.51 |
| January-June 2022 | 1.06 | 0.77 |
| **July-December 2022** | **0.64** | **0.30** |

The rate of youth-on-staff violence also decreased significantly (0.30 during the current Monitoring Period, compared to rates above 0.50 in previous Monitoring Periods). ACS leaders attributed the decrease to improvements in basic security functions (*e.g.,* key control), as well as improved relationships among staff and youth. When interviewed, staff reported a greater sense of stability and control, and visible efforts from the new facility administration to seek their

---

[3] Rate = ((# of incidents/# days in month)/ADP) * 100. See Appendix A for monthly data on the number and rate of youth-on-youth assault and youth-on-staff assault.

input, elevate their skills through coaching rather than discipline, and genuine attempts to solve problems.

The reduction in youth violence is particularly impressive given the fact that Horizon youth's long lengths of stay (driven by COVID-related delays in case processing in addition to the serious nature of many Horizon youth's charges) have driven the average daily population up. The ADP during the current Monitoring Period was 15% higher than the previous Monitoring Period (77.6 versus 67.3) and 109% higher than the first Monitoring Period (37.1). While the use of a *rate* statistically controls for changes in the size of Horizon's youth population, the statistical controls cannot account for the impact of crowding on interpersonal dynamics, stress, frustration and challenges in providing services to a larger number of youth that are inevitable byproducts of higher population densities in congregate care.

The recent reduction in youth violence appears to be the result of the accumulation of small improvements over time that have brought more security, predictability and stability to the structure of the youth's day such as: improved security practices, reported improvements in school attendance, and programming efforts that are now defined by their appeal to youth and age-appropriate focus. Though there is more work to do in each area, in addition to fully implementing the behavior management program (STRIVE), these steps were essential for creating a foundation upon which more individualized youth interventions can stand (*e.g.*, skills groups to teach youth new ways to address interpersonal conflict, manage anger, and tolerate frustration; behavior modification plans to better support youth who frequently engage in violent conduct).

Key improvements to safety practices and protocols that occurred during the current Monitoring Period include:

- Enhancing search procedures at the facility's front gate to increase the detection of contraband flowing into the facility;
- Improving key control procedures including daily inventory, detention-grade key rings and limiting the number of staff on the housing units who carry keys to the corridor posts;
- Enforcing requirements for all staff to wear duty belts to properly secure their equipment (including keys);
- Procuring additional radios so that all staff can be properly equipped, which improves communication about youth movement and incident response time;
- Increasing tactical searches of youth, youth rooms, and common areas to reduce the volume of contraband, particularly weapons and drugs;
- Integrating ACS Special Officers into the facility's safety efforts, including participation in rapid response and search operations within the building, rather than limiting them to

perimeter control, securing the front gate, and responding to incidents only when restraints are required.

These improvements have undoubtedly accelerated ACS' progress toward compliance with the provisions of the Second Agreement, progress which is laudable and necessary but not yet sufficient. Regarding youth violence, the Monitoring Team remains concerned about the frequency of serious violence, particularly incidents that involve dangerous weapons and serious assaults on staff (including strangulation holds) that occurred during larger group disturbances. Historically, assaults with sharpened weapons have been rare in juvenile facilities. However, concurrent with legislation that has raised the age of jurisdiction in juvenile courts, the problem has begun to emerge in some jurisdictions that are struggling to control youth violence. The list below includes events that occurred at Horizon during the current Monitoring Period.  A similar number of serious incidents with equally troubling circumstances occurred during the previous Monitoring Period as well. Therefore, while overall violence has reduced significantly, the frequency of very serious incidents of violence remains at a concerning level.

- A youth was treated for a 3-inch, deep laceration to his hand and a 1.5 inch, deep cut to his right cheek. Another youth was taken to the hospital for a 3cm laceration to the left side of his face.

- During a group disturbance, a youth attempted to assault others with a 1-foot-long metal shank.

- A youth "gashed" another youth's leg, and then cut the victim's face.

- A youth slashed another youth on the left side of his neck with a hard plastic object. Another youth was slashed in the neck and back with a sharpened metal object.

- A youth sustained a 6-inch cut to the side of his neck. Another youth sustained a 5-inch cut to his wrist.

- Staff unlocked a youth's door and allowed another youth to enter, where an altercation ensued. The victim was slashed in the chest. A scalpel was recovered from the other youth involved.

- Youth from one housing unit attacked staff in an attempt to steal keys in order to gain access to another housing unit. During the attack, a youth strangled a staff member to unconsciousness, and threatened to cut another staff member's throat by placing a sharpened object close to his neck.

An obvious precursor to this type of serious violence is the availability of weapons. As noted above, ACS has increased the frequency of searches of youth in custody and facility housing areas, worked to repair the physical plant to decrease the chance that weapons can be fashioned from broken parts and fixtures, and changed facility entry practices to better search staff and vendors upon facility entry. In addition, ACS plans to increase supervision of visitation to better detect the introduction of contraband, but this is not yet possible given current staffing

levels (discussed further below). In addition to detecting and confiscating dangerous weapons, improved search practices should also stem the flow of marijuana into the facility, which is also at a concerning level. The presence of drugs in any facility—particularly if staff are responsible, even in part—has serious consequences for the quality of supervision, staff-youth dynamics, and the extent to which staff trust each other and are able to work as a cohesive unit.

Opportunities and temptations to access youth from other housing units, often for the purpose of exacting violence, is another concern for the Monitoring Team. Youth frequently attacked staff to access keys, particularly during the first half of the Monitoring Period (continuing a trend seen in prior Monitoring Periods). This behavior appeared to decrease during the latter part of the Monitoring Period, which coincided with ACS' improved key-control and decreased use of radio transmissions to announce movement (both of which reduce opportunity and temptation for these types of attacks).

In short, compelling reductions in youth violence were observed during the current Monitoring Period and ACS has prioritized strategies to improve overall security and reduce the availability of weapons to address the remaining areas of concern. This trajectory is essential to mitigate the risk of harm to youth and create a safe facility.

   o   *Injuries Among Youth and Staff*

The intersection between the frequency of violence and the severity of violence is illustrated in the charts below. The first chart shows the number and type of youth injuries sustained from youth-on-youth violence. The different colored bars represent the type of injury (blue = none, orange = less serious/Injury B, grey = more serious/Injury A).[4] The number of each type of injury that occurred in each of the four Monitoring Periods is indicated within each bar. As indicated by the total number of injuries listed after each time frame, the number of injuries decreased significantly in the current Monitoring Period—from 129 injuries during the previous Monitoring Period to 88 injuries during the current Monitoring Period, a decrease of 32%. However, the proportion of those injuries that were serious increased slightly from 5% in the previous Monitoring Period (6 of 129) to 9% in the current Monitoring Period (8 of 88). The increase in serious injury is a byproduct of the increasing use of weapons during assaults, which makes ACS' efforts to prevent and detect the presence of contraband in the facility that much more essential.

---

[4] Injury A includes injuries requiring clinical treatment beyond what can be provided by a layperson with over-the-counter products. Injury B includes injuries that are treatable by a layperson with over-the-counter products such as ibuprofen, antibiotic ointment, ice packs, etc. All injury classifications are made by medical staff.



As noted above, the rate of youth-on-staff assault has also declined significantly compared to prior Monitoring Periods. The proportion of assaults that resulted in an injury to staff (orange bar in the graph below) has varied a bit:  40% in the first Monitoring Period, 42% in the second, 54% in the third, and 48% in the current Monitoring Period. Importantly, the raw number of injuries sustained by staff decreased 60% between the third and fourth Monitoring Periods (from 50 to 20). ACS does not track the severity of staff injuries given that most are treated off-site.



The reduction in the number of injuries sustained by youth and staff as a result of youth violence is encouraging and should continue to decrease if violence continues on its current downward trajectory and if Horizon can decrease the volume of weapons procured by youth.

- **Staff-on-Youth Violence**

In addition to reductions in youth violence, during the current Monitoring Period, there were no sustained allegations of staff-on-youth violence. Although sustained allegations were rare during the previous Monitoring Periods, *any* mistreatment by staff is cause for concern. The uptick noted in the previous Monitor's Report (*see* dkt. 471, Third Monitor's Report at. pg. 28) fortunately did not continue. Agency leaders attribute this to improvements in the quality of relationship between staff and youth, with youth provoking staff less often and staff maintaining their professionalism and not retaliating when provoked. Indeed, the Monitoring Team's review of videotaped footage of incidents routinely reveals obvious attempts to temper their physical interventions and signs of extraordinary patience when managing youth.

