N4rWnunC

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    MARK NUNEZ, et al.

 4                    Plaintiffs,

 5              v.                              11 Civ. 5845 (LTS)

 6    CITY OF NEW YORK, et al.

 7                    Defendants.
                                               Conference
 8    ------------------------------x
                                               New York, N.Y.
 9                                             April 27, 2023
                                               2:00 p.m.
10
      Before:
11
                         HON. LAURA TAYLOR SWAIN,
12
                                               Chief Judge
13

14                            APPEARANCES

15

16

17    EMERY CELLI BRINCKERHOFF ABADY WARD & MAAZEL LLP
           Attorneys for Plaintiff Class
18    BY:   JONATHAN S. ABADY
            DEBRA L. GREENBERGER
19          -and-
      THE LEGAL AID SOCIETY PRISONERS' RIGHTS PROJECT
20    BY:   MARY LYNNE WERLWAS
            KAYLA SIMPSON
21

22

23

24

25
```

N4rWnunC

                        APPEARANCES (continued)

 1

 2

 3

 4  HON. SYLVIA O. HINDS-RADIX
         Corporation Counsel of the City of New York
 5       New York City Law Department
         Attorney for Defendants
 6  BY:  ALAN H. SCHEINER
         SHERYL R. NEUFELD
 7       Assistants Corporation Counsel

 8

 9  DAMIAN WILLIAMS
         United States Attorney for the
10       Southern District of New York
         Attorney for Intervenor Plaintiff
11       United States of America
    BY:  JEFFREY K. POWELL
12       LARA K. ESHKENAZI
         Assistant United States Attorneys

13

14

15  EIXGER LLP
         Attorneys for Monitor Steve J. Martin
16  BY:  ANNA E. FRIEDBERG, Deputy Monitor

17

18

19  Also Present:  Christina Bucci Vanderveer
                   Associate Deputy Monitor
20
                   Alycia M. Karlovich
21                 Monitoring Team Analyst

22                 Dennis Gonzalez
                   Monitoring Team Associate Director
23
                   Commissioner Louis Molina
24                 New York City Department of Correction

25

N4rWnunC

1          (Case called; appearances noted)

2          THE COURT:  Good afternoon, and greetings to everyone

3     in attendance today and everyone in the overflow courtroom.

4          We are here today for a status conference.  This

5     conference was scheduled to discuss the city and the Department

6     of Correction's implementation of the action plan that was

7     approved and entered by the Court on June 14, 2022 -- that's at

8     Dkt. entry No. 465 for those who are looking up the documents

9     on PACER -- and this includes whether meaningful progress has

10    been made in achieving the reforms set forth in the action plan

11    or whether additional remedial relief is warranted at this

12    juncture.

13         I remind everyone here that, as provided in the

14    Court's January 19, 2021, standing order, filed in Dkt. No. 21

15    MC 45, neither recording nor any retransmission of any part of

16    the proceeding is permitted.  And all who have been permitted

17    to keep electronic devices here must keep those devices on

18    silent and are not to use them for communications without

19    permission from me.  And again, no photography, no recording,

20    no retransmission.

21         Today's conference, as I said, was scheduled to assess

22    the city and the department's progress in implementing

23    meaningful reform at Rikers.  I'll begin with an overview of my

24    own observations regarding the current status of the case and

25    key issues of concern.

N4rWnunC

1        This case, from its inception in 2011, has been

2   focused on the Department of Correction's pattern of using

3   unnecessary and excessive force against incarcerated

4   individuals and detained individuals.  The parties stipulated

5   to a settlement, known as the consent judgment, in 2015, which

6   set forth the concrete reforms that the department is required

7   to effectuate in order to remedy the practice of staff violence

8   against individuals in custody and to ensure the safety and

9   well-being of individuals in custody.

10        The monitoring team, which the Court appointed

11   pursuant to the consent judgment to assess the compliance in

12   implementing the reforms set forth in the 2015 consent

13   judgment, has submitted periodic and comprehensive reports over

14   the past eight years.  The monitoring team has also provided

15   expertise and consultant resources to assist the defendants in

16   identifying and addressing impediments to progress.  As time

17   has progressed, it has become evident to the monitoring team

18   that the department lacks the foundational good practices that

19   are critical to implementation of the provisions of the consent

20   judgment and to the creation of a safe environment for detained

21   persons and staff at Rikers.  To put it bluntly, the monitoring

22   team has reported that the consent judgment presupposed a

23   foundational level of good correctional practices that did not,

24   in fact, exist.

25        To prioritize the key foundational issues at the core

N4rWnunC

of the department's mismanagement of the jails, the department, the monitoring team and the other parties to this case have made a marked shift in focus over the past year.  In June 2022, defendants and the monitoring team submitted an action plan, which was approved by the Court, and set forth concrete reforms to be implemented immediately in order to build a foundation upon which meaningful reform and compliance with court orders can be achieved.

At this point, it has been about ten months since the Court approved the action plan.  The Court last convened in November 2022 to assess the department's progress in implementing the reforms set forth in the action plan.  Since then, the Court has watched the reports of conditions at Rikers closely, received and reviewed three status reports from the monitoring team and met with the monitoring team to keep abreast of developments.  The Court has also received and reviewed the parties' briefings and status updates on conditions related to intake at Rikers, which was the subject of recent contempt motion practice by the parties.  The Court has likewise received and reviewed the parties' April 25, 2023, submissions on the current conditions at Rikers and proposed next steps.

Today's conference represents an opportunity to examine closely the areas in which improvements have been made and those in which reform has stalled.  The monitoring team's

N4rWnunC

April 3 and April 24, 2023, status reports provided an updated

account on the conditions at Rikers and relate that the

department is in what they characterize as a state of flux as

it attempts to implement reforms across a wide spectrum of

areas.  The conditions remain deeply disturbing.

     The April 3 report shows that high rates of force

incidents continue.  There has been an exorbitant increase in

the number of stabbings and slashings over the past two years.

The department's emergency services unit has continued to use

problematical practices that catalyze rather than de-escalate

security incidents, and the monitoring team has reported that

there has been, since the summer of 2022, a discernible

deterioration in the quality of investigations conducted by the

investigations division, which plays a critical role in

fostering accountability for use-of-force violations.

     The Court was encouraged to learn from the most recent

monitoring reports that the monitoring team has observed that

the department has taken important initial steps in building

each area of the desperately needed foundation from which

meaningful reform can be achieved.  Reforms made in certain

areas subject to the action plan, including staffing,

conditions in intake and disciplinary processes, have given the

monitoring team a reported sense of cautious optimism that

progress is being made, and real change has occurred, according

to the team, since the action plan refocused the department on

N4rWnunC

1    the core issues underlying its mismanagement of the jails.  In

2    its April status reports, the monitoring team set forth several

3    recommendations that the team reported are critical to

4    improving conditions at Rikers and working toward compliance

5    with court orders.

6            At today's conference, the Court looks forward to

7    learning more about the city's and the department's

8    implementation of the action plan, including whether sufficient

9    meaningful progress has been made or whether further remedial

10   relief is necessary.  The Court also expects to hear each

11   party's views on the monitoring team's recommendations from the

12   April status reports and whether those recommendations present

13   viable solutions to implementing wide-scale reform and

14   achieving compliance with court orders.  As we all know, broad

15   reform is needed, and that is why a clear path forward,

16   including the prioritization of certain issues, is necessary

17   for purposes of both focus and efficiency.

18           I will turn shortly to the monitoring team and the

19   parties for their views on the lessons learned since we last

20   met in November 2022, the areas of focus that should be

21   prioritized to ensure better protection from violence of those

22   in custody at Rikers and the parties' views on concrete next

23   steps.  I will be particularly interested to hear the

24   defendants' assessment of the reasons for the deterioration of

25   investigative division performance and why there appears to

N4rWnunC

1    have been a substantial delay in responding to the monitoring

2    team's alerts concerning the problem.  I'm also eager to learn

3    how defendants intend to address the persistent and

4    longstanding excessive use of force by the ESU, the emergency

5    unit.

6           Now I will call on the parties for their opening

7    status reports, and then we'll circle back later with questions

8    and further in-depth discussion, as needed.  We'll begin with

9    the monitor and the deputy monitor.

10          MR. MARTIN:  Thank you.

11          THE COURT:  You can all speak from your seats instead

12   of standing and leaning.  I will take that audibility

13   concession as deep respect for the Court and everyone in

14   attendance here.

15          MR. MARTIN:  Thank you, your Honor.

16          Your Honor, I would seek the Court's --

17          THE COURT:  If you would move that microphone even

18   closer to you.

19          MR. MARTIN:  Oh, OK.

20          THE COURT:  Yes.  Great.

21          MR. MARTIN:  Your Honor, I would seek the Court's

22   indulgence to take a few very brief moments to render two

23   thanks you that I believe are appropriate for this hearing.

24          May I do that?

25          THE COURT:  Yes.

1          MR. MARTIN:  Simply, the monitoring team in preparing

2     and assembling the materials for both the April 3 report and

3     the April 25 report did so under fairly demanding time lines

4     and responsibility and, I believe, rendered a valuable work

5     product that will aid the Court and the parties, and I wanted

6     to simply say thank you to my team.

7          THE COURT:  The Court thanks the team as well.

8          MR. MARTIN:  Secondly, Christina Vanderveer, who is

9     the associate deputy monitor, has given seven years of sterling

10    service by our office, and she leaves tomorrow.  She will be

11    sorely missed, as she has tremendous skills and knowledge

12    developed over the seven years.

13         And we wish you very, very well and much success as

14    you move on to the other endeavors.

15         THE COURT:  Thank you so much for your work over these

16    years, Ms. Vanderveer.  We've all benefitted from your work.

17    It has been a pleasure to be in communication with you, and I

18    wish you the best as you move on.

19         MR. MARTIN:  Thanks for allowing me that.

20         Now, the matters at hand.

21         Your Honor, the conclusion of the April 3 report

22    includes the following observation:  "Parts of the report

23    support cautious optimism that progress is being made, but

24    others provide ample cause for continuing concern about the

25    current state of affairs.  Both reactions are justified and

N4rWnunC

1   reflect the anticipated pace of reform."

