# Special Report of the *Nunez* Independent Monitor

**May 26, 2023**

### THE NUNEZ MONITORING TEAM

Steve J. Martin
*Monitor*

Kelly Dedel, Ph.D.
*Subject Matter Expert*

Anna E. Friedberg
*Deputy Monitor*

Dennis O. Gonzalez
*Associate Director*

Patrick Hurley
*Subject Matter Expert*

Alycia M. Karlovich
*Analyst*

Emmitt Sparkman
*Subject Matter Expert*

## INTRODUCTION

The Monitoring Team issues this special report regarding five recent incidents that have raised serious concerns about the City's and Department's ability to accurately and timely report serious and/or life-altering injuries, to safely manage the individuals in its custody, commitment to transparency and to engage, collaborate with, and provide the Monitoring Team with timely and accurate information. These cases represent a troubling state of affairs. In each of the cases highlighted in this report, the Monitoring Team was not proactively advised by the Department and the Monitoring Team either learned of the incident through allegations made by credible external sources or media reports. Upon learning of each incident, the Monitoring Team has worked diligently to obtain relevant and accurate information from the Department and as outlined below, the Department has provided certain information in response to those requests. The Monitoring Team has advised the City and the Department of its concerns and that immediate steps must be taken to address them. Given that these incidents, described in more detail below, constitute exigent circumstances, the Monitoring Team is compelled to issue this report to the Court as directed in the April 27, 2023, status conference.[1]

## SUMMARY OF RECENT INCIDENTS INVOLVING SERIOUS INJURIES OR DEATH AMONG INDIVIDUALS IN CUSTODY

Five serious and disturbing incidents involving harm to incarcerated persons have occurred in the past two weeks and are described below. They include: (1) an incident in which a person in custody ("PIC") sustained serious and life-altering permanent injuries following a use of force incident, (2) an incident involving a PIC's self-harm and subsequent death, (3) an

---

[1] *See* April 27, 2023 Transcript at page 69, lines 14 to 17.

incident in which a PIC sustained serious and life-altering injuries as a result of an assault while in new admission Intake and was not initially reported, (4) an incident in which a PIC had a serious medical condition that resulted in placement on life support and subsequent compassionate release and which was not initially reported, and (5) an incident in which a PIC over 80 years old, with alleged cognitive impairments and language barriers, was involved in a use of force while being processed through the new admission intake, was allegedly placed in restraints behind his back for a prolonged period of time while alone in a pen, and after less than two days of being taken into custody sustained serious and life-altering injuries and has subsequently been compassionately released. To protect the privacy of the individuals involved, their names are not provided herein.

- **Incident #1**: On May 11, 2023, a person in custody ran out of an elevator unauthorized. Video of the incident showed that the individual passed multiple staff and was eventually taken to the ground and placed in restraints. The staffs' actions while the individual was on the ground can only partially be seen on camera due to placement of the staff. The probe team arrived and placed the individual on a gurney and took him to intake. The person in custody was observed with blood on his face. He was then taken off the gurney and walked to the search area. After the search, hand-held video shows that staff escorted the individual to the front of the room. The individual stood as staff attempted to assist him in putting on his shoes. At this time, the individual was rear-cuffed and in leg shackles. The individual's leg jerked towards what appeared to be the helmet of one of the staff members assisting him with his shoes. Multiple staff then took the individual to the floor. Due to the restraints, the individual was unable to break the fall or minimize its impact. Some of the takedown is not clearly visible on camera due to staff positioning

2

and a partition in the search area. The individual can be heard making a pained noise, and when the camera focused back on the person in custody, he was face-down on the floor with his head near a metal bench and staffs' hands on his arms and back. The probe team lifted the individual off the ground, and he appeared unable to support his own body weight. While the probe team lifted and lowered the individual, his head hit a plastic container, the partition's leg, and then the cement floor. Spots of blood were also visible on the floor below the bench and next to the partition where the person in custody's head was resting on the floor. The individual's body was limp and the probe team then lifted the individual up and placed him on the gurney. The probe team escorted the individual to the clinic and into a medical exam room where he was seen by medical staff. The use of force incident was classified as a Class A incident given the injuries sustained by the person in custody. Following his involvement in the use of force, the person in custody was taken to the hospital and has since undergone three surgeries and the individual is now paralyzed from the neck down. The incident was reported via COD and was updated multiple times on May 11, 2023, and May 12, 2023, to identify additional staff members who were involved in the incident.[2] COD reports were not generated regarding the individual's serious injury or transport to the hospital. On May 23, 2023, the Commissioner and his leadership team were advised of the individual's medical condition and that medical staff diagnosed the individual as quadriplegic. On May 24, 2023, the Monitoring Team first learned of the incident when it received an external allegation regarding the individual's involvement in the use of force and his medical

