# Special Report
# by the
# *Nunez* Independent Monitor

**June 8, 2023**

### THE NUNEZ MONITORING TEAM

Steve J. Martin
*Monitor*

Kelly Dedel, Ph.D.
*Subject Matter Expert*

Anna E. Friedberg
*Deputy Monitor*

Dennis O. Gonzalez
*Associate Director*

Patrick Hurley
*Subject Matter Expert*

Alycia M. Karlovich
*Analyst*

Emmitt Sparkman
*Subject Matter Expert*

# Table of Contents

**Introduction** ...................................................................................................... **1**

    Executive Summary ............................................................................. 1

    Organization of the Report ................................................................. 2

    Monitoring Team's Assessment of Progress and the Current State of Affairs ..................... 3

**Current State of Affairs** .................................................................................. **5**

    Unsafe Conditions, Imminent Risk of Harm, and Ongoing Security Failures ................... 5

    Security Indicators ............................................................................. 7

    Conclusion ........................................................................................ 13

**DOC's Management of Nunez Court Orders and Lack of Transparency** ....... **15**

    Monitor Responsibilities and Access to Information ......................... 16

    Nunez Court Order Requirements for Consultation and
Collaboration with the Monitoring Team ........................................... 17

    Department's Regression in Collaborating and Consulting
with Monitoring Team Beginning in 2021 .......................................... 18

    Department's Deteriorating Transparency, Accuracy, Consultation
and Collaboration with the Monitoring Team ..................................... 20

    Failure to Follow Through on Commitments to the Court or
Provision of Incomplete, Misleading and Inaccurate Information to the Court ................. 23

    Incomplete, Misleading and Inaccurate Information Provided to the Monitoring Team .... 26

    Conclusion ........................................................................................ 37

**Update on Five Incidents Detailed in The Monitor's May 26, 2023 Special
Report** ............................................................................................................. **39**

    Illustrative Operational Failures ........................................................ 40

    Proposed Department-Wide Corrective Action in Response to Incidents ......................... 46

    Future Notifications to the Monitoring Team from the City and Department ................... 48

**Conclusion** .................................................................................................... **49**

**Appendix A: Data** ......................................................................................... **i**

    Annual UOF Number and Rate ......................................................... ii

    UOF Number and Rate – January 2022 to April 2023 ...................... iv

    Annual Number and Rate of Stabbing and Slashing ......................... v

    Recent Number and Rate of Stabbing and Slashing from January 2022 to April 2023 ...... vii

    Annual Number and Rate of Fights .................................................. viii

    Recent Number and Rate of Fights from January 2022 to April 2023 ............................ x

    Assault on Staff ................................................................................ xi

Deaths In-Custody & Compassionate Release .................................................. xii

## Appendix B: Summary of Five Incidents from May 26, 2023 Special Report

.......................................................................................................................... xiii

Incident #1 .................................................................................................... xiv

Incident #2 .................................................................................................... xv

Incident #3 .................................................................................................... xvi

Incident #4 .................................................................................................... xvii

Incident #5 .................................................................................................... xviii

## Appendix C: Proposed Order ........................................................................... xix

## Appendix D: Proposed Agenda for June 13, 2023 Court Conference ......... xxvii

# INTRODUCTION

This report is the sixth filed by the Monitoring Team since the Action Plan was ordered by the Court on June 14, 2022 (dkt. 465) and is filed pursuant to the Court's May 31, 2023 Order (dkt. 535). The purpose of this report is to provide a neutral and independent assessment of the current state of affairs, updates regarding the Department's management of the *Nunez* Court Orders[1] and lack of transparency, and to provide an update on the five incidents outlined in the Monitor's May 26, 2023 Special Report (dkt. 533) and May 31, 2023 Letter to the Court (dkt. 537).

## *Executive Summary*

The current state of affairs in the jails remains alarming, not just for the rampant violence and frequency with which force is used, but also because of regression in the Department's management of the *Nunez* Court Orders and its lack of transparency, as discussed in more detail throughout this report.

Since the inception of the Consent Judgment, the Monitoring Team has been committed to guiding and assisting the Department in its efforts to address the many concerning practices and procedures that underlie the dangerous conditions, providing advice on prioritizing these initiatives, and advancing and accelerating the reform. Institutional reform of this magnitude will take far longer than the urgency of the situation demands, but the pace of reform in this Department over the past eight years has been glacial and at times, marked by distressing regression. The Monitoring Team further amplified its efforts to support the Department

---

[1] The *Nunez* Court Orders, include, but are not limited to the Consent Judgment (dkt.249), the First Remedial Order (dkt. 350), the Second Remedial Order (dkt. 398), the Third Remedial Order (dkt. 424), the Action Plan (dkt. 465) and any other relevant Orders issued by this court in the matter prior to the issuance of this Order and any Order in the future.

following the issuance of the Action Plan as the Department navigated new protocols (*e.g.*, modernizing its infrastructure for scheduling, assigning and deploying staff; and other actions designed to address foundational barriers to compliance) within a new management framework of civilian leaders. Unfortunately, these efforts have been insufficient to abate the imminent risk of harm.

The Monitoring Team is increasingly concerned that the Department's unwillingness and inability to collaborate effectively has also compromised the quality of the information available to the Court, the Monitoring Team and the Parties. This report cites many examples of the Department's lack of transparency and failures to adequately manage compliance with the *Nunez* Court Orders and timely respond to the Monitoring Team's feedback and requests for information. Furthermore, in the update on the five incidents originally discussed in the Monitor's May 26, 2023 Special Report, this report cites how these incident illustrate broader operational concerns, provides specific examples in which it appears the Department may be deflecting responsibility for serious issues and the way staff managed them, and the Department's ineffective process for supplying the Monitoring Team with the information needed to keep the Court properly apprised.

### ***Organization of the Report***

This report has three sections. The first section provides a summary of the Current State of Affairs. The second section is an overview of the Department's Management of the *Nunez* Court Orders and includes examples of the troubling lack of transparency. The third section provides an update on the five incidents detailed in the Monitor's May 26, 2023 Special Report. This report also includes four appendices. Appendix A provides relevant data referenced in the Current State of Affairs section. Appendix B provides a summary of and relevant information

about each of the five incidents described in the Monitor's May 26, 2023 Special Report. Appendix C includes a proposed Order that the Monitor respectfully requests that the Court enter to ensure he is able to fulfill his responsibilities under the *Nunez* Court Orders. Appendix D is a proposed agenda for the emergency Court Conference on June 13, 2023.

### *Monitoring Team's Assessment of Progress and the Current State of Affairs*

As context for the work of the Monitoring Team and the information provided in this report, the Monitoring Team's approach to assessing progress and the current state of affairs is described. This requires multiple measures to be evaluated in each key area of the Consent Judgment, Remedial Orders, and Action Plan because no one metric adequately represents the multi-faceted nature of these requirements. While quantitative data is a necessary component of any analysis, relegating a nuanced, complex, qualitative assessment of progress towards achieving compliance with these requirements into a single, one-dimensional, quantitative metric is not practical or advisable. Data—whether qualitative or quantitative—cannot be interpreted in a vacuum to determine whether progress has been made or compliance has been achieved. The Monitoring Team therefore uses a combination of quantitative data, qualitative data, contextual factors, and reference to sound correctional practice to assess the current state of affairs.

It is axiomatic that reform is intended to improve upon the conditions at the time Court Orders (*e.g.*, Consent Judgments, Remedial Orders and Action Plans) are imposed. Equally critical is recognition that *all* Parties—including the City and Department—agreed to the parameters of the Consent Judgment and three Remedial Orders. It is also true that, since the Consent Judgment was entered, profound changes have occurred in the context within which the jails operate and these externalities must be recognized.

The array of quantitative metrics, qualitative assessments, and appreciation of externalities mean that discussions about the current state of affairs can be cast in a multitude of ways, all of which are legitimate strategies for understanding the Department's trajectory. Multiple comparison points can be used (*e.g.*, before/after COVID, prior administration versus current administration, since the Action Plan was issued, etc.) which, depending on the yardstick selected, lead to different conclusions about the magnitude or pace of progress or the lack thereof. The Monitoring Team has dutifully examined changes in metrics and patterns in staff behavior from all angles in order to gain insight into the factors that may be catalyzing or undercutting progress. These explorations are useful for the purpose of understanding and solving problems, but they do not stand-in for the overarching requirement for the Department to materially improve the jails' safety and operation compared to the conditions that existed at the time the Consent Judgment went into effect.

# CURRENT STATE OF AFFAIRS

The dangerous conditions in the jails and the underlying dysfunctions in managing the jails have been the subject of every Monitor's report filed to date. This section of the report discusses the current state of the jails' persistently unsafe conditions.

### *Unsafe Conditions, Imminent Risk of Harm, and Ongoing Security Failures*

While conditions in the jails may be somewhat better than at the apex of the crisis in 2021, a pervasive, imminent risk of harm to both people in custody and staff remains. The Department's poor security practices, the frequent use of unnecessary and excessive force and the level of violence in the jails was, of course, of paramount concern to the Monitoring Team at the inception of the Consent Judgment in 2015 and the level of concern has only increased as the rate of these problems has increased exponentially. An unfortunate and dangerous side-effect of the decades-long high rates of use of force and violence is that they have become normalized and have seemingly lost their power to instill a sense of urgency among those with the authority to make change.

The Monitoring Team reported with alarm in its March 16, 2022 Report that **the Department's high rates in each of the critical violence indicators are *not* typical, they are *not* expected, they are *not* normal. The same remains true today. Even with reductions in *some areas*, the current rates of use of force, stabbing and slashing, fights, assaults on staff, and in-custody deaths are *not* typical, they are *not* expected, they are *not* normal.**

- **Poor Security Practices & Unnecessary and Excessive Force**

There is a lengthy, detailed record of the deficiencies in staff's basic security practices.[2] To date, and over 20 months since the filing of the Second Remedial Order which focused directly on these security issues, the Department has not meaningfully implemented sustainable solutions to *any* of the immediate problems such as unsecured doors, post abandonment, poor key control, outdated post orders, escorted movement with restraints when required, incarcerated individuals congregating around secure ingress/egress doors, poorly managed vestibules, and poorly secured OC spray. To be certain, efforts have been and continue to be made, but they have not yet resulted in the necessary material and widespread change in staff practice.

The Monitoring Team's findings made throughout the life of the Consent Judgment affirm the lack of progress in elevating staff practice and controlling violence. The Monitoring Team's contemporaneous review of initial reports and rapid reviews of all use of force incidents from May 2023 revealed the following trends and patterns.

- A large proportion of uses of force are related to fights among people in custody, in response to attempts to search people in custody, and during escort.

- Multiple security failures contribute to and/or exacerbate use of force events such as unsecured A stations, staff being off-post, staff failing to wear/activate body-worn cameras, failure to lock doors and poor escort technique.

- Poor staff practice is revealed in numerous events that involve staff failing to render aid and failing to intervene timely; deploying chemical agents in excessive amounts and at an unsafe distance; unnecessarily deploying probe teams; staff's unprofessional conduct, use of profanity and other actions that escalate the situation; and situations in which the use

---

[2] For example, *see* Monitor's March 16, 2022 Report at pages 21 to 22 and 44 to 46

of force could have been avoided if staff practiced good de-escalation, communication or security measures.

In addition, of significant concern are reports from Department leaders to the Monitoring Team that staff feel unsafe and/or unable or unwilling to do their jobs and frequently report that they would rather be disciplined than do their job as expected. When reviewing videos of incidents, the Monitoring Team frequently observes an apathetic approach to basic security practices or a failure to intervene that is all too common in systems where staff feel they are inadequately prepared for and supported while on the job, feel unsafe, and lack the skills and confidence to maintain the necessary order without causing an event to escalate. That the Department has identified this as an underlying cause of poor security practices is positive (*i.e.*, that they are searching for the source of the problem) but it is also evidence of the deep inadequacy of the basic security function of the jails.

### *Security Indicators*

Turning to quantitative metrics, the rate of every safety and violence indicator is substantially higher than when the Consent Judgment went into effect in November 2015, and higher than the rates in each of the subsequent five years (*i.e.*, 2016-2020). While the rates of nearly every indicator reached a highpoint in 2021 and some of the rates have decreased, they have yet to return to levels near those observed when the Consent Judgment was entered. Further, the Monitoring Team agrees with the City's position that "the sheer numbers don't really tell you the whole story." [3] This is why the Monitoring Team's demonstrated expertise in evaluating these incidents is so critical to understanding the nature of the Department's

---

[3] See, April 27, 2023 Status Conference at 57, lines 7 to 8.

problems. The data, in combination with the Monitoring Team's qualitative assessment of staff practice, demonstrates that the Department continues to fall far short of the requirement to materially improve upon the level of safety, the rate at which force is used in the jails, and the amount of unnecessary and excessive force which remains far too prevalent. The Monitoring Team's assessment of the current security indicators is discussed below, and relevant data is attached to this report as Appendix A.

