N6d2NunH

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    -------------------------------x

 3    MARK NUÑEZ, et al.

 4                    Plaintiffs,

 5            v.                              11 Civ. 5845 (LTS)

 6    CITY OF NEW YORK, et al.

 7                    Defendants.
                                             Conference
 8    -------------------------------x
                                             New York, N.Y.
 9                                           April 27, 2023
                                             2:00 p.m.
10

11    Before:

12                    HON. LAURA TAYLOR SWAIN,

13                                           Chief Judge

14

15

16                         APPEARANCES

17

18    EMERY CELLI BRINCKERHOFF ABADY WARD & MAAZEL LLP
           Attorneys for Plaintiff Class
19    BY:  JONATHAN S. ABADY
           DEBRA L. GREENBERGER
20
           -and-
21
      THE LEGAL AID SOCIETY PRISONERS' RIGHTS PROJECT
22    BY:  MARY LYNNE WERLWAS
           KAYLA SIMPSON
23         KATHERINE HAAS

24

25
```

N6d2NunH

1                          APPEARANCES (continued)

2

3    HON. SYLVIA O. HINDS-RADIX
          Corporation Counsel of the City of New York
4         New York City Law Department
          Attorney for Defendants
5    BY:  ALAN H. SCHEINER
          Assistants Corporation Counsel
6

7    DAMIAN WILLIAMS
          United States Attorney for the
8         Southern District of New York
          Attorney for Intervenor Plaintiff
9         United States of America
     BY:  JEFFREY K. POWELL
10        LARA K. ESHKENAZI
          Assistant United States Attorneys
11

12

13   OFFICE OF THE MONITOR
          Nuñez, *et al.* V. City of New York, *et al.*
     BY:  STEVE J. MARTIN, Monitor
14
          – and –
15
     EIXGER, LLP
16        Attorneys for Monitor Steve J. Martin
     BY:  ANNA E. FRIEDBERG, Deputy Monitor
17

18

19

20   Also Present:

21                   Commissioner Louis Molina
                     New York City Department of Correction
22

23

24

25

N6d2NunH

1          (Case called)

2          THE COURT:  Good morning.  We are here today for an

3     emergency status conference.  Today's conference was scheduled

4     at the request of the monitoring team and plaintiffs' counsel

5     in light of the monitoring team's May 26, 2023 special report

6     regarding five recent incidents that have raised serious

7     concerns about the city's and the department's ability to

8     accurately and timely report serious injuries, to safely manage

9     the individuals in its custody, and to provide the monitoring

10     team with timely and accurate information.

11          These disturbing incidents, which involve serious

12     injuries and unexplained neglect of supervision, and the

13     apparent lack of proactive reporting and cooperation in

14     following up by the monitoring team, suggest that the

15     atmosphere of commitment to progress and candor with respect to

16     safety issues on which the Court's support of recent

17     undertakings by the defendants has been premised may have

18     broken down.

19          The monitoring team has since filed supplemental

20     reports and the city and the department have made related

21     statements to the news media.

22          I will first ask that today's participants state their

23     appearances, beginning with the monitor and the representative

24     of the monitoring team.

25          MR. MARTIN:  Good morning, your Honor.  This is Steve

N6d2NunH

```
 1    Martin, the court monitor.
 2              THE COURT:  Good morning, Mr. Martin.
 3              MS. FRIEDBERG:  Good morning, your Honor.  This is
 4    Anna Friedberg.  I am the deputy monitor.
 5              THE COURT:  Good morning, Ms. Friedberg.
 6              And now counsel for the plaintiffs.
 7              MS. WERLWAS:  Good morning, your Honor.  Mary Lynne
 8    Werlwas, from the Legal Aid Society Prisoners Rights Project,
 9    for the plaintiffs' class.
10              THE COURT:  Good morning, Ms. Werlwas.  And will any
11    of your colleagues be speaking today?
12              MS. WERLWAS:  They may, your Honor, and so they are on
13    the audio line and can make their appearances through the audio
14    line.
15              THE COURT:  All right.  So if they wish to speak
16    through the audio line -- actually, let's have them state their
17    appearances so that the court reporter can hear their voices.
18              So, Ms. Simpson, are you on the phone line?
19              MS. SIMPSON:  Yes, your Honor.  Kayla Simpson, The
20    Legal Aid Society Prisoners Rights Project.  Good morning.
21              THE COURT:  Good morning.
22              And Ms. Haas.
23              MS. HAAS:  Yes.  This is Katherine Haas from the
24    Prisoners Rights Project.
25              THE COURT:  Good morning.
```

N6d2NunH

