# Special Report
# by the
# *Nunez* Independent Monitor

**July 10, 2023**

# THE NUNEZ MONITORING TEAM

Steve J. Martin
*Monitor*

Kelly Dedel, Ph.D.
*Subject Matter Expert*

Anna E. Friedberg
*Deputy Monitor*

Dennis O. Gonzalez
*Associate Director*

Patrick Hurley
*Subject Matter Expert*

Alycia M. Karlovich
*Analyst*

Emmitt Sparkman
*Subject Matter Expert*

# Table of Contents

**Introduction** ............................................................................................. **1**

    Executive Summary ................................................................ 2

    Role of the Monitor & Reporting ........................................... 3

    Background of Nunez Court Orders ....................................... 4

    Monitoring Team's Assessment of Progress .......................... 6

    Organization of the Report .................................................... 10

**Security, Violence, and Use Of Force** ........................................ **12**

    Unnecessary and Excessive Force ......................................... 13

    Staff Reporting of Incidents ................................................. 28

    Security Initiatives ............................................................... 31

    Violence Indicators .............................................................. 54

    Department's Use of Data to Improve and Reduce the
Use of Force and Increase Facility Safety ............................ 64

    Conclusion ........................................................................... 67

**Leadership, Supervision, and Training** ..................................... **69**

    Department Leadership .......................................................... 69

    Supervision ........................................................................... 73

    Training ................................................................................. 82

    Conclusion ........................................................................... 87

**Uniform Staffing Practices** ........................................................ **89**

    Efforts to Improve the Availability of Staff .......................... 89

    Staff Assignments to Posts in the Jails ................................. 98

    Conclusion ........................................................................... 107

**Management of Incarcerated Individuals** .................................. **109**

    Intake .................................................................................... 110

    Classification ........................................................................ 121

    Management of Incarcerated Individuals Following Serious Incidents of Violence .......... 123

    Conclusion ........................................................................... 126

**Staff Accountability – Identifying and Addressing Misconduct** ..................**127**

    Regression in Identifying Misconduct.................................................................. 127

    Addressing the Misconduct & Case Processing .................................................. 131

    Conclusion .......................................................................................................... 140

**DOC's Management Structure Management of Nunez Court Orders** ..........**142**

    DOC's Dysfunctional Management Structure...................................................... 142

    Department's Efforts to Address the Monitoring Team's April 2023 Recommendations.. 160

    Update on Issues Discussed at the June 13, 2023 Emergency Court Conference.............. 163

    Conclusion .......................................................................................................... 165

**Overarching Initiatives Related to Reform** .....................................................**166**

    Citywide Task Force ........................................................................................... 166

    Recruiting, Hiring and Onboarding New Staff.................................................... 166

    Reducing the Population & Addressing Increasing Lengths of Stay in Custody............... 168

**Conclusion and Monitor's Assessment**
**Related to § G ¶ 6 of the Action Plan** ...............................................................**171**

    Assessment of Progress & Risk of Harm Pursuant to Action Plan § G. ¶ 6....................... 172

    Next Steps........................................................................................................... 177

**Appendix A: Data** ............................................................................................**180**

    Annual UOF Number and Average Monthly Rate.............................................. 181

    UOF Number and Average Monthly Rate – January 2022 to May 2023 ........................... 183

    Annual Number and Average Monthly Rate of Stabbing and Slashing.............................. 184

    Number and Rate of Stabbing and Slashing from January 2022 to May 2023 .................. 186

    Annual Number and Average Monthly Rate of Fights........................................ 187

    Recent Number and Average Monthly Rate of Fights from January 2022 to May 2023.... 189

    Number and Average Monthly Rate of Assault on Staff, with and without UOF ............. 190

    Rapid Review Outcomes .................................................................................... 191

    Use of Force Involving Unmanned Posts ........................................................... 192

    Cell Door Installation ......................................................................................... 194

    Number of ADWs and Captains ......................................................................... 195

    Status of UOF Investigations.............................................................................. 197

Outcome of Intake Investigations ....................................................... 198

Status of Investigations ..................................................................... 200

Staff Suspensions .............................................................................. 201

Status of Disciplinary Cases ............................................................. 202

Command Discipline .......................................................................... 203

Unmanned Posts & Triple Tours ....................................................... 204

Sick Leave, Medically Monitored/Restricted, and AWOL ................. 206

Leadership Appointments – January 2022 to June 2023 .................. 209

**Appendix B: Images of May 26, 2023 Incident #1** ................ **211**

**Appendix C: Monitor's April 2023 Recommendations** .................. **224**

**Appendix D: Transcript of Nunez Video** .................................. **232**

**Appendix E: Proposed Court Order** .......................................... **235**

**Appendix F: Commissioner's May 26, 2023 Letter To Monitor** ............ **240**

**Appendix G: Disciplinary Decisions by OATH &
Civil Service Commission** ............................................................ **245**

# INTRODUCTION

This report is the eighth[1] filed by the Monitoring Team since the Action Plan was ordered by the Court on June 14, 2022 (dkt. 465) and is filed pursuant to § G ¶ 2 of the Action Plan (as revised pursuant to the Court's May 5, 2023 Order (dkt. 529)). The purpose of this report is to provide a neutral and independent assessment of the Department's progress toward compliance with the requirements of the Action Plan after its first year of implementation along with relevant updates regarding the Department's management of the *Nunez* Court Orders[2] and the Monitor's Assessment of Compliance pursuant to § G ¶ 6 of the Action Plan.

The Monitoring Team last filed a report on June 8, 2023 and participated in an Emergency Court Conference on June 13, 2023. Since then, the Monitoring Team has remained actively engaged with all Parties. The Monitoring Team continues to communicate routinely with Department officials and to evaluate relevant information and data. The Monitoring Team has also met with counsel for the Plaintiff Class and the Southern District of New York. The Monitor and Deputy Monitor have also met with the City's Corporation Counsel, the U.S. Attorney for the Southern District of New York and the Court to discuss the current state of affairs.

---

[1] *See* Monitor's June 30, 2022 Report (dkt. 467), Monitor's October 27, 2022 Special Report (dkt. 471), the Monitor's February 3, 2023 Special Report (dkt. 504), Monitor's April 3, 2023 Report (dkt. 517), Monitor's April 24, 2023 Status Report (dkt. 520), Monitor's May 26, 2023 Special Report (dkt. 533), and Monitor's June 8, 2023 Special Report (dkt. 541). The Monitor has also filed two letters on May 31, 2023 (dkt. 537) and June 12, 2023 (dkt. 544).

[2] The *Nunez* Court Orders, include, but are not limited to the Consent Judgment (dkt.249), the First Remedial Order (dkt. 350), the Second Remedial Order (dkt. 398), the Third Remedial Order (dkt. 424), the Action Plan (dkt. 465), and the June 13, 2023 Order (dkt. 550).

*Executive Summary*

Following the first year of the Action Plan's implementation and after nearly eight years of monitoring since the Consent Judgment went into effect, there is no question that some progress has been made, but many of the initiatives required by the Action Plan remain incomplete or have not been addressed, and worse, there has been a disturbing level of regression in a number of essential practices. Compounding the concerns about the overall lack of progress is what appears to be the Department's inability or unwillingness to identify (and therefore address) the objective evidence regarding the pervasive dysfunction and harm that continues to occur daily in the jails. The Department's recent notable failures to consult with the Monitoring Team on issues that are clearly *Nunez*-related are also a concerning trend that serves as an impediment to reform.

As discussed in each section throughout this report, the pace of reform has stagnated instead of accelerated in a number of key areas, meaning that there has been no meaningful relief for people in custody or staff from the violence and the unnecessary and excessive use of force. A common theme unites the discussions in each section of this report—discrete areas of success and progress can be identified, but more frequent are failures to apply even the most basic correctional skills to improve practice.

Throughout this report, the Monitoring Team makes recommendations about short-term actions that can and must be taken in the next few months to address this imminent risk of harm. Further, for the reasons outlined in this report, and explained in greater detail in the conclusion, the Monitoring Team recommends that the Court initiate contempt proceedings in order to coerce compliance by the City, Department, and the Commissioner to address the condition precedents on which the *Nunez* Court Orders rest – including the pace of reform, improved

2

security practices, and the management of the *Nunez* Court Orders. More broadly the totality of circumstances require that *additional* remedial relief (beyond contempt proceedings) is necessary in order to implement the requirements of the *Nunez* Court Orders and catalyze the substantive changes required to protect the safety and welfare of the many people held in custody and who work in the jails.

## Role of the Monitor & Reporting

The Monitor is an agent of the Court. *See* Consent Judgment § XX. ¶ 30. The essence of a Monitor's role is to provide a neutral and independent assessment of compliance, which is specifically required by the Consent Judgment in this case. *See* Consent Judgment § XX. ¶¶ 1 and 18. Together, these paragraphs hold the Monitor responsible for assessing compliance via "independently verifying any representations from the Department regarding its progress toward compliance [ . . .] and examining any supporting documentation where applicable[.]" Further, as part of the Monitor's reporting obligations he must include "…the factual basis for the Monitor's findings [. . . ]."

The Monitoring Team has issued more than 40 reports and letters to the Court since the inception of the Consent Judgment. Just during the past three months, the Monitoring Team has issued five reports (including this report)[3] and has submitted two substantive letters to the Court.[4] Nearly all of the issues, deficiencies and poor practices discussed in this report have been addressed in multiple Monitor's Reports, some dating back years. In many of the substantive areas of the Action Plan, the discussion in this report closely mirrors reporting from October

---

[3] *See* Monitor's April 3, 2023 Report (dkt. 517), Monitor's April 24, 2023 Report (dkt. 520), Monitor's May 26, 2023 Report (dkt. 533), Monitor's June 8, 2023 Report (541) and this instant report.

[4] *See* Monitor's May 31, 2023 letter (dkt. 537) and June 12, 2023 letter (dkt. 544)

2022 and/or April 2023. To the extent that information or findings are consistent with what has been previously reported, citations to prior reports are provided to facilitate cross-referencing to more detailed information.

*Background of Nunez Court Orders*

The Consent Judgment was entered on October 22, 2015. Since then, the Court has entered five substantive Orders intended to address the City and Department's failure to implement the requirements of the Consent Judgment. The First Remedial Order was entered on August 14, 2020 following the non-compliance notice[5] issued on June 15, 2019 by counsel for the United States and Plaintiff Class to address Defendants' non-compliance with a number of provisions of the Consent Judgment.[6] A Second Remedial Order was entered on September 29, 2021 in response to the "deteriorating circumstances at Rikers Island and the ongoing dangerous and unsafe conditions in the jails addressed in the Monitor's reports dated August 24, 2021 (Dkt. No. 378), September 2, 2021 (Dkt. No. 380), and September 23, 2021 (Dkt. No. 387)." The Second Remedial Order required the Department to take a number of steps outlined in the Monitor's September 23, 2021 Report to address the unsafe conditions in the jails and the ongoing violation of core provisions of the Consent Judgment.[7] A Third Remedial Order was entered on November 22, 2021 to address "the Department's ongoing, widespread, and long-

---

[5] This notice was provided to Defendants pursuant to Section XXI, ¶ 2 of the Consent Judgment.

[6] The following provisions of the Consent Judgment were identified: Section IV, ¶ 1 (Implementation of Use of Force Directive); Section VII, ¶ 1 (Thorough, Timely, Objective Investigations); Section VII, ¶ 7 (Timeliness of Preliminary Reviews); Section VII, ¶ 9 (Timeliness of Full ID Investigations); Section VII, ¶ 11 (ID Staffing); Section VIII, ¶ 1 (Appropriate and Meaningful Staff Discipline); Section XV, ¶ 1 (Inmates Under the Age of 19, Protection from Harm); Section XV, ¶ 12 (Inmates Under the Age of 19, Direct Supervision); and Section XV, ¶ 17 (Inmates Under the Age of 19, Consistent Assignment of Staff).

[7] Recommendations included immediate security initiatives, expanding criteria for Department leadership, and appointing a Security Operations Manager.

standing non-compliance with Section VIII, ¶ 1 of the Consent Judgment and [the Monitor's] concerns with the backlog of disciplinary cases involving UOF Violations."[8]

In its December 6, 2021 Report (dkt. 431), the Monitoring Team stated that since the inception of the Consent Judgment, "four foundational issues [have been revealed] that stymie the efforts to reform the agency and are directly contributing to the inability to reform the agency." *At* pg. 11. The Monitoring Team's concerns intensified, leading the Monitoring Team to report in the Monitor's March 16, 2022 Report (dkt. 438) that "[i]t is therefore impossible for the Department to improve the practices targeted by the Consent Judgment without first addressing four foundational issues: (1) ineffective staff management, supervision, and deployment; (2) poor security practices; (3) inadequate inmate management; and (4) limited and protracted discipline for staff misconduct." *At* pg. 2. To address these foundational issues, the Monitoring Team worked with the Department to develop an Action Plan that was intended to provide a pathway for the Department to correct bedrock deficiencies so that it could ultimately achieve the reforms contemplated under the Consent Judgment. In other words, "[t]he purpose of the Action Plan is to provide a roadmap for addressing the foundational deficiencies that inhibit the Department's ability to build sustainable reforms. It is intended to guide the development of reasonable and sound correctional practices and procedures and includes several timelines to conduct this work."[9] Furthermore, the Monitoring Team found that "[w]hile the Action Plan certainly is a viable pathway forward, […] given the decades of mismanagement, quagmire of bureaucracy, and limited proficiencies of many of the people who must lead the necessary

---

[8] These concerns were described in the Monitor's September 30, 2021 Report (dkt. 399).

[9] *See* Monitor's June 10, 2022 Letter to the Court (dkt. 462) at pg. 2.

transformation, serious concerns remain about whether the City and Department are capable of fully and faithfully implementing this Action Plan with integrity."[10]

The Court entered the Action Plan on June 14, 2022 explaining "[t]his action plan represents a way to move forward with concrete measures now to address the ongoing crisis at Rikers Island. The Court has approved the proposed measures contained with the action plan, in full recognition that further remedial relief may be necessary should Defendants not fulfill their commitments and demonstrate their ability to make urgently needed changes."[11]

On June 13, 2023, one day before the one-year anniversary of the Action Plan, the Court entered an order[12] requiring the Department collaborate with Monitor, among other things, to ensure that the Monitor is able to fulfill his responsibilities. The Court also required the Department to implement systemwide remedial actions to address operational deficiencies noted in five serious incidents discussed in the Monitor's May 26, 2023 Report.[13]

_Monitoring Team's Assessment of Progress_

The Monitoring Team's approach to assessing progress and to describing the current state of affairs provides important context for the information provided in this report. A comprehensive assessment requires multiple measures to be evaluated in each key area of the

---

[10] Ibid, p. 3.

[11] June 14, 2022 Order (dkt. 466) at pg. 2.

[12] The order entered by the Court was proposed by the Monitoring Team on June 12, 2023 (dkt. 544). Counsel for the Plaintiff Class and the Southern District of New York consented to entry of the proposed Court Order. _See_, id. The City consented to the entry of the Order with the exception of three objections related to § I, ¶¶ 1 and 7 of the proposed Court Order. _See_ City' June 12, 2023 letter (dkt. 545). The Court overruled the City's objections for the reasons stated on the record during the June 13, 2023 Court Conference. _See_ June 13, 2023 Emergency Court Conference Transcript at pgs. 85 to 89.

[13] The Court's June 13, 2023 order also addressed the Monitoring Team's assessment of compliance for the period of January to June 2023.

Consent Judgment, Remedial Orders, and Action Plan (*i.e.*, staffing, safety and security, managing people in custody, and staff discipline) because no one metric adequately represents the multi-faceted nature of these requirements. While quantitative data is a necessary component of any analysis, relegating a nuanced, complex, qualitative assessment of progress towards achieving compliance with these requirements into a single, one-dimensional, quantitative metric is not practical or advisable. Data—whether qualitative or quantitative—cannot be interpreted in a vacuum to determine whether progress has been made or compliance has been achieved. For example, meeting the requirements of the Staffing section of the Action Plan relies on a series of closely related and interdependent requirements (*e.g.*, unpacking the source of the dysfunction regarding abuse of leave, modernizing systems for scheduling staff, and teaching facility leaders how to properly deploy staff to meet the Department's core responsibilities) working in tandem to ultimately increase the number of staff who are available to work directly with incarcerated individuals. As such, there is no single metric that can determine whether the Staffing section of the Action Plan has been properly implemented. Analogous situations appear throughout this report, whether focused on discussions about the Department's use of force practices, improving safety in the facilities, or making the process for imposing staff discipline timelier and more effective. The Monitoring Team therefore uses a combination of quantitative data, qualitative data, contextual factors, and reference to sound correctional practice to assess progress with the Action Plan's requirements.

Further, two cautions are needed regarding the use of quantitative metrics. First, the use of numerical data suggests that there is a definitive line that specifies a certain point at which the Department passes or fails. There are no national standards regarding a "safe" use of force rate, a reasonable number of "unnecessary or excessive uses of force" nor an "appropriate" rate at

which staff are held accountable.[14] Consequently, the Monitoring Team uses a multi-faceted strategy for assessing compliance that evaluates all inter-related issues. For this type of analysis, the decades-long experience and subject-matter expertise of the Monitoring Team is critical to not only contextualize the information, but also to compare the Department's current performance with the operation of other jails and correctional systems.

Second, there are infinite options for quantifying the many aspects of the Department's approach and results. Just because something *can* be quantified, does not mean it is necessarily useful for understanding or assessing progress. The task is to identify those metrics that actually provide insight into the Department's processes and outcomes and are useful to the task of problem solving. If not anchored to a commitment to advance and improve the processes and outcomes that underpin the requirements of the *Nunez* Court Orders, the development of metrics merely becomes a burdensome and bureaucratic distraction.

It is axiomatic that reform is intended to improve upon the conditions at the time the Court first entered the Consent Judgment. Equally critical is to recognize that the City and Department agreed to the parameters of each of the *Nunez* Court Orders.[15] The Action Plan addresses foundational issues with the overall goal of creating the capacity to comply with the requirements of the Consent Judgment. None of the Court's Orders "move the goal posts" or materially change the Department's obligation to fully comply with the Consent Judgment. For

---

[14] Notably, this is why neither the Consent Judgment, the underlying *Nunez* litigation, CRIPA investigation, the Remedial Orders, nor the Action Plan include specific metrics the Department must meet with respect to operational and security standards that must be achieved.

[15] The City and Department were signatories to the Consent Judgment, First Remedial Order, Second Remedial Order, and Third Remedial. With respect to the Action Plan, the City supported the Court's entering of the City's Final Action Plan. *See* City's June 10, 2022 Letter (dkt. 463). As for the Court's June 13, 2023 Order, the City and Department consented to the Order with three objections related to §I ¶¶ 1 and 7. *See* City's June 12, 2023 Letter (dkt. 545).

this reason, the Monitoring Team compares current performance levels and key outcomes to various periods of time, including those at the time the Consent Judgment went into effect. The Monitoring Team has taken this same approach throughout the duration of its work.

Since the Consent Judgment was entered, changes to the context within which the jails operate have occurred and these externalities must be recognized. One of the most obvious externalities is the COVID-19 pandemic which began in March 2020, and triggered a staffing crisis that exacerbated decades-long mismanagement of the Department's most important resource—its staff—which then cascaded into even more problems in many of the areas that impact jail safety (*e.g.*, failure to provide mandated services which generates frustration; levels of stress among people in custody and staff which can trigger poor behavior; interruptions in programming that increase idle time). In addition, recent bail reform enacted by the state has changed the composition of the jails' incarcerated population. Individuals with less serious offenses who previously may have been incarcerated are generally no longer held pending trial. While this has had the effect of reducing the overall population, it has resulted in a heavier concentration of offenders with more serious offenses in the jails. Most importantly, these external factors did not change the City's obligation to provide safe and humane treatment to those within its jails, and while important for understanding shifts in the size and characteristics of the jail population and the resulting dynamics that surround jail safety, they cannot be used to excuse or defend the City's and Department's failure to comply with the *Nunez* Court Orders and to provide minimally adequate levels of safety. The constitutional minimum that must be afforded to all incarcerated individuals has remained the same and continues to be the standard by which all reform must be measured.

The array of quantitative metrics, qualitative assessments, and an appreciation of externalities mean that discussions about the current state of affairs can be cast in many ways, many of which are legitimate strategies for understanding the Department's trajectory. The choice of comparison points selected, can lead therefore to different conclusions about the magnitude or pace of progress or the lack thereof. The Monitoring Team has dutifully examined changes in metrics and patterns in staff behavior from multiple angles in order to gain insight into the factors that may be catalyzing or undercutting progress. While such explorations are useful for purposes of understanding and problem-solving they do not replace the overarching requirement that the Department must materially improve the jails' safety and operation compared to the conditions that existed at the time the Consent Judgment went into effect.

*Organization of the Report*

The report includes the following sections to address the requirements of the Action Plan, select provisions of the Consent Judgment and the Remedial Orders, and the Court's June 13, 2023 Order:

- Security, Violence, and Use of Force
- Leadership, Supervision, and Training
- Uniform Staffing Practices
- Management of Incarcerated Individuals
- Staff Accountability – Identifying and Addressing Misconduct
- Department's Management Structure and Management of the *Nunez* Court Orders
- Overarching Initiatives Related to Reform
- Conclusion and Monitor's Assessment Related to § G ¶ 6 of the Action Plan

The report includes the following appendices:

- **Appendix A** includes the data required by the Action Plan, § G ¶4(b) to the extent the data is not otherwise provided in the report.

- **Appendix B** includes images from the May 26 2023 Report Incident #1.

- **Appendix C** includes a chart with the status of the Monitor's April 2023 Recommendations

- **Appendix D** includes a transcript of the Department's Video regarding the *Nunez* Court Orders.

- **Appendix E** is a proposed court order from the Monitoring Team as described in the Conclusion of this report.

- **Appendix F** includes a copy of the Commissioner's May 26, 2023 Letter to the Monitor

- **Appendix G** includes a disciplinary decision by OATH and the subsequent decisions by Civil Service Commission described in the Staff Accountability – Identifying and Addressing Misconduct section of the report.

# Security, Violence, and Use Of Force

The jails remain dangerous and unsafe, characterized by a pervasive, imminent risk of harm to both people in custody and staff. This remains true even though conditions in certain areas *may* have improved since the apex of the crisis in 2021. The ***current*** state of affairs and rates of use of force, stabbings and slashings, fights, assaults on staff, and in-custody deaths remain extraordinarily high—they are *not* typical, they are *not* expected, they are *not* normal. One of the most disturbing, if not frightening, patterns associated with the internecine violence in the Department, as observed on video of incidents, is the too-frequent occurrence where staff cede control of a housing unit to the people in custody housed in those units. Such an abdication of staff control inevitably leads to negative outcomes. A number of illustrative examples of this dynamic are described in this report, all of which produced multiple serious injuries with no intervention or supervision by staff, and in all of which the assailants had unfettered and uninterrupted access to their victims.

As explained in the Introduction, the world has changed during the eight years that the Consent Judgment has been in effect, as it does in all cases involving large-scale institutional reform. While these externalities impact the context within which the jails operate, they are not the cause of the endemic levels of harm and current lack of safety in the jails nor the cause of staff's continued pattern and practice of unnecessary and excessive use of force.

Furthermore, the use of force rate and rates of violence are demonstrably worse than at the time the Consent Judgment went into effect. Throughout the eight-year period, the jails' safety has continued to deteriorate in an alarming fashion, producing negative outcomes that occur far more often than in 2016. In a few areas, recent improvements are evident, but at

*current levels*, the use of force rate and rates of violence are far higher than in any jurisdiction with which the Monitoring Team is familiar. Department leaders have reported to the Monitoring Team that staff feel unsafe and/or are unable or unwilling to do their jobs. Some staff report they would rather be disciplined than do their job as expected. When reviewing videos of incidents, the Monitoring Team frequently observes an apathetic approach to basic security practices or a failure to intervene that is all too common in systems where staff feel they are inadequately prepared for and supported while on the job, feel unsafe, and lack the skills and confidence to maintain the necessary order without causing an event to escalate. That the Department has identified this as an underlying cause of poor security practices is positive (*i.e.*, that they are searching for the source of the problem), but it is also further evidence of the deep inadequacies of the basic security function of the jails.

This section explores the level of safety in the jails using a variety of measures, both qualitative and quantitative. Data referenced throughout this section of the report is provided in Appendix A of this report.

*Unnecessary and Excessive Force*

The Department's use of unnecessary and excessive force is at the core of the reforms required by the *Nunez* Court Orders. The Monitor, prior to his appointment,[16] found in 2015 that "the frequency of use of force incidents, including the number of incidents resulting in injuries to staff and inmates, was unusually high compared to other metropolitan jail systems. [He] identified instances where staff engaged in excessive and/or unnecessary use of force in violation

---

[16] During the investigation and litigation phase of the *Nunez* litigation, the Monitor served as Plaintiffs' expert. During the negotiation of the Consent Judgment, both sides approved his appointment to the role of Monitor.

of the Constitution, including a number of incidents where correction officers delivered blows to an inmate's head or facial area or improperly employed force to punish or retaliate against inmates." Martin Declaration (dkt. 234), ¶ 6. As outlined in detail below, this finding has not changed materially during the eight years of the remedial phase or in the past year during the pendency of the Action Plan. Further, the Department remains in Non-Compliance with the seminal requirement of the Consent Judgment to implement the Use of Force Policy, § IV, ¶ 1. As discussed in more detail below, and throughout this report, ***_a pattern and practice of the excessive and unnecessary use of force remains clearly evident in this system._***

In addition to the externalities that have occurred in the world at large (*e.g.*, COVID, bail reform), an important contextual factor when assessing the Department's use of force practices is the fact that the Department routinely shifts its own landscape by closing/re-opening various jail facilities. EMTC was opened and closed multiple times in 2020 and 2021, and has now remained open since September 2021.[17] On June 17, 2022 OBCC was no longer used to house people in custody. However, the annex at EMTC (which has been closed for at least a year) and OBCC are now slated to re-open in order to house the incarcerated individuals currently housed at AMKC, and AMKC is now slated to close by August 2023. Ostensibly, facility closures are executed in response to the changing size of the detainee population, a deteriorating physical plant, or—in the case of AMKC—because the facility's physical plant is seen as an obstacle to reform. The closures and subsequent re-openings may be beneficial in the long term, but they are destabilizing in the short term. With the closure of AMKC, a massive rehousing effort is

---

[17] EMTC has opened and closed multiple times since 2020. The facility was first closed in March 2020 and was subsequently reopened a few weeks later following the outbreak of COVID-19. EMTC was closed again in June 2020 but was then re-opened in November 2020. EMTC was closed again in May 2021, but then reopened in September of 2021.

currently underway, but the impact of this shift on key outcome measures will not be known for some time.

The number, average monthly rate of the use of force, and frequency of injuries sustained from uses of force are examined below, in tandem with qualitative assessments of the reasonableness of the force used in each incident.

- **Number and Rate of Use of Force**: The Department's average monthly use of force rate from the most recent five-month period (January-May 2023; 9.13) is 25% lower than the average monthly rate at the apex of the crisis (2021; 12.23) but is 131% higher than the average monthly use of force rate at the inception of the Consent Judgment (2016; 3.96).

- **Injuries Sustained from Use of Force**: The proportion of uses of force that resulted in serious injuries during the most recent four-month period (January-May 2023; 4%) is lower than the proportion at the apex of the crisis (2021; 6%), but higher than the proportion at the inception of the Consent Judgment (2016; 2%). More importantly, because the number of uses of force has increased so substantially since 2016, these proportions translate to a significant increase in the number of people who sustain serious injuries during use of force events (*e.g.*, 74 in 2016, compared to 434 in 2022).

- **Monitoring Team Assessment of Use of Force Incidents**: The Monitoring Team's ongoing, contemporaneous review of all use of force incidents in 2023 indicates that neither the seriousness nor the frequency of the excessive use of force has abated. This finding is present in each of the Monitor's Reports to date which are replete with

descriptions of staff's pervasive excessive and unnecessary use of force.[18] For instance, the Monitoring Team's analysis of COD reports of UOF incidents for the two-week period of June 2-15, 2023 reflected 89 uses of force occurring during escorts. This is an extraordinarily high number suggesting a significant level of basic security failures. This analysis also identified 30 uses of force occurring during searches. Again, this is a very high number which likewise indicates security management failures. The Department's failures to improve general security practices and inadequate search procedures and to address the use of painful escorts are discussed elsewhere in this report and, in many cases, are contributory factors in situations where the use of force was avoidable and thus unnecessary. The Monitoring Team's qualitative assessment of recent use of force incidents also indicates that the *proportion* of incidents involving the excessive and/or unnecessary use of force is currently the same, if not higher, than the proportion of incidents involving the excessive and/or unnecessary use of force that was observed at the time the Consent Judgment went into effect in 2016.

- **Consultation on UOF Related Policies**: The Department has inexplicably failed to consult or advise the Monitoring Team when it has considered or made changes to tactics. First, as described in the Monitor's June 8, 2023 Report, the Department did not consult the Monitoring Team about its intention to utilize soft-hand force in response to court refusals (*see* pgs. 34 to 35). The Department reports it now intends to advise the Monitoring Team, after the filing of this Report, about its use of force related to court refusals. Second, as discussed in the Management of People in Custody section of this

---

[18] *See,* for example, Monitor's March 16, 2022 Special Report at pgs. 39 and 40; Monitor's October 28, 2022 Report at pgs. 2, 61, and 117, and Monitor's April 3, 2023 Report at pgs. 3, 127, 128, 137, 138, and 166.

report, the Department did not consult the Monitoring Team about its decision to utilize three-point restraints with all ESH Level 1 participants in May and June 2023. The Department subsequently rescinded the policy in late June, explaining it was rescinded because the Monitoring Team was not consulted on the policy and that the Department did not intend to utilize the practice anymore. However, the Commissioner subsequently directed that the policy be reinstituted on July 4, 2023 as discussed in the Management of Incarcerated Individuals section of this report. The Monitoring Team was again not consulted on the change in policy, but was advised the policy was reinstated on July 5, 2023.

- **Head Strikes**: Given the significant risk of harm associated with the tactic, Department policy and sound correctional practice dictate that head strikes should not be used absent an imminent threat of death or serious bodily injury to staff or other persons present. The Department has an extensive history of utilizing head strikes in situations where it is not merited.[19] Since the Consent Judgment went into effect, the use of head strikes has ebbed and flowed, but remains extremely high and the tactic continues to be used in situations when it should not be used. The Monitoring Team's assessment of incidents from 2022 revealed that Department staff utilized head strikes almost 400 times. By comparison, the Los Angeles County jail system, which is also struggling to reduce its use of force (and is currently subject to litigation), utilized head strikes 52 times during calendar year 2022,

---

[19] *See* Monitor's 1st Report, pg. 68; see Monitor's 2nd Report, pg. 4, pgs. 10-11, pg. 12, pg. 110; Monitor's 3rd Report, pgs. 12-16 and pgs. 127-128; Monitor's 5th Report, pg. 18-21; Monitor's 7th Report, pg. 24; Monitor's 8th Report, pg. 3-5 and pg. 151; Monitor's 9th Report, pgs. 31-32; Monitor's 10th Report, pg. 25; Monitor's 11th Report, pg. 4; Monitor's September 23, 2021 Letter to the Court, pg. 3; Monitor's June 30, 2022 Status Report, pg. 15.

and has a population larger than the Department's.[20] Thus far in 2023, the Department's use of head strikes remains high — in a recent two-month period, staff used head strikes 69 times.

- **Suspensions for UOF Related Misconduct**: Nearly 60 staff were suspended for use of force policy violations during the first five months of 2023. The Department's improvement in the last few months in identifying misconduct and taking immediate action in response to these violations is laudable, though the Monitoring Team continues to find that misconduct that is unidentified and unaddressed remains a consistent problem, as described in more detail below. Most importantly, the fact that such a large number of staff engaged in use of force misconduct serious enough to warrant suspension during just a five-month period, despite the Department's ongoing inadequacies in identifying misconduct, is another indicator that harmful staff practices continue to be endemic in this Department. The misconduct that resulted in these suspensions reflects staffs' inappropriate use of head strikes, chokeholds, kicks, and body slams; use of racial slurs; failures to intervene; and staff having abandoned their posts. Some of these actions by staff against people in custody were retaliatory, punitive, and designed to inflict pain. Moreover, there is evidence that staff have been complicit in causing or facilitating assaults among people in custody. Many of these cases appear to involve misconduct that likely would require the Department to seek termination of these individuals pursuant to § VIII, ¶ 2(d) of the Consent Judgment. Such incidents in well-run systems should be

---

[20] *See* Meg O'Connor, LASD Says It Wants to Keep Hitting People in the Head, THE APPEAL, https://theappeal.org/lasd-los-angeles-jails-aclu-rosas-luna-head-strike/?utm_source=TMP-Newsletter&utm_campaign=404ab2c6ce-EMAIL_CAMPAIGN_2023_06_29_10_58&utm_medium=email&utm_term=0_5e02cdad9d-404ab2c6ce-%5BLIST_EMAIL_ID%5D.

isolated and rare, but they appear to be near commonplace in this Department. In the

Monitoring Team's experience, the frequency of such serious misconduct during just a

five-month period is unprecedented. A chart of all suspensions is included in Appendix A

of this report.

- **Department's Assessment of Use of Force Incidents**: Additional indicators of the

  prevalence of unnecessary and excessive force can be found in the findings of facility

  leaderships' Rapid Reviews and the Investigation Division's findings.

  - <u>Rapid Reviews</u>: Rapid Reviews detect misconduct close-in-time to the incident,

    but are not as consistent and reliable as they should be.[21] Even with the under-

    identification that occurs via the Department's internal analysis, the Rapid

    Review data reveals pervasive problems with staff's ability to apply the requisite

    skill set and decision-making needed to effectively decrease the rate at which

    force is used. This includes, but is not limited to, failures to secure cell doors or

    food slots, to escort individuals in proper restraints, to supervise large groups of

    people in custody, to remain on post, to enforce mandatory lock-in, and to follow

    proper guidelines for anticipated uses of force, as well as the improper use of

    chemical agents at close range or in a retaliatory manner. Staff also frequently

    exhibit unnecessarily confrontational demeanors (particularly during searches).

    Some of these failures directly contributed to the circumstances that facilitated the

    incidents and subsequent uses of force. For instance, cases involving unmanned

---

[21] The Monitoring Team's assessment of the findings of the Rapid Reviews has been mixed. While Rapid Reviews conducted in 2022 showed some improvement in identifying misconduct (as noted in the Monitor's April 3, 2023 Report), the Monitoring Team's assessment of Rapid Reviews completed in 2023 revealed that certain issues (such as identifying that an incident was avoidable and therefore should not have occurred) are not reliably identified. For this reason, Rapid Review data underestimates the prevalence of misconduct and leaves certain problems undetected and unaddressed.

posts and off-post staff have resulted in a number of uses of force; almost 50% of which the Rapid Reviews found were avoidable.[22] Furthermore, facility leadership determined that 12% of incidents that occurred between January and May 2023 were avoidable and therefore would not have occurred if staff had utilized sound correctional practices including security-related actions, interpersonal communication and conflict resolution skills.

o ID Findings: ID's *closed* Intake Investigations from January to April of 2023 found 14% of those cases were "unnecessary," "excessive," and/or "avoidable."[23] Fourteen percent is a high prevalence rate, particularly given that these Intake Investigation results do not account for the results of Full ID Investigations or the fact that ID does not consistently or reliably identify all misconduct. The percentage of cases that fit in this category is certainly higher than this data reflects.

As described throughout this report, the Department's ability to identify and address unnecessary and excessive force is a key component to the reform effort. A recent use of force incident (first identified in the Monitor's May 26, 2023 Report as Incident #1[24]) illustrates concerns about the Department's ability to identify and address particularly concerning incidents.

---

[22] More detailed data is available in Appendix A.

[23] The Department and the Monitoring Team have not finalized an agreed upon definition of these categories. The definition of these findings and the development of corresponding data is complex, especially because it requires quantifying subjective information where even slight factual variations can impact an incident's categorization. A concrete, shared understanding of what these categories are intended to capture is necessary to ensure consistent assessment across the board. While efforts were made in summer 2021 to finalize common definitions, they were never finalized, and the effort has since languished given the focus on higher priority items last year. Also, this categorization process has not been expanded to Full ID Investigations.

[24] *See* Monitor's May 26, 2023 Report at pgs. 2 to 4; Monitor's June 8, 2023 Report at pgs. 45 to 46; Monitor's June 12, 2023 Letter to the Court (dkt. 546) at pg. 2 to 4 and 10 to 11.

Key facts of the incident are summarized below. Illustrative images of both uses of force incidents are included in Appendix B of this report.

- ***May 26, 2023 Report Incident #1****: On May 11, 2023, an individual was left unattended in the elevator by a staff member while escorting a large group of people in custody, and eventually exited out of the elevator and moved through a gate which staff had left unsecured. A large cadre of staff was immediately on the scene, including two captains. The individual was encircled with staff (10 plus officers) as he stood with his hands at his side. The individual then stepped forward and an officer abruptly reached over the captain to initiate a takedown. One captain pushed/shoved his way through the officers toward the individual. Staff then descended and swarmed the individual and very forcibly took him to the floor. During the melee, the captain literally fell into the pile of officers engaged in the takedown. Once the individual was in restraints, the probe team arrived, placed the individual on a gurney and took him to intake where he was walked to the search area. After the search, staff attempted to assist him in putting on his shoes, which he could not do independently because he was rear-cuffed and in leg shackles. The individual's leg jerked towards the helmet of one of the officers who was in full protective gear. Multiple staff then took the individual to the floor, face-down on the floor with his head near a metal bench and staffs' hands on his arms and back. The probe team lifted the individual off the ground, and he appeared unable to support his own body weight. As the probe team lifted and lowered the individual, his head hit a plastic container, the leg of a partition, and then the concrete floor. The individual's body was limp as the probe team lifted the individual up and placed him on a gurney. Spots of blood were also visible on the floor below the bench and next to the partition where the person in custody's head was on the floor. The probe team escorted the individual to the clinic and into a medical exam room where he was seen by medical staff. The use of force incident was classified as a Class A incident given the injuries sustained by the person in custody. The individual was subsequently taken to the hospital and has since undergone three surgeries and is now paralyzed from the neck down.*

This case involves numerous reporting, security and operational failures including use of force tactics that were excessive given the extant threat. Further, the Commissioner's and other Department leaders' assessments of this incident are emblematic of the pretextual claims about the appropriateness of staff's behavior that brought about this case to begin with and are at the heart of the culture of impunity that *Nunez* intends to address.

- Staff's failure to properly supervise those in the elevator and leaving the security gate unsecured are precursors to what followed. Had proper practice been employed, the entire incident could have been avoided, but instead, these errors

led to a cascade of harm suffered at the hands of staff.

- The Commissioner characterized this event an "escape attempt,"[25] which obscures the reality of the situation and overstates the nature of the threat. None of the staff reports claim it was an escape nor was it labeled as such by the Department's preliminary investigation. The Monitoring Team's review of incidents routinely identifies individuals in custody who run away from staff (e.g., down corridors, out of vestibules, etc.) during the course of an incident – none of which has the Monitoring Team ever seen described as an escape. This type of exaggeration contributes to a culture that encourages staff to overreact and to apply overly aggressive responses to typical, non-threatening conduct.

- The Commissioner characterized the action of the individual *who was in full restraints* as an "assault on staff." [26] This overstates the severity of the individual's behavior, and thus contributes to a culture in which staff apply unnecessary levels of force.

- Taking the individual to the ground was out of proportion to the extant level of threat, particularly since the individual's legs were restrained and his hands were restrained behind his back which limited not only his ability to assault someone, but also the ability to break his fall. Staff are required by policy to "use the minimum amount necessary to stop or control the resistance or threat encountered and it must be proportional to the resistance or threat encountered." The Department's training highlights the risk of injury present in any restraint, and specifically notes that takedowns are a serious escalation of force.

- The incident was reported via the COD, which was updated multiple times, but the second use of force was not reported, and the COD was never updated to document the individual's serious injury or transport to the hospital. This has obvious ramifications to the extent to which the Department's data inaccurately represents the frequency of events and injuries that occur in the jails.

- As the Monitoring Team attempted to initially learn what occurred, a senior Department leader made unequivocal claims about the cause of injury that turned out to be inaccurate and did not reflect the facts available to the leader at the time. The individual also did not relay the litany of operational concerns that had been detected to the Monitoring Team, which obfuscated the full extent of the issues presented by this incident.[27]

---

[25] *See* Dean Moses, EXCLUSIVE| Correction commissioner, Mayor Adams show Rikers Island security videos in effort to counter federal monitor's claims of misdeeds, amNY, https://www.amny.com/police-fire/rikers-island/exclusive-correction-commissioner-mayor-adams-show-rikers-island-security-videos-in-effort-to-counter-federal-monitors-claims-of-misdeeds/.

[26] *See*, id.

[27] *See* June 8, 2023 Report at pgs. 45 to 46.

- Public statements by the Commissioner also underplayed the role of staff misconduct in the tragic outcome. In media reports "the Correction Department maintain that the videos demonstrate that their officers did not employ unnecessary use of force or acted inappropriately."[28] Further, the Commissioner claims "…preliminarily the actions of those officers I think, when I look at the moment of what those officers' decision-making had to make in that moment, preliminarily I don't find concerning as of yet, but the investigation is ongoing."[29] These assertions belie the facts that the Rapid Review determined that the incident was "avoidable," and that the Department took immediate corrective action against five staff, including staff discipline for improper escort, failure to secure a gate, failure to report the severity of the injuries, and failure to report the individual's transport via EMS. It is also notable that no less than eight of the staff participants had histories of use of force misconduct and related charges.

This incident is but one example of the Department's continued efforts to minimize staff's culpability in such tragic outcomes and to ignore its duty to identify such conduct for what it is—poor security practices that elevate, rather than minimize, the imminent risk of harm to people in custody. There is a disturbing disconnect between the Department's obligation to confront and correct poor staff practice and its apparent disregard for what incidents like this reveal about patterns of staff conduct that may help to explain, in part, why the reform effort has yet to produce the intended result.

- **Illustrative Examples of Use of Force Cases Occurring in 2023**: Outlined below are four cases that occurred in 2023 that illustrate recent poor practices that mirror those observed throughout the duration of the Consent Judgment and that continue unabated. These cases are not unique, but rather illustrate the *typical* patterns and trends observed by the Monitoring Team over the last eight years.

---

[28] *See* footnote 25.

[29] *See* June 13, 2023 Emergency Court Conference Transcript at pg. 37, 3 to 7.



*Image of Illustrative Example 1*

o ***Illustrative Example 1:*** *On March 3, 2023 at the Brooklyn Courthouse, a fully restrained PIC, wearing both front cuffs and leg shackles, refused to enter a search pen by standing in the doorway. A Captain instructed officers to push the PIC into the search pen, and as officers were pushing him into the pen, one officer wrapped his arm around the PIC's neck in a chokehold. This officer leaned back, taking the PIC to the floor. It is noteworthy that the PIC was unable to break his fall because he was fully restrained, and his body hit the floor next to a metal bench with a high impact. When the PIC hit the ground, there were two officers on top of him. The supervising Captain and multiple other officers told the officer who used the chokehold to stop repeatedly, but he continued to hold and hit the PIC's head while he was on the ground for a few seconds. Both the officers on top of the PIC got up, and all staff then quickly exited the pen, and closed the door. After the incident, one officer can be repeatedly heard saying "Good job." The PIC refused medical attention but displayed no visible injuries and no staff formally reported injuries to the COD. The officer was suspended for 30 days because of the prohibited hold. None of the staff reported the chokehold in their use of force or witness reports. The officer who used a head strike did note that he used a closed fist strike to the PIC's facial area, but he claimed it was inadvertent and he was aiming for the PIC's torso. None of the other staff mentioned the officer's use of head strikes in their use of force or witness reports either. These officers received formal disciplinary charges for failing to report the chokehold and head strikes, and these charges are currently pending with the Trials Division. The officer who used the choke hold and head strikes also*

24

received formal disciplinary charges for failing to turn on his body-worn camera, and these charges are also pending with the Trials Division. The facility supervisor who conducted the Rapid Review only noted that the officer used an "unauthorized force technique" and did not specifically mention the chokehold or head strikes; the Rapid Reviewer also reported that the staffs' actions were in compliance with the Department's Use of Force Directive.

o   *Illustrative Example 2*: On January 3, 2023 in NIC, an officer arrived at a PIC's cell door and opened the cuffing slot to pass food to the PIC inside. Unsecured cuffing slots can be observed within the housing unit. The PIC reached his arms through the cuffing slot and splashed the officer with an unknown liquid. The officer reached his arm through the cuffing slot and deployed a 5-second burst of OC spray towards the PIC inside, who ran towards the back of the cell. In his Use of Force report, the officer reported that he used chemical agents for 1-3 seconds. The Investigation Division determined that "use of chemical agents was excessive, unnecessary, and retaliatory as the PIC was secured inside a cell and [the officer] had alternatives to force, such as departing the area." The officer was suspended for 15 days and currently has formal disciplinary charges pending with the Trials Division for this use of force. After the OC deployment, the officer then entered the PIC's cell and walked towards the PIC, though what occurs in that brief moment is not visible on surveillance camera angles, and then leaves the cell. Just over a minute later, the same officer reentered the same PIC's cell, followed by a Captain. They walk towards the PIC at the back of the cell, again not visible on surveillance camera. The Captain quickly leaves the cell, failing to supervise by leaving the officer unattended in the PIC's cell for around 15 seconds before they both exited the housing area. The PIC alleged that the officer punched and stabbed him within his cell. Both times that the officer entered the cell, he should have activated his Body Worn Camera, but failed to do so. The Captain noted that he observed the officer "engaged in a physical struggle" with the PIC, but provided no further detail. Despite the Captain's witness report, the officer did not mention using force on the PIC within the cell in his report. In his Use of Force Report, the officer only stated that the PIC was physically resistant when he tried to secure the PIC in restraints, yet claimed that he sustained a "sprained wrist, thumb, middle and pinky fingers" from trying to secure the PIC. Because the officer failed to mention the force he used within the PIC's cell, he was referred for a retraining in report writing. Around 10 minutes after the staff's use of force, 6 ESU members arrive to remove the individual from his cell. In late 2022, the same officer was found guilty of formal disciplinary charges and

*received 15 suspension days for deploying chemical agents through a PIC's
cuffing port after a splashing incident in May 2021.*



*Image of Illustrative Example 3*

o **Illustrative Example 3**: *On February 3, 2023 at RMSC, a captain and officers
responded to an individual that was in the vestibule area. The captain had the A
Station door open while the PIC was unsecured in the vestibule. Staff were talking
to the PIC when one officer attempted to grab the PIC's arm and she pulled away.
A struggle began, and other officers arrived. A total of seven officers were in the
area, and the breaker gate was left open. As depicted in the photo above, one
officer appeared to be twisting and bending the PIC's arm and wrist as he pulled
it behind her. The PIC struggled and the officer aggressively pushed her to the
wall. The PIC swung her arm towards the officer's head, and another officer
deployed chemical agents towards the PIC's face. Two more officers arrive at the
still-open breaker gate. It appears the OC is taking effect on the PIC, when two
officers aggressively took her to the floor, falling on top of her, then applied
restraints. The PIC was brought to her feet and escorted from the area. Two
officers appeared to be applying pressure to the PIC's wrists during the escort,
even though the PIC was not resisting the escort. The PIC sustained a Class A
post concussive syndrome requiring a CT scan.*

26



*Image of Illustrative Example 4*

o ***Illustrative Example 4***: *On June 7, 2023 in GRVC, there were multiple PICs in the barber shop, some without any restraints, and others in full restraints with mitts. One PIC who was restrained to a barber chair was repeatedly getting up and down in his chair and verbally arguing with staff. An excessive number of staff arrived on scene for a total of 15 or more uniformed staff in the barber shop, as depicted in the photos above. The PIC continued to verbally argue while restrained to the barber chair but is eventually rear-restrained and escorted out of the barber shop without force. The bulk of the staff left with this PIC, leaving 5 uniformed staff remaining in the barber shop with no supervisors. After these staff left, another PIC appeared to verbally argue with officers. This PIC was not restrained to the chair, but was in full restraints, including front cuffs with mitts and leg shackles, and had an officer standing on both sides of him. The PIC appeared to make a spitting motion in front of an officer, and a few moments after, the officer charged towards the PIC, punching his head and pushing him into the chair. The officer continued to throw multiple closed fist strikes at the PIC's head and torso while the PIC remained in the chair. Staff pulled him away from the PIC, while three other staff grabbed the PIC's arms and torso and brought him to the ground. While the PIC was on the ground, more staff arrived, including a supervisor, and placed him in rear restraints and a spit hood. Staff then assisted the PIC to his feet but physically struggled with the PIC, pushing him against a nearby locker and pulling on his arms and rear restraints before they escorted him out of the barber shop. The officer who used facial strikes*

27

> stated in his Use of Force report that he was attempting to strike the PIC in the
> chest but missed and made contact with the chair; he did not mention any other
> strikes made towards the PIC even though other strikes were observed on video.
> DOC staff's initial review of the incident noted the officer's use of facial strikes
> on a restrained PIC and recommended him for suspension. He was suspended for
> 10 days, and it was noted that the officer's use of force was avoidable as he had a
> means of egress after the PIC spat at him.

<u>Staff Reporting of Incidents</u>

In order for the Department to address the issues that occur within the facilities, they first must be reported (i.e., *every* incident must be reported) comprehensively (*i.e.*, must provide all of the salient facts in language that describes, rather than labels, the behavior of every actor involved). The most troubling incidents are those that staff **do not** report because none of the individuals or structures responsible for assessing and improving staff practice can access the facts surrounding the incident and because neither people in custody nor staff can be held accountable for any misconduct.

The Monitoring Team has identified a number of recent incidents in which staff reports were either not generated at all or were completed after a significant delay. In at least one case, it is unclear whether the incident would have been reported at all but for subsequent events and inquiries by the Monitoring Team.[30] For example, staff reporting practices in at least four of five incidents that occurred during a nine-day period in May 2023 (as first reported in the Monitor's May 26, 2023 Report) raised concerns about the veracity with which staff consistently report incidents involving serious injuries. In one instance, a self-harm incident (which later resulted in the individual's death) was reported 33 hours after the incident occurred. In another, an individual suffered serious injuries that ultimately resulted in the individual's death and the only

---

[30] *See* Monitor's May 26, 2023 Report at pgs. 6 to 8 regarding Incident # 3.

staff report regarding the event was a handwritten logbook entry about the hospital run. In yet another incident, serious injuries sustained by a person in custody in intake were not reported until 69 hours after the incident occurred and only after the Monitor brought the incident to the Department's attention. Four assailants in this incident were subsequently charged with assault by the Bronx District Attorney's Office. Finally, in another incident, staff failed to report one of two uses of force that occurred involving the same individual and did not report the nature of the individual's injuries. As of the drafting of this report, Department records regarding this second use of force still have not been updated to reflect these facts.

In addition to these reporting failures identified in May 2023, in June 2023, the Monitoring Team also identified at least five stabbing/slashing incidents that were reported in part, but which failed to properly categorize the stabbing/slashing that occurred during the event. Specifically, the Monitoring Team's video review of incidents revealed that five stabbings or slashings occurred, but were not reported to the Central Operations Desk as a stabbing or slashing.[31] In each case, the initial report of the incident was classified as a use of force or serious injury and failed to document a stabbing or slashing that was evident via the Monitoring Team's review of objective evidence (*e.g.*, video footage or injury reports). As a result, the Department's stabbings/slashings data does not include these incidents and therefore underreports the number of events that have occurred. Further, the Monitoring Team's findings are not exhaustive; additional stabbings/slashings might not have been properly reported and/or coded and thus not included in the data the Department provides to the Monitoring Team for its analysis and is included in this report.

---

[31] These incidents occurred on January 2, 2023 (2 incidents), January 25, 2023, January 27, 2023, and June 8, 2023.

Staff's failure to report and/or properly categorize incidents leads to a number of interrelated problems that go to the heart of the *Nunez* Court Orders as outlined below:

- Key metrics used to identify progress, or the lack thereof, become distorted when incidents are not properly reported/categorized, potentially underestimating the frequency of the use of force and facility violence.

- Agency and facility leaders' efforts to understand the nature of the problems (*e.g.*, frequency, location, underlying causes and contributing factors) are undercut because they operate with an incomplete/inaccurate data set. This skews the problem-solving effort in a way that may render any solutions ineffective, because they were not informed by the total universe of events and thus may not target the relevant dynamics.

- Accountability measures for people in custody and staff cannot be applied if the behavior/misconduct is not properly documented. The failure to hold people accountable for violent behavior or for staff misconduct allows both types of behavior to continue unabated, perpetuating the imminent risk of harm in the jails.

Each of these problems has an obvious impact on the Department's ability to address the unsafe conditions in the jails, and thus staff's failure to timely and/or accurately report incidents weakens the entire reform effort in a very direct and consequential manner.

In the Monitoring Team's experience, the failure to report these types of incidents is cause for serious concern, especially given the egregious nature of the incidents discussed above. These were not isolated cases. The City's and Department's suggestion that the May 2023 incidents are not factually similar and therefore do not reflect a pattern fails to appreciate the universal need for comprehensive, accurate staff reporting. All cases have a unique set of facts,

but, what ties these cases together is that all of these incidents should have been reported, but were not, reporting were significantly delayed, or reports omitted key facts, which is particularly concerning given their serious nature. Staffs' failure to adhere to reporting requirements for even the most serious events calls into question the overall veracity of reporting and commitment to transparency within the agency.

*Security Initiatives*

Given the lengthy record of inadequate staff practice in each area, the Action Plan includes various requirements to improve security practices, the use of response teams, intake practices, and the response to self-harm events. An update on the Department's efforts to address these requirements is shared below.

- **Security Plan**:[32] The Monitoring Team has established a lengthy, detailed record of the deficiencies in staff's basic security practices.[33] To date, and over 20 months since the Second Remedial Order (which required a Security Plan to address specific security-related problems) was entered, the Department has not meaningfully implemented sustainable solutions to *any* of the identified problems such as unsecured doors, abandonment of a post, key control, post orders, escorted movement with restraints when required, control of undue congregation of detainees around secure ingress/egress doors, proper management of vestibules, and properly securing officer keys and OC spray. The

---

[32] As required by the Action Plan, § D, ¶ 2(a) and the Second Remedial Order, ¶ 1(a).

[33] *See* Martin Declaration (dkt. 397), Exhibit E "Citations to Monitoring Team Findings re: Security Failures" and Monitor's December 12, 2021 Report at pgs. 17 to 23, Monitor's March 16, 2022 Report at pgs. 7 to 30; Monitor's April 27, 2022 Report at pgs. 2 to 3; Monitor's June 30, 2022 Report at pgs. 13 to 17, Monitor's October 28, 2022 Report at pgs. 56 to 77; and Monitor's April 3, 2023 Report at pgs. 36 to 63.

Department's own audits conducted by NCU between January 2022 and May 2023[34] have not demonstrated any improvement in this period of time with basic security practices including staff being off post, cell doors being manipulated/unsecured, inadequate touring practices, poor enforcement of lock-in, or poor movement of individuals in custody. Over half of NCU's 2022 and 2023 audits found staff off post, cell doors unsecured and issues with staff touring the housing units. Further, the Department's Rapid Reviews identified procedural errors (*e.g.*, failure to secure doors, failure to properly apply restraints) in 41% of incidents that occurred from January to May 2023.

NCU's findings, which are consistent with findings from the Monitoring Team's site visits and incident reviews, reveal that many housing areas have multiple security lapses at once including unsecured doors, individuals congregating in prohibited areas out of staff view, and lock-in not being enforced. Because many housing areas lack proper supervision and control by staff, people in custody consequently exercise an unacceptable level of control within these areas. For example, access to cells is supposed to be afforded to people in custody at specific times during a staff member's tour. However, people in custody frequently demand access whenever and to whichever cells they choose, with little or no resistance from staff. This wholly inappropriate imbalance of authority is often directly related to safety risks that lead to dangerous incidents and uses of force. Recent

---

[34] NCU issued 107 security reports between 2022 to May 2023. In 2022, NCU issued 91 reports, 67% of which found staff off post, 69% found unsecured doors, 58% found issues with staff tours, 52% found lock-in was not enforced, and 26% found crowding or unauthorized areas. From January to May 2023, NCU audited various housing areas in four facilities and issued 16 reports. These reports identified numerous security issues. Specifically, 63% of reports found staff off post, 88% found unsecured doors, 69% found issues with staff tours, 25% found lock-in was not enforced, and 44% found crowding/access to unauthorized areas. While covering only the first five months of the year, these findings were either similar or worse to the NCU audit findings from 2022.

incidents at GRVC and at RNDC (discussed in more detail below) illustrate the troubling outcomes that result. In these cases, incarcerated individuals were seriously assaulted by other people in custody and in each of these incidents, staff ceded control of the housing areas to the incarcerated population, who were allowed to congregate and enter cells at will to carry out these assaults.

- **Intake**:[35] The conditions within Intake have been subject to significant scrutiny, multiple Remedial Orders, and motion practice before the Court. Efficiently processing individuals through intake and reducing the use of intake units to manage the aftermath of use of force events are critical to improving the level of safety and reducing the use of force within intake units.

The overall number of uses of force occurring in the jails remains exceedingly high, but the proportion of uses of force occurring in intake units has decreased slightly over the past few months.

| *Uses of Force in Intake* | | | | | | |
|---|---|---|---|---|---|---|
| | **2018** | **2019** | **2020** | **2021** | **2022** | **2023 (Jan. to May)** |
| **# of Uses of Force in Intake** | 913 | 1123 | 992 | 1483 | 963 | 309 |
| **Total # of Uses of Force** | 5901 | 7169 | 6197 | 8184 | 7005 | 2718 |
| **% of UOF Occurring in Intake** | *15%* | *16%* | *15%* | *18%* | *14%* | *11%* |

This slight decrease in the proportion of uses of force that occur in intake is encouraging, nonetheless serious problems remain with respect to the level of safety in the Department's intake units. The Monitor's May 26, 2023 Report and June 8, 2023 Reports discussed two serious incidents that occurred in intake units: Incident #3 (where an individual was the victim of a violent assault and lay naked in an intake cell for over

---

[35] As required by the Action Plan, § D, ¶ 2(b) and the Second Remedial Order, ¶ 1(c).

three hours before receiving medical care) and Incident #5 (where an individual was subject to prolonged mechanical restraint and may not have been appropriately supervised while in an intake pen). These incidents raise serious concerns about the management of individuals in new admission intake and the Department's ability and commitment to ensure safety and to provide adequate supervision, timely medical care, and accurate reporting. Intake processing is discussed in more detail in the Management of People in Custody section of this report.

- **Reliance on and Composition of Emergency Response Teams**:[36] The Monitoring Team has long raised concerns about the Department's overreliance on and the conduct of Emergency Response Teams, including those that are composed of facility staff ("Probe Teams") and specialized units that respond system-wide (Emergency Services Unit or ESU; Strategic Response Team or SRT; and Special Search Team or SST).[37]

    The Department's data suggests that it is relying on Emergency Response Teams less often. First, the overall rate of alarms (including Level A, in which a Supervisor or other staff near the location respond in an effort to resolve issues without using physical force and Level B, where an Emergency Response Team is activated) decreased nearly 70% between 2020 (rate 16.8) and the first part of 2023 (rate 5.2).[38] In addition to having fewer alarms altogether, Level B alarms comprised an increasingly smaller proportion of all alarms (from 79% in 2020 to 49% in the first part of 2023). This data suggests that the

---

[36] As required by the Action Plan, § D, ¶ 2(c) and the First Remedial Order, § A, ¶6.

[37] These concerns have been extensively laid out in the 11th Monitor's Report at pgs. 38 to 50 and 116 to 120, Monitor's 12th Report at pgs. 49-51, the Monitor's Second Remedial Order Report at pgs. 3-4, and the Monitor's April 3, 2023 Report at pg. 137 to 143.

[38] The average monthly rate of events is calculated using the following formula: (number of incidents/number of months)/ADP x 100.

Department is resolving situations more often without the use of response teams. This trend is also evident in the 80% decrease in the rate of Level B alarms between 2020 (13.3) and the first part of 2023 (2.6).

| Number of Alarms January 2020-May 2023 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2020 | | 2021 | | 2022 | | 2023 (Jan-May) | |
| | # | % total | # | % total | # | % total | # | % total |
| **TOTAL** | 9,145 | 100% | 6,860 | 100% | 4,257 | 100% | 1,559 | 100% |
| *Level A* | *1,894* | *21%* | *2,264* | *33%* | *1,888* | *44%* | *799* | *51%* |
| *Level B* | *7,249* | *79%* | *4,597* | *67%* | *2,369* | *56%* | *760* | *49%* |

| Average Monthly Rate of Alarms January 2020-May 2023 | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2020 | | | | 2021 | | | | 2022[39] | | | | 2023 (January-May) | | | |
| | # | Avg /mo | ADP | Rate | # | Avg/ mo | ADP | Rate | # | Avg/ mo | ADP | Rate | # | Avg/ mo | ADP | Rate |
| **All** | 9,145 | 762 | 4,544 | 16.8 | 6,860 | 572 | 5,574 | 10.3 | 4,257 | 355 | 5,639 | 6.3 | 1,559 | 312 | 5,940 | 5.2 |
| **Level A** | 1,894 | 158 | 4,544 | 3.5 | 2,264 | 189 | 5,574 | 3.4 | 1,888 | 157 | 5,639 | 2.9 | 799 | 160 | 5,940 | 2.7 |
| **Level B** | 7,249 | 604 | 4,544 | 13.3 | 4,597 | 383 | 5,574 | 6.9 | 2,369 | 197 | 5,639 | 3.5 | 760 | 152 | 5,940 | 2.6 |

These trends are clearly positive—with fewer alarms overall and a decreasing proportion of Level B alarms, there are fewer opportunities for the types of egregious misconduct that have generated the concern about the use of response teams. That said, the Monitoring Team's review of incidents still reveals the unnecessary deployment of Emergency Response Teams in situations where staff should have been able to resolve the incident without using force, and also reveals the continued hyper-confrontational

---

[39] There was a calculation error in the previous reporting on alarm data (dkt. 517 at p. 138). It was previously reported that there were 4,763 alarms in 2022, but this error has been corrected and the total number of alarms in 2022 was 4,257.

behavior among Emergency Response Team members that causes situations to escalate. Both issues require continued improvement, and are illustrated in the below example.



*Image of Illustrative Example 5*

- o ***Illustrative Example 5****: On February 26, 2023 at GRVC a PIC who was lying on the floor of the top tier, appeared to be making slight movements, but may have been somewhat nonresponsive. The PIC remained on the floor as the SRT team entered the housing unit. The officer and another PIC left the PIC lying on the top tier and moved to the stairs. PICs were milling around in the housing unit and began covering their faces. It appears they were refusing orders to lock in. One PIC tried to walk down the stairs to the common area of the housing unit, and SRT staff deployed chemical agents and took him to the ground. The one PIC remained lying on the top tier floor and appeared to speak to other PICs but did not stand or exhibit much movement. Upon their arrival to the housing unit, SRT did not check on this individual. As depicted in the image above, an SRT Captain deployed an OC grenade in the middle of the housing unit even though the PICs were not advancing and were walking away from the SRT staff. More chemical agents were deployed to the upper tier even though the PICs were not advancing there either. The nonresponsive PIC was still lying on the upper floor tier and was seen holding his hand over his chest and coughing. Another PIC appeared to assist him and turned his body on his side. SRT staff eventually walked up to the*

36

*upper tier approaching the PIC lying on the floor. A captain repeatedly sprayed the two PICs, even though no threat was observed. The PIC that was assisting can be seen speaking with the officers and pointing to the PIC on the ground. After multiple deployments of chemical agents, the PIC that was assisting charged forward towards the SRT officers, and the staff took him to the floor. The nonresponsive PIC got up and began to move away, but an officer sprayed his face and back as he was running away. Staff secured both PICs and then escorted them into cells. While being secured in cells, one PIC was screaming and another PIC was complaining about a wrist hold used by an officer, though neither allegations can be confirmed as the video does not depict them within the cells.*

While the Department's data indicates that Emergency Response Teams are utilized less often, several concerns keep the Department in Non-Compliance with the First Remedial Order § A., ¶ 6 and the relevant provision of the Action Plan. These include the ESU/SRT/SST's policies, practices, leadership, screening, and training. Each is discussed in turn below.

- o ***ESU Policies***: ESU maintains about 10 Command Level Orders ("CLOs"), including at least two which govern the use of specialized chemical agent tools (*i.e.*, Pepperball system and the Sabre Phantom Fog Aerosol Grenades). Several of these CLOs lack sufficient guidance on the tools' place in the use of force continuum and need to be revised. The Monitoring Team first shared feedback with recommended improvements to the policies in August of 2021 and has repeatedly raised the need to revise the policies with the Department. Given the Department's failure to address these recommendations, this issue was included in the Monitor's April 2023 Recommendations. Despite repeated claims by Department leaders that the policies were being updated and would be shared with the Monitoring Team for review, this has not occurred. Given the longstanding mismanagement of ESU and the fact revisions to these policies has languished

37

over an extended period of time, this issue is included in the Monitoring Team's priority recommendations for the Court to direct the Department to address as detailed in the Conclusion of this report.

o **ESU Practices**: As discussed in previous Monitor's Reports and in the incident example above,[40] the arrival of ESU/SRT/SST on the scene of an incident typically guarantees that force will be used, and also brings the risk of a host of concerning practices. Some of the problems appear to be triggered by the large numbers of staff who respond, creating a chaotic situation and an excessive show of force. In addition, many ESU/SRT/SST staff use a hyper-confrontational approach when interacting with people in custody, which often triggers the very behavior that a response team should be attempting to resolve or prevent. Furthermore, ESU/SRT/SST staff often engage in poor security practices such as painful escort holds which also unnecessarily escalate an already tense situation. Finally, when these teams are used to conduct searches, the scenes are often chaotic and disorganized; leading to uses of force that would be avoidable if the teams' approach was more coordinated and appropriate.

o **Use of Tasers and Grenades**: ESU's taser usage increased significantly between December 2021 and summer 2022.[41] Once the Monitoring Team

---

[40] These concerns have been discussed extensively in the 11th Monitor's Report at pgs. 38 to 50 and 116 to 120, Twelfth Monitor's Report at pgs. 49-51, the Second Remedial Order Report at pgs. 3-4, and the Monitor's April 3, 2023 Report at 137 to 143.

[41] As noted in the Monitor's October 28, 2022 Report at pg. 118, ESU began using and displaying the taser again in December 2021 after a long hiatus, which raised serious concerns for the Monitoring Team. However, at the behest of the Monitoring Team, significant intervention and individualized training for ESU by the Commissioner and Security Operations Manager in August 2022 put a stop to the concerning practices. ESU staff were reminded of the circumstances in which a taser may be used and were cautioned that tasers may never be used for the purpose of pain compliance.

expressed its concern about this emerging problem, ESU essentially ceased use of the taser, subsequently using the taser in drive or stun mode only once in August 2022, and displaying the taser once in January 2023.

In 2022, ESU staff also began to use "OC grenades" more frequently. Ostensibly, OC grenades may be used to gain a tactical advantage, but ESU's poor practice further compounds the problem. Instead of lobbing the device into an enclosed area, closing the door/port, and giving time for the chemical agent to take effect, ESU squads toss the device and enter the unit simultaneously. Not only has the chemical agent not yet taken effect, but the people in custody are able to pick up the grenade and toss it back toward staff. Subsequent efforts to apply mechanical restraints and gain control of the situation are thus made more difficult.

o  ***ESU Leadership***: ESU had the same leadership for many years. Given the ongoing problems with ESU's conduct and the apparent unwillingness or inability to change staff practice, the Monitoring Team recommended a leadership change. The initial attempt to replace ESU leadership was haphazard as discussed in the Monitor's June 8, 2023 Report, at pg. 29.

o  ***ESU Screening***: An overarching concern regarding ESU's management is the selection of ESU staff, particularly the pattern of retaining staff who have been disciplined for misconduct. The Department's ESU policy requires routine staff screening to prevent this situation, but the policy is not being followed reliably. In

January 2023, several staff who had been removed from ESU in 2021[42] and who should not be permitted to serve on the team per policy were reinstated on ESU. After the Monitoring Team identified the problem, the Department reported that the staff were subsequently removed from ESU, although as noted in the Monitor's June 8, 2023 Report (*see* pg. 24), this information was later determined to be inaccurate as some of these individuals remained on ESU/SRT/SST despite claims to the contrary. The ESU policy also requires routine screening of all staff to determine whether any disqualifying charges exist. Historically, this routine screening did not occur, but was started in January 2023. The screening was poorly executed, causing the Monitoring Team to recommend rescreening and to provide detailed feedback to ensure the integrity of the rescreening. The Monitoring Team repeatedly offered to consult with the Department on how it could revise its procedures, but the Department never engaged with the Monitoring Team. Instead, just prior to the filing of this report, the Department provided the Monitoring Team with the outcome of the most recent screening. It did not provide the underlying documentation that would enable the Monitoring Team to assess and evaluate the quality of that screening and has not responded to the Monitoring Team's inquiry about whether the screening addressed the Monitoring Team's detailed feedback. Over many years, the Department has demonstrated an inability to adequately screen and assign staff to ESU. Accordingly, this issue is included in the Monitoring Team's priority

---

[42] *See* 11th Monitor's Report at pgs. 44 to 46.

recommendations for the Court to direct the Department to address as detailed in the Conclusion of this report.

o  ***ESU Training***: Given the poor practice, ineffective leadership and poor screening procedures, in April 2023, the Monitoring Team recommended that ESU/SRT/SST staff receive training to improve practice. The Department's training program is wholly inadequate; it fails to address the areas of concern regarding the practices of these teams as has been reported by the Monitoring Team for years, the course content itself is inadequate in addressing the skills set necessary for the work of these teams, and at least some of the course content is inconsistent with the Department's own policies and procedures (e.g., the discussion of Incident Command is not aligned with the Department's practices regarding Level A/B alarms). The training materials are rudimentary, and at a level that is appropriate for an entry-level recruit but falls far short of the depth of information and nuance needed to elevate the skill-level of the Department's "elite squad." A more detailed discussion of the problems regarding collaboration and the substance of this training is included in the Leadership, Supervision, and Training section of this report. As a result of these findings, this issue is included in the Monitoring Team's priority recommendations for the Court to direct the Department to address as detailed in the Conclusion of this report.

o  ***ESU Rapid Review***: Previously, internal reviews of ESU's practices occurred during the Rapid Review at the facility where ESU responded to an incident. Because ESU may respond to any of the jails, this facility-based approach meant that the oversight of ESU's practice was fragmented and de-centralized and thus

lacked appropriate rigor, continuity and efficacy. Beginning in June 2023, a
centralized Rapid Review is now conducted for all incidents in which ESU is
involved. The process is led by the Security Operations Manager and ESU
leadership.

- **Searches**:[43] In 2022, DOC conducted a total of 196,738 searches (195,348 completed by
the facilities and 1,390 special searches[44]). Through May 2023, DOC has conducted a
total of 63,899 searches (63,451 completed by the facilities and 448 special searches).
The Monitoring Team has not observed any change in practice that would suggest the
process or effectiveness of search procedures have improved.[45] Though it is reasonable
that some searches do not result in contraband recovery, the Monitoring Team has found
throughout its comprehensive review of incident reports, investigations, and post-incident
management audits that staff regularly fail to recover weapons during many searches of
housing units and individuals following violent incidents involving weapons. During
review of surveillance videos for violent incidents, the Monitoring Team often observes
persons in custody hiding weapons after an incident occurs, only to watch the responding
staff fail to find these items during their searches. Further, the Department has not
reported any effort to address the Monitoring Team's June 2021 feedback regarding
enhancements to its search procedures nor has the Department sought to consult with the

---

[43] As required by the Action Plan, § D, ¶ 2(d).

[44] These include searches by the Emergency Services Unit, the Special Search Team, the Canine Unit
and/or Tactical Search Operations.

[45] *See*, for example, Monitor's 3rd Report (dkt. 295) at pgs. 13 to 14 and 128; Monitor's 6th Report (dkt.
317) at pg. 42, Monitor's 10th Report (dkt. 360) at pgs. 16, 29, 75; Monitor's 11th Report (dkt. 368) at pgs.
24; 43-44, 48 and 124; Monitor's 12th Report (dkt. 431) at pg. 26; Monitor's March 16, 2022 Report (dkt.
438) at pgs. 22 and 71 to 72; Monitor's October 28, 2022 (dkt. 472) at pgs. 71-72, 81, 117; Monitor's
April 3, 2023 Report (dkt. 517) at pg. 54 and 138.

Monitoring Team on this issue. Not only does poor search technique contribute to the prevalence of weapons and other contraband, but it also compounds the Department's problems with the use of force. During a two-week period in June 2023, 30 uses of force were related to searches, comprising about 12% of all uses of force during that period of time, which is high for a system of this size. The Monitoring Team's reviews of incidents have also continued to identify situations in which individuals hid weapons after incidents and the weapons were not recovered during the search conducted in response to the incident. As a result of these findings, this issue is included in the Monitoring Team's priority recommendations for the Court to direct the Department to address as detailed in the Conclusion of this report.

- **Weapons and Contraband**:[46] Compared to 2021, the volume of contraband recovered by the Department increased in 2022. In 2022, the Department seized 35% more drugs, 75% more weapons, 168% more escape-related items, and 30% more "other contraband" than in 2021. Contraband seizures have declined thus far in 2023, particularly the number of weapons and "other contraband," as shown in the table below.

| Contraband Recovery, 2021-2023[47] | | | |
|---|---|---|---|
| | **2021** | **2022** | **Jan.-May 2023** |
| Drugs | 1,049 | 1,423 | 780 |
| Weapons | 3,144 | 5,539 | 1,147 |
| Escape-Related Item | 196 | 525 | 166 |
| Other | 878 | 1,145 | 402 |
| **Total** | **5,267** | **8,598** | **2,495** |

---

[46] As required by the Action Plan, § D, ¶ 2(e).

[47] The method for calculating contraband recovery data varies depending on the type of contraband. For example, drug contraband is counted by incident, not the actual number of items seized. For example, if three different types of drugs were recovered in one location, this is counted as a single seizure. In contrast, when weapons are seized, each item recovered is counted separately. For example, if three weapons were seized from a single individual, all three items are counted.

Any successful effort to remove weapons and contraband from a facility is obviously positive but the relatively low rate of return (*i.e.,* contraband seized per searches conducted) and observations of videotaped footage of search technique and procedure suggests to the Monitoring Team that additional work to refine practice remains necessary.

Further, the Department reports it has taken steps to reduce the volume of drugs in the jails. The Commissioner recently touted to the press on June 26, 2023 that "calendar year to date, we have not had an overdose death."[48] Tragically, just eight days later, on July 4, 2023, an individual in custody died of an alleged drug overdose after openly smoking an unknown substance in the housing unit in the presence of an officer late in the evening after lock-in was supposed to occur. The Monitoring Team's routine video observations also include situations in which individuals in custody are observed smoking as demonstrated in the picture below:



---

[48] *See* Robert Moses, Meet the K9 unit keeping Rikers Island safe from drugs, contraband, Meet the K9 unit keeping Rikers Island safe from drugs, contraband, FOX 5 NEW YORK, https://www.fox5ny.com/news/rikers-island-k9-unit-queens.

- **Escort Techniques**:[49] During its routine review of incidents, the Monitoring Team has not observed any improvement to staff escort techniques, and the pattern of unnecessarily painful escort holds continues unabated.[50] During the first year of the Action Plan's implementation, the Department reported numerous times its intention to consult the Monitoring Team on this issue, but it has never actually done so. In addition to the needless infliction of pain upon people in custody, the use of painful escort holds contributes to the Department's larger use of force problem. During a two-week period in June 2023, 89 uses of force occurred during escort, comprising about 37% of all uses of force in that period. The fact that a routine escort so often escalates to an additional use of physical force suggests that the application of this basic correctional skill requires significant remediation. Further, despite the prevalence of painful escorts visible via video of use of force incidents, the Department's Rapid Reviews only rarely identify this as an issue. This issue is included in the Monitoring Team's priority recommendations for the Court to direct the Department to address as detailed in the Conclusion of this report.

- **Self-Harm Procedures**:[51] Since the Court entered the Second Remedial Order in September 2021,[52] which required the Department to ensure staff understand and follow

---

[49] As required by the Action Plan, § D, ¶ 2(f).

[50] *See* Monitor's 2nd Report, pg. 110; Monitor's 3rd Report, pg. 13 and pg. 149; Monitor's 4th Report, pg. 8; Monitor's 5th Report, pgs. 18-21; Monitor's 7th Report, pg. 24; Monitor's 8th Report, pg. 3-4; Monitor's 9th Report, pgs. 30-31, pg. 39 and pg. 79; Monitor's 10th Report, pg. 3, 13, 17, 29 and 31; Monitor's 11th Report, pgs. 24-25 and pgs. 46-47; and Monitor's June 8, 2023 Special Report, pg. 6.

[51] As required by the Action Plan, § D, ¶ 2(g).

[52] The Monitoring Team has long raised concerns regarding self-harm and suicide. *See* Monitor's 1st Report (dkt. 269) at pgs. 52-53; Monitor's 9th Report (dkt. 341) at pgs. 22-23; Monitor's 10th Report (dkt. 36) at pg. 23; Monitor's 11th Monitor's Report (dkt. 368) at pgs. 33-35; Monitor's August 24, 2021 Status Report Letter to the Court (dkt. 378) at pgs. 3, 7; Monitor's September 2, 2021 Status Report (dkt. 380) at pgs. 1-2; Monitor's September 23, 2021 Status Report (dkt. 387) at pgs. 1-3, 6, Appx. A, pgs. i-ii, vi; Monitor's October 14, 2021 Status Report (dkt. 403) at pgs. 5-6; Monitor's November 17, 2021 Status

the Suicide Prevention and Intervention Policy, seven people have died by suicide or

suspected suicide (six of whom died since the Action Plan was entered in June 2022).

Further, the Department's response to staffs' failures to address self-harm incidents is

also of concern as discussed in the Staff Accountability – Identifying and Addressing

Misconduct section of this report. The Monitor's October 28, 2022 Status Report outlined

a number of concerns about the Department's policies, procedures and practices for

preventing and responding to self-harming behavior and the risk of suicide and made a

number of recommendations (*see* pgs. 17 to 31).

The Monitor's April 3, 2023 Report (at pgs. 69 to 72) reported that the

Department took a number of positive steps. The Department retained a consultant to

support its work in this area, appointed a new Deputy Commissioner of Health Affairs,

convened a Mortality Review Committee that includes the Department and CHS, and

convened a Suicide Prevention Task Force comprised of a variety of agency leaders,

uniformed staff and representatives from H+H. The City also reported that the

Department and H+H have agreed that the Department receives sufficient information

from H+H to carry out its responsibilities with respect to reporting and addressing

injuries, suicides, and other types of self-harming behaviors. These are all encouraging

steps forward to prevent additional tragic outcomes.

The Department's actions taken to date, while important first steps to create a

functional infrastructure for change, do not directly identify, assess or remediate *staff*

---

Report (dkt. 420) at pgs. 3, 9; Monitor's 12th Report (dkt. 431) at pgs. 18-19, 31-32; Monitor's March 16, 2022 Special Report (dkt. 438) at pgs. 46, 71; Monitor's October 28, 2022 Report (dkt. 472) at pgs. 27-31; Monitor's April 3, 2023 Report (dkt. 517) on pgs. 64-72, 164; Monitor's May 26, 2023 Special Report (dkt. 533) on pgs. 4-6; Monitor's June 8, 2023 Special Report (dkt. 541) on pgs. 9, 42, 44.

*practice* which is the crux of the Monitoring Team's concerns. The Monitoring Team's October 28, 2022 recommendations[53] found that an external assessment by a qualified expert of a number of different areas was necessary because the City and the Department had not conducted this analysis on their own and do not appear to have the requisite expertise or skills to conduct such an assessment, which remains true. Accordingly, the Monitoring Team recommended the following assessment be conducted by an external consultant with the requisite skill set:

- o   Assessing DOC and H+H policies related to Suicide Prevention to ascertain whether they reflect generally accepted practice. The Department reports this task has been referred to the Law Department to take the lead, but no date has been provided as to when this policy development will be completed. The Department further reports its consultant will review the policy *after* a draft has been developed.

- o   Assessing the adequacy of H+H protocols for screening, assessing, and treating the risk of suicide and Department protocols for responding to suicidal ideation, making referrals and monitoring those who are on suicide precautions.

- o   Assessing Department staff's practices and responses to self-harm incidents to identify problem areas.

- o   Assessing current H+H and Department practices to identify where performance is subpar.

The Monitoring Team originally intended to contract with a qualified individual to conduct the above-referenced assessment, but the City and Department reported that

---

[53] *See* the Monitor's October 28, 2022 Report at pg. 31.

they had engaged their own expert to conduct this work. The individual contracted by the Department is well-qualified to do the work and so the Monitoring Team acquiesced to the City's and Department's arrangement, particularly because the City and Department committed to the same scope of work proposed by the Monitoring Team.

Initially, in late 2022/early 2023, the Department actively engaged with its consultant who provided suggestions and guided the development of a Mortality and Morbidity Review process and worked with the Department and H+H to facilitate coordination on these issues. However, the Monitoring Team's recent discussions with the Department's contracted expert confirmed that the Department has essentially not utilized the individual since February 2023, except for a few brief phone calls. It appears that the Department now intends to utilize the consultant only to review any updated policies it may develop, although a timeline for this task is unknown (and already incredibly protracted). Furthermore, although the consultant gave the Department guidance as to the structure/content for the Morbidity and Mortality Review, the Monitoring Team understands that the consultant has not been invited to actually *observe* any of the reviews that have been convened or taken any other steps to directly assess staff practice. After more than nine months since the Monitoring Team's recommendation that the City and Department assess a variety of practices related to self-harm and make changes as necessary to ensure their adequacy, the Department is no closer to improving practice and reducing the risk of self-harm. Accordingly, the Monitoring Team's strongly reiterates its recommendation for an objective, comprehensive external assessment and so this issue is included in the Monitoring

Team's priority recommendations for the Court to direct the Department to address as detailed in the Conclusion of this report.

Finally, the Suicide Prevention Task Force previously reported its *plans* to address several additional concerns,[54] but to date, has not taken tangible action on these initiatives. These include: (1) reviewing policy and procedures; (2) evaluating and reviewing training; (3) improving follow-up on mental health referrals; (4) improving information sharing during the new admissions process; (5) increasing video surveillance coverage; (6) improving tracking of 15-minute tours; (7) rotating individuals assigned to Suicide Watch Officer duty.

The fact that these initiatives continue to languish is particularly concerning given the implications for direct harm to individuals in custody. Seven people have died by suicide or suspected suicide (six of whom died since the Action Plan was entered in June 2022) since the Court required the Department to improve its practices regarding self-harm.

- **Post-Incident Management**:[55] The Department developed a post-incident management protocol for RNDC to better isolate the perpetrators of acts of violence, limit the potential to exchange/abandon contraband, efficiently search the individuals involved, and transfer those involved to more secure locations as appropriate. While the facility has begun to

---

[54] *See* Monitor's April 3, 2023 Report, pg. 71.

[55] As required by the Action Plan, § D, ¶ 2(h).

better structure its response, NCU's audits suggest these improvements are often offset by the failure to follow the basic steps of the policy.[56]

- **Impact of Poor Security Practices**: The Monitoring Team's findings made throughout the life of the Consent Judgment affirm the lack of progress in elevating staff practice and controlling violence. The Monitoring Team's contemporaneous review of initial reports and Rapid Reviews of all use of force incidents from May 2023 revealed the following trends and patterns:

  o A large proportion of uses of force were related to fights among people in custody, in response to attempts to search people in custody, and during escort. As noted above, many of these events may have been successfully avoided if staff had the requisite skill set in basic correctional practice, interpersonal communication and conflict resolution, if lock-in time was enforced by staff, and if out-of-cell time was more structured and/or enriched with programming.

  o Multiple security failures contributed to and/or exacerbated use of force events such as unsecured A stations, staff being off-post, staff failing to wear/activate body-worn cameras, failure to lock doors, failure to enforce mandatory lock-in and poor escort technique.

  o Poor staff practice was revealed in numerous events that involved staff failing to render aid and failing to intervene timely; deploying chemical agents in excessive amounts and at an unsafe distance; unnecessarily deploying probe teams; staff's unprofessional conduct, use of profanity and other actions that escalated the

---

[56] *See* Monitor's March 16, 2022 Report (dkt. 438) at pg. 53; Monitor's June 30, 2022 Report (dkt. 467) at pg.20; Monitor's April 3, 2023 Report (dkt. 517) at pg. 54.

situation; and situations in which the use of force could have been avoided if staff
practiced good de-escalation, communication or security measures.

- **Illustrative Examples Reflecting the Harm from Poor Security Practices**: Three
recent incidents, one at RNDC and two at GRVC are shared as illustrative examples of
the harm that flows from poor security practices. These are not isolated cases, as
demonstrated in NCU's practice audits in May 2023 and based on reviews by the
Monitoring Team, and are shared in the interest of providing context for the impact these
poor practices have on operations and the harm that flows from them. These incidents are
outlined below.



*Image of Illustrative Example 6*

   o **Illustrative Example 6**: *On May 12, 2023, in a General Population unit at
   GRVC, many PICs were out in the dayroom area. Cell doors were visibly
   open, unsecured, manipulated, and obstructed. A PIC was seen openly
   smoking contraband. There was no officer on the floor post, so the individuals
   were unsupervised. Two PICs engaged in a fistfight. After briefly fighting,*

*other incarcerated individuals separated the two. An officer entered the area approximately 45 seconds after the fight started. One of the PICs involved in the fight moved to the stairwell, where he was then punched in the face. The PIC then ran up the stairs as other PICs pursued him. The Officer on the floor tried to go up the stairs, but other PICs pushed him back and blocked his path. The Officer did not advance. At the top of the tier, as the PIC was running, he was elbowed in the face by another incarcerated individual, knocking him to the floor. While on the floor, several incarcerated individuals kicked him in the head and body as depicted above. The Officer on the floor watched the assault from the stairwell. When the assault concluded, the incarcerated individuals blocking him moved and allowed him up the stairs. The Officer got to the victim of the assault, and the victim began convulsing. Other incarcerated individuals carried the victim to the vestibule, where the victim tried to get up and stumbled around until medical staff arrived. The victim of this incident sustained a laceration on his right eyebrow, right eyelid, and post-concussive syndrome, which required hospitalization at Bellevue Hospital.*



*Image of Illustrative Example 7*

o  **Illustrative Example 7**: *On May 31, 2023, in a General Population housing
    area at GRVC, shortly after midnight, several incarcerated individuals were
    seen freely entering and exiting cells during institutional lock-in (a mandatory
    time when individuals are to be locked in their cell). Cell doors were visibly
    open, unsecured, manipulated, and obstructed. The housing area walls and
    floors were covered in dirt, soot, and graffiti. Approximately a dozen people
    in custody can be seen entering and exiting numerous cells during this time. In
    one instance, nine people in custody were observed entering a single cell. As
    depicted above, video captured a group of individuals pushing a PIC into a
    cell as the PIC resisted by holding on to another PIC, but the group forced
    him into the cell. They all entered and closed the door. As this occurred, the
    Officer was seated at the housing area desk facing the general direction of the
    cell. Approximately two and a half minutes after the PICs entered the cell, the
    Officer exited the area, leaving the area unsupervised. The group of PICs
    exited the cell approximately sixteen minutes after they forced their way in.
    Later that morning, a DOC supervisor and Officer toured the housing area
    and interacted with the victim of the assault in the cell through the cell's food
    slot. The DOC supervisor appeared to take no action. Finally, during the
    evening a team of DOC Officers entered the housing area and escorted the*

*victim of the assault out of the area. The video depicts serious injuries on the victim's face as he is escorted out of the area. **The victim was evaluated in the clinic 18 hours after the incident occurred**. The victim alleged sexual assault with penetration and medical staff found orbital swelling, tenderness, ecchymosis, bilateral subconjunctival hemorrhage, nasal bridge swelling, and tenderness. The victim was referred to Bellevue Hospital.*



*Image of Illustrative Example 8*

- o **Illustrative Example 8**: *On June 8, 2023, at RNDC, several young adults congregated in the tier and unauthorized areas like the staff desk. The Officer assigned to the area exited the floor and entered the A-station, leaving the area unsupervised. Video appears to capture the young adults directing the A station Officer to unlock cell doors. A cell door near where the young adults congregated opened, which allowed six PICs to enter and engage in an assault on the induvial housed in the cell as depicted above. Shortly thereafter, the Officer re-entered the area and all six PICs exited the cell and closed the cell door, leaving the victim inside. The Officer appeared to interact with the PIC that was assaulted inside the cell but does not take him out. Over the next several hours, multiple Officers and DOC supervisors toured the area and interacted with the PIC that was assaulted, but none took action. **Over seven hours after the incident, the PIC was taken out of his cell and evaluated in the clinic.** He was transferred to the Urgicare with bilateral lacerations.*

<u>Violence Indicators</u>

Turning to quantitative metrics regarding violence, the average monthly rate of every safety and violence indicator is substantially higher than when the Consent Judgment went into effect in November 2015, and higher than the rates during each of the subsequent five years (*i.e.*, 2016-2020). While the rates of nearly every indicator reached a highpoint in 2021 and some of the rates subsequently decreased, they have yet to return to levels near those observed when the Consent Judgment was entered. Further, the Monitoring Team agrees with the City's position that "the sheer numbers don't really tell you the whole story." [57] The data, in combination with the Monitoring Team's qualitative assessment of staff practice, demonstrates that the Department continues to fall far short of the requirement to materially improve the level of safety. Not only are acts of violence alarmingly frequent, but they also contribute to the Department's problems with the use of force. The Monitoring Team's assessment of current data on facility violence is discussed below, and relevant data is attached to this report as Appendix A.

- **Stabbing and Slashing**: The Department's average monthly rate of stabbings/slashings during the most recent five-month period (January-May 2023; 0.48) is 24% lower than the average monthly rate at the height of the crisis (2021; 0.63) but is 243% higher than the average monthly rate of stabbings/slashings at the inception of the Consent Judgment (2016; 0.14).

    o A total of 420 and 468 stabbings/slashings occurred in the jails in 2021 and 2022, respectively. Given that 144 stabbings/slashings have already occurred during the first five months of 2023 (January-May), the Department is on track for 346 stabbings/slashings this year.

---

[57] *See* April 27, 2023 Status Conference Transcript at pg. 57, lines 7 to 9.

o Although the number of stabbings/slashings appears to be decreasing, the fact that hundreds of stabbings and slashings are expected to occur this year is troubling, particularly when viewed in the context of the number of incidents at a time when the jails' poor conditions were found to be serious enough to warrant federal court intervention (*i.e.*, 159 stabbings and slashings occurred in 2016, just as the Consent Judgment went into effect). The escalating rate of this serious form of violence that began in 2021 and continues to the present is emblematic of the imminent risk of harm present every day in the jails. Further, concerning as noted above is that the Monitoring Team is aware of at least some stabbing/slashing incidents that occurred that are not part of this data.

- **Assaults on Staff**: The Department's average monthly rate of assaults on staff during the most recent five-month period (January-May 2023; 0.99) is 38% lower than the average monthly rate at the height of the crisis (2021; 1.6) but is 39% higher than the average monthly rate of assault on staff at the inception of the Consent Judgment (2016; 0.71).[58]

- **Fights**: The Department's average monthly rate of fights during the most recent five-month period (January-May 2023; 8.05) is 15% lower than the average monthly rate at the apex of the crisis (2021; 9.28) but is 58% higher than the average monthly rate of fights at the inception of the Consent Judgment (2016; 5.11).

- **Serious Injuries**: The Department currently has a reporting mechanism for tracking incidents in which an incarcerated individual sustains a serious injury, wherein the incident is coded as a "serious injury to inmate" in the Department's records. The

---

[58] These comparisons only include assaults on staff that involved a use of force, because relevant comparison data for assaults on staff without a use of force are not available.

Monitoring Team has started to scrutinize these reports more closely given that they represent direct harm to people in custody and because many of them relate to a variety of *Nunez* issues. At this time, neither the full scope and contours of the reporting category nor the aggregate data that may be available are fully known. The Monitoring Team is now exploring these questions. However, it is clear that many of the incidents identified as "serious injuries to inmate" reflect ongoing harm to incarcerated individuals and the Monitoring Team's review of a select group of cases revealed that these incidents are a result of significant security and operational failures. These incidents must be considered as part of the overall assessment of facility safety because many relate to harm sustained during violent incidents. The Monitoring Team is not aware whether the Department evaluates, analyzes or otherwise utilizes "serious injury" data as part of its overall assessment of the state of affairs, but it is clearly relevant and an important indicator of violence in the jails. Further, the referral criteria, scope and quality of any investigation or potential follow-up for these incidents is unknown. As a result, the Monitoring Team will be conducting a more fulsome assessment of this information for future reporting. The Monitoring Team's initial review of incidents categorized as "serious injury to inmate" that occurred during a one week period, June 13 to 20, 2023, included 15 incidents involving _**14**_ incarcerated individuals who sustained the following injuries: 3 individuals with a concussion; 3 individuals with a laceration to the eye; 1 individual with a fractured hand; 1 individual with a nose fracture; 1 individual with a laceration to the arm; 1 individual with a possible head injury; 1 individual with a possible hand injury; 1 individual with a laceration to the scalp, a fracture to the scalp and a concussion; 1 individual with a fracture to the head and a concussion; and 1 individual with a laceration

to the head. Further, the Monitoring Team's review of videos of "serious injury to inmate" incidents reveal similar concerns (e.g., illustrative examples 6, 7, and 8 discussed above) as well as the illustrative example that occurred at GRVC recently:



*Image of Illustrative Example 9*

o **Illustrative Example 9**: *On May 14, 2023, in a General Population Housing area at GRVC, incarcerated individuals were eating lunch in the day room. Cell doors were visibly open, unsecured, manipulated, and obstructed. There was no Officer on the floor post, so PICs were unsupervised. PICs congregated in various areas, including unauthorized areas like the staff desk. Video captured three PICs entering a cell and closing the door. Another individual stood in front of the door and apparently guarding it. Approximately thirty seconds later, the cell door opened, and several incarcerated individuals dragged another incarcerated individual out as depicted above. The individual was dragged to the front of the housing area, where he was punched several times. A few seconds later, two Officers entered the housing area, and the assaulted PIC tried to stand up but stumbled around, clearly disoriented. Officers took the PIC to the clinic, where medical staff noted the individual had a right orbital hematoma, right lower eyelid laceration, left upper eyelid laceration, and a swollen nasal bridge.*

- **Violence Reduction Plans**:[59] The Action Plan requires the Department to develop violence reduction plans for three facilities (RNDC, GRVC and AMKC) and requires new cell doors to be installed at RNDC and AMKC (an update on the installation of Cell Doors is included in Appendix A). The Monitoring Team has reported extensively on current conditions at RNDC and GRVC.[60] All three facilities continue to rank among the highest in the Department on most indicators of safety. Certain RNDC indicators reflect significant improvement over historical high points. Certain GRVC indicators have improved compared to recent highs but remain significantly higher than the average monthly rates in 2016. AMKC's indicators continue to trend in the wrong direction.

  o At RNDC, a steady reduction in the average monthly use of force rate has occurred since July-December 2018 [61] (28.1) through the first five months of 2023 (8.2). The average monthly rates of stabbings/slashings and fights also substantially decreased during that time (stabbings/slashings decreased from 1.41 in 2021 to 0.50 in 2023; fights decreased from 11.8 in 2021 to 7.0 in 2023). The decrease in fights is particularly encouraging given that in July-December 2018, the average monthly rate was 21.77. The current rate of stabbings/slashings is about 27% higher than it was in July-December 2018 (0.55 versus 0.43). However, the Monitoring Team's assessment of recent incidents at RNDC continues to reveal poor security practices and that staff and persons in custody are exposed to harm daily.

---

[59] As required by the Action Plan, § A, ¶¶ 1(a) to (b).

[60] *See* Monitor's March 16, 2022, Report pgs. 17 to 30, Monitor's Report June 3, 2022, Report pgs. 17 to 27, Monitor's October 28, 2022, Report pgs. 65 to 71, Monitor's April 3, 2023 Report pgs. 52 to 62.

[61] With GMDC's closure in July 2018, most of the young adults (age 18-21) were transferred to RNDC. Given this significant change in RNDC's composition, 2018 is used as the most relevant reference point.

o At GRVC, the improvements in the *data* have been more modest but are still trending in the right direction. Thus far in 2023, the monthly average use of force rate is 10.7, the monthly average rate of stabbings/slashings is 1.01, and the monthly average rate of fights is 5.5, all of which remain at concerning levels, particularly compared to the rates of these indicators in 2016 (UOF = 6.91; Stabbings/Slashings = 0.15; Fights = 3:32). However, the Monitoring Team's assessment of recent incidents at GRVC continues to reveal poor security practices and that staff and persons in custody are exposed to harm daily.

o Unfortunately, the rates of use of force and violence at AMKC are trending in the wrong direction (*i.e.*, they ticked upward in 2023) and so additional efforts are needed to improve safety. Thus far in 2023, the average monthly use of force rate is 9.13 (compared to 2.42 in 2016 and 7.27 in 2022), the average monthly rate of stabbings/slashings is 0.53 (compared to 0.10 in 2016 and 0.4 in 2022), and the average rate of fights is 9.01 (compared to 4.91 in 2016 and 6.59 in 2022). The Department is now planning to close AMKC and to re-open OBCC, as discussed in other sections of this report.

o In summary, while certain data points viewed in isolation suggest that some progress has been made at RNDC and GRVC, particularly in the downward trends noted since 2021, the fact remains that none of these decreases are of the magnitude needed to achieve the reform required by the Consent Judgment. In every case, quantitative metrics show that violence and the use of force are exponentially higher than they were in 2016. Further, security breaches and operational failures continue to be prevalent. Several NCU audits of practice during a few randomly selected days in

60

May 2023 at RNDC and GRVC found operations to be in disarray, including

unsecured cell doors and incarcerated individuals freely entering and exiting their

cells, no staff on post throughout various tours, inadequate supervisor tours, and

incarcerated individuals smoking contraband. Many of these problems were present

in the three recent incidents that occurred at RNDC and GRVC, which are

summarized above.

- **In-Custody Deaths**: In 2022, more people died in custody or were released just prior to

  their death (n=19) than in any other year since the Consent Judgment was entered in

  November 2015. No matter the time period used for comparison, the number of people

  who have died in custody has been tragic and is related, at least in part, to the poor

  conditions and security practices in the jails as set forth herein. In fact, video review of

  one of the most recent in-custody deaths which occurred on July 4, 2023 reveals a

  number of security and operational failures including, but not limited to, failure to

  enforce lock-in, individuals use of contraband (smoking) on the housing unit, failure to

  provide timely medical treatment, and failure by the Captain to tour. The Department has

  enacted four suspensions related to this death including for the two officers on the A and

  B Post of the housing unit, the Captains and the Deputy Warden of the Facility.[62]

  The Monitoring Team has been working with the Department since the Court's

  June 13, 2023 Order (dkt. 550) was issued to ensure that it is promptly notified of all in-

  custody deaths and of those individuals who have been compassionately released. In so

---

[62] The Commanding Officer of this Facility is a Deputy Warden. The Deputy Warden was suspended for failure to adequately recommend appropriate discipline for the individuals involved in this incident. It must be noted that had previously been decided, prior to this incident, that the this individual was no longer going to serve as a Command Officer of a Facility upon closure of the Facility in a few weeks.

doing, the Department advised the Monitoring Team that the term "compassionate release," does not adequately capture the intended group of individuals because the use of the term is limited to sentenced individuals and does not apply to pre-trial detainees. More specifically, the Department reports that "compassionate release" is defined by the NY State Department of Corrections and Community Supervision (NY DOCCS) and used by sentenced individuals who make a request to the Board for Compassionate Release consideration.[63] This particular procedure is not applicable to the Department. However, other mechanisms serve a similar function for the New York City jails.

       If an incarcerated individual has a health condition that may merit release, the process has a few steps and must be ordered by the Court. The Department does not have any authority to release an individual because of a health condition although it may certainly identify and recommend individuals that should be considered for potential release.[64] To the extent an individual has a health condition that may merit release, CHS may issue a clinical condition letter, with the patient's consent, which is then provided to the individual's defense counsel. Counsel then may petition the Court to release the individual. Release is not automatic, and an individual determination must be made by the Court. If the court determines release is appropriate, the Department is notified via a court order that the individual is being released on their own recognizance ("ROR"). However, the order does not specify a medical reason for the release.

---

[63] New York State Department of Corrections and Community Supervision. Directive #4304 *Medical Parole and Compassionate Release*. Dated 01/23/2023. Accessed at: https://doccs.ny.gov/system/files/documents/2023/02/4304-public_1.pdf

[64] *See*, for example, Jan Ransom, Jails Boss Urged Man's Release in Apparent Bid to Limit Rikers Death Toll, NEW YORK TIMES, https://www.nytimes.com/2022/09/27/nyregion/riker-death-count.html in which the Commissioner recommended an individual may be suitable for release due to their health condition.

The City **_only_** has authority to release an incarcerated individual in its custody is pursuant to New York State Correction Law 6-a which affords the City the power to release incarcerated individuals, who have been sentenced to under one year behind bars, into a work release program. With this background, the Department reported the following:

- o   Four individuals have died in custody between January 1 and July 10, 2023.
- o   One individual was released from custody by the Court following the issuance of a clinical condition letter and subsequently passed away a few days later (this is Incident # 4 from the Monitor's May 26, 2023 Report).
- o   One individual was released from custody by the Court following the issuance of a clinical condition letter, but their current health condition is unknown.
- o   No one has been released via New York State Correction Law 6-a between January 1 and June 13, 2023.[65]
- o   CHS issued 41 clinical condition letters between January 1 and June 28, 2023. The Monitoring Team is working with the Department to determine the number of individuals subsequently released by the Court.

Given this information, the Monitoring Team reports that thus far in 2023, five individuals have died in custody or shortly following their release due to a health condition that occurred while in custody. A chart of the causes of death from January 1, 2015 to July 10, 2023 is below.

---

[65] Since 2020, the City has released 327 incarcerated individuals to work release programs (297 in 2020, 13 in 2021, 62 in 2022, and 0 in between January 1, 2023 and June 13, 2023).

| NYC DOC Causes of Death, *2015 to July 10, 2023* | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023[66] | Total |
| Accidental | | | | | | | | 1 | | 1 |
| COVID-19 | | | | | | 3 | 2 | | | 5 |
| Medical Condition | 9 | 11 | 4 | 7 | 3 | 2 | 4 | 4 | 1 | 45 |
| Overdose | | 2 | 1 | | | | 4 | 6 | | 13 |
| Suicide | 2 | 2 | | 1 | | 1 | 4 | 5 | | 15 |
| Drowned | | | | | | | | 1 | | 1 |
| Pending OCME Confirmation | | | | | | | | | 4 | 3 |
| Undetermined Due to Death Outside DOC Custody | | | | | | 4[67] | 2 | 2 | | 8 |
| Undetermined by OCME | | | 1 | | | 1 | | | | 2 |
| **Total** | **11** | **15** | **6** | **8** | **3** | **11** | **16** | **19** | **5** | **94** |

*Department's Use of Data to Improve and Reduce the Use of Force and Increase Facility Safety*

Using data to understand and improve practice is commonplace in correctional systems and is an essential strategy for properly targeting solutions and assessing whether those solutions are having the desired impact. The Monitoring Team has consistently reported that significant data and information is available to Department and facility leaders, but they have not effectively utilized that information to identify and address the underlying causes of the unnecessary and excessive force and violence occurring in the agency. The Monitoring Team has persistently encouraged the Department to develop strategies to leverage the available information and data,

---

[66] This data is based on information provided by the Department. The Monitoring Team has not yet had a chance to evaluate the release of individuals based on a clinical condition letter as noted above.

[67] 4 of the 11 individuals who passed away in 2020 were not technically in DOC custody at the time they passed away as they were participating in programs in the community and were not under the supervision of DOC staff at the time of their death and were not physically in the Department's custody (*i.e.*, they were participating in Brooklyn Justice Initiatives, Specialized Model for Adult Reentry and Training (SMART), and Work release programs). The cause of death for each of these individuals is not known and categorized as "Undetermined."

but the Department has demonstrated that it does not have this capacity, ability and/or desire. As a result of the Department's failure to adequately evaluate and consider this data, the First Remedial Order, §A, ¶ 2 requires the Department leadership to conduct such assessments and analysis. However, the Department has remained in non-compliance with this requirement since the 11th Monitoring Period (July to December 2020), when it was entered by the Court.

Most recently, especially in the past year, the Department's approach to using data devolved into one that appears to prioritize simply identifying discrete metrics and numbers to pinpoint areas of "progress." With limited exceptions, Department leadership and staff simply state that numbers are "trending down." Such a conclusion, while perhaps serving a useful public relations function, is factually questionable. An assessment of the data cannot be limited to just a few data points and the totality of the circumstances must be considered. Further, as discussed elsewhere in this report, there are serious questions about whether the data accurately represents all incidents that have occurred. Basic probes by the Monitoring Team to understand the Department's perspective on its limited review of data reveal that Department leadership and staff do not further analyze or understand the implications of the Department's own data. For example, the Department's narrow focus on outcomes from the past 18 months and the purported downward trends are short-sighted and simplistic. By not using available data to understand what operational changes have occurred and whether such changes can be leveraged so that further gains can be achieved or whether additional changes in practices may be necessary to continue the apparent trend, the Department is failing to utilize a valuable tool to identify and implement good practices. Similarly, the Department does not appear to engage in basic analysis of the factors driving the high rates of use of force and what steps could be taken to reduce those rates. If such analyses were occurring, targeted solutions to address the specific issues highlighted in

this section could have been identified and initiated. For instance, even a cursory review of use of force data reveals that an unnecessarily high number of uses of force occur during searches and escorts. Correctional practice is replete with a variety of strategies that could be used to better understand and then address the typical dynamics that characterize each of these factors. However, as noted above, the Department has not taken any steps to address either issue.

In their discussions with the Monitoring Team, Department and facility leaders rarely appear to have knowledge of this information and when asked about elements of the operation that are not going well, offer only superficial observations or platitudinous statements. Only rarely is a problem-solving approach discussed with a level of detail that makes clear how and why a certain initiative to improve practice should be developed and implemented. For example, in addition to tracking macro-statistics like the overall use of force rate or the number of fights, an effective problem-solving effort should also include a basic "hot-spot analysis" (*i.e.,* where do most fights occur (location/housing unit), during what situation, at what time of day, among which people in custody, which staff are present) and then generate a root-cause analysis to understand why each of those trends is present. For instance, why are fights prevalent on the Mental Observation units? Why do those fights tend to occur on the night shift (11 pm to 7 am)? What procedures are not being followed by staff creating an opportunity for violence to occur? What prevents or diminishes staffs' ability to follow procedures? How do the people in custody explain their involvement in fights? And ultimately, how can each of those dynamics be addressed? This type of analysis should be on-going for any and all of the intractable problems the Department is facing: use of force, fights, stabbings and slashings, problems during lock-in hours, failure to utilize tour wands, failure to provide daily recreation, head strikes, failures to secure doors, presence of illicit drugs, etc. The Department reportedly focuses on changes to key

metrics during the recently reinstated TEAMS meetings, but any such problem-solving analysis, if it is occurring, has not been shared with the Monitoring Team, and based on the Monitoring Team's observations and analyses, are not having the desired impact of making the Department more safe and secure for both staff and persons in custody.

As stated above, the Department has a broad array of data that could be useful to the task if it were properly deployed, and also has a number of structures and forums that could effectively house such a problem-solving approach (e.g., TEAMS, *Nunez* meetings, the OMAP, the NCU). Under the current rubric, the perpetual state of dysfunction will simply continue unless and until the Department identifies the salient data necessary to conduct an objective assessment of the current state of affairs and then correctly analyzes and interprets the data so that it can be used *to inform solutions* to its entrenched problems. Given this long-standing problem, this issue is included in the Monitoring Team's priority recommendations for the Court to direct the Department to address as detailed in the Conclusion of this report.

*Conclusion*

The quantitative data and qualitative findings discussed above demonstrate that the risk of harm in the jails remains grave and that the jails remain patently unsafe. The use of force rate is exponentially higher than when the Consent Judgment went into effect, and the proportion of incidents involving unnecessary and/or excessive uses of force and serious injuries remains unchanged. Further, the significantly larger number of use of force incidents over time means that more people in custody are subjected to the excessive and unnecessary use of force and more people are suffering serious injuries. Further, the number and rate of stabbings and slashings have skyrocketed since 2021, so much so that the reduction achieved in 2023 is being touted by the Department as a "success" at a time when the Department is projected to have at least 346

stabbings and slashings this year. This is more than the number of stabbings and slashings that occurred in the *combined* three-year period, 2017-2019 when the Department's population was significantly higher. And tragically, a record number of people died in 2022 while they were in custody. In addition to the concerning trends in key safety-related outcomes, the Department's continued problems related to ESU, failures in basic security practices, lack of objective expertise to assess its procedures for preventing self-harm, and problems with staff reporting mean that without effective remediation, the imminent risk of harm in the jails will continue unabated.

As outlined in the Conclusion of this report, the Monitoring Team has recommended that the Court enter an order to impose specific deadlines and increased oversight by the Monitoring Team to address certain priority items that have continued to languish but that can and should be implemented in the near term. This includes: (1) improving the Department's use of data, (2) improving search and escort procedures, (3) improving lock-in procedures, (4) ensuring staff remain on post, (5) multiple initiatives to address the problematic assignment, deficient training and dangerous practices of ESU staff, and (6) undertaking an objective assessment of and making necessary improvements to the City's and Department's procedures for preventing self-harm and suicide.

# LEADERSHIP, SUPERVISION, AND TRAINING

The success of a reform initiative of this magnitude depends to a large extent on the leadership delivered by agency executive staff, facility leadership, and those who supervise officers' work with people in custody. The leaders are the messengers of change and set the tone for whether the change will move beyond the superficial and become the new cultural norms and entrenched practices required by the *Nunez* Court Orders. Not only must these leaders have a nuanced understanding of what the *Nunez* Court Orders require, but they must also understand the obstacles and barriers that managers and staff will face as they endeavor to implement new practices and they must have solutions for overcoming the many challenges that arise as that process evolves. While new concepts are introduced to officers during training, it is the leaders and supervisors who transfer that initial introduction into everyday practice through their messaging, guidance, coaching and role modeling. These three elements—leadership, supervision and training—are the assets that translate the words on the pages of the *Nunez* Court Orders into improved day-to-day practice that will fundamentally alter staffs' approach to people in custody and to maintaining a safe environment.

## *Department Leadership*

The Action Plan required an infusion of external expertise into the Department's leadership structure to address the widespread skill deficits in sound correctional practice. The original leadership structure outlined in the Action Plan, § A ¶ 3(b) was altered by Court Order on December 6, 2023 (dkt. 492), which "permit[ed] the Department to hire facility leadership at the Warden level from outside the Department's current uniformed ranks." In addition, the Action Plan's original concept for the hierarchy of facility leadership (*see* Action Plan, § A ¶ 3(b)(ii)(2)(b)) was also reformulated. Rather than having a civilian leader partnered with a

uniformed Warden as originally conceptualized, the top level of the facility leadership structure is *solely* a civilian Assistant Commissioner of Operations who serves as the Commander of the Facility, replacing the Warden. The overall goal of infusing expertise in sound correctional practice into the facilities' operation remains the same, but the new structure streamlines the authority and reporting structure.

- **Senior Deputy Commissioner**:[68] The role of Senior Deputy Commissioner ("SDC"), akin to a Chief of Department, has essentially remained vacant for one year (except for three months when it was filled), so the Commissioner has been serving in this role. Given the broad scope of the Commissioner's existing duties, it is critical that this gap in the management structure is filled as soon as possible, as the SDC is the chief operations executive that guides the uniformed rank in its 24/7 operations.

- **Deputy Commissioners**:[69] Three well-qualified individuals serve as Deputy Commissioner of Security (Security Manager), Deputy Commissioner of Administration (Staffing Manager) and Deputy Commissioner of Classification, Custody Management and Facility Operations (Classification Manager). Together, they are responsible for three of the core areas of the Action Plan.

- **Security Operations Leadership**. An Assistant Commissioner of Security Operations was appointed to report to the Security Manager. In addition, a uniform leader is serving as an Acting Chief of Security Operations and also reports to the Security Manager.

---

[68] As required by the Action Plan § A, ¶ 3(b)(ii).

[69] As required by the Action Plan § A, ¶ 3(b)(ii)(1), (2), and (3); § C, ¶ 1; § D, ¶ 1; § E, ¶ 1.

- **Associate Commissioners of Operations**:[70] Two Associate Commissioners of Operations report to the Classification Manager. The Associate Commissioners supervise the Assistant Commissioners of Operation (discussed below).

- **Assistant Commissioners of Operations**:[71] Seven Assistant Commissioners of Operations have been appointed, six of whom serve as the Commanding Officers (*i.e.*, Warden) of individual facilities (EMTC, GRVC, RNDC, RMSC, OBCC, and VCBC). Two of the newly appointed Assistant Commissioners formerly served as uniformed Wardens in the facilities. Each Commanding Officer is responsible for their facility's operation and supervises the Deputy Wardens ("DW"), Assistant Deputy Wardens ("ADW"), Captains and officers assigned to their command. The Assistant Commissioners of Operations report to the Associate Commissioners of Operations noted above. The seventh Assistant Commissioner of Operations works directly with the Classification Manager and is currently assigned to Department-wide initiatives.[72]

The goal and purpose of infusing external correctional expertise into the system was so that the deficient and entrenched practices and staff behaviors that have long plagued the agency could be identified and rectified. There is no question that the recently hired executive staff can have a positive impact on staff practice and their work to date reaffirms the necessity of installing individuals with demonstrated correctional expertise in order to begin to align the Department's functioning with generally accepted practice. Already, some of the new leaders

---

[70] As required by the Action Plan § A, ¶ 3(b)(ii)(2)(a).

[71] As required by the Action Plan § A, ¶ 3(b)(ii)(2)(b).

[72] As of July 5, ,2023, this Assistant Commissioner has been appointed to manage AMKC on at least a temporary basis. Given the imminent closure of this facility, this position is not likely to be a permanent assignment.

have identified deficiencies and poor practice and have been working to address them. However, the Monitoring Team has observed in discussions with some of the newly appointed leaders that they do not appear to have sufficient insight into ongoing and/or recurring deficiencies and problems, which is critical for the formulation of appropriate solutions. While progress must be recognized, as discussed in the Department's Management Structure and Management of the *Nunez* Court Orders section of this report and elsewhere, the Monitoring Team has observed that some leaders tend to focus only on the progress and fail to acknowledge or address concerning lapses in security and operational failures. For example, during a recent discussion with the Monitoring Team regarding the current status of GRVC, a senior Department executive failed to acknowledge any of the security or operational failures discussed in the Security, Violence, and Use of Force section of this report that had just recently occurred. It is unclear whether this senior Department executive was unaware of the issues or whether the individual chose not to acknowledge them to the Monitoring Team. Either way, such apparent lack of insight into the facilities' continuing practice failures is concerning and does not engender confidence in the prospect that practices will materially change, especially given the magnitude of change that must occur.

This integration of new leaders with experience in other correctional systems and/or demonstrated mastery of sound correctional practice is essential, but on its own is not sufficient to change the on-the-ground practice in the way the *Nunez* Court Orders require. As outlined in the Department's Management Structure and Management of the *Nunez* Court Orders section of the report significant concerns remain about the agency leadership's ability and approach to managing the reform initiative and the extent to which they have fully embraced the requirements of the *Nunez* Court Orders.

_Supervision_

Quality supervision is not about simply advising staff on what to do, but also requires consistent expectations, frequent drill and practice, reinforcement and recognition of improved practice, and accountability and discipline for those whose practice does not evolve as required. It requires recognizing progress, but also keen insight into continued deficiencies and problems so that appropriate solutions can be formulated.

In this Department, the goal of quality supervision has been particularly difficult to achieve because the number of supervisors is limited and because the supervisors generally lack the requisite perspective and experience to guide their subordinates toward better practice.[73] The Monitoring Team's observations over the past eight years indicate that supervisors at all levels have a limited command of the restrictions and prohibitions of the Use of Force Directive, appear to act precipitously, and many ultimately end up contributing to or catalyzing the poor outcomes that are of concern. They also fail to detect and then fail to correct the lax security practices among their subordinates that contribute to problems consistently observed and identified by the Monitoring Team in many incidents. Their skill deficits are exacerbated by the fact that this Department has fewer levels of supervisors in its chain of command than is seen in most correctional systems.[74] Most areas in need of skill development are basic correctional practices but infusing them to the point that they become reflexive practice among thousands of staff and hundreds of supervisors is a monumental undertaking. Embedding external correctional expertise

---

[73] _See_ for example, Martin Declaration (dkt. 397), Exhibit D "Citations to Monitoring Team Findings re: Supervisory Deficiencies."

[74] _See_ for example, Monitor's October 28, 2022 Report, at pgs. 78-80; March 16, 2022 Report at pgs. 4 to 6, 39 to 41; 11th Monitor's Report at pgs. 8 to 11; 10th Monitor's Report at pgs. 25 to 30; 9th Monitor's Report at pgs. 22 to 24.

into this agency was an essential first step, but the requisite expertise among the subordinates will not magically appear without dedicated mentorship and leaders who consistently model effective supervision strategies. While certain qualified people are being brought into the organization, improvements to the quality of supervision at all levels of the chain of command remain imperative. The Department has begun to recognize this core necessity, which is positive, but the dearth of quality staff supervision remains a serious concern. Several steps—some of which will take some time to complete—are needed to meet the requirements of the *Nunez* Court Orders such that staff practices related to safety and security can be demonstrably improved and sustained.

- **Selection of Supervisors**

The staff the Department chooses to promote to the positions of DW, ADW, and Captain sends a message about agency leadership's values, the culture it intends to cultivate and promote, and the type of behavior that is set out as an example for others to emulate.[75] During the last Monitoring Period (July to December 2022), the Monitoring Team outlined a number of concerns regarding the Department's promotional screening process, and the Department's Substantial Compliance rating with Consent Judgment § XII, ¶ 1 was downgraded to Partial Compliance.[76]

Since the Action Plan went into effect, a total of 26 staff were promoted to Captain and an additional class of Captains will reportedly be promoted in July 2023.[77] Further, the

---

[75] *See* for example the Monitor's April 3, 2023 Report at pg. 210 and the Monitor's Eighth Report (dkt. 332) at pg. 199.

[76] The Department had achieved Substantial Compliance during the Fifth to Twelfth Monitoring Periods. The provision was not rated in the Thirteenth or Fourteenth Monitoring Periods.

[77] The Monitoring Team's complete compliance assessment of new ADWs' and Captains' pre-promotional screening will be provided in the Monitoring Team's next report.

Department has appointed 32 individuals to the rank of ADWs– 26 were promoted in January 2023 and six candidates were selected in mid-June 2023. The Monitoring Team's assessment in January 2023 found that 12 of the 26 staff promoted to ADW in early 2023 lacked an objective or sound basis for promotion based on the screening materials provided.[78] More specifically, almost half of the individuals promoted had been identified *via the Department's own screening process* as unsuitable for promotion, but they were promoted anyway. Despite requests from the Monitoring Team to understand the decision-making process used for each individual, the Commissioner simply reported that he "carefully considered each of those assistant deputy warden promotions and determined that it was appropriate to give each individual an opportunity to succeed in their new leadership role."[79]

As for the six candidates identified for promotion to ADW in June 2023, several concerning issues emerged. First, the Department did not follow its own policy for pre-promotional screening in that only a truncated screening process was utilized rather than the full assessment of the individuals' background and qualifications required by policy. More specifically, the Department *only* sought input from the Trials Division and Investigation Division (before it was split into two units). Further, the Department's screening practices did not comport with the Monitoring Team's April 2023 Recommendations regarding necessary improvements to the screening process to include an assessment of an individual's use of force disciplinary history required by Consent Judgment, § XII, ¶2 (*i.e.*, to review an individual's history of Command Discipline and PDRs), despite assurances from a senior Department

---

[78] *See* the Monitor's April 3, 2023 Report at pg. 212 to 216.

[79] *See* April 27, 2023 Court Conference Transcript at pg. 20, 15:18.

executive that it would do so.[80] Finally, an initial review of the screening materials identified that one candidate was initially not recommended due to discipline related to two violent incidents. One of those two incidents also had corresponding criminal charges, which were subsequently dropped. As a result, six weeks later the Trials Division recommended the individual for promotion because the criminal charges were dropped, but continued to note the individual still had formal disciplinary charges with the Trials Division for two violent incidents. It is concerning that the Department's pre-promotional screening practices have not addressed the deficiencies identified by the Monitoring Team and has become even less rigorous as the Department is failing to follow its own policy to screen staff for promotions. Finally, the Department failed to timely provide the Monitoring Team with accurate information regarding the promotion of these candidates. Conflicting information about those staff to be promoted was initially provided as outlined in the Monitor's June 8, 2023 Report at pgs. 24 to 25. The Department subsequently committed to providing routine updates regarding promotions but did not do so. The Monitoring Team ultimately learned that the candidates had indeed been promoted when the Training Division advised the Monitoring Team that pre-promotional training was scheduled to commence shortly. After the Monitoring Team made yet another request for information, the Monitoring Team was finally advised about the promotions and provided the requested documentation for these six individuals.

---

[80] A senior Department executive reported to the Monitoring Team on May 17, 2023 that prior to promoting this newest class of ADWs, the Department would address the Monitoring Team's feedback regarding the assessment of a candidate's disciplinary record, pursuant to Consent Judgment § XII, ¶ 2. This individual assured the Monitoring Team that the screening protocol would be revised to include an assessment of relevant Command Discipline and PDRs. This did not occur, and the same deficient process regarding the assessment of an individual's use of force disciplinary history described in the Monitor's April 3, 2023 Report (see pgs. 214 to 215) was conducted.

On the afternoon of July 7, 2023, the Monitoring Team learned, through the Department's public social media page, that in fact 10, not 6 ADWs, have recently been promoted. The Monitoring Team immediately requested confirmation about the number of individuals promoted to ADW as it appeared this public report was inconsistent with the Department's report to the Monitoring Team that 6 ADWs were promoted. In response to this request, the Department reported that four additional candidates were in fact promoted to ADW "at the very last minute" so there could be a "bigger" promotional class. It is unclear why the Department did not advise the Monitoring Team about the promotion of these individuals given the repeated and long-standing request for this information. It is deeply disturbing that the Monitoring Team continues to have to rely on public reports to verify information that the Department should be providing to the Monitoring Team in response to its requests.

Given the findings regarding the Department's faulty screening procedures, this issue is included in the Monitoring Team's priority recommendations for the Court to direct the Department to address as detailed in the Conclusion of this report.

- **Supervisor Deployment and Direct Supervision of Staff in the Facilities**

A tangible step toward improved staff supervision is the effort by the Staffing Manager to alter the schedules of the Deputy Wardens and ADWs to spread their deployment across shifts and throughout the week (including weekends). Another initiative endeavors to ensure that ADWs who are responsible for the on-the-ground supervision of each shift more directly supervise their subordinates. Finally, the Department is seeking to reduce the span of control of Captains (meaning, how many staff they supervise) so that they can more adequately supervise the housing units. Below is a brief summary of the Department's efforts to address the supervisory requirements of the Action Plan.

o   <u>Deputy Warden Assignment & Schedules</u>: At the beginning of 2023, the DWs'
schedules were reorganized using staggered start times to provide better coverage
throughout the day (previously, DWs all worked on the same tour). Each DW is
now also required to work one weekend day each week. This approach to
scheduling is consistent with sound correctional practice in which a DW is
available for a large portion of each day.

o   <u>Reassignment of ADWs</u>:[81] The Staffing Manager has assessed ADW assignments
across facilities in order to broaden the presence of supervisors throughout
evenings and weekends. In particular, the Staffing Manager reports that ADWs
are now assigned to all three shifts every day of the week. Since the Action Plan
went into effect, the Department increased the number of ADWs by 34%, from 67
to 90. The proportion assigned to facility and court commands also increased
from 73% to 82% during this same time period. This translates to an additional 25
ADWs in the facility/court commands. A chart with the staffing numbers for
ADWs is provided in Appendix A. This is an important step, but the Department
reports it still does not have quite enough ADWs to ensure that each tour has both
a Tour Commander as well as ADWs to supervise Captains. With respect to the
Tour Commanders, they have traditionally been stationed in an office in the
administrative corridor of the jails. They were supported by at least one
uniformed assistant who was frequently tasked with touring the jail while the
Tour Commander remained in the office. In order to ensure that the Tour
Commander is physically located within and integrated into the operations of the

---

[81] As required by Action Plan § C, ¶ 3(iii)

jails, Tour Commanders are now required to work from inside each facility's

control center (the central hub of the jail) instead of from an administrative office.

Further, the assistants historically assigned to the Tour Commander have been

reassigned to posts working with incarcerated individuals and the Staffing

Manager reports the Roster Management unit vigilantly assesses assignments of

these staff to ensure they are assigned to posts that directly supervise the

incarcerated population.

o  Assignment of Captains:[82] The Staffing Manager reports he has assessed

Captains' assignments across facilities to improve the span of control for

Captains. However, this is challenging as since the Action Plan went into effect,

the number of Captains decreased 9% (from 607 to 553). A slightly larger

proportion is now assigned to facility or court commands compared to when the

Action Plan went into effect (74% versus 69%, respectively), but given the overall

decline in the number of Captains, this translates to a net loss of 5 Captains (411

versus 416, respectively) in the facility/court commands. The Department further

reports that the number of Captains is currently insufficient to ensure a reasonable

span of control. A chart with the staffing numbers for Captains is provided in

Appendix A.

▪  Re-assignment of Captains on Temporary Duty:[83] The Department has

reduced the number of Captains on non-facility-based assignments via

Temporary Duty status ("TDY"). At least 20 Captains previously on TDY

---

[82] As required by Action Plan § C, ¶ 3(ii)

[83] As required by Action Plan § A, ¶ 3(a)

status elsewhere in the agency have been returned to posts in the jails. About 30 Captains (about 5% of all Captains) remain on long-term TDY status. TDY status is used sparingly and the circumstances in which the Department has reported using it appear appropriate given certain budgetary factors and, in some cases, where specific expertise is needed for a position. The Monitoring Team has evaluated the post assignments of Captains who remain on long term TDY status, and the post assignments appear reasonable.

o  <u>Routine Tours & Tour Wands</u>:[84] Line staff's routine tours of their assigned housing units and assessment of each individual in a cell are essential for verifying the welfare of people in custody and for addressing their concerns and service needs. Similarly, Captains' tours are important for detecting and correcting poor staff practice, for providing support to line officers and for resolving any remaining concerns among people in custody. Verifying the welfare of people in custody at frequent intervals anytime they are confined to a cell is an essential (and very basic) correctional practice. Internal audits and reports from facility leaders indicate that routine tours of housing units are not occurring as they should (as discussed in more detail in the Security, Violence, and Use of Force section of this report). One tool for ensuring that staff conduct routine tours of their assigned units are electronic tour wands, which, when tapped on a sensor affixed to the wall in key locations in the housing units, provide a record of the

---

[84] As required by Action Plan § A, ¶ 1(d).

frequency of tours. This tool was originally implemented in late 2022.[85] The Department's policy also requires Captains to utilize the tour wands to document their supervisory tours of celled housing areas. The policy requires Tour Commanders to review tour wand data each day. This data provides insight into staffs' touring practices (particularly when combined with the qualitative assessments conducted by NCU, as discussed in the Security, Violence, and Use of Force section of this report) and can be used as a basis for corrective action if staff are not conducting tours at the required frequency. The Department has a dashboard populated with tour wand data for both officers and Captains, however, the Department is still devising a method to analyze trends or otherwise conduct analyses to support a quality assurance strategy or ensure staff compliance with these requirements. The Department reports this will occur in July 2023.

o   Early Intervention, Support and Supervision (E.I.S.S.):[86] The Department's E.I.S.S. unit supports staff who demonstrate a need for more intensive supervision than that available through their superiors in the facility chain of command. The E.I.S.S. unit has expanded its monitoring program to include any staff on disciplinary probation and all supervisors during their probationary period, as required by the Action Plan. The Department reports that 35 staff on disciplinary probation have been onboarded since June 1, 2022. Further, over 30 ADWs and Captains that were recently promoted have been onboarded to E.I.S.S. With

---

[85] A description of the efforts to implement the use of tour wands was provided in the Monitor's October 28, 2022 Report on pgs. 72 to 74.

[86] As required by Action Plan § A, ¶ 3(c).

respect to E.I.S.S. access to information, E.I.S.S. staff report that has improved.
See the Monitor's April 3, 2023 Report at pgs. 172 to 175.

## Training

Over the years, training has generally been a bright spot in the Department's efforts to fulfill its *Nunez* obligations. The Department has taken two important steps regarding training since the entry of the Action Plan. First, the training for the new class of recruits took place in the NYPD's state-of-the-art training academy. Since the inception of the Consent Judgment, the Monitoring Team has lamented the poor conditions of the Department's training space and strongly encouraged the Department to improve its training facilities.[87] The City previously reported its intention to build a new training academy, but the status of that initiative is unknown. As the Monitoring Team noted in its very first report on this matter, the NYPD training academy is a state-of-the-art space that provides for both classroom and tactical instruction in a modern, spacious facility with the newest technology to aid in educational practices, emphasizing the importance and critical linkage of training and good law enforcement.[88] The Monitoring Team applauds the Department's use of this space for its training. However, the Department's effort to build a new training academy as announced in August 2021 is unknown.[89]

In addition, the Department is making efforts to increase staff skill/experience via an extended Field Training program. Rather than the traditional two-weeks of on-the-job training,

---

[87] *See*, for example, Monitor's 1st Report at pgs. 56 to 57 (dkt. 269), Monitor's 6th Report at pgs. 5 to 6 (dkt. 317); Monitor's 7th Report at pg. 74 (dkt. 332); Monitor's 8th Report at pg. 94 (dkt. 327); Monitor's 9th Report at pg. 110 (dkt. 341); Monitor's 10th Report at pgs. 101 to 102 (dkt. 360); Monitor's 11th Report at pgs. 149 to 150 (dkt. 368).

[88] *See* Monitor's 1st Report at pgs. 56 to 57 (dkt. 269).

[89] *See* Monitor's 12th Report at pg. 68 (dkt. 431).

recent Academy graduates have been matched with experienced officers and Captains (Field

Training Officers) for an eight-week mentorship focused on good correctional practice and

interpersonal communication/conflict resolution skill development. While these individuals do

not yet have sufficient tenure to be considered "experienced," this is one way that the

Department is trying to increase the number of staff with the requisite skill set to effectively

supervise and solve problems on the housing units. This is an encouraging step. Further, the

Department reports it has contracted with an external training consultant to provide a leadership

training course to 10 ADWs. The training consisted of about 7 sessions across 10 weeks.

     With respect to the content of the Department's new trainings, initial steps to develop and

refine its trainings following the entry of the Action Plan appeared promising but have since

deteriorated. The Monitoring Team's assessment of newly submitted training materials for

ESU/SRT, ADWs, and a *Nunez* overview (discussed in the Department's Management Structure

and Management of the *Nunez* Court Orders section of this report) revealed significant and

concerning deficits. Further, functional consultation with the Monitoring Team is simply not

occurring. Although Department leadership claims to be seeking input, the approach taken to

obtain the Monitoring Team's input is such that no meaningful consultation with the Monitoring

Team can occur.[90]

     The Monitoring Team's significant collaboration with the Department's Training

Division rested on the exchange of a *complete* set of training materials such that lesson plans,

---

[90] On numerous occasions, the Department provided copies of training materials to the Monitoring Team mere days before a roll-out. On at least two occasions, training materials were provided on the Saturday before the training was set to begin on Monday morning (*e.g.*, the Captain Promotion training was provided on Saturday, February 11, 2023 with training set to begin on February 13, 2023; Field Training Program course materials were shared on the evening of Saturday, May 6, 2023 with training scheduled to begin on Monday, May 8, 2023.). Additional examples are discussed in this report.

instructor cues, scenarios, group exercises and proficiency assessments could be reviewed and

discussed in detail. Most recently, training materials were shared primarily in outline form and

lacked the substance required for any meaningful collaboration. In many cases, the material

appeared to be outdated and/or compiled in a haphazard, non-cohesive manner and, of greatest

concern to the Monitoring Team, the content of the trainings is not always consistent with the

*Nunez* Court Orders, Department policies and directives, or feedback from the Monitoring Team.

Further, assuming the materials provided to the Monitoring Team are indeed the only materials

available related to each course, it raises significant concerns about whether the instructors

teaching the courses have sufficient instructional support and guidance about content and

whether Department leadership has sufficient understanding of course content to be able to

identify expected changes in staff practice. ***Most importantly, efforts at reforming the agency***
***are significantly undermined by such insufficient and deficient training programs and efforts***
***to improve practice and supervision are doomed to fail under such circumstances.***

Outlined below are three recent examples, all of which occurred following the June 13,

2023 Emergency Court Conference, regarding training programs' poor content and the lack of

consultation with the Monitoring Team.

- **ESU/SRT Training**: In April 2023, the Monitoring Team recommended that the
  Department re-train all ESU/SRT staff.[91] In response to the Monitoring Team's findings,
  the Department reported it had begun to develop the training materials. In response to a
  request from the Department and in an effort to support this work, on April 25, 2023, the
  Monitoring Team provided detailed written feedback on considerations for inclusion in
  the training for ESU/SRT. On June 2, 2023, the Department provided an outline of the
  course, but the accompanying materials did not include any detailed or substantive

---

[91] *See* Monitor's April 24, 2023 Report at pg. 18.

information (including sufficient instructor cues or guides) to establish what information was going to be provided to those receiving the training or the intended learning objectives. The materials lacked substance and were too limited to enable the Monitoring Team to properly assess the information and the messaging that would be conveyed during the training. On June 6, 2023, the Monitoring Team submitted initial feedback based on the limited information provided and requested more fulsome training materials to permit a proper evaluation of the course. On June 14, 2023, the Monitoring Team was advised that the Department had elected to proceed with ESU/SRT training on that day, despite the fact that the requested training materials had still not been provided to the Monitoring Team.[92] Why the Department elected to proceed with this training is unclear given that the Deputy Commissioner of Training had advised the Monitoring Team on June 5, 2023 that the Department "will craft a [training] schedule around [the Monitoring Team] completing [its] review [of the ESU/SRT training materials]." The training materials were finally produced on June 15, 2023, after the training had already begun.

In terms of substance, the training materials fail to address the areas of concern regarding the practices of these teams which have been reported by the Monitoring Team for years, the Monitoring Team's feedback shared on April 25 and June 6, 2023 were not incorporated, the course content itself is inadequate to address the work of these teams, and at least some of the course content is inconsistent with the Department's own policies and procedures (e.g., the discussion of Incident Command is not aligned with the Department's practices regarding Level A/B alarms). The training materials are at a rudimentary level that might be appropriate for an entry-level recruit but fall far short of the depth of information and nuance needed to elevate the skill-level of the Department's "elite squad." In addition, the training materials do not address the Monitoring Team's concerns about ESU's excessive use of force when discussing various techniques, providing only general precautions (e.g., "utilize situational awareness") and ignoring the specific problematic circumstances that need to be remediated (e.g., "do not take a rear-cuffed individual to the floor face-first"). In addition, the training materials do not

---

[92] It is the Monitoring Team's understanding that ESU/SRT training occurred for some staff on June 14 and 15, 2023 and that the Department has elected to suspend all additional training until it has an opportunity to consult with the Monitoring Team on the content of the training.

include any examples/scenarios that illustrate the Monitoring Team's concerns about ESU's excessive use of force, making only general references to "a video" without describing what the video shows and/or including video footage that features a regular housing unit officer—not ESU staff (which are abundant among the videos the Monitoring Team has reviewed). These materials are simply inadequate and have very little potential to address ESU/SRT's dangerous practices.

- **ADW Pre-Promotional Training**: The Monitoring Team repeatedly requested the ADW training materials in May and June 2023. The training materials were eventually provided on the evening of Thursday, June 15, 2023 and on the morning of Friday, June 16, 2023. The Department advised the Monitoring Team that the training would begin on Monday, June 19, 2023. This timetable clearly precludes meaningful collaboration between the Department and Monitoring Team. The Monitoring Team's review of these materials suggests that they provide inadequate guidance to supervisors. In particular, the training materials included only a superficial treatment of the ADWs' duties without any explanation of the standards or expectations in each area. For example, regarding the ADWs' responsibility to oversee Captains' routine tours of the housing units, the training materials provide none of the expected practices regarding frequency or substance and offer no guidance as to *how* to develop these skills among one's subordinates. This theme is applicable to nearly every topic included in the ADW training curriculum. Again, the training materials are simply substandard and inadequate.

- **Overview of *Nunez* Consent Judgment**: In response to the Monitoring Team's request, the Monitoring Team was provided training materials related to an overview of the *Nunez* Consent Judgment on June 5, 2023. The Monitoring Team shared some initial feedback the next day, June 6, 2023, noting that the training materials appeared outdated and did not provide a sufficient description of the *Nunez* Court Orders or the current state of affairs. On June 8, 2023, the Monitoring Team indicated that it would connect with the relevant training staff during the following week (June 12-16, 2023) to discuss the training.[93] However, on June 16, 2023, the Monitoring Team learned that the Department produced a video featuring a senior Department executive delivering an overview of the

---

[93] The Monitoring Team remains open to providing such assistance and information on a reasonable timeframe.

*Nunez* Consent Decree and the Use of Force Policy. A transcript of this video is included as Appendix D. This video was reportedly presented at the June 14 and 15, 2023 ESU/SRT training and possibly others. It is unclear why the Department did not specifically consult the Monitoring Team on the production of this video or provide a copy in advance of its deployment given its clear connection to *Nunez* and the Monitoring Team's specific request for any materials related to the content of the *Nunez* Court Orders. The lack of consultation prior to implementation is particularly concerning given that the Monitoring Team believes that parts of the video contain questionable messaging and in some areas are misleading, if not factually inaccurate (discussed in the Department's Management Structure and Management of the *Nunez* Court Orders section).

<u>Conclusion</u>

Tangible and concrete steps have been taken to infuse external correctional expertise into the management of the Department and many, but not all, of the new leaders have started to identify certain deficiencies and are working to correct them. However, a corresponding improvement in the quality of staff supervision by ADWs and Captains in the jails has not been realized. The Department has made questionable, if not poor, decisions regarding who it has promoted. Further, while the number of ADWs has increased somewhat since the Action Plan was entered, the number of Captains available to supervise officers in the jails has decreased. Additional ADWs and Captains are needed to meet the supervision requirements of the *Nunez* Court Orders. Furthermore, facility leaders report their continued struggles to ensure that Captains (as well as officers) make meaningful rounds and have an appropriate span of control.

The poor quality of training being offered to ADWs and ESU/SRT means that even the initial introduction to core concepts lacks potency and does not properly contextualize the information with the requirements of the *Nunez* Court Orders. Further, the training materials that have been recently produced and are being used are substandard and, even more concerning, are

in some areas factually inaccurate and/or misleading. Rather than improving staff practice and encouraging compliance with the *Nunez* Court Orders and departmental policy, such poor-quality training materials will serve to further undermine the reform effort.

Finally, because the quality of staff supervision is a less tangible requirement than many of the *Nunez* Court Orders' requirements that rely on the presence of a policy or the number of staff or specific actions, it is incumbent upon the Department to clearly articulate and fully explain its approach and process for increasing supervisors' skills. Ultimately, improvements in supervision or the failure to do so will determine to a large extent the success or failure of a key element of the *Nunez* reform effort—that is materially changing staff practice on the ground to ensure the safety of the incarcerated population and staff. Doing so will require Department leaders at all levels to be candid and transparent with the Monitoring Team about the struggles they are encountering. The ongoing failures to consult with the Monitoring Team are missed opportunities. The Monitoring Team has extensive expertise in sound correctional practice and the Department's practices and procedures and can is a valuable source of information and assistance to the Department.

# UNIFORM STAFFING PRACTICES

The Department has a very rich complement of staff, but making sure they come to work in the first instance and are then appropriately assigned to posts in a manner that ensures proper coverage in the facilities has always been the issue. Addressing the Department's staffing problems thus requires a two-fold process. First, the Department must have adequate controls, procedures, and enforcement mechanisms to manage staff who are on leave or who need to be placed on modified duty. Second, the Department must also revamp its poor staff assignment practices in order to maximize the deployment of staff within the jails and to ensure key housing unit posts are always covered. This section explores the Department's efforts to improve the availability of staff and to deploy staff within the jails properly.

## *Efforts to Improve the Availability of Staff*

In 2020 and 2021, the Department was crippled by the large number of staff out sick (20-30% of the workforce) and the large number of staff with a restricted medical status (3-9% of the workforce).[94] The historical practices relating to staff mismanagement combined with the mass sick leave problem coalesced into a crisis, one that exacerbated extant safety threats and threatened to fully collapse the system, hence the Action Plan's emphasis on this issue. Since 2022, the Department has made great strides in its effort to increase the number and proportion of staff available to work with the incarcerated population. This was accomplished via an overhaul of the Health Management Division, charged with oversight of the sick leave and

---

[94] Sick leave and restricted medical statuses are utilized for both work-related and non-work-related illnesses and injuries.

modified duty processes, and by improving the enforcement of existing sick leave and modified duty procedures.[95] The current status of those efforts and key outcomes are discussed below.

- **Staff Availability**: The number of staff who are unavailable to work has been markedly reduced since the apex of the staffing crisis. The Department has made solid progress in shoring up its sick leave procedures and addressing staff abuse of this benefit. Since January 2022, when an average of 26% of staff were out sick on any given day, the proportion of staff out sick decreased substantially to an average of 8% of staff out sick on any given day in May 2023. Further, the proportion of staff on medically restricted status decreased from 9% of staff on any given day in January 2022 to 6% on any given day in May 2023.[96] During the year since the Action Plan has been in place, the number of staff on sick leave has decreased about 45%, from an average of 951 staff in June 2022 to an average of 514 staff in May 2023. Further, the number of staff on the most stringent modified duty status (MMR 3, not permitted to be in contact with the incarcerated population) has decreased about 35% from an average of 624 in June 2022 to an average of 403 in May 2023. Monthly data for sick leave, medically monitored/restricted and AWOL status is provided in Appendix A.

---

[95] A more detailed discussion of these matters can be found at the Monitor's October 28, 2022 Report at pgs. 44 to 45 and the Monitor's April 3, 2023 Report at pgs. 23 to 30.

[96] Medical restrictions are defined as follows: <u>MMR 1</u> – No physical limitations. Only restrictions are the overtime/tour restrictions of work environment. <u>MMR 2</u> – Some physical limitations (able to work categorized posts). Able to work a normal tour (in duration) where the job allows ample opportunity for sitting with some standing, walking, or climbing stairs. (This employee cannot be expected to do strenuous physical activity and cannot supervise an incarcerated individual alone.) <u>MMR 3</u> – Serious physical/psychological limitations. Physical abilities are more limited than those described above. HMD Medical staff will specifically indicate the employee's duty limitations, but generally staff in this category cannot work with the incarcerated population.

| Sick Leave, Medically Modified Duty and AWOL, January 2019 to May 2023 | | | | |
|---|---|---|---|---|
| Month | Total Headcount | Avg. # Sick (%) | Avg. # MMR3 (%) | Avg. # AWOL (%) |
| January 2019<br>*Pre-COVID-19* | 10,577 | 621 (6%) | 459 (4%) | Not Available |
| April 2020<br>*Apex of COVID-19* | 9,481 | 3,059 (32%) | 278 (3%) | Not Available |
| September 2021<br>*First Emergency Court Hearing* | 8,081 | 1,703 (21%) | 744 (9%) | 77 (1%) |
| January 2022<br>*New Commissioner* | 7,668 | 2,005 (26%) | 685 (9%) | 42 (1%) |
| June 2022<br>*Action Plan Effective Date* | 7,150 | 951 (13%) | 624 (9%) | 16 (<1%) |
| December 2022<br>*End of 15th Monitoring Period* | 6,777 | 754 (11%) | 452 (7%) | 7 (<1%) |
| May 2023<br>*Most Recent Data* | 6,516 | 514 (8%) | 403 (6%) | 10 (<1%) |

- **Unstaffed Posts & Triple Shifts**: Important decreases in the number of unstaffed posts[97] and staff working triple shifts have occurred since the apex of the staffing crisis in 2021 when nearly 70 posts were unstaffed on any given day, as shown in the table below. More recently, since the inception of the Action Plan, the number of unstaffed posts decreased 20%, from an average of 27.2 per day (June 2022) to an average of 21.7 per day (May 2023). However, the number of unstaffed posts per day has been steadily rising in 2023, and there were 9 more unstaffed posts per day in May 2023 compared to January 2023. The number of staff required to work triple shifts remained approximately the same (an average of 6.8 staff per day in June 2022 versus 6.52 staff per day in May 2023. Monthly data regarding unstaffed posts and triple shifts is provided in Appendix A. It must be emphasized that *any* unstaffed post and *any* need for staff to work multiple shifts is antithetical to a healthy and safe correctional operation, thus there is clearly more work to do in this area. *Note that this data does not account for situations where a staff member is assigned a post but then leaves the post unattended for some period of time. The*

---

[97] Note, this does not include a post in which a staff member, after being assigned, may abandon that post.

*Monitoring Team continues to detect this problem with disturbing frequency during its routine review of use of force incidents.*

| Unstaffed Posts and Triple Shifts, July 2021 to May 2023 | | | | |
|---|---|---|---|---|
| | Unstaffed Posts | | Triple Shifts | |
| Monitoring Period | Total # Unstaffed Posts | Daily Average # Unstaffed Posts | Total # Triple Shifts[98] | Daily Average # Triple Shifts |
| July to December, 2021 | 8,192* | 68.3 | 3,717 | 20.7 |
| January to June, 2022 | 5,523 | 30.7 | 1,950 | 10.8 |
| July to December, 2022[99] | 3,509 | 19.5 | 808 | 4.5 |
| | | | | |
| June 2022 | 815 | 27.2 | 204 | 6.8 |
| May 2023 | 671 | 21.7 | 202 | 6.5 |
| *\* Note: The Department did not begin tracking unstaffed posts until September 2021, so data for this period does not include July or August, 2021.* | | | | |

- **Overtime:** An important indicator of efficient workforce management is the level of an agency's use of overtime. Given the Department's problems with inefficient staff scheduling and deployment and abuse of leave benefits, overtime has become a routine strategy to increase staff availability on any given shift. Overtime can of course be used efficiently to address *temporary* staff shortages and unusual situations. However, using overtime to address *chronic* staffing issues, as this Department does, has significant fiscal consequences and an obvious negative impact on staff wellness and morale. The number of occasions where staff are required to work triple tours decreased, but the Department's monthly overtime costs *increased* significantly—24%--during the past 18 months (*i.e.*, $18,847,000 in January 2022 versus $23,358,000 in May 2023. The table below shows

---

[98] This data includes staff who worked any amount of a third consecutive tour, including staff who worked less than, equal to, or greater than 3.75 hours.

[99] The data provided in this row in the Monitor's April 3, 2023 Report (at pg. 15) included an *average* instead of the total in the "Total # of Unstaffed Posts" column in the July-December 2022 data. As a result, the calculation of the "Daily Average # of Unstaffed Posts" was not correct. The data in both columns has been corrected in this report.

the steady increase in the Department's monthly overtime costs for uniform staff since January 2022.

| Overtime Data for Uniform Staff<br>*January 1, 2022 to May 31, 2023* | | | |
|---|---|---|---|
| **Month** | **All Uniform** | **Month** | **All Uniform** |
| **Jan-22** | $18,847,000 | **Jan-23** | $22,893,000 |
| **Feb-22** | $18,226,000 | **Feb-23** | $20,819,000 |
| **Mar-22** | $20,969,000 | **Mar-23** | $23,855,000 |
| **Apr-22** | $20,783,000 | **Apr-23** | $22,414,000 |
| **May-22** | $21,423,000 | **May-23** | $23,358,000 |
| **Jun-22** | $21,721,000 | | |
| **Jul-22** | $22,064,000 | | |
| **Aug-22** | $22,453,000 | | |
| **Sep-22** | $22,006,000 | | |
| **Oct-22** | $22,901,000 | | |
| **Nov-22** | $22,215,000 | | |
| **Dec-22** | $22,276,000 | | |

- **Improved Management of the Health Management Division**:[100] The Department has significantly improved the management of HMD. The unit is supervised by the First Deputy Commissioner. A Chief Surgeon has been appointed to HMD and an Assistant Deputy Warden supports the unit's management. A thoughtful and thorough assessment of HMD was conducted during Summer 2022 to identify deficiencies and inefficiencies. The results of the evaluation revealed significant mismanagement and corruption.[101] In short, poor supervision and staff practices, staff shortages, lack of collaboration among HMD units, and a disconnect between the division and the facilities were all impeding the management of staff leave benefits and modified duty statuses. These findings led HMD to engage in a significant overhaul to improve practices and increase efficacy and reduce abuse in the system.[102]

---

[100] As required by the Action Plan § A, ¶ 2(e) and § A, ¶ 3(b)(iii).

[101] *See* Monitor's October 28, 2022 Report at pgs. 46-47.

[102] See Monitor's April 3, 2023 Report at pgs. 25 to 29.

- **Policy Revisions**:[103] The Department's sick leave policies and procedures were old and outdated, some dating back more than 20 years. The Home Confinement Visit policy was updated in May 2022, right before the Action Plan was entered by the Court in June 2022. The revised policy created more sensible requirements for determining whether someone who is out sick has remained at home as required (*e.g.,* fewer door knocks and fewer phone calls) and has resulted in improved enforcement. The sick leave and absence control policies were revised and implemented on May 15, 2023, about eight months after the deadline set by the Action Plan and following persistent follow-up by the Monitoring Team. The revised policies clarify the processes for managing sick leave and absence control and clarify the situations in which a staff may be terminated for abusing sick leave benefits.[104] With respect to the Department's MMR policy, progress towards documenting new procedures has been slow and arduous. The Department finally shared a proposal regarding its plan to significantly reduce the use of Medically Modified/Restricted duty status and to prevent the abuse of this designation. First, the Department recently initiated another review of all staff on MMR status. Doctors employed by the Department will evaluate all staff on this status to determine if they should remain on the same status, whether the MMR level should be changed, or whether they can return to work. As of November 1, 2023, any staff identified to remain on MMR status will only be permitted to stay on the status for a certain period of time.[105] Beginning on May 1, 2024 the Department will eliminate the use of levels for MMR status with varying amount of contact with people in custody. Instead, a staff member will be placed on MMR, with no contact with people in custody, if *only* an HMD doctor determines that the staff member: (1) has a line of duty injury, where staff are permitted by law to be on limited duty for up to two years; or (2) is pregnant or has post-partum depression, or (3) they have a serious medical illness (such as cancer or other terminal

---

[103] As required by the Action Plan § A, ¶ 2(d).

[104] A staff member may be terminated if within a 12-month period, the staff member is out sick on 40 or more workdays, or out sick on 15 or more occurrences, or out sick on 10 or more weekend days (including Fridays and scheduled days off ("pass days") from a 5x2 rotation), or out sick on 10 days immediately before or after a pass day, or out sick for 15 days on a combination of weekend days, pass days, or days before or after a weekend or pass day.

[105] 90 days for MMR 3 and 60 days for MMR 2 or MMR 1.

illness). If an officer does not meet one of these criteria as determined by HMD, they will not be eligible for MMR status and thus may be assigned to a post where they have contact with people in custody. The Department has shared a copy of its written proposal with the Monitoring Team and also provided a copy to the unions for review.[106] The Department issued the plan via teletype on July 10, 2023.

- **Evaluation of Current Uniform Staff on Sick Leave & Medically Restricted Status**:[107] HMD has utilized a number of initiatives to evaluate and reduce the number of staff on sick leave or restricted status and to hold staff who abuse these statuses accountable:

  - **Initiatives to Reduce Abuse**: HMD has utilized a number of different tactics including increasing scrutiny of documentation and medical records; increasing Home Confinement Visits; increasing referrals for discipline of staff violating protocols; referrals to DOI; identifying staff with consecutive AWOLs; identifying staff with chronic absences; and evaluating medical facilities.[108]

  - **Accountability**: HMD and the Trials Division have made significant progress in holding staff accountable for abuses of sick leave and modified duty, which has resulted in more staff being available to work than at any time since the staffing crisis began in 2021. The Department has several options for addressing staff who are chronically absent or who have abused sick leave policies, including placing staff on unpaid leave,[109] non-disciplinary separation proceedings,[110] disciplinary

---

[106] The Correction Officers' Benevolent Association contract provides that the Department will provide notice of any new directive affecting terms and conditions of employment, *see* Article XVI, section 15, "Sharing of Directives: The Department shall send the union a copy of any directive or order affecting terms and conditions of employment at least ten (10) calendar days prior to issuance, except where the Department determines emergency circumstances make such a timeframe impracticable, in which case the policy will be shared as soon as practicable prior to issuance."

[107] As required by the Action Plan § A, ¶ 2(f).

[108] *See* Monitor's April 3, 2023 Report at pgs. 27 to 29.

[109] Pursuant to New York Civil Service Law 72, a staff member may be placed on unpaid leave if they are on "indefinite sick" or MMR status for a year or more for non-work-related reasons.

[110] Medical and AWOL Separation is a non-disciplinary action (pursuant to Civil Service Laws §§ 71 to 73 and New York City Administrative Code § 9-113) to separate an employee who has been cumulatively/continually out sick, unavailable to work, AWOL 5 days or more, or unable to fulfill work duties for a significant period of time, generally one or two years.

proceedings (known as Medical Incompetence),[111] and suspensions. Further, the Department may refer staff to the Department of Investigations ("DOI") to investigate cases of suspected staff abuse of sick time or restricted status when the conduct of the staff member appears to be criminal in nature.

- **Medical Incompetence Cases**:
  - Pending Cases: The Monitoring Team has recommended deadlines for closure for two sets of pending cases.
    - For cases that were pending as of October 2022, the Monitoring Team set a deadline for closure of April 30, 2023. Of the 386 cases pending at that time, 360 have been closed or the final closing memo is awaiting a signature (93%); 18 cases involved staff on approved leave (*e.g., military leave or maternity leave*), thus the cases cannot be addressed at this time (5%); and eight cases are in trial or awaiting other follow-up from OATH (2%).
    - For cases pending between October 1, 2022 and March 31, 2023, the Monitoring Team set a deadline for closure of August 31, 2023. Of the 340 cases, 190 have been closed (56%) and 150 remain pending (44%) as of May 31, 2023.
    - As of May 31, 2023, a total of 257 Medical Incompetence cases are pending. This total includes pending cases from the two sets described above, and those identified since March 31, 2023.
  - Cases Brought: A total of 201 cases were brought in 2021, 406 were brought in 2022, and 182 were brought between January and May 2023.
  - Cases Resolved: A total of 705 cases were resolved between January 2022 and May 2023. The table below presents data related to case closure type for 2022 and 2023.

---

[111] Medical Incompetence is a disciplinary action in response to a variety of patterns of behaviors related to the abuse of the sick leave benefit.

| Closure Type for Medical Incompetence Cases Resolved, 2022 and 2023 | | | | | | |
|---|---|---|---|---|---|---|
| Closure Type | 2022 | | Jan-May 2023 | | Total | |
| Total Cases Closed | 363 | *100%* | 342 | *100%* | 705 | *100%* |
| Removal from DOC Employment* | 184 | *51%* | 95 | *28%* | 279 | *40%* |
| NPA for Compensatory Time | 6 | *2%* | 8 | *2%* | 14 | *2%* |
| NPA with Probation or Suspension | 146 | *40%* | 193 | *56%* | 339 | *48%* |
| Dismissed** | 27 | *7%* | 46 | *14%* | 73 | *10%* |

*\* This includes Medical Separation, resignation, retirement, termination, and termination via OATH.*
*\*\* This includes cases that were Administratively Filed and those dismissed at OATH.*

- **Suspensions**: Between January 2022 and May 2023, a total of 478 staff were suspended for abusing sick leave/absence control policies or for being AWOL (365 staff were suspended for home confinement violations and 113 staff were suspended for being AWOL[112]).

- **Chronic Absence**: In order to discourage staff from utilizing an unreasonable number of sick days, staff may be designated "chronically absent" (*i.e.*, those out sick for 12 days or more in a rolling 12-month period). This designation triggers limits on various discretionary benefits and privileges and impacts the staffs' ability to be promoted, thus serving as a deterrent to excessive sick leave. The number of staff placed on this status increased exponentially in 2022, with over 1,000 staff now identified as chronically absent. While the increased number of staff identified for this designation is an important step, the facilities are responsible for processing staff with this designation so they are actually designated as chronic absent in their personnel file. This process is incredibly protracted. Furthermore, the facilities' tracking mechanism is not well-maintained which inhibits their ability to properly administer the status. For instance, the Department reports that only 50% of the staff

[112] In 2021, a total of 165 staff were suspended for being AWOL. The reduction in suspensions for AWOL in 2022 and 2023 is likely due in part to fewer staff being AWOL.

identified as chronic absent in 2023 have been processed as such. The Monitoring Team continues to recommend the Department improve these practices to ensure that those staff who should be identified as chronic absent are in fact then designated as such, so that the various disincentives can be applied. The label alone will not result in the desired outcome.

o **Referrals of Staff Who Abuse Sick Leave or Restricted Status**:[113] HMD's increased vigilance about the quality of the documentation has identified at least 20 instances of potentially fraudulent documentation that may rise to the level of criminal misconduct. These cases have been referred to DOI for investigation and at least three referrals have resulted in criminal prosecution.[114]

## _Staff Assignments to Posts in the Jails_

The Department has lacked an appropriate framework and basic tools to properly administer staff assignments, particularly because of poor scheduling and deployment practices, which have been discussed in detail in various Monitor's Reports.[115] The Action Plan's requirements relating to streamlining staff scheduling and assignment within the facilities are discussed in this section. A discussion regarding the assignment of supervisors within the facilities is included in the Leadership, Supervision, and Training section of the report.

The proper deployment of staff is critical to improving safety in the jails. When present in the housing units in appropriate numbers, staff who follow required safety procedures, who communicate in constructive ways with incarcerated individuals, and who are able to solve both interpersonal and logistical problems when they arise can effectively address the circumstances

---

[113] As required by the Action Plan § A, ¶ 2(g).

[114] _See_, Eastern District of New York, Three Former New York City Correction Officers Plead Guilty to Sick Leave Fraud, https://www.justice.gov/usao-edny/pr/three-former-new-york-city-correction-officers-plead-guilty-sick-leave-fraud.

[115] _See_ Monitor's 11th Report at pgs. 10 to 14 and March 16, 2022 Report at pgs. 30 to 44.

that currently result in physical harm to both incarcerated individuals and staff alike. The Staffing Manager, in conjunction with his team, has been working to untangle the Department's archaic practices and taken many steps to modernize the scheduling process, to ensure staff are properly assigned to priority posts and to begin to teach facility leaders how to staff their facilities efficiently and effectively. These initial steps have focused primarily on getting staff in the right places, which is a necessary precursor to skill development.

These innovations remain in the early implementation phase and as such have not yet resulted in a staffing strategy that demonstrably increases safety or reduces the risk of harm. The Monitoring Team's routine review of violent incidents and those that involve a use of force (along with onsite observations) continues to reveal an overabundance of staff responding to incidents and the presence of large numbers of staff in locations that do not involve direct supervision of incarcerated individuals (*e.g.,* corridors). In the most glaring example of the failure to effectively supervise the incarcerated population, too often, staff simply abandon their assigned posts, leaving the housing units unattended.[116] As discussed in the Security, Violence, and Use of Force section of this report, staff being off post has been a contributing factor to both serious violence and the unnecessary and excessive use of force to regain control of situations that escalated during the staff members' absence. A chart of use of incidents involving posts with no staff is included in Appendix A of this report.

---

[116] The Department does not maintain data on the number of Staff that abandon their post. However, Rapid Reviews identify use of force as a result of posts in which a staff member is not on post (either because a staff member is not assigned or the assigned staff member walked away and the post is unmanned).

Outlined below are the steps that have been taken to address the requirements related to assignment of Staff pursuant to the Action Plan:

- **Roster Management Unit**:[117] The Schedule Management and Redeployment Team ("SMART") serves as the Department's Roster Management Unit and is under the direction of the Staffing Manager. SMART includes one supervisor, fourteen officers, and a civilian administrative assistant. The officers were previously assigned to scheduling duties in the jails but were reassigned to SMART to ensure consistency and accountability. Overall, the Staffing Manager reports that the SMART unit has reduced the number of officers in the Facilities involved in scheduling by about 50%, and allowed the remainder to be assigned to posts within the facility with direct supervision responsibilities. The Staffing Manager has been actively interviewing candidates to serve as the SMART manager, though recent interviews have not identified a viable candidate. The Staffing Manager believes the salary to be competitive but is planning to repost the position with additional detail regarding the position's location/duties and to clarify that previous relevant experience includes fields other than law enforcement to attract a broader group of candidates.

- **Modern Tools for Staff Schedules & Tracking Attendance**
    - <u>Attendance Scanning System</u>:[118] The Department is utilizing a staff scanning system wherein each staff member scans their ID card upon facility entry/exit and arrival/departure at their assigned post to ensure timekeeping integrity. This was first rolled out at RNDC in September 2022, EMTC in December 2022, GRVC in January 2023, AMKC in February 2023, RMSC in March 2023, NIC/WF in April 2023, and VCBC in May 2023. The attendance scanning system is expected to roll out at OBCC in July 2023, when the facility reopens, and will then roll out at Bellevue Prison Ward and the courts before the end of 2023.

---

[117] As required by § C, ¶ 2.

[118] As required by § A, ¶ 2(c).

- o <u>Implementing InTime Scheduling Software:</u>[119] The Department has procured and customized a cloud-based, single source tracking system, InTime. SMART and facility staff were trained to use the system, and InTime replaced the legacy paper-based system at RNDC in January 2023, GRVC in February 2023, EMTC, VCBC, NIC/WF in March 2023, and RMSC in April 2023. InTime will roll out at OBCC when it opens in July 2023, along with the Courts. InTime will not be used at AMKC given its imminent closure. A timeline for rolling out InTime at Bellevue is still to be determined.

- o <u>Improved Management of Staff Rosters:</u>[120] Converting staff rosters from a handwritten document to an electronic platform is an obvious way to improve the management and deployment of staff. Prior to implementing the InTime system at a given facility, the Staffing Manager obtained a list of all budgeted posts to ensure that unbudgeted/"off-books" posts could no longer be used except in emergency situations (e.g., suicide precautions, hospital transport, etc.).[121] Each facility compiled a list of the staff assigned to the facility and their schedule/shift.[122] The software provides a format for a clear, legible "line-up" that identifies which staff are assigned to which post, each day of the week. Specific staff assignments are made collaboratively between SMART and the facility, and the Staffing Manager recently tightened procedures to prevent facilities from circumventing the approved line-up. SMART staff also verify the implementation of the approved daily line-up (i.e., verifying that the person assigned is actually working the post) via direct contact, the staff attendance scanning system, and /or Genetec video. Going forward, the Staffing Manager also plans to evaluate all posts in each facility to determine which posts to maintain, which to eliminate, and which to convert to civilian positions.[123]

---

[119] As required by § C, ¶ 5.

[120] As required by § C, ¶ 3(i).

[121] As required by § C, ¶ 3(viii).

[122] As required by § A, ¶ 2(b).

[123] As required by § C, ¶ 3(viii).

- o <u>Priority Posts</u>: The Department reports that in each facility, posts in the housing units, central control, intake, and those that facilitate programming are prioritized to ensure these posts take precedence on all daily rosters. The job responsibilities of many facility posts have also been analyzed to maximize efficient deployment. Procedures are in place to ensure that priority posts are filled before non-priority posts (i.e., clear direction from the staffing manager, procedures that prevent facilities from altering an approved line-up, and visual cues in the InTime platform that highlight which posts must be filled first).[124] SMART staff provide real-time assistance to the facilities to ensure all priority posts have a staff member assigned per the schedule and that schedules are accurate (including properly documenting reasons staff may be out such as training, leave, FMLA, etc.).

- **Maximizing Deployment of Staff**: The Department's efforts to maximize deployment of staff within the facilities is still very much a work in progress and remains an area of concern.

  - o <u>Deployment of Experienced Staff in Housing Units</u>:[125] Currently, the facility Wardens/designees suggest staff for assignment to housing unit posts, which are then approved by SMART. The criteria for housing unit assignment (to deploy sufficiently experienced staff to these posts, as required by the Action Plan) has not yet been formalized, as the initial focus has been on ensuring all housing unit posts are covered. There is no evidence that there is any concerted practice to ensure that experienced staff are deployed to the housing units.

    - ▪ The Department is making efforts to increase staff skill/experience via an extended Field Training program for new recruits to increase the number of staff with the requisite skill set discussed in more detail in the Leadership, Supervision, Training section of this report.

---

[124] As required by Action Plan § C, ¶ 3(i).

[125] As required by § C, ¶ 3(iv).

o <u>Reduction of Awarded Posts:</u>[126] First, the Department reported that beginning in Fall 2022, specific posts are no longer awarded to staff. However, the Department's efforts to reduce the number of awarded posts previously assigned has been mired in unnecessary confusion, lack of internal coordination and bureaucracy. The City and Department have repeatedly claimed that the Department has the unilateral ability to reduce awarded posts. Despite these repeated claims, those individuals tasked with doing the work to reduce awarded posts have maintained that they are not able to take such action. On at least four occasions, despite assurances to the Monitoring Team that the Department can reduce awarded posts, staff reported the contrary. In addition, after persistent follow-up from the Monitoring Team for over a year, the Department has *now* determined that its data related to awarded posts was inaccurate (despite repeated claims to the contrary) and furthermore, found that individuals who were not officially designated with an awarded post were nonetheless treated as such (meaning the facility continued to assign the individual to a specific post, even when it was not required to do so). The Department now claims it has updated this data, but it has not provided the Monitoring Team with the methodology for how the revised data was generated, so the Monitoring Team is unable to assess the veracity of the data. Further, the Department reported that staff who had not been officially awarded a post (i.e., the award was not documented) but had been informally assigned to a specific post have been removed from these assignments. This verbal report to the Monitoring Team was not accompanied by any documentation and thus the report cannot be verified. Given that the Department reports it does not have an internal mechanism to monitor this process, it is difficult to determine the veracity of any of these claims. Further, during the past year, the Department has submitted multiple plans to reduce awarded posts, but none have been implemented. Despite a request for an update and information by May 22, 2023, the Monitoring Team has not received any further information.

---

[126] As required by § C, ¶ 3(v).

    o  <u>Maximizing Staff Schedules</u>:[127] The Department reported on June 15, 2023 that it is "actively working on schedule optimization, which [is defined] as developing and implementing an algorithm to maximize staffed posts (minimize unstaffed posts) and control overtime. Optimizing the schedule is a collaborative effort with researchers from Columbia University. [The Department is] currently in the algorithm development stage, which is primarily operations research. The variables being assessed include: the number of posts; the number of staff available; schedule and tour length; and the probabilities of posts being staffed using historical staffing data and statistical estimates. Possible schedules are currently tested via computer modeling and the resulting data is analyzed and evaluated for practical implementation. It is important to note that this modeling phase is not simply an analysis of existing schedules, but of all possible schedules for a certain number of posts and varied number of staff."[128] It is unclear how long this process will take before optimized schedules can be implemented, but it appears the research phase has been underway for at least six months.

        ■  In the meantime, the Department has made several changes to staff schedules. First, given the increases in the number of staff available to work with the incarcerated population discussed above, as of early 2023, all facilities now operate using three 8-hour shifts rather than two 12-hour shifts.[129] Further, the majority of posts in the facilities now operate according to these same three shifts, in contrast to the dizzying array of split shifts that characterized previous conventions.

        ■  The Department is also converting a segment of staff to a 5x2 schedule (5 days on, 2 days off) from a 4x2 schedule to increase the proportion of the workforce who are at work on any given day. On a 5x2 schedule, two thirds of the workforce are at work on any given day, in comparison to a

---

[127] As required by Action Plan § C, ¶ 3(vi).

[128] This information was provided almost six months after the Monitoring Team's initial request for information.

[129] Beginning in 2021, at the apex of the staffing crisis, the Department switched to a 12-hour work shift because this convention requires fewer staff.

4x2 schedule where only half of the workforce is at work on any given day. Thus, the 5x2 schedule provides greater flexibility for coverage, as required by the Action Plan.[130] The Monitoring Team requested updated data regarding the number of staff on 4x2 on April 6, 2023. The data was produced almost three months later at the end of June. The Monitoring Team sought clarification about the data within 2 business days of production and learned that the individual responsible for the data was on vacation and further information could not be provided until after the filing of this report. As a result, the Monitoring Team does not believe production of this data is appropriate because additional context and verification must occur before the data can be reported. As noted in other sections of this report, this is yet another example of the Department's failure to produce timely information to the Monitoring Team that directly impacts the ability to assess compliance and provide reliable and accurate information to the Court and the Parties.

- Finally, the number of "squads" (*i.e.*, groups with the same days off) was also reduced from six to three, which simplifies the task of managing the workforce and provides for greater flexibility.

o Reduction of Uniformed Staff in Civilian Posts:[131] There has been very little progress in the Department's efforts to reduce the use of uniform staff assigned to posts with duties that can be reasonably accomplished by a civilian. The Department reports that it has transferred 7 uniform positions at HMD to civilian posts and that it intends to transfer 16 uniform staff engaged in timekeeping to civilian posts, but this has not yet occurred. In a system of this size, this complement of only 23 uniformed staff is hardly sufficient to meet the requirements of the Action Plan. Although the Department has reported for

---

[130] A 5x2 schedule where staff work five consecutive 8.5-hour workdays, followed by 2 consecutive days off. Staff on 4x2 schedules work four consecutive 8.5-hour workdays, followed by 2 consecutive days off. By way of illustration, not accounting for staff on leave, 300 staff working 4x2 schedules are able to fill 2,800 posts over the course of 2 weeks, but 300 staff working 5x2 schedules are able to fill 3,000 posts over 2 weeks. This difference is solely due to the differing work schedules and assigned days off.

[131] As required by Action Plan § C, ¶ 3(vii).

months that Human Resources, the Chief of Staff, and the Office of Administration has been meeting with facilities bi-weekly to identify posts that are currently manned by uniformed staff and should be civilianized, the facilities have not yet identified any such posts (such as those responsible for administrative tasks) and nor have any such posts been identified in the many other divisions within the Department. The Monitoring Team questions the veracity of the Department's report regarding this assessment. At worst these meetings are *not* occurring as reported and, at best, the process has been completely ineffective given the lack of results. The Department reports that via budget cuts, the number of civilian staffing lines has been reduced. If the Department maintains that the relevant duties remain necessary, it appears the Department may be suggesting that a budget-driven reduction in civilian staff may require the Department to use uniformed staff to fulfill the relevant duties. Further, despite claims that the Department's staffing assessment identified certain administrative posts in the facilities (that have historically been filled by uniform staff) to be altogether superfluous, the Department has not taken any action to eliminate these unnecessary posts, and thus they remain filled by uniform staff.

o   <u>Post Analysis</u>:[132] The Staffing Manager reported that an analysis is currently underway and that he will make recommendations to either keep, eliminate, or civilianize each post in each facility.

o   <u>Relief Factor</u>:[133] The Department has not yet developed a relief factor. A relief factor calculation relies on leave and absence patterns of the workforce and so current and accurate trend data must be available. Furthermore, the Department reports that the relief factor will be customized for each facility, and each rank,

---

[132] As required by Action Plan § C, ¶ 3(viii).

[133] As required by Action Plan § C, ¶ 3(ix). A shift relief factor is the number of full-time-equivalent (FTE) staff needed for a single shift to fill a post that is filled on a continuous basis. In staffing calculations, the shift relief factor is multiplied by the number of staff assigned to a specific post to determine the number of staff needed to provide continuous coverage for the post. Pertinent variables include characteristics of the post (number of hours/days it must be filled) as well as leave and absence patterns of the workforce, including both paid and unpaid leave.

which will take some time given that the full roll-out of InTime was only recently completed. Finally, extracting the necessary data (e.g., amount of leave taken per officer and categories of leave) from InTime has proved more challenging than anticipated.

*Conclusion*

The Department has made progress in increasing the availability of its uniform workforce and untangling many of its dysfunctional staffing practices, in particular those related to sick leave and modified duty, that have been entrenched for decades. Nonetheless, significant work remains (*e.g.*, better managing staff on modified duty) and practice improvements need to be sustained over time to achieve the goals of the Action Plan. Given the complexity of the task and the sheer number of staff who must be managed, this is no small task. The newly available staff must be properly scheduled and deployed in order to ensure that posts do not go unmanned, and that staff are not unduly burdened with overtime.

While useful progress in modernizing the Department's staff scheduling and deployment practices has occurred and the central organizing force of the SMART unit is a valuable asset, staffing practices have not yet been transformed. The facilities continue to need significant assistance and oversight to ensure that new practices become routine and are not circumvented. Furthermore, the Department continues to operate the jails with unstaffed posts each day and, although reductions to the use of triple tours have occurred, overtime continues to be utilized far too frequently. Further, the Department has not developed a coherent strategy for minimizing the use of awarded posts, still has not eliminated uniform posts in the jails that it identified as superfluous, and has identified only a small number of posts for conversion to civilian positions. Staffing analyses and post analyses need to be completed for each jail, schedules need to be fully optimized, and a proper relief factor needs to be calculated.

Additionally, the Monitoring Team's routine incident reviews and site work continue to reveal an overabundance of staff responding to incidents and large numbers of staff still congregating in corridors and other common areas, even as housing unit posts go "unmanned." The Department reports it has been working to improve the deployment of supervisors across tours and to ensure better coverage in the housing units. However, the Department has yet to produce data to illustrate their efforts and thus the Monitoring Team cannot verify the Department's reports of improved practice.

# MANAGEMENT OF INCARCERATED INDIVIDUALS

In order to achieve the goals of the *Nunez* Court Orders, the Department must focus on certain operational matters that contribute to the underlying conditions that brought about the unsafe conditions and high rates of unnecessary and excessive force. The Action Plan requires improvement to specific practices in three such areas: intake processing, classification, and restrictive housing. Each has its own unique impact on the Department's operations and security practices, and the requirements are intended to minimize the potential for disruptive behaviors that could catalyze the need to use force and ensuring safer facilities by: (1) reducing the individuals who are sent to intake and length of stay while there, (2) by fortifying the response to misconduct via custody classification/reclassification and (3) implementing an appropriate restrictive housing program. Together these initiatives can support a reduction in the frequency of violent behavior with a consequent reduction in the need to use force.

Effectively preventing violent and disruptive behavior requires a multi-faceted strategy that goes beyond classification and restricted housing. The Monitoring Team has long encouraged the Department to pursue strategies that increase structure during out-of-cell time and that effectively incentivize positive behavior and hold individuals accountable for misconduct, all of which have been negligible in this agency. The jails would benefit from posted daily schedules in each housing unit that articulate the activities and services that should be provided each day (*e.g.*, recreation, barbershop, commissary, law library, meals, hygiene, etc.) and facility leaders should endeavor to limit idle time via programming and other structured activities. In addition, incentives for positive behavior and consequences for less serious misconduct are essential elements of any violence/use of force reduction effort. Some of the facilities have made recent improvements in this area, such as GRVC's Beacon Center and

RNDC's PEACE Center (which offer enhanced leisure time activities and programming) and various tournaments. The Department has also begun to impose commissary restrictions as a penalty for less-serious infractions (previously, the only sanctions available were a verbal reprimand or Punitive Segregation). These types of initiatives should be maximized in order to reduce the frequency of violent and disruptive behavior, which should in turn decrease the number of situations where staff must intervene and thus decrease the risk of unnecessary and excessive use of force.

*Intake*

The Department's effort to achieve compliance with the provisions regarding intake in the *Nunez* Court Orders (collectively the "intake provisions")[134] has been subject to significant scrutiny and a Motion for Contempt before the Court.[135] The Monitoring Team has issued multiple reports this year with updates on the work related to intake.[136] Further, the City's and Department's three submissions to the Court describe the efforts to achieve compliance with the requirement to track the length of stay of all individuals in intake units and to process them through intake within 24 hours.[137] Overall, the Department has made progress with respect to improving the physical conditions in intake units and efficiently processing individuals through intake, but the Department has made a number of missteps and the process of implementing reliable practice has taken far longer than expected.

---

[134] The specific intake provisions contained in the *Nunez* Court Orders are the First Remedial Order, § A, ¶ (3), Second Remedial Order, ¶ 1(i)(c) and the Action Plan § D, ¶ 2(b) and § E, ¶ (3)(a)-(b).

[135] *See* March 13, 2023 Order (dkt. 511).

[136] *See* Monitor's February 3, 2023 Special Report (dkt. 504), Monitor's April 3, 2023 Report (dkt. 517), and Monitor's April 24, 2023 Status Report (dkt. 520).

[137] *See* City's April 17, 2023 Letter and Miller Affidavit (dkt. 519), the City's May 17, 2023 Letter and Miller Affidavit (dkt. 532), and the City's June 21, 2023 Letter and Miller Affidavit (dkt. 553).

Intake is the processing center for people entering, exiting, and moving within the jails, and the Department uses two types of intake units. First, individuals newly admitted to DOC custody ("new admissions") must be processed through intake before they are assigned to a housing unit. Second, individuals may be brought to an intake unit within each individual jail either for the purpose of exiting/re-entering the facility (*e.g.*, going to/returning from Court or the hospital, or moving to another facility) or to be transferred within the facility (*e.g.*, going to the clinic following a use of force or going to another housing unit) ("inter/intra facility transfers").

The overall goal of the *Nunez* intake provisions is for the Department to ensure that intake is utilized only for these specific purposes (and is no longer utilized as a *de facto* de-escalation unit) and to ensure that individuals are processed through intake efficiently and do not languish beyond a 24-hour period. Limiting the length of stay in an intake unit is important because the physical plant of an intake unit (typically, congregate pens with benches (no bunks and shared toilets) means it is not a suitable long-term housing location. Intake units are intended to be processing hubs, and thus the efficiency of that processing is the central concern. Outlined below is a summary of the Department's efforts to process and track new admissions and inter/intra facility transfers.

- **Intake for People Newly Admitted to the Department**

The procedures in place for processing people who are newly admitted to the Department are described in the Monitor's February 3, 2023 Report at pgs. 15 to 18 and Monitor's April 3, 2023 Report at pgs. 74 to 75. Unbeknownst to the Monitoring Team, the Department issued a policy regarding New Admission processing on April 10, 2023.[138] On June 14, 2023, the

---

[138] *See* June 8, 2023 Report at pg. 23 to 24.

Department acknowledged to the Monitoring Team that promulgation of the New Admissions policy without first consulting the Monitoring Team was an error and the policy was rescinded on June 20, 2023.[139] With respect to the physical conditions in intake units, the Monitoring Team also reported in late May/early June 2023 the details of two incidents that occurred in intake that raised concerns about the management and supervision in these units.[140]

      ○  *Length of Stay for New Admissions in Intake*

New admission processing data from January to May 2023 identifies the proportion of people who were processed through new admission intake within the required 24-hour timeline. The data below combines information from EMTC (used for male new admissions) and RMSC (used for female new admissions). Two different data points can be utilized as the "start time" when tracking length of stay: the time that an individual is transferred from NYPD to NYC DOC custody, which typically occurs in a court setting (custody time) *or* the time that an individual arrives at the intake unit (arrival time). Both are considered separately in the analysis below.[141] The "end time" at which intake processing is considered complete is the time that the individual is either transferred to a housing unit or is discharged from custody (for those who make bail or are not returned to custody following a return to court or trip to a hospital).

---

[139] *See* also Miller June 21, 2023 Affidavit (dkt. 533-1) at ¶ 10.

[140] *See* the Monitor's June 8, 2023 Report at pg. 43.

[141] As noted in the Monitor's February 3, 2023 Special Report on Intake (dkt. 504), the Monitoring Team assesses the time each person arrives in the intake unit (*i.e.*, "arrival time") compared to the time the individual is transported to their assigned housing unit when calculating whether the 24-hour requirement has been met. Counsel for the Plaintiff Class has advised the Monitoring Team that it believes that the assessment of compliance should be based on the time an individual is taken into custody (*i.e.*, "custody time"). Discussions about the appropriate compliance standard will occur in conjunction with the discussion related to clock stoppages. Given that, this report provides outcomes using both data points for the Court's consideration.

As shown in the section under the orange bar in the table below, whether using custody time or arrival time as the starting point, nearly all individuals admitted between January and May 2023 were processed within a 24-hour period. Using custody time as the starting point, 95% of new admissions were processed through intake in under 24 hours. Using arrival time as the starting point, 97% of new admissions were processed through intake in under 24 hours. These calculations were made using a continuously running clock, *without deducting time for clock stoppages*, which are described in more detail below.

| Intake Processing Times for All New Admissions January 5 to May 31, 2023 | | | | |
|---|---|---|---|---|
| **Outcome** | **Per Custody Time** | | **Per Arrival Time** | |
| | **N=8,258** | **100%** | **N=8,258** | **100%** |
| Housed/Discharged within 24 hours | 7,809 | 95% | 7,972 | 97% |
| Housed/Discharged beyond 24 hours | 449 | 5% | 286 | 3% |
| **Length of Stay ("LOS") Beyond 24 Hours** | | | | |
| **LOS (# hrs. overdue)** | **449** | **5%** | **286** | **3%** |
| 24-27 hours (≤ 3 hrs.) | 161 | 1.9% | 113 | 1.4% |
| 27-30 hours (3-6 hrs.) | 92 | 1.1% | 61 | 0.7% |
| 30-33 hours (6-9 hrs.) | 67 | 0.8% | 34 | 0.4% |
| 33-36 hours (9-12 hrs.) | 41 | 0.5% | 18 | 0.2% |
| 36-48 hours (12-24 hrs.) | 39 | 0.5% | 30 | 0.4% |
| More than 48 hours (≥24 hrs.) | 48 | 0.6% | 26 | 0.3% |

The data beneath the green bar in the table above shows the total length of stay for the small proportion of individuals whose processing did not meet the 24-hour timeline (*i.e.*, 5% of all new admissions using custody time as the starting point, and 3% of all new admissions using arrival time). Of these, most were housed within 30 hours (253 of 449 people (56%) using custody time and 174 of 286 people (61%) using arrival time).

113

○ _Temporarily Suspending New Admission Processing, a.k.a. Clock-Stoppage_

Historically, the Department has identified circumstances in which new admission intake processing is interrupted and has tolled its accounting of the processing time (*i.e.*, "stopped the clock") until the circumstance is resolved and processing can resume.[142] The situations in which the Department temporarily suspends its intake processing clock include when: an individual is returned to court before the intake process is completed, an individual refuses to participate in intake processing, an individual is transferred to a hospital or Urgi-Care (a clinic in another facility on Rikers Island) before the intake process is complete, or an individual makes bail and must be released from custody before the intake process is complete. Suspending intake processing appears to have a logical element (*e.g.*, processing cannot occur if the person is not physically present) and may also be functional (*e.g.*, Department or CHS staff need to know that an individual will not be presented for a certain procedure). Although the Department tracks all clock stoppages, the data presented above regarding the 24-hour timeline utilized a continuously running clock, *without deducting any time when processing was suspended.*

The data from January to May 2023 provide some insight into this practice. First, nearly all individuals newly admitted to the Department (89%; 7,385 of 8,258 people) were processed through intake without the process being suspended for any reason. Further, the fact that the process was suspended in some cases did not necessarily mean that the individual was not processed within 24 hours. In fact, among the 873 individuals whose intake process was suspended for some period of time, most were housed within 24 hours (53% using custody time, 68% using arrival time). Among those whose intake process was temporarily suspended and

---

[142] *See* Monitor's February 2023 Report at pgs. 17 and 19-20 and Monitor's April 3, 2023 Report at 79 to 81.

whose processing lasted more than 24 hours (n=411 using custody time, n=279 using arrival time), the largest category of suspensions occurred because the individual was required to return to court (68% of those in intake longer than 24 hours per custody time; 73% of those in intake longer than 24 hours per arrival time). The next two largest categories of suspensions occurred because the individual refused to participate in the intake process (22% of those in intake longer than 24 hours per custody time; 19% of those in intake longer than 24 hours per arrival time) and those transferred to the hospital (13% of those in intake longer than 24 hours per custody time; 10% of those in intake longer than 24 hours per arrival time). Suspensions for Urgi-Care and bail payment coupled with intake processing lasting more than 24 hours are rare combinations, only occurring 11 times per custody time and six times per arrival time in a five-month period.[143]

The Department would like to exclude these clock stoppages from the calculations when determining compliance with the 24-hour requirement. The parameters and appropriateness of this proposal requires discussion among the Parties and the Monitoring Team. The Monitoring Team intends to develop recommendations in the coming months after it has a chance to fully digest the most recent data and conduct some additional evaluations of the Department's current practices.

- o *NCU's Audits to Verify Data Entry*

Concurrent with the implementation of the improved New Admission Dashboard, the *Nunez* Compliance Unit ("NCU") initiated an audit strategy to corroborate time entries using

---

[143] Note, these proportions do not total 100% because an individual's intake processing may be suspended more than once.

Genetec footage.[144] Audit results from January to June 18, 2023 are summarized for the 142 people who were newly admitted during the audits' sampling frames.[145]

- 136 of 142 people (96%) arrived in intake and were processed and transferred to a housing unit within the 24-hour timeline (confirmed via Genetec review).

- 120 of 142 arrival time entries (85%) were generally accurate (*i.e.*, within 20 minutes of the time shown on Genetec). Among the 22 inaccuracies, nine stated a time *before* the person actually arrived, and twelve stated a time *after* the person actually arrived. One inaccuracy was simply reported as a "data entry error."

- 115 of 142 housing time entries (81%) were generally accurate (*i.e.*, within 20 minutes of the time shown on Genetec). Among the 27 inaccuracies, 14 stated a time *before* the person was actually transferred to a housing unit, and 13 stated a time *after* the person was actually transferred to a housing unit.

- 17 of the 142 people (12%) had "clock stoppages" during the intake process. Of these, seven were housed within 24 hours of their arrival time in intake and ten were not.

The Department has made progress in ensuring that staff are accurately entering data regarding the person's arrival time in intake and the time the person was transferred to a housing unit. With respect to those cases in which errors in data entries were found, the Department reports that three staff members received retraining, and one individual who was responsible for errors on prior audits was removed from operating the dashboard.

---

[144] *See* Monitor's February 3 2023 Report at pgs. 20 to 22 and Monitor's April 3, 2023 Report at pgs. 78 to 79.

[145] NCU confirms the status of all individuals in the intake to determine whether they are a new admission or if the individual may already have been in custody and is therefore in intake as an inter/intra facility transfer. Upon confirmation of the new admissions, the audit is limited to those individuals.

- **Intake for those Transferred Within and Between Facilities**

Beginning March 27, 2023, the Department required all facilities to track individuals in intake for the purpose of housing transfers within or between jail facilities using the Inmate Tracking System ("ITS") and incarcerated individuals' "accompanying card" or "Housing Locator Card" (which reliably establishes the individual's identity).

   o *Scope of Tracking*

The Department has not consistently tracked the length of stay in intake for intra/inter facility transfers in accordance with the requirements of the Action Plan. Problems relate to both individual staff practice and the Department's guidance to staff about which transfers should be entered into ITS. This spring, while on site, the Monitoring Team observed at some facilities that some individuals' arrival to facility intake units was not entered into ITS at all and/or that entries were not being made contemporaneously.[146] In addition, the Monitoring Team's inquiries on site revealed that certain groups of individuals' entry to/exit from intake was not being tracked in ITS at all. Intake Staff reported that certain individuals "did not need to be entered into ITS" despite being physically present in the intake including those who were expected to be in intake for only a short period of time, those individuals being transferred out of state, and those individuals being moved to another facility to attend a particular event. The Action Plan does not allow for such exceptions.

The Department's position on this matter has shifted multiple times in the last month. On May 30, 2023, a senior Department executive reported to the Monitoring Team, for the first time, that certain individuals in intake are not being tracked because their placement in intake was "not

---

[146] *See* Monitor's April 24, 2023 Report at pg. 12 and Monitor's June 8, 2023 Report at pgs. 30 to 31.

a *Nunez* issue." This report was surprising given the clear requirements of the *Nunez* Court

Orders, the Department's policy and previous claims that such information was being tracked.[147]

Subsequently, the Monitoring Team learned via the Department's June 21, 2023 submission to

the Court that staff had been given verbal direction not to track all individuals in intake such that,

"people present [in intake] for reasons other than a reassignment of their housing location (i.e.

people who are changing their beds) are not being entered into ITS such as those going to court,

the hospital, a clinic in a different facility, or religious services in a different facility."[148]

However, in that same Court filing, the Department acknowledges that the *Nunez* Court Orders

"requires the reliable tracking of all individuals in all Intake areas [and the] Department intends

to fully comply with that requirement going forward."[149]

    o   *Oversight of Intake and Efforts to Validate ITS Data*

        The Department has developed several initiatives to ensure individuals do not languish in

facility intake units. First, the Department reports that a Facility Operations Team in the Deputy

Commissioner of Classification's office monitors video of intake areas 24 hours per day, 7 days

per week. Second, the Department directed each facility to submit a list of every individual in

intake six times daily (*i.e.*, every four hours) to the Deputy Commissioner's office along with a

---

[147] The Second Remedial Order and the Action Plan require the Department to develop and implement a "reliable system to track and record the amount of time any incarcerated individual is held in Intake [. . .]" Second Remedial Order, ¶ 1(i)(c) as incorporated into § E, ¶ 3(a) of the Action Plan. Furthermore, the approach is not aligned with the Department's report to the Court on January 10, 2023 (dkt. 495) that "[a]ll persons in custody entering or exiting an intake area will be manually scanned and tracked by ITS" (at pg. 4) and in the April 17, 2023 Miller Affidavit (dkt. 519) which stated "[. . .] each facility is responsible to record the time an individual enters and leaves intake area in the Inmate Tracking System ("ITS") using the bar code on the individual's accompanying card [. . . ]" *See* Paragraph B 10. Finally, the Department's own policy requires "[a]ll PIC's Entering / Exiting an Intake Area shall be tracked by the ITS system."

[148] *See* Miller June 21, 2023 Affidavit (dkt. 533-1) at ¶ 15.

[149] *See* Miller June 21, 2023 Affidavit (dkt. 533-1) at ¶ 17.

screenshot of the ITS system and a Genetec photograph of each intake pen. The Facility

Operations Team then reviews these reports to determine if any individual has remained in intake

for an extended period of time. If an individual is identified as having been in intake for more

than four hours, the Facility Operations Team contacts the facility to determine why the

individual remains in intake and takes steps to expedite the individual's transfer. It is unknown

whether the facilities continue to provide a copy of intake logbooks daily as evidence that the

Warden, Deputy Warden, Tour Commander, and Intake Captain are conducting their required

tours of the intake area. These appear to be useful strategies to ensure intake units are properly

managed.

      With respect to validating data entered into ITS, the Department reports that it can

generate data on the length of stay for all individuals transferred between and within the jails.[150]

The Monitoring Team has repeatedly requested this data, for months, but the Department has not

provided it. The Monitoring Team is therefore unable to provide any information about what this

data may reveal about the length of stay and whether the Department is complying with the

relevant Action Plan requirement for the portion of people in intake who are entered into ITS (as

noted above, the Department has not been entering data on *all* individuals in intake units).

      The Department also reports that data quality analysts' reviews revealed that 65% to 90%

of intake data was entered into ITS correctly on any given day, although the data and methods

have not been shared with the Monitoring Team so the report cannot be validated. Further, the

Department reports that recommendations have been made to alter the ITS to: (1) add an alert for

duplicate or contradictory data entries and (2) allow a user to change information in the system if

it is added in error, and to subject all such changes to audit to prevent manipulation. The

---

[150] *See* Miller June 21, 2023 Affidavit (dkt. 533-1), ¶ 12.

Department has not consulted with the Monitoring Team about these quality assurance efforts or potential ITS revisions but claims the changes will be made later in summer 2023.[151]

- **Summary of Intake Matters**

The Department's performance with regard to intake requirements is mixed—new admissions processing/tracking is better established than inter/intra facility transfers processing/tracking, which has been negatively impacted by inaccurate data entry and guidance about tracking that does not comport with the Action Plan's requirements. New admissions intake has addressed many of the poor conditions that led to the Second Remedial Order, few individuals remain in intake for more than 24 hours, and quality assurance audits continue the verify the accuracy of data at acceptable levels. On the surface, these outcomes are encouraging, but given the Department's overall problems in operational management, problems validating data in other areas and several concerning incidents that have occurred in the intake unit, the Monitoring Team is not confident about the veracity or durability of these results or that the dangerous conditions have been fully ameliorated.

In addition, intake processing for inter/intra facility transfers still does not conform to the Action Plan's requirements and has been further complicated by attempts to carve out exceptions to the tracking requirements. Even where indicators of progress reportedly exist (*e.g.*, reports from ITS about length of stay; audits that assess the accuracy of data entry), the Department has not shared this information with the Monitoring Team and thus the claims cannot be verified. Given the foregoing, the Monitoring Team recommends the Court direct the Department to file additional reports on the Court Docket regarding the status of their continued efforts to implement reliable Intake tracking systems for new admissions and inter/intra facility transfers

---

[151] *See* Miller June 21, 2023 Affidavit (dkt. 533-1), ¶ 13.

on September 15, 2023 and November 15, 2023.[152] this issue is included in the Monitoring

Team's priority recommendations for the Court to direct the Department to address as detailed in

the Conclusion of this report.

*Classification*

The Deputy Commissioner of Classification, Custody Management and Facility

Operations hired by the Department in July 2022 continues to serve as the Classification

Manager and oversees the central Custody Management Unit ("CMU").[153] The Department's

procedures remain intact for initially determining each incarcerated individual's custody level,

for reclassifying individuals every 60 days, and for ensuring individuals' housing assignments

are commensurate with their custody level.[154] The Department's initial work to address the

Action Plan's requirements was discussed in the Monitor's October 28, 2022 Report (*see* pgs.

90-91) and were updated in the Monitor's April 3, 2023 Report (*see* pgs. 89-92).

The Department continues to achieve good results in the timeliness of initial

classification and reclassification. In April and May 2023, the Department reported that the one-

day count of overdue initial classifications averaged about 53 and the one-day count of overdue

60-day reclassifications was 31. This represents less than 5% of the total population and is a

generally acceptable rate of exception. The Department reported it has continued to impress upon

staff the importance of documenting misconduct via an infraction, given that the

presence/absence of infractions can change an individual's custody level upon reclassification.

The Department also reported that audits of the extent to which paper infractions were entered

---

[152] The Court first required production of such reports in it's March 13, 2023 Order at pg. 29 (dkt. 511).

[153] As required by the Action Plan, § E, ¶ 1 and § E, ¶ 2(a).

[154] As required by Action Plan § E, ¶ 2(a) and (b).

into IIS (and thus could be counted during reclassification) have yielded good results. Department and facility leaders have also noted a change in staff's willingness to document misconduct on an infraction now that dependable consequences are available (*i.e.*, commissary restrictions for infractions and/or the possibility of ESH placement). These claims have yet to be independently verified by the Monitoring Team.

An individual's housing unit assignment should be the product of their custody level, SRG affiliation and service needs or program interests. The Department reported that efforts to identify the extent to which an individual's housing unit is commensurate with their custody level continue (*e.g.*, celled housing for maximum custody, and dormitory housing for minimum custody), and that a "Mis-Housing Report" is generated for each facility every weekday, wherein facility leaders must explain why a person is mis-housed and how they have or will rectify the problem. In theory, this generally takes one of two forms—the individual is either moved to a housing unit that is aligned with their custody level, or an override is applied which, once signed by a supervisor, provides an explanation and authorization to house the person "out-of-class." Several years ago, the override process was in place at RNDC, but the practice reportedly deteriorated with various personnel changes. The Monitoring Team has encouraged the Department to restart the use of classification overrides to document legitimate reasons for someone to be housed out-of-class (*e.g.*, program opportunities, service needs, SRG balance or other peer dynamics), which the Department reports it is considering. Utilizing overrides will help both the Department and the Monitoring Team to more efficiently identify the segment of individuals who are mis-housed due to staff error.

Finally, Department and facility leadership continues to report close collaboration between CMU and facility security teams to maintain the balance of SRG affiliates such that no

one housing unit is dominated by people affiliated with the same group.[155] The process was described in detail in the Monitor's April 3, 2023 Report (*see* pgs. 92-93) and has now been implemented in all facilities (with the exception of certain units that are service/program driven, such as MO, PACE or ESH Level 1). The initial effort to blend affiliations within units reportedly resulted in reactionary spikes in violence in summer 2023, but facility leaders at RNDC and GRVC have reported that reactions among people in custody have largely stabilized. That said, gang-related tensions continue to underlie many acts of violence.

*Management of Incarcerated Individuals Following Serious Incidents of Violence*

The Monitoring Team remains troubled by the ongoing level of violence in the jails and has found that there is a compelling need to control and extinguish gratuitous and predatory acts of serious violence committed by a relatively small number of people in custody, which results in disturbing levels of harm to other incarcerated individuals and staff. The Action Plan requires the Department to implement a restrictive housing program that will safely and adequately manage those incarcerated individuals who have engaged in serious acts of violence and who therefore pose a heightened risk to the safety of other incarcerated individuals and staff.[156] A restrictive housing model must effectively separate those who have engaged in serious acts of violence from potential victims, provide the necessary structure and supervision to provide safety to the individuals housed in the unit and should provide rehabilitative services that decrease the likelihood of subsequent violent acts. The context for and initial steps of the Department's efforts to develop a restrictive housing model (Enhanced Supervision Housing, or "ESH") are discussed in the Monitor's April 3, 2023 Report (pgs. 95-99).

---

[155] As required by Action Plan § E, ¶ 2(d).

[156] As required by Action Plan § E, ¶ 4.

Once the ESH pilot at GRVC was initiated, the Department planned to move the program to the RMSC facility, where construction was recently completed to ensure that all program components can be properly implemented. The transfer from GRVC to RMSC was completed at the end of June 2023.[157] The staffing complement will include some officers who were assigned to ESH at GRVC, along with others who applied and were selected for the assignment upon transfer to RMSC.

The Monitoring Team has had discussions with the Chair of the ESH Committee (the Associate Commissioner of Programs and Community Partnerships) and the Department's consultant on this matter (Dr. James Austin) to inform the Monitoring Team's efforts to develop a robust monitoring strategy for the ESH program. The sources of information have been identified, and the Department has recently started to produce an initial set of information (*e.g.*, data, case files, etc.). Once reviewed, the parameters of the routine information request will be finalized which will permit an ongoing assessment of the number of people who flow into and out of the program (and their demographics, referral characteristics, etc.) along with documentation of individuals' progress and lengths of stay in each level of the program. Program delivery data will also be addressed, along with key security measures in the ESH units.

While the Department's engagement with the Monitoring Team on its monitoring strategy has been fully satisfactory, the collaborative approach has not been universal. In May 2023, the Department issued a Directive requiring ESH staff to utilize 3-point restraint (*i.e.*, both ankles and one wrist) when securing *all* Level 1 participants to the restraint desk. Exceptions could be made on an individual basis and only with approval from the Deputy Commissioner. The

---

[157] Construction on building a final unit at RMSC for ESH is still underway.

Department's restraint policy requires securing the individual's ankles, leaving both hands free, but allows the use of three-point restraint *on an individualized basis*.

The Department's Directive to utilize three-point restraint on all Level 1 participants in May 2023 was promulgated following an incident in late April 2023. In that incident, one individual was not properly restrained in the restraint desk and was able to attack and slash another individual in a restraint desk. The fact that a policy was changed as the result of one incident in which *staff* failed to follow appropriate security procedures thereby imposing more restrictive conditions on the incarcerated population is questionable at best. Under the Department's logic, staff's inability to properly secure a restraint device means that incarcerated individuals should be placed in more restrictive devices. This clearly fails to address the underlying problem of *staff's improper use of security equipment* and is unnecessarily punitive toward Level 1 participants. It must also be noted that the Department did not consult or advise the Monitoring Team about this blanket change in practice, as required by the *Nunez* Court Orders. The practice is also inconsistent with the Department's restraint policy, which is subject to approval of the Monitor. The Monitoring Team learned about the Directive through anonymous sources and requested a copy of it. When producing it to the Monitoring Team, the Department apparently realized its failure to consult with the Monitoring Team pursuant to the terms of the *Nunez* Court Orders and reported it then rescinded the Directive in mid-June 2023. Further, Department leadership reported to the Monitoring Team that it no longer intends to utilize 3-point restraints. However, just a few weeks later, on July 4, 2023, at the direction of the Commissioner, the Department reinstated the directive regarding the utilization of the 3-point restraints. The Monitoring Team was advised after the fact that the Commissioner directed the policy must be reinstated. The Department reported that the three-point restraint was reinstated

because a slashing occurred when one individual in a restraint desk was able to slash another individual in a restraint desk. The Monitoring Team reviewed the incident and it is unclear why this single incident would merit the imposition of a unilateral policy to utilize three-point restraints. The incident gave rise to a number of potential security and operational lapse. First, there are questions about whether adequate search procedures were followed given the individual had access to a weapon while in the restraint desk.[158] Further, it is unclear whether the leg restraints were applied appropriately and if there may have been too much "slack." Finally, it is unclear whether the distance between desks is sufficient. Overall, this appears to be yet another example where the Department simply defaults to placing incarcerated individuals in more devices rather than considering improvements in practice.

The Monitoring Team will continue assessing the operation of ESH using routine data on the flow of people into and out of the program, evaluating program delivery and measuring various security indicators to determine whether any changes to the ESH policy are required. Given the need for further evaluation and refinement of the program, the Monitor is not yet in a position to approve the current policy, as required by the Action Plan.

_Conclusion_

The Department's efforts in these three areas—intake, classification, and restrictive housing—reflect the same dynamics discussed throughout this report, meaning discrete areas of success and progress, but also continuing failures to apply even the most basic skills to improve staff practice along with notable failures to consult with the Monitoring Team on issues that are clearly _Nunez_-related.

---

[158] The Department reports it was unable to recover the weapon. However, review of video after the incident revealed the individual secreting the weapon back into his body following the attack.

# STAFF ACCOUNTABILITY –
# IDENTIFYING AND ADDRESSING MISCONDUCT

In order to effectively respond to staff's misuse of force, the Department must reliably *identify* misconduct that occurs *and then address* the misconduct through appropriate corrective action. This section of the report provides a summary of the Department's efforts to properly identify misconduct, followed by an update on the Department's efforts to reduce the backlog of cases awaiting accountability while also applying timely discipline for misconduct that occurred in 2022.

## Regression in Identifying Misconduct

Despite the previous improvement in the Department's ability to properly identify misconduct via Rapid Reviews and Investigation Division ("ID") investigations, significant regression occurred in both areas during the first year of the Action Plan's implementation. The Monitoring Team's analysis of nearly all UOF incidents (via CODs, Rapid Reviews, and ID Investigations[159]) continues to reveal that staff misconduct is still prevalent and there is no evidence to suggest that practices have materially improved since the inception of the Consent Judgment. Although there were fewer cases in 2022-2023 in which the Department identified misconduct and determined that discipline was merited, this reduction did not have a reasonable basis and was instead due to a deterioration in the quality of investigations and the failure to properly identify misconduct when it occurred.

---

[159] For selected incidents, the Monitoring Team also reviews video, staff use of force and witness reports, injury reports, and any other available documentation.

- **Facility Assessment of UOF via Rapid Reviews**

Facility leadership continues to conduct close-in-time reviews of all use of force incidents ("Rapid Reviews" or "Use of Force Reviews"). Rapid Reviews do detect some misconduct, but since their inception, the Monitoring Team has found that they do not do so consistently and often fail to identify *all* misconduct observed via the available evidence at the time the Rapid Review was completed. More specifically, the Rapid Reviews conducted in 2022 showed some improvement in identifying certain misconduct compared to prior years (as noted in the Monitor's April 3, 2023 Report). However, a closer examination of the 2022 data and Rapid Reviews conducted in 2023 revealed an increasing failure to identify certain issues (such as identifying that an incident was avoidable and therefore should not have occurred). In other words, the Department's performance regressed. In 2022, the number of staff identified for corrective action was the lowest it has been (n=2,860) since tracking began in 2018, even though there were more uses of force in 2022 and no appreciable improvement to staff practice had been detected throughout the Monitoring Team's various reviews of incidents. Given the number of staff identified for corrective action by Rapid Reviews in January to May 2023, the Department is on track to identify even fewer staff for corrective action in 2023 than it did in 2022. Thus, it appears that Rapid Review data continues to underestimate the prevalence of misconduct and leaves some volume of the misuse of force undetected and unaddressed. A chart of the rapid review outcomes is provided in Appendix A.

In May 2023, the Monitoring Team shared feedback with the Department in an effort to improve the quality, reliability, and consistency of Rapid Reviews. The Department has subsequently consulted with the Monitoring Team on efforts it has made to improve the Rapid Reviews, including revisions to the Rapid Review Template.

- **Investigation Division**

The quality of the Investigation Division's work product deteriorated significantly beginning in summer 2022. The Monitoring Team found that ID was not consistently addressing or analyzing the available evidence and the investigators' conclusions did not appear to be objective.[160] The Monitoring Team's continuing assessment of investigations completed in early 2023 has revealed the same patterns previously reported, reinforcing the Monitoring Team's finding that investigators' practices had regressed and substantively changed for the worse.

The decline in quality did not appear to be the product of less skilled investigators or supervisors, nor did the deterioration appear to be related to the type of investigation (*e.g.*, Intake Investigations versus Full ID Investigations). It appeared to be the result of poor leadership and a possible shift in direction to alter the approach on how to conduct an investigation. The Monitoring Team's concerns regarding the decline in quality were shared with the Department and were only exacerbated by the Commissioner's and Department's protracted and lackluster response to the Monitoring Team's findings, which failed to propose reasonable solutions to address the issues identified by the Monitoring Team. Ultimately, concrete action (*i.e.*, the resignation of the DC of Investigations and appointment of new leadership, and changed practices) was only taken on the eve of the filing of the Monitor's April 3, 2023 Report. An update on the status of ID investigations is provided in Appendix A.

This regression during the pendency of the Action Plan offset the progress the Department had previously made toward compliance to "conduct thorough, timely, and objective investigations of all Use of Force Incidents to determine whether Staff engaged in the excessive

---

[160] These findings were extensively reported in the Monitor's April 3, 2023 Report at pgs. 100 to 102 and pgs. 155 to 171 and in the Monitor's April 24, 2023 Report at pgs. 1 to 9.

or unnecessary Use of Force or otherwise failed to comply with the New Use of Force Directive," as required pursuant to § VII. ¶ 1 of the Consent Judgment. In 2020, during the 10th Monitoring Period, the Department had moved out of Non-Compliance with this provision and maintained Partial Compliance through the 14th Monitoring Period (January to June 2023).[161] In the 15th Monitoring Period (July to December 2022), as result of the significant regression in the quality of investigations, the Department was returned to Non-Compliance with this requirement thus erasing its prior progress.

In April 2023, a new leadership team was installed in the Investigation Division, and the division was split so that ID now focuses exclusively on use of force investigations, and a separate unit conducts investigations into all other types of misconduct. Initiatives are also underway to restore the quality of the investigations. One foundational component that is necessary for this remediation work is that ID must have sufficient staff to do the work. The staff assigned to work on UOF investigations in ID has decreased 50% from January 2020 (when 142 investigators and supervisors were assigned to use of force investigations) compared with a total of 71 investigators and supervisors in June 2023.

While additional staff were assigned between April and June 2023, given attrition of staff within ID, there was a net loss of 3 individuals (74 to 71). The Department reports that 15 additional staff are slated to be assigned to ID in early July and additional recruitment efforts are underway. An assessment of the ID's staffing needs found that the Division at least 21

---

[161] A compliance rating for this provision was awarded in the 13th Monitoring Period because the Monitoring Team did not assess compliance with any provisions of the Consent Judgment or Remedial Orders for the period between July 1, 2021 and December 31, 2021 as the Court suspended the Monitoring Team's compliance assessment during the Thirteenth Monitoring Period because the conditions in the jails during that time were detailed to the Court in seven status reports (filed between August and December 2021), a Remedial Order Report (filed on December 22, 2022) as well as in the Special Report filed on March 16, 2022 (dkt. 441). The basis for the suspension of compliance ratings was also outlined in pgs. 73 to 74 of the March 16, 2022 Special Report (dkt. 438).

supervisors and at least 85 investigators are necessary, which has not been achieved.
Accordingly, even greater vigilance is needed as the current staffing numbers are insufficient to
manage the workload. Given the need for adequate staffing, this issue is included in the
Monitoring Team's priority recommendations for the Court to direct the Department to address
as detailed in the Conclusion of this report.[162]

Overall, the regression within ID during the pendency of the Action Plan is disturbing
and consequently resulted in a reduction in the level of the Department's imposition of
meaningful and timely accountability for misconduct that occurred during pendency of the
Action Plan.

### Addressing the Misconduct & Case Processing

The Department's ability to impose appropriate and meaningful accountability has been a
key focus since the inception of the Consent Judgment and has also been subject to multiple
Remedial Orders, including the Action Plan. The overarching goal is for the Department to have
an appropriate and adequate continuum of responses to staff misconduct (*e.g.*, immediate action,
command discipline and formal discipline) and to improve the Department's process for
imposing each type of discipline. With respect to formal discipline, over the last few years, the
Department exerted significant effort to ensure a sufficient number of staff were assigned to the
various tasks and to ensure that OATH, which is responsible for adjudicating matters that cannot
be resolved internally, was aligned with the requirements of the *Nunez* Court Orders and was
able to support timely case processing.

---

[162] This proposal is consistent with the requirement for Trials Staffing in the Action Plan § F, ¶ 1(a).

During the first year of the Action Plan's implementation, the Department has worked to create a more functional continuum of accountability and to significantly reduce the backlog of use of force disciplinary cases and medical incompetence cases. This makes the problems in identifying misconduct, as described above, that much more unfortunate, as overall accountability for misconduct has demonstrably suffered during the Action Plan's first year of implementation. The status of various components of the formal discipline process is discussed below.

- **Immediate Action**:[163] The Department's ability to take immediate action is a critical tool to rapidly address particularly egregious misconduct, especially in this agency where accountability can be so protracted. The use of immediate action, particularly suspension, decreased during the first six months after the Action Plan went into effect. The change appeared to be the result of the former Deputy Commissioner of ID's practice of utilizing formal discipline instead of immediate suspension. This is obviously problematic given the protracted formal disciplinary process. Following feedback from the Monitoring Team, in the beginning of 2023, ID began to impose suspensions in cases where immediate action was merited. As a result of these changes, nearly 60 individuals were suspended for use of force related misconduct between January and May 2023. A chart of suspensions is included in Appendix A. It must be noted that the Monitoring Team continues to identify *additional* cases that also merit suspension, but suspension was not imposed and to make recommendations to address those cases pursuant to the First Remedial Order, § C, ¶ 2.[164]

---

[163] As required by the Action Plan, § F, ¶¶ 8 and 9.

[164] The Monitoring Team is judicious in the recommendations that it makes to the Department with regard to immediate action cases and only identifies those cases where immediate action should be considered, *and* the incident is not yet stale for *immediate* action to be taken. Given the Monitoring Team's role, it is not often in a position to have contemporaneous information, and so there are inherent limitations to the scope of misconduct the Monitoring Team can identify and recommend for consideration of *immediate* action. For instance, if the Monitoring Team identifies an incident that warranted immediate corrective action (and none was taken), but the incident occurred many months prior, an immediate action recommendation is not shared because the appropriate window of opportunity for immediate action has

- **Command Discipline**:[165] The Department implemented a revised Command Discipline ("CD") Policy[166] to expand the use of the tool, to provide a much-needed path toward increasing close-in-time discipline for lower-level use of force violations, and to support the facilities' ability to hold staff accountable for misconduct. A CD is an appropriate way to address a variety of low-level poor staff practices, and if properly applied, the Monitoring Team supports their use. The CD process articulated in policy is reasonable, but in practice, the Monitoring Team has long found that CDs are often not properly managed or adjudicated.[167] Dismissals due to procedural violations are common (25% from July to December 2022)[168] and CDs too often default to the least punitive sanction available rather than one that is proportional to the severity of the misconduct. A chart of the status of Command Discipline is included in Appendix A of this report. Referral procedures for MOCs/formal discipline are not properly monitored, allowing some staff who qualify for formal discipline to escape a more significant penalty. The Department has long struggled to reliably and consistently adjudicate CDs, and additional oversight and quality assurance is needed to ensure that CDs are adjudicated as required by policy. The Monitoring Team has long recommended improvements to the process and, in conjunction with the revised policy, made written recommendations in August 2022.[169]

---

passed. If the appropriate window of opportunity for immediate action has passed, the Monitoring Team still recommends that the Investigation Division revisit the investigation for the case to address the specific concerns raised by the Monitoring Team so that staff recognize these issues and misconduct when reviewing similar incidents in the future. The Monitoring Team's immediate action recommendations are therefore only a subset of cases where immediate action was likely warranted but not taken. The Monitoring Team's overall goal is to avoid lost opportunities for immediate action, but this approach is not failsafe.

[165] As required by the Action Plan, § F, ¶ 3.

[166] Detailed discussions regarding Command Disciplines can be found in the Monitor's April 3, 2023 Report at pgs. 180 to 183 and the Monitor's April 24, 2023 Report at pgs. 20 to 22.

[167] *See* Monitor's 7th Report, pgs. 40-44; Monitor's 8th Report, pgs. 55-58 and pg. 65; Monitor's 9th Report, pg. 67-72; Monitor's 10th Report, pgs. 60-65; Monitor's 11th Report, pgs. 81-86; Monitor's 12th Report, pgs. 39-41; Monitor's March 16, 2022 Special Report, pg. 43; Monitor's October 28, 2022 Report, pg. 98 and pgs. 147-149; Monitor's April 3, 2023 Report, pg. 106 and 108 and pgs. 180-183; Monitor's April 24, 2023 Status Report, pgs. 20-22.

[168] The number of cases dismissed for CDs issued in 2023 is not yet known given 21% of cases for incidents that occurred in January-March 2023 are still pending adjudication.

[169] A summary of the recommendations can be found in the Monitor's April 3, 2023 Report at pg. 108.

Unfortunately, the Department has made no progress in implementing the recommendations, despite repeated follow-up from the Monitoring Team and inclusion of these recommendations in the April 2023 Recommendations. The Department has repeatedly reported that it is working to develop appropriate oversight mechanisms, most recently advising that a proposal would be shared by early June 2023. In late June, the Monitoring Team was advised that the Department has reassigned responsibility of addressing this recommendation and that it intended to make additional revisions to the Command Discipline policy and the process and will consult with the Monitoring Team on any changes. In the meantime, the development and implementation of the necessary safeguards for this process are not in place almost a year after the Monitoring Team's latest feedback (and years after the issue was first raised). As a result of the Department's failure to adequately manage this issue, the Monitoring Team has recommended that the Court Order require that specific safe guards are put in place, by a specific date and subject to approval of the Monitor as discussed in more detail in the Conclusion section of this report.

- **Expedited Case Closures**:[170] Since the inception of the Action Plan, the Department expedited the processing of over 40 cases of egregious conduct and resolved the majority with close-in-time discipline, which has generally been found to be reasonable.[171] The ability to address in a timely manner these more egregious cases, while few in number, remains a critical tool to ensure meaningful accountability.

- **Formal Disciplinary Process & Staffing for Trials Division**:[172] Case processing within the Trials Division has improved with the reduction in the backlog (discussed below), streamlined internal processes, increased capacity and efficiencies at OATH, and enhanced staffing levels. However, the Department is still not timely addressing disciplinary matters as it must in order to achieve Substantial Compliance with the Consent Judgment provisions (*e.g.*, it is not uncommon for a year to elapse from the time misconduct occurred to the imposition of formal discipline). To address this problem, the

---

[170] As required by the Action Plan, § F, ¶ 2.

[171] *See* Monitor's April 3, 2023 Report (dkt. 517) at pgs. 196 to 198.

[172] As required by the Action Plan, § F, ¶¶ 1 and 6.

Trials Division recruited and retained additional staff as required by the Action Plan. The Department has made progress on increasing the number of staff assigned to the Trials Division. However, the Trials Division leadership continues to report that recruiting for attorneys is challenging, especially because the salary offered is not competitive. While the City approved a salary increase in July 2022, the Trials Division reports the salary continues to inhibit its ability to recruit qualified candidates. It is for this reason that the City and Department must remain vigilant to ensure that the Trials Division maintains adequate staffing levels to meet the demands of the workload and necessary staff must be brought on board as quickly as possible. As update overall recruiting efforts is provided in the Overarching Initiatives Related to Reform section of the report.

- **OATH Practices**:[173] The increased availability of OATH pre-trial conferences has facilitated more timely resolution of matters when the ALJ facilitates a settlement (or schedules a trial) in cases that cannot be resolved between the Department and the staff member directly. The number of use of force cases ultimately requiring a trial remains very low, and thus the Monitoring Team continues to encourage OATH to schedule trials to occur as close in time to the pre-trial conference as possible to facilitate the timely resolution of the matter. Trials at OATH are occurring closer in time to the pre-trial conference and are conducted more efficiently than they have been in the past. Compared to previous practice, the Report and Recommendations from the ALJs are completed closer in time to the trial conducted and reflect an improved assessment and analysis of the Department's disciplinary guidelines than in the past. OATH recommended termination for 12 staff for UOF-related misconduct in 2022, double the number recommended for this reason in 2021. This is particularly noteworthy as OATH did not recommend termination for *any* staff for UOF related misconduct for the first five years after the Consent Judgment went into effect, despite circumstances that merited such a recommendation.

- **Case Closures**: Overall, between January 2022 and May 2023, the Department closed 2,441 cases involving UOF-related discipline. More cases were closed in 2022 (n=2,163) than any other year since monitoring began, and the number of cases closed in 2022 is

---

[173] As required by the Action Plan, § F, ¶ 10.

nearly the same as the number of cases closed in the previous five years ***combined*** (n=2,225 cases were closed between 2017 to 2021). The Monitoring Team has not identified an overall negative impact on the appropriateness of the dispositions given the large number of closures. The Monitoring Team has recommended that the use of lower-level sanctions (*e.g.*, 10 days or less) and cases in which the disposition only remains on the staff member's record for one year must be reduced and has recommended the Department impose prudent limitations on the use of this strategy going forward. The Monitoring Team has been consulting with the Deputy Commissioner of the Trials Division on revised parameters for the use of these sanctions and the Department is currently on track to meet the July 30, 2023 deadline to limit the circumstances in which low-level sanctions and expungement may be utilized.

- **Formal Disciplinary Backlog**:[174] The Department has made great strides in reducing the backlog of use of force related disciplinary cases.[175] The Department has essentially eliminated the backlog of use of force related disciplinary cases for incidents that occurred prior to December 31, 2020[176] and is now working to close out the backlog of cases that occurred between January 1, 2021 and June 30, 2022 by August 15, 2023.[177] As the Monitoring Team has cautioned in every report to date, eliminating the backlog (or portions of it) ***does not mean*** that all cases are now closed timely nor does it mean that discipline is applied in all cases that require it, as discussed in more detail below.

- **Formal Discipline for Incidents in 2022**:[178] The Department has brought only 433 cases for formal discipline related to 317 of the 7,005 use of force incidents that occurred in

---

[174] As required by the Action Plan, § F, ¶ 4.

[175] Reducing the backlog of disciplinary case for UOF-related misconduct occurred over three phases: (1) closure of 400 priority use of force cases by April 30, 2022 pursuant to the Third Remedial Order (*See* Monitor's June 30, 2022 Report at pg. 31); (2) closure of cases occurring on December 31, 2020, and earlier, (the "2020 Backlog") by December 31, 2022; and (3) closure of cases that occurred between January 1, 2021 and June 30, 2022 by August 15, 2023.

[176] As of May 31, 2023, about 50 cases related to this time period remain pending. The Department reports that the majority of cases that remain pending involve staff members on excused leave (*e.g.*, military or maternity leave). In other cases, the Department is awaiting a decision from OATH.

[177] The Monitoring Team originally recommended a deadline of July 15, 2023, but, following discussions with the Department, the recommended deadline was revised to August 15, 2023. The Department has reported it intends to meet this deadline. *See* City's April 25, 2023 Status Letter (dkt. 523) at pg. 4.

[178] As required by the Action Plan, § F, ¶ 3.

2022, or about 5%. This is the lowest number of charges brought since the inception of the Consent Judgment in 2016 when 471 cases were brought among the 4,652 total uses of force, or about 10%. In 2019, when the Department had a similar number of uses of force as 2022 (n=7,169), it brought 1,027 cases for formal discipline (about 14% and more than double the number of cases brought in 2022). The decline in the number of cases brought for formal discipline is a signal of continuing dysfunction and that accountability for use of force related misconduct has declined despite the Monitoring Team's findings that use of force related misconduct did not itself decline in 2022. A chart of the status of disciplinary cases by date of incident is included in Appendix A.

- **Supervisory Accountability in 2022**: During the pendency of the Action Plan, the Department reported the following data on accountability imposed against supervisors for use of force related misconduct, inefficient performance of duties or inadequate supervision:

| Accountability for Facility Leadership and Supervisors, June 2022 to June 2023 | | | |
|---|---|---|---|
| | **Warden** | **Deputy Warden** | **Assistant Deputy Warden** |
| Formal Discipline | 0 | 1 case (involving 1 DW) | 31 cases (involving 18 ADWs) |
| Command Discipline | 0 | 0 | 33 |
| 5003 Counseling | 0 | 0 | 15 |
| Corrective Interview | 0 | 1 | 17 |

Given the volume and pervasiveness of issues regarding the use of force, inefficient performance of duties and inadequate supervision identified by the Monitoring Team during its routine review of incidents, the fact that so few disciplinary actions have been taken against facility leaders and supervisors is troubling. Not only do facility leaders and supervisors serve as role models for expected practice, but they also have an affirmative duty to supervise and correct poor staff practice when it occurs in their presence. The Monitoring Team frequently identifies situations where leaders and supervisors have not upheld these responsibilities and yet no corrective action has been taken. Two such examples are described below.

In a particularly concerning event, multiple staff (including a DW,[179] Captain and three officers) did not follow sound practice or required procedures when responding to an individual engaging in self-harm. This incident is reflective of the Monitoring Team's longstanding concerns regarding self-harm as it demonstrates DOC staff's endemic dismissal and disregard for individuals who are physically hurting themselves without harming other staff and individuals present. The conclusion of ID's investigation was consistent with the available evidence and its conclusion recommending charges was reasonable and consistent with DOC policy and sound correctional practice. Despite the fact that charges were brought against these staff members, the Commissioner absolved those involved from discipline and dismissed the charges based upon "further review of pertinent information documents". Based on a review of the available evidence, the Monitoring Team does not find the reversal to be reasonable, and the fact that one of the individuals was later promoted to a high-ranking position is equally troubling. The fact of their misconduct and the lack of accountability for leaders and supervisors does not bode well for the prospect of reform.

In a second case, in April 2021, a Captain was indicted for criminally negligent homicide (a felony) in the death of a detainee who hanged himself. The Captain ordered officers not to perform potentially lifesaving measures and left him hanging in a locked cell for about 15 minutes. The Captain was convicted of negligent homicide and sentenced in April 2023.[180] At the time of the Captain's arrest, in April 2021, the Captain was suspended for a little over 30 days — 28 days of those suspension days were without pay. The Captain was then placed on modified duty (and paid) for the duration of the case. In Spring 2022, the Department reports the Captains' union objected to the 2021 suspension. In response, on August 22, 2022 the Commissioner rescinded the suspension and the Captain was provided back pay for the time of the suspension. It is unclear why this decision was made. DOC's suspension policy does not place *any* limitations on the

---

[179] The Deputy Warden has subsequently been promoted, most recently to serve as an Assistant Commissioner of Operations.

[180] *See*, D.A. Bragg Announces Jail Sentence of Corrections Captain for Negligent Homicide, https://manhattanda.org/d-a-bragg-announces-jail-sentence-of-corrections-captain-for-negligent-homicide/.

length of time a Captain may be suspended (as long as suspensions occur in 7-day increments). Further, pursuant to NY Administrative Code § 9-112 (Suspension of members of the uniformed force), permits the Department to suspend a uniform staff member without pay for the duration of time that criminal charges are pending. This case is incredibly troubling given both the egregious nature of the misconduct and the Department's failure to reasonably utilize available accountability measures (and reversing course on the limited accountability imposed). This calls into question the Department's commitment to imposing meaningful accountability or in certain cases, any accountability at all.

- **Pending Cases**: As of the end of May 2023, the number of cases pending formal discipline has remained low (although this may be in part due to the decreased number of referrals from ID) but is greater than in December 2022 (440 versus 409). The number of pending cases will, of course, often ebb and flow. Once the required improvements to the investigation process have been implemented, the number of cases referred for discipline is expected to increase, but the Trials Division should be in a position to manage the influx given the reduction in the backlog and its improved staffing level.

- **Civil Service Commission's Ability to Overturn Commissioner's Imposition of Discipline**: A disciplinary decision made by the Commissioner is appealable to the Civil Service Commission which is authorized to make the final disciplinary decision.[181] While in the majority of appeals, the Commissioner's decision is affirmed, the Civil Service Commission recently reversed the Commissioner's decision to terminate a staff member who utilized a deadly chokehold that was found to be both unnecessary and excessive.[182] The Civil Service Commission found, following a motion for reconsideration, that the staff member's "record overall is truly exceptional, such that it warrants a penalty short of termination."[183] That staff member must now be reinstated. The Civil Service

---

[181] The Civil Service Commission opinion notes "[t]his decision constitutes the final decision of the City of New York."

[182] *See*, also, Monitor's April 3, 2023 Report at 105 to 106 and 192 to 193.

[183] The Civil Service Commission agreed that the Respondent engaged in unnecessary and excessive force and falsified his involvement in the case, so there is no dispute about the facts. Further, in its decision on the Motion for Reconsideration, the Civil Service Commission clarified that the lack of injury to the individuals in the incident is "irrelevant to evaluation" of the penalty.

Commission's original determination and subsequent decision on the Motion for Reconsideration raise a number of concerning issues. As an initial matter, the Commissioner's efforts to take the steps required by the Consent Judgment have been undermined by another agency.[184] Further, the question raised by the Civil Service Commission as to whether or not the disciplinary guidelines were in place when the incident occurred (the incident occurred on September 11, 2017 prior to the implementation of the disciplinary guidelines on October 17, 2017) does not absolve the City and Department from implementing a zero-tolerance policy for unnecessary and excessive force, and the Use of Force Policy *was* in effect at the time this misconduct occurred. *See* Consent Judgment, § IV. (Use of Force Policy), ¶ 3(a). Finally, in an egregious case of use of force misconduct such as this one, the fact that the staff member may not have engaged in misconduct previously should not preclude termination. That is illogical. In addition to this individual's return to duty notwithstanding the person's questionable fitness for the job, the reversal of discipline (and particularly, for such dubious and illogical reasons) runs counter to the very goals of the Consent Judgment. The relevant decisions are attached as Appendix G to this report.

*Conclusion*

During the Action Plan's first year of implementation, the Department lost significant ground in its ability to detect misconduct at both the facility and agency level. This has obviously undercut the Department's ability to ensure appropriate and meaningful accountability, and further perpetuates the culture of impunity for the misuse of force that gave rise to the Consent Judgement. This further undermines the significant progress the Department has made in

---

[184] Counsel for the City of New York has reported to the Monitoring Team that the Civil Service Commission is <u>not</u> a City agency despite the fact that the opinion notes it is the "final decision of the City of New York." The City reported that "the CSC is a legally distinct and independent entity. <u>New York v. City Civil Serv. Com.</u>, 60 N.Y.2d 436, 470 N.Y.S.2d 113, 458 N.E.2d 354 (1983). CSC decisions pursuant to CSL 76 are final and are not subject to judicial review. The only way to reverse them is to prove that they are "purely arbitrary," and to show that the decision "contravene statutes or constitutional provisions, or countenance their contravention" N.Y.C. Dep't of Envtl. Prot. v. N.Y.C. Civil Serv. Comm'n, 78 N.Y.2d 318, 323, 574 N.Y.S.2d 664, 666, 579 N.E.2d 1385, 1387 (1991)."

addressing the backlog of disciplinary cases and ensuring that a large number of cases can be processed. The Department's failure to detect misconduct when it occurs thus translates to the failure to hold staff accountable when necessary. The regression in identifying misconduct resulted in 2022 having the lowest number of charges for use of force related misconduct since the Consent Judgment came into effect and the lack of adequate controls on Command Disciplines has resulted in an unreasonable number of cases being dismissed. This has a direct and negative impact on the Department's ability to impose appropriate and meaningful discipline as required by § VIII. ¶ 1 of the Consent Judgment. While the Department's progress on processing its large volume of cases, and reducing the backlog of disciplinary cases, can certainly be leveraged going forward, the regression in accountability for incidents that have occurred since 2022 is concerning and calls into question the City's and Department's level of commitment and ability to achieve compliance with the requirements regarding investigation and accountability of the *Nunez* Court Orders.

# DOC'S MANAGEMENT STRUCTURE
# MANAGEMENT OF NUNEZ COURT ORDERS

The Monitoring Team has consistently reported on the Department's various nonfunctional systems and ineffective practices and procedures which form a deeply entrenched culture of dysfunction that has persisted across decades and many administrations. These deficiencies have been normalized and embedded in many facets of the Department's operation and have served to impede reform efforts. The issues stymying reform are complex, with a number of "problem centers" which are inextricably intertwined and layered. Finding effective and sustainable solutions to such complex problems necessitates peeling back the layers of dysfunction to uncover the core problems and then developing multilateral and multifaceted approaches to correct them. The Department, thus far, has not been able to do so. It has therefore been impossible for the Department to improve the practices targeted by the Consent Judgment without first addressing certain foundational issues. Similar dysfunction characterizes the Department's capacity to manage the reform and its effort to demonstrate its progress toward the requirements of the *Nunez* Court Orders. This section describes the complex and often circular cycle of management dysfunction that has prevented the Department from advancing along the trajectory of reform.

## *DOC's Dysfunctional Management Structure*

The City and Department have attempted to put the jails on a different course for almost eight years under the *Nunez* Court Orders. While progress has been made in some areas, stalled initiatives and regression in other areas have neutralized any real sustained momentum toward reform. The Monitoring Team has observed this cycle for the past eight years across four Commissioners and two City administrations.

142

From the outset, the Department's efforts to reform its dysfunctional practices have moved at a glacial pace. Given the current state of affairs, the Court advised that the Department's work "requires a pace faster than any that [the City and DOC has] managed to achieve so far." *See* April 27, 2023 Status Conference Transcript at pg. 68:17-18. Unfortunately, as discussed in this report, the pace of reform has not accelerated and in fact, has slowed in some areas, and worse, regressed in others. More broadly, the Monitoring Team does not believe there is sufficient evidence to suggest that the pace of reform will accelerate within the confines of the current structures. The management dynamics inhibiting reform are described below.

**State of Crisis**: The Department operates in a near-constant state of crisis such that the concentrated attention and effort needed to reform core practices is constantly being diverted to other issues. Rather than focusing the necessary attention on building strong foundational structures, the Department continues to veer from one crisis to another. Over the last eight years, the Monitoring Team has observed this cycle repeatedly. All correctional systems are confronted with frequent crises, but in the Monitoring Team's experience, functional systems that are committed to reform do not permit the crises to continually derail their reform efforts. The Department has permitted the existence of perpetual crises to divert its focus from the priorities of the *Nunez* Court Orders or used the crises to defend its lack of progress and significant regression in core areas of the *Nunez* reform effort.[185] This is particularly true given that this system has more resources available than almost any other confinement operation with which the Monitoring Team has experience.

---

[185] For example, the Commissioner reported to the Court that the delay in addressing the regression with the quality of ID's work that occurred during his tenure was because "the department was undertaking a number of just complex challenges" and the "[Court must] understand all of the macro issues that [he is] trying to address throughout the whole department." See April 27, 2023 Status Conference Transcript at 23:15-16, 23:25 and 24:1-2.

**Lack of Continuity**: If sustainable reform is the goal, the various initiatives to ameliorate dangerous conditions and improve core practices must endure beyond a single administration. Of course, as new agency leaders are appointed, they must have time to adapt and must have some latitude to initiate their own vision. Further, some amount of trial and error is necessary to develop durable solutions to complex and entrenched problems. Having said that, the Department's work over the past year has often repeated the same cycle the Monitoring Team has seen in the past—initiatives are created, changed in some material way, and then must be restarted. Three such examples of this cycle that have occurred over the past year include the need to improve use of force investigations and corresponding accountability (again), to reconfigure ESU's management and staffing (again), and to rebuild its internal structure for managing the *Nunez* Court Orders (again). At various times, the Department made progress on each of these issues, but either new actors took over and altered the course of the work, or various problems emerged (many of them preventable, few insurmountable) causing the Department to restart the project yet again. Perpetually restarting the clock is antithetical to advancing reform and accelerating progress.

Furthermore, at times, new elements related to issues that must be remediated emerged that needed to be addressed but were not directly related to the core problem that needed to be targeted. For instance, with respect to Staffing, the Monitor's May 11, 2021 Report found the "Department struggles to manage its large number of Staff productively, to deploy them effectively, to supervise them responsibly, and to elevate the base level of skill of its Staff. [The Monitoring Team found] overall Staff assignment is not aligned with the values that undergird the reform effort, such as de-escalation and reliable service provision on the housing units." *At* pgs. 11 and 13. Two years later, these findings are equally applicable to the current state of

affairs. However, during the two years since these findings were made, the staffing crisis occurred, and the Department's focus was diverted to addressing rampant absenteeism. The essence of the recommendation to better deploy, supervise and equip staff for the job lost its priority status and garnered little attention while the Department developed a strategy to return staff to work. One year into the Action Plan's implementation, staff absentee rates have gone down, and certain progress related to improving staff deployment can be identified (*e.g.*, modernizing staff scheduling, improving oversight of sick leave benefits) but other requirements to improve staff deployment have not yet begun, such as reducing the use of awarded posts and optimizing the staff schedules. The Department is also unable to develop any reports regarding the deployment of staff so that patterns and trends can be identified, which is a foundational step in conducting an analysis and revisiting the strategy for staff deployment.

**Lack of Elementary Skills**: In this Department, steps to improve practice are often undercut by staffs' lack of elementary skills and lack of understanding of basic correctional practices. This leaves the Department at an impasse—in a place where many of the requirements of the Consent Judgment are simply unattainable, and even the more basic requirements of the *Nunez* Court Orders are inaccessible because the basic foundations needed to improve practice either do not exist or are too weak to incorporate and sustain the necessary changes. An example of this is the Department's effort to address the requirements of the Second Remedial Order and the Action Plan related to Intake. While the Department has made progress in managing intake, it still appears unable to ensure that accurate, reliable data is maintained, to effectively track the process (particularly inter/intra facility transfers, and to identify and expeditiously rectify problems that emerge. Additional work is needed to ensure that data related to intake arrival/departure times are properly tracked in ITS to ensure individuals do not languish in

intake. This initiative has taken far longer than expected due, at least in part, to the lack of basic data entry skills and poor supervision at the facility level compounded with other management issues.[186]

**Inability to Identify and Address Problems Proactively**: Over the past eight years, the Monitoring Team has had to identify and report on obviously deficient practices in order for the Department to recognize the problems and determine how to fix them. It is a core responsibility of the Monitoring Team's work to provide an objective and neutral assessment of the current state of affairs. The hope of any reform effort is that this function will become an *internal* capacity to identify and solve problems; however, to date, the Department has not demonstrated an ability to perform this function on its own. The most glaring example of this over the past year is the Department's inability to identify its significant regression in conducting use of force investigations. Whether it can ultimately address and sustain progress in restoring the Investigation Division's ("ID") work remains to be seen.

Despite the alarming regression in ID's functioning and the significant reduction in accountability for misconduct that occurred in 2022, the Department's initial response was lackluster, insufficiently robust and did not appear to appreciate the depth of the problems,[187] and how it significantly reduced the Department's ability to hold Staff accountable for misconduct that *occurred* in 2022. Since the inception of the Consent Judgment, almost eight years ago, the *lowest* number of charges for use of force related misconduct were brought in 2022, despite an increase in the number of use of force incidents over this time and there has been no change in

---

[186] The Monitoring Team's site work in April, May, and June 2023 identified certain lapses in tracking individuals in intake, as discussed in the Management of Incarcerated Individuals section of this report.

[187] *See* Monitor's April 24, 2023 Report at pgs. 2 to 3.

practice to suggest that a reduction in accountability is because there is less misconduct; in fact the opposite is true. This fact is often obfuscated by the Commissioner and Department's repeated reports about the significant progress in eliminating the disciplinary backlog (which is laudable), but ignores the fact that the Department's ability to impose timely and meaningful discipline for use of force related misconduct occurring *now* has been severely compromised. Unlike many of the issues the Commissioner faced when he took office, this particular problem was the result of actions taken by this Commissioner and a Deputy Commissioner that he appointed. It is one example where progress toward compliance markedly deteriorated during his tenure.

**Department Action Taken Only Following Public Reporting**: During spring 2023, the Department elected to take action on at least three notable issues *only* right before or right after the filing even though the Monitoring Team briefed the Department well in advance and sought to engage in problem-solving efforts in real-time.[188] First, the Department addressed the Monitoring Team's concerns regarding ID's leadership and performance just one day before the Monitor's April 3, 2023 Report was filed, despite the Monitoring Team having initially raised the issue in December 2022. Second, the Department only started addressing the Monitoring Team's concerns regarding ESU's management and staffing three weeks *after* the Monitor's April 3, 2023 Report was filed, even though these issues had been raised repeatedly before and during the pendency of the Action Plan (beginning in June 2022). Finally, the Department appointed a *Nunez* Manager on June 9, 2023, just days before the June 13, 2023 Emergency Court Conference, despite the fact that the Monitoring Team had been recommending that the Department fill this position for months.

---

[188] *See* Monitor's April 24, 2023 Report at pgs. 2 to 3.

**Candor and Transparency Issues with the Monitoring Team:** In response to the
Monitoring Team's concerns about the quality of communication with the Department, the
Department frequently cites the fact that it produces a large volume of information to and is in
frequent contact with the Monitoring Team. Both assertions are true. The Department has
provided a large volume of documents to the Monitoring Team *since the inception of the
Consent Judgment* and under every Commissioner. Given the original size and increased scope
of the *Nunez* Court Orders, the fact that the Monitoring Team must make a significant number of
requests for information in order to fulfill its responsibilities is not surprising. The Monitoring
Team is very cognizant of the work involved and continues to make efforts to obtain information
as efficiently as possible to minimize the burden on the Department.[189] The Department's
implication that the production of a significant amount of information means there is no issue
with information-sharing ignores the Monitoring Team's concerns about the *quality and
timeliness* of information provided. The Monitor's recent reports are replete with examples of
these problems, and reveal a concerning trend in which consultation does not occur, information
is not provided and when information is provided to the Monitoring Team it is vague, inaccurate,
or incomplete based on facts known to the Department (or that reasonably should have been
known) at the time the report was made.[190] This is particularly concerning given that, in some
cases, the information came from the Commissioner and other high-ranking officials. The
Monitoring Team's subsequent inquiries revealed (1) premature conclusions about Departmental

---

[189] For instance, the number of requests by the Monitoring Team has actually decreased over the last three
years as the Monitoring Team has worked to further leverage certain routine reports and other information
produced.

[190] *See* Monitor's December 6, 2021 Report (Monitor's Twelfth Report) noted at pg. 121-122, Monitor's
March 16, 2022 Report at pgs. 24 to 29, Monitor's April 3, 2023 Report at pgs. 113 to 115, Monitor's
May 26, 2023 Report, Monitor's June 8 2023 Report at pgs. 15 to 38, and Monitor's June 12, 2023 letter
(dkt. 544) at pgs. 1 to 2.

wrongdoing, (2) the perpetuation of inaccurate information, and (3) multiple failures to provide timely, accurate and complete information. The significant regression in the accuracy, thoughtfulness and responsiveness of the information provided requires significant follow-up from the Monitoring Team. Furthermore, the Department now takes much longer to produce information than it has in the past. Finally, the Department does not generally provide information proactively, which means the Monitoring Team must constantly request status updates to ensure the Monitoring Team is aware of actions the Department is taking to comply with the *Nunez* Court Orders. The Department simply fails to appreciate and address the significant regression in the *quality, timeliness, and proactive sharing of information.*

**Lack of Context when Describing the Current State of Affairs**: The City and Department have frequently reported that they agree with the Monitoring Team's findings,[191] but recent public reporting and statements from the City and Department raise serious questions as to whether they truly embrace the need for transparency, accountability, and oversight. For instance, the Commissioner appeared to suggest that the Monitoring Team should not file the May 26, 2023 Special Report[192] because it will cause "great harm [to the Department] at a time

---

[191] *See* for example, the City's April 25, 2023 Status Letter to the Court noting "[t]he Defendants appreciate the Monitor's exhaustive and analytical status report submitted on April 3, 2023 ("Report"), and generally agree with its assessments." at pg. 1 (dkt. 523); on March 1, 2023, the Commissioner stated "[t]he Monitor and his Deputy have been overseeing the Department for a number of years and they have a keen sense of the challenges that exist in the Department." MANHATTAN INSTITUTE, Rescuing Rikers: Fireside Chat with Louis A. Molina, available at https://www.youtube.com/watch?v=sESzluNYXeI at 24:28; the City's November 17, 2022 Status Letter to Court noting "Defendants appreciate the Monitor's status report submitted on October 28, 2022 (Dkt. 472), generally agree with its contents and assessments, and share the Monitor's concerns about the work that remains to be done." at pg. 1 (dkt. 476).

[192] At the April 27, 2023 Status Conference, the Court "direct[ed] the monitoring team to file additional special reports if necessary should exigent circumstances present themselves, including if defendants fail to remain adequately engaged with the monitoring team and appropriately committed to implementing sustained reform." *See* Transcript of April 27, 2023 Status Conference Transcript at pg. 69 lines 14 to 17.

when we are making great strides [and] will fuel the flames of those who believe that we cannot govern ourselves." [193]

The Department repeatedly offers the fact that the current administration inherited significant problems and dysfunction as a reason for the lack of progress. This is true in some respects. In fact, all four Commissioners over the past eight years "inherited" a dysfunctional system. The Monitoring Team appreciates the context and background of what gave rise to the current state of affairs, and certainly recognizes the complexity of the task. But such references to a prior administration's deeds and "macro issues" (*e.g.*, COVID) merely serve to deflect attention from the fact that the City and Department have an unequivocal responsibility to address the problems and ensure the safety of those in their custody.

The Monitoring Team fully appreciates the importance of acknowledging progress in managing the Department and has acknowledged all indications of progress in each of its reports to date.[194] However, discussions about what has been accomplished must be balanced and must not overstate progress where it is not warranted, especially with regard to the level of safety in the jails. Such overstatements normalize the imminent risk of harm and/or minimize the dangerous state of affairs. The City's and Department's apparent lack of perspective is troubling and further compounded by the Department's inability to self-correct and its defensiveness when concerns are raised that the Department is failing to take necessary action on urgent matters.

---

[193] *See* letter from Commissioner to Monitor, dated May 26, 2023, in Appendix F of this report.

[194] *See*, for example, Monitor's April 20, 2022 Status Report (dkt. 445) at pgs. 2 to 3; Monitor's June 30, 2022 (dkt. 467) at pgs. 1, 8, 10 to 11, 18 to 19, 30 to 34; Monitor's October 28, 2022 Report (dkt. 472) at pgs. 7 to 9, 32 to 33, 57, 80 to 81, 99 to 100; Monitor's April 3, 2023 Report (dkt. 517) at pg. 1, 3 to 4, 34, 40, 128 to 129, 131 to 132, 220. *See also*, April 26, 2022 Status Conference Transcript at 10:20-11:8, 54:15-24, 55:13-56:18; November 17, 2022 Status Conference Transcript at pgs. 48:8-50:22; and April 27, 2023 Status Conference Transcript at pgs. 9:21-10:21.

Concerning examples of the lack of context and clarity are demonstrated by two recent videos produced by the Department. These two videos, one of which was presented to new recruits and the other to be used in training courses for staff reflect the lack of context and clarity regarding the Department's responsibilities in reforming the dire conditions in the jails and a lack of understanding that, at their core, the *Nunez* Court Orders mandate significant changes to staff practice.

- On May 19, 2023, the Department publicly posted a video that was played at the new recruit graduation ceremony.[195] The video includes themes about challenging and improving oneself, which are certainly appropriate messages. However, the video *exclusively* depicts confrontational situations such as the use of probe teams, the use of OC, and images of firearms. The video does not promote the need for staff to utilize interpersonal communication skills, to solve problems and avoid escalating them, nor does it mention the Department's ongoing effort to reform its culture. Below are two illustrative images from the video that was posted on DOC's public social media page:



---

[195] New York City Department of Correction [@jointheboldest]. "*Check out our video that we played this morning at our recruit graduation ceremony at the NYPD Academy.* [Video]." Instagram. https://www.instagram.com/p/Csbf6ywg7gE/?hl=en.



- On June 16, 2023, the Department provided the Monitoring Team with a video that it produced and had begun to use in its training courses (notably with ESU/SRT) for both recruits and veteran staff. The video features an agency leader describing the *Nunez* Consent Judgment and its original requirements (*e.g.,* new Use of Force policy, increased programming, investigations and staff discipline, body worn cameras, criteria for promotion, and increased training), along with the requirements of subsequent Remedial Orders (*e.g.*, self-harm, staffing, sick leave). Toward the end of the video, the speaker emphasizes that "*Nunez* is not a 'no use of force policy' or a 'no use of force decree'" and comments that those in custody are "among the most dangerous in the city" and thus "there will be occasions when force is necessary." While the Monitoring Team has long supported the safe, well-timed, properly executed use of force that is proportional to the extant level of threat, the video's message lacks appropriate nuance, particularly when commenting on what the *Nunez* Court Orders prohibit. Statements such as "What *Nunez* means is force can never be unnecessary or excessive" and "Never use force when it is excessive" do not provide staff with the necessary framework for determining *when* and *how* to use force appropriately and instead distill the essential staff responsibility to a superficial, rather unintelligible slogan. Further, commentary that the individuals in custody "are among the most dangerous in the city" only serves to incite staff.[196] The content of this video calls into question the extent to which the Department takes its obligation to radically change staff practice seriously. The Leadership, Supervision, and Training section of this report provides a detailed account regarding the Department's lack of consultation with the Monitoring Team on this video.

Recent public statements by Department leadership and the Mayor of New York City have also demonstrated the failure to appreciate the current state of affairs. In these statements, these leaders lauded the Department's progress during the past year without appropriate context

---

[196] A transcript of this video is included as Appendix D.

and have thus minimized the jails' grave conditions and the current level of ongoing harm to people in custody and staff. A non-exhaustive list of examples is shared below:

- In late May 2023, the Commissioner released a statement to the media noting that "[o]ver the last 18 months, [the Department has] dramatically reduced violence [and] Rikers Island [is] safer for every person in our custody and every single officer. Simply put, the Department of Correction is in a much better place today than it was during the last administration. [Department leadership] have brought this organization back from the brink of collapse and we will not be deterred in continuing our good work."[197] Such a statement does not provide an accurate description of the state of affairs, which remain volatile and unsafe for incarcerated individuals and staff alike. Further, such statements are clearly belied by the record in this case and disregard objective data as reported by the Monitoring Team. There is no objective basis to conclude that violence has been *dramatically* reduced or the jails are *safer*. The jails remain unsafe for incarcerated individuals and staff.

- On June 8, 2023, the Department released a statement noting that the Monitor's June 8, 2023 Report "appears to move the goalposts by focusing on data from the six-year period prior to this administration."[198] This claim appears to be an attempt to obfuscate the Monitor's findings. Every Monitor's report to date has compared outcomes to the inception of the Consent Judgment, including every Monitor's report written since 2022 when the new administration took office.[199] The City itself conceded to the Court that "the City is an institutional defendant [in the *Nunez* litigation] and that failure by the institution to take meaningful action over the last six years [from November 2015 to May 2022] cannot be ignored." *See* May 27, 2022 Status Conference Transcript at pgs. 42, 23:25 and 43, 1.

- On June 8, 2023, the same day the Monitor's report was filed, the Mayor of New York City and the Commissioner made public comments (which were published on June 9 and June 12, 2023) suggesting that the Monitoring Team's concerns related to five serious incidents and the overall conditions in the jails were somehow inappropriate.[200] The Monitoring Team

---

[197] *See* Courtney Gross, Report reveals violent, life-altering incidents the last two weeks at Rikers, NY1, https://www.ny1.com/nyc/all-boroughs/news/2023/05/27/report-reveals-violent--life-altering-incidents-at-rikers.

[198] *See* Courtney Gross, Federal monitor criticizes department again for lack of transparency, NY1, https://www.ny1.com/nyc/all-boroughs/politics/2023/06/08/federal-monitor-criticizes-department-again-for-lack-of-transparency.

[199] *See* Monitor's March 16, 2022 Report at pgs. 13 to 15; Monitor's June 30, 2022 Report at pg. 13; October 28, 2022 at pgs. 60 to 65; Monitor's April 3, 2023 Report at 37 to 38 and 47 to 52.

[200] *See* Dean Moses, EXCLUSIVE| Correction commissioner, Mayor Adams show Rikers Island security videos in effort to counter federal monitor's claims of misdeeds, amNY, https://www.amny.com/police-fire/rikers-island/exclusive-correction-commissioner-mayor-adams-show-rikers-island-security-videos-in-

believes that such comments reflect a failure to fully to appreciate the Monitoring Team's findings in every report to date which have noted unsafe and dangerous conditions. The circumstances at issue were not new nor were they tied specifically to the five incidents being discussed at the time. The City itself contends that conditions are unsafe as it has filed Emergency Executive Orders every five days since September 21, 2021.[201] To suggest that the concerns the Monitor raised in his report were "absurd" and the Department's responses to these five incidents reflected "great discipline," "great patience," and "professionalism" fails to appreciate the objective evidence and even in some cases, the Department's own findings of wrongdoing. [202] Further details are discussed in the Security, Violence and Use of Force section of this report and included in the Monitor's June 12, 2023 Letter (dkt. 544).

**Shifting Positions of the City and Department**: As noted in the Monitor's recent reports to the Court,[203] the City's and Department's position on certain issues (*e.g.*, ESU leadership, awarded posts, *Nunez* Manager) changes frequently and information is sometimes misrepresented or later determined to be inaccurate. This makes it difficult for the Monitoring Team to provide fulsome, accurate accounts of the Department's progress to the Court. A series of examples were outlined in the "Failure to Follow Through on Commitments to the Court or Provision of Incomplete, Misleading and Inaccurate Information to the Court" section of the Monitor's June 8, 2023 Report at pgs. 23 to 26.[204] A second such example is outlined in detail in the Monitor's June 12, 2023 Letter to the Court (dkt. 544) at pgs. 1 to 2.

---

effort-to-counter-federal-monitors-claims-of-misdeeds/. *See* also, Marcia Kramer, CBS2 gets exclusive look at Rikers Island security tapes mentioned in federal monitor's scathing report on city jail, CBS New York, https://www.cbsnews.com/newyork/news/rikers-island-security-tapes-federal-monitor-scathing-report-government-eric-adams/.

[201] *See*, e.g. Mayor's Executive Order 449 signed on July 4, 2023 at https://www.nyc.gov/office-of-the-mayor/news/449-003/emergency-executive-order-449.

[202] *See* letter from Commissioner to Monitor, dated May 26, 3023, in Appendix F of this report.

[203] *See* Monitor's June 8, 2023 Report at pgs. 15 to 38.

[204] The Monitoring Team is aware of the City's June 12, 2023 letter to the Court (dkt. 548) in which it reports that "the Law Department's attorneys would not knowingly make any misrepresentations to the Court, and we have not done so in this matter" related to the findings on pgs. 23 to 26 of the Monitor's June 8, 2023 Report. As an initial matter, certain findings in this section relate to statements made by the Department, and not the Law Department. Second, with respect to information provided by the Law Department on behalf of its client (the Department), the Monitoring Team has no basis to conclude, nor

The Commissioner's purported commitment to transparency and his direction to staff regarding their engagement with the Monitoring Team also suffers from this same lack of clarity and consistency. On May 26, 2023, in the Commissioner's letter to the Monitor, he advised that the Monitoring Team would not be permitted to speak with certain staff to obtain a briefing because "[b]riefings on ongoing investigations are hardly the norm," and because the Commissioner "[does not] know what [the Monitor] would expect [from a briefing]"[205] and further that information about in-custody deaths would not be provided because "[i]t is not a requirement under the Consent Decree or the Action Plan" to provide it.[206] Then, about two weeks later at the June 13, 2023 Emergency Court Conference, the Commissioner represented to the Court that "if I believe even that there is even a 1 percent chance that it might intersect with the work of the core mission of [the Consent Judgment], I have encouraged my staff to confer with the monitor or a member of the monitoring team. That is still ongoing [as of June 13, 2023]." At pg. 34, 24:25 and pg. 35, 1:3. Despite this claim, the very next day the Monitoring Team learned that the Department elected to proceed with training programs for the ESU/SRT teams *and* to promote the newest ADW class without providing the Monitoring Team the requested training materials or consulting on its contents. Further, the video providing an overview of the *Nunez* Court Orders and the use of force policy (discussed above) was not

---

did the report allege, that the Law Department knowingly made misrepresentations. However, this does not alter the fact that some information provided to the Court by the Department (via the Law Department) could not be verified by the Monitoring Team. In fact, the City's June 12, 2023 letter only serves to underscore the Monitoring Team's concern about shifting positions and information flow between City and Department officials and the Law Department.

[205] *See* letter from Commissioner to Monitor, dated May 26, 3023, in Appendix F of this report.

[206] The Monitoring Team contends it is entitled to access to such information as described in the Monitor's June 8, 2023 Report at pgs. 25 to 29. The City subsequently reported to the court that "not reporting a death in custody pursuant to that request was an error." June 13, 2023 Emergency Conference Transcript at pg. 44, 24:25.

provided to the Monitoring Team in advance nor was the Monitoring Team consulted on its substance. Despite the Monitoring Team's requests to review training content and the obvious connection to the Monitoring Team's work, the Department did not seek consultation.

Recently, in late June 2023, the Department publicly reported on social media that "Commissioner Molina relaunched bi-weekly TEAMS (Total Efficiency Accountability Management System) meetings [to bring] leadership from across the uniformed and civilian ranks together to share best practices, improve training, evaluate facility performance, and increase accountability by using data and metrics and translating them into strategic, actionable solutions."[207] The public statement went on to report that the meetings purportedly focused on "the significant drop in violence, including a 36% decrease in slashings and stabbings calendar year to date, decreases in assaults on staff and injuries to people in custody, and dramatic increases in court production."[208] The Commissioner's efforts to revamp and reinstate these meetings which address specific requirements of the *Nunez* Court Orders is laudable, however, the Monitoring Team has raised questions regarding the Department's assessment of its data as discussed in the Security, Violence and Use of Force section of this report.[209] In the past (and during the period of time when the now Commissioner served as the Chief Internal Monitor), the Monitoring Team observed these meetings routinely.[210] The Department's three prior Commissioners extended an open invitation to the Monitoring Team to observe these

---

[207] New York City Department of Correction [@jointheboldest]. "This week Commissioner Molina relaunched biweekly TEAMS (Total Efficiency Accountability Management System) . . ." Instagram. https://www.instagram.com/p/Ct2F06hMIhe/?hl=en.

[208] *See*, id.

[209] *See*, also, the Monitoring Team's findings regarding the First Remedial Order, § A, ¶ 2 outlined in prior reports.

[210] *See* for example the Monitor's 3rd Report at pg. 161; Monitor's 5th Report at pgs. 22 to 24; Monitor's 11th Report at pgs. 108 to 110; Monitor's 12th Report at pgs. 42 to 43.

meetings.[211] However, the Monitoring Team was not advised (before or after) that these meetings had been reinstated and were occurring, has not been consulted about the data and metrics being utilized, and only learned that the meetings had been relaunched through public reporting by the Department. Such a deviation in practice clearly does not comport with the Commissioner's claims of openness and transparency with the Monitoring Team.

The lack of notification and consultation on matters directly related to the *Nunez* Court Orders, in particular, data, metrics and other considerations to identify areas of weakness or progress related to the core goals of *Nunez* only serves to inhibit the work necessary to advance the reforms under the *Nunez* Court Orders. A number of other examples in which Department leadership failed to consult with the Monitoring Team on issues that are clearly *Nunez*-related (e.g., use of force practices with those who refuse court and the use of restraints in ESU-Level 1) are outlined in this report and in the Monitor's June 8, 2023 Report (e.g. at pgs. 22 and 34). The Commissioner's and the Department's actions simply do not align with his stated commitment to fully engage with the Monitoring Team.

**DOC's Inability to Manage the *Nunez* Court Orders and Lack of Transparency**: In the year since the Action Plan was put into effect, the Department's accuracy, transparency and collaboration with the Monitoring Team has markedly deteriorated. The Department's approach to working with the Monitoring Team began to falter in Fall 2021 and, during that Monitoring Period, the Department was downgraded to Partial Compliance with Consent Judgment §XVIII, ¶ 3[212] (*i.e.*, requiring an individual to coordinate compliance and to serve as the point of contact

---

[211] For a time, from Fall of 2022 to Spring 2023, the Department invited a representative of the Monitoring Team to observe its weekly meetings regarding the Action Plan. However, these meetings ceased in Spring 2023.

[212] *See* Monitor's 12th Report at pgs. 121-122

with the Monitoring Team) after having been in Substantial Compliance for the previous 11

Monitoring Periods. The collaboration with the Monitoring Team further devolved in early 2022

with the transition to the current Department leadership.[213] Some improvement to the

Department's position on information-sharing and willingness to collaborate was observed

following the issuance of the Monitor's March 16, 2022 Report, but these improvements were

not sustained.[214] In late 2022 and early 2023, similar problems re-emerged[215] and have since

intensified, as reported in the Monitor's June 8 and 12, 2023 Reports.[216] Key problems include:

- failing to provide the Monitor with the full and complete information necessary to perform his responsibilities,

- deflecting attention and providing inconsistent, inaccurate, incomplete or misleading information to the Monitoring Team and to the Court,

- data errors and poorly vetted information provided to the Monitoring Team,[217]

- failing to follow-through on commitments made to the Court,

- making premature conclusions, while not providing the underlying facts to the Monitoring Team,

- failing to consult and collaborate with the Monitoring Team on *Nunez*-related policies and practices,

---

[213] *See*, Monitor's March 16, 2022 Report at pgs. 24 to 29.

[214] *See* Monitor's April 4, 2022 Report at pgs. 3-4 noting *some* improvements but reiterating its March 16, 2022 recommendations regarding the Department's approach to working with the Monitoring Team. *See also* April 26, 2022 Status Conference Transcript at pg. 11, lines 4 to 8 and pg. 55, lines 13 to 17; Monitor's October 28, 2022 Report at pgs. 7 to 9; November 17, 2022 Status Conference Transcript at pg. 65, lines 12 to 22.

[215] *See* Monitor's April 3, 2023 Report at pgs. 113 to 115

[216] *See* Monitor's June 8, 2023 Report at pgs. 15 to 38, Monitor's June 12, 2023 letter (dkt. 544) and discussed at the June 13, 2023 Emergency Conference Transcript at pgs. 14 to 15.

[217] The Monitoring Team acknowledges that data entry errors can and do occur. However, certain data issues were identified only after significant follow-up from the Monitoring Team and were the result of the Department's failure to take reasonable steps to ensure the data were accurate. For example, the data regarding awarded posts was not internally vetted for over a year, despite repeated follow-up from the Monitoring Team. These large-scale problems cannot simply be deemed purported "errors" as contended by the City at the June 13, 2023 Emergency Court Conference Transcript at pg. 30, 20:25.

- failing to encourage staff to cooperate with the Monitor,

- dwindling resources assigned to *Nunez* matters,

- poor internal coordination on *Nunez* matters,

- inability to produce complete and relevant information, and to properly manage deadlines and priorities.

The number of actions taken, across various divisions and actors within the Department, that do not comport with the *Nunez* Court Orders is distressing. The Commissioner previously served as the Chief Internal Monitor and Acting Commissioner of the *Nunez* Compliance Unit so his knowledge of the *Nunez* Court Orders' substance is irrefutable. There is simply no reasonable basis for Department's leadership to claim confusion or lack of awareness of the *Nunez* Court Orders, or for failures to seek guidance if there is ambiguity. These issues directly inhibit the Department's ability to advance the reform effort.

As a result of these issues, the Monitoring Team proposed that the Court issue an order to further clarify the City's and Department's obligations to work with the Monitor so they may fulfill their responsibilities. At the June 13, 2023 Emergency Court Conference, the City acknowledged "errors"[218] in its management of the *Nunez* matter and consented to the entering of an order (with a few noted exceptions).[219] In entering the June 13, 2023 Order, the Court found that "it is unfortunately necessary to clarify and, again, underscore the responsibilities [of the Monitor] that have been imposed by orders that have been in place for years and more recent orders. But to the extent there are any ambiguities and to the extent that specifics of timing and execution of methodology of responsibilities is necessary to make sure that we are all clear, it is appropriate and it is necessary." *See* June 13, 2023 Emergency Court Conference Transcript at

---

[218] *See*, e.g., June 13, 2023 Court Transcript at pg. 44, 24:25.

[219] The City had three noted objections to § I. ¶¶ 1 and 7.

pg. 85, 11:18. The fact that a Court order was necessary to compel the Department to properly

collaborate with the Monitoring Team nearly eight years after the Consent Judgment went into

effect raises significant questions about the City's and Department's commitment to reform.

While the June 13, 2023 Court Order has resulted in some progress in the Department's work

with the Monitoring Team, the Department still continues to fail to consult and seek approval

from the Monitor as required (*e.g.* in early July the Commissioner authorized the use of three

point restraint without consulting or seeking approval from the Monitor as discussed in the

Management of Incarcerated Individuals section of this report) and the Monitoring Team must

continue to rely on public reports to obtain relevant information (*e.g.* on July 7, 2023, the

Monitoring Team only learned about the total number of individuals promoted to ADW through

DOC's public social media content as discussed in the Leadership, Supervision and Training

section of this report).

*Department's Efforts to Address the Monitoring Team's April 2023 Recommendations*

     In April 2023, as outlined in the Monitor's April 3 and April 24, 2023 Reports, the

Monitoring Team made a number of recommendations to facilitate progress on various initiatives

in the Action Plan (collectively the "April 2023 Recommendations").[220] At the April 27, 2023

Status Conference the City reported that "[t]he department has agreed on deadlines for meeting

specific recommendations with the monitor and will carefully work with the monitor on all of the

others. The way to keep the results moving in the right direction, as they are right now, is to let

the teamwork of Commissioner Molina and his staff and the monitoring team continue." *See*

April 27 Status Conference Transcript at pg. 17, 18:23. Further, the Deputy Monitor explained to

---

[220] A comprehensive chart of these recommendations was filed with the Court on April 28, 2023 (dkt. 527).

the Court that the Monitoring Team's "engagement with the department since [the Monitoring Team] submitted the recommendations, both after the April 3 report and actually, in fact, after the April 24 report, has been strong." *See* April 27 Status Conference Transcript at pg. 67, 1:4. The City acknowledged that "we'll have an opportunity to, you know, take remedial steps" should the Monitoring Team report that the City or Department refuse to do the work required by the *Nunez* Court Orders. *See* April 27 Status Conference Transcript at pg. 52, 16:25.

Unfortunately, the Department has not sustained an adequate level of engagement in addressing the April 2023 Recommendations, albeit with certain exceptions (*e.g.,* addressing the issues related to investigations). The Monitoring Team has attempted to engage the Department to advance its efforts to address the April 2023 Recommendations, but the Department has made little progress. The Department's approach to the April 2023 Recommendations is emblematic of many of the issues outlined in this section of the report. For instance, the Department has repeatedly advised that other emergent issues and limited resources have inhibited its ability to timely address the recommendations and actively engage and consult with the Monitoring Team. In addition, despite a commitment to provide the Monitoring Team with a "detailed plan" for how the Department would address the recommendations, in most cases, the plan that was produced did not provide fulsome information about *how* the Department will address the recommendations. Instead, the Department's response either reported on recent events (*e.g*., that a meeting occurred) or made only vague statements that the Department intended to adopt the recommendation or is working to develop a solution. For instance, in response to the recommendations regarding Security Initiatives, the written response with a "plan" simply noted that the Security Manager "provided [the Monitoring Team] a demonstration of the OC Dashboard on 5/10/23" and that roll call trainings have occurred with supervisors. No

overarching plan on what concrete steps will be taken has been provided. In another example, in response to the April 2023 Recommendation that the screening policy must be revised, the Department reported that the revision "would be completed before the next round of promotions," even though the next round of promotions had not been scheduled at the time.[221] Ultimately, as discussed in other sections of this report, the Department failed to update its policy before the next round of promotions, and only after considerable prodding by the Monitoring Team did the Department agree it will now update its policies and procedures (although the timeframe for completion is unknown).

Further, despite the Monitoring Team's repeated requests for timelines to be attached to each recommendation to ensure these initiatives move forward, almost none have been provided and to the extent a timeline was provided the Department has generally failed to meet the date it proposed. It is also unclear, for many of these recommendations, whether any specific individual with operational expertise has been assigned the responsibility for addressing the recommendation and whether there is any concrete plan about how recommendations are to be addressed.

The Department shared an update on its efforts to address the April 2023 Recommendations on June 26, 2023, a month after the Monitoring Team shared its feedback. While additional information was provided, most of the responses suffered from the same issues described above. Further, consistent with the Monitoring Team's experience with the Department on many issues, the Department reports that it has assigned a *new* person to address the issue and a *new* plan is now underway. For instance, with respect to screening, the *Nunez*

---

[221] It was subsequently learned that a group of ADWs would be promoted in mid-June 2023, followed by a class of Captains in July 2023.

Manager will now manage that process. The Monitoring Team certainly welcomes the leadership

of the *Nunez* Manager (and others) to address these issues, but remains cautious as to whether

this will result in any forward movement on the issue given the Department's history, including

over the last year of the Action Plan, of unfulfilled promises and lack of sustained reform efforts.

Overall, the Department's efforts to address the April 2023 Recommendations are

languishing. This is particularly disappointing given the Court's statement that it will be "very

unpleasantly surprised if [the Court] hear[s] from the monitoring team that the recommendations

are not being taken seriously and moving forward at the necessary rapid pace." A chart of the

current status of the April 2023 Recommendations is provided in Appendix C of this report. The

Monitoring Team continues to maintain that the Department's adoption of the April 2023

Recommendations are necessary to support advancing the reforms. Given the limited progress in

advancing these recommendations through this process, the Monitoring team has recommended

that the Court direct the City and Department to address certain priority items, outlined in the

Conclusion of this report, to ensure that the City and Department take the necessary action on

these items without further delay.

### *Update on Issues Discussed at the June 13, 2023 Emergency Court Conference*

Since the June 13, 2023 Emergency Court Conference, the Department has taken a
number of actions:

- ***Nunez* Manager**: On June 14, 2023, the Monitor approved the selection of the *Nunez*
  Manger pursuant to the June 13, 2023 Order, § I, ¶ 7. For years, the Monitor and Deputy
  Monitor have had an extensive and productive working relationship with the individual
  serving as the *Nunez* Manager that even pre-dates the execution of the Consent Judgment.
  The Monitor found that the individual possesses the necessary expertise in the
  requirements and provisions of the *Nunez* Court Orders and is suitable for the role as the
  *Nunez* Manager. In just a few weeks, the *Nunez* Manager has proven to be open and

transparent, adept at the role, and has facilitated the advancement of initiatives within the Department, provided critical assistance to the Monitoring Team, and overall demonstrated the value and need for this role to support the Department's work to achieve compliance with the *Nunez* Court Orders. It must be emphasized that the *Nunez* Manager's anticipated workload will require the Department to assign additional staff and resources to ensure that she can fulfill her responsibilities. The Monitoring Team strongly recommends the City and Department ensure the *Nunez* Manager has any necessary resources as soon as possible. The work of the *Nunez* Manager will certainly support and facilitate coordination of *Nunez* matters across the agency and facilitate the Monitoring Team's ability to fulfill its responsibilities. However, the presence of the *Nunez* Manager does not resolve the management, security, operational, and implementation issues discussed throughout this report and others, which must be adopted and addressed by the individuals actually responsible for operating and managing the Facilities.

- **Communication to All Staff**: On June 15, 2023, the Monitor approved the communication to all Department leadership and staff regarding their obligations under the *Nunez* Court Orders, pursuant to the June 13, 2023 Order, § I, ¶ 1. The Monitoring Team was consulted on the substance and provided input that was considered and incorporated prior to the communication being finalized and distributed. On June 15, 2023, the communication was emailed to all staff who have an assigned email account. However, not all staff have an email address, so the Department reports it will mail copies to approximately 2,400 staff who do not have an email address by July 20, 2023.

- **Notification of Deaths In-Custody and Compassionate Releases in 2023**: An update on the information provided to the Monitoring Team pursuant to § I ¶ 2 of the June 13, 2023 Order is outlined in the Security, Violence and Use of Force section of the report.

- **Immediate Notification to the Monitor of Serious Events**: The *Nunez* Manager has been advising the Monitoring Team of serious injuries or serious conditions that require admission to a hospital.

- **Department-Wide Remedial Steps to Address the Five Incidents Discussed in the May 26, 2023 Special Report**: The Department is consulting with the Monitoring Team on updating its existing policies to address individuals who are unclothed and revising

procedures to require that an incarcerated individual who is involved in a violent encounter should be seen at the clinic on an "urgent basis." With respect to installing a preventive barrier, the Department reports that it would like to install the barrier and is in the process of seeking approval from the State Commission of Correction for the construction.

- **Policy Vetting**: The Department reported that the *Nunez* Manager will now vet all new policies prior to their promulgation to ensure *Nunez*-matters are properly considered and that the necessary consultation with the Monitoring Team occurs.

- **Recent Issues Regarding Consultation and Collaboration**: Overall, the appointment of the *Nunez* Manager has helped to improve the facilitation of information to the Monitoring Team. However, the Department is still struggling to adequately engage with the Monitoring Team even after the entry of the June 13, 2023 Order. This report includes a list of critical areas in which the work of various Department officials is not consistent with the *Nunez* Court Orders, the work is languishing when the pace should be accelerated, and consultation and collaboration with the Monitoring Team is still not occurring. It is also deeply disturbing that even after the issuance of the Court's June 13, 2023 Order that the Department continues to fail to consult with the Monitoring Team as required (*e.g.* on its restraint policy) and fails to provide complete and accurate information to the Monitoring Team. It remains troubling that the Monitoring Team continues to *first* learn about *Nunez* related matters via public reporting.

## *Conclusion*

The cyclical dynamics outlined in this section of the report means that on balance, the Department continues to operate in a persistent crisis mode and lacks a clear and overarching plan of action for implementing the changes necessary for achieving reform.

# OVERARCHING INITIATIVES RELATED TO REFORM

A number of overarching initiatives are necessary to support the reform efforts underway. These include the work of the City's Rikers Island Interagency Task Force ("Rikers Task Force"), recruiting and hiring various staff for the Department, and addressing the protracted length of stay for individuals in custody. Each is taken in turn below.

*Citywide Task Force*

The City reports that the Rikers Task Force,[222] comprised of representatives from key City agencies, continues to meet weekly to address issues related to the reform effort and to ensure they are supporting the work by eliminating obstacles to implementation. The City reports that the City Task Force has discussed the following issues since April 2023: OMB approvals, staffing levels, recruiting/hiring/retaining staff, salaries, job requirements, remote work, staff disciplinary cases, timekeeping, and programming.

*Recruiting, Hiring and Onboarding New Staff*

The Department needs strong recruitment and an efficient hiring process to support the reform effort given the need for additional staffing support in many areas.[223] Recruiting qualified candidates to work in this Department is particularly challenging given its location in a residential area in Queens (with its attendant transportation and parking issues), the disparaging public discourse about the agency, and general constraints of City employment (including the lengthy onboarding process, few options for remote work, residency requirements, salary, etc.).

---

[222] As required by the Action Plan, § B, ¶ 1.

[223] As required by the Action Plan, § B, ¶¶ 2 and 3.

Quite simply, recruiting individuals to work at the Department of Correction is challenging and difficult. It is for these reasons that creative recruitment efforts for positions with attractive benefits are needed to attract qualified candidates.

An essential element in the recruitment effort is for the Department to attract individuals with correctional expertise, preferably from other jurisdictions, to serve in leadership positions; staff for the Trials Division, Investigations Division ("ID Division" or "ID") and Legal Division; and civilian staff to backfill positions previously held by uniform staff, once those positions have been identified. The recruitment effort to identify qualified candidates is supported by the HR Division in addition to a couple of executive search firms. The HR Division advertises positions via job fairs and online marketing. Finally, the Department, working with the Task Force, obtained a waiver of residency requirements from DCAS for most new hires effective June 9, 2022.

The Department has successfully hired a number of qualified individuals for leadership positions. The table provided in Appendix A identifies the Department's efforts to fill leadership positions between January 1, 2022 and June 2023, including the position title, the date of appointment, and the departure date, if applicable.

The Monitoring Team continues to strongly recommend that the City and Department afford staff in the ID, Legal, and Trials Division an opportunity to work remotely in order to make the positions more attractive. Even if permitted for only a few days per week, this benefit would support the effort to recruit qualified candidates. Currently, a potential remote work option is limited to those covered by the City's agreement with DC37 union, where a pilot will be developed and is expected to begin during summer 2023. The Department reports that about 80 individuals in the ID Division (note, not the Legal or Trials Divisions) are part of the DC37

union that is piloting remote work. The Department is in the process of developing a remote work policy to support the pilot. The City reports that it intends to engage with other staff and unions representing those who work for the Department to expand the work-from-home pilot.

The Department has reported that low salaries are a barrier to recruiting staff to work in both the ID Division and the Trials Division, among other divisions. The City reports that in general, due to fiscal constraints, it has limited flexibility to increase salaries, even for positions that are difficult to fill. The City reported it does not yet know how these fiscal constraints may impact a potential increase in salary for ID staff. The City reported that a salary increase for attorneys in the Trials Division was approved by OMB and went into effect in July 14, 2022. However, the Trials Division reports that even with the increase, the current salary being offered remains an impediment to hiring. The Department has indicated that it intends to submit a proposal to OMB to increase salaries for ID staff but the status of potential efforts to increase salaries for the Trials Division is unknown. The City reports that the Rikers Task Force can facilitate inter-agency coordination and timing of potential requests for salary increases if necessary.

### *Reducing the Population & Addressing Increasing Lengths of Stay in Custody*

Reducing the jail population is necessary to support the overall reform efforts because it would reduce the number of people exposed to the dangerous conditions in the facilities. Given the imminent risk of harm to those incarcerated in New York City's jails, all stakeholders must continue to maximize every possible avenue to reduce the population, by reducing the number of

people sent to jail, expeditiously processing court cases, or via release to the community.[224]

Below is a table of table provided by the City regarding length of stay on Rikers.[225]

| | Pre-Covid Snapshot 1/3/2020 | | Post-Covid Snapshot 9/3/2021 | | Present Snapshot 6/23/2023 | |
|---|---|---|---|---|---|---|
| Total Population: | 5,867 | | 6,078 | | 6,075 | |
| Average Days | 205.8 | | 285.6 | | 254.7 | |
| Median Days | 119 | | 153 | | 140 | |
| | Number of People | Percent | Number of People | Percent | Number of People | Percent |
| Under 30 Days | 945 | 16.1% | 985 | 16.2% | 1,021 | 17% |
| 30-90 Days | 1,443 | 24.6% | 1,311 | 21.6% | 1,341 | 22% |
| 91-180 Days | 1,326 | 22.6% | 1,002 | 16.5% | 1,142 | 19% |
| 181-365 Days | 1,157 | 19.7% | 1,205 | 19.8% | 1,248 | 21% |
| Over 1 Year | 996 | 17.0% | 1,575 | 25.9% | 1,323 | 22% |

The increasing length of stay and the proportion of people who have been in custody for more than one year was discussed in detail in the Monitor's April 3, 2023 Report at pgs. 117 to 121. The City reports that the Mayor's Office of Criminal Justice ("MOCJ") has worked on the following steps since the April 3, 2023 Report to reduce the lengths of stay in the jails:[226]

- **Coordination with DOC**: MOCJ coordinates with DOC on a weekly basis to discuss individuals who have been in custody beyond a year.

- **Coordination with District Attorneys in Each Borough**: MOCJ continues to meet regularly with representatives from the District Attorney's Office in each Borough to discuss barriers or delays affecting the resolution of cases with long lengths of stay.

---

[224] New York State Correction Law 6-a affords the City the power to release incarcerated individuals, who have been sentenced to under one year behind bars, into a work release program. Since 2020, the City has released 327 incarcerated individuals to work release programs (297 in 2020, 13 in 2021, 62 in 2022, and 0 in between January 1, 2023 and June 13, 2023).

[225] The City reports that the 2020 and 2021 snapshots are sourced from a live Office of Court Administration DSH data feed. This feed has undergone changes over the past year that makes the 2020 and 2021 extracts less reliable. The present data snapshot from 2023 comes from a new updated OCA data extract that relies on the OCA UCE feed. This most recent data is better quality than the 2020 and 2021 snapshots. Additionally, because of these different sources, the 2023 snapshot is not directly comparable with the 2020 and 2021 snapshots.

[226] As required by the Action Plan, § B, ¶ 4.

- **Coordinating with the Center for Justice Innovation ("CJI")**: Since October 2022, MOCJ has worked with the CJI (formerly the Center for Court Innovation, or CCI) to identify any overlap in target populations and ways in which to expedite cases. Further, MOCJ has been coordinating with the CJI on a recently passed NYC Administrative Code § 9-310 that requires a jail population review program to identify people in custody of the DOC whose cases could be resolved or who could be safely released into community-based programs. This law is required to be implemented in a phased approach in Fall 2023 and Spring 2024.

The Monitoring Team recognizes that reducing length of stay is only one component of broader reforms to reduce the number of people in custody, and as noted above, other initiatives must complement this work. Court processing is a complex endeavor involving many actors beyond the Department, which can sometimes lead to a diffusion of responsibility such that no one agency takes responsibility for the outcome. An individual's length of stay in jail is the product of actions by a variety of stakeholders—the courts, prosecutors, and defense counsel. With so many agencies and individual actors involved, all too often, the responsibility for addressing delays and other structural problems becomes diffuse and uncoordinated. It is imperative for these stakeholders to collaborate to swiftly and creatively to find ways to process cases more expeditiously through the court system and to otherwise limit the use of secure detention (*e.g.*, via joint action review committees, jail diversion programs, etc.). This group of stakeholders collaborated effectively at the onset of COVID-19 to significantly reduce the jails' populations, so such actions are clearly possible. A comparable level of action is required to limit exposure to and relieve pressure on the jails.

# CONCLUSION AND MONITOR'S ASSESSMENT
# RELATED TO § G ¶ 6 OF THE ACTION PLAN

The Monitoring Team has established an extensive and detailed record of neutral and independent assessments of the City's and Department's efforts to achieve compliance with the *Nunez* Court Orders. As part of this work, the Monitoring Team has identified when progress has been made and has made painstaking efforts to identify and report on even incremental changes that move the Department toward compliance (even when it has been difficult to obtain information from the Department). The Monitoring Team has always approached its work overall with cautious optimism that the necessary evolution and culture change could occur. To that end, in the past year, the Monitoring Team supported the development and implementation of the Action Plan in hopes it would catalyze the necessary momentum to advance the reforms. Further, the Monitoring Team has and continues to offer significant technical assistance to the Department to support its efforts to achieve compliance with the *Nunez* Court Orders.

An assessment of the totality of the circumstances after eight years of monitoring and after one year of the Action Plan's implementation is such that the cautious optimism that characterized prior reports and testimony can no longer be maintained. As noted in the Monitor's April 3, 2023 Report on the Department's Action Plan:

> *The Monitoring Team has provided a significant volume of reporting on the conditions of the jails. What must not be lost in this maze of documentation is the fact that real harm to both people in custody and staff continues to occur at unacceptable levels. The unacceptable rates of use of force, fights, assaults on staff and stabbing and slashings cause both physical and emotional harm. The sheer number of incidents cannot begin to capture the real abject harm that occurs in this setting. These incidents can be described and reported in words, but it is almost impossible to understand how the current "predatory environment" is experienced by the typical person in custody or staff member. The harm can be witnessed*

*directly in the images from inside the jails— images of chaos, disorder, and sometimes serious injuries—which still belie the real fear felt by the participants, witnesses, and bystanders in real time.*

That statement continues to reflect the current concerns of the Monitor and the Monitoring Team. Of additional concern is that over the past eight years and, particularly during the past year, the current state of affairs in the New York City jails, which reflects unprecedented rates of use of force and violence, appears to have become normalized. The Monitor and the Monitoring Team are concerned by this apparent normalization of something that is clearly abnormal. Real harm is occurring to real people in real time, and that cautious optimism that meaningful change can occur in this system has significantly diminished given the current climate of regression in key areas and the lack of sustained progress in others coupled with an increasing and troubling lack of transparency.

*Assessment of Progress & Risk of Harm Pursuant to Action Plan § G. ¶ 6*

The Action Plan, pursuant to § G, ¶ 6, requires the Monitor to make an assessment as to first, whether the Department has made substantial and demonstrable progress implementing the requirements of the Action Plan and, second, whether there has been a substantial reduction in the risk of harm. This report and all others filed to date have been considered and subsumed in the assessment below. Each requirement is taken in turn.

With respect to the Monitor's assessment related to progress with implementation, the Monitoring Team has considered all of the work completed during the past year, since the Action Plan was entered. There is no question that some progress has been made in some areas (*e.g.*, hiring executive staff with demonstrated expertise in sound correctional practice, increasing the number of staff available, improving enforcement of sick leave policies, modernizing staff

scheduling systems, reducing the disciplinary backlog, and improving classification practices and SRG blending). However, many initiatives remain incomplete, many gaps remain, and worse, there has been a disturbing level of *regression* in a number of critical areas and essential practices during the past year (notably, the investigation of and accountability for use of force related misconduct, the conduct of ESU, quality of training programs, pre-promotional screening and the Department's overall management of the *Nunez* Court Orders). ***Accordingly, the Monitor's assessment is that the City and Department have not made substantial and demonstrable progress in implementing the reforms, initiatives, plans, systems, and practices outlined in the Action Plan***. Compounding the lack of progress is what appears to be the Department's inability to identify (and therefore address) the objective evidence regarding the current state of affairs, seeming rather to ignore or try to diminish the import of the pervasive dysfunction and harm that continues to occur daily in the jails. Further, the Department's failure to adequately manage the *Nunez* Court Orders and provide information to the Monitoring Team, especially in light of the Court's June 13, 2023 Order (as described throughout this report) is deeply disturbing.

With respect to the Monitor's assessment regarding whether a substantial decrease in the risk of harm has occurred, the Monitoring Team has considered all the qualitative and quantitative metrics related to the harm faced by people in custody at the hands of other incarcerated individuals, staff and/or themselves. Throughout the year that the Action Plan has been in effect, the jails have remained dangerous and unsafe for incarcerated individuals and staff. ***Accordingly, the Monitor's assessment is that there has not been a substantial reduction in the risk of harm currently facing incarcerated individuals and Department staff***.

In connection with this assessment, it must also be emphasized that the Department remains in non-compliance with the implementation of the Use of Force Policy, as required by § IV, ¶ 1 of the Consent Judgment, which is a seminal provision of the *Nunez* Court Orders. The Use of Force Policy was designed to ensure the safe, appropriate, proportional use of physical intervention in a wide array of situations and the Department's continued over-reliance on the use of force, and the frequency with which it is unnecessary or excessive, or contributes directly to the unsafe conditions in the jails. The Department was first found in non-compliance with the implementation of the Use of Force Policy in the Fifth Monitoring Period (July to December 2017).[227] The Department is no closer to achieving compliance with this seminal provision of the *Nunez* Court Orders today than it was when the Consent Judgment began. Further, and deeply concerning, is that the Department has not improved its security practices and is in non-compliance with Action Plan § D, ¶ 2 as detailed in the Security, Violence, and Use of Force section of this report.

The Monitoring Team has long reported that there are no ready-made solutions to address the complicated issues facing this agency and that reform is going to take far longer than the urgency of the situation demands. This remains true, but the current trajectory is sorely inadequate to the task of untangling the dysfunction in this agency.

---

[227] The Monitoring Team did not assess compliance with any provisions of the Consent Judgment or Remedial Orders for the period between July 1, 2021 and December 31, 2021 (the "Thirteenth Monitoring Period"). The Court suspended the Monitoring Team's compliance assessment during the Thirteenth Monitoring Period because the conditions in the jails during that time were detailed to the Court in seven status reports (filed between August and December 2021), a Remedial Order Report (filed on December 22, 2022) as well as in the Special Report filed on March 16, 2022 (dkt. 441). The basis for the suspension of compliance ratings was also outlined in pgs. 73 to 74 of the March 16, 2022 Special Report (dkt. 438).

The ongoing harm and lack of safety in the facilities cannot continue unabated. The City's and Department's on-going failure to implement initiatives to improve the underlying security deficiencies and failed operational practices (as outlined in the Security, Violence and Use of Force section of this report and throughout this report) coupled with the City and Department's unwillingness and inability to acknowledge the myriad of issues, disturbing regression to address core issues of the *Nunez* Court Orders, and the lack of urgency to address these matters has become normalized. **Real people are experiencing real trauma and pain and, in some cases are suffering irreparable injuries and death**, as noted throughout this report and in prior reports.

These dangerous conditions and disturbing dynamics compel the Monitoring Team to recommend that the Court consider the initiation of contempt proceedings in order to coerce the City, Department and the Commissioner to:

(**1**) "make urgently needed changes"[228] and "to make up for lost time and increase the safety and rational and appropriate operation of the institution as soon as possible. And that requires a pace faster than any that we've managed to achieve so far"[229];

(**2**) improve security initiatives, in particular to address non-compliance with the requirements of the Second Remedial Order, ¶ 1(i)(a), and the Action Plan, § D, ¶ 2;

(**3**) ensure the Department manages the *Nunez* Court Orders as required, including, but not limited to, consulting and seeking approval, as necessary, with the Monitoring Team (*e.g.*

---

[228] As directed by the Court in its June 14, 2022 order (dkt. 466).

[229] As directed by the Court at the April 27, 2023 Status Conference. *See* Transcript at pg. 68: 14 to 19).

consulting and seeking approval on use of force policies and practices[230]) and ensuring the information that is provided is complete, responsive so the Monitor may fulfill his responsibilities under the *Nunez* Court Orders.

The Monitoring Team appreciates "civil contempt is a potent weapon meant to coerce a party into future compliance with a court order."[231] The Monitoring Team does not make such a recommendation to the Court lightly and, in fact is doing so only after it has exhausted other available strategies to achieve compliance. However, as demonstrated throughout this report, the City's and the Department's efforts have languished, regressed in some areas, and in other areas it appears that steps may have been taken that run counter to the overall goals and requirements of the *Nunez* Courts Orders. This is all despite the persistent efforts made to date by the Monitoring Team to work collaboratively and advance the reforms coupled with the failure of multiple remedial orders to achieve compliance.[232] Consequently, the Monitoring Team is recommending that civil contempt proceedings be initiated on the three items above, at a minimum, because they are condition precedent to achieving compliance with the *Nunez* Court Orders more broadly.

---

[230] As described in Consultation on UOF related polices portion of the Security, Violence and Use of Force section of this report. Over the last few months, the Commissioner has repeatedly approved changes to use of force practices and policies without consulting or seeking approval of the Monitor despite the fact that such consultation and approval is required by the *Nunez* Court Orders.

[231] *See* Court's March 13, 2023 Order (dkt. 511) at pg. 27.

[232] Even on more discrete matters, such as Intake, despite significant scrutiny and litigation before this Court, the Department still has not implemented ITS tracking that it reported directly to the Court would be completed by March 15, 2023. *See* Defendants' Memorandum of Law In Opposition to Plaintiffs' Motion for Civil Contempt at pgs. 10 and 13 (dkt. 505). Unfortunately, the Court's finding in its March 13, 2023 Order (dkt. 511) at pg. 29 that the Department had demonstrated a "recent sense of urgency and dedication" has not continued (as outlined in the Management of Incarcerated Individuals section of this report).

With respect to *how* the reforms will be managed and implemented moving forward, it is for the Court and the Parties to determine the course forward. Thus far, the City and Department have repeatedly and consistently demonstrated they are incapable of effectively directing the multilayered and multifaceted reform effort and continuing on the current path is not likely to alter the present course in any meaningful way. The Monitoring Team remains ready to serve as a resource to support the development of a structure that is capable of this task.

<u>Next Steps</u>

The Monitoring Team is cognizant that the initiation of potential contempt proceedings and the formulation of any additional remedial relief will take time and require significant consultation among the Parties and the Court. Outlined in this section is a summary of proposed next steps regarding: (1) the Parties' and Monitoring Team's meet and confer prior to the August 10, 2023 Court Conference, (2) the City and Department's areas of focus on the reform effort over the next few months, (3) the Monitoring Team's recommendations for court-ordered relief for short-term priorities over the next few months, and (4) the Monitoring Team's reporting schedule for the rest of the year.

- **Steps Between the Monitor's July 10, 2023 Report and the August 10, 2023 Court Conference**

As directed by the Court, the Parties and the Monitoring Team will meet and confer regarding the Monitoring Team's recommendation for consideration of the initiation of immediate contempt proceedings as well as the structure and timing of potential motion practice on broader remedial relief. The Monitoring Team has scheduled three meet and confer sessions with all Parties to occur in July 2023. The Monitoring Team will also meet with the Parties

individually on various occasions during this time. Additional consultation will be scheduled as necessary.

The Monitoring Team will file an update on this process and any substantive matters for the Court's consideration on August 7, 2023, by 2:00 pm. The Monitor's August 7, 2023 Report will also include the positions of each of the Parties regarding potential motion practice.

- **Continued Prioritization of Foundational Issues**

The Monitoring Team appreciates that proceedings before the Court and crafting additional remedial relief will take time. In the meantime, the City and Department must continue to focus on developing and implementing core foundational practices as a necessary precursor to the Department's ability to achieve compliance with the other requirements of the *Nunez* Court Orders. The specific requirements of the Action Plan must therefore continue to be the focal point and priority of the reform effort. In other words, requiring the Department to comply with *all* the requirements of the *Nunez* Court Orders simultaneously is not viable and will only further degrade conditions. Accordingly, the Action Plan must remain the focal point for the City and Department's work at least through December 31, 2023.

- **Proposed Remedial Steps for the Department to Address by December 31, 2023**

The Monitoring Team has identified several critical items that have continuously languished and that are necessary to reduce the risk of harm and the City and Department have not adequately moved forward through the consultation process with the Monitoring Team. These steps should be prioritized during the next few months as other remedial relief is being contemplated. It must be emphasized this is a short-term, ***interim*** measure, over the next few months, to ensure a proper focus and pace for initiatives that have direct bearing on the imminent risk of harm continue to move forward. The Monitor finds that this group of initiatives are

necessary and narrowly tailored to address the Department's non-compliance with certain requirements of the *Nunez* Court Orders as described in detail in this report. A proposed court order is attached as Appendix E of this report.

- **Monitor Reporting in 2023**

The Monitoring Team has provided the Court and the Parties with extensive reporting this year, including six reports (including this instant report) and two substantive letters during the first six months of 2023. The Monitoring Team will also file a status update with the Court on August 7, 2023 in advance of the August 10, 2023 Court Conference. Following the conference, the Monitoring Team recommends the Monitoring Team submit two status letters to the Court on October 10, 2023, and November 16, 2023, that apprise the Court and the Parties of the Department's efforts to address the specifically enumerated remedial relief outlined in the proposed court order in Appendix E. As for the production of the next Monitor's Report, the Monitoring Team respectfully requests it file its next report on December 21, 2023. A four-month period following the August 10, 2023 Court Conference is necessary to provide sufficient time for the Department to undertake *new* action and for the Monitoring Team to collect, analyze, and interpret the information and data and then report on those efforts. Together, the status letters and report will ensure that the Parties and the Court still receive frequent and timely reports and provides more reports than contemplated by the Nunez Court Order (which, at most, would have provided for three reports this year). As has been the practice, the Monitoring Team will not hesitate to file an interim report if required by the circumstances. The Monitoring Team's recommended reporting schedule is incorporated in the proposed court order in Appendix E.

# APPENDIX A:
# DATA

## *Annual UOF Number and Average Monthly Rate*

The following pages provide systemwide and facility-based data on key outcomes. These are discussed in the Security, Violence, and Use of Force section of this report.









*UOF Number and Average Monthly Rate – January 2022 to May 2023*

| Systemwide Use of Force January 2022 to May 2023 | | | | |
|---|---|---|---|---|
| Months | Total # UOF | Average/month | ADP | Rate |
| January-June 2022 | 3241 | 540.2 | 5491 | 9.83 |
| July-December 2022 | 3764 | 627.3 | 5787 | 10.85 |
| January-May 2023 | 2718 | 543.6 | 5954 | 9.13 |

| Use of Force at RNDC January 2022 to May 2023 | | | | |
|---|---|---|---|---|
| Months | Total # UOF | Average/month | ADP | Rate |
| January-June 2022 | 653 | 108.8 | 727 | 15.0 |
| July-December 2022 | 478 | 79.7 | 812 | 9.8 |
| January-May 2023 | 339 | 67.8 | 834 | 8.2 |

| Use of Force at GRVC January 2022 to May 2023 | | | | |
|---|---|---|---|---|
| Months | Total # UOF | Average/month | ADP | Rate |
| January-June 2022 | 621 | 103.5 | 622 | 16.7 |
| July-December 2022 | 824 | 137.3 | 743 | 18.5 |
| January-May 2023 | 442 | 88.4 | 829 | 10.7 |

| Use of Force at AMKC January 2022 to May 2023 | | | | |
|---|---|---|---|---|
| Months | Total # UOF | Average/month | ADP | Rate |
| January-June 2022 | 682 | 113.7 | 1975 | 5.74 |
| July-December 2022 | 1094 | 182.3 | 2073 | 8.79 |
| January-May 2023 | 889 | 177.8 | 1954 | 9.13 |

*Annual Number and Average Monthly Rate of Stabbing and Slashing*







184



*Number and Rate of Stabbing and Slashing from January 2022 to May 2023*

| Systemwide Stabbings/Slashings January 2022 to May 2023 | | | | |
|---|---|---|---|---|
| Months | Total # S/S | Average/month | ADP | Rate |
| January-June 2022 | 254 | 42.3 | 5491 | 0.77 |
| July-December 2022 | 214 | 35.7 | 5787 | 0.62 |
| January-May 2023 | 144 | 28.8 | 5954 | 0.48 |

| Stabbings/Slashings at RNDC January 2022 to May 2023 | | | | |
|---|---|---|---|---|
| Months | Total # S/S | Average/month | ADP | Rate |
| January-June 2022 | 70 | 11.7 | 727 | 1.6 |
| July-December 2022 | 37 | 6.2 | 812 | 0.76 |
| January-May 2023 | 21 | 4.2 | 834 | 0.50 |

| Stabbing/Sashing at GRVC January 2022 to May 2023 | | | | |
|---|---|---|---|---|
| Months | Total # S/S | Average/month | ADP | Rate |
| January-June 2022 | 58 | 9.7 | 622 | 1.55 |
| July-December 2022 | 99 | 16.5 | 743 | 2.22 |
| January-May 2023 | 42 | 8.4 | 829 | 1.01 |

| Stabbing/Sashing at AMKC January 2022 to May 2023 | | | | |
|---|---|---|---|---|
| Months | Total # S/S | Average/month | ADP | Rate |
| January-June 2022 | 49 | 8.2 | 1975 | 0.41 |
| July-December 2022 | 49 | 8.2 | 2073 | 0.39 |
| January-May 2023 | 52 | 10.4 | 1954 | 0.53 |

*Annual Number and Average Monthly Rate of Fights*









## *Recent Number and Average Monthly Rate of Fights from January 2022 to May 2023*

| Systemwide Fights January 2022 to May 2023 | | | | |
|---|---|---|---|---|
| Months | Total # Fights | Average/month | ADP | Rate |
| January-June 2022 | 2764 | 460.7 | 5491 | 8.39 |
| July-December 2022 | 3071 | 511.8 | 5787 | 8.84 |
| January-May 2023 | 2396 | 479.2 | 5954 | 8.05 |

| Fights at RNDC January 2022 to May 2023 | | | | |
|---|---|---|---|---|
| Months | Total # Fights | Average/month | ADP | Rate |
| January-June 2022 | 455 | 75.83 | 727 | 10.43 |
| July-December 2022 | 451 | 75.17 | 812 | 9.26 |
| January-May 2023 | 292 | 58.4 | 834 | 7.0 |

| Fights at GRVC January 2022 to May 2023 | | | | |
|---|---|---|---|---|
| Months | Total # Fights | Average/month | ADP | Rate |
| January-June 2022 | 275 | 45.8 | 622 | 7.37 |
| July-December 2022 | 330 | 55.0 | 743 | 7.40 |
| January-May 2023 | 228 | 45.6 | 829 | 5.5 |

| Fights at AMKC January 2022 to May 2023 | | | | |
|---|---|---|---|---|
| Months | Total # Fights | Average/month | ADP | Rate |
| January-June 2022 | 676 | 112.7 | 1975 | 5.70 |
| July-December 2022 | 925 | 154.2 | 2073 | 7.44 |
| January-May 2023 | 880 | 176.0 | 1954 | 9.01 |

*Number and Average Monthly Rate of Assault on Staff, with and without UOF*





*\*\*The Department began tracking assaults on staff that did not involve a use of force in 2020. Prior years' data are not available.*

190

*Rapid Review Outcomes*

The chart provides an overview of the outcomes of Rapid Reviews from January 1, 2018 to May 30, 2023. The Security, Violence, and Use of Force section of this report explores the current outcomes and recent regression in the Rapid Review's functioning, which appears to have inaccurately reduced the proportion of incidents identified as avoidable and those with procedural/policy violations.

| Rapid Review Outcomes, 2018 to May 2023 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **2018** | **2019** | **2020** | **2021** | **2022** | **Jan-June 2022** | **July-Dec 2022** | **Jan-May 2023** |
| **Incidents Identified as Avoidable, Unnecessary, or with Procedural Violations** | | | | | | | | |
| **Number of Rapid Reviews** | 4,257 (95% of all UOF) | 6,899 (97% of all UOF) | 6,067 (98% of all UOF) | 7,972 (98% of all UOF) | 6,889 (98% of all UOF) | 3,183 (98% of all UOF) | 3,706 (98% of all UOF) | 2,704 (99% of all UOF) |
| **Avoidable** | 965 (23%) | 815 (12%) | 799 (13%) | 1,733 (22%) | 1,135 (16%) | 549 (17%) | 586 (16%) | 324 (12%) |
| **Violation of UOF or Chemical Agent Policy** | | | *345 (11%) (July-December 2020 Only)* | 1,233 (16%) | 835 (12%) | 515 (16%) | 320 (9%) | 227 (8%) |
| **Procedural Violations[233]** | 1,644 (39%) | 1,666 (24%) | 1,835 (30%) | 3,829 (48%) | 3,296 (48%) | 1,686 (53%) | 1,610 (43%) | 1,112 (41%) |
| **Corrective Action Imposed by Staff Member** | | | | | | | | |
| **Number of Staff with Recommended Corrective Action** | 3,595 | 3,969 | 2,966 | 5,748 | 2,860 | 1,748 | 1,112 | 677 |

---

[233] Procedural errors include a variety of instances in which staff fail to comply with applicable rules or policies generally relating to operational functions, such as failure to don equipment properly (such as utilizing personal protective equipment), failure to secure cell doors, control rooms, or "bubbles," and/or the failure to apply restraints correctly.

## *Use of Force Involving Unmanned Posts*

The table below provides the number and proportion of uses of force involving "unmanned posts" as identified by the Department during three time periods (January-June 2022, July-December 2022 and January-May 2023). These incidents involve posts to which no staff member was assigned *and* instances where the assigned officer left their post without being relieved (collectively "unmanned posts"). The first two columns list the number of uses of force involving unmanned posts and the proportion of all uses of force that this number represents. The third and fourth columns identify the number and proportion of uses of force that involved unmanned posts **and** were avoidable (as identified by the Department) specifically due to the lack of staff on post. In other words, had a staff member been present, these incidents likely could have been avoided. While the number of incidents involving an unmanned post were relatively small (approximately 4% of all uses of force in both 2022 and January-May 2023), the Department found that over half of these incidents could have been avoided had staff been present. The problem appears to be particularly pronounced at AMKC.

| Uses of Force involving Unmanned Posts: January-June 2022 | | | | |
|---|---|---|---|---|
| **Facility** | **# of Total UOF Incidents involving Unmanned Posts** | **% of Total UOF Incidents involving Unmanned Posts[234]** | **# of UOF Incidents that UOF incidents involving Unmanned Posts & Were Avoidable** | **% of Total UOF Incidents involving Unmanned Posts & Were Avoidable** |
| AMKC | 48 | 1.48% | *39* | *81.25%* |
| EMTC | 22 | 0.68% | *10* | *45.45%* |
| GRVC | 13 | 0.40% | *6* | *46.15%* |
| NIC | 2 | 0.06% | *1* | *50.00%* |
| OBCC | 19 | 0.59% | *7* | *36.84%* |
| RMSC | 6 | 0.19% | *2* | *33.33%* |
| RNDC | 40 | 1.23% | *22* | *55.00%* |
| VCBC | 1 | 0.03% | *1* | *100.00%* |
| **TOTAL** | **151** | **4.66%** | *88* | *58.28%* |

---

[234] There were 3,240 total actual uses of force in January-June 2022. This number does not include alleged uses of force because the Department does not provide avoidable reasons for alleged uses of force.

| Uses of Force involving Unmanned Posts: July-December 2022 | | | | |
|---|---|---|---|---|
| Facility | # of Total UOF Incidents involving Unmanned Posts | % of Total UOF Incidents involving Unmanned Posts[235] | # of UOF Incidents that UOF incidents involving Unmanned Posts & Were Avoidable | % of Total UOF Incidents involving Unmanned Posts & Were Avoidable |
| AMKC | 51 | 1.35% | 33 | 64.71% |
| EMTC | 24 | 0.64% | 12 | 50.00% |
| GRVC | 35 | 0.93% | 13 | 37.14% |
| NIC | 4 | 0.11% | 2 | 50.00% |
| RMSC | 32 | 0.85% | 15 | 46.88% |
| RNDC | 10 | 0.27% | 4 | 40.00% |
| VCBC | 3 | 0.08% | 1 | 33.33% |
| TOTAL | 159 | 4.22% | 80 | 50.31% |

| Uses of Force involving Unmanned Posts: January-May 2023 | | | | |
|---|---|---|---|---|
| Facility | # of Total UOF Incidents involving Unmanned Posts | % of Total UOF Incidents involving Unmanned Posts[236] | # of UOF Incidents that UOF incidents involving Unmanned Posts & Were Avoidable | % of Total UOF Incidents involving Unmanned Posts & Were Avoidable |
| AMKC | 42 | 1.54% | 26 | 61.90% |
| EMTC | 16 | 0.59% | 9 | 56.25% |
| GRVC | 17 | 0.63% | 7 | 41.18% |
| NIC | 1 | 0.04% | 0 | 0.00% |
| RMSC | 13 | 0.48% | 4 | 30.77% |
| RNDC | 7 | 0.26% | 3 | 42.86% |
| VCBC | 0 | 0.00% | 0 | - |
| TOTAL | 96 | 3.53% | 49 | 51.04% |

[235] There were 3,765 total actual uses of force in July-December 2022. This number does not include alleged uses of force because the Department does not provide avoidable reasons for alleged uses of force.

[236] There were 2,719 total actual uses of force in January-May 2023. This number does not include alleged uses of force because the Department does not provide avoidable reasons for alleged uses of force.

*Cell Door Installation*

The Action Plan requires the installation of a total of 950 new cell doors by July 31, 2023 at RNDC and AMKC in order to strengthen the security hardware of the jails.[237] Given AMKC's imminent closure, the Department has focused on the installation of cell doors as RNDC. A discussion regarding the funds allocated for this project, the process for procuring cell doors, and installation of cell doors in the Department was included in the Monitor's October 28, 2022 Report at pgs. 74 to 77. It continues to appear that the City and Department have taken all available steps to maximize the procurement of new cell doors and have taken the necessary steps to complete the project as efficiently as possible.

As shown in the table below, a total of 900 new cell doors were installed at RNDC between July 2019 and May 11, 2023. The pace of installation accelerated significantly in 2022, when 300 new cell doors were installed and another 250 were installed in the first five months of 2023.

| RNDC Cell Door Installation—Completed | |
| --- | --- |
| **Date Installation Completed** | **Number Installed** |
| July to December 2019 | 50 |
| January to December 2020 | 100 |
| January to December 2021 | 200 |
| January to December 2022 | 300 |
| January to May 11, 2023 | 250 |
| **Total Doors Installed** | **900** |

---

[237] As required by the Action Plan, § A, ¶ 1(c); § D, ¶ 5.

## *Number of ADWs and Captains*

The two tables below identify the number and assignment of ADWs and Captains at specific points in time from July 18, 2020 to May 20, 2023. The Leadership, Supervision, and Training section of the report explores this data further.

| Number of ADWs & Assignments in the Department[238] | | | | | | | |
|---|---|---|---|---|---|---|---|
| Facility | # of ADWs As of July 18, 2020 | # of ADWs As of Jan. 2, 2021 | # of ADWs As of June 26, 2021 | # of ADWs As of Jan. 1, 2022 | # of ADWs As of June 18, 2022 | # of ADWs As of Dec. 31, 2022 | # of ADWs As of May 20, 2023 |
| AMKC | 9 | 21 | 13 | 12 | 9 | 12 | 16 |
| EMTC[239] | 0 | 0 | 0 | 0 | 0 | 8 | 9 |
| GMDC[240] | 0 | 0 | 0 | 0 | 0 | 0 | 5 |
| GRVC | 6 | 10 | 11 | 9 | 8 | 12 | 12 |
| MDC[241] | 6 | 2 | 1 | 1 | 0 | 1 | 0 |
| NIC | 6 | 8 | 8 | 5 | 7 | 8 | 9 |
| OBCC[242] | 6 | 8 | 8 | 14 | 7 | 0 | 0 |
| RMSC | 5 | 6 | 6 | 5 | 4 | 5 | 5 |
| RNDC | 7 | 15 | 15 | 10 | 7 | 12 | 10 |
| VCBC | 4 | 6 | 5 | 5 | 4 | 5 | 6 |
| Court Commands (BKDC, BXDC, QDC) | 3 | 4 | 3 | 3 | 3 | 3 | 2 |
| Total # of ADWs in Facilities & Court Commands | 52 | 80 | 70 | 64 | 49 | 66 | 74 |
| Total # of ADWs Available Department-wide | 55 | 95 | 88 | 80 | 67 | 82 | 90 |
| % of ADWs in Facilities & Court Commands | 79% | 84% | 80% | 80% | 73% | 80% | 82% |

---

[238] The specific post assignments of ADWs within the Facility is not available so this data simply demonstrates the number of ADWs assigned per facility.

[239] EMTC has been closed and opened in these Monitoring Periods. Until late 2022, staff that work at EMTC were technically assigned to AMKC.

[240] The Department reports that staff were transferred to GMDC as part of an administrative effort to get an accurate count of staff available to work at each facility. Any uniformed staff member on extended leave (military, FMLA, etc.) as well as any staff out sick more than 30 days was administratively transferred to GMDC for that purpose.

[241] MDC was utilized in a limited capacity at the end of the Twelfth Monitoring Period and was closed by June 2021. The staff currently assigned to MDC are in fact assigned to the Manhattan Courts (Criminal, Supreme, and Family).

[242] OBCC was closed by July 2022. Staff were then reassigned to other commands.

| Number of Captains & Assignments in the Department[243] | | | | | | | |
|---|---|---|---|---|---|---|---|
| Facility | # of Captains As of July 18, 2020 | # of Captains As of Jan. 2, 2021 | # of Captains As of June 26, 2021 | # of Captains As of Jan. 1, 2022 | # of Captains As of June 18, 2022 | # of Captains As of Dec. 31, 2022 | # of Captains As of May 20, 2023 |
| AMKC | 91 | 111 | 97 | 87 | 81 | 80 | 67 |
| EMTC[244] | 0 | 0 | 0 | 0 | 0 | 38 | 39 |
| GMDC[245] | 0 | 0 | 0 | 0 | 0 | 0 | 45 |
| GRVC | 75 | 72 | 86 | 86 | 81 | 90 | 66 |
| MDC[246] | 72 | 39 | 15 | 12 | 11 | 11 | 1 |
| NIC | 51 | 45 | 45 | 56 | 45 | 50 | 45 |
| OBCC[247] | 85 | 81 | 78 | 77 | 38 | 7 | 7 |
| RMSC | 51 | 50 | 49 | 36 | 34 | 31 | 27 |
| RNDC | 58 | 56 | 60 | 63 | 70 | 70 | 66 |
| VCBC | 27 | 25 | 27 | 25 | 23 | 22 | 22 |
| Court Commands (BKDC, BXDC, QDC) | 39 | 37 | 35 | 32 | 33 | 28 | 26 |
| Total # of Captains in Facilities and Court Commands | **558** | **523** | **499** | **474** | **416** | **427** | **411** |
| Total # of Captains Available Department-wide | **810** | **765** | **751** | **670** | **607** | **573** | **553** |
| % of Captains in Facilities and Court Commands | **69%** | **68%** | **66%** | **71%** | **69%** | **75%** | **74%** |

[243] The specific post assignments of Captains within the Facility is not available so this data demonstrates the number of Captains assigned per facility.

[244] EMTC has been closed and opened in these Monitoring Periods. Until late 2022, staff that work at EMTC were technically assigned to AMKC.

[245] The Department reports that staff were transferred to GMDC as part of an administrative effort to get an accurate count of staff available to work at each facility. Any uniformed staff member on extended leave (military, FMLA, etc.) as well as any staff out sick more than 30 days was administratively transferred to GMDC for that purpose.

[246] MDC was utilized in a limited capacity at the end of the Twelfth Monitoring Period and was closed by June 2021. The staff currently assigned to MDC are in fact assigned to the Manhattan Courts (Criminal, Supreme, and Family).

[247] OBCC was closed by July 2022. Staff were then reassigned to other commands. Due to a locker room shortage at other facilities, some staff use the locker room at OBCC. DOC reports that these 7 Captains assigned to OBCC are on medically monitored status and are assigned to OBCC to monitor the staff locker room.

## *Status of UOF Investigations*

The table below provides, *as of June 15, 2023*, the investigation status of all UOF incidents that occurred between January 2018 and May 2023.[248]

| Investigation Status of UOF Incidents Occurring Between January 2018 and May 2023 *as of June 15, 2023* | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Incident Date | 2018 | | 2019 | | 2020 | | 2021 | | 2022 | | Jan. to May 2023 (Partial 16th MP) |  |
| Total UOF Incidents[249] | 6,302 | | 7,494 | | 6,402 | | 8,422 | | 7,231 | | *2,779* | |
| Pending Intake Invest. | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 1 | <1% | *388* | *14%* |
| Pending Full ID Invest. | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 51 | <1% | *201* | *7%* |
| Total Closed Invest. | 6,302 | 100% | 7,494 | 100% | 6,402 | 100% | 8,422 | 100% | 7,179 | 99% | *2,190* | *79%* |

[248] All investigations of incidents that occurred prior to 2018 have been closed.

[249] Incidents are categorized by the date they occurred, or date they were alleged to have occurred, therefore these numbers fluctuate very slightly across Monitoring Periods as allegations may be made many months after they were alleged to have occurred and totals are updated later.

## *Outcome of Intake Investigations*

Intake Investigations can be closed with no action, by referring the case for further investigation via a Full ID investigation, or by referring the case for some type of action (*e.g.*, MOC, PDR, Re-Training, Facility Referral). With respect to cases closed with no action, in some, the violation identified by ID had already been identified by the Facility via Rapid Review and ID determined that the recommended action by the Rapid Review was sufficient to address the violation. Therefore, "no action" cases are better understood as cases in which *ID took no action*.[250] The table below identifies the outcome of the Intake Investigations, *as of May 31, 2023*, for incidents that occurred February 3, 2021 (the inception of the Intake Squad) to April 30, 2023.

As discussed in the April 3, 2023 Report, and demonstrated in the chart below, the proportion of incidents with certain outcomes changed sharply during the 15th Monitoring Period, compared to all prior Monitoring Periods since the inception of the Intake Squad. More specifically, significantly more cases were closed with no action (56% during the 15th Monitoring Period, compared to an average of 42% in prior Monitoring Periods), and significantly fewer cases were referred for Full ID Investigations (only 3% in the 15th Monitoring period, compared to an average of 15% in prior Monitoring Periods). Thus far in 2023, case outcomes have yet to return to their prior patterns. These issues are discussed in more detail in the Staff Accountability – Identifying and Addressing Misconduct section of the report.

---

[250] Cases that close with no action may have been addressed by the Facility through Rapid Reviews. ID analyzed almost 1,000 Intake Investigations closed with no action this Monitoring Period and determined that the facilities took action in 46% of them, including 5003 counseling, verbal counseling, corrective interviews, or Command Disciplines.

| Incident Date | Feb. 3[253] to June 2020 (10th MP) | July to Dec. 2020 (11th MP) | Jan. to June 2021 (12th MP) | July to Dec. 2021 (13th MP) | Jan. to June 2022 (14th MP) | July to Dec. 2022 (15th MP) | Jan. to Apr. 2023 (Partial 16th MP) |
|---|---|---|---|---|---|---|---|
| **Outcome of Intake Investigations[251]** *as of May 31, 2023[252]* | | | | | | | |
| Pending Intake Investigation | 0 | 0 | 0 | 0 | 0 | 0 | 90 |
| **Closed Intake Investigation** | **2,492** | **3,272** | **4,468** | **3,916** | **3,349** | **3,883** | **2,098** |
| *No Action* | *1,060* *43%* | *1,279* *39%* | *1,386* *31%* | *947* *24%* | *1,249* *37%* | *2,183* *56%* | *1,018* *49%* |
| *MOC* | *47* *2%* | *28* *1%* | *48* *1%* | *36* *1%* | *22* *1%* | *60* *2%* | *44* *2%* |
| *PDR* | *6* *<1%* | *2* *<1%* | *0* *0%* | *0* *0%* | *1* *<1%* | *3* *<1%* | *1* *<1%* |
| *Re-Training* | *148* *6%* | *226* *7%* | *342* *8%* | *91* *2%* | *35* *1%* | *38* *1%* | *40* *2%* |
| *Facility Referrals* | *820* *33%* | *1,159* *35%* | *1,903* *43%* | *2,208* *56%* | *1,641* *49%* | *1,464* *38%* | *602* *29%* |
| *Command Discipline[254]* | | | | | *5* *<1%* | *2* *<1%* | *64* *3%* |
| *Referred for Full ID* | *411* *12%* | *567* *17%* | *781* *17%* | *634* *16%* | *360* *11%* | *110* *3%* | *149* *7%* |
| *Data Entry Errors[255]* | | | | | *36* | *22* | *180* |
| **Total Intake Investigations** | **2,492** | **3,272** | **4,468** | **3,916** | **3,349** | **3,883** | **2,188** |

[251] For the purpose of this chart, the results only identify the highest level of recommended action for each investigation. For example, while a case may be closed with an MOC *and* a Facility Referral, the result of the investigation will be classified as "Closed with an MOC" in the chart below.

[252] Other investigation data is this report is reported *as of* June 15, 2023 while the Intake Investigation data is also reported *as of* May 31, 2023 because the data is maintained in two different trackers that were produced on two different dates. The number of pending Intake cases therefore varies between data provided "as of June 15, 2023" and "as of May 31, 2023," depending on which tracker was utilized to develop the necessary data.

[253] Incidents beginning February 3, 2020 received Intake Investigations, so those incidents from the early part of the Tenth Monitoring Period are not included in this data.

[254] For incidents occurring in 2020-2021, command disciplines were included in the "Facility Referrals" row as command disciplines are handled by the facilities. This data was entered into a new row beginning in 2022.

[255] These investigations had data entry errors in the Intake Squad Tracker. The Monitoring Team is unable to determine the outcome for these cases.

*Status of Investigations*

The table below depicts the findings of Intake Investigations that were closed as of *May 31, 2023* and were not referred for a Full ID Investigation. Intake Investigation findings included a statement of whether the incident was "unnecessary," "excessive," and "avoidable."[256] Given the Monitoring Team's concern about the decline in the detection of and accountability for misconduct by Intake Investigations discussed in the Monitor's April 3, 2023 and April 24, 2023 Reports, changes in the percentage identified as excessive, unnecessary or avoidable are also viewed with skepticism and concern.

| Investigations Status *As of May 31, 2023* | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Incident Date** | *Feb. 3[257] to June 2020 (10th MP)* | *July to Dec. 2020 (11th MP)* | *Jan. to June 2021 (12th MP)* | *July to Dec. 2021 (13th MP)* | *Jan. to June 2022 (14th MP)* | *July to Dec. 2022 (15th MP)* | *Jan. to Apr. 2023 (Partial 16th MP)* |
| **Closed Intake Investigations** | **2,492** | **3,272** | **4,468** | **3,916** | **3,349** | **3,883** | **2,098** |
| *Referred for Full ID* | 411 | 567 | 781 | 634 | 360 | 110 | 149 |
| *Investigations Closed at Intake* | 2,081 | 2,700 | 3,687 | 3,285 | 2,989 | 3,773 | 1,949 |
| *Findings of Investigations Closed at Intake* | | | | | | | |
| Investigations Closed at Intake | 2,081 | 2,700 | 3,687 | 3,285 | 2,989 | 3,773 | 1,949 |
| *Excessive, and/or Unnecessary, and/or Avoidable* | *180 (9%)* | *477 (18%)* | *734 (20%)* | *737 (22%)* | *531 (18%)* | *543 (14%)* | *268 (14%)* |
| *Chemical Agent Violation* | *164 (8%)* | *163 (6%)* | *260 (7%)* | *324 (10%)* | *287 (10%)* | *245 (6%)* | *146 (7%)* |

---

[256] The Department and the Monitoring Team have not finalized an agreed upon definition of these categories. The definition of these findings and the development of corresponding data is complex, especially because it requires quantifying subjective information where even slight factual variations can impact an incident's categorization. A concrete, shared understanding of what these categories are intended to capture is necessary to ensure consistent assessment across the board. While efforts were made in summer 2021 to finalize common definitions, they were never finalized, and has since languished. The effort has not been reinvigorated given the focus on higher priority items this year. This categorization process has also not been expanded to Full ID Investigations.

[257] Incidents beginning February 3, 2020 received Intake Investigations, so those incidents from the early part of the Tenth Monitoring Period are not included in this data.

*Staff Suspensions*

The following table identifies suspensions from January 2020 to May 2023 and discussed in more detail in the Security, Violence, and Use of Force and Staff Accountability – Identifying and Addressing Misconduct sections of the report.

| Reason | Jan. to June 2020 | July to Dec. 2020 | Total 2020 | Jan. to June 2021 | July to Dec. 2021 | Total 2021 | Jan. to Jun 2022 | July to Dec. 2022 | Total 2022 | Jan. to May. 2023 | Total 2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Abuse of Sick Leave | 27 | 12 | 39 | 48 | 90 | 138 | 162 | 143 | 305 | 60 | 60 |
| Conduct Unbecoming | 32 | 60 | 92 | 44 | 84 | 128 | 44 | 55 | 99 | 65 | 65 |
| Use of Force | 36 | 42 | 78 | 52 | 30 | 82 | 36 | 30 | 66 | 59 | 59 |
| AWOL | 0 | 0 | 0 | 0 | 165 | 165 | 34 | 63 | 97 | 16 | 16 |
| Arrest | 21 | 39 | 60 | 38 | 32 | 70 | 19 | 13 | 32 | 7 | 7 |
| Inefficient Performance | 25 | 19 | 44 | 24 | 5 | 29 | 16 | 23 | 39 | 17 | 17 |
| Electronic Device | 4 | 14 | 18 | 2 | 2 | 4 | 5 | 5 | 10 | 4 | 4 |
| NPA | 5 | 5 | 10 | 3 | 3 | 6 | 8 | 9 | 17 | 10 | 10 |
| Other | 2 | 4 | 6 | 1 | 3 | 4 | 3 | 8 | 11 | 6 | 6 |
| Contraband | 4 | 3 | 7 | 4 | 1 | 5 | 0 | 0 | 0 | 3 | 3 |
| Erroneous Discharge | 5 | 0 | 5 | 0 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| Abandoned Post | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 1 |
| **Total** | 161 | 198 | 359 | 216 | 415 | 631 | 329 | 350 | 679 | 248 | 248 |

Table caption (header): **Staff Suspensions**[258] *January 2020 to May 2023*

---

[258] The Department utilizes broad categories for tracking the reason a staff member was suspended. In some instances, the misconduct that resulted in the suspension can fit numerous categories interchangeably. The selection of the category depends on the judgment of the individual manually entering and tracking this information for the Department. For example, an MOS may be suspended for leaving a door unsecured that later resulted in a Use of Force. This suspension could be tracked under "Inefficient performance of duty" or "Use of Force." Similarly, an MOS may display unprofessional behavior prior to a Use of Force and can be suspended for "Conduct Unbecoming" or "Use of Force." While the Monitoring Team has not conducted an extensive assessment of every suspension, these examples appear infrequent, and most suspensions appear to be appropriately categorized. More importantly, the suspensions are effectuated.

## *Status of Disciplinary Cases*

The table below presents the status of all cases referred for formal discipline (by *incident date*). This data illustrates that about 170 cases with incident dates from over a year ago (*i.e.*, 2021 or earlier) remain pending, and thus the opportunity for *timely* discipline has clearly been lost. This data is discussed in more detail in the Staff Accountability – Identifying and Addressing Misconduct sections of the report.

| Status of Disciplinary Cases & Pending Investigations by Date of Incident *As of May 2023* | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2016 | | 2017 | | 2018 | | 2019 | | 2020 | | 2021 | | 2022 | | Jan. to May. 2023 | Total | |
| Total Individual Cases | 471 | | 620 | | 784 | | 1027 | | 695 | | 713 | | 433 | | 66 | 4,809 | |
| Closed Disciplinary Cases | 470 | 99.8% | 614 | 99% | 772 | 98% | 1007 | 98% | 683 | 98% | 594 | 83% | 222 | 51% | 7 | 11% | 4,369 | 91% |
| Pending Disciplinary Cases | 1 | 0.2% | 6 | 1% | 12 | 2% | 20 | 2% | 12 | 2% | 119 | 17% | 211 | 49% | 59 | 89% | 440 | 9% |
| | | | | | | | | | | | | | | | | | |
| Unique UOF Incidents | | | | | 456 | | 604 | | 448 | | 561 | | 317 | | 55 | | |
| | | | | | | | | | | | | | | | | | |
| Pending UoF Investigations | 0 | | 0 | | 0 | | 0 | | 0 | | 1 | | 51 | | 819 | 871 | |
| Total Uses of Force | 4,652 | | 4,780 | | 5,901 | | 7,169 | | 6,197 | | 8,184 | | 7,005 | | 2,718 | 46,606 | |

## *Command Discipline*

The table below summarizes the results of all CDs referred from Rapid Reviews since 2019, based on an analysis conducted by NCU. This data is discussed in more detail in the Staff Accountability – Identifying and Addressing Misconduct sections of the report.

| Month of Incident/Rapid Review | Total # of CDs Recommended | Still Pending in CMS | | Resulted in 1-5 Days Deducted | | Resulted in MOC | | Resulted in Reprimand | | Resulted in Corrective Interview | | Dismissed at Hearing or Closed Administratively in CMS | | Never Entered into CMS | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Status and Outcome of Command Disciplines Recommended by Rapid Reviews** *As of March 2023 NCU Report* | | | | | | | | | | | | | | | |
| *Jan.-June 2019 (8th MP)* | 757 | 5 | 1% | 390 | 52% | 50 | 7% | 66 | 9% | 42 | 6% | 180 | 24% | 15 | 2% |
| *July-Dec. 2029 (9th MP)* | 878 | 2 | 0% | 489 | 56% | 72 | 8% | 90 | 10% | 11 | 1% | 180 | 21% | 26 | 3% |
| *Jan.-June 2020 (10th MP)* | 492 | 3 | 1% | 263 | 53% | 30 | 6% | 37 | 8% | 10 | 2% | 110 | 22% | 39 | 8% |
| *July-Dec. 2020 (11th MP)* | 948 | 12 | 1% | 410 | 43% | 78 | 8% | 89 | 9% | 22 | 2% | 289 | 30% | 43 | 5% |
| *Jan.-June 2021 (12th MP)* | 1229 | 41 | 3% | 511 | 42% | 131 | 11% | 150 | 12% | 15 | 1% | 318 | 26% | 65 | 5% |
| *July-Dec. 2021 (13th MP)* | 1126 | 24 | 2% | 283 | 25% | 150 | 13% | 120 | 11% | 23 | 2% | 426 | 38% | 97 | 9% |
| *Jan.-June 2022 (14th MP)* | 907 | 23 | 3% | 291 | 32% | 59 | 7% | 134 | 15% | 30 | 3% | 286 | 32% | 84 | 9% |
| *July-Dec. 2022 (15th MP)* | 1216 | 60 | 5% | 450 | 37% | 69 | 6% | 183 | 15% | 46 | 4% | 303 | 25% | 105 | 9% |
| *Jan.-Mar. 2023 (Partial 16th MP)* | 546 | 113 | 21% | 260 | 48% | 26 | 5% | 22 | 4% | 18 | 3% | 78 | 14% | 22 | 4% |
| *Jan-23* | 181 | 49 | 27% | 71 | 39% | 5 | 3% | 10 | 6% | 4 | 2% | 33 | 18% | 9 | 5% |
| *Feb-23* | 142 | 12 | 8% | 78 | 55% | 9 | 6% | 9 | 6% | 6 | 4% | 20 | 14% | 7 | 5% |
| *Mar-23* | 223 | 52 | 23% | 111 | 50% | 12 | 5% | 3 | 1% | 8 | 4% | 25 | 11% | 6 | 3% |
| *CDs pending more than a year are not tracked in the CD reports analyzed for this chart and therefore may still appear pending although it is likely they have since been dismissed. | | | | | | | | | | | | | | | |

*Unmanned Posts & Triple Tours*

The table below provides the monthly total and daily average from January 2021 to May 2023 of the total uniform staff headcount, unmanned posts (a post in which a staff member is not assigned), and triple tours. The total number and daily average of unmanned posts and triple tours have both decreased since January 2022 and from their prior peak in 2021. On average, there were 37 fewer unstaffed posts per day in May 2023 compared to the previous peak in January 2022. There were also 25 fewer triple tours on average in May 2023 compared to the previous peak in August 2021. On the other hand, the number of unstaffed posts per day has been steadily rising in 2023, and there were 9 more unstaffed posts per day in May 2023 compared to January 2023.

| Month | Average Headcount per Day | Average Unmanned Posts per Day | Total Unmanned Posts per Month | Average Triple Tours per Day[259] | Total Triple Tours per Month |
|---|---|---|---|---|---|
| January 2021 | 8,872 | | | 0 | 6 |
| February 2021 | 8,835 | | | 3 | 91 |
| March 2021 | 8,777 | | | 5 | 169 |
| April 2021 | 8,691 | | | 4 | 118 |
| May 2021 | 8,576 | | | 4 | 109 |
| June 2021 | 8,475 | | | 4 | 108 |
| July 2021 | 8,355 | | | 15 | 470 |
| August 2021 | 8,459 | | | 25 | 764 |
| September 2021 | 8,335 | | | 22 | 659 |
| October 2021 | 8,204 | | | 6 | 175 |
| November 2021 | 8,089 | | | 6 | 174 |
| December 2021 | 7,778 | | | 23 | 706 |
| January 2022 | 7,708 | 59 | 1825 | 24 | 756 |
| February 2022 | 7,547 | 23 | 638 | 3 | 90 |
| March 2022 | 7,457 | 29 | 888 | 1 | 41 |

[259] This column contains data for the number of staff who worked over 3.75 hours of their third tour. This chart does not contain data for staff who have worked 3.75 hours or less of their third tour.

| Month | Average Headcount per Day | Average Unmanned Posts per Day | Total Unmanned Posts per Month | Average Triple Tours per Day[259] | Total Triple Tours per Month |
|---|---|---|---|---|---|
| April 2022 | 7,353 | 13 | 385 | 0 | 3 |
| May 2022 | 7,233 | 31 | 972 | 1 | 33 |
| June 2022 | 7,150 | 27 | 815 | 2 | 67 |
| July 2022 | 7,138 | 20 | 615 | 2 | 58 |
| August 2022 | 7,068 | 24 | 735 | 2 | 50 |
| September 2022 | 6,994 | 22 | 649 | 4 | 105 |
| October 2022 | 6,905 | 26 | 629 | 2 | 63 |
| November 2022 | 6,837 | 16 | 486 | 2 | 50 |
| December 2022 | 6,777 | 13 | 395 | 4 | 115 |
| January 2023 | 6,700 | 13 | 391 | 1 | 38 |
| February 2023 | 6,632 | 15 | 419 | 0 | 8 |
| March 2023 | 6,661 | 17 | 525 | 0 | 7 |
| April 2023 | 6,590 | 16 | 491 | 0 | 11 |
| May 2023 | 6,516 | 22 | 671 | 0 | 7 |

*Sick Leave, Medically Monitored/Restricted, and AWOL*

The tables below provide the monthly average from January 1, 2019 to May 31, 2023 of the total staff headcount, the average number of staff out sick, the average number of staff on medically monitored/restricted duty, and the average number of staff who were AWOL.[260] The Monitoring Team's assessment of this data is included in the Uniform Staffing Practices section of this report.

| 2019 | | | | | | | | |
|------|------|------|------|------|------|------|------|------|
| **Month** | **Head-count** | **Average Daily Sick** | **Average Daily % Sick** | **Average Daily MMR3** | **Average Daily % MMR3** | **Average Daily AWOL** | **Average Daily % AWOL** |
| January 2019 | 10577 | 621 | 5.87% | 459 | 4.34% | | |
| February 2019 | 10482 | 616 | 5.88% | 457 | 4.36% | | |
| March 2019 | 10425 | 615 | 5.90% | 441 | 4.23% | | |
| April 2019 | 10128 | 590 | 5.83% | 466 | 4.60% | | |
| May 2019 | 10041 | 544 | 5.42% | 501 | 4.99% | | |
| June 2019 | 9953 | 568 | 5.71% | 502 | 5.04% | | |
| July 2019 | 9859 | 538 | 5.46% | 496 | 5.03% | | |
| August 2019 | 10147 | 555 | 5.47% | 492 | 4.85% | | |
| September 2019 | 10063 | 557 | 5.54% | 479 | 4.76% | | |
| October 2019 | 9980 | 568 | 5.69% | 473 | 4.74% | | |
| November 2019 | 9889 | 571 | 5.77% | 476 | 4.81% | | |
| December 2019 | 9834 | 603 | 6.13% | 463 | 4.71% | | |
| **2019 Average** | **10115** | **579** | **5.72%** | **475** | **4.71%** | | |

---

[260] The AWOL data is only available for August 1, 2021-January 26, 2022 and April 2022-May 31, 2023.

| 2020 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Month | Head-count | Average Daily Sick | Average Daily % Sick | Average Daily MMR3 | Average Daily % MMR3 | Average Daily AWOL | Average Daily % AWOL |
| January 2020 | 9732 | 586 | 6.02% | 367 | 3.77% | | |
| February 2020 | 9625 | 572 | 5.94% | 388 | 4.03% | | |
| March 2020 | 9548 | 1408 | 14.75% | 373 | 3.91% | | |
| April 2020 | 9481 | 3059 | 32.26% | 278 | 2.93% | | |
| May 2020 | 9380 | 1435 | 15.30% | 375 | 4.00% | | |
| June 2020 | 9302 | 807 | 8.68% | 444 | 4.77% | | |
| July 2020 | 9222 | 700 | 7.59% | 494 | 5.36% | | |
| August 2020 | 9183 | 689 | 7.50% | 548 | 5.97% | | |
| September 2020 | 9125 | 694 | 7.61% | 586 | 6.42% | | |
| October 2020 | 9079 | 738 | 8.13% | 622 | 6.85% | | |
| November 2020 | 9004 | 878 | 9.75% | 546 | 6.06% | | |
| December 2020 | 8940 | 1278 | 14.30% | 546 | 6.11% | | |
| 2020 Average | 9302 | 1070 | 11.49% | 464 | 5.02% | | |

| 2021 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Month | Head-count | Average Daily Sick | Average Daily % Sick | Average Daily MMR3 | Average Daily % MMR3 | Average Daily AWOL | Average Daily % AWOL |
| January 2021 | 8872 | 1393 | 15.70% | 470 | 5.30% | | |
| February 2021 | 8835 | 1347 | 15.25% | 589 | 6.67% | | |
| March 2021 | 8777 | 1249 | 14.23% | 676 | 7.70% | | |
| April 2021 | 8691 | 1412 | 16.25% | 674 | 7.76% | | |
| May 2021 | 8576 | 1406 | 16.39% | 674 | 7.86% | | |
| June 2021 | 8475 | 1480 | 17.46% | 695 | 8.20% | | |
| July 2021 | 8355 | 1488 | 17.81% | 730 | 8.74% | | |
| August 2021 | 8459 | 1416 | 17.27% | 767 | 9.36% | 90 | 1.05% |
| September 2021 | 8335 | 1703 | 21.07% | 744 | 9.21% | 77 | 0.92% |
| October 2021 | 8204 | 1558 | 19.46% | 782 | 9.77% | 30 | 0.37% |
| November 2021 | 8089 | 1498 | 19.08% | 816 | 10.39% | 42 | 0.52% |
| December 2021 | 7778 | 1689 | 21.79% | 775 | 10.00% | 42 | 0.54% |
| 2021 Average | 8454 | 1470 | 17.46% | 699 | 8.32% | 56 | 0.68% |

207

| 2022 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Month | Head-count | Average Daily Sick | Average Daily % Sick | Average Daily MMR3 | Average Daily % MMR3 | Average Daily AWOL | Average Daily % AWOL |
| January 1-26, 2022 | 7708 | 2005 | 26.01% | 685 | 8.89% | 42 | 0.55% |
| February 2022 | 7547 | 1457 | 19.31% | 713 | 9.45% | | |
| March 2022 | 7457 | 1402 | 18.80% | 617 | 8.27% | | |
| April 2022 | 7353 | 1255 | 17.07% | 626 | 8.51% | 23 | 0.31% |
| May 2022 | 7233 | 1074 | 14.85% | 634 | 8.77% | 24 | 0.34% |
| June 2022 | 7150 | 951 | 13.30% | 624 | 8.73% | 16 | 0.22% |
| July 2022 | 7138 | 875 | 12.26% | 608 | 8.52% | 19 | 0.26% |
| August 2022 | 7068 | 831 | 11.76% | 559 | 7.91% | 17 | 0.24% |
| September 2022 | 6994 | 819 | 11.71% | 535 | 7.65% | 6 | 0.09% |
| October 2022 | 6905 | 798 | 11.56% | 497 | 7.20% | 6 | 0.09% |
| November 2022 | 6837 | 793 | 11.60% | 476 | 6.96% | 7 | 0.09% |
| December 2022 | 6777 | 754 | 11.13% | 452 | 6.67% | 7 | 0.10% |
| 2022 Average | 7181 | 1085 | 14.95% | 586 | 8.13% | 17 | 0.23% |

| 2023 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Month | Head-count | Average Daily Sick | Average Daily % Sick | Average Daily MMR3 | Average Daily % MMR3 | Average Daily AWOL | Average Daily % AWOL |
| January 2023 | 6700 | 692 | 10.33% | 443 | 6.61% | 9 | 0.13% |
| February 2023 | 6632 | 680 | 10.25% | 421 | 6.35% | 9 | 0.14% |
| March 2023 | 6661 | 639 | 9.59% | 401 | 6.02% | 11 | 0.17% |
| April 2023 | 6590 | 595 | 9.03% | 393 | 5.96% | 10 | 0.15% |
| May 2023 | 6516 | 514 | 7.89% | 403 | 6.18% | 10 | 0.15% |
| 2023 Average | 6620 | 624 | 9.42% | 412 | 6.23% | 10 | 0.15% |

## _Leadership Appointments – January 2022 to June 2023_

The table below identifies the leadership positions that were filled between January 2022 and June 2023, including the date of appointment and the departure date, if applicable. This is discussed in the Overarching Initiatives Related to Reform section of the Report.

| TITLE | DIVISION/ BUREAU | DATE OF APPOINTMENT | DATE OF DEPARTURE |
|---|---|---|---|
| Deputy Commissioner | IT | 9/24/2017 | 6/1/2023 |
| Chief Of Staff | Commissioner's Office | 2/14/2022 | |
| Associate Commissioner | Program & Community Partnership | 3/14/2022 | |
| Assistant Commissioner | Programs | 3/14/2022 | |
| Assistant Commissioner | Program Operations | 3/18/2022 | |
| Assistant Commissioner | Advancement and Enrichment Program | 4/7/2022 | |
| Associate Commissioner | Human Resources | 4/7/2022 | 4/1/2023 |
| Deputy Chief Of Staff | Commissioner's Office | 4/11/2022 | |
| Assistant Commissioner | Preparedness and Resilience | 4/11/2022 | |
| Deputy Commissioner | Management Analysis & Planning | 4/18/2022 | |
| Deputy Commissioner | Investigation Division | 5/9/2022 | 4/1/2023 |
| Deputy Commissioner | Security Operations | 5/16/2022 | |
| Deputy Commissioner | Trials | 5/31/2022 | |
| Assistant Commissioner | AIU | 6/16/2022 | |
| Assistant Commissioner | Human Resources | 6/16/2022 | 4/9/2023 |
| Deputy Commissioner | DCPI | 7/1/2022 | 4/14/2023 |
| Associate Commissioner | Data Quality & Metrics | 7/3/2022 | |
| Assistant Commissioner | CIB | 7/11/2022 | |
| Deputy Commissioner | Classification & Population Management | 7/25/2022 | |
| Assistant Commissioner | Human Resources | 8/8/2022 | |
| Executive Director, Intergovernmental & Policy | Intergovernmental & Policy | 8/8/2022 | |
| Associate Commissioner | IT | 8/8/2022 | |
| Deputy Commissioner/General Counsel | Legal Division | 8/8/2022 | |
| Associate Commissioner | Trials | 8/8/2022 | |
| Associate Commissioner | Operations | 8/22/2022 | |
| Assistant Commissioner | Data Analytics and Research | 8/29/2022 | |
| Deputy Commissioner | Administration | 9/6/2022 | |
| Assistant Commissioner | Training Academy | 9/6/2022 | 9/17/2022 |
| Assistant Commissioner | Operations Research | 9/12/2022 | 6/16/2023 |
| Senior Deputy Commissioner | Operations | 10/31/2022 | 2/3/2023 |
| Associate Commissioner | Operations | 11/9/2022 | |
| Deputy Commissioner | Training | 12/5/2022 | |
| Assistant Commissioner | Investigations | 12/11/2022 | 3/1/2023 |
| Assistant Commissioner | Investigations – PREA | 12/19/2022 | |
| Acting Deputy Commissioner | Human Resources | 1/9/2023 | |

| TITLE | DIVISION/ BUREAU | DATE OF APPOINTMENT | DATE OF DEPARTURE |
|---|---|---|---|
| Assistant Commissioner | Management Analysis and Planning | 1/17/2023 | |
| Deputy Commissioner | Health Affairs | 1/30/2023 | |
| Assistant Commissioner | Public Information | 1/30/2023 | |
| Assistant Commissioner | Training Academy | 1/30/2023 | |
| Acting Assistant Commissioner | Human Resources | 4/1/2023 | |
| Assistant Commissioner | Security Operations | 4/3/2023 | |
| Acting Deputy Commissioner | Investigations | 4/3/2023 | |
| Acting Deputy Commissioner | IT | 4/10/2023 | |
| Assistant Commissioner | EMTC | 4/24/2023 | |
| Assistant Commissioner | GRVC | 4/24/2023 | |
| Assistant Commissioner | OBCC | 4/24/2023 | |
| Assistant Commissioner | RMSC | 4/24/2023 | |
| Assistant Commissioner | VCBC | 4/24/2023 | |
| Deputy Commissioner | DCPI | 5/3/2023 | |
| Deputy Commissioner | Facilities & Fleet Administration | 5/22/2023 | |
| Assistant Commissioner | Classification & Population Management | 5/24/2023 | |
| Nunez Manager | | 6/14/2023 | |
| Assistant Commissioner | RNDC | 6/20/2023 | |

# APPENDIX B:
# IMAGES OF MAY 26, 2023
# INCIDENT #1

*Images of May 26, 2023 Report Incident #1*

The images below are related to Incident #1 which involved two uses of force.[1]



**Picture 1 (First UOF)**: Prior to the escort, the individuals being escorted were left in a vestibule unrestrained. An officer appeared to be conducting a commissary distribution through an open door to other persons in custody outside the vestibule. The A station door was repeatedly opened as well.

---

[1] The Mayor and Commissioner shared this video with the media and it was reported by at least two outlets. *See* Dean Moses, EXCLUSIVE| Correction commissioner, Mayor Adams show Rikers Island security videos in effort to counter federal monitor's claims of misdeeds, amNY, https://www.amny.com/police-fire/rikers-island/exclusive-correction-commissioner-mayor-adams-show-rikers-island-security-videos-in-effort-to-counter-federal-monitors-claims-of-misdeeds/.  *See* also, Marcia Kramer, CBS2 gets exclusive look at Rikers Island security tapes mentioned in federal monitor's scathing report on city jail, CBS New York, https://www.cbsnews.com/newyork/news/rikers-island-security-tapes-federal-monitor-scathing-report-government-eric-adams/.



**Picture 2 (First UOF)**: 10 individuals, including the individual involved in the uses of force, were escorted in an elevator together.



**Picture 3 (First UOF)**: The other individuals were escorted off the elevator, but the individual involved in the uses of force was left on the elevator alone.

2



**Picture 4 (First UOF)**: A CO entered the elevator and rode it with the person involved in the use of force. The elevator stopped and a civilian staff entered. The person involved in the uses of force walked towards the door and the CO extended her arm in front of the doorway, but he pushed past.



**Picture 5 (First UOF)**: Two COs were standing in a hallway near an open breaker gate. The individual involved in the use of force walked down the hallway towards the already-open breaker gate.

3



**Picture 6 (First UOF)**: The individual walked through the already-open breaker gate.



**Picture 7 (First UOF)**: The person in custody reached a closed doorway in the hallway and tried to open the locked door. A large number of officers quickly responded and surrounded him.

4



**<u>Picture 8 (First UOF)</u>**: The officers closed in on the individual and he tried to push past. Multiple officers took him to the ground face first. His face makes contact with the floor during the takedown.



**<u>Picture 9 (Second UOF)</u>**: After the first UOF, the individual was brought to the search area. He had ESU officers on all sides and was rear cuffed and in leg shackles, both visible in this picture. An ESU Captain was supervising (in the front).

5



**Picture 10 (Second UOF)**: The individual jerked his knee towards the ESU officer's helmet as he assisted him putting on shoes. From the camera angles, it is unclear if he made contact with the helmet.



**Picture 11 (Second UOF)**: Officers took the individual to the ground. It appears they took him down face first. He was still rear restrained and in leg shackles. The takedown occurred in the area to the right that is not visible on camera.

6



**Picture 12 (Second UOF)**: The camera operator moved, and the individual was on the ground behind a partition.



**Picture 13 (Second UOF)**: ESU officers lifted the individual, and he is depicted hitting his head on the plastic container in the picture above.

7



**Picture 14 (Second UOF)**: ESU officers lifted the individual again and he hit his head on the partition leg. Spots of blood are visible on the floor below his nose and on his pants.



**Picture 15 (Second UOF)**: The individual then hit his head on the concrete floor and made a pained face.

8



**Picture 16 (Second UOF)**: After the individual has repeatedly hit his head and is in clear pain, multiple ESU staff continued to hold him against the floor and did not render any aid.



**Picture 17 (Second UOF)**: There is blood on the floor beneath the metal bench and next to the plastic box where the takedown occurred. ID took photos of this area early the next day, and that red spot is no longer on the floor. The red spot was cleaned, and the individual's injury report stated he had lacerations to the face, so therefore these spots appear to be the individual's blood.

9



**Picture 18 (Second UOF)**: Staff picked him up by his leg and side.



**Picture 19 (Second UOF)**: Another red spot is visible on the floor near where his head was sitting next to the partition leg. In the picture above, the red spot is visible by his knee.

10



**Picture 20 (Second UOF)**: Staff toss the individual onto the gurney. They are using so much force that it's hard to get a non-blurry picture.



**Picture 21 (Second UOF)**: The individual was thrown face first onto the gurney.

11



**Picture 22 (Second UOF)**: The individual was transported to the clinic, still face first on the gurney. He did not move since he was placed in this position by staff. Multiple ESU staff continued to hold him down during their escort. They never rendered aid.

12

# APPENDIX C:
# MONITOR'S
# APRIL 2023 RECOMMENDATIONS

**Monitoring Team's April 2023 Recommendations**

The chart below provides a comprehensive list of the Monitoring Team's April 2023 Recommendations.

| Recommendations | Update |
|---|---|
| **Security Practices** | |
| **Improved Security Practices**: Improved security practices, reducing the use of excessive and unnecessary force, and the resulting improvement in facility safety is undoubtedly the most important aspect of advancing the reforms and achieving compliance with the Consent Judgment. It is for this reason that the requirements enumerated in the Action Plan § D. (Security Practices) must remain a top priority. | *See* Security, Violence and UOF Section of Report. |
| **Investigations** | |
| **Deputy Commissioner of ID**: Recruit an appropriately qualified, permanent Deputy Commissioner of ID. | The Commissioner has selected a Deputy Commissioner of ID who is currently in the process of vetting. |
| **Improve Quality of Investigations**: ID, in consultation with the Monitoring Team, must implement a concrete plan to improve the quality of investigations going forward. | Two teams have been assigned to conduct immediate reviews of all incidents to identify cases for immediate action. ID has also increased supervision of Full ID and Intake Investigations, including routine meetings with investigators to review pending and closed investigations. Finally, ID leadership reviews all closed cases. |
| **Conducting Investigations Without Fear or Favor**: investigators and supervisors must be advised that investigations are to be conducted without fear or favor, that the requirements of the Consent Judgment are to be adhered to, and that all staff within ID are encouraged to work collaboratively with the Monitoring Team. | The Department reports that ID has conducted at least three Town Hall meetings with all ID Staff regarding their obligations and expectations to conduct timely, thorough and independent investigations. |
| **Improved Training:** Improve training curricula for new investigators and for ID refresher training to ensure they are consistent with the requirements of the Court's orders and directly address the concerning practices identified in 2022 and 2023. | The Department has advised the Monitoring Team it will consult the Monitoring Team on its training program which is currently under development. |
| **Quality Assurance Program**: A quality assurance program must be instituted to assess those use of force investigations that are closed with no action. | ID initiated a quality assurance program for Intake Investigations and Full ID investigations that are closed without charges. On a weekly basis, a random selection of 30 intake investigations and 5 |

| Recommendations | Update |
|---|---|
| | Full Investigations that meet this criteria are evaluated. The QA of intake investigations began with cases closed in November of 2022. |
| **Re-evaluate Certain 2022 and 2023 Investigations**: ID must reevaluate certain 2022 and 2023 investigations where additional scrutiny is merited to ensure the robust identification of all staff misconduct. ID, in consultation with the Monitoring Team, shall develop appropriate criteria to identify such cases. | ID, in consultation with the Monitoring Team, identified XX cases that were closed between July 1, 2022 and December 31, 2022 that merited re-evaluation. Leadership of the ID Division is in the process of re-evaluating these cases and providing routine updates to the Monitoring Team. Evaluation of 2023 cases will occur through the QA process described above. |
| **Assignment of ID Investigators**: The number of ID investigators and supervisors dedicated to working on UOF investigations must be significantly increased by either: (1) re-assigning investigators from SIU to ID, and (2) through aggressive recruitment efforts. In particular, to entice candidates to work at the Department, the City will likely need to further increase the salary and/or benefit package available to investigators given that initial efforts have not resulted in the number of candidates needed to fully staff ID. | *See* Staff Accountability – Identifying and Addressing Misconduct Section of Report. |
| **Intake** | |
| **Appoint Dedicated Leadership of Intake Department-Wide**: A dedicated leader should be appointed to manage the Department's intake functions (*see* pg. 88 of the April 3, 2023 Monitor's Report). | The Classification Manager has consulted with the Monitoring Team on potential options to address this recommendation, but the Department has not provided a formal proposal. |
| **Implementation of ITS to Track Intra/Inter-Facility Transfers**: Support the roll-out of ITS tracking and the Dashboard at all facilities to ensure they are incorporated into practice, including that each facility have clear procedures and appropriate working space to ensure staff can accurately enter data into ITS, regardless of competing priorities. As part of this work, the Department should begin to assess *why* staff in each facility are not utilizing the ITS tracking as they have been trained to do. While stating expectations and training staff are important components of implementation, they are often insufficient unless they are informed by an understanding of what gets in the way of meeting the expectations. The facilities vary in size and intake traffic and experience different obstacles and barriers to compliance. The Monitoring Team recommends that the Department assess *what* kind of operational changes are needed to respond to these barriers and *how* they may be implemented to increase compliance within each facility's intake. This should also include On-the-Ground Oversight described on page 85 of the April 3, 2023 report. | *See* Management of Incarcerated Individuals Section of Report. |

| Recommendations | Update |
|---|---|
| **Management of the Quality Assurance Process for New Admissions and Inter/Intra Facility Intake Data**: The Department must identify *practical* quality assurance strategies, in consultation with the Monitoring Team, for assessing whether staff are following established procedures (*see* pgs. 84- to 87 of the April 4, 2023 Monitor's Report). Most recently, the Deputy Commissioner of Operations' staff has initiated a few procedures intended to assess compliance with tracking requirements. A Facility Operations Team consisting of uniformed staff from the Deputy Commissioner of Classification's office has been monitoring the operation of the intake units. They are ideally suited to the task described above. As that work unfolds, the Monitoring Team recommends that formal protocols are developed that document any findings or recommendations identified by the team and what is communicated to the facilities, along with the responses received from the facilities. Further, the Legal Division has endeavored to collect relevant data. However, neither effort has been particularly formulaic, and the results of these efforts have not been compiled in a meaningful way that could establish appropriate proof of practice or be verified by the Monitoring Team. The Monitoring Team recommends that the Nunez Compliance Unit ("NCU") be engaged in collecting and managing the various data and information that is prepared by the Deputy Commissioner of Operations office and Legal Division about the various initiatives underway so the information can be consistently and routinely reviewed. NCU's specific expertise and dedicated resources are well suited for this task to obtain the relevant information, analyze it and routinely evaluate and report out findings. | *See* Management of Incarcerated Individuals Section of Report. |
| **Additional Reporting by the Department**: Given the current state of affairs, the Monitoring Team recommends that the City and Department file two additional reports on the status of intake before the next Monitor's Report, one on **May 17, 2023** and another on **June 16, 2023**. | Complete |
| ESU[261] | |
| **ESU Leadership and Staffing**: ESU must be reconstituted to include leadership that embraces the goals of the Consent Judgment and that directs its staff to manage crises in ways that reduce harm rather than amplify it. | *See* Security, Violence and UOF Section of Report. |
| **Training ESU Staff**: Create and implement the two-day in-service refresher training for ESU (and SRT) in consultation with the Monitoring Team.[262] | *See* Leadership, Supervision and Training Section of Report. |

---

[261] These recommendations apply to the Emergency Services Unit or any unit that may serve the same function, but may utilize a different name.

[262] Consultation with the Monitoring Team on this training has already been initiated by the Deputy Commissioner of Training.

| Recommendations | Update |
|---|---|
| **Revise ESU Screening Policy**: Revise Operations Order 24/16 (Special Unit Assignment) to eliminate the loopholes identified in the April 3, 2023 Monitor's Report. | *See* Security, Violence and UOF Section of Report. |
| **Screening Procedures for Assignment of ESU**: Improve processes for screening, and the individuals appointed to conduct said screenings, and ensuring adequate oversight to ensure that the screenings are appropriate and reliable and are not susceptible to potential malfeasance | *See* Security, Violence and UOF Section of Report. |
| **Screening of Staff Assigned to ESU**: Screen all current ESU staff (both permanent and support teams) for suitability of assignment. | *See* Security, Violence and UOF Section of Report. |
| **Revise ESU CLOs**: Relevant ESU's command level orders related to use of force must be updated, in consultation with the Monitoring Team. | *See* Security, Violence and UOF Section of Report. |
| **Supervision** | |
| **Assistant Commissioners of Operations: On-board the new Assistant Commissioners of Operations** as quickly as possible to provide the long-awaited leadership, expertise and hands-on/eyes-on supervision that the facilities need to truly begin their culture change. | *See* Leadership, Supervision and Training Section of Report. |
| **Deployment of Supervisors**: Complete efforts to redeploy supervisors to the facilities and to ensure their presence throughout evenings and weekends to properly oversee staff assignments and to provide much needed on-the-ground coaching and guidance to officers. | *See* Leadership, Supervision and Training Section of Report. |
| **Support for Supervisors**: Department must make it a high priority for the Deputy Wardens and Wardens to actively supervise and provide in-service training to these newly promoted ADWs to ensure that the quality of the supervision improves. | *See* Leadership, Supervision and Training Section of Report. |
| **Facility Leadership**: The Assistant Commissioners of Operations must be on-boarded as quickly as possible to provide the long-awaited leadership, expertise and hands-on/eyes-on supervision that the facilities need to truly begin their culture change. This mentorship and support is acutely necessary starting with the DW, ADW and Captain ranks such that they can properly motivate, guide and shape the practices of their subordinates. Five Assistant Commissioners of Operations are scheduled to begin work in April 2023. | *See* Leadership, Supervision and Training Section of Report. |
| **Screening/Promotions** | |
| **Evaluation of Candidates for Promotion**: Carefully evaluate candidates for Deputy Warden to determine if a candidate without one-year jail experience is appropriate for promotion. While there may be candidates for which this exception is appropriate (e.g., the Executive Director of the Classification Unit), supervision experience in the jails is a key component in understanding and assessing the facility operations and practices that underpin this work. | *See* Leadership, Supervision and Training Section of Report. |
| **Revise Screening Policy**: The erroneous removal of the provision regarding the ranking of outstanding candidates should be reinstated in the Department's screening policy. | *See* Leadership, Supervision and Training Section of Report. |

| Recommendations | Update |
|---|---|
| **Scrutinize ADWs not Recommended for Promotion**: The Department should carefully scrutinize the 12 recently promoted staff with concerning screening information, provide necessary support to these staff while they are in their 1-year probationary period, and closely review and assess any misconduct (use of force or otherwise) before their probationary period expires. | The Department reported that the Commissioner is satisfied with his choices. One ADW has been demoted. The other 11 will be monitored and evaluated during their probationary period for conduct that suggests a lack of qualification. |
| **Revise Screening Policy**: The Monitoring Team recommends that the Department improve the rigor of its screening procedures and revise its Pre-Promotional Screening policy, in consultation with the Monitoring Team, to address the concerns identified in the April 3, 2023 Monitor's Report. | *See* Leadership, Supervision and Training Section of Report. |
| **Discipline** | |
| **Eliminate the Backlog of UOF Disciplinary Cases Pending 1 Year or More from the Incident Date**: The Monitoring Team recommends that all pending use of force disciplinary cases that occurred between January 1, 2021 and June 30, 2022 must be closed **by August 15, 2023**. | *See* Staff Accountability – Identifying and Addressing Misconduct Section of Report. |
| **Evaluate the Use of Lower-Level Sanctions & Expungement**: The Monitoring Team recommends that the Trials Division revise its protocols, in consultation with the Monitoring Team, to limit the circumstances in which low-level sanctions and expungement may be utilized, to be implemented no later than **July 30, 2023**. | *See* Staff Accountability – Identifying and Addressing Misconduct Section of Report. |
| **Revise Command Discipline Procedures**: Expanded use of Command Disciplines necessitates vigilance by the Department to ensure this process has integrity and is not abused. This includes appropriate oversight of the revised Command Discipline process to ensure cases are processed and not dismissed due to procedural errors. Further, oversight of the outcome of CDs is necessary to ensure that they reach appropriate outcomes and do not simply default to the lowest level sanction (despite evidence to the contrary). Appropriate mechanisms must be in place to ensure that cases that require formal discipline are referred. There must be sufficient oversight to ensure that if a staff member has exceeded the number of allowable CDs in a given time period that the cases are referred for MOCs. Finally, an appropriate tracking system for CD appeals must also be developed by the Legal Division. | *See* Staff Accountability – Identifying and Addressing Misconduct Section of Report. |
| **Resolution of Medical Incompetence Cases**: The Trials Division must resolve the medical incompetence cases brought between October 1, 2022 and March 31, 2023 for active staff and that are still pending **by August 31, 2023**. | *See* Uniform Staffing Practices Section of Report. |
| **Staffing for Trials Division**: The City and Department must continue to vigorously recruit necessary staff for the Trials Division. While progress has been made, the number of staff is still not sufficient to manage the caseload and process cases in a timely manner. As part of this effort, the Monitoring Team also continues to strongly recommend that the City and | *See* Staff Accountability – Identifying and Addressing Misconduct Section of Report. |

| Recommendations | Update |
|---|---|
| Department afford staffing in the Trials Division an opportunity to work remotely. Even if permitted for only a few days per week, this benefit would support the overall recruitment efforts of qualified candidates. | |
| **Staffing for OATH**: OATH must continue to evaluate its staffing needs to determine whether additional staff are necessary to support the timely resolution of disciplinary matters. | OATH reported that it conducted a staffing analysis and found it currently has sufficient staff to ensure the timely resolution of disciplinary matters pursuant to the Third Remedial Order and Action Plan. OATH reported that its Trial Division's overall capacity will increase in July 2023 with the onboarding of a new ALJ and three new law clerks. |
| **Management of Uniform Staffing** | |
| **Finalization of Sick/Leave and Absence Control Policies**: Revise and implement the Sick Leave and Absence Control **by May 15, 2023**. | *See* Uniform Staffing Practices Section of Report. |
| **Finalization of Medically Modified/Restricted Policies**: Revise and implement Medically Modified/Restricted procedures **by June 30, 2023**. | *See* Uniform Staffing Practices Section of Report. |
| **Management of SMART Unit**: Recruit and hire a manager of the SMART unit. | *See* Uniform Staffing Practices Section of Report. |
| **Overall Hiring of Staff** | |
| **Overall Recruitment for Department**: The Monitoring Team continues to strongly encourage the Department to develop a remote work option, even for a few days per week, for staff with amenable job responsibilities as it would greatly enhance the Department's ability to attract qualified candidates. | *See* Overarching Initiatives Related to Reform Section of Report |
| **Management of Nunez Matters** | |
| **Department Coordination with Nunez Monitor**: Dedicate additional resources to supporting the work of the Monitoring Team to ensure information is provided in a timely manner. | *See* Department's Management Structure and Management of the *Nunez* Court Orders Section of Report. |
| **Management of Nunez Matters**: Identify an individual to manage the Department's overall compliance efforts with the Court's orders. An incredibly unique skill set is required. This individual must have appropriate and recognized authority, a command of the Department's entire operation, and a nuanced understanding of the requirements in the various Court orders in this matter. Their core tasks are to set priorities and resolve conflicts within those priorities that may demand the same resources; anticipate potential barriers to implementation; communicate proactively with the Monitoring Team regarding upcoming initiatives, progress and obstacles encountered; and respond to the Monitoring Team's feedback and ensure it is incorporated into practice. | *See* Department's Management Structure and Management of the *Nunez* Court Orders Section of Report. |
| **EISS** | |

| Recommendations | Update |
|---|---|
| **E.I.S.S. Access to Information**: E.I.S.S. staff must have timely access to the relevant information on staff backgrounds so that they can obtain a complete understanding of the staff's practices prior to placement in E.I.S.S., and to ensure that the monitoring plans are tailored to address the underlying conduct that may have resulted in the staff's placement on probation or any issues raised during the screening of newly promoted staff. The Monitoring Team recommends information is shared with E.I.S.S. as efficiently as possible—including materials which identify concerns raised during the screening process for newly promoted supervisors. | *See* Leadership, Supervision and Training Section of Report. |
| **Staffing for E.I.S.S.**: The unit currently has three open positions for civilian employees, but progress towards filling these roles has been on pause as the ADW positions were filled. The Monitoring Team strongly recommends that recruiting additional civilians to support this work should resume given the current strain on uniformed resources. | *See* Leadership, Supervision and Training Section of Report. |

# APPENDIX D:
# TRANSCRIPT OF NUNEZ VIDEO

**<u>Transcription of Video re: DOC'S Bold Path Forward and Introduction to Nunez</u>**

Hello. My name is [Redacted] and I am the General Counsel of the New York City Department of Corrections. I have been asked to speak to you to introduce the training program that you are headed into and, in specific, to talk about the Nunez Decree and what flows from it. The Nunez suit was filed in 2011 by a group of incarcerated individuals, in which the name plaintiff was Mr. Nunez, against the Department alleging that force on Rikers Island was being applied excessively and unnecessarily. In 2014, the federal government, the Department of Justice, joined that lawsuit. It had initially investigated use of force against juveniles on the island but it came in as a full partner to the plaintiffs in 2014. Nunez is a federal case, in federal court.

In October of 2015, the Nunez lawsuit was settled. It is a 63 page settlement agreement. It is a consent decree that has had a major impact on the island and on all of our work ever since. It required a new use of force policy, a policy that you know, but I have little doubt, will be reviewed with you. It increased programming on the sensible view that idleness, as they say, is the Devil's playpen and that if people are idle, they are more likely to get involved in fights and the like. It required prompt investigation of use of force cases and it improved the disciplinary process for use of force cases, which is to say it impacted both our investigations division and our trial division and it called for a pilot program for body worn cameras -- a program that has now gone far beyond being a pilot program and is now a way of life on the island. In addition, it called for increased training -- training that all of you have had before and training that this program that you are about to embark on is part of what is required. It also established rules and guidelines for assigning people to special units, for promoting people, to make sure that anyone assigned to a special unit like ESU, or promoted has not been involved in serious use of force incident in the prior five years. It has changed the way of life for anyone who has worked on Rikers Island since 2011 or 2015. What also happened then was the appointment of a federal monitor, Steve Martin, whose job it was to oversee the decree and make sure we complied with its terms. The Monitor is still in place and calls with the monitoring team are almost daily. Important to know that the decree sort of increased the sanctions for filing a false report of a use of force incident and increased the sanctions for failing to report a use of force incident. And it prescribed certain conduct, in particular, use of chemical agents when that was unnecessary and

gratuitous when an incident had been calmed or quelled -- striking someone in the head, choke holds, things that by definition were excessive force. That was the Nunez Consent Decree in 2015. Since then, in the Nunez case, there have been three more court orders expanding the agreement to different areas and an action plan in June of 2022.

The Nunez Decree now not only covers use of force, it covers intake, it covers self-harm incidents, it covers staffing and sick leave and the like. There are a great many aspects of what goes on in Rikers Island, what goes on in headquarters, that are subject to the Nunez Consent Decree and the subsequent court orders. What I want to say before I close is this. Nunez is not a no use of force policy or a no use of force decree. I testified in City Council and a Council person said that people on Rikers Island, the incarcerated individuals, are among the most dangerous in the city. And another Councilman responded and said you cannot say that. They are pretrial detainees and I thought to myself, well the truth is they are dangerous and they are pretrial detainees. People are here in large numbers, some 35% for homicides and for violent crimes. The days when Rikers Island housed shoplifters and misdemeanants and non-violent criminals are behind us with bail reform. What we house today are dangerous individuals and we house a large portion of individuals with mental health issues who one wishes were elsewhere but are ours and ours to keep safe and secure. What that means is that there will be occasions when force is necessary. You know that and I know that; the Commissioner knows that. But What Nunez means is force can never be unnecessary or excessive. Your work is scrutinized. There is Genetec film everywhere. People are looking at you; lawyers are looking at you; judges are looking at you and so it is critically important that while you are bold, you are also right and thoughtful. That as each incident as it arises, you bring to it not only your experience, which in most instances is vast, but your good judgment. I say to people Rikers Island is the only place where when people go to work, they begin their day by saying "be safe". It is not an easy job, but in addition to be safe, be wise, be thoughtful, use force when it's necessary. Never use force when it's excessive. I thank you for giving me the opportunity to talk today. I wish you well in your training and perhaps the most important thing I can say is be safe and be well.

# APPENDIX E:
# PROPOSED COURT ORDER

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
                                                   :

MARK NUNEZ, et al.,                          :
                                                   :
 Plaintiffs,                             :
                                                   :
 - against -                           :
                                                   :
CITY OF NEW YORK, et al.,              :
                                                   :
 Defendants.                          :
                                                   :  **11 Civ. 5845 (LTS)(JCF)**
------------------------------------------------------------ X
                                                   :

UNITED STATES OF AMERICA,         :
                                                   :
              Plaintiff-Intervenor,    :
                                                   :
 - against -                           :
                                                   :
CITY OF NEW YORK and NEW YORK CITY   :
DEPARTMENT OF CORRECTION,        :
                                                   :
              Defendants.          :
------------------------------------------------------------ X

**[PROPOSED] ORDER**

236

**Section I: Remedial Steps for the Department to Address by December 31, 2023**

1. **UOF, Security and Violence Indicators**: By, September 30, 2023, the Department, in consultation with the Monitor, shall develop a set of data and metrics for use of force, security and violence indicators that will be routinely evaluated by Department leadership to identify trends and patterns regarding unnecessary and excessive force and violence in order to identify the root cause of these issues and develop strategies to address them. The Monitoring Team shall be permitted immediate access to the Department's actions (including but not limited to meetings, discussions, and internal reports) and data in order to evaluate the quality of the Department's assessment of its data and metrics.

2. **Revise Search Procedures**: By, October 30, 2023, the Department, in consultation with the Monitor, shall reconstitute its search procedures to ensure searches are conducted in an efficient, timely, safe manner and to reduce the possibility of a use of force. The new search procedures shall be subject to the approval of the Monitor.

3. **Revise Escort Procedures**: By, October 30, 2023, the Department, in consultation with the Monitor, shall revise its escort procedures to eliminate the use of painful escort holds. The new escort procedures shall be subject to the approval of the Monitor.

4. **Lock-in Procedures**: By September 25, 2023, the Department shall develop and implement a protocol that requires each lock-in to occur at certain times each day. Housing unit staff must ensure the lock-in occurs and report the lock-in time for the housing unit to the Tour Commander. The Department shall track and record the lock-in times at each unit in every Facility to ensure the lock-in occurs as required. These protocols and procedures shall be subject to the approval of the Monitor.

5. **Door Security**: By September 25, 2023, the Department shall develop and implement a protocol to ensure the Control Station Door is secured at all times and to ensure that an Control Station Door is never opened when a housing unit door is opened or an incarcerated individual is in the vestibule. This protocol shall be subject to the approval of the Monitor.

6. **Staff Off Post**: Staff shall not leave their post or place of assignment without the permission of a superior. Employees who are authorized to leave their post for any reason must return to the post as quickly as possible. Staff assigned to work to a housing unit post (either the A or B post) shall not be permitted to leave their post until they have been properly relieved or exigent circumstances exist.

7. **ESU Training**: By, August 31, 2023, the Department, in consultation with the Monitor, shall develop and implement a training curriculum for the Emergency Services Unit or any functional equivalent unit, including, but not limited to the Special Response Team and the Special Search Team. The training shall include, among other things, procedures and protocols for use of force, conducting searches, and responding to alarms and emergency situations in a manner that ensures safety for incarcerated individuals and staff. The content of the training programs shall be subject to the approval of the Monitor.[263]

---

[263] This approval requirement is consistent with Consent Judgment, § XIII, ¶1(c) for Probe Team Training.

8. **Revise ESU CLOs**: By, November 30, 2023, the Department, in consultation with the Monitor, shall review and revise as necessary all of ESU's command level orders[264] related to the use of force. The new ESU command level orders related to the use of force shall be subject to the approval of the Monitor.[265]

9. **Screening and Assignment of Staff to Special Teams**[266]: By, October 30, 2023, the Department, in consultation with the Monitor, shall develop and implement a screening and assignment process for the initial assignment to ESU and routine reassessment of ESU staff to ensure their continued fitness for duty. The Department's screening policy and reassessment procedures shall be subject to the approval of the Monitor.

10. **Revise Pre-Promotional Screening Policies and Procedures**: By, September 30, 2023, the Department, in consultation with the Monitor, shall revise its pre-promotional screening policies and procedures to address the issues identified by the Monitor in each of its Court filings in 2023.

11. **ID Staffing**: By, November 30, 2023, the City shall ensure that the Department's ID Division maintains at least 21 supervisors and 85 investigators to conduct use of force investigations unless and until the Department presents an internal staffing analysis and can demonstrate to the Monitor that fewer staff are necessary to conduct thorough, timely, and objective investigations of all Use of Force Incidents as required by the *Nunez* Court Orders.

12. **Additional Reporting by the City and Department Regarding Intake**: On September 15, 2023 and November 15 2023, the City and Department shall file two additional reports on the Court docket regarding the status of their continued efforts to implement reliable Intake tracking systems for new admissions and inter/intra facility transfers.

13. **Revise Command Discipline Policy and Procedures**: By November 30, 2023, the Department, in consultation with the Monitor, shall develop and implement appropriate controls and procedures regarding the adjudication of Command Discipline, including but not limited to the following:

    a. timely processing of cases so that a minimal number of cases are dismissed due to procedural errors;

    b. quality assurance measures to ensure that all Command Disciplines impose an appropriate outcome and do not merely default to the lowest level sanction, unless proportional to the severity of the misconduct;

    c. appropriate mechanisms to ensure cases that require referral for formal discipline via MOCs are completed as required by policy, including but not limited to, when

---

[264] This applies to the Emergency Services Unit or any unit that may serve the same function, but may utilize a different name (e.g. the Special Response Team, the Special Search Team, etc.).

[265] This approval requirement is consistent with Consent Judgment, § IV, ¶1 regarding approval of the Use of Force Policy.

[266] This includes the Emergency Services Unit or any functional equivalent, including but not limited to Strategic Response Team and Special Search Team.

the conduct merits formal discipline or when a staff member has exceeded the number of allowable CDs in a given time period; and

    d.  appropriate tracking of any appeal to the Legal Division and the outcome of the appeal.

The Department's Command Discipline policy and procedures shall be subject to the approval of the Monitor.

14. **External Assessment of Procedures for Preventing and Responding to Self-Harm**: The City and Department shall authorize, and the Department and CHS shall engage, a consultant (and any necessary staff) who is a qualified expert in the prevention and response to self-harm in correctional settings to conduct the assessment outlined below. The Monitor has approved of the selection of Dr. Timothy Belavich. If Dr. Belavich proves to be unavailable or becomes unavailable or his continued service becomes otherwise unfeasible in the future, the Department will retain an appropriate replacement subject to approval of the Monitor. The consultant shall conduct the following assessment in consultation with the Monitor:

    a.  DOC and H+H policies related to Suicide Prevention to ascertain whether they reflect generally accepted practice.

    b.  H+H protocols for screening, assessing, and treating the risk of suicide and DOC protocols for responding to suicidal ideation/referrals and for monitoring those who are on suicide precautions to determine whether they are adequate.

    c.  DOC staff's practices and responses to self-harm incidents.

    d.  Current H+H and DOC protocols and practices to identify where performance is subpar.

    e.  DOC and H+H's Morbidity-Mortality Review process to ensure that it reflects the generally accepted practice and relevant professional standards.

The consultant shall provide the Monitor with a report of his findings by December 31, 2023.

## Section II: Monitor Reporting

1. The Monitor shall file status reports on October 10, 2023 and November 16, 2023 on the City and Department's efforts to address the specifically enumerated remedial relief outlined in this Order.

2. On December 21, 2023, the Monitor shall file his next report with the compliance assessments of the *Nunez* Court Orders pursuant to the Court's June 13, 2023 Order, § 3.

SO ORDERED this _____ day of _____, 2023

_____

LAURA TAYLOR SWAIN
Chief United States District Judge

# APPENDIX F:
# COMMISSIONER'S
# MAY 26, 2023
# LETTER TO MONITOR

**Note: Reference to Incidents Numbers are
Those Incidents Identified in the Monitor's
May 26, 2023 Report (dkt. 533).**

**NEW YORK CITY DEPARTMENT OF CORRECTION**
**Louis A. Molina, Commissioner**
**Office of the Commissioner**
75-20 Astoria Boulevard, Suite 305
East Elmhurst, New York. 11370

718 • 546 • 0890
Fax 718 • 278 • 6022

Dear Mr. Martin:

Your May 24, 2023 letter to Corporation Counsel Hinds-Radix and me begins with this sentence: "[w]e write . . . regarding three recent incidents that have raised significant concerns about the City and Department's ability to accurately and timely report serious injuries, to safely manage the individuals in its custody and to collaborate with and provide the Monitoring Team with timely and accurate information." I write because I believe the record belies that claim. Each of the three incidents is discussed below.

████ Incident 2 ████    On Sunday, May 14, 2023, at 12:18 p.m., ████ PIC 2 ████ jumped from the top tier of a mental observation housing unit at GRVC, leaving a suicide note behind. He had exhibited no signs of suicidal ideation, and the act occurred quickly, giving no one time to intervene. (There were two officers on the floor.) ██ PIC 2 ██ was rushed to Elmhurst Hospital and placed on life support, from which he was removed late on May 16 and pronounced dead. A JAR meeting was held on May 17, and neither CHS nor DOC found any evidence that staff had acted inappropriately in responding to the incident and that no immediate corrective measures were necessary.

On Tuesday, May 16 at 12:06 a.m., a COD was issued about the incident. It indicated that medical staff were reporting that ██ PIC 2 ██ had sustained a fracture to the head. A second COD was issued on the morning of May 17, indicating that ██ PIC 2 ██ had been pronounced dead at 11:51 p.m. the night before. It is not a requirement under the Consent Decree or the Action Plan for us to report deaths in custody.

At 3:13 p.m. on May 17, the Deputy Monitor sent an email to the Department's First Deputy Commissioner and General Counsel advising them that she had received a news report about ██ PIC 2 ██'s death. (There were stories in the Post and Gothamist.) She asked this question: "What can be shared with us?" Your May 24 letter criticizes the Department for not responding to that email, but the criticism is unwarranted. Neither the First Deputy Commissioner nor the General Counsel received the email. It included a hyperlink to a

document stored on the Tillid Group's cloud platform, which resulted in its being directed to their spam folders. Had either of them received the email, they would surely have responded.

[Incident 3] The facts of the [PIC 3] incident are these: On May 17, 2023, [PIC 3] was assaulted by several other incarcerated individuals in an intake pen at EMTC. As our General Counsel told you, an investigation is underway. (It will include whether CODs were filed belatedly.) In your May 24 letter, you write that "on May 22, the Monitoring Team sought a briefing on the investigation but, to date, a briefing has not been provided." I don't know what you would expect. The Department's General Counsel told the Deputy Monitor by telephone that several MEO 16 interviews had been scheduled and that appropriate disciplinary action would be taken if any officer had shirked their duty. (Three interviews have taken place to date.) Briefings on ongoing investigations are hardly the norm. Moreover, as you acknowledge, the Department's General Counsel facilitated your access to video footage and reports so that you could review the incident.

[Incident 4] On May 20, 2023, [PIC 4], age 31, was transported from a PACE unit at AMKC to the Elmhurst Hospital after he complained to medical staff about headaches. Although he left the unit on his own power, he quickly took a turn for the worse: he was placed on life support, where he remains. On May 22, the Monitoring Team received a report from someone about [PIC 4]s' hospitalization and asked a Department lawyer to "keep an eye out for any CODs." That afternoon, the Department lawyer told the Deputy Monitor that she had done "some double checking [and] wanted to let you know there are no COD's for [PIC 4]." That response should not have come as a surprise. In September 2022, a Department lawyer had informed the Deputy Monitor by email that "typically there is no notification to COD generated for hospital runs . . . with the exception of UOF cases." [PIC 4]s' was not a use of force case. As your letter indicates, on May 23, the Department's General Counsel reported to the Deputy Monitor that [PIC 4] "[who] is 31 years old, appeared to have a heart attack and no foul play is currently suspected." Your letter criticizes the Department for not making "other details regarding the incident . . . available to the Monitoring Team." But that criticism is also misplaced.

We know of no other details; you know what we know about the case.[1]

---

[1] [PIC 4] was discharged from DOC custody on May 24 on compassionate release. As a result, we no longer have any information about his condition.

       *                 *                  *

Your letter suggests that the three incidents "relate to matters that have long plagued the Department." That is not so. In two of the incidents—PIC 2 and PIC 4—there was no departmental wrongdoing. Our sin in those matters, it seems, was not reporting them to the Deputy Monitor quickly enough. I am not sure that you would have done anything differently if you had learned on May 15, and not May 17, that PIC 2 had jumped to his death, or on May 20, and not May 22, that PIC 4 had taken a turn for the worse. I do not believe that any delay in notification impeded your work.

You write that that "[g]iven the aggravated nature of these particular incidents, staff's failure to report them . . . in a timely manner also calls into question the overall veracity of reporting and transparency within the agency." That is baseless. There is no indication in the PIC 2 incident or the PIC 4 incident that anyone submitted a false report or attempted to cover up wrongdoing and the PIC 3 incident is under investigation. Notably, in PIC 2's case, a JAR was held promptly after the incident, something that has never occurred in years past. It evidences transparency within the agency and cooperation with our partner. I don't expect your praise, but to say that these three incidents call our veracity into question is patently untrue.

A letter to the Court that reads like your May 24 letter to the Corporation Counsel and me will do the Department great harm at a time when we are making great strides. Sentences like "[t]hese cases represent significant cause for concern about imminent risk of harm to those in custody" will fuel the flames of those who believe that we cannot govern ourselves. Can that really be said about PIC 2's case? Or PIC 4's"?

Finally, let me say this. We respond daily to a steady stream of emails and telephone calls from the Deputy Monitor, many on short deadlines, and try to do so in a timely and accurate fashion. That is indisputable. To describe what occurred in these three cases as evidence of lack of cooperation is wrong. Hyperbole is always unfortunate, and it permeates the last pages of your May 24th letter.

---

The Monitoring Team has recently emailed about two other cases not mentioned in your May 24 letter: PIC 1 and PIC 5 . If you intend to discuss them in any letter to the Court, I would like additional time to address them. I am disappointed that we were given so little time to prepare this response—that a 12:00 p.m. deadline (already unnecessarily short) was moved to 10:30 a.m. after it was agreed upon.

Sincerely,

Louis A. Molina

Commissioner

# APPENDIX G:
# DISCIPLINARY DECISIONS BY OATH & CIVIL SERVICE COMMISSION

# *Dep't of Correction v. McGibbon*

OATH Index No. 1526/20 (Apr. 27, 2022), *adopted*, Comm'r Dec. (July 1, 2022), *modified*, NYC Civ. Serv. Comm'n Case No. 2022-0579 (Oct. 28, 2022), **appended**

> Petitioner proved that Respondent, a correction officer, used excessive and impermissible force against two inmates in two different incidents, and submitted a false or misleading report about the incidents. ALJ recommends that Respondent's employment be terminated.
>
> CSC modified penalty to maximum penalty short of termination.

---

### NEW YORK CITY OFFICE OF
### ADMINISTRATIVE TRIALS AND HEARINGS

*In the Matter of*
### DEPARTMENT OF CORRECTION
*Petitioner*
*- against -*
### DAVID MCGIBBON
*Respondent*

---

## REPORT AND RECOMMENDATION

**JOYCELYN McGEACHY-KULS,** *Administrative Law Judge*

The Department of Correction ("Department" or "petitioner") referred this disciplinary proceeding to this tribunal pursuant to section 75 of the Civil Service Law. Civ. Serv. Law § 75 (Lexis 2021) alleging that Respondent, Correction Officer David McGibbon used excessive force against two inmates in two separate incidents (Charges, Pet. Exs. 1A, 1B). Respondent denied any wrongdoing and contended that he used appropriate force in each incident. The Department also alleged that Respondent submitted false or misleading use of force ("UOF") reports regarding incident.

The trial was conducted remotely via Webex due to the COVID-19 pandemic. The Department presented documentary evidence, including video footage of the alleged incidents, screenshots from those videos, and testimony from three witnesses: Supervising Investigator ("SI") J. Weinbrecht; Investigator J. Barfield; and Deputy Director of Investigations ("DDI") T. Johnson. Respondent relied on documentary evidence and testified in his own behalf. Respondent did not call any other witnesses.

For the reasons below, I find that Petitioner proved the charges and recommend a penalty of termination.

## ANALYSIS

The charges stem from two separate incidents that occurred at the Anna M. Kross Center ("AMKC") Clinic on September 11, 2017 and March 31, 2020.  The Department alleges that on September 11, 2017, Respondent used impermissible and excessive force against inmate Cruz by placing him in a chokehold and pushing him into a metal shelving unit when he failed to follow Respondent's directive to enter the housing unit.  The Department alleges that use of the chokehold was prohibited in the absence of imminent danger of death or serious bodily harm to Respondent or others.  The Department claims that on March 31, 2020, Respondent used unnecessary force against Fajardo by pushing the inmate with his stomach when the inmate failed to follow Respondent's directive to enter a holding cell.  The Department also alleges that Respondent submitted false, misleading, incomplete or inaccurate reports regarding each of these incidents.

**Use of Force Incident: September 11, 2017**

*Video Evidence*

During the trial, the Department played Genetec surveillance videos from several angles that recorded the events in the vestibule (Pet. Ex. 2).  These videos do not capture audio therefore there is no recording of the conversations between Respondent and Cruz.  The majority of the interaction is captured from angle 31.183 which depicts the vestibule between the housing unit and the control room ("A Station").  There is a large window in the A Station allowing a view of the vestibule and housing area gate.  The gate to the housing unit is on the left side and the A station is on the right.  A metal door is at the end of the vestibule.  At 7:42:47, Cruz is depicted alone in the vestibule where he removes a small object from his waist and passes it through the gate to another inmate in the housing area.  Cruz continues pacing alone in the vestibule and talking to inmates on the other side of the gate.  Other correction officers briefly enter and exit the vestibule without speaking to Cruz.  At 7:46:15, Cruz brings a large plastic garbage can into the vestibule and sits on the lid of the garbage can and continues talking with inmates.  At 7:47:06, Officer Regice comes out of the control room and speaks to Cruz, who then throws the garbage can and lid against a wall in the vestibule area.  Cruz appears to be agitated and resumes pacing and waving his arms.

3

At 7:48:01, Respondent enters the vestibule from the A Station.  Respondent and Cruz engage in an animated conversation, waving their arms and gesturing while speaking to each other. Respondent approached Cruz several times causing Cruz to step back.  At 7:48:21, Officer Regice intervenes and guides Respondent away from Cruz.  Respondent moves away from Officer Regice and continues to argue with Cruz.  At 7:48:33, Respondent and Cruz are standing in close proximity of each other, and Officer Regice attempts to create space between them on several occasions.  Inmate Cruz's arms are raised and his hands are empty.  At 7:49:00, Respondent approaches Cruz and Officer Regice stands between them and attempts to separate them as they continue to argue.

At 7:50:15, Officer Regice guides Respondent to the A station.  Cruz remains in the vestibule.  He is animated and appears to be talking to Respondent who emerges seconds later from the A station.  At 7:50:28, Officer Regice stands between Respondent and Cruz as they continue to argue.  At 7:51:05, Captain Johnston and another officer enter the vestibule.  At 7:51:14, Cruz walks toward Captain Johnston and removes a small object from his sock and shows it to Captain Johnston.  At 7:51:26, Officer Regice again stands between Cruz and Respondent. Captain Johnston and Cruz begin talking to each other.  At 7:52:00, Respondent steps between Cruz and Captain Johnston.  Cruz continuing to argue with Respondent, raises his arms; his hands are open and empty.

At 7:52:18, Respondent lunges at Cruz, grabbing him by the neck with both hands, placing Cruz in a chokehold.  From angle 31.182, Respondent is seen choking Cruz and pushing him against a wall.  Cruz places his hands on Respondent trying to push him away.  At 7:52:57, two officers intervene to separate Respondent and Cruz (Pet. Ex. 8).

The Department produced three still shots from the video depicting the following: Respondent choking Cruz; Cruz attempting to push Respondent away while Respondent maintains the chokehold; and two officers attempting to separate Respondent and Cruz while Respondent's hands remained around Cruz's neck (Pet. Ex. 2B-D).



(Pet. Ex. 2B)



(Pet. Ex. 2C)



AMKC-QL13-VEST-1  2017-09-11  19:48:16

(Pet. Ex. 2D).

*The Investigation*

DDI Johnson has been employed by the Department since 2007.  She began her career at the Department as an investigator and was promoted to supervising investigator in 2015.  She has been a deputy director of Investigations since 2018.  She explained that this matter was initially investigated by the AMKC field team and Supervising Investigator J. Henderson.  DDI Johnson was subsequently assigned to supervise and review SI Henderson's investigation (Tr. 192).  She testified that SI Henderson reviewed the Genetec video and reports related to the case, including the injury to inmate report and use of force reports.  He interviewed witnesses to the incident however, Cruz declined to be interviewed.

DDI Johnson also reviewed the video and collected documents and reports to determine whether additional documentation or interviews were necessary to complete the investigation.  DDI Johnson testified that she and SI Henderson referred to the Use of Force Directive 5006R-C, which was in effect on the date of the incident, to analyze the evidence and come to a determination regarding Respondent's conduct.  SI Henderson wrote a closing report with his investigation findings.  He concluded that "although Cruz was non-compliant and aggressive toward DOC staff, the force that Respondent used against Cruz was not within the guidelines in the Use of Force

Directive 5006R-C."   DDI Johnson reviewed and signed the closing report accepting SI Henderson's investigation and conclusion regarding the incident.  SI Henderson also signed the report (Tr. 188- 94; Pet. Ex. 1).

After watching the video of the incident, DDI Johnson highlighted that Respondent and Cruz argued for four to five minutes.  She noted that Officer Regice intervened on several occasions attempting to de-escalate the tension between Respondent and Cruz by talking to them and attempting to separate them.  She noted that "at some points, [Officer Regice] even places his, physically places his body in between the two, like he's trying to de-escalate the situation. . . [Officer Regice] is looking directly at Officer McGibbon, and he's talking to him face-to-face" (Tr. 206).  She described Officer Regice pointing and telling Cruz to go that way and observed that Officer Regice was trying to pull Respondent by the hand towards the A station.  She noted that Respondent entered the A station and seconds later returned to the vestibule and resumed the argument with Cruz.  DDI Johnson described that "at several points, [Respondent and Cruz were] chest to chest" and noted that Officer Regice continued with his attempts to separate them.  She stated that Officer McGibbon should have stepped into the A station and called the supervisor (Tr. 206, 241).

DDI Johnson emphasized that during the argument, Respondent pushed Cruz back and placed his hands around Cruz's neck pushing him back by his neck into the metal shelfing units.  Officer Regice and another officer intervened to separate Respondent from Cruz.  Cruz was escorted out of the vestibule, and Officer McGibbon returned to the A station.  DDI Johnson testified that the placing of both hands around Cruz's neck is considered a chokehold (Tr. 221).

DDI Johnson testified that according to the Use of Force Directive, officers are not permitted to use deadly physical force such as a chokehold, except when all other alternatives to such force have been exhausted and when an officer must defend himself or another person from what they reasonably believe to be the use of imminent deadly physical force by the inmate.

According to DDI Johnson, a chokehold is an example of deadly physical force.  She asserted that Respondent's use of the chokehold was not proportionate to Cruz's level of resistance at the time the chokehold was executed.  She noted that prior to Respondent choking Cruz, Cruz's hands were up and open and therefore he did not pose a threat of deadly physical force that would justify Respondent's use of force.  DDI Johnson also observed that Respondent remained engaged in an argument with Cruz for four to five minutes and concluded that Respondent should have

7

remained in the A station to avoid further escalating their interaction.  DDI Johnson noted that members of service are not permitted to use force in response to a verbal threat (Tr. 243, 304).

DDI Johnson testified that Cruz's custody level was "maximum security" which means that he was considered "highly assaultive and has a high propensity to injure other inmates."  She acknowledged that this information was not reviewed as part of the investigation.  However, DDI Johnson offered that knowledge of the inmate's infraction history would not have changed the investigation findings because the determination that Respondent used excessive force was based on staff reports and the video (Tr. 272, 299).

*Respondent's Evidence*

Respondent has been employed by the New York City Department of Correction for 14 years.  Before joining the Department, Respondent worked as a machinist in the U.S. Navy.  Upon joining the Department, he underwent four months of training including instruction on use of force and other Department directives.  Between 2007 and 2017, he took multiple use of force refresher courses that consisted of classroom lessons and interactive physical simulations.  Before this incident, Respondent also received training in defensive tactics, where he learned authorized and prohibited use of force techniques.  Respondent testified that he was trained in conflict resolution and crisis intervention and was taught to use interpersonal communication ("IPC") skills to de-escalate situations that might arise with inmates.  He learned that maintaining a safe distance from an inmate was a de-escalation technique and testified that he should request the assistance of a supervisor to resolve any conflicts with an inmate.  Respondent also received training in the use of deadly physical force and was instructed that deadly physical force may only be used as a last resort.  He was further instructed that, in accordance with the use of force directive, alternatives must be exhausted before deadly physical force was used (Tr. 372-75).

Respondent is assigned to AMKC which houses inmates in rehabilitation programs or with mental health issues.  On the date of this incident, he was assigned to escort inmates between their housing units and the main clinic to get their medication (Tr. 322, 324).  He explained that he first escorts inmates from the housing unit to the bridge area.  Once in the bridge area, he pat-frisks the inmates for security reasons, then calls to confirm his clearance to escort the inmates to the main clinic.  Respondent elaborated that after inmates returned from the clinic, they have to wait in the bridge area, outside of the A Station, to be pat-frisked again before they are permitted to enter the

housing area.  Respondent testified that he has escorted as many as 10 inmates at a time to the clinic "safely without incident" and that he had escorted Cruz to the clinic on a daily basis for almost a year prior to this incident (Tr. 326, 327, 329).

Upon review of the Genetec video, Respondent provided a chronology of his encounter with Cruz in which he conceded, ultimately, that he used a chokehold against the inmate when the inmate did not pose a threat of serious physical injury or death.  Respondent recalled that he did not escort Cruz from the clinic on the date of the incident because Cruz ran away from him.  Thus, he continued to the A Station without Cruz.  Although Cruz had not been pat-frisked, Respondent insisted that Cruz was secured and did not pose a threat to other inmates.  Inmate Cruz later entered the vestibule area and refused to go behind the gates of the housing area (Tr. 378, 379, 393).  Respondent described Cruz as loud and irate, telling Respondent that he was not going back behind the gate.  Respondent related that Cruz then approached him "in an aggressive manner" and Respondent told him to step back and calm down.  However, Cruz continued to be aggressive and refused to enter the housing area telling Respondent "make me, make me, make me" (Tr. 331, 334).  He recalled that Capt. Johnson entered the vestibule area because she heard a commotion and that Cruz approached her in an "aggressive manner."  At that point, Respondent intervened and testified that he "made contact with Cruz's body" after Cruz said "I'm about to cut you" and began talking in a threatening manner.  Because he feared for his safety, Respondent "jumped on [Cruz]" (Tr. 338-40).

Respondent claimed that he was not agitated during his interaction with Cruz.  He asserted that despite the depiction in the Genetec video, he was not arguing with the inmate.  Rather, he was having a discussion with Cruz and was utilizing IPC skills.  Respondent described his demeanor as calm, not agitated, throughout his interaction with Cruz, asserting that he only raised his voice because Cruz could not hear him.  Respondent claimed that he talks with his hands (Tr. 393, 410).

Respondent conceded that he was standing very close to Cruz and that there was not a safe distance between them.  He admitted that he made physical contact with Cruz and characterized it as Cruz's torso in his hand (Tr. 398).  Respondent also acknowledged that Officer Regice was trying to create distance between himself and Cruz to de-escalate the situation.  While admitting that he advanced toward inmate, Respondent claimed that he was attempting to de-escalate the situation.  Respondent denied pushing Cruz but noted that his "hands advanced toward [Cruz]" to

create distance between them.  Respondent recalled that Cruz removed an object from his sock but did not perceive the object as a weapon (Tr. 410, 413, 414, 418).  Respondent testified that although Cruz did not attempt to strike him at any point during their interaction, he believed that Cruz was a threat because he continued to advance toward him.  Respondent further acknowledged that he could have gone into the A Station to avoid further conflict with Cruz.  Respondent conceded that Cruz did not pose a threat of serious injury or death and admitted that placing Cruz in a chokehold was excessive (Tr. 423, 424).  Respondent shared that at the time of the incident, he was upset about news of a family member's medical condition and that he regretted his conduct during this incident (Tr. 343).

**Respondent Violated the Department's Use of Force Directive 5006R-C**

The Department must prove by a preponderance of the credible evidence that Respondent used unauthorized or impermissible force on Cruz.  *See Dep't of Correction v. Hall*, OATH Index No. 400/08 at 2 (Oct. 18, 2007), *adopted*, Comm'r Dec. (Nov. 2, 2007), *aff'd*, NYC Civ. Serv. Comm'n Item No. CD 08-33-SA (May 30, 2008); *Dep't of Correction v. Ingram*, OATH Index No. 320/04 at 4 (Feb. 13, 2004), *adopted*, Comm'r Dec. (Mar. 18, 2004).  I find that the Department met its burden.

The Department's Use of Force Directive 5006R-C, in effect on the date of this incident, expressly prohibits the use of more force than is necessary to restrain an inmate, control a situation or protect oneself or others.  It delineates the circumstances under which force may or may not be used and alternatives to the use of force.  The Directive offers alternatives to the use of force and specifically states that force may be used "only as a last alternative after all other reasonable efforts to resolve a situation have failed" (Pet. Ex. 3 at V. A, B. 1).  Pursuant to the Directive, force may be used against an inmate only to defend oneself or another from a physical attack or from an imminent physical attack or as a last resort, and when there is no practical alternative available to prevent serious physical injury to staff, visitors, inmates, or any other person (Pet. Ex. 3 at IV. A. 1, 8).  Use of a chokehold is deadly physical force and permits that a member of service may use deadly physical force against an inmate only "to defend him/herself or another person from what he/she reasonably believes to be the imminent use of deadly physical force by the inmate" (Pet. Ex. 3 at V. C. 2. A).

The Department produced compelling video evidence depicting Respondent lunging at Cruz and placing him in a chokehold with both hands around his neck. It is apparent from the video footage that Respondent was not facing an imminent use of deadly physical force from Cruz. Immediately prior to the chokehold, Cruz's arms were extended upward and his hands were empty. Nonetheless, Respondent grabbed him by the neck with both hands. Respondent initially attempted to justify this use of deadly physical force by stating that he felt threatened because Cruz continued to advance toward him. However, this account is contradicted by the video evidence. Respondent also testified that Cruz threatened him, stating that he was going to cut him. Respondent's account of this threat is not credible as Respondent later acknowledged that prior to his use of force, Cruz did not pose a threat of serious injury or death. Further, even if there were credible evidence of the inmate's statements, Respondent's use of force would not be justified against verbal threats. Respondent ultimately conceded that the force he utilized was excessive.

Accordingly, the charge that Respondent used impermissible and excessive force against Cruz is sustained.

**Respondent Submitted a False or Misleading Use of Force Report**

Staff members who use or witness a use of force must prepare a written report "based on their own observations," with a "complete account" of events leading to the use of force and a "precise description of the incident," including the force used by the report writer (Pet. Ex. 4; Directive 5006R-C § V(F)(3)(a), (b)). To prove that Respondent provided a false or misleading account of the use of force incident, Petitioner must establish, by a preponderance of the credible evidence, "that the underlying incident occurred, and that respondents' statements materially deviated from the actual events." *Dep't of Correction v. Dominguez, Hernandez, and Christie*, OATH Index Nos. 615/19, 731/19, and 770/19 at 16 (May 21, 2019), *adopted*, Comm'r Dec. (Aug. 6, 2019), *aff'd*, NYC Civ. Serv. Comm'n Case Nos. 2019-0824, 2019-0825 (Feb. 5, 2020) (report that omitted altercation, but included events leading up to it and after it was misleading). The Department has proved this charge.

Respondent submitted his use of force report on the date of the incident and testified that he wrote this report while the incident was still fresh in his mind. He admitted that he was required to provide an accurate and precise description of the incident and that he had a duty to describe the incident truthfully (Tr. 425). Respondent reported that Cruz was cursing and was acting

aggressively toward him and Captain Johnston. Respondent stated that when he and Captain Johnston attempted to "gain separation" from Cruz, the inmate moved his hand into his groin area and threatened them stating, "I'll do you like that other officer in the tombs." Respondent justified the use of force by stating that Cruz advanced toward him and Captain Johnston and that he believed that Cruz had hidden an "unknown object" in his groin. In addition, Respondent wrote that he feared for his life and attempted to secure the inmate against a wall using an "upper control hold to [Cruz's] upper chest area." Respondent then noted that this control hold shifted to Cruz's "collar area" because of Cruz's movement. Respondent reported that he attempted to take Cruz to the floor but "lost grip" of the inmate. Respondent further reported that force was applied to Cruz's upper torso (Pet. Ex. 6).

Respondent reported some details of the events leading up to the use of force but he omitted or mischaracterized significant events that were depicted in the video. Most significantly, while the chokehold is clearly depicted in the video, Respondent fails to report his use of the chokehold or any reference to contact with Cruz's neck. Respondent's report does not accurately describe where the force was inflicted on Cruz's body. He described contact with Cruz's "upper body" that shifted inadvertently to Cruz's "collar area" rather than stating that he grabbed Cruz by the neck as clearly captured in the video and the photographs in evidence. These statements were false and misleading demonstrating Respondent's attempt to cover up the excessive force which he used against Cruz. Further, his description of the events immediately preceding his use of force is not consistent with the video evidence. Respondent reported that prior to his use of force, Cruz had an "unknown object" in his hand and that he feared for his life. However, Cruz's hands were open and empty at the time that the force was used.

Respondent's use of force report is materially false and misleading. Respondent did not report that he placed Cruz in a chokehold and did not state that he placed his hands on Cruz's neck as clearly depicted in the video. The charge that Respondent provided false or misleading testimony in his use of force report is, therefore, sustained.

**Use of Force Incident: March 31, 2020**

*Video Evidence*

On March 31, 2020, Respondent was working at the security post in the main clinic in AMKC. He was responsible for ensuring that inmates waiting to go to the clinic or return back to

the housing area were secured in the holding pen.  The Genetec surveillance videos from several angles recorded the events in the main clinic in AMKC (Pet. Ex. 8).

From angle 91.168, beginning at 8:49:24, Fajardo is depicted standing in the corridor of the main clinic in AMKC with two other inmates.  Respondent is at the other end of the corridor. Respondent gestures for the inmates to come towards him.  Respondent walks toward the clinic pens with the inmates.  Fajardo moves a few steps towards the pen then turns around to face Respondent and made a fist towards the officer's face but does not make contact with Respondent's face or body.  Respondent then continues to walk behind the inmate as they headed towards the pen.

Angle 91.181 captures the events inside the clinic pen and through the bars outside of the pen.  Fajardo and Respondent are standing outside of the pen.  Fajardo continues to argue with Respondent as he enters the pen.  The inmate then turns back around to face Respondent.  At 8:50:59, Fajardo continues into the pen and Respondent enters behind him.  Fajardo again turns around to face Respondent and Respondent, who appears to be several inches taller than Fajardo, uses his stomach to push the inmate in the chest as they continue to argue, causing the inmate to step back.  Two other officers enter the pen and attempt to separate Respondent and Fajardo.  At 8:52:05, all the officers leave the pen and Fajardo is secured inside with other inmates.

*The Investigation*

This case was assigned to J. Barfield for investigation under the supervision of SI Weinbrecht.  As supervising investigator, SI Weinbrecht advises her assigned investigators on the sufficiency of their investigations and reviews their intake closing reports to determine accuracy and completeness.  She reviews the intake report and the evidence, including the Genetec video, the inmate statements, the staff reports, and injury reports to determine whether the report is accurate and review whether or not the staff was in compliance with directives and policy (Tr. 13, 14, 17).

Citing the Directive, SI Weinbrecht testified that when an inmate presents passive resistance, such as being verbally abusive or refusing an order, the officer should summon a supervisor, maintain a safe distance, and use IPC skills to resolve the situation.  SI Weinbrecht noted that Fajardo was passively resisting Respondent's verbal directives (Pet. Ex. 9; Directive 5006R-D § VI(B)(1)(d); Tr. 59).

When reviewing the Genetec video of this incident at trial, SI Weinbrecht noted that Fajardo was animated and agitated when he spoke to Respondent.  Respondent stepped closer to the inmate and gestured to Fajardo to enter the pen.  At that point, Fajardo turned around to face Respondent and gestured a fist punch towards the officer.  Fajardo was non-compliant and passively resisted Respondent's order.  Respondent did not attempt to de-escalate and continued to engage in a verbal debate with the inmate.  Fajardo ultimately complied with Respondent's order and entered the holding pen.  However, Respondent followed Fajardo into the pen, where he continued their verbal confrontation.  Respondent utilized his stomach to push the inmate in the chest when Fajardo was compliant and had not presented any active resistance.  SI Weinbrecht concluded that, based on Fajardo's compliance, it was not necessary for Respondent to enter the pen.  Respondent had an opportunity to secure the inmate in a pen and close the door and notify a supervisor of the inmate's behavior (Tr. 62, 63).

SI Weinbrecht testified that Respondent reported that Fajardo spit in his face prior to entering the holding pen but the investigation was inconclusive regarding this allegation.  She elaborated that there was no spit observed on the Genetec video and there were no gestures that would indicate that Fajardo spit on Respondent (Pet. Ex. 7; Tr. 72).

Investigator Barfield drafted the closing report and concluded that Respondent's use of force was unnecessary and violated the UOF Directive because Fajardo "could have been secured in the pen without force."  Respondent could have closed the door to the holding pen after Fajardo entered the pen (Pet. Ex. 7).  She noted that Respondent created a dangerous situation by entering the pen with inmates and that due to the escalation and use of force with Fajardo, other officers had to enter the holding pen to separate Respondent from Fajardo.  Both Investigator Barfield and SI Weinbrecht testified that MEO-16 interviews were not conducted because the video evidence and the documentation obtained during the investigation were sufficient to close the case with charges (Tr. 112, 131).

*Respondent's Evidence*

Respondent reviewed the video during the trial and testified that when he was escorting Fajardo to the holding pen, Fajardo was behaving aggressively and pointed his index finger in Respondent's face.  Respondent testified that he repeatedly asked Fajardo to go into the holding pen and when Fajardo entered the pen he turned around and spit in Respondent's face.  Respondent

14

ordered the inmate out of the pen but he refused.  Respondent then went into the pen behind the inmate, told him that his behavior was disgusting and disrespectful, and asked Fajardo to come out of the holding pen.  Respondent claims that when he entered the pen, he and Fajardo "bumped each other" (Tr. 358, 362, 367).

Respondent explained that he did not secure the door to the pen because he "got spit in the face."  He explained that he followed Fajardo into the pen because he refused to step out of the pen as Respondent directed.  Respondent acknowledged that Fajardo complied with his initial request to enter the holding pen and that his "order changed after [Respondent] got assaulted" (Tr. 433).  He testified that immediately after Fajardo spit on him, he followed him into the pen and asked him to step out.

Regarding the bump, Respondent initially testified that when he was in the pen, he and Fajardo "bumped into each other" when the inmate turned around.  Respondent later testified that this force was necessary to control the situation because he was assaulted (Tr. 366; Pet. Ex. 10).  Respondent denied that he pushed the inmate with his stomach, explaining that he is at least 100 pounds heavier than Fajardo "so my force is going to make him move, he's a smaller guy than me."  However, Respondent testified that he considered this contact to be a use of force (Tr. 438, 445).

**Respondent Violated the Department's Use of Force Directive 5006R-D**

At the time of this incident, the Department's Use of Force Directive 5006R-D was in effect.  This directive provides that a use of force includes "any instance where Staff use their hands or other parts of their body . . . to restrain, subdue, or compel an inmate to act or stop acting in a particular way."  Directive 5006R-D § III.

This Directive limits the types of force that may be used against inmates and prohibits use of force, inter alia, "[t]o punish discipline, assault, or retaliate against an inmate."  Directive 5006R-D § V(B).  Force may be used on an inmate, inter alia, "[a]s a last resort and where there are no practical alternatives available to prevent physical harm to Staff, visitors, Inmates, or other persons"; or "[t]o prevent or stop the commission of crimes . . . or [t]o prevent the destruction of property that raises a safety or security risk; or [t]o enforce Department or Facility rules, policies, regulations and/or court orders where lesser means have proven ineffective and there is an immediate need for compliance . . . ".  Directive 5006R-D § V(A).

15

It is not disputed that Fajardo ultimately complied with Respondent's order to enter the holding cell. Respondent claims that when Fajardo was entering the holding pen, Fajardo spit in his face causing Respondent to order Fajardo to leave to pen. Although the video did not capture Fajardo spitting on Respondent, it is clear from the video that Respondent followed Fajardo into pen and bumped him with his stomach causing Fajardo to step back. Contrary to Respondent's testimony, this contact appeared to be deliberate and in retaliation for Fajardo spitting is his face.

Accordingly, the charge that Respondent used unnecessary force against this inmate is sustained.

**Respondent Submitted a False or Misleading Use of Force Report**

As noted in the analysis of the prior incident, members of service are required to file a written use of force report when they employ a use of force. The use of force report shall include a detailed description of the Use of Force incident, the events preceding the Use of Force incident, including any attempts to de-escalate the situation and avoid the Use of Force, and the reasons for engaging in the Use of Force (Tr. 65-68; Pet. Ex. 9, Directive 5006R-D §VI (C) (5) (a), (c)).

In his use of force report, Respondent wrote that while directing Fajardo to enter the holding pen, Fajardo became verbally aggressive and refused Respondent's directives. He claimed that Fajardo cursed at him and that Respondent continued to give verbal commands. As Fajardo and other inmates were walking to the pen, Fajardo turned and made "a closed fist as if he was going to strike" Respondent. Respondent reported that Fajardo again told him "fuck you" and spit in his face. Respondent directed Fajardo to step out of the pen and when Fajardo did not comply, Respondent stepped back into the pen and "as the inmate turned around [Respondent] and the inmate bumped (sic) into each other. Respondent further reported that "force was necessary to control the situation because [Respondent] was assaulted" (Pet. Ex. 10).

SI Weinbrecht reviewed this report as part of her investigation and concluded that this report was false and inaccurate because Respondent's force against Fajardo was deliberate. She further noted that the incident was not terminated after Respondent used his stomach to push into the inmate as Respondent reported rather, Respondent continued to engage in a verbal confrontation and advanced toward the inmate. Further, Respondent failed to report that additional staff came to the pen to separate both Respondent and the inmate. SI Weinbrecht testified that the video evidence was inconclusive regarding Fajardo spitting in Respondent's face (Tr. 69).

Respondent acknowledged certain omissions in his report such as his failure to report that he placed his finger in Fajardo's face and that another officer had to separate him from Fajardo when the interaction escalated (Tr. 447-449).  Based on Respondent's mischaracterizations and omissions, I find the charge that Respondent provided false or misleading information in his use of force report is therefore sustained.

## FINDINGS AND CONCLUSIONS

1. Petitioner established that Respondent used excessive force against an inmate on September 11, 2017, in violation of petitioner's rules and its UOF Directive.

2. Petitioner established that Respondent provided a false or misleading use of force report relating to the September 11, 2017, incident, in violation of petitioner's rules and its UOF Directive.

3. Petitioner established that Respondent used unnecessary force against an inmate on March 31, 2020, in violation of petitioner's rules and its UOF Directive.

4. Petitioner established that Respondent provided a false or misleading use of force report relating to the March 31, 2020, incident, in violation of petitioner's rules and its UOF Directive.

These findings of fact are final pursuant to section 1046(e) of the New York City Charter. Charter § 1046(e) (Lexis 2022).

## RECOMMENDATION

Upon making the above findings, I requested and received a summary of Respondent's personnel abstract.[1]  Respondent was hired as a correction officer in August 2007.  He has no prior disciplinary history.  For Respondent's excessive, impermissible use of force against Cruz and the unnecessary use of force against Fajardo and his filing of false or misleading use of force reports,

---

[1] In response to my request to the Department for Respondent's personnel record, Respondent produced a Certificate of Appreciation from AMKC dated December 7, 2018.  Respondent also produced a reference letter from Capt. K. Skinner dated July 3, 2020 citing Respondent's "remarkable talents" as a Correction Officer.  However, these references and commendations do not mitigate Respondent's misconduct in these instances.

the Department seeks a recommendation of termination. [2]  My penalty recommendation is based on the evaluation of the evidence establishing the misconduct, in addition to the consideration of any aggravating or mitigating factors.  I find that termination is the appropriate penalty.

Although the incidents occurred over three years apart, there are striking similarities in the circumstances and in Respondent's conduct.  In each incident, Respondent engaged with "irate" inmates, allowing himself to be drawn into arguments with the inmates where he was taunted or provoked.  In each incident, Respondent reacted with anger, demonstrating a lack of self-control, and evincing a penchant toward violence in response to passive resistance.  In each of these instances, Respondent could easily have de-escalated the situation and terminated the interaction with the inmate without using force by walking away, maintaining distance from the inmates, or by contacting a supervisor.  However, in each instance, Respondent demonstrated a determination to engage with these inmates by rejecting the assistance and intervention of his colleagues as they spoke to him, stood between him and the inmates or tried to pull him away from the inmates.  On each occasion, such interaction escalated resulting in Respondent's use of force against inmates.

In considering appropriate penalties, this tribunal has consistently applied the principle of progressive discipline with the objective of achieving employee behavior modification through increasing penalties for repeated or similar misconduct.  *See Dep't of Transportation v. Jackson*, OATH Index No. 299/90 at 12 (Feb. 6, 1990), *adopted*, Comm'r Dec. (Mar. 20, 1990) ("It is a well-established principle in employment law that employees should have the benefit of progressive discipline wherever appropriate, to ensure that they have the opportunity to be apprised of the seriousness with which their employer views their misconduct and to give them a chance to correct it.").  To that end, penalties for excessive use of force against an inmate have ranged from a 15-day suspension to termination, depending on the "employee's disciplinary record, the extent of force, the degree of provocation, if any; and the extent of any subsequent deception."  *Dep't of Correction v. Ward*, OATH Index No. 2137/18 at 6 (Dec. 31, 2018) (quoting *Dep't of Correction v. Scott*, OATH Index No. 376/06 at 5 (July 10, 2006).

However, in the event that an employee has little or no disciplinary history, termination may be imposed where the proven conduct is so egregious that a lesser penalty is inadequate.  *See*

[2] The initial incident prior to the October 27, 2017 effective date of the Department's Disciplinary Guidelines for Use of Force Incidents which were developed as an outgrowth of a federal lawsuit.  See Nunez v. City of New York, 11 Civ.5845 (LTS) (JCF) (S.D.N.Y. Oct. 21, 2015).

*Keith v. NYS Thruway Auth.*, 132 A.D.2d 785, 786 (3d Dep't 1987) (upholding termination for first offense where incident was egregious); *Dep't of Correction v. Agbai*, OATH Index No. 156/14 (Nov. 25, 2013), *adopted*, Comm'r Dec. (Jan 2, 2014), *aff'd*, NYC Civ. Serv. Comm'n Case No. 2014-0064 (June 3, 2014), *aff'd*, Sup. Ct. Index. No. 101083/2014 (Mar. 27, 2015), *aff'd*, 150 A.D.3d 443 (1st Dep't 2017) (officer terminated for using excessive force by stomping on inmate's head causing loss of permanent front tooth); *Dep't of Correction v. Andino*, OATH Index Nos. 731/13 & 1000/13 (May 14, 2013), *adopted*, Comm'r Dec. (July 8, 2013), *aff'd*, NYC Civ. Serv. Comm'n Case No. 35462 (Jan. 27, 2014) (termination recommended for officer with brief tenure and no prior discipline where he was found guilty of using excessive force against inmates and making false statements on multiple occasions); *Latimer v. Dep't of Health*, NYC Civ. Serv. Comm'n Item No. CD 84-77 (Oct. 5, 1984) (in spite of policy of progressive discipline, penalty of termination for first offense upheld where proved misconduct was intentional and obstinate). The fact that an inmate is not seriously injured is also not a bar to a recommendation of termination where, as here, the force used had the propensity to end in a fatality.  *See Dep't of Correction v. Black*, OATH Index No. 231/21 (June 22, 2021), *adopted*, Comm'r Dec. (Oct. 19, 2021).

I find that the use of deadly physical force against an inmate who is passively resisting Respondent's directives to be egregious misconduct warranting termination.  This misconduct coupled with Respondent's subsequent use of force, in response to passive resistance and his false statements and omissions while reporting his uses of force are significant violations of the Department's Use of Force Directives rendering termination of Respondent's employment appropriate, and I so recommend.


Joycelyn McGeachy-Kuls
Administrative Law Judge

April 27, 2022


SUBMITTED TO:

**LOUIS A. MOLINA**
*Commissioner*

APPEARANCES:

**YVETTE CHANG, ESQ.**
**YVONNE PRITCHETT, ESQ.**
*Attorneys for Petitioner*

JOEY JACKSON LAW, PLLC.
*Attorneys for Respondent*
**BY: BERNARDA VILLALONA, ESQ.**



**NEW YORK CITY DEPARTMENT OF CORRECTION**
**Louis Molina, Commissioner**

**Solange Grey, Deputy Commissioner**
Trials & Litigation Division
75-20 Astoria Boulevard – Suite 310
East Elmhurst, NY 11370

718-546-0364
Fax 718-278-6526

C.O. David McGibbon Jr.

**RE: Final Determination**
DRs #: 0097/2018; and 0677/2020

Dear C.O. David McGibbon Jr.:

After a complete review of the record and the report and recommendation of the Honorable Joycelyn McGeachy-Kuls, Administrative Law Judge, duly designated to conduct a disciplinary hearing on the charges and specifications listed above, I find you guilty as reflected in the report and recommendation. A copy of the report and recommendation is enclosed.

I accept the courts factual findings and the recommended penalty of termination of employment.

The sanction imposed upon is:

**TERMINATION OF EMPLOYMENT.**

Under the provision of Section 76 of the Civil Service Law, you are entitled to appeal from this determination by application either to the Civil Service Commission or to a court in accordance with the provisions of Article 78 of the Civil Practice Law and Rules. If you elect to appeal to the Commission such appeal must be filed in writing within twenty (20) days of receipt of this determination. A decision of the Commission is final and conclusive.

Sincerely,

Louis Molina, Commissioner

Date: _7/1/22_

C: Office of Administrative Trials and Hearings

Employee's Signature: _____ Date: _____
                           Print & Sign Name

Witness Signature: _____ Date: _____
                           Print & Sign Name

*Visit NEW YORK'S BOLDEST on the Web at: www.nyc.gov/boldest*

**THE CITY OF NEW YORK**
**DEPARTMENT OF CORRECTION**

**Findings and Recommendations of**
**Charges and Specifications**

**AGAINST**

| | |
|---|---|
| File No. | OATH Index No. 1526/2020 |
| Case No. | DR # 0097/18 and 0677/20 |
| Book No. | Page |

| Correction Officer | David McGibbon Jr. | 18430 | AMKC | 8/30/2007 |
|---|---|---|---|---|
| Rank or Title | Name | Shield/ID | Facility/Unit | Date Appointed |

**-By-**

| Contract Attorney | Patrick J. Paul | | Office of Trials and Litigation |
|---|---|---|---|
| Rank or Title | Name | | Facility/Unit |

| 02/04/2019 and 05/19/2020 | 03/05/2021 | 10/19/2021 |
|---|---|---|
| Date of Charges | Trial Commenced | Trial Concluded |

ADJOURNMENTS: _____

_____

_____   EXAMINED BY:   Hon. Joycelyn McGeachy-Kuls

---

| **CHARGES** | **FINDINGS AND RECOMMENDATION** |
|---|---|
| Directives:   5006R-C | **DATE:**   4/27/22 |
| | **ON CHARGES** |
| Rules:   3.05.120 | Directive: 5006R-C-Guilty |
| 3.20.010 | |
| 3.20.030 | Rules:   3.05.120 - Guilty |
| 3.20.300 | 3.20.010 - Guilty |
| | 3.20.030 - Guilty |
| | 3.20.300 - Guilty |
| Other: | |

| **SPECIFICATIONS** | **ON SPECIFICATIONS** |
|---|---|
| **DR #** | |
| 1.  Said officer, on or about September 11, 2017, failed to efficiently perform his duties, engaged in conduct unbecoming an officer and of a nature to bring discredit to the Department in that he used impermissible force on Inmate Edwin Cruz.<br><br>Directive 5006R-C<br>Rules: 3.05.120; 3.20.010; 3.20.030; and 3.20.300 | Guilty |
| 2.  Said officer, on or about September 11, 2017, failed to efficiently perform his duties and engaged in conduct unbecoming and in a manner to bring discredit to the Department, in that he submitted a false, misleading, incomplete and/or inaccurate Use of Force Report regarding the abovementioned incident involving Inmate Edwin Cruz.<br><br>Directive 5006R-C<br>Rules: 3.05.120; 3.20.010; 3.20.030; and 4.30.020 | Guilty |
| 1.  Said officer, on or about March 31, 2020, inside the AMKC clinic area, failed to efficiently perform his duties, engaged in conduct unbecoming an officer and failed to maintain a professional demeanor, in that he failed to maintain a safe distance from Inmate Juan Fajardo and used unnecessary force by pushing said inmate in the torso area.<br><br>Directive 5006R-C | Guilty |

| | | |
|---|---|---|
| 3.20.300 | Rules: 3.05.010; 3.05.120; 3.20.010; 3.20.030(4); and | |
| | 2. Said officer, on or about March 30, 2020, failed to efficiently perform his duties and engaged in conduct unbecoming an officer and in a manner to bring discredit to the Department, in that he submitted a false, misleading, incomplete and/or inaccurate Use of Force Report regarding the use of force incident involving Inmate Juan Fajardo.<br><br>Directive 5006R-C<br>Rules: 3.05.010; 3.05.120; 3.20.030(4); 3.20.300; and 4.30.020 | Guilty |

**DISPOSITION**

Termination of employment.

                                          **DEPUTY COMMISSIONER**

ACTION OF THE COMMISSIONER

DATE 7/1/2022

                                          COMMISSIONER OF CORRECTION

**THE CITY OF NEW YORK**
**CITY CIVIL SERVICE COMMISSION**

*In the Matter of the Appeal of*

**DAVID McGIBBON**

*Appellant*

-*against*-

**DEPARTMENT OF CORRECTION**
*Respondent*

*Pursuant to Section 76 of the New York*
*State Civil Service Law*

CSC Index No: 2022-0579

**DAVID MCGIBBON** ("Appellant") appealed from a determination by the Department of Correction ("DOC") finding Appellant guilty of incompetency and/or misconduct and imposing a penalty of termination following disciplinary proceedings conducted pursuant to Civil Service Law Section 75 ("CSL Sec. 75").

DOC charged Appellant, a Correction Officer, with the following:

Charge 1.
        Said Officer on or about September 11, 2017, failed to efficiently perform his duties, engaged in conduct unbecoming an officer and of a nature to bring discredit to the Department in that he used excessive and impermissible force on Inmate Edwin Cruz (B&C# 349-17-06947).

Charge 2.
        Said Officer on or about September 11, 2017, failed to efficiently perform his duties and engaged in conduct unbecoming an officer and in a manner to bring discredit to the Department, in that he submitted a false, misleading, incomplete and/or inaccurate Use of Force Report regarding the abovementioned incident involving Inmate Edwin Cruz.

Charge 3.
        Said Officer on or about March 31, 2020, at approximately 2050 hours, inside the AMKC clinic area, failed to efficiently perform his duties and engaged in conduct unbecoming an officer and failed to maintain a professional demeanor,

1

in that he failed to maintain a safe distance from Inmate Juan Fajardo (B&C# 349-19-04650) and used unnecessary force by pushing said inmate in the torso area.

Charge 4.
      Said Officer on or about March 31, 2020, failed to efficiently perform his duties and engaged in conduct unbecoming an officer and in a manner to bring discredit to the Department, in that he submitted a false, misleading, incomplete and/or inaccurate Use of Force Report regarding the use of force incident involving Inmate Juan Fajardo (B&C# 349-19-04650) described in Specification #3.

These charges arose from two incidents. On September 11, 2017, Appellant is accused of using excessive force against Inmate Edwin Cruz after Cruz failed to follow Appellant's directive to enter the housing unit. On March 31, 2020, Appellant is accused of using unnecessary force against Inmate Juan Fajardo in a holding cell. The disciplinary hearing was held at the Office of Administrative Trials and Hearings ("OATH") before Administrative Law Judge Jocelyn McGeachy-Kuls ("ALJ") over five days in March, April, May, June, and October 2021.

The ALJ's Report and Recommendation ("R&R") concluded that DOC had presented a preponderance of credible evidence to sustain all the charges and recommended that the Appellant be terminated. In his final decision, the Commissioner adopted the findings of fact and the recommended penalty. Appellant was terminated effective July 14, 2022.

Appellant filed an appeal with the Civil Service Commission ("Commission") on July 28, 2022. The Commission requested and received written arguments from both parties. The Commission has carefully reviewed the record and the arguments on appeal. For the reasons indicated below, the Commission affirms the findings of fact but modifies the penalty to time served as unpaid suspension.

The Commission finds that the record supports the ALJ's determination that Appellant's actions on September 11, 2017, constitute serious misconduct and were in violation of DOC's Use

of Force Directive 5006R-C, which was in effect on the day of the incident.[1] The video surveillance footage of the September 11, 2017 incident supports the ALJ's finding that Appellant was not defending himself or another person from what he reasonably believed to be imminent use of deadly physical force by inmate Cruz. The record also supports the ALJ's factual finding that Appellant's use of force report for this incident was false or misleading in its description of the type of force he used to Cruz's neck area. Appellant reported that he tried to secure Cruz using an "upper control hold to his upper chest area" and that his "control hold" shifted inadvertently to Cruz's "collar area" rather than stating that he grabbed Cruz by the neck as clearly captured in the video and the photographs in evidence.

Furthermore, the evidence supports the ALJ's finding that Appellant's conduct on March 31, 2020, was in violation of DOC's Use of Force Directive 5006R-D, which was in effect on the day of the incident.[2] Although the force used on March 31, 2020 was significantly less serious than the September 11, 2017 incident, the Commission finds that the record supports the ALJ's conclusion that it was unnecessary. The Commission also finds that the record supports the ALJ's determination that Appellant's use of force report for this incident was false and misleading. Appellant reported that he and the inmate inadvertently bumped into each other, whereas in the video footage, the contact appears deliberate on the part of Appellant.

Nevertheless, while the record supports the ALJ's findings of fact, and Appellant's misconduct warrants a serious penalty, the particular circumstances of this case support the

---

[1] The Commission notes that Appellant's charged misconduct on September 11, 2017, occurred prior to the October 27, 2017, effective date of DOC's Disciplinary Guidelines for Use of Force Incidents, which were adopted pursuant to the *Nunez* federal lawsuit. See *Nunez v. City of New York*, 11 Civ.5845 (LTS) (JCF) (S.D.N.Y. Oct. 21, 2015). Hereinafter referred to as the "*Nunez* Disciplinary Guidelines."

[2] In assessing Appellant's charged misconduct on March 31, 2020, however, the Commission did consider the *Nunez* Disciplinary Guidelines. Consistent with the Guidelines, the Commission reasoned as part of its penalty assessment that termination was not appropriate, since Appellant had no prior record of use of force misconduct or of providing a false use of force report.

conclusion that the penalty should be the maximum suspension short of termination. Penalties for excessive use of force against an inmate have ranged from a 15-day suspension to termination, depending on the "employee's disciplinary record, the extent of force, the degree of provocation, if any; and the extent of any subsequent deception." *Dep't of Correction v. Ward*, OATH Index No. 2137/18 at 6 (Dec. 31, 2018) (quoting *Dep't of Correction v. Scott*, OATH Index No. 376/06 at 5 (July 10, 2006). In assessing penalty, the Commission is persuaded by OATH precedent which states that "termination of employment, the most severe penalty, should be reserved for the worst offenders, where an inmate sustains serious physical injury, the use of force is extreme, the officer has a significant disciplinary history, or there is an extensive cover-up." *Dep't of Correction v. Sinacore*, OATH Index No. 1244/18 at 34 (May 4, 2018).

Here, the Commission finds significant mitigation from Appellant's unblemished employment record over his fourteen-year tenure as a Correction Officer. In fact, the record establishes that Appellant is regarded as a valued member of the Department by many colleagues and supervisors. Appellant has a remarkable attendance record as he went his first six consecutive years as a Correction Officer without using a sick day.

One year *after* the September 11, 2017, use of force incident, Appellant was presented with a "Certificate of Appreciation," from the Warden of the Anna M. Kross Center (AMKC). This award was given to Appellant in recognition of his "outstanding performance, professionalism, and knowledge, which has been crucial in maintaining the success of this command and the ideals and objectives of the New York City Department of Correction." Furthermore, the record includes letters from four Assistant Deputy Wardens, five Captains, and six fellow Correction Officers that speak to Appellant's positive character and performance as a Correction Officer.[3] One of the

---

[3] In DOC's brief, the agency objects to the Commission's consideration of the character letters. We note that these letters were submitted as exhibits to Appellant's letter to DOC Commissioner Molina pursuant to *Fogel v. Board of*

Deputy Wardens wrote that "Officer McGibbon has always been extremely professional, considerate to the needs of the inmate population and goes the extra mile to resolve issues without using force." Another Deputy Warden wrote about Appellant that "[t]he way he conducts himself is very rare, very approachable, always lending assistance to all ranks/civilians and people in custody." Additionally, a Captain wrote that "[t]he department needs more Officers like McGibbon."

Further, while both incidents were unnecessary, and Appellant's actions on September 11, 2017 constitute very serious misconduct, the fact that neither inmate was seriously hurt is a mitigating factor. Finally, while Appellant's reporting of both incidents was less than forthcoming, they do not constitute an extensive coverup as he reported the incidents and admitted the contacts.

In sum, the record supports the conclusion that given Appellant's otherwise admirable record and the particular circumstances of this case, the maximum penalty short of termination is warranted.   Therefore, the Commission modifies the penalty from termination to time served. Appellant's disciplinary record will reflect this as the maximum period of suspension.

**SO ORDERED.**

Dated: <u>October 28, 2022</u>

---

*Education*. The Commission reviewed the letters as part of the record before the Commissioner when the final determination was made. DOC's objection is overruled.



**CITY OF NEW YORK**
# CIVIL SERVICE COMMISSION

NANCY G. CHAFFETZ, *CHAIR*
RUDY WASHINGTON, *VICE CHAIR*
LARRY DAIS
CHARLES D. MCFAUL
*COMMISSIONERS*

www.nyc.gov/csc
appeals@nyccsc.nyc.gov

AMANDA M. WISMANS
*GENERAL COUNSEL*

JOAN RICHARDS
*DIRECTOR OF ADMINISTRATION*

---

## NOTICE OF CITY CIVIL SERVICE COMMISSION DECISION ON MOTION FOR RECONSIDERATION

**Peter Troxler, Esq.**
Joey Jackson Law, PLLC.
Attorney for Appellant
peter.troxler@joeyjacksonlaw.com

| | |
|---|---|
| **Date:** | 06/02/2023 |
| **Case No.:** | 2022-0579 |
| **Appeal Type:** | 76 Disciplinary |
| **Appellant:** | David McGibbon |
| **Position/Title:** | Correction Officer |
| **Agency:** | DOC |

Attached is a decision in connection with your Civil Service Commission appeal.

This decision constitutes the final decision of the City of New York. For information regarding judicial review of this decision, you may wish to review the NYS Courts website at http://nycourts.gov/. Please note that a proceeding pursuant to Article 78 of the New York State Civil Practice Law and Rules must be commenced within four months after a determination becomes final.

### NEW YORK CITY CIVIL SERVICE COMMISSION

c:   **Solange Grey**
Deputy Commissioner of
Trials & Litigation
solange.grey@doc.nyc.gov

**Yvonne Pritchett, Esq.**
Agency Attorney
New York City Department of Correction
yvonne.pritchett@doc.nyc.gov

**Andrew Rozo**
DOC Agency Attorney
Andrew.Rozo@doc.nyc.gov

**Patrick J. Paul**
Attorney for Respondent
Department of Correction
Patrick.Paul@doc.nyc.gov

**Paul Shechtman**
Deputy Commissioner of Legal Matters/General
Counsel at NYC Dept. of Correction
Paul.Shechtman@doc.nyc.gov

**Michael Booker**
Manager of Trial & Litigation
Michael.Booker@doc.nyc.gov

**THE CITY OF NEW YORK**
**CITY CIVIL SERVICE COMMISSION**

───────────────────────────

*In the Matter of the Appeal of*

**DAVID McGIBBON**
*Appellant*

*-against-*

**DEPARTMENT OF CORRECTION**
*Respondent*

*Pursuant to Section 76 of the New York*
*State Civil Service Law*

CSC Index No: 2022-0579

───────────────────────────

## <u>DECISION ON MOTION FOR RECONSIDERATION</u>

**DAVID McGIBBON** ("Appellant") appealed from a determination by the Department of Correction ("DOC") finding Appellant guilty of incompetency and/or misconduct and imposing a penalty of termination following disciplinary proceedings conducted pursuant to Civil Service Law ("CSL") Section 75.  On October 28, 2022, the Civil Service Commission ("Commission") issued a decision modifying the penalty of termination to a suspension for time served. The Commission found that the extraordinary circumstances surrounding the Appellant's history with the Department warranted the imposition of a penalty less than termination.

DOC moved for reconsideration of the Commission's final decision on January 12, 2023, arguing that Appellant's misconduct required the maximum penalty of termination. Appellant submitted a response to DOC's motion on January 27, 2023. After a preliminary review of the motion, the Commission determined that more information was necessary to make a ruling. Accordingly, on March 2, 2023, the Commission issued certified questions to the parties seeking

clarification regarding DOC's Disciplinary Guidelines for Use of Force Incidents.[1] The parties submitted a series of briefs in response to the certified questions to supplement their respective arguments.

**Commission's Authority and the *Nunez* Disciplinary Guidelines**

The Civil Service Commission is authorized to hear and decide appeals by "any person aggrieved by a final determination of guilt and/or a penalty of punishment imposed in a disciplinary proceeding conducted pursuant to CSL § 75."[2] The Commission routinely reviews appeals involving disciplinary penalties imposed by DOC for use of force-related incidents.[3]

On October 15, 2015, the United States District Court for the Southern District of New York signed a consent judgment (the "*Nunez* consent judgment") against the City of New York, which required DOC to implement Disciplinary Guidelines ("*Nunez* Disciplinary Guidelines" or "the Guidelines") to mandate more severe disciplinary penalties for certain acts of excessive force and failure to report use of force.[4] In its 2020 decision in *Kim Royster v Department of Correction*[5], the Commission held that both the OATH ALJ recommending a disciplinary penalty and the DOC Commissioner, who imposes the discipline, are obligated to apply the *Nunez* Disciplinary Guidelines in cases involving  misconduct to which the Guidelines apply.[6]

---

[1] These Guidelines were adopted pursuant to the *Nunez* federal lawsuit. *See Nunez v. City of New York*, 11 Civ.5845 (LTS) (JCF) (S.D.N.Y. Oct. 21, 2015). Hereinafter referred to as the "*Nunez* Disciplinary Guidelines" or "the Guidelines" The effective date of the Guidelines was October 27, 2017. *Twelfth Nunez Independent Monitor Report*, at 105.
[2] 60 RCNY § 3-01; *see also*, Civ. Serv. Law § 76(1) (Lexis 2023); *see also*, N.Y.C. Charter § 813(d) (Lexis 2023); *see also*, *Matter of City of New York v. City Civ. Serv. Comm'n.*, 60 N.Y.2d 436 (1983).
[3] Pursuant to Section 76 of the New York State Civil Service Law, a Correction Officer may choose to appeal a DOC disciplinary penalty determination to either the Commission or "to the court in accordance with the provisions of article seventy-eight of the civil practice law and rules." Civ. Serv. Law § 76(1) (Lexis 2023).
[4] *Kim Royster v. Dept. of Correction*, Comm'r Dec. (Sept. 8, 2020), at 3.
[5] *Kim Royster v. Dept. of Correction*, CSC Index No. 2020-0643 (July 9, 2021), *affirming* Comm'r Dec. (Sept. 8, 2020).
[6] *Id.* at 4.

Following its *Royster* decision, the Commission has consistently considered the *Nunez* Disciplinary Guidelines in its review of use of force-related appeals from DOC disciplinary determinations.[7] Most recently, in *Jabari Stewart v. Department of Correction*, the Commission applied the *Nunez* Disciplinary Guidelines in affirming Commissioner Molina's termination of a 10-year Correction Officer for using excessive and unnecessary force in three separate incidents and submitting false and misleading use of force reports regarding two of those incidents.[8] Although C.O. Stewart had a relatively lengthy tenure and no prior discipline, the Commission found termination to be an appropriate penalty in light of the *Nunez* Disciplinary Guidelines.[9]

We note that a request to reconsider a final decision is extraordinary relief that is infrequently granted.  However, the Commission now finds that an element of the reasoning in its October 28, 2022 decision pertaining to the application of the *Nunez* Disciplinary Guidelines warrants reconsideration and clarification. The decision relied on a misapplication of the Guidelines as it related to Appellant's charges of deliberately providing false information in a use of force report. We therefore grant the motion to reconsider and revise our October 28, 2022 decision.

After reconsideration, the Commission finds that Appellant's first false use of force report charge[10] constitutes a "prior record" under Section 2 of the *Nunez* Disciplinary Guidelines, and

---

[7] *See Jonathan Douglas v. Dept. of Correction*, CSC Index No. 2022-0344 (Nov. 7, 2022), *affirming* Comm'r Dec. (Apr. 20, 2022) (The Commission affirmed the termination of a 5-year Correction Officer with no prior disciplinary history, in light of the *Nunez* Disciplinary Guidelines, for an excessive use of force incident.); *see also*, *Benny Locicero v. Dept. of Correction*, CSC Index No. 2022-0714 (Jan. 25, 2023), *affirming* Comm'r Dec. (Sep. 29, 2022) (The Commission affirmed the termination of a 7-year Correction Officer, in light of the *Nunez* Disciplinary Guidelines, for an excessive use of force incident); *see also*, *Joel Vanterpool v. Dept. of Correction*, CSC Index No. 2022-0763 (Feb. 24, 2022), *affirming* Comm'r Dec. (Oct. 20, 2022) (The Commission affirmed the termination of a 9-year Correction Officer, in light of the *Nunez* Disciplinary Guidelines, for using excessive force and submitting false and misleading use of force reports.).
[8] *Jabari Stewart v. Dept. of Correction*, CSC Index No. 2023-0058 (Apr. 20, 2023), *affirming* Comm'r Dec. (Jan. 3, 2023).
[9] *See id.*
[10] Appellant committed this offense on September 11, 2017.

that because two false use of force report violations were sustained in the underlying disciplinary proceeding, the Guidelines call for a presumptive penalty of termination.[11]   The Commission further finds, however, that the extraordinary and exceptionally rare nature of Appellant's record with the Department overcomes the presumptive penalty in this case. As a result, the final disposition in the Commission's October 28, 2022, decision remains unchanged.

**DOC's Arguments in Support of the Motion**

In support of its motion for reconsideration, DOC argued, for the first time, that "the [*Nunez* Disciplinary] Guidelines treat guilty findings on two false reporting charges adjudicated in one proceeding as triggering the '2nd offense' penalty when the offenses arise from separate incidents."[12] DOC therefore asserted that Appellant's first false use of force report incident and his second false use of force report incident should collectively carry the "2nd offense" penalty of termination.[13] Additionally, DOC argued that the phrase "prior similar record" in Section 2 of the *Nunez* Disciplinary Guidelines includes instances of false use of force report misconduct that occurred prior to the October 27, 2017 effective date of the Guidelines.[14] In support of its argument, DOC asserted that "[w]hen the Guidelines were promulgated, an officer, like…[Appellant], who prior to the effective date had knowingly submitted a false report in a use of force incident, was on *notice* that, if he did it again, he would be treated as a recidivist. (emphasis added)"[15] DOC relied on this argument to counter an assertion by Appellant that such an

---

[11] On September 11, 2017, Appellant was found to have submitted a false use of force report in connection with an incident involving excessive force against Inmate Edwin Cruz after Cruz failed to follow Appellant's directive to enter the housing unit. Hereinafter referred to as "the Cruz incident." On March 31, 2020, Appellant was found to have submitted a false use of force report in connection with an incident involving unnecessary force against Inmate Juan Fajardo in a holding cell. Hereinafter referred to as "the Fajardo incident."

[12] DOC's response to the Commission's certified questions, dated March 9, 2023, at 2-3.

[13] *See* DOC's motion for reconsideration, dated January 12, 2023, at 10 n.6; *see also* DOC's response to the Commission's certified questions, dated March 9, 2023, at 2-3.

[14] DOC's response to the Commission's certified questions, dated March 9, 2023, at 2.

[15] *Id.*

4

interpretation of "prior similar record" would violate notions of fair notice.[16] DOC argued that, following his charges on February 4, 2019 for using excessive force and submitting a false use of force report in connection with the Cruz incident, Appellant was on notice that further similar misconduct could subject him to termination.[17] Furthermore, DOC noted that Appellant was trained on the *Nunez* Disciplinary Guidelines in February 2017, before the Cruz incident occurred.[18]

In its motion papers, DOC stated that "[t]he Guidelines do not limit what can be a mitigating factor in a particular case and that "[a]n employee's length of sentence, commendations, disciplinary history, and prior use of sick time and leave are among the 'mitigating factors' that the Commissioner may consider in determining appropriate discipline."[19] However, DOC argued that "the [G]uidelines establish presumptive discipline and that deviations are meant to be the exception."[20] DOC concluded that the mitigation in this case is insufficient to set aside the presumptive penalty set by the Guidelines, especially here, where Appellant used serious force against a passive inmate.[21]

### Appellant's Arguments Opposing the Motion

In opposing the motion, Appellant argued, *inter alia*, that two different false use of force report charges adjudicated in one proceeding should not trigger the "2nd offense" penalty under

---

[16] Appellant noted that the Constitution prohibits the passage of *ex post facto* laws, a category including, "[e]very law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed." *Peugh*, 569 U.S. at 533 (quoting *Calder v. Bull*, 3 Dall. 386, 390 (1798)). Appellant therefore argued that considering misconduct committed before the effective date of the Guidelines would deprive him of fair notice. The Commission notes, however, that "[i]t is beyond dispute that the *ex post facto* clause applies only to criminal cases." *In re Various Grand Jury Subpoenas*, 235 F. Supp. 3d 472, 481 (SDNY 2017) (citing to *United States v. D.K.G. Appaloosas, Inc.*, 829 F.2d 532, 540 (5th Cir. 1987); *see also Plaza Health Labs., Inc. v. Perales*, 702 F. Supp. 86, 89-90 (S.D.N.Y. 1989)).

[17] DOC's sur-reply to Appellant's response, dated March 30, 2023, at 1.

[18] *Id.*

[19] DOC's response to the Commission's certified questions, dated March 9, 2023, at 3.

[20] *Id.*

[21] Referring to the Cruz incident. *See id.*

Section 2 of the *Nunez* Disciplinary Guidelines when both charges are sustained, because it would deprive Appellant of the opportunity for "progressive discipline."[22] Appellant asserted that "[a]n officer cannot be granted the opportunity to learn from the alleged misconduct unless an officer is on notice that any misconduct occurred."[23] Appellant argued that he did not have fair notice of the misconduct due to "the fact that multiple charges…[were] adjudicated in one proceeding…due to DOC's carelessness for not calendaring cases when the violation 'occurs' i.e., the date of the charged misconduct."[24] Additionally, Appellant argued that the phrase "prior similar record" in Section 2 of the *Nunez* Disciplinary Guidelines only includes false use of force reports that occurred after October 27, 2017.[25] As is discussed above, Appellant asserted that to conclude otherwise would violate notions of fair notice.[26]

In addressing DOC's position regarding mitigation under the Guidelines, Appellant argued that the "Commission properly found that significant mitigation existed so as to justify the modification of the penalty from termination to time served."[27] Appellant asserted that "an employee's tenure, commendations, military service, disciplinary history, and prior use of time and leave are among the 'mitigating factors' that the Commissioner may consider in determining appropriate discipline."[28] Here, Appellant argued that the Commission's consideration of Appellant's 14-year tenure, his unblemished disciplinary history, his impressive attendance record throughout his DOC career, his commendations, and the letters from several members of the

---

[22] *See* Appellant's response to the Commission's certified questions, dated March 24, 2023, at 3.
[23] *Id.* at 3-4.
[24] *Id.* at 3.
[25] *Id.* at 2.
[26] *See Id.*
[27] Appellant's response to DOC's motion for reconsideration, dated January 27, 2023, at 5.
[28] Appellant's response to the Commission's certified questions, dated March 24, 2023, at 4.

Department speaking to his positive character and performance as a Correction Officer, collectively served as mitigation significant enough to warrant a penalty short of termination.[29]

**Reconsideration and Clarification of the Commission's Prior Decision**

The Commission has considered the full record as expanded by the arguments submitted on the motion for reconsideration and finds that its reasoning regarding multiple false use of force report violations warrants reconsideration. The Commission hereby amends its finding regarding the Appellant's second false use of force report and finds that he is subject to a presumption of termination based on two false reports.

*"Prior Similar Record" of False Use of Force Reporting*

The Commission modifies its reasoning as it relates to the application of the *Nunez* Disciplinary Guidelines to Appellant's charges of deliberately providing false information in a use of force report. In the October 28, 2022 decision, the Commission considered the *Nunez* Disciplinary Guidelines in assessing the Fajardo incident, but reasoned that "termination was not appropriate, since Appellant had no prior record of use of force misconduct or of providing a false use of force report."[30] The Commission notes that the drafters of the Guidelines chose not to include language limiting the time frame of what would constitute a "prior similar record" in the "Deliberately Providing False Information" section[31] despite explicitly limiting the scope of "prior similar record" in other areas of the Guidelines.[32] Further, the *Nunez* Disciplinary Guidelines do not specifically define the phrase "prior similar record." Accordingly, the Commission adopts the

---

[29] *See* Appellant's response to DOC's motion for reconsideration, dated January 27, 2023, at 5-6.
[30] *David McGibbon v. Dept. of Correction*, CSC Index No. 2022-0579 (Oct. 28, 2022), *modifying on penalty* Comm'r Dec. (July 1, 2022) ("Original Commission decision"), at 3 n.2.
[31] *Nunez* Disciplinary Guidelines, at 3.
[32] *See Id.* at 4-5 nn.5-6, limiting the look-back period to 10 years from the date of the incident for use of force related offenses that resulted in a "Negotiated Plea Agreement."

plain language meaning of "prior similar record," and interprets the phrase to include Appellant's first false use of force report, even though it was adjudicated in the same proceeding as the second false use of force report. We further find that Appellant was on notice when he was served with disciplinary charges for filing a false use of force report in the Cruz incident that a second false report charge could result in his termination. Finally, had the incidents of false reporting been close in time and adjudicated together, it would be nonsensical and inconsistent with settled civil service law for DOC to be limited to imposing discipline for one incident, as Appellant's counsel argues.

Therefore, the Commission modifies its October 28, 2022 decision to reflect a finding that Appellant's two sustained false use of force report violations create a presumption of termination under the *Nunez* Disciplinary Guidelines. Section 2 of the Guidelines provides that if an officer commits a second false use of force report, the minimum penalty is termination. Here, Appellant's false use of force report from September 11, 2017, was his first offense. His false use of force report from March 31, 2020, serves as the "2nd offense" resulting in a presumption of termination in this case.

*Appellant's Mitigation Overcomes the Presumption of Termination*

Despite the presumption of termination, the Commission finds that the mitigation in this case warrants a penalty of time served. The preamble to the *Nunez* Disciplinary Guidelines provides that Use of Force-related misconduct "must be evaluated based on the specific facts evidencing the nature of the misconduct and a review of any mitigating and/or aggravating factors."[33] In DOC's response to the Commission's certified questions, it confirmed that the Commission is permitted to consider an employee's tenure, commendations, disciplinary history,

---

[33] *Nunez* Disciplinary Guidelines, at 1.

and prior use of sick time and leave as mitigating factors when assessing the appropriate penalty in a disciplinary determination. In fact, DOC indicated that the *Nunez* Disciplinary Guidelines do not impose restrictions on what can be considered as a mitigating factor, but that mitigation in cases where there is a presumption of termination should be the exception. The Commission finds that this case is that rare exception in which there is sufficient mitigation to overcome the presumptive penalty of termination.[34]

As was stated in the Commission's prior decision, the Appellant has an exemplary and unblemished employment record over his fourteen-year tenure as a Correction Officer.[35] Appellant's attendance record is extremely rare for the Department: he went his first six consecutive years as a Correction Officer without using a single sick day.[36] In addition, one year after the Cruz incident, Appellant was presented with a "Certificate of Appreciation," from the Warden of the Anna M. Kross Center (AMKC)[37] in recognition of his "outstanding performance, professionalism, and knowledge, which has been crucial in maintaining the success of this command and the ideals and objectives of the New York City Department of Correction."[38] Furthermore, letters from four Assistant Deputy Wardens, five Captains, and six fellow Correction Officers speak to Appellant's positive character and performance as a Correction Officer.[39] One of the Deputy Wardens wrote that "Officer McGibbon has always been extremely professional, considerate to the needs of the inmate population and goes the extra mile to resolve issues without

---

[34] In its October 28, 2022, decision, the Commission found that "the fact that neither inmate was seriously hurt is a mitigating factor." Commission's October 28, 2022 decision, at 5. While lack of serious injury to either inmate can have evidentiary value in such a disciplinary proceeding, the Commission notes that lack of serious injury to either inmate is irrelevant to evaluation of Appellant's penalty.
[35] Original Commission decision, at 4.
[36] *Id.*
[37] *Id.*
[38] *Id.*
[39] *Id.*

using force."[40] Another Deputy Warden wrote that "[t]he way [Appellant] conducts himself is very rare, very approachable, always lending assistance to all ranks/civilians and people in custody."[41] Additionally, a Captain wrote that "[t]he department needs more Officers like McGibbon."[42]

The Commission notes that an employee's lack of prior disciplinary history alone, regardless of the length of tenure, would not be sufficient to overcome the presumption of termination in a case involving a "2nd offense" of submitting a false use of force report. Here, however, Appellant's record overall is truly exceptional, such that it warrants a penalty short of termination. Nevertheless, Appellant's misconduct was indeed serious, and his disciplinary record will now reflect that he served the maximum penalty short of termination, which places him on notice that any further misconduct of this nature will subject him to termination.

Therefore, the Commission upholds its original determination to modify the penalty from termination to time served. Appellant's disciplinary record will reflect this as the maximum period of suspension.

**SO ORDERED.**

Dated: <u>June 2, 2023</u>

---

[40] Original Commission decision, at 4-5.
[41] *Id.* at 5.
[42] *Id.*