# Special Report
# by the
# *Nunez* Independent Monitor

**August 7, 2023**

## THE NUNEZ MONITORING TEAM

Steve J. Martin
*Monitor*

Kelly Dedel, Ph.D.
*Subject Matter Expert*

Anna E. Friedberg
*Deputy Monitor*

Dennis O. Gonzalez
*Associate Director*

Patrick Hurley
*Subject Matter Expert*

Alycia M. Karlovich
*Analyst*

Emmitt Sparkman
*Subject Matter Expert*

# Table of Contents

**Introduction** ...................................................................................................................... **1**

**Update on Department's Steps to Address the Monitoring Team's Findings** ....................... **2**

**Update on the Department's Consultation with the Monitoring Team** ................................ **7**

**Update on In-Custody Deaths** .............................................................................................. **10**

**Update on the Quality of Supervision** ................................................................................. **12**

**Update on Optimizing Staff Schedules** ............................................................................... **16**

**Next Steps & August 10, 2023 Conference** ......................................................................... **19**

    Proposed Court Order for the Department to Address by December 31, 2023 .................... 19

    Status of Interim Protective Order .................................................................................... 24

    Proposed Motion Practice .................................................................................................. 25

    Summary of Requests for Court Ordered Relief ................................................................ 26

    Proposed Court Agenda .................................................................................................... 28

**Appendix A: Incidents** ......................................................................................................... **29**

    Summary of Incident #1 .................................................................................................... 30

    Summary of Incident #2 .................................................................................................... 33

**Appendix B: In-Custody Deaths** .......................................................................................... **35**

    Overview of In-Custody Deaths ........................................................................................ 36

**Appendix C: Proposed Court Order** ..................................................................................... **41**

**Appendix D: Proposed Agenda for August 10, 2023 Conference** ......................................... **52**

# INTRODUCTION

This report is the ninth[1] filed by the Monitoring Team since the Action Plan was ordered by the Court on June 14, 2022 (dkt. 465) and is filed pursuant to the Court's June 13, 2023[2] and July 18, 2023 Orders (dkt. 558). This report provides the Court with the following updates:

- the Defendants' plans to address certain findings in the Monitor's July 10, 2023 Report (as required by the Court's July 18, 2023 Order),

- the Department's efforts to collaborate with the Monitoring Team,

- in-custody deaths, concerning supervision practices and a number of corresponding concerning incidents, as well as staff scheduling conventions, since the Monitor's July 10, 2023 Report,

- the Court-ordered meet and confer process that has occurred over the last few weeks regarding the Parties' positions on the Monitor's Proposed Order (originally attached as Appendix E to the Monitor's July 10, 2023 Report and slightly modified in this report), the Parties' positions regarding the interim Protective Order, and the Parties' positions regarding the structure and timing of motion practice, and

- a proposed agenda for the August 10, 2023 Conference.

---

[1] *See* Monitor's June 30, 2022 Report (dkt. 467), Monitor's October 27, 2022 Special Report (dkt. 471), the Monitor's February 3, 2023 Special Report (dkt. 504), Monitor's April 3, 2023 Report (dkt. 517), Monitor's April 24, 2023 Status Report (dkt. 520), Monitor's May 26, 2023 Special Report (dkt. 533), Monitor's June 8, 2023 Special Report (dkt. 541), Monitor's July 10, 2023 Special Report (dkt. 557). The Monitor has also filed two letters on May 31, 2023 (dkt. 537) and June 12, 2023 (dkt. 544).

[2] *See* Court's June 13, 2023 Minute Entry.

# UPDATE ON DEPARTMENT'S STEPS TO ADDRESS THE MONITORING TEAM'S FINDINGS

The Department must address its security and operational failures in order to advance the reforms required by the *Nunez* Court Orders. As described in the "Security, Violence, and Use of Force" section of the Monitor's July 10, 2023 Report, little progress has been evident. The Monitoring Team has long advocated that the Department and City must develop detailed and concrete strategies to remediate the many deficient practices. In response, the Department and City have frequently noted that the Department is "working diligently" and offered reminders that "reform takes time." While there is no doubt that many people are working hard—in particular the Classification Manager, Staffing Manager, Security Manager and the Associate Commissioners who report to them—and that reform can be a protracted process, the mere acknowledgement of these factors without the corresponding evidence of progress and change cannot be used as a defense or excuse for continued poor performance. While hard work is commendable, it does not obviate the fact that substantially more progress is needed and on a more expeditious timeline than has occurred to date. The Department's current pace is not commensurate with the ongoing and serious level of harm occurring in the jails nor has the regression in the Department's performance in certain areas been adequately addressed and remedied. In other words, given the gravity of the current conditions, the Monitoring Team has not yet observed evidence of the necessary change in perspective regarding either the severity of the problems that must be addressed or a sense of urgency to identify and implement concrete solutions.

The Court's July 18, 2023 Order (dkt. 558) required "Defendants [to] provide the Monitoring Team, Plaintiffs' counsel, and the Office of the United States Attorney with a detailed outline of what steps, if any, the Department plans to take to address the findings in the

July 10, 2023 Special Report, as they relate to (1) security and harm (Report at 12-68) and (2) leadership, supervision, and training (id. at 69-88)." at pg. 1. The City and Department have advised of certain steps they intend to take to address the Monitoring Team's findings, but few appear to contain an adequate level of detail, substance or intensity to resolve these long-standing issues.

- **Policies and Procedures**: Since the Court's July 18, 2023 Order, the Department has provided the Monitoring Team with several draft policies for consultation, feedback, and approval (as necessary) including, but not limited to, policies regarding Facility Inspections, Key Control, Facility Response Teams, Use of Force Procedures for Court Refusals, Screening for ESU, and Command Level Orders for ESU regarding the use of Pepperball Spray and Grenades. The Monitoring Team's initial assessment of the proposed policy revisions indicates that at least some of these revisions will require significant feedback and discussion as the proposed changes appear hastily drafted, are not consistent with other Department policies, do not adequately address the Monitoring Team's concerns, and/or the proposed revisions are not consistent with the Department's stated intent for the policy or procedure it purports to be changing.

  - *UOF policies*:[3] At the Monitoring Team's request, the Department consulted the Monitoring Team on the use of force for court refusals[4] and the use of three-point restraints in ESH Level 1.[5] At the recommendation of the Monitoring Team, the Department drafted procedures regarding the use of force for court refusals for the Monitoring Team's review and approval. The Monitoring Team recently shared feedback on these procedures. As for the use of three-point restraints in ESH Level 1, following consultation with the Monitoring Team, the Department rescinded the protocol on August 1, 2023, after deciding that the necessary

---

[3] The Monitoring Team reiterates its concern that the Department did not consult with the Monitoring Team, nor seek approval, regarding either of these use of force related policies as required by the *Nunez* Court Orders (described in detail in the Monitor's June 8, 2023 Report at pgs. 34 to 35 and July 10, 2023 Report at pgs. 16 to 17). Consultation on these policies only occurred following multiple requests by the Monitoring Team to the Department.

[4] After the July 10, 2023 Report was filed, the Monitoring Team learned that the initial information provided to the Monitoring Team regarding the use of force for court refusal that was provided by Department leadership on May 30, 2023 was inaccurate and was not consistent with the information available at the time the Monitoring Team was briefed. For example, a written communication was shared with staff regarding the use of force for court refusals on May 15, 2023, but on May 30, 2023, Department leadership advised the Monitoring Team that no written procedures existed. Further, the description of the procedures in place (*e.g.,* staff were only to utilize soft hand techniques) was not consistent with the communication on May 15, 2023.

[5] *See*, the Monitor's July 10, 2023 Report at pgs. 16-17, 124-26.

security could be obtained by slightly modifying the equipment used in the original two-point restraint.

- **Training:** In response to the Monitoring Team's concerns about the deteriorating quality of staff training and poor collaboration with the Monitoring Team on its content, the Department stated its intention to cooperate with the requested timeline for Monitoring Team review of training materials. The Department also stated it was reviewing the Monitoring Team's recent feedback and was considering contracting with an outside organization to develop curricula for certain training programs, the time frame for such work is unknown. The Department also intends to revise and re-record the "*Nunez* training module," in consultation with the Monitoring Team.

- **Poor Security Practices and Ceding Control of Housing Units**: In response to the Monitoring Team's findings regarding staff ceding control of housing units to people in custody and a wide variety of poor security practices (*e.g.*, unsecured food slots and doors, permitting people in custody to congregate in no-go zones, failing to enforce lock-in, abandoning post, failure to maintain control of keys and OC spray, improper use of OC grenades and improper use of head strikes), the Department stated its intention to: (1) develop a teletype to be read at consecutive roll calls to reinforce the need to follow Department policies and procedures; (2) reinstitute annual refresher training in use of force/defensive tactics; (3) revise the Key Control Directive, draft a teletype and develop a training module; and (4) develop new guidance for ESU staff on the use of OC grenades.

- **Overreliance on and Hyper-Confrontational Behavior of Response Teams:** To address the long-standing concern about the deployment of ESU and its practices, the Department proposed a change in policy regarding authority for deployment (from the Tour Commander to the Deputy Commissioner of Security/designee). The Department has also reported it intends to address the Monitoring Team's feedback regarding the revised ESU training curriculum and stated its intention to revise procedures for conducting searches and for screening ESU staff for fitness.

- **Concerning Use of Force Patterns**: In response to the Monitoring Team's findings regarding the large number of uses of force that occur during escorts and searches, the Department requested (and received) the list of incident numbers from the Monitoring Team and stated that it would review the incidents for any violations of policy and that Rapid Reviews continue to examine these types of incidents.

- **Rapid Reviews**: In response to the Monitoring Team's concern about the poor quality of Rapid Reviews and inconsistent ability to identify misconduct, the Department reported its intention to continue its practice of daily calls ("the 1 p.m. call") between facilities and the Deputy Commissioner of Security. In addition, the Nunez Compliance Unit ("NCU") is revising the Rapid Review template based on feedback from the Monitoring Team in an effort to capture information more easily and efficiently.

- **Failures to Report/Accurately Record Incident Characteristics**: In response to several incidents that the Monitoring Team found to be unreported or improperly categorized, the Department stated its intention to continue to review incidents for violations of Department policies and procedures.

