UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x

MARK NUNEZ, et al.,

                              Plaintiffs,      **DECLARATION OF**
                                                  **JAMES AUSTIN**

-against-

CITY OF NEW YORK, et al.,

                                                     11 Civ. 5845 (LTS)(JCF)

                              Defendants.

-------------------------------------------------------------------x

UNITED STATES OF AMERICA,

                              Plaintiff-Intervenor,

-against-

CITY OF NEW YORK and NEW YORK CITY
DEPARTMENT OF CORRECTION,

                              Defendants.

-------------------------------------------------------------------x

STATE OF NEW YORK    )
                              :SS:
COUNTY OF QUEENS    )

    **JAMES AUSTIN**, declares pursuant to 28 U.S.C. Code §1746 under penalty of perjury that the following is true and correct:

1. I have been asked by the New York City Department of Correction (NYC DOC) to prepare the following declaration regarding the current situation at the Rikers Island jail system.

2. By way of background, I am a criminologist having started my career as a correctional counselor and later sociologist at the Joliet and Stateville correctional centers. Since then, I earned my Ph.D. in sociology at the University of California at Davis and then was employed by the National Council on Crime and Delinquency, The George Washington University and the JFA Institute which I founded in 2002 (see attached resume).

3.  Over the past 40 years, I have consulted with numerous local, state, and federal agencies on matters that pertain to jail and prison classification systems, restricted housing programs, various risk assessment systems, and correctional population projections.

4.  I am currently working in four jurisdictions (excluding New York City) as either an expert for the federal court or as a monitor of an existing consent decree (Rhode Island, Alameda County, U.S. Virgin islands and Santa Clara County).

5.  In 2021 I was retained by the NYC DOC at the request of the Federal Monitor, Steve Martin, to develop a plan to reduce violence on Rikers Island.

6.  In my final report dated March 2022 I made the following four recommendations:

    a.  Establish a single Restricted Housing Program (RHP) to safely manage the disruptive and violent detainees;

    b.  Lower the jail population;

    c.  Reform the Jail Classification System; and,

    d.  Cease the current practice of housing people by gang affiliation.

7.  In 2022, I was asked by NYC DOC Commissioner Louis Molina to continue my work with the NYC DOC under the leadership of Deputy Commissioner Chris Miller and Assistant Commissioner Tim Kepler with a special emphasis on implementing the newly designed Enhanced Supervision Program (ESP) and continuing to assess and analyze the level of violence occurring on Rikers Island. Establishing the ESP is a reflection of my recommendation to create a single Restricted Housing Program.

8.  I am pleased to report that since 2022, the following major changes have occurred, which have reduced the level of violence occurring on Rikers Island:

    a.  The classification system has been corrected and is being applied to the jail population in a timely manner. Specifically, Persons in Custody (PICs) are being classified using a well established and valid classification system that I helped designed with the National Institute of Corrections (NIC) which is part of the U.S. Department of Justice. PICs are now properly classified and generally assigned to their appropriate housing units. In so doing this reduces the level of violence in the jail system.

    b.  The ESH program is operational. A portion of the Rose M. Singer Center has been completely renovated with PICs transferred from the previous and less effective ESH units located in the George R. Vierno Center.

    c.  A recent assessment completed in conjunction with the Monitor examined 40 PICs who 1) were randomly selected from a pool of about 400 PICS who had committed

2

      acts of violence in the past six months that would qualify them for ESH, 2) were still in custody and 3) were not currently in ESH. That review found that only one PIC who should have been assigned to the ESH was not. This review indicated that the Department is properly identifying those PICs who should be referred to the ESH.

   d. The major group that should be in a restricted housing program but are not assigned to the ESH are those who have recently committed an assault on staff or other PICs and have a mental health condition that does not allow them to be so assigned (about 150 active PICs). As discussed in Paragraph 10 below, the Department is developing a plan to address these PICs.

   e. Anna M. Kross Center facility has been closed and PICs re-assigned to the renovated and more secure Otis Bantum Correctional Center.

   f. PICs are no longer housed by gang affiliation alone.

9. The results of these reforms are promising. As shown in the Figure 1 below, the serious assault rate on PICs and staff have been rapidly declining since 2021.

10. Based on the review of PICs who should be assigned to an ESH type program but are not due to a mental health condition, the NYC DOC is now developing, in coordination with the Monitor and Correctional Health Services (CHS), plans to establish a Behavioral Health Unit (BHU) which when operational will replace the current CAP unit and allow people with mental health restrictions who are assaulting others to be placed in a more secure and therapeutic setting. The first planning meeting is now scheduled for August 15, 2023.

11. The Monitor agrees that DOC has made substantial progress in some areas since the Action Plan was adopted. "There is no question that some progress has been made in some areas (*e.g.*, hiring executive staff with demonstrated expertise in sound correctional practice, increasing the number of staff available, improving enforcement of sick leave policies, modernizing staff scheduling systems, reducing the disciplinary backlog, and improving classification practices and SRG blending)." (Status Report – Doc. 557, pages 172-73, S.D.N.Y. July 10, 2023).

12. The use of a receivership for a City or County jail system is rarely if ever used. Setting aside the protracted legal process for demonstrating the need for a Receivership, placing the NYC DOC under a Receivership at this time would be highly disruptive to the progress that has been made in reducing violence, which I expect will continue over the remainder of this year.

13. There are many problems associated with appointing a Receiver, which may stall or even deter change in a jail facility instead of enacting change. One such problem is that a Receiver imposes another layer of administrative structure that can often raise confusion among the work force on who is in charge of the jail and for how long. When a Receiver

is appointed, the Receiver typically will bring in other key administrative staff to help manage the jail system, resulting in loss of other leadership in the facility who have institutional knowledge.

14. The only receivership for a major city or county jail system was the one imposed in the Washington DC jail system in 1995, was limited to medical and mental health care, and only after an agreed upon remedial plan failed to produce any progress in the medical and mental health care system for a number of years (Inmates of D.C, v. Delbert Jackson, C.A. No. 75-1618).

15. The most recent example I am familiar was the Orleans Parish jail system where the Federal court replaced the administrative authority of the sheriff with an "Independent Compliance Director" in 2016.[1] That person resigned in 2018 due to an inability to make improvements to meet compliance with the Consent Decree. Merely replacing the Sheriff with an outside and external administrator had no positive impact on the jail system.

16. NYC DOC, through its current leadership, have recruited key security and administrative staff from other City agencies and from the other correctional agencies to enhance the agency's performance and reduce the level of violence. The appointment of a Receiver may likely result in the vacating of several of these key administrative positions.

17. Lower level staff who handle the basic operations of DOC may likely question the authority of the Receiver. Should this occur, needed reforms will be unnecessarily delayed and perhaps remain unmet.

18. For these reasons I would recommend that a Receiver not be appointed at this time and that Commissioner Molina and the NYC DOC be permitted to continue its work with the Monitoring Team to ensure that progress continues as required by the agreed to Action Plan.

_____    Date: 8/8/2023
James Austin, Ph.D.

---

[1] https://...

4

