N8AzzNUN1-ND

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

MARK NUNEZ, et al.,

                    Plaintiffs,

          v.                          11 Civ. 5845 (LTS)

CITY OF NEW YORK, et al.,

                    Defendants.        Conference

------------------------------x

                                       New York, N.Y.
                                       August 10, 2023
                                       2:00 p.m.

Before:

                    HON. LAURA TAYLOR SWAIN,

                                       Chief District Judge

                         APPEARANCES

THE LEGAL AID SOCIETY PRISONERS' RIGHTS PROJECT
BY:  MARY LYNNE WERLWAS
     KAYLA SIMPSON
     KATHERINE HAAS

HON. SYLVIA O. HINDS-RADIX,
     Corporation Counsel of the City of New York
     New York City Law Department
     Attorney for Defendants
BY:  SYLVIA O. HINDS-RADIX
     JOHN SCHEMITSCH
     SHERYL R. NEUFELD

DAMIAN WILLIAMS,
     United States Attorney for the
     Southern District of New York
     Attorney for Intervenor Plaintiff
     United States of America
BY:  JEFFREY K. POWELL
     LARA K. ESHKENAZI
     Assistant United States Attorneys

N8AzzNUN1-ND

1                           APPEARANCES (continued)

2

        Attorneys for Monitor Steve J. Martin
3  BY:  STEVEN J. MARTIN, Monitor
        ANNA E. FRIEDBERG, Deputy Monitor
4

5

6  Also Present:  Christina Bucci Vanderveer
                   Associate Deputy Monitor
7
                   Alycia M. Karlovich
8                  Monitoring Team Analyst

9                  Dennis Gonzalez
                   Monitoring Team Associate Director
10
                   Commissioner Louis Molina
11                 New York City Department of Correction

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N8AzzNUN1-ND

```
1            (Case called)
2            THE COURT:  Again, good afternoon, and welcome to
3    counsel, to the members of the press and the public and city
4    officials in attendance and to everyone in the courthouse or
5    listening in, and thank you for attending today's conference.
6    I will ask today's speakers in the well to introduce themselves
7    starting with the monitoring team representatives.
8            MR. MARTIN:  Good afternoon, your Honor.  My name is
9    Steve Martin, the federal court monitor.
10           THE COURT:  Good afternoon, Mr. Martin.  You can be
11   seated.
12           MS. FRIEDBERG:  Good afternoon, your Honor.  My name
13   is Anna Friedberg.  I'm the deputy monitor.
14           THE COURT:  Good afternoon, Ms. Friedberg.
15           MS. KARLOVICH:  Hi, I'm Alycia Karlovich, and I'm an
16   analyst for the monitoring team.
17           THE COURT:  Good afternoon, Ms. Karlovich, and maybe
18   you could introduce your colleague next to you.
19           MR. GONZALEZ:  Good afternoon.  I'm Dennis Gonzalez,
20   the associate director.
21           THE COURT:  Good afternoon, Mr. Gonzalez, and you can
22   be seated.  And next, plaintiff's counsel?
23           MS. WERLWAS:  Good afternoon.  Mary Lynne Werlwas for
24   The Legal Aid Society Prisoners' Rights Project for the
25   plaintiff.
```

N8AzzNUN1-ND

1              THE COURT:  Good afternoon, Ms. Werlwas.

2              MS. SIMPSON:  Good afternoon, your Honor, Kayla

3    Simpson, The Legal Aid Society Prisoners' Rights Project also

4    for the plaintiffs.

5              THE COURT:  Good afternoon, Ms. Simpson.

6              MS. HAAS:  Good afternoon, your Honor, Katherine Haas,

7    also from The Legal Aid Society and also on behalf the

8    plaintiff class.

9              THE COURT:  Good afternoon, Ms. Haas.  And from the

10   United States Attorney's Office?

11             MR. POWELL:  Good afternoon, Jeffrey Powell

12   representing the government, your Honor.

13             THE COURT:  Good afternoon, Mr. Powell.

14             MS. ESHKENAZI:  Good afternoon, Laura Eshkenazi, also

15   representing the government.

16             THE COURT:  Good afternoon, Ms. Eshkenazi.

17             MR. SCHEMITSCH:  Good afternoon, your Honor, John

18   Schemitsch for the City of New York for defendants.

19             THE COURT:  Good afternoon, Mr. Schemitsch.

20             MS. NEUFELD:  Good afternoon, your Honor, Sheryl

21   Neufeld, also for the city defendants.

22             THE COURT:  Good afternoon, Ms. Neufeld.

23             MR. MOLINA:  Good afternoon, your Honor, Louis Molina,

24   Commissioner, New York City Department of Corrections.

25             THE COURT:  Good afternoon, Commissioner.

N8AzzNUN1-ND

1          MS. HINDS-RADIX:  Good afternoon, your Honor, Sylvia

2    Hinds-Radix, Corporation Counsel of the City of New York.

3          THE COURT:  Good afternoon, Ms. Hinds-Radix.

4          I remind everyone as provided in the Court's

5    January 2021 standing order, no photography, recording or

6    retransmission of any part of this proceeding is permitted.

7          We are here today for a status conference.  Since the

8    last status conference, the monitoring team filed a status

9    report on July 10th, 2023.  In that status report, the

10   monitoring team made a finding pursuant to section G, paragraph

11   6 of the previously approved action plan.  That finding was

12   that, (1) the city has not made sufficient progress under the

13   action plan, and (2) that incarcerated individuals and

14   Department of Corrections staff continue to face a grave risk

15   of harm.  It has been more than a year since the action plan

16   went into effect, and these recent findings raise profound

17   questions as to whether the city and the department are capable

18   of making the facilities management changes that are necessary

19   to protect detainees and staff properly, and have the requisite

20   objectivity and transparency necessary to address serious

21   incidents reliably and to advance the court-ordered reforms.

22          In the time since the July 10th report was issued,

23   two more individuals have died while in custody at Rikers

24   Island.  Since the last conference, the parties have also

25   engaged in court-ordered meet-and-confers to discuss the city

N8AzzNUN1-ND

1    and the department's plan to address the findings in the

2    monitoring team's January 10th, 2023, status report, to

3    discuss a potential briefing schedule for a motion for contempt

4    or to appoint a receiver and to discuss any other requests for

5    court-ordered relief in the interim.

6            The monitoring team filed a report on those

7    discussions on August 7th, and today we will review the

8    status of the defendants' response and issues of violence and

9    management failures at the Rikers jails and discuss next steps.

10   I'll be calling on each speaker during the proceedings.  Each

11   time that you speak, please identify yourself by name for

12   clarity of the record and for the benefit of those who are

13   listening in to today's conference on the audio feed.  To

14   ensure audibility and to minimize the need for movement around

15   the courtroom, I authorize you to speak from your seats today,

16   if that's comfortable for you and enables you to remain close

17   to the microphone.  Each time that you speak, please speak

18   directly into the microphone at your table so that the people

19   who are on the phone line can hear you as well as the people in

20   the overflow courtroom.

21           Please don't interrupt each other or me during the

22   conference.  If we interrupt each other, it's difficult to

23   create an accurate transcript.  But having said that, I

24   apologize in advance for breaking this rule because I may

25   interrupt if I have questions.  If anyone has any difficulty

N8AzzNUN1-ND

1    hearing me or another participant, please say something right

2    away.  And it is important that those of you who are speaking

3    always speak clearly and answer any questions with words rather

4    than with sounds or gestures because, of course, I can see you,

5    but the people who are listening in can't and the reporter

6    needs to be able to make an accurate transcript of what is

7    being said.

8            I just have a few more introductory remarks.  The

9    action plan identified key areas of reform for the department

10   to prioritize in light of foundational impediments to

11   implementing each requirement of the consent judgment.  The

12   recent monitoring team reports indicate that progress on these

13   court-ordered reforms has stalled and that communication

14   channels between the monitoring team and the department have

15   broken down.  The urgency of the danger facing those

16   incarcerated in the jails on Rikers can't be overstated.  The

17   current state of affairs is as tragic and disturbing as it is

18   unacceptable.

19           I acknowledged and I reviewed carefully the letter and

20   declaration that defendants' counsel filed on August 9th.  It

21   is true and it is commendable that there has been some

22   improvement since early 2022 in the appalling death and

23   casualty statistics associated with the Rikers jails.  Turning

24   Rikers around has never presented an easy task, and the Court

25   recognizes that incident rates had skyrocketed between the time

1    the consent judgment was entered in 2015 and the end of 2021.

2    But some improvement in selected statistics, even accompanied

3    by decisions to move detainees into more sound facilities, and

4    significant restaffing is not enough.  At this juncture, the

5    Court expects and will demand a coordinated, rational response

6    to the monitoring team's findings and constructive work under

7    the observation and guidance of the monitoring team across a

8    targeted spectrum of responsibilities and urgent problems.

9    That work must be patently transformative of the Rikers jails

10   in the very near term.

11           I will be following the proposed agenda that was

12   submitted by the monitoring team in its August 7th, 2023,

13   report, and that begins with initial remarks by the monitoring

14   team.  So I now call on Mr. Martin.

15           MR. MARTIN:  Thank you, your Honor.  Our August 7th

16   report provides updates on the following:  Number one, DOC

17   steps to address some of our findings from the July 10th

18   report.

19           THE COURT:  Mr. Martin, would you mind angling the

20   microphone down just a little bit more and projecting even a

21   little bit more.

22           MR. MARTIN:  A little bit better?  Do you ever tire of

23   correcting me on the microphone.

24           THE COURT:  These microphones are quirky.

25           MR. MARTIN:  Shall I start over?

1          THE COURT:  Yes, please.

2          MR. MARTIN:  Thank you, your Honor.  Our August 7th

3     report provides updates on the following.  Number one, DOC

4     steps to address some of our findings from the July 10th

5     report.  Number two, an update on DOC's consultation with our

6     office.  Number three, an update on in-custody deaths, and

7     number four, a summary of the meet/confer process.

8          Let me first comment on DOC's efforts and actions to

9     address our findings related to the safety and welfare of both

10    detainees and staff.  As has been the pattern of compliance

11    with the terms of the Court's orders throughout the eight-year

12    history of the remedial phase of this case, DOC typically steps

13    up compliance efforts in response to the monitor's reports.

14    There's often a flurry of activity to comply.  Some concrete

15    steps are initiated in select areas that suggest progress.

16    Then there are some areas where the response constituted a

17    little more than window dressing.

18          Let me give you two examples of these different

19    approaches to compliance.  We set out serious concerns about

20    the DOC's practice of not consistently locking in detainees

21    during the night hours, and cited several instances of harm

22    that ensued when the detainees were allowed to congregate after

23    lock-in.  We strongly signaled that consistent enforcement of

24    lock-in was critical and essential for the safety of the

25    population.  The DC, deputy commissioner -- I'm sorry -- for

1    classification has moved quickly with a plan to address this

2    issue that would be put into place in the coming weeks.  Such a

3    plan, if, and I emphasize if, it is successfully implemented

4    stands to reduce harm.  That is a positive response.

5            However, the DOC response to a number of other

6    deficient basic security practices that were highlighted as

7    problematic was to simply issue a teletype to remind staff to

8    "follow department policy and procedures."  That, in my view,

9    is a wholly inadequate response that is nothing more than a

10   facile window dressing.  That kind of response does not signal

11   a true commitment to progress.

