# Status Report on DOC's Action Plan by the *Nunez* Independent Monitor

**October 5, 2023**

### THE NUNEZ MONITORING TEAM

Steve J. Martin
*Monitor*

Kelly Dedel, Ph.D.
*Subject Matter Expert*

Anna E. Friedberg
*Deputy Monitor*

Dennis O. Gonzalez
*Associate Director*

Patrick Hurley
*Subject Matter Expert*

Alycia M. Karlovich
*Analyst*

Emmitt Sparkman
*Subject Matter Expert*

# Table of Contents

Introduction ................................................................................................................ 1

Current Conditions ...................................................................................................... 4

Specific Examples That Illustrate the Unsafe and Dangerous Conditions ................................. 17

Department's Work to Address the  Recent *Nunez* Court Orders ............................... 20

Conclusion .................................................................................................................. 24

Appendix A:  Events After Lock-In between September 11 and 17, 2023 ............................. 26

Appendix B:  Unreported Stabbing/Slashings ................................................................. 30

Appendix C:  DOC Reported Incidents September 11 to 17, 2023 ............................... 33

Appendix D:  Reporting of Serious Injuries On September 18 & 19, 2023 ............................ 39

Appendix E:  Three Examples of Serious Injuries from September 2023 ............................... 42

    Summary of Illustrative Example #1 ....................................................................... 43

    Summary of Illustrative Example #2 ....................................................................... 44

    Summary of Illustrative Example #3 ....................................................................... 48

Appendix F:  Use of Force Case Example #4 ................................................................... 50

Appendix G:  Nunez Compliance Unit Audit Results ......................................................... 54

Appendix H:  September 27, 2023 Site Visit Notes ......................................................... 57

# INTRODUCTION

This report is the tenth[1] filed by the Monitoring Team since the Action Plan was ordered by the Court on June 14, 2022 (dkt. 465). The purpose of this report is to provide the Court with an update on the current state of affairs in the New York City jails since the August 10, 2023 Status Conference.

The Monitoring Team remains extremely concerned about the current state of affairs. The jails remain dangerous and unsafe, characterized by a pervasive, imminent risk of harm to both people in custody and staff. The Monitoring Team is disturbed by evidence that suggests the alarming conditions reported to the Court during the August 10, 2023 Status Conference have only worsened. In particular, the Monitoring Team notes a continuing lack of urgency to address basic security practices, continuing and emerging problems with staff availability, a growing level of abdication of control on the housing units, a continuing failure to adequately identify misconduct when it occurs (via Rapid Reviews and investigations), continuing lapses in timely internal incident reporting and Monitoring Team notification, and continuing efforts to impede transparency and obfuscate the work of the Monitoring Team.

It has been *over two years* since the Monitoring Team *first* raised concerns about the deteriorating conditions in the jails and issued a special report to the Court in which the Monitoring Team strongly implored the City and the Department to take immediate steps to

---

[1] *See* Monitor's June 30, 2022 Report (dkt. 467), Monitor's October 27, 2022 Special Report (dkt. 471), the Monitor's February 3, 2023 Special Report (dkt. 504), Monitor's April 3, 2023 Report (dkt. 517), Monitor's April 24, 2023 Status Report (dkt. 520), Monitor's May 26, 2023 Special Report (dkt. 533), Monitor's June 8, 2023 Special Report (dkt. 541), Monitor's July 10, 2023 Special Report (dkt. 557), and Monitor's August 7, 2023 (dkt. 561). The Monitor has also filed two letters on May 31, 2023 (dkt. 537) and June 12, 2023 (dkt. 544).

address the various causes of harm to people in custody.[2] The conditions that gave rise to the *first* Monitor's Special Report on August 24, 2021 remain just as indisputable today:

> *This status report is being provided to the Court because the conditions reported therein have further deteriorated in the past few months with a steady increase in serious use of force incidents, a disturbing rise in the level of security lapses and unchecked breaches and failures of basic security protocols, and instances of inadequate supervision, all of which are compounded by staffing challenges. [The serious incidents occurring in the jails] are marked by security lapses and breaches of the most fundamental duties of staff such as abandoning housing units, failing to secure doors, and allowing detainees access to highly secure areas that should never be entered by people in custody. August 24, 2021 Monitoring Team Letter to the Court (dkt. 378)at pgs. 1 and 2.*

Since the Monitoring Team filed that August 24, 2021 letter to the Court, in an effort to catalyze much needed change, the Court has issued two Remedial Orders (dkts. 350 and 398), an Action Plan (dkt. 465) and two additional Orders (dkts. 550 and 564), and two additional Orders focused on improving the Department's transparency and collaboration with the Monitoring Team and addressing specific security practices. Over the last few months, the Department's efforts have been limited and ineffective, with few concrete plans for solving the intractable problems despite clear direction from the Court to "make urgently needed changes"[3] and "to make up for lost time and increase the safety and rational and appropriate operation of the institution[s] as soon as possible. And that requires a pace faster than any that we've managed to achieve so far."[4] While a few of the Department's recent proposals (**if** meticulously developed and properly implemented) could address problems in discrete areas, most recent proposals

---

[2] *See* Monitor's August 24, 2021 Report (dkt. 378).

[3] As directed by the Court in its June 14, 2022 order (dkt. 466).

[4] As directed by the Court at the April 27, 2023 Status Conference. *See* Transcript at pg. 68: 14 to 19.

remain haphazard, tepid, and insubstantial and will not create the type of culture change and practice improvements that are prerequisite to effective reform.

 This report has three sections. The first section provides an update on the current state of affairs. This is followed by a section with current illustrative examples of the unsafe and dangerous conditions within the jails. The final section includes updates on the Department's work since the August 10, 2023 Status Conference. The Monitoring Team's findings from recent reports, especially those from July 10, 2023 and August 7, 2023 (dkts. 557 and 561), and the problems identified therein remain prevalent. For those reasons, a detailed recitation of those matters and findings is unnecessary and is not repeated. The reader's knowledge of those reports and findings is assumed.

# CURRENT CONDITIONS

Since the August 10, 2023 Status Conference, the Monitoring Team's continued review of incidents, data, the Department's own reports and assessments of conditions (in particular audits conducted by NCU and the Rapid Reviews of use of force incidents by Facility Leadership), site visits, and discussions with Department leadership continue to reveal a set of intertwined, intractable problems with only superficial, poorly implemented or ineffective efforts to ameliorate them. These include:

- **<u>Lack of Ownership</u>:** The Department continues to offer narrowly-tuned rhetoric about the context of the problems in the jails (e.g., prior administrations' failures, COVID, all jail systems are currently struggling) without taking ownership of the problems and the way in which current decisions, actions and inactions perpetuate and, in some areas, worsen the problems. This dominating focus on the historical context in statements made during internal leadership meetings and in comments to the Monitor and to the Court comes at the expense of a clear, unwavering message about responsibility for solving the problem. This approach to reform is particularly disturbing in light of the current state of affairs as outlined in this report.

- **<u>Security and Violence Indicators</u>:** High levels of violence and fear among people in custody and staff remain a fact of daily living in every facility. All security and violence indicators remain alarmingly elevated (*see* Monitor's July 2023 Report (dkt. 557) for trends, pgs. 12 to 52), reflect significant dysfunction and result in a high risk of harm to staff and incarcerated individuals. The Department does not have rigorous, effective, wide-ranging plans to reduce violence or to elevate the poor practices that contribute to it. The Monitoring Team's review of recent incidents continues to reveal deficits in basic security practices, such as securing doors, officers being off post, failures to timely intervene, failures to use force appropriately, and failures to properly utilize equipment. All of these contribute to the high risk of harm and unsafe conditions. These security failures, combined with the failure to deliver facility services consistently, result in high levels of frustration for incarcerated individuals and staff alike.

  - *In-Custody Deaths:* Nine people have died in custody or shortly after their release thus far in 2023, including two people who died after the August 10, 2023 Status Conference (one of whom passed away on the day this report was filed). At least two of the nine deaths are suspected to be drug related and two are suspected to involve self-harm. Notably, in at least five of the deaths, poor staff practices

precipitated and/or exacerbated these events such as poor touring practices, being off-post, failing to enforce lock-in, allowing individuals to smoke prohibited substances, and allowing staff to enter the A-station area.[5]

o   *High Impact Force*: The Monitoring Team continues to identify aggravated use of force cases in which staff utilize high impact force and head strikes (in some cases when the incarcerated individual was in restraints). These cases continue to occur with alarming frequency. For instance, on August 9, 2023, an officer was escorting a restrained incarcerated individual down a tier when the officer suddenly and violently threw the person in custody ("PIC") into a railing, hitting his head with full force into the railing. The individual's resistance, which consisted of defensively twisting and turning, was in all likelihood in response to a painful bent wrist being applied by the officer. The officer then grabbed the restrained individual by the neck and threw him to the floor. Such hard impact tactics create a high degree of unnecessary risk of harm and more often than not do in fact cause injury.[6]

o   *Stabbings and slashings*: The number of stabbings/slashings has significantly increased. In August and September 2023, there were 91 stabbings/slashings in the jails.[7] The recent substantial increase in stabbings/slashings has altered the downward trajectory of stabbings/slashings from earlier this year. Current data reflect a 30% increase from the 69 stabbings/slashings that occurred in August and September 2022. The Department is on track to have 405 stabbings/slashings in 2023.

o   *GRVC and RNDC*: Although the Department targeted these two facilities with intensive violence reduction strategies, their initially positive impact has eroded and both facilities are again mired in high rates of violence and disorder; in continued challenges in ensuring that the facility is properly staffed; and in surrounding degradation in sanitation.

o   *Incidents of Self-Harm*: Between April 6, 2023 and July 31, 2023, the Department reports that there have been approximately 380 incidents of self-injurious behavior or attempted suicides.[8] The Monitoring Team's review of incidents

---

[5] The Department has reported taking immediate corrective action in many of these cases, as described in the Monitor's August 7, 2023 Report at pgs. 10 to 11 and Appendix B.

[6] The officer's report of the incident was not accurate, and he was suspended for using excessive force.

[7] Notably, the number of stabbings/slashings in August and September reflect the 4th and 5th highest months of stabbings/slashings since the inception of the Consent Judgment (the only months with higher stabbings/slashings were March 2022 (n=65); September 2021 (n=50); January 2023 (n=48).

[8] As noted in various Monitor Reports, incidents tracked in IRS may fall under multiple categories, but must be tracked by the "main" category so it is possible that some self-injurious behavior or attempted

continue to reflect that staff generally fail to address these incidents as they should (*e.g.* failing to urgently respond to events of self-harm and failing to supervise individuals following a suicide attempt). The Department issued a teletype in June of 2022 reminding staff of their obligations following a self-harm event and reports an instructional video on addressing self-harm incidents is played on DOC screens. However, little to no progress has otherwise been made to address staff practices. Further, as of September 11, 2023, 67% of staff have received the annual training on suicide prevention. An assessment of current policies and procedures, required by the Court's August 10, 2023 Order, is ongoing by an external consultant (discussed below).

o  *Staff Suspensions*: In July and August 2023, a total of 31 staff were suspended in response to use of force related misconduct.[9] The number of staff who were suspended is notable given that these cases reflect egregious violations of basic security protocols and poor practice that leads to unnecessary uses of force and physical harm to people in custody. While the Department still does not identify all cases in which suspension should occur, the high numbers of suspensions that occur indicate significant staff misconduct and facility mismanagement.

