<u>Monitor's Fifth Report on the Conditions of Confinement
for 16- and 17-Year-Old Adolescent Offenders
at the Horizon Juvenile Center</u>

Fifth Reporting Period
January 1-June 30, 2023

### The Monitoring Team

Steve Martin, J.D.—*Monitor*

Kelly Dedel, Ph.D.—*Subject Matter Expert*

Anna Friedberg, J.D.—*Deputy Monitor*

Dennis Gonzales—*Associate Director*

Pat Hurley—*Subject Matter Expert*

Alycia Karlovich—*Analyst*

Emmitt Sparkman—*Subject Matter Expert*

## Table of Contents

Introduction .................................................................................................................................... 4

   *Background* ................................................................................................................................ 4

   *The Voluntary Agreements* ..................................................................................................... 5

   *Summary of the Current State of Affairs* ................................................................................ 6

Facility Management and Facility Safety ........................................................................................ 7

   *Facility Management* ............................................................................................................... 7

      Agency and Facility Leadership ............................................................................................ 7

      Staffing Levels ....................................................................................................................... 8

   *Facility Safety* ....................................................................................................................... 12

      Data on Youth Violence and Injuries to Youth and Staff .................................................... 13

      Continued Prevalence of Serious Youth Violence ............................................................... 16

      Management Challenges ..................................................................................................... 19

      ACS' Efforts to Address Safety and Security Issues ............................................................ 22

      Conclusion ........................................................................................................................... 24

Compliance with the Substantive Provisions of the Second Agreement .................................... 25

   *Summary* ............................................................................................................................... 25

   ¶2(a). Protection from Unreasonable Risk of Harm ............................................................ 27

   ¶2(b). Use of Physical Restraints ......................................................................................... 29

   ¶2(c). Incident Report Review and Referral ........................................................................ 33

   ¶2(d). Programming. ............................................................................................................ 39

   ¶2(e). Behavior Management. ............................................................................................. 42

   ¶2(f). Room Confinement ..................................................................................................... 47

Appendix A: Monthly Data on Physical and Mechanical Restraints .......................................... 51

Appendix B: Monthly Data on Physical and Mechanical Restraints .......................................... 53

Appendix C: Third Voluntary Agreement ................................................................................... 55

# Introduction

This is the Monitoring Team's fifth report on the conditions of confinement for 16- and 17-year-old Adolescent Offenders at the Horizon Juvenile Center (Horizon), as required by the Voluntary Agreements ("the Agreements") between the Monitor, the City of New York (the "City"), and the Administration of Children Services ("ACS") (dkt. entries 364 and 502 of 11-cv-5845 (LTS)). This report provides a summary and assessment of the good faith efforts and work completed by the City and ACS to achieve compliance and advance the reforms required by the Agreement from January 1 to June 30, 2023 ("current monitoring period" or "Fifth monitoring period") as well as a summary of data, trends and patterns from the entire 30-month period (January 1, 2021 to June 30, 2023) during which the Agreements have been in effect.

This report has three sections. The first provides background on the Monitoring Team's work with respect to 16- and 17-year-old incarcerated youth, followed by a description of the Agreements and a summary of the current state of affairs. The second section discusses the facility's management, safety and operation, which provides important context for discussing the progress that has occurred and the challenges that remain to achieve compliance with the provisions of the Second Voluntary Agreement. The final section presents a detailed compliance assessment for each of the provisions of the Second Voluntary Agreement.

## Background

The Monitoring Team first began to evaluate the conditions of detained 16- and 17-year-olds under the *Nunez* Consent Judgment (dkt. entry 249 of 11-cv-5845 (LTS)).[1] When the Consent Judgment went into effect in November 2015, incarcerated 16- and 17-year-olds were legally classified as adults and detained in an adult jail on Rikers Island, which is managed by the New York City Department of Correction ("the Department"). The Consent Judgment included specific provisions regarding the management of this age group (§ XV ("Safety and Supervision of Inmates Under the Age of 19") and § XVI ("Inmate Discipline")) and separately required the Department to seek off-island housing for youth younger than 18 ((§XVII "Housing Plan for Inmates Under the Age of 18", ¶1-3)). In 2017, New York State passed the Raise the Age law ("RTA") that raised the age of criminal responsibility to 18-years-old and created a new legal status for youth called "Adolescent Offenders," (AOs), which is defined as 16- and 17-year-olds who are charged with a felony-level offense. RTA was implemented in stages, with the AO category applying to any 16-year-old charged on or after October 1, 2018, and any 17-year-old

---

[1] *See* Monitor's First *Nunez* Report at pgs. 87 to 111, Second *Nunez* Report at pgs. 123 to 155, Third *Nunez* Report at pgs. 196 to 238, Fourth Nunez Report at pgs. 203 to 252, Fifth *Nunez* Report at pgs. 140 to 180, Sixth *Nunez* Report at pgs. 149 to 196, Seventh *Nunez* Report at pgs. 192 to 207, Eighth *Nunez* Report at pgs. 218 to 247, Ninth *Nunez* Report at pgs. 253 to 282, Tenth *Nunez* Report at pgs. 221 to 237.

charged on or after October 1, 2019. RTA also prohibited housing 16- and 17-year-olds on Rikers Island as of October 1, 2018.

By October 1, 2018, all 16- and 17-year-olds who were incarcerated on Rikers Island were transferred to the Horizon Juvenile Center, which, at the time, was jointly operated by the Department and ACS, where the Department was responsible for the care and custody of the 16- and 17- year-olds and ACS was responsible for programming and managing the provision of medical and mental health services. All 16- and 17-year-olds who were charged prior to the RTA effective dates for their age group were called, collectively, "Pre-Raise the Age (RTA) Youth." All Pre-RTA Youth remained at Horizon until they were sentenced, released to the community or residential programs, or they turned 18-years-old, at which time they were transferred to Rikers Island. The day-to-day management of Horizon also gradually shifted to become the sole responsibility of ACS. Since October 1, 2019, all 16- and 17-year-olds prosecuted pursuant to RTA are held in ACS custody if detained by the courts.

By the end of 2019, ACS had assumed full operational control of Horizon, save for a small number of DOC staff who operated the front security gate and held transportation positions.[2] By July 27, 2020, the last Pre-RTA Youth was transferred out of Horizon, and the *Nunez* Monitoring Team suspended its monitoring activities while the City, ACS, the Monitoring Team, and the Parties to the *Nunez* litigation determined the appropriate path forward given the change in circumstances. At the same time, the onslaught of the COVID-19 pandemic had begun, which significantly impacted facility operations and has yet to fully dissipate with continued struggles in hiring staff and long lengths of stay among youth detained at Horizon.

### The Voluntary Agreements

In 2021, the City and ACS voluntarily entered into an agreement with the Monitoring Team concerning the supervision of 16- and 17-year-old AOs at Horizon during an 18-month period, January 2021 through June 2022 ("First Voluntary Agreement"). The First Voluntary Agreement included 10 substantive areas. In late 2022, the City and ACS extended the work with the Monitoring Team and entered into a second agreement for an additional 12 months (through June 2023) for continued monitoring of a subset of six of the original 10 substantive provisions ("Second Voluntary Agreement"). During the time that the Second Voluntary Agreement is in effect (as with the First Voluntary Agreement), the Monitoring Team will not assess compliance with the *Nunez* Consent Judgment's provisions pertaining to 16- and 17-year-olds and *Nunez* Plaintiffs and the United States have agreed not to seek judicial action to enforce the portions of the *Nunez* Consent Judgment pertaining to this age group (*see* dkt. entry 503).

---

[2] As of August 2021, no DOC staff were deployed to Horizon.

The Second Voluntary Agreement includes six substantive provisions, all of which are discussed in detail in this report. For each provision, the Monitoring Team provides an assessment of current practice and applies a compliance rating.

The Monitoring Team is required to file two reports during the pendency of the Second Voluntary Agreement. The first described facility conditions during the Fourth monitoring period covering July 1, 2022 to December 31, 2022. This report covers the Fifth monitoring period, January 1, 2023 to June 30, 2023.

The Monitoring Team and the City have agreed to voluntarily extend the agreement ("Third Agreement" attached as Appendix C to this report) for an additional year, through June 30, 2024. Recognizing ACS' success in meeting the requirements of some of the provisions discussed in this report, the Third Agreement includes only those provisions related to protecting youth from harm, incident report review, behavior management and programming. The Monitoring Team will file a single report on the status of compliance after the monitoring period has concluded.

## *Summary of the Current State of Affairs*

Throughout the past 30 months (the duration of the two Voluntary Agreements), the Monitoring Team has worked closely with ACS and facility leaders at all levels to assess compliance, discuss the various dynamics and potential obstacles that make reform challenging, and to supply information and examples from other jurisdictions that have confronted similar problems. ACS has worked in good faith with the Monitoring Team and the collaboration has been both transparent and productive.

During the current monitoring period (January to June 2023, the Fifth Monitoring Period), facility safety and stability continued to benefit from the vision and approach of the current ACS and facility leaders. Notably, some important hires at the middle management level (particularly the Executive Director of Operations, several Operations Managers and key positions within the ACS Police) have allowed the vision of the Agency leadership to move further down into the ranks, and hold promise for shoring up the facility's security function and properly supporting the newly implemented behavior management program. However, the Monitoring Team remains very concerned about staffing levels, the incidence of very serious violence and youth's access to contraband weapons and drugs, though incremental progress in addressing these issues is evident. Increasingly during the current monitoring period, some staff are showing signs of corrections fatigue in their responses to youth's provocations and/or in their failure to intervene when circumstances demand decisive action. These dynamics are discussed in detail below, along with the various initiatives ACS is undertaking to address the root causes of the problems.

## Facility Management and Facility Safety

Fully understanding the overall current state of affairs requires an overview of agency and facility leadership, staffing levels, and facility safety including youth violence, and the steps ACS is taking to improve facility safety and security.

### *Facility Management*

- ▪ Agency and Facility Leadership

An important aspect of any reform effort is ensuring that the right leaders are in place, those who possess a safety- and youth-focused vision and those who recognize that staff wellness is an essential underpinning to achieve that vision. ACS' Commissioner, the Deputy Commissioner of the Division of Youth and Family Justice and the Assistant Commissioner of Horizon embody this philosophy. During the current monitoring period, the facility leadership team was further enhanced by a new Executive Director of Operations, a new Chief and Captain of ACS Police (*i.e.*, security officers), and the addition of five experienced Operations Managers who are tasked with, among other things, cultivating the skills of their subordinates and leading the team approach to youth management on their assigned units.

Strong facility leaders can only be successful when they are appropriately supported, and leaders at all levels reported that the reform effort underway at Horizon has benefitted from the Commissioner's commitment to provide concrete support (*e.g.*, equipment, physical plant improvements) as well as human resources (*e.g.*, ACS staff, consultants and vendors) who can meaningfully contribute to the agency's mission. One recent example of this commitment is the agency's addition of an Assistant Commissioner of Behavioral Management position. An offer has been extended to a candidate, who is being vetted by City Hall. This individual will be responsible for coordinating a multi-disciplinary response to youth who engage in serious misconduct in order to ensure a holistic approach. Given the concerns about violence discussed throughout this report, the City is encouraged to expedite vetting and onboarding so that the facility can begin to benefit from this individual's expertise and focus.

Another important recent development is the restructuring of the ACS Police which occurred in June 2023. The ACS Police are special officers who work in tandem with the "group services staff" (OMs, Tour Commanders, AYDSs and YDSs). ACS Police provide security at the facility entrance, monitor live video feed, staff Main Control, and respond to calls for assistance from the direct care staff, among other things. For several years, their collaboration with group services staff was fractured and ACS struggled to hire and retain qualified individuals for ACS

Police positions. During the previous monitoring period, the approach began to shift when a new structure was envisioned by the Deputy Commissioner. During the current monitoring period, a Deputy Chief of ACS Police was selected to oversee both of ACS' detention facilities. His reputation has reportedly been a boon for recruitment and a catalyst for increasing professionalism among the ranks. The Deputy Chief is supported by a Captain who leads ACS Police operations at Horizon and who will be supported by two Lieutenants to further enhance the security operation in the facility. Candidates for the Lieutenant positions have been identified. The addition of charismatic leaders and an improved supervisory structure appears to be improving the collaboration between ACS Police and group services staff which has, in turn, begun to improve the facility's security operation. Future plans include developing a more structured, organized and effective response to staff's calls for assistance, which may help to address some of the issues described later in this report.

- **Staffing Levels**

The provisions in the Second Voluntary Agreement address the key elements known to improve facility safety (*i.e.*, adequate youth supervision, programming, and behavior management practices; the appropriate use of physical restraint; procedures to direct, guide and coach staff to improve skill mastery via incident reviews). As is detailed throughout this report, ACS is making substantial efforts to improve each of these areas of facility functioning. However, the precursor to the successful implementation of all of these is having an adequate number of staff. Like most juvenile justice agencies across the nation, ACS is having significant difficulty retaining sufficient numbers of direct care staff, a challenge which is compounded by concerns about facility safety. These issues are not unique to ACS and are being experienced in juvenile facilities across the country. Nonetheless, solving them is key to ACS' success.

Although ACS has hired many staff during the 30 months since the Agreement went into effect, continuous attrition has undercut functional progress in staffing levels. Indeed, this problem underlies many of the areas with slower progress toward compliance with the Agreements. For example, training staff in the behavior management program, STRIVE, was extraordinarily difficult given staff shortages. Program access can also be compromised when there are not enough staff to split housing units into smaller groups when a subset of youth wants to attend, and another does not. Higher staffing levels and stable complements of staff assigned to housing units are also essential to the type of unit-based strategies that are key to reducing violence. As noted above, Horizon made important progress toward this vision during the current monitoring period with the onboarding of several well-qualified Operations Managers (OMs). Each housing unit now has an assigned OM who can thus begin to infuse

behavior management efforts with more individualed, team-driven approaches to the youth on each unit. That said, a larger corps of YDSs is needed to control overtime, improve staff wellness and morale, and to permit YDSs to focus on developing rapport and effective behavior management strategies with the youth housed on their assigned units.

