# Status Report on DOC's Action Plan
# by the
# *Nunez* Independent Monitor

**November 8, 2023**

### THE NUNEZ MONITORING TEAM

Steve J. Martin
*Monitor*

Kelly Dedel, Ph.D.
*Subject Matter Expert*

Anna E. Friedberg
*Deputy Monitor*

Dennis O. Gonzalez
*Associate Director*

Patrick Hurley
*Subject Matter Expert*

Alycia M. Karlovich
*Analyst*

Emmitt Sparkman
*Subject Matter Expert*

# Table of Contents

Introduction ..................................................................................................................... 1

    Current State of Reforms ............................................................................................. 1

        Risk of Harm ........................................................................................................ 2

        Leadership ........................................................................................................... 2

        Pace of Reform .................................................................................................... 2

        Use of Force ......................................................................................................... 3

        Security Practices ................................................................................................. 3

        Incident Reporting ............................................................................................... 3

        Training ................................................................................................................ 3

        Staffing ................................................................................................................ 3

        Staff Selection ..................................................................................................... 3

        Staff Supervision ................................................................................................. 4

        Restricted Housing .............................................................................................. 4

        Identifying Misconduct ....................................................................................... 4

        Interference with the Monitor's Work ................................................................ 4

    Organization of the Report .......................................................................................... 5

Security, Operations & Supervision ............................................................................. 6

    Illustrative Examples .................................................................................................. 8

    Department's Assessment of Deficient Security Practices ....................................... 10

    Failure to Address the Sources of Harm ................................................................... 14

    Plans to Address the Immediate Risk of Harm ........................................................ 17

        DOC's Report on Recently Completed Action Items to Reduce Violence .................. 19

        DOC's Near-Term Strategies to Reduce Violence ............................................ 19

        DOC's Longer Term Strategies to Reduce Violence ......................................... 21

    Monitor's Initial Assessment of the Department's October 2023 Security Plan ...... 21

    Immediate Steps to Abate the Risk of Harm ............................................................ 23

    Inadequacies at the Supervisory Level ..................................................................... 25

    Conclusion ................................................................................................................. 28

Incident Reporting, Tracking And Conclusions About Progress ............................. 29

    Reporting Policies ..................................................................................................... 30

    Circular Definitions, Subjectivity and the Impact on Violence Data ....................... 31

Failure to Track Key Data ........................................................................................ 33

Tracking of Hospital Admissions and Notifications to the Monitor ......................... 34

Conclusion About Data and Progress and Recommendations ................................. 35

**Update on Court's 2023 Orders & Plaintiffs' Request for Information................................ 38**

June 13, 2023 Order ................................................................................................ 38

Notifications ............................................................................................... 39

Production of Information, Consultation and Access to Staff (§I, ¶¶4, 5, 6) ................ 39

Nunez Manager (§I, ¶7) ............................................................................. 39

Department-Wide Remedial Steps to Address the Five Incidents Discussed
in the May 26, 2023 Special Report (§II) ................................................... 39

August 10, 2023 Order ............................................................................................ 40

UOF, Security and Violence Indicators (§ I, ¶ 1) ...................................... 40

Revised Search Procedures (§ I, ¶ 2) ......................................................... 40

Revised Escort Procedures (§ I, ¶ 3) ......................................................... 41

Lock-in and Lock-out Procedures (§ I, ¶ 4) ............................................... 41

Control Station Security (§ I, ¶ 5) .............................................................. 41

Staff Off Post (§ I, ¶ 6) .............................................................................. 42

Special Teams Training (§ I, ¶ 7)................................................................ 42

Special Team Command Level Orders (§ I, ¶ 8) ........................................ 42

Screening and Assignment of Staff to Special Teams (§ I, ¶ 9) ................ 43

Revised Pre-Promotional Screening Policies and Procedures (§ I, ¶ 10) ...................... 43

ID Staffing (§ I, ¶ 11)................................................................................. 43

Command Discipline Directive (§ I, ¶ 13)................................................. 43

External Assessment (§ I, ¶ 14) ................................................................. 44

October 10, 2023 Order ............................................................................................ 44

Immediate Security Plan ............................................................................ 44

Immediate Reporting Initiatives ................................................................ 44

Plaintiffs' Requests for Information........................................................................... 45

**Managing the *Nunez* Court Orders .................................................................................. 47**

Examples of Defendants Attempts to Deflect, Interfere and
Obstruct the Work of the Monitor ............................................................................ 48

Ongoing Pattern of Interference and Obstruction of the Monitor's Work ................ 53

Leadership's ............................................................................................... 53

Deflecting Attention.................................................................................... 54

Providing Inaccurate and Conflicting Information ........................................................ 54

Poor Internal Coordination ........................................................................................... 55

Haphazard Consultation on Policy Revision ................................................................ 55

Lack of Initiative to Develop Concrete Plans .............................................................. 56

Delayed Information ...................................................................................................... 56

Staff's Hesitation to Engage with the Monitor ............................................................. 56

Managing the Nunez Court Orders ................................................................................... 56

Conclusion .......................................................................................................................... 57

**Conclusion** .............................................................................................................................. **59**

Upcoming Schedule & Proposed Additions ...................................................................... 60

**Appendix A: Responses to Plaintiffs' Request** .................................................................. **63**

Monitoring Team Response to Plaintiffs' July 28, 2023 Requests
for Information  pursuant to Consent Judgment §XIX, ¶ 8.............................................. 64

Monitoring Team Response to Plaintiffs' August 31, 2023 Requests
for Information  pursuant to Consent Judgment §XIX, ¶ 8.............................................. 93

Monitoring Team Response to Plaintiffs' September 6, 2023 Requests
for Information  pursuant to Consent Judgment § XIX, ¶ 8............................................. 112

Monitoring Team Response to Plaintiffs' November 2, 2023 Requests
for Information  pursuant to Consent Judgment § XIX, ¶ 8............................................. 115

**Appendix B: Nunez Compliance Unit  Audit Results September & October 2023** ............ **116**

Nunez Compliance Unit Security Audits ........................................................................... 117

**Appendix C: Summary of Major Disturbance** ................................................................... **120**

**Appendix D: Summary of Unreported Stabbing & Slashings** ............................................ **129**

Stabbing/Slashing Incidents that Were Not Initially Categorized as Such .......................... 130

**Appendix E: January 31, 2023 Memo Acts of Violence** ..................................................... **132**

Acts of Violence Determination Memo – January 31, 2023 .................................................. 133

**Appendix F:  Corrected Rapid Review Data** ....................................................................... **134**

**Appendix G:  Proposed Court Order** ................................................................................... **136**

# INTRODUCTION

This report is the eleventh[1] filed by the Monitoring Team since the Action Plan was ordered by the Court on June 14, 2022 (dkt. 465). The purpose of this report is to provide the Court with an update on the current state of affairs in the New York City jails since the October 5, 2023 Report.

## Current State of Reforms

Facility safety and the various practices that should support it have noticeably deteriorated over the past year as has been detailed throughout the Monitor's multiple reports in 2023.[2] The Monitoring Team's findings from recent reports, especially those from the May 26, 2023, June 8, 2023, July 10, 2023, August 7, 2023 and October 5, 2023 reports (dkts. 533, 541, 557, 561, and 581), and the problems identified therein remain pervasive and rampant in the jails. A detailed recitation of these findings is unnecessary and is not repeated. The Monitoring Team has summarized a number of incidents in its reports that illustrate recent poor practice and the harm that flows from it. The cases highlighted in the 2023 reports are not unique; instead, they illustrate the *typical* patterns and trends as reported by the Monitoring Team over the past eight years and that continue unabated at the present time.

---

[1] *See* Monitor's June 30, 2022 Report (dkt. 467), Monitor's October 27, 2022 Special Report (dkt. 471), the Monitor's February 3, 2023 Special Report (dkt. 504), Monitor's April 3, 2023 Report (dkt. 517), Monitor's April 24, 2023 Status Report (dkt. 520), Monitor's May 26, 2023 Special Report (dkt. 533), Monitor's June 8, 2023 Special Report (dkt. 541), Monitor's July 10, 2023 Special Report (dkt. 557), Monitor's August 7, 2023 Report (dkt. 561), Monitor's October 5, 2023 Report (dkt. 581). The Monitor has also filed two letters on May 31, 2023 (dkt. 537) and June 12, 2023 (dkt. 544).

[2] The Monitor, in his July 10, 2023 Report (dkt. 557), found that the City and Department have not made substantial and demonstrable progress in implementing the reforms, initiatives, plans, systems, and practices outlined in the Action Plan. The Monitor also found that, since the Action Plan was entered in June 2022, there has not been a substantial reduction in the risk of harm currently facing incarcerated individuals and Department staff. These findings remain the same as of the filing of this report.

Instead of a reform trajectory characterized by incremental progress, the Department's path has recently been dominated by deteriorating practices, failures to utilize policies and procedures that had previously been in place, and the inability to effectively implement the few new strategies that have been developed. Sustained and chronic institutional resistance and recalcitrance toward court ordered reform is an insurmountable impediment to any Monitorship.

Outlined below is a summary of the current state of the reform effort.

- **Risk of Harm**. Both people in custody and staff in the jails continue to face a grave risk of harm *on a daily basis*. High rates of violence, high use of force rates, the continued prevalence of excessive and unnecessary force, and apathetic and slipshod security practices frequently produce chaos, trauma, injuries and in some cases, death.

- **Leadership**. The City recently reported that the Commissioner will be transferred to another position outside the Department with possible responsibility for oversight of the jails, but he will no longer serve as Commissioner. A transition plan did not accompany this report, which has injected additional uncertainty into a system already roiling in chaos. The Department has had three Commissioners during the past two and a half years, resulting in frequent changes to the executive leadership team, shifting priorities and corresponding plans that are not realized before they change yet again. Individual facilities also continue to be destabilized by a constant revolving door of leadership.

- **Pace of Reform**. The pace of reform has not accelerated and appears to have stagnated despite direct Orders from the Court in the April 2023 Status Conference, four successive Orders in June, July, August and October 2023 related to these matters, and repeated and ongoing recommendations from the Monitoring Team to address the current conditions. Instead, the City and Department continue to spend significant time engaged in a concerted effort to create a narrative that is misleading and wholly inconsistent with the reality of the conditions at DOC. The consequence of this approach is that the City and Department have normalized the dangerous and chaotic conditions that permeate the jails.

- **Use of Force**. The pattern and practice of unnecessary and excessive force that brought about the Consent Judgment remains pervasive.

- **Security Practices**. The Department has been unable to alter its deficient security practices and operations despite repeated recommendations by the Monitor and multiple Court Orders. The interim Department-wide security plan developed in 2021 was never fully implemented before it was abandoned in 2022. Although the RNDC and GRVC Violence Reduction Plans initially catalyzed some improvement, they were not sustained, and the safety of both facilities has significantly worsened.

- **Incident Reporting**. Significant incidents continue to go unreported or are reported only after a significant delay. Reporting policies are not comprehensive or well-coordinated, thus deciphering incident definitions and staff's duty to report is not as straightforward as it must be. Practices for reporting stabbings/slashings are so unregulated that the Monitor no longer has confidence in the accuracy of the Department's data in this area.

- **Training**. In 2023, the quality of training curricula and lesson plans—a key pathway toward improved staff practice—were significantly flawed. Extensive revisions are underway to bring the curricula for Supervisory Training and ESU Training to a level of basic adequacy.

- **Staffing**. Better management of sick leave benefits and modified duty statuses has displaced the problem of staff absenteeism, and equally disruptive problems have surfaced in other areas, such as Personal Emergency leave and FMLA. Facilities attempt to work around endemic staff shortages by using overtime, but too often, sufficient staff resources are not available to deliver mandated services, leading to high levels of stress, frustration, and violence among people in custody.

- **Staff Selection**. The Department continues to assign and promote individuals with questionable fitness for the roles. In 2023, the Department assigned several staff to ESU without proper screening, which included several who had been previously removed from ESU. One of these staff was recently arrested for planting evidence and falsifying records after his re-assignment to ESU. This situation tragically illustrates the real-world consequences of the Department's failure to follow procedures that may on their surface appear "bureaucratic," but that have a crucial role in ensuring that authority is properly assigned. Similarly, in late 2022, the Department promoted 26 people to the rank of

ADW, even though 12 were not recommended for promotion by various internal vetting divisions. Subsequently, in 2023, 10 additional ADWs were promoted without following internal vetting protocols. Of these 36 ADWs, four have since been demoted, and two resigned their position within the first year.

- **Staff Supervision**. Supervisors lack the willingness or skill to effectively support, guide, and coach staff practice, which is perhaps unsurprising given their tenure in a deeply dysfunctional system that does not adequately select, train or prepare them for the task at hand. In addition to being poorly equipped for or resistant to their role and responsibilities, supervisors are far too few in number to be able to provide the type of hands-on coaching needed for this workforce.

- **Restricted Housing**. The initial implementation of the Department's new restricted housing units for those who engage in serious violence while in custody has been exceedingly poor. Rife with leadership turnover, staffing shortages, inconsistent delivery of mandated services, and inexplicable security failures (including a steady flow of weapons and drugs into these high-security units), the RESH program has been plagued by violence such that some of the people in custody choose to remain in their cells throughout the day.

- **Identifying Misconduct**. Gains in this area achieved in 2020 and 2021 were erased in 2022. The quality of the Investigation Division's work product deteriorated such that staff misconduct is not being properly identified and thus is not corrected or met with proper accountability measures or discipline. The decline appears to be related to poor leadership by a Deputy Commissioner who was installed in 2022 (and subsequently resigned in March 2023). A well-respected individual who was instrumental in the subsequent attempt at course correction was removed from ID in September 2023. Facility Rapid Reviews of use of force incidents have deteriorated and do not reliably identify misconduct. For the past two years, at each turn, the Department's ability to properly identify staff misconduct has degraded and remains on a downward trajectory.

- **Interference with the Monitor's Work**. Defendants persistent interference, obstruction, and lack of transparency has resulted in an erosion of the Monitoring Team's confidence that the Department is operating transparently and in a manner that advances the reforms. The Department's internal disorder and lack of coordination means that the

Monitoring Team cannot routinely rely on the veracity, timeliness, or accuracy of the information the Defendants provide.

The City and Department have long maintained that addressing the issues within the jails is entirely within their power.[3] It remains troubling that Defendants are unwilling or unable to embrace the realities of the situation and take definitive action to address the problems directly and effectively. On this present trajectory, the current state of affairs will continue, and likely worsen.

_Organization of the Report_

This report has four substantive sections. The first section provides an overview of the security and operational failures and the Department's plans to address them. The second section provides an update on the Department's incident reporting practices. The third section provides updates on the Department's work related to the Court's Orders of June 13, August 10, and October 10, 2023. The fourth section includes an update on Defendants' management of the _Nunez_ Court Orders. The report's conclusion also includes a list of future items the Monitor recommends is addressed by the Court. Finally, the report includes multiple appendices:

- Appendix A: Monitoring Team Responses to Plaintiffs Requests for Information
- Appendix B: September & October 2023 Summary of NCU Audits
- Appendix C: Illustrative Example of Major Disturbance
- Appendix D: Summary of Unreported Stabbing/Slashing Incidents
- Appendix E: January 31, 2023 Acts of Violence Memo
- Appendix F: Corrected Rapid Review Data
- Appendix G: Proposed Order

---

[3] _See_ City's June 10, 2022 Letter to the Court (dkt. 463) at pgs. 1 to 2.

# SECURITY, OPERATIONS & SUPERVISION

The Department continues to lurch from crisis to crisis under a revolving door of leadership which hinders, if not prevents, the full and faithful implementation of both short- and long-term security initiatives. Plans proposed by the Department alter so frequently that they are seldom fully developed before they are changed yet again. Given the Department's lack of a stable, comprehensive and robust strategy, facility leadership often does not know what is planned or who is doing what or when. This haphazard, piecemeal approach has led to overall confusion regarding the priorities, focus, and initiatives underway.

The pervasive and rampant security and operational deficiencies in staff practice and the corresponding harm that flows from them to both incarcerated individuals and staff are extensively documented in the Monitor's reports. The various conditions described in the Monitor's July 10, 2023 Report (at pgs. 12 to 68) generally reflect current conditions, although in several areas the conditions have worsened. Since the Monitor's October 5, 2023 Report was filed, a number of concerning indications of ongoing harm and worsening conditions have emerged:

- October 5, 2023: An individual died in custody hours before the Monitor's report was filed. Three Staff were suspended following the individual's death. One officer and one Captain were suspended for failing to conduct meaningful tours and one officer was suspended for disobeying a direct order to relieve a fellow Correction Officer.
  - The New York Attorney General released a report in October that summarized the completion of 15 investigations of deaths in custody that occurred in 2022 and 2023. This report revealed a number of security and operation failures associated with these incidents including, in 7 cases that an Officer or Supervisor

failed to tour or completed only a superficial tour, in 3 cases the individual's cell window was not clear, and in three cases staff made false entries in logbooks. The report found that there was no evidence that DOC staff caused the death in any of the 15 cases.[4]

- October had the highest number and rate of use of force in 2023 (655 and 10.61, respectively).

- The number of stabbings and slashings has continued to rise over the last three months, even with the underreporting discussed in the Incident Reporting section. A total of 43 stabbings and slashings were recorded in October 2023, putting the Department on a trajectory to report almost 400 stabbings and slashings in 2023. Between August and October there were 134 stabbing/slashings more than all stabbing/slashings in 2020 (n=121).

- Between January 1 and October 31, 2023, over 400 fires were reported, with most occurring at RNDC. Concerningly, between RESH's opening in late June and October 2023, 51 fires were started in this high security unit.

- The Monitoring Team's routine discussions with facility leadership continue to be dominated by leaderships' struggles to provide proper staff coverage given ongoing problems with absenteeism, to abate security problems, and to respond effectively to facility violence. These leaders are well-intentioned and report receiving useful guidance from some of the agency's executive leadership, but also appear to be stymied

---

[4] *See* Third Annual Report of the Office of Special Investigation dated October 1, 2023. Available at: https://ag.ny.gov/sites/default/files/2023-10/20230929f-third-ann-rpt.pdf.

by the deep skill deficits among the staff and many staff member's unwillingness or inability to enforce even the most basic rules and practices.

- Two Assistant Commissioners responsible for managing Facilities resigned since the Monitor's October 5, 2023 Report was filed. In addition, OBCC and RESH (restricted housing units), both opened this summer and have each had at least three leaders in the past three to four months.

## *Illustrative Examples*

Two recent incidents are shared to illustrate the current state of affairs. First, a major disturbance occurred on a housing unit at GRVC in summer 2023 that illustrates the severe, wide-reaching harm that can flow from the breakdown of basic security and operational practices. This incident, categorized by the Department as both a use of force and a stabbing/slashing, occurred at GRVC on May 14, 2023 at approximately 8:58 p.m. The incident reflects numerous security lapses, management failures, and investigatory omissions that are endemic to the Department's practices and are prevalent among many of the incidents the Monitoring Team reviews. This incident occurred just minutes before the 9:00 p.m. daily lock-in, but neither staff nor people in custody appeared to be preparing in any way for what should be a basic security practice. Most of the people in custody were gathered in the dayroom area, while a few others stood along the top tier. People in custody were seen freely opening and closing unsecured cell doors without staff assistance, despite a B post officer's presence on the floor and an A officer posted in the A station. The litany of serious security breaches includes, but is not limited to, the following staff failures:

- Officer failed to secure cell doors, vestibule doors, janitor's closet and pantry, and the corridor was left unsecured.
- Incarcerated individuals took the Officer's OC canister.

8

- Officer failed to act or intervene in multiple assaults, some of which involved the use of sharpened weapons.
- Captain failed to intervene.
- Officer abandoned the housing unit.
- Probe Team response was delayed, leaving detainees free to engage in assaultive conduct and other misconduct for approximately 30 minutes.
- Medical attention to several detainees was delayed.
- The facility's Rapid Review was inadequate.
- ID's Intake Investigation was inadequate.
- A Facility Referral was made inappropriately, rather than a referral for a Full ID Investigation and consideration for Immediate Action.

Three detainees sustained injuries requiring EMS transport to a hospital: one received multiple stab wounds to his upper back and shoulder, one sustained multiple punctures and lacerations to the lower back, shoulder, hand and leg, and one sustained punctures and lacerations to the upper back, palm, and shoulder. Incident details are provided in Appendix C.

Second, several serious incidents occurred on a single day (October 31, 2023) at OBCC, revealing significant unrest and multiple violent incidents in housing units at the facility. At least three slashings/stabbings occurred in three separate housing units. Fights, acts of self-harm, splashings, drug use and contraband weapons were rampant in these same locations. The Monitor, upon inquiry, received a report from the Assistant Commissioner of the Facility that much of the unrest was the product of violence among rival gang members. These tensions were apparently so volatile that several housing units were locked down. The AC also reported that OBCC is the only facility in which all housing units are "blended," meaning that individuals are assigned to housing units in such a way that no one gang is dominant in number and individuals with different affiliations are housed together. The AC reported that many incarcerated individuals do not like this housing model as they prefer to live in units with those who share

their affiliation. While the purpose of blended housing units is to ensure that staff's authority is

not usurped by people who share the same gang affiliation, many staff at all facilities appear

unable to properly manage blended housing units and to control the potential for violence among

individuals of different affiliations. Such blending without the requisite strong security

foundations and staff competency levels does not appear to effectuate a reduction in violence,

but creates an environment where violence escalates as the current situation shows. The

Monitoring Team has received conflicting reports about whether housing units across the

Department have been blended by SRG affiliation.

Since being reopened in July 2023 to replace AMKC, OBCC has been volatile and

chaotic. The facility has had three different leaders during the past three months. In October

2023, the facility reported 13 stabbings/slashings, the highest among the Department's facilities.

OBCC also has the highest population of all the jails and is operating at near full capacity with a

large number of maximum custody detainees. The Anti-Violence Response Team (discussed in

more detail below) has reportedly not yet begun targeting this facility.

_Department's Assessment of Deficient Security Practices_

The Department has several internal sources of data and information, including internal

reporting (e.g. CODs), information flowing from the live video monitoring unit, the _Nunez_

Compliance Unit (NCU),[5] the Office of Policy Compliance (OPC), Rapid Reviews, and Intake

Investigations. The Department has committed significant resources to developing an internal

capacity to identify problems via NCU and OPC which have consistently identified a long list of

---

[5] The work of the Assistant Commissioner of NCU and her team continue to be a bright spot in the reform
effort. The work completed by this unit is generally reliable and credible and appears to reflect a neutral
and independent assessment of the current conditions in the jails.

deficient staff practices. In addition, for several years, the Department has had a dedicated live video monitoring unit that utilizes the Genetec system to detect security breaches in-the-moment such that housing unit staff can be alerted to the problems and directed to rectify them. The unit has repeatedly identified failures to manage lock-in and properly secure doors.

In September and October 2023, NCU audited practices at OBCC, RNDC, and GRVC multiple times (six audits of two-day periods each in select housing units at these facilities a summary of which is included in Appendix B).[6] The audits revealed essentially the same problems that have been identified and reported on for years with little to no improvement:

- Unsecured cell doors throughout the lock-out period;
- People in custody moving freely in and out of each other's cells;
- Unenforced 9 p.m. lock-in;
- Staff off post (reported in nearly every audit);
- PICs observed smoking on the tier; and
- Failures to consistently conduct rounds at the required frequency, use the tour wand, or look inside cells when making rounds.

OPC's September 2023 audit of GRVC also identified numerous problems that contribute to the risk of harm:

- Failures to pat frisk, strip search, use transfriskers and BOSS chairs prior to allowing people in custody to enter and exit the facility and its housing units;
- Failures to conduct scheduled counts and maintain count sheets;

---

[6] NCU has issued 132 reports of the security practices at various housing units in different facilities for a 24 hour period between December 2021 and October 2023. In 2022, NCU issued 96 reports, 69% of which found staff off post, 70% found unsecured doors, 57% found issues with staff tours, 53% found lock-in was not enforced, and 27% found crowding or unauthorized areas. From January to October 2023, NCU audited various housing areas in four facilities and issued 31 reports. These reports identified numerous security issues. Specifically, 71% of reports found staff off post, 84% found unsecured doors, 81% found issues with staff tours, 26% found lock-in was not enforced, and 35% found crowding/access to unauthorized areas. While only 31 reports have been issued in 10 months of 2023, many of the findings, specifically staff off post, cell door security, issues with staff tours, and PIC movement, have increased from those reports issued in 2022. These audits may indicate that security practices in the facility may be worsening compared to last year.

- Failures to secure cell doors;
- Failures to prohibit staff with training lapses from carrying OC; and
- Failures to properly maintain logbooks, tool inventories, and visitor logbooks.

Rapid Reviews and ID investigations are intended to identify incidents that are (or should be) deemed avoidable when staff fail to utilize sound security practices or otherwise take action that escalates tensions rather than resolves problems or prevents violence. Similarly, policy violations are (or should be) cited when staff fail to utilize the authorized protocols or techniques when using force. Together, the proportion of cases so designated are an amalgam of the many poor security practices that the Monitor routinely cites (e.g., unsecured doors/gates, poor supervision/failure to tour, failure to intervene, abandoned posts, poorly controlled movement, improper escorts, etc.) and the subsequent unnecessary/excessive use of force.

Between January and June 2023, Rapid Reviews found that 11% of use of force incidents were avoidable and 8% of use of force incidents involved violations of the use of force or chemical agent policy. The number of incidents deemed avoidable and in which policy violations are cited by the facility's Rapid Reviews has dropped precipitously (almost 50%) compared to previous years. This appears to be due to inadequate assessments of use of force incidents as there is no evidence of a corresponding change in practice that would explain the decline. The same is true with respect to ID's decline in identifying violations. *See* Appendix F. Further, closed investigations of use of force incidents that occurred between January and June 2023 found that 13% of incidents were unnecessary or excessive. *See* Appendix A, August 31, 2023 Request 1. The prevalence of misconduct cited in Rapid Reviews and Intake Investigations should be considered a floor, not a ceiling. This is particularly true for the proportion of cases deemed problematic in 2022 and 2023 due to a concerning decline in the quality of

investigations produced by ID. *See* the Monitor's April 3, 2023 and April 24, 2023 Reports. Even with the documented failure by Facility Leadership and ID to consistently identify poor practice and policy violations when they occur, the proportion of incidents cited by these internal sources are evidence of an ongoing pattern and practice of unnecessary and excessive force.

Finally, pervasive, serious deficiencies regarding officers' and Captains' active supervision of the housing units have been repeatedly and consistently reported by the Monitoring Team for years.[7] In fact, the importance of active supervision has been emphasized since the inception of the Consent Judgment though little progress has been made. In the past few years, the Department invested significant resources in tour wands, docking stations, software, etc. to ensure that housing unit tours occur as required. While tour wands do not ensure the quality of the tour, the wands are a tool to identify whether staff at least conducted the tour. The Department's most recent data on the frequency of touring indicates that officers and Captains are making only about *half* of the required tours, and NCU's audits have repeatedly revealed that the tours are not particularly meaningful (i.e., officers fail to look in the cell door windows or windows are obstructed, preventing the officer from seeing inside the cell). Furthermore, during the Monitoring Team's September 2023 site visit, it was revealed that staff did not always have access to the tour wands and that the sensors for swiping the wands were not always installed. In response to the Monitoring Team's discovery, the Department reported that a series of miscommunications were to blame, and that the Commissioner's Office would resume managing this initiative after it had been managed by others for several months. Notably, but for

---

[7] *See* for example, Monitor's October 5, 2023 Report (dkt. 581) at pg. 8; Monitor's July 10, 2023 Report (dkt. 557) at pgs. 73 to 81; Monitor's October 28, 2022 Report (dkt. 472) at pgs. 78-80; March 16, 2022 Report (dkt. 438) at pgs. 4 to 6, 39 to 41; 11th Monitor's Report (dkt. 368) at pgs. 8 to 11; 10th Monitor's Report (dkt. 360) at pgs. 25 to 30; 9th Monitor's Report (dkt. 341) at pgs. 22 to 24.

the Monitoring Team's site work it does not appear these issues would have been identified despite the Department's reports that this was an area of focus and attention.

In short, the Department has ample information—from both internal and external sources, generated for years—on the types of problems that contribute to the high risk of harm in the jails. However, while it is an essential component of problem-solving, on its own, simply *detecting* or *identifying* the problems does nothing to actually rectify them. As noted above, in interviews with facility leadership and staff they generally acknowledge these issues and their contribution to the unsafe conditions in the jails. However, discussions with facility leadership, NCU staff and observations of various Department meetings (e.g., TEAMS) reveal that scant attention is subsequently given to the findings and implications of these internal audits, and thus, despite their value and potential, these internal assessments have done little to advance the reform.

*Failure to Address the Sources of Harm*

Despite repeated findings from both external and internal stakeholders that specific practices are actively contributing to the risk of harm faced by both staff and people in custody, little effort has been made to remediate some of them. The perpetual changes in leadership are, at least in part, a contributing factor to the Department's inability to focus on and follow through on addressing ongoing areas of deficiencies. As noted previously, this cycle often results in persistent directional shifts and restarts on initiatives before they can get off the ground.

This case is replete with examples in which the Department has been unable to fully develop or implement a plan before the leadership changes and the proposed plans are abandoned. For example, painful escorts have been identified as a contributor to unnecessary

uses of force for years, but no substantive efforts have been taken to change staff practice.[8]

Similarly, Emergency Response Teams have long been a concern for their tendency to escalate,

rather than de-escalate, problems.[9] The Department has proposed numerous plans on how it

intends to curtail the deficient practices of these teams. More than two years after the Monitoring

Team provided feedback on the relevant policy, the Department shared proposed revisions to the

Emergency Response Team policy in August 2023. Unfortunately, the proposed revisions did not

address most of the Monitoring Team's feedback and inexplicably did not reflect the changes

that the Department reported it was intending to make. The Monitoring Team shared extensive

feedback and recommendations to the revised policy which remains outstanding. In recent

meetings, it appears that the Department's plans for Emergency Response Teams may be

changing yet again and so the status of the draft policy and any corresponding changes in

practice is once more in a state of flux and is unknown. Finally, the Monitoring Team provided

feedback in 2021[10] on strategies for improving staff's search techniques to avoid catalyzing a

need to use force and reduce the on-scene chaos that often accompanies search operations.[11]

---

[8] *See* Monitor's 2nd Report (dkt. 291) at pg. 110; Monitor's 3rd Report (dkt. 295) at  pg. 13 and pg. 149; Monitor's 4th Report (dkt. 305) at pg. 8; Monitor's 5th Report (dkt. 311) at pgs. 18-21; Monitor's 7th Report (dkt. 327) at pg. 24; Monitor's 8th Report (dkt. 332) at pg. 3-4; Monitor's 9th Report (dkt. 341) at pgs. 30-31, pg. 39 and pg. 79; Monitor's 10th Report (dkt. 360) at pg. 3, 13, 17, 29 and 31; Monitor's 11th Report (dkt. 368) at pgs. 24-25 and pgs. 46-47; Monitor's June 8, 2023 Report (dkt. 541) at pg. 6.; and Monitor's July 10, 2023 Report (dkt. 557) at pg. 45.

