```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
                                                             :
MARK NUNEZ, et al.,                                          :
                                                             :
                        Plaintiffs,                          :
                                                             :
    - against -                                              :
                                                             :
CITY OF NEW YORK, et al.,                                    :
                                                             :
                        Defendants.                          :
                                                             :   11 Civ. 5845 (LTS)(JCF)
------------------------------------------------------------ X
                                                             :
UNITED STATES OF AMERICA,                                    :
                                                             :
                        Plaintiff-Intervenor,                :
                                                             :
    - against -                                              :
                                                             :
CITY OF NEW YORK and NEW YORK CITY                           :
DEPARTMENT OF CORRECTION,                                    :
                                                             :
                        Defendants.                          :
------------------------------------------------------------ X
```

## DECLARATION OF STEVE J. MARTIN

**STEVE J. MARTIN** hereby declares as follows:

1. I am currently the Court-appointed Monitor of the *Nunez* Consent Judgment (dkt. 249) ("Consent Judgment") and I am responsible for assessing New York City's compliance with the Consent Judgment. The Monitoring Team includes professionals with substantial experience and commitment to advancing correctional reform (collectively, "the Monitoring Team"). Team members include the Monitor, Deputy Monitor, Associate Director, Analyst, and three Subject Matter Experts all of whom reflect diverse professional backgrounds, experiences, and perspectives that help to ensure that the Monitoring Team's work is neutral, independent, balanced, objective, fair, reasonable, and responsible. The Monitoring Team has developed significant expertise in the operations of the New York City Department of Correction (DOC) as it relates to the

1

requirements of the *Nunez* Court Orders. Further, the Monitor and three Subject Matter Experts collectively have over one hundred years of experience in the management, operation, and monitoring of confinement facilities across the country.

2. I have worked as a corrections professional for over 50 years, including as a correction officer, General Counsel of the Texas State Prison System, and expert consultant for the United States Department of Justice, Civil Rights Division, and the United States Department of Homeland Security, Office of Civil Rights and Civil Liberties. I have visited or inspected over 700 confinement facilities in the United States and abroad, and have been continuously involved in institutional reform litigation. Since 1987, I have been retained as an expert witness and consultant in more than 200 cases involving correctional facilities, many of which involved allegations of excessive and unnecessary use of force. Notably, I served as one of two Joint Expert Consultants in the remedial phase of *Sheppard v. Phoenix*, 91 Civ. 4141 (RPP) (S.D.N.Y.), an earlier class action brought against Defendant The City of New York (the "City") with respect to use of force in the Central Punitive Segregation Unit. I also was retained as an expert by the plaintiffs in *Ingles v. Toro*, 01 Civ. 8279 (DC) (S.D.N.Y.), another action alleging a pattern and practice of excessive and unnecessary use of force in the City jails. I also have served as a federal court monitor in numerous prisons and state systems, large metropolitan jail systems, and juvenile justice facilities. I keep myself apprised of developments with respect to legal standards, as well as best practices, with respect to use of force by corrections staff. A copy of my curriculum vitae is attached to this declaration as Exhibit A.

3. **Role in the Nunez Litigation**: In October 2012, I was retained as a consulting expert to advise and assist Ropes & Gray LLP, Emery Celli Brinckerhoff & Abady LLP, and The Legal Aid Society Prisoners' Rights Project (collectively, "Plaintiffs' Class Counsel") in their representation of the putative class and class representatives in this action. In my role as consulting expert, I reviewed significant amounts of information and conducted site visits as described in my October 2, 2015 Declaration to this Court attached as Exhibit XX. I also directly participated in the settlement negotiations in this class action that resulted in the Court's entry of the Consent Judgment, also described in my October 2, 2015 Declaration to this Court attached as Exhibit B.

1. **Role of the Monitor**: On October 22, 2015, the Court approved the parties' stipulation to appoint me the Monitor pursuant to the Consent Judgment. The Monitor is an agent of the Court. *See* Consent Judgment § XX. ¶ 30. The essence of a Monitor's role is to provide a neutral and independent assessment of compliance, which is specifically required by the Consent Judgment in this case. *See* Consent Judgment § XX. ¶¶ 1 and 18. The Monitor is responsible for assessing compliance via "independently verifying any representations from the Department regarding its progress toward compliance [ . . .] and examining any supporting documentation where applicable[.]" Further, as part of the Monitor's reporting obligations I must include "…the factual basis for the Monitor's findings [in my reports to the Court]." Consent Judgment § XX. ¶ 18.

