OFFICE OF THE MONITOR
NUNEZ, ET AL. V. CITY OF NEW YORK, ET AL.

Steve J. Martin
Monitor

Anna E. Friedberg
Deputy Monitor

1+1 646 895 6567 | afriedberg@tillidgroup.com

November 15, 2023

**VIA ECF**
The Honorable Laura Taylor Swain
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10006

Re: *Nunez, et al. v. City of New York, et al.*, 11-cv-5845 (LTS) (JCF)

Dear Chief Judge Swain,

      The Monitoring Team writes pursuant to the Court's June 13, 2023 Order, § I, ¶ 8 in order to "promptly notify the Court that the Monitor believes that Defendants are not complying with the requirements of Paragraphs I.1 – I.7 of [the June 13, Order (and other Orders) and] is otherwise not engaging with the Monitor or his team in a good faith manner." Defendants' pattern of persistent interference, obstruction, and lack of transparency has continued with a recent development that requires immediate notification to the Court. This situation further erodes the Monitoring Team's confidence that the Department is operating transparently and in a manner that advances the reforms.

      On November 14, 2023, the Monitoring Team learned from an anonymous source that the Department opened an Arson Reduction Housing Unit ("ARHU") the day before, on November 13, 2023. The Department reported that the purpose of the unit "was to take immediate action to reduce violence to ensure the safety of staffing [sic] and PICs in our custody." The ARHU was opened without consultation or notification to the Monitor despite the fact that such consultation is required by the *Nunez* Court Orders,[1] despite repeated requests from the Monitor that the

---

[1] Among others, the Department is required to "proactively consult with the Monitor in advance of promulgating any new policies or procedures that relate to compliance with the *Nunez* Court Orders." *See*

Department do so, and despite a commitment from Department leadership that such consultation and notification would occur ***prior*** to implementing any such unit.[2]

- **Operation of the Arson Reduction Housing Unit ("ARHU")**

The Department reports that the ARHU was opened following lock-in (after 9 p.m.) on November 13, 2023 and five individuals in custody were placed in the unit. These placements occurred just four days after the Department reported that the unit was in the "early planning stages" and assured the Monitor that he would be consulted prior to opening the unit. On November 15, 2023, the Department reported to the Monitoring Team that "[t]his was a well-organized plan of action" and "to see change [DOC] must do something different." In contrast to these claims, the Monitoring Team identified a number of problems with the approach, all of which could have been avoided if the Department had consulted with the Monitoring Team as required.

The unit's operation guide, subsequently provided by the Department, is poorly written, haphazard, vague, and ambiguous. The criteria for admission to the ARHU are unclear. A review of the disciplinary histories of the five individuals placed in the unit suggested that an element of

---

June 13, 2023 Order, § I, ¶5. Further, the Department is required to consult with the Monitor on Security Practices (*see* Action Plan § D ¶ 3) and must consult with and seek the Monitor's approval regarding the strategy for managing incarcerated individuals following serious incidents of violence (*see* Action Plan § E ¶ 4). The Court has advised Defendants "I expect nothing less than scrupulous compliance with the proposed order that I am entering today. And this includes transformative change in the defendants' working relationship with the monitor, whose team brings essential added expertise to the challenges facing the jails." *See* August 10, 2023 Status Conference Transcript at pg. 73, 24:25 and 74, 1:5. On October 10, 2023, the Court directed the Department leadership to work with the Monitor "to devise a plan that can be implemented immediately to ameliorate the unacceptable levels of harm." *See* October 10, 2023 at pg. 2. The Court has also directed that Defendants "(i) must not limit access to information to which the Monitor is entitled under the Nunez Court Orders and (ii) must report to the Court as required by the Nunez Court Orders." *See* October 10, 2023 at pg. 2.

[2] The Department is required to *pro-actively* consult with the Monitor on the development of a unit such as this, pursuant to the *Nunez* Court Orders. *See,* e.g., June 13, 2023 Order § I, ¶5. However, given the Department's recent poor record of consulting as required, the Monitoring Team explicitly requested consultation about this issue on at least three occasions, including on October 26 and November 9, 2023. On November 9, 2023 the Deputy Monitor requested "the Department consult with the Monitoring Team and provide any proposed policies related to either of these housing model strategies (or similar ones) ***prior*** to the opening of these units." (emphasis in original). In response, the *Nunez* Manager reported on November 9, 2023 that "[the Monitoring Team] will be consulted on the OBCC Annex Pilot and the [ARHU] prior to the opening of any such units, but ***plans are still in the early stages***." (emphasis supplied).

