# EXHIBIT 52



**Office of the New York State Attorney General Letitia James**

# Office of Special Investigation

Office of Special Investigation

Third Annual Report

October 1, 2023

# Table of Contents

1. Introduction.................................................................................  1

2. Summary of Indictments.............................................................  5

3. Reports Released by OSI in the Past 12 Months.........................  7

4. New York City Department of Correction.................................  28

5. Recommendations...................................................................  42

6. OSI Data...............................................................................  44

# 1. INTRODUCTION

This is the third Annual Report of the New York Attorney General's Office of Special Investigation (OSI), issued October 1, 2023, pursuant to Paragraph 7 of New York Executive Law Section 70-b (Section 70-b). Prior Annual Reports, including two biennial reports from OSI's predecessor unit, can be found on the OSI Annual Reports page.

## Section 70-b

Effective April 1, 2021, Section 70-b directs OSI to investigate any incident in which a police officer or a peace officer, as defined, has caused the death of a person by an act or omission, or in which there is a question whether such officer may have caused a death. Section 70-b further directs OSI, if warranted, to prosecute any criminal offense that the officer may have committed in connection with the incident.

Section 70-b makes no distinction between on-duty and off-duty officers or between armed and unarmed decedents. Peace officers, as defined in Section 70-b, include corrections officers in all jails and prisons in the state.

The Attorney General's investigative authority and criminal jurisdiction over such incidents are state-wide and arise, by operation of law, at the time of death (Section 70-b, Paragraph 2). The Attorney General's criminal jurisdiction over such incidents supersedes and displaces that of the District Attorney for the county in which the incident occurred (Section 70-b, Paragraph 4).[1]

## OSI's Personnel

As of the date of this Report, the members of OSI include 18 assistant attorneys general (AAGs), including supervisors, in eight offices around the state (Manhattan, Nassau and Westchester Counties, Albany, Rochester, Binghamton, Syracuse, and Buffalo). The Attorney General has assigned 11 full-time and five part-time detectives (including supervisors) to work with OSI. Plans are in place to increase the count for both AAGs and detectives, due to the volume of cases of which OSI is notified.

In addition, OSI has a policy analyst, who focuses on OSI's data and recommendations (including for this Report); legal support analysts, who work with attorneys and detectives in investigations, trial preparation, and the preparation of video (such as body-worn camera

---

[1] The full text of Section 70-b can be read here. Prior to the effective date of Section 70-b, Executive Order 147, issued in 2015 and in effect through March 31, 2021, gave the Attorney General a narrower form of authority, to investigate and, when warranted, prosecute offenses arising from incidents in which a police officer (but not a peace officer) caused the death of an unarmed (but not of an armed) civilian. Executive Order 147 can be read here: Executive Order 147.

footage) for public release; and family liaisons and a community liaison, who, together with attorneys and detectives, attend meetings with family members of persons who have died in law enforcement encounters and with members of communities affected by these incidents.

<u>OSI's Process: Assessments and Investigations</u>

Under Section 70-b, OSI has investigative authority and criminal jurisdiction when an officer, as defined, has caused a death, or when there is a question whether an officer has caused a death. At the time OSI is notified of an incident it is not always clear whether these three elements – a death, a defined officer, and a causal relationship between an officer's act or omission and the death – are present.

Regarding the first element, a death, there are times OSI receives a notification about a person believed to be "likely" to die. If the person does not die, OSI will close the case when it becomes clear that the person is going to survive and will communicate with the district attorney for the county where the incident occurred to confirm that the district attorney will review the matter for any potential criminal conduct.

Regarding the second element, a defined officer, there are times when OSI receives a notification involving an officer mistakenly believed to be a police officer or a peace officer as defined in Section 70-b. For example, OSI sometimes receives notifications of incidents where the officer involved is a federal officer. In such cases, OSI will close the case when it confirms with objective evidence that an officer as defined by Section 70-b was not involved.

However, the vast majority of notifications received by OSI clearly involve a death and a defined officer. When the third element – causation – is not initially clear, OSI calls its investigations "preliminary assessments," though they often take months to complete. For example, if a person dies from illness in a prison, OSI, in the course of its preliminary assessment, gathers evidence to determine whether the death was caused by the neglect ("omission") of a corrections officer. This may require the review of many hours of video, review of handwritten logbooks and electronic logs, incident reports, medical records, autopsy and toxicology reports, as well as interviews of corrections officers, medical staff, incarcerated persons housed near the person who died, and the medical examiner. At the end of the assessment, OSI may conclude that it does not find reason to believe that a corrections officer caused the death and will close the matter.

When OSI closes a case after a preliminary assessment based on the absence of causation, OSI sends a letter, pursuant to Paragraph 2 of Section 70-b, to the district attorney for the county in which the incident occurred, informing the district attorney that a preliminary assessment shows that the Attorney General does not have investigative authority or criminal jurisdiction in the matter. At that point jurisdiction reverts to the district attorney.

On the other hand, when OSI has a case where it is clear from the start that an officer has caused a death, such as a shooting case, or where OSI's preliminary assessment establishes that an officer has caused a death, OSI pursues a full investigation. At the conclusion of the investigation, pursuant to Section 70-b, OSI must do one of two things: (a) present evidence to a grand jury and obtain an indictment, or (b) issue a public report detailing the investigation and its results, explaining why OSI did not present evidence to a grand jury. OSI must also issue a public report if it presents evidence to a grand jury and the grand jury does not return an indictment.

The data tables on OSI's website list every incident of which OSI has been notified since April 1, 2021, the effective date of Section 70-b, including the date of the incident, the name and demographic information of the person who died, the county in which the incident occurred, the police or corrections agency involved, and the status of the matter. If a matter is closed, the tables say whether it was closed because: there was no death; there was no defined officer; OSI did not find that an officer caused the death; OSI issued a published report; or OSI obtained an indictment. If a matter is open, the tables say whether the matter is "pending preliminary assessment" (meaning causation is not yet clear), or "pending investigation" (meaning causation is clear, but OSI has not yet determined whether to present evidence to a grand jury).

<u>Family Meetings</u>

When OSI begins a full investigation, we reach out to the family members of the person who has died and ask to meet with them in person. In these family meetings the AAG and the detective assigned to the investigation, as well as an OSI family liaison, introduce themselves, provide their contact information, and explain OSI's role under the law and OSI's investigative process. The family liaison, in addition, provides the family with information about services that might be available to them (for example, counseling) and offers to help the family access those services, if they wish.

When a case has video evidence, OSI offers the family the opportunity to view it, if they wish. This may occur at the initial family meeting or at a later meeting. It is the Attorney General's policy to publicly release relevant video in connection with OSI's investigations, but the office will not release video before providing the family an opportunity to view it.

The AAG, the detective, and the family liaison remain in touch with the family as the investigation proceeds. When the investigation is completed, whether it is going to result in a report or a grand jury presentation, the AAG, the detective, and the family liaison ask to meet with the family again. At that meeting, the team will explain the results of the investigation to the family and provide them with the reasons why OSI made the determination either to issue a report or to present evidence to a grand jury.

<u>Pending Indictments</u>

Assistant attorneys general in OSI are currently prosecuting five indictments, each of which charges an officer with murder or manslaughter. See Section 2, below, for a summary of the indictments.

<u>Published Reports</u>

Since OSI's last Annual Report, OSI has issued 26 public reports about incidents in which OSI, after a full investigation and an analysis of the law, found that an officer caused a death but determined that criminal charges were not warranted. Public issuance of such reports is required by Paragraph 6 of Section 70-b. See Section 3, below, for a summary of the investigative reports OSI published since OSI's last Annual Report.

In determining whether criminal charges are warranted, OSI's attorneys are ethically bound to evaluate whether the admissible evidence obtained in the investigation would carry the prosecutor's burden to prove the criminal charges beyond a reasonable doubt at trial, and, where relevant, the prosecutor's burden to disprove the defense of justification beyond a reasonable doubt at trial. [2]

<u>New York City Department of Correction</u>

OSI investigates (or assesses to determine causation) the deaths of persons in the custody of corrections departments around the state, including persons in the custody of the New York City Department of Correction (NYC DOC) at Rikers Island and elsewhere. See Section 4, below, for summaries of the assessments OSI has completed of NYC DOC matters since OSI's last Annual Report.

<u>Recommendations</u>

Section 70-b authorizes OSI to make recommendations based on its investigative work. Please see Section 5, below, for OSI's recommendations.

---

[2] Pursuant to the American Bar Association's Standards for the Prosecution Function, Standard 3-4.3, Minimum Requirements for Filing and Maintaining Criminal Charges: "(a) A prosecutor should seek or file criminal charges only if the prosecutor reasonably believes that the charges are supported by probable cause, that admissible evidence will be sufficient to support conviction beyond a reasonable doubt, and that the decision to charge is in the interests of justice." See also, Rule 3.8 of the New York Rules of Professional Conduct. See below, Section 3, for an explanation of the defense of justification under New York law and the prosecutor's burden to disprove the defense of justification beyond a reasonable doubt in cases where the defense is applicable.

Data

Because Section 70-b requires that OSI's Annual Report be published on October 1, OSI uses a data year ending August 31, to provide for 30 days to collate and analyze OSI's annual data. In the data year ended August 31, 2023, OSI received notification of 281 incidents potentially coming within the ambit of Section 70-b, a substantial increase over the 234 notifications OSI received in the data year ended August 31, 2022. See Section 6, below, for a discussion of selected data, and see the tables on OSI's webpage of the Attorney General's website for OSI's complete data, including updates on data reported in previous OSI Annual Reports.

## 2. SUMMARY OF INDICTMENTS

Members of OSI are prosecuting the five indicted cases described below. Indictments are accusations. Every criminal defendant is presumed innocent unless and until a jury determines that the evidence proves the defendant's guilt beyond a reasonable doubt.

People v. Errick Allen

The indictment charges that Errick Allen, who was an officer of the New York City Police Department (NYPD), committed Murder in the Second Degree, Manslaughter in the First Degree, and Menacing when he used his service weapon to threaten and then to kill Christopher Curro on May 12, 2020, in Nassau County.[3]

Allen and Curro lived in Nassau County and were longtime friends, but text messages indicated they were in a dispute. On May 12, 2020, shortly after 8:00 pm, in a residential neighborhood in Farmingdale, Allen, who was off-duty, allegedly killed Curro by shooting him five times at close range, including twice in the head, with his NYPD service weapon. Mr. Curro was unarmed.

The indictment is pending in Nassau County Court. A trial date has not been set. The indictment is at this link: Errick Allen Indictment. Christopher Curro was white and was 25 years old when he died. NYPD terminated Allen after the incident.[4]

People v. Christopher Baldner

The indictment charges that Christopher Baldner, who was a trooper in the New York State Police (NYSP), committed Murder in the Second Degree, Manslaughter in the Second Degree, and Reckless Endangerment in the First Degree when he used his trooper vehicle to

---

[3] This incident occurred prior to the effective date of Section 70-b, and OSI is therefore prosecuting the matter pursuant to Executive Order 147; see Footnote 1.

[4] Paragraph 7 of Section 70-b directs OSI to include in the Annual Report "racial, ethnic, age, gender and other demographic information concerning the persons involved" in its investigations.

cause the death of Monica Goods, who was 11 years old, and to endanger other members of her family, on December 22, 2020, in Ulster County. The indictment also charges that, in September of 2019, Baldner similarly endangered the lives of a driver and his passengers by using his police vehicle to ram their car. [5]

On December 22, 2020, at 11:40 pm, Tristan Goods was driving on the New York State Thruway with his wife and two daughters, ages 11 and 12, on the way to visit family for Christmas. Trooper Baldner was on patrol in his marked NYSP vehicle and stopped the Goods family car for speeding. During the stop the defendant pepper sprayed Mr. Goods, and Mr. Goods sped away. During the pursuit, when both cars were traveling over 100 miles per hour, the defendant allegedly deliberately rammed his police vehicle into the rear of the Goods family car, twice. Upon the second strike, the Goods family car flipped over and came to rest upside down in the median. The impact ejected Monica Goods from the car, killing her. No one in the Goods car was armed.

The indictment is pending in Ulster County Court. A trial date has not been set. The indictment is at this link: Christopher Baldner Indictment. Monica Goods was Black and was 11 years old when she died. The defendant has retired from NYSP.

People v. Yvonne Wu

The indictment charges that Yvonne Wu, who was an officer in the NYPD, committed Murder in the First and Second Degrees, Attempted Murder in the First and Second Degrees, Assault in the First Degree, and Burglary in the First Degree when she used her service weapon to shoot and kill Jamie Liang and to shoot and wound Jenny Li on October 13, 2021, in Kings County.

On October 13, 2021, the defendant, while off-duty, went to the Brooklyn home of Jenny Li, whom she knew, and allegedly forced Jenny Li to let her inside, where the defendant allegedly used her service weapon to shoot and kill Jamie Liang, a friend of Li's, and to shoot and wound Li. Neither Ms. Liang nor Ms. Li was armed.

The indictment is pending in Kings County Supreme Court. A trial date has not been set. The indictment is at this link: Yvonne Wu Indictment. Jamie Liang was Asian and was 24 years old when she died. NYPD terminated the defendant after the incident.

