# EXHIBIT 53



**BOARD OF CORRECTION**
**CITY OF NEW YORK**

# First Report and Recommendations on 2023 Deaths in New York City Department of Correction Custody[1]

## November 9, 2023

[1] Authored by Deputy General Counsel Melissa Cintrón Hernández, in collaboration with Director of Special Investigations Rahzeem Gray and Special Investigations Coordinator Imahnni Jeffries. Director of Violence Prevention Bart Baily assisted with these investigations. Many thanks to Executive Director Jasmine Georges-Yilla for her insight and comments, and to the members of the Board of Correction's Committee on Deaths, Near Deaths, and Serious Injuries (the "Committee"): Committee Chair Joseph Ramos, Board Chair Dwayne C. Sampson, Dr. Rachael Bedard, and Jacqueline Pitts.

## I.    INTRODUCTION & METHODOLOGY

The New York City Board of Correction ("Board" or "BOC") investigates deaths in custody[2] pursuant to New York City Charter §626(h)[3] and §3-10(c)(2) of title 40 of the Rules of the City of New York.[4] These investigations focus on identifying areas for improvement and making recommendations to the Department of Correction ("DOC" or "Department") and Correctional Health Services ("CHS") to prevent future deaths.

Nine deaths occurred in New York City jails under DOC's jurisdiction in 2023 as of the date of this report. This report focuses on the first four deaths that occurred in custody in 2023, from January through early July. The Committee is investigating the deaths of William Johnstone, Curtis Davis, Donny Ubiera, and Manish Kunwar and will publish a separate report with our findings.

The death of Ricky Howell, who passed away in Bellevue Hospital while in custody on July 6, 2023, will not be covered in this report or any future report. DOC and medical records show that Mr. Howell had been receiving hospital level care since his admission to custody. The Office of the Chief Medical Examiner of the City of New York ("OCME") informed DOC's Health Affairs Division that Mr. Howell's cause of death was "natural," due to Squamous Cell Carcinoma of the Tonsils, a terminal illness.

The Committee identified the following opportunities for review and intervention among the four investigations included in this report:

- Correctional staff failed to conduct adequate rounding and supervision of housing areas, impacting prompt identification and assistance for people in custody in distress.
- In one instance, there was no "B" post officer present for a span of three hours on a unit as a person deteriorated.
- Board staff identified deficient, inaccurate, or incomplete logbook entries in all four investigations, which makes it difficult to obtain accurate information about what occurred and what corrective actions should be taken.

---

[2] Based on feedback from the United States Department of Justice's Bureau of Justice Statistics, the Board considers "death in custody" to be instances when a person dies in the custody of the Department of Correction or those whose deaths are attributable to their time in custody, including those who are declared brain dead before their release from custody.

[3] The board, or by written designation, a member of the board or the executive director, may conduct hearings, or study or investigate any matter within the jurisdiction of the department, and the board may make recommendations and submit reports of its findings to the appropriate authorities.

[4] The Board of Correction shall conduct an investigation of inmate deaths including the review of all medical records of the deceased.

- Two individuals had mental health diagnoses. This is consistent with an overrepresentation of people with mental health issues amongst those in custody who have died over the past two years.
- Issues concerning medical emergency responses were present in two events leading up to deaths.

As part of its investigation, Board staff conducted interviews with people in custody and staff, reviewed jails video footage, DOC records, CHS and NYC Health + Hospitals ("H+H") medical records, and OCME records. OCME records are not currently available for all decedents listed. In those instances, causes of death are labeled as suspected rather than confirmed.

Of the four investigations covered in this report, one person died of a confirmed seizure disorder, one from suspected blunt force trauma to the head, one from suspected drug overdose, and one remains pending OCME confirmation.

The Committee provided CHS and DOC with advance copies of this report and an opportunity to comment. Their written responses, if any, are appended to this report.

## II.   DEATHS IN CUSTODY

### 1.  MARVIN PINES

| | |
|---|---|
| Age | 65 |
| Date of death | February 4, 2023 |
| DOC admission date | August 3, 2022 |
| Cause of death | Seizure disorder of unknown etiology |
| Facility at time of death | North Infirmary Command ("NIC"), general population housing |
| Bail amount, if any | Remanded |

As part of CHS's intake evaluation[5] on August 4, 2022, CHS staff asked Marvin Pines if he had a history of seizures, which he denied. At intake, Mr. Pines reported being prescribed Lisinopril (ACE inhibitor). Medical staff prescribed Mr. Pines medication for hypertension and polysubstance abuse. Mr. Pines was placed in general population housing on August 4, 2022. He was enrolled in a methadone treatment program known as the Key Extended Entry Program ("KEEP") on August 5, 2022.

CHS medical records reflect that, on August 11, 2022, medical staff responded to Mr. Pines' housing area in the Eric M. Taylor Center ("EMTC") due to a seizure event. Medical staff noted that Mr. Pines demonstrated tonic-clonic movements (violent muscle contractions often associated with seizure activity) but did not appear to be in a post-ictal state after the movements

---

[5] CHS clinicians conduct medical and mental health evaluations of people who enter DOC custody to determine the most appropriate housing assignment based on their medical needs, separate from DOC's security screening for classification.

(a period of generalized confusion that begins when a seizure subsides and ends when the patient returns to baseline). Mr. Pines was able to intermittently engage in conversation, reporting chest pain since the day before.

Medical staff assisted Mr. Pines to reach the stretcher down the stairs before staff transferred him to the clinic. Clinical staff did not observe further seizure-like movements. Nursing staff administered Aspirin and sublingual nitroglycerin to treat Mr. Pines' chest pain. Mr. Pines reported that his pain subsided following the sublingual nitroglycerin. Mr. Pines' medical chart does not note any change in his ability to engage in conversation or any other clinical aspect. After consulting with Urgicare (an emergency medicine doctor staffed 24/7, situated at West Facility to respond to emergencies and triage urgent situations), Emergency Medical Services ("EMS") was called at 1:09 pm and arrived at 1:37 pm to transport Mr. Pines to Bellevue Hospital. Mr. Pines arrived at Bellevue Hospital at 3:15 pm.

Bellevue Hospital records show that Mr. Pines' chief complaint was chest pain. Records note that he was mildly short of breath, and he reported not eating in the last two or three days. Mr. Pines underwent an electrocardiogram, which was unremarkable. Bellevue staff deemed Mr. Pines stable, did not admit him to the hospital, and discharged him back to EMTC at Rikers Island. Hospital records did not mention seizure activity.

On August 12, 2022, Mr. Pines was discharged from new admission housing to "detox" general population housing in EMTC.[6] According to CHS, "detox" communicates that the patient will be receiving medications, but DOC does not have specific "detox" housing.

On August 15, 2022, Mr. Pines was transported to Elmhurst Hospital after a person in custody found him lying on the bathroom floor with a large and actively bleeding hematoma on the upper back of his scalp. The person in custody alerted the "B" post officer[7] that Mr. Pines needed medical assistance. The "B" post officer's incident report form notes that, upon arriving to the bathroom, the "B" post officer observed Mr. Pines slumped over the sink and "starting to go into a seizure." The "B" post officer told the "A" post officer[8] to call for a medical emergency response, then moved Mr. Pines to the floor and onto his side with the assistance of a person in custody. The "B" post officer further reported that they fetched Narcan from the "A" station and administered two doses before medical assistance arrived.[9] EMS reported to Elmhurst staff that

---

[6] General population housing is designated by custody level for individuals who have completed classification and new admission processing, including medical and mental health screening, and do not require special housing.

[7] "B" post officers or floor officers interact directly with people in custody and are posted inside the living area. The "B" post desk is usually placed near the "A" station, by the housing unit entry.

[8] "A" post officers remain inside the "A" station, colloquially known as the "bubble." The "A" station is the housing area's secured control room and cannot be accessed by people in custody.

[9] DOC Directive #2/22, effective June 30, 2022, concerning Naloxone (Narcan) states that trained and certified staff shall administer Narcan to an incarcerated individual who exhibits symptoms of an opioid overdose. The Directive

Mr. Pines had copious bleeding from a scalp wound and that his blood pressure and heart rate were stable on the way to the hospital.

Mr. Pines was alert, verbal, and could move all his extremities when he arrived at Elmhurst Hospital. Mr. Pines refused to answer hospital staff questions about his medical history. Elmhurst records show that Emergency Department staff witnessed Mr. Pines exhibiting seizure-like activity (generalized rhythmic jerking) in the trauma bay that self-aborted after about 10 seconds. He was given Ativan (sedative used to treat seizure disorders). Records further show that Mr. Pines had been previously seen at Elmhurst Hospital in June 2021, when staff noted a history of benzodiazepine withdrawal seizures.

Elmhurst neurology staff recommended prescribing Keppra (anticonvulsant) and conducted an electroencephalogram ("EEG"), which did not show evidence of status epilepticus (a seizure that lasts longer than five minutes or having more than one seizure within a five-minute period without returning to a normal level of consciousness between episodes). The EEG results reflected a likely diagnosis of nonspecific diffuse cortical dysfunction and suggested a low risk for subsequent or new acute seizures.

A CT scan taken at the hospital shows a right posterior parietal scalp hematoma (bruise on the scalp, no bleeding in the brain) near the vertex with skin staples, but an otherwise normal non-contrast brain CT result. Elmhurst's Neurology Department recommended a trial of Keppra, an anti-seizure medication, after diagnosing him with "provoked GTC" (generalized tonic-clonic seizures). They also recommended a plan for a possible future Keppra taper if no further seizures occurred.

