# EXHIBIT 55



**BOARD OF CORRECTION**
**CITY OF NEW YORK**

# Second Report and Recommendations on 2022 Deaths in New York City Department of Correction Custody[1]

# November 16, 2022

---

[1] Authored by Deputy General Counsel Melissa Cintrón Hernández, in collaboration with Director of Special Investigations Rahzeem Gray and Special Investigations Coordinator Imahnni Jeffries. Director of Public Accountability Barbie Melendez, Director of Violence Prevention Bart Baily, Director of Environmental Safety Katrina Blackman, Director of Programming and Community Support Schency Augustin, Standards Review Specialist Dilcio Acosta, and Standards Review Specialist Jemarley McFarlane assisted these investigations. Many thanks to Executive Director Amanda Masters and Deputy Executive Director of Research Chai Park for their insight and comments, and to the members of the Jail Death Review subcommittee of the Board of Correction: Committee Chair Jacqueline Sherman, former Interim Board Chair Julio Medina, Dr. Robert Cohen, and Freya Rigterink.

## I.     INTRODUCTION & METHODOLOGY

The New York City Board of Correction ("Board" or "BOC") is required, by statute, to investigate the circumstances of deaths in custody, as defined in §3-10(c)(2) of title 40 of the Rules of the City of New York.[2] These investigations focus on identifying areas for improvement and making recommendations to the Department of Correction ("DOC" or "Department") and Correctional Health Services ("CHS") to help prevent future fatalities.

There have been 18 fatalities in New York City jails in 2022 as of the date of this report. The Board covered the deaths of Tarz Youngblood, George Pagan, and Herman Diaz in a May 9, 2022 report titled February & March 2022 Deaths in DOC Custody Report and Recommendations. This report focuses on nine deaths in custody from May 2022 through mid-August 2022. The Board is investigating the remaining six deaths and will publish a report with our findings.

Of the nine deaths covered in this report, three people died by suicide (two confirmed[3] and one suspected), four from acute drug intoxication (two confirmed and two suspected), and two from suspected natural or medical-related reasons.

The Board found the following trends among the nine deaths:
- Correction officers did not tour in accordance with Department policy in seven of the deaths outlined.
- A unit was without a "B" post officer in one instance.
- Correction officers failed to render immediate first aid to unresponsive individuals in three instances.
- The Board identified deficient or inaccurate logbook entries in three cases.
- CHS documented mental health concerns for seven of the nine decedents upon their admission to DOC custody.
- According to CHS records, all nine decedents missed medical or mental health appointments at least once.

As part of its investigation, Board staff conducted interviews with people in custody, staff, and decedents' loved ones, reviewed video footage in the jails, DOC records, CHS and NYC Health + Hospitals ("H+H") medical records, Office of the Chief Medical Examiner ("OCME") records, and press coverage. OCME records are not currently available for all decedents listed below. In those instances, causes of death are labeled as suspected rather than confirmed.

Throughout this report, the Board highlights the number of clinic visits individuals attended or missed while they were in DOC custody. People often come into custody suffering from chronic

---

[2] The Board defines "death in custody" as instances when a person dies in the custody of the Department of Correction or those whose deaths are attributable to their time in custody.
[3] Confirmation based on Office of the Chief Medical Examiner ("OCME") records.

diseases, mental health issues, addiction problems, or not having had access to quality care outside of confinement. Issues around attendance or access to clinical staff are crucial to understanding the level of care available to people during often prolonged periods in custody, and previous incarcerations very close in time. CHS and DOC records often differ in their accounting of whether an individual refused to attend their medical appointment given that clinic staff is not made aware of all instances where a person is not produced because they refused to leave their housing unit.

The Board provided CHS and DOC with advance copies of this report and an opportunity to comment. Their written responses are appended to this report.

## II.   DEATHS IN CUSTODY
### 1. DASHAWN CARTER

| Age | 25 |
|---|---|
| Date of death | May 7, 2022 |
| DOC admission date | May 5, 2022[4] |
| Cause of death | Hanging[5] |
| Facility at time of death | Anna M. Kross Center ("AMKC"), general population housing |
| Bail amount | Remanded |

Dashawn Carter was in DOC custody for two days after his discharge from Central New York Psychiatric Center, where he was evaluated to determine his fitness to proceed to trial, before he died by suicide. According to Mr. Carter's criminal attorney, he was found fit to proceed with his legal case. During his last two days in custody, Mr. Carter was housed in a general population unit,[6] and his assigned cell was one of the farthest away from the "B" post desk.[7]

Clinicians at New York City Health + Hospital Corporation's Brooklyn/Staten Island Forensic Psychiatric Clinic evaluated Mr. Carter on September 16, 2021. Mr. Carter reported childhood diagnoses of attention deficit hyperactivity disorder ("ADHD") and schizophrenia, accompanied by symptoms of auditory and visual hallucinations. He also disclosed that he was prescribed Adderall (used to treat ADHD) and Risperdal (antipsychotic) as a child, and Buspar (anxiety medication) during a prior incarceration. Further, Mr. Carter disclosed that he thought about suicide "one time two years ago," but denied current suicidal ideation. Examiners at the

---

[4] Date of return to DOC custody following a transfer to New York State Office of Mental Health Hospital. Mr. Carter was initially admitted to DOC custody on April 12, 2021.

[5] As determined by OCME.

[6] General population housing is designated by custody level for individuals who have completed classification and new admission processing, including medical and mental health screening, and do not require special housing.

[7] "B" post officers or floor officers interact directly with people in custody and are posted inside the living area. The "B" post desk is usually placed near the "A" station, by the housing unit entry. "A" post officers remain inside the "A" station, colloquially known as the "bubble." The "A" station is the housing area's secured control room and cannot be accessed by people in custody.

psychiatric clinic diagnosed Mr. Carter with Unspecified Schizophrenia Spectrum and Other Psychotic Disorder.

Due to Mr. Carter's inpatient psychiatric history, CHS submitted a mental health referral for an evaluation on May 5, 2022.[8]  A note signed by CHS staff on May 6 indicates that Mr. Carter was in the care of the Central New York Psychiatric Center pursuant to a court order under Article 730.5 of the New York Criminal Procedure Law, aiming to rehabilitate him for trial. CHS records reflect that, prior to his hospitalization at Central New York Psychiatric Center, Mr. Carter had been diagnosed with other specified disruptive impulse control, conduct disorder, and cannabis use disorder. He had been treated with Remeron (antidepressant) and Buspar. Clinicians at Central New York Psychiatric Center described him as fairly stable and did not prescribe him standing medication because he was not perceived to be a serious danger to himself or others. Although Mr. Carter was disruptive on two separate occasions in April 2022, and was restrained and given STAT intramuscular injection medication as a result, he did not engage in any suicidal ideation or self-harm while at the hospital.

Mr. Carter told medical staff at his initial CHS psychiatric assessment that he was "alright." Medical records describe him as alert and oriented to person, place, and time, calm, cooperative, and not exhibiting signs of psychosis. He denied past mental health hospitalizations and denied psychiatric complaints or concerns. He also denied suicide attempts in the past or any current thoughts of hurting or killing himself. Mr. Carter admitted using marijuana daily prior to his arrest but denied using other drugs or having problems with alcohol. CHS deemed him stable for general population housing, along with mental health follow-up, including psychotherapy. CHS found no indication for medication, although Mr. Carter was advised and encouraged to request medication if the need arose.

Mr. Carter was incarcerated from October 2, 2019 through November 30, 2020, and again on April 12, 2021. CHS records indicate that during those two incarcerations, Mr. Carter missed a combined total of 92 medical appointments, 76 instances due to the Department's failure to escort him to the clinic.

Since at least 6:00 am on May 7, the day of Mr. Carter's death, correction officers did not conduct tours every 30 minutes as required by DOC policy in general population units, including a stretch of almost four hours between 6:37 am and 10:10 am when no officer or captain toured the unit.[9]

---

[8] Correctional Health Services clinicians conduct medical and mental health evaluations of people who enter DOC custody to determine the most appropriate housing assignment based on their medical needs, separate from DOC's security screening for classification.

[9] Per DOC Directive #4517R, Inmate Count Procedures, effective June 18, 2014, correction officers are responsible for the care, custody, and control of people in custody. Officers shall remain in their assigned areas and conduct visual observations at 30-minutes intervals in general population areas.

When correction officers did conduct tours, they did not check individual cells to ensure those inside were alive and breathing.

Logbook entries state that general supervision tours of the area were conducted between 7:00 am and 10:00 am, but the officer was either behind the gate or inside the "A" station from 6:40 am to 10:10 am.

DOC Rules and Regulations section 2.25.010, requires captains to conduct tours at "frequent intervals." Based on the Board's staff observations of surveillance footage, a captain last toured the unit at 6:37 am. The floor post logbook documents a captain conducting an unannounced tour at 8:13 am, however, surveillance footage reveals the captain stood by the "A" station and did not enter the housing unit.

At 2:05 pm, the "B" post officer entered the "A" station, then stepped out of the housing area completely at 2:10 pm. The officer returned to the housing area at 2:24 pm but remained in the "A" station until 4:46 pm. At that point, the "B" post officer toured the housing unit for the first time since 2:05 pm, yet did not check individual cells one by one. He briefly looked inside Mr. Carter's cell without stopping.

At 4:57 pm, people in custody gathered around Mr. Carter's cell, knocking on the door and opening it slightly. According to DOC preliminary reports, Mr. Carter was unresponsive with a sheet wrapped around his neck affixed to the window. People in custody reported to Board staff that if one were to glance while passing by Mr. Carter's cell, he seemed to be standing by the window, leaning forward.

One person in custody went to the front of the housing area to alert the "B" post officer. Surveillance footage shows the "B" post officer standing outside Mr. Carter's cell, but not entering, instead walking to the front of the housing unit. A minute later, the "B" post officer returned and went into Mr. Carter's cell, yet shortly thereafter exited and paced down the corridor. A person in custody seemed to confront the correction officer, who then went to the "A" station. Nine minutes later, an Assistant Deputy Warden briefly entered the cell with the officer. Given the brevity of their presence within the cell (40 seconds), it does not appear they rendered any first aid.

