# EXHIBIT 56



**BOARD OF CORRECTION**
**CITY OF NEW YORK**

# Third Report and Recommendations on 2022 Deaths in New York City Department of Correction Custody[1]

# April 12, 2023

[1] Authored by Deputy General Counsel Melissa Cintrón Hernández, in collaboration with Director of Special Investigations Rahzeem Gray and Special Investigations Coordinator Imahnni Jeffries. Director of Violence Prevention Bart Baily assisted with these investigations. Many thanks to former Executive Director Amanda Masters and Interim Executive Director Jasmine Georges-Yilla for their insight and comments, and to the members of the Jail Death Review subcommittee of the Board of Correction: Committee Chair Jacqueline Sherman, Board Chair Dwayne C. Sampson, Dr. Robert Cohen, and Joseph Ramos.

## I.       INTRODUCTION & METHODOLOGY

The New York City Board of Correction ("Board" or "BOC") is required, by law, to investigate the circumstances of deaths in custody, as defined in §3-10(c)(2) of title 40 of the Rules of the City of New York.[2] These investigations focus on identifying areas for improvement and making recommendations to the Department of Correction ("DOC" or "Department") and Correctional Health Services ("CHS") to prevent future deaths.

19 deaths occurred in New York City jails in 2022. The Board covered the deaths of Tarz Youngblood, George Pagan, and Herman Diaz in a May 9, 2022 report titled *February & March 2022 Deaths in DOC Custody Report and Recommendations*. The *Second Report and Recommendations on 2022 Deaths in New York City Department of Correction Custody*, published November 16, 2022, encompassed the deaths of Dashawn Carter, Mary Yehudah, Emanuel Sullivan, Antonio Bradley, Anibal Carrasquillo, Albert Drye, Elijah Muhammad, Michael Lopez, and Ricardo Cruciani. This report focuses on seven deaths in DOC custody between mid-August 2022 and December 2022.

The Board identified the following trends **among all nineteen deaths** that occurred in DOC custody in 2022:

- Correction officers did not tour or supervise people in custody in accordance with Department policy in 13 of the deaths.
- A "B" post officer was not assigned to a housing unit in four cases.
- Correction officers failed to render immediate first aid to unresponsive individuals in five instances.
- There were inaccurate or incomplete logbook entries in six cases.
- Six of the nineteen decedents spent more than a year in custody.

As part of its investigation, Board staff conducted interviews with people in custody, staff, and decedents' family members, reviewed video footage in the jails, DOC records, CHS and NYC Health + Hospitals ("H+H") medical records, Office of Chief Medical Examiner of the City of New York ("OCME") records, and press coverage. OCME records are not currently available for all decedents listed. In those instances, causes of death are labeled as suspected rather than confirmed. This report may be amended if new information becomes available.

Of the seven investigations covered in this report, three individuals died by suicide (two confirmed and one suspected), one from confirmed acute fentanyl intoxication, one from

---

[2] The Board defines "death in custody" as instances when a person dies in the custody of the Department of Correction or those whose deaths are attributable to their time in custody.

suspected anoxic brain injury due to cardiac arrest and pulmonary embolism, one from confirmed complications of drowning, and one is still pending further study by OCME.

The Board provided CHS and DOC with advance copies of this report and an opportunity to comment. Their written responses are appended to this report.

## II.   DEATHS IN CUSTODY

### 1.  MICHAEL NIEVES

| | |
|---|---|
| Age | 40 |
| Date of death | August 30, 2022 |
| DOC admission date | April 10, 2019[3] |
| Cause of death | Incised wound of neck with injury of jugular vein (suicide) |
| Facility at time of death | Anna M. Kross Center ("AMKC"), Program to Accelerate Clinical Effectiveness ("PACE") housing |
| Bail amount, if any | Remanded |

Mid-Hudson Forensic Psychiatric Center records reflect that Michael Nieves had a long history of psychiatric problems and involvement in community and correctional-based treatments. He was first psychiatrically hospitalized for self-cutting behavior, suicidal ideation, and disorganized speech and behavior when he was 15 years old, then again at 17 years old. From September 12, 1999 through November 3, 1999, Mr. Nieves was admitted to Bellevue Hospital for cutting himself and banging his head against surfaces while he was in jail.

Mr. Nieves was arrested on April 9, 2019 and admitted to Department custody on April 10, 2019. He tested positive for cocaine on a urine drug screen collected on April 10. His mental status was described as alert and oriented, and his mood and affect were euthymic (stable mental state). However, on a psychiatric assessment two days later, staff found that Mr. Nieves had a long history of mental health problems that manifested with impulse dyscontrol, mood changes, slight psychomotor agitation, and increased impulsivity. He was fully oriented, but disclosed auditory hallucinations and suicidal thoughts, including a "recent gesture." Records note that Mr. Nieves started to bang his head on a wall in the courthouse before he was transported to Rikers Island. Mr. Nieves was placed in mental observation housing[4] on suicide watch[5] and was prescribed Abilify (an antipsychotic).

---

[3] Mr. Nieves returned to DOC custody following admission from Mid-Hudson Forensic Psychiatric Center on June 8, 2022.

[4] Mental observation units house those individuals whose mental condition requires a higher level of observation than those in general population or are at increased risk of suicide.

[5] People on suicide watch are subject to constant supervision, as defined in DOC Directive #4521R-A, on Suicide Prevention and Intervention. Constant supervision requires maintaining uninterrupted personal visual observation without the aid of surveillance devices and the officer must permanently occupy an established post near the person under supervision.

A discharge plan progress note signed on April 23, 2019 reflects that Mr. Nieves had been exhibiting self-injurious behavior since admission, like banging his head, "suicidal gestures," and other intermittent explosive behaviors. He had not been engaging with mental health staff and had less than 40% medication compliance.

On August 30, 2019, Mr. Nieves was hospitalized in Bellevue Hospital's inpatient jail psychiatric unit after cutting his left forearm with a razor. Bellevue records report that, on admission, Mr. Nieves was paranoid that correction officers were "out to get him" by not letting the wound on his hand heal. On September 3, 2019, an attending psychiatrist described him as rambling "about correctional officers planning to set him on fire, lawyers conspiring against him, and corrupt judges, while poring over large stacks of legal documents and medical records that he insists will exonerate him." Through the end of September 2019, when Mr. Nieves was scheduled to appear in court, records show he continued to make delusional statements, presented paranoid ideation, reported auditory hallucinations, banged his head on a nursing station, and punched another patient in the unit. He refused to take lithium.

CHS' Forensic Psychiatric Evaluation Court Clinic[6] staff examined Mr. Nieves on September 20, 2019 to evaluate his fitness to proceed with legal proceedings under Article 730 of the Criminal Procedure Law ("CPL"). Records show that he was diagnosed with Schizoaffective Disorder in January 2004 and as a rule-out on September 2007, Unspecified Psychosis on September 2007 and August 2013, Schizotypal Personality Disorder, in addition to Borderline and Antisocial Personality Disorder, on September 2008, and Intracranial Injury With Loss of Consciousness of Unspecified Duration on June 2012.

Mr. Nieves reported past use of crack cocaine, marijuana, alcohol, and crystal methamphetamine. Mr. Nieves also disclosed that, following his release from state prison in August 2018, he was referred to Kingsboro Psychiatric Center's transitional residence and hospitalized at Harlem Hospital. After his release from Harlem Hospital, he received Assertive Community Treatment[7] through VNS Health, and was medicated with Aripiprazole Maintena (long-acting injectable antipsychotic), Bupropion (antidepressant), and Trazodone (antidepressant and sedative).

Bellevue staff noted that further personal information could not be gathered because of Mr. Nieves's insistence that his arrest "violated Criminal Procedure Law" and was based on a "fabricated felony report."

---

[6] CHS took over Forensic Psychiatric Evaluation Court Clinics ("FPECC") from Bellevue and Kings County Hospitals in 2018. The clinics, which are located in Manhattan, Bronx, Brooklyn, and Queens, conduct court-ordered (under Criminal Procedure Law § 730) psychiatric evaluations of adult criminal defendants in order to assess competence to stand trial and support pre-sentencing investigations.

[7] Assertive Community Treatment is an evidence-based practice that offers treatment, rehabilitation, and support services, using a person-centered recovery-based approach to individuals that have been diagnosed with serious mental illness ("SMI").

During the September 20, 2019 examination, hospital staff observed visible injuries to Mr. Nieves's neck and a healing wound on his forehead, likely from banging his head against glass at a nursing station. He stated that, even on Risperidone (antipsychotic), he experienced auditory hallucinations. He denied current suicidal and homicidal ideation but presented with over-detailed speech, illogical and rigid thought process, paranoia, and poor insight and judgment into his mental illness. Based on this evaluation, the evaluating doctor found that Mr. Nieves's mental illness interfered with his ability to possess both a factual and rational understanding of his legal situation and to assist in his defense with a reasonable degree of rational understanding. Therefore, he was not found fit to proceed and was committed to the care and custody of the New York State Office of Mental Health for inpatient competency restoration pursuant to a court order dated October 16, 2019.

Mr. Nieves was psychiatrically evaluated and hospitalized at Mid-Hudson Forensic Psychiatric Center from December 11, 2019 through April 30, 2020 in accordance with a court order pursuant to Article 730 of the CPL, for treatment to restore his competence to stand trial. During that evaluation, Mr. Nieves denied experiencing visual and auditory hallucinations, although he stated he did not want to discuss the latter. Mr. Nieves was diagnosed with Unspecified Schizophrenia and Other Psychotic Disorders, prominently demonstrating symptoms of mania, and further demonstrating psychotic symptoms as might be seen in the manic phase of a bipolar illness. Mid-Hudson staff opined that, with a reasonable degree of medical certainty, Mr. Nieves evidenced symptoms of a mental disease or defect that would render him unable to understand the proceedings against him or to assist in his own defense. Upon admission to Mid-Hudson, staff noted that Mr. Nieves did not present florid psychotic or major mood symptoms, although he was marginally cooperative and argumentative about his legal situation.

Mid-Hudson Forensic Psychiatric Center's Model Report in Support of Competency Restoration made pursuant to CPL Section 730.60, dated April 3, 2020, states that Mr. Nieves exhibited hostility, engaged in assaults and extensive self-injurious acts (including head-butting against objects), mood dysregulation, poor impulse control, disorganized thinking and behavior, as well paranoia and grandiosity. Mr. Nieves was "diagnosed with a myriad of psychiatric conditions; however, the more consistent one has been Schizophrenia." Medication trials included antipsychotics, mood-stabilizing medication, and antidepressants.

The same model report noted a substantial improvement in Mr. Nieves's condition during his 2019-2020 hospitalization while he was administered Abilify for psychotic remission and benztropine (anti-tremor medication). Mr. Nieves enrolled and participated in treatment groups tailored to his needs, including medication education, health and wellness, understanding mental illness, mental health education, forensic education, forensic process, coping with life stressors, and conflict resolution groups. Mid-Hudson psychiatric staff noted that Mr. Nieves showed none to minimal impairment in orientation as to person, place, and time, perceptual impairment (hallucinations) or delusions, understanding of the trial process and roles of participants, ability to establish a working relationship with an attorney, and intelligence/judgment to listen to the

advice of counsel and to consider risk and benefits of alternative courses of conduct/legal action. According to the same, Mr. Nieves remained compliant with treatment and demonstrated enough psychiatric stability to withstand the stresses of trial. Accordingly, Mid-Hudson Forensic Psychiatric Center discharged Mr. Nieves to DOC custody on April 30, 2020, after it was determined by the center's Associate Clinical Director that he was no longer an incapacitated person.

