# EXHIBIT 61

# *COBA*, 14 OCB2d 19 (BCB 2021)

## (IP) (Docket Nos. BCB-4393-20)

***Summary of Decision***:  Petitioner alleged that the DOC violated the NYCCBL by failing to bargain over the terms of a remedial consent order and its practical impact on unit members' safety, workload, and discipline.  The City moved to dismiss the petition on the grounds that it was untimely and because the order did not materially change existing policies and its provisions are not mandatory subjects of bargaining.  Further, the City argued the record does not support finding a *per se* impact on officer safety.  The Board found that the petition was timely, that the remedial consent order is not a mandatory subject of bargaining, and that a safety impact could not be determined on the pleadings alone.  Accordingly, the Board granted the motion to dismiss as to the decisional bargaining and *per se* safety impact claims and ordered the City to file an answer regarding the remaining practical impact claims.  ***(Official decision follows)***.

---

## OFFICE OF COLLECTIVE BARGAINING
## BOARD OF COLLECTIVE BARGAINING

### In the Matter of the Improper Practice Proceeding

*-between-*

### CORRECTION OFFICERS' BENEVOLENT ASSOCIATION,

*Petitioner,*

*-and-*

### THE CITY OF NEW YORK and
### THE NEW YORK CITY DEPARTMENT OF CORRECTION,

*Respondents.*

---

### <u>INTERIM DECISION AND ORDER</u>

On September 11, 2020, the Correction Officers Benevolent Association ("COBA" or "Union") filed a verified improper practice petition against the City of New York ("City") and the New York City Department of Correction ("DOC") claiming that the City violated § 12-306(a)(4) of the New York City Collective Bargaining Law (New York City Administrative Code, Title 12,

Chapter 3) ("NYCCBL") by failing to bargain over a federal Remedial Consent Order on Non-Compliance ("RCO") and its practical impact on Correction Officer ("CO") safety, discipline, and ability to use force.[1]  The City moved to dismiss the petition as untimely since the RCO did not materially change existing policies set forth in an earlier Consent Judgment.[2]  In addition, the City argued that the RCO and its provisions are not mandatory subjects of bargaining and that the record does not support finding a *per se* impact on CO safety.  While the Board finds the petition timely, we hold that the RCO is not a mandatory subject of bargaining and that the pleadings alone do not demonstrate a practical impact on employee safety.  Accordingly, the Board grants the City's motion to dismiss as to the decisional bargaining and *per se* safety claims and orders the City to answer the remaining practical impact claims.

## BACKGROUND

This case arises from a Consent Judgment signed on October 21, 2015, in a class action lawsuit against the City and DOC, filed by the Legal Aid Society.[3]  (COBA Pet., Ex. B (hereinafter "Consent Judgement"))  Among other things, the Consent Judgment required the DOC to take

---

[1] Simultaneously, the Union filed a request for injunctive relief that was denied by the Board on October 1, 2020.

[2] In accordance with § 1-12(l) of the Rules of the Office of Collective Bargaining (Rules of the City of New York, Title 61, Chapter 1) ("OCB Rules"), the City sought permission to file a motion in lieu of an answer.  The Director granted the request to file a motion to dismiss on November 24, 2020.

[3] The lawsuit is docketed as *Nunez v. City of New York*, 11 Civ. 5845 (SDNY 2013) ("*Nunez*").  It was filed on behalf of DOC inmates and alleged unnecessary and excessive use of force in violation of the Eighth and Fourteenth Amendments to the United States Constitution and the Constitution and laws of the State of New York**.**  The U.S. Attorney intervened as a plaintiff, and ultimately the parties negotiated a Consent Judgment, signed by SDNY District Court Judge Swain on October 21, 2015.

specific actions to reduce the incidence of violence in the jails including instructions to issue a new Use of Force ("UOF") policy and disciplinary guidelines for excessive and unnecessary UOF.[4] Under the Consent Judgment, a court appointed monitor ("Monitor") is required to issue periodic reports analyzing the DOC's compliance. Between October 2015 and December 2020, the Monitor filed ten reports with the District Court in which he repeatedly found that the City and DOC were not in compliance with various sections of the Consent Judgment.

On August 14, 2020, the District Court issued the RCO, the express purpose of which was to address the Monitor's findings that the DOC was not in compliance with seven sections of the Consent Judgment.[5] (COBA Pet., Ex. A (hereinafter "RCO")) The Monitor participated in the negotiations that led to the RCO and in a sworn statement to the Court, stated:

> [T]he relief included in the proposed Remedial Order is necessary to adequately address the continued violations occurring as a result of sustained Non-Compliance with provisions of the Consent Judgment, and is narrowly tailored to properly address the implicated rights and interests, and no more intrusive than is necessary to protect incarcerated individuals' constitutional rights.

(RCO, *Declaration of Steve J. Martin*, ¶ 11)

The Union seeks to bargain over five sections of the RCO: (a) "Initiatives to Enhance Safe Custody Management, Improve Staff Supervision, and Reduce Unnecessary Use of Force," (b)

---

[4] Starting in 2015, the Union challenged numerous aspects of the Consent Judgment and DOC actions that followed in improper practice petitions. In addition, it requested injunctive relief four times between 2015 and 2017. The Board did not authorize the Union to seek injunctive relief in any of those cases. In addition, the Board dismissed the Union's claim that the City failed to bargain over the terms of the Consent Judgment and its alleged practical impact. *See COBA*, 14 OCB2d 10 (BCB 2021).

[5] Specifically, the RCO notes that the Monitor repeatedly found the DOC non-compliant with the following sections of the Consent Judgment: "Implementation of the UOF Directive," "Thorough, Timely, Objective Investigations of UOF," "Timeliness of Preliminary Reviews" and "Full ID Investigations," "Appropriate and Meaningful Staff Discipline," "Inmates Under the Age of 19, Protection from Harm," "Direct Supervision," and "Consistent Assignment of Staff." (RCO at 2)

Improved and Prompt Use of Force Investigations," (c) "Timely, Appropriate, and Meaningful Staff Accountability," (d) "18-Year-Old Incarcerated Individuals at RNDC"[6] and (e) "Other Modifications to Certain Consent Judgment Provisions." The RCO requires the DOC to implement the provisions either immediately or within 30, 60, 90, or 120 days. Consultation with and approval of the Monitor is required prior to implementation of many, if not most, of these provisions. In addition to the sections of the RCO noted above, the Union also seeks to bargain over the practical impact of these provisions including its impact on discipline, disciplinary procedures and penalties, officer stigma, safety, work hours, transfers, and officer assignments. A summary of each of the five RCO sections that the Union seeks to bargain follows.

