# EXHIBIT 62

### *COBA*, 14 OCB2d 10 (BCB 2021)
(IP) (Docket Nos. BCB-4137-15; BCB-4141-15; BCB-4209-17; BCB-4216-17)

***Summary of Decision***:  Petitioners alleged that the DOC violated the NYCCBL by unilaterally implementing the terms of a consent judgment and a use of force directive and failing to negotiate over the practical impact on unit members' safety, workload, and discipline.  In addition, COBA alleged that the DOC engaged in direct dealing and failed to provide requested information.  The City argued the directive did not materially change existing policies, that any changes are nonmandatory because they are either managerial prerogatives or required by the consent judgment, and that the record does not support finding a practical impact on uniformed staff.  Further, the City denied that it engaged in direct dealing or failed to provide information.  After a hearing, the Board found that the Consent Judgment and directive are not mandatory subjects of bargaining, a practical impact on terms and conditions of employment was not demonstrated, and the City did not engage in direct dealing or fail to provide information.  Accordingly, the petition was dismissed.  ***(Official decision follows)***.

_____

**OFFICE OF COLLECTIVE BARGAINING**
**BOARD OF COLLECTIVE BARGAINING**

**In the Matter of the Improper Practice Proceeding**

*-between-*

**CORRECTION OFFICERS' BENEVOLENT ASSOCIATION,**
**CORRECTION CAPTAINS' ASSOCIATION, and**
**ASSISTANT DEPUTY WARDENS/DEPUTY WARDENS ASSOCIATION,**

*Petitioners,*

*-and-*

**THE CITY OF NEW YORK and**
**THE NEW YORK CITY DEPARTMENT OF CORRECTION,**

*Respondents.*

_____

### <u>DECISION AND ORDER</u>

On November 9, 2015, the Correction Officers' Benevolent Association ("COBA") filed

an improper practice petition, docketed as BCB-4137-15, against the New York City Department

of Correction ("DOC" or "Department") and the City of New York ("City") alleging that the DOC violated § 12-306(a)(l) and (4) of the New York City Collective Bargaining Law (New York City Administrative Code, Title 12, Chapter 3) ("NYCCBL") when it unilaterally issued a pilot use of force ("UOF") directive at one DOC facility.   On December 15, 2015, COBA filed a second petition, docketed as BCB-4141-15, alleging that the DOC violated NYCCBL §§ 12-306(a)(l), (4), and (5) and 12-306(c)(4) by unilaterally implementing the terms of a consent judgment, promulgating a Department-wide UOF directive, Directive 5006R-D ("Directive"), failing to adequately train its members, failing to bargain over the safety, workload, and disciplinary impacts, engaging in direct dealing, and failing to respond to an information request.[1]

On September 15, 2017, COBA's petitions were consolidated with scope of bargaining and improper practice petitions, docketed as BCB-4209-17 and BCB-4216-17, filed by the Assistant Deputy Wardens/Deputy Wardens Association ("ADW/DWA") and Correction Captains' Association ("CCA") on March 10, 2017, and April 11, 2017, respectively.   The ADW/DWA and CCA petitions assert that the Directive involves mandatory subjects of bargaining, was unilaterally implemented in violation of NYCCBL § 12-306(a)(4), and creates a practical impact upon the safety and workload of ADW/DWA and CCA unit members.   They also allege that the Directive violates NYCCBL § 12-306(a)(1) independently.

The City argues that it made no unilateral changes requiring bargaining because the Directive clarifies, rather than materially changes, existing policies.   In the alternative, it argues

---

[1] Simultaneous with the filing of both improper practice petitions, COBA sought permission to apply to the State Supreme Court to obtain an injunction preventing the DOC from enforcing disputed provisions of the two directives.   The Board denied COBA's requests.

that any changes are managerial prerogatives or are required by a federal consent judgment.  The

City further argues that to the extent the Directive contains new provisions that are not mandatory

subjects of bargaining, a practical impact on the terms and conditions of employment of uniformed

staff regarding safety, workload, or discipline has not been demonstrated.  The City also argues

that petitioners have failed to plead facts to support an independent violation of NYCCBL § 12-

306(a)(1).  Further, the City denies that it engaged in direct dealing with COBA's members or

failed to provide information.

The Board finds that the Consent Judgment and the Directive are not mandatory subjects

of bargaining, a practical impact on terms and conditions of employment was not demonstrated,

and the City did not engage in direct dealing or fail to respond to an information request.

Accordingly, the petition is dismissed.


**BACKGROUND**

The Trial Examiner held 12 days of hearings and found that the totality of the record,

including the pleadings, exhibits, and briefs, established the relevant facts set forth below.[2]

The DOC is responsible for the operation and management of ten jail facilities, two hospital

prison wards, and court holding facilities.  COBA is the certified bargaining representative for

DOC employees in the Correction Officer ("CO") title.  The CCA is the certified bargaining

---

[2]  By mutual agreement of counsel, the hearing in this matter did not commence until November
3, 2016.  No hearing dates were held between January 31, 2017, and February 9, 2018, during
which time additional petitions were filed and consolidated and responsive pleadings were
submitted.  The record was closed on September 25, 2019, and the parties submitted post-hearing
briefs on October 30, 2020.

representative for DOC employees in the Correction Captain ("Captain") title.  The ADW/DWA is the certified bargaining representative for DOC employees in the ranks of Assistant Deputy Warden (Warden Level I) ("ADW"), Deputy Warden (Warden Level II), and Deputy Warden-in-Command (Warden Level III).

This matter arises out of a class action lawsuit filed against the City and the DOC in the United States District Court for the Southern District of New York by the Legal Aid Society on May 24, 2012.[3]  The federal complaint alleged a pattern and practice of the use of unnecessary and excessive force against DOC inmates in violation of their rights under the Eighth and Fourteenth Amendments of the United States Constitution and the laws and constitution of the State of New York.  On October 21, 2015, District Court Judge Swain signed a 63-page consent judgment ("Consent Judgment") negotiated by the parties to "protect the constitutional rights of the inmates confined in jails operated by the Department."  (COBA Pet., Ex. A (hereinafter "Consent Judgment", p. 1))[4]  COBA, the CCA, and the ADW/DWA (collectively "Unions") were neither parties to the lawsuit nor involved in the negotiations resulting in the Consent Judgment.

The Consent Judgment directs the DOC to "develop, adopt, and implement a new comprehensive use of force policy with particular emphasis on permissible and impermissible uses of force."  (Consent Judgment, p. 5)  It further provides that the new directive shall be written and

---

[3] On or about December 23, 2014, the Court granted a motion by the United States Attorney's Office for the Southern District of New York to intervene as a plaintiff.  The lawsuit is docketed as *Nunez v. City of New York*, et al., 11 Civ. 5845 (SDNY).

[4] Unless otherwise indicated, all references to the "COBA Pet." are to the improper practice petition in BCB-4141-15.

organized in a manner that is "clear and capable of being readily understood by Staff." (*Id.*)

The Consent Judgment's UOF Policy section sets forth a detailed description of what must be included in the new DOC policy. In particular, it provides that it must include:

> A statement at the beginning of the New Use of Force Directive that sets forth the following general principles: "(i) the force used shall always be the minimum amount necessary, and must be proportional to the resistance or threat encountered; (ii) the use of excessive and unnecessary force is expressly prohibited; (iii) the Department has a zero tolerance policy for excessive and unnecessary force; (iv) the best and safest way to manage potential Use of Force situations is to prevent or resolve them without physical force."

(Consent Judgment, p. 5) Among the requirements imposed by the Consent Judgment is a mandate that the DOC revise the training program available to current staff and new recruits.

The Consent Judgment also established a federal monitor ("Monitor") to ensure compliance and directed the DOC to develop a new directive in consultation with the Monitor. (*See* Consent Judgment §§ IV(1) and XX)  The Monitor is subject to the Court's supervision. The Monitoring Team, authorized by the Consent Judgment, includes three subject matter experts: an expert on conditions of confinement for juveniles, a veteran correction professional, and a veteran correction administrator, among others. (*See* Jt. Ex. 4, *First Report of the Nunez Independent Monitor (filed May 31, 2016)* at p. 4) The Monitor is required by the Consent Judgment to issue periodic reports. Since 2016, bi-annual reports have been filed with the Court that set forth data relating to UOF, analysis of the data, a review of the DOC's compliance with the Consent Judgment, explanations of non-compliance, and proposals to be implemented to achieve future compliance. In addition to the Directive, Monitor approval is required before implementation of many of the Consent Judgment's requirements including training programs.

**Pilot Program**

Before establishing new Investigation Division ("ID") procedures across all its facilities and in anticipation of approval of the Consent Judgment, the DOC developed Directive 7003, applicable only to one facility, the Anna M. Kross Center ("AMKC"), entitled "Investigation Division: Facility Use of Force Investigations-AMKC Only." Its stated purpose is to "set forth the responsibilities of the facility Tour Commanders with regards to reporting and investigating UOF incidents involving inmates in their facilities." (Jt. Ex. 3) Directive 7003 was a pilot program that took effect on October 12, 2015, nine days before Judge Swain signed the Consent Judgment, and terminated on January 12, 2018.

**Rollout of the Directive**

In August 2015, as directed by the Consent Judgment and in consultation with the Monitor, the DOC began revising its policies concerning UOF. (*See* Jt. Ex. 4, p. 25) The Monitor concluded that the best and most efficient implementation strategy involved providing staff with the opportunity to master the policy requirements, to change practice and enhance skills necessary to comply with the policies before the Directive and disciplinary guidelines took effect. (*Id.* at 24-25) The record establishes that at least some bargaining unit members helped develop the Directive. (Tr. 471) For example, CO Mark Mack testified that, as part of the team in the Emergency Services Unit ("ESU"), he reviewed and made comments on certain parts of the Directive.[5]

---

[5] Mack has worked at the DOC for 29 years and is currently in the ESU, the unit that responds to emergencies. He is also an ESU delegate for COBA.

The completed Directive had an effective date of November 20, 2015.[6]  The Directive supersedes the DOC's prior UOF directive, Directive 5006R-C, which was effective January 1, 2008 ("prior directive" or "prior policy").

In September 2015, COBA officials began writing letters to the DOC to express their concerns regarding the Consent Judgment and draft Directive and to request meetings.  (Tr. 36-37)  Thus, in a letter dated September 23, 2015, COBA's First Vice President, Elias Husamudeen, wrote to DOC Chief of Department Murphy seeking to discuss what, if any, changes would be made to the Defensive Tactics training provided to COs.[7]  On September 25, 2015, Husamudeen wrote to DOC Commissioner of Operations Errol Toulon Jr. that, absent significant changes to the DOC training program, COs would not be prepared to implement the Directive.  Husamudeen concluded that letter with a request for a labor-management meeting to discuss COBA's concerns. On September 28, 2015, Marc Steier, COBA's Director of Legal Affairs, submitted a letter to DOC General Counsel Heidi Grossman raising similar issues.

On October 22, 2015, Husamudeen submitted a letter to Murphy regarding Directive 7003 expressing COBA's concern that its unit members at AMKC "will be held to a new standard by the Investigation Division without the benefit of adequate or appropriate training in the proper use

---

[6] Eventually, the effective date of the Directive was changed to February 17, 2016, and again to September 27, 2017.  Unless otherwise specified, all references to the Directive refer to the version that became effective on September 27, 2017.

[7] We take administrative notice that Husamudeen succeeded Norman Seabrook as COBA's interim President in or about June 2016.  Husamudeen served in that position until Benny Boscio was elected President in or about July 2020.

of force." (COBA Pet., Ex. J) Additionally, the letter charged that the DOC unilaterally adopted

Directive 7003 and requested that the DOC engage in bargaining over any necessary changes.

In anticipation of the Directive's implementation, the DOC commenced efforts to inform

affected employees about the new UOF policy.  In a November 23, 2015 teletype order to

commanding officers, facilities, and divisions, Commissioner Joseph Ponte stated that "our staff's

ability to use force is legally supported by the new use of force policy." (City Ans., Ex. 6)[8]  The

Commissioner emphasized that:

> A.  The guiding principle behind all use of force will continue
>     to be whether the force was necessary to control the situation
>     and was reasonable under the circumstances.
> B.  As always, staff will continue to have discretion to use the
>     full range of force to restrain, subdue, or compel an inmate
>     to act or stop acting in a particular way when there are no
>     practical non-force alternatives.
> C.  As always, staff will be able to use force to defend
>     themselves or others from physical harm.

(City Ans., Ex. 6)  The DOC scheduled information sessions for employees to learn about the new

policy.  It also established a dedicated email address for uniformed staff to express their concerns

directly to the DOC.  (*See* City Ans., Ex. 2, at ¶ 6; Ex. 3)

On November 4, 2015, COBA and DOC officials met to discuss the Directive and the

rollout of the related training.  At that meeting, Husamudeen expressed COBA's ongoing concerns

that the rollout of the Directive was too quick and that the training for its unit members was

inadequate.  In a November 7, 2015 letter, COBA detailed its objections to the DOC's plans to (i)

---

[8] Unless otherwise indicated, all references to the City's answer are to the answer it filed in the
case docketed as BCB-4141-15.

provide copies of the Directive to COBA members and ask for their signature acknowledging receipt; (ii) "conduct facility open forums"; (iii) "hold public town hall meetings"; (iv) "meet with staff in smaller groups"; (v) "issue teletypes pretending to be 'instructive'"; and (vi) "hold roll calls with 'staff updates and trainings.'"  (COBA Pet., Ex. K)

Several days later, on or around November 9, 2015, Husamudeen learned that a spokesperson for the Mayor had issued a statement that the "top-to-bottom reforms were developed in close consultation with the department's staff, leadership, and stakeholders, including unions." (COBA Pet. ¶ 58)  Furthermore, the announcement stated that "DOC's new Use of Force policy was also drafted with significant contribution from uniformed members of staff from across the Department and other bodies, including the unions and the Board of Correction."  (COBA Pet., Ex. DD)  Husamudeen stated that he was told by COBA members that DOC officials said that the Unions had made significant contributions to the new Directive and that the Unions were "on board" with the Directive, although neither were true.  (Tr. 90)  Husamudeen testified that COBA was not consulted on either the rollout plan or the Directive itself.[9]

In a November 19, 2015 email, DOC Deputy Chief of Staff Sean Jones notified COBA officials that the effective date of the Directive would be delayed to "give staff the opportunity to read the policy, ask questions, [and] attend small group training during the interim period prior to the policy going into effect." (COBA Pet., Ex. E)  The email further explained that the DOC would establish "point people" at each facility for officers who have questions, "hold groups and forums

---

[9] Husamudeen "set the record straight" in a letter to the editor in the *New York Post* on November 19, 2015.  (COBA Pet. ¶ 63)

hosted by members of the executive staff" to address staff questions, and that it was currently training Captains and other officers in the Correction Academy on the new UOF policy.  (COBA Pet., Ex. E)

On November 23 and 24, 2015, the DOC planned three information sessions regarding the Directive, all led by DOC Chief Hazel Jennings.  Husamudeen testified that, despite the voluntary nature of the information sessions, some officers expressed a belief that attendance was compulsory.  At the November 23 information session and the November 24 morning information session, Union officials protested that the meetings were an improper form of training.  (City Ans., Ex. 5 (Affidavit of Chief Jennings ¶ 16)) Chief Jennings explained that the meetings were not a training but an information session on the updated policy.  She alleged that she was unable to complete either presentation due to the protests, and the session scheduled for the afternoon of November 24 was cancelled.

