# EXHIBIT 63

# *COBA,* 11 OCB2d 17 (BCB 2018)

(IP) (Docket No. BCB-4204-17)

***Summary of Decision***:  The Union alleged that the DOC violated NYCCBL § 12-306(a)(1) and (4) by changing the role of seniority in awarding job assignments within a command by requiring the consideration of use of force incidents over the prior five years and by requiring training for certain posts that many experienced COs lack.  The Union further alleged that the DOC unilaterally added a review of a CO's current assignment to a Special Assignment Post after the CO is involved in a use of force incident.  The City argued that the petition should be dismissed because determining qualifications and required training for an assignment are managerial prerogatives.  The City further argued that the role of seniority in awarding assignments has not changed, there are no new training prerequisites, and any changes are *de minimis*.  After a hearing, the Board found that the DOC had not changed the role of seniority, use of force history, or training in the awarding of job assignments and that the changes at issue were managerial prerogatives.  Accordingly, the petition was dismissed.  ***(Official decision follows).***

---

### OFFICE OF COLLECTIVE BARGAINING
### BOARD OF COLLECTIVE BARGAINING

**In the Matter of the Improper Practice Proceeding**

*-between-*

**CORRECTION OFFICERS' BENEVOLENT ASSOCIATION,**

*Petitioner,*

*-and-*

**THE CITY OF NEW YORK and**
**THE NEW YORK CITY DEPARTMENT OF CORRECTION,**

*Respondents.*

---

### DECISION AND ORDER

On March 20, 2017, the Correction Officers' Benevolent Association ("Union") filed a verified improper practice petition alleging that the City of New York ("City") and its Department of Correction ("DOC" or "Department") violated § 12-306(a)(1) and (4) of the New York City

Collective Bargaining Law (New York City Administrative Code, Title 12, Chapter 3) ("NYCCBL"), by changing the role of seniority in awarding job assignments within a command by requiring the consideration of use of force incidents that a Correction Officer ("CO") has had over the prior five years and by requiring training for certain posts that many experienced COs lack.  The Union further alleges that the DOC unilaterally added a review of a CO's current assignment to a Special Assignment Post after the CO is involved in a use of force incident.  The City argues that the petition should be dismissed because determining the qualifications and required training for assignments are managerial prerogatives.  The City further argues that the role of seniority in awarding assignments has not changed, there are no new training prerequisites, and any changes are *de minimis*.  After a hearing, the Board finds that the DOC has not changed the role of seniority, use of force history, or training in the awarding of job assignments and that the changes at issue are managerial prerogatives.  Accordingly, the petition was dismissed.

## BACKGROUND

The Trial Examiner held a five-day hearing and found that the totality of the record, including the pleadings, exhibits, and briefs, established the relevant facts to be as follows.

The Union represents DOC employees in the CO civil service title.  The DOC is responsible for the management and operation of 12 jail facilities, two hospital prison wards, and court holding facilities.  DOC facilities are also known as "commands."  (Tr. 356)

Operations Order 14/91 "Awarding Job Assignments Within A Command" ("Order 14/91") was in effect from 1991 through 2016.  (Union Ex. A)  Section II(E) of Order 14/91 provided that new and vacant job assignments shall be awarded based on the following four criteria: (i) seniority, (ii) work performance, (iii) attendance record, and (iv) "[s]pecial skills if

required for the position."[1]  (Union Ex. A)  Former Chief of Department William Clemons and former Warden David Colon testified for the Union and Chief Yolanda Canty testified for the City as to the awarding of assignments under Order 14/91.[2]

To fill a vacant position under Order 14/91, it would be posted and COs would submit their application.  Warden Colon testified that the COs' applications were organized according to seniority.  A Captain would review the applications and gather the necessary documentation, creating application packets.  The application packets would then be reviewed by several Deputy Wardens, including the Deputy Warden of Security and the Deputy Warden of Administration, who would make recommendations.  The application packets and recommendations would then be presented to the Commanding Officer to make the decision.  Chief Clemons testified that seniority was the most important factor in awarding an assignment.[3]

Order 14/91 did not contain any reference to uses of force.  However, the application packet always included a CO's Form 22R and Form 5003.  Form 22R contains a CO's work performance, including discipline.[4]  (*See* City Ex. 10)  Form 5003 contains a CO's use of force history, which

---

[1]  Order 14/91 does not define "special skills."  Union witnesses testified that term "special skills" refers to skills such as handgun certification or a commercial driver's license but does not encompass any other required training provided by the DOC.  (*See* Tr. 201)

[2]  Chief Canty is Bureau Chief of Facility Operations B and reports to the Chief of the Department.

