# EXHIBIT 89

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MARK NUNEZ, *et al.*,

       *Plaintiffs*,

-against-

CITY OF NEW YORK, *et al.*,

       *Defendants*.

-------------------------------------------------------

UNITED STATES OF AMERICA,

       *Plaintiff-Intervenor,*

-against-

CITY OF NEW YORK and NEW YORK CITY DEPARTMENT OF CORRECTION,

       *Defendants*.

11 Civ. 5845 (LTS)(JCF)

**DECLARATION OF MICHAEL P. JACOBSON IN SUPPORT OF PLAINTIFFS' MOTION FOR CONTEMPT AND APPOINTMENT OF A RECEIVER**

I, Michael P. Jacobson, do hereby declare:

## I.      PERSONAL BACKGROUND AND QUALIFICATIONS

1. I submit this declaration in support of Plaintiffs' motion for contempt and appointment of a receiver.

2. I am currently the founding Executive Director of the City University of New York ("CUNY") Institute for State and Local Governance and a sociology professor at the CUNY Graduate Center. I hold a Ph.D in in Sociology from the CUNY Graduate Center and have over two decades of experience in the New York City Government.

3. I served as Deputy Budget Director in the New York City Office of Management and Budget from 1984 until 1992. In this capacity, I had oversight responsibility for criminal justice and other uniformed agencies, including the Department of Correction, and had regular contact with the uniformed and civilian leadership of these agencies and was required to have a detailed understanding of how these agencies operated.

4. Between 1992 and 1996, I served as the Commissioner of the New York City Department of Probation.

5. Between 1995 and 1998, I served as the Commissioner of the New York City Department of Correction (the "Department" or "DOC"). As DOC Commissioner, I was involved in every aspect of the Department's operations, including decisions relating to how DOC recruited, trained, supervised and disciplined staff, and selection of the entire uniformed leadership team from the Chief of the Department down to wardens. During my time as DOC Commissioner, the Department was involved in *Sheppard v. Phoenix*, 91-cv-4148 (S.D.N.Y.) (the "*Sheppard* Litigation"), a class action brought against the City of New York and others,

which specifically related to excessive force in the Central Punitive Segregation Unit ("CPSU") within the Department.

6. Between 1998 and 2005, I was a professor at John Jay College of Criminal Justice and the Graduate Center of CUNY. During this time, I wrote a book entitled *Downsizing Prisons: How to Reduce Crime and End Mass Incarceration* (New York University Press 2005).

7. From 2005 through 2013, I served as the Director and President of the Vera Institute of Justice, an independent nonprofit national research and policy organization. In this role, I spoke with members of the New York City Mayoral administration with respect to a variety of criminal justice issues, including with respect to jail conditions and the recruitment of DOC Commissioners. In addition, the Vera Institute of Justice partnered with jail and prison systems around the United States, through which I assisted on projects relating to improving prison conditions and other topics. A key focus of this role was to bridge the gap between academia and correctional operations, including the experience of incarcerated individuals.

8. In 2013, I commenced my current role, as the founding Executive Director of the CUNY Institute for State and Local Governance. The CUNY Institute for State and Local Governance is the national intermediary for the MacArthur Foundation's Safety and Justice Challenge ("SJC"), a multi-year, $400 million effort to reduce jail incarceration in cities across the United States, and to reduce racial and ethnic disparities in those systems. The SJC is comprised of 52 jurisdictions, including New York City. The CUNY Institute for State and Local Governance is a primary provider of research and performance measurement for 26 of the participating cities, in addition to managing a consortium of policy and academic organizations that also conduct important research to assess the outcomes and impacts of the effort to inform

the criminal legal field more broadly. During this time, I have also continued to work with successive New York City Mayoral administrations on a range of justice reform issues.

9. The statements set forth in this declaration are based on my prior personal experience as a senior official within the DOC, the Department of Probation and the New York City Office of Management and Budget, my knowledge and experience with correctional facilities, systems, and practices, and informal discussions with multiple DOC commissioners over the past decade.

**II.    CURRENT STATE OF THE CITY'S JAILS**

10. Based on my review of the reports of the Independent Monitor and other publicly available data and reporting, along with informal discussions with multiple DOC commissioners, I am deeply concerned about the current state of the City's jails and the extreme levels of violence and disorder being experienced by the individuals incarcerated and working in these jails. When I was appointed as DOC Commissioner in 1995, the Department's jails were in a state of crisis with historic levels of violence that I believed would not be seen again once alleviated. However, on almost every per-capita measure, the rates of violence and disorder at the Department's facilities are now materially worse than they were during my tenure as Commissioner, notwithstanding the subsequent resolution of the *Sheppard* Litigation.

11. While there have intermittently been incremental improvements regarding the safety of the jails, it is clear to me that these are not sustainable improvements and are rather mere anomalies in a multi-year decline in safety conditions at the City's jails.

12. Based on my personal observations and informal discussions with multiple DOC commissioners over the past decade, and as confirmed by the dire situation described in the reports of the Independent Monitor, it is clear that the pervasive culture of violence and disorder

that permeates the DOC can only be meaningfully addressed through drastic, fundamental changes at every level within the Department.

13. Such fundamental changes are currently impossible in light of the numerous impediments that prevent even incremental change within the DOC. These impediments include (1) the consistently short tenures of DOC commissioners; (2) the inability to hire and train competent uniformed supervisory officers; and (3) the influence yielded by external actors over the civilian leadership of the DOC.

