# Special Report by the *Nunez* Independent Monitor

**November 30, 2023**

### The Nunez Monitoring Team

Steve J. Martin
*Monitor*

Kelly Dedel, Ph.D.
*Subject Matter Expert*

Anna E. Friedberg
*Deputy Monitor*

Dennis O. Gonzalez
*Associate Director*

Patrick Hurley
*Subject Matter Expert*

Alycia M. Karlovich
*Analyst*

Emmitt Sparkman
*Subject Matter Expert*

# Table of Contents

**Introduction** ...................................................................................................................... **1**

Transparency & Advancing Reforms ......................................................................... 1

Organization of Report ............................................................................................. 1

**Department Leadership Update** ....................................................................................... **3**

**Arson Reduction Housing Unit** ........................................................................................ **4**

DOC's Development and Operationalizing of ARHU ............................................... 4

Lack of Consultation and Notification to the Monitor about ARHU ......................... 7

**Lack of Transparency & Interference with the Monitor's Work** ...................................... **12**

Defendants' Verbal Commitments to Work and Collaborate with the Monitor ...................... 12

Department Leadership & Management of Court Orders ........................................ 14

Monitor's Efforts to Improve Transparency and Collaboration ............................... 18

Department Production of Information, Consultation & Collaboration .................... 20

- Withholding Nunez-Related Information ............................................................ 21

- Failure to Consult on Violence Reduction Initiatives ........................................ 21

- Obfuscation and Mismanagement .................................................................... 21

- Ongoing Reliance on Anonymous Sources ...................................................... 22

- Failure to Provide Unencumbered Access to Staff and to Encourage
  Staff to Cooperate with the Monitor ................................................................. 22

**Conclusion** ...................................................................................................................... **24**

**Appendix A: Responsibilities of the Monitor** ................................................................. **26**

Monitor's Role as Defined by the Nunez Court Orders ........................................... 27

Monitor's Consultation & Technical Assistance ..................................................... 29

**Appendix B: Summary of Court Orders & Monitor Reports** ........................................... **31**

Summary of Court Orders & Monitor Reports Regarding Defendants' Transparency and
Collaboration with the Monitor .............................................................................. 32

- Initial Regression in Summer 2021 to Spring 2022 ......................................... 32

- Resurgence of Issues in 2023 ......................................................................... 33

- April 27, 2023 Status Conference & the Events that Followed
  Described in the Monitor's May 26, June 8 and June 12, 2023 Reports ........... 34

- June 13, 2023 Emergency Status Conference, June 13, 2023 Court Order
& the Events that Followed Described in the Monitor's July 10, 2023 Report..........................35

- July 18, 2023 Order & the Events that Followed Described
in the Monitor's August 7, 2023 Report.........................................................................................37

- August 10, 2023 Status Conference, August 10, 2023 Court Order &
the Events that Followed Described in the Monitor's October 5, 2023 Report..........................38

- October 10, 2023 Order, October 30, 2023 Order and Events that Followed
Described in the Monitor's November 8 & 15, 2023 Reports.....................................................39

- November 15, 2023 Monitor's Report & Court's November 16, 2023 Order ....................41

**Appendix C: Email Communications ..................................................................................... 43**

# INTRODUCTION

This report is filed pursuant to the Court's November 16, 2023 Order (dkt. 600).

*Transparency & Advancing Reforms*

Successful institutional reform requires Defendants to embrace a number of key dynamics. These include active transparency regarding the agency's processes and outcomes, realistic assessments of the size and scope of the agency's problems, accepting ownership of the solutions, and embracing and actively engaging in functional collaboration and candid communication with the Monitor. Over the past two years, the City's and Department's approach to the *Nunez* Court Orders has not reflected a strong commitment to these key tenants. Interference, obfuscation, and deflection have become normalized, and yet another imminent leadership transition is expected to further impact an already unstable, erratic, and chaotic environment. This has exacerbated the Monitoring Team's concerns about the elevated risk of harm faced by those in custody and the staff who work in the jails on a daily basis.

Defendants' persistent interference, obstruction, and lack of transparency have eroded the Monitoring Team's confidence that the City and Department fully appreciate the extent of the problems facing the agency and that they are in fact capable of advancing the reform. Defendants must openly acknowledge the reality of the situation in order to fix it. The Department's persistent minimization of the extent of problems, combined with the internal disorder and lack of coordination, means that the Monitoring Team cannot rely on the veracity, timeliness, or accuracy of the information the Defendants provide. This is problematic for many reasons, as it impedes the Monitoring Team's ability to keep the Court apprised, to assist in the analysis of the various problems, and to support development of potential solutions. While the Department has always struggled to provide a fulsome accounting of the jails' operations, in previous years, the problems appeared to stem from a lack of skill in assessing practice and compiling and analyzing information, rather than from deliberate attempts to interfere and obfuscate that characterize Defendants' more recent interactions with the Monitoring Team.

*Organization of Report*

This report has three sections and three appendices. The first section provides an update on the Department's leadership. The second section provides an overview of the Arson

Reduction Unit and the corresponding management issues, and the third section describes Defendants' lack of transparency and interference with the Monitor's work. The report also includes three appendices. Appendix A is a summary of the Monitor's responsibilities pursuant to the *Nunez* Court Orders. Appendix B is a summary of the multiple Court Orders entered in 2023 related to the Department's work with the Monitor and the corresponding Monitor's reports describing the problems it has encountered. Appendix C is copies of the November 9, 2023 and November 15, 2023 communications between the Monitoring Team and the Department.

## DEPARTMENT LEADERSHIP UPDATE

On October 31, 2023, the Mayor announced that Commissioner Molina will be transferred to a position in City Hall, the Assistant Deputy Mayor of Public Safety, where he may retain responsibility for overseeing the jails, but will no longer serve as DOC Commissioner. The announcement was not accompanied by any information regarding a transition plan. Shortly before a press release was issued, the Commissioner advised the Monitor that he would be leaving the Department in mid-November.[1] On that same day, a City Hall spokesperson advised the New York Times that "Mr. Molina would stay in his current job until mid-November."[2] The Monitor has had no further communication from or with the Commissioner regarding the transition.

The City reported on November 28, 2023, via Commissioner Molina's declaration, that "at the present time, [Commissioner Molina is] not aware of a timeline for the appointment of a successor Commissioner or acting Commissioner."[3] Commissioner Molina reported he will serve as Commissioner until a replacement is appointed. Since the announcement of the Commissioner's impending transfer on October 31, 2023, the Monitoring Team is not aware of any communications shared with Department leadership or staff regarding his departure, the timing of the Commissioner's departure, his successor, or how his responsibilities will be transferred. This has infused both speculation and confusion in an agency that is already struggling with adequate management and leadership.

---

[1] The City's Press Release, Mayor Adams Appoints Louis Molina as Assistant Deputy Mayor for Public Safety, can be found here: https://www.nyc.gov/office-of-the-mayor/news/835-23/mayor-adams-appoints-louis-molina-assistant-deputy-mayor-public-safety.

[2] *See* Jonah E. Bromwich, William K. Rashbaum and Jan Ransom, New York's Embattled Jails Leader Gets a New Job in City Hall, The New York Times, https://www.nytimes.com/2023/10/31/nyregion/louis-molina-deputy-mayor-safety.html.

[3] *See* Louis Molina's Declaration of November 24, 2023 (dkt. 614-1) at ¶ 4.

## ARSON REDUCTION HOUSING UNIT

### DOC's Development and Operationalizing of ARHU

The Department opened an Arson Reduction Housing Unit ("ARHU") on November 13, 2023. This was a specialized unit developed as part of the Department's Violence Reduction Plan[4] to purportedly reduce arson and is intended to address individuals that pose a heightened security risk to the safety of other incarcerated individuals and staff.[5] The unit relates to various requirements of the *Nunez* Court Orders and consultation with the Monitor is required.[6]. Since the Monitoring Team learned the unit was opened, the City and Department have provided various accounts to both the Monitoring Team and the Court about how and why the unit was opened, how and why it was closed, and whether it appropriately consulted with the Monitoring Team. The Monitoring Team attempts to summarize the available information below.

The Senior Deputy Commissioner authorized[7] the opening of the unit on November 9, 2023, despite the fact it was in its "early stages" of planning with an operational guide that was poorly written, haphazard, vague, and ambiguous. The criteria for admission to the ARHU were also unclear. It also does not appear that any effort was made to appropriately screen staff for assignment to the unit to ensure they were best suited to manage the population, nor does it appear that the staff selected were trained on the unit's operation. The unit was opened on November 13, 2023 without consultation or notification to the Monitor despite the fact that such consultation is required by the *Nunez* Court Orders,[8] despite repeated requests from the Monitor that the Department do so, and despite a commitment from Department leadership that such

---

[4] Pursuant to the Court's October 10, 2023 Order (dkt. 582).

[5] *See* Charles Daniels Declaration of November 28, 2023 (dkt. 614-2) at ¶ 7 and email from V. Baranchuk on November 15, 2023 at Appendix C.

[6] Including, but not limited to, the October 10, 2023 Order (dkt. 582) at pg. 2; June 13, 2023 Order (dkt. 550), § I, ¶ 5; Action Plan (dkt. 465), § D, ¶ (3) and § E, ¶ (4), and the Second Remedial Order (dkt. 398), § I, ¶ (1)(a) (codified again in the Action Plan (dkt. 465) at § D, ¶ 2(a)).

[7] *See* Charles Daniels Declaration of November 28, 2023 (dkt. 614-2) at ¶ 10.

[8] *See* Court's October 10, 2023 Order (dkt. 582) at pg. 2, June 13, 2023 Order (dkt. 550), § I, ¶5, Action Plan (dkt. 465) § D ¶ 3 and § E ¶ 4, and the Court's direction at the August 10, 2023 Status Conference Transcript at pg. 73, 24:25 to pg. 74, 1:7.

consultation and notification would occur *prior* to implementing any such unit.[9] The Monitor only learned the unit was opened on November 14, 2023 from an anonymous source and immediately reached out to the *Nunez* Manager and the Assistant Commissioner of the *Nunez* Compliance Unit to obtain more information about the unit. The Monitor was compelled to immediately report this situation to the Court, pursuant to the *Nunez* Court Orders, given the risk of harm posed by the Department's haphazard and poorly planned unit and the lack of consultation with the Monitor. *See* Monitor's November 15, 2023 Letter to the Court (dkt. 599). Notably, at the time the Monitoring Team reported these issues to the Court it was not aware of yet another concerning factor which is that the ARHU did not have a working fire suppression system, which is necessary for all housing units, but the need is particularly acute for a unit attempting to re-house known fire-setters and thereby reduce arson.

The development and implementation of a specialized unit like the ARHU requires meticulous planning and preparation to ensure appropriate policies and procedures are in place, staff are appropriately selected and trained, the proposed physical plant is appropriate and secure, and there is adequate management and leadership in place. Such preparatory work is necessary even in well-functioning systems, but it is particularly important in this agency which has long struggled to adequately manage specialized housing units.[10] As described above and in the Monitor's November 15, 2023 letter, the unit was opened haphazardly and furtively with inadequate planning, policies, procedures, and training. It turns out that the unit also did not have an adequate physical plant.

On November 9, 2023, the Senior Deputy Commissioner authorized the opening of the unit.[11] On this same day, the *Nunez* Manager reported to the Monitoring Team that development of the ARHU was in the "early stages."[12] The *Nunez* Manager's account that the unit was in the

---

[9] The *Nunez* Manager reported on November 9, 2023 that "[the Monitoring Team] will be consulted on the [ARHU] prior to the opening of any such units, but plans are still in the early stages." *See* Appendix C.

[10] *See* Monitor's November 15, 2023 Letter (dkt. 599) at pg. 4 and the Monitor's November 8, 2023 Report (dkt. 595) at pgs. 4, 7, 8, and 20.

[11] There are conflicting reports on when the ARHU was authorized. The Ronald Brereton Declaration of November 28, 2023 (dkt. 614-3) at ¶ 4 reported the SDC authorized the unit on October 23, 2023 while the Charles Daniels Declaration of November 28, 2023 (dkt. 614-2) at ¶ 10 reported authorization for the ARHU was given on November 9, 2023.

[12] *See* email from K. Joyce on November 9, 2023 at 2:02 p.m. at Appendix C.

"early stages" of development is consistent with the information available to the Monitor which suggests that authorization occurred on short notice, with little planning, little to no development of operational guidance, unclear admission criteria, and poorly defined rules and restrictions.[13] The Commissioner surprisingly and disturbingly reports he had not discussed the specifics of the ARHU with the Senior Deputy Commissioner and was not aware of the timeline for its roll-out.[14]

The unit was opened on November 13, 2023 despite the fact the Senior Deputy Commissioner on that same day advised the Deputy Commissioner of Security that the unit should not be opened because it did not "have adequate fire suppression."[15] The unit was opened anyway because of apparent miscommunications among leadership.[16] The unit was subsequently closed on November 14, 2023. The Department initially reported to the Monitoring Team that the unit was closed "due to the Monitoring Team's disappointment and frustration [noted in a November 14, 2023 email from the Deputy Monitor which advised the Department of the Monitoring Team's concerns that the Department has elected to proceed in opening a specialized unit with little to no planning and no consultation with the Monitoring Team]."[17] Defendants now report to the Court that its initial report to the Monitoring Team about the basis for the closure was not correct and that the unit was closed because it did not have an adequate fire suppression system.[18] It is unknown how the SDC learned the unit was operational and whether the unit might still have been in operation but for the fact that the Monitoring Team raised concerns about the unit on November 14, 2023.

