# EXHIBIT A

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

MARK NUNEZ, et al.,

      Plaintiffs,

         v.

CITY OF NEW YORK, et al.,

      Defendants.

**11 Civ. 5845 (LTS)(JCF)**

UNITED STATES OF AMERICA,

      Plaintiff-Intervenor,

         v.

 CITY OF NEW YORK and NEW YORK CITY
DEPARTMENT OF CORRECTION,

      Defendants.

**_AMICI CURIAE_ BRIEF OF FORMER NEW YORK CITY OFFICIALS WITH OVERSIGHT FOR NEW YORK CITY'S JAILS IN SUPPORT OF APPOINTMENT OF A RECEIVER**

Elizabeth Glazer, Esq.
Vital City
605 West 113th Street
New York, NY 10025

## <u>TABLE OF CONTENTS</u>

**Page(s)**

STATEMENT OF INTEREST ................................................................................................ 1

SUMMARY OF ARGUMENT ........................................................................................... 3

ARGUMENT ...................................................................................................................... 3

I.     The Causes of the Unconstitutional Levels of Violence and the Resistance To Change Are Structural and Organic, Prizing Fear and Favor Over Management and Principle as the Mode of Governance ................................................................................. 7

      A.    Reliance on Entrenched Customs and Practices Over Law and Sustained Sound Policy Perpetuates Chaos and Violence in the Jails .............. 7

      B.    The Inability to Staff Appropriately, Despite the Resources, Fuels Violence ................................................................................................. 10

      C.    Lack of Accountability and Discipline, Further Fostered Under this Administration, Fuels the Violence ............................................... 11

II.    A Receiver has the Power to Establish Durable, Arms-length Governance that Will Quell the Violence for the Long-term ..................................................................... 14

CONCLUSION .................................................................................................................. 19

## STATEMENT OF INTEREST

*Amici curiae* are former New York City public servants who have dedicated their careers to criminal justice and corrections reform. They include Elizabeth Glazer, the former Mayor's advisor on Rikers Island; Martha W. King, the former head of the Board of Correction carrying oversight authority for the Department of Correction (the "Department" or "DOC"); and Sarena Townsend, the former lead investigator for the City's jails and uses of force. *Amici* have been motivated through their careers by an abiding faith in the ability of the City's government to perform effectively and to serve the best interests of its inhabitants, including those incarcerated in its jails. But *amici* have reluctantly come to recognize that the City is unable and unwilling to fix the causes of the unconstitutional levels of violence in the City's jails. *Amici*'s extensive experience and insights into the politics, governance, management and staffing of the jails offer a unique perspective on why it has become imperative that a federal receiver be appointed to end the escalating and intractable violence.[1]

**Amicus Glazer** headed the New York City Mayor's Office of Criminal Justice from 2014 to 2020, where she served as the Mayor's criminal justice adviser. This included addressing the issues driving violence in the jails. Previously, as the New York State Governor's Deputy Secretary for Public Safety from 2011 to 2013, she oversaw nine criminal justice agencies, including Corrections, Parole and the State Commission of Corrections, the oversight body of the state's jails, including Rikers. She has served as the First Deputy Commissioner in the New York City Department of Investigation and earlier as an Assistant United States Attorney in the Southern District of New York, where she led successively the Organized Crime, Violent Gangs

---

[1] No party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and no person other than the *amici curiae* contributed money that was intended to fund preparing or submitting this brief.

and Crime Control Units. Most recently, Ms. Glazer has founded Vital City, a policy venture that offers practical solutions to public safety problems.

**Amicus King** was the Executive Director of the New York City Board of Correction (the "BOC") from July 2015 through July 2019. The BOC monitors conditions in the City's jails; investigates issues related to safety, supervision and health care; evaluates the performance of the Department of Correction; reviews grievances and makes recommendations in areas of correctional planning. As BOC Executive Director, Ms. King oversaw production of dozens of reports and audits on violence, health care, services, visiting, grievances, restrictive housing and other conditions and supervised hundreds of investigations into complaints and appeals from people in custody. Prior to that role, Ms. King was an adviser on criminal justice and corrections policy to New York City's first deputy mayor from approximately January 2014 through June 2015. In this capacity, she met with DOC and jail health care staff on a regular basis to address policy priorities and implementation progress and challenges. Ms. King has also held policy positions at the Center for Alternative Sentencing and Employment Services, the Vera Institute of Justice and the New Jersey Office of Management and Budget. She is a long-time scholar of criminal justice and corrections.

