**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

MARK NUNEZ, ET AL.,

                *Plaintiffs,*

      v.

THE CITY OF NEW YORK, ET AL.,

          *Defendants.*

                    **Civ. No. 11-cv-5845 (LTS) (JCF)**

UNITED STATES OF AMERICA,

          *Plaintiff-Intervenor,*

      v.

THE CITY OF NEW YORK and NEW
YORK CITY DEPARTMENT OF
CORRECTION,

          *Defendants.*

**BRIEF OF THE BRONX DEFENDERS, BROOKLYN DEFENDER SERVICES,
NEIGHBORHOOD DEFENDER SERVICE OF HARLEM, NEW YORK COUNTY
DEFENDER SERVICES, AND QUEENS DEFENDERS AS *AMICI CURIAE*
IN SUPPORT OF PLAINTIFFS' MOTION FOR CONTEMPT AND
APPLICATION FOR APPOINTMENT OF A RECEIVER**

Brooklyn Defender Services
177 Livingston St, 7th Floor
Brooklyn, NY 11201
(347) 831 – 7643

Civil Rights in the Criminal Legal System Clinic
Washington Square Legal Services
NYU School of Law
245 Sullivan Street
New York, NY 10012
(212) 992 – 8824

Dated:  December 1, 2023

## **<u>TABLE OF CONTENTS</u>**

TABLE OF AUTHORITIES ......................................................................................... ii

INTRODUCTION AND STATEMENT OF INTEREST ........................................... 1

ARGUMENT .............................................................................................................. 3

   I.  The Department is Responsible for Violence Causing Grave and Immediate Harm to People in Custody.................................................................................................... 5

     A. DOC Staff Brutalize People in Custody with Unnecessary and Excessive Use of Force. 5

     B. The Department Fuels Violence Between Incarcerated People and Perpetuates Chaos and Disorder ................................................................................................... 13

   II. Experiencing and Witnessing Violence at DOC Facilities Causes Incarcerated People to Suffer Trauma and Psychological Harm ................................................................ 17

     A. Trauma from DOC Dysfunction and Violence Leads to Higher Rates of Self-Harm and Mental Health Issues For People in Custody ................................................. 17

     B. Trauma From Violence Results in Long-Term Physical and Psychological Harm ........ 19

     C. Trauma from Violence in DOC Facilities Threatens the Integrity of the Criminal Legal System ................................................................................................................ 22

CONCLUSION........................................................................................................... 25

## **TABLE OF AUTHORITIES**

**Cases**

*Plata v. Schwarzenegger*,
   No. 01-cv-1351, 2005 WL 2932253 (N.D. Cal. Oct. 3, 2005),
   *aff'd*, *Brown v. Plata*, 563 U.S. 493 (2011) ................................................................. 4

*United States v. Hinds Cnty.*,
   No. 16-cv-489, 2023 WL 1186925 (S.D. Miss. Jan 30, 2023) ................................... 4

**Other Authorities**

Jhilam Biswas et al., *Treatment Delayed Is Treatment Denied*,
   46 J. Am. Acad. Psychiatry & L. 447 (2018) ........................................................... 17

Calli M. Cain & Jared M. Ellison, *Identifying Individuals at Risk of Suicide and
   Self-Harm in Jail,* Corrections, Jan. 22, 2022 ......................................................... 17

*Chronic Traumatic Encephalopathy (CTE)*, Alzheimer's Ass'n, ................................. 21

Combs et al., *Posttraumatic Stress, Panic Disorder, Violence, and Recidivism Among
   Local Jail Detainees*, 15 Int'l J. Prisoner Health 366 (2019)........................ 16, 20, 21

Mika'il DeVeaux, *The Trauma of the Incarceration Experience*,
   48 Harv. C.R.-C.L. L. Rev. 257 (2023) ....................................................... 19, 20, 21

Fovet et al., *Trauma Exposure and PTSD Among Men Entering Jail: A Comparative
   Study with the General Population*, 145 J. Psychiatric Rsch. 205 (2022) .......... 20, 21

Chris Haney, *The Wages of Prison Overcrowding: Harmful Psychological Consequences
   and Dysfunctional Correctional Reactions*, 22 Wash. U. J. L. & Pol'y. 265 (2023) ............... 16

Fatos Kaba et al., *Solitary Confinement and Risk of Self-Harm Among Jail Inmates*,
   104 Am. J. Public Health 442 (2014)........................................................................ 17

Huinan Liu et al., *Trauma Exposure and Mental Health of Prisoners and Ex-prisoners:
   A Systematic Review and Meta-Analysis*, 89 Clinical Psych. Rev. 1 (2021) ............... 19, 20, 21

New York State Division of Criminal Justice Services, Jail Population in New York State,
   Nov. 2, 2023,.............................................................................................................. 24

Alicia Piper & David Berle, *The Association Between Trauma Experienced During
   Incarceration and PTSD Outcomes: A Systematic Review and Meta-Analysis*,
   30 J. Forensic Psychiatry & Psych. 854 (2019) ........................................... 19, 20, 21

Bernadette Rabuy & Daniel Kopf, *Detaining the Poor: How Money Bail Perpetuates an Endless Cycle of Poverty and Jail Time*, Prison Pol'y Initiative, May 10, 2016 ...................... 24

Siegler et al., *Head Trauma in Jail and Implications for Chronic Traumatic Encephalopathy in the United States: Case Report and Results of Injury Surveillance in NYC Jails*, 28 J. Health Care for the Poor and Underserved 1042 (2017) ................................................. 21

Western et al. *The Cumulative Risk of Jail Incarceration*, 118 Proc. Nat'l Acad. Scis. (2021)... 24

Emily Widra, *No Escape: The Trauma of Witnessing Violence in Prison,* Prison Pol'y Initiative (Dec. 2, 2020), .................................................................................. 16

Wolff et al., *Trauma Exposure and Posttraumatic Stress Disorder Among Incarcerated Men*, 91 J. Urb. Health 707 (2014) ......................................................................................................... 20

**INTRODUCTION AND STATEMENT OF INTEREST**

Eight years after this Court entered its Consent Decree mandating significant reforms to reduce the use of excessive force in New York City jails, the people held in those jails are increasingly subject to intolerable and sometimes deadly violence and dysfunction. *Amici curiae*[1] The Bronx Defenders,[2] Brooklyn Defender Services, Neighborhood Defender Service of Harlem,[3] New York County Defender Services, and Queens Defenders are not-for-profit public defender offices that provide multidisciplinary legal services along with social work and advocacy support to low-income New Yorkers. As public defenders, *amici* collectively represent hundreds of thousands of people each year charged in New York City's criminal courts, including thousands each year who are detained or incarcerated in the New York City jail system while they fight their cases in court or serve a sentence of a year or less. The majority of the people we represent are Black and brown New Yorkers from under-resourced neighborhoods. As public defenders, *amici* have unique insight and experience regarding the humanitarian crisis unfolding at New York City Department of Corrections ("DOC" or the "Department") facilities. For years, *amici* have seen New York City jails plunge deeper and deeper into an abyss of chaos and cruelty. Yet what *amici* have witnessed in the last two years is alarming beyond measure: an increasingly pervasive culture of hostility and aggression within DOC causing outrageous violence, suffering, and neglect.

