## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

MARK NUNEZ, *et al.*,

      Plaintiffs,

v.

THE CITY OF NEW YORK, *et al.*,

      Defendants.

No. 11 Civ. 5845 (LTS)(JCF)

UNITED STATES OF AMERICA,

      Plaintiff-Intervenor,

v.

THE CITY OF NEW YORK and NEW YORK CITY
DEPARTMENT OF CORRECTION,

      Defendants.

## BRIEF OF AMICI CURIAE NEW YORK CITY BAR ASSOCIATION AND VERA INSTITUTE OF JUSTICE

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................ ii

INTERESTS OF AMICI ................................................................................................. 1

SUMMARY ................................................................................................................... 2

ARGUMENT ................................................................................................................. 2

I.   Appointing A Federal Receiver Will Promote The Rule Of Law By Ensuring That
     Individuals Held By The NYC DOC Are Not Subject To Unconstitutional Violence. ........... 7

II.  To Uphold The Rule Of Law, The Court Should Order The Receiver To Act
     Consistently With Legislation Passed By The City Council To Close Rikers By
     2027. .................................................................................................................. 10

     A.   An Order Instructing The Receiver To Act In A Manner Consistent With
          Closing Rikers Is Within The Court's Power And Consistent With The PLRA ............. 12

     B.   Requiring That A Receiver Not Impede The Closure Of Rikers Will Ensure That
          The Entire Plaintiff Class Is Protected. .................................................................. 13

     C.   A Receiver In Place Before, During, And After The Closure Of Rikers Will
          Have A Unique Opportunity To Create The Cultural Shift Required To End
          Unconstitutional Violence At DOC Facilities. .......................................................... 14

CONCLUSION ............................................................................................................. 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Battle v. Anderson,*
    708 F.2d 1523 (10th Cir. 1983) ................................................................7, 15

*Brown v. Plata,*
    563 U.S. 493 (2011)................................................................. *passim*

*Cruz v. Beto,*
    405 U.S. 319 (1972) (per curiam).........................................................10

*Darnell v. Pineiro,*
    849 F.3d 17 (2d Cir. 2017)......................................................................7

*Duran v. Carruthers,*
    678 F. Supp. 839 (D.N.M. 1988) ............................................................9

*Floyd v. City of New York,*
    959 F. Supp. 2d 668 (S.D.N.Y. 2013).....................................................8

*Gates v. Collier,*
    501 F.2d 1291 (5th Cir. 1974)...............................................................10

*Green v. Cnty. Sch. Bd. of New Kent Cnty., Va.,*
    391 U.S. 430 (1968)................................................................................7

*Hutto v. Finney,*
    437 U.S. 678 (1978)..........................................................................8, 10

*Johnson v. Avery,*
    393 U.S. 483 (1969)................................................................................9

*Plata v. Schwarzenegger,*
    No. C01-1351, 2005 WL 2932253 (N.D. Cal. Oct. 3, 2005).........................8, 9, 10

*Procunier v. Martinez,*
    416 U.S. 396 (1974), *overruled on other grounds by*
    *Thornburgh v. Abbott*, 490 U.S. 401 (1989) .........................................9

*SEC v. Malek,*
    397 F. App'x 711 (2d Cir. 2010) ...........................................................12

*SEC v. Safety Fin. Serv., Inc.,*
    674 F.2d 368 (5th Cir. 1982) ................................................................12

*SEC v. Vescor Cap. Corp.*,
 599 F.3d 1189 (10th Cir. 2010) ............................................................12

*Stone v. City & County of San Francisco*,
 968 F.2d 850 (9th Cir. 1992) .................................................................9

*United States v. Lee*,
 106 U.S. 196 (1882)...............................................................................8

**Statutes and Rules**

18 U.S.C. § 3626..........................................................................12, 13, 14

City of N.Y. Bd. of Corr. Minimum Standard § 1-09(a) ...............................6

Fed. R. Civ. P. 23(e)(2)(D) ........................................................................13

N.Y.C. Admin. Code § 4-215 ........................................................6, 10, 15

**Legislative Materials**

Hr'g Tr. of the Stated Meeting of the City Council, N.Y.C. Council Res. 1091-
 2019 (Oct. 17, 2019) ..............................................................................6

N.Y.C. Council Res. 1091-2019 ....................................................6, 10, 15

**Other Authorities**

Alexander Hamilton, *The Federalist* No. 78 .................................................7

Benjamin Weiser, *Lawsuits Suggest Pattern of Rikers Guards Looking Other
 Way*, N.Y. Times (Feb. 3, 2009), https://www.nytimes.com/2009/02/04
 /nyregion/04rikers.html............................................................................9

Cal. Legis. Analyst's Off., *Overview and Update on the Prison Receivership*
 (Nov. 8, 2023), https://lao.ca.gov/Publications/Report/4813 .................14

Ed Morales, *Behind the Growing Calls to Close Rikers Island*,
 City Limits (Nov. 24, 2015), https://citylimits.org/2015/11/24/behind-the-
 growing-calls-to-close-rikers-island .....................................................15

Indep. Comm'n on N.Y.C. Crim. Just. & Incarceration Reform,
 *A More Just New York City* (Apr. 2, 2017), https://nyti.ms/3tBkHtG ............*passim*

Indep. Comm'n on N.Y.C. Crim. Just. & Incarceration Reform,
 *A Safer, More Effective Option Than Rikers* (Oct. 2023),
 https://www.morejustnyc.org/reports ....................................................13

Indep. Comm'n on N.Y.C. Crim. Just. & Incarceration Reform, *Closing Rikers Island: A Roadmap for Reducing Jail in New York City* (July 2021), https://www.morejustnyc.org/s/Roadmap_for_Reducing_Jail_NYC-5a4k.pdf ......................11

