UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MARK NUNEZ, ET AL.

                    Plaintiffs,

    -against-

THE CITY OF NEW YORK, ET AL.

                    Defendants.

Case No. 11-cv-5845 (LTS)

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR
CONTEMPT AND APPLICATION FOR APPOINTMENT OF A RECEIVER**

The Legal Aid Society
Prisoners' Rights Project
49 Thomas Street, 10th Floor
New York, New York 10013
(212) 577-3300

Emery Celli Brinckerhoff Abady
Ward & Maazel LLP
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

<u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ..................................................................................1

SUMMARY OF PROPOSED FINDINGS OF FACT ...................................................4

ARGUMENT ........................................................................................................9

    I.      DEFENDANTS ARE IN CONTEMPT OF THE CONSENT
           JUDGMENT AND THIS COURT'S SUBSEQUENT ORDERS .......................11

          A.      This Court's Orders are Clear and Unambiguous.....................................12

          B.      The Record Overwhelmingly Demonstrates that Defendants Have
               Not Complied With Core Provisions of the Court's Orders. ....................13

               1.     Defendants Have Not Implemented the Use of Force
                     Directive......................................................................................13

               2.     Defendants Do Not Conduct Thorough, Timely, and
                     Objective Use of Force Investigations or Hold Staff
                     Accountable ................................................................................17

                    a.      Defendants Do Not Conduct Thorough and
                           Objective Use of Force Investigations...............................17

                    b.      Defendants Do Not Conduct Timely Use of Force
                             Investigations ...................................................................20

                    c.      Defendants Failed to Hire Sufficient Investigatory
                           Staff..................................................................................21

                    d.      Defendants Do Not Impose Meaningful Discipline..........22

                 3.     Defendants Have Not Complied with Court Orders to Correct
                       Failures in Security and Basic Correctional Practice....................24

                      a.      Failing to Implement the Interim Security Plan................24

                    b.      Failing to Conduct Routine Tours.....................................28

                    c.      Failing to Improve Escort Practices, Searches, and
                           Contraband Detection and Recovery .................................30

                 4.     Defendants Have Not Complied with Orders Requiring
                       Adequate Supervision of Staff and Facility Leadership ...............33

                    a.      Failure of Facility Leadership to Adequately Address
                           Excessive and Unnecessary Use of Force.........................34

i

|  | b. | Failing to Adequately Supervise Captains | 36 |

|  | c. | Failing to Prioritize Assigning Captains to Housing Units | 38 |

| 5. | Defendants Have Not Complied with Requirements to Effectively Deploy Uniformed Staff to Ensure Adequate Supervision of Incarcerated Individuals | | 39 |

|  | a. | Failing to Reduce Awarded Posts | 41 |

|  | b. | Failing to Minimize 4-by-2 Schedules | 41 |

|  | c. | Failing to Reduce Uniform Staff in Civilian Posts | 42 |

| 6. | Defendants Have Not Complied with Orders to Curb Emergency Response Teams' Excesses | | 43 |

|  | a. | Failing to Appropriately Select and Screen Staff Assigned to Emergency Response Teams | 45 |

|  | b. | Excessive Staff Are Assigned to Emergency Response Teams | 46 |

|  | c. | Emergency Response Teams Fail to Use De-Escalation Tactics | 47 |

| 7. | Defendants Have Not Complied with Orders Designed to Ensure the Safety of Young People in Custody | | 48 |

C. Defendants Have Not Diligently Complied with the Court's Orders ........ 50

| 1. | Despite Numerous Clear Assessments of Their Failures Defendants Have Remained in Non-Compliance for Years | 51 |

| 2. | Defendants Have Failed to Take Obvious Steps That Would Move Them Toward Compliance, Including Those Recommended by the Monitor | 53 |

| 3. | The Measures Defendants Have Taken Have Been Ineffective and Insufficient | 56 |

| 4. | Defendants Have Taken Affirmative Steps, Sometimes Against the Monitor's Recommendations, That Have Resulted in Regression as Opposed to Compliance | 61 |

II.   APPOINTMENT OF A RECEIVER IS NECESSARY TO SECURE RELIEF FOR THE PLAINTIFF CLASS ........................................... 63

A.     Federal Courts Have Broad Remedial Authority to Ensure Compliance with their Orders and Appoint a Receiver. ...........................63

B.     Plaintiffs Face a Grave and Immediate Threat and Actuality of Harm .................................................................................................67

     1.     The Gravity of Harm is at Crisis Levels ........................................67

     2.     Recent Individual Instances of Violence Underscore the Imminence and Severity of the Harm Faced by the Plaintiff Class ............................................................................................69

     3.     Too Many People Have Died in DOC Custody............................72

C.     Continued Lesser Measures of Remediation Are Futile and Will Lead to Further Confrontation and Delay.....................................74

     1.     Neither Eight Successive Court Orders, Nor Eight Years of Active Monitoring, Have Moved Defendants to Comply .........75

     2.     Other Options to Obtain Compliance Are Futile, or More Extreme Than Receivership..........................................................78

D.     Defendants' Attempts to Hamper the Monitor's Work Support Appointment of a Receiver, Regardless of Whether Those Attempts Rise to the Level of Bad Faith ....................................................79

E.     Defendants Waste Resources of the City, the Monitor, and the Court ...................................................................................................82

F.     Defendants Lack the Leadership to Turn the Tide within a Reasonable Amount of Time ......................................................85

G.     Receivership Is an Efficient Remedy.........................................87

H.     Receivership Satisfies the Prospective Relief Requirements of the Prison Litigation Reform Act.................................................91

     1.     Courts Have Appointed Receivers in Prison and Jail Cases on Similar Records. ...........................................................92

     2.     The Proposed Receivership is Narrowly Drawn, Extends No Further than Necessary, and Is the Least Intrusive Means to Correct the Violations of Federal Rights. ..................................94

CONCLUSION.................................................................................98

TABLE OF AUTHORITIES

**Cases**

*Aspira of New York v. Bd. of Educ. of the City of New York,*
423 F. Supp. 647 (S.D.N.Y. 1976)................................................................ 50, 51, 52, 59

*Benjamin v. Schriro,*
370 Fed. Appx. 168 (2d Cir. 2010).......................................................................... 96

*Berger v. Heckler,*
771 F.2d 1556 (2d Cir. 1985)............................................................................ 63, 65

*Brown v. Plata* (*Plata III*),
563 U.S. 493 (2011)..................................................................................... 64, 65, 91

*CBS Broad. Inc. v. FilmOn.com, Inc.,*
814 F.3d 91 (2d Cir. 2016)..................................................................................... 64

*Chao v. Gotham Registry, Inc.,*
514 F.3d 280 (2d Cir. 2008).................................................................................... 50

*Chere Amie, Inc. v. Windstar Apparel, Corp.,*
175 F. Supp. 2d 562 (S.D.N.Y. 2001)...................................................................... 50

*Dixon v. Barry,*
967 F. Supp. 535 (D.D.C. 1997)................................................................. 4, 64, 67, 69

*E.E.O.C. v. Loc. 580, Int'l Ass'n of Bridge, Structural & Ornamental Ironworkers, Joint*
*Apprentice-Journeyman Educ. Fund,*
925 F.2d 588 (2d Cir. 1991)................................................................................... 64

*Fisher v. Koehler,*
692 F. Supp. 1519 (S.D.N.Y. 1988)......................................................................... 90

*Gary W. v. State of Louisiana,*
Civ. A. No. 74-2412, 1990 WL 17537 (E.D. La. Feb. 26, 1990) ..................................... 65

*Harper v. Bennett,*
No. 1:04-cv-01416-MHS (N.D. Ga. July 14, 2004) ...................................................... 66

*Harte v. Ocwen Fin. Corp.,*
No. 13-CV-5410, 2018 WL 1559766 (E.D.N.Y. Mar. 30, 2018).................................... 10

*Harte v. Ocwen Fin. Corp.,*
No. 13-CV-5410, 2018 WL 1830811 (E.D.N.Y. Feb. 8, 2018) ...................................... 10

iv

*Hutto v. Finney,*
   437 U.S. 678 (1978)................................................................................. 63

*In re Birchall,*
   913 N.E.2d 799 (2009).............................................................................. 65

*Inmates of D.C. Jail v. Jackson,*
   158 F.3d 1357 (D.C. Cir. 1995) ................................................................ 65

*Jones v. Gusman,*
   Case No. 2:12-cv-00859 (E.D. La. June 21, 2016).................................... 66

*Judge Rotenberg Educ. Ctr, Inc. v. Comm'r of Dep't of Mental Retardation,*
   677 N.E.2d 127 (1997).............................................................................. 65

*King v. Allied Vision, Ltd.,*
   65 F.3d 1051 (2d Cir. 1995).............................................................. 52, 64

*Lynch v. Weicker,*
   37 F.3d 874 (2d Cir. 1994)........................................................................ 10

*Manhattan Indus., Inc. v. Sweater Bee by Banff, Ltd.,*
   885 F. 2d 1 (2d Cir. 1989)........................................................................ 51

*McBean v. City of New York,*
   2007 WL 2947448 (S.D.N.Y. Oct. 5, 2007) ...................................... 94, 96

*McComb v. Jacksonville Paper Co.,*
   336 U.S. 187 (1949).................................................................................. 11

*Monahan v. N.Y.C. Dep't of Corr.,*
   214 F.3d 275 (2d Cir. 2000)...................................................................... 43

*Morgan v. McDonough,*
   429 U.S. 1042 (1977)................................................................................ 64

*Morgan v. McDonough,*
   540 F.2d 527 (1st Cir. 1976)..................................................................... 64

*N.Y.S. Nat'l Org. for Women v. Terry,*
   886 F.2d 1339 (2d Cir. 1989).................................................................... 12

*Nat'l Research Bureau, Inc. v. Kucker,*
   481 F. Supp. 612 (S.D.N.Y. 1979)............................................................ 13

*Newman v. Alabama,*
   466 F. Supp. 628 (M.D. Ala. 1979) .......................................................... 65

*Palmigiano v. Garrahy,*
    448 F. Supp. 659 (D.R.I. 1978)..................................................................... 85

*Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Techs., Inc.,*
    369 F.3d 645 (2d Cir. 2004)......................................................................... 11

*Plata v. Schwarzenegger* ("*Plata II*"),
    603 F.3d 1088 (9th Cir. 2010) ............................................................. passim

*Plata v. Schwarzenegger* (*Plata I*),
    No. C01-1351 TEH, 2005 WL 2932253, (N.D. Cal. Oct. 3, 2005).......................... passim

*Powell v. Ward,*
    487 F. Supp. 917 (S.D.N.Y. 1980)....................................................... 11, 51, 60

*Powell v. Ward,*
    643 F.2d 924 (2d Cir. 1981)......................................................................... 51

*Shaw v. Allen,*
    771 F. Supp. 760 (S.D.W.Va. 1990) ........................................................ 65, 78

*Sheppard v. Phoenix,*
    91-CV-4148, 1998 WL 397846 (S.D.N.Y. July 16, 1998)............................. 85

*Swann v. Charlotte–Mecklenburg Bd. of Educ.,*
    402 U.S. 1 (1971)................................................................................. 63, 88

*Telenor Mobile Commc'ns AS v. Storm LLC,*
    587 F. Supp. 2d 594 (S.D.N.Y. 2008)........................................................ 12

*Turner v. Goolsby,*
    255 F. Supp. 724 (S.D. Ga. 1966).............................................................. 65

*United States ex rel. Anti-Discrimination Ctr. of Metro New York, Inc. v. Westchester Cnty.,*
    *New York*, 689 F. App'x 71 (2d Cir. 2017).................................................. 65

*United States ex rel. Anti-Discrimination Ctr. of Metro New York, Inc. v. Westchester Cnty.,*
    No. 06 CIV. 2860 (DLC), 2016 WL 3004662 (S.D.N.Y. May 24, 2016)....................... 65

*United States v. Hinds Cnty.,*
    No. 3:16-CV-489-CWR-BWR, 2023 WL 1186925 (S.D. Miss. Jan. 30, 2023) .. 65, 66, 79

*United States v. ILA Loc. 1588,*
    77 F. App'x 542 (2d Cir. 2003) ................................................................. 64

*United States v. Loc. 359,*
    55 F.3d 64 (2d Cir. 1995) .......................................................................... 63

*United States v. Miami-Dade Cnty.*,
  Case No. 13-cv-21570 ................................................................................................. 65

*United States v. Visa U.S.A., Inc.*,
  No. 98-cv-7076, 2007 WL 1741885 (S.D.N.Y. June 15, 2007) ....................................... 65

*Wayne County Jail Inmates v. Wayne County Chief Executive Off'r*,
  178 Mich. App. 634 (1989) ............................................................................................ 65

*Zino Davidoff SA v. CVS Corp.*,
  2008 WL 1775410 (S.D.N.Y. Apr. 17, 2008) ............................................................ 50, 51

**Statutes**

18 U.S.C. § 3626 ..................................................................................................... 66, 92

**Rules**

Fed. R. Civ. P. 66 ........................................................................................................ 64

## PRELIMINARY STATEMENT

When our government arrests and confines people in jail, the Constitution imposes a profound duty: to keep them safe. The City of New York has failed in this fundamental obligation for decades. Recognizing this failure, in 2015 this Court entered the Consent Judgment to protect people confined in our City's jails from being brutalized and beaten, in violation of their Eighth and Fourteenth Amendments rights. Over eight years later, and despite the entry of seven additional court orders, Defendants have failed to curtail the violence and brutality. Faced with daily harm and mounting deaths, the Plaintiff Class urgently needs relief. The record makes plain that relief will not come from Defendants. Their delinquency, ineptitude, and resistance to making necessary changes has spanned multiple administrations, numerous commissioners, and far too many years. Accordingly, the Court must appoint a federal receiver to finally bring Defendants into compliance and protect the safety of people in custody.

The record of ongoing violence and chaos—substantiated by the Monitor, the City's own records, and other evidence submitted in support of this motion—is overwhelming. Incarcerated people, largely individuals who await trial and are thus presumed innocent, live in a state of terror and despair in the City jails. Carlton James is one such person. He is now paralyzed from the neck down after correction officers tackled him while he was shackled, slammed his head into a bench, and then tossed him onto a gurney. Joshua Gonzalez is another. Last April, an officer, who was displeased that Mr. Gonzalez paused during an escort to ask when he could shower, took Mr. Gonzalez to the ground face first. Handcuffed, Mr. Gonzalez could not protect his face as he fell, and ultimately lost a fractured tooth. Joseph Myers is a third. DOC knew Mr. Myers, who has asthma, was under medical orders not to be pepper-sprayed because it would be dangerous. In June, staff pepper-sprayed Mr. Myers anyway, despite his compliance with their instructions. Mr. Myers struggled to breathe, and his skin burned for days.

1

Each individual story is horrific and yet they are the tip of the iceberg: on nearly every objective measure, use of force misconduct and the operational and security failures that often cause it are no better now than when the Constitution required entry of the Consent Judgment in the first place. By many measures, they are worse. For far too many people, detention in a City jail is a death sentence: 19 people died in 2022, and nine so far in 2023. Many of these deaths were likely preventable, had DOC complied with this Court's orders regarding basic supervision of people in custody.

Instead of facing this grave humanitarian crisis, Defendants "have normalized the dangerous and chaotic conditions that permeate the jails" with a "diminished sense of urgency" to address the gravity of the problems. FOF ¶¶ 1102, 1172-1173.[1] Defendants' cascading, interconnected failures begin with their failure to comply with the core tenet of the Consent Judgment: implementation of their Use of Force ("UOF") Directive addressing permissible and impermissible uses of force. DOC staff routinely violate the Directive, reducing it to so many words on paper. The persistent record of excessive and unnecessary force in the jails is the predictable result.

Faulty accountability mechanisms allow violations of the Use of Force Directive to remain not only unchallenged, but coddled. Officers face little to no consequence for even the most egregious misconduct, as DOC fails to detect it and thus cannot punish it, signaling tolerance for abusive, unsafe practices. Such tolerance is further conveyed by DOC's decisions to appoint officers who engage in misconduct to elite teams, and to fire the Deputy Commissioner who was designated as the Department's Disciplinary Manager with no clear

---

[1] The following citations are used: Plaintiffs' Proposed Findings of Fact in support of Motion for Contempt and for Application of a Receiver ("FOF"); Exhibits to the Declaration of Mary Lynne Werlwas dated November 17, 2023 ("Ex."). All exhibits cited in this brief are attached to the Werlwas Declaration.

reason for doing so, apparently in concession to a union demand. Meanwhile, the jails'
supervisors are former DOC officers steeped in the same troubling culture as the officers
themselves, and DOC resists the Monitor's advice to hire outsiders who have experience with
other, safer correctional systems.

DOC also perpetuates the pattern of abuse by tolerating practices in its facilities that fuel
violence. DOC's housing units are understaffed, despite its unusually rich staffing ratio, because
officers exploit opportunities to avoid working directly with incarcerated people, with DOC's
tacit permission. Even when staff are on post, they often do not "actually do their jobs," FOF ¶
340, failing to perform even the most basic tasks like touring housing units and properly securing
cell doors to protect incarcerated people. Their conduct goes largely unpunished and uncorrected.
This reflects a culture of not only impunity, but also apathy.

Individually, each of these failures is a clear violation of this Court's orders, warranting
multiple findings of civil contempt. Collectively, they present irrefutable evidence that, unless
this Court takes decisive action, Defendants will not comply with the Consent Judgment. Indeed,
after eight years of working closely with DOC, the Monitor concluded that Defendants "have
repeatedly and consistently demonstrated they are incapable of effectively directing the
multilayered and multifaced reform effort." FOF ¶¶ 1169-1170. Rather than making steady
progress toward compliance, DOC has "lurch[ed] from one hastily developed and/or ill-
conceived plan to another," *id.* ¶ 1054, resulting in "stalled initiatives and regression" that have
"neutralized any real sustained momentum toward reform." *Id.* Whether as a result of ineptitude,
indifference, contempt for the rights of people who are incarcerated, or some combination of
these factors, DOC "is destined to remain in a persistent state of dysfunction" under the current
remedial scheme. *Id.* ¶ 1175.

This is the sixth class action seeking to address the decades-long pattern and practice of excessive and unnecessary force in the City jails. FOF ¶¶ 1040-1047. The pace of Defendants' progress is intolerable, and continuing along the current path of reform will simply not generate the necessary results. *Id.* ¶¶ 1050-1053, 1157-1175. The only option remaining to fix this broken system and protect the Plaintiff Class from severe, ongoing harm is the appointment of a receiver. The failures of the present are the cumulative result of a "deeply entrenched culture of dysfunction that has persisted across decades and many administrations." *Id.* ¶¶ 1159. The Court has issued order after order, and the Monitor has provided extraordinary guidance, all in an effort to change this pattern. But nothing has worked. A receiver answerable directly to the Court—separate from whatever aspects of the City's bureaucratic and political structure have stymied reform—presents the only chance for true change.

Appointing a receiver is an extraordinary step. But the record here is equally extraordinary: in the extent of harm that people in custody face on a daily basis, in the resources that the Court and the Monitor have invested, and in Defendants' persistent refusal to make the changes it has *admitted* are necessary to correct their violations of the Eighth and Fourteenth Amendments. Plaintiffs respectfully request that the Court grant this motion because "without severe action by the Court . . . suffering and loss of life will continue unabated." *Dixon v. Barry*, 967 F. Supp. 535, 550 (D.D.C. 1997).

## SUMMARY OF PROPOSED FINDINGS OF FACT

We refer the Court to the attached Proposed Findings of Fact and evidence cited therein. In summary, eight years after this Court entered a Consent Judgment to remedy a pattern and practice of unnecessary and excessive use of force by DOC, the Plaintiff Class continues to suffer intolerable levels of violence and harm. These many years of oversight by the Court, the

4

Monitor, and Plaintiffs, as well as numerous remedial orders entered in succession, have not diminished the pattern and practice of unconstitutional use of force.

At this moment, ***every indicator of physical harm—use of force, stabbings and slashings, fights, serious injuries, in-custody deaths—is demonstrably worse than 2016.*** FOF ¶¶ 75-77. At the current rate, there will be over 6,500 use of force incidents in 2023, as compared to almost two thousand fewer incidents in 2016. *Id.* ¶¶ 85-88. Judged by an average monthly rate *per capita* to reflect change in population, use of force is still 131% higher this year than in 2016. *Id.* ¶ 87. The percentage of use of force incidents resulting in serious injuries to incarcerated people and staff has doubled since 2016. *Id.* ¶¶ 92-94. The average monthly rate of stabbings/slashings is almost 250% higher than 2016, and fights occur 58% more frequently this year than in 2016. *Id.* ¶¶ 101-104, 112. Self-harm incidents are all too frequent. Tragically, more people have recently died in DOC custody than in over a decade—in 2022 and 2023, 28 people have died. *Id.* ¶¶ 121-123.

DOC's ongoing violation of the Court's orders reflects a complex series of systemic failures, including DOC's failure to implement the Use of Force Directive ("the Directive"). FOF ¶¶ 214-216. Since July 2017, the Monitor has found a continuous pattern and practice of DOC staff using force that is unnecessary and excessive, in a manner that reflects system-wide disregard of the Directive. FOF ¶¶ 215-221. Neither the severity nor the frequency of excessive or unnecessary force has abated since 2016. FOF ¶ 220. In the first five months of 2023, dozens of staff were suspended for use of force misconduct—including for using prohibited techniques like head strikes, chokeholds, kicks, and body slams—underscoring the pervasiveness of such violations even as the low proportion of discipline relative to the Monitor's findings indicates a lack of meaningful accountability. *Id.* ¶ 221. DOC's Investigation Division ("ID") identified well

over 1,000 incidents of excessive, unnecessary, and/or avoidable force in 2022; and 268 such incidents during the first half of 2023. *Id.* ¶ 225, 239. Shocking as these statistics are, they are likely an underestimate, as ID does not consistently or reliably identify all use of force misconduct. *Id.* ¶ 240. The Monitor has consistently found that DOC staff engage in hyper-confrontational behavior, painful escort holds, and a lack of situational awareness—all of which provoke or contribute to unnecessary force.

Moreover, DOC's regular breaches of basic security protocols—including leaving doors unlocked, abandoning posts, failing to tour, and permitting people to congregate in certain areas—create a pervasive, high level of violence and disorder, which in turn leads to more uses of force. FOF ¶¶ 281-284. Of DOC's internal operational audits in 2022 and 2023, approximately two-thirds found staff off post; between 70% and 84% found unsecured doors; between 57% and 81% found issues with staff tours; between a quarter and half found lock-in was unenforced; and between 27% and 35% found incarcerated people in unauthorized areas. *Id.* ¶ 402. Staff must remain on post and follow other basic security protocols in order to detect and prevent the various problems that lead to uses of force. *Id.* ¶¶ 299, 334-339. Conflicts among incarcerated people, frustration over the lack of access to basic services, or attempts at self-harm can escalate to officers using force to intervene. *Id.* ¶¶ 266, 441-443, 455, 459, 624. When officers are not on post and do not ensure that facilities are secure, as DOC's own audits indicate regularly occur, these scenarios arise more often, and officers use more force. *Id.* Incarcerated people also suffer other kinds of harm, including assaults, injuries, and even deaths. *Id.*

Another source of excessive and unnecessary force at DOC is the troubling behavior of emergency response teams. FOF ¶¶ 465-467, 472-492. These teams have long exacerbated tense situations instead of deescalating them. *Id.* ¶¶ 472-492. The First Remedial Order required DOC

to implement a protocol governing the composition and deployment of such teams, but DOC has never complied. *Id.*  ¶¶ 466-469. Emergency teams continue to use excessive and unnecessary force at disproportionate rates, rely on hyper-confrontational tactics, and deploy excessive staff when responding to incidents, resulting in injuries to incarcerated people. *Id.* ¶¶ 472-497. Since 2021, DOC has not adequately revised various Emergency Service Unit ("ESU") policies and continues to staff these teams with officers with alarming use of force histories. *Id.*  ¶¶ 498-515.