- **Staffing Levels**

The provisions in the Second Agreement address the key elements known to improve facility safety (*i.e.*, adequate youth supervision, programming, and behavior management practices; the appropriate use of restraints; procedures to direct, guide and coach staff to improve skill mastery via incident reviews). As is detailed throughout this report, ACS is making substantial efforts to improve each of these areas of facility functioning. However, the precursor to the successful implementation of all of these is having an adequate number of staff. Not unlike most juvenile justice agencies across the nation, ACS is having significant difficulty attracting and retaining sufficient numbers of direct care staff, challenges which are compounded by the level of youth violence occurring at the facility over the past few years. These issues are not unique to ACS and are being experienced in juvenile facilities across the country. Nonetheless, solving them is key to ACS' success.

Although ACS has hired many staff, continuous attrition has severely undercut substantive progress in staffing levels. Indeed, this problem underlies many of the areas with slower progress toward compliance with the Agreements. For example, training staff in the behavior management program, STRIVE, was extraordinarily difficult given staff shortages and program access can be compromised because there are not enough staff to split housing units into smaller groups when a subset of youth wants to attend and another does not. Furthermore, some of the actions that ACS wishes to take to address serious violence (*e.g.*, search teams, response teams, closer supervision of visitation) cannot be fully accomplished without additional staff.

ACS estimates that it needs 337 Youth Development Specialists (YDSs) to staff the facility at full capacity (*i.e.*, 10 housing units open, 3 YDS per unit) with staff working three 8-hour shifts. As shown in the table below, throughout the 24-month period, Horizon had only 60-70% of that number of YDSs on the payroll. In addition, about 38% of staff on the payroll were "inactive" (*i.e.*, on some type of leave, including sick leave and work-related injury leave) and thus not able to work. This left Horizon with less than half of the YDSs it needs to fully staff the facility. As a

result, existing staff are working exorbitant amounts of overtime. The Monitoring Team's interviews with staff revealed that a significant proportion of staff work overtime up to 4 or 5 times per week. Essentially, every time they report to work, they work a 16-hour shift. That a segment of staff (both YDS and AYDS, discussed below) remains committed to the job even under these difficult conditions is laudable.

The situation is no better for front-line supervisors (AYDSs). ACS estimates that it needs 56 AYDS to properly staff the facility with supervisors (assuming 10 housing units are open, 1 AYDS per unit, and three 8-hour shifts). As shown below, Horizon averaged only 60-70% of that number of AYDSs on the payroll (between 207.8 and 245.0) over the past two years. As with YDSs, the AYDS rank also suffers from significant proportions of "inactive" AYDSs (about 25% during the current Monitoring Period), leaving the facility with only about half of the AYDSs (37.7 active AYDSs) it needs to properly staff the facility with supervisors.

| Average Number on Payroll, Proportion Inactive, and Number Active 2021-2022 | | | |
|---|---|---|---|
| Period | # on Payroll | % Inactive | # Active |
| Youth Development Specialists (YDS)—**Target 337 YDS** | | | |
| Jan-Jun 2021 | 207.8 | 38% | 128.3 |
| Jul-Dec 2021 | 218.2 | 37% | 138.2 |
| Jan-Jun 2022 | 245.0 | 36% | 156.3 |
| Jul-Dec 2022 | 229.7 | 41% | 136.3 |
| Associate Youth Development Specialists (AYDS)—**Target 56 AYDS** | | | |
| Jan-Jun 2021 | 33.0 | 27% | 24.2 |
| Jul-Dec 2021 | 38.0 | 17% | 31.7 |
| Jan-Jun 2022 | 36.3 | 24% | 27.7 |
| Jul-Dec 2022 | 37.7 | 33% | 25.2 |

ACS reports that increasing the availability of staff has been its top priority since assuming operational control of Horizon. Despite various innovative strategies in advertising, recruiting, and hiring described in previous reports that have brought in a large number of YDSs (over 200 during the previous 24 months), high levels of attrition have seriously undercut progress toward full staffing. The table below illustrates the flow of hire and attrition over the past 24 months, resulting in a net gain of only a small fraction of the number of staff and supervisors needed to fully staff the facility.

| Hiring and Attrition, 2021-2022 | | | |
|---|---|---|---|
| Period | Hired | Lost | Net |
| Youth Development Specialists (YDS) | | | |
| Jan-Jun 2021 | 52 | -37 | 15 |
| Jul-Dec 2021 | 80 | -39 | 41 |
| Jan-Jun 2022 | 60 | -53 | 7 |
| Jul-Dec 2022 | 43 | -37 | 6 |
| TOTAL | 235 | -166 | 39 |
| Associate Youth Development Specialists (AYDS) | | | |
| Jan-Jun 2021 | 0 | -1 | -1 |
| Jul-Dec 2021 | 1 | 0 | 1 |
| Jan-Jun 2022 | 0 | -3 | -3 |
| Jul-Dec 2022 | 2 | -1 | 1 |
| TOTAL | 3 | -5 | 2 |

That Horizon continues to operate with less-than-optimal staffing provides insight into the areas where ACS struggles to achieve compliance with the requirements of the Agreements, and also makes the things the facility has achieved that much more impressive. Most of the substantive provisions of the Agreements require a full complement of staff to implement and operationalize.  A core component of adequately operationalizing and implementing initiatives requires that staff must be trained (and then provided ongoing guidance) on their new responsibilities.  ACS faces a real struggle here. That said, just as staffing and facility violence may create a vicious cycle, improving facility safety and staff morale may boost staff hiring and retention. The Monitoring Team fully supports the many initiatives ACS has implemented to attract and retain staff and would encourage any additional support the City and other external stakeholders may provide to ACS to optimize staffing levels.

- **Summary of Compliance with the Substantive Provisions of the Second Horizon Agreement**

Throughout the remainder of this report, current practice in each of the substantive areas of the Second Agreement is assessed. This assessment was informed by the analysis of a variety of documents, video evidence, collaborative discussions with ACS leadership, observations and interviews conducted during two on-site visits, ACS's written assessment of practice in each area and a detailed videoconference presentation attended by ACS leadership and the Monitoring Team. This methodology provided a multi-faceted vantage point from which both progress and areas in need of continued improvement could be identified. Throughout the

Monitoring Period, ACS was both transparent and candid about its journey toward implementing its vision of quality care. Without a doubt, the pace of progress would be accelerated if Horizon had a full complement of appropriately skilled staff as staff shortages and the volume of overtime required has seriously compromised ACS's ability to achieve the things it has set out to do. ACS is on a well-conceptualized path where compliance is certainly closer than it was at the outset of the First Agreement but given that improvements to Horizon's staffing situation will likely come slowly, the pace of progress may also continue to be moderated.

A fulsome discussion of ACS' progress toward compliance with each of the Second Agreement's 6 substantive provisions follows this Introduction, but in summary:

- ❖ **Protection from Harm (¶ 2(a)).** Significant reductions in youth violence were observed during the Monitoring Period, with the rate of youth-on-youth assault and youth-on-staff assault approximately 40% lower than that of prior Monitoring Periods. Staff continue to exhibit patience and use force appropriately and proportionately, and there were no sustained incidents of staff-on-youth assault (*i.e.*, physical abuse) during the current Monitoring Period. However, the Monitoring Team remains concerned about the overall risk of harm to youth, in particular the frequency of assaults involving sharpened weapons. ACS has implemented several strategies to improve the detection and seizure of dangerous contraband.

- ❖ **Physical Restraint (¶ 2(b)).** Staff use or attempt to use trained SCM techniques, and the Monitoring Team has not observed a pattern or practice of unnecessary or excessive physical intervention. However, staff's use of physical restraint often appears simply inadequate to quell or control youth during mass disturbances, but strategies discussed throughout this report appear to have reduced the frequency of such disturbances making this less of a driving concern.

- ❖ **Incident Review (¶ 2(c))**. ACS finalized a new incident review policy this Monitoring Period but has not yet implemented the review process outlined in the policy. Meanwhile, *ad hoc* reviews continued this Monitoring Period, with some additional involvement from NPJS consultants. The Monitoring Team encourages ACS to set a timeline to implement the revised policy or revisit the policy to establish an achievable review process that is practical to be implemented in the short term.

- ❖ **Programming (¶ 2(d))**. ACS continues to make substantial efforts to provide an array of programming to youth at Horizon by dedicating significant resources to ACS staff and vendors to provide structured activities. Recent efforts to ensure that vendors focus on age-appropriate programming given the older age of Horizon youth post-

Raise the Age and ACS' youth surveys to ensure offerings are aligned with their interests should help to increase youth engagement and rehabilitation. ACS appropriately restructured Program Counselor duties and also reduced the number of vacant Program Counselor positions during the current Monitoring Period. The electronic program tracking system ("PATS") is an important development because it allows ACS to monitor the extent to which scheduled programming actually occurs. That said, PATS has revealed problems with program delivery that must be addressed in order to reach compliance with this provision.