2          Having reviewed the conclusion in preparation for the

3   hearing, I was struck by that sentence in the sense that it put

4   me in mind of the great 19th century novel by Charles Dickens,

5   A Tale of Two Cities, which some of you may or may not know

6   started with these two sentences:  "It was the best of times"

7   and "It was the worst of times."

8          The April 3 report sets out both progress and setbacks

9   for the June to December 2022 time period.  Our most recent

10  status report of April 24 sets out the remedial steps taken and

11  steps not yet taken between April 3 and April 24.  The

12  defendants will, of course, focus on progress made, while the

13  plaintiffs and the Southern District of New York will

14  understandably focus on the setbacks, seeking further

15  remediation on a variety of issues.

16         Our reports, I believe, have been rendered in a

17  neutral fashion and provide detailed observations that credits

18  the progress made and just as properly identifies areas in

19  which progress is lacking and/or retarded.  The reports provide

20  the Court and the parties a record upon which a future course

21  of action may be considered and determined.  My deputy monitor

22  and I stand ready to answer questions the Court may have as to

23  the matters that need further clarification or discussion.  The

24  deputy monitor, at the appropriate time, will speak to the

25  recommendations that is later in the agenda, but she will take

N4rWnunC

1    that charge.  And I believe, just so the Court is fully up to

2    date, literally, the deputy monitor and I spent yesterday on

3    site and at the Bulova headquarters.

4         The on-site work, we visited GRVC, the ESH housing

5    units, and made observations on how that unit, housing unit is

6    being been administered and operated and observed one of the

7    30-day hearings for one of the residents there and also had the

8    opportunity to interact with quite a number of residents.  I

9    personally interviewed as many as I could, both out of cell and

10   in cell, and learned a great deal.  And there's more, of

11   course, to be learned, because it's still ongoing, but that was

12   very worthwhile time spent.

13        We then went over to Rose M. Singer, where they are

14   engaged in a retrofitting construction project, which will

15   accommodate the ESH program once that construction is

16   completed, and I was given a thorough tour of that facility.

17   And it's pretty far along, to where I was able to understand

18   the configuration, the layout, security features, etc.  So that

19   was time very well spent.

20        We then returned to the headquarters, and the

21   commissioner had made available three of the new assistant

22   commissioners/wardens for us to meet, which we had not met.  We

23   were given ample time just for an initial visit and hear a

24   little bit about where they're going to work, when they

25   started, their properties, etc.  That was, again, very helpful

1    to lay eyes on those key positions and to establish contact,

2    where we can reach out and they reach out to us.

3              Thereafter, the commissioner had assembled virtually

4    his entire executive staff to review with us their assessments

5    on the recommendations and their intended progress and intended

6    actions taken and progress to be made.  It was a very good

7    back-and-forth, where we were certainly allowed to ask

8    questions, and various executives responded appropriately in

9    kind.  The commissioner may -- obviously I'll leave it to

10   him -- want to reference that meeting and add obviously

11   whatever he should choose, but it was a very productive

12   meeting.

13             We then met with two of the top officials in the

14   investigation division, because we had already had some working

15   sessions with them post the April 3 report on addressing the

16   investigative issues.  So since those issues had already been

17   placed in the works, that was simply to see, get more update on

18   that progress that they had made since our last meeting and to

19   engage in some discussion on a particular issue that's going to

20   be difficult and the parties are very interested in; and that

21   is the issue of returning to investigations that occurred in

22   the June to December period and likely extended to March as to

23   whether those incidents need to be revisited and possibly

24   reinvestigated.  Very, very difficult issue, going to result in

25   some very time-consuming, demanding work, so we're trying to be

N4rWnunC

1    extremely careful and develop a structure and criteria for

2    which of those cases need to be revisited.  So that, again, was

3    an important meeting that is ongoing and will be attending to

4    with the agency officials.

5            I believe that brings you up to date as to our

6    activities and our observations on these most recent --

7            THE COURT:  Just keep your voice up.

8            MR. MARTIN:  Our most recent work yesterday.

9            Unless your Honor has any immediate questions, that's

10    pretty much all I had to say at this point.

11            THE COURT:  Thank you, Mr. Martin.  I have no further

12    questions for this opening round.

13            MR. MARTIN:  Thank you, your Honor.

14            THE COURT:  I'll turn now to counsel for the city of

15    New York.

16            MR. SCHEINER:  Good afternoon, your Honor.

17            THE COURT:  Good afternoon.

18            MR. SCHEINER:  I'm Alan Scheiner of the New York City

19    Law Department.  To my left is Sheryl Neufeld, also from the

20    Law Department.  And to her left is Commissioner Louis Molina,

21    who will address the Court after my remarks.

22            The city, the department and Commissioner Molina are

23    deeply committed to the core mission of this proceeding, which

24    is to enhance the safety and security of all the people

25    committed by the courts to the city's custody as well as the

N4rWnunC

1    safety of the department's staff and the public at large.  It

2    is that mission that brings us all here today.

3          Correctional work is among the most difficult and

4    dangerous in government.  As I believe the monitor's report

5    shows, to achieve the paramount goal of safety, the department

6    must wrestle with nuanced and complex issues, so undoubtedly, a

7    lot more work remains to be done to achieve our mission.  The

8    department's new and growing leadership is doing it and making

9    rapid progress.

10          The department carefully considers all of the concerns

11   and data presented by the monitor's thorough and painstaking

12   work and is thankful for the monitor's help in achieving our

13   shared goals.  Under Commissioner Molina's leadership, the

14   department has worked hand in hand with the monitoring team to

15   track results and resolve problems.  The evidence shows that

16   this team effort has produced objective, measurable and

17   striking success.  The department's overall rate of use of

18   force has declined from 12.1 per 100 persons in June 2022 to

19   9.2 per 100 in March 2023.  Use-of-force incidents declined by

20   over 1,000 from 2021 to 2022.  The percentage of use-of-force

21   incidents resulting in no injuries increased from 63 percent in

22   2016 to 83 percent in 2022:  The commissioner's

23   violence-reduction plan at RNDC, which houses our youngest

24   custodial population, resulted in a decline from 24 stabbings

25   or slashings in March 2022 to only five in March 2023.  In that

N4rWnunC

same facility, uses of force declined by 27 percent, from 111 in March 2022 to only 81 in March 2023.

As you know, GRVC is the facility most troubled by violence, and its residents present the highest security risks of the department's custodial population.  Comparing October 2022 to March 2023, slashings and stabbings at GRVC are down by 70.8 percent, and use-of-force incidents are down by 63.7 percent.  Unfortunately, 2021 and 2022 showed an increase in overall slashings and stabbings compared to 2020, but as the monitor noted, under the department's new team, those incidents have declined in the latter half of 2022 and even more so in 2023.  For example, there were 50 such incidents in January 2022 but only 32 in March 2023.

Of course, this is only some of the positive results we've seen, and it's only the beginning of even more striking improvements, but these objective facts demonstrate that the department's new leadership team, working in tandem with the monitor, is getting the work done.  As the monitor notes, the department has made sweeping improvements in staffing, which is vital to improving safety -- a 99 percent decrease in unstaffed posts, comparing the period of July to December 2021 to the same period in 2022; a 78 percent decrease in staff working triple shifts, comparing the same two periods.

THE COURT:  Could I just ask you, did you say that the periods being compared are July of 2021 and July of 2022, or is

N4rWnunC

1        there -- what is the end point?

2                MR. SCHEINER:  No, your Honor.  It's a several-month

3        period, so the period is July to December, and that's in 2021

4        compared to the same period in 2022.

5                THE COURT:  Thank you.

6                MR. SCHEINER:  And that was a 99 percent decrease in

7        unstaffed posts.

8                THE COURT:  So you're comparing two six-month periods.

9                MR. SCHEINER:  Yes, your Honor.  Is it six or eight

10       months?

11               It's six months, yes.

12               THE COURT:  July to December.

13               MR. SCHEINER:  Yes.

14               THE COURT:  Thank you.

15               MR. SCHEINER:  Yes.

16               So that was a 99 percent decrease in unstaffed posts,

17       and the daily average sick leave percentage has declined from

18       26.1 percent in January 2022 to 9.5 percent in March 2023.

19               The monitor has correctly lauded the achievements of

20       the department's new deputy commissioner for administration,

21       just hired in September 2022, noting that he is the, quote,

22       driving force behind the many improvements in staffing.  The

23       department has stepped up its supervisory hiring both through

24       internal promotions and external recruiting of new talents.

25       The monitor specifically noted the success of four new deputy

1    commissioners -- first, the DC for classification, custody

2    management and facility operations; second, deputy commissioner

3    for administration; third, the deputy commission for security;

4    and fourth, the deputy commissioner for training and

5    development -- as well as two new associate commissioners of

6    operations.

7            Since January 2022, more than 40 professionals were

8    recruited as new additions to the department, and while the

9    department has made strides in external recruiting, to be

10   clear, the department has a strong pipeline of talented leaders

11   within its existing rank, and it is its priority to retain,

12   train and develop those individuals.  Last month, the

13   department promoted 26 officers to captain, the first captain

14   promotions in five years.  And in that regard, I need to

15   correct a typo in my letter to the Court.  I wrote 2015 when I

16   should have said 2018 when I wrote about that.  I apologize for

17   that, your Honor.

18           The department has agreed on deadlines for meeting

19   specific recommendations with the monitor and will carefully

20   work with the monitor on all of the others.  The way to keep

21   the results moving in the right direction, as they are right

22   now, is to let the teamwork of Commissioner Molina and his

23   staff and the monitoring team continue.  When you hire people

24   to fix something that's broken, you don't pull them off the job

25   or distract them just when things are starting to get fixed.

N4rWnunC

1    The plaintiffs' counsel are seeking a new court order because

2    they are unsatisfied, and no doubt, when lawyers see problems,

3    they think first of court orders.  But not every problem is

4    best solved by a new court order.

5         We already have five detailed governing orders in this

6    case with what we count as approximately 400 discrete

7    requirements.  Orders are difficult to write and hard to

8    interpret in this extremely complex area.  They are

9    time-consuming to draft, including the time of the very people

10   doing the work of improving safety.  Ultimately, another page

11   or two of orders will not accomplish the goals that we share.

12   What will do that is the hard, hands-on work of people like

13   Commissioner Molina and his staff.

14        Unless the Court has questions at the moment, then the

15   commissioner would like to address the Court.