---

[2] As of May 24, 2023, the COD had not been updated to include any additional information about the nature of the injuries the individual sustained.

condition. The Monitoring Team immediately sought additional information from the Commissioner and his executive team as no information had heretofore been provided by the Department. Following the Monitoring Team's inquiry, but before any information was provided to the Monitoring Team from the Department, a story about the incident was released by the media, including a statement from the Department.[3] After the media story was released, the Department provided the Monitoring Team with a preliminary copy of the investigation, and two summaries of the individual's medical condition (including one summary prepared for the media). On May 24, 2023, the Department also reported to the Monitoring Team "[ki]ndly note that the PIC's hospitalization and current physical state of paralysis arose from a serious pre-existing medical condition (spinal stenosis) that was exacerbated when he fell trying to tie or put on his shoes." The basis for the Department's claim is unknown and its veracity and accuracy are questionable at best given the evidence uncovered in the Department's own investigation of the incident and the available video evidence of the use of force incident preceding the individual's injuries.

- **Incident #2**: On May 14, 2023, the Department reported that a person in custody engaged in an act of self-injurious behavior by jumping from the upper tier's stairway and landing on the floor of the bottom tier of his housing unit at GRVC. The person in custody was subsequently taken to the hospital. Staff did not immediately report this self-harm incident. Instead, the self-harm incident was reported via COD *33 hours after it occurred*

---

[3] *See* Reuven Blau, Detainee at City's Floating Jail Was on Life Support for Two Weeks After Guard Tackle, THE CITY, https://www.thecity.nyc/2023/5/24/23736551/detainee-on-life-support-after-guard-tackle.

and at the same time his death was reported via COD.[4] The Department did not provide

the Monitoring Team with a close-in-time briefing, as they have done in the past,[5] and

the COD report was not provided to the Monitoring Team within 24 hours of the incident,

as the Department has also done in the past.[6] In fact, the Monitoring Team only learned

about the incident via a media report, which included a statement from the

Commissioner.[7] The Department reports an initial JAR meeting was held between DOC

and CHS on May 17, 2023. On May 23, 2023, DOC reported to the Monitoring Team

that because the person in custody was housed on a unit with a higher level of mental

health service and custodial oversight, no immediate corrective actions were required or

taken. However, the Monitoring Team has been unable to ascertain the veracity and

reasonableness of that conclusion. On May 26, 2023, the Commissioner, by written

communication, shared additional details about this incident and explained that the

Monitoring Team's request for information made on May 17, 2023, to the First Deputy

Commissioner, General Counsel, and an Agency attorney went to a "spam" folder and

was therefore not received,[8] but that they would have responded had they received it.

However, the Commissioner then went on to advise that "it is not a requirement under the

---

[4] Department Directives 4521R-A (Suicide Prevention and Intervention) and 5000R-A (Reporting Unusual Incidents) both require reporting of such events within at least an hour (and possibly sooner).

[5] Beginning in 2022, the Commissioner (or the First Deputy Commissioner) began briefing the Monitoring Team on every in-custody death and compassionate release. *See* Monitor's October 28, 2022 Report at pg. 17.

[6] The Monitoring Team has a long-standing request that the CODs for all in-custody deaths are provided within 24 hours of the event.

[7] *See* Graham Rayman, Rikers Island detainee dead after apparent jump at jail complex; was charged in Brooklyn murder, DAILY NEWS, https://www.nydailynews.com/new-york/ny-jump-rikers-20230517-lj2szn5chfevndx3zx3hvri3rq-story.html.