- **Use of Force**.
  - The Department's average monthly use of force rate from the most recent four-month period (January-April 2023; 9.0) is 26% lower than the average monthly rate at the apex of the crisis (2021; 12.23) but is 127% higher than the average monthly use of force rate at the inception of the Consent Judgment (2016; 3.96).
  - The proportion of uses of force that resulted in serious injuries during the most recent four-month period (January-April 2023; 4%) is lower than the proportion at the apex of the crisis (2021; 6%), but higher than the proportion at the inception of the Consent Judgment (2016; 2%). More importantly, because the number of uses of force has increased so substantially since 2016, these proportions translate to a significant increase in the number of people who sustain serious injuries during use of force events (*e.g.*, 74 in 2016, compared to 434 in 2022).
  - The number and rate of uses of force do not provide a complete picture and must be viewed in tandem with qualitative assessments of the reasonableness of the force used in each incident. The Monitoring Team's ongoing, contemporaneous review of all use of force incidents *this year* indicate that neither the seriousness nor the frequency of the excessive use of force has abated. This finding is present

in each of the Monitor's Reports to date which are replete with descriptions of staff's pervasive excessive and unnecessary use of force.[4]

- **In-Custody Deaths**

  o To date, three people have died while in custody or were compassionately released just prior to their death in 2023.[5] In 2022, more people died in custody or were compassionately released just prior to their death (n=19) than any other year since the Consent Judgment was entered in November 2015. No matter the time period used as comparison, the number of people who have died in custody has been tragic. Even after Court Orders specifically related to preventing suicide were imposed over 18 months ago, seven people have died by suicide or suspected suicide (six of whom died by suicide or suspected suicide since the Action Plan was entered in June 2022).

- **Stabbing and Slashing**

  o The Department's average monthly rate of stabbings/slashings during the most recent four-month period (January-April 2023; 0.5) is 21% lower than the average monthly rate at the height of the crisis (2021; 0.63) but is 257% higher than the average monthly rate of stabbings/slashings at the inception of the Consent Judgment (2016; 0.14).

  o A total of 420 and 468 stabbing/slashings occurred in the jails in 2021 and 2022, respectively. Given that 144 stabbings/slashings have already occurred during the

---

[4] *See* Monitor's March 16, 2022 Special Report at pages 39 and 40; Monitor's October 28, 2022 Report at pages 2, 61, and 117, and Monitor's April 3, 2023 report at pages 3, 128, 137-138, and 166.

[5] This data is based on information provided by the Department and has not been independently verified. As described in this report and others, given recent concerns regarding the Department's lack of transparency and the accuracy of data provided, it is possible this number could be higher.

first five months of 2023 (January-May), the Department is on track for 346 stabbing/slashings this year.

o   Although the number of stabbings/slashings appears to be decreasing, the fact that hundreds of stabbings and slashings are expected to occur this year is troubling, particularly when viewed in the context of the number of incidents at a time when the jails' poor conditions were found to be serious enough to warrant federal court intervention (*i.e.*, 159 stabbings and slashings occurred in 2016, just as the Consent Judgment went into effect). The escalating rate of this serious form of violence that began in 2021 and continues to the present is emblematic of the imminent risk of harm present each and every day in the jails.

- **Assaults on Staff**

  o   The Department's average monthly rate of assaults on staff during the most recent four-month period (January-April 2023; 1.0) is 38% lower than the average monthly rate at the height of the crisis (2021; 1.6) but is 41% higher than the average monthly rate of assault on staff at the inception of the Consent Judgment (2016; 0.71).[6]

- **Fights**

  o   The Department's average monthly rate of fights during the most recent four-month period (January-April 2023; 7.98) is 14% lower than the average monthly rate at the apex of the crisis (2021; 9.28), but is 56% higher than the average monthly rate of fights at the inception of the Consent Judgment (2016; 5.11).

---

[6] These comparisons only include assaults on staff that involved a use of force, because relevant comparison data for assaults on staff without a use of force are not available.

- **Facility Comparisons**

The Action Plan requires the Department to develop violence reduction plans for three facilities—RNDC, GRVC and AMKC (§ A, ¶ 1(a) and (b) of the Action Plan). The Monitoring Team has reported extensively on current conditions at RNDC and GRVC.[7]

- o All three facilities continue to rank among the highest in the Department on most indicators of safety. Recent improvements at RNDC and GRVC are encouraging compared to their historical high points, but AMKC's poor outcomes are trending upward.

- o At RNDC, a steady reduction in the average monthly use of force rate has occurred since 2018 [8] (28.1) through the first four months of 2023 (8.2). The average monthly rates of stabbing/slashing and fights also substantially decreased during that time (stabbing/slashing decreased from 1.41 in 2021 to 0.55 in 2023; fights decreased from 11.8 in 2021 to 6.93 in 2023) but, nonetheless, remain at concerning levels.

- o At GRVC, the improvements have been a bit more modest but are still trending in the right direction. Thus far, 2023's monthly average use of force rate is 10.5, the monthly average rate of stabbing/slashing is 1.03, and the monthly average rate of fights is 5.16, all of which remain at concerning levels.

- o Unfortunately, the rates of use of force and violence at AMKC are trending in the wrong direction (*i.e.*, they ticked upward in 2023) and so additional efforts are

---

[7] See Monitor's March 16, 2022, Report pages 17 to 21, Monitor's Report June 30, 2022, Report pages 17 to 21, Monitor's October 28, 2022, Report pages 65 to 71, Monitor's April 3, 2023 Report pages 52 to 62.

[8] With GMDC's closure in July 2018, most of the young adults (age 18-21) were transferred to RNDC. Given this significant change in RNDC's composition, 2018 is used as the most relevant reference point.

needed to improve safety. Thus far in 2023, the average monthly use of force rate is 8.71, the average monthly rate of stabbing/slashing is 0.56, and the average rate of fights is 8.89. The Department has reported that closing AMKC is one solution being considered to address this problem. However, the Monitoring Team's request for a briefing regarding considerations for closing AMKC has not yet been fulfilled.[9]

In summary, while certain data points viewed in isolation illustrate that some progress has been made, particularly in the downward trends noted since 2021, the fact remains that none of these decreases are of the magnitude needed to achieve the reform required by the Consent Judgment. In every case, quantitative metrics show that use of force and violence are exponentially higher than they were in 2016, and qualitative data reveals the continued pervasiveness of unnecessary and excessive uses of force.

The Monitoring Team evaluates multiple measures and facets of the Department's work to assess the current state of affairs and determine the scope of progress and whether it has achieved its intended goal of harm reduction. Given existing deficiencies in foundational practices, the assessment of progress must evaluate the steps taken to implement the reforms, initiatives, plans, systems, and practices required by the *Nunez* Court Orders. Certainly, since the inception of the Consent Judgment, important progress has been observed (*e.g.*, improving training curricula, improving the process for use of force investigations, expanding the capacity for formal discipline) even though a large number of requirements of the *Nunez* Court Orders remain unmet. Similarly, since the Action Plan was ordered by the Court, some progress has

---

[9] On May 9, 2023, the Monitoring Team requested a briefing regarding the plans for closure of AMKC. One has not been provided.

been observed, but significant gaps remain. These will be explored in greater detail in the Monitoring Team's next report to be filed on July 10, 2023.

## *Conclusion*

The quantitative data and qualitative findings discussed above demonstrate that the risk of harm in the jails remains grave and that the jails remain patently unsafe. The use of force rate is exponentially higher than when the Consent Judgment went into effect, and the proportion of incidents involving unnecessary and/or excessive uses of force and serious injuries remains unchanged. Even though the proportion has not changed, the number of incidents involving a use of force is significantly higher, which means that more people in custody are subjected to the excessive and unnecessary use of force and many more are suffering serious injuries. Further, the number and rate of stabbings and slashings have skyrocketed since 2021, so much so that the reduction achieved in 2023 is being touted by the Department as a "success" at a time when the Department is projected to have nearly 350 stabbings and slashings this year. This is more than the number of stabbings and slashings that occurred in the *combined* three-year period, 2017-2019 when the Department's population was significantly higher. And tragically, a record number of people in 2022 died while they were in custody.

The Monitoring Team has long reported that the Department must first address the core foundational areas of correctional management as a prerequisite to achieving substantial compliance with the terms of the *Nunez* Court Order. Otherwise, the Department will simply perpetuate the cycle of unsuccessful, albeit sometimes well-intentioned, compliance efforts that have existed during the life of the remedial phase and puts the goal of ending oversight even farther out of reach. To that end, as it has done since January 2022, the Monitor recommends that it maintain its focus on assessing compliance with the Action Plan and the select provisions of

13

the Consent Judgment and First Remedial Order for the period of January to June 2023. In other words, the Monitoring Team recommends that the Court extend the Monitoring Team's requirements for compliance assessment under Action Plan § G, ¶ 5(b) from December 31, 2022 to June 30, 2023. The recommendation is included in the proposed order attached as Appendix C.

# DOC's Management of Nunez Court Orders and Lack of Transparency

The Monitor's ability to keep the Court and Parties *accurately* apprised of Defendants' progress toward court-ordered reform must be the product of *robust consultation* and *deep collaboration* between Defendants and the Monitoring Team. A core component of the *Nunez* Monitoring Team's work is to advance the reform effort by identifying problems and obstacles and supporting the creation of appropriate solutions. It is therefore necessary for the Department to engage in good-faith efforts to provide accurate information to the Monitoring Team, is transparent about its challenges and plans, maintains a strong and consistent commitment to collaboration with the Monitoring Team and holds as its first premise, *progress*. Indeed, the Consent Judgment, Remedial Orders and Action Plan are replete with requirements for the Department to consult and collaborate with the Monitoring Team as the Department develops and implements the many initiatives required for successful reform of the dangerous conditions that continue to plague the City's jails.

In the early years (*i.e.*, 2016-2021) the Department's management of its efforts to comply with *Nunez* embodied these values. In the past six months, however, the commitment to effective collaboration as evidenced by the Department's recent performance has deteriorated. As discussed in detail below, the Department's approach to reform has recently become characterized by inaccuracies and a lack of transparency. The Department's recent conduct undercuts the ability to effectively collaborate as required by the *Nunez* Court Orders. These problems have grave consequences for the prospect of reform and eliminating the imminent risk of harm faced by incarcerated individuals and staff.

**_Monitor Responsibilities and Access to Information_**

First and foremost, the Monitor is an agent of the Court. _See_ Consent Judgment § XX. ¶ 30. The essence of a Monitor's role is to provide a neutral and independent assessment of compliance, which is specifically required by the Consent Judgment in this case. _See_ Consent Judgment § XX. ¶¶ 1 and 18. Together, these paragraphs hold the Monitor responsible for assessing compliance via "[. . . ] independently verifying any representations from the Department regarding its progress toward compliance [ . . .] and examining any supporting documentation where applicable[.]" Further, as part of the Monitor's reporting obligations he must include "…the factual basis for the Monitor's findings [. . . ]."

Accordingly, the Consent Judgment permits the Monitor access to the people, locations and information necessary "to perform his responsibilities under this Agreement." _See_ Consent Judgment § XX. ¶ 8. To facilitate this effort, the Consent Judgment also requires the Department to "encourage all Staff Members to cooperate fully with the Monitor." _See_ Consent Judgment § XX. ¶ 13. Further, "[n]o Party, or any employee or agent of any Party, shall have supervisory authority over the Monitor's activities, reports, findings, or recommendations." _See_ Consent Judgment § XX, ¶ 23. The Consent Judgment also requires the Monitor to utilize a robust methodology for assessing compliance including site visits, interviews, records review (including policies, protocols, training curricula, incident reports, investigations, etc.), data and other documents pertinent to monitoring compliance. _See_ Consent Judgment § XX, ¶ 15. Thus, the Monitor's _authority_ and _duty_ to request information from the Department is clearly established by Court Order.

Given the Monitoring Team's position as an independent actor separate from the Department, collecting and assessing the information that the Monitoring Team needs to conduct

its work can only occur with the Department's cooperation. This, together with the Department's obligation to demonstrate compliance with the *Nunez* Court Orders, means the Department must maintain, produce, and otherwise facilitate the flow of information. *See* Consent Judgment § XIX, ¶ 7.

### *Nunez Court Order Requirements for Consultation and Collaboration with the Monitoring Team*

The Monitoring Team's collection and assessment of information cannot be done in a vacuum but must occur via consultation and collaboration with the Department. There are *over 100* requirements for the Department to consult with the Monitoring Team throughout the *Nunez* Court Orders.