```
1              Is anyone else representative of the plaintiff class
2    on the phone line and intending to speak?
3              MS. GREENBERGER:  Good morning, your Honor.  This is
4    Debra Greenberger, Emery Celli Brinckerhoff Abady Ward &
5    Maazel, for the plaintiff class.
6              THE COURT:  Good morning, Ms. Greenberger.  And did
7    you say Mr. Abady is on, as well?
8              MR. ABADY:  Yes, your Honor.  Jonathan Abady, Emery
9    Celli Brinckerhoff Abady Ward & Maazel, also on the line, your
10   Honor.
11             THE COURT:  Good morning, Mr. Abady.
12             For the intervenor plaintiffs, U.S. Attorney's Office
13   for the Southern District of New York, who is on?
14             MR. POWELL:  Jeffrey Powell, with the U.S. Attorney's
15   office, for the government, your Honor.
16             THE COURT:  Good morning, Mr. Powell.
17             And is any of your colleagues on the phone line and
18   intending to speak?
19             MR. POWELL:  Ms. Eshkenazi is on, is participating
20   here as well.
21             THE COURT:  Good morning.  Ms. Eshkenazi, would you
22   please just state your appearance so that the reporter can hear
23   your voice.
24             MS. ESHKENAZI:  Yes, good morning.  Lara Eshkenazi for
25   the government.
```

N6d2NunH

1          THE COURT:  Good morning, Ms. Eshkenazi.

2          And counsel for the defendants.

3          MR. SCHEINER:  Good morning, your Honor.  This is Alan

4    Scheiner, from the Corporation Counsel's Office of the City of

5    New York, for the city and the Department of Correction.

6          THE COURT:  Good morning, Mr. Scheiner.

7          And Commissioner Molina, are you here?

8          COMMISSIONER MOLINA:  Yes, I am, your Honor.  Good

9    morning.  Louis Molina, Commissioner, New York City Department

10   of Corrections.

11         THE COURT:  Good morning, Mr. Commissioner.

12         I greet the members of the public and press who are

13   listening in on the phone line that was provided and I thank

14   them for attending in that way.  And participants who are not

15   on camera who have just dialed in, please mute your phones

16   unless you are requesting to speak, and I would ask that

17   counsel and the commissioner, who are on camera, mute their

18   phones when they are not speaking.

19         If you are listening on the dial-in line, please don't

20   hang up and try to dial back in if we take a break.  You can

21   put your phone on hold if you need to take a break or we call a

22   break.

23         And I remind everyone participating or listening in

24   any way that, as provided in the Court's January 19, 2021

25   standing order, neither recording, photography, nor any

N6d2NunH

retransmission of any part of this proceeding is permitted.

I will be calling on each speaker during the proceeding. Each time that you speak, please identify yourself by name for clarity of the record and for the benefit of those who have audio access only. Please don't interrupt each other or me during the hearing. If we interrupt each other, it is difficult to create an accurate transcript. But having said that and, as usual, I apologize in advance for breaking this rule because I may interrupt if I have questions.

If anyone has difficulty hearing me or another participant, please unmute and indicate that promptly. And it is important that anyone who speaks always answer any questions with words rather than by sounds, nodding, or gestures, because even though I can see many of you, the people who are listening in can't see you and the court reporter needs to be able to make an accurate transcript of what's being said.

As I noted a moment ago, today's emergency status conference was scheduled as requested by the monitoring team and plaintiffs' counsel because the monitoring team's May 26, 2023, June 8, 2023 special reports and June 12, 2023 letter, as well as media reports of remarks by the mayor of the city of New York and the commissioner of the Department of Corrections raised profound questions as to whether the city and the department are capable of making the facilities' management changes that are necessary to protect detainees and staff

N6d2NunH

1   properly, have the requisite objectivity and transparency

2   necessary to address serious incidents reliably, and advance

3   the Court-ordered reforms, and are willing to engage in

4   effective collaboration with the monitoring team.

5          It is disappointing that the current state of affairs

6   has necessitated an emergency status conference just one day

7   before the anniversary of the action plan which was entered on

8   June 14, 2022.  That action plan identified key areas of reform

9   for the department to prioritize in light of the foundational

10  impediments to implementing each requirement of the consent

11  judgment.

12         The recent reports suggest that progress on these

13  court-ordered reforms have stalled and that communication

14  channels between the monitoring team and the department have

15  broken down, and it is my intention and hope to explore these

16  issues and take appropriate steps to get things on an

17  appropriate track this morning.

18         I would first like to ask counsel for the city about a

19  proposed protective order that was filed sometime after 9:00

20  last night dealing with the provision of information to

21  plaintiffs' counsel.

22         Mr. Scheiner, I have read your letter and the proposed

23  order.  Is this something that's on consent?

24         MR. SCHEINER:  Good morning, your Honor.  This is Alan

25  Scheiner.

N6d2NunH

1          Yes.  It is submitted upon consent.  All counsel agree

2     to enter that order as an interim order, as it states.

3          THE COURT:  Very well, then.  I will enter the order.

4     And it provides for further meeting and conferring and

5     attention by the Court, if necessary.  So I will enter that

6     order in connection with today's proceeding.

7          So I would now like to begin things by asking the

8     monitor to give a short status report on the disclosures and

9     investigations and remedial steps of which the monitoring team

10    is aware with respect to the incidents that were described in

11    the report.

12         MR. MARTIN:  Good morning, your Honor, counsel,

13    commissioner.

14         I would like to begin my remarks today by emphasizing

15    that the current state of affairs in the jails remains

16    alarming, not just for the serious levels of ongoing violence

17    and frequency in which force is used, but also because of the

18    regression in the department's management in the *Nuñez* court

19    orders and its lack of transparency.

20         The monitor's role is to be an independent, neutral,

21    and objective party which monitors, assesses, and reports on

22    the department's progress in complying with the *Nuñez* court

23    orders.  We have done so for eight years.  We have reported the

24    department's progress; likewise, we have reported its failures

25    and regressions.  We are here today to report on the latter

N6d2NunH

1    with respect to three key issues:

2         1.  Five illustrative incidents in which persons in

3    custody sustained serious injuries and/or died:

4         2.  Concerns about the department's management for the

5    *Nuñez* court orders; and

6         3.  A concerning trend emerged wherein the department

7    is no longer acting in a transparent manner and has begun to

8    engage in what I can only characterize as an obstructive manner

9    that is negatively impacting the monitor team's ability to

10   fulfill its obligations to the Court and the parties.

11        I would like to offer a brief outline of how we got to

12   today's hearing.

13        In mid May, my team began to learn about a number of

14   concerning incidents and raised them with various department

15   officials.  On May 24, my office submitted an official letter

16   of notification advising the commissioner and corporate counsel

17   of our concerns about these three disturbing incidents

18   involving in-custody deaths and serious injuries and the DOC's

19   failure to notify the monitor's office.

20        Within hours of the submission of this letter, the

21   monitoring team learned of a few additional disturbing

22   incidents.  The commissioner, in a letter dated May 26,

23   provided a response that further heightened our level of

24   concern as it appeared to reflect a limited appreciation of the

25   gravity of these cases and also advised us, among other things,

N6d2NunH

1    there was no requirement to report deaths in custody to the

2    monitor's office.  He further advised us that we were not

3    entitled to briefings about ongoing investigations.  Finally,

4    he expressly discouraged the monitor's office from filing a

5    report to the Court and the parties on these matters because it

6    would cause "great harm" to the department and "fuel the flames

7    of those who do not believe the department can govern

8    ourselves."

9            This troubling lack of transparency is further

10   compounded by the fact that the Court specifically instructed

11   my office to immediately file reports with the Court if exigent

12   circumstances present themselves or if the defendants failed to

13   remain adequately engaged with the monitoring team.

14           Between May 26 and June 12, the monitoring team

15   submitted two reports and two letters to the Court outlining

16   five serious incidents that occurred over a nine-day period in

17   May, as well as a summary of the overall deterioration of the

18   department's efforts to manage the *Nuñez* court orders and the

19   lack of transparency.  These reports include detailed

20   information about these incidents to the extent available to

21   the monitoring team.

22           The commissioner and the mayor have each made claims

23   in the media which adamantly deny any wrongdoing by the

24   department or its staff with regard to these incidents.  How

25   such claims are to be given any credence -- how are such claims

N6d2NunH

1    to be given any credence when the department itself, that it

2    reported in a single incident, that is, incident number one, at

3    least five officers had already been charged with misconduct

4    ranging from improper escort to failing to secure a gate to

5    various failures to report.  Furthermore, the investigations

6    remain active in these cases so additional questions remain

7    unresolved.

8            Each incident on its own is disturbing and that the

9    five incidents occurred just over a nine-day period is

10   extremely troubling.  And unfortunately the problems

11   illuminated by these events are not new, are emerging.  They

12   characterize the variety of failures that gave rise to the

13   consent judgment and have since continued unabated.  More

14   specifically, they reflect:

15           1.  Serious injuries resulting in the death of two

16   incarcerated individuals, life-altering injuries for two

17   incarcerated individuals, and one individual remains in

18   critical care;

19           2.  Serious security breaches and operational

20   failures;

21           3.  Failures by staff to adequately report;

22           4.  Concerns about the management of intake;

23           5.  Questionable and premature specific assertions of

24   individual cases;

25           6.  The department's sharing of information regarding

N6d2NunH

1    these incidents from the time they occurred until the present

2    has raised serious concerns about its transparency and efforts

3    to proactively manage these matters.

4              With respect to the specific details of each incident,

5    the status investigations and remedial efforts, I will defer to

6    our extensive reporting in our submissions on May 26, May 31,

7    June 8, and yesterday, June 12.

8              Following the submission of the agenda, the plaintiffs

9    requested of the monitor that they be given an opportunity to

10   address questions regarding these five incidents.  I defer to

11   the Court on how it would like to proceed in view of that

12   request.

13             Thank you, your Honor.

14             THE COURT:  Thank you.

15             We will go through the agenda as set.  Mr. Martin, at

16   this point, do you believe that it is -- you have viewed the

17   questions.  I haven't seen them.  Do you believe that any of

18   them is necessary to cover an area that the monitor's report or

19   remarks or the plaintiffs' remarks would not raise sufficiently

20   or appropriately?

21             MR. MARTIN:  I don't believe so, your Honor.

22             THE COURT:  All right.  Then let's proceed with the

23   agenda as previously proposed.

24             So I will turn now to the deputy monitor to introduce

25   further remarks regarding disclosure and communications issues

N6d2NunH

1    with respect to the orders that are in place.

2                MS. FRIEDBERG:  Good morning, your Honor.  As

3    Mr. Martin -- oh, good morning, your Honor.  This is Anna

4    Friedberg.  I am the deputy monitor of the *Nuñez* consent

5    orders.

6                THE COURT:  Good morning.

7                MS. FRIEDBERG:  The monitoring team has provided a

8    detailed summary of our concerns regarding the regression in

9    the department's management of the *Nuñez* court orders and its

10   lack of transparency.  These concerns continue to grow each

11   day, as demonstrated by the need for the monitoring team to

12   update the Court just yesterday, only four days after our June

13   8 report, with additional issues that call into question the

14   veracity of information provided and the lack of transparency.

15   The monitoring team simply cannot operate under these

16   conditions and fulfill its responsibilities under the *Nuñez*

17   court orders to provide the Court and the parties timely,

18   accurate, and reliable information.

19                The monitoring team feels strongly that these issues

20   must be addressed immediately to ensure that there is no

21   further regression and to maintain the integrity of our work.

22   We appreciate that the proposed next steps will be discussed a

23   little later in this conference and we will address those items

24   at that time.

25                Accordingly, we defer to the Court and the parties to

N6d2NunH

1    address those issues related to the defendants' compliance with

2    disclosure and communication requirements under the consent

3    decree, remedial orders, and action plan.

4            THE COURT:  And so the specifics of those compliance

5    issues you believe are sufficiently set out in the extensive

6    reports that you have filed which also include a proposed order

7    which you intend to address in the next steps segment of the

8    conference.  Is that correct, Ms. Friedberg?

9            MS. FRIEDBERG:  Correct, your Honor.

10           THE COURT:  All right.  And so at this point you have

11   completed your remarks for this segment, is that correct?

12           MS. FRIEDBERG:  Correct.

13           THE COURT:  Thank you.

14           And so I will turn now to counsel for the plaintiff

15   class.  And just for those who are watching on the screens, you

16   may see me turning my head to the side.  That's no disrespect

17   for you.  I am looking at the monitor that is to the side.

18           So Ms. Werlwas.

19           MS. WERLWAS:  Good morning, your Honor, and thank you

20   very much for calling this conference today.  We know you will

21   appreciate the gravity of the harm that brings us here today.

22           We appreciate you also starting with this topic of the

23   disclosure and communication requirements, because this entire

24   remedial process is built on reliable information and

25   good-faith engagement from the city.  The lack of accurate

N6d2NunH

1    information renders this entire process unworkable.  If the

2    commissioner says, for example, that staff were removed from

3    the emergency services unit but they weren't or if the city

4    says in court that the number of awarded posts can be reduced

5    without labor law barriers and that is not true, then we are

6    all at an impasse in moving forward.

7          This process cannot work when we cannot trust in

8    court, in filings, or in meet-and-confers fundamental elements

9    of what the city is saying.

10         As a threshold matter, I want to note that we, the

11   plaintiffs' counsel, are at a disadvantage here in that we have

12   not received the materials that were given to the monitor and

13   the press about the five incidents.  They are being delivered

14   to our office today, but we just want to make clear that our

15   remarks about those incidents are based upon the information

16   that has been provided in the monitor's reports and not in an

17   independent review of any videos or materials.

18         The problem we face here is that these difficulties

19   with obfuscation and disclosure are not an isolated problem.

20   There is a record in the monitor's reports and before the Court

21   of concerns with this administration stretching back to the

22   March 16, 2022 report.  The monitor says that these same

23   concerns reemerged towards the end of 2022 and clearly not only

24   continue but have gotten worse.

25         This is grave because it's not merely a failure to

N6d2NunH

1   disclose or affirmatively communicate although those issues are

2   of course important.  What we wish to just point out are our

3   serious concerns about the outright misrepresentations of

4   material facts to the Court and to the parties.  These failures

5   of disclosure, overt lies and lies of omission, materially

6   impact the compliance issues that have been addressed in the

7   Court conferences.

8           I will draw attention to simply two such categories.

9           The first are the misrepresentations regarding intake.

10  As the Court is more than aware, the issues and policies

11  governing intake have been the subject of immense focus over

12  the past several months——litigation of a contempt motion.

13          The department has repeatedly reassured the Court that

14  it intends to track all individuals who pass through internal

15  facility intake areas as the second remedial order requires.

16          In a January 10, 2023 status report, defendants

17  clearly stated that it was tracking all such persons.  In an

18  April 17 sworn declaration, ECF 519, a senior member of

19  department staff admitted that they were not scanning yet, but

20  seemingly reiterated the department's goal that it would scan

21  every person in intake and stated that the IT team was

22  developing information to track all——emphasis

23  added——inter-facility transfers.

24          And in another sworn declaration on May 17, ECF 532,

25  the department stated that it was making efforts to ensure all

N6d2NunH

individuals in inter-facility intra-intake were tracked and