4

- **Preventing and Responding to Self-Harm**: In response to the Monitoring Team's long unaddressed recommendation for an external expert's review of a variety of practices related to preventing and responding to self-harm, the Department reported that it had begun implementation and is now working with its expert, Dr. Timothy Belavich, who recently observed a Morbidity and Mortality Review and intends to observe future meetings and to provide feedback to the City, Department and CHS on any areas where improvement may be necessary.

- **Analysis of Serious Injuries**: In response to the Monitoring Team's concern that the Department was not analyzing and utilizing data regarding serious injuries in its effort to assess the current state of affairs, the Department reported that it has a source of information regarding injuries (a monthly spreadsheet created by CHS), stated its intention to distribute that report to the NCU and *Nunez* Manager and indicated that it would discuss how the information would be utilized.

- **Hot Spot Analysis**: In response to the Monitoring Team's suggestion that the Department use its data to better understand the underlying causes of unnecessary and excessive uses of force and violence (*e.g.*, a "hot spot analysis"), the Department stated its agreement with the concept, its intention to engage the Monitoring Team to identify indicators and its intention to leverage several Department divisions for this work (*e.g.*, OMAP and NCU).

- **Lock-in and Lock-out**: At the recommendation of the Monitor, the Classification Manager, in consultation with the Monitor, is devising protocols to ensure that the overnight lock-in of housing units is conducted on schedule and reports this will be implemented in the coming weeks. The protocols will require an accountability form to be filed daily with the Operations Desk. The Operations Desk will be required to review the Genetec loop for each housing unit to confirm compliance with the initial lock-in and, subsequently, to monitor the Genetec loops to ensure compliance until lock-out.

- **Emergency Response Teams and Improved Search and Escort Procedures**: In response to the Monitoring Team's long-standing concerns regarding Emergency Response Teams, poor escort practices and search procedures, on August 4, 2023, the Department provided an update on various initiatives and plans to address the Monitoring Team's feedback. An initial review of the information suggests the Department's response is largely an update on various initiatives the Department *intends* to implement and will require significant consultation and review. In some cases, the Department reports that certain initiatives are underway (*e.g.* improving ESU training based on the Monitoring Team's feedback and an attempt to re-screen staff for ESU). In other cases, the Department reports its intent to work on certain issues (*e.g.* it will work to improve its search procedures). In other cases, the information shared appears inconsistent with *other* plans recently provided to the Monitoring Team, which must be reconciled. In some cases, the Department reports its intent to continue using practices already in place. For instance, the Monitoring Team has repeatedly reported concerns about the Department's escort practices and procedures which frequently lead to unnecessary and excessive force. The Department, in its response, appears to suggest its escort practices are appropriate because other law enforcement agencies are looking to the Department of Correction to provide training on these very procedures. Such a response is not relevant and ignores the

fact that improper escort procedures in the agency are leading to numerous cases of unnecessary and excessive force. The focus must be on eliminating the use of painful escort holds given the deficiencies in Department's current practice and procedures. As these materials were only provided in a last minute flurry prior to this filing, additional review and consultation is necessary to determine what the Department is in fact proposing to do and to determine whether the proposed plans and initiatives are consistent with the *Nunez* Court Orders (including the proposed Court Order discussed in this Report) and are viable solutions to address the Monitoring Team's longstanding concerns.

In summary, although a few of the steps articulated above represent a new approach to persistent problems, most of these initiatives identified by the Department and the City merely focus on revising policy, reading teletypes at roll call (which, notably, not all staff attend) or reiterating existing practices or trainings. The Department's efforts over the last few weeks have been haphazard, tepid, and insubstantial. While a few of the proposals (if meticulously developed and properly implemented) could address problems in discrete areas, they will not create the type of culture change and practice improvements that are prerequisite to effective reform.

Finally, it must be emphasized that the City and Department are the actors responsible for operating the jails and, notably, who continue to insist that they are best positioned to do so. This claim stands in stark contrast to their defensiveness regarding certain practices and lack of resourcefulness when asked to devise concrete, specific solutions to address the problems identified by the Monitoring Team and to meet their responsibilities to operate safe, secure jails.

# UPDATE ON THE DEPARTMENT'S CONSULTATION WITH THE MONITORING TEAM

The Court's July 18, 2023 Order (dkt. 558) required Defendants to "advise the Monitoring Team, no later than July 31, 2023, of what steps they are taking to comply with paragraph 5 of the Court's June 13, 2023 Order (docket entry no. 550) in light of the Monitor's July 10, 2023 Special Report findings regarding (1) "Recent Issues regarding Consultation and Collaboration" (Report at 165), and (2) the Department's failure to consult with the Monitoring Team on recently-implemented use of force polices related to court refusals (id. at 16-17) and three-point restraints (id. at 16-17, 124-26)."

The work of the *Nunez* Manager has already demonstrated the importance of her role in coordinating *Nunez* matters across the agency and facilitating the Monitoring Team's ability to fulfill its responsibilities. The *Nunez* Manager and the Monitoring Team have daily contact and the *Nunez* Manager has been both responsive and resourceful, and clearly has a strong command of the Department's issues and the requirements of the *Nunez* Court Orders. While the *Nunez* Manager is a much-needed asset for the Department, this position alone cannot resolve the management, security, operational, and implementation issues discussed throughout the Monitoring Team's reports. The individuals actually responsible for operating and managing the facilities must take ownership of these problems and their solutions.

With respect to the Department's efforts to improve its working relationship with the Monitoring Team, the City and Department's update to the Monitoring Team cited the fact that the Department produces a large volume of information to and is in frequent contact with the Monitoring Team. The Monitoring Team has always acknowledged that both assertions are true and that this has been the case since the inception of the Consent Judgment and under every

Commissioner. The Department's implication that the production of a significant amount of information means there is no issue with information-sharing ignores the Monitoring Team's concerns about the *quality, accuracy and timeliness* of information provided. Since the appointment of the *Nunez* Manager, some improvement in the timeliness and responsiveness to requests has been noted (although there is continued room for improvement).

That said, concerns remain[6] about the Department's ability to take initiative regarding consultation with the Monitoring Team, the accuracy of information provided to the Monitoring Team, and the continued identification of the Department's inability or unwillingness to identify (and therefore address) the objective evidence regarding the pervasive dysfunction and harm that continues to occur daily in the jails. For instance, the Monitoring Team still must proactively request consultation on a number of *Nunez* matters to ensure collaboration occurs as required by the *Nunez* Court Orders and should be proactively provided (*e.g.,* regarding the UOF policy matters discussed above and the operational manual for ESH that is required by the ESH policy). Further, the Monitoring Team continues to find that the Department, in some cases, provides inaccurate information to the Monitoring Team that is rectified only through the Monitoring Team's repeated follow-up to verify the information (*e.g.*, ESU's use of sub-machine guns[7]).

---

[6] The Monitor's recent reports are replete with such examples. *See* Monitor's June 8, 2023 Report at pgs. 20 to 37 and 43 to 46; Monitor's July 10, 2023 Report at pgs. 146 to 160.

[7] In June 2023, it was reported that the Department recently purchased 30 sub-machine guns. In response to the Monitoring Team's inquiry about the use of these weapons, DOC reported they were for exclusive use by ESU should there be an issue at the airport. However, repeated follow-up by the Monitoring Team to verify this information revealed this report was not accurate. The Department later reported 22 sub machine guns will go to ESU and the remaining 8 will go to the range for training purposes and their use is governed by the Firearms Directive as service long arms, which notably does not include the situations in which such a weapon may be utilized. Further, the Department reports that only staff members who have been trained and maintained "qualified status" are authorized to carry it on-duty. The Monitoring Team is currently evaluating the Department's Fire Arm Directive and ESU's Command Level Order for Ballistic Searches and will be providing feedback regarding the policies and procedures on the use of these weapons.

Finally, as discussed later in the report, with respect to the proposed Court Order in Appendix C, the Department is attempting to limit the Monitor's access to information. This approach to working with the Monitoring Team is the antithesis of advancing reform and appears to be yet another attempt to inhibit the Monitoring Team's ability to conduct neutral and independent assessments of the current state of affairs and for Department leadership to control the narrative of the current state of affairs. This cannot and should not be tolerated by the Court or the Parties.

Regarding staff's engagement with the Monitoring Team, as required by the Court's June 13, 2023 Order, the Department issued a statement that encouraged all staff to be open and transparent with the Monitoring Team. Of note is that Department leadership were also asked to notify the Legal Division of all communication with the Monitoring Team. While the desire for this type of central coordination is a typical practice in institutional reform cases, the Monitoring Team is concerned that staff may have been given the false impression that they are not permitted to speak confidentially with the Monitoring Team. In fact, staff are absolutely permitted to do so under the requirements of the Court's June 13, 2023 Order, § I, ¶ 6 ("The Monitor shall be permitted to have confidential communications with Department leadership and staff outside the presence of other Department personnel."). In order to ensure that Department Leadership and staff are empowered to have such confidential discussions, the Department should, at a minimum, amend its staff guidance to ensure staff are made aware of this provision and to ensure that staff do not construe the request to notify the Legal Division as a limitation or impediment to any confidential communication with the Monitoring Team.

# UPDATE ON IN-CUSTODY DEATHS

The death of a person in custody is always tragic, particularly so when related, at least in part, to the poor conditions and substandard security practices in the City's jails. In the four weeks since the Monitoring Team last reported to the Court, two more people have died, bringing the 2023 total, thus far, to seven people who have died in custody or shortly after release.

A review of video footage related to five of the seven deaths revealed that the surrounding circumstances were not particularly unusual or unique, but instead were typical of the variety of security problems that plague all the Department's housing units. These include security lapses like unsecured doors, individuals in unauthorized areas, superficial Officer and Supervisor tours, and staff being off-post or providing inadequate supervision. Alarmingly, many of these practices appear to have become normalized and staff seemingly fail to recognize the resulting safety risks or the ways in which these practices elevate the likelihood of a tragic outcome.