12           And I want to comment at this point in the city and

13   DOC's letter to the Court from yesterday, an eight-page

14   document, setting out initiatives, progress, et cetera.  And I

15   certainly don't begrudge defendants counting their purported

16   successes.  But what stood out in that letter to both the

17   deputy monitor and I was there was not one mention or reference

18   to correcting these flawed, pervasive security deficiencies in

19   that eight-page letter, which, in my view, is the most urgent

20   compliance issue in this case because it relates directly to

21   harm and protection from harm.

22           And while DOC undoubtedly has been engaged in a flurry

23   of activity since the July 10th hearing, the reality is that

24   serious incidents of harm related to security failures and

25   malpractice continue.  The deputy monitor will detail here

N8AzzNUN1-ND

1    momentarily that it continues right up to yesterday during site

2    visits we made to two separate facilities, real abject harm.

3          For example, on August 1st, a major disturbance

4    occurred at GRVC in which some 16 detainees from two separate

5    housing units were allowed to engage in assaults on one another

6    with makeshift weapons because staff failed to secure doors.

7    Two inmates penetrated a control station and opened doors.

8    Number two, on July 29th, also at GRVC, a detainee was

9    brutally assaulted in his cell by approximately six detainees

10   while an officer stood and watched, making no effort whatsoever

11   to intervene.  The victim sustained a fractured nose, injury to

12   the eye orbit, a concussion and other head injuries.

13         Number three, during the month of July, there were

14   eight slashings and stabbings in the enhanced housing unit at

15   Rose M. Singer, units that are supposed to be richly staffed

16   not only with security staff but program staff.  It is one of

17   the most high-security units in the facility with eight

18   stabbings and slashings in July.  We were there yesterday.

19   Those are now spilling over into August with continued

20   slashings and stabbings that are quite disturbing in what

21   generated them, which the deputy monitor may or may not go into

22   in detail, but we have it if the Court is interested.

23         Number four, three of the four in-custody deaths as of

24   July and August involved security staff-related deficiencies.

25   Unfortunately, incidents of violence and harm inevitably occur

1    in large confinement settings even when there's sound

2    correctional practices in place.  However, when ongoing failure

3    to comply with court-ordered remediation is coupled with

4    pervasive, unsound correctional practice and violence and harm

5    are allowed to flourish, in my view, a constitutional line is

6    crossed.

7            I wrote some years ago about institutional reform and

8    noted that effective intervention depends in large measure on

9    the ability of those involved to translate broad constitutional

10   principles into specific normative mandates which are viewed as

11   legitimate in the distinct day-to-day context of prison life.

12   Perceptions of legitimacy by staff and prison leaders alike

13   greatly influence whether these principles become patterns of

14   action.  Perceptions of legitimacy and the bureaucratic will to

15   change are closely intertwined.

16           This is very much true of the implementation problems

17   in this case.  The dysfunction we observe in the DOC can be

18   attributed to a variety of dynamics, but clearly, bureaucratic

19   will or the lack thereof in perceptions of legitimacy play no

20   small part in our ability to identify and implement a

21   comprehensive scheme to achieve institutional reform by the

22   DOC.  The bureaucratic will of legitimacy must start with the

23   following edicts:  (1) if the detainee population is secure at

24   night and not permitted to roam about, it will reduce harm; (2)

25   if officers remain on post and in position to intervene in

1    detainee conflicts and actually do so, it will reduce harm.  If

2    officers secure doors, cell doors, housing unit doors and

3    control station doors, it will reduce harm.

4          I could go down, but the short version is simply this:

5    Safety of a detainee population starts with sound security

6    practices.  In fact, the American Correctional Association

7    Standards for Detention Facilities for the Security Performance

8    Standard cites "protection from harm" as the primary governing

9    objective for sound security practices.  Unless and until the

10   New York Department of Corrections embraces and implements this

11   most basic corrections management tenet, harm will continue to

12   flourish.  Unless and until DOC from the frontline officer to

13   the commissioner abide by these most elementary of standards,

14   harm will continue to flourish.  Needless to say, harm must be

15   seen as a scourge by every single actor who operates under

16   color of law.  Sound correctional standards demand it, as does

17   the rule of law.  Diminishing import of this fundamental tenet

18   by whatever means merely undermines the process and ensures

19   that a harmful and unconstitutional status quo remains.

20          It is, of course, my fervent hope that the parties in

21   this honorable court can devise a path forward that materially

22   reduces the violence and harm that is occurring daily at the

23   New York City Department of Corrections such that these

24   circumstances become the exception rather than the norm; the

25   infrequent rather than the pervasive, so the detainees and

N8AzzNUN1-ND

1  staff have a reasonable expectation of safety in these

2  institutions.

3        Thank you, your Honor.  Do you have any questions on

4  that?

5        THE COURT:  No, thank you, Mr. Martin.  Would the

6  deputy monitor wish to speak?

7        MS. FRIEDBERG:  Good afternoon, your Honor.  My name

8  is Anna Friedberg.  I'm the deputy monitor.  I'll be addressing

9  three issues at this portion of the conference.  First, I

10  intend to provide some additional context and information

11  regarding the city's submission to the Court yesterday.

12  Second, we'd like to share information regarding our initial

13  assessment of the declaration provided by Dr. James Austin, and

14  third, I plan to provide a summary of three days at Rikers over

15  the last week based on the DOC's own reporting and personal

16  observations by the monitoring team.

17        I will take each in turn now.  First, with respect to

18  the city's August 9th, 2023, submission to the Court, the

19  overall context to that communication raised the question:

20  What has changed since April 2023?  It must be emphasized that

21  the monitor's April 2023 reports made a number of

22  recommendations given the significant concerns we had about

23  harm in the jails.  During our April court conference, we

24  talked about whether there needed to be a court order to

25  address those recommendations.  At the time, I advised the

1    Court that the monitoring team didn't believe one was

2    necessary.  But as our July 10th and August 7th reports

3    demonstrate, the department has not made the progress we had

4    hoped in the April conference.

5          In particular, I highlight the first recommendation of

6    the monitor's April 2023 recommendations related to security

7    practices.  They have been the seminal recommendations from the

8    monitoring team for years.  And as we outlined in the

9    July 10th and August 7th report, we have real concerns

10   about whether there are any viable plans to addressing these

11   problems.  The city's letter from yesterday didn't even include

12   this topic.  The city has asked what has changed since April?

13   That is exactly the problem.  Nothing has changed since April.

14   I'm going to take a few of their comments with respect to the

15   letter from here.

16         First, the city provided a significant amount of data

17   in their letter.  The monitoring team has not had a chance to

18   evaluate that data to see if we agree with the conclusions or

19   not.  So I'm just advising the Court that we intend to do so.

20   As part of the data presented in the city's letter, there was a

21   table included from Dr. Austin that includes data that we find

22   hard to interpret as well as it includes data that we have

23   never seen before.  We intend to examine that more closely as

24   well.  The city's letter also addresses what they refer to as

25   RESH.  That's the enhanced supervised housing unit at the Rose

1    M. Singer Center and the moves to the OBCC.  I will take each

2    in turn.

3           We are closely reviewing the RESH program.  As you

4    know, under the action plan, the monitoring team is ultimately

5    required to approve it.  That approval has not yet been

6    provided.  We note that effectiveness simply cannot be

7    determined until the program has been implemented according to

8    design, and we have significant concerns about what has

9    occurred to date both from our work throughout the last few

10   months and up to and including our observations yesterday.

11          As Mr. Martin noted, there were eight stabbings and

12   slashings at RESH in July.  That's more than any other facility

13   and particularly concerning that weapons are present in the

14   most high-security self-contained setting in the jails.  The

15   monitoring team toured yesterday and identified problems with

16   safety such that individuals were not permitted to lock-out.

17   We heard that -- we also heard about concerning security

18   breaches such as individuals escaping from their cells and

19   attacking other individuals who were restrained to a desk.  We

20   also saw an individual following a concerning use of force

21   after a stabbing and slashing that occurred on Tuesday.

22   Finally, we observed active drug use while we were on the unit;

23   again, in the highest-security unit that has no contact visits.

24   But for the monitoring team alerting staff to the individual

25   using drugs and our concern about that individual's well-being,

1    the issue would not have been identified.  When staff were

2    alerted, they essentially reported to the monitoring team that

3    individuals use drugs all the time, and in fact, the department

4    has a fentanyl problem.  I do not know the status of that

5    particular individual at this time.

6            With respect to OBCC, they are currently on track to

7    have 220 uses of force this month.  That reflects perhaps

8    one-third to a half of the use of force incidents that

9    generally occur monthly in the department.  The facility has

10   had four stabbings and slashings, one a day for the past four

11   days.  As the monitoring team has noted before, it's true that

12   issues inevitably occur as individuals are moved en masse to a

13   new facility.  It was reported to us yesterday that OBCC is now

14   trying to address rules and procedures that had not properly

15   been employed at the facilities where these individuals had

16   previously come from, the majority of which came from AMKC,

17   which is leading to serious problems.

18           For example, we were advised that at OBCC, individuals

19   are now being blended so that there's not one particular gang

20   affiliation per housing unit.  That apparently was not

21   occurring at AMKC, where many of these individuals came from,

22   and hence, interpersonal violence has resulted.  I will note

23   that one of our visits yesterday at OBCC was at the intake.

24   During our visit, we met with a victim from a stabbing and

25   slashing who had been in the intake for a prolonged period of

1   time.  According to the department, they provided some

2   information literally just a few minutes before this conference

3   suggesting that perhaps the individual had only been in there

4   for about 21 hours.  The individual reported being there beyond

5   24 hours.  We, obviously, need to look at that issue.

6         Second, four perpetrators who were involved in a

7   second and separate stabbing and slashing at OBCC were placed

8   in a pen in the back of the intake unit outside the line of

9   sight of intake staff.  When the monitoring team went to meet

10  with them, they were actively smoking an illicit substance and

11  burning joints were on the floor.  If not for the monitoring

12  team's intervention, intake staff would not have known of these

13  issues, nor would they have addressed them.  I will also tell

14  you that visually these individuals were clearly suffering and

15  highly intoxicated, some of whom could not stand.  Why were

16  these people not in staff's line of sight?  How do they have

17  drugs if they got searched before coming into intake?  Why

18  wouldn't anybody in intake notice that they were smoking?  I do

19  not have answers to any of those questions.

20        I will address two other comments with the city's

21  letter first with respect to staff discipline.  The monitoring

22  team has spent extensive time and energy related to the

23  department's efforts to improve its efforts of imposing

24  discipline over the years.  The monitoring team agrees that DOC

25  has made progress in addressing the backlog, but for the city

N8AzzNUN1-ND

1   to suggest that they are committed to holding wrongdoers

2   accountable fails to address the monitoring team's findings,

3   that in 2022, they held fewer people accountable for misconduct

4   in that year than any other year in the consent judgment.  The

5   department's regression in detecting wrongdoing in 2022 via its

6   investigation process means that the lower number of charges

7   that were brought in 2022, since the inception of the consent

8   judgment in 2016, such a reduction can only be attributed to a

9   regression in detecting misconduct and the department's ability

10  to actually hold wrongdoers accountable.

11          The one final comment I will raise with respect to the

12  city's mission is with respect to their collaboration with the

13  monitoring team.  The monitoring team does not dispute anything

14  in the city's letter, but we do direct the Court to our

15  commentary in our August 7th report.  Concerns about

16  information is not just simply about the volume of information

17  provided, but it is also about the quality of the information

18  provided to the monitoring team and what we are able to access

19  reliably and timely.  The monitoring team has exerted more

20  effort, time and resources to obtain information from the

21  department than ever before.  That continues until today.