- **Restricted Housing**: The Department renovated an area of RMSC to house its most restrictive units for those individuals who have engaged in serious violence (e.g., stabbings, slashings, assaults that cause serious injuries). The new units (Enhanced Supervision Housing at RMSC, or "RESH") opened in June 2023. Despite the new physical plant, a policy that emphasizes extensive security protocols and programmatic engagement, an allocation of leadership positions precisely for the units, specifically selected uniformed and programming staff, a specialized training curriculum, and low staffing ratios, the units are chaotic, violent and unsafe. In July and August, RESH has had the highest UOF rate in the Department and the largest number of stabbings and slashings of any command. A summary of the incidents at RESH that were reported between September 11 and 17, 2023 are included in Appendix C of this report. RESH leadership has changed multiple times during the past three months, with additional changes expected this week. Despite being newly renovated, the physical plant has already deteriorated, and sanitation is poor. The units have not maintained the requisite staffing levels, which has led to the inability to operate the program as designed, particularly the required 7-hour lockout and programming component. The units should have extensive security protocols (including frequent searches, controlled movements,

---

suicides are reported under a different category (*e.g.,* in-custody death or logbook entries) so the IRS category of "Self-Injurious Behavior" and "Suicide Attempts" likely produce an underestimate of events that have occurred.

[9] This includes suspension for misconduct related to use of force, conduct unbecoming, and inefficient performance of duty.

and no-contact visitation), but contraband—both weapons and drugs—are pervasive, leading to frequent slashings and open drug use (observed by the Monitoring Team during its site visits, as recent as last week). This failure to properly implement the program has led to such high levels of violence and fear among people in custody that many choose to remain in their cells throughout the day, resulting in an environment that, in practice, is not substantially different from punitive segregation.

- **Basic Facility Operations**: Attempts to ensure that staff adhere to even the most basic protocols of operating a correctional facility (such as lock-in/count, housing unit tours, and providing basic services) have required multiple layers of planning, engagement, support, etc.

  - *Facility Closing/Reopening and Departing Leaders*: The status and composition of the Department's facilities is constantly changing. Over the past few months, OBCC was re-opened, AMKC was closed, VCBC was closed, and ESH was relocated from GRVC to RMSC. This has changed both the size of the facility populations (with multiple facilities now nearing/above 1,000 people in custody) and their composition (e.g., adults now comprise the majority of people housed at RNDC; GRVC has a significant population of people who need an increased level of mental health services). In at least some cases, the closure of facilities and reassignment of individuals to other facilities appears to be occurring without sufficient time for planning and coordination. This has been a constant pattern over the past eight years as is the practice of frequently transferring leaders from one jail to another (*e.g.*, RESH leadership discussed above). Further, key leaders have either left the agency or are planning to leave (*e.g.*, the Department's General Counsel left over a month ago and there is no one serving in an acting capacity).

  - *Touring*: Staff do not consistently or routinely tour the housing units and, in some instances, make logbook entries such as "no issues noted" even though they did not actually conduct a tour. Even when tours do occur, they are often perfunctory, and there is limited enforcement to ensure that obstructions on cell windows and door manipulations are removed. These obstructions make it impossible for staff to visually confirm the well-being of individuals, which renders the tour pointless. A recent site visit also revealed that tour wands are not always readily available to staff. But for the Monitoring Team's feedback following a site visit last week, the Department was not aware of this issue and how pervasive it is across the Facilities.[10]

---

[10] The Department reported to the Monitoring Team that it is working to devise a new plan to monitor and assess tour compliance given the issues that have been uncovered.

o   *Poor Supervision*: Supervision of line staff remains insufficient to provide the skill development and oversight needed to ensure the workforce functions skillfully and responsibly. The Department has attempted to ensure supervisors are present across tours throughout the week, but the actual *supervision* of line staff remains sporadic and inconsistent. Some supervisors are stepping up to meet expectations, but many are not. Staff on many units continue to suffer from a lack of coaching and support that should be provided by their superiors, and thus poor practice persists. When line staff report issues to supervisors (*e.g.*, an individual who is waiting for sick call, an individual without a mattress, or an issue with services), the issues often go unattended, leaving line staff fatigued and disheartened. Given the limited supervision and other attendant matters, it appears staff too often cede control of a housing unit to the incarcerated individuals housed in their units.

o   *Events Occurring After Lock-in*: A number of incidents involving force, violence, and self-harm continue to occur after lock-in. During the week of September 11, 2023, there were at least 15 such incidents that occurred while the incarcerated population should have been locked in (9:00 p.m. to 6:00 a.m.). A description of these incidents is included in Appendix A. Most facilities are still unable to conduct the 3:00 p.m. and 9:00 p.m. lock-ins consistently or reliably across all housing units. The efforts of the Deputy Commissioner of Classification, Custody Management and Facility Operations and his team to focus attention on this issue are appreciated, as they attended to the matter quickly after it was raised by the Monitor. However, this is an area where staff complacency, lack of skill, and fear all coalesce to make a seemingly simple action unnecessarily complicated. This element of facility operations, and many others, remain outside the range of generally accepted practice.

o   *Dangerous Contraband*: Dangerous weapons are easily available to people in custody, as evidenced by the large number of stabbings/slashings and self-harm incidents that continue to occur. Further, Department records, video evidence, leadership reports, and first-hand observations by the Monitoring Team reveal on-going and rampant drug use among people in custody.

o   *Service Provision*: Delivering mandated services, in particular programming and recreation, remains an ongoing struggle. Efforts to repair facility recreation spaces have largely been effective/completed, but facility leaders report they must continue to look for staffing workarounds (with varying success) to be able to provide the services people in custody are entitled to receive. As a result, the incarcerated population and staff experience heightened stress levels attributable to the absence of a structured and consistent service routine, leading to uncertainty regarding the trajectory of their day. The stress on the incarcerated

population often results in tension or disruptive behavior, which makes the job of line staff more challenging and potentially dangerous.

- **Staff Morale and Corrections Fatigue**: Staff morale at all levels, both uniform and civilian, remains low. Uniformed staff in the jails are tired and fearful for their own safety. Those who report to work continue to work many hours of overtime. The violence and disorder in the jails makes for poor working conditions for staff, which contributes to vicious cycles of absenteeism and complacency. Staff's fatigue contributes to an ongoing pattern where staff concede to the demands of those in custody because they have neither the energy nor the support from their supervisors required to exercise their authority to resolve problems and enforce rules. Further, civilian staff and Department leadership are also showing signs of exhaustion as they endeavor to confront the monumental challenges in front of them and the lack of consistent or sustained progress.

- **Staffing**: The Department's staffing complement is highly unusual and is one of the richest staffing ratios among the systems with which the Monitoring Team has had experience. Making sure staff come to work in the first instance and are then appropriately assigned to posts in a manner that ensures proper facility coverage have been an area of significant weakness for the Department. The Department continues to struggle to ensure that staff come to work. While progress has been made in tightening protocols and procedures for managing staff out sick or on modified duty, a large number of staff remains on these statuses and, overall, a large number of staff are absent on any given day. Concerningly, as the ability of staff to misuse the sick leave benefit has been somewhat constrained, staff have *recently* identified and begun to misuse other mechanisms to avoid coming to work as scheduled. The weak system for administering these mechanisms (*e.g.*, Personal Emergency Days and FMLA), coupled with a lack of quality record-keeping, makes it difficult to quantify the size and scope of the emerging problems at this time. The Monitoring Team has recently learned the available data, for certain status (*e.g.*, Personal Emergency Data) does not appear to accurately reflect the total number of staff who do not come to work. Given the Department's poor foundation in managing staff availability, the system is susceptible to this type of manipulation. The Staffing Manager has demonstrated a strong understanding of these issues and has discussed the need for a global approach to managing this problem. He reports additional efforts are underway to curtail the manipulation of the system and to devise a strategy to eliminate these loopholes. That said, the evidence belies the Commissioner's claim at the end of August 2023 that the Department "doesn't have a staffing crisis anymore."[11] Reports from facility leadership, overtime data, the Monitoring Team's incident reviews, and first-hand observations of facility operations all reveal that the Department continues

---

[11] *See* Department of Correction Commissioner Louis Molina talks 2027 deadline for Rikers Island shutdown, https://ny1.com/nyc/all-boroughs/in-focus-shows/2023/08/23/department-of-correction-commissioner-louis-molina-talks-2027-deadline-for-rikers-island-shutdown# at 5:48.

to struggle to ensure that staff report to work as expected and are deployed as they should be. These staffing issues impact the good working order of all the facilities in countless ways described throughout this report (and prior reports).

- o *Deployment of Staff*: Poor staff assignment practices within the facilities continue. The Department continues to have instances where housing unit posts are unstaffed. This is particularly confounding as the Monitoring Team continues to observe that large numbers of staff respond when an incident occurs. In addition, incidents continue to occur when staff simply go off post and do not follow the protocols for contacting the control room to obtain relief, as several facility leaders have begun to emphasize. Finally, despite the Department's large cadre of staff, overtime usage is exorbitant. Since the inception of the Consent Judgment, the Department has spent over $1.5 billion on uniform staff overtime.[12] In 2022, the Department spent $255 million in overtime, the highest spent on overtime payments since the start of the Consent Judgment. The Department is on track to exceed that amount in 2023, as $180 million has already been spent on overtime during just the first eight months of the year.

- o *Staff Recruitment*: Recruiting staff to the Department has long been difficult. However, the volume of recent media stories that report on the concerning state of the jails and that raise questions about the Department's management logically undercut the Department's ability to attract and retain staff and leaders. The Department has reported that a number of individuals have elected not to work with the agency given its reputation and the potentially critical media reports that could be associated with their appointment.

- **Incident Reporting**: Staff reporting of serious events continues to be unreliable. Further, the Court's Order to notify the Monitor of serious incidents has not been executed with the required fidelity. The Monitoring Team's concern that the Department's incident reporting practices are not as reliable or consistent as they must be has deepened since the Monitoring Team's reports in May 2023.[13] Reports of serious injuries are delayed, and in some cases, do not occur, and the Department's convoluted reporting conventions further compound the problem. Incident reporting is a basic and essential tool for properly

---

[12] The Department's overtime data is based on the month it was paid so it may not necessarily reflect the month in which the overtime was earned. The Department notes that the data for each month may be impacted by pay period cadence as well as processing lags in paperwork submission which results in overtime being paid weeks and potentially months after it was worked. Further, on occasion, there are instances such as collective bargaining settlements that call for substantial retroactive overtime payments.