ACS estimates that it needs 337 Youth Development Specialists (YDSs) to staff the facility at full capacity (*i.e.*, 10 housing units open, 3 YDS per unit) with staff working three 8-hour shifts. As shown in the table below, throughout the past 30 months, Horizon had only 60-70% of that number of YDSs on the payroll (range 207.8 to 245.0). In addition, during the current monitoring period, an average of 34% of YDS on the payroll were "inactive" (*i.e.*, on some type of leave, including sick leave and work-related injury leave) and thus were unable to work. This left Horizon with less than half of the YDSs it needed to fully staff the facility (an average of 157.2 active YDSs). As a result, most staff are working inordinate amounts of overtime. The Monitoring Team's interviews with staff revealed that many staff continue to work overtime up to 4 or 5 times per week. Essentially, every time they report to work, they work a 16-hour shift. That a segment of group services staff remains committed to the job even under these difficult conditions is laudable.

The situation is no better for front-line supervisors (AYDSs). ACS estimates that it needs 56 AYDS to properly staff the facility with supervisors (assuming 10 housing units are open, one AYDS per unit, and three 8-hour shifts). As shown below, Horizon averaged only 60-70% of that number of AYDSs on the payroll (range 33 to 38) during the time an Agreement has been in place. As with YDSs, the AYDS rank also suffers from significant proportions of "inactive" AYDSs (an average of 28% during the current monitoring period), leaving the facility with about half of the AYDSs (an average of 27 active AYDSs) it needs to properly staff the facility with front-line supervisors.

| Average Number on Payroll, Proportion Inactive, and Number Active January 2021- June 2023 | | | |
|---|---|---|---|
| Period | # on Payroll | % Inactive | # Active |
| Youth Development Specialists (YDS)—**Target 337 YDS** | | | |
| Jan-Jun 2021 | 207.8 | 38% | 128.3 |
| Jul-Dec 2021 | 218.2 | 37% | 138.2 |
| Jan-Jun 2022 | 245.0 | 36% | 156.3 |
| Jul-Dec 2022 | 229.7 | 41% | 136.3 |
| **Jan-Jun 2023** | **237.0** | **34%** | **157.2** |

| Associate Youth Development Specialists (AYDS)—**Target 56 AYDS** | | | |
|---|---|---|---|
| Jan-Jun 2021 | 33.0 | 27% | 24.2 |
| Jul-Dec 2021 | 38.0 | 17% | 31.7 |
| Jan-Jun 2022 | 36.3 | 24% | 27.7 |
| Jul-Dec 2022 | 37.7 | 33% | 25.2 |
| **Jan-Jun 2023** | **37.5** | **28%** | **27.0** |

In addition to the shortage of YDSs and AYDSs who are available to work, the facility is challenged on a daily basis when staff call out for their scheduled shift. ACS reports that on average, 39 YDSs are scheduled on the AM and PM shifts, and 32 on the Night shift. During the current monitoring period, about 15-20% of scheduled YDSs called out for their shifts (YDS call outs averaged 7.9 on the AM shift, 6.1 on the PM shift, and 7.0 on the Night shift). Similar proportions of callouts occurred among AYDSs. On average, 4 AYDS are scheduled on the AM shift, 5 on the PM shift, and 3.5 on the Night shift. The number of AYDS call outs averaged 0.75 on the AM shift, 1.1 on the PM shift and 0.84 on the Night shift. Given the shortage of available staff, those who have already worked or are scheduled to work a shift later that day are often asked to work overtime to cover these callouts, which has a significant negative impact on staff wellness and morale. ACS reports that call outs often occur among staff who want to avoid working overtime (*i.e.*, they are willing to work their regularly scheduled shift, but do not want to be held over), which further compounds the problem because the staff's original shift and the overtime shift must then be covered. Facility leaders are working to develop a staff incentive program wherein staff may earn a one-time pass to be protected from working overtime, giving more certainty to their ability to attend a special event, family obligation, etc. and thus providing the assurance needed for staff to report for their regularly scheduled shift. This strategy to reduce call outs has been effective in other jurisdictions with which the Monitoring Team is familiar.

ACS reports that increasing the availability of staff has been its top priority since assuming operational control of Horizon. Various innovative strategies in advertising, recruiting, hiring and incentivizing described in previous reports succeeded in bringing a large number of YDS recruits to the facility. Unfortunately, high levels of attrition have undercut the effort to expand the size of Horizon's YDS workforce. The table below illustrates the flow of hiring and attrition over the past 30 months. That the facility has lost about two-thirds of the number of YDSs it has hired (214 lost and 310 hired; 69%) means that despite attracting a large number of people to YDS

jobs, high attrition resulted in a small net gain (only 97 YDS). Horizon has lost more AYDSs than it has promoted/hired, resulting in a net loss of two AYDSs.

| Hiring and Attrition, January 2021-June 2023 | | | |
|---|---|---|---|
| Period | Hired | Lost | Net |
| Youth Development Specialists (YDS) | | | |
| Jan-Jun 2021 | 52 | -37 | 15 |
| Jul-Dec 2021 | 80 | -39 | 41 |
| Jan-Jun 2022 | 60 | -53 | 7 |
| Jul-Dec 2022 | 43 | -37 | 6 |
| **Jan-Jun 2023** | **85** | **-57** | **28** |
| TOTAL | 320 | -223 | 97 |
| Associate Youth Development Specialists (AYDS) | | | |
| Jan-Jun 2021 | 0 | -1 | -1 |
| Jul-Dec 2021 | 1 | 0 | 1 |
| Jan-Jun 2022 | 0 | -3 | -3 |
| Jul-Dec 2022 | 2 | -1 | 1 |
| **Jan-Jun 2023** | **0** | **0** | **0** |
| TOTAL | 3 | -5 | -2 |

When interviewed, Horizon staff observed that the recruitment efforts appear to be attracting people who do not accurately understand the unique combination of security and counseling skills required to be an effective YDS. Once deployed to the facility, many new YDSs are surprised by youth's level of aggression and reportedly feel ill-equipped to manage the interpersonal dynamics at play, and reportedly do not receive sufficient supervision from AYDSs and OMs to elevate their skill set or develop the confidence needed for the difficult work. High levels of turnover result. Youth interviews suggested that they detect this staff selection problem as well. Though all youth reported that many staff are very supportive and interested in them, others just "go through the motions." ACS reported a variety of efforts to increase retention:

- Realign the YDS job description to portray the security role of the YDS position more accurately.

- Increase the number of AYDSs and OMs to permit more frequent, direct supervision to elevate YDSs' skill set.

- Improve Academy training for new recruits to ensure they develop some proficiency with basic security procedures (*e.g.*, radio transmissions, key control, door control, youth movement, etc.). This training is essential to bolster YDSs' confidence and to help them develop the necessary presence and authority to properly supervise the housing units. ACS was enthusiastic about the Monitoring Team's ability to connect them to peers in other jurisdictions to provide ideas for fortifying training.

Finally, as with many juvenile justice systems across the country, ACS also struggles to properly manage its leave benefits. The management of sick leave, work-related injury leave and FMLA is an ACS function, and improvements to the ability to reduce any abuses of these benefits would also support the goal of increasing the number of staff who are available to work at Horizon.

That Horizon continues to operate with less-than-optimal staffing provides insight into the areas where ACS struggles to achieve compliance with the requirements of the Agreements, and also makes the things the facility has achieved that much more impressive. Most of the substantive provisions of the Agreements require a full complement of staff to implement and operationalize. A core component of adequately implementing and operationalizing initiatives requires that staff must be trained and then provided with ongoing guidance on their new responsibilities. ACS faces a real struggle here. That said, just as staffing and facility violence may create a vicious cycle, improving facility safety and staff morale may boost staff hiring and retention. Although the turnover rate has been high, over the past few years, ACS has increased the number of YDSs at Horizon by nearly 100. The recent addition of highly skilled Operations Managers and ACS Police leadership is an encouraging achievement, and one that makes ACS/facility leaders' vision of a unit-based, properly trained workforce more attainable.

### Facility Safety

This section first discusses data related to protecting youth from harm, including key reductions in the rates of youth-on-youth assault and youth-on-staff assault, along with slight upticks in serious injuries among both youth and staff sustained during assaults. Descriptions and examples of the types of serious violence that continue to occur at Horizon are discussed below (*e.g.*, youth's use of weapons and dangerous strangulation holds, large group disturbances, and group assaults of single victims). Next, various management challenges are discussed including those presented by youth's increasing length of stay, the presence of contraband, and signs of correctional fatigue among staff. Finally, ACS' efforts to address security vulnerabilities that provide an opportunity for violence to occur are discussed.

- ### Data on Youth Violence and Injuries to Youth and Staff

The data on facility violence is mixed. Important reductions in the frequency of youth violence have occurred, but the number and proportion of serious injuries to youth and the proportion of incidents in which staff are injured have increased slightly.

- *Youth-on-Youth Assault and Youth-on-Staff Assault*

As shown in the table below, the average monthly rate of youth-on-youth assault during the most recent two monitoring periods (July 2022-June 2023) was significantly lower than the previous 18-month period (about 37% lower). Similarly, during the most recent two monitoring periods, the average rate of youth-on-staff assault was significantly lower than the previous 18-month period (about 55% lower).

| Average Rate of Youth Violence, January 1, 2021- June 30, 2023 [3] | | |
|---|---|---|
| Date | Youth-on-Youth Assault | Youth-on-Staff Assault |
| January-June 2021 | 1.06 | 1.02 |
| July-December 2021 | 1.13 | 0.51 |
| January-June 2022 | 1.06 | 0.77 |
| July-December 2022 | 0.64 | 0.30 |
| **January-June 2023** | **0.72** | **0.39** |

These same data are shown in the line graph to visually represent the significant reduction in the frequency of youth violence that has occurred. Appendix A provides monthly data on the number and rate of youth-on-youth and youth-on-staff violence.

---

[3] Rate = ((# of incidents/# days in month)/ADP) * 100. See Appendix A for monthly data on the number and rate of youth-on-youth assault and youth-on-staff assault.



The reduction in the frequency of youth violence appears to be the result of an accumulation of small improvements over time that have improved security, predictability and stability in the structure of the youth's day such as: incremental improvements to security practices, reported improvements in school attendance, and programming efforts that are increasingly defined by their appeal to youth and age-appropriate focus. These steps are essential for creating a foundation upon which more individualized youth interventions can stand (*e.g.*, skill-focused groups that teach youth new ways to address interpersonal conflict, manage anger, and tolerate frustration; behavior modification plans to better support youth who frequently engage in violent conduct). Both should become available as STRIVE (ACS' behavior management program) becomes more fully implemented and further refined.

ACS leaders attribute the decreases in the rate of youth violence to improvements in basic security functions (*e.g.,* key control, youth movement, response time), as well as improved relationships among staff and youth. When interviewed, most youth remarked on the care and support they receive from Horizon staff, believing that staff had their best interest in mind. When interviewed, staff reported a greater sense of stability and control, and expressed hope for greater support on the housing units via the expanding corps of OMs and the improving collaboration with ACS Police.

    o   *Injuries Among Youth and Staff*

The intersection between the frequency of violence and the severity of violence is illustrated in the charts below. The first chart shows the number of incidents involving each type

of injury from youth-on-youth violence sustained by AOs housed at the facility.[4] The different colored bars represent the type of injury (blue = none, orange = less serious/Injury B, grey = more serious/Injury A).[5] The number of incidents involving each type of injury that occurred in each of the five monitoring periods is indicated within each bar, and the total number of incidents for the monitoring period is indicated alongside the date for each bar.

The total number of incidents involving injuries has fluctuated over time (40 incidents involved injuries during the first monitoring period, 53 incidents during the second, 58 incidents during the third, 37 injuries during the fourth, and 48 incidents during the current monitoring period). During the current monitoring period, the number of incidents involving injuries increased 30% compared to the previous monitoring period, with only a 10% increase in the number of AOs at the facility. Since the time an Agreement first went into effect, slightly more than half of the incidents of youth-on-youth assault have not resulted in any injury to youth, which is of course positive. However, of significant concern is the fact that the proportion of incidents involving serious injuries (represented by the top grey section of the bars in the chart below) continues to increase. During the current monitoring period, the number of incidents involving serious injuries comprised about 15% of all incidents of youth-on-youth assault during the current monitoring period (16 of 110 incidents). This continues an increase noted in the previous monitoring period (8 of 88 incidents, or 9%) and appears to be a byproduct of the increased use of weapons during assaults, which makes ACS' efforts to prevent and detect the presence of contraband in the facility that much more essential.

---

[4] This injury data is *incident based*, meaning that it shows the number of incidents in which a certain type of injury occurred, not the number of youth who sustained each type of injury. It also includes only incidents/injuries involving AOs and does not include incidents/injuries among youth of other legal statuses.

[5] Injury A includes injuries requiring clinical treatment beyond what can be provided by a layperson with over-the-counter products. Injury B includes injuries that are treatable by a layperson with over-the-counter products such as ibuprofen, antibiotic ointment, ice packs, etc. All injury classifications are made by medical staff.



As noted above, the rate of youth-on-staff assault has declined significantly compared to prior monitoring periods. The proportion of assaults on staff that resulted in an injury to staff (orange bar in the graph below) has varied a bit:  40% in the first monitoring period, 42% in the second, 54% in the third, 48% in the fourth, and 55% in the current monitoring period. The frequency with which staff are injured, in addition to the obvious impact on staff wellness, has a deleterious impact on the number of staff who are available to work at the facility when staff who are injured on-the-job go out on leave.



- ■ **Continued Prevalence of Serious Youth Violence**

While the overall rates of youth violence remain low, the Monitoring Team remains very concerned about the frequency of serious violence, particularly incidents involving dangerous weapons and serious assaults on staff (including strangulation holds) that have occurred during

larger group disturbances. The list below includes events that occurred at Horizon during the current monitoring period. A similar number of serious incidents with equally troubling circumstances occurred during the previous two monitoring period as well. Therefore, **while the overall rate of violence has been significantly reduced, the frequency of incidents involving serious violence remains very concerning**. The list below is a non-exhaustive sample of the types of concerning incidents that occurred during the current monitoring period.