[9] *See* 11th Monitor's Report (dkt. 368) at pgs. 38 to 50 and 116 to 120, Monitor's 12th Report (dkt. 431) at pgs. 49-51, the Monitor's Second Remedial Order Report (dkt. 373) at pgs. 3-4, Monitor's April 3, 2023 Report (dkt. 517) at pg. 137 to 143; Monitor's July 10, 2023 Report (dkt. 557) at pgs. 34 to 42.

[10] In 2021, the Monitoring Team recommended: (1) the span of control for searches should be limited in order to reduce the number of excessive staff involved in searches; (2) a specific plan must be devised before each search takes place; (3) facility leadership must be involved in any planning for a search that includes external teams like ESU; and (4) specific procedures for conducting searches in celled and dormitory housing and common areas so that searches are completed in an organized and efficient manner and are not chaotic and disruptive.

[11] *See*, for example, Monitor's 3rd Report (dkt. 295) at pgs. 13 to 14 and 128; Monitor's 6th Report (dkt. 317) at pg. 42, Monitor's 10th Report (dkt. 360) at pgs. 16, 29, 75; Monitor's 11th Report (dkt. 368) at pgs. 24; 43-44, 48 and 124; Monitor's 12th Report (dkt. 431) at pg. 26; Monitor's March 16, 2022 Report (dkt.

Unfortunately, the Department's proposed policy revisions shared *two years later* did not address most of the Monitoring Team's feedback. The policy revisions remain incomplete.

It is imperative that the Department acknowledge and address the root causes of these fundamental security issues head on. For example, the Department has long reported that the cause of many of the problems is because of "broken cell doors/food slots" and that has impeded the safe management of certain facilities. While the doors' operability may be part of the problem, merely ensuring the doors' good working condition has not resolved the issue of ensuring the doors are actually locked and secured. Were the underlying causes so rudimentary, the pervasive issues identified would not continue once those issues have been addressed. For instance, at RNDC, the Department installed 950 new doors over the past few years, yet incidents continue to occur in which doors were not properly secured. NCU's security audit in October 2023 revealed that "Cell doors were observed unsecured throughout the audit." Last month, the Department reported that it closed AMKC and reopened OBCC because OBCC had operable cell doors. However, OBCC has experienced rampant violence, partly due to the fact that individuals are moving freely about the housing units because staff have failed to enforce lock-in or refused to secure the operable doors (see NCU's Security Audit of OBCC in Appendix B). The operability of doors alone will not bring about facility safety.

In summary, despite the wealth of information that identifies specific practices that are both individually and cumulatively contributing to the imminent risk of harm, the Department has failed to take the necessary steps to understand the dynamics that actually underlie poor

---

438) at pgs. 22 and 71 to 72; Monitor's October 28, 2022 (dkt. 472) at pgs. 71-72, 81, 117; Monitor's April 3, 2023 Report (dkt. 517) at pg. 54 and 138; and Monitor's July 10, 2023 Report (dkt. 557) at pgs. 42 to 43.

practice. Such an inquiry is essential for developing strategies that move beyond superficial actions and delve into both what needs to be done and how it can be accomplished. Further, even when provided specific recommendations for remediating deficient practices, the Department has taken few concrete actions to adopt these recommendations (or devise reasonable alternatives) as the examples above demonstrate. The remainder of this section discusses the Department's plans for improving safety and makes several recommendations toward that end.

_Plans to Address the Immediate Risk of Harm_

Despite repeated attempts via multiple Court Orders and Monitor's recommendations, the Department has simply been unable to implement any immediate or short-term initiatives to ameliorate harm. The Department-wide interim security plan, first required by the Second Remedial Order, devised in fall 2021[12] under the prior Commissioner was abandoned in 2022.[13] In spring 2022, individual violence reduction plans for RNDC and GRVC were devised and implemented. Although the strategies initially had a positive impact, the plans were ultimately abandoned with seemingly little attention to which parts were effective and why. Recently, in fall 2023, RNDC reported its intention to reinvigorate its plan to address violence, utilizing some of the same strategies included in the previous plan and adding others. Further, a new Department-wide security plan is underway, following the Court's October 10, 2023 Order and recommendations from the Monitor. The Department has made several _plans_, but too often these plans are abandoned prior to implementation or are discontinued without first attempting to understand which components may have been effective such that they should be continued. The

---

[12] _See_ Monitor's November 17, 2021 Report (dkt. 420) at pgs. 2 to 3.

[13] The Security Manager took some steps to address portions of the interim security plan as discussed in the Monitoring Team's response to Plaintiffs September 6, 2023 Follow-up Question 7, none of which materially advanced these initiatives.

end result is that the Department has yet to develop and fully implement and sustain a coherent strategy for improving staffs' security practices. This inability to develop and implement a coherent, sustained strategy contributes significantly to the unabated level of violence in the jails.

Many of the issues facing the Department are rudimentary and basic (e.g., "lock the cell doors") such that using a formulaic approach to improve practice is appropriate. It is likely why most of the strategies in the Department's plans to enhance security and reduce violence utilize a similar formula depicted in the graphic below:



In many jurisdictions with a more willing or capable workforce, the sequence of strategies depicted above *is* sufficient to improve practice. However, the Department's various efforts to write new policies, educate and remind staff about expectations, threaten corrective action, and audit/track staff practice have not made any appreciable difference in remediating the basic security practice failures that underlie so much of the violence and disorder in the jails. This is due in part to poor development efforts, and in part to poor implementation of these initiatives. It is also why having an understanding of both the root causes of what contributes to practice failures and why prior failed efforts to remediate them are so critical. Continued failure by the Department to address these factors means that the Department is destined to remain in a persistent state of dysfunction.

The Department has crafted another plan to address the immediate risk of harm in response to the Court's October 10, 2023 Order and the Monitor's recommendations. The Department's plan includes three sections: steps already taken, steps that can be implemented in the near term, and longer-term solutions.

- **DOC's Report on Recently Completed Action Items to Reduce Violence**

  - The Department promulgated new guidance on use of force[14] to facilitate court appearances and, by extension, to reduce length of stay.

  - The transfer of people in custody and staff from AMKC to OBCC eliminated the issue of non-securable cell doors. But as discussed above, staff appear unwilling to consistently secure the operable cell doors. Notably, high levels of violence have plagued OBCC since it re-opened.

  - The EMTC Annex was opened on July 27, 2023 to provide housing for people with low-level offenses and City-sentenced individuals to increase opportunities for work assignments and to reduce idle time.

  - The number of beds for people who need more intensive mental health services was increased by opening Mental Observation units at GRVC.

  - Beginning in March 2023, the Department utilized the intake monitoring unit to improve tracking and processing times in facility intakes.

  - In April 2023, the Department reports it issued instructions for staff to keep television remote controls secured in the A station to prevent people in custody from accessing/removing the remote batteries and using them as an ignition source for fires. The Monitoring Team's recent site work suggests this hasn't been consistently enforced as remotes were observed in the housing units in RNDC and OBCC.

- **DOC's Near-Term Strategies to Reduce Violence**

  - The type and frequency of searches to detect and seize contraband will be increased. This includes facility searches and utilizing body scanners at RNDC and OBCC to search staff and visitors. The Department is also piloting Rapiscan drug detection to scan incoming mail.

---

[14] The Monitoring Team's consultation on use of force in these circumstances is described in the Monitor's August 7, 2023 Report (dkt. 561) at pgs. 3 to 4.

- o An Anti-Violence Response Team of staff assigned to the office of the Senior Deputy Commissioner[15] will be established to target basic security practices (e.g., conducting searches, managing lock-in/lock-out, clearing camera and cell door window obstructions). The team will be dispatched to certain housing units when poor practice is detected via live video monitoring. Upon arrival, the team, the facility's Tour Commander and two Captains will proceed to the unit and provide on-the-spot training to all staff in attendance.

  - The team is currently focused on specific housing units at RESH, RNDC and GRVC based on the Department's determination that these are "hot spots."

- o RESH leadership was changed, and the Department reports it intends to fortify the management of the units by increasing the capacity of RESH Level 1, assigning an additional Deputy Warden, and assigning an additional 36 officers.

- o The leadership at OBCC was changed in October 2023.

- o Staff will be directed to remove access to source materials used to start fires (e.g., tablet batteries, remote control batteries, electrical outlets).

- o The Senior Deputy Commissioner and other Executive leaders will be more visible at the facilities on weekends to reinforce proper search practices with new recruits.

- o Enforcement of certain policies was "reinvigorated" by:

  - Issuing teletypes related to incident reporting, "A-station" door security, remaining on post, and employee scanning. The teletypes on incident reporting, door security and remaining on post were issued in October 2023.

  - Utilizing the video monitoring unit to monitor and track these issues and to report identified violations to the facilities for corrective action.

- o Oversight, tracking, and discipline for tour wand compliance has been returned to the Commissioner's Office after the Monitoring Team's site work revealed current practices were deficient.

- o Approximately 50 staff with non-PIC facing posts have been assigned to PIC-facing posts 2 to 3 times per week.

- o A protocol to ensure routine lock-in from 9 p.m. to 5 a.m. at all facilities will be developed.

---

[15] The Monitoring Team's request for information about the selection process for these individuals and any training they may have received has not been provided.

- **DOC's Longer Term Strategies to Reduce Violence**

  o Developing a Behavioral Health Unit to respond to serious violence committed by people with Serious Mental Illness (SMI).

  o Implementing gang interdiction strategies.

  o Improving and standardizing training for supervisors.

  o Continuing to work with MOCJ to expedite cases of those individuals with a high propensity for violence and disorder.

  o Developing an Incident Command System to respond to emergency health and mental health crises.

  o Providing UOF and Defensive Tactics refresher training.

  o Implementing an employee performance appraisal system.

*Monitor's Initial Assessment of the Department's October 2023 Security Plan*

Certain elements of the Department's latest security plans are obviously essential. Detection and seizure of contraband is the only way to stem the flow of drugs and weapons into and throughout jail facilities, although such strategies are only as effective as staff's consistency in the application and utilization of sound search procedures (which have long been lacking in the Department). Similarly, updating written guidance, training staff, and reiterating expectations are a standard part of any correctional facility that should occur routinely. Monitoring and auditing staff's performance is an important element to assessing whether any strategy has remediated the identified problems. Corrective action is an important element of accountability, but if not disseminated consistently and close-in-time to the incident it has little power to catalyze behavior change across all staff.[16]

---

[16] Improvements to the Command Discipline process are welcome but are not expected to improve the consistency with which misconduct is identified. Further, given the significant number of backlogged cases, processing speed for command disciplines is not expected to improve for some time.

The elements articulated in the Department's strategy are important and not problematic per se—they are not wrong or misguided. However, the proposed plan lacks adequate detail, and many components of the plan are substantially similar to what has been attempted in the past, without a corresponding discussion of how the implementation failures of the past will now be avoided. For instance, the video monitoring unit has been in operation for years, reportedly tracking violations so that corrective action can be taken. It is unclear how the tracking and accountability mechanisms will be any different this time such that they might be more effective in actually changing staff practice.[17] Further, while training is always a critical element, the underlying training programs must reflect sound correctional practice and address the deficient practices that are embedded in staff practice. The training programs developed over the last year have been seriously deficient (revisions are currently underway), frequently served to reinforce problematic practices, and were inconsistent with policy or did not address the problematic staff practices that need to be remediated. It is therefore critical that the Department identify, acknowledge and most importantly, *understand* the shortcomings of previous strategies and past implementation failures in order to ensure effective and sustainable change in the future.

Skill deficits can never be overcome without directed instruction and ongoing performance support to help staff access the skills they need when they need them. Therefore, increased presence of Executive Leadership with correctional expertise and the Anti-Violence Response Team concept hold promise, assuming the individuals on the team[18] are appropriately qualified and in a position to deliver expertise to staff in the moment when they are struggling or

---

[17] The Department has repeatedly reported that the information obtained by the video monitoring unit is tracked. It is unclear how accountability will be improved in the short term.

[18] The Monitoring Team has requested the selection criteria and expertise of the individuals on the team, but it has not been provided.

refusing to enforce rules, demonstrate required practice, etc. This on-the-spot support is an effective way to change behavior because it allows staff to verbalize, and work through, the circumstances that they perceive to be a barrier to sound practice in the moment. Such *ad hoc* teams for temporary support can be an effective remedy for staffs' lack of fundamental skills and poor practice that is routinely reinforced by a culture that resists change, is burdened by the weight of old habits, and as has been well-documented, lacks appropriate guidance from Captains. Currently, the team only has eight members and only targets a few housing units in a few facilities, so it can only provide a fraction of the support that is needed systemwide.

While the Anti-Violent Response Team may be able to introduce both staff and Captains to necessary skills and illustrate how smoothly the operation can flow when basic correctional skills are utilized, the *ad hoc* team's presence will likely be too sporadic, insufficiently intensive, and of inadequate duration to catalyze the type of wholesale behavior change that is needed *on each housing unit in every jail*.

Given the limitations discussed throughout this report (and others), the Monitoring Team recommends two additional strategies for consideration. The first is focused on immediate steps to abate the ongoing and immediate risk of harm; and the second relates to strategies to supplement the supervisory rank that is so often central to the Department's plans to improve staff practice.

### *Immediate Steps to Abate the Risk of Harm*

Immediate, targeted initiatives to address the current driving forces of violence and to bring about even small pockets of relief to the ongoing harm are required. In devising these immediate and targeted initiatives, the Department must confront the realities of the current state of affairs and the deficits in staff practice.

For example, recent facility closures have drastically increased the size of the population at the jails that remain open, as well as the number of people in custody assigned to each housing unit. For a workforce that has struggled to safely manage less densely populated housing units, the facility closures and burgeoning population sizes have only compounded the problems. Strategies to reduce the span of control for the individual officers who appear to be incapable of properly managing the number of individuals on any given housing unit are worth exploring. For instance, certain groups of individuals (e.g., SRG affiliates, maximum custody detainees) have a higher propensity for violence and must be managed differently. Simply assigning them to a celled housing unit rather than an open dormitory will not mitigate the risk of harm they pose to other individuals. Instead, they must be supervised differently, with greater structure and control as core features of the environment. For example, these individuals could be permitted to engage with other individuals only in small groups and/or for shorter periods of time. This type of immediate strategy should be utilized until staff are able to better manage the housing units.

The composition of those assigned to housing units should also be evaluated, particularly as it relates to SRG affiliation, at least in the short term. While the concept of blending of SRG affiliates may support improved safety in the jails (as discussed above), managing blended units requires staff to have mastered certain core skills and appropriate security protocols. The cascade of violence at OBCC on October 31, 2023 discussed above is a prime example of the harm that can occur when staff lack the appropriate skill set. Given the immediate risk of harm, the Department must evaluate whether certain housing assignments must be altered until staff are able to safely manage these individuals in a particular unit.

While many of the broader solutions will take time to implement, all stakeholders must ensure that reasonable steps are taken to reduce the immediate and persistent risk of harm *now*.

This requires the Department to conduct a candid assessment of its current capacity, keeping the safety and security of both persons in custody and staff at the forefront. This is why the Department must focus on those areas where there is the greatest risk of harm and bring greater creativity to its obligation to take decisive, immediate action to reduce it.

_Inadequacies at the Supervisory Level_

The pervasive and rampant issues of security and operational breaches have not been adequately curtailed with the initiatives implemented to date and reinforce the need for a fundamental shift in the Department's overall approach. In particular, there is a critical need for an infusion of additional correctional expertise in a form that can reach more broadly, deeply and consistently than those recently recruited to the Department at the executive leadership level (e.g. Senior Deputy Commissioner, Deputy Commissioners, Associate Commissioners, and Assistant Commissioners) to work within the Facilities. The leaders with correctional backgrounds that have been brought in have unquestionably been helpful, but they are insufficient in number to fully address the problems at hand and with the Department's uniformed workforce of approximately 6,400 staff.

The Department's plans as proposed to date, and those required by the various _Nunez_ Court Orders, are unlikely to be sufficient because they do not address key dynamics that underlie staffs' inability or unwillingness to utilize proper security practices. Definitive measures to ensure that staff are available in sufficient numbers and that they stay on post are obviously necessary. It is equally critical that staff _actually do their jobs_, which requires that they have received thorough training, mastered the essential skills, have the confidence to implement the expected practices, and that they utilize those skills when they are needed. Too often, staff are present and yet fail to enact or enforce even the most basic security protocols.

What is needed is a practice that will ensure pervasive, direct intervention by well-trained, competent supervisory staff—guiding and correcting staff practice in the moment, as it happens. Only with this type of hands-on approach will the Department be able to confront and break through staffs' resistance and/or unwillingness to take necessary actions. In other words, a system of consistent, intensive support must be available to every housing unit until staff demonstrates the consistent application of basic correctional practice. The Department does not appear to have the necessary supervisory staff with the necessary competency to fulfill this need as described in prior reports. To date, the Department's efforts to obtain adequate numbers of competent supervisors have not been successful. More can and must be done to ensure that there are a sufficient number of supervisors who are adequately qualified to supervise the staff operating the jails.

Another aspect contributing to this supervisory deficit is the Department's multiple limitations in its basic supervisory structure. First, most correctional systems have three supervisor ranks (Sergeant, Lieutenant, Captain), but this Department has only two (Captain, Assistant Deputy Warden). Captains are essentially the only line supervisors because most ADWs serve as Tour Commanders. This means that there is essentially only one line of supervisors and Captains often go unsupervised given that most ADWs are focused on serving in the role of Tour Commanders and are not supervising the Captains.

Second, the problems with this truncated chain of command are exacerbated by the inadequate number of individuals holding the two ranks. There are plainly insufficient numbers of supervisors to provide the type of *intensive* supervision that is needed to elevate officers' skills. The First Remedial Order required an increase in the number of Supervisors, but no significant change in the number of supervisors has occurred since this Order was entered on

August 14, 2020, *over* three years ago. In fact, since 2020, the number of Captains assigned to work in the facilities has decreased by about 33% (558 as of July 18, 2020, compared to 371 as of October 21, 2023). This number is simply insufficient to adequately supervise thousands of officers. While the number of ADWs assigned to work in the facilities has *increased* by almost 38% during this time (52 as of July 18, 2020 compared to 72 as of October 21, 2023), the small number of ADWs has had limited impact, particularly given the significant deficit in the number of Captains.[19]

Third, compounding the problem of too few supervisors is that many of those holding one of these two ranks have only marginal competence in the skills necessary to provide *effective* supervision.[20] Many supervisors in the Department lack core competencies that render them ineffective in the supervisory roles they occupy. Given the problems articulated in prior Monitor's Reports regarding screening and selection of ADWs and Captains and the poor quality of pre-promotional training curricula,[21] it is perhaps unsurprising that the supervisory ranks are unprepared to support the weight of the strategies that place them at the center of officers' skill development.

Supervision cannot be passive—these individuals must have an active presence on the housing units demonstrating the requisite skills, providing opportunities for staff to practice them, and helping staff to understand and eventually overcome what hinders their ability to consistently utilize the skills they are being taught. The Department simply does not have the

---

[19] Data regarding the current number of Captain and ADWs is provided in response to Plaintiffs August 31, 2023 Request 22.

[20] For example, of 36 recently promoted ADWs, four have already been demoted and 12 were not recommended for promotion based on internal screening protocols.

[21] *See* for example, Monitor's July 10, 2023 Report (dkt. 557) at pgs. 71 to 83.

necessary assets among its current corps of supervisors to provide the type and intensity of hand-to-hand coaching that is required, suggesting that the solution to the problem will also require the necessary human resources. Supervision is fundamental to changing practice and sustaining those changes. The long-standing supervisory void—in both number and competency—is a leading contributor to the Department's inability to alter staff practice and to make meaningful changes to basic security practices and operations.

*Conclusion*

A critical and necessary component to addressing the issues in the Department is to ensure basic and sound correctional practice is infused throughout the system. The depth of dysfunction within the management of the New York City jails (beyond just the operations) makes it difficult for any initiative to even get off the ground, much less be fully implemented, nurtured and adjusted to meet changing needs and dynamics, and ultimately sustained over time.

The current conditions necessitate that the Department take both immediate steps to abate and ameliorate the serious and ongoing harm and develop longer-term initiatives to address the polycentric issues that have plagued this agency unabated from the inception of the *Nunez* Court Orders. As discussed above, the Monitoring Team has recommended considerations for both immediate steps (targeting specific areas of harm, compensating for poor staff practice) and long-term solutions (infusing direct supervision into the jails) to support making inroads in the reform efforts. However, while the Monitoring Team remains willing and able to render desperately needed technical support, it is ultimately the responsibility of the City's and the Department's leadership to devise viable, well-reasoned solutions that first and foremost reflect sound correctional practices and that are actually sustainable, rather than the current practice of lurching from one hastily developed and/or ill-conceived plan to another.

# INCIDENT REPORTING, TRACKING AND CONCLUSIONS ABOUT PROGRESS

Throughout 2023, the Monitoring Team uncovered several indicators that Department staff are not reporting incidents as they should be. The Department has complicated and convoluted reporting structures that make understanding reporting requirements difficult, including various notifications that must be made to the Monitor. In particular, the Monitoring Team identified a troubling number of instances in which serious incidents (including stabbings and slashings) were not reported or were reported after a significant delay.[22] In addition to being convoluted and ambiguous, requirements for reporting and tracking stabbings and slashings were altered this year to permit more subjectivity and greater staff discretion in the process.

Incident reporting is a basic and essential tool for properly managing a facility and is necessary to identify and solve problems. The integrity of any incident reporting system rests on a foundation that accurate reporting is mandatory, and that staff reflexively report incidents when they occur. The fact that in this Department, these tenets do not appear to hold true—even in cases of serious injuries and violent events like a stabbing or slashing—casts doubt on the integrity of the system. It also seriously impedes the reform effort.

---

[22] The Monitoring Team reported on nine incidents that were illustrative of broader concerns regarding staff incident reporting practices. This includes four (of the five) incidents identified in the May 26, 2023 Monitor's Report (dkt. 533) (described in the Monitor's June 8, 2023 Report (dkt. 541) at pg. 42) and five stabbing/slashing incidents that staff did not report (described in the Monitor's July 10, 2023 Report (dkt. 557) at pgs. 29 to 31). The Monitoring Team also reported on serious injuries that were reported on a significant delay in the October 5, 2023 Monitor's Report (dkt. 581) at pgs. 11 to 12 and Appendix D and E.

_Reporting Policies_

Since the Monitor's October 5, 2023 Report was filed, and as directed in the Court's October 10, 2023 Order, the Monitoring Team has worked to better understand the scope of the issues related to reporting. The Monitoring Team has met with Department officials to discuss how best to address the variety of reporting issues, and the Department reported some initial efforts to address these issues as discussed below.

Many of the Department's poor reporting practices are the result of long-standing issues. For instance, the Department does not maintain one central policy for reporting or even one list of what must be reported and the corresponding incident definitions. In contrast to most correctional systems that have a comprehensive _Incident Reporting_ policy, the Department's requirements for incident reporting are embedded in at least 8 different policies, none of which give a fulsome picture of the whole. Neither the staff required to report incidents nor the Central Operations Desk ("COD") that receives and disseminates incident data have a comprehensive list of what must be reported and the corresponding definitions. Further, while the Department was required to develop clear definitions of violent indicators under the Consent Judgment, it appears that in at least some cases, the definitions developed as part of this requirement have been abandoned.[23] The Monitoring Team has had to exert significant time and effort by making numerous requests to obtain information from the Department about its reporting practices. In addition, the Monitoring Team has had to make a number of follow-up requests because the

---

[23] Pursuant to Consent Judgment § V, ¶ 21 the Department was required "in consultation with the Monitor, [to] review the definitions of the categories of institutional violence data maintained by the Department, including all security indicators related to violence (_e.g._, "allegations of Use of Force," "inmate-on-inmate fight," "inmate-on-inmate assault," "assault on Staff," and "sexual assault") to ensure that the definitions are clear and will result in the collection and reporting of reliable and accurate data." This provision was terminated on August 14, 2023 (dkt. 349). As noted above, in some cases it appears the definitions developed under this requirement are no longer in place.

information the Department provided was unclear and ambiguous. Sustained efforts over a

period of months were required in order for the Monitoring Team to identify the list of incidents

that must be reported and their current definitions.[24]

*Circular Definitions, Subjectivity and the Impact on Violence Data*

    The Department utilizes a variety of incident definitions that are poorly constructed such

that the parameters are often rendered nearly unintelligible. For example, the COD definition of a

slashing is "slashing injuries sustained by inmates" and the definition of a stabbing is "stabbing

injuries sustained by inmates."[25] Such circular definitions that contain the same word being

defined do not support proper incident categorization. It is also in contrast to the

stabbing/slashing definition that the Department developed in response to Consent Judgment § V

(Use of Force Reporting and Tracking) ¶ 21 "Definitions of Institutional Violence," which states

"the use of a sharp instrument to cut an inmate's body with a sweeping stroke, or the use of a

sharp instrument to pierce an inmate's body."

    The unclear parameters of and contradictions within the Department's definitions for

stabbings/slashings were further confused by the Department's notification to the Monitoring

Team in October 2023 that incidents are not categorized as a stabbing/slashing "if the injury

sustained is superficial or an abrasion." This narrow construction of the definition defies

common sense. Just as the absence of a serious injury does not mean that a use of force was

appropriate, the same logic applies when evaluating the actions of people in custody—the

---

[24] The Monitoring Team requested one comprehensive list of items that must be reported and the corresponding definitions. This took months and multiple requests. The Department ultimately created and provided this list to the Monitoring Team.

[25] These are not the definitions of stabbing and slashing that were developed pursuant to Consent Judgment § V, ¶ 21.

absence of serious injury does not mean a stabbing/slashing did not occur. The Monitoring Team

has long reported that the focus on serious injuries is misguided and that the risk of harm and

serious pain are equally concerning and must be equally considered in evaluating an incident.[26]

Furthermore, the Department classifies an event as an Assault on Staff even when the staff

person does not sustain a serious injury, so the Department's faulty logic is not even universal,

and thus likely reduces the number of events that must be reported in the stabbing/slashing

category. The Department has consulted on potential revisions to the definition of stabbings and

slashings, but a new definition has not been finalized.

The Department reported that the narrow construction based on injury severity has not

been codified in a written policy or document, but rather is based on what Department leadership

and OSIU "are seeing in practice." The Department further reported that "DOC's policy allows

for staff discretion." The Department reports that this "discretion" was authorized via a

Memorandum issued on January 31, 2023 that is difficult to interpret, but which intimated that

certain incidents of violence may not need to be reported if mitigating factors are present.

Notably, immediately following the issuance of this memo, the number of reported stabbings and

slashings dropped 49% from January to February 2023, with no corresponding report of

improved security practices or operations that would explain such a precipitous drop. The text of

this memo is included in Appendix E of this Report.

Finally, in 2023, the Monitoring Team identified a number of stabbing and slashing

incidents that were not reported appropriately. Five such incidents were described in the

Monitor's July 10, 2023 Report. Subsequently, after months of repeated follow-up, the

---

[26] *See* Monitor's Seventh Report (dkt. 327) at pgs. 156 to 157.

Department reported that two of the five incidents were ultimately categorized as stabbings/slashings, but the other three incidents were not because they did not involve serious injuries.[27] The Department's decision not to categorize these three incidents as stabbings/slashings is unreasonable for the reasons described above. Furthermore, since the filing of the October 5, 2023 Report, the Monitoring Team identified six additional unreported stabbing/slashing incidents. *See* Appendix D of this Report. The full extent to which stabbing/slashing incidents have been unreported is unknown. However, the fact that the Monitoring Team has identified 11 stabbing/slashing incidents *this year* that were not reported as such is significant. Even without knowing the full extent of unreported incidents, sufficient evidence exists for the Monitoring Team to conclude that the Department's data regarding slashings/stabbings underestimates the frequency that this type of serious violence occurs.

In response to the Monitoring Team's findings, on October 6 and October 20, 2023, the Department issued written directives to staff to advise them of their obligations to timely report incidents. The October 20, 2023 memo also rescinded the Department's January 31, 2023 memo.

*Failure to Track Key Data*

In addition to poorly constructed definitions and inadequate protocols for reporting, the Monitoring Team has also identified problems with the Department's practices for timely reporting of certain data. The Department's deficiencies in reporting serious injuries and the underlying incidents were described in the Monitor's October 5, 2023 Report at pgs. 10 to 12; 17 to 18 and Appendix B and C. In addition to these issues, after the Monitor's October 5, 2023 Report was filed, the Monitoring Team also learned of an additional category of data that was

---

[27] *See* the Monitor's October 5, 2023 Report (dkt. 581) Appendix B.

not reported as it should have been. In October 2023, the Department reported that, for currently unknown reasons, RESH had not entered any information into the Fight Tracker in August and September 2023.[28] In addition to the obvious concern about the failure to track this data, the Department was not even aware of the problem until the Monitoring Team requested the data and the Department determined that the data did not exist.

*Tracking of Hospital Admissions and Notifications to the Monitor*

The Department has not yet devised a satisfactory process for notifying the Monitoring Team of incidents in which serious injuries or serious conditions resulted in an individual's admission to the hospital ("Serious Hospital Cases"). To date, fewer than 10 cases have been reported, despite objective evidence that many more cases should have been brought to the Monitoring Team's attention. Case tracking is haphazard and disorganized, but the Monitoring Team has found that the Department *does have* sufficient information to identify cases that meet the criteria for notification, and yet has not done so reliably.[29]

The Monitoring Team has met with the Department several times to discuss how to strengthen its protocol for notifying the Monitoring Team of Serious Hospital Cases. It is worth highlighting that the purpose of this provision is to ensure that the Monitoring Team is advised of particularly egregious incidents, and an admission to the hospital should certainly be categorized as such. Indeed, the City proposed this notification process in June 2023 and suggested using the standard of "serious injuries or serious conditions." Subsequent discussions with the Department indicate that this standard does not appear to be workable, given the limited medical information

---

[28] The Fight Tracker is a database that tracks the number and characteristics of fights (e.g., individuals involved, the location, whether force was used, whether injury was sustained, etc.) that occur in each jail. Facility staff are responsible for entering data into the Fight Tracker.

[29] *See* Monitor's October 5, 2023 Report (dkt. 581) at pgs. 10 to 12.

available to the Department at the time of the hospital admission. Accordingly, the Monitoring

Team has made two requests of the Department: (1) to provide a list of all individuals admitted

to the hospital to the Monitoring Team on a daily basis; and (2) to provide the Monitoring Team

with all information available to the Department about the reason the individual was transported

and admitted to the hospital. In October 2023, the Department began providing the Monitoring

Team with a daily report of the individuals admitted to the hospital, but this report does not yet

include any information about why the individual was transported to or admitted to the hospital.