2. **Nunez Court Orders**: The Consent Judgment was entered on October 22, 2015. Since then, the Court has entered at least seven Orders intended to address the City and Department's failure to implement the requirements of the Consent Judgment. The First Remedial Order was entered on August 14, 2020 following the non-compliance notice[1] issued on June 15, 2019 by counsel for the United States and Plaintiff Class to address Defendants' non-compliance with a number of provisions of the Consent Judgment.[2] A Second Remedial Order was entered on September 29, 2021 in response to the "deteriorating circumstances at Rikers Island and the ongoing dangerous and unsafe conditions in the jails addressed in the Monitor's reports dated August 24, 2021 (Dkt. No. 378), September 2, 2021 (Dkt. No. 380), and September 23, 2021 (Dkt. No. 387)." The Second Remedial Order required the Department to take a number of steps outlined in the Monitor's September 23, 2021 Report to address the unsafe conditions in the jails and the ongoing violation of core provisions of the Consent Judgment.[3] A Third Remedial Order was entered on November 22,

---

[1] This notice was provided to Defendants pursuant to Section XXI, ¶ 2 of the Consent Judgment.

[2] The following provisions of the Consent Judgment were identified: Section IV, ¶ 1 (Implementation of Use of Force Directive); Section VII, ¶ 1 (Thorough, Timely, Objective Investigations); Section VII, ¶ 7 (Timeliness of Preliminary Reviews); Section VII, ¶ 9 (Timeliness of Full ID Investigations); Section VII, ¶ 11 (ID Staffing); Section VIII, ¶ 1 (Appropriate and Meaningful Staff Discipline); Section XV, ¶ 1 (Inmates Under the Age of 19, Protection from Harm); Section XV, ¶ 12 (Inmates Under the Age of 19, Direct Supervision); and Section XV, ¶ 17 (Inmates Under the Age of 19, Consistent Assignment of Staff).

[3] Recommendations included immediate security initiatives, expanding criteria for Department leadership,

2021 to address "the Department's ongoing, widespread, and long-standing non-compliance with Section VIII, ¶ 1 of the Consent Judgment and [the Monitor's] concerns with the backlog of disciplinary cases involving UOF Violations."[4] On June 14, 2022, the Court entered the Department's Action Plan which was intended to provide a pathway for the Department to correct bedrock deficiencies so that it could ultimately achieve the reforms contemplated under the Consent Judgment. In other words, "[t]he purpose of the Action Plan is to provide a roadmap for addressing the foundational deficiencies that inhibit the Department's ability to build sustainable reforms. It is intended to guide the development of reasonable and sound correctional practices and procedures and includes several timelines to conduct this work."[5] In 2023, the Court issued four additional Orders focused on improving the Department's transparency and collaboration with the Monitoring Team and addressing specific security and reporting practices. These orders were issued on June 13, 2023 (dkt. 550), July 18, 2023 (dkt. 558), August 10, 2023 (dkt. 564), and October 10, 2023 (dkt. 586). My team and I have participated extensively in the discussion and negotiation among the Parties as to both the Consent Judgment and the subsequent remedial orders.

3. **Declarations Filed in this Case**: I have submitted 5 declarations to the Court in this matter.

    a. On October 2, 2015, I submitted a declaration in support of the parties' Joint Motion for Final Approval of the Consent Judgment (dkt. 234). A copy of that declaration is attached as Exhibit B.

    b. On August 12, 2020, I submitted a declaration in support of the First Remedial Order (dkt. 348). A copy of that declaration is attached as Exhibit C.

    c. On September 28, 2021, I submitted a declaration in support of the Second Remedial Order (dkt. 397). A copy of that declaration is attached as Exhibit D.

    d. On November 19, 2021, I submitted a declaration in support of the Third

---

and appointing a Security Operations Manager.

[4] These concerns were described in the Monitor's September 30, 2021 Report (dkt. 399).

[5] *See* Monitor's June 10, 2022 Letter to the Court (dkt. 462) at pg. 2.

    Remedial Order (dkt. 423). A copy of that declaration is attached as Exhibit E.

  e. On November 30, 2022, I submitted a declaration in support of the Order on Facility Supervisors (dkt. 486). A copy of that declaration is attached as Exhibit F.

4. **Sources of Information**: Since the inception of the Consent Judgment, my team and I have conducted countless site visits and have also observed operations via video tape and other information. My team and I also meet with staff of all levels from leadership to staff in the jail via in-person, video conference, and phone meetings. Since the inception of the Consent Judgment, the Monitoring Team has sent the Department over 3,000 requests for information, many of which include sub-parts and require routine production of information. The Department provides a significant amount of information to the Monitoring Team, including routine data, information, and reports on a weekly, bi-weekly, and monthly basis. My Team and I have also reviewed thousands of videos, reports, and investigations (including facility investigations, preliminary reviews, intake investigations, and full ID investigations) related to use of force, other violent incidents, and other Department operations. My team and I have also reviewed videos and reports related to in-custody deaths (or deaths of individuals shortly after release) that occurred in 2022 and 2023.