2

arbitrariness may be present in the selection of the individuals who were placed in this unit. The unit also has a number of restrictions, some of which may trigger due process rights that are not currently afforded. While the operation guide notes that the individuals housed in ARHU will be afforded access to mandated services on the unit, it is unclear how and whether this will actually occur in practice.  In addition, the Department reported that "ARHU, was more than just a housing area per se but a pilot program where PICs agreed to terms and conditions of behavioral change. [The Acting Chief of Security] had a 1:1 with each PIC including a group session whereby each PIC was tasked to write an essay as to the reason for their impulsive action and pledged to cease such behavior which was due [on November 15, 2023]. PICs were receptive and showed commitment to completing this program." In the Monitoring Team's experience, this type of agreement/essay has been a useful convention in other settings,[3] but given the absence of a robust program design for the ARHU and the lack of expected consultation, insufficient context is available for the Monitoring Team to determine the value of such a convention in this instance.

    It also does not appear that any effort was made to appropriately screen staff for assignment to the unit[4] to ensure they are best suited to manage the population, nor does it appear that the staff were trained on the unit's operation.  The heading of the written procedures reference "Operation Restore Order." The Department has not provided any information to the Monitoring Team about "Operation Restore Order."

    The written guidance is not dated or signed by any Department leadership. It is unclear who developed these procedures and who authorized opening the unit. However, the Department reported "[t]his was a well-organized plan of action amongst leadership."  At a minimum, the Commissioner and Senior Deputy Commissioner must have had knowledge regarding the

---

[3] The Department attempted a similar strategy in 2021 at RNDC, but it was subsequently abandoned in 2022.

[4] One of the officers who was selected to work on the ARHU was previously assigned to ESU.  The officer was removed from ESU in 2021 because the officer "either had certain pending charges or had discipline imposed as a result of utilizing excessive force and/or failing to report a use of force incident" (i.e., the officer met the criteria for ESU removal). Inexplicably, in February 2023, the officer was subsequently reinstated to ESU. The Department did not conduct the requisite screening before placing the officer back on ESU. *See* Monitor's November 8, 2023 Report (dkt. 595) at pgs. 3 - 4 and 107 - 109. The officer was removed from ESU in April 2023.

opening of such a unit. The authorization by Department leadership to open and operate this unit under these conditions is deeply troubling.

There is no question that the Department must have a management strategy to manage individuals following serious disruptive acts. This is codified in the Action Plan (Action Plan § E ¶ 4) and the need for such a management structure is well documented in the Monitor's Reports. However, opening such a housing unit on short notice, with little planning, little to no guidance to staff, unclear admission criteria, and poorly defined rules and restrictions is unwise, at best, and is the antithesis of restoring order.

The Department's development of this unit (and failure to consult) cannot be viewed in a vacuum. The Department has long struggled to properly implement specialized housing units. The violence and dysfunction associated with the restricted housing units at RMSC ("RESH") remains incredibly troubling. *See* Monitor's November 8, 2023 Report at pgs. 4, 7, 8, and 20. In fact, in October 2023, the use of force rate at RESH was 62.84, nearly doubling from the prior month. This is an astronomically high use of force rate. The Department's difficulties in safely operating restricted housing units were the foundation for the Monitor's recommendation that the Department retain an expert to support this work.[5] The Department does not appear to have engaged this expert on the development of ARHU or otherwise addressed or improved upon the many deficiencies in implementation of a specialized unit that have long been reported in this case.

Following the Monitoring Team's inquiries about the unit, the Department advised the Monitoring Team that the unit was disbanded on November 14, 2023, less than 24 hours after it opened. The Department reported that "leadership had high expectations for this program/initiative," but rather than (belatedly) consulting with the Monitor to address the issues, the Department reported that "due to the Monitoring Team's disappointment and frustration as noted in the email, the ARHU was dismantled as of [the evening of November 14, 2023]." On the evening of November 14, 2023, the Monitoring Team did advise the Department that "we note our significant concerns that the Department has elected to proceed in opening a specialized unit with little to no planning and no consultation with the Monitoring Team." The Monitoring

---

[5] *See* the Monitor's June 30, 2022 Report (dkt. 467) at pg. 26.

Team went on to advise that "it is difficult for the Monitoring Team to know how to proceed given that even when the Department affirmatively commits to consultation and collaboration, it does not occur, and the Monitoring Team must rely on anonymous sources to learn about information that Defendants should proactively be advising the Monitor [about]." The fact that the unit was hastily disbanded compounds the original concern and replicates the erratic, chaotic, and dysfunctional management practices frequently cited by the Monitor.