---

[5] This incident occurred prior to the effective date of Section 70-b, and OSI is therefore prosecuting the matter pursuant to Executive Order 147, see Footnote 1, as well as Executive Order 7, pertaining to a prior act which did not result in death. Executive Order 7 can be seen in this link: Executive Order 7. On February 2, 2023, the judge presiding over the case issued a decision dismissing the count charging the defendant with Murder in the Second Degree and reducing the counts charging Reckless Endangerment in the First Degree to Reckless Endangerment in the Second Degree. The Attorney General is appealing that decision. No date has been set for the argument of the appeal.

People v. Dion Middleton

The indictment charges that Dion Middleton, an officer in NYC DOC, committed Murder in the Second Degree and Manslaughter in the First and Second Degrees when he used his service weapon to shoot and kill Raymond Chaluisant in the Bronx on July 21, 2022.

On July 21, 2022, shortly after 1:00 am, when he was off duty and on foot near the Cross Bronx Expressway and Morris Avenue in the Bronx, the defendant allegedly shot and killed Raymond Chaluisant, who was a passenger in a car. Mr. Chaluisant was unarmed.

The indictment is pending in Bronx County Supreme Court. A trial date has not been set. The indictment is at this link: Dion Middleton Indictment. Raymond Chaluisant was Hispanic and was 18 years old when he died. NYC DOC suspended the defendant pending a disciplinary process.

People v. Nigro

The indictment charges that Anthony Nigro IV, who is a New York State Trooper, committed Manslaughter in the First and Second Degrees when he used his service weapon while he was on duty to shoot and kill James Huber in Buffalo on February 12, 2022.

On the morning of February 12, 2022 state troopers, including the defendant, were pursuing Mr. Huber, who was speeding and driving erratically, on highways near Buffalo. After Mr. Huber took an exit off the highway the defendant followed Mr. Huber's car until Mr. Huber stopped his car in the middle of a side street in downtown Buffalo. The defendant parked in front of Mr. Huber's car and got out of his trooper car with his gun drawn. With his gun in one hand, the defendant used his other hand to grab Mr. Huber through the open window of the driver's side of the car. Mr. Huber put his car in reverse, and the defendant allegedly fired his service weapon and shot Mr. Huber twice, including once in the head, killing him. Mr. Huber was unarmed.

The indictment is pending in Erie County Supreme Court. A trial date has been set for March 7, 2024. The indictment is available here: New York State Trooper Anthony Nigro IV Indictment. Mr. Huber was white and was 38 years old when he died. After the indictment the defendant was suspended for 30 days without pay; he is currently suspended with pay.

## 3. REPORTS RELEASED BY OSI IN THE PAST 12 MONTHS

*OSI's Process: Published Reports*

When OSI determines not to seek charges in an incident in which a police officer or peace officer caused the death of a person, Section 70-b, Paragraph 6, requires OSI to publish a report about the investigation and the reasons why OSI declined to present evidence to a

grand jury. That Paragraph also authorizes OSI to include in the published report recommendations for systemic or other reforms arising from the investigation.

Each of OSI's published reports describes OSI's investigation in detail, as well as the legal analysis that led OSI to conclude that a prosecutor would not be able prove the officer guilty of a crime beyond a reasonable doubt at trial, or that a prosecutor would not be able to disprove the defense of justification beyond a reasonable doubt at trial. These are not conclusions that an officer's conduct was proper, only that a prosecutor would not be able to prove the officer guilty of a crime at trial under the standards required by law.

When OSI completes an investigation, and prior to issuing a report, the OSI attorney and detective assigned to the investigation, as well as a family liaison and, often, the community liaison meet with family members of the person who died (and their counsel, if they wish) to explain the steps OSI took in the investigation and OSI's investigative findings and legal analysis. Members of OSI also meet with family members earlier in the course of an investigation to explain the investigative process and, in cases where video of the incident exists, to show video to family members who wish to see it. In addition, in many investigations, OSI staff and members of the Attorney General's office of Intergovernmental Affairs will meet with elected officials and community leaders.

### OSI's Investigations

OSI's investigations, each of which takes a number of months to complete, include, depending on the case:

- interviews of

  - the police officers or corrections officers who are the subjects of the investigation;[6]
  - other police officers and corrections officers who may be witnesses;

---

[6] The officer-subjects of OSI's investigations often refuse OSI's requests for interviews. The same is true of officer-witnesses. As in any criminal investigation, the subjects and witnesses in OSI's investigations have the right not to talk to law enforcement, pursuant to the Fifth Amendment to the United States Constitution. OSI has civil subpoena authority, and uses it, but even when a person is civilly subpoenaed and appears for testimony, he or she has a right to refuse to answer questions. In New York criminal investigations, a prosecutor can only require a person to speak by subpoenaing the person to a grand jury and proceeding to take the person's testimony under oath, because a witness in the grand jury is granted full immunity from prosecution by operation of law, Criminal Procedure Law Article 50 and Section 190.40. Immunity is considered a complete substitute for the person's Fifth Amendment privilege. Police departments can and do compel statements from officers when conducting internal investigations of possible misconduct. However, if OSI were to become privy to such a compelled statement concerning an officer who was the subject of an OSI investigation, that officer would gain use immunity and derivative use immunity with regard to the compelled statement, based on their Fifth Amendment rights. *Garrity v. New Jersey*, 385 US 493 (1967). As a result, any OSI investigator or AAG with knowledge of the compelled statement would be considered "tainted" and would have to leave the investigation, and OSI would be required to bring in a new team of investigators and AAGs.

- civilian bystander witnesses and jail and prison witnesses;
- the medical examiner who performed the autopsy and other members of the medical examiner's staff;
- the emergency medical responders, treating physicians, and responding jail and prison medical staff; and
- other experts, such as consulting medical examiners, accident reconstruction experts, video analysts, and firearms and other forensic experts;

- and reviews of

- officers' body-worn camera (BWC) videos and dashboard camera (dashcam) videos;
- police and corrections departments' surveillance camera videos
- data from gunshot detection technologies;
- civilian videos from cell phones and security cameras in homes and businesses;
- recorded 911 calls, dispatch transmissions, and officer-to-officer communications;
- police departments' crime scene and other photographs, ballistics reports, DNA reports, and accident reconstruction reports;
- police and corrections departments' incident reports, interview reports, and investigative reports;
- medical and mental health records, including reports from responding EMTs and responding doctors, records from prison and jail medical services, and records from hospitals to which decedents were brought before they died; and
- autopsy reports, including photographs and toxicology reports.

### New York's Law of Justification

Many of the cases OSI decides not to present to a grand jury turn on New York's law of justification, which is set forth in Article 35 of the New York Penal Law. As applied to OSI's cases, the basic idea underlying the law of justification is the right to defend oneself or another from wrongful physical force.

Two provisions in Article 35 are often relevant to OSI's investigations. One is the general provision justifying all persons' (civilians' or officers') use of deadly physical force to defend themselves or others from another person's wrongful use of deadly physical force (Penal Law Section 35.15, Subdivision 2). The other is a provision specifically justifying police officers' or peace officers' use of deadly physical force to defend themselves or others from another person's wrongful use of deadly physical force when the officer is making an arrest or preventing an escape from custody for a criminal offense (Penal Law Section 35.30, Subdivisions 1 and 2).

An important difference between the general provision and the officer-specific provision concerns the duty to retreat. Civilians may not use deadly physical force in defense of self or

another if they know they can retreat with complete safety to themselves and others, Penal Law Section 35.15(2)(a). However, officers who are justified in using deadly physical force under Penal Law Section 35.30 because they are making an arrest or preventing an escape for an offense are under no duty to retreat, even if they could do so with complete safety to themselves and others, Penal Law Section 35.15(2)(a)(ii).

Justification is legally a "defense," not an "affirmative defense," Penal Law Section 35.00. This means that if a case goes to trial the burden is on the prosecutor to disprove justification beyond a reasonable doubt, Penal Law Section 25.00(1). This burden of proof is often a decisive factor in OSI's determination whether or not to seek criminal charges against an officer.

### *Summary of Observations from OSI's Published Reports*

<u>Mental Health</u>

A number of incidents investigated by OSI and summarized in this section involved people who appeared to be in a mental health crisis. The members of OSI are not mental health specialists, and we do not know whether even a mental health specialist would be able to "diagnose" a person by investigating a past event, especially as the person in question has died and cannot be medically examined. Nevertheless, of the 26 published OSI reports summarized in this section, 11 appear to show a person in a mental health crisis: Roger Lynch, Paul Weeden, Brian Astarita, Eudes Pierre, Carson Dobson, Yoskar Feliz, Jamie Feith, Joshua Kavota, David Litts, Daniel Kachinoski, and Enrique Lopez. Along similar lines, in eight of the published OSI reports summarized in the last Annual Report, the persons who died appeared to be in a mental health crisis: Jeffrey McClure, George Zapantis, Judson Albahm, Tyler Green, Jesse Bonsignore, Christopher Van Kleeck, Brandi Baida, and Allison Lakie.

For these reasons, OSI continues to recommend, as stated in last year's Annual Report, that the Legislature and the Governor require by statute that all police and sheriff's departments meaningfully train all officers in crisis intervention, both at the academy and on an ongoing basis, and provide smaller departments with related state funding and, through DCJS, training.

<u>Breath Tests</u>

In six of the cases summarized below, police officers were not breath tested promptly after fatal motor vehicle collisions in which they were the drivers: Delroy Morris, Lopamudra Desai, Marcelo Pelaez and Leonardo Rodriguez-Mendoza, Amos Domfeh, Chatuma Crawford, and Ronald Anthony Smith. Although OSI did not find that the officer-drivers in these cases were impaired at the time of the collisions, the failure to promptly breath-test officer-drivers clearly impedes investigations of this type and could engender public mistrust

of the process. Therefore, as set forth in the Recommendations section later in this Report, OSI recommends that all police departments breath test driver-officers, whether on or off duty, promptly after any collision in which injury or death results.

BWC

In four of the cases summarized below, the involved police officers either were not equipped with BWCs or were equipped with them and failed to activate them: Roger Lynch, Paul Weeden, Jamie Feith, and Enrique Lopez. In the Lynch case the police department involved, NYSP, had a BWC program, but exempted the special unit involved from BWC use.

Similarly, in the last Annual Report, seven of the summarized cases involved officers who did not have or did not use BWC: Jeffrey McClure, Judson Albahm, Jesse Bonsignore, Timothy Flowers, David Wandell, Dedrick James, and Brandi Baida. In the Flowers and James cases, the department or departments involved had a BWC program, but exempted special units from use.

Therefore, OSI continues to recommend, as stated in last year's Annual Report, that the Legislature and Governor require by statute that all police and sheriff's departments deploy and use BWCs and dashcams and provide smaller departments with related funding from the state and training by DCJS. The continuing failure of multiple departments to equip their officers with BWCs and dashcams shows the need for such legislation. In addition, because some departments appear to broadly exempt special units from BWC and dashcam use, we are expanding our recommendation to clarify that the requirement to equip officers with BWCs and dashcams should apply to all police units expected to have encounters with civilians, including search, arrest, and special operations teams, with only limited exceptions, as set forth in more detail in the Recommendations section later in this Report.

### *Reports OSI Published in the Last 12 Months*

The reports OSI published in the 12 months since the last OSI Annual Report are summarized below. See OSI's data tables for cases that remain under investigation.

Delroy Morris, July 5, 2020, Kings County[7]

On the night of July 25, 2020, two NYPD officers responding to a 911 call were driving on Metropolitan Avenue, approaching the intersection with Driggs Avenue, in Brooklyn, in a marked police car with the turret lights on. The officer driving the vehicle slowed and then drove through a steady red light at the intersection, striking Delroy Morris, who was crossing

---

[7] This incident occurred prior to the effective date of Section 70-b, and OSI therefore investigated it pursuant to Executive Order 147; see Footnote 1.

through the intersection on a motorcycle, with the green light, from the officer's right. The impact resulted in Mr. Morris's death.

A tracking system used by NYPD showed that the NYPD car was going 23 miles per hour (mph) shortly before entering the intersection; video showed that the car's brake lights came on before entering the intersection. A collision reconstruction found, based on video, that Mr. Morris was traveling between 37 and 49 mph before entering the intersection (the speed limit was 25 mph).

Although the police car went through a red light, Section 1104(b)(2) of New York's Vehicle & Traffic Law (VTL) permits a police car answering an emergency call to go through a red light, "after slowing down as may be necessary for safe operation." Under VTL Section 1104(e), the red-light exemption and other exemptions under VTL 1104 "shall not relieve the driver of an authorized emergency vehicle from the duty to drive with due regard for the safety of all persons, nor shall such provisions protect the driver from the consequences of his reckless disregard for the safety of others."

Case law from New York's Court of Appeals establishes that even in civil cases, with their lower burden of proof, a police officer responding to an emergency pursuant to the exemptions of VTL Section 1104 will not be held liable "unless the officer acted in reckless disregard for the safety of others" and has "intentionally done an act of an unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow and has done so with conscious indifference to the outcome." *Saarinen v. Kerr*, 84 NY 2d 494, 501 (1994) (citations omitted). In a later civil case the Court added that the *Saarinen* "approach avoids judicial second-guessing of the many split-second decisions that are made in the field under highly pressured conditions ...." *Frezzell v. City of New York*, 24 NY3d 213, 217 (2014) (internal quotation marks and citations omitted).