Elmhurst Hospital's After Visit Summary, dated August 15, 2022, stated that the reason for Mr. Pines' visit was seizures. His staples were removed on August 26, 2022.

A CHS medical note signed on August 28, 2022 states that Mr. Pines was transferred to the North Infirmary Command ("NIC") due to his multiple comorbidities. NIC Main has some cohorted housing with patients with chronic medical conditions or older age. From August 2022 through January 2023, Mr. Pines complained of headaches, dizziness, memory loss, and lack of appetite but no further seizure activity, and no further falls. According to a medical note signed on January 18, 2023, Mr. Pines had a normal neurological examination. He denied visual disturbances, imbalance, falls, or weakness in the extremities.

A CHS neurologist who evaluated Mr. Pines on January 18, 2023 reinforced the recommendation from Elmhurst's Neurology Department that Mr. Pines continue using Keppra, but that staff should consider tapering off at the next neurological visit in three months. CHS staff informed

_____

lists the following as symptoms of an opioid overdose: 1) unresponsive/unconsciousness, 2) slow breathing or the person is not breathing, 3) blue or grey lips and/or fingernails, and/or 4) snoring or gurgling sounds.

the Board that when a single seizure episode is thought to have been "provoked," it is common for neurologists to recommend a trial of antiepileptic medications because many patients with this diagnosis do not require long-term treatment. According to CHS's Medication Administration Records, Mr. Pines was last dispatched a 10-day supply of levetiracetam (generic name for Keppra) on January 27, 2023.

Mr. Pines' unit was dormitory-style housing, where people are assigned beds rather than cells. Board staff's observation of surveillance footage confirms that a "B" post officer was not present in Mr. Pines' unit from 12:12 am to 3:17 am on February 4, 2023. However, logbook entries reflect that staff conducted active supervision tours at 12:30 am, 1:00 am, 1:30 am, and 2:00 am. As reflected in the February 4, 2023 surveillance footage, these tours did not occur. A captain and the "B" post officer entered the housing unit at 12:12 am for one minute, then exited.

Based on Board staff's observations of surveillance footage, at 3:17 am, a "B" post officer signed onto the post and conducted their first tour, though they did not check if anyone was in the bathroom. The "B" post officer again toured at 3:44 am but did not check the bathroom.

Mr. Pines left his bed and entered the bathroom at 4:12 am. Based on Board staff's review of surveillance footage, the "B" post officer observed that Mr. Pines went into the bathroom. However, Mr. Pines did not return to his bed.

DOC Directive #4517R, Inmate Count Procedures, requires "B" post officers to tour every 30 minutes in general population housing. The "B" post officer toured again at 5:01 am, approximately an hour and 40 minutes after their last tour, and 50 minutes after Mr. Pines entered the bathroom. The "B" post officer did not check the bathroom. The "B" post officer left the unit for nine minutes, from 5:03 am to 5:12 am; they did not make note of the personal break in the logbook.

At 5:17 am, a person in custody entered the bathroom. A minute later, the "B" post officer went into the bathroom. The "B" post officer told DOC investigators that a person in custody notified them that Mr. Pines needed assistance in the bathroom and that, when they arrived at the bathroom, they observed Mr. Pines slumped over the sink and starting to go into a seizure. The officer stated that once Mr. Pines' seizure stopped, "he started snoring loudly and didn't respond." The "B" post officer communicated with the "A" post officer, who reported the medical emergency to the clinic. Prior to medical staff's arrival, the "B" post officer went to the "A" post to fetch Narcan and administered two doses to Mr. Pines. OCME toxicology results confirm Mr. Pines tested positive for Narcan post-mortem.

According to CHS documents, the clinic received the emergency call at 5:15 am and emergency response staff arrived at the unit at 5:17 am. Based on Board staff's review of video footage, the

6

"A" post officer reported the emergency to the clinic closer to 5:19 am, while medical staff arrived at the unit at 5:23 am.

Surveillance camera angles do not include DOC bathrooms; therefore, Board staff are unable to visually verify what happened in the bathroom or what aid was rendered to Mr. Pines while inside the bathroom. However, according to CHS records, a member of the emergency response team noted that Mr. Pines opened his eyes and nodded when the medical staffer tapped him on the shoulder and called his name.

Medical staff arrived without a gurney to the unit, which they retrieved from the clinic at 5:28 am. After people in custody assisted in placing Mr. Pines on the gurney, medical and correctional staff started to transport him to the clinic at 5:30 am. Medical records show that, while on the way to the clinic, Mr. Pines had another seizure. According to DOC Health Affairs Preliminary Report, this happened at approximately 5:34 am. Mr. Pines then became unresponsive, at which point medical staff attempted to apply automated external defibrillator ("AED") pads onto his chest, but the pads slid off. Medical staff and the "B" post officer initiated Cardiopulmonary Resuscitation ("CPR") and used a bag valve mask to administer rescue breaths while attempting to apply the AED pads. The "B" post officer realized that the AED pads slid off because their protective plastic covers had not been removed. Once the plastic covers were removed, staff tried to use the AED pads. The machine flashed a message that no shock was advised.[10]

A CHS Urgicare note signed on February 4, 2023 states that Mr. Pines had multiple seizures without a return to baseline. The same Urgicare note states that EMS pronounced Mr. Pines deceased at 6:18 am. OCME determined that Mr. Pines' cause of death was a seizure disorder of unknown etiology, with contributory hypertensive and atherosclerotic cardiovascular disease.

CHS suspended and filed disciplinary charges against two nursing staff for failure to follow the clinical chain of command with regards to responsibility for treatment as assigned to members of the response team and improper use of medical devices and equipment.[11] The two staff members resigned from NYC Health + Hospitals pending CHS's investigation into the emergency response.

DOC suspended five uniformed staff members and issued one command discipline following Mr. Pines' death. One assistant deputy warden was suspended for failure to supervise, while the

---

[10] AEDs do not advise using shock when the individual has a pulse or when the heart's electrical system fails entirely. "No shock advised" is a standard AED recommendation that relates to whether the patient has a cardiac rhythm that requires a shock. According to CHS staff, receiving this guidance is not an indication that the machine was incorrectly connected. It indicates that the machine detected the cardiac rhythm and determined it was one that did not need a shock.

[11] CHS's Med 10 Emergency Response Policy establishes the responsibilities of nursing staff members in the event of an emergency and the Nursing Protocols Guides set out the protocols for emergency responses and guidelines on the proper use of medical devices and equipment.

other was suspended for failing to maintain the security and good order of the facility. DOC suspended a captain for failure to make more than one tour in eight hours. One "B" post officer was issued command discipline for signing off the post at 2:00 am without being relieved, leaving the unit without a "B" post officer from 2:00 am to 3:20 am. The "B" post officer present during the events that led to Mr. Pines' death was suspended for failure to conduct constant tours of the entire housing area. A second correction officer was suspended for failing to conduct proper tours of their assigned area.

## 2. RUBU ZHAO

| | |
|---|---|
| Age | 52 |
| Date of death | May 16, 2023 |
| DOC admission date | December 14, 2022 |
| Cause of death | Suspected blunt force trauma to the head[12] |
| Facility at time of death | George R. Vierno Center ("GRVC"), Program to Accelerate Clinical Effectiveness ("PACE") housing |
| Bail amount, if any | Remanded |

Rubu Zhao disclosed feeling hopeless and worthless, feeling like his thoughts were controlled by others, and hearing and seeing things that others did not see or hear during an initial intake evaluation signed by CHS staff on December 15, 2022. He denied suicidal ideation and thoughts of self-harm. DOC's Suicide Prevention Screening Guidelines form[13] reflects that the court ordered that Mr. Zhao submit to a "730 exam," a mental health evaluation pursuant to Article 730 of the New York Criminal Procedure Law to determine if the individual has a mental disease or defect that affects their fitness to proceed in legal proceedings.

CHS determined the best placement for Mr. Zhao was mental observation housing following an initial mental health and treatment plan assessment on December 15, 2022. During that assessment, Mr. Zhao reported hearing voices whispering in his head for the last three weeks, which bothered him a lot, kept him awake, and got stronger and more intense recently. Mr. Zhao denied hearing voices before the prior three weeks and did not report extraneous stressors prior to suddenly beginning to hear voices. He also denied a prior history of mental health or psychiatric treatment, psychiatric hospitalizations, inpatient care, or self-harm attempts or behavior. Mr. Zhao reported mild to moderate depressive, anxiety, and psychosis symptoms (sad or low mood, helplessness, poor sleep, feeling worried and nervous, overthinking, voices whispering in his head, feeling controlled by others, etc.). Mental health staff noted that this appeared suggestive of other specified schizophrenia spectrum and other psychotic disorder. Mr.

---

[12] According to OCME autopsy findings in DOC's Health Affairs Preliminary Investigative Report.
[13] This is a set of questions designed to identify potential suicide risks for individuals in the first 24 to 72 hours of their incarceration.

Zhao agreed to see a psychiatrist and discuss medication treatment to aid with alleviating his symptoms.

On December 19, 2022, Mr. Zhao again denied thoughts of suicide to mental health staff. On that date, CHS records reflect he was alert, oriented, and did not display signs of internal preoccupation, but endorsed depression and anxiety symptoms, paranoia, and hearing voices. Based on his presentation during the mental health session, CHS staff determined Mr. Zhao met the criteria for other specified schizophrenia and adjustment disorder with mixed anxiety and depressed mood. He was prescribed Risperdal (antipsychotic) and Lexapro (antidepressant).