DOC records reflect that the "B" post officer used a 911 knife (a specially designed rescue tool for safe and fast cutting) to cut Mr. Carter out of the ligature, and that the officer performed cardiopulmonary resuscitation ("CPR"). Given the short time the officer spent inside the cell based on Board staff's own observations of video footage, this is in question. A person in custody told Board staff that other incarcerated individuals were the first to render aid, and two of them performed CPR. Another person in custody stated that the officer refused to perform CPR.

Medical staff arrived at 5:12 pm. According to CHS medical records, Mr. Carter was laying on the bed, pulseless, with rigor mortis present, unable to bend at the elbow or knees due to stiffness. He was pronounced deceased immediately. Two officers and two captains were suspended following Mr. Carter's death.

## 2. MARY YEHUDAH

| Age | 31 |
|---|---|
| Date of death | May 18, 2022 |
| DOC admission date | February 12, 2022 |
| Cause of death | Suspected severe diabetic ketoacidosis[10] |
| Facility at time of death | Rose M. Singer Center ("RMSC"), general population housing |
| Bail amount | $10,000 |

The Department transferred Mary Yehudah to a new general population housing unit on May 12, nearly a week before her death on May 18. This was her ninth transfer within RMSC since her admission to DOC custody on February 12, 2022. People in custody told Board investigators that from May 12 through May 17, Ms. Yehudah only left her cell once, on May 13 around 5:30 am, to shower. People in custody also said that correction officers checked on Ms. Yehudah during tours and delivered meals at mealtime.

Department records reflect that Ms. Yehudah was scheduled for 25 medical appointments from February 12, 2022 to May 17, 2022. Ms. Yehudah attended 22 of those appointments, refused to attend two appointments, and missed a third due to a conflicting court appearance.

On May 16, the day before Ms. Yehudah was admitted to Elmhurst Hospital, Department records show that correction officers were not touring consistently every 30 minutes, including instances when the "B" post officer remained inside the "A" station rather than within the housing unit. The same trend continued May 17. People in custody told DOC investigators that they heard Ms. Yehudah making moaning sounds from approximately 9:00 pm on May 16 to 5:00 am on May 17. Based on Board staff's review of surveillance footage, at 8:55 am on May 17, a person in custody looked inside Ms. Yehudah's cell and alerted an officer. Minutes later, both an officer and a captain entered Ms. Yehudah's cell, subsequently calling in a medical emergency. Ms. Yehudah was found breathing but unresponsive. CHS medical staff arrived at the unit at 9:09 am, followed by EMS at 9:26 am.

Ms. Yehudah was transported to Elmhurst Hospital and admitted to the intensive care unit ("ICU"). On May 18 at approximately 4:40 am, she went into ventricular fibrillation (arrythmia) and was pronounced dead at 5:11 am. Elmhurst Hospital staff told Board investigators that Ms. Yehudah was diabetic, had low blood pressure and high cholesterol, and was COVID-positive. Upon admission to the emergency room, doctors managed Ms. Yehudah for "very bad diabetic ketoacidosis," because "her blood levels were so bad." Elmhurst Hospital records confirm that

---

[10] According to Elmhurst Hospital records.

Ms. Yehudah died of severe diabetic ketoacidosis. CHS medical records show that during her last and previous two incarcerations, Ms. Yehudah denied having diabetes on intake screenings. Based on a drug urine screen collected at 3:15 pm on May 17 at Elmhurst Hospital, Ms. Yehudah tested negative for opiates. Her glucose on admission to the hospital was greater than 685 mg/dL, which is extremely elevated.  She also had ketones present in her urine. This happens when the body breaks down fat rather than glucose for energy, producing an acid. There was no evidence of a stroke or brain hemorrhage on a head CT scan.

### 3. EMANUEL SULLIVAN

| | |
|---|---|
| Age | 20 |
| Date of death | May 28, 2022 |
| DOC admission date | February 8, 2022 |
| Cause of death | Suspected overdose |
| Facility at time of death | Robert N. Davoren Center ("RNDC"), general population housing |
| Bail amount | Remanded |

Emanuel Sullivan tested positive for opiates when first admitted to DOC custody. Among other diagnoses, CHS diagnosed him with opioid use disorder. During sick call visits on February 15 and February 17, Mr. Sullivan reported opioid withdrawal symptoms. He was enrolled in a methadone treatment program known as the Key Extended Entry Program ("KEEP") following a KEEP initial counseling session on February 17. Based on CHS's Medical Administration Records, CHS dispensed methadone to Mr. Sullivan on a nearly daily basis starting February 17. Mr. Sullivan reported to CHS mental health staff that he felt anxious, that he had a history of mental health diagnoses and anxiety, and had received treatment including outpatient individual therapy, one past psychiatric hospitalization, and medication management. CHS prescribed Mr. Sullivan antidepressants and anxiety medication.

On May 13, Mr. Sullivan reported to CHS psychiatric staff that his medications were not working because he had anxiety, he was shaking, and at times it was hard to breathe due to panic. He further disclosed that he was stressed about his incarceration, that he missed his home, and that he was suffering from poor sleep. CHS staff noted that Mr. Sullivan was calm, cooperative, and not suicidal, but that he had been poorly compliant with his medication and his follow-up appointments. As a result, CHS adjusted Mr. Sullivan's treatment plan to provide him with supportive therapy, psychological education on the benefits and side effects of medications and the need for compliance, and increased his medication dosage to target anxiety.

A note signed by KEEP staff on May 17 shows that Mr. Sullivan expressed a desire to increase his methadone dose because he was still experiencing sweats at night and difficulty sleeping. KEEP staff agreed that Mr. Sullivan would benefit from the increase in his quest for stability, and subsequently increased his methadone dosage. CHS records state that Mr. Sullivan missed 16 medical appointments from February 18, 2022 through May 20, 2022. These same records state that DOC failed to produce him for 12 of these missed visits, one visit was missed due to court, and three were rescheduled by CHS. Department records show that, from February 15, 2022 through May 27, 2022, Mr. Sullivan had 100 scheduled medical visits and missed 21

7

appointments (one due to school, one due to an alarm, one rescheduled by CHS, 16 refusals, and two walk-outs).

On May 28, the day Mr. Sullivan died, a review of surveillance footage reveals that correction officers mostly conducted tours every 30 minutes in accordance with DOC policy, although there were gaps exceeding 30 minutes on a few instances. Between 1:05 pm and 3:37 pm, correctional staff toured the housing area six times, but only glanced inside Mr. Sullivan's cell on one of those occasions, at 2:15 pm. At 2:19 pm, Mr. Sullivan handed a food tray to a person in custody through the food slot of his cell door, which was then immediately passed on to an individual locked in another cell. Between 2:25 pm and 2:50 pm, people in custody looked inside Mr. Sullivan's cell, appearing to check on him.

At 4:02 pm, a person in custody opened Mr. Sullivan's cell door, then alerted a correction officer who was in the process of conducting a tour. The officer entered the cell, found Mr. Sullivan unresponsive, and went to alert the "A" station. Two minutes later, the officer returned to the cell. A person in custody told DOC investigators that the officer performed CPR. An additional officer and a captain arrived at 4:07 pm. CHS medical staff arrived at 4:10 pm, pronouncing Mr. Sullivan deceased at 4:25 pm.

OCME investigators noted a visible "foam cone" and bleeding from Mr. Sullivan's nostrils, which is typical in suspected overdoses, as well as rigor mortis, which sets in faster in cases of suspected overdose. An empty clear plastic bag was found in the cell assigned to Mr. Sullivan. All occupied operable cells and common areas were searched following Mr. Sullivan's death, but no contraband was recovered. People in custody speculated Mr. Sullivan died from an accidental overdose because he was reportedly known to hoard pills. The last search conducted in Mr. Sullivan's housing area prior to his death was on May 20, 2022, although Mr. Sullivan was not yet housed there on that date.

### 4.  ANTONIO BRADLEY

| | |
|---|---|
| Age | 28 |
| Date of death | June 18, 2022 (after attempting suicide in custody on June 10, 2022) |
| DOC admission date | October 15, 2021 |
| Cause of death | Complications of hanging[11] |
| Facility at time of death | AMKC, mental observation housing |
| Bail amount | $40,000 |

CHS medical staff assessed Antonio Bradley on October 15, 2021, his first day in DOC custody. He reported current mental health problems but denied current suicidal ideation, both to CHS staff and on DOC's Suicide Prevention Screening Guidelines form.[12] CHS prescribed Mr. Bradley medication for depression, anxiety, and

---

[11] As determined by OCME.

[12] This is a set of questions designed to identify potential suicide risks for individuals in the first 24 to 72 hours of their incarceration.

alcohol withdrawal. Mr. Bradley was referred for a psychiatric assessment. DOC did not produce him to his initial psychiatric assessment and treatment plan appointment on October 18, and CHS canceled and rescheduled his October 20 appointment. DOC failed to produce him for scheduled initial psychiatric assessments 10 times from October 22 through November 5.

CHS records reflect that Mr. Bradley missed 86 medical visits from October 17, 2021 through June 13, 2022, the vast majority due to DOC non-production. Meanwhile, DOC records state that, from May 14, 2022 through June 15, 2022, Mr. Bradley had 68 clinic appointments scheduled, attended 32, and missed 36 (29 refusals and no appointments missed due to lack of escorts).

On November 6, 2021, CHS mental health staff assessed Mr. Bradley. A note signed by CHS staff on that day reflects that DOC referred him for a psychiatric assessment due to reported psychotic symptoms. According to the same, DOC did not produce Mr. Bradley to his appointments while he was housed in the Eric M. Taylor Center ("EMTC") – the Department's new admission housing – because he was too afraid to go outside the housing area. Mr. Bradley disclosed drug and alcohol use prior to his incarceration, that he was in psychiatric treatment for many years, and that he suffered from rapid mood swings, bipolar disorder, and depression. However, Mr. Bradley was not suicidal and expressed that he was more afraid of being assaulted. At that point, Mr. Bradley was housed in general population housing with mental health follow-up by a clinician/psychiatrist.

CHS records signed on November 7, 2021 state that Mr. Bradley used his asthma pump to injure his wrists. When questioned by mental health staff about his self-injurious behavior, Mr. Bradley refused to answer and continuously banged his head on the wall. Given this, he was sent to Bellevue Hospital for less than a day. Upon his return to Rikers, he was placed on suicide watch. People on suicide watch are subject to constant supervision, as defined in DOC Directive #4521R-A, on Suicide Prevention and Intervention. Constant supervision requires maintaining uninterrupted personal visual observation without the aid of surveillance devices and the officer must permanently occupy an established post near the person under supervision.