CHS medical records state that Mr. Nieves cut his throat in November 2020 while he was at Bellevue Hospital Prison Ward, which required surgical repair and ICU care. Mr. Nieves reportedly did this in response to being "skipped" while waiting for a dental appointment.

CHS referred Mr. Nieves to Bellevue Hospital, where he was admitted from March 15, 2022 through April 5, 2022. According to New York State Office of Mental Health paperwork, CHS staff found that Mr. Nieves decompensated in custody, likely due to treatment noncompliance. CHS staff observed him "cheeking" his psychotropic medications and becoming increasingly symptomatic. He endorsed paranoid beliefs and homicidal ideation and was increasingly internally preoccupied, evasive, guarded, suspicious, hostile, rigid in his thinking, and irritable. The CHS referral notes that Mr. Nieves also made remarks suggesting suicidal ideation, indicating that he did not want to live. He had been on suicide watch since March 3, 2022, after reportedly slamming his head against the wall. He refused all treatment in the PACE[8] unit because he believed he was jailed illegally to experiment on him. CHS staff determined that Mr. Nieves would be referred to Bellevue Hospital because he could no longer be safely managed at the highest level of psychiatric care available on Rikers Island.

A suicide risk assessment in Mr. Nieves's Bellevue Hospital inpatient psychiatry discharge summary dated April 3, 2022, found that he had "static, unmalleable risk factors for suicide given his history of suicide attempts requiring medical hospitalization/intervention, mood/psychotic illness, trauma, and male gender." According to the same, when admitted to Bellevue Hospital on March 15, he was at an elevated risk of suicide. He was frustrated about his legal case and clinical care, completely noncompliant with medications while at Rikers Island, and likely had ongoing mood and psychotic symptoms.

During this Bellevue admission, Mr. Nieves's risk for suicide was mitigated through medication, individual and group psychotherapeutic intervention, coping skills, and support. Throughout his hospitalization, he showed no acute or active suicidal thinking or behavior of self-harm. At the time of discharge, he was medication-compliant. He reported depressive symptoms but refused to accept antidepressants other than Wellbutrin. His risk of suicide was no longer elevated and had been mitigated substantially by this acute inpatient admission. Due to his chronically limited frustration tolerance and coping, consistent with borderline personality disorder, it was noted

---

[8] PACE is a mental observation housing cell area designed as a therapeutic environment to offer intensive, specialized, and multidisciplinary programs and treatment. Medical and mental health clinicians provide care directly in the unit.

that he might engage in self-harm or develop future suicidal ideation when faced with stress or disappointment.

Mr. Nieves was again committed to the custody of the Commissioner of Mental Health and was hospitalized at Mid-Hudson Forensic Psychiatric Center from April 5, 2022 through June 8, 2022, pursuant to a CPL 730.50 Order of Commitment issued on March 2, 2022. An initial psychiatric evaluation dated April 5 found that Mr. Nieves exhibited extensive paranoid delusions, marked impulsivity, notable mood reactivity, propensity to engage in self-injurious acts, suicidal behavior, and engaged in assaultive acts.

Mid-Hudson Forensic Psychiatric Center's Model Report in Support of Competency Restoration made pursuant to CPL Section 730.60, dated May 25, 2022, states that upon admission in April, Mr. Nieves was paranoid and impulsive. Despite taking Abilify, he exhibited episodes of aggression towards others, ongoing grandiosity, lability (instability), and delusional thoughts. He refused a recommended change in medications, requiring a hearing to order medication over his objection. On May 12, 2022, the Supreme Court of the State of New York in the County of Orange granted a final order, authorizing the New York State Mental Health Commissioner to administer treatment over Mr. Nieves's objection during his current hospitalization.

Once Mr. Nieves began taking the recommended medications, his symptoms improved, such that he became organized and cooperative, with better impulse control and improved insight and judgment. The psychiatric center staff treated Mr. Nieves, to good effect, with lithium (mood stabilizer), Cogentin (anti-tremor), and Haldol (antipsychotic). He also enrolled and participated in the same treatment groups he attended during his 2020 hospitalization, as well as Dimensions of Wellness and Actions and Consequences groups. He attended all group sessions. As in 2020, Mr. Nieves again showed none to minimal impairment in areas regarding fitness and functional legal ability relevant to competence to proceed (orientation, perceptual impairment, understanding of the trial process and roles of participants, etc.). Mr. Nieves was deemed psychiatrically and behaviorally stable, demonstrating adequate factual and rational understanding of the adjudicative process. Therefore, he was found fit to proceed. On May 25, 2022, the psychiatric center's Clinical Director determined that Mr. Nieves was no longer an incapacitated person and requested the local Department of Correction to take custody of him. This happened only two weeks after Mid-Hudson obtained a court order authorizing the facility to treat Mr. Nieves over his objection. Treatment over objection for seriously mentally ill patients is not available on Rikers Island.

Mr. Nieves was hospitalized in Mid-Hudson Forensic Psychiatric Center from April 5, 2022 through June 8, 2022. Mr. Nieves's Mid-Hudson discharge summary dated June 7, 2022 notes that he would need medication management to prevent relapse, that he may benefit from continued efforts to improve his understanding of his psychiatric symptoms, that he would require ongoing support to ensure medication compliance, and that he may benefit from structured therapeutic activities to address his borderline personality disorder traits and minimize his impulsivity.

According to CHS staff, Mr. Nieves was admitted to DOC custody on June 8 at 4:26 pm and was presented to CHS at 11:05 pm for medical intake. CHS mental health staff evaluated Mr. Nieves on June 9, 2022, noting that he presented as calm, cooperative, alert, and oriented, although his speech was a bit fast and pressured. Mr. Nieves acknowledged the importance of medication compliance and verbalizing thoughts and concerns. He denied suicidal and homicidal ideation, auditory and visual hallucinations, and delusions. Mental health records note that his self-harm and violence risk factors remained chronically high but were mitigated due to his increased insight into his illness, medication adherence, and willingness to work with his team. CHS continued the medication administered during his hospitalization and continued his therapy, however, Mr. Nieves was completely non-compliant. Mr. Nieves was placed in PACE housing.

CHS dispensed medication for Mr. Nieves on June 10, 2022, but he refused. He was placed on suicide watch on June 10 as a precaution due to his history and quick decompensation when not compliant with medication. That same day, he refused to take medication and was extremely upset about being placed on suicide watch. He presented with a hostile mood, pacing, and making threats toward mental health staff.

On June 13, mental health staff prescribed Abilify in place of Haldol since Mr. Nieves insisted Abilify was the only medication he would accept. He had refused all medications since his admission to Rikers Island.

On June 29, CHS removed Mr. Nieves from suicide watch. Medical records reflect that Mr. Nieves had not engaged in self-harm since his arrival at the unit. He verbalized no health concerns or complaints, remained stable and in no sign of distress, and he denied pain, active thoughts of suicide, and hallucinations. They further noted that he was able to communicate needs and concerns to staff, and that he was out and about on the unit but remained largely independent from his peers. Finally, he continued to refuse lithium medication. Mr. Nieves remained in mental observation housing.

Pursuant to Article 730 of the CPL, on June 24, 2022, the court ordered another psychiatric examination to determine if, as a result of mental disease or defect, Mr. Nieves lacked the capacity to understand the proceedings against him in his legal action or lacked the capacity to assist in his own defense. This would be the third psychiatric examination for these purposes since 2019. CHS' Forensic Psychiatric Evaluation Court Clinic staff would conduct the examination at the jail facility unless it was determined that an effective examination could only take place in a hospital.

Throughout July 2022, CHS records state that Mr. Nieves denied suicidal ideation, did not engage in self-injury, and remained stable, although he continued refusing lithium medication and exhibited paranoia and delusions. Mr. Nieves was mostly consistent with his Abilify prescription during this month, only refusing it twice.

On August 2, Mr. Nieves and another individual in custody were involved in an altercation, during which Mr. Nieves hit the individual. According to Department staff, Mr. Nieves did not respond

to attempts to de-escalate and was sprayed with a chemical agent. Nursing staff spoke to Mr. Nieves after the incident. He appeared very agitated and angered due to being locked in after the altercation. He refused medical assessment and treatment.

A medical note signed on August 5 states that Mr. Nieves steadily decompensated following the altercation, with increasingly rapid and pressured speech, and worsening disorganization in his presentation of chronic delusional beliefs. In the following days, Mr. Nieves denied suicidal ideation, remained stable, and showed no signs of distress, despite ongoing symptoms of paranoid delusions, rapid pressured speech, and tangential thought process. He did not engage in assaultive behavior. According to Mid-Hudson Psychiatric Center and CHS records, Mr. Nieves was compliant with medication, specifically lithium, when hospitalized in 2022, but refused to take lithium while in Rikers Island.

According to Legal Aid attorneys, Mr. Nieves reportedly lived in fear of being sent to a punitive segregation unit. Mr. Nieves rarely made statements of despair, self-harm, or suicidal thoughts to his Legal Aid representation, but in the few instances he did, he would immediately deny suicidal ideation. According to the same, Mr. Nieves was not happy with his medical treatment, reported hearing voices, and was agitated and anxious. However, Mr. Nieves did not express intent to self-harm when he last spoke to his attorneys.

A mental health note dated August 25, 2022 states that the court order for another psychiatric evaluation was a trigger for Mr. Nieves, who endorsed paranoid ideation and was visibly agitated as a result. He exhibited notable behavior changes, such as an increase in agitation in the unit, a decline in engagement with the clinical supervisor and his assigned clinician, and a recent resurgence in utilizing the phone. He was internally preoccupied, with a visible increase in paranoid ideation. Staff did not believe hospitalization was warranted because his behaviors were within his baseline. According to the same mental health note, Mr. Nieves and a Department staff member were involved in a verbal dispute on August 23 and Mr. Nieves then "met with investigations" on August 24. DOC staff informed the Board that DOC have no record of Mr. Nieves meeting with investigators on August 24.

There was no Suicide Prevention Aide ("SPA") assigned to Mr. Nieves's PACE unit on August 25, 2022. This is counter to DOC Directive #4017R-D (Observation Aide Program), which requires the presence of a SPA in this unit 24 hours a day. SPAs, also referred to as Observation Aides, are people in custody who are trained to "monitor incarcerated individuals identified as suicide risks and to recognize the warning signs of suicidal behavior in incarcerated individuals who had not previously been identified." SPAs are supposed to operate in their assigned units in shifts covering all hours of the day and must conduct at least six tours per hour.

There was no psychiatric nurse in the unit. CHS assigns nursing staff to PACE units, but they are not required to remain on the unit at all times.

Department records reflect that Mr. Nieves requested an institutional razor at 8:56 am on August 25. Board staff review of surveillance footage shows that at approximately 9:18 am, a correction

9

officer opened the janitor's closet for Mr. Nieves, presumably so he could fetch a razor. DOC Directive #4008R-A on Distribution and Control of Razors states that people in custody under special observation for suicide watch or mental health reasons shall not be denied the opportunity to shave, but shall be closely monitored by staff or a designated person in custody who has been trained in suicide prevention.

On the morning of August 25, CHS's 730 Mobile Team[9] met with Mr. Nieves after he showered at around 9:20 am. Records show that Mr. Nieves presented as more anxious, paranoid, and delusional.