### A. Initiatives to Enhance Safe Custody Management, Improve Staff Supervision, and Reduce Unnecessary Use of Force

Section A of the RCO contains six provisions that consist of directions to Wardens and/or the highest levels of facility leadership to develop, adopt, and implement protocols and procedures to address a variety of responses to UOF incidents. The first provision states that Facility Wardens (or Deputy Wardens) shall promptly conduct an initial review and assessment of all UOF Incidents occurring in a facility to determine whether any corrective action may be merited ("UOF Review") and directs the DOC to implement appropriate corrective action when a Warden determines it is merited. DOC leadership must conduct assessments to determine if the UOF Reviews are unbiased, reasonable, and adequate.[7] Wardens are directed to review data collected from UOF

---

[6] RNDC refers to the Robert N. Davoren Complex on Rikers Island.

[7] The RCO also provides that, "if a Facility Warden (or Deputy Warden) is found to have conducted a biased, unreasonable or inadequate Use of Force Review, they shall be subject to either appropriate instruction or counseling, or the Department shall seek to impose appropriate discipline." (RCO § A(1)(ii))

Reviews to determine whether operational changes or corrective action plans are needed to reduce excessive or unnecessary UOF and the number of UOF Incidents or injuries to staff and inmates. Wardens must meet and confer with facility leadership about planned changes and document those meetings.  (RCO § A(2))

The RCO also directs the DOC to develop, adopt, and implement a revised de-escalation protocol to be followed after UOF incidents that will address factors relevant to the inmate population in those areas.  (RCO § A(3))  The DOC will improve supervision of Captains by increasing the number of Assistant Deputy Wardens ("ADWs") currently assigned to each facility. (RCO § A(4))  The DOC is required to develop, adopt, and implement a plan for inmates with involvement in significant numbers of UOF incidents to have a health care evaluation to determine if mental health issues are being addressed and whether appropriate security measures are being used.  (RCO § A(5))  The DOC must develop, adopt, and implement a protocol governing appropriate composition and deployment of Facility Emergency Response Teams ("ERTs"), including selection and number of staff assigned, criteria for deployment, and appropriate de-escalation tactics to use.  DOC leadership must conduct and document its review of the Facility ERT responses and impose discipline on staff who violate the protocol.[8]  (RCO § A(6))

---

[8] The Consent Judgment did not contain any provisions regarding a Warden's or Deputy Warden's responsibility for the initial review and assessment of all UOF incidents, only a provision for the review of facility reports.  (Consent Judgment § VII, ¶ 13(g))  It also did not address the creation of de-escalation protocols, supervision of Captains, creation of protocols governing Facility ERTs, or directives for inmates involved in UOF incidents to have a health care evaluation.  The Consent Judgment required appropriate and meaningful discipline for unnecessary and excessive UOF and the collection and review of data on UOF incidents.  (Consent Judgment §§ VIII and XIX)  It also required the review of staff UOF incidents through an early warning system to determine where policy and training deficiencies exist and directed facility leadership to determine appropriate corrective actions for staff and other interventions and services for inmates.  (Consent Judgment § X, ¶ 1)

### B.  Improved and Prompt Use of Force Investigations

Section B of the RCO sets forth requirements and procedures for the DOC's investigations of UOF incidents, including conduct and staffing of intake investigations, prioritizing of investigations, and tracking and reporting.  The RCO requires the DOC to promptly complete investigations of any UOF Incidents that occurred more than 120 days prior to the order date.[9] (RCO § B(1))

The DOC must also develop, adopt, and implement a policy that sets forth the process for conducting Intake Investigations ("Intake Investigation Policy") and continue the Intake Investigation Unit's conduct of these investigations.  That unit is required to collaborate with Trials Division attorneys.[10]  (RCO § B(2))  The DOC must develop, adopt, and implement improvements to the Intake Investigation Unit's case assignment process, as well as reasonable caseload targets for investigators, and ensure target compliance.[11]  (RCO § B(3))  The DOC's Investigation Department "shall continue to prioritize the investigations of certain incidents involving potentially serious and egregious Uses of Force and/or misconduct by Staff with a history of

---

[9] While the Consent Judgment does not require the DOC to create procedures to address the backlog of UOF investigations, it requires the DOC to "develop a plan to effectively and efficiently complete all ID Use of Force investigations and reviews that are outstanding as of the Effective Date" of the Consent Judgment.  (Consent Judgment § VII, ¶ 10)

[10] This Unit is responsible for conducting investigations of UOF Incidents and determining whether Full ID Investigations are required ("Intake Investigation").  The Consent Judgment does not contain procedures or any provisions unique to Intake Investigations or the Intake Investigations Unit.

[11] This section also includes certain procedures that the Monitor will follow to review the conduct of and outcomes in backlogged UOF Investigations and the assignment of Full Investigation Division investigations and caseloads.  It also specifies that the Monitor will develop a methodology to use to assess compliance with caseload targets.  (RCO § B(3))

misconduct."[12]   (RCO § B(4))   The DOC must develop a process to track and report UOF investigation findings and maintain data by facility, type of investigation, and type of violation.[13] (RCO § B(5))

## C. Timely, Appropriate, and Meaningful Staff Accountability

The provisions of § C of the RCO are directives to the DOC to process and implement discipline for violations of the UOF Policy in a timely and consistent fashion.   In essence, it requires the DOC to determine if immediate corrective action is needed prior to the completion of a UOF investigation and impose such immediate corrective action promptly.[14]   It also requires the DOC to document and track all immediate corrective actions taken.[15]   Like the Consent Judgment,

---

[12] The Consent Judgment contains provisions governing the categorization of UOF incidents. (Consent Judgment § VII, ¶¶ 7, 8)   Those provisions do not appear to require the DOC to prioritize certain categories of incidents above others for investigation purposes.