The Consent Judgment contains five detailed pages of additional staff training requirements that the DOC must implement that include training on the Directive, crisis intervention and conflict resolution, probe team procedures and protocols, defensive tactics, cell extraction, young inmate management, direct supervision training, and post-incident re-training. On May 31, 2016, Commissioner Ponte announced to all Commanding Officers that, commencing on June 26, 2016, all staff would "receive four days of training as part of the new Special Tactics And Responsible Techniques ("START") training program . . . ."  (COBA Pet., Ex. QQ)  START includes a one-day training course on UOF under the Directive and a three-day training course on

new Defensive Tactics.[10]  The UOF portion of the START program covers the Directive and addresses the standard applied to a determination of excessive force.  It also addresses the disciplinary consequences of excessive UOFs as well as false reporting or failing to report a UOF.[11]

The *First Report of the Nunez Independent Monitor*, filed with the Court on May 31, 2016, stated that "most (if not all) Staff should receive training on the New Use of Force Policy and Defensive Tactics before the New Use of Force Directive and New Disciplinary Guidelines go into effect and Staff are held accountable under both policies."  (Jt. Ex. 4, p. 24) The Report noted that "[t]he skills are not easy to master without appropriate training.  Staff need an opportunity to practice the new physical skills on the mats so they can execute the techniques safely, without injuring themselves or the inmates."  (*Id.*)  Beginning with the May 2016 class of recruits, all graduates from the Correction Academy received START training.   For in-service officers, training was conducted in groups of up to 25, one facility at a time.  DOC Acting Assistant Chief Pennye Jones provided unrebutted testimony that all staff had received training by September 2017.[12]  The Directive was implemented on September 27, 2017.

---

[10] Supervisors are responsible for providing training on the Directive, and certified Defensive Tactics instructors are responsible for providing training on Defensive Tactics.

[11] In addition, the DOC introduced an Advanced Correctional Techniques ("ACT") course, a three-day refresher for in-service officers that follows completion of the START program and includes training in conflict resolution, the Directive, and defensive tactics.

[12] In an Affidavit, Chief Jennings stated that staff had made her aware of concerns regarding discipline related to the new Directive.  She stated that staff was advised at the November 23, 2015 roll call that it is DOC policy that any discipline would take into account whether an officer had received training on the new Directive. (*See* City Ans., Ex. 5) Jennings' statement is also reflected in a *Nunez* Settlement Update publication, dated November 2, 2015.  (*See id.*, Ex. 4, p. 23)

**Information Request**

In the course of expressing its concerns about the Directive, COBA submitted requests to the DOC for information.  In a September 23, 2015 letter to a DOC official, Husamudeen requested that DOC provide the following:

1.  the number of (i) assaults by inmates and visitors against Correction Officers; (ii) inmates and visitors who were arrested as a result of those assaults; (iii) arrested inmates and visitors who were actively prosecuted by the Bronx District Attorney; and (iv) inmate arrests for "splashing" of Correction Officers with feces and other bodily fluids for the period from January 1 to August 31, 2015;
2.  the DOC's written policy for housing inmates with a record of assaults against Correction Officers;
3.  the DOC's reporting procedures for assaults on staff;
4.  DOC efforts to inform COBA members about scheduled court appearances for inmates who are arrested for "splashing" Correction Officers; and
5.  a copy of the Training Manual detailing defensive tactics taught at the Correction Academy.

(COBA Pet., Ex. H)

Shortly thereafter, in a September 25, 2015 letter, Husamudeen requested additional information pertaining to the DOC's training techniques.  Among other things, he sought data on what techniques (beyond certain techniques he listed) are being taught to keep COBA members safe while still complying with the DOC's UOF policy, as well as what changes have been instituted to prepare unit members for compliance with the Consent Decree and "reform generally."[13]  (COBA Pet., Ex. I)  Finally, COBA sought copies of the DOC's Mental Health and Mental Hygiene Training Manuals and any changes to the mental health programs and training since April 2014.

---

[13] COBA asserts that it received five responsive DOC documents that were prepared in the regular course of business "by alternate means."  (COBA Rep. Br. at 8)

In November 2016, Husamudeen testified that COBA had received no response to the September 25, 2015 letter.  The record does not reflect whether the DOC provided any responsive information after that date.

**The Directive**

As noted earlier, prior to the issuance of the Directive and at least since 2008, the DOC had a UOF policy.  The prior directive was 18 pages and set forth the DOC's guidelines for staff to follow in handling and reporting UOF incidents.  Its purpose was to establish policy "concerning the use of force and use of security equipment, and to provide guidelines and procedures for staff when they are confronted with a situation requiring the use of force in order to minimize injuries to both inmates and staff."  (COBA Pet., Ex. C)  Its provisions addressed when force can and cannot be used against an inmate, steps to follow when the UOF is anticipated, alternatives to UOFs, procedures to follow to seek mental health professional intervention, and appropriate UOF techniques.  The prior directive also contained definitions, as well as prohibited actions and mandates for staff to follow before, during, and after UOF incidents.

The Directive replaced the prior UOF policy.  It is nearly ten pages longer, more detailed, and incorporates mandates dictated by the Consent Judgment.[14]  Its purpose is the same as the

---

[14] There are a few Consent Judgment mandates cited by the Unions that are not incorporated into the Directive: (1) a pilot program for officers to wear body cameras; (2) an Anonymous Reporting System requiring expedited investigation of UOFs; (3) a Risk Management Program creating an Early Warning System based on an officer's UOFs; (4) a UOF Tracking System; (5) a requirement that DOC officials review violent inmate incidents for re-arrest recommendation; (6) adoption of new requirements for the discipline of young inmates; (7) officers lose inmate contact positions based on the number of UOF allegations against them; (8) consideration of UOFs in evaluating and awarding assignments and promotions; and (9) disciplinary penalties in UOF incidents.

earlier policy, in addition to providing, "the Department's commitment to apply force in the most responsible manner possible to minimize injuries to both staff and Inmates and to achieve the Department's objective of resolving potential physical confrontations between Staff and Inmates through methods other than the use of force whenever possible."   (Jt. Ex. 2 (hereinafter "Directive"), p. 1)

> The *First Report of the Nunez Independent Monitor*, noted that the Directive:
>
>> is consistent with both the requirements in the Consent Judgment and with sound correctional practices and legal standards.  The New Use of Force Directive is a common-sense policy that should enable Staff to clearly understand when and how force may be used.  The policy also sets forth explicit provisions regarding the use of certain categories of force and provides uniformed Staff with clear direction on when and how the use of such force is appropriate.  Under the new policy, Staff continue to be empowered to take appropriate steps to protect themselves, their co-workers, and the inmates in their care.

(Jt. Ex. 4, p. 7) The Report also noted that the Directive "is not based on new law, nor does it abandon core principles from its predecessor.  Rather . . . [it] retains core principles while providing further explanation, emphasis, detail and guidance to Staff on the steps officers and their supervisors should take in response to threats to safety and security."  (*Id.* at 22) In addition, the report explained that the additional staff training prior to implementation of the Directive was "appropriate given the focus on changing practice and enhancing skills among staff."  (*Id.* at 25)

There are some new provisions in the Directive, including prohibitions on certain actions, new requirements, and a new definitions section with 20 defined terms.  Other Directive provisions remain identical to corollary provisions in the prior policy.  In addition, some Directive provisions provide greater detail or use different words to explain a procedure or instruction than was

contained in the prior directive.  For example, the prior directive states that the use of force "must be consistent with the law and this [d]irective," while the Directive provides that "practical techniques" shall be used to prevent or resolve incidents without use of force "consistent with Departmental training and this Directive,"[15] that "use of force may be used in accordance with Department policy and law,"[16] and adds that the Department has a "zero tolerance policy" for excessive and unnecessary force.  (Directive § (II)(D))

A close review of the Consent Judgment, the Directive, and the prior directive revealed many of the provisions of the Directive were expressly required by the Consent Judgment, and some of these requirements were also set forth in the prior directive.  These provisions include: conflict resolution and de-escalation techniques;[17] the statement that there is zero-tolerance for excessive and unnecessary UOF;[18] the prohibition on use of "high impact force techniques, with certain exceptions;[19] the requirement that staff intervene to prevent "clearly excessive uses of

---

[15] Prior directive § (III) and Directive § (II)(B).

[16] Directive § (V)(A).

[17] Directive §§ (II)(B) and (VI)(A)(1) and (2).  *Compare* Consent Judgment § (IV)(3)(g)-(h). These provisions are also substantially the same as provisions contained in the prior directive §§ (V)(A)(1), (A)(2) and (B)(2).

[18] Directive § (II)(D).  *Compare* Consent Judgment § (IV)(3)(a).

[19] Directive § (II)(G), (VI)(B)(1)(f)(vi).  *Compare* Consent Judgment § (IV)(3)(b).  Prohibited high impact techniques include strikes or blows to the head, face, groin, neck, kidneys and spinal column.  Also, kicks, choke holds, carotid restraint holds, and other neck restraints.  *Id.* at § (II)(G).

force;"[20] the requirement to de-escalate inmate confrontations;[21] the requirement that force be withheld until certain pre-conditions are met;[22] the requirement that directions be given to reduce the risk of "positional asphyxia" including that staff monitor breathing of inmates placed face down on the floor;[23] the prohibition on submitting false or misleading UOF reports;[24] the direction that force may be used only when no practical alternatives are available;[25] the prohibition on using force in response to verbal insults, threats and swearing;[26] the prohibition on using unnecessary painful escort or restraint techniques without a lawful purpose;[27] the prohibition on provoking inmates to commit an assault;[28] the prohibition on using racial, ethnic or homophobic slurs;[29] the

---

[20] Directive § (II)(H).  *Compare* Consent Judgment § (IV)(3)(l).

[21] Directive § (II)(I).  *Compare* Consent Judgment § (IV)(3)(m).  These provisions are also substantially the same as provisions contained in § (V)(A) and (B) of the prior directive.

[22] Directive § (VI)(A)(2)(a-d).  *Compare* Consent Judgment § (IV)(3)(h)(i-iv).

[23] Directive § (VI)(B)(5).  *Compare* Consent Judgment § (IV)(3)(o).

[24] Directive § (II)(J).  *Compare* Consent Judgment § (V)(8)(b).

[25] Directive § (V)(A)(1)-(2).  *Compare* Consent Judgment § (IV)(3)(d)(i)-(ii).  These provisions are substantially the same as provisions contained in § (V)(B)(1) and (2) of the prior directive.

[26] Directive § (V)(B)(1)(b). *Compare* Consent Judgment § (IV)(3)(c)(ii).  While the prior directive did not contain an express prohibition on these actions, it prohibited any UOF to punish, assault, or retaliate, or where there was no inmate resistance.  *See* prior directive §§ (IV)(B)(1)-(2) and (V)(B)(1).

[27] Directive § (V)(B)(1)(d).  *Compare* Consent Judgment § (IV)(3)(c)(vii).

[28] Directive § (V)(B)(2)(a).  *Compare* Consent Judgment § (IV)(3)(c)(vi).

[29] Directive § (V)(B)(2)(b).  *Compare* Consent Judgment § (IV)(3)(c)(v).

prohibition on harassing or publicly humiliating inmates;[30] the directive that the use of deadly

force is permissible when a lesser tactic or force is unavailable, impractical, or ineffective;[31] the

requirement to contact a supervisor when de-escalating or UOF is anticipated;[32] the requirement

to summon a mental health professional prior to using force, if one is available and there is no

safety risk;[33] the requirement that a mental health professional be afforded reasonable time to gain

inmate's compliance, if practicable;[34] the requirement to videotape anticipated uses of force;[35] the

requirement to prepare a UOF report as soon as practicable, unless excused by the Tour

Commander;[36] the requirement that if receiving medical care, staff must provide a verbal UOF

---

[30] Directive § (V)(B)(2)(c).  *Compare* Consent Judgment § (IV)(3)(c)(iv).

[31] Directive §§ (V)(D) and (VI)(B)(4)(a).  *Compare* Consent Judgment § (IV)(3)(q). These provisions are substantially the same as the prior directive § (V)(C).

[32] Directive § (VI)(A)(1)(e) and (A)(3)(b).  *Compare* Consent Judgment § (IV)(3)(f).  Prior directive §§ (IV)(C)(1) and (V)(A)(1)(e) contains the same instructions.

[33] Directive § (VI)(A)(3)(d) and (4)(a).  *Compare* Consent Judgment § (IV)(3)(n)(v)-(vi).  Prior directive § (V)(A)(2)(a) contained the same requirement for "extractions" only but also required supervisors at the scene to relay information regarding medical information.  (*See* prior directive § (IV)(D)(1)(b))

[34] Directive § (VI)(A)(4)(b).  *Compare* Consent Judgment § (IV)(3)(n)(vi).  Prior directive § (V)(A)(2)(a) contains the same requirement for "extractions" only.

[35] Directive § (VI)(A)(3)(e).  *Compare* Consent Judgment § (IV)(3)(n)(vii).  This requirement is also substantially the same as prior directive § (IV)(C)(4).

[36] Directive § (VI)(C)(5)(a)(ii).  *Compare* Consent Judgment § (V)(4).  The same provision appears in the prior directive § (V)(F)(2)(a) but does not state that the Tour Commander is responsible for excusing staff from completing the report.

report as soon as practical;[37] the requirement that UOF reports be drafted independently from other staff involved;[38] the prohibition on reviewing video footage prior to completing a report for staff involved in a UOF incident;[39] the direction that failure to submit a UOF report or notify a supervisor of a UOF incident will result in an instruction, retraining or discipline;[40] and the requirement that after a UOF incident, an escort team that was not present shall be used.[41]

Generally, the Directive carries forward many of the core terms and concepts set forth in the prior policy, explaining some that were previously undefined and expanding on the descriptions of others with more specific language and greater detail.  There are also provisions that are identical or substantially the same as instructions found in the prior UOF policy.  Specifically, the following parts of the Directive are the same or substantially similar to provisions in the prior policy:  force used must be the minimum necessary to stop or control inmates and

---

[37] Directive § (VI)(C)(5)(a)(iii).  *Compare* Consent Judgment § (V)(4).  Prior directive § (V)(F)(2)(a) contains the same instruction.

[38] Directive § (VI)(C)(5)(b)(ii), (iii).  *Compare* Consent Judgment § (V)(2) and (6).  Prior directive § (V)(F)(3) contains the instruction that the reports be completed independently from others involved in the UOF incident.

[39] Directive § (VI)(C)(5)(b)(ii).  *Compare* Consent Judgment § (V)(5).  Both prohibit staff from changing their reports after reviewing video but allow submission of supplemental use of force reports.

[40] Directive § (VI)(C)(5)(b)(iv).  *Compare* § Consent Judgment (V)(8).

[41] Directive § (VI)(C)(1).  *Compare* § Consent Judgment (V)(3).

proportional to the threat encountered;[42] the definitions of "serious physical injury,"[43] and "deadly

physical force;"[44] criteria used to assess when a use of force is likely needed;[45] Tour Commander

responsibility to ensure that mental health professionals have reasonable time to gain inmate's

compliance, if practicable;[46] use of force permissible to prevent splashing of any liquid;[47] where

UOF is anticipated the supervisor must notify, maintain a dialogue with and get guidance from a

Tour Commander;[48] supervisors and Tour Commanders must ensure that inmates receive

necessary medical attention;[49] Tour Commanders are responsible for preserving evidence,

reviewing video and forwarding it[50] and insuring that video cameras are operable;[51] and all UOFs

and security devices must be used consistent with DOC policy and training.[52]   In addition, the

---

[42] Directive § (II)(C); prior directive §§ (III) and (V)(B)(1)-(2).