[3]  Seniority is addressed in the parties collective bargaining agreement ("Agreement").  The provision at issue provides that the "Department recognizes the importance of seniority in filling vacancies within a command and shall make every effort to adhere to this policy, providing the senior applicant has the ability and qualifications to perform the work involved."  (Union Ex. C)

[4]  Form 22R documents the CO's seniority, attendance record, all formal discipline (known as a Memorandum of Complaint or "MOC"), and any informal discipline (known as a Command Discipline) received in the past year.  Accordingly, a MOC permanently remains on the CO's Form 22R while a Command Discipline is only on the Form 22R for one year.  Form 22R lists the rule(s) violated by the CO with a brief description of the conduct.  Allegations of improper behavior, such

includes every use of force by a CO, whether or not it resulted in discipline.  The Captain also may

investigate anything of significance, such as excessive lateness or discipline, on his own or at the

instruction of a Warden.  Chief Canty testified that, in doing so, the Captains regularly contacted

the Investigation Division and the Trial and Litigation Division to get more information regarding

uses of force noted on Forms 22R and 5003.  Chief Clemons acknowledged that, when he was

Chief of the Department, he occasionally received recommendations from the Investigation

Division and the Trial and Litigation Division regarding the awarding of an assignment, and

estimated that these Divisions were contacted less than 25 percent of the time.

**Operations Order 10/17**

In response to the Consent Judgment in *Nunez v. City of the New York*, 11 Civ. 5845

(SDNY) ("*Nunez* Consent Judgment"), the DOC made changes to the process for awarding a post

within a command.[5]  The DOC issued Operations Order 10/17 ("Order 10/17"), effective June 15,

2017.[6]  (*See* City Ex. 5)  The participation of the CO in the application process was not changed

under this new Order.  However, the Union challenges changes in the role of supervisors and

managers in awarding assignments, including the criteria they must consider.

─────────────────

as an improper use of force, that did not result in discipline do not appear on the Form 22R.

[5]  The *Nunez* Consent Judgment was signed on October 21, 2015.  It resolved a federal court action filed on behalf of inmates in DOC jails alleging that the use of unnecessary and excessive force violated the New York State and United States Constitutions.  The parties disagree as to the extent the changes to the bidding process were required by the *Nunez* Consent Judgment.

[6]  Order 14/91 was first superseded by Operations Order 23/16 ("Order 23/16"), effective November 21, 2016.  Subsequent to the instant petition being filed, Order 23/16 was itself superseded by Order 10/17.  Accordingly, we only reference Order 10/17 herein.  Order 10/17 contains the same provisions contained in Order 23/16 that the Union alleged in its petition were improper unilateral changes and was addressed in the hearing and post-hearing briefs.  (*Compare* Union Ex. B *with* City Ex. 5)  Order 14/91, Order 23/16, and Order 10/17 are all titled "Awarding Job Assignments Within A Command."

The same four criteria stated in Order 14/91 for awarding assignments are found in Order 10/17, but Order 10/17 adds a fifth criteria: "Meeting all required clearances." (City Ex. 5) In addition, Order 10/17 contains the provisions regarding Use of Force Screening and other requirements that were not in Order 14/91 and are discussed in detail below.[7] Chief Canty testified that, under Order 10/17, the importance of seniority has not changed and that seniority is always considered.