### III.   SHORT-TERM TENURES OF DOC COMMISSIONERS

14. At any correctional facility and system, in order for the demands, positions and requirements set by senior leadership to be respected and habitually complied with, all staff – whether uniformed or otherwise – must credibly believe that the leadership will be there for the long term.

15. Between my departure in 1998 and Commissioner Molina's announced resignation there have been 11 DOC Commissioners and Interim Commissioners, with each serving an average term of less than 2.3 years. In the same time period, I understand that there have been just three presidents of the Correction Officers' Benevolent Association ("COBA"). This pattern of frequent, and expected, turnover of DOC leadership has undermined the various Commissioners' ability to curb staff violence and other malfeasance within the DOC. In my experience as Commissioner, and as I understand has continued through recent years, uniformed staff often disregard, and actively undermine, directives from DOC commissioners and other civilian DOC leaders on the belief that such civilian leaders will depart their posts before such policies can take root.

16. For example, in my informal discussions with DOC commissioners over the past decade, I have learned of situations where uniformed staff have ignored and/or refused to comply

with directives issued by DOC leadership. I understood from these conversations that such willful non-compliance was, at least in part, motivated or influenced by an understanding among uniformed staff and COBA leadership that they could effectively "wait out" senior DOC leadership before any real repercussions of their noncompliance would occur. It is clear that in order to bring about the changes necessary to the DOC, there must be leadership that serves until sustainable progress is achieved, and that the relevant stakeholders credibly believe will serve until that goal is reached.

IV.    **INABILITY TO HIRE COMPETENT SUPERVISORY OFFICERS**

17.    For the DOC to function effectively, the DOC needs to be able to hire competent personnel throughout its uniformed ranks. In particular, the DOC must fill its uniformed supervisory positions, including captains, deputy wardens, wardens, chiefs and others, with effective managers who possess the skills and temperament needed to maintain order and safety for staff and inmates. The DOC, however, has repeatedly taken the position that they are required to fill such supervisory uniformed ranks exclusively with individuals who are currently employed by the DOC. This precludes the DOC from even considering many qualified candidates for these critical roles. Instead, the DOC frequently fills these roles with individuals who have been immersed in the organizational culture of the Department which results in supervisors who are unable or reluctant to control exceedingly high levels of violence and disorder, further compounding this very issue.

18.    Over the course of my career, I have had numerous conversations with civilian DOC leaders who have expressed their frustration with the quality of candidates for uniformed supervisory roles. Such complaints include that eligible candidates from within the DOC ranks have at times been the very individuals who have engaged in impermissible uses of force and other types of malfeasance. Each DOC facility is largely run by uniformed workers who work in

extremely challenging conditions that, without effective leadership and supervision, can and have bred inappropriate, ineffective, and emotional responses to the varied situations staff-members face each day. By limiting the pool of candidates for such uniformed supervisory roles, the DOC is severely limited in its ability to significantly and dramatically change the organizational culture which now has an over reliance on use of force, is not capable of creating an environment that minimizes stabbings and slashings and where any notion of human dignity as a guiding principle is nowhere to be found. For example, while recent, Court-ordered changes to the DOC's hiring practices – long called for by the Independent Monitoring team – have permitted civilian leaders in a newly formed position titled "Facility Supervisor" with correctional expertise and insight via their work in other jurisdictions to replace uniformed wardens in some facilities, the restrictions on who may serve in many operational positions continue to impede cultural change within the facilities.  This often results in underperforming supervisors not being removed simply due to the lack of qualified candidates within the system to replace them.

V.    INFLUENCE YIELDED BY EXTERNAL ACTORS

19.    Based on my informal discussions with multiple DOC commissioners, including those who served in the DOC in the past five years, I have become aware of persistent staffing difficulties at particular DOC facilities. I understand that such persistent staffing issues arise in significant part due to influence and control from external forces, including COBA, the Correction Captains' Association ("CCA") and the Assistant Deputy Wardens/Deputy Wardens Association ("DWA" and, together with COBA and the CCA, the "Unions").

20.    Based on this information, it is apparent to me that the threat and fear of extreme disruptive and retaliatory responses by uniformed staff and their representatives – including "sick-outs" – to even relatively modest managerial decisions by the Department, has served to

chill effective decision making by DOC leadership and has contributed to the Department's inability to implement the difficult but necessary fundamental policy changes required to change the culture and environment at the Department's facilities.

21. I understand that Union influence has also prevented DOC from appropriately disciplining uniformed personnel who engage in egregious misconduct. Formal complaints against a staff member can take over a year to resolve and during such time Union representatives exert pressure on investigators and agency managers, thus additional misbehavior may take place while the process works out. By the time an investigation reaches the Office of Administrative Trials and Hearings ("OATH"), there is reluctance to take serious disciplinary action. As a result, this chills DOC from taking formal disciplinary action. In addition, beyond any formal limits or restrictions on the Department's ability to suspend officers accused of serious misconduct, I understand that lengthier suspensions do not occur based on informal agreements between DOC leadership and the Unions, even where such suspensions may otherwise be permissible.

22. Based on my personal experience, conversations with former commissioners and observations throughout my career, when leadership attempts to impose discipline despite these systemic issues, there is consistent pushback from the Unions. This causes discipline to either not occur or to be delayed. Well-intentioned efforts by individuals over the years that show signs of cutting through this Union influence have been strategically stymied. For example, Ms. Sarena Townsend, as Deputy Commissioner for Investigations, Intelligence and Trials, was responsible for disciplinary investigations of staff. The Unions repeatedly called for her termination. Ms. Townsend was terminated from the DOC on the first day of Commissioner Molina's tenure.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Dated: November 15, 2023          By: _____
                                       Michael P. Jacobson