---

[13] *See* Monitor's November 15, 2023 Letter (dkt. 599).

[14] *See* Louis Molina's Declaration of November 24, 2023 (dkt. 614-1) at ¶ 6.

[15] *See* Charles Daniels Declaration of November 28, 2023 (dkt. 614-2) at ¶ 12 and Ronald Brereton Declaration of November 28, 2023 (dkt. 614-3) at ¶ 8.

[16] *See* Charles Daniels Declaration of November 28, 2023 (dkt. 614-2) at ¶ 12 and Ronald Brereton Declaration of November 28, 2023 (dkt. 614-3) at ¶ 9.

[17] *See* email from V. Baranchuk on November 15, 2023 and email from A. Friedberg on November 14, 2023 at 5:15 p.m.  at Appendix C

[18] *See* Charles Daniels Declaration of November 28, 2023 (dkt. 614-2) at ¶¶ 11 to 12 and Ronald Brereton Declaration of November 28, 2023 (dkt. 614-3) at ¶ 12.

On the very day the SDC reports he authorized opening the unit on November 9, 2023,[19] the Deputy Commissioner of Security advised the Monitor and members of the Monitoring team that the Department was *exploring* the *possibility* of developing a pilot housing unit for individuals that frequently start fires. The Monitor was not advised that the unit was authorized by the SDC or that any official proposal or documentation regarding the operation of such a unit had been developed. Given the report that the unit was in the planning stages, the Monitor advised the Deputy Commissioner of Security that the Department must consult with the Monitor, including sharing any written policies and procedures, before the unit could be opened. It is unclear how or why the Deputy Commissioner of Security believed that based on that conversation with the Monitor the Department "could initiate the pilot and open the ARHU."[20] This is wholly *inconsistent* with the Monitoring Team's recollection of the discussion as demonstrated by the Monitoring Team's subsequent communication to the Department. About an hour after the meeting, the Deputy Monitor wrote to the *Nunez* Manager and advised "we understand from discussions with various DOC leadership that the Department is considering at least two different housing models – one at the OBCC Annex and [ARHU]. We appreciate that the briefings shared to date haven't had many details because the plans are still under development. Once the plans have been finalized, we request the Department consult with the Monitoring Team and provide any proposed policies related to either of these housing model strategies (or similar ones) ***prior*** to the opening of these units."[21] A few minutes later, the *Nunez* Manager confirmed that the Monitoring Team "will be consulted on the OBCC Annex Pilot and the [ARHU] prior to the opening of any such units, but plans are still in the early stages."[22]

*Lack of Consultation and Notification to the Monitor about ARHU*

The City appears to contend that it is not clear if consultation with the Monitor was required for ARHU and what such consultation, if any, was necessary.[23] It appears, in part, these

---

[19] As noted above, the Deputy Commissioner of Security Operations reports the unit was authorized on October 23, 2023.

[20] *See* Ronald Brereton Declaration of November 28, 2023 (dkt. 614-3) at ¶ 7.

[21] *See* November 9, 2023 at 1:55 p.m. email from A. Friedberg to K. Joyce attached as Appendix C.

[22] *See* November 9, 2023 at 2:02 p.m. email from K. Joyce to A. Friedberg attached as Appendix C.

[23] The City's November 28, 2023 letter to the Court repeatedly notes that the June 13, 2023 Order (dkt. 550), § I, ¶ 5 requires "communication" with the Monitor. While communication is an inherent requirement of

arguments may be an effort to deflect from the fact that the Department committed to the Monitoring Team that consultation on the ARHU would occur prior to the opening of the unit and did not do so as the City's November 28, 2023 submission to the Court does not address its November 9, 2023 commitment to the Monitoring Team. Further, Defendants appear to suggest that if consultation was required the fact that the Department consulted the Monitor on *other* initiatives was sufficient to meet its obligation to consult on the ARHU. It does not appear there is a basis for these contentions.

The *Nunez* Court Orders include over 80 provisions in which Defendants are required to consult the Monitor on either specific items or more general issues related to the *Nunez* Court Orders.[24] In this case, consultation was required by specific provisions of the *Nunez* Court Order (e.g. those that require consultation with the Monitor on security initiatives and housing strategies),[25] the overarching requirement that the Department consult on any new policies or procedures that relate to compliance with the *Nunez* Court Orders,[26] and because the Monitor requested consultation.[27]

First, the City's suggestion that its obligations to consult the Monitor on the ARHU were satisfied because it consulted the Monitor on *other* housing and facility management is patently absurd.[28] Consultation on other matters does not excuse the lack of consultation on ARHU, it only reinforces the point that consultation on ARHU should have occurred, but did not.

Second, the City's suggestion that the more general consultation requirement is not clear and is ambiguous because the requirement "does not set forth specific or definite requirements to apprise Defendants of what is required in order to 'proactively' communicate"[29] is untenable and

---

consultation, § I, ¶ 5 of the June 13, 2023 Order explicitly requires the Department to "proactively consult" with the Monitor in order to permit the "the Monitor an opportunity to provide meaningful feedback" before the Department implements "any new policy and practice."

[24] *See* Appendix A at pg. 32.

[25] Including, but not limited to, the October 10, 2023 Order (dkt. 582) at pg. 2; June 13, 2023 Order (dkt. 550), § I, ¶ 5; Action Plan (dkt. 465), § D, ¶ (3) and § E, ¶ (4), and the Second Remedial Order (dkt. 398), § I, ¶ (1)(a) (codified again in the Action Plan (dkt. 465) at § D, ¶ 2(a)).

[26] *See* June 13, 2023 Order (dkt. 550), § I, ¶ 5.

[27] *See* Consent Judgment, § XX, ¶ 8.

[28] *See* City's November 28, 2023 Letter (dkt. 614) at pgs. 2 to 3.

[29] *See* City's November 28, 2023 Letter (dkt. 614) at pg. 3.

perplexing. The June 13, 2023 Order clearly stated that the purpose of proactive consultation is to permit "the Monitor an opportunity to provide meaningful feedback" before the Department implements "any new policy and practice." This inherently requires notification to the Monitor of the specifics of the plan so that meaningful engagement can occur.

Defendants suggestion that it is not clear whether consultation on the ARHU is belied by the City's November 28, 2023 submission and other situations in which consultation has occurred as required. The SDC declared that the ARHU was developed in response to a recommendation from the Monitor to take immediate steps to reduce violence.[30] It is non-sensical to suggest that it isn't clear whether consultation should occur on an initiative developed in response to a recommendation *by the Monitor* and is subject to a Court Order requiring the SDC (among others) to devise plans to immediately reduce violence with the Monitor.[31] From the inception of the Consent Judgment to the end of 2021, Defendants routinely consulted with the Monitoring Team on matters pertaining to *Nunez* Court Orders with limited issues. While the Department's ability to reliably consult has faltered since 2022,[32] it has consulted with the Monitoring Team on initiatives similar to ARHU, such as the Behavioral Health Unit, which is referenced in Kimberly Joyce's Declaration of November 28, 2023 (dkt. 614-4) at ¶ 3, (g), and so it clearly understood when consultation should occur.

Defendants have attempted to excuse previous failures to consult with similar claims that the *Nunez* Court Orders lack clarity or are ambiguous. The City's purported lack of clarity on what must be provided to the Monitor is one of the reasons the June 13, 2023 Order was entered by the Court.[33] Defendants consulted with the Monitor on the terms of the June 13, 2023 Order, prior to its entry by the Court, and did not raise any issues about the lack of clarity or ambiguity

---

[30] *See* Charles Daniels Declaration of November 28, 2023 (dkt. 614-2) at ¶ 7.

[31] *See* Court's October 10, 2023 Order at pg. 2 (dkt. 582).

[32] "The city acknowledges that in some instances cited by the monitor reporting our consultation that was required did not occur, and those were errors." *See* June 13, 2023 Emergency Status Conference Transcript at pg. 26, 24:25 to pg. 27, 1.

[33] In entering the June 13, 2023 Order, the Court noted "I find that it is unfortunately necessary to clarify and, again, underscore the responsibilities that have been imposed by orders that have been in place for years and more recent orders." *See* June 13, 2023 Emergency Status Conference Transcript at pg. 85, 11:14.

about this provision.[34] In fact, the City consented to the entry of the Order and reported to the Court that the June 13, 2023 Order "should resolve most differences about whether cooperation and consultation have occurred as promised."[35] Now, less than six months later, and only in response to an Order to Show Cause, Defendants *now* contend the June 13, 2023 Order is not clear. Such concerns about the lack of clarity have not been raised since the entry of the June 13, 2023 Order in any forum with the Monitor, including the multiple meetings that the Monitor and Deputy Monitor have had with Department Leadership and the Corporation Counsel. In fact, the Monitor and Deputy Monitor have repeatedly advised the Corporation Counsel and her team about our concerns regarding the Department's lack of consultation and interference with the work of the Monitor and where the Monitor and Deputy Monitor have implored the City to take steps to address these issues. While assurances were given that steps were taken to address the Monitor's concerns, at no time was there a request for clarification as to the Monitoring Team's expectations or the Department's obligations.

While neither the City nor the Department have sought clarification as to their obligations, the Monitoring Team has nonetheless endeavored to clearly articulate its expectations and the requirements of the *Nunez* Court Orders. This AHRU case is a prime example of those efforts. The Monitor specifically requested to be consulted *prior* to the opening of the ARHU and that as part of the consultation, any proposed policies, et cetera be provided in advance of opening the unit. The Monitor requested such information on multiple occasions — including in two email communications sent on October 26 and November 9[36] and in the course of multiple meetings with Department leadership (and counsel for the City) on October 16, October 23, and November 9. It is therefore somewhat incomprehensible how Defendants can contend that the court-ordered requirement to proactively consult with the Monitoring Team is unclear. Further, the Monitoring Team plainly specified what was required in its various communications. If Defendants had any questions about the expectations in this instance, they

---

[34] *See* City's June 12, 2023 Letter (dkt. 545) at pg. 1. Defendants raised objections related to two other provisions, neither of which are relevant to the particular provision at hand.

[35] *See* June 13, 2023 Emergency Status Conference Transcript at pg. 30, 16:19. *See* also, pg. 26, 24:25 to pg. 27, 1:3.

[36] *See* October 26, 2023 at 3:08 p.m. and November 9, 2023 at 1:55 p.m. emails from A. Friedberg to K. Joyce attached as Appendix C.

could have asked the Monitor. Instead, Defendants affirmatively and unequivocally reported that they *would* consult the Monitor on the ARHU before it opened and then did not.

The failure to consult in this instance cannot be viewed in a vacuum. It comes after a long record of consultation failures and repeated commitments from the City and Department that things would improve. The failure to consult in this case was not just a bureaucratic failure. This housing unit posed a serious risk of harm to those incarcerated and to staff. Disturbingly, the risk of harm was not even fully known to the Monitoring Team when it first reported these events to the Court on November 15, 2023. Only *after* the filing of the November 15, 2023 letter to the Court did the Monitoring Team learn that the unit physical plant did not have a fire suppression system, heightening the concerns about the planning and management of this unit. Consultation is not merely a bureaucratic requirement, but a necessity as it helps to ensure that the operation of such a specialized housing unit is consistent with sound correctional practice, that sufficient safeguards are in place to ensure its safe operation, that the program design is consistent with the requirements of appropriate correctional law, that the unit's operation is consistent with the requirements of the *Nunez* Court Orders, and to ensure that the units are subject to appropriate monitoring by the Department and the Monitoring Team. It is deeply troubling to the Monitoring Team that despite the myriad steps the Monitoring Team has taken to improve the consultation with the Department, and despite the repeated assurances from the highest levels of the Department's leadership, particularly the Commissioner and Senior Deputy Commissioner, that there is adequate understanding and appreciation of the requirements of the *Nunez* Court Orders that such a breach would occur.[37]

---

[37] *See* Footnote 31, Louis Molina's Declaration of November 24, 2023 (dkt. 614-1) at ¶ 5 and Charles Daniels Declaration of November 28, 2023 (dkt. 614-2) at ¶ 5.

# LACK OF TRANSPARENCY & INTERFERENCE WITH THE MONITOR'S WORK

Defendants are well acquainted with the requirements of the *Nunez* Court Orders and the work of the Monitor. Defendants consented to the entry of the Consent Judgment, First Remedial Order, Second Remedial Order, Third Remedial Order, Action Plan, June 13, 2023 Order (with a few minor objections),[38] and the August 10, 2023 Order (with a few minor objections).[39] The responsibilities of the Monitor pursuant to the *Nunez* Court Orders are included in Appendix A.