**Amicus Townsend**[2] led the DOC's internal affairs and staff discipline units on Rikers Island from 2016 to 2022 as the Deputy Commissioner of the Intelligence, Investigation and Trials Division. In that role, she oversaw thousands of investigations and dozens of trials at the Office of Administrative Trials and Hearings, many into the use of excessive force in the City's jails. Prior to her position at the Department of Correction, Ms. Townsend was a Deputy Bureau

---

[2] After leaving the City's employ, as part of her private legal practice, Ms. Townsend has served as a paid consulting expert for counsel to the Plaintiff Class.

Chief at the Kings County District Attorney's Office, where she prosecuted crime throughout Brooklyn for ten years.

## SUMMARY OF ARGUMENT

The appointment of a federal receiver represents the only feasible method to gather both the power and the will necessary to reduce the escalating violence within City jails to constitutionally permissible levels. Nearly a decade after this Court entered the Consent Judgment (Dkt. No. 249), violence in the jails has only increased. The causes of the violence and the failure to address them are rooted in a self-reinforcing and malign set of structures, bureaucracy, politics and culture that control the jails. These include a system committed to or cowed by union influence, resulting in decisions—or the failure to make decisions—about management, training, supervision, security and accountability that undermine the safety and dignity of both incarcerated people and staff, and feed escalating violence.

A receiver has three central features that are essential if the City is to meet its constitutional obligations: (1) a receiver will be in place until the job is done, untouched by the duration of mayoral terms or the changing cast of DOC Commissioners, thus providing stability; (2) a receiver will not be hamstrung by political and other power dynamics and instead will be singularly focused on the well-being of those incarcerated and of staff, and on competent management of the jails; and (3) a receiver will have the power to shape contracts in the best interests of incarcerated people and staff, with a flexibility unavailable to current City administrators. As a result, an effective receiver could restructure and reshape the Department to be functional, safe and stable, ready for the City to resume full operations.

## ARGUMENT

Overwhelming violence is the defining and tragic hallmark of New York City's jails. The violence stems from structural problems in the management of the agency that cannot be fixed in

the current "normal" course. As the Monitor succinctly summarized the situation: "**[t]hese high rates [of violence] are *not* typical, they are *not* expected, they are *not* normal.**" *See* Mar. 16, 2022 Monitor Report at 14, Dkt. No. 438 (emphasis in original). The violence, measured by uses of force, have escalated to such extremes that a return even to the unconstitutional levels of 2015 seems like an unattainable dream.[3]

The source of the violence is as banal as its effects are savage: the absence of a working management structure, appropriate staffing and training, and responsible accountability. *Id.* at 2. This combination leads to escalating violence: hyper-aggressive and inadequately trained officers respond in a predatory environment to disputes or violence among incarcerated people; the violence between the officers and the incarcerated further twists the rubber band of tension in the facility; incarcerated people arm themselves—often from the broken doors, windows and walls that surround them—creating a vicious cycle of fear and violence among all housed and working in the jails.[4] Each incident of violence provides a diagnostic of the governance and training failures fueling the dysfunction. *See* May 26, 2023, Monitor Report at 11, Dkt. No. 533.

If past is prologue, then it is noteworthy that the City has been unable to address the jails' problems for decades, spanning eight mayors, 25 commissioners and six consent decrees.[5] That

---

[3] The average monthly use of force rate for FY23 is 145% higher than in FY16, and the average monthly rate of use of force resulting in serious injury to a person in custody is 526% higher than in FY16. *Compare* Mayor's Management Report Fiscal 2016 (Sept. 2016), https://www.nyc.gov/assets/operations/downloads/pdf/mmr2016/2016_mmr.pdf, *with* Mayor's Management Report Fiscal 2023 (Sept. 2023), https://www.nyc.gov/assets/operations/downloads/pdf/mmr2023/2023_mmr.pdf.

[4] The Monitor's reports are replete with examples of poor staffing and training, and how force has become the first resort for the DOC. *See, e.g.*, Jul. 10, 2023 Monitor Report at 198, Dkt. No. 557. Examples of poor training leading to violence and death in the City's jails have been well documented by the press. *See, e.g.*, Jonah E. Bromwich and Jan Ransom, *An 'Absolute Emergency' at Rikers Island as Violence Increases*, N.Y. Times (Aug. 24, 2021), https://www.nytimes.com/2021/08/24/nyregion/rikers-island-emergency-chaos.html; Jan Ransom, *Man Held at Rikers Dies From Razor Wound After Guards Fail to Intervene*, N.Y. Times (Aug. 30, 2022), https://www.nytimes.com/2022/08/30/nyregion/rikers-island-death.html.