---

[1] No party counsel authored any part of the brief, and no person or entity other than *amici* contributed money to prepare or file it.  None of *amici* are corporations.

[2] Earl S. Ward, a partner at Emery Celli Brinckerhoff Abady Ward & Maazel LLP, serves on the board of *amicus curiae* The Bronx Defenders ("BxD"). Mr. Ward was not involved in the decision to approve or sign on to the amicus brief, and was not involved with writing or editing the brief.

[3] Jonathan S. Abady, a partner at Emery Celli Brinckerhoff Abady Ward & Maazel LLP and counsel of record for Plaintiffs, serves on the board of *amicus curiae* Neighborhood Defender Service of Harlem ("NDS"). The Board of NDS was not involved in the decision to approve or sign on to the amicus brief, and was not involved with writing or editing the brief.

*Amici* respectfully submit this brief in support of Plaintiffs' Motion for Contempt and Application for Appointment of a Receiver (ECF No. 601). *Amici* have a substantial and compelling interest in advocating for the safety and constitutional rights of people in DOC custody. In this brief, *amici* offer insights from their experience as public defenders to highlight how the Department's excessive force and hyper-confrontational culture impacts people in custody and the severe consequences of exposure to normalized violence and disorder. The stories below of people who have suffered enormous physical and psychological harm as a result of the chaos and dysfunction in New York City jails are but a small sampling of the myriad harms that people in DOC custody endure on a daily basis. There is no question that DOC is unwilling and unable to protect the people in its custody and their constitutional rights, or to undertake the reforms needed to comply with core provisions of the Consent Decree and other Court-ordered relief.

*Amicus curiae* The Bronx Defenders ("BxD") is a non-profit provider of innovative, holistic, client-centered criminal defense, family defense, civil legal services, and social work support to indigent people in the Bronx. Each year, BxD's advocates defend thousands of low-income Bronx residents in criminal cases—including individuals who are held in custody at Rikers Island—and civil, family, and immigration cases, and reaches hundreds more through outreach programs and community legal education.

*Amicus curiae* Brooklyn Defender Services ("BDS") is one of the largest public defense offices in New York State, representing low-income people in nearly 22,000 criminal, family, civil, and immigration proceedings each year. Its staff consists of specialized attorneys, social workers, investigators, paralegals, jail services specialists, and administrative staff who are experts in their individual fields. For over twenty-five years, BDS has worked, in and out of court, to

protect and uphold the rights of individuals and to change laws and systems that perpetuate injustice and inequality.

*Amicus curiae* Neighborhood Defender Service of Harlem ("NDS") is a community-based public defender office. Since 1990, NDS has sought to improve the quality and depth of criminal, family, and civil defense for those in Harlem and Northern Manhattan who cannot afford an attorney. NDS accomplishes this by providing holistic, cross-practice representation to its clients.

*Amicus curiae* New York County Defender Services ("NYCDS") is a public defender office serving indigent clients in the borough of Manhattan in New York City since 1997. NYCDS provides comprehensive legal advocacy for its clients while promoting systemic reforms to the criminal legal system. Its diverse staff of attorneys, social workers, investigators, paralegals, jail advocates, and support staff is committed to protecting the rights of its clients both inside and out of the courtroom. On any given day, approximately 300 NYCDS clients are confined to the custody of DOC.

*Amicus curiae* Queens Defenders provides free, high-quality legal representation to individuals accused of crimes in Queens County. Since 1996, Queens Defenders' highly skilled attorneys have represented over 450,000 people and handle major trials and homicides, work with clients involved in Queens treatment courts, and represent cases involving domestic violence, youth charged with felonies, and immigrants facing criminal charges.

## ARGUMENT

The severity and urgency of the crisis in New York City jails require the appointment of a receiver. No lesser remedy is appropriate, given the experiences of the people *amici* represent. When evaluating whether to appoint a receiver for a prison or jail, "[w]hether there is a grave and immediate threat or actuality of harm to plaintiffs" is one of two factors "given predominant

weight." *Plata v. Schwarzenegger*, No. 01-cv-1351, 2005 WL 2932253, at *23 (N.D. Cal. Oct. 3, 2005), *aff'd*, *Brown v. Plata*, 563 U.S. 493 (2011); *see also United States v. Hinds Cnty.*, No. 16-cv-489, 2023 WL 1186925, at *5 (S.D. Miss. Jan 30, 2023) (applying *Plata* factors and appointing receiver finding, *inter alia*, incarcerated people faced an "unconstitutional risk of harm, including death, rampant [] assaults, and neglect of the seriously mentally ill"). As described below, people in custody consistently face "grave and immediate" harm as a result of the chaotic and violent conditions the Department has systematically engendered over many years and its entrenched refusal to comply with court-ordered relief.

Part I of this brief describes the violence that people in custody suffer on a regular basis because of DOC's unwillingness to remediate its systemic dysfunction. It recounts stories of people *amici* represent who faced unacceptable uses of force by DOC staff, through beatings, head strikes, and the excessive use of chemical agents. It further discusses how the Department's operational failures, security failures, and hostile culture result in staff instigating and facilitating violence between incarcerated people, failing to intervene, and escalating altercations.

Part II of this brief details how the constant threat of violence pervasive in DOC facilities traumatizes incarcerated people, resulting in exacerbated mental illness and higher propensity for self-harm, long-term psychological and physical harm, and increased difficulties securing a just outcome in their criminal case. To understand the full scope of the harm endured by people in New York City jails, it is important to understand the full emotional and psychological cost of DOC's inability to comply with its obligations to keep people safe.

*Amici* continue to hear reports of excessive use of force and brutality month after month with no sign of improvement.[4] Along with the many incidents relayed in the Monitor's reports throughout the years,[5] and Plaintiffs' motion papers (Pls.' Proposed Findings of Fact in support of Mot. for Contempt and for Appl. for Appointment of a Receiver ¶¶ 266-73, 440-52, ECF No. 605 [hereinafter "FOF"]; Exhibits to the Decl. of Mary Lynne Werlwas at 84-90, ECF No. 602 [hereinafter "Ex."]), the stories *amici* share in this brief represent only a modicum of the pain and danger felt by people in custody. The situation in DOC facilities is untenable and we respectfully ask the Court to order relief commensurate with the urgency of the crisis.