Insha Rahman, *Politics, Ambition, and the Hard Work of Making the Closure of Rikers Island a Reality*, Vera Inst. Just. (July 13, 2017), https://www.vera.org/ news/politics-ambition-and-the-hard-work-of-making-the-closure-of-rikers-island-a-reality ...................................................................................................................1

Jan Ransom, *Once Praised, Jails Chief Draws Ire Over Lack of Transparency on Rikers*, N.Y. Times (July 25, 2023), https://www.nytimes.com/2023/07/25/ nyregion/rikers-island-jail-chief-molina.html.............................................................4

Janos Martin, *#CLOSErikers: The Campaign to Transform New York City's Criminal Justice System*, 45 Fordham Urban L.J. 499 (2018)...................................2

Jonah E. Bromwich, *Rikers Watchdog Sues New York City Over Lack of Transparency*, N.Y. Times (Aug. 9, 2023), https://www.nytimes.com/2023/ 08/09/nyregion/rikers-jail-watchdog-lawsuit.html .....................................................4

Kimberly Gonzalez et al., *A Timeline on the Closure of Rikers Island*, City & State N.Y. (Nov. 20, 2023), https://www.cityandstateny.com/politics/2023/11/ timeline-closure-rikers-island/376662 ...............................................................10, 15

Letter from Jocelyn Samuels, Acting Assistant Att'y Gen., and Preet Bharara, U.S. Att'y, to Bill de Blasio et al. (Aug. 4, 2014), https://www.justice.gov/sites/default/files/usao-sdny/legacy/2015/03/ 25/SDNY%20Rikers%20Report.pdf .......................................................................10

M.J.C. Vile, *Constitutionalism and the Separation of Powers* (2d ed. 1998) ................7

Michael Jacobson et al., *Beyond the Island: Changing the Culture of New York City Jails*, 45 Fordham Urban L.J. 373 (2018) .........................................................2

N.Y.C. Bar Ass'n, *About Us*, https://www.nycbar.org/about (last visited Dec. 1, 2023) ............................................................................................................................1

N.Y.C. Comptroller Brad Lander, *The State of New York City Jails* (Aug. 2023), https://comptroller.nyc.gov/wp-content/uploads/documents/The-State-of-New-York-City-Jails.pdf ....................................................................................3, 11

N.Y.C. Dep't Corr., *Population Demographics: FY23 Qtr. 4*, https://www.nyc.gov/assets/doc/downloads/pdf/Population_ Demographics_Report_FY23_Q4.pdf (last visited Dec. 1, 2023)............................3

N.Y.C. Mayor, *Mayor's Management Report* (Sept. 2023), https://www.nyc.gov/ assets/operations/downloads/pdf/mmr2023/2023_mmr.pdf...................................11

NYC, *NYC Borough-Based Facilities*, https://rikers.cityofnewyork.us/nyc-borough-based-jails (last visited Dec. 1, 2023) ....................................................6

NYC, *What Is the NYC Borough-Based Jail System*, https://rikers.cityofnewyork.us/what-is-the-borough-based-jail-system (last visited Dec. 1, 2023) ..........................................................................................6, 7

N.Y. State Comm'n Corr., *The Worst Offenders Report: The Most Problematic Local Correctional Facilities of New York State* (Feb. 2018) ....................................5

N.Y. State Div. Crim. Just. Servs., *Annual Jail Population Trends* (Aug. 1, 2023), https://www.criminaljustice.ny.gov/crimnet/ojsa/jail_pop_y.pdf.............................3

Off. N.Y.C. Comptroller, Bureau of Budget, *Agency Watch List: Department of Correction FY 2023* (Mar. 2022), https://comptroller.nyc.gov/wp-content/uploads/documents/Agency_Watch_List_DOC_FY2023.pdf....................................8

Press Release, N.Y.C. Bar Ass'n, Statement in Support of Closing Rikers Island (Oct. 15, 2019), https://www.nycbar.org/media-listing/media/detail/closing-rikers-island-support-for-borough-based-jail-plan ....................................................1

Raven Rakia, *A Sinking Jail: The Environmental Disaster That Is Rikers Island*, Grist (Mar. 15, 2016), https://grist.org/justice/a-sinking-jail-the-environmental-disaster-that-is-rikers-island ..........................................................5

Reuven Blau, *Eight Rikers Detainees Slashed While Shackled to 'Restraint Desks'*, The City (Sept. 18, 2023), https://www.thecity.nyc/2023/09/18/eight-rikers-detainees-slashed-shacked-restraint-desks ........................................................3

U.N. Off. Drugs & Crime, *The Prevention of Recidivism and the Social Reintegration of Offenders* (2018), https://www.unodc.org/documents/justice-and-prison-reform/18-02303_ebook.pdf....................................................................7

*U.S. Relinquishes Alabama Prisons*, N.Y. Times (Jan. 15, 1989), https://www.nytimes.com/1989/01/15/us/us-relinquishes-alabama-prisons.html..................................................................................................14

## INTERESTS OF AMICI

Amici are not-for-profit institutions based in New York City that advocate for improvements to our justice systems.[1]  Amici have long supported the closure of the Rikers Island jail complex ("Rikers Island" or "Rikers").[2]

The New York City Bar Association ("City Bar") is a voluntary association of over 23,000 lawyers and law students in New York City.  Its mission is to promote reform of the law and uphold the rule of law and access to justice in support of a fair society and the public interest.[3]  To achieve this mission, the City Bar engages in social issues via policy initiatives, involvement in access-to-justice initiatives, and pro bono representation in many areas, including immigration, homelessness, and criminal justice.  Multiple City Bar committees and task forces composed of experienced practitioners study and advocate for criminal justice reform.