Sufficient numbers of skilled staff are critical to tackling the violence and chaos in the jails and preventing the unnecessary and excessive force that all too often result.  FOF ¶¶ 657-658. Facilities need leadership at the Warden and Deputy Warden level that can analyze use of force patterns, as well as Assistant Deputy Wardens ("ADWs") who can adequately supervise line officers and captains. *Id.* ¶¶ 542-546, 598-609, 610-627. The facilities also need a sufficient number of officers on post in housing units to carry out the front-line responsibilities of working with incarcerated people, and a sufficient number of experienced, well-trained, and knowledgeable captains in housing units to supervise them. *Id.* ¶¶ 660-672, 534-546. The First Remedial Order and Action Plan targeted all of these issues by, for example, requiring facility leadership to use available data to identify and implement operational changes to reduce excessive and unnecessary force (which facility leaders have failed to do); and by requiring an increase in the numbers of ADWs and Captains such that they can adequately supervise (which DOC has not accomplished). *Id.* ¶¶ 545-558. The existing supervisor corps is deficient: supervisors contribute to and catalyze uses of force, lack a strong command of the Use of Force Directive, refuse to engage with staff on housing units, and fail to correct deficient staff practice when they observe it. *Id.* ¶¶ 530-539. DOC has exacerbated these deficiencies by promoting staff to supervisory levels even when DOC's internal screening divisions have recommended against

it due to disciplinary histories for use of force and other misconduct. *Id.* ¶¶ 628-647. The Action Plan also contained a series of provisions designed to remedy DOC's dysfunctional staffing practices, and thus ensure that enough officers were actually in housing units supervising incarcerated people. *Id.* ¶¶ 655-659. Despite the Court's orders and its repeated promises otherwise, DOC has not altered its system of allowing certain staff to receive "awarded posts" outside of housing units that tie management's hands to deploy staff effectively, has not increased the number of days actually worked by officers in the facilities each year, and has not made significant steps towards civilianizing positions to free up uniformed staff for supervision of the incarcerated population. *Id.* ¶¶ 660-705.

That staffing and supervision are critical to curbing use of force is highlighted by the Consent Judgment's provisions on 18-year-olds in DOC custody. FOF ¶¶ 878-913. DOC has never complied with the provisions requiring implementation of a Direct Supervision model and consistent assignment of the same staff to the same housing units. *Id.* ¶¶ 878-896. The predictable result is that violence and use of force within RNDC's 18-year-old housing units are exponentially higher than they were in 2016. *Id.* ¶¶ 861-862.

Excessive and unnecessary use of force also persists because DOC has not held staff accountable for misconduct. FOF ¶¶ 706-858. DOC has never achieved substantial compliance with the Consent Judgment's requirement to conduct thorough, timely, and objective investigations of use of force incidents. *Id.* ¶¶ 720-793. The investigations process has been restructured several times, with the creation of entirely new categories of investigations and the appointment of a Disciplinary Manager to provide leadership, but the improvements were not lasting. *Id.* ¶¶ 730-733, 752-761. In January 2022, DOC fired the Disciplinary Manager without a meaningful explanation and, under new leadership, ID's investigations deteriorated to the point

8

where many were incomplete, inadequate, and unreasonable, showing strong indications of improper interference. *Id.* ¶¶ 752-762. The City ignored the Monitor's concerns about this for months and a Deputy Commissioner resigned from his position only on the eve of the Monitor's public revelations about ID's decline. *Id.* ¶¶ 763-765. Investigations remain grossly delayed, and yet DOC still has not assigned sufficient staff or supervisors to ID. *Id.* ¶¶ 781-805. Investigations only rarely lead to meaningful accountability, with DOC imposing formal discipline in only 352 of the 7,228 use of force incidents that occurred in 2022, the lowest number of formal disciplinary charges brought since 2016, even though use of force incidents and related misconduct did not decline over those years. *Id.* ¶ 837.

Moreover, DOC has increasingly obstructed the reform process by failing to cooperate with the Monitor. FOF ¶¶ 934-1039. DOC refuses to provide the Monitor with information, or provides the Monitor with inconsistent, conflicting information. *Id.* ¶¶ 934-941, 971-1028. Despite obligations to consult with or receive the approval of the Monitor before issuing new policies, DOC has unilaterally promulgated policies on use of force, restraints, intake admissions, supervisory tours, and staff promotions without the Monitor's input. *Id.* ¶¶ 960-970. DOC has trained ESU staff and ADWs using curricula that were half-finished and did not address dangerous practices. *Id.* At bottom, the City leadership is unwilling or incapable of undertaking the reforms needed for compliance with the Consent Judgment and remedial orders. *Id.* ¶¶ 1040-1175.

## ARGUMENT

Defendants have not complied with critical provisions of the Consent Judgment and subsequent remedial orders, despite eight years of successive court interventions and the Monitor's extensive guidance. Because Defendants will not comply, the Court must appoint an independent receiver to take the necessary steps to bring the Defendants into compliance.

Receiverships "are recognized equitable tools available to the courts to remedy otherwise uncorrectable violations of the Constitution or laws." *Plata v. Schwarzenegger* ("*Plata II*"), 603 F.3d 1088, 1093-94 (9th Cir. 2010).[2] Courts have appointed receivers in prisons and jails, and in other institutional litigation, where local authorities have failed to comply with court orders to remedy constitutional violations and no other remedies are available. While a contempt finding is not a prerequisite to the appointment of a receiver, the record here overwhelmingly demonstrates that Defendants' persistent failures to comply with the core provisions of the Consent Judgment and remedial orders provide ample basis for multiple findings of contempt, as well as powerful evidence of the necessity of receivership.

This record is grounded in the robust evidence obtained and presented by the Monitor in his reports filed with the Court. It is well established that the Monitor's reports are admissible evidence and can serve as the basis for the Court's factual findings. *See*, *e.g.*, *Juan F. ex. rel. Lynch v. Weicker*, 37 F.3d 874, 879 (2d Cir. 1994) (rejecting argument that "the monitor was not authorized to make findings of fact" and that "the district court erred because it did not make its own independent findings, but instead adopted the monitor's report"); *Harte v. Ocwen Fin. Corp.*, No. 13-CV-5410, 2018 WL 1830811, at *23 (E.D.N.Y. Feb. 8, 2018), *report and recommendation adopted*, 2018 WL 1559766 (E.D.N.Y. Mar. 30, 2018) (Monitor's Reports could be admitted "under the public records exception to hearsay, under the residual exception to hearsay, or as party admissions"). The exceptional detail in the Monitor's reports filed with this Court over the last eight years is supplemented here by additional DOC records—such as internal reviews and audits, investigative findings, and data reflecting admissions of an alarming level of violence, harm, and disorder in the jails—as well as data from external investigative bodies and

---

[2] All legal citations that contain internal quotations or citations have been cleaned up.

the reports of people most directly impacted by the brutality that is part of daily life in the City

jails.

## I.      DEFENDANTS ARE IN CONTEMPT OF THE CONSENT JUDGMENT AND THIS COURT'S SUBSEQUENT ORDERS

A finding of civil contempt for failing to comply with a court order is appropriate if: "(1)

the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of

noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to

comply in a reasonable manner." *Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys.*

*Info. Techs., Inc.*, 369 F.3d 645, 655 (2d Cir. 2004). Because the purpose of civil contempt is to

enforce compliance and remedy the harms caused by non-compliance, it does not require a

finding of bad faith, nor does good faith preclude contempt. *See McComb v. Jacksonville Paper*

*Co.*, 336 U.S. 187, 191 (1949). As this Court held, "the movant need not establish that the

violation of the Court's order was willful." Mem. and Order on Mot. for Contempt, Dkt. 511, at

18 (citing *Paramedics*, 369 F.3d at 655); *see also Powell v. Ward*, 487 F. Supp. 917, 934

(S.D.N.Y. 1980) (Bedford Hills prison superintendent's good faith did not excuse non-

compliance with court order to modify prison disciplinary procedures).

Defendants are in contempt of many critical provisions of the Consent Judgment and the

Court's subsequent orders to redress their non-compliance. These orders go to the heart of the

case: requiring DOC to use force within lawful limits, hold staff accountable for misuse of force,

and remedy the failures in basic security and correctional practice that are causing and

perpetuating the pattern of excessive and unnecessary force. The Court should find Defendants in

contempt of the following provisions:

- Consent Judgment, § IV, ¶ 1: Implement New Use of Force Directive
- Consent Judgment, § VII, ¶ 1: Thorough, Timely, Objective Investigations
- Consent Judgment, § VII, ¶ 9(a): Timeliness of Full ID Investigations

- Consent Judgment, § VII, ¶ 11: ID Staffing
- Consent Judgment, § VIII, ¶ 1: Appropriate and Meaningful Discipline
- Second Remedial Order, ¶1(i)(a): Interim Security Plan
- Action Plan, § A, ¶1(d): Improved Routine Tours
- Action Plan, § D, ¶ 2(a), (d), (e), and (f): Improved Security Initiatives
- First Remedial Order, § A, ¶ 2: Facility Leadership Responsibilities
- First Remedial Order, § A, ¶ 4: Supervision of Captains
- Action Plan, § C, ¶ 3(ii), (iii): Increased Assignment and Improved Supervision of Captains
- Action Plan, § C, ¶ 3(v), (vi), (vii): Improved and Maximized Deployment of Staff
- First Remedial Order, § A, ¶ 6: Facility Emergency Response Teams
- Consent Judgment § XV, ¶ 1: Prevent Fights/Assaults (Safety and Supervision of Inmates Under the Age of 19) – *18-year-olds*
- Consent Judgment § XV, ¶ 12: Direct Supervision (Safety and Supervision of Inmates Under the Age of 19) – *18-year-olds*
- Consent Judgment § XV, ¶ 17: Consistent Assignment of Staff (Safety and Supervision of Inmates Under the Age of 19) – *18-year-olds*
- First Remedial Order, § D, ¶ 1: Consistent Staff Assignment and Leadership
- First Remedial Order, § D, ¶ 3; 3(i): Reinforcement of Direct Supervision

Defendants' contempt for each of these court orders taken individually is an affront to judicial authority; collectively, they have perpetuated dangerous and demonstrably fatal conditions and demonstrate Defendants' incapacity or unwillingness to comply.

### A.      This Court's Orders are Clear and Unambiguous.

A court order is clear and unambiguous when it is "'specific and definite enough to apprise those within its scope of the conduct that is being proscribed' or required." *Telenor Mobile Commc'ns AS v. Storm LLC*, 587 F. Supp. 2d 594, 615 (S.D.N.Y. 2008) (quoting *N.Y.S. Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1352 (2d Cir. 1989)). There can be no reasonable dispute as to the clarity of the court orders at issue here. The language of the orders is clear on its face and all orders were entered on consent, after Defendants actively engaged in negotiating and drafting their terms. Moreover, through years of remedial proceedings and detailed Monitor reports evaluating Defendants' obligations, Defendants never suggested to the Court that additional clarity was needed. *See* FOF ¶¶ 5-7, 20-27, 35-44, 47-51, 60-65; *see also Nat'l*

*Research Bureau, Inc. v. Kucker*, 481 F. Supp. 612, 615 (S.D.N.Y. 1979) ("if an order is ambiguous . . . then a clarification should be sought before acts are performed in the ambiguous area").

> **B.      The Record Overwhelmingly Demonstrates that Defendants Have Not Complied With Core Provisions of the Court's Orders.**

The record demonstrates non-compliance for each provision on which contempt is sought.

> **1.      Defendants Have Not Implemented the Use of Force Directive**

The Consent Judgment's central requirement is that "the Department shall develop, adopt, and *implement* a new comprehensive use of force policy with particular emphasis on permissible and impermissible uses of force." Dkt. 249, § IV, ¶ 1 (emphasis added). This "seminal provision of the *Nunez* Court Orders" lies at the very heart of the case. FOF ¶ 216. While Defendants developed and adopted the Use of Force Directive in 2017, they have not "implemented" it, which under the terms of the Consent Judgment requires "consistently following, applying, or using" the Directive. Dkt. 249, § III(17). The Monitor has found Defendants non-compliant with the requirement to implement the Directive nine consecutive times, every time he has issued such a rating since the Directive was adopted. FOF ¶ 218.

The Directive sets forth comprehensive guidance on when and how staff may use force. *See* Ex. 1 (UOF Directive). It includes, *inter alia:* a strict ban on excessive or unnecessary force ("the use of excessive and/or unnecessary force is expressly prohibited," and the Department "has a zero tolerance policy for excessive and unnecessary force"); a requirement to avoid force and use alternate means to defuse conflict when possible ("staff shall use practical techniques to prevent use of force situations and/or resolve them without physical force"); and a "strict prohibit[ion]" against highly dangerous use of force techniques such as head strikes and neck

restraints, unless a person is in imminent danger of serious bodily injury or death and lesser means are impractical or ineffective. *Id.* ¶ 217, 244. Defendants are violating all of these provisions, and more.

The DOC Investigation Division ("ID") investigates every reported use of force. *Id.* ¶¶ 708-711. ID investigations—which likely undercount misconduct, *id.* ¶ 240—identified more than 1,600 incidents of excessive, unnecessary, and/or avoidable force in 2021; more than 1,100 such incidents in 2022; and 421 such incidents during the first half of 2023. *Id.* ¶ 239; *see also id.* ¶¶ 222-226, 231-234. Neither the frequency nor the seriousness of the excessive use of force within DOC has abated since 2016, *id.* ¶ 220, and in 2023, the proportion of use of force incidents involving excessive and/or unnecessary use of force was the same, if not higher, than the proportion observed when the Consent Judgment went into effect. *Id.* ¶ 219. DOC staff also continue to use prohibited force techniques at an extremely high rate: the Monitor identified 587 incidents involving head strikes between January 2022 and May 2023. *Id.* ¶¶ 246-251. In October 2023, the Monitor confirmed that uses of such prohibited techniques "continue to occur with alarming frequency." *Id.* ¶ 246.

There is also evidence of numerous other violations of the Directive, including officers using unnecessary neck restraints or chokeholds, *id.* ¶¶ 251-252, 273, 274, 276-277; using punitive or retaliatory force designed to inflict pain on incarcerated people, *id*. ¶¶ 253-255; using unnecessary force against incarcerated people in restraints, *id*. ¶¶ 268, 272, 277, 280; facilitating or instigating violence between incarcerated people, *id*. ¶¶ 256, 258; using racial slurs, *id*. ¶¶ 256-257; using painful escort holds, *id*. ¶¶ 361-371; and gratuitous use of OC spray, *id*. ¶¶ 267, 278, 492. Some of these incidents are described below.

Each of these thousands of instances of excessive or unnecessary force represents an incarcerated person who was subjected to violence, pain, or danger at the hands of DOC. A fraction of class members' experiences from 2023 are shared below. These events are described in greater detail in the Proposed Findings of Fact and the class members' declarations.

- In May 2023, an officer grabbed a class member, pulled his legs out from under him so that he fell down face-first, and then repeatedly punched his head while he was on the ground. Throughout the incident the officer used provocative and unprofessional language. The officer's use of force report misrepresented his actions. *Id.* ¶ 278.

- In June 2023 in the new admissions intake area, an officer punched James Bradley in the face twice while he was in handcuffs. Mr. Bradley had been waiting for a long time on a bus to enter the jail, asked several times to have his handcuffs removed, and then extended his cuffed hands toward the officer who then punched him. Mr. Bradley's jaw, head, and ear were injured. Declaration of James Bradley dated November 9, 2023, Ex. 88; FOF ¶ 268.

- In June 2023, an officer threw multiple closed fist strikes at the head and torso of a class member who was in full restraints in the barbershop—including front cuffs with mitts and leg shackles. *Id.* ¶ 272.

- In March 2023, officers put a class member wearing front cuffs and leg shackles in a chokehold after he refused to enter a search pen. The officers forced the class member to the ground and hit his head while he was on the ground, despite being told to stop repeatedly. *Id.* ¶ 270.

- In April 2023, at the Bellevue Hospital ward, an officer took a class member to the ground and placed him restraints, after which a second officer put his hand on the class member's neck, causing him to make a choking sound. Video of the incident also recorded an additional "smacking sound" as the officer moved his hand. *Id.* ¶ 276.

- In May 2023, an officer grabbed the neck of a class member who was in restraints, with the officer's hand in a c-shape as she grabbed the class member's neck. The officer submitted a false and inaccurate report about this use of force. *Id.* ¶ 277.

- In June 2023, an officer punched a class member in the face, causing a swollen and painful bruise to his right eye. The officer had pushed the class member in the chest when the class member had not exited a search area when asked; when the class member pushed the officer back, the officer engaged in the above-described head strike. *Id.* ¶ 279.

- In March 2023, an officer approached a class member and grabbed the individual by the neck, though the class member's hands were in cuffs shackled to his waist chain. *Id.* ¶ 274.

- In June 2023, as discussed above, Joseph Myers was in a recreation yard when an officer ordered him and other incarcerated people to stand with their hands on the wall. Declaration of Joseph Myers dated November 9, 2023, Ex. 87; FOF ¶ 267. Although Mr. Myers and the others complied and posed no threat, a captain nonetheless sprayed them with a spray akin to pepper spray though Mr. Myers, an asthmatic, was under doctor's orders not to be pepper sprayed. Mr. Myers had

16

difficulty breathing and felt intense burning all over his body, which spread every time he had to touch a new part of his body, including when he needed to use the restroom. The burning pain continued despite Mr. Myers' efforts to wash all the spray off.

The Monitors' reports have detailed countless more such incidents and demonstrate widespread, persistent violations of the Use of Force Directive that amount to a failure to comply with the requirement to "implement" that Directive, reducing it to impotent words on paper.

> **2.    Defendants Do Not Conduct Thorough, Timely, and Objective Use of Force Investigations or Hold Staff Accountable**

Holding correctional staff accountable when they misuse force is key to reducing excessive force in the jails. *Id.* ¶ 706. Accountability requires DOC both to effectively detect misconduct by thoroughly investigating uses of force, and to impose appropriate discipline when misconduct is found. *Id.* ¶¶ 706-07. For that reason, the Consent Judgment and remedial orders contain a number of provisions related to investigations and discipline. *Id.* ¶¶ 716-19. DOC has not complied with several of these provisions, including the most fundamental: to conduct timely, objective, and thorough investigations and to hold staff accountable.

> **a.    Defendants Do Not Conduct Thorough and Objective Use of Force Investigations**

Section VII, Paragraph 1 of the Consent Judgment requires that "the Department shall conduct thorough, timely, and objective investigations of all Use of Force Incidents to determine whether Staff engaged in the excessive or unnecessary Use of Force or otherwise failed to comply" with the Use of Force Directive. Dkt. 249. DOC has never achieved substantial compliance with this provision according to the Monitor's ratings. FOF ¶ 720. Rather, the Monitor found Defendants non-compliant five consecutive times from 2017 through 2019 and then, after a few "partial compliance" ratings, found that Defendants had erased those gains and

17

downgraded them to non-compliance once again in his most recent rating. *Id.* ¶¶ 726-32. ID conducts two types of use of force investigations: limited "intake investigations" for every reported UOF and more in-depth "Full ID" investigations, which are required for incidents that are particularly concerning. *Id.* ¶¶ 235, 710-11. The Monitor has long raised concerns about the quality of the investigations conducted by ID, noting as early as 2016 that they lacked critical analysis. *Id.* ¶ 724. Defendants were rated non-compliant with the requirement to conduct thorough, timely, and objective investigations from July 2017 through December 2019 due to their failure to neutrally assess evidence and their tendency to ignore evidence (including video) contrary to investigators' ultimate findings. *Id.* ¶¶ 727-30. In 2020, after the Court ordered DOC to expeditiously complete its significant backlog of outstanding investigations, the Monitor concluded that there was some improvement. *Id.* ¶¶ 731-33; First Remedial Order, Dkt. 350, § B(1)-(2). In recognition of DOC's progress in reducing the backlog, the Monitor raised the rating for this provision to "partial compliance," but also made clear that "more work [was] needed" to reach substantial compliance, noting the mixed quality of Full ID investigations conducted for the most serious incidents. *Id.* ¶¶ 732-34.

Unfortunately, this minimal progress was promptly undone. Beginning in 2022, there was a dramatic regression in the quality of investigations, resulting in hundreds more investigations being closed without disciplinary action as compared to previous Monitoring Periods. *Id.* ¶¶ 737-41. This substantial reduction in identifying misconduct and referring uniformed staff for appropriate discipline was not due to any decline in the amount of misconduct occurring. Instead, ID staff were being improperly influenced to compromise the quality of investigations. *Id.* ¶¶ 752-55.

The Monitor found this decline of investigation quality "alarming," and, based on his review of hundreds of investigation files, reported that "a substandard approach was often taken in assessing evidence such that the ultimate quality of the investigations was compromised." *Id.* ¶ 747. ID's intake investigations regularly "ignored objective evidence of misconduct" and improperly closed cases, and in the infrequent instances where cases were referred for Full ID investigations, those investigations "were **often** incomplete, inadequate, and unreasonable." *Id.* ¶¶ 748-749 (emphasis in original). Full ID investigations failed to include necessary interviews with staff or persons in custody, disregarded objective evidence of misconduct, discredited allegations from people in custody without evidence, and recommended insufficient corrective action. *Id.* ¶ 750.

The Monitor determined that DOC had "eras[ed] its prior progress," and moved DOC from a "partial compliance" to a "non-compliance" rating in the Fifteenth Monitoring Period (July-December 2022). *Id.* ¶¶ 738-40. The situation has not meaningfully improved since. As the Monitor explained just last week: "For the past two years, at each turn, the Department's ability to properly identify staff misconduct has degraded and remains on a downward trajectory." *Id.* ¶ 775.

ID's most recent deterioration took place upon the appointment in May 2022 of a new Deputy Commissioner, Manuel Hernandez. The Monitor has suggested that, under his leadership, "staff [were] influenced or prompted, either overtly or implicitly to adopt a more lenient approach when assessing cases and to change their practice in ways that compromised the quality of the investigations." *Id.* ¶¶ 752-53, 762. Deputy Commissioner Hernandez was appointed after Defendants fired Disciplinary Manager and former Deputy Commissioner Sarena Townsend, whose work had been lauded by the Monitor but who was the subject of extensive

union animus. *Id.* ¶¶ 756-61, 1147-56. The Monitor raised concerns to the Commissioner about the decline in the quality of ID's investigations, but DOC did not respond at all for two months, and then provided no meaningful response. *Id.* ¶ 764. Ultimately, Mr. Hernandez resigned on the eve of the Monitor's public reporting on this topic, but the problems created during his leadership have not abated. *Id.* ¶ 765.