❖ **Behavior Management Program (¶ 2(e))**. ACS achieved an important milestone in that 90% of Horizon staff are now trained to deliver the behavior management program (STRIVE) and its basic components were implemented in all living units on December 12, 2022. Once the point card mechanics are solid and the application of rewards/sanctions are reliable, additional program components will be layered on including some additional rewards, more targeted restorative activities, individualized behavior contracts for youth who frequently engage in problem behavior, and the skill-development component designed to teach youth strategies for managing interpersonal conflict and anger and for tolerating frustration and distress.

❖ **Room Confinement (¶ 2(f))**. Horizon reported only two room confinement events during the current Monitoring Period. Although the practice is infrequent, compliance with policy requirements and protections for youth in room confinement continues to be poor. While ACS reports that it does not intend for room confinement to become a widespread practice, ACS must ensure that all protections are dependably in place to ensure room confinement is not prolonged unnecessarily and to safeguard the welfare of youth while in isolation.

In summary, a significant amount of growth and improved practice has occurred at Horizon. The scope and quality of information shared with the Monitoring Team, ACS' openness to feedback, and the various steps ACS has undertaken or plans to undertake to elevate the level of performance in each of the substantive areas demonstrated ACS' deliberate good faith efforts to improve its practice (as required by ¶ 1 of the Horizon Agreement). These good faith efforts demonstrate ACS's potential and willingness to remediate the remaining practice and performance gaps, stabilize the facility, and reduce the risk of harm from serious violence.

The remainder of this report provides additional detail on each of the six substantive provisions of the Second Agreement.

## Compliance Assessment

In this report, when assessing ACS' level of compliance with the substantive provisions of the Second Agreement, as required by ¶ 5(c), the Monitoring Team considered and described the broader context for our findings, including the challenges and obstacles presented (particularly those related to COVID and changes to the City's and ACS's leadership) to implementing the requirements of the Second Agreement as well as the generally accepted practices for 16- and 17-year-old youth. Further, the Monitoring Team also gave due consideration to ACS' diligent and good faith efforts to implement the requirements of the Second Agreement and, the totality of the circumstances. For each of the substantive provisions enumerated in ¶ 2 of the Second Agreement, ACS' efforts to implement the required practices are described, generally accepted practices are referenced, and key challenges and obstacles are highlighted. The Compliance standard as defined in the Second Agreement, ¶ 5, is whether "ACS has consistently complied with the relevant requirement and any violations of the relevant requirement are only minor or occasional and not systemic, material or recurring."

An assessment of compliance with each of the six substantive provisions of the Second Agreement is below.

---

### ¶2(a). Protection from Unreasonable Risk of Harm. AO Youth shall be supervised at all times in a manner that protects them from an unreasonable risk of harm. Staff shall intervene in a timely manner to prevent youth-on-youth fights and assaults, and to de-escalate youth-on-youth confrontations, as soon as it is practicable and reasonably safe to do so.

**ACS Policy & Practice.**
- As a Specialized Secure Detention Facility that is authorized to house Adolescent Offenders (AOs), Horizon must abide by OCFS Regulation 9 CRR-NY 180-3.11 "Staffing and Supervision of Youth."
  - This regulation requires a 1:6 ratio of YDSs to youth and requires a minimum of two staff in each area except when a staff is escorting an individual youth within the building.
  - The regulation also requires a sufficient number of supervisors to adequately supervise direct care staff and provide relief coverage when needed on the units.
  - The regulation also requires facilities to have a separate unit of staff to respond to emergency situations that require additional de-escalation and crisis intervention. At Horizon, the ACS Police provide reinforcement for the YDSs, can apply mechanical restraints when necessary, and have arrest powers (in addition to other duties such as managing the front gate, live video monitoring, perimeter security, transportation, etc.).

---

- ACS Policy #2014/10 "Safe Intervention Policy for Secure and Non-Secure Detention" provides guidelines for staff to follow "when they are required to contain the acute physical behavior of youth." It emphasizes that the primary purpose of emergency interventions is to protect the safety of youth and staff. While staff must utilize the least amount of force necessary, the policy also reinforces that staff have a duty to act to protect youth or staff from harm due to assaultive or violent behavior.
  - ACS utilizes Safe Crisis Management (SCM) to promote safety and to guide physical interventions when needed.
  - SCM's practice guidelines include more than the use of physical intervention. They also require staff to utilize "primary strategies" to prevent incidents from occurring (e.g., structured daily schedule, behavior management system that teaches necessary skills, etc.); a range of non-verbal and verbal "secondary strategies"; and trained physical intervention techniques.
  - SCM requires both youth and staff to engage in a de-briefing protocol within 24 hours of a physical intervention.
- ACS Policy #2018/09 "Behavior Management in Secure and Specialized Secure Detention" articulates the importance of and pathway toward physical and emotional safety:
  - V.A. "When youth sense that they are at risk of harm, the entire rehabilitative process is undermined."
  - V.C. "Staff shall be deployed in a manner that maximizes visibility and maintains a high degree of supervision throughout the facility, maintaining appropriate staff ratios at all times…"
  - V.D. "Predictability and structure are hallmarks of a safe and therapeutic environment. Staff of multiple disciplines and varying levels of seniority shall work together to develop daily programming and activities that are meaningful to youth and minimize idle time on the living unit."
- ACS Policy #01/2012 "Reporting of Incidents and Data Management for Group Oriented Analysis Leadership Strategies (GOALS)" outlines procedures necessary for comprehensive, accurate reporting of incidents that occur in ACS facilities. This type of information is essential for creating an accurate record of what occurred, and it is also critical to ensure uniform, valid data on key indicators regarding facility safety.
  - An "incident" is defined as "any event which might adversely affect the health, safety, and/or security of residents, staff, or the communication or with impacts on a facility, the agency, or agency property."
- ACS maintains quantitative data regarding youth-on-youth assaults, youth-on-staff assaults, physical aggression, threats, and restraints along with narrative summaries of all incidents occurring at Horizon.
- The Deputy Commissioner and facility leadership continue to work to ensure that all direct care staff at Horizon (i.e., YDS, AYDS, OM, TC and ACS Police) collaborate effectively to improve safety and security at the facility.

**Monitoring Team's Analysis.**

As noted in the Introduction to this report, the *rate* of violence decreased significantly during the current Monitoring Period which, importantly, reduces the level of chaos, disorder and fear among staff and youth. Fewer disruptions also make it more likely that programming, school, and efforts to develop trust and constructive rapport among youth and staff can occur. This trend is unquestionably positive. That said, the frequency of serious violence is a remaining concern that impedes compliance with this provision, although as detailed above, ACS is making reasonable and on-going efforts to improve safety and to reduce the volume of contraband weapons in the facility.

The Monitoring Team's review of incidents (discussed in more detail below) shows that while security practices which still need to be improved continue to contribute to violent incidents, staff respond safely and proportionately and do not utilize unnecessary or excessive force when doing so. An array of high-interest, age-appropriate programs and a robust behavior management program are two key tools for reducing all types of violence. Horizon has made important progress in both areas, though it has not yet achieved compliance with these provisions, as discussed in detail below. Further, the Monitoring Team's experience suggests that robust implementation of, and thus compliance with, the Second Agreement's provisions will be difficult to achieve without sufficient numbers of staff to properly supervise youth.

**Compliance Rating**. Progress Made, but Compliance not yet Achieved

## ¶2(b). Use of Physical Restraints.
ACS shall comply with applicable ACS policies governing staff's use of physical interventions and restraints (collectively "Physical Restraints") and any required reporting of such incidents, including Policy #2014/10 ("Safe Intervention Policy for Secure and Non-Secure Detention") and Administrative Order #01/2012 ("Reporting of Incidents and Data Management for Group Oriented Analysis of Leaderships Strategies (GOALS)"). The aforementioned policies shall be referred to herein as "the ACS Physical Restraint Policies." The City and ACS shall also agree to comply with 9 NY-CRR §§180-3.15 and 180-3.16.[5]

(i). The Monitoring Team Panel shall assess, in collaboration with ACS's division of Youth and Family Justice ("DYFJ") senior managers, on ACS' staff reporting and use of Physical Restraints, and shall provide feedback and any necessary recommendations for enhancements to reporting, limiting physical interventions where possible, and improvements to the use of Physical Restraints. This assessment shall include a review by the Monitoring Team Panel of a reasonable number of incidents involving the use of Physical Restraints (including the review of staff reports and/or video footage), to provide feedback on de-escalation and restraint approaches to youth-on-youth violence, youth-on-staff violence, staff-on-youth violence, and other situations with an imminent threat of harm. The Monitoring Team Panel shall make recommendations about staff training and articulate general improvements to practice as necessary, in consultation with DYFJ senior management.