16        Thank you.

17        THE COURT:  Thank you, Mr. Scheiner.

18        Mr. Commissioner.

19        MR. MOLINA:  Good afternoon, your Honor.  Thank you

20   for inviting me to participate in these proceedings.

21        I recognize as a department we have a long way to go

22   on our pathway to reforming and enhancing the city's jail

23   system.  However, considering where the department was on

24   January 1, 2022, when the Adams administration took over

25   leadership of this city, the department has come a long way and

N4rWnunC

1    made some strides in key areas, and I will share a few with the

2    Court.

3            The department has addressed the absentee crisis with

4    a combination of supporting staff and proactive staff

5    engagement along with enforcing longstanding policies to hold

6    staff accountable -- accountability, which, quite frankly, did

7    not exist between 2015 and 2021.  This has led to approximately

8    a 70 percent decrease in staff absenteeism.

9            On enforcing basic correctional security practices, we

10   have seen a sustained decrease in slashings and stabbings.

11   Fiscal year to date, approximately ten months, slashings and

12   stabbings department-wide have decreased 21 percent.  Calendar

13   year to date that decrease is 40 percent, and since the

14   November 2022 proceeding, when I was last in your court, your

15   Honor, to date, that decrease is 34 percent.  While the

16   department has been experiencing an increase in the

17   incarcerated population during calendar year 2022, use-of-force

18   incidents, for the first time, decreased in calendar year 2022

19   versus calendar year 2021.  That decrease was approximately 14

20   percent.

21           During the monitored years of 2015 to 2021, the

22   department experienced steady population declines, yet

23   use-of-force incidents continued to rise.  For the first time,

24   the department actually experienced a decrease in calendar year

25   2022 in use-of-force incidents, despite the population

N4rWnunC

increasing.  Fiscal year to date, the numbers are flat, and I

recognize that, despite the calendar year 2022 decreases, the

number of force incidents overall are still too high, and over

time, with our new leadership team and training efforts, I

expect we will make progress in this area too.

        As I had previously recommended, in 2016, when I was

the chief internal monitor at the department, but had not been

done, we have now infused outside correctional expertise at the

three-star uniformed chief level and two-star chief level.

With this Court's assistance, we have also done so at the

warden level.  An outside warden started on April 24 to lead

three of our facilities.  We have recently promoted 26 officers

to captains, which is the first time the department was able to

promote captains in five years, and 27 captains to assistant

deputy wardens.  I carefully considered each of those assistant

deputy warden promotions and determined that it was appropriate

to give each individual an opportunity to succeed in their new

leadership role.

        I am further committed to ensuring that our officers

receive training and mentorship so that future promotions from

within our ranks can be made.  And it is important to note that

our current staff are the ones who contributed to the recent

reductions in slashings and stabbings and uses of force.

        In the area of staff accountability, after inheriting

a disciplinary-case backlog of over 3,700 cases, going back to

N4rWnunC

1   calendar year 2017, with the hiring of a former judge as the

2   department's deputy commissioner of trials, I have signed off

3   on the adjudication of over 3,000 disciplinary cases, and

4   unfortunately, in over 285 of those cases, staff were forced to

5   separate from the department via termination, medical

6   separation, forced resignation or forced retirements.  The

7   level of disciplinary adjudication and forced separation is

8   more disciplinary action than any commissioner in DOC or in any

9   agency in the city's history.  We are on our way towards having

10  a timely and meaningful disciplinary process.

11          In addition, I'm committed to ensuring that possible

12  misconduct is fully investigated.  When I became commissioner,

13  I undertook a massive leadership transition.  One of the areas

14  in which there was new management was the investigations

15  division, which had issues prior to the start of this

16  administration.

17          As this Court is deeply aware, there are many complex

18  problems as well as regulatory challenges in the management of

19  the persons in custody, and we are going to have bumps in the

20  road with staff adapting to different styles of management --

21  and that is to be expected and what was happening in the

22  investigations division over the last ten months.  But that

23  should not take away from the enormous work that went into

24  addressing a number of operational improvements we have made to

25  stabilize the entire department, which at the time was at the

N4rWnunC

brink of collapse in January 2022.  And in support of my

commitment to investigations, especially in the area of use of

force, the current acting deputy commissioner of the

investigation division will be focused on use-of-force

investigations, and nine new hires will soon join the

investigation division.  All other misconduct and other

compliance investigations will be handled by the special

investigations unit so that the acting and eventual deputy

commissioner of the investigations division does not have to

balance multiple priorities and can focus solely on

use-of-force investigations.

          Your Honor, I'll close with this.

          The current administration is committed to

action-oriented reform and evolving the criminal justice system

in this city, focused on safety, rehabilitation, and

appropriate second chances.  The Department of Correction is

far from perfect, but our staff care, and many can identify

with the lived experiences of those in our custody.  I think

over the last almost 16 months we have shown what the staff can

do when they are properly led, trained, and mentored, and this

administration is committed to supporting this department, and

it has shown that via the interagency task force and all the

support the mayor has provided me as the department's

commissioner.  For once we see what is possible when city

leadership is committed to action.

N4rWnunC

1          Thank you for your patience and the time to share my

2     thoughts.  I'm happy to answer any further questions the Court

3     may have.

4          THE COURT:  Thank you, Commissioner Molina.

5          I'd like to come back to the two topics that I queued

6     up in my introductory remarks that were of particular concern

7     to me.  One is what appears to have been a substantial time

8     delay in engaging the reports of problems with ID.  And so can

9     you contextualize that for me.

10          MR. MOLINA:  I'll try to, your Honor.

11          So, I did communicate with the monitor and the deputy

12     monitor on or about December 21 about their concerns, and they

13     alerted me that they were going to send me their concerns in

14     writing.  At that time, in December, we just came out of our

15     last proceeding in November, the department was undertaking a

16     number of just complex challenges, and I asked at that time how

17     quickly did the monitoring team need a response from me on that

18     letter so that I can digest it, and they communicated to me at

19     that time that they had concerns but allowed me the time to

20     digest it and respond back to the monitoring team, which we did

21     within two months.

22          We also did take some action during that time, after

23     we had sent the letter back to the monitoring team, which

24     clearly -- I think they viewed how they described it as being

25     lackluster, but you have to understand in the context of the

N4rWnunC

1   all of the macro issues that I'm trying to address throughout

2   the whole department, fixing a number of all these complex

3   problems simultaneously is just going to take some bit of time.

4   But we did address them, and if you have further questions

5   regarding that, I'm happy to answer them.

6          THE COURT:  I will leave that topic at that for now,

7   and I thank you for that response.

8          As to the ESU and probe team issue, where do things

9   stand now, and are there immediate measures that are being put

10  in place?

11         MR. MOLINA:  Yes.  Thank you for your question, your

12  Honor.

13         So, as it relates to the ESU issue, I think at the

14  beginning of 2022, as we were trying to stabilize the

15  department, which violence at that point had significantly

16  exceeded, as has been reported in the monitor's reports, there

17  was an unnecessarily, I think, overreliance on the use of the

18  emergency services unit to provide support to our various

19  facilities, overtaxing that unit, which I think impacted the

20  decision-making of the unit.

21         At that time our probe teams were -- I would say had a

22  lot of challenges because we were also dealing at the beginning

23  of the staffing crisis during that time as well.  I will say --

24  we have appointed a new ESU commander, but what I will say

25  about the prior ESU commander, I was engaged with the ESU

1  commander.  He, on a number of occasions, took proactive steps

2  when he reviewed incidences and did suspend members of the team

3  or removed members of the team when he thought that there was a

4  problem or indicia of being concerned, and he also made the

5  proper notifications to other oversight bodies that needed to

6  be made during that time.

7          But I understand the monitor has had challenges with

8  the ESU since, I believe, the inception of this oversight -- of

9  the consent judgment.  So I understand why there is -- people

10  are impatient to see change happen.  But we responded.  We have

11  a new ESU commander.  That gentleman brings over 35 years of

12  experience at the Department of Corrections.  He's a very

13  skilled manager.  One of the things that we talked about in our

14  meeting yesterday is that the monitor had asked if it would

15  make sense for him to engage with the ESU commander because he

16  had not had much engagement with the prior ESU commander, and

17  of course, I support the monitoring team being able to speak to

18  any employee or staff member that they feel they need to speak

19  to to understand, to get a nuance of the situation.

20          We also had recently appointed, as this Court knows, a

21  deputy commissioner of security.  We've also recently appointed

22  assistant commissioner of security operations, and the deputy

23  commissioner engages with the monitoring team frequently, as

24  the monitor requests, and he's also fully engaged with the

25  management of the emergency services unit, and the ESU

N4rWnunC

1   commander reports directly to the deputy commissioner of

2   security, which is also the deputy security manager under the

3   consent judgment.

4           In addition to that, we are also concerned about any

5   future appointments to members of the ESU team, and we made it

6   clear to the monitor and his team yesterday that no member will

7   be assigned to the ESU unless the deputy commissioner of

8   security and myself both, together, agree that that person is

9   deserving, mature and skilled enough for the appointment of

10  being placed in a skilled unit like ESU.

11          THE COURT:  Thank you, Mr. Commissioner.

12          MR. MOLINA:  You're welcome.

13          THE COURT:  I will now turn to counsel for the U.S.

14  Attorney's Office.

15          MR. POWELL:  Good afternoon, your Honor.

16          THE COURT:  Good afternoon.

17          MR. POWELL:  The government remains extremely

18  concerned about the ongoing unsafe conditions on Rikers Island

19  and the department's ongoing failure to expeditiously and

20  effectively implement the reforms required by the action plan

21  as well as the department's ongoing failure to comply with the

22  consent judgment and other prior court orders.  The government

23  shares many of the concerns itemized in the class counsels'

24  April 25 letter, so we're not going to reiterate all those

25  here, given time constraints.

N4rWnunC

1        While the department has made some progress in

2   implementing certain components of the action plan, as the

3   monitor states in his report, the well-documented patterns and

4   practices of use of force-related misconduct continues without

5   any appreciable improvement, and the jails remain volatile and

6   deeply dysfunctional.  Simply put, the pace of reform must be

7   accelerated.