[8] It is unknown whether the Agency Attorney that was also sent the communication received it or not.

Consent Decree or the Action Plan for [the Department] to report deaths in-custody" to the Monitoring Team and so it is unclear whether the Department intends to provide the information in the future. With respect to the Commissioner's claim that providing such information is not required, such an assertion is inaccurate. Information about this incident, including death, relates to many provisions of the *Nunez* Court Orders including, but not limited to the Second Remedial Order, ¶ 1(i)(b), Action Plan, § D, ¶ 2(g), §G, ¶ 4 (iv)(1). As a result, the Monitoring Team is entitled to access such information to "perform [their] responsibilities." Consent Judgment § XX, ¶ 8.

- **Incident #3**: On May 17, 2023, while awaiting processing in a very crowded new admission pen at EMTC, a person in custody was repeatedly assaulted by multiple individuals. The video showed the person in custody, after the assault, in obvious distress. Staff arrived after the assault occurred and removed the victim from the pen. The video shows the individual struggling to walk and falling numerous times on his way to a different pen, where he was left naked and alone for at least three hours. During this time, the individual was exhibiting a significant level of distress. Although the video shows multiple staff passing by him during this time, none provided assistance. He was finally given a pair of underwear only minutes before he was taken to the clinic, which occurred at least three hours after the assault. The injury report completed following his visit to the clinic notes that he sustained a number of injuries. The individual was then taken to the hospital for subsequent treatment. This incident was not reported by staff. This incident first came to the Monitoring Team's attention on May 19, 2023, when the Monitoring Team received an external allegation. Along with the information described above, the allegation reported that the individual, while at the hospital, required intubation and

experienced internal bleeding, and was found to have sustained multiple rib fractures and a ruptured spleen, which required treatment via an emergency splenectomy. The Monitoring Team immediately initiated inquiries about the incident with the Department. Only then was the incident reported as a serious injury via a COD dated May 20, 2023, *approximately 69 hours after the incident occurred.*[9] On May 22, 2023, the Monitoring Team sought a briefing on the status of the investigation of this incident from the Special Investigations Unit's leadership (who the Department reported was conducting the investigation), but, to date, the leadership from the Special Investigation Unit has not responded to the request. The Monitoring Team appreciates that the General Counsel provided some initial information upon receipt of our request. The General Counsel advised the Monitoring Team that DOC leadership reviewed the incident and found it problematic, and that an investigation is underway. The General Counsel advised the Monitoring Team that staff did not contemporaneously report the incident when it occurred, but that reports had been requested following the Monitoring Team's inquiry. On May 22 and 23, 2023, the General Counsel subsequently facilitated the Monitoring Team's access to video of the incident, the delayed COD, and several Staff reports that had been generated following the Monitoring Team's inquiry. On May 26, 2023, the Commissioner advised that upon completion of the investigation that "disciplinary action would be taken if any officer had shirked their duty." With respect to a requested briefing from SIU leadership, the Commissioner advised "I don't know what you would expect" from a briefing by the SIU leadership and further noted that "[b]riefings on ongoing

---

[9] Department Directive 5000R-A requires reporting of such events within at least an hour (and possibly sooner).

investigations are hardly the norm." This is not consistent with the record or orders in this
case. Several officials from the Department, including the Commissioner, have provided
briefings on various ongoing investigations over the course of the eight years of
Monitoring. The Monitoring Team seeks briefings on ongoing investigations in limited
cases and does so only in order to perform its responsibilities under the Consent
Judgment § XX, ¶ 8. Further, the Commissioner's suggestion that such a briefing would
not be provided because "[the Commissioner doesn't] know what [the Monitoring Team]
would expect" and it is "hardly the norm" is not a basis to deny the Monitoring Team
access to such information under the *Nunez* Court Orders. Further, it is not for
Commissioner, or any employee or agent of any Party to determine what the Monitor
may need to perform his duties. *See* Consent Judgment § XX, ¶ 23. The Monitoring
Team continues to request a briefing on the investigation of this incident. The Monitoring
Team's review of the video suggests that there are aspects of this incident that may be
criminal in nature. Consequently, the Monitoring Team referred the case to the
Department of Investigation on May 24, 2023.