The Action Plan further strengthens this mandate with individual provisions that require the Department to consult with the Monitor on "the system, plans and initiatives to improve and maximize deployment of staff" (§C, ¶ 4). This requires the Monitor to specifically determine the plans' sufficiency, and requires the Department to implement any additional requirements from the Monitor (§C, ¶ 4). The Action Plan also requires the Department to "consult with the Monitor on the system, plans and initiatives to improve security practices," and requires the Monitor to specifically determine the plans' sufficiency, and requires the Department to implement any additional requirement from the Monitor (§D, ¶ 3). Furthermore, various provisions of the Consent Judgment, Remedial Orders, and Action Plan require the Monitor's *approval* including the Use of Force Policy (Consent Judgement § IV, ¶ 1), a de-escalation protocol (First Remedial Order § A, ¶ 3), the number of ADWs assigned to supervise housing area Captains (First Remedial Order § A, ¶ 4), and the Restrictive Housing strategy (Action Plan § E, ¶ 4).

The expectation for the Department to consult and collaborate with the Monitoring Team is abundantly clear in the Court's Orders. Further, it is a fundamental expectation that the Department review and verify the accuracy of any information provided to the Monitoring Team to the best of its ability. The Monitoring Team has observed each of these aspects of effective collaboration materially deteriorate.

To be certain, Monitoring Team *still* maintains a constructive relationship with several divisions within the Department whose staff are responsible for managing the flow of information to and from the Monitoring Team, including members of the Legal Division and NCU, with whom the Monitoring Team communicates routinely. The ID Tracking Unit also routinely produces a significant number of uses of force investigations to the Monitoring Team. These staff are critical to supporting the Department's efforts to advance reforms in the agency and are hardworking, conscientious and responsive to the Monitoring Team.

### *Department's Regression in Collaborating and Consulting with Monitoring Team Beginning in 2021*

The Department's approach to working with the Monitoring Team began to falter in fall 2021 and, during that Monitoring Period, the Department was downgraded to Partial Compliance with Consent Judgement §XVIII, ¶ 3 (*i.e.*, requiring an individual to coordinate compliance and to serve as the point of contact with the Monitoring Team) after having been in Substantial Compliance for the previous 11 Monitoring Periods. The Monitor's December 6, 2021 Report (Monitor's 12th Report) noted at pg. 121-122: "While the Monitoring Team continued to receive requested routine information, there was a noted shift in access to other relevant information towards the end of the Monitoring Period with the transition to new leadership. Understandably,

the transition brought about a number of changes.[10] This resulted in strained communication and coordination on the Department's initiatives, priorities, and the various other dynamic issues at play."

The collaboration with the Monitoring Team further devolved in early 2022 with the transition to the current Department leadership. In its March 16, 2022 Report, the Monitoring Team noted: "Since the New Year [2022], the Department has altered its management of its compliance efforts with the Monitoring Team to essentially eliminate the proactive and collaborative approach that previously existed, reduced its level of cooperation, and limited its information-sharing and access in ways which inhibit the work of the Monitoring Team." *See* March 16, 2022 Report at pgs. 24 to 29. Some improvement to the Department's position on information-sharing and willingness to collaborate was observed following the issuance of the Monitor's March 16, 2022 Report, but these improvements were not sustained.[11] In late 2022 and early 2023, similar problems began to re-emerge[12] and have grown since then. The problems reported herein have culminated in a lack of transparency, consultation, and collaboration that has impacted the Monitoring Team's work.

---

[10] For instance, the Deputy General Counsel resigned shortly after the close of the Monitoring Period. She was a responsible, dynamic, and creative professional and provided invaluable assistance and leadership to the Department in managing the reform effort.

[11] *See* Monitor's April 4, 2022 Report at pages 3-4 noting *some* improvements, but reiterating its March 16, 2022 recommendations regarding the Department's approach to working with the Monitoring Team. *See also* April 26, 2022 Status Conference at page 11, lines 4 to 8 and page 55, lines 13 to 17; Monitor's October 28, 2022 Report at pages 7 to 9; November 17, 2022 Status Conference at page 65, lines 12 to 22.

[12] *See* Monitor's April 3, 2023 Report at pgs. 113 to 115

**_Department's Deteriorating Transparency, Accuracy, Consultation and Collaboration with the_**
**_Monitoring Team_**

A core component for a successful reform effort is to ensure that the information

provided by the Department is reliable and accurate. As required by the Consent Judgment (*e.g.*

§ XX. ¶ 18), the Monitoring Team's efforts to independently verify the Department's

representations regarding its progress toward compliance have become increasingly difficult and

reflect the lack of rigor with which the Department manages, collects and shares information. To

be clear, the Monitoring Team fully appreciates that information can be dynamic and fluid. This

is yet another reason that close communication and consultation is necessary so that appropriate

background, context, and updates can be shared as information changes and evolves. Given the

change in the Department's information sharing practices, even when the Department provides

an initial production of information or response to a request, a significant number of follow-up

requests have become necessary to enable the Monitoring Team to fully understand the non-

responsive or otherwise inadequate information initially submitted by the Department. This

constellation of follow-up requests is preventable, and unnecessarily time consuming.

Further, as described in the Monitor's April 3, 2023 Report, the Department's approach

to managing the work under the *Nunez* Court Orders generally lacks a through-line and

organizing thread for the robust efforts of multiple leaders in various disciplines. This lack of a

central organizing entity means that some initiatives continue forward even when a refocus to an

adjacent issue is needed. Further, it is often necessary for the Monitoring Team to coordinate

across divisions within the agency to ensure that feedback and information has been received by

the various individuals tasked with managing the issue. This clearly should be done by the

Department. Discussions with the Monitoring Team to provide advanced notice of certain plans,

to consult on initiatives in progress, or to digest and respond to feedback also suffer from this lack of a dedicated *Nunez* manager or coordinator with a unified vantage point.

Common themes to illustrate the variety of difficulties the Monitoring Team has faced in doing its work are outlined below.

- **Inefficient Collaboration**. Agency leaders frequently claim they have too many tasks to manage or were pulled away to address other priorities; do not follow-up after claiming additional consult with others is necessary before answering a question; are defensive and/or object to the Monitoring Team's scrutiny (*e.g.*, claiming too much information is being sought). Each of these strategies unnecessarily expends valuable time of both the agency leaders and the Monitoring Team.

- **Deflecting Attention and Inaccurate Information**. There are numerous situations in which only selective information is shared in response to a request that serves to blur the reality of the situation or to gloss over concerning facts (e.g., the five incidents highlighted in the Monitor's May 26, 2023 Report).

- **Lack of Substance**. Detailed plans are sometimes promised, but the resulting production contains only vague assertions with no specificity or substance. The Monitoring Team must then attempt to supplement the information which often proves difficult because the initial information was too vague to enable the Monitoring Team to formulate appropriate and targeted clarifying questions.

  - At times, the information produced suggests that a certain response has been hastily drawn to address a request, rather than to provide complete or thoughtful responses to the issues raised by the Monitoring Team.

  - Other times, the Department agrees to take a certain action recommended by the Monitoring Team but then either enacts only a limited part of the recommendation or, without explanation, fails to take any action at all.

- **Deadlines Ignored**. Recently, the Monitoring Team has attached more specific deadlines to requests for information because otherwise, information is simply not provided. Even with these deadlines, a significant number of requests for information go unfulfilled, sometimes accompanied by a complaint that insufficient time was provided to respond.

  - Delays have become particularly pronounced in the last few months—for instance, as of May 9, 2023, at least 20 requests for information or responses to Monitoring Team feedback remained outstanding for over a month with no response. This includes over 10 were pending beyond two months and a number were pending from 2022.

- o   The situation is no better for self-imposed deadlines. The Department often advises that information will be provided on a certain date, but then does not follow through.

- o   The Monitoring Team must frequently remind the Department about key deadlines in order to catalyze progress or the production of information required to demonstrate progress. Even with this assistance, the Department has difficulty meeting these deadlines.

- **Dwindling Resources**. Originally, two units within the Department were dedicated to working on the Nunez matters – CLU and NCU. The NCU remains relatively intact, and manages the routine tracking of certain *Nunez* issues and provides an important quality assurance function. The CLU, on the other hand, previously included a corps of supervisors, multiple attorneys and administrative staff to manage the complexities of information flow and collaboration with the Monitoring Team. These resources have dwindled with no corresponding dedication of resources within the Legal Division or similarly situated division. This has undermined the quality of the collaboration. More specifically, as of the end of March 2023, only two attorneys and one part-time administrative staff were assigned to *Nunez* matters, all of whom also have other, non-*Nunez* responsibilities. Since then, the Department has reported that two additional attorneys have been added to the team (who have other responsibilities beyond *Nunez* matters). Unfortunately, one attorney who has worked on *Nunez* matters for years is leaving the Department in a few weeks and so there is only a net gain of one additional attorney.

- **Poor Internal Coordination**. Responses to complex issues are often provided piecemeal and, most troubling, without any acknowledgement or awareness of each component's contribution to the larger whole.

- **Data Errors/Poor Vetting**. Despite multiple productions and multiple conversations with the Monitoring Team about its implications, data on several key issues (*e.g.*, awarded posts and medical incompetence) has proved to be inaccurate. The lack of internal vetting of this information casts doubt on the veracity of the information the Monitoring Team receives and necessitates repeated follow-up to ensure the accuracy of the information provided.

- **Failure to Consult**. Consultation with the Monitoring Team has waned, both with respect to certain substantive issues (*e.g.*, UOF) and regarding the larger gestalt of the Department's reform effort. Further, certain policies require Monitor approval and others require consultation with the Monitoring Team. The Department has not adhered to this protocol as required.

The decline in the Department's consultation with the Monitoring Team along with the decline in the reliability and accuracy of information provided by the Department has impacted the Monitoring Teams ability to fulfill its role in *Nunez* on many levels. To illustrate the effect of these issues on the Monitoring Team's work under the *Nunez* Court Orders, specific events that occurred mainly in April and May 2023 are described below. The larger trends extend far beyond the subset of incidents noted below.

### *Failure to Follow Through on Commitments to the Court or Provision of Incomplete, Misleading and Inaccurate Information to the Court*

The Monitoring Team has identified several instances where information provided by the City and Department to the Court was either incomplete, misleading, or included factual inaccuracies. The Monitoring Team describes these instances below in chronological order.

- **City and Department's April 25, 2022 Status Letter to the Court** (dkt. 450). In advance of the Court's April 26, 2022 Status Conference, called in response to the Monitor's March 16, 2022 Special Report, the City's update to the Court advised that "[t]he City and the Department want to reaffirm their commitment to providing timely information – both in response to requests by the Monitoring Team, and proactively as issues arise that relate to the consent judgment and remedial orders. We commit to continuing to provide the Monitoring Team with direct access to Department staff at all levels." *At* page 3. This commitment did not endure the test of time. For instance, provision of information is often delayed and difficult to obtain, important information is not always proactively raised, and there are concerns about the Monitoring Team's ability to speak freely with Staff. Thus, events subsequent to the City's 2022 representation to the Court of full cooperation with the Monitoring Team suggest that the City and Department have waivered in their commitment.

- **City and Department's Status Reports Regarding Intake** (filed on April 17, 2023 and May 17, 2023, dkt. 519 and 532). Both of the City's April and May 2023 Status Reports failed to disclose the promulgation of the New Admission policy which was issued on April 10, 2023. The policy was promulgated despite the fact that the Department agreed

to hold the policy in abeyance until a determination about the scope of "clock stoppages" had been made. The Monitoring Team was not consulted on this policy (as it should have been pursuant to the *Nunez* Court Orders, by Department policy, and as requested by the Monitoring Team on multiple occasions) and was only notified the policy had been promulgated *42 days* after it was issued. The Monitoring Team's request to the Department about how and why this occurred is still pending.

- **City and Department's April 25, 2023 Status Letter to the Court** (dkt. 523). Several recent representations by the City to the Court were misleading, and in some cases, were later determined to be inaccurate.

  o <u>Removal of ESU Staff Did Not Occur as Reported</u>: The City reported that "twenty-one individuals as to whom the monitoring team raised concerns have been removed from the unit" (at pg. 5). However, on May 23, 2023, the Department reported that at least five of the staff purported to have been removed were still assigned to ESU or SRT/SST (*i.e.,* equivalent assignments to ESU). The Monitoring Team's follow-up request to the Department regarding these assignments remains pending.

  o <u>Misleading Representation Regarding Monitoring Team's Access to Information</u>: The City reported that "the Monitor has unfettered access to Department staff to gather information" (at pg. 7). However, the Commissioner reported to the Monitor on May 26, 2023, that certain requested information would not be provided to the Monitoring Team (*e.g.*, notification of in-custody deaths and briefings on investigations). *See* Monitor's May 26, 2023 Special Report, pgs. 5 to 6 and 7 to 8.

  o <u>Misleading Representation Regarding Promotion of ADWs</u>: The City reported that "[f]ive more individuals will be promoted to ADW when they finish their training" (at pg. 5). However, the Monitoring Team's effort to determine the status of these promotions has been arduous. For example, on a single day in mid-May 2023, the Department provided three accounts, by three different individuals within the agency, as to whether such promotions will actually occur. The Department ultimately reported that the effort to screen potential candidates was not complete, that the specific individuals and total number of staff to be

promoted had not been finalized, but that the promotions were expected to be completed in late May 2023. The Department has not provided a subsequent update.

o  <u>Misleading Representation Regarding Staffing on *Nunez* Matters</u>*:* The City reported that "[i]t recently added a fourth attorney to work on Nunez matters." (*At* pgs. 6 to 7). However, the Monitoring Team subsequently learned that this claim was inaccurate, as the individual was only *advised* of his new assignment on May 4, 2023, nine days after the City's reported the assignment had already occurred, and as of the date of the inquiry (May 9, 2023), the individual had not been assigned any *Nunez*-related tasks.