that they would receive the main booking case number of each
individual in each intake.

       The monitor's June 8 report now tells us that this
information was not accurate as the department has in fact
decided it does not need to track everyone in inter-facility
intake and instead takes the position, according to the
monitor's report, that certain individuals in intake are not
being tracked because their placement in intake is not a *Nuñez*
issue.

       Relatedly to intake, in a sworn declaration submitted
by senior department staff on April 17, defendants stated, and
I quote, "Procedures for new admissions have not changed since
March 20, '23."

       In another sworn declaration on May 17, this was
reiterated, that procedures for new admission have not changed.
We now know, according to the monitor's reports, those
statements were not accurate.  According to the monitor, the
department promulgated a revised new admissions policy on April
10, 2023.  The monitoring team's requested to the department of
how this occurred is still pending.

       For the Court and the parties to have such fundamental
doubts about the veracity of information reported about these
obligations in the case, given all of the effort that has been
extended on this issue alone, is a mockery of this judicial

N6d2NunH

1        process.

2                  In addition and more briefly, we will point to the

3        issues about representations regarding the emergency services

4        unit.  The defendants' April 25 letter to this Court of this

5        year addressed the removal of individuals from the emergency

6        services unit who were, according to the monitor, unfit for

7        service.  We were told that 28 people were removed from the ESU

8        and learned through the monitor that at least five of those

9        individuals remained assigned to these emergency response

10       teams.

11                 These are simply a few of the representations

12       addressed in court.  The monitor -- we will not restate here

13       what the monitor has put forth in the monitor's reports about

14       various misrepresentations or obfuscations in reports made to

15       the monitor and more recapitulating the similar experiences in

16       meet-and-confer sessions about topics that were -- the Court

17       had asked the parties to confer about.

18                 More globally, we also will not recapitulate the

19       monitor's reports about the tremendous barriers to the

20       monitor's access to information needed to evaluate compliance.

21       Those do leave us, however, with questions that, as the monitor

22       noted, we do think it critical for the city to address today.

23                 We would ask the city to address questions about what

24       corrective action has been taken as of today in the multiple

25       incidents in the monitor's reports.  We understand that there

1    may be more action at some later point after investigations,

2    but we still do not know what has happened to date.

3            As one particular example -- we do know some of this.

4    For the first incident, incident one, in which an individual is

5    paralyzed after a probe team slammed his head into a cement

6    floor while he was rear-cuffed in restraints last month, we do

7    know, as the monitor referenced in his opening remarks, that

8    some corrective action has been taken for officers in the

9    initial security breaches that took place before this

10   individual was brought to the intake area, but has there been

11   any action taken for those probe team officers who -- in the

12   search pen whose actions apparently paralyzed this man?  Have

13   there been suspensions, removals from the probe team, placement

14   on a different desk while the incident is being investigated?

15   We don't know.

16           The same question obtains for officers who saw and

17   spoke with the person in the third incident, a person who was

18   naked, in a pen, in obvious distress for hours, who we now know

19   had fractured ribs and a ruptured spleen.  Has any action been

20   taken to date for those officers who saw this individual and

21   took no action?  And if not, why not?  Pending investigations

22   do not rob the commissioner of immediate corrective tools.

23           A second category of questions that we believe should

24   be clarified today is whether the commissioner stands by his

25   assertions of no staff wrongdoing.  When the commissioner and

N6d2NunH

1    mayor showed videos of incidents one and two to members of the

2    press——videos we have not seen——one media outfit reported that

3    the commissioner "adamantly denied his officers committed any

4    wrongdoing and that force was necessary and there was no

5    inappropriate conduct."  The monitor says that these reported

6    conclusions for the first incident, which resulted in the man

7    being paralyzed, appear inconsistent with the available

8    objective evidence, but also suggest an attempt to excuse or

9    avoid responsibility for a serious event.

10           We cannot of course attest to the accuracy of

11   reporting, but we think it is critical to know.  Is it still

12   the commissioner's conclusion that there was no excessive or

13   unnecessary force for this incident, that, as he said to CBS-2,

14   that it showed restraint and empathy?

15           Similarly, for the second incident involving a death

16   by suicide, we ask the Court to ascertain if it is still the

17   commissioner's view that, quote, there was no departmental

18   wrongdoing even though we are told from the monitor that the

19   video contradicts his assertion that there were two officers in

20   that unit and the monitor reports the video showing inadequate

21   supervision.

22           There are a long host of unanswered questions——and we

23   could go on, but we will not, given the time today——that the

24   department can answer right now and should answer right now.

25   But more globally, where we are is that this remedial scheme,

N6d2NunH

1    and the one particularly in this case, is unusually tethered to

2    the monitor's access to information.  The monitor cannot,

3    however, verify data on every point.  The Court and the parties

4    rely on the city to provide full, accurate, and factual

5    information, and what we have seen is that this has not taken

6    place about issues material to this Court's decision, and this

7    trustee's process is broken.  It was not broken just this past

8    month, nor with the astonishing statements, such as the

9    department blaming preexisting injuries for paralysis or

10   dismissing a skull fracture as a heart attack.

11        We stood in this courtroom just about six weeks ago,

12   well, the virtual courtroom, and submitted papers and discussed

13   with great particularity these issues about which there is now

14   backtracking, retrenchment, and doubt, and we cannot have court

15   processes that are so meaningless.  That is not a path to

16   justice or relief.

17        I will -- certainly we support the entry of the

18   monitor's proposed order about disclosure to the monitoring

19   team.  It is necessary for the reasons that the monitor

20   describes.  But more orders about patently clear obligations to

21   cooperate will not fix these.  This is a structural problem and

22   how to address this particular illegal conduct in this city and

23   the outcomes show that the process has not worked.

24        The conduct that is described in the monitor's reports

25   clearly demonstrates contempt of this Court, and the Court

N6d2NunH

1    would be fully within its bounds to hold the city in contempt

2    on the paper record before it.  But as we note, the court

3    orders alone will not and cannot, we believe, resolve a

4    structural problem.  The monitor cannot be all places at once.

5    The monitor and parties cannot verify every important factual

6    assertion the city makes.  The monitors do not have the power

7    to implement its recommendations, and the record for years is

8    replete with the city failing to act on monitor recommendations

9    or doing so only at a glacial pace.  That extraordinary

10   expenditure of resources is simply unsustainable and, as a

11   result, because relief in this case has tethered to a process

12   that we all hoped would work but that has not, thousands of

13   lives are in serious jeopardy every day that the status quo

14   continues.

15          In the later part of the agenda, we will discuss the

16   next steps that we think are necessary to gain relief for the

17   plaintiff class, given not only these most recent revelations

18   but this entire history that has shown that this process, one

19   that we negotiated and stood by as well, that the city agreed

20   to has not worked.

21          I will halt there unless the Court has questions.

22          THE COURT:  Thank you, Ms. Werlwas.  We will of course

23   return to next steps questions.

24          At this point I will call on counsel for the

25   government to speak.  Mr. Powell.

N6d2NunH

1          MR. POWELL:  Thank you, your Honor.  It is Jeffrey

2    Powell for the government.

3          I am going to keep my comments fairly brief because we

4    are anxious to hear from the city, and I'm going to just

5    address the issue of the disclosure or not disclosure of

6    information.

7          Briefly, prior to the Court's approval of the action

8    plan, Commissioner Molina appeared before your Honor back in

9    April 2022 and stated that he and the monitor were "aligned"

10   and that he was committed to working with Mr. Martin and his

11   team to implement the changes necessary to truly reform this

12   deeply troubled agency.

13         The monitor of course now contends that the department

14   is failing to timely provide him and his team the complete,

15   accurate, and reliable information which he needs and must have

16   to adequately fulfill his assessment and reporting obligations

17   and your Honor's multiple orders in this case.

18         Instead of partnering and collaborating with the

19   monitor and his expert team, as the commissioner represented

20   the department would do more than a year ago, the commissioner

21   and current department leadership are reportedly failing to

22   consent with him on key areas related to the consent judgment

23   and failing to respond to requests for information.

24         As your Honor pointed out and as plaintiffs' counsel

25   have pointed out, this of course undermines the entire

N6d2NunH

1    structure of court oversight established by the consent

2    judgment, since it is the monitor, as an agent of the Court,

3    who is responsible for providing both the parties and the Court

4    with his objective assessment of the department's efforts to

5    comply with the Court-ordered relief.  It simply cannot

6    continue.

7         We respectfully request that the Court enter the

8    proposed order attached to the monitor's June 12 report as

9    submitted by the monitor.  It is deeply disturbing that almost

10   eight years after the consent judgment was entered in this case

11   the monitor feels that he must resort to seeking a court order

12   to ensure that he receives timely and accurate information from

13   the department, including basic information about persons who

14   have died in custody or who have sustained serious injuries

15   while in custody.

16        If your Honor wishes, we can address the three

17   suggested changes that the city offered to make to the proposed

18   order which we oppose.

19        Finally, to date, the city has not submitted any

20   response to the Court addressing the monitor's multiple

21   submissions of the last couple of weeks detailing his clear

22   exasperation with the department's recent conduct.

23        In his June 8 report, the monitor provides numerous

24   examples of what he describes as "the department's lack of

25   transparency and failures to accurately manage compliance with

N6d2NunH

1   the *Nuñez* court orders and timely respond to the monitoring

2   team's feedback and requests for information."  We look forward

3   to now hearing the city's report to the monitor's very serious

4   concern.

5           Thank you, your Honor.

6           THE COURT:  Thank you, Mr. Powell.

7           We will speak about the specific objections or any

8   other controversies with respect to the proposed order when we

9   get to proposed next steps, but at this point I will call on

10  the city's counsel and the commissioner to respond.

11          MR. SCHEINER:  Good morning, your Honor.  I am Alan

12  Scheiner, senior counsel at the New York City Law Department,

13  representing the city of New York and New York City Department

14  of Correction.

15          THE COURT:  Good morning.

16          MR. SCHEINER:  And here with me -- good morning.  Here

17  with me, as you know, is Commissioner Molina.  And --

18          THE COURT:  Good morning.

19          MR. SCHEINER:  -- with the proposed -- the agenda

20  proposed by the monitor, at the moment I will restrict my

21  remarks to the subject of defendants' compliance with

22  disclosure requirements and other mandates of the Court's

23  orders with respect to communication with the monitor.

24          The city acknowledges that in some instances cited by

25  the monitor reporting our consultation that was required did

N6d2NunH

1    not occur, and those were errors.  We believe that the order

2    proposed by the monitor, with some minor revisions that the

3    city is requesting, will avoid such errors in the future.

4          The demands of reporting to the monitor are

5    substantial.  It has been difficult for the department to fully

6    meet those needs with existing staff in recent months.  The

7    *Nuñez* manager, who is already appointed, who we understand is

8    acceptable to the monitor, has years of experience with *Nuñez*

9    requirements, including in appearances before your Honor.

10         The monitor says that reporting on five recent events

11   was absent or, when made, incomplete or incorrect, and the city

12   takes very seriously its obligations under the Constitution to

13   protect that health and safety of those in its custody and to

14   provide information to the monitor as required by the Court's

15   orders.  The department reports on a routine basis about uses

16   of force, PIC——or person in custody——fights, staffing, and many

17   other matters, and the monitor received additional information

18   about specific incidents or personnel matters when requested.

19   Dozens of communications occur on a typical day between

20   department staff and the monitoring team, and routine data

21   flows appear from the monitor's report to be working as

22   intended.  The department has responded to thousands of formal

23   requests for information or feedback from the monitor.

24         The five recent events giving rise to the monitor's

25   recent filings occurred coincidentally around the same time in

1    a two-week period, but each concerned very different

2    circumstances with very different causes which in some cases

3    remain unknown to the city until further medical analysis.  In

4    fact, these matters present no pattern either in lack of

5    communication or in the conditions at the department's

6    facilities.  Attempting to draw conclusions on the sole basis

7    of the recency of a handful of events is a logical fallacy.

8    Investigation is certainly appropriate, but conclusions about

9    trends or systems made solely on the basis of this coincidence

10   in time would be incorrect.

11          The communication problems identified by the monitor

12   do not represent a breakdown in the city's willingness to be

13   responsive to the needs of the monitorship.  Rather, they arose

14   from other factors.

15          First, there was ambiguity about what the monitor

16   expects to be reported on an urgent basis rather than in

17   routine reports.  As the monitor acknowledges, most of the

18   recent events were not required by any orders or requests of

19   the monitor to be reported immediately.  The proposed order,

20   with the city's minor changes, solves that problem by making

21   the urgent recording requirements explicit and the city

22   welcomes the clarity.

23          The second factor contributing to the communication

24   problems has been the perceived need to respond quickly to the

25   monitor, and in some instances information was provided based

N6d2NunH

1    on secondhand reports and it turned out to be incorrect.  The

2    city shares the monitor's goal of timely, accurate, and

3    complete information.

4           But no recording system is perfect, and inevitably are

5    tradeoffs between each of those goals.  Quicker information is

6    inevitably less accurate and more complete information may

7    contain elements that are less reliable than others.

8    Reasonable people may differ on what they consider timely where

9    investigation or verification of data is required.

10          All of the five events involve medical questions.  The

11   department has no direct access to the medical information of

12   persons in custody.  It knows only what it is told by the

13   correctional health service which is under the aegis of the

14   Health and Hospitals Corporation which is not part of the city

15   government.

16          Even less is known by the department about events

17   during hospitalizations.  This presents inherent risk of error

18   if the department is asked why someone went to the hospital or

19   why they died or got sick.

20          With the appointment of a *Nuñez* manager, the

21   department will exercise greater caution in reporting on

22   emergent matters.  It will be one person with access to the

23   information available to the department so that they can report

24   more reliably and completely or make clear when reliable

25   reporting is simply not possible because of the absence of

N6d2NunH

1    information.

2           The monitor has alleged the city engaged in

3    misrepresentations to the monitor and the Court.  Absolutely no

4    intentional misrepresentations have been made by the city.

5    Some of the alleged misrepresentations arise from the monitor's

6    interpretation of specific order words, for example, the term

7    "on the floor" which the monitor has referred to more than

8    once, as a misrepresentation.  Meetings for the department is

9    in the housing unit where the event occurred, and the phrase

10   was used correctly in reporting on that incident.

11          Second, the monitor asserts that commitments made by

12   the department and the city in the past were

13   misrepresentations.  That is not so.  The fact that the monitor

14   believes that expectations were not met does not mean that a

15   commitment was falsely made, and no false commitments were made