The Department acknowledged that poor staff practices precipitated and/or exacerbated these events. Staff were disciplined for their actions/inactions related to five of the seven deaths. More specifically, eight Officers, four Captains, three Assistant Deputy Wardens, and one Acting Warden were suspended. As shown in more detail in the table in Appendix A, the eight Officers were suspended for a variety of reasons including poor touring practices, being off-post, failing to enforce lock-in, allowing individuals to smoke prohibited substances, and allowing staff to enter the A-station area. The four Captains were suspended for reasons including failing to conduct proper tours, falsifying logbook entries, failing to timely report an unusual incident and failing to inspect cells. The Assistant Deputy Wardens were suspended for failing to conduct

proper tours, failing to ensure that a housing area was always manned and supervised by Officers, and failing to ensure that the supervisor assigned to the post conducted meaningful and efficient tours. The Acting Warden was suspended for failing to identify significant misconduct of two members of service. While it is impossible to know with certainty what would have occurred had staff's actions reflected sound correctional practice, there is little doubt that the opportunity for these tragic outcomes to occur would at least have been reduced by staff remaining on post, conducting proper tours, and effectively managing the behavior of people in their care.

The death of an individual in custody is the most acute harm that one can suffer and is tied directly to the conditions that the *Nunez* Court Orders are intended to address. The Monitoring Team is deeply concerned about the increases in death since 2020, particularly those related to poor security practices, operational failures, suicide, and overdose. While the Department has reported ongoing work to prevent in-custody deaths (*e.g.,* hiring an expert to advise on needed practice improvements, conducting death reviews, and suicide prevention training), the pace of this work has moved far too slowly. Severe risks to the lives of people in custody remain, and housing areas across the Department are rampant with security lapses that heighten the risk of serious injury or an in-custody death in every housing area. The Department must work at an increased pace to not only review and assess in-custody deaths to prevent future incidents but also immediately improve security and staffing practices to mitigate lethal risks. It is noteworthy that the Department, in connection with CHS, has initiated a Morbidity and Mortality Review for incidents that occurred in 2023 and, over the last few weeks, engaged Dr. Timothy Belavich to work on these issues in a more meaningful way. A more fulsome update on trends and information related to deaths in custody is provided in Appendix A.

# UPDATE ON THE QUALITY OF SUPERVISION

The Monitoring Team has long reported on its concerns regarding the quality of supervision on the housing units and the abilities of higher-ranking individuals (primarily Captains and ADWs) who supervise the staff on the housing units. In particular, one of the most disturbing patterns associated with the internecine violence in the Department, as observed via video footage of incidents, is the too-frequent occurrence wherein staff cede control of a housing unit to the people in custody housed in those units. Such an abdication of staff control inevitably leads to negative outcomes. For example, the Monitoring Team recently reviewed extremely disturbing video footage from an incident in late July 2023 that reflects this concerning trend. In a housing unit of GRVC, a group of incarcerated individuals who had congregated on the top tier of the housing unit moved downstairs and into the cell of an individual. The group remained in the cell for a full three minutes, then exited. Thereafter, a victim whose face was bloodied and swollen emerged from the cell. Throughout this assault, the Officer stood passively at the opposite end of the housing unit, simply watching the events unfold. The Officer on the housing unit floor did not immediately call for assistance or deploy her OC; she did **nothing** to intervene.[8] Appendix B provides a detailed description of this incident #1.

Conversely, hyper-confrontational behavior and unnecessary and excessive force utilized by staff also continues. For instance, in an incident from April 2023, Officers were heard on BWC recordings bragging about beating up the person in custody in previous incidents including one instance when the individual was in a designated Mental Observation unit. In the April 2023 incident, Officer #1 was talking to Officer #2 in a dayroom in AMKC as an incident was taking place with a person in custody and stated, "[person in custody] is a p***y man, I beat him up.

---

[8] The Officer was subsequently suspended for 30 days.

Man, when he made it to MOD 1 Lower with me, man, we f***ed him up. That's why I really don't talk to him too much … he putting on a show, I wish he would have tried to spit at me." Officer #1 then walked towards the person in custody and repeatedly shouted at him "You a b***h!" "Do it again!" and "I'm gonna f*** you up again!" Officer #1 then reentered the dayroom and stated to other another person in custody, "I beat his a** before and I'll do it again. I'm gonna catch him." Officer #1 then exited the dayroom and continued to stand near the person in custody and verbally antagonized him on and off for over 10 minutes before the individual was removed from the area. At one point, Officer #1 told a Captain, "I put my hands on him before." In discussing potential discipline for the incident with Officer #2, Officer #1 stated, "I don't want them to take days, I want them to suspend me, let's say if I got suspended for ten days right now, I'm going on a trip somewhere, my finances are not f***ed up that I will be missing that check." Unfortunately, such examples of hyper-confrontational behavior and unnecessary and excessive force utilized by staff are all too common in the Monitoring Teams reviews of incidents.

The concerns regarding staff actions on the housing units are compounded by the poor-quality supervision they receive from supervisors. Most recently, the Monitoring Team's concerns about the fitness of candidates recently promoted to the position of Assistant Deputy Warden were discussed at length in the Monitor's July 10, 2023 Report (at pgs. 74-77). Twelve of the 26 ADWs promoted in January 2023 lacked a sound basis for promotion in that they had been deemed unsuitable for promotion via the Department's own screening process. The Commissioner disagreed with these determinations, stating that after careful consideration, he judged the promotions appropriate. The Monitoring Team believed this judgment to be questionable at the time, and thus recommended that these individuals be subject to additional

scrutiny and guidance during their probationary periods. The Monitoring Team's concerns about this group of new ADWs, and subsequent promotions of others, have only increased during the intervening months. Three of the 12 recently-promoted-despite-questionable-fitness ADWs have engaged in demonstrably poor practice. One had been previously promoted to ADW in 2020, then was demoted to Captain in 2021. Following her *second* promotion to ADW in December 2022, this individual was *again* demoted to Captain in February 2023.[9] In a second incident, another newly promoted ADW was among those suspended in response to behavior relating to one of the in-custody deaths discussed above.

A third ADW, recently promoted despite the fact that four different divisions did *not* recommend the individual for promotion, organized a "hostage drill"[10] involving people in custody that inexcusably placed both staff and persons in custody at serious risk of harm. In this event, the ADW (who had been assigned the responsibility of Tour Commander), along with two other ADWs (including one who had also been recently promoted) planned and executed a simulation of a hostage event wherein they directed people in custody to obstruct stationary cameras and to barricade the unit's door. Their failure to communicate their plans to others resulted in an uninvolved officer attempting to enter the unit, meeting resistance, and deploying her OC spray, subjecting multiple individuals to its effects. Using incarcerated individuals, **real people**, to execute an unsanctioned drill that was poorly communicated to facility leadership and other staff in the vicinity and that resulted in exposure to chemical agents is not only unethical

---

[9] See Monitor's April 3, 2023 Report at pg. 216.

[10] The Department does not maintain any policies or procedures related to conducting hostage drills. The Department conducted some hostage trainings for two weeks in July 2023 with an external vendor, but those training exercises did not involve incarcerated individuals.

but is the epitome of an excessive and unnecessary use of force. A detailed description of this incident # 2 is provided in Appendix B).

The Monitoring Team's concern about the questionable judgment that led to these individuals' promotion has unfortunately been borne out by the ADWs' subsequent actions. The concerns were further heightened when the subsequent promotion of 10 ADWs in June 2023 did not occur according to the Department's *own* policy (*see* Monitor's July 10, 2023 Report at pgs. 75 to 77) and because the training programs for these candidates were substandard (*see* Monitor's July 10, 2023 Report at pg. 86).

# UPDATE ON OPTIMIZING STAFF SCHEDULES

The Monitor's July 10, 2023 Report provided an update on the Department's efforts to maximize staff work schedules as required by Action Plan § C, ¶ 3(vi). The purpose of this requirement is for the Department to optimize staff scheduling by implementing alternatives to the work schedule for uniform staff assigned to work in the facilities. Specifically, the Department is required to minimize the use of the 4x2 schedule. Most correctional systems utilize a 5x2 schedule where staff work five consecutive 8.5-hour workdays, followed by two consecutive days off, resulting in a total of 261 workdays per year. However, in this Department, the majority of staff is on 4x2 schedules and work four consecutive 8.5-hour workdays, followed by two consecutive days off. This schedule results in staff being assigned to work 243 days.

In order to illustrate the practical impact of these two different schedules, 300 staff working 4x2 schedules are able to fill 2,800 posts over the course of two weeks, but 300 staff working 5x2 schedules are able to fill 3,000 posts over two weeks. This difference is due solely to the varying work schedules and assigned days off. Given these facts, the Monitoring Team's staffing consultant found that if the Department assigned the majority of its staff to a traditional 5x2 schedule instead of a 4x2 schedule, it would automatically increase in the number of staff available to cover facility posts on any given day. As a result, the Action Plan requires the Department to maximize the availability of staff by minimizing the use of the 4x2 schedule.

Subsequently, the Monitoring Team learned that the traditional 5x2 schedule utilized by most correctional systems across the country is not the same as the 5x2 schedule utilized by this Department. The Department's version of the 5x2 schedule has been altered by labor agreements between the Department and uniform staff (including agreements dating back to 1979) and

Operations Orders dating back to the 1990s. The Department explained the impact of these agreements and the resulting adaptations to the 5x2 staffing convention as follows.

In this Department, staff assigned to the 5x2 schedule receive 16 additional compensatory days each year and two additional vacation days, for a total of 18 days off. As a result, instead of the traditional 261 days, DOC staff on a 5x2 schedule work the same number of days a year, 243, as staff on a 4x2 schedule. The additional compensatory and vacation days awarded negate the ability of the 5x2 schedule—as practiced by this Department—to produce the increased staff availability that would normally accompany the use of the 5x2 scheduling convention. Further, Staff on the Department's 5x2 schedule are afforded at least one weekend day/two consecutive days off (i.e., Friday/Saturday, Saturday/Sunday, or Sunday/Monday). As a result, the Department's version of the 5x2 schedule negatively impacts the Department's ability to have adequate staffing on the weekends. For example, out of 99 employees on a 4x2 schedule, 66 would be working on a Saturday and a Sunday, and 33 would be off. However, those 99 people on the Department's 5x2 schedule would result in only 50% of staff working on the weekends which, given current trends in leave/modified duty, limits both flexibility and the ability to ensure all posts are properly manned.

Under the Department's scheduling structure, the 4x2 schedule provides for a larger proportion of staff to be present on any given day, but has significant limitations given that the 4x2 schedule results in staff working 18 fewer days per year than standard practice in correctional systems across the country. In short, while the City has reported that the requirements of the "Action Plan [are] entirely within the power of the Commissioner, and more

broadly the Mayor, to execute,"[11] the current union contracts impede the ability to maximize the scheduling of staff as required by the Action Plan.