22  Responses have to be checked and double-checked.  Even

23  something as simple as getting a list of active policies for

24  one particular unit has required multiple back-and-forths just

25  this week.

N8AzzNUN1-ND

1          Further, whether the department is committed to full

2     transparency and appreciates the gravity of these issues is

3     still an open question.  Certain actions continue to raise

4     questions, and the city's submission is entirely silent on

5     what, if anything, it plans to do to ensure full transparency.

6     As I will discuss later, or in a few moments, we still have

7     questions regarding the department's efforts to shape public

8     perception of the serious issues in the jails over the last few

9     days.

10          I will now move to Dr. Austin's declaration.  We have

11     completed an initial review of Dr. Austin's declaration that

12     may not be consistent with the information available to the

13     monitoring team.  First, we note that Dr. Austin makes some

14     conclusions about classification in paragraph 8a of his

15     declaration.  He also makes conclusions regarding the

16     effectiveness of the ESH unit at GRVC and RMSC in paragraph 8b.

17     And finally, he makes some conclusions regarding housing people

18     by gang affiliation in paragraph 8f.  All three of those

19     conclusions are under evaluation by the monitoring team so that

20     we can understand how we arrived to those conclusions.  We have

21     already made some requests and inquiries to get further

22     information and that review is ongoing.  There were certain

23     facts or information shared in the declaration that we wish to

24     highlight because they are either not consistent with the

25     information available to the monitoring team or do not appear

N8AzzNUN1-ND

1    to be accurate.

2            First, with respect to paragraph 8e, AMKC has been

3    closed, but our understanding is that individuals have been

4    transferred from AMKC to multiple facilities, not just to OBCC

5    as stated in Dr. Austin's declaration.  With respect to

6    Dr. Austin's update regarding the management of individuals

7    that may have qualified for placement in ESH but were not due

8    to mental health description, the description in paragraph 10

9    is not congruent with the monitoring team's perspective of

10   where we are with that issue.  The monitoring team has had

11   initial discussions with DOC officials and Dr. Austin to better

12   understand who may require additional services and what

13   services they may need.  This includes exploring the potential

14   development of a new housing unit or maybe repurposing housing

15   units already in existence.

16           The monitoring team believes it's premature to suggest

17   a new housing unit, such as a behavioral housing unit to be

18   created, or the elimination of CAPS is to occur.  More

19   information is necessary and a discussion among the monitoring

20   team, DOC leadership, Dr. Austin and CHS is needed.  We have

21   initiated the fact that a meeting, at least one initial

22   meeting, needs to occur.  The monitoring team has attempted to

23   schedule this meeting, in fact, on August 15th, as noted in

24   Dr. Austin's declaration; however, we were advised this

25   department is not available for such a meeting on

N8AzzNUN1-ND

1   August 15th.  So we know that despite the claim in the

2   declaration that a meeting will occur August 15th, it will

3   not.  We hope to have something scheduled soon, but currently

4   there's no meeting scheduled and the monitoring team's request

5   to have it scheduled is outstanding.

6          Finally, we note that Dr. Austin appears to take a

7   position on behalf of the monitor in the first sentence of

8   paragraph 11 of his declaration, which reads, "The monitor

9   agrees that DOC has made substantial progress in some areas

10  since the action plan was adopted."  As an initial matter,

11  Dr. Austin is not in a position to speak on behalf of the

12  monitor, nor is he a member of the monitoring team.  He is a

13  consultant for DOC.  The monitor speaks through his reports or

14  testimony before this Court.  Most importantly, this statement

15  is not true.  In the monitor's July 10th, 2023, report on

16  page 173, I will quote, "The monitor's assessment is that the

17  city and department have not made substantial and demonstrative

18  progress in implementing the reforms, initiative, plans,

19  systems and practices outlined in the action plan."

20         With respect to the items that I have laid out here,

21  we seek the Court's guidance if you will require further

22  information from the monitoring team regarding these matters.

23         THE COURT:  I would appreciate a filed communication

24  that corrects the record on anything the monitoring team

25  believes materially needs correction.

1          MS. FRIEDBERG:   Thank you, your Honor.

2          Third, I'd like to share a synopsis of three days over

3     the last week at Rikers Island to provide the Court and the

4     parties with a better understanding and context of what is

5     occurring in the jails each and every day.

6          The monitoring team shares the Court's concerns

7     articulated by your Honor at the June 13th conference in

8     which you noted concern "by the way in which the leadership has

9     approached seeking to shape public opinion and public

10    perception of these very serious issues that have been raised

11    by the monitor."  Over the last few days, the department has

12    facilitated a number of tours with various public officials

13    apparently showing various physical plant improvement, such as

14    new paint on cell doors and various program options, and

15    provide the press briefings and photographs as well as social

16    media content.  The monitoring team doesn't dispute these

17    physical changes, but they can't be viewed in a vacuum as the

18    department appears it wants to do.

19         To that end, I share a summary of these three days.

20    I'm going to start with August 3rd and then August 8th and then

21    August 9th.  With respect to August 3rd, I plan to share with

22    the Court a summary of the department's rapid reviews of the

23    use of force that occurred that day.  As a reminder, rapid

24    reviews are completed at each facility by the facility

25    leadership as an initial assessment and summary of these

N8AzzNUN1-ND

1    incidents.   On August 3rd, 2023, 25 uses of force incidents

2    received a rapid review and involved 93 staff.   As a reminder,

3    these are initial assessments, and further, the monitoring team

4    is working with the department to enhance and improve the

5    findings in those rapid reviews.   To date, we have found that

6    while they are helpful, they are not fully reliable.

7           With that said, we will note just a few highlights.

8    First, the department itself determined that six out of those

9    25 uses of force were avoidable.   That means, they didn't have

10   to happen.   Almost one out of four on that given day did not

11   need to occur.   The reasons being:   Staff failing to secure a

12   gate, failure to have situational awareness, proper securing of

13   individuals in custody and failure to secure food slots.   I

14   won't go into all of them, but I will note the department

15   recommended suspension for four staff on that day, command

16   disciplines for five staff, corrective interviews for three

17   staff, as well as counseling for four staff.   Given our

18   discussions about ESH at Rose M. Singer, I will also note that

19   three of the incidents on that day occurred in that unit.   Two

20   of those three were considered avoidable.

21          I will now move to Tuesday, August 8th.   On this day,

22   we note that the department initiated a large tour of

23   individuals to identify progress on that date.   There has been

24   significant media attention related to the findings on those

25   dates.   We took the department's own reporting through the

1    central operations desk to identify what occurred or what they

2    reported occurred on that day.  Sixty-seven incidents occurred

3    on that day.  I'm going to outline them now.  I will note that

4    the numbers do not exactly add up to 67 because some incidents

5    might need to be counted twice.  For instance, an incident

6    could have a fire and a use of force.

7         So I will walk you through those 67 now.  There were

8    29 instances of use of force.  There were four stabbings and

9    slashings.  There were 12 inmate-on-inmate fights, seven

10   incidents of fires, two incidents of serious injury that would

11   not otherwise be qualified in the incidents I have just

12   described.  There were ten incidents in which individuals

13   engaged in or expressed an intent to engage in self-harm.

14   Narcan was administered to two individuals.  There were

15   multiple emergency lock-ins.  There were also two allegations

16   related to staff assault and sexual abuse misconduct.  On that

17   day, there were also nine assaults on staff, six reportedly

18   because staff were splashed with liquids, two in which

19   incarcerated individuals pushed an officer, and one in which an

20   individual reportedly bit and kicked an officer.

21        On that day, the department also recovered a

22   significant amount of contraband.  I will just list this to

23   give you a sense of the types of items identified.  Over

24   9 grams of cocaine, 1.9 grams of fentanyl, 21 grams of

25   marijuana, 20 Suboxone strips, 17 pills of Prozac, 18 pills of

1    Ambien, mail soaked in fentanyl, mail soaked in cocaine,

2    Newport cigarettes, 15 sharp objects and two iPhones.  I

3    reiterate, this was only one day at Rikers Island.  In

4    particular, I will note with respect to RNDC, which is where

5    one of the tours occurred, one stabbing occurred there, three

6    fires and multiple uses of force.  As I mentioned earlier,

7    OBCC, that was also a location of one of those tours, had a

8    significant number of uses of force as well as a stabbing and

9    slashing that day as well.

10        Finally, with respect to August 9th, the monitoring

11    team personally toured the jails.  I will note that generally

12    the monitoring team's practice is that when we go to tour the

13    jails, we make announced visits.  We do not do them by

14    surprise, and, in fact, we invited representatives of the

15    department to join us as well as lawyers from the city's law

16    department.  At this point, they may as well see what we see.

17    It was quite unfortunate.  It was one of the most disturbing

18    tours that we have had since we've been on site.  We toured

19    both the ESH unit at Rose M. Singer and then we went to OBCC.

20        I'll walk you through the day very quickly.  We

21    started at the intake at the Rose M. Singer for ESH.  When we

22    got there, we do some typical type of situations, such as

23    making sure that, for instance, how many individuals are in the

24    intake and are they being tracked appropriately.  We were

25    advised there were two individuals in the intake, but they had

1    not yet been entered into the tracking system because they had

2    just arrived.  When we actually went back into the intake,

3    there were, in fact, three individuals in the intake, not two,

4    all of whom claimed that they had been in the intake for

5    multiple hours.  We then went to visit to tour multiple units

6    of the ESH units, levels one and two, of which you heard some

7    of my remarks earlier, in which we identified an individual

8    actively engaging in the use of narcotics or what appeared to

9    be narcotics in particular based on their response.  We met

10   with multiple individuals who described their experiences with

11   respect to violent incidents.  The monitor met with an

12   individual who was the victim of a stabbing and slashing and

13   then a very painful -- followed by a very painful use of force.

14          I will move on.  Those are high-level issues.  I will

15   note that many of the individuals that we met with -- I will

16   note the final component is that despite the need for high

17   levels of staffing in the RESH units, that is not occurring.

18   Staff and incarcerated individuals confirmed that essentially

19   there is minimal staffing that precludes the lockout even at

20   the more limited periods of time, and that there's certain

21   individuals locked in for significant periods of time due to

22   staffing issues.  That's both from staff reports, reports of

23   incarcerated individuals and within the department's own

24   tracking of log books.

25          We then went and toured OBCC, which is now the, quote,

1    unquote, department's newest facility.  During that tour, we

2    were able to speak with staff and leadership regarding the

3    incidents that are occurring as we noted at the beginning.

4    OBCC, right now, has already had 64 uses of force this month,

5    on track for over 220 uses of force.  During our time on the --

6    at the facility, we had the opportunity to meet with one

7    individual who had been a victim of a stabbing and a slashing.

8    He was in intake for at least over 20 hours.  We also met, at

9    the intake, the purported perpetrators of a stabbing and

10   slashing that had occurred a few hours before we were there.

11        As I noted during our time at that intake, the

12   monitoring team identified those individuals to be under the

13   influence of some type of substance.  There was burning joints

14   on the ground.  As you know, your Honor, I'm nine months

15   pregnant, so once it was identified, I had to vacate the area.

16   We did ask the staff to address that issue.  Those individuals

17   were not in the line of sight of the staff, nor was it clear

18   that it would have been addressed but for the monitoring team's

19   identifying the issue.

20        THE COURT:  Were all of those individuals in the same

21   area?