[13] Earlier this year, the Monitoring Team reported on nine incidents that were illustrative of broader concerns regarding staff incident reporting practices. This includes four (of the five) incidents identified in the May 26, 2023 Monitor's Report (dkt. 533) (described in the Monitor's June 8, 2023 Report (dkt. 541) at pg. 42) and five stabbing/slashing incidents that staff did not report (described in the Monitor's July 10, 2023 Report (dkt. 557) at pgs. 29 to 31).

managing a facility, and obviously, for any reform effort that expects to identify and solve problems. The integrity of any incident reporting system rests on a foundation that reporting is mandatory, and that staff reflexively report incidents when they occur. The fact that, in this Department, these tenets do not appear to hold true—even in the case of an egregious incident like a serious injury that requires treatment at a hospital—casts doubt on the integrity of the system.[14]

o   *Reporting of Stabbing/Slashing Data*: Between January and June 2023, the Monitoring Team identified at least five stabbing/slashing incidents that were not reported as such (although the incidents were reported as either a use of force or a serious injury) as described in detail in the Monitor's July 10, 2023 Report (dkt. 557) at pgs. 29 to 30. Following the issuance of that report, the Monitoring Team requested that the Department evaluate these five incidents and advise whether they would be classified as a stabbing/slashing. After repeated follow-up, the Department finally responded (almost 12 weeks after the incidents were brought to the Department's attention) and reported that two of the five incidents would be reclassified as stabbing/slashing, but advised that the other three incidents were not slashings or stabbings according to the Department's policy. A summary of each of the five cases and the Department's position on them is included in Appendix B. The Department's determination that three events do not meet the definition of a stabbing/slashing does not comport with the facts of each case. The Department's definition of a stabbing/slashing is "a stabbing/slashing [. . . .] injury sustained by inmates."[15] While the Department's definition is circular and lacks clarity, even under this construction, the three cases should have been reported as a stabbing/slashing because there is clear and objective evidence of a weapon, video demonstrating swiping and slashing motions, and injuries noted in injury reports. The Department's decision not to reclassify these incidents as a stabbing/slashing raises the question whether other events are going unreported due to a similar failure in judgment.

o   *Reporting of Serious Injuries*: The Monitoring Team's review of serious injuries has identified various deficiencies that result in serious incidents going unreported and/or being reported only after significant delay. First, staff do not reliably report the underlying incident during which an injury is sustained to the COD *at the time the incident occurred*. Second, COD reports are not *reliably or timely* amended to

---

[14] The Department has reported that is working to address the Monitoring Team's recent feedback on these reporting issues and will consult with the Monitoring Team on these initiatives in the coming weeks.

[15] The definition is circular and not clear, similar to many other incident definitions. The Monitoring Team is in the process of evaluating the Department's reporting policies and plans to share recommendations with the Department following the completion of its assessment.

include a serious injury upon receiving an injury assessment from CHS. Third, the Department does not separately report to COD when people in custody are transported to the hospital, such that no centralized, electronic record exists of these critical events. Without a centralized, electronic record, the Department lacks a failsafe to ensure that all such incidents are reported, which is particularly critical given staff's unreliable incident reporting practices. In light of this information, the Monitoring Team emphasizes that the Department's data regarding serious injuries must be viewed with extreme caution. For example, the City's August 9, 2023 claim that fewer incarcerated individuals have sustained serious injuries cannot be verified.[16] Following multiple requests and follow-up, the Department conceded to the Monitoring Team the inaccuracy in the phrasing of the original claim explaining it was reporting on a decrease in the number of incidents and not individual injuries. Whether there has been an actual decrease in the number of incidents is unknown given the issues with reporting of incidents.

o   *Notifications to the Monitoring Team*: Since the Court's June 13, 2023 Order, the Department has notified the Monitoring Team about five cases in which serious injuries or serious conditions resulted in an individual's admission to the hospital ("Serious Hospital Cases"). Although case tracking is haphazard and disorganized, the Department does have sufficient information to identify cases that meet the criteria for notification. To that end, the Monitoring Team discovered evidence in the Department's possession of additional cases (at least 12 cases and likely others as yet unidentified) that should have been reported to the Monitoring Team and were not.

- **<u>Inconsistent Accountability</u>**: The Department is still struggling to consistently identify misconduct when it occurs and to detect unsafe practice and security breaches. This results in a lack of consistency in applying corrective action, which further undermines legitimate efforts for accountability when corrective action does occur because staff feel they are not being treated fairly when held accountable. The fact that misconduct also continues to go undetected (via Rapid Reviews and investigations), also means that the likelihood of being held accountable is far from certain. Together, these dynamics have undercut the effectiveness of the Department's accountability efforts.

---

[16] The City claimed in its Court filing on August 9, 2023 (dkt. 562) that "serious injuries to incarcerated individuals (SITI) have declined 39% comparing the two periods." The Monitoring Team's attempt to verify this claim was difficult, requiring multiple requests and repeated follow-up to determine how the Department came to this conclusion. The Department ultimately reported that this statement was not accurate and that the data underlying this claim related to *incidents* and not *individuals*. Notably, an incident may include injuries to multiple individuals. Further, conclusions about the potential decrease in the number of incidents must be viewed with extreme caution.

    o  *Leadership of the Investigation Division ("ID")*: The Commissioner recently removed and demoted the Associate Commissioner of the Investigation Division, who is a well-respected and seasoned leader. The Commissioner reported to the Monitor that the basis for the decision was not related to *Nunez* matters, but the Monitoring Team has not been made privy to the factors that provided the basis for the Commissioner's decision.[17] The Monitoring Team had worked closely with the former Associate Commissioner since the inception of the Consent Judgment and found him to be forthright and credible and to possess a keen acumen for assessing use of force incidents in a neutral and independent manner. His leadership and experience, in conjunction with that of a few others, was credited for the Investigation Division's various successes prior to the current administration.[18] This spring, following the removal of the prior Deputy Commissioner of ID in March 2023,[19] the former Associate Commissioner's leadership was essential in revitalizing the unit and regaining the ground that had been lost under the prior Deputy Commissioner of ID. The Monitoring Team has grave concerns that the removal of the Associate Commissioner will compromise the revitalization effort and morale within the division.

- **_Nunez_ Management**: The *Nunez* Manager (and her team) has provided significant assistance to the Monitoring Team since her appointment. The *Nunez* Manager has proven to be a critical element to managing the *Nunez* Court Orders and working with the Monitoring Team. Her team serves an essential organizational and planning function, but importantly, is not responsible for actually making the changes and improvements in the Department's *operations* that are so desperately needed. Despite the significant efforts by the *Nunez* Manager, it remains difficult for the Monitoring Team to obtain certain information timely, verify certain statements made by the City and Department to the Court (*e.g.*, serious injuries as discussed above), and to stay apprised of matters within

---

[17] The Monitoring Team requested the written basis for this determination, but the Commissioner has refused to produce it to the Monitoring Team as discussed in more detail below.

[18] *See* Monitor's 12th Report (dkt. 431) at pgs. 79 to 80 noting that he and the then-Deputy Commissioner of ID were "smart, creative, dedicated and reform-minded leaders who have successfully guided the significant reform of the ID Division and have helped identify and support initiatives to elevate the level of practice needed in the facilities." Note, at the time the Monitor's 12th Report was filed, this individual served as the Assistant Commissioner of the Investigation Division.

[19] *See* Monitor's April 3, 2023 Report at pgs. 101 to 102 and 155 to 159 for a detailed discussion on the marked shift in the quality of investigations and subsequent removal of the Deputy Commissioner of ID in the spring 2023.

the Department as described in this report and prior reports.[20] The Monitoring Team must frequently piece together the state of affairs, make numerous proactive and follow-up requests for information, and review materials from different sources to ascertain what is occurring. Particularly challenging is that the Department's positions on certain matters will shift, sometimes day-to-day as described below.

- *Verifying Department's Report of Use of Submachine Guns:* The Department has taken varying positions on which staff and under what conditions recently purchased submachine guns may be used. In June 2023, the Department reported that submachine guns were for exclusive use by ESU should an issue occur at the airport. Subsequently, in July 2023 after repeated follow-up by the Monitoring Team, the Department reported that statement was not accurate. However, in September 2023, the Department's position appeared to shift again when it publicly reported to multiple news outlets[21] that submachine guns were for use by staff serving as first responders, such as responding to events in the airport. As of the filing of this report, the Department has not responded to requests to reconcile this matter. It is notable that the Department has not produced any policies that permit staff to utilize submachine guns. In fact, the Department's two policies on the use of firearms do not identify any circumstances when submachine guns may be used. The Monitoring Team has recently shared feedback on the Department's Firearm Directive and ESU's Command Level Order for Ballistic Searches to address this significant and disturbing gap in policy, along with other identified problems.

o  *Consultation*: The Monitoring Team routinely provides technical assistance to the Department. Given the significant mismanagement and dysfunction in this system, the Monitoring Team's assistance is a combination of support at a basic level (*e.g.*, reminders of deadlines or identifying relevant policies that govern certain practices), ensuring that new policies, protocols and training curricula comport with generally accepted practice and the requirements of the *Nunez* Court Orders (*e.g.*, ESU and Captain training), and identifying targets that are ripe for root cause analysis (*e.g.*, evaluation of escort and search procedures that lead to

---

[20] *See*, Monitor's March 16, 2022 Report at pgs. 24 to 29; Monitor's June 8, 2023 Report at pgs. 15 to 38; Monitor's June 12, 2023 letter (dkt. 544) and discussed at the June 13, 2023 Emergency Conference Transcript at pgs. 14 to 15.

[21] *See* Charles Lane, NYC jails buying accessories for sniper rifles it rarely uses, THE GOTHAMIST, https://gothamist.com/news/nyc-jails-buying-accessories-for-sniper-rifles-it-rarely-uses; and Craig McCarthy and Steve Janoski, NYC Department of Correction shells out $150K for sniper rifles, accessories: report, THE NEW YORK POST, https://nypost.com/2023/09/11/nyc-department-of-correction-shells-out-150k-for-sniper-rifles-accessories-report/.

unnecessary and excessive force). It is for these reasons that consultation with the Monitoring Team is critical. Notification to and consultation with the Monitoring Team remains an ongoing concern. Consultation on many *Nunez* matters occurs only after the Monitoring Team has proactively inquired about the status of an initiative or has requested the Department take a certain action. Even when the Department is reminded and specifically directed by the Court to consult with the Monitoring Team on certain actions, that consultation does not always occur and the Monitoring Team learns, after the fact, about an action that should have been discussed collaboratively. For example, the Department recently implemented new forms for RESH and rolled out a revised Conflict Resolution training. Both matters require Monitor *approval* yet the Monitoring Team was not even consulted.

- **Avoiding Transparency**: The Commissioner continues to take actions that appear counter to his stated intent to be transparent and work with the Monitor. Most recently, on September 5, 2023, the Commissioner attempted to influence the Monitor's reporting on a recent demotion by advising the Monitor he should refrain from making "glowing representations" about the individual in the Monitor's report or the Commissioner would "have to get into a public back and forth."[22] In light of this, the Monitor requested the written basis for the demotion. The Commissioner refused to provide the requested information, claiming it was "not *Nunez* related,"[23] despite the fact that the Monitor requested the information to perform his duties under the *Nunez* Court Orders because the information is clearly relevant to work under the *Nunez* Court Orders, and the Commissioner claimed he would disclose the information publicly depending on what is in the Monitor's report.[24] The production of certain information (e.g. recently requested

---

[22] The Commissioner also appeared to attempt to influence the Monitoring Team's reporting by requesting that the Monitor not file the May 26, 2023 Special Report. *See* Monitor's July 10, 2023 Report at pgs. 149 to 150.

[23] On September 29, 2023, the Department reported that "[i]t is the Commissioner's position that [this request is] not within the scope of the Nunez Consent Judgment and Remedial Orders and he does not intend to respond, absent a court order to do so. As you are aware, the Department responds to the vast majority of Monitoring Team requests for information without objection. However, here, the Commissioner strongly objects to these requests as outside the scope of the Consent Judgement and Remedial Orders and as not relevant to remedying the constitutional violations at issue. The Commissioner is entitled to make personnel decisions, and with respect to [this position], a position that does not require consultation or approval of the Monitor, he elected to exercise his discretion to make a personnel decision."