- <u>Multiple incidents occurred in which youth used sharp weapons to slash or stab the victim</u>. For example, in one incident, a youth attacked another youth, using a razor blade to cut the victim. The event turned into a large group disturbance. The victim sustained a laceration to his arm that required 20 stitches. Two staff also sustained cuts (stitches not required) and one reported being headbutted by a youth. In another incident, a youth was seated in a chair with his back to an assailant, who snuck up behind him and cut the victim on the side of his face. During a group disturbance, a youth sustained a deep 7cm laceration to his neck, 7cm cut to his forearm, a 4-5cm laceration to the scalp and a 7cm laceration to his lower back. In another incident, two units gained access to a shared terrace. Multiple assaults occurred in which youth punched, repeatedly stomped, cut and used weapons (hard objects placed in socks) that injured multiple victims. One received a laceration to the nose, one had a laceration to the scalp that required 3 stitches, one sustained three lacerations to the back requiring 13, 14 and 5 stitches to close. While staff attempted to intervene, they were simply overwhelmed by the cascade of events.

- <u>Serious injuries to staff continued to occur</u>. In one incident, while intervening in a fight, two staff were injured—one received 8 stitches, the other received 3 stitches. In another incident, a supervisor was headbutted by a youth, causing a gash in the Supervisor's forehead that required 13 stitches. In another incident, a YDS was pushed to the floor while trying to prevent youth from exiting the housing unit unauthorized and fell backwards and hit her head. An EMS unit transported her to the hospital. In another incident, while a YDS was completing logbook entries, a youth grabbed the YDS around the neck, lifted him off his feet and pulled him backwards, causing them both to fall over a chair onto the floor. Although the staff eventually got to his feet, the YDS was motionless on the floor for a period of time and may have lost consciousness.

- <u>Serious injuries also occur during horseplay, which is particularly problematic when staff engage in this type of behavior</u>. For example, a youth reached into staff's pocket apparently trying to get the facility keys. This turned into prolonged horseplay between the youth and staff. The youth obtained possession of the staff's utility belt and the

horseplay continued—the staff involved was smiling and his partner did not intervene. The youth eventually placed the staff in a very dangerous strangulation hold that lasted three minutes. The staff's partner eventually called for help, and when the responders arrived, the youth released the staff who then left the facility to seek medical attention. In another incident, during a round of horseplay amongst youth, one youth was demonstrating a strangulation hold on another youth, which quickly rendered the youth unconscious. The victim likely urinated on the floor during the event, which is a critical sign of a medical emergency. A youth carried the victim to the clinic and the victim was transported to the hospital by EMS. While horseplaying with staff, a youth placed a staff in a headlock and the staff was kicked in the stomach. The staff then headbutted the youth, who at the time was holding the staff by the throat.

- <u>Youth continued to attack staff to access keys and/or aggressively pushed past staff when housing unit and hallway doors were unlocked in order to access rivals from other housing units</u>. During a large group disturbance, youth were carrying broom handles and large chunks of what appeared to be drywall as they ran toward the rival group. Staff were hit and punched as they tried to restrain the youth involved. The event lasted over 20 minutes. In another event, two youth who were returning from the barbershop were attacked when youth in another unit rushed out when their unit door was opened. One of the barbershop returnees was attacked, and was dragged, punched, and stomped by the other youth. In another incident, youth from one housing unit breached the unit door and attacked a youth from another unit who was being escorted by staff. The victim sustained a six-inch laceration. Following the event, a youth surrendered a small scalpel to a supervisor.

An obvious precursor to some of these incidents is the availability of weapons. In a concerning number of incidents and during routine searches, a significant number of scalpels and sharpened metal objects were found. Throughout the monitoring period, staff were routinely punched, pushed, kicked or otherwise assaulted as they attempted to intervene in these incidents. Staff are being injured at a concerning rate, and some sustain multiple injuries over time. The long-term physical impact of these injuries, and the trauma that ensues, is of serious concern in addition to the adverse effect these events have on staff availability and on staff retention. Opportunities and temptations for youth to access youth from other housing units, often for the purpose of exacting violence, is an area that is ripe for the preventative benefit that should accompany efforts to identify and address security and operational vulnerabilities.

- **Management Challenges**

  o *Length of Stay and Facility Population Size*

Many of the facility's youth have histories involving perpetrating, witnessing and being the victim of serious violence, a combination that leads to both complex peer dynamics and challenging behavioral health profiles. Among those in Horizon's custody during the current monitoring period, nearly two-thirds of the youth have Murder or Attempted Murder charges, and many are facing extended sentences if convicted, a reality which is not only incredibly stressful but that also impacts the way in which youth calculate the costs/benefits of engaging in or resisting violent peer dynamics in the facility. In many detention facilities across the country, the average length of stay is quite short (*e.g.*, about half of the population has a length of stay of less than one week) due in large part of the proportion of youth who are detained on lower-level offenses. In contrast, due in part to New York City's success in diverting youth charged with less serious offenses from secure detention, those youth who are placed at Horizon typically have much longer stays. The average length of stay at Horizon is 133 days, driven in part by COVID-related delays in case processing and the serious nature of many Horizon youth's charges. A significant number of youth remain at Horizon for more than one year.

In addition to being stressful to the youth, youth's long lengths of stay present management challenges that increase the difficulty of creating facility safety. Longer stays have driven the average daily population higher. The facility's average daily population of Adolescent Offenders during the current monitoring period was approximately 84 youth,[6] compared to about 78 youth in the prior monitoring period and less than 40 youth when the First Agreement went into effect. In addition, the facility now houses Juvenile Offenders and a very small number of Juvenile Delinquents (*i.e.*, youth of different legal statuses, not covered by the Agreements) which pushed the average daily population to just over 100 during the current monitoring period. The youth violence data discussed above utilizes a *rate* that statistically controls for changes in the size of Horizon's youth population. However, the statistical controls cannot account for the impact of having more youth on each housing unit in terms of interpersonal dynamics, stress, the lack of housing flexibility and challenges in providing services to a larger

---

[6] Most of Horizon's youth are Adolescent Offenders ("AOs")—a legal status created via Raise the Age that consists of youth charged with serious felonies—although ACS recently began to house Juvenile Offenders at Horizon ("JOs," a different legal status, primarily youth with less serious offenses being processed via the traditional juvenile court). Horizon's population has recently been approximately 80% AOs and 20% JOs. While JOs are not covered by the scope of the Agreement, any improvement at Horizon would benefit them equally as programming and services are not differentiated by legal status.

number of youth, all of which are inevitable byproducts of higher population densities in congregate care.

   o  *Contraband*

As signified by the number of incidents in which serious injuries are caused by youth using sharp weapons discussed above, an alarming volume of contraband continues to be detected/recovered at the facility. In addition to the prevalence of sharpened objects, searches routinely detect and seize marijuana, tobacco, cell phones and chargers, pills, cash and other evidence of financial transactions (*i.e.*, numbers connected to electronic payment accounts). During the Monitoring Team's tour of the facility in July 2023, four of the 10 housing units visited smelled of marijuana, and in June 2023, 84 "clips" of marijuana were recovered during a single search. The presence of drugs in any facility—particularly if staff are responsible, even in part—has serious consequences for the quality of supervision, staff-youth dynamics, and the extent to which staff trust each other and are able to work as a cohesive unit.

The necessity for robust strategies to detect and recover contraband cannot be overstated. During the current monitoring period, in addition to strategies that address the flow, detection and seizure of contraband, ACS has taken steps to strengthen accountability measures for staff who are complicit in the contraband trade. Previously, staff reported a lack of confidence in the confidentiality of information they offered to facility supervisors and leadership (*i.e.*, concerns that youth and staff would discover that they had reported a problem), which deterred staff from coming forward with their concerns. Now, staff are directed to bring their concerns *directly* to the Assistant Commissioner or Executive Director of Operations, both of whom were seen as trustworthy among the staff interviewed. In addition, ACS launched an internal hotline that permits staff to make an anonymous allegation of misconduct if they so choose (in addition to one operated by the City's Department of Investigation). ACS reports it has terminated and suspended staff who were found to have or were suspected of introducing contraband into the facility.

   o  *Signs of Corrections Fatigue*

Some staff are showing signs of corrections fatigue,[7] evidenced by their inappropriate responses to a variety of events, either failing to intervene in situations where decisive action was clearly warranted or responding aggressively to youth's provocations. For example:

---

[7] "Corrections Fatigue," or burnout among those who work in correctional settings, refers to staff's loss of caring about the people they work with and inability to sustain the kind of care and commitment that is the essence of the

- A staff member did not provide appropriate supervision or intervention when multiple youth were gathered in one youth's room, assaulting a victim. The case was referred to ELU and formal disciplinary charges have been served.

- In several separate incidents, youth engaged in prolonged periods of property destruction without staff intervention.

- A YDS appeared to condone a "Fight Night" event in a youth's room and allowed the event to continue unaddressed for a prolonged period of time without intervention.

- During a horseplay incident described above, a staff member was placed in a strangulation hold that lasted three minutes. While the staff's partner's motivation is unknown, he did not appear to recognize the potential lethality of the situation and did not respond for several minutes.

- A youth went on a 20-minute property destruction rampage in a housing unit. A Supervisor responded to a call for assistance but left without appearing to address any concerns. Other youth joined in the property destruction. The unit was not secured by staff for the duration of the incident, though eventually activities returned to normal.

The underlying motivation, or lack thereof, in these situations can only be hypothesized. In the Monitoring Team's experience, such failure to act on the part of staff can arise from staff's concerns for their own safety given a lack of staff available to assist; a lack of self-confidence in their own skills and proficiencies; fear of youth's aggression; fear of discipline if they select the "wrong" action; tacit agreement with youth not to intervene; or compromises to the staff's authority given their willingness to transport contraband inside the facility, among others.

More serious signs of corrections fatigue were evident when staff lost their composure and responded to youth aggressively when provoked or assaulted.[8] For example:

- A youth was standing aside passively as he watched staff break up a group of youth engaging in a fight in a resident's room. A supervisor who responded to the scene used unnecessary and excessive force to toss/sling the observing youth toward his room. Other staff attempted to temper the supervisor's response, while others appeared

---

work. Corrections fatigue can manifest in a variety of different ways, commonly including the development of negative attitudes about the work, the failure to act when necessary as well as taking actions that are excessive, unnecessary and/or abusive. The perceived or actual threat of violence increases the risk of burnout.

[8] In addition to concerning incidents that occurred during this monitoring period, in July 2023, the SDNY also announced federal charges against two Supervisors related to their assault of a youth and attempts to cover-up the event. The event occurred in April 2022.

reluctant to intervene. The supervisor has been on Worker's Compensation leave since shortly after the incident. DOI is investigating the matter.

- A Counselor was hit in the back of the head by a youth and responded by approaching the youth aggressively, and they exchanged punches. Several staff were required to pull the counselor and youth apart. The staff received a disciplinary conference.

- A youth threatened to hurt a YDS if he refused to bring in contraband and threw a bowl of food at the YDS, hitting him in the face. The YDS charged at the youth, tackled him and began to throw punches at the youth's head. ACS reported that the staff was terminated for reasons unrelated to this incident.

Evidence of correctional fatigue in the form of staff aggression is always tragic and sadly, is often somewhat predictable given the difficult work conditions and frequent overtime that many staff endure. ACS is encouraged to continue to delve into the underlying causes of inaction to identify and resolve those that could be impacted by additional training and support. ACS is also encouraged to continue to be vigilant for signs of distress among its workforce and to take proactive steps to reduce the risk of staff mistreating youth in their care. Horizon leaders and supervisors have reported being more proactive in asking questions about how staff are feeling, how they can help, and providing relief from housing unit posts when needed (*e.g.*, moving the individual to a post with less youth interaction for a short period of time, or offering time for reflection with the facility's Chaplain if staff desires).

Finally, during the current monitoring period, a very concerning event occurred during which staff sexually abused a youth. The offending staff was relieved of her duties, escorted from the facility in NYPD custody and terminated. Another staff who witnessed the event but failed to take any action was also terminated.

- ### ACS' Efforts to Address Safety and Security Issues

One of the Deputy Commissioner's priorities has been to enhance the security operation at Horizon. Various consultants have been engaged to assist in this area, and a number of new and/or fortified practices have been developed.

- An important step toward infusing all ranks with agency and facility leaders' safety- and youth-focused vision has been ensuring that supervisors of all levels make frequent tours of the housing units to offer support and to guide staff practice, to model constructive responses to youth's concerns and strategies for resolving interpersonal conflict and to facilitate the delivery of programming. These tours, and the supervisors' findings, are

now documented on a "Tour of Inspection Form" which brings greater accountability to the expectation that supervisors maintain a strong presence on the housing units.

- Improved search procedures at the facility's front gate have reportedly increased the detection of contraband flowing into the facility. Notably, the larger number of ACS Police who are now available means that the front gate has additional manpower to ensure that all search functions (*e.g.*, observation, line scan, magnometer and wanding) are given proper attention.

- A recently completed key control project fortified basic procedures such as the daily inventory and the use of detention-grade key rings. The facility continues to limit the number of staff on the housing units who carry keys to the unit doors that exit to the corridor.

- All staff now wear duty belts to properly secure their equipment (including keys) and additional radios were procured which has reportedly improved communication about youth movement and shortened incident response time.

- ACS is working to repair the physical plant to decrease the chance that weapons can be fashioned from broken parts and fixtures.

- Housing units are searched frequently using specially selected search teams, and youth are subjected to pat searches prior to leaving the housing units and must sit on the Body Orifice Security Scanner ("BOSS") Chair when entering/exiting school. The facility reports a 31% increase in contraband recovery of all types (weapons, illegal substances and unauthorized property).

- Signs of improved hallway movement were evident during the current monitoring period due to a more coordinated approach with ACS Police, though additional steps are needed to decrease the number of large-scale events that continue to occur in corridor spaces.

- ACS is working to give youth additional recreation time with the hope that expending energy will effectively address some of the dynamics underlying interpersonal violence (e.g., boredom, pent-up energy) and is also increasing food portions at meals. Once implemented, these changes would respond to the top complaints voiced by youth when interviewed by the Monitoring Team.

These are important improvements to the security functions at the facility with the potential to enhance youth and staff safety. As key control and communication improved, the need for improved unit door control was even more visible during the Monitoring Team's

incident reviews. Staff continue to open unit doors with large numbers of youth pressing behind them, which too often leads to a breach of the door and cascades into an event in the hallway. This area of basic security practice appears to be ripe for improvement.