_Conclusion About Data and Progress and Recommendations_

Overall, despite significant efforts and studied review of Department policies, the

Monitoring Team has found that the policies and procedures for reporting are haphazard and

unclear about what must be reported, when it should be reported, and how staff are instructed

about their reporting responsibilities. This lack of clarity may explain in part the Monitoring

Team's findings that certain incidents are simply not reported, and that other incidents are only

reported following the notification of a serious injury and, even then, the reporting is often

delayed. _See_ Monitor's October 5, 2023 Report at pgs. 10 to 12. The variety of problems with the

Department's parameters for defining and categorizing incidents, the protocols for reporting

incidents, and the integrity of several incident tracking systems are serious. Collectively, they

have critically undercut the Monitoring Team's confidence in the accuracy of the Department's

quantitative data such that the accuracy of past findings regarding changes to the rates of key

metrics cannot be assured.

In particular, the poorly constructed definitions, divergent reporting instructions,

subjectivity in reporting and categorizing incidents, and findings of unreported incidents have

eroded the Monitoring Team's confidence in the accuracy of the Department's stabbing/slashing

data. Consequently, the Monitoring Team has determined that it cannot reliably verify purported

decreases in stabbings or slashings in 2023. In 2023, at a minimum, multiple stabbing and

slashing incidents that should have been reported and included in the Department's violence data

metrics were not. The extent to which additional unreported incidents exist is likely but

unquantifiable without extensive scrutiny of thousands of incidents. This underscores the

Monitoring Team's long-standing position that the most troubling incidents are those that are not

reported. To the extent that the Monitoring Team has made any findings or drawn conclusions

about purported decreases in the number of stabbings or slashings in 2023, those findings and

conclusions are retracted.[30] The Monitoring Team does not take such a step lightly, but the

Monitoring Team's confidence regarding the data's accuracy and reliability has been severely

diminished. Thus, the number of reported stabbings and slashings—which is already staggering

and a clear indicator of the appalling lack of safety in the jails—should be seen as a floor, not a

ceiling.

In order to ensure that violence-related metrics are reliable, the Department must

immediately remediate these problems, and the Monitoring Team recommends the following:

- **Centralized Reporting Policy & Clear Definitions of Incidents**: The Department must
  develop and promulgate a centralized *Incident Reporting* policy that utilizes clear,
  objective definitions for reportable incidents (i.e., reinstating Consent Judgment §V ¶ 21)
  and a durable protocol for reporting, including specific timelines. This policy must be
  developed in collaboration with the Monitoring Team and must be subject to the
  Monitor's approval. This requirement and approval must be subject to Court Order. A

---

[30] See, Monitor's June 8, 2023 Report (dkt. 541) at pgs. 5, 9-10, 11, 13; Monitor's July 10, 2023 Report
(dkt. 557) at pgs. 55-56, 59-60, and 67-68; and June 13, 2023 Status Conference Transcript at pg. 46 lines
16 to 19.

proposed Court Ordered provision is included in the proposed order at Appendix G of this report.

- **Improved Staff Reporting**: The Department must put in place a robust strategy—beyond issuing a Teletype and reminding staff at Roll Call—to ensure that all staff comply with their duty to timely report all incidents.

- **Centralized Tracking for Hospital Transport**: The Department must develop and implement a process for centralized tracking of all individuals who are transported to the hospital and the reason the individual was transported to the hospital.

## UPDATE ON COURT'S 2023 ORDERS & PLAINTIFFS' REQUEST FOR INFORMATION

This section of the report provides an update on the work related to the three most recent Court Orders – June 13, August 10, and October 10, 2023. Taken together, these three Orders were intended to catalyze improvement in the Department's management of the *Nunez* Court Orders, work with the Monitor, and efforts to address fundamental security, reporting, and management practices to bring about some immediate relief to the ongoing harm faced by staff and people in custody on a daily basis. Following these updates is a discussion regarding the Monitoring Team's responses to Plaintiffs' requests for information.

*June 13, 2023 Order*

The Court entered an Order on June 13, 2023 regarding the City's and Department's obligation to work with the Monitor and his team, including providing relevant information as requested and notifying the Monitor of serious incidents in the jails. The Court explained "it is unfortunately necessary [to issue this Order in order] to clarify and, again, underscore the responsibilities [of the Monitor] that have been imposed by orders that have been in place for years and more recent orders. But to the extent there are any ambiguities and to the extent that specifics of timing and execution of methodology of responsibilities is necessary to make sure that we are all clear, it is appropriate and it is necessary." *See* June 13, 2023 Emergency Court Conference Transcript at pg. 85, 11:18. The Monitoring Team provided updates on the Department's obligations related to this Order in the Monitor's July 10, August 7 and October 5,

2023 Reports.[31] To the extent that those reports remain reflective of current practice, they are not repeated below.

- **Notifications to the Monitor (§I, ¶3(b))**: The Department's ability to provide prompt and accurate information regarding hospital admissions remains problematic, as described in the Incident Reporting section of this report.

- **Production of Information, Consultation and Access to Staff (§I, ¶¶4, 5, 6)**: Scrupulous compliance with these requirements is necessary to advance the reform effort and for the Monitor to fulfill his obligation to the Court. The Monitoring Team remains deeply concerned about the ongoing efforts to interfere, obfuscate and otherwise impede the work of the Monitor. A detailed discussion of these matters is included in the Managing of *Nunez* Court Orders section of this report.

- **Nunez Manager (§I, ¶7)**: The *Nunez* Manager continues to be an advantageous and critical player in the Defendant's otherwise chaotic management of the *Nunez* Court Orders. Given the vast scope of this work, the *Nunez* Manager must have sufficient resources, which remain inadequate, and her team should include individuals who have a strong command of both the Department's operations and the *Nunez* Court Orders.

- **Department-Wide Remedial Steps to Address the Five Incidents Discussed in the May 26, 2023 Special Report (§II)**: The Department reports that a preventive barrier was installed in the relevant housing unit in GRVC on October 3, 2023. Although in June 2023, the Department stated its intention to (1) update existing policies to address individuals who are unclothed and (2) revise procedures to require incarcerated individuals who are involved in a violent encounter to be seen at the clinic on an "urgent basis," neither issue has been addressed. As reported in the Monitor's October 5, 2023 Report, repeated requests by the Monitoring Team to determine which policies will be updated and to review any revisions have gone unanswered.

---

[31] *See* Monitor's July 10, 2023 Report (dkt. 557) at pgs. 163 to 165; Monitor's August 7, 2023 Report (dkt. 561) at pgs. 7 to 9; and Monitor's October 5, 2023 Report (dkt. 581) at pgs. 10 to 12 and 22 to 23.

*August 10, 2023 Order*

The Court entered an Order on August 10, 2023 to address several critical items identified by the Monitoring Team that are necessary to reduce the imminent risk of harm but have continuously languished. The purpose of this Order was for the Department to prioritize these actions as other remedial relief is being contemplated. These steps were intended to be immediate, *interim measures* to ensure a proper focus on and pace for initiatives that have direct bearing on the imminent risk of harm. An update on their status is outlined below.

- **UOF, Security and Violence Indicators (§ I, ¶ 1)**: The Monitoring Team has evaluated the Department's data, observed TEAMs meetings, and reviewed minutes from meetings related to ID. The Monitoring Team has shared feedback that the data utilized to inform these meetings does not appear to address the root causes of many of the indicators being evaluated and does not leverage information from NCU's security audits or the Rapid Reviews. Because the size of the facilities' populations have increased so substantially, the Monitoring Team also encouraged the Department to begin using *rates*, rather than raw numbers, when assessing changes in the frequency of certain events. The Department's response to the Monitoring Team's feedback lacked clarity and so follow-up questions were submitted to better understand what steps, if any, the Department intended to take to address the Monitoring Team's feedback. The Department has not replied, so the Monitoring Team does not know whether the Department intends to enhance its analysis of use of force and security and violence indicators as recommended by the Monitoring Team.

- **Revised Search Procedures (§ I, ¶ 2)**: The Department identified three policies that must be revised to address this requirement. While only a very small step toward complying with the Court's Order, this is the first time in over two years that the Department has taken *any* steps towards addressing the Monitoring Team's 2021 recommendations to improve search procedures. In September 2023, the Department provided revisions to the first of the three policies for the Monitoring Team's consideration. The Monitoring Team shared extensive feedback and comments on the

draft in October 2023. The Department reports that it is evaluating the Monitoring Team's feedback and is also working to provide proposed revisions to the other two search policies. The Monitoring Team has not yet received proposed drafts for either policy.

- **Revised Escort Procedures (§ I, ¶ 3)**: The Department identified five policies that must be revised to address this requirement, all of which are in different stages of internal review. Once proposed revisions have been drafted, the Department reports it will share them with the Monitoring Team for their consideration. The Monitoring Team has not yet received proposed drafts for any of the five policies.

- **Lock-in and Lock-out Procedures (§ I, ¶ 4)**: The Department has started to focus on properly implementing the evening lock-in (9:00 p.m.) and has consulted the Monitoring Team on its plans. On October 31, 2023, the Department issued a teletype articulating the requisite procedures and required each facility to devise a lock-in plan. While most facilities still do not complete lock-in on time and do not ensure that individuals in custody remain locked-in throughout the night, the current focus is an important first-step initiative. The Department has elected to first focus on the 9:00 p.m. lock-in before addressing compliance with the 3:00 p.m. lock-in. This is a reasonable approach given the difficulty the Department experiences in ensuring that staff properly execute basic security procedures.

- **Control Station Security (§ I, ¶ 5)**: On October 20, 2023, the Department issued a teletype regarding staff's obligations to secure the control station doors, which includes a set of written requirements very similar to those developed in November 2021. The Monitoring Team advised the Department that a plan for monitoring and enforcing the requirements is necessary given the pervasive and long-standing problems in this area and given that prior written protocols have had little impact. The Department reports that the Video Monitoring Unit will monitor this issue and track its findings. The Department reported its intention to share the proposed tracking process with the Monitoring Team for its consideration, but it has not yet been provided. More broadly, the Department must seek to understand the barriers to staff compliance with this basic security practice such that the root causes can be specifically targeted.

- **Staff Off Post (§ I, ¶ 6)**: On October 20, 2023, the Department issued a teletype regarding staff's obligations to remain on post until properly relieved, and that abandoning one's post may result in disciplinary action. The Department does not have a centralized tracking mechanism of staff who are found to be off post. However, the Department reported that NCU's security audits will continue to focus on staff being off post. NCU's security audits have identified this problem since the audits' inception in late 2021 but that has not effectuated any appreciable change in practice. Although the audits will be useful to assess changes to the size and scope of the problem, the teletype/audit combination lacks an actual intervention that could impact staff practice. The Department reports that it also plans to reinvigorate its employee scanning process to help identify when a staff member may be off post. The effectiveness of this strategy is questionable given the low likelihood that a staff member would scan themselves out of the unit if they were leaving without being properly relieved. At present, the Department does not have a centralized tracking mechanism of staff that are found to be off post.

- **Special Teams Training (§ I, ¶ 7)**: The Department is in the process of revising the Special Teams training. The first draft was shared with the Monitoring Team in June 2023 but was inadequate, as described in the Monitor's July 10, 2023 Report at pg. 41. In late August 2023, the Department shared a revised version of the training program that incorporated feedback from the Monitoring Team. The Monitoring Team provided additional feedback in September 2023. The Department provided a revised version of the training on November 6, 2023, which the Monitoring Team will review.

- **Special Team Command Level Orders (§ I, ¶ 8)**: The Department reports that nine CLOs are related to ESU and that there are no CLOs related to any other Special Teams (including SST and SRT).[32] For the nine CLOs identified, the Monitoring Team has provided feedback regarding three, as discussed below. The other six CLOs are undergoing internal review, and the Department reports that proposed revisions will be shared with the Monitoring Team once that review is complete.

  - Two of the three CLOs (related to Aerosol Grenades and Pepperball Spray) have outstanding feedback from the Monitoring Team from August 2021 that went

---

[32] As noted elsewhere in this report, it took the Department months to confirm the number of relevant policies related to ESU.

unaddressed for almost two years. In July 2023, the Department shared proposed revisions to the CLOs and the Monitoring Team provided feedback in August 2023. In response to the Monitoring Team's feedback, the Department reported it no longer intends to utilize Pepperball spray and will not update the CLO.[33]

- o In August 2023, the Monitoring Team provided feedback on the third CLO related to Ballistic and Lethal Weapon Teams. The Department has not proposed revisions to address this feedback.

- **Screening and Assignment of Staff to Special Teams (§ I, ¶ 9)**: The Monitoring Team has raised a number of concerns about the veracity and reliability of the staff screening process for special teams. The Department shared proposed revisions to the policy at the end of September 2023, and the Monitoring Team provided feedback in October 2023. Additional revision is needed before this policy can be finalized.

- **Revised Pre-Promotional Screening Policies and Procedures (§ I, ¶ 10)**: The Department reports it has been working on revisions to the policy governing pre-promotional screening, but proposed revisions have not been provided to the Monitoring Team's for review.

- **ID Staffing (§ I, ¶ 11)**: ID reports that it is recruiting and interviewing investigators and supervisors. ID staffing levels as of late October 2023 are included in response to the Plaintiffs' requests for information from July 28, 2023 (Request 23) in Appendix A of this Report. The Department previously reported that it planned to initiate an internal staffing analysis in August 2023. It appears that an initial assessment may have begun in October 2023, however, the Department's responses to inquiries from the Monitoring Team about the methodology were vague or unresponsive and the Department has not responded to the Monitoring Team's follow-up questions.

- **Command Discipline Directive (§ I, ¶ 13)**: The Department submitted proposed policy revisions in late September 2023 and the Monitoring Team provided feedback in October 2023. Additional revision is needed before this policy can be finalized.

---

[33] The Monitoring Team has requested the Department provide any written documentation disseminated to staff that use of Pepperball spray has ceased and confirmation that the Pepperball spray can no longer be accessed by staff. The Department has not provided a response to these requests.

- **External Assessment (§ I, ¶ 14)**: Dr. Belavich continues to work with the Department to improve its suicide prevention practices and has routinely consulted with the Monitoring Team.

*October 10, 2023 Order*

On October 10, 2023, the Court issued an Order that reminded Defendants of their obligations to collaborate with the Monitor and to comply with the *Nunez* Court Orders, and that directed Defendants to engage with the Monitoring Team on immediate initiatives to address the risk of harm and reporting issues identified in the October 5, 2023 Report.

- **Immediate Security Plan**: The Monitoring Team met with the Senior Deputy Commissioner, the *Nunez* Manager, the Security Manager, the Classification Manager, and the Staffing Manager on two separate occasions, as required by the Court's Order. In the first meeting, the Senior Deputy Commissioner's presentation focused primarily on gang interdiction efforts and the failures of the prior administration. During this meeting, the Monitor reiterated his concerns that the proposed plans did not target the well-documented and on-going security and operational failures and that the plans also did not include initiatives that could be implemented in the near term. In response to this feedback, the Department suggested convening another meeting and stated that the Department would provide a written submission with proposed plans for immediate implementation in advance of that meeting. The subsequent meeting occurred on October 23, 2023 and additional details about the proposed plan were shared, as discussed in the Security and Operations section of this report.[34] As described in that section, the Monitor believes that given the currently dire conditions, the Department must focus on formulating a set of *immediate* strategies to establish operational control and stability in those areas or among those individuals with the highest risk of harm.

- **Immediate Reporting Initiatives**: Department representatives met with the Monitoring Team on October 16, 2023 to provide background and context for various long-term technological enhancements currently underway to improve its tracking processes. The Department's efforts to promptly notify the Monitoring Team of hospital admissions was

---

[34] This meeting is also discussed in the Managing of *Nunez* Court Orders section of this report.

also discussed. The Department issued two teletypes, on October 6 and 20, 2023 that reminded staff of their reporting obligations and to rescind the January 31, 2023 memo that permitted greater subjectivity and discretion in what information to report (discussed in the Incident Reporting section of this report). The Monitoring Team has made three recommendations to improve incident reporting practices, which are described in the Incident Reporting section and also incorporated into the proposed Court Order.

*Plaintiffs' Requests for Information*

Between July and November 2023, the Monitoring Team received over 60 requests for documents and information (many with multiple subparts) from Plaintiffs' Counsel and the Southern District of New York (collectively, "Plaintiffs"). The first set of requests was made during the Meet & Confer process in July 2023. Plaintiffs subsequently submitted four sets of requests on July 28, 2023, August 31, 2023, September 6, 2023, and November 2, 2023. These requests for information were made pursuant to Consent Judgment § XIX, ¶ 8 which permits Plaintiffs to obtain information and/or documents regarding specific concerns if they believe in good faith that Defendants may not be in compliance with any obligation under the Consent Judgment. Plaintiffs must first seek the information from the Monitor. If the Monitor does not have the information, then Plaintiffs may seek it from Defendants. The Monitor's production of information to Plaintiffs is also governed by the Consent Judgment § XX, ¶¶ 10 and 25.

The Monitoring Team provided responses to these requests on a rolling basis to all Parties beginning in August 2023. The Monitoring Team had the vast majority of the requested information but directed Plaintiffs to seek the information directly from Defendants in a few instances. Defendants have produced the requested information to Plaintiffs. Some debate among the Parties occurred about whether certain investigatory files should be produced. This dispute was addressed directly with the Court and resolved by the Court's October 17, 2023 Order which

required Defendants to produce the documents. A comprehensive document with the Monitoring Team's responses to all Plaintiffs' requests is included in Appendix A of this Report.

On October 17, 2023, Plaintiffs submitted over 100 comments and questions to the Monitoring Team related to the information that was provided in response to their original requests, as well as various questions related to the Monitor's October 5, 2023 Report. The Monitoring Team's replies to the comments and questions are incorporated into the responses in Appendix A, and some are directly addressed in this report. To the extent that the Monitoring Team did not have any additional information, the Monitoring Team so advised Plaintiffs.

## MANAGING THE *NUNEZ* COURT ORDERS

The essence of the Monitor's role is to provide a neutral and independent assessment of compliance, which is specifically required by the Consent Judgment in this case. *See* Consent Judgment § XX. ¶¶ 1 and 18. The Monitoring Team's collective experience of more than one hundred years suggests that advancing court-ordered reform will occur only when the Defendants are candid, transparent, and willing to engage and collaborate with the Monitoring Team. Such an approach is particularly critical in this case, where problems are not readily identified or acknowledged by the agency and where the requisite expertise in sound correctional practice is lacking among so many of the Department's actors.

The Monitoring Team has a long record of attempting to work collaboratively with this agency. Indeed, even though the substance and rate of progress has been insufficient throughout the past eight years, for many of them, the Monitoring Team and Department mutually benefitted from a strong collaboration. The Monitoring Team remains committed to working with the agency and hopes the City and Department will return to the spirit of collaboration that characterized much of this monitorship.

The purpose of collaboration between the Department and the Monitoring Team is to support the development of reasonable initiatives to improve facility safety and security that can be implemented with fidelity, and to elevate the work of the Department wherever possible. Given the Monitoring Team's long-standing expertise in corrections as well as its deep understanding of the operations of *this* agency, the Monitoring Team routinely provides constructive feedback to ensure proposals are consistent with sound correctional practice and will adequately address the current problems being experienced within the agency. The Monitoring Team is also vigilant about whether proposals are in conflict with other Department

policies or practices so that they may be reconciled.[35] In order for the Monitor to perform his duties, the Monitor, and the Monitoring Team, must be in a position to question and challenge information provided by Department officials, to raise concerns about the sufficiency of initiatives under development and practices already in place and how they may or may not address ongoing deficiencies, and, most recently, to raise concerns about repeated efforts to evade ownership of the current state of affairs by placing blame on prior administrations. These efforts by the Monitoring Team are not always well received by the Department.

In this section of the report, three recent examples of the City's and Department's attempts to hamper the work of the Monitor are described, followed by a description of what has emerged as a troubling, ongoing pattern of interference and obstruction.

*Examples of Defendants Attempts to Deflect, Interfere and Obstruct the Work of the Monitor*

The City's and Department's response to three recent requests by the Monitor illustrate the Monitoring Team's ongoing concerns that Defendants are attempting to hamper the Monitor's work. As illustrated below, requested information is often provided only after a protracted delay and repeated follow-up by the Monitoring Team. The Department frequently asserts baseless objections requiring various discussions by email and phone (and, in the most egregious case, an Order from the Court) in order to obtain information that the Monitor is entitled to under the *Nunez* Court Orders. At times, the Commissioner and the City have attempted to deflect responsibility or fundamentally mischaracterize the nature of the

---

[35] As discussed in more detail below and in prior Monitor's Reports, the Monitoring Team routinely finds that Department leadership and staff lack the institutional knowledge and history of certain issues. In some cases, Department staff appear unaware of their own policy requirements until the Monitoring Team reminds them. For example, the Department did not follow its policies regarding screening staff for Special Teams in 2021 or 2023, purportedly because the requirements were unknown to leadership.

information requested, which has shaken the Monitor's confidence in the reliability of the information provided.[36]

In September and October 2023, the Commissioner (and ultimately in one case, the City) refused to provide information in response to three Monitor's request for: (1) the underlying information related to the Department's compliance with Consent Judgment § VII, ¶ 4 which relates to discipline for biased, inadequate or incomplete use of force investigations, (2) any written documentation regarding the recent demotion of the Associate Commissioner of ID, and (3) the Commissioner's February 2022 referral letter to the Department of Investigation ("DOI") regarding *Nunez* matters that was referenced in the Department's Compliance Report.

The Department advised they would not respond to these requests because "*[i]t is the Commissioner's position that [these requests are] not within the scope of the Nunez Consent Judgment and Remedial Orders and he does not intend to respond, absent a court order to do so. As you are aware, the Department responds to the vast majority of Monitoring Team requests for information without objection. However, here, the Commissioner strongly objects to these requests as outside the scope of the Consent Judgement and Remedial Orders and as not relevant to remedying the constitutional violations at issue.*"

Following the Commissioner's initial refusal to provide the information, the Monitoring Team had to engage in repeated follow-up and lengthy discussions with Department leadership and counsel for the City in order to advocate for the materials' production. The requested information in response to the first two requests was ultimately provided. With respect to the

---

[36] The Monitor has reported a number of these instances in prior reports. For example, see the Monitor's June 8, 2023 Report (dkt. 541) at pgs. 23 to 36 and Monitor's October 5, 2023 Report (dkt. 581) at pgs. 11 to 12.

final request, the requested letter was only produced after the Court compelled production on

October 30, 2023. A summary of the issues related to each request is taken in turn below.

- **Request Number 1**: In mid-October 2023, 40 days after the information was originally requested and after repeated follow-up and an initial refusal, the Department produced information regarding discipline for investigators who conducted biased use of force investigations from January 2022 to the present. Accompanying the Department's response was information related to discipline imposed between 2018 and 2022, purportedly in the interest of "full transparency."[37] The Department stated that the purpose of this historical information was to demonstrate the "infrequency of discipline" during 2018-2022 and also stated that the paucity of discipline in that time frame "should not come as a surprise as the prior ID leadership permitted over 2000 cases to be summarily dismissed without any discipline for staff." The facts related to ID's historical performance level are well documented in the Monitor's Reports. Further, the Department's admission of prior non-compliance in this situation is perplexing. The statements appear to concede that the Department was well aware, as they should be, of their persistent non-compliance with this requirement, and yet the Department does not appear to have taken any meaningful action since 2022 to address this. In response to the request for information regarding discipline for investigators who conducted biased use of force investigations from January 2022 to the present, the Department reported it could only identify a small number of records that may be responsive to the request.

- **Request Number 2**: The Department initially claimed that the request for written documentation regarding the recent demotion of the Associate Commissioner of ID was beyond the scope/unrelated to *Nunez* matters. This claim is suspect as the City advised the Court on April 25, 2023 that this same individual's leadership role within ID *supported its efforts to improve ID* and address the Monitor's findings or regression.[38] Further, on September 5, 2023, the Commissioner advised the Monitor that he would engage in a "public back and forth" if the Monitor were to include "glowing representations" about the individual in future Monitor's Report. After repeated follow-

---

[37] Notably, the Department conceded this effort was not exhaustive, that tracking was insufficient to determine all steps taken during this time and that many of the supervisors and managers are no longer with the Division to provide this information now

[38] *See*, City's Letter to the Court on April 25, 2023 (dkt. 523) at pg. 5 in which the City reports "[i]n addition, in March 2023, the Deputy Commissioner for ID resigned, and a new leader was appointed. *The Associate Commissioner for ID, in whom we believe the Monitor has considerable confidence, remains in place.* The Monitoring Team has shared that it has already seen a clear improvement in cooperation in ID since the recent leadership changes." Emphasis supplied.

up, the requested information was finally produced 49 days after the request, and the substance of the materials confirmed the request was within the scope of the *Nunez* matters. The baseless refusal and subsequent protracted debate appear to be an attempt to interfere with the Monitor's ability to conduct a thorough examination of the issues.

- **Request Number 3**: On August 17, 2023 in the Department's routine *Nunez* Compliance Report, the Department reported the Commissioner referred a number of concerns related to *Nunez* matters to the Department of Investigations in 2022 in a letter. The Commissioner's letter was submitted to DOI following a meeting, attended by DOI representatives, the Commissioner, and a high-ranking City official, in which the allegations in the referral letter were discussed. The Monitoring Team requested a copy of this letter on September 8, 2023 based on DOC's representations. As described below, the City and Commissioner attempted to withhold this letter from the Monitor despite its relevance to the Monitor's work.

  - *Timing of Production & Baseless Objection to Production*: The Commissioner's and City's position on whether it intended to produce this information extended over a 50-day period, well beyond the deadlines required by the *Nunez* Court Orders.[39] During repeated follow-up by the Monitoring Team, the City's and Department's positions continually shifted about whether the information would be produced and, if not, the basis for refusing to produce the information. This unduly delayed resolution of the matter.[40] The Monitor ultimately had to seek an order from the Court to produce the letter and the Court reaffirmed the Monitor's position that the Commissioner's and City's objections to production were baseless. *See* October 30, 2023 Order at pg. 2.

  - *Transparency and Relevance*: The Commissioner's DOI referral letter includes multiple references to the Department's work with the Monitor, concerns about

---

[39] The Department must produce any information requested to verify information in the Department's Compliance Report *within 14 days* of the request. *See* Consent Judgment § XIX, ¶ 7. Moreover, the Court's June 13, 2023 Order requires the Department to produce information requested by the Monitoring Team within 10 business days of receipt. *See* June 13, 2023 Order § I, ¶ 4. Defendants may request an extension to produce information beyond 10 business days but must first seek approval from the Monitor. *See Id.* Notably, Defendants did not request, and the Monitor did not approve, an extension to the timeline for providing the information requested on September 8, 2023.

[40] The City's position on producing this information changed multiple times during the course of one month. First, the City reported that the documents would not be produced because the matter was not within the scope of the *Nunez* Court Orders. Then, the City reported production was contingent on obtaining approval from DOI and learning the status of the investigations. Later, the City appeared to report that they would not produce the documents because the DOI investigation remained open although DOI had directly advised the Monitoring Team that they did not object to production of the letter to the Monitor. Finally, the City reported to the Court that the City would not produce the documents because it determined that the document was not relevant to the work of the Monitor.

transparency, "abuses" that the Commissioner described as "systemic", purported failures to address the root cause of problems, and actions that appeared to violate the *Nunez* Court Orders. Many of the allegations underpinning the concerns amount to hearsay, but in at least three instances, the Commissioner reports on his personal involvement in, knowledge of, or belief that Department staff actions violated the *Nunez* Court Orders and that the violations may be ongoing.

The veracity and reliability of the claims in the letter is unknown. The Monitoring Team appreciates that the purpose of this referral was to ask DOI to investigate the allegations raised and as a result, they may or may not be substantiated. The City and Department appear to suggest that the contents of the letter are not well-grounded given their claims that the contents of the letter are not "relevant to current compliance" or "remedying the constitutional violations at issue." That said, the allegations are plainly relevant to the *Nunez* Court Orders and thus within the Monitor's purview and should have been disclosed. The Commissioner and City's depiction of this information mischaracterizes the contents of the referral letter. Defendants reported on the letter in its *own* Compliance Report shared with the Monitor on August 17, 2023 so it impossible to understand how Defendants now claim it is not relevant.[41] As described above, the allegations directly relate to the work of the *Nunez* Court Orders, including multiple references to the Monitor. More broadly, the fact that the Commissioner and City believe the issues outlined in the letter (whether they are substantiated or not) are not directly relevant to "remedying the constitutional violations at issue" suggests that they fail to appreciate both the requirements of the *Nunez* Court Orders and the scope of work that remains.

In all three instances described above, the requested information was clearly and objectively related to the requirements of the *Nunez* Court Orders, the plans the Department put forward to remediate deficiencies, and/or the Department's compliance with the *Nunez* Court Orders—all of which are clearly within the purview of the Monitor. Such information should be provided without delay. These examples illustrate why the Monitor in his sole discretion must determine what is *Nunez* related and what information is needed to fulfill his duty to the Court —

---

[41] In what appears to be another attempt at deflection, the City subsequently referred to this as a "passing reference." *See* City's October 28, 2023 Letter (dkt. 523) at pg. 1.

not the Commissioner, Department or City officials, or any other Party. Furthermore, if the City's and Department's basis for objection is accepted (i.e., that the City/Department believed that the materials at issue are not *Nunez* related), the Monitor is deeply concerned about their apparent fundamental failure to understand their obligations under the *Nunez* Court Orders.

*Ongoing Pattern of Interference and Obstruction of the Monitor's Work*

For many years, open and transparent collaboration between the Monitoring Team and Department was the hallmark of the reform effort. However, beginning in January 2022, the Department's posture toward the Monitoring Team shifted. Some improvement to the Department's willingness to share information and to collaborate was observed following the Monitor's March 16, 2022 Report, but the improvements were short lived and not sustained.[42] In late 2022 and early 2023, similar problems reemerged and have since intensified, as described below and in multiple Monitor's Reports.[43]

- **Leadership's Interference and Obstruction**: On multiple occasions, the Commissioner, other agency officials, and possibly others have appeared to attempt to influence the work of the Monitor. On two separate occasions, the Commissioner attempted to discourage the Monitor from reporting a specific finding and to dissuade the Monitor from reporting a certain event in a neutral and independent manner.[44] The Commissioner has also refused to provide the Monitor with information necessary to perform his duties (as discussed in detail above). In addition, on October 23, 2023, a senior Department leader

---

[42] *See* Monitor's April 20, 2022 Report (dkt. 445) at pgs. 3-4 noting *some* improvements but reiterating its March 16, 2022 recommendations regarding the Department's approach to working with the Monitoring Team. *See also* April 26, 2022 Status Conference Transcript at pg. 11, lines 4 to 8 and pg. 55, lines 13 to 17; Monitor's October 28, 2022 Report (dkt. 472) at pgs. 7 to 9; November 17, 2022 Status Conference Transcript at pg. 65, lines 12 to 22.