5. **Technical Assistance**: The Monitoring Team has routinely provided technical assistance to the Department since the Consent Judgment was entered. The Monitoring Team's assistance is a combination of support at a basic level (*e.g.*, reminders of deadlines or identifying relevant policies that govern certain practices), ensuring that new policies, protocols and training curricula comport with generally accepted practice and the requirements of the *Nunez* Court Orders (*e.g.*, Emergency Services Unit and Captain training), and identifying targets that are ripe for root cause analysis (*e.g.*, evaluation of escort and search procedures that lead to unnecessary and excessive force). The Monitoring Team has shared with the Department over 700 separate feedbacks with recommendations, comments and questions on Department practices, policies and procedures. These recommendations have included the Monitoring Team's professional opinion on procedures, policies, systems, and other measures that the Department could take to enhance compliance with the

requirements of the Court orders entered in this case. These recommendations have related to a variety of operational areas, including, but not limited to, use of force practices, security protocols and procedures, identifying and addressing the use of excessive and unnecessary force, the effective management of incarcerated individuals, the deployment and supervision of corrections staff, and training.

6. **Monitoring Team Methodology**: The Monitoring Team's approach to assessing compliance and to describing the current state of affairs provides important context for the information provided in the Monitor's report. The Monitoring Team has made a comprehensive assessment by evaluating multiple measures in each key area of the Consent Judgment, Remedial Orders, and Action Plan (*i.e.*, staffing, safety and security, managing people in custody, and staff discipline) because no one metric adequately represents the multi-faceted nature of these requirements. While the Monitoring Team uses quantitative data as a necessary component of our analysis, relegating a nuanced, complex, qualitative assessment of progress towards achieving compliance with these requirements into a single, one-dimensional, quantitative metric is not practical or advisable. The Monitoring Team does not interpret data—whether qualitative or quantitative—in a vacuum to determine whether progress has been made or compliance has been achieved. For example, meeting the requirements of the Staffing section of the Action Plan requires the Department to implement a series of closely related and interdependent requirements (*e.g.*, unpacking the source of the dysfunction regarding abuse of leave, modernizing systems for scheduling staff, and teaching facility leaders how to properly deploy staff to meet the Department's core responsibilities) in tandem to ultimately increase the number of staff who are available to work directly with incarcerated individuals. As such, the Monitoring Team does not use a single metric to determine whether the Staffing section of the Action Plan has been properly implemented. Analogous concerns apply to provisions throughout the *Nunez* Court Orders, whether focused on the Department's use of force practices, improving safety in the facilities, or making the process for imposing staff discipline and accountability timelier and more effective. The Monitoring Team therefore uses a combination of quantitative data, qualitative data, contextual factors, and reference to sound correctional practice to assess

progress with the court orders.

7. There are two cautions needed regarding the use of quantitative metrics.

  a. First, the use of numerical data alone suggests that there is a definitive line that specifies a certain point at which the Department passes or fails. There are no national standards regarding a "safe" use of force rate, a reasonable number of "unnecessary or excessive uses of force" nor an "appropriate" rate at which staff are held accountable.[6] Consequently, the Monitoring Team uses a multi-faceted strategy for assessing compliance that evaluates all inter-related issues. For this type of analysis, the decades-long experience and subject-matter expertise of the Monitoring Team is critical to not only contextualize the information, but also to compare the Department's current performance with the operation of other jails and correctional systems.

  b. Second, there are infinite options for quantifying the many aspects of the Department's approach and results. Just because something *can* be quantified, does not mean it is necessarily useful for understanding or assessing progress. The Monitoring Team seeks to identify those metrics that actually provide insight into the Department's processes and outcomes and are useful to the task of problem solving.

8. **Monitor Reports**: The Monitoring Team has filed at least 50 reports with the Court that have covered the period of October 22, 2015 to November 8, 2023. The reports describe the efforts the Department has taken to implement the requirements of the Consent Judgment and evaluate the extent to which the Department has complied with each substantive provision of the *Nunez* Court Orders. The reports are developed and drafted by me and my team. Our reports reflect our professional judgment and expertise in monitoring the jails, and include facts and information provided by the Department and analyses by me and the Monitoring Team. The

---

[6] Notably, this is why neither the Consent Judgment, the underlying *Nunez* litigation, CRIPA investigation, the Remedial Orders, nor the Action Plan include specific metrics the Department must meet with respect to operational and security standards that must be achieved.

reports describe in detail the steps taken by me and the Monitoring Team to assess compliance and the factual basis for the Monitor's findings. Our observations and the supporting facts and information relating to these observations are developed after careful review and consideration in order to provide a proper basis for establishing the level of compliance and any recommendations for appropriate remedial action necessary to fulfill the aims of the Court's Orders. Where appropriate, we report on the remedial steps that have been taken or that reportedly will be taken by the agency. A list of the reports and substantive letters submitted by the Monitor to the Court is attached as Exhibit G.

9. My written submissions to the Court via letters and reports reflect my work, along with the Monitoring Team, that to the best of my ability is accurate, neutral, independent, balanced, objective, fair, reasonable, and presents reasonable and responsible assessments of the work of the Department of Correction.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 9, 2023.

                                         s/ Steve J. Martin
                                           Steve J. Martin
                                           *Monitor*