- **Consultation and Approval of the Monitor**

Consultation and notification to the Monitor is a necessary component of this monitoring effort.  In this case, it helps to ensure that the operation of the specialized housing unit is consistent with sound correctional practice, that sufficient safeguards are in place to ensure its safe operation, that the program design is consistent with the requirements of appropriate correctional law, that the unit's operation is consistent with the requirements of the *Nunez* Court Orders, and to ensure that the units are subject to appropriate monitoring by the Department and the Monitoring Team.

The City's and Department's obligation to consult with the Monitor and provide information is well established by the *Nunez* Court Orders.[6] The City, Commissioner, and Department leadership also continue to report to the Court and the Monitor that they intend to consult with the Monitor and his team and will seek approval as necessary.[7] It remains perplexing that such consultation did not occur despite explicit Court Orders to do so and

---

[6] See in Footnote 1 above.

[7] The City and Department have long reported a commitment to working with the Monitor. In the City's April 25, 2022 submission to the Court (dkt. 450) the City advised that "The City and the Department want to reaffirm their commitment to providing timely information – both in response to requests by the Monitoring Team, and ***proactively as issues*** arise that relate to the consent judgment and remedial orders. We commit to continuing to provide the Monitoring Team with direct access to Department staff at all levels" at pg. 3 (emphasis supplied).  At the June 13, 2023 Emergency Court Conference, the Commissioner reported to the Court that "if I believe even that there is even a 1 percent chance that it might intersect with the work of the core mission of [the Consent Judgment], I have encouraged my staff to confer with the monitor or a member of the monitoring team. That is still ongoing [as of June 13, 2023]." At pg. 34, 24:25 and pg. 35, 1:3. The City has advised the Court that the June 13, 2023 Order would "resolve most differences about whether cooperation and consultation have occurred as promised." *See* June 13, 2023 Emergency Court Conference Transcript at pg. 30: 17 to 19. The City subsequently reported a commitment to improved communications with the Monitor to the Court in August 2023. *See* City's August 9, 2023 Letter to the Court (dkt. 562) at pg. 7.

repeated assurances from the City and Department that they are committed to consultation. It is axiomatic that in order for the Monitoring Team to function, we must be able to rely on the fact that Defendants will provide information as required, as requested, and *as they have repeatedly committed to do*.

The Department reports that consultation in this case did not occur because "[t]he intent was not to disregard the Monitoring Team's approval but to show a proactive approach to the Agency's progress." It is unclear how the Department's interest in demonstrating "a proactive approach to the Agency's progress" precludes the Department from consulting the Monitor, especially when it affirmatively agreed to do so and is required to do so by the *Nunez* Court Orders. It is further unclear why the Department's stated interest in "proactively" addressing issues was then not proactively reported to the Monitor. Finally, the Department's interest in "show[ing] a proactive approach to the Agency's progress" is not a basis for the Department to elect not to provide information the Monitor requested[8] *or* not to consult/seek approval of the Monitor under the *Nunez* Court Orders. This explanation for the failure to consult appears to be yet another attempt by Department leadership to deflect responsibility for its obligations.

There is an urgent need to ameliorate the risk of harm, yet haphazardly and furtively opening a specialized restrictive housing unit is likely to *increase* the risk of harm rather than diminish it. The Monitoring Team fully appreciates the dynamic nature of this work. It is for this reason that the Monitoring Team is always available to work with the Department regarding urgent matters and provides prompt feedback even when only given short notice.[9]

---

[8] The Consent Judgment permits the Monitor access to the people, locations, and information necessary "to perform his responsibilities under this Agreement." *See* Consent Judgment § XX. ¶ 8. To facilitate this effort, the Consent Judgment also requires the Department to "encourage all Staff Members to cooperate fully with the Monitor." *See* Consent Judgment § XX. ¶ 13. Further, "[n]o Party, or any employee or agent of any Party, shall have supervisory authority over the Monitor's activities, reports, findings, or recommendations." *See* Consent Judgment § XX, ¶ 23.