OSI's investigation, which included witness interviews,[8] NYPD's accident reconstruction, review of the driving officer's sworn testimony, including cross examination, in a hearing about the incident, and review of security video and the records of electronic tracking devices, did not find evidence that the driving officer acted in "reckless disregard for the safety of others" or that he was distracted or impaired. OSI concluded that a prosecutor would not be able to prove beyond a reasonable doubt that the driving officer committed a crime.

The driving officer was not breath-tested until two hours after the collision, when an officer qualified to administer the test arrived. Therefore OSI recommended that all patrol supervisors be trained in administering breath tests to avoid similar delays in the future.

---

[8] The driving officer refused OSI's request for an interview.

Mr. Morris was Black and was 37 years old when he died. Report: [Delroy Morris](#).

Lopamudra Desai, May 23, 2021, Queens County

In the afternoon of May 23, 2021, an off-duty NYPD officer was driving her personal car in a residential neighborhood in Queens. The officer made a left turn and struck Ms. Desai, who was walking in a crosswalk. Ms. Desai later died of her injuries.

OSI's investigation, which included an interview of the off-duty driver-officer and review of NYPD's accident reconstruction, the officer's cell phone use, security video from a nearby building, and the sobriety tests administered to the officer, did not find evidence that the officer was driving recklessly or was speeding or distracted or impaired. OSI concluded that a prosecutor would not be able to prove a crime against the officer beyond a reasonable doubt.

The off-duty officer was not breath-tested until two and a half hours after the incident. Therefore OSI recommended that NYPD hold officers to the same standards as civilians and breath-test them as quickly as practicable after a serious motor vehicle collision.

Ms. Desai was South Asian and was 82 years old when she died. Report: [Lopamudra Desai](#).

Marcelo Pelaez and Leonardo Rodriguez-Mendoza, May 24, 2021, Queens County

On May 24, 2021, shortly before 12:30 am, an off-duty NYPD officer was driving in his personal car with his wife and daughter, in Queens. He had the green light as he drove through an intersection and struck Mr. Pelaez and Mr. Rodriguez-Mendoza, who were crossing in a crosswalk against the light. Mr. Pelaez and Mr. Rodriguez-Mendoza died of their injuries.

OSI's investigation, which included review of NYPD's accident reconstruction, New York City Department of Transportation Automated Enforcement Unit bus lane videos of the collision, civilian video of the officer's conduct at various times before the collision, review of the officer's cell phone use, and interviews with witnesses,[9] did not find evidence that the officer was driving recklessly or excessively fast (he was driving 5 to 9 mph above the speed limit) or that he was distracted or impaired. OSI concluded that a prosecutor would not be able to prove a crime against the officer beyond a reasonable doubt.

There was evidence that the off-duty officer had been drinking earlier in the evening: civilian video showed him apparently drinking from three beers when he and his family were visiting friends, beginning two and a half hours and ending one and a half hours before the collision. More than an hour and 45 minutes after the collision, an NYPD officer administered field

---

[9] The off-duty officer refused OSI's request for an interview.

13

sobriety tests to the off-duty officer, which he passed. However, the off-duty officer refused to take a breath test, which resulted in his suspension from NYPD for 30 days and a summons for violating VTL Section 1194(1)(b). Because of the delay in attempting to administer the breath test, OSI recommended that NYPD hold officers to the same standards as civilians and breath-test them as quickly as practicable after a serious motor vehicle collision.

Mr. Pelaez was Hispanic and was 46 years old when he died. Mr. Rodriguez-Mendoza was Hispanic and was 45 years old when he died. Report: Marcelo Pelaez and Leonardo Rodriguez-Mendoza.

Roger Lynch, August 6, 2021, Delaware County

Between 8:00 pm and 8:30 pm in the evening of August 5, 2021, officers of police and sheriff's departments responded to reports of a shooting at a house in Delhi, Delaware County. Officers who arrived at the scene found that a person had been shot (not fatally), learned that the shooter might be Roger Lynch, and obtained an address for Mr. Lynch. At 8:40 pm, an off-duty NYSP sergeant and an on-duty NYSP sergeant, in separate cars, responded to a radio dispatch that gave Mr. Lynch's address in Franklin. Shortly after they arrived at his house Mr. Lynch came outside and fired at them. Despite this, they got Mr. Lynch to yell out his phone number to them as he retreated inside, and the on-duty sergeant called it and proceeded to speak to Mr. Lynch in a series of calls over the next 9 hours, attempting to persuade him to come out of his house unarmed. In the course of the evening additional NYSP officers arrived at Mr. Lynch's house, including members of an NYSP Crisis Negotiation Team, who gave advice to the sergeant who was speaking with Mr. Lynch. Members of an NYSP Special Operations Response Team (SORT) arrived in an armored vehicle called a Bearcat. The negotiations were unsuccessful. At 6:49 am Mr. Lynch came out of his house and pointed a long gun at the Bearcat. A trooper in the turret of the Bearcat fired one shot at Mr. Lynch, causing his death.

Based on the investigation, including witness interviews,[10] review of radio transmissions, ballistics evidence, and audio from BWCs in use at a distance from the Bearcat, OSI concluded that a prosecutor would not be able to disprove beyond a reasonable doubt that the firing officer's action was justified.

NYSP members in and near the Bearcat did not activate their BWCs. NYSP told OSI that it assumes sensitive communications will occur during SORT operations and therefore exempts SORT members from activating their BWCs during such operations. However, BWCs record but do not transmit, and therefore communications among officers cannot be overheard in real time through the operation of BWCs. In any event, OSI's investigation of

---

[10] The shooting officer refused OSI's request for an interview; other officers present agreed to OSI's requests for interviews.

this case did not find evidence of sensitive communications. Therefore, OSI recommended that NYSP require SORT members to activate their BWCs during every encounter with members of the public unless the incident commander on site has a specific and articulable reason for protecting a confidential communication, and, even then, to have the officers de-activate only audio and keep video going. OSI also recommended that NYSP deploy exterior cameras on armored vehicles to enhance the likelihood that activity will be visually captured.

Mr. Lynch was white and was 59 years old when he died. Report: [Roger Lynch](#).

Mike Rosado, August 29, 2021, Bronx County

In the early morning hours of August 29, 2021, two NYPD officers whose shifts had just ended were in a parking lot a few blocks from their precinct house in the Bronx, to get their personal cars and drive home. They noticed a group of people gathered outside a store at the corner of East 180th Street and Valentine Avenue and heard a commotion followed by two gunshots. The officers started running toward the group. As the officer in the lead got close to the corner he saw Mr. Rosado with a gun in his hand, standing between parked cars and facing the street. The officer announced that he was a police officer (he was in plain clothes) and told Mr. Rosado to drop the gun. Mr. Rosado stepped toward the officer and raised the gun in the officer's direction. The officer fired, striking Mr. Rosado, who died of his wounds. At a later time, other officers recovered Mr. Rosado's gun from a woman who had fled the scene with it.

Based on the investigation, including interviews of the firing officer and the other officer who was present, an interview of the medical examiner, and interviews of other witnesses, and review of multiple security videos from the store, the ballistics evidence, and the medical examiner's report, OSI concluded that a prosecutor would not be able to disprove beyond a reasonable doubt that the shooting officer's actions were justified.

Mr. Rosado was Hispanic and was 24 years old when he died. Report: [Mike Rosado](#).

Amos Domfeh, September 16, 2021, Dutchess County

At dusk on September 16, 2021, Amos Domfeh left his residence in Poughkeepsie and began crossing Violet Avenue in an area without a crosswalk or a traffic light. A Dutchess County Sheriff's deputy was driving toward him along Violet Avenue. The deputy braked a half second before hitting Mr. Domfeh but struck him nevertheless, causing his death. OSI did not find evidence that the deputy was driving recklessly or excessively fast (she was going 7 to 14 mph over the speed limit of 35 mph) or that she was impaired or distracted.

Based on the investigation, including witness interviews[11] and review of NYSP's accident reconstruction, security video footage, and the deputy's cell phone use, OSI concluded that a prosecutor would not be able to prove beyond a reasonable doubt that the deputy committed a crime.

The deputy involved in the collision was not breath-tested until three hours later. Though the test was negative for alcohol, and OSI did not otherwise find evidence that the deputy was impaired or intoxicated, OSI recommended that all officers be given a breath test after serious collisions as soon as a member of law enforcement qualified to administer the test is on scene.

Amos Domfeh was Black and was 57 years old when he died. Report: Amos Domfeh.

Paul Weeden, October 4, 2021, Delaware County

In the middle of the night on October 4, 2021, Mr. Weeden called 911, said he was going to hurt himself, and requested that a police officer be sent to his home in the Village of Walton, Delaware County. An officer from the Village of Walton Police Department (WPD) responded to the call. The officer recognized the address, as he had been to Mr. Weeden's residence before, and requested backup because he knew Mr. Weeden kept guns in his house. The WPD officer got to the house before the backup arrived and went inside. He saw Mr. Weeden on a couch under a blanket.

Mr. Weeden asked the officer to come closer, and the officer asked Mr. Weeden to take his hands out from under the blanket – at which point he saw a gun in Mr. Weeden's right hand. The officer backed away to the door of the house and told Mr. Weeden to drop the gun. Mr. Weeden followed the officer to the door, pointing the gun at the officer, and the officer fired at Mr. Weeden. Mr. Weeden fell, but raised the gun again, and the officer fired again. Mr. Weeden was pronounced dead at the scene. Officers recovered a gun at the scene, which upon examination proved to be a pellet gun, though it lacked any markings to distinguish it from a firearm.[12]

Based on the investigation, which included witness interviews,[13] ballistics evidence, and statements the firing officer made immediately after the incident, captured on the BWC of a responding officer from a different department, OSI concluded that a prosecutor would not be able to disprove beyond a reasonable doubt that the officer's action was justified.

---

[11] The driving deputy refused OSI's request for an interview.

[12] After OSI recommended in a report (Judson Albahm, summarized in last year's Annual Report) that the state require imitation guns to be brightly colored and easily distinguishable from real firearms, the Legislature passed just such a law, which the Governor signed. See legislation S.687/A.3998.

[13] The firing officer refused OSI's request for an interview.

WPD did not equip its officers with BWCs, and therefore OSI recommended WPD equip all officers with BWCs as soon as possible.

Paul Weeden was white and was 66 years old when he died. Report: [Paul Weeden](#).

Brian Astarita, November 11, 2021, Kings County

In the afternoon of November 11, 2021, an NYPD Highway officer was conducting radar enforcement on the Belt Parkway in Brooklyn, where the speed limit was 50 mph. The radar scanner clocked a Jeep Grand Cherokee driving past at 71 mph, so the officer drove from her position on the shoulder into traffic and directed the driver of the Jeep to pull over. The Jeep driver, Mr. Astarita, complied but, after telling the officer he did not have a license because it was suspended, drove away. The officer got back into her car and pursued Mr. Astarita, repeatedly attempting to pull him over, and radioed for backup. Mr. Astarita finally stopped, and a backup officer pulled up, but, when the two officers got out of their cars, Mr. Astarita got out of his Jeep, got what appeared to be a gun from the back seat, and pointed it at the officers. The officers and Mr. Astarita were in the Belt Parkway roadway and many other cars were nearby. The officers shouted at Mr. Astarita to drop the gun, but he continued to point the gun at the officers and yelled at them to let him go. The officers fired at Mr. Astarita, striking him, and he died of his injuries. Upon inspection Mr. Astarita's gun proved to be a BB gun, though it lacked any markings to distinguish it from a firearm.[14]

Based on the investigation, which included interviews of the firing officers, interviews of other witnesses, and review of the first officer's dash cam video and both officers' BWC video, bystander cell phone video, ballistics evidence, and the medical examiner's report, OSI concluded that a prosecutor would not be able to disprove beyond a reasonable doubt that the officers' actions were justified.

Brian Astarita was white and was 65 years old when he died. Report: [Brian Astarita](#).

Raymierik Lopez, December 16, 2021, Queens County

At 3:00 am on December 16, 2021, an off-duty NYPD officer left a nightclub in Woodside, Queens, went to his nearby parked car, and waited for a friend whom he was going to take to the airport. As the off-duty officer sat in the driver's seat with the door open another car pulled up and Mr. Lopez and two other men got out and approached the officer. The men, holding guns, pulled gold chains off the off-duty officer's neck. The off-duty officer and the three men exchanged gunfire; it was not clear who fired first. Two of the men ran away; Mr. Lopez lay in the street, half a block from the officer's car, fatally wounded. A gun was recovered near Mr. Lopez's body. The off-duty officer suffered gunshot wounds to his forehead, chest, arm, hand, and thigh; he was treated and eventually recovered. (The two

---

[14] See the previous footnote regarding legislation [S.687/A.3998](#) requiring imitation guns to be brightly colored.

men who ran away were found later and prosecuted by the Queens County District Attorney for robbery.)

Based on the investigation, which included review of security video from nearby businesses, interviews of the off-duty officer and other witnesses, and review of ballistics evidence and the off-duty officer's medical records, OSI concluded that a prosecutor would not be able to disprove beyond a reasonable doubt that the off-duty officer's actions were justified.