On January 12, 2023, mental health staff increased Mr. Zhao's dosage of both medications to address delusions, auditory hallucinations, and anxiety. He continued to deny thoughts of self-harm. On January 20, 2023, Mr. Zhao was transferred to a PACE unit.[14]

Throughout his time in the PACE unit, Mr. Zhao denied suicidal thoughts, was compliant with medication, calm, cooperative, and in behavior control, without acute medical or psychiatric events. He continued to report ongoing, intermittent auditory hallucinations in the first few weeks in PACE. On February 13, 2023, he told mental health staff that auditory hallucinations had reduced from three to four times every one to two days to once or twice every three to five days. CHS records do not reflect the content of the hallucinations on this date, but Mr. Zhao reported that he was able to ignore the voices and that the auditory hallucinations became less intrusive.

On March 13, 2023, Mr. Zhao told mental health staff he lately felt "stressed" and "sad" due to his court case. Mr. Zhao reported that his antidepressant medication benefited him, although minimally. He denied suicidal ideation and continued to report intermittent auditory hallucinations.

According to CHS medical records, throughout the following weeks, Mr. Zhao appeared calm, cooperative, and easily engaged. He denied being depressed and denied current auditory hallucinations. He continued to report not having suicidal ideation.

A mental health note signed on April 24, 2023 shows that Mr. Zhao did not exhibit any notable changes in his clinical presentation. He continued to demonstrate good treatment adherence and took daily medication without complaint, remaining in full behavior control and cooperating with the daily routines of PACE. However, Mr. Zhao tended to be evasive when asked directly about his past and generally seemed rather resigned to the potential outcomes of his criminal case. He was reserved and did not interact a lot with other people in custody, even with those who spoke

---

[14] PACE is a mental observation housing cell area designed as a therapeutic environment to offer intensive, specialized, and multidisciplinary programs and treatment. Medical and mental health clinicians provide care directly in the unit.

Mandarin as he did. While he endorsed "feeling down," Mr. Zhao denied thoughts of self-harm and suicide.

On April 27, 2023, mental health staff noted that Mr. Zhao endorsed auditory hallucinations, though this was inconsistent with his observable presentation. Medical records note that he denied thought-blocking, internal preoccupation, distractibility, impaired attention, or other overt signs of residual or breakthrough symptoms of psychosis, and did not express suicidal ideation.

On May 8, 2023, the last mental health encounter before Mr. Zhao's death, medical records reflect that he continued to be compliant with medication. On that day, he appeared calm and cooperative, in no distress, and in good spirits. His thought process was linear and free of delusions. According to the same mental health note, Mr. Zhao's immediate risk of violence and suicide, while elevated by his history, was mitigated by his calm demeanor, denial of suicidal ideation, and the closely monitored PACE setting.

People in custody interviewed by Board staff following Mr. Zhao's death stated that Mr. Zhao would usually spend his days either pacing the back of the unit or watching television in the dayroom (common area). They also stated that on May 14, 2023, he "looked like he didn't want to be bothered."

Mr. Zhao's housing area is comprised of two floors of cells and a common area with tables and chairs in the middle of the unit. On May 14, 2023, the "B" post logbook states that active supervision tours took place every 30 minutes. Based on Board staff's review of surveillance footage starting at 10:30 am, a "B" post officer and a Suicide Watch Officer[15] were present in the unit but mainly stayed at the "B" post desk. People in custody were locked out of their cells and congregated in the common area. Whenever the correction officers toured, they did not look inside cell windows to check for breathing bodies. A captain and one correction toured the unit and checked all occupied cells to ensure those inside were living and breathing at 11:13 am. Other tours were conducted at 11:35 am, 12:10 pm, and 12:45 pm, but staff rarely looked inside cell windows.

At around 1:00 pm, the "B" post officer and the Suicide Watch Officer left the unit, appearing to be relieved by a third correction officer. This new "B" post officer never toured the unit but socialized with a small group of individuals in the dayroom. At 1:40 pm, he was joined by another

---

[15] Correction officers assigned to the Suicide Watch post must prevent inmate suicide by maintaining a direct, constant and continuous clear view of all persons in custody on suicide watch (DOC Post Description Index #007, effective November 19, 2008, regarding Suicide Watch). They are not required to tour and are assigned to supervise specific people in custody. Mr. Zhao was not on suicide watch and did not require a Suicide Watch Officer. CHS determines whether people in custody are placed on suicide watch depending on their risk of suicidality, based on expressed suicidal ideation, attempts to self-harm or commit suicide, and other clinical factors.

"B" post officer. This second "B" post officer also never toured the unit. Instead, they both remained in the dayroom. The next tour was conducted by a captain at 2:07 pm, but the captain only toured the bottom tier before leaving at 2:15 pm.

Mr. Zhao climbed the main staircase and began pacing along the top tier at around 2:13 pm.[16] A person in custody told DOC investigators that Mr. Zhao had been walking up and down the stairs and along the top tier for two hours prior. At 2:16 pm, the captain left the housing area and one of the "B" post officers entered an office on the top tier of the unit, near the main staircase.

Through video footage, Board staff observed Mr. Zhao walking along the upper tier at 2:18 pm, seconds before he jumped. However, the actual moment Mr. Zhao jumped was not captured by cameras due to a blind spot in the coverage. The available camera angle shows Mr. Zhao suddenly falling, in midair, and landing at the base of the stairs. OCME's medicolegal investigator conducted a postmortem investigation of the incident scene, determining that the height from the top of the railing where Mr. Zhao jumped to the floor was 13 feet and 8 inches. The stairs consist of two flights, with seven steps each.

A "B" post officer immediately approached Mr. Zhao and rolled him to his side. Based on what could be seen through surveillance footage, Board staff observed that Mr. Zhao appeared to be motionless. The other "B" post officer, who was in the upper-level office, exited the office and descended the stairs, approaching Mr. Zhao. Staff incident reports indicate Mr. Zhao was alert and breathing on his own.

CHS's emergency response team arrived at 2:28 pm, exiting the unit and entering the vestibule with Mr. Zhao on a gurney at 2:31 pm. According to CHS emergency response records, Mr. Zhao was breathing but not responsive to pain or verbal stimuli and his forehead was swelling. He had a right thigh deformity, but there was no bruising or swelling. Medical staff placed a cardiac monitor on his chest. At 2:38 pm, Mr. Zhao was transported on a gurney to the main clinic, where medical staff placed a neck collar. His vitals remained stable at that point. EMS transported him to Elmhurst Hospital Center.

According to CHS records, medical staff discovered a note written in Mandarin inside Mr. Zhao's pocket, additionally, DOC records state that DOC staff located the note during a search of his cell. Based on Board staff's observations through surveillance footage, shortly before jumping from the stairwell, at 2:16 pm, Mr. Zhao appeared to slide a note underneath his cell door. The note was later translated into English. It was titled "suicide note," wherein Mr. Zhao described hearing voices in his head saying they would kill him.

Elmhurst Hospital records reflect that Mr. Zhao was unresponsive throughout the ride to the hospital and upon arrival at the hospital. Mr. Zhao had a fractured femur. A medical note signed

---

[16] The unit has two stairwells. One is near the front entrance of the unit and the other is near the back.

by Elmhurst staff on May 16, 2023 states that neurosurgery was consulted and Mr. Zhao was diagnosed with diffuse anoxic-hypoxic brain injury with resulting diffuse global edema, loss of the majority of intracranial blood flow, and irreversible ischemic changes and injury as evidenced by the diffuse loss of the grey-white differentiation. Per the neurosurgeon, this injury portended a negligible chance of a meaningful neurological recovery despite intervention. The note recommended no aggressive treatments beyond supportive care. Mr. Zhao was declared brain-dead on May 16, 2023, at 10:52 am and pronounced dead that same day at 11:51 pm.

### 3. JOSHUA VALLES

| | |
|---|---|
| Age | 31 |
| Date of death | May 27, 2023 |
| DOC admission date | April 8, 2023 |
| Cause of death | Pending |
| Facility at time of death | Anna M. Kross Center ("AMKC"), mental observation housing |
| Bail amount, if any | $10,000 |

Upon admission to DOC custody, Joshua Valles self-reported a history of schizophrenia, bipolar disorder, attention deficit hyperactivity disorder, and post-traumatic stress disorder. At an initial mental health assessment on April 9, 2023, CHS mental health staff diagnosed Mr. Valles with adjustment disorder with mixed anxiety and depressed mood, an intellectual disability based on prior medical record notes, and several substance abuse related disorders. Mental health staff found that Mr. Valles' diagnoses significantly impacted his functioning, but at the time of evaluation he was cognitively intact, appeared capable of asking for help, and was not in acute distress. On April 14, 2023, CHS staff confirmed Mr. Valles' current diagnosis of schizoaffective disorder based on previous psychiatric hospitalizations. CHS records reflect that during a psychiatric hospitalization in February 2023 prior to his incarceration, Mr. Valles received an Invega Sustenna injection (treats schizophrenia and schizoaffective disorder). CHS mental health staff prescribed him hydroxyzine (psych) and paliperidone (oral version of Invega).

On April 19, 2023, Mr. Valles told CHS nursing staff that a bar of soap was thrown at his head the day before. He complained of a severe stabbing headache. A DOC incident report form completed by a correction officer states that on April 19, an individual in custody struck Mr. Valles once to the facial area with a closed fist punch. A DOC Injury to Inmate Report also states that, on that day, Mr. Valles was involved in a physical fight with another person in custody. Medical staff signed the form and noted that Mr. Valles had no visible or serious injuries. Nursing telehealth staff referred him to nursing services that same day and prescribed Tylenol and ibuprofen. Mr. Valles returned to his housing area after his medical evaluation.