On November 29, 2021, while he was still on suicide watch, Mr. Bradley told CHS mental health staff: "I don't want to hurt myself, I just don't want to go through all this. I want to die. I tried to hang up last night." Throughout CHS's suicide watch rounds, Mr. Bradley continually expressed how much he struggled with being incarcerated.

Mr. Bradley was taken off suicide watch on January 3, 2022. According to a CHS record entry, Mr. Bradley stated that he was okay and that his tablet had been helping. He denied suicidal ideation and reported eating, sleeping, and showering. He presented alert, oriented, and in no acute distress, with a neutral mood and appropriate affect, as well as a spontaneous, organized, and

relevant thought process. CHS determined Mr. Bradley would continue mental health treatment in mental observation housing[13] with psychiatric and clinician follow-up.

He was transferred to general population housing nearly three months later, on March 24, 2022, because his mental health treatment team agreed that mental observation was no longer needed. According to CHS medical records dated March 24, Mr. Bradley met with mental health staff for both weekly encounters and psych medication re-evaluations. He maintained a stable psychiatric presentation and did not exhibit symptoms warranting a mental observation level of care, presenting as organized, linear, and in no psychiatric distress. Per CHS records, although Mr. Bradley had a diagnosis of Major Depressive Disorder, he demonstrated the capacity to cope with his symptoms and exhibited strong self-advocacy behaviors that would assist him to advocate for his mental health needs in general population housing. CHS would continue to provide services to address his depressive symptoms.

Only a day later, on March 25, 2022, Mr. Bradley tried to hang himself in a Bronx Hall of Justice holding pen after being denied a request for reduced bail. Mr. Bradley told CHS staff that he tied his sweater around his neck and attempted to hang himself when officers came and interrupted his attempt. An Injury to Inmate Report completed by a DOC captain characterized the incident as a manipulative gesture and "an effort to expedite his placement on the bus back to Riker's Island from the Bronx Courts."

Mr. Bradley was then escorted to the bus, where he reported waiting for a long time to return to Rikers Island. He stated that he did not feel actively suicidal, although he was depressed and emotionally unstable. CHS subsequently placed him on suicide watch, which was discontinued on April 8, 2022. At that point, CHS staff noted that Mr. Bradley did not engage in self-harm gestures while on suicide watch and that his initial complaint was due to him being upset by his legal representation, but was otherwise thinking about his case on a long-term basis. He had refused to engage with mental health staff multiple times. According to CHS records, Mr. Bradley appeared well-nourished and rested, with appropriate hygiene. He remained in mental observation housing for further assessment and treatment.

On April 28, 2022, Mr. Bradley was again placed on suicide watch after he approached mental health staff in the mental observation unit and said that he saved a variety of pills and planned to take them. CHS staff provided Mr. Bradley with supportive therapy and encouraged him to reach out to social supports, which he agreed to do. His suicide watch was discontinued the following day. Mr. Bradley had an improved mood and mental health state after speaking with his father. He reported medication helped him stay positive and consider alternative ways of

---

[13] Mental observation units house those individuals whose mental condition requires a higher level of observation than those in general population or are at increased risk of suicide.

coping with the stresses of incarceration, and his tablet helped him cope with bad thoughts. He did not express suicidal intent and was future-oriented.

On June 3, Mr. Bradley reported to CHS mental health staff that he was having intrusive thoughts about ending his life, showing staff a stockpile of several pills that he felt the urge to take. He refused to surrender his pills and DOC was notified. Mr. Bradley was placed on suicide watch. During the next few days, he stated he felt anxious about his upcoming court date on June 10. Suicide watch was discontinued on June 7. CHS noted that he had largely denied suicidal ideation since June 3, and that he was trying to remain positive and prevent himself from becoming overwhelmed with negative thoughts. He denied suicidal ideation, was future-oriented, and hopeful about being released at his next court appearance. He remained in mental observation housing for monitoring and support.

The Department transported Mr. Bradley to a Bronx Hall of Justice holding pen on June 10 at around 9:37 am. Correction officers assigned to Court Divisions are required to perform routine tours of their assigned posts and observe all individuals in custody for unusual incidents, behavior, or conditions, at a minimum of every 15 minutes.[14] During these tours, staff is required to remain alert for any behavior that could indicate that an individual in custody is mentally ill or suicidal.

While in the holding pen, Mr. Bradley alternated between pacing and lying down. At 12:03 pm, two officers escorted him out of the pen, presumably to attend his court appearance. He returned at around 12:27 pm, had lunch, and kept pacing and lying down for the next few hours. At 4:18 pm, Mr. Bradley had a short conversation with a DOC supervisor, after which he began kicking the bars, removed his sweater, and threw milk on the floor outside of the pen. At 4:22 pm, an officer briefly spoke to him, then left. Just a minute later, Mr. Bradley tied his sweater to the gate and tested the knot to ensure it was tight before dropping his weight and falling to his knees. A DOC supervisor was the first to find Mr. Bradley at 4:33 pm. Four correction officers responded to the scene, opened the pen, removed the sweater from Mr. Bradley's neck, and performed chest compressions. According to Department records, uniformed staff performed CPR and chest compressions, and used an automated external defibrillator ("AED") shock pad. EMS arrived at 4:50 pm and departed the facility with Mr. Bradley at 5:04 pm, transporting him to Lincoln Hospital.

Mr. Bradley did not regain consciousness. On June 15, he was compassionately released from DOC custody after suffering brain death. He was taken off life support on June 18. The Department did not notify the Board of Mr. Bradley's passing, nor did they issue a Central Operations Desk notification. DOC leadership informed the Board that they do not count a death after discharge as an in-custody death, and that, accordingly, Lincoln Hospital did not inform the

---

[14] DOC Directive #4521R-A, Suicide Prevention and Intervention.

Department of his death. DOC learned of Mr. Bradley's passing when they were contacted by OCME to obtain additional information regarding his incarceration.

## 5. ANIBAL CARRASQUILLO

| Age | 39 |
|---|---|
| Date of death | June 20, 2022 |
| DOC admission date | September 29, 2019 |
| Cause of death | Acute fentanyl intoxication[15] |
| Facility at time of death | George R. Vierno Center ("GRVC"), general population housing |
| Bail amount | Remanded |

Anibal Carrasquillo was housed in nine different facilities throughout the 33 months he spent in DOC custody. Mr. Carrasquillo self-reported daily drug and alcohol use to CHS staff when he first entered the jail, including a past accidental overdose, and tested positive for cocaine at admission. He further disclosed a history of mental health problems. Following this evaluation, Mr. Carrasquillo received Librium detox and was referred for a mental health evaluation.

On October 2, 2019, Mr. Carrasquillo was assessed by mental health staff. Mr. Carrasquillo was diagnosed with multiple substance use-related disorders and antisocial personality disorder given a long history of substance use, prior incidents of self-injurious behavior and suicide attempts while incarcerated, and non-compliance with mental health medication, among other factors. He was referred to KEEP and A Road Not Taken, ("ARNT"), a substance abuse program operating in AMKC. However, he declined these referrals.

Mr. Carrasquillo was placed in general population housing with mental health follow-up by a clinician. Throughout his incarceration, Mr. Carrasquillo received individual therapy every two weeks, was treated with antidepressants, and was diagnosed with other specified trauma and stressor-related disorder.

CHS medical records show that Mr. Carrasquillo missed 207 medical visits from September 29, 2019, through June 16, 2022. DOC did not produce Mr. Carrasquillo for 193 of these visits. Medical record annotations by CHS staff on 12 of the 193 visits reflect that the patient refused to be produced. In the 30 days prior to Mr. Carrasquillo's death on June 20, 2022, he attended two mental health services appointments, refused one appointment, and CHS rescheduled one visit. According to Department records, from May 14, 2022 through June 15, 2022, Mr. Carrasquillo has 68 scheduled clinic appointments, refused to attend 29, missed five due to court appearances, two were rescheduled by CHS, and none were missed due to lack of escort.

Mr. Carrasquillo was in the dayroom – the unit's shared common area – and interacted with people in custody from around 5:20 pm to 9:01 pm on June 19, 2022. A "B" post officer was present on the floor while most people congregated in the dayroom, however, the officer did not

---

[15] As determined by OCME.

check individual cells every 30 minutes. The correction officer stepped out of the unit for ten minutes at 9:03 pm. At that point, surveillance footage shows Mr. Carrasquillo speaking with another person in custody who was rolling up an item, presumably contraband.

Mr. Carrasquillo was last seen outside of his cell at 10:19 pm, when he had a brief conversation with the "B" post officer.

The "B" post officer left the unit from 10:45 pm until 11:09 pm, then again from 11:29 pm until 11:45 pm. There are no entries in the "B" post logbook indicating that the correction officer took these personal breaks or explanations for leaving the unit three times since 9:00 pm.

A person in custody told DOC investigators that Mr. Carrasquillo complained about not feeling well to a correction officer at 10:30 pm. Another person in custody told Board investigators that Mr. Carrasquillo asked to go to the clinic for chest pain on the afternoon of June 19, but he was ignored. DOC noted to Board members and staff that there is a telephone in the housing area that allows any incarcerated individual to call CHS directly.

At 10:22 pm, the "B" post officer secured the bottom tier cell doors, then the upper tier cell doors at 10:30 pm. A "B" post logbook entry on June 19 notes that "inmate cell locks are easily manipulated."

The correction officer conducted a tour at 11:23 pm but did not verify individual cells to ensure those inside were alive and breathing. At 12:53 am on June 20, a captain toured the housing unit with the "B" post officer. The captain observed Mr. Carrasquillo inside his cell at 12:54 am, and the officer immediately ran to the "A" station to activate a medical emergency. The "B" post logbook documents that a medical emergency was activated at 12:45 am, but this is inaccurate based on Board staff's review of surveillance footage. Correctional staff discovered Mr. Carrasquillo at 12:54 am.

The captain reported to DOC and OCME that he observed Mr. Carrasquillo slumped forward, facing the cell door, with foam around his nose and mouth. People in custody noted that when Mr. Carrasquillo's cell door opened, he fell to the floor, the top half of his body extending out of the cell. Surveillance footage shows the captain performing chest compressions and using an AED pad. DOC and OCME records reflect that the captain administered two doses of Narcan. When CHS staff arrived at 1:02 pm, Mr. Carrasquillo was not breathing. CHS staff, and later Urgicare staff, administered epinephrine (medication to restore cardiac rhythm) and intubated Mr. Carrasquillo. OCME records state that by 1:10 pm, Mr. Carrasquillo was cold and cyanotic (bluish or grayish skin), but without signs of rigor mortis. He was pronounced deceased at 1:31 am.