> "Patient had rapid, pressured speech, intense eye contact, and tangential. He was difficult to interrupt. Patient was preoccupied about his inventions, the government, and legal lawsuits. He stated that he spoke with investigations yesterday sharing information about the government (stating that he "blew the whistle") and that he feared for his life. Patient denied any suicidal ideation, intent, or plan. He also denied any homicidal ideation, intent, or plan. Writer and Patient were unable to discuss legal updates as he was preoccupied about conspiracies. However, Mr. Nieves is aware of legal updates as he speaks with his attorney regularly. Patient asked Writer to make a copy of his list of inventions and legal documents. Once Writer exited the office, 2 officers stated that he had a razor that he did not return. Mr. Nieves stated he left it in his cell and seemed fearful and anxious. Writer attempted to de-escalate the situation, however, Writer was told was to leave the unit. Writer spoke with officer and staff in the bubble about what transpired during the encounter. Writer emailed treatment team about incident."

The Board's review of surveillance footage shows that, throughout the morning, Mr. Nieves walked around the housing area and spoke to staff. The correction officer assigned to the PACE unit conducted tours of the area and checked individual cells to ensure the safety of those within, although not every 15 minutes as required in mental observation units.

According to Department records, at approximately 10:30 am, a correction officer notified Mr. Nieves that he completed his allotted time with the razor, but Mr. Nieves stated that he could not find the razor. Uniformed staff commenced an emergency lock-in of all individuals housed in the unit. A correction officer and a captain searched Mr. Nieves's cell, as well as the cell of

---

[9] CHS' 730 Restoration Support Team is comprised of Masters' level staff who provide services to individuals who returned to jail after being restored to fitness at an OMH facility.  The overall goal of the team is to support the maintenance of fitness and subsequent case adjudication through individualized services including coordination with CHS mental health treatment teams and criminal defense legal teams, and individual sessions targeting a patient's specific fitness barrier.

another person in custody who was in the shower area at the same time as Mr. Nieves said his razor went missing, but did not locate the razor.

Body-worn camera footage shows that, after the unsuccessful search, the captain instructed the "C" post correction officer to escort Mr. Nieves to the intake area so he can go through a body scanner (conducts full body scans to detect objects placed on, attached to, or secreted within, a person's body). Mr. Nieves entered his cell to gather legal paperwork. The captain informed him that he could not take any items with him. Mr. Nieves began placing papers and books inside what appeared to be a pillowcase and did not exit his cell. After about a minute, the captain told the "C" post officer to close the cell and that she would come back and get Mr. Nieves. The officer told Mr. Nieves they would return to get him and shut the cell door at around 11:28 am.

A "C" post logbook entry made at 11:40 am reads that: "Inmate Nieves was given a direct order to go to intake to do a body scan." The note does not mention that Mr. Nieves did not go to intake, that staff conducted a search of his cell and did not locate a razor, or that he was subsequently locked in his cell.

Based on Board staff's review of surveillance footage and body-worn camera video, at approximately 11:41 am, the "C" post officer opened Mr. Nieves's cell. The officer found Mr. Nieves bleeding from his neck, dripping onto his shirt and onto the floor. A captain who was present in the area noticed and immediately went to the "A" station, presumably to activate a medical emergency. Mr. Nieves had his hands on his knees and periodically placed his hands on the wound on his neck.

While awaiting medical staff's arrival, the "C" post officer repeatedly asked Mr. Nieves what happened to him and told him to sit down on the bed, but did not enter Mr. Nieves's cell. Mr. Nieves told the "C" post officer that the "state forced me to commit suicide." The officer responded that "hurting yourself is not the best way." Mr. Nieves mostly remained silent, speaking once or twice. The "C" post officer asked Mr. Nieves if he was bleeding from his mouth or throat. Mr. Nieves said he was bleeding from his neck. The "C" post officer placed a blanket on the floor for Mr. Nieves but did not enter the cell. Body-worn camera footage captured a second correction officer in the unit. The captain approached Mr. Nieves's cell and asked him if he wanted them (the captain and the "C" post officer) to help him. A male voice responded "no," but it is unclear who spoke based on the video footage. The captain stated that medical staff was on their way.

Neither officer nor the captain rendered aid during the approximately nine minutes they waited for medical staff, instead standing outside of Mr. Nieves's cell. Department records show that DOC trained the "C" post officer to work with individuals housed in PACE units in January 2021. Uniformed staff assigned to PACE units also receive Crisis Intervention Training, designed to train staff to de-escalate situations involving individuals with mental illness.

According to CHS records, the medical clinic received the emergency call at 11:40 am and medical staff arrived at the unit at 11:45 am. Surveillance footage shows CHS staff arriving at the unit

closer to 11:51 am. Upon CHS's arrival, they found Mr. Nieves sitting in a pool of blood and his back against the wall. Blood gushed out of the left side of his neck. He was pale, had facial cyanosis (blue skin or lips due to lack of oxygen in blood), and he gasped for air. The nursing staff immediately applied pressure to the area and rendered aid. The medical team called for backup to the AMKC clinic, Urgicare, and EMS.

Based on body-worn camera footage, when medical staff arrived, they expressed concerns about the lack of information shared during the request for emergency assistance. A CHS clinician remarked: "it would have been better for us to know what it is… We didn't even bring [unintelligible]… At least we need to know what it is. Nobody told us anything. We have no [unintelligible]. We have nothing." The captain told medical staff that Mr. Nieves did not want them (DOC uniformed staff) to touch him. Another clinician asked where the nurse was, to which the captain responded that she did not know.

The Department suspended two correction officers and one captain as a result of this incident.

EMS arrived at approximately 12:29 pm and continued aid efforts, including attempts to intubate Mr. Nieves. Paramedics transported Mr. Nieves out of the unit at 12:59 pm. EMS transported Mr. Nieves to Elmhurst Hospital, where he was immediately rushed into surgery to close the 15-centimeter by 5-centimeter laceration on the left side of his neck. OCME records state that, on arrival at the emergency room, Mr. Nieves was in hemorrhagic shock. He was intubated, placed on a ventilator, and taken directly to the operating room for a massive transfusion.

Elmhurst Hospital medical staff reported to DOC staff that the laceration was millimeters from Mr. Nieves's jugular vein. A CHS note signed on August 29 stated that the severe penetrating neck wound injury would require emergency operative repair for internal jugular vein and sternocleidomastoid muscle laceration. Mr. Nieves also experienced brain injury related to severe bleeding. According to OCME records, a head CT scan showed diffuse cerebral edema, multifocal infarcts, and severe brain stem function deterioration. Mr. Nieves was declared brain dead by neurologic criteria at 1:21 pm on August 26. On August 30, 2022, at 9:47 pm, Mr. Nieves was removed from life support and pronounced dead.

## 2. KEVIN BRYAN

| | |
|---|---|
| Age | 35 |
| Date of death | September 14, 2022 |
| DOC admission date | September 8, 2022 |
| Cause of death | Suspected suicide |
| Facility at time of death | Eric M. Taylor Center ("EMTC"), general population housing |
| Bail amount, if any | $5,003 |

On September 8, 2022, Kevin Bryan tested positive for cocaine during his intake drug screening. DOC's Suicide Prevention Screening Guidelines[10] notes that Mr. Bryan disclosed last using heroin two days prior and he showed signs of heroin withdrawal. He denied current mental health or emotional problems, past suicide

---

[10] This is a set of questions designed to identify potential suicide risks for individuals in the first 24 to 72 hours of their incarceration.

attempts, current suicidal or self-harm ideation, and feelings of hopelessness. Mr. Bryan was placed in general population housing. Based on a review of CHS records, Mr. Bryan did not miss any medical appointments. CHS did not place him on suicide watch during any of his incarcerations.

Following his death, people in custody told Board investigators that Mr. Bryan showed no signs of depression and that he was bullied by other incarcerated individuals. Department uniformed staff told Board investigators that Mr. Bryan was transferred to the intake unit on September 12 or September 13 for being disruptive, but he was returned to his unit that same day. Based on a review of CHS records, Mr. Bryan was not referred to CHS for evaluation on September 12 or September 13.

Mr. Bryan's unit was dormitory-style housing, where people are assigned beds rather than cells. The unit has a separate dayroom, a common area with tables and chairs, which should not be in use after 9:00 pm.

From 12:00 am through 2:00 am on September 14, 2022, Mr. Bryan can be spotted through surveillance footage alternating between lying in bed, spending time in the dayroom, and talking with people in custody throughout the dormitory. According to Department records, there was no "B" post officer present in the unit.

At around 2:06 am, while in the dayroom, Mr. Bryan and another individual in custody fumbled with toilet paper, and then proceeded to try and ignite it. Shortly thereafter, Mr. Bryan went to lie in his bed. At 3:07 am, Mr. Bryan returned to the dayroom, where two people smoked. At 3:08 am, a captain entered the housing area to conduct a tour. Mr. Bryan and the other individuals noticed and attempted to hide that they were smoking. Mr. Bryan then began smoking under a blanket in the dayroom. At 3:09 am, the captain left the unit without checking the dayroom. Mr. Bryan slept from 3:14 am through 5:20 am, after which he spoke to the "A" post officer[11] behind the gate.

At 5:22 am, Mr. Bryan went to the dayroom for a few seconds. Another individual in custody followed him out while appearing to yell at him. The person hit Mr. Bryan's head and pointed to the gate, where a correction officer stood on the other side. The individual also grabbed and threw Mr. Bryan's mattress at him. Mr. Bryan banged on the "A" station window while a second person in custody helped him gather his belongings. At 5:23 am, a correction officer opened the gate and allowed Mr. Bryan to exit the dormitory. Mr. Bryan laid on a mattress outside the housing area gate, in the vestibule, settling down towards the end of the hallway across from the staff bathroom. Teletype Order No. HQ-02947-0, dated December 9, 2021, states that incarcerated individuals are not permitted to congregate in vestibules under any circumstance.

---

[11] "A" post officers remain inside the "A" station, colloquially known as the "bubble." The "A" station is the housing area's secured control room and cannot be accessed by people in custody.

DOC protocol requires correction officers to notify and request the presence of a captain after incidents such as these. Logbooks show that correction officers did not notify a captain that Mr. Bryan was pushed out of the housing unit by another individual in custody or that Mr. Bryan was in the vestibule.

At 6:01 am, a correction officer gave Mr. Bryan food. At 6:06 am, Mr. Bryan entered the staff bathroom, then reemerged to grab his mattress. He locked himself in the bathroom at 6:09 am. Based on surveillance footage, it did not appear that staff was present in the vestibule at the time.

At 6:36 am, a correction officer tried to open the staff bathroom but was unsuccessful. The correction officer and a captain stood by the door while waiting for assistance. The captain banged on the bathroom door. A DOC staff incident report states that Mr. Bryan refused direct orders to step out. Maintenance staff was notified, and uniformed staff kicked and pushed the door while awaiting maintenance staff's arrival. An Assistant Deputy Warden gained access to the staff bathroom at 7:04 am by kicking the door. They discovered Mr. Bryan with linen tied around his neck and a pipe. Uniformed staff used a knife to cut the ligature around his neck and commenced chest compressions.

CHS records indicate that they received the emergency call to the clinic at 7:05 am and responded to the area at 7:07 am. Mr. Bryan was pulseless. CHS staff used a LUCAS device (a device that provides mechanical chest compressions to patients in cardiac arrest), administered epinephrine and IV fluids, and placed a breathing tube down his throat. Medical staff called for Urgicare and EMS. EMS arrived at 7:33 am. According to CHS records, Mr. Bryan was pronounced deceased at 7:44 am.

### 3. GREGORY ACEVEDO

| | |
|---|---|
| Age | 48 |
| Date of death | September 20, 2022 |
| DOC admission date | February 27, 2022 |
| Cause of death | Complications of drowning[12] |
| Facility at time of death | Vernon C. Bain Center ("VCBC"), general population housing |
| Bail amount, if any | Remanded |

Gregory Acevedo tested positive for cocaine and THC at his intake drug screening on February 27, 2022. He denied current mental health or emotional problems, past suicide attempts, current suicidal or self-harm ideation, and feelings of hopelessness. Mr. Acevedo was placed in general population housing. On August 19, 2022, CHS referred Mr. Acevedo for mental health screening because Department staff flagged that Mr. Acevedo's behavior had changed, that he paced back and forth, that he was unable to sleep, and that he was depressed. CHS scheduled the screening for August 20, but it was rescheduled to August 21 for administrative reasons.