[13] The RCO amends the text of § VII (Use of Force Investigations) ¶¶ 7 and 8 of the Consent Judgment to replace provisions governing preliminary reviews of UOF incidents with new detailed procedures for the Intake Investigation Unit to categorize, organize, investigate, and report on incidents.   (RCO, Ex. A)   The Consent Judgment also has a full section on UOF Reporting and Tracking (Consent Judgment § V) that is expressly revoked by the RCO.   In pertinent part, the revoked tracking provisions required the DOC to track various types of information concerning each UOF incident.   The new tracking provisions in the RCO do not specify what data is required but generally state that the DOC shall routinely collect and analyze data relating to UOF incidents and discipline imposed as well as identify trends and patterns based on frequency, location, facility, severity, and staff involved, including supervisors.   *Id.*

[14] Immediate corrective action may include "counseling or re-training, reassignment to a different position with limited or no contact with Incarcerated Individuals, placement on administrative leave with pay, or immediate suspension."   (RCO § C(1))   The Consent Judgment did not require immediate corrective actions other than to mandate that the DOC ID determine within two business days of an incident whether involved staff should be reassigned or placed on administrative leave. (Consent Judgment § VII, ¶ 7)

[15] The Consent Judgement required the DOC to regularly report to the Monitor, "a brief description of any corrective, remedial, disciplinary, or other actions recommended and/or taken against the Staff Member who committed the UOF Violation."   (Consent Judgment § XIX, ¶ 4(c)(ii)(1))

the RCO expressly notes that these requirements "are not intended to alter the rights of Staff or the burden of proof in employee disciplinary proceedings under applicable laws and regulations." (RCO § C(1), *see* Consent Judgment § VIII, ¶ 2)   This section also permits the Monitor to recommend immediate corrective actions, expeditious completion of investigations, disciplinary proceedings, or other appropriate action.[16]   (RCO § C(2))

The DOC's Trials Division must develop, adopt, and implement protocols to expedite disciplinary cases involving UOF Policy violations, including timeframes for serving discovery after the service of charges; selection and use of expert witnesses; criteria to prioritize and expedite the resolution of cases; and ways to promptly settle disciplinary cases.[17]   (RCO § C(3))   The RCO states that disciplinary cases before the City's Office of Administrative Trials and Hearings ("OATH") involving UOF violations must proceed expeditiously and that each month "Defendants shall hold pre-trial conferences before OATH for at least 50 disciplinary cases involving charges related to UOF Violations, absent extraordinary circumstances that must be documented."[18]   (RCO § C(4))   The RCO states that Disciplinary Guidelines developed pursuant to § VIII, ¶ 2 of the

---

[16] The Monitor's recommendations must be promptly implemented unless the Commissioner reviews and provides the Monitor with a reasonable basis for non-compliance.  (RCO § C(2))  The Consent Judgment did not provide that the Monitor could recommend immediate corrective action or other actions relating to discipline.

[17] The Consent Judgment provided that the Trials Division needed to prepare and serve charges within a reasonable period after receiving disciplinary recommendations and prosecute cases expeditiously.  (Consent Judgment § VIII, ¶ 3(c))  It did not require written protocols or case processing deadlines.

[18] The Union alleges that it was informed on August 26, 2020, by the DOC's Trials Division that "an additional day of OATH trials was being scheduled each week starting with September 18, 2020."  (Pet. ¶ 30)  The RCO also states that "OATH will assign additional resources to hear these cases," if there continue to be delays in case conferencing and that after an annual review the Monitor may recommend that the minimum number of case conferences be reduced.  (RCO § C(4))  Similar provisions were not in the Consent Judgment.

Consent Judgment shall apply to any OATH proceeding involving proposed discipline for violations of the DOC's Use of Force policy.  The DOC is directed to advise all OATH Administrative Law Judges in writing, quarterly, that the Consent Judgment's Disciplinary Guidelines apply to proceedings involving discipline for UOF, that the Consent Judgment and RCO set forth the City's obligations concerning staff discipline and accountability for UOF incidents and provide any Monitor findings relating to the DOC's compliance with its obligations under those portions of the Consent Judgment and RCO.[19]  (RCO § C(5))

### D.    18-Year-Old Incarcerated Individuals at RNDC

The provisions of § D of the RCO set forth new protocols for the staffing of units at RNDC that house 18-year-old Incarcerated Individuals as well as require the DOC to establish new methods for staff to respond to inmate conduct in these units.  The RCO requires the DOC to "enhance the implementation of a staff assignment system" to the extent feasible by consistently assigning the same COs, Captains, and ADWs to work at the same housing unit and on the same tour.  (RCO § D(1))  The DOC must implement a quality assurance process that evaluates compliance with these consistent staffing requirements every month and report the results to the Monitor.  This evaluation will include the percentage of tours that were staffed by the same COs,

---

[19] The Consent Judgment required the Trials Division to seek penalties consistent with the DOC's Disciplinary Guidelines.  (Consent Judgment § VII, ¶ 5)  It did not compel the DOC to provide OATH with any specific information.  Section C(5) of the RCO also states that the Monitor will regularly assess the final resolution of proceedings before OATH concerning discipline for UOF to determine whether the discipline imposed is appropriate, meaningful, and consistent with the Disciplinary Guidelines and detail his findings in Monitor Reports.  The Consent Judgment provided the Monitor with broad authority to determine whether the DOC was in compliance and to recommend actions to address non-compliance.  (Consent Judgment § XX)  It did not address the Monitor's authority to review disciplinary results.

Captains, and ADWs, at a substantial number of RNDC housing units.[20]  (RCO § D(1))  The RCO directs the DOC to develop, adopt, and implement an established, structured system of staff responses to 18-year-old Incarcerated Individuals' behavior ("Incentives & Consequences System"),[21] procedures and processes for the implementation of an Incentives & Consequences System, and to develop and implement a training program for all RNDC staff in units that house 18-year-old Incarcerated Individuals.   Instances in which inmates are provided rewards or punishments will be tracked and documented.  The DOC must develop, adopt, and implement a protocol that will include relevant data to assess implementation.[22]  (RCO § D(2))

The DOC staff will improve the "Direct Supervision Model" for Incarcerated Individuals, especially "the development of proactive and interactive supervision; appropriate relationship building; early intervention to avoid potential confrontations; de-escalating conflicts; rewarding positive behavior; and the consistent operation of the unit."  (RCO § D(3))  The RCO provides that the Direct Supervision Model will be reinforced with staff by "appropriate staff supervision, coaching, counseling, messaging strategies, or roll call training," among other things.  (RCO § D(3)(i))  The DOC must periodically assess the extent to which the Direct Supervision Model is

---

[20] Similarly, the Consent Judgment required consistent staff assignments to all Young Inmate Housing units to the extent feasible and maintenance of records that would show the consistency of those assignments.  (Consent Judgment § XV, ¶¶ 17, 18)

[21] The RCO states that, consistent with the terms of the Consent Judgment, the Monitor will consult with the *Nunez* Plaintiffs' counsel on the Incentives & Consequences System in order to provide Plaintiffs' counsel with an opportunity to provide input on the development and implementation of the system.  It also specifies that the inmate Incentives & Consequences System "will include a variety of short-term and long-term rewards and consequences" that staff can use in a timely manner "to incentivize positive behavior and sanction negative conduct" and that such system will "be consistent with all applicable laws or regulations."  (RCO § D(2)(i))