[43] Directive § (IV)(D); prior directive § (V)(C).

[44] Directive § (IV)(C); prior directive § (V)(C).

[45] Directive § (VI)(A)(3)(a)(iv); prior directive § (IV)(C)(2).

[46] Directive § (VI)(A)(4)(b); prior directive § (V)(A)(2)(b).  In the prior directive, the requirement to utilize mental health professionals was limited to anticipated UOFs. The Directive requires such interventions when possible for all UOFs.

[47] Directive § (V)(A)(3); prior directive § (IV)(A)(2).

[48] Directive § (VI)(A)(3)(a)(iv) and (3)(d); prior directive § (IV)(D)(1)(d).

[49] Directive § (VI)(C)(2)(a); prior directive § (V)(D).

[50] Directive §§ (VI)(C)(3), (9) and (10); prior directive §§ (V)(F)(2)(b), (G)(3), and (I).

[51] Directive § (VI)(A)(3)(e); prior directive § (IV)(C)(5).

[52] Directive § (V)(C); prior directive §§ (III) and (V)(B)(1).

section of the Directive that describes UOF techniques incorporates all the tactics listed in the prior

policy, and both list the techniques in order of minimum to greatest degree of force.[53]

There are some sections or statements in the Directive that did not appear in the prior policy

and were not mandated by the Consent Judgment that the Unions assert are mandatory subjects of

bargaining.[54]   The Unions specifically point to the Directive's use of undefined terms

"misleading,"[55] "lawful purpose,"[56] "provoking,"[57] "harassment,"[58] "intimidation," and

"otherwise derogatory slurs."[59]  There is also a new provision that describes when UOF is needed

and the standard the DOC will use when it reviews staff conduct in UOF incidents.   Section

(VI)(B)(1)(b) of the Directive sets forth that:

> The need for physical force is established considering all elements
> of the situation confronting Staff and by the type and amount of
> resistance exhibited by the inmate and applying an objective
> "reasonableness" standard.   The Department acknowledges that
> Staff decision must be based on their perceptions during the
> situation, rather than on an analysis after the fact; however, the
> reasonableness of the force must be judged from the perspective of
> a reasonable Staff Member on the scene at the time of the incident.

---

[53] Directive § (VI)(B)(1); prior directive § (V)(B)(2).

[54] The Directive contains many new provisions, but we address only those that the Unions assert
are mandatory subjects of bargaining.

[55] Directive § (II)(J).

[56] Directive § (V)(B)(1)(d).

[57] Directive § (V)(B)(2)(a).

[58] Directive § (V)(B)(2)(c).

[59] Directive § (V)(B)(2)(b).

In addition, there are new instructions and/or assignments of certain tasks to specific titles.  For example, the requirement that supervisors involved in anticipated UOF incidents obtain information on the inmate's medical conditions and mental health;[60] the requirement that the Tour Commander only use an escort team that was not present for the incident;[61] the requirement that the Tour Commander preserve all evidence after a UOF incident,[62] the requirement that a Tour Commander be responsible for authorizing staff to leave the facility without completing a use of force report,[63] and the requirement that Captains photograph their subordinates' injuries after a UOF incident.[64]  With regard to the photographing of staff injuries, the record reflects that DOC Operations Order 20/07 states that "Commanding Officers of facilities shall ensure that digital color photographs are taken relative to the following unusual incidents, wherein medically detectable injuries are present or claimed: . . . (3) Assault on staff, where injuries are present or claimed by staff."  (City Ans. (BCB-4137-15), Ex. 4 at (III)(A))  Finally, Directive 7003, the pilot program that preceded the Directive, also contained two new provisions similar to those in the Directive – one explains the Tour Commander's responsibility in investigating UOF incidents, the

---

[60] Directive § (VI)(A)(3)(d)(ii).

[61] Directive § (VI)(C)(1).  The Consent Judgment requires that "under normal circumstances no Staff involved in a Use of Force Incident participate in escorting the Inmate away from the scene…."  Consent Judgment § (IV)(3)(j).  It does not specify that this is the Tour Commander's responsibility.

[62] Directive § (VI)(C)(3).

[63] Directive § (VI)(C)(5)(a)(ii).

[64] Directive § (VI)(C)(4)(a).  This provision provides that the "photographs shall capture the Staff Member and Inmate from the waist up, showing left, right, front and back views."  *Id.*

other sets forth the Deputy Warden's authority to interview staff and advise the Warden of issues in UOF investigations.[65]

**Evidence of Practical Impact**

   The Unions claim a variety of practical impacts resulted from the Consent Judgment and the Directive, including safety, discipline, and workload.  Union witnesses testified that the Directive's prohibitions on using certain techniques and responses, the mandated use of non-violent and de-escalation techniques, lack of clarity, and insufficient training have had deeply negative implications for uniformed staff.  Generally, the City's witnesses denied that the Directive was a substantial change in instruction or procedure and/or that it negatively impacted staff safety, discipline, or workload.

   With respect to safety impact, Joseph Russo, an ADW and President of the ADW/DWA, testified that the Directive's guidelines are unrealistic and do not allow for uniformed staff to protect themselves from inmates in UOF situations.[66]  He stated that, as a result, officers believe that it is safer not to physically engage in confrontation with inmates for fear of discipline and the risk to their own safety.  He explained:

> if you're involved in an incident . . . you cannot defend yourself
> effectively based on unrealistic guidelines.  So they avoid it . . .
> [U]nless you fear serious injury, and you have to be able to explain
> that well enough for the managers who are going to scrutinize this
> to believe you, you cannot punch back.  You're very limited.  If you
> take out your [pepper] spray and spray too close you lose vacation

---

[65] Directive 7003 §§ III(B) and (C)(1).

[66] Although Russo testified as a witness for the ADW/DWA, he explained that his observations apply "to the chief of the department down to the correction officer" and that he receives emails from the DOC's Central Operations Desk regarding all UOF incidents.  (Tr. 818-20)

days.  If they feel you sprayed too soon and it wasn't fully required yet, you're penalized.  So it's safer for them, for their jobs, their vacation days, their records, it is safer in that capacity and it is safer for them physically to avoid the use of force.

(Tr. 832-33) According to Russo, the effect of these unrealistic instructions is that the staff is reluctant to act and becomes passive.  Captain Sauda bin Abdul-Malik similarly testified that there is a disconnect between staff understanding the policy and their ability to apply it in the field in real time.  She explained that once staff receive training, they go back to their regular assignment, and the training must be applied to inmates in the facilities with no further hypothetical scenarios.  She further testified that while the new Directive clarifies some gray areas, staff confusion regarding its application can be a deterrent to an appropriate UOF.

ADW Russo further testified that there has been a notable increase in UOF incidents under the Directive and that staff had been attacked with razors and splashed.  As a result, the Directive has made officer morale "horrendous" and negatively impacted working conditions.  (Tr. 809) He claimed that due to the Directive, staff now has less control over inmates.  According to Russo, inmates are aware of the staff's "decreased authority" and have no fear of consequences.  (*Id.* at 815) The result is that they "resist us every step of the way" because there are no consequences, and staff is reluctant to engage them.  (*Id.* at 838)

DOC Bureau Chief of Facility Operations Becky Scott disagreed with the Union witnesses' assertion that the Directive caused staff to be passive or that the policy changes make it more difficult for COs and other staff to protect themselves.  She testified that the Directive did not change the scope of authority of uniformed staff and maintained that there is no merit to the allegation that there are no consequences for inmates who violate or resist staff direction.

Similarly, DOC Acting Assistant Chief Jones also testified about the continuity of concepts in the current and prior UOF policies.  While the definition of UOF is now memorialized in the Directive, Jones testified that there is in fact no change to the definition or UOF standard between the two policies.  According to Jones, the Directive did not alter when a UOF is authorized, permissible degrees of force, or when a UOF must cease.  Jones testified that she believes the Directive is "more robust" than the prior policy because the latter did not provide the clear, concise explanations and definitions like those set forth in the Directive.  (Tr. 923)

     ADW Russo also testified that officer safety is put at risk by the Directive's prohibitions on certain defense techniques.  Particularly concerning, in his view, are the bans on kicking or striking an inmate with institutional equipment and employing a choke hold or head lock.[67]  Russo testified that the choke hold is an effective technique to control an inmate without cutting off his air, and he asserted that these prohibitions could impact officer safety because "if they followed the rules and then they were reluctant to act . . . that injury would be more likely than not . . . ."[68] (Tr. 878)

     As described earlier, the DOC provided training to staff to educate them on the Directive

---

[67] Directive § (VI)(f) provides: "(viii) Kicking an Inmate or striking an inmate with institutional equipment is prohibited.  Institutional equipment includes, but is not limited to keys, flashlights, and handcuffs.  (ix)  Employing a choke hold, or intentionally striking an Inmate's head against the wall or floor, or other object, is prohibited."  However, such tactics can be employed when someone, including staff, "is in imminent danger of Serious Physical Injury or death."  (Directive § (VI)(f)(x))

[68] Russo acknowledged that while these techniques were also prohibited under the prior directive there was an exception "for instances where you were in danger of being seriously injured."  (Tr. 877) In the prior policy, employing a chokehold or intentionally striking an inmate's head was permissible only when the use of deadly force was permissible. (prior directive § (V)(B)(2)(h)) Similarly, kicking an inmate was only permissible "as a last resort." (prior directive § (V)(B)(2)(g))

and ensure compliance.   Captain Abdul-Malik, who is assigned to the Correction Academy,

Officer Toussaint Boyd, a Correction Academy trainer, and Officer Mack, who provides ESU

training, explained how the training curriculum changed in response to the Consent Judgment.

Abdul-Malik testified that the Directive represents a "change in culture" as to what staff understand

as a UOF and that a lot of the training was focused on overcoming habits that prevailed under the

prior Directive.   (Tr. 712) Several witnesses explained that training focused on the UOF definition

because staff did not understand the scope of what was considered a UOF.   Further, trainers are

now using examples, personal experiences, and more exercises to emphasize appropriate action.

They are also teaching levels of inmate resistance to assist staff in understanding that force used

needs to be proportional to inmate resistance.   Abdul-Malik testified that in the past, they taught

that the first defensive tactic used should be chemical agents.   Now, the Directive provides that

after applying interpersonal communication skills, staff has the discretion to use chemical agents

first or a "soft hand technique," such as a push or grab.   (*Id.* at 698)

Further, less aggressive techniques were added to the Defensive Tactics training,[69] while

some defensive tactics such as the "Bend-wrist come-along," the "Kote-Gashi technique," and the

"rear arm lock with control,"[70] are no longer taught.   (Tr. 158) Officer Boyd testified that the new

---

[69] These new techniques are consistent with those approved by the Municipal Police Training Council ("MPTC") and curriculum used by State-level officers.   However, there are techniques, such as certain types of kicking, that are certified by the MPTC, that are not approved or taught by the DOC.

[70] All three tactics are designed to ensure inmate compliance by applying pressure to the inmate's wrist or shoulder, or in the case of the Kote-Gashi technique, by grabbing and bending the inmate's wrist around the pelvis.

defensive tactics that he is teaching are effective for officers to control inmates and that removal

of the three other techniques has not made it more difficult for officers to protect themselves.  (*Id.*

at 254-55) Captain Abdul-Malik also stated that staff is being taught new techniques that permit

them to safely take a person down to the floor and subdue an inmate in a manner that minimizes

injury.  These techniques include "pressure points" and "arm bars."  (*Id.* at 727) However, ADW

Russo disagreed with the effectiveness of eliminating certain defensive techniques.  He testified

that the headlock is an instinctive move and that the inability to use it has had an adverse effect on

the personal safety of uniformed staff.

      Several witnesses testified that some unit members were confused about what defensive

tactics are now appropriate.  For example, Officer Boyd explained that the Defensive Tactics

curriculum includes certain kicking techniques, but the Directive prohibits the use of "high-impact

force, including . . . kicks."  (Tr. 278)  According to Boyd, staff have expressed concerns that they

might be in violation of the Directive if, while intending to perform a Directive-compliant kick,

they accidentally performed a high-impact kick.[71]  Further, Boyd testified that officers have

expressed confusion over when it is permissible to use force and have told him that they were

taught during training that under the Directive, they cannot defend themselves unless the inmate

makes contact with them first.  Boyd acknowledged that such a policy is not consistent with the

Directive and that he corrects this misunderstanding when raised.  He testified that under the prior

directive if an officer felt threatened or was about to be assaulted, he or she could engage with

---

[71] The kick taught in the Defensive Tactics training targets an inmate's upper thigh, not a high
impact kick, which is "bone-on-bone."  (Tr. 283)

enough force to terminate the incident.  Boyd further testified that he teaches officers who witness a clearly excessive UOF by another officer that they are not required to restrain that officer.  Officer Mack stated that, while UOFs and deadly UOFs are permissible in certain circumstances, staff have reported that supervisors are discouraging UOFs and therefore they are confused as to whether force is permissible, even in self-defense.  Notably, Mack stated that officer confusion and/or hesitancy to protect themselves may put them at risk of injury, and he emphasized that this hesitancy stems from fear of being disciplined.  For example, officers expressed concern to him that after they use force, it will be deemed excessive or unnecessary by those reviewing the incident.

Albert Craig, a 20-year CO and COBA's First Citywide Trustee, asserted that the START training curriculum was insufficient in that it failed to include instruction regarding when to call a supervisor for assistance or what is permitted during a conflict with an inmate.  According to Craig, these omissions cause staff confusion and increase the risks that any force used will subject COs to discipline and risk of injury if officers fail to react.  He explained that, unlike prior to the Directive, the training also does not address when a CO should use a personal body alarm, which allows staff to "take out anybody" who is disruptive with a minimum amount of force.[72]  (Tr. 323) Further, Craig testified that he observed a post-*Nunez* in-service training for COs and Captains during which the trainer incorrectly advised staff that it was acceptable to give a blow to the inmate's head.  Craig stated that blows to the head were never permissible but did not always lead

---

[72] Craig conceded that nothing in the new Directive prohibits staff from using personal body alarms or calling a supervisor.

to termination prior to *Nunez*, depending on the circumstances.  He testified that now "nobody is sure."  (*Id.* at 390)

There was also ample testimony regarding the impact of the Directive's instructions and training on non-violent responses and de-escalation techniques.  ADW Russo testified that techniques taught in the START training were too complicated to master in only five days, "especially when you add fear and adrenaline and the fear of being humiliated into the equation." (Tr. 853) Officer Mack testified that unit members were confused about the de-escalation protocol set forth in the Directive because it differs from the prior protocol.  He explained that under his previous lesson plan, he taught that electronic weapons, chemical agents, and batons were all considered the same level of force.[73]  By contrast, the Directive provides that use of chemical agents, electronic weapons, and batons, respectively, are actions that employ greater amounts of force when escalation is needed.[74]  In this regard, Russo testified that the best way for an officer to defend himself is to use chemical spray.  Further, Captain Abdul-Malik stated that staff members expressed confusion over how to proceed after the use of interpersonal skills fails to de-escalate an inmate's behavior.