**Use of Force Screening**

Order 10/17 provides that a CO seeking a Special Assignment Post "shall be subject to a required *Nunez* Screening."[8] (City Ex. 5) The *Nunez* Screening is commonly referred to as "Use of Force Screening" as it is a "screening regarding [COs'] involvement in Use of Force Incidents."[9] (*Id.*)

Order 10/17's Use of Force Screening consists of three parts. First, the Investigation Division reviews the CO's Use of Force Incident history for the prior five years.[10] Second, the

---

[7] Order 10/17, § III(A), defines "Screening" as "any mechanisms and/or procedures that allow the Department to obtain information about a staff member to determine if that individual is eligible and/or qualified for a particular assignment." (City Ex. 5)

[8] Order 10/17, § III(B), defines "Special Assignment Post" as "any post in Enhanced Supervision Housing; Transitional Restorative Unit; Second Chance Housing; Restricted Housing Unit; Punitive Segregation; any Mental Health housing unit; any Secure Unit; any post in the Nursery; and any equivalent future housing unit as established by the Department." (City Ex. 5) All Commands do not have Special Assignment Posts.

[9] Order 10/17, § III(C), defines "Use of Force Incident" as "any incident in which staff engages in Use of Force, or is alleged to have engaged in Use of Force, against an Inmate, as delineated in Directive 5006R-C, 'Use of Force,' or its successor." (City Ex. 5) The record establishes that there are more allegations of improper use of force at certain posts and that, due to their length of service, the more senior COs are likely to have more allegations of an improper use of force than less senior COs.

[10] Specifically reviewed by the Investigation Division are the number and class of incidents; the

Trials and Litigation Division reviews the CO's disciplinary history for the prior five years, including whether the CO has been found guilty or pleaded guilty to charges relating to a Use of Force Incident and whether any Command Discipline has been imposed as a result of a Use of Force Incident within the last year.[11]   Third, the Investigation Division reviews any of its closing memoranda issued in the prior two years for any incident in which the CO used or was alleged to have used force.

The Trials and Litigation Division and the Investigation Division document their reviews in forms attached to Order 10/17.  These forms are then reviewed by the Deputy Warden of Security and the Deputy Warden of Administration, who make recommendations to the Commanding Officer as to whether the applicant should be awarded or denied the assignment. Order 10/17 requires that the Commanding Officer consider the results of the Use of Force Screening and make a final determination concerning the assignment.  Chief Canty testified that the Commanding Officer's discretion to award job assignments under Order 10/17 is the same as was under Orders 14/19.  Further, Order 10/17 explicitly provides that the results of a Use of Force Screening will not automatically disqualify a CO from an assignment.  The Union did not identify

---

type and severity of injuries sustained by staff and/or inmate(s); whether the incident involved, or was alleged to involve, a strike or blow to the head or other vital area of an inmate, kicking an inmate, the use of a baton or other instrument of force, or the employment of a prohibited restraint hold; and whether the inmate was in restraints at the time of the incident.  (*See* City Ex. 5)  Chief Clemons and Warden Colon both testified that under Order 14/91, Wardens were not required to review a CO's non-disciplined Use of Force Incidents for the prior five years.

[11]   Chief Canty testified that Order 10/17 does not require the Trial and Litigation Division to do anything that it was not already doing when Order 14/91 was in effect.  (*See* Tr. 453)

any COs who were not allowed to apply for or were denied an assignment due to their Use of Force

Incident history.[12]

Chief Canty testified that, under Order 10/17, there is no specific number of Use of Force

Incidents over a five-year period that would disqualify a CO from being awarded an assignment.

However, if a Commanding Officer awards a post "against the recommendations" of another

reviewing official, a justification for that decision must be documented, and copies of the review

must be stored in the CO's personnel file.  (City Ex. 5: Attachment D)  Chief Clemons testified

that a Commanding Officer was not required under Order 14/91 to document when he disagreed

with a recommendation that a CO should not be awarded an assignment.

Chiefs Clemons and Canty both compared to how undisciplined Use of Force Incidents

were considered under Order 14/91 and Order 10/17.  Chief Clemons testified that under Order

14/91, a Commanding Officer would consider any counseling that a CO received regarding blows

to an inmate's head, which are documented on the Form 5003, but otherwise did not consider

undisciplined Use of Force Incidents.  Chief Canty testified that, through the review of Forms 22R

and 5003, a CO's entire use of force history, including all undisciplined Use of Force Incidents,

were considered by the Commanding Officer when Order 14/91 was in effect.