### *Defendants' Verbal Commitments to Work and Collaborate with the Monitor*

Defendants have repeatedly advised the Court and the Monitoring Team that they have and will continue to cooperate with the Monitor and intend to take steps to improve the quality of the collaboration. In light of the concerns raised in the Monitor's March 16, 2022 Report, the City wrote a letter to the Court in April 2022 in which it reaffirmed Defendants' commitment to work with the Monitor.[40] Approximately one year later, in April 2023, the City reported in another letter to the Court that "the Monitor has unfettered access to Department staff to gather information."[41] A few days later at the April 27, 2023 status conference, the City reported to the Court that "the monitor will not hesitate to report to the Court if they feel that we've refused to do something that's obviously required and feasible under the action plan or the consent

---

[38] The City had three noted objections to the June 13, 2023 Order in § I. ¶¶ 1 and 7. Defendants objected to the requirement to advise all Department leadership and staff of their Obligations Under the *Nunez* Court Orders, to the fact that the selection of the Nunez Manager was subject to the approval of the Monitor, and that the Nunez Manager responsibilities shall be limited to the areas covered by the *Nunez* Court Orders. *See* June 13, 2023 Emergency Status Conference Transcript at pg. 79, 17:25 to pg. 81, 1:24.

[39] The City noted two objections. First, the City objected to the language regarding the Monitor's observations of meetings related to UOF, Security and Violence Indicators contending it should be limited to observation of TEAMs meetings. *See* August 10, 2023 Status Conference at pg. 42, 24:25 to pg. 49, 1:7. Second, the City initially objected to the provision regarding the specific number of supervisors to appoint. However, during the course of the Court Conference, the City agreed to the provision as drafted with a slight modification to the date by which it must be accomplished. *See* August 10, 2023 Status Conference Transcript at pg. 49, 9:25 to pg. 55, 1:11.

[40] The City submitted a letter to the Court in which it reported "[t]he City and the Department want to reaffirm their commitment to providing timely information – both in response to requests by the Monitoring Team, and proactively as issues arise that relate to the consent judgment and remedial orders. We commit to continuing to provide the Monitoring Team with direct access to Department staff at all levels." City's April 25, 2022 letter to the Court (dkt. 450) at pg. 3.

[41] *See* City's April 25, 2023 letter to the Court (dkt. 523) at pg. 7.

judgment, and then, your Honor, we'll have an opportunity to, you know, take remedial steps at that point."[42]

Following the issuance of the Monitor's May 26, 2023 and June 8, 2023 Reports and June 12, 2023 letter in which serious concerns about Defendants' failure to collaborate with the Monitor were raised, the City reported to the Court at the June 13, 2023 status conference that it "acknowledges that in some instances cited by the monitor reporting [sic] our consultation that was required did not occur, and those were errors. We believe that the order proposed by the monitor, with some minor revisions that the city is requesting, will avoid such errors in the future."[43] The Commissioner and the City repeatedly advised the Court that "[t]he commissioner has consistently encouraged cooperation with the monitor and will continue to do so and will address with staff the monitor's recent concerns."[44]

In response to the Monitor's reports on July 10, 2023 and August 7, 2023 in which the Monitor raised ongoing concerns about the Defendants' failure to collaborate, the City reported a commitment to improved communications with the Monitor in its August 9, 2023 letter to the Court.[45] The City also advised the Court "defendants reemphasize their commitment to continuing to make steady progress to achieve sustainable reforms."[46] The Department reiterated this commitment to the Monitor and the Parties in its bi-annual compliance report shared with Parties on August 17, 2023, stating that it "will continue to demonstrate its commitment to continued open communication [with the Monitor] in the coming weeks and months." Two months later, in response to the Court's October 10, 2023 Order directing Defendants to work with the Monitor, a Law Department spokesperson reported to the media that "The city is working diligently to comply with the court's [October 10, 2023] order."[47] A spokesperson for the

---

[42] *See* April 27, 2023 Status Conference transcript at pg. 52, 19:23.

[43] *See* June 13, 2023 Emergency Status Conference Transcript at pg. 26, 24:25 to pg. 27, 1:3. *See also*, pg. 30, 16:19, pg. 44, 24:25, and pg. 45, 7:10.

[44] *See* June 13, 2023 Emergency Status Conference Transcript at pg. 80, 18:21. *See also*, pg. 34, 18:25 to pg. 35, 1:3, pg. 39, 10:20, and pg. 61, 9:15.

[45] *See* City's August 9, 2023 Letter to the Court (dkt. 562) at pg. 7.

[46] *See* August 10, 2023 Status Conference Transcript at pg. 69, 24:25 to pg. 70, 1:2.

[47] *See* Graham Rayman, Judge raps NYC Correction boss Louis Molina, aides for interfering with Rikers, jails monitor, NY Daily News, https://www.nydailynews.com/2023/10/11/judge-raps-nyc-correction-boss-louis-molina-aides-for-interfering-with-rikers-jails-monitor/. See also, Jacob Kaye, Federal judge scolds DOC boss

13

mayor issued a statement in response to the Monitor's November 8, 2023 Report noting "As we have said repeatedly, we take the safety of people in our custody very seriously and remain committed to continued reforms and working with the monitor."[48] The City advised the Court on November 28, 2023 that it "takes it obligations to consult with the Monitoring Team seriously."[49]

The fact that the Court has had to repeatedly issue multiple orders in such a short time span directing the Defendants to fulfill their obligations to share information and collaborate with the Monitor is itself a commentary that efforts to date have not achieved what is required. Appendix B to this report details the Court's Orders and the Defendant's actions reported in each monitor report following the issuance of the successive Court Orders in 2023.

_Department Leadership & Management of Court Orders_

The Commissioner has longstanding knowledge and understanding of the _Nunez_ Court Orders.[50] Appointed in January 2022, the Commissioner has overseen the negotiations and consented to the entry of the Action Plan, as well as the June 13, 2023 and August 10, 2023 Court Orders.[51] The Commissioner's work with the agency and engagement with _Nunez_ matters also pre-dates his appointment as Commissioner. He worked for the Department in 2016 and 2017, serving as the Internal Chief Monitor[52] (known as the "UOF Auditor" under the Consent Judgment § X, ¶ 3[53]) and as the Acting Assistant Commissioner of the _Nunez_ Compliance Unit. The Commissioner has advised the Court that after leaving the Department following his first

---

for 'disturbing' attempt to influence Rikers monitor, Queens Eagle, https://queenseagle.com/all/2023/10/12/federal-judge-scolds-doc-boss-for-disturbing-attempt-to-influence-rikers-monitor.

[48] _See_ Jacob Kaye, Rikers monitor slams DOC as commissioner heads out the door, Queens Eagle, https://queenseagle.com/all/2023/11/9/rikers-monitor-slams-doc-as-commissioner-heads-out-the-door.

[49] _See_ City's November 28, 2023 Letter to the Court (dkt. 614) at pg. 4.

[50] _See_ Louis Molina's Declaration of November 24, 2023 (dkt. 614-1) at ¶ 5.

[51] Defendants noted a few select objections to the June 13, 2023 and August 10, 2023 Orders described in the footnotes above.

[52] _See_ Louis Molina's Declaration of November 24, 2023 (dkt. 614-1) at ¶ 5 footnote 1.

[53] This position was eliminated in the First Remedial Order (dkt. 350), § E, ¶ 3.

tenure, he gained experience working on court-ordered reform in other jurisdictions.[54] With respect to his work on the *Nunez* Court Orders, the Commissioner advised the Court that he encourages staff to engage with the Monitor,[55] in fact noting "if I believe even that there is even a 1 percent chance that it might intersect with the work of the core mission of [the Consent Judgment], I have encouraged my staff to confer with the monitor or a member of the monitoring team. That is still ongoing [as of June 13, 2023]."[56] In one exchange with the Court, the Commissioner advised that he "[a]bsolutely" understood and accepted "the monitor has the authority and the duty under [the Court's] orders to speak with any member of staff and to be able to do so in confidence if that's necessary."[57] On November 14, 2023, the Commissioner testified before the Board of Correction, an oversight agency of DOC, that "that any restrictive housing model that this department was going to implement had to be approved by the federal monitor."[58] The Commissioner reiterated the need to work with the Monitor in his November 24, 2023 Declaration. Despite these assurances, the Monitor has reported several occasions where the Commissioner has refused to provide the Monitor with information and has also attempted to interfere, obfuscate, and unduly influence the work of the Monitor.[59] The Monitor also receives continuing reports that staff are afraid to speak or be candid with the Monitor for fear of reprisal by the Commissioner and possibly other Department leadership.[60]

---

[54] Commissioner advised the Court he "successfully guided Westchester County Jail out of federal oversight." See May 27, 2022 Status Conference Transcript at pg. 48, 22:23. *See also* Commissioner's remarks at April 26, 2022 Status Conference at pg. 25, 6:15.

[55] The Commissioner advised the Court on April 27, 2023 that he "support[s] the monitoring team being able to speak to any employee or staff member that they feel they need to speak to to understand, to get a nuance of the situation." *See* April 27, 2023 Status Conference transcript at pg. 25, 17:19.

[56] *See* June 13, 2023 Status Conference Transcript at pg. 34, 24:25 to pg. 35, 1:3. The veracity of this statement was questioned by the Monitoring Team at the time it was made given the Monitor's concerns outlined in the Monitor's June 8, 2023 Report. *See* June 13, 2023 Status Conference Transcript at pg. 43, 11:19.

[57] *See* June 13, 2023 Emergency Status Conference Transcript at pg. 39, 10:14. *See also,* pg. 61, 9:15.

[58] *See* Commissioner's testimony at the November 14, 2023 Board of Correction Meeting at minute 50 and 11 seconds to 23 seconds; video available at: https://www.nyc.gov/site/boc/meetings/november-14-2023.page.

[59] *See* Monitor's November 8, 2023 Report (dkt. 595) at pgs. 53 to 54; Monitor's October 5, 2023 Report (dkt. 581) at pgs. 9 to 10, 13, 15 to 16, 18 to 19; Monitor's July 10, 2023 Report (dkt. 557) at pgs. 21 to 23, 152 to 157 and Appendix F; Monitor's June 12, 2023 Letter to the Court (dkt. 544) at pgs. 2 to 7; Monitor's June 8, 2023 Report (dkt. 541) at pgs. 24 to 30; Monitor's May 26, 2023 Report (dkt. 533) at pgs. 2 to 11 and 13 to 17.

[60] *See* Monitor's November 8, 2023 Report (dkt. 595) at pg. 56 and Monitor's October 5, 2023 Report (dkt. 581) at pg. 16.

The Department's Senior Deputy Commissioner ("SDC") was appointed in September 2023. As with the Commissioner, his work with the agency pre-dates his most recent appointment. The SDC previously served in the same role as SDC in 2017. The *Nunez* Consent Judgment was in place at the time he worked with the Department in 2017. The Senior Deputy Commissioner is the functional equivalent of the Chief of Department, meaning he is responsible for all Facility Operations. To that end, and as required by the Action Plan, § A, ¶ 3(b), the Deputy Commissioner of Security, the Deputy Commissioner of Classification, Custody Management, and Facility Operations, and the Deputy Commissioner of Administration all report to the SDC. Therefore, all Associate Commissioners and Assistant Commissioners (i.e., facility Wardens) are under his command.[61]

The Monitor and Deputy Monitor (and other Monitoring Team members) have met with the SDC on at least four occasions since his appointment.[62] In each of these meetings, the requirements of the *Nunez* Court Orders were discussed, and explicit requests were made by the Monitor or Deputy Monitor for consultation on relevant *Nunez* matters, including security initiatives. In each meeting, the Senior Deputy Commissioner, or members of his team, acknowledged that the Department must remain actively engaged with the Monitoring Team and must consult on matters prior to implementation. Despite these claims, on October 23, 2023, the Senior Deputy Commissioner, in the presence of other Department leadership and the counsel for the City, threatened the Monitor with legal action, in what appeared to be an attempt to both deflect from the issues at hand and to intimidate the Monitor.[63] A few weeks later, without consulting or notifying the Monitor, the SDC authorized the implementation of an Arson Reduction Housing Unit that was poorly conceptualized, had inadequate policies and procedures, and had significant physical plant deficiencies.[64] That such a unit was permitted to be operationalized given these deficiencies raises significant concerns about the SDC's leadership ability and the Department's management of the *Nunez* Court Orders.

---

[61] *See* Charles Daniels Declaration of November 28, 2023 (dkt. 614-2) at ¶ 3.

[62] These meetings occurred on September 21, October 12, October 16, and October 23, 2023. The meetings on October 16 and 23, 2023 were discussed in the Monitor's November 8, 2023 Report (dkt. 595) at pgs. 44 to 45 and 53 to 54.

[63] *See* November 8, 2023 Report (dkt. 595) at pgs. 53 to 54.

[64] *See* Monitor's November 15, 2023 Report (dkt. 599).