[5] *See* Michael Jacobson *et al.*, *Beyond the Island: Changing the Culture of New York City Jails*, 45 Fordham Urb. L.J. 373, 385–88 (2018); New York Correction History Society, NYC Correction Commissioners, https://www.correctionhistory.org/html/chronicl/nycdoc/html/comslist.html (last visited Nov. 30, 2023); City of

failure has accelerated, as the United States has noted, with the failure to comply with seven different orders over the past 39 months aimed at "systemic deficiencies and dangerous conditions repeatedly identified by the Monitor." Nov. 17, 2023, Ltr. from the United States at 3, Dkt. No. 604 (collecting sources). Threaded throughout are the politics of unions and elected officials. The unions have used their power to resist the kinds of management changes that might, ironically, improve the very conditions they deplore. And fatal to any hopes of compliance with the Consent Judgment is the fact that in the last 23 months, the City has been unabashed in demonstrating its unwillingness to take the steps necessary to reduce the violence.

Further fueling the violence is the failure of accountability, what the Monitor refers to as the "culture of impunity." *See, e.g.*, June 30, 2022 Monitor Report at 27, Dkt. 467. This includes the agency-wide failure to have a neutral, efficient and impartial method of discipline, or for its leadership to submit to oversight and to comply with court and other lawful orders. When the current administration took office in January 2022, newly-appointed Commissioner Louis Molina proceeded to undermine systematically the effectiveness and independence of the Department's Investigations Division, responsible for identifying officer misconduct, resulting in plummeting and ineffective discipline for excessive uses of force. *See infra* Section I.C. Commissioner Molina also reset the norms for whether a DOC Commissioner will comply with external oversight, whether from the Court or elsewhere. One of his first acts was to limit the Board of Correction's access to surveillance video of uses of force, the primary evidence of such conduct.[6] The Commissioner's increasing resistance to transparency and cooperation to address violence is starkly apparent in yet another of many examples. He announced that he is not

---

New York, Mayors of the City of New York, https://www.nyc.gov/site/dcas/about/green-book-mayors-of-the-city-of-new-york.page (last visited Nov. 30, 2023).

[6] Press Release, Board of Corrections, City of New York, New York City Board of Correction Regains Full Access to Jails Video Footage Systems, (Sept. 28, 2023), https://www.nyc.gov/assets/boc/downloads/pdf/News/Board-statement-on-litigation-settlement-2023.09.28.pdf.

required to provide the Monitor information on deaths and serious injuries.[7] Left to learning about serious injury and even death from news accounts or tipsters, and in the face of Department recalcitrance, the Monitor has recently made the extraordinary report to the Court that he cannot rely anymore on the accuracy of the core numbers provided by DOC purporting to measure violence in the facilities. *See* Nov. 8, 2023, Monitor Report at 3, Dkt. No. 595; May 26, 2023, Monitor Report at 13–16, Dkt. No. 533.

This is not normal functioning or even dysfunction within the range of normal. Other City agencies may not operate perfectly, but when it comes to their core missions they operate within the acceptable range of norms. Sanitation picks up the garbage, the fire department responds to fires, the police address crimes, but DOC does not keep incarcerated people and staff safe—the Department's core mandate. Other uniformed agencies have unlimited sick leave, but they have enough functioning management and accountability that those out sick on any given day is a fraction of those out at DOC.[8]

The unconstitutional violence and dysfunction in the City's jails, and the City's inability and resistance to do what is necessary to stop it, are so extraordinary as to demand an extraordinary remedy, that of federal receivership. Issuing court orders is futile if the Department cannot and will not obey. Thousands of pages of the Monitor's detailed technical assistance do not serve their intended purpose if the agency ignores them. A different kind of power, not just to monitor but to govern and operate, is needed, one that will stay until the job is done, bent to its

---

[7] Reuven Blau, *City Jails No Longer Announcing Deaths Behind Bars, Angering Watchdogs*, The City (May 31, 2023), https://www.thecity.nyc/2023/05/31/correction-jails-not-announcing-deaths-rikers/.
[8]    *See*    Mayor's    Management    Report    Fiscal    2023    at    437    (Sept.    2023), https://www.nyc.gov/assets/operations/downloads/pdf/mmr2023/2023_mmr.pdf   (reporting that FY22 sick leave was approximately 18% for the Department of Correction, 4% for the Fire Department, 4% for the Police Department and 9% for the Department of Sanitation); *see also infra* Point I.A.

task with urgency and single-minded commitment freed from the political pressures, explicit and implicit, that can otherwise corrode good governance.