I.   **The Department is Responsible for Violence Causing Grave and Immediate Harm to People in Custody**

A.   **DOC Staff Brutalize People in Custody with Unnecessary and Excessive Use of Force**

The Monitor has detailed extensive quantitative and qualitative evidence of the Department's intensifying levels of violence against incarcerated people.[6] As the Monitor has documented, "[h]igh rates of violence, high use of force rates, the continued prevalence of excessive and unnecessary force, and apathetic and slipshod security practices frequently produce

---

[4]  *See* Monitor's Status Rep. at 25, Oct. 5, 2023, ECF No. 581 ("The City and Department have repeatedly and consistently demonstrated they are incapable of effectively directing and managing the multilayered and multifaceted reform effort, and continuing on the current path is not likely to alter the present course in any meaningful way.").

[5]  *See, e.g.*, Monitor's Tenth Status Rep. at 28-29, Oct. 23, 2020, ECF No. 360 (describing a fight after which a captain deployed O.C. spray and allowed people in custody to enter the area through an unlocked door, unsupervised); Monitor's Special Rep. at 13-14, Mar. 16, 2022, ECF No. 438 (describing an incident in which a person in custody was slashed by another incarcerated person and staff deployed O.C. spray to break up the incident; despite multiple logbook entries reporting the incident, a Captain later stated, "no incidents [were] reported."); Monitor's Status Rep. at 1-11, May 26, 2023, ECF No. 533 (describing five incidents involving harm to incarcerated people that occurred within a two-week span).

[6]  Monitor's Special Rep. at 12, July 10, 2023, ECF No. 557 (finding that "the use of force rate and rates of violence are demonstrably worse than at the time the Consent Judgment went into effect."); Monitor's Status Rep. at 25, Oct. 5, 2023, ECF No. 581; Monitor's Status Rep. at 37, Apr. 3, 2023, ECF No. 517; Monitor's Status Rep. at 1, Nov. 8, 2023, ECF No. 595; *see also* Mem. of Law in Support of Pls.' Mot. for Contempt and Appl. for Appointment of a Receiver at 5 [hereinafter Pls.' Mem.].

chaos, trauma, injuries and in some cases, death." Monitor's Status Rep. at 2, Nov. 8, 2023, ECF No. 595. The Monitor's recent report makes clear that people held in the jails "face a grave risk of harm *on a daily basis*." *Id.* (emphasis in original).

The Monitor has attributed DOC's failure to reduce violence in its facilities to several persistent factors including the refusal to implement the Use of Force Directive,[7] failure to implement basic security protocols,[8] overreliance on emergency teams that often escalate violence,[9] failure of uniform leadership to address misconduct,[10] and—more recently—the Department's attempts to evade accountability for problems in the jails.[11] These factors directly contribute to the conduct of Department staff as detailed in the stories below: use of head strikes, punitive and retaliatory force meant to inflict pain, hyper-confrontational staff behaviors that escalate or precipitate violence,[12] avoidable use of force during escort and searches,[13] and widespread and excessive use of the chemical agent oleoresin capsicum ("O.C.") spray.[14]

---

[7] FOF ¶¶ 214-16.

[8] *See, e.g.*, Monitor's Status Rep. at 3, 10-14, Nov. 8, 2023, ECF No. 595; Monitor's Status Rep. at 1, Oct. 5, 2023, ECF No. 581; Monitor's Status Rep. at 56-58, Oct. 28, 2022, ECF No. 472; *see also* Pls.' Mem., at 6.

[9] *See, e.g.*, Monitor's Eleventh Rep. at 9, 36-37, 42, May 11, 2021, ECF No. 368; Monitor's Second Status Rep. at 2, 56, Oct. 28, 2022, ECF No. 472; Monitor's Status Rep. at 38, Apr. 3, 2023, ECF No. 517; Monitor's Special Rep. at 4, Aug. 7, 2023, ECF No. 561; *see also* Pls.' Mem. at 40, 44-45.

[10] *See, e.g.*, Monitor's Eleventh Rep. at 8-10, May 11, 2021, ECF No. 368; Monitor's Status Rep. at 1, Oct. 5, 2023, ECF No. 581; Monitor's Status Rep. at 106-07, Apr. 3, 2023, ECF No. 517; *see also* Pls.' Mem. at 36.

[11] *See, e.g.*, Monitor's Letter at 6, Nov. 15, 2023, ECF No. 599; Monitor's Status Rep. at 4, Oct. 5, 2023, ECF No. 581; Monitor's Special Rep. at 21-22, Aug. 7, 2023, ECF No. 561; Monitor's Special Rep. at 148-49, July 10, 2023, ECF No. 557; Monitor's Special Rep. at 37-38, June 6, 2023, ECF No. 541; Monitor's Special Rep. at 17, May 26, 2023, ECF No. 533; *see also* Pls.' Mem. at 79-82.

[12] Monitor's Tenth Rep. at 75, Oct. 23, 2020, ECF No. 360; Monitor's Eleventh Rep. at 24-25, 46-47, May 11, 2021, ECF No. 368; Monitor's Second Status Rep. at 2, Oct. 28, 2022, ECF No. 472; Monitor's Status Rep. at 38, Apr. 3, 2023, ECF No. 517.

[13] FOF ¶¶ 363-364.

[14] Monitor's Tenth Rep. at 16, 75, Oct. 23, 2020, ECF No. 350; Monitor's Eleventh Rep. at 46-47, May 11, 2021, ECF No. 368.

This summer, the Monitor reiterated that the violence and dysfunction in Department facilities "are *not* typical," "*not* expected," and "*not* normal." Monitor's Special Rep. at 5, June 8, 2023, ECF No. 541 (emphasis in original).[15] The human impact of the Department's failure to implement the necessary Court-ordered changes to ban excessive and unnecessary force is enormous. As the Monitor reported in April 2023:

> What must not be lost in [the] maze of documentation is the fact that real harm to both people in custody and staff continues to occur at unacceptable levels. . . . The sheer number of incidents cannot begin to capture the real abject harm that occurs in this setting . . . . The harm can be witnessed directly in the images from inside the jails—images of chaos, disorder, and sometimes serious injuries—which still belie the real fear felt by the participants, witnesses, and bystanders in real time.

Monitor's Status Rep. at 2, Apr. 3, 2023, ECF No. 517.