Since 1961, the Vera Institute of Justice ("Vera") has worked to end the overcriminalization and mass incarceration of people of color, immigrants, and people experiencing poverty.  Vera's president and other leaders played key roles on the Independent Commission on New York City Criminal Justice and Incarceration Reform, also known as the Lippman Commission.  Vera continues to work with other advocates and policymakers to realize

---

[1] Plaintiffs and the United States of America consented to the filing of this brief.  Defendants declined to consent.  No party's counsel authored any portion of this brief.  No party or party's counsel contributed money intended to fund this brief's preparation or submission.  No person other than the amici curiae, their members, or their counsel contributed money that was intended to fund this brief's preparation or submission.

[2] *See, e.g.*, Press Release, N.Y.C. Bar Ass'n, Statement in Support of Closing Rikers Island (Oct. 15, 2019), https://www.nycbar.org/media-listing/media/detail/closing-rikers-island-support-for-borough-based-jail-plan; Insha Rahman, *Politics, Ambition, and the Hard Work of Making the Closure of Rikers Island a Reality*, Vera Inst. Just. (July 13, 2017), https://www.vera.org/news/politics-ambition-and-the-hard-work-of-making-the-closure-of-rikers-island-a-reality.

[3] *See* N.Y.C. Bar Ass'n, *About Us*, https://www.nycbar.org/about (last visited Dec. 1, 2023).

the City's commitment to closing Rikers Island and moving closer to a City that delivers both justice and safety for all its residents.

## SUMMARY

For decades, Rikers Island has been a byword for human misery.[4]  Individuals confined in its antiquated, rotting facilities face extraordinary risks of violence both from other incarcerated people and from New York City Department of Correction ("DOC") personnel, owing to the complex's "toxic environment" and "deep-seated culture of violence."[5]  This is a crisis—one that poses an ongoing threat to the constitutional rights, the human dignity, and, most gravely, the very lives of those confined there.  Amici respectfully submit this brief to present their position that appointing a federal receiver to take control of the ongoing crisis at the DOC is necessary to preserve the rule of law.  Amici also write to emphasize that the receiver's work can and must be done in parallel with the Defendants' legal obligation to close Rikers Island.

## ARGUMENT

Throughout this litigation, including in the Consent Judgment in 2015 and the subsequent remedial orders and Action Plan, the Court and the independent Monitor have provided Defendants with countless opportunities to implement reforms.[6]  Yet not only have Defendants, for their part, "not made any progress," but "in fact, the opposite has occurred": DOC facilities are less safe

---

[4] Janos Martin, *#CLOSErikers: The Campaign to Transform New York City's Criminal Justice System*, 45 Fordham Urban L.J. 499, 503-18 (2018); Michael Jacobson et al., *Beyond the Island: Changing the Culture of New York City Jails*, 45 Fordham Urban L.J. 373, 379-88 (2018).

[5] Indep. Comm'n on N.Y.C. Crim. Just. & Incarceration Reform, *A More Just New York City* 13-14, 17-18, 71 (Apr. 2, 2017) [hereinafter "Lippman Commission Report"], https://nyti.ms/3tBkHtG; *see* Letter from Steve J. Martin, Monitor, to Hon. Laura T. Swain at 1, ECF No. 378 (citing the "pervasive high level of disorder and chaos in the New York City jails"); Status Report on DOC's Action Plan by the *Nunez* Independent Monitor at 4, ECF No. 581 [hereinafter "Monitor's October 5, 2023 Report"] ("The jails remain dangerous and unsafe, characterized by a pervasive, imminent risk of harm to both people in custody and staff.").

[6] *See generally, e.g.*, Consent Judgment, ECF No. 249; Order: Action Plan, ECF No. 465; Order, ECF No. 564; Order, ECF No. 582.

today than in 2016.[7]  In particular, rates of violence have *dramatically increased* during the time period when Defendants were purportedly implementing reforms,[8] which is especially troubling considering the substantial *decrease* in the incarcerated population during those years.[9] Importantly, Black and Latinx communities, whose members comprise approximately 88.4% of those held at Rikers Island, bear the brunt of that failure.[10]

The conditions at Rikers Island require "prompt, effective, and targeted work on key foundational and day-to-day issues" to root out spiraling dysfunction.[11]  But rather than meet that need with serious action, Defendants' efforts have been "haphazard, tepid, and insubstantial," reflecting "a continuing lack of urgency" to address the constitutional violations, violence, and deaths taking place on their watch; what progress Defendants have made was followed by

---

[7] Status Report of the *Nunez* Independent Monitor at 16, ECF No. 467.

[8] Status Report on DOC's Action Plan by the *Nunez* Independent Monitor at 51-54, ECF No. 517 [hereinafter "Monitor's April 3, 2023 Report"].  As of 2022, DOC personnel are using force against incarcerated people more than twice as often as they did in 2016, and these uses of force are causing more serious injuries.  *Id.* at 52-53.  Stabbings and slashings occur *five times as often* as they did at the time of the Consent Judgment.  *Id.* at 54.  Over a two-week period in September 2023, eight people in the Singer Enhanced Supervised Housing unit were slashed after DOC personnel shackled them to desks, leaving them entirely helpless.  Reuven Blau, *Eight Rikers Detainees Slashed While Shackled to 'Restraint Desks'*, The City (Sept. 18, 2023), https://www.thecity.nyc/ 2023/09/18/eight-rikers-detainees-slashed-shacked-restraint-desks.  Between August and October 2023, there were 134 stabbings and slashings "more than all stabbing/slashings in 2020."  Status Report on DOC's Action Plan at 12, ECF No. 595 [hereinafter "Monitor's November 8, 2023 Report"].  And in 2023 so far, nine people have died while in DOC custody or shortly after release. Monitor's October 5, 2023 Report at 7.