Indeed, a disturbing pattern appears to be emerging. In September 2023, the Commissioner removed and demoted the Associate Commissioner of ID, a seasoned employee the Monitor praised for his neutral and independent assessments of use of force incidents. *Id.* ¶¶ 770-72. Indeed, this individual was "instrumental" in what the Monitor has called the "attempt at course correction" after Mr. Hernandez's resignation. *Id.* ¶ 770. The Commissioner refused to provide the Monitor a substantive reason for the demotion. This raised "grave concerns" for the Monitor about Defendants' efforts to revitalize ID, reflecting the Department's apparent inability to free itself of the same bureaucratic tendencies that for many decades have stymied its ability to develop meaningful systems of accountability for misconduct. *Id.* ¶ 773.

### b. Defendants Do Not Conduct Timely Use of Force Investigations

The Consent Judgment requires investigations to be "timely;" more specifically it requires Full ID investigations conducted after October 1, 2018 to be completed within 120 days from the referral date. Consent Judgment § VII, ¶ 9(a); Proposed Findings of Fact, ¶ 651. Given that Full ID investigations address the most serious use of force incidents, including those that result in serious injuries or involve head strikes, it is vital these investigations be conducted timely to ensure prompt accountability if there is a finding of misconduct. FOF ¶¶ 711, 782-83. DOC's failure to act swiftly to investigate and impose appropriate discipline has created a culture

of impunity, as misconduct goes unredressed, and as officers who escalate incidents, misuse force, and injure incarcerated people face few or no apparent consequences. *Id.* ¶ 824.

The record of non-compliance is stark. The Monitor has issued eight consecutive findings of non-compliance with the deadlines laid out in Consent Judgment § VII, ¶ 9(a), spanning from 2018 through the Monitor's most recent ratings for the end of 2022. FOF ¶ 781. For Full ID investigations closed between January 2022 and July 17, 2023, only 8% were closed within the mandatory 120-day period, with 92% being closed late; indeed, a full 48% of the investigations—or 879 investigations—took more than *a year* to close, more than *three times* the required 120-day period. *Id.* ¶¶ 791-93. On top of that, as of October 16, 2023, 571 Full ID investigations have been pending for more than 120 days. *Id.* ¶ 793.

### c.      Defendants Failed to Hire Sufficient Investigatory Staff

ID's long delays in completing investigations are caused at least in part by the City's failure to staff the division sufficiently. *Id.* ¶¶ 794-805. The Consent Judgment requires Defendants to "hire a sufficient number of additional qualified ID investigators . . . so that they can complete Full ID Investigations in a manner consistent with this Agreement." Consent Judgment § VII, ¶ 11. The number of staff is trending in the wrong direction, with the number of investigators assigned to conduct Full ID investigations cut from 82 to only 23 between February 2020 and October 2023. FOF ¶ 797. The number of ID supervisors working on Full ID investigations dropped from 15 to 5 in the same time period. *Id.*

In July 2023, the Monitor reported that ID needed at least 85 investigators and 21 supervisors to effectively conduct use of force investigations (both intake investigations and Full ID investigations), but DOC did not commit to meet those specific targets by a specific date. *Id.* ¶¶ 795, 804. The Court was therefore forced to enter yet another order in August 2023 directing ID to maintain at least 85 investigators and 21 supervisors by the end of the year. *Id.* ¶ 805. As of

21

October 2023, Defendants had only 67 such investigators and 15 such supervisors. *Id.* ¶ 798. In order to comply with the Court's deadline, ID would need to add a net of 18 investigators and 6 supervisors in approximately two months. Defendants have explained to the Monitor that training and hiring of additional ID staff is in progress, but the results, especially given foreseeable attrition, remain unknown. *Id.* ¶¶ 799-802.

### d.     Defendants Do Not Impose Meaningful Discipline

The Consent Judgment requires Defendants to "take all necessary steps to impose appropriate and meaningful discipline, up to and including termination, for any Staff Member who violates Department policies, procedures, rules, and directives relating to the Use of Force[.]" Consent Judgment § VIII, ¶ 1. Defendants have never achieved substantial compliance, and the Monitor concluded that they were non-compliant continuously from 2017 through 2021, FOF ¶¶ 807, 812-26, before granting a "partial compliance" rating for the first time in 2022 while cautioning that "much more work remains." *Id.* ¶¶ 827-41. The Monitor has not provided a formal rating since then, but has found that "overall accountability for misconduct . . . demonstrably suffered" after June 2022, and there had been a "reduction in the level of the Department's imposition of meaningful and timely accountability for misconduct" during that period. *Id.* ¶¶ 806-07.

As early as 2017, during the Fourth Monitoring Period, the Monitor concluded that the Department did not impose discipline or corrective action nearly often enough compared to the volume of misconduct taking place. *Id.* ¶ 813. Approximately six years later, the Department is in the same position: the decline in ID's ability to detect misconduct over the last two years has resulted in a failure to hold staff accountable. *Id.* ¶¶ 855-57. Defendants brought formal disciplinary charges for only 352 of the 7,228 use of force incidents that occurred in 2022, the lowest number of disciplinary charges brought since 2016. *Id.* ¶ 837. Thus far in 2023, the

situation has not improved, with formal disciplinary charges brought for only 132 out of 3,313

use of force incidents between January and June 2023. *Id*. As the Monitor has explained, these

low numbers of charges are "a signal of continuing dysfunction," given his findings that "use of

force related misconduct did not itself decline." *Id.* ¶ 836.

The extremely slow speed at which formal discipline is imposed also undermines its

effectiveness. The Monitor has repeatedly made clear that timeliness is a critical component of

meaningful accountability. *Id.* ¶ 824. But the Department has long failed to impose formal

discipline close in time to the misconduct it seeks to redress. *Id.* ¶¶ 815-17, 819, 821-23, 825-26,

828. While the Department has made some progress on this front, it is still a significant problem,

with 275 formal disciplinary cases still pending more than a year since the incident as of

December 2022. *Id.* ¶ 831. Defendants' non-compliance is further highlighted by the striking

inadequacy of command discipline, an informal type of discipline adjudicated by the

Department's own facility leaders (rather than a more neutral entity as is the case with formal

discipline). *Id.* ¶¶ 842, 846. Unlike formal discipline, command discipline is expunged from

one's personnel records after only one year. *Id.* ¶ 1145. While formal discipline can result in

sanctions up to and including termination of a staff member, the maximum sanction for a

command discipline is only the loss of 10 vacation or compensatory days. *Id.* ¶ 845. Although

command discipline is generally reserved for relatively minor violations, and previously could

not be imposed for misuse of force, DOC recently changed this to permit command discipline in

lieu of formal discipline for excessive and unnecessary uses of force under certain circumstances.

*Id.* ¶ 844. As a result, command discipline has been imposed recently where such lenience is

questionable at best, such as a March 22, 2023 incident in which an officer received a command

discipline for excessive force and using a prohibited neck hold. *Id.* ¶ 274 (UOF 1463/23); *see also id.* ¶ 455 (UOF 2883/23).

Moreover, DOC frequently bungles command discipline cases, regularly dismissing them not because of their merits, but due to processing failures. *Id.* ¶¶ 846-48. Indeed, from July through December 2022, a full one-fourth of command disciplinary cases were dismissed due to such administrative issues. *Id.* ¶ 848. Facility leaders also overuse the most lenient sanctions when adjudicating command disciplines, often defaulting to a reprimand or corrective interview rather than the revocation of any actual vacation or compensatory days. *Id.* ¶¶ 849-51.

### 3.    Defendants Have Not Complied with Court Orders to Correct Failures in Security and Basic Correctional Practice

The Second Remedial Order and the Action Plan require Defendants to redress failures in security and basic correctional practice that have created a violent, chaotic environment that leads to excessive and unnecessary uses of force and render DOC non-compliant with the Use of Force Directive. FOF ¶¶ 281-283; Second Remedial Order, ¶1(i)(a), and Action Plan, §§ A, ¶1(d); D, ¶¶ 2(a), (d), (e), and (f). Defendants have not complied with these provisions.

Although the Monitor has not provided compliance ratings for specific provisions of the Second Remedial Order or the Action Plan, in July and November 2023, the Monitor found that Defendants had not made substantial and demonstrable progress in implementing the Action Plan. *Id.* ¶ 310. As the Monitor concluded in November 2023, DOC's passivity is an "alarming failure to recognize staff's poor security practices for what they are: a tragic failure to protect people in custody from harm." *Id*.

### a.    Failing to Implement the Interim Security Plan

In September 2021, after years of security failures escalated into "nothing short of an emergency posing an immediate threat to the safety and well-being of Inmates and Staff"

(Second Remedial Order, at 1; FOF ¶ 31), the Court ordered DOC to "*immediately* address the current lapses in security management" by, *inter alia,* developing and implementing by October 11, 2021 an "Interim Security Plan." The Interim Security Plan was required to address, "in detail," security breaches including: "unsecured doors, abandonment of a post, key control, post orders, escorted movement with restraints[...], control of undue congregation of detainees around secure ingress/egress doors, proper management of vestibules, and properly securing officer keys and OC spray." Second Remedial Order, ¶1(i)(a) (emphasis supplied); *see id.* ¶ 298.

Despite the urgent need for relief and the deadline, DOC never genuinely implemented an Interim Security Plan. Though DOC appears to have *developed* agency-wide security plans in late 2021, it failed to implement them—and then subsequently and unilaterally "abandoned" them.[3] *Id.* ¶ 321. In March 2022, the Monitor found that DOC's implementation of the Interim Security Plan was "sporadic and of such poor quality that unsafe staff practices remain[ed] rampant." *Id.* ¶ 322. Whatever the changes made on paper through new policies and materials (which themselves reinforced poor practices), supervisors often did not follow them. *Id.* The Monitor made the same findings in October 2022, April 2023, June 2023, July 2023, and October 2023. *Id.* ¶¶ 311, 327. The Monitor detailed that most DOC facilities are unable to conduct required lock-in[4] and DOC has failed to correct staff's "apathetic approach to basic security practices [and] failure[s] to intervene," and there are "too-frequent occurrences where staff cede control of a housing unit." *Id.* ¶¶ 317, 328. Indeed, DOC's failures to keep staff on

---

[3] Defendants have recently claimed that the RNDC and GRVC Violence Reduction Plans are equivalent to the Interim Security Plan the Court ordered in 2021. FOF ¶ 325. This is meritless, as the Action Plan makes clear these were completely different obligations with different scopes. *Compare* Action Plan, §§ A, *with* ¶¶ 1(a-b); D, ¶ 2(a). Moreover, the GRVC and RNDC plans simply did not work. FOF ¶¶ 323-325, 117-119. Any initial "positive impact has eroded and both facilities are again mired in high rates of violence and disorder," and "the safety of both facilities has significantly worsened," and the plans "were ultimately abandoned with seemingly little attention to which parts were effective and why." FOF ¶ 117.

[4] As an illustration, at least fifteen incidents involving uses of force, violence, and self-harm occurred after lock-in during *one week* in September 2023. FOF ¶ 329.

post were so profound that the Court again ordered Defendants to address that issue on August 10, 2023. *Id.* ¶¶ 71-72. In November 2023, the Monitor again found there remain "pervasive and rampant security and operational deficiencies in staff practice and the corresponding harm that flows from them" which DOC has been "unable to alter . . . despite repeated recommendations by the Monitor and multiple Court Orders." *Id.* ¶ 327.

Defendants' own analyses from the Nunez Compliance Unit ("NCU")[5] audits and the facility-level Rapid Reviews consistently show unremitting failures to follow basic security protocols. The internal audits conducted by NCU in 2021-2023 starkly reveal ongoing, concurrent security lapses in the housing units. *Id.* ¶¶ 345, 402, 404-432, ████. That facility leaders received the results of these audits and failed, over a period of two years, to correct these basic security breaches represents a serious failure to comply. *Id.* ¶¶ 580, 582.

Specifically, of the 31 NCU audits conducted from January to October 2023, 71% found staff off-post, 84% found unsecured doors, 26% found lock-in was not enforced, and 35% found crowding in unauthorized areas. *Id.* ¶ 402. The August, September, and October 2023 NCU audits show ongoing violations of basic security protocols such as unsecured doors, visible obstructions to locking mechanisms, individuals openly smoking, lock-in violations, officers off-post, and touring failures from both supervisors and line staff. *Id.* ¶¶ 403, 429-431. For example, in an April 2023 audit conducted of an EMTC housing unit—nearly a year after the Action Plan was ordered—NCU found that the "area was unmanned" for one shift, and that during lock-in on the next shift, the officer was observed "constantly leaving the floor." *Id.* ¶ 423. A comparison between NCU audits of two different facilities in December 2021/January 2022 and twenty

---

[5] The Nunez Compliance Unit ("NCU") is a unit within DOC that, among other duties, "develop[s] and analyze[s] data to show the nature and extent of various operational issues that contribute to the interrelated problems of violence and excessive and unnecessary uses of force." FOF ¶ 400.

months later in August/September 2023, reveals "little to no improvement in security practices." *Id.* ¶ 312; *see also* FOF ¶¶ 345, 402 (96 NCU audits in 2022 demonstrating rampant security breaches).

The facility-level Rapid Reviews reinforce that security lapses are widespread. FOF ¶¶ 224-230. In 2022 and 2023, nearly half of Rapid Reviews of use of force incidents revealed staff conduct that violated the basic protocols that should have been addressed by the Interim Security Plan, such as unsecured doors and improper restraints. *Id.* ¶¶ 227, 230.[6]

The consequences of DOC's failure to implement the October 2021 Interim Security Plan are severe. The Monitor has described the "very high incidence of force associated with security lapses, i.e. avoidable incidents of force," and "both the sheer number of incidents and the frequency of use of force violations" associated with those lapses. *Id.* ¶ 282. For example:

- In a disturbing number of use of force incidents and even deaths, staff are off-post, *id.* ¶¶ 334-336, yet are rarely held accountable. *Id.* ¶ 339 (noting from January 2022 to May 2023—nearly a year and a half—only *two staff members* were suspended for abandoning posts).[7]

- Staff's failure to secure doors has led to unnecessary takedowns, chemical agent deployment, serious injuries such as paralysis or post-concussive syndrome, and sexual assault. *Id.* ¶¶ 260; 443; 444; 625.

---

[6] This is likely an underestimate of how often staff fail to follow security protocols since Rapid Reviews do not consistently and reliably identify misconduct. FOF ¶ 561.

[7] As of November 2023, DOC has not even devised a centralized way to track staff off-post. DOC merely issued a teletype and said NCU audits will "focus" on the issue—but those audits have identified this pervasive problem since 2021 and have "not effectuated any appreciable change in practice." FOF ¶ 337. The assertion that DOC will rely on NCU audits as part of their "new" October 2023 plan is all the more perplexing given that they are on pace to conduct fewer audits in 2023 (31 as of October) than they did in 2022 (96 for the year). FOF ¶ 345.

- Continued mismanagement of vestibules—locations which have historically been among the most common for uses of force—has in some cases resulted in serious injury. A May 2023 disturbance illustrates the danger: a large fight between people barricaded behind a vestibule gate and those on the other side resulted in serious puncture wounds and uses of force. *Id.* ¶¶ 386-394; ¶ 443.

In sum, and despite multiple years of successive court orders, DOC "has yet to develop and fully implement and sustain a coherent strategy for improving staffs' security practices [which] contributes significantly to the unabated level of violence in the jails." *Id.* ¶ 327. DOC's latest security plan—which the Court ordered in October 2023 due to "unacceptable levels of harm" in the jails—represents more of the same demonstrably ineffective response to this record of clear abdication of basic correctional responsibility. *Infra* I(C)(1); *id.* ¶ 73.

### b.    Failing to Conduct Routine Tours

The Action Plan requires staff to "conduct routine tours, including, but not limited to, tours of the housing units every 30 minutes," to "immediately institute improved practices to ensure that routine touring is occurring, including the use of the 'tour' wand," and for the Office of the Commissioner to audit the electronic touring records. Action Plan, § A, ¶1(d). The record of non-compliance is overwhelming: captains and correction officers do not do the mandated tours, and leadership does not adequately enforce compliance.

Facility leaders report to the Monitor that routine tours of housing units are not occurring as they should and NCU audits from 2022 and 2023 confirm these failures. *Id.* ¶¶ 340, 345. NCU conducted five audits in 2021, and all revealed failures to adequately conduct required tours of housing areas. *Id.* ¶ 345. Of the 96 NCU audits conducted in 2022, 57% found issues with staff tours. *Id.* Of the 31 NCU audits conducted in January to October 2023, *a shocking 81%* revealed failures to adequately conduct required tours of housing areas. *Id*. In total, of the

132 reports NCU has generated since December 2021, **85 of them (64%)** have found problems with staff tours. *Id*.

The Action Plan specifically addressed tour wands because they were a centerpiece of DOC's response to touring failures. But DOC's roll out of tour wands has been ineffective: too often staff do not have the requisite equipment and do not use them, and leadership seemed unaware of this problem until the Monitor told them so. *Id.* ¶¶ 351-360. More fundamentally, however, tour wands, while useful, are "a tool to verify whether the required tours are occurring, but they do not and cannot assess whether tours are of adequate quality." *Id.* ¶ 348. As the Monitor found in October 2023, "even when tours occur, they are often perfunctory" and since staff fail to remove obstructions on cell windows and doors, it is "impossible for staff to visually confirm the well-being of individuals, which renders the tour pointless." *Id.* ¶ 343. NCU audits too have "repeatedly revealed that the tours are not particularly meaningful." *Id.* ¶ 345. For example, in a May 2023 audit at RNDC, NCU found that though staff used tour wands, staff failed to actually look inside of the cells in 75% of officer tours and 45% of supervisor tours. *Id.* ¶ 425. Two separate NCU audits in July 2023 of different housing units in RNDC revealed the same problem. *Id.* ¶¶ 427-428. Staff also misrepresent that they have conducted tours, for instance entering "no issues noted" in a logbook when they have not toured the area. *Id.* ¶ 341.

While failures to tour increase the risk of violence and harm broadly, the impact is most stark when people die. In thirteen of the nineteen cases where people died in 2022, correction officers did not tour or properly supervise the housing unit. *Id.* ¶ 171. The same is true in seven of the nine deaths in 2023. *Id.* ¶¶ 126-168, 213. When Gilberto Garcia died on October 31, 2022, the assigned officer did not look inside the cell while touring, as the BOC reported and as Gilberto's brother—who was housed in the neighboring cell and had to watch his brother die—

confirms. *See* Declaration of Gilson Garcia dated November 9, 2023, Ex. 90. DOC has been forced to suspend numerous staff for these failures.  *Id.* ¶ 213.

Leadership have failed to hold staff accountable for their violations of the applicable touring and supervision policies. Failures to tour are pervasive across facilities, shifts, and ranks. *Id.* ¶ 402. Yet from January 2022 to July 2023, only 15 staff were recommended for corrective action via Rapid Reviews for touring failures; 11 staff were charged with formal discipline for failures to tour in connection with use of force incidents; and 8 staff were suspended for failures to tour in conjunction with a death in custody. *Id.* ¶ 360. "Given the frequency with which these deficiencies are observed, and the harm that flows from them, the number of corrective measures is not commensurate with the number of violations observed." *Id.* ¶ 359.

Finally, DOC has not complied with the specific order that the Office of the Commissioner audit the tour wand data.[8] As of November 2023, the Monitor could not verify the veracity of DOC's claim that the Commissioner's Office had indeed audited the data as reported. *Id.* ¶ 354. While the Commissioner's Office unilaterally delegated the audits to the office of the Deputy Commissioner of Facility Operations earlier this year, the Deputy Commissioner's office has not conducted those audits. *Id.* ¶ 353.

### c.    Failing to Improve Escort Practices, Searches, and Contraband Detection and Recovery

The Action Plan requires DOC to "implement improved security practices and procedures," including "improved procedures on how searches are conducted," "enhanced efforts to identify and recover weapons and other contraband," and "improved escort techniques to

---

[8] DOC also fails to use its own data regarding tours. In July 2023, DOC reported that it was still devising a method to analyze tour wand data to ensure staff compliance, and still had not done so by November 2023. FOF ¶ 354.

eliminate the unnecessary use of painful escort holds." Action Plan, § D, ¶ 2(d), D, ¶ 2(e), D, ¶ 2(f). The record is clear that Defendants have failed to comply with each requirement.

*Improper and Painful Escort Practices*. For too long, too often, and for no justifiable reason, DOC staff have used painful escort techniques following a use of force, like bending a person's wrist or overextending their shoulder. FOF ¶ 287, 289. These techniques are ineffective, cause unnecessary pain, and are often used as a basis to justify additional force by provoking an otherwise compliant person to resist the painful escort hold. *Id*. Unnecessarily painful escort techniques are explicitly prohibited under the Use of Force Directive. *Id.* ¶ 290 (citing Ex. 1).

The fact that escorts so frequently devolve to a use of force—DOC records from two weeks in June 2023 revealed that 37% of all uses of force in that period occurred during an escort—indicates that the staff escort practices require serious correction to prevent avoidable uses of force. *Id.* ¶¶ 363-364. For example, in August 2023, when an individual twisted and turned in response to an officer's "painful bent wrist" escort technique, the officer "suddenly and violently threw the person in custody . . . into a railing, hitting his head with full force into the railing . . . [then] grabbed the restrained individual by the neck and threw him to the floor." *Id.* ¶ 273.

Yet Defendants have made "no substantive efforts . . . to change staff practice": no improvement in escort techniques; no reduction in the pattern of painful escort holds; and no improvement in identifying painful escorts in facility Rapid Reviews even when they are plainly visible on video. *Id.* ¶¶ 362, 365. Defendants failed to consult with the Monitor on how to improve escort practices despite promising on "numerous" occasions to do so over the first year of the Action Plan, leading to another court order requiring DOC to revise escort policies to "eliminate the use of painful escort holds." *See* Dkt. 564 at ¶ 3; FOF ¶¶ 366-370. Despite the

additional order, Defendants have not even provided the Monitor with draft *revisions* to the five policies requiring changes—much less implemented them. *Id.* ¶ 371.

*Deficient Search Procedures*. Inadequate search procedures often contribute to avoidable and unnecessary uses of force, and a significant portion of uses of force occurs during search attempts. *Id.* ¶¶ 373-376. DOC has repeatedly failed to implement the Monitor's feedback regarding deficient search practices. DOC began, but then abandoned, its work to implement feedback the Monitor provided in February 2021. *Id.* ¶¶ 376-377. In November 2023, after being ordered twice to do so, DOC submitted a partial set of revised policies, most of which ignored the feedback the Monitor provided two years earlier. *Id.* ¶ 380. There have been no observable changes in practice to suggest that the quality or effectiveness of search procedures have improved. *Id.* ¶¶ 375, 379 (during two-week period in June 2023, 30 uses of force occurred during searches, indicating security management failures).