---

[5] NY State Law regarding the use of physical restraint (§180-3.15) has requirements that limit the circumstances in which it can be used; requirements for staff training; prohibitions on specific types of restraints; requirements for medical review; reporting; parent notification; and post-restraint debriefing protocols. NY State Law regarding the use of mechanical restraints (§180-3.16) limits the type of equipment that can be used; requires staff to be trained; positions mechanical restraints as a last resort in the facility's restraint continuum; requires constant supervision of youth while in mechanical restraints; and requires authorization at various intervals.

**ACS Policy & Practice.**
- ACS Policy #2014/10 "Safe Intervention Policy for Secure and Non-Secure Detention" requires that ACS staff employ Safe Crisis Management ("SCM"), a comprehensive approach to behavior management which requires substantial effort in prevention and non-physical interventions before staff may resort to Emergency Safety Physical Interventions ("ESPIs") to restrain residents.
    - This policy outlines the training requirements for implementing SCM, the proper application of ESPIs, and considerations before, during, and after an ESPI is used.
    - Mechanical restraints may only be used when ESPI techniques are unsuccessful in controlling aggressive physical behavior and when staff have determined that such an intervention is in the best interests of the youth involved.
    - Overarching Principles:
        - The policy states that the primary purpose of any emergency intervention is to "protect the safety of the youth who is being restrained and all other youth, the staff, the community, and others who may be present within a context that promotes healthy relationships with youth, including employing effective communication, making empathetic connections, and establishing a structured, consistent environment."
        - The policy states that when physical interventions are necessary, staff shall use only the minimum amount of physical intervention necessary to stabilize the youth or situation.
        - The policy expressly prohibits the use of excessive force or inappropriate restraint techniques.
- Reinforcement of SCM:
    - A total of 5 ACS staff have received specialized training to become "SCM Coaches." The role of these coaches is to provide additional support and training in SCM at the facility-level through informal coaching. These coaches work throughout the facility and facilitate short, skill-building sessions to reinforce SCM best practices, respond to incidents to assist and provide real-time debriefings and provide feedback to staff.
- Staff reporting of physical restraints is discussed in ¶ 2 (c) below.

**Monitoring Team's Analysis**.

Physical intervention by staff in a secure setting is at times required to maintain order and safety—there are times in which staff must utilize a physical restraint to prevent harm or avoid further harm from occurring. A well-executed, well-timed physical restraint that is proportional to the observed threat can actually protect both staff and residents from serious harm.

Overall, the Monitoring Team has not observed a pattern or practice of excessive or unnecessary force utilized by ACS staff. ACS staff's use of physical restraints has been observed to generally be proportional to address the issue, and staff appeared to utilize or at least attempted to utilize trained SCM techniques when physical intervention was necessary. The Monitoring Team observed that staff demonstrate significant professional control and tempered force throughout this Monitoring Period as in prior periods.

- *Physical and Mechanical Restraint Data*

Accurately interpreting the data regarding the use of restraints requires some important considerations. First, ACS maintains restraint data that tabulates the number of *youth* who were restrained (in contrast to data on youth violence reviewed in the Introduction above, which tabulates the number of *incidents*). This means if 6 youth were involved in an assault and all six were restrained, the data related to that incident would include <u>one</u> assault and <u>six</u> restraints. Second, it is also important to recognize that not all acts of violence lead to a restraint (*e.g.*, the youth involved could cease their activity based on staff's verbal commands). Further, restraints are also used to respond to youth behaviors other than acts of violence (*e.g.*, a youth who is physically aggressive and posing an imminent risk of physical harm to another's safety may be restrained prior to an assault actually occurring). Finally, ACS's physical restraint data only includes a very specific category of physical intervention used by staff on residents—known as Emergency Safety Physical Interventions ("ESPIs") under the Safe Crisis Management ("SCM") framework.[6] Because escort holds are excluded from the physical restraint data in this report, this data should be considered under-inclusive in terms of understanding the frequency with which staff needed to use physical force with a non-compliant resident. For all of these reasons, the Monitoring Team's assessment of risk of harm, as outlined in the introduction and the discussion of ¶ 2 (a) above, considers a much broader array of information beyond the restraint data.

The chart below presents the rate of both physical and mechanical restraints from January 1, 2021 to December 31, 2022 (the entire period the Agreements have been in

---

[6] ACS' restraint data does not include escort holds, even if the escort is of a non-compliant resident and some physical coercion is needed. It also does not include incomplete ESPIs that do not result in a physical restraint (that is, a staff member attempts a specific restraint technique but fails and does not restrain the resident, the event then terminates with the resident ultimately complying without the use of physical restraint). ACS' approach to categorizing and calculating the restraint data is guided by the well-respected organization (JKM Training, Inc.) that developed ACS' curriculum for responding to aggressive behaviors (Safe Crisis Management, or SCM). While escort holds and incomplete ESPIs are not considered "physical restraints," they are *reportable events* and are included in the GOALS reports shared with the Monitoring Team.

effect). *See* Appendix B for monthly data on the number and rate of physical and mechanical restraints. These graphs illustrate that the number *and* rate of restraints decreased significantly during the current Monitoring Period. While there were some spikes throughout the First through Third Monitoring Periods, there has been overall downward trend in both the number and rate of physical and mechanical restraints, and the end of 2022 marked a two-year low in restraints. The table below shows that the average rate of restraints has consistently declined across Monitoring Periods, with a current average that is 79% lower than the average rate during the First Monitoring Period.

| Average Rate of Physical and Mechanical Restraint, 2021-2022 [7] | | |
|---|---|---|
| Date | Physical Intervention | Mechanical Restraint |
| 1st Monitoring Period (January-June 2021) | 2.51 | 0.43 |
| 2nd Monitoring Period (July-December 2021) | 1.69 | 0.28 |
| 3rd Monitoring Period (January-June 2022) | 1.55 | 0.37 |
| **4th Monitoring Period (July-December 2022)** | **0.53** | **0.18** |

As noted in the Introduction to this report, these trends correspond with Horizon's lower rates of youth violence, a correlation that makes sense since most restraints occur in response to violence. Further, physical restraints were often used in the past as a necessary response to occasions in which youth physically engaged with staff to obtain their keys. As noted in the Introduction to this report, ACS has made a concerted effort, particularly towards the end of the Monitoring Period, to improve key control and create fewer opportunities for this type of assault on staff. The Monitoring Team has continued to provide technical assistance in this area, to which ACS has been receptive.

- *Trends in Physical Interventions*

To assess the necessity, execution, and proportionality of Horizon's use of physical interventions, the Monitoring Team reviewed video footage and related documentation such as staff reports and injury reports (collectively referred to as "packets") for 32 events occurring between July and December 2022 at Horizon. Of these, 12 were classified as physical restraints, and 20 were other types of events captured by the GOALS reports. Events were selected based on the initial description in the GOALS reports where either a significant physical intervention occurred or some other type of interaction between staff and residents that appeared to warrant review by the Monitoring Team.

For the most part, ACS staff either used or attempted to use trained SCM techniques in response to situations involving an imminent risk of harm. Most restraints were in response to youth-on-youth violence or violence directed at staff, and the Monitoring Team noted some improvements with staff responding more quickly and gaining control more effectively and

---

[7] Rate = ((# of incidents/# days in month)/ADP) * 100.

efficiently. As noted in the Introduction of this report, group disturbances remain common (although decreased toward the end of the Monitoring Period), and a couple of incidents involved assaults on staff in which youth utilized dangerous strangulation holds and head strikes. In spite of this, staff often showed professionalism and maintained their composure following an assault and did not hesitate to intervene to protect residents from youth-on-youth violence, often putting themselves in harm's way to protect victims of assault. Indeed, some staff's actions rose to the level of "heroic" in terms of their efforts to protect youth from assault.

Staff still appear to be simply overwhelmed at times and without effective tools to address mass disturbances or significant violent attacks. Early in the current Monitoring Period, the Monitoring Team recommended that ACS leadership consider some heightened form of physical tactics (such as defensive tactics) beyond SCM, for training staff to respond to life-threatening situations. As noted above, during the current Monitoring Period, incidents occurred in which youth used life threatening force on staff, who were unable to defend themselves from attacks. The Monitoring Team engaged with ACS leadership and SCM experts to explore potential options, but none were identified for specific pursuit at this time.