8        There are several statistics that have been provided

9   in the submissions and by the city today.  At best, I think the

10  statistics paint a mixed picture.  Just to point out a very few

11  of them, with respect to use-of-force numbers, in 2022 alone,

12  there were 434 use-of-force incidents resulting in serious

13  injuries.  That's more than twice the number of such incidents

14  in 2020 and almost six times the number of those types of

15  incidents in 2016, the year after we entered into a consent

16  judgment to address constitutional violations.

17       With respect to stabbings and slashings, based on the

18  reporting from the monitor, they appear to be at a record high.

19  In 2022 alone, there were 468 instances where a staff member or

20  inmate was slashed or stabbed in the jails.  In 2020, there

21  were only 121.

22       Finally, according to the department's own reviews,

23  during the second half of 2022, there were 320 use-of-force

24  incidents where staff violated the department's own

25  use-of-force policy or the policy on the use of chemical agents

N4rWnunC

1    and 586 incidents that were deemed to be avoidable.  I'm going

2    to stop there with the statistics, but at best, I would say

3    they paint a mixed picture.  It often depends on which period

4    you're looking at, and if we look back to 2016 and 2015, where

5    we found it was necessary to implement a court order, the

6    numbers are all much, much worse.

7         Further, as found by the monitor, the city and

8    department continue to be in noncompliance with the core

9    provisions of the consent judgment and other court orders.  I

10   won't go through them all, but they're in noncompliance with

11   the requirement to implement and follow a use-of-force policy;

12   the requirement to conduct timely, thorough and objective

13   investigations of use-of-force incidents; the requirement to

14   adequately supervise the youngest people in their custody in a

15   manner that protects them from harm; and they're in violation

16   of the requirements related to the deployment and conduct of

17   the emergency response teams that you talked about a bit this

18   afternoon.

19        The government appreciates the commissioner's efforts

20   to bring in well-credentialed individuals to fill top

21   leadership positions and the recent hiring of a handful of

22   assistant commissioners of operations to run several of the

23   jails.  We will see how that goes, and we are cautiously

24   optimistic.

25        The monitor has found that these new leaders have made

N4rWnunC

some progress in addressing some of the longstanding systemic

problems in the jails and have been able to stabilize certain

facilities, such as RNDC, which, as you know, has a history of

extraordinary levels of violence.  Unfortunately, other actions

and personnel decisions by this department call into on

question its commitment to appoint competent and qualified

individuals at all levels of the agency who will dismantle the

culture of violence that has existed for decades.  I'd like to

highlight just a few items from the monitor's report that

exemplify the cause for our skepticism.

        With respect to the ADW promotions, which was briefly

addressed, the department promoted 12 individuals to this

important facility leadership position even though the

department's own internal screening process deemed those

individuals unsuitable for the position.  The monitor, with

obviously a tremendous amount of corrections experience, also

expressed disagreement with those promotions given these

individuals' documented prior disciplinary history and poor

conduct.  Indeed, the department's own trials division, the

unit responsible for imposing discipline on officers,

recommended that most of these folks not be promoted at all.

In one instance, three separate divisions of the department

recommended against promotion.  The recommendations were

ignored.  The commissioner promoted all 12 anyway, and we still

haven't, I don't think, today received an adequate explanation

1   for why all these 12 individuals with checkered histories and

2   who were not recommended by other divisions with the department

3   have been promoted into what are top leadership positions at

4   the facility level.

5           With respect to staff supervision generally, the

6   monitoring team has continued to express alarm with the overall

7   deficiencies in the department's supervision of uniformed

8   staff, including supervisors' lack of command of the

9   use-of-force policy and their failure to detect and address

10  improper security practices.  That's in this report.  You

11  probably will find it in the 10, 15, 20 prior reports as well.

12  Given the recent ADW promotions and the substantial reduction

13  in the number of captains and ADWs who actually are working in

14  the housing areas -- again, going to the data in the monitor's

15  report -- it appears the department still lacks a sufficient

16  number of qualified internal candidates to meet its current

17  need for more robust staff supervision and to ensure adequate

18  supervisory presence, particularly on evenings and on weekends,

19  as the monitor has pointed out.

20          As we have done before in prior court conferences and

21  in our meetings, we urge the city to consider filling

22  second-tier leadership positions, like ADWs and deputy wardens,

23  with qualified individuals outside the current department ranks

24  and, if necessary, to consent to a court order that will allow

25  it to do so.

N4rWnunC

1          Briefly, with respect to the ESU issue that your Honor

2     referenced, similar problematic personnel decisions were made.

3     Over the last several years, the monitor has repeatedly

4     expressed grave concerns about the conduct, management and

5     leadership of the department's emergency response teams,

6     including the frequent use of excessive and unnecessary force,

7     the hyper-confrontational behavior, the unit's inadequate

8     leadership and its failure to properly screen its members.  The

9     department, over those many years, has done little to address

10    those problems despite court orders directing it to do so.  It

11    was only after the monitor issued his report early this month

12    that the department removed the leader of ESU and replaced him

13    with another individual.  The monitor also discussed how 16

14    officers who had been previously removed from the ESU in 2021,

15    after another screening process, were put back on the ESU in

16    2013 under Commissioner Molina's and his leaders' supervision.

17          THE COURT:  Should the year reference be 2023, not

18    2013?

19          MR. POWELL:  I'm sorry.  2021 is when the 16 were

20    taken off, removed from the ESU, and then they were put back on

21    this year, 2023.

22          THE COURT:  Thank you.

23          MR. POWELL:  Despite meet-and-confer sessions we've

24    had with the city, we still don't understand exactly why that

25    happened.  We do understand that the process has begun to

N4rWnunC

1    remove them once again.

2           You know, it is our understanding that the department

3    has committed now to reviewing the current membership of the

4    ESU, which has always been a concern, and we look forward to

5    receiving the results of those reviews, but the fact that

6    individuals are removed and then placed back on -- removed for

7    a reason, presumably, and placed back on -- call into question

8    again the commitment to put the right people in the most

9    important positions in the jails.

10          I know your Honor has asked about the use-of-force

11   investigations and the abrupt decline in the quality of those

12   investigations.  That was particularly alarming to the

13   government as well.  The consent judgment requires objective

14   and thorough investigations of every use-of-force incident and

15   the imposition of meaningful discipline when staff utilize

16   excessive force.  However, under the leadership of the deputy

17   commissioner of investigation divisions, appointed by this

18   commissioner in the summer of 2022, the quality of use-of-force

19   investigations deteriorated significantly.  Far fewer cases

20   were referred for a full ID investigation, which is a more

21   thorough, complete investigation, and use of force-related

22   misconduct, most importantly, was frequently not detected and

23   went unpunished.  Even incidents involving head strikes to

24   inmates and incidents involving serious injuries were not

25   consistently referred for full ID investigations, as required

1     by your Honor's prior court orders.

2          We still today, although the commissioner acknowledged

3     that the monitor had presented his concerns in writing and

4     verbally on December 21, 2022 -- other than describing it as a

5     bump in the road, we still are not satisfied that there's an

6     explanation for why it took so long to address what was a clear

7     regression in one of the core parts of the consent judgments.

8     And again, it wasn't until the eve of the filing of this report

9     publicly that was going to describe and did describe all these

10    shortcomings and deteriorations that the deputy commissioner of

11    ID resigned.  The fact that the commissioner allowed such a

12    decline within the unit responsible for holding staff

13    accountable for misconduct and didn't take any meaningful

14    action to address the problem after being notified of it,

15    including by removing the leader, which he now says was largely

16    responsible for the problems, has shaken our confidence in the

17    department's commitment to true reform.

18         With respect to the issue of the look-backs on those

19    investigations that were closed from June 2022 to March 2023,

20    as of today, it remains unclear how the department intends to

21    review the hundreds of potentially flawed use-of-force

22    investigations that were closed without further action and to

23    make sure that any officers who engaged in misconduct are held

24    accountable.  We understand that it's a lot of cases and that

25    it's going to take a lot of resources, but we got here because

N4rWnunC

the decision, the issue that was raised by the monitor, which
is now referred to as a bump in the road, wasn't timely dealt
with.  Given the monitor's finding that closed investigations
were often incomplete, inadequate and unreasonable, we
respectfully request that the Court direct the department to
file a report with the Court updating your Honor and the
parties on the steps it intends to address these closed
investigations.

            Similarly, with respect to ID, we share the monitor's
concerns that the investigation division currently simply does
not have a sufficient number of investigators to conduct timely
and thorough investigations of all use-of-force incidents, as
required by the consent judgment.  Approximately 25
investigators left the unit in 2023 alone, possibly given, due
to the way it was being managed, and the number of
investigators and supervisors assigned to work on use-of-force
investigations is about half of what it was in January 2020.
Though the commissioner has told you and we learned before this
conference that there are nine candidates in the hiring
pipeline, the numbers just simply don't come close to the
number needed to handle the large volume of use-of-force
incidents which we know will continue to occur.

            Again, we respectfully request that the Court direct
the department to report on the steps it intends to take to
recruit and hire a sufficient number of ID staff to meet its

N4rWnunC

1    obligations under the consent judgment.

2            Finally, an issue we haven't talked about this

3    morning -- this afternoon, the June 2022 action plan required

4    the department to conduct tours of housing units every 30

5    minutes and to immediately institute improved practices to

6    ensure that routine touring is occurring, including through the

7    use of tour wands.  That's from the action plan.  The action

8    plan also required that the monitoring report, including the

9    one that was just filed, include data regarding compliance with

10   housing tours.  This refers to the basic function of walking

11   around the jails and making sure people are safe and their

12   needs are being met.

13           In the most recent report by the board of correction

14   on deaths in custody in 2022, the board of correction found

15   that insufficient or inadequate rounding and supervision was

16   present in five of the seven deaths covered in the report.

17   However, during our meet-and-confer sessions, the department

18   has still not adequately explained the steps it is taking to

19   ensure that supervisors and correction officers conduct timely

20   and appropriate tours of housing areas to ensure that the

21   people incarcerated on Rikers Island are safe and are having

22   their basic needs met.  It appears that the department has done

23   little to move forward with actually implementing its tour wand

24   project, including the use of tour wand data or other tools to

25   evaluate staff's touring practices.  They invite the department

N4rWnunC

1      to provide more details on its effort in this area and request

2      that the Court direct that reliable data reflecting compliance

3      with tour requirements be included in future monitor reports.