- **Incident #4**: On May 20, 2023, a logbook entry indicated that a person in custody was
  transported from AMKC to the hospital for medical evaluation for a non-incident related
  condition or injury. It was reported that the individual complained to medical staff about
  headaches. According to the Commissioner, the individual "left the unit on his own
  power, he quickly took a turn for the worse: he was placed on life support, where he
  remains." The Monitoring Team first learned of the incident on May 22, 2023, when the
  Monitoring Team received an external allegation that this individual was in the hospital
  and on life support. Upon receipt of the allegation, the Monitoring Team immediately

requested that the Department provide any CODs involving this individual and was advised that none could be located.[10] On May 23, 2023, the Department advised the Monitoring Team that the individual remains on life support and is not likely to survive. According to the Department, the individual is in his early thirties, appeared to sustain a heart attack and that the Department does not suspect that any foul play occurred. On May 26, 2023, the Commissioner reported that "there was no official wrongdoing" and "they know of no other details; [and the Monitoring Team] know[s] what the Department know[s] about the case." The Commissioner reported the individual was compassionately released. It is unclear how the Department was able to reach the conclusion that there was "no Departmental wrongdoing" given the limited information available about the underlying incident. As the Monitoring Team received no further details regarding the incident other than that which is stated herein, the Monitoring Team is unable to assess the incident and the veracity of the Department's claims.

- **Incident #5**: On May 20, 2023, a person in custody, reportedly over 80 years old with possible cognitive impairment, serious underlying health issues and limited English proficiency, was involved in a use of force in the EMTC clinic during new admission intake processing and was subsequently left restrained behind his back in a pen alone for at least four hours. The next day, the individual had a serious medical condition that required hospitalization. On May 24, 2023, the Monitoring Team received an external

---

[10] On May 26, 2023, the Commissioner reported that the lack of a COD should "not have come as a surprise [to the Monitoring Team] [because a Department lawyer reported to the Monitoring Team in] September 2022 . . . that 'typically there is no notification to COD generated for hospital runs . . . with the exception of UOF cases.'" This response does not explain why there may or may not have been a COD for the serious medical condition experienced by the individual and none was provided by the Commissioner.

allegation regarding this incident. The Department had not advised the Monitoring Team of this incident and so the Monitoring Team immediately sought information from the Commissioner and his Executive Team. On May 25 and 26, 2023, the Department provided the Monitoring Team with the available staff reports for the use of force, the individual's injury report, and relevant video. Video reveals that approximately 16 hours after the individual's admission to DOC custody and following his initial medical examination, the individual exited the medical pen and was involved in a use of force. The individual refused to enter a holding pen within the clinic, lying his body down on the ground. Staff attempted to use verbal interpersonal communication skills to persuade the individual for approximately 10 minutes to no avail, so two staff members lifted him by his shoulders in an attempt to place him into a wheelchair. The individual continued to physically resist, so staff pushed him into the chair, then pulled and twisted his arms for approximately 30 seconds to place him into rear mechanical restraints. The video shows that the individual was rear-cuffed and placed in a small pen without a sink or toilet, where he remained for about 4 hours in mechanical restraints secured behind his back. During that time, an Associate Commissioner interacted with the individual briefly, but did not appear to take action regarding his condition and his potentially unnecessary continued mechanical restraint. The individual was transferred to a mental health dorm (i.e., about 23.5 hours post-admission), where he spent the night. The allegation reported that the following morning, the individual was transported to the clinic due to significant hematuria and was subsequently transported to Bellevue Hospital, where he was admitted to the Intensive Care Unit. On May 25, 2023, the Department reported the individual, over 80 years old and possibly cognitively impaired, was recently compassionately

released.

## DANGEROUS CONDITIONS AND UNSAFE PRACTICES HIGHLIGHTED BY THESE INCIDENTS

These five incidents, four of which occurred within a six-day period at three different facilities, all relate to various issues in the *Nunez* Court Orders, including, but not limited to, protecting people in custody from harm at the hands of staff and other people in custody, preventing self-harm, timely reporting, adequately managing and tracking individuals within intake, and engagement and transparency with the Monitoring Team. The identified practice and reporting deficiencies revealed by these events relate to matters that have long plagued the Department. A brief summary of the concerns raised by these incidents related to the *Nunez* Court Orders is outlined below.