- **April 27, 2023 Status Conference**
  - o  <u>Misleading Statement Regarding Amenability to Monitor Reporting</u>: The City advised the Court that "the monitor will not hesitate to report to the Court if they feel that we've refused to do something that's obviously required and feasible under the action plan or the consent judgment, and then, your Honor, we'll have an opportunity to, you know, take remedial steps at that point." *See* April 27, 2023 Status Conference transcript at page 52 lines 19 to 23. This apparent amenability to the Monitor's reporting shifted one month later when, on May 26, 2023, the Commissioner suggested that the Monitor should not file the Special Report because it "will do the Department great harm [. . . .]" and "fuel the flames of those who believe that we cannot govern ourselves."

  - o  <u>Misleading Statement Regarding Monitoring Team's Access to Department Staff</u>: The Commissioner advised the Court that he "support[s] the monitoring team being able to speak to any employee or staff member that they feel they need to speak to understand, to get a nuance of the situation." *See* April 27, 2023 Status Conference transcript at page 25 lines 17 to 19. However, one month later, on May 26, 2023, the Commissioner stated that the Monitoring Team would not be permitted to speak with certain staff to obtain a briefing because "[b]riefings on ongoing investigations are hardly the norm," and because the Commissioner "[doesn't] know what [the Monitor] would expect [from a briefing]."

- o Misleading Position Regarding Considering the Monitoring Team's concerns:
  During the April 27, 2023 Status Conference the City reported that "[t]he
  department carefully considers all of the concerns and data presented by the
  monitor's thorough and painstaking work and is thankful for the monitor's help in
  achieving our shared goals. Under Commissioner Molina's leadership, the
  department has worked hand in hand with the monitoring team to track results and
  resolve problems." at page 14 lines 10 to 15. Contrary to this assertion, less than
  one month later the Monitoring Team raised significant concerns about a number
  of serious incidents (ultimately reported in the Monitor's May 26, 2023 Special
  Report). Instead of "working hand-in-hand with the monitoring team" to address
  these concerns, the Commissioner's response to the Monitor on May 26, 2023
  was strident and defensive and he suggested that the Monitoring Team's concerns
  were "hyperbole." As outlined in this report, the concerns regarding the five
  incidents highlighted in the May 26, 2023 Special Report have only intensified as
  additional information has been obtained that suggests that the Monitoring Team's
  concerns were clearly warranted.

**_Incomplete, Misleading and Inaccurate Information Provided to the Monitoring Team_**

The Monitoring Team has identified several instances where the City's and Department's
information provided to the Monitoring Team was either incomplete, misleading, or included
factual inaccuracies.

- **Failure to Provide the Monitoring Team with Information Necessary to Perform Its
  Responsibilities**: On May 26, 2023, the Commissioner advised the Monitoring Team that
  "[i]t is not a requirement under the Consent Decree or the Action Plan for [the
  Department] to report deaths in custody." The Commissioner's claim that the Department
  is not required to provide this information is inaccurate. Information about this incident,
  including death, relates to many provisions of the *Nunez* Court Orders including, but not
  limited to the Second Remedial Order, ¶ 1(i)(b), Action Plan, § D, ¶ 2(g), §G, ¶ 4 (b)
  (iv)(1). As a result, the Monitoring Team is entitled to access such information to
  "perform [their] responsibilities." Consent Judgment § XX, ¶ 8.

This record is replete with examples of the relevance and need for this information, and which, until earlier this year, was provided. On October 7, 2021, the Monitoring Team submitted Request 2511[13] seeking routine notification of in-custody deaths. The Department immediately began to comply with this request and its first notification of an in-custody death occurred on October 15, 2021. Further, since 2021, the Department, in response to requests from the Monitoring Team, has also routinely provided additional information regarding in-custody deaths including, but not limited to, official causes of death, status of investigations, and other relevant information. Beginning in 2022, the Commissioner (or the First Deputy Commissioner) also began briefing the Monitoring Team on every in-custody death and compassionate release. *See* Monitor's October 28, 2022 Report at pg. 17. The Commissioner also reported on in-custody deaths during his appearance on *Nunez*-related matters before the Court on November 17, 2022.[14] Further, on February 7, 2023, the Department reported on in-custody deaths to the Parties and the Monitor in its Compliance Report (a confidential report required to be produced to the Parties and Monitor pursuant to Consent Judgment § XIX, ¶ 1). In that report, the Department explained that the information on in-custody deaths was provided in response to the Court's November 21, 2022 Order (dkt. 482) in which the Department was directed to provide information required by the Action Plan § G, ¶ 4(b), which includes the requirement to report on in-custody deaths. The Department also advised the Court in its April 25, 2023 Status Letter (dkt. 523) about the City's efforts to address suicide prevention and it had "developed and convened a mortality review committee to analyze in-custody deaths." *At* page 6. The last notification the Monitoring Team received regarding an in-custody death occurred on February 4, 2023.[15]

---

[13] The Monitoring Team's request sought "Notice of Deaths in Custody: As soon as practicable (and no later than 24 hours), the Monitoring Team must be advised of any death in custody. If available (or provided later), please provide the COD and any additional information regarding the circumstances of the death."

[14] *See* Commissioner's testimony at the November 17, 2022 Status Conference at page 20 lines 4 to 15.

[15] The Monitoring Team was also provided additional details regarding this incident and potential management failures from various Department leaders subsequent to the notification on February 4, 2023.

On May 17, 2023, the Monitoring Team learned from a media report that an individual died while in custody on May 16, 2023.[16] The Department did not proactively inform the Monitor about this event as required, as described as Incident #2 in the Monitor's May 26, 2023 Report. Along with claiming that the Department is not required to produce such information, the Commissioner also claimed that the Monitoring Team's follow-up requests to obtain the information was not received because it was caught in a "spam" folder.[17] Regardless of whether the Department received the Monitoring Team's request for more information, the Department had an obligation to proactively provide the information and failed to do so and the Monitoring Team only obtained the information through a press report. On May 31, 2023, a news article reported that the Department has stated that it will now no longer notify the media when an individual dies in custody.[18] On June 5, 2023, the City reported that it now does intend to timely notify the Monitoring Team of deaths in custody. The City explained it does not believe that the Consent Judgment and Action Plan include an express notification requirement for deaths in custody,[19] however, the City conceded, that "the Monitor has requested such notification and that the information is needed by the Monitor to fulfill its duties under the Consent Judgment, Action Plan and other orders." With respect to the notifications

---

[16] *See* Graham Rayman, Rikers Island detainee dead after apparent jump at jail complex; was charged in Brooklyn murder, DAILY NEWS, https://www.nydailynews.com/new-york/ny-jump-rikers-20230517-lj2szn5chfevndx3zx3hvri3rq-story.html.

[17] On May 30, 2023, the Monitoring Team requested the City and Department "take immediate and reasonable measures to ensure communications from the Monitoring Team are routed appropriately" and to ensure "[a]ny particular filters on the City and Department email systems related to certain senders are a matter in the City and Department's control and must be corrected to ensure timely receipt of requests" from the Monitoring Team. The Department has subsequently reported that the Department's IT Division they "have taken appropriate steps to ensure that future emails from the Monitoring Team" to the First Deputy Commissioner, General Counsel and Supervising Assistant General Counsel. The City has reported that it is also working with its IT Department to ensure it receives communications from the Monitoring Team without delay.

[18] *See* Reuven Blau, City Jails No Longer Announcing Deaths Behind Bars, Angering Watchdogs, Detainee at City's Floating Jail Was on Life Support for Two Weeks After Guard Tackle, THE CITY, https://www.thecity.nyc/2023/5/31/23744666/correction-jails-not-announcing-deaths-rikers.

[19] Repeated claims that certain information (such as deaths in custody) is not "explicitly" required to be produced fails to appreciate the role of the Monitor. In order for the Monitor to perform his duties, the Monitor necessarily must have the latitude to request information as necessary and not be limited to information that is "expressly" required. The Monitor simply could not do his work with such an approach.

moving forward, it is unclear if the City or the Department intends to make these notifications to the Monitoring Team and whether they intend to provide the information within 24 hours as requested.

- **Inaccurate Reports and Failure to Provide All Available Information to the Monitor**: Certain information provided by the Department appears to be inaccurate, ambiguous or misleading.

  o <u>Inaccurate Statements About Assignment of ESU Leadership</u>: In response to public reports questioning the fitness of a potential candidate to lead ESU, the Department reported to the Monitoring Team on April 21, 2023 that no final decision had been made on ESU leadership, despite having transferred the individual originally tapped for this role (who had a very concerning background suggesting he was unfit) to ESU on April 17, 2023 (the Monitoring Team only learned about this transfer after the Department's April 21, 2023 report). A different individual was subsequently identified and transferred to serve as the leader of ESU. In response to subsequent inquiries to determine whether the original ESU leader candidate had been transferred out of the unit, the Monitoring Team received two different responses on the same day in May 2023. One reported that the individual was still assigned to ESU while the other reported the individual had been transferred back to work in a facility during the prior week. On June 5, 2023, the Department reported that the individual has been removed from ESU.

  o <u>Statements About Five Serious Incidents</u>. The five incidents identified in the May 26, 2023 illustrate a concerning trend in which information provided to the Monitoring Team was either inaccurate or incomplete based on facts known to the Department (or reasonably should have been known) at the time the report was made. This is particularly concerning given that the information came from the Commissioner and other high-ranking officials. The Monitoring Team's subsequent inquiries revealed (1) premature conclusions about Departmental wrongdoing, (2) the perpetuation of inaccurate information, and (3) multiple failures to provide timely, accurate and complete information.

- **Failure to Encourage Staff to Cooperate with the Monitor**: Despite the Consent Judgment's requirement that staff are to be encouraged to cooperate with the Monitor, the Monitoring Team has learned that, in at least some cases, the opposite is true.

  o <u>Staff Elected Not to Speak to Monitor for Fear of Reprisal</u>: Some DOC staff reported that they did not feel comfortable speaking openly and candidly with the Monitor because of fear of reprisal by the then Deputy Commissioner of Investigations were he to learn of such communications.[20]

- **Inconsistency in Department's Reporting**: Two dynamics lead to inconsistent reporting: (1) the Department's strategy for managing certain issues changes abruptly and (2) the agreed upon approach to an issue has not been effectively communicated to the various actors involved. For example:

  o <u>Shifting Positions on Tracking Individuals in Intake</u>: The Monitoring Team's recent site work reveled at least some situations in which an individual was in intake but was not being tracked according to the Action Plan's requirements. In response to inquiries onsite, Intake Staff reported that certain individuals did not need to be entered into ITS despite being physically present in the intake (*e.g.*, those who are expected to be in intake for only a short period of time, those individuals being transferred out of state, and those individuals being moved to another facility to attend a particular event). The Monitoring Team advised the Department of its findings on May 30, 2023 and the Department advised the Monitoring Team, for the first time, that certain individuals in intake are not being tracked because their placement in intake was "not a *Nunez* issue." The basis for the Department's position that certain individuals present in intake do not need to be tracked is not consistent with the requirement in the Second Remedial Order and the Action Plan which require the Department to develop and implement a "reliable system to track and record the amount of time any incarcerated individual is held in Intake [. . .]" Second Remedial Order, ¶ 1(i)(c) as incorporated into § E, ¶ 3(a) of the Action Plan. Furthermore, the approach is not

---

[20] *See* Monitor's April 3, 2023 Report at 158.

aligned with the Department's report to the Court on January 10, 2023 (dkt. 495) that "[a]ll persons in custody entering or exiting an intake area will be manually scanned and tracked by ITS" (at pg. 4) and in the April 17, 2023 Miller Affidavit (dkt. 519) which stated "[. . .] each facility is responsible to record the time an individual enters and leaves intake area in the Inmate Tracking System ("ITS") using the bar code on the individual's accompanying card [. . . ]" *See* Paragraph B 10. Finally, the Department's own policy requires "[a]ll PIC's Entering / Exiting an Intake Area shall be tracked by the ITS system." The Department has not yet responded to the Monitoring Team's feedback on this issue.