16   here.  The procedures adopted in the monitor's proposed order

17   with the city's requested changes should resolve most

18   differences about whether cooperation and consultation have

19   occurred as promised.

20          Third, some purported misrepresentations are indeed

21   just errors.  These are typically corrected by the department

22   itself.  Some of these occur when information is rushed, as

23   noted above.  Others are data errors which occur in any large

24   organization when data from different sources has to be

25   compiled.  The department is taking steps to improve its data

N6d2NunH

1    collection systems that will make its data far more reliable

2    for its own operations as well as for the monitor.

3          Of course we will answer any questions the Court may

4    have as best we can, but it's possible that given the time

5    frame of these events and the recent filings that we will have

6    to ask to respond in a later submission.

7          Thank you, your Honor.

8          THE COURT:  Thank you.

9          Did the commissioner wish to say anything?  I will

10   have a couple of follow-up questions for you both, I suppose.

11         COMMISSIONER MOLINA:  Good morning, your Honor.  I

12   will just say -- I will just add to that briefly, that there

13   have been, over the last 18 months, since this administration

14   has took over management of city's jail system, some

15   significant and sweeping change, change that did not happen in

16   2016 to 2021, given the former members had recommended them

17   back as late as 2017.  Those recommendations were ignored and

18   not implemented, which sent this department on the trajectory

19   where every year from 2016 to 2021 the department performed

20   very, very poorly.  So at the point of January 2022, the

21   department that we inherited was on the brink of collapse, as

22   everybody involved in this conference is well aware.

23         When we think about what existed in December of 2021

24   to January 2022 and where we are today, the department has

25   moved forward significantly.  We have remade the leadership and

N6d2NunH

1   makeup of the department with infusing talent which had been a

2   longstanding recommendation I made back in 2016 and '17, which

3   was ignored, which inserted an infusion of correctional experts

4   into the system so that we can begin not only the cultural

5   change but the introduction of best practices into the

6   department.  A situation where wardens had a stranglehold by

7   civil service law in those positions with working in

8   partnership with the monitor and with the support of this

9   Court, as well as the support of the mayor of the city of New

10  York, we joined together to get that suspended so that we can

11  infuse outside talent into facility leadership positions, and

12  over time that will take significant hold.

13          As this department's detainee population increased

14  over 2022, it was the first time that the department had

15  experienced not only a decrease in incidences which was

16  approximately 14 percent in calendar year 2022, but the only

17  time that it experienced a decrease from 2016 to 2021 in where

18  the detainee population was decreasing, the use of force

19  incidences were increasing.

20          I recognize that the number of use of force incidences

21  and incidents overall are still at a high rate, but the fact

22  that we are trending in a direction where those metrics are

23  declining is something I think should give a lot of hope and

24  optimism to.

25          It wasn't that long ago, on December 13 of 2022, the

1   monitor informed me on a phone call that it was refreshing to

2   engage with people who know what they are doing, and that

3   engagement with the DOC team has not changed.  The monitor's

4   team engages with a number of members of the department——from

5   executives to mid level managers——on a day-to-day basis on a

6   whole host of issues——to provide them information, answer their

7   questions.  Sometimes that information is provided verbally.

8   On over 1600 occasions its been in reports and other e-mail

9   communications over the course of this administration has been

10  over about 1600 times.  So we are engaged with the monitor.

11          In addition to that, when we think about the level of

12  staffing absenteeism that existed in January of 2022 and where

13  we are at today.  We have abated that issue significantly and

14  it's been about a 70 percent decrease in staff absenteeism and

15  we have staff coming back to work.

16          This department inherited a disciplinary backlog which

17  the Court is well aware of.  I believe the number was over 3700

18  disciplinary cases which went unaddressed and unadjudicated for

19  misconduct, procedural violations, going back to calendar year

20  2017.  This backlog, coupled with the failure of the prior

21  leadership which caused over 2000 disciplinary cases in I

22  believe 2019 to have to summarily either not be addressed

23  because the statute of limitations had expired or that, was so

24  detrimental to the department because what it did was embed

25  core operational practice in the rank and file unfortunately.

N6d2NunH

1    And we addressed that backlog issue and I have signed off on

2    the adjudication of over 3,000 disciplinary cases and, when

3    called for, have taken action in maximizing my powers as

4    commissioner of this department.

5            So it wasn't long ago that the monitor in a report,

6    and I'm paraphrasing here, when he said that he saw a sea

7    change occur under this administration that had not occurred

8    before, I think that that's still holds true today.  If I have

9    an issue where I myself professionally think I need to speak to

10   the monitor about, there is nothing stopping me from calling

11   the monitor and speaking to him directly on a number of issues.

12   I have done that over the past 16 or 18 months many, many

13   times.  And if the monitor himself, as the principal overseeing

14   the monitorship on the Court's behalf, wants to speak to me

15   about an issue, I have never turned away a phone call from the

16   monitor or allowed an e-mail to go unaddressed or any other

17   communications.

18           And I have always openly supported in my executive

19   staff meetings and every time I engage with the staff that they

20   should be cooperative with whatever the monitor wants.  I

21   reinforce that message.  And when recommendations, creative,

22   innovative ideas are brought out by the highly talented persons

23   who we have hired over the last 18 months to work for this

24   department, if I believe even that there is even a 1 percent

25   chance that it might intersect with the work of the core

N6d2NunH

1    mission of consistent judgment, I have encouraged my staff to

2    confer with the monitor or a member of the monitoring team.

3    That is still ongoing today.

4                Thank you, your Honor.

5                THE COURT:  Thank you, Mr. Commissioner.

6                I do want to follow up on the specific questions about

7    the statements of there being no wrongdoing in connection with

8    the incidents that were highlighted in the monitor's report,

9    and I have also read the media reports and seen the CBS clip

10   regarding showing of the elevator floor level portion of the

11   encounters in incident one and the statements that were made by

12   you and the mayor regarding this being appropriate correctional

13   practice.

14                And so how do you reconcile the statement that there

15   is no wrongdoing with the fact that apparently internal charges

16   have been brought and there is, as far as I know, been nothing

17   in writing to this Court or in these media appearances that

18   address the physical banging of this person on the ground in

19   the intake area?

20                COMMISSIONER MOLINA:  Thank you for your question,

21   your Honor.

22                My comments to the media were specific about the

23   isolated moments of when the officers involved specifically in

24   incident one had to engage in force to stop the attempted

25   escape of a person in custody, and that's what I was commenting

N6d2NunH

1    about.  Where there were procedural violations where, for

2    example, you talked about in the elevator, where the initial

3    escort officer that was escorting a number of persons in

4    custody failed and allowed one person in custody to stay on the

5    elevator, we took immediate action in that.  And while that was

6    not aired on the press because I have no control of what the

7    final show that would be put on for the press as to their news,

8    we did share with the press that that failure exited.

9           But specifically to the use of force in the first use

10   of force encounter to stop the attempted escape preliminarily,

11   I feel that those officers showed restraint in subduing someone

12   and stopping them from escaping.

13          In the second use of force incident regarding after

14   the person in custody was body scanned, where he kneed to

15   assault one of the members of the team that was trying to put

16   on his shoes because he was in leg restraints and they brought

17   him down to the floor.  Inadvertently it appears that the

18   person in custody's head may have hit a bench, may have hit

19   part of the floor.  That investigation is ongoing, but

20   preliminarily the actions of those officers I think, when I

21   look at the moment of what those officers' decision-making had

22   to make in that moment, preliminarily I don't find concerning

23   as of yet, but the investigation is ongoing.

24          THE COURT:  So you don't find it concerning that the

25   person was taken to the floor cuffed behind and in shackles to

N6d2NunH

1    a concrete floor and in being taken down face first, as I

2    understand it.

3         COMMISSIONER MOLINA:  I preliminarily believe that was

4    an option.  You have to look at all of these incidents as

5    unique and, given what options may have been available to those

6    officers at that moment, it is for the officers during this

7    investigation and MEO 16 process to be able to convey their

8    justification for the tactics that they have used.

9         THE COURT:  There is an investigation still in

10   process?

11        COMMISSIONER MOLINA:  That's correct, your Honor.

12        THE COURT:  And with respect to the self-harm incident

13   and what the monitor indicates the video and records show about

14   the actual locations of the officers who were in the unit at

15   the time——one being in a closed office area and the other

16   engaging with the detainees in the unit——do you believe that

17   there is no issue with respect to adequate supervision of the

18   unit at the time the self-harm incident took place?

19        COMMISSIONER MOLINA:  Preliminarily, I do not.  We

20   had -- you know, I used the term or phrase that we had two

21   officers on the floor meaning, as the city's counsel has

22   represented, meaning that we had two officers in the housing

23   unit.  As you might be well aware, that is a designated mental

24   health unit that also has a high level of touring by clinical

25   staff of Correctional Health Services.  So I have no concerns

N6d2NunH

1    about, at least preliminarily, on the staffing of the unit

2    right now.

3         THE COURT:  Is there an investigation going on of the

4    incident in which the person who had apparently been assaulted

5    was naked for three hours and apparently had some interactions

6    but not relief in those three hours in the intake unit?

7         COMMISSIONER MOLINA:  Yes.  That is under

8    investigation, your Honor.

9         THE COURT:  And the incident regarding the elderly

10   person who was ultimately compassionately released who had been

11   back-cuffed for I think it was four hours?

12        COMMISSIONER MOLINA:  So that detainee has not been

13   compassionately released.  There is an ongoing -- I'm sorry,

14   your Honor, there is an ongoing investigation in that incident.

15        THE COURT:  And in terms of the delays in reporting

16   the deaths and the serious injuries, there is a 33-hour delay,

17   there was a 69-hour delay, there were -- there was a lack of

18   reporting to the COD which would have triggered some systemic

19   reporting.  Is there a problem with that?

20        COMMISSIONER MOLINA:  No.  I mean, thousands of

21   notifications are made to the COD, and then we have a situation

22   like we have in this case, in these cases, where there was a

23   delay in reporting.  Those are investigated so that the

24   managers of those responsible to make those notifications

25   explain themselves as to why that delay occurred and if

N6d2NunH

1   corrective action or necessarily discipline action has to be

2   taken at the conclusion of that investigation, then we will do

3   so.

4         I think we have taken some steps regarding late

5   reporting in incident number one, if my memory serves me

6   correctly.  But if there is not any justification provided to

7   us that we think merits any delay in reporting to the COD,

8   because things could happen, then we would take corrective

9   action with the staff that failed in that reporting.

10        THE COURT:  And do you understand and accept that the

11  monitor has the authority and the duty under my orders to speak

12  with any member of staff and to be able to do so in confidence

13  if that's necessary?

14        COMMISSIONER MOLINA:  Absolutely.  I encourage all

15  staff who feel that they have any concerns to be proactive in

16  reaching out to the monitor or any oversight body, whether that

17  be the New York City Department of Investigation, the New York

18  State Attorney General's office, the New York City Board of

19  Corrections, which we have a number of staff that take that

20  opportunity to do those things.  And I am very clear with the

21  staff of the responsibility that we have to be responsive to

22  the monitor when they have questions.

23        But for the sake of responding quickly, we want to --

24  I tell staff to be sure that they take the time that they need

25  to respond as accurately as possible with information they have

N6d2NunH

1    at that moment that they are going to convey to the monitor.

2    And I tell that to my executive staff.  I tell it to staff when

3    I am touring.  All are welcome and all are required to

4    cooperate with the monitor.  It is not an option.

5           THE COURT:  Is there any reason that I should not be

6    disturbed that you commented to the monitor in your first

7    report that an emergency report regarding I think it was the

8    first two serious incidents should not be made to the Court

9    despite my instruction to the monitor that serious and exigent

10   circumstances should be reported to the Court.

11          COMMISSIONER MOLINA:  Thank you for the question, your

12   Honor.

13          I think that our perception of those incidences from

14   our points of view are different.  I think the monitor, if I

15   can recall correctly, in conversation with me and in our

16   discussions before this Court talked about the complexity that

17   exists in trying to reform and make sure that those reforms are

18   sustainable with the department.

19          There are other issues in the department which we are

20   contending with that are outside of the consent judgment, and

21   from time to time I share those concerns also with the monitor

22   just to try to get his point of view on them, on ideas that I

23   may have or trying to take corrective action on those areas

24   that are not even specifically related to the consent judgment.

25          And I think, as I think this Court would appreciate,

N6d2NunH

1    when you are trying to involve an agency as large as the jail

2    system of the city of New York, one that was allowed to implode

3    from 2015 to 2021, and where the weaknesses that currently --

4    that existed in that system throughout a global pandemic to

5    include even a staffing crisis that occurred, much of which I

6    think was manufactured because of failed leadership, from my

7    point of view as commissioner, what I was trying to convey to

8    the monitor that we have to look at these things at a macro

9    level.  And I did not think that these very different

10   incidences really spoke to or reached the level where there was

11   cascading or systemic harm on the persons in custody.

12         To the contrary, we have done significant work, with

13   the support of the mayor, the interagency task force, where,

14   for once, this has been an all-city proposition.  I recognize

15   that incidents that are occurring today are still higher than

16   what incidents that occurred in 2016, but they are down

17   significantly from, to use the monitor's term, the apex of the

18   crisis.  Fiscal year to date, slashes and stabbings are down 20

19   percent.  Calendar year to date they are down 30 percent.

20         You know, we have done a lot to address idle time with

21   persons in custody.  This morning we have over 20 persons in

22   custody that are graduating from high school, and that number

23   is increasing of those that we have engaged with the Department

24   of Education programs.

25         So we have done a lot to stabilize the department, and

N6d2NunH

1    what I was trying to get the monitor to appreciate is that we

2    have a number of groups that just want to see the department

3    fail because it advances their position that Rikers Island or

4    our city's jail systems should just not exist.  And I don't

5    take a position on whether Rikers should close or stay open.

6    The city council has passed a law that in August of 2027 that

7    is going to happen.  But we still have a responsibility, as

8    this Court, I believe, appreciates, to stabilize the system so

9    that we can keep persons in our custody not only safe but do

10   all that we can to address the new drivers of the justice

11   involvement.

12          THE COURT:  Thank you, Mr. Commissioner.

13          The monitor and deputy monitor, was there anything

14   that you wished to say further to this first topic before

15   moving on to the -- any discussion that you have of the trends?

16          MS. FRIEDBERG:  Your Honor, I'm not going to take each

17   one of these, but there are three comments that I do just want

18   to address with respect to the city's response.

19          They note, for instance, that some of the concerns

20   with respect to our reporting was as a result of ambiguity in

21   our request that will be resolved through our court order.

22   While we certainly appreciate the clarity that a court order

23   may bring, it's certainly unworkable if the city's defense is

24   merely, every time we ask for information, it may be ambiguous.