The Department reports that the Correction Officer and Captain's Unions have asked the Office of Labor Relations ("OLR") to engage in bargaining, and sessions are being arranged. The City and Department have engaged with OLR to discuss adding transitioning to a true 5x2 schedule to the bargaining unit agendas and will keep the Monitoring Team apprised. In the meantime, the City contends that it has taken many other steps to address the assignment of staff to lessen the practical impact of this scheduling pattern, including increasing the total number of staff, promoting more Captains and ADWs, and increasing supervisory presence across shifts and on weekends.

This issue is more than semantics—the agreements the City and Department have entered contribute to its continued inability to properly staff its facilities. On any given day in June 2023, 15 posts were unstaffed. While the Department has devised workarounds to its scheduling practices, the current labor agreements mean that the Department's staff are required to work fewer days per year than the industry standard, resulting in pervasive, insufficient coverage particularly on weekends.

---

[11] *See*, City's June 10, 2022 Letter to the Court at pg.1 (dkt. 463).

## NEXT STEPS & AUGUST 10, 2023 CONFERENCE

The Court directed the Parties to meet and confer in advance of the August 10, 2023 hearing to discuss: (1) the Monitor's Proposed Order (originally attached as Appendix E to the July 10, 2023 Report and slightly modified in this Report), (2) the Parties position regarding the Interim Protective Order, and (3) the structure and timing of potential motion practice. Since the filing of the Monitor's July 10, 2023 Report, all of the Parties and the Monitoring Team met and conferred on four occasions. The Monitoring Team also convened multiple meetings and phone calls with Plaintiffs' counsel, counsel for the Southern District of New York and the Defendants. The Parties' positions on each of the matters under discussion are outlined below, followed by a summary of the Parties' proposals for determination by the Court and finally, a proposed agenda for the August 10, 2023 Conference.

### _Proposed Court Order for the Department to Address by December 31, 2023_

As described in the Monitor's July 10, 2023 Report, the Monitoring Team identified several critical items that have continuously languished and that are necessary to reduce the risk of harm and the City and Department have not adequately moved forward through the consultation process with the Monitoring Team. These steps should be prioritized during the next few months as other remedial relief is being contemplated. It must be emphasized this is a short-term, **_interim_** measure for the next few months to ensure a proper focus and pace for initiatives that have direct bearing on the imminent risk of harm. The Monitor finds that this group of initiatives are necessary and narrowly tailored to address the Department's non-compliance with certain requirements of the _Nunez_ Court Orders as described in the Monitor's July 10, 2023 Report.

The Monitoring Team has discussed this proposed court order with the Parties and has made some modifications in light of the feedback and comments received from all Parties. A revised version of the proposed order is attached as Appendix C of this report as well as a redline comparing the August 7, 2023 version with the July 10, 2023 version. The Plaintiffs and SDNY consent to the entry of this order as proposed by the Monitoring Team. The Defendants have advised that they will consent to the entry of the order but with modifications to two provisions to Section I, Paragraph 1 and Paragraph 11. Defendants' position on these two provisions, and the Monitoring Team's response, are taken in turn below.

- *Section I, Paragraph 1*
  - o  **Defendants' Proposal**: While the Defendants are in full agreement with working in consultation with the Monitor to develop data and metrics for use of force, security and violence indicators, Defendants do not agree with the last sentence of the provision as written and are concerned that these meetings involve conversations and discussions, which, at times, are preliminary and not ready for feedback from the Monitor. Defendants propose instead a monthly scheduled meeting between the Commissioner and the Monitor, where the Commissioner shall brief the Monitor on all meetings the Commissioner has been a part of that are relevant to use of force, security, and violence Indicators. Defendants believe a dedicated monthly meeting will accomplish the objective of providing this information to the Monitor. The Commissioner will be available for additional meetings in the event they are required. Defendants propose the following revision:

      > **<u>UOF, Security and Violence Indicators</u>**: *By, September 30, 2023, the Department, in consultation with the Monitor, shall develop a set of data and metrics for use of force, security and violence indicators that will be routinely evaluated by Department leadership to identify trends and patterns regarding unnecessary and excessive force and violence in order to identify the root cause of these issues and develop strategies to address them. Upon request by the Monitor, the Department shall provide data regarding use of force, security, and violence indicators.* ~~*and permit observation of meetings in which such information is evaluated by Department leadership.*~~ <u>*There shall be a monthly scheduled meeting between the Commissioner and the Monitor. The Commissioner shall brief the Monitor on all meetings the Commissioner has been a part of that are relevant to UOF, Security, and Violence Indicators.*</u>

o **Monitoring Team's Response**: The Monitoring Team revised the last sentence in this provision from the original July 10, 2023 version to address concerns raised by the Defendants. However, the Defendants' additional revisions (outlined above) are wholly unworkable. This provision was crafted because of the Department's failures to adequately evaluate and address these data and metrics, as discussed in the Monitor's July 10, 2023 Report at pgs. 64 to 67. The Monitor, in his judgment, must have the ability to observe these meetings in order to perform his responsibilities under the Nunez Court Orders (*e.g.* Consent Judgment § XX, ¶¶ 1, 8 and 18). The Monitor's assessment of compliance cannot be dependent on a summary of meetings from the Commissioner and when that summary is proposed to be limited to only those meetings the Commissioner has personally attended, considers relevant, or elects to discuss. This proposal is especially concerning given the Monitoring Team's findings regarding inaccurate and unreliable information from Department leadership. *See* Monitor's July 10, 2023 Report at pgs. 157 and 160 and the Monitor's June 8, 2023 Report at pgs. 16 to 17.

The standard for the Monitor's access to information in the *Nunez* Court Orders does not limit access to information because it is "preliminary and not ready for feedback from the Monitor." In fact, the *Nunez* Court Orders encourage transparency and collaboration, and historical practice has shown that it is particularly the collaboration at the early stages of concept development that ensures the Department and Monitoring Team are aligned. Discussions during the early phases of an initiative prevents the recent all-too-common delays that occur when the Department moves forward with an initiative without consultation and input from the Monitoring Team, only to find at some later point that the initiative has structural and conceptual problems that preclude the Monitor's approval. These problems need to be identified and resolved during the preliminary phase of development.

Furthermore, allowing the Department to decide what will be shared with the Monitoring Team discounts the value of the Monitoring Team's objective perspective that is informed by decades of experience with other correctional systems. This perspective often leads to the Monitoring Team's ability to offer constructive feedback on issues that have not garnered the Department's attention. The City's proposal would effectively neutralize one of the core advantages of having an experienced Monitoring Team.

As discussed above, and noted in previous reports, the Monitoring Team has serious ongoing concerns regarding the Department's transparency. Restricting the Monitoring Team's access to information summarized by the Commissioner is not the approach of an agency or Department leadership committed to transparency. Adopting the Department's approach would also set a concerning precedent going forward if the Department, by its own determination, decides to limit the Monitoring Team's access to information because the "ideas are preliminary." This places the Department in the position to "have supervisory authority over the Monitor's activities" which is prohibited by the Consent

21

Judgment, § XX. ¶ 13. It must also be emphasized that the City and Department previously invited, indeed *encouraged*, the Monitoring Team to observe meetings throughout the past eight years and has indicated that the Monitoring Team's observation and participation was productive. The Department has never lodged a complaint to the contrary.

Finally, the City's proposal for a Court Order to ensure the Commissioner meets with the Monitor about this issue (or any other issue) is unnecessary. The Monitor and his team have always been available for meetings with Department leadership. In fact, the Commissioner testified to this very fact at the Court's Emergency June 13, 2023 Conference.[12] The Monitoring Team may request briefings as necessary, and, in fact, currently have regularly scheduled meetings with certain Department leadership. The Commissioner has been and remains welcome to speak or meet with the Monitor or a member of his team at any time without any need for a Court Order.

- *Section I, Paragraph 11*

  o **Defendants' Proposal**: Defendants are in agreement with the proposal, except as it pertains to the increase in the number of supervisors. Defendants are concerned that the proposal requires an increase in staffing to 21 supervisors before the Department's completion of an ongoing staffing analysis on the adequacy of supervision. The adequacy of supervision is not necessarily tied to the number of supervisors, but may, instead, be tied to how supervision is allocated. To that end, Defendants propose the Department increase the number of supervisors to a range of between 16 and 21, until the completion of a comprehensive review and restructuring so that the supervision is tied appropriately for review and escalation. The City proposes the following language for the proposed order:

  > **ID Staffing**: By, November 30, 2023, the City shall ensure that the Department's ID Division maintains ~~at least 21 supervisors and~~ 85 investigators to conduct use of force investigations unless and until the Department presents an internal staffing analysis and can demonstrate to the Monitor that fewer staff are necessary to conduct thorough, timely, and objective investigations of all Use of Force Incidents as required by the Nunez Court Orders. <u>By November 30, 2023, the City shall increase the number of supervisors for the ID division to be between 16 and 21. The Department is continuing an internal staffing analysis related to the</u>

---

[12] Commissioner Molina testified, "[i]f I have an issue where I myself professionally think I need to speak to the monitor about, there is nothing stopping me from calling the monitor and speaking to him directly on a number of issues. I have done that over the past 16 or 18 months many, many times. And if the monitor himself, as the principal overseeing the monitorship on the Court's behalf, wants to speak to me about an issue, I have never turned away a phone call from the monitor or allowed an e-mail to go unaddressed or any other communications." *See* Court's Emergency June 13, 2023 Transcript 34: 8-17.

> *number of supervisors and will continue to update the Monitor as to*
> *determination of the appropriate number of supervisors for ID.*

- o **Monitoring Team's Response**: A specific requirement to increase the current number of supervisors within ID is necessary to ensure the Division has adequate staff to comply with the requirements of the *Nunez* Court Orders. The Monitoring Team has previously found that ID has an insufficient number of investigators and supervisors to conduct its work.[13] The Monitoring Team consulted with the new ID leadership and evaluated ID's historical staffing numbers and caseloads to identify the minimum number of staff necessary to conduct its work. This analysis resulted in the proposed number of investigators and supervisors identified in this provision.[14] Since January 2022, a concerning decline in the number of staff dedicated to conducting UOF investigations has occurred.