22        MS. FRIEDBERG:  They were four individuals in the pen.

23   They appeared to be perhaps sharing narcotics together.  A few

24   of them appeared to almost not be able to stand once we

25   arrived.  They all appeared in various levels, for lack of a

1    better word, of distress.  They were unable to communicate

2    clearly.  They were unable to move themselves in a way that

3    appeared normal and appeared to be heavily intoxicated.

4              THE COURT:  And all of these people were suspected to

5    have been involved jointly in the stabbing/slashing incident?

6              MS. FRIEDBERG:  Correct.  All four of them were

7    suspected as perpetrators of a stabbing and slashing a few

8    hours before.

9              With that, your Honor, I'm going to conclude my

10   remarks and close with:  We simply cannot proceed with the way

11   we are going now.  Something can and must change.  The dynamic

12   has to be different, and we look forward to supporting the

13   Court and the parties to develop those initiatives.

14             THE COURT:  Thank you, Ms. Friedberg.

15             I now call on the defendants.  I have the opportunity

16   to make inquiries.  I think there are so many that I could make

17   that it would not be the most productive use of our time right

18   now, but should you wish to make any statement or statements

19   now before we go on to talk about the meet-and-confer process

20   and the proposed order, I would welcome that.

21             MR. SCHEMITSCH:  John Schemitsch, your Honor.  The

22   commissioner is prepared to make a statement.

23             THE COURT:  Thank you Mr. Schemitsch.

24   Mr. Commissioner?

25             MR. MOLINA:  Good morning, your Honor.  Thank you for

1    the opportunity to address this court.  As Commissioner of the

2    New York City Department of Correction, I have a duty and

3    responsibility to the public and to the court to provide an

4    accurate, unfiltered and complete view of this administration's

5    progress in rebuilding the department.  First, I would like to

6    share with the Court statistics of the department's progress

7    since what has been described by the monitor's reports as the

8    apex of the crisis, which this administration inherited on

9    January 1, 2022, approximately 19 months ago.

10           Slashings and stabbings have decreased more than

11   20 percent when comparing fiscal year '22 to fiscal year '23,

12   which just ended on June 30th, 2023.  Moreover, we have seen

13   a more than 30 percent decrease of slashings and stabbings

14   department wide during calendar to date in 2023 when compared

15   to the same period in 2022.  Despite a rising incarcerated

16   population, use of force comparing 2021 calendar year to

17   calendar year 2022 was down 14 percent.  This is unprecedented

18   in comparison to the years prior to this administration, where

19   from 2016 to 2021, the incarcerated population decreased every

20   year but use of force incidents continued to increase.  It

21   should be noted that calendar year to date as of July 30 of

22   2023, the department's Class A uses of force are down

23   60 percent and the department Class B uses of force are down

24   39.7 percent.  These are uses of force that involve injury.

25           Assaults on staff without serious injury have

1    decreased in fiscal year '23 by 38.9 percent, and assaults on

2    staff involving use of force have decreased in fiscal year '23

3    by 19.4 percent.  We have dedicated significant resources to

4    resolving the new admission intake process, which was left to

5    flounder for years.  Our efforts have resulted as of late in

6    successfully processing new admissions in less than 24 hours

7    99.5 percent of the time.

8            We have turned around core production, which was

9    previously a major departmental issue.  Our core production

10   rate for the month of June 2023 was 98 percent, and we have

11   been hovering calendar year to date between 88 and 91 percent.

12   We have successfully induced our workforce to return to our

13   facilities by instilling accountability and increasing trust in

14   leadership.  This is evidenced in our success by reducing

15   chronic staff absenteeism.  In 2022, the average daily sick

16   call-out was 242 staff a day.  In June of this year, the

17   average was 72.  That is a 70 percent decrease in staff

18   absenteeism as it relates to sick.  Accountability is being

19   enforced.  More than 3,000 disciplinary cases have been

20   adjudicated since my administration took office.  That includes

21   terminations, forced resignations and retirements of more than

22   300 employees and thousands of cases finally addressed.

23           This is a mere snapshot of where we've taken this

24   department in approximately 19 months.  These metrics are just

25   a few of the reasons why I'm proud of the leadership team I

1    have in place and the immense efforts they and the dedicated

2    correction officers have displayed over the past year and a

3    half.  And this is why I think the monitor in his April 3rd

4    report stated, in sum and substance, that the department has

5    taken some important initial steps in building each area of the

6    foundational issues that were desperately needed and that the

7    impact on intermediate outcomes appears to be promising.  The

8    monitor went on to state, and I quote, "The department has

9    developed insight into the nuances of the problems and has

10   crafted a logical, orderly plan for how to address them."

11        The correction industry as a whole has regrettably

12   faced issues in recent years with rising violence, use of force

13   and deaths in custody.  And we are, in fact, below trends seen

14   elsewhere.  In 2023, this year, the New York City Department of

15   Correction has experienced six in-custody deaths plus one

16   person who passed away shortly after being released, bringing

17   the total to seven.  That is 36 percent fewer than the cohort

18   average of 11 of similar size jails in large American cities.

19   That means for approximately every two deaths in other systems,

20   there's one in the New York City Department of Corrections;

21   recognizing that one death is one death too many, but that is

22   also counting the recently released person, which to my

23   knowledge no other jurisdiction would even acknowledge.

24        Since 2016, the department has drastically improved

25   the footprint of facility-wide Genetec video recording.  We use

N8AzzNUN1-ND

1    Genetec to identify and investigate violence and use of force.

2    The department has implemented body-worn and handheld cameras

3    increasing our ability to capture incidents by an order of

4    magnitude.  Our use of force definitions have evolved and

5    improved over the past decade, so that we are significantly

6    more liberal in defining a use of force than most

7    jurisdictions.  All of these enhancements are essential to

8    supporting our reform efforts and rising the threshold of

9    accountability both for people in custody and our staff who are

10   charged with their care.

11             THE COURT:  May I just ask you one question,

12   Mr. Commissioner?

13             MR. MOLINA:  Yes, ma'am.

14             THE COURT:  In terms of the evolution and improvement

15   of the use of force definitions, I think you spoke of a

16   ten-year look-back, so that would include the 2015 consent

17   decree that defined use of force and set out dozens, if not

18   over 100 pages, of requirements for the department to meet; is

19   that correct?

20             MR. MOLINA:  That is correct, your Honor.

21             THE COURT:  Thank you.

22             MR. MOLINA:  Comparing 2016 to 2023, I believe is

23   flawed.  We have raised the level of transparency and expanded

24   our ability to closely manage our operation.  We have greater

25   scrutiny of our operations, which is a good thing, and more

1    transparent accounting of incidents.  These reforms should not

2    be used against us to support the argument of contempt based on

3    a deeply, what I believe to be, flawed comparison of 2016.  Of

4    equal importance, our population has evolved dramatically from

5    2016.  As of July 20 of 2023, 27 percent of our detainees are

6    being held on homicide-related charges, 10.9 percent on serious

7    assault charges, 13.3 percent on robbery charges and 9.9 on

8    weapons charges.  That is a total of 61 percent of the

9    department's current population.  By comparison, on January 1,

10   2016, those held on homicide-related charges comprised of 9.7

11   percent of detainees, serious assault charges 8.5 percent,

12   robbery charges 11.9 percent, and weapons charges 6.3 percent

13   for a total of 36.4 percent of the department's 2016 population

14   at that time.

15          Simply put, since 2016, the concentration of

16   individuals that are capable of violent acts has dramatically

17   increased.  Again, the comparison of 2016 to the present-day

18   violence metrics in our facilities is not instructive.

19   Respectfully, your Honor, the Adams administration has made

20   progress that has been made possible at a breakneck pace.

21   Things are not getting worse.  The facts suggest the very

22   opposite.  We are accelerating progress at an ever-increasing

23   clip.  We have hired and retained dozens of experienced

24   corrections, government and business professionals at all

25   levels of leadership.  Many of these leaders have come out of

N8AzzNUN1-ND

1   retirement, relocated to New York City and committed themselves

2   to our vision of relentless reform.  The Adams administration

3   enlisted these outside professionals despite the years of being

4   advocated by many, including myself in 2017 when I was the

5   chief internal monitor.

6           My team, with the support of Mayor Adams, have taken

7   this department from the precipice of collapse, and for the

8   first time since the inception of the consent judgment, I

9   believe, put us on a pathway towards achieving reforms that are

10  sustainable.  The word appreciation is constantly being used,

11  and there should be an appreciation of the decades of

12  mismanagement and disinvestment in the city's jail system with

13  the immense challenges were driven by four major issues; our

14  staffing crisis driven largely by significant staff

15  absenteeism, escalating violence, particularly slashings and

16  stabbings, rising use of force every year since 2016 to 2021,

17  despite the population of people in custody decreasing in all

18  of those years, as I have previously stated, and no

19  accountability.

20          The department had over 2,000 internal investigations,

21  the significant majority around use of force, which because of

22  mismanagement and poor leadership, the statute of limitations

23  expired, which meant holding persons accountable for not

24  meeting performance standards did not happen.  And if that was

25  not bad enough, there were another 3,700 disciplinary cases

1    that had not been addressed going back to calendar year 2017.

2    This level of disciplinary inaction built a muscle memory of

3    poor practices for thousands of uniformed staff.

4         As we look back to January 2022, the apex of this

5    manufactured crisis, the transformation of the New York City

6    Department of Corrections to date is substantial when you look

7    at it from that point of view.  Many indicators of safety have

8    improved.  Our collective progress is a story woven together by

9    our team's perseverance, the support from our community, and

10   the mayor's relentless pursuit of the long overdue

11   transformation of this agency.  We are not just reforming the

12   department.  With the Court's assistance, we have revitalized

13   the staff.  We are attracting seasoned correction, government

14   and business professionals who bring expertise, empathy and

15   accountability to their roles.

16        But let me be clear:  We have been, like I stated,

17   rebuilding this department and making unprecedented progress

18   since the apex of this crisis.  There is no one more capable or

19   committed than the team of deeply experienced and talented

20   individuals that have been assembled with the mayor's support.

21   Our work is far from complete.  We will continue to drive real

22   change, address every roadblock that we identify, and deliver a

23   safe environment for those in our care, those who work in our

24   facilities and the people of New York City.

25        No receiver will come into the New York City

N8AzzNUN1-ND

1    Department of Correction and induce greater reform at a faster

2    pace than what we have accomplished and continue to accomplish

3    every day.  The historical record of past receiverships and

4    current receiverships, which have spanned four years to 18

5    years and still ongoing in other jurisdictions, have shown this

6    despite the significant cost to taxpayers.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            MR. MOLINA:  I recognize that the department has miles

2     to go to improve our correctional system.  The incidents that

3     the monitor has highlighted reveal flawed correctional

4     practices that must be changed.  At most, I have handed out

5     firm discipline to hold individuals accountable for the failure

6     to do their jobs properly.  Changing culture and organizational

7     transformation does not happen overnight, but the statistics in

8     this case do not lie.  Things are significantly better than the

9     apex of this crisis, and that is undeniable.

10            Your Honor, I have addressed this Court candidly and

11    honestly today.  I declare before this Court that we are not

12    done, but we have demonstrated measurable irrefutable progress.

13    We are public servants who are committed to accelerating the

14    pace of reform, to benefit those in our care, those in our

15    service, and those in our community.  We are welcome to work

16    with any party or entity who shares our mission.