[24] There is no basis in the *Nunez* Court Orders for the Commissioner to deny production of information because he determines that it is "not *Nunez*" related. The Department is required to provide the Monitor with access to information that the Monitor, *in his sole discretion*, determines is necessary "to perform his responsibilities." *See* Consent Judgment § XX. ¶ 8. It is the antithesis of the work of the Monitor if the Commissioner (or any Party) had the authority to determine what information the Monitor may have

information regarding the Investigation Division) has also been delayed because of objections by the Commissioner, which were ultimately overruled and the City and Department report will be produced.[25] Finally, the Commissioner continues to make public statements that obfuscate and distort the current state of affairs (*e.g.*, claiming there is no staffing crisis, noted above, and distorting the facts of a recent serious incident, which is discussed in more detail below). These examples, and those outlined in prior Monitor's Reports, raise grave concerns about the Commissioner's commitment to transparency and reform. Finally, the Monitoring Team continues to receive reports that staff are afraid to be forthright in conversations with the Monitor, for fear of reprisal.

---

access to in order for him to do his job in a neutral and independent manner. It is for this reason the Consent Judgment specifically states that "[n]o Party, or any employee or agent of any Party, shall have supervisory authority over the Monitor's activities, reports, findings, or recommendations." *See* Consent Judgment § XX, ¶ 23.

[25] The production of information has been delayed or denied by the Commissioner due to similar and meritless objections since 2022. *See* Monitor's March 16, 2022 Report at pgs. 24 to 29 and Monitor's July 10, 2023 Report at pgs. 155 to 156.

# SPECIFIC EXAMPLES THAT ILLUSTRATE THE UNSAFE AND DANGEROUS CONDITIONS

The concerns, issues, and patterns discussed above are illustrated by the following examples. These are not isolated events nor unique circumstances. These various examples are shared because they illustrate a series of issues that are indicative of much broader system failures identified throughout the history of this case and that remain present in current operations. In the Monitoring Team's considerable experience, the frequency and severity of these incidents, all occurring essentially over the span of one week, are reflective of chaotic and dysfunctional management.

- **<u>Summary of Incidents from 9/11 to 9/17</u>**: A summary of the incidents reported by DOC staff to the Department's Central Operations Desk for a week (9/11/23 to 9/17/23) provides a tangible example of the type of disorder and violence that people in custody and staff must endure on a daily basis. A list of these incidents is included in Appendix C. Given the concerns about the veracity of the Department's reporting described above, the Monitoring Team cautions that even this long list of incidents may not fully capture all that occurred during this time period.

    - During this one-week period, 145 uses of force, 12 stabbings/slashings, 74 fights among incarcerated individuals, 48 individuals engaged in self-injurious behavior, 3 medical emergencies, 5 individuals that received Narcan, 15 fires, 34 assaults on staff, and 19 serious injuries were reported. One incarcerated individual was left unattended in the recreation yard. A significant amount of contraband was recovered, including weapons, drugs, and cell phones.

- **<u>Serious Injuries Reported on 9/18/23 and 9/19/23</u>**: Over a two-day period, September 18 and 19, 2023, reports of several incidents involving serious injuries revealed a significant delay between the event and the centralized reporting of the event. A total of 19 incidents involving serious injuries that occurred in multiple facilities were first reported to the COD on September 18 and 19, 2023. The date of the COD report was *between 5 and 110 days **after** the incidents occurred*. It does not appear that centralized reporting was made on any of the 19 incidents at the time the incidents occurred. In at least one case, it is unclear whether the incident would have been reported at all without the Monitoring Team bringing the incident to the Department's attention. A list of these cases is included in Appendix D.

- **<u>Three Examples of Serious Injuries from September 2023</u>**: Three incidents from the week of September 11, 2023 illustrate how poor staff practice exacerbates the grave risk of harm to people in custody. Centralized reporting was delayed in each of the three incidents. A summary of each incident is below, and a more detailed summary of each case is included in Appendix E.

17

o On September 11, 2023, on an unstaffed housing unit, an incarcerated individual attacked another individual by throwing hot water. The victim sustained second degree burns to his back and neck and was admitted to the hospital for at least 6 days. The incident was not reported to the COD until 7 days after the incident.

o On September 14, 2023, an incarcerated individual was assaulted by another incarcerated individual on a housing unit. Staff did not immediately assist the victim after he was assaulted. In fact, the staff on post initially walked past the victim without providing assistance. The victim went to his cell and remained unassisted for about 5 hours. He was ultimately taken to the clinic and then transported to the hospital where he was admitted with a fractured nose, injury to the eye, and post-concussive syndrome. The incident was not reported to the COD until 5 days after it occurred and only after the Monitoring Team raised concerns with the Department.

o On September 17, 2023, a staff member opened an incarcerated individual's cell and then immediately left the housing unit. While the unit was unstaffed, the individual was assaulted in his cell. Following the assault, a staff member entered the unit, but did not tour the housing unit or otherwise address the victim. The original staff member returned to his post about 25 minutes after the assault and did not tour the housing unit or appear to address the victim. The victim finally received medical care on September 19, two days after the assault. Medical staff determined that the victim sustained a fracture to the left side of his face. The incident was not reported to COD until 4 days after it occurred.

- **<u>Serious Assault on Staff & Housing Unit Mismanagement</u>**: On August 23, 2023, a troubling incident occurred on a mental observation housing unit at 1:00 a.m., well after lock-in. Incarcerated individuals were milling around the unit and not in bed. An incarcerated individual brutally and spontaneously assaulted an officer on the housing unit. Two officers and a Captain were in the A station at the time of the assault. Another incarcerated individual on the housing unit came to the officer's aid and removed the assailant. A Captain and an officer entered the unit after the assault, and the officer then dispersed OC spray. A more detailed summary of Use of Force Case Example #4 is included in Appendix F.

  o *Public Distortion of the Facts*: This incident is obviously of great concern, and those concerns are compounded by the Commissioner's public distortion of the facts.[26] Following the incident, the Commissioner issued a statement "to commend the second officer who intervened and stopped the attack." In fact, the

---

[26] The Monitoring Team raised similar concerns regarding the Commissioner's statements related to "May 26, 2023 Report Incident #1" in the Monitor's July 10, 2023 Report at pgs. 21 to 23 and Appendix B of that Report.

attack was stopped by another incarcerated individual, not a staff member. The second officer only came on the scene after a second incarcerated individual had pulled off the assailant. Further, the Commissioner's went on to state in response to this incident that "[w]hen people write Op-Eds about how the Department of Correction is overstaffed, they display for the public how uninformed they are on criminal justice issues and display for New Yorkers the full breadth of their ignorance on what it takes to manage a correctional system." It is unclear what, if anything, this tragic incident, has to do with staffing matters, particularly in light of the fact that a Captain and two officers were in the A Station during the incident. As discussed in this report (and others), the Department has a number of significant staffing issues, most of which are the result of dysfunctional mismanagement of staff absenteeism and inefficient and poor deployment practices. It is troubling that such a tragic incident is utilized as an attempt to distort the facts surrounding the Department's staffing.

- **NCU's Security Audits**: The *Nunez* Compliance Unit (NCU) regularly conducts security audits of housing areas, during which NCU staff review the live Genetec video feed from a facility's housing area for an entire day to identify security issues. After each audit, NCU generates a security report with its findings. These audits have revealed poor management of the housing units, infrequent touring, and staff off post. The summary *prepared by NCU* of its Security Audits for two different facilities from December 2021/January 2022 and August/September 2023 are presented side-by-side in Appendix G. The comparison of the audits at both facilities, conducted 20 months apart, reveals little to no improvement in security practices.

- **Site Visit Impressions**: The Monitoring Team's recent site visit to the jails, conducted one week prior to filing this report, revealed dysfunctional management of RESH, widespread disruption to basic services for people in custody (the extent and magnitude of which the Department did not appear to appreciate for its impact on overall operations), problems with staff attendance, and continued deficiencies in basic security practices including sanitation, unsecured doors, inadequate tours, obstructed cell door windows, dismal cell conditions, open drug use, and uncontrolled movement of people in custody. Detailed notes from the site visits to RESH, RNDC, OBCC, and GRVC are provided in Appendix H.

# DEPARTMENT'S WORK TO ADDRESS THE RECENT *NUNEZ* COURT ORDERS

Recent steps the Department has taken to address the various requirements of the *Nunez* Court Orders are outlined below.

- **Department Leadership**: The Commissioner recently appointed a Senior Deputy Commissioner who will serve in the role formerly held by the Chief of Department. The Monitoring Team continues to find that certain Department leadership takes a proactive approach to managing the issues outlined in this report. In particular, the Deputy Commissioner of Administration (Staffing Manager) is making a concerted effort to attend to the myriad staffing issues and to identify creative solutions that are well-grounded in sound correctional practice. The Deputy Commissioner of Security (Security Manager) has demonstrated a strong understanding of the lapses in security practices that must be addressed. In addition, the Deputy Commissioner of Classification, Custody Management and Facility Operations (Classification Manager) continues to demonstrate a strong command of the issues and works to implement concrete solutions. Finally, the *Nunez* Manager has provided much needed support to the Department's efforts (as discussed above).

- **Policy Revisions**: The Department is consulting with the Monitoring Team on revisions to the following policies: Facility Inspections, Key Control, Facility Response Teams, Screening for Special Teams (including ESU), the use of Firearms, Restricted Housing (RESH), Contraband/Searches, Command Discipline, and Command Level Orders for ESU regarding the use of Pepperball Spray, Grenades, and Ballistics. The Department has also reported it is in the process of conducting a holistic review of all policies related to escorts and searches as required by the Court's August 10, 2023 Order.

- **Security Audits**: The office of the Deputy Commissioner of Security initiated security audits to evaluate various security practices. These audits are separate and apart from the security audits conducted by NCU. To date, an audit of one facility has been completed and it found a number of issues that parallel the findings discussed in this report. The Deputy Commissioner of Security also found that the facility leadership's response to the audit was inadequate and is working with them to address the deficiencies the audit identified. Another security audit at a different facility is currently underway.

- **Training Program Revisions**: The Training Division is consulting with the Monitoring Team on revisions to three training programs, Pre-Promotional Training for ADWs, Pre-Promotional Training for Captains, and Training for Special Teams (which includes ESU). The quality of the initial drafts of the training curricula for these programs was

poor and inadequate.[27] The revisions reflect marked improvements to the original submission, but more work remains. The Department reports it continues to refine the curricula.

- **Program for People with Serious Mental Illness Who Commit Serious Violence**: The Deputy Commissioner of Classification, Custody Management and Facility Operations invited the Monitoring Team to participate in weekly multi-agency collaborative discussions to identify a better approach for addressing the security and mental health needs of people in custody who commit serious violence and are struggling with serious mental illness. These meetings are well-organized and reveal significant work is occurring to deepen the collaboration between the Department and CHS.

- **Lock-in/Lock-out**: The Department has started to focus on proper implementation of the evening lock-in (9:00 p.m.). While most facilities still do not complete lock-in on time and do not ensure that individuals in custody remain locked-in, the current focus is a welcomed initiative.

- **Rapid Review Template Revision**: The Department consulted with the Monitoring Team to improve the Rapid Review template and directive regarding the facilities' daily review of use of force incidents. These revisions included streamlining the Rapid Review template to consolidate data entry for identifying staff practice errors and referring staff for discipline; providing additional guidance within the template on what information staff should enter in response to specific prompts; and shifting key determinations on whether incidents were avoidable or probe team deployments were necessary to the Security Operations Office during meetings with facilities. Additionally, a separate Rapid Review template and process was established to review use of force incidents involving the special teams.

- **Control Station Procedures**: The Department provided the Monitoring Team with a proposed notice it intends to post on all Control Station doors regarding the requirements to keep the door secure. The Monitoring Team shared feedback on the content of the notice. The notice includes a similar set of written requirements that were developed in November 2021. The Monitoring Team advised the Department that a plan for monitoring and enforcing the requirements is necessary given the pervasive and long-standing problems in this area and given that prior written policy statements (similar to the notice recently produced) have had little impact.