- Conclusion

In summary, compelling reductions in the *frequency* of youth violence were sustained during the current monitoring period compared to the levels witnessed when the Agreement first went into effect. However, incidents involving group assaults of a single victim, dangerous strangulation holds, and sharpened weapons continue, all of which present a high risk of serious injury or disfigurement and some of which could be lethal. ACS continues to develop and implement strategies to improve overall security, address operational vulnerabilities, improve staff support and response time, and to reduce the availability of weapons and illicit substances. These efforts are essential to mitigate the risk of harm to youth and staff, and to create a safer facility. Finally, recent additions to the facility's middle-management bode well for ensuring that staff are properly supervised and are guided toward practice that enhances facility safety.

The scope and quality of information shared with the Monitoring Team, ACS' openness to feedback, and the various steps ACS has undertaken or plans to undertake to elevate the level of performance in each of the substantive areas demonstrated ACS' deliberate good faith efforts to improve its practice (as required by ¶ 1 of the Horizon Agreement). These good faith efforts demonstrate ACS's potential and willingness to remediate the remaining practice and performance gaps, stabilize the facility, and reduce the risk of harm from serious violence.

## Compliance with the Substantive Provisions of the Second Agreement

When assessing ACS' level of compliance with the substantive provisions of the Second Voluntary Agreement, as required by ¶ 5(c), the Monitoring Team considered and described the broader context for our findings, including the challenges and obstacles presented to implementing the requirements of the Second Voluntary Agreement as well as the generally accepted practices for 16- and 17-year-old youth. Further, the Monitoring Team also gave due consideration to ACS' diligent and good faith efforts to implement the requirements of the Second Voluntary Agreement within the totality of the circumstances. For each of the substantive provisions enumerated in ¶ 2 of the Second Voluntary Agreement, ACS' efforts to implement the required practices are described, generally accepted practices are referenced, and key challenges and obstacles are highlighted. The Compliance standard as defined in the Second Voluntary Agreement, ¶ 5, is whether "ACS has consistently complied with the relevant requirement and any violations of the relevant requirement are only minor or occasional and not systemic, material or recurring."

### Summary

Throughout the remainder of this report, current practice in each of the six provisions of the Second Voluntary Agreement is assessed. The Monitoring Team's assessment was informed by the analysis of a variety of documents, incident reports and video footage; collaborative discussions with ACS leadership who responded to questions and provided important details about their steps toward compliance and facility improvement plans; observations and interviews conducted while on-site; and ACS's written assessment of practice in each area. This methodology provided a multi-faceted vantage point from which both progress and areas in need of continued improvement could be identified. ACS has been both transparent and candid about its journey toward implementing its vision for providing quality care. Without a doubt, the pace of progress would be accelerated if Horizon had a full complement of appropriately skilled staff, as staff shortages and the volume of overtime required has seriously compromised ACS's ability to achieve the things it has set out to do. ACS is on a well-conceptualized path where compliance is certainly closer than it was at the outset of the First Voluntary Agreement but given that improvements to Horizon's staffing situation will likely come slowly, the pace of progress may also continue to be moderated.

❖ **Protection from Harm (¶ 2(a)).** The facility's progress toward protecting youth from harm is mixed. Significant reductions in the overall *frequency* of youth violence were sustained during the monitoring period, with the rate of youth-on-youth assault and

youth-on-staff assault approximately 40-50% lower than the first few monitoring periods. Staff continue to generally exhibit patience and use force appropriately and proportionately, although there are still concerning cases of staff misconduct and signs of correctional fatigue are becoming more common. The Monitoring Team remains very concerned about the risk of harm to youth due to the prevalence of assaults involving sharpened weapons and dangerous strangulation holds, group assaults of a single victim and the frequency of serious injuries. ACS has implemented several strategies to improve the detection and seizure of dangerous contraband and to address overall security lapses.

❖ **Physical Restraint (¶ 2(b))**. Staff use or attempt to use trained SCM techniques, and the Monitoring Team has not observed a pattern or practice of unnecessary or excessive physical intervention. At times, staff's use of physical restraint appeared simply inadequate to quell or control youth during mass disturbances, but strategies discussed throughout this report appropriately target increasing staff numbers and improving response time, making this less of a driving concern.

❖ **Incident Review (¶ 2(c))**. ACS finalized a new incident review policy during this monitoring period and submitted it to the state oversight agency for approval. The recent hiring of several Operations Managers brought the necessary resources to make the policy requirements more achievable. Full implementation will bring a more systematic element to the *ad hoc* reviews that are reportedly ongoing and should increase the frequency with which staff receive feedback to support and guide their skill development.

❖ **Programming (¶ 2(d))**. ACS continues to make substantial efforts to provide an array of programming to youth at Horizon by dedicating significant resources to ACS staff and vendors to provide structured activities. Recent efforts to ensure that vendors focus on age-appropriate programming given the interests of the older youth housed at Horizon post-Raise the Age should help to increase youth engagement and rehabilitation. PATS revealed that program delivery is not yet dependable, and that youth received the required complement of programs only about half the time. ACS has several tools to identify the obstacles to delivering programming more consistently (typically, youth movement and youth refusals). While 100% consistency is not required for compliance, these obstacles need to be addressed such that the programming schedule is delivered more reliably.

❖ **Behavior Management Program (¶ 2(e))**. Nearly all Horizon staff are now trained to deliver the behavior management program (STRIVE) and its basic components were

implemented in all living units on December 12, 2022. Both internal audits and those conducted by the Monitoring Team revealed significant problems with point card mechanics (many are left blank and/or not filled out contemporaneously). The facility is taking steps to adjust the parameters of Restorative Status to ensure that consequences for misconduct are consistent, dependable and proportional. The addition of several new Operations Managers creates new potential to improve the support and guidance offered to staff regarding their use of STRIVE.

❖ **Room Confinement (¶ 2(f))**. The use of this tool remains very rare, as Horizon reported only two room confinement events during the current monitoring period. Compliance with policy requirements and protections for youth in room confinement improved somewhat, but still lack the essential elements of individualization (*i.e.,* staff make only general statements about youth's welfare, youth involved in a group event are all released from room confinement at the exact same time). In addition, staff do not reassess the youth's risk of imminent harm as required (*i.e.,* stating only that youth are "safe and secure" but not providing descriptions of each youth's behavior or verbalizations). The facility needs to ensure that proper reassessments of the need for room confinement occur at the required intervals to demonstrate that extended stays in room confinement are properly justified.

A fulsome assessment of compliance with each of the six substantive provisions of the Second Voluntary Agreement is below.

---

**¶2(a). Protection from Unreasonable Risk of Harm**. AO Youth shall be supervised at all times in a manner that protects them from an unreasonable risk of harm. Staff shall intervene in a timely manner to prevent youth-on-youth fights and assaults, and to de-escalate youth-on-youth confrontations, as soon as it is practicable and reasonably safe to do so.

**ACS Policy & Practice.**
- As a Specialized Secure Detention Facility that is authorized to house Adolescent Offenders (AOs), Horizon must abide by OCFS Regulation 9 CRR-NY 180-3.11 "Staffing and Supervision of Youth."
  - This regulation requires a 1:6 ratio of YDSs to youth and requires a minimum of two staff in each area except when a staff is escorting an individual youth within the building.
  - The regulation also requires a sufficient number of supervisors to adequately supervise direct care staff and provide relief coverage when needed on the units.
  - The regulation also requires facilities to have a separate unit of staff to respond to emergency situations that require additional de-escalation and crisis

intervention. At Horizon, the ACS Police provide reinforcement for the YDSs, as the ACS Police can apply mechanical restraints when necessary and have arrest powers (in addition to other duties such as managing the front gate, live video monitoring, perimeter security, transportation, etc.).

- ACS Policy #2014/10 "Safe Intervention Policy for Secure and Non-Secure Detention" provides guidelines for staff to follow "when they are required to contain the acute physical behavior of youth." It emphasizes that the primary purpose of emergency interventions is to protect the safety of youth and staff. While staff must utilize the least amount of force necessary, the policy also reinforces that staff have a duty to act to protect youth or staff from harm due to assaultive or violent behavior.
  - o ACS utilizes Safe Crisis Management (SCM) to promote safety and to guide physical interventions when needed.
  - o SCM's practice guidelines include more than the use of physical intervention. They also require staff to utilize "primary strategies" to prevent incidents from occurring (*e.g.*, structured daily schedule, behavior management system that teaches necessary skills, etc.); a range of non-verbal and verbal "secondary strategies"; and trained physical intervention techniques.
  - o SCM requires both youth and staff to engage in a de-briefing protocol within 24 hours of a physical intervention.
- ACS Policy #2018/09 "Behavior Management in Secure and Specialized Secure Detention" articulates the importance of and pathway toward physical and emotional safety:
  - o V.A. "When youth sense that they are at risk of harm, the entire rehabilitative process is undermined."
  - o V.C. "Staff shall be deployed in a manner that maximizes visibility and maintains a high degree of supervision throughout the facility, maintaining appropriate staff ratios at all times…"
  - o V.D. "Predictability and structure are hallmarks of a safe and therapeutic environment. Staff of multiple disciplines and varying levels of seniority shall work together to develop daily programming and activities that are meaningful to youth and minimize idle time on the living unit."
- ACS Policy #01/2012 "Reporting of Incidents and Data Management for Group Oriented Analysis Leadership Strategies (GOALS)" outlines procedures necessary for comprehensive, accurate reporting of incidents that occur in ACS facilities. This type of information is essential for creating an accurate record of what occurred, and it is also critical to ensure uniform, valid data on key indicators regarding facility safety.
  - o An "incident" is defined as "any event which might adversely affect the health, safety, and/or security of residents, staff, or the communication or with impacts on a facility, the agency, or agency property."
- ACS maintains quantitative data regarding youth-on-youth assaults, youth-on-staff assaults, physical aggression, threats, and restraints along with narrative summaries of all incidents occurring at Horizon.

- The Deputy Commissioner and facility leadership continue to work to ensure that all direct care staff at Horizon (*i.e.*, YDS, AYDS, OM, TC and ACS Police) collaborate effectively to improve safety and security at the facility.

**Monitoring Team's Analysis**.

The Monitoring Team assesses the risk of harm by examining the totality of the circumstances in the facility. Several positive trends are evident, but the risk of harm remains high. ACS meets the required 1:6 ratio of staff to youth but has fewer staff per tour than would be optimal. The number of staff and the under-developed skill set of many new staff is insufficient to properly supervise, anticipate and intervene in circumstances that present a significant risk of harm in the form of youth violence. The behavior management program and structured programming have yet to maximize their potential to meaningfully deter violence, particularly that which involves the use of weapons, group assaults on a single victim, and large group disturbances. The Monitoring Team's observations regarding increasing signs of correctional fatigue and some staff's failure to take action during youth's prolonged periods of property destruction designed to gain access to rivals is further concerning.

As noted in the Introduction to this report, the *rate* of violence has remained relatively low for the past 12 months which, importantly, reduces the level of chaos, disorder and fear among staff and youth. Fewer disruptions also make it more likely that programming, school, and efforts to develop trust and constructive rapport among youth and staff can occur. This trend is unquestionably positive. That said, the frequency of serious violence is a remaining concern that impedes compliance with this provision. ACS is making reasonable and on-going efforts to improve basic security practices, to reduce the volume of contraband weapons in the facility, and to increase the presence of supervisors on the units in order to enhance YDSs' skill in managing the population, but these efforts have yet to adequately reduce the risk of serious harm to youth in custody.

The Monitoring Team's review of incidents (discussed in more detail below) shows that lapses in basic security practices continue to contribute to violent incidents, but that many staff do respond safely and proportionately, and utilize or attempt to utilize trained techniques. Along with improved security procedures, an array of high-interest, age-appropriate programs and a robust behavior management program are two key tools for reducing all types of violence. Horizon has made important progress in both areas, though it has not yet achieved compliance with the relevant provisions, as discussed in detail below. The Monitoring Team's experience suggests that robust implementation of, and thus compliance with, the Second Voluntary Agreement's provisions will be difficult to achieve without sufficient numbers of skilled staff to properly supervise youth.

**Compliance Rating**. Progress Made, but Compliance not yet Achieved

**¶2(b). Use of Physical Restraints**. ACS shall comply with applicable ACS policies governing staff's use of physical interventions and restraints (collectively "Physical Restraints") and any required reporting

of such incidents, including Policy #2014/10 ("Safe Intervention Policy for Secure and Non-Secure Detention") and Administrative Order #01/2012 ("Reporting of Incidents and Data Management for Group Oriented Analysis of Leaderships Strategies (GOALS)"). The aforementioned policies shall be referred to herein as "the ACS Physical Restraint Policies." The City and ACS shall also agree to comply with 9 NY-CRR §§180-3.15 and 180-3.16.[9]

(i). The Monitoring Team Panel shall assess, in collaboration with ACS's division of Youth and Family Justice ("DYFJ") senior managers, on ACS' staff reporting and use of Physical Restraints, and shall provide feedback and any necessary recommendations for enhancements to reporting, limiting physical interventions where possible, and improvements to the use of Physical Restraints. This assessment shall include a review by the Monitoring Team Panel of a reasonable number of incidents involving the use of Physical Restraints (including the review of staff reports and/or video footage), to provide feedback on de-escalation and restraint approaches to youth-on-youth violence, youth-on-staff violence, staff-on-youth violence, and other situations with an imminent threat of harm. The Monitoring Team Panel shall make recommendations about staff training and articulate general improvements to practice as necessary, in consultation with DYFJ senior management.

ACS Policy & Practice.

- ACS Policy #2014/10 "Safe Intervention Policy for Secure and Non-Secure Detention" requires that ACS staff employ Safe Crisis Management ("SCM"), a comprehensive approach to behavior management which requires substantial effort in prevention and non-physical interventions before staff may resort to Emergency Safety Physical Interventions ("ESPIs") to restrain residents.
  - o This policy outlines the training requirements for implementing SCM, the proper application of ESPIs, and considerations before, during, and after an ESPI is used.
  - o Mechanical restraints may only be used when ESPI techniques are unsuccessful in controlling aggressive physical behavior and when staff have determined that such an intervention is in the best interests of the youth involved.
  - o Overarching Principles:
    - The policy states that the primary purpose of any emergency intervention is to "protect the safety of the youth who is being restrained and all other youth, the staff, the community, and others who may be present within a context that promotes healthy relationships with youth, including employing effective communication, making empathetic connections, and establishing a structured, consistent environment."
    - The policy states that when physical interventions are necessary, staff shall use only the minimum amount of physical intervention necessary to stabilize the youth or situation.