[43] *See* Monitor's April 3, 2023 Report (dkt. 517) at pgs. 113 to 115; Monitor's June 8, 2023 Report (dkt. 541) at pgs. 15 to 38, Monitor's June 12, 2023 letter (dkt. 544); Monitor's July 10, 2023 Report (dkt. 557) at pgs. 142 to 163; Monitor's August 7, 2023 Report (dkt. 561) at pgs. 7 to 9; Monitor's October 5, 2023 Report (dkt. 581) at pgs. 13 to 16; Monitor's October 27, 2023 Emergency Motion to Compel (dkt. 588) and discussed at the June 13, 2023 Emergency Conference Transcript at pgs. 14 to 15.

[44] *See* Monitor's July 10, 2023 Report (dkt. 557) at pgs. 149 to 150 and Appendix F of that Report and Monitor's October 5, 2023 Report (dkt. 581) at pgs. 15 to 16.

threatened the Monitor with legal action. He reported to the Monitor and his team, in the presence of other Department leadership and counsel for the City, that he was "prepared to have legal counsel address this matter with the courts if you refuse to extend the professional courtesy we have earned and deserve." [45] This threat of legal action appeared to be made to both deflect from the issues at hand and to intimidate the Monitor. The concerns about "professional courtesy" appear to be in response, at least in part, to the fact that the Monitor did not immediately embrace the Senior official's proposed plans, that the Monitor challenged the sufficiency of those plans, and that the Monitor confronted the individual's ongoing and repeated assertions about the failures of prior administrations rather than addressing the reality of the current deficiencies in operations.

- **Deflecting Attention**: In multiple forums, the Department continues to focus on the failures of prior administrations as pretext for its current actions and inactions. Notably, the Department's proposals are often substantially similar to those of prior administrations, with little to no apparent awareness that the plans were ineffective in the original incarnation or why.

- **Providing Inaccurate and Conflicting Information**: In response to the Monitoring Team's requests, the Department routinely provides information that is either non-responsive or ambiguous, or is inconsistent or conflicting, both of which make it difficult to ascertain the current state of affairs. Two recent illustrative examples are:

  o *List of ESU Command Level Orders ("CLOs")*: Over three months elapsed before the Department was able to provide the Monitoring Team with a comprehensive list of the ESU CLOs. Initially, the Department reported that ESU only had two active CLOs. This information was inconsistent with information that the Department provided in 2021 and so the Monitoring Team inquired about the list that had been previously provided. The Department then reported that, given the change in leadership in ESU, it mistakenly believed that only two CLOs were in effect. The Department now reports that there are 9 CLOs which, again, is consistent with the information previously provided to the Monitoring Team.

  o *Conflicting Information Regarding Submachine Guns*:[46] Over four months have elapsed since the Monitoring Team first requested that the Department identify who will be authorized to use the submachine guns the Department purchased and what policy will govern their use. The Department has provided conflicting information to the Monitoring Team about who may use the submachine guns, the

---

[45] The Court of jurisdiction, the basis for any claim, and the standard upon which the Department would assess "professional courtesy" is unknown.

[46] *See* Monitor's October 5, 2023 Report (dkt. 581) at pg. 14.

circumstances in which they may be used, and whether any policy governs their use. The answers to these questions remain unknown.

- o *Use of De-escalation Units*: The Department has provided conflicting reports about whether de-escalation units are currently in use and whether they will be utilized in the future. A *De-Escalation Unit* policy is currently in effect and the NCU conducts monthly audits. Recently, Department officials informed the Monitoring Team that some facilities halted the use of de-escalation units (some in mid-2022 and another in summer 2023). NCU leadership advised the Monitoring Team that NCU had not been notified that certain facilities were no longer utilizing de-escalation units. The Monitoring Team has sought to reconcile the current state of affairs, but the Department has continued to provide conflicting information.

- **Poor Internal Coordination**: In part, the problems discussed above are related to the Department's lack of internal coordination and disorganization. While the *Nunez* Manager has helped to improve coordination with the Monitoring Team, the Department's lack of a well-structured system of internal coordination for the Department's various operators appears to contribute to the misinformation and conflicting reports that impede both internal management and the Monitor. This disorganization also appears to negatively impact implementation of various initiatives through a lack of coherent direction or unified focus around a commonly understood goal.

- **Haphazard Consultation on Policy Revision**: The Monitoring Team has expended significant effort to ensure that the Department consults as required on *Nunez*-related matters, but situations continue to arise where the Department fails to engage on revisions to policy and training curricula as required. When consultation does occur, the proposed revisions are frequently internally inconsistent, may not address previous feedback or recommendations from the Monitoring Team, may not always be consistent with sound correctional practice, may not reflect the practices the Department reported the revisions were intended to address, and paradoxically, may even reintroduce the very practices the policies were intended to curtail. The Department also routinely provides proposed policies and curricula and then expects the Monitor's input or approval on an accelerated timeline. For example, last week, the Department sought the Monitoring Team's input on revisions to the Enhanced Supervised Housing policy and advised that any feedback had to be provided *in less than 24 hours*, despite the fact that the proposed revisions were

based on feedback from a state oversight body that had been provided to the
Commissioner over two months before.[47]

- **Lack of Initiative to Develop Concrete Plans**: Since 2022, there has been a diminishing
  sense of urgency to address the gravity of the problems in the jails. Plans and initiatives
  are in a continual state of flux or are never fully implemented or properly operationalized.
  But for the Monitor's insistence, critical problems were not being recognized or
  addressed.[48] The Monitoring Team remains committed to advancing the reform by
  untangling the morass of problems that face the jails, but too often it appears that the
  Department rests in a reactive posture, waiting for the Monitoring Team to identify
  problems that need to be addressed, rather than initiating necessary changes.

- **Delayed Information**: The Department continues to fail to provide timely information to
  the Monitoring Team. Currently, over 80 of the Monitoring Team's requests for
  information and feedback are outstanding, with more than 50 of them outstanding over 30
  days. There is no question that the Monitoring Team requests a significant volume of
  information, and that the Department responds to and provides a large number of
  requests. However, the lengthy delays and repeated follow-ups have resulted in the
  Monitoring Team's activities being too often dominated by project management tasks
  and divert resources and focus from addressing the Monitoring Team's responsibilities.

- **Staff's Hesitation to Engage with the Monitor**: Since 2022, Department staffs'
  willingness to speak freely and candidly with the Monitoring Team has noticeably
  declined. While some staff continue to engage with and provide reliable information to
  the Monitoring Team, other staff continue to report a fear of reprisal if they do so.

*Managing the Nunez Court Orders*

The *Nunez* Manager and her team continue to work incredibly hard and have brought

great value to the efforts to provide information and communicate transparently with the

Monitoring Team. However, as discussed above and throughout this report, the work of the

---

[47] The Monitoring Team accommodated this short-term request and provided substantive feedback within
the timeframe requested. Notably, some of the Department's proposed edits introduced many of the issues
described, including potentially harmful practices and guidance that is inconsistent with other Department
policies.

[48] For example, the need for external expertise among Department and facility leadership; the need for a
*Nunez* Manager; the regression in the quality of ID's work product; the failure to properly screen ESU
team members; operational problems with incident reporting, staff/Captain touring, and managing lock-in
times; and most recently, the development of a Security Plan.

*Nunez* Manager has not mitigated the significant concerns about interference and obstruction by Department leadership. The *Nunez* Manager's primary task is to coordinate and facilitate the flow of information to the Monitoring Team. While the *Nunez* Manager and her team are making valiant efforts, their work is significantly hampered by the issues described in this report. The *Nunez* Manager's ability to succeed at this task—to say nothing of the overarching need to improve staff practice—inherently depends on the active participation and engagement of the operators in the agency and the jails. Furthermore, three key individuals with significant experience in both Department operations and managing the response to the *Nunez* Court Orders have left the Department this year. This loss of institutional knowledge and expertise is particularly concerning.

The Monitoring Team continues to strongly encourage the Department to provide the *Nunez* Manager with adequate resources, and to ensure that the *Nunez* Manager is vested with the authority to compel the various operators to be responsive to her direction and requests. Further, to the extent possible, the Department should recruit individuals with the requisite expertise in both the *Nunez* Court Orders and Department operations to support the work of the *Nunez* Manager.

<u>*Conclusion*</u>

Since the Court's October 10, 2023 Order, the Monitoring Team continues to struggle to obtain accurate, reliable and timely information in response to many of its requests. While some information is provided in a timely manner, too often, repeated follow-up is necessary to obtain a full response or address various ambiguities and unclear answers. In other cases, multiple exchanges with the City's legal counsel are necessary before the Department produces the requested information and even then, the information is not always produced, as discussed

above. The Monitoring Team's inability to easily obtain accurate, reliable and timely information creates unnecessary work and diverts resources and focus from the urgent matters at hand. This situation is simply unsustainable.

Most significantly, the Monitoring Team's confidence in both the reliability of information provided and the City's and Department's commitment to transparency has been further eroded during this past month given the ongoing efforts by the Commissioner and others to interfere with and/or obstruct the Monitor's work.

# CONCLUSION

The jails remain chaotic and unsafe as the Department arrives at another crossroad with yet another change in leadership. Given the imminent departure of the Commissioner, and a yet to be named successor, more change and destabilization within the agency is inevitable. This report, as have prior reports, describes a myriad of obstacles that must be addressed, the most immediately important of which is the ongoing, imminent risk of harm to people in custody and staff. Other critical issues include: (1) the Department's lackluster performance in addressing the requirements of recent Court Orders, (2) an alarming failure to recognize staff's poor security practices for what they are: a tragic failure to protect people in custody from harm and (3) various failures to collaborate with the Monitoring Team and attempts to obstruct and impede the Monitor's ability to fulfill his obligation to the Court.

The Monitoring Team strongly urges the Department to prioritize changes to its framework for managing the incarcerated population *immediately*, and to devise a viable strategy to supplement and strengthen the competency of the supervisory ranks which are crucial to strategies to reform staff practice. The agency's current framework is, from many perspectives, clearly inadequate and ill-suited for the task.

The Monitoring Team remains actively engaged in and committed to notifying Department officials about issues of concern, attempting to identify target areas ripe for remediation, reminding the Department of upcoming deadlines, and offering concrete and constructive feedback on Department policies, procedures and training in order to elevate practice and to ensure alignment with sound correctional practice and the *Nunez* Court Orders. While the Monitoring Team is a readily available source of valuable technical assistance, it is ultimately incumbent upon the City and the Department to take the steps necessary to enhance

safety, to ameliorate the imminent risk of harm that is pervasive in the jails, and to reinstate some degree of control and competent management in the tumultuous climate that currently permeates the jails.

Sustained and chronic institutional resistance and recalcitrance toward court ordered reform is an insurmountable impediment to any Monitorship. The Department desperately needs committed leadership with expertise and experience in sound correctional practice, practical and achievable strategies to advance the reforms, openness to working constructively with the Court and the Monitor, and a clear vision for how to implement and sustain needed initiatives. It is axiomatic that reforming and fundamentally altering the jails' management represents a complex, polycentric problem that will take time to address. However, after eight years and four (soon to be five) Commissioners, the City and the Department have failed to gain traction in the effort to build the necessary foundation for reform and must, at this juncture, accelerate the pace and substantially elevate their efforts. Unfortunately, thus far, neither the City nor the Department has demonstrated a willingness or an ability to materially alter the current trajectory.

*Upcoming Schedule & Proposed Additions*

Several filings and reports are due to the Court over the next few months. The chart below outlines the schedule for current filings and Court proceedings. The Monitoring Team also respectfully proposes adding a few additional items to the schedule, including two additional reports on December 7, 2023 and March 21, 2024.[49] The Monitoring Team also proposes that the Parties meet and confer following the conclusion of motion practices to discuss any issues in

---

[49] The Monitor recommends that it maintain its focus on assessing compliance with the Action Plan and the select provisions of the Consent Judgment and First Remedial Order for the period of July to December 2023. In other words, the Monitoring Team recommends that the Court extend the limitation of compliance assessment under Action Plan § G, ¶ 5(b) from June 30, 2023 to December 31, 2023. The recommendation is included in the proposed order attached as Appendix G.

dispute, including findings of fact. Then, the Monitoring Team recommends the Parties submit a

joint filing to advise the Court if there are any issues in dispute and, if so, to provide a proposal

on how they may be addressed. Finally, the Monitoring Team proposes a Court conference in

late March/early April 2024 following the completion of motion practice, the submission of

Parties' joint report and the Monitor's March 21, 2024 Report. All proposed items include the

clause "[Proposed]" in red text in the table below.

| Schedule of Nunez Filings & Court Conferences | |
|---|---|
| **Item** | **Date** |
| Monitor's Declaration Filing | November 9, 2023 |
| City's Filing on Intake | November 15, 2023 |
| Counsel for the Plaintiff Class and the Southern District of New York to file motion for contempt and relief, including proposed findings of facts and law and any supporting materials | November 17, 2023 |
| [Proposed] Monitor's Status Update with proposed Court Conference Agenda and Parties Position on November 8, 2023 Proposed Order | December 7, 2023 |
| Court Conference | December 14, 2023 |
| Monitor's Report on Current State of Affairs and Limited Compliance Ratings covering January to June 2023 | December 21, 2023 |
| Defendants to file opposition to motion for contempt, including a statement indicating whether they agree or disagree with each proposed finding of fact submitted by the Counsel for the Plaintiff Class and the Southern District of New York | January 16, 2024 |
| Counsel for the Plaintiff Class and the Southern District of New York to file reply motion for contempt | February 15, 2024 |
| [Proposed] Parties meet and confer regarding findings of fact in dispute and any other matters related to the motion practice | February 16 to March 15, 2024 |
| [Proposed] Joint status report from the Parties on to propose approach for addressing any items that remain in dispute following the complete submission of the motions for contempt. | March 15, 2024 |
| [Proposed] Monitor's Report on current state of affairs and limited Compliance Ratings covering July to December 2023 | March 21, 2024 |
| [Proposed] Court Conference | Week of March 25 or April 1, 2024 |

The Monitoring Team respectfully requests that the Court permit the Monitor to file a

report on December 7, 2023 with a proposed agenda for the December 14, 2023 Conference and

the Parties position on the Proposed Court Order at Appendix G and the schedule for the first few months of 2024.

# APPENDIX A:
# RESPONSES TO PLAINTIFFS'
# REQUEST

***Monitoring Team Response to Plaintiffs' July 28, 2023 Requests for Information***
***pursuant to Consent Judgment §XIX, ¶ 8***

| |
|---|
| ***July 2023 Meet and Confer Request A****: NCU Security Audits* |

**Monitoring Team Response**: The Monitoring Team provided the Parties with: (1) copies of the NCU security audits that were completed between December 2021 and August 2023; and (2) copies of the NCU COD Assessments that were completed between November 2021 and July 2023, which audit a random sample of RNDC's use of Post-Incident Management.

| |
|---|
| ***July 2023 Meet and Confer Request B****: Violence Reduction Plans* |
| ***August 31, 2023 Request 19****. The Interim Security Plan referenced on page 15 of DOC's 16th Compliance Report.* |
| ***September 6, 2023 Follow-up Question 1****. The Second Remedial Order § 1(i)(a) requires DOC to develop, in consultation with the Monitor, and implement an Interim Security Plan. The City's August 23, 2023 letter regarding non-compliance states that a "violence reduction plan" is the interim security plan. However, we understand that the "violence reduction plan" is limited to certain facilities. In an email today, September 6, 2023, the Deputy Monitor indicated there were interim security plans from 2021 and January 2022. Can you confirm whether there is a system-wide interim security plan that is currently being implemented, and if so, provide us with a copy of it? Can you please provide us with copies of the prior security plans?* |
| ***September 6, 2023 Follow-up Question 7****. The City's August 23, 2023 letter referenced audits conducted by the security team regarding key control, post description, restraint equipment, and no-go zones (page 10). What is meant by "the security team," how many audits were conducted over what period of time, what did the audits consist of (i.e., what method), and what were the results of those audits? We request the audit results.* |

**Monitoring Team Response**: The RNDC violence reduction plans (dated February 22, 2022 and April 14, 2022) and GRVC violence reduction plan (dated October 11, 2023) were provided by the Monitoring Team to the Parties on July 26, 2023 and October 31, 2023. The Department did not create a violence reduction plan for AMKC. The City also reported to the Parties on September 13, 2023 that its response to the Non-Compliance Letter regarding the Second Remedial Order § 1(i)(a) "referenced security plans are the RNDC and GRVC Violence Reduction Plans, which the Monitor provided to Plaintiffs on July 26, 2023."

The staff assigned to work with the Deputy Commissioner of Security Operations (referred to as the security team) advised each facility conducted the following audits:

1. *Key Control*: The Department reported on September 13, 2023 that "Facilities were required to account for all keys and ensure each are accurately labeled. Broken keys were repaired while non-essential keys removed. Key control audits occur on a yearly basis with the next audit anticipated for late October/early November 2023." The documentation provided by the Department was a memo from the Commanding Officer

of each facility indicating that the inventory was conducted and a copy of the key inventory.

2. *Post Descriptions*: The Department reported on September 13, 2023 that "Facilities were required to complete a thorough review of all facility post orders (or post descriptions) for accuracy. The AC was required to sign-off on all updated post descriptions." The Department provided the Monitoring Team with the post orders/descriptions, but did not include the universe (i.e., a list of all posts in the facility), so it is unclear if all posts have a post description. The Department reported that in 2019, it moved all post orders to a shared drive for greater accessibility to staff. However, most staff on post do not have access to a computer. The Monitoring Team's site work has found that most post descriptions are not available in hard copy in the location of each post and most staff are unaware that post orders are available on a shared drive or how to access them.

3. *Inventory of Restraint Equipment*: The Department reported on September 13, 2023 that "Facilities were required to account for all equipment. In their audit, they verified an appropriate number of each restraint equipment type was available for their needs. The Facilities also tested the equipment for any deficiencies (e.g., inoperable equipment) and indicated additional, related equipment in their possession (e.g., spit masks)." The documentation provided by each facility reported the number of restraints in their possession and all facilities but one reported that their equipment was operable. Some facilities noted that additional equipment was needed. It is unknown whether the Department provided the additional equipment.

4. *Presence of No-Go Zones*: The Department reported on September 13, 2023 that "Facilities were required to ensure the visible placement of signage (e.g., "STOP" signs) to reduce incarcerated individuals from congregating. If required, locations were repainted in the event fading may have occurred." The documentation included photographs of the no-go zones in each facility. It is unclear from the documentation whether all locations that require a no-go zone were identified in the audit. Further, it does not appear the results of the audit were interpreted or acted upon to ensure that: (1) all locations that require a no-go zone in fact have a no go-zone and (2) that facilities that reported additional work was underway had completed it.

The chart below identifies the date that the facilities conducted each of the audits and whether the facility submitted Post Descriptions.

| | Enhanced Restraint | Key Control | No Go Zones | Post Descriptions |
|---|---|---|---|---|
| **AMKC** | 10/19/2022 | 10/31/2022 | April 2023 | Submitted |
| **EMTC** | 10/27/2022 | 10/27/2022 | Nov/Dec 2022 | Submitted |
| **GRVC** | 10/31/2022 | 10/31/2022 | April 2023 | Submitted |
| **NIC** | 10/28/2022 | 1/4/2023 | April/May 2023 | Submitted |
| **OBCC** | 8/31/2023 | 9/1/2023 | August/September 2023 | Submitted |
| **RESH** | 8/27/2023 | ~ | ~ | Submitted |
| **RMSC** | 10/28/2022 | 10/31/2022 | March 2023 | Submitted |
| **RNDC** | 10/20/2022 | 10/28/2022 | March 2023 | Submitted |
| **VCBC** | 10/20/2022 | 10/21/2022 | April 2023 | Submitted |

> ***July 2023 Meet and Confer Request C****: Command Level Order for 3-Point Restraint in ESH (at RMSC)*

**Monitoring Team Response**: The July 5, 2023 Command Level Order was produced by the Monitoring Team on July 19, 2023. The recission notice that went into effect on August 1, 2023 was produced by the Monitoring Team on July 27, 2023.

> ***July 2023 Meet and Confer Request D****: Serious Injury Data provided to NCU*

**Monitoring Team Response**: DOC provided the information directly to Plaintiffs/SDNY on July 25, 2023. On July 25, 2023, the Department reported "[Plaintiffs/SDNY] asked if NCU is provided with the monthly reconciled CHS injury to inmate report. The answer was no. [The Nunez Manager] spoke to the Senior Policy Analyst who is in charge of this project and she will ensure that [the Assistant Commissioner of NCU, the Nunez Manager and a member of her team] are sent the report every month going forward."

> **July 2023 Meet and Confer Request E:** *What accountability has DOC imposed "If a Facility Warden (or Deputy Warden) is found to have conducted a biased, unreasonable, or inadequate Use of Force Review, they shall be subject to either appropriate instruction or counseling, or the Department shall seek to impose appropriate discipline." as required by the First Remedial Order, Section A, Paragraph 1(ii).*

> **September 6, 2023 Follow-up Question 4.** *The City's August 23, 2023 letter regarding non-compliance states that there are calls every weekday with the DC of Security's Office, the leadership of each facility, and Assistant Commissioners from the DC of Facility Operations office to discuss the rapid reviews and issue any necessary corrective action or immediate discipline (page 3). When did those weekday calls begin, and please provide information regarding how many corrective actions and immediate disciplinary actions were issued (on a weekly or monthly basis, whichever best conforms to the information available?*

**Monitoring Team Response**: The Deputy Commissioner of Security Operations reports he has a call every weekday with the leadership of each facility, and Assistant Commissioners from the Deputy Commissioner of Facility Operations' office to discuss the rapid reviews and issue any necessary corrective action or immediate discipline. The Department reports the weekday calls chaired by the Deputy Commissioner of Security Operations began in January 2023. The Department previously reported to the Monitoring Team that these weekday calls have been held by prior leadership for many years.

The Monitoring Team's most recent findings regarding Rapid Reviews are described in the Monitor's July 10, 2023 Report at page 19 (including footnote 21) and the Monitor's October 5, 2023 Report at pages 1, 12, and 21. Those reports reflect the Monitoring Team's continued findings.

With respect to "accountability if a Facility Warden (or Deputy Warden) is found to have conducted a biased, unreasonable, or inadequate Use of Force Review, they shall be subject to either appropriate instruction or counseling, or the Department shall seek to impose appropriate discipline", the Monitoring Team is only aware of a few instances where this has occurred on an ad hoc basis and is not aware of any systematic process, as described in our compliance assessments of First Remedial Order, Section A, Paragraph 1(ii). The few instances the Monitoring Team identified are listed below.

- As reported on page 41 of the Monitor's December 6, 2021 Report, during the 12th Monitoring Period, "the Department determined that the misconduct in 6 of the 52 use of force-related suspensions (involving five unique incidents) that occurred in this Monitoring Period should have been identified by the Rapid Review, but was not. The Chief's and leadership from ID and the Nunez Compliance Unit ("NCU") met with the facility leadership that conducted these problematic Rapid Reviews and discussed the issues and/or conducted corrective interviews with those leaders."

- As reported on pages 125-126 of the Monitor's April 3, 2023 Report, during the 15th Monitoring Period, the Deputy Commissioner of Security Operations has been overseeing the Rapid Review Process and reports that he has been conducting informal

counseling of staff who conduct Rapid Reviews to address biased, unreasonable, or inadequate Rapid Reviews. However, this has not been systematically tracked or documented.

> ***July 28, 2023 Request 1***. *Number of Class A UOF incidents that have resulted in serious injuries since Jan. 1, 2023.*

**Monitoring Team Response**: The Department provided this data in its August 17, 2023 Compliance Report.

> ***July 28, 2023 Request 2***. *Number of incidents coded as a "serious injury to inmate" since January 1, 2023.*

**Monitoring Team Response**: 683 *incidents* were *coded* as serious injury to inmate between January 1, 2023 and September 30, 2023. An *incident* may have more than one individual that has obtained an injury. Further, given that certain incidents are reported on a delay, some of these reports include incidents that occurred prior to January 1, 2023.

> ***July 28, 2023 Request 3***. *Number of UOF incidents where staff used head strikes since Jan. 1, 2022.*

**Monitoring Team Response**: The Monitoring Team has identified 587 Use of Force incidents involving head strikes between January 1, 2022 and May 2023 based on DOC's reporting and the Monitoring Team's assessment of use of force incidents.

> ***July 28, 2023 Request 4***. *All "Post-Incident Management" protocols developed and implemented by the Department. If no "Post-Incident Management" protocols have been developed for facilities other than RNDC, please confirm that fact.*

**Monitoring Team Response**: The Post-Incident Management protocol was only developed for RNDC. There are no Post-Incident Management protocols for any other facilities. A copy of the Post-Incident Management protocol was produced by the Monitoring Team to the Parties on July 14, 2023.

> ***July 28, 2023 Request 5***. *Data on the number of instances in which people in custody have attempted suicide or engaged in self-harm since January 1, 2022.*

**Monitoring Team Response**: Data regarding completed suicides has been provided with the information on in-custody deaths in the Monitor's August 7, 2023 Report, Appendix B, pg. 37.

There is no *comprehensive* source that tracks the frequency with which people in custody have attempted suicide or engaged in self-harm since January 1, 2022, but there is some data available as described more below.

With respect to tracking attempted suicide or individuals engaging in self-harm, the Department has a new category for "Self-Injurious Behavior" in IRS, its data tracking system, that was first utilized on April 6, 2023. Between April 6, 2023 and September 30, 2023, approximately 560 incidents of self-injurious behavior were reported. As noted in various

Monitor Reports, incidents tracked in IRS may fall under multiple categories, but must be tracked by the "main" category so it is possible that some self-injurious behavior was reported in under a different category (e.g., in-custody death or logbook entries) so the IRS category of "Self-Injurious Behavior" may produce an underestimate.

Prior to the Department adding the "Self-Injurious Behavior" category, these incidents were generally reported under "Logbook Entry" in IRS along with a variety of other types of incidents.[50] Between January 1, 2022 and June 30, 2023, over 1,900 incidents were coded as "Logbook Entry." The Monitoring Team's review of those entries suggested that the majority of incidents involved some type of self-injurious behavior. However, development of specific data would require manual review of each incident, which would be overly burdensome.

Beginning in 2022, the Department began to track "Suicide Attempts" via CODs. Between January 1, 2022 and September 30, 2023, 17 suicide attempts were reported. As noted above, incidents tracked in IRS may fall under multiple categories, but must be tracked by the "main" category so it is possible that some suicide attempts are reported under a different category (e.g., self-injurious behavior or logbook entries) so the IRS category of "Suicide Attempts" is likely an underestimate. To that end, the Monitoring Team's review of reports of "Self-Injurious Behavior" have revealed events that were in fact suicide attempts.

> ***July 28, 2023 Request 6***. *Data on the frequency of the use of Narcan by staff since January 1, 2022*

**Monitoring Team Response**: The Monitoring Team did not have the requested information and advised Plaintiffs to direct the request to Defendants. On September 8, 2023, the City advised "the Department only began electronically monitoring the administration of Narcan by staff in June 2023." The City also provided the following chart of information:

| FACILITY | Jun-23 | Jul-23 | Aug-23 | Total |
|----------|--------|--------|--------|-------|
| AMKC | 1 | 1 | 0 | 2 |
| BXCT | 0 | 1 | 0 | 1 |
| EMTC | 1 | 7 | 3 | 11 |
| GRVC | 2 | 1 | 0 | 3 |
| NIC | 1 | 2 | 2 | 5 |
| OBCC | 0 | 3 | 3 | 6 |
| RMSC | 0 | 1 | 0 | 1 |
| RNDC | 2 | 2 | 3 | 7 |
| VCBC | 1 | 0 | 2 | 3 |
| **DEPT** | **8** | **18** | **13** | **39** |

---

[50] The Monitoring Team's review of COD reports suggests that even after the implementation of the "self-injurious behavior" category that certain self-harm events are still categorized in a different category like log book entry.

> ***July 28, 2023 Request 7****. The total number of housing unit lock downs since January 1, 2022, broken down by facility, housing unit, and month.*

**Monitoring Team Response**: The Monitoring Team did not have the requested information and advised Plaintiffs to direct the request to Defendants. On September 8, 2023, the City advised "the Department publicly reports lock-ins quarterly and annually here: https://www.nyc.gov/site/doc/about/emergency_lock-in_Reports.page"

> ***July 28, 2023 Request 8****. Records relating to the Illustrative Examples 1-9 in the Monitor's July 10, 2023 report.*

**Monitoring Team Response**: The Monitoring Team requested that the City produce these files directly to the Parties. The City reports it produced Illustrative Examples 1 to 4 on October 17, 2023. Illustrative Examples 5, 6, 7, 8 and 9 were produced on October 25, 2023, pursuant to the Court's October 17, 2023 Order.

> ***July 28, 2023 Request 9****. The findings of any city agency investigation of deaths of people in custody since January 1, 2022, and any corrective/disciplinary actions taken in response to these findings.*

**Monitoring Team Response**: There are three agencies that issue public reports regarding the investigation of deaths in custody – the Board of Correction, the Attorney General's Office, and the State Commission of Correction. The Monitoring Team provided a chart that identifies the reports from BOC and the AG's office regarding the deaths of people in custody since January 1, 2022. The SCOC has not issued any reports for deaths in custody since January 1, 2022. Following these charts is a chart of any correction action taken by the Department with staff related to an in-custody death since January 1, 2022.