[9] For example, on October 30, 2023 the Department sought the Monitoring Team's input on revisions to the Enhanced Supervised Housing policy and advised that any feedback had to be provided *in less than 24 hours*, despite the fact that the proposed revisions were based on feedback from a state oversight body that had been provided to the Commissioner over two months before. The Monitoring Team accommodated this short-term request and provided substantive feedback within the timeframe requested. Notably, some of the Department's proposed edits introduced potentially harmful practices and guidance that is inconsistent with other Department policies. The Monitoring Team provided feedback and

The slipshod development of guidance and management for this unit reinforces the need for consultation. This unit's operating guide triggers a number of important issues that impact the immediate risk of harm faced by staff and people in custody and that would have been identified during the consultation process. As noted above, these include staff selection and training, defining the target population, the extent to which the restrictions imposed may trigger due process rights, and ensuring that past failures in implementation are not repeated again. The requirements for notification and consultation are not simply bureaucratic or formulaic—they are in response to a legitimate need for information and technical assistance, as outlined in various Monitor's Reports and fully on display in this instance. The Monitor must be able to obtain accurate and contemporaneous reports of operations, especially when requested in advance as done in this instance.

- **Conclusion**

The Department's efforts to withhold information from the Monitoring Team and failure to consult in this instance appear to be part of an ongoing pattern to distract from the immediate need to reduce the ongoing risk of harm in the jails and to impede the Monitor's ability to *accurately* report on the conditions in the jails.[10] It must be emphasized that without the anonymous report, this information would not currently be known and the unit would likely still be in place.[11] Defendants' implementation of a specialized housing unit under the circumstances

---

recommendations to ensure the policy was consistent with sound correctional practice and DOC's other policies. *See* the Monitor's November 8, 2023 Report (dkt. 595) at pg. 55 to 56.

[10] In response to similar concerns voiced previously, Defendants repeatedly asserted that the Monitoring Team requests a significant volume of information, and that the Department responds to and provides a large amount of information and facilitates frequent discussions with staff. This is true. Given the scope of the *Nunez* Court Orders, the fact that the Monitoring Team must make a significant number of requests for information in order to fulfill its responsibilities is not surprising. Defendants' repeated refrain that a lot of information is provided to the Monitor ignores the Monitoring Team's ongoing concerns about the *quality and timeliness* of information provided and that there has been no material change in this regard despite repeated assertions by Defendants that it will improve. It appears that efforts to improve in this area are significantly hampered by the Commissioner, other Department officials and possibly City officials. *See* the Monitor's November 8, 2023 Report at pg. 56 to 57.

[11] This is not the first time the Monitor has had to rely on anonymous reports to obtain relevant information about serious events occurring in the jails that the Department should have provided to the Monitor. In May 2023, the Monitor reported on five serious incidents, including two deaths and two individuals with life altering injuries, in which the Monitor only learned of these serious events following

described in this letter further erodes the Monitor's overall confidence in the Defendants' ability to safely manage the jails and the reliability and integrity of the information it provides.[12] It is deeply disturbing that such brazen actions by Defendants continue to occur especially in light of the Court's recent orders clearly articulating the Defendants' obligations to proactively consult with and provide information to the Monitor.[13]

It is becoming increasingly difficult for the Monitor to do the work required of him by the *Nunez* Court Orders. Sustained and chronic institutional resistance and recalcitrance toward court ordered reform is an insurmountable impediment to any Monitorship.

                Sincerely,

                s/ Steve J. Martin
                Steve J. Martin, *Monitor*
                Anna E. Friedberg, *Deputy Monitor*

---

either anonymous reports or reports in the media. *See* the Monitor's May 26, 2023 Report (dkt. 533), June 8, 2023 Report (dkt. 541) and June 12, 2023 letter (dkt. 544).

[12] There are a number of situations in which it does not appear that Defendants provide reliable information. For example, the Monitor reported last week that the Department's data regarding stabbing and slashings is not reliable because the collection of data has been compromised. *See* November 8, 2023 Report (dkt. 595) at pgs. 7, 31 to 33, and 35 to 36. *See* also other reports of conflicting and inaccurate information at Monitor's November 8, 2023 Report (dkt. 595) at pgs. 54 to 55; the inability of the Monitor to verify information reported by the City to the Court regarding serious injury data as described in the Monitor's October 5, 2023 Report (dkt. 581) pgs. 11 to 12 and footnote 16; and a series of misrepresentations in Court filings described in the Monitor's June 8, 2023 Report (dkt. 541) pgs. 25 to 26.

[13] This is the second such example since the Court's October 10, 2023 Order. Less than three weeks ago, on October 27, 2023, Defendants withheld information from the Monitor baselessly, claiming that it was not related to the *Nunez* Court Orders when, in fact, the information was clearly related to the *Nunez* Court Order (e.g., the document included at least five references to the Monitor). The information was only produced after the Court granted the Monitor's emergency order to compel. *See* Monitor's November 8, 2023 Report (dkt. 595) at pgs. 51 to 52 related to Request 3.