Mr. Lopez was Hispanic and was 20 years old when he died. Report: [Raymierik Lopez](#).

Chatuma Crawford, December 17, 2021, Onondaga County

On the evening of December 17, 2021, an off-duty police officer with the Town of Cicero Police Department (CPD) was driving with a passenger in an SUV on Northern Boulevard in Cicero, Onondaga County. The officer passed a person standing beside a car stopped on the right shoulder of the road, who, though not known to the officer, had been in the car with Mr. Crawford and had just seen him throw a cell phone into the road. A moment later the officer's car hit Mr. Crawford, who was crouched in the roadway, looking for the cell phone. Mr. Crawford died of his injuries. OSI did not find evidence that the off-duty officer was driving recklessly or was speeding or impaired or distracted.

Based on the investigation, which included accident reconstruction and interviews of the off-duty officer and other witnesses, OSI concluded that a prosecutor would not be able to prove beyond a reasonable doubt that the off-duty officer had committed a crime.

Chatuma Crawford was Black and was 20 years old when he died. Report: [Chatuma Crawford](#).

Eudes Pierre, December 20, 2021, Kings County

Early in the morning of December 20, 2021, a caller told a 911 operator that a man in a Tommy Hilfiger jacket was walking back and forth on Eastern Parkway between Utica and Schenectady Avenues in Brooklyn with a gun and a knife. (The investigation later showed that Mr. Pierre was the 911 caller.) Responding NYPD officers encountered Mr. Pierre, who fit the description from the 911 call and had a knife in his hand; his other hand was in his jacket pocket. When Mr. Pierre walked down a staircase into a subway station, officers followed him and saw him on the other side of the turnstiles with the knife in his hand. Officers told him to drop the knife and to show his other hand. They fired Tasers at him, which had no effect. Mr. Pierre came out of the station and up the steps, and the officers backed away. Out on the street officers continued to tell Mr. Pierre to drop the knife and show his other hand, until Mr. Pierre ran at one officer with the knife. The officer at first tried to run away but when Mr. Pierre got within a few feet of him the officer turned and fired his

gun and stumbled to the ground. A second officer fired at Mr. Pierre. Mr. Pierre was struck, and he died of his wounds. Officers recovered a knife at the scene.

Based on the investigation, which included interviews of the firing officers and other witnesses, and review of BWC footage from the firing officers and a number of other officers involved in the encounter, the 911 recording, and a note recovered from Mr. Pierre's home, OSI concluded that a prosecutor would not be able to disprove beyond a reasonable doubt that the firing officers' actions were justified.

Eudes Pierre was Black and was 26 years old when he died. Report: <u>Eudes Pierre</u>.

<u>Carson Dobson, December 24, 2021, Herkimer County</u>

On December 24, 2021, members of the Dolgeville Police Department and NYSP responded to a report of a stabbing. The complainant, who lived in a house beside a long private road, told the officers that her son, Mr. Dobson, had stabbed her and then gone to his camping trailer, which was parked on the private road, a few hundred yards from the house. Officers went to the trailer and, through the closed door, tried to persuade Mr. Dobson to come out. Mr. Dobson said he wanted to kill himself and was having out of body experiences. Mr. Dobson asked the officers to give him a generator, which was on the ground outside the trailer, so he could "blow himself up." Officers placed the generator outside the trailer door and told Mr. Dobson to come out for it. When Mr. Dobson opened the trailer door, an NYSP trooper fired a Taser at him, twice, with no effect. After the second Taser shot, Mr. Dobson ran out of the trailer, directly at the trooper, holding a sword and a knife. When Mr. Dobson was within a few feet of him, the trooper fired his gun, striking Mr. Dobson and causing his death.

Based on the investigation, which included interviews of police and civilian witnesses[15] and review of BWC video from the firing trooper and other officers involved in the encounter, OSI concluded that a prosecutor would not be able to disprove beyond a reasonable doubt that the firing trooper's actions were justified.

Mr. Dobson was white and was 24 years old when he died. Report: <u>Carson Dobson</u>.

<u>Yoskar Feliz, January 20, 2022, Bronx County</u>

In the middle of the night on January 19, 2022, Mr. Feliz broke into his ex-girlfriend's apartment in the Bronx when she was not there. Midday on January 20 (more than 24 hours later), the ex-girlfriend called 911 to report the break-in, after the super told her he had seen the break-in on security video. Two NYPD officers entered the apartment; one was in the

---

[15] The firing trooper refused OSI's request for an interview. Other officers present agreed to OSI's requests for interviews.

front hall when Mr. Feliz appeared from around a corner, brandished a gun, and pointed it at himself and then at that officer. The officer fired a Taser at Mr. Feliz, which had no effect, and told him to put down the gun. Mr. Feliz backed away behind the same corner in the apartment from which he had appeared. The officers heard two shots and realized Mr. Feliz had shot out a window and escaped through it. Video showed that Mr. Feliz ran behind a few buildings, crossed a street, and ran into a park, holding the gun, where a number of other responding officers pursued him and shouted at him to drop the gun. When Mr. Feliz pointed the gun at one of the officers, three officers fired, striking him. Mr. Feliz died of his wounds. His gun was recovered at the scene.

Based on the investigation, including interviews of the firing and other responding officers, interviews of civilian witnesses, and review of BWC video from multiple officers in the apartment and in the park, and security video from the apartment building, OSI concluded that a prosecutor would not be able to disprove beyond a reasonable doubt that the firing officers' actions were justified.

Mr. Feliz was Hispanic and was 27 years old when he died. Report: Yoskar Feliz.

Lashawn McNeil, January 21, 2022, New York County

In the late afternoon of January 21, 2022, Mr. McNeil's mother called 911 and reported that he was threatening her with physical abuse. Three NYPD officers, with BWCs activated, responded to the mother's apartment in Manhattan and had a conversation with her in the living room. She described the situation between herself and her son, said there were no weapons in the house, and said her son was in the bedroom down the hall. Two officers walked down the hall to Mr. McNeil's bedroom while the third officer remained in the living room with his mother. When the officer in the lead in the hallway was two to three feet from the bedroom doorway, Mr. McNeil appeared in the doorway holding a handgun and shot him at close range; the officer died of his wounds. The second officer exchanged gunfire with Mr. McNeil but was struck and fell; the second officer died of his wounds. The third officer fired at Mr. McNeil as he was entering the living room, striking him. Mr. McNeil died of his wounds.

Based on the investigation, including review of the three officers' BWC videos, OSI concluded that a prosecutor would not be able to disprove beyond a reasonable doubt that the officers' actions were justified.

Mr. McNeil was Black and was 47 years old when he died. Report: Lashawn McNeil.

Clarence Little, February 3, 2022, Kings County

On January 4, 2022, at 4:20 pm, Mr. Little entered a Dollar Tree store on Rockaway Parkway in Brooklyn, wearing a wig and sunglasses, went to the cashier three different times to

purchase small items, and left the store at 4:40 pm. When he re-entered the store about five minutes later an employee called 911 and provided a description of Mr. Little, including the wig and glasses. A few minutes before 5:00 pm Mr. Little got back on the cashier line to purchase some items but, when the cashier opened the register, Mr. Little took a gun out of his jacket pocket, pointed it at the employees, went to the register, took cash from it, and began to walk out of the store. As Mr. Little was walking out, two NYPD officers were walking in, responding to the 911 call. One officer grabbed Mr. Little, and the officer and Mr. Little fell to the floor. Mr. Little fired his gun twice, and the second officer, still standing, fired his gun at Mr. Little, striking him. Mr. Little died on February 3, 2022, from complications of the gunshot wound. Officers recovered Mr. Little's gun at the scene.

Based on the investigation, including interviews of the firing officers and civilian witnesses and review of store video and the two officers' BWC videos, OSI concluded that a prosecutor would not be able to disprove beyond a reasonable doubt that the firing officer's actions were justified.

Mr. Little was Black and was 46 years old when he died. Report: [Clarence Little](#).

Troy Eames, February 7, 2022, Onondaga County

In the morning of February 7, 2022, the mother of Troy Eames called 911, reporting that she was seriously injured, but seemingly unaware of exactly what had happened to her or to the other members of her family. When officers arrived at the address the caller gave, they found Troy Eames and Troy Eames's father, a deputy in the Onondaga County Sheriff's Office (OCSO), in the house, dead of gunshot wounds, and found Troy Eames's mother in the house, seriously wounded by a gunshot. Crime scene, ballistics, and medical evidence, and a statement given to OCSO investigators by Troy Eames's mother, as well as security video at the house, which showed that no one else had entered or left the house in the hours before the incident, established that the deputy had shot his son and his wife with his service weapon and then shot himself. The investigation produced no evidence that anyone other than the deputy was involved in the shooting, and therefore no one alive against whom OSI could seek charges.

Troy Eames was white and was 21 years old when he died. Report: [Troy Eames](#).

Ronald Anthony Smith, April 7, 2022, Kings County

April 7, 2022 was a dark and rainy evening. A few minutes after 8:00 pm, an NYPD officer was driving four arrested persons from the 73rd Precinct stationhouse to Brooklyn Central Booking. He drove an NYPD van, with the turret lights on,[16] along Eastern Parkway in Brooklyn, and another officer was in the passenger seat. The officer-driver at times

---

[16] There was conflicting evidence whether the siren was in use at the time of the collision.

exceeded the speed limit and went through at least two intersections against a red light. As the van approached the intersection with Schenectady Avenue the officer-driver, who was distracted by the actions of one of the arrested persons (who had been physically resistant when he was arrested and was secured within the van only by a chain to two of the other arrested persons), steered the van into the left-turn-only lane to avoid a car that had unexpectedly moved in front of the van. The officer, who had the green light, continued driving in a straight line through the intersection, into a painted median, which was not a traffic lane or a pedestrian zone, on the far side of the intersection. At that moment, Mr. Smith was walking or standing in the painted median, and the van struck him. Mr. Smith landed on the hood of the van and fell to the ground as the officer came to a stop. Mr. Smith died of his injuries.

The driving officer was breath tested an hour and 45 minutes after the collision, and registered zero alcohol. OSI reviewed his cell phone use, which showed he was not using his cell phone before or at the time of the collision. NYPD's vehicle tracking system showed that the van was traveling almost 46 mph as it approached the intersection with Schenectady Avenue; the speed limit was 25 mph.

VTL 114-b includes transporting prisoners in the definition of emergency vehicle operation. VTL 1104(b) permits the driver of an emergency vehicle engaged in an emergency operation to (3) "Exceed the maximum speed limits so long as he does not endanger life or property"; and (4) "Disregard regulations governing directions of movement or turning in specified directions." Under VTL 1104(e), the exemptions of VTL 1104(b) "shall not relieve the driver of an authorized emergency vehicle from the duty to drive with due regard for the safety of all persons, nor shall such provisions protect the driver from the consequences of his reckless disregard for the safety of others."

A departmental proceeding found the driving officer at fault in the collision and recommended that he be subjected to the disciplinary process.

As described above in connection with the Delroy Morris investigation, case law from New York's Court of Appeals establishes that even in civil cases, with their lower burden of proof, a police officer responding to an emergency pursuant to the exemptions of VTL 1104 will not be held liable "unless the officer acted in reckless disregard for the safety of others" and has "intentionally done an act of an unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow and has done so with conscious indifference to the outcome." *Saarinen v. Kerr*, 84 NY 2d 494, 501 (1994) (citations omitted). In a later civil case the Court added that the *Saarinen* "approach avoids judicial second-guessing of the many split-second decisions that are made in the field under highly pressured conditions ...." *Frezzell v. City of New York*, 24 NY3d 213, 217 (2014) (internal quotation marks and citations omitted).

Based on the investigation, which included interviews of the driving officer and the other officer in the van, arrested persons in the van, and civilian witnesses, and review of NYPD video from fixed cameras along the van's route, NYPD video of the arrest and later actions of the person the driving officer was concerned about, data from NYPD's vehicle tracking system, an independent accident reconstruction, and extensive review of NYPD training and policies regarding prisoner transport, OSI concluded that there was insufficient evidence that the driving officer acted with "reckless disregard" for the safety of others or with "conscious indifference" to the risk that his driving could kill a pedestrian to prove beyond a reasonable doubt that the officer committed a crime.

OSI made a series of recommendations as a result of the Ronald Anthony Smith investigation.

First, although VTL 114-b states that prisoner transport is an emergency operation and therefore entitled to the exemptions of VTL 1104, NYPD has discretion to fashion policies more restrictive than those permitted by law. Because of New York City's population, density, and traffic congestion, including pedestrians and cyclists, a cautious approach to emergency operation is needed to protect officers and civilians. NYDP should not deem routine prisoner transport, absent articulable exigent circumstances or prior authorization by a supervisor, to be emergency operation.

Second, it is clear that the transport chain used in this case – which only attached to one hand on each prisoner, left them with almost complete hand and arm freedom, and could even have been used as a weapon – was inadequate under the circumstances. The driving officer had cause for concern about the behavior of one of the prisoners because of that prisoner's actions during and after his arrest, which OSI confirmed through video review. If that prisoner had been rear-cuffed – in fact, if all three male prisoners had been rear-cuffed, as the female prisoner was – the driving officer might have been less distracted and the tragedy in this case might have been averted. The NYPD Patrol Guide fails to address the transport of prisoners who present safety and security concerns and fails to require that such prisoners be restrained with more secure options – either rear-cuffs or leg restraints – and therefore should be amended.