According to CHS records, Mr. Valles missed a sick call appointment on April 20 because he was not produced by DOC. Nursing staff assessed and physically examined Mr. Valles on April 21, 2023. He had no visible injuries and did not report discomfort. He was not in acute distress and his head was described as normocephalic (normal condition without significant abnormalities).

12

Mental health staff noted that, on April 15, 2023, Mr. Valles was "acting bizarrely, standing at window staring at officer and [mental health staffer] for an extended period of time." He also exhibited impoverished speech. A clinician note dated May 1, 2023 states that Mr. Valles presented as intrusive with poor social skills.

Mr. Valles complained of a headache during an indirect encounter with medical staff on May 7, 2023. He was prescribed Tylenol and referred to a follow-up with nursing staff. A Clinical Alternative to Punitive Segregation (CAPS)[17]/PACE weekly nursing note signed that same day reflects that during PM medications, Mr. Valles reported having a headache (5/10 on the pain scale). Mr. Valles took two Tylenol and reported lessened pain (1/10 on the pain scale) within one hour of taking the medication. Nursing staff observed Mr. Valles sitting, standing, and walking around the unit with a steady gait, and in a stable condition.

A mental health note signed on May 19, 2023 states that Mr. Valles "was in DOC lock in yesterday to enforce behavioral control" because he was exhibiting child-like behaviors and attention-seeking and intrusive behaviors toward staff. CHS informed Board staff that DOC is solely responsible for determining lock-ins, as was the case in this instance. According to the same note, Mr. Valles banged on the door to express his frustration and remained upset after he was allowed to come out of his cell. Board staff reviewed video surveillance footage to determine if Mr. Valles used his head to bang against the door. Based on the footage, at times it appears that Mr. Valles banged the door with his hand and other times his head appears to be moving back and forth in a rhythmic manner. However, it is not possible to definitively determine that he banged the door with his head, especially given the distance of the camera and only being able to see his silhouette through the door glass panels. The "A" post logbook and the "C" post (floor post) logbook do not mention any possible incident or encounter between Mr. Valles and DOC or CHS staff. Both logbooks also lack entries stating that Mr. Valles was placed in "DOC lock in." The only entry in both books on May 18 regarding Mr. Valles is that he was escorted to a video conference at 9:08 am.

Surveillance footage shows that, at around 10:48 am and 11:01 am on May 19, 2023, a person in custody looked inside Mr. Valles' cell. At that time, a "B" post officer passed by Mr. Valles' cell without looking inside. The correction officer connected their tour wand to the nearby station. At 11:08 am, the "B" post officer, accompanied by civilian staff, opened Mr. Valles' cell door. The identity of the civilian staff member is unknown because no logbook entries reflect their presence in the unit. After what appeared to be a five-second interaction, the correction officer closed the door.

About an hour later, at 12:02 pm, the "B" post officer passed the area of Mr. Valles' cell and, without checking his individual cell, connected the tour wand to the nearby station. Correction

---

[17] Housing for people with serious mental illness following an infraction.

officers assigned to mental observation units must tour every 15 minutes when Suicide Prevention Aides are not present in the housing units, and every 30 minutes when they are present. There was a Suicide Prevention Aide in the area at the time, as well as a Suicide Watch Officer[18] assigned to the unit. The "B" post officer did not tour at the 30-minute mark between 11:08 am and 12:02 pm.

At 12:10 pm, lunch trays were delivered to the unit. A second correction officer briefly opened Mr. Valles' cell door (presumably to ask if he wanted lunch), then closed the door. At 12:39 pm, the same person in custody who checked on Mr. Valles earlier looked inside his cell. At 12:40 pm, a third correction officer, a new "B" post officer, checked Mr. Valles' cell, while a captain passed by without looking inside, then connected their tour wand to the nearby station. At around 1:00 pm, the "B" post officer conducted a tour and paused by Mr. Valles' cell for two seconds.

At around 1:05 pm, the person in custody who had been checking on Mr. Valles spoke to the "B" post officer, who sat at the "B" post desk.[19] At 1:31 pm, the "B" post officer checked Mr. Valles' cell and then immediately went to the "A" station.

Medical staff arrived at the unit at 1:38 pm, interacting with the "B" post officer and the individual in custody who notified the correction officer that Mr. Valles was unwell. At 1:40 pm, medical staff and the "B" post officer went into Mr. Valles' cell, exiting two minutes later and closing the door behind them. At 1:48 pm, the person in custody knocked on Mr. Valles' cell door and appeared to wave at him. A minute later, the "B" post officer conducted a tour but did not check Mr. Valles' cell. The correction officer tapped the tour wand to the nearby station as they went by. At 1:51 pm, the medical staffer returned and entered Mr. Valles' cell with the "B" post officer.

At 1:53 pm, Mr. Valles exited his cell, walking with his head down and, at one point, clutching his head with both hands. Mr. Valles then walked out of the unit with medical staff and arrived at the Hart's Island Clinic at 1:57 pm.[20]

CHS medical staff conducted a physical examination of Mr. Valles. Mr. Valles was in moderate distress, complaining of a severe headache, with decreased neurological strength, weakness, and lethargy. Mr. Valles did not want to eat that day and refused to take his methadone because he was afraid he would vomit. Clinic staff activated an EMS run to Elmhurst Hospital Center at 2:37 pm. DOC Health Affairs Report indicates that Mr. Valles was alert and responsive when he departed the facility.

Elmhurst Hospital records show that Mr. Valles had one tonic-clonic seizure episode in the ambulance, for which he was given diazepam intravenously. In the hospital triage, Mr. Valles

---

[18] Mr. Valles was not on suicide watch, therefore, the Suicide Watch Officer was not assigned to his care.
[19] The "B" post desk is usually placed near the "A" station, by the housing unit entry.
[20] The Hart's Island Clinic is used by CHS to provide mental health services in AMKC.

appeared somnolent. According to an Emergency Department note, from 5:30 pm through 7:00 pm on May 19, 2023, Elmhurst staff saw Mr. Valles moving in his stretcher trying to get comfortable. Shortly before 7:23 pm, during a change of shift, a registered nurse noted Mr. Valles unresponsive and unable to be aroused with tactile stimuli. Medical staff asked the correction officers stationed by Mr. Valles' bedside if they noticed any change. The correction officers stated that they saw Mr. Valles sitting up and turning around on the stretcher to get comfortable but did not notice any seizure-like activity. The sensor monitoring Mr. Valles' oxygen levels suggested low blood oxygen. He was transferred to a cardiac room. A resident doctor performed CPR from 7:23 pm through 7:27 pm, when Mr. Valles' spontaneous circulation returned. Medical records reflect that he went into cardiac arrest likely due to hypoxia (low level of oxygen in body tissues).

According to Elmhurst Hospital records, Mr. Valles had extensive anoxic brain injury. Neurosurgery and neurology staff recommended no intervention due to minimal brain function. An evaluation for potential brain death completed on May 21, 2023 at 12:11 pm demonstrated that the anoxic brain injury was irreversible, with already severe loss of grey matter in the basal ganglia and basal cortex only preserved at the vertex.

Mr. Valles' bail status was modified, and he was released on his own recognizance due to his medical condition on May 24, 2023.

An Elmhurst medical record note signed by a registered nurse on May 27, 2023 states that Mr. Valles left Elmhurst for another hospital for organ donation at 3:20 pm. According to DOC's Health Affairs Report, Mr. Valles was pronounced deceased on May 27, 2023, at 8:17 pm. Mr. Valles' cause of death is pending confirmation from OCME.

### 4. FELIX TAVERAS

| | |
|---|---|
| Age | 40 |
| Date of death | July 4, 2023 |
| DOC admission date | March 28, 2023 |
| Cause of death | Suspected overdose |
| Facility at time of death | AMKC, general population housing |
| Bail amount, if any | $30,000 |

DOC new admission forms completed during the intake process and CHS records reflect that Felix Taveras disclosed using heroin and cocaine. Mr. Taveras informed CHS staff that he had accidentally overdosed in the past. According to CHS records, Mr. Taveras tested positive for cocaine via urinalysis testing upon admission to custody and reported taking methadone prior to his incarceration but not being enrolled in any other drug treatment or rehabilitation program. He did not report any current or past mental health needs, or heart disease or chronic illness issues. He requested help for drug abuse. On March 29, 2023, CHS prescribed him methadone and referred him to KEEP. He successfully enrolled in KEEP on April 7.

On April 17, 2023, Mr. Taveras was discharged from general population new admission housing in EMTC and transferred to "detox" general population housing in AMKC ("detox" in this context refers only to the need to administer medication, not existing "detox" DOC housing).

On May 11, 2023, Mr. Taveras expressed to KEEP staff that he wished to reduce his methadone dosage from 60 mgs to 40 mgs with the aim of reducing his dosage to around 20 mgs by the time he left Rikers Island, with a future goal of abstinence. KEEP staff educated Mr. Taveras on the expectancies of decreasing his dose and the probable side effects. Mr. Taveras stated that he was physically and mentally prepared for the decrease.

On June 1, 2023, Mr. Taveras signed and submitted a request for voluntary withdrawal from medication-assisted treatment (withdrawal from methadone treatment). He acknowledged that the withdrawal process and potential side effects were explained to him, and that he worked with KEEP staff to develop a taper schedule he was comfortable with. Mr. Taveras told KEEP staff that he wanted to switch from methadone to suboxone. The methadone taper schedule concluded on June 22, 2023.