One officer was suspended following Mr. Carrasquillo's death.

13

A search of Carrasquillo's belongings uncovered a tray containing ashes, white residue, and rolled tissue burnt at one end, and a plastic tube with residue within. OCME investigators observed ashy residue throughout the cell, multiple disassembled writing pens with burnt residue, and a modified AA battery used as a lighter, although they did not observe illicit substances. The Department last conducted a search of Mr. Carrasquillo's housing unit before he died on June 12, 2022.

## 6. ALBERT DRYE

| Age | 52 |
|---|---|
| Date of death | June 21, 2022 |
| DOC admission date | May 19, 2022 |
| Cause of death | Suspected cardiogenic shock and endocarditis |
| Facility at time of death | Bellevue Hospital Prison Ward |
| Bail amount | $2,500 |

Albert Drye tested positive for methamphetamines during his initial CHS medical screening on May 20. Mr. Drye disclosed that he had been in the hospital the month prior to his incarceration due to "low sodium." DOC records also reflect that Mr. Drye complained of chest pains after his arrest, leading NYPD to transport him to New York Presbyterian Hospital.

On May 20, Mr. Drye complained to CHS of a sore throat for two days and requested a multi-vitamin injection. Mr. Drye disclosed a history of seizures, although he reported not having seizures or taking antiepileptic drugs for six years, and a history of asthma, but he contended he had been asymptomatic and not used an inhaler or medication for five years. He also had a history of adjustment disorder with mixed anxiety and depression but denied mental health encounters in the last six years. He had not taken medication for these conditions in years and the community medication fill history check did not locate any records. CHS referred him for a follow-up appointment due to a canker sore and a routine mental health assessment due to past adjustment disorder. Two COVID-19 tests came back on May 23, one positive and one negative. On May 24, Mr. Drye visited the CHS clinic for sick call, complaining of lost appetite for months, and dry mouth and skin. In its summary, CHS diagnosed Mr. Drye with a bacterial infection and prescribed intramuscular penicillin once a week. He was also referred for a thorough neuro exam.

On May 25, at approximately 6:30 am, EMS transported Mr. Drye to Bellevue Hospital. His condition was described as "showing erratic behavior, unintelligible language, tachycardic (fast heart rate) with vital signs that were otherwise normal." According to Department records, Mr. Drye suffered from chronic conditions and bacterial infections, including MRSA bacteremia,[16] endocarditis,[17] and intraparenchymal hemorrhage (a form of intracerebral bleeding).

---

[16] Methicillin-resistant Staphylococcus aureus (MRSA) infection is caused by a type of staph bacteria resistant to antibiotics. MRSA bacteremia is one of the more severe forms of MRSA infection.

[17] Endocarditis a life-threatening inflammation of the inner lining of the heart's chambers and valves.

On June 21 at 11:30 am, a correction officer assigned to the Bellevue Hospital outpost medical ICU observed Mr. Drye in a state of distress. The officer alerted medical staff, who activated a hospital emergency code. Mr. Drye was pronounced deceased at 11:34 am. Although OCME has not yet issued a cause of death, DOC's Health Affairs Division documents describes the cause of death as cardiogenic shock and endocarditis.

### 7.  ELIJAH MUHAMMAD

| Age | 31 |
|---|---|
| Date of death | July 10, 2022 |
| DOC admission date | June 9, 2022 |
| Cause of death | Acute fentanyl intoxication[18] |
| Facility at time of death | GRVC, general population housing |
| Bail amount | $16,998 |

While in NYPD custody on June 7 and June 8, Elijah Muhammad was evaluated at Woodhull Hospital and New York Presbyterian Hospital for substance abuse and psychiatric agitation. Medical and mental health evaluations continued once Mr. Muhammad was admitted to DOC custody.

During CHS's initial medical screening, Mr. Muhammad self-reported daily drug and alcohol use. He also tested positive for amphetamines, cocaine, and methamphetamines at intake. Mr. Muhammad disclosed current mental health issues, including trying to kill himself in the past, feelings of hopelessness, and auditory and visual hallucinations. Based on this, a mental health assessment was scheduled on June 13. CHS canceled and rescheduled that appointment for the following day, however, DOC did not produce Mr. Muhammad to that visit.

CHS mental health staff first evaluated Mr. Muhammad on June 15. A note entered in CHS medical records reflects Mr. Muhammad had a history of mental health disorder diagnoses, psychiatric hospitalizations, and suicidal ideation. Mr. Muhammad did not currently exhibit acute psychiatric symptoms, denied current hallucinations, and denied feeling suicidal or plans to self-harm. He was subsequently diagnosed with multiple substance use-related disorders and antisocial personality disorder. Mr. Muhammad was placed in general population housing with mental health and psychiatric follow-up. CHS notes that Mr. Muhammad was referred to KEEP but was not able to be enrolled due to difficulties with patient access.

According to Department records, Mr. Muhammad had 49 scheduled medical appointments between June 9, 2022 and July 10, 2022 including mental health services, sick call, Direct Observation Therapy (DOT), and KEEP. DOC records state that Mr. Muhammad missed 15 of those appointments and none were due to a lack of escorts. CHS records reflect that Mr. Muhammad missed 118 appointments from September 28, 2020 through July 9, 2022; 100 of the missed visits were due to DOC non-production.

---

[18] As determined by OCME.

On July 2, 2022, Mr. Muhammad reported to CHS staff that he felt ill following six days without methadone. A note entered by CHS on that date reflects that Mr. Muhammad did not receive methadone for six days because DOC did not produce him to his appointments. On July 8, Mr. Muhammad stated that he had a fever, chills, and headaches for three weeks, and requested to be placed back on methadone. DOC records show that Mr. Muhammad was seen in the clinic on 13 occasions from June 27, 2022 through July 2, 2022.

Review of surveillance footage shows that on July 10, at around 2:23 am, a person in custody slid an item that appeared to be lit and attached to a string underneath Mr. Muhammad's cell door. At the time, all people in custody were supposed to be locked in their cells. DOC uniformed staff failed to tour every 30 minutes overnight. Board staff noted only six completed tours between 12:51 am and 5:47 am, during which the "B" post officer failed to check each individual cell.

Mr. Muhammad was locked out of his cell at 5:50 am. Later, at 11:52 am, Mr. Muhammad appeared to be rolling pieces of paper. At around 12:30 pm, Mr. Muhammad and a person in custody fumbled with toilet paper and Mr. Muhammad placed a piece of paper in his mouth. A person in custody told Board investigators that Mr. Muhammad "smoked wet paper." While this was happening, the "B" post officer was present and toured the housing area.

At 2:55 pm, Mr. Muhammad appeared sluggish while standing against the "B" post desk and leaning against a wall. Shortly thereafter, other people in custody and the "B" post officer assisted Mr. Muhammad to his cell because he had no balance. According to people in custody, Mr. Muhammad requested medical help. The officer checked on him often, yet no medical emergency was activated nor was he transported to the clinic.

At around 4:30 pm, an altercation took place between two people in custody, and the area was placed on lockdown by the Strategic Response Team. An incarcerated individual with a view into Mr. Muhammad's cell told Board staff that he could see something was wrong with Mr. Muhammad. The "B" post officer abandoned the post at 8:10 pm, returned for one minute at 8:58 pm before leaving again, and then returned at 9:42 pm, right before Mr. Muhammad was found unresponsive.

DOC's review of the incident concluded that the "B" post officer remained in the bubble for extended periods of time in contravention of departmental policy. In addition to the "B" post officer leaving the post, people in custody reported no tours conducted by a captain since 4:00 pm. The area logbook supports their statement.

A person in custody cleaning the area after the nightly lock-in notified uniformed staff that Mr. Muhammad was not well. One of the correction officers present in the unit turned on their body-worn camera as they opened Mr. Muhammad's cell. Footage shows one officer entering Mr. Muhammad's cell at 9:45 pm, looking at him then running out, presumably to activate a medical

16

emergency. The officer wearing the camera remained and approached Mr. Muhammad, tapping his shoulder and saying "yo, Eli." The officer did not render immediate first aid, instead waiting until 9:48 pm to move Mr. Muhammad from the bed and onto the floor to begin chest compressions. A captain arrived with a blue naloxone kit found in "A" stations and administered a dose. At 9:52 pm, medical staff arrived and continued CPR efforts. Medical staff administered epinephrine, additional doses of Narcan, and intravenous fluids. Mr. Muhammad was pronounced deceased at 10:30 pm.

OCME investigators found that there was blood and a large "foam cone" emanating from Mr. Muhammad's mouth, and early onset of rigor in the upper and lower extremities. They further observed remnants of two rolled-up cigarettes in Mr. Muhammad's cell. The Department last searched Mr. Muhammad's housing unit before he died on July 2, 2022.

The Department confirmed that the "B" post officer noticed Mr. Muhammad was incoherent and sluggish but failed to activate a medical emergency or alert the area captain. The "B" post officer was on mandatory overtime when the incident occurred. The correction officer was fired.

## 8. MICHAEL LOPEZ

| | |
|---|---|
| Age | 34 |
| Date of death | July 15, 2022 |
| DOC admission date | May 19, 2022 |
| Cause of death | Suspected overdose |
| Facility at time of death | AMKC, mental observation housing |
| Bail amount | $2,500 |

Michael Lopez was housed in a mental observation unit and placed on suicide watch when he was first admitted to DOC custody. CHS staff referred him for an immediate mental health assessment on May 20, 2022, noting in the referral that Mr. Lopez admitted to multiple inpatient psychiatric hospitalizations, including one within the last week, and at least one suicide attempt two and half years ago. CHS also found Mr. Lopez to be actively formulating suicidal ideation, hearing multiple voices, and presenting unkempt and disheveled.

The psychiatric assessment held that same day described Mr. Lopez as angry, superficially cooperative, and unkempt, stating a desire to hurt himself and others. Mr. Lopez also had significant mental health diagnoses and received psychiatric medication and methadone during a previous incarceration. He tested positive for cocaine at intake. CHS prescribed him anxiety medication and an antipsychotic. CHS also diagnosed Mr. Lopez with severe cocaine use disorder and referred him to KEEP.