---

[12] Confirmed by OCME's Report of Autopsy and ruled an accident.

CHS held an initial mental health assessment and treatment plan session on August 21, 2022. Mr. Acevedo denied suicidal ideation, self-harm ideation, auditory or visual hallucinations, past inpatient psychiatric admission or outpatient treatment, and mental health or emotional problems. However, he disclosed depression, anxiety, mood swings, stress, and insomnia, due to his arrest and incarceration. Mental health staff determined that none of these symptoms resulted in clinically significant distress or impairment in functioning. Mr. Acevedo also reported a history of trauma from his time in prison. CHS staff noted that Mr. Acevedo was not manic, psychotic, or in acute distress and that he was stable, goal-directed, calm, alert, cooperative, forward-thinking, coping well, and had good hygiene. CHS identified that he had poor adaptive inflexibility, maladaptive behavior, and emotional instability, and diagnosed him with other specified trauma- and stressor-related disorders, adjustment disorder with mixed anxiety and depressed mood, and other personality disorders.

Mental health staff prescribed Mr. Acevedo psychiatric medication, which was given to him from August 23 through August 28. They also referred him to A Road Not Taken ("ARNT"), a substance abuse program operating in AMKC, but records do not indicate he ever enrolled or participated. Mr. Acevedo was placed in general population housing with mental health follow-up with a clinician/psychiatrist.

On August 23, 2022, CHS emergency staff attended to Mr. Acevedo for what seemed to be chest pains related to an anxiety attack. His treatment plan included mental health follow-up with medication. A referral note signed on August 23, 2022 states that Mr. Acevedo was referred to a neurology appointment due to chronic posttraumatic headaches, scheduled for September 27, 2022.

At a comprehensive treatment plan appointment on August 31, Mr. Acevedo refused mental health services, stating that he was depressed but he did not want to be moved to mental observation housing for fear of being assaulted in a new unit. CHS staff advised him that, because he denied suicidality and self-harm and did not display symptoms of psychosis, he would not be transferred to mental observation housing. Mental health staff determined that Mr. Acevedo did not appear to be in clinical distress, his affect was appropriate, and he did not demonstrate mood instability or functional impairment.

A medical record note signed on September 15, 2022 indicates that Mr. Acevedo had occasional anxiety reactions after he reported that his heart raced when he lied down, although his vitals and EKG were normal. He was referred to a routine mental health screening on September 15.

On September 16, 2022, Mr. Acevedo disclosed to CHS mental health staff that he felt depressed due to his incarceration and that he had been assaulted while incarcerated and was fearful it would happen again. Due to this, he worried about being moved to another facility if he enrolled in mental health services. CHS staff assured Mr. Acevedo that mental health services were offered in every building, and he did not need to be sent elsewhere. Mr. Acevedo denied wanting to hurt himself, and after CHS provided supportive therapy, he agreed to ongoing mental health

services. Mr. Acevedo was to be scheduled for a mental health check-in in two weeks due to his struggle to cope with his incarceration.

On September 19, the day before Mr. Acevedo's death, the Department flagged that Mr. Acevedo showed radical changes in behavior, was unable to sleep, and showed poor personal hygiene. CHS' Mental Health Unit Chief documented the mental health referral on September 20, 2022. People in custody told Board investigators that Mr. Acevedo usually slept all day, barely mingled with others, complained regularly about his legal matters, had outbursts, and paced up and down the unit. According to the same, a captain briefly removed Mr. Acevedo from the unit on the morning of his death because incarcerated individuals picked on him.

On September 20, 2022, at 11:30 am, Mr. Acevedo and other individuals were in the recreation yard at VCBC, also known as the boat, a jail barge anchored in the East River. The recreation yard is enclosed by a 30-foot-tall metal fence, topped with razor wire, on the facility's roof. The roof is five stories high. At the time of the events, three correction officers were assigned to recreation posts.

At 11:42 am, most incarcerated individuals exited the yard to return to their unit. Surveillance footage captured one correction officer walking towards the recreation yard exit. Given camera angle limitations, it is not clear whether the correction officer walked inside or remained outside by the door. At that point, Mr. Acevedo began climbing the fence. Two correction officers noticed Mr. Acevedo. According to Department records, they ordered him to stop but he did not comply with the orders. Based on Board staff's review of surveillance footage, at 11:44 am, a third officer arrived. They tried to spray chemical agent on Mr. Acevedo, but he was too high up on the fence for the spray to reach him. At 11:45 am, one correction officer attempted to climb the fence but stopped. At 11:46 am, Mr. Acevedo climbed over the barbed wire at the top of the fence, ran towards the edge of the roof, and leaped into the water.

Additional Department uniformed staff arrived at the recreation yard at 11:47 am, then quickly departed. At 11:55 am, surveillance footage captured more uniformed staff gathering on the roof. The New York City Police Department ("NYPD") Harbor Unit's boat arrived and recovered Mr. Acevedo from the water at 11:56 am. NYPD staff immediately performed chest compressions. The NYPD boat departed from VCBC at 11:58 am. Department records show that the NYPD Harbor Unit arrived at Rikers Island's harbor dock and escorted Mr. Acevedo off the boat on a stretcher.

EMS staff transported Mr. Acevedo to Mount Sinai's Astoria Hospital. Department records state that Mr. Acevedo was placed on life support upon admission to the hospital, then removed from life support and pronounced deceased at 10:53 pm. Mr. Acevedo had an asystole heart rhythm (flatline), multiple organ failures, and multiple fractures throughout his body.

### 4. ELMORE ROBERT PONDEXTER

| | |
|---|---|
| Age | 59 |
| Date of death | September 22, 2022 |
| DOC admission date | April 28, 2020 |
| Cause of death | Anoxic brain injury due to, or as a consequence of, cardiac arrest and pulmonary embolism[13] |
| Facility at time of death | George R. Vierno Center ("GRVC"), PACE housing |
| Bail amount, if any | Remanded |

Elmore Robert Pondexter disclosed a history of colon cancer, heart disease, and asthma to CHS staff upon admission to DOC custody. Mr. Pondexter was placed on suicide watch from April 28, 2020 through July 7, 2020, then immediately placed again on July 8, 2020 following emotional dysregulation and threats to harm himself once he learned his suicide watch was discontinued. He was removed from suicide watch observation on July 20, 2020 but remained in mental observation housing and received psychiatric medication.

Mental health staff diagnosed Mr. Pondexter with Major Depressive Disorder on May 14, 2021. CHS determined Mr. Pondexter would better benefit from services available in a PACE unit and transferred him accordingly. He was placed on suicide watch on May 21, 2021, after reporting experiencing auditory hallucinations telling him to harm himself. He was removed from suicide watch on June 4, 2021, because he was compliant with his psychiatric medication and had improved his eating habits. He remained in PACE housing.

Throughout his incarceration, Mr. Pondexter regularly refused medical evaluation and treatment, including vital signs measurement and physical examinations, colonoscopies, COVID-19 testing, x-rays, diagnostic testing, and laboratory bloodwork. CHS staff frequently engaged with Mr. Pondexter and advised him of the risks associated with refusing medical evaluation and treatment. In 2022, Mr. Pondexter began consenting to more consistent laboratory bloodwork.

Based on a review of surveillance footage, at 4:59 am on September 18, 2022, people in custody in Mr. Pondexter's unit lined up for breakfast. A correction officer had just stepped out of the unit. Mr. Pondexter stood off to the side of the breakfast line, then stumbled and fell to the floor five minutes later. A person in custody waved to the "A" station to alert the officers. Two correction officers immediately responded, tending to Mr. Pondexter, who appeared to be conscious. At 5:05 am, he sat up with assistance from the officers. At 5:10 am, correction officers escorted Mr. Pondexter out of the housing area. Mr. Pondexter walked on his own. They arrived at the clinic at 5:16 am.

CHS records note that Mr. Pondexter verbalized that he was sitting and as he stood, he felt dizzy, his eyes blurred, and he fell, but he did not voice complaints of pain or discomfort. Staff performed an EKG and consulted with Urgicare by phone for additional clinical guidance. CHS referred Mr. Pondexter to Urgicare for further evaluation. Urgicare determined that, given his age and presentation, Mr. Pondexter would go to Bellevue Hospital Prison Ward for further

---

[13] According to Bellevue Hospital Center records.

evaluation. EMS departed the clinic with Mr. Pondexter on a stretcher at 7:19 am. Mr. Pondexter appeared conscious at the time.

Hospital staff's evaluation on September 18 shows that Mr. Pondexter was awake, alert, oriented, speaking in full sentences, responding appropriately, appearing well, and in no acute distress. Mr. Pondexter denied having chest pains, shortness of breath, or palpitations. He reported to Bellevue Hospital staff that he fainted three weeks earlier and subsequently fell down four to five stairs but did not sustain injuries as a result.

Mr. Pondexter was hospitalized on September 18. On September 19, he reported feeling lightheaded, then lost consciousness and went into cardiac arrest, prompting hospital staff to begin immediate chest compressions and CPR. Throughout resuscitation efforts, Mr. Pondexter had significantly low levels of oxygen in his body tissues. His spontaneous circulation then returned and his O2 improved to 98%. Hospital records state that his cardiac arrest was likely due to a massive pulmonary embolism. Imaging results showed irreversible global hypoxic ischemic brain injury with brain herniation, persistent coma, and absent brain stem reflexes.

On September 21, 2022, Mr. Pondexter was compassionately released from DOC custody. Mr. Pondexter was unresponsive to touch and voice and, following testing on September 22, imaging found an absence of visible cerebral blood flow, consistent with brain death. Mr. Pondexter was declared brain dead at 2:40 pm on September 22, and cardiac death was declared at 7:28 pm that same day. According to Bellevue Hospital's Death Notice, the immediate cause of death was anoxic brain injury due to, or as a consequence of, cardiac arrest and pulmonary embolism.

The Department did not notify the Board of Mr. Pondexter's passing, nor did they issue a Central Operations Desk notification. DOC did not initially count Mr. Pondexter's death after discharge as an in-custody death. However, DOC staff have since informed the Board that DOC recognizes Mr. Pondexter's death as an in-custody death.

The Board has not yet had the opportunity to review the report of the OCME.

### 5. ERICK TAVIRA

| | |
|---|---|
| Age | 28 |
| Date of death | October 22, 2022 |
| DOC admission date | June 15, 2021 |
| Cause of death | Hanging |
| Facility at time of death | GRVC, mental observation housing |
| Bail amount, if any | $20,000 |

Metropolitan Hospital Center's Psychiatric Emergency Department evaluated Erick Tavira on June 6, 2021, prior to his admission to DOC custody. Hospital records show that Mr. Tavira had previous psychiatric history, including diagnoses of schizoaffective disorder, polysubstance use disorder, and bipolar 1 disorder. Mr. Tavira had a history of multiple psychiatric admissions and emergency department visits in the context of substance use. Further, Mr. Tavira reported medication non-adherence for "a long time." The hospital's review of past medical records showed multiple suicide attempts years ago, most recently in February 2020.