[22] The Consent Judgment also provided that the DOC was required to develop and implement policies and procedures that "incentivize positive behaviors" and "an adequate continuum of alternative disciplinary sanctions" for 18-year-old inmates.  (Consent Judgment § XVI, ¶¶ 2, 6)

implemented by qualitative and quantitative measures, including consistency in following the daily schedule. The DOC will provide staff with identified deficiencies "with appropriate instruction, counseling, or re-training. The results of these assessments shall be documented."[23]   (RCO § D(3)(ii))

### E. Modifications to Certain Consent Judgment Provisions

Section E of the RCO amends specific sections of the Consent Judgment. The Union cites to only two provisions of this section, § E(2) and E(4), which address Risk Management and Screening after a UOF incident. The amendment to § X, ¶ 2 of the Consent Judgment (Risk Management) revises the conditions under which a CO will be required to receive a Counseling Meeting. The RCO requires the DOC to make a determination as to whether to conduct a Counseling Meeting after every UOF incident, instead of after three or more UOF incidents.[24] It eliminates consideration of the staff member's UOF history but broadens the need for counseling to include whenever a CO is found to be "in need of additional guidance" regarding the DOC's UOF rules, policies, or procedures.[25]  (RCO, Appendix B)

Section E(4) of the RCO modifies § XII, ¶¶ 6-7 of the Consent Judgment (Screening) that addresses staff assignments. The RCO combines and adds provisions regarding reassignments

---

[23] The Consent Judgment required the DOC to "adopt and implement a Direct Supervision Model in all Young Inmate Housing Areas." (Consent Judgment § XV, ¶ 12)

[24] Under the Consent Judgment, a Counseling Meeting was required after a UOF incident only when the CO had been involved in a certain number or type of UOF incidents in the past two years, and it was determined by an appropriate supervisor that the at-issue UOF and CO's UOF history over the past five years warranted a Counseling Meeting. The Consent Judgment expressly provided that Counseling Meetings are separate from disciplinary proceedings; this statement is not in the RCO. (Consent Judgment § X, ¶ 2)

[25] The RCO did not change the substance or record-keeping required by the Consent Judgment for Counseling Meetings. (RCO, Appendix B; Consent Judgment § X, ¶ 2)

from Special Units or to units with limited or no-inmate contact.[26]   Under the RCO, determinations

for both Special Unit and reduced inmate contact reassignments must occur whenever a CO is

found guilty or pleads guilty to misconduct arising from a UOF incident.   The requirement for the

DOC to review staff assignments is no longer limited to instances of multiple UOF violations and

does not make a distinction between Special Unit and other assignments.   In addition, under the

RCO, the Trials Division must make a recommendation regarding reassigning a CO and/or placing

the CO into an early intervention and monitoring program ("EISS") after staff have been found or

pleaded guilty to misconduct relating to a UOF incident.[27]

---

[26] Under the Consent Judgment, a determination regarding reassignment from a Special Unit would occur when a CO was disciplined for misconduct arising from a UOF incident and it was determined that the underlying conduct "suggests that the [CO] cannot effectively and safely perform the duties associated with the assignment."   (Consent Judgment § XII, ¶ 6)   A determination regarding reassignment to a limited or no-inmate contact assignment was limited to circumstances where a CO was found guilty or pleaded guilty to two or more specified types of UOF misconduct in the past five years.   Under such circumstances, a reassignment would occur if a determination was made that the underlying conduct "suggests that the [CO] should have reduced inmate contact."   (*Id.*, at ¶ 7)   These determinations are made by the Warden.   The results of a review were documented in the CO's personnel file and sent to the Monitor.   The RCO amendment also contains this requirement.

[27] Specifically, the RCO amends the Consent Judgment to require prompt consideration and recommendation for a reassignment by the Warden or similar official, and reassignment of CO when it is determined that the CO "cannot effectively and safely perform the duties associated with the assignment and/or the Staff Member should have limited or no inmate contact."   (RCO, Ex. A, § XII(6)(a)(i), (b))   Upon such a determination, the reassignment must be made promptly, and the results documented in the CO's personnel file and sent to the Monitor.   If the Trials Division recommends placement into the EISS program, the recommendation will be determined by the DOC, including the EISS unit.   A determination must be "timely" made, and "if warranted" a CO should be promptly placed into EISS monitoring.   (*Id.*, at § XII(6)(a)(ii), (c))   The Consent Judgment required the DOC to establish an "early warning system" to identify, track and determine training deficiencies and correct inappropriate staff conduct.   (Consent Judgment § X, ¶ 1)   It appears that the EISS is part of that system.

## POSITIONS OF THE PARTIES

**City's Position**

      The City argues that the Union's claims are time-barred because the RCO is merely "a vehicle which ensures compliance" with the 2015 Consent Determination and thus the Union is seeking to collaterally attack the Consent Judgment.  (Insardi Aff. ¶ 3)  Since the RCO does not change the disciplinary grounds or standards set forth in the Consent Judgment, the City asserts that the petition is untimely.  It argues that the Consent Judgment was final and binding on the City and DOC in 2015, that the Union was aware of it at the time, and that continued violations of the kind necessitating a further court order do not resuscitate an expired statute of limitations. According to the City, most of the Union's arguments simply repeat the claims it asserted regarding the Consent Judgment in *COBA*, 14 OCB2d 10.[28]  The City asserts that any changes in the RCO are "a *de minimus* extension" of the Consent Judgment and relate to management's proper exercise of discretion in making sure that its disciplinary system is functioning and that cases are properly prioritized. (Rep. ¶ 12)

      Further, the City argues that this Board lacks jurisdiction to grant the Union's request for a cease and desist order.  It contends that the Board does not have the authority to annul court orders, impede the City's compliance with the RCO, and subject the City to contempt of court. According to the City, the Board would be usurping the power of the federal courts if it enjoined the DOC from remedying identified constitutional violations.  Since constitutional compliance is not within the Board's province, the City asserts that the Union's challenge to the RCO must be brought in federal court.

---

[28] The pleadings in this matter were completed prior to the Board's issuance of *COBA*, 14 OCB2d 10.  Following the issuance of the decision, the parties did not request to supplement their pleadings.

In addition, the City contends that the petition fails to state a claim under the NYCCBL because compliance with constitutional mandates cannot constitute an improper practice.  The City argues that inmates' constitutional rights are a prohibited subject of bargaining as a matter of public policy because the RCO leaves the DOC with no discretion for negotiation.  It asserts that compliance with constitutional rights is a prerequisite to fulfilling its mission to provide for the care and custody of inmates.  Since the RCO is narrowly tailored to remedying deficiencies, by reviewing incidents promptly and eliminating backlogs, the City asserts that these measures fall within its management rights to determine standards of service offered, direct its employees, and determine the means and methods by which government operations are conducted.