---

[73] Mack's instruction in this regard appears to be inconsistent with the prior directive.  (*See* prior directive § (V)(B)(2))

[74] Directive § (VI)(B)(1)(f)(iii) provides, in part: "use of non-contact control techniques such as hand-held chemical agents."   Section (VI)(B)(1)(f)(v) provides: "Employing an authorized weapon, such as an Electronic Immobilization Shield, in an authorized manner consistent with Department training."   Section VI(B)(1)(f)(vii) provides, in part: "Employing an authorized weapon, such as a baton, in an authorized manner consistent with Department training."

Officer Craig testified that training in interpersonal communication skills was also not clear.  He explained that under the prior directive "what [supervisors] told you to do is to give instruction [and] if the inmate was noncompliant, try to find out what was going on with him.  If he was still noncompliant . . . keep a safe distance and call the supervisor."[75] (Tr. 321) In contrast, now COs are instructed to talk to a noncompliant inmate "for five or ten minutes."  (*Id.* at 318-19, 330) Craig testified that officers are being trained to use interpersonal skills but there is no training on when to call a supervisor.  In his view, the instruction to attempt to gain compliance by continuously talking, without advising staff when to call a supervisor, makes it more likely that the confrontation will turn physical.

Chief Scott testified that the DOC's UOF policy has always included the use of de-escalation and interpersonal communication skills.  She noted, however, that the Directive contains new details on how de-escalation is conducted and there are also changes to how de-escalation is being taught in training.

The Monitor's reports have continuously reviewed and addressed UOF incidents since 2015, including specifically tracking the number of incidents, data on excessive or unnecessary UOF, and explanations for the data.  More recent Monitor reports have noted that since November 2015, the jail population had been drastically reduced by 60%.[76] (*See Ninth Report of the Nunez Independent Monitor* (for the reporting period July 1, 2019 – December 21, 2019) at 2)  Despite

---

[75] Craig also testified that the START training did not address gaining compliance by threatening to charge the inmate with an infraction, which he has historically found to be an effective tactic.

[76] While not in the record, we take administrative notice of the *Ninth and Tenth Reports of the Nunez Independent Monitor* available along with all the reports on the DOC's website.

the declining inmate population, recent reports set forth statistics that show a rise in the total

number of UOF incidents since November 2015, as well as increased UOF rates.[77]  Further, the

*Ninth Report of the Nunez Independent Monitor* stated that "the frequency of excessive or

unnecessary uses of force has not shown a marked decrease" since the effective date of the Consent

Judgment.  (*Id.* at 3)  That report goes on to explain that, "Staff appear to utilize force more often

now than when the Consent Judgment first went into effect," and "[t]oo often, Staff select

approaches which escalate and exacerbate the problem (e.g., painful escort, hyper-confrontation)

rather than solve it, which increases both the likelihood that force will be used and the potential

for harm."  (*Id.* at 13 and 14) The *Ninth Report of the Nunez Independent Monitor* indicates that

in 2019 the DOC-wide injury rate was decreasing, which means that a smaller "proportion" of

injuries have resulted from UOFs.  (*Id.* at 17) Nevertheless, the report notes that since 2016,

because the total number of UOF incidents has increased, the total number of people injured each

year has also increased.  That report summarized that none of the principles set forth in the Consent

Judgment "can take root without a culture change within the agency that embraces them," and that

"[a]lthough a lot of work has been done, a lot of work remains."  (*Id.* at 3) Both the *Ninth* and

*Tenth* Monitor's reports similarly noted that:

> The Department has not yet demonstrated progress in reducing the
> frequency of unnecessary and excessive force.  In fact, this
> Monitoring Period reflected the highest rate of use of force since the
> Effective Date.  The driving forces of use of force remain the same
> overreliance on Probe Teams and alarms, the use of unnecessarily
> painful escort techniques, unnecessary and too close use of [pepper]
> spray, and hyper-confrontational Staff behaviors.

---

[77] This is a number that adjusts the total number of UOF incidents by the inmate population.

(*Tenth Report of the Nunez Independent Monitor (*January 1, 2020 - June 30, 2020) at 3; *see also*

*Ninth Report of the Nunez Independent Monitor* at 3)[78]  Chief Scott acknowledged that the UOF

rate has increased since the implementation of the Directive and that violence has also increased;

however, she attributed the increase in violence to gang activity and a more violent jail population.

Turning to evidence of impact on officer discipline, ADW Russo testified that there has

been greater scrutiny of staff actions under the Directive as a result of pressure on the DOC to

comply with the Consent Judgment.  This scrutiny has resulted in more interviews, accusations,

and charges against uniformed staff for rule violations or other criminal behavior.[79]  He explained

that officers "feel less supported, less protected, and . . . more scrutinized now than they were

before."  (Tr. 884)  In his view, officers are now more likely to "pass the responsibility to another

person" in order to avoid mistakes and any possible disciplinary consequences.[80]  (*Id.* at 830-31)

Captain Abdul-Malik noted that staff can be disciplined for insufficient report writing.  Similarly,

---

[78] A Remedial Consent Order was entered into in August 2020 that modified the Consent Judgment in certain respects and was recommended by the Monitor in order for the DOC to better achieve full compliance with the Consent Judgment.

[79] The record does not contain data on disciplinary actions taken for UOF policy violations. However, we note that large portions of the *Ninth and Tenth Monitor's Reports* note significant investigation backlogs and call for additional efforts to promptly and properly identify and review improper UOFs and to process related disciplinary actions.

[80] Russo also testified that the increased scrutiny of officer conduct imposes a safety risk because it encourages staff to take a "passive role," which has "emboldened the inmates," thereby making them harder to manage.  (Tr. 830, 884-86)

Russo noted that the UOF reports are now heavily scrutinized and an incorrectly completed report could result in warnings and potentially disciplinary charges.[81]

Officer Mack testified that staff expressed concerns about the Directive's zero-tolerance policy.  While he acknowledged that zero tolerance has "always" been a policy, he reported that officers believe that the standard for whether force is "excessive" or "unnecessary" is inherently subjective.  (Tr. 484, 493, 543)  In this regard, Officers Boyd and Mack testified that some unit members expressed their concern that they may be disciplined for using force because their own good-faith belief that force is necessary during an inmate interaction may not be shared by a supervisor reviewing the UOF incident.[82]   (*Id.* at 191, 263)   Boyd elaborated that because perception of danger can vary, officer conduct may be reviewed by someone who had a different opinion of the degree of threat.  (*Id.* at 263) ADW Russo testified that he has observed ID members fail to adequately consider the officer's application of a "reasonableness" standard to a UOF.  (*Id.* at 872-73)

Captain Abdul-Malik testified that objective reasonableness means that "the officer's perception of the inmate's actions and what the officer does with that information should be reasonable in regards to how they apply force."  (Tr. 703-04) According to Abdul-Malik, the

---

[81] Abdul-Malik testified that UOF report writing is not covered during in-service training under the new Directive, something that she considers to be a mistake, particularly since such reporting is now required to be more detailed.

[82] Officer Boyd further testified, in response to this concern, that "as long as you can defend yourself and you can articulate what you've done on paper and it [is] within the bounds of the Directive, then . . . you really have little to worry about."  (Tr. 266)

current training explains the meaning and application of that standard in part by training the staff to understand proportionality and the difference between reasonable and excessive force.

Officer Craig, who has significant experience representing COs at disciplinary hearings before the Office of Administrative Trials and Hearings ("OATH"), conveyed that officers are more likely to be disciplined under the Directive.  For example, in cases involving improper UOFs, DOC Trials and Litigations Division attorneys now argue that the UOF was "anticipated," and therefore that the CO improperly failed to call for help before using force.[83]  (Tr. 328-29)  He also stated that post-*Nunez*, officers have been disciplined and sometimes terminated for using deadly force when they should not have.

In contrast, Chief Scott testified that the concepts of objective reasonableness and proportional UOF existed prior to issuance of the Directive.  She stated that the DOC's policy has always been that the UOF must be consistent with the threat.  The prior directive states that "When force is necessary, the amount of force used at any time should always be proportional to the threat posed by the inmate at the time."  (prior directive § (V)(B)(1))  Scott further testified that while the prior UOF policy did not explicitly state that the DOC has a "zero tolerance" for excessive and unnecessary force, this is not a new concept.  (Tr. 960-61)  Scott acknowledged that there has been an increase in staff discipline for excessive or unnecessary UOFs since the implementation of the Directive.  Acting Assistant Chief Jones testified that, in contrast to the prior policy, under the Directive the DOC's UOF review assesses whether the officer first used conflict resolution

_____

[83] He testified that there is a negative connotation to an anticipated UOF in the DOC's disciplinary process because it is assumed that the officer could have utilized other alternatives prior to using force.

techniques to diffuse the situation and confirmed that alternatives to force should only be used when possible.[84]

In addition to assertions of a safety impact and disciplinary consequences resulting from the new policies set forth in the Directive and the resulting training, some witnesses testified that certain revisions to the UOF policy resulted in an increased workload.  ADW Russo characterized his bargaining unit members' workload as "almost unmanageable" as a result of the Directive.  (Tr. 837) He testified that when he reports to work at the Brooklyn jail, "it's usually nonstop from start to finish" because "inmates resist almost everything we want to do."  (*Id.*)  Russo reiterated that this is because there is no consequence for the inmate and the staff is reluctant to engage.  He testified that while the staff can handle one uncooperative inmate, when there are 10 or 15 inmates, they are not permitted to use physical force on all of them.  He explained that once staff uses force on one inmate, they now have to focus on completing all the administrative requirements for that UOF, "which are review the video, take pictures, make sure we collect all the reports, make sure he's seen by medical in four hours . . . Documents have to be uploaded in the computer."  (*Id.* at 840)

Bruce Arnold is a CO who works in the DOC's ID and has exclusively handled UOF cases since 2004.  Arnold testified that since the Consent Judgment was implemented, there are more requirements regarding "detailed information pertaining to investigation, timeframes, and accountability when it comes to conducting your investigation."  (Tr. 620)  For example, ID staff

---

[84] This concept is reflected in the Directive, which provides that under certain circumstances, the use of de-escalation techniques may not be reasonably available to staff or may be impractical or ineffective.  *See* Directive, § VI(A)(1)

is now being held accountable for preservation of media following a UOF.  Similar to other officers, Arnold testified that warnings or discipline are taken against ID staff who do not comply with these requirements.  He testified that ID officers have had a workload increase because they now conduct almost all facility investigations in addition to all permanent investigations. Additionally, the ID now conducts preliminary reviews, during which information about a UOF is gathered, within two days of a UOF incident instead of five days.

## POSITIONS OF THE PARTIES

**Unions' Position**[85]

The Unions argue that DOC violated NYCCBL § 12-306(a)(1) and (4)[86] by refusing to bargain over the unilateral implementation of the Consent Judgment and Directive.[87]   They

---

[85] To the extent the Unions make similar arguments, their arguments are summarized together. Arguments specific to particular unions are summarized at the end of this section.

[86] NYCCBL § 12-306(a) provides that "[i]t shall be an improper practice for a public employer or its agents":

> (1) to interfere with, restrain or coerce public employees in the exercise of their rights granted in section 12-305 of this chapter;
> *       *       *
> (4) to refuse to bargain collectively in good faith on matters within the scope of collective bargaining with certified or designated representatives of its public employees; . . .

NYCCBL § 12-305 provides that [p]ublic employees shall have the right to self-organization, to form, join or assist public employee organizations, to bargain collectively through certified employee organizations of their own choosing and shall have the right to refrain from any or all of such activities."

[87] COBA's unilateral change claim also encompasses the pilot program in Directive 7003.

contend that decisional bargaining was required because the changes involve mandatory subjects and are not *de minimus*.[88]   COBA notes that the *Nunez* litigation was aimed at major reform, not marginal technicalities, and that the Consent Judgment demanded "a new comprehensive use of force policy," not mere clarifications.   (Consent Judgment § (IV)(1))   It argues that the implementation of new extensive training requirements demonstrates that the challenged modifications are substantial.

The Unions claim that changes in job duties, training, and predicates for discipline are mandatorily bargainable.   In addition, COBA asserts that the Directive's new "objective reasonableness" standard and other rules with respect to post-UOF interviews are bargainable disciplinary procedures.   Further, it argues that photographing injured officers after a UOF incident is bargainable because the employees' privacy interests outweigh the employer's interest in record-keeping.

The Unions argue that the Consent Judgment does not excuse the DOC's failure to bargain. COBA asserts that it retains the right to challenge the Consent Judgment because it was not a party to *Nunez* and there was no effort to join it as a party; ADW/DWA and CCA assert that they are not seeking to litigate the merits or the resolution of *Nunez* before the Board.   The Unions contend

---

[88] For example, COBA alleges a change to whether an injured officer is permitted to leave a facility without completing a UOF report, that an officer can be compelled to appear before commanders and wardens for interviews related to safety and security issues, that an injured officer can be compelled to submit to post-use of force photography, and that there are new topics in the officer training curricula.   CCA alleges changes specific to Captains, such as the instruction to assist in anticipated UOFs.   Similarly, ADW/DWA alleges that the Directive includes the following provisions that were in neither Consent Judgment nor the prior directive: asking inmates for their cooperation, requiring the presence of a supervisor, use of a video camera, the deployment of chemical agents, a list of defined terms to assess discipline, and procedures for splashing incidents.

that the DOC's obligation to comply with the federal and state constitutions does not preclude bargaining over terms and conditions of employment. Further, COBA avers that the DOC is not shielded by the management rights clause in NYCCBL § 12-307(b), which it claims is void because it is not substantially equivalent to the provisions found in the Taylor Law.[89]

Even if these matters are not within the scope of bargaining, the Unions argue that the DOC had a duty to bargain over their practical impact pursuant to NYCCBL § 12-307(b).[90] Regarding safety, the Unions argue that the unilateral implementation of the Directive has made their members' jobs more dangerous. COBA asserts that its witnesses confirmed that, post-*Nunez*, jails

---

[89] NYCCBL § 12-307(b) provides:

> It is the right of the city, or any other public employer, acting through its agencies, to determine the standards of services to be offered by its agencies; determine the standards of selection for employment; direct its employees; take disciplinary action; relieve its employees from duty because of lack of work or for other legitimate reasons; maintain the efficiency of governmental operations; determine the methods, means and personnel by which government operations are to be conducted; determine the content of job classifications; take all necessary actions to carry out its mission in emergencies; and exercise complete control and discretion over its organization and the technology of performing its work. Decisions of the city or any other public employer on those matters are not within the scope of collective bargaining, but, notwithstanding the above, questions concerning the practical impact that decisions on the above matters have on terms and conditions of employment, including, but not limited to, questions of workload, staffing and employee safety, are within the scope of collective bargaining.

[90] The ADW/DWA notes that the Board has rejected the argument that an employer has an opportunity to unilaterally alleviate any practical impact prior to the Board's finding that a practical impact exists.

have become chaotic and violent on an unprecedented basis. It avers that its members are threatened by the inadequate provision of alternative techniques, having to engage inmates in verbal de-escalation, only being able to use force as a last resort, and no longer being able to use force in response to verbal taunting from inmates. CCA contends that mandating Captains to contact medical staff distracts them from UOF incidents in progress; and ADW/DWA notes that its President demonstrated that the gravity and frequency of splashing was lower under the prior UOF policy.