Order 10/17 further provides that if a CO who already holds a Special Assignment Post

pled or was found guilty on two or more occasions in the prior five years to specified charges

related to excessive, impermissible, or unnecessary use of force, the Commanding Officer must

evaluate the CO "to determine whether the staff member should be reassigned to a position with

more limited inmate contact."  (City Ex 5)  The Commanding Officer's review in these

---

[12]  Under both Order 14/91 and Order 10/17, a CO cannot be awarded a Special Assignment Post
while the subject of pending disciplinary charges.  (*See* Tr. 395-6)

circumstances must be documented and placed in the CO's personnel file.  Chief Clemons testified

that this documentation was not required when Order 14/91 was in effect.  Chief Canty testified

that, when Order 14/91 was in effect, a Commanding Officer would review a CO's assignment if

the CO was involved in a Use of Force Incident, albeit no documentation regarding that review

would be created or added to the CO's file.

**Training Requirements for Posts**

Order 14/91 did not address specific training requirements for posts.  It is undisputed that

when Order 14/91 was in effect, a CO could apply for a post even if they lacked the training

required for a post and the CO's lack of the requisite training would not be held against the CO.

As an example, Chief Clemons testified that under Order 14/91, COs who lacked Probe Team

training could still apply for posts in Intake areas, which require such training, and be selected

"pending training."  (Tr. 264)  Once selected, a Captain need only contact the Corrections

Academy to have the CO placed "in the next slot" to get trained.  (*Id.*)  Chief Clemons also noted

that COs have been awarded assignments that require a commercial driver's license prior to

actually acquiring the license.

Order 10/17 specifies that certain posts require specific training.  Specifically, Order 10/17

provides that COs are required to have "successfully completed (or complete)" Probe Team

training prior to an assignment in Intake area, and Safe Crisis Management and Direct Supervision

training prior to an assignment in an Adolescent and Young Adult Housing area. (City Ex. 5) Safe

Crisis Management training and Direct Supervision training did not exist prior to the *Nunez*

Consent Judgment.

The training specified in Order 10/17 is provided to all new recruits at the Corrections

Academy.  While the DOC provides in-service training for COs, due to the recent significant

increase in hiring, few COs hired prior to 2016 ("experienced COs") have received the training

specified in Order 10/17 and these types of training have not been available to experienced COs

with any regularity.[13]  CO Cynthia Green, the Corrections Academy's Scheduling Officer, testified

that slots in training courses are allocated to commands in relation to their size and that the

Corrections Academy would accommodate a request from a command to increase the size of a

training class.  As of the date of the hearing, 2086 COs, or approximately 16 percent of all COs,

have received Probe Team training.  (*See* Union Exs. T, X).  However, no experienced COs have

received Probe Team Training since the *Nunez* Consent Judgment.   Approximately 1,100

experienced COs had received Safe Crisis Management training, and approximately 300

experienced COs had received Direct Supervision training.[14]

Order 10/17 also provides that a CO applying for any post that requires inmate contact

must meet Prison Rape Elimination Act of 2003 ("PREA") screening requirements.  There was no

reference to PREA in Order 14/91.  Order 10/17 does not explicitly define PREA screening

requirements or reference PREA training but does reference DOC Directive 5011, which requires

PREA training once every two years for staff who have inmate contact.[15]  (*See* City Ex. 6)  It is

---

[13]   CO Boyd testified that under Order 10/17 experienced COs were at a disadvantage when compared with newly minted Correction Officers, who have the courses they need to serve in every post at the Department right out of the Academy.

[14]   As of the date of the hearing, the percentage of all COs who have received training in and remained qualified in Safe Crisis Management and Direct Supervision were 13 percent and 15 percent, respectively.  (*See* Union Exs. W, Y)

[15]   In January 2017, the City's Board of Correction amended to the Rules of the City of New York to require PREA training for all DOC employees with inmate contact.  The new Rule does not state that PREA training is a requirement for any assignment or that COs cannot bid for, or be assigned to, a position until they receive PREA training.  The Rule provides that all DOC employees are to receive their initial PREA training by the end of 2021, with at least 20% of COs trained each year from 2017 until the end of 2021, and that employees are to receive refresher

undisputed that no CO was PREA trained prior to 2014, that all new recruits receive PREA training, and that, as of the hearing, approximately one-third of the all COs, including 2,600 experienced COs, have received PREA training.[16]  Regarding job assignments, Directive 5011, which became effective in May 2016, provides that the "Department Office of Equal Employment Opportunity, the Legal Division, and the Trials and Litigation Division must be consulted prior to any staff member being promoted or transferred to determine if there are any pending or past charges of sexual allegations against the employee."  (City Ex. 6)

It is undisputed that any training specified by Order 10/17 and Directive 5011 is not required for COs to remain in a post; it is also undisputed that a CO cannot begin working in a new post, known as "manning" a post, prior to completing the required training.