The Department has three Deputy Commissioners who were appointed pursuant to the Action Plan. They are responsible for managing key initiatives related to the *Nunez* Court Orders and have each been valuable to the agency and the reform effort. The Deputy Commissioner of Administration (i.e., Staffing Manager) is making a concerted effort to address the myriad staffing issues and to identify creative solutions that are well-grounded in sound correctional practice. The Deputy Commissioner of Security (i.e., Security Manager) has demonstrated a strong understanding of the poor security practices that must be addressed. Finally, the Deputy Commissioner of Classification, Custody Management and Facility Operations (i.e., Classification Manager) continues to demonstrate a strong command of the issues and works to implement concrete solutions. Although the three Deputy Commissioners are highly skilled, their work to reform the critical foundation of the agency is impeded when they must start/stop/restart initiatives because the Department has failed to consult with the Monitor. Nowhere is the need for a unified, absolute, and clear mandate from City officials, the Commissioner and the SDC that Department leaders and staff must consult with the Monitor more critical than in this area. The Department exerted significant effort to recruit leaders with much needed correctional expertise. It is disturbing that the potential impact of their contributions is being minimized and undermined by the Department's current approach to managing the *Nunez* Court Orders.

The *Nunez* Manager and Assistant Commissioner of the *Nunez* Compliance Unit (and their respective teams) have likewise been beneficial and are crucial to the reform effort. However, as the Monitor has consistently reported, their appointment alone will not change the overarching issues related to the imminent risk of harm or the Defendants' work with the Monitor. The *Nunez* Manager's primary task is to coordinate and facilitate the flow of information to the Monitoring Team, and she and her team frequently communicate with the Monitoring Team. Despite their significant efforts, the *Nunez* Manager's team still is not adequately resourced as described in the November 8, 2023 Report (dkt. 595) at pgs. 39 and 56 to 58. The *Nunez* Manager must be fully empowered such that her direction regarding consultation, information sharing and ensuring that initiatives are substantively aligned with the *Nunez* Court Orders is heeded by staff at all levels. The individuals who are actually responsible for operating and managing the facilities must own both the problems and their solutions, a task which would be facilitated by a more deliberate effort to utilize the many audits produced by the NCU that reliably reflect the size and scope of poor practice in the jails. Poor internal

coordination among Department leadership and ongoing efforts by the Commissioner and SDC (and possibly others) to impede the Monitor's work also hampers the functioning of the *Nunez* Manager and the NCU.

As outlined in detail throughout this report, even with multiple Court Orders and clear direction from the Court during Status Conferences, Defendants continue to attempt to interfere with the work of the Monitor, obfuscate the current state of affairs, and unnecessarily divert the limited resources of the Department, the City, and the Monitor to dispute matters that should be easily resolved but instead require time-consuming negotiation.

<u>*Monitor's Efforts to Improve Transparency and Collaboration*</u>

The Monitoring Team has made extensive efforts to reverse the current trajectory and to restore the quality of collaboration that characterized the early years of the *Nunez* Court Orders. First, the Monitoring Team recommended the appointment of a *Nunez* Manager, who was finally appointed in June 2023, months after the recommendation was initially made and in spite of shifting positions on whether the Department intended to accept the Monitor's recommendation.[65] The *Nunez* Manager's primary task is to coordinate with the Monitoring Team, and she has been diligent about doing so, often proactively providing information and helping the Monitoring Team to understand where obstacles to information-sharing lie and other barriers to implementation. Similarly, the Monitoring Team has a functional relationship with the Assistant Commissioner of the *Nunez* Compliance Unit ("NCU"). The strength of these relationships has helped to mitigate some of the significant issues with transparency, interference, and obfuscation. However, as discussed in prior Monitor's Reports and in the next section of this report, while both the *Nunez* Manager and Assistant Commissioner of NCU are valuable resources, they are intended to support the reform effort, not lead it. Further, their work is significantly hampered by the actions of Department leadership who are responsible for operating the jails and implementing the reforms.

Given the ongoing issues with information sharing and transparency, the Monitoring Team must consistently reiterate the requirements for consultation and constantly search various sources of information to discover what is occurring in an attempt to ensure consultation occurs

---

[65] *See* Monitor's June 8, 2023 Report (dkt. 541) at pgs. 31 to 32.

as it should, and repeatedly follow up to verify information accuracy, to clarify vague and ambiguous information shared, to obtain updates, and to untangle inconsistent reports received from different actors. In recent months, the Monitoring Team has increased the frequency and breadth of contact with facility leadership via site work and routine meetings. Frequent site visits help the Monitoring Team to verify the information that the Department provides and also supply important input from facility staff and people in custody who grapple with safety issues on a daily basis. Site work is supplemented by routine calls with each facility leader and other Department managers which provide both a window into the Department's efforts to solve problems and a forum for discussing new initiatives to ensure that information is provided to the Monitoring Team as it should be. The Monitoring Team routinely reiterates the importance of consultation to Department leaders and reminds the Department (via phone calls and emails) to advise the Monitoring Team about its plans and initiatives.

The Monitor and the Deputy Monitor have also met with the Corporation Counsel, and other lawyers from the City, on at least five occasions since the Monitor's May 26, 2023 Report.[66] In each meeting (and during other routine communication), the Monitor and Deputy Monitor have reported concerns about the accuracy and reliability of data provided by the Department, the Department's failure to consult as required, and the need for Defendants to alter their approach to the work under the *Nunez* Court Orders.

These efforts reflect the Monitoring Team's deep desire for and commitment to resuming the functional relationship with Department leadership that existed for many years. The Monitoring Team's best efforts to do so have thus far been unsuccessful, but the Monitoring Team strongly believes a return to an era of cooperation is possible. Certainly, all stakeholders— parties to the litigation, the Monitoring Team and, most of all, the people in custody and staff who suffer a heightened risk of harm every day—would be better off if engaged in a functional collaboration that is focused on developing solutions to the many problems facing the jails rather than getting mired in needless distractions about access to information and the Department's failure to keep the Monitoring Team informed.

---

[66] These meetings took place on May 31, 2023; June 22, 2023; July 6, 2023; September 28, 2023; and November 6, 2023. The Corporation Counsel and members of her team also joined the October 16, 2023 meeting with the Monitor, Senior Deputy Commissioner and others which was convened pursuant to the Court's October 10, 2023 Order. Representatives of the Law Department also joined the follow-up meeting on October 23, 2023.

_Department Production of Information, Consultation & Collaboration_

In response to the Monitor's concerns about information sharing, Defendants repeatedly report that they provide a significant amount of information to the Monitor and that the Monitor routinely communicates with Department leadership and staff.[67] The Monitor has consistently acknowledged in his reports that the Department produces a significant amount of information.[68] As discussed above, under the _Nunez_ Court Orders, the Monitor can and must make a significant number of requests and the Department, in turn, is required to provide a significant amount of information. While a significant amount of information is shared, the flow and quality of information provided to the Monitoring Team has deteriorated since 2022, eroding the Monitoring Team's confidence in the veracity of the information it receives regarding current operations and future initiatives.

Further, while Defendants sorely need technical assistance in developing and implementing the initiatives required by the _Nunez_ Court Orders, Defendants have frequently bypassed the Monitoring Team when developing and implementing policies and procedures, training curricula and operational practices and have failed to notify the Monitor about critical information. This approach impedes the Monitor's ability to consult with the Department on these matters and to provide feedback that elevates these practices, ensures consistency with sound correctional practice and the _Nunez_ Court Orders, and avoids implementation pitfalls from the past. The Monitoring Team's ability to speak candidly with Department leaders and staff has changed significantly since 2022, with staff reporting concerns about being candid with the Monitor for fear of reprisal. Unfortunately, since April 2023, despite Orders at three successive Court Conferences and the issuance of six Court Orders directing a change in practice, the Monitor has continued to encounter and report on problems with Defendants' transparency, obfuscation, and interference with the Monitor's work, all of which impede the Defendants'

---

[67] _See_ City's April 25, 2023 Letter to the Court (dkt. 523) at pgs. 6 to 7, City's August 9, 2023 Letter to the Court (dkt. 562) at pg. 7, City's October 28, 2023 Response to the Motion to Compel (dkt. 589) at pg. 1, City's November 28, 2023 Letter to the Court (dkt. 614) at pgs. 3 to 4, and Kimberly Joyce's Declaration of November 28, 2023 (dkt. 614-4).

[68] _See_, for example, Monitor's November 8, 2023 Report (dkt. 595) at pg. 56, Monitor's August 7, 2023 Report (dkt. 561) at pgs. 7 to 8, Monitor's July 10, 2023 Report (dkt. 557) at pgs. 148 to 149, Monitor's June 8, 2023 Report (dkt. 541) at pgs. 37 to 38, Monitor's May 26, 2023 Report (dkt. 533) at pgs. 16 to 17.

ability to advance the reforms. A summary of these Orders and the subsequent Monitor's Reports is included in the Appendix B to this report.

Since the issuance of the Court's October 10, 2023 Order, the following situations occurred that further eroded the Monitor's confidence that Defendants have taken adequate steps to comply with the Court's Orders.

- _Withholding Nunez-Related Information_: At the end of October 2023, following protracted negotiations, Defendants produced _Nunez_-related information after the Court compelled production. This particular case raises significant concerns about Defendants' understanding and commitment to compliance with the _Nunez_ Court Orders. The City and Department attempted to withhold the information without a legitimate basis, inexplicably suggesting the document should not be produced because the City and Commissioner deemed it was not _Nunez_-related. This particular position raises serious doubts given the document was disclosed _by_ Defendants as part of their August 2023 report on compliance with the _Nunez_ Court Orders and the contents of the document overtly reference _Nunez_ (_e.g._ specific references to the work of the Monitor). [69]

- _Failure to Consult on Violence Reduction Initiatives_: Om November 13, 2023, without consulting or notifying the Monitor, a specialized housing unit was opened that was not well planned, appropriately staffed, nor equipped with adequate safeguards in the physical space. The Monitor only learned about the opening of this housing unit through an anonymous source, despite requirements by the _Nunez_ Court Orders to consult and advise the Monitor, despite specific requests from the Monitor for consultation and notification, and despite the Department's own commitment to do so. [70]

- _Obfuscation and Mismanagement_: The City's response to the Order to Show Cause appears to be another attempt to obfuscate the facts of a serious breach of the _Nunez_ Court Orders and raises concerns about whether the City and Department understand, appreciate, and can ultimately manage the _Nunez_ Court

---

[69] A detailed discussion of this matter (referred to as request number 3) is included in the Monitor's November 8, 2023 Report (dkt. 595) at pgs. 51 to 52. Further discussion is also included in Appendix A of this report.

[70] _See_ Monitor's November 15, 2023 Report (dkt. 599).

Orders and the significant work that is required to advance the reforms. This
specialized housing unit was developed without the Commissioner's
knowledge;[71] although knowledge of a unit like this is clearly something he
should be advised of and aware of prior to authorization and implementation. The
Senior Deputy Commissioner authorized opening this specialized unit despite it
being in its "early planning stages"[72] without adequate polices or procedures[73] as
long as it had an adequate physical plant.[74] These are serious breaches in
management that cannot simply be excused by apparent miscommunications by
and/or to subordinates and distortion of the facts reported to both the Monitor and
the Court.

- *Ongoing Reliance on Anonymous Sources:* The fact that the Monitoring Team
  learned about the ARHU from an anonymous source is but one example of the
  frequency with which the Monitoring Team only learned about a *Nunez*-related
  occurrence or initiative because an anonymous source advised the Monitoring
  Team. In this case, the Department opened a housing unit purportedly to address
  violence and fire setting without consulting or notifying the Monitor. The
  Monitoring Team has had to rely on anonymous sources and the media to learn
  about serious incidents or new initiatives the Department has implemented. This
  includes five serious incidents that occurred between May 11 and 20, 2023, as
  well as a serious incident on September 14, 2023.[75] If not for anonymous sources
  and the media, the Monitor would have been unaware of these events because the
  information was not reported to the Monitor or within the Department's internal
  channels as it should have been.

- *Failure to Provide Unencumbered Access to Staff and to Encourage Staff to
  Cooperate with the Monitor:* The Monitor and Monitoring Team continue to

---

[71] *See* Louis Molina's Declaration of November 24, 2023 (dkt. 614-1) at ¶ 6.

[72] *See* November 9, 2023 email at 2:02 p.m. from K. Joyce to A. Friedberg attached as Appendix C.

[73] *See* Monitor's November 15, 2023 Letter (dkt. 599) at pgs. 2 to 3.

[74] *See* Charles Daniels Declaration of November 28, 2023 (dkt. 614-2) at ¶ 10.

[75] *See* Monitor's May 26, 2023 Report (dkt. 533) and Monitor's October 5, 2023 Report (dkt. 581), Illustrative
Example #2 at pgs. 44 to 47.

receive confidential reports from Department leadership and staff that the Commissioner and Senior Deputy Commissioner (and possibly others) make comments that do not encourage or support cooperation with the Monitor *and* that staff are afraid to speak freely with the Monitor and his team for fear of reprisal.

A durable commitment to consult and collaborate with the Monitor and to provide timely and reliable information remains elusive given Defendant's current posture. The production of a large volume of information does not excuse the regression that has occurred in the quality of collaboration, the provision of *timely* and *reliable* information, and agency leaderships' stance on engaging with and consulting the Monitor on <u>all</u> *Nunez* related matters. Defendants often engage in a flurry of activity following a Court Order or in anticipation of a Monitor's Report, usually reiterating their commitment to do things differently and to engage in transparent communications, and frequently via a high-ranking official from the Department or City who reaches out to the Monitor or members of the Monitoring Team.[76] However, Defendants have not demonstrated any material change in their everyday *practice*.