I.   **THE CAUSES OF THE UNCONSTITUTIONAL LEVELS OF VIOLENCE AND THE RESISTANCE TO CHANGE ARE STRUCTURAL AND ORGANIC, PRIZING FEAR AND FAVOR OVER MANAGEMENT AND PRINCIPLE AS THE MODE OF GOVERNANCE**

The Department of Correction prizes short-term accommodations and favors over dispassionate dedication to the well-being of all. The result is the daily repudiation of durable and neutral principles of good governance and operations, shirking the power necessary to make changes for the common good.

A.   **Reliance on Entrenched Customs and Practices Over Law and Sustained Sound Policy Perpetuates Chaos and Violence in the Jails**

All government agencies, in *amici*'s experience, run on a combination of law and practice. While laws provide the backbone of how an agency operates, the practice, or culture, fills in the gaps. When norms are unclear and decisions made in self-interest, not the public interest, a malign culture can metastasize and corrode, or even destroy, the backbone.

At DOC, the "favor bank" dominates over neutral, rational governance in the interest of a common good. It underlies DOC's inability to comply with the detailed operating manual provided by the Monitor over the past eight years. And it is why DOC's inability to achieve compliance has now, foreseeably and inevitably, hardened into open defiance of the Consent Judgment and this Court's other orders, epitomized recently and astonishingly, in a Court order to the Department to reveal the identity of the "Commissioner and Senior Deputy Commissioner who are currently functioning as Commissioner and Senior Deputy Commissioner of the Department." *See* Nov. 16, 2023 Order, Dkt. No. 600. The game has now become "beat the receiver," not institute good governance. *See, e.g.*, May 26, 2023, Monitor Report at 14, Dkt. No. 533 (quoting from a letter from the Commissioner urging the Monitor not to file a special report

7

on five incidents of serious harm or death "because it will cause 'great harm [to the Department] at a time when we are making great strides" and "will fuel the flames of those who believe that we cannot govern ourselves.").

Rikers' difficult history is intertwined with the dance between, on the one side, the permanent government comprised of the unions (*i.e.*, the long-time DOC staff), and, on the other, the appointed government consisting of the Commissioner and top deputies (*i.e.*, political appointees), who directly or indirectly carry out the political wishes of the Mayor. All government agencies experience this tension to one degree or another, with the permanent government willing to "wait out" unpopular policies. It is not a long wait at DOC, since a DOC Commissioner typically lasts, at most, little over two years. Commissioners, for their part, have learned appeasement of the permanent government as a mode of governance, willing to buy peace to avoid the high price of strife. Indeed, the unions' power derives from many sources, most notable among them the willingness to wield it, especially when it comes to the greatest prize of all: how staff will be allocated, managed and disciplined—the very elements of governance that, well-managed, could reduce the violence.

For example, twice the correction officers' union has blockaded Rikers Island, resulting in, among other things, stopping incarcerated individuals from attending court appearances, including to testify against DOC officers.[9] Although both blockades were violations of state law prohibiting strikes by public employees, no action was taken against the union in either instance. The Department of Investigation, which investigated the first blockade, summed up the realpolitik this way: the City decided to negotiate with the union "despite the illegality of the job

---

[9] *See* New York City Report to the Mayor: The Disturbance at the Rikers Island Otis Bantum Correctional Center, Aug. 14, 1990: Its Causes and the Department of Correction Response, April 1993, at 5 ("Blockade Rpt."); *see also* Michael Schwirtz and Michael Winerip, *At Rikers Island, Union Chief's Clout Is a Roadblock to Reform*, N.Y. Times (Dec. 14, 2014), https://www.nytimes.com/2014/12/15/nyregion/at-rikers-a-roadblock-to-reform.html.

action," because it feared it would provoke both growing defiance among the officers and violence.[10] More recently, in 2021, the union's power was used to stage a "sick-out" when a Commissioner tried to get officers to work in the jails. At its height, approximately 30% of the uniformed workforce was not coming to work or was unavailable to work with incarcerated individuals in the City's jails. *See* Mar. 16, 2023 Monitor Report at 8, Dkt. No. 438.