The stories below of physical harm and mental trauma felt by the people in custody who were beaten and brutalized by Department staff shed light on the depth of the humanitarian crisis facing New York City jails.[16]

### ___R.Z.___

While R.Z. was in pretrial detention, he was assaulted by correction officers on two occasions as he was being escorted and was fully restrained. He was struck repeatedly in the head, a highly dangerous use of force that is strictly prohibited. FOF ¶ 243. The Monitor has detailed how staff escorts regularly result in avoidable use of force. *Id.* ¶¶ 363-64; Pls.' Mem. at 31. In 2023, R.Z. was restrained in handcuffs and shackles as an escorting officer took him back to his cell. While being escorted, R.Z. stopped to ask another officer for help with an ongoing issue. The escorting officer became impatient and slammed R.Z. to the ground facedown and punched him

---

[15] *See also* Monitor's Special Rep. at 12, July 10, 2023, ECF No. 557.

[16] The stories included in this brief have been anonymized and the initials are pseudonyms. The stories are distinct from the Plaintiff class member declarations appended to Plaintiffs' motion papers at Exs. 84-90.

repeatedly in the head while R.Z. was still restrained. As a result of the attack, R.Z. experienced head, neck and back pain, bruising, and neck spasms.

A few months later, another correction officer attacked R.Z. while he was restrained and being escorted by bus. R.Z. repeatedly asked why he was being moved. In response, an officer seated in the back of the bus with him slammed him to the ground and punched him in the head. R.Z. again suffered head, neck, and back pain.

He experiences ongoing back pain from these assaults and has nightmares and trouble sleeping. He is constantly anxious that anything he does could cause a correction officer to erupt in violence, particularly when he is shackled and cannot defend himself. As a result, R.Z. avoids interacting with correction officers and is so nervous around certain officers that he will not accept food or water from them.

### _H.J._

In 2023, during intake, an officer made H.J. squat in the nude while examining him for contraband and made sexual comments. Once the search was over, H.J., humiliated and uncomfortable from squatting, asked if he could stand and put his clothes on. For no apparent reason, the officer demanded that H.J. remain naked in the exposed squatting position. H.J. complied, but again asked for permission to stand and cover himself. When H.J. finally stood from the squatting position, the officer sprayed O.C. spray into H.J.'s face and across his nude body. Several other officers joined in the attack and also sprayed him with O.C. spray.

H.J., still completely naked and now blinded by the chemical agent, felt multiple officers pushing him to the ground and cuffing him. H.J. felt something sharp cut his leg and felt blood dripping from the wound—the chemical agent in his eyes made it impossible for H.J. to know if an officer had intentionally cut him. Officers took him cuffed by his wrists and ankles to a shower

cell, where they left H.J. for a few hours before taking him to the medical clinic. For approximately the next seven days, H.J. was locked in his cell for nearly twenty-four hours a day based on false claims stemming from the attack. Despite DOC failing to provide him a notice of infraction or a disciplinary hearing, he served a several-month sentence in restrictive housing for the alleged assault. H.J. challenged his placement and was finally moved after a finding that DOC had wrongfully placed him there.

### **_B.K._**

While B.K. was in pretrial detention, he was assaulted by correction officers while restrained during searches of his cell and faced threats discouraging him from reporting this abuse. While the Monitor has reported on the significant number of use of force incidents that occur during searches, the Department has disregarded the Monitor's feedback on its deficient search procedures that lead to avoidable and unnecessary use of force. FOF ¶¶ 375-77, 380; Pls.' Mem. at 32.

In 2023, a captain and several officers approached B.K.'s cell to conduct a search. As they started to search, the officers handcuffed his arms behind his back, and a captain sprayed him with a chemical agent after he was restrained. B.K. asked them why they were doing this, and a captain gave an order to take him down, and the officers tackled B.K. to the floor. One officer knelt on his back while he was still rear-cuffed and facedown on the floor and another sprayed him with chemical agent at close range in his eyes and nose. B.K. was screaming and crying; he was terrified, unable to protect himself and knew there was no one who would help him. After not finding contraband in his cell or his clothes, the officers took B.K. to a "decontamination room" outside of the housing area, where there was no running water, soap, or towels that would allow him to clean himself from the chemical agent. He was brought to the clinic, where he reported

back and shoulder pain where the officer had knelt on him, and pain in his mouth, where, he later learned, he had a chipped tooth from the attack. He also continued to feel a burning sensation on his skin, face, and eyes and had difficulty breathing because of the chemical agent. He was given aspirin but did not receive other care. Officers first made him sit for hours in an intake cell and then took him to another facility, where he again sat for hours in an empty cell until late in the afternoon. He was alone, cuffed, shackled, and waist-chained, with hand restraint mittens, and was not given anything to eat all day.

Several weeks later, officers sprayed chemical agent through the meal slot of B.K.'s cell, rushed in and restrained him before conducting another search of his cell. Subsequently, B.K. was threatened several times that if he complained about the abuse, his time in the housing unit would be difficult. B.K. has nightmares where he relives the violent attacks. When he hears keys outside his cell or staff nearby, his heart races and he is worried he will be attacked again.

### *C.F. and E.G.*

Like many people in DOC custody, C.F. and E.G. have suffered the debilitating consequences of the Department's indiscriminate use of O.C. spray and its often callous disregard for the medical needs of the people it contaminates. The Department's overreliance on emergency response teams often leads to uses of force that are "exceedingly disproportionate to the level of threat," including the excessive use of O.C. spray and O.C. grenades. Monitor's Eleventh Rep. at 47, May 11, 2021, ECF No. 368. The dispersal of chemical agents throughout an entire housing unit threatens everyone present and poses particularly grave risks to medically vulnerable people. The Monitor has warned and advised DOC specifically about the use of chemical agents, the unsafe

amount and distance of deployment, and the importance of ensuring timely access to decontamination and medical care.[17]

C.F. experienced two incidents in which officers indiscriminately dispersed excessive amounts of O.C. spray and left those affected to cope with the pain and injury without any aid or medical attention. In 2023, C.F. witnessed a non-aggressive disagreement between a person in custody and a captain. The captain brought in an emergency response team who dispersed what seemed like entire cans of O.C. spray into C.F.'s housing unit. As the chemical agent filled the unit, people in custody began sprinting away, pleading with the officers to stop. The captain locked down the housing unit and people were unable to escape the chemicals. Their only recourse against the effects of the chemical agent was to douse themselves in milk. After this incident, C.F.'s eyes were constantly irritated and he was in a significant amount of pain.