[9] New York City's jail population declined from 9,614 in 2016 to 6,182 in 2023.  N.Y. State Div. Crim. Just. Servs., *Annual Jail Population Trends* 3 (Aug. 1, 2023), https:// www.criminaljustice.ny.gov/crimnet/ojsa/jail_pop_y.pdf; N.Y.C. Comptroller Brad Lander, *The State of New York City Jails* 2 (Aug. 2023), https://comptroller.nyc.gov/wp-content/uploads/ documents/The-State-of-New-York-City-Jails.pdf.

[10] N.Y.C. Dep't Corr., *Population Demographics: FY23 Qtr. 4*, https://www.nyc.gov/assets/doc/ downloads/pdf/Population_Demographics_Report_FY23_Q4.pdf (last visited Dec. 1, 2023).

[11] Nov. 17, 2022 Conference Tr. at 8:24-9:1, ECF No. 490.

regression.[12]   Through their failure, Defendants have consistently violated the Consent Judgment

and this Court's remedial orders,[13] and have even taken active measures to evade oversight, such

as concealing evidence of violations from the City Board of Correction (the independent watchdog

that supervises the DOC) and the Court-appointed Monitor.[14]   As the Monitor wrote just two weeks

ago—while reporting on Defendants' concealment of an entire new housing unit—"[i]t is deeply

disturbing that such brazen actions by Defendants continue to occur . . . in light of the Court's

recent orders" requiring transparency and cooperation.[15]   And this Court agreed: the DOC's actions

"both violate a number of recent Court orders and are exemplars of the ways in which the current

Department management practices contribute to the unacceptable level of danger posed to

individuals in custody and employees at Rikers Island."[16]   Because the rule of law cannot

---

[12] Monitor's October 5, 2023 Report at 4, 6; *see* Monitor's November 8, 2023 Report at 56 (citing Defendants' "diminishing sense of urgency to address the gravity of the problems in the jails," particularly since 2022); Special Report by the *Nunez* Independent Monitor at 1, ECF No. 541 [hereinafter "Monitor's June 8, 2023 Report"] ("[T]he pace of reform . . . over the past eight years has been glacial and at times, marked by distressing regression.").

[13] *See, e.g.*, Monitor's November 8, 2023 Report at 1-5; Order to Show Cause at 1, ECF No. 600.

[14] Special Report by the *Nunez* Independent Monitor, ECF No. 616; Monitor's November 8, 2023 Report at 7, 9-10, 52-63 (describing "persistent interference, obstruction, and lack of transparency" by Defendants, which has worsened since January 2022); *see* Letter from Steve J. Martin, Monitor, to Hon. Laura T. Swain at 7 n.11, ECF No. 599 [hereinafter "Monitor's November 15, 2023 Letter"] (the Monitor has been forced "to rely on anonymous reports to obtain relevant information about serious events . . . that the Department should have provided" under this Court's orders); Monitor's Emergency Letter Motion at 5, ECF No. 588 (describing a "disturbing pattern that has emerged where the Commissioner and other Defendants appear to be engaged in a concerted effort to interfere with the work of the Monitor and his team"); Monitor's June 8, 2023 Report at 19-42; Special Report of the *Nunez* Independent Monitor at 19, ECF No. 533; *see also, e.g.*, Jonah E. Bromwich, *Rikers Watchdog Sues New York City Over Lack of Transparency*, N.Y. Times (Aug. 9, 2023), https://www.nytimes.com/2023/08/09/nyregion/rikers-jail-watchdog-lawsuit.html (describing DOC's refusal to provide Board of Correction with information necessary to its job); Jan Ransom, *Once Praised, Jails Chief Draws Ire Over Lack of Transparency on Rikers*, N.Y. Times (July 25, 2023), https://www.nytimes.com/2023/07/25/nyregion/rikers-island-jail-chief-molina.html (describing steps taken by Defendants to limit oversight of DOC).

[15] Monitor's November 15, 2023 Letter at 8.

[16] Order to Show Cause at 1, ECF No. 600.

countenance Defendants' noncompliance with constitutional requirements, their nose-thumbing at the Monitor and this Court's orders, and the mounting cost in suffering and lives, the Court should appoint a receiver to take charge of this deteriorating situation.

However, a Court-appointed receiver is not a panacea.  To maximize the likelihood that this "last resort" remedy will succeed in the long term, the Court should ensure that the receiver acts consistently with the legislatively mandated obligation to close Rikers Island.  The City has long recognized that Rikers Island itself—an isolated complex constructed on a noxious landfill,[17] where crumbling infrastructure becomes makeshift weaponry[18]—is a major obstacle to bringing the DOC into compliance with the Constitution.  An independent commission established by the City Council, headed by former Court of Appeals Chief Judge Jonathan Lippman (the "Lippman Commission"), found that the DOC *could not* become compliant without closing Rikers:

> We reviewed, studied, and debated every possible solution to the problem of Rikers.  We have concluded that simply reducing the inmate population, renovating the existing facilities, or increasing resources will not solve the deep, underlying issues on Rikers Island. We are recommending, without hesitation or equivocation, permanently ending the use of Rikers Island as a jail facility in any form or function.[19]

New York City, including its City Council, then-Mayor Bill de Blasio, and other elected officials, responded by putting that recommendation into law, with many members highlighting how Rikers

---

[17] Raven Rakia, *A Sinking Jail: The Environmental Disaster That Is Rikers Island*, Grist (Mar. 15, 2016), https://grist.org/justice/a-sinking-jail-the-environmental-disaster-that-is-rikers-island.
[18] Lippman Commission Report at 72.
[19] *Id.* at 2; *see also* N.Y. State Comm'n Corr., *The Worst Offenders Report: The Most Problematic Local Correctional Facilities of New York State* 3 (Feb. 2018) (agreeing that it is necessary "to expeditiously close Rikers" to bring "[t]he New York City jail system . . . into compliance with the laws, guarantees, and protections provided by the Federal and State constitutions").