*Failing to Detect and Recover Contraband*. As a result of DOC's deficient search practices, the agency often does not recover contraband, as shown by the "relatively low rate of return" from searches. *Id.* ¶ 381. DOC also does not detect or recover contraband in plain view, as shown by NCU security audits, Monitoring Team site visits, and other material showing people openly smoking and using illicit substances. *Id.* ¶¶ 382-385, 405-408, 416, 421, 431. During an August 9, 2023 announced site visit, Deputy Monitor Anna Friedberg observed "clearly suffering and highly intoxicated individuals" who were "actively smoking an illicit substance and burning joints were on the floor." *Id.* ¶ 384. These individuals were together in intake following their alleged involvement in a slashing, meaning that DOC staff should have searched and confiscated contraband prior to escorting them to intake. *Id*. The Monitoring Team again observed open drug use during a September 2023 site visit. *Id.* ¶ 385.

### 4. Defendants Have Not Complied with Orders Requiring Adequate Supervision of Staff and Facility Leadership

Facility leadership and supervisors have critical roles within facilities. Leadership—wardens, Deputy Wardens ("DWs") and Assistant Deputy Wardens ("ADWs")—must ensure staff adequately supervise people in custody and take corrective actions to respond to misuses of force, violence, and security breaches. FOF ¶¶ 532, 534-535. Captains supervise line officers and are the first level of supervision. *Id.* ¶ 527. DOC's supervisory failures contribute to chaos and violence in the jails, harm to incarcerated individuals, and the excessive and unnecessary use of force. *Id.* ¶¶ 530, 537-540.

The First Remedial Order and the Action Plan sought to redress these failures by ordering DOC to: have facility leaders develop and implement operational changes and corrective actions in their jails based on an analysis of available data relating to use of force incidents, (First Remedial Order, § A, ¶ 2); improve supervision of captains by increasing the ranks and presence of ADWs in the facilities, (*id.* § A, ¶ 4; Action Plan, § C, ¶ 3(iii))); and prioritize assignment of captains to the housing areas rather than non-custodial posts (Action Plan, § C, ¶ 3(ii)). Defendants have not complied with these orders.

As a result, as of November 2023, supervisors still "lack the willingness or skill to effectively support, guide, and coach staff practice, which is perhaps unsurprising given their tenure in a deeply dysfunctional system that does not adequately select, train or prepare them for the task at hand. In addition to being poorly equipped for or resistant to their role and responsibilities, supervisors are far too few in number to provide the type of hands-on coaching needed for this workforce." *Id.* ¶ 611.

33

### a. Failure of Facility Leadership to Adequately Address Excessive and Unnecessary Use of Force

The Monitor has repeatedly attributed ongoing non-compliance with the Use of Force Directive and provisions of the Consent Judgment to the inability of facility leaders to identify misconduct in UOF incidents, take immediate action to respond to that misconduct, analyze their facility's UOF data, refine potential initiatives to address facility-specific issues, and implement initiatives that will advance reforms within the facility. FOF ¶¶ 532-533. Facility leaders could not "discriminate between permissible, necessary force and unnecessary or excessive force," and as a result "essentially sanction[ed]" staff misconduct. *Id.* ¶ 533. Exacerbating this problem was a "revolving door of leadership" where constantly replacing facility leaders "obstruct[ed] progress in developing and implementing solutions to the particular issues facing each Facility." *Id*. These extraordinary deficiencies in the supervisory ranks render even more illogical the City's strong reluctance to expand the leadership hiring pool beyond the ranks of DOC. *See infra* I(C)(2)*.*

The First Remedial Order attempted to address these deficiencies in facility leadership by requiring Wardens and Deputy Wardens to routinely analyze available data relating to use of force incidents in their jails and develop operational changes and corrective action plans to reduce excessive or unnecessary force, the frequency of force, and the harm resulting from the use of force. First Remedial Order, § A, ¶ 2. Defendants have been in non-compliance with this provision during each of the monitoring periods in which it has been assessed.  FOF ¶¶ 548-549.

While facility leaders have access to extraordinarily robust information about their jails—NCU audits, ID Quickstats Weekly Reports, Facility Risk Dashboards, and more—they pay "scant attention" to that data, despite the Court's order to scrutinize it. *Id.* ¶¶ 573-594. They do

34

not analyze data in a meaningful way to determine the factors driving high rates of use of force and violence and fail to develop effective strategies to address them. *Id.* ¶¶ 573-594.

Because of these ongoing failures, in August 2023, the Court again ordered DOC to evaluate data and metrics to identify the root causes of unnecessary and excessive force and violence in the facilities and develop strategies to address them. Dkt. 564, Order, Section I, ¶ 1. Yet in November 2023, the Monitor found "few rigorous attempts to utilize the large volume of information that [the Department] possesses" and that "the few plans that have been devised are either ineffective, or shortly abandoned before their impact on staff practice can be discerned." FOF ¶ 555.

Nor do facility leaders develop specific, concrete strategies to curb the misuse of force by staff and the overall disorder in their jails, ████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████ Even more concerning, facility leaders typically prepared no written response or corrective action plan at all when presented with the security deficiencies outlined in the NCU security audits. *Id.* ¶ 583. ████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████████

Facility leaders not only fail to reliably detect and address misconduct when conducting required Rapid Reviews of uses of force, *id.* ¶¶ 561-563, their ability to do so appears to have significantly deteriorated in 2023. *Id.* ¶ 232. They rarely engage in effective "problem-solving" approaches such as conducting "hot-spot" analyses. *Id.* ¶ 589.

While facility leaders meet with DOC leadership to discuss operational issues, the meetings rarely appear to lead to changes or corrective action plans. *Id.* ¶ 553. DOC does not document the results of these meetings and the plans discussed, as required by the First Remedial Order. *Id.* ¶ 552. The few plans that have been developed have not been effective at reducing use of force, serious injuries, or excessive or unnecessary use of force. *Id.* ¶ 555.

### b.   Failing to Adequately Supervise Captains

Captains are directly supervised by ADWs. FOF ¶ 527. The First Remedial Order § A, ¶ 4 requires DOC to improve the level of supervision of Captains by *substantially* increasing the number of ADWs assigned to the Facilities such that there are sufficient ADWs to "adequately supervise" the Housing Area Captains and housing units. When Defendants failed to meet that obligation, the Action Plan reiterated it. Action Plan, § C, ¶ 3(iii). Defendants have not complied.

Defendants were rated non-compliant with First Remedial Order § A, ¶ 4 in two of the last three applicable Monitor's reports. FOF ¶ 596. Although DOC received a partial compliance rating in April 2023 for increasing the number of ADWs, the Monitor emphasized that would not itself be sufficient to provide "adequate supervision." *Id*. ¶ 597. To date, Defendants have not made substantial and demonstrable progress in implementing the Action Plan—including the requirement to bolster the ADW ranks and ensure supervision of Captains. *Id.* ¶¶ 310, 604-609.

First, there has been no significant change in the percentage of ADWs in facilities since the First Remedial Order was entered in August 2020. *Id.* ¶ 602. In July 2020, 79% of ADWs were assigned to facilities and court commands, and in October 2023, it was 82%—a nearly

identical percentage. *Id.* The raw number of ADWs in the facilities, and Department-wide, has actually decreased since January 2021. *Id.* As of July 10, 2023, DOC did not have enough ADWs to ensure that each tour had both a Tour Commander and ADWs to supervise Captains. *Id.* ¶ 604. There are still a "plainly insufficient" number of supervisors to provide the intensive supervision needed to elevate officers' skills; therefore, additional ADWs and Captains were "needed to meet the supervision requirements of the [First Remedial Order and Action Plan]." *Id.* ¶ 605.

Second, ADWs do not effectively supervise Captains as required by the Court's orders. Supervisors fail to detect misconduct, have a limited command over the use of force policy, and generally lack the aptitude or willingness to properly guide subordinates. *Id.* ¶¶ 610-627. They lack core competencies, rendering them ineffective in their roles, and many ADWs and Captains "have only marginal competence in the skills necessary to provide effective supervision." *Id.* ¶ 611.

The poor performance of ADWs is partly attributable to how they are selected. ADWs are promoted and drawn from the same corps of Captains who lack basic, essential skills. *Id.* ¶ 616, 628-644. Defendants promote unsuitable candidates to ADW positions despite negative internal recommendations—for example, of 36 recently promoted ADWs, four have already been demoted and 12 were not recommended for promotion based on DOC's own screening protocols. *Id.* ¶¶ 617, 644. Of the 12 ADWs who were promoted notwithstanding internal concerns with their qualifications, one had previously been demoted from the rank of ADW, another was subsequently suspended in connection with the death of Curtis Davis, and another unilaterally orchestrated an irresponsible "hostage drill" using people in custody that resulted in an unnecessary use of force. *Id.* ¶¶ 640-642. Even after the Monitor raised serious concerns about these 12 candidates in early 2023, one of the additional ADW candidates Defendants

promoted in June 2023 had formal disciplinary charges pending with the Trials Division for two violent incidents. *Id.* ¶ 646.

When the Monitor raised serious concerns with the ADW promotion practices and made recommendations in April 2023, Defendants failed to address them despite assurances from a senior DOC official that they would do so—and then failed to follow even their own flawed screening process in promoting another class of ADWs. *Id.* ¶¶ 645-647. Defendants have failed to comply with the Court's order to revise pre-promotional procedures by October 30, 2023; DOC has not yet even provided draft revisions to the Monitor. *Id.* ¶ 647. In addition to promoting candidates who should have been disqualified, DOC offers significantly flawed supervisory training, *id.* ¶¶ 964-968, which currently requires extensive revision to reach even basic adequacy. *Id.* ¶ 970.

### c.   Failing to Prioritize Assigning Captains to Housing Units

Defendants have likewise failed to comply with Action Plan § C, ¶ 3(ii) requiring them to "develop and implement a plan to prioritize assignment of Captains to supervise housing units to increase Captain presence on housing units."

In July and November 2023, the Monitor found that Defendants have not made substantial and demonstrable progress in implementing the Action Plan—including the requirement to increase Captain presence on housing units. FOF ¶¶ 310, 607-609. The number of Captains assigned to facilities has decreased by 33% since 2020; from June 18, 2022 to October 21, 2023—while the Action Plan was in effect—the number of Captains actually decreased from 607 to 541 with *45 fewer* Captains assigned to the facilities. *Id.* ¶ 607. This number of Captains is insufficient to adequately supervise thousands of officers. *Id.* ¶ 608.

As the Monitor summarized in November 2023 regarding all supervisors in DOC, including Captains and ADWs:

38

What is needed is...pervasive, direct intervention by well-trained, competent supervisory staff—guiding and correcting staff practice in the moment, as it happens. Only with this type of hands-on approach will the Department be able to confront and break through staffs' resistance and/or unwillingness to take necessary actions. In other words, a system of consistent, intensive support must be available to every housing unit until staff demonstrates the consistent application of basic correctional practice. The Department does not appear to have the necessary supervisory staff with the necessary competency to fulfill this need as described in prior reports. To date, the Department's efforts to obtain adequate numbers of competent supervisors have not been successful. More can and must be done to ensure that there are a sufficient number of supervisors who are adequately qualified to supervise the staff operating the jails.

*Id.* ¶ 611; Dkt. 595.

### 5.   Defendants Have Not Complied with Requirements to Effectively Deploy Uniformed Staff to Ensure Adequate Supervision of Incarcerated Individuals

Defendants have not complied with several interconnected provisions of the Action Plan intended to redress a fundamental obstacle to compliance: DOC simply does not have correction officers on post, where they are needed, to operate the housing areas safely. Action Plan, § C, ¶ 3(v), (vi), (vii), Dkt. 465. Although DOC has one of the richest staffing ratios in the country, its staffing and deployment practices are deeply dysfunctional, significantly limiting the number of staff available to actively supervise incarcerated people. FOF ¶¶ 648-653, 655-658.

For decades, DOC has operated under a system where its leaders perceive severe constraints on their ability to deploy staff and cannot consistently assign staff to housing areas based on need. In March 2022, the Monitor found that Defendants were so poorly administering staff that even the most basic aspects of workplace management were neglected for decades and caused a sea of inadequacies and impediments to reform. *Id.* ¶ 657.

DOC's mismanagement of staff is inextricably linked to the high rates of use of force and violence in the jails. *Id.* ¶ 658. DOC's inability to efficiently manage and deploy uniformed staff has resulted in unstaffed posts, an excessive use of overtime, staff having to work double and

triple shifts, staff not being consistently assigned to the same housing units, and an overall failure to ensure there are enough staff on each housing unit to adequately manage the population. *Id.* ¶¶ 652-653, 658. Staffing shortages also lead to the overreliance on confrontational emergency response teams who too often needlessly escalate incidents and utilize excessive and unnecessary force. *Id.* ¶¶ 460-461, 465, 658.

DOC has not complied with the Action Plan's provisions designed to increase the presence of staff in housing areas. *Id.* ¶ 310. For example, DOC did not conduct the post analysis required by Action Plan § C, ¶ 3(viii).[9] FOF ¶ 705. Nor is there evidence DOC is deploying sufficiently experienced staff to housing units as required by Action Plan § C, ¶ 3(iv). FOF ¶¶ 660-661. DOC continues to not have enough staff in housing units to deliver mandated services, leading to high levels of stress, frustration, and violence among people in custody. *Id.* ¶ 662.

Defendants' noncompliance with the following requirements of the Action Plan warrants contempt: (a) DOC must "[r]educe the use of awarded posts so they are primarily utilized for those positions in which a particular skill set is required," Action Plan § C ¶ 3(v); (b) DOC must "[c]reate and implement alternatives to the work schedule for uniform staff assigned to work in the facilities in order to minimize the use of a 4 by 2 schedule and optimize staff scheduling," *id.* ¶ 3(vi); and (c) DOC must "[r]educe the assignment of uniform staff to civilian posts, including Temporary Duty Assignment, in order to minimize the reliance on uniform staff for tasks that can and should be reasonably completed by civilians." *id.* ¶ 3(vii).

---

[9] In August 23, 2023, the City described compliance with this obligation obliquely, stating that because the "jails' operations have been constantly changing due to the closure of various facilities," the "post analysis is ongoing and continuing to evolve." Ex. 50. The dynamic nature of jail operations, which is nothing new, does not explain why in the 14 months since the Action Plan, the City still had not completed this foundational step in solving its critical staffing problems.

### a.      Failing to Reduce Awarded Posts

DOC has not reduced "awarded posts," as required by the Action Plan, § C ¶ (3)(iv). Awarded posts allow staff to bid for a specific post within a facility and allow more senior or experienced staff to obtain posts where they do not supervise housing units. FOF ¶¶ 674-675. These staff cannot be re-deployed to work other posts, significantly inhibiting DOC's flexibility to assign staff where they are needed and to place the most qualified staff in housing units that require elevated supervision. *Id.*

Initially, DOC reported that they had not reduced the number of awarded posts: that there were as many such posts in March 2023 as in September 2022, and even more than there were in August 2021. *Id.* ¶¶ 677-680. The Monitor then discovered that DOC cannot even accurately identify the number of people with awarded posts, given that some staff have official and others have de facto awarded posts—and DOC cannot tell the difference. *Id.* ¶ 679. As of November 2023, DOC has not yet initiated a plan to evaluate or eliminate awarded posts. *Id.* ¶ 677.

Defendants have repeatedly represented to the Court and the parties that they can unilaterally reduce awarded posts without labor law constraints; yet DOC executives tasked with doing this work have maintained the opposite, claiming on at least four occasions they cannot reduce awarded posts due to constraints imposed by collective bargaining agreements. *Id.* ¶¶ 682-683. DOC has either refused to, or been unable to, direct its leaders to reduce awarded posts.

### b.      Failing to Minimize 4-by-2 Schedules

DOC has not complied with Action Plan § C, ¶ 3(vi) requiring it to optimize staff scheduling by implementing alternative work schedules. DOC's staff is generally on a "4x2" schedule where they work four consecutive 8.5-hour workdays, followed by two days off, resulting in 243 workdays per year—far less than the correctional standard of 261 workdays annually that would result from a "5x2" schedule (five days on, two off). FOF ¶¶ 687-689.

41

While the Court ordered DOC to minimize the use of 4x2 schedules and optimize staff schedules, it has not: as of November 2023, no staff actually work the 261-day schedule intended by the 5x2 scheduling requirement. *Id.* ¶¶ 691-693. Due to convoluted labor agreements limiting weekend assignments, even those staff nominally on 5x2 schedules still work 243 workdays—the same number of days as those on 4x2 schedules—and receive weekends off, negating the advantage of a 5x2 schedule for facilities that must operate around the clock. *Id.* Thus, whether labeled a 4x2 or 5x2 schedule, the Department's scheduling structure continues to limit the availability of staff compared to other jurisdictions, leading to unstaffed posts. *Id.* ¶ 694. On any given day in June 2023, 15 posts were unstaffed, and the numbers are trending up in 2023. *Id.* ¶ 686. There is still pervasive, insufficient coverage, particularly on weekends. *Id.*

The City asserts that collective bargaining agreements and internal operations orders require the additional vacation days and weekends off for staff assigned to the faux 5x2 schedule. *Id.* ¶ 695. Defendants had yet to even begin sessions with the labor unions to attempt to address this issue, nor sought from the Court a waiver of applicable contractual requirements. *Id.* ¶ 696. Such inaction is particularly unacceptable given Defendants' repeated assurances to the Court in May 2022 that "there are no legal impediments to us fulfilling our obligations under the Action Plan." *Id.* ¶ 62.

### c.    Failing to Reduce Uniform Staff in Civilian Posts

DOC has not complied with Action Plan ¶ C(3)(vii)'s requirement to reduce the assignment of uniformed staff to civilian posts—posts that do not require special training or specialized correctional officer duties.[10] FOF ¶ 698. Because uniformed staff are frequently

---

[10] The Monitor explained the importance of this provision in its March 16, 2002: "The Department assigns uniform staff to positions that can reasonably be undertaken by civilians...This is true for both positions within facilities (e.g., administrative and clerical positions in the jails) and those outside the facilities (e.g., Data input operators, data

assigned to such posts, fewer uniformed staff are available for posts that require trained correctional staff, such as housing areas, compounding staffing difficulties and "squandering an essential resource." *Id.* As of March 2022, over 700 uniformed staff held positions that could be undertaken by civilians—a significantly higher number than typically seen in other systems. *Id.* ¶¶ 698-699.

DOC has made next to no progress in complying with this provision. As of July 10, 2023, DOC had converted only 7 uniformed posts to civilian posts—all of which were in the Health Management Division ("HMD"), which oversees sick leave by DOC staff. *Id.* ¶¶ 703-704; c*f. Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 280-82 (2d Cir. 2000) (describing HMD operations in detail). DOC announced it would transfer 16 uniformed staff engaged in timekeeping; not only had this not occurred as of July 2023, it would not suffice to meet the Action Plan's requirements. FOF ¶¶ 703-704. DOC has also failed to eliminate uniformed posts that it asserts are superfluous, so they remain filled by uniformed staff despite staffing shortages in housing units and other parts of the jail. *Id.* ¶ 700. Finally, DOC asserts that it is meeting biweekly to identify posts that can be civilianized, but its lack of progress in identifying any such posts indicates that any such meetings have been ineffective. *Id.* ¶¶ 701-702.

### 6.  Defendants Have Not Complied with Orders to Curb Emergency Response Teams' Excesses

The First Remedial Order and the Action Plan directed DOC to "minimize [emergency response teams'] unnecessary or avoidable uses of force" by taking specific steps to curb their abusive practices. First Remedial Order, § A(6); Action Plan § D(2)(c). The Monitor has long

---

analytics, receptionists, administrative support, timekeeping, public information). While it is reasonable that some uniformed staff may be required to hold certain roles typically held by civilians, the number of staff that hold such roles (over 700) is a significant and higher than is typically seen in other systems. This is because these are positions that do not typically require the special training or match the specialized duties of a correctional officer, which is to maintain [. . .] security within correctional facilities and is responsible for the custody, control, care, job training and work performance of inmates in detention and sentenced correctional facilities." FOF ¶ 697.

documented concerns about the Emergency Service Unit ("ESU") and other emergency teams' central role in perpetuating the pattern and practice of brutality in the jails.[11] FOF ¶¶ 462-465. Emergency response teams are deployed when officers activate an alarm to signal a disturbance they believe requires additional staff, and the teams arrive in large groups, dressed in riot gear. *Id.* ¶ 461. These teams frequently exhibit hyper-confrontational behavior and use problematic tactics which counter-productively escalate incidents, leading to excessive and unnecessary force. *Id.* ¶ 465. The teams engage in a pattern of unnecessary and excessive force because they often presume that force will be required, ignoring the Use of Force Directive's requirement to use the minimum amount of force necessary to control a threat. *Id.* ¶¶ 472-492.

To redress these units' outsized contributions to the Department's systemic excessive force problem, the First Remedial Order required DOC, "in consultation with the Monitor, to develop, adopt, and implement a protocol governing the appropriate composition and deployment of the Facility Emergency Response Teams." FOF ¶ 466. This protocol was required to address four problem areas the Monitor had identified: "(i) the selection of Staff assigned to Facility Emergency Response Teams; (ii) the number of Staff assigned to each Facility Emergency Response Team; (iii) the circumstances under which a Facility Emergency Response Team may be deployed. . . ; and (iv) de-escalation tactics designed to reduce violence during a Facility Emergency Response Team response." *Id.* The Court initially ordered DOC to comply with this provision within 90 days (i.e., by November 2020), and then incorporated the same requirement in the Action Plan that was entered in June 2022. Dkt. 350 at ¶ 6.

---

[11] DOC relies on at least three types of emergency response teams: a Probe Team, which is comprised of officers who regularly work in a given facility; the Emergency Services Unit ("ESU"), a separate command outside of any facility chain of command; and Special Search Teams ("SST"), which as their name implies conduct large scale search operations. FOF ¶¶ 460-461.  Probe Teams, ESU, SST, and similar units are collectively referred to as "emergency response teams." *Id.*

DOC has never met these requirements: the Monitor found non-compliance every time he rated the relevant First Remedial Order provision between July 2020 and December 2022, and then again in July 2023. FOF ¶¶ 469-471. Although DOC has made some progress in reducing the frequency with which emergency response teams are deployed (although they are still deployed unnecessarily), it still has not implemented screening of staff on such teams, reduction of the number of staff assigned, or de-escalation tactics. These are addressed in turn below.

### a.  Failing to Appropriately Select and Screen Staff Assigned to Emergency Response Teams

Screening emergency team staff for misconduct is essential to ensure these highly weaponized units are not staffed with officers who may exacerbate, rather than prevent, harm. FOF ¶¶ 494-497; 506-508. DOC protocols require that an officer may not be assigned to ESU ██

███████████████████████████████████████████████████

███████████████████████████ *Id.* ¶ 498 (citing Operations Order 24/16).

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████. *Id.* ¶ 499 (citing Operations Order 25/19). Nonetheless, DOC has continued to staff emergency response teams with officers who have use of force histories that should preclude their assignment.

For years, DOC failed to screen staff assigned to the ESU as its policies required. *Id.* ¶ 500. After the First Remedial Order mandated such screening, *and* after significant prompting from the Monitor, DOC finally conducted an assessment in 2021 to identify and remove ESU staff whose disciplinary charges should have disqualified them. *Id.* ¶ 501. Based on this screening, 50 staff—one quarter of the 200-person unit—were removed. *Id*. But this step forward was reversed when 10 of these people were reinstated to ESU in 2023. *Id.* ¶ 506. The dangers of

45

this course were almost immediately apparent, as one reinstated officer has since been indicted for an April 2023 incident in which he allegedly planted a weapon in an incarcerated person's cell during an ESU operation, and falsely claimed he recovered it there. *Id.* ¶ 509.