Overall, the Monitoring Team has not observed a pattern or practice of excessive or unnecessary force by ACS staff. ACS staff's use of physical restraint has been observed to generally be proportional to the severity of the event, and staff appeared to utilize or at least attempted to utilize trained SCM techniques when physical intervention was necessary. The Monitoring Team will continue to engage with ACS to ensure staff have the tools necessary to defend themselves in life-threatening situations and continues to recommend that staff receive training and guidance on defensive tactics such as defense against weapons, how to protect youth during multiple youth-on-youth assault events, and techniques for staff to use during last resort exigent circumstances situations.

**Compliance Rating**. Compliance

## ¶2(c). Incident Report Review and Referral. ACS shall conduct timely and thorough reviews of incidents involving Physical Restraints to determine whether the intervention was appropriate and whether ACS staff complied with the ACS Physical Restraint Policies.

ACS Policy & Practice.
- ACS Policy #01/2012 "Reporting of Incidents and Data Management for Group Oriented Analysis Leadership of Strategies (GOALS)" creates a procedure for comprehensive, accurate reporting of incidents that occur in ACS facilities. GOALS reports are created for every incident occurring in the Facility, including physical restraints, mechanical restraints, etc. as noted in ¶ 2(a), above.
- ASC Policy #2014/10 "Safe Intervention Policy for Secure and Non-Secure Detention" requires:

(1) that any use of an ESPI on a resident must be immediately reported to a supervisor or Tour Commander, and each staff member involved in or who witnessed the event must submit an Incident Report Form;
(2) a supervisor must complete the "Supervisory Follow-Up" portion of the Incident Report Form; and
(3) Executive Directors must review all Incident Report Forms involving an ESPI within 48 hours.

- For all incidents reported to GOALS (not just those involving ESPIs as described above), additional layers of supervisory review *can* occur on an *ad hoc* basis, including:
  - An Operations Manager's (OM's) Report is supposed to be generated for critical incidents, which are generally those incidents involving a resident injury or alleged child abuse.
  - OMs review more serious incidents on a weekly basis.
  - ACS reports other layers of review including by senior leadership, particularly for more serious incidents.
- ASC Policy #2022/03 was promulgated in September 2022, but has not yet been implemented as discussed in more detail below. This new policy:
  - establishes layers of supervisory review for all incidents, and heightened scrutiny for "critical" incidents;
  - includes standardized forms to support these reviews including a critical incident report form, a manager's report form, a video review form, and a documented checklist to ensure all relevant documents and information for each incident is gathered as required; and
  - articulates a process and related forms for documenting any required corrective action, including ELU referrals.

**Monitoring Team's Analysis.**

The assessment of compliance with this provision is divided into three sections: (1) Horizon's internal assessment of incidents within the facility, (2) an assessment of staff reporting of incidents they are involved in or witness, and (3) appropriate corrective action for identified misconduct.

*(1) Horizon's Internal Assessment of Incidents*

Horizon has an adequate mechanism for reporting incidents internally, including all physical restraints, via GOALS. The GOALS reports provide a high-level summary of each incident that occurred at Horizon. However, as reported in the First Monitor's Report, Horizon continues to lack a systematic process for incidents to be *assessed* by a supervisor. While ACS promulgated an incident review policy during this Monitoring Period, the required procedures have not yet been fully implemented.

  - *New Policy and Procedure*

Policy 2022/03 "Incident Review in Secure and Specialized Secure Detention" was finalized and issued on September 7, 2022. This policy outlines a process for multiple levels of

review including expanding managerial review to include every incident, with successive levels of supervisory review for more serious incidents—starting with AYDS, Tour Commander, Operation's Manager and Executive Director review of all incidents all within 24-48 hours of an incident, up to final layers of review by ACS leadership including the Assistant Commissioner for certain critical incidents. The policy requires Operations Managers, trained in SCM, to assess staff's conduct during the incident, and to clearly record and track any recommended corrective action as part of the final assessment of the incident. ACS has not implemented the policy beyond the corrective action tracking discussed below, and ACS leadership has indicated that full implementation may not be achievable due to other priorities, the current shortage of supervisors, and the onerous review process outlined in the policy. The Monitoring Team is working with ACS to either establish a timeline for implementation of the policy as written or revisit the procedures in the policy to ensure the policy outlines a realistic process for incident review that can be achieved in the short term.

The Monitoring Team recognizes that formal reviews are only one component of how staff skill is elevated, but a systematic and formal approach to these reviews is necessary to identify both strengths and weaknesses in the management of incidents. Further, such reviews are necessary to both identify and drive potential procedural and operational changes and thus formal reviews are an essential component of managing a safe facility.

    o  *Ad Hoc Reviews*

The *ad hoc* incident reviews and elevation of problematic incidents for further investigation described in the prior reports continued throughout this Monitoring Period.[8] ACS leadership reported they regularly review incident videos and take action, including referrals when potential misconduct was identified that warranted consideration for discipline by the Employment Law Unit ("ELU referrals"). ACS also continued a targeted incident review process in which a team of NPJS consultants and behavioral management staff conduct regular video incident review with the front-line staff and supervisors involved in the incidents to identify issues and develop corrective action plans. These sessions provide an opportunity to discuss situational positioning, identify early points of intervention and de-escalation that may have been missed, and assess SCM techniques, in addition to evaluating whether appropriate counseling measures were taken with the involved youth. ACS reports that these sessions have provided a useful forum for learning, training, and re-direction. ACS has begun to formalize this process via a Corrective Action Tracker to ensure that significant incidents receive supervisory review and result in responsive interventions. The Monitoring Team strongly supports this type of interdisciplinary review. ACS also reported prioritizing real-time video review to identify and address operational or procedural issues and assist in de-escalation of an event before an incident occurs. This practice is certainly important, but, as noted above, without a reliable formal process in place it is difficult to assess the frequency with which these reviews occur, how robust they may be, and does not allow supervisors to conduct a more holistic assessment of incidents.

---

[8] *See* First Monitor's Report at pg. 18, Second Monitor's Report at pgs. 20-21, and Third Monitor's Report at pg. 27.

*(2) Staff Reporting*

The "Safe Intervention Policy for Secure and Non-Secure Detention" requires that any use of an ESPI on a resident must be immediately reported to a supervisor or Tour Commander, and each staff member involved in or who witnessed the event must submit an Incident Report Form. The Incident Report Form has required fields including basic information such as date, time, and youth involved; a general narrative section; and an ESPI-specific portion where staff must identify the type of physical restraint utilized, its duration, and other information specific to the physical restraint.

As noted above, the Monitoring Team reviewed the incident packets for 32 incidents that occurred from July to December 2022, including 12 that included the use of physical restraint, and found that the Incident Report Forms written by staff who either participated in or witnessed the incident were often vague or incomplete. While staff appear to accurately detail the actions of youth, staff's reports are often vague or inaccurate regarding their own actions and/or those of other staff. Reviewing staff reports, and identifying and addressing any deficiencies, must be part of a formal incident review protocol to improve staff practice in this area. While identifying and addressing issues with staff reporting was incorporated in the incident review policy promulgated this Monitoring Period, the Monitoring Team has not seen this aspect addressed by any of the reviewers and it must remain a goal of any incident review process implemented.

*(3) Response to Identified Misconduct*

The new ACS/facility leadership has emphasized a focus on skill development to less serious departures from policy, rather than the preference for disciplinary measures that characterized the approach in the past.  ACS reports it wants to maximize the use of corrective actions to support improved staff practice and does not simply want to default to immediately terminate staff (particularly probationary staff) if it appears that staff are in a position to improve their practice going forward. ACS attributes some of the perceived improvement in staff morale to the administrators' change in philosophy.  Coaching, mentoring, and training are important tools for enhancing staff skill in response to less serious policy violations that not only boost staff morale, but that may also stem the tide of staff turnover. However, a functional system must also include adequate accountability especially in cases of repeated misconduct or particularly egregious misconduct, which is also underway. For all 32 incident packets described in ¶ 2(b) above, ACS provided the Monitoring Team with information on the administration's response to any identified poor practices, and training and counseling (in the form of a written conference, verbal de-briefing, or video review) were frequently invoked. As in prior Monitoring Periods, a number of the staff involved had resigned and some were out on worker's compensation (so these corrective actions would await their return).