4              Finally, to address the point that the Court asked

5      with respect to recommendations, and I know that's later on the

6      agenda, but very, very briefly, the government believes the

7      city and the department should firmly commit to promptly

8      implementing the monitoring team's recommendations.  We

9      understand, though, that how to best implement some of these

10     recommendations may require some consultation with the

11     monitoring team, which we understand has started and that

12     Mr. Martin referred to earlier, and that the discussions may

13     lead to more fleshed-out operational suggestions.  We expect

14     that the monitor will provide a description of the extent to

15     which the department has implemented these recommendations in

16     its next report and will closely evaluate this assessment when

17     deciding our next steps, but we do feel that the city should

18     agree to implement those recommendations promptly.

19              Thank you, your Honor.

20              THE COURT:  Thank you, Mr. Powell.

21              Now, counsel for the plaintiffs.

22              MS. SIMPSON:  Yes.  Good afternoon, your Honor, and

23     thank you.

24              We agree with the many concerns expressed by the

25     United States government.

N4rWnunC

1          We've heard a great deal today about grounds for

2    cautious optimism, that continuing this now almost eight

3    yearlong process will get the city to live up to its

4    commitments enshrined in the court orders and to end the

5    pattern and practice of brutality against our clients, but

6    respectfully, we simply do not think that the record justifies

7    that optimism.  It is a grim conclusion -- but we think there

8    can be no other -- that this remedial process has not, is not

9    working.  Excessive and unnecessary force is entrenched in the

10   city jails, and I'll try not to repeat too many statistics

11   here, but over and over again, the data shows that it's a

12   feature of the department, not a bug.

13          Use-of-force rates are twice as high as they were when

14   the Court first entered relief, and while it is not surprising

15   that violence in 2022 came down from the unprecedented

16   emergency levels of 2021, what that means is that last year

17   there were 7,005 use-of-force incidents.  The proportion of

18   incidents with serious injuries is three times the proportion

19   in 2016.  The monitor describes the rate of slashings and

20   stabbings as "exorbitant," and today the city lauded five

21   stabbings and slashings in a month in RNDC, but for reference,

22   in 2019 and 2020, there were 13 and 15, respectively, in the

23   entire year in that facility.  These would have been simply

24   unfathomable numbers when the consent judgment was entered, and

25   they are, frankly, unfathomable now.  What are considered major

1    events in other systems are routine incidents in this city, and

2    it's important to remember the brutality behind these

3    numbers -- heads that have to be stapled; fractures; gashes;

4    shoves headfirst into solid doors; being handcuffed while

5    you're kicked or punched or your head is shoved into the

6    ground; being sprayed with OC spray that hurts, that stays on

7    you for hours, that makes it difficult to breathe.  It's

8    gratuitous pain and injury.  It's about fear, our class members

9    never knowing when this could happen to them.

10          And the record is also clear that at least half of

11   these uses of force, 48 percent by the department's own

12   analysis, came from basic correctional failures to do things

13   like lock a door.  Despite nearly eight years of the monitor's

14   robust assistance of their recommendations, the monitor still

15   describes staff's hyper-confrontational behavior and absurd

16   inadequacies in supervision, such as writing in a logbook no

17   issues after a tour, when there are clear security lapses

18   plainly visible; failing to even have a command of the

19   use-of-force policy; routinely making situations worse.  A

20   limited number of supervisors, says the monitor, with, quote, a

21   skilled deficit.  Both the remedial orders and the action plans

22   were targeted at improving staff supervision in the jails, but

23   the city simply has not done it.  The number of captains has

24   decreased.  The roster of assistant deputy wardens does not

25   provide adequate supervision because of the quality of the

N4rWnunC

individuals in those roles and, as the monitor puts it, that
they are, quote, drawn from the same core of captains who have
generally struggled with these essential skills and that, as
the government said, deficiency was evident in this monitoring
period, when nearly half of the 26 people the commissioner
promoted to assistant deputy warden were not recommended for
promotion by the department's own divisions, the city promoted
them anyway.  And the city refuses to look outside the agency
for a better pool of candidates, and we agree with Mr. Powell
that they should do so immediately.

There are, as we began to lay out in the letter we
submitted on April 25, many areas in which the city has simply
failed to make progress.  The total failure to reduce even one
awarded post assignment in nine months, almost ten, due to a
claimed union contractual barrier, which the city denied
existed in November 2022, when your Honor questioned them about
it, no meaningful movement on civilianizing jobs held by
uniformed staff, no indication that the city tracks how many
posts are abandoned by officers during their tours, not even
revising its sick leave policy, despite being ordered to do so
within 90 days of the action plan being entered and, as the
monitor notes in their report, consistent pressure from them.

Another stark example -- and I know that the
government went into this somewhat, but I'll return to it -- is
how the city has not only failed to reform the emergency

N4rWnunC

1   services unit but is indeed doubling down on reinforcing its

2   culture of brutality and impunity.  I want to be clear that the

3   accounts about ESU, given for years by the monitor, describe a

4   unit that is abusive, unprofessional, excessive and violent.

5   Over and over again the reports reflect this.  And in addition

6   to what Mr. Powell said about reinstating the staff removed in

7   2021, the city has failed to take other basic measures to rein

8   that in, including ignoring its own policy of screening

9   officers who are assigned to the unit, ignoring its own

10  recommendations to remove staff who exhibit problematic

11  behavior, routinely failing to identify ESU misconduct within

12  ID.  The message this sends to the department as a whole about

13  reforming, the commitment to reforming the culture of violence

14  is unmistakable, and only when the monitor's report professed a

15  lack of confidence in ESU leadership, only when that was made

16  public did the city act to replace the ESU leader.

17          In our meet-and-confer last week, the city said it had

18  chosen a new leader of ESU to effectuate change but would not

19  inform us of the name of that selection until it had been

20  announced to staff.  But then a media report came out that same

21  day reporting that a particular ADW, an officer who reportedly

22  appeared on videotape slamming Kalief Browder to the ground

23  while he was rear cuffed in custody was the new ESU leader.

24  Not only would that incident be troubling in itself, but

25  following up we learned that that ADW was one of the 12 ADWs

N4rWnunC

1    that the commissioner recently promoted despite the negative

2    recommendations he received.

3            The city has now changed course and announced a

4    different head of ESU and claims, contrary to what they said on

5    our meet-and-confers, that that ADW was only being considered.

6    But seriously considering this person is yet more evidence that

7    the department continues to make choices to perpetuate this

8    culture and appears to only move away from those positions via

9    critical public attention or pressure from the monitor or from

10   the parties or from your Honor.

11           Similarly, we are deeply concerned by yesterday's

12   media reports that one of the new assistant commissioners for

13   warden replacements had been suspended in 2021 for standing by

14   while a person with mental illness banged his head repeatedly

15   against the wall and did not intervene.  We understand that the

16   commissioner dismissed those charges, administratively filed

17   them in late 2022 -- November, I believe -- and we believe the

18   city should explain the circumstances of this incident and the

19   disposition of the charges given that this promotion is for a

20   leadership role and implementing this Court's orders regarding

21   suicide prevention and staff performance in crisis, among

22   others.

23           So it comes as no surprise that the monitor makes a

24   truly damning set of observations in his April 3 report, but

25   nearly a year into this action plan, 16 months with this

N4rWnunC

1    commissioner and over seven years of this consent judgment,

2    "the work completed today has not appreciably improved the

3    department's security practices and the department's

4    problematic approach to use of force department-wide"; that

5    "misconduct is prevalent, and there is no evidence to suggest

6    that practices have materially improved"; that "conditions are

7    demonstrably worse."

8            So where do we go from here?  We believe, of course,

9    that the city should follow the Court's orders, including the

10   action plan, that they should enact the recommendations made by

11   the monitoring team in that April report, which are reasonable

12   though, again, not sufficient.  We have always said that the

13   city should, and must, take whatever immediate next steps it

14   can to address the risk of harm in the jails, but what we

15   continue to see is not only a slow pace but a slow pace coupled

16   with an agency that tends to regress in areas not constantly

17   illuminated by the brightest spotlights.  Investigations and

18   intake provide excellent endless illustrations of this.

19   Investigations deteriorated rapidly the moment that attention

20   was directed elsewhere by way of the action plan, and the head

21   of ID resigned only on the eve of a public report.  And

22   laborious, glacial gains in intake over the past year and a

23   half have only occurred after the board of correction made

24   findings and we filed a contempt motion.

25            ESU screening is another example.  The monitor directs

1    the city's attention to ESU personnel, encourages the removal

2    of problematic staff members in 2021, helps them develop a

3    screening policy.  Two years later they aren't following that

4    policy and have reinstated some of those staff.  That's why

5    reform of this department is not as simple as commonsense steps

6    taking time, because sequencing only works when progress is

7    cumulative, when you can trust where you've been to remain

8    prior progress, and that just has not happened here.

9            How many times will the department only act after the

10   monitor detects a problem or a public report emerges?  This

11   structure does not scale up for reform.  The monitor cannot be

12   in every corner of the agency, cannot review every command

13   discipline outcome, cannot take deep dives into every ID filed

14   to root out bias, cannot be the captain in the facility that

15   has to lead an incident towards de-escalation rather than

16   unnecessary force.  And the same can even be said for our

17   perfect set of assistant commissioners.  The inability to trust

18   this agency to sustain progress or implement policy cannot

19   result in an indefinite extension of the action plan or

20   additional recommendations.  This amounts to a continuing

21   lowering of the bar, that because the department's intractable

22   dysfunction requires deeper and deeper and deeper levels of

23   remediation, that they get more and more time to attempt this,

24   despite extraordinary harm to our clients.

25           This is, of course, a complex agency, as are many in

1  our city, but it still can and must be expected to operate

2  lawfully.  We cannot keep building foundations in perpetuity,

3  especially with what are essentially the same materials.

4  Simply put, the current state of affairs is intolerable.

5  Staying the same course will not, in our view, and on this

6  record, provide relief and correct a constitutional violation.

7  We are mindful, of course, that under the current schedule,

8  there will be certain benchmarks being assessed in the coming

9  months, and certainly we will look to see what the department

10  will show at that point in the summer report.  We're genuinely

11  glad to see long-overdue steps being taken, and we don't wish

12  to stand in the way of those, but on this record, we have not

13  seen evidence to change the views we expressed when we were

14  last before your Honor in November 2022 -- that the city has

15  not disturbed the structures necessary to correct these

16  longstanding harms and that further relief, such as authority

17  independent of the city, remains necessary.