First, the significant harm, life-altering injuries, and death that were sustained during these incidents is disturbing. The full extent to which they are the result of poor operational and security practices is not yet known, but there is no doubt that each of these cases involves at least some level of unsafe practices and procedures that are inconsistent with the *Nunez* Court Orders. Further exacerbating these issues is the limited information available, as discussed below, which inhibits the ability to identify, address, and improve practices.

Second, the most troubling incidents are those that go unreported because they cannot be accessed by any of the individuals or structures responsible for assessing and improving staff practice. The COD reports for these serious, disturbing, and life-altering incidents were either not generated at all, were completed after a significant delay, were completed only after the issue was raised by external inquiries, and/or omitted crucial information about injuries sustained. Further, in at least one case, it is unclear whether the incident would have been reported at all but for subsequent events and external inquiries. Given the aggravated nature of these particular

incidents, staffs' failure to report them and/or report them in a timely manner also calls in to question the overall veracity of the Department's incident reporting. Furthermore, the Department's centralized report on people in custody who have been admitted to the hospital lacks the necessary information to identify the reason the individual was admitted to the hospital as well as the individual's physical condition or injury.

Third, the conditions within Intake have been subject to significant scrutiny and motion practice before the Court. Incident #3, above, with its alleged deficiencies in supervision, care, and reporting in the EMTC intake unit, is similar to incidents that occurred in November 2019 in GRVC's intake involving a young adult who attempted suicide and an incident in August 2021 in OBCC's intake when a person in custody sustained serious injuries and was taken to the hospital, but the event went unreported until the Monitoring Team raised inquiries.[11] Incident #3 along with Incident #5 raise serious concerns regarding the management of individuals in the new admission intake and the Department's ability and commitment to provide safety and security to individuals, and provide adequate supervision, timely provision of medical care, and accurate reporting. Notably, Incident #3 occurred on the same day and Incident # 5 occurred three days after the City reported to the Court in its May 17, 2023, Status Report (dkt. entry 532) that it has been making strides in the management of new admissions intake.

Finally, with very few exceptions, the information related to these incidents was only provided to the Monitoring Team upon request, required significant and repeated follow-up, and even then, certain requests for information remain outstanding. The Monitoring Team appreciates the efforts of the small group of individuals who have attempted to address these requests after they have been made, but the fact remains that information is provided on a delay

---

[11] *See* March 16, 2022, Monitor's Report at Page 23.

and little to no proactive efforts have been made to provide the Monitoring Team the information necessary. It must be noted, these difficulties in obtaining information are not limited to the instances described in the report and are reflective of a larger and concerning trend.

## TRANSPARENCY AND PROVISION OF INFORMATION TO THE MONITORING TEAM

The Monitoring Team raised concerns with the Department as it learned about each of these incidents. On May 24, 2023, given the grave issues presented, the Monitoring Team advised the Corporation Counsel, the Commissioner of the Department of Correction and their respective teams in writing of our recommendation that these matters must be immediately addressed and that the Monitoring Team was compelled to file a Special Report with the Court given the exigent circumstances presented. It is notable that at the time the letter was written on May 24, 2023, the Monitoring Team was only aware of Incidents #2, #3, and #4 described above. Within a few hours of sending the May 24, 2023 letter, the Monitoring Team learned of Incidents # 1 and #5. This, of course, only reinforces that time is of the essence to address these matters.

On May 25, 2023, the Department requested an opportunity to provide the Monitoring Team with additional information to respond to the Monitoring Team's May 24, 2023, letter so that the information could be considered prior to the issuance of the Special Report. The Monitoring Team advised that, given the exigent circumstances and the ongoing delayed notifications and information sharing previously discussed, the City and Department needed to provide any additional information by the morning of May 26, 2023, so as to minimize the ongoing delays of information to the Monitoring Team and so that the Monitoring Team was in a position to advise the Court forthwith.