o  <u>Shifting Positions on Whether Awarded Posts Can be Reduced as Required by the Action Plan</u>: In order to optimize staff deployment and scheduling, the Action Plan § C, ¶ 3(v) requires the Department to reduce the number of staff with "awarded posts." The City and Department on numerous occasions have insisted that the collective bargaining agreement does not prevent the Department from reducing the number of staff on awarded posts. However, on at least three different occasions, following each assertion by the City and Department that there are no barriers to reducing the use of awarded posts, the Monitoring Team has been advised by the Staffing Manager that the Department cannot unilaterally reduce awarded posts and the collective bargaining agreement remains an impediment to changes in practice. To date, the Department has not reduced the number of individuals with awarded posts. The Department has presented multiple plans on how it intends to do so, but none have been implemented and the Monitoring Team's feedback and questions related to the latest plan remain unanswered.

o  <u>Shifting Position on Appointing a *Nunez* Manager</u>: The Department's position on whether it intends to appoint a Nunez Manager as recommended[21] by the

---

[21] The Monitoring Team has recommended the Department "[i]dentify an individual to manage the Department's overall compliance efforts with the Court's orders. An incredibly unique skill set is required. This individual must have appropriate and recognized authority, a command of the Department's entire operation, and a nuanced understanding of the requirements in the various Court orders in this matter. Their core tasks are to set priorities and resolve conflicts within those priorities that

Monitoring Team remains unknown. At the end of March 2023, the Commissioner reported to the Monitor and Deputy Monitor that he intended to appoint a *Nunez* Manager and proposed a candidate. Since then, Department leaders have reported different positions on whether a *Nunez* Manager will be appointed. In late April 2023, in a meeting with the Commissioner and other agency leaders, a senior Department Executive reported to the Monitoring Team that the Department objected to appointment of the *Nunez* Manager because they viewed the role as just another person that the Deputy Monitor would call. A few days later on May 1, 2023, the First Deputy Commissioner reported that a *Nunez* Manager would be appointed within a few days. While a *Nunez* Manager was not appointed, on May 4, 2023, the Department reported it intended to adopt the recommendation of appointing a *Nunez* Manager. Then, on May 11, 2023, the Department reported "[t]his is still under discussion." Since then, the Department has not engaged in any further discussion with the Monitoring Team about its position on the *Nunez* Manager and one has not been appointed.

- **Questionable Data Integrity**: Several events have raised questions about the veracity with which the Department vetted information provided to the Monitoring Team.

  - <u>Inaccuracy of Awarded Post Data</u>: In mid-May 2023, the Department reported that data provided on the number of staff on "awarded posts" since late 2021 to mid-2023 was not accurate. It appears the Department only determined the data was not accurate only after repeated follow-up by the Monitoring Team. Further, only after repeated follow-up, questions and attempts from the Monitoring Team to better understand this discovery that the information was not accurate did the Department report that staff are now "doing a count of the posts actually awarded - -i.e., for which we have documentation. The number will be less than 1,600 and perhaps significantly so." It is unclear why this obvious step to verify the accuracy of information only occurred now as it should have occurred prior to

---

may demand the same resources; anticipate potential barriers to implementation; communicate proactively with the Monitoring Team regarding upcoming initiatives, progress and obstacles encountered; and respond to the Monitoring Team's feedback and ensure it is incorporated into practice." *See* Monitor's Recommendations from April 3 and 24, 2023 Reports (dkt. 527) at page 9.

submission to the Monitoring Team or in response to the Monitoring Team's repeated requests about the data over the last year. The Monitoring Team sent detailed follow-up questions to the Department to, among other things, understand how this discrepancy in the data occurred, to verify whether the new data is accurate, and what it says about the Department's ability to reduce the number of awarded posts. The Monitoring Team has not yet received a response despite a request that the information be provided by May 22, 2023.

o   <u>Inaccuracy of Medical Incompetence Data</u>: In a similar situation where information was not properly vetted, in mid-May 2023, the Legal Division reported that the Trials Division identified that the Medical Incompetence disciplinary data previously provided to the Monitoring Team did not capture all cases. The Monitoring Team had previously provided detailed feedback and had engaged in numerous discussions with Department staff regarding this data, as recently as the day before receiving this notification, but had not been advised that there might be issues with the data. Only when following up on the status of the Department's work to address the Monitoring Team's recommendations regarding case closure did the Department disclose that they had underreported the number of pending cases. Because the Department did not provide any additional information regarding the reason for the inaccuracies when notifying the Monitoring Team about the problem, the Monitoring Team had to follow-up and learned "[d]ue to an update, one of [the Department's] computer systems was unexpectedly down for approximately two weeks in late April/early May so we were unable to cross check data, thereby resulting in discrepancies. [The Department has] been informed by IT that the system is currently functioning properly." It must be noted that the data provided to the Monitoring Team was provided in late March, not late April, so it is unclear how this impacted the March data.

- **Failure to Consult on *Nunez* Related Policies and Practices**: The Consent Judgment, Remedial Orders and Action Plan require the Department to consult and at times receive approval from the Monitor on certain policies.

o <u>Utilization of "Soft-Hand Force" for Court Refusals</u>: The Department reported it
is now utilizing "soft-hand force" with those who refuse to go to court in order to
transport them to court. The Department did not consult or seek approval from the
Monitoring Team on this change in practice regarding use of force. The
Monitoring Team only learned that the Department was utilizing this tactic
through media reports.[22] In response to the Monitoring Team's inquiry to the
General Counsel, he reported that the Commissioner approved this practice in
April 2023 following recommendations from the General Counsel and the Deputy
Commissioner of Facility Operations, Classification and Custody Management
and claimed they reverted to the practice "employed prior to late 2022 when force
was used to get people to court when necessary."[23] It is unclear what prior
practice is being referenced. The Department reported that no written guidance
has been produced and so it is unclear as to when and under what circumstances it
can be used (*e.g.,* what constitutes a refusal, at what point soft-hand force may be
used once an individual refuses, whether staff are required to utilize verbal
communication first). Without more information, it is unclear whether such an
approach is appropriate or consistent with the Use of Force Directive. A response
was not provided to the Monitoring Team's inquiry as to why the Department did
not consult or seek the Monitor's approval on this change in practice but it
appears the Department did not engage in consultation because no *written* change
in written policy occurred. It was also reported that force was used three times for
court production refusals in May 2023 and posited that this practice resulted in a

---

[22] *See* Matt Katz, Rikers Island exists to make sure people show up to court. That's not happening, THE
GOTHAMIST, https://gothamist.com/news/rikers-island-exists-to-make-sure-people-show-up-to-court-
thats-not-happening.

[23] The Monitoring Team was unaware that such practices were "employed prior to late 2022."  As way of
background, in March 2022 and early April 2022, the General Counsel at the time sought the Monitoring
Team's input on whether use of force could be used when individuals refuse to go to court. Several
exchanges occurred as the Monitoring Team sought additional information. However, DOC provided no
response to the Monitoring Team's last request information and the relevant General Counsel left the
Department on April 8, 2022. The issue was not raised again until December 2022, when the current
General Counsel reached out to the Monitoring Team regarding a rise in individuals who were refusing
to go to court and shared some data. The General Counsel indicated that the Department was considering
using force in these situations. The Monitoring Team advised that a specific proposal was needed, but the
Department did not provide one.

reduction in court refusals from 1,100 in March 2023 to 150 court refusals in May 2023. The Monitoring Team has not assessed this data to determine its veracity, but such a claim (and whether the Department's data is accurate) is questionable. That the use of soft-hand force in only three cases could result in such a significant change in outcomes across the Department in such a short period of time is doubtful.

- o Screening Staff for Promotion and New Admissions Processing. Despite the clear requirements of the Consent Judgment—and the Department's own internal directive on policy development—to consult with the Monitoring Team on policy development, the Department promulgated policies related to Screening Staff for Promotion and New Admission Processing (as discussed above) without consulting the Monitoring Team or providing a draft policy for review and comment.

- **Inability to Produce Relevant Information, Manage Deadlines and Priorities**: There is a pervasive need for dogged prompting from the Monitoring Team to ensure deadlines are met.

  - o Delayed Promulgation of Sick Leave and Absence Control Policies: The Action Plan's deadline to update Sick Leave and Absence Control policies elapsed in September 2022 with no action from the Department. At the time, the Monitoring Team shared detailed feedback on possible revisions to the policies and only after eight months of persistent effort by the Monitoring Team were the policies revised and finally promulgated. Further, the Monitoring Team's continuous prompting and inquiry was necessary to ensure the Absence Control policy was promulgated on the newly instituted deadline of May 15, 2023.

  - o Limited Engagement on Monitoring Team's April 2023 Recommendations (dkt. 527): While its early actions suggested the Department would appropriately engage with the Monitoring Team on its recommendations,[24] the Department's engagement with the Monitoring Team's recommendations slowed and is now

---

[24] *See*, April 27 Status Conference at 67 lines 1 to 18.

languishing. On May 4, 2023, the Department advised it intended to adopt the Monitoring Team's Recommendations outlined in the April 3 and 24, 2023 reports, absent three recommendations that required further discussion, and that a "detailed plan" regarding its approach would be provided on May 11, 2023. On May 11, 2023, some information was provided, but it was not the fulsome accounting of the pursuit of compliance that is needed at this juncture. For example, the only information regarding progress toward the recommendations regarding security plans explained that "[the Security Manager provided the Monitoring Team] a demonstration of the OC Dashboard May 10, 2023."[25] Further, despite repeated requests for information regarding the Department's approach to improving ESU screening to ensure the Monitoring Team's feedback was being addressed, the Department has failed to engage the Monitoring Team, only reporting that the re-screening of all staff assigned to ESU will be done in early June 2023. Whether the screening process will address the Monitoring Team's feedback is unknown. Overall, the Monitoring Team has requested a description of the Department's plans to address each of the recommendations along with specific follow-up questions related to the Department's updates. Given the Department's record, the Monitoring Team anticipates that several additional rounds of follow-up, over a protracted period of time, will be necessary.

In addition to confounding the Monitoring Team's efforts to hold the Department accountable, the most important consequence of the Department's lack of commitment to consultation and the quality of information it provides is that it negatively impacts the Department's own efforts to adequately satisfy the requirements of the *Nunez* Court Orders and demonstrate areas where tangible progress is being made.

---

[25] The Security Manager has subsequently reported on a few initiatives underway, such as roll call trainings, but an overarching plan to address security issues has not been provided.

## Conclusion

The deterioration in accuracy, transparency and collaboration is problematic because it calls into question the Department's ability to manage its responsibilities under the *Nunez* Court Orders and because it jeopardizes the Monitoring Team's ability to function fully and support the shared goal of increasing safety in the City's jails. Certainly, in order to fulfill its obligation to assess compliance with over 400 provisions of the *Nunez* Court Orders, the Monitoring Team requires the Department to produce a significant amount of information, including routine data, information, and various reports on a weekly, bi-weekly, and monthly cadence. The Department also responds to *ad hoc* requests from the Monitoring Team which are made to advance the Monitoring Team's understanding of core issues and events, or to assess progress toward intermediate goals related to any of the various Court Orders.

Unfortunately, the accuracy, thoroughness, and production speed of information has noticeably degraded over the last year. Accordingly, the Monitoring Team has been required to expend significantly more time verifying the accuracy of information, filling gaps in information, and untangling discrepancies in order to fulfill its duties. Increasingly, the Department has begun to voice complaints about the frequency and volume of the Monitoring Team's requests. The Monitoring Team appreciates the significant burden on the Department to comply with the *Nunez* Court Orders. However, just because the Department shares a significant amount of information with the Monitoring Team does not absolve the agency from responding to *all* requests and providing information in a timely, reliable, and accurate manner. Further, the provision of more fulsome responses in the first instance and proactive provision of information would reduce the need for follow-up and expedited production of information after the fact. Finally, there is no basis to suggest that the information requested by Monitoring Team (with its

37

four full-time and three part-time members) cannot be managed by a Department with over 7,000 employees and a City that continues to report it will adequately resource the reform effort.

Nearly 15 months have elapsed since the Monitoring Team first requested that the Court "direct the Department to return to fully proactive and transparent communication practices with the Monitoring Team" *See* Monitor's March 16, 2022 Report (*see* pgs. 29-30). The circumstances have only become more troubling since that time. Accordingly, the Monitoring Team renews its request to the Court that additional direction and orders are necessary to ensure the Monitoring Team can fulfill its responsibilities under the *Nunez* Court Orders. The Department's actions and the Monitor's efforts detailed in this report demonstrate that the Monitor has exhausted the available options and requires specific enforceable orders to ensure that the Monitor can fulfill his responsibilities under the *Nunez* Court Orders. The Monitor therefore respectfully requests that the Court direct the Department to take the steps enumerated in Appendix C which are necessary for the Monitor to fulfill his responsibilities.