25          I will give you example with respect to our requests

N6d2NunH

1    for in-custody deaths.  We have had a longstanding request from

2    October 2021 where the monitoring team explicitly stated the

3    following and I will just read it to you.  It was also in our

4    June 8 report.  It states, hold on one second as I pull it up,

5    "Notices of deaths in custody.  As soon as practicable and no

6    later than 24 hours, the monitor must be advised of any death

7    in custody." there is some additional information there.  "To

8    the extent that there is a question about the ambiguity of such

9    a request and that we now need a court order for it raises

10   significant concerns."

11         Second, with respect to the fact that the department

12   apparently, even if there is a 1 percent chance that something

13   is *Nuñez* related, will be consulted, I will just direct you to

14   our June 8 report with respect to a number of items of which we

15   were not consulted.  Probably the most important is with

16   respect to practices related to use of force.  So while I

17   certainly hope that staff are being asked to be consulted with

18   us on these matters, certainly there are items within our

19   report that raise significant concerns.

20         And finally, the monitoring team certainly appreciates

21   the complexity of the issues that are faced at the Department

22   of Correction.  That cannot and does not obfuscate the

23   monitoring team's obligations to do our work under these court

24   orders.  We certainly understand your orders, Judge, to be

25   quite clear; and to the extent that we have to take into

N6d2NunH

1   account external factors when determining whether to report to

2   the Court raise significant concerns for us and are not things

3   that we anticipate considering as we move forward.

4           So that's just a few.  We obviously -- in the interest

5   of time, I will defer to our significant reporting on these

6   issues of which we have outlined many great concerns.  They go

7   beyond those of those five incidents.  You saw an illustrative

8   example of those in the June 8 report and the June 12 report.

9           Unless, your Honor, you have any other questions, I

10  will move on to the next item on the agenda.

11          MR. SCHEINER:  Your Honor, if I may?

12          THE COURT:  Yes.

13          MR. SCHEINER:  This is Alan Scheiner for the city.

14          Yeah, I would like to respond to something that deputy

15  monitor just mentioned in order to reiterate my remarks and

16  explain what I was referring to.  The death in custody

17  reporting is not one of the requirements that the city believes

18  was ambiguous.  What I was referring to, and I apologize if it

19  wasn't clear, but I said that the majority of the incidents

20  here, that is, four out of five, were not subject to any clear,

21  immediate reporting requirement.  They are matters that on a

22  routine basis are reported to the monitor, but they are not

23  covered by that death in custody request.

24          We acknowledge that not reporting a death in custody

25  pursuant to that request was an error.  So we are not saying

N6d2NunH

1    that that was ambiguous.  I think the monitor has acknowledged

2    that there was ambiguity with respect to what was required

3    regarding immediate reporting of the other incidents, although

4    the monitor expected immediate reporting based on a prior

5    practice, the monitor acknowledged it was not an explicit

6    requirement.  So that was what I was referring to there.

7          And with respect to the use of force policy as well as

8    the -- or use of force issues, to be more broad, as well as the

9    intake policy that was mentioned before, not consulting with

10   the monitor on those were also errors.  So that we are not

11   saying there were no errors and that everything is ambiguous.

12   We are saying that some of this is ambiguous and that that

13   ambiguity is being resolved by the proposed order.

14          THE COURT:  Thank you, Mr. Scheiner.

15          Ms. Friedberg.

16          MS. FRIEDBERG:  Your Honor, if you don't have any

17   other questions, I will move to the next topic of the agenda.

18   Are you okay with that?

19          THE COURT:  Yes, please.

20          MS. FRIEDBERG:  Great.

21          Your Honor, we must reiterate here, as we talk about

22   use of force, self-harm, and mortality trends, comparing them

23   from 2016 to 2021 and 2022, that since the inception of the

24   consent judgment in 2015 and discussed throughout today's

25   conference, the department continues to have high rates in each

N6d2NunH

1    of the critical violence indicators.

2              Even with reductions in some areas, the current rates

3    of use of force, stabbings and slashings, fights and assaults

4    on --

5              (Court reporter confers)

6              THE COURT:  Ms. Friedberg, we need you to speak more

7    slowly so that the court reporter can get everything down, so

8    would you start again, please?

9              MS. FRIEDBERG:  No problem.

10             Your Honor, with respect to the third agenda item

11   today, which relates to use of force, self-harm, and mortality

12   trends, from 2016 and comparisons with 2021 and 2023, we must

13   reiterate at the outset that, since the inception of the

14   consent judgment in 2015, the department continues to have high

15   rates in each of the critical violence indicators.

16             Even with reductions in some areas, the current rates

17   of use of force, stabbing and slashing, fights, assaults on

18   staff, and in-custody deaths are not typical, they are not

19   expected, and they are not normal.

20             I must highlight a few key findings for you.

21             First, there are a number of different measures to

22   assess progress, and the monitoring team has dutifully examined

23   changes in metrics and patterns and staff behavior from all

24   angles in order to gain insight into the factors that must be

25   catalyzed for undercutting progress.  With respect to where we

N6d2NunH

are right now, use of force rates remain all too high.

Unnecessary and excessive use of force has not been abated.

The monitoring team's ongoing, contemporaneous review of all

use of force incidents this year, 2023, indicates that neither

the seriousness nor the frequency of the excessive use of force

has abated.  This finding is present in each of the monitor's

reports to date which are replete with descriptions of staff's

pervasive, excessive, and unnecessary use of force.

Stabbings and slashings.  The department is currently

projected to have nearly 350 stabbings and slashings this year.

This is more than the number of stabbings and slashings that

occurred in the combined three-year period of 2017 to 2019 when

the department's population was significantly higher.

In-custody deaths.  In 2022, more people died in

custody or compassionately released than any other year since

the consent judgment was entered in 2015.  In 2022, 19 people

died or were compassionately released.

Self harm.  Even after the Court specifically --

sorry.  Excuse me.  Even after court orders specifically

related to preventing suicide were imposed, the first 18 months

ago in the second remedial order, seven people have died by

suicide or suspected suicide.  Further, six of those seven died

by suicide or suspected suicide since the action plan was

entered in June 2022.  I share these brief -- this brief

information related to these use of force trends.  They will

N6d2NunH

1    also be further explored in our July 10 report.

2            With that, I will now defer to the parties and the

3    Court to discuss these items in more detail.

4            THE COURT:  Thank you.

5            I will now call on plaintiffs' class counsel.

6            MS. WERLWAS:  Thank you, your Honor.  Mary Lynne

7    Werlwas for the plaintiffs.

8            Your Honor, we will not spend our time recapitulating

9    the monitor's data, which is amply laid out in the Court's

10   reports but wish to make a few observations about the use of

11   force rates and trends.

12           We fully expect that the city will cite some of its

13   own data and numbers that it chooses to show improvements from

14   the atrocities of 2021, and at the outset, these recent reports

15   call into question whether these numbers are even trustworthy.

16   As the monitor has explained regarding this first incident,

17   that the catastrophic use of force in the intake search room,

18   at least as of June 8, still was not officially reported via

19   COD, that is, the department's internal initial reports.  In

20   practical terms, states the monitor, this means the second use

21   of force is not included in the department's monthly use of

22   force data.  That is a serious use of force incident.  If that

23   use of force is missing from the official channels, what other

24   forces are missing from the data that produces these rates?

25   And we stress that these are not mere data collection errors.

N6d2NunH

1    The entire foundation of this remedial reporting process has

2    rested on the integrity of these department processes that

3    begin with the gateway, which is the timely and accurate

4    reporting of force.  The system cannot function, we cannot get

5    data, we cannot get information if such incidents are not

6    reported absent extraordinary interventions such as we have

7    seen in the last two weeks.

8         But in any event, what is clear is this:  The harm to

9    the plaintiff class that the city was supposed to abate through

10   compliance with the consent decree and remedial orders has

11   deepened and worsened.  On numbers alone, the use of force

12   rates are twice what they were when the city entered into the

13   consent judgment.  And even more distressingly, use of force

14   has become more injurious.  Incidents resulting in injuries,

15   serious injuries, are triple what are they were at the time of

16   the consent judgment.  We strongly endorse the monitor's

17   prescient warning that "an unfortunate and dangerous side

18   effect of the decades long high rates is that they have become

19   normalized," and that can no longer be the case.

20        The city effectively seems to argue that the clock

21   should restart with the appointment of a new commissioner, as

22   it likely will argue every time there is a new commissioner.

23   That does not hold up to analysis in this case and on this

24   record because what we have seen is that the city is unwilling

25   or unable to disturb the causes of this constitutional crisis.

N6d2NunH

1      It's been unwilling or unable to rein in the emergency services

2      unit and the probe teams which appear to be responsible for

3      incident one.  It's been unable or unwilling to supervise its

4      line staff to ensure that they can perform the basic tasks of

5      jailing, to stay on post.  It's been unable or unwilling to

6      honestly and candidly identify misuse of force when it happens.

7              We can expect numbers of incidents and data to wax and

8      wane in a facility, across different facilities.  We have seen

9      that pattern time and again in this city with the same problem.

10     This is the fifth class action about the pattern and practice

11     of excessive force in the city jails, and each time use of

12     force practices improve when in the glare of the judicial

13     spotlight but then revert to this department's norm of

14     brutality when attention is focused elsewhere.

15             So, too, we see that on a smaller level in the last

16     year with some ostensible improvements in use of force rates at

17     RMBC and GRVC, two facilities that were the subject of enormous

18     monitoring attention, and we see a noticeable and distressing

19     decline at AMKC, one of the department's largest facilities and

20     the one that houses significant numbers of people with mental

21     illnesses.  The goal of this lawsuit was to stop this game of

22     whack-a-mole and irradicate rampant brutality throughout the

23     department.

24             Plaintiff will just note that at this very late stage

25     in the remedial process the absolute numbers of use of force,

1   horrific as they are, are not even the most important metric.

2   As the monitor reports, even among incidents from May, the

3   patterns of misuse of force remain entrenched——the multiple

4   security failures, staff off post, staff failure to render

5   timely aid.  For there to be little material traction on these

6   areas despite the near exclusive focus on these practices

7   throughout action plan squarely tells us the action plan has

8   not worked.

9          The incidents from a few weeks ago that led to today's

10  conference do indeed present a pattern, not only a pattern of

11  death and serious injury, but they reflect the same failures

12  that were at the root of this Court's remedial orders in 2021,

13  whether that means the death by suicide in the PACE unit, which

14  is supposed to be the most intensively supervised unit in the

15  department, whether it means the rampant misuse of force by

16  probe teams such as the suited up and helmeted team that

17  apparently has paralyzed a man, or whether it means the failure

18  to intervene, such as, according to the monitor's reports, an

19  associate commissioner seeing an elderly man locked in a cage,

20  with no toilet, with his hands handcuffed behind his back and

21  he is now in the ICU.

22          Most disturbingly, perhaps, though, is fundamentally

23  we think one of the measures of the lack of progress in

24  performing this agency's culture of brutality and its

25  understanding of brutality is a word that we heard earlier

N6d2NunH

1    today.  "Inadvertently."  We were stunned to hear the

2    commissioner suggest that the use of force that paralyzed this

3    man apparently in the first incident may have involved

4    inadvertent use of force, because that's a code word.  This has

5    been throughout decades of litigation with this agency.

6    Reaching that conclusion about a use of force incident that is

7    still under investigation?  For the head of a department to

8    suggest that intent about an incident still under investigation

9    and that looking at a video, which again we have not seen, it

10   could be explained or suggested as an inadvertent use of force

11   tells us that at the very top virtually nothing has changed.

12   It is precisely because this culture as well as these failures

13   at basic correctional practices have mortal stakes that the

14   department's fundamental inability to change its staff

15   practices, its unwillingness to interrupt labor practices that

16   deprive the jails of supervision needed cannot be countenanced.

17   Eight years after these promises were made and a historic

18   investment in the jails provided by virtue of this Court's

19   attention, we have exhausted the limits of this process.

20            I will stop now, absent questions.

21            THE COURT:  Thank you, Ms. Werlwas.

22            I will turn to Mr. Powell.

23            MR. POWELL:  Thank you, your Honor.

24            And we would just reiterate on that point our deep

25   concern with Commissioner Molina's and the mayor's decision to

N6d2NunH

1   make public comments to media regarding an incident and stating

2   their opinions, even if they were preliminary, about whether

3   misconduct had occurred when there are clearly pending

4   investigations into that conduct by, it appears, more than one

5   agency.  I would be remiss if we didn't also express our

6   concerns and ask the commissioner for why they thought that

7   those public statements were appropriate or necessary.

8          Very briefly addressing the use of force and the other

9   metrics, I'm not going to burden the Court with repeating the

10   various stats that the monitors report.  The department will

11   undoubtedly argue that some of the violence-related measures,

12   and you have heard it today, have improved when compared to

13   certain points in 2021 when we were in the midst of the

14   pandemic and staff absenteeism rates were peaking.  However, we

15   all need to be mindful regarding these data comparisons because

16   they always depend on what precise period or snapshot of time

17   you are looking at, in which particular facility you are

18   looking at.  What can't be disputed is that every safety and

19   violence indicator is substantially worse now than it was when

20   the consent judgment went into effect in November 2015, and

21   that consent judgment was put into place to address the city's

22   ongoing violation of the constitutional rights of persons in

23   their custody that was occurring back then in 2015.

24          Neither the monitor nor the government are moving the

25   goal post, as I believe a DOC spokesman recently stated.  We

N6d2NunH

1    are not moving the goal post by looking at data and comparing

2    it to what it's been over the last several years or before the

3    consent judgment and keeping in mind that the jail population

4    was significantly higher back then than it is now.  Instead of

5    moving the goal post, as the department contends, the city and

6    department should be held to the same constitutional standard

7    that any municipality or jail system must meet.  They must take

8    reasonable measures to ensure that people in their custody do

9    not face dangerous conditions that subject them to an ongoing

10   substantial risk of serious harm.

11         I don't have anything further on this particular

12   agenda topic unless your Honor has further questions.

13         THE COURT:  Thank you, Mr. Powell.

14         Mr. Scheiner and Mr. Commissioner.

15         MR. SCHEINER:  This is Alan Scheiner for Corporation

16   Counsel's office.

17         I know this part of the agenda is to address the

18   statistics and I will do that, but I wanted to briefly respond

19   to some of the accusations about a specific incident, one of

20   the five that has come up recently during this conference, as

21   well as the use of easy words to throw around but I think not

22   supported by the evidence like "brutality" and "atrocity."

23         There is only one particular use of force before the

24   Court on which -- well, there are two, but the one that has

25   been mentioned frequently, it seems like people have drawn the

N6d2NunH

conclusion, based on the result of that, which was tragic and
extremely unfortunate, result of paralysis, that the force must
have been excessive.

Obviously, the determination of whether or not a use
of force is excessive or even improper under regulations is not
determined solely by the result.  It may be part of the
picture, yeah, you need to know, but it doesn't determine that
misconduct occurred.  The legal standard for excessive force is
whether it was reasonable under the totality of the