  The Monitoring Team has long recommended that the Department increase ID's staffing, most recently as part of its April 2023 recommendations. The Department has made little to no progress in doing so despite repeated encouragement from the Monitoring Team to address this issue. The Department agrees that more investigators are necessary (agreeing to add between 20 and 25 investigators), but inexplicably suggests that the number of supervisors should remain the same (agreeing to increase the number of supervisors by as few as two) because the "adequacy of supervision is not necessarily tied to the number of supervisors, but may, instead, be tied to how supervision is allocated." Efficient allocation of resources is critical, but there is simply no question that there are an insufficient number of supervisors within ID. The Department's basis for suggesting that the adequacy of supervision is not tied to the number of supervisors is unknown. This belief has not been raised by ID Leadership in its numerous briefings to the Monitoring Team on its efforts to address the significant regression in the quality of investigations. This provision, as drafted by the Monitoring Team, permits the Department to conduct a staffing analysis and to reduce the number of supervisors if supported by the results of that analysis. However, the Department's newly-stated commitment to conduct a staffing analysis[15] is insufficient because it lacks a timeframe for completion, and more importantly, is simply unnecessary at this juncture because of the known deficiencies regarding the quality of investigations. The Department's proposal will essentially allow the *status quo* of inadequate staffing numbers to continue and will inhibit the Department's ability to actually address the regression in the

---

[13] For example, *see* Monitor's April 3, 2023 Report at pg. 169 and the Monitor's April 24, 2023 Report at pgs. 7 to 8.

[14] This provision is modeled after the provision in the Action Plan, § F, ¶ 1(a) which successfully supported the increase of staffing for the Trials Division after the City and Department similarly failed to address the staffing needs for that Division.

[15] The Department first advised the Monitoring Team that it must conduct this staffing analysis during the past few weeks despite the Monitoring Team's requests and recommendations—for months—to both the City and Department regarding this issue.

quality of investigations and corresponding decrease in staff accountability that has occurred.

*Status of Interim Protective Order*

- **Plaintiff Class' Position**: Pursuant to the terms of the Interim Protective Order, and the parties' correspondence regarding the materials exchanged under the Interim Protective Order, Defendants asserted: (1) that certain materials related to five incidents contained protected health information ("PHI"); and (2) that materials related to incident #3 were subject to the law enforcement privilege. The parties attempted to meet-and-confer regarding these issues on July 18, 25, and 27, 2023, but Defendants were not ready to do so. The parties then met on August 4, 2023 to address these issues:

  o *First*, with respect to PHI, the parties have agreed to confer over particular documents that may contain a mixture of PHI and non-PHI to determine whether they can reach agreement on which information is PHI and therefore subject to redaction.

  o *Second*, with respect to the law enforcement privilege asserted over incident #3, Defendants asserted that *all* documents related to this incident are subject to the privilege. When asked for the basis of the privilege, Defendants stated only that the incident "remains under investigation." Defendants refused to identify the agency or agencies conducting any investigation. Defendants refused to articulate which of the four categories of information outlined in *In re City of New York*, 607 F.3d 923, 944 (2d Cir. 2010), are contained in the documents. *See id.* (party asserting the law enforcement privilege bears the burden to show that the documents contain information that the privilege is intended to protect, namely, (1) "information pertaining to law enforcement techniques and procedures"; (2) "information that would undermine the confidentiality of sources"; (3) "information that would endanger witness and law enforcement personnel or the privacy of individuals involved in an investigation"; and (4) "information that would otherwise interfere with an investigation.").

  o *Third*, Defendants agreed to provide a privilege log containing all documents over which they assert confidentiality. They subsequently stated, "Following our conversations at the meet and confer today, Defendants will provide a privilege log and discuss times for a further meet and confer on the documents produced under the Interim Protective Order by August 7, 2023."

  o Plaintiffs request that (1) should Defendants continue to assert law enforcement privilege or confidentiality over any documents related to the five incidents, that the parties meet-and-confer no later September 1, 2023; and (2) should Defendants continue to assert law enforcement privilege or confidentiality over any documents related to the five incidents, Defendants seek the Court's resolution of that issue together with the filings due on September 11, 2023.

- **City's Position**: With regard to disputes related to the protective order, Defendants requested that Plaintiffs identify any pages to which Plaintiffs believe are not subject to the Amended Protective Order in advance of a meet and confer, to which Defendants did not receive a response. The parties met and conferred on August 4th, 2023, regarding whether the documents produced to Plaintiffs remain subject to confidentiality or privilege. Defendants will produce a privilege log as to the documents produced in anticipation of a further meet and confer on this issue.

*Proposed Motion Practice*

During the meet and confer process, the Parties discussed the structure and timing of potential motion practice. As part of these discussions, counsel for the Southern District of New York and the Plaintiff Class identified provisions in which the Department may be in non-compliance and the Defendants' advised of their plans to address various areas of deficiency. These meetings also included discussions regarding potential remedial relief. On July 24, 2023, Plaintiffs sent a notice of non-compliance to Defendants pursuant to Consent Judgment Section XXI, Paragraph 2. As required by this provision of the Consent Judgment, by August 23, 2023, which is 30 days of receipt of such notice, Defendants shall respond in writing to Plaintiffs' Counsel and the Monitor setting forth their position with respect to whether they are in compliance with the relevant terms of the Agreement and what actions, if any, they propose to take to address the alleged lack of compliance. The Parties shall engage in good faith negotiations to attempt to resolve the dispute. If, by September 8, 2023, which is 45 days of written notice from Plaintiffs' Counsel, the Parties have been unable to resolve the dispute, the Parties may seek relief from the Court. Accordingly, the Parties propose that a joint submission will be made on September 11, 2023 to advise the Court on the status of these discussions. The Parties' positions on potential motion practice are outlined below:

- **Plaintiff Class Counsel**: The excessive and ongoing level of harm to the Plaintiff Class, together with Defendants' continued noncompliance with key provisions of the Consent Judgment, Remedial Orders, Action Plan, and other Court orders, warrants a finding of contempt and additional relief. On July 24, 2023, Plaintiffs sent a notice of non-

compliance to Defendants pursuant to Consent Judgment Section XXI, Paragraph 2. Assuming the parties cannot resolve the issues underlying Defendants' noncompliance through meet-and-confers, Plaintiffs intend to move for contempt on certain provisions of the Consent Judgment, Remedial Orders, Action Plan, and other court orders. Plaintiffs will also seek additional remedial relief in the form of an appointment of a receiver. Plaintiffs are ready to file a motion for contempt and application for additional relief as soon as practicable, but agree that the position of the Plaintiff Class and SDNY be submitted at the same time. Therefore, Plaintiffs propose filing a motion for contempt and application for appointment of a receiver by November 17, 2023, together with a memorandum of law in support of that motion and a detailed document setting forth enumerated proposed findings of fact with citations to the evidence in support of that proposed fact. Defendants' opposition would be filed no later than January 16, 2024, and that opposition would contain a response to Plaintiffs' proposed findings of fact in which Defendants identify which facts they dispute and cite the evidentiary basis for disputing that fact. Plaintiffs would file any reply by February 15, 2024. The Court would then determine if an evidentiary hearing is necessary and further steps for resolution of the motion.

- **Counsel for the Southern District of New York**: The Government also intends to move for contempt and seek additional relief from the Court, including the appointment of a receiver, to address the ongoing noncompliance with core provisions of the Consent Judgment and other court-ordered relief as well as the ongoing harm to incarcerated individuals and DOC staff. Over the past eight years, the Government has worked closely with the Monitor to address the unsafe conditions on Rikers Island. Given the lack progress in implementing the required reforms and the failure to substantially reduce the level of violence and disorder in the jails, the Government believes extraordinary relief is now necessary. The Government concurs with the motion schedule proposed above.

- **City's Position**: [Defendants] have received Plaintiffs' non-compliance letter, dated July 24, 2023, regarding twenty-five provisions with which Defendants are alleged to be in non-compliance. [Defendants] will be responding within thirty days pursuant to the Consent Judgment, Section XXI, Paragraph 2. Defendants contend they are not in contempt of these provisions. Should the Court grant Plaintiffs' request for motion practice, [Defendants] agree with the proposed schedule [outlined above].

*Summary of Requests for Court Ordered Relief*

For the Court's convenience, below is a summary of the requests before the Court:

- *Proposed Court Order*: The Monitoring Team respectfully requests the Court to so order the proposed order in Appendix C for the reasons outlined in the Monitor's July 10, 2023 Report and this report. Counsel for the Plaintiff Class and the Southern District of New

York consent to entry of the order as proposed by the Monitoring Team. The Defendants consent to the entry of the proposed order, with two modifications as outlined above.

- *Reporting to the Court & Court Conference*: Assuming the Court enters the Proposed Order attached as Appendix C, the chart below identifies the reports that will be filed with the Court for the remainder of 2023. The Monitoring Team respectfully recommends that the Court schedule a conference in late November 2023, following the issuance of the Monitoring Team's November 2023 status report.

| Proposed Reporting Schedule & Court Conference | |
|---|---|
| **Reporting** | **Date** |
| Additional Reporting by the City and Department Regarding Intake | September 15, 2023 |
| Monitor's Status Report | October 10, 2023 |
| Additional Reporting by the City and Department Regarding Intake | November 15, 2023 |
| Monitor's Status Report | November 16, 2023 |
| Court Conference | [*Late November/early December per the availability of the Court*] |
| Monitor's Report | December 21, 2023 |

- *Interim Protective Order*: The Parties intend to continue to meet and confer. Plaintiffs have proposed that the Parties meet and confer no later September 1, 2023, and if Defendants should continue to assert law enforcement privilege or confidentiality over any documents related to the five incidents, Defendants seek the Court's resolution of that issue together with the filings due on September 11, 2023.

- *Proposed Motion Practice*: Counsel for the Plaintiff Class and the Southern District of New York request that the Court permit them to make a motion for contempt. However, Defendants contend that the Court should not grant the application for a motion for contempt. If the Court does permit counsel for the Plaintiff Class and the Southern District of New York to file a motion for contempt, the Parties agree on the following schedule:

| Proposed Motion Schedule | |
|---|---|
| **Filing** | **Date** |
| Parties to file a brief joint statement advising the Court of whether the parties have been able to resolve without the need for court relief pursuant to Consent Judgment § XXI., ¶ 2 | September 11, 2023 |
| Counsel for the Plaintiff Class and the Southern District of New York to file motion for contempt and relief, including proposed findings of facts and law and any supporting materials | November 17, 2023 |
| Defendants to file opposition to motion for contempt, including a statement indicating whether they agree or disagree with each proposed finding of fact submitted by the Counsel for the Plaintiff Class and the Southern District of New York | January 16, 2024 |
| Counsel for the Plaintiff Class and the Southern District of New York to file reply motion for contempt | February 15, 2024 |

*Proposed Court Agenda*

A proposed agenda for the Court Conference on August 10, 2023 at 2:00 p.m. Eastern Time is included in Appendix D.