17            Thank you.

18            THE COURT:  Thank you, Mr. Commissioner.

19            Is there anything specific that you're in a position

20    to say about specific steps being taken on lock-ins or on

21    making sure that staff are on post?  It's my understanding that

22    a number of these incidents occurred when staff were not where

23    they were supposed to be or inmates were -- incarcerated people

24    were not in their cells or had the ability to go in and out of

25    cells when they shouldn't have been.

N8AVNUN2

1           MR. MOLINA:  Thank you, your Honor, for the question.

2           What I will say is that I agree with the monitor staff

3   not conducting their tours when they're supposed to, staff

4   taking it upon themselves to leave posts presents a situation

5   of harm.  What I will say, we have been immediate in responding

6   to those issues with discipline, suspending where warranted,

7   and taking action, holding not only officers accountable, but

8   even their first-line supervisors and, to some degree,

9   sometimes their managers.

10          And I would just like to share with the Court that it

11  was not frequent that first-line supervisors or managers in the

12  past were held accountable, and we have been doing that.  I am

13  obviously concerned when staff do not conduct tours or leave

14  their post and abandon their post.  What I will say, while that

15  incident happening even just once is not acceptable to me, it

16  is happening significantly less frequent than when it happened

17  through the years of 2016 to 2021.  And the deputy commissioner

18  of facility operations constantly is evolving his ability to be

19  able to observe and have oversight to make sure that these

20  things are not occurring.  I myself too frequently, as well as

21  others, randomly review cameras.  And when we notice

22  deficiencies, we order immediate action be taken place.

23          THE COURT:  Thank you, Mr. Commissioner.

24          I will now turn to the second segment of our agenda,

25  which is commentary on the meet-and-confer process and the

N8AVNUN2

1    proposed court order on immediate initiatives that was provided

2    by the monitor in the August 7th report at Appendix C of the

3    August 7th report.  And so I would ask that the monitor and

4    deputy monitor speak first.

5          MS. FREIDBERG:  Your Honor, this is Anna Freidberg.  I

6    am the deputy monitor.

7          As you know, the Court directed the parties to meet

8    and confer in advance of this conference today.  The monitoring

9    team helped facilitate those discussions.  As you may know,

10   that has been my role for almost a decade with this group.  And

11   so we engaged in that practice again over the last month.  We

12   had numerous meetings and phone calls as a collective group and

13   various different one-off meetings as necessary.

14         We discussed three issues.  The first is the monitor's

15   proposed order related to Appendix C; second, we discussed some

16   issues related to discovery that is ongoing; and third, the

17   structure and timing of potential motion practice.

18         With respect to this agenda item, I will talk about

19   the proposed court order.

20         As we described in our July 10th report and our August

21   7th report, the monitoring team identified several critical

22   items that have continuously languished and that are necessary

23   to reduce the risk of harm.  And the city and department have

24   not adequately moved forward through the consultation process

25   with the monitoring team.  The monitoring team found these

N8AVNUN2

1    steps should be provided during the next few months as other

2    remedial relief is being contemplated.

3            It must be emphasized that this is a short-term

4    interim measure for the next few months to ensure proper focus

5    and pace for initiatives that have direct bearing on the

6    imminent risk of harm.  The monitor finds that this group of

7    initiatives are necessary and narrowly tailored to address the

8    department's noncompliance with certain requirements of the

9    Nunez court orders, as described in both the July 10th and

10   August 7th report.

11           It is my understanding that the plaintiffs and the

12   S.D.N.Y. consent to the entry of the order as proposed by the

13   monitoring team in Appendix C of the August 7th report.  The

14   report outlines two provisions in which the defendants take a

15   different position than the monitoring team.  I'm going to just

16   direct the Court with respect to the monitor's position on

17   those two provisions to pages 21 through 25 of our court order

18   for our position on why the proposed order as drafted is

19   appropriate.  Of course, should the Court have any questions,

20   I'd be happy to answer them.

21           THE COURT:  Thank you.

22           Ms. Werlwas -- did you have any further remarks,

23   Ms. Freidberg, before I make my way to hearing from the

24   defendants?

25           MS. FREIDBERG:  I do not, your Honor.  Thank you.

N8AVNUN2

1          THE COURT:  And so, Ms. Werlwas, do I correctly

2     understand that plaintiffs consent to the order as proposed?

3          MS. WERLWAS:  Yes, your Honor, as proposed by the

4     monitor.  We consent.

5          THE COURT:  Thank you.

6          And the government?

7          MR. POWELL:  We consent to the order as well.  We have

8     no objection to it being entered, but do note for the record

9     that we view it as an insufficient remedy to address the

10    overall ongoing constitutional violations that are going on in

11    the jail system.

12         THE COURT:  Yes.  This is an order that concerns

13    short-term deadlines and short-term steps.

14         MR. POWELL:  But as identified by the monitor, yes,

15    your Honor, we have no objection.

16         THE COURT:  Thank you, Mr. Powell.

17         And so counsel for the city, I understand that you

18    have made a counterproposal to the last sentence of section 1,

19    paragraph 1, which is proposed by the monitor to read:  Upon

20    request by the monitor, the department shall provide data

21    regarding use of force, security, and violence indicators, and

22    permit observation of meetings in which such information is

23    evaluated by department leadership.

24         Would you care to speak further to that objection?

25         MR. SCHEMITSCH:  Yes, your Honor.

1            As to provision 1, defendants are concerned as to the

2     broad and vague language of the monitor's proposal of access to

3     meetings in which such information, namely, regarding use of

4     force, security, and violence indicators is evaluated by

5     department leadership.  Some of these meetings involve

6     conversations and discussions which, at times, are preliminary

7     and not ready for feedback from the monitor and may give an

8     inaccurate impression of the policies and practices that the

9     department is discussing to get a fulsome view of all options,

10    but which are not going to be put in place.  Additionally, the

11    vague language would seem to cover spontaneous meetings, as

12    well as scheduled meetings.

13           In addition to the proposal that we annunciated in the

14    monitor's report --

15           THE COURT:  And that proposal is to have a monthly

16    summary report to the monitor by the commissioner of meetings

17    in which the commissioner was involved; is that correct?

18           MR. SCHEMITSCH:  Yes, it would be a proposed monthly

19    scheduled meeting between the commissioner and the monitor,

20    where the commissioner would brief the monitor on all meetings

21    the commissioner has been a part of relevant to use of force,

22    security, and violence indicators.  In addition, being

23    available for additional meetings in the event that they are

24    required.

25           In addition to that, we now propose the department has

N8AVNUN2

1   a meeting that's called the Total Efficiency Accountability

2   Management System or TEAMS meeting.  Those occur on an

3   approximately monthly basis in person, where department

4   leadership is present to evaluate use of force, security, and

5   violence indicators.  Defendants are in agreement to permit the

6   monitor to observe these TEAMS meetings in order to encourage

7   transparency of the department's abilities to evaluate and

8   address data and metrics on use of force, security, and

9   violence indicators.

10           THE COURT:  And so I will ask Ms. Freidberg whether

11  she is familiar with these TEAMS meetings, whether the proposed

12  changes are acceptable to the monitor, and also to give us a

13  little bit of color on how you would expect the language that

14  you have proposed to work.  How would you find out what

15  meetings to observe?  Is there a certain level of meeting or

16  type of gathering that would be anticipated by the use of the

17  word "meeting" in your proposal?

18           MS. FREIDBERG:  With respect to the city's proposal,

19  the first I've heard of it is just right now.  It's quite

20  disappointing, given the extensive negotiation we've had on

21  this.  So I am familiar with the TEAMS meeting.  Certainly we

22  welcome the invitation.  Prior to this administration, every

23  other administration invited us to such meetings without the

24  need for court intervention.  Certainly we welcome those --

25  that invitation.

1          None of that changes the monitoring team's position

2     with respect to the provision in this particular requirement.

3     As noted in our response, the monitoring team's access to

4     information is critical; it is a broad access right to allow us

5     to conduct neutral and independent assessments.

6          For the reasons that we've already stated, we believe

7     that the language we propose is appropriate, and the monitoring

8     team's eight years of expertise in working with the department

9     makes clear that that would be conducted in a reasonable

10    manner.  And we have never demonstrated anything other than a

11    reasonable approach to addressing our access to information;

12    but anything in which the department has the ability to control

13    the narrative or manipulate what information we may be able to

14    obtain gives us grave concern about transparency.

15         So while we thank the department for the ability to

16    observe the TEAMS meetings, which would certainly be applicable

17    under the proposed language, it does not alter in any way our

18    view that the language as described in the proposed order is

19    most appropriate.

20         THE COURT:  And so operationally or in practice, you

21    would expect to be communicating with the department and

22    individuals at the department to identify gatherings that you

23    believe are appropriate for observation and to elicit

24    invitations to such gatherings or what?

25         MS. FREIDBERG:  Correct.

N8AVNUN2

1          During our eight years of -- well, I should correct

2     that.  During our seven years of monitoring prior to the

3     department's current position with respect to sharing of

4     information, there was a natural flow with respect to the ways

5     in which meetings occurred.  It happened in a manner where we

6     would identify what types of routine meetings were occurring.

7     They've altered over the years.  TEAMS meetings have occurred

8     monthly; they then stop.  They change names.  All those types

9     of things, there's going to be a dynamic flow.

10          But when there is good communication, we learn about

11     those meetings often as an initial starting point.  We learn

12     about what are those meetings?  What happens at them, right?

13     Depending on what those are, we then determine whether or not

14     it makes sense for us to attend.

15          The monitoring team has always asked to attend a

16     meeting in advance.  The monitoring team has never

17     spontaneously attended a meeting.  And quite frankly, if a

18     spontaneous meeting occurred, I'm not even sure how the

19     monitoring team would be in a position to attend.  We don't

20     work on-site, right.  I mean, the concern that there's some

21     spontaneous meeting that the monitoring team would just show up

22     at doesn't seem like a feasible concern, nor has there ever

23     been an opportunity -- I can't think of the eight years that

24     we've been monitoring, where the monitoring team shows up

25     unannounced and surprised.  In fact, the benefit of the Nuñez

N8AVNUN2

1    manager is that it would facilitate an opportunity for us to

2    learn about what is occurring, what are the types of items that

3    may be addressed, and whether or not the monitoring team should

4    attend.

5            Until this very recent objection, it has never been an

6    issue.  In fact, it's actually always been a very dynamic, easy

7    conversation.  I think the monitoring team probably would

8    observe one to two, three meetings a month.  It just sort of

9    depends.  Sometimes one month you might review a few, then you

10   might not review any.  It also is partly dependent on how the

11   department structures its meetings.  It alters these meetings

12   so frequently that to the extent that we try to delineate one

13   type of meeting, next month the meeting could get a new name

14   and it doesn't occur anymore, which is why I have a concern

15   about including anything in this provision related to a

16   specific meeting by a specific name, because there is a

17   long-standing practice of the department to alter their types

18   of meetings.  That's fine.  I certainly have no problem with

19   the fact that they might need to alter meetings, but it

20   certainly would impede our ability if we started to go down the

21   road of identifying a specifically named meeting given their

22   practice of changing the way these meetings occur.

23           THE COURT:  Thank you.

24           Mr. Schemitsch, anything further?

25           MR. SCHEMITSCH:  Yes, your Honor.

N8AVNUN2

1          We're concerned about the broad and undefined language

2     in the order as the monitor proposes it.  It could be the case

3     that defendants could be held in contempt if we, for instance,

4     did not invite the monitoring team to a spontaneous meeting

5     with the -- to spontaneous meetings with the language as it

6     stands presently.