- **UOF, Security and Violence Indicators**: The Department provided the Monitoring Team with the data it utilizes regarding use of force, security, and violence indicators for its monthly TEAMs meetings (discussed in more detail in the July 10, 2023 Report (dkt. 557) at pgs. 64 to 68). Further, the Department also advised the Monitoring Team of its

---

[27] *See* Monitor's July 10, 2023 Report (at pgs. 84 to 86).

plans to conduct routine meetings related to the findings of use of force investigations. The Monitoring Team has shared feedback with the Department encouraging a deeper focus on the root causes of security breaches, violence, and use of force. The current analyses describe the frequency with which something occurs/location/time of day, but the discussion does not appear to dissect *why* the incidents occur. This type of analysis is essential for an effective preventative strategy. The Monitoring Team has also submitted a number of questions to better understand the framework for the proposed meetings regarding the findings of use of force investigations.

- **Investigation Look-back**: ID, in consultation with the Monitoring Team, identified approximately 470 cases that were closed between July 2022 and December 2022 and must be reevaluated to ensure the robust identification of all staff misconduct. A team of ID leadership (including the Deputy Commissioner and the former Associate Commissioner of ID) was responsible for evaluating these 470 cases. The initial review is complete and cases that merited additional investigation were identified.

- **External Assessment of Procedures for Preventing and Responding to Self-Harm**: The City, Department and CHS are working with Dr. Belavich regarding the external assessment of procedures for preventing and responding to self-harm. Dr. Belavich has provided routine reports to the Monitoring Team on his work and appears on track to complete his assessment by the end of the year.

- **June 13, 2023 Order**:

   - *Communicate Obligations Under the Nunez Court Orders[28] to All Department Leadership and Staff*: On June 15, 2023, the Department sent an email with the required communication, approved by the Monitor, to all staff. The Department mailed the communication to over 2,400 staff who do not have access to email. The Department reported the mailing was completed in August 2023.

   - *Immediate Notification to the Monitor of Serious Events*: The Department has notified the Monitoring Team of in-custody deaths and routinely provides updates on cases where CHS provides a clinical condition letter to an incarcerated individual.[29] The Department has also notified the Monitoring Team of five Serious Hospital Cases, but as noted above, should have provided notice in many more cases but did not.

---

[28] The *Nunez* Court Orders, include, but are not limited to the Consent Judgment (dkt.249), the First Remedial Order (dkt. 350), the Second Remedial Order (dkt. 398), the Third Remedial Order (dkt. 424), the Action Plan (dkt. 465) and any other relevant Orders issued by this court in the matter prior to the issuance of this Order and any Order in the future.

[29] *See* Monitor's July 10, 2023 Report at pgs. 61 to 63.

- o *Production of Information and Consultation*: As noted above, the Department continues to struggle with production of timely and accurate information to the Monitor and consultation often does not occur without reminders from the Monitoring Team.

- o *Department-Wide Remedial Steps to Address the Five Incidents Discussed in the May 26, 2023 Special Report (dkt. 533)*: The Department reported it intended to update existing policies to address individuals who were unclothed and intended to revise procedures to require that an incarcerated individual who is involved in a violent encounter should be seen at the clinic on an "urgent basis." Repeated requests to determine which policies will be updated and to review any revisions have gone unanswered. With respect to installing a preventive barrier, the Department reported on October 3, 2023 that the barrier was installed.

In summary, although a few of the steps articulated above represent new approaches to persistent problems, most of the initiatives the City and Department have identified so far merely focus on revising policy, issuing memorandums and reading teletypes at roll call (which, notably, not all staff attend) or reiterating existing practices or trainings. The Department's efforts have generally been haphazard, tepid, and insubstantial. While a few of the proposals (**if** meticulously developed and properly implemented) could address problems in discrete areas, they will not create the type of culture change and practice improvements that are prerequisite to effective reform.

## CONCLUSION

The Monitoring Team's concerns about the deteriorating conditions in the jail have only intensified since the Monitoring Team issued a Special Report on August 24, 2021 (dkt. 378). These particularly aggravated, unsafe and dangerous conditions have now persisted for over *two years*, and the Department has made little to no progress in improving its security or supervision practice.

Case in point, the Court had to issue two separate orders in the last three months to address particularly important security initiatives that the Department has not attended to and to address the Department's regression with respect to transparency and collaboration with the Monitoring Team. The City and Department's response to the Court's June 13, 2023 and August 10, 2023 Orders has been mediocre, at best, and for the reasons outlined in this report, fail to address the gravity of the current situation with solutions of equal magnitude. Conditions have appreciably deteriorated over the past two months such that the glimmers of progress that had been observed previously are unraveling. In particular, the Monitoring Team notes a lack of urgency to address basic security practices, continued and emerging problems with staff availability, a growing abdication of control on the housing units, a failure to adequately identify misconduct when it occurs (via Rapid Reviews and investigations), lapses in timely internal incident reporting and Monitoring Team notification, and continued efforts to impede transparency and obfuscate the work of the Monitoring Team. All of these are warning signs that reform is falling even further out of reach.

It appears the unsafe and dangerous conditions in the jails, characterized by unprecedented rates of use of force and violence, have become normalized despite the fact that it

is clearly abnormal. Perhaps, most concerningly, is the disparity between the Monitoring Team's findings and the administration's assessment of the current state of affairs. The violence and conditions in the jails are in many ways worse than when the Consent Judgment went into effect. Rather than acknowledging this and committing to genuine sustainable reform, this administration continues to attempt to normalize the violence and harmful conditions and espouse excuses ranging from blaming previous administrations, or stating the world is a different place than when the Consent Judgment went into effect, to stating that other jail systems are grappling with a similar amount of violence and destabilization. While there may be truth in those statements, it does not change, or even mitigate, the fact that the City and Department have not taken the necessary steps to address the issues and ongoing levels of very real harm in *this* system. This point of view is alarming because it attempts to distort the contextual perspective and the current reality, and if the City and Department cannot own what is occurring, then meaningful progress and compliance with the *Nunez*-related orders cannot occur in earnest.

The City and Department have repeatedly and consistently demonstrated they are incapable of effectively directing and managing the multilayered and multifaceted reform effort, and continuing on the current path is not likely to alter the present course in any meaningful way. The Monitoring Team remains ready to serve as a resource to support the development of a structure that is capable of this task.

# APPENDIX A:
# EVENTS AFTER LOCK-IN

## *Events After Lock-In Reported between September 11 and 17*

Below is a description of a variety of incidents reported by the Department between September 11 to 17 to the Central Operations Desk that occurred after the lock-in (2100 to 0600 hours). During this time, incarcerated individuals should be locked within their cells in celled housing units or remain within their beds in dormitory-style housing units.

- **September 10, 2023**

  o **Use of Force Incident #1:** On 9/10/23 at 11:32 PM, a person in custody ("PIC") threw an unknown substance from the top of his cell at the officer's back. PIC motioned to throw another liquid substance towards the officer, then the officer deployed OC spray into the cell with no staff or PIC injuries reported. This incident was reported on 9/11/23.

- **September 11, 2023:**

  o **Use of Force Incident #2:** On 9/11/23 at 3:27 AM in a housing area, four PICs were fighting when the officer gave orders to stop and warned that OC spray would be used. PICs refused to comply, and the officer deployed OC spray with no staff or PIC injuries reported.

  o **Other Incident #1:** On 9/11/23 at 10:35 PM in a housing area, a suicide attempt occurred in which PIC reported to the officer that he swallowed 15 unknown pills. PIC was referred to the hospital and mental health.

  o **Use of Force Incident #3:** On 9/11/23 at 11:12 PM, Officer observed PIC with a bedsheet around his neck tied to a light fixture. PIC refused the officer's commands to remove the sheet, and the officer deployed OC spray with no staff or PIC injuries reported. This incident was reported on 9/12/23.

- **September 12, 2023:**

  o **Other Incident #2**: On 9/12/23 at 12:11 AM in housing area, PIC splashed officers with an unknown liquid substance unprovoked. No staff or PIC injuries were reported.

  o **Other Incident #3:** On 9/12/23 at 12:17 AM a PIC manipulated the cuffing port of his cell and splashed the officer with an unknown liquid substance to the upper torso and facial area. No PIC or staff injuries were reported.

  o **COD Incident #1:** On 9/12/23 at 4:30 AM in a housing area, a PIC began punching the station window unprovoked. PIC sustained fractured and swollen fourth and fifth finger metacarpals and was referred to mental health services. This incident was reported on 9/15/23.

  o **Other Incident #4:** On 9/12/23 at 10:27 PM in housing area, officer observed PIC ignite a still fire using paper and an unknown ignition item inside his cell. Officer put out the fire with a fire extinguisher. No staff or PIC injuries reported. Incident was reported on 9/13/23.

- o **Other Incident #5:** On 9/12/23 at 11:11 PM in a housing area, PIC lit paper on fire using an unknown ignition source and threw it from his food slot into the tier. Officer used a fire extinguisher to put out the fire. No staff or PIC injuries reported. Incident was reported on 9/13/23.

- **September 13, 2023**

  - o **COD Incident #2:** On 9/13/23 at 5:14 AM, Officer observed two PICs enter and exit the cell of another PIC. The PIC in the cell sustained a foreign metallic body protruding from the skin below the right eye, as well as bruises and tenderness to the right eye. The housing area was placed on lockdown pending this investigation.

  - o **Other Incident #6:** On 9/13/23 at 9:11 PM in a housing area, PIC asked officer for water and then threw an unknown liquid substance through the food slot. Officer was struck in facial and upper torso area. No staff or PIC injuries reported.

  - o **COD Incident #3 & Use of Force Incident #4:** On 9/13/23 at 11:20 PM, PIC was stabbed by another PIC and officers used OC spray on both PICs to stop the incident. PIC sustained a right interior chest area deep laceration 3 inches long, right upper back/chest deep laceration 3 inches long, and multiple body and scalp minor lacerations with controlled bleeding. The housing area was placed on lockdown during this investigation. This incident was reported on 9/14/23.

- **September 14, 2023**

  - o **Other Incident #7:** On 9/14/23 at 1:15 AM in the main intake (GRVC), Officer observed PIC with institutional pants tied around his neck affixed to the top of the pen. The officer untied PIC and escorted him to the clinic. PIC was referred to mental health, with no injuries reported.

  - o **Use of Force Incident #5:** On 9/14/23 at 9:00 PM in a housing area, PIC punched another PIC in the face, knocking him down to the floor, and continued to assault the PIC against officer's orders until they used soft hand techniques to separate the PICs. PIC sustained abrasion tenderness to the scalp, a laceration to the left side of the lip, and post concussive syndrome.

  - o **Other Incident #8:** On 9/14/23 at 11:51 PM in a housing area, Officers observed an obstruction in PIC's cell window. PIC threw an unknown liquid substance at officers when they opened the door. No pic injuries reported, staff injuries pending. Incident was reported on 9/15/23.

- **September 15, 2023**

  - o **Use of Force Incident #6:** On 9/15/23 at 12:08 AM, PIC removed the bottom part of his bed and struck another PIC in the upper torso. When the PIC who was struck advanced toward the other PIC, the officer deployed OC spray, with no staff or PIC injuries reported.

  - o **Use of Force Incident #7:** On 9/15/23 at 2:40 AM, Officer observed PIC with a sweatshirt tied around his neck affixed to the back of a camera. PIC struggled with officers while they confiscated the sweatshirt and used cuffing procedures,

which resulted in officers giving a warning and then deploying OC spray. PIC sustained facial laceration, and no staff injuries were reported.