---

[9] NY State Law regarding the use of physical restraint (§180-3.15) has requirements that limit the circumstances in which it can be used; requirements for staff training; prohibitions on specific types of restraints; requirements for medical review; reporting; parent notification; and post-restraint debriefing protocols. NY State Law regarding the use of mechanical restraints (§180-3.16) limits the type of equipment that can be used; requires staff to be trained; positions mechanical restraints as a last resort in the facility's restraint continuum; requires constant supervision of youth while in mechanical restraints; and requires authorization at various intervals.

- ▪ The policy expressly prohibits the use of excessive force or inappropriate restraint techniques.
- Reinforcement of SCM:
  - o The facility continues to have SCM Coaches who provide additional support and training in SCM at the facility-level through informal coaching. These coaches work throughout the facility and facilitate short, skill-building sessions to reinforce SCM best practices; respond to incidents; and provide real-time debriefings and feedback to staff. ACS also reports that a facility-based trainer (in SCM, among other topics) is scheduled to begin in September 2023.
- Staff reporting of physical restraints is discussed in ¶ 2 (c) below.

**Monitoring Team's Analysis**.

Physical intervention by staff in a secure setting is at times required to maintain order and safety—there are times in which staff must utilize a physical restraint to prevent harm or to avoid further harm from occurring. A well-executed, well-timed physical restraint that is proportional to the observed threat can actually protect both staff and residents from serious harm.

Overall, the Monitoring Team has not observed a pattern or practice of excessive or unnecessary force utilized by ACS staff. ACS staff's use of physical restraints has been observed to generally be proportional to the extant threat, and staff appeared to utilize or at least attempted to utilize trained SCM techniques when physical intervention was necessary. Throughout this monitoring period and in prior periods, the Monitoring Team observed that most staff demonstrate significant professional control and tempered their use of force appropriately. ACS first achieved Compliance with this provision during the previous monitoring period and sustained the requisite performance level during the current monitoring period.

- *Physical and Mechanical Restraint Data*

Accurately interpreting the data regarding the use of restraints requires some important context and considerations. First, ACS maintains restraint data that tabulates the number of *youth* who were restrained (in contrast to data on youth violence reviewed in the Introduction above, which tabulates the number of *incidents*). This means if six youth were involved in an assault and all six were restrained, the data related to that incident would include <u>one</u> assault and <u>six</u> restraints. Second, it is also important to recognize that not all acts of violence lead to a restraint (*e.g.*, the youth involved could cease their activity based on staff's verbal commands). Further, restraints are also used to respond to youth behaviors other than acts of violence (*e.g.*, a youth who is physically aggressive and posing an imminent risk of physical harm to another's safety may be restrained prior to an assault actually occurring). Finally, ACS's physical restraint data only includes a very specific category of physical intervention used by staff on residents—known as Emergency Safety Physical

Interventions ("ESPIs") under the Safe Crisis Management ("SCM") framework.[10] Because escort holds are excluded from the physical restraint data in this report, this data should be considered under-inclusive in terms of understanding the frequency with which staff needed to use physical force with a non-compliant resident. For all of these reasons, the Monitoring Team's assessment of the risk of harm, as outlined in the introduction and the discussion of ¶ 2 (a) above, considers a broad array of information beyond the restraint data.

The chart below presents the rate of both physical and mechanical restraints from January 1, 2021 to June 30, 2023 (the 30-month period since the Agreements went into effect). *See* Appendix B for monthly data on the number and rate of physical and mechanical restraints. This data illustrates that the number and rate of restraints decreased significantly during the previous monitoring period and the rate of physical intervention further decreased during the current monitoring period. The average rate of physical restraints has consistently declined across monitoring periods, with a current average that is 82% lower than the average rate during the first monitoring period (0.44 versus 2.51).

| Average Rate of Physical and Mechanical Restraint, January 2021-June 2023 [11] | | |
|---|---|---|
| Date | Physical Intervention | Mechanical Restraint |
| 1st monitoring period (January-June 2021) | 2.51 | 0.43 |
| 2nd monitoring period (July-December 2021) | 1.69 | 0.28 |
| 3rd monitoring period (January-June 2022) | 1.55 | 0.37 |
| 4th monitoring period (July-December 2022) | 0.53 | 0.18 |
| **5th monitoring period (January-June 2023)** | **0.44** | **0.26** |

The trends are commensurate with Horizon's lower rates of youth violence, a correlation that makes sense since most restraints occur in response to violence.

- *Trends in Physical Interventions*

To assess the necessity, execution, and proportionality of Horizon's use of physical interventions, the Monitoring Team reviewed video footage and related documentation such as staff reports and injury reports (collectively referred to as "packets") for 51 events occurring between January and June 2023 at Horizon. Events were selected based on the initial description in the GOALS reports where either a significant physical intervention occurred or some other type of interaction between staff and residents appeared to warrant

---

[10] ACS' restraint data does not include escort holds, even if the escort is of a non-compliant resident and some physical coercion is needed. It also does not include incomplete ESPIs that do not result in a physical restraint (that is, a staff member attempts a specific restraint technique but fails and does not restrain the resident, the event then terminates with the resident ultimately complying without the use of physical restraint). ACS' approach to categorizing and calculating the restraint data is guided by the well-respected organization (JKM Training, Inc.) that developed ACS' curriculum for responding to aggressive behaviors (Safe Crisis Management, or SCM). While escort holds and incomplete ESPIs are not considered "physical restraints," they are *reportable events* and are included in the GOALS reports shared with the Monitoring Team.

[11] Rate = ((# of incidents/# days in month)/ADP) * 100.

review by the Monitoring Team. About three-quarters of the incidents reviewed included physical intervention by staff.

As in previous monitoring periods, for the most part, ACS staff either used or attempted to use trained SCM techniques in response to situations involving an imminent risk of harm. Most restraints were in response to youth-on-youth violence or violence directed at staff, and staff appeared to respond more quickly, and to gain control more effectively and efficiently than they did earlier in the 30-month period. Staff typically showed patience and professionalism and maintained their composure following assaults or provocations and generally did not hesitate to intervene to protect residents from youth-on-youth violence, often putting themselves in harm's way to protect victims of assault. At times, exigent circumstances appeared to warrant intervention, but staff did not take appropriate action (examples are provided in the Introduction to this report). Given the volume of overtime that many staff work and the fact that so many Horizon staff are new to the field, the risk of corrections fatigue (wherein staff either remain overly passive or may "snap" and respond aggressively to youth) is real and something that ACS should continue to strive to proactively identify and address.

At times, staff were overwhelmed by the number of youth engaging in violent attacks or attempting to breach doors to engage rival peers. Increased presence by supervisors and stronger collaboration with ACS Police (both a work-in-progress as discussed in the Introduction to this report) should be helpful in gaining control of large group disturbances. The Monitoring Team remains concerned about the potential lethality of strangulation holds and has provided technical assistance to help ACS properly communicate these risks to staff and/or take additional defensive action. Unfortunately, in some cases, neither staff actions nor supervisors' incident reviews suggested that they fully understood the risks present. ACS is encouraged to concentrate on the SCM "escape" techniques to bolster staff's confidence and skill in escaping these dangerous situations and should explore any other techniques that can be used to protect or rescue others from strangulation holds.

Overall, the Monitoring Team has not observed a pattern or practice of excessive or unnecessary force by ACS staff. ACS staff's use of physical restraint has been observed to generally be proportional to the severity of the event, and staff appeared to utilize or at least attempted to utilize trained SCM techniques when physical intervention was necessary. ACS remains in Compliance with this provision.

**Compliance Rating**. Compliance

## ¶2(c). Incident Report Review and Referral. ACS shall conduct timely and thorough reviews of incidents involving Physical Restraints to determine whether the intervention was appropriate and whether ACS staff complied with the ACS Physical Restraint Policies.

ACS Policy & Practice.

- ACS Policy #01/2012 "Reporting of Incidents and Data Management for Group Oriented Analysis Leadership of Strategies (GOALS)" creates a procedure for comprehensive, accurate reporting of incidents that occur in ACS facilities. GOALS reports are created for every incident occurring in the Facility, including physical restraints, mechanical restraints, etc. as noted in ¶ 2(a), above.
- ACS Policy #2014/10 "Safe Intervention Policy for Secure and Non-Secure Detention" requires:

  (1) that any use of an ESPI on a resident must be immediately reported to a supervisor or Tour Commander, and each staff member involved in or who witnessed the event must submit an Incident Report form;

  (2) a supervisor must complete the "Supervisory Follow-Up" portion of the Incident Report Form; and

  (3) Executive Directors must review all Incident Report Forms involving an ESPI within 48 hours.

- ACS Policy #2022/03 "Incident Review in Secure and Specialized Secure Detention" was revised during the current monitoring period and submitted to the Office of Children and Families for approval in mid-July 2023. The new policy:

  o requires staff who were involved in or who witnessed the event to complete an incident report. The Incident Report Form has required fields including basic information such as date, time, and youth involved; a general narrative section; and an ESPI-specific portion where staff must identify the type of physical restraint utilized, its duration, and other information specific to the physical restraint.

  o identifies responsible parties and provides guidance for the compilation of incident report packages.

  o establishes layers of supervisory review for all incidents, and heightened scrutiny for "critical" incidents.

    ▪ These procedures, among other things, require supervisors to review all staff incident reports to ensure they are detailed and complete, and to complete the "Supervisory Follow-Up" section of the incident report. This section includes information regarding restraints, injury and medical follow-up, youth and staff debriefing, and any necessary reporting to the Justice Center. This section of the form also requires a short narrative of the supervisor's findings which according to policy must "include any disciplinary action or recommendation, as well as commendations."

    ▪ Once the incident report package is compiled and finalized by a supervisor, the policy requires the Operations Manager to complete a Manager's Report for all critical incidents, significant incidents, child

abuse allegations and any incidents that resulted in serious injury.[12] This report must include, among other things, a description of the incident including what is learned from a review of video footage, follow-up actions, and any recommendations for staff training or disciplinary action. A Manager's Report should also identify any issues that the initial supervisor's review failed to detect.

o   articulates a process and related forms for documenting any required corrective action, including ELU referrals.

▪   These actions have been tracked in a "Corrective Action Tracker" since November 2022.

▪   If any corrective action is recommended, the Executive Director of Operations or the Associate Commissioner must approve and then document any facility-based corrective actions and must prepare the necessary Employment Law Unit ("ELU") referrals for formal discipline. All ELU referrals must be approved by the Deputy Commissioner. The Deputy Commissioner must also review incidents involving child abuse allegations, other egregious acts or injuries and must approve any arrests (of youth or staff) related to an incident.

•   For all incidents reported to GOALS (not just those involving ESPIs as described above), additional layers of supervisory review *may* occur on an *ad hoc* basis, including:

o   Video review by facility managers when debriefing with staff and youth and approving incident reports from their subordinates;

o   Regular Operations Managers' incident review meetings; and

o   Reviews by facility and ACS senior leadership of more serious incidents.

**Monitoring Team's Analysis**.

The assessment of compliance with this provision examined incident review practices—both those prescribed by the new "Incident Review in Secure and Specialized Secure Detention" policy and those occurring in an *ad hoc* fashion—and ACS' efforts to apply corrective action when deemed necessary.

*(1) Incident Review Policy and Practice*

Generally accepted practices in juvenile facilities dictate that all incidents must be reported, in detail, to permit responses to both youth misconduct (discussed in the Behavior Management section of this report, below) and to address any staff practices in need of remediation or that warrant corrective action. ACS has an adequate mechanism for reporting

---

[12] Policy defines a Critical Incident as "any occurrence or event in a facility or involving staff, volunteers, youth or visitors that has an impact on the safety, well-being, functioning or security of the facility or staff, volunteers, youth or visitors. Attachment A of the policy lists and defines the following crucial incident types: attempted escape, birth, child abuse allegation-external, child abuse allegation-internal, contraband, death, employee misconduct, escape, fire, fractures, group action, head injuries, hostage situations, loss of consciousness, lost keys, lost shields/identification, major disorder, miscarriage, natural/civil emergency, physical altercation with injury, physical assault, sexual abuse/assault, and suicide attempt.

incidents internally, including all physical restraints, via staff incident reports and the GOALS summaries of those incidents.

Next, supervisors should conduct a systematic review of incident reports, with the more serious incidents moving further up the chain of command. This review provides an opportunity to understand the underlying dynamics of the event, to ensure that youth received any necessary follow-up services and, importantly, to assess staff practice. When viewed in the aggregate, incident reviews provide an opportunity to detect systemic operational vulnerabilities that need to be addressed and procedures that need to be fortified. Supervisory reviews also provide an opportunity to provide recognition and accolades for staff's sound decision-making during stressful situations and also an opportunity to provide guidance when practices need to be refined. The value of assessing and guiding staff practice, via a review of *all* incidents, cannot be understated, particularly for a facility with an inexperienced workforce like Horizon. Furthermore, a robust supervisory review of every incident is the first step of a robust procedure to detect staff misconduct and apply corrective action when warranted.

o   *New Policy and Procedure*

As discussed in previous Monitor's Reports, crafting a practical policy that meets the requirements of this provision of the Agreement has taken ACS a long time. The first iteration of Policy 2022/03 "Incident Review in Secure and Specialized Secure Detention" (promulgated on September 7, 2022) was cumbersome and impractical and thus was never fully implemented. With encouragement from the Monitoring Team, ACS revised this policy to prescribe a more streamlined process that clarifies the types of incidents that require review from the highest levels of facility leadership and expands the supervisory titles that can initiate the lower-level review. The revised policy now provides greater flexibility and should improve the consistency and fidelity of implementation.

Until formal policy implementation occurs, ACS plans to continue its *ad hoc* incident reviews described in prior reports.[13] In addition, ACS reports that the Senior Operations Manager has begun to conduct regular incident review meetings attended by relevant Operations Managers and Tour Commanders. Still in the early phases, these meetings are providing an important framework for teaching new supervisors *how* to conduct a robust incident review (*e.g.*, how to approach the review, what to look for, and how to respond to both exemplary staff practice and staff practice in need of remediation).