### BOC Reports on In-Custody Deaths

*Reports Available here*: **https://www.nyc.gov/site/boc/reports/board-of-correction-reports.page**

| Date | Name | BOC Report |
|------|------|------------|
| 2/27/2022 | Youngblood, Tarz | May 5, 2022 Report |
| 3/17/2022 | Pagan, George | May 5, 2022 Report |
| 3/18/2022 | Diaz, Herman | May 5, 2022 Report |
| 5/7/2022 | Carter, Dashawn | November 16, 2022 Report |
| 5/18/2022 | Yehudah, Mary | November 16, 2022 Report |
| 5/28/2022 | Emanuel Sullivan | November 16, 2022 Report |
| 6/18/2022 | Bradley, Antonio | November 16, 2022 Report |
| 6/20/2022 | Carrasquillo, Anibal | November 16, 2022 Report |
| 6/21/2022 | Drye, Albert | November 16, 2022 Report |
| 7/11/2022 | Muhammad, Elijah | November 16, 2022 Report |
| 7/15/2022 | Lopez, Michael | November 16, 2022 Report |
| 8/15/2022 | Cruciani, Ricardo | November 16, 2022 Report |
| 8/30/2022 | Nieves, Michael | April 12, 2023 Report |
| 9/14/2022 | Bryan, Kevin | April 12, 2023 Report |

| Date | Name | BOC Report |
|---|---|---|
| 9/20/2022 | Acevedo, Gregory | April 12, 2023 Report |
| 9/22/2022 | Pondexter, Robert | April 12, 2023 Report |
| 10/22/2022 | Tavira, Erick | April 12, 2023 Report |
| 10/31/2022 | Garcia, Gilberto | April 12, 2023 Report |
| 12/11/2022 | Mejias, Edgardo | April 12, 2023 Report |

**Attorney General Reports on In-Custody Deaths**

*Reports available here***: https://ag.ny.gov/office-special-investigation/annual-reports**

| Date | Name | AG Report |
|---|---|---|
| 2/27/2022 | Youngblood, Tarz | 2023 OSI Annual Report |
| 3/18/2022 | Diaz, Herman | 2023 OSI Annual Report |
| 5/7/2022 | Carter, Dashawn | 2023 OSI Annual Report |
| 5/18/2022 | Yehudah, Mary | 2023 OSI Annual Report |
| 5/28/2022 | Emanuel Sullivan | 2023 OSI Annual Report |
| 6/18/2022 | Bradley, Antonio | 2022 OSI Annual Report |
| 6/20/2022 | Carrasquillo, Anibal | 2023 OSI Annual Report |
| 6/21/2022 | Drye, Albert | 2023 OSI Annual Report |
| 7/15/2022 | Lopez, Michael | 2023 OSI Annual Report |
| 8/15/2022 | Cruciani, Ricardo | 2023 OSI Annual Report |
| 9/14/2022 | Bryan, Kevin | 2023 OSI Annual Report |
| 9/20/2022 | Acevedo, Gregory | 2023 OSI Annual Report |
| 10/22/2022 | Tavira, Erick | 2023 OSI Annual Report |
| 12/11/2022 | Mejias, Edgardo | 2023 OSI Annual Report |
| 5/16/2023 | Zhao, Rubu | 2023 OSI Annual Report |
| 7/6/2023 | Howell, Ricky | 2023 OSI Annual Report |

**Chart of Corrective Action Taken by DOC Related to In-Custody Deaths - 2022-2023**

| Staff Member | Penalty | Reason for Suspension |
|---|---|---|
| **Death of Dashawn Carter on 5/7/2022** | | |
| CO 1 | Suspended, resigned | Failed to make proper tours and made false entries in the logbook |
| CO 2 | Suspended - 30 days | Failed to make proper tours and made false entries in the logbook |
| Captain 3 | Suspended - 30 days | Failed to make proper tours and made false entries in the logbook |
| Captain 4 | Suspended - 30 days | Failed to make proper tours and made false entries in the logbook |
| **Death of Elijah Muhammad on 7/11/2022** | | |
| CO 5 | Terminated | Failed to notify supervisor or medical staff |
| **Death of Michael Lopez on 7/15/2022** | | |
| CO 6 | Suspended - 30 days | Failed to make proper tours and made false entries in the logbook |
| CO 7 | Suspended - 30 days | Failed to make proper tours and made false entries in the logbook |
| Captain 8 | Suspended - 30 days | Failed to make proper tours and made false entries in the logbook |
| **Death of Ricardo Cruciani on 8/15/2022** | | |
| Captain 9 | Suspended - 30 days | Failed to conduct tour |
| **Death of Michael Nieves on 8/30/2022** | | |
| CO 10 | Suspended - 30 days | Failed to render aid |
| CO 11 | Suspended - 30 days | Failed to render aid and provide timely report |
| Captain 12 | Suspended - 30 days | Failure to supervise |
| **Death of Erick Tavira on 10/22/2022** | | |
| CO 13 | Suspended - 7 days | Failed to make proper tours and made false entries in the logbook |

| Staff Member | Penalty | Reason for Suspension |
|---|---|---|
| **Death of Gilberto Garcia on 10/31/2022** | | |
| CO 14 | Suspended - 7 days | Failed to conduct tour |
| **Death of Marvin Pines on 2/4/2023** | | |
| CO 15 | Suspended - 6 days | Failed to conduct tours/off post |
| CO 16 | Suspended - 6 days | Failed to conduct tour |
| Captain 17 | Suspended - 15 days | Failed to make proper tours and made false entries in the logbook |
| ADW 18 | Suspended - 30 days | Failed to conduct tours/supervise |
| ADW 19 | Suspended - 6 days | Failed to supervise |
| **Death of Anibal Carrasquillo on 6/20/2023** | | |
| CO 20 | Suspended - 30 days | Failure to conduct proper tour |
| CO 21 | Suspended - 30 days | Failure to conduct proper tour/Off post |
| **Death of Felix Taveras on 7/4/2023** | | |
| CO 22 | Suspended - 30 days | Failed to intervene and lock in |
| CO 23 | Suspended - 15 days | Failed to intervene |
| CO 24 | Suspended - 30 days | Failed to conduct tour |
| ADW 25 | Suspended - 15 days | Failed to identify misconduct |
| **Death of Ricky Howell on 7/6/2023** | | |
| Captain 26 | Documented Counseling | Failed to call incident into COD within required time frame |
| **Death of William Johnstone on 7/15/2023** | | |
| Captain 27 | Suspended - 7 days | Failure to conduct proper tour |
| CO 28 | Suspended - 15 days | Permitting unauthorized person or employee on their post |
| CO 29 | Suspended - 30 days | Abandoned Post |
| **Death of Curtis Davis on 7/23/2023** | | |
| CO 30 | Suspended - 30 days | Off post |
| CO 31 | Suspended - 15 days | Failed to secure post |
| ADW 32 | Suspended - 7 days | Failure to conduct proper tour |
| **Death of Manish Kunwar on 10/5/2023** | | |
| Captain 33 | Suspended - 30 days | Failed to conduct meaningful tours |
| CO 34 | Suspended - 30 days | Failed to conduct meaningful tours |
| CO 35 | Suspended - 30 days | Disobeying a direct order to relieve fellow CO |

| |
|---|
| *July 28, 2023 Request 10. The results of audits of the electronic records of tours conducted by staff (e.g., data from use of tour wand), which were required to be completed under Action Plan, Section A(1)(d).* |

| |
|---|
| *July 28, 2023 Request 11. A description of the extent to which the Department is currently using tour wands to ensure that staff are engaging in regular touring, including which facilities require staff to use tour wands and the extent to which supervisors are required to use tour wands to record their tours.* |

| |
|---|
| *July 28, 2023 Request 12. All data (other than manual logbook entries) reflecting the extent to which uniformed staff comply with the requirement to tour housing areas every 30 minutes. (See data referenced in Action Plan, Section G, Para. 4(b)(ii)(7)).* |

| |
|---|
| *July Request during Meet and Confer. Any discipline for staff's failure to conducting tours – see description in the July 10, 2023 report at pages 80 to 81.* |

| |
|---|
| *July 28, 2023 Request 13. The number of instances when staff were subject to discipline for not conducting required housing tours since January 1, 2022, broken down by facility, housing unit, and month. Please note the level of discipline imposed for each instance.* |

| |
|---|
| <u>***September 6, 2023 Follow-up Question 2.***</u> *The Action Plan § A(1)(d) requires the Office of the Commissioner to audit the electronic records of tours conducted by uniform staff to ensure compliance with the touring requirements. The Monitor's October 28, 2022 report states that this task was transferred to the Deputy Commissioner of Classification, Custody Management, and Facilities Operations (page 74). The City's August 23, 2023 letter regarding non-compliance states that "[q]uarterly audits and reports will be conducted by the Office of Facility Operations." (page 12). Have any audits by the Office of the Commissioner or the Deputy Commissioner been conducted to date, and if so, when?* |

\*\**Note: All of the requests related to Tour Wands are addressed together as responses to these requests are intertwined and overlap.*

     As an overarching matter, it must be emphasized that the tour wands are simply a tool to verify whether the required tours are occurring, but they do not and cannot assess whether tours are of adequate quality. *See* Monitor's April 3, 2023 Report at pgs. 44 to 45. For instance, the NCU Security Audit completed on July 14, 2023 at RNDC found "[w]hile the watch tour pipe was consistently utilized throughout the 24 hours, most of the time the officers were not looking inside of the cells while conducting the watch pipe tours."

## Overview of Policies and Procedures Regarding Use of Tour Wands

DOC revised the policy governing staffs' use of tour wands and issued it as Operations Order 01/23 on March 7, 2023. This order requires tour wands to be used by correction officers and Captains in all celled housing units (including ESH units), as well as any de-escalation units, for all shifts. In July 2023, the Department reported that tour wands were being utilized in AMKC, EMTC, GRVC, NIC, RESH, RMSC, RNDC, VCBC, WF, and would come online at OBCC in August 2023. Tour wands are not used in dormitory-style housing units. Under Operations Order 01/23, COs working "B" and "C" posts must conduct tours of their assigned housing unit at least twice per hour with a maximum duration of 30 minutes between tours, and every 8-hour shift, Captains must conduct three tours of all their assigned housing units, with each tour of a given housing area occurring at least one hour apart. The COs and Captains upload the data from the tour wands before the final hour of their shift, and during this final hour of the shift, the Tour Commander reviews the data generated by the tour wands for any late or missed tours, documenting any missed or late swipes within the Tour Commander logbook. The Tour Commander also requires COs and Captains to submit a written memo explaining the reasons for the missed or late tours, and upon review of the written memo, the Tour Commander determines whether discipline is warranted. If the Tour Commander determines that a staff member is late for a tour or missed a tour, they are given a Corrective Interview. After three consecutive missed or late tours within a 3-week period, staff are given a Command Discipline. Every day, the Tour Commander forwards data reports with recommended discipline for missed or late tours to the facility Warden or designee for review.

## Data Regarding Staff's Use of Tour Wands

There are a number of ways in which the Department may track whether staff tours occurred. The tour wands create data that both populate a dashboard that can be reviewed for contemporaneous compliance and can be used to develop reports, which can then be used to conduct audits for compliance. Further, NCU routinely conducts security audits in which tour wand data as well as Genetec footage is reviewed. Outlined below is a more detailed discussion of what this information has revealed. The Monitoring Team is aware of the following electronic records regarding tour wands:

**Tour Wand Data & Dashboard**: The tour wands are capable of tracking each time they are swiped against designated buttons within housing units and when plugged into their downloaders, they create data that can then be populated into Excel or to an electronic dashboard. The tour wand dashboard provides the ability to review close-in-time tour wand data for both officers and Captains. This dashboard provides a visual of whether tour wand swipes were on-time, missed, or late for each housing area, and tracks the duration of time between the tour wand swipes. The Department reports that facility leadership has access to this dashboard, and that facility leaders are reviewing the dashboard for compliance in real-time. What does not yet exist is the facilities' performance level, derived from data on the number of tours required

versus the number actually completed timely. The Monitoring Team received an initial data set from the Department so that it can determine what data is available and how it can be synthesized and analyzed routinely. The Monitoring Team will report on the outcomes of this work once the review and assessment is complete.

## Audits of Staff Use of Tour Wands

The Monitoring Team is aware of the following audits regarding staff's use of tour wands:

**Commissioner's Office Audits**: In mid-July 2022, the Department reported that the Commissioner's office was conducting daily audits of the use of tour wands to identify missing and late tours, to follow-up with facilities regarding reasons for these late or missing tours, and to determine any potential discipline for staff who did not conduct the tours as required. The Department provided the Monitoring Team with over 540 Excel files containing uninterpreted data regarding the tour wand swipes that occurred in July and August 2022. The Commissioner's office provided the Monitoring Team with an additional 175 Excel files of unanalyzed data from September 2022 to April 2023. While these files contained a large volume of data, it is not particularly informative when not analyzed or interpreted in any way. An analysis plan needs to be developed that identifies the percentage of required tours that were actually conducted, and that documents the actions taken in response to poor staff practice.

The Monitoring Team asked the Department to explain how the Commissioner's office uses this data, to provide a summary of what was found (to the extent it was analyzed/interpreted at the time), and what corrective actions (if any) were taken as a result of these findings.

In response, the Department reported "[t]he Commissioner's Office utilized the data in conjunction with the daily watch tour report submitted by the Facility to determine if discipline was warranted. If necessary, members of service in violation of utilizing the watch tour as specified, were made the subject of a Corrective Interview or Command Discipline. In some instances, members of service also received verbal reprimands." The Department did not provide any data or underlying information to support these assertions despite the Monitoring Team's request. It is unclear whether the data exists, and the Monitoring Team is unable to verify the assertions made by the Department.

The Commissioner's office reported it stopped conducting tour wand audits on April 30, 2023 because the office of the Deputy Commissioner of Facility Operations assumed the operation on May 1, 2023. Subsequently, after the Monitoring Team's site visit in late September 2023 that revealed pervasive problems with the availability and use of the tour wands, the Department reported that the Commissioner's Office resumed this auditing function.

**Quarterly Audits**: As of March 7, 2023 when Operations Order 01/23 went into effect, the Office of the Deputy Commissioner for Facility Operations is required to audit facility

compliance on at least a quarterly basis and to report to the Commissioner regarding the compliance. The Department reports it intends to initiate the quarterly audits in the near future, but none have been completed to date.

**Monitoring of Captains' Tour Wand Compliance**: The Office of the Deputy Commissioner for Facility Operations briefly monitored Captains' tour wand compliance reports from the facilities for quality assurance and auditing purposes. This tracking began in mid-July 2023 and ended in September 2023 when the Commissioner's Office assumed this function again. For the audits completed by the Office of the Deputy Commissioner for Facility Operations, a housing unit tour was considered "in compliance" if the Captain physically tapped the assigned tour wand on all buttons in the housing unit at least 3 times during an 8-hour shift. The audit report tracked compliance and whether the Captain or facility provided any documented reason for missing or late tours. The report also contained information about recommended, pending, and completed discipline for Captains who were not in compliance with their touring requirements, and the Office of Facility Operations documents all completed corrective action resulting from the Captains' tour wand data in a handwritten logbook. Data has not been compiled, analyzed, interpreted in any way because the data only recently became available, and now the management of this process has been changed again.

**NCU Audits**: The Nunez Compliance Unit (NCU) conducts security audits of housing areas, which require NCU staff to review video footage from Genetec cameras monitoring a facility's housing area for an entire day to identify security issues. After each audit, NCU generates a security report with its findings. Between December 2021 and October 2023, NCU issued 132 security reports. In 2021, 5 reports were issued, and problems with staff tours were found in each report. In 2022, NCU issued 96 reports, and in 57% of these reports (n=55 reports), issues with staff tours were found. From January to October 2023, NCU issued 31 reports, and 81% (n=25 reports), identified issues with staff tours.

**Corrective Action for Staff's Failure to Conduct Tours**

There are a number of avenues for taking corrective action when staff fail to conduct tours, including via the Office of the Deputy Commissioner of Facility Operations (discussed above, but data is not yet available), suspensions, Rapid Reviews, and formal discipline following the conclusion of a UOF investigation. Given the frequency with which these deficiencies are observed, and the harm that flows from them, the number of corrective measures is not commensurate with the number of violations observed.

**Corrective Action Identified Via Rapid Reviews**: This data is pulled from referrals for staff discipline made in the daily Rapid Reviews completed by the facilities for use of force incidents that occurred between January 1, 2022 and July 31, 2023. The following staff were recommended for discipline for failure to conduct tours or failure to conduct meaningful tours.

- 1 Captain was recommended for a command discipline for failure to conduct a tour in OBCC on 2/6/22. This command discipline was not processed because of a due process violation.
- 1 Captain was recommended for a command discipline and 5003 counseling for failure to conduct a proper tour in AMKC on 10/18/22. This command discipline was closed with a penalty of 5 days.
- 1 Captain was recommended for a suspension for failure to conduct a tour in AMKC on 4/14/22. This officer was suspended from 4/24-4/30/22 for inefficient performance of duties.
- 1 CO was recommended for a corrective interview for failure to conduct meaningful tours in RNDC on 6/14/22.
- 1 CO was recommended for a command discipline for failure to conduct a proper tour in AMKC on 8/21/22. This command discipline was referred for an MOC, which is currently pending with the Trials Division.
- 1 Captain was recommended for a command discipline for failure to conduct a proper tour in AMKC on 1/2/23. This command discipline was closed with a penalty of 5 days.
- 1 CO was recommended for a command discipline for failing to conduct proper tours in AMKC on 2/15/23. This command discipline was closed with a penalty of 5 compensatory days.
- 1 Captain was recommended for a command discipline for failure to conduct a proper tour in AMKC on 3/16/23. This command discipline was dismissed.
- 1 CO was recommended for a corrective interview for failure to conduct a proper tour in AMKC on 3/25/23.
- 2 COs were recommended for command disciplines for failure to tour in VCBC on 3/30/23. Both command disciplines were closed with corrective interviews for the COs.
- 1 CO was recommended for an MOC for failing to conduct a proper tour on 4/9/23 in AMKC. However, the Monitoring Team could not confirm the MOC was actually issued.
- 1 CO was recommended for a corrective interview for failure to conduct tours in AMKC on 4/17/23.
- 2 COs were recommended for a command discipline for failure to conduct proper tours in AMKC on 4/20/23. Both received command disciplines with penalties of 5 days each.

**Suspensions related to Touring Deficiencies and In-Custody Deaths**: From January 2022 to July 2023, 8 Staff were suspended for failures to tour related to in-custody deaths.

| Date | Rank | Penalty | Reason |
|---|---|---|---|
| 2/4/2023 | CO | Suspended - 6 days | Failed to conduct tours/off post |
| 2/4/2023 | CO | Suspended - 6 days | Failed to conduct tours |
| 2/4/2023 | Captain | Suspended - 15 days | Failed to conduct tours/False logbook entry |
| 2/4/2023 | ADW | Suspended - 30 days | Failed to conduct tours/supervise |
| 6/20/2023 | CO | Suspended - 30 days | Failure to conduct proper tour |
| 6/20/2023 | CO | Suspended - 30 days | Failure to conduct proper tour/Off post |
| 7/4/2023 | CO | Suspended - 30 days | Failed to tour |
| 7/23/2023 | ADW | Suspended - 7 days | Failed to conduct proper tour |

**Formal Discipline**: The Department has only sought formal discipline in a small number of cases related to staff failing to conduct or conducting inadequate tours as part of a UOF incident, as demonstrated in the chart below. As noted above, given the frequency with which touring deficiencies occur, and the frequency with which violent incidents flow from staff's failure to conduct proper tours, a larger number of cases with formal discipline would be expected. The chart below was provided to the Parties on September 6, 2023.

| DOC CASE DESCRIPTION (*Identifying Information Removed*) | Case Status |
|---|---|
| ON 12/25/22 AT APPROX 0800 HOURS IN HOUSING AREA, 4 PIC'S WERE INVOLVED IN A FIGHT OUTSIDE A CELL. THE MOS WHO WAS ASSIGNED AS THE FLOOR OFFICER ON THE 0500X1331 HOUR TOUR GAVE THE PIC'S ORDERS TO STOP FIGHTING AND THEY REFUSED TO COMPLY. A PIC WAS SLASHED AND WAS ESCORTED TO THE CLINIC WITH SEVERAL CUTS AND A SHARPENED PIECE OF PLASTIC WAS RECOVERED. UPON REVIEW OF GENETEC ANGLES, THE MOS FAILED TO CONDUCT A PROPER SECURITY INSPECTION TO ENSURE ALL CELL DOORS WERE SECURED AND FAILED TO UTILIZE CHEMICAL AGENTS IN ORDER TO STOP THE FIGHT. INJURY CLASS: C. | CHARGES PENDING FOR 2 STAFF |
| ON 10/28/2022, THE RESPONDENT WAS ASSIGNED TO THE "C'" POST WHICH WAS OBSERVED WITH UNSECURED CELLS AND JANITOR'S CLOSET. THE RESPONDENT FAILED TO MAINTAIN EFFICIENT PERFORMANCE OF DUTY BY NOT CHECKING ALL BARS, LOCKS, WINDOWS, DOORS, AND OTHER SECURITY AREAS OF THE ASSIGNED POST AT LEAST TWICE DURING THE TOUR OF DUTY TO ENSURE THAT THEY HAVE NOT BEEN TAMPERED WITH AND ARE IN GOOD CONDITION. ANY UNUSUAL CONDITIONS OF SECURITY WITHIN THE FACILITY MUST BE REPORTED IMMEDIATELY TO A SUPERIOR OFFICER. INJURY CLASS: C. | NPA - COMPENSATORY TIME (10) DAYS + RETURN TO COMMAND |
| ON 10/10/22 MOS WAS INSTRUCTED TO CONDUCT TOURS IN HOUSING AREA. A LEVEL B WAS ACTIVATED FOR THE POST, WHILE THE SOUTHSIDE WAS CONDUCTING LUNCH, AND LED TO THE UOF TO OCCUR. UPON REVIEW OF THE LOGBOOKS, IT WAS DISCOVERED THAT THE MOS FAILED TO CONDUCT A TOUR IN THE AREA OR SUPERVISE LUNCH. | NPA - COMPENSATORY TIME (3) DAYS + SUSPENSION (7) DAYS |
| ON DECEMBER 5, 2022 IN HOUSING AREA SEVERAL INMATES WERE INVOLVED IN A FIGHT. THE MOS FAILED TO CONDUCT A MEANINGFUL TOUR OF THE AREA TO ENSURE THAT ALL CELL DOORS WERE SECURED. HE OBSERVED MULTIPLE INMATES IN AND OUT OF CELLS AND DID NOT HAVE HIS BODY WORN CAMERA. INJURY CLASS C | NPA - COMPENSATORY TIME (3) DAYS + RETURN TO COMMAND |
| ON 2/23/23, THE RESPONDENT WAS ASSIGNED TO THE HOUSING AREA POST ON THE 2200X0631 HR TOUR. UPON REVIEW OF GENETEC VIDEO, BETWEEN 0555 - 0630 HRS, THE RESPONDENT FAILED TO CONDUCT TOURS AND FAILED ENSURE THAT ALL CELL DOORS WERE SECURED. | CHARGES PENDING FOR 1 STAFF |
| ON AUGUST 5, 2022 AT APPROXIMATELY 1715 HOURS IN HOUSING AREA SEVERAL INMATES WERE INVOLVED IN A UOF INCIDENT. UPON REVIEW OF GENETEC SURVEILLANCE SEVERAL CELL DOORS WERE LEFT UNSECURED ON THE TOP AND BOTTOM TIER AND THE MOS FAILED TO PROPERLY SECURE THE CELL DOORS DURING HER TOUR. INJURY CLASS C | NPA - COMPENSATORY TIME (9) DAYS + RETURN TO COMMAND |

| DOC CASE DESCRIPTION (*Identifying Information Removed*) | Case Status |
|---|---|
| ON 8/27/2022 THE MOS WAS ASSIGNED TO HOUSING AREA POST, TOUR 1800 X 0631 HOURS. AT 2101 HOURS THERE WAS AN INSTITUTIONAL LOCK IN. GENETEC VIDEO REVEALED THE MOS CONDUCTING A SECURITY INSPECTION AND NOT CHECKING IF ALL THE CELLS WERE SECURE. THIS LEAD TO AN INMATE ON INMATE FIGHT. | NPA - COMPENSATORY TIME (20) DAYS + EXPUNGEMENT (12) MONTHS |
| ON 11/17/22, THE MOS WAS ASSIGNED AS THE FLOOR OFFICER ON THE 1300X2131 HOUR TOUR. IN HOUSING AREA, 5 PIC'S WERE INVOLVED IN A FIGHT IN A CELL, 4 OF THEM WERE OBSERVED MAKING STABBING AND SLASHING MOTIONS TOWARDS THE OTHER ONE'S FACIAL AREA AND UPPER TORSO. ANOTHER OFFICER ORDERED THE PIC'S TO STOP FIGHTING AND THEY REFUSED TO COMPLY SO THEY DEPLOYED CHEMICAL AGENTS TO THE PIC'S FACE. THE MOS UTILIZED UPPER BODY CONTROL HOLDS TO ONE OF THE PIC'S TO PUSH THEM BACK TERMINATING THE INCIDENT. GENETEC ANGLES SHOWED THAT THE MOS DID NOT ENSURE THE PERSONS IN CUSTODY WERE NOT GATHERING IN AN UNAUTHORIZED GROUP ON THE TIER. ALSO, THE MOS DID NOT CONDUCT SECURITY INSPECTIONS OF THE HOUSING AREA TO ENSURE THE PANTRY AND ALL CELL DOORS WERE SECURED. | CHARGES PENDING FOR 1 STAFF |
| ON 2/7/23, THE RESPONDENT WAS ASSIGNED TO THE QUAD LOWER POST ON THE 0600X1431 HR TOUR. UPON REVIEW OF GENETEC VIDEO, BETWEEN 1400-1430 HRS, THE RESPONDENT FAILED TO CONDUCT TOURS AND FAILED TO ENSURE ALL CELL DOORS WERE SECURED IN HOUSING AREA. | CHARGES PENDING FOR 1 STAFF |
| ON 2/10/23 RESPONDENT FAILED TO SECURE CELL DOORS DURING HIS TOUR OF HIS ASSIGNED AREA, WHICH LED TO A UOF INCIDENT OCCURRING. | CHARGES PENDING FOR 1 STAFF |

> **July 28, 2023 Request 14.** *All documents reflecting operational changes or correction action plans that were developed by a Facility to "reduce the use of excessive or unnecessary force, the frequency of Use of Force Incidents, or the severity of injuries or other harm to Incarcerated Individuals or Staff resulting from Use of Force Incidents." (See First Remedial Order, Section § A, ¶ 2.)*

**Monitoring Team Response**: One of the overarching goals of the *Nunez* Court Orders is to reduce the frequency of uses of force overall, particularly the unnecessary and excessive use of force. Many of the provisions of these Orders are designed to reduce the likelihood that an individual staff member will utilize force when it is not necessary or in a manner that is out of proportion to the extant threat. This individual level impact is derived primarily from training, coaching/supervision and discipline. In addition to individual level efforts, jail administrators can make a more global impact by aggregating incident-level data to identify patterns in persons, places, times or circumstances that lead to a use of force and in which problematic practices tend to occur. The First Remedial Order § A, ¶ 2 requires facility leadership to conduct an analysis of Use of Force Reviews (i.e., Rapid Reviews) for this purpose. Following such an analysis, this provision of the *Nunez* Court Orders would then require facility leadership to enact strategies that directly target those people, places, times or circumstances in an effort to reduce the likelihood of problematic staff conduct.

The Department's leadership (both uniform and civilian) routinely meets to discuss the various issues facing the agency, and facility leadership consistently conducts a Rapid Review for every use of force incident. However, these conversations rarely appear to lead to operational changes or corrective action plans. The few that have been developed have not been effective, and the problems related to the frequency of uses of force, serious injuries and unnecessary/excessive uses of force continue unabated. The Department's plans tend to rely on issuing memos to staff, reminders at Roll Call and corrective action for specific staff, but only rarely include an operational change that targets the root causes of a specific problem.

The few documents containing more global or problem-focused strategies that have been created are listed below and were provided on a hard drive to a representative of each of the Parties. Four sets of documents were provided in response to this request:

1. Six facility responses to NCU's Security Audits (on select occasions, a facility provided a written response to NCU's Security Audit).

   - AMKC provided a written response to 1 of the 32 NCU audits of that facility.

   - RNDC provided a written response to 4 of the 38 NCU audits of that facility.

   - VCBC provided a written response to 1 of the 8 NCU audits of that facility.

   - No other written responses were provided by any of the facilities.

2. Facility responses to the NCU COD Assessments (on select occasions, a facility provided a written response to NCU's COD Assessment).

3. A January 2023 After Action Review for VCBC which was completed at the request of the former Senior Deputy Commissioner following an incident.

4. Operational Changes/Corrective Action Plans developed by EMTC, GRVC, NIC/WF, RESH, and RMSC. These five facilities reportedly collected all available information regarding this request. The information provided by each facility generally included corrective action taken with respect to individual staff, Roll Call talking points, memos to staff, and policy revisions. The Department reported that the other facilities were unable to provide any documentation regarding steps that they have taken because of facility opening/closures (AMKC's and VCBC's closing; OBCC's reopening) and changes in facility leadership (e.g., RNDC) that occurred at the time the request was made.

Overall, the documents above suggest few rigorous attempts to utilize the large volume of information the Department possesses to address the underlying causes of unnecessary and excessive uses of force and facility violence. Furthermore, the few plans that have been devised are either ineffective, or shortly abandoned before their impact on staff practice can be discerned.

> *July 28, 2023 Request 15. All documents relating to the required meetings between the Facility Wardens (or designated Deputy Wardens) and Department leadership "to discuss any planned operational changes or corrective action plans, as well as the impact of any operational changes or corrective action plans previously implemented," including any documents reflecting the results of such meetings.*
> *(See First Remedial Order, Section § A, ¶ 2.).*

**Monitoring Team Response**: The Department reported that in 2022, the Commissioner began holding a scheduled weekly Operations Meeting. In summer 2022, these meetings were led by the former Chief of Department before his departure. Then, they were led by the former Senior Deputy Commissioner from November 2022 to February 2023, and have since been led by the Deputy Commissioner of Facility Operations. Typically, the following individuals are present at the meetings: the Deputy Commissioner of Security, the Deputy Commissioner of Administration, the Associate Commissioners of the facilities, and the Assistant Commissioners/Wardens of the facilities. The Department reported that minutes from these meetings are not kept, but rather sign-in sheets maintained by the Commissioner's staff. Further, the Commissioner's calendar invitation is available for meetings from November 2022 through July 2023 to demonstrate who participated. Accordingly, the topics of discussions and whether any action plans were developed through these meetings are unknown.

> *July 28, 2023 Request 16. The total number of awarded posted as of the June 14, 2022 (the date of the Action Plan), including instances where the post was not officially designated as "awarded" but was functionally treated one (see July 10, 2023 Report at 104); the number of awarded posts eliminated since June 14, 2022; and the current total number of awarded posts and a description of such posts.*

**Monitoring Team Response**: The Monitoring Team provided a summary of the status of the Department's efforts to reduce the use of awarded posts and to develop relevant data in the

Monitor's July 10, 2023 Report. There are no updates since that report—the requested data is not available. The Department's records regarding awarded posts are manually developed based on paper records at each individual facility.

- **June 14, 2022 Data**: The Monitoring Team is not aware of any way that data can be retroactively developed from a prior date certain (e.g., June 14, 2022). Even if retroactive data could be developed, the development of such data is overly burdensome, and the Monitoring Team believes that such an exercise would be futile given that there is no evidence the Department is capable of reliably identifying those staff with awarded posts by policy versus posts awarded for other reasons.