Third, once again, the driving officer was not breath-tested until nearly two hours after the collision, and therefore, once again, OSI recommended that NYPD hold officers to the same standards as civilians and breath-test them as quickly as practicable after a serious motor vehicle collision.

Mr. Smith was Black and was 53 years old when he died. Report: Ronald Smith.

Jamie Feith, April 29, 2022, Dutchess County

In the afternoon of April 29, 2022, two Hyde Park Police Department (HPPD) officers and an NYSP trooper responded to a 911 call placed by Ms. Feith reporting "domestic violence" at her home. After arrival, one of the HPPD officers, outside the residence, spoke with the man Ms. Feith lived with, while the NYSP trooper and the other HPPD officer were inside with Ms. Feith. The trooper, who had activated his BWC, mainly stayed with Ms. Feith's three young children, while the inside HPPD officer, who was not equipped with BWC, spoke with Ms. Feith. The HPPD officer asked Ms. Feith a series of questions, and, after a few minutes, Ms. Feith began to sway and answer his questions by saying, "Oh yeah?" The HPPD officer grabbed Ms. Feith by the arm and she took a knife out of her back pocket. The trooper yelled, "Knife, knife, knife," and the HPPD officer wrestled Ms. Feith to the floor, unsuccessfully attempting to get the knife from her. Ms. Feith stood up, and the other HPPD officer, who had come inside, fired a Taser at her, without effect. Ms. Feith moved past the Tasing officer, and past the trooper, who tried to hold her back, toward the first HPPD officer with the knife pointed at him, and that officer fired his gun, striking Mr. Feith, who later died of her wounds.

Based on the investigation, including interviews of the trooper and civilian witnesses[17] and review of the trooper's BWC video, OSI concluded that a prosecutor would not be able to disprove beyond a reasonable doubt that the firing officer's actions were justified.

OSI recommended that HPPD equip its officers with BWC.

Ms. Feith was white and was 34 years old when she died. Report: Jamie Feith.

Edward Wilkins, May 8, 2022, Orange County

On the night of May 8, 2022, an off-duty NYPD officer, driving a Dodge Charger, crashed into Edward Wilkins, driving a Hyundai, on Route 211 East, in Middletown. Both men were in relationships with the same woman. When Mr. Wilkins ran from his car, the off-duty officer chased him into a parking lot and shot him, and then shot himself. Both men died.

OSI's investigation, which included witness interviews and review of security camera video, did not indicate that any person other than the off-duty officer was involved in Mr. Wilkins's death.

Mr. Wilkins was white and was 20 years old when he died. Report: Edward Wilkins.

---

[17] The HPPD officers refused OSI's requests for interviews. OSI served them with subpoenas for testimony; they appeared as directed but refused to answer questions.

Rameek Smith, May 10, 2022, Bronx County

On the night of May 10, 2022, two officers assigned to NYPD's Public Safety Team were patrolling the 46th and 48th Precincts in the Bronx, in uniform, in an unmarked police car. They observed Mr. Smith on Third Avenue with what they believed to be a gun at his waist. The officers' BWCs and other video show what happened next. The officers stopped their car near Mr. Smith, and he ran. The officer in the passenger seat got out of the car and chased Mr. Smith on foot for a number of blocks. Mr. Smith fired a gun at the pursuing officer, striking him in the left arm, and the officer fired at Mr. Smith. The driving officer was following the foot pursuit in the car. After Mr. Smith shot the first officer he crossed the street in front of the following police car with the gun in his hand; the driving officer stopped the car, got out, and fired at Mr. Smith, striking him. Mr. Smith died of his wounds.

Based on the investigation, including interviews of the two firing officers and civilian witnesses, and review of the two officers' BWC videos, civilian cell phone video, and civilian security camera video from nearby buildings, OSI concluded that a prosecutor would not be able to disprove beyond a reasonable doubt that the firing officers' actions were justified.

Mr. Smith was Black and was 25 years old when he died. Report: Rameek Smith.

Joshua Kavota, June 29, 2022, Franklin County

In the morning of June 29, 2022, in the Village of Saranac Lake, two staff members of a supported living organization went to check on a client, Joshua Kavota, because of reports they had received of troubling behavior. The two staff members and Mr. Kavota were talking for a couple of minutes outside Mr. Kavota's apartment building when Mr. Kavota took out a knife and stabbed one of them. The stabbed staff member drove himself to the hospital while the other staff member, in the passenger seat, called 911. Other people, too, called 911 to report a man with a knife. Mr. Kavota walked a few blocks to a Stewart's Shop and was standing by its front door when two Saranac Lake Police Department officers arrived and got out of their cars. One officer approached him, with her BWC activated, and told him to turn over the knife. He said he couldn't do that and ran at her with the knife in his hand. As the first officer fell backward the other officer shot Mr. Kavota, who died of his wounds.

Based on the investigation, including interviews of civilian witnesses[18] and review of the first officer's BWC video and civilian videos, OSI concluded that a prosecutor would not be able to disprove beyond a reasonable doubt that the firing officer's actions were justified.

Mr. Kavota was Black and was 33 years old when he died. Report: Joshua Kavota.

---

[18] The two Saranac Lake police officers refused OSI's requests for interviews.

David Litts, September 12, 2022, Oneida County

In the evening of September 12, 2022, Mr. Litts, who lived in a residential neighborhood in the City of Utica, called 911 and said he had guns, had assaulted his wife, wanted to die, and would kill any police officer who came to his house. Utica Police Department (UPD) officers responded to the block where Mr. Litts's house was and used a loudspeaker to persuade him to come outside. When Mr. Litts came out, he held a large kitchen knife and started pacing along the sidewalk and the street, screaming threats. A trained police negotiator, using the loudspeaker, tried to get Mr. Litts to drop the knife and to talk about what was upsetting him, to no avail. After a time, Mr. Litts, with the knife raised, moved toward two of the officers stationed on the block. The two officers moved back and shouted at Mr. Litts to drop the knife, but he continued to advance with the knife. One of the two officers fired, and a third officer, who was stationed to the side, also fired. The officers' shots struck Mr. Litts, and he died of his wounds.

Based on the investigation, including BWC videos, civilian video, Mr. Litts's 911 call, which continued during the events on the block, and interviews with officers[19] and civilians, OSI concluded that a prosecutor would not be able to disprove beyond a reasonable doubt that the firing officers' actions were justified.

OSI made one recommendation, that UPD officers get regularly refreshed training in the use of the less-than-lethal shotgun, which fires rubber bullets, and which was available at the scene in a sergeant's car. Although sergeants at the scene told other officers a number of times to go get the less-than-lethal shotgun, no officer actually retrieved it. Various reasons were given for this failure; UPD representatives acknowledged that training in the use of the weapon was rarely refreshed. There is reason to believe that uncertainty about the weapon's proper use may have made the officers present hesitant to retrieve it and use it.

Mr. Litts was white and was 61 years old when he died. Report: David Litts.

Angely Solis, November 14, 2022, Monroe County

In the evening of November 14, 2022, Ms. Solis called her sister. The sister heard arguing in the background and called 911; the recording of the 911 call indicated an ongoing physical fight or struggle. Ms. Solis's sister drove to Ms. Solis's house in Rochester and saw a woman (who was an off-duty Town of Greece police officer) fighting with Ms. Solis and attempted to break them up. The off-duty officer had a gun and shot Ms. Solis and her sister, and then shot herself. The sister survived, but Ms. Solis and the off-duty officer died of their wounds.

---

[19] The UPD officers who fired refused OSI's requests for interviews; the other UPD officers present agreed to OSI's requests for interviews.

OSI found no evidence in its investigation, which included witness interviews and video from a dashcam in Ms. Solis's sister's car, indicating that any person other than the off-duty officer was involved in the death of Ms. Solis.

Angely Solis was Hispanic and was 27 years old when she died. Report: [Angely Solis](Angely Solis).

Daniel Kachinoski, November 19, 2022, Niagara County

In the evening of November 19, 2022, in the Town of Niagara, Daniel Kachinoski and his mother each called 911 complaining about the other. Two officers of the Town of Niagara Police Department responded to the house where Mr. Kachinoski, his child, and his mother lived. One officer spoke to the mother in the kitchen while the other spoke to Mr. Kachinoski (with his child at his side) in an adjacent room. The officer from the kitchen joined the officer with Mr. Kachinoski and the child in the room. The conversation quickly became belligerent: Mr. Kachinoski ordered the officers to leave the house and, when one officer said they would not leave, Mr. Kachinoski said he would make them leave. One officer directed Mr. Kachinoski to put his hands behind his back to be handcuffed, and Mr. Kachinoski refused to comply. A shouting match ensued. One officer used a Taser, with no effect. Mr. Kachinoski picked up a wooden chair and it was unclear whether he was going to use it as a shield or as a weapon. Again an officer used a Taser, with no effect. Mr. Kachinoski moved quickly toward the officers with the chair in one hand and picked up a knife from a table with the other. He came at the officers with the knife raised over his head and the chair in front of him. Mr. Kachinoski was about an arm's length from them when one officer fired his gun. Mr. Kachinoski died of his wounds.

Based on the investigation, including review of BWC videos from both officers, interviews of both officers, and review of crime scene evidence, including the recovered knife, OSI concluded that a prosecutor would not be able to disprove beyond a reasonable doubt at trial that the firing officer's actions were justified.

Mr. Kachinoski was white and was 40 years old when he died. Report: [Daniel Kachinoski](Daniel Kachinoski).

Enrique Lopez, December 28, 2022, Suffolk County

On December 28, 2022, Suffolk County Police Department (SCPD) officers responded to a 911 call from a supported housing services worker who said that a client, Enrique Lopez, had threatened a roommate in his apartment with a fire extinguisher and was behaving erratically. Three officers arrived at the address provided, in Medford, and spoke to witnesses in Mr. Lopez's apartment. Two officers went to Mr. Lopez's room, the door to which was closed, and asked him to come out. When Mr. Lopez did not come out, one officer opened the door and the two officers entered and approached Mr. Lopez. As they tried to take hold of him by his arms, a struggle ensued and Mr. Lopez stabbed both officers

with a knife. One officer shot Mr. Lopez four times, and he died from his injuries. Both officers, one of whom was seriously injured, survived their wounds.

Based on the investigation, including interviews of the supported services worker, the roommate, and the three responding officers, and review of the worker's cell phone video, crime scene evidence, including the recovered knife, and medical records, OSI concluded that a prosecutor would not be able to disprove beyond a reasonable doubt at trial that the firing officer's actions were justified.

Although the responding officers did not have BWCs, because SCPD had not fully implemented its BWC program at the time of the incident, SCPD informed OSI at the time the report was issued that its BWC program had been fully implemented, and for that reason OSI did not make a recommendation concerning BWC in its report concerning Enrique Lopez.

Mr. Lopez was Hispanic and was 56 years old when he died. Report: [Enrique Lopez](#).

Christopher Torres, January 10, 2023, Putnam County

On January 10, 2023, members of the Putnam County Sheriff's Office (PCSO) and a local police department responded to 911 calls that a woman had been violently kidnapped by her estranged partner, Christopher Torres. When PCSO deputies found them, at a construction site off a side road, they could see Mr. Torres stabbing the woman with a knife. The deputies shouted at Mr. Torres to drop the knife. Instead, he brought the knife up to the woman's throat, and two deputies fired. Mr. Torres died of his wounds. The woman was not shot, but was seriously injured from the stabbing; she has undergone multiple surgeries and is recovering.

Based on the investigation, which included review of BWC and dashcam video of responding officers, review of medical records, and interviews of the woman and the firing officers, OSI concluded that a prosecutor would not be able to disprove beyond a reasonable doubt that the officers were justified when they shot Mr. Torres.

Mr. Torres was Hispanic and was 34 years old when he died. Report: [Christopher Torres](#).

## 4. NEW YORK CITY DEPARTMENT OF CORRECTION

### Background

NYC DOC operates jails on Rikers Island and in a nearby barge. Persons in the custody of NYC DOC include detainees awaiting trial, detainees awaiting sentencing, and prisoners sentenced to one year or less of jail time. NYC DOC also has custody of detainees and prisoners in transit, at courthouses, and in hospitals. According to the Fact Sheet published

by DCJS, the NYC DOC population in August 2023 was 6,152, a 10% increase over August 2022.[20]

All jails and prisons in the state of New York are required to report deaths and other significant incidents to the New York State Commission of Correction (SCOC), an independent oversight body. SCOC issues reports describing its activities, investigations, and findings.[21] The New York City Board of Correction (NYC BOC) is an independent oversight body for the jails in New York City. NYC BOC conducts investigations and issues reports on deaths in NYC DOC custody, jail conditions, housing density, and access to health and mental health care.[22]

NYC DOC's operation of the jails at Rikers Island is the subject of ongoing federal litigation, begun in 2015, which includes oversight by a court-appointed monitor and intervention by the United States Attorney for the Southern District of New York. The concerns raised in the litigation and by the monitor include detainee safety, insufficient staffing, officers' use of force, and the Department's resistance to oversight, lack of transparency, and concealment of incidents.[23] Parties to the litigation, including the United States Attorney, have advocated that a receiver be appointed to take over the management of the jails from NYC DOC.[24]

Following reports and proposals by the Independent Commission on New York City Criminal Justice and Incarceration Reform, city ordinances require that the jails on Rikers Island be closed and replaced by borough-based jails by 2027.[25]

*Cause of Death under Criminal Law Principles*

Executive Law Section 70-b authorizes the members of OSI to investigate whether criminal offenses have been committed and, when warranted, to seek criminal charges. Therefore, OSI members conduct investigations and reach conclusions based on the principles of criminal law.