Mr. Taveras last received methadone on June 22, 2023. At a sick call visit on June 28, 2023, Mr. Taveras complained that, per a KEEP counselor, he was supposed to receive suboxone that night. He was instructed that the medication would start the following day, on June 29. According to CHS's medication administration records, Mr. Taveras received his first dose of suboxone on June 29, 2023. His starting dose was 2.9 mgs daily, which increased to 5.7 mgs on July 1, then again to 8.6 mgs on July 3. A KEEP note signed on June 30 states that Mr. Taveras started receiving suboxone and that, based on his legal status and medical assessment, he would continue to participate in the KEEP program.

Mr. Taveras was housed in a general population dormitory-style unit in AMKC – an open room with rows of beds and no assigned lockable cells. Based on surveillance footage reviewed by Board staff, on July 3, 2023, at around 7:30 pm, the "B" post officer assigned to Mr. Taveras' unit sat at the "B" post desk while people in custody socialized in the dormitory and the dayroom. The dayroom is a separate lockable common room adjacent to the dormitory.

The "B" post officer exited the floor and remained in the "A" station on five separate occasions in the following hours.[21] When the "B" post officer was present inside the dormitory, they failed to conduct any tours after 7:30 pm and they sat by the "B" post desk, which is near the housing area entry. However, the "B" post officer documented tours every 30 minutes in logbook entries

---

[21] The "B" post officer was in the "A" station from 7:37 pm through 7:45 pm, 8:18 pm through 8:23 pm, 8:56 pm through 9:00 pm, 9:07 pm through 9:24 pm, and 10:00 pm through 10:06 pm. They spent the rest of the time in the housing unit at the "B" post desk.

from 7:30 pm until Mr. Taveras' medical emergency. Further, the "B" post officer did not document personal breaks or meals in the logbook whenever they vacated the "B" post.

People in custody informed Board investigators that Mr. Taveras seemed fine early in the evening, and that he played cards and interacted with others as usual. At 8:02 pm, two individuals in custody (not Mr. Taveras) can be seen on surveillance footage rolling up pieces of paper on their beds. At 9:24 pm, Mr. Taveras also began rolling up pieces of paper. At that same moment, the "B" post officer returned from the "A" station and checked that the dayroom door was locked but did not conduct a tour of the unit. At 9:26 pm, Mr. Taveras exited the bathroom with a string-like object, then began smoking outside the bathroom with three other people in custody. The "B" post officer was present in the unit, sitting by the "B" post desk at the time. Mr. Taveras continued smoking until 9:32 pm, then went to bed.

At 11:13 pm, a person in custody spoke to the "B" post officer while pointing to the back of the dormitory, around the area where Mr. Taveras' bed was located. People in custody reported to Board investigators that Mr. Taveras woke up screaming in pain, saying he was having a heart attack. The "B" post officer talked to the "A" post officer through the window, then walked near Mr. Taveras' bed at 11:18 pm before returning to the "A" station window. At 11:24 pm, the correction officers turned on the dormitory lights. Mr. Taveras was on his bed, showing signs of pain and discomfort. Mr. Taveras rocked left to right, kicked his feet in the air, stood up and rested his hands on his knees, and touched his chest.

The "B" post officer went to the "A" station to presumably notify them of the need for medical attention at 11:26 pm. DOC records reflect that correctional staff notified the main clinic that Mr. Taveras was experiencing chest pains at 11:30 pm.

There is a discrepancy between DOC records and CHS records about whether Mr. Taveras' emergency was communicated to officers and CHS staff in the AMKC. According to DOC's Health Affairs Unit Preliminary Investigative Report, the "A" post officer spoke to the correction officer assigned to the main clinic patrol post. The main clinic patrol officer informed the "A" post officer that Mr. Taveras could be escorted to the clinic to be seen. The "A" post officer then notified the captain, who advised that Mr. Taveras should be escorted to the clinic. Mr. Taveras told correctional staff that he was in too much pain to walk. Upon learning of this, the main clinic patrol officer stated that, due to CHS's change of shift, there was no available medical staff to respond, therefore Mr. Taveras would have to walk to the clinic to be seen. However, CHS informed Board staff that CHS was appropriately staffed. According to the same, CHS has no record of receiving an emergency call at 11:30 pm, and state that they were first made aware of the emergency when Mr. Taveras was brought to the clinic. Further, CHS informed the Board that the main clinic patrol officer's reference to "change of shift" may have been referencing DOC staff's change of shift, as CHS' Medicine shift change is at 12:00 am, not 11:30 pm. CHS nursing

17

staff are set to change shifts at 8:00 pm and CHS has asserted that staff were available to respond to this emergency.

At 11:47 pm, the "B" post officer, with the assistance of three people in custody, carried Mr. Taveras off the bed and to the clinic. They arrived at the clinic with Mr. Taveras at 11:55 pm. CHS emergency response records reflect that Mr. Taveras presented to the medical clinic with complaints of chest pain and breathing problems. Very shortly after, he became unresponsive and clinic staff were unable to finish taking his vitals as a result. Staff administered four doses of Narcan, placed Mr. Taveras on a cardiac monitor, and began CPR efforts with a bag valve mask and chest compressions. Mr. Taveras then became pulseless. According to CHS, clinic staff contacted EMS at approximately 12:05 am, EMS arrived at approximately 12:25 am, and they departed the facility to transport Mr. Taveras to Elmhurst Hospital Center at approximately 12:50 am.

According to Elmhurst Hospital records, Mr. Taveras was intubated in the field. By the time he arrived at the hospital, advanced cardiovascular life support efforts (chest compressions via a Lund University Cardiopulmonary Assist System device) had been ongoing for 30 minutes. Mr. Taveras was unresponsive in cardiac arrest, pulseless, and with no external signs of trauma. He was pronounced deceased at 1:21 am.

DOC records reflect that, following Mr. Taveras' death, a search of his property uncovered a brown leafy substance in a plastic bag confirmed to be tobacco, a brown paper bag soaked in liquid fentanyl, and a white powdery substance folded in a card detected to be Methylenedioxy Methamphetamine (ecstasy/MDMA). DOC uses a test swab kit to detect opiates, stimulants, synthetics, Tetrahydrocannabinol (THC), hallucinogens, and depressants. DOC staff also attempted to drug test the occupants of the housing area via urinalysis, however, AMKC's drug testing machine stopped working. The machine was repaired 24 hours later. Two individuals in the unit tested positive for marijuana.

Following Mr. Taveras' death, a captain was suspended for four days for disregarding departmental policies by failing to conduct tours as required[22] and for not taking immediate action to properly care for Mr. Taveras. The "B" post officer was suspended for 15 days for failure to conduct and follow proper lock-in procedures and for not intervening or giving orders to stop when observing people in custody inhaling unknown substances. The "A" post officer was also suspended for 15 days for failure to act and notify a supervisor when they observed Mr. Taveras smoking an unknown substance.

---

[22] DOC Rules and Regulations section 2.25.010, requires captains to conduct tours at "frequent intervals."

## III.   KEY FINDINGS

### 1.  Insufficient touring and supervision

Previous Board investigative reports regarding deaths in DOC custody highlighted how insufficient rounding and supervision by correctional staff, both correction officers and supervisors, impact safety and security in jail facilities. This requires immediate attention by DOC. Ameliorative measures such as the implementation of tour wands is a commendable effort to address this issue, however, as explained below, its effectiveness is hindered by correctional staff's poor policy execution. Each of the four investigations described in this report featured inadequate touring and supervision of housing units.

DOC has multiple policies addressing the need for constant supervision of people in custody. For instance, per DOC Directive #4517R, Inmate Count Procedures, correction officers are responsible for the care, custody, and control of people in custody. Accordingly, officers must remain in their assigned areas and conduct visual observations at 30-minute intervals in general population areas.

Similarly, DOC Directive #4017R-D, Observation Aide Program, requires that Observation Aides ("Suicide Prevention Aides" or "SPA") be assigned to all special housing areas where the entire population of incarcerated individuals has been placed under observation. These areas include mental health housing areas, restrictive housing, protective custody housing areas, intake areas, and new admission housing areas. This directive further orders that correction officers assigned to the security post – the "B" post – tour every 30 minutes, ensuring signs of life for all incarcerated individuals in the area. If an SPA is not assigned during a particular period, an additional correction officer must be assigned to the housing area and the officer must conduct tours every 15 minutes until an adequately trained SPA arrives for their shift.

Finally, DOC's Rules and Regulations, Section 7.05.090 titled General Supervision, directs that correction officers "shall be constantly alert, while on duty, observing everything that takes place on post within sight or hearing and shall constantly patrol the post during the tour of duty."

In **Marvin Pines'** dormitory, a "B" post officer signed out of their post at 12:12 am, but they were not replaced until 3:17 am on the night of Mr. Pines' death. At that point, a "B" post officer signed onto the post and conducted their first tour, as well as another tour at 3:44 am, but did not check the bathroom either time. Their next tour was not until 5:01 am. The "B" post officer then left the unit for nine minutes. Based on DOC's own policies regarding active supervision in non-cell housing areas,[23] the "B" post officer did not comply with proper procedures by failing to tour

---

[23] Active supervision applies to all non-cell housing areas at all times, and includes but is not limited to: (a) direct and uninterrupted communication with each inmate; (b) tour at 30-minute intervals; (c) ability of the officer on post to immediately respond to emergency situations; and (d) if a facility housing area houses 20 or more inmates, the

every 30 minutes. In this case, DOC suspended the "B" post officer, as well as a captain for their failure to make more than one tour in eight hours.

**Rubu Zhao** was housed in a PACE unit. On the day of this death, "B" post officers and a Suicide Watch Officer were present in the unit while people in custody were locked out of their cells. The two correction officers mainly stayed by the "B" post desk. After 1:00 pm, newly arrived "B" post officers did not tour the unit.[24] A captain toured at 2:07 pm, but only the bottom tier.