On May 24, 2022 at a KEEP initial counseling session, Mr. Lopez declined agonist treatment (treatment for addiction to opioid drugs through methadone or buprenorphine) and expressed a desire to attend rehabilitation services at Cornerstone once released from custody. Mr. Lopez agreed to sign consents to coordinate services with Cornerstone. KEEP staff counseled Mr. Lopez on the importance of addressing substance use and mental health to achieve better outcomes.

17

CHS removed Mr. Lopez from suicide watch on May 26. Mental health staff found Mr. Lopez fully engaged in mental health sessions and more alert than in previous days. Mr. Lopez did make concerning references to death, but CHS did not characterize them as direct statements of suicidal ideation. He remained in mental observation housing.

Mr. Lopez was housed in an open dormitory-style housing area in AMKC, where individuals are assigned beds rather than cells. Board staff's review of surveillance footage shows Mr. Lopez sniffing and smoking substances the day before his death. At around 5:00 pm on July 14, Mr. Lopez sat on his bed and sniffed a substance from his hand on two occasions. Mr. Lopez and another person in custody also started smoking in the back of the dormitory, while the "B" post officer sat towards the front of the unit. Only ten minutes after Mr. Lopez last sniffed a substance, he interacted with two correction officers about receiving a mattress.

At 5:22 pm, Mr. Lopez handed another person in custody a white piece of paper from under his mattress. Mr. Lopez and three other people in custody proceeded to smoke. This occurred while the "B" post officer sat at a desk in front of the dormitory.

At 6:08 pm, Mr. Lopez began smoking again, joined by two other people in custody. At 6:16 pm, a correction officer walked by Mr. Lopez's bed where he and other people were smoking and rolling pieces of paper, but the officer did not intervene.

Correction officers failed to conduct tours every 15 minutes that evening, as mandated in mental observation units. However, the "B" post officer documented active supervision tours of the area in logbook entries every 30 minutes between 5:00 pm and 10:00 pm. These tours did not take place.

Officers also failed to intervene when witnessing individuals smoking in the unit. Throughout the next hours, Mr. Lopez sniffed substances he poured into his hands, and smoked both alone and with other people in custody, all while officers were either at the front of the unit or walking past. Overnight, correction officers neglected to tour every 15 minutes to check that all individuals in their care were alive and breathing. DOC records reflect that at one point, the "B" post officer seemed to be asleep. The "B" post logbook states that tours were made with nothing unusual to report every 30 minutes on the dot between 12:00 am and 9:00 am. Surveillance footage instead shows that tours were conducted at 12:00am, 12:23am, 1:57am, 2:17am, 3:01am, 4:46am, 5:08am, 6:30am, 6:35am, 7:04am, 8:43am, and 9:28am.

Based on surveillance footage observations, Mr. Lopez last moved at around 9:18 am and 9:24 am, when his body twitched multiple times. At 9:28 am, a correction officer touring the area stopped by Mr. Lopez's bed and tapped him, attempting to wake him up for one minute and checking his pulse. A second officer alerted the "A" station. Multiple people in custody and a correction officer continued shaking Mr. Lopez for the next few minutes before they moved him

to the floor at 9:35 am. Correction officers and people in custody performed chest compressions, alternating until CHS staff arrived at 9:39 am. Mr. Lopez was pronounced deceased at 10:13 pm.

Two correction officers and a captain were suspended following Mr. Lopez's death.

Medicolegal investigators noted the early onset of rigor mortis in Mr. Lopez's jaw and hands, and the beginning stages of dependent lividity (purplish-red discoloration of the skin following death). Multiple pills were recovered from under Mr. Lopez's mattress, including two CHS-prescribed medications: Haloperidol (an antipsychotic), Benztropine (an anti-tremor medication typically used to treat side effects of other drugs), and a third illegible pill.

Department staff reviewing past surveillance footage spotted other individuals ingesting drugs with Mr. Lopez prior to his death. CHS dispatched staff to medically assess the housing area's occupants.

## 9. RICARDO CRUCIANI

| Age | 68 |
|---|---|
| Date of death | August 15, 2022 |
| DOC admission date | July 29, 2022 |
| Cause of death | Suspected suicide |
| Facility at time of death | Eric M. Taylor Center ("EMTC"), general population housing |
| Bail amount | Convicted |

The County of New York Supreme Court judge assigned to Ricardo Cruciani's case ordered that he be placed in protective custody and on suicide watch upon his conviction on July 29, 2022. DOC's Arraignment and Classification Risk Screening Form[19] also mentions court-ordered suicide watch. However, DOC records shows that the Department did not place Mr. Cruciani on suicide watch or protective custody.

DOC's Health Affairs Preliminary Investigative Report[20] notes that DOC gave CHS Mr. Cruciani's New Admission folder, which would include court paperwork and screening forms, for review. Mr. Cruciani denied suicidal ideation and any history of mental illness to CHS medical staff when he was evaluated at intake on July 30. CHS medical notes do not mention suicide watch as ordered by the court, nor do CHS records provided to the Board include court paperwork. CHS asserts that the Department did not notify them, orally or in writing, of a court-ordered suicide watch. Mr. Cruciani was placed in general population housing.

---

[19] This form identifies whether a person in custody has (1) any immediate medical needs; (2) whether the securing order or commitment papers request medical or mental health attention; (3) officer's observation of any obvious indication of immediate medical needs or any display of extreme nervousness or depression; (4) physical condition as stated by the person in custody; (5) whether documents indicate Suicide Watch and/or Protective Custody; (6) any reasons to consider special housing, among other personal characteristics and details.

[20] A report prepared by the Department of Correction's Health Affairs Division immediately following a death in custody. This report details the decedent's background, preliminary findings, medicolegal findings, movement history, medical history, and autopsy date and assignment.

Mr. Cruciani initially refused nursing treatment but was subsequently seen for a sick call visit and received medication for chronic conditions. Further, CHS referred him to a mental health assessment on August 8, at his own request, although he denied suicidal ideation. His mental health screening was scheduled for August 9, but CHS canceled and rescheduled the appointment. CHS mental health staff did not conduct the referred mental health assessment before Mr. Cruciani's death on August 15, 2022.

Mr. Cruciani was housed in an open dormitory-style unit where people in custody are free to move about the room. No "B" post officers were assigned to this unit on August 14 or August 15. Surveillance footage shows Mr. Cruciani fiddling with a rope-like ligature while lying in bed from 5:50 am to 6:13 am on August 14. Throughout the day, Mr. Cruciani interacted with other people in custody, read, played chess, and ate. People in custody told Board investigators that on August 14, Mr. Cruciani seemed irritated and spent the day in bed after his return from a tele-visit. Board staff observations of jail footage found that correction officers conducted only two tours on August 14, at 11:29 am and 11:24 pm. No captains toured the unit on August 14 or the morning of August 15.

At 4:20 am on August 15, 2022, Mr. Cruciani walked to the "A" station window and looked inside, before collecting linen outside of camera view. At 4:23 am, Mr. Cruciani entered the unit's bathroom with linen, exited two minutes later to retrieve more linen, then returned to the bathroom. From 4:30 am through 5:04 am, multiple individuals entered and exited the bathroom.

At 5:36 am, a person in custody alerted the "A" station officer. This person told DOC investigators that he noticed someone sitting behind the shower curtain on a grey chair in the bathroom. He called Mr. Cruciani's name but received no answer. When he approached the shower curtain, he noticed a sheet around Mr. Cruciani's neck and that "his lips were blue and blood was on his collar."

The person in custody notified the "A" post officer, who cut the sheet from around Mr. Cruciani's neck. The "A" post officer called in a medical emergency. However, the officer did not render immediate first aid; instead, the officer remained within the "A" station after cutting Mr. Cruciani out of the ligature.

CHS medical staff arrived at 5:44 am, followed by EMS at 6:16 am. Medical staff described Mr. Cruciani as unresponsive with no vital signs, clammy and cold. Medical staff administered epinephrine and intubated Mr. Cruciani. He was pronounced deceased at 6:30 am.

### III.    KEY FINDINGS

#### 1.    Insufficient rounding and supervision

This report, as well as earlier Board reports about deaths in Department custody, highlight how insufficient rounding and supervision by correctional staff is a pressing issue that requires the Department's immediate attention. Seven of the nine investigations described in this report illustrate poor touring and observation practices within housing units.

Correction officers consistently failed to tour and supervise people in their care in accordance with DOC policy, whether it be every 30 minutes in general population housing or 15 minutes in mental observation housing. Even when correction officers and captains did walk through the unit, they often did not check each cell to ensure the people within were alive and breathing. These deficient practices were most evidently present in the deaths of **Dashawn Carter**, **Mary Yehudah**, **Anibal Carrasquillo**, **Elijah Muhammad**, and **Michael Lopez**.

In the case of **Emanuel Sullivan**, correction officers toured consistently, although the gap between tours sometimes exceeded thirty minutes. However, officers did not look inside each cell as they toured.

Finally, the captain did not tour **Ricardo Cruciani's** housing unit both the day before and the morning of his death. Captains are required to tour at frequent intervals.

Direct visual observation at constant intervals by correctional staff is vital to interrupt suicide attempts and prevent the use of drug contraband. People in custody are often the first to raise the alarm that someone in their unit is hurt or unresponsive, as was the case in five of the deaths described here.

#### 2.    Insufficient staffing

The Department's long-standing staffing shortages can have devastating consequences when units are without "B" post officers. "B" post or floor officers are assigned to the housing area itself, among people in custody, and are tasked with rounds and active supervision. These officers are the first line of response when emergencies occur inside the unit.

In the case of **Ricardo Cruciani**, there was no "B" post officer assigned to his housing area both the day before and the day of his death. Mr. Cruciani was able to take linen into the shared bathroom and hang himself without intervention.

#### 3.    Lack of immediate first aid by officers

DOC Operations Order #05/17 on Emergency Health Care Log requires uniformed staff members to render CPR or first aid in case of emergencies, until the arrival of medical personnel.

Correctional staff is continuously trained and recertified in CPR, first aid, and the use of AEDs. Officers failed to fulfill this basic duty in three of the deaths covered in this report.