18

Hospital staff noted that, given his behavior and presentation, Mr. Tavira suffered from acute intoxication. According to the same, his disheveled appearance and inappropriate affect (pressured speech, actively talking to himself, easily distracted, laughing and smiling inappropriately at times) was likely secondary to substance use versus decompensation of his schizoaffective disorder due to medication non-adherence, complicated by poor frustration tolerance and lack of healthy coping skills. Following an overnight observation, Mr. Tavira appeared calm and cooperative, with a euthymic mood and a goal-directed thought process. He denied suicidal ideation and hallucinations. He was deemed a low acute suicide risk and was subsequently discharged.

Mr. Tavira's Suicide Prevention Screening Guidelines form, completed on June 15, 2021, notes that he attempted suicide in 2012, that he showed signs of depression (emotional flatness), and that Mr. Tavira reported taking psychiatric medication. The screening officer completed out a 929B Medical Flagging Notice Form, recommending immediate medical attention and a referral to mental health services.

During medical intake, Mr. Tavira disclosed to CHS staff that he had current mental health and emotional problems, including auditory hallucinations, that he received treatment and medication in the community, and had a previous suicide attempt. During his intake medical screening, Mr. Tavira injured another patient. He said he did so because "spirits" told him to be assaultive. CHS referred Mr. Tavira for a mental health evaluation, which he received immediately after completion of medical intake.

At an initial mental health assessment on June 16, 2021, Mr. Tavira stated that he had racing thoughts, that he felt paranoid, and heard voices telling him to hurt himself and others. Mr. Tavira also disclosed a long history of substance abuse. CHS mental health staff noted he seemed to be restless and slightly preoccupied. CHS notes reflect that Mr. Tavira had been briefly admitted to AMKC's mental health unit during a previous incarceration, for unspecified depressive disorder. CHS staff preliminarily diagnosed Mr. Tavira with Other Specified Schizophrenia. He was prescribed psychiatric medication and placed on suicide watch as a precaution given his suicidal and homicidal ideation, as well as potential decompensation.

Mr. Tavira was removed from suicide watch on June 23, 2021. CHS found him to be alert, oriented, goal-directed, and with normal mood, appropriate affect, and an organized and relevant thought process. He denied auditory and visual hallucinations, as well as suicidal and homicidal ideations. Mr. Tavira agreed to continue follow-up with his treatment plan, including medication, individual therapy, group therapy, creative art therapy, and substance use treatment. Mr. Tavira remained in mental observation housing and was provisionally diagnosed with Other Specified Schizophrenia Spectrum and Other Psychotic Disorders, pending further collateral information and observation of his behavior in the housing area.

CHS staff decided that, given Mr. Tavira's stable and coherent functioning, he would be transferred out of mental observation housing on September 1, 2021.

A psychiatrist note signed on November 3, 2021 shows that Mr. Tavira expressed a preference for stopping his medication. CHS reviewed the risks and benefits of this plan and agreed to stop medication and continue therapy, with a low threshold to transfer Mr. Tavira to mental observation housing or to resume medication, if indicated.

Mr. Tavira requested to resume medication on May 4, 2022, expressing paranoia and delusions that he did not elaborate on. CHS restarted some of Mr. Tavira's medication, but he remained in general population housing with mental health follow-ups, as CHS staff noted that he did not appear to be in acute distress or a danger to himself or others.

On August 4, 2022, Mr. Tavira was transferred back to mental observation housing, without suicide watch, after he reported poor medication efficacy, auditory hallucinations, and paranoia. He did not endorse suicidal ideation. CHS records note he was 33% compliant with medication at the time.

On August 18, 2022, Mr. Tavira told CHS staff that he was not sleeping. He denied suicidal ideation and hallucinations. He was prescribed medication for insomnia. The following day, he presented as disorganized and he endorsed suicidal ideation, although he "unequivocally denied any desire to hurt himself here on Rikers Island." CHS's mental health note reflects that Mr. Tavira did not seem overtly internally preoccupied, his appearance was good and fair, and he engaged with peers and staff.

A DOC Incident Report Form dated August 23, 2022, reflects that Mr. Tavira and another individual in custody "engaged in a physical altercation involving closed fist punches to the facial and body areas."

Based on Board staff's review of surveillance footage on August 23, an individual in custody lunged at Mr. Tavira with a blanket, unprovoked. The individual pinned Mr. Tavira to a bed and struck him repeatedly while Mr. Tavira was unable to defend himself. Other persons in custody pulled the individual away from Mr. Tavira while a correction officer stood at the end of the bed. The individual appeared to yell at Mr. Tavira. A correction officer escorted the individual out of view of camera footage. Mr. Tavira did not appear to engage in the fight at any point.

As of September 1, 2022, Mr. Tavira was 57% compliant with medication. On September 8, 2022, CHS medical records note that Mr. Tavira presented as "suspicious, had thought blocking, and had flight of ideas." He rambled and expressed paranoia. He did not endorse suicidal ideation. He expressed those same sentiments when he was next evaluated by CHS staff on September 14. At a psychiatric medication reevaluation the following day, staff continued Mr. Tavira's psychiatric medications and increased his insomnia medication dosage. He was made aware of the importance of medication compliance.

On September 5, 2022, Mr. Tavira was found guilty of assault and fighting in absentia because he refused to attend the hearing. This infraction elevated his classification level[14] to the maximum level.

Correction officers transferred Mr. Tavira from AMKC to GRVC on September 20, 2022. Body-worn camera footage shows that Mr. Tavira did not stand up when correction officers instructed him to come with them so he could be transported to his new housing unit. Officers characterized him as passively resisting and informed him that "mental health has put you on a list to be moved to another unit." According to CHS staff, CHS did not initiate this move.

Officers engaged in a back-and-forth with Mr. Tavira about whether he was supposed to be moved and the cell housing structure in GRVC. Correction officers warned him that they would spray him with a chemical agent if he continued resisting. While officers attempted to place handcuffs on Mr. Tavira, he used his body weight to pull back as he was lifted from a chair. A correction officer deployed a chemical agent and removed Mr. Tavira from the unit.

A CHS medical note signed that same day states that Department staff sprayed Mr. Tavira with a chemical agent, causing a burning sensation to his upper chest area, neck area, and eyes.

Board investigative staff reviewed DOC's Mental Health Status Notification and Observation Transfer forms and the transfer list for September 20, 2022. Mr. Tavira's name was not on either. According to Department and CHS staff, since Mr. Tavira was transferred between mental observation units for classification reasons, that transfer does not require such a form or list.  Mr. Tavira was moved from AMKC mental observation to GRVC mental observation.

According to a medical note signed on September 20, 2022, Mr. Tavira stated to medical staff that he burned his hand by pouring hot water on it to relieve stress but denied that he wanted to end his life. CHS staff discussed alternate coping mechanisms, which they noted Mr. Tavira was receptive to. He remained and was monitored in mental observation housing.

On September 22, 2022, Mr. Tavira spoke to mental health staff about feeling depressed, stressed, and angry because of the jail environment. He reported that medications helped with his visual hallucinations and paranoia. CHS noted that Mr. Tavira maintained good medication compliance, did not appear to be having any acute mood issues or present acute psychotic features, and was not a danger to himself or others. Mr. Tavira agreed to increase his psychiatric medication to address his mood symptoms.

CHS medical records signed on October 4 and October 5 note that Mr. Tavira did not express suicidal ideation. He was future-oriented and engaged in mental health services. Mr. Tavira hoped his case would be transferred to Mental Health Court. On October 12 and 13, Mr. Tavira

---

[14] Classification includes the establishment of a custody score and a custody level, and the identification of people in custody who have special housing or other needs or require special status designation. The initial and reclassification processes inform the assignment of people in custody to the most appropriate custody level and housing units, and management strategies. (DOC Directive #4100R-C on Classification)

refused to speak to CHS staff during a mental health visit, which prompted a referral to PACE housing for a higher level of care. However, Mr. Tavira was not transferred to PACE housing before his death. According to CHS staff, Mr. Tavira was not expedited for transfer to PACE given subsequent denial of suicidal ideation and lack of acute mood or psychotic symptoms, suggesting that his psychiatric symptoms were largely well-managed on the mental observation unit.

On October 19, 2022, Mr. Tavira denied suicidal ideation and hallucinations, and he did not appear to be having acute mood or psychotic issues, although he was superficially cooperative with mental health staff. CHS staff noted that his medication compliance had been at 50% for the previous two weeks. Mr. Tavira's behavior remained the same on October 20. A note signed by a mental health clinician that day additionally characterized him as evasive when exploring his emotions.

One individual in custody told Board staff that he was the last to speak to Mr. Tavira. Mr. Tavira confided in him about wanting to kill himself, though Mr. Tavira was calm and showed no signs of acting on his words. The person encouraged Mr. Tavira to have "more positive thoughts."

Based on a review of surveillance footage, starting at 9:00 pm on October 21, the "B" post correction officer assigned to Mr. Tavira's unit continually left his post on the housing area floor to enter the "A" station or leave the area entirely. The "B" post officer also did not conduct tours every 15 minutes as mandated by DOC policy in mental observation housing. The "B" post officer toured the unit at 10:58 pm on October 21 and at 12:25 am, 12:54 am, and 1:52 am on October 22. The "B" post officer last checked Mr. Tavira's cell at 12:57 am.

The Suicide Prevention Aide assigned to the unit worked from 6:00 am until 2:00 pm. No Suicide Prevention Aide was present on the unit after 2:00 pm on October 21.

At 1:55 am on October 22, 2022, the "B" post correction officer looked inside Mr. Tavira's cell for approximately 20 seconds. According to Department records, the correction officer discovered Mr. Tavira with a sheet around his neck. Surveillance footage shows that the officer ran to the "A" station, appearing to ask for assistance, then returned to the cell and opened it, proceeding to cut Mr. Tavira out of the ligature. The correction officer performed chest compressions on Mr. Tavira. A second correction officer joined the efforts to render aid.

CHS records state that the clinic received the emergency call at 1:58 am and that CHS staff arrived at the housing area at 2:03 am. Medical staff found Mr. Tavira supine on the floor, pulseless and unresponsive to verbal and tactile cues. Mr. Tavira was "already rigid and blue as per assessment." CHS staff continued additional aid, such as CPR, a LUCAS device, EpiPen, Narcan, and an ambubag with a non-rebreather attached. Urgicare staff pronounced Mr. Tavira deceased at 2:16 am.

Following his death, people in custody housed in Mr. Tavira's unit told Board investigators that he would spend most of the day in his cell and did not step out to shower or eat. They said that the medication prescribed to him made him sleepy. Mr. Tavira's family informed Board staff that

Mr. Tavira called them in the early hours of the morning because he could not sleep. According to people in custody, Mr. Tavira did not participate in art therapy, the only program available in the unit. According to CHS, CHS provides groups other than art therapy in mental observation units when adequate security is in place.

### 6. GILBERTO GARCIA

| | |
|---|---|
| Age | 26 |
| Date of death | October 31, 2022 |
| DOC admission date | November 2, 2019 |
| Cause of death | Acute fentanyl intoxication |
| Facility at time of death | AMKC, general population housing |
| Bail amount, if any | Remanded |

Gilberto Garcia tested positive for benzodiazepines via urine testing when he was first admitted to DOC custody on November 2, 2019. Mr. Garcia denied using that substance. While in custody, Mr. Garcia was found guilty, through the Department's infraction process, of possessing drugs on three instances. The latest infraction was in July 2022 for intent to sell contraband.

Board staff's review of surveillance footage shows that, between 7:00 am and 12:13 pm on October 31, 2022, the "B" post correction assigned to Mr. Garcia's cell housing unit toured every 30 minutes as required by DOC protocol in general population housing. However, the officer failed to look inside every cell to ensure the occupants were alive and breathing. Further, the "B" post officer left the "B" post and entered the "A" station at 7:02 am for 13 minutes, at 7:27 am for 3 minutes, at 8:01 am for 12 minutes, and at 12:17 am for 2 minutes. The officer did not log any of these personal breaks in the logbook. Lastly, the view into some cells was obscured by linen, including Mr. Garcia's. Other cells were not secured, meaning people were able to enter and exit cells without correction officer authorization or intervention.