The City claims that the Union's allegations of safety impacts resulting from the RCO are speculative and conclusory since the RCO made no changes regarding COs' obligations during a UOF incident.  In addition, the City asserts that the Union's safety claims are contradicted by the Monitor, who stated that the City's actions to comply with the RCO are consistent with sound security practice and are likely to promote, not impede, the safety of COs.  The City argues that not only is there no *per se* safety impact but that the Union's factual allegations are insufficient to warrant a hearing on safety impact.  Accordingly, the City requests that the Union's petition be dismissed in its entirety.

**Union's Position**

The Union argues that its improper practice petition is timely because it challenges the RCO issued in 2020.  It asserts that the *Nunez* litigation does not render the petition untimely since it was not a party and did not participate in the settlement discussions that produced the Consent Judgment or the RCO.  Further, the Union contends that it could not have challenged the contents of the 2020 RCO in 2015.

The Union claims that decisional bargaining would not infringe on inmates' constitutional rights because the provisions of the RCO are not a "fault line between constitutional compliance and constitutional violation." (Opp. Mem. at 9) According to the Union, the City's reliance on the NYCCBL's management's rights clause is misplaced because it is not substantially equivalent to the Taylor Law. In addition, the Union asserts that the appropriate inquiry is not whether the RCO addresses "solely supervisory functions" but whether it effects terms and conditions of COs' employment, such as the circumstances that result in discipline, threats to safety, and opportunities for specialized assignments. (Opp. Mem. at 4) The Union contends that the modifications of the RCO are designed to put pressure on everyone in the UOF process, including investigators and adjudicators, to increase the number of disciplinary cases prosecuted, the penalty outcomes, and the likelihood that a UOF will be deemed improper, which will alter COs' expectations and impact whether they act to defend themselves or others in life and death situations.

Further, the Union argues that compliance with the Consent Judgment does not excuse the City's failure to bargain over the RCO. According to the Union, the settlement of a private lawsuit does not preempt bargaining even when the settlement has judicial approval. Instead of excluding anything related to UOF from bargaining, the Union asserts that bargainability of the RCO must be evaluated piece by piece. The Union claims that nothing in the RCO overcomes the strong presumption in favor of bargaining or explicitly forecloses bargaining over UOF, safety, and discipline.

The Union claims that the RCO's modifications are not *de minimus*. Since the Monitor found that existing measures were failing and noted that the provisions of the RCO were extensively negotiated and closely analyzed, the Union concludes that substantial changes were both needed and intended. Further, since the RCO does not specify the elements of the systems,

policies, and training that the DOC must develop and implement, the Union postulates that the scope of the changes will be "exceedingly broad." (Opp. Mem. at 13)  The Union asserts that the RCO's imprecision heightens the need for bargaining as soon as possible.[29]

As further evidence that the provisions of the RCO are not immaterial, the Union asserts that the role of the Monitor has fundamentally changed.  According to the Union, the RCO gives him the authority to dictate to OATH's Administrative Law Judges that prior UOF precedent is inapplicable, "publish public criticism" on individual UOF cases, require that the DOC suspend COs, and have "near dictatorial powers" over the investigation and prosecution of UOF cases. (Opp. Mem. at 14)  Thus, the Union contends that the Monitor has *de facto* supplanted his judgment for that of the employer in UOF cases.

Even if decisional bargaining is not mandatory, the Union asserts that the City must still bargain the impact, regardless of whether it acted independently or was compelled to act by the federal court.  The Union asserts that impact bargaining has "no bearing on the constitutional standards in the court's order" because it permits the Union to negotiate the "primarily economic" impact on COs.  (Opp. Mem. at 6)  On the other hand, the Union argues, failing to compel the City to bargain the impact of unilateral changes to safety and discipline would infringe on COs' collective bargaining rights.  According to the Union, failing to bargain the unilateral changes of the RCO and their impact sends a clear message to COs that union representation is meaningless, which is inherently destructive and jeopardizes the position of the Union in violation of NYCCBL § 12-306(a)(1).

---

[29] According to the Union, the Monitor "concedes" that his statement that the RCO's provisions were the least intrusive means necessary is from the perspective of inmates, not the DOC or COs. (Opp. Mem. at 14)

The Union asserts that it has alleged sufficient facts to sustain an improper practice petition because all its factual assertions must be assumed true for the purpose of deciding a motion to dismiss.  It claims that its assertion of a practical impact is sufficient at this stage because the safety impact claim raises a factual dispute that should be resolved following an evidentiary hearing.  The Union argues that the RCO's significantly altered protocols, such as the absence of the probe team in a crisis and the loss of a staging area for processing inmates after an incident, as well as the inherent unknowns in the undeveloped reward and consequences program pose a clear threat to the COs' ability to protect themselves and others.  Thus, the Union requests that the City's motion to dismiss be denied in full.

## DISCUSSION

In this interim decision, we address solely the legal issues raised in the City's motion to dismiss.

### Timeliness

Pursuant to NYCCBL § 12-306(e) and OCB Rule § 1-07(b)(4), the statute of limitations for an improper practice petition is four months.[30]  Thus, "an improper practice charge 'must be filed no later

---

[30] NYCCBL § 12-306(e) provides, in pertinent part:

> A petition alleging that a public employer or its agents or a public employee organization or its agents has engaged in or is engaging in an improper practice in violation of this section may be filed with the board of collective bargaining within four months of the occurrence of the acts alleged to constitute the improper practice or of the date the petitioner knew or should have known of said occurrence.

OCB Rule § 1-07(b)(4) provides, in pertinent part, that an improper practice petition filed pursuant to NYCCBL § 12-306 "must be filed within four months of the alleged violation."

than four months from the time the disputed action occurred or from the time the petitioner knew or should have known of said occurrence.'" *DC 37, L. 420*, 5 OCB2d 19, at 7 (BCB 2012); *see Mahinda*, 2 OCB2d 38, at 9 (BCB 2009), *affd., Matter of Mahinda v. City of New York*, Index No. 117487/09 (Sup. Ct. N.Y. Co. Oct. 5, 2010) (Scarpulla, J.), *affd.*, 91 A.D.3d 564 (1st Dept. 2012); *Raby*, 71 OCB 14, at 9 (BCB 2003), *affd., Matter of Raby v. Office of Collective Bargaining*, Index No. 109481/03 (Sup. Ct. N.Y. Co. Oct. 8, 2003) (Beeler, J.); NYCCBL § 12-306(e); OCB Rule § 1-07(b).