COBA further contends that the new "objective reasonableness" standard of review, the requirements that officers must evaluate the conduct of their colleagues and monitor the medical condition of inmates, and the DOC's failure to provide clarity on the post-*Nunez* requirements also pose safety threats.[91] COBA alleges that training materials were "divorced from the reality of DOC jails" and that the confusion among officers has translated into hesitancy to use any force, which "places officers under a direct threat of severe beatings." (COBA Br. at 46)

The Unions also argue the completion of additional tasks and new stringent deadlines place an excessive burden on workload. COBA references the report-submission requirements, the investigation procedures requiring more detailed information, and the shorter timeframes with increased measures of accountability. Further, COBA asserts that "absorbing the vast amount of culture changing information" requires extensive off-duty study. (COBA Br. at 57) CCA and

---

[91] According to COBA, New York State Criminal Procedure Law § 2.20, General Municipal Law § 50-k, Correction Law § 137(5), and Penal Law § 35.10(2) do not limit the use of force as specified in the Consent Judgment and the Directive. COBA argues that its members are familiar with the protections granted to officers by these statutes and that the failure to align the Directive's definitions with these statutes is also a safety threat.

Case 1:11-cv-05845-LTS   Document 602-57   Filed 11/17/23   Page 40 of 76

14 OCB2d 10 (BCB 2021)                                                                          39

ADW/DWA assert that their members are now required to ensure the operation of cameras in their

facilities, upload and review videos of use of force incidents, take photos of inmates subject to

UOFs, and ensure immediate medical attention for such inmates.

 COBA and the CCA also argue that the City violated NYCCBL § 12-306(a)(1)

independently.  According to the CCA, DOC's prohibiting members from consulting with their

union representatives before submitting UOF reports and interacting directly with CCA members

regarding enforcement interferes with union activity.  COBA asserts that the DOC engaged in

direct dealing by holding information sessions, providing a dedicated email address for staff to

express concerns, and identifying members at each facility to be trained on *Nunez*-related policy

and serve as a point of contact for other officers.  Further, COBA alleges that the City made false

comments in order to convince union members that their unions, including COBA, were "on

board" with the Consent Judgment and helped craft the Directive.  (COBA Br. at 36-37, quoting

Tr. 90)  COBA contends that these false comments have undermined the Unions by giving the

impression that they consented to what is "popularly perceived by officers to be a disaster" or were

powerless to stop it.  (COBA Br. at 77-78)

 Lastly, COBA asserts that the DOC violated NYCCBL § 12-306(c)(4) by refusing to

furnish the information requested in September 2015.[92]  It claims that the information was needed

for contract administration and negotiation of mandatory subjects.

---

[92] NYCCBL § 12-306(c) provides that the duty to bargain in good faith includes the obligation:

> (4) to furnish to the other party, upon request, data normally
> maintained in the regular course of business, reasonably available

**City's Position**

The City argues that the DOC did not violate NYCCBL § 12-306(a)(1) and (4) because the Directive does not implicate a mandatory subject of bargaining. It asserts that regulating the use of force by DOC employees against inmates within its custody is within its managerial rights pursuant to NYCCBL § 12-307(b). In addition, the City claims that terms of the Consent Judgment are excluded from collective bargaining as a matter of public policy. The City asserts that the Board does not have jurisdiction over decisions made in a federal court order and that ADW/DWA's and CCA's claims related to the Consent Judgment are untimely. It notes that the Unions were fully aware of the *Nunez* lawsuit, but made no attempt to intervene, and that the City did not have an obligation to join them as third parties. The City asserts that an order to bargain over any aspect of the Consent Judgment would force it to make its compliance contingent on the outcome of bargaining, leaving it liable to contempt charges. Further, the City argues that its obligation to protect inmates' constitutional rights outweighs collective bargaining and is so different from its obligation to conform to other laws and regulations that ancillary procedural changes are also not bargainable. In any case, it claims that the changes required by the Consent Judgment are narrow, with no discretion left to the DOC.

In addition, the City argues that the petitions should be dismissed because any change to the work obligations of the Unions' members resulting from the Directive are *de minimis*. The City contends that the Directive clarified the DOC's pre-existing UOF policy and that its core

---

and necessary for full and proper discussion, understanding and negotiation of subjects within the scope of collective bargaining.

elements remain the same.  Citing Chief Scott's testimony, the City asserts that the Directive "has more specific language and provides more detail" but did not make fundamental policy changes. (City Br. at 33)  It claims that the Directive addresses subjects, such as the concept of zero tolerance for excessive force, the application of an objective reasonableness standard for assessing UOF incidents, de-escalation techniques, and the prohibition against painful escort techniques, which previously existed as DOC policy, but were made explicit in the Directive.

Further, the City argues that the Unions have failed to establish the existence of a practical impact on their members' terms and conditions of employment.  According to the City, the Unions' argument with respect to an adverse safety impact is based on hearsay, conclusory allegations, and speculation regarding the effects of defensive tactics, de-escalation, and conflict resolution.  Since the Unions' opinion testimony addressed circumstances that also existed before *Nunez*, the City avers that no connection was made between the requirements of the Consent Judgment and any increased risk of injury to the Unions' members.  The City asserts that any argument that officers are at an increased risk for injury when not permitted to use excessive force is untenable.  It claims that any evidence regarding trainee confusion about the Department's UOF policies is insufficient to create a practical impact on safety.  In addition, the City avers that there is no support for the argument that the Directive places officers at a greater risk of discipline.  It contends that the Directive provides more detailed expectations that make it less likely that officers would inadvertently violate the UOF policy.[93]

---

[93] The City asserts that the installation of additional cameras in DOC facilities neither represents a change to disciplinary policy nor implicates a mandatory subject of bargaining.

The City asserts that it did not engage in direct dealing with COBA's members in violation of NYCCBL § 12-306(a)(1).  The City argues that it acted within its managerial rights under NYCCBL § 12-307(b) when it conducted voluntary information sessions regarding non-mandatory subjects.  It contends that there is no evidence that the DOC negotiated directly with COBA's members, much less attempted to mislead, persuade, or otherwise negotiate without the union.  Further, it contends that statements made to the general public by the Mayor's office regarding the *Nunez* settlement and reform efforts were generic and in no way intended to announce that COBA had endorsed the terms of the settlement or directly participated in crafting the Directive.

Finally, the City argues that COBA failed to identify any failure to provide data normally maintained in the ordinary course of business.  It asserts there can be no violation of NYCCBL § 12-306(c)(4) because the revisions to the Directive are not within the scope of bargaining.

**DISCUSSION**

At the outset, this Board acknowledges that Correction Officers, Captains, and Assistant and Deputy Wardens are highly trained professionals who have the responsibility for the safety and supervision of inmates.  Their work is important, difficult, and inherently dangerous.  The Directive was the means of implementing a federal court order issued to remedy constitutional violations wherein the DOC was directed to take effective steps to dramatically change the manner in which it provides supervision of inmates; namely, by reducing violence and unnecessary and excessive UOF.  When successfully implemented, the mandates of the Consent Judgment are

intended to make the jails less violent and, therefore safer for staff and inmates.  Nevertheless, this process remains on-going.

We consider the Unions' claims in the following order:  duty to bargain over the Consent Judgment, duty to bargain over the Directive, claims of practical impact, direct dealing and independent NYCCBL 13-306 (a)(1) violations, and alleged failure to provide requested information.

**Bargaining Regarding the Consent Judgment**

An overriding issue presented by the petitions is the effect of the Consent Judgment on the parties' bargaining obligations.[94]  COBA maintains that the *Nunez* litigation has no impact on its bargaining rights because it was not a party to that proceeding and that the City was affirmatively obligated to join COBA to that litigation if it is to be bound by the terms of the Consent Judgment.[95] The City argues the opposite, contending that the Consent Judgment is a federal court order that it is obligated to obey; thus its contents are not subject to bargaining.  The City further argues that, irrespective of the Consent Judgment, federal court jurisprudence establishes that the subject matters at issue are excluded from bargaining.  We find that the Consent Judgment, a federal court

---

[94] Because the ADW/DWA and the CCA clarified in their replies that they are not challenging the terms of the Consent Judgment, we need not address the City's argument that their claims are untimely.

[95] In its brief in support of its application for an injunction in connection with this matter (OCB Docket No. BCB-4142-15), COBA averred that it "waited for the finalization of a settlement between the parties involved" and "intended to negotiate with . . . the DOC . . .the impact of the terms of the Consent Decree, including the use of force directive, as it applies to the terms and conditions of Union members' employment." (COBA Injunction Petition ¶ 23)  In this proceeding, it seeks to bargain both decisional and impact bargaining.  We address decisional bargaining here, and impact bargaining below.

order, imposes a legal obligation on the City to abide by its mandates and that the City is not obligated to engage in bargaining over its requirements.

The Southern District of New York held that unions cannot bargain over changes explicitly required by a consent determination. *Floyd v. City of New York*, 302 F.R.D. 69 at 115 (S.D.N.Y.), *aff'd in part, appeal dismissed in part,* 770 F.3d 1051 (2d Cir. 2014) (concluding that "the Court's power to remedy constitutional violations cannot be constrained by PERB or BCB decisions or the Unions' state law rights" and denying police unions' motion to intervene to appeal the court's remedial order concerning the NYPD's stop and frisk policies); *Sheppard v. Phoenix*, 1998 WL 397846, at *8-*9 (S.D.N.Y. July 16, 1998) (finding that UOF provisions in a stipulation remedying violations of inmates' constitutional rights were prohibited subjects of bargaining because "[t]here is no more compelling public policy than compliance with the mandates of the United States Constitution" and denying correction unions' motion to intervene).

Board precedent amply supports the conclusion that the City is not obligated to engage in bargaining over its obligations under the Consent Judgment.  Where an employer's actions are required by law or regulations, the duty to bargain is limited to those matters where the laws and regulations permit the exercise of discretion.  *See, e.g., Local 333, United Marine Division, ILA,* 3 OCB2d 11, at 11-12 (BCB 2010) (finding that bargaining over federal regulations governing drug and alcohol testing was limited to areas where the agency had discretion as to how to achieve compliance); *Doctors Council*, 69 OCB 31, at 11-12 (BCB 2002) (finding no obligation to bargain over disciplinary penalties imposed by statute); *see also Matter of City of Watertown v. State of N.Y. Pub. Empl. Relations Bd.*, 95 N.Y.2d 73, 78-79 (2000) ("The presumption in favor of bargaining may be overcome only in 'special circumstances'… where a specific statutory directive

leaves 'no room for negotiation.'"); *LEEBA*, 3 OCB2d 29, at 25 (BCB 2010) (bargaining over terms and conditions of employment may be prohibited where a negotiation demand is covered by statute and (a) bargaining would contravene law or (b) the subject has been pre-empted by statute).

COBA identifies various state statutes addressing the subject of UOF that arguably establish standards and definitions that differ from the requirements set forth in the Consent Judgment. It contends that this divergence creates confusion as to how COs should perform their jobs, creating safety issues that mandate bargaining over elements of the Consent Judgment. In making this argument, it is unclear whether COBA is seeking decisional bargaining and/or impact bargaining. To the extent it claims that the City's failure to engage in decisional bargaining constitutes an improper practice, we disagree. The Consent Judgment is a federal court order issued to remedy violations of the United States and New York State constitutions. Even if the requirements of the Consent Judgment were to differ from those of the cited state statutes, a conclusion we need not reach, the requirements of the Consent Judgment would prevail. *See* U.S. Constitution, Art. VI; *Sheppard v. Phoenix*, 1998 WL 397846, at *8-*9; 18 U.S.C. §§ 3626(a)(1)(A) and (B).

COBA provides no persuasive authority or argument suggesting that this Board has the authority to abrogate the Consent Judgment, and we decline to take such action. COBA cites to general legal authority regarding the negotiability of matters of safety and New York's broad public policy favoring collective bargaining. It fails, however, to address such authority in the context of a federal court order addressing the matters being challenged. The Consent Judgment is a final court order, which obligates the City to adopt specific requirements regarding the UOF

at the DOC.  Those requirements have been established, and the City is not obligated to bargain over them.[96]

We do not find the failure of the parties in *Nunez* to seek COBA's joinder to the litigation compels a finding that its bargaining rights are unaffected by the Consent Judgment.  COBA relies upon *Assoc. for Retarded Citizens v. Thorne*, 30 F.3d 367 (2nd Cir. 1994), for this assertion.  We find that *Thorne* is not controlling here.  In *Thorne*, a court was found to have abused its discretion by joining a state agency to a lawsuit two years after a consent decree had been issued. Importantly, the lower court had not reached the constitutional issues presented.[97]  Here, the *Nunez* court found constitutional violations.  The Consent Judgment specifically states:

> The Parties stipulate and agree, *and the Court finds*, that this Agreement complies in all respects with the provisions of 18 U.S.C. § 1626(a).  The Parties further stipulate and agree, *and the Court finds*, that the prospective relief in this Agreement is narrowly drawn, extends no further than is necessary to correct the violations of federal rights as alleged by the United States and the Plaintiff Class, is the least intrusive means necessary to correct these violations, and will not have an adverse impact on public safety or the operation of a criminal justice system.  Accordingly, the Parties agree and represent that the Agreement complies with the provisions of 18 U.S.C. § 3626(a).  Except to enforce this Agreement, this section shall not be admissible in any court, for any purpose.

---

[96] We reject COBA's claim that there is no basis for a consent judgment to affect its bargaining rights because it was reached in a "private lawsuit."  (COBA Pet. 22) *Nunez* was a lawsuit prosecuted by, among others, the United States Department of Justice against the City and the DOC, all of whom are public entities.

[97] In addition, *Thorne* pertains to an application to join a party to a lawsuit.  It does not stand for the proposition that a consent decree is inapplicable to parties that have not been joined.  In fact, a non-party may be bound by a court order if its actions would frustrate the court's order.  *See Ronnie Van Zant, Inc. v. Pyle*, 20 F. Supp.3d 656, 673-674 (S.D.N.Y 2017) (limiting *Thorne* to joinder applications and enforcing a consent decree against a third party).

Consent Judgment (XXIL) (1) (emphasis added).

The inclusion of a section in the Consent Judgment regarding its compliance with the requirements of 18 U.S.C. § 3626(a) is not insignificant.  This section of the U.S. Code requires that judicial relief regarding prison conditions may not be granted or approved "unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the [f]ederal right, and is the least intrusive means [to do so]."  18 U.S.C. § 3626(a)(1)(A).  In addition, it provides that such a court order may not require a government official to exceed their authority unless a violation of state or local law is required under federal law, the relief is necessary and no other relief will correct the violation of a federal right.  18 U.S.C. § 3626(a)(1)(B).

We are also not persuaded by COBA's assertion that *Sheppard v. Phoenix*, 1998 WL 397846, does not apply here.  In *Sheppard*, the federal court held that the provisions of a stipulation of settlement to remedy constitutional violations in the City's prison system were not subject to collective bargaining.  COBA and CCA had attempted to intervene in the proceeding after a settlement was reached following several years of litigation but while the agreement was pending court approval.  Contrary to COBA's portrayal, the court described many of the underlying issues encompassed by the stipulation, including UOF policy, the investigation of UOF incidents, employee discipline and penalty schedules, staff assignments and transfers, the use of chemical agents, and access to employee records.  The court held that the matters the unions sought to bargain were prohibited based on both the management rights provision of the NYCCBL as well as public policy.  The court explained the public policy upon which its decision was based in blunt terms:

> There is no more compelling public policy than compliance with the mandates of the United States Constitution . . .clearly the responsibilities conferred upon the City of New York (and all other state and local governments), by the federal courts, for safeguarding the constitutional rights of incarcerated persons in their custody, cannot be delegated, abnegated or surrendered through collective bargaining.