Chief Canty testified that Order 10/17 did not create any training prerequisites before a CO can apply for or be awarded a post, that a CO with the required training does not have an advantage over CO who does not, and that, if a CO who lacks the requisite training was selected, the CO would be sent for the training after being awarding the post.[17]  She testified that she had personally instructed those under her command that they should not take into consideration whether a CO already has the training when awarding an assignment.  No evidence was presented that any

---

training every two years.  (*See* 40 RCNY § 5-01 *et seq*)

[16]   DOC Assistant Commissioner of Sexual Abuse and Sexual Harassment Prevention Faye Yelardy, who is responsible for the Department's PREA compliance, testified that Order 10/17 did not create a PREA training requirement for the awarding of an assignment and that a CO can be assigned to any post, including inmate contact posts, without being PREA trained.

[17]   Chief Canty acknowledged that she has not assigned a CO to a post within a command since Order 14/91 was superseded and could not recall a situation under Order 10/17 where a CO was sent for training after being awarded a post.

experienced CO has been denied an assignment or not allow to apply due to a lack of any training specified by Order 10/17 or Directive 5011.


## POSITIONS OF THE PARTIES

### Union's Position

The Union argues that the DOC violated NYCCBL § 12-306(a)(1) and (4) by unilaterally changing "the bidding process; that is the criteria for the awarding of a post within a command."[18] (Union Br. at 1)   According to the Union, Order 10/17 changed the criteria for awarding assignments within a command by requiring consideration of the number of non-disciplined Use of Force Incidents a CO has had over the last five years and by creating training prerequisites.  The Union argues that when training is required for improvement in pay or work assignments, it is a mandatory subject of bargaining.

Regarding Use of Force Incidents, the Union alleges that the DOC, under Order 10/17, now considers each CO's number of Use of Force Incidents even when that CO had not been charged

---

[18]  NYCCBL § 12-306(a)(1) and (4) provide, in pertinent part, that:

> It shall be an improper practice for a public employer or its agents:
>
> (1) to interfere with, restrain or coerce public employees in the
>     exercise of their rights granted in [§] 12-305 of this chapter;
>
> *   *   *
>
> (4) to refuse to bargain collectively in good faith on matters within
>     the scope of collective bargaining with certified or designated
>     representatives of its public employees;

NYCCBL § 12-305 provides, in pertinent part, that: "Public employees shall have the right to self-organization, to form, join or assist public employee organizations, to bargain collectively through certified employee organizations of their own choosing, and shall have the right to refrain from any or all of such activities."

with, or found guilty of, an improper use of force.  The Union notes that both Chief Clemons and

Warden Colon testified that they were not previously required, as Wardens, to review five years

of a CO's Use of Force Incidents and that their review only included a CO's disciplinary history.

The Union further argues that the procedures for the evaluation of employees has also long

been a mandatory subject of bargaining.  According to the Union, Order 10/17 created a new

review of COs' assignment to a Special Assignment Post if a CO was found guilty of or pleaded

guilty to a use of force.  That review is documented, becomes a part of that CO's personnel file,

and may result in the CO being transferred.  The Union argues that nowhere is there any authority

that permits unfounded or unsubstantiated allegations or exonerations in the CO's personnel folder.

The Union argues that these changes "degraded" seniority and that the use of seniority in

the awarding of assignments within a job title is a mandatory subject of bargaining.  (Union Br. at

1)  According to the Union, the number of uses of forces a CO has increases with seniority as

purely a function of the length of service, and newly hired COs have received the training

mandated by Order 10/17 while only a minority of experienced COs have.  The Union

acknowledges that the Agreement provides that seniority is only considered when "the senior

applicant has the ability and qualifications to perform the work involved."  (Union Ex. C)

However, the Union argues that the Agreement's seniority provision presupposes that the DOC is

providing the same basic training to all COs.