---

[76] *See*, for example, Monitor's August 7, 2023 Report (dkt. 561) at pg. 6 and August 10, 2023 Status Conference Transcript at pg. 9, 8:17.

# CONCLUSION

As noted in multiple Monitor's Reports, sustained and chronic institutional resistance and recalcitrance toward court ordered reform is an insurmountable impediment to any Monitorship. Advancing the much-needed reforms required the by *Nunez* Court Orders demands committed leadership with expertise and experience in sound correctional practice, practical and achievable strategies to advance reform, openness to working constructively with the Court and the Monitor, explicit acknowledgement of the current state of affairs within the Department and risk of harm within the facilities, and a clear vision for how to implement and sustain needed initiatives. Defendant's current approach to managing the *Nunez* Court Orders undermines progress toward reform.

The issues detailed in this report are fundamental to the overarching goal of increasing facility safety. Transparency is essential for the Monitor to fully understand the problems facing the jails and to accurately assess progress toward compliance with the substantive provisions of the *Nunez* Court Orders. Equally important are collaboration and consultation so that the Monitoring Team can effectively deploy its expertise to assist the Department in crafting practical, effective solutions.

The current dynamics characterizing Defendant's approach to working with the Monitor are a distraction for all stakeholders who must divert finite resources to address issues related to transparency and consultation rather than focusing those resources on improving safety for people in custody and the staff who work in the jails. The imminent risk of harm remains both very real and very high, and all parties must refocus squarely on addressing this issue. To date, the efforts by the Monitor and the Court Orders have not materially changed the Department's approach to working with the Monitoring Team.

The City and Department must substantively alter their approach in order to advance the reforms. The Monitoring Team is concerned that the Department's dysfunctional and haphazard approach to managing the *Nunez* Court Orders and working with the Monitor has become normalized. Despite repeated claims of a commitment to change, the same problems continue to occur and, in some cases, have worsened. The Monitoring Team has attempted to reverse this course by raising these issues with the Department, the Corporation Counsel and the Court. This year, the Monitor has also proposed, and negotiated with the Parties, multiple Court Orders to

address these issues. The Monitoring Team's overall confidence that Defendants are committed to the kind of collaboration that is essential for progress has been eroded. Clear and unequivocal messaging from the City and Department leadership, both externally and internally, must state that Defendants intend to comply with the *Nunez* Court Orders and that a failure to consult with or provide the Monitor with requested information will not be tolerated or excused. And most critically, transformative change in *actual practice* by all relevant City and Department leadership and staff must accompany these public proclamations. The City's and Department's *actions*, or lack thereof, will demonstrate whether there is a true commitment to reform.

# APPENDIX A:
# RESPONSIBILITIES OF THE MONITOR

<u>*Monitor's Role as Defined by the Nunez Court Orders*</u>

The essence of a Monitor's role is to provide a neutral and independent assessment of compliance with court-ordered reform. *See* Consent Judgment § XX. ¶¶ 1 and 18. The Monitor is responsible for assessing compliance via "[. . .] independently verifying any representations from the Department regarding its progress toward compliance [ . . .] and examining any supporting documentation where applicable." *See* Consent Judgment § XX. ¶ 18. To that end, the Monitor is required to provide "…the factual basis for the Monitor's findings [. . . ]." *Id.* In order for the Monitor to maintain his neutrality and independence, "[n]o Party, or any employee or agent of any Party, shall have supervisory authority over the Monitor's activities, reports, findings, or recommendations." *See* Consent Judgment § XX, ¶ 23.

The Consent Judgment requires the Monitor to utilize a robust methodology for assessing compliance including site visits, interviews, records review (including policies, protocols, training curricula, incident reports, investigations, etc.), data and other documents pertinent to monitoring compliance. *See* Consent Judgment § XX, ¶ 15. Therefore, in order for the Monitor to execute his responsibilities, the Consent Judgment permits the Monitor – in his sole discretion – to request access to the people, locations, documents, and information necessary "to perform his responsibilities under this Agreement." *See* Consent Judgment § XX. ¶ 8[77] and October 30, 2023 Order (dkt. 590) at pg. 2. To facilitate this effort, the Department must produce complete, responsive, and accurate information to the Monitor in a timely manner. *See* Consent Judgment § XIX, ¶ 7 and June 13, 2023 Order (dkt. 550), § I, ¶ 4. The Consent Judgment also requires the Department to "encourage all Staff Members to cooperate fully with the Monitor." *See* Consent Judgment § XX. ¶ 13. Given the importance of obtaining information, "[t]he Monitor shall have unencumbered, direct access to communicate with and seek information from all Department leadership and staff to fulfill his responsibilities under the *Nunez* Court Orders. The Monitor shall be permitted to have confidential communications with Department leadership and staff outside the presence of other Department personnel." *See* June 13, 2023 Order (dkt. 550), § I, ¶

---

[77] In order for the Monitor to perform his duties, the Monitor necessarily must have the latitude to request information as necessary and not be limited to information that is "expressly" required. The Monitor simply could not do his work with such an approach.

6. *See also* Consent Judgment § XX. ¶ 8 (which permits the Monitor to have confidential conversations and to speak with staff outside the presence of other staff).

Although the Monitor collects information about the state of affairs via direct observation and interviews with leadership, staff and people in custody, , the Monitor fundamentally depends on the City and the Department to provide most of the data and information necessary to do his job. The City and the Department must provide the Monitor with complete, responsive and accurate information about the facilities' operations because otherwise, the Monitor simply cannot access the information needed to understand the jails' problems and their potential solutions. Therefore, Defendants must provide information timely, accurately, and reliably. *See* Consent Judgment § XIX, ¶ 7 and June 13, 2023 Order (dkt. 550) § I, ¶ 4. In some cases, the Department shares information that is preliminary and therefore may need to be updated in the future, but it is critical for the Department to share all information *available at the time of the request* and not just the Department's final conclusions about what they believe the information shows.

The reform effort culminates in the production of public reports on the Defendants efforts to achieve compliance with the *Nunez* Court Orders and the Monitor's work. *See* Consent Judgment § XX. ¶ 16 – 21, First Remedial Order (dkt. 350), § F, ¶ 7, Second Remedial Order (dkt. 398), ¶ 2(i) and (iii), Third Remedial Order (dkt. 424), ¶ 6, Action Plan (dkt. 465), § G, ¶¶ 2 and 5, June 13, 2023 Order (dkt. 550) § III. These reports are necessary for the Court, the Parties and the public to know the status of the Defendants' efforts to affect the changes they promised to make and to identify obstacles to reform. The Monitor may also make recommendations regarding how Defendants may alter practice to achieve compliance. *See* Consent Judgment, § XX, ¶ 19. These public reports are essential to hold Defendants accountable for advancing the reform. Indeed, the Court has required the Monitor to promptly advise the Court "if defendants fail to remain adequately engaged with the monitoring team and appropriately committed to implementing sustained reform" or are not engaging with the Monitor and his team as required by the Court's orders. *See* April 27, 2023 Status Conference Transcript at pg. 69, 16:19, June 13, 2023 Order (dkt. 550), § I, ¶ 8.

*Monitor's Consultation & Technical Assistance*

Along with assessing Defendants' compliance with the *Nunez* Court Orders, the Monitor is also required to consult with the Defendants on over 80 policies, procedures and systems that must be developed and implemented pursuant to the *Nunez* Court Orders.[78] In some cases, the Monitor must also approve certain policies, procedures and systems. In order for this consultation to be meaningful, Defendants must approach the task proactively, provide sufficient information about the initiatives, and grant sufficient time for the exchange of ideas. Such an approach is inherent to any obligation to consult and in all situations in which Monitor approval is required. To avoid any potential ambiguity related to this obligation, the Department has been specifically ordered to proactively communicate with the Monitor on matters related to the *Nunez* Court Orders, articulated in five successive Court Orders on June 13, 2023 Order (dkt. 550 at § I, ¶ 5), July 18, 2023 Order (dkt. 558 at pg. 2), August 10, 2023 Order (dkt. 564 at § 1), October 10, 2023 (dkt. 582 at pgs. 1 and 2), and October 30, 2023 (dkt. 590 at pg. 2), and during the last three status conferences on April 27, 2023, June 13, 2023 and August 10, 2023.

Since the Consent Judgment went into effect, the Monitoring Team has provided feedback on hundreds of issues and has made countless recommendations to improve practice in order to elevate the level of safety in the jails. In this agency, where the need for technical assistance is particularly acute, it is important for the Monitoring Team to be informed in advance about the development of initiatives to advance the reform because, too often, the Department's work product is inadequate and requires significant revision or reformulation. The Monitoring Team's assistance is a combination of basic project support (e.g., reminders about deadlines or identifying relevant policies that govern certain practices), ensuring that new policies, protocols and training curricula comport with generally accepted practice and the requirements of the *Nunez* Court Orders (e.g., ESU and Captain training), and identifying targets for root cause analysis (e.g., escort and search procedures that often lead to unnecessary and excessive uses of force). The Monitoring Team's extensive knowledge of the Department's

---

[78] See Consent Judgement, § IV, ¶¶ 1, and 4, § V, ¶¶ 9, 20, and 21, § VI, ¶ 1, § VII, ¶¶ 6, 12, and 15, § IX, ¶¶ 2(a)-(e), 2(g), and 3(d), § X, ¶¶ 1, 1(b), 4, and 6, § XI, ¶¶ 1, and 2, § XIII, ¶ 1, § XV, ¶¶ 4, and 18, § XVI, ¶¶ 3, 4, and 6, § XVIII, ¶ 1, § XX, ¶ 26; First Remedial Order, § A, ¶¶ 1(i), 3, 4, 4(i), 4(ii), 5, and 6, § B, ¶¶ 2(i), 3, and 5, § C, ¶ 3, § D, ¶¶ 1(i), 2, 2(iii), 2(iv), 3(ii); Second Remedial Order, ¶¶ 1, i(a), i(e), i(f); Third Remedial Order, ¶¶ 1(i), 3, 5; June 13, 2023 Order, § I, ¶¶ 1, 4, 5, and 7; August 10, 2023 Order, § I, ¶¶ 1-5, 7-10, and 13-14; October 10, 2023 Order at pg. 2.

operations and its efforts to improve practice over the years also gives the Monitoring Team a unique institutional and historical perspective. The Monitoring Team frequently identifies procedures, practices and previous attempts to solve problems of which the current administration is unaware. This historical knowledge is essential for avoiding the pitfalls of the past.

The Monitoring Team's approach to the work of advancing the reform has always been steeped in collaboration, which requires being actively engaged with Department officials and staff at all levels. To that end, the Monitoring Team routinely speaks with Department leaders and staff as well as counsel for the City. The Monitoring Team also requests and receives a significant amount of information on a routine cadence (weekly, bi-weekly, and monthly) and in response to *ad hoc* requests. Given the volume and breadth of obligations under the *Nunez* Court Orders, these requests are necessarily extensive. In order for this exchange of information and technical assistance to meaningfully contribute to improving facility safety, the Monitoring Team must be able to trust that the information it receives is accurate and complete. Events in 2023, detailed in this report and others, have suggested some information the Department provides is not accurate or complete, which makes it difficult for the Monitoring Team to ensure that its feedback and technical assistance properly respond to what is occurring in the jails. The Monitor can only fulfill his duties to inform the Court and assist the Department when the flow of information is unencumbered and when Defendants do their best to provide accurate, complete and reliable information.

# APPENDIX B:
# SUMMARY OF COURT ORDERS & MONITOR REPORTS

<u>Summary of Court Orders & Monitor Reports Regarding Defendants' Transparency and
Collaboration with the Monitor</u>

This appendix provides a summary of the issues related to the Department's lack of
collaboration and transparency that the Monitoring Team has encountered since summer 2021
and the corresponding Court Orders. This includes:

- o *Initial Regression in Summer 2021 to Spring 2022*
- o *Resurgence of Issues in 2023*
- o *April 27, 2023 Status Conference & the Events that Followed as Described in the
  Monitor's May 26, June 8 and June 12, 2023 Reports*
- o *June 13, 2023 Emergency Status Conference, June 13, 2023 Court Order & the
  Events that Followed as Described in the Monitor's July 10, 2023 Report*
- o *July 18, 2023 Order & the Events that Followed as Described in the Monitor's August
  7, 2023 Report*
- o *August 10, 2023 Status Conference, August 10, 2023 Court Order & the Events that
  Followed as Described in the Monitor's October 5, 2023 Report*
- o *October 10, 2023 Order, October 30, 2023 Order and Events that Followed as
  Described in the Monitor's November 8 & 15, 2023 Reports*
- o *November 15, 2023 Monitor's Report & Court's November 16, 2023 Order*

- • *Initial Regression in Summer 2021 to Spring 2022*

The Department's approach to working with the Monitoring Team first began to falter in
summer 2021 and the Department was downgraded to Partial Compliance with Consent
Judgement § XVIII, ¶ 3 (*i.e.*, requiring an individual to coordinate compliance and to serve as the
point of contact with the Monitoring Team) after having been in Substantial Compliance for the
previous 11 Monitoring Periods.[79] Towards the end of the Twelfth Monitoring Period (June

---

[79] The Monitoring Team did not assess compliance with any provisions of the Consent Judgment or Remedial
Orders for the period between July 1, 2021 and December 31, 2021 (the "Thirteenth Monitoring Period"). The
Court suspended the Monitoring Team's compliance assessment during the Thirteenth Monitoring Period
because the conditions in the jails during that time were detailed to the Court in seven status reports filed
between August and December 2021 (dkt. 378, dkt. 380, dkt. 387, dkt. 399, dkt. 403, dkt. 420, dkt. 429), a
Remedial Order Report filed on December 22, 2021 (dkt. 435) as well as in the Special Report filed on March
16, 2022 (dkt. 438). The basis for the suspension of compliance ratings was also outlined in pgs. 73 to 74 of

2021), with a transition to new leadership, there were strained communication and coordination with the Monitoring Team on the Department's initiatives, priorities, and the various other dynamic issues at play. *See* Monitor's December 6, 2021 Report (dkt. 431) at pgs. 121 to 122.