Although New York City has the most richly staffed jails in the nation,[11] the Department has been plagued by officers working double and triple shifts, leaving them exhausted and raising the tension in the jails, further leading to deaths of incarcerated people. *See* Mar. 16, 2023 Monitor Report at 7–8, Dkt. No. 438. The Department has also struggled with getting the most experienced officers to work in the jails, achieving appropriate staffing ratios and reducing the number of officers assigned to perform civilian jobs, such as bakers and drivers.[12] To give a sense of how much the assignment of staff occurs outside "normal" channels, consider these two facts. First, DOC has at least 3,400 recognized posts but also hundreds, if not thousands, of additional "unauthorized" posts that facility leaders create at their discretion. *See* Aug. 24, 2021, Status Rpt. at 5, Dkt. No. 378. Second, the Monitor found that only 47% of staffing assignments on a given day were worked by the people assigned to them on paper. *See* May 11, 2023, Monitor Report at 310, Dkt. No. 595.

How far the unions would go turned almost farcical during what became known as the "Columbus Day Massacre." Over Columbus Day weekend 2021, short of staff in the jails where stabbings and slashings were up and incarcerated people had gained control over some of the

---

[10] *See* Blockade Rpt. at 8.

[11] *See, e.g.*, Vera Institute of Justice, *Jails in New York State Are Severely Overstaffed* (March 2022) https://www.vera.org/downloads/publications/new-york-jail-staffing-fact-sheet.pdf.

[12] Jan Ransom and Bianca Pallaro, *Behind the Violence at Rikers, Decades of Mismanagement and Dysfunction*, N.Y. Times (Dec. 31, 2021), https://www.nytimes.com/2021/12/31/nyregion/rikers-island-correction-officers.html (noting both numbers of non-jail posts and wasteful staffing, for example, 750 officers to guard 16 people in Manhattan jail).

housing units, then-Commissioner Vincent Schiraldi sought to redeploy officers posted at the courthouse where, over the holiday, duty was light. But when the bus arrived at the courthouse, the redeployed officers refused to board and instead each suddenly claimed illness. Seven dialed 911, complaining of chest pain, leg injuries, lightheadedness and palpitations. One produced a cane as proof of disability. More than a dozen officers left in ambulances. Schiraldi not only lost the services of the 19 officers but, per a union contract, was required to have a second officer accompany those who left in ambulances.[13]

These incidents provide brief flashes of insight into why fear and favor are at play in Rikers governance and staffing decisions that should be free of both. Commissioners hoping to get through the day are willing to make the accommodation of the moment to avoid the blockading of the bridge, the wild walk-out, another Columbus Day Massacre or more. All of which leads to a culture of appeasement instead of adherence to good management.

### B.    The Inability to Staff Appropriately, Despite the Resources, Fuels Violence

The Department's inability to build a management structure stands in the way of safer conditions for both incarcerated people and staff. The Department is missing an entire cohort of middle management—the engine of daily operations in the City's jails.[14] A middle management cohort should be supervising and supporting officers; ensuring proper movement within and between jails to healthcare, the courts and elsewhere; overseeing the cleanliness and upkeep of the physical plant; maintaining and distributing adequate and required supplies; effectively responding to violence; and, of course, keeping those incarcerated and working in the jails safe.

For years, the Monitor has urged the Department to fill the lacking complement of wardens, deputy wardens, assistant deputy wardens and captains from outside DOC because the

---

[13] *Id.*
[14] Elizabeth Glazer, *The Fatal Cost of Waiting: What Must Happen Now in the City's Jails*, Vital City NYC (July 26, 2022), https://www.vitalcitynyc.org/articles/liz-glazer-nyc-jails-fatal-cost-of-waiting.

ranks are thin and not up to the job. In December 2022, the City agreed to apply for an order to permit hiring wardens from outside the Department. *See* Dec. 6, 2022 Order at 2, Dkt. No. 492; Nov. 14, 2022 Status Rpt. at 2, Dkt. No 475. Importantly, and fatally, however, the City did not ask to hire from outside to fill the much-needed and more numerous deputy and assistant deputy warden and captain roles required to ensure that the wardens are successful. *See* Dec. 6, 2022 Order, Dkt. No. 492. Why this partial and inadequate solution? We do not know for sure, but it is striking that the deputy wardens, assistant deputy wardens and captain positions are union jobs, while the wardens and the 38 top-level hires, including deputy commissioners, associate commissioners and assistant commissioners, are civilian non-union positions.[15] To hire that full complement of uniformed officers would require a negotiation with the union and a change or waiver of the rules that the City has been either unwilling or unable to accomplish.

In short, over the years the administration has traded management stability and the reduction in violence that goes with it for labor peace. A federal receiver would be best able to act unencumbered by the politics and ossified obligations that have stymied commissioner after commissioner.