About a month later, C.F. was accosted by another person in custody. Correction officers reacted by spraying copious amounts of chemical agent without attempting to deescalate the situation. Even though C.F. has asthma, he was brought to an intake unit rather than receiving medical attention. C.F.'s defense team met with him the next day and immediately requested medical attention. During the meeting with his defense team, C.F. was in constant pain. His skin was burning, he was unable to see, and he smelled of O.C. spray. DOC staff brought C.F. to the medical clinic approximately six days after the formal request for medical attention. C.F. was issued a notice of infraction for this incident, which was later dismissed. The adjudicating captain condemned the officer's deployment of O.C. spray and the failure to deescalate the attack against

---

[17] *See*, *e.g.*, Monitor's Special Rep. at 25-26, 36-37, 39, 50, July 10, 2023, ECF No. 557 (describing multiple examples of problematic staff deployment of chemical agents and explaining, "[p]oor staff practice was revealed in numerous events that involved staff . . . deploying chemical agents in excessive amounts and at an unsafe distance. . . .").

C.F. Frustrated and hopeless, C.F. fears that the next O.C. spray attack could come at any moment and has no faith that DOC will provide him proper treatment.

Similarly, E.G. also has asthma, and each time he was subject to chemical agent, he felt like his respiratory system was going to shut down. In 2023, officers deployed an excessive amount of chemical spray throughout E.G.'s housing unit in response to a fight in which E.G. was not involved. Even after E.G. and the other people in the unit were able to clean themselves of the spray, they risked re-exposing themselves to the burning chemical agent if they tried to use their pillows and sheets. After E.G. asked a captain for new bedlinens, the captain responded that E.G. should get over it. After E.G. continued to ask for clean sheets, the captain derided him repeatedly with sexually abusive language and threatened him. The captain had E.G. brought into the hallway and summoned other officers who handcuffed E.G., took his sneakers, which were never returned, and left him to wear a pair of DOC-issued shoes that were several sizes too large. During the incident, one officer intervened on E.G.'s behalf, insisting that there was no need to issue him a ticket or transfer him out of the housing unit. Incensed, the captain told the officer to issue E.G. a notice of infraction based on allegations that a subsequent disciplinary hearing determined to be false.

C.F.'s and E.G.'s experiences mirror an incident the Monitor reported from January 2022 in which members of an emergency response team "wantonly" sprayed O.C. cannisters, as well as a chemical munitions grenade, at a group of people who had been trying for almost ten minutes to alert Department staff to a person in medical distress convulsing in his bed. Monitor's Special Rep. at 30-31, Mar. 16, 2022, ECF No. 438. The Monitor described the incident as "avoidable, precipitated, and exacerbated by staff-related ineptitude and over-confrontational behavior all too common in the Department." Monitor's Special Rep. at 30, Mar. 16, 2022, ECF No. 438.

**B.      The Department Fuels Violence Between Incarcerated People and Perpetuates Chaos and Disorder**

Department staff encourage, facilitate, and precipitate violence between people in custody as a form of retaliation and discipline. Chronic security and operational deficiencies, such as the routine failure of DOC staff to lock doors, create high levels of disorder and chaos, which fuel violence—both between people in custody and from DOC staff who respond to incidents with hyper-confrontational tactics.[18] As detailed in the stories below, the result is significant harm to people in custody, including serious injuries in a jail system that is incapable of providing regular access to medical care.

## _M.T._

Correction officers disclosed details of M.T.'s criminal case to other people in custody, presumably to make him a target for violence. As a result, he has been assaulted many times and correction officers in his housing unit have not adequately intervened to protect him. In 2023, when M.T. was transferred to a new housing unit, he overheard a correction officer talking about him with other people in the unit and telling them to wait until nighttime when the captain would be gone to "do what you have to do to get him out." Feeling fearful and seeking to defuse any attack, that night M.T. packed his belongings and told the people in his unit that he was leaving. Nonetheless, when he went to the bathroom, multiple people in custody punched and kicked him repeatedly, including in the head, after he had fallen to the ground. The officer on duty entered the bathroom during the attack and watched without intervening. At some point, the officer told M.T.'s attackers, "that's enough," and removed M.T. from the housing unit. M.T. asked to go to the

---

[18] As the Plaintiffs detail in their memorandum of law, the Department was ordered in 2021 to remedy security breaches, including failures to secure doors. *See* Second Remedial Order ¶ 1(i)(a), Sept. 29, 2021, ECF No. 398; Pls.' Mem. at 24-25. The Department failed to implement the necessary changes. Pls.' Mem. at 24-25.

hospital because of the pain in his head—he worried he had sustained a concussion—but was never taken.

A few months later, M.T. was moved back to a housing unit where he had previously been attacked. Soon after, another person in custody there began sharing M.T.'s charges, which had initially been disclosed by correction officers. After this person attacked him in the bathroom, M.T. was gathering his things to leave the unit when he was assaulted by multiple people, who knocked him to the ground and kicked him repeatedly in the head. He put his arms over his head, trying in vain to protect himself. There was an officer nearby, but they were unable to stop the attack. Although his memory of the rest of the day is blurry at best, witnesses reported that he lost consciousness. He was taken to the hospital but was so confused that he did not remember that he had been arrested and put in jail. In addition to sustaining a concussion, he had bruises all over his body, severe swelling on his face and around his eye and jaw, and lacerations on his head and back.

Upon release from the hospital, M.T. was taken to a new housing area. Almost all of his belongings had been stolen, including his documents containing confidential discovery from his case, private letters from his family, and even pictures of his dog. As a result of these assaults he experiences frequent headaches, back pain, and poor vision in one eye. He suffers from nightmares, flashbacks, and hypervigilance, and barely sleeps from fear; he keeps himself awake until he is confident that everyone near him is asleep.

### *N.D.*

N.D.'s experiences of severe violence are demonstrative of the Department's failed operational and security practices. In 2023, a group of people in custody were able to arm themselves with broomsticks, ice picks, and O.C. spray and enter N.D.'s unlocked cell after lock-

in time. DOC officers failed to prevent access to makeshift weapons and chemical agent, and to adhere to lock-in procedures. During the attack, N.D. feared that he would die in his cell. N.D. suffered blows to his head and body and was stabbed twice in the back before he was sprayed in the face with O.C. spray while escaping his cell. He finally got the attention of the correction officer on duty, who called other officers to assist.

N.D. was taken to the clinic and then to the hospital. His lung had collapsed, requiring lung surgery. Doctors scheduled N.D. for a follow-up appointment approximately two weeks after his surgery. DOC failed to produce N.D. for the surgery follow-up. The attack left N.D. with scarring, nerve damage in his back, and skeletomuscular damage to his shoulder that continues to cause him pain. He also experiences symptoms consistent with post-traumatic stress disorder ("PTSD"), including difficulty sleeping, hypervigilance, and intrusive flashbacks.