had become "a symbol of brutality and inhumanity."[20]  As a result, by law, the DOC may not use

Rikers Island as a jail after August 31, 2027.[21]

The City is building multiple new, smaller jails, with facilities specifically designed to

afford incarcerated people the safe conditions and rehabilitative services and programming they

need and to which they are entitled.[22]  Unlike the current isolated penal colony at Rikers, these

local facilities will foster "connections to families, attorneys, courts, medical and mental health

care, and faith and community-based organizations."[23]  Not only are these modern jails designed

to keep incarcerated people safe, but by enabling DOC to carry out interventions that reduce

violence, they will also make our community safer.[24]

Closing Rikers, and replacing it with modern facilities better equipped for constitutional

compliance, cannot in and of itself bring the DOC into compliance with the Constitution.[25]  Nor

can it, by itself, change DOC's culture.  But together, the appointment of a receiver and the closure

of Rikers Island present a realistic way forward to achieve lasting institutional and cultural change

---

[20] Hr'g Tr. of the Stated Meeting of the City Council at 31:8, N.Y.C. Council Res. 1091-2019 (Oct. 17, 2019) (statement of Speaker Corey Johnson); *see also, e.g.*, *id.* at 50:4-12 (statement of Council Member Karen Koslowitz); *id.* at 87:10-88:4 (statement of Council Member Donovan Richards).
[21] N.Y.C. Council Res. 1091-2019; N.Y.C. Admin. Code § 4-215(a)(1).
[22] *See* NYC, *NYC Borough-Based Facilities*, https://rikers.cityofnewyork.us/nyc-borough-based-jails (last visited Dec. 1, 2023); Lippman Commission Report at 76-87.
[23] NYC, *What Is the NYC Borough-Based Jail System*, https://rikers.cityofnewyork.us/what-is-the-borough-based-jail-system (last visited Dec. 1, 2023).
[24] *See id.*; Lippman Commission Report at 76-87, 92-94; *see also, e.g.*, City of N.Y. Bd. of Corr. Minimum Standard § 1-09(a) ("Maintaining personal connections with social and family networks and support systems is critical to improving outcomes both during confinement and upon reentry."); U.N. Off. Drugs & Crime, *The Prevention of Recidivism and the Social Reintegration of Offenders* 3-9 (2018), https://www.unodc.org/documents/justice-and-prison-reform/18-02303_ebook.pdf (explaining how attention to the "social integration issues" that led someone to commit a crime can help prevent recidivism).
[25] *See* Jacobson et al., *supra* note 4, at 378.

in New York City's jails.  Amici therefore write to urge this Court to shape a receivership that will

be consistent with City laws requiring DOC to leave Rikers in the past where it belongs.

**I.     Appointing A Federal Receiver Will Promote The Rule Of Law By Ensuring That Individuals Held By The NYC DOC Are Not Subject To Unconstitutional Violence.**

Defendants' persistent violations, utter lack of progress, and outright interference with the

Court-appointed Monitor all bespeak a lack of will to carry out the Court's orders and uphold the

federal Constitution.  This status quo is untenable.  Because it ultimately falls to the federal courts

to rein in state actors who violate the Constitution and laws—and thus to uphold the basic principle

that, like everyone else, government actors are subordinate to the law[26]—it is time for this Court

to put in place a receiver who will bring DOC under the control of the law.

By appointing a receiver, the Court would fulfill its obligation to maintain the rule of law

when the executive branch tramples on individuals' constitutional rights.[27]  When persistent

violations arise from structural rot, courts must continue to take remedial action until the

unconstitutional conditions are eliminated "root and branch."[28]  That is why, in *Brown v. Plata*,[29]

the Supreme Court held that courts must not allow constitutional violations to continue, even if it

---

[26] M.J.C. Vile, *Constitutionalism and the Separation of Powers* 25 (2d ed. 1998); *see* Alexander Hamilton, *The Federalist* No. 78.

[27] *Cf. United States v. Lee*, 106 U.S. 196, 218-19 (1882).  Convicted detainees at Rikers have an immutable Eighth Amendment right to conditions of confinement that meet basic human needs, including adequate food, medical care, and safety.  *See Hutto v. Finney*, 437 U.S. 678, 687 (1978). And the large majority of DOC's incarcerated population who are confined *pretrial*, *see* Off. N.Y.C. Comptroller, Bureau of Budget, *Agency Watch List: Department of Correction FY 2023* at 6 (Mar. 2022), https://comptroller.nyc.gov/wp-content/uploads/documents/Agency_Watch_List_ DOC_FY2023.pdf, possess Fourteenth Amendment Due Process rights that are "at least as great" as the Eighth Amendment protections for individuals who have actually been convicted, *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017).

[28] *Battle v. Anderson*, 708 F.2d 1523, 1538 (10th Cir. 1983) (quoting *Green v. Cnty. Sch. Bd. of New Kent Cnty., Va.*, 391 U.S. 430, 438 (1968)); *see also id.* at 1539 ("Present compliance is insufficient to bring an end to this litigation if the compliance is simply a transient excursion above the constitutional threshold.").