DOC still does not take ESU screening assignments seriously. In early 2023, 26 staff were assigned to ESU without being screened at all. *Id.* ¶ 506. Had they been screened, some would not have been assigned to ESU. *Id.* After the Monitor detected the problem, all 26 staff were removed. *Id.* Even when DOC does screen, the Monitor reports that it does not do so with integrity, instead using "semantic loopholes" to avoid removing certain staff, "even when available circumstances would require removal by policy." *Id.* ¶ 504. In 2023, five staff who DOC's own screening recommended for removal from ESU were simply not removed, with no explanation. *Id.* ¶ 503.

Defendants' stark defiance of the Court's orders requiring ESU members to be adequately screened resulted in the Court issuing an order on August 10, 2023 yet again requiring DOC to implement a policy concerning the assignment and screening of special teams staff by the end of October 2023—three years after the initial court-ordered deadline of November 2020. *Id.* ¶ 514. As of November 8, 2023, Defendants had not yet implemented such a policy, but rather were still revising it. *Id.* ¶ 515.

### b.        Excessive Staff Are Assigned to Emergency Response Teams

The First Remedial Order also required DOC to address the large number of people who staff emergency response teams. Dkt. 350, § A(6). DOC has not complied: emergency response teams continue to deploy excessive numbers of staff in response to an incident, raising tensions and fueling use of force. FOF ¶ 493. For example, a search performed by a "very large" group of ESU officers in 2022 devolved into a chaotic situation involving a chokehold, a takedown where an individual landed on his head, and more. *Id.* ¶¶ 488.

c.    **Emergency Response Teams Fail to Use De-Escalation Tactics**

Defendants also have not implemented protocols requiring emergency response teams to use de-escalation tactics to reduce violence, as the First Remedial Order required them to do by November 2020. Dkt. 350, § A(6). This requirement was necessitated by the Monitor's findings of numerous "disorderly, chaotic, and unsafe" emergency team operations, which "ultimately resulted in unnecessary and excessive force," including head strikes, neck restraints, body slams, striking of passive residents with batons, misuse of chemical agents, and more. FOF ¶¶ 483-488, 492. Several such incidents are described in detail in Plaintiffs' Proposed Findings of Fact. *Id.*

DOC's policy requires emergency response teams ████████████████████ ████████████████████, *id*. ¶ 475 (citing Operations Order 25/19), but the actual practice is nearly the opposite. The arrival of an emergency response team "typically guarantees that force will be used," and the teams continue to use hyper-confrontational behavior that causes situations to intensify. *Id.* ¶¶ 477-481. Indeed, the Monitor reported in 2023 that "the concerning practices of emergency response teams remain static." *Id.* ¶ 470.

ESU's use of tactical weaponry or devices only heightens this dangerous dynamic. ESU recently began using OC grenades—grenades containing a pepper-spray like substance that can be tossed toward incarcerated individuals—more frequently, and in unhelpful ways. *Id.* ¶¶ 490. For instance, during one incident in February 2023, an emergency response team deployed an OC grenade in the middle of a housing unit, despite the fact that incarcerated individuals were walking away from the team rather than advancing. During the same incident, officers also sprayed incarcerated individuals with OC spray even where no threat was observed. *Id.* ¶ 492. Use of such tactics clearly does not de-escalate conflicts. If reports of the City's recent purchase of submachine guns for this unit are correct, there is profound danger ahead. *Id.* ¶ 497.

### 7. Defendants Have Not Complied with Orders Designed to Ensure the Safety of Young People in Custody

Defendants have not complied with several provisions intended to reduce the risk of harm to 18-year-olds in DOC custody (the youngest people in custody), who have been persistently subject to the use of force even more frequently than the rest of the population. FOF ¶¶ 859-860.

The Consent Judgment requires that 18-year-olds in custody be supervised at all times in a manner that protects them from an unreasonable risk of harm. Consent Judgment § XV, ¶ 1. Defendants have been rated non-compliant with this provision for eight consecutive periods; RNDC, the facility in which young adults are most often housed, continues to rank highest in most indicators of danger; poor staff practices and security failures expose both staff and 18-year-olds in custody to daily harm. FOF ¶¶ 865-871. When DOC recently failed to sustain the reforms called for under the RNDC Violence Reduction Plan, safety in the facility "significantly worsened." *Infra* I(C)(4); *see also* FOF ¶¶ 868-877. May, September, and October 2023 NCU security audits found "operations [in RNDC] to be in disarray, including unsecured cell doors and incarcerated individuals freely entering and exiting their cells, no staff on post throughout various tours, inadequate supervisor tours, and incarcerated individuals smoking contraband." *Id.* ¶¶ 871, 877. Use of force and fighting are rampant, particularly this year; DOC's 16th Compliance Report documents ███████████████████████████████████████████ ███████████████████ *Id.* ¶ 867. Other safety issues abound: 400 fires were reported so far this year, most occurring at RNDC. *Id.* ¶ 868.

Underlying this dire situation is DOC's second specific failure to comply with the Court's orders regarding young adults: the failure to implement the Direct Supervision model, a best correctional practice with proven effectiveness. FOF ¶¶ 878-896. The Consent Judgment required implementation of the Direct Supervision Model and the First Remedial Order reiterated

that requirement. Consent Judgment § XV, ¶ 12; First Remedial Order, § D, ¶ 3, 3(i). The

Monitor has rated Defendants in non-compliance with this obligation both times he rated the

First Remedial Order provisions and four of the last six times he rated the analogous Consent

Judgment provision; Defendants have never been in substantial compliance.[12] FOF ¶¶ 884-887.

Since the Seventh Monitoring Period, the Monitor's description of DOC's efforts to implement

the direct supervision model have noted a failure to make "any substantial effort," taking only

"initial steps" or developing a mere "framework," protracted failures in pilots and training, and a

lack of staffing structure to support the model. FOF ¶¶ 880-894. Even after a long process of

training staff, DOC has failed to implement the most basic components of the model, neglecting

both core programmatic elements and staffing requirements, which require a mobilization of

resources the Department cannot seem to muster. *Id*. ¶ 896.

The failure to mobilize staffing resources connects to a third specific failure to comply

with the Court's orders regarding safeguarding young people: DOC has failed to consistently

assign the same staff—including correction officers, captains, and ADWs—to RNDC units used

to house 18-year-olds, a best correctional practice that is a hallmark of Direct Supervision and

required by the Consent Judgment and First Remedial Order. Consent Judgment § XV, ¶ 17;

First Remedial Order, § D, ¶ 1; FOF ¶¶ 897-898. Steady staffing "facilitate[s] constructive Staff-

youth relationships" and is "particularly important in units with youth who are difficult to

manage." *Id*. The Monitor has rated DOC non-compliant with this requirement in four

consecutive ratings of Consent Judgment § XV, ¶ 17 and on both occasions where the Monitor

rated the analogous provision in First Remedial Order § D, ¶ 1. FOF ¶¶ 902-903. As of

November 8, 2023, the Monitor found definitively, once again, that "Staff are not consistently

---

[12] Compliance with this provision has not been rated after the Twelfth Monitoring Period because of the focus on evaluating progress with the RNDC Violence Reduction Plan. FOF ¶ 895.

assigned to the same housing unit day-to-day at RNDC." *Id.* ¶ 901. DOC's internal analysis confirms its persistent non-compliance with this staffing requirement; even where posts were consistently assigned "on paper," facility leaders frequently re-assigned staff so, in practice, posts were worked by the assigned person half the time, or less—as NCU audits confirm. *Id.* ¶¶ 904-913; *id.* ¶¶ 909-910 (noting NCU's inability to even assess basis for lack of progress).

   Defendants appear not to even appreciate the existence of this consistent staffing requirement, despite specific court orders establishing it. Defendants' response to Plaintiffs' non-compliance notice notes only general efforts to reduce department-wide staffing outages and claims "it's not necessarily about the consistency of staff but about the consistent delivery of services by staff, regardless of who is assigned to the post." FOF ¶ 913. This assertion is not only inaccurate, as consistent staff assignments are intended to ensure that the same staff members are present on housing units and so "who is assigned to the post" is the fundamental question, but also simply disregards court-ordered obligations to the contrary.

### C.      Defendants Have Not Diligently Complied with the Court's Orders

   The third prong of the civil contempt inquiry is whether Defendants have made reasonably diligent efforts to comply with the relevant orders. "Reasonable diligence, at the very least, requires a party . . . to develop reasonably effective methods of compliance." *Zino Davidoff SA v. CVS Corp.*, 2008 WL 1775410, at *8 (S.D.N.Y. Apr. 17, 2008).  While it is not required that a party "exhaust all means available" to comply, *Chao v. Gotham Registry, Inc.*, 514 F.3d 280, 293 (2d Cir. 2008), "[m]ore is required than a grudging, half-hearted or foot dragging attempt at compliance," *Chere Amie, Inc. v. Windstar Apparel, Corp.*, 175 F. Supp. 2d 562, 565 (S.D.N.Y. 2001). The relevant inquiry is whether a defendant has been "reasonably diligent and energetic in attempting to accomplish what was ordered." *Aspira of New York v. Bd. of Educ. of the City of New York,* 423 F. Supp. 647, 654 (S.D.N.Y. 1976). "Reasonably energetic

50

compliance, at a minimum, requires a party to energetically police the effectiveness of its compliance measures and, when advised that such measures have fallen short, to modify them accordingly." *Zino Davidoff,* 2008 WL 1775410, at *8.

To determine reasonable diligence, courts have also considered, *inter alia,* whether the defendant in face of the requirements of a court order has "neglected to marshal [its] own resources, assert [its] high authority, and demand the results needed from subordinate persons and agencies in order to effectuate the course of action required by the consent decree." *Aspira of New York*, 423 F. Supp. at 654. A defendant has not engaged in reasonable diligence when it has "displayed an evident sense of nonurgency bordering on indifference." *See id.* It is not enough to instruct employees to comply with the terms of an order—a defendant must ensure that its employees effectively implement the instructions to comply with the Court's order. *See Manhattan Indus., Inc. v. Sweater Bee by Banff, Ltd.*, 885 F. 2d 1, 5 (2d Cir. 1989). "[W]here the [C]ourt determines that defendants violated their obligations under the decree by failures of diligence, effective control, and steadfast purpose to effectuate the prescribed goals, contempt findings are in order." *Powell v. Ward*, 487 F. Supp. 917, 933 (S.D.N.Y. 1980), *aff'd and modified*, 643 F.2d 924 (2d Cir. 1981).

Here, a years-long pattern of conduct clearly demonstrates that Defendants have not made reasonably diligent efforts to comply with the above-referenced Court orders.

### 1. Despite Numerous Clear Assessments of Their Failures Defendants Have Remained in Non-Compliance for Years

The Consent Judgment has been in effect for more than *eight years*. Later Remedial Orders (only entered because of Defendants' noncompliance) also took effect years ago and had applicable deadlines which have long since passed. The sheer length of time that has gone by without meaningful progress toward substantial compliance is shocking.

Contempt is appropriate where Defendants "have allowed deadlines to pass without advance announcements or volunteered explanations" and "have borne with seeming equanimity long periods of nonperformance." *See Aspira*, 423 F. Supp. at 654. Indeed, courts have found a lack of diligence based on delays of mere weeks or months. *See King v. Allied Vision, Ltd.*, 65 F.3d 1051, 1056 (2d Cir. 1995). The *years* of non-compliance in this matter constitute clear, convincing evidence that Defendants have not acted with reasonable diligence.

Defendants' failures of diligence are made all the more obvious by the unequivocal notice they have received regarding their non-compliance over the years. As just a few illustrative examples, the Monitor rated Defendants in non-compliance nine consecutive times over five years for their failure to implement the Use of Force Directive; eight consecutive times over four years for their failure to protect young adults from an unreasonable risk of harm; eight consecutive times over four years for their failure to complete Full ID investigations within mandatory time limits; and four consecutive times over two years for their failure to bring emergency response teams under control. FOF ¶¶ 215-216, 465-469, 781, 865. The Monitor repeatedly found—in its March 2022, June 2022, October 2022, April 2023, July 2023, and October 2023 reports—that Defendants had failed to implement requirements in the Second Remedial Order and Action Plan concerning fundamental security practices, touring, and searches and contraband recovery. *Id.* ¶¶ 300-303, 309-327, 340-354, 372-385. Yet Defendants remain in non-compliance with all of these provisions and more. *See supra* I(B).

Indeed, Defendants' failure has been so troubling that the Court found it necessary to issue multiple orders with substantially similar requirements because DOC did not comply the first time. The Court has issued multiple overlapping orders regarding security and basic correctional practices, use of force investigations, staff supervision, and emergency response

Case 1:11-cv-05845-LTS   Document 651   Filed 12/13/23   Page 61 of 106

teams. *See infra* II(C)(1). The fact that the Court needed to issue multiple orders directing DOC to adhere to the most basic security protocols fundamental to operating any secure correction setting, for example, speaks volumes; the fact that DOC has continued not to comply with these basic security protocols for years is inexplicable and constitutes a complete lack of diligence.

Defendants have engaged in years of foot-dragging, consistently failing to respond effectively to obvious evidence of their non-compliance. The concept of "reasonable diligence" cannot be stretched to include such behavior without losing all meaning.

**2.      Defendants Have Failed to Take Obvious Steps That Would Move Them Toward Compliance, Including Those Recommended by the Monitor**

One reason Defendants have failed is their frequent unwillingness to take actions that could move them into compliance. Because DOC "has failed to take the necessary steps to understand the dynamics that actually underlie poor practice [so as to] move beyond superficial actions," the Monitor regularly provides DOC with recommendations that would improve their compliance and offers extraordinary technical assistance. FOF ¶¶ 11, 1171. But again and again, DOC has ignored the recommendations or has engaged in protracted delays before acting, and "has taken few concrete actions to adopt these recommendations (or devise reasonable alternatives)." *Id.* ¶ 1171. That a clear and reasonable path toward improving compliance is laid out in front of Defendants, but they do not take it, is a clear dereliction of the requirement to act diligently in attempting to comply with the Court's orders.

For example, after identifying numerous flaws with the command discipline system that impeded compliance with the Consent Judgment's requirement to impose appropriate discipline, *id.* ¶¶ 846-853, the Monitor made written recommendations to DOC in August 2022—including recommendations to ensure that command discipline cases were properly adjudicated rather than dismissed due to procedural errors, and to ensure that outcomes were proportional to the

misconduct identified rather than simply defaulting to the most lenient option for staff. *Id.* ¶ 854. Rather than working diligently to implement these recommendations, the Department seemingly ignored them and had made no progress nearly a year later despite the Monitor's repeated follow-ups. *Id*. After yet another court order in August 2023, DOC provided proposed revisions to the applicable directive in September 2023—and further revision is still needed. *Id.* ¶ 857.

Defendants have similarly ignored the Monitor's repeated recommendations and offers of assistance with regard to selecting officers for promotions. When Defendants promoted problematic captains to ADW positions in early 2023, FOF ¶¶ 638-644, the Monitor recommended revisions to the screening process to ensure these problematic promotions would not recur. *Id.* ¶ 645. But Defendants did not implement these recommendations, despite a senior Department executive assuring the Monitor that they would do so, and despite discussing these recommendations at a Court status conference. *Id.* Even an additional court order was not sufficient motivation for DOC to revise pre-promotional procedures. Aug. 10, 2023 Order at ¶ 10; *supra* I(B)(4)(b).

Along the same lines, DOC did not engage with the Monitor's repeated offers to assist with the revisions to the ESU screening process required by First Remedial Order Section A, ¶ 6, and at one point failed even to provide the Monitor with sufficient documentation to effectively evaluate the screening process when asked. FOF ¶¶ 511-515, 521-525. After the Court ordered Defendants to revise the screening policies, DOC finally proposed revisions, but they were not sufficient, so additional revision is still needed—in contravention of the Court's deadline of October 30, 2023. *Id.* ¶¶ 514-515. The Court's August 10, 2023 Order also required Defendants to revise other ESU-related policies regarding what types of force ESU staff may use, including some policies on which the Monitor had provided feedback two *years* earlier which was never

addressed. *Id.* ¶¶ 521-525. When DOC eventually did supply proposed revisions, they "did not address most of the Monitoring Team's feedback and inexplicably did not reflect the changes that the Department reported it was intending to make." *Id.* ¶ 525.  To date, the policies have not been revised. *Id.*

Another glaring example of Defendants' unreasonable delay in addressing the Monitor's recommendations is their persistent resistance to the Monitor's May 2021 recommendation to expand the hiring pool for wardens and deputy wardens to external candidates. FOF ¶¶ 1112-1125. It took a year –and –a half for Defendants to agree to the requisite court order to allow for external warden candidates, first insisting on a blatantly unworkable substitute even as the Monitor expressed serious concerns about that plan—which predictably failed. *Id.* ¶¶ 1118-1123. Now, even though they demonstrably cannot comply with the Court's order to improve facility leadership, *see supra*, Defendants still refuse to seek a court order to permit hiring deputy wardens externally. *See* FOF ¶ 1124.

Defendants also have failed to take advantage of the Monitor's expertise in order to improve escort practices and search procedures as required by the Action Plan and the August 10, 2023 order. Action Plan § D(2); Aug. 10, 2023 Order ¶¶ 2, 3. Defendants made "numerous" commitments to consult with the Monitor regarding how to improve escort practices, but never did so. *Supra* II(B)(3)(c). Defendants also failed to even address written feedback on search procedures for *two years* despite the Action Plan requirement to improve them. *Id.* After the Court ordered DOC to revise the search procedures in August 2023, DOC finally provided proposed revisions—but they "did not address most of the Monitoring Teams' feedback" and "remain incomplete." FOF ¶ 380.

These failures to take reasonable, recommended steps toward compliance are striking evidence of Defendants' lack of diligence.

### 3. The Measures Defendants Have Taken Have Been Ineffective and Insufficient

Over the years, DOC has spilled much ink describing measures it promises to take to comply with the Court's orders. But its actions have been nowhere near the sustained, drastic measures that are needed to bring DOC into compliance. DOC's efforts can be thus summarized:

- *Superficial Initiatives*. As the Monitor explained, "most of the initiatives the City and Department have identified so far merely focus on revising policy, issuing memorandums and reading teletypes at roll call (which, notably, not all staff attend) or reiterating existing practices or trainings." FOF ¶ 1171.

- *Deflection*. DOC "continues to focus on the failures of prior administrations as pretext for its current actions and inactions [when] the Department's proposals are often substantially similar to those of prior administrations, with little to no apparent awareness that the plans were ineffective in the original incarnation or why." *Id.* ¶ 1102.

- *Haphazard Policy Revision*. When DOC does finally engage and propose revisions, "they are "frequently internally inconsistent, may not address previous feedback[,] . . . may not always be consistent with sound correctional practice, may not reflect the practices the Department reported the revisions were intended to address, and paradoxically, may even reintroduce the very practices the policies were intended to curtail." *Id.* ¶ 1107.

- *Unreliable Development and Implementation*. In line with a "diminishing sense of urgency," DOC's initiatives are in ongoing "flux or are never fully implemented"; and absent "the Monitor's insistence, critical problems were not being recognized or addressed." *Id.* ¶¶ 1172 (including security plans, ESU screening, ID regression).

As a result, most of Defendants' recent proposals remain "haphazard, tepid, and insubstantial," and will not create the type of culture change and practice improvements that are prerequisite to effective reform. FOF ¶ 1171-1173. These plans are "too often . . . abandoned prior to implementation or . . . discontinued without first attempting to understand which components may have been effective." *Id.* ¶ 1056. Such facially insufficient steps taken to comply with court orders do not constitute reasonable diligence.

As recently as four days ago, DOC engaged in the "erratic, chaotic, and dysfunctional management practices" that are the hallmark of its initiatives. FOF ¶ 1181. On November 13, 2023, DOC opened a new Arson Housing Reduction Unit ("AHRU")—and after an anonymous source notified the Monitor of the unit's existence, and the Monitor sought information from DOC—hastily closed it less than 24 hours later. *Id.* ¶¶ 1176-1181. DOC failed once again to consult with and notify the Monitor despite its obligations under the Consent Judgment and telling the Monitor it would do so. *Id.* ¶ 1178. DOC appears to have opened the housing unit "on short notice, with little planning, little to no guidance to staff, unclear admission criteria, and poorly defined rules and restrictions," which was "unwise, at best, and is the antithesis of restoring order." *Id.* ¶ 1179. Such actions are more "likely to *increase* the risk of harm rather than diminish it." *Id.* ¶ 1180.

DOC's failure to address basic security deficiencies as ordered by the Court in the Second Remedial Order, Action Plan, and August 2023 Order illustrates the shocking insufficiency of their efforts. DOC unilaterally abandoned implementation of a system-wide security plan despite two court orders requiring it to adopt one, and subsequently abandoned even their far narrower violence plans at specific facilities. *Supra* I(B)(3)(a). Defendants' own *recent* representations regarding their efforts indicate lethargic and stale approaches: focusing on

policy revisions, roll call binders, and filing systems. *Id.* ¶ 1171.  Defendants have failed to hold staff accountable for pervasive failures to tour, only *begun to devise* methods to utilize tour wand information a year after the Action Plan was ordered, and, despite court-ordered requirements to audit tour wand data, were not even aware of the unavailability of tour wands across facilities until the Monitor raised the issue. *Supra* I(B)(3)(b).

In October 2023—sixteen months after the Action Plan was entered—the Monitor observed Defendants' "continuing lack of urgency to address basic security practices" and found that "alarming conditions . . . have only worsened." FOF ¶ 327; *see supra* I(B)(3). Even as conditions continued to deteriorate and after the Court ordered DOC to meet with the Monitor to develop a plan to ameliorate harm last month, DOC leadership "focused primarily on gang interdiction efforts and the failures of the prior administration." *Id.* ¶ 326. When the Monitor raised concern that these proposals were insufficient, DOC came up with a new plan—one that "lack[s] adequate detail, and many components of the plan are substantially similar to what has been attempted in the past, without a corresponding discussion of how the implementation failures of the past will now be avoided." *Id.* In those October 2023 meetings, DOC also touted a new "Anti-Violence Response Team" as a solution to violence, even though an eight-member team for a system of thousands is patently insufficient and the ad hoc team's presence will likely be "too sporadic, insufficiently intensive, and of inadequate duration to catalyze the type of wholesale behavior change that is needed on each housing unit in every jail." *Id.*

Defendants' deficient efforts to implement the Use of Force Directive and improve basic security practices stem from their abject failure—and, at times, resistance—to improve supervision at all levels of the agency. Facility leaders simply do not reasonably utilize the voluminous information available to them to inform supervision approaches. *Supra* I(B)(4)(a).

For example, audits of security practices have proved ineffectual to improve Defendants' supervision strategies because facility leaders consistently fail to adequately respond to their disturbing findings. *Supra* I(B)(4)(a); FOF ¶¶ 337, 438-439, 582-583, 1171. Facility leaders also regularly fail to identify use of force misconduct in Rapid Reviews. *Supra* I(B)(4)(a). These derelict responses—especially as security failures like touring lapses and unsecured doors contribute to unnecessary force, deaths, and serious injury, *supra* I(B)(3)—are the definition of "[bearing] with seeming equanimity long periods of nonperformance." *See Aspira of New York*, 423 F. Supp at 654. As noted above, these longstanding inadequacies in the ranks of facility leaders render Defendants' prior resistance to considering external warden candidates, and ongoing resistance to considering external Deputy Warden candidates, even more bewildering, and are evidence of a lack of reasonable diligence.