ACS also began using an Excel spreadsheet in November 2022 to track corrective actions at the end of this Monitoring Period as an internal quality assurance tool designed to ensure timely, appropriate responses to significant incidents. Corrective action tracked by this spreadsheet includes staff coaching and de-briefing, verbal reprimands, and formal disciplinary conferences for misconduct related to physical restraints, contraband, failure to

supervise, and involvement in other incident types. The Monitoring Team noticed that information about corrective action responses were quickly obtainable after the implementation of this tool and is encouraged that the use of this tracking tool will ensure that recommended corrective action is ultimately applied.

<u>Conclusion</u>

To achieve compliance, ACS must implement a reasonable incident review policy that is capable of identifying and addressing poor practice, operational concerns that arise during (or were the cause of) an incident, and staff reporting issues. While progress was made in finalizing a policy this Monitoring Period and implementing a corrective action tracker, as noted above, the newly promulgated policy may need to be altered to ensure that it is operationally achievable.

**Compliance Rating**. Progress Made, but Compliance not yet Achieved

---

**¶2(d). Programming.** ACS shall develop, track, and maintain a sufficient level of programming for AO Youth, consistent with best practices for adolescents and young adults.

**ACS Policy & Practice.**
- ACS Policy #2019/04 "Exercise, Recreational and Leisure Activities in Secure and Specialized Secure Detention," which requires a balance of structured recreational, exercise and leisure activities that are posted on a daily unit schedule, remains in effect.
  - This policy requires one hour of large muscle activity per day.
  - ACS has set an internal target of at least 2.5 hours of programming per day during the school year and 3 hours of programming per day during the summer months. These targets were adjusted beginning with the 2022-2023 school year to accommodate the later school start time implemented to encourage attendance.
- ACS Policy #2019/31 "Educational Services in Secure and Specialized Secure Detention" remains in effect.
  - Youth of compulsory education age (*i.e.*, age 16 or younger) are to receive educational programming for 5.5 hours per day, Monday through Friday when school is in session.
  - Youth with a diploma/GED are to receive 5.5 hours of instruction per weekday, which includes literacy, math, life skills and workforce development.
  - YDS staff are required to facilitate timely arrival and attendance.
- At the beginning of the Monitoring Period, ACS operated a summer enrichment program ("Freedom School") during a six-week period in Summer 2022 in which all Horizon youth participated. ACS also offered a variety of other special Career Pathway programs, including dog training, culinary arts and audio pictures. Subsets of Horizon youth also participated in the Summer Youth Employment Programming, facility

beautification programs, a week-long intensive music programming and re-entry services during summer 2022.

- ACS has engaged with several Violence Interrupter and Credible Messenger groups to support communication and interpersonal conflict resolution among factions of youth embroiled in disputes originating in both the community and facility.

- During the current Monitoring Period, ACS restructured the Programming Division to ensure greater consistency across the two detention centers and adjusted Horizon's Program's staffing complement to account for the presence of vendors who provide a significant portion of Horizon's programming.

- ACS has begun to refine its program model to better address the needs and interests of the older population of youth at Horizon since Raise the Age went into effect. This included a youth survey and a review of existing contracts/partnerships/volunteers to assess outcomes and the quality of services delivered. The new vendor list includes those who provide general rehabilitative programming, urban farming, music, entrepreneurial skills, and fitness programs. Request for proposals (RFPs) have been issued to increase the number, quality and age-appropriateness of workforce development services.

- A robust Chaplain program delivers faith-based programming for youth and has also become an important part of Horizon's approach to staff wellness by providing support and refuge to staff who need it.

- ACS recently upgraded its entire fleet of tablets which contain mostly entertainment content, but also some educational and life skills content. Youth earn tablet usage via the facility's behavior management program, STRIVE.

## Monitoring Team's Analysis.

Implementing a robust daily schedule full of engaging, structured activities is a powerful strategy for reducing facility violence and disorder. ACS recently reduced its internal target for programming from 3 hours to 2.5 hours of after-school/weekend programming each day to accommodate the later school start time (which was adjusted in an effort to increase attendance/engagement). This target is within the generally accepted practice and is certainly reasonable for school days, given the other things that must be accomplished before bedtime (*e.g.*, dinner, phone calls, visitation, showers).[9]

Programming at Horizon is provided by Program Counselors, vendors, behavioral health staff and the YDSs assigned to each housing unit. Most of the programming facilitated by YDSs is semi-structured leisure time activities (*e.g.*, card games, video games, movies), while Program Counselors and vendors provide rehabilitative and skills-based programs such as creative arts, performing arts, cooking, personal fitness, goal setting, decision making and conflict resolution. Behavioral health staff provide group psychotherapy.

---

[9] The Agreements do not include provisions related to educational programming at Horizon and thus it is not discussed in this report, despite the Monitoring Team's support for ACS' actions taken to improve attendance and engagement.

In prior Monitoring Periods, Horizon had 17 Program Counselor positions, and had a difficult time attracting/retaining counselors as discussed in previous Monitor's Reports. ACS also determined that the contracts for vendor-led program reduced the need for as many counselor positions. The current staffing allocation is 12 Program Counselors, 10 of whom provide services to youth on the housing units and 2 of whom oversee recreation/large muscle activity. ACS reported that the variety of vendors currently contracted to provide services at Horizon has lessened the reliance on Program Counselors. At the end of the Monitoring Period, all 12 Program Counselor positions were filled, although two Program Counselors were on leave.

Vendors provide a music engineering workshop, culinary skills, an introduction to barbering, college courses and tutoring, and a popular fitness program will begin in early 2023. Previously, Program Counselors were assigned to specific housing units, but now are deployed to units according to where the gaps in vendor-led programming lie. Program Counselors also conduct other stand-alone programming such as holiday and birthday celebrations, Family Days and the Elite Lounge (available to youth at the highest level of the behavior management program).

The previous Monitor's Report described the launch of the Program Assessment and Tracking System (PATS) in April 2022 but lamented the lack of valid data on program delivery for the latter part of the previous Monitoring Period (April/May/June 2022). PATS is now fully operational, and ACS continues to work through any glitches that arise. Staff have been trained and retrained, and data are verified against each unit's schedule to ensure that all activities are captured. ACS staff reported planned enhancements to PATS including ensuring that all staff responsible for entering data have access to the database, adding fields for cancelled activities to track and evaluate the frequency with which scheduled programs do not occur and the reason for their cancellation, and ensuring that structured programming led by YDSs is properly entered into the database.

Programming data were reviewed for July/August/September/October 2022 to assess the extent to which the 2.5-hour programming targets are being met. Unfortunately, the results showed that programming targets are not being met consistently. Program targets were met on only 64% of days in July, 31% of days in August, 51% of days in September, and 49% of days in October.[10]  ACS reports that in addition to fortifying data entry as described above, procedural improvements in youth movement and scheduling will be instituted to increase the delivery of programming.

ACS continues to make substantial efforts to provide an array of programming to youth at Horizon by dedicating significant resources to ACS staff and vendors to provide structured activities for youth that are led by an adult. Ensuring that vendors focus on age-appropriate

---

[10] ACS provided data for each day of each month, providing a "Y" or "N" indicator based on whether each housing unit met the 2.5 hour target. These data were aggregated to identify the proportion of days across all general population units (*i.e.*, excluding the SHU) when program targets were met. However, due to this reporting method, it was not possible to calculate the magnitude of the deficiencies each day (*i.e., whether the target was missed by 15 minutes or two hours*).

programming given the older age of Horizon youth post-Raise the Age and conducting youth surveys to ensure offerings are aligned with youth interests should help to increase youth engagement and rehabilitation. ACS appropriately restructured Program Counselor duties and also reduced the number of vacant Program Counselor positions. The electronic program tracking system is an important development because it allows ACS to monitor the extent to which scheduled programming actually occurs. That said, PATS has revealed problems with program delivery that must be addressed in order to reach compliance with this provision.

**Compliance Rating**. Progress Made, but Compliance not yet Achieved

---

**¶2(e). Behavior Management.** ACS shall maintain systems, policies and procedures for AO Youth that: (i) reward and incentivize positive conduct and (ii) sanction negative conduct. The application of these procedures shall be individualized, consistent with any treatment needs for AO Youth and shall not compromise the safety of other AO Youth or ACS staff.

ACS Policy & Practice.