18          Thank you very much.

19          THE COURT:  And to be clear, your letter referred to

20  discussing a draft of an order that I haven't seen with the

21  parties, and the monitor's report and the letter from the city

22  spoke of certain points of agreement on timetables.  Are you

23  asking me today to develop any specific form of relief or

24  further action?

25          MS. SIMPSON:  Beyond the recommendations, your Honor,

N4rWnunC

1   you mean?

2          THE COURT:  Well, my understanding from the letters

3   was that the request regarding the recommendations related to

4   the attempt to embody some version or evolution of the

5   recommendations in an order that is still in process, so I am

6   assuming you're not asking me to indicate that I will sign or

7   to sign something that doesn't yet exist and as to which pieces

8   are still moving.

9          MS. GREENBERGER:  If I may, your Honor?

10          THE COURT:  Yes.

11          MR. POWELL:  We don't have an order to provide to you,

12   your Honor, because the city has taken the position since we

13   filed our letter that they refuse to consent to an order.

14   Frankly, we thought this order would be low-hanging fruit.  It

15   wouldn't address the fundamental problems that we believe the

16   city management continues to have and the city continues to

17   have, but they were the monitor's recommendations.  They were

18   all reasonable recommendations.  We thought the city would

19   agree to them.  Some of them, in fact, are extending deadlines

20   that the city failed to meet that were clear deadlines in your

21   action plan that I can go into.

22          The city, however, has taken the position, which we

23   think is unwarranted, that the recommendations are not ones --

24   there's two categories, that as to one category of

25   recommendations, and I can go into this, they agree with the

N4rWnunC

1    monitor's recommendations but they object to them appearing in

2    a court order, which, frankly, makes no sense to us.  And as to

3    a second category of recommendations, despite having the

4    monitor's recommendations for some time, they won't even tell

5    us whether they agree with the recommendations or not, and they

6    won't even tell us when they could tell us whether or not they

7    agree with the monitor's reasonable recommendations.

8            And so what we would ask, your Honor, on that front,

9    because we absolutely believe that on this record you could

10   order the city to comply with the monitor's recommendations,

11   but at a minimum, we would ask that the city have to engage and

12   explain, especially as to the monitor's recommendations -- and

13   I can be more specific, your Honor, if that would be helpful.

14           THE COURT:  Stay on this conceptual level --

15           MS. GREENBERGER:  Yes.

16           THE COURT:  -- for now.

17           MR. POWELL:  No problem.

18           So, at a minimum, we think the city should have to

19   explain as to those recommendations which they have not taken a

20   position on what their position is and whether and when they

21   will implement the monitor's recommendations.

22           THE COURT:  Now, the PLRA, as you know, with respect

23   to orders requires that a court be able to find that any

24   prospective relief that is ordered be narrowly drawn and extend

25   no farther than necessary to correct particular violations of

N4rWnunC

federal rights and be the least intrusive means necessary to

correct the violation of the federal rights.  And so as I

understand it, you have the city willing to make undertakings,

and then you've just said that there are areas as to which the

city has not provided a reaction one way or another.

I also noticed, in looking through the summary of the

recommendations, that there are some that seem to be at a major

conceptual level, as in things should improve, which would be,

at best, difficult to embody in a court order and, at worst,

sort of precatory.  And so as to any of these buckets of

recommendations, it is certainly a salutary thing to have

undertakings and to have focus on recommendations and how they

could be implemented, but are you saying that you, plaintiffs,

believe that today the PLRA standard could be met as to these

recommendations?

MS. GREENBERGER:  I think it is helpful to be

specific, your Honor, and I do also want to reiterate that

these recommendations -- again, we thought these would be

low-hanging fruit that the city would agree to, and that's why

we discussed a proposed order.  We did not envision that this

would be a big fight with the city, and it's disappointing that

it's come to this.

First of all, I think it's clearest if you are looking

at the April 24 submission by the monitoring team, and on page

26 of the report, there are six specific recommendations that

N4rWnunC

1    the department has agreed they intended to adopt.  Two of

2    these -- I think it's important to be clear -- are changing

3    policies that the action plan required them to change, that

4    they completely violated.  They did not change those policies,

5    and now the department has agreed, but will not agree to a

6    court order, to more time to fix their noncompliance.  And so

7    respectfully, your Honor has already made all of the PLRA

8    findings that are necessary for those policies.  And I will say

9    that the amount of time that the city is asking for and the

10   monitoring team has suggested seems quite excessive to us.  I

11   do think it's important to note that, but certainly at a

12   minimum, at a bare minimum, those policies should be

13   embodied -- or, I'm sorry, those changes should be embodied in

14   a court order, and I can be more specific, if that would be

15   helpful, your Honor, on that.

16          So, specifically --

17          THE COURT:  Specifically the absence control

18   policies --

19          MS. GREENBERGER:  And the MMR policies.

20          So, the MMR policies were supposed to be done within

21   60 days, which was last August, and then in the April 3 report,

22   the monitoring team recommended the deadline be May 15 and the

23   revised recommendation that the city has now agreed to is June

24   30 for policies that were supposed to be revised last August

25   and were not.  And they're just policies, your Honor; it

1    doesn't make any sense to us.  But at a minimum, your Honor

2    already held that those policies should be revised and needs to

3    make no further findings on that.

4           There is then the sick leave policy, as you mentioned.

5    That one, the deadline -- I'm just looking -- was last

6    September, I believe, 90 days, and the monitoring team and the

7    department are suggesting May 15 for that.

8           The third, there's another one that's also a policy

9    change.  That's with the trials division.  That is not part of

10   the action plan, but I think the record that's in front of you

11   have from the monitoring team is more than sufficient to meet

12   the PLRA findings that that change is necessary.

13          The fourth of these is status reports to the Court on

14   the intake matters.  Frankly, your Honor has already ordered

15   that there be status reports as part of its contempt order, and

16   I don't actually believe PLRA findings are necessary for a

17   status report to the Court.

18          The last two are eliminating backlogs of disciplinary

19   cases and resolving medical incompetence cases, and the record

20   is ample about the need to eliminate those backlogs and resolve

21   those medical incompetence cases.  And in prior remedial orders

22   that dealt with both of those issues, your Honor made findings

23   as well.  Again, none of these findings would be necessary if

24   the city would just consent to these orders, and they should be

25   asked more clearly why they are unwilling to consent to orders,

N4rWnunC

1    especially orders that are extending time for things that they

2    promised your Honor that they would do, that were completely

3    within their control to do and we are many months later and

4    they have inexplicably not done.

5              THE COURT:  Thank you.

6              MS. GREENBERGER:  I'm sorry, your Honor.  Just one

7    more thing?

8              THE COURT:  Yes.

9              MS. GREENBERGER:  There is another set of relief that

10   the -- I'm sorry, recommendations that the monitoring team has

11   suggested and, as I said, the city has not responded to.  And

12   you're completely right, your Honor, that some of those

13   recommendations would require additional discussion and

14   probably are not ripe for a court order, but some are actually

15   quite discrete and are ones that are completely unobjectionable

16   and discrete, and I don't understand why the city hasn't agreed

17   to them and agreed to entry of a court order.

18             So there's three that I would highlight in that

19   category:  Screening of staff currently assigned to ESU for

20   suitability of assignment, which is something we've discussed a

21   lot today; second, ensuring that supervisors are assigned 24/7

22   to the facilities; and third, determining what its -- as

23   Mr. Powell and we have discussed, there is a shortage of staff

24   investigators in ID.  What is the city's plan to resolve that?

25             The monitoring team's recommendation was that the ID

N4rWnunC

| | |
|---|---|
| 1 | should either reassign investigators from SIU to ID or do |
| 2 | aggressive recruitment efforts, and the city hasn't agreed to |
| 3 | either. |
| 4 | THE COURT:  Thank you. |
| 5 | Does the monitor wish to be heard on any of this |
| 6 | before I return to the city's counsel? |
| 7 | MS. FRIEDBERG:  No, your Honor. |
| 8 | THE COURT:  Mr. Scheiner. |
| 9 | MR. SCHEINER:  Yes, your Honor.  Please let me know if |
| 10 | there's something specific that you want me to respond to that |
| 11 | I haven't -- that I've mentioned. |
| 12 | THE COURT:  Well, there's the -- oh, I'm sorry. |
| 13 | You're going to speak and then I can follow up. |
| 14 | MR. SCHEINER:  Right, because I might not cover a |
| 15 | point that you want to hear us on. |
| 16 | With respect to the last thing that was mentioned, |
| 17 | that there were recommendations that were not part of one of |
| 18 | our agreements with the monitor and the plaintiffs thought they |
| 19 | were appropriate for an order, we don't agree with that, but |
| 20 | part of the reason is some of them are actually being done or |
| 21 | have been done.  So I don't understand the motivation for the |
| 22 | order.  But the screening of staff for ESU, that occurs |
| 23 | periodically.  I think it's quarterly.  That's already |
| 24 | happening.  It's stated in the monitor's report, so I don't |
| 25 | understand why that would be an appropriate topic for an order. |

N4rWnunC

1          The supervisors 24/7, there are supervisors in every

2     facility 24/7, so I don't know if there was a prior deviation

3     from that, but certainly the current condition is that there

4     are supervisors 24/7 in all the facilities.

5          With respect to, you know, hiring or moving people to

6     investigate use of force, I think that falls into the category

7     of something that is aspirationally a good idea.  I mean we

8     don't disagree with it in principle, but it does require

9     working with the monitor on exactly what that means, how many

10    people could be moved from the special investigations unit to

11    ID without compromising other interests, on how to hire people

12    within, you know, budgetary constraints.  There are a lot of

13    moving parts to doing that, and there's no obvious phrasing of

14    an order that would be objective as to whether or not it was

15    achieved.

16         We feel that the best way to measure whether or not

17    the department is making progress with respect to these

18    recommendations, or any of them, is to continue working with

19    the monitor, and the monitor will not hesitate to report to the

20    Court if they feel that we've refused to do something that's

21    obviously required and feasible under the action plan or the

22    consent judgment, and then, your Honor, we'll have an

23    opportunity to, you know, take remedial steps at that point.