On May 26, 2023, the Commissioner sent a written communication to the Monitor with

13

additional information regarding Incidents #2, #3, and #4. The Commissioner's communication

to the Monitor only reinforced the concerns outlined in this letter with regard to ongoing

engagement and collaboration with the Monitoring Team. The communication did include some

relevant information related to Incidents #2, #3, and #4 which were incorporated in the summary

above.[12]

Overall, the Commissioner's May 26, 2023 communication raises significant concerns

about whether the Commissioner and the Department fully appreciate the gravity of the issues at

hand and the importance of transparency and oversight. Serious, life-altering harm has occurred,

and an imminent risk of harm to others in custody remains.

First, the Commissioner appears to suggest that the Monitoring Team should not file the

Special Report[13] because it will cause "great harm [to the Department] at a time when we are

making great strides." The Commissioner goes on to advise that the Monitoring Team's findings

related to Incidents # 2, # 3, and # 4, which the Monitoring Team believes represent significant

cause for concern about imminent risk of harm to those in custody, "will fuel the flames of those

who believe that we cannot govern ourselves. Can that really be said about [Incident # 2]? Or

[Incident #4]?" These statements are concerning and certainly do not provide a basis for the

Monitoring Team to withhold filing the Special Report advising the Court of exigent

_____

[12] The Commissioner requested additional time to provide information regarding Incidents #1 and #5.
The Department was notified about the Monitoring Team's concerns about these incidents very close in
time to the submission of the May 24, 2023 letter as the Monitoring Team raised these incidents mere
hours later.  In response to the Commissioner's request for more time, the Monitor advised the
Commissioner that he welcomes any additional information regarding these incidents, but the filing of
this report could not be delayed any further given the gravity of the issues.

[13] At the April 27, 2023 Status Conference, the Court "direct[ed] the monitoring team to file additional
special reports if necessary should exigent circumstances present themselves, including if defendants fail
to remain adequately engaged with the monitoring team and appropriately committed to implementing
sustained reform." *See* Transcript of April 27, 2023 Status Conference at page 69 lines 14 to 17.

circumstances.

Further, the Commissioner's letter suggests that the Commissioner does not fully appreciate the significance of these incidents. For instance, with respect to Incidents #2 and # 4 the Commissioner advised that there is "no departmental wrongdoing" and then suggests the Department's "[only] sin in those matters, it seems, was not reporting them to the Deputy Monitor quickly enough." The record belies such an assertion that the Monitoring Team's concerns are limited to such a narrow focus. The Commissioner goes on to explain that he does "[. . .] not believe that any delay in notification [related to Incidents #2, # 3, and #4] impeded your work."

This is not simply about a delay in providing information. Along with the serious concerns about harm and the lack of safety that these incidents present, it is disturbing that the Monitoring Team, and consequently the Court, would have been unaware that the incidents had occurred but for the allegations received from external stakeholders and/or media reports. It is further unclear whether, absent the Monitoring Team's inquiries, the Department would have taken the necessary steps to investigate these incidents. Further, while the Commissioner may believe that these issues do not "impede [our] work," it is not for the Commissioner to decide what does or does not impede the Monitoring Team's work. That is for the Monitor to determine in his sole discretion. The essence of a Monitor's role is to provide a neutral and independent assessment of compliance. It is for that reason the Consent Judgment explicitly states that "[n]o Party, or any employee or agent of any Party, shall have supervisory authority over the Monitor's activities, reports, findings, or recommendations." *See* Consent Judgment § XX, ¶ 23. Finally, the Commissioner suggests that the Monitoring Team's findings regarding Incidents #2, #3, and #4 are "hyperbole." The facts outlined in this report and the Monitoring Team's longstanding

record of reporting in this case belies such an assertion about the Monitoring Team's work.

Finally, the Commissioner raises concerns that they did not have adequate time to provide the Monitoring Team with information. It must be emphasized that these issues, and the lack of information provided to the Monitoring Team, are problems of the Department's own making. Claims from the Department that they were given insufficient time to address these requirements are misplaced. For instance, the Department reported that it needed additional time to respond because certain officials were unavailable because they were out of the office at a ribbon cutting ceremony. Had the Department provided the information when requested or, better still, had they proactively informed the Monitoring Team about these incidents, as has been the consistent practice until recently, this last-minute push to provide information to the Monitoring Team would be unnecessary. The circumstances outlined in this report reflect a series of failures on the part of the Department rather than reflect on the conduct of the Monitoring Team.