# UPDATE ON FIVE INCIDENTS DETAILED IN THE MONITOR'S MAY 26, 2023 SPECIAL REPORT

The five incidents described in the Monitor's May 26, 2023 Special Report reflect a pattern of serious operational failures in the management of the incidents themselves and deficiencies in the Department's response. Each incident, on its own, is disturbing, and the fact that the five incidents occurred over just a nine-day period is extremely troubling. Unfortunately, the problems illuminated by these events are not "new" or "emerging." They characterize the variety of failures that gave rise to the Consent Judgement and have since continued unabated. A summary of each of the five incidents and relevant information is included in Appendix B of this report.

On May 31, 2023, the Court directed the City to provide the Monitoring Team with a status report containing "any outstanding information . . . regarding Incidents # 1 to #5 outlined in the [Special Report]" (dkt. no. 533 at 20) and, consistent with Consent Judgment § XIX, ¶ 8, the information enumerated in Plaintiffs' May 26, 2023, letter (dkt. no. 534 at 1-2) for each of the five incidents, including [a number of enumerated items]." (dkt. 535 at pg. 1). As required, the City provided the Monitoring Team with a written report and corresponding materials on June 5, 2023. The Department and City have also provided the Monitoring Team with over 240 documents related to the incidents, including surveillance footage, handheld and body-worn camera videos, medical records, photos of logbook entries, injury reports, staff reports, investigative reports and case folders, rapid reviews, COD reports, disciplinary paperwork, and

correspondence, both internal and with other agencies.[26] The Monitoring Team has provided the parties a detailed list of all materials received in order to facilitate discussions regarding production of this information to the Parties in response to the requests from counsel for the Plaintiff Class for this information pursuant to § XIX, ¶ 8 of the Consent Judgment.

This section of the report provides a summary on the various operational failures identified through these cases, the Department-wide remedial steps the Department has committed to take to strengthen practice, and the City's and Department's position on notifying the Monitor of certain events going forward.

### *Illustrative Operational Failures*

On June 5, 2023, the City asserted to the Monitoring Team that it does not believe that these five incidents "show a pattern of unsafe practices or other violations of the City's obligations to the Court or the Constitution." While each of these five incidents have unique circumstances (as all events do), together the Monitoring Team believes they encompass a series of issues that are illustrative of the many failures identified throughout the history of this case and remain present in current operations.

---

[26] The City has reported that it is aware that some additional medical records remain to be produced and it is working with the medical providers from Health + Hospital Corporation to produce them to the Monitoring Team as soon as possible.

- **Serious Injuries**

All five incidents resulted in significant harm to individuals in custody. Two individuals have died,[27] one is paralyzed, one has fractured ribs and his spleen was removed, and one individual is in the hospital in critical condition.

- **Questions about Specific Assertions within Individual Cases**

In a few cases, the information produced by the City and Department on May 26, 2023 and June 5, 2023 raises questions about the veracity and care with which these cases have been evaluated. For example, with respect to incident #1, the initial incident was reported as a use of force via the Central Operations Desk ("COD"), however, the second use of force in the search room was not initially reported to COD, and still goes unreported. The Department acknowledges a second use of force occurred, but the second use of force still has not been officially reported via COD. In practical terms, this means the second use of force is not included in the Department's monthly use of force data. Furthermore, at least nine days after the incident, the COD had not been updated to include information about the extent of the injury.

With respect to incident # 2, the City and Commissioner both reported that "[t]wo officers were present on the floor of the housing unit." However, at the time the individual jumped from the second tier; the second officer did not appear to be physically present on the floor, but rather inside of a cell on the top tier that had been converted to an office, seated at a desk with the door closed and therefore was not providing direct supervision of the people in custody on the floor of the housing unit.

---

[27] One of the two individuals was compassionately released before he died. An incarcerated individual may be immediately released from confinement due to extraordinary or compelling circumstances that were not present at the time the individual was initially incarcerated.

With respect to incident #5, the necessity of holding an elderly individual in a pen alone for four hours and keeping him rear-cuffed for the duration has not been fully explicated in any of the information received by the Monitoring Team. The individual remained rear-cuffed for four hours before a medical evaluation began. Section II.B of the Department's Directive on restraints 4522R-B, which was subject to the approval of the Monitor, requires that restraints may only be applied when necessary and for the least amount of time necessary to gain control of the individual. Further, a staff member must document their observation of the individual in restraints every 15 minutes pursuant to Section VI.B of the restraint directive. While in restraints, the elderly individual was passive and alone in a pen. It is therefore *at least* questionable whether the use of handcuffs for this prolonged period of time was necessary and, in fact, may have been excessive. While some supervisors did check on the individual during the time he was in the pen, it is unclear whether active supervision at 15-minute intervals occurred.

- **Staff Reporting**

At least four of these five incidents reflect serious concerns about the veracity with which staff report incidents involving serious injuries. In one instance, the self-harm incident (which later resulted in death) was reported 33 hours after the incident occurred. In another, an individual suffered serious injuries that ultimately resulted in death and the only report about the event was a handwritten logbook entry about the hospital run. In yet another incident, serious injuries sustained by a person in custody were not reported until 69 hours after the incident occurred and only after the Monitor brought the incident to the Department's attention. Finally, as discussed above regarding incident #1, Department records have still not been updated to reflect that two uses of force occurred or the nature of the individual's injuries.

- **Management of Intake**

The conditions within Intake have been subject to significant scrutiny and motion practice before the Court. Incident #3 with its alleged deficiencies in supervision, care, and reporting in the EMTC intake unit, is similar to incidents that occurred in November 2019 in GRVC's intake involving a young adult who attempted suicide and an incident in August 2021 in OBCC's intake when a person in custody sustained life-altering injuries and was taken to the hospital, but the event went unreported until the Monitoring Team inquired.[28] Incident #3 along with Incident #5 (where, as discussed above, an individual was subject to prolonged mechanical restraint and may not have been appropriately supervised) raise serious concerns regarding the management of individuals in the new admission intake and the Department's ability and commitment to ensure safety, and to provide adequate supervision, timely medical care, and accurate reporting.

- **Failures to Provide Adequate Information to the Monitoring Team**

The Department's response to the Monitoring Team's inquiries regarding these incidents calls into question whether the Department fully appreciates the serious issues that these incidents raise. The Monitoring Team raised concerns with the Department as it learned of each of these incidents. The Monitoring Team also sent a letter to the Corporation Counsel and the Commissioner on May 24, 2023 regarding Incidents # 2, #3, and #4 (the Monitoring Team was not aware of Incidents #1 and #5 at the time the letter was sent, but learned of them mere hours

---

[28] *See* March 16, 2022, Monitor's Report at Page 23. "In August 2021, an incarcerated individual held in an intake cell was beaten by another detainee and suffered significant injuries—he is paralyzed from the neck down and had multiple broken ribs and a collapsed lung which necessitated a ventilator. This assault was not reported and so it was not investigated through the normal channels; instead, Monitoring Team's inquiries brought this otherwise unreported assault to light. The facility did not report the assault and no injury report was generated."

after sending the letter). The Monitoring Team's communications stated that the concerns raised by these cases needed to be addressed immediately and that the Monitoring Team was compelled to file a Special Report given that the incidents presented exigent circumstances and the Court must be made aware. In particular, the Monitoring Team raised concerns about the serious risk of harm, staffs' failure to either timely report or report these incidents at all through internal channels, the management of intake, and overall concern about the provision of information to the Monitoring Team. In response to these concerns, the Commissioner claimed that they were "hyperbole," despite the significant basis for concern laid out in the Monitor's letter. The information gathered since the Monitor first raised these issues has only heightened the original concerns, given that two additional incidents were identified, and that information subsequently gathered contains evidence of a variety of poor practices and casts doubt on the veracity of the information reported internally and to the Monitoring Team.

The Department's response to requests for information regarding these cases also further causes concern regarding the Monitoring Team's ability to trust the information provided by the Department. Three such examples are provided below which supplement the concerns raised in the Monitor's May 26, 2023 Special Report, May 31, 2023 letter to the Court, and other sections of this report.

First, on May 26, 2023 the Commissioner asserted in two separate cases (Incidents #2 and #4) that there was "no departmental wrongdoing" when objective evidence suggests, *at a minimum* that an investigation into the circumstances was necessary. With respect to incident #2, despite the original assertion that staff behaved within the boundaries of policy, the Department now concedes, that there is a question with respect to whether reporting of the self-harm event occurred pursuant to policy and an investigation of the overall incident has been initiated.

Further, there are questions regarding whether there was active supervision. As for incident # 4, an investigation is now underway to address the multitude of open questions, including how the individual sustained the injury and the role it may have played in his death. As noted in the Monitor's May 26, 2023 Special Report, the Department's conclusion that there was "no Departmental wrongdoing" was premature and speculative.

Second, with respect to Incident #1, a Deputy Commissioner unequivocally reported the cause of the individual's injuries to the Monitoring Team, relating that the injury was due to a pre-existing condition that was exacerbated when he fell trying to tie or put on his shoes. Given that this report was not consistent with the video evidence, the Monitoring Team requested that the Deputy Commissioner provide the basis for his initial claim of the cause of injury. In response, the Deputy Commissioner provided the information that he used to formulate his conclusion. This conclusion was based on information that he received 12 days prior, and appeared to be based on a summary of an interview with the incarcerated individual who simply explained he had bent down to tie his shoe but did *not* state that was the cause of his injury. The underlying information provided to the Monitoring Team, that the Deputy Commissioner had at the time he responded to the Monitoring Team (and was in his possession for at least 12 days prior to the report to the Monitor), also included that the individual had hit his head and a litany of operational concerns and issues related to the incident that were not originally disclosed. This makes it difficult to understand the subsequent report from the Deputy Commissioner that the information provided on May 24 included all the "medical and situational" detail available at the time because it actually did not. Further, while the Monitoring Team appreciates that investigations are dynamic and fluid, instead of providing the Monitoring Team with the facts and information known to him at the time, the Deputy Commissioner provided an unequivocal

conclusion about the cause of the injury, which obfuscated the full extent of the issues presented by this incident. While it certainly is important to take greater care when sharing information, at its core the issue is simply about providing the available information at the time when it is requested.

The Monitoring Team had similar concerns with respect to the description of the cause of the injuries related to the individual in Incident #4. On May 26, 2023 the Commissioner asserted that the "[department] know[s] of no other details; you know what [the Department] know[s] about the case." However, in response to follow-up from the Monitoring Team to determine the veracity of the information provided, the Department reported on May 31, 2023 that the information provided regarding the cause of the injury was a mistaken conclusion drawn about medical information that was available at the time the report was made to the Monitoring Team. Here, as in the cases above, these issues could easily be avoided by simply providing the available information at the time rather than attempting to draw conclusions about what it means or stridently asserting the Monitoring Team has all the information available to the Department when we do not.

There is no question that investigations are both complicated and necessary and that incoming information is often dynamic and fluid. However, in each of these cases, it appears that there was an effort to either deflect responsibility or there was a level of carelessness that resulted in the reporting of information that was inaccurate or incomplete in light of the available information at the time the reports were made.

### *Proposed Department-Wide Corrective Action in Response to Incidents*

On June 5, 2023, the City reported three Department-wide remedial steps being considered in response to these five incidents which include the following:

46

- The Department intends to promulgate a policy that people in custody should not remain unclothed for an extended period absent exigent circumstances. The timing for when such a policy would be promulgated is unknown.

- The Department is reviewing the feasibility of installing a preventive barrier in the housing unit where the individual jumped from the top tier. The scope and timing of the evaluation and potential physical plant improvements are unknown.

- The Department is evaluating whether procedures should be revised to require that an incarcerated individual who is involved in a violent encounter should be seen at the clinic on an "urgent basis" under certain circumstances that are not currently specified in its Directive. The specifics and timing of the procedural revision are unknown.

The Monitoring Team appreciates that the Department is now attempting to identify ways to improve practice based on these incidents. However, the proposals are vague and somewhat amorphous and without more detail about who will be responsible for the initiatives and the time frame in which they will be completed, it is unknown whether these steps will occur or at all. Accordingly, in order for the Monitoring Team to be able to adequately assess whether such measures have been taken, the Monitor has recommended, in the proposed order of Appendix C, that the Court direct the Department to produce a concrete plan of action to the Monitoring Team by June 27, 2023 so it may be reviewed and assessed before the Monitor's next report on July 10, 2023. Any corrective action taken with individual staff related to each incident is outlined in Appendix B.