circumstances, the threat of the person, and the needs of the
department to maintain order and safety.

That in most cases is a very complex question that in
cases that I have litigated can take years to determine whether
a particular use of force was proper and what effect that it
had.  Counsel for the plaintiffs seem to have drawn ethical
conclusions in a very short period of time about the cause of
some of the conditions at issue here and they also seem to have
drawn conclusions about there being excessive force based
solely on -- without even reviewing the video of what occurred.

There has been no blanket statement that the
individuals involved in that engaged in no wrongdoing or error
under the department procedures and the full circumstances of
the force used and what exactly they did remains to be
determined.  Video can't tell the whole story.  In this case
even part of the incident is obscured by a privacy partition.

N6d2NunH

1          So that it is really very, very premature to say that

2     excessive force or brutality occurred.  An investigation

3     certainly is warranted.  Conclusions at this time are not.  And

4     that matter is under investigation.

5          So I want to turn to the metrics, the numbers.  And it

6     was asserted that the department would use its own numbers, but

7     actually for the most part I am going to use the monitor's

8     numbers.  And if I don't, I will certainly highlight that.

9          But the most recent metrics show that the department

10    is continuing to improve markedly over prior years in the areas

11    that are central to this proceeding, which is use of force,

12    slashing, stabbings, and deaths in custody.  And I want to

13    address the allegation that all of these numbers should be

14    called into question because of some of the recent incidents,

15    and I don't think that that conclusion is warranted.  Because

16    the only incident -- there is only one incident in which a COD

17    was not reported or created, you know, report to the COD, which

18    is part of the department's procedures for making sure that

19    important incidents resulting in substantial injury or death

20    are tracked.  And so we acknowledge that that report should

21    have been made and that is something that's under

22    investigation.  But you can't conclude from one failure to file

23    one COD that an entire reporting system is flawed and

24    inaccurate.  It warrants investigation, it warrants perhaps

25    audits, certain review of records, but you can't make that

N6d2NunH

1    conclusion that these numbers are meaningless because of one

2    single incident.

3            So what do the numbers show?  They show that despite

4    the allegations of unsafe conditions, imminent harm, and

5    excessive force, and the evidence for that is not in the

6    numbers provided by the monitor in their June 8 report.

7    (Inaudible) 12.23 that's --

8            THE COURT:  Mr. Scheiner, you froze for a minute, so

9    if you could go back to the beginning of the sentence that

10   includes 12.23, that would be helpful.

11           MR. SCHEINER:  Sure.  Thank you.

12           The systemwide rate of use of force peaked in 2021 at

13   a rate of 12.23.  That is a rate based on incidents over

14   population, and it is now at a rate of 9 as of April 2023,

15   which is a 26 percent decline.

16           I also want to add there about use of force that there

17   seems to be an assumption being made or an assertion that all

18   use of force is improper, that all use of force is excessive.

19   For the reasons that I mentioned before, that's simply not a

20   valid conclusion.  Some use of force is necessary for the

21   safety of persons in custody, and whether or not it is

22   excessive requires investigation of the circumstances, and

23   there are only two incidents currently before the Court where

24   that's even an issue and no evidence in the submissions other

25   than reports on what the evidence might show.

1            So there is also data on systemwide stabbings and

2       slashings which peaked in 2022 at a rate of 0.69 and is now at

3       a rate of 0.5 as of April 2023.  That is a 27.5 percent

4       decline.  And this trend is even more clear if you start in mid

5       2022.  The first half of that year had a rate of 0.77, but the

6       second half had a rate of 0.62, which is a 19.4 percent decline

7       just in that year.

8            The rate of systemwide fights declined from 9.28 in

9       2021 to 7.98 from 2023.  That is a 14 percent decline.

10           And assaults on staff with use of force is down from a

11      rate of 1.67 in 2021 to 1 in 2023, a 40 percent decline, and

12      these were all numbers reported by the monitor.

13           In addition, assaults on staff without a use of force

14      was at a rate of 2.26 in 2021 and is down to 1.04 in 2023, a

15      53.9 percent decline.

16           I think for plaintiffs' counsel to assert that somehow

17      these figures should be ignored is unsupported.

18           Now, with respect to deaths in custody, the department

19      has a different way of counting those than the monitor because

20      the monitor lumped together in deaths in custody persons who

21      are no longer in custody, specifically, compassionate release

22      individuals, persons who were released under the compassionate

23      release policy because of severe medical conditions.

24           But even using the monitor's own way of counting

25      deaths in custody, in this year there were only three deaths in

N6d2NunH

| | |
|---|---|
| 1 | custody through June 2023.  The rate in 2022 was highlighted as |
| 2 | the highest rate ever, but just as with use of force, that not |
| 3 | every use of force indicates any type of misconduct, not every |
| 4 | death in custody indicates a fault of the facility or the |
| 5 | department.  Unfortunately, people in custody die for many |
| 6 | reasons. |
| 7 | In 2022, the monitor has identify the different |
| 8 | reasons.  One of those deaths was characterized by the monitor |
| 9 | as accidental.  Four concerned medical conditions.  Six were |
| 10 | overdoses.  Five were suicides.  One drowned.  Two were |
| 11 | undetermined due to death outside of DOC custody.  So to say 19 |
| 12 | people died in custody may be more or less a fact, except for |
| 13 | the two that were added who were not in custody, but it doesn't |
| 14 | really tell you anything about whether the department was at |
| 15 | fault in connection with those deaths.  But we know that this |
| 16 | year the rate of deaths in custody is far reduced. |
| 17 | In the April 3 report, the monitor found that the |
| 18 | department's trends in death and custody, even counting them in |
| 19 | the way that they count them, were no different from and in |
| 20 | some years significantly better than the municipalities they |
| 21 | chose for comparison, which were L.A. County and San Diego. |
| 22 | The city had lower death in custody rates than San Diego for |
| 23 | every year—every year—from 2013 to 2022, and in some years |
| 24 | far below L.A. as well. |
| 25 | There are other statistical comparisons done by the |

N6d2NunH

1    department using the department's definition of death in

2    custody, which excludes people who are on compassionate release

3    who have been released when they are dying.  But they have done

4    a comparison to other comparable municipalities and they found

5    that the city's death in custody rates for 2023 are superior to

6    the cohort systems, including L.A. County and San Diego County,

7    two of the systems, the two systems that the monitor chose for

8    comparison in the April 3, 2023 report.

9              Of course the department wants to improve all of these

10   metrics as much as does anyone in this room, but that cannot be

11   done overnight starting from the position, the unfortunate

12   position that the department was found in two years ago.  Some

13   of the force, some fights and slashings and even some deaths

14   and hospitalizations are in fact an inevitable part of any

15   correctional system.  There is no statistical evidence showing

16   that the department has had an increase in excessive force or

17   any worsening of unsafe conditions.  That is not to normalize

18   the rates of these unfortunate events that exist now.  The

19   department is committed to reducing them.

20             But to say that something is excessive requires that

21   you answer the question compared to what?  Here, when compared

22   to the recent part of, there is no doubt that the metrics are

23   moving quickly in the right direction.  In comparison to 2015,

24   although worth noting, it is not really apt because since that

25   time we have had rise in crime rates, rise in rates of mental

N6d2NunH

1    illness, and the staffing problems that COVID brought and other

2    changes, and analyzing the reasons why the rates increased so

3    much between 2015 and 2021 is not possible within the confines

4    of the current record or today's conference.

5           But whatever the cause of the trends since 2015 to

6    2021, they are now moving in the opposite direction and to us

7    it makes little sense to declare a crisis or breaking point has

8    been reached just when things are starting to improve.

9           Now although the monitor says that communication has

10   declined since 2021, the hard data also shows rapid improvement

11   in outcomes since 2021.  And of course we want to improve on

12   both scores.  To do that, we need continued cooperation with

13   the monitor, not conflict, and the proposed order with the

14   slight modifications by the city is the best means to move

15   ahead with its continued success.

16          I can answer any questions the Court may have.

17          THE COURT:  Do you have any comment in response to

18   Mr. Powell's question as to the choice of speaking to the media

19   rather than to the specifics raised in the monitor's

20   submissions to the Court?

21          MR. SCHEINER:  Well, your Honor, I can speak only for

22   my own office, the law department.  The monitor's submission of

23   June 8 occurred only four full days in the past, two business

24   days, two weekend days, and it is not within our earthly power

25   to respond definitively in writing to every assertion that was

N6d2NunH

1    made in that report.  It was 81 pages long.

2                With respect to comments to the press, I don't even

3    know when they were made.

4                THE COURT:  Before June 8 and on June 8 I think.

5                MR. SCHEINER:  Well, I will just clarify when the

6    reports came out is not necessarily when the comments were

7    made, and I do not have the facts on that, and the law

8    department was not part of that -- those statements.  So I have

9    to defer to the commissioner on any questions about the public

10   statements.

11               THE COURT:  Thank you.

12               Mr. Commissioner, you and the mayor made some joint

13   statements and statements along the same themes after at least

14   the initial reports came out.  I would be grateful for anything

15   you would wish to share as to your reasoning there rather than

16   organizing your response to the Court or a response that dealt

17   with the scope and gravity of what at least was perceived by

18   the monitor

19               COMMISSIONER MOLINA:  Thank you for question, your

20   Honor.

21               I think our response is sort of regarding the report

22   that was filed with the Court, which is public, with a need to

23   provide our preliminary point of view on the incidents that had

24   occurred and our point of view that they did not represent a

25   cascading, systemwide situation that were causing persons

N6d2NunH

1    placed in our city's jail system at risk of harm.

2              THE COURT:  And so that was a message that you wanted

3    to convey to the public?

4              COMMISSIONER MOLINA:  Yes.

5              THE COURT:  Thank you.

6              If you will all hold on just one second, I have to

7    check something on our timing before we go to the discussion of

8    next steps.

9              (Pause)

10             MR. SCHEINER:  Your Honor, when you are ready I would

11   just like to add one more thing, when you are ready.

12             THE COURT:  You might as well do that now.

13             MR. SCHEINER:  I also wanted to clarify that your

14   Honor ordered us to report to the monitor rather than the

15   Court.  The order was issued on May 31.  The deadline was June

16   5 at noon, and we did our utmost to do that in a very unusually

17   short period of time, considering that these were five complex

18   incidents of which there are hundreds of documents relevant to

19   each one.  So we did our best to report to the monitor in

20   response to questions about those five incidents within that

21   period of time, as well.

22             THE COURT:  Thank you, Mr. Scheiner, and I do

23   acknowledge that, as the monitor's subsequent submissions

24   indicate, that response was made to the monitor and a great

25   deal of information was provided to the monitor.

N6d2NunH

1          Now if you will all bear with me for a moment.

2          (Discussion off the record)

3          THE COURT:  Counsel and Mr. Commissioner and those

4     observing, we are going to take just a five-minute break, and

5     so when you are done whatever you are doing in those five

6     minutes, come back and when everybody is back on camera, we

7     will proceed and people on the AT&T line don't hang up.

8          Thank you.  See you in a few.

9          (Recess)

10         THE COURT:  Good afternoon.  This is Judge Swain.  I

11    am back on the bench, and so I would ask that those who are

12    participating turn their cameras back on so that we can do a

13    quick check to see if everyone is here.

14         I think that we are all here.  I see Ms. Werlwas,

15    Mr. Powell, Mr. Martin just came on, the deputy commissioner --

16    I'm sorry, the deputy monitor, the commissioner, and

17    Mr. Scheiner.  And so I think we are ready to proceed now with

18    the next steps aspect.

19         So I will begin again with the monitor and the deputy

20    monitor.

21         MS. FRIEDBERG:  Your Honor, I think Mr. Martin -- this

22    is Anna Friedberg.  Mr. Martin is going to take this one, but I

23    did just want to respond with two comments with respect to the

24    necessary and excessive force statements that were recently

25    made by the city.

N6d2NunH

1          The first is with respect to the status of unnecessary

2     and excessive force.  As you know the monitor team has --

3          THE COURT:  Slow down just a little bit, please.

4          MS. FRIEDBERG:  Sure.

5          THE COURT:  Thank you.

6          MS. FRIEDBERG:  Sorry, your Honor.

7          The monitoring team is charged with assessing

8     compliance with respect to the use of unnecessary and excessive

9     force, so I will just reiterate my comments at the beginning of

10    this, which is that the monitoring team's findings are that the

11    unnecessary and excessive use of force in this agency have not

12    been abated.

13         The second is with respect to the timing for

14    investigations of unnecessary and excessive force.  The city

15    claims that perhaps it can take upwards of years.  I will just

16    remind all the parties that this consent judgment has specific

17    deadlines for investigations depending on whether their intake

18    investigations are full ID investigations.  I won't go into

19    those details, but I can assure you it is not years.  It should

20    be, at most, 120 days.

21         With the rest of it, I will not go into any further

22    detail but did just want to make those two clarifying points

23    for the Court.

24         And unless you have any other questions, I will leave

25    it to Mr. Martin to proceed with respect to the proposed next

N6d2NunH

1    steps.

2              THE COURT:  Thank you, Ms. Friedberg.

3              I will turn to Mr. Martin now.

4              MR. MARTIN:  Thank you, your Honor.

5              Your Honor, there are a number of considerations

6    regarding next steps.  We outline three today.

7              First, the monitoring team will be submitting its next

8    report to the Court on July 10, 2023.  In this report, the

9    monitoring team will be making an assessment regarding the

10   progress that has occurred under the action plan in the ongoing

11   risk of harm as required by section G, paragraph (6) in the

12   action plan.  This will be a critical and important evidentiary

13   finding, and my team is working hard preparing this report.

14             Second, we have recommended that certain immediate

15   steps must be taken to address the ability for myself, as the

16   monitor, and my team to fulfill our responsibilities under the

17   *Nuñez* court order.  To that end, we respectfully request that

18   the Court enter the proposed order that the monitoring team

19   submitted to the Court yesterday on June 12.  The basis for our

20   recommendations is outlined in three submissions we made to the

21   Court on June 8 and June 12.

22             As part of this relief, we also respectfully reiterate

23   our recommendation that the Court impose any other such relief

24   the Court deems just and proper to ensure that the city and

25   department abide by the *Nuñez* court orders to ensure that I, as

N6d2NunH

1  the monitor, may fulfill my responsibilities under the *Nuñez*

2  court orders, and to ensure that the Court receives accurate,

3  timely, and reliable information.  I want to repeat that,

4  accurate, timely, reliable information.

5        Finally, we believe the parties and the Court must

6  also consider the additional remedial relief that may be

7  necessary to that end.

8        We now defer to the parties and the Court for

9  discussion on additional next steps and remedial action to be

10 taken.

11       Thank you, your Honor.

12       THE COURT:  Thank you.

13       I would, I think, first ask -- actually, I will ask

14 each of the parties to speak, and to the extent anyone wishes

15 to address the objections that have been raised to the proposed

16 order, that can be done in the context of the remarks.  To the

17 extent there is a request for anything else, any other specific

18 steps to be taken at this time, that should be made clear in

19 the remarks as well.

20       And so I will turn to Ms. Werlwas.

21       MS. WERLWAS:  Thank you, your Honor.  Mary Lynne

22 Werlwas for the plaintiffs.

23       Your Honor, addressing the two items that you just

24 requested, first, with respect to the proposed order by the

25 monitor, as I believe the monitor represented, plaintiffs

N6d2NunH

1    certainly consent to entry of the proposed order by the monitor

2    as the monitor submitted it.  We think that the monitor has