# APPENDIX A:
# INCIDENTS

### *Summary of Incident #1*

Video footage of an incident on July 29, 2023 revealed the following: several incarcerated individuals in a general population housing area in GRVC were congregated in various places (dayroom tables, the top tier of the unit, and at the B post desk where a logbook was left unattended). Several cell doors were unsecured and cell door windows were obstructed. As nine incarcerated individuals who were congregating on the top tier descend the stairs, the B-post officer was standing across the housing unit, facing the stairway. Once on the bottom tier, six of the individuals opened and entered an unsecured cell, while the other three remained outside the cell. The B-post officer watched as the individuals entered the cell but took no action.



**Picture 1**: *Numerous individuals enter an unsecured corner cell as the Officer on the floor watches.*



**Picture 2**: *While individuals are inside the cell, several other individuals stand outside and look on. The Officer continues to watch from a distance and fails to intervene.*

Over two minutes later, several individuals exited the cell while dragging the victim, and proceeded to kick him in the head. The B-post officer, who had an unobstructed line of sight to the assault, took no action.



**<u>Picture 3</u>**: *The individuals drag the victim from outside his cell, and he is kicked in the head. The Officer walks away from the incident.*



**<u>Picture 4</u>**: *The Officer appears to Communicate with the A station Officer while the victim is assaulted and kicked in the head again.*

The victim got to his feet and stumbled around, surrounded by three of the assailants, and remained unassisted by the B-post officer. The B-post officer eventually motioned for the victim to move toward her. As he approached, a stationary camera clearly captured his face, bloody and swollen.



**Picture 5**: *The victim stumbles to his feet and remains surrounded by individuals who assaulted him. The Officer remains distant and fails to render aid or disperse the other individuals.*



**Picture 6**: *The victim walks to the Officer to exit the housing area. His shirt is visibly torn and covered in blood.*

The victim exited the area with the B-post officer, who left the housing area unattended for over four minutes. Medical staff reported that the victim had multiple head and facial bruises and swelling, nasal deviation and fracture, and post-concussive syndrome. Medical staff referred the victim to EMS to rule out facial bone fracture, orbital fracture, and intracranial injury. The Department reported that the officer involved in this incident was suspended for 30 days, and an MOC was generated.

32

### *Summary of Incident #2*

Video footage, staff reports, and statements by people in custody regarding an incident at EMTC on May 8, 2023 revealed the following: three ADWs were in the Tour Commander's office discussing the fact that a "hostage drill" that had been scheduled for the previous day had not been conducted. Despite not having been trained or authorized to do so, two of the ADWs (one of whom was the designated Tour Commander at the time)[16] decided to simulate a hostage event by directing the incarcerated individuals in a general population dormitory-style housing unit to obstruct the stationary cameras and to barricade the unit's entrance using tables and chairs.



The incarcerated individuals began to follow these instructions. The A-station officer reported that she attempted multiple times to obtain information about what was going on from the ADWs but had been unable to do so. While the camera obstruction and barricading were

---

[16] This individual is one of the 12 individuals recently promoted ADWs flagged in previous Monitor's Reports who had not been recommended for promotion by various Divisions due to a history that includes excessive use of force, inaccurate use of force reporting, inefficient performance of duties, and Department property violations. *See* Monitor's April 3, 2023 (dkt. 517) at pgs. 210-216 and Monitor's July 10, 2023 (dkt. 557) at pgs. 74-75.

underway, the A-station officer allowed a medical escort officer to enter the area. When the medical escort officer attempted to open the door to the housing unit, a person in custody pushed up against the door using a table. The medical escort officer deployed OC spray directly to the individual's face, and several other incarcerated individuals also showed effects of the chemical agent (*e.g.*, coughing, wiping their eyes, covering their faces).

The ADWs who had orchestrated the "drill" appeared to smile and laugh in response. The officer who deployed the OC spray reported that staff did not inform her about the "drill" until after she had deployed the spray. The individual who had been sprayed directly did not receive prompt medical attention or decontamination and alleges that staff told him not to provide a formal statement. Various aspects of these events were not properly reported to COD, nor were they properly assessed via the Rapid Review (e.g. the Rapid Review failed to acknowledge concerns about the incident at all or the actions of the ADWs and focused exclusively on the CO that utilized the OC spray). A Full ID investigation is underway, along with the application of discipline to the various actors involved. There is no evidence that immediate corrective action was taken following this incident.

# APPENDIX B:
# IN-CUSTODY DEATHS

### *Overview of In-Custody Deaths*

The number of people who have died while in custody is tragic and is related, at least in part, to the poor conditions and security practices in the jails as set forth herein. It is particularly alarming that in the four weeks since the Monitoring Team last reported to the Court, two more people have died while in custody.

Thus far in 2023, at least seven individuals have died in custody or shortly after their release.[17] An updated table on the number of people who have died and their causes of death is provided below. It is particularly concerning that eight people have died by suicide or suspected suicide (seven of whom died since the Action Plan was entered in June 2022) since the Court required the Department to improve its practices regarding self-harm in September 2021.

---

[17] If an incarcerated individual has a health condition that may merit release, the process has a few steps and must be ordered by the Court. The Department does not have any authority to release an individual because of a health condition although it may certainly identify and recommend individuals that should be considered for potential release. To the extent an individual has a health condition that may merit release, CHS may issue a clinical condition letter, with the patient's consent, which is then provided to the individual's defense counsel. Counsel then may petition the Court to release the individual. Release is not automatic, and an individual determination must be made by the Court. If the court determines release is appropriate, the Department is notified via a court order that the individual is being released on their own recognizance ("ROR"). However, the order does not specify a medical reason for the release.

| NYC DOC Causes of Death, _2015 to August 07, 2023_ | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** | **Total** |
| Accidental | | | | | | | | 1 | | 1 |
| COVID-19 | | | | | | 3 | 2 | | | 5 |
| Medical Condition | 9 | 11 | 4 | 7 | 3 | 2 | 4 | 4 | 2 | 46 |
| Overdose | | 2 | 1 | | | | 4 | 6 | | 13 |
| Suicide | 2 | 2 | | 1 | | 1 | 4 | 5 | | 15 |
| Drowned | | | | | | | | 1 | | 1 |
| Pending OCME Confirmation | | | | | | | | | 5 | 5 |
| Undetermined Due to Death Outside of DOC Custody | | | | | | 4 | 2 | 2 | | 8 |
| Undetermined by OCME | | | 1 | | | 1 | | | | 2 |
| **Total** | **11** | **15** | **6** | **8** | **3** | **11** | **16** | **19** | **7** | **96** |

To the extent an individual has a health condition that may merit release, CHS may issue a clinical condition letter, with the patient's consent, which is then provided to the individual's defense counsel. Counsel then may petition the Court to release the individual. CHS submitted 34 clinical condition letters between January 1, 2023 and June 13, 2023. The Department reports that 15 of the 34 individuals with clinical condition letters have been released from custody. The Department reports of those 15 individuals, six individuals were released on their own recognizance and their health status is unknown, one individual was released on their own recognizance and died shortly thereafter their release (incident # 4 of the Monitor's May 26, 2023 Report), two individuals were released with time served, two individuals had their warrants lifted, one individual was released because his sentence expired, one individual was released on conditional discharge, one individual was transferred to state prison, and one individual died while in-custody. The other 19 individuals with clinical condition letters remain in custody.

The table below shows the Department's mortality rate from January 2010 to August 7, 2023. The sharp increase in the mortality rate between 2020 and 2022, is troubling. The mortality

rate in 2022 was the highest in over a decade and more than double the rate in 2016, at the inception of the Consent Judgment. The mortality rate in 2023 was not computed because it is not comparable to previous years, as it includes only seven of the 12 months that have elapsed.

| Mortality Rate | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| Annual ADP | 13,026 | 12,421 | 12,083 | 11,692 | 10,913 | 9,890 | 9,802 | 9,224 | 8,397 | 7,388 | 4,543 | 5,574 | 5,639 | 5,958 |
| Number of Deaths | 17 | 12 | 21 | 24 | 10 | 11 | 15 | 6 | 8 | 3 | 11 | 16 | 19 | 7 |
| Mortality Rate | 1.31 | 0.97 | 1.74 | 2.05 | 0.92 | 1.11 | 1.53 | 0.65 | 0.95 | 0.41 | 2.42 | 2.87 | 3.37 | ~ |
| *Note: Mortality Rate per 1000 people in custody uses the following formula: Rate = (# of deaths/average # of people in custody)*1000* | | | | | | | | | | | | | | |

### *In-Custody Deaths in 2023*

Thus far in 2023, seven people have died while in custody or shortly after their release. The table below provides details on the circumstances of those incidents and the immediate action the Department has imposed following these events.