7          MS. FREIDBERG:  Your Honor, this is Anna Freidberg.

8          As I'll note, it says "upon request from the

9     monitoring team."  There is no invitation request.  I have no

10    idea.  I engaged in various discussions with the department

11    related to their concerns.  This last-minute effort here at

12    this conference to be raising concerns about spontaneous

13    meetings, one, it's just unfortunate that we're dealing with

14    this in front of you, when I offered myself to have these

15    conversations over the last month, over a significant period of

16    time.

17         But nonetheless, to the extent that the city has this

18    concern about spontaneous meetings, it says upon request.  How

19    could they possibly be held in contempt?  They are not being

20    asked to invite.  We are going to request; we'll have to learn.

21         The monitoring team has worked with the department for

22    eight years and has demonstrated a reasonableness with respect

23    to access to information.  This appears to be yet another

24    attempt for the department to evade transparency with the

25    monitoring team.

N8AVNUN2

| | |
|---|---|
| 1 | THE COURT:  And you will represent here on the record |
| 2 | that you do not intend to make a request that you be permitted |
| 3 | to observe all spontaneous meetings as a generic term. |
| 4 | MS. FREIDBERG:  Correct, your Honor. |
| 5 | THE COURT:  Thank you. |
| 6 | Mr. Schemitsch, anything further? |
| 7 | MR. SCHEMITSCH:  No, nothing further, your Honor. |
| 8 | THE COURT:  Thank you. |
| 9 | Going to the second issue that I understand is in |
| 10 | contention, Ms. Freidberg, would you please tell us succinctly |
| 11 | why it is that the monitoring team believes that the number 21 |
| 12 | for supervisors in the ID division is a necessary floor at this |
| 13 | point, as set forth in one of the provisions here, section 1, |
| 14 | paragraph 11, ID staffing of the proposed order. |
| 15 | MS. FREIDBERG:  The number 21 for supervisors, your |
| 16 | Honor, first was a number identified by the department's own |
| 17 | leadership within the ID division of what they needed.  It |
| 18 | happens to also reflect essentially the same number of |
| 19 | supervisors that they had when their investigative numbers were |
| 20 | about 85, which is the number of investigators that the |
| 21 | department is currently planning to address.  And so that's how |
| 22 | we achieved those -- that's how we obtained those numbers. |
| 23 | The department essentially right now is suggesting |
| 24 | that they maintain the status quo with respect to |
| 25 | investigators -- supervisors, I'm sorry; perhaps, at most, |

N8AVNUN2

1    adding one or two, while adding over 20 investigators.

2    Certainly efficiency with respect to supervision is incredibly

3    important.

4            That said, there is also a numbers game here.  It

5    remains unclear to the department -- I mean, unclear to the

6    monitoring team why this number is so contentious.  In

7    particular, I will note that the department just recently

8    appointed a third leader to the ID division that has now been

9    cut in half from where it used to be.  And so it's incredibly

10   difficult for the monitoring team to understand how the

11   department takes one position that the ID division for use of

12   force requires additional high-level supervision; and yet at

13   the lower levels with high numbers of use of force incidents

14   and high levels of investigators, it doesn't need a similar

15   sort of ratio of supervisors to investigators.

16           For whatever reason, despite the fact that the

17   monitoring team raised this issue of staffing for over four

18   months, both directly with the city and the department, about a

19   week or two prior to this court order they now claim that they

20   have to conduct yet another staffing analysis, and that for the

21   first time, they believe there's issues with respect to

22   efficiency of supervision, none of which has been raised in the

23   monitoring team's long-standing discussions with ID, nor who's

24   going to conduct such an assessment, what expertise they have,

25   or why it is necessary.

N8AVNUN2

1          THE COURT:  Thank you.

2          Mr. Schemitsch?

3          MR. SCHEMITSCH:  Defendants are in agreement with the

4     proposal, except as it pertains to the increase in the number

5     of supervisors.  We are concerned that the proposal requiring

6     the increase to staffing 21 supervisors would occur before the

7     department's completion of an ongoing staffing analysis on the

8     adequacy of supervision, which is being undertaken at present

9     by the Office of Management Planning and Analysis, OMAP.

10         The adequacy of supervision is not necessarily tied to

11    the number of supervisors, but may instead be tied to how

12    supervision is allocated.  To that end, the defendants'

13    proposal was that the department increase the number of

14    supervisors to arrange between 16 and 21 until the completion

15    of a comprehensive review and restructuring so that supervision

16    is tiered appropriately for review and escalation.

17         THE COURT:  Need you to recognize that the proposal

18    for 21 contemplates a scenario in which the department could

19    present an internal staffing analysis and demonstrate to the

20    monitor that fewer staff are necessary to conduct timely and

21    objective investigations of all use of force incidents as

22    required; and so this is -- this proposal is not asking me to

23    write 21 into stone in all circumstances.

24         Does the department believe that that is an

25    insufficient protection of its ability to work toward

N8AVNUN2

1    efficiencies?

2             MR. SCHEMITSCH:  We believe that it would be more

3    practical and efficient for the department to finish their

4    review and then be able to make that determination.

5             THE COURT:  And when was this review begun?

6             MR. MOLINA:  Your Honor, the Office of Management

7    Analysis -- Louis Molina, Commissioner for New York City DOC.

8             The Office of Management Analysis and Planning just

9    finalized the model that it will use to conduct this analysis.

10   And we anticipate that in the early part of November, that

11   analysis will be complete.

12            If I can just talk about the range.  I think the range

13   16 to 21 is fair; so that if we hire 21, and let's say we

14   needed 17, what do I do with the additional staff members that

15   are there that we have hired to employ?  Our ratio would allow

16   us to have one to four investigators.  In most best practices

17   of investigative units, the ratio of supervisor to investigator

18   is one in eight.  I'm not proposing that we go to one in eight,

19   but I would just like for us to be able to be within the range

20   of 16 to 21, so that we don't find ourselves in a situation

21   where if we don't achieve 21 for a number of reasons, that the

22   Court would be finding us in violation in some way.

23            MS. FREIDBERG:  Your Honor, I will raise just a couple

24   things.

25            One, with respect to the city's position, I don't have

1    any way to verify whether or not the model for the staffing

2    analysis has occurred or not.  It's quite disappointing, as you

3    know, the issue with respect to ID staffing has been raised in

4    April 2023.  Now here we are in August, and purportedly it's

5    been completed.  I will be asking the department to verify --

6               THE COURT:  It's been started.

7               MS. FREIDBERG:  The model has been created.

8               We will be asking tomorrow for that model and the

9    specific dates.  Given our concerns about the department's

10   representations, we will need that specific information.

11              Nonetheless, taking them at their word for this

12   particular conference, nothing with respect to what the

13   department described would be precluded from this particular

14   order that would require 21 supervisors by November 30, 2023.

15   Pursuant to the commissioner's representation that such a

16   staffing analysis will be done by November, the early part of

17   November, should such analysis be done, they would not be held

18   in contempt of the Court because they could provide a staffing

19   analysis to the monitoring team in which the number could be

20   reduced.

21              I will raise, I'm not sure what expertise OMAP has

22   with respect to the conducting of use of force investigations;

23   that's something we will need to evaluate as part of the

24   reasonableness of any staffing analysis.  Again, as I noted,

25   it's quite unfortunate that we're at this stage of the

1    conversation where we're getting information at a court

2    conference, despite repeated requests for this information over

3    the last few months to learn about it.

4           Nonetheless I don't see why what the department is

5    describing they are going to do right now could not occur under

6    the language proposed by the monitor.  The language proposed by

7    the department includes no deadlines, no dates, and essentially

8    says they can conduct a staffing analysis, they will keep us

9    posted as to when that will be done.

10          We're already there.  That's what we were doing from

11   April 2023 till now.  And but for this conference today, I'm

12   pretty sure we would not be hearing anything with respect to a

13   staffing analysis or when it's been conducted.  So I leave it

14   to the -- we would propose that the language as described as

15   appropriate, and to the extent that the department has raised

16   any viable concerns, they would be addressed with the language

17   as written by the monitoring team.

18          THE COURT:  Thank you.

19          Anything further, Mr. Commissioner or Mr. Schemitsch?

20          MR. SCHEMITSCH:  John Schemitsch, your Honor.

21          We would agree to the increase to 21 if the date

22   proposed was moved from November 30 to December 31st, 2023, so

23   the department has an opportunity to complete concurrently its

24   analysis.

25          THE COURT:  Ms. Freidberg.

N8AVNUN2

1          MS. FREIDBERG:  Well, I would much prefer November

2    30th.  I'm not going to have a fight here over a month; so

3    we'll agree to December 31st.  We will note that we'll be

4    making a request for the department to provide us the model and

5    the dates upon which the staffing analysis occurred to be

6    produced to us by tomorrow.

7          THE COURT:  Will the department produce that

8    information by tomorrow?

9          MR. SCHEMITSCH:  We can produce the model tomorrow,

10   your Honor.

11         THE COURT:  Thank you.

12         So based on those representations and that agreement,

13   unless the plaintiffs or the government wish to be heard on the

14   one month change of dates, I will accept that amendment.

15         So paragraph 1, section 11 is amended to make the

16   staffing deadline December 31 of 2023, rather than November

17   30th of 2023.  As to the last sentence of paragraph 1, I am not

18   persuaded by the defendants' objection to the proposed

19   language; it is therefore overruled.  I find that it is both

20   reasonable and necessary that the department be required to

21   permit the monitoring team to review the referenced meetings on

22   request; and that we do have a track record here of a

23   cooperative process of identifying appropriate meetings and

24   observing meetings.  And I see no reason for that to be

25   narrowed or interrupted; it is necessary to have transparency

N8AVNUN2

1    here, and this will promote transparency.

2              So is the AT&T line still connected?

3              THE DEPUTY CLERK:  It's muted.  Sorry.  It's good.

4              THE COURT:  All right.  It's working?

5              Okay.  Very well.

6              And so the order as proposed with that one change is

7    approved and will be entered.

8              Now we turn to the briefing schedule for the proposal

9    of a motion for contempt or receivership.  And so the proposal,

10   as I understand it by the plaintiffs and the government, is

11   that the opening brief be due November 17th, the opposition

12   brief due January 16th, and the -- of 2024, and the reply brief

13   due February 15th, 2024.  And the report that has been filed

14   discusses the development, and I think we've had enough

15   discussions on parameters to have a general idea of what is in

16   mind.

17             Is there anything further, Ms. Werlwas, that the

18   plaintiff class wishes to say before I make the same invitation

19   to the government and hear anything that the city or

20   commissioner wish to offer?

21             MS. WERLWAS:  Thank you, your Honor.  Excuse me.

22   Pardon me.  Mary Lynne Werlwas, for the plaintiff class.

23             We'll be brief, your Honor.

24             We think that the relevant facts are well laid out

25   before the Court and we don't need to recite any of those.  We

1    are happy to answer questions from your Honor about the nature

2    of the proposal for steps forward, but wanted to note a few

3    things.

4             The reason we have made the proposal that we have,

5    worked it out with the U.S. Attorney's Office, is that

6    regardless of the variation in the facts over the years, where

7    we stand today is that there remains a pattern and practice of

8    excessive force and violation of the plaintiffs' constitutional

9    rights this very day in the department.  And we've been through

10   four commissioners, countless recommendations from the monitor

11   that have gone unheeded, several court conferences, several

12   judicial interventions in the form of new orders.  And the

13   resources expended on this task, the tasks we've engaged in

14   today and in prior conferences, with so little gain to show for

15   it, are extraordinary.  And the harm that our class is

16   suffering, from people with mental illness being taunted by

17   staff who hope for a suspension vacation, as reported in the

18   most recent report, to injuries in unguarded housing areas, to

19   deaths, is profound.