- o **Use of Force Incident #8:** On 9/15/23 at 2:47 AM, Officer observed PIC with a string around his neck attached to the bedframe. After the officer removed the string and began to escort PIC to the vestibule, PIC then placed a plastic garbage bag over his own head. When the officer removed the garbage bag and began to escort PIC to intake, PIC then resisted escort until control holds were used. No staff or PIC injuries reported.

- o **Other Incident #9:** On 9/15/23 at 11:25 PM in housing area, Officer observed PIC in distress and throwing up in the bathroom. Officer administered one application of Narcan. EMS was activated, but no information on PIC injuries was provided. Incident was reported on 9/16/23.

- **September 16, 2023**

  - o **Use of Force Incident #10:** On 9/16/23 at 1:30 AM, PIC did not comply with the officer's orders to enter his assigned cell and instead advanced aggressively toward the officer. Officer deployed OC spray twice and used upper body holds to gain control of the PIC, with no staff or PIC injuries reported.

  - o **Other Incident #10:** On 9/16/23 at 5:42 AM in the intake area, PIC was observed with a t-shirt tied around his neck and the other side attached to the window. No PIC injuries reported, and PIC was referred to mental health.

  - o **Use of Force Incident #11:** On 9/16/23 at 9:56 PM, two PICs were involved in a fight and did not comply with the officer's commands to stop. The officer warned that OC spray would be used, then deployed OC spray, with no staff or PIC injuries reported.

  - o **Other Incident #11:** On 9/16/23 at 11:13 PM in a housing area, PIC used an unknown item to ignite an institutional shirt and threw it out of the food slot onto the tier. Officer put out the fire with a fire extinguisher. No staff or PIC injuries reported. Incident was reported on 9/17/23.

# APPENDIX B:
# UNREPORTED STABBING/SLASHINGS

### *Stabbing/Slashing Incidents that were Initially Not Reported*

The Monitoring Team identified the five stabbing/slashing incidents that were reported in part, but which failed to properly categorize the stabbing/slashing that occurred during the event. Specifically, the Monitoring Team's video review of incidents revealed that five stabbings/slashings occurred, but were not reported to the Central Operations Desk as such. In each case, the initial report of the incident was classified as a use of force or serious injury and failed to document a stabbing or slashing that was evident via the Monitoring Team's review of objective evidence (*e.g.*, video footage or injury reports). A summary of these five cases and the Department's position on whether they should be reported as a stabbing/slashing is outlined below.

- **January 2, 2023**: In an Enhance Supervision Housing area ("ESH"), several persons in custody ("PIC"s) were standing in front of a the housing area vestibule door. A video review showed one PIC gets behind another PIC and make a rapid slashing motion to the PIC's face. The perpetrator then runs down the housing area with what appears to be a small sharp object. The perpetrator then wraps it in a piece of paper to conceal it. The ID investigation noted that in the injury report, Medical Staff found the victim suffered a "superficial scratch" and with "visible injuries". This incident was reported as a use of force, but the Department reported "[t]his is not a slashing according to DOC's policy. Additionally, superficial scratches should not be categorized as a serious injury."

- **January 2, 2023**: In a celled Young Adult housing area, several PICs were walking down the tier. One PIC suddenly turned and began assaulting another PIC. Immediately, additional PICs join the assault. Several PICs can be seen making swiping and stabbing motions with weapons in their hands. The ID investigation noted that in the injury report, Medical Staff found the victim sustained "a 3 cm bilateral laceration to both ears, a 1.5 cm laceration to his posterior scalp, 4 cm superficial scratch to his left cheek, (2) 6 cm superficial lacerations to his lower back and 2 linear 4 cm superficial wounds to his right forearm". The Department reported the incident "was a slashing in [Redacted Facility] but was called in as a [use of force]. It occurred on the tier causing multiple injuries [and multiple] individuals were placed in ESH as a result of the incident. On January 24, 2023 it was updated as a serious injury. This should have been reported as a slashing at the time of the incident." On October 2, 2023, almost nine months after the incident occurred, the Department advised the Monitoring Team that it reported the incident as a slashing.

- **January 25, 2023**: In a dorm housing area, two PICs were involved in a fight in the dayroom. A video review showed one of the PICs making stabbing motions with a metal object in his hand while the victim was on the ground. The ID investigation noted that in the injury report, Medical staff found the victim of the assault sustained "superficial

abrasions to his back, right upper back, and two at the right lower back", and there were "visible injuries." This incident was reported as a use of force, but the Department reported "[t]his is not a slashing according to DOC's policy. Additionally, abrasions should not be categorized as a serious injury."

- **January 27, 2023:** In an Enhance Supervision Housing area, one PIC was seated at a dayroom table when another PIC approached him from behind and made a slashing motion to the right of his neck. The ID Investigation noted that in the injury report, Medical Staff found the victim suffered a "superficial scratch to the right side of his neck and was treated with local wound care". This incident was reported as a use of force, but the Department reported "[t]his is not a slashing according to DOC's policy. Additionally, superficial scratches should not be categorized as a serious injury."

- **June 8, 2023:** In a celled Young Adult housing area, several PICs can be seen standing in a tier in front of a closed cell door. Shortly thereafter, the cell door opens, and as the PIC inside steps out, he is violently assaulted by several PICs and pushed back into his cell. A review of the injury report noted medical staff found the victim sustained "2 lacerations wounds" to the face, "3cm on the left and 5 cm on the right side." The injury report noted treatment in the form of cleaning/dressing wound and a referral for urgi-care for repair. The Department reported this incident "was called in as a Serious Injury in RNDC. The incident occurred in the cell. The victim sustained sutures and lacerations. [Multiple] individuals were placed in ESH. This should have been reported as a slashing at the time of the incident." On October 2, 2023, almost four months after the incident, the Department advised the Monitoring Team that it reported the incident as a slashing.

# APPENDIX C:
# DOC REPORTED INCIDENTS
# SEPTEMBER 11 TO 17, 2023

### *Reported to COD from September 11 to 17, 2023*

Outlined below is a summary of all incidents reported by DOC staff to the Central Operation Desk, the electronic centralized reporting repository for the Department.  The list below includes all incidents *reported* between September 11 and 17, 2023. At the end of the document is a subset of these incidents that occurred at RESH.

- 145 Uses of Force
    - Most uses of force were the result of refusals by persons in custody ("PIC") to comply and fights between incarcerated individuals.
    - 2 of these incidents were allegations of use of force by staff reported by incarcerated individuals.
- 12 stabbing/slashing incidents.
    - One person-in-custody sustained a deep laceration 3 inches long to his chest area and a deep laceration 3 inches long to his upper back along with multiple lacerations all over his body.
    - One person in custody sustained a 5cm laceration to his forehead.
    - A weapon or weapons were recovered in 6 of the 12 incidents.
- 74 fights between incarcerated individuals, 60 of which resulted in uses of force by staff.
- 15 incidents where incarcerated individuals started fires.
    - The source of ignition was not identified or recovered in 14 of the 15 incidents. There was one incident where the source of the ignition was identified. In this case, it was batteries.
    - 10 of the 15 fires were started in RNDC.
- 48 incidents where incarcerated individuals engaged in self-injurious behavior.
    - Of these 48 incidents, incarcerated individuals engaged in suicide attempts in 23 incidents.
    - 5 incidents of self-injurious behavior were reported days after the incident occurred:
        - In one incident, a person in custody engaged in a suicide attempt on 8/9, but the incident wasn't reported to the COD until 9/11.
        - In one incident, a person in custody engaged in a suicide attempt on 8/13, but the incident wasn't reported to the COD until 9/16.
        - In one incident, a person in custody engaged in self-injury on 8/18, but the incident wasn't reported to the COD until 9/16.
        - In one incident, a person in custody engaged in self-injury, but the incident wasn't reported to the COD until 9/13.

- In one incident, a person in custody engaged in self-injury, but the incident wasn't reported to the COD until 9/15. The individual fractured two fingers after punching the A station window.
  - After one suicide attempt, the incarcerated individual was sent to Jacobi Hospital.
  - In one incident, staff used force to stop a suicide attempt. The PIC sustained a facial laceration after staff used multiple control holds and a takedown.
- 19 incidents were reported as "Serious Injury to Inmate."
- 5 incarcerated individuals were administered Narcan over 4 separate incidents.
- 3 medical emergencies were called for incarcerated individuals in medical distress.
  - In one incident, the individual was incoherent and banging his head on the floor and wall. He sustained swelling to both eyes, a laceration on the elbow, swelling to the face, and post-concussive syndrome.
- 37 lockdowns.
  - 17 of these lockdowns lasted 5-8 uninterrupted hours.
- 34 assaults on staff.
  - In 18 of these incidents, incarcerated individuals splashed officers with unknown liquids or spit at officers.
    - In one incident, a staff member struck an incarcerated individual in the face after the individual spat at the officer.
  - In 5 incidents, incarcerated individuals pushed officers.
    - In one incident, an incarcerated individual was taken to the ground and sustained a lip contusion, swelling in his shoulder, and tenderness in one finger.
    - In another incident, the incarcerated individual left the housing area unauthorized after pushing the officer.
  - In 4 incidents, incarcerated individuals punched or struck officers.
  - In 2 incidents, incarcerated individuals sexually assaulted staff members.
  - In 2 incidents, incarcerated individuals hit officers with food trays.
    - In one incident, the staff member sustained a laceration to the forehead.
  - In 1 incident, an incarcerated individual kicked an officer's leg.
  - In 1 incident, an incarcerated individual threw a garbage pail, hitting an officer's head.
  - In 1 incident, an incarcerated individual grabbed a CHS staff member's hand.
- 2 staff were arrested while off duty.
- 1 reported sexual harassment allegation.
- 2 incidents where incarcerated individuals  engaged in property destruction.

35

- - In one incident, the individual used the damaged property to engage in self-harm.
  - In the other incident, the individual broke a partition and threw pieces of it at staff
- Other incidents:
  - In one incident, an incarcerated individual was left unattended in a recreation yard. He went into another recreation yard and tried to enter that building. No force was used to return him to his housing area.
  - DOC staff discovered $41,815.30 worth of spoiled packaged potatoes.
  - There were 4 instances where staff lost or were not in possession of their ID card, shield, or parking placard.
  - While staff were driving in the City, a DOC transportation van window fell out and shattered.
  - There were 3 minor collisions involving DOC vehicles.
    - In 1 incident, 23 incarcerated individuals were onboard at the time of the collision.
- Contraband recovery:
  - The following items were recovered from planned searches:
    - 2 1.25-inch black ceramic scalpel blades
    - 1 3-inch hobby blade
    - 1 1-inch scalpel blade
    - 2 iPhones
    - 1 iPhone charger
    - 111 sheets of paper soaked in methamphetamine
      - 109 of these papers were discovered in one PIC's cell in RESH
    - 3 sheets of paper soaked in K-3
    - Synthetic amphetamine
    - 2 methamphetamine pills
    - 1 book soaked in synthetic cannabinoids
  - The following was recovered in the mail:
    - 2 black ceramic razors
    - 9 sheets of paper soaked in cocaine
    - 34 pieces of paper soaked in fentanyl
    - 2 envelopes soaked in fentanyl
    - 2 sheets of paper soaked in methamphetamine
    - 1 Debit Card

- o The following items were recovered during random searches:
  - ▪ 6 $1 bills soaked in methamphetamine
  - ▪ 4 color pictures soaked in methamphetamine
  - ▪ 11 Bible pages soaked in methamphetamine
  - ▪ 9 color pictures soaked in fentanyl
  - ▪ 3 pages of written notes soaked in fentanyl
- o The following items were recovered in the visitor areas. In all 5 instances, the visitor was arrested for smuggling contraband.
  - ▪ 36.3 grams of marijuana
  - ▪ 19 strips of suboxone
  - ▪ 9 grams of K2
  - ▪ 7 rolling papers
  - ▪ 29.4 grams of tobacco
- o The following items were recovered following fights or stabbings/slashings between incarcerated individuals:
  - ▪ 1 10-inch piece of sharpened metal
  - ▪ 2 7-inch pieces of sharpened metal
  - ▪ 1 5-inch piece of sharpened metal
  - ▪ 1 1-inch ceramic razor
  - ▪ 2 0.5-inch ceramic blades

RESH – Outlined below are a subset of the above incidents reported to the COD between September 11 and 17, 2023 that occurred in the Enhanced Supervision Housing at RMSC ("RESH").