ACS reports that, on a daily basis, supervisors of all levels have begun to utilize video review when debriefing with staff, approving incident reports from their subordinates or in preparation for group debriefing with youth (called "Circle-Ups"). When interviewed by the Monitoring Team, supervisors discussed this component of their job responsibilities, some of whom appreciated the usefulness of the tool and some of whom were uncertain about how to maximize its usefulness and/or reported they didn't have sufficient time to engage with their subordinates in this way. The facility's efforts in this area are supported by National

---

[13] *See* First Monitor's Report at pg. 18, Second Monitor's Report at pgs. 20-21, and Third Monitor's Report at pg. 27.

Partnership for Juvenile Services (NPJS) consultants who regularly participate in video incident reviews with YDSs and supervisors to identify issues. NPJS consultants are also expected to be available as the newly revised policy discussed above begins implementation.

As noted above, the Monitoring Team reviewed the incident packets for 51 incidents that occurred from January to June 2023, most of which included the use of physical restraint, and found that the Incident Report Forms completed by staff who either participated in or witnessed the incident were often vague or incomplete, with some omitting critical details. While staff appear to accurately detail the actions of youth, staff's reports are often vague or inaccurate regarding their own actions and/or those of other staff. Furthermore, a significant number of the incident report packets did not include staff reports from all of the staff who participated in or witnessed the incident.

The Monitoring Team's review of incident reports indicated that the incident review process is not yet being implemented as designed. Evidence that supervisors reviewed the incidents was present (with a narrative on one of the staff reports, and references to that report being listed on the other reports so that it can be found by those doing other levels of review) and a few of the reviews included a holistic assessment of the incident. However, the substance of most of the reviews was generally limited to whether any youth sustained an injury and were taken to medical and whether youth were debriefed. Notably, a critique of staff actions was rarely included. ACS reported that when the supervisor calls the incident in to ACS headquarters (the Movement Control Communications Units, or MCCU), additional detail may be requested, but reported that these inquiries need to be made more consistently by the Operations Managers who should assess the quality of supervisors' review of incident reports that are generated on their units, using the Manager's Report required by policy.

The Manager's Report summarizing the incident and any response is an essential component of policy that is not yet in systematic practice, although some incidents reportedly do receive this level of review. A couple of the incidents reviewed by the Monitoring Team included a Manager's Report, but many of the others qualified for this review given that they met the definition of a "critical incident" yet did not receive this review. This is one of many improvements that ACS believes the more robust corps of Operations Managers is now positioned to accomplish. A fulsome Manager's Report will not only provide transparency but will also be important evidence of the facility's ability to recognize and address staff's policy violations, potential mistreatment and/or inappropriate relationships. ACS reports that steps regarding corrective action and the review by senior facility and ACS leaders occur dependably. What has not yet been fully implemented are procedures related to front-line supervisors' review of incidents and the Manager's Report discussed above.

The revised policy was submitted to the Office of Children and Family Services for approval in mid-July 2023, and will be introduced to facility staff upon approval. The roll-out will include a policy brief read at roll call and disseminated in hard copy to staff, who will have an opportunity to ask questions. ACS also recently created an electronic policy library that contains the most current versions of all policies and is working to ensure staff have access to

the library. In the meantime, hard copies of policies are available in multiple locations throughout the facility and Policy Briefs/Quick Reference Guides are distributed regularly.

The full implementation of the revised Incident Review policy should provide a dependable framework to ensure that <u>all</u> incidents receive the necessary scrutiny in order to make consistent, meaningful incident review the norm at the facility.

*(2) Response to Identified Misconduct*

Coaching, mentoring, and training are important tools for enhancing staff skill in response to less serious policy violations. This type of response may not only boost staff morale but may also stem the tide of staff turnover. The new ACS/facility leadership has emphasized cultivating skill development in response to less serious departures from policy, rather than imposing disciplinary measures which reportedly characterized the previous facility leadership's approach. ACS reports it wants to maximize the use of facility-based corrective actions to support improved staff practice and does not simply want to default to immediately terminate staff (particularly probationary staff) if it appears that staff are in a position to improve their practice going forward. ACS attributes some of the perceived improvement in staff morale to the administrators' change in philosophy.

For all 51 incident packets described above, ACS provided the Monitoring Team with information on the administration's response to any identified poor practices. Five of the incidents were referred to the ELU for formal discipline, resulting in at least four staff being terminated and one suspension. The more frequent accountability measure was corrective action at the facility level. Corrective action was taken in 18 of the 51 incidents, typically in the form of a written conference addressing securing keys, securing doors, situational awareness and proper supervision. A few staff also were required to attend SCM retraining. As in prior monitoring periods, a few of the staff involved had resigned and some were out on Worker's Compensation (so any necessary corrective actions would await their return).

In general, for the subset of 51 incidents, ACS's actions in response to identified misconduct were aligned with the problems with staff practice the Monitoring Team identified during its review. Tracking appears to be reliable and most corrective actions appeared to be proportional to the severity of the identified issues. ACS' record-keeping regarding corrective actions appears to be a dependable mechanism for ensuring that necessary action is taken in response to identified misconduct and/or poor practice.

<u>Conclusion</u>

With the recently revised "Incident Review in Secure and Specialized Secure Detention" policy and the addition of several Operations Managers to Horizon's staff, ACS is now well positioned to meet the requirements of this provision of the Agreement. The procedures for incident review are now clear and appear to be practical and feasible for implementation. Some skill development is required among Operations Managers to identify areas in need of improvement in the incident reporting practices of their subordinates, and then to elevate staff's skill set in this area, but this is reportedly underway. In addition to the benefits that a systematic incident review process should bring to the ability to coach and guide staff

practice, the new policy, once implemented should also assist the facility in identifying operational vulnerabilities that can then be targeted for improvement in a more systematic fashion than accomplished by the current *ad hoc* processes.

**Compliance Rating**. Progress Made, but Compliance not yet Achieved

## ¶2(d). Programming. ACS shall develop, track, and maintain a sufficient level of programming for AO Youth, consistent with best practices for adolescents and young adults.

**ACS Policy & Practice.**
- ACS Policy #2019/04 "Exercise, Recreational and Leisure Activities in Secure and Specialized Secure Detention," which requires a balance of structured recreational, exercise and leisure activities that are posted on a daily unit schedule, remains in effect.
  - This policy requires one hour of large muscle activity per day.
  - In the previous monitoring period, ACS adjusted the internal targets of at least 2.5 hours of programming per day during the school year and 3 hours of programming per day during the summer months. These targets were adjusted beginning with the 2022-2023 school year to accommodate the later school start time implemented to encourage attendance.
- ACS Policy #2019/31 "Educational Services in Secure and Specialized Secure Detention" remains in effect.
  - Youth of compulsory education age (*i.e.*, age 16 or younger) are to receive educational programming for 5.5 hours per day, Monday through Friday when school is in session.
  - Youth with a diploma/GED are to receive 5.5 hours of instruction per weekday, which includes literacy, math, life skills and workforce development.
  - YDS staff are required to facilitate timely arrival and attendance.
- Programming at Horizon is provided by Program Counselors, vendors, behavioral health staff and the YDSs assigned to each housing unit. Most of the programming facilitated by YDSs consists of semi-structured leisure time activities (*e.g.*, card games, video games, movies), while Program Counselors and vendors provide rehabilitative and skills-based programs such as creative arts, performing arts, cooking, personal fitness, goal setting, decision making and conflict resolution. Behavioral health staff provide group psychotherapy.
- Horizon's Program Team continues to deliver daily structured programming on each Hall, as well as a variety of building-wide events. These included Family Day, Juneteenth Celebration, carnivals, a self-care event and gaming competition, during which each Hall rotated through the program separately. A graduation event was held with youth from multiple Halls together.
- The Program Team includes a recently promoted Director of Programs, two Program Supervisor positions (one of which is now vacant due to that promotion; the Program

Supervisor position has been posted), and a Recreation Supervisor. Of the 10 Program Counselor positions that provide on-unit services, four are currently vacant (though two offers have been extended and interviews are being conducted for the other two). Two other Program Counselors oversee recreational/large muscle activity. Previously, Program Counselors were assigned to specific housing units, but now are deployed to units according to where the gaps in vendor-led programming lie. Program Counselors also conduct other stand-alone programming such as holiday and birthday celebrations, Family Days and the Elite Lounge (available to youth at the highest level of the behavior management program).

- Horizon operates a complete education program for youth who have not yet graduated from high school or earned an equivalent diploma. Horizon expanded its tutoring/mentoring program to ensure that tutors/mentors have a strong presence in the facility each day. During the 2022/2023 academic year, sixteen youth earned a Regents Diploma or High School Equivalency Degree. In addition, 34 introductory college-level courses are available through the College Level Examination Program (CLEP).

- ACS has identified a candidate (currently being vetted by City Hall) for an Assistant Commissioner of Workforce Development position. As noted in the Introduction, the City is encouraged to expedite vetting and onboarding so that the facility can begin to benefit from this new resource.

- ACS continues to refine its vendor-led program model to better address the needs and interests of the older population of youth at Horizon since Raise the Age went into effect. After a competitive selection process, ACS awarded a $4.5 million contract to The Children's Village to deliver workforce programming and tutoring to youth in secure detention. This partnership builds on existing efforts and requests by youth for programming that focuses on career exploration, work readiness, vocational education and training, education, labor market readiness, and life skills. Services are scheduled to begin in August 2023. The Children's Village team includes a program manager who is responsible for capturing and analyzing data regarding program delivery.

- Other vendors also provide programming to Horizon youth, including CONBODY (a fitness program) and Defy Ventures (which coaches youth in entrepreneurship, employment readiness and personal development and which offers re-entry support).

- A robust Chaplain program delivers faith-based programming for youth and has also become an important part of Horizon's approach to staff and youth wellness by providing support and refuge to staff and youth who need it.

- ACS has also provided administrative support to assist with recordkeeping, so that the Program Counselors may focus on providing services. A Senior Program Impact Coordinator provides training, coaching and quality assurance for the Program Assessment Tracking System (PATS) which tracks the delivery of programming and is used to assess whether internal programming targets are being met. In addition, a Program Liaison joined the Program Team in April 2023, and assisted with addressing the backlog of PATS data that needed to be entered.

**Monitoring Team's Analysis**.

Implementing a robust daily schedule full of engaging, structured activities is a powerful strategy for reducing facility violence and disorder. ACS' targets for daily programming hours are within the generally accepted practice and are certainly reasonable for school days, given the other things that must be accomplished before bedtime (*e.g.*, dinner, phone calls, visitation, showers).[14]

For the current monitoring period, PATS data revealed that daily program targets were met a little less than half the time (45%) in January-April 2023.[15] While this level of performance indicates that there are pervasive challenges to dependable program delivery, the fact that ACS, through PATS, now has the capability to track program delivery is a notable and important asset. In addition, the facility has two additional tools for monitoring program delivery—a *daily schedule* which shows which programs should occur on every unit, and a *daily program report* that shows which programs were actually delivered and if they were not, why not. This information is used to identify obstacles, which can then lead to facility-wide solutions. When interviewed, youth universally reported an interest in programming, but many were frustrated by the frequent disruptions to the daily program schedule. All reported a higher level of interest in vocational/job development programs compared to some of the other programs Horizon has historically offered.

Discussions while the Monitoring Team was on site indicated that the primary obstacle to consistent program delivery is youth movement. When youth on one unit delay movement to programming (*e.g.*, by being slow to prepare for movement or by refusing), that unit's delay cascades into the program access for other housing units for the rest of the day. Some of the problems arise from a lack of youth interest in available programming, which as noted above, ACS is addressing by reformulating its program offerings. Program refusal has become an intractable part of the youth culture on some units and ACS is looking for ways to address it. In addition, YDS staffing levels (discussed in the Introduction to this report) impact program access. When a segment of youth on a housing unit refuses to attend, staff must be deployed to both supervise that group and also to transport and supervise the youth who want to attend the program. To stay within required ratios and policy requirements (ACS staff are not permitted to supervise youth alone), two available staff must be identified, further stressing the facility's staffing complement which already operates with razor-thin margins.

ACS continues to make substantial efforts to provide an array of programming to youth at Horizon by dedicating significant resources to ACS staff and vendors to provide structured activities for youth that are led by an adult. By ensuring that vendors focus on age-appropriate

---

[14] The Agreements do not include provisions related to educational programming at Horizon and thus it is not part of the Compliance Assessment, despite the Monitoring Team's support for ACS' actions taken to improve attendance and engagement.

[15] ACS provided data for each day of each month, providing a "Y" or "N" indicator based on whether each housing unit met the 2.5-hour target. These data were aggregated to identify the proportion of days across all general population units (*i.e.*, excluding the SHU) when program targets were met. However, due to this reporting method, it was not possible to calculate the magnitude of the deficiencies each day (*i.e.*, whether the target was missed by 15 minutes or two hours*)*.

programming given the older age of Horizon youth post-Raise the Age and ensuring that offerings are aligned with youth interests, ACS expects to see increases in youth engagement and rehabilitation. ACS has sufficient tools (daily schedules, daily program reports and PATS) to both track performance levels and to identify obstacles to program access. While meeting internal programming targets each and every day is not required for compliance with this provision, obstacles to program access need to be identified and addressed.

**Compliance Rating**. Progress Made, but Compliance not yet Achieved

**¶2(e). Behavior Management.** ACS shall maintain systems, policies and procedures for AO Youth that: (i) reward and incentivize positive conduct and (ii) sanction negative conduct. The application of these procedures shall be individualized, consistent with any treatment needs for AO Youth and shall not compromise the safety of other AO Youth or ACS staff.

ACS Policy & Practice.
- ACS Policy #2018/09 "Behavior Management in Secure and Specialized Detention" remains in effect. It guides the delivery of a multi-tiered behavior management system that cultivates a "therapeutic institutional culture." The policy states that staff interactions with youth should teach youth self-regulation and problem-solving skills and emphasizes that youth with aggressive behaviors are the ones most in need of positive relationships with staff rather than punitive approaches to behavior management. These are important philosophical underpinnings to the facility's approach to behavior management. The policy specifically requires:
  - Safety Plans
  - Level System with incentives and consequences, that is consistent with each youth's Safety Plan (which is consistent with the requirements of this provision)
  - Therapeutic groups, individual interventions and opportunities for youth empowerment and self-advocacy
- In 2020, the National Partnership for Juvenile Services (NPJS) helped ACS to strengthen its behavior management system's (STRIVE) design, particularly regarding youth skill development, the reliability of incentives for desirable, prosocial behavior and ensuring meaningful consequences for negative behavior.
- ACS developed an excellent manual to guide implementation of Restorative Justice activities that includes restorative circles and an array of group-based activities.
- NPJS consultants continue to facilitate training sessions for all staff (except that which occurs at the Academy—where those instructors were trained by NPJS consultants). Training includes the mechanics of the program (strategies to increase appropriate behaviors such as praise, point cards and privilege levels; strategies to decrease inappropriate behaviors using a continuum of interventions that are calibrated to the severity of misconduct) and Restorative Justice activities. Scenario-based activities are included to facilitate the application of the various concepts.