- **Elimination of Awarded Posts**: Given the manner in which the data on awarded posts is maintained, it is not currently feasible to identify the number of awarded posts that have been eliminated since June 14, 2022. While the Department has not yet initiated a plan to evaluate or eliminate awarded posts, they have suggested that their current effort to identify all staff with awarded posts will then permit an assessment of the mechanism by which the post was awarded (e.g., via policy versus informally). This will permit improperly assigned posts to be rectified. The Monitoring Team requested information regarding this assessment in May 2023 but it has not been provided as of November 2, 2023.

- **Current Total of Awarded Posts**: The Monitoring Team requested a current accounting of staff with awarded posts in May 2022 but it has not yet been provided. When it is produced, it must be closely scrutinized to assess its accuracy.

The Monitoring Team has submitted a number of requests and feedback to the Department regarding the development and implementation of a plan for reducing the use of awarded posts. The Department reports that it intends to assign the *Nunez* Manager and the Staffing Manager the responsibility of developing and implementing such a plan. However, no substantive plans have been produced as of November 2, 2023.

> *July 28, 2023 Request 17*. *Data reflecting the extent to which the Department has reduced the use of 4 by 2 schedules since June 14, 2022, including the number of staff whose schedule was changed from a 4 by 2 schedule to a true 5 by 2 schedule, broken down by facility.*

**Monitoring Team Response**: *See* the Monitor's August 7, 2023 Report regarding scheduling and 4x2 schedules. The Monitoring Team believes the information shared in that report is the most current and reliable information available.

> *July 28, 2023 Request 18*. *A description of all efforts to create and implement an assignment process in which sufficiently experienced uniform staff are deployed to housing units, as required by Action Plan § C, ¶ 3(iv).*

**Monitoring Team Response**: Action Plan § C, ¶ 3(iv) requires the Department to create and implement a staff deployment process in which sufficiently experienced uniform staff are assigned to housing units. The goal of this requirement is to ensure that staff who are supervising the housing units have the requisite skill set to consistently utilize sound security practices and effectively supervise people in custody and the willingness to resolve their problems and concerns. These skills are necessary to adequately protect people in custody, minimize

frustrations that can erupt into violence, and reduce the overall risk of harm. The Monitoring Team does not have any evidence that this requirement has been implemented and so there is no information to provide in response to this request.

> ***July 28, 2023 Request 19***. *A description of all efforts to re-evaluate UOF investigations closed between July 1, 2022 and March 31, 2023 without any further action; the number of investigations re-evaluated; and the results of such re-evaluations.*
>
> **September 6, 2023 Follow-up Question 3.** *The City's August 23, 2023 letter regarding non-compliance states that, as of August 22, ID completed review of 70% of the "look back" incidents. (page 3). How many incidents were subsequently reopened?*

**Monitoring Team Response**: ID reviewed cases closed between July 1, 2022 and March 31, 2023 using two methods (1) quality assurance audits and (2) look-back audits. In summary, these efforts to assure the quality of investigations have identified problems very similar in substance and scope to those identified by the Monitoring Team. While the Monitoring Team has yet to fully assess whether the quality assurance process is sufficiently robust, the initial findings suggest that cases have been closed precipitously without identifying the full range of misconduct and policy violations that occurred.

- **Intake & Full ID Quality Assurance Audits**

      The first method utilized was for ID's quality assurance team to audit a sample of closed Intake Investigations and Full ID Investigations. Each week, the quality assurance team reviewed approximately 30 randomly selected closed cases. In addition, each week, the Deputy Director of ID reviewed approximately five Full ID cases that were closed with no charges. The audit of Full ID cases was temporarily suspended from June 27, 2023 to September 25, 2023 while the look-back assessment was completed (discussed below).

      *Audit of Intake Investigations.* As of September 11, 2023, a total of 650 Intake Investigations that were closed during the first six months of 2023 were evaluated. The incident dates and audit completion dates are listed in the chart below. The audit identified an issue of some type (ranging from minor to more serious) in 291 of the 650 cases (45%).

| Range of Incident Dates | Range of Dates the Intake Investigations were Closed | Range of Audit Complete Dates |
|---|---|---|
| 11/25/22 – 5/19/23 | 1/3/23 – 6/26/23 | 3/20/23 – 9/11/23 |

      *Audit of Full ID Investigations.* As of June 20, 2023, a total of 22 Full ID investigations that were closed between April 2022 and June 2023 were reviewed. The incident dates and audit completion dates are listed in the chart below. Of the 22 cases, three needed to be re-opened. Discussions with the assigned investigator team were warranted in 17 of the 22 cases. The Closing Report required an update in 16 of the 22 cases (in three cases, the update was required to address grammar). The sample size is very small, making it difficult to draw any conclusions from these findings and what it may say regarding the overall quality of Full ID investigations.

| Range of Incident Dates | Range of Full ID Investigation Close Dates | Range of Audit Completion Dates |
|---|---|---|
| 10/10/22 - 3/9/23 | 4/12/22 - 6/12/23 | 4/19/23 - 6/20/23 |

In addition to meeting with individual investigators to discuss findings, ID leadership also identified several common issues. The most common issues were presented by the head of the Quality Assurance division at ID's recent town hall on October 24, 2023. These issues include:

- Failing to mention all injuries (including injuries to staff) and to identify the source of injuries;
- Failing to preserve Genetec footage and/or failing to include the proper scope (i.e., 30 minutes before and after, until the person in custody is secured);
- Failing to address problematic conduct captured on BWC (e.g., profanity, allegations made by people in custody) and failing to address staff who do not properly activate their BWC;
- Failing to include relevant UOF Directive charges on MOCs;
- Failing to address problematic staff conduct leading up to, during and after an incidents (e.g., failing to address complaints from people in custody, failing to call a Supervisors, behavior that escalates the issue, unprofessional statements/behavior, deploying OC from a dangerously close distance);
- Failing to send Facility Referrals or reclassifications;
- Failing to request staff medical documentation and failing to include all staff injuries in Closing Reports;
- Failing to conform to the UOF Directive's requirements for photographs, photographing the wrong person, not including photographs of all individuals involved, failing to photograph staff and staff injuries;
- Failing to verify that the facility took the corrective action indicated by the Rapid Review, failing to include the CD, MOC or Teletype reference number;
- Failing to differentiate between unmanned posts and staff off post in Closing Reports, and lack of evidence to support unmanned post designation;
- Inappropriately asserting that a certain investigative step will not change the outcome of an investigation.

That ID has initiated a QA process is encouraging, as is its ability to identify consistent problems that are amenable to improvement. The quality assurance initiative is too recent to assess its impact on the quality of investigations.

- **Look-Back Audits**

The second method for assessing the appropriateness of case closures in Full ID investigations included a "look-back" audit, which took place in July/August/September 2023. ID, in consultation with the Monitoring Team, developed a set of criteria for selecting cases for assessment. These included:

- Closure between July 2022 and December 2022 with no charges,
- Involved members of ESU or certain staff who are frequently involved in uses of force,
- Resulted in a Class A categorization or headstrikes.

A total of 468 cases met a combination of these criteria and thus were selected for review. A team of ID leadership (including the Deputy Commissioner and Associate Commissioner of ID) assessed the quality of the investigative process in each case and the appropriateness of the investigations' outcomes.

ID determined that 156 of the 468 cases (33%) should be re-opened for further investigation. Of these, 119 (76%) were re-opened because the look-back auditors found that violations were not addressed appropriately. Four cases (3%) were re-opened because "further investigative action to make an appropriate determination" was needed. In 33 of the re-opened cases (28%), the reason for re-opening the case was unclear in the documentation provided to the Monitoring Team.

---

*July 28, 2023 Request 20. The total number of Full ID Investigations closed since January 1, 2022; how many of these investigations were closed within 120 days of the Referral Date; how many of these investigations were closed 121-180 days after the Referral Date; how many of these investigations were closed 181-365 days after the Referral Date; and how many of these investigations were closed more than 365 days after the Referral Date.*

---

**Monitoring Team Response**: See chart below.

| | Number of Full ID Investigations closed since January 1, 2022 | Closed within 120 days of the Referral Date | Closed within 121-180 days of the Referral Date | Closed within 181-365 days of the Referral Date | Closed more than 365 days after the Referral Date |
|---|---|---|---|---|---|
| **Number of Full ID Investigations Closed and Time to Case Closure As of July 17, 2023** | | | | | |
| **Number** | 1822 | 150 | 141 | 652 | 879 |
| **%** | | 8% | 8% | 36% | 48% |

---

*Request 21. The total number of Full ID Investigations currently pending; how many of these investigations were referred to ID more than 120 days ago; how many of these investigations were referred to ID before February 1, 2023; how many of these investigations were referred to ID before November 1, 2022; and how many of these investigations were referred to ID before August 1, 2022.*

---

**Monitoring Team Response**: The Monitoring Team has provided the data slightly different from what was requested so the information provide is consistent with prior reporting on this issue. The table below shows the status of Full ID investigations for all incidents that occurred between January 2022 and June 2023. Only 14% (n=234) were closed (or remained pending) within the 120-day timeline, while the remaining 86% were either closed (or remained pending) outside the required time frame.

| Pending less 120 Days or less | Closed within 120 Days | Closed Beyond 120 Days | Pending Beyond 120 Days | Total |
|---|---|---|---|---|
| **Status of Full ID Investigations for incidents that *occurred* between January 2022- June 2023 As of October 16, 2023** | | | | |
| 15 | 219 | 841 | 571 | 1,646 |
| 1% | 13% | 51% | 35% | |

*July 28, 2023 Request 22. For each ID investigator assigned to handle Full ID investigations, provide the current number of open UOF investigations assigned to the investigator and the number/type of other investigations assigned to that individual.*

**Monitoring Team Response**:

| INVESTIGATOR DOCKETS *As of August 23, 2023* | | |
|---|---|---|
| | **Open cases** | **Team assignment** |
| Investigator 1 | 7 | UPS |
| Investigator 2 | 21 | Full ID |
| Investigator 3 | 8 | UPS |
| Investigator 4 | 17 | Full ID |
| Investigator 5 | 8 | UPS |
| Investigator 6 | 20 | Full ID |
| Investigator 7 | 16 | Full ID |
| Investigator 8 | 16 | Full ID |
| Investigator 9 | 6 | UPS |
| Investigator 10 | 24 | Full ID |
| Investigator 11 | 24 | Full ID |
| Investigator 12 | 11 | Full ID |
| Investigator 13 | 11 | Full ID |
| Investigator 14 | 16 | Full ID |
| Investigator 15 | 14 | Full ID |
| Investigator 16 | 6 | Full ID |
| Investigator 17 | 22 | Full ID |
| Investigator 18 | 21 | Full ID |
| Investigator 19 | 25 | Full ID |
| Investigator 20 | 18 | Full ID |
| Investigator 21 | 18 | Full ID |
| Investigator 22 | 15 | Full ID |
| Investigator 23 | 6 | UPS |

*July 28, 2023 Request 23. The number of new ID investigators and ID supervisors added to the ID unit since January 2022, broken down by month and whether the added individual was a civilian or uniformed staff.*

**Monitoring Team Response**: Three charts with information relevant to this request are shared below. The first chart identifies the hires within ID and any net gains between January 2022 and October 2023. As demonstrated in the chart, ID has hired 66 new investigators, supervisors, and executives but 30 of the 66 individuals have since departed ID, so there was a net gain of 36 staff.

| Summary of ID Hires & Net Gains January 2022 to October 2023 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Total Investigator | Civilian Investigator | Uniform Investigator | Total Supervisor | Civilian Supervisor | Uniform Supervisor | Deputy Director | Assistant Commissioner | Total |
| Jan-22 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Feb-22 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Mar-22 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Apr-22 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| May-22 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Jun-22 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Jul-22 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Aug-22 | 4 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
| Sep-22 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oct-22 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Nov-22 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| Dec-22 | 9 | 9 | 0 | 0 | 0 | 0 | 0 | 0 | 9 |
| Jan-23 | 10 | 6 | 4 | 0 | 0 | 0 | 0 | 0 | 10 |
| Feb-23 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mar-23 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Apr-23 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| May-23 | 8 | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 8 |
| Jun-23 | 1 | 1 | 0 | 9 | 0 | 9 | 0 | 0 | 10 |
| Jul-23 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Aug-23 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 2 |
| Sep-23 | 6 | 6 | 0 | 0 | 0 | 0 | 0 | 0 | 6 |
| Oct-23 | 5 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 5 |
| Total Hired | 55 | 51 | 4 | 9 | 0 | 9 | 1 | 1 | 66 |
| Since Departed | 20 | 16 | 4 | 9 | 0 | 9 | 1 | 0 | 30 |
| Total Current in ID | 35 | 35 | 0 | 0 | 0 | 0 | 0 | 1 | 36 |

| | Total Investigator | Civilian Investigator | Uniform Investigator | Total Supervisor | Civilian Supervisor | Uniform Supervisor | Deputy Director | Assistant Commissioner | Total |
|---|---|---|---|---|---|---|---|---|---|
| Resigned | 9 | 9 | 0 | 0 | 0 | 0 | 0 | 0 | 9 |
| Transferred to SIU | 10 | 6 | 4 | 0 | 0 | 0 | 1 | 0 | 11 |
| Terminated | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Return to Command | 0 | 0 | 0 | 0 | 0 | 9 | 0 | 0 | 0 |
| Total | 20 | 16 | 4 | 9 | 0 | 9 | 1 | 0 | 30 |

The second and third charts below demonstrate the current staffing levels of investigators and supervisors within ID as of October 20, 2023. The current staffing levels within ID have generally remained the same throughout the year. However, ID reports that there are seven (7) new investigators in training who are not reflected in the chart below because they are not assigned to teams yet. Another sixteen investigators (16) are pending hire with HR. Additionally, the Supervising Investigator posting just closed and interviews of candidates were just completed.

The Department just recently initiated a pilot that will allow certain investigators to work remotely one day a week. It is too soon to determine the impact of this policy on both employee satisfaction and work product.

| Supervisors in ID Assigned to UOF | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | February 2020 | January 2021 | January 2022 | January 2023 | April 2023 | June 2023 | July 2023 | August 2023 | October 2023 |
| Rapid Reviews | | | | | 1 | 2 | 2 | 2 | 2 |
| Intake Squad | 8 | 10 | 13 | 12 | 9 | 8 | 8 | 6 | 6 |
| Full ID | 15 | 10 | 7 | 3 | 3 | 3 | 4 | 5 | 5 |
| UPS | 1 | 1 | 1 | 0 | 1 | 1 | 1 | 1 | 1 |
| **Total** | **24** | **21** | **21** | **15** | **14** | **14** | **15** | **14** | **15** |

| Investigators in ID Assigned to UOF | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | February 2020 | January 2021 | January 2022 | January 2023 | April 2023 | June 2023 | July 2023 | August 2023 | October 2023 |
| Rapid Reviews | | | | | 4 | 8 | 8 | 7 | 8 |
| Intake Squad | 32 | 51 | 51 | 51 | 42 | 32 | 36 | 34 | 30 |
| Full ID | 82 | 58 | 36 | 10 | 10 | 12 | 19 | 18 | 23 |
| UPS | 4 | 3 | 3 | 4 | 4 | 5 | 5 | 5 | 5 |
| **Total** | **118** | **112** | **90** | **65** | **60** | **57** | **68** | **64** | **67** |

> ***July 28, 2023 Request 24***. *Any new protocols developed relating to the composition and deployment of the ESU (including any functionally equivalent unit such as the "Strategic Response Team" and the "Special Search Team") or facility emergency response teams (i.e., probe teams) in order to minimize unnecessary or avoidable Uses of Force, as required by First Remedial Order, A.6; documents reflecting reviews assessing compliance with these protocols and a description of any instance when staff were found to have violated these protocols and any corrective or disciplinary action taken.*

**Monitoring Team Response**: *Note, an additional request related to the composition of the ESU team was made in August 31, 2023, Request 21. Please also cross reference to that response, below.* The First Remedial Order, §A, ¶ 6 requires the Department to have protocols to limit the use of Emergency Response Teams and ensure that they are staffed by individuals that are best suited for the position. Given the role and responsibilities of the Emergency Response Team, those that are selected to serve on these teams is important and must be done with appropriate consideration.

**Protocols regarding Composition and Deployment of**
**ESU/Facility Emergency Response Teams**

The protocols developed in response to the First Remedial Order §A, ¶ 6 are the Facility Response Team policy, implemented on August 22, 2019, first shared with the Parties on October 28, 2019 and re-sent on July 14, 2023. Further, the Special Unit Assignment Policy, which governs the screening of staff to ESU and other Special Teams, dated 12/20/16 was shared

with the Parties on July 14, 2023. The Department shared draft revisions to the Facility Response Team policy and the Special Unit Assignment policy with the Monitoring Team in September 2023. In October 2023, the Monitoring Team shared feedback and comments with the Department on the proposed revisions.

### Assessment of Deployment of ESU/Facility Emergency Response Teams

The Department's assessment of compliance with Emergency Response Team protocols occurs via the Rapid Reviews and individual UOF investigations. A more detailed discussion of the findings from the Rapid Reviews is outlined below. As for the individual UOF investigations, the outcomes of these investigations are maintained in individual case files and therefore it is not feasible, and is overly burdensome, to identify each incident in which staff were found to have violated the Emergency Response Team protocols and any corrective or disciplinary action taken.

The Rapid Review template for all use of force incidents includes a prompt to: (1) determine whether an Emergency Response Team was present, and if so, what Level Response Team was present; and (2) if a Level B / Probe Team was deployed, to assess whether the deployment of the Probe Team was necessary. To date, the Department's data collection regarding an assessment of the deployment of Emergency Response Teams via Rapid Reviews has not been completed reliably. As the Monitoring Team has consistently reported since the 11th Monitoring Period, the compliance assessment of the Rapid Review process first found that Rapid Reviews identify and address a significant number of issues, but they do not reliably and consistently identify *all* issues that would reasonably be expected to be identified through a close in time assessment of the video. One area where the identification of issues is not consistent or reliable is the Department's assessment of deployment of Emergency Response Teams. As a result, data regarding this assessment has not previously been developed or reported by the Monitoring Team. However, in light of this specific request, the below information was developed and gathered. However, this data must be evaluated with extreme caution because the Monitoring Team does not believe this data accurately reflects a neutral or objective assessment of the deployment of Emergency Response Teams.

- **Rapid Reviews of All UOF Incidents:** Rapid Reviews are conducted for the uniformed staff involved in all uses of force across the Department, but these daily Rapid Reviews were not conducted for special team staff unless the UOF was solely related to the special teams. Unfortunately, the Rapid Review data does not easily distinguish between staff assigned to the facilities and special team staff, so it also makes developing data about whether corrective action was taken specifically related to the work of the Emergency Response Team difficult to develop. The Rapid Reviews do track whether incidents were avoidable, involved response teams, and if deployed, whether the facility-based emergency response team (also referred to as the probe team) deployment was necessary.

89

- o There were Rapid Reviews conducted for approximately 39,625 staff involved in 10,668 UOF incidents from January 1, 2022 to July 31, 2023.
  - ▪ There were Rapid Reviews conducted for 1,613 UOF incidents involving response teams before, during, or after the use of force.
    - Finding of whether the incident was avoidable
      - o 1,236 (77%) were found to be unavoidable
      - o 377 (23%) were found to be avoidable
    - Finding of whether the Level B/Probe Team deployment was necessary
      - o 1,162 (72%) Level B deployments were necessary
      - o 32 (2%) Level B deployments were not necessary.
      - o 419 (26%) UOFs involved other level response teams (such as the Level A/De-escalation team) or the Rapid Reviewer failed to identify whether the Level B/Probe Team deployment was necessary
    - Referrals for discipline for staff involved in the 1,613 UOFs (note this may include discipline for staff involved in the UOF but that were not assigned to the special response team(s)):
      - o 743 staff were recommended for command disciplines
      - o 165 staff were recommended for retraining
      - o 388 staff were recommended for corrective interviews
      - o 62 staff were recommended for MOCs
      - o 38 staff recommended for suspensions
      - o 333 staff recommended for 5003 counseling
      - o 5 staff recommended for referrals to EISS
      - o 1 staff recommended for CARE

- **Special Team Rapid Reviews:** DOC began conducting Rapid Reviews for special teams (ESU, SRT, SST and K9) on May 19, 2023. The template for the Rapid Reviews for special teams is slightly different from the Rapid Review template for all incidents, and specifically assesses the conduct of staff assigned to the special teams. The format of the Special Team Rapid Review template is more streamlined, and it does not contain a prompt to assess whether the special team deployment was necessary.[51]

  - o There were Rapid Reviews conducted for 90 special team staff involved in 26 UOF incidents from May 19, 2023 to July 31, 2023. As this data is only recently available, it has not been fully evaluated by the Monitoring Team. However, the

---

[51] The Monitoring Team is currently consulting with DOC on revisions to this Rapid Review template and will address whether this information will be included in a revised version of the template.

data available suggests that greater scrutiny is necessary to determine whether all cases that merit review are being evaluated and the accuracy and veracity of these findings and will be subject to further evaluation by the Monitoring Team in the coming months.

- The Rapid Reviewers determined that all 26 (100%) UOFs were unavoidable.

- The Rapid Reviewers identified procedural errors involving 8 special team staff involved in 6 UOFs.

  - One MOS applied extensive pressure to a PIC's wrist and was recommended for a command discipline and retraining.

  - Three MOS used chemical agents too close to the PIC's facial area. Two of the MOS were recommended for retraining and corrective interviews. One of the MOS was recommended for a command discipline and retraining.

- Four MOS failed to activate their BWC. All four staff were recommended for retraining and corrective interviews.

---

***July 28, 2023 Request 25****. Did the wristband pilot at RNDC continue after its initial implementation? What is the current status, if any?*

---

**Monitoring Team Response**: The Monitoring Team is unable to recreate the history of the wristband pilot at RNDC. It has been used on and off since it was initially piloted. The Department reports that as of September 26, 2023, all incarcerated individuals at RNDC *have* a wristband except for 208 incarcerated individuals. However, the Monitoring Team did not observe incarcerated individuals wearing wristbands during its recent site visit in September 2023. The Department reports that it is not tracking individuals using the wristbands because some of the scanners on the monitor machines located in the corridor and intake appear inoperable. Additionally, the Department reports that the machine that generates new wristbands when an incarcerated individual is transferred from facility to facility also malfunctions frequently.

The Department reports that in September 2023, RNDC conducted a security assessment to determine the scope of the issue with its machines, but the Monitoring Team does not know the results of that assessment. The Department reports that when the scanning machines are inoperable (as they are now) that staff manually enter the incarcerated individuals into the monitor machines (which is connected to computers and filters to the Inmate Tracking System) for the intake, the clinic, housing area A station, and medication windows. The Monitoring Team has not verified that such tracking is occurring or that it is completed consistently.

---

***July 28, 2023 Request 26****. Any NCU audits of consistent assignment of staffing in RNDC in 2022 and 2023. If NCU ceased conducting such audits, please confirm when they were last conducted and provide the most recent audit.*

---

**<u>Monitoring Team Response</u>**: Staff are not consistently assigned to the same housing unit day-to-day at RNDC and no audits of consistent staffing have occurred since January 2022. *See* the Monitor's March 16, 2022 Report on page 20. *See also*, Monitor's October 28, 2022 Report at pg. 172 and Monitor's April 3, 2023 Report at pg. 219.

*Monitoring Team Response to Plaintiffs' August 31, 2023 Requests for Information pursuant to Consent Judgment §XIX, ¶ 8*

---

*August 31, 2023 Request 1.*

*1. Data on the outcomes of closed "Full ID" investigations for incidents that have taken place since January 1, 2022, including:*

*a.  Number and percentage of investigations finding excessive, unnecessary, and/or avoidable uses of force*

*b.  Number and percentage of investigations finding violations of the Use of Force Directive*

*c.  Number and percentage of investigations finding other types of misconduct, and the type of misconduct*

---

**Monitoring Team Response**: Timely detection and appropriate response to misconduct is necessary for the Department to succeed in using force safely, proportionally, and only when necessary.  It is axiomatic that if the misconduct isn't identified then it can't be addressed and corrected in the future and therefore may persist. It is why the regression in ID's work (along with Rapid Reviews) is so concerning.

Data meeting the exact parameters of this request does not exist. However, the Monitoring Team shares two sets of data as a proxy for this information.

- *Findings of Closed Intake Investigations (including those Closed at Intake and those Referred for Full ID Investigations)*

  The table below shows the outcomes of closed ID investigations as of September 30, 2023. This data includes cases that were closed following the Intake Investigations and those closed following a Full ID Investigation. The data are organized by incident date, showing the proportion of cases where the use of force was deemed excessive, unnecessary and/or avoidable[52] and those in which a chemical agent violation was identified.

  A few caveats to the interpretation of this data are required. First, the data related to Full ID investigations was extracted from the Department's October 17, 2023 Compliance Report. The Monitoring Team has not had an opportunity to verify the veracity of the investigations' findings or the way in which incidents were categorized for this set of cases and thus cannot vouch for its accuracy. Given the Department's historical patterns of significantly under-

---

[52] The Department and the Monitoring Team have not finalized an agreed upon definition of these terms. The categorizing the findings and developing corresponding data is complicated, particularly because qualitative information with slight factual variations must be categorized consistently. A concrete, objective and shared understanding of what each category is intended to capture is necessary to ensure reliable and consistent findings. Efforts were made in summer 2021 to finalize common definitions, but they were never finalized. The project has since languished given the focus on higher priority items.

identifying staff misconduct, the prevalence of misconduct shown in the table below should be considered a floor, not a ceiling. This is particularly true for the proportion of cases deemed problematic in 2022/2023 due to a concerning decline in the quality of investigations produced by ID (*see* the Monitor's April 3, 2023 and April 24, 2023 Reports).

| Findings of Closed ID Investigations (includes those closed at Intake Investigations and following a Full ID Investigation) as of September 30, 2023 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Finding | Incident Date | | | | | | |
| | Feb 3 to Jun. 2020 (10th MP)[53] | July to Dec. 2020 (11th MP) | Jan. to Jun. 2021 (12th MP) | July to Dec. 2021 (13th MP) | Jan. to Jun. 2022 (14th MP) | July to Dec. 2022 (15th MP) | Jan. to June 2023 (16th MP) |
| Total | 2,492 | 3,272 | 4,468 | 3,916 | 3,349 | 3,883 | 3,281 |
| Excessive, Unnecessary, or Avoidable | 252 (10%) | 563 (17%) | 809 (18%) | 797 (20%) | 585 (17%) | 575 (15%) | 421 (13%) |
| Chemical Agent Violation | 164 (7%) | 163 (5%) | 260 (6%) | 324 (8%) | 287 (9%) | 245 (6%) | 224 (7%) |

- *Referrals for Formal Discipline*

Data on the proportion of use of force incidents that result in a referral for formal discipline is another proxy for the data requested. Nearly all referrals to the Trials Division for formal discipline for use of force related misconduct are made following the completion of a Full ID Investigation. This is unsurprising given that the more egregious and complex cases are referred for Full ID Investigations. That said, with sufficient evidence, Intake Investigations can also result in formal disciplinary referrals to the Trials Division (although likely not at the same rate as those flowing from a Full ID Investigation). While the Monitoring Team's review of use of force incidents continues to identify a significant number of cases where referrals for formal discipline appear to be appropriate, incongruously, in 2022, the overall proportion of cases referred for formal discipline (from any type of UOF investigation) significantly decreased. The Monitoring Team has not identified a contemporaneous change in the pattern and practice of unnecessary and excessive force that would account for a reduction in the number of referrals. In fact, the number of such referrals typically *increases* as the quality of investigations improves

---

[53] All incidents received Intake Investigations beginning February 3, 2020. Incidents from the early part of the Tenth Monitoring Period are thus not included in this data.

and the ability to identify misconduct is more consistent and reliable. The decline in investigation quality no doubt contributes to the decline in referrals for formal discipline.[54]

From 2016 to 2021, the average proportion of use of force incidents in which at least one staff member was referred for formal discipline was 7%. However, in 2022, the proportion of use of force incidents in which at least one staff member was referred for formal discipline decreased to 5%. For those incidents that occurred thus far in 2023, the proportion of use of force incidents in which at least one staff member was referred for formal discipline is 4%. Some investigations of 2022 incidents (~200) and January to June 2023 incidents (~230) were pending when the graph related to charges, below, was developed, so some additional referrals for discipline may be forthcoming. The resolution of these pending investigations is not expected to alter the findings significantly.

---

[54] These findings were extensively reported in the Monitor's April 3, 2023 Report (dkt. 517) at pgs. 100 to 102 and pgs. 155 to 171 and in the Monitor's April 24, 2023 Report (dkt. 520) at pgs. 1 to 9.