---

[20] DCJS Jail Population by Month Report. A detailed description of NYC DOC's facilities can be found at NYC DOC Facilities Overview.

[21] SCOC's Annual Reports and Incarcerated Individual Mortality Reports.

[22] NYC Board of Correction Reports. According to the Board, in January 2023 the Department restricted the Board's access to video footage, severely impeding its investigatory and oversight functions (NYC BOC press release January 18, 2023) and, on September 28, 2023, after the Board sued, restored the Board's access to video footage (NYC BOC press release, September 28, 2023).

[23] Consent Judgment for the Nunez Monitorship; United States Department of Justice August 6, 2020 press release; Rikers Island Remedial Order addressing NYC DOC non-compliance; Politico (June 20, 2015); Gothamist (September 28, 2022); Forbes (January 12, 2023); City & State New York (February 9, 2023); Queens Daily Eagle (April 4, 2023); New York Times (June 8, 2023); ABC News (July 10, 2023); CBS New York (July 11, 2023); Nunez Monitor Reports.

[24] New York Times (July 17, 2023).

[25] Halfway to History: Five Year Status Report on the Path to Closing Rikers.

In a criminal case concerning a death, a person may be found guilty of a homicide crime only if the person has caused the death. A person is deemed to cause the death of another when his or her "actions were an actual contributory cause of the death, … [forging] a link in the chain of causes which actually brought about the death," and when "the fatal result was reasonably foreseeable," *People v Stan Xu Hui Li*, 34 NY3d 357, 369 (2019); see *People v Davis*, 28 NY3d 294, 300 (2016). Even when the defendant's conduct was not the sole cause of death, the defendant may be deemed to have caused a death when his or her conduct "set in motion" or continued in motion the events which resulted in death, *People v Matos*, 83 NY2d 509, 511 (1994).

An omission or a failure to act may be the basis of criminal liability if the defendant has failed "to perform a duty imposed by law," Penal Law Sections 15.00(3) and 15.10. The Court of Appeals has held that the state imposes a duty of care for persons in custody, *Sanchez v State of New York*, 99 NY2d 247, 250 (2002).

Under Section 70-b, OSI's authority to investigate and prosecute is limited to police officers and peace officers as defined, including corrections officers. OSI does not have legal authority to investigate or prosecute members of correctional staff, such as medical personnel, other than corrections officers.

When OSI finds insufficient evidence to conclude that a corrections officer has caused a death, that finding is based solely on the principles of New York's criminal law and Section 70-b, and therefore is not necessarily a conclusion that the conduct of the involved officer was proper, nor that the conditions in a jail were in compliance with legal standards.[26]

### NYC DOC Assessments Completed by OSI in the Last 12 Months

OSI summarizes below the assessments it has completed since the last Annual Report of the deaths of persons in NYC DOC custody. If not described below or in OSI's 2022 Annual Report, OSI's investigations into and assessments of the deaths of persons in NYC DOC's custody remain active. See OSI's data tables for the status of all NYC DOC notifications OSI received from April 1, 2021, the effective date of Section 70-b, through August 31, 2023.

---

[26] As explained in the Introduction to this Report, when OSI is determining whether an officer has caused a death, OSI calls the process a "preliminary assessment" – although the preliminary assessments are often in reality lengthy investigations. When OSI has determined that an officer has caused a death, and is proceeding to determine whether the conduct could be proved to be criminal, OSI calls the process an "investigation." When a preliminary assessment is closed with a finding of no causation, OSI closes the matter internally. When an investigation is closed with a finding that an officer caused a death but a conclusion that a crime cannot be proved beyond a reasonable doubt, OSI issues a public report.

Robert Jackson, June 30, 2021, Anna M. Kross Center

Robert Jackson arrived on Rikers Island on October 19, 2020, after an arrest for Burglary in the Third Degree. On June 30, 2021, a few minutes after 8:00 pm, a corrections officer, assigned as a floor officer, noticed that Mr. Jackson was sluggish and lethargic and made a call to activate a medical emergency response. There is conflicting evidence whether the corrections officer who received that call, and who was responsible for notifying medical personnel, notified medical personnel promptly. There was conflicting evidence on whether a second medical emergency call was made around 8:30 pm. A third call for a medical emergency was made around 9:00 pm. The officer who received the emergency calls notified the medical personnel shortly after 9:00 pm. The medical team got to Mr. Jackson's cell a few minutes before 9:30 pm, when he no longer showed signs of life. Medical personnel declared him dead shortly afterward. According to the autopsy report, Mr. Jackson died of heart disease. The medical examiner told OSI she was unable to opine that a quicker medical response would have saved Mr. Jackson's life.

OSI's assessment included interviews of corrections and medical staff, [27] review of surveillance video of the area around Mr. Jackson's cell and of the station of the corrections officer responsible for transmitting calls to medical staff, the involved corrections officers' incident reports, recorded and written records of radio and telephone communications, corrections and medical logbooks, and medical records. OSI concluded that there was insufficient evidence to find that the possible delay by the corrections officer who received the first call for a medical emergency caused the death of Mr. Jackson.

Mr. Jackson was Black and was 42 years old when he died.

Anthony Scott, October 14, 2021, New York County Courthouse

On October 14, 2021, Mr. Scott was arraigned in criminal court on a charge of Assault in the Second Degree and afterward was received by NYC DOC in the New Admissions cells in the New York County Courthouse. At 4:17 pm video shows[28] that Mr. Scott, sitting on a bench in a cell, pulled a string from his sweatshirt and tied it around his neck. A few minutes later, Mr. Scott took a few steps across the cell to the toilet enclosure, which had partitions from waist height to about knee height, and tied the string to a support in the enclosure and sat down, with his body just above the floor and the string taut around his neck. Corrections officers noticed Mr. Scott's situation at 4:45 pm and attempted to open the cell, but the lock was jammed; video shows that Mr. Scott was putting something into the lock before he tied the string around his neck. Officers used a knife attached to a pole to cut the ligature from Mr. Scott's neck and called the New York City Fire Department (FDNY), who eventually opened the cell door at 5:06 pm, began aid, and took Mr. Scott to the hospital. He was

---

[27] The officer responsible for notifying medical personnel refused OSI's request for an interview.
[28] Floor officers in NYC DOC facilities generally cannot see live video feeds.

declared dead two days later. The medical examiner deemed the hanging the cause of death.

The corrections officers assigned to the New Admissions area were required to conduct rounds every 15 minutes, but no corrections officer walked by Mr. Scott's cell between 4:05 pm and 4:45 pm, though four corrections officers were nearby during that period of time.[29] However, video showed that Mr. Scott appeared to be watching for corrections officers as he jammed something into the lock of the cell and tied the string around his neck. The medical examiner told OSI that after the ligature had deprived Mr. Scott's brain of oxygen for a few minutes the damage would have been irreversible. Therefore, even if a corrections officer had noticed Mr. Scott hanging himself at 4:20 pm, Mr. Scott likely could not have been saved, due to the delay caused by the jammed lock.[30] As a result, OSI concluded that there was insufficient evidence to find that the corrections officers' failure to do their required 15-minute rounds caused Mr. Scott's death.

Mr. Scott was Black. Mr. Scott provided various dates of birth; he was from 57 to 60 years old when he died.

Tarz Youngblood, February 27, 2022, George R. Vierno Center

Mr. Youngblood arrived on Rikers Island on September 5, 2021, after an arrest for Assault in the Third Degree. Video shows that on February 27, 2022, at 7:35 am, Mr. Youngblood walked into a cell to which he was not assigned and remained there until other incarcerated people carried him out, unresponsive, three hours later. During those three hours at least seven other incarcerated people went into and out of the cell, and the window in the door of the cell was covered. A floor officer was present in the area for almost all of those three hours, but only conducted one genuine tour, at 7:41 am. The floor officer's failures to keep people from congregating in a cell, to keep the window to the cell clear, and to conduct tours every 30 minutes violated NYC DOC rules.[31]

After incarcerated people carried Mr. Youngblood out of his cell, corrections officers and then medical personnel rendered aid, including administering Narcan, a drug that can reverse the effects of an opioid overdose. One of the doctors who rendered aid told OSI that Mr. Youngblood did not show any evidence of rigor mortis. At 11:00 am FDNY personnel arrived, took over aid, and took Mr. Youngblood to Elmhurst Hospital, where he was pronounced dead less than an hour later. The medical examiner determined the cause of death to be a drug overdose involving fentanyl and heroin, both opioids.

---

[29] The corrections officers involved agreed to OSI's requests for interviews.
[30] As Mr. Scott's initial suicide risk screening did not indicate a risk of suicide, corrections officers were not required to remove all strings and shoelaces from him.
[31] The corrections officer refused OSI's request for an interview.

Despite the floor officer's violation of a series of rules, it is not clear that Mr. Youngblood's death would have been prevented had the officer followed those rules, as there is no evidence Mr. Youngblood was unresponsive for a significant period of time before he was carried out of the cell. Therefore, OSI concluded there was insufficient evidence to find that the floor officer caused Mr. Youngblood's death.

Mr. Youngblood was Black and was 38 years old when he died.

Herman Diaz, March 18, 2022, Eric M. Taylor Center

Mr. Diaz arrived on Rikers Island on February 26, 2022, after an arrest for Robbery in the First Degree.

In the morning of March 18, 2022, video shows that Mr. Diaz peeled an orange and placed a large piece of it in his mouth as he walked into a bathroom. A few minutes later Mr. Diaz staggered out of the bathroom and fell to the ground. A corrections officer called a medical emergency. Medical staff did not respond right away and several incarcerated people attempted to render aid by rolling Mr. Diaz on his side and using the Heimlich maneuver. A corrections officer opened the housing unit door to allow four incarcerated people to carry Mr. Diaz to the clinic. Medical staff unsuccessfully rendered aid to Mr. Diaz, including the removal of a piece of orange obstructing his airway, and Mr. Diaz was pronounced dead. The medical examiner deemed the cause of death to be asphyxia due to aspiration of food.

OSI concluded that there was insufficient evidence to find that a corrections officer caused Mr. Diaz's death.

Mr. Diaz was Hispanic and was 52 years old when he died.

Dashawn Carter, May 7, 2022, Anna M. Kross Center

Mr. Carter arrived at Rikers Island on May 5, 2022. Previously, he had been found unfit to stand trial pursuant to an examination under Criminal Procedure Law Article 730 and was held in a secure mental health facility. On April 26, 2022, following an examination finding him no longer unfit, a judge ordered him transferred to NYC DOC. Upon arrival at Rikers Island, despite his history of mental illness, Mr. Carter was placed in the general population. An NYC DOC mental health screening form was signed by a doctor but was otherwise blank.

Video last showed Mr. Carter alive when he walked into his cell at 9:35 pm on May 6, 2022. (Video showed the corridors but not the insides of the cells in this area of the jail.) The next day, a few minutes before 5:00 pm, other incarcerated people, after not seeing Mr. Carter all day, went into Mr. Carter's cell, which was unlocked, found him hanging, and alerted corrections officers.

Video from the time Mr. Carter entered his cell in the evening of May 6 until the time he was found hanging the next day showed that corrections officers assigned as floor officers in the area of Mr. Carter's cell failed to conduct many of their tours, which NYC DOC rules required every 30 minutes, failed to conduct required standing counts, and, even when they did conduct tours, failed to look into Mr. Carter's cell. Other rule violations by the corrections officers included making false entries in logbooks and false incident reports and permitting Mr. Carter to cover the window in the door of his cell.[32]

When an investigator from the medical examiner's office arrived at the jail three hours after Mr. Carter was found hanging, she found that Mr. Carter was in advanced rigor mortis. After the autopsy the medical examiner found that the cause of Mr. Carter's death was hanging but would not opine on how long he had been dead when he was found. However, based on the medical examiner's statements, a person who hangs himself could die within minutes, and therefore the involved corrections officers might not have been able to save Mr. Carter even if they had properly performed their duties. As a result, OSI concluded that there was insufficient evidence to find that a corrections officer caused Mr. Carter's death.

Mr. Carter was Black and was 25 years old when he died.

Mary Yehuda, May 18, 2022, Rose M. Singer Center

Ms. Yehuda arrived on Rikers Island on February 12, 2022, after an arrest for Robbery in the First Degree.