"B" post officers assigned to **Joshua Valles'** mental observation unit were required to tour every 30 minutes since an SPA was active in the unit. Instead, their tours took place more than 30 minutes, or an hour, apart. When conducting tours, correction officers did not consistently check the cell Mr. Valles occupied, then tapped their tour wands to the nearby station.

Operations Order #01/23 regarding the Guard 1 Plus Patrol System (The PIPE), effective March 7, 2023, establishes DOC's guidelines on the system used to track rounds made by staff at designated points within facility areas. Correction officers utilize a hand-held battery-operated device that records data using wall-mounted touch memory buttons. These buttons are located at specific pre-determined locations as designated by wardens. The Operations Order sets forth that "[c]orrection officers assuming "B" and "C" posts in celled and de-escalation housing units shall conduct tours of their assigned areas at a minimum of twice per hour at periods not to exceed thirty (30) minutes between tours." The Order further defines a correction officer's failure to tour every 30 minutes and a captain's failure to tour three times per unit each at least one hour apart as a discrepancy. For discrepancies, tour commanders are required to submit a report explaining the tours missed or conducted late.

As essential as tour wands can be to make sure correction officers are held accountable and tours are conducted in a timely manner, officers must still verify each occupied cell to ensure that those inside are breathing and living, and do not require immediate medical attention.

In **Felix Taveras'** general population dormitory, the "B" post officer failed to tour every 30 minutes and did not intervene when people in the unit smoked an unknown substance. The "B" post officer was also not continuously present in the unit as required in non-cell housing areas

---

continuous presence of an assigned correction officer within that housing area to ensure optimal safety and security are provided. (Directive #4514R-C, Housing Area Logbooks, effective October 13, 2015)

[24] Active supervision applies to cell housing areas during all lock out periods when inmates are allowed to freely move about the confines of the housing area (0500 x 2100 hours) and those inmates who remain in their cells during lock out hours. It includes but is not limited to: (a) direct and uninterrupted communication with each inmate; (b) tour at 30-minute intervals; (c) ability of the officer on post to immediately respond to emergency situations; and (d) if a facility housing area houses 20 or more inmates, the continuous presence of an assigned correction officer within that housing area to ensure optimal safety and security are provided. (Directive #4514R-C, Housing Area Logbooks, effective October 13, 2015)

with more than 20 people (the census at the time was 50), by constantly abandoning their post to go to the "A" station for upwards of 10 minutes at times.

DOC suspended correctional staff for failures to comply with departmental policies following Mr. Pines' and Mr. Taveras' deaths, including failures pertaining to insufficient rounding. The Board commends DOC for taking swift disciplinary action and urges the agency to pair disciplinary measures with increased auditing of touring and supervision practices to correct long-standing deficient habits. This must also go hand in hand with continuous training to refresh uniformed staff's knowledge and understanding of applicable directives.

### 2. Inaccurate or incomplete logbook entries

DOC Directive #4514R-C on Housing Area Logbooks, states: "Logbook entries must be made without undue delay and must be recorded legibly, accurately, and concisely, in chronological order using military time." All incidents described in this report involved incomplete or inaccurate logbooks entries.

The "B" post officer assigned to **Marvin Pines'** unit documented active supervision tours from 12:30 am through 2:00 am on February 4, 2023, when the officer had been away from their post from 12:12 am to 3:17 am. A captain documented that they conducted an unannounced PREA tour at 12:01 am. Pursuant to DOC policy, all supervisors conducting PREA tours should be looking to see that no cell doors are covered, and secluded places are clear of any people being sexually assaulted or harassed, and no other activity is going on that would cause a safety issue, sexual or otherwise.[25] Instead of checking secluded areas and that cell doors were not covered, the captain and the "B" post officer entered the housing unit at 12:12 am for one minute before exiting.

The "A" post logbook reflects that DOC staff activated a medical emergency for **Rubu Zhao** at 2:20 pm on May 14, 2023. Yet there are no entries documenting what time CHS staff arrived and departed the unit with Mr. Zhao en route to the clinic. There are also no details regarding the nature of the incident.[26]

On May 19, 2023, the day **Joshua Valles** was transported to the hospital, a captain made a logbook entry at 12:46 pm stating: "Tour of area, all appears secure." Based on a review of surveillance footage, at 12:40 pm, a correction officer checked Mr. Valles' cell as the captain passed by the cell without personally checking it. The captain then connected their tour wand to the nearby station.

---

[25] DOC Directive #5011R-A, Elimination of Sexual Abuse and Sexual Harassment, effective May 31, 2019
[26] DOC's directive concerning housing area logbooks requires that, if there is an unusual incident, situation, or condition to report during a correction officer's tour, the officer shall make a logbook entry describing the details of the event and the name of the supervisor who was notified.

Further, the "A" and "C" post logbooks for Mr. Valles' unit on May 19, 2023 lack entries reflecting that he was escorted to the clinic at 1:54 pm and what the possible reason might have been. Instead, the "A" post officer signed off at 1:45 pm, stating that they were properly relieved by another officer, while the "C" post logbook contains entries stating that active supervision tours of the area occurred and there was nothing to report every 30 minutes for the entire day. Based on Board staff's review of surveillance footage beginning at 10:48 am, tours were inconsistent. A correction officer toured at 11:00 am, 12:00 pm, and 12:40 pm, but did not look inside Mr. Valles' cell. The "B" post officer did not tour at 11:30 am. The officer toured at 1:00 pm and 1:30 pm and did check Mr. Valles' cell.

The "B" post officer assigned to **Felix Taveras'** unit did not document every instance in which they stepped away from their post in the "B" post logbook as either a meal or a personal break. Lastly, they documented tours of the housing unit every 30 minutes after 7:30 pm when the correction officer was instead seated at the "B" post desk.

### 3. Medical response concerns

When **Marvin Pines** became unresponsive following a seizure, emergency response staff tried to use AED pads but did not notice that the pads had a protective plastic cover until the "B" post officer pointed it out. Although shock was not advised once they did try to properly use the AED pads, this was illustrative of inexperience or a poor response to the emergency. CHS suspended and submitted disciplinary charges against two nursing staff following these events.

CHS informed Board staff that central clinical leadership reviews a decedent's clinical care immediately after each death. The review process includes soliciting information from relevant members of the local care team and offering them support and education. CHS also incorporate relevant learning opportunities from death reviews into their systemwide educational interventions, using identified errors to build training opportunities.

As highlighted in previous Board reports, miscommunication between CHS and DOC on the need for medical assistance in housing units can delay emergency treatment. DOC staff allege that, after **Felix Taveras** complained of chest pains, the "A" post officer assigned to his unit called the clinic and was informed by the main clinic patrol officer that Mr. Taveras should be escorted to the clinic, even after they were told that Mr. Taveras reported being in too much pain to walk on his own.

Following this incident, CHS informed Board staff that DOC can initiate a "medical emergency" any time DOC staff are concerned that an individual is having an acute medical issue, which may include someone being unable to walk.  DOC can also bring patients with non-emergency medical issues to the clinic for evaluation. According to CHS, DOC is responsible for clearly communicating a medical emergency to CHS, providing an escort officer, and helping medical staff get to an ill

patient. Upon receiving notification from DOC of a medical emergency, CHS activates its emergency response team and equipment, and gets to the site of the emergency as expeditiously as possible. Per CHS, they aim to respond no more than eight to 10 minutes after receiving an emergency call, which they understand is comparable to community EMS response times. CHS reports that the actual median response time for calendar year 2023 through August 15, 2023 was 5.5 minutes.

In the case of Mr. Taveras, the main clinic patrol officer also reportedly told unit staff that due to a change of shift, medical staff were unable to respond to the housing area. Mr. Taveras was eventually carried to the clinic by the "B" post officer and other individuals in custody.

CHS denies ever receiving the emergency call in the first place and affirmed that the clinic was appropriately staffed at the time. Board staff reviewed DOC's clinic logbook, which would reflect the call, but the writing was illegible and unclear. CHS informed Board staff that, during a Jail Assessment and Review[27] of Mr. Taveras' death, DOC showed CHS the reporting correction officer's documentation. The correction officer did not indicate when the notification call to the clinic was made. DOC informed CHS that it would investigate that missing information.

On the issue of improving medical emergency communications between housing areas and clinics, CHS created a reference tool for correction officers to ensure officers clearly communicate the critical details of an emergency response. CHS shared this tool with DOC leadership for their review.

DOC informed the Board that DOC is engaging the National Commission on Correctional Healthcare ("NCCHC") to survey the quality of care provided to persons in custody. According to DOC, this survey will help to further identify any gaps in custodial and medical oversight to develop a plan of correction to address any risks or gaps identified by the NCCHC. The Board supports these efforts and recommends that DOC and CHS work jointly on this endeavor.

### 4. COD notification delay

The Central Operations Desk ("COD") is a DOC unit that accepts notification and information related to unusual incidents and disseminates that information.[28] Board staff, as well as multiple DOC units, receive COD notifications via e-mail when issued. DOC policy requires that deaths or serious injuries of people in custody, as well as instances when people in custody are unconscious, be reported to COD via telephone within 15 minutes "so that, if/when assistance is

---

[27] According to CHS staff, CHS and DOC hold Jail Assessment and Review meetings on deaths in custody to share pertinent information and insights, and to identify opportunities for systemic change that can reduce the risk of recurrence.
[28] DOC Directive #5000R-A, Reporting Unusual Incidents, effective November 19, 2004 and amended on June 15, 2016. Unusual incidents are specific events that may affect or affect the safety, security, and wellbeing of the Department, its personnel, visitors, volunteers, and people in custody.

required, it can be provided without undue delay." The reporting time frame starts when it becomes apparent to the Tour Commander that an unusual incident has occurred.