People in custody discovered **Dashawn Carter** unresponsive with a sheet wrapped around his neck affixed to the widow and alerted the "B" post officer. The "B" post officer went to the "A" station to activate a medical emergency and briefly returned to Mr. Carter's cell to presumably cut him out of the ligature. The officer did not render first aid or CPR, instead pacing the corridor where he was confronted by a person in custody, before going to the "A" station. People in custody reported to Board staff they were the first to render emergency first aid to Mr. Carter.

Body-worn camera footage shows that correction officers waited at least three to four minutes before moving **Elijah Muhammad** from his bed, where he lay unresponsive, to the floor to begin chest compressions.

Finally, after cutting **Ricardo Cruciani** out of the ligature around his neck, the "A" post officer failed to render any immediate first aid or CPR, instead returning to the "A" station to await the arrival of medical staff.

### 4. Failure to flag concerning behavior or use of contraband

DOC Directive #4021, Constant Supervision, effective February 2, 2021, sets guidelines for identifying individuals at risk and in need of constant supervision due to (a) self-harm, risk of self-harm, suicide attempt, or threat of; (b) recent substance use or abuse, either stated or witnessed; (c) medical status; (d) mental health status; or (e) security concerns. Said directive requires officers to conduct tours and observe individuals in their custody for unusual incidents, behavior, or conditions.

Correctional staff can refer people in custody for medical or mental health services when they believe it is merited based on their behaviors or statements. Referral forms are in each "A" station.

**Mary Yehudah** reportedly did not leave her assigned cell for nearly a week except once to shower, yet correction officers did not flag her withdrawn and isolated behavior or submit a request to CHS for a mental health check-up. **Elijah Muhammad** was visibly impaired and sluggish in front of a "B" post officer, standing against the "B" post desk and leaning against a wall. Instead of escorting Mr. Muhammad to the clinic, the officer, along with other people in custody, helped him walk to his cell because he lacked balance. Finally, **Michael Lopez** and others smoked and sniffed substances in an open dormitory-style unit, in plain sight of correctional staff, yet staff did not intervene or confiscate the contraband.

### 5. Inaccurate logbook entries

Correctional uniformed staff completed inaccurate or deficient logbook entries in at least three of the deaths described in this report. Per DOC Directive #4514R-C, Housing Area Logbooks, effective October 13, 2015: "Logbook entries must be made without undue delay and must be recorded legibly, accurately, and concisely, in chronological order using military time."

Logbook entries made by correctional staff in **Dashawn Carter's** assigned unit documented tours completed between 7:00 am and 10:00 am, but surveillance footage shows the officer was either behind the gate or inside the "A" station from 6:40 am to 10:10 am. Further, a captain last toured the unit at 6:37 am, yet a logbook entry indicated that a captain toured at 8:13 am. The captain stood by the "A" station and did not go into the unit.

The "B" post officer assigned to **Anibal Carrasquillo's** unit left the unit completely on three occasions from 9:00 pm to 11:45 pm the evening before Mr. Carrasquillo died. However, there were no entries in the logbook reflecting why the officer abandoned the post. Further, Mr. Carrasquillo was not discovered by correctional staff until 12:54 am on June 20, yet the "B" post logbook states that the medical emergency was called into the clinic at 12:45 am.

Correction officers assigned to **Michael Lopez's** unit did not tour every 15 minutes on July 14, as required in mental observation housing, yet documented tours in the logbook every 30 minutes between 5:00 pm and 10:00 pm. Surveillance footage reveals that no tours were completed at 15 or 30-minute intervals. Officers also failed to actively supervise the area overnight but noted in the logbook that tours were done every 30 minutes between midnight and 9:00 am.

### 6. Missed medical visits and lack of escorts

According to CHS medical records, each person mentioned in this report missed at least one medical appointment because DOC did not produce, or escort, them to the clinic. This issue is the subject of ongoing litigation. On August 11, 2022, a Bronx Supreme Court judge ordered the Department to pay $100.00 for each missed escort to the infirmary from December 11, 2021 through January 2022.[21] The City of New York and the Department are currently appealing this decision.

The table below, based on a review of records produced by CHS and DOC, illustrates material discrepancies between the two agencies' accounting of missed medical visits. CHS is not routinely made aware of why people in custody miss their medical appointments, particularly when it is due to an alleged refusal to attend.

---

[21] NY St Cts Elec Filing [NYSCEF] Doc No. 147, judgment/order, in Matter of Joseph Agnew et al v. New York City Department of Correction, Sup Ct, Bronx County, Index No. 813431/2021E

| Name | Missed visits (CHS)[22] | Non-production (CHS) | Date range (CHS) | Missed visits (DOC)[23] | Non-production (DOC) | Date range (DOC) |
|---|---|---|---|---|---|---|
| Dashawn Carter | 92 | 80 | 10/08/2019-04/20/2022 | None | None | 05/05/2022-05/07/2022 |
| Mary Yehudah | 6 | 3 (1 refusal)[24] | 05/26/2021-05/11/2022 | 3 | 2 refusals | 02/12/2022-05/17/2022 |
| Emanuel Sullivan | 16 | 12 | 02/18/2022-05/20/2022 | 21 | 16 refusals | 02/15/2022-05/27/2022 |
| Antonio Bradley | 88 | 71 (1 refusal) | 10/17/2021-06/13/2022 | 36 | 29 refusals | 05/14/2022-06/15/2022 |
| Anibal Carrasquillo | 207 | 193 (12 refusals) | 09/29/2019-06/16/2022 | 36 | 29 refusals | 05/14/2022-06/15/2022 |
| Albert Drye | 2 | 1 | 05/23/2022-05/25/2022 | 1 | None | 5/25/2022 |
| Elijah Muhammad | 118 | 100 (1 refusal) | 09/28/2020-07/09/2022 | 15 | 9 refusals | 06/09/2022-07/10/2022 |
| Michael Lopez | 16 | 13 | 05/20/2022-07/14/2022 | 10 | 8 refusals | 06/11/2022-7/14/2022 |
| Ricardo Cruciani | 2 | 1 | 08/08/2022-08/09/2022 | None | None | 8/3/2022-8/8/2022 |

### 7. Suicide prevention

A New York County Supreme Court judge ordered that **Ricardo Cruciani** be placed in protective custody and on suicide watch. The Department did not comply with the Court's orders and CHS records make no mention of the order. According to CHS, they were not notified of Mr. Cruciani's court-ordered suicide watch designation. CHS scheduled a mental health assessment for Mr. Cruciani on August 9, but it was canceled and rescheduled. Mr. Cruciani died by suicide before the rescheduled appointment.

**Antonio Bradley** had a well-documented history of suicidal ideation, as well as self-harm and suicide attempts, particularly in court pens. Mr. Bradley continually expressed concern and frustration to CHS staff about the outcome of his court appearances, which are described in subsection (4) of this report. In March of 2022, Mr. Bradley wrapped a ligature around his neck and tied it to the gate of a Bronx Hall of Justice holding pen. A DOC captain characterized it as a "manipulative gesture" and an effort to return to Rikers Island quicker. Three months later, Mr. Bradley hung himself in the same courthouse holding pen area.

---

[22] Missed visits and instances of non-production according to CHS records.

[23] Missed visits and instances of non-production according to DOC records.

[24] The count of alleged refusals is based on CHS medical records and not DOC-generated documents, therefore it is not a full accounting of all instances in which DOC claimed a person in custody refused to attend a medical visit.

Finally, **Dashawn Carter** had just returned to DOC custody on May 5, 2022 following psychiatric hospitalization to determine his fitness for trial. At his initial CHS assessment, Mr. Carter denied past mental health hospitalizations and past suicide attempts. However, based on his medical records and psychiatric history, he did have past mental health hospitalizations. Mr. Carter was placed in general population housing. Mr. Carter's adjustment in custody should have been closely monitored in mental observation housing where increased and consistent direct observation is required.

### 8. Contraband and searches

DOC's Directive #4508R-E, Control of and Search for Contraband, tasks each Commanding Officer to develop scheduled searches of cells and common areas "on a regular and frequent basis." The Department utilizes various methods to recover contraband, such as Tactical Search Operations ("TSO"), special searches, scheduled or unscheduled institutional searches, K9 searches, and Emergency Service Unit ("ESU") searches.

There is a concerning increase of drugs laced with fentanyl throughout jail facilities, which resulted in the overdose deaths of **Anibal Carrasquillo** and **Elijah Muhammad**.

OCME has yet to determine the causes of Mr. Lopez's and Mr. Sullivan's deaths, although it is suspected their deaths were drug-related. People in custody speculated **Emanuel Sullivan** died from an accidental overdose because he was reportedly known to hoard pills. Mr. Sullivan also suffered from significant withdrawal and was prescribed methadone to alleviate his symptoms.

**Michael Lopez** openly smoked and sniffed substances, which seemed to be hidden under his mattress and around his assigned bed. The Department must not only frequently conduct scheduled and unscheduled searches to identify and confiscate contraband, but correction officers must immediately intervene when they witness drug use or people in custody exchanging contraband.

### 9. Narcan

Naloxone, also known as brand name "Narcan", is a nasal spray designed to help reverse the effects of a known or suspected opioid overdose. It is easy to use and does not cause adverse effects if used on someone who is not overdosing. CHS distributed naloxone kits to the Department's "A" stations and its availability throughout the jails is expected to increase.

People in custody can request naloxone from the unit's "A" station when they suspect someone is suffering from an overdose. This is a critical tool to combat the dangers of drug use in jails and its life-saving potential was on display following **Michael Lopez's** death. An incarcerated individual was unresponsive in the same unit Mr. Lopez died in just one day earlier. People in custody carried the unresponsive individual from his bed to the front of the housing area,

retrieved naloxone from the "A" station, and appeared to administer it, reviving him. Medical staff arrived a few minutes later and administered three additional Narcan doses. The Department did not report this unresponsive incident through the Central Operations Desk notification system, and it was only discovered by Board staff when checking the non-reportable logbook.

### 10. CHS medical and patient tracking issues

Lack of awareness of patients' whereabouts led to CHS scheduling clinic visits for two individuals who were not on Rikers Island. CHS records reflect that DOC did not produce **Albert Drye** for six medical follow-ups at CHS's Rikers Island clinic, but Mr. Drye was already admitted to the hospital at that point. A note signed on June 13, 2022 in **Antonio Bradley's** medical chart states that Mr. Bradley refused medication and treatment, with a poor understanding of the use of and need for medication. Yet on June 13, Mr. Bradley was unresponsive at Lincoln Hospital.