At 12:17 pm, the "B" post officer entered the "A" station. At 12:18 pm, two incarcerated individuals exited Mr. Garcia's unsecured cell. One of them went to speak to the "A" and "B" post officers in the "A" station, while the other returned to Mr. Garcia's cell. At 12:20 pm, the "B" post officer approached Mr. Garcia's cell but did not enter, remaining outside while other incarcerated individuals were inside the cell. Another correction officer arrived at 12:22 pm but also did not enter the cell. After a few seconds, the second officer went to the "A" station, returning two minutes later and entering Mr. Garcia's cell, followed by the "B" post officer. A captain arrived at the unit at 12:25 pm. CHS staff arrived at 12:30 pm. Department records state that DOC uniformed staff administered Narcan.

The "A" post logbook reflects that DOC staff called a medical emergency at 12:10 pm. However, this is inaccurate given that people in custody alerted officers that there was something wrong with Mr. Garcia at 12:18 pm.

CHS medical records state that the clinic received the emergency call at 12:23 pm. According to the same, a correction officer flagged that Mr. Garcia was unresponsive to a Physician Assistant ("PA") working in the clinic. The PA responded immediately to the unit, finding Mr. Garcia lying

in bed and unresponsive while another person in custody performed CPR. The PA took over CPR while awaiting CHS's emergency team. Resuscitation efforts continued for more than 30 minutes. CHS records state that CHS staff did not administer Narcan. Urgicare staff pronounced Mr. Garcia deceased at 1:50 pm.

OCME's investigation report states that Mr. Garcia was last seen alive at 12:15 pm, when footage captured him reaching out of the door slot of his cell. OCME investigators did not locate illicit drugs or paraphernalia in his cell.

Board investigators who responded to the unit following Mr. Garcia's passing found multiple people in custody smoking an unknown substance within feet of correction officers, without intervention. Board staff reported their findings to the Assistant Deputy Warden, who stated that DOC staff would report to the unit to search the incarcerated individuals and their living areas.

OCME has not completed its investigation. The Board may amend this section based upon OCME's findings.

### 7. EDGARDO MEJIAS

| | |
|---|---|
| Age | 39 |
| Date of death | December 11, 2022 |
| DOC admission date | October 2, 2022 |
| Cause of death | Pending further OCME study |
| Facility at time of death | AMKC, general population housing |
| Bail amount, if any | $10,000 |

CHS medical records show that when first admitted to DOC custody, Edgardo Mejias reported a history of asthma, including a hospitalization within the previous year for asthma, and using asthma medication every day.

On November 21, 2022, Mr. Mejias complained of chest congestion and tightness, exercise intolerance, and coughing with brown sputum for more than two weeks. He reported using an albuterol metered-dose inhaler six to eight times, daily. CHS referred Mr. Mejias for a chest x-ray. He was transferred to West Facility's Contagious Disease Unit ("CDU") for respiratory isolation following a positive result for right lower lobe pneumonia and was given antibiotics.

Given his improved condition and lack of symptoms, CHS discharged Mr. Mejias from the CDU to AMKC on November 29, 2022, with asthma and chronic care follow-up in general population housing.

Mr. Mejia's housing unit in AMKC, West 19 Lower B, is a significant walking distance from the nearest clinic, requiring exiting the main building, walking outside, and climbing stairs to reach the clinic.

Following his discharge from the CDU, CHS records reflect that Mr. Mejias was not produced to a visit with an infectious disease specialist on November 30, was not produced to a radiology appointment on December 1, was not produced to a nursing visit on December 2, and refused a physical examination on December 4. Mr. Mejias' infectious disease specialist appointment took place on December 5. Notes from said visit show that Mr. Mejias stated that his asthma pump

ran out of medication. Mr. Mejias again missed a nursing appointment for vaccination on December 6 and December 7, according to CHS records. Mr. Mejias received a vaccination on December 8. CHS stated to Board staff that a new asthma pump was ordered and picked up by Mr. Mejias on December 5. According to CHS records, Mr. Mejias last received medication for his asthma pump on December 8, 2022 at 9:00 pm.

Per Department records, from September 11, 2022 through December 11, 2022, Mr. Mejias only missed one medical visit because he refused to attend.

Mr. Mejias was housed in a dormitory-style unit. A review of surveillance footage on December 11, 2022 shows Mr. Mejias eating, walking around the housing area, and conversing with others throughout the day.

The "B" post officer assigned to the unit failed to tour the dormitory every 30 minutes, as required by Department policy.  From 10:00 am onwards on December 11, the "B" post officer toured at 11:28 am, 12:55 pm (did not check the dayroom), 2:56 pm, and 3:49 pm. Lastly, the "B" post officer left the dormitory and entered the "A" station twice, at 12:36 pm and 2:27 pm, yet the "B" post logbook did not reflect that the officer took these breaks.

At 4:20 pm, while sitting in bed, Mr. Mejias began leaning forward occasionally but was not in visible distress. At 4:21 pm, Mr. Mejias knelt on the bed and put what appeared to be an asthma pump to his mouth. Other people in custody crowded his bed and one person rubbed his back. At 4:23 pm, two incarcerated individuals alerted the "B" post correction officer. The correction officer quickly came over, saw Mr. Mejias in distress, and alerted the "A" station. At 4:24 pm, multiple individuals carried Mr. Mejias out of the dormitory, escorted by the "B" post officer. Once outside the unit, they placed Mr. Mejias on a wagon and pushed him down a walkway.

Medical records show that the clinic received the emergency call at 4:24 pm for a patient with "seizure activity" and that, two minutes later when the medical team was about to leave the clinic, DOC informed them that Mr. Mejias was being transported to the clinic. Mr. Mejias was unresponsive, pulseless, and cyanotic on arrival at the clinic's treatment room at 4:29 pm. Clinic staff began chest compressions and CPR immediately, administering Narcan, epinephrine, and bicarbonate, and placed him on a LUCAS machine, noting that the patient was becoming blue. EMS pronounced Mr. Mejias deceased at 5:04 pm.

A "B" post logbook entry notes that the "B" post officer activated the medical emergency alarm at 4:14 pm, yet the officer was made aware of the emergency at 4:23 pm. Further, the "B" post logbook states that the officer left the unit with Mr. Mejias and other detainees at 4:15 pm, but this did not occur until 4:24 pm. Lastly, the "B" post officer wrote that she returned to the unit at 4:28 pm. Surveillance footage captured the officer and the individuals who helped escort Mr. Mejias to the clinic returning to the unit at 4:40 pm.

Following his passing, DOC searched Mr. Mejias' property and did not locate any contraband.

The manner and cause of death remain pending further study by the OCME. Per DOC records, OCME found that Mr. Mejias' lungs were hyperinflated and had mucus obstructing the bronchi of each lung, consistent with an acute asthma exacerbation.

## III.    KEY FINDINGS

### 1.    Insufficient rounding and supervision

The pervasive issue of insufficient or inadequate rounding and supervision was present in five of the seven deaths investigated in this report. "B" post correction officers must tour every 30 minutes in general population housing and every 15 minutes in mental observation housing. When a Suicide Prevention Aide is present in a mental observation unit, officers tour every 30 minutes. Correction officers must also verify each cell or each occupied bed to ensure that people are alive and breathing. This requires that each cell door be clear of items obstructing the view inside the cell, such as linen or paper.

Lastly, Department leadership informed the Board that tour wands are set up in every cell housing area. Correction officers activate a tour wand by making contact with the receiver on the walls, stationed intermittently down the tier between cells. Department leadership further stated that the tour wand policy will undergo revision. The revised policy must consider that tour wands may assist in the frequency of touring but not necessarily the quality of those tours.

The "B" post officer assigned to **Erick Tavira's** mental observation cell unit frequently left the post and failed to tour every 15 minutes. Similarly, the "B" post officer working in **Edgardo Mejias'** general population dormitory did not tour every 30 minutes on December 11.

The "B" post officer assigned to the unit housing **Gilberto Garcia** toured every 30 minutes as required in general population housing, even using the tour wand at times. However, the officer failed to check each cell to ensure the occupants were alive and breathing. Further, the view into Mr. Garcia's cell was blocked by linen and his cell was unlocked.

Recreation officers did not immediately notice when **Gregory Acevedo** began scaling the metal fence in VCBC's recreation yard given that all three officers were already inside the facility and no one stayed behind to supervise those that still remained in the yard.

A captain conducted a tour of **Kevin Bryan's** dormitory at approximately 3:00 am in the morning but did not verify the dayroom where people in custody were smoking. Finally, when an individual in custody antagonized Mr. Bryan and made him leave his assigned housing area, correction officers left Mr. Bryan unsupervised in the vestibule, where people in custody are not permitted to remain.

### 2.    Insufficient staffing

"B" post officers work inside the housing area, interact directly with people in custody, and are the first line of response in case of emergencies. It is vital that the post is staffed at all times and that officers are vigilant.

**Kevin Bryan's** dormitory did not have a "B" post officer present on September 14, which allowed people in custody to smoke in the dayroom overnight without intervention.

### 3. Lack of immediate first aid by officers

Department uniformed staff are trained to render CPR, first aid, and the use of automated external defibrillators.[15] DOC Directive #4521R-A, Suicide Prevention and Intervention, requires uniformed staff to commence emergency first aid, without delay, and to continue administering aid until medical assistance arrives in situations when an individual appears to be injured or has stopped breathing.

Uniformed staff waited four minutes before going inside **Gilberto Garcia's** cell after discovering him unresponsive. When clinic staff arrived at the unit, they found another person in custody performing CPR on Mr. Garcia, not a correction officer.

**Michael Nieves** used a razor to cut his throat after he was locked in his cell. A correction officer found him in his cell, bleeding, but did not render first aid or apply pressure to the wound for the approximately nine minutes it took medical staff to arrive. A second correction officer and a captain were also in the unit at the time, and neither intervened.

### 4. Inaccurate or incomplete logbook entries

Logbook entries must be made without undue delay and must be recorded legibly, accurately, and concisely.[16] Uniformed staff did not record complete or accurate entries in three of the investigations in this report.

In **Michael Nieves's** case, a logbook entry states that he was given a direct order to go to intake to do a body scan. The entry fails to note that Mr. Nieves did not go to the intake area or go through a body scanner because he was locked in his cell, or that staff searched his cell for a razor and could not locate it.

An "A" post logbook entry reflects that a correction officer called in a medical emergency regarding **Gilberto Garcia** at 12:10 pm, yet staff was not alerted by people in custody that Mr. Garcia needed medical assistance until 12:18 pm.

The "B" post officer assigned to **Edgardo Mejias'** unit did not record logbook entries for two instances when the officer left the floor and entered the "A" station. A "B" post logbook entry notes that the "B" post officer activated the alarm for Edgardo Mejias' medical emergency at 4:14 pm, yet the officer was made aware of the emergency at 4:23 pm.

Further, the "B" post logbook states that the officer left the unit with Mr. Mejias and other detainees at 4:15 pm, but this did not occur until 4:24 pm. Lastly, the "B" post officer wrote that

---

[15] DOC Operations Order #05/17 on Emergency Health Care Log
[16] DOC Directive #4514R-C, Housing Area Logbooks

she returned to the unit at 4:28 pm. Surveillance footage captured the officer and the individuals who helped escort Mr. Mejias to the clinic returning to the unit at 4:40 pm.