Here, the Union is challenging specific provisions of the RCO, none of which are identical to provisions in the Consent Judgment.[31]  The Consent Judgment and the RCO both arise from the *Nunez* litigation and are both intended to address and remedy unnecessary and excessive UOF that may violate the Eighth and Fourteenth Amendments to the United States Constitution. Nevertheless, a comparison of the Consent Judgment and the RCO provisions underlying the Union's claims clearly shows that the RCO contains directives and requirements that were not present in the Consent Judgment issued in 2015.  Thus, the petition filed on September 11, 2020, less than one month after the District Court issued the RCO on August 14, 2020, is timely.

**Bargaining Regarding the Remedial Consent Order**

The main issue presented by the City's motion to dismiss is the effect of the RCO on the parties' bargaining obligations.[32]  We find that like the Consent Judgment, the RCO is a federal

---

[31] To the extent the Union is repeating arguments regarding the Consent Judgment, those claims were addressed in *COBA*, 14 OCB2d 10, and are untimely raised here*. See UMD, L. 333, ILA*, 4 OCB2d 37, at 14 (BCB 2011) ("*[r]es judicata* is applicable when a cause of action that could have been presented in a prior proceeding involves the same parties, is based upon the same harm, arises out of the same or related facts").

[32] NYCCBL § 12-306(a) provides in pertinent part:

It shall be an improper practice for a public employer or its agents:

                    *        *        *

court order, imposes a legal obligation on the City to abide by its mandates and that the City is not

obligated to engage in bargaining over its requirements.  *See COBA*, 14 OCB2d 10, at 48.

We recently addressed whether the City had a duty to bargain over the terms of the Consent

Judgment in *COBA*, 14 OCB2d 10, and found that the City was not obligated to engage in

bargaining over those terms.[33]  In reaching this conclusion, the Board relied upon *Floyd v. City of*

*New York*, 302 F.R.D. 69 at 115 (S.D.N.Y. 2014), *aff'd in part, appeal dismissed in part,* 770 F.3d

1051 (2d Cir. 2014) (police unions' motion to intervene to appeal the court's remedial order

concerning the NYPD's stop and frisk policies denied because "the Court's power to remedy

constitutional violations cannot be constrained by PERB or BCB decisions or the Unions' state

law rights"), and *Sheppard v. Phoenix*, 1998 WL 397846, at *8-*9 (S.D.N.Y. July 16, 1998)

(finding that UOF provisions in a stipulation remedying inmates' constitutional rights were

prohibited subjects of bargaining and denying correction unions' motion to intervene).  In addition,

we relied on other cases where we found that a statute or regulation limited the duty to bargain.

*See, e.g., Local 333, United Marine Division, ILA,* 3 OCB2d 11, at 11-12 (BCB 2010) (no duty to

bargain over federal drug and alcohol testing regulations); *Doctors Council*, 69 OCB 31, at 11-12

(BCB 2002) (no obligation to bargain over statutory disciplinary penalties); *see also Matter of City*

*of Watertown v. State of N.Y. Pub. Empl. Relations Bd.*, 95 N.Y.2d 73, 78-79 (2000) ("The

presumption in favor of bargaining may be overcome only in 'special circumstances' . . .  where a

specific statutory directive leaves 'no room for negotiation.'"); *LEEBA*, 3 OCB2d 29, at 25 (BCB

---

(4) to refuse to bargain collectively in good faith on matters within
the scope of collective bargaining with certified or designated
representatives of its public employees.

[33] We note that this decision was not appealed to the State court.

2010) (bargaining prohibited where issue is covered by statute and (a) would contravene law or (b) be pre-empted by statute).

For the same reasons noted in our decision regarding the Consent Judgment issued earlier this year, we find that the City is not obligated to bargain over the terms of the RCO. Like the Consent Judgment, the RCO is a federal court order issued to remedy violations of the United States and New York State constitutions, which obligates the City and the DOC to take specific actions and adopt specific requirements regarding the UOF.[34]  Further, the RCO does not extinguish the Consent Judgment, but adds to and modifies it.[35]  In approving the RCO, the Court expressly found that:

> this Order complies in all respects with the provisions of 18 U.S.C. § 3626(a).  The Parties further stipulate and agree, *and the Court finds*, that the prospective relief in this Order is narrowly drawn, extends no further than is necessary to correct the violations of federal rights as alleged by the United States and the Plaintiff Class, is the least intrusive means necessary to correct these violations, and will not have an adverse impact on public safety or the operation of a criminal justice system.  Accordingly, the Parties agree and represent that the Order complies with the provisions of 18 U.S.C. § 3626(a).

(RCO § F(4) (emphasis added).[36]

---

[34] As stated in *COBA*, 14 OCB2d 10, at 46, "the failure of the parties in *Nunez* to seek COBA's joinder to the litigation" does not compel a finding that the Consent Judgment did not affect COBA's bargaining rights.  Therefore, the failure to join COBA in *Nunez* does not nullify the effect of the RCO on the Union's bargaining rights.

[35] RCO § F(2) provides that, "[a]ll terms of the Consent Judgment shall continue to be in force except those terms previously modified by the Court and those provisions modified pursuant to Exhibit A of this Order."

[36] The U.S. Code requires a court to only grant or approve judicial relief regarding prison conditions that "is narrowly drawn, extends no further than necessary to correct the violation of the [f]ederal right, and is the least intrusive means [to do so]."  18 U.S.C. § 3626(a)(1)(A).  It also provides that judicial relief may not "require a government official to exceed their authority unless

As a result, we find no basis upon which to distinguish the legal effect of the RCO from the Consent Judgment it modifies.  We find that the RCO has the force of law and is legally binding on the City and therefore, the City is not obligated to bargain over the requirements set forth in the RCO.[37]

Our holding in *COBA*, 14 OCB2d 10, at 43-44, noted that while statutes, court orders and regulations may limit bargaining obligations, where a law and regulation permits a public employer to exercise discretion in implementing the mandate, bargaining may be required.  *See Local 333, United Marine Division, ILA,* 3 OCB2d 11, at 11-12 (BCB 2010) (no duty to bargain over federal drug and alcohol testing regulations; duty to bargain limited to agency discretion in implementation of matters such as compliance procedures); *Doctors Council*, 69 OCB 31, at 11-12 (BCB 2002) (no obligation to bargain over statutory disciplinary penalties but implementation procedures may be negotiated); *see Matter of City of Watertown v. State of N.Y. Pub. Empl. Relations Bd.*, 95 N.Y.2d 73, 78-79 (2000) ("The presumption in favor of bargaining may be overcome only in 'special circumstances'. . . where a specific statutory directive leaves 'no room for negotiation.'").  In such circumstances, the Board must consider whether the legal mandate

---

a violation of state or local law is required under federal law, the relief is necessary and no other relief will correct the violation of a federal right."  *COBA*, 14 OCB2d 10, at 47; *see* 18 U.S.C. § 3626(a)(1)(B).