*Id.* at \*8.  We are now confronted with a federal court order imposed under strikingly similar circumstances.  As the *Sheppard* court explained:

> A federal court faced with a pattern of constitutional violations has an obligation to remedy it.  The City has acknowledged that the remedies set out in the Stipulation are narrowly drawn, extend no further than is necessary to correction [sic] the violations of the class's constitutional rights, and are the least intrusive means necessary to accomplish redress.

*Id*. (citations omitted).  COBA has provided no compelling argument or legal authority to ignore *Sheppard's* holding, and we decline to do so.

Accordingly, we find that the terms of the Consent Judgment have the force of law and, therefore, are not mandatory subjects of bargaining.[98]  Similarly, the provisions of the Directive that were expressly required by the Consent Judgment do not fall within the DOC's duty to bargain.[99]

---

[98] Unless otherwise noted, we do not separately address all claims relating to Directive 7003 because it was a short-term, pilot program applicable to only one DOC facility and its provisions were incorporated into and replaced by provisions of the Directive that are discussed here.

[99] We do not repeat the provisions of the Directive required by the Consent Judgment here, but they can be found in the Background section under the heading "Directive."  Because the Consent Judgment requires staff to complete UOF reports independently, we do not address CCA's allegation that by prohibiting members from consulting with their union representatives before submitting these reports the DOC has interfered with union activity.

**Duty to Bargain over the Directive**

It is well settled that an employer violates its duty to bargain in good faith when it makes a unilateral change to a mandatory subject of bargaining.  *See UFA*, 10 OCB2d 5, at 13 (BCB 2017).  Therefore, when a new policy or directive is alleged to violate the duty to bargain in good faith, the petitioner must show that the new policy or directive is a material change.  *See DC 37, L.436*, 4 OCB2d 31, at 13 (BCB 2011); *PBA*, 73 OCB 12, at 17 (BCB 2004).  We find that many of the provisions of the Directive that the Unions seek to bargain are identical or substantially the same as those found in the prior UOF policy.  To the extent Directive provisions are identical or substantially the same as those in the earlier policy, the Directive did not materially change the DOC's UOF policy, and therefore we find it did not give rise to the duty to bargain.[100]

Generally, the Directive provides much greater emphasis and provides greater detail on the need to use minimal and proportional force and avoid all unnecessary and excessive use of force than its predecessor.  Therefore, in certain instances the complained-of provision in the Directive is not identical to the corollary section of the prior policy, i.e. additional or fewer words or phrases are used.  In the following instances, we find that despite some variation, the instruction provided was substantially the same in both policies.  Section (V)(A)(6) of the Directive provides force may be used to enforce rules, policies or court orders "*when there is an immediate need for compliance.*"  (emphasis added) Section (IV)(A)(4) of the prior policy allowed UOF in the same instances, but that section of the policy did not limit such action to when there is an immediate

---

[100] The provisions of the Directive that we find were not changed can be found in the Background section under the heading "Directive."  Because we find there was no substantive change to these provisions, we are not reaching the issue of whether they are mandatory subjects of bargaining.

need.  Nevertheless, a review of the prior policy shows that staff was instructed that unless "immediate physical intervention" was needed, non-force techniques must be used.  (prior directive § (V)(A)(1)) Therefore, we find the different phrasing in § (V)(A)(6) of the Directive does not present a substantive change in the DOC's policy.

A minor variance is also present between § (VI)(B)(1)(e) of the Directive and § (V)(B)(2)(c) of the prior policy, which set forth acceptable initial UOF tactics.  The Directive requires the use of chemical agents first, "unless circumstance dictate otherwise."  (Directive § (VI)(B)(1)(e))  The prior policy does not contain this statement, but instead provides that staff must start with the minimum amount of force and if needed escalate to more severe tactics, and lists in order of escalation: talking, intervention of mental health staff (when appropriate) and "non-contact control techniques such as hand-held chemical agents . . . ." (prior directive § (V)(B)(2)) Further, the prior policy introduces these acceptable tactics by expressly acknowledging that "not all options will be available in all circumstances."  (*Id.*)  In short, both policies require unit members to employ the least level of force at the outset, namely chemical agents, and acknowledge that the escalation order of tactics may not apply in all circumstances.  Accordingly, we find that while certain tasks or instructions are articulated differently in the Directive, there was no substantive change to the instruction concerning the use of chemical agents to de-escalate a confrontation.

The Unions also identified a few Directive provisions that are new and that were not mandated by the Consent Judgment: certain undefined terms, training, tasks and assignments, and the standard for UOF reviews.  For each of these provisions, we discuss whether they concern mandatory subjects of bargaining.

The Unions complain that the Directive uses but fails to define certain terms such as "misleading," "lawful purpose" and "otherwise derogatory slurs."[101]   (Directive §§ (II)(J), (V)(B)(1)(d) and (2)(b))  These terms are not expressly defined but are used in the Directive when setting forth staff actions that are prohibited.  For example, the new policy prohibits the filing of "false or misleading" reports on UOF incidents.  (Directive § (II)(J))  We disagree that these terms are vague or confusing in the absence of explicit definitions.  Therefore, we do not find their usage imposes a duty to bargain.

Similarly, to the extent the absence of a clear definition is part of the Unions' claim that the DOC has a duty to bargain over training provided on the Directive, the Board has held that training is not a mandatory subject of bargaining.  *See, e.g., UFA*, 37 OCB 43, at 15 (BCB 1986).  The exception to this general rule is when training is required by an employer as a qualification for continued employment, for improvement in pay or work assignments, or for promotion.  *See UFOA*, 71 OCB 6, at 9 (BCB 2003).  While the training given on the Directive was required for all staff, it was not related to any new qualification for continued employment, pay increase, additional work assignment, or promotion.  *See COBA*, 11 OCB2d 17 (BCB 2018) (bargaining not required where mandatory training was not a prerequisite for an assignment); *UFOA*, 71 OCB 6, at 9 (BCB 2003) (citing *DC 37*, 69 OCB 20, at 5-6 (BCB 2002); *UFA*, 37 OCB 43, at 15; *NYSNA*, 11 OCB 2, at 15 (BCB 1973)).  Rather, the Directive is a revised policy that provides instructions to staff on how to effectively perform their pre-existing job duties.  The fact that staff may now be

---

[101] COBA complains about many other undefined terms, including but not limited to the words: "provoking," "harassment," "humiliation." (COBA Pet. at 112-114.)

tested or that they must certify that they completed training, does not transform the new training required by the Consent Judgment and provided by the DOC into a mandatory subject of bargaining. Therefore, we do not find merit in the Unions' claims that the DOC violated its duty to bargain over the training provided.

There are certain provisions of the Directive that specify new tasks to be performed and/or specifically designate who is responsible for certain duties.[102] For example, § (VI)(A)(3)(d)(ii) of the Directive provides that when a UOF is anticipated, the supervisor, in conferring with medical care staff, must "gather pertinent information about the Inmate's medical condition and mental health status"; and § (VI)(C)(1) and (3) specifically directs the Tour Commander, after a UOF incident, to assign an escort team that was not present at the incident and ensure the preservation of all evidence. The Directive also expressly designates the Tour Commander as having the authority to permit staff to leave a facility without completing a UOF report. (Directive § (VI)(C)(5)(a)(ii)) Further, Directive § (VI)(B)(1)(f)(ii) now requires staff to call upon mental health professionals "when appropriate" in all UOF incidents, not merely in situations when a UOF is anticipated as required in the prior directive. The Unions cite these and other Directive provisions and generally contend that they set forth new work rules and create new disciplinary standards for bargaining unit members. Moreover, in several instances the Unions characterize these provisions as procedures that are mandatory subjects of bargaining.

---

[102] The conclusions in this paragraph also apply to two sections of Directive 7003, which was the subject of BCB-4137-15. One provision concerns the Tour Commander's role in investigation of UOF incidents, and the other concerns the Deputy Warden's authority to interview staff and advise the Warden of issues in UOF investigations. (Directive 7003 §§ (III)(B) and (C)(1))

NYCCBL § 12-307(b) grants employers the right "to direct its employees, maintain efficient governmental operations, and determine the methods, means and personnel by which government operations are to be conducted." *UFA*, 3 OCB2d 16, at 27 (BCB 2010) (citing *DC 37, L. 1506*, 79 OCB 21, at 23 (BCB 2007)).  While we have found that certain procedures relating to a management right fall within the scope of bargaining, merely labeling something a procedure does not automatically make it bargainable.  *See generally*, *DC 37*, 75 OCB 13, at 11 (BCB 2005) (procedures for implementing performance evaluations, imposing and reviewing disciplinary action, and determining eligibility for merit pay are mandatory subjects of bargaining) (citing *PBA*, 63 OCB 2 (BCB 1999); *DC 37*, 67 OCB 25 (BCB 2001); and *Local 371, SSEU*, 71 OCB 31 (BCB 2003)).  Indeed, management has the discretion to determine job assignments.  *See DC 37, L. 376*, 79 OCB 20, at 13 (BCB 2007); *DC 37, L. 3621*, 11 OCB2d 5, at 22 (BCB 2018).  In addition, it can unilaterally determine how job assignments are performed.  *See UFA*, 13 OCB2d 9, at 30-31 (BCB 2020) (specified tasks in active shooter incidents such as identifying a staging location, use of discretion in communications, and coordinating with NYPD personnel are not mandatory subjects of bargaining); *COBA*, 10 OCB2d 21, at 13 (BCB 2017) (new instruction requiring COs to "ensure the physician responsible for the inmate's medical care completes the revised restraint form as soon as practicable" not a mandatory subject of bargaining); *UFA,* 3 OCB2d 16, at 27-28 (BCB 2010) (instructions to wear specific suits, be equipped with proper respiratory protection, and perform decontaminations on gear and rigs were not mandatory subjects of bargaining)

We find that the provisions of the Directive cited here by the Unions are not procedures relating to a management right.  Instead, they are instructions and guidelines to staff on when and how to use force and other techniques to control inmates that fall squarely within the DOC's right

to direct its employees.  The Directive sets forth tasks and responsibilities to follow in UOF situations and in some instances makes specific assignments of duties.  In setting forth these instructions, certain prohibited actions are also described.  Nevertheless, the policy essentially sets forth "the methods, means and personnel by which" DOC has determined its "operations are to be conducted" and therefore falls squarely within management's right "to direct its employees." NYCCBL § 12-307(b).  *See COBA*, 69 OCB 26, at 11; *Poughkeepsie City School Dist.*, 19 PERB ¶ 3046.  Therefore, we do not find that the Directive contains procedures that require bargaining.[103]

Similarly, we do not find the Directive contains predicates for discipline that are mandatory subjects of bargaining.  To be clear, this claim is only proper as to the limited Directive provisions concerning tasks or assignments that are new or substantive changes.  As set forth above, those changes fall within management's discretion to direct its workforce.  Moreover, we have held that mere exposure to disciplinary consequences does not give rise to an obligation to bargain.  *See COBA*, 69 OCB 26, at 11 (standards for sick leave monitoring are not mandatory subjects of bargaining).  *See also Doctors Council*, 69 OCB 24, at 8-9 (BCB 2002) (an employer has the right to promulgate productivity standards, therefore, it has the "inherent right to enforce those standards" through the exercise of its disciplinary powers); *State of New York (OMH)*, 31 PERB ¶ 3051, at 3106 ("All employer directives to employees carry with them, at least implicitly, the possibility of an employment consequence for noncompliance.").  *Cf. UFOA* 39 OCB 7 (BCB 1987), *affd and modified in part*, *Levitt v. Board of Collective Bargaining*, 140 Misc.2d 727 (Sup.

---

[103] We also do not find that any aspect of the Directive can be construed as a disciplinary procedure that would require bargaining.

Ct. N.Y. Co. 1988), *affd.*, 171 A.D.2d 545 (1st Dept. 1991), *affd in part*, *modified in part*, 79 N.Y.2d 120 (1992) (policy regarding payroll deduction debt collection a new predicate for discipline).

The Unions also claim that § (VI)(C)(4)(a) of the Directive is new, infringes on bargaining unit members' privacy rights, and is a mandatory subject of bargaining. This provision expressly requires Captains to photograph subordinates' injuries after a UOF incident. While Captains were assigned this duty as it related to inmates in the earlier policy, the new policy expands the Captains' photography responsibilities to subordinates' injuries. As indicated above, to the extent the Unions' complaints concern the assignment of additional photography duties specifically to Captains, this provision is not a mandatory subject of bargaining. *See DC 37, L. 3621*, 11 OCB2d 5, at 22 (no duty to bargain "assigning and directing [] employees, determining their duties during working hours, and allocating duties among [] employees, unless the parties themselves limit that right in bargaining") (citing *COBA*, 63 OCB 26, at 9-10 (BCB 1999); *PBA*, 63 OCB 12 (BCB 1999), *affd.*, *Matter of Saunders v. DeCosta*, Index No. 103467/1999 (Sup. Ct. N.Y. Co. July 7, 1999) (Wilkins, J.)); *Local 621, SEIU*, 51 OCB 34 (BCB 1993)).

Further, to the extent the Unions object to this requirement on the basis that requiring injured staff be photographed infringes on their personal privacy, we need not address this issue because photographing staff injuries due to assaults is not new and is required by the Consent Judgment. Prior to issuance of the Directive, DOC Operations Order 20/07 required commanding officers "to ensure that digital color photographs are taken" when there is an "[a]ssault on staff, where injuries are present or claimed . . .." (City Ans. (BCB-4137-15), Ex. 4, at (III)(A)). In addition, the Consent Judgment requires that "color photographs also shall be taken of Staff

Members who sustained injuries during the Use of Force incident."  (COBA Pet., Ex. A, §
(VII)(13)(e)).  Accordingly, because we find that photographing staff injuries after a UOF incident
was required prior to issuance of the Directive, insertion of that requirement in the policy and its
impact on employee privacy does not give rise to a duty to bargain.[104]  *See COBA*, 11 OCB2d 17,
at 15-16 (BCB 2018), *affd. sub nom. Correction Officers' Benevolent Assn v. NYC Bd of Coll Barg,
et al.*, Index No. 101012/2018, 182 A.D.3d 522 (1st Dept. Apr. 30, 2020) (holding that addition of
UOF screening requirement to Operations Order criteria for awarding job assignments was not a
substantive change to prior practice); *DC 37, L.436*, 4 OCB2d 31, at 13 (BCB 2011); *PBA*, 73
OCB 12, at 17 (BCB 2004).

      The Unions also seek to bargain over the standard used when the DOC reviews a UOF.
The Directive provides that the need for force is based on all elements of the situation including
the amount of inmate resistance.  Further, it provides that the standard for review will be based on
the staff's "perceptions during the situation" and "judged from the perspective of a reasonable
Staff Member on the scene."  (Directive § (VI)(B)(1)(b))  In essence, the Unions maintain that this
standard is new and that it minimizes or eliminates the perspective of the staff member involved
when determining whether the need to use force was appropriate.  The City maintains that UOF
reviews have always been based on whether the action taken was reasonable and asserts that the
Unions' claim that the standard has changed is speculative.  The record reflects that the DOC's
policies have always mandated a review of UOF incidents.  In addition, the express language of

---

[104] Because we find no change to this instruction, we do not address the claim that requiring
photographs of an injured officer creates a practical impact on his or her privacy.

the Directive indicates that the perception of the staff involved in the incident is considered when reviewing a UOF.  On these points there is no evidence of a change.  However, there is a dispute of fact concerning whether consideration of "the perspective of a reasonable Staff Member on the scene" is new.