**City's Position**

The City argues that determining the qualifications for a job assignment and the training to

be completed before beginning the assignment are managerial prerogatives under NYCCBL § 12-

307(b).[19]  The City asserts that considering seniority in awarding an assignment does not turn

Order 10/17 into a mandatory subject of bargaining.  According to the City, Order 10/17 did not

change the importance of seniority in awarding job assignments.  The parties have negotiated over

the importance of seniority in awarding job assignments and "it yields to an employee's

qualifications."  (City Br. at 2)

Further, the City argues that Order 10/17 does not make any training a prerequisite for a

CO to be awarded a job assignment.  The City asserts that experienced COs are receiving the

training referenced in Order 10/17 and that COs who have had the training do not have an

advantage in the awarding of assignments over COs without the training.

**DISCUSSION**

The Union argues that the required consideration of Use of Force Incidents and training for

certain posts has changed the role of seniority in the awarding of job assignments within a

command in violation of NYCCBL § 12-306(a)(1) and (4).  The Union further argues that the

review of the use of force history of a CO in a Special Assignment Post, which could result in the

CO's transfer, also violates the NYCCBL.  After a hearing, the Board finds that the DOC has not

---

[19]  NYCCBL § 12-307(b) provides, in pertinent part, that.

> It is the right of the city ... to determine the standards of services to
> be offered by its agencies; ... direct its employees; ... determine the
> methods, means and personnel by which government operations are
> to be conducted; ... and exercise complete control and discretion
> over … the technology of performing its work.  Decisions of the city
> ... on those matters are not within the scope of collective bargaining,
> but ... questions concerning the practical impact that decisions on
> the above matters have on terms and conditions of employment,
> including, but not limited to, questions of workload, staffing and
> employee safety, are within the scope of collective bargaining.

changed the role of seniority, use of force history, or training in the awarding of job assignments. Further, the evaluation mandated by Order 10/17 requires no participation by COs but only alters supervisory functions and the discretion of supervisors and thus is not mandatorily bargainable. Accordingly, the petition is dismissed.

NYCCBL § 12-306(a)(4) makes it an improper practice for a public employer or its agents "to refuse to bargain collectively in good faith on matters within the scope of collective bargaining with certified or designated representatives of its public employees." Thus, NYCCBL § 12-306(c) requires that public employers and employee organizations "bargain over matters concerning wages, hours, and working conditions, and any subject with a significant or material relationship to a condition of employment." *CEU, L. 237, IBT*, 2 OCB2d 37, at 11 (BCB 2009). The Board has long held that "[a]s a unilateral change in a term and condition of employment accomplishes the same result as a refusal to bargain in good faith, it is likewise an improper practice." *DC 37, L. 420*, 5 OCB2d 19, at 9 (BCB 2012). A failure to comply with "NYCCBL § 12-306(c)(4) necessarily constitutes a violation of the duty to bargain in good faith pursuant to NYCCBL § 12-306(a)(4)." *COBA*, 7 OCB2d 11, at 9 (BCB 2014) (quoting *DC 37*, 6 OCB2d 2, at 12 (BCB 2013)).

In order to establish that a unilateral change has occurred in violation of the NYCCBL, a union "must demonstrate that (i) the matter sought to be negotiated is, in fact, a mandatory subject and (ii) the existence of such a change from existing policy." *DC 37, L. 436*, 4 OCB2d 31, at 13 (BCB 2011) (quoting *DC 37*, 79 OCB 20, at 9 (BCB 2007)) (internal quotation marks omitted). The Board has consistently held that unilateral changes in terms and conditions of employment that violate NYCCBL § 12-306(a)(4) also violate NYCCBL § 12-306(a)(1) because a violation of the duty to bargain in good faith also interferes "with employees' rights to bargain collectively." *DC 37*, 6 OCB2d 24, at 19, n. 14 (BCB 2013).