The collaboration with the Monitoring Team further devolved in early 2022 with the transition to the current Department leadership. In its March 16, 2022 Report, the Monitoring Team reported that beginning in early 2022, the Department "essentially eliminate[d] the proactive and collaborative approach that previously existed, reduced its level of cooperation, and limited its information-sharing and access in ways which inhibit the work of the Monitoring Team." *See* Monitor's March 16, 2022 Report (dkt. 438) at pgs. 24 to 29. In that report, the Monitoring Team provided several examples including: refusal to provide staffing data, interference with communications with DOC staff, refusal to provide a briefing on safety and security initiatives; and a refusal to consult and advise on Department policies that pose an imminent risk of harm. *See* Monitor's March 16, 2022 Report (dkt. 438) at pgs. 24 to 30. The Monitoring Team requested that the Court "direct the Department to return to fully proactive and transparent communication practices with the Monitoring Team" *See* Monitor's March 16, 2022 Report (dkt. 438) at pgs. 29-30.

Some improvement to the Department's position on information-sharing and their willingness to collaborate was observed following the issuance of the Monitor's March 16, 2022 Report, but these improvements were not significant, and they were not sustained.[80]

- *Resurgence of Issues in 2023*

In late 2022 and early 2023, similar problems began to reemerge as reported to the Court in the Monitor's April 3, 2023 Report. *See* Monitor's April 3, 2023 Report (dkt. 517) at pgs. 113 to 115. The Monitor found "the Department's approach at times [to managing the Nunez Court Orders] lacks a through-line and is without an organizing thread for the robust efforts of multiple leaders in various disciplines. This lack of a central organizing force means that at times,

---

the Monitor's March 16, 2022 Special Report (dkt. 438). Compliance ratings since the 13th Monitoring Period have been suspended pursuant to the Action Plan (dkt. 465) § G, ¶5.

[80] *See* Monitor's April 20, 2022 Report (dkt. 445) at pgs. 3-4 noting *some* improvements but reiterating its March 16, 2022 recommendations regarding the Department's approach to working with the Monitoring Team. *See also* April 26, 2022 Status Conference at pg. 11, 4:8 and pg. 55, 13:17; Monitor's October 28, 2022 Report (dkt. 472) at pgs. 7 to 9; November 17, 2022 Status Conference at pg. 65, 11:22.

initiatives continue forward even when a refocus to an adjacent issue is needed. Discussions with the Monitoring Team to provide advanced notice of certain plans, to consult on certain initiatives in progress, or to digest and respond to feedback also suffer from this lack of a unified vantage point. Simultaneously, although the Department continues to provide all requested information, the decrease in the number of individuals dedicated to facilitating the flow of information to the Monitoring Team has led to delays in receiving requested information." The Monitor also received its first reports that some staff did not feel comfortable speaking openly and candidly with the Monitor for fear of reprisal.[81] *See* Monitor's April 3, 2023 Report (dkt. 517) at pg. 158.

- *April 27, 2023 Status Conference & the Events that Followed Described in the Monitor's May 26, June 8 and June 12, 2023 Reports*

At the April 27, 2023 Status Conference, the Court "direct[ed] the monitoring team to file additional special reports if necessary should exigent circumstances present themselves, including if defendants fail to remain adequately engaged with the monitoring team and appropriately committed to implementing sustained reform." *See* April 27, 2023 Status Conference Transcript at pg. 69, 14:19.

The Defendants' efforts to work with the Monitor further devolved following the Court's April 27, 2023 Order, as reported in the Monitor's May 26 and June 8, 2023 Reports and June 12, 2023 Letter to the Court. These documents recounted three pervasive issues.

First, the Monitoring Team learned from anonymous sources and the news media about five incidents that occurred between May 11 and May 20, 2023. These incidents illustrated serious operational and security issues that had long been identified by the Monitoring Team (e.g., staff reporting, misrepresentations, deflection, and failure to timely provide information to the Monitoring Team). Following these findings, the Commissioner refused to provide the Monitor with a briefing on the investigation of one case, refused to provide information about in-custody deaths, and requested that the Monitor not report these cases to the Court because doing so would cause "great harm [to the Department] at a time when we are making great strides [and]

---

[81] These first reports related to fear of reprisal by the Deputy Commissioner of Investigations. *See* Monitor's April 3, 2023 Report (dkt. 517) at pg. 158. Reports have subsequently broadened to fear of reprisal by other Department leadership.

will fuel the flames of those who believe that we cannot govern ourselves." *See* Monitor's May 26, 2023 Report (dkt. 533) at pgs. 14 to 15.

Second, the overall quality and reliability of information and the level of transparency continued to wane. The Monitor reported several problems: inefficient collaboration, efforts to deflect attention, inaccurate information and information that lacked substance, deadlines that were ignored, dwindling resources, poor internal coordination, data errors/poor vetting, and a failure to consult. *See* Monitor's June 8, 2023 Report (dkt. 541) at pgs. 21 to 22. A number of illustrative examples, mainly occurring between April to May 2023 were provided that were emblematic of the issues observed. These included the Monitor's inability to verify certain information provided by the City and Department to the Court and the Monitor;[82] conflicting, misleading, or inaccurate information provided to the Court and the Monitor; the City and Department's shifting positions; a failure to consult with the Monitor on *Nunez* related matters, and delays in producing information and meeting deadlines. *See* Monitor's June 8, 2023 Report (dkt. 541) at pgs. 23 to 38.

Third, the Monitor also advised the Court that "[a]s a procedural matter, it is difficult for the Monitoring Team to keep the Court appropriately apprised of matters when the City and Department take positions and actions that shift day to day and certain information is only provided piecemeal days after the deadline imposed by the Court." *See* Monitor's June 12, 2023 Letter (dkt. 544) at pgs. 1 to 2.

- *June 13, 2023 Emergency Status Conference, June 13, 2023 Court Order & the Events that Followed Described in the Monitor's July 10, 2023 Report*

The Court held an Emergency Status Conference on June 13, 2023 following the issuance of the Monitor's May 26, 2023 Report. At the conference, the Court issued an Order reiterating Defendants' obligations for transparency and to work with the Monitor. In entering the Order, on consent of all Parties,[83] the Court noted that "it is unfortunately necessary to clarify and, again,

---

[82] The City reported to the Court on June 12, 2023 that it "would not knowingly make any misrepresentations to the Court, and we have not done so in this matter." See City's June 12, 2023 Letter (dkt. 548).

[83] Defendants consented to entry of the order with three noted objections to the June 13, 2023 Order in § I. ¶¶ 1 and 7. Defendants objected to the requirement to advise all Department leadership and staff of their Obligations Under the *Nunez* Court Orders and to the fact that the selection of the Nunez Manager was subject to the approval of the Monitor and that the Nunez Manager responsibilities shall be limited to the areas

underscore the responsibilities [of the Monitor] that have been imposed by orders that have been in place for years and more recent orders. But to the extent there are any ambiguities and to the extent that specifics of timing and execution of methodology of responsibilities is necessary to make sure that we are all clear, it is appropriate and it is necessary." *See* June 13, 2023 Emergency Status Conference Transcript at pg. 85, 10:18.

Following the Court's June 13, 2023 Emergency Status Conference and Order of the same date, the issues with lack of consultation and information-sharing persisted as described in the Monitor's July 10, 2023 Report. The Department failed to consult the Monitor on a three-point restraint policy for its Enhanced Supervision Housing before implementing the policy on two separate occasions – notably the first policy was rescinded because the Department reported it should have consulted with the Monitor. Inexplicably, the Commissioner reinstated the policy *again* on July 4, 2023 without consultation.[84] The Department also began to use training materials for ESU/SRT,[85] the new ADW class,[86] and a summary of the *Nunez* Court Orders[87] — all of which had serious deficiencies —without consulting the Monitor despite requirements and requests to do so. The Monitoring Team was also unable to ascertain which staff were promoted to the position of ADW and the timing of those promotions despite long standing requests for such information. The Monitor only learned that certain ADWs had been promoted via a Department social media post.[88] Notably, despite the Monitor's feedback to enhance pre-promotional screening procedures, the ADWs were promoted without the Department conducting the screening procedures required by its own policy. The Department and the Commissioner also continued to make statements to the media that obfuscated responsibility for

covered by the *Nunez* Court Orders. *See* June 13, 2023 Emergency Status Conference Transcript at pg. 79, 17:25 to pg. 81, 1:24.

[84] *See* Monitor's July 10, 2023 Report (dkt. 557) at pgs. 16 to 17 and pgs. 124 to 126.

[85] *See* Monitor's July 10, 2023 Report (dkt. 557) at pgs. 41 and pgs. 84 to 86.

[86] *See* Monitor's July 10, 2023 Report (dkt. 557) at pg. 86.

[87] *See* Monitor's July 10, 2023 Report (dkt. 557) at pgs. 86 to 87, pg. 152, and Appendix D.

[88] *See* Monitor's July 10, 2023 Report (dkt. 557) at pgs. 74-77.

serious incidents.[89] The Monitor's July 10, 2023 Report also provided a detailed summary of the Department's overall ongoing deficiencies in managing the *Nunez* Court Orders.[90]

- *July 18, 2023 Order & the Events that Followed Described in the Monitor's August 7, 2023 Report*

The Court issued an order following the Monitor's July 10, 2023 Report which, among other things, directed that "Defendants must advise the Monitoring Team, no later than July 31, 2023, of what steps they are taking to comply with paragraph 5 of the Court's June 13, 2023, Order (docket entry no. 550) in light of the July 10, 2023, Special Report findings regarding (1) "Recent Issues regarding Consultation and Collaboration" (Report at 165), and (2) the Department's failure to consult with the Monitoring Team on recently-implemented use of force polices related to court refusals (id. at 16-17) and three-point restraints (id. at 16-17, 124-26)." *See* July 18, 2023 Court Order (dkt. 558) at pg. 2.

Following this Order, problems continued to occur, and the Monitor's August 7, 2023 Report included concerns about the Department failing to proactively engage the Monitoring Team on initiatives related to the *Nunez* Court Orders, about the accuracy of information, and about potential ongoing efforts to limit the information available to the Monitoring Team.[91]

The Monitoring Team also learned that Department leadership was asked to notify the Legal Division of all communication with the Monitoring Team.[92] The City reported that it made this request of Department leadership in order to demonstrate the immense amount of data and information shared with the Monitor.[93] The Monitor has always acknowledged that Defendants share a significant amount of information with the Monitor.[94] The concern the Monitor had about the City's outreach was that it may have had a chilling effect on staff's willingness to speak to the Monitor and/or that staff would have the impression that they are not permitted to speak

---

[89] *See* Monitor's July 10, 2023 Report (dkt. 557) at pg. 44, pgs. 152 to 154.

[90] *See,* Monitor's July 10, 2023 Report (dkt. 557) at pgs. 146 to 160.

[91] *See* Monitor's August 7, 2023 Report (dkt. 561) at pgs. 8 to 9.

[92] *See* Monitor's August 7, 2023 Report (dkt. 561) at pg. 9.

[93] *See* City's August 9, 2023 Letter to the Court (dkt. 561) at pgs. 7 to 8.