### C. Lack of Accountability and Discipline, Further Fostered Under this Administration, Fuels the Violence

While high standards in hiring, training and management are the irreducible minimum to a well-run institution, these cannot be sustained without an impartial and consistent system of accountability. If officers do not believe their work is important and valued, and also that transgressions will be consistently and fairly addressed, management will be undermined and corroded. Here again, the pull of union politics and the failures of management threaten the safety of all in the City's jails.

---

[15] Elizabeth Glazer, Martha King, and Sarena Townsend, *What You Don't Know Will Hurt You*, Vital City NYC (Apr. 27, 20223), https://www.vitalcitynyc.org/articles/why-the-citys-jails-are-broken.

An egregious recent case is that of Captain Rebecca Hillman. In November 2020, as an incarcerated person started to hang himself in full view of officers, she instructed an officer not to cut him down, refused to do so herself, and then lied about her actions. The man was left hanging until he was dead. Hillman was convicted this year of criminally negligent homicide after testifying she thought the man was joking.[16] But in the two-and-a-half years between the death and her conviction, Hillman continued to collect a full paycheck, with only a 28-day suspension. Why? While the complex of agreements and laws permits DOC to suspend officers through conclusion of a felony prosecution, an informal "handshake" agreement years ago between the captains' union and the DOC limited suspensions of captains accused of felonies to only 28 days.[17]

The corrosive arrangements at work in the Hillman case are evident in the systemic and unremediated failure over the past 23 months of the Investigations Division ("ID"), which is responsible for investigating all staff misconduct and is presided over by a Deputy Commissioner. It serves a critical function as the integrity arm of the DOC. Over time, the Monitor increased ID's responsibility as it became clear that the supervisors of the individual jail operations had failed to identify and punish staff misconduct consistently, or in an unbiased fashion. Significantly, the Monitor recommended that ID investigate every use of force, the main benchmark of the Consent Judgment. *See, e.g.*, May 29, 2020, Monitor Report at 175, Dkt. 341; Oct. 23, 2020, Monitor Report at 40, Dkt. 296.

On January 3, 2022, the first day of the current mayoral administration, the new DOC Commissioner fired ID's Deputy Commissioner, *Amicus* Townsend, after she refused to dump

---

[16] Press Release, Manhattan District Attorney, D.A. Bragg Announces Jail Sentence of Corrections Captain for Negligent Homicide (Apr. 28, 2023), https://manhattanda.org/d-a-bragg-announces-jail-sentence-of-corrections-captain-for-negligent-homicide/.

[17] *See* Elizabeth Glazer, Martha King, and Sarena Townsend, *What You Don't Know Will Hurt You*, Vital City NYC (Apr. 27, 20223), https://www.vitalcitynyc.org/articles/why-the-citys-jails-are-broken.

thousands of substantiated cases of use of force misconduct to clear a backlog.[18] The only way to "clear" the cases was either to dismiss them completely or plead them out to lower penalties than warranted, contrary to directives in the Consent Judgment. *See* Oct. 21, 2015, Consent Judgment at 25, Dkt. 249. While a new administration is expected to appoint its own people to top agency positions, Townsend's firing appeared to be in direct response to union pressure and her refusal to improperly clear cases. *See* Nov. 17, 2023, Decl. in Support of Motion, Exhibits 80, 81, Dkt. Nos. 602-75, 602-76. Her firing with no replacement lined up was also a violation of this Court's Third Remedial Order, which sought to insulate this crucial discipline role from politics by making the position subject to Monitor approval. *See* Nov. 22, 2021 Third Remedial Order at 5, Dkt. No. 424.

Over the course of 2022, the City further weakened ID. First, the DOC Commissioner removed ID's independent ability to suspend officers for misconduct, including for excessive use of force, and mandated that he approve all suspensions. Suspensions for use of force misconduct dropped drastically. *See, e.g.,* Mar. 16, 2023 Monitor Report at 16, Dkt. No. 438; Oct. 28, 2022, Monitor Report at Appendix A, vii, Dkt. 472. Under the new head of ID, Manuel Hernandez, use-of-force investigations were suddenly being closed with no action taken, and misconduct was identified "much less frequently," with a "disturbing trend that suggested under [Hernandez's] leadership . . . staff had been influenced or prompted, either overtly or implicitly, to adopt a more lenient approach when assessing cases and to change their practice in ways that compromised the quality of the investigations." Apr. 3, 2023, Monitor Report at 105, Dkt. No.

---

[18] *See* Jan Ransom, *Jail Unions Gain a Powerful Supporter: The New Mayor*, N.Y. Times (Jan. 14, 2022), https://www.nytimes.com/2022/01/14/nyregion/rikers-jail-unions-eric-adams.html.