The collapsed lung exacerbated N.D.'s preexisting asthma and led to increased difficulty breathing. Correctional Health Services issued a no-spray order stating that the Department should not deploy chemical agent against him due to the risk of serious medical complications. Nonetheless, the Department ignored this order and sprayed him with chemical agent on two separate occasions following his lung injury. In the first incident, officers on an emergency response team threw an O.C. grenade into N.D.'s housing unit in response to an altercation that other people in custody had already broken up. The indiscriminate and unnecessary use of the O.C. grenade exposed everyone in the unit to chemical agent. In the second incident, a captain sprayed chemical agent directly into N.D.'s face when he and other members of his housing unit expressed reluctance to move where directed because another housing unit was present and threatening them. Each time N.D. was sprayed with chemical agent, he felt like his eyes, nose, mouth, and throat were on fire. Touching his eyes increased the pain. His throat closed up, his chest hurt, and he

began coughing; after being sprayed, he has coughed so hard that he coughed up blood and experienced nasal bleeding. Even after "decontaminating," the pain and coughing lasted for days.

\*       \*       \*

Exposure to violent attacks by correction officers or other incarcerated people perpetuates violence. For some incarcerated people, witnessing violence creates trauma significant enough to result in PTSD, which can manifest as hypervigilance, emotional dysregulation, and poor impulse control, all of which enhance the likelihood of violent outbursts and physical aggression.[19]

Moreover, when a carceral system fails to adequately address the needs of people in custody, widespread frustration can lead to destructive behavior and interpersonal conflict.[20] As the Monitor has observed, frustration is the norm at DOC facilities. *See* Monitor's Status Rep. at 37, Apr. 3, 2023, ECF No. 517 (noting that amid an "increasingly disordered environment," people in custody face "constant disruption of even the most basic services (*e.g.*, recreation, laundry, commissary, barbershop), which create[s] additional frustration among the people in custody who [a]re already stressed by the level of facility violence, separation from their loved ones, and uncertainty in their court proceedings to name a few"). In sum, DOC's dysfunction and toxic culture fuels a cycle of violence.

---

[19] *See, e.g.*, Combs et al., *Posttraumatic Stress, Panic Disorder, Violence, and Recidivism Among Local Jail Detainees*, 15 Int'l J. Prisoner Health 366, 368, 372 (2019), https://doi.org/10.1108/IJPH-06-2018-0036 (discussing evidence that PTSD diagnoses and symptomology may be related to experiences of trauma in jail); Emily Widra, *No Escape: The Trauma of Witnessing Violence in Prison,* Prison Pol'y Initiative (Dec. 2, 2020), https://www.prisonpolicy.org/blog/2020/12/02/witnessing-prison-violence/ (same).

[20] *See, e.g.*, Chris Haney, *The Wages of Prison Overcrowding: Harmful Psychological Consequences and Dysfunctional Correctional Reactions*, 22 Wash. U. J. L. & Pol'y. 265, 272-75 (2023), https://openscholarship.wustl.edu/law_journal_law_policy/vol22/iss1/22 (noting that overcrowding and "idleness-related frustration" increase the likelihood of interpersonal conflict and assaults in jails).

## II.     Experiencing and Witnessing Violence at DOC Facilities Causes Incarcerated People to Suffer Trauma and Psychological Harm

### A.     Trauma from DOC Dysfunction and Violence Leads to Higher Rates of Self-Harm and Mental Health Issues For People in Custody

Incarceration poses unique risks to mental health, even for those without preexisting mental illness. Experiencing and witnessing violence in jail—a fact of daily life in DOC facilities—compounds the risk of self-harm and suicide for incarcerated people.[21] A recent study conducted at a large metropolitan jail found that the odds of threatening suicide and self-harm "were nearly two and a half times greater for individuals who were assaulted by another detainee."[22] The same study found that the "odds of threatening and/or attempting suicide more than doubled for each violent incident they witnessed in jail."[23] The cumulative threat to a person's mental health from repeatedly witnessing violence is immense.

Delaying or denying treatment for incarcerated people suffering from mental health issues greatly increases both short- and long-term harm. Delaying treatment for people with "acute episodes of mental illness" can lead to myriad problems, including "higher medical comorbidity," and "the development of refractory mental illnesses with poorer prognoses in the long run."[24] Leaving chronic mental illness untreated similarly results in higher risks of suicide attempts and poor responses to treatment when it is eventually provided.[25]

---

[21] Research conducted in New York City has found that length of stay, preexisting mental illness, solitary confinement, and young age increases vulnerability to self-harm in jail. *See* Fatos Kaba et al., *Solitary Confinement and Risk of Self-Harm Among Jail Inmates*, 104 Am. J. Public Health 442, 447 (2014), https://nicic.gov/resources/nic-library/all-library-items/solitary-confinement-and-risk-self-harm-among-jail-inmates.

[22] Calli M. Cain & Jared M. Ellison, *Identifying Individuals at Risk of Suicide and Self-Harm in Jail,* Corrections, Jan. 22, 2022, at 10, https://doi.org/10.1080/23774657.2022.2031350.

[23] *Id.* at 10.

[24] Jhilam Biswas et al., *Treatment Delayed Is Treatment Denied*, 46 J. Am. Acad. Psychiatry & L. 447, 449 (2018), https://doi.org/10.29158/JAAPL.003786-18.

[25] *Id.* at 449-50.

The stories below illustrate the mental health crises that arise regularly under DOC's supervision and its failure to provide timely services, risking the wellbeing of those who are incarcerated.

### _S.V._

S.V., a person living with mental health and substance use disorders, was repeatedly denied access to mental health care, even after witnessing violence and a serious self-harm incident involving his bunkmate. From the start of his incarceration, in 2023, S.V. made repeated requests and pleas for mental health services to alleviate the symptoms brought on by incarceration. Across two jails, DOC responded to his requests with silence and denials.

S.V.'s mental health further deteriorated after he was transferred to a new jail and witnessed a violent attack on a person in custody in the shower while a correction officer was within earshot. For several minutes, S.V. heard crying and screaming coming from the shower, and the attack did not appear to stop until the person who was attacked dropped to the floor in front of the doorway to the shower, bleeding. It was only at this point that an officer intervened. After witnessing this attack, S.V. felt even greater anxiety and panic than before. His symptoms ranged from shaking to difficulty sleeping, nightmares, sweating, and difficulty breathing. He continued to ask DOC staff to help him get mental health care, but his requests were repeatedly denied, and a DOC staff member told S.V. to back off.