[29] 563 U.S. 493 (2011).

means that courts must wade into the realm of correctional administration.[30]  In *Plata*, the district court entered a series of orders and stipulations requiring the government defendants to stop violating prisoners' rights under the federal Constitution.  When all of those efforts failed to produce compliance over the next three years, the court finally appointed a receiver.[31]

Like in *Plata*, Defendants have proven themselves incapable or unwilling to carry out judicially mandated remedial steps over some *eight* years.[32]  More than that, however, and unlike in *Plata*, Defendants have waged a campaign of *"interference and obstruction"* against the Court-appointed Monitor, seeking to hide critical information from the Court to obscure their noncompliance.[33]  In any event, the bottom line is the same:  Defendants leave the Court no choice but to impose a stronger remedy to bring Defendants under the control of the law.  Where, as here, the Court has otherwise "exhausted all reasonable coercive measures," a receivership remains the least intrusive remedy to prevent needless violence.[34]

In fashioning such a remedy, a court may wield its broad and flexible equitable power to craft an order ensuring constitutional violators are "strictly adhering to the rule of law."[35]  This power extends to cases "where that relief relates to a state's administrative practices," because "equity often requires the implementation of injunctive relief to correct unconstitutional conduct."[36]  And where prisoners' constitutional rights are systematically being "traduced," any

---

[30] *Id.* at 511 (citing *Hutto v. Finney*, 437 U.S. at 687 n.9).

[31] *See Plata v. Schwarzenegger*, No. C01-1351, 2005 WL 2932253, at *19-20, *31 (N.D. Cal. Oct. 3, 2005).  The Supreme Court later determined that it was proper for a three-judge district court to order that the state reduce the prison population to adequately address Eighth Amendment violations.  *Plata*, 563 U.S. 493.

[32] *See* Monitor's November 8, 2023 Report at 65.

[33] *Id.* at 58-63 (emphasis added); *see* Monitor's October 5, 2023 Report at 27; *supra* note 14.

[34] *Plata*, 2005 WL 2932253, at *28.

[35] *Floyd v. City of New York*, 959 F. Supp. 2d 668, 674 (S.D.N.Y. 2013).

[36] *Id.*

principles of restraint that might augur against involving the court in prison administration must "dissolve."[37]   The Supreme Court has acknowledged that such remedies are particularly appropriate where the court has afforded defendants "repeated opportunities" to remedy the unconstitutional conditions, and they have not complied.[38]

Here, Defendants have been on notice for years—certainly before the Complaint was filed in August 2011—that they were abdicating their constitutional responsibility to humanely incarcerate people.[39]   Indeed, there have been calls to close Rikers since the late 1970s.[40]   And the Court has given Defendants innumerable chances to come into compliance.[41]   Yet the Monitor describes Defendants' efforts to respond as "mediocre, at best" and has found that "violence and conditions in the jails are in many ways worse than when the Consent Judgment went into effect."[42]

---

[37] *Stone v. City & County of San Francisco*, 968 F.2d 850, 860 (9th Cir. 1992) (citing *Duran v. Carruthers*, 678 F. Supp. 839, 847 (D.N.M. 1988)); *see also Procunier v. Martinez*, 416 U.S. 396, 405-06 (1974) ("A policy of judicial restraint cannot encompass any failure to take cognizance of valid constitutional claims . . . . When a prison regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights." (citing *Johnson v. Avery*, 393 U.S. 483, 486 (1969))), *overruled on other grounds by Thornburgh v. Abbott*, 490 U.S. 401 (1989); *Plata*, 563 U.S. at 511 ("Courts may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration.").

[38] *Hutto*, 437 U.S. at 687.

[39] *See, e.g.*, Letter from Jocelyn Samuels, Acting Assistant Att'y Gen., and Preet Bharara, U.S. Att'y, to Bill de Blasio et al., at 8 (Aug. 4, 2014), https://www.justice.gov/sites/default/files/usao-sdny/legacy/2015/03/25/SDNY%20Rikers%20Report.pdf ("DOC officials have been well aware" of the widespread violence on Rikers for many years, "but have failed to take reasonable steps" to protect those incarcerated); Benjamin Weiser, *Lawsuits Suggest Pattern of Rikers Guards Looking Other Way*, N.Y. Times (Feb. 3, 2009), https://www.nytimes.com/2009/02/04/nyregion/04rikers.html; *supra* note 4.

[40] *See* Martin, *supra* note 4, at 510-11; Kimberly Gonzalez et al., *A Timeline on the Closure of Rikers Island*, City & State N.Y. (Nov. 20, 2023), https://www.cityandstateny.com/politics/2023/11/timeline-closure-rikers-island/376662.

[41] *See supra* note 6.

[42] Monitor's October 5, 2023 Report at 27-28.

To allow the Defendants to obstruct implementation of constitutionally required, Court-ordered changes would subvert the rule of law and undermine the authority of the judicial branch generally and this Court specifically.[43]  For that reason, courts facing gross constitutional violations in carceral systems have found that, when injunctions or consent orders prove inadequate, instituting a receivership is the appropriate response.[44]

While the Court should generally be sensitive to New York City's interest in the administration of its jails, it "nevertheless must not shrink from [its] obligation to enforce the constitutional rights of all 'persons,' including prisoners."[45]  Indeed, where government officials fail to carry out the fundamental law of the United States, creating the need for court intervention, any blame lies with those officials; the DOC, by its failure to comply, "has effectively turned over its obligations to the federal judicial branch."[46]  It is fair to say that "[r]eceivership is being imposed on the Court, rather than on the [DOC], for it is the [DOC's] abdication of responsibility that has led to the current crisis."[47]

## II. To Uphold The Rule Of Law, The Court Should Order The Receiver To Act Consistently With Legislation Passed By The City Council To Close Rikers By 2027.

Not only is the City's executive branch obligated by the Constitution (and this Court's orders) to remediate the rolling catastrophe at DOC, but it is also obligated by legislation enacted by the City Council to stop using Rikers Island by August 31, 2027, in favor of more modern jail facilities.[48]  New York City, through its legislative body and with the approval of then-Mayor de

---

[43] *See Plata*, 563 U.S. at 511 (internal quotation marks omitted); *see also Gates v. Collier*, 501 F.2d 1291, 1321-22 (5th Cir. 1974).

[44] *See, e.g.*, *Plata*, 2005 WL 2932253, at *24-28.