Defendants have likewise approached the requirements to improve supervision by ensuring the adequacy of the ADW and Captain ranks with a "sense of nonurgency bordering on indifference." *Id*. The First Remedial Order and Action Plan requirements to increase the number of ADWs to ensure adequate supervision of Captains and to increase the number of Captains were entered over three years and one year ago, respectively. First Remedial Order § A, ¶ 4; Action Plan § C, ¶ 3(iii). Defendants' efforts to comply have been sluggish at best. In April 2023—nearly a year after the Action Plan was entered— Defendants had merely "begun" an "evaluation" as to how to fulfill their court-ordered obligation to prioritize assignment of Captains in housing units. FOF ¶ 601. Despite admitting in July 2023 that they had an insufficient number of Captains and the Monitor's finding that the number of ADWs and Captains was insufficient to fulfill Defendants' obligations under this Court's orders, as of October 2023, Defendants have yet to materially increase the number of ADWs and Captains in

the housing units. *Supra* I(B)(4)(b), (c). These failures come at the same time as Defendants have made poor ADW promotion decisions and offered inadequate ADW training, virtually ensuring supervision will remain inadequate to correct use of force misconduct and fundamental security breaches. *Supra* I(B)(4)(b).

Yet another example of Defendants' woefully insufficient efforts is the completely inadequate approach to staffing deployment reforms required by the Action Plan: reducing awarded posts, minimizing 4x2 scheduling, and civilianizing appropriate positions to free up uniform staff. DOC's ability to reduce awarded posts and implement 4x2 scheduling both appear to be impeded by labor agreement constraints, which Defendants first insisted to the Court did not exist, then utterly failed to take meaningful steps to resolve. *Supra* I(B)(5)(a), (b).

In the case of awarded posts, the City continued to represent that it was within DOC's unilateral power to reduce the number of awarded posts as the Court had ordered, only for DOC officials to insist several times, over a period of months, that they were barred from doing so by labor agreements. *Supra* I(B)(5)(a). Even more fundamentally, DOC has yet to ascertain how many awarded posts even exist. *Id*.

DOC has also failed to even identify posts that do not require specialized training and thus could be—but are not—staffed by civilians. DOC's reported biweekly meetings for months have produced no results, and even in the rare case where DOC identified posts that should be staffed by civilians or eliminated as superfluous, they did not move diligently to "reduce" the assignment of unnecessary uniformed posts. FOF ¶ 700; *supra* I(B)(5)(c).

These lethargic efforts fall far short of "diligence, effective control, and steadfast purpose." *Powell* at 933. And this lack of reasonable efforts has a cascading effect—as DOC fails to efficiently utilize its extraordinary staffing complement, for example, it also fails to make

reasonable efforts toward satisfying the court order to consistently assign staff and implement Direct Supervision in units housing 18-year-olds. *Supra* I(B)(7).

4.   **Defendants Have Taken Affirmative Steps, Sometimes Against the Monitor's Recommendations, That Have Resulted in Regression as Opposed to Compliance**

Perhaps most troublingly, Defendants have made decisions that predictably moved them backwards. "Instead of a reform trajectory characterized by incremental progress, the Department's path has recently been dominated by deteriorating practices, failures to utilize policies and procedures that had previously been in place, and the inability to effectively implement the few new strategies that have been developed." FOF ¶ 1174. This is most clearly the case with respect to investigations of staff misconduct and the closely related requirement to hold staff accountable for such misconduct. As described in detail above, *supra* I(B)(2)(a), Defendants fired a leader the Monitor had praised for making progress, installed a new leader who promptly undermined the integrity of ID, and then ignored for months the Monitor's warnings that ID was deteriorating. This resulted in a substantial regression in the quality of Use of Force investigations and accountability, which has still not been repaired seven months after the Monitor publicly reported it. FOF ¶¶ 752-755, 768-769, 774-775.  Defendants recently demoted another leader the Monitor had praised for his objectivity and identified as key to the effort to reverse ID's recent deterioration. *Supra* I(B)(2)(a). DOC has also failed to remedy plunging ID staffing levels, reporting that it is engaging in an "internal staffing analysis" but providing "vague or unresponsive" answers about the nature of that analysis." FOF ¶ 805.

Although DOC has initiated some look-back processes and a quality assurance system, these actions have thus far primarily resulted in correcting mistakes in previously closed investigations, and in identifying problems that the Monitor had already highlighted. FOF ¶¶ 766-769. But DOC has failed to take an important and obvious step to improve future

61

investigations: DOC could not identify *a single case* in which an ID investigator or supervisor was formally or informally disciplined for conducting an inadequate investigation since January 2022, despite the Monitor's finding that inadequate investigations occurred frequently during this period. *Id.* ¶¶ 776-777, 780. This failure is all the more troubling given that the Consent Judgment requires that "any Staff Member found to have conducted a biased, incomplete, or inadequate investigation of a Use of Force Incident, and any Supervisor or manager who reviewed and approved such an investigation, shall be subject to appropriate discipline, instruction, or counseling." Consent Judgment § VII (4). Also troubling is DOC's initial refusal to respond to the Monitor's requests for this information. FOF ¶ 780.

This regression that has happened in ID is antithetical to the concept of reasonable diligence. Indeed, as the Monitor explained, it "calls into question the City's and Department's level of commitment and ability to achieve compliance with the requirements regarding investigation and accountability of the Nunez Court Orders." FOF ¶ 856.

The deterioration of RNDC and GRVC further illustrate the Department's inability to sustain progress. In spring of 2022, individual violence reduction plans for RNDC and GRVC were devised and implemented, initially had a "positive impact," then were ultimately abandoned with "seemingly little attention to which parts were effective and why." FOF ¶¶ 117-119. Such lack of focused attention resulted in a resurgence of dangerous, violent conditions. *See supra* I(B)(3)(a).

At bottom, Defendants simply cannot show reasonable diligence because they have not created or implemented any "reasonably effective" methods of compliance. If they had, eight years would not have gone by with so little progress toward substantial compliance with the Consent Judgment.

## II.    APPOINTMENT OF A RECEIVER IS NECESSARY TO SECURE RELIEF FOR THE PLAINTIFF CLASS

Eight years of leaving reform in the hands of Defendants have failed to protect the

Plaintiff Class and remedy the violations of federal law that threaten their lives and their safety.

Appointment of a receiver is necessary to bring Defendants into compliance with the Court's

orders and constitutional standards. The equitable factors that courts, including the Second

Circuit, typically consider when contemplating receivership in the institutional reform context all

support the need for a receiver here; the voluminous factual and procedural record establishes

Defendants' longstanding inability and unwillingness to meet the requirements of the Consent

Judgment and this Court's subsequent orders, their complete failure to remedy the violations of

class members' constitutional rights, and the futility of pursuing further paths that depend on the

actions of these Defendants. In addition, the appointment of a receiver with the powers necessary

to implement the Court's orders in this case complies with the limitations on prospective relief

set forth in the Prison Litigation Reform Act ("PLRA").

### A.    Federal Courts Have Broad Remedial Authority to Ensure Compliance with their Orders and Appoint a Receiver.

The Supreme Court and Second Circuit have long recognized that courts possess broad

equitable powers to fashion relief that compels compliance with their orders. *See Swann v.*

*Charlotte–Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971); *Berger v. Heckler*, 771 F.2d 1556,

1568 (2d Cir. 1985); *Hutto v. Finney,* 437 U.S. 678, 696 (1978). A "federal court's interest in

orderly, expeditious proceedings justifies any reasonable action taken by the court to secure

compliance with its orders." *Berger*, 771 F.2d at 1568. A consent decree "vests the court with

equitable discretion to enforce the obligations imposed on the parties . . . . The court's interest in

protecting the integrity of such a decree justifies any reasonable action taken by the court to

secure compliance." *United States v. Loc. 359*, 55 F.3d 64, 69 (2d Cir. 1995); *see also CBS*

*Broad. Inc. v. FilmOn.com, Inc*., 814 F.3d 91, 101 (2d Cir. 2016); *King v. Allied Vision, Ltd.*, 65

F.3d 1051, 1058 (2d Cir. 1995) ("[D]istrict court has broad equitable discretion to enforce the

obligations of the decree."); *E.E.O.C. v. Loc. 580, Int'l Ass'n of Bridge, Structural &*

*Ornamental Ironworkers, Joint Apprentice-Journeyman Educ. Fund*, 925 F.2d 588, 593 (2d Cir.

1991) ("Until parties to such an instrument have fulfilled their express obligations, the court has

continuing authority and discretion – pursuant to its independent, juridical interests – to ensure

compliance.").

  Courts have drawn on their equity jurisdiction to appoint receivers to secure compliance

with their orders. *See United States v. ILA Loc. 1588*, 77 F. App'x 542, 545 (2d Cir. 2003)

(affirming appointment of an administrator to take control of a union); *Morgan v. McDonough*,

540 F.2d 527, 533 (1st Cir. 1976), *cert. denied,* 429 U.S. 1042 (1977) (noting that "receiverships

are and have for years been a familiar equitable mechanism" in contexts outside of institutional

reform litigation) (citing Fed. R. Civ. P. 66; 4 Pomeroy, Equity Jurisprudence § 1330 *et seq.*

(Symons ed. 1941)); *Plata v. Schwarzenegger* (*Plata I*), No. C01-1351 TEH, 2005 WL 2932253,

at *22–23 (N.D. Cal. Oct. 3, 2005), *aff'd*, *Brown v. Plata* (*Plata III*), 563 U.S. 493 (2011)

(detailing expansion of receivership remedy from its roots in English Chancery Courts to use in

public institutional reform litigation). Receiverships "are recognized equitable tools available to

the courts to remedy otherwise uncorrectable violations of the Constitution or laws." *Plata II*,

603 F.3d at 1093-94. "[C]ourts have appointed receivers to protect constitutional and statutory

rights in a variety of circumstances." *Dixon v. Barry*, 967 F. Supp. 535, 550 (D.D.C. 1997).

Receivers have been appointed "to coerce public officials to comply with legal mandates in a

number of factual settings, including public schools, housing, highways, nursing homes, and

prisons." *Id*.; *Morgan*, 540 F.2d at 529-30 (affirming district court's appointment of receiver

over South Boston high school to ensure compliance with court's desegregation decrees and

protect students); *Gary W. v. State of Louisiana*, No. 74-cv-2412, 1990 WL 17537, at *30-33

(E.D. La. Feb. 26, 1990) (state children's services agencies*); Turner v. Goolsby*, 255 F. Supp.

724, 730 (S.D. Ga. 1966) (county school system); *Judge Rotenberg Educ. Ctr., Inc. v. Comm'r of

Dep't of Mental Retardation*, 677 N.E.2d 127, 150 (1997) *abrogated on other grounds by In re

Birchall*, 913 N.E.2d 799, 813 (2009).[13]

      Prisons and jails, too, have been placed in receivership to remedy entrenched violations

of the law, and the PLRA does not diminish the Court's equitable authority to appoint a receiver.

*See Plata II,* 603 F.3d at 1093-94; *accord Plata III*, 563 U.S. at 526 ("The PLRA should not be

interpreted to place undue restrictions on the authority of federal courts to fashion practical

remedies when confronted with complex and intractable constitutional violations."). Just as

courts appointed receivers over prisons and jails prior to enactment of the PLRA,[14] several courts

have appointed receivers over prisons and jails since the PLRA was enacted in 1996. *See United

States v. Hinds Cnty.,* No. 3:16-CV-489-CWR-BWR, 2023 WL 1186925 at *5 (S.D. Miss. Jan.

30, 2023) (appointing receiver and noting that "[j]ail receiverships [] hew to the recognized

statutory and equitable bounds of a district court's authority"); *United States v. Miami-Dade

Cnty.*, Case No. 13-cv-21570, Stipulated Order Regarding Appointment of Independent Jail

---

[13] Courts can enter equitable remedial relief, including receivership, "even absent a finding of contempt." *Berger*, 771 F.2d at 1569 (citing *Alexander v. Hill*, 707 F.2d 780, 783 (4th Cir. 1983)); *see, e.g.*, *United States ex rel. Anti-Discrimination Ctr. of Metro New York, Inc. v. Westchester Cnty*., No. 06 CIV. 2860 (DLC), 2016 WL 3004662, at *21 (S.D.N.Y. May 24, 2016), *aff'd sub nom. United States ex rel. Anti-Discrimination Ctr. of Metro New York, Inc. v. Westchester Cnty*., *New York*, 689 F. App'x 71 (2d Cir. 2017) (ordering county to take certain steps to effectuate development of affordable housing units); *United States v. Visa U.S.A., Inc*., No. 98-cv-7076, 2007 WL 1741885, at *3 (S.D.N.Y. June 15, 2007) (as remedy for Visa's violation of final judgment, requiring Visa to rescind corporate by-law and to permit banks to terminate their contracts with Visa); *Plata v. Schwarzenegger (Plata I)*, No. C01-1351 TEH, 2005 WL 2932253, at *22–23 (N.D. Cal. Oct. 3, 2005), *aff'd, Brown v. Plata* (Plata III), 563 U.S. 493 (2011).
[14] *See Inmates of D.C. Jail v. Jackson*, 158 F.3d 1357, 1359 (D.C. Cir. 1995) (jail's medical and mental health services); *Shaw v. Allen*, 771 F. Supp. 760 (S.D. W.Va. 1990) (county jail); *Wayne County Jail Inmates v. Wayne County Chief Executive Off'r*, 178 Mich. App. 634 (1989) (county jail); *Newman v. Alabama*, 466 F. Supp. 628, 635 (M.D. Ala. 1979) (Alabama state prison system).

Compliance Director (S.D. Fla. Feb. 16, 2023) (Dkt. 260) (appointing receiver with control over certain conditions in county jails); *Jones v. Gusman,* Case No. 2:12-cv-00859, Stipulated Order for Appointment of Independent Jail Compliance Director (E.D. La. June 21, 2016) (Dkt. 1082) (appointing individual with control over Orleans Parish jail); *Plata I,* 2005 WL 2932253 at *33 (appointing receiver over delivery of health care in California prisons); *Harper v. Bennett,* No. 1:04-cv-01416-MHS, Order Appointing Receiver (N.D. Ga. July 14, 2004) (Dkt. 41) (appointing receiver for Fulton County Jail to replace Sheriff until next election).

Appointment of a receiver under the PLRA must satisfy the statute's general provision limiting prospective relief to that which is "narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right," and which gives "substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief." 18 U.S.C. § 3626(a)(1); *see Plata II,* 603 F.3d at 1098 (affirming finding that continuation of a receivership satisfied §3626(a)(1) need-narrowness-intrusiveness requirements); *Hinds Cnty.*, 2023 WL 1186925, at *2, 13, 15, 20 (making need-narrowness-intrusiveness findings to support appointment of a receiver); *Harper*, No. 1:04-cv-01416-MHS, Consent Order Regarding Jail Custodian and Receiver at 3 (N.D. Ga. July 3, 2004) (Dkt. 24).

*Plata I* made those findings, 2005 WL 2932253, at *33, after reviewing the factors that courts have commonly considered in determining the appropriateness of a receivership in cases involving public institutions. These include: (1) Whether there is a grave and immediate threat or actuality of harm to plaintiffs; (2) Whether the use of less extreme measures of remediation have been exhausted or prove futile; (3) Whether continued insistence that compliance with the Court's orders would lead only to confrontation and delay; (4) Whether there is a lack of

leadership to turn the tide within a reasonable period of time; (5) Whether there is bad faith; (6) Whether resources are being wasted; and (7) Whether a receiver is likely to provide a relatively quick and efficient remedy. *Plata I*, 2005 WL 2932253, at *23; *Dixon*, 967 F. Supp. at 550. The first two elements are given "predominant weight." *Plata I,* 2005 WL 2932253, at *23.

Plaintiffs discuss each of these factors below.

### B.      Plaintiffs Face a Grave and Immediate Threat and Actuality of Harm

As the Monitor recently concluded, "[t]he jails remain dangerous and unsafe, characterized by a pervasive, imminent risk of harm to both people in custody and staff." FOF ¶ 75.

The record demonstrates—and this submission has already discussed extensively—Defendants' persistent failure to abate their pattern and practice of using excessive and unnecessary force, and failure to keep people in their custody safe. From deaths to serious injuries, to stabbings and slashings, threats to the safety and well-being of the Plaintiff Class are as numerous as they are shocking. Here, Plaintiffs provide recent data demonstrating that harm to incarcerated people in the City jails is currently at crisis levels; give several documented examples of serious harm from this calendar year that underscore the imminence of this pervasive harm; and discuss how the pattern of recent deaths in DOC custody both underscores Defendants' systemic failure to comply with the Court's orders, and speaks for itself in establishing the gravity of the risk to the Plaintiff Class.

### 1.      The Gravity of Harm is at Crisis Levels

Plaintiffs will not repeat here the Monitor's findings and other data, discussed extensively in the preceding sections, that demonstrate the overall pervasiveness of excessive and unnecessary force in DOC's jails, although that data is relevant to the Court's consideration of this issue. Rather, two additional points bear emphasis.

First, the risk of severe harm in the jails is as imminent, if not more imminent, in the present moment as it was when the Consent Judgment was entered. The average rate of use of force for January through May 2023 was 9.13, more than double the rate of 3.96 from 2016. FOF ¶¶ 87; 115. Similar patterns are present with regard to other harm indicators. There were 468 stabbings or slashings in Defendants' facilities in 2022, as compared to 159 in 2016, and DOC is on track to record almost 400 stabbings or slashings this year if rates continue (although this is likely an undercount, for reasons explained below, *infra* II(D)). FOF ¶¶ 101-103. There were more than 5,800 fights among incarcerated people in 2022, and 2,396 in just the first five months of 2023. *Id.* ¶¶ 111-13. Although not every use of force is an excessive or unnecessary one, general use of force rates as high as those in DOC—where there were *more than 7,000 uses of force in 2022 alone, id.* ¶ 88—pose a significant risk of severe harm to incarcerated people. Even minor use of force incidents can escalate quickly, and the overall prevalence of force sows distrust, anger, and fear that can create a downward spiral of conflict and more force. *Id.* ¶ 283. Along the same lines, frequent fights and stabbings create an environment of violence and chaos inside the jails, resulting in a vicious cycle that leads to more excessive and unnecessary force. *Id.* ¶¶ 111-113; 282-283.

Second, the severity of the harm is extreme. DOC classifies use of force incidents based on the most serious injury sustained by anyone involved in the incident, designating as "Class A" those incidents that produce the most serious injuries. FOF ¶ 90-91. ████████████ ███████████████████████████████████████████████████████████ ██████. *Id.* ¶¶ 92-93. These numbers are disconcertingly high, both on their own and in comparison to DOC's previous performance: in 2016, there were 74 Class A use of force incidents. *Id.* ¶ 92. The proportion of use of force incidents resulting in serious injuries has also

68

increased, from 2% in 2016 to 4% in the first five months of 2023. *Id.* ¶ 94. Similarly, the frequency of head strikes—with 587 use of force incidents in January through May 2023 involving blows to the head—is extraordinary. *Id.* ¶ 248. For the prevalence of dangerous and injurious force to be so high after eight years of a remedial effort means that the remedies have failed.

This ongoing, grave harm clearly demonstrates that "without severe action by the Court . . . suffering and loss of life will continue unabated[.]" *Dixon,* 967 F. Supp. 535, 554. As the Monitor stated last week, Defendants continue "to spend significant time engaged in a concerted effort to create a narrative that is misleading and wholly inconsistent with the reality of the conditions at DOC. The consequence of this approach is that the City and Department have normalized the dangerous and chaotic conditions that permeate the jails." FOF ¶ 1102.

**2.     Recent Individual Instances of Violence Underscore the Imminence and Severity of the Harm Faced by the Plaintiff Class**

In May 2023, Mr. Carlton James (whose experience is described in the Monitor's May 26, 2023 report as "Incident 1") was involved in two successive uses of force, and suffered an injury so severe that he required three surgeries and is now paralyzed from the neck down. Declaration of Carlton James dated November 10, 2023, Ex. 84; FOF ¶¶ 260-265. During the second incident, in which he was rear cuffed and in leg shackles in a search room, multiple officers took him to the floor face down, and his shackles prevented him from protecting himself. *Id.* His head hit objects and ultimately the concrete floor, after which his body was limp. *Id.* He remains paralyzed to this day. *Id.*[15]

---

[15] Rather than take accountability for this horrific incident and the extreme harm it caused, DOC immediately denied that there had been any staff misconduct at all, in contrast with the objective evidence. FOF ¶¶ 262-263. Indeed, in response to inquiries from the Monitor, DOC asserted that Mr. James's paralysis was a result of his falling while trying to tie or put on his shoes. FOF ¶ 262. Given the video showing that Mr. James was subjected to two serious uses of force just before his injuries, including one in which his head hit the concrete floor and his body went limp, the Monitor described this claim as "questionable at best." FOF ¶ 262.

69

The incidents of unnecessary or excessive force described in section I.A., *supra*, further illustrate the harm the Plaintiff Class continues to suffer on a daily basis in DOC custody, as do other examples drawn from DOC's intake investigations, class members' accounts, and the Monitor's reports. For instance:

- In April 2023, an officer who was escorting class member Joshua Gonzalez from the clinic to his housing area took Mr. Gonzalez to the ground face-first while Mr. Gonzalez's hands were cuffed behind his back, causing Mr. Gonzalez to hit the floor hard, injuring his mouth. Because Mr. Gonzalez's hands were restrained behind his back, he could not use his arms to break his fall. Ultimately, after weeks of pain and difficulty eating, Mr. Gonzalez had a tooth removed because it was fractured and could not be restored. The escorting officer's take-down occurred in response to Mr. Gonzalez's movement toward a different officer he wanted to speak to about being permitted to take a shower. Declaration of Joshua Gonzalez dated November 9, 2023, Ex. 85; FOF ¶ 266 (UOF 1951/23).

- In June 2023, a class member sustained visible injuries to his mouth and a chin laceration that required sutures when an officer reacted to his lack of cooperation with an escort by pushing him against a wall and then grabbing his leg irons, causing him to fall face first to the floor, all while he was in restraints. FOF ¶ 280 (UOF 3650/23).

- In August 2023, Andre Brown asked the officer in his housing unit to open his cell door so he could go into his cell after finishing a phone call with his mother. As he entered the cell, two other incarcerated people followed him in, likely within view of the floor officer. The two people shut the door behind them, which automatically locked, and then immediately attacked Mr. Brown with sharp plexiglass and a razor blade. They were able

to stab Mr. Brown more than a dozen times before an officer opened the door. Mr. Brown's injuries were so severe that he needed staples in his head, stitches all over his body, and surgery on his ear to repair his wounds. Declaration of Andre Brown dated November 9, 2023, Ex. 86; FOF ¶ 450.