- ACS Policy #2018/09 "Behavior Management in Secure and Specialized Detention" remains in effect. It guides the delivery of a multi-tiered behavior management system that cultivates a "therapeutic institutional culture." The policy states that staff interactions with youth should teach youth self-regulation and problem-solving skills and emphasizes that youth with aggressive behaviors are the ones most in need of positive relationships with staff rather than punitive approaches to behavior management. These are important philosophical underpinnings to the facility's approach to behavior management. The policy specifically requires:
  - o Safety Plans
  - o Level System with incentives and consequences, that is consistent with each youth's Safety Plan (which is consistent with the requirements of this provision)
  - o Therapeutic groups, individual interventions and opportunities for youth empowerment and self-advocacy
- In 2020, the National Partnership for Juvenile Services (NPJS) helped ACS to strengthen its behavior management system's (STRIVE) design, particularly regarding youth skill development, the reliability of incentives for desirable, prosocial behavior and ensuring meaningful consequences for negative behavior.
- ACS developed an excellent manual to guide implementation of Restorative Justice activities that includes restorative circles and an array of group-based activities.
- As reported in the previous Monitor's Report, the originally planned sequential rollout of STRIVE was accelerated during the current Monitoring Period so that all staff could be trained, and all living units could implement the basic STRIVE processes by the end of 2022.
- NPJS consultants were redeployed from providing on the ground implementation support to facilitate training sessions for all staff. Training includes the mechanics of the program (strategies to increase appropriate behaviors such as praise, point cards

and privilege levels; strategies to decrease inappropriate behaviors using a continuum of interventions that are calibrated to the severity of misconduct) and the skill-building components (*e.g.*, cognitive behavioral therapy groups) and Restorative Justice activities. Scenario-based activities are included to facilitate the application of the various concepts.

- NPJS is also training each unit team's core members (Core Leadership Team or "CLT") to effectively facilitate the various community meetings, groups and activities central to STRIVE's program design. As of the end of 2022, one Hall had a CLT that met regularly. It is anticipated that the arrival of multiple new Operations Managers in early 2023 will enable CLTs to convene consistently on each Hall.

- STRIVE training was incorporated into YDS pre-service training in February 2022, so new staff arrive at Horizon with this training completed. In addition, some of the pre-service trainers have received training on Restorative Justice but they have not yet begun to deliver this content in YDS pre-service training.

- All living units implemented the basic components of STRIVE on December 12, 2022. Additional components will be layered on throughout 2023.

- ACS is developing an app that will automate many of the tasks commonly completed manually by staff. This unique and sophisticated approach to implementation may help Horizon to avoid many of the "operator errors" that undercut the delivery of behavior management programs in other jurisdictions.

- ACS plans to work with NPJS to implement a variety of skills-based group interventions, including cognitive behavioral therapies and restorative justice groups. Training is scheduled to begin in mid-2023.

### Monitoring Team's Analysis.

A robust behavior management program is an essential element of a safe facility. Such a program should teach skills that promote prosocial behavior (*e.g.*, skills for resolving interpersonal conflict, managing anger and resisting impulsive actions) and should incentivize and reinforce positive behavior with an array of meaningful rewards. A behavior management program should also provide for appropriate, proportional, skill-based responses to negative behaviors that hold youth accountable and that lessen the likelihood of subsequent misconduct. In addition to having a sufficient number of well-trained staff and an engaging array of programming, a well-designed and consistently implemented behavior management program is the cornerstone of a safe facility.

The First Monitor's Report (*see* pgs. 29-31) discussed the evolution of the STRIVE model, how the model's design was strengthened, and the initial timeline for implementation which began with training all managers during Summer 2020. As noted throughout the Monitor's Second and Third Reports, COVID's impact on staffing made the regular delivery of programming difficult (a key component of behavior management), and substantially undercut Horizon staff's ability to attend scheduled trainings and to take the time necessary to cultivate new practices. As a result, the implementation of the new STRIVE model did not

expand as quickly as ACS hoped it would and was limited to only two pilot halls for much of 2021 and 2022.

The Third Monitor's Report (see pg. 38) discussed ACS' accelerated training schedule, adopted so that the basic structures of the STRIVE model could be implemented facility-wide more quickly than originally planned. ACS reached this goal in late 2022. About 90% of all Group Services staff (Tour Commanders, Operations Managers, AYDS, YDS, Program Counselors and Case Managers) have now been trained via a combination of pre-service training for new staff and in-service training for existing staff. All 10 Halls implemented the basic components of the new STRIVE model on December 12, 2022. This accomplishment has been years in the making and is an important milestone in bringing a consistent approach to facilitating positive behavior among youth at Horizon.

The initial layer of the program includes:

- Clear expectations for each component of the youth's day (*e.g.*, morning routine, restrooms, movement, school, meals, group, leisure time, recreation, etc.) that are posted throughout the facility.
- Point cards where staff award points when youth meet expectations and/or explanatory comments when they do not as they rate youth's behavior throughout the day.
- Tiered incentive levels (*i.e.*, Bronze, Silver, Gold, Independent) that provide an array of rewards and incentives in response to sustained positive behavior. These include phone calls, commissary, letter writing supplies, playing cards, radios, special meals and events.
- Proportional sanctions imposed in response to discrete categories of misconduct. Sanctions include a drop in level, and activities that must be completed to return to point-earning status (restorative tasks, a reentry interview with Hall leadership). Disciplinary review meetings occur twice weekly to assess appropriate STRIVE levels for youth involved in incidents and to assign responsive restorative justice tasks.

For the next several months, ACS will scrutinize the mechanics of the program (*e.g.*, point tallies and data entry; quality card completion and supervisory review) and will respond to areas of weakness with "learning bursts" during roll call and other individualized training. Once the foundation is solid, additional program components will be layered on, including:

- Daily rewards for youth who earn a certain percentage of points each day (originally designed to be differentiated bedtime according to incentive level, but which has proven difficult to implement).
- Commissary enhancements to ensure youth receive appropriate incentives. ACS and Horizon behavior management staff are also updating the commissary order form and expanding the items available in accordance with youth preferences.

- Refined restorative activities that are more closely related to the nature of the misconduct, fortifying the process to ensure integrity/accountability, and developing staff skill for these difficult conversations.
- Opportunities for youth to de-escalate and/or reflect (*i.e.*, "chill time") when tensions arise, or a youth engages in threatening or assaultive behavior.
- Strategic Modified Programs, which are skill-focused and developed by a multidisciplinary team, for youth with frequent aggressive behaviors.
- Skill-focused groups (*e.g.*, cognitive behavioral therapy, restorative justice groups) that teach youth skills for managing anger and frustration, and teaching staff how to cue youth to access these skills in the moment.

Once fully implemented, STRIVE will include all of the components necessary for a program that meets the generally accepted practice. It is appropriate to hold off on implementing these structures until the point card mechanics and delivery of incentives/consequences are reliable, but these final layers are also those which bring important individualization and skill-development to the basic program structure and thus are essential.

To get a sense of the quality of implementation upon the initial roll out, the Monitoring Team reviewed point cards from a one-week period in December 2022, just two weeks after the program was implemented. On a positive note, point cards were created for each youth, each day along with the daily summary form for each unit (which shows whether each youth earned a daily reward, starting point total/ending point total). However, as is typical in all early-stage behavior management programs, staff will need intensive on-the-ground coaching to address the many problems identified through this review. These include staff's failure to rate behavior during <u>all</u> eight rating periods (*e.g.,* may have only rated behavior in 3 of the 8 rating periods; this fails to recognize youth's positive behavior and inhibits youth's movement up the levels), failure to differentiate points across the 4 dimensions (safety, respect, integrity, engagement—when points were awarded, youth always received the same number of points on all 4 dimensions), failure to individualize points across youth (staff tended to award the same number of points for all youth on the unit), and a failure to record comments related to both bonus points that were awarded and infractions that occurred. Fortunately, ACS has enacted daily/weekly point card audits, is fully aware of these problems, and implemented booster trainings during roll call to address them. The importance of getting the mechanics right cannot be overstated. In the Monitoring Team's experience, the effectiveness of a behavior management program depends on staff's consistent and accurate rating of each youth's behavior so that youth are able to access rewards they have earned and receive appropriate sanctions in response to misconduct.

During the next Monitoring Period, monitoring will focus on assessing whether new staff and those returning to work have received appropriate training, quality of point card mechanics, the application of rewards and sanctions, along with each of the new layers of program implementation as they occur.

**Compliance Rating**. Progress Made, but Compliance Not Yet Achieved

## ¶2(f). Room Confinement. ACS shall comply with applicable ACS policies and practices governing the use of room confinement.