24    But the monitor is not asking for these orders, and we don't

25    think that it's appropriate, because every time an order is

N4rWnunC

1   issued -- well, first of all, let me back up a little bit as to

2   the question of whether it meets the standard.

3              I don't see the connection, your Honor, between the

4   particular provisions of these orders and an identified

5   constitutional violation.  I realize that they are meant to

6   implement an action plan, which was agreed to by the

7   department, to implement the consent judgment which was meant

8   to remedy deliberate indifference to excessive use of force and

9   conditions of violence, but at this granular level of these

10  particular orders, I don't agree that it meets requirements of

11  the PLRA.

12             We are committed to, obviously, complying with the

13  deadlines that the monitor requested, and we intend to do so,

14  but even compliance with those is really a matter of opinion of

15  the monitor, because we're required to finalize MMR policies;

16  doesn't say what they're supposed to say.  What they're

17  supposed to say is being worked out between us and the monitor

18  as well as finalized sick leave and absence control policies.

19  We can finalize policies, but that doesn't say what those

20  policies are.  So it seems to me that a rather arbitrary court

21  order to just say we have to issue new policies, they're

22  supposed to be policies that the monitor agrees with us are

23  appropriate and feasible and can be enforced.

24             And I do want to point out in this connection that

25  there's demonstrable -- in fact, drastic -- improvement in

N4rWnunC

these areas of absenteeism, of reducing sick leave, of

discipline of those who are abusing sick leave.  So the

problems that the new policies are meant to address are being

solved.  It doesn't mean we don't need new policies.  We do.

We've always agreed with that.  But to put it colloquially,

where's the emergency with respect to sick leave?  We

drastically reduced the abuse of sick leave.  So in other

words, as a practical matter on the ground, the problem is

being solved.

        And also, I don't see a connection between sick leave

*per se* and any constitutional violation.  But we want the staff

to be present so that the people in our custody are safe, and

that's why, in accordance with the action plan, we've stepped

up enforcement against sick-leave abuse and taken steps that

are having obvious, objective impact in the right direction.

So we don't see a need for orders in that respect.

        One of the provisions we've agreed to do is the trials

division shall evaluate the use of lower level sanctions and

expunge the case in consultation with the monitoring team.  I

don't see how that could be more subjective and difficult to --

not permitting of enforcement really.  We're already evaluating

them, and we will consult with the monitoring team.  But

whether we did so sufficiently, whether the consultation was

enough, how many meetings that means, how much consideration is

required, I think it's entirely subjective and not appropriate

N4rWnunC

1    for court enforcement.

2            So that's my response with respect to the court order.

3            I also want to mention that, of course, we have agreed

4    to court orders in the past, and our experience is that they

5    take a very long time to negotiate if our, you know, consent is

6    needed.  And the thing is, is that the same people who would

7    have to inform the construction of the court order are the

8    people who are taking the steps, and I'll address the issue of

9    the statistics in a moment.  But they're taking effective steps

10   to solve these problems, such as the sick leave problem, such

11   as use-of-force cases going down.  And to draw them away from

12   that in order to work out a court order to enforce

13   recommendations that the monitor is working with us on, you

14   know, completing seems to me an unnecessary distraction and a

15   drain on our resources as well as ultimately the Court's if

16   there's going to be enforcement action with respect to any new

17   court order.

18           You know, bottom line is, your Honor, we think we have

19   enough court orders to work with here, and as I mentioned

20   before, whatever has happened in the past, I think that almost

21   all the indications -- perhaps the U.S. Attorney's Office or

22   Legal Aid could find an exception, but when I look at the

23   monitor's report, every indication is that the use of force is

24   going down.  You know, slashings and stabbings have been a

25   difficult area, but we have improvement there too.  But most

N4rWnunC

1    importantly, the use of force has been going down even while,

2    as the commissioner noted, the population is going up.  So it's

3    moving in the right direction.

4         But I want to speak to the repetitive comparison of

5    where we are now versus 2015.  I wasn't on this case in 2015.

6    I didn't study the situation at that time, but what I do know,

7    as I think everyone knows, is this is a very, very different

8    world from the world of 2015.  We haven't had an opportunity to

9    brief why that is.  It's a complex question, but there are some

10   obvious things that have occurred.  One is the COVID-19

11   pandemic, which drastically cut into our available staffing as

12   well as our total available staff.

13        Another thing that's happened since that time is bail

14   reform, which has changed the composition of people who are

15   being committed to our custody to those who are accused of the

16   most violent crimes.  Another thing that's happened in that

17   time is a general societal rise in mental illness.  And I don't

18   have the numbers, but I would suspect that that's reflected --

19   serious mental illness -- in the population that's in our

20   custody.

21        We also have rising crime rates since 2015, so that

22   the simplistic approach that because something is worse in the

23   jails today than it was in 2015 must be our fault, must be the

24   result of deliberate indifference, I think, is far too

25   simplistic a formula.

N4rWnunC

1          Obviously –– maybe it's not obvious to the plaintiffs,

2     but your Honor, the city's firmly committed to doing everything

3     possible to come into compliance with your Honor's orders and

4     the prior undertakings, but we do so in a different environment

5     than existed in 2015, and the sheer numbers of use of force, as

6     unhappy as we are with them –– and I believe we are as unhappy

7     with them as are the plaintiffs, the sheer numbers don't really

8     tell you the whole story, because unfortunately, it is very

9     difficult to confine people against their will without the use

10    of force occasionally.  And sometimes people get hurt because

11    appropriate force is used.  Other times they get hurt because

12    it's inappropriate, and we can't infer simply from numbers

13    which is which.  That's why we have investigations.

14         So I think there have been a lot of sweeping

15    accusations that inmates don't know when they're going to be

16    set upon by correction officers for no reason and harmed

17    significantly.  I think that's unfair, and I don't think

18    there's any evidence in this record that correction officers

19    are randomly attacking inmates.  That's not what is happening.

20    Each incident has cause, and as we sit here today, we don't

21    know what the cause of each incident is.  What we do know is

22    that the city is firmly committed to reducing the need for use

23    of force, to reducing the situations that give rise to injury

24    either because the people in our custody are engaging in

25    violence with each other or against officers.

1          For example, it seems like a simple thing, but

2     recently, the department distributed tablets to the people in

3     custody, because it was observed that a lot of time people who

4     were idle, who were not able to pursue their interests or

5     things they needed to access through the criminal justice

6     system, because of that idleness, it raised the risk of violent

7     incidents, which, of course, raises the risk of injury, which,

8     of course, raises the risk that force has to be used.  So we

9     took upon the idea of giving the inmates the tablets, and we

10    think that that's actually having a beneficial effect.  That's

11    just one small piece of the puzzle.  There are many, many

12    variables that contribute to the level of violence and the

13    level of use of force.

14          So I just have to come back to the bottom line of if

15    you look at the statistics, they do show a consistent

16    improvement since at least the middle of 2022 and much more

17    rapidly in 2023.  And there's an explanation for that.  It's

18    because new management can't change everything immediately.  It

19    takes time to hire new people, to put new practices into place

20    and to put a new culture in place.  And I think the monitor has

21    given the Court sufficient reason to conclude that we are well

22    on the way towards that.

23          I do want to address the assertion that the promotion

24    of certain staff to ADW was allegedly improper, because there

25    were some recommendations in the file of those people that were

1    contrary to promotion -- in other words, recommended against

2    promotion.  And going back to the consent judgment, the consent

3    judgment has very detailed and specific rules about who can be

4    promoted and who can't, and it identifies things that would

5    disqualify people from promotion unless, you know, there's a

6    written explanation of why, you know, an exception should be

7    made, and then I believe it requires that there be consultation

8    with the monitor.  When those conditions have been met, we have

9    done that to the letter.  You know, there were people who would

10   have been disqualified under the consent judgment and we

11   consulted with the monitor.  And I don't know the result,

12   whether they agreed with us the person should be promoted or

13   not, but whatever, there's no dispute or disagreement with the

14   monitor about how those people were handled.

15         All these people, the 12 that have been called into

16   question, there was no reason for us to contact the monitor

17   about them under the consent judgment.  There was nothing in

18   the records that would disqualify them from promotion under the

19   consent judgment.  The plaintiffs have not said otherwise, nor

20   has the monitor.  So the upshot is, is that an agreement was

21   made as to what discretion the commissioner would have in

22   making these promotions, and that agreement should be honored.

23         The commissioner did not ignore the comments made by

24   the people in the various departments at the department.  The

25   commissioner has told the plaintiffs that he carefully

N4rWnunC

considered everything in the file when making these decisions, and nobody has, I don't think -- there's no evidence to put that in dispute.  These things were not ignored.  But the commissioner has to make determinations as a professional manager of a complex organization and has to consider many, many different factors, including how long ago the problem was, what the person has done since that problem arose, the need to retain and develop talent within the organization, the need to motivate people, the need to meet the expectations of people who are loyal to the department and who do have a good record, even if there are some negative things in it, but who overall have a good record of doing their job with integrity.  So the commissioner has to make those hard judgments.

Under the consent judgment in these particular instances, that is left to the commissioner's judgment, which we think was exercised appropriately.  Those people are on probation.  I think it lasts for a year.  If they were to act contrary to the rules, to the expectations of their promotion and the rules of the department and the principle and the goal that we're all here to talk about today -- the safety of the inmates; if they were to act contrary to that, then their promotion would be revoked.  I believe in some instances it's already occurred.  So there's no hesitation to do that.

So I don't think it's really appropriate to say that somehow violates our undertakings or the consent judgment and

N4rWnunC

made those promotions, when it did not.  And the current

administration of the department has a very good record of

taking action when it's necessary to make sure that standards

are upheld.

Is there anything else your Honor wanted me to address

that the plaintiffs had raised?

THE COURT:  From your perspective, are there

recommendations as to which you have been asked for a response

or positive/negative reaction that you haven't responded to

yet?

MR. SCHEINER:  Well, your Honor, I think that response

has been made to the monitor.  In other words, there are

discussions -- even just yesterday -- with the monitor.

THE COURT:  The monitor did mention that there were

discussions yesterday.