This current dynamic is simply unsustainable. The Monitoring Team must make repeated requests and exert significant oversight, follow-up, and diligence to obtain information. Certain information that has been routinely provided in the past may now apparently only be obtained after significant effort by the Monitoring Team or following the receipt of external allegations or in light of public reporting. The pace of reform cannot accelerate, as directed by the Court, if the Monitoring Team must expend such considerable time and effort to simply become aware of recent problems, let alone information on how the Department intends to address them.

The Monitoring Team fully appreciates that officials in the agency have a significant workload, are working hard, and many individuals are attempting to respond to the Monitoring Team's requests. This work is demanding, requires significant dedication, focus, and resources.

The Monitoring Team is also aware that a significant amount of information is requested and produced by the Department. The Monitoring Team is always available to speak with DOC officials upon request. The Monitoring Team also appreciates that Department officials are busy and working hard, and that there are insufficient resources to meet the demands of the requests of the Monitoring Team. However, none of these are an excuse nor a defense to the Department's failure to provide information that is requested and for not meeting the obligations of the *Nunez* Court Orders.

The Department's approach to addressing these concerns and providing information is antithetical to advancing reform. The situation raises serious concerns about the deterioration of the Department's level of transparency with the Monitoring Team and reflects a significant deviation from prior practice. Further, the Department's failure to provide timely information is inconsistent with the Court's direction at the April 27, 2023, Status Conference for the City and Department to remain actively engaged with the Monitoring Team and to increase the pace of reform. Instead, the opposite has occurred. The Monitoring Team remains committed to advancing the reform and continues to make itself available to communicate and collaborate with the Department.

## CONCLUSION

There is significant cause for concern about the imminent risk of harm to people in custody and concomitant practice failures by the Department. Not only are the incidents summarized above disturbing because of the unsafe practices utilized and severity of physical harm—including death—involved, but they also cast serious doubt on the Department's compliance with a basic tenet of reform, which is to accurately record incidents so that underlying problems can be identified and resolved. The issues raised in this Special Report raise

17

profound uncertainties and significant questions about whether the Commissioner and agency officials are capable of managing such serious incidents, have the requisite objectivity and transparency necessary to address such incidents and advance the reforms, and are capable of engaging in effective collaboration with the Monitoring Team.[14]

At this point, the City and Department's simple assertions that staff will follow policy and that they intend to consult and collaborate with the Monitoring Team appear to be inconsistent with their present practice. As an immediate and interim measure, the Monitoring Team strongly recommends that, at a minimum, the City and Department take the following immediate steps: (1) address the security and reporting failures to ameliorate the risk of harm outlined in this report, (2) immediately provide any outstanding information to the Monitoring Team regarding Incidents # 1 to #5 outlined in this report and ensure that any newly acquired information is proactively and timely provided to the Monitoring Team by individuals with the requisite information and understanding, and (3) ensure the Monitoring Team is proactively and immediately provided timely and accurate information regarding any future incidents in the jails that relate to the *Nunez* Court Orders. The Monitoring Team remains eager to assist with advancing the reform effort and has advised the City and Department that, as always, it remains available to consult and collaborate with the City and the Department, but their appropriate and active engagement is a prerequisite to initiate this process.

The gravity of this situation compelled the Monitoring Team to file this Special Report so that the Court may advise or order any additional steps to ensure the Department addresses,

---

[14] These concerns regarding transparency, proactive coordination, collaboration, and cooperation have been raised before and are consistent with findings the Monitoring Team made in March of 2022 related to the Commissioner and Department's management of the *Nunez* Court orders. *See* Monitor's March 16, 2022, Report at pages 24 to 29.

recognizes and moves to abate these serious, dangerous, and, in some cases, life-altering incidents of abject harm with the full transparency required of an agency charged with the safekeeping of incarcerated persons. The Monitoring Team is available to provide any additional information the Court may require. Further, as has been the Monitoring Team's routine practice, the Monitoring Team will inform the Court promptly should additional critical, life-threatening incidents or other urgent matters arise.