### _Future Notifications to the Monitoring Team from the City and Department_

On June 5, 2023, the City advised that it will timely notify the Monitoring Team of any deaths in custody[29] and that the Department will notify the Monitoring Team when anyone is hospitalized for a serious injury[30] or serious condition, regardless of its cause. On June 7, 2023, the Department made its first notification to the Monitoring Team regarding the hospitalization of an individual with a serious injury. The Monitoring Team appreciates this commitment to notification. Additional work will be necessary to learn how this process will work, the scope of the information that will be provided, when notification will be made, and by whom. This flow of information will, of course, be dynamic and fluid but what is critical is that the information is shared timely, and that the most accurate and reliable information available at the time is shared rather than conclusions about what the reporter _believes_ occurred. Given the significant concerns about the City and Department's shifting positions on notification as well as overall concerns about information sharing, explicit direction from the Court to report such information to the Monitoring Team is necessary to ensure the Monitoring Team timely receives the information needed to fulfill its duty. These steps are outlined in the proposed order in Appendix C.

---

[29] In its June 5, 2023 Report, the City acknowledged that "the City is mindful that the Monitor has requested such notification [about in-custody deaths] and that the information is needed by the Monitor to fulfill its duties under the Consent Judgment, Action Plan and other orders."

[30] The City provided the following definition: "[s]erious injury is defined as any of the following injury determinations: laceration requiring sutures, staples or glue (e.g. dermabond); dislocation; structural injury to organ (e.g. corneal abrasion, hepatic laceration); fracture; tendon tear; post-concussive syndrome or head injury requiring imaging such as CT or MRI; clinical nasal fracture; amputation; blistering burn involving the face or >9% of total body surface area. A serious injury is determined by CHS."

# CONCLUSION

The City's and Department's efforts to reduce the imminent risk of harm and achieve compliance with the core goals of the *Nunez* Court Orders is stymied by the issues outlined in this report. In terms of *immediate* next steps, the Monitor has provided the Court with a proposed order in Appendix C, which he believes is necessary to ensure he is able to fulfill his responsibilities. Further, the Monitor respectfully requests that the Court impose any other such relief the Court deems just and proper to ensure that the Monitor may fulfill his responsibilities as required under the *Nunez* Court Orders and to ensure that the Court receives accurate, timely, and reliable information. A proposed agenda for the emergency Court Conference on June 13, 2023 at 9:30 a.m. Eastern is included in Appendix D.

The Monitor's Team will file its next report on July 10, 2023. Among other things, this report will describe the status of the Monitoring Team's recommendations outlined in the Monitor's April 3 and 24, 2023 Reports. Further, as required by the Action Plan, § G, ¶ 6,[31] the report shall include the Monitor's assessment as to: (a) whether the City and Department have made substantial and demonstrable progress in implementing the reforms, initiatives, plans, systems, and practices outlined in the Action Plan; and (b) whether such efforts have resulted in a substantial reduction in the risk of harm currently facing incarcerated individuals and DOC staff.

---

[31] *See* Court's May 5, 2023 Order (dkt. 529).

# APPENDIX A:
# DATA

*Annual UOF Number and Rate*









*UOF Number and Rate – January 2022 to April 2023*

| Systemwide Use of Force January 2022 to April 2023 | | | | |
|---|---|---|---|---|
| Months | Total # UOF | Average/month | ADP | Rate |
| January-June 2022 | 3241 | 540.2 | 5491 | 9.83 |
| July-December 2022 | 3764 | 627.3 | 5787 | 10.85 |
| January-April 2023 | 2135 | 533.8 | 5938 | 9.0 |

| Use of Force at RNDC January 2022 to April 2023 | | | | |
|---|---|---|---|---|
| Months | Total # UOF | Average/month | ADP | Rate |
| January-June 2022 | 653 | 108.8 | 727 | 15.0 |
| July-December 2022 | 478 | 79.7 | 812 | 9.8 |
| January-April 2023 | 266 | 66.5 | 815 | 8.2 |

| Use of Force at GRVC January 2022 to April 2023 | | | | |
|---|---|---|---|---|
| Months | Total # UOF | Average/month | ADP | Rate |
| January-June 2022 | 621 | 103.5 | 622 | 16.7 |
| July-December 2022 | 824 | 137.3 | 743 | 18.5 |
| January-April 2023 | 346 | 86.5 | 823 | 10.5 |

| Use of Force at AMKC January 2022 to April 2023 | | | | |
|---|---|---|---|---|
| Months | Total # UOF | Average/month | ADP | Rate |
| January-June 2022 | 682 | 113.7 | 1975 | 5.74 |
| July-December 2022 | 1094 | 182.3 | 2073 | 8.79 |
| January-April 2023 | 686 | 171.5 | 1972 | 8.71 |

*__Annual Number and Rate of Stabbing and Slashing__*









***Recent Number and Rate of Stabbing and Slashing from January 2022 to April 2023***

| Systemwide Stabbings/Slashings January 2022 to April 2023 | | | | |
|---|---|---|---|---|
| Months | Total # S/S | Average/month | ADP | Rate |
| January-June 2022 | 254 | 42.3 | 5491 | 0.77 |
| July-December 2022 | 214 | 35.7 | 5787 | 0.62 |
| January-April 2023 | 118 | 29.5 | 5938 | 0.50 |

| Stabbings/Slashings at RNDC January 2022 to April 2023 | | | | |
|---|---|---|---|---|
| Months | Total # S/S | Average/month | ADP | Rate |
| January-June 2022 | 70 | 11.7 | 727 | 1.6 |
| July-December 2022 | 37 | 6.2 | 812 | 0.76 |
| January-April 2023 | 18 | 4.5 | 815 | 0.55 |

| Stabbing/Sashing at GRVC January 2022 to April 2023 | | | | |
|---|---|---|---|---|
| Months | Total # S/S | Average/month | ADP | Rate |
| January-June 2022 | 58 | 9.7 | 622 | 1.55 |
| July-December 2022 | 99 | 16.5 | 743 | 2.22 |
| January-April 2023 | 34 | 8.5 | 823 | 1.03 |

| Stabbing/Sashing at AMKC January 2022 to April 2023 | | | | |
|---|---|---|---|---|
| Months | Total # S/S | Average/month | ADP | Rate |
| January-June 2022 | 49 | 8.2 | 1975 | 0.41 |
| July-December 2022 | 49 | 8.2 | 2073 | 0.39 |
| January-April 2023 | 44 | 11.0 | 1972 | 0.56 |

*__Annual Number and Rate of Fights__*









***Recent Number and Rate of Fights from January 2022 to April 2023***

| Systemwide Fights January 2022 to April 2023 | | | | |
|---|---|---|---|---|
| Months | Total # Fights | Average/month | ADP | Rate |
| January-June 2022 | 2764 | 460.7 | 5491 | 8.39 |
| July-December 2022 | 3071 | 511.8 | 5787 | 8.84 |
| January-April 2023 | 1896 | 474 | 5938 | 7.98 |

| Fights at RNDC January 2022 to April 2023 | | | | |
|---|---|---|---|---|
| Months | Total # Fights | Average/month | ADP | Rate |
| January-June 2022 | 455 | 75.83 | 727 | 10.43 |
| July-December 2022 | 451 | 75.17 | 812 | 9.26 |
| January-April 2023 | 226 | 56.5 | 815 | 6.93 |

| Fights at GRVC January 2022 to April 2023 | | | | |
|---|---|---|---|---|
| Months | Total # Fights | Average/month | ADP | Rate |
| January-June 2022 | 275 | 45.8 | 622 | 7.37 |
| July-December 2022 | 330 | 55.0 | 743 | 7.40 |
| January-April 2023 | 170 | 42.5 | 823 | 5.16 |

| Fights at AMKC January 2022 to April 2023 | | | | |
|---|---|---|---|---|
| Months | Total # Fights | Average/month | ADP | Rate |
| January-June 2022 | 676 | 112.7 | 1975 | 5.70 |
| July-December 2022 | 925 | 154.2 | 2073 | 7.44 |
| January-April 2023 | 701 | 175.3 | 1972 | 8.89 |

***Assault on Staff***





*\*\*The Department began tracking assaults on staff that did not involve a use of force in 2020. Prior years' data are not available.*

*__Deaths In-Custody & Compassionate Release__*

| NYC DOC Causes of Death, _2015 to June 08, 2023_ | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** | **2022** | **2023**[32] | **Total** |
| Accidental | | | | | | | | 1 | | 1 |
| COVID-19 | | | | | | 3 | 2 | | | 5 |
| Medical Condition | 9 | 11 | 4 | 7 | 3 | 2 | 4 | 4 | 1 | 45 |
| Overdose | | 2 | 1 | | | | 4 | 6 | | 13 |
| Suicide | 2 | 2 | | 1 | | 1 | 4 | 5 | | 15 |
| Drowned | | | | | | | | 1 | | 1 |
| Pending OCME Confirmation | | | | | | | | | 2 | 2 |
| Undetermined Due to Death Outside DOC Custody | | | | | | 4[33] | 2 | 2 | | 8 |
| Undetermined by OCME | | | 1 | | | 1 | | | | 2 |
| **Total** | **11** | **15** | **6** | **8** | **3** | **11** | **16** | **19** | **3** | **92** |

[32] This data is based on information provided by the Department. It has not been independently verified. As described in this report and others, given recent concerns regarding the accuracy and transparency of data provided, it is possible this number could be higher.

[33] 4 of the 11 individuals who passed away in 2020 were not technically in DOC custody at the time they passed away as they were participating in programs in the community and were not under the supervision of DOC staff at the time of their death and were not physically in the Department's custody (_i.e._, they were participating in Brooklyn Justice Initiatives, Specialized Model for Adult Reentry and Training (SMART), and Work release programs). The cause of death for each of these individuals is not known and categorized as "Undetermined."

# APPENDIX B: SUMMARY OF FIVE INCIDENTS FROM MAY 26, 2023 SPECIAL REPORT

The following tables include a summary of the five incidents detailed in the Monitor's May 26, 2023 Special Report and May 31, 2023 Status Letter to the Court. Each table also includes any additional relevant information that has been obtained since the filing of the Special Report and Status Letter.

| Incident #1 | |
|---|---|
| After running out of an elevator unauthorized, an individual was taken to the ground and placed in restraints when the probe team arrived. After being transported to Intake on a gurney, the individual walked to the search area. At one point, the individual stood, while rear-cuffed and shackled, as staff attempted to assist him with putting on his shoes. The individual jerked his leg toward the staff helping him with his shoes and he was taken to the floor by two staff. During the take-down, the individual hit his head on a bench, partition and the floor. The individual's body was limp as the probe team lifted him on to the gurney. | |
| **Date of Incident** | May 11, 2023 |
| **Status of the individual** | The individual underwent three surgeries and is now paralyzed from the neck down. |
| **Status of investigation** | The ID Division opened an investigation into the use of force, but that investigation is now on hold as the Department of Investigation is conducting an investigation. |
| **Corrective action imposed** | The City and Department report that corrective action has been taken with respect to at least four staff members as a result of various misconduct due to their involvement in the incident. |
| **Reporting of incident within Department** | Initial incident was reported as required, but Staff failed to report the second use of force, the individual's injury, and transport to the hospital. |

| Incident #2 | |
|---|---|
| A person in custody jumped from a GRVC housing unit's upper tier onto the floor below, after leaving a suicide note. He was subsequently taken to the hospital and placed on life support. He was removed from life support and pronounced dead on May 16, 2023. | |
| **Date of Incident** | May 14, 2023 |
| **Status of the individual** | The individual is deceased. |
| **Status of reviews/ investigation** | <ul><li>The Department and Correctional Health Services (CHS) have held two Joint Action Reviews (JAR) related to this incident.</li><li>The Special Investigation Unit is conducting an investigation. The Department reports that the Department of Investigation and Attorney General's office are also reviewing the matter.</li></ul> |
| **Corrective action imposed** | <ul><li>The Department reported it is considering the feasibility of installing a preventative barrier to be affixed to help prevent similar incidents.</li><li>No corrective action for staff reported.</li></ul> |
| **Internal staff reporting** | Staff did not report this self-harm incident until 33 hours after it occurred. The self-harm incident was reported at the same time of his death. |

| Incident #3 |
|---|
| While awaiting processing in a crowded new admissions pen in EMTC, a person in custody was repeatedly assaulted by multiple assailants. Staff responded after the assault concluded and removed the victim from the pen. The victim was left naked and alone for at least three hours. Staff who passed by did not render assistance. Three hours later, he was given underwear and provided medical assistance. He sustained a number of injuries and was taken to the hospital for subsequent treatment. The individual required intubation, sustained multiple rib fractures and a ruptured spleen which was removed during emergency surgery. |