3    well stated the necessity for the provisions that the city

4    seeks to strike out, and we do not think that those are

5    certainly not merely ministerial or housekeeping edits on the

6    city's part but, rather, are material changes in an order that

7    is meant to underscore and, in our view, not to create new

8    obligations but to underscore existing obligations that have

9    not been honored in the department, and therefore we would ask

10   the Court to enter the monitor's proposed order as the monitor

11   submitted it.

12          That said, that order alone in our view is not

13   sufficient to address the harm to the plaintiff class or,

14   frankly, in our view, to materially alter the course of

15   conduct.  Even if -- while we also agreed of course that

16   appointment of a *Nuñez* manager is an important step to breaking

17   many of the logjams that have resulted in today's hearings and

18   to this profound crisis and lack of trust in this process, a

19   *Nuñez* manager alone does not change the facts on the ground,

20   does not change the staff practices, does not provide the

21   leadership that is necessary and that is profoundly lacking.

22   So as noted, it is, in other words, a welcome but ultimately

23   small move forward.

24          THE COURT:  Ms. Werlwas, could you hold on one second?

25   I see that we lost the picture of the deputy monitor.  I am

N6d2NunH

1    asking my courtroom deputy whether she can -- oh, the deputy

2    monitor is back.  Okay.  I just wanted to make sure we hadn't

3    lost you, Ms. Friedberg.

4              MS. FRIEDBERG:  Your Honor, my wifi is a little bit

5    unsteady so when I am not speaking I have just been putting my

6    camera off so that I can ensure I can hear the feed well, if

7    that's okay with you.

8              THE COURT:  That's fine.  I just wanted to be sure we

9    hadn't lost you altogether.

10             My apologies for interrupting you, Ms. Werlwas.  You

11   may continue.

12             MS. WERLWAS:  Thank you.

13             So what -- in terms of what specific next steps must

14   happen, we are summarizing here, but we think it is very clear

15   that the next steps that have to happen in this case have to be

16   steps that will change these eight years of failed efforts.  We

17   cannot simply continue down the same path expecting different

18   results.  And what, in our view, as is no surprise, as we have

19   told the Court, it requires at this point is that the Court

20   should now begin the proceedings to lead to appointment of a

21   receiver to undertake the actions necessary to bring the

22   department into compliance with this Court's orders in this

23   matter.

24             As a threshold step, certainly the Court and the

25   parties have thoughts on how that process could be most

N6d2NunH

efficiently done given the posture of this case.  The Court

undoubtedly has views on the proper procedure and, given the

fact that much of the evidence in support of such an

application is already before the Court in the form of the

monitoring reports, we would welcome such guidance.  That said,

we do have our own proposals for the procedures by which this

should move forward and that we are happy to discuss.

           As for timing, while we believe the record before the

Court and right now fully demonstrates that the action plan has

failed as have the myriad of plans, initiatives, and programs

that preceded it, and indeed as have the preceding class

actions that for decades have tried to solve this problem, and

we think the record will show why a receiver is necessary to

bring relief to the plaintiff class, we are mindful that the

monitor is filing this report on July 10, that there is an

existing process under way, and in that report that the monitor

is tasked with its formal assessment of compliance with the

action plan and other court orders.  So we think that in order

to avoid a piecemeal presentation to the Court of the state of

the record and honoring other stakeholders' wishes, we propose

that the monitor file its report on July 10 and within two

weeks the plaintiffs file motion papers addressing the relief

that we seek, including receivership, and that a motion

schedule then follow.  We propose the city's reply due promptly

within 30 days, our reply in two weeks, but those further

N6d2NunH

1    details, again, about the process, your Honor, while we have

2    our proposals, we would welcome a discussion with the Court.

3            But to make clear, where we are now is we believe the

4    record at this point mandates moving forward with the relief

5    that we think is necessary in this case to provide relief and

6    that no lesser relief will provide relief to the plaintiff

7    class.

8            THE COURT:  Thank you.

9            I will hear from Mr. Powell.

10           MR. POWELL:  Thank you, your Honor.

11           First, with respect to the proposed order submitted by

12   the monitor and attached to his report filed yesterday, as we

13   said, we fully support the entry of the filing that -- of the

14   filing of that order in the form that it was submitted by the

15   monitor.  It appears very clear from today that there is a

16   fundamental difference in view between the city and the monitor

17   about the extent of transparency and the current working

18   relationship.  The monitor has expressed severe concerns in

19   numerous submissions about a deterioration in transparency of

20   the city and the department and a failure to provide timely and

21   accurate information to him.  The mayor has expressed -- made

22   some public statements that certainly could be read to question

23   the credibility of the monitor.  And when we sit here today,

24   the city and Commissioner Molina are explaining a very

25   different picture, that they are fully cooperative, fully

1    partnering, and doing their best to provide information

2    whenever requested.

3           I can't opine or provide information on which

4    perspective is correct, but it is very, very concerning that

5    the monitor, who is an agent of the Court, is concerned about

6    his ability to carry out his functions here and his ability, in

7    essence, to trust the information that he is getting from the

8    city.

9           As to the order, I can address the three proposed

10   changes the city has made and why we oppose them if you would

11   like.  Would that be helpful to your Honor or would you like to

12   hear from the city on those three changes first?

13          THE COURT:  I think, in fairness to the city, your

14   specific response in opposition would be helpful.  The monitor

15   has already done that in writing, so I would ask you to speak

16   to your response to the objections now before I call on the

17   city.

18          MR. POWELL:  Sure.

19          Very briefly, I think there are three substantive

20   changes proposed by the city.

21          The first was the leading language requiring the

22   monitor to approve the selection of the individual to serve as

23   a *Nuñez* manager.  I think that -- I don't think the monitor has

24   any objections with the person who has been chosen to at least

25   initially serve in that capacity, but the monitor is the one

N6d2NunH

1   who is going to be dealing regularly with this person and this

2   person is going to be the point of contact for the monitor, so

3   we think it is a very reasonable position to allow the monitor

4   to at least approve whoever may hold that position.

5          Second, there was a change to the description of the

6   responsibilities of the *Nuñez* manager, and this was all in what

7   was in paragraph 7 of the proposed order, your Honor.  The city

8   has deleted language limiting the monitor's -- *Nuñez* manager's

9   responsibilities to those covered by the *Nuñez* court orders.

10  The city has proposed that they just include those

11  responsibilities, leaving open the possibility that this

12  individual may have many other responsibilities not related to

13  the broad court orders in this case.  We think that defeats the

14  purpose of what the monitor is seeking here.  I think he

15  certainly can speak for himself, but I think in his submissions

16  he has indicated he needs someone who is explicitly devoted to

17  focusing on the myriad of issues in the *Nuñez* court orders.  If

18  this person is distracted by other responsibilities——we are

19  just talking one person here——we think it could undermine the

20  function that the monitor thinks necessary here.

21         Finally, the city has deleted what was paragraph 1 of

22  the proposed order which in essence requires the department to

23  send out communication to their staff, which they regularly do.

24  In this case it would reiterate the obligations of staff to be

25  candid, transparent, forthright, and accurate when

N6d2NunH

1    communicating with the monitor.  We do not see any harm in

2    doing that given the issues that the monitor has raised.

3    Communications go out to staff all the time.  Given the record

4    and the monitor's concerns with the accuracy of the information

5    he's been receiving, we think there is no harm in reminding

6    staff of their obligations to be candid and forthright with the

7    monitor.

8              I do want to note that my, just, responses to the

9    points made by city, I do want to very briefly address the

10   city's views as to -- the government's views as to next steps,

11   your Honor.

12             THE COURT:  Yes.

13             MR. POWELL:  Based on the most recent reports filed by

14   the monitor and our ongoing discussions with the team which are

15   very, very frequent, the government has grave doubts about the

16   ability of this administration and the department's current

17   leadership to implement the reforms and changes that are

18   necessary to bring the city into compliance with the 2015

19   consent judgment and four subsequent orders entered by this

20   Court since August 2020.

21             As the Court is aware, the action plan approved by

22   your Honor on June 14, 2022, represented what the monitor

23   referred to as a road map, and I'm quoting, "road map for

24   addressing the foundational deficiencies that inhibit the

25   department's ability to build sustainable reforms."  That's

1   Docket No. 462.

2              The action plan was developed with significant input

3   from the department.  The plan was designed to keep the primary

4   goal of the consent judgment and prior court orders to

5   substantially reduce the level of violence and the ongoing harm

6   being suffered by people detained in the city's jails and the

7   staff who work there.

8              Now, almost half a year -- almost a year and a half

9   after Commissioner Molina's appointment and a year after the

10  action plan was finalized, the constitutional rights of people

11  in the city jails continue to be violated on a daily basis, the

12  staff continues to be injured on a regular basis due to the

13  high level of violence in these facilities.  The monitor's June

14  8 report includes "the people in custody, as well as DOC staff,

15  continue to face a pervasive, imminent risk of harm," quoting

16  page 5 of that report.

17             Based on his analysis of the data and review of staff

18  practices, the monitor further finds that the department

19  continues to fall far short of their requirement to materially

20  improve upon the level of safety and the rate at which force is

21  used in the jails and the amount of unnecessary and excessive

22  force which remains far too prevalent.  These findings are, of

23  course, consistent with the conclusions that the monitor has

24  repeatedly made in prior reports submitted to the Court since

25  the action plan was entered.

N6d2NunH

1          Moreover, as outlined in the monitor's previous three

2     reports, including the 200-plus page report filed on April 3,

3     the city and department continued to be in clear noncompliance

4     with core provisions of the consent judgment and your Honor's

5     subsequent orders, including the requirement to implement and

6     follow through in the department's own use of force policy and

7     requirements to conduct thorough, timely, and objective

8     investigations of use of force incidents.

9          We were hopeful that the city's commitment to revamp

10    the department's leadership structure, to bring in outside

11    corrections experts, and to work in close consultation with the

12    monitor and his subject matter experts could potentially avert

13    the need for more intrusive relief.  We are now concerned that

14    that may not be the case.

15         As the monitor has referenced and as the Court is

16    aware, the monitor will be filing his final report under the

17    action plan on July 10.  Pursuant to paragraph G(6) of that

18    plan, the report must include the monitor's assessment, a

19    two-pronged assessment, one, as to whether the city and

20    department have made substantial and demonstrable progress in

21    implementing the reforms, initiatives, plans, systems, and

22    practices outlined in the action plan; and, two, whether such

23    efforts that resulted in a substantial reduction in the risk of

24    harm currently facing people in custody and DOC staff.

25         The government will carefully review the monitor's

N6d2NunH

1    July 10 report, including the monitor's determinations with

2    respect to these two questions and the basis for those

3    determinations.  We will then advise the Court regarding our

4    views on next steps, including whether we will ask your Honor

5    and join in Legal Aid's anticipated application to appoint an

6    outside receiver with independent authority to take all

7    necessary actions, bringing the city and department into

8    compliance with the consent judgment and remedial orders

9    entered in this case, or whether we would seek other forms of

10   extraordinary court relief.

11         Thank you, your Honor.

12         THE COURT:  Thank you, Mr. Powell.

13         Now Mr. Scheiner and the commissioner.

14         MR. SCHEINER:  Hi.  This is Alan Scheiner for the city

15   of New York and the department.

16         I want to address first something that was said

17   recently that I think -- well, I think I was misquoted to

18   suggest that the city did not intend to comply with the

19   timeliness requirements for investigations and disciplinary

20   actions.  What I was referring to earlier as taking years is

21   not investigations, but litigations, to point out simply that

22   these are complex legal questions if the question is did

23   somebody violate the Constitution in using force.  The city

24   acknowledges the requirements for it to investigate and

25   discipline people for excessive force, and I don't think

N6d2NunH

1    there's been anything in the current record to show that

2    currently the city is deficient in that regard.

3         I also want to point out something that was said

4    earlier which highlights the difficulty in coming to quick

5    conclusions about what specific and recent incidents mean

6    because plaintiffs' counsel claimed that the individual in

7    incident five was in the ICU.  That is not true.  They are not

8    in the ICU.  They are in city custody and in a city facility.

9    And they also asserted that, on the basis of I don't know what,

10   that the person was in the hospital to begin with because of

11   some excessive force.  That is a medical question.  I won't get

12   into the details because it's confidential and also because it

13   would be premature, especially as no medical experts have been

14   consulted.

15        But I want to get now to the issue of remedies and

16   first address the assertion that the Court should set a

17   schedule for briefing on the appointment of a receiver.  We

18   believe that would be extremely premature to do that before

19   having the monitor's report on July 10, and we look forward to

20   that report.  So we ask the Court to simply defer that question

21   of briefing schedule on a receiver, whether it is warranted at

22   all, and, if so, what the pace should be until then.

23        But I do want to note, however, something about the

24   significance of that request for receiver because I'm not sure

25   that the way it's been presented appreciates it.  The mayor of

N6d2NunH

1    the city of New York, of course, is elected democratically and

2    the mayor has delegated to the commissioner the responsibility

3    of the city government to administer the Department of

4    Correction, and that department does what it does under

5    obligations under state law and obligations to other

6    governmental entities.  What the appointment of a receiver

7    means is that control over all of that, as well as the fiscal

8    expenditures associated with it, as well as the liabilities

9    associated with it, control of everything would be taken away

10   from the voters and taxpayers of the city of New York and put

11   in the hands of somebody who is appointed by the Court but is

12   not accountable to the people of the city of New York and --

13   unless there was -- it would present burdens on the city of New

14   York—liability and fiscal—that result in decisions by

15   somebody not accountable democratically.

16         So I think that although that step has been taken in

17   other cases, it is a very, very big step.  It is a very, very

18   undemocratic step.  We believe it is a very, very complex

19   question about whether or not the standard for receiver has

20   been met, and so to suggest that that issue should be briefed

21   in the minimum amount of time for a motion under the Federal

22   Rules of Civil Procedure, 30 days, suggests a rather flippant

23   attitudes toward the weight of that question.

24         But I will turn now to the proposed order because the

25   city agrees with all of the provisions in the monitor's

N6d2NunH

1   proposed order.  We also want clear reporting requirements,

2   we want a clarified process for the review of policy changes,

3   and we want a *Nuñez* manager dedicated to ensuring that the

4   department manages and addresses all of the items required by

5   the consent judgment and subsequent orders in this case and

6   requests for information from the monitor.  And we are grateful

7   that the monitor took into account most of the city's concerns

8   in advising the Court.

9          But I want to address the few areas of disagreement.

10  They concern the commissioner's retention of four elements of

11  his management authority——communication and control of the

12  staffing.  The commissioner needs to be able to communicate

13  with his staff as needed, when needed, and in the manner

14  needed.  Correctional work is challenging and dangerous.  The

15  commissioner's relationship with his staff is of paramount