| 2023 Deaths While In-Custody/Shortly After Release | | | | |
|---|---|---|---|---|
| Date | Name | Official Cause of Death | Summary of Circumstances | Summary of Immediate Action Taken or Other Issues Identified |
| 2/4/2023 | Pines, Marvin | Seizure disorder of unknown etiology; Contributory: hypertensive and atherosclerotic cardiovascular disease (natural) | Mr. Pines was found unresponsive in the bathroom of a housing area in NIC. | 2 Officers, 1 Captain, 2 ADWs were suspended: -1 Officer was suspended for not conducting tours of the entire housing area including the bathroom. The officer also abandoned his post without being relieved of duty. -1 Officer was suspended for not conducting regular tours of the housing area. -1 Captain was suspended for failing to conduct proper tours of inspection, failing to enter the housing area to conduct tour of supervision and making a false logbook entry that the housing unit to occurred. -2 ADWs were suspended for failing to conduct proper tours of inspection of specialized housing, failing to ensure that the housing area was manned and supervised by officers at all times and failing to ensure that |

| | | | | 2023 Deaths While In-Custody/Shortly After Release |
|---|---|---|---|---|
| **Date** | **Name** | **Official Cause of Death** | **Summary of Circumstances** | **Summary of Immediate Action Taken or Other Issues Identified** |
| | | | | the supervisor assigned to the post conducted meaningful and efficient tours. |
| 5/16/2023 | Zhao, Rubu | Suspected Suicide (pending OCME confirmation) | Mr. Zhao jumped from the top tier of his MO housing unit in GRVC. | No discipline was reported, but one of the officers assigned to the housing unit was not actively supervising the housing unit at the time of the event and was in a closed office. |
| 5/27/2023 | Valles, Joshua | Suspected Skull fracture (pending OCME confirmation) | Mr. Valles complained of extreme headaches. He was taken to the hospital where he later died. | No staff discipline was reported. |
| 7/4/2023 | Taveras, Felix | Suspected Overdose (pending OCME confirmation) | Mr. Taveras was smoking in his housing unit when he later began to express pain and discomfort. He was taken to the hospital and died shortly thereafter. | 2 Officers, 1 Captain, and 1 Acting Warden were suspended: -2 Officers were suspended for failing to enforce lock-in and allowing individuals in custody to smoke on the housing unit. -1 Captain was suspended for failing to tour and not conducting a proper tour. -1 Acting Warden was suspended for failing to identify significant misconduct by two members of service. |
| 7/6/2023 | Howell, Ricky | Throat Cancer | Mr. Howell had throat cancer and died in the hospital prison ward. | 1 Captain was suspended: -1 Captain was disciplined for failing to report an unusual incident timely and according to policy. |
| 7/15/2023 | Johnstone, William | Suspected Heart Disease (pending OCME confirmation) | Mr. Johnstone was found unconscious in his cell. A correction officer gave him Narcan. He was taken to the hospital and pronounced dead. | 2 Officers and 1 Captain were suspended: -1 Officer was suspended for permitting an officer on their post and failure to supervise. -1 Officer was suspended for abandoning post and failing to ensure the safety of the individuals in custody. -1 Captain was suspended for inefficient performance of duties for failing to inspect every cell. |
| 7/23/2023 | Davis, Curtis | Suspected Suicide (pending OCME confirmation) | Mr. Davis was found with a ligature tied around his neck and to the vent hook in his cell. | 2 Officers and 1 ADW were suspended: -1 Officer was suspended for failing to ensure he remained on his assigned post for the duration of his tour. -1 Officer was suspended for permitting an unauthorized person to enter their assigned post. -1 ADW was suspended for negligence in performing duties for failing to conduct proper tour. |

A summary of the steps the Department has taken to address both self-harm and in-custody deaths as well as the Monitoring Team's recommendation for additional steps that must be taken are outlined in the Monitor's July 10, 2023 Report at pgs. 45 to 49.

# APPENDIX C:
# PROPOSED COURT ORDER

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
                                                             :
MARK NUNEZ, et al.,                                          :
                                                             :
 Plaintiffs,                                                 :
                                                             :
 - against -                                                 :
                                                             :
CITY OF NEW YORK, et al.,                                    :
                                                             :
 Defendants.                                                 :
                                                             :   **11 Civ. 5845 (LTS)(JCF)**
------------------------------------------------------------ X
                                                             :
UNITED STATES OF AMERICA,                                    :
                                                             :
                Plaintiff-Intervenor,                        :
                                                             :
 - against -                                                 :
                                                             :
CITY OF NEW YORK and NEW YORK CITY                           :
DEPARTMENT OF CORRECTION,                                    :
                                                             :
                Defendants.                                  :
------------------------------------------------------------ X


**[PROPOSED] ORDER**

42

**Section I: Remedial Steps for the Department to Address by December 31, 2023**

This Order is intended to redress practices causing imminent harm and to remediate the Department's non-compliance with certain provisions of the prior *Nunez* Court Orders. This order does not displace the requirements of prior *Nunez* Court Orders, which remain in effect. The Court now enters this remedial Order to impose specific requirements and deadlines on the Department to immediately address some of the ongoing deficiencies that the Monitor has identified in its July 10, 2023 Report (dkt. 557).

1. **UOF, Security and Violence Indicators**: By, September 30, 2023, the Department, in consultation with the Monitor, shall develop a set of data and metrics for use of force, security and violence indicators that will be routinely evaluated by Department leadership to identify trends and patterns regarding unnecessary and excessive force and violence in order to identify the root cause of these issues and develop strategies to address them. Upon request by the Monitor, the Department shall provide data regarding use of force, security, and violence indicators and permit observation of meetings in which such information is evaluated by Department leadership.

2. **Revise Search Procedures**: By, October 30, 2023, the Department, in consultation with the Monitor, shall reconstitute its search procedures and practices to ensure searches are conducted in an efficient, timely, safe manner and to reduce the possibility of a use of force. The new search procedures shall be subject to the approval of the Monitor.

3. **Revise Escort Procedures**: By, October 30, 2023, the Department, in consultation with the Monitor, shall revise its escort procedures and practices to eliminate the use of painful escort holds. The new escort procedures shall be subject to the approval of the Monitor.

4. **Lock-in and Lock-out Procedures**: By October 30, 2023, the Department shall revise and implement a new protocol that requires each lock-in and lock-out to occur at certain times each day. Housing unit staff must ensure the lock-in and lock-out occur and report the times for the housing unit to the Tour Commander. The Department shall track and record the lock-in and lock-out times at each unit in every Facility to ensure the lock-in and lock-out occur as required. These protocols and procedures shall be subject to the approval of the Monitor.

5. **Control Station Security**: By September 25, 2023, the Department shall revise and implement a protocol to ensure the Control Station Door is secured at all times and to ensure that a Control Station Door is never opened when a housing unit door is opened or an incarcerated individual is in the vestibule. This protocol shall be subject to the approval of the Monitor.

6. **Staff Off Post**: Staff shall not leave their post or place of assignment without the permission of a superior. Employees who are authorized to leave their post for any reason must return to the post as quickly as possible. Staff assigned to work to a housing unit post (either the A or B post) shall not be permitted to leave their post until they have been properly relieved or exigent circumstances exist.

7. **Special Teams Training**: By, August 31, 2023, the Department, in consultation with the Monitor, shall develop a training program and provide such training to Special Teams[18]. The training program shall include fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students. The content of the training program shall include, among other things, procedures and protocols for use of force, conducting searches, and responding to alarms and emergency situations in a manner that ensures the safety of incarcerated individuals and staff. The content of the training programs shall be subject to the approval of the Monitor.

8. **Revise Special Teams Command Level Orders**: By, November 30, 2023, the Department, in consultation with the Monitor, shall review and revise as necessary all of Special Teams command level orders related to the use of force. The new Special Teams command level orders related to the use of force shall be subject to the approval of the Monitor.

9. **Screening and Assignment of Staff to Special Teams**: By, October 30, 2023, the Department, in consultation with the Monitor, shall revise and implement its screening and assignment process for the initial assignment to Special Teams and routine reassessment of Special Teams staff to ensure the staff assigned to Special Teams are appropriately fit for duty. The Department's screening policy and reassessment procedures shall be subject to the approval of the Monitor.

10. **Revise Pre-Promotional Screening Policies and Procedures**: By, October 30, 2023, the Department, in consultation with the Monitor, shall revise its pre-promotional screening policies and procedures to address the issues identified by the Monitor in each of its Court filings in 2023.

11. **ID Staffing**: By, November 30, 2023, the City shall ensure that the Department's ID Division maintains at least 21 supervisors and 85 investigators to conduct use of force investigations unless and until the Department presents an internal staffing analysis and can demonstrate to the Monitor that fewer staff are necessary to conduct thorough, timely, and objective investigations of all Use of Force Incidents as required by the *Nunez* Court Orders.

12. **Additional Reporting by the City and Department Regarding Intake**: On September 15, 2023 and November 15, 2023, the City and Department shall file two additional reports on the Court docket regarding the status of their continued efforts to implement reliable Intake tracking systems for new admissions and inter/intra facility transfers.

13. **Revise Command Discipline Policy and Procedures**: By November 30, 2023, the Department, in consultation with the Monitor, shall develop and implement appropriate controls and procedures regarding the adjudication of Command Discipline, including but not limited to the following:

    a. timely processing of cases so that a minimal number of cases are dismissed due to procedural errors;

---

[18] Special Teams is defined as the Emergency Services Unit and any functional equivalent unit, including, but not limited to the Strategic Response Team and the Special Search Team.

    b.   quality assurance measures to ensure that all Command Disciplines impose an appropriate outcome and do not merely default to the lowest level sanction, unless proportional to the severity of the misconduct;

    c.   appropriate mechanisms to ensure cases that require referral for formal discipline via MOCs are completed as required by policy, including but not limited to, when the conduct merits formal discipline or when a staff member has exceeded the number of allowable CDs in a given time period; and

    d.   appropriate tracking of any appeal to the Legal Division and the outcome of the appeal.

The Department's Command Discipline policy and procedures shall be subject to the approval of the Monitor.

14. **External Assessment of Procedures for Preventing and Responding to Self-Harm**: The City and Department shall authorize, and the Department and CHS shall engage, a consultant (and any necessary staff) who is a qualified expert in the prevention and response to self-harm in correctional settings to conduct the assessment outlined below. The Monitor has approved of the selection of Dr. Timothy Belavich. If Dr. Belavich proves to be unavailable or becomes unavailable or his continued service becomes otherwise unfeasible in the future, the Department will retain an appropriate replacement subject to approval of the Monitor. The consultant shall conduct the following assessment in consultation with the Monitor:

    a.   DOC and H+H policies related to Suicide Prevention to ascertain whether they reflect generally accepted practice.

    b.   H+H protocols for screening, assessing, and treating the risk of suicide and DOC protocols for responding to suicidal ideation/referrals and for monitoring those who are on suicide precautions to determine whether they are adequate.

    c.   DOC staff's practices and responses to self-harm incidents.

    d.   Current H+H and DOC protocols and practices to identify where performance is subpar.

    e.   DOC and H+H's Morbidity-Mortality Review process to ensure that it reflects the generally accepted practice and relevant professional standards.

The consultant shall provide the Monitor with a report of his findings by December 31, 2023.