20            We have been most troubled recently that this remedial

21   scheme that we've been engaged in for eight years has been

22   premised enormously on the agency's openness to technical input

23   and recommendations from the monitor and the national

24   correctional experts on the monitoring team.  It's a

25   monitorship, but in some ways New York City has benefited from

N8AVNUN2

1   enormous capacity building from the monitor.

2           But for far too long, report after report, the

3   recommendations have fallen to the ground.  There have been

4   stolid plans for reform.  There's no shortage of protocols, no

5   shortage of remedial plans in this case.  What has lacked has

6   been implementation of those plans and basic supervision of

7   this workforce.

8           And as we have heard illustrated today, but have seen

9   for the last several years and years before, at its core, this

10  is an agency in which the staff and supervisors are permitted

11  to abdicate their basic correctional responsibilities with

12  impunity.  And when it's tolerated that staff are off post when

13  they are supposed to be working, that supervisors fail to tour,

14  and that wardens cannot assess use of force objectively, then

15  no further policy revisions, not even a directive such as in

16  the order before us today, saying staff shall remain on post,

17  is going to fix that problem.

18          And most disturbingly, the agency does not give a

19  sense that it appreciates the magnitude of the harm it inflicts

20  on people in its custody and how remarkably deviant its

21  practices are.  We see the commissioner reaching to declare

22  suspicious deaths and misconduct as justifiable, promoting to

23  management people who are demonstrably unfit, placing tactical

24  weaponry like submachine guns in the hands of the emergency

25  services unit, without responding to the monitor's reports that

```
1    they have assigned to that unit, people with a propensity for
2    violence.  It's this persistence of unnecessary and excessive
3    force through this day, and the city's inability to see and
4    remedy what is happening on its watch, and it's disturbingly
5    cavalier attitude towards truthfulness that has led us to where
6    we are today in which we have worked with the U.S. Attorney's
7    Office to craft a remedial path to break this quagmire.
8            To annotate one or two things about the process we've
9    proposed for moving forward, as you've seen, we think this is
10   the path that most suits this case, where the parties and the
11   Court are very familiar with the overwhelming corpus of facts
12   that would be relevant to contempt and remedial proceedings.
13   We will include in our papers proposed findings of fact,
14   something akin in style to a 56.1 statement, and the city will
15   have an opportunity to identify the facts with which it agrees
16   or it disputes and the evidentiary basis therefrom.  And we
17   think that that --
18           THE COURT:  And you will provide an evidentiary basis
19   for your opening --
20           MS. WERLWAS:  Yes, we are -- yes, that has citations
21   to the record.  It's no surprise here that overwhelmingly the
22   facts are drawn from the monitor's reports, but that they will
23   be all duly cited.
24           And we think that that will significantly narrow — if
25   not entirely eliminate — disputed facts.  And so for that
```

1    reason, we don't know at this juncture whether an evidentiary

2    hearing would be necessary.  But it is our hope and our belief

3    that this process can eliminate much of the need for a hearing.

4        The proposed filing date of November 17th we will note

5    has come about because while we are ready to file more promptly

6    and we think that the urgency of our clients' needs with their

7    lives at stake demands an immediate response, we do understand

8    that the U.S. Government needs that as their filing date.  And

9    we don't think piecemeal litigation or an asynchronous briefing

10   schedule is going to be at all efficient or protect people any

11   faster.  And so for that reason, in our view, the most

12   efficient path to a resolution has been a joint filing date,

13   and so that the city can file a singular opposition.

14        But we are available to answer questions from your

15   Honor about how we see the path moving forward.

16        THE COURT:  It appears a pretty clear path to me.

17        In terms of procedure, obviously, my approval of the

18   schedule in this proposal would be without prejudice, of

19   course, to the city's ability to oppose and raise issues with

20   respect to whether there are factual issues or the record.  I

21   would hope and trust that to the greatest extent possible,

22   there would be open lines of communication to eliminate

23   disputes that can be resolved between the parties from being

24   brought before the Court.  But otherwise, it's clear to me.

25        Thank you.

N8AVNUN2

1            MS. WERLWAS:  Thank you.

2            THE COURT:  Mr. Powell.

3            MR. POWELL:  Jeffrey Powell, for the government.

4       Thank you, your Honor.

5            Just briefly, obviously the jail system has been in

6       crisis for many years.  The pervasive system at dysfunction, in

7       effective practices and procedures, and culture of violence

8       clearly continue to persist, and they have deep roots that go

9       back over the terms of many administrations and many department

10      commissioners.

11           Simply put, the government just can't wait any longer

12      for conditions to substantially improve, and that's why we have

13      decided to seek the appointment of a receiver.  We want to make

14      clear that the government does not make the decision to seek

15      the appointment of a receiver lightly.  However, in light of

16      the current levels of violence and disorder in the jails —

17      which cannot be disputed — the frequency with which staff are

18      utilizing unnecessary and excessive force, which is exactly

19      what this consent judgment was intended to prevent, the daily

20      risk of harm to incarcerated people and department staff

21      members and the many years of ongoing noncompliance with the

22      court-ordered relief that preceded this administration and

23      continues, we simply think that we must seek this form of

24      extraordinary relief in the form of a court-appointed receiver.

25           More well-thought-out sound recommendations from the

N8AVNUN2

1    monitor or additional directives from this Court in the form of

2    orders for the department to implement remedial steps to make

3    sure they are safe, staff do basic things like stay on post, is

4    just not going to be sufficient in our view.  Simply put, the

5    department is not fulfilling its core obligation to follow

6    basic security protocols, ensure the safety of people in

7    custody, and protect them and department staff from harm.  This

8    was only further made clear today by the account that the

9    monitor gave of his recent visit to the two facilities in the

10   last -- yesterday.

11           Every safety and violence indicator is substantially

12   higher than it was when this consent judgment was entered.  At

13   that time there were unconstitutional conditions.  To the

14   extent the city argues that that is not the appropriate

15   comparison, we just note that the comparing data to the end of

16   2021, when the city was in the midst of a pandemic and up to a

17   third of the staff were not showing up for work, we don't think

18   that is the proper comparison either.  Even according to the

19   city's own statistics, slashing and stabbings are on pace to be

20   over 300 this year.  Use of force numbers are over 6,000 this

21   year.  These numbers are just simply unheard of it any other

22   system.

23           As the monitor has noted, there are many instances --

24   the most concerning thing is there are many instances where the

25   department staff has basically ceded control of housing units

N8AVNUN2

1    to the incarcerated people that they are supposed to be

2    protecting.  These individuals are left to freely enter and

3    exit cells, congregate in large groups, and all too often

4    engage in violent conduct that have resulted in severe

5    injuries.  This continues unabated.

6         The department is failing to provide its line

7    correction officers with adequate support and supervision, and

8    staff continue to regularly abandon their post and don't

9    conduct required tours.

10        The monitor's report from July 10th of this year — and

11   this is recent data — as of May 2023, there were 671 total

12   unmanned posts.  The department continues to engage in

13   excessive and unnecessary use of force on a regular basis, and

14   that's according to its own internal records and reviews.

15   These incidents can routinely be avoided and, again, that's

16   according to the department's own reviews.

17        The use of head strikes, which was, you may recall, a

18   major issue that led to this lawsuit and the consent judgment,

19   is at sky-high figures.  The monitor reports that almost 400

20   times in 2022, staff used head strikes on people in custody.

21        I'm not going to belabor on any additional statistics

22   or description of the circumstances, which are obviously dire;

23   but the one other point I would add is that we did engage in

24   meet-and-confer sessions, multiple sessions with the city since

25   the issuance of the July 10th report.  And we just feel like we

1    have to say that, in our view, the city's response in what they

2    presented during those sessions were underwhelming, to say the

3    least.  The city has failed thus far to offer any novel

4    strategies or fresh approaches to address the patently unsafe

5    conditions in the jails.  Instead, we have heard more of the

6    same things that we have been hearing for the last several

7    years.

8            As the monitor mentioned, we heard about new teletypes

9    that will be read at roll calls to remind staff of their basic

10   jobs, including that they need to stay on post and avoid using

11   head strikes; plans to retrain staff again; plans to revise

12   policies and directives to address the very same deficiencies

13   that the monitor has reported during the last eight years and

14   has told your Honor about at multiple court conferences.

15           At this point, this is simply not enough.  We expect

16   to hear -- we expected to hear about much more creative and

17   aggressive changes given the ongoing crisis in the jail system

18   and the harm being suffered.  We simply did not.

19           And with respect to the motion schedule, I think all

20   parties consent to what has been proposed and the procedure

21   contemplated with respect to timing.  We would just note — I

22   think your Honor may be aware of this — that the government and

23   class counsel have made requests for a variety of data and

24   information that we feel is very relevant to establishing

25   noncompliance with the various core provisions at issue.  The

1   monitor expects to provide much of this information to us next

2   month.  That, combined with what we view are going to be

3   substantial motion papers and proposed findings of fact, as

4   well as the internal review process that the government will go

5   through before filing anything, is why we think and

6   collectively with the plaintiffs' counsel, propose November

7   17th as the deadline.

8           THE COURT:  Thank you.

9           I think you were alluding to this a few minutes ago

10  and I'd forgotten to this call this out specifically with

11  Ms. Werlwas.  There is also a September 11th joint letter

12  report date built into the schedule.  And as I understand it,

13  that is connected with the data requests and the potential for

14  a dispute concerning the sufficiency of the response to the

15  data request; is that correct, Mr. Powell?

16          MR. POWELL:  I think that's partly correct.

17          But as your Honor is aware, under the consent

18  judgment, we were required and did issue a notice of

19  noncompliance to the city, identifying a number of provisions

20  that we believe that they are in noncompliance with.  That was

21  issued, I believe, on July 24th.

22          The consent judgment contemplates and requires a

23  45-day meet-and-confer period prior to the parties taking any

24  action.  And we thought it was appropriate when that 45-day

25  period is over on September 11th, to advise your party as to

N8AVNUN2

1   whether any resolution has been reached.

2           THE COURT:  And so there's an August 23rd response

3   date by the defendants, and then the September 11th report

4   would be at the end of that.

5           MR. POWELL:  45-day period, yes.  The response, again,

6   is required under the consent judgment.  We're hopeful that

7   that response, maybe we can reach some agreement as to some

8   facts or noncompliance issues, or maybe not.  We continue to be

9   open to discussing with the city next steps here, and we can

10   spend that time as well to do that.

11           It's unfortunate, in our view, that the city is

12   choosing to take an adversarial posture here, instead of taking

13   this as an opportunity to finally address the long-standing

14   systemic problems that have plagued the system well before this

15   mayor and commissioner took their positions.  But we are always

16   willing -- open to talk, and I think this 45-day period allows

17   for that, as well as issues with respect to the documents and

18   information that we have requested.

19           THE COURT:  Thank you.

20           And just one follow-up question also.  There is an

21   issue with respect to a privilege claim.  And as I understand

22   it, the parties have taken to meet and confer about that by

23   September 1; and that if that is unresolved by September 11th,

24   the plaintiffs would be able to make an application and trigger

25   a briefing schedule with respect to that discovery dispute; is

1    that correct?  I'll ask Ms. Werlwas, since my notes have it in

2    relation to plaintiffs taking the lead on this issue.