- • 10 uses of force were reported in RESH.
- • 5 assaults on staff were reported in RESH.
  - o In 4 incidents, incarcerated individuals splashed officers with an unknown liquid or spit at officers.
  - o In 1 incident, an incarcerated individual struck an officer's torso.
- • 2 stabbings/slashings were reported in RESH.
  - o Ceramic blades were recovered in both incidents.
- • There were 4 incidents of self-injurious behavior.
- • There were 10 lockdowns, 3 of which lasted at least 7 hours.
- • The following items were recovered from planned searches:

- o 2 1.25 inch black ceramic scalpel blades
- o 109 sheets of paper soaked in methamphetamine
- o 3 sheets of paper soaked in K-3
- o Synthetic amphetamine
- There were 2 fires. The source of ignition was not recovered in either incident.
- 1 staff member was arrested off-duty.
- One incident encapsulates many of the management issues within RESH:
  - o While one incarcerated individual was engaging in a suicide attempt, another individual in a RESH desk manipulated his restraints and managed to get out, slashing another individual who was restrained at a desk. Injuries are still pending.

# APPENDIX D:
# REPORTING OF SERIOUS INJURIES
# ON SEPTEMBER 18 & 19, 2023

### _Serious Injuries Reported to the_
### _Central Operations Desk between September 18 and 19, 2023_

Outlined below is a summary of all serious injuries _reported_ by DOC staff to the Central Operation Desk, the electronic centralized reporting repository for the Department.

- _September 18, 2023_: There were 10 COD reports of serious injuries on this day. At least **8** of **10** incidents involved a PIC who sustained a serious injury, but the underlying incident had not been reported at the time it occurred and should have been.
  - A PIC fight was reported 123 days after it occurred in which a PIC sustained a 2 cm superficial laceration to the left cheek and an 8 cm scratch to the left cheek.
  - A PIC injury was reported 110 days after it occurred in which a PIC burned his hand while carrying a pot filled with hot water, resulting in a blistering burn to the left hand.
  - A PIC injury was reported 25 days after it occurred in which a PIC bumped his head in his cell, resulting in a 1.5 cm laceration to the forehead requiring sutures.
  - A PIC injury was reported 13 days after it occurred in which a PIC cut his finger on a cuffing port, resulting in a 1 cm superficial laceration to the left inner thumb requiring cleaning and dressing in SteriStrips and Dermabond.
  - A PIC assault was reported 7 days after it occurred in which another PIC threw hot water on the PIC's upper torso, resulting in a blistering burn to the facial area.
  - A PIC fight was reported 5 days after it occurred, in which a PIC sustained post-concussive syndrome and a head injury requiring CT/MRI.
  - A PIC assault was reported 5 days after it occurred in which a PIC was placed in a headlock and punched by other PICs, resulting in post-concussion syndrome requiring CT/MRI.
  - A PIC assault was reported 2 days after it occurred, in which a PIC sustained a nasal bone fracture with displacement, right orbital fracture, and right maxillary fracture (face).
  - A PIC injury was reported the same day it occurred in which a PIC hurt his hand while moving an institutional fan, resulting in lacerations to the 2nd and 4th digital fingers of the right hand.
  - A PIC assault was reported the same day it occurred in which a PIC was punched in the face by another PIC and hit his head against the wall, resulting in a 2.5 cm laceration to the left side of the forehead.
- _September 19, 2023_: There were 12 COD reports of serious injuries on this day. At least **11** of **12** incidents involved a PIC who sustained a serious injury, but the underlying incident had not been reported at the time it occurred and should have been.

o A PIC injury from a fight was reported 42 days after it occurred, resulting in a fracture, post-concussive syndrome, and head injury requiring CT/MRI.

o A PIC fight was reported 34 days after it occurred in which a PIC sustained a 2 cm laceration to the upper eye lid requiring an x-ray.

o A PIC injury was reported 34 days after it occurred in which a PIC fell while playing basketball, resulting in a fractured ankle.

o A PIC fight was reported 34 days after it occurred in which a PIC sustained a 2 cm laceration on the left cheek repaired with sutures, and in addition required a left finger x-ray.

o A PIC fight was reported 32 days after it occurred, in which a PIC sustained right eye tenderness and redness with blurred vision and a left upper lip through laceration 1/2 cm long and 1/2 cm deep.

o A PIC fight was reported 28 days after it occurred in which a PIC sustained a deep laceration to the left temple requiring an x-ray.

o A PIC injury was reported 25 days after it occurred in which a PIC slipped and fell in the shower, resulting in post-concussive syndrome and a head injury requiring CT/MRI.

o A PIC fight was reported 11 days after it occurred in which a PIC sustained 2 dislodged teeth from the lower jaw, a missing lower front tooth, and a loose 2nd tooth.

o A PIC assault was reported 5 days after it occurred in which a PIC was punched by another PIC and fell to the floor, resulting in a fractured nose, injury to the eye, and post-concussive syndrome.

o A PIC fight was reported 4 days after it occurred in which a PIC sustained post-concussive syndrome and a head injury.

o A PIC injury was reported 2 days after it occurred in which a PIC slipped and fell in the bathroom, resulting in a deep wound with a jagged edge 1 cm to the left lateral eyebrow area requiring sutures, and multiple scratches to the right exterior leg.

o A PIC injury was reported the same day it occurred in which an officer observed a PIC out of his wheelchair on the floor and bleeding from his head, requiring a CT scan and 6 sutures.

# APPENDIX E:
# THREE EXAMPLES OF SERIOUS
# INJURIES FROM SEPTEMBER 2023

## *Summary of Illustrative Example #1*



On September 11, 2023, in a New Admissions dormitory unit at EMTC, PICs were out in the housing or resting in their beds. A review of video confirmed there was no B Post officer on the post, so the individuals were unsupervised. A PIC was sitting in his bed when another PIC approached him with a green cup and dumped hot water on the PIC. The victim immediately stood up, removed his shirt, and showed signs of distress and pain. The perpetrator then began sweeping the floor as if nothing happened. About a minute later, an officer entered the housing area and escorted the victim to a vestibule, where a Captain arrived and took the victim to the clinic. About 8 minutes later, the perpetrator was removed from the area. The victim's injury report indicates that he was seen by my medical staff about 30 minutes after the incident. Medical staff found that the victim had second-degree burns to his back and neck. EMS was activated to transport the victim to the hospital, where he remained for at least six days. An incident report was also completed on September 11, 2023, at 2:40 p.m. by the officer assigned to the housing area. However, for unknown reasons, the incident was not called into COD at the time it occurred.  On September 13, 2023, the Department received a second report from CHS (the first was the injury report on September 11) that the victim sustained serious injuries.  On September 18, 2023, the incident was reported for the first time to the Central Operations Desk. The Department did not notify the Monitoring Team of this incident as required by the June 13, 2023, Order, despite the fact that the individual sustained serious injuries and was admitted to the hospital.

### *Summary of Illustrative Example #2*

On the morning of September 14, 2023, in a housing unit with staff present, one PIC ran up behind another PIC and violently blindsided him with a hard impact strike to his head and thereafter knocked him down causing the PIC to hit his head face first to the concrete floor. (Screenshot 1).



*Screenshot 1*

When this occurred, the B-post officer was on the upper tier and appeared to look over the railing at this incident which occurred on the lower tier. The officer then continued to walk down the upper tier, farther away from the area where the assault occurred. The victim struggled to stand, but eventually stood up and walked over to the stairwell, leaning against the wall along the way and dragging his feet in an unusual manner.

He collapsed on the stairwell, where he remained for approximately 9 minutes. While the injured PIC was on the stairwell, approximately 4 minutes after the assault, the B-post officer walked down the stairs and stepped directly around the PIC without hesitation or acknowledgment of him (Screenshot 2).



*Screenshot 2*

At least one other PIC appeared to speak with the victim and then with the B-post officer after this occurred. The B-post officer approached the victim 6 minutes after the assault and appeared to speak to him on the stairwell before he returned to the B-post desk where he made hand motions directing the A station officer to make a phone call. Neither the A station nor B station officer provided aid to the injured PIC. The injured PIC eventually stood up on his own and walked with visible blood around the neck of his shirt and on his pants (Screenshot 3) to the A station window, then to his cell, where he shut the door and remained for the next five and a half hours.



*Screenshot 3*

While the victim was in his cell, the original B-post officer wrote in a logbook and entered the A station with the logbook and a Captain, there was a shift change resulting in a change of staff, and multiple staff conducted tours throughout the housing unit. Despite the multiple staff and multiple tours in the housing area, only once did staff speak with the injured PIC inside his cell, and otherwise, they merely walked by the cell without even looking in the window. Approximately 5 hours and 40 minutes after the assault, an officer and Captain let the victim out of his cell and escorted him out of the housing area. At this point, the PIC's eye was visibly swollen shut (Screenshot 4).



*Screenshot 4*

The PIC was taken to the clinic and then transported to the hospital by EMS to treat his injuries. On the day of the incident, September 14, 2023, a captain submitted a written report regarding the individual's injuries, but the incident was not called into the COD. The Department's injury to inmate report dated September 14, 2023 stated "Examination shows swelling and tenderness to right forehead, right orbital and left neck laterally. The right eyelid is

closed. There is dry blood in nostrils and tenderness at right posterior lateral upper neck." The captain's incident report notes the visible injuries and blood on the injured PIC and states that Genetec was reviewed and revealed the initial assault. On September 15, 2023, the Department's Hospital Outpost Report, disseminated to Department leadership, noted the individual had been admitted to the hospital. It was ultimately reported that the PIC sustained a fractured nose, injury to the eye, and post-concussive syndrome. On September 19, 2023, the Monitoring Team advised the Department that it received an allegation that the PIC had been assaulted and was in the hospital. Only then, a few hours after the Monitoring Team's notification, and five days after the incident, did the Department report the incident to the COD. It is unclear why the incident was not reported to COD until September 19, 2023.  The Department also did not notify the Monitoring Team of this incident as required by the June 13, 2023 Order, § I. ¶ 1.

### *Summary of Illustrative Example #3*

On September 19, 2023, the B-post officer entered a GRVC housing unit and unlocked a cell door, then walked away from the cell and out of the housing unit as multiple PICs entered the cell (Screenshot 1).



*Screenshot 1*

Within moments, there appears to be a physical altercation between multiple PICs inside the cell while one PIC opens and shuts the door to let PICs in and out of the cell. The physical altercation appears to last approximately a minute and a half (Screenshots 2 and 3).