- Nearly all Horizon leaders, managers, supervisors and staff have been trained in STRIVE (90+ %). Training is delivered to newly hired YDSs as part of Academy training, and full training is offered monthly to newly hired managers and staff returning from leave. At roll call, key concepts are reviewed (*e.g.*, behavior expectations, point cards, circle-ups, tier infractions, restorative status). Individual and small group coaching is also provided by NPJS consultants and ACS' behavioral management specialists. This coaching reportedly occurs on all housing units, providing real-time support, individualized feedback and remedial instruction.
- All living units implemented the basic components of STRIVE on December 12, 2022. Additional components will be layered on throughout 2023/2024.
- As part of its work to install a Core Leadership Team ("CLT") of managers, supervisors and key staff on each unit, ACS/NPJS identified STRIVE Captains to lead the effort. These individuals are convened weekly to review STRIVE's implementation on their housing units and to make plans to address identified deficiencies. NPJS also uses these meetings to develop plans for how they can best support Horizon staff.
- Three STRIVE Champions (staff in all job titles who demonstrate a depth of understanding or particular interest in behavior management) have received supplemental STRIVE training and Train-the-Trainer style support. They lead the "learning bursts" at roll call and will ultimately be able to lead the full STRIVE training. Two additional Champions were recently identified.
- ACS is developing an app that will automate many of the tasks commonly completed manually by staff. This unique and sophisticated approach to implementation may help Horizon to avoid many of the "operator errors" that undercut the delivery of behavior management programs in other jurisdictions.
- ACS plans to work with NPJS to implement a variety of skills-based group interventions, including cognitive behavioral therapies and restorative justice groups. Training is anticipated for 2024.

**Monitoring Team's Analysis**.

A robust behavior management program is an essential element of a safe facility. Such a program should teach skills that promote prosocial behavior (*e.g.*, skills for resolving interpersonal conflict, managing anger and resisting impulsive actions) and should incentivize and reinforce positive behavior with an array of meaningful rewards. A behavior management program should also provide for appropriate, proportional, skill-based responses to negative behaviors that hold youth accountable in an effort to reduce the likelihood of subsequent misconduct. In addition to having a sufficient number of well-trained staff and an engaging array of programming, a well-designed and consistently implemented behavior management program is the cornerstone of a safe facility.

As noted above, nearly all Horizon staff have now been trained, and all 10 housing units implemented the basic components of the new STRIVE model on December 12, 2022. These accomplishments have been years in the making and are important milestones in bringing a consistent approach to facilitating positive behavior among youth at Horizon.

The initial layer of the program includes:

- Clear **behavior expectations** for each component of the youth's day (*e.g.*, morning routine, restrooms, movement, school, meals, group, leisure time, recreation, etc.) that are posted throughout the facility.
- **Point cards** where staff award points when youth meet expectations and/or explanatory comments when they do not as they rate youth's behavior throughout the day.
- **Tiered incentive levels** (*i.e.*, Bronze, Silver, Gold, Independent) that provide an array of rewards and incentives in response to sustained positive behavior. These include phone calls, commissary, letter writing supplies, playing cards, radios, special meals and events.
- A **Restorative Process** during which proportional sanctions are imposed in response to discrete categories of misconduct. Sanctions include a drop in level, and activities that must be completed to return to point-earning status (restorative tasks, a reentry interview with Hall leadership). Restorative Meetings occur twice weekly to assess appropriate STRIVE levels for youth involved in incidents and to assign responsive restorative justice tasks.

The Monitoring Team assessed each of these program components. First, **behavior expectations** are clear and visibly posted in key areas of the facility. Facility leaders reported the expectations are frequently reviewed with staff to promote consistent application across staff and housing units.

The quality of implementation of **point cards** was assessed by reviewing point cards from two one-week periods (one week in February 2023 and one week in April 2023) and by reviewing point cards in use on each of the 10 housing units while on site in July 2023. This assessment revealed significant problems with the point cards' implementation. Many of the cards were incomplete, with only a portion of the eight rating periods completed; some were completely blank. Cards for youth on Bronze, Silver and Gold levels should be completed throughout the day, and the assessment revealed that this was not occurring for many youth on those levels. When cards were complete, they were not differentiated across youth (*i.e.,* points and comments were identical on all cards).

By design, youth on Independent level and those on Restorative Status do not accrue points (Independent youth, through their consistently positive behavior, have earned continued access to the highest levels of reward; Restorative Status youth must complete a variety of restorative tasks in order to return to point-earning status). Therefore, their point cards do not technically need to be completed by staff. On any given day at Horizon, about 70% of the population is on one of these two levels. Given what is known about the level of misconduct at the facility via GOALS reports, the high proportion of youth on Independent Status (about 40%) is questionable, a sentiment echoed by some of the staff who were interviewed by the Monitoring Team.

The Monitoring Team's expertise suggests this occurs for one of two reasons: 1) this status may be too easy to achieve. For many reasons, including the ability to deliver a vast

array of high-end incentives, achieving this status should not be easily accessible but rather should require consistently positive behavior over a significant period of time; or, more likely, 2) youth's point totals (and thus their level) may be artificially inflated. This can occur in a couple ways. First, when a point card is turned in blank, policy requires that staff entering the data award the youth the maximum number of points per grading period. Second, staff are required to address youth's negative behavior in the moment (indicated by awarding less-than-maximum points, or by writing an infraction for misbehavior), but often do not. This results in youth receiving points when they did not earn them, and thus artificially inflates youths' point totals. Finally, when interviewed, youth and staff both conceded that youth sometimes fill out their own point cards when staff often leave them unsecured. Conversations with facility leaders and staff on site, coupled with the attributes of the cards reviewed, suggest that it is likely that many youth's point totals may be artificially inflated, hence the large proportion of youth on Independent level.

The Monitoring Team provided several recommendations to address these implementation problems, including:

- Require AYDS, TC and OM to verify completion and accuracy of point cards during their routine tours of the housing units.
- Make clear on the point card record which points were awarded contemporaneously, versus which were awarded after-the-fact by staff entering the data who were following policy guidelines to award full points if a card was left blank. This will improve the ability to detect and address poor practice among individual staff members.
- Consider modifying the STRIVE policy to require points to be awarded and recorded for youth on all levels, including Restorative and Independent. This could promote better habits regarding point card completion since staff would not have to discern which subset of point cards require completion.

The importance of accurate point card completion cannot be understated. The points earned are the foundation for the incentive program and the levels should properly categorize youth according to whether their behavior meets expectations and their involvement in misconduct. Currently, the poor implementation of the point cards renders much of the STRIVE incentive program arbitrary and unfair, because the youth's point totals are often not congruent with their behavior. This permits youth to access incentives when they have not actually earned them.

On a positive note, the design of the **tiered incentive program** reflects good practice, with a robust and interesting array of rewards that increase at each level. ACS reports it is also making changes to its commissary ordering to ensure that the items available are compelling to Horizon youth. When interviewed, all youth reported that they received the incentives granted at their assigned level.

Finally, the **Restorative Process** continues to evolve to become more individualized. Rather than providing standardized packets to complete, ACS' Director of Practice Improvement leads a collaborative meeting among the OMs to select meaningful restorative

activities that are related to type of misconduct, and to ensure those activities are processed with the youth more consistently. This is essential toward the goal of applying consequences that are both meaningful and proportional to the nature of the youth's misconduct. To assess this process, Restorative Packets from two weeks during the current monitoring period (one week in February 2023 and one week in April 2023) were reviewed and while on site, the Monitoring Team observed a Restorative Meeting and interviewed the Director of Practice Improvement. Documentation from February 2023 revealed little evidence of the type of individualization and interactive discussion that is intended in STRIVE's program design. April 2023 documentation revealed more timely discussions following each incident and prompt implementation of the restorative activity selected. Reentry interviews were also conducted as required by the STRIVE program design. That said, several opportunities to fortify this component were identified and shared with ACS while on site. These included:

- A daily process for ensuring that a youth's level was dropped immediately in response to misconduct is essential to harness the power of meaningful consequences to deter negative behavior. Staff reports and the Restorative Meeting observation suggested that this may not occur dependably. While the Director of Practice Improvement attempts to verify that youth's level was dropped appropriately by comparing GOALS reports and the following day's point sheets, a more unit-based strategy may improve response time and ensure that the level reduction occurs close-in-time to the misconduct.
- Although a Restorative Meeting is convened regularly, most of the work to identify youth who had engaged in serious misconduct, verify that the appropriate level drop had occurred and to design and apply the restorative activities was being done by a single person—the Director of Practice Improvement. While this individual has been able to keep this component operational, it is not sustainable. A more realistic division of labor would be for those involved in the Restorative Meeting (particularly the Operations Managers) to gradually take responsibility for implementing this function for the youth on their assigned housing units. Meeting observation revealed that these individuals are extremely well informed about peer dynamics among their youth and certainly seem capable of the task, once fully installed at the facility. The Monitoring Team has examples of different methods for applying consequences from other jurisdictions if this suggestion turns out not to be feasible.
- The short duration of the Restorative Status was often cited as a problem that weakened the consequence side of STRIVE's design. Ensuring that the duration is proportional to the severity of the youth's misconduct is essential. Even though a youth may complete the required restorative activities, additional time at the lowest level/time out of point-earning status or other contingencies may be appropriate in some circumstances.

In summary, STRIVE's implementation accelerated rapidly during the current monitoring period, providing a consistent structure and language for encouraging positive

behavior and responding to negative behavior. As in all behavior management programs, fidelity to design is both critical and very difficult to achieve in the early phase of implementation. ACS appears to have an abundance of well-informed managers, consultants and other sources of support to guide and refine staff practice in the ways described above. The recent addition of additional Operations Managers and the way in which the facility's leadership is preparing them to manage the operations of their assigned housing units has significantly advanced the trajectory of full implementation.

Once the foundation is solid, additional STRIVE program components will be layered on, including:

- Daily rewards for youth who earn a certain percentage of points each day (originally designed to be differentiated bedtime according to incentive level, but which has proven difficult to implement).
- Opportunities for youth to de-escalate and/or reflect (*i.e.*, "chill time") when tensions arise, or when a youth engages in threatening or assaultive behavior.
- Strategic Modified Programs, which are support- and skill-focused plans developed by a multidisciplinary team, for youth with frequent aggressive behaviors.
- Skill-focused groups (*e.g.*, cognitive behavioral therapy, restorative justice groups) that teach youth skills for managing anger and frustration, and that teach staff how to cue youth to access these skills in the moment.

Once fully implemented, STRIVE will include all of the components necessary for a program that reflects the generally accepted practice. It is appropriate to delay the training and implementation of the more complicated structures until the point card mechanics and delivery of incentives/consequences are reliable, but these final layers are also those which bring important individualization and skill-development to the basic program structure and thus are essential.

**Compliance Rating**. Progress Made, but Compliance Not Yet Achieved

## ¶2(f). Room Confinement. ACS shall comply with applicable ACS policies and practices governing the use of room confinement.

**ACS Policy & Practice.**
- ACS Policy #2019/32 "Room Confinement Policy for Secure and Specialized Secure Detention" was revised in September 2022, during the previous monitoring period. The policy limits the use of isolation to address circumstances in which a youth poses an immediate risk of physical harm to another person and prescribes various protections for youth in confinement. Key policy changes included:
  - Permitting staff to place a youth in a locked room for less than 30 minutes before the room confinement requirements must be initiated.

- o Lengthening the timeline for notifying a youth's parents about the use of room confinement from 12 hours to 24 hours. This change is within the generally accepted practice.
- Policy requirements include:
  - o All room confinement practices must be documented in the Room Confinement logbook, and entries are required by each of the individuals who visits the youth.
  - o Mental health staff must be consulted within 30 minutes of the onset of room confinement.
  - o Any use of room confinement must be authorized by the Facility Director/designee, and re-authorized at prescribed intervals (within two hours, and every two hours thereafter) and up the chain of command.
  - o Youth's safety and welfare must be checked at 15-minute intervals and documented in a logbook.
  - o Youth must be assessed for their readiness for return to regular programming at 30- minute intervals by YDS and/or facility administrators. Supervisors must visit every 60- minutes to reassess. The Facility Director/designee must visit the youth within two hours of the onset of room confinement. These assessments must also be documented in a logbook.
  - o A variety of services must be provided to youth in room confinement including meals; case management if the youth remains in room confinement for more than one hour; mental health services within the first hour, preferably, but within eight hours and then every eight hours thereafter; medical within three hours and every eight hours thereafter; and assigned school work if the youth is in room confinement during school hours for more than one class period. All services must be documented in the Room Confinement logbook.
- During the previous monitoring period, staff were provided copies of the revised policy. Room Confinement logbooks were redistributed to each living unit and are now kept in the Tour Commander's office when not in use.
- A job aid is attached to each logbook to provide more immediate access to policy requirements when room confinement is used.
- ACS developed a comprehensive "Room Confinement Compliance Checklist" for quality assurance that includes fields corresponding to each policy requirement. The Monitoring Team provided feedback, which was incorporated. The audit tool was introduced in January 2023, and compliance audits began that same month.
- Roll-call briefings are utilized to remind staff of the policy requirements and a review log was created to facilitate administrative review of each room confinement event. Room confinement documents are also now maintained in a centralized file. ACS reports it has prioritized the quality assurance process described above over the administrative reviews, particularly since the room confinement events are so few in number.

**Monitoring Team's Analysis**.

While isolation is not an effective *disciplinary strategy* (*i.e.*, not effective when used as a consequence for a rule violation), short periods of room confinement are an essential tool for responding to an imminent risk of harm to another person's safety and/or managing the aftermath of a violence incident. The Monitoring Team has encouraged Horizon to consider and better utilize room confinement as part of its response to incidents, especially to contain situations where an ongoing risk of harm remains (*e.g.*, retaliation, chaos from large group events, inability to return to regular programming, etc.). When properly utilized and rigorously monitored, the use of room confinement following a serious incident is an important safety tool. Not only does it provide an opportunity for the youth involved to de-escalate, but it also provides the necessary time and space for uninvolved youth and staff to regain their footing, de-escalate, restore a sense of order, and return to programming.