*August 31, 2023 Request 2. We list below several incidents described in the Monitor's reports, and seek to be as up to date as possible on any corrective actions taken or disciplinary charges filed and/or resolved with regard to these incidents. For each, please provide the most up to date information on: 1) any immediate corrective actions (including but not limited to immediate suspensions) taken; 2) any informal discipline such as command discipline imposed; and 3) whether formal disciplinary charges were filed, the status of the proceedings on such charges, and the disposition of such charges.*

*a.  Incident # 1 of the Monitor's May 26, 2023 Report where officers' use of force paralyzed an individual from the neck down. (The Monitor's June 12 report states that officers were disciplined, but we don't know the disposition or nature of charges.)*

*b.  Illustrative Example 1 from the Monitor's July 10, 2023 Report, where on March 3, 2023, an individual wearing both front cuffs and leg shackles was pushed into a search pen and placed in a chokehold at the Brooklyn courthouse.*

*c.  Illustrative Example 4 from the Monitor's July 10, 2023 Report, where on June 7, 2023, an officer attacked a restrained individual in a barber shop at GRVC.*

*d.  Illustrative Example 3 from the Monitor's July 10, 2023 Report, where on February 3, 2023 in RMSC, a group of officers struggled with a woman, aggressively pushed her against a wall, and sprayed her with a chemical agent.*

*e.  April 2023 incident described on pages 12-13 of the Monitor's August 7, 2023 Report where an officer bragged about beating up an individual on prior occasions and threatened to do so again while stating that a suspension would be welcomed as vacation.*

*f.  Incident # 1 described in Appendix A of the Monitor's August 7, 2023 report, where on July 29, 2023 an officer watched a group of people enter a cell and assault someone but took no action.*

*g.  Incident # 2 described in Appendix A of the Monitor's August 7, 2023 Report, where on May 8, 2023, an ADW used incarcerated individuals as part of a hostage drill. Is this person still an ADW, or have they been demoted?*

**Monitoring Team Response**: Please see the chart below. The Department provided the information in the chart.

| Incident | Date | Facility | 1) any immediate corrective actions (including but not limited to immediate suspensions) taken; | 2) any informal discipline such as command discipline imposed; and | 3) whether formal disciplinary charges were filed, the status of the proceedings on such charges, and the disposition of such charges. | Additional actions (Non Discipline) taken by ID upon case closure |
|---|---|---|---|---|---|---|
| **Illustrative Example # 3 from the Monitor's July 10, 2023 Report** | February 3, 2023 | RMSC | N/A | Officer 1 Command Discipline | Officer 2 Signed NPA 9/25/23; Case is in closing process | **Officer 1** -Retraining: defensive tactics **Officer 3** -Retraining: handheld video **Facility referral**- failure to photograph staff injuries |
| **Illustrative Example # 1 from the Monitor's July 10, 2023 Report** | March 3, 2023 | BKCTS | Officer 4 -On April 8, 2023, Officer 4 was suspended by ID for 30 days | N/A | Officer 4 Signed NPA ON 5/30/23 for 15 Comp Days & 30 Suspension Days; Case Closed; Memorandum of Complaint for Captain 1; Memorandum of Complaint for Officer 5. Charges are pending for Captain 1 and Officer 5 in Trials. | **Officer 6** -Retraining: Report Writing **Officer 7** -Retraining: Report Writing |
| **April 2023 incident described on pages 12-13 of the Monitor's August 7, 2023 Report** | April 18, 2023 | AMKC | N/A | N/A | Memorandum of Complaint for Officer 8. Signed NPA on 9/19/23; Case in Closing Process. | **Facility referral**- delay in medical attention |
| **Incident # 2 described in Appendix A of the Monitor's August 7, 2023 Report** | May 8, 2023 | EMTC | N/A | N/A | Memorandum of Complaint- Charges and discovery to be served this week for ADW 1 and PDR to demote; Memorandum of Complaint- charges and discovery to be served this week for ADW 2 and PDR to demote; and Memorandum of Complaint for ADW 3. | **Officer 9** -Retraining: situational awareness **Facility Referral**-regarding decontamination process |
| **Incident # 1 of the Monitor's May 26, 2023 Report** | May 11, 2023 | VCBC | Officer 10 was suspended by the facility on May 11, 2023 for 10 days | Case is still an open investigation on hold with DOI. Pending clearance from DOI to proceed. | Case pending in ID | **Pending** |
| **Illustrative Example # 4 from the Monitor's July 10, 2023 Report** | June 7, 2023 | GRVC | Officer 11 was suspended by the facility on June 7, 2023 for 10 days. | N/A | Officer 11 Signed NPA (F2 CASE); In Closing Process; Officer 12 Signed NPA; in Closing Process; Officer 13 was served with charges, Offer and Discovery sent to opposing counsel, awaiting OATH Pre-Trial Conference. | **Officer 14** -Retraining- BWC policy **Officer 15** -Retraining - Report Writing **Facility referral**- failure to document/record PIC refusal |
| **Incident # 1 described in Appendix A of the Monitor's August 7, 2023 report** | July 29, 2023 | GRVC | Officer 16 was suspended for 30 days effective July 31, 2023. | N/A | Memorandum of Complaint for Officer 16. Charges were served and awaiting OATH Pre-Trial Conference | N/A |

> *August 31, 2023 Request 3. The complete Investigation Division files for the following use of force incidents, as well as any information related to the incidents regarding 1) immediate corrective actions (including but not limited to immediate suspensions) taken; 2) any informal discipline such as command discipline imposed; and 3) whether formal disciplinary charges were filed, the status of the proceedings on such charges, and the disposition of such charges.*
>
> *[Requested 26 Use of Force Investigations]*

**Monitoring Team Response**: The City provided these files to Plaintiffs in two separate productions. The City reports the first production was mailed on October 17, 2023 and the second production was mailed on October 25, 2023.

> *August 31, 2023 Request 4. Which one of the 2023 deaths in custody involved the suspension of an ADW who was one of the 12 promoted in January 2023, despite the concerns expressed by DOC divisions regarding the individual's promotion? Has this ADW been demoted, or do they still hold the ADW rank?*

**Monitoring Team Response**: This suspension occurred following the death of Curtis Davis on July 23, 2023. This is ADW Candidate # 9 of the screening memo shared with the Parties on April 19, 2023 and was not recommended for promotion based on DOC's internal screening. The Department reports that this ADW is now in the process of retiring from the Department. Out of the 12 ADWs that were not recommended for promotion, but were, nonetheless, promoted, two have since been demoted. One of the ADWs demoted was involved in Incident #2 from the Monitor's August 7, 2023 Report. The other ADW involved in incident #2 from the August 7, 2023 Report was also demoted, but was not in the group of 12 individuals not recommended for promotion. Overall, of these 36 ADWs promoted in 2023, four have since been demoted, and two resigned their position within the first year.

> *August 31, 2023 Request 5. Two additional Assistant Commissioners were appointed as of July 10, 2023 (July 10 Report). What are the names of the two assistant commissioners? Were they external or internal candidates?*

**Monitoring Team Response**: The two Assistant Commissioners appointed as of July 10, 2023 are [name redacted] and [name redacted]. They are both external candidates.

> *August 31, 2023 Request 6. What is the most recent data on number of staff identified as "chronic absent," as referenced on pages 28-29 of the Monitor's April 3, 2023 Report?*
>
> *a. Have all those designations been processed?*
>
> *b. Has any individual designated as a "chronic absent" suffered a limitation on discretionary benefits, privileges or promotions? What have those consequences been?*

**Monitoring Team Response**: The Monitoring Team last reported on this issue in the Monitor's July 10, 2023 Report at pgs. 97 to 98. To summarize, the Monitoring Team reported that the "facilities are responsible for processing staff with this designation so they are actually designated as chronic absent in their personnel file. This process is incredibly protracted.

Furthermore, the facilities' tracking mechanism is not well-maintained which inhibits their ability to properly administer the status. For instance, the Department reports that only 50% of the staff identified as chronic absent in 2023 have been processed as such. The Monitoring Team continues to recommend the Department improve these practices to ensure that those staff who should be identified as chronic absent are in fact then designated as such, so that the various disincentives can be applied. The label alone will not result in the desired outcome."

As of the end of August 2023, the Department reports that 70% of the staff identified as chronic absent in 2023 have been processed as such. As for those staff designated as chronic absent in 2022, the Department reported that only 79% were processed by the end of June 2023. These inefficiencies have significant consequences. The Department reported that certain staff who have been identified as chronic absent may never actually be designated as such because the 6-month applicability of the designation expires before the processing occurs. With respect to tracking what limitations on discretionary benefits, privileges or promotions are actually imposed on a staff member designated as chronic absent, the Department does not track this information in a manner amenable to reporting. The Department is in the process of consulting with the Monitoring Team to develop a tracker for managing this information.

> ***August 31, 2023 Request 7***. *Are any staff on a "true" 5x2 schedule that would permit them to work 261 days a year?*
>
> *a. If so, how many?*
>
> *b. We request the labor agreements that would prevent DOC from having uniformed staff work "true" 5x2 schedules.*

**Monitoring Team Response**: See the Monitor's August 7, 2023 Report at pgs. 16 to 18. The Department's current labor agreements are such that uniform staff do not work 261 years a day so there is no "true" 5x2 schedule. The Monitoring Team also provided the Parties with the two relevant policies on September 12, 2023.

> ***August 31, 2023 Request 8***. *Has the Department developed improvements to the case assignment process and caseload targets for investigators as required by the First Remedial Order Section B, Paragraph 3? If so, what are the targets?*

**Monitoring Team Response**: The Monitoring Team is not aware that ID has set caseload targets for investigators.

> ***August 31, 2023 Request 9***. *All records related to the 2023 deaths in custody listed below to the extent not already produced:*
>
> *a. Marvin Pines (2/4/23)*
>
> *b. Rubu Zhao (5/16/23)*
>
> *c. Joshua Valles (5/27/23)*
>
> *d. Felix Tavares (7/4/23)*
>
> *e. Ricky Howell (7/6/23) – Plaintiffs withdrew request on 9/22/23*

> *f. William Johnstone (7/15/23)*
>
> *g. Curtis Davis (7/23/23)*
>
> *h. Donny Ubiera (8/22/23)*

**Monitoring Team Response**: The files related to the death of Mr. Pines and Mr. Zhao were produced by the City in June 2023. The City produced the rest of the files to the Plaintiffs on October 25, 2023.

> ***August 31, 2023 Request 10***. *CHS monthly injury inmate reports generated since January 1, 2022*

**Monitoring Team Response**: It is not entirely clear to the Monitoring Team what information is being sought. Monthly injury reports are available on the BOC website here: https://www.nyc.gov/site/boc/reports/chs-doc-joint-reports.page. We share background on the process for collecting serious injury data below. Serious injury data has also been provided in response to the July 31, 2023 Request 2 and included in the Monitor's August 7, 2023 Report.

Per the Board of Correction (BOC) Minimum Standard that governs the Department's injury response, *§ 3-16 Injury Response*, the "Health Authority" – Correctional Health Services (CHS)– is responsible for defining what constitutes a serious injury. Medical staff render an initial injury designation on page one of Form 167R-A, "Injury to Inmate Report," and provide their final disposition on page two of this same form. Every injury that occurs in a DOC command, be it a facility, a court command, at Bellevue Hospital, or during the PIC transportation process (e.g., for court production) is supposed to receive an "Injury to Inmate Report."

As the "Injury to Inmate Report" form shows on page one, there are currently nine clinical findings that will render a serious determination:

- Laceration requiring sutures, staples or glue (e.g., Dermabond);
- Dislocation;
- Structural injury to organ (e.g., corneal abrasion, hepatic laceration);
- Fracture;
- Tendon Tear;
- Post-concussive syndrome or head injury requiring imaging such as CT or MRI;
- Clinical Nasal Fracture;
- Amputation;
- Blistering burn involving the face or >9% of total body surface area.

Injury designations may be updated based on diagnoses received after the preliminary medical evaluation. The Department reports that it receives updates from CHS when injuries are deemed "serious" and CHS communicates this to the facilities daily. If there is a new serious injury denoted in this report, facilities are supposed to immediately provide that information to the Central Operation Desk (COD). An update from CHS designating what was initially ruled a non-serious injury to a serious injury may occur weeks, or even months, after the injury date.

Injury data is reconciled in conjunction with CHS. Each month, CHS sends a raw data file to DOC stakeholders that outlines for each injury which was evaluated in the clinic in the prior month:

- NYSID;
- Book and case number;
- Name of PIC;
- Facility at the time of evaluation;
- Current facility;
- Signed date;
- Signed time;
- Tour;
- Injury date;
- Event location;
- If a DOC injury report is available;
- DOC injury report number;
- Bodily location of injury;
- Injury determination;
- Initial injury evaluation;
- Serious/non-serious injury designation; and,
- DOC command tour;

From there, because of the reporting requirement rules, DOC facility staff must add the following line data to each injury:

- Date that the injury investigation was completed;
- Days elapsed from injury date to the injury investigation being completed;
- Date DOC supervisor was notified of the injury;
- Time DOC supervisor was notified of the injury;
- Date treated by clinic;
- Time treated by clinic;
- Time elapsed from DOC supervisor notification of injury to time treated by clinic;
- Name of housing unit where injury occurred;
- Specific housing area within housing unit where injury occurred;
- Cause of injury result of facility investigation;
- Whether the injury investigation is pending;
- Whether the injury was witnessed;
- Shield/ID number for staff witness; and,
- COD/UOF number (for serious injuries only)

From there, two Correction Officers, formerly under the Chief of Department, combine each individual command's injury data together. The Department's Intergovernmental Affairs unit (IGA) then spearheads the completion of the report. This newly compiled data is sent to the Department's Office of Management, Analysis, and Planning (OMAP) for data cleaning and review. From there, the data is sent back to IGA, which completes a final reconciliation against CHS's raw data file. This final reconciliation is done in conjunction with CHS to the extent that there are remaining data needs or questions.

The aforementioned BOC Minimum Standard also details the Department's reporting requirements. The Department completes a monthly report in conjunction with CHS and this report is posted on BOC's website. As part of the monthly reporting rules, the Department also shares a reconciled data file with the data that is enumerated in the report, which is complete with identifying information and kept confidential by BOC.

| *August 31, 2023 Request 11*. Revised sick leave and MMR policies. |
| --- |

**Monitoring Team Response**: On September 12, 2023, the Monitoring Team provided the Parties with Directive 2258R-B (Absence Control) and Revision Notice (with Teletype); Directive 2262R-C (Sick Leave Regulations); and Teletype with MMR Policy.

| *August 31, 2023 Request 12. The most recent data regarding staff on MMR/sick leave.* |
| --- |

**Monitoring Team Response**: The tables below provide the monthly averages from January to September 2023 including the total staff headcount, the average number of staff out sick, the average number of staff on medically monitored/restricted duty, and the average number of staff who were AWOL.[55]

| 2023 | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| **Month** | **Headcount** | **Average Daily Sick** | **Average Daily % Sick** | **Average Daily MMR3** | **Average Daily % MMR3** | **Average Daily AWOL** | **Average Daily % AWOL** |
| **January 2023** | 6700 | 692 | 10.33% | 443 | 6.61% | 9 | 0.13% |
| **February 2023** | 6632 | 680 | 10.25% | 421 | 6.35% | 9 | 0.14% |
| **March 2023** | 6661 | 639 | 9.59% | 401 | 6.02% | 11 | 0.17% |
| **April 2023** | 6590 | 595 | 9.03% | 393 | 5.96% | 10 | 0.15% |
| **May 2023** | 6516 | 514 | 7.89% | 403 | 6.18% | 10 | 0.15% |
| **June 2023** | 6449 | 466 | 7.23% | 399 | 6.19% | 10 | 0.16% |
| **July 2023** | 6406 | 443 | 6.92% | 394 | 6.15% | 9 | 0.14% |
| **August 2023** | 6427 | 437 | 6.80% | 386 | 6.01% | 17 | 0.26% |
| **September 2023** | 6418 | 424 | 6.61% | 378 | 5.89% | 20 | 0.31% |
| **2023 Average** | 6533 | 543 | 8.29% | 402 | 6.15% | 12 | 0.18% |

---

[55] The AWOL data is only available for August 1, 2021-January 26, 2022 and April 2022 to the present.

> **August 31, 2023 Request 13.** *Data regarding formal and informal discipline, or other corrective actions, taken against ID investigators and/or their supervisors since January 2022, including:*
>
> *a.  A list of all ID investigators and supervisors who have been subject to formal disciplinary charges since January 1, 2022, including their names, the misconduct with which they were charged, the date the charges were resolved, and the outcome of the charges.*
>
> *b.  A list of all ID investigators and supervisors who have been subject to informal discipline since January 1, 2022, including the misconduct for which they received informal discipline, the nature of the informal discipline imposed, and the date the informal discipline was imposed.*
>
> *c.  A list of all ID investigators and supervisors who have been subject to any other form of corrective action (including but not limited to corrective interviews, counseling, and re-training) since January 1, 2022, including the misconduct for which the corrective action was imposed, the nature of the corrective action imposed, and the date the corrective action was imposed.*

**Monitoring Team Response**: The Consent Judgment § VII., ¶ 4 requires "[a]ny Staff Member found to have conducted a biased, incomplete, or inadequate investigation of a Use of Force Incident, and any Supervisor or manager who reviewed and approved such an investigation, shall be subject to appropriate discipline, instruction, or counseling." In 2019 (both the 8th and 9th Monitoring Periods), the Department was in non-compliance with this requirement at the same time it was in non-compliance with the requirement to conduct timely, thorough, and objective investigations. These provisions are intertwined given that the goal of § VII., ¶ 4 is to identify and hold staff accountable when biased, incomplete, or inadequate investigations are completed in an effort to improve staff practice in the future. The improvements in the quality of investigations observed during 2020 and 2021 were due in part to improved practices by investigators and supervisors. The Department was moved out of non-compliance and into Partial Compliance with this provision in 2020 (the 10th Monitoring Period).

In response to this request, the Department was unable to provide evidence that any actions were taken related to 13(a) or 13(b) since January 1, 2022. With respect to 13(c), below is a chart showing the number of investigators and supervisors who received either verbal counseling or a corrective interview. The Department reported that the information "was located by searching through all employee folders and what management was able to locate in emails. Since verbal counseling's are rarely documented, and there was not a centralized location where that information was being logged/maintained, we cannot accurately account for all counseling's handled by the team supervisors and managers back from 2018. In addition, due to a high rate of turn-over in the Division over the last few years, many of the supervisors and managers are no longer with the Division to provide this information now."

| Corrective Action for ID Investigators and Supervisors | | | | |
|---|---|---|---|---|
| | Jan. to June 2022 | July to Dec. 2022 | Jan. to June 2023 | July to Sept. 2023 | Total |
| Investigator | 3 | 0 | 5 | 2 | 10 |
| Supervisor | 3 | 0 | 3 | 1 | 7 |
| **Total** | **6** | **0** | **8** | **3** | **17** |

***August 31, 2023 Request 14**. Teletype issued on July 3, 2023 regarding suspension of Captain Bond*

**Monitoring Team Response**: The Monitoring Team provided the teletype to the Parties on September 29, 2023.

***August 31, 2023 Request 15**. The May 15, 2023 "written communication" shared with staff regarding the use of force for court refusals (August 7, 2023 Report at 3, n.4).*

**Monitoring Team Response**: On September 12, 2023, the Monitoring Team provided the email communication to the Parties.

***August 31, 2023 Request 16**. "Watch Tour Compliance/Discipline" memorandum issued by the Office of Classification, Custody Management, and Facility Operations in April 2023 (described in DOC 16th Compliance Report at page 39)*

***September 6, 2023 Follow-up Question 9**. The City's August 23, 2023 letter states that the Department has developed policies for discipline and compliance with the tour wand policies (page 12). Can the City please provide those policies?*

**Monitoring Team Response**: On September 12, 2023, the Monitoring Team provided the memo to the Parties. On September 29, 2023, the Monitoring Team provided two teletypes and an Operations Order.

***August 31, 2023 Request 17**. All documents related to the "quality assurance/audit process where the Office of Classification, Custody Management and Facility Operations reviews tour wand compliance reports, notes any deficiencies, and any action taken (including discipline) with respect to noncompliance." (DOC 16th Compliance Report at 39). Please be sure to produce the results of any reviews completed, as well as documents reflecting any actions taken based on these reviews, including but not limited to any disciplinary actions against staff.*

**Monitoring Team Response**: This request for information overlaps with the tour wand requests made on July 28, 2023 Requests 10 to 13. See that request for a full response.

***August 31, 2023 Request 18**. The "Audit Plan" used for the facility "Security Audits" that commenced in May 2023, and all documents relating to any Security Audits conducted of*

> *DOC facilities, including but not limited to the "OPC Audit Working Papers" and any other documents reflecting the findings of the Security Audits (DOC 16th Compliance Report at 40-41).*

**Monitoring Team Response**: On September 29, 2023, the Monitoring Team provided the audit and the facilities responses to the Parties.

> ***August 31, 2023 Request 19****. The Interim Security Plan referenced on page 15 of DOC's 16th Compliance Report.*

**Monitoring Team Response**: This overlaps with the July 2023 Meet and Confer Request B and is answered in response to that request, above.

> ***August 31, 2023 Request 20****. A description of how the "Facility Security Team structure" has been "revamped," as referenced on p. 16 of DOC's 16th Compliance Report.*

> ***September 6, 2023 Follow-up Question 10.*** *The Department's 16th Compliance report says the "Facility Security Team structure" has been "revamped" (p.16), but the Monitoring Team says in their September 6, 2023 email that it is unaware of any changes implemented to the Probe Team/Facility Security Team structure and that any changes would require consultation. Can the City clarify the status of any changes to the Facility Security Team structure, and what those changes are?*

**Monitoring Team Response**: It is the Monitoring Team's understanding that no changes to the Probe Team/Facility Security Team structure have occurred. In August 2023, the Monitoring Team shared feedback with the Department on the policies and procedures related to Emergency Response Teams, including on the Department's stated intentions to utilize Facility Security Teams. The Department has not provided a revised policy in response to that feedback, and it is the Monitoring Team's understanding that no changes in practice have yet occurred. Such changes would require consultation with the Monitoring Team to enact a revised policy.

> **August 31, 2023 Request 21**. *A description of the results of the evaluation of "all current ESU members' fitness to serve," which is referenced on pp. 16 and 59 of DOC's 16th Compliance Report. Please describe the criteria used to conduct this evaluation and indicate how many, if any, ESU members were removed from the ESU as a result of the review and the basis for the removal.*

**Monitoring Team Response**: Appropriate criteria for selecting staff to be assigned to the Department's Emergency Response Teams[56] is required by the First Remedial Order, § A, ¶ 6 and is necessary given the role these individuals are intended to play in addressing emergencies and reducing conflict. The Department does not currently utilize any specific criteria to select those who serve on the teams within the facilities (despite years of recommendations from the Monitoring Team and reports from the Department that they intend to do so).[57] Department policy does require screening to select and assign staff to the Emergency Services Unit. However, the Department has not adhered to its own screening and selection process.

In early 2021, over 50 staff were removed from the ESU pursuant to Operations Order 24/16 "Special Unit Assignment" because they either had certain pending charges or had discipline imposed as a result of utilizing excessive force and/or failing to report a use of force incident. This action occurred only after the Monitoring Team advised the Department that its *own* policy required the Department to review all staff and to remove any staff who met specified criteria, and that Department was not following the policy. Following this one action in 2021, despite repeated feedback from the Monitoring Team, the Department did not conduct another review for almost two years. In early 2023, the Department conducted a review to identify whether any staff should be removed because they met the criteria specified in Operations Order 24/16. This review had a number of flaws including that the actions indicated by the review were not implemented (e.g., a staff member was recommended for removal, but remained on the ESU). Further, the integrity of the underlying screening considerations was compromised (e.g., misconduct by ESU staff was often not identified by ID and the Trials Division resolved cases in an attempt to excuse the misconduct). *See* Monitor's April 3, 2023 Report at pgs. 140 to 142.

In spring 2023, the Monitoring Team discovered that 26 officers and Captains had been assigned to the Emergency Services Unit earlier in 2023 without any screening. Had the Department conducted the required screening, the results would have prohibited the assignment

---

[56] There are a few types of Emergency Response Teams: a Probe Team, which is a team of facility-based staff; the Emergency Services Unit ("ESU"), an "elite" team of staff specifically dedicated and trained to respond to emergencies across the Department; and Security Response Teams ("SRT") and Special Search Team ("SST"), which function similarly to ESU and are deployed to facilities as part of operational security efforts.

[57] Most recently, the Department reported in August 2023 that it intended to assign specific staff to the Emergency Response Teams based in the facilities. However, as of the filing of this report, the Department has not provided any revised policies or procedures to suggest it has taken any concrete steps to implement this plan.

of at least some of these individuals to ESU.[58] Of the 26 individuals added to ESU in early 2023, 10 of them had previously been removed in 2021 because they either had certain pending charges or had discipline imposed as a result of utilizing excessive force and/or failing to report a use of force incident. Following the Monitoring Team's discovery, all 26 officers and Captains were removed from ESU.

Far from being a bureaucratic requirement, proper screening should exclude individuals who are not fit for this particular duty and who may exacerbate, rather than prevent harm from occurring. The failure to do so has real-world consequences. As reported by the Bronx District Attorney, "on April 4, 2023, members of the DOC Emergency Services Unit, including [Officer Dionisio] Rosario, were conducting a search inside of Robert N. Davoren Center ("RNDC") 5 Upper North housing area. During the search, the defendant [Officer Rosario] was involved in a use of force with an inmate. Following the use of force, the defendant is captured on video surveillance, including his own body worn camera, grasping a sharpened object inside of his right hand, and is seen entering the cell of the person with whom he had the use of force and placing the 4.5-inch piece of sharpened plexiglass underneath a piece of paper by the sink area. The defendant is seen searching other areas of the cell before coming back to the sink area, where he removed the sharpened object from where he had previously planted it. The defendant allegedly stated that he recovered it by the sink area but also stated that it was in the inmate's hand and gave other false information in four DOC reports."[59] The Department suspended Officer Rosario after the incident.

Officer Rosario was removed from ESU on March 25, 2021 as he met the criteria for removal pursuant to Operations Order 24/16 "Special Unit Assignment" because he either had certain pending charges or had discipline imposed as a result of utilizing excessive force and/or failing to report a use of force incident.[60] Inexplicably, he was reassigned to ESU in January 2023, along with several other staff who had been previously been removed from ESU. The Department did not screen Officer Rosario (or the other individuals re-assigned to the unit) before reassigning them to ESU, as required by policy. The screening, had it occurred, would have identified that he should have been precluded from assignment to ESU. Officer Rosario was removed from ESU in April 2023 after the Monitoring Team alerted the Department about its findings regarding the lack of screening.

---

[58] Notably, the Department conceded that the screening did not take place only after the Monitoring Team requested the screening materials and numerous follow-up communications.

[59] Available at: https://www.bronxda.nyc.gov/downloads/pdf/pr/2023/68-2023%20correction-officer-indicted-evidence-tampering.pdf. Accessed 10/27/23.

[60] This screening in 2021, although required by DOC policy, was only conducted following prompting by the Monitoring Team. *See* Monitor's Eleventh Report at pg. 44-51.

As of October 2023, a total of 95 staff are assigned to ESU. The Department reported its intention to screen all staff assigned to ESU under the revised screening procedures once the Operations Order 24/16 "Special Unit Assignment" has been finalized and approved by the Monitor.

> *August 31, 2023 Request 22. The 16th Compliance Report references the promotion and deployment of "10 additional Assistant Deputy Wardens." (p. 20) When were these ADWs promoted? Are these 10 ADWs separate from the group of ADWs that were promoted in early 2023? Please provide the current number of ADWs, the percentage assigned to facilities and court commands, and a breakdown of the number assigned to each facility and court command.*

**Monitoring Team Response**: The "10 additional Assistant Deputy Wardens" referenced in the 16th Compliance Report were promoted in July 2023. These 10 ADWs are separate from the group of 26 ADWs who were promoted in January 2023. Please see the Monitor's July 10, 2023 Report at pages 74-77 for more information regarding the promotion of this group of 10 ADWs.

The two tables below identify the number and assignments of ADWs and Captains at various points in time from July 18, 2020 to October 21, 2023. The first table illustrates that the Department now has a larger number of ADWs available (n=88) than in years prior, and that about 82% of them are assigned to facilities and court commands. The second table shows that the Department has significantly fewer Captains than in years past (a reduction of almost 33%) and that about 69% of them are assigned to facilities and court commands.

| Number of ADWs & Assignments in the Department[61] | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Facility | # of ADWs As of July 18, 2020 | # of ADWs As of Jan. 2, 2021 | # of ADWs As of June 26, 2021 | # of ADWs As of Jan. 1, 2022 | # of ADWs As of June 18, 2022 | # of ADWs As of Dec. 31, 2022 | # of ADWs As of May 20, 2023 | # of ADWs As of Oct. 21, 2023 |
| AMKC[62] | 9 | 21 | 13 | 12 | 9 | 12 | 16 | 0 |
| EMTC[63] | 0 | 0 | 0 | 0 | 0 | 8 | 9 | 12 |
| GRVC | 6 | 10 | 11 | 9 | 8 | 12 | 12 | 11 |
| MDC[64] | 6 | 2 | 1 | 1 | 0 | 1 | 0 | 1 |
| NIC | 6 | 8 | 8 | 5 | 7 | 8 | 9 | 10 |
| OBCC[65] | 6 | 8 | 8 | 14 | 7 | 0 | 0 | 12 |
| RMSC | 5 | 6 | 6 | 5 | 4 | 5 | 5 | 13 |
| RNDC | 7 | 15 | 15 | 10 | 7 | 12 | 10 | 10 |
| VCBC[66] | 4 | 6 | 5 | 5 | 4 | 5 | 6 | 1 |
| Court Commands (BKDC, BXDC, QDC) | 3 | 4 | 3 | 3 | 3 | 3 | 2 | 2 |
| **Total # of ADWs in Facilities & Court Commands** | **52** | **80** | **70** | **64** | **49** | **66** | **69** | **72** |
| **Total # of ADWs Available Department-wide** | **66** | **95** | **88** | **80** | **67** | **82** | **90** | **88** |
| **% of ADWs in Facilities & Court Commands** | **79%** | **84%** | **80%** | **80%** | **73%** | **80%** | **77%** | **82%** |

[61] The specific post assignments of ADWs within the Facility is not available so this data simply demonstrates the number of ADWs assigned per facility.

[62] AMKC was closed in August 2023.

[63] EMTC has been closed and opened in these Monitoring Periods. Until late 2022, staff that work at EMTC were technically assigned to AMKC.

[64] MDC was utilized in a limited capacity at the end of the Twelfth Monitoring Period and was closed by June 2021. The staff currently assigned to MDC are in fact assigned to the Manhattan Courts (Criminal, Supreme, and Family).

[65] OBCC was closed by July 2022. Staff were then reassigned to other commands. OBCC was then reopened in July 2023.

[66] VCBC was closed in October 2023.

| Number of Captains & Assignments in the Department[67] | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Facility | # of Captains As of July 18, 2020 | # of Captains As of Jan. 2, 2021 | # of Captains As of June 26, 2021 | # of Captains As of Jan. 1, 2022 | # of Captains As of June 18, 2022 | # of Captains As of Dec. 31, 2022 | # of Captains As of May 20, 2023 | # of Captains As of Oct. 21, 2023 |
| AMKC[68] | 91 | 111 | 97 | 87 | 81 | 80 | 67 | 12 |
| EMTC[69] | 0 | 0 | 0 | 0 | 0 | 38 | 39 | 40 |
| GRVC | 75 | 72 | 86 | 86 | 81 | 90 | 66 | 48 |
| MDC[70] | 72 | 39 | 15 | 12 | 11 | 11 | 1 | 12 |
| NIC | 51 | 45 | 45 | 56 | 45 | 50 | 45 | 48 |
| OBCC[71] | 85 | 81 | 78 | 77 | 38 | 7 | 7 | 55 |
| RMSC | 51 | 50 | 49 | 36 | 34 | 31 | 27 | 70 |
| RNDC | 58 | 56 | 60 | 63 | 70 | 70 | 66 | 53 |
| VCBC[72] | 27 | 25 | 27 | 25 | 23 | 22 | 22 | 4 |
| Court Commands (BKDC, BXDC, QDC) | 39 | 37 | 35 | 32 | 33 | 28 | 26 | 29 |
| **Total # of ADWs in Facilities & Court Commands** | **558** | **523** | **499** | **474** | **416** | **427** | **411** | **371** |
| **Total # of ADWs Available Department-wide** | **810** | **765** | **751** | **670** | **607** | **573** | **553** | **541** |
| **% of ADWs in Facilities & Court Commands** | **69%** | **68%** | **66%** | **71%** | **69%** | **75%** | **74%** | **69%** |

[67] The specific post assignments of Captains within the Facility is not available so this data demonstrates the number of Captains assigned per facility.

[68] AMKC was closed in August 2023.

[69] EMTC has been closed and opened in these Monitoring Periods. Until late 2022, staff that work at EMTC were technically assigned to AMKC.