Video shows that Ms. Yehuda did not come out of her cell for three days, from 5:55 am on May 14, 2022 until she was found unresponsive on the floor of her cell, at 8:55 am on May 17, 2022, when an incarcerated person alerted a corrections officer to her condition. In interviews, incarcerated people housed near Ms. Yehuda reported that she had been moaning loudly overnight, from the 16th to the 17th. Video shows that corrections officers doing rounds over that night looked into Ms. Yehuda's cell, including at times with a flashlight, on six occasions from 9:00 pm to 2:20 am. However, from 2:20 am until Ms. Yehuda was found unresponsive at 8:55 am, corrections officers did not conduct rounds or, if they did, did not look into her cell again, except for a corrections officer who looked into her cell at 7:32 am.[33]

Medical personnel arrived at Ms. Yehuda's cell at 9:09 am, began to render aid, and, at 9:40 am, removed her on a stretcher. Ms. Yehuda was taken to Elmhurst Hospital where she

---

[32] One of the involved corrections officers resigned after the incident; OSI's attempts to contact him for an interview were unavailing. All the other corrections officers contacted by OSI refused OSI's requests for interviews. Three involved corrections officers, one of whom was a captain, were suspended by NYC DOC.
[33] Each of the corrections officers whom OSI requested to interview refused the request.

was pronounced dead the next day, May 18, 2022, at 5:11 am. The medical examiner determined Ms. Yehuda's cause of death to be ketoacidosis, a complication of diabetes.

The medical examiner explained to OSI that medication at the onset of Ms. Yehuda's symptoms of diabetic ketoacidosis (DKA) could have increased her chances of survival but that she still could have died, since DKA is often fatal. The medical examiner said the symptoms of DKA are subtle and non-specific and typically discernable only by trained medical professionals: DKA causes mental decline and those with DKA become less responsive, weak, lethargic, confused, and stop communicating. The medical examiner said that if a doctor had examined Ms. Yehuda during her apparent decline, when she stayed in her cell for three days, the doctor might have properly diagnosed her, but that by the time mental decline is noticeable the person is already in the later stages of DKA and may die even if medication is administered. The medical examiner said Ms. Yehuda's condition likely started three or four days before she was discovered unresponsive in her cell, and that she would have needed to be examined within the first 24-48 hours of DKA onset, at a time when symptoms would have been very subtle, for any likelihood of survival.

At the time of Ms. Yehuda's intake process at Rikers Island, in February 2022, she said she did not have any immediate medical needs and specifically denied having diabetes. Records show Ms. Yehuda had 25 scheduled clinic appointments (for nursing, dental, or mental health) during her incarceration and was produced for 22 of them.

OSI concluded that there was insufficient evidence to find that a corrections officer caused Ms. Yehuda's death.

Ms. Yehuda was Black and was 31 years old when she died.

Emanuel Sullivan, May 28, 2022, Robert N. Davoren Complex

Mr. Sullivan entered Rikers Island in early February 2022 after an arrest for Murder in the Second Degree. On May 28, 2022, at about 4:00 pm, an incarcerated person (who said in an interview that Mr. Sullivan "sleeps a lot") went into Mr. Sullivan's cell to check on him, found him unresponsive, and alerted a corrections officer, who called a medical emergency. Medical personnel arrived a few minutes later, rendered aid, found that early rigor had set in, and declared Mr. Sullivan dead at 4:25 pm. The medical examiner determined that Mr. Sullivan died of a methadone overdose and opined that he might have died "a few hours" before he was found.

Video showed that Mr. Sullivan entered his cell at 9:35 pm the night before he was found and did not come out again. Video showed that corrections officers conducted eight rounds the next day in the four and a half hours before Mr. Sullivan was found, walking by his cell each time, though it is not clear from the video whether officers looked into Mr. Sullivan's

cell when they walked by. When Mr. Sullivan was found the window in his cell door was covered, which was a rule violation.[34]

Despite the rule violation of allowing the cell door window to be covered, it is not clear that corrections officers would have seen anything other than an apparently sleeping person had they looked into Mr. Sullivan's cell before he was found unresponsive. Therefore, OSI concluded that there was insufficient evidence to find that a corrections officer caused Mr. Sullivan's death.

Mr. Sullivan was Black and was 20 years old when he died.

Anibal Carrasquillo, June 20, 2022, George R. Vierno Center

Mr. Carrasquillo arrived on Rikers Island on September 29, 2019, after an arrest for Robbery in the First Degree.

Video shows that he entered his cell at 10:19 pm in the evening of June 19, 2022, and that a corrections officer conducted 30-minute tours thereafter, but failed to look into each cell. At 12:49 am the corrections officer and a captain did a tour together and found Mr. Carrasquillo unresponsive in his cell. They called a medical emergency and began to render aid.[35] Medical staff took over aid a few minutes later and declared Mr. Carrasquillo dead at 1:30 am.

When an investigator from the medical examiner's office arrived a few minutes after 4:00 am she observed that there was no rigor in the body. The medical examiner deemed the cause of death a fentanyl overdose and would not opine as to how long Mr. Carrasquillo might have been dead when he was found.

As it was not clear that Mr. Carrasquillo had been dead any length of time before he was found unresponsive, OSI concluded that there was insufficient evidence to find that a corrections officer caused Mr. Carrasquillo's death by failing to look into his cell during tours.

Mr. Carrasquillo was Hispanic and was 39 years old when he died.

Albert Drye, June 21, 2022, Bellevue Hospital Prison Ward/Eric M. Taylor Center

When Albert Drye was arrested on May 17, 2022, for Assault in the Second Degree, he complained of chest pain and was taken to a hospital before arraignment. The hospital performed tests and released him the same day. On May 19, 2022, after he was arraigned, Mr. Drye was admitted to a jail on Rikers Island. On May 20, during his initial medical and mental health screenings, Mr. Drye reported sore throat, asthma, and a history of seizures,

---

[34] The involved corrections officers refused OSI's requests for interviews.
[35] The corrections officer and captain each refused OSI's request for an interview. The corrections officer was subjected to a disciplinary process.

and denied diabetes, heart disease, hypertension, and kidney disease. He tested positive for syphilis and was given medication. On May 24 Mr. Drye went to the Rikers clinic complaining of lost appetite, dry mouth, and dry skin.

Video over a period of hours in the early morning of May 25, 2022, shows that other incarcerated people and a corrections officer were speaking to Mr. Drye, and, by their gestures, seemed to be concerned for his health (the video has no audio). They took him to a clinic at 4:00 am. Clinic staff found that Mr. Drye was acting erratically and speaking unintelligibly; they called an ambulance at 4:38 am. Mr. Drye spent the next four weeks at the hospital, and his condition worsened until, on June 21, he was declared dead. The medical examiner deemed the cause of death to be complications of bacterial endocarditis with MRSA infection (methicillin-resistant staphylococcus aureus).

OSI concluded there was insufficient evidence to find that a corrections officer caused Mr. Drye's death.

Mr. Drye was Black and was 52 years old when he died.

<u>Michael Lopez, July 15, 2022, Anna M. Kross Center</u>

Mr. Lopez arrived at Rikers Island on May 15, 2022, after an arrest for Burglary in the Third Degree. In the evening of July 14, 2022, video shows that Mr. Lopez went to bed in a dormitory-style housing area a few minutes before 10:00 pm and did not thereafter get out of bed. Corrections officers conducted 11 rounds in the area overnight and in the morning before realizing, at 9:28 am, that Mr. Lopez was unresponsive and calling a medical emergency. (Video shows that Mr. Lopez may have slightly moved his head and arm at 9:21 am.) Corrections officers rendered aid until medical staff arrived at 9:38 am. A doctor declared Mr. Lopez dead at 10:13 am. An investigator from the medical examiner's office who arrived at 12:39 pm found the body still warm to the touch and with only slight rigor. The medical examiner deemed the cause of death to be an overdose of methadone.

As the evidence indicates that aid, including Narcan, was rendered to Mr. Lopez not long after he became unresponsive, OSI concluded there was insufficient evidence to find that a corrections officer caused the death.

Mr. Lopez was Hispanic and was 34 years old when he died.

<u>Ricardo Cruciani, August 15, 2022, Eric M. Taylor Center</u>

Dr. Cruciani was remanded to Rikers Island on July 29, 2022, after conviction at trial of Predatory Sexual Assault, pending sentencing on September 14, 2022. A note in the court paperwork indicated the judge ordered Dr. Cruciani to be placed in protective custody and on suicide watch. However, NYC DOC records show Dr. Cruciani was not placed in protective

custody or on suicide watch at any point during his incarceration. NYC DOC's initial suicide prevention screening form indicated that Dr. Cruciani denied suicidal ideation or any history of mental illness. Mental health staff evaluated Dr. Cruciani the next day, July 30, 2022, and deemed him safe for general population housing. An Assistant Commissioner of NYC DOC told OSI that NYC DOC does not consider a judge's order for suicide watch to be binding and does not place an incarcerated person on suicide watch unless a qualified medical or mental health professional (as defined in NYC DOC rules) examines the person and finds that suicide watch is needed.

Dr. Cruciani was housed in an open dormitory-style area. Video shows that at 4:20 am on August 15, 2022, Dr. Cruciani walked to the area's control room and looked in the control room window. At 4:23 am Dr. Cruciani entered the area's bathroom with linen, came out two minutes later to retrieve more linen, and returned to the bathroom.[36] From 4:30 am to 5:04 am a number of incarcerated people went into and out of the bathroom. There was no video in the bathroom, and there was no floor officer assigned to Dr. Cruciani's housing area at the time. From 11:00 pm through 6:30 am the housing area's supervising captain did not conduct a tour. Because the control room has the security controls for the housing area, the corrections officer assigned to the control room is not supposed to come out of the control room.

At 5:35 am an incarcerated person went to the control room and told the control room officer that someone had hanged himself in the shower. The control room officer left her post, went to the bathroom, and saw Dr. Cruciani in a gray chair in the shower area with a braided white bed sheet wrapped around his neck and attached to a grate on the wall. The officer used her knife to cut the sheet from the wall, returned to the control room, and called a medical emergency. Medical personnel arrived at 5:44 am and began to render aid. A doctor pronounced Dr. Cruciani dead at 6:30 am.

Based on interviews NYC DOC investigators conducted with incarcerated people who knew Dr. Cruciani in the jail and on a review of 25 of Dr. Cruciani's telephone calls from the five days before he died, OSI did not find evidence that Dr. Cruciani exhibited signs of mental illness or suicidal intent.

Because asphyxia from hanging can cause irreversible brain damage within minutes, OSI concluded that the evidence was insufficient to find that a corrections officer caused Dr. Cruciani's death.

Dr. Cruciani was white and was 68 years old when he died.

---

[36] The NYC DOC Assistant Commissioner told OSI it is not unusual for incarcerated people to bring sheets and towels into the bathroom, to use as privacy partitions when showering or to launder the items in the sinks.

Kevin Bryan, September 14, 2022, Eric M. Taylor Center

Mr. Bryan arrived at Rikers Island on September 8, 2022, after an arrest for Burglary in the Second Degree. Mr. Bryan's suicide prevention screening form indicated no suicide risk. Mr. Bryan was housed in an open dormitory-style area. At the time of the incident, no officer was assigned as the floor officer of Mr. Bryan's housing area.

Video shows that Mr. Bryan fought with other incarcerated people in his housing area on September 14, 2022 at 5:22 am. The control room officer unlocked the wire-mesh door at the housing area's entrance and let Mr. Bryan out. Mr. Bryan, who had brought his mattress with him, settled on his mattress in front of the housing area entrance but was harassed by incarcerated people through the mesh door. Mr. Bryan moved down the hall and settled down across from a staff bathroom at 5:25 am. An officer checked on Mr. Bryan about 30 minutes later and gave him food. At 6:09 am, video showed that Mr. Bryan entered the staff bathroom with his belongings. Video shows that, beginning shortly after 6:30 am, four corrections officers spent half an hour trying to open the staff bathroom door. Once inside, they found Mr. Bryan hanging. The corrections officers called a medical emergency and rendered aid until medical personnel arrived, at 7:09 am, and took over. A doctor pronounced Mr. Bryan dead half an hour later.

Because asphyxia from hanging can cause irreversible brain damage within minutes, OSI concluded that the evidence was insufficient to find that a corrections officer caused Mr. Bryan's death.

Mr. Bryan was Black and was 35 years old when he died.

Gregory Acevedo, September 20, 2022, Vernon C. Bain Center

Mr. Acevedo arrived at Rikers Island after an arrest on February 26, 2022 for Robbery in the First Degree. At the time of his death Mr. Acevedo was housed in the Vernon C. Bain Center (VCBC), which is a jail barge moored on the Bronx shore, near Rikers Island.

Video shows that on September 20, 2022, at 11:40 am, Mr. Acevedo was in an outdoor recreation yard on top of the VCBC barge when he walked to the fence surrounding it and began to climb. Over the next few minutes commands from corrections officers, the use of OC spray,[37] and a corrections officer's attempt to climb up after Mr. Acevedo failed to get Mr. Acevedo to come down off the fence. Mr. Acevedo got over the barbed wire at the top of the fence, got down onto the ledge of the barge, ran along the ledge, and jumped into the water. Corrections officers threw flotation rings into the water, but Mr. Acevedo did not grab one. At 11:55 am NYPD Harbor personnel pulled Mr. Acevedo out of the water and began to

---

[37] OC spray is oleoresin capsicum spray, or pepper spray.

render aid. He was taken to Mount Sinai-Queens hospital where he was declared dead 10 hours later. The medical examiner determined Mr. Acevedo's cause of death to be drowning.

OSI concluded that there was insufficient evidence to find that a corrections officer caused Mr. Acevedo's death.

Mr. Acevedo was Hispanic and was 48 years old when he died.