**Rubu Zhao** jumped from the top tier stairwell on May 14, 2023, at 2:18 pm. DOC staff statements reflect that there were issues notifying GRVC management of what occurred because staff on the ground did not comprehend the severity of Mr. Zhao's injuries and initially treated it as a "slip and fall." Staff noted the incident in the non-reportable logbook (logbook for incidents outside the "unusual" categories). However, by May 15 at the latest, DOC staff were or should have been aware that Mr. Zhao sustained head trauma and a femur fracture – a serious injury, which required notification to COD at that point. The incident was reported to COD at 12:06 am on May 16, 2023.

DOC facility leadership informed Board investigators that DOC staff directly involved in these incidents meet with facility leadership to go over the events. According to DOC, their leadership highlight the mistakes staff made and share the correct way to respond if a similar situation presented itself again. DOC also report that, during roll call before the start of tours, uniformed staff are shown videos of the incident to avoid similar mistakes.

### 5. Contraband and drug usage intervention

OCME has yet to determine **Felix Taveras'** cause of death, though, based on the events immediately before his passing and the drug contraband found in his property, it is suspected to be drug related. The "B" post officer present in Mr. Taveras' unit hours before his death witnessed several individuals inhaling unknown substances but did not intervene. DOC suspended the "B" post officer, as well as the "A" post officer, for failure to give orders to stop when they observed people smoking. The Board commends DOC for taking disciplinary action in response to the correction officers' dereliction of duty, with the aim that this instills improved intervention practices from other staff.

### 6. Notification to the Board

Consistent and timely notification to the Board of deaths in custody is crucial to our investigations. DOC leadership did not directly notify Board members or staff of any of the deaths highlighted in this report. Since early 2022, direct notification has been inconsistent. In some instances, DOC Intergovernmental staff have called or e-mailed the Board's Executive Director to notify them of deaths in custody. In many other instances, Board leadership has found out about deaths through CODs or media reporting.

For example, Board staff learned of **Marvin Pines'** and **Rubu Zhao's** deaths through CODs, which can sometimes be delayed and have only scant preliminary information.

DOC did not alert the Board of **Joshua Valles'** passing because he was not in custody at the time of his death. The Board learned of his death through media articles. The Board has requested to

be contacted and notified if a patient is found to have brain death while in custody, since brain death is *death*, even if there is still the possibility of organ donation.

Finally, DOC issued a COD regarding the death of **Felix Taveras** at 3:00 am on July 4, 2023 and did not follow it up with direct communication to the Board's Executive Director to ensure that Board members and staff were aware of this late-night notification during a holiday.

### 7. Mental health

The September 2023 Mayor's Management Report indicates an increase in the percentage of individuals in custody with a mental health diagnosis, from 50% in Fiscal Year 2022 to 51% in Fiscal Year 2023.[29] The percentage of individuals with a serious mental health diagnosis also rose, from 16.2% in Fiscal Year 2022 to 18.9% in Fiscal Year 2023.

As highlighted in the investigative findings above, CHS mental health staff diagnosed **Rubu Zhao** with other specified schizophrenia and adjustment disorder with mixed anxiety and depressed mood, given his reports of depression and anxiety symptoms, paranoia, and hearing voices.

CHS records reflect that prior to his incarceration, **Joshua Valles** had been diagnosed with schizoaffective disorder (bipolar type), bipolar disorder, attention-deficit/hyperactivity disorder, and post-traumatic stress disorder. Mr. Valles also had numerous past psychiatric hospitalizations. A mental health note signed by CHS staff on April 15, 2023 shows that, when mental health staff contacted a case manager from an external provider familiar with Mr. Valles, they noted surprise that he was incarcerated in Rikers Island given his intellectual disabilities.

## IV.   RECOMMENDATIONS[30]

**To CHS and DOC, jointly**

1. CHS and DOC report that they are now conducting joint reviews of each death in custody, which was recommended by the Board in its last four reports on deaths in custody. This review must include the exchange of relevant clinical information (not including a full review of a person's entire medical history if not relevant). DOC and CHS must relay their findings to the Board, which is authorized, by law, to investigate deaths in custody and offer recommendations to prevent further incidents. Issues regarding confidentiality and protected health information (PHI) must be resolved by each agencies' legal departments and, if necessary, the New York City Law Department.[31]

---

[29] Mayor's Office of Operations. (September 2023). *Mayor's Management Report.* Retrieved from https://www.nyc.gov/assets/operations/downloads/pdf/mmr2023/doc.pdf

[30] As noted in footnotes 30 through 34 of this report, several recommendations in this section were made in prior reports on deaths in custody. The Board has again included these recommendations or variations of them because, to date, DOC and CHS have not implemented them.

[31] A variation of this recommendation was made in *February & March 2022 Deaths in DOC Custody Report and Recommendations, Report and Recommendations on 2021 Suicides and Drug-Related Deaths in New York City*

2. CHS staff responded to Mr. Pines' medical emergency without a gurney. Both agencies should coordinate on a list of standardized questions or information to be mandatorily shared with CHS clinic staff so they can identify what equipment and materials are necessary to appropriately respond to the emergency.[32]

3. The Board has historically recommended a dedicated direct phone line for medical emergencies that does not rely on information being relayed through multiple staff to reach the medical response team.[33] CHS informed Board staff that their staff have investigated alternate options and discussed some of these with DOC but determined there is no immediate alternate solution that does not present other potential risks, such as new breakdowns in communications. The Board encourages both DOC and CHS to continue their work to identify an alternate means of communicating medical emergencies between housing areas and clinics while mitigating any potential risks, including increased training for clinic correction officers. DOC informed the Board that DOC and CHS met on October 17, 2023 to discuss this recommendation. As a result of that meeting, DOC stated that it is exploring the installation of emergency communication telephones dedicated for medical emergencies at the respective "A" post.

4. CHS and DOC should identify what led to medical emergency call discrepancies and develop necessary fail-safe protocols to prevent future miscommunication. Any joint review and development of an action plan to improve both agencies' role in responding to medical emergencies must address CHS staffing in clinics and determinations on when patients must ambulate to the clinic.[34]

5. Due to correctional staff inaction when witnessing people in custody using or exchanging contraband, DOC must immediately reenforce protocols and train both non-uniformed and uniformed staff on how to intervene in these situations. Similarly, CHS should ensure that their staff is aware that they must immediately notify DOC staff if they observe people in custody using or exchanging contraband.

**To CHS**

1. CHS staff did not realize that the AED pads had a plastic covering when attempting to use the machine on Mr. Pines, until a member of correctional staff pointed it out. Clinic staff

---

*Department of Correction Custody, Second Report and Recommendations on 2022 Deaths in New York City Department of Correction Custody,* and *Third Report and Recommendations on 2022 Deaths in New York City Department of Correction Custody.*

[32] As variation of this recommendation was made in *Third Report and Recommendations on 2022 Deaths in New York City Department of Correction Custody.*

[33] A variation of this recommendation was made in *February & March 2022 Deaths in DOC Custody Report and Recommendations* and *Report and Recommendations on 2021 Suicides and Drug-Related Deaths in New York City Department of Correction Custody.*

[34] A variation of this recommendation was made in *February & March 2022 Deaths in DOC Custody Report and Recommendations.*

also did not bring a gurney when responding to the emergency. Emergency response staff should ensure that all medical equipment is appropriately prepared for use and that they bring all necessary equipment to housing areas when responding to emergencies.

2. CHS must ensure that clinics are appropriately staffed during change of shifts.

3. CHS informed Board staff that if a patient cannot walk to the clinic and correctional staff cannot assist the patient in getting to the clinic, DOC should call an emergency response and CHS staff will respond to the housing area. CHS must ensure that only authorized medical staff make determinations as to whether individuals in custody are able to ambulate to the clinic or if emergency response staff should report to a housing unit.

**To DOC**

1. DOC leadership must notify the Board's Executive Director of each death that occurs in custody through e-mail or telephone within 30 minutes of learning of the death.

2. Multiple past Board reports highlighted DOC's obligation to ensure that correction officers and captains conduct regular tours and directly supervise people in custody, in accordance with DOC's own policies. Since then, DOC implemented the full-scale use of tour wands. DOC's tour wand policy must include an auditing procedure to measure the length of time between each tour wand tap on the stations around the housing area, to ensure that uniformed staff are carefully conducting visual inspections of individual cells to verify that those within are alive and breathing.[35]

3. DOC must ensure that correctional staff timely document accurate information in logbooks and other agency databases. DOC should transition out of the practice of keeping paper logbooks and develop an electronic log system. The electronic system should capture information triggered at the individual cell level. Until such a system is implemented, tour commanders should articulate an action plan to regularly audit logbooks against Genetec video footage and watch tour data at unpredictable times to ensure that rounds are taking place as required and to detect incorrect entries.[36]

4. DOC should constantly reinforce and retrain staff on basic supervision, touring, and logbook entry practices, including but not limited to, correction officers' responsibility to remain on post and remain vigilant, accurately and legibly document personal breaks, meals, tours, and incidents in logbooks, and tour units as required.