The New York State Commission of Correction ("SCOC") identified the same issue in their final report on the death of Javier Velasco, who died in DOC custody in 2021. In that case, CHS records reflected three missed medical visits due to DOC non-production after Mr. Velasco had died, including one instance of DOC reporting the patient did not wish to come to the clinic. In response to this, CHS argued that the patient appeared on call-down lists because DOC's Inmate Information System ("IIS") did not reflect his discharge from custody, and that this was a testament to CHS's follow-up process. SCOC's Medical Review Board, in turn, did not accept this response and found that "this is demonstrative of a deficient population management and accountability system."

CHS informed Board staff that they rely on the Department, responsible for custody and management, to update IIS in real time to ensure that an individual's status is accurately captured in their medical records.

### 11. Mental health

City & State reporting describes Rikers Island as New York's largest psychiatric provider.[25] DOC performance indicators in the Mayor's September 2022 Management Report note an upward trend in the number of individuals in custody with a mental health diagnosis, at around 50% during Fiscal 2022. The number of individuals in custody with a serious mental health diagnosis hovered at 16.2% in Fiscal 2022, about the same as the previous fiscal year.

**Dashawn Carter**, **Emanuel Sullivan**, **Antonio Bradley**, **Anibal Carrasquillo**, **Elijah Muhammad**, **Albert Drye**, and **Michael Lopez** all experienced issues surrounding mental health, drug

---

[25]McDonough A. (2022, Sep. 30). *Mental health care on Rikers: New York's largest psychiatric provider.* City & State. https://www.cityandstateny.com/policy/2022/09/mental-health-care-rikers-new-yorks-largest-psychiatric-provider/377870/

addiction, or a combination of both prior to their incarcerations. When individuals who require psychiatric treatment or therapy are not consistently brought to their mental health or medication appointments, they run the risk of decompensating. When individuals who are diagnosed with substance abuse disorders, who disclose daily alcohol or drug consumption outside of jail, and who are undergoing withdrawal symptoms enter a facility where drugs are rampant and easily accessible, the risk of overdose sharply increases.

### 12. Length of stay

The Mayor's September 2022 Management Report notes that the average length of stay in DOC custody increased from 87 days in Fiscal 2021 to 120 days in Fiscal 2022, and nearly 30 percent of the population has been in custody for more than a year, with some having been in custody for three years or more.

The Mayor's Management Report also found that the number of on-trial individuals in custody produced to court on time declined by 16 percent in Fiscal 2022. 79.1 percent of on-trial individuals were delivered to court on time in Fiscal 2022, as compared to 94.6 percent in 2021. According to the same, DOC added conference booths throughout facilities and reconfigured devices to be compatible with Office of Court Administration software to support an increased need for remote court appearances and access to counsel.

**Anibal Carrasquillo** spent two years, 8 months, and 22 days in Department custody until his death on June 20, 2022; the longest-serving detainee in this report. Although **Dashawn Carter** only returned to Department custody from the hospital two days before his death, his initial incarceration dated back to April 12, 2021. Finally, the third longest length of stay belonged to **Antonio Bradley**, who had been incarcerated for 8 months.

## IV.    RECOMMENDATIONS

### To CHS and DOC, jointly

1. CHS, DOC, and BOC should hold timely death review conferences to discuss the circumstances around each death, what operational or clinical problems can be identified, and how both agencies can work collaboratively to prevent further incidents. This must include the exchange of clinical information. Issues regarding confidentiality and protected health information (PHI) must be addressed and resolved between each agency's legal department. Death, whether in a jail, at home, or in a hospital, is a clinical event that cannot be adequately reviewed without clinical information being provided to DOC and a joint mortality review conference between DOC and CHS.[26][27]

---

[26] As recommended in *February & March 2022 Deaths in DOC Custody Report and Recommendations* and *Report and Recommendations on 2021 Suicides and Drug-Related Deaths in New York City Department of Correction Custody*.
[27] The Department represented to the Board that they have hired someone who would oversee death review conferences.

2. There were no suicides in the jails during the three years prior to 2020. DOC and CHS should jointly review all policies, procedures, and directives regarding suicide screening and suicide prevention in light of the 12 suicides that have occurred in 2021 and 2022 so far. DOC and CHS should also develop and promulgate new policies, procedures, and directives, and review, enhance, and deliver suicide screening and prevention training for all security and civilian staff.

3. Given the high number of drugs present in the jails, CHS and DOC should implement immediate measures to actively track suspected non-fatal overdoses in all housing areas. Said tracking system should incorporate information on whether Narcan was administered and by whom, as well as real-time updates on the person's status and whereabouts.[28]

4. CHS and DOC must ensure their respective movement and transfer tracking systems are updated in real-time with accurate information.

5. CHS and DOC must verify, review, and communicate all incoming court documents, including securing orders and remarks regarding protective custody and suicide watch, before placement disposition. DOC must forward CHS all relevant court paperwork in a timely manner and set up a standardized system to ensure all court orders are communicated to relevant parties within the Department and CHS.

6. There are discrepancies in the number of missed medical appointments and the reason for each missed appointment (lack of escorts, refusals, cancelations, court, etc.) reported by both agencies. DOC and CHS must improve information-sharing so both agencies' records are consistent with each other and accurate.

**To CHS**

1. CHS must conduct a quality assurance review of clinical determinations to place individuals returning from psychiatric hospitalizations or who have significant known mental health history in general population housing.

2. CHS must verify that patients scheduled for medical visits are housed in Rikers Island facilities. Appointment slots should not go to individuals who are either in hospital outposts or discharged from DOC custody.

**To DOC**

1. DOC must ensure that correction officers and captains conduct regular tours and directly supervise people in custody, in accordance with DOC's own policies. DOC should implement and expand the use of "tour wands" – electronic wands used to tap pads outside of cells to ensure correction officers check individual cells – throughout all facilities.

---

[28] As recommended in *Report and Recommendations on 2021 Suicides and Drug-Related Deaths in New York City Department of Correction Custody.*

28

2. DOC must ensure that correctional staff timely document accurate information in logbooks and other agency databases. DOC should transition out of the practice of keeping paper logbooks and develop an electronic log system. The electronic system should capture information triggered at the individual cell level. Until such a system is implemented, tour commanders should articulate an action plan to regularly audit logbooks against Genetec video footage and watch tour data at unpredictable times to ensure that rounds are taking place as required and to detect incorrect entries.[29]

3. Correctional staff failed to render immediate first aid to people in custody on multiple occasions. DOC should reevaluate and strengthen its CPR and first aid training for staff as several officers. Training should focus specifically on how to aid a person hanging from a ligature and people who show signs of overdose, such as bleeding or foaming from the nose or mouth.[30]

4. DOC must stop the flow of contraband into the jails, whether it be through mail, visitors, or uniformed and civilian staff. As recommended by Dr. James Austin in his Declaration in Support of Plaintiff's Motions for Preliminary Injunction and Provisional Class Certification before the United States District Court of the Southern District of California filed on May 2, 2022 regarding San Diego jail facilities,[31] the Department should require all individuals, including medical staff, custody staff, and contractors, to undergo body scanning before entry. Per Dr. Austin, "when body scan technology is used properly on all individuals entering a jail, it is nearly impossible for contraband to enter a correctional facility on or in a person's body."[32]

5. During a public Board meeting, Board members asked the Department how many Suicide Prevention Aides ("SPA") they require for full coverage, but DOC did not offer a response. DOC do not currently employ sufficient Suicide Prevention Aides ("SPA") to cover all units and facilities. DOC must immediately deploy trained Suicide Prevention Aides ("SPA")[33] to all housing units, intake areas, de-escalation units, restrictive housing units, new

---

[29] A variation of this recommendation was made in *February & March 2022 Deaths in DOC Custody Report and Recommendations*, *The Death of Layleen Xtravaganza Cubilette-Polanco 1991-2019*, and *Report and Recommendations on 2021 Suicides and Drug-Related Deaths in New York City Department of Correction Custody.*

[30] A variation of this recommendation was made in *Report and Recommendations on 2021 Suicides and Drug-Related Deaths in New York City Department of Correction Custody.*

[31] Dunsmore v. San Diego County Sheriff's Dep't, Civil No. 11-0083 IEG (WVG) (S.D. Cal. Mar. 1, 2011)

[32] As recommended in *Report and Recommendations on 2021 Suicides and Drug-Related Deaths in New York City Department of Correction Custody.*

[33] Suicide Prevention Aides (SPA) are people in custody who are trained to monitor incarcerated individuals identified as suicide risks and to recognize the warning signs of suicidal behavior in incarcerated individuals who had not previously been identified. All detained and sentenced facilities shall maintain an Observation Aide Program unless it is a Maximum Security Housing Area (excluded because of the unique number of uniformed personnel assigned) or is granted a variance from an Order or Directive. (Directive #4017R-D on Observation Aide Program effective April 8, 2022)

admission areas, and units with a higher census. DOC must ensure that there is 24/7 SPA coverage in all these areas.[34]

6. Antonio Bradley twice attempted suicide in a court pen, and had a documented history of suicidal ideation while incarcerated. DOC must inform Court Division uniformed staff about incarcerated individuals who are or have been on suicide watch at some point during their incarceration so they may be placed in pens with high visibility to correctional staff and constant supervision. This is especially critical for those individuals in custody who are known to have attempted suicide in court pens.

7. DOC has not articulated a specific plan or timeline to prevent suicides in court pens. DOC must immediately develop a plan to deploy SPAs and increased uniformed staff supervision in court pens.

8. The Department's committee tasked with the review of existing Incarcerated Individual Wages must significantly raise wages for SPAs, currently set at $1.45 per hour.[35] There is precedent for raising wages for important jobs. Notably, at the height of the pandemic in 2020, DOC raised wages for critical job assignments in enhanced sanitation details and Hart's Island to encourage more participation. DOC must increase SPA wages beyond the arbitrary limits of their existing directive to attend to the crisis precipitated by the increase in suicides, suicidal ideation, and self-harm.[36]

9. The Board must be made aware of the use of compassionate releases. DOC must immediately create a reporting mechanism for situations where a person in custody has been hospitalized and is granted a compassionate release while in the hospital. Such compassionate releases and any subsequent deaths during the hospitalization must be reported to the Board.