### 5. Missed medical visits and lack of escorts

The table below illustrates the number of missed medical appointments of each decedent during their time in custody. It is based on a review of records produced by DOC and CHS.

CHS and DOC records often differ in their accounting of whether an individual refused to attend their medical appointment given that clinic staff is not made aware of all instances where a person is not produced because they refused to leave their housing unit.

Of note, CHS records show that, after **Erick Tavira** was transferred from mental observation housing to general population housing in September 2021, DOC did not produce him for mental health follow-up for the following two months.

CHS records reflect that **Edgardo Mejias** missed 7 medical appointments from November 30 through December 8 due to DOC non-production, with one refusal. Meanwhile, DOC records state that, from September 11 through December 11, Mr. Mejias only missed one medical visit because he refused to attend.

**Table 1.** Missed medical appointments according to DOC and CHS records

| Name | | CHS | | DOC | |
|---|---|---|---|---|---|
| | Date range[17] | Missed visits[18] | Non-production | Missed visits | Non-production |
| **Michael Nieves** | 05/30/22-08/30/22 | 5 | 4 | 0 | 0 |
| **Kevin Bryan** | 06/14/22-09/14/22 | 0 | 0 | 0 | 0 |
| **Gregory Acevedo** | 06/20/22-09/20/22 | 3 | 0 | 3 | 3 (3 refusals) |
| **Elmore Robert Pondexter** | 06/22/22-09/22/22 | 2 | 2 (refusal) | 0 | 0 |
| **Erick Tavira** | 07/14/22-10/14/22 | 10 | 9 | 0 | 0 |
| **Gilberto Garcia** | 07/31/22-10/31/22 | 16 | 13 | 1 | 1 |
| **Edgardo Mejias** | 09/11/22-12/11/22 | 19 | 13 (1 refusal) [19] | 1 | 1 (refusal) |

---

[17] The Board received medical visit records from DOC for the three months prior to the date of death and received medical records from CHS from the date of admission to custody. The Board has only included the count of missed visits according to CHS records for the three months prior to the person's death. The Board notes that issues around attendance or access to clinical staff are crucial to understanding the level of care available to people during often prolonged periods in custody, not only the last few months of a person's life.

[18] Reasons for missed visits can include non-production by DOC, refusal by patient, patient left without being seen, court, CHS canceling and rescheduling the appointment, among others. According to the Department, CHS does not generally know why an individual failed to appear for a scheduled medical visit.

[19] The count of alleged refusals is based on CHS medical records and not DOC-generated documents, therefore it is not a full accounting of all instances in which DOC claimed a person in custody refused to attend a medical visit.

### 6. Suicide Prevention Aides

Suicide Prevention Aides are people in custody who are trained to monitor incarcerated individuals identified as suicide risks and to recognize the warning signs of suicidal behavior in incarcerated individuals who had not previously been identified. All detained and sentenced facilities must maintain an Observation Aide Program unless it is a Maximum Security Housing Area (excluded because of the unique number of uniformed personnel assigned) or is granted a variance from an Order or Directive.[20]

The Suicide Prevention Aide assigned to **Erick Tavira's** unit worked from 6:00 am until 2:00 pm on September 13, 2022. The unit did not have an active SPA after 2:00 pm. The "B" post officer discovered Mr. Tavira unresponsive in his cell at approximately 1:55 am the following day.

### 7. Contraband

**Gilberto Garcia** tested positive for fentanyl postmortem. He died of acute fentanyl intoxication. Fentanyl is a powerful synthetic opioid that is 30 to 50 times more potent than heroin. It is short-acting and cannot be seen, tasted, or smelled when mixed with other drugs.[21] The presence of illicit (non-pharmaceutical) fentanyl in New York City has dramatically increased the number of overdose deaths, and fentanyl is now the most common drug involved in overdose deaths.[22]

DOC Commissioner Louis Molina testified at the Board's January 10, 2023 public meeting that the Department distributed Narcan to court divisions and transportation division areas. Commissioner Molina further stated that he expects uniformed correctional staff to carry Narcan on their persons at some point. The Department advised that body scanning began on March 13, 2023 at the Robert N. Davoren Center ("RNDC"). According to Department staff, not everyone will be scanned and the process will be randomized. Media reporting[23] highlighted that Department of Correction staff and their vehicles will be periodically searched upon entry to Rikers Island, the first of which took place on January 18, 2023. The NYPD, assisting in the operation, arrested at least one correction officer after discovering illicit substances on him or his car.

All these steps are crucial and must be implemented speedily, effectively, and in conjunction to stem the flow of contraband into the jails.

### 8. Medical or mental health concerns

**Edgardo Mejias** was diagnosed with pneumonia and transferred to the Contagious Disease Unit in West Facility as a result. CHS discharged him to general population housing in AMKC on November 29. Mr. Mejias' housing unit in AMKC, West 19 Lower B, is a significant walking

---

[20] Directive #4017R-D on Observation Aide Program effective April 8, 2022
[21] New York City Department of Health. (n.d.) *Fentanyl*. https://www.nyc.gov/site/doh/health/health-topics/fentanyl.page
[22] *Id.*
[23] Rayman G. & Keogh E. (2023, Jan 18). *Rikers Island staff, cars to undergo drug searches by NYPD, Department of Correction.* New York Daily News. Retrieved from https://www.nydailynews.com/new-york/nyc-crime/ny-rikers-island-staff-cars-search-20230119-jjiuw4f6a5dgtaqwlno4i4lshu-story.html

distance from the nearest clinic, requiring exiting the main building, walking outside, and climbing stairs to reach the clinic. It took five minutes for people in custody and a correction officer to transport Mr. Mejias to the clinic moments before his death.

When emergency medical staff arrived at **Michael Nieves's** PACE unit, they were unaware of Mr. Nieves's state and expressed frustration at DOC uniformed staff over the lack of information conveyed when they received the medical emergency call. Clinical staff did not seem to have all the items necessary to provide aid to Mr. Nieves as a result. Further, the PACE unit was not staffed with a psychiatric nurse at the moment of events. Per CHS, policy does not require the presence of a psychiatric nurse at all times and that nursing staff cover PACE units during designated hours.

Lastly, the Nunez Federal Monitor's Second Status Report of Action Plan, dated October 28, 2022, described how the availability of mental health and medical information to the Department is limited, even when critical to support the needs of those in custody. The Monitor further noted that NYC Health + Hospitals does not share relevant information because they state it is prohibited by the Health Insurance Portability and Accountability Act ("HIPAA"). The Monitor concluded that the real and perceived barriers to cross-discipline collaboration between DOC and CHS must be identified and resolved, as has also been recommended by the Board in the last three reports of deaths in DOC custody.

### 9. Razor control

DOC Directive #4008R-A on Distribution and Control of Razors states that people in custody under special observation for suicide watch or mental health reasons shall not be denied the opportunity to shave, but shall be closely monitored by staff or a designated person in custody who has been trained in suicide prevention.

**Michael Nieves** was housed in a PACE unit, an intensive type of mental observation housing, and had a well-documented history of self-harm. Uniformed staff did not monitor Mr. Nieves closely enough to prevent him from concealing a razor either on his person or in his cell. After staff failed to locate the razor in his cell, the captain determined Mr. Nieves would be taken to intake to pass through the body scanner. Yet when Mr. Nieves delayed in following said order, the captain instructed a correction officer to lock him in his cell.

### 10. De-escalation units

The Department established Directive #5016, De-Escalation Unit, on January 19, 2022, to eliminate the use of intake areas for temporary post-incident placement. De-escalation units are to be used, for no more than six hours, to calm disruptive or violent behavior, for the safety of those who have been victimized by another individual in custody, for decontaminating an individual after exposure to a chemical agent, or as a preventative measure when tension in a housing area has created an increased threat of violence. Facility intakes shall only be used to facilitate inter-facility transfers, court processing, discharges, transfers to medical appointments outside of the facility, work cadre searches, body scans, and new admissions.

According to DOC uniformed staff, **Kevin Bryan** was taken to the intake on September 12 or September 13 for being disruptive, but he was returned to his unit that same day. The most suitable short-term placement for Mr. Bryan would have been a de-escalation unit. Similarly, instead of allowing Mr. Bryan to remain in the vestibule on September 14, he should have been either transported to a de-escalation unit (if staff intended for him to stay housed in his current unit), or to the intake area (if staff intended to transfer him to a different unit).

### 11. Facility transfers and infractions

DOC staff upgraded **Erick Tavira's** custody classification from medium to maximum after finding him guilty, in his absence due to his refusal to appear, of assault and fighting during an incident on August 23, 2022. However, Board review of surveillance footage showed that Mr. Tavira did not provoke or initiate a fight or assault, and Mr. Tavira did not fight back when another individual in custody pinned him to a bed and struck him. Given this, there was no factual basis for the infraction conviction, therefore DOC had no basis for the classification upgrade and subsequent transfer.

Uniformed staff informed Mr. Tavira that "mental health" placed him on a list to move to another unit. However, Mr. Tavira was transferred for classification reasons, not because mental health staff directed him to be moved to a different mental observation unit.

### 12. Mental health

People often enter DOC custody suffering from chronic diseases, mental health issues, addiction problems, or not having had access to quality care outside of confinement. In Fiscal Year 2022, 50% of individuals in custody had a mental health diagnosis and 16.2 had a serious mental health diagnosis.[24]

**Michael Nieves**, **Gregory Acevedo**, **Erick Tavira**, and **Robert Pondexter** had extensively documented mental health or emotional problems. Mr. Nieves, Mr. Acevedo, and Mr. Tavira also experienced issues around substance abuse.

### 13. Length of stay

An individual's length of stay in jail can be impacted by, among many other factors, the effectiveness of jail transportation and court administration, and the actions of a variety of actors within the court system, including defense and prosecuting lawyers. The COVID-19 pandemic also dramatically impacted the functioning of courts and the scheduling of court appearances, including trials. The subjects of this report were in pre-trial detention. They had not been convicted or sentenced. Four of the seven decedents were in custody for more than a year, or multiple years, at the time of their deaths.

**Michael Nieves** was in custody for nearly 41 months. He was psychiatrically hospitalized twice during that time to rehabilitate him for legal proceedings and had just received a third referral to

---

[24] Mayor's Office of Operations. (2022). *Mayor's Management Report Fiscal 2022*. Retrieved from https://www1.nyc.gov/assets/operations/downloads/pdf/mmr2022/2022_mmr.pdf

determine his capacity to stand trial when he died. **Gilberto Garcia** had been incarcerated for 36 months. **Robert Pondexter** spent almost 29 months in jail awaiting trial. Finally, **Erick Tavira** was the fourth longest stay, at a little over 16 months.

## IV.   RECOMMENDATIONS

**To CHS and DOC, jointly**

1.  The Nunez Independent Monitor noted that, while there are various investigations of each death in custody, a process for a comprehensive, holistic assessment of each incident does not exist.[25] CHS, DOC, and BOC should hold timely death review conferences to discuss the circumstances around each death, what operational or clinical problems can be identified, and how both agencies can work collaboratively to prevent further incidents. On March 8, 2023, Department staff notified the Board that CHS and DOC are now conducting comprehensive holistic assessments of each death in custody. This must include the exchange of clinical information. Death, whether in a jail, at home, or in a hospital, is a clinical event that cannot be adequately reviewed without clinical information being provided to DOC and a joint mortality review conference between DOC and CHS.[26]

2.  DOC and CHS must ensure that uniformed staff relay all relevant information to clinic medical staff when calling in a medical emergency. Both agencies should coordinate on a list of standardized questions or information to be mandatorily shared with clinic staff so they can identify what equipment and materials are necessary to appropriately respond to the emergency.