[37] The Union characterizes certain RCO mandates as discipline, disciplinary procedures and/or penalties.  We do not find that any RCO provision concerns disciplinary procedures or penalties. *See COBA*, 14 OCB2d 10, at 54-55 (finding provisions of the Consent Judgment were not procedures or disciplinary rules that required bargaining).  Unlike the RCO, the Consent Judgment required the DOC to implement Disciplinary Guidelines, and this Board addressed whether those guidelines were mandatory subjects of bargaining in *COBA*, 12 OCB2d 3 (BCB 2019).  The RCO does not modify the DOC's Disciplinary Guidelines.

leaves any discretion to the employer and whether exercise of that discretion concerns employee terms and conditions of employment.

Here, the RCO contains directives for the DOC to take or implement certain actions.  The express dictates do not leave room for the DOC to exercise discretion in implementation and therefore do not require bargaining.[38]  While some of the remaining RCO provisions that the Union seeks to bargain leave the manner of implementation within the DOC's discretion, in certain instances we find that these provisions fall within management's right to direct its employees and determine the methods by which its operations are conducted.

NYCCBL § 12-307(a) provides that parties "shall have the duty to bargain in good faith on wages (including but not limited to wage rates, pensions, health and welfare benefits, uniform allowances and shift premiums), hours (including but not limited to overtime and time and leave benefits), [and] working conditions."  Mandatory subjects of bargaining generally include "any subject with a significant or material relationship to a condition of employment."  *LEEBA*, 3 OCB2d 29, at 5; *see also EMS SOA*, 75 OCB 15, at 5 (BCB 2005); *DC 37, L. 2507 & 3621*, 73 OCB 7, at 15 (BCB 2004).  However, the statute also leaves to management the right to "direct its employees," and "determine the methods, means and personnel" by which its operations are

---

[38] RCO provisions that the DOC must expressly implement include: instructions to conduct timely UOF reviews, implement and track immediate corrective actions; descriptions of facility leadership responsibilities in UOF reviews; directive to increase supervision of Captains (RCO §§ A(1), (2) & (4) & C(1)) and to promptly address UOF investigation backlog (RCO § B(1)); description of Intake Investigations Unit responsibilities (RCO § B(2)), Monitor responsibilities in reviewing ID investigations (RCO § B(3)) and Monitor, Commissioner, or designee's roles in issuing immediate corrective action and/or discipline (RCO § C(2)); requirements to insure expeditious OATH proceedings (RCO § C(4)); application of DOC Disciplinary Guidelines to OATH proceedings and the Monitor's responsibility to review disciplinary penalties in cases processed through OATH (RCO § C(5)); reinforce and assess the Direct Supervision Model with all staff including supervisors at RNDC (RCO § D(3)) and require Counseling Meetings with staff (RCO § E(2)).

conducted.  NYCCBL § 12-307(b); *UFA*, 3 OCB2d 16, at 27 (BCB 2010) (citing *DC 37, L. 1506*, 79 OCB 21, at 23 (BCB 2007)).

Specifically, the RCO instruction for the DOC to develop a plan to provide health care evaluations and management assessments for inmates involved in UOF incidents and to develop a system of incentives and punishments for persons housed in RNDC are matters that concern DOC's core function, namely the custody and care of incarcerated individuals.  (RCO §§ A(5) and D(2))  Similarly, the directive to develop and maintain data governing UOF incidents and investigations does not involve COs' terms and conditions of employment.  (RCO § B(5))  Therefore, the DOC does not have a duty to bargain those provisions.[39]  *COBA*, 14 OCB2d 10 at 54 (BCB 2021); *COBA*, 69 OCB 26, at 11; *Poughkeepsie City School Dist.*, 19 PERB ¶ 3046 (1986).  We also find that the RCO provisions requiring the creation of an Intake Investigation Policy for the Intake Investigations Unit and implementation of ID caseload targets are not mandatory subjects of bargaining.  (RCO § B(2))  The Intake Investigation policy will provide instructions to staff on how to conduct intake investigations.  These instructions along with establishing ID caseload targets are within the purview of management's right to determine how work is performed.  *See UFA*, 13 OCB2d 9, at 30-31 (BCB 2020) (specified tasks in active shooter incidents such as identifying a staging location, use of discretion in communications, and coordinating with NYPD personnel are not mandatory subjects of bargaining); *COBA*, 10 OCB2d 21, at 13 (BCB 2017) (new instruction requiring COs to "ensure the physician responsible for the inmate's medical care completes the revised restraint form as soon as practicable" is not a

---

[39] In addition, there are some RCO provisions, like RCO § B(4), that merely repeat and do not substantively modify the Consent Judgment and therefore do not establish a change that gives rise to a bargaining obligation.  *See COBA*, 14 OCB2d 10 at 49-50 (finding no substantive change to UOF policy); *DC 37, L.436*, 4 OCB2d 31, at 13 (BCB 2011); *PBA*, 73 OCB 12, at 17 (BCB 2004).

mandatory subject of bargaining); *UFA,* 3 OCB2d 16, at 27-28 (BCB 2010) (instructions to wear specific suits, be equipped with proper respiratory protection, and perform decontaminations on gear and rigs were not mandatory subjects of bargaining).

Further, this Board has consistently found that job assignments are not a mandatory subject of bargaining.  *See DC 37, L. 3621*, 11 OCB2d 5, at 22 (BCB 2018); *LEEBA*, 3 OCB2d 29 at 24-25 (BCB 2010); *UFA*, 3 OCB2d 16, at 27 (BCB 2010) (citing *DC 37, L. 1506*, 79 OCB 21, at 23 (BCB 2007)); *DC 37, L. 376*, 79 OCB 20, at 13 (BCB 2007).  Several RCO provisions directly relate to staff assignments and are therefore not mandatory subjects of bargaining.[40]  Specifically, the instruction to improve the ID case assignment process, improve consistent staff assignments to RNDC and review and re-assign staff who violate the UOF policy do not require bargaining.[41] (RCO §§ B(3), D(1) & E(4))

Finally, some RCO provisions that give the DOC discretion in implementation are directions to formulate instructions or procedures for staff.  RCO provisions that meet these criteria

---

[40] We note that neither party pointed to any contract language limiting management's right to assign staff.