The Directive makes clear that if the DOC concludes that the action was excessive, there is potential for discipline.[105]  Inherent in that policy, as well as its predecessor, is that actions taken consistent with the instructions and guidelines will be considered appropriate while actions that are inconsistent may be considered excessive or unnecessary UOF.  In this regard, the DOC Commissioner emphasized in his November 2015 teletype order that "[t]he guiding principle behind all use of force will continue to be whether the force was necessary to control the situation and was reasonable under the circumstances." (City Ans., Ex. 6)  Accordingly, there is insufficient evidence to conclude that the newly articulated consideration of the reasonable staff member's perspective is different from the pre-existing analysis.

Even assuming that the standard of review for UOF is new, we do not find it is a mandatory subject of bargaining.  We have long stated that it is an employer's prerogative to determine whether to discipline and that criteria related to that determination are not mandatory subjects of bargaining.  *See PBA*, 11 OCB2d 20 at 21 (BCB 2018) ("establishing criteria used for evaluation, and substantive changes to those criteria, are not mandatory subjects of bargaining") (citing *PBA*, 6 OCB2d 36, at 15; *DC 37, L. 1508*, 79 OCB 21, at 25 (BCB 2007) (citing *Matter of Patrolmen's*

---

[105] *See COBA,* 12 OCB2d 3 (BCB 2019), for a discussion of the DOC's Disciplinary Guidelines for violations of the Directive.

*Benevolent Assn. of the City of NY v NY City Bd. of Collective Bargaining*, Index No. 112687/04,

at 4 (Sup. Ct. N.Y. Co. Aug. 17, 2005) (Friedman, J.), *affd.,* 38 AD3d 482 (1st Dept. 2007)); *PBA*,

6 OCB2d 33 at 9 (BCB 2013) (changes in criteria and standards in performance evaluations are

not subject to bargaining).  *See also* NYCCBL § 12-306(b).  Further, in reviewing whether certain

COBA bargaining proposals that related to the DOC's Disciplinary Guidelines were appropriate

for impasse, we found that a proposal seeking to negotiate a "standard of review to be used by the

DOC Commissioner . . . in the formal discipline process" was not a mandatory subject of

bargaining.  *COBA*, 12 OCB2d 3, at 20.  While the standard of review at issue here may be applied

during the investigation stage and prior to commencement of a formal disciplinary process, it is

nevertheless within the purview of management to determine the standard for such performance

review.  Accordingly, we find that the standard applied to reviews of UOF in the Directive is not

a mandatory subject of bargaining.

### Allegations of Practical Impacts on Terms and Conditions of Employment

Petitioners have alleged multiple practical impacts on the terms and conditions of

employment of their unit members resulting from the DOC's implementation of the Directive.  In

analyzing allegations of practical impact, we recognize that the City's managerial prerogative

under NYCCBL § 12-307(b) is not an unfettered right.  Rather, it balances the rights of

management and public employees.  *See UFA*, 3 OCB2d 16, at 29 (BCB 2010) (citing *UFA*, 43

OCB 70, at 3 (BCB 1989) (holding that "managerial action (or inaction) may be challenged . . . on

the ground that it allegedly has had a 'practical impact' on affected employees")).  Notwithstanding

that the City's managerial right is not unlimited, we cannot find a practical impact on employees

where there has been no change to the terms and conditions of employment.  Therefore, we do not

address any alleged practical impact relating to the provisions of the Directive that we found to be substantially the same as in the prior UOF policy.

We have held that "a public employer is not required to bargain over a question concerning a practical impact prior to this Board determining that a practical impact exists." *DC 37*, *L. 3621 & 2507*, 11 OCB2d 10, at 21 (BCB 2018) (citation omitted). "A petitioner urging the Board to find such an impact must present more than conclusory statements of a practical impact in order to require the employer to bargain." *Id.* In establishing a finding of practical impact on safety, a union "must substantiate with sufficiently specific details . . . the existence of a threat to safety." *EMS Superior Officers Assn.*, 75 OCB 15, at 16 (BCB 2005). However, we have consistently held that a finding of practical impact on safety does not require a showing of actual injury. A potential impact arising from exposure to a dangerous condition can be a basis for finding that a practical safety impact exists and ordering the parties to bargain over said impact. *See EMS Superior Officers Assn.*, 79 OCB 7, at 31 (BCB 2007) ("[T]he Board does not require a union to show that injuries have actually resulted from management's action in order to demonstrate a practical impact on safety"). Where the record demonstrates such concrete potential for injury, the Board will order the parties to bargain over its amelioration.

We first analyze Petitioners' claims of a practical impact on officer safety. In determining whether a practical impact on safety exists, this Board has considered such factors as whether the employer has adopted measures that offset any potential threat to safety and whether employees' adherence to management procedures and guidelines would obviate any safety concerns. *See UFA*, 7 OCB2d 4, at 19 (BCB 2014); *see also LBA*, 51 OCB 45, at 30 (BCB 1991) (holding no practical impact on safety existed because employer's solo patrol program incorporated safeguards,

including only dispatching solo patrols "as back-up units in emergencies when no other back-up unit is available"); *UFA*, 43 OCB 70, at 7-8 (finding no practical impact on safety would occur through the FDNY's proposed plan to reduce the minimum staffing requirement in some firefighting companies from five to four-person crews due, in part, to adaptive response and revised engine company tactics).

Petitioners allege that the Directive's prohibitions on certain previously permissible techniques used to contain and control inmates result in a practical safety impact on officers by limiting their means of protecting themselves. These include the prohibition on the use of "high impact force," including "[s]trikes or blows to the head, face, groin, neck, kidneys and spinal column;" "kicks;" and "[c]hoke holds, carotid restraint holds and other neck restraints." (*See* Directive § (II)(G)) In essence, some witnesses testified that these techniques were effective in gaining control of noncompliant inmates and that prohibiting these actions, some of which are instinctive, will cause staff to be reluctant to take any action against an inmate and therefore increase the possibility of officer injury.

We recognize that the revisions set forth in the Directive amount to a shift in how officers approach a potentially violent inmate. However, a review of the evidence does not establish that the prohibition and removal of these particular high-impact force techniques has directly resulted or may result in a safety impact on officers. *See EMS Superior Officers Assn.*, 75 OCB 15, at 16. Substantially the same limitations on using choke holds, kicking, or intentionally striking an inmate's head against the wall, floor, or other object existed in the prior directive, except as either a "last resort" or only when the use of deadly force was permissible. (*See* prior directive §(V)(B)(2)(g) and (h)) Further, the Directive is clear that an exception to the prohibitions on these

high impact force techniques exists: "[i]n a situation where a Staff Member or other person is in imminent danger of serious bodily injury or death, and where lesser means are impractical or ineffective, Staff Members may use any necessary means readily available to stop or control the situation."  (Directive §§ (II)(3) and (VI)(B)(1)(f)(x))  This exception is stated in two separate places in the Directive.  Accordingly, the evidence does not support the conclusion that the Directive's prohibition on use of these high-impact force techniques places officers at any greater risk of harm.

We do not find that requiring the initial use of non-violent de-escalation tactics in lieu of using force has a practical impact on officer safety.  While certain UOF tactics used to control inmates may have become instinctual for officers, it does not necessarily follow that prohibiting those tactics and requiring officers to hone other skills will put officers at greater risk of injury. Indeed, CO Boyd testified that the new defensive techniques taught to officers are effective in controlling situations they encounter with inmates.  Similarly, Captain Abdul-Malik stated that new techniques that permit staff to safely take a person down to the floor and subdue them minimizes injury.

We acknowledge that hesitancy to take action may have an effect on the outcome of a conflict situation.  Correction staff must evaluate how to handle inmates quickly and often instinctively.  The testimony presented by the Union witnesses that officers are now hesitant to use force or are fearful of using the non-violent techniques and de-escalation tactics required by the Directive should be of great concern to the DOC as it may be an impediment to achieving full compliance with the Consent Judgment.  Nevertheless, we find no evidence that these new mandates have had a direct impact on officer safety.  On the contrary, the Directive sets forth a

series of actions that should be taken and describes how staff should determine what tactics are appropriate at various times.  Evaluating a conflict or inmate resistance situation and determining the appropriate action to take is inherent in the responsibility for inmate supervision.  Therefore, we find no evidence that new mandates to use non-violent techniques or de-escalation have had a direct impact on officer safety.[106]

Our conclusion is bolstered by the Monitor's conclusions regarding the current cause of the increased number of UOF incidents.  The Monitor notes that notwithstanding the declining inmate population, statistics show a rise in the total number of UOF incidents since November 2015.  (*See Ninth Report* at 2)  The *Ninth Report* notes that the frequency of excessive or unnecessary UOFs "has not shown a marked decrease" since the effective date of the Consent Judgment (*Id.* at 3), but concludes that "too often, Staff select approaches which escalate and exacerbate the problem (e.g., painful escort, hyper-confrontation) rather than solve it, which increases both the likelihood that force will be used and the potential for harm."  (*Id.* at 13, 14)

---

[106] We further find no support in the record for the assertion that the Directive's prohibitions on staff provoking inmates to commit an assault; using racial, ethnic, homophobic, or otherwise derogatory slurs; and harassing or publicly humiliating inmates result in a practical impact on safety by rendering COs less able to protect themselves.  Similarly, we reject the claim that the prohibitions on using force in response to verbal insults, threats, and swearing by inmates or using "unnecessarily" painful escort or restraint techniques without a lawful purpose have a practical impact on officer safety.  Regarding the latter prohibition, we cannot condone UOF for an unlawful purpose.  Moreover, there is no evidence in the record that the inability to use these tactics has a safety impact on officers.

Additionally, we do not find a safety impact due to insufficient or confusing instructions.[107] While there is no dispute that officers have been trained on the Directive's policies, a number of witnesses testified that many aspects of the training were confusing and inconsistent. They described inconsistencies between the Directive's language and what was being taught, inconsistencies between the Directive and the New York State Criminal Procedure Law, and confusion regarding when to use force, what kind of force to apply, and prohibited versus permissible tactics. Testimony was offered to show that some officers were confused about the instructions given in training and that this lack of clarity could result in officer injury. Officer Craig's testimony, for example, referenced a series of training videos involving officers engaged in UOFs that he contends created confusion among the staff regarding when force is permissible, and led to officer injury based on their failure to act. Officer Boyd testified that officers informed him that they were taught during training that they cannot defend themselves unless the inmate makes contact first notwithstanding that no such rule is in the Directive. He further testified that officers believed that they could violate the Directive if they accidently performed the wrong type of kick. Officer Mack testified that officers expressed confusion over the zero-tolerance policy for excessive and unnecessary force. He testified that confusion exists because supervisors are discouraging staff from engaging in UOFs and using deadly force, even under permissible

---

[107] We find that the Unions have not alleged specific, probative facts to support the contention that the vagueness or lack of clarity of certain terms in the Directive, such as "misleading," "lawful purpose," "otherwise derogatory slurs," "provoking," "harassment," and "humiliation," or undefined terms such as "minimum amount necessary," "the proportionality requirement," or "lawful purpose" have resulted or could result in a practical impact on officer safety. (COBA Closing Br. p. 12)

circumstances.  Still other witnesses expressed confusion over the "objective reasonableness standard" and whether an officer's judgment would be deemed unreasonable based on the perceptions of a witness to the incident.

Unlike in an office, here the potential for injury is significant and pervasive should an officer not take effective steps to control an uncooperative inmate.  However, as noted earlier, the Directive and the accompanying training provided do not prohibit staff from using force when reasonably necessary.  Instead, the Directive requires officers to use non-violent means to control a situation unless those tactics have been or would be unsuccessful.  This requires officers to make decisions in the moment, as they always have, to select the least amount of force necessary to subdue an inmate.  Accordingly, we are not persuaded that officer confusion over aspects of the training demonstrate a safety impact.  Witness testimony reflected that officers are being retrained on permissible UOFs and are discouraged from using unnecessary or excessive force consistent with the express provisions of the Directive and the goals of the Consent Judgment.  While it is unfortunate that some trainers may have provided officers with information that either contradicts or is not included in the Directive, we do not find that such errors are pervasive or will result in a safety impact on officers.

Moreover, in significant part, witness testimony regarding officers' confusion reflects that it largely related to concerns about heightened scrutiny over UOFs and an increased risk of discipline for engaging in improper UOFs.  These concerns are reasonable in light of the Consent Judgment and its mandates, the purposes of which are to significantly reduce UOFs and eliminate unnecessary and excessive UOFs.  It is also true that heightened enforcement of these policy goals may lead to more disciplinary actions.  However, we have long held that mere exposure to

disciplinary consequences does not give rise to a bargainable impact claim.  *See COBA*, 12 OCB2d

3, at 16.  *See also Doctors Council*, 69 OCB 24, at 8-9 (an employer has the right to promulgate

productivity standards, therefore it has the "inherent right to enforce those standards" through the

exercise of its disciplinary powers).  Moreover, as we have stated, we do not find that the

instruction to use the least amount of force necessary is new.  Indeed, the Consent Judgment, the

Directive, and the accompanying training have placed staff on notice that adherence to the UOF

policy is expected, and the DOC has afforded them time to learn, understand, and adapt to these

expectations.[108]  Therefore, we do not find that heightened scrutiny of staff UOFs has created a

practical impact that requires bargaining.

      We next analyze whether any of the new duties or instructions set forth in the Directive

create a safety impact on officers.  These requirements mandate that staff who witness a "clearly

excessive" UOF attempt to stop or reduce the force used "where practical and consistent with

safety and security" and that, following a UOF incident, a Tour Commander shall ensure that staff

most directly involved in the incident do not escort the inmate from the scene.  (*See* Directive ¶

(II)(H))  Additionally, prior to an anticipated UOF, a mental health professional must now be

summoned if one is available and there is no safety risk, and the Tour Commander shall allow the

mental health professional a reasonable amount of time to gain the inmate's compliance, if

---

[108] As we have held, the decision to provide training is not a mandatory subject of bargaining.  *See, e.g., UFA*, 37 OCB 43, at 15.  To the extent Petitioners allege that no training was provided on certain Directive topics, such as report writing, and when to call a supervisor or use a personal body alarm prior to a UOF, we do not find evidence in the record that a lack of training on these matters creates a practical impact on the safety of officers.

practicable.   Previously, these requirements involving a mental health professional were only mandated in the context of an inmate extraction.

Initially, we find no evidence supporting an allegation that the duty to intervene to stop an unnecessary or excessive UOF may result in a practical safety impact on the intervening officers. Moreover, on its face, this provision provides a caveat that officers need only intervene where it can be done so safely, and witness testimony confirms that such an obligation does not mandate that the intervening witness restrain the offending officer.   COBA contends that summoning a mental health professional and allowing that person time to gain the inmate's compliance "pressures the supervisors, including Tour Commanders, to hesitate by summoning non-correction staff rather than take swift action to subdue a dangerous inmate."  (COBA Pet. ¶ 138) According to COBA, this "hesitation" makes an officer vulnerable to attack and thus poses a direct safety threat.   As noted above, none of these new instructions are mandated in all incidents.   To the contrary, they are required only when safety and security will not be compromised.   Therefore, we do not find that the new instructions support a practical impact on the safety of officers or the Tour Commander.  *See DC 37, L. 3621 & 2507*, 11 OCB2d 10, at 21 ("A petitioner urging the Board to find such an impact must present more than conclusory statements of a practical impact in order to require the employer to bargain.")