In the instant case, it is undisputed that the participation of COs in the process of awarding assignments within a command has not changed. The Union argues only that Order 10/17 has altered the role of seniority in how job assignments are awarded by requiring consideration of Use of Force Incidents and training prerequisites to the determent of experienced COs. However, the record establishes that the DOC has not altered the consideration of Use of Force Incidents in the awarding of job assignments or created new training prerequisites. The unrebutted testimony of Chief Canty establishes seniority is considered under Order 10/17 as it was under Order 14/91.

**Use of Force Screening**

The Union argues that since more experienced COs, due to their greater length of service, are likely to have more Use of Force Incidents, Order10/17's requirement to consider COs' use of force history impacts the role of seniority in awarding assignments. The record, however, establishes that the consideration of a CO's Use of Force Incident history when awarding job assignments has not changed. It is undisputed that when Order 14/91 was in effect, COs' Forms 22R and 5003 were considered in the awarding of assignments. These Forms contain the same information required to be considered under Order 10/17's Use of Force Screening. Specifically, Form 22R contains any formal discipline (*i.e.*, MOCs) a CO has received and any Command Disciplines for the prior year, including those related to Use of Force Incidents, while Form 5003 contains the CO's Use of Force Incident history for their entire career, including those that did not result in discipline. The record also establishes that under Order 14/91, the Investigation Division and Trials and Litigation Division were regularly consulted and that the Deputy Warden of Security and Deputy Warden of Administration made recommendations to Commanding Officers.

Accordingly, Order 10/17's requirements relating to Use of Force Screenings was not a substantive change to the process of awarding job assignments.[20]

**Training Requirements for Posts**

The Union argues that since recruits and recently hired COs have received all the training required by Order 10/17, while experienced COs largely have not, the training required by Order 10/17 impacted the role of seniority in awarding assignments.  Order 10/17, however, does not create any new training prerequisites for applying for or being awarded an assignment.  Order 10/17 lists new training requirements for working in certain posts.  There have always been posts that require a CO to have had specific training prior to beginning to work in the post.  It is undisputed that, when Order 14/91 was in effect, a CO lacking the training required to work in a post could apply for that post on an equal footing against a CO who had the requisite training and that, if the CO lacking the requisite training was awarded the post, the CO would then receive the training prior to working the post.  Chief Canty's unrebutted testimony is that is also the case under Order 10/17.  Thus, there has not been a change that requires bargaining.

Further, the Board has held that generally training is not a mandatory subject of bargaining.  *See, e.g., UFOA*, 71 OCB 19, at 9 (BCB 2003); *UFA*, 37 OCB 43, at 15 (BCB 1986).  However, "the Board has established an exception when training is required by an employer as a qualification

---

[20]   Order 10/17 altered the duties of supervisors in the awarding of assignments.  For example, under Order 10/17, a Commanding Officer is required to document when he disagrees with the recommendation of a Deputy Warden; no such requirement existed when Order 14/91 was in effect.  Also, Order 10/17 details aspects of a CO's use of force history contained on the Forms 22R and 5003 that is to be considered as part of the Use of Force Screening.  However, "[a]n employer may extend to or retract from a supervisor['s] discretion with respect to the performance of supervisory functions without incurring a decisional bargaining obligation in that regard."  *PBA*, 73 OCB 12, at 15 (BCB 2004), *affd Matter of Patrolmen's Benevolent Assn. of the City of NY v. NYC Bd. of Collective Bargaining*, Index No. 112687/04 (Sup Ct New York County Aug. 17, 2005) (Friedman, J.), *affd* 38 AD3d 482 (1ˢᵗ Dept 2007), *lv denied* 9 NY3d 807 (2007) (quoting *Town of Carmel (PBA)*, 31 PERB ¶ 3023, at 3051 (1998)).