[94] *See,* for example, Monitor's November 8, 2023 Report (dkt. 595) at pg. 56, Monitor's August 7, 2023 Report (dkt. 561) at pgs. 7 to 8, Monitor's July 10, 2023 Report (dkt. 557) at pgs. 148 to 149, Monitor's June 8, 2023 Report (dkt. 541) at pgs. 37 to 38, Monitor's May 26, 2023 Report (dkt. 533) at pgs. 16 to 17.

confidentially with the Monitoring Team, despite provisions in the *Nunez* Court Orders that such confidential discussions are permitted. *See* June 13, 2023 Order (dkt. 550) § I, ¶ 6. In fact, the staff who reported this communication to the Monitor raised the very concern about a chilling effect. As a result, the Monitor advised in his August 7, 2023 Report that Defendants must ensure that "Department Leadership and staff are empowered to have such confidential discussions [with the Monitor], the Department should, at a minimum, amend its staff guidance to ensure staff are made aware of this provision and to ensure that staff do not construe the request to notify the Legal Division as a limitation or impediment to any confidential communication with the Monitoring Team."[95]

- *August 10, 2023 Status Conference, August 10, 2023 Court Order & the Events that Followed Described in the Monitor's October 5, 2023 Report*

At the August 10, 2023 Status Conference, the Court entered an order requiring Defendants to take immediate steps to improve jail operations before the end of 2023. Most of these initiatives required consultation with the Monitor and some required Monitor approval. In entering the Order, on consent of all Parties,[96] the Court advised Defendants that "I expect nothing less than scrupulous compliance with the proposed order that I am entering today. And this includes transformative change in the defendants' working relationship with the monitor, whose team brings essential added expertise to the challenges facing the jails. Higher expectations for the working methods, standards, and compliance for those whom defendants employ in the jails is also expected and, most important, rapid improvement of the day-to-day results of these efforts is expected." *See* August 10, 2023 Status Conference Transcript at pg. 73, 24:25 to pg. 74, 1:7.

During the status conference, the Monitoring Team raised concerns with the veracity of certain information included in the City's August 9, 2023 submission.[97] At the direction of the

---

[95] *See* Monitor's August 7, 2023 Report (dkt. 561) at pg. 9.

[96] The City noted two objections. First, the City objected to the language regarding the Monitor's observations of meetings related to UOF, Security and Violence Indicators contending it should be limited to observation of TEAMs meetings. *See* August 10, 2023 Status Conference at pg. 42, 24:25 to pg. 49, 1:7. Second, the City initially objected to the provision regarding the specific number of supervisors to appoint. However, during the course of the Conference, the City agreed to the provision as drafted with a slight modification to the date by which it must be accomplished. See August 10, 2023 Status Conference at pg. 49, 9:25 to pg. 55 1:11.

[97] *See* August 10, 2023 Status Court Conference Transcript at pg. 14, 17:25, to pg. 20, 1:9.

Court, following the August 10, 2023 conference, the Monitoring Team submitted certain clarifications to the Court regarding Dr. James Austin's declaration which cited information that did not comport with information the Monitoring Team had and statements that misrepresented the Monitor's findings. *See* Monitor's August 14, 2023 Letter (dkt. 565).

During the two months following the Court's Order, the Monitor's overarching concerns regarding transparency continued.[98] The Monitor was unable to verify information reported by the City to the Court on August 9, 2023 regarding serious injury data.[99] The Monitor was also unable to verify certain information (e.g. ESU's policy regarding the use of submachine guns) and proactive consultation continued to be an issue.[100] The Department also did not notify the Monitoring Team about Serious Hospital Cases as required by the June 13, 2023 Order—the Department reported five such cases, yet the Monitoring Team identified at least 12 cases that should have been reported, but were not.[101] Notification about the reason an individual was admitted to the hospital is still not provided. The Commissioner's efforts to publicly obfuscate the issues plaguing the agency continued.[102] The Commissioner also attempted to interfere with the Monitor's reporting again.[103] Finally, the Monitor continued to report that staff were afraid to be forthright in conversations with the Monitor, for fear of reprisal.[104]

- *October 10, 2023 Order, October 30, 2023 Order and Events that Followed Described in the Monitor's November 8 & 15, 2023 Reports*

Following the Monitor's October 5, 2023 Report, the Court entered an Order on October 10, 2023 explaining that "in light of the disturbing reports of Defendants' recent behavior, the Court reminds the Commissioner of the Department of Correction and all Defendants that they must not interfere with, attempt to influence, or otherwise threaten the Monitor. Specifically, they (i) must not limit access to information to which the Monitor is entitled under the <u>Nunez</u> Court

---

[98] *See* Monitor's October 5, 2023 Report (dkt. 581) at pgs. 15 to 16.

[99] *See* Monitor's October 5, 2023 Report (dkt. 581) at pgs. 11 to 12 and footnote 16.

[100] *See* Monitor's October 5, 2023 Report (dkt. 581) at pgs. 14 to 15.

[101] *See* Monitor's October 5, 2023 Report (dkt. 581) at pg. 12.

[102] *See* Monitor's October 5, 2023 Report (dkt. 581) at pgs. 9 to 10 and pgs. 18 to 19.

[103] *See* Monitor's October 5, 2023 Report (dkt. 581) at pgs. 15 to 16.

[104] *See* Monitor's October 5, 2023 Report (dkt. 581) at pg. 16.

Orders and (ii) must report to the Court as required by the <u>Nunez</u> Court Orders. Continued failure by the Commissioner, or by any Defendant, to scrupulously comply with any of the Court's <u>Nunez</u> Orders, including this order, may result in additional orders or sanctions as the Court deems appropriate." *See* October 10, 2023 Court Order (dkt. 582) at pg. 2.

Following the Court's October 10, 2023 Order, significant issues both emerged and continued, which were described in the Monitor's November 8, 2023 Report. First, the Monitor discovered that data related to stabbings and slashing was not reliable, and retracted his findings related to this issue reported in 2023. *See* Monitor's November 8, 2023 Report (dkt. 595) at pg. 3, pgs. 31-33, pgs. 35-36, and Appendix D.

Second, the Department's management of the *Nunez* Court Orders continued to be problematic. The ongoing pattern of interference and obstruction of the Monitor's work was detailed in the report.[105] The report also included incidents of interference by the Commissioner and the Senior Deputy Commissioner.[106] Staff also continued to report a fear of reprisal if they engaged with the Monitoring Team.[107]

Third, Defendants' response to three requests from the Monitor for Defendants to produce certain information illustrated the various impediments to obtaining information. These three requests are discussed in detail at pages 48 to 53 of the Monitor's November 8, 2023 Report (dkt. 595). Most notable was Defendants' refusal to produce a document the Defendants disclosed in their August 16, 2023 Compliance Report (referred to as request number 3).

The Monitor had to file an emergency motion to compel to obtain the information. In response to the motion to compel, the City reported to the Court on October 28, 2023 that "Defendants take seriously their obligations under the Nunez Consent Decree and Remedial Orders and comply with the vast majority of document and information requests submitted by the Monitor without objection." *See* City's October 28, 2023 Letter to the Court (dkt. 589) at pg. 1. However, Defendants continued to object to the production of certain information requested by the Monitor because *Defendants* deemed the information "not relevant to assessing the

---

[105] *See* Monitor's November 8, 2023 Report (dkt. 595) at pgs. 53 to 58.

[106] *See* Monitor's November 8, 2023 Report (dkt. 595) at pg. 44 and pgs. 53-54 regarding the SDC's threat of litigation.

[107] *See* Monitor's November 8, 2023 Report (dkt. 595) at pg. 56.

Department's current compliance with Consent Judgement and Remedial Orders, nor is it relevant to remedying the constitutional violations at issue." *See* City's October 28, 2023 Letter to the Court (dkt. 589) at pg. 2. The City did not cite any authority in the *Nunez* Court Orders that would permit withholding information on their purported basis.

The Court entered an order, granting the Monitor's emergency motion to compel the Department to produce the document, reaffirming that "the Consent Judgment requires the Department to "encourage all Staff Members to cooperate fully with the Monitor" and likewise demands that "[n]o Party, or any employee or agent of any Party, shall have supervisory authority over the Monitor's activities, reports, findings, or recommendations." (Consent Judgment at § XX, ¶¶ 13, 23.)" *See* October 30, 2023 Court Order (dkt. 590) at pg. 2. The Court also found that Defendants' refusal to produce information requested by the Monitor because Defendants believe "it is not relevant" is not a legitimate basis to withhold information. *See* October 30, 2023 Court Order (dkt. 590) at pg. 2.

- *November 15, 2023 Monitor's Report & Court's November 16, 2023 Order*

Following the Monitor's November 8, 2023 Report, on November 14, 2023, the Monitor learned that the Department opened a specialized housing unit (the Arson Reduction Housing Unit) without consulting or notifying the Monitor, despite the fact that such consultation is required by the *Nunez* Court Orders,[108] despite repeated requests from the Monitor that the Department do so,[109] and despite a commitment from Department leadership that such

---

[108] Among others, the Department is required to "proactively consult with the Monitor in advance of promulgating any new policies or procedures that relate to compliance with the *Nunez* Court Orders." *See* June 13, 2023 Order (dkt. 550), § I, ¶ 5. Further, the Department is required to consult with the Monitor on Security Practices (*see* Action Plan (dkt. 495) § D ¶ 3) and must consult with and seek the Monitor's approval regarding the strategy for managing incarcerated individuals following serious incidents of violence (*see* Action Plan (dkt. 465) § E ¶ 4). The Court has advised Defendants "I expect nothing less than scrupulous compliance with the proposed order that I am entering today. And this includes transformative change in the defendants' working relationship with the monitor, whose team brings essential added expertise to the challenges facing the jails." *See* August 10, 2023 Status Conference Transcript at pg. 73, 24:25 to pg. 74, 1:3. On October 10, 2023, the Court directed the Department leadership to work with the Monitor "to devise a plan that can be implemented immediately to ameliorate the unacceptable levels of harm." *See* October 10, 2023 Court Order (dkt. 582) at pg. 2. The Court has also directed that Defendants "(i) must not limit access to information to which the Monitor is entitled under the Nunez Court Orders and (ii) must report to the Court as required by the Nunez Court Orders." *See* October 10, 2023 Court Order (dkt. 582) at pg. 2.

[109] The Monitor requested consultation on any initiative related to security initiatives on multiple occasions, including during both meetings convened by the Senior Deputy Commissioner on October 16 and 23, 2023. These requests were also made via email on October 6, 2023 and November 9, 2023.

consultation and notification would occur ***prior*** to implementing any such unit.[110] The Monitor was compelled to immediately report this situation to the Court given the risk of harm posed by the Department's haphazard and poorly planned unit and the lack of consultation with the Monitor. *See* Monitor's November 15, 2023 Letter to the Court (dkt. 599).

The Court entered an Order to Show Cause following the filing of the Monitor's November 15, 2023 Letter to the Court. The Court found the "Letter details a significant series of actions, undertaken by the Department of Correction (the "Department"), that both violate a number of recent Court orders and are exemplars of the ways in which the current Department management practices contribute to the unacceptable level of danger posed to individuals in custody and employees at Rikers Island. Indeed, this pattern of dysfunction has been well-documented by recent Status Reports from the Monitoring Team. (See, e.g., docket entry nos. 533, 557, 561, 581, 595.) In light of these reports, the Court has entered a series of orders requiring the Department to undertake specific steps to improve their cooperation and transparency with the Monitoring Team. (See docket entry no. 550 at § I, ¶ 5; docket entry no. 582 at 2.) These orders go directly to the fundamentals of safety for staff and individuals in custody at Rikers. The Monitoring Team has brought, and continues to bring, vital expertise to the essential task of bringing the Department into compliance with the Consent Judgment. The Court is disturbed that the conditions of the jails at Rikers—which were already notoriously dangerous—continue to deteriorate, and that effective administrative reform remains elusive, despite the clear requirements detailed in the Consent Judgment and recent Court orders." *See* November 16, 2023 Order to Show Cause (dkt. 600) at pg. 1.

A more detailed discussion about the ARHU and the City's November 28, 2033 submission in response to the Court's November 16, 2023 Order is included in this report.

---

[110] On November 9, 2023 the Deputy Monitor requested "the Department consult with the Monitoring Team and provide any proposed policies related to either of these housing model strategies (or similar ones) ***prior*** to the opening of these units." (emphasis in original). In response, the *Nunez* Manager reported on November 9, 2023 that "[the Monitoring Team] will be consulted on the OBCC Annex Pilot and the [ARHU] prior to the opening of any such units, but ***plans are still in the early stages***." (emphasis supplied).

# APPENDIX C:
# EMAIL COMMUNICATIONS

| | |
|---|---|
| **From:** | Anna Friedberg |
| **To:** | Joyce, Kimberly (DOC) |
| **Cc:** | DL - Nunez Legal Team; LawNunezTeam; Nunez-NYC; Steve Martin |
| **Subject:** | RE: [EXTERNAL] RE: Nunez Follow-up on Violence Reduction Plan |
| **Date:** | Tuesday, November 14, 2023 5:15:00 PM |

Hi Kim,

As you know from our prior communications, the Monitoring Team learned that housing Unit 1A was opened yesterday without consultation or notification to the Monitoring Team.  We have requested the Department provide any written documentation on the operation of the unit and await production as soon as possible.  In the meantime, we note our significant concerns that the Department has elected to proceed in opening a specialized unit with little to no planning and no consultation with the Monitoring Team. The Monitoring Team is considering how best to advise all stakeholders of this matter as it is difficult for the Monitoring Team to know how to proceed given that even when the Department affirmatively commits to consultation and collaboration that it does not occur and the Monitoring Team must rely on anonymous sources to learn about information that Defendants should proactively be advising the Monitor.