517.[19] Finally, ID's staffing was hollowed out; investigators and supervisors dropped by 48% between January 2020 and April 2023. *See* Apr. 25, 2023, Monitor Report at 8, Dkt. No. 520.

These problematic events are not simply attributable to a single bad apple but also reflect the malignancy of the culture and feeble management feeding the violence through a corroded bargain for union peace. *See* Apr. 3, 2023, Monitor Report at 5–6, Dkt. No. 517 ("The most disturbing pattern that emerged during this reporting period is the decline in performance of the Investigations Division, which is the *sine qua non* of accountability[.]"). The Department signals it will not investigate or prosecute cases, and when it does, it will offer light penalties, to satisfy the union or union leadership. Along the way, the message to the law-abiding is clear: why bother?

Unions rightly and essentially are zealous advocates for their members. But a corrupt system undermines the confidence and safety of all. There comes a point—and *amici* believe we are at that point—where some other power and authority is required that can govern and conduct operations unbiased and at arms-length, untrammeled by past agreements, associations or fear of future debts.

## II.   A RECEIVER HAS THE POWER TO ESTABLISH DURABLE, ARMS-LENGTH GOVERNANCE THAT WILL QUELL THE VIOLENCE FOR THE LONG-TERM.

In the face of an entrenched toxic culture, failures of management and oversight and, now, open defiance of court orders, a court-appointed receiver offers the best hope and speediest and most cost-effective path to remake the specific operations of the Department and quell the grave and immediate threat of violence. *See generally Plata v. Schwarzenegger*, 2005 WL

---

[19] *See also* Graham Rayman, *NYC Rikers Island Misconduct Investigations Boss Resigns Over Questions About Lax Excessive Force Probes*, N.Y. Daily News (Apr. 2, 2023), https://www.nydailynews.com/2023/04/02/nyc-rikers-island-misconduct-investigations-boss-resigns-over-questions-about-lax-excessive-force-probes/.

2932253 (N.D. Cal. Oct. 3, 2005) (hereinafter "*Plata*"). Re-aligned management structures, with proper sustenance, would offer the City the best route to a firm foundation for a durable future.

Receivership is, for sure, an extraordinary remedy. But the grave conditions feeding the violence require a different degree and kind of power than has been exercised directly by the City or attempted indirectly through the Court and its appointed Monitor. *See* Nov. 17, 2023 Ltr. from United States, at 6, Dkt. No. 604. The long history of futile attempts and the more recent history of escalating violence, hand in hand with both the inability and unwillingness to control it, make plain that the existing structure is not working.

Can appointment of a receiver guarantee a surefire win? No. But it offers three features that are essential—and now missing—to right the Department's current course. *First*, a receiver offers stability because he or she will remain in place until the job is done, providing the "leadership to turn the tide within a reasonable period of time." *See Plata*, 2005 WL 2932253, at *23. The stability reduces the possibility that the "permanent government" will simply wait out political appointees.

*Second*, the receiver's only allegiance will be reduction of violence by all means necessary and proper. This is in stark contrast to the many tugs on the sleeve of a mayor or a commissioner concerned with the future support of a politically powerful union, or the negotiations in the instant to buy peace with accommodations that corrode the very structure of both management and accountability.

*Third*, the receiver will have the power, conferred by the court in consultation with the parties, to address the particular and entrenched problems fueling the unconstitutional violence. Fixing some of these problems may touch on both the lore and the law of agreements with the unions. But as Hernandez Stroud, a scholar of receivership, has noted: "[i]ntense as disagreement

15

between unions and receivers may be, however, that disagreement . . . needn't be a win-big-or-go-home contest. The parties may lock horns over discrete portions of a collective bargaining agreement while leaving undisturbed the rest of the agreement creating no controversy."[20]

The receivership implemented in Cook County, Illinois to remedy the soaring violence and broken management of its juvenile detention facility addressed problems similar to those plaguing this City's jails. There, the court's order gave the receiver a broad mandate to restructure the institution and specific powers to oversee staffing to that end. *See* Order, *Doe, et al. v. Cook Co., et al.,* No. 99 cv 3945, Dkt. No. 330 (N.D. Ill., Aug. 14, 2007). The receiver had the power "to establish personnel policies; to create, abolish or transfer positions; and to hire, terminate, promote, transfer, and evaluate the management and staff of the facility." *Id.* at 7. And, indeed, the "temporary administrator," as the receiver there was titled to signal both the operational centrality and temporary nature of the post, engaged in a comprehensive process to review facility staffing, create new job descriptions, and reshape the composition of the staff—both letting go some and hiring others.