S.V. learned that his bunkmate was having suicidal ideations and he saw DOC staff members repeatedly brush off his bunkmate's requests for mental health services, even when his bunkmate stated he planned to harm himself. One night, S.V. watched as his bunkmate went into the bathroom and began cutting himself. S.V. remembers seeing the blood pooling up in the bathroom, and he remembers hearing his bunkmate's cries. S.V. felt shocked and powerless. Over

the next few weeks, S.V. felt scared and anxious, and continued to ask for help from DOC staff. Even though S.V.'s mental health needs after these traumatic incidents were clearly expressed and should have been obvious, DOC continued to deny or ignore his requests for care.

### *L.P.*

L.P. was on suicide watch for most of the time that he has been incarcerated. L.P. was sexually assaulted while in jail and, after seeing a Prison Rape Elimination Act poster in his unit, he reported the assault and was taken to the hospital to be evaluated. During the trip to the hospital, the DOC officers assigned to transport him taunted him and joked about the sexual violence that he experienced. L.P. made it back to his unit and made a plan to attempt suicide the following morning: "I did what it said on the walls. I followed the rules and I was only more traumatized. I wish I had done nothing. I'm not going to make it out of here. I cannot survive this."

**B.    Trauma From Violence Results in Long-Term Physical and Psychological Harm**

The Department's abject failure to protect the people in its custody from systemic violence exposes everyone in custody to trauma.[26] The astronomically high rates of violence mean that trauma from experiencing or witnessing violence is a virtually unavoidable and universal experience for everyone.[27] The chaos in the jails inflicts not only immediate injury on the victims, but also causes widespread and long-term physical and psychological harm from trauma. As the

---

[26] Traumatic events include "any form of actual, attempted, or threatened physical, sexual, emotional, or environmental abuse or neglect, resulting in significant psychological distress." Alicia Piper & David Berle, *The Association Between Trauma Experienced During Incarceration and PTSD Outcomes: A Systematic Review and Meta-Analysis*, 30 J. Forensic Psychiatry & Psych. 854, 855 (2019), https://doi.org/10.1080/14789949.2019.1639788.

[27] A person does not need to directly experience the traumatic event to be affected by it—witnessing, learning about, or being exposed to the details of a traumatic event that occurs to someone else can also lead to a trauma reaction. *See* Huinan Liu et al., *Trauma Exposure and Mental Health of Prisoners and Ex-prisoners: A Systematic Review and Meta-Analysis*, 89 Clinical Psych. Rev. 1, 1 (2021), https://doi.org/10.1016/j.cpr.2021.102069; Mika'il DeVeaux, *The Trauma of the Incarceration Experience*, 48 Harv. C.R.-C.L. L. Rev. 257, 261 (2023), https://journals.law.harvard.edu/crcl/wp-content/uploads/sites/80/2013/04/DeVeaux_257-277.pdf (describing trauma as, *inter alia*, an event in which a person who "witnesses . . . a violent event is 'damaged' by it.").

Monitor has stated, "[t]he jails' unsafe environments create extraordinary challenges for anyone to manage successfully and . . . trigger a vicious cycle of fear, stress, trauma and violence." Monitor's Twelfth Rep. at 22, Dec. 6, 2021, ECF No. 431.

In *amici*'s experience, people's exposure to violence in DOC custody does immeasurable harm to their mental health. Before entering the jails, people in DOC custody are already more likely to have experienced trauma and suffer from PTSD.[28] Incarceration itself—even for relatively short periods of time—will aggravate these mental health issues.[29] Many people *amici* represent with pre-existing mental health issues decompensate rapidly, and many of those who previously did not present with mental health issues develop them while in custody.

For people in custody, experiencing traumatic events, particularly those involving interpersonal violence, can lead to higher rates of anxiety and panic disorders, depression, ADHD, psychosis, personality disorders, and most significantly, PTSD.[30] PTSD is extremely disruptive to daily living and is characterized by significant mood and sleep disturbances, avoidance, hypervigilance, persistent intrusive memories, dissociative reactions or "flashbacks," and negative cognitions.[31] PTSD can also cause higher rates of substance abuse, comorbid psychiatric

---

[28] *See* Fovet et al., *Trauma Exposure and PTSD Among Men Entering Jail: A Comparative Study with the General Population*, 145 J. Psychiatric Rsch. 205-06 (2022), https://doi.org/10.1016/j.jpsychires.2021.12.014. Risk factors for PTSD include lower socioeconomic status, limited schooling, poor mental health, higher rates of previous trauma, and histories of abuse and neglect. *Id*; *see also* Wolff et al., *Trauma Exposure and Posttraumatic Stress Disorder Among Incarcerated Men*, 91 J. Urb. Health 707, 717 (2014), https://doi.org/10.1007/s11524-014-9871-x (discussing "the evidence on the comorbidity of PTSD and other mental health disorders, especially serious mental health disorders, among incarcerated men and women.").

[29] *See* DeVeaux, *supra* note 27, at 258 (noting that the psychological effect of incarceration is substantial, even among those experiencing relatively short-term confinement in a jail); Wolff et al., *supra* note 29, at 716.

[30] *See* Piper & Berle, *supra* note 26, at 856 (discussing the increased incidence of PTSD among people who experience potentially traumatic events in jail); Liu et al., *supra* note 27, at 12 (finding that "trauma was positively associated with mental disorders among prisoners and ex-prisoners.").

[31] *See, e.g.*, Piper & Berle*, supra* note 26, at 855; Combs et al., *supra* note 19, at 366.

conditions such as depression and anxiety, mental health symptoms, poor general health, and difficulty trusting others.[32]

PTSD has long-term detrimental effects on incarcerated people's psychological and cognitive functioning, which includes memory, attention, beliefs, coping strategies, and ability to find and rely on social support.[33] This can impede people's ability to reintegrate into the community upon release, which in turn harms their communities.[34]

Another extremely concerning trend is the connection between head trauma and Chronic Traumatic Encephalopathy ("CTE"), a progressive and potentially fatal brain disease associated with repeated traumatic brain injuries.[35] The Monitoring Team "identified 587 Use of Force incidents involving head strikes between January 1, 2022 and May 2023 . . . ." Monitor's Status Rep. at 68, Nov. 8, 2023, ECF No. 595. People who suffer blows to the head, particularly if repeated, are at risk of CTE and may experience symptoms including behavioral outbursts, self-injury, and dysregulated emotions. These effects are persistent and felt not only by incarcerated people themselves, but also their families and communities when they are released.[36]

---

[32] *See, e.g.*, Liu et al., *supra* note 27, at 2; Combs et al., *supra* note 19, at 367; Fovet et al., *supra* note 28, at 206; Piper & Berle, *supra* note 26, at 868.