[45] *Plata*, 563 U.S. at 511 (quoting *Cruz v. Beto*, 405 U.S. 319, 321 (1972) (per curiam)).

[46] *Plata*, 2005 WL 2932253, at *31.

[47] *Id.*

[48] *See* N.Y.C. Council Res. 1091-2019; N.Y.C. Admin. Code § 4-215(a)(1).

Blasio, committed to closing Rikers Island for the same reason a receivership is necessary: to ensure that incarcerated people will no longer be subjected to inhumane, unlawful conditions.

Closing Rikers was a City-wide decision requiring City-wide effort, and it will not be the responsibility of a receiver managing DOC to lead that effort.  However, DOC's daily operations *will* inevitably impact the City's progress toward closing Rikers—for example, through DOC policies' effects on the number of people incarcerated,[49] or its decisions to use, not use, or close certain facilities on Rikers—as will the work of a receiver to overhaul those operations.  So, while a receiver will need to act swiftly to alleviate the suffering on Rikers Island, it is imperative—and required by City law—that these actions not impede the City's progress toward closing Rikers.

The Court can and should minimize the risk that the DOC will further violate the law by crafting an order that ensures the receiver acts consistently with the City's obligation to close Rikers by August 2027.  Doing so will help address the unconstitutionally violent conditions that prevail at Rikers today, while also protecting the rights of future incarcerated people, and respecting elected officials' determination about a necessary step to bring the City's jails into compliance with constitutional—and moral—requirements over the long term.

---

[49] Closing Rikers will require reducing the number of people incarcerated there, because the borough-based jails that will replace Rikers are expected to have smaller capacities.  *See* Indep. Comm'n on N.Y.C. Crim. Just. & Incarceration Reform, *Closing Rikers Island: A Roadmap for Reducing Jail in New York City* 2 (July 2021), https://www.morejustnyc.org/s/Roadmap_for_Reducing_Jail_NYC-5a4k.pdf.  Incarcerating too many people can also lead to understaffing and opportunities for violence.  Second Status Report on DOC's Action Plan at 4-5, ECF No. 472. However, the incarcerated population has not just held steady over the last year but increased, due in part to "systemic failures involving case processing." *Id.* at 4; N.Y.C. Comptroller Brad Lander, *The State of New York City Jails* at 2 (Aug. 2023), https://comptroller.nyc.gov/wp-content/uploads/documents/The-State-of-New-York-City-Jails.pdf.  Rikers contributes to these case processing problems by isolating people from their defense counsel and impeding them from attending court dates.  Lippman Commission Report at 73-74; N.Y.C. Mayor, *Mayor's Management Report* at 83 (Sept. 2023), https://www.nyc.gov/assets/operations/downloads/pdf/mmr2023/2023_mmr.pdf (in fiscal year 2023, individuals on trial were timely delivered to court only 81.9% of the time).

### A.   An Order Instructing The Receiver To Act In A Manner Consistent With Closing Rikers Is Within The Court's Power And Consistent With The PLRA.

The appointment and discharge of a receiver lie within the district court's inherent power to fashion equitable relief, and therefore can be shaped according to the Court's discretion.[50]  The Court thus has the authority to craft an order appointing a receiver specifying that the receiver's actions must be consistent with the City's obligation to close Rikers.

Furthermore, the Prison Litigation Reform Act ("PLRA") provision that restricts prospective relief neither bars nor requires, but does support, appointing a receiver and ensuring its authority does not extend to allowing unilateral interference with the laws mandating the closure of Rikers.  The PLRA does not "place undue restrictions on the authority of federal courts to fashion practical remedies when confronted with complex and intractable constitutional violations" (and it certainly does not foreclose the appointment of a receiver).[51]  As relevant here, the PLRA only requires that "[p]rospective relief . . . extend no further than necessary to correct the violation of [a] Federal right," and instructs courts to "give substantial weight to any adverse impact on public safety or the operation of the criminal justice system caused by the relief."[52]  In this case, respecting the City's determination that closing Rikers is necessary for public safety will ensure that the Court's order "extend[s] no further than necessary" to correct the constitutional violations at issue in this case.[53]

---

[50] *SEC v. Vescor Cap. Corp.*, 599 F.3d 1189, 1194 (10th Cir. 2010) ("It is generally recognized that the district court has broad powers and wide discretion to determine . . . relief in an equity receivership." (internal quotation marks omitted) (quoting *SEC v. Safety Fin. Serv., Inc.,* 674 F.2d 368, 372-73 (5th Cir. 1982)); *see SEC v. Malek*, 397 F. App'x 711, 713 (2d Cir. 2010) (upholding order creating a receivership "under the district court's broad equitable discretion").

[51] *Plata*, 563 U.S. at 526.

[52] 18 U.S.C. § 3626(a)(1)(A).

[53] *Id*.

12

And the City's determination is well-supported.  As the Lippman Commission has observed, "there is little to suggest that Rikers Island improves public safety"—and much to suggest that it harms public safety, including by promoting recidivism.[54]  Among other things, Rikers destabilizes people—including those already struggling with serious mental illness and substance use disorders—by subjecting them to violent chaos and depriving them of treatment and community support; "[t]he result is further harm, reduced safety—and often, re-incarceration."[55] By contrast, there is ample evidence that closing Rikers in favor of modern, local facilities would *improve* public safety, including through providing mental health services, community-based reentry services, and other interventions that cannot be effectively implemented at Rikers.[56]  Court intervention that supports the closure of Rikers Island is likely to improve, rather than harm, public safety, and is permitted by the PLRA.[57]

### B.     Requiring That A Receiver Not Impede The Closure Of Rikers Will Ensure That The Entire Plaintiff Class Is Protected.