- In September 2023, a class member sustained a fracture to the side of his face after an officer opened the door to his cell and then immediately left the housing unit, allowing the class member to be assaulted in his cell. The officer returned to the housing unit about 25 minutes after the incident, but did not address the class member, who did not receive medical attention until two days later. FOF ¶ 452.

- In April 2023, a class member sustained post-concussive syndrome and a facial and nose contusion when officers took him to the ground during an escort, despite the fact that he was rear-cuffed. FOF ¶ 275 (UOF 1656/23).

- In February 2023, a class member experienced post-concussive syndrome requiring a CT scan when a group of officers pushed her against the wall, sprayed her in the face with a chemical agent, and then aggressively took her to the floor, falling on top of her. FOF ¶ 269 (UOF 683/23).

- In September 2023, a class member sustained second-degree burns so severe he was hospitalized for at least six days. The burns occurred after an officer abandoned his post in the new admissions intake area of EMTC, leaving the area unsupervised, thus allowing an incarcerated person to pour hot water on this class member. DOC did not inform the Monitor of this incident, even though the Court's June 13, 2023 order requires DOC to inform the Monitor when a class member sustains a serious injury that requires a hospital visit. FOF ¶ 451.

- In May 2023, a class member sustained orbital swelling, bruising, bilateral subconjunctival hemorrhage, and nasal bridge swelling and tenderness after an officer did not act when a group of nine incarcerated people pushed this class member into his cell and then closed the door behind them. In fact, rather than responding to this incident, the officer left the housing area, leaving it unsupervised and allowing the group of nine people to remain in the class member's cell for sixteen minutes. FOF ¶¶ 444, 622 (COD 1779/23).

### 3.   Too Many People Have Died in DOC Custody

Of all the harms the Plaintiff Class face, none are more disturbing than the risk that an individual will die an avoidable death while incarcerated. Tragically, 19 people died either in Defendants' custody or immediately following their release in 2022, the highest number since 2013, and more than double the mortality rate at the inception of the Consent Judgment in 2016. FOF ¶¶ 121-23. The Board of Correction ("the Board"), a New York City governmental oversight body which is required by law to investigate the circumstances of deaths in DOC custody, documented a number of security and correctional failures surrounding these deaths, including that 13 of the 19 deaths involved failures by staff to tour or supervise people in custody, thus linking those deaths to Defendants' systemic failures to comply with this Court's orders.  *Id.* ¶¶ 171, 346; *see supra* I(B)(3)(b) (discussing non-compliance with Court's orders regarding routine tours).

A review of the correctional failures precipitating these deaths begins to sound like a broken record: Mr. Tarz Youngblood died after correction officers failed to check his cell and remove a cell window obstruction for more than three hours. FOF ¶¶ 176-77. Mr. Elijah Muhammad was found unresponsive after the floor officer abandoned their post for one and a half hours, with no captain having toured in over five hours. *Id.* ¶¶ 194-95.  Mr. Ricardo Cruciani

died in August 2022 after he was able to collect linen and enter a bathroom without being

stopped, where he was later found with a sheet around his neck—not by Department staff, but by

a fellow incarcerated person.[16] *Id.* ¶¶ 198-200. There was no B post officer assigned to supervise

the floor of Mr. Cruciani's unit on the day of his death nor the day prior, and no captain toured

Mr. Cruciani's unit on the day he died. *Id.* ¶¶ 198. The Board noted similar deficiencies

surrounding other deaths in 2022. *Id.* ¶¶ 171-76, 178-80, 185-212.

These horrific patterns have continued in 2023, underscoring the imminent risk of new

deaths. As of November 15, 2023, nine people have died in DOC jails or immediately following

their release this year, and the available investigations and reports show many of these same

patterns of correctional failures. FOF ¶ 123. For example, officers were suspended for

abandoning post, failing to tour, and making false logbook entries in relation to Mr. Marvin

Pines's death. *Id.* ¶¶ 129-33. Similarly, officers were suspended for abandoning their posts and

failing to supervise in connection with Mr. William Johnstone's death. *Id.* ¶¶ 158-60. Video of

Mr. Felix Tavares's housing unit in the hours leading up to his death showed failures to enforce

lock-in, failures by a captain to tour, and failures to provide timely medical treatment. *Id.* ¶¶ 152-

55. Similar deficiencies were also present in the circumstances surrounding several other deaths

in 2023. *Id.* ¶¶ 124-69. According to the Monitor:

---

[16] The Monitor has raised concerns about self-harm in DOC custody for years, leading the Court to require in its
Second Remedial Order that Defendants must take necessary steps to ensure their Suicide Prevention Policy is
followed. FOF ¶¶ 914-915. This requirement was reiterated in the Action Plan. FOF ¶ 629. In October 2022, more
than a year after the Second Remedial Order and several months after the Action Plan was entered, the Monitor's
concerns remained. He thus made a number of recommendations for "immediate steps" Defendants should take to
reduce self-harm risk in their facilities. FOF ¶ 923. While the Department did make initial efforts toward some of
these steps, in July 2023 the Monitor found that these efforts did not successfully remediate staff practice, which
was the crux of the concern. FOF ¶ 925. Unnecessary delays had been introduced, such as Defendants' failure to
utilize their retained expert on suicide prevention for several months, and as well as the DOC Suicide Prevention
Task Force's failure to take any tangible actions on many of its planned initiatives, allowing them to languish.
Between the Second Remedial Order and October 31, 2022, seven people died as a result of suicide or suspected
suicide in DOC custody. FOF ¶ 927. Between April 6, 2023 and September 30, 2023, DOC data tracking indicates
there were approximately 560 incidents of self-injurious behavior or attempted suicides reported. FOF ¶ 916

> a review of video footage related to five of the . . . deaths [in 2023]
> revealed that the surrounding circumstances were not particularly
> unusual or unique, but instead were typical of the variety of
> security problems that plague all the Department's housing units.
> These include security lapses like unsecured doors, individuals in
> unauthorized areas, superficial Officer and Supervisor tours, and
> staff being off-post or providing inadequate supervision.
> Alarmingly, many of these practices appear to have become
> normalized and staff seemingly fail to recognize the resulting
> safety risks or the ways in which these practices elevate the
> likelihood of a tragic outcome.

*Id.* ¶ 123. DOC's failure to abide by the Court's orders is thus much more than an abstract

matter. For some members of the Plaintiff Class, it is a matter of life or death.

### C.    Continued Lesser Measures of Remediation Are Futile and Will Lead to Further Confrontation and Delay

The Court has exhausted all feasible measures short of receivership to bring Defendants

into compliance. The Court has issued seven remedial orders addressing the various causes of

excessive and unnecessary force and appointed a Monitoring Team with extensive correctional

expertise to provide unparalleled assistance for eight years. But as the Monitor concluded on

November 7, 2023, "[t]he pace of reform has not accelerated and appears to have stagnated

despite direct Orders from the Court in the April 2023 Status Conference, four successive Orders

in June, July, August and October 2023 . . . and repeated and ongoing recommendations from the

Monitoring Team to address the current conditions." FOF ¶ 1052. These interventions have not

been effective because DOC has consistently responded with delay, ineptitude, recalcitrance and

confrontation, and there is every reason to believe that this pattern will persist. As the Monitor

recently explained, "on this present trajectory, the current state of affairs will continue, and likely

worsen." *Id.* ¶ 1168.

### 1.   Neither Eight Successive Court Orders, Nor Eight Years of Active Monitoring, Have Moved Defendants to Comply

Defendants' ongoing non-compliance has required this Court to issue seven additional substantive orders since first entering the Consent Judgment in 2015. FOF ¶¶ 17-73. In 2020 and 2021, three successive orders were entered addressing Defendants' failure to comply with the Consent Judgment's provisions related to implementing the Use of Force Directive, investigations, accountability, and more. *Id.* ¶¶ 25-53. After these three Remedial Orders failed to result in meaningful improvements, the Court shifted to a new approach in June 2022 and entered the Action Plan. *Id.* ¶¶ 54-68.

The Action Plan, developed by DOC along with the Monitor, was designed to address DOC's overall lack of progress by focusing on four foundational obstacles to compliance: poor security practices, inadequate supervision and leadership, ineffective staffing practices, and lack of staff accountability. FOF ¶¶ 54-66. The Plan was supposed to be a threshold step to achieving the goal of the Consent Judgment and prior Remedial Orders. DOC represented to this Court that the Action Plan was "a road map to sustainable reform and to the stabilization of the Department" and a plan that will "ensure the safety of all those who live and work at Rikers." *Id.* ¶ 62; Dkt. No. 463. However, more than one year later, the Monitor found that Defendants had not made substantial progress in implementing its terms, and had not substantially reduced the risk of harm to people in the jails. *Id.* ¶¶ 69-70, 74-75.

After this major failure, Defendants' continued pattern of non-compliance required the Court to enter three additional orders since June 2023. FOF ¶¶ 68-73. These orders required Defendants to cooperate with the Monitor, to take emergency remedial steps to address security failures, and to "devise a plan that can be implemented immediately to ameliorate the unacceptable levels of harm in the New York City jails." *Id.* ¶ 73; Dkt. 582. The Monitor's

November 8 report detailed Defendants' *increasing* refusals or failures to comply with these basic orders—while chaos inside the jails continues.

Defendants have demonstrated — in virtually every core area the Court has identified as related to the persistence of excessive and unnecessary force — that neither court orders nor the Monitor's interventions are sufficient to push DOC toward compliance. Multiple areas of non-compliance described in the contempt section of this brief illustrate the fundamental inability of court orders in this matter to compel reform. Whether addressing Defendants' basic security and correctional failures that fuel the cycle of chaos and violence; the lack of adequate supervision of both line staff and captains; the excessive force of emergency response teams; or entrenched staffing practices that result in housing areas without adequate supervision, the dynamic has been the same. For each, the Monitor's reports established DOC's multiple failures to comply with the Consent Judgment; the Court ordered targeted actions under specific deadlines, sometimes in multiple orders, but these, too, were ignored; and the fundamental problems remain, or in some cases, have become even worse. In this context, the notion that continued insistence on compliance with the Court's orders could lead to productive change borders on the absurd. The history of this case clearly demonstrates what the Monitor has also observed: court orders are simply not sufficient to catalyze real-world changes in how Defendants run the City jails. FOF ¶ 1052.

The failure of this process is all the more troubling given that Defendants have had eight years of assistance from the Court's Monitor and his team. This team includes three subject matter experts who, in combination with the Monitor himself, have over one hundred years of experience in the management, operation, and monitoring of jails and prisons. Decl. of Steve J. Martin, Dkt. 596, ¶ 1. The Monitor has not just reported on DOC's work, but has also offered an

enormous amount of feedback, technical assistance, and expertise. *Id.* at ¶ 5; FOF ¶¶ 9-11. The Monitoring Team has, among other things, conducted numerous site visits, reviewed video footage and reports regarding thousands of violent incidents, participated in countless meetings and discussions with all levels of DOC leadership and staff, and submitted at least 50 reports to the Court detailing the root causes underpinning Defendants' dysfunctional management of the City's jail system. Decl. of Steve J. Martin, Dkt. 596, ¶¶ 4-5. Despite its high quality, this extensive assistance has not been effective. Defendants' pattern of resistance and delay has contributed to their utter failure to correct the constitutional violations at the heart of this case. The current remedial structure, which relies on the Court's detailed orders combined with the Monitor's hard work and expertise, can do no more. As the Monitor recently found, "continuing on the current path is not likely to alter the present course in any meaningful way." FOF ¶ 1169. "Sustained and chronic institutional resistance and recalcitrance toward court ordered reform is an insurmountable impediment to any Monitorship." *Id.* ¶ 1174.

The cost of continuing with the current remedial structure will be delay and confrontation, with that confrontation only leading to even more delay. Indeed, the Parties and the Court have devoted many hours over the last several years to non-compliance correspondence, contempt motions, meet and confers, emergency court conferences, and other adversarial proceedings in a fruitless effort to move Defendants toward compliance. Confrontation has also grown between Defendants and the Monitor, as the Monitor has become progressively more concerned about Defendants' lack of transparency and reliability, and has even recently been forced to seek relief from the Court to compel production of information. *See infra* II(D); FOF ¶¶ 934-1031; Dkt. 590.

The only reasonable conclusion left to draw is the one the Monitor has already reached: "the City and Department have repeatedly and consistently demonstrated that they are incapable of effectively directing the multilayered and multifaced reform effort." FOF ¶ 1169. Without the appointment of a receiver, the patterns described above will simply continue indefinitely. *See Hinds*, 2023 WL 1186925, at \*8 (finding less intrusive means had failed where defendants did not comply with a consent decree, subsequent remedial order, and a new injunction); *Shaw v. Allen*, 771 F. Supp. 760 (S.D.W.Va. 1990) (appointing receiver where defendants remained in non-compliance with a comprehensive order after eight years).

### 2.   Other Options to Obtain Compliance Are Futile, or More Extreme Than Receivership

In theory, there may be other remedies available to the Court aside from receivership, such as financial sanctions, incarceration of incalcitrant defendants, or the extraordinary measure of ordering the release of incarcerated people or closure of jail facilities. But there is little reason to believe these remedies, even if feasible, would secure relief.

Financial costs do not effectively motivate Defendants to improve treatment of people in their custody. The City already pays large sums to individual plaintiffs for damages cases brought against DOC each year, including $37.2 million in Fiscal Year 2022 alone. FOF ¶ 1048. The City also already spends an enormous amount of money running the jails. *See infra* II(E); *Id.* ¶¶ 1081-1083. There is no reason to believe that further financial burdens would result in compliance. *See Hinds*, 2023 WL 1186925, at \*9 (explaining that financial penalties were inappropriate where the county had already spent millions of dollars trying to fix the facility); *Plata I*, 2005 WL 2932253, at \*27 (appointing receiver where usual contempt sanctions would extend the lifespan of a dysfunctional system).

Incarcerating DOC or City leaders until compliance is achieved is also not a realistic option in this complex case that will surely involve a lengthy reform process. Moreover, this remedy is arguably more extreme than that of receivership. *See Hinds*, 22023 WL 1186925, at *7 (noting that "experiencing life at the jail firsthand would surely motivate [defendants] to correct unconstitutional conditions," but declining to impose that "extreme remedy").

Finally, even if this Court were to consider convening a three-judge panel to order the release of incarcerated people, *see* 28 U.S.C. § 3626(a)(3), courts contemplating the appointment of a receiver in the jail or prison context have determined that release or the closure or facilities is a more drastic and intrusive form of relief than the appointment of a receiver. *See Hinds*, 2023 WL 1186925, at *7; *Plata I*, 2005 WL 2932253, at *28.

### D. Defendants' Attempts to Hamper the Monitor's Work Support Appointment of a Receiver, Regardless of Whether Those Attempts Rise to the Level of Bad Faith

While *Plata* listed defendants' "bad faith" as a factor potentially relevant to appointment of a receiver, both that court and the *Hinds County* court appointed a receiver without any finding of bad faith. *See Plata I*, 2005 WL 2932253, at *30; *Hinds*, 2023 WL 1186925, at *12. Here, there is evidence that Defendants have repeatedly failed to cooperate with the Monitor and impeded his work—evidence that further establishes the need for a receiver whether or not it rises to the level of bad faith.

The Monitor has raised concerns that "Defendants are attempting to hamper the Monitor's work." FOF ¶ 941. The problems the Monitor has encountered include DOC's refusals or long delays in providing information to the Monitor, attempts by DOC leaders to discourage the Monitor's reporting, deflection of responsibility by DOC leaders, and the provision of unreliable or conflicting information. *Id.* ¶¶ 938-941, 974-1028. DOC has also failed to consult with the Monitor—or even inform him—about the development of important new policies when

it was required to or had agreed to do so. *Id.* ¶¶ 942-970, 1176-1181. The Monitor has even

reported that some DOC employees fear reprisal if they speak freely and candidly with the

Monitor. *Id.* ¶¶ 1029-1032. Indeed, the Court was forced to issue multiple orders regarding

Defendants' pronounced lack of cooperation in the past several months. Dkt. 550; Dkt. 582 ("the

Court reminds . . . all Defendants that they must not interfere with, attempt to influence, or

otherwise threaten the Monitor.")  And yet, problems continue.

Examples of DOC's problematic actions on this front include:

- In advance of the Monitor's May 26, 2023 emergency report that highlighted five

  disturbing incidents involving serious harm to class members, including the uses

  of force that led to the paralysis of Mr. Carlton James, *supra* II(B)(2), DOC

  leadership called the Monitor's concerns "absurd," and encouraged the Monitor

  not to bring these incidents to the Court's attention. FOF ¶ 979, 985.

- DOC refused to provide information in response to three of the Monitor's requests

  in September and October 2023. The Commissioner claimed the requests were not

  related to this case, despite the fact that all three related to the investigation and

  discipline of staff misconduct, which is a core aspect of the Consent Judgment.

  Ultimately, after weeks of objection and delay, Defendants complied with two of

  the requests, but did not respond to the third until the Court ordered them to do so.

  *Id.* ¶¶ 986-991. One of the responses to the Monitor's request for information

  about discipline of ID investigators and their supervisors, revealed what the

  Monitor called Defendants' "persistent non-compliance" with the Consent

  Judgment requirement to hold ID staff accountable for inadequate investigations.

  *Id.* ¶ 988; *see supra* I(C)(4).

- A senior DOC leader threatened the Monitor with legal action in October 2023, apparently to deflect from the issues at hand and to intimidate the Monitor after he challenged the Department's proposed plans and confronted the individual's unwillingness to address the reality of current deficiencies. *Id.* ¶ 1032.

- Even after the Court explicitly ordered Defendants to notify the Monitor of instances where incarcerated people must go to the hospital due to a serious injury or medical condition, DOC does not reliably make such notifications even when it has the necessary information. *Id.* ¶¶ 1025-1026.

- DOC reported that it issued a memorandum on January 31, 2023 that allowed staff to exercise discretion when determining whether to report certain acts of violence, and suggested that a Tour Commander could consider "various mitigating factors" when determining whether an incident should be reported. *Id.* ¶ 106. Immediately following the issuance of this memo, the number of reported stabbings and slashings dropped by 49%, with no corresponding change in security practices or operations that would explain such a drop. *Id.* ¶ 107. The Monitor subsequently identified stabbing and slashing incidents that were not reported as such this year. The full extent of such unreported incidents is unknown. *Id.* ¶¶ 79-84, 108-110.

- Just this week, as detailed above, the Monitor reported that DOC opened a new unit (AHRU) without consulting the Monitor or even notifying him, despite being required to do so and repeatedly promising him it would. The Monitor only learned of AHRU through an anonymous source. *Id.* ¶¶ 1176-1181. In response to this incident and others illustrating Defendants' deficient transparency and

cooperation with the Monitor—and given the "profound questions that demand

answers about the management of the Department" in light of the Commissioner's

intention to resign—this Court found it necessary to order Defendants to produce

information about ARHU, disclose what (if any) plans DOC has for a leadership

transition, and show cause as to why they are not in contempt. Dkt. 600 at 2.

These actions, individually and cumulatively, impede efforts to comply with the Consent

Judgment and undermine the integrity of the data that the Monitor provides to the Court.

### E.      Defendants Waste Resources of the City, the Monitor, and the Court

The cumulative effect of DOC's repeated noncompliance with court orders has been an

extraordinary waste of taxpayer money as well as the time, effort, and resources of the Court and

the Monitor. The ongoing patterns of starting and stopping various near-identical initiatives,

failing to properly implement plans, regressing in areas where progress was once made, and

failing to effectively deploy valuable resources such as DOC's large staff, drain all of the actors

involved and leave DOC unable to achieve necessary changes.

For years, DOC has wasted time and money cycling through various pilots, programs,

initiatives, and projects that failed or were never launched. FOF ¶¶ 1054-1083; *see Hinds*, 2023

WL 1186925, at *10 (appointing receiver based in part on testimony that the Defendant wasted

time and resources, as "there seems to be a lot of stopping and starting and going in one direction

and then … going in a different direction."). Since 2015, DOC has begun and abandoned scores

of initiatives intending to reduce violence and improve staff use of force practices, including the

"14-point anti-violence reform plan," "The Commissioner's Twelve," a "Medical Triage Pilot," a

"Satellite Intake" initiative, a "Use of Force Improvement Plan," and the "Transfer of Learning."

FOF ¶¶ 1054-1083. And in October 2023, DOC rolled out yet another initiative, the "Anti-

Violence Response Team," which the Monitor has already predicted will likely "be too sporadic,

insufficiently intensive, and of inadequate duration" to be effective. *Id.* ¶ 326. The Department has engaged in a cycle where initiatives are created, changed in some material way, and then must be restarted. *Id.* ¶ 1056. To make matters worse, these plans have been created at great expense by consulting firms hired to do what the City could not, including paying over $20 million to McKinsey between 2018-2021 to develop a violence reduction plan that was ultimately jettisoned in 2021; and, more recently, the City's contract with KPMG for "Implementation of the Nunez Action Plan," for which it has already paid over $1 million. *Id.* ¶ 1083.

Defendants also waste resources by failing to properly implement the plans they invest time and money in, resulting in stagnation or, in some instances, worsening performance. For example, in order to develop a new restrictive housing program for incarcerated people accused of serious violence,[17] Defendants contracted with correctional expert Dr. James Austin, renovated a facility, and created new staffing, security, and training protocols. But as of October 2023, inadequate staffing, poor security practices, and program implementation failures rendered the program a failure mired in violence, chaos and fear. *Id.* ¶ 120. Along the same lines, DOC invested significant time and resources into closing AMKC and opening OBCC in its place, stating that this was necessary because many of the problems at AMKC were caused by inoperable cell doors that did not lock properly. *Id.* ¶ 331. But the Monitor reports all this effort did not help because the same problems that existed at AMKC have replicated themselves at OBCC, where although the doors are operable, staff have failed to enforce lock-in or refused to actually secure operable doors. *Id.* ¶ 332. Partly due to this fact, violence is now rampant at OBCC, including 13 stabbings/slashings in a single month, the highest number in any DOC

---

[17] As required by Action Plan § E, ¶ 4.

facility. *Id.* ¶ 116. Other examples of DOC's tendency to undo its own progress include the deterioration of ID and the failure of the GRVC and RNDC reduction plans. *Supra* I(C).

Finally, Defendants waste an enormous quantity of resources through their inefficient deployment of staff. DOC has employed more correction officers than the average daily jail population from 2016 through at least 2021, the last year for which the New York City Comptroller published such information. *Id.* ¶ 650. But despite this extraordinary staffing ratio, DOC operates as if it is understaffed, partially due to its difficulties with assigning staff to the posts where they are most needed, discussed in more detail above. *See supra* I(B)(5). Also contributing to persistent staffing deficiencies is DOC's ongoing struggle with getting its staff to reliably show up for work. *Id.* ¶ 652, 672. Indeed, while Defendants had previously pointed to improved management of sick leave and modified duty as evidence of progress, staff appear to have begun misusing other forms of leave that are "equally disruptive" and staff shortages persist. *Id.* ¶ 672. Together, these problems lead DOC to spend exorbitantly on overtime, with overtime costs per incarcerated individual rising from $19,166 in 2015 to $30,788 in 2021, and total overtime costs hitting $255 million in 2022 — the highest level since the Consent Judgment was entered — with 2023 costs on track to be even higher. *Id.* ¶ 653. And even despite all this spending, a lack of staff to assign to posts continues to be a problem: on any given day in May 2023, 22 posts were unstaffed, and on any given day in June 2023, 15 posts were unstaffed. *Id.* ¶ 686.