**ACS Policy & Practice.**
- ACS Policy #2019/32 "Room Confinement Policy for Secure and Specialized Secure Detention" was revised during the current Monitoring Period (September 2022). The policy limits the use of isolation to address circumstances in which a youth poses an immediate risk of physical harm to another person and prescribes various protections for youth in confinement. Key policy changes include:
    - Permitting staff to place a youth in a locked room for less than 30 minutes before the room confinement requirements must be initiated.
    - Lengthens the timeline for notifying a youth's parents about the use of room confinement from 12 hours to 24 hours. This change is within the generally accepted practice.
- All room confinement procedures must be documented in each Hall's Room Confinement logbook, and entries are required by each of the individuals who visits the youth.
- Mental health staff must be consulted within 30 minutes of the onset of room confinement.
- Any use of room confinement must be authorized by the Facility Director/designee, and re-authorized at prescribed intervals (within 2 hours, and every 2 hours thereafter) and up the chain of command.
- Youth's safety and welfare must be checked at 15-minute intervals and documented in a logbook.
- Youth must be assessed for their readiness for return to regular programming at 30-minute intervals by YDS and/or facility administrators. Supervisors must visit every 60 minutes to reassess. The Facility Director/designee must visit the youth within 2 hours of the onset of room confinement. These assessments must also be documented in a logbook.
- A variety of services must be provided to youth in room confinement including meals; case management if the youth remains in room confinement for more than 1 hour; mental health services within the first hour, preferably, but within 8 hours and then every 8 hours thereafter; medical within 3 hours and every 8 hours thereafter; and assigned school work if the youth is in room confinement during school hours for more than one class period. All services must be documented in a logbook.
- During the current monitoring period, staff were provided copies of the revised policy. Room Confinement logbooks were redistributed to each living unit and are now kept in the Tour Commander's office when not in use.
- A job aid was attached to each logbook to provide more immediate access to policy requirements when room confinement is used.
- ACS developed a comprehensive "Room Confinement Compliance Checklist" that includes fields corresponding to each policy requirement and requested input from the

36

> Monitoring Team. The audit tool was introduced in January 2023, and compliance audits began that same month.
> - ACS reports that, during the next Monitoring Period, it plans to implement roll-call briefings to remind staff of the policy requirements and also plans to create a review log to facilitate administrative review of each room confinement event.

**Monitoring Team's Analysis.**

While isolation is not an effective *disciplinary strategy* (*i.e.*, not effective when used as a consequence for a rule violation), short periods of room confinement are an essential tool for responding to an imminent risk of harm to another person's safety and/or manage the aftermath of a violence incident. The Monitoring Team has encouraged Horizon to consider and better utilize room confinement as part of its response to incidents, especially to contain situations where an ongoing risk of harm remains (*e.g.*, retaliation, chaos from large group events, inability to return to regular programming, etc.). When properly utilized and rigorously monitored, the use of room confinement following a serious incident is an important safety tool. Not only does it provide an opportunity for the youth involved to de-escalate, it also provides the necessary time and space for uninvolved youth and staff to regain their footing, de-escalate, restore a sense of order and return to programming. Notably, both staff and youth reported that room confinement "isn't used" when interviewed.

Indeed, ACS reported only two room confinement events during the current Monitoring Period, although the GOALS reports summarizing each incident that occurred at Horizon included many references to youth being "escorted to their room" following a restraint or violent incident. If youth remain in their rooms for only a short period of time, this is a reasonable approach because it provides an opportunity for youth to calm down and for staff to determine exactly what occurred and regain operational control. Some professional standards and other jurisdictions permit a similar "cooling off period," but typically limit the period to only 15 minutes (compared to the 30 minutes permitted by ACS policy). The Monitoring Team has encouraged ACS to develop an efficient mechanism to verify that youth are released from their rooms within the 30-minute threshold for room confinement.

The two uses of room confinement are noteworthy not only because of the significant decrease in use from the 49 incidents reported in the previous Monitoring Period, but also because of the continued failure to properly follow policy requirements. In the first event (in July 2022, 3 hours and 19 minutes in duration), *none* of the policy requirements were followed. More specifically, the "immediate risk of physical harm" was not described to justify the use of room confinement (the incident summary in GOALS suggests the incident was quite minor and fully de-escalated on the scene); 15-minute checks were not timely; Mental Health staff were not initially consulted; parents were not notified; relevant staff were not notified; a meal was not delivered despite the incident occurring around lunchtime; the Facility Director did not visit the youth at all; Supervisors did not visit the youth at any time until release; a case manager did not visit; medical staff did not visit the youth. In the second event (in November 2022, two hours in duration), policy compliance was somewhat improved, but documentation indicated various practice failures including: the initial mental health consultation did not occur, 15-minute checks were not timely, the results of the 30/60 minute individual assessments were not recorded (though documentation indicated that they did occur), the

case manager did not visit, and a meal was not provided despite the incident occurring around dinner time. Although room confinement is used infrequently, the failure to follow policy requirements regarding room confinement has been a consistent finding in each of the previous Monitoring Periods.

ACS reports that it does not intend for room confinement to become a widespread practice. As noted above, a brief cool down for youth also gives time for staff to regain their footing. At times, however, a cool down longer than 30 minutes may be necessary to address an immediate risk of physical injury and to restore safety. For this reason, it is essential that ACS ensure that all protections are dependably in place. It is possible that the full implementation of STRIVE (discussed above) will replace this tool with a variation called "Chill Time." If that occurs, the intersection between "Chill Time" and room confinement will be closely monitored.

**Compliance Rating**. Compliance not yet Achieved

## APPENDIX A: MONTHLY DATA ON YOUTH-ON-YOUTH AND YOUTH-ON-STAFF VIOLENCE



**Number of Youth-on-Youth and Youth-on-Staff Assaults**
January 2021 - December 2022

|  | Jan 21 | Feb 21 | Mar 21 | Apr 21 | May 21 | Jun 21 | Jul 21 | Aug 21 | Sep 21 | Oct 21 | Nov 21 | Dec 21 | Jan 22 | Feb 22 | Mar 22 | Apr 22 | May 22 | Jun 22 | Jul 22 | Aug 22 | Sep 22 | Oct 22 | Nov 22 | Dec 22 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| YOYA | 8 | 5 | 5 | 12 | 16 | 30 | 31 | 14 | 17 | 21 | 22 | 23 | 24 | 7 | 25 | 16 | 35 | 22 | 24 | 16 | 11 | 15 | 11 | 11 |
| YOSA | 5 | 13 | 5 | 11 | 21 | 15 | 14 | 9 | 7 | 12 | 12 | 3 | 12 | 12 | 13 | 22 | 24 | 10 | 9 | 9 | 5 | 6 | 5 | 8 |



### Rate of Youth-on-Youth and Youth-on-Staff Assaults
January 2021 - December 2022

1st MP    2nd MP    3rd MP    4th MP

| | Jan 21 | Feb 21 | Mar 21 | Apr 21 | May 21 | Jun 21 | Jul 21 | Aug 21 | Sep 21 | Oct 21 | Nov 21 | Dec 21 | Jan 22 | Feb 22 | Mar 22 | Apr 22 | May 22 | Jun 22 | Jul 22 | Aug 22 | Sep 22 | Oct 22 | Nov 22 | Dec 22 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| YOYA | 0.76 | 0.54 | 0.5 | 1.09 | 1.27 | 2.19 | 1.88 | 0.76 | 0.88 | 1.09 | 1.1 | 1.09 | 1.05 | 0.37 | 1.21 | 0.79 | 1.77 | 1.16 | 1.2 | 0.74 | 0.5 | 0.42 | 0.4 | 0.68 |
| YOSA | 0.47 | 1.4 | 0.5 | 1 | 1.66 | 1.1 | 0.85 | 0.49 | 0.36 | 0.62 | 0.6 | 0.14 | 0.52 | 0.63 | 0.63 | 1.09 | 1.21 | 0.53 | 0.45 | 0.41 | 0.23 | 0.23 | 0.19 | 0.29 |

## APPENDIX B: MONTHLY DATA ON PHYSICAL AND MECHANICAL RESTRAINTS



Number of Physical and Mechanical Restraints
January 2021 - December 2022

| | Jan 21 | Feb 21 | Mar 21 | Apr 21 | May 21 | Jun 21 | Jul 21 | Aug 21 | Sep 21 | Oct 21 | Nov 21 | Dec 21 | Jan 22 | Feb 22 | Mar 22 | Apr 22 | May 22 | Jun 22 | Jul 22 | Aug 22 | Sep 22 | Oct 22 | Nov 22 | Dec 22 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Physical | 16 | 25 | 15 | 30 | 40 | 44 | 52 | 27 | 20 | 39 | 26 | 25 | 31 | 21 | 37 | 48 | 32 | 20 | 13 | 16 | 8 | 21 | 13 | 3 |
| Mechanical | 3 | 3 | 1 | 5 | 8 | 11 | 7 | 2 | 5 | 5 | 3 | 10 | 7 | 5 | 8 | 13 | 8 | 4 | 2 | 5 | 3 | 9 | 5 | 1 |