MR. SCHEINER:  Right.  So that the response, I think,

because of the complexity of many of the recommendations, is

best made to the monitor.  I think the spirit of the

recommendations in terms of, you know, what we all want to

achieve, we're not saying any of them would not be good, in

principle.  It's a question of how to achieve them.  And so I

think -- but I do think that it's appropriate for us to respond

to the monitor in the areas where there's some ambiguity or

something that, you know, is not relatively obvious and simple,

where we've -- you know, we've made the commitments where we

N4rWnunC

1    think we can commit to specific dates, and the plaintiffs are

2    aware of those.

3              THE COURT:   Thank you.

4              Let me first ask the court reporter -- we've been

5    going for about an hour and 45 minutes -- do you need a break?

6              All right.  We will take a ten-minute break and resume

7    at five minutes to four, with the goal of wrapping up within,

8    at the most, 20 minutes after that.  So we'll need to be

9    concise.

10             When we come back, I am first going to ask

11   Ms. Friedberg to speak from the monitor's perspective as to the

12   status of the recommendations and whether she believes that

13   there is appropriate engagement going on in the current mode

14   and whether an order is necessary to keep that level of

15   engagement going.  And then we will also take up the question

16   of the extension of reporting time that's been requested.  And

17   I will tell you all that that -- I think it's a three-week

18   extension in the summer -- seems reasonable and appropriate to

19   me, coming from the monitor, and that my intention would be to

20   set a next conference date in the second week of August.  And I

21   have a couple of dates so that you can look in your calendars

22   during the break, August 7, 10th or 11th at two in the

23   afternoon.

24             All right.  Let's, we'll reconvene at 4 o'clock.

25   That's easier than three minutes to four.  Thank you.

N4rWnunC

1       (Recess)

2       THE COURT:  Good afternoon.  Please be seated.

3       Ms. Friedberg.

4       MS. FRIEDBERG:  Thank you, your Honor.

5       I'd just like to start with two housekeeping items

6  that I think are helpful contextually for the questions you

7  raised with me.

8       First, I do understand the city's position with

9  respect to the monitoring team or their view on screening.  I

10  just would direct the Court to our April 3 report with respect

11  to our findings on screening.  I'm not going to go piece by

12  piece, but I would suggest that the monitoring team's position

13  is quite clear, and that's what should stand with respect to

14  the monitoring team's position versus the city's

15  characterization of our position with respect to screening.  So

16  that's item No. 1.

17       Second, my understanding from right before the end of

18  the Court's break was that the Court is inclined to grant the

19  monitoring team's request with respect to the filing of our

20  next monitor's report to be on July 10, 2023.  Should that be

21  true, I just wanted to share the monitoring team's expectations

22  for what will be in that report, because I think that will then

23  help guide some of the answers that you have asked me for.

24       The monitoring team's report will, of course, address

25  the requirements of the action plan that are enumerated in

N4rWnunC

1    section G of the action plan.  We also intend to specifically

2    address each one of the recommendations in the April 24 report

3    and the status of those recommendations with respect to how we

4    are working with the department.  Just to be clear for all

5    parties that that will be a core focus of that report and the

6    status of those within that July 10 report.

7             THE COURT:  And will that report as to the

8    recommendations that it will report on specifically include

9    progresses against the deadline targets that the city has

10   undertaken to comply with.

11            MS. FRIEDBERG:  Correct.  There are six -- well,

12   technically, there are five recommendations with deadlines that

13   we would be required to address.  One of the recommendations

14   with a deadline is actually for the city to provide two reports

15   to the Court, so I will ask them to do that, just to be totally

16   clear.

17            The other five, those are embedded in our

18   recommendations in appendix A of the April 24 report.  Each one

19   of those will be addressed, including any of those with respect

20   to their progress on any enumerated deadlines.

21            One final -- I'm sorry.  I said there were only two

22   housekeeping items.  There's actually a third.  Just for

23   clarity's sake, following the issuance of the April 24 report,

24   the monitoring team did identify that there were four

25   recommendations embedded in the narrative of the report but

N4rWnunC

1    didn't make it into the chart.  A revised chart of

2    recommendations have been provided to all parties.  After this

3    hearing we're certainly happy to provide a revised version with

4    you, but just for clarity for what I know are my very, very

5    type A -- in all due respect -- colleagues here, I just want to

6    clarify that our report would intend to address the revised set

7    of recommendations and not just those that are enumerated in

8    the April 24 report, but those that were revised subsequent to

9    the April 24 report.  They're not new recommendations.  They

10   were in the narrative.  They just, simply as an oversight, were

11   not included in the chart.

12       THE COURT:  Very good.  And I do ask you to provide

13   the revised chart, file it on the record so that we're all

14   clear as to what the reference document is.

15       MS. FRIEDBERG:  If it's OK with the Court, would it be

16   OK if we could file it by tomorrow --

17       THE COURT:  Yes.

18       MS. FRIEDBERG:  -- instead of today?

19       OK.  Great.  We'll file it by the end of the day

20   tomorrow.

21       THE COURT:  Good.

22       MS. FRIEDBERG:  I believe you gave me some homework

23   assignments during the break.

24       THE COURT:  Yes.

25       MS. FRIEDBERG:  The first was with respect to the

N4rWnunC

1    status of our discussions of the recommendations with the

2    department.  We have engaged with the department with respect

3    to the recommendations.  In fact, some of those discussions

4    predated the filing of the April 3 and the April 24 reports on

5    certain discrete areas.  For instance, with respect to

6    investigations, as you know, we had had discussions prior to

7    and subsequent to the report.

8         We have had pretty in-depth discussions on certain

9    matters, investigations probably being the highest one.  The

10   other, with respect to discipline, I have routine

11   communications with the deputy commissioner of trials, and so

12   we have already started to engage in a more substantive manner

13   how to address the recommendations with respect to discipline.

14        With respect to the overarching level of

15   recommendations, it's a mixed bag.  There's over 35

16   recommendations.  We have had an opportunity to at least

17   initially engage on each one of them, some in greater depth

18   than others.  So that, we had a very helpful conversation

19   yesterday.  I believe that there's going to need to be a

20   subsequent, many, many conversations, probably meetings and

21   phone calls to address them, and they sort of vary.  Some, as

22   the parties have acknowledged, are very discrete and probably

23   easy to address.  Others are actually going to require some

24   back-and-forth with respect to what was the intent of the

25   recommendation and how best can it be addressed.

N4rWnunC

1          To date, our engagement with the department since

2     we've submitted the recommendations, both after the April 3

3     report and actually, in fact, after the April 24 report, has

4     been strong.  Our view is that to the extent that engagement

5     falters in any way, shape or form, we will not hesitate to

6     advise the Court immediately -- be that even if it is prior to

7     the July 10 report.  But at this point, I think the engagement

8     has been where it needs to be with respect to the monitoring

9     team.  As I said, I think I've probably spoken with the

10    department every day since the April 3 report with respect to

11    at least some of them, some again in greater detail than

12    others.  And as Mr. Martin mentioned, yesterday we had a

13    meeting with the commissioner and all of their high-level

14    executives who walked through kind of what I'd say an initial

15    conversation about all of them.  Their position on them varies,

16    and it would be quite laborious to go through them each now,

17    but that engagement has been where I think it needs to be at

18    this juncture.

19          THE COURT:  Thank you.

20          In light of that report and corroboration from the

21    monitor that the monitor is pursuing, productively, engagement

22    on the recommendations, including clarification of the more

23    conceptual recommendations with the department, I find it

24    neither necessary nor prudent in terms of the use of resources

25    and increase of particular granular points or argument about

N4rWnunC

specific compliance or noncompliance to require that anything
be embodied in an order at this juncture, and so I am declining
to pronounce particular orders today or to require the parties
to engage with each other in the formulation of an order or
orders embodying the further recommendations.

         Having said that, I expect to hold the city to the
undertakings that it has made in respect of particular
requirements, and I will be very unpleasantly surprised if I
hear from the monitoring team that the recommendations are not
being taken seriously and moving forward at the necessary rapid
pace.  I understand that the new leadership team has many, many
challenges and is working on many different fronts, but this is
a very big problem that affects many, many, many people who are
not in control of this process.  And so it is necessary to make
up for lost time and increase the safety and rational and
appropriate operation of the institution as soon as possible.
And that requires a pace faster than any that we've managed to
achieve so far.

         It is a very good thing that the new staff have been
put in place in the new structure, and that is one reason that
I believe that it is not only appropriate but reasonable to
expect that we will see increasingly improving results on the
particular issues that we have been discussing and that are the
subject of the recommendations, and it is my hope and my
expectation that the data that are provided to the monitoring

N4rWnunC

1    team and on which the monitoring team reports will show further

2    improvement.  I hope that will be significant.

3          And so now as to the monitoring team's request to

4    modify the reporting schedule set forth in the action plan, the

5    requested extension from June 9 to July 10, 2023, is granted.

6    And I'll just say for the record, so that there is language

7    embodying this order, the request to modify the monitoring

8    team's reporting schedule as set forth in section G, paragraph

9    2(iv) of the action plan is granted.  The Court grants the

10   request in order to ensure the most effective and efficient

11   allocation of the monitoring team's resources and to ensure

12   that the reporting schedule provides an adequate opportunity to

13   measure the defendants' progress in implementing meaningful

14   reform pursuant to the action plan, and the Court directs the

15   monitoring team to file additional special reports if necessary

16   should exigent circumstances present themselves, including if

17   defendants fail to remain adequately engaged with the

18   monitoring team and appropriately committed to implementing

19   sustained reform.

20         Right before we broke, I identified three different

21   days in the second week of August.  I realize there was a lot

22   happening in ten minutes.  Is there any constituency that

23   cannot make it on August 10 at two in the afternoon?

24         All right.  We will make the next conference August 10

25   at two in the afternoon.

N4rWnunC

1            Is there anything further that we absolutely need to

2    discuss together this afternoon?

3            Thank you, all.

4            After we adjourn, before we leave the courtroom, check

5    in with the court reporter as to whether there are particular

6    spellings that she will need in order to complete the

7    transcript.  And I direct the city to order the transcript,

8    including ordering a copy for the Court, to be provided to me

9    within a week.

10            Thank you, all.  And I thank everyone who's come to

11    observe today.  Stay safe and keep well.

12            We are adjourned.

13            (Adjourned)

14

15

16

17

18

19

20

21

22

23

24

25