| | |
|---|---|
| **Date of Incident** | May 17, 2023 |
| **Status of the individual** | The individual has been discharged from the hospital and is now housed at a facility on Rikers Island. |
| **Status of investigation** | The Special Investigation Unit opened an investigation into this incident, but that investigation is now on hold as the Department of Investigation is conducting an investigation. |
| **Corrective action imposed** | <ul><li>The Department is considering issuing a policy that no one should remain unclothed for an extended period of time absent exigent circumstances.</li><li>The Department is examining whether procedures should be revised to expand the circumstances where individuals must be seen at the clinic on an "urgent basis" following involvement in a violent encounter.</li></ul> |
| **Internal staff reporting** | A COD was generated approximately 69 hours after the incident occurred and only after the Monitoring Team advised the Department it had received an allegation about the event. |

| **Incident #4** | |
|---|---|
| An individual housed at AMKC was taken to the hospital for a medical evaluation after complaining of headaches to medical staff. A logbook entry indicated the transport occurred for a non-incident related condition or injury. Once leaving the unit, the individual took a turn for the worse, and was placed on life support. The Department reported that the individual was involved in a fight in mid-April, 2023. | |
| Date of Incident | May 19, 2023 |
| **Status of the individual** | The individual was compassionately released on May 24, 2023, and subsequently died on May 27, 2023. The Medical Examiner reported that the individual had a skull fracture, and that more information was needed to determine the manner of death. |
| **Status of investigation** | The Special Investigation Unit opened an investigation into this case, but that investigation is now on hold as the Department of Investigation is conducting an investigation. The Department reports that the Attorney General is also reviewing the matter. |
| **Corrective action imposed** | The Department reports that discipline was taken with respect to one staff member related to the fight that occurred in April. No other staff discipline has been reported. |
| **Internal staff reporting** | A written log book entry of the hospital run was generated. No other contemporaneous reports regarding this incident or the injury have been produced. |

| **Incident #5** |
|---|
| An elderly person with possible cognitive impairment, serious underlying health issues and limited English proficiency refused to enter a holding pen in the EMTC clinic following the medical screening for new admission. After attempting to persuade the individual verbally, staff attempted to place the individual in a wheelchair. The individual resisted and was rear cuffed by staff. He remained restrained behind the back and was left alone in a pen for at least four hours. After visiting the clinic again, he was transferred to a mental health dorm for the night and then went to the clinic the following morning with a hematuria. He was transferred to the hospital and admitted to the Intensive Care Unit. The individual remains hospitalized.[34] |

| | |
|---|---|
| **Date of Incident** | May 20, 2023 |
| **Status of the individual** | The individual remains in the hospital. |
| **Status of investigation** | The ID Division opened an investigation into the use of force, but that investigation is now on hold as the Department of Investigation is conducting an investigation. |
| **Corrective Action** | None Reported |

---

[34] The Monitoring Team has subsequently learned the individual was *not* compassionately released. He remains in DOC custody and is in the hospital.

# APPENDIX C:
# PROPOSED ORDER

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
                                           :

MARK NUNEZ, et al.,                   :
                                             :

  Plaintiffs,                       :
                                             :

  - against -                      :
                                             :

CITY OF NEW YORK, et al.,         :
                                             :

  Defendants.                   :
                                             :  **11 Civ. 5845 (LTS)(JCF)**
------------------------------------------------------------ X

UNITED STATES OF AMERICA,       :
                                             :

              Plaintiff-Intervenor,    :
                                             :

  - against -                      :
                                             :

CITY OF NEW YORK and NEW YORK CITY   :
DEPARTMENT OF CORRECTION,        :
                                             :

              Defendants.          :
------------------------------------------------------------ X

**[PROPOSED] ORDER**

xx

I.    **Monitor's Access to Information**

1.  Communicate Obligations Under the *Nunez* Court Orders[35] to All Department
    Leadership and Staff: Within 7 days of this Order:

    a.  All Department leadership and staff must be advised that they must engage
        with the Monitor and must be candid, transparent, forthright, and accurate in
        their communications with the Monitor. This communication must be
        approved by the Monitor prior to its dissemination. Within 14 days of this
        Order, the Department must provide the Monitor with verification that this
        communication was provided to all Department leadership and staff.

2.  Notification of Deaths In-Custody and Compassionate Releases in 2023: Within 10
    days of this Order, the Department shall advise the Monitor of all relevant
    information regarding individuals who have: (a) died in custody or (b) were
    compassionately released between January 1, 2023, and the date of this Order. At a
    minimum, to the extent it has not already been provided, the Department shall advise
    the Monitor of the name of each individual, the date and time of death or
    compassionate release, any report to the Central Operations Desk regarding the either
    the death or compassionate release, the cause and circumstances surrounding the
    event, and current investigative findings. Any additional information the Monitor may
    request about these incidents shall be provided by the Department to the Monitor
    within 5 business days of the request.

---

[35] The *Nunez* Court Orders, include, but are not limited to the Consent Judgment (dkt.249), the First
Remedial Order (dkt. 350), the Second Remedial Order (dkt. 398), the Third Remedial Order (dkt. 424),
the Action Plan (dkt. 465) and any other relevant Orders issued by this court in the matter prior to the
issuance of this Order and any Order in the future.

3. <u>Immediate Notification to the Monitor of Serious Events</u>: As of the date of this Order, the Department must advise the Monitor of any individual who: (a) dies in custody, (b) sustains a serious injury or serious condition that requires admission to a hospital, or (c) is compassionately released. An initial report of the death in custody; serious injury or serious condition that requires admission to a hospital; or compassionate release must occur as soon as practical, but no later than 24 hours after it occurred. The Department shall provide the Monitor with all available information at the time including any report to the Central Operations Desk regarding the event; the circumstances (to extent known) that resulted in or preceded the death, hospital admission, or compassionate release; any immediate corrective action taken and any initial investigative findings. The Department shall timely provide the Monitor with any additional information regarding the circumstances and causes of the incident as it becomes available. Any video, or other information, relating to such incidents shall be made available to the Monitor upon request.

4. <u>Produce Timely, Accurate and Reliable Information to the Monitor</u>: The Department shall promptly, and no later than within 10 business days of a request, provide the Monitor with all information that the Monitor requests to fulfill his responsibilities[36] under the *Nunez* Court Orders. In the event that the Monitor determines that he needs the requested information to be provided on a more expedited timeline in order to fulfill his responsibilities under the *Nunez* Court Orders, the Department shall make

---

[36] The Monitor's responsibilities are any and all of those requirements enumerated in the *Nunez* Court Orders, including, but not limited to, his responsibility to evaluate and report to the Court on the Department's efforts to implement any requirements of the *Nunez* Court Orders, assess the Department's compliance with the requirements of the *Nunez* Court Orders, as well as his responsibility to consult on the development of policies, procedures, and initiatives and to approve such policies, procedures and initiatives as required by the *Nunez* Court Orders.

all efforts to provide the information on an expedited timeframe. The Department shall take all necessary steps to ensure that the information provided to the Monitor is complete, responsive, and accurate.

5. Engage in Proactive Communications with the Monitor Related to the *Nunez* Court Orders: The Department shall proactively consult with the Monitor in advance of promulgating any new policies or procedures that relate to compliance with the *Nunez* Court Orders. The Department shall provide the Monitor reasonable notice and information of any such new policy and practice, at least four weeks prior to planned implementation, in order to afford the Monitor an opportunity to provide meaningful feedback and for the Department to incorporate any feedback from the Monitor prior to implementing any new policy and practice.

6. Provide the Monitor with Unfettered Access to Department Leadership and Staff: The Monitor shall have unencumbered, direct access to communicate with and seek information from all Department leadership and staff to fulfill his responsibilities under the *Nunez* Court Orders. The Monitor shall be permitted to have confidential communications with Department leadership and staff outside the presence of other Department personnel.

7. Appoint *Nunez* Manager: Within 30 business days of the Order, the Department shall designate a senior official to serve as the Department's internal *Nunez* Manager. The *Nunez* Manager's responsibilities shall be limited to the areas covered by the *Nunez* Court Orders. The *Nunez* Manager shall serve as a point of contact for the Monitor, ensure that the Monitor timely receives the information he needs to fulfill his responsibilities under the *Nunez* Court Orders, coordinate the Department's responses

to requests from the Monitor, and ensure that any recommendations or feedback provided by the Monitor concerning requirements or areas covered by the *Nunez* Court Orders are timely conveyed to the appropriate and relevant Department personnel. Selection of the *Nunez* Manager, and any subsequent *Nunez* Manager in the event the individual selected leaves or is removed from the position, shall be subject to the approval of the Monitor.

    a.  The *Nunez* Manager shall have unfettered access to all Department records and information necessary to perform these responsibilities, and the City and Department shall provide the *Nunez* Manager with sufficient resources to allow them to perform these responsibilities.

8.  <u>Notification to the Court</u>: The Monitor shall promptly notify the Court if he determines that the City or the Department are not complying with the requirements of Paragraphs I.1 – I.7 of this Order, or is otherwise not engaging with the Monitor or his team in a good faith manner.

## II.  <u>Department-Wide Remedial Steps to Address the Five Incidents Discussed in the May 26, 2023 Special Report</u>

The Department shall produce a concrete and specific plan of action related to its stated intention to (1) promulgate a policy that people in custody should not remain unclothed for an extended period absent exigent circumstances, (2) consider installing a preventive barrier in the housing unit where the individual jumped from the top tier, (3) consider revising procedures to require that an incarcerated individual who is involved in a violent encounter should be seen at the clinic on an "urgent basis" under certain circumstances that are not currently specified in its Directive and (4)consider any subsequent or additional remedial measures that alter Department

policy or procedure to address the issues identified during its review of the five incidents described in the Monitor's May 26, 2023 Report. This plan of action must include reasonable deadlines by which the Department will complete each task and identify the specific Department leaders and staff responsible for implementing these initiatives. The plan of action must be produced to the Monitor no later than June 27, 2023. The Monitor shall report to the Court on the sufficiency of the plan of action in its July 10, 2023 and identify whether additional remedial measures are necessary.

### III.   <u>Prioritize and Focus on Foundational Requirements of *Nunez* Court Order</u>

The Action Plan, § G, ¶ 5(b) shall be modified to include the language in bold below:

<u>*Modification to § G, ¶5(b) of the Action Plan - Compliance Assessment*</u>: Given the Monitor's findings in the Monitor's March 16, 2022 Special Report, (pages 63 to 65), **the Monitor's October 27, 2022 Special Report, the Monitor's February 3, 2023 Special Report, the Monitor's April 3, 2023 Report, the Monitor's April 24, 2023 Status Report, the May 26, 2023 Special Report, and the Monitor's June 8, 2023 Special Report,** the Monitor's assignment of compliance ratings for each provision of the Consent Judgment (required by § XX, ¶ 18 of the Consent Judgment) and the First Remedial Order are suspended for the time period covering January 1, 2022 to **June 30, 2023**, except for those provisions incorporated into this Order and the provisions listed below (collectively "select group of provisions").

    i.   The Monitor shall assign compliance ratings, required by § XX, ¶ 18 of the Consent Judgment, for the following provisions from the Consent Judgment and the First Remedial Order:

         1.   Consent Judgment § IV. (Use of Force Policy), ¶ 1;

         2.   Consent Judgment § V. (Use of Force Reporting & Tracking), ¶¶ 2 & 22;

3. Consent Judgment § VII. (Use of Force Investigations), ¶¶ 1 & 9(a);

4. Consent Judgment § VIII. (Staff Discipline and Accountability), ¶¶ 1, 3(c) & 4;

5. Consent Judgment § X. (Risk Management) ¶ 1;

6. Consent Judgment § XII. (Screening and Assignment of Staff), ¶¶ 1 to 3;

7. Consent Judgment § XV. (Safety and Supervision of Inmates Under the Age of 19), ¶ 1, 12 and 17;

8. First Remedial Order § A. (Initiatives to Enhance Safe Custody Management, Improve Staff Supervision, and Reduce Unnecessary Use of Force), ¶¶ 1 to 4, & 6; and

9. First Remedial Order § C. (Timely, Appropriate, and Meaningful Staff Accountability), ¶¶ 1, 2, 4 & 5.

SO ORDERED this _____ day of _____, 2023

_____
LAURA TAYLOR SWAIN
Chief United States District Judge

# APPENDIX D:
# PROPOSED AGENDA FOR
# JUNE 13, 2023 COURT CONFERENCE

**Proposed Agenda for Court Conference**
*June 13, 2023 – 9:30 a.m.*

- Updates regarding the incidents described in the Monitor's May 26, 2023 Special Report, and status of related disclosures, investigations, and remedial steps

- Defendants Compliance with disclosure and communication requirements of the Consent Decree, Remedial Orders and Action Plan

- UOF, self-harm, and mortality trends 2023 compared with 2021 and 2016

- Next steps