16  importance to morale and motivation.  The monitor's proposal

17  would allow the monitor to dictate precisely what can be said

18  by the commissioner in a manner that is not needed.  The

19  commissioner has consistently encouraged cooperation with the

20  monitor and will continue to do so and will address with staff

21  the monitor's recent concerns.  But to allow the monitor to

22  dictate how and when that is said would impair the

23  commissioner's ability to manage the department.

24          Regarding the *Nuñez* manager, the commissioner should

25  also be permitted to choose the people who work at the

N6d2NunH

1   department.  That is an authority inherent in and necessary to

2   management of this vital function.  The mayor elected by the

3   people of the city of New York -- the mayor was elected, as I

4   noted before, and delegated his authority to the commissioner,

5   and there is no evidence that the commissioner would use that

6   authority over hiring or assignment of department employees to

7   interfere with the monitor's work.  The monitor acknowledges

8   that the department's choice of a *Nuñez* manager is highly

9   qualified.  If changes are made in the future, the department

10  will seriously consider the need with the monitor.  And if the

11  monitor believes that the *Nuñez* manager, whoever that may be at

12  that time, is interfering with the goals of this proceeding,

13  then the city will consult with the monitor about that and, if

14  necessary, the issue can be brought to the Court.

15          The same is true of the change in the *Nuñez* manager's

16  responsibilities.  The department intends for the *Nuñez* manager

17  to attend to their *Nuñez* role on a full-time basis and has no

18  plans to alter that.  The city only asks that the commissioner

19  retain the discretion to assign other duties to that person, if

20  necessary, under future circumstances that cannot be predicted,

21  if that is consistent with the *Nuñez* manager's role.  The city

22  will seriously consider the monitor's advice should this ever

23  present problems and, as always, disputes can be brought up

24  with the Court.

25          The city looks forward to moving forward with the

N6d2NunH

1   procedures in the monitor's proposed order with the slight

2   modifications requested, and we will try to address any

3   questions from the Court.

4           Thank you.

5           THE COURT:  Thank you.

6           I will now hear the monitor's further response, if

7   any, to the objections to the provisions in the proposed order.

8           MS. FRIEDBERG:  Your Honor, this is Anna Friedberg,

9   the deputy monitor.

10          We have nothing to add beyond our submission

11  yesterday, and the city's additional information now doesn't

12  change our position.

13          THE COURT:  Thank you.

14          I just ask that everybody be patient with me for a

15  couple of minutes while I reflect on what I have heard, and

16  then I will make my rulings on the issues that have been

17  raised.

18          (Pause)

19          THE COURT:  I do just want to make one thing clear.

20  Ms. Friedberg, the proposed order also includes a date shift

21  that would defer until the end of the year the next overall

22  compliance report, is that correct?

23          MS. FRIEDBERG:  Your Honor, actually no.  The

24  provision -- I assume what you are referring to is section 2 of

25  the proposed order related to the monitoring team's compliance

N6d2NunH

1   assessment for the action plan and select provisions of the

2   consent judgment and remedial orders.  Am I correct that we are

3   discussing the same provision?

4           THE COURT:  I, frankly, was working from memory of

5   discussions, so section Roman II, not Arabic 2, yes.

6           MS. FRIEDBERG:  Okay.  I am happy to provide some

7   clarification with respect to that provision.  What that

8   provision relates to is what the monitor -- the monitoring team

9   has a report due July 10.  That does not change.  However,

10  under the consent judgment, so a different order, the monitor

11  must provide biannual reporting on certain compliance ratings.

12  The provision -- sorry this is a little confusing.  The

13  provision with respect to II would permit the full biannual

14  report --

15          THE COURT:  I'm sorry.  The provision that I am

16  thinking of is in III, which is modification of section G

17  paragraph (5)(b) of the action plan suspending certain

18  compliance ratings and such through June 30.  So is that what

19  you were discussing right now?

20          MS. FRIEDBERG:  Your Honor, I'm sorry.  I didn't mean

21  to interject my own confusion by referencing Roman numeral. . .

22          THE COURT:  Now you have frozen.  I don't know if you

23  can hear us.

24          MS. FRIEDBERG:  I can hear you.  Can you hear me?

25          THE COURT:  Now I can hear you, yes.

N6d2NunH

1          MS. FRIEDBERG:  I am going to turn my camera off, if

2     you don't mind, and maybe that will make sure that the audio

3     feed is better.

4          THE COURT:  That would be fine.  Thank you.

5          MS. FRIEDBERG:  So, your Honor.  I will start again.

6          With respect to the provision related in III, which is

7     a modification to section G, paragraph 5, under the action

8     plan, what we are simply relating to is certain compliance

9     ratings the monitoring team is obligated to provide biannually.

10    So this will not impact the July 10 report.  However, it will

11    impact what we report out in the fall of 2023.  We seek

12    modification at this juncture because it will impact the work

13    that we need to do over the next few months in order to assess

14    compliance.

15         In practical terms, what it means is that our fall

16    report will look very similar to the report that you were --

17    that you received on April 3 that provides an update on every

18    section of the action plan as well as compliance ratings

19    related to the select group of consent judgment provisions and

20    remedial order provisions rather than a compliance rating for

21    every provision in every four of the court orders to date or

22    five court orders to date.  So given our seven -- or six or

23    seven reports already for this first six-month period of the

24    year, we thought it would be appropriate to continue with our

25    focus on that with respect to compliance for our fall 2023

N6d2NunH

1    report.

2           THE COURT:  Thank you.  I have not heard of or

3    received any objections to that provision, but I wanted to make

4    clear, especially for our public and press listeners, that if I

5    enter this order, there will also be that change in the

6    content, really, more than the timing of the fall report.

7           So give me just a couple of moments again.

8           (Pause)

9           THE COURT:  Thank you for your patience.

10          I will approve and enter the proposed order, which is

11   substantially consensual.  I find that it is unfortunately

12   necessary to clarify and, again, underscore the

13   responsibilities that have been imposed by orders that have

14   been in place for years and more recent orders.  But to the

15   extent there are any ambiguities and to the extent that

16   specifics of timing and execution of methodology of

17   responsibilities is necessary to make sure that we are all

18   clear, it is appropriate and it is necessary.

19          I also find that it has been established sufficiently,

20   and the city has agreed, that there is a need for a

21   *Nuñez*-specific manager.  The city has objected to three -- just

22   one minute, really two provisions of the order, but related

23   provisions.  No, I guess it is three.  So as to the *Nuñez*

24   manager, there are objections to the specification of the scope

25   of the duties of the *Nuñez* manager and specifically to the

N6d2NunH

1    requirement in this proposed order that the *Nuñez* manager's

2    duties be exclusive to *Nuñez* compliance.  The city and the

3    department have represented on the record that that is the

4    commissioner's expectation at this point, but that there might

5    be circumstances in the future that would lead the commissioner

6    to believe that other duties should be assigned and they have

7    proffered that the city would consult with the monitor for the

8    monitor's input in connection with consideration of any such

9    change.  I am overruling that objection and rejecting that

10   proposal.  The communication and compliance issues, not only

11   with respect to these five incidents, but that have arisen over

12   the years under this and prior administrations and that have

13   manifested themselves over the past few months, make it clear

14   to the Court that an exclusively focused *Nuñez* manager is

15   necessary to coordinate communications while not in any way

16   compromising the monitor's ability to gather information from

17   and within the Department of Correction through the *Nuñez*

18   manager, from the *Nuñez* manager, and also from any others as

19   the monitor determines may be necessary to carry out the

20   monitor's duties.

21           So as with all court orders, on a showing of good

22   cause, the Court will consider a request in the future from the

23   city and the department to add or to give the commissioner the

24   ability to add other duties to the *Nuñez* manager without

25   compromising the function for which the *Nuñez* manager is being

N6d2NunH

1    appointed now, but the provision of the proposed order

2    requiring exclusive dedication of the *Nuñez* manager to *Nuñez*

3    compliance will remain.

4          As to the communications, there are, as I understand,

5    there are two objections, but I may be incorrect.  I certainly

6    understand that there is an objection to paragraph 1(a) which

7    gives the substance of communication to be delivered to all

8    staff and leadership and the precise wording of the

9    communication is required to be approved by the monitor, and

10   there is an objection to that as improperly invasive of the

11   commissioner's ability to communicate with staff.  This

12   particular communication is specific to the delivery of

13   information in connection with the monitor's ability to be able

14   to perform the monitor's Court-imposed responsibilities under

15   these court orders, and it is important to the Court that the

16   monitor be comfortable that the statement is sufficiently

17   specific, strong, and uniform and delivered in the way that is

18   contemplated by this order, that this provision will remain and

19   the city's objection to inclusion of the requirement in

20   paragraph 1(a) is overruled.  That was the

21   communication-specific objection.

22         And the third objection is to the provision of the

23   order that requires the approval of the monitor of any future

24   appointment to the *Nuñez* manager position.  That objection is

25   also overruled.  The Court recognizes the commissioner's duty

N6d2NunH

1    and responsibility and authority to determine the

2    qualifications of a *Nuñez* manager.  This provision does not

3    impede the commissioner's responsibilities or duty or authority

4    to determine who may be qualified to serve in that post.  What

5    it does do is ensure that if the monitor believes that the

6    person is not someone with whom the monitor will be able to

7    work effectively in performing the monitor's responsibilities

8    to the Court, and thereby to the public under the *Nuñez* orders,

9    the monitor does not have to be put in a wait-and-see position

10   about that.  And so it is appropriate, it is practical, and it

11   is consistent with the purpose and spirit of these orders in

12   this case to have the monitor approval requirement in

13   connection with future appointments to this very essential and

14   very important function that is designed to address fundamental

15   difficulties that the monitor has experienced and cataloged at

16   some length in being able to be confident of both the

17   availability and the accuracy of information that is provided

18   to the monitor.

19          And so the three objections to the order are

20   overruled.  The copyrighting, or not copyright in the sense of

21   protection of information, but the typographical or wording

22   error that was identified by the city will be corrected in the

23   version of the order that I sign, and so I will enter that

24   order.

25          As to the request for permission to commence

N6d2NunH

1    receivership motion practice, I think everyone recognizes

2    here—and the Court certainly does—that receivership would be

3    an extraordinary step here.  The Court has obviously yet to

4    determine, since motion practice hasn't even begun, whether it

5    will be appropriate and necessary here.

6         The Court's willingness to work with the parties and

7    to require the parties to engage in good faith in working with

8    the city and the department and in supporting and facilitating

9    the department's good faith and what the Court hoped would be

10   vigorous undertakings to both effectuate and speed up the

11   process of reform have been premised on the Court's expectation

12   that it would be able to be entirely confident of the

13   dedication and candor of the department and city leadership

14   with respect to information regarding these fundamental safety

15   issues, structure issues, and management issues in the jails,

16   and particularly Rikers.  The mayor has delegated to the

17   commissioner, and the mayor, as the elected leader of this

18   city, has overall responsibilities that go to the very safety

19   of the lives of people who are in custody pending determination

20   and disposition of criminal charges, people who do not have the

21   choice to be there, and for years now there has been a

22   situation that is, in the monitor or the deputy monitor's

23   words, not normal and not acceptable.  That has to change.

24        My confidence in the commitment of the city leadership

25   to be all in on in recognizing that need and in working with

N6d2NunH

1    the monitoring structure that the Court has imposed in good

2    faith and in all candor has been shaken by the incidents of the

3    past few weeks as detailed in the letters and by the way in

4    which the leadership has approached seeking to shape public

5    opinion and public perception of these very serious issues that

6    have been raised by the monitor.

7           And so while I am not ready to authorize or structure

8    receivership motion practice which would bring its own very

9    serious set of procedural and substantive questions and

10   questions as to the ability of another person or team to truly

11   achieve the aims of this process in which we have been engaged

12   for so long, I am willing to let the parties explore further

13   and seek to concretize the nature of any receivership motion

14   practice proposal and the set of issues that it would

15   implicate.

16          Therefore, following the July 10 report of the

17   monitoring team and in advance of the August 10 conference that

18   is scheduled, should the plaintiffs seek to pursue a request

19   for authorization to commence receivership motion practice, the

20   plaintiffs must meet and confer with the other stakeholders,

21   namely, the city and its leadership, the United States

22   Attorney's Office for the Southern District of New York, and

23   the monitoring team, which is a monitoring team and not a

24   stakeholder in the traditional sense, but clearly central to

25   the informational flow and evaluative function that has been

N6d2NunH

1    put in place here, regarding the potential structure and timing

2    of any receivership motion practice or motion practice seeking

3    some other type of relief.  And for the consideration of that

4    proposal in connection with the August 10 conference, a joint

5    report of the parties' proposals and positions must be filed on

6    the docket by August 3.  The Court will consider that

7    submission and it can be discussed at the August 10 upcoming

8    conference in this case.

9            Are there any questions about the Court's rulings?

10           Is there --

11           MS. FRIEDBERG:  Your Honor?

12           THE COURT:  Yes, Ms. Friedberg.

13           MS. FRIEDBERG:  This is Anna Friedberg, deputy

14    monitor.

15           I have a logistical question for you with respect to

16    the ordering of the city to provide a transcript of today's

17    hearing, and just respectfully request that such an order be

18    made and provided to the Court and the monitoring team.

19           THE COURT:  Yes.  The Court -- thank you for reminding

20    me.

21           The Court directs the city to order the transcript of

22    this proceeding and orders that it be provided by Friday and

23    that copies be provided by the court reporter to the monitoring

24    team and to the Court.  So that is Friday of this week, which

25    is the 16th of June, and I am just going to ask the court

N6d2NunH

1    reporter to indicate whether that is feasible.

2              (Court and court reporter confer)

3              THE COURT:  And she has confirmed that that is

4    feasible.

5              Thank you, again, for reminding me, Ms. Friedberg.

6              Is there anything else that we need to discuss

7    together in this conference?

8              Seeing nothing, I thank you all very much.

9              MR. POWELL:  Judge?  Your Honor?

10             THE COURT:  Yes, Mr. Powell.

11             MR. POWELL:  Sorry to jump in, but I was conferring

12   with Ms. Eshkenazi.  Due to prescheduled commitment, it may be

13   difficult for us to meet and confer and meet that August 3

14   deadline.  Would it be possible to move that to a little closer

15   to the conference?  I don't have a calendar in front of me.

16             THE COURT:  August 3 is the week before.  So what are

17   you thinking about?

18             (Counsel confer)

19             THE COURT:  August 10 is a Thursday.  So August 3

20   would be a Thursday.

21             MR. POWELL:  Is there any way to have -- yeah, is

22   there any way to have it be August 7 or 8?  Just that prior

23   week is the week where our availability is limited.  We

24   certainly can participate in calls, but to make a written

25   submission, we understand that it needs to be well in advance

N6d2NunH

1     of your Honor's conference, but would August 7 be possible?

2                THE COURT:  August 7, by Tuesday afternoon.

3                MR. POWELL:  Okay.  Thank you.

4                THE COURT:  Thank you.

5                And so we are now adjourned.  Thank you.  Stay safe

6     and be well, everyone.

7                COUNSEL:  Thank you, your Honor.

8                                    oOo

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25