## Section II: Monitor Reporting

1. The Monitor shall file status reports on October 10, 2023 and November 16, 2023 on the City and Department's efforts to address the specifically enumerated remedial relief outlined in this Order.

2. On December 21, 2023, the Monitor shall file his next report with the compliance assessments of the *Nunez* Court Orders pursuant to the Court's June 13, 2023 Order, § 3.

SO ORDERED this _____ day of _____, 2023

_____
LAURA TAYLOR SWAIN
Chief United States District Judge

**Redline of Proposed Court Order**
*Comparing July 10, 2023 Version with August 7, 2023 Version*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
                                                                 :

MARK NUNEZ, et al.,                         :
                                                                  :

 Plaintiffs,                            :
                                                                  :

 - against -                            :
                                                                  :

CITY OF NEW YORK, et al.,                :
                                                                  :

 Defendants.                          :
                                                     :  **11 Civ. 5845 (LTS)(JCF)**
------------------------------------------------------------ X
                                                                  :

UNITED STATES OF AMERICA,          :
                                                                   :

          Plaintiff-Intervenor,           :
                                                                   :

 - against -                            :
                                                                  :

CITY OF NEW YORK and NEW YORK CITY  :
DEPARTMENT OF CORRECTION,       :
                                                                   :

          Defendants.                   :
------------------------------------------------------------ X

**[PROPOSED] ORDER**

47

### Section I: Remedial Steps for the Department to Address by December 31, 2023

This Order is intended to redress practices causing imminent harm and to remediate the Department's non-compliance with certain provisions of the prior *Nunez* Court Orders. This order does not displace the requirements of prior *Nunez* Court Orders, which remain in effect. The Court now enters this remedial Order to impose specific requirements and deadlines on the Department to immediately address some of the ongoing deficiencies that the Monitor has identified in the July 10, 2023 Report (dkt. 557).

15. **UOF, Security and Violence Indicators**: By, September 30, 2023, the Department, in consultation with the Monitor, shall develop a set of data and metrics for use of force, security and violence indicators that will be routinely evaluated by Department leadership to identify trends and patterns regarding unnecessary and excessive force and violence in order to identify the root cause of these issues and develop strategies to address them. The Monitoring Team shall be permitted immediate access to the Department's actions (including but not limited to meetings, discussions, and internal reports) and data in order to evaluate the quality of the Department's assessment of its data and metrics. Upon request by the Monitor, the Department shall provide data regarding use of force, security, and violence indicators and permit observation of meetings in which such information is evaluated by Department leadership.

16. **Revise Search Procedures**: By, October 30, 2023, the Department, in consultation with the Monitor, shall reconstitute its search procedures and practices to ensure searches are conducted in an efficient, timely, safe manner and to reduce the possibility of a use of force. The new search procedures shall be subject to the approval of the Monitor.

17. **Revise Escort Procedures**: By, October 30, 2023, the Department, in consultation with the Monitor, shall revise its escort procedures and practices to eliminate the use of painful escort holds. The new escort procedures shall be subject to the approval of the Monitor.

18. **Lock-in and Lock-out Procedures**: By September 25October 30, 2023, the Department shall developrevise and implement a new protocol that requires each lock-in and lock-out to occur at certain times each day. Housing unit staff must ensure the lock-in occursand lock-out occur and report the lock-in timetimes for the housing unit to the Tour Commander. The Department shall track and record the lock-in and lock-out times at each unit in every Facility to ensure the lock-in occursand lock-out occur as required. These protocols and procedures shall be subject to the approval of the Monitor.

19. **DoorControl Station Security**: By September 25, 2023, the Department shall developrevise and implement a protocol to ensure the Control Station Door is secured at all times and to ensure that ana Control Station Door is never opened when a housing unit door is opened or an incarcerated individual is in the vestibule. This protocol shall be subject to the approval of the Monitor.

20. **Staff Off Post**: Staff shall not leave their post or place of assignment without the permission of a superior. Employees who are authorized to leave their post for any reason must return to the post as quickly as possible. Staff assigned to work to a housing unit post (either the A or B post) shall not be permitted to leave their post until they have been properly relieved or exigent circumstances exist.

21. ~~ESU~~**Special Teams Training**: By, August 31, 2023, the Department, in consultation with the Monitor, shall develop ~~and implement~~ a training ~~curriculum for the Emergency Services Unit or any functional equivalent unit, including, but not limited~~program and provide such training to ~~the Special Response Team and the~~ Special ~~Search Team~~Teams[19]. The training program shall include fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students. The content of the training program shall include, among other things, procedures and protocols for use of force, conducting searches, and responding to alarms and emergency situations in a manner that ensures the safety ~~for~~of incarcerated individuals and staff. The content of the training programs shall be subject to the approval of the Monitor.[20]

22. **Revise ~~ESU CLOs~~Special Teams Command Level Orders**: By, November 30, 2023, the Department, in consultation with the Monitor, shall review and revise as necessary all of ~~ESU's~~Special Teams command level orders[21] related to the use of force. The new ~~ESU~~Special Teams command level orders related to the use of force shall be subject to the approval of the Monitor.[22]

23. **Screening and Assignment of Staff to Special Teams**[23]: By, October 30, 2023, the Department, in consultation with the Monitor, shall ~~develop~~revise and implement ~~a~~its **s**creening and assignment process for the initial assignment to ~~ESU~~Special Teams and routine reassessment of ~~ESU~~Special Teams staff to ensure ~~their continued fitness~~the staff assigned to Special Teams are appropriately fit for duty. The Department's screening policy and reassessment procedures shall be subject to the approval of the Monitor.

24. **Revise Pre-Promotional Screening Policies and Procedures**: By, ~~September~~October 30, 2023, the Department, in consultation with the Monitor, shall revise its pre-promotional screening policies and procedures to address the issues identified by the Monitor in each of its Court filings in 2023.

25. **ID Staffing**: By, November 30, 2023, the City shall ensure that the Department's ID Division maintains at least 21 supervisors and 85 investigators to conduct use of force investigations unless and until the Department presents an internal staffing analysis and can demonstrate to the Monitor that fewer staff are necessary to conduct thorough, timely, and objective investigations of all Use of Force Incidents as required by the *Nunez* Court Orders.

---

[19] Special Teams is defined as the Emergency Services Unit and any functional equivalent unit, including, but not limited to the Strategic Response Team and the Special Search Team.

[20] ~~This approval requirement is consistent with Consent Judgment, § XIII, ¶1(c) for Probe Team Training.~~

[21] ~~This applies to the Emergency Services Unit or any unit that may serve the same function, but may utilize a different name (e.g. the Special Response Team, the Special Search Team, etc.).~~

[22] ~~This approval requirement is consistent with Consent Judgment, § IV, ¶1 regarding approval of the Use of Force Policy.~~

[23] ~~This includes the Emergency Services Unit or any functional equivalent, including but not limited to Strategic Response Team and Special Search Team.~~

26. **Additional Reporting by the City and Department Regarding Intake**: On September 15, 2023 and November 15, 2023, the City and Department shall file two additional reports on the Court docket regarding the status of their continued efforts to implement reliable Intake tracking systems for new admissions and inter/intra facility transfers.

27. **Revise Command Discipline Policy and Procedures**: By November 30, 2023, the Department, in consultation with the Monitor, shall develop and implement appropriate controls and procedures regarding the adjudication of Command Discipline, including but not limited to the following:

   e. timely processing of cases so that a minimal number of cases are dismissed due to procedural errors;

   f. quality assurance measures to ensure that all Command Disciplines impose an appropriate outcome and do not merely default to the lowest level sanction, unless proportional to the severity of the misconduct;

   g. appropriate mechanisms to ensure cases that require referral for formal discipline via MOCs are completed as required by policy, including but not limited to, when the conduct merits formal discipline or when a staff member has exceeded the number of allowable CDs in a given time period; and

   h. appropriate tracking of any appeal to the Legal Division and the outcome of the appeal.

   The Department's Command Discipline policy and procedures shall be subject to the approval of the Monitor.

28. **External Assessment of Procedures for Preventing and Responding to Self-Harm**: The City and Department shall authorize, and the Department and CHS shall engage, a consultant (and any necessary staff) who is a qualified expert in the prevention and response to self-harm in correctional settings to conduct the assessment outlined below. The Monitor has approved of the selection of Dr. Timothy Belavich. If Dr. Belavich proves to be unavailable or becomes unavailable or his continued service becomes otherwise unfeasible in the future, the Department will retain an appropriate replacement subject to approval of the Monitor. The consultant shall conduct the following assessment in consultation with the Monitor:

   f. DOC and H+H policies related to Suicide Prevention to ascertain whether they reflect generally accepted practice.

   g. H+H protocols for screening, assessing, and treating the risk of suicide and DOC protocols for responding to suicidal ideation/referrals and for monitoring those who are on suicide precautions to determine whether they are adequate.

   h. DOC staff's practices and responses to self-harm incidents.

   i. Current H+H and DOC protocols and practices to identify where performance is subpar.

   j. DOC and H+H's Morbidity-Mortality Review process to ensure that it reflects the generally accepted practice and relevant professional standards.

The consultant shall provide the Monitor with a report of his findings by December 31, 2023.

### Section II: Monitor Reporting

3.   The Monitor shall file status reports on October 10, 2023 and November 16, 2023 on the City and Department's efforts to address the specifically enumerated remedial relief outlined in this Order.

4.   On December 21, 2023, the Monitor shall file his next report with the compliance assessments of the *Nunez* Court Orders pursuant to the Court's June 13, 2023 Order, § 3.


SO ORDERED this _____ day of _____, 2023


_____
LAURA TAYLOR SWAIN
Chief United States District Judge

# APPENDIX D:
# PROPOSED AGENDA FOR
# AUGUST 10, 2023 CONFERENCE

**Proposed Agenda for Court Conference**
*August 10, 2023 – 2:00 p.m.*

- Current conditions in the jails and engagement with the Monitoring Team since the Monitor's July 10, 2023 Report (25 minutes)

  o Introduction by the Monitor

  o Inquiries from the Court to the City of New York and Department of Correction

- Meet and Confer Process & Proposed Court Order For Immediate Initiatives to Address by December 31, 2023 (15 Minutes)

  o Deputy Monitor

  o City of New York

- Proposed Motion Practice & Schedule (30 Minutes)

  o Plaintiff Class Counsel

  o Southern District of New York

  o City of New York

- Court Conclusion & Next Steps