3             MS. WERLWAS:  Mary Lynne Werlwas, for the plaintiffs.

4             That is, in part, correct.

5             To clarify, there are multiple privilege and discovery

6    disputes happening right now, and they are each teed up

7    slightly different, whether they are pursuant to a claim of

8    privilege or under different timetables.  So there are a couple

9    of different buckets.  We hope to resolve all of them as soon

10   as possible.

11            However, we do want to note that that has been -- we

12   didn't -- the city didn't make themselves available to meet for

13   the first time until last Friday on these.  And so we had hoped

14   they would be resolved before now, but they haven't.

15            We are deeply concerned with that process.  We hope it

16   will work and that we will get answers.  We have not, for

17   example, even been able to get answers as to what documents

18   they are claiming privilege over for several days, asking

19   distinctly from a list, saying, which of these are you claiming

20   privilege, and we can't even get an answer on that, which we

21   hoped we could get today.

22            But, in any event, under different -- just to be

23   clear, that we will submit these to the Court under some of the

24   privilege disputes.  It's the defendants' obligation under the

25   consent judgment to submit disputes to the Court.  In other

N8AVNUN2

1    words, there's one agreement under which the plaintiffs agreed

2    to bring it before the Court, under the default amended

3    protective order, it's docket number 89 in this case.  If the

4    defendants wish to pursue a confidentiality designation, then

5    they need to bring it to the Court.

6            Hopefully, we'll resolve all of these.  We will report

7    out what we have or haven't resolved, but that's just one way

8    to clarify that they are in slightly different postures as to

9    who needs to bring it to the Court.

10           THE COURT:  Thank you for that clarification.

11           And now I'll hear from the defense.

12           MR. SCHEMITSCH:  Yes, your Honor.

13           First, with regard to disputes for documents,

14   defendants initially did request that plaintiffs identify any

15   pages of documents that would be covered by the interim

16   protective order, which would not be subject to the amended

17   protective order in advance of a meet-and-confer that happened

18   last Friday to which defendants did not receive a response in

19   advance of the meet-and-confer.

20           The parties did meet and confer on August 4th

21   regarding which documents remain subject to confidentiality or

22   privilege.  Defendants have since produced a privilege log, and

23   we proposed dates to plaintiff for a meet-and-confer, and we

24   will get back to them and confirm those dates for a further

25   meet-and-confer in that process.

N8AVNUN2

1          THE COURT:  And you will engage in an effort to

2     resolve this without -- these issues without litigation.

3          MR. SCHEMITSCH:  Yes, your Honor.

4          THE COURT:  Of those issues.  Thank you.

5          MR. SCHEMITSCH:  With respect to a proposed contempt

6     motion, we received plaintiff and the Southern District's

7     noncompliance letter dated July 24th, 2023, regarding some 25

8     provisions which defendants are alleged to be in noncompliance.

9     We will be responding within 30 days, on August 23rd, pursuant

10     to the consent judgment, which I believe the section is section

11     21, paragraph 2.

12          Defendants contend that we are not in contempt of

13     these provisions.  As the monitor noted in the April 2023

14     report, the various requirements of the consent judgment and

15     ensuing orders are interconnected, which led to the creation of

16     the action plan intended to set policies and persons in place

17     so the department can make compliance with the consent

18     judgment.  Defendants are aware of the urgency of these steps

19     to be taken at a fast pace, and we dispute that the department

20     has not been working diligently in working to meet these

21     conditions.  To that end, we oppose plaintiffs' need for a

22     motion for contempt.

23          A receivership is an extraordinary remedy that should

24     not be considered lightly.  The department is still enacting

25     change, and defendants reemphasize their commitment to

N8AVNUN2

1    continuing to make steady progress to achieve sustainable

2    reforms.  Should the Court grant the plaintiffs' and Southern

3    District's request for motion practice, we are in agreement

4    with the proposed schedule that was circulated by the monitor

5    in the August 8th, 2023 report.

6           THE COURT:  Thank you.

7           I have considered carefully the submissions in advance

8    of today and have listened carefully to everything that has

9    been said here today.

10          The Prison Litigation Reform Act, the PLRA, authorizes

11   the Court to grant prospective relief if the Court finds that

12   relief is narrowly drawn, extends no further than necessary to

13   correct the violation of a federal right that is at issue, and

14   is the least intrusive means necessary to correct the violation

15   of the federal right.  And the question that will be addressed

16   in the motion practice is whether there are violations, and

17   what relief, if any, is necessary and meets the requirements of

18   the PLRA.

19          The Court is persuaded that the proposal to move ahead

20   at this time with an application for contempt and/or the

21   appointment of a receiver is appropriate.  The submissions, as

22   well as the remarks here today, have made clear that the people

23   incarcerated at Rikers are at a grave risk of immediate harm;

24   and that although some progress is being made, it is not being

25   made at a rate that is commensurate with the perils that are

N8AVNUN2

1   presented in the period of time over which those perils have

2   existed.

3           The Court concludes that counsel for the plaintiff

4   class and the government have on the record — that includes the

5   monitor's multiple reports — made a sufficiently plausible

6   showing that a finding of contempt and/or the appointment of a

7   receiver could comport with the requirements of Section

8   (a)(1)(A) of the PLRA and, therefore, counsel's request to set

9   a briefing schedule is approved.

10          The Court is deeply concerned about the safety and

11  well-being of every person held at Rikers Island and all of

12  those who work there.  The Court is committed to seeing

13  effective reform that improves the safety and overall

14  conditions for those in custody at Rikers and other city jails.

15          By virtue of the use of force focus of the litigation

16  and the consent decree, the Court's attention centers on

17  ensuring that the city and the department implement the

18  structural changes that are necessary to achieve compliance

19  with the requirements of the consent judgment, subsequent

20  remedial orders, and the action plan.  The Court has made clear

21  on many occasions that it will hold defendants accountable for

22  maintaining a sustained pace of reform.  The Court also made it

23  clear that should the defendants fail to make progress on the

24  reforms necessary to comply with the Court orders in this case,

25  the Court would entertain a renewed motion for contempt and/or

N8AVNUN2

1    a motion to appoint a receiver.

2         The monitoring team's recent reports and the remarks

3    today indicate, despite the defendants' overall undertakings

4    and reiteration of commitments to sincerity, transparency, and

5    further progress today, that the defendants have not

6    demonstrated by action sufficient willingness or ability to

7    engage productively with the monitoring team, let alone sustain

8    the necessary, significant, and effective progress toward the

9    reforms that are necessary to ensure safety for everyone at

10   Rikers.

11        The application is granted.  Defendants must respond

12   to the noncompliance notice by August 23rd of 2023.  The

13   parties must file a joint letter to the Court by September

14   11th, 2023, informing the Court of the status of the parties'

15   work regarding the plaintiffs' noncompliance notice.

16        Assuming -- I hate to assume this, but I am realistic.

17   Assuming that the parties' dispute regarding the alleged

18   noncompliance with the Court orders has not been completely

19   resolved by September 11th, 2023, plaintiffs and the government

20   are to file their opening brief on contempt motion practice,

21   contempt and/or receivership, by November 17th, 2023.  The

22   defendants must file their opposition by January 16th, 2024.

23   And the reply brief is to be filed by February 15th, 2024.

24        Of course, if the parties come to a consensual

25   resolution of the dispute, the parties are directed to inform

N8AVNUN2

1    the Court and seek approval of any necessary orders or

2    modifications of schedules.  The briefing schedule will be

3    suspended, if appropriate, upon a joint application.

4            The fact that I am authorizing this motion practice

5    does not mean that I have given up on defendants or that my

6    expectations of the department and the city are a millimeter

7    lower.  Defendants hold a crucial public trust:  Responsibility

8    for the safety of those who have been accused of crimes and are

9    being held for just adjudication of the charges against them.

10   Instead, I've authorized this motion practice because the

11   defendants have not yet shown me that they are willing and able

12   to make the rapid radical changes in the administration of the

13   jails that are necessary to protect the people who have been

14   committed to their custody and those whom defendants employ to

15   guard them.

16           I'm not saying that the progress described in the

17   August 9th, 2023 letter is not a positive development.  I'm

18   saying that it is not yet enough, and that it does not appear

19   to signal the thorough and dynamic change that is necessary.

20           Defendants should take these next few months as a

21   challenge to prove that they can and will and are doing what

22   the taxpayers have put them in place to do; and that they

23   deserve the trust of the public and the Court.

24           I expect nothing less than scrupulous compliance with

25   the proposed order that I am entering today.  And this includes

N8AVNUN2

1    transformative change in the defendants' working relationship

2    with the monitor, whose team brings essential added expertise

3    to the challenges facing the jails.  Higher expectations for

4    the working methods, standards, and compliance for those whom

5    defendants employ in the jails is also expected and, most

6    important, rapid improvement of the day-to-day results of these

7    efforts is expected.

8          The monitoring team will be watching.  I will be

9    watching.  And the people of this city and the press will be

10   watching.  The loved ones of those who live and those who work

11   in the jails will be watching in justifiable expectation, as

12   well as in hope.

13         I will set a conference date for early December so

14   that we can touch base as to where we are on the schedule that

15   is set forth in the order that I will be signing.

16         Ms. Ng, do you have a late November/early December

17   date that you can give us for a conference?

18         THE DEPUTY CLERK:  Yes, Judge.

19         Tuesday, November 28th, 2023, at 2 p.m.

20         THE COURT:  Is there anyone who is unavoidably

21   unavailable for November 28th at 2 in the afternoon?

22         It looks like it works for everybody.  And so the next

23   conference is set for November 28th, 2023, at 2 in the

24   afternoon.

25         Is there anything further that we need to take up

N8AVNUN2

1   together, Ms. Freidberg?

2              MS. FREIDBERG:  Your Honor, this is my routine

3   request, that the Court order the city to provide a transcript

4   of this proceeding to the Court and the monitoring team at a

5   date you select.

6              THE COURT:  Thank you for reminding me.

7              The city is to order a copy of the transcript and

8   provide -- to be provided to the -- each of the Court and to

9   the monitoring team.  Is a week's time sufficient or should I

10  order it more -- yes, more rapidly.

11             Madam Reporter, can the transcript be provided by

12  Monday?

13             THE COURT REPORTER:  Yes, Judge.

14             THE COURT:  By Monday.

15             MS. FREIDBERG:  If it wasn't for the fact that I'm

16  having a baby in a week, I would be a little more

17  accommodating, but I appreciate it, your Honor.  So thank you.

18             THE COURT:  Would it be more prudent and would it be

19  feasible to produce this as an overnight or by the end of the

20  day tomorrow?

21             By the end of the day tomorrow then.  Thank you, Madam

22  Reporter, and thank you to the city for making that order and

23  having that transcript provided.

24             And I thank -- this is a difficult situation, to say

25  the least, and I appreciate the way in which each and every

N8AVNUN2

1   person here has engaged.  I have made my expectations very

2   clear.  I thank the monitoring team for their persistence,

3   their clarity, and the expertise that they have brought to

4   their duties over these years and that they will continue to

5   bring to their duties.  I express certainly my best wishes and

6   hopes, and I think those of everyone here, for safe delivery of

7   Ms. Freidberg of the newest member of this team.  And I urge

8   the families of those who are in custody to continue to live in

9   hope, expectation, and watchfulness.

10           Stay safe and keep well, everyone.

11           We are adjourned.

12                        *    *    *

13

14

15

16

17

18

19

20

21

22

23

24

25