*Screenshot 2*                    *Screenshot 3*

Before and after the incident, the B-post officer was not present within the housing unit, and PICs can be seen freely entering and exiting cells without staff assistance. Approximately 13 minutes after the altercation inside the cell concluded, a different officer entered the housing area, briefly spoke with the PICs in the common area and exited the housing area again without touring the housing area or checking any cells. Another 13 minutes later and approximately 25 minutes after the assault occurred, the B-post officer who opened the cell where the assault occurred reentered the housing unit, eventually sitting back down at the B-post desk. For the remainder of the 30 minutes of video available to the Monitoring Team, the B-post officer remained in the housing unit but did not check all the cells or the cell where the assault occurred.

On September 19, 2023, over 2 days after the assault, the victim was taken to the clinic for medical treatment, where medical staff noted the victim sustained a fracture to the left side of his face.  On September 21, 2023, the ADW on duty reported reviewing the incident on Genetec.  On September 22, 2023, the incident was reported to the COD.

# APPENDIX F:
# USE OF FORCE CASE EXAMPLE #4

*Use of Force Case Example #4*

On August 23, 2023, a life-threatening incident occurred on a mental observation housing unit at 1 a.m., well after lock-in. During this time there were multiple PICs standing in the vestibule of the housing unit and speaking with one another, passing by an officer seated at a desk in the vestibule. In the A station, there was a supervisor and at least two officers present.

At 1:19 am, one PIC began abruptly assaulting the officer seated at the desk in front of the A station window, punching his head and knocking him to the ground, then repeatedly slamming his head and upper torso against the ground. About 10 seconds into the assault, the officer's body stopped moving. At this same moment, another PIC who had been standing nearby intervened and began to pull the assaultive PIC away from the officer as the assaultive PIC began kicking towards the officer's head (screenshot 1).



*Screenshot 1*

After the intervening PIC pushed the assaultive PIC to the wall, a Captain arrived (screenshot 2).



*Screenshot 2*

The captain appeared to try and grab the assaultive PIC, but another officer quickly ran in behind him and immediately dispersed OC spray at the assaultive PIC's face (screenshot 3), also making contact with the intervening PIC who came to the aid of the officer.



*Screenshot 3*

After a copious amount of OC spray was deployed, the assaultive PIC immediately ran back into the housing unit and was not immediately separated from the other PICs in the unit. Within a few minutes, the Captain and officer entered the housing area. The assaultive PIC immediately turned around to be cuffed by the captain and officer, who then escorted him out of the housing area. The injured officer remained unresponsive on the floor and staff did not immediately provide aid. At one point, staff lifted the unresponsive officer's torso and lowered him back to the ground. Another officer stayed watching over the unresponsive officer while the captain ordered other PICs from the housing area to keep away. Around 4 minutes later, the injured officer began moving his legs and other correctional staff arrived to provide aid to the injured officer on the floor. Approximately 8 minutes after the assault, medical staff arrived and escorted the injured officer out of the housing area on a stretcher. All uniformed staff exited the housing area, leaving the B-post inside the housing area unmanned. The injured officer arrived at the clinic approximately 20 minutes after he was assaulted and was then transported to EMS.

# APPENDIX G:
# NUNEZ COMPLIANCE UNIT
# AUDIT RESULTS

## <u>*Nunez Compliance Unit Security Audits – Side by Side Comparison*</u>

The Nunez Compliance Unit (NCU) conducts security audits of housing areas, during which NCU staff review the live Genetec video feed from a facility's housing area for an entire day to identify security issues. After each audit, NCU generates a security report with its findings. The summary *prepared by NCU* of its Security Audits for two facilities from December 2021/January 2022 and August/September 2023 are presented side-by-side.

| Facility 1 Audit: January 20 to 21, 2022 | Facility 1 Audit: August 6 to 7, 2023 |
|---|---|
| *NCU conducted an audit of a housing unit at Facility 1 for a 24 hour period spanning January 20 to 21, 2023.  NCU summarized its findings by stating the following*: | *NCU conducted an audit of a housing unit at Facility 1 for a 24 hour period spanning August 6 to 7, 2023.  NCU summarized its findings by stating the following*: |
| "Some of the ongoing issues that have been referenced by the Nunez Monitor were apparent. The security practices that were outlined in recent teletypes did not appear to be adhered to consistently:<br><br>• Cell doors at times remained unsecured and incarcerated individuals freely entered cells together.<br><br>• Incarcerated individuals were not secured in their respective cells during the change of tours.<br><br>• Individuals congregated in vestibules frequently.<br><br>• Supervisors were observed in [location redacted] only twice throughout the 24-hour period.<br><br>A few positives takeaways were:<br><br>• For the staff on post in [location redacted] -consistent tours conducted.<br><br>• When supervisors did conduct tours, they appeared to address door security in respective housing areas." | "The following are NCU's findings throughout the 24-hour period:<br><br>• Cell doors observed unsecured and incarcerated individuals freely entered cells throughout the audit.<br><br>• Multiple PICs observed in one cell at different times throughout audit.<br><br>• Multiple obstructions to cell lock mechanisms observed.<br><br>• PICs were observed openly smoking contraband; staff did not address the issue.<br><br>• Officers did not remove obstructions or secure doors while conducting tours.<br><br>• Cell door security inspections were not thoroughly conducted during 21:00 hour lock-in procedure or during midnight tour. PIC were observed exiting their cells after lock-in.<br><br>• Supervisors were present nine (9) times within twenty-four hours and utilized watch tour pipes while touring" |

| Facility 2 Audit: December 21, 2021 | Facility 2 Audit: September 5 to 6, 2023 |
|---|---|
| *NCU conducted an audit of a housing unit at Facility 2 for a 24 hour period on December 21, 2021 NCU summarized its findings by stating the following*: | *NCU conducted an audit of a housing unit at Facility 2 for a 24 hour period on September 5 to 6, 2023 NCU summarized its findings by stating the following*: |
| "[. . . ] many of the ongoing issues that have been referenced by the Nunez Monitor were apparent. The security practices that were outlined in recent teletypes did not appear to be adhered to consistently: | "[. . .] The following are NCU's findings throughout the 24-hour period. |
| • Cell doors remained unsecured and incarcerated individuals freely entered cells together without any intervention from staff. [Housing Unit] is an area where new cells doors have been installed. | • Several cell doors were observed unsecured throughout the audit period. Multiple individuals would enter and exit each others' cells. |
| • No staff on post consistently/unmanned posts despite different officers going in and out of the area for security, services, and escorts | • 21:00 lock in not enforced, individuals observed exiting cells past the lock in hour. Multiple individuals observed in one cell several hours past 21:00 lock in. |
| • The doors leading to the vestibule were unsecured and allowing incarcerated individuals routinely to go in and out of the housing area | • Officers observed off-post throughout the audit period. |
| • Lock-in was not enforced as no staff were on post." | • While tour wands were observed being utilized by the Officers, on several occasions the officers failed to check doors/look inside the cells while touring. |
| | • Supervisors were in the area a total of five (5) times throughout the 24-hour period. They did not utilize watch tour wands while touring. There was no supervisor observed on the 3X11 tour." |

56

# APPENDIX H:
# SEPTEMBER 27, 2023
# SITE VISIT NOTES

*Notes from Site Visit – September 27, 2023*

▪ **RESH**

- **Closed Restricted Housing Area**

  - Observed new metal backings, which appear to be useful to protect PICs seated. Unit will open [date].

- **Level 1 Restricted Housing Area**

  - No PICs in chairs. It was reported PICs were out at 7 but programming staff did not arrive, so they went back in their cells.

  - Some PICs were showering. Most PICs were in cell/sleeping.

- **Level 2 Restricted Housing Area**

  - About 7 PICs were out.

  - Programming was in the area.

  - PIC in Cell [#] was openly smoking inside his cell.

  - Cell doors obstructed/food slots open and manipulated.

  - PICs had many complaints re: structure/consistency of unit. Complaint about amount of time locked in. New PICs complain about 24-hour mandatory lock-in when they get to the area.

  - Many PICs did not have tablets.

- **Level 2 Restricted Housing Area**

  - B post officer reported working OT and is very tired.

  - PIC in Cell [#] actively smoking.

  - Top tier PICs were out and receiving programming.

  - PICs in bottom tier were complaining about the structure.

▪ **RNDC**

- **Intake**

  - 3 PICs in intake (Only 1 in ITS. Other 2 are not in ITS because it was reported that 1 is going upstate and 1 just arrived from out of state).

  - **Young Adult General Population Maximum Security Housing Area**

    - PICs crowding tier. Several cell doors were open and unsecured.

    - B post officer had no tour wand.

- PICs complained of no pantry access so they are eating cold food.

- Complaints of cold temperatures in cells and no thermal clothes.

- PICs complain no recreation or access to PEACE Center.  A review of the logbook in the last 3 days verified complaints.

- **Young Adult General Population Maximum Security Housing Area**

  - Housing area is in deplorable condition. Many cells flooded. Walls, floors and ceilings stained and dirty. Unpleasant odor.

  - Doors/food slots manipulated.

  - B post officer had no tour wand.

  - PICS complained about conditions, recreation, barbershop.

  - PICs allege facility is implementing "alternative SRG lockout" where certain SRGs (Security Risk Groups) are allowed out for half the day and others are allowed out another part of the day.  Leadership deny it is occurring.

- **Young Adult Mental Observation Housing Area**

  - Area was relatively clean, calm, and orderly.

  - CHS was in area speaking with PICs.

  - This unit appeared to be functioning better than other units on the tour.

- **Young Adult General Population Maximum Security Housing Area**

  - PICs appeared under the influence of drugs. Deputy Warden touring with us confiscated joint from PICs openly smoking in day room.

  - Doors and food slots were obstructed and openly manipulated.

  - PICs had many complaints re: rec, barbershop, and peace center.

- **Adult General Population Maximum Security Housing Area**

  - PICs were very tense and questioned our visit considering "things never get better". Complaints of no laundry, rec, or mail.

  - The area was cleaner than YA area.

  - PICs state barbershop is offered every two months, and recreation is only happening once a week. One PIC said "I'mma do a slashing so I can get to RESH. At least they go to rec every day".

- **OBCC**
  - **Intake**
    - 7 PICs in the intake. 4 were in ITS and 3 were not because "they just got here."
  - **Adult General Population Maximum Security Housing Area**
    - Doors secured but obstructed.
    - Many PICs out, relatively calm and orderly, playing games and watching TV.
    - PICs out of ESH complained that they are not getting their property when they come out.
  - **Adult General Population Maximum Security Housing Area**
    - Windows were obstructed, but doors were secured.
    - Several PICs did not have mattresses because they were taken during a search.
    - One unoccupied cell had a toilet flooded with waste. When a PIC complained about this and the odor, the Captain said the problem was abated because no one occupied the cell which stunned the PIC. The captain completely missed the point that it was appalling for a waste-filled toilet to occupy a room for over 3 days.
    - The area smelled like smoke.
  - **Adult General Population Maximum Security Housing Area**
    - PICs out and relatively calm and orderly.
    - PICs state they get rec every other day.
    - Staff on floor states better communication and consistency with services are needed throughout the facility.
- **GRVC**
  - **Intake**
    - Intake area was not that clean.
    - 4 PICs were in intake. All 4 were in ITS and 2 were in for "incident management."
  - **Adult General Population Maximum Security Housing Area**
    - Nearly every single door was either manipulated with a towel or had a window obstructed. If staff toured this area, they would not be able to look into the windows of nearly every door. The Captain we toured with banged

on the doors, and when a PIC responded, she would move to the next door but she did not visually confirm their wellbeing.

- The area smelled like smoke and one PIC appeared to be under the influence of drugs.

- Graffiti over the walls.

- The population was relatively calm but complained of idle time.