GOALS reports summarizing each incident that occurred at Horizon included many references to youth being "escorted to their room" following a restraint or violent incident, but the duration did not trigger the room confinement protocol. If youth remain in their rooms for only a short period of time, this is a reasonable approach because it provides an opportunity for youth to calm down and for staff to determine exactly what occurred and regain operational control. Some professional standards and other jurisdictions permit a similar "cooling off period," but typically limit the period to only 15 minutes (compared to the 30 minutes permitted by ACS policy). The Monitoring Team has encouraged ACS to develop an efficient mechanism to verify that youth are released from their rooms within the 30-minute threshold for room confinement.

During the current monitoring period, Room Confinement was used twice. In only one of the five monitoring periods covered by the Agreement did Horizon utilize room confinement any more than sporadically. During the Third Monitoring Period, approximately 50 youth were placed in room confinement, but in all others, room confinement was used only a handful of times.

The first use of room confinement during this monitoring period occurred in February 2023 and involved a single youth who spent five hours in room confinement. Documentation revealed that the use of room confinement was appropriately justified; 15-minute welfare checks were conducted reliably; meals, bathroom breaks and showers were provided; and medical, case management and mental health staff visits were conducted as required. This is a notable improvement over prior monitoring periods when few if any of the policy requirements and protections were properly applied. That said, in this event, reauthorization at the 4-hour mark was not obtained, education services were not provided, and administrative visits did not occur at the required frequency nor, when they did occur, did they include an assessment of the youth's readiness for release.

In the second room confinement event from May 2023, four youth were placed in room confinement at 8am in response to an event that occurred at about midnight. None of the youth's current risk to others' safety was reassessed, as the rationale only recounted what occurred the night before (where one of the four youth assaulted a staff, resulting in a serious

injury). The four youth spent 9 hours in room confinement, and significant lapses occurred in most of the protections required by policy. For example, two long gaps in the required 15-minute checks occurred (one lasting two hours and one lasting one hour), comments on the status of the youth at the 15-minute intervals were not individualized, several administrative visits were missed and those that did occur did not include reassessment of risk for each youth, parents were not notified, and no evidence that youth were provided meals, showers, exercise or education was available. The room confinements were re-authorized every 4 hours as required, and supervisors/OMs/TCs visited the unit more often than in the past. However, their presence makes the many departures from policy that much more troubling. For the most part, the Monitoring Team's review was congruent with the findings of the newly implemented quality assurance audits.

The continued inability to demonstrate compliance with policy requirements—even with an increasing presence of supervisors and facility leaders on the unit—is a concern. ACS reports that it does not intend for room confinement to become a widespread practice but the Monitoring Team encourages ACS to ensure that all protections are dependably in place in order to properly insulate the small number of youth who are placed in room confinement from harm. Utilizing the results of the newly implemented quality assurance audits to address staff practice would be helpful (reportedly, quality assurance results are discussed only at the administrative level).

Given the risk of harm that accompanies isolation, the original purpose of this provision was to ensure that Horizon does not use isolation in response to youth behaviors that do not pose an imminent risk of harm to another person's safety and to ensure that youth do not languish in isolation for long periods of time. The Monitoring Team has found no evidence of a pattern or practice of undue isolation, and thus this provision was not included in the Third Voluntary Agreement.

**Compliance Rating**. Progress Made, but Compliance not yet Achieved

## APPENDIX A: MONTHLY DATA ON YOUTH-ON-YOUTH AND YOUTH-ON-STAFF VIOLENCE





### Rate of Youth-on-Youth and Youth-on-Staff Assaults
January 2021 - June 2023

|  | Jan 21 | Feb 21 | Mar 21 | Apr 21 | May 21 | Jun 21 | Jul 21 | Aug 21 | Sep 21 | Oct 21 | Nov 21 | Dec 21 | Jan 22 | Feb 22 | Mar 22 | Apr 22 | May 22 | Jun 22 | Jul 22 | Aug 22 | Sep 22 | Oct 22 | Nov 22 | Dec 22 | Jan 23 | Feb 23 | Mar 23 | Apr 23 | May 23 | Jun 23 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| YOYA | 0.76 | 0.54 | 0.5 | 1.09 | 1.27 | 2.19 | 1.88 | 0.76 | 0.88 | 1.09 | 1.1 | 1.09 | 1.05 | 0.37 | 1.21 | 0.79 | 1.77 | 1.16 | 1.2 | 0.74 | 0.5 | 0.59 | 0.42 | 0.4 | 0.68 | 0.67 | 0.84 | 0.61 | 0.84 | 0.67 |
| YOSA | 0.47 | 1.4 | 0.5 | 1 | 1.66 | 1.1 | 0.85 | 0.49 | 0.36 | 0.62 | 0.6 | 0.14 | 0.52 | 0.63 | 0.63 | 1.09 | 1.21 | 0.53 | 0.45 | 0.41 | 0.23 | 0.23 | 0.19 | 0.29 | 0.34 | 0.38 | 0.38 | 0.41 | 0.46 | 0.39 |

1st MP   2nd MP   3rd MP   4th MP   5th MP

# APPENDIX B: MONTHLY DATA ON PHYSICAL AND MECHANICAL RESTRAINTS



| | Jan 21 | Feb 21 | Mar 21 | Apr 21 | May 21 | Jun 21 | Jul 21 | Aug 21 | Sep 21 | Oct 21 | Nov 21 | Dec 21 | Jan 22 | Feb 22 | Mar 22 | Apr 22 | May 22 | Jun 22 | Jul 22 | Aug 22 | Sep 22 | Oct 22 | Nov 22 | Dec 22 | Jan 23 | Feb 23 | Mar 23 | Apr 23 | May 23 | Jun 23 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Physical | 16 | 25 | 15 | 30 | 40 | 44 | 52 | 27 | 20 | 39 | 26 | 25 | 31 | 21 | 37 | 48 | 32 | 20 | 13 | 16 | 8 | 21 | 13 | 3 | 14 | 8 | 15 | 8 | 16 | 6 |
| Mechanical | 3 | 3 | 1 | 5 | 8 | 11 | 7 | 2 | 5 | 5 | 3 | 10 | 7 | 5 | 8 | 13 | 8 | 4 | 2 | 5 | 3 | 9 | 5 | 1 | 8 | 9 | 3 | 7 | 7 | 6 |



### Rate of Physical and Mechanical Restraints
January 2021 - June 2023

| | Jan 21 | Feb 21 | Mar 21 | Apr 21 | May 21 | Jun 21 | Jul 21 | Aug 21 | Sep 21 | Oct 21 | Nov 21 | Dec 21 | Jan 22 | Feb 22 | Mar 22 | Apr 22 | May 22 | Jun 22 | Jul 22 | Aug 22 | Sep 22 | Oct 22 | Nov 22 | Dec 22 | Jan 23 | Feb 23 | Mar 23 | Apr 23 | May 23 | Jun 23 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Physical | 1.51 | 2.69 | 1.51 | 2.81 | 3.33 | 3.22 | 3.16 | 1.46 | 1.04 | 2.02 | 1.3 | 1.18 | 1.35 | 1.1 | 1.78 | 2.37 | 1.62 | 1.06 | 0.65 | 0.74 | 0.36 | 0.82 | 0.5 | 0.11 | 0.53 | 0.34 | 0.57 | 0.33 | 0.61 | 0.24 |
| Mechanical | 0.28 | 0.32 | 0.1 | 0.45 | 0.63 | 0.8 | 0.43 | 0.11 | 0.26 | 0.26 | 0.15 | 0.47 | 0.31 | 0.26 | 0.39 | 0.64 | 0.4 | 0.21 | 0.1 | 0.23 | 0.14 | 0.35 | 0.19 | 0.04 | 0.3 | 0.38 | 0.11 | 0.28 | 0.27 | 0.24 |

1st MP   2nd MP   3rd MP   4th MP   5th MP

Appendix C: Third Voluntary Agreement

**Third Agreement with Monitoring Team Panel
to Monitor 16- and 17-Year-Old Adolescent Offenders at Horizon Juvenile Center**

This Agreement ("Agreement") is voluntarily entered into by the Monitor appointed in the *Nunez* Consent Decree (11-cv-5845, docket entry 249) as defined in § XX, ¶ 1 & 6 (the "Monitoring Team Panel" or "Monitor"), the City of New York (the "City"), and the Administration of Children Services ("ACS"), for the period from July 1, 2023 to June 30, 2024. This Agreement concerns the management and supervision of Adolescent Offenders, as defined under Criminal Procedure Law § 1.20(44), who are or will be housed at the Horizon Juvenile Center ("AO Youth"), and the operation of that facility.

(1) ACS will make deliberate and good faith efforts to improve its practices regarding the enumerated provisions in ¶ 2 below.

(2) ACS agrees to the following:

    a. AO Youth shall be supervised at all times in a manner that protects them from an unreasonable risk of harm.  Staff shall intervene in a timely manner to prevent youth-on-youth fights and assaults, and to de-escalate youth-on-youth confrontations, as soon as it is practicable and reasonably safe to do so.

    b. ACS shall conduct timely and thorough reviews of Physical Restraints to determine whether the intervention was appropriate and whether ACS staff complied with the ACS Physical Restraint Policies.

    c. ACS shall develop, track, and maintain a sufficient level of programming for AO Youth, consistent with best practices for adolescents and young adults.

    d. ACS shall maintain systems, policies, and procedures for AO Youth that: (i) reward and incentivize positive conduct and (ii) sanction negative conduct.  The application of these procedures shall be individualized, consistent with any treatment needs for AO Youth and shall not compromise the safety of other AO Youth or ACS staff.

(3) ACS agrees, in the spirit of collaboration and in recognition of the deep mutual commitment to improving program and practice goals, to continue to consult with the Monitoring Team Panel regarding the areas set forth above in Paragraphs 2(a)-(d). The Monitoring Team Panel may, as necessary, meet on a quarterly basis with the ACS Commissioner and relevant associated senior staff, to discuss the Monitoring Team Panel's observations and assessment of ACS program and practice at Horizon Juvenile Center, improvements made or not, and to relate any other information that the Monitoring Team Panel deems relevant and appropriate for enhancing ACS' practice at Horizon Juvenile Center.

(4) During the period of this Agreement, the Monitoring Team Panel may, as necessary, provide technical assistance to ACS regarding the terms of this Agreement.

(5) The Monitor will assess compliance with the requirements set forth above in Paragraphs 2(a)-(d). For purposes of this Agreement, the Monitor shall find ACS to be in "Compliance" with a provision if the Monitor finds that ACS has consistently complied with the relevant requirement and any violations of the relevant requirement are only minor

1

or occasional and not systemic, material, or recurring.  The Monitor will file one public report ("Monitor's Report") on the docket 11-cv-5845 (LTS) (S.D.N.Y.) assessing ACS' compliance with these requirements during the reporting period.

    a.    There shall be one reporting period during the term of this Agreement. The reporting period shall cover July 1, 2023 to June 30, 2024.

    b.    The Monitor shall issue a report within 80 business days following the reporting period. Within 30 days from the end of the reporting period, detailed in subdivision (a) of this Section, ACS will share a Written Compliance Assessment, followed by a presentation/meeting with the Monitoring Team describing ACS efforts, successes and challenges in meeting the expectations detailed in Paragraphs 2(a-d) of this Agreement.   The Monitor's Report shall be provided to the City and ACS in draft form for comment at least 30 business days prior to its issuance. The City and ACS shall provide the Monitor with their comments, if any, within 15 business days after receipt of the draft Monitor's Report. The Monitor shall consider the comments, and make any changes deemed appropriate, before issuing the final report.  The Monitor's Report shall be written with due regard for the privacy interests of individual AO Youth and ACS staff members; federal, state and local laws regarding the privacy of such information; and the interest of ACS in protecting against the disclosure of non-public or privileged information. Consistent with such interests and laws, the Monitor shall redact individual-identifying information from the Monitor's Report and any documents submitted with that report, and shall give due consideration to ACS's requests to edit or redact any other information.  The Monitor shall provide the final report and redline comparing the final report with the draft Monitor's Report to ACS 5 business days prior to issuing the final report. To the extent the Monitor declines to make the edits or redactions requested by ACS, ACS can append any comments to the Monitor's Report that is submitted by providing such appendix to the Monitor by noon the day the final report is to be issued.

    c.    The Monitor's Report shall provide relevant and appropriate context for its findings and give due consideration to the totality of the circumstances. Further, as appropriate and relevant, the Monitor's Report shall describe: (1) ACS' diligent and good faith efforts to implement ¶ 2 (a)-(d) of this Agreement, (2) generally accepted practice for 16- and 17-year old youth as it relates to this Agreement, and (3) any challenges or obstacles related to implementing ¶ 2 (a)-(d) of this Agreement.

    d.    ACS will be afforded the opportunity to append a response to the final Monitor's Report filed with the Court.

(6) In furtherance of this Agreement, the City shall bear all reasonable fees, costs, and expenses of the Monitor, including payments to the Monitor's staff as required under the *Nunez* Consent Judgment § XX, ¶ 5 and consistent with the Monitoring Team Panel's payment structure with the City that is in place for the *Nunez* Consent Judgment.

(7) ACS will provide the Monitoring Team Panel reasonable and timely access to relevant information and documents in order to perform the responsibilities of this Agreement. The January 7, 2021 confidentiality agreement between the Monitoring Team Panel and ACS, which delineates the acquisition and appropriate use by the Monitoring Team Panel of confidential information, prohibitions on secondary dissemination, record retention during the period of this Agreement, and destruction of records provided to the Monitoring Team Panel at the end of the period of this Agreement, remains in effect.

Date: October 13, 2023

**FOR THE CITY OF NEW YORK AND**
**THE ADMINISTRATION FOR CHILDREN'S SERVICES:**
SYLVIA O. HINDS-RADIX
Corporation Counsel for the City of New York

Sheryl Neufeld

**FOR THE MONITOR:**

s/ Steve J. Martin
Steve J. Martin, *Monitor*
Anna E. Friedberg, *Deputy Monitor*
*r*

4