[70] MDC was utilized in a limited capacity at the end of the Twelfth Monitoring Period and was closed by June 2021. The staff currently assigned to MDC are in fact assigned to the Manhattan Courts (Criminal, Supreme, and Family).

[71] OBCC was closed by July 2022. Staff were then reassigned to other commands. OBCC was then reopened in July 2023.

[72] VCBC was closed in October 2023.

111

*Monitoring Team Response to Plaintiffs' September 6, 2023 Requests for Information*
*pursuant to Consent Judgment § XIX, ¶ 8*

| Request | Monitoring Team Response |
|---|---|
| *September 6, 2023 Follow-up Question 1*. The Second Remedial Order § 1(i)(a) requires DOC to develop, in consultation with the Monitor, and implement an Interim Security Plan. The City's August 23, 2023 letter regarding non-compliance states that a "violence reduction plan" is the interim security plan. However, we understand that the "violence reduction plan" is limited to certain facilities. In an email today, September 6, 2023, the Deputy Monitor indicated there were interim security plans from 2021 and January 2022. Can you confirm whether there is a system-wide interim security plan that is currently being implemented, and if so, provide us with a copy of it? Can you please provide us with copies of the prior security plans? | This request overlaps with the July 2023 Meet and Confer Request B and is addressed with that response. |
| *September 6, 2023 Follow-up Question 2*. The Action Plan § A(1)(d) requires the Office of the Commissioner to audit the electronic records of tours conducted by uniform staff to ensure compliance with the touring requirements. The Monitor's October 28, 2022 report states that this task was transferred to the Deputy Commissioner of Classification, Custody Management, and Facilities Operations (page 74). The City's August 23, 2023 letter regarding non-compliance states that "[q]uarterly audits and reports *will* be conducted by the Office of Facility Operations." (page 12). Have any audits by the Office of the Commissioner or the Deputy Commissioner been conducted to date, and if so, when? | This request overlaps with July 28, 2023 Requests 10 to 13 and is addressed with those responses. |
| *September 6, 2023 Follow-up Question 3*. The City's August 23, 2023 letter regarding non-compliance states that, as of August 22, ID completed review of 70% of the "look back" incidents. (page 3). How many incidents were subsequently reopened? | This request overlaps with July 28, 2023 Request 19 and is addressed with that response. |
| *September 6, 2023 Follow-up Question 4*. The City's August 23, 2023 letter regarding non-compliance states that there are calls every weekday with the DC of Security's Office, the leadership of each facility, and Assistant Commissioners from the DC of Facility Operations office to discuss the rapid reviews and issue | This request overlaps with the July 2023 Meet and Confer Request E and is addressed with that response. |

| Request | Monitoring Team Response |
|---|---|
| any necessary corrective action or immediate discipline (page 3). When did those weekday calls begin, and please provide information regarding how many corrective actions and immediate disciplinary actions were issued (on a weekly or monthly basis, whichever best conforms to the information available? | |
| _September 6, 2023 Follow-up Question 5_. The City's August 23, 2023 letter regarding non-compliance states that the Commissioner has fired senior executive leadership and reassigned facility leadership for poor performance and/or judgment (page 5). When did these terminations and reassignments occur, and what were the positions held by the individuals terminated and reassigned? | The former Senior Deputy Commissioner was terminated and one Assistant Commissioner was removed from leading one facility and reassigned to another facility for poor performance and/or judgment. A different Assistant Commissioner was reassigned to the fill the vacancy left by the first Assistant Commissioner. Both Assistant Commissioners resigned from the Department in October 2023. |
| _September 6, 2023 Follow-up Question 6_. The City's August 23, 2023 letter regarding non-compliance references revisions to the Command Discipline policy (page 5). What are the substance of these revisions? | The Department is currently in the process of revising the CD policy pursuant to the August 10, 2023 Order as well as various feedbacks shared by the Monitoring Team. The Monitoring Team shared detailed feedback on the draft version of the policy at end of October 2023. More information will be shared once the policy is finalized. |
| _September 6, 2023 Follow-up Question 7_. The City's August 23, 2023 letter referenced audits conducted by the security team in all facilities regarding key control, post description, restraint equipment, and no-go zones (page 10). What is meant by "the security team," how many audits were conducted over what period of time, what did the audits consist of (i.e. what method), and what were the results of those audits? We request the audit results. | This request overlaps with the July 2023 Meet and Confer Request B and is addressed with that response. |
| _September 6, 2023 Follow-up Question 8_. Has the key control policy been revised and approved (City's August 23, letter, page 10), and will the City provide it? | The Monitoring Team shared feedback on the proposed policy revisions on August 15, 2023. The Department has not provided a revised |

| Request | Monitoring Team Response |
|---|---|
| | draft of the policy for the Monitoring Team's review and so the policy is not yet final. |
| *September 6, 2023 Follow-up Question 9*. The City's August 23, 2023 letter states that the Department has developed policies for discipline and compliance with the tour wand policies (page 12). Can the City please provide those policies? | This policy was requested under August 31, 2023 Request 16 and was provided on September 12, 2023 in response to that request. |
| *September 6, 2023 Follow-up Question 10*. The Department's 16th Compliance report says the "Facility Security Team structure" has been "revamped" (p.16), but the Monitoring Team says in their September 6, 2023 email that it is unaware of any changes implemented to the Probe Team/Facility Security Team structure and that any changes would require consultation. Can the City clarify the status of any changes to the Facility Security Team structure, and what those changes are? | This request overlaps with the August 31, 2023 Request 20 and is addressed in response to that request. |
| *September 6, 2023 Follow-up Question 11*. We have heard reports that [former Associate Commissioner of ID] has been demoted, which is of serious concern given the role we understand he was intended to play in ID following [former Deputy Commissioner of ID] departure. To what position and unit is [former Associate Commissioner of ID] now assigned, and what was the basis for his demotion? | The Department reported on October 24, 2023 that "[t]he [Associate Commissioner of ID] is serving in his permanent title as Administrative Investigator, M-III, reporting to the Assistant Commissioner of the Applicant Investigation Unit (AIU)." |

***Monitoring Team Response to Plaintiffs' November 2, 2023 Requests for Information
pursuant to Consent Judgment § XIX, ¶ 8***

| Request | Monitoring Team Response |
|---|---|
| *November 2, 2023 Request 1*. The name of the individual who has assumed the position of Associate Commissioner of ID, previously held by [Name Redacted], as well as their resume. | The ID Division has a new Assistant Commissioner, [Name Redacted], who was appointed in August 2023. His resume was shared with the Parties on November 2, 2023. |
| *November 2, 2023 Request 2*. The referral letter to DOI that was the subject of the Court's October 30, 2023 order (Dkt. 590). | The Monitoring Team shared a copy of this letter with the Parties on November 6, 2023. |

# APPENDIX B:
# NUNEZ COMPLIANCE UNIT
# AUDIT RESULTS
# SEPTEMBER & OCTOBER 2023

### *Nunez Compliance Unit Security Audits*

*September & October 2023*

The Nunez Compliance Unit (NCU) conducts security audits of housing areas, during which NCU staff review the live Genetec video feed from a facility's housing area for an entire day to identify security issues. After each audit, NCU generates a security report with its findings. The summary *prepared by NCU* of its Security Audits for three facilities between September 1 and October 2, 2023 are provided below.

| OBCC Audit: September 1 to 2, 2023 |
|---|
| *NCU conducted an audit of [one housing unit] at OBCC for a 24-hour period spanning September 1 to 2, 2023. NCU summarized its findings by stating the following*: <br><br> The following are NCU's findings throughout the 24-hour period: <br><br> • Several cell doors were observed unsecured. <br><br> • Staff were observed utilizing the watch tour wands and, most of the time, were looking inside of the cells while touring. <br><br> • Staff were observed off post on several occasions. <br><br> • Supervisors were present ten (10) times within a 24-hour period and utilized watch tour wands while touring. |

| RNDC Audit: September 5 to 6, 2023 |
|---|
| *NCU conducted an audit of [one housing unit] at RNDC for a 24-hour period spanning September 5 to 6, 2023. NCU summarized its findings by stating the following*: <br><br> The following are NCU's findings throughout the 24-hour period: <br><br> • Several cell doors were observed unsecured throughout the audit period. Multiple individuals would enter and exit each others' cells. <br><br> • 21:00 lock in not enforced, individuals observed exiting cells past the lock in hour. Multiple individuals observed in one cell several hours past 21:00 lock in. <br><br> • Officers observed off-post throughout the audit period. <br><br> • While tour wands were observed being utilized by the Officers, on several occasions the officers failed to check doors/look inside the cells while touring. <br><br> • Supervisors were in the area a total of five (5) times throughout the 24-hour period. They did not utilize watch tour wands while touring. There was no supervisor observed on the 3X11 tour. |

| **OBCC Audit:** |
|:---:|
| **September 15 to 16, 2023** |

*NCU conducted an audit of [one housing unit] at OBCC for a 24-hour period spanning September 15 to 16, 2023. NCU summarized its findings by stating the following*:

The following are NCU's findings throughout the 24-hour period:

- Cell doors observed unsecured throughout the lock-out period.

- Multiple PIC were observed exiting one cell.

- Staff were observed conducting housing area tours; however, touring was not consistent (not every 30 min) and watch tour wands were not utilized.

- Supervisors were present in the area (12) times within a 24-hour period. During 8 of those 12 times the supervisors toured the housing area and utilized the watch tour pipe while touring.

| **GRVC Audit:** |
|:---:|
| **September 24 to 25, 2023** |

*NCU conducted an audit of [one housing unit] at GRVC for a 24-hour period spanning September 24 to 25, 2023. NCU summarized its findings by stating the following*:

The following are NCU's findings throughout the 24-hour period:

- Cell doors were observed unsecured and incarcerated individuals freely entered cells throughout the audit. Multiple PICs were observed exiting one cell.

- The lights in the housing area were not turned on during 0500 hour Institutional Lock-Out.

- Staff were observed off post on multiple occasions. There was no officer on the floor to conduct a tour with Supervisor at 1741 hrs.

- Housing area tours were not consistently conducted by staff; watch tour pipes were not utilized.

- 2100 lock in was not enforced.

- The supervisors were observed in the area six (6) times within a 24-hour period; however, the supervisors only toured the housing area 5 times, watch tour pipes were utilized during those tours.

118

| **RNDC Audit:** |
| :---: |
| **September 26 to 27, 2023** |

*NCU conducted an audit of [one housing unit] at RNDC for a 24-hour period spanning September 26 to 27, 2023. NCU summarized its findings by stating the following*:

The following are NCU's findings throughout the 24-hour period:

- Several cell doors were often observed unsecured throughout the audit.

- Multiple individuals entered and exited each others' cells.

- Staff were observed off-post on multiple occasions.

- Officers were not conducting proper security inspections or complete tours of the area (sometimes only going halfway and then returning to the front of the tier). Watch tour pipes were not utilized.

- PIC observed smoking on the tier.

- Supervisors were in the area a total of eight (8) times throughout the 24-hour period. (6 of those 8 times housing area tours were conducted by the supervisors, during 3 of those tours the watch tour pipe was utilized.) At 2152 hours a supervisor was observed assisting staff to lock in unsecured individuals.

- Services were afforded to the PIC in the housing area.

| **RNDC Audit:** |
| :---: |
| **October 1 to 2, 2023** |

*NCU conducted an audit of [one housing unit] at RNDC for a 24-hour period spanning October 1 to 2, 2023. NCU summarized its findings by stating the following*:

The following are NCU's findings throughout the 24-hour period:

- Cell doors were observed unsecured throughout the audit.

- Multiple individuals were observed entering/exiting each others' cells.

- Staff were off-post on several occasions.

- Individuals observed smoking on the housing area tier.

- Housing area tours were not consistently conducted; watch tour pipes were not always utilized by staff while touring. The mid-night officer was hardly on the floor. She was mostly present when the captain visited the area.

- 2100 lock in was not enforced.

- Supervisors were in the area a total of nine(9) times throughout the 24-hour period and utilized watch tour pipes while touring. However, there was a 5 ½ hour gap between supervisor tours on 3x11 tour (no supervisor toured the area between 1549 and 2127 hrs)

# APPENDIX C:
## SUMMARY OF MAJOR DISTURBANCE

**Summary of Major Disturbance on May 14, 2023**

The Monitoring Team has chosen the following incident to illustrate the types of security lapses, management failures, and investigatory omissions that are endemic to DOC's practices and prevalent amongst many of the incidents reviewed by the Monitoring Team. This incident, categorized by the COD as both a use of force and a stabbing/slashing, occurred in GRVC on May 14th at approximately 8:58pm. It must be noted that this incident occurred close in time to DOC's 9:00pm daily lock-in time, but neither staff nor PICs appeared to be preparing for or engaging in lock-in. Most PICs were gathered in the dayroom area on the housing area floor, while other PICs stood along the top tier. Furthermore, PICs were seen freely opening and closing unsecured cell doors without staff assistance, despite there being a B post officer on the floor and an A post officer in the A station.



*Screenshot 1*



*Screenshot 2*



*Screenshot 3*

The B post officer was walking around the dayroom floor when he approached a PIC and

began speaking with him. Another PIC approached the officer from behind and abruptly put his

arms around the officer's torso. Both PICs grabbed the B-post officer by the torso and took his

OC cannister from his waistbelt and then released the officer (see Screenshots 1 and 2). These

two PICs and others from the housing unit then opened a PIC's unlocked cell door, and a fight

ensued between multiple PICs inside the cell. Multiple PICs then began fighting throughout the

housing unit. Multiple PICs were brandishing canes and large weapons, with multiple sharpened

weapons more than a foot in length (see Screenshot 3), making swiping and stabbing motions

towards other PICs. PICs grabbed and threw objects from the unsecured janitor's closet and

pantry. As the fights ensued, the B-post officer walked around the floor, securing the hot water

cannister, but did not take any action to stop the fighting or otherwise regain control of the

housing area (see Screenshots 4 and 5).



*Screenshot 4*



*Screenshot 5*

At the entrance of the housing area in front of the door to the vestibule is a small, gated area. The housing area door was secured, but the gate was unsecured. Multiple PICs repeatedly tried to barricade themselves behind the unsecured gate in front of the housing area door, using a trash can and food trays to hold off the PICs on the other side of the gate. They banged on the A station window to be let into the vestibule, but the A station officer did not open the housing area door despite the onslaught of attacks and weapons brandished by the PICs on the other side of the gate.

While this incident was occurring on the A-side of the housing area, a fight and use of force had transpired on the B-side. As the PICs were barricaded against the door on the A-side, the PICs, Captain, and officer who were involved in the incident on B-side exited the housing unit into the vestibule, just on the other side of the door where the PICs were barricaded on the

A-side. As the PICs and staff from the B-side entered the vestibule, a supervisor in the corridor sprayed them with MK9 through the vestibule's gate. The supervisor then ordered the PICs onto the ground while other supervisors arrived. The vestibule gate to the corridor was left unsecured during this time, despite the unsecured PICs within the vestibule. As the additional supervisors and staff arrived, they flex cuffed and escorted the PICs from the vestibule down the corridor (see Screenshot 6). Despite the presence of multiple supervisors and support staff in the vestibule dealing with those involved in the incident on the B-side, none of these staff assisted the PICs barricaded in the gated area on the A-side. It should also be noted that the A-side and B-side share the same A station and thus the A station officer was in a position to alert the staff responding to the B-side as to what was transpiring on the A-side of the housing unit, but did not do so.



*Screenshot 6*

After the PICs from the B-side had cleared the vestibule, at 9:08pm, a supervisor and officer arrived in the vestibule and opened the A-side door, allowing the 3 PICs who were

barricaded by the door to exit the housing area into the vestibule. These PICs voluntarily put on

flex cuffs and were escorted out of the area. Other combative PICs remained in the housing area,

walking around openly brandishing large weapons and threatening other PICs who had remained

in their cells while the B post officer stood at the B post desk. Multiple PICs continued to walk

freely in and out of unsecured cells. At 9:12pm, the B post officer abruptly ran to the housing

area door and was let out of the housing area and into the vestibule by the A station officer. This

left the housing area without any staff on the floor. Immediately after the officer left the housing

unit, multiple PICs started openly smoking substances on the top tier. Staff did not return to the

floor for nearly 20 minutes, during which time PICs continued to smoke, congregate around the

top tier, enter other PIC's cells, walk around with large weapons, and threaten PICs within cells

(see Screenshots 7 and 8).



*Screenshot 7*



*Screenshot 8*

At 9:23pm, Probe Team staff arrived, but entered the B-side of the housing area first. At 9:32pm, 34 minutes after the initial fight broke out on the A-side, Probe Team staff entered the A-side of the housing unit. The Probe Team ordered PICs into their cells, then secured all cell doors. One PIC refused to enter his cell, so staff dispersed OC spray and then flex cuffed the PIC and escorted him out of the housing unit. One other PIC was also escorted out of the housing area. Multiple PICs received delayed medical following the incident. Three PICs sustained injuries that required EMS transports to the hospital: one PIC sustained multiple stab wounds to his upper back and shoulder, one PIC sustained multiple puncture/slash wounds to the left lower back, left shoulder, right hand, and lower right leg, and one PIC sustained a puncture/0.2 cm slash wound to the upper back, a puncture/slash wound to the palm of the left hand, and a puncture wound to the right shoulder with decreased passive range of motion. These three PICs did receive prompt medical attention at the GRVC clinic.

Upon review of this incident, facility leadership identified that the B-post officer failed to obtain and utilize his BWC, failed to secure the cell doors, meal pans, janitor's closet, and pantry door, and as a result, recommended the officer be subject to formal disciplinary charges through an MOC. Furthermore, this incident was closed upon the intake investigation with a facility referral by ID.

The Monitoring Team has a number of concerns with the Rapid Review and the processing of this case through ID. At a minimum, a referral for a Full ID investigation was merited given the magnitude of the issues. Both the facility's Rapid Review and ID's intake investigation were inadequate as they both failed to address multiple staff members' failure to respond to the A-side of the housing unit and to intervene in the violence. Neither the Rapid Review nor the Intake Investigation mentioned the delayed response by the Probe Team, which left the PICs free to engage in assaultive and other impermissible conduct for approximately 20 minutes. Additionally, at a minimum, immediate corrective action should have been considered for the B-post officers' multiple security breaches that could have at least minimized the risk of harm, both before and during the incident, from failing to secure doors, including the gate in front of the housing area door, the janitor's closet, and the pantry, losing control of his OC cannister, failing to act or intervene during the fight, and abandoning the housing unit.

The fact that the Rapid Review and Intake Investigation did not identify multiple critical security failures that contributed to this major disturbance demonstrates significant flaws in the Department's assessment of incidents and ability to identify and respond to staff misconduct.

# APPENDIX D:
# SUMMARY OF UNREPORTED
# STABBING & SLASHINGS

### *Stabbing/Slashing Incidents that Were Not Initially Categorized as Such*

Since the filing of the October 5, 2023 Report, the Monitoring Team identified six additional incidents that were reported in part, but which failed to properly categorize the stabbing/slashing that occurred during the event. In other words, the Monitoring Team's video review of these incidents revealed that six stabbings/slashings occurred but were not reported to the Central Operations Desk as such. In each case, the initial COD report of the incident was classified as a use of force but failed to document a stabbing or slashing despite evidence like video footage and/or injury reports that suggest one occurred. A summary of these six cases is included below.

- **April 8, 2023:** In a celled adult General Population housing area, PICs are standing on the tier and a PIC is in the dayroom area on the phone. The B post officer on the floor goes off post and enters the A station. Immediately after the officer goes off post, a PIC enters the dayroom area and advances toward the PIC who is on the phone. The PIC swings his fist at the PIC who is on the phone, making contact, and the two each take a fighting stance. The perpetrator reaches into the back of his pants and removes a weapon. The B post officer emerges from the A station and deploys OC to terminate the fight. The ID investigation noted that medical staff reported that the victim sustained visible injuries including a 2-3 cm laceration to the right cheek. The treatment notes indicated that the victim was referred to Urgicare for laceration repair and a tetanus booster. A CHS update noted that the victim sustained a head/face laceration that required sutures, staples, or Dermabond.

- **May 2, 2023**: In a New Admissions dormitory housing area, a PIC was walking in front of the bathroom area when another PIC standing nearby suddenly pulled out a shirt filled with what ID later identified as a rock and began to swing and swipe it in a violent motion at the victim's body and head. Video revealed that the B post officer was not on the floor at the time, and the officer in the A station failed to intervene. Three minutes after the assault, two officers and three supervisors arrived on the unit and used OC spray when the two individuals originally involved re-engaged and began to fight again. The ID investigation noted that in the injury report, medical staff noted that the victim sustained a scalp laceration, left-hand contusion, and the right hand's 3rd and 5th fingers had been bitten. Medical staff also noted that the victim refused Urgicare and laceration repair.

- **May 15, 2023**: In a celled adult General Population housing area, numerous PICs were leaving the search area when one PIC suddenly advanced toward another and walked behind him and reached to the front of his face and made a swiping motion to the PICs face. Video showed the perpetrator holding a long, pointed object in his hand. Staff separated the two individuals without further incident. The ID investigation noted that medical staff reported that the victim complained of right facial injury and had a

superficial linear abrasion on the right facial area. Treatment was recommended in the form of wound care.

- **June 19, 2023:** In a celled Protective Custody housing area, video shows a PIC standing in front of a cell talking to another PIC in the cell. An officer walks down the tier where multiple unsecured doors are observed and opens a cell behind where the PIC is standing. Suddenly, a PIC runs out of a cell that had just been opened, holding a weapon in his hand and attacks the PIC who was standing by the other cell talking. The officer deploys OC spray to terminate the assault. The ID investigation noted that medical staff reported an injury on the victim's left ear, with posterior and interior lacerations, and recommended treatment in the form of Urgicare for laceration repair**.**

- **July 17, 2023:** In an Intake area, video shows two PICs standing and talking to staff when suddenly, one PIC makes a stabbing motion to the other PIC's head. The two PICs began fighting until staff separated the PICs using control holds and OC to terminate the incident. The ID investigation noted that medical staff reported that the victim sustained a 0.75" deep scratch to his forehead and was treated with wound cleaning. ID also noted that the Captain failed to supervise court production and that staff neglected to secure PICs based on security classification/protocol and had multiple PICs in the area who were unsecured. The Body Worn Camera audio/video of the Captain said, "*Did you see him drop the uh, did he use a pen*?" An Officer then showed the Captain a pen. The Captain responded by saying, "*You sure there was nothing in it*?" The officer responded by saying, "*There's nothing in it right now*." The Captain then said, "*But he still used it as a weapon. But the thing is that means they didn't search him well, he could of….*". The ID investigation found that the Captain failed to document in the Use of Force report that a weapon/instrument was used to cut the victim's head, and a Facility Referral was generated. Despite the Captain's observation of the weapon after the incident and acknowledging it on video, the incident was not reported as slashing or stabbing. Further, despite ID acknowledging the Captain's failure to document the use of a weapon, ID did not take any action to have the facility correctly classify the incident as a slashing or stabbing.

- **October 8, 2023**: In a New Admissions Mental Observation dormitory housing area, a PIC was seated at a dayroom desk when another PIC standing nearby advanced toward the seated PIC and made a downward striking motion to the right side of the PIC's face. The perpetrator then made another downward striking motion to the victim's face, and the victim stood up. The two PICs started swinging punches at each other until the perpetrator grabbed the victim and brought him to the floor. Staff then deployed OC spray, terminating the incident. The video showed the victim sustained an injury to his face that was actively bleeding. In the Body Worn Camera video, the victim alleged he was cut. The injury report from CHS noted that the victim sustained a ¾ inch deep laceration to the right side of the face with treatment recommended in the form of Urgicare for repair.

# APPENDIX E:
# JANUARY 31, 2023 MEMO
# ACTS OF VIOLENCE

### _Acts of Violence Determination Memo – January 31, 2023_

Below is a DOC Memorandum issued on January 31, 2023 to all staff by a DOC executive. This memo was rescinded via teletype on October 20, 2023.

"EFFECTIVE IMMEDIATELY

In rendering a determination that an Act of Violence (AOV) occurred various mitigating factors shall be considered by the on-duty Tour Commander, such as Genetec video review (stabbing and slashing motions etc.), Inmate to Injury Report, Staff reports and Persons in Custody witness statements. _**A medical evaluation on it own does not constitute an AOV and is not required to make a determination of an AOV.**_

Wardens and Deputy Wardens shall review Genetec video of _**all incidents**_ in their respective facility and ensure compliance with this memorandum to include an override of a Tour Commanders action as appropriate.

**Any questions concerning this memorandum should be forwarded to your appropriate Associate Commissioner.**"

# APPENDIX F:
# CORRECTED RAPID REVIEW DATA

The Monitoring Team identified an error in one of the tables in the April 3, 2023 Monitor's Report. Specifically, the table titled "Rapid Review Outcomes, 2018 to December 2022" provided incorrect data in the row titled "Number of Staff with Recommended Corrective Action."

The chart below contains the corrected data for the number of staff with recommended corrective action for 2018-2022, as well as updated data for January-June 2023.

| Rapid Review Outcomes, 2018 to June 2023 | | | | | | |
|---|---|---|---|---|---|---|
| | **2018** | **2019** | **2020** | **2021** | **2022** | **Jan.-Jun. 2023** |
| **Incidents Identified as Avoidable, Unnecessary, or with Procedural Violations** | | | | | | |
| **Number of Rapid Reviews** | 4,257 (95% of all UOF) | 6,899 (97% of all UOF) | 6,067 (98% of all UOF) | 7,972 (98% of all UOF) | 6,889 (98% of all UOF) | 3,225 (99% of all UOF) |
| **Avoidable** | 965 (23%) | 815 (12%) | 799 (13%) | 1,733 (22%) | 1,135 (16%) | 360 (11%) |
| **Violation of UOF or Chemical Agent Policy** | | | *345 (11%) (July-December 2020 Only)* | 1,233 (16%) | 835 (12%) | 273 (8%) |
| **Procedural Violations** | 1,644 (39%) | 1,666 (24%) | 1,835 (30%) | 3,829 (48%) | 3,296 (48%) | 1,281 (40%) |
| **Corrective Action Recommended by Staff Member** | | | | | | |
| **Number of Staff with Recommended Corrective Action[73]** | N/A | N/A | 2,040 | 2,970 | 2,417 | 1,395 |

---

[73] Please note that this data captures referrals for discipline as recommended in the Rapid Reviews routinely shared with the Monitoring Team. The Rapid Reviews, and therefore this data, does not reflect whether these discipline referrals were all enacted as recommended. Data on enacted discipline, even for past Monitoring Periods, is subject to continued changes based on protracted closures of certain types of disciplinary charges. For example, a command discipline can take many months to process, only to be eventually turned into an MOC, and then an MOC can take months to process to reach an NPA, but if the case goes to OATH, it can take even more months for this disciplinary referral to be fully closed out. Furthermore, a staff member can be suspended, only to have the days returned upon a Report & Recommendation from OATH. The protracted nature of enacted discipline for these recommendations is further compounded by the various disciplinary backlogs.

# APPENDIX G:
# PROPOSED COURT ORDER

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
                                             :

MARK NUNEZ, et al.,                      :
                                             :
  Plaintiffs,                       :
                                             :
  - against -                      :
                                           :
CITY OF NEW YORK, et al.,        :
                                           :
  Defendants.                   :  **11 Civ. 5845 (LTS)(JCF)**
------------------------------------------------------------ X
                                           :

UNITED STATES OF AMERICA,     :
                                           :
               Plaintiff-Intervenor,   :
                                           :
  - against -                      :
                                         :
CITY OF NEW YORK and NEW YORK CITY  :
DEPARTMENT OF CORRECTION,    :
                                         :
               Defendants.        :
------------------------------------------------------------ X

**[PROPOSED] ORDER**

1. _Department's Incident Reporting Practices_: By February 29, 2024, the Department, in consultation with the Monitor, shall:

   a. Review, revise, and implement proper definitions for the various incident categories maintained by the Department, including all security indicators related to violence (e.g., "allegations of Use of Force," "stabbing/slashing," "inmate-on-inmate fight," "inmate-on-inmate assault," "assault on Staff," and "sexual assault") to ensure that the definitions are clear and concise and will result in the collection and reporting of reliable and accurate data. The definitions of the various incident categories shall be subject to the approval of the Monitor.

   b. Develop and implement a comprehensive and streamlined policy and procedures for all incidents and events that must be reported. The policy and procedures shall be subject to the approval of the Monitor.

2. _Monitor's Compliance Assessment - Modification to § G, ¶5(b) of the Action Plan_: The Action Plan, § G, ¶ 5(b) shall be modified to include the language in bold below:

   Given the Monitor's findings in the Monitor's March 16, 2022 Special Report, (pages 63 to 65), and subsequent reports on **October 27, 2022, February 3, 2023, April 3, 2023, April 24, 2023, May 26, 2023, June 8, 2023, July 10, 2023, August 7, 2023, October 5, 2023 and November 8, 2023**, the Monitor's assignment of compliance ratings for each provision of the Consent Judgment (required by § XX, ¶ 18 of the Consent Judgment) and the First Remedial Order are suspended for the time period covering January 1, 2022 to **December 31, 2023**, except for those provisions incorporated into this Order and the provisions listed below (collectively "select group of provisions").

i.  The Monitor shall assign compliance ratings, required by § XX, ¶ 18 of the Consent Judgment, for the following provisions from the Consent Judgment and the First Remedial Order:

1.  Consent Judgment § IV. (Use of Force Policy), ¶ 1;

2.  Consent Judgment § V. (Use of Force Reporting & Tracking), ¶¶ 2 & 22;

3.  Consent Judgment § VII. (Use of Force Investigations), ¶¶ 1 & 9(a);

4.  Consent Judgment § VIII. (Staff Discipline and Accountability), ¶¶ 1, 3(c) & 4;

5.  Consent Judgment § X. (Risk Management) ¶ 1;

6.  Consent Judgment § XII. (Screening and Assignment of Staff), ¶¶ 1 to 3;

7.  Consent Judgment § XV. (Safety and Supervision of Inmates Under the Age of 19), ¶ 1, 12 and 17;

8.  First Remedial Order § A. (Initiatives to Enhance Safe Custody Management, Improve Staff Supervision, and Reduce Unnecessary Use of Force), ¶¶ 1 to 4, & 6; and

9.  First Remedial Order § C. (Timely, Appropriate, and Meaningful Staff Accountability), ¶¶ 1, 2, 4 & 5.

3.  *Monitor's Report*: The Monitor shall file his compliance assessment of the *Nunez* Court Orders for the period July 1, 2023 to December 31, 2023, pursuant to the modified version of Action Plan, § G, ¶ 5(b), on March 21, 2024.

SO ORDERED this _____ day of _____, 2023

_____

LAURA TAYLOR SWAIN

Chief United States District Judge