Erick Tavira, October 22, 2022, George R. Vierno Center

Erick Tavira arrived on Rikers Island on June 15, 2021, after an arrest for Strangulation in the Second Degree. A series of intake evaluations indicated suicide risk and mental illness. Mr. Tavira was placed on constant observation (often called suicide watch) for one day and then was housed in a mental observation unit (MOU).[38] In September of 2021, according to NYC DOC mental health (MH) records, MH personnel determined that Mr. Tavira's condition had improved and cleared him for general population housing, but, in May 2022, Mr. Tavira reported hallucinations to MH personnel and requested to resume medication. On August 4, 2022, Mr. Tavira was transferred back to an MOU, where he was seen by MH personnel 14 times between August 19 and October 20.

According to video surveillance of Mr. Tavira's housing unit, which showed the corridor outside his cell, but not the cell interior, Mr. Tavira entered his cell on October 21, 2022, at 6:27 pm. Corrections officers conducted 30-minute tours, but missed the 1:30 am tour. A corrections officer, conducting a tour at 1:55 am, used a flashlight to look into Mr. Tavira's cell and ran to the control room. According to the officer's incident report, he saw Mr. Tavira hanging, went to the control room to call in an emergency, and returned to the cell to cut Mr. Tavira down and begin aid, which is consistent with the video. Medical personnel arrived at 2:06 am and declared Mr. Tavira dead 10 minutes later. The medical examiner determined hanging to be the cause of death.

Although corrections officers missed a required round before finding Mr. Tavira hanging, medical examiners in OSI's cases consistently say that irreversible brain damage from asphyxia caused by hanging can occur within a few minutes. Therefore the evidence in Mr. Tavira's case did not show that a corrections officer likely would have saved Mr. Tavira from death if all rounds had been conducted as required, and OSI concluded that there was insufficient evidence to find that a corrections officer caused Mr. Tavira's death.

Mr. Tavira was Hispanic and was 28 years old when he died.

---

[38] Mental Observation Units (MOUs) are for incarcerated individuals with serious mental illness. The MOUs provide individualized care coordinated by social workers, psychologists, psychiatrists, and pharmacists. See health.ny.gov.

Edgardo Mejias, December 11, 2022, Anna M. Kross Center

Edgardo Mejias arrived on Rikers Island on October 2, 2022, after an arrest for Burglary in the Third Degree, and was housed in a dormitory style housing area.

On December 11, 2022, Mr. Mejias returned to the dormitory area from a meal in the late afternoon. Video shows that Mr. Mejias seemed to have difficulty breathing, beginning at 4:19 pm. Other incarcerated people went over to Mr. Mejias and one alerted corrections officers. An officer and several incarcerated people placed Mr. Mejias on a cart and pushed him to a clinic, arriving at 4:29 pm. Medical staff rendered aid. EMTs from FDNY arrived and took over aid. Mr. Mejias was declared dead in the clinic at 5:04 pm. The medical examiner determined the cause of death to be an acute asthma attack, complicated by a viral infection. OSI found insufficient evidence to conclude that a corrections officer caused the death of Mr. Mejias.

Mr. Mejias was Hispanic and was 39 years old when he died.

Rubu Zhao, May 16, 2023, George R. Vierno Center

Rubu Zhao arrived at Rikers Island on December 14, 2022, after an arrest for Murder in the Second Degree, and was housed in an MOU.

NYC DOC medical records indicate Mr. Zhao had suicidal thoughts, heard voices, and believed a tracking device had been implanted in him. Mr. Zhao met regularly with mental health professionals. In notes from May 8, 2023, medical staff indicated Mr. Zhao was compliant with his medication; was calm, cooperative, and easily engaged, and denied being depressed.

On May 14, 2023, video surveillance shows that Mr. Zhao was in common areas and corridors from 9:14 am to 2:18 pm. At 11:32 am video shows Mr. Zhao, from the corridor, putting a piece of paper under the door of his cell. He went back to his cell four times over the next two and a half hours, sometimes looking into the cell's window from the corridor, sometimes taking the paper from under the door and putting it back under the door. At 2:18:06 pm video shows Mr. Zhao walking away from his cell and down a corridor at a normal pace. At 2:18:56 pm a video camera in the 8B stair, which was aimed at the lowest level of the staircase from an angle above that level, shows that Mr. Zhao fell through the air (from above the camera's view) and hit the floor at the base of the staircase.

Staff arrived, brought Mr. Zhao to a clinic at the facility, and EMTs took him to a hospital; he arrived at 4:12 pm, unresponsive, with multiple traumatic injuries. On May 16, 2023, doctors declared him dead of those injuries.

DOC staff recovered a suicide note in Mr. Zhao's cell and medical staff recovered a second suicide note from Mr. Zhao's clothing.

OSI concluded there was insufficient evidence to find that a corrections officer caused the death of Mr. Zhao.

Mr. Zhao was Asian and was 52 years old when he died.

Ricky Howell, July 6, 2023, North Infirmary Command[39]/Bellevue Hospital Prison Ward

Ricky Howell arrived at Rikers Island on September 3, 2022, after an arrest for Burglary in the Second Degree.

NYC DOC medical records show that when Mr. Howell was admitted to Rikers Island he had stage IV squamous cell cancer in his tonsils, which had metastasized to the chest; he had been treated at Elmhurst Hospital Center before his incarceration. During his incarceration he was sent to Bellevue Hospital for treatment six times, the last time from February 9 to July 6, 2023, when he was declared dead. The medical examiner determined that metastatic cancer was the cause of Mr. Howell's death.

OSI concluded there was insufficient evidence to find that a corrections officer caused Mr. Howell's death.

Mr. Howell was Black and was 60 years old when he died.

## 5. RECOMMENDATIONS

Section 70-b directs OSI to include in the Annual Report recommendations for systemic or other reforms indicated by OSI's investigations. OSI made five recommendations in its 2022 Annual Report, which can be read here, and continues to advocate for those recommendations. To those five recommendations OSI adds the following:

***Breath Tests for Officers After a Collision***

OSI recommends that police officers be held to the same standards as civilians when it comes to protocols following a serious motor vehicle collision and be breath-tested as quickly as possible following an incident.

It is common for alcohol use to be a factor in motor vehicle collisions. In New York State, more than 30% of fatal car crashes are alcohol related.[40] Civilian drivers are often breath-tested on scene by police officers shortly after a collision to determine if they were driving

---

[39] The North Infirmary Command houses people who have a serious medical condition or a disability that requires special housing.

[40] See New York State Police Impaired Driving Stats

while impaired or intoxicated, even if there are no obvious signs of impairment or intoxication. This same standard should be applied to police officers involved in car accidents, especially when a collision results in death.

In six of the cases summarized in this Report, officer-drivers were not breath tested promptly after fatal motor vehicle collisions: Delroy Morris, Lopamudra Desai, Marcelo Pelaez and Leonardo Rodriguez-Mendoza, Amos Domfeh, Chatuma Crawford, and Ronald Anthony Smith. Although OSI did not find that the officer-drivers in these cases were impaired at the time of the collisions, the failure to promptly breath-test officer-drivers clearly impedes investigations of this type and could engender public mistrust of the process.

A delay in breath-testing is problematic. The average person's blood alcohol level falls by 0.015 per hour.[41] For men, this is a rate of about one standard drink per hour. Consequently, delay in breath-testing likely causes a significant effect on the results.

OSI recommends that all police officers involved in serious motor vehicle collisions be subject to the same standards as civilians, with breath-testing done as quickly as possible after an incident, whether officers are on or off-duty. This will help to determine with greater accuracy whether driver-officers were impaired or intoxicated, will support the goal of police transparency, and will avoid the appearance of preferential treatment for officers.

### BWCs and Dashcams

In four of the cases summarized in this Report, involved police officers either were not equipped with BWCs or were equipped with them and failed to activate them: Roger Lynch, Paul Weeden, Jamie Feith, and Enrique Lopez. In the Lynch case the department involved, NYSP, had a BWC program, but exempted the special unit involved from BWC use.

Similarly, in the last Annual Report, seven of the summarized cases involved officers who did not have or did not use BWC: Jeffrey McClure, Judson Albahm, Jesse Bonsignore, Timothy Flowers, David Wandell, Dedrick James, and Brandi Baida. In the Flowers and James cases, the department or departments involved had a BWC program, but exempted special units from use.

Therefore, OSI continues to recommend, as stated in last year's Annual Report, that the Legislature and Governor require by statute that all police and sheriff's departments deploy and use BWCs and dashcams and provide smaller departments with related funding from the state and training by DCJS. The continuing failure of multiple departments to equip their officers with BWCs and dashcams shows the need for such legislation. In addition, because some departments appear to broadly exempt special units from BWC and dashcam use, we are expanding our recommendation to clarify that the requirement to equip officers with

---

[41] See Alcohol Rehab Guide

BWCs and dashcams should apply to all police units expected to have encounters with civilians, including search, arrest, and special operations teams. The law may provide for exceptions to the requirement, but any such exceptions should be specific and clearly articulated and justified, such as exceptions for detectives who interview civilian witnesses in the course of an ongoing investigation or officers participating in undercover operations whose identities need to be kept confidential.

Our updated Recommendation therefore reads: The Legislature and the Governor should require by statute that all police and sheriff's departments deploy and use body-worn cameras and dashboard cameras in all encounters with members of the public. The statute should provide smaller departments with funding from the state as needed for such deployment and training by the Division of Criminal Justice Services as needed for such use. The statute should permit departments to create exceptions to such deployment or use, but exceptions must be limited to specific and clearly articulated and justified law enforcement needs.

## 6. OSI'S DATA

Section 70-b requires that, for each matter investigated, OSI's Annual Report give the county where the incident occurred and racial, ethnic, age, gender, and other demographic information for persons involved. OSI now has tables with comprehensive data concerning these areas on its website, which can be read here.[42] This Section of the Report discusses selected data from the 12 months since OSI's last Annual Report.

OSI's Data Year

Section 70-b requires that OSI's Annual Report be published on October 1 every year. Since the first Annual Report, published on October 1, 2021,[43] OSI has used a "data year" ending on August 31 so that OSI will have 30 days to collate and analyze data before the Report is published on October 1. The data discussed below therefore relate to the 12-month period from September 1, 2022, through August 31, 2023 and are compared with the data from the prior 12-month period.

Notifications OSI Received, Current Year and Prior Year

In the 12-month period ended August 31, 2023, agencies around the state notified OSI of 281 incidents potentially coming within Section 70-b, which was a substantial increase over the 234 incidents reported to OSI in the prior data year. Of those 281 reported incidents, 21

---

[42] Please see above, Section 1, "OSI's Process: Assessments and Investigations," for information on how to read the data in the tables on the website.
[43] OSI's first Annual Report did not cover a full year, as Section 70-b required that it be published October 1, 2021, six months after the effective date of the law, on April 1, 2021.

did not result in a death and two did not involve a defined officer, leaving 258 net incidents; there were 210 net incidents in the prior year. All data discussed below will be based on the net incidents.

Of the 258 net incidents in the 12 months ending August 31, 2023, 150 were incidents in jails and prisons and 108 were incidents involving police officers. See Figures 1 and 2 for current year deaths by month and a comparison of current year deaths to prior year deaths.





Police Shootings

Of the 108 net notifications involving police officers in the year ended August 31, 2023, 21 were shootings, but one was a murder-suicide, leaving 20 net shootings. This compares with 22 net shootings in the prior data year.

See Figures 3a through 6 for comparisons of shootings in the current and prior data years, broken down by the gender, ethnicity, and age of the decedent, and whether the decedent was armed or unarmed.



**Fig 3a: Shooting Deaths by Race
(22 incidents, Sep 1, 2021-Aug 31, 2022)**

■ White  ■ Black  ■ Hispanic  ■ Asian



**Fig 3b: Shooting Deaths by Race
(20 incidents, Sep 1, 2022-Aug 31, 2023)**

■ White  ■ Black  ■ Hispanic







Note: In 2023, one decedent was armed with a knife and an imitation gun.
The incident is captured in the Imitation Gun data category.

Incidents in Jails and Prisons

Of the 150 deaths OSI investigated in the jails and prisons in the current data period, 109 incidents related to facilities operated by the state Department of Corrections and Community Supervision (DOCCS) (prior year 80), 14 related to NYC DOC (prior year 20), and 27 related to county jails (prior year 22). See Figures 7 through 10b for comparisons of jail and prison cases for the current year and the prior year, broken down by the involved agency, and the ethnicity, gender, and cause of death of the decedent.[44]

As the graphs show, one number increased significantly: deaths in the DOCCS system (109 vs. 80, as shown in Fig. 7). That increase appears to have resulted from an increase in deaths from medical causes (87 vs. 42) offset by fewer deaths from suicides (15 vs. 18) and drug overdoses (6 vs. 19), as shown in Figs. 8a and 8b. The increased number of deaths from medical causes might be related to the increased number of deaths in the 55 and older age bracket (69 vs. 46), as shown in Fig. 9.

---

[44] Figs. 8a and 8b each show two deaths by assault. OSI's assessments showed that in those cases the assaults were by one incarcerated person against another, not by a corrections officer. Separately, the overall number of deaths in all the graphs with regard to county jails does not include the death of a child born to an incarcerated person.













October 1, 2023