---

[35] A variation of this recommendation was made in *Report and Recommendations on 2021 Suicides and Drug-Related Deaths in New York City Department of Correction Custody, Second Report and Recommendations on 2022 Deaths in New York City Department of Correction Custody,* and *Third Report and Recommendations on 2022 Deaths in New York City Department of Correction Custody.*

[36] A variation of this recommendation was made in *February & March 2022 Deaths in DOC Custody Report and Recommendations, The Death of Layleen Xtravaganza Cubilette-Polanco 1991-2019, and Report and Recommendations on 2021 Suicides and Drug-Related Deaths in New York City Department of Correction Custody, Second Report and Recommendations on 2022 Deaths in New York City Department of Correction Custody, and Third Report and Recommendations on 2022 Deaths in New York City Department of Correction Custody.*

5. Correctional uniformed staff receive annual trainings on Narcan administration, CPR, first aid and the use of AEDs. DOC must also incorporate annual refreshers on departmental rounding and supervision protocols and other crucial directives.

6. DOC's Video Monitoring Unit ("VMU") is charged with the responsibility to "remotely monitor all facility inmate activity in real time, promptly identify security concerns, and when necessary, make immediate notifications to the appropriate personnel so action can be taken to avoid potential incidents, whenever possible[.]"[37] It operates seven days a week. During day tours, VMU assigns one staffer to oversee operations in the West Facility, the Rose M. Singer Center, and NIC, one staffer to oversee GRVC and the Vernon C. Bain Center, one staffer to oversee the newly reopened Otis Bantum Correctional Center, and one staffer to oversee the Robert N. Davoren Center. AMKC closed on August 3, 2023. During the 9:00 pm to 5:00 am tour, only two staffers are assigned to oversee all jail facilities. VMU could be a crucial tool in identifying poor touring practices, deficient supervision, unsecured and covered cells doors, as well as other incidents that pose a risk to individuals in custody and staff alike. DOC must immediately increase the number of staff assigned to VMU to properly supervise all areas where people in custody are held, proportionate to the census.

7. Housing area correctional staff must immediately notify the Tour Commander when they observe the presence or use of contraband. DOC staff must arrange an unscheduled search of the unit immediately after such notification is received and drug test the individuals in custody assigned to that unit.

8. DOC currently has one drug testing machine available per facility and they are not shared between facilities. DOC must procure backup testing machines for all facilities so that efforts to immediately drug test individuals are not hampered by broken or faulty machines.

9. DOC must stop the flow of contraband into the jails, whether it be through mail, visitors, or uniformed and civilian staff. The Department advised that randomized body scanning began on March 13, 2023 at RNDC. DOC informed the Board that it is not operationally feasible to scan every person coming and going from the facility due to time and space constraints.[38] DOC further recognizes that body scanning not only allows DOC to recover contraband items on or inside persons entering DOC facilities, but also, importantly, body scanning serves as a deterrent. DOC must extend this practice to other facilities and scan as many incoming staff as possible within the current time and space constraints, and explore ways to limit or eliminate those constraints. As recommended by Dr. James Austin

---

[37] Operations Order #2/19, Video Monitoring Unit (VMU) and Video Review Unit (VRU), effective date January 18, 2019

[38] Once a person in custody has reached the maximum number of scans allowed as set forth in DOC Directive #4597R, they cannot be body scanned again. Based on this, DOC has informed the Board that they are limited in how many times it can scan a person in custody or someone who leaves and returns into DOC custody.

in his Declaration in Support of Plaintiff's Motions for Preliminary Injunction and Provisional Class Certification before the United States District Court of the Southern District of California filed on May 2, 2022 regarding San Diego jail facilities,[39] the Department should require all individuals, including medical staff, custody staff, and contractors, to undergo body scanning before entry. Per Dr. Austin, "when body scan technology is used properly on all individuals entering a jail, it is nearly impossible for contraband to enter a correctional facility on or in a person's body."[40]

10. To ensure drugs are confiscated and do not cause harm to the population, DOC must create a regular contraband search schedule that covers all housing units and areas where people in custody are held.[41]

---

[39] Dunsmore v. San Diego County Sheriff's Dep't, Civil No. 11-0083 IEG (WVG) (S.D. Cal. Mar. 1, 2011)

[40] As recommended in *Report and Recommendations on 2021 Suicides and Drug-Related Deaths in New York City Department of Correction Custody* and *Second Report and Recommendations on 2022 Deaths in New York City Department of Correction Custody.*

[41] A variation of this recommendation was made in *Second Report and Recommendations on 2022 Deaths in New York City Department of Correction Custody.*

## NYC HEALTH + HOSPITALS/CORRECTIONAL HEALTH SERVICES RESPONSE TO FINDINGS AND RECOMMENDATIONS CONTAINED IN THE NYC BOARD OF CORRECTION'S "FIRST REPORT AND RECOMMENDATIONS ON 2023 DEATHS IN NEW YORK CITY DEPARTMENT OF CORRECTION CUSTODY"

New York City Health + Hospitals / Correctional Health Service (CHS) has reviewed the Board of Correction's report, "First Report and Recommendations on 2023 Deaths in New York City Department of Correction Custody."

CHS reiterates its concern regarding the Board's public disclosure, throughout the report, of protected health information. As noted in the previous report, CHS believes that, even posthumously, the privacy and confidentiality of a person's information should be respected and protected, in accordance with law.

While the Board did not identify any gaps in routine medical or mental health care in its report, the recommendations for CHS and the joint recommendations for CHS and DOC merit responses.

## IV. Recommendations

**To CHS and DOC, jointly:**

1. "CHS and DOC report that they are now conducting joint reviews of each death in custody, which was recommended by the Board in its last four reports on deaths in custody. This review must include the exchange of relevant clinical information (not including a full review of a person's entire medical history if not relevant). DOC and CHS must relay their findings to the Board, which is authorized, by law, to investigate deaths in custody and offer recommendations to prevent further incidents. Issues regarding confidentiality and protected health information (PHI) must be resolved by each agencies' legal departments and, if necessary, the New York City Law Department."

Response: **CHS and DOC have conducted joint reviews of deaths in custody since 2016, when CHS established the Joint Assessment and Review (JAR) process – which is separate from the Board review or any independent review by DOC or CHS.**

**As the Board is aware, CHS established this process precisely to recognize the importance of joint reviews of deaths, while respecting the independence of DOC and CHS and the confidentiality rules governing each. The JAR continues to provide a forum wherein DOC and CHS can appropriately share pertinent information regarding security and health operations**

and can together identify systemic risk-reduction remedies in order to minimize the recurrence of similar cases with significant adverse outcomes. CHS and DOC have recently established a more formal timeframe for JAR reviews to help ensure a more productive process.

As the Board is also aware, while federal and state confidentiality and disclosure laws prevent CHS from disclosing protected health information, CHS does share relevant patient information to support DOC's security and custody management operations, as authorized.

Finally, as noted by CHS each time in previous BOC reports, BOC holds the authority to convene the Board's death review with DOC and CHS. It remains entirely up BOC to convene the Board's death reviews as timely as it wishes, separately from any independent review each agency may conduct.

2. "CHS staff responded to Mr. Pines' medical emergency without a gurney. Both agencies should coordinate on a list of standardized questions or information to be mandatorily shared with CHS clinic staff so they can identify what equipment and materials are necessary to appropriately respond to the emergency."

Response: CHS agrees that communicating relevant information is essential when calling in a medical emergency. CHS has developed a reference card, currently under review by the Department, which includes guidance on what to communicate to CHS when calling an emergency. Extensive questioning of laypersons may delay critical in-person clinical evaluation. In addition, while it is standard to bring all equipment to most responses, in some instances, a rapid assessment of the patient by clinically trained staff may take precedence.

3. "CHS and DOC should identify what led to medical emergency call discrepancies and develop necessary fail-safe protocols to prevent future miscommunication. Any joint review and development of an action plan to improve both agencies' role in responding to medical emergencies must address CHS staffing in clinics and determinations on when patients must ambulate to the clinic."

Response: CHS staffing availability was not a factor in any of the deaths cited in this report. CHS responds to the housing area for all emergencies called by DOC, including when patients cannot ambulate.

**To CHS:**

1. "CHS staff did not realize that the AED pads had a plastic covering when attempting to use the machine on Mr. Pines, until a member of correctional staff pointed it out. Clinic staff also did not bring a gurney when responding to the emergency. Emergency response

staff should ensure that all medical equipment is appropriately prepared  for use and that they bring all necessary equipment to housing areas when responding to emergencies."

Response: **CHS recognizes the importance of an effective emergency response in the jail setting and conducts staff training – led by an interdisciplinary team – that includes simulation center work, unannounced housing area drills, and clinic-based educational sessions and webinars. This is in addition to credentialing procedures that require staff to maintain BLS/ACLS certification. In the case of Mr. Pines, CHS suspended two nursing staff, who are no longer employed by CHS.**

2. "CHS must ensure that clinics are appropriately staffed during change of shifts."

Response: **CHS staffing availability was not a factor in any of the deaths cited in this report. Regarding the Mr. Tavarez incident, the clinic was staffed appropriately, as noted by the Board. CHS has protocols in place to ensure proper staffing, as well as an escalation protocol to address coverage issues.**

3. "CHS informed Board staff that if a patient cannot walk to the clinic and correctional staff cannot assist the patient in getting to the clinic, DOC should call an emergency response and CHS staff will respond to the housing area. CHS must ensure that only authorized medical staff make determinations as to whether individuals in custody are able to ambulate to the clinic or if emergency response staff should report to a housing unit."

Response: **It is not feasible for CHS staff to make an assessment without evaluating the patient. CHS evaluates the patient at the scene, after an emergency response is called, or in the clinic. If there is a question about a patient's stability to physically come to the clinic, a medical emergency should be called, just as someone would call 911 in the community. Remote consultation to determine if an emergency response is warranted is not a safe standard workflow, as it risks delaying timely emergency responses and introducing points of miscommunication.**