10. People in custody demonstrated self-isolating behavior and signs of sluggishness and incoherence, yet correctional staff did not act. DOC must train their uniformed and civilian staff on how to spot and flag behaviors that are indicative of suicidality, illness, or physical impairment due to substance use.

11. DOC staffing shortages result in unstaffed posts, such as "B" post officers who actively supervise units at all hours, and escorts to transport people to medical and mental health appointments. DOC must prioritize assignment, deployment, and coverage of all "B" posts, escort posts, and critical posts that require direct contact with people in custody.

---

[34] As recommended in *Report and Recommendations on 2021 Suicides and Drug-Related Deaths in New York City Department of Correction Custody.*

[35] Directive #4014R-B, Incentive Pay Plan for Incarcerated Individuals, effective October 12, 2021. Job assignments categorized as low are paid $0.55 per hour, those categorized as medium are paid $1.00 per hour, and those categorized as high are paid $1.45 per hour. DOC adopted the Board's previous recommendation to reclassify SPA positions from medium to high.

[36] As recommended in *Report and Recommendations on 2021 Suicides and Drug-Related Deaths in New York City Department of Correction Custody.*

12. To ensure drugs are confiscated and do not cause harm to the population, DOC must create a contraband search schedule that covers all housing units and areas where people in custody are held. Each area should be searched, at a minimum, once a week.

13. Due to correctional staff inaction when witnessing people in custody using or exchanging contraband, DOC must immediately enforce protocols and train both civilian and uniformed staff on how to intervene in these situations.

14. Given the prevalence of fentanyl within the jails, DOC should ensure that surfaces and areas are appropriately cleaned and sanitized after contact with fentanyl or fentanyl-laced products.

15. Efficient court production is key to lowering length of stay in City jails. DOC must continue efforts to improve technological resources for remote court appearances. DOC must also ensure that sufficient escort and transport staff is available to transport individuals to their in-person court appearances on time.

## NYC HEALTH + HOSPITALS/CORRECTIONAL HEALTH SERVICES RESPONSE TO FINDINGS AND RECOMMENDATIONS CONTAINED IN THE NYC BOARD OF CORRECTION'S "SECOND REPORT AND RECOMMENDATIONS ON 2022 DEATHS IN NEW YORK CITY DEPARTMENT OF CORRECTION CUSTODY"

New York City Health + Hospitals / Correctional Health Service (CHS) reviewed the draft Board of Correction (BOC) report, "Second Report and Recommendations on 2022 Deaths in New York City Department of Correction Custody". CHS identified factual omissions of important information that was integral to the clinical decisions made by CHS staff, and also submitted comments to the Board's proposed Findings and Recommendations. CHS appreciates the corrections subsequently made by the Board and provides its comments to the revised Finding and Recommendations below, to be included with the Board's final report.

**II. Key Findings**
1. The board writes under finding 7: "CHS scheduled a mental health assessment for Mr. Cruciani on August 9, but it was canceled and rescheduled. Mr. Cruciani died by suicide before the rescheduled appointment."
   - Clarification: **The Board omits clinical information documented by clinicians that was relevant to the mental health referral and subsequent rescheduling.**

2. The board writes under finding 7: "Mr. Bradley continually expressed concern and frustration to CHS staff about the outcome of his court appearances."
   - Clarification: **The Board omits clinical information documented by clinicians that was relevant to Mr. Bradley's risk assessment. This statement also does not acknowledge the complexities of this risk assessment, and risk assessments in correctional settings in general.**

3. The board writes under finding 7: " Mr. Carter's adjustment in custody should have been closely monitored in mental observation housing where increased and consistent direct observation is required"
   - Clarification: **The decision to place Mr. Carter in general population was appropriate given his available history and presentation, and was consistent with the clinical formulation of the CNYPC treatment team. In addition, the provider evaluating Mr. Carter could not have foreseen the lapses in supervision and rounding that the Board cites in its report. However, since this incident, CHS has made a policy decision to house all returns from the Office of Mental Health (OMH) on mental health therapeutic housing units, even if not clinically indicated, to mitigate the risk of harm stemming from the operational challenges and subsequent environmental risks that the Board repeatedly cites in its report.**

**III. Recommendations to CHS and DOC, jointly:**
1. CHS and DOC Recommendation #1: "CHS, DOC, and BOC should hold timely death review conferences to discuss the circumstances around each death, what operational or clinical problems can be identified, and how both agencies can work collaboratively to prevent further incidents. This must include the exchange of clinical information. Issues regarding confidentiality and protected health information (PHI) must be addressed and resolved between each agency's legal department. Death, whether in a jail, at

home, or in a hospital, is a clinical event that cannot be adequately reviewed without clinical information being provided to DOC and a joint mortality review conference between DOC and CHS."

Response: **CHS notes that the BOC holds the authority to convene DOC and CHS for the Board's death reviews as timely as it wishes, separately from whatever independent reviews each agency may conduct. Apart from the Board review and any independent agency reviews, CHS also established in 2016 a new process it calls the Joint Assessment and Review (JAR) process. As the Board is aware, CHS established this process precisely in recognition of the importance of joint reviews of deaths while respecting the independence of and confidentiality rules differently governing DOC and CHS. The JAR is designed to provide a forum wherein DOC and CHS can appropriately share pertinent information regarding the security and health operations and can together identify systemic risk reduction remedies in response to and to minimize recurrence of similar cases with significant adverse outcomes. CHS has continued to convene and initiate agendas for these meetings, and has continued to be represented by its core executive team. CHS believes that the JAR offers precisely the appropriate structure and process to achieve what the BOC is recommending. To the extent that the JAR has proven inadequate, CHS believes the shortfall has been due to the lack of consistent and meaningful participation by stakeholders who can engage in substantive discussion and decision-making. As the Board is also aware, while federal and state confidentiality and disclosure laws prevent CHS from disclosing protected health information, unless authorized, CHS does share relevant patient information that supports DOC's security and custody management operations.**

2. CHS and DOC Recommendation #2: "DOC and CHS should jointly review all policies, procedures, and directives regarding suicide screening and suicide prevention in light of the 12 suicides that have occurred in 2021 and 2022 so far. There were no suicides in the jails during the three years prior to 2020. DOC and CHS should develop and promulgate new policies, procedures, and directives, and review, enhance, and deliver suicide screening and prevention training for all security and civilian staff."

Response: **While CHS continues to welcome ongoing joint discussions with DOC, as it has over the years, on ways to minimize risk of suicide in the jail population, we strongly believe that the Board should first ensure that existing procedures related to monitoring and suicide prevention are followed before suggesting the need for additional measures or changes to a suicide prevention approach that demonstrated success prior to the onset of severe and persistent challenges in jail operations. We note that the joint suicide prevention committee that BOC created last year, has not convened since February 2022. The need for the Board to ensure adherence to existing procedures is pressing since, as CHS has stated previously and as the Board itself notes, in the past three years, there has been a significant increase in environmental and systemic stressors throughout the entire criminal-legal system that have negatively affected our patients. These operational and environmental stressors cannot be fully mitigated by CHS' adaptations of its clinical workflows and approaches to managing self-harm risk.**

3. CHS and DOC Recommendation #3: "Given the high number of drugs present in the jails, CHS and DOC should implement immediate measures to actively track suspected non-fatal overdoses in all housing areas. Said tracking system should incorporate information on whether Narcan was administered and by whom, as well as real-time updates on the person's status and whereabouts.

Response: **CHS does track possible suspected overdoses, which includes data on use of naloxone that CHS initiated for availability in housing areas. While CHS is proud of its initiative to train and supply its patients in housing areas with access to naloxone, CHS has requested and continues to rely upon DOC to notify CHS on when such usage occurs.  Timely notification by DOC of naloxone use on patients in housing areas is essential for CHS to ensure that adequate supply is maintained and to provide care as needed after suspected overdoses. CHS also conducts post-overdose outreach to follow-up clinically with individual patients to offer medications to treat opioid use disorder to eligible patients, provide naloxone training to anyone in an involved housing area, resupply naloxone kits in involved housing areas, and discuss risks of contaminated drug supply with anyone interested.**

4. CHS and DOC Recommendation #4: "CHS and DOC must ensure their respective movement and transfer tracking systems are updated in real-time with accurate information."

   Response: **CHS depends on DOC for notification as to patient movement and location.  CHS is not responsible for custody management and does not and cannot independently track the movement and placement of persons in DOC custody. CHS must rely on DOC, who is responsible for custody and management, to update its "Inmate Information System" in real time so that CHS can locate its patients.**

5. CHS and DOC Recommendation #5: "CHS and DOC must verify all incoming court documents, including securing orders and remarks regarding protective custody and suicide watch, before placement disposition. DOC must forward CHS all relevant court paperwork in a timely manner."

   Response: **CHS agrees that clinically relevant paperwork should be provided to CHS by DOC and in a timely manner.**

6. CHS and DOC Recommendation #6: "There are discrepancies in the number of missed medical appointments and the reason for each missed appointment (lack of escorts, refusals, cancelations, court, etc.) reported by both agencies. DOC and CHS must improve information-sharing so both agencies' records are consistent with each other and accurate."

   Response: **CHS staff documents unknown missed appointments as not produced.  DOC, as the patient custody and management agency, maintains the reason for non-production of patients to their medical appointment. The reporting of missed medical appointments by CHS and DOC are the data maintained by both agencies as intended for their respective operations.**

**IV. Recommendations to CHS:**

1. CHS Recommendation #1: "CHS must conduct a quality assurance review of clinical determinations to place individuals returning from psychiatric hospitalizations or who have significant known mental health history in general population housing."

   Response: **CHS has existing structures and protocols in place to ensure that individuals returning from OMH hospitals are referred to housing that is appropriate to their clinical needs and risk.  As part of the NYC Health + Hospitals system, CHS also maintains a robust quality assurance program.**

2. CHS Recommendation #3: "CHS must verify that patients scheduled for medical visits are housed in Rikers Island facilities. Appointment slots should not go to individuals who are either in hospital outposts or discharged from DOC custody."

Response: **As previously noted, CHS is not responsible for custody management and does not and cannot independently track the movement and placement of persons in DOC custody. CHS must rely on DOC, who is responsible for custody and management, to update its "Inmate Information System" in real time so that CHS can locate its patients. CHS regularly requests that DOC update IIS when staff become aware of inconsistencies. CHS staff are instructed to not schedule appointments to individuals known to be in the hospital or discharged from the community.**