3.  There are discrepancies in the number of missed medical appointments and the reason for each missed appointment (lack of escorts, refusals, cancelations, court, etc.) reported by both agencies. DOC and CHS must improve information-sharing so both agencies' records are consistent with each other and accurate.[27]

**To CHS**

1.  Per CHS, they have systems in place to clinically prioritize and operationally expedite requests for the transfer of individuals who require elevated levels of mental health care, including PACE. Given the number of individuals with mental illness or serious mental illness within the jail population, CHS should continue to work with the Department to increase the number of beds and space available for PACE units and other mental health

---

[25] The Nunez Monitoring Team (2022, Oct. 28). *Second Status Report on DOC's Action Plan by the Nunez Independent Monitor*.

[26] A variation of this recommendation was made in *February & March 2022 Deaths in DOC Custody Report and Recommendations, Report and Recommendations on 2021 Suicides and Drug-Related Deaths in New York City Department of Correction Custody,* and *Second Report and Recommendations on 2022 Deaths in New York City Department of Correction Custody*.

[27] As recommended in *Second Report and Recommendations on 2022 Deaths in New York City Department of Correction Custody*.

housing. This would enable CHS to address the needs of more individuals who require continuous mental health monitoring and treatment.

2. CHS should consider a housing area's distance from clinical settings when determining the most appropriate placement for those patients with urgent chronic illnesses.

3. According to CHS, CHS policy and the PACE model does not call for the presence of a psychiatric nurse at all hours of the day, but it does require mental health staff to be present in the PACE unit from 6:00 am to 10:00 pm every day, so long as adequate security is present. CHS should ensure that nursing and mental health posts within PACE units are staffed as required and that, in the interim, staff is available in close proximity to the unit to immediately respond to emergencies.

4. Mr. Nieves was released to DOC custody by the New York State Mental Health Department only two weeks after Mid-Hudson Forensic Psychiatric Center obtained a court order authorizing the facility to treat Mr. Nieves over his objection. Treatment over objection for seriously mentally ill patients is not available on Rikers Island. Patients with serious mental illnesses requiring regular medication over objection should not be housed in a setting where they cannot be appropriately treated. CHS must continue to work with its health care partners on a case-by-case basis so that patients who are in need of regular parenteral medication can get their required treatment when clinically necessary.

**To DOC**

1. DOC must ensure that correction officers and captains conduct regular tours and directly supervise people in custody, in accordance with DOC's own policies. DOC must revise its current policies on the use of "tour wands" throughout all facilities. The revised policy should address how DOC will enforce protocols on visual inspection of individual cells to verify that those within are alive and breathing.[28]

2. DOC must ensure that correctional staff timely document accurate information in logbooks and other agency databases. DOC should transition out of the practice of keeping paper logbook and develop an electronic log system. The electronic system should capture information triggered at the individual cell level. Until such a system is implemented, tour commanders should articulate an action plan to regularly audit logbooks against Genetec video footage and watch tour data at unpredictable times to ensure that rounds are taking place as required and to detect incorrect entries.[29]

---

[28] A variation of this recommendation was made in *Report and Recommendations on 2021 Suicides and Drug-Related Deaths in New York City Department of Correction Custody* and *Second Report and Recommendations on 2022 Deaths in New York City Department of Correction Custody.*

[29] A variation of this recommendation was made in *February & March 2022 Deaths in DOC Custody Report and Recommendations, The Death of Layleen Xtravaganza Cubilette-Polanco 1991-2019, and Report and Recommendations on 2021 Suicides and Drug-Related Deaths in New York City Department of Correction Custody,* and *Second Report and Recommendations on 2022 Deaths in New York City Department of Correction Custody.*

3. Many individuals with serious mental illnesses are housed in PACE units. DOC must use its Video Monitoring Unit and other auditing or compliance-measuring instruments available to enforce PACE training protocols.

4. Correctional staff failed to render immediate first aid to people in custody on multiple occasions. DOC should reevaluate and strengthen its CPR and first aid training for staff. Training should focus specifically on how to aid a person hanging from a ligature and people who show signs of overdose, such as bleeding or foaming from the nose or mouth.[30]

5. DOC must adequately inform and train staff on how to proceed when a person in custody is suspected to have retained a razor or possess any type of instrument that might cause that person, or others, harm. This can include cell searches, pat frisks, the use of magnetometers or body scanners, or Separation Status, but *must* include constant direct observation of individuals, especially those with documented mental illnesses.

6. DOC does not currently employ sufficient Suicide Prevention Aides to cover all units and facilities at all hours, especially overnight. DOC must immediately deploy trained Suicide Prevention Aides to all housing units, intake areas, de-escalation units, restrictive housing units, new admission areas, and units with a higher census. DOC must ensure that there is 24/7 coverage in all these areas.[31]

7. At least one recreation officer must remain behind the last person in custody left in the recreation area, especially in VCBC's recreation yards.

8. DOC must consider structural modifications in VCBC's recreation yards and other VCBC areas enclosed by metal fences to prevent people from scaling them.

9. DOC staffing shortages result in unstaffed posts, such as "B" post officers who actively supervise units at all hours, and escorts to transport people to medical and mental health appointments. DOC must prioritize assignment, deployment, and coverage of all "B" posts, escort posts, and critical posts that require direct contact with people in custody.[32]

10. Board staff observed, in person, correctional staff's inaction when witnessing people in custody smoking following a death in custody due to acute fentanyl intoxication. DOC must immediately enforce protocols and train both civilian and uniformed staff on how to intervene in these situations.[33]

---

[30] A variation of this recommendation was made in *Report and Recommendations on 2021 Suicides and Drug-Related Deaths in New York City Department of Correction Custody* and *Second Report and Recommendations on 2022 Deaths in New York City Department of Correction Custody*.

[31] A variation of this recommendation was made in *Report and Recommendations on 2021 Suicides and Drug-Related Deaths in New York City Department of Correction Custody* and *Second Report and Recommendations on 2022 Deaths in New York City Department of Correction Custody*.

[32] As recommended in the *Second Report and Recommendations on 2022 Deaths in New York City Department of Correction Custody*.

[33] A variation of this recommendation was made in the *Second Report and Recommendations on 2022 Deaths in New York City Department of Correction Custody*.

11. Given the prevalence of linen or paper covering cell doors, DOC must inform its staff to order people in custody to immediately remove any object blocking a direct line of sight into cells.

12. DOC must fully investigate alleged infractions committed by people in custody before rendering a guilty or not guilty decision, particularly cases tried in absentia. DOC staff must review surveillance footage, statements from other individuals in custody and staff, and any other source of information available to reach an informed decision.

13. When individuals in custody are transferred to a different housing unit or facility, DOC must confirm whether the transfer is for medical/mental health or classification reasons through paperwork review and accurately inform the person in custody.

## NYC HEALTH + HOSPITALS/CORRECTIONAL HEALTH SERVICES RESPONSE TO FINDINGS AND RECOMMENDATIONS CONTAINED IN THE NYC BOARD OF CORRECTION'S "THIRD REPORT AND RECOMMENDATIONS ON 2022 DEATHS IN NEW YORK CITY DEPARTMENT OF CORRECTION CUSTODY"

New York City Health + Hospitals / Correctional Health Service (CHS) has reviewed the Board of Correction (BOC) report, "Third Report and Recommendations on 2022 Deaths in New York City Department of Correction Custody."

CHS notes its concern regarding the Board's public disclosure, throughout the Report, of protected health information. CHS believes that, even posthumously, the privacy and confidentiality of a person's information should be respected and protected in accordance with law.

CHS' review of the Board report finds:

- There are factual omissions or mischaracterizations in the Board's report of important, confidential information that was integral to the clinical decisions made by CHS staff. CHS has noted these important omissions in a separate transmittal to the Board.
- There are incorrect and/or inaccurate statements contained in the Board's report of Findings and Recommendations. CHS provides its comments to these Finding and Recommendations below, and asks that they be included with the Board's final Report.

### III. Key Findings

1. The board writes under finding 8: Medical or mental health concerns: "[T]he PACE unit was not staffed with a psychiatric nurse at the moment of events. Per CHS, policy does not require the presence of a psychiatric nurse at all times and that nursing staff cover PACE units during designated hours."

   - Correction: **The PACE unit was staffed appropriately by nursing at the time of the incident. A nurse was nearby and available to perform all assigned duties. This includes responding to a medical emergency, when informed of such an event.**

### IV. Recommendations to CHS and DOC, jointly:

1. CHS and DOC Recommendation #1: "The Nunez Independent Monitor noted that, while there are various investigations of each death in custody, a process for a comprehensive, holistic assessment of each incident does not exist.  CHS, DOC, and BOC should hold timely death review conferences to discuss the circumstances around each death, what operational or clinical problems can be identified, and how both agencies can work collaboratively to prevent further incidents. This must include the exchange of clinical information. Issues regarding confidentiality and protected health information (PHI) must be addressed and resolved between each agency's legal department. Death, whether in a jail, at home, or in a hospital, is a clinical event that cannot

be adequately reviewed without clinical information being provided to DOC and a joint mortality review conference between DOC and CHS."

Response: **As noted by CHS each time in previous BOC reports, it is BOC itself that holds the authority to convene the Board's death review with DOC and CHS.  It remains entirely up the BOC to convene the Board's death reviews as timely as it wishes, separately from any independent review each agency may conduct.**

**Also, as previously noted, separate from the Board review or any independent review by DOC or CHS, in 2016, CHS established the Joint Assessment and Review (JAR) process. As the Board is aware, CHS established this process precisely to recognize the importance of joint reviews of deaths, while respecting the independence of DOC and CHS and the confidentiality rules governing each. The JAR continues to provide a forum wherein DOC and CHS can appropriately share pertinent information regarding security and health operations and can together identify systemic risk-reduction remedies in order to minimize the recurrence of similar cases with significant adverse outcomes. CHS and DOC have recently begun to develop a more specific protocol for sharing both security and patient information relevant to a death, while maintaining the JAR frame.**

**As the Board is also aware, while federal and state confidentiality and disclosure laws prevent CHS from disclosing protected health information, CHS does share relevant patient information to support DOC's security and custody management operations, as authorized.**

2.  CHS and DOC Recommendation #2: "DOC and CHS must ensure that uniformed staff relays all relevant information to clinic medical staff when calling in a medical emergency. Both agencies should coordinate on a list of standardized questions or information to be mandatorily shared with clinic staff so they can identify what equipment and materials are necessary to appropriately respond to the emergency."

    Response: **CHS agrees that communication of relevant information is essential when calling in a medical emergency. CHS has developed a reference card, currently under review by the Department, which includes guidance on what to communicate to CHS when calling an emergency.**

3.  CHS and DOC Recommendation #3: "There are discrepancies in the number of missed medical appointments and the reason for each missed appointment (lack of escorts, refusals, cancelations, court, etc.) reported by both agencies. DOC and CHS must improve information-sharing so both agencies' records are consistent with each other and accurate."

    Response: **CHS provides DOC with the names of individuals who require production for clinical purposes. The discrepancies noted for missed medical appointments primarily reflect the different operations of the respective agencies. CHS' documentation in its electronic health record system captures the final outcome of a clinical encounter between CHS providers and their patients.**

**Recommendations to CHS**

1. CHS Recommendation #2: "CHS should consider a housing area's distance from clinical settings when determining the most appropriate placement for those patients with urgent chronic illnesses."

   Response: **Individuals with high-risk medical and mental health needs are housed on therapeutic housing units, where care is delivered on-unit. CHS does not make housing recommendations for individuals who have been deemed stable for general population.**