[41] We note that our conclusions are consistent with the Public Employment Relations Board's ("PERB's") findings on these subjects.  *See County of Nassau*, 41 PERB ¶ 4552 (ALJ 2008) (decision to utilize GPS technology in vehicles was a non-mandatory subject of bargaining); *State University of New York (Stony Brook)*, 33 PERB ¶ 3045 (2000) (transfer of teaching assistants to tutoring from classroom assignments found to be "a management prerogative and is nonmandatory"); *City School District of the City of New Rochelle*, 4 PERB ¶ 3060 (1971) (explaining that "the public employer . . . must determine the manner and means by which [constituent services] are to be rendered and the extent thereof . . . [and] decisions of a public employer with respect to carrying out its mission . . . are matters that a public employer should not be compelled to negotiate with its employees.").  We further note that, by statute, only PERB has standing to seek a ruling on the question of the NYCCBL's substantial equivalence to the Taylor Law.  Taylor Law § 212(2); *see Mayor of the City of New York v. Council of the City of New York*, 9 N.Y.3d 23, 28-29 (2007).

include the directives to: revise the de-escalation procedure (RCO § A(3)), create ERT protocols (RCO §A(6)), and issue new Trials Division protocols (RCO § C(3)).  Like other RCO sections noted above, these directives are for the DOC to determine how certain tasks are to be performed, a responsibility that falls outside the scope of bargaining.  *See UFA*, 13 OCB2d 9, at 30-31 (BCB 2020); *COBA*, 10 OCB2d 21, at 13 (BCB 2017).  However, at this time there is also no evidence before us concerning the DOC's implementation of these directives.  Therefore, our conclusions here are limited to the subjects identified in the RCO and not the actual protocols and/or procedures implemented.[42]  In the absence of such facts, we do not reach the issue of whether the DOC's implementation of these RCO provisions raise areas of impact bargaining.  The parties may address these issues in the remainder of the processing of this petition.

### *Per Se* Safety Impact

As noted earlier, the Union also seeks to bargain over the practical impact of the RCO on discipline, disciplinary procedures and penalties, officer stigma, safety, work hours, transfers, and officer assignments.  Here, we only address the City's motion to dismiss the Union's *per se* safety impact claim.

To establish a practical impact on safety, a union "must demonstrate that the exercise of a management right has created a clear and present or future threat to employee safety."  *UFOA*, 3 OCB2d 50, at 17 (BCB 2010).  The Board will find a *per se* safety impact only where it can be concluded that a practical impact exists "based on the pleadings alone."  *UFA, L. 94*, 13 OCB2d 9, at 32 (quoting *UFA*, 4 OCB2d 30, at 29 (BCB 2011)).  "In a *per se* practical impact case, [] there is no question that the action proposed by the employer will result in a practical impact on

---

[42] It should be noted that the RCO requires these protocols and procedures to contain certain express provisions that would not be subject to bargaining based on our holding here.

the affected employees." *UFA*, 47 OCB 25A, at 28 (BCB 1991).  For example, in *UFA, L. 94*, this Board found a *per se* safety impact in assigning firefighters to operate in "Warm Zones" of active shooter incidents prior to receiving training.  13 OCB2d 9, at 38.  The Board relied on the express language of the active shooter protocol and training materials regarding "the uncontroverted risks to employees' safety when working in a Warm Zone" and the documentary evidence that training had not been completed.  *Id.* at 33.  Thus, there was "no factual dispute that warrant[ed] a hearing" in order for the Board to determine that there was a safety impact.  *Id*. at 38.

In *COBA*, 14 OCB2d 10, unlike in *UFA, L. 94*, a practical impact could not be found based on the pleadings alone, and an evidentiary hearing on practical impact was held.  After the hearing, this Board found that in implementing the Consent Judgment the DOC's introduction of new tactics and techniques to control and contain inmates did not have a practical impact on CO safety.  *See COBA*, 14 OCB2d 10, at 59-67.  The Board acknowledged COBA's assertions that "the potential for injury is significant and pervasive should an officer not take effective steps to control an uncooperative inmate" and that "hesitancy to take action may have an effect on the outcome of a conflict situation."  *Id*. at 61, 64.  Nevertheless, the Board found insufficient evidence that prohibitions on previously permissible techniques, requiring the initial use of non-violent de-escalation tactics, "insufficient or confusing instructions," and new duties or instructions regarding intervening in excessive UOF incidents or summoning a mental health professional demonstrated a practical impact on safety.  *Id*. at 63-64.

Here, we do not find that the petition sets forth evidence of a *per se* practical impact on employee safety.  The RCO addresses the Monitor's findings that the DOC was not in compliance with the Consent Judgment.  On its face, the RCO, like the Consent Judgment, does not contain express language regarding "uncontroverted risks" to CO safety.  *See UFA, L. 94*, 13 OCB2d 9, at 33.  Further, many RCO provisions address duties that are not performed by COs, such as the

review and investigation of UOF incidents and the processing of discipline related thereto. However, the RCO also requires the DOC to develop and implement protocols governing ERTs, staffing at RNDC units that house 18-year-old Incarcerated Individuals, an Incentives & Consequences System, training for all RNDC staff in units that house 18-year-old Incarcerated Individuals, and assessments of compliance with staffing requirements and implementation of the Incentives & Consequences System.  In addition, the RCO mandates that the DOC improve the Direct Supervision Model, reinforce the Model with staff, assess and document its implementation, and provide additional instruction and training when necessary.  As in *COBA*, 14 OCB2d 10, to the extent these changes present a practical impact on CO safety is a disputed question of fact.[43] *See UFA*, 47 OCB 25A, at 28-29.

    Accordingly, we grant the City's motion to dismiss as to the *per se* safety impact claim. We order the City to answer the remaining practical impact claims, including safety impact, in the petition within ten business days of service of this Decision and Order.

---

[43] Our findings here do not reach the issue of whether the Union's practical impact claims are sufficiently plead and warrant a hearing.

**ORDER**

Pursuant to the powers vested in the Board of Collective Bargaining by the New York City

Collective Bargaining Law, it is hereby

ORDERED that the City's motion to dismiss the petition docketed as BCB-4393-20 is

granted as to the decisional bargaining and *per se* safety impact claims; and it is further

ORDERED that the City answer the remaining practical impact claims within ten business

days of service of this Decision and Order.

Dated: August 3, 2021
      New York, New York

SUSAN J. PANEPENTO
CHAIR

ALAN R. VIANI
MEMBER

M. DAVID ZURNDORFER
MEMBER

CAROLE O'BLENES
MEMBER

PETER PEPPER
MEMBER