Here, the record is also clear that all DOC officers have been provided training in techniques to utilize in lieu of more aggressive and violent tactics.[109]   This Board has recognized

---

[109] To the extent Petitioners argue that delays in training officers on the Directive's policies negatively impacted their safety, the record reflects that training of DOC staff was completed by September 2017 prior to the effective date of the Directive, September 27, 2017.   Accordingly, we

that the failure to properly train employees may result in a practical impact. *See UFA*, *L. 854*,

*IAFF*, 49 OCB 39 (BCB 1992) (failure to properly train light-duty firefighters in the duties unique

to Division Aides negatively impacted the safety of full-duty firefighters working with them at the

fire scene).  Here, the record reflects that during the DOC's training process and to some extent

thereafter, staff were confused and/or misunderstood when certain tactics and techniques should

be utilized.  Nevertheless, we do not find this evidence sufficient to conclude that the training

provided was inadequate such that a practical impact was established.  *See UFA*, 7 OCB2d 4, at

19 (to demonstrate whether a safety impact results from a failure to train or properly train,

petitioner must show that the lack of training had a direct impact upon safety).  *See also PBA*, 63

OCB 12, at 7 (BCB 1999) (evidence of lesser amount of training and supervision given to recruits

than officers does not make recruits' work unsafe, nor is there evidence that more training would

have prevented one traffic-related injury), *affd. sub. nom. Savage v. DeCosta*, 120860 (Sup. Ct.

N.Y. Co. Jan 13, 1999).

Petitioners also allege that the implementation of the Directive has resulted in a practical

impact on officers' workload.  Specifically, COBA argues that the "vast amount of culture

changing information in the Directives" has required COs to engage in "extensive off duty study

and analysis."[110]  (COBA Br. at 57)  It further contends that the Directive's revised investigation

procedures require that COs in the ID gather more detailed information in a shorter time period

---

find no practical impact on safety resulting from any delay in officer training on the Directive.

[110] We find no support in the record for the assertion that learning the concepts in the Directive
required "extensive off duty study."  (COBA Br. at 57)

than previously mandated.  COBA argues that this change resulted in increased accountability and discipline for COs who fail to meet these more rigorous standards.  Similarly, the ADW/DWA contends that the Directive "impermissibly increases" the duties required of its bargaining unit members by mandating that they complete additional tasks, including ensuring the operation and function of the cameras in their facilities as well as that inmates subjected to a UOF receive immediate medical attention.  (ADW/DWA Br. at 24)  Unit members must also complete additional tasks following a UOF, including submitting photos and related reports of subordinates and inmates involved in a UOF, and uploading and reviewing videos of UOF incidents, none of which were required under the prior directive.  Additionally, the ADW/DWA asserts that supervisory obligations for reporting UOF incidents contain stringent deadlines that did not exist in the prior directive.

To successfully establish a case for a practical workload impact, the Board has held that a petitioner must "allege sufficient facts to show that the managerial decision created an unreasonably excessive or unduly burdensome workload as a regular condition of employment." *DC 37*, *L. 3621 & 2507*, 11 OCB2d 10, at 21.  A petitioner "does not demonstrate a practical impact [on workload] merely by enumerating additional duties assigned to employees or by noting a new assignment of duties covered in the job specifications."  *Local 333*, *UMD*, 5 OCB2d 15, at 14-15 (BCB 2012) (citation omitted).  Thus, a "claim of increased workload during the workday does not amount to a workload impact absent a showing that employees were subject to working more time than scheduled or overtime to complete their work."  *Id.* at 15-16 (citation omitted).

Based on the record before us, we find that the new duties in the Directive have not created a practical workload impact on unit members that requires bargaining.  The Unions' claims of

workload impact are based on responsibilities and tasks set forth in the Directive that bargaining

unit members were not previously required to perform.  Our caselaw is clear, however, that an

increase in responsibilities alone does not "constitute[s] an unreasonably excessive or unduly

burdensome workload as a regular condition of employment."  *See ADW/DWA*, 69 OCB 16, at 7

(BCB 2002) (citation omitted).  In addition, while new or stricter deadlines to perform certain tasks

may be burdensome, there is no evidence in the record that unit members are unable to meet these

deadlines or that they had to work overtime to do so.  Indeed, we have declined to find a workload

impact even in scenarios where the employees' caseload has doubled.  *See*, *e.g.*, *PPOA*, *L. 599*,

*SEIU*, 17 OCB 2 at 15 (BCB 1976) (doubling of probation officers' caseloads was not, in and of

itself, sufficient to establish a workload impact, in part because "both before and after the layoffs,

probation officers have been required to work to capacity during the seven hour workday").

Accordingly, we dismiss Petitioners' claims of practical workload impact.

        We also address alleged practical impacts resulting from provisions in the Consent

Judgment that are not incorporated into the Directive.  For the reasons discussed, *supra*, we held

that provisions of the Directive mandated by the Consent Judgment do not trigger bargaining.

However, COBA contends that the City should be required to bargain over the impact of these

mandated provisions on officers, including: (1) a pilot program mandating body cameras be worn

by unit members; (2) Anonymous Reporting System requiring expedited investigation of reports;

(3) Risk Management Program creating an Early Warning System based on an officer's UOFs; (4)

a UOF Tracking System; (5) requirement that DOC officials review a violent inmate incident

regarding a re-arrest recommendation; (6) adoption of new requirements for the discipline of

young inmates; (7) new rule mandating officers lose inmate contact positions based on number of

UOF allegations; (8) consideration of UOFs in evaluating and awarding officer assignments and promotions; (9) disciplinary penalties in UOF incidents.

Initially, we note that we have addressed some of these policies in separate Board decisions and will not revisit them here. *See, e.g., COBA*, 11 OCB2d 17, at 9 (addition of UOF screening requirement to DOC Operations Order criteria for awarding job assignments not a substantive change to prior practice); *COBA*, 11 OCB2d 33 (BCB 2018) (new promotion rules, including consideration of UOF history, did not violate NYCCBL § 12-306(a)(1) and (4)), *affd.*, *Correction Officers' Benevolent Assn v. NYC Bd of Coll Barg*., Index No. 159233/2018 (Sup. Ct. NY Co., Sept. 5, 2019) (Perry, J.); *COBA*, 12 OCB2d 3 (BCB 2019) (aspects of new disciplinary guidelines for violations of the UOF policy that set forth penalties for certain categories of offenses found to be mandatory subjects of bargaining). As to the remaining Consent Judgment mandates referenced by COBA, we find insufficient evidence in the record to support a claim that they created a practical impact on DOC officers' terms and conditions of employment. COBA alleged these claims in its petition but did not present testimony or other probative evidence sufficient to establish that requiring unit members to wear body cameras, establishing an Anonymous Reporting System, requiring expedited investigation of UOFs, creating a UOF tracking system that includes warnings triggered by an officer's UOFs, mandating review of violent inmate incidents for re-arrest recommendations, or adopting new requirements for the discipline of young inmates had a practical impact on its bargaining unit members. On this record, we therefore do not find a practical safety impact based on these provisions.

**Direct Dealing and other Independent NYCCBL § 12-306(a)(1) Claims**

  Direct dealing in violation of NYCCBL § 12-306(a)(1) and (4) occurs when an employer, "in its communications with employees, [] obtains or endeavors to obtain the employees' agreement to some matter affecting a term or condition of employment, whether by making either 'a threat of reprisal or promise of benefit,' or 'otherwise subvert[ing] the members' organizational and representational rights.'" *DC 37*, 5 OCB2d 1, at 15 (BCB 2012) (quoting *CIR*, 49 OCB 22, at 22 (BCB 1992)); *see also Matter of Patrolmen's Benevolent Assn.* 35 Misc. 3d 1234(A), 2012 NY Slip Op. 50997(U), at 6-7 (Sup. Ct. N.Y. Co. May 29, 2012) (Schoenfeld, J.). "Prohibited direct dealing is 'characterized by actions that attempt to mislead employees or to persuade them to believe that they will best achieve their objectives directly through the employer rather than through the union; in other words, the employer, by what it says or does, attempts to establish a negotiating relationship with unit employees to the exclusion of the employees' bargaining agent.'" *COBA*, 10 OCB2d 19, at 18 (BCB 2017) (quoting *PBA*, 77 OCB 10, at 14 (BCB 2006)).

  We find that the record does not support a claim of direct dealing. It does not contain any evidence regarding what was said or presented to bargaining unit members at the partial information sessions held on November 23 and 24, 2015. To the extent that any mandatory subjects were discussed at the informational sessions, we cannot conclude that the DOC attempted to bargain directly with COBA members.

  Further, this Board "has repeatedly acknowledged that not all direct communications between employers and bargaining unit members are prohibited." *COBA*, 10 OCB2d 19, at 17 n. 26 (BCB 2017) (citing *IUPAT, L. 806*, 7 OCB2d 25, at 22 (BCB 2014); *UFA*, 69 OCB 5, at 7 (BCB 2002); *CIR*, 49 OCB 22 (BCB 1992)). We have found that communication of the employer's

"intention to act in a specific matter, without seeking to obtain the employees' assent" is insufficient for a finding of direct dealing.  *DC 37*, 5 OCB2d 1, at 15; *see DC 37*, 6 OCB2d 3, at 14 (BCB 2013); *SEIU, L. 371*, 69 OCB 1, at 9 (BCB 2002); *CIR*, 49 OCB 22, at 24.  For instance, in *CEU, L. 237, IBT*, we found that "the instruction . . . for employees to contact their supervisor with any specific questions they had . . . was not an effort to engage the employees in direct negotiation" because nothing "implie[d] that the employees would be able to bargain with their supervisors."  6 OCB2d 34, at 9 (BCB 2013).  In addition, we have found that "statements regarding 'ramifications' for failing to comply with existing Department policy" do not constitute an "impermissible threat that would undermine the representational and organizational rights." *DC 37*, 2 OCB2d 28, at 12 (BCB 2009) (noting that, absent evidence of improper motivation, advising employees that the failure to follow existing written agency policy may provide a basis for corrective or disciplinary action does not constitute an improper practice).  Thus, to the extent that any mandatory subjects of bargaining were even addressed at the information sessions or in response to inquiries to the designated email address or contact people, the facts presented here do not establish direct dealing.  *See SEIU, L. 371*, 69 OCB 1, at 9.

Similarly, we find that the City's statements that the Unions were consulted and contributed to the Directive did not violate the NYCCBL.  This Board previously held that a misrepresentation concerning the actions of union leadership, "did not subvert the members' organizational and representational rights."  *PBA*, 77 OCB 10, at 19 (finding no direct dealing when the Mayor misrepresented that union leaders had not informed their constituents).  Therefore, to the extent the City's statements misrepresented the level of COBA involvement in or approval of the Directive, we do not find that such action interfered with, restrained, or coerced employees in

exercising their rights under the law.  Further, we note that COBA's President "set the record straight" in a letter to the editor in the *New York Post* on November 19, 2015.  (COBA Pet ¶ 63)  *See LEEBA*, 7 OCB2d 21, at 12-14 (BCB 2014) (finding no violation of NYCCBL § 12-306(b)(1) for allegedly false and misleading statements during a representation campaign when the petitioner had ample time to correct any misrepresentations).  We are not persuaded that the City's statements constitute unlawful interference because they lead to employee dissatisfaction with COBA.  In *PBA*, we found that "the bald allegation that Bloomberg's remarks caused dissent within the membership is insufficient" to establish a violation of NYCCBL § 12-306(a)(1).  77 OCB 10, at 19.  Accordingly, COBA's claim of direct dealing and the other claims alleging independent violations of NYCCBL § 12-306(a)(1) are dismissed.

**Information Request Claim**

The duty to bargain in good faith includes the obligation "to furnish data normally maintained in the regular course of business, reasonably available and necessary for full and proper discussion, understanding and negotiation of subjects within the scope of collective bargaining." NYCCBL § 12-306(c)(4).  "This duty extends to information that is relevant to and reasonably necessary for purposes of collective negotiations or contract administration."  *DC 37*, 9 OCB2d 30, at 6 (BCB 2016) (citing *DC 37*, 6 OCB2d 8, at 9 (BCB 2013); *PBA*, 73 OCB 14, at 10-11 (BCB 2004) *affd. as modified, Patrolmen's Benevolent Assn. v. City of New York*, No 1113062/04 (Sup. Ct. N.Y. Co. Feb. 4, 2005), *affd.*, 27 A.D.3d 381 (1st Dept. 2006)).

The Union's burden "is not an exceptionally heavy one, requiring only a showing of probability that the desired information is relevant and that it would be of use to the union in carrying out its statutory duties and responsibilities."  *DC 37*, 6 OCB2d 8, at 9 (BCB 2013)

(quotations omitted) (citing *NYSNA*, 3 OCB2d 36, at 13 (BCB 2010)).  Assuming the information request is reasonable and necessary for this purpose, an employer that does not possess the requested information must make a good faith effort to obtain the information sought.  *See DC 37*, 6 OCB2d 8, at 9 (citing *PBA*, 73 OCB 14, at 11).

Here, we find that the record is simply insufficient to ascertain whether the City violated its duty under NYCCBL § 12-306(c)(4).  While we do not condone the City's failure to promptly respond to COBA's request, the record does not clearly reflect facts needed to conclude that the information requested was data maintained in the regular course of business and reasonably available.  In its petition, COBA did not make any arguments in support of its claimed violation of NYCCBL § 12-306(c)(4) and merely attached letters requesting information.  In its reply, COBA asserts that it received "by alternate means" five responsive DOC documents that were prepared in the regular course of business.[111]  (COBA Rep. Br. at 8)  However, this is insufficient to establish a violation of NYCCBL § 12-306(c)(4).  *See COBA*, 7 OCB2d 11, at 10-11 (BCB 2014) (finding that COBA failed to meet its burden concerning requested correspondence with the Bronx District Attorney about the re-arrest of inmates for assaulting correction officers especially since it admitted that it already received reports that are more descriptive concerning assaults on staff).

For all the reasons discussed above, the petitions are denied in their entirety.

---

[111] Neither the City nor COBA addressed the information requests in their post-hearing briefs.

14 OCB2d 10 (BCB 2021)                                                              75

## ORDER

Pursuant to the powers vested in the Board of Collective Bargaining by the New York City

Collective Bargaining Law, it is hereby

ORDERED, that the verified improper practice and scope of bargaining petitions filed by

the Correction Officers' Benevolent Association, the Assistant Deputy Wardens/Deputy Wardens

Association, and the Correction Captains' Association against the City of New York and the New

York City Department of Correction, docketed as BCB-4137-15, BCB-4141-15, BCB-4209-17,

and BCB-4216-17, are hereby dismissed in their entirety.

Dated: April 1, 2021
      New York, New York

SUSAN J. PANEPENTO
CHAIR

ALAN R. VIANI
MEMBER

M. DAVID ZURNDORFER
MEMBER

CAROLE O'BLENES
MEMBER

I dissent.    CHARLES G. MOERDLER
        MEMBER

GWYNNE A. WILCOX
MEMBER