for continued employment, for improvement in pay or work assignments, or for promotion … are a mandatory subject of bargaining because they affect a term and condition of employment." *UFOA*, 71 OCB 6, at 9 (BCB 2003) (citations omitted) (citing *DC 37*, 69 OCB 20, at 5-6 (BCB 2002); *UFA*, 37 OCB 43, at 15; *NYSNA*, 11 OCB 2, at 15 (BCB 1973)). *See also Floyd v. City of New York*, 302 FRD 69, 114 (SDNY 2014) (explaining Board precedent as holding that training is a mandatory subject of bargaining where a condition of continued employment), *affd in part, dismissed in part on other grounds*, 770 F3d 1051 (2d Cir 2014). In other instances, including where new training is limited to new work assignments or new employees or when opportunities for newly required training are readily available, the Board has not found new training requirements to be a mandatory subject of bargaining. *See UFOA*, 71 OCB 19, at 11; *UFA*, 37 OCB 43, at 15; *CIR*, 37 OCB 38, at 15 (BCB 1986). Here, since the record establishes that COs without the training required to work a post can apply for the post and compete for the post on an equal footing against COs who already have the requisite training, the training specified in Order 10/17 is not required as a qualification for continued employment, for improvement in pay or work assignments, or for promotion. Accordingly, it is not mandatorily bargainable.

**Use of Force Evaluation**

The Union argues that procedures for the evaluation of employees are a mandatory subject of bargaining. Order 10/17 requires a re-evaluation by the Commanding Officer of any CO who holds a Special Assignment Post who has pled or was found guilty on two or more occasions in the prior five years to specified charges related to excessive, impermissible, or unnecessary use of force to determine if the CO should be reassigned. The parties disagree as to the extent, prior to Order 10/17, that Commanding Officers evaluated whether COs should be reassigned after charges related to use of force. Order 10/17 clearly states that the Commanding Officers are required to

do so and dictates when they must make such an evaluation.  However, the evaluation mandated by Order 10/17 requires no participation by COs; rather, it only alters supervisory functions and the discretion of supervisors.  The Board has held, in the evaluation context, that changes that "pertain only to supervisory functions" and are not mandatorily bargainable.  *PBA*, 6 OCB2d 36, at 15 (BCB 2013).  *See also PBA*, 73 OCB 12, at 15; *Town of Carmel (PBA)*, 31 PERB ¶ 3023, at 3051.

Further, the "imposition of criteria used for evaluation, and substantive changes in that criteria, are areas of managerial prerogative which need not be bargained with an employee organization."  *Matter of Patrolmen's Benevolent Assn. of the City of NY v. NYC Bd. of Collective Bargaining*, Index No. 112687/04 at 4 (Sup Ct New York County Aug. 17, 2005) (Friedman, J.), *affd* 38 AD3d 482 (1st Dept 2007), *lv denied* 9 NY3d 807 (2007) (*affg PBA*, 73 OCB 12) (citations and quotation marks omitted); *see also PBA*, 6 OCB2d 36, at 15 ("[C]riteria used for evaluation, and substantive changes to that criteria, are not mandatory subjects of bargaining because they fall within an employer's rights under NYCCBL § 12-307(b) to determine the 'methods, means and personnel' by which government operations are to be conducted.") (citing *DC 37, L. 1508*, 79 OCB 21, at 25 (BCB 2007)).  Accordingly, the alleged unilateral changes in evaluation criteria found in Order 10/17 are not mandatorily bargainable.

## **ORDER**

Pursuant to the powers vested in the Board of Collective Bargaining by the New York City Collective Bargaining Law, it is hereby

ORDERED, that the verified improper practice petition, docketed as BCB-4204-17, filed by the Correction Officers' Benevolent Association against the City of New York and its Department of Correction, be, and the same hereby is, dismissed.

Dated: June 14, 2018
      New York, New York

 

                                       SUSAN J. PANEPENTO
                                             CHAIR

                                       ALAN R. VIANI
                                           MEMBER

                                       PAMELA S. SILVERBLATT
                                           MEMBER

                                       CAROL O'BLENES
                                           MEMBER

I dissent (see attached opinion)          CHARLES G. MOERDLER
                                           MEMBER

                                       GWYNNE A. WILCOX
                                           MEMBER

### DISSENT OF CHARLES G. MOERDLER IN BCB-4204-18

I dissent.  For the reasons repeatedly articulated in dissents to a variety of prior decisions, I remain of the view that NYCCBL Section 12-307(b), a cornerstone of this determination, is invalid because not coextensive with any provision of the Taylor Law and thus is an unauthorized.  Sadly, the City persists in invoking a managerial prerogative that it simply does not have as a matter of law and, most unfortunately, a majority of my distinguished colleagues have acquiesced.  Perhaps someday an appellate court will squarely rule or the Legislature will intervene to provide clarity.