Anna

_·_·_·_·_·_·_·_

Anna E. Friedberg

Tillid - President

178 Columbus Avenue, # 230842

New York, NY 10023-9998

Redacted

Redacted

www.tillidgroup.com

**From:** Joyce, Kimberly (DOC) Redacted

**Sent:** Thursday, November 9, 2023 2:02 PM

**To:** Anna Friedberg Redacted

**Cc:** DL - Nunez Legal Team Redacted LawNunezTeam

Redacted Nunez-NYC Redacted Steve Martin

Redacted

**Subject:** Re: [EXTERNAL] RE: Nunez Follow-up on Violence Reduction Plan

Hi Anna,

Received. I have a number of responses from stakeholders to your follow-up questions that I'll send today and tomorrow (once I get that report summary we talked about out of the way).

And yes, you will be consulted on the OBCC Annex Pilot and the GRVC1A arson units prior to the opening of any such units, but plans are still in the early stages.

Thank you,
Kim

---

**From:** Anna Friedberg [Redacted]
**Sent:** Thursday, November 9, 2023 1:55 PM
**To:** Joyce, Kimberly (DOC) [Redacted]
**Cc:** DL - Nunez Legal Team [Redacted] LawNunezTeam [Redacted] Nunez-NYC [Redacted] Steve Martin [Redacted]
**Subject:** [EXTERNAL] RE: Nunez Follow-up on Violence Reduction Plan

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.  Forward suspect email to [Redacted] as an attachment (Click the More button, then forward as attachment).

Hi Kim,

I wanted to follow-up on our October 26, 2023 requests related to the Violence Reduction Plan.  We are hoping to get the information requested below by November 16th.

We also wanted to reiterate our request for consultation on any Violence Reduction initiatives related to the plan or otherwise.  For instance, we understand from discussions with various DOC leadership that the Department is considering at least two different housing models – one at the OBCC Annex and one in GRVC 1A.  We appreciate that the briefings shared to date haven't had many details because the plans are still under development. Once the plans have been finalized, we request the Department consult with the Monitoring Team and provide any proposed policies related to either of these housing model strategies (or similar ones) prior to the opening of these units.

Thanks,
Anna

_ . _ . _ . _ . _ . _ . _ . _ .
Anna E. Friedberg

Tillid - President
178 Columbus Avenue, # 230842
New York, NY 10023-9998
[Redacted]
[Redacted]
www.tillidgroup.com

**From:** Anna Friedberg Redacted
**Sent:** Thursday, October 26, 2023 3:08 PM
**To:** Joyce, Kimberly (DOC) Redacted
**Cc:** DL - Nunez Legal Team Redacted LawNunezTeam
Redacted Nunez-NYC Redacted Steve Martin
Redacted
**Subject:** Nunez Follow-up on Violence Reduction Plan

Hi Kim,

Thank you for sharing the follow-up information regarding the violence reduction plan.  We have some additional follow-up requests as outlined below.  Given our upcoming report, we would appreciate all efforts to provide the information as soon as possible and that the Department keep us abreast of any relevant updates and information.

Thanks,
Anna

Ongoing Request Re: Violence Reduction Plan: Please provide routine updates to the Monitoring Team on any and all violence reduction initiatives.  Further, if plans are changed, please consult the Monitoring Team as appropriate and advise the Monitoring Team of those changes, when they went into effect, and why the changes were made.

Ongoing Request re: Safety & Security in the Jails: The Monitoring Team reiterates its on-going request that the Department advise the Monitoring Team of relevant information regarding safety and security matters within the Department.

Redacted

Redacted



_·_·_·_·_·_·_·_·_·_

Anna E. Friedberg

Tillid - President

178 Columbus Avenue, # 230842

New York, NY 10023-9998

Redacted

Redacted

www.tillidgroup.com


Redacted

| | |
|---|---|
| **From:** | Baranchuk, Victoriya |
| **To:** | Anna Friedberg |
| **Cc:** | Joyce, Kimberly (DOC); DL - Nunez Legal Team; Nunez-NYC; Steve Martin |
| **Subject:** | RE: [EXTERNAL] HP Request |
| **Date:** | Wednesday, November 15, 2023 12:52:34 PM |
| **Attachments:** | The Arson Reduction Unit.pdf |
| | Housing History.xlsx |

Hi Anna,

Please see attached as requested (pg 34-35).  Please be advised that ▮DC of Operations▮ confirmed that the Arson Reduction Housing Unit (A.R.H.U.) opened in GRVC, Building 1A, on Monday, November 13, 2023.

A total of five PICs were placed in the unit (as confirmed by the information I provided to you yesterday, and the Housing History spreadsheet attached) and two Officers.  Officer ▮Redacted▮ was assigned to the B post, and Officer ▮Redacted▮ was assigned to the Control Station referred to as the "A" station post.

The purpose of the ARHU was to take immediate action to reduce violence to ensure the safety of staffing and PICs in our custody.  The intent was not to disregard the Monitoring Team's approval but to show a proactive approach to the Agency's progress.  However, this initiative, ARHU, was more than just a housing area per se but a pilot program where PICs agreed to terms and conditions of behavioral change ▮Acting Chief of Security▮ had a 1:1 with each PIC including a group session whereby each PIC was tasked to write an essay as to the reason for their impulsive action and pledged to cease such behavior which was due today. PICs were receptive and showed commitment to completing this program.

Additionally, each PIC signed a formal agreement acknowledging their behavior and understands that if they breach this agreement, they will be returned to ARHU **(see attached)**.  This was a well-organized plan of action amongst leadership recognizing to see change we must do something different.  The leadership had high expectations for this program/initiative but due to the Monitoring Team's disappointment and frustration as noted in the email, the ARHU was dismantled as of yesterday evening.

Please let me know if you have any further questions.

Thank you.

**Victoriya V. Baranchuk**
**Assistant Commissioner**
**Nunez Compliance Unit**
New York City Department of Correction
▮Redacted▮
▮Redacted▮
Socialize with us on **FB** | **Twitter** | **YouTube**
**nyc.gov/doc**

IMPORTANT NOTICE: This e-mail and any attachments may contain confidential or sensitive information which is, or may be, legally privileged or otherwise protected by law from further disclosure. It is intended only for the addressee(s). If you received this in error or from someone who

was not authorized to send it to you, please do not distribute, copy or use it or any of its attachments. Please notify the sender immediately by reply e-mail and delete this from your system. Thank you for your cooperation.

---

**From:** Anna Friedberg ████████ Redacted ████████
**Sent:** Wednesday, November 15, 2023 9:31 AM
**To:** Baranchuk, Victoriya ████████ Redacted ████████
**Cc:** Joyce, Kimberly (DOC) ████ Redacted ████ DL - Nunez Legal Team ██Redacted██
████ Redacted ████ Nunez-NYC ████ Redacted ████ Steve Martin
████ Redacted ████
**Subject:** RE: [EXTERNAL] HP Request

Hi Vicky and Kim,

I'm following up in hopes that the written guidance related to the operation of GRVC 1A can be provided as soon as possible.

Thank you,
Anna


_ · _ · _ · _ · _ · _ · _ · _

Anna E. Friedberg

Tillid - President
178 Columbus Avenue, # 230842
New York, NY 10023-9998
████████ Redacted ████████
████████ Redacted ████████
www.tillidgroup.com

---

**From:** Baranchuk, Victoriya ████████ Redacted ████████
**Sent:** Tuesday, November 14, 2023 4:48 PM
**To:** Anna Friedberg ████ Redacted ████
**Cc:** Joyce, Kimberly (DOC) ████ Redacted ████ DL - Nunez Legal Team ██Redacted██
████ Redacted ████ Nunez-NYC ████ Redacted ████ Steve Martin
████ Redacted ████
**Subject:** RE: [EXTERNAL] HP Request

Hi Anna,

I am still waiting for the list from OMAP. However, I also had my staff check through the inmate tracking system and it appears that, as of now, there are a total of 5 PICs in 1A. They were transferred to the house the evening of 11/13. My staff also confirmed via Genetec and the housing area was closed until approx. 2100hrs on 11/13. The individuals are as follows:



- Redacted - PIC 1
- Redacted - PIC 2
- Redacted - PIC 3
- Redacted - PIC 4
- Redacted - PIC 5

CODs are attached for all 5 listed above as requested. Once I receive the information from OMAP I will also send it your way.

Thank you.

**Victoriya V. Baranchuk**
**Assistant Commissioner**
**Nunez Compliance Unit**
New York City Department of Correction
Redacted
Redacted
Socialize with us on **FB** | **Twitter** | **YouTube**
**nyc.gov/doc**

IMPORTANT NOTICE: This e-mail and any attachments may contain confidential or sensitive information which is, or may be, legally privileged or otherwise protected by law from further disclosure. It is intended only for the addressee(s). If you received this in error or from someone who was not authorized to send it to you, please do not distribute, copy or use it or any of its attachments. Please notify the sender immediately by reply e-mail and delete this from your system. Thank you for your cooperation.

**From:** Anna Friedberg              Redacted
**Sent:** Tuesday, November 14, 2023 2:58 PM
**To:** Baranchuk, Victoriya              Redacted
**Cc:** Joyce, Kimberly (DOC)              Redacted              DL - Nunez Legal Team Redacted
              Redacted              Nunez-NYC              Redacted              Steve Martin
              Redacted
**Subject:** Re: [EXTERNAL] HP Request

Hi Vicky,

In sharing this list, can you please provide the CODs for all of 2023 involving any of the individuals in the housing unit.

Thanks,
Anna

_ . _ . _ . _ . _ . _ . _ . _

**Anna E. Friedberg**

Tillid - President
178 Columbus Avenue, # 230842
New York, NY 10023-9998

Redacted

Redacted

www.tillidgroup.com

On Nov 14, 2023, at 2:46 PM, Baranchuk, Victoriya

Redacted wrote:

No problem. OMAP is working on this now and I will forward the information upon receipt.

Thanks

**Victoriya V. Baranchuk**
**Assistant Commissioner**
**Nunez Compliance Unit**
New York City Department of Correction

Redacted

Redacted

Socialize with us on **FB** | **Twitter** | **YouTube**
**nyc.gov/doc**

IMPORTANT NOTICE: This e-mail and any attachments may contain confidential or sensitive information which is, or may be, legally privileged or otherwise protected by law from further disclosure. It is intended only for the addressee(s). If you received this in error or from someone who was not authorized to send it to you, please do not distribute, copy or use it or any of its attachments. Please notify the sender immediately by reply e-mail and delete this from your system. Thank you for your cooperation.

**From:** Anna Friedberg Redacted
**Sent:** Tuesday, November 14, 2023 2:41 PM
**To:** Baranchuk, Victoriya Redacted
**Cc:** Joyce, Kimberly (DOC) Redacted DL - Nunez Legal Team Redacted
Redacted Nunez-NYC Redacted Steve
Martin Redacted
**Subject:** Re: [EXTERNAL] HP Request

Hi Vicky,

We would just like it for the last day or two for right now. We can discuss routine productions in the future.

Thanks!

_ . _ . _ . _ . _ . _ . _ . _
**Anna E. Friedberg**

Tillid - President
178 Columbus Avenue, # 230842
New York, NY 10023-9998

<span style="background-color:black;color:white">Redacted</span>

<span style="background-color:black;color:white">Redacted</span>

www.tillidgroup.com

On Nov 14, 2023, at 2:28 PM, Baranchuk, Victoriya

<span style="background-color:black;color:white">Redacted</span> wrote:

Hi Anna,

I am coordinating with OMAP in providing the below:

<mark>Census report for GRVC 1A and the individuals assigned since 11/12</mark>

Please advise as to the frequency of production— (weekly, biweekly, monthly etc)?

Thanks

**Victoriya V. Baranchuk**
**Assistant Commissioner**
**Nunez Compliance Unit**
New York City Department of Correction

<span style="background-color:black;color:white">Redacted</span>

<span style="background-color:black;color:white">Redacted</span>

Socialize with us on **FB** | **Twitter** | **YouTube**
nyc.gov/doc

IMPORTANT NOTICE: This e-mail and any attachments may contain confidential or sensitive information which is, or may be, legally privileged or otherwise protected by law from further disclosure. It is intended only for the addressee(s). If you received this in error or from someone who was not authorized to send it to you, please do not distribute, copy or use it or any of its attachments. Please notify the sender immediately by reply e-mail and delete this from your system. Thank you for your cooperation.

**From:** Anna Friedberg █████████Redacted█████████
**Sent:** Tuesday, November 14, 2023 1:23 PM
**To:** Baranchuk, Victoriya ████████Redacted████████ Joyce, Kimberly (DOC) ████████Redacted████████ DL - Nunez Legal Team
█████████Redacted█████████
**Cc:** Nunez-NYC ████████Redacted████████ Steve Martin
████████Redacted████████
**Subject:** [EXTERNAL] HP Request

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. Forward suspect email to ████Redacted████ as an attachment (Click the More button, then forward as attachment).

Hi Vicky and Kim,

On an HP basis and a rolling basis, can you please provide the following:

Census report for GRVC 1A and the individuals assigned since 11/12.

Any and all written documentation, emails, teletypes, other materials related to the management of 1A.

Thank you,
Anna


_ . _ . _ . _ . _ . _ . _ . _

**Anna E. Friedberg**

Tillid - President
178 Columbus Avenue, # 230842
New York, NY 10023-9998
██████████Redacted██████████
████████Redacted████████
www.tillidgroup.com