None of this was done unilaterally, although technically the order might have permitted that. Rather, as the deputy temporary administrator has described, the path to a stable, effective and satisfied workforce, and thus to lower levels of violence, demanded that the temporary administrator work through, together with the workforce's representatives, what kinds of positions, held by whom, would make for the safest and most humane institution. In thinking through implementing "changes . . . that can be sustained," the crucial, and unsurprising, insight

---

[20] Hernandez Stroud, *The Possibilities and Limitations of Receivership for New York City Jails*, Vital City NYC (Aug. 3, 2023), https://www.vitalcitynyc.org/articles/the-possibilities-and-limitations-of-a-receivership-in-nyc-jails.

was that "staff are critical to any change."[21] Thus, it was imperative that a "team" consisting of all the interested constituencies work together. Among these dynamics was the recognition at the "end of the day, management and union have the same goal, which is to create a safer and healthy environment for staff and for [those incarcerated.]."[22] As the deputy administrator put it: "I always look at the unions as a partner to change as opposed to looking at them as the enemy, and really try to embrace and have them be part of the process."[23]

Indeed, government and unions have supported receiverships in jurisdictions facing problems similar to New York City's. With the Cook County receivership, the County did not litigate to the end. Rather once it recognized the strength and detail of the evidence that would emerge at a hearing, it decided to negotiate who the receiver would be and the scope of the authority. "It was the best way to have more say with the appointment of the [Transitional Administrator]."[24] Subsequently, the full participation of all the parties was critical to establishing an enduring framework. Within seven years the receiver returned the department to county control, restructured for lasting improvements with the participation of the county government, the union, plaintiffs and others.. The California Correctional Peace Officers Association also supported appointment of a receiver for the state's prisons because "it became clear [that California officials] lacked the ability in institutional capacity [and willingness] . . . to effectively address the overcrowding" and deplorable conditions.[25]

---

[21] *The Cook County Story: Panel One of Vital City's 5/19/22 forum, "Fixing New York City's Jails: A Federal Receiver?"* (May 19, 2022 Vital City NYC, https://www.vitalcitynyc.org/articles/fixing-new-york-citys-jails-a-federal-receiver-panel-one.
[22] *Id.*
[23] *Id.*
[24] *Id.*
[25] Trial Tr. at 35, *Plata*, No. 4:01-cv-01351, Dkt. No. 1829 (N.D. Ca. Nov. 19, 2008) (trial testimony of California's Prison officers' union spokesperson); Amicus Curiae CCPO's Br., *Plata*, No. 4:01-cv-01351, Dkt. No. 719 (N.D. Ca. June 18, 2007); *see also* Chief Probation Officers of California, *Chief Probation Officers of California Call for an Immediate Limited Court Receivership for Los Angeles County's Juvenile Facilities,*

Stepping back from the combative stance of the last 23 months of litigation, the City would do well to consider whether a receiver could bring the power, durability and dispassion needed to cure the unconstitutional scourge of violence. A cool assessment of the facts, unhampered by the calculus of union recalcitrance, should persuade the City of what is in the best interests of those incarcerated, as well as the correction officers. The order as proposed by the plaintiffs leaves room for a receiver to be put in place and for the City to retain a DOC Commissioner and control over non-*Nunez* implicated operations.

*Amici* acknowledge that they and the administration in which they served were unable to bring the City into compliance with constitutional mandates, but contend that this cannot justify allowing the jails to continue to sink further. The City, considering how best to solve the problem of violence, noting its continuing and escalating presence in the City's jail, should see that, compared to the current course, receivership would carry the best chance to reduce violence — durability, neutrality and the power to implement operationally effective governance. To come to that view will require focusing simply on what is required to reduce the violence, not what will satisfy the multiple constituencies present in the daily life of a City Mayor and a DOC Commissioner. It would be an act of courage and necessity. The only surefire thing is this: if the City continues on the current course, the problem will not be solved and people will needlessly die. Decades of experience have taught us that lesson.

---

https://www.cpoc.org/post/chief-probation-officers-california-call-immediate-limited-court-receivership-los-angeles (last visited Nov. 30, 2023).

**CONCLUSION**

For all of the foregoing reasons, and those set forth in the submissions of the Plaintiff

Class and the United States, the Court should grant the motion to appoint a receiver.


Dated: December 1, 2023          By:   */s/ Elizabeth Glazer*
                                      Elizabeth Glazer, Esq.
                                      Vital City
                                      605 West 113th Street
                                      New York, NY 10025