[33] *See, e.g.*, Piper & Berle, *supra* note 26, at 868; Combs et al., *supra* note 19, at 367.

[34] *See* DeVeaux, *supra* note 27, at 259 (noting that people diagnosed with PTSD and other psychiatric disorders "find social adjustment and integration difficult upon release.").

[35] *See, e.g.*, Siegler et al., *Head Trauma in Jail and Implications for Chronic Traumatic Encephalopathy in the United States: Case Report and Results of Injury Surveillance in NYC Jails*, 28 J. Health Care for the Poor and Underserved 1042, 1047 (2017), 10.1353/hpu.2017.0095 (discussing the high incidence of traumatic brain injury in New York City jails and the "physical and emotional effects" on those who sustain them in jail and on their communities); *Chronic Traumatic Encephalopathy (CTE)*, Alzheimer's Ass'n, https://www.alz.org/alzheimers-dementia/what-is-dementia/related_conditions/chronic-traumatic-encephalopathy.

[36] *See, e.g.*, Siegler et al., *supra* note 35, at 1047.

### C.      Trauma from Violence in DOC Facilities Threatens the Integrity of the Criminal Legal System

*Amici's* defense teams need to be able to form trusting relationships with their clients for many reasons, including to help clients make crucial decisions about their cases and develop pre-pleading or mitigation reports. Such reports tell the clients' stories in an effort to show prosecutors and judges that *amici's* clients are complex human beings who are much more than the offenses they are accused of committing. The mitigation reports frequently detail clients' childhoods, strengths, and positive relationships with loved ones in addition to any trauma they have experienced, or mental health and substance use issues they may have. These reports can result in plea offers resulting in reduced jail time, opportunities to do treatment programs instead of incarceration,[37] and even outright dismissal of charges.

When clients are in DOC custody, the trauma of their present situation often becomes overwhelming and impairs their ability to form trusting relationships. A social worker reported that one of her clients who was initially able to participate in interviews to prepare a mitigation report and had normal speech patterns decompensated while incarcerated to the point where he was essentially non-verbal and at one in-person meeting, began banging his head repeatedly on a cinderblock wall.

During interviews to develop mitigation or an appropriate treatment plan, social workers and attorneys must ask clients about previous trauma they have experienced, usually unrelated to their time in custody. However, it is incredibly difficult for people to relive past trauma when they are currently experiencing new traumas. This can lead to clients having difficulty communicating and experiencing heightened distress, therefore social workers must often balance getting the

---

[37] Certain treatment programs are only available to people who have experienced particular types of trauma; thus, some clients would be ineligible for treatment if they were not comfortable disclosing difficult experiences to their defense teams.

information they need to advocate for the client in their criminal case with not worsening their client's mental health.

A social worker reported that one of her clients was seriously assaulted by a group of people in custody in front of a correction officer who did nothing to intervene. Prior to the assault, this person was coping with incarceration and was able to discuss her history as a victim of domestic violence with the social worker. She understood that her criminal defense team was working to secure the best possible outcome for her case, and that it unfortunately would take time to do so. However, the assault compounded her trauma, and she became extremely distraught and began constantly contacting the social worker. The fact that correction officers did not intervene to protect her made her realize that her life was continually at risk while she was in jail. She kept saying, "I can't stay here," and was increasingly willing to resolve her case in any way that would result in her leaving Rikers Island, regardless of her previous goals.

Many clients find themselves faced with this same dilemma, caught between accepting an unfavorable plea offer now or enduring the harsh conditions of DOC custody while waiting for a more just outcome later. While defense teams constantly advocate for their clients, securing the best possible result often takes time. Sometimes a case falls apart after DNA results come back or when discovery turned over later in the case reveals crucial investigative leads. Prosecutors may make better plea offers once mitigation reports are submitted or after a subsequent conversation with a witness makes them doubt their case. However, many clients who are subjected to daily violence and dysfunction in DOC custody cannot afford to wait and are forced to accept plea offers prematurely just to get out of New York City jails. Some clients are so brutalized during their first few days in DOC custody that they take pleas against the advice of their attorneys before their case is even presented to a grand jury. The outcomes that such a system produces are deeply unjust.

*        *        *

The stories above show the enormity and immediacy of the crisis in New York City jails. It is important to highlight that these grave harms are felt primarily by people detained pretrial, most of whom simply cannot afford bail and are presumed innocent as they await trial.[38] Moreover, these harms fall disproportionately on the most vulnerable New Yorkers. The majority of the people in DOC custody are Black and Latine people from highly surveilled and low-income communities and are also more likely to be subjected to repeated arrest and pretrial incarceration.[39] Further, those facing persistent homelessness, untreated addiction, and mental illness are incarcerated in New York City jails at high rates.[40] Without an adequate remedy to address the urgent crisis, these communities will continue to bear the burden of the brutality and violence in City jails.

---

[38] People in pretrial detention constitute over ninety percent of people incarcerated in New York City jails. New York State Division of Criminal Justice Services, Jail Population in New York State, at 3, Nov. 2, 2023, https://www.criminaljustice.ny.gov/crimnet/ojsa/jail_population.pdf; *cf.* Bernadette Rabuy & Daniel Kopf, *Detaining the Poor: How Money Bail Perpetuates an Endless Cycle of Poverty and Jail Time*, Prison Pol'y Initiative, 1-2 (May 10, 2016), https://www.prisonpolicy.org/reports/DetainingThePoor.pdf.

[39] *See, e.g.*, Western et al. *The Cumulative Risk of Jail Incarceration*, 118 Proc. Nat'l Acad. Scis., at 3-5 (2021), https://doi.org/10.1073/pnas.2023429118.

[40] *Id.* at 1.

## **CONCLUSION**

For the foregoing reasons, *amici* respectfully request that this Court grant Plaintiffs'

Motion for Contempt and Application for Appointment of a Receiver (ECF No. 601).


Dated: December 1, 2023
         Brooklyn, NY


/s/ *S. Lucas Marquez*                             /s/ *Alexis Karteron*
S. Lucas Marquez                                   Alexis Karteron
Alyssa Briody *                                    Civil Rights in the Criminal Legal System Clinic
Kevin Siegel                                       Washington Square Legal Services
Brooklyn Defender Services                         NYU School of Law
177 Livingston St, 7th Floor                       245 Sullivan Street
Brooklyn, NY 11201                                 New York, NY 10012
Tel: (347) 831 – 7643                              Tel: (212) 992 – 8824
slmarquez@bds.org                                  alexis.karteron@nyu.edu

   * application for admission pending            *Clinical law students Zoe Chang and Michelle*
                                                   *Dahl contributed to the preparation of this brief*


*Attorneys for Amici Curiae*