The Federal Rules of Civil Procedure require that a class settlement must treat all class members equitably.[58]  Here, the plaintiff class includes "all present and future" incarcerated people "confined in jails operated by the New York City Department of Correction," other than the Elmhurst and Bellevue Prison Wards.[59]  Although the parties, the Court, and the Monitor are understandably focused on current conditions and those currently incarcerated, protecting the

---

[54] Lippman Commission Report at 28, 75.

[55] Indep. Comm'n on N.Y.C. Crim. Just. & Incarceration Reform, *A Safer, More Effective Option Than Rikers* 2 (Oct. 2023), https://www.morejustnyc.org/reports.

[56] *See id.*; *supra* notes 22-24; Lippman Commission Report at 48, 76-87, 136.

[57] *Plata*, 563 U.S. at 535-38 (upholding order to reduce prison population in part on this basis).

[58] Fed. R. Civ. P. 23(e)(2)(D).

[59] Stipulation and Order ¶ 2, ECF No. 61 (defining the plaintiff class); *see* Order Preliminarily Approving Consent Judgment ¶ 8, ECF No. 214 (expanding the definition of the plaintiff class to include those incarcerated at the Eric M. Taylor Center); Consent Judgment § II(2), ECF No. 249 (same).

interests of the entire class necessitates protecting the interests of individuals who will be confined by the DOC in the future.

As New York City's elected officials have recognized, closing Rikers is an important step toward preventing future constitutional violations.[60]  By the same token, if the receiver's actions substantially delay or undercut the closure of Rikers, this could privilege the rights of presently incarcerated class members over the rights of class members who will be impacted in the future. To avoid that result, the Court should order the receiver to act in a manner consistent with the timely closure of Rikers.

### C.   A Receiver In Place Before, During, And After The Closure Of Rikers Will Have A Unique Opportunity To Create The Cultural Shift Required To End Unconstitutional Violence At DOC Facilities.

At this stage in the lawsuit, the Court's focus is correctly on reforming the DOC in general, not on Rikers specifically.  Likewise, any receiver must focus their efforts on the DOC, wherever its facilities are located.  But, as the Monitor has repeatedly expressed, "cultur[al] change" is required to effectively reform the DOC.[61]  Achieving that cultural change will take time[62]—and

---

[60] *See supra* notes 20-21 and accompanying text.

[61] *See* Special Report by the *Nunez* Independent Monitor at 9, ECF No. 561; Monitor's October 5, 2023 Report at 6, 26; *see also* Eighth Report of the *Nunez* Independent Monitor at 6, ECF No. 332 (referring to the "decades-long culture of violence in these Facilities").

[62] A receivership would be terminable, if the Court finds termination is warranted, on motion after two years.  18 U.S.C. § 3626(b)(1).  Given the deeply rooted dysfunction at issue in this matter, the eight years of oversight already carried out by the monitor, and lessons from receiverships in other jurisdictions, it appears likely that the receiver will need more than two years to carry out its job.  *See, e.g.*, Cal. Legis. Analyst's Off., *Overview and Update on the Prison Receivership* (Nov. 8, 2023), https://lao.ca.gov/Publications/Report/4813 (describing receivership initially created in 2006 and still in effect over certain state facilities after delegating control of others back to state); *U.S. Relinquishes Alabama Prisons*, N.Y. Times (Jan. 15, 1989), https://www.nytimes.com/1989/01/15/us/us-relinquishes-alabama-prisons.html (describing decade-long receivership that substantially improved conditions in Alabama prisons).

instituting a receiver who will develop consistent policies, guidance, and goals, in place of the "revolving door of leadership" that has destabilized Rikers, can create the necessary opportunity.[63]

As long ago as the 1970s and '80s, Rikers was overpopulated, dangerous, and violent.[64] These longstanding problems persist today.  In particular, the Monitor has highlighted the shocking "normaliz[ation]" of "unacceptable rates of use of force, fights, assaults on staff and stabbing and slashings," and the "real abject harm" that is its inevitable result.[65]

Closing Rikers is necessary to end a culture within the DOC that accepts as inevitable the violence and wretchedness that define the status quo.[66]  And continued management by a receiver is necessary to ensure that Rikers's culture of violence ends when Rikers does, and is not perpetuated at new DOC facilities.[67]  Simply put, Rikers is a gangrenous limb within the DOC, and its excision is necessary to heal the DOC as a whole.

## CONCLUSION

Amici respectfully submit that the rule of law requires that a receiver be appointed to manage the DOC, and that the receiver be constrained to act consistently with Section 4-215 of the New York City Administrative Code and other laws requiring the closure of Rikers Island.[68]

---

[63] Monitor's November 8, 2023 Report at 7, 11.
[64] Ed Morales, *Behind the Growing Calls to Close Rikers Island*, City Limits (Nov. 24, 2015), https://citylimits.org/2015/11/24/behind-the-growing-calls-to-close-rikers-island; Gonzalez et al., *supra* note 40.
[65] Special Report by the *Nunez* Independent Monitor at 176-77, ECF No. 557 (quoting Monitor's April 3, 2023 Report at 6); *see* Monitor's November 8, 2023 Report at 7.
[66] *See* Lippman Commission Report at 71.
[67] *Cf. Battle*, 708 F.2d at 1538-39 ("The court must exercise supervisory power over the matter until it can say with assurance that the unconstitutional practices have been discontinued and that there is no reasonable expectation that unconstitutional practices will recur.").
[68] *See* N.Y.C. Council Res. 1091-2019; N.Y.C. Admin. Code § 4-215.

Dated: December 1, 2023

JENNER & BLOCK LLP

By: /s/ Jeremy M. Creelan
Jeremy M. Creelan
Elizabeth Edmondson
Owen Keiter
Sara Cervantes
Sarah L. Atkinson
1155 Avenue of the Americas
New York, NY 10036
jcreelan@jenner.com
(212) 891-1678

*Counsel for Amici Curiae*