DOC's overall budget is massive, totaling more than $1 billion per year. *Id.* ¶ 1081. Expending so much City money on a system that causes the numerous harms described above is not only unnecessary, but deeply troubling. As the *Plata* Court observed when appointing a receiver, "spending over one billion dollars annually on a system that far too often neglects,

mistreats, and at times literally kills those it is intended to serve is a massive waste of money and, more importantly, life." *See Plata I*, 2005 WL 2932253, at *31; *see also Palmigiano v. Garrahy,* 448 F. Supp. 659, 674 (D.R.I. 1978) ("[A]lready the heavy financial costs, which the prison administration imposes by maintaining many prisoners [in unconstitutional conditions], fall on the taxpayers; this cost should soon be diminished. The citizens of this state also bear the human costs of operating a degraded prison system.").

A receiver who deploys staff properly, follows through on important initiatives, and focuses on preventing regression rather than waiting for the Monitor to identify and publicly report it, will reduce such extensive waste of the City's and taxpayers' resources.

### F.     Defendants Lack the Leadership to Turn the Tide within a Reasonable Amount of Time

The history of not only this case, but three decades of City use of force litigation, demonstrate that the problems at DOC extend far beyond any one leader. In the time since the Consent Judgment was entered, there have been four different Commissioners of Correction, soon to be five, none of whom were able to achieve compliance with this Court's orders. FOF ¶¶ 1157-1158. Indeed, the Department's failures in this regard extend many years further back, as the City has been forced to litigate and remediate class actions regarding the pattern and practice of excessive force in its jails almost continually since 1990. *Id*. ¶¶ 1040-1047. Michael Jacobson, who was DOC Commissioner between 1995 and 1998, during the litigation of *Sheppard v. Phoenix*, 91-CV-4148, 1998 WL 397846 (S.D.N.Y. July 16, 1998), *see infra,* confirmed that the current rates of violence and disorder in the Department's facilities are worse than those during his tenure, and that there has been a "multi-year decline in safety conditions at the City's jails." FOF ¶ 1159. Even as several committed corrections professionals have come and gone from DOC, bringing skill and dedication, the fundamental dynamics have not changed.

85

While no single leader is to blame for all of DOC's failures, it is clear that DOC has a leadership problem. The agency simply does not have the broad base of active, competent leaders that would be necessary to lift the jails out of what the Monitor has called their "deeply entrenched culture of dysfunction." *Id.*; *see* I(B)(4)(a). When it appointed a receiver in *Plata*, the district court gave significant weight to its assessment that defendants had been "unwilling or incapable of breaking out of a deeply entrenched bureaucratic mind-set, and [had] refused or been unable to take the steps necessary to prevent further needless loss of life and suffering." *Plata I,* 2005 WL 2932253 at *26. The lack of necessary leadership at DOC has led to the same dynamics here.

Indeed, the Monitor has repeatedly described the troubling culture of inertia that currently prevails among DOC leadership. Leaders are often unable to grasp, or unwilling to acknowledge, the seriousness of the problems the jails face, and therefore choose to minimize such problems rather than attack them head-on. FOF ¶¶ 1084-1111. This has led to a lack of urgency and an intolerably slow pace of reform. *Id.* ¶¶ 1050-1053, 1172. Examples of the problematic choices that arise from this culture of apathy and inertia abound. For instance:

- DOC leaders do not take advantage of the fulsome data available to them to analyze the root causes of excessive and unnecessary force. *Supra* I(B)(4)(a).

- DOC leaders do not effectively utilize the Monitor, often stymying his work by failing to cooperate, *supra* II(D), or ignoring his recommendations, *supra* I(C), rather than using his expertise to address urgent problems.

- DOC leaders tend to ignore problems and focus on inflated claims of progress instead, spending what the Monitor called "significant time" creating a misleading

narrative of progress at DOC, rather than remaining focused on concrete efforts to make actual progress. FOF ¶ 1102.

- DOC falls victim to bureaucratic inertia, declining to adopt new or innovative ideas. As the Monitor put it, DOC leaders tend to be "myopic," and "rarely emerge as champions of an idea or new practice" because "they simply do not know other ways to solve problems besides 'how we've always done it.'" *Id.* ¶ 1107.

- DOC leaders tolerate disorganization and confusion, leading to situations where DOC staff and even leaders are unaware of their own policies or responsibilities until the Monitor intervenes. *Id.* ¶ 1110.

These are just a few of the problematic practices the Monitor has observed over eight years of working closely with DOC leadership of all levels. With this type of leadership culture so firmly in place, DOC will not be able to turn the tide on its eight years of non-compliance in any reasonable timeframe.

### G.   Receivership Is an Efficient Remedy

The Monitor has already concluded that continuing along the current path of reform will not generate results. FOF ¶¶ 1157-1175. The appointment of a receiver, backed by the power of the Court, is the change needed to correct the trajectory of this remedial effort. While it is not reasonable to expect a receiver to fix decades of dysfunction immediately, a receiver will have the mandate and power to cut through political and institutional barriers that Defendants are loath to challenge. As in *Plata I*, "steady progress here under the direction of a Receiver is possible," and is "far preferable to the current state of paralysis." 2005 WL 2932253 at *31.

The City administration is a political entity with multiple, often conflicting, constituencies influencing its decisions, including municipal labor unions, other city agencies

and employees, and the voting public. New York City Commissioners of Correction are political appointees selected by the Mayor. It is thus inevitable that political considerations will have some influence over DOC's decision making under the current leadership structure. Such political considerations may sometimes clash with the remedial effort in this case. As the district court recognized in *Plata*, and as decades of school desegregation litigation made clear to an entire nation, the political considerations of local elected officials are not always in harmony with what must be done to comply with the Constitution. *Id.*, at *32; *Swann,* 402 U.S. at 13 (affirming court's remedial power where "deliberate resistance of some to the Court's mandates has impeded the good-faith efforts of others to bring school systems into compliance. The detail and nature of these dilatory tactics have been noted frequently by this Court and other courts").

One prevalent example of this challenging dynamic can be seen with regard to the influence of labor unions. Labor unions, and particularly law enforcement unions, are an important political constituency for any City administration to consider. At times it appears that the desire to satisfy this key constituency has been a motivator for DOC's poor personnel-related decisions. Indeed, commissioners have privately admitted that pressure from the correctional unions, and the fear of a retaliatory union response "chill[s] effective decision making by DOC leadership" and is a cause of DOC's "persistent staffing issues." FOF ¶¶ 1135-1136.

For example, DOC spent a year and a half resisting the Monitor's recommendation to expand the hiring pool for wardens beyond DOC ranks, which required abrogation of a state law. *See supra* I(C)(2). Counsel for the City acknowledged that hiring external warden candidates was "not a popular move with the current rank and file" because it was perceived as limiting advancement opportunities. *Id.* ¶ 1118. We can infer that the opposition of an important political constituency to the Monitor's recommendation likely contributed to the City's 18-month delay in

adopting it. Notably, Defendants still have not adopted the recommendation to expand the hiring pool for Deputy Wardens to include non-DOC candidates. *Id.* ¶¶1112-24, 1133.

Other recent examples of this dynamic include:

- DOC's utter failure to reduce the number of awarded posts, despite this Court's order to do so, reportedly due to concerns about a potential barrier posed by labor agreements. *See supra* I(B)(5)(a).

- DOC's failure to increase the number of officers working industry-standard 5x2 schedules despite this Court's order to do so, again due to a barrier in a labor agreement. *See supra* I(B)(5)(b).

- DOC's decision to promote certain captains to the role of ADW, and to assign certain officers to the specialized ESU team, despite negative recommendations or instances of misconduct that should have prevented those decisions. *See supra* I(B)(4)(b), I(B)(6)(a).

- DOC's firing of the former Deputy Commissioner of Investigations and Trials after the labor unions representing DOC uniform staff called for her firing. The unions claimed credit for the firing after the fact. *Id.* ¶¶ 1147-1156.

Many of the labor-related barriers the City has cited in the examples above could be eliminated if the City renegotiated certain labor contracts, or if the Court abrogated certain state and local laws or contractual agreements—such as by seeking the power to hire outside supervisors, *see supra* I(C)(2), or the power to introduce another layer of supervision into the hierarchy to combat "skill deficits...exacerbated by...fewer levels of supervisors [at DOC]," FOF ¶ 615. But Defendants have not taken any of these steps, demonstrating the same "trained

incapacity" the district court observed in *Plata I*, 2005 WL 2932253, at *18, *26, *30. These are mistakes made under a cloud of political influence, which a receiver could rectify.

To be sure, various obstacles to reform will still exist under a receivership, and political constituencies such as unions will certainly continue to advocate for their goals. However, a receiver will have several advantages over a commissioner when it comes to overcoming these obstacles. First, to state the obvious, a receiver will not be a political actor who is motivated by the same political forces as a mayoral appointee. Unlike a typical DOC leader, who must report to a Mayor's office that deals with hundreds of competing priorities every day, a receiver would report solely to the Court, and have only one responsibility he or she must fulfill: to achieve compliance with the Court's orders in this case.

This alone would be a significant structural change that one would reasonably expect to significantly change DOC's remedial performance. But a receiver would have other structural advantages as well. Commissioners of correction typically serve very short tenures. Since entry of the Consent Judgment, there have been four DOC commissioners—soon to be five—and two mayoral administrations, with each successive actor pointing fingers at the last. A receiver will have the advantage of continuity and stability for the time necessary to effectuate reform. As Judge Lasker noted in 1988, "the depressing reality is that while commissioners come and go, problems linger on, and present and future inmates are entitled to the assurance that these problems will be, and remain, redressed." *Fisher v. Koehler*, 692 F. Supp. 1519, 1566 (S.D.N.Y. 1988). In order for a DOC leader to achieve sustainable reform, all staff —whether uniformed or otherwise—must credibly believe that the leadership will be there until reform is achieved. FOF ¶¶ 1085, 1095. The appointment of a receiver would accomplish this goal, and enable progress toward reform that has simply not been possible under politically-appointed commissioners.

A mandate that is tied to the achievement of compliance rather than to a political calendar will be a powerful tool for a receiver. This is because the expectation that a commissioner is likely to depart quickly, regardless of progress made, can undermine that commissioner's remedial power. As former Commissioner Jacobson noted, the 11 DOC commissioners since his departure have served an average term of 2.3 years, while there have been just three presidents of the correction officers' union in the same time period. *Id.* ¶¶ 1086-1087. In his experience, the "pattern of frequent, and expected, turnover of DOC leadership has undermined the various Commissioners' ability to curb staff violence and other malfeasance within the DOC." *Id.* ¶ 1091. One reason DOC policies aimed at reform are ineffective in practice is that when COBA leadership or staff disagree with such policies, they understand they can effectively "wait out" senior DOC leadership who are likely to leave before implementing policies over staff opposition. *Id.* ¶ 1094. This results in a pattern like the one the Monitor has described: DOC "continues to lurch from crisis to crisis" under a "revolving door of leadership" that hinders, if not prevents, the "full and faithful implementation of both short and long-term security initiatives." *Id.* ¶ 1054, 1092.

### H.   Receivership Satisfies the Prospective Relief Requirements of the Prison Litigation Reform Act

The Supreme Court has recognized that "[t]he PLRA should not be interpreted to place undue restrictions on the authority of federal courts to fashion practical remedies when confronted with complex and intractable constitutional violations." *Plata III*, 563 U.S. at 526. At this point, a receivership is the only feasible option to remedy Defendants' constitutional violations and is far more likely to lead to compliance with the Constitution and the end of federal oversight of the jail system than any other alternative. Appointment of a receiver is consistent with the PLRA's requirement that prospective relief must be "narrowly drawn,

extend[] no further than necessary to correct the violation of the Federal right, and [be] the least

intrusive means necessary to correct the violation of the Federal right." 18 U.S.C §

3626(a)(1)(A); *see Plata II*, 603 F.3d at 1093-1098.

> **1.    Courts Have Appointed Receivers in Prison and Jail Cases on Similar Records.**

The courts facing a record of prison and jail failure like the one here —a demonstrable

risk of imminent harm and death, operational dysfunction, lack of skilled personnel, supervision,

and accountability, and leadership that has repeatedly failed to comply with court orders—have

concluded that receivership is necessary and the least intrusive means to compel defendants to

meet their constitutional obligations.

In *Plata*, Judge Henderson appointed a receiver to oversee a state "prison medical care

system broken beyond repair." 2005 WL 2932253, at *1. Judge Henderson noted that he had

"given defendants every reasonable opportunity to bring its prison medical system up to

constitutional standards," but the state had failed to do so. *Id.* Incarcerated people faced a "threat

of future injury and death [that] is virtually guaranteed in the absence of drastic action," due to a

combination of leaders that lacked "the capability and resources necessary to deliver adequate

health care," to "address issues requiring systemic change," or to complete "even minimal goals

toward the design and implementation of a functional medical delivery system." *Id.* at *3, *5.

Not only were health care professionals inadequately trained, poorly qualified, and under little

supervision, but the few supervisors were also incompetent—resulting in little accountability or

discipline for substandard medical care. *Id.* at *5, *9, *10, *17. Ultimately the "leadership

vacuum and lack of discipline . . . foster[ed] a culture of non-accountability and non-

professionalism whereby the acceptance of degrading and humiliating conditions [becomes]

routine and permissible." *Id.* at *10. A receiver was the least intrusive means for resolving the

crisis after the state had been presented with innumerable recommendations and specific

achievable measures to remediate the constitutional problems, but the leadership had failed to

take steps to overcome bureaucratic barriers and took only very limited and piecemeal measures.

*Id.* at \*26. The court found compelling the "huge waste" in resources and inefficiencies,

including the purchase of large amounts of pharmaceuticals that were not used, and ultimately

thrown away, due to mismanagement. *Id.* at \*30-31. As the Ninth Circuit noted in affirming the

appointment of a receiver, "[a]fter attempting less drastic remedies, and after long periods of

working closely with State authorities to try to bring them into compliance with the orders to

which they had stipulated, the district court justifiably concluded that the State's personnel

simply could not or would not bring the State into constitutional compliance in the foreseeable

future." *Plata II*, 603 F.3d at 1097.

The court in Hinds County similarly concluded the county was "incapable, or unwilling,

to handle its affairs" after repeatedly failing to abide by a consent decree over the jail's

conditions. *Hinds County*, 2023 WL 1186925, at \*3-4. People held at the county jail faced severe

risk of harm, including "death, rampant physical and sexual assaults, and neglect of the seriously

mentally ill," as a result of "[p]ersistent shortcomings in staffing and supervision." *Id.* at \*5.

Inadequate staffing meant that touring did not occur, and staff were afraid to work in certain

housing units. *Id.* at 6. Cell doors did not lock, cameras did not work, and staff did not conduct

mandatory welfare checks. *Id.* at \*8. Lesser intrusive means of remedial relief—including a

comprehensive remedial plan and extensive technical assistance from a monitor—had failed

despite additional time for the county to comply. *Id.* The county obstructed and frustrated the

work of the monitor—refusing to provide her with documents and information—and delayed

implementing simple tasks, such as procuring tables and chairs for individuals to have meals. *Id.*

at *9-10. Turnover in leadership, training of staff that leave, and "stopping and starting and going in one direction then . . . going in a different direction," all wasted the county's time and resources. *Id.* at *10. Leadership ultimately deflected responsibility and blamed others for the problems. *Id.* at *11.

In this case, after eight years of remediation, it is clear that the appointment of a receiver is the only realistic solution, and thus a necessary means of effectuating the constitutional prohibition on the use of excessive and unnecessary force and finally achieving compliance with the Court's orders. *See Plata I*, 2005 WL 2932253, at *28.

> **2.      The Proposed Receivership is Narrowly Drawn, Extends No Further than Necessary, and Is the Least Intrusive Means to Correct the Violations of Federal Rights.**

First, the proposed receivership would extend no further than necessary to correct the violation of the Plaintiff Class's right to be free from excessive and unnecessary force.

 Plaintiffs do not currently seek an order that contains any substantive requirements beyond what the Court has thus far commanded, but rather seek the appointment of a receiver who will work to achieve compliance with the orders this Court has *already* entered. All relief the Court has ordered is "intended to ensure compliance with [the] core constitutional command" to refrain from the use of excessive or unnecessary force. *McBean v. City of New York*, 2007 WL 2947448, at *4 (S.D.N.Y. Oct. 5, 2007). Defendants have agreed, and the Court has concluded, that the Consent Judgment, the three Remedial Orders, and the Action Plan were necessary to correct the violations of a constitutional right and comply with the PLRA. FOF ¶¶ 7, 23, 38, 43, 48, 67.

Yet, as Plaintiffs have demonstrated throughout this brief, Defendants have not complied with these orders, and will not do so within any reasonable timeframe. As a result, excessive and unnecessary force continues to be used with disturbing regularity in the City jails. *See supra*

94

II(B). Because Defendants, in the Monitor's words, "have repeatedly and consistently demonstrated that they are incapable of directing the multilayered and multifaceted reform effort" that is required, FOF ¶ 1169, the appointment of a receiver who will *implement* the Court's orders is the necessary next step to protect the constitutional rights of the Plaintiff Class. *See Plata II*, 603 F.3d at 1097 (affirming the appointment of a receiver under the PLRA where "the district court justifiably concluded that the State's personnel simply could not or would not bring the State into constitutional compliance in the foreseeable future.").

Second, receivership is unquestionably an intrusive remedy, but on the extraordinary record here the proposed receivership is the least intrusive means necessary to correct the violations of Plaintiffs' constitutional rights. As Judge Henderson noted in *Plata,*

> "Looking at the full spectrum of powers typically exercised by the courts, there is no doubt that the imposition of a Receivership is a drastic measure. But it is not a measure that the Court has sought, nor is it one the Court relishes. Rather, the Court is simply at the end of the road with nowhere else to turn. Indeed, it would be fair to say that the Receivership is being imposed on the Court, rather than on the State, for it is the State's abdication of responsibility that has led to the current crisis." 2005 WL 2932253 (N.D. Cal. Oct. 3, 2005), at 47.

As discussed in detail above, *supra* II(C), this Court has "exhausted all reasonable coercive measures at its disposal" short of receivership to achieve compliance with its orders, including appointing a Monitor with enormous expertise and entering a series of seven remedial orders designed to move the Department towards compliance with the Consent Judgment. *Plata I*, 2005 WL 2932253, at *28. "[T]he time has now come when the number of options with any realistic chance of success has dwindled down to a single one — Receivership." *Id*.

That Defendants have continually failed to comply for years and have even engaged in questionable tactics such as providing inaccurate or incomplete information to the Monitor*, see supra* II(D), is evidence that an unusually intrusive remedy like the appointment of a receiver is

now justified. As the Second Circuit explained when affirming a district court's additional, more

detailed order designed to bring defendants into compliance with an earlier order regarding

unhealthy environmental conditions in the City jails:

> The needs-narrowness-intrusiveness requirement of the PLRA
> notwithstanding, we find that nearly a half-decade of
> untruthfulness, non-compliance and inaction constitutes sufficient
> justification for the intrusiveness of a subsequent order to compel
> compliance with an original order entered pursuant to the PLRA
> that has been ignored.

*Benjamin v. Schriro*, 370 Fed. Appx. 168, 171 (2d Cir. 2010); *see also McBean*, 2007 WL

2947448, at *3 (approving order under PLRA based in part on "the history of this litigation, and

of DOC's long record of failing to comply with well-established law"). Importantly, the notion

that Defendants may have made some limited, inadequate progress on select portions of the

Court's orders does not change this reasoning, because there is still no realistic chance of the

drastic changes that are needed to correct the ongoing constitutional harm taking place within a

reasonable timeframe. *See Plata I*, 2005 WL 2932253, at *26 (appointing receiver under PLRA

standard where "defendants were able to enact only very limited and piece-meal measures, with

no prospect for system-wide reform or restructuring").

In these extraordinary circumstances, where Defendants have continually violated the

constitutional rights of the Plaintiff Class for many years and failed to adequately respond to this

Court's numerous escalating attempts to coerce their compliance, the extraordinary remedy of a

receiver is the least intrusive option that remains.

Third, the proposed receivership would be drawn as narrowly as possible to achieve its

goals. Receiverships are particularly appropriate in instances where Defendants have struggled

and failed to solve complex and difficult problems, particularly "polycentric" problems, meaning

problems that involve several subsidiary issues with inter-related solutions. *See Plata*, 2005 WL

2932253, at \*25-\*26. That is exactly the scenario the Court faces here, where the Monitor has described a "depth of dysfunction, created over decades of mismanagement, that permeates the entire system," which has led to "a number of interrelated 'problem centers' for which the solution to each is dependent upon finding the solution to some, if not at all, of the others." FOF ¶ 1175. The interrelated problems which subject incarcerated people to an imminent risk of serious harm range from inadequate supervision structures, to poor security practices, to inefficient staffing systems, to compromised investigations, to a slow and inadequate disciplinary system, and more, so the solution must be broad enough to remedy all of these issues.

Plaintiffs' proposed Order provides the Receiver broad authority as he or she will need to address these myriad issues, while also limiting that authority to ensure it is no broader than needed. First, the Receiver's "Mandate" in the proposed Order is to take "all necessary steps to promptly achieve Substantial Compliance (defined in Section XX, ¶ 18 of the Consent Judgment) with the Nunez Orders." Proposed Order § I(A). The Receiver has no power to act unless "necessary to fulfill the Mandate." *Id.* § II. Second, the Receiver would be bound by applicable state and local laws, regulations, and contracts; if necessary, the Receiver could ask the Court to order that a particular legal or contractual requirement be waived. *Id.* §IX (B), (D). Third, once Substantial Compliance is reached, the Receivership would terminate—long before the 24 months of sustained Substantial Compliance required for the Consent Judgment to terminate. *Id.* § VIII. Finally, the Monitor would continue his role in assessing compliance and reporting to the Court. *Id.* § IV(A).

For this reason, the appointment of a receiver with the powers outlined in the proposed Order is the narrowest possible remedy remaining, and that receiver must be tasked with taking

all necessary steps to achieve substantial compliance with the Court's inter-related orders in this case.

In summary, the circuit court's conclusion when affirming the appointment of a receiver in *Plata* resonates here: "The court imposed the receivership not because it wanted to, but because it had to." *Plata II*, 603 F.3d at 1097.

## CONCLUSION

For the foregoing reasons, Plaintiffs request that the Court grant their motion, find Defendants in civil contempt, and appoint a receiver to bring Defendants into compliance with the Consent Judgment, the three Remedial Orders, and the Action Plan.


Date:   November 17, 2023
        New York, New York


THE LEGAL AID SOCIETY

By: /s/ Mary Lynne Werlwas
Mary Lynne Werlwas
Kayla Simpson
Katherine Haas
Corey Stoughton
49 Thomas Street, 10th Floor
New York, New York 10013
(212) 577-3300


*Attorneys for Plaintiff Class*

EMERY CELLI BRINCKERHOFF
ABADY WARD & MAAZEL LLP

By: /s/ Jonathan S. Abady
Jonathan S. Abady
Debra L. Greenberger
Vasudha Talla
Sana Mayat
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000