# Status Report
# by the
# *Nunez* Independent Monitor

**December 22, 2023**

### THE NUNEZ MONITORING TEAM

Steve J. Martin
*Monitor*

Kelly Dedel, Ph.D.
*Subject Matter Expert*

Anna E. Friedberg
*Deputy Monitor*

Dennis O. Gonzalez
*Associate Director*

Patrick Hurley
*Subject Matter Expert*

Alycia M. Karlovich
*Analyst*

Emmitt Sparkman
*Subject Matter Expert*

## Table of Contents

**Introduction** ............................................................................................................. **1**

   Updates since the Monitor's November 8, 2023 Report ............................................ 1

   Focus for 2024 ........................................................................................................... 3

**Initiatives to Enhance Safe Custody Management, Improve Staff Supervision,  and Reduce Unnecessary Use of Force (Remedial Order § A)** ............................. **6**

   First Remedial Order § A., ¶ 1 (Use of Force Reviews) ........................................... 6

   First Remedial Order § A., ¶ 2 (Facility Leadership Responsibilities) .................... 9

   First Remedial Order § A., ¶ 3 (Revised De-escalation Protocol) ......................... 11

   First Remedial Order § A., ¶ 4 (Supervision of Captains) .................................... 14

   First Remedial Order § A., ¶ 6 (Facility Emergency Response Teams) ................ 17

**Use of Force Policy (Consent Judgment § IV)** ...................................................... **23**

   CJ § IV. Use of Force Policy, ¶ 1 (New Use of Force Directive) .......................... 23

**Use of Force Reporting and Tracking (Consent Judgment § V)** ............................ **25**

   CJ § V. Use of Force Reporting and Tracking, ¶ 2 (Independent Staff Reports) ............ 25

   CJ § V. Use of Force Reporting and Tracking, ¶ 22
(Providing Medical Attention Following Use of Force Incident) ........................... 31

**Use of Force Investigations (Consent Judgment § VII)** ........................................ **33**

   CJ § VII. Use of Force Investigations, ¶ 1 (Thorough, Timely, Objective Investigations) & 33

   ¶ 9 (a) (Timing of Full ID Investigations) ........................................................... 33

**Risk Management (Consent Judgment § X)** ......................................................... **46**

   CJ § X. Risk Management, ¶ 1 (Early Warning System) ...................................... 46

**Staff Discipline and Accountability (Consent Judgment § VIII & Remedial Order § C)** ... **48**

   CJ § VIII. Staff Discipline and Accountability, ¶ 1
(Timely, Appropriate and Meaningful Accountability) ......................................... 48

   First Remedial Order § C. (Timely, Appropriate, and Meaningful Staff Accountability),
¶ 2 (Monitor Recommendations) .......................................................................... 67

   First Remedial Order § C. 4Third Remedial, ¶ 2 (Expeditious OATH Proceedings) ........... 71

   & First Remedial Order § C. (Applicability of Disciplinary Guidelines to OATH
Proceedings), ¶ 5 ................................................................................................... 71

   CJ § VIII. Staff Discipline and Accountability, ¶ 4 (Trials Division Staffing) ..................... 75

**Screening & Assignment of Staff (Consent Judgment § XII)** ............................... **78**

   CJ § XII. Screening & Assignment of Staff, ¶¶ 1-3 (Promotions) ........................ 78

**Safety and Supervision of Inmates Under the Age of 19 (Consent Judgment § XV)** ........... **87**

CJ § XV. Safety and Supervision of Inmates Under the Age of 19, ¶ 1
(Prevent Fight/Assault) ................................................................................................ 87

CJ § XV. Safety and Supervision of Inmates Under the Age of 19, ¶ 12
(Direct Supervision) .................................................................................................... 89

CJ § XV. Safety and Supervision of Inmates Under the Age of 19, ¶ 17
(Consistent Assignment of Staff) ................................................................................ 90

**Appendix A:  Supplementary Data** ........................................................................... **91**

Annual Number and Average Monthly Rate of UOF ............................................. 92

Number and Average Monthly Rate of UOF .......................................................... 94

Annual Number and Average Monthly Rate of Stabbing and Slashing ................ 96

Number and Average Monthly Rate of Stabbing and Slashing ............................. 99

Annual Number and Average Monthly Rate of Fights ......................................... 101

Number and Average Monthly Rate of Fights ...................................................... 103

Number and Average Monthly Rate of Assault on Staff,
with and without UOF ............................................................................................ 105

Facility Searches & Contraband Recovery ........................................................... 106

Overview of In-Custody Deaths ............................................................................. 107

Use of Force Involving Unmanned Posts .............................................................. 109

Number of ADWs and Captains ............................................................................. 111

Unmanned Posts & Triple Tours ............................................................................ 115

Sick Leave, Medically Monitored/Restricted, AWOL, PE, and FMLA .............. 117

OATH Pre-Trial Conferences ................................................................................. 122

# INTRODUCTION

This is the eleventh report filed by the Monitoring Team in 2023.[1]  The Monitoring Team has also filed five substantive letters with the Court this year.[2] The purpose of this report is to provide a neutral and independent assessment of the current state of affairs and the Department's efforts to achieve compliance with the *Nunez* Court Orders.  Given the significant volume of reporting by the Monitoring Team during the past 12 months, an exhaustive update on the current state of affairs is not needed. The grave conditions of the jails have been well documented throughout the year and no significant changes in practice have occurred.

This introductory section will include a brief update summarizing certain recent events. This is followed by a directory of the provisions that are subject to the pending motion for contempt and where the relevant discussion is located in this report (or prior reports). This is followed by a compliance assessment for a select group of provisions from the Consent Judgment, First Remedial Order, and Third Remedial Order as required by the Court's June 13, 2023 Order (dkt. 550), § III.  Finally, the report includes an appendix containing various charts and tables with relevant data.

*Updates since the Monitor's November 8, 2023 Report*

Since the Monitor's November 8, 2023 Report was filed, a number of significant events have occurred. In chronological order:

---

[1] *See*, Monitor's February 3, 2023 Report (Dkt. 504), Monitor's April 3, 2023 Report (Dkt. 517), Monitor's April 24, 2023 Report (Dkt. 520), Monitor's April 26, 2023 Report (Dkt. 525), Monitor's May 26, 2023 Report (Dkt. 533), Monitor's June 8, 2023 Report (Dkt. 541), Monitor's July 10, 2023 Report (Dkt. 557), Monitor's August 7, 2023 Report (Dkt. 561), Monitor's October 5, 2023 Report (Dkt. 581), Monitor's November 8, 2023 Report (Dkt. 595), Monitor's November 30, 2023 Report (Dkt. 616).

[2] *See*, Monitor's May 31, 2023 Letter (Dkt. 537), Monitor's June 12, 2023 Letter (Dkt. 544), Monitor's June 12, 2023 Letter (Dkt. 546), Monitor's November 15, 2023 Letter (Dkt. 599), and Monitor's December 8, 2023 Letter (Dkt. 639).

- **Failure to Consult on ARHU**: On November 15, 2023, the Monitoring Team advised the Court that the Department had opened a restrictive housing unit intended to manage incarcerated individuals who set fires. This unit was opened with little to no planning, poor operational guidance, no staff training, and without consulting the Monitoring Team. The Court issued an Order to Show Cause on November 16, 2023 and the City responded on November 28, 2023 (dkt. 614) and December 12, 2023 (dkt. 649). The Monitoring Team issued a report on these issues, and the broader concerns regarding the lack of transparency and consultation on November 30, 2023 (dkt. 616). Plaintiffs Class Counsel also submitted a response on December 5, 2023 (dkt. 633). The matter was subsequently argued at the Court's December 14, 2023 Status Conference and the Court found the Defendants in contempt.[3]

- **Contempt and Receivership Motion Practice**: On November 17, 2023, counsel for the Plaintiff Class, along with the Southern District of New York, filed a motion for contempt and the appointment of a receiver. The motion for Contempt and Application for Appointment of a Receiver (dkt. 601). The schedule for ongoing proceedings was entered by the Court on December 15, 2023 (dkt. .658).

- **Appointment of New Commissioner**: Mayor Adams appointed Lynelle Maginley-Liddie as the Department's new Commissioner on December 8, 2023.[4] The Monitor and the Monitoring Team have worked with Commissioner Maginley-Liddie for many years and have developed a good working relationship with her during this time. In her work at the Department, the Monitoring Team has found the Commissioner to be transparent and forthright. She also oversaw one of the most candid, insightful, and transparent assessments of the Department's sick leave practices during her tenure as the First Deputy Commissioner.[5] The Commissioner is well acquainted with the *Nunez* Court Orders, the requirements necessary to advance much needed reform, and the need to work collaboratively and constructively with the Monitoring Team.

---

[3] *See* Court's December 20, 2023 Order (dkt. 665).

[4] A new Acting General Counsel and Acting Deputy General Counsel were also appointed in early December 2023. Prior to these appointments, the General Counsel position had been vacant for approximately three months and the position of Deputy General Counsel had been vacant for approximately one month (and had not been filled for much of the past two years).

[5] In the Monitor's October 28, 2022 Report, the Monitoring Team found, "The First Deputy Commissioner [now Commissioner] and her team evaluated [Health Management Division] practices to identify weaknesses and deficiencies. In the Monitoring Team's opinion, the assessment of HMD is one of the most candid, insightful, and transparent projects undertaken by the Department in the past seven years." *See* pg. 46.

*Focus for 2024*

The new Commissioner's appointment appears to reflect an attempt by the City to alter its approach to managing the *Nunez* Court Orders by prioritizing transparency and by making a renewed commitment to consultation and collaboration. This, of course, must be accompanied by significant and tangible *changes in practice* both within the agency and in the manner with which it engages the Monitoring Team. To that end, the Monitoring Team met with the Commissioner and advised the Court of the following recommended areas of focus:

- **Security**: The Department must develop and implement sound strategies to address the basic failures in security and operations pervasive throughout all facilities and consistent with the Nunez Court Orders.

- **Supervision**: Changing staff culture and practice such that the required reforms can be implemented will require active and engaged oversight, coaching and guidance from the facilities' Supervisors at all levels (Captains, ADWs, DWs and Wardens/ACs).

- **Reporting**: The Department must ensure that incidents are reported both timely and accurately and that incident types are properly defined.

- **Investigation**: The Investigation Division must investigate use of force incidents in a neutral and independent manner, without fear or favor, to restore integrity to this process.

- **Accountability**: The Department must mitigate the loss of 1,300 Command Disciplines to due process violations and OATH must continue to improve its efficiency in order to ensure staff discipline is swift and certain.

- **Engagement with the Monitor**: The Department has to shift the tenor of its work with the Monitoring Team and ensure that transparency and consultation are its guiding values. To the extent there is reasonable ambiguity about what is required, the Department must immediately raise the issue with the Monitoring Team. Defendants must not tolerate any failure to provide the Monitoring Team with requested information and/or to consult on *Nunez*-related matters.

This is a critical time for the agency. Concrete and tangible action must focus on reducing the ongoing risk of harm facing those in custody and those who work in the jails.

*Chart of Monitoring Team's Assessments on Provisions Subject to Motion for Contempt*

Listed below are the provisions subject to Plaintiffs' Motion for Contempt. This chart identifies whether the provision is: (1) has a compliance assessment for January to June 2023 (16th Monitoring Period) or (2) if a compliance assessment is not provided then a citation to the most Monitor's Report that addresses the issue is provided.

| Provision | Monitor's Most Recent Findings |
| --- | --- |
| Consent Judgment, § IV, ¶ 1: Implement New Use of Force Directive | Compliance Assessment Section of the December 22, 2023 Report |
| Consent Judgment, § VII, ¶ 1: Thorough, Timely, Objective Investigations | Compliance Assessment Section of the December 22, 2023 Report |
| Consent Judgment, § VII, ¶ 9(a): Timeliness of Full ID Investigations | Compliance Assessment Section of the December 22, 2023 Report |
| Consent Judgment, § VII, ¶ 11: ID Staffing | Compliance Assessment Section of the December 22, 2023 Report |
| Consent Judgment, § VIII, ¶ 1: Appropriate and Meaningful Discipline | Compliance Assessment Section of the December 22, 2023 Report |
| Second Remedial Order, ¶1(i)(a): Interim Security Plan | Monitor's November 8, 2023 Report (dkt. 595) at pgs. 6 to 28 and Appendix A at pgs. 64 to 66. |
| Action Plan, § A, ¶1(d): Improved Routine Tours | Monitor's November 8, 2023 Report (dkt. 595) at pgs. 6 to 28 and Appendix A at pgs. 71 to 79. |
| Action Plan, Improved Security Initiatives § D, ¶ 2(a): Interim Security plan | *See* Second Remedial Order, ¶1(i)(a) above. |
| Action Plan, Improved Security Initiatives § D, ¶ (d): Searches | Monitor's November 8, 2023 Report (dkt. 595) at pg. 40 and December 22, 2023 Report at Appendix A. |
| Action Plan, Improved Security Initiatives § D, ¶ (e): Identify/Recover contrabands | Monitor's November 8, 2023 Report (dkt. 595) at pgs. 19-20 and December 22, 2023 Report at Appendix A. |
| Action Plan, Improved Security Initiatives § D, ¶ (f): Escort holds | Monitor's November 8, 2023 Report (dkt. 595) at pgs. 12 and 40. |
| First Remedial Order, § A, ¶ 2: Facility Leadership Responsibilities | Compliance Assessment Section of the December 22, 2023 Report. |

| Provision | Monitor's Most Recent Findings |
|---|---|
| First Remedial Order, § A, ¶ 4: Supervision of Captains | Compliance Assessment Section of the December 22, 2023 Report. |
| Action Plan, § C, ¶ 3(ii) Increased Assignment of Captains in the Facility | *See* First Remedial Order, § A, ¶ 4 above. |
| Action Plan, § C, ¶ (iii): Improved Supervision of Captains | *See* First Remedial Order, § A, ¶ 4 above. |
| Action Plan § C, ¶ 3, (v): Awarded Posts | Monitor's November 8, 2023 Report (dkt. 595) at Appendix A at pgs. 81-82. |
| Action Plan § C, ¶ 3, (vi): Maximize Work Schedules | Monitor's November 8, 2023 Report (dkt. 595) at Appendix A at pg. 82. |
| Action Plan § C, ¶ 3, (vii): Reduction of Uniformed Staff in Civilian Posts | Monitor's November 8, 2023 Report (dkt. 595) at Appendix A at pg. 82 to 83. |
| First Remedial Order, § A, ¶ 6: Facility Emergency Response Teams | Compliance Assessment Section of the December 22, 2023 Report. |
| Consent Judgment § XV, ¶ 1: Prevent Fights/Assaults (Safety and Supervision of Inmates Under the Age of 19) – *18-year-olds* | Compliance Assessment Section of the December 22, 2023 Report. |
| Consent Judgment § XV, ¶ 12: Direct Supervision (Safety and Supervision of Inmates Under the Age of 19) – *18-year-olds* | Compliance Assessment Section of the December 22, 2023 Report. |
| Consent Judgment § XV, ¶ 17: Consistent Assignment of Staff (Safety and Supervision of Inmates Under the Age of 19) – *18-year-olds* | Compliance Assessment Section of the December 22, 2023 Report. |
| First Remedial Order, § D, ¶ 1: Consistent Staff Assignment and Leadership | *See* Consent Judgment § XV, ¶ 12 above. |
| First Remedial Order, § D, ¶ 3; 3(i): Reinforcement of Direct Supervision | *See* Consent Judgment § XV, ¶ 17 above. |

**INITIATIVES TO ENHANCE SAFE CUSTODY MANAGEMENT, IMPROVE STAFF SUPERVISION, AND REDUCE UNNECESSARY USE OF FORCE (REMEDIAL ORDER § A)**

---

**FIRST REMEDIAL ORDER § A., ¶ 1 (USE OF FORCE REVIEWS)**

§ A., ¶ 1. *Use of Force Reviews.* Each Facility Warden (or designated Deputy Warden) shall promptly review all Use of Force Incidents occurring in the Facility to conduct an initial assessment of the incident and to determine whether any corrective action may be merited ("Use of Force Review"). The Department shall implement appropriate corrective action when the Facility Warden (or designated Deputy Warden) determines that corrective action is merited.

i. The Department, in consultation with the Monitor, shall implement a process whereby the Use of Force Reviews are timely assessed by the Department's leadership in order to determine whether they are unbiased, reasonable, and adequate.

ii. If a Facility Warden (or Deputy Warden) is found to have conducted a biased, unreasonable, or inadequate Use of Force Review, they shall be subject to either appropriate instruction or counseling, or the Department shall seek to impose appropriate discipline.

---

This provision requires facility leadership to conduct a close-in-time review of all use of force incidents ("Rapid Reviews" or "Use of Force Reviews"). Further, this provision requires the Department to routinely assess Rapid Reviews to identify any completed reviews that may be biased, unreasonable, or inadequate and address with appropriate corrective action.

Overall, the quality of Rapid Reviews has declined, as evidenced by the fact that the Monitoring Team's review of incidents has not found improvement in staff practice or change in the proportion of incidents that involve poor practice and/or misconduct, and yet the proportion of Rapid Reviews identifying poor practice and misconduct has continued to decrease over time. The lack of quality of close-in-time reviews and action is a significant contributor to the persistence of the operational problems plaguing the jails.

**Rapid Review Data**

During this Monitoring Period, nearly all use of force incidents (3,225, or 99%) were assessed via a Rapid Review. The table below presents data on the number of reviews and their outcomes since 2018.

| Rapid Review Outcomes, 2018 to June 2023 | | | | | | |
|---|---|---|---|---|---|---|
| | **2018** | **2019** | **2020** | **2021** | **2022** | **Jan.-Jun. 2023** |
| **Incidents Identified as Avoidable, Unnecessary, or with Procedural Violations** | | | | | | |
| **Number of Rapid Reviews** | 4,257 (95% of UOF) | 6,899 (97% of UOF) | 6,067 (98% of UOF) | 7,972 (98% of UOF) | 6,889 (98% of UOF) | 3,225 (99% of UOF) |
| **Avoidable** | 965 (23%) | 815 (12%) | 799 (13%) | 1,733 (22%) | 1,135 (16%) | 360 (11%) |
| **UOF or Chemical Agent Policy Violations** | | | 345* (11%) | 1,233 (16%) | 835 (12%) | 273 (8%) |
| **Procedural Violations** | 1,644 (39%) | 1,666 (24%) | 1,835 (30%) | 3,829 (48%) | 3,296 (48%) | 1,281 (40%) |
| **Number of Staff Recommended for Corrective Action** | | | | | | |
| **Number of Staff Recommended for Corrective Action[6]** | ~ | ~ | 2,040 | 2,970 | 2,417 | 1,395 |
| *Note: Data for 2020 UOF/Chemical Agent Policy Violations include only July-December.* | | | | | | |

During the current Monitoring Period, Rapid Reviews found that over half of all use of force incidents involved procedural violations (40%; failure to secure doors, poor restraint technique, etc.), UOF or Chemical Agent policy violations (8%), or circumstances that if handled differently could have avoided the incident altogether (11%). While this is a concerning outcome on its own, the fact remains that the Monitoring Team's assessments of these same incidents suggests that the prevalence of problematic practice is even higher. Furthermore, the proportion of incidents where poor practice is identified by the Rapid Review has decreased over time (86% in 2021; 76% in 2022, and 59% in the first half of 2023) which also stands in contrast to the Monitoring Team's findings that the proportion of incidents involving poor staff practice is essentially unchanged.

**Rapid Review Quality**

Rapid Reviews are intended to identify procedural violations, recommend corrective action for staff misconduct, and also identify incidents that could have been avoidable had staff made different choices in the moment. These findings are relied upon by both the Department and Monitoring Team to

---

[6] This data captures referrals for discipline as recommended by the Rapid Reviews shared with the Monitoring Team. The Rapid Review (and therefore this data) does not include information on whether the discipline referrals were enacted as recommended. Data on enacted discipline, even for past Monitoring Periods, changes frequently because of protracted closures of certain types of disciplinary charges. For example, a Command Discipline can take many months to process, only to be eventually turned into an MOC, and then an MOC can take months to process to reach an NPA, and if the case goes to OATH, it can take several more months for this disciplinary referral to be fully closed out. Furthermore, a staff member can be suspended, only to have the days returned upon a Report & Recommendation from OATH. The protracted nature of enacted discipline for Rapid Review recommendations is further compounded by the various disciplinary backlogs.

identify patterns and trends. That said, Rapid Reviews do not reliably and consistently identify *all* issues that would reasonably be expected to be identified via review of video footage of the incidents. This provision requires the Department to assess whether the reviews are appropriately unbiased, reasonable and adequate and if not, to take affirmative steps to provide instruction/counseling and/or apply discipline to those responsible for a poor-quality review.

Throughout 2023, the Monitor's Reports have discussed the Department's efforts to improve the quality of Rapid Reviews (*see* Monitor's July 10, 2023 Report at pg. 19; Monitor's October 5, 2023 Report at pgs. 1, 12 and 2; Monitor's November 8, 2023 Report at pgs. 67-68.) Collectively, these reports establish the ongoing inadequacies and decline of this process and highlight the inconsistency with which corrective action is applied to the staff involved, the very few instances when Wardens/Deputy Wardens were held accountable for the inadequacy of their reviews, and most importantly, the ineffectiveness of the process to elevate the quality of staff practice. The Department must take steps to better understand—and then address—the dynamics underlying facility leadership's inability or unwillingness to consistently detect poor practice when it occurs.

An initial step toward that end is to improve Rapid Reviews' documentation by revising the template. As noted in the Monitor's October 5, 2023 Report (at pg. 21), after the close of the current Monitoring Period, the Department is taking steps to streamline and consolidate documentation while providing better guidance on the type of information that should be included. Notably, when the template is deployed, the responsibility for determining whether incidents were avoidable and whether response team deployments were necessary will shift to the DC of Security Operation's and the Assistant Commissioner assigned to each Facility.

**Recommended Corrective Action**

In response to identified problems with staff practice, Rapid Reviews can recommend various types of corrective action, including counseling (either 5003 or corrective interviews), re-training, suspension, referral to Early Intervention, Support and Supervision Unit ("E.I.S.S."), Correction Assistance Responses for Employees[7] ("C.A.R.E."), Command Discipline ("CD," as further discussed in the Compliance Assessment (Staff Accountability & Discipline) section of this report, and a Memorandum of Complaint ("MOC"). The Monitoring Team has found that corrective actions are generally imposed when

---

[7] C.A.R.E. serves as the Department's Wellness and Employment Assistance Program. C.A.R.E. employs two social workers and two psychologists as well as a chaplain and peer counselors who provide peer support to staff. The services of C.A.R.E. are available to all employees of the Department. The Department reports that the members of the unit are tasked with responding to and supporting staff generally in the day-to-day aspects of their work life as well as when unexpected situations including injuries or serious emergencies occur. C.A.R.E. also works with staff to address morale, productivity, and stress management, and provide support to staff experiencing a range of personal or family issues (*e.g.* domestic violence, anxiety, family crisis, PTSD), job-related stressors, terminal illness, financial difficulties, and substance abuse issues. The C.A.R.E. Unit also regularly provides referrals to community resources as an additional source of support for employees. Staff may be referred to the C.A.R.E. use by a colleague or supervisor or may independently seek assistance support from the unit.

recommended and NCU also collects proof of practice to demonstrate that corrective actions have occurred.

The most frequent corrective action recommended is a Command Discipline. Although, the recommendation for a Command Discipline decreased during this Monitoring Period compared to the last (1,007 compared with 1,216 respectively, a decrease of 17%). At the same time, significantly fewer 5003 counseling and corrective interviews were recommended via Rapid Reviews compared to the previous Monitoring Period (839 versus 1,036, a decrease of 19%). The only increase in disciplinary referrals from Rapid Reviews during this Monitoring Period was for re-training, which was only recommended in a small number of instances (199 compared with 171 respectively, an increase of 16%).

**Conclusion**

The Rapid Reviews conducted during the current Monitoring Period identify endemic levels of poor staff practice, and even so, the Monitoring Team has found that Rapid Reviews do not reliably identify all issues. As a result, Rapid Reviews have not yet proven to be an effective tool for preventing similar misconduct from reoccurring. Rapid Reviews identify and recommend corrective action for a wide array of security lapses, and yet the same problems have persisted for many years. The Rapid Review concept is grounded in sound correctional practice and has elevated the quality of staff practice in other jurisdictions. However, catalyzing improved practice requires facility leadership to possess a strong command of the security protocols and procedures that must be utilized on a daily basis, to develop skills to guide and coach their staff toward sound correctional practice, and to ensure Captains are supervising staff in a manner that allows them to address these issues in real time. While Rapid Reviews provide some insight and benefit into to Department practice, their full potential is not yet realized.

| **COMPLIANCE RATING** | **§ A., ¶ 1.** Partial Compliance |
| --- | --- |

| **FIRST REMEDIAL ORDER § A., ¶ 2 (FACILITY LEADERSHIP RESPONSIBILITIES)** |
| --- |

§ A., ¶ 2. Each Facility Warden (or designated Deputy Warden) shall routinely analyze the Use of Force Reviews, the Department leadership's assessments of the Use of Force Reviews referenced in Paragraph A.1(i) above, and other available data and information relating to Use of Force Incidents occurring in the Facility in order to determine whether there are any operational changes or corrective action plans that should be implemented at the Facility to reduce the use of excessive or unnecessary force, the frequency of Use of Force Incidents, or the severity of injuries or other harm to Incarcerated Individuals or Staff resulting from Use of Force Incidents. Each Facility Warden shall confer on a routine basis with the Department's leadership to discuss any planned operational changes or corrective action plans, as well as the impact of any operational changes or corrective action plans previously implemented. The results of these meetings, as well as the operational changes or corrective action plans discussed or implemented by the Facility Warden (or designated Deputy Warden), shall be documented.

The goal of this provision is to ensure that the leadership of each facility is consistently and reliably identifying pervasive operational deficiencies, poor security practices, and trends related to problematic uses of force and that they address these patterns so that supervisors and staff alike receive the guidance and advice necessary to improve their practices. Facility leadership is required to routinely analyze available data regarding uses of force, including the daily Rapid Reviews, to

determine whether any operational changes or corrective action plans are needed to reduce the use of excessive or unnecessary force, the frequency of use of force incidents, or the severity of injuries or other harm to incarcerated individuals or staff resulting from use of force incidents.

The level of on-going harm to people in custody and staff cannot be overstated, and the factors contributing to the Department's inability to infuse an appropriate skillset to minimize this risk of harm have been discussed in each of the Monitor's Reports to date. This is one of the problems that the new agency leadership structure and broader pool of candidates for facility leadership positions was intended to address.[8] The Monitoring Team continues to emphasize that jail administrators can and should make improvements to the quality of staff practice by aggregating incident-level data (e.g., Rapid Reviews and other indicators extracted from CODs) to identify patterns in persons, places, times and circumstances that lead to a use of force and in which problematic practices tend to occur, and then should develop strategies that directly target those people, places, times or circumstances in an effort to reduce the likelihood of problematic staff conduct.

Unfortunately, the improvements to this process anticipated to flow from the new facility leaders had not yet become visible during the current Monitoring Period. Previously, the Department held weekly TEAMS meetings to discuss facility metrics and, ostensibly to develop strategies to improve safety. These meetings were suspended during the Monitoring Period, but resumed in July 2023. The Department reported that in January 2023, the Deputy Commissioner of Security Operations reinstated daily calls with facility leadership and Assistant Commissioners from the Deputy Commissioner of Facility Operations'. Reportedly, the calls focused on Rapid Reviews and any corrective action/immediate discipline required, but do not appear to have focused on overall trends or operational changes as required by this provision.

The Department reports that agency and facility leadership routinely meet to discuss the various issues facing the facilities. However, these conversations rarely appeared to lead to operational changes or specific corrective action plans, as required by this provision. Instead, the Department's strategies tended to rely on issuing memos to staff, reminders at Roll Call and corrective action for individual staff, but only rarely included actionable, operations changes that target the root causes of a specific problem. The few documents containing more global or problem-focused strategies are described in the Monitor's November 8, 2023 Report (see pgs. 80-81), although most were either short-sighted or abandoned before their impact on staff practice could be discerned.

**Conclusion**

Although the Monitoring Team continues to support the recent installation of facility leaders with demonstrated expertise in jail operations and the experience to lead the type of culture change that is required, these appointments have yet to have the intended effect on problem-solving strategies at the facility level. Agency and facility leaders have access to a significant amount of data from CODs, Rapid Reviews and NCU audits that provide clear targets for problem-solving, but those responsible

---

[8] *See* Monitor's July 10, 2023 Report at pgs. 69-72.

for setting the course of correction have yet to articulate the type of specific, actionable plans to address the identified problems that is required by this provision.

| **COMPLIANCE RATING** | **§ A., ¶ 2.** Non-Compliance |
| --- | --- |

**FIRST REMEDIAL ORDER § A., ¶ 3 (REVISED DE-ESCALATION PROTOCOL)**

§ A., ¶ 3. Within 90 days of the date this Order is approved and entered by the Court ("Order Date"), the Department shall, in consultation with the Monitor, develop, adopt, and implement a revised de-escalation protocol to be followed after Use of Force Incidents. The revised de-escalation protocol shall be designed to minimize the use of intake areas to hold Incarcerated Individuals following a Use of Force Incident given the high frequency of Use of Force Incidents in these areas during prior Reporting Periods. The revised de-escalation protocol shall address: (i) when and where Incarcerated Individuals are to be transported after a Use of Force Incident; (ii) the need to regularly observe Incarcerated Individuals who are awaiting medical treatment or confined in cells after a Use of Force Incident, and (iii) limitations on how long Incarcerated Individuals may be held in cells after a Use of Force Incident. The revised de-escalation protocol shall be subject to the approval of the Monitor.

This box provides a compliance assessment on the Department's efforts to reduce the reliance on the use of intake in general operations pursuant to the requirements of the First Remedial Order § A., ¶ 3. This assessment also includes references to Action Plan § (E) ¶ (3)(a) (which adopts ¶1(c) of the Second Remedial Order regarding tracking of inter/intra facility transfers), and Action Plan § (E) ¶ (3)(b) (which requires the new leadership to address these requirements) given the interplay with the First Remedial Order § A., ¶ 3. These provisions require the various processes that are negatively impacting intake's orderly operation to be identified and addressed with new procedures.

To ascertain the Department's progress in minimizing the use of intake, the Monitoring Team assesses the use of force in intake, available data regarding the time individuals stay in intake areas, and the Department's ability to manage individuals *outside* of intake. The Monitoring Team also makes observations from site visits of intake areas and its assesments of use of force incidents. The Department has made progress on this provision and beginning in 2022, the Department is no longer in non-compliance with the First Remedial Order § A., ¶ 3.[9]

**Use of Force Incident in Intake Areas**

The Monitoring Team continues to evaluate the frequency with which use of force occurs in the intake as the Monitoring Team has long explained that a chaotic environment and longer processing times (which are often mutually reinforcing) within intake can result in a greater frequency of the use of force. This is why efficient processing of individuals within intake and reducing reliance on intake following a use of force are so critical. While the number of uses of force within the Department remains too high, improved conditions within intake have resulted in a reduced number of uses of force. The total number of uses of force in intake in the first six months of 2023 (371) is on track to be

---

[9] The Department was in non-compliance with this provision in the Eleventh and Twelfth Monitoring Periods. A compliance assessment was not provided for the Thirteenth Monitoring Period. The Monitoring Team found that the Department was in Partial Compliance with this provision in the Fourteenth Monitoring Period in the October 28, 2022 Report.

lower than the total number of uses of force in intake in 2022 (963) and would be the lowest number of any of the previous five years. Since 2022, the proportion of use of force in intake has decreased, suggesting improvement in conditions has contributed to a reduced likelihood of use of force incidents.

| Use of Force in Intake | | | | | | |
|---|---|---|---|---|---|---|
| | 2018 Total | 2019 Total | 2020 Total | 2021 Total | 2022 Total | 2023 Jan. to Jun. Total |
| # of Use of Force Incidents in Intake | 913 | 1123 | 992 | 1483 | 963 | 371 |
| Total UOF | 5901 | 7169 | 6467 | 8194 | 7005 | 3236 |
| % of UOF in Intake | 15% | 16% | 15% | 18% | 14% | 11% |

### Intake Data Tracking & NCU Audits of Individuals in Intake

Inter/intra facility transfers are required to be tracked pursuant to ¶ 1(c) of the Second Remedial Order. Historically, the Department did not track inter/intra facility transfers in any centralized way. Starting in 2023, the Deputy Commissioner, Classification, Custody Management & Facility Operations ("DC of Classification") oversaw several initiatives to improve the tracking of inter/intra facility transfers to ensure they did not languish in intake for more than 24 hours. These initiatives are outlined below:

- *Tracking in Inmate Tracking System ("ITS")*: Beginning March 27, 2023, the Department required all facilities to track individuals in intake for the purpose of housing transfers within or between jail facilities using the Inmate Tracking System ("ITS"). Intake staff enter individuals in ITS by manually entering the individual's personal information such as their Booking and Case Number.[10]
- *Facility Operations Team*: Facility Operations Team in the DC of Classification's office monitors video of intake areas 24 hours per day, 7 days per week.
- *Facility Reporting*: The Department has directed each facility to submit a list of every individuals in intake six times a day (*i.e.*, every four hours) to the DC of Classifications Office. The Facility Operations Team reviews these reports to determine if any individual has remained in intake for an extended period of time. If the assigned officer identifies any individuals noted at each four-hour mark that have been in the intake area for four hours or more, the monitoring officer contacts the facility for an explanation and takes steps to expedite the individual's movement.
- *Intake Logbook Review*: The Department reports that facilities have been directed to provide a copy of intake logbooks daily to the DC of Classification office as evidence of the Warden, Deputy Warden, Tour Commander, and Intake Captain conducting their required tours of the intake area.
- *Data Entry*: The Department reports that they began using ITS-generated data to produce reports and evaluate information like the average time, minimum time, and maximum time in intake as part

---

[10] Intake staff may also scan an incarcerated individual's "accompanying card" or "Housing Locator Card" to enter the individual in ITS. However, the Monitoring Team site visits reveal this practice is not utilized frequently as staff more commonly manually enter the individual's information into the system.

of their overall effort to evaluate how long individuals are intake. The Monitoring Team has not evaluated these reports or the reliability of the data, but the Department reports quality analysts have been reviewing the ITS system for errors. The Department also reports that they are working to improve the reliability of data entry in ITS as some staff are still not scanning individuals into ITS.

Overall, these appear to be useful strategies to ensure intake units are properly managed.

The Monitoring Team site work confirms intake areas generally appear more orderly and the frequency of individuals languishing in intake for unknown periods has subsided. Most importantly, Staff working in areas generally know who is in each intake pen and why. In most instances, intake staff demonstrated to the Monitoring Team that individuals were entered in ITS and thus tracked. However, two important issues remain. First, the Department is not tracking all individuals in ITS, such as Court transfers.[11] Second, some inter/intra facility transfers are not being entered in ITS in a timely manner. For example, during site visits this Monitoring Period, the Monitoring Team identified numerous individuals who were intake cells and had not yet entered ITS. When asked why, Intake staff reported that the individual "just got there," and they hadn't had the time to enter them given their competing priorities. These findings indicate that additional steps are needed to ensure staff comply with the tracking requirements.

The Monitoring Team reiterates the recommendations described in the April 3, 2023, Status Report (pgs. 87-88), including appointing dedicated leadership to oversee intake, assessing root cause issues like why Staff are still not entering individuals into ITS, and developing a practical quality assurance process.

### Reduced Reliance on Intake & De-Escalation

As part of the effort to eliminate the reliance on intake areas, de-escalation units were opened in each Facility by July 2022. De-escalation units were in unoccupied housing units in each facility and have cells with secured doors, a bed, toilet, and sink. The housing units also contained a shower. While the First Remedial Order does not require the use of de-escalation units, the Department opened these units as one alternative for staff to use instead of intake. The Department promulgated Directive 5016 "De-escalation Unit," which establishes the Department's policy and procedures for conducting de-escalation outside of facility intakes. The policy prohibits the use of intake pens for post incident management or violence prevention. Instead, the policy indicates that intake should only be used for facility transfers, court processing, discharges, and transfers to medical appointments, cadre searches, body scans, and new admissions.

---

[11] See Christopher Miller's June 20, 2023 Declaration (dkt. 553-1) at ¶ 15 in which it is reported that "[i]ndividuals who go out to court, to work, or to religious services a few times a year are now not recorded in the ITS system. Their movement in and out of intake, however, is captured in other ways, including by the four-hour intake checks…" The Monitoring Team has not yet evaluated these other tracking systems.

In this Monitoring Period, NCU conducted audits between January 2023 to June 2023 to determine how facilities are managing individuals in custody following a use of force incident and to assess every facility's adherence to the de-escalation policy. Specifically, NCU reviewed Genetec video to track the movement of individuals after a use of force incident to determine if staff are following the policy on de-escalation protocol (*i.e.*, not placing individuals in intake pens after incidents).

The NCU audits covering January to June 2023 (the Sixteenth Monitoring Period) revealed that 49 of 84 individuals (58%) (compared with 71% in July to December 2022) were not taken to intake and instead were taken back to their assigned cell to de-escalate, immediately rehoused, taken directly to the clinic for medical care, or were placed in a de-escalation unit (specifically, 6 individuals were placed in a de-escalation pen during this time). 35 of 84 individuals (42%) were brought to intake areas. NCU's findings indicate a decrease in the percentage of individuals who were not taken to intake compared to the previous Monitoring Period. Reports from Department leadership, Facility leadership, and onsite observations appear to confirm that facilities no longer use de-escalation.

Identifying ways to avoid an individual's placement in intake and ensuring individuals are processed through intake in a timely manner are important steps to reducing the reliance on intake. However, still too many people are placed in intake after an incident. It is critical for the Department to continue to improve practice, so no individuals are placed in intake following use-of-force incidents and that the practice is eliminated from Department culture.

**Conclusion**

The Department has taken important steps and utilized considerable resources to improve the conditions intake. However, additional work remains to reduce the utilization of intake after the use of force as it is still used more frequently than is necessary. Further, the Department must remain vigilant in ensuring that individuals are tracked consistently when they are brought to and leave the intake area.

| COMPLIANCE RATING | § A., ¶ 3. Partial Compliance |
| --- | --- |

## FIRST REMEDIAL ORDER § A., ¶ 4 (SUPERVISION OF CAPTAINS)

¶ 4. _Supervision of Captains_. The Department, in consultation with the Monitor, shall improve the level of supervision of Captains by substantially increasing the number of Assistant Deputy Wardens ("ADWs") currently assigned to the Facilities. The increased number of ADWs assigned to each Facility shall be sufficient to adequately supervise the Housing Area Captains in each Facility and the housing units to which those Captains are assigned and shall be subject to the approval of the Monitor.

This provision requires the Department to improve staff supervision by hiring and deploying additional ADWs within the facilities to better supervise Captains. The goal of this provision is to ensure that Captains are properly managed, coached, and guided in order to elevate their skill set, as they in turn better supervise the officers on the housing units. Thus, the issue of adequate supervision is

multifactorial, requiring an examination of both the supervisors (ADWs) and the supervisees (Captains).

Changing staff practice requires an infusion of correctional expertise in a form that can reach more broadly, deeply and consistently than the leadership by those recently recruited to the Department at the executive level (e.g. Senior Deputy Commissioner, Deputy Commissioners, Associate Commissioners, and Assistant Commissioners). Hiring leaders with correctional backgrounds has unquestionably been helpful, but they are insufficient in number to fully address the problems at hand and to materially elevate the skillset of Department's uniformed workforce of approximately 6,400 staff. This compliance assessment mirrors the discussion in the Monitor's November 8, 2023 Report (*see* pgs. 25-28).

The Department's plans as proposed to date, and those required by the various *Nunez* Court Orders, are unlikely to be sufficient because they do not address key dynamics that underlie staffs' inability or unwillingness to utilize proper security practices. Definitive measures to ensure that staff are available in sufficient numbers and that they stay on post are obviously necessary. It is equally critical that staff *actually do their jobs*, which requires thorough training, mastering the essential skills, having the confidence to implement the expected practices, and that they utilize those skills when they are needed. Too often, staff are present and yet fail to enact or enforce even the most basic security protocols and Roll Call talking points are unlikely to catalyze the type of skill development that is necessary. Instead, officers' skill mastery should be a core responsibility of the Department's Captains.

Improved practice by line staff and captains require on-going, direct intervention by well-trained, competent supervisors—guiding and correcting staff practice in the moment, as situations arise. Only with this type of hands-on approach will the Department be able to confront and break through staffs' inability, resistance and/or unwillingness to take necessary actions. In other words, a system of consistent, intensive support must be available to every housing unit, and those required to supervisors those units, until staff demonstrates the consistent application of basic correctional practice.

Unfortunately, the Department does not appear to have a sufficient number of supervisors who possess the necessary proficiencies to fulfill this need. To date, the Department's efforts to obtain adequate numbers of competent Captains have not been successful. But this is not only a problem of quantity—it also requires adequate numbers of ADWs who can provide similarly intensive coaching and guidance to elevate the skill set of the Captains, which is the core of this provision.

An organizational aspect contributing to the inadequate supervision is the Department's basic supervisory structure. Most correctional systems have three supervisor ranks (Sergeant, Lieutenant, Captain), but this Department has only two (Captain, Assistant Deputy Warden). Captains are essentially the only line supervisors because most ADWs serve as Tour Commanders and thus cannot focus on skill development among their subordinates. Thus, Captains too often go without the supervision needed to ensure that they are properly functioning in their roles.

The problems with this truncated chain of command are exacerbated by the inadequate number of individuals holding the two ranks. Two tables that identify the number and assignment of ADWs and Captains at specific points in time from July 18, 2020 to October 21, 2023 in Appendix A. There are plainly insufficient numbers of supervisors to provide the type of *intensive* supervision—throughout the chain of command—that is needed to elevate officers' skills. This provision requires an increase in the number of ADWs and while the number of ADWs assigned to work in the facilities has increased by almost 38% since the First Remedial Order went into effect (52 as of July 18, 2020 compared to 72 as of June 16, 2023), the small number of ADWs has had limited impact, particularly given the significant deficit in the number of Captains and the fact that most ADWs work as Tour Commanders. Since 2020, the number of Captains assigned to work in the facilities has decreased by about 33% (558 as of July 18, 2020, compared to 366 as of June 16, 2023).

Compounding the problem of too few supervisors is the reality that many of those holding one of these two ranks have only marginal competence in the skills necessary to provide *effective* supervision. The Department continues to assign and promote individuals with questionable fitness for the roles. In late 2022, the Department promoted 26 people to the rank of ADW, even though 12 were not recommended for promotion by various internal vetting divisions. Subsequently, in 2023, 10 additional ADWs were promoted without following internal vetting protocols. Of these 36 ADWs, four have since been demoted, and two resigned their position less than a year after their promotion. Given the problems articulated in prior Monitor's Reports regarding screening and selection of ADWs and Captains and the poor quality of pre-promotional training curricula,[12] it is perhaps unsurprising that the supervisory ranks are unprepared to support the weight of the strategies that place them at the center of officers' skill development.

Supervision by ADWs and Captains cannot be passive—these individuals must have an active presence on the housing units demonstrating the requisite skills, providing opportunities for staff to practice them, and helping staff to understand and eventually overcome what hinders their ability to consistently utilize the skills they are being taught. The Department simply does not have the necessary assets among its current corps of supervisors to provide the type and intensity of hand-to-hand coaching that is required, which is perhaps unsurprising given their tenure in a deeply dysfunctional system that does not adequately select, train or prepare them for the task at hand. In addition to the Captains' need for intensive guidance, ADWs will also need substantial and quality coaching, supervision, and mentoring from their superiors to develop into the type of supervisor that is so desperately needed in this Department. The task of cultivating the ADWs will largely fall to the Deputy Wardens and Wardens/Assistant Commissioner's in each command, which brings yet another layer of complexity to supervision problem and the task of reforming the Department's practices. The long-standing supervisory void—in both number and competency—is a leading contributor to the Department's inability to alter staff practice and to make meaningful changes to basic security practices and operations. As a result, the Department is in Non-Compliance with this provision.

---

[12] *See* for example, Monitor's July 10, 2023 Report (dkt. 557) at pgs. 71 to 83.

| COMPLIANCE RATING | § A., ¶ 4. Non-Compliance |
|---|---|

### FIRST REMEDIAL ORDER § A., ¶ 6 (FACILITY EMERGENCY RESPONSE TEAMS)

§ A., ¶ 6. Within 90 days of the Order Date, the Department shall, in consultation with the Monitor, develop, adopt, and implement a protocol governing the appropriate composition and deployment of the Facility Emergency Response Teams (i.e., probe teams) in order to minimize unnecessary or avoidable Uses of Force. The new protocol shall address: (i) the selection of Staff assigned to Facility Emergency Response Teams; (ii) the number of Staff assigned to each Facility Emergency Response Team; (iii) the circumstances under which a Facility Emergency Response Team may be deployed and the Tour Commander's role in making the deployment decision; and (iv) de-escalation tactics designed to reduce violence during a Facility Emergency Response Team response. The Department leadership shall regularly review a sample of instances in which Facility Emergency Response Teams are deployed at each Facility to assess compliance with this protocol. If any Staff are found to have violated the protocol, they shall be subject to either appropriate instruction or counseling, or the Department shall seek to impose appropriate discipline. The results of such reviews shall be documented.

This provision requires the Department to minimize unnecessary or avoidable uses of force by Emergency Response Teams. There are a few types of Emergency Response Teams: a Probe Team, which is a team of facility-based staff; the Emergency Services Unit ("ESU"), an "elite" team of staff specifically dedicated and trained to respond to emergencies across the Department; and Security Response Teams ("SRT") and Special Search Team ("SST"), which function similarly to ESU and are deployed to facilities as part of operational security efforts. The Special Teams are utilized in the Facilities in the same manner as a Probe Team. The following discussion provides data on the use of these teams via facility alarm responses, addresses the Monitoring Team's overarching concerns regarding Emergency Response Team members' conduct, outlines the steps the Department has taken to reduce reliance on these teams, and, finally, details the Monitoring Team's specific concerns regarding ESU.

**Concerns Regarding Emergency Response Teams**

The Monitoring Team has long raised concerns about the Department's overreliance on Emergency Response Teams, team members' conduct and the teams' composition—both at the Facility-level through the use of "Probe Teams" and ESU (including SRT and SST which are now being used akin to ESU).[13] Themes that explain these concerns fall into the following categories for all Emergency Response Teams:

- Overreliance on specialized teams to address issues that could and should be addressed by either uniform staff on the housing unit or facility-level supervisors.

- Overabundance of staff on these teams such that an excessive number of staff arrive on-scene, which often raises tensions (including chaotic nature of fielding Probe Teams using an "all call for assistance.").

---

[13] *See* 11th Monitor's Report (dkt. 368) at pgs. 38 to 50 and 116 to 120, Monitor's 12th Report (dkt. 431) at pgs. 49-51, the Monitor's Second Remedial Order Report (dkt. 373) at pgs. 3-4, Monitor's April 3, 2023 Report (dkt. 517) at pg. 137 to 143; Monitor's July 10, 2023 Report (dkt. 557) at pgs. 34 to 42.

- Hyper-confrontational approach of response team members, which often exacerbates conflict and leads to the unnecessary and/or excessive use of force.

- Failure to appropriately staff these teams to ensure they are comprised only of those who are qualified, and who do not have a history of unnecessary and/or excessive force.

- Team members utilizing concerning security practices such as painful escort holds.

- Utilizing Emergency Response Teams to conduct searches, which are then implemented in a manner that is inefficient and chaotic and can result in the unnecessary use of force.

- Lack of specific criteria to select those who serve on the Emergency Response teams within the facilities (despite years of recommendations from the Monitoring Team and reports from the Department that they intend to do so).[14]

**Steps to Reduce Reliance on Emergency Response Teams**

The Department's strategy for addressing the risk of harm via Emergency Response Teams has continued to shift. Following the end of the current Monitoring Period and more than two years after the Monitoring Team provided feedback on the Emergency Response Team policy, the Department shared proposed revisions in August 2023. Unfortunately, the proposed revisions did not address most of the Monitoring Team's feedback and inexplicably did not reflect the changes that the Department reported it was intending to make. In October 2023, the Monitoring Team shared extensive feedback and recommendations to the revised policy which remains outstanding. In recent meetings, it appears that the Department's plans for Emergency Response Teams may be changing yet again and so the status of the draft policy and any corresponding changes in practice (including criteria for selecting team members) is once more in a state of flux and is unknown. The Department's policies and procedures related to searches are intertwined with the actions of the Emergency Response Teams given they often conduct searches. The Monitoring Team provided feedback in 2021[15] on strategies for improving staff's search techniques to avoid catalyzing a need to use force and reduce the on-scene chaos that often accompanies search operations.[16] The Department is working to revise these policies as required by the Court's August 10, 2023 Order.

---

[14] Most recently, the Department reported in August 2023 that it intended to assign specific staff to the Emergency Response Teams based in the facilities. However, as of the filing of this report, the Department has not provided any revised policies or procedures to suggest it has taken any concrete steps to implement this plan.

[15] In 2021, the Monitoring Team recommended: (1) the span of control for searches should be limited in order to reduce the number of excessive staff involved in searches; (2) a specific plan must be devised before each search takes place; (3) facility leadership must be involved in any planning for a search that includes external teams like ESU; and (4) specific procedures for conducting searches in celled and dormitory housing and common areas so that searches are completed in an organized and efficient manner and are not chaotic and disruptive.

[16] *See*, for example, Monitor's 3rd Report (dkt. 295) at pgs. 13 to 14 and 128; Monitor's 6th Report (dkt. 317) at pg. 42, Monitor's 10th Report (dkt. 360) at pgs. 16, 29, 75; Monitor's 11th Report (dkt. 368) at pgs. 24; 43-44, 48 and 124; Monitor's 12th Report (dkt. 431) at pg. 26; Monitor's March 16, 2022 Report (dkt.

The Department has attempted to assess the appropriateness of alarms and of Emergency Response Teams' tactics during the Rapid Review process. Most of the facilities' Rapid Reviews do assess whether Level B alarms were necessary, although the reviewers sometimes fail to comment on the issue. In May 2023, the Department began conducting Special Teams Rapid Reviews using a template that specifically assesses team members' conduct (rather than being considered in concert with facility staff's conduct, as occurs in the facilities' Rapid Reviews). After reviewing the Special Teams Rapid Review findings from the first few months, the Monitoring Team provided feedback regarding the substance of the template, how cases are selected for review and the accuracy of the team's findings.

While significant concerns remain about the conduct of the members of Emergency Response Teams, efforts to reduce the reliance on their use are important foundational steps to improving practice in this area.

**Overview of Alarm Data**

The table below presents the number and rate of Level A and Level B alarms from 2020 through June 2023. Level B alarm responses involve the deployment of an Emergency Response Team, while Level A responses involve supervisors and/or de-escalation teams not outfitted in tactical gear. During this Monitoring Period, the number of alarms of both types decreased. Between January and June 2023, the total number of alarms was less than half of the previous 12-month period (1,880 in January-June 2023 versus 4,763/2 = 2,381 in 2022). The average monthly rate of alarms is also significantly lower than in previous years (5.3 versus 16.8, 10.3 and 7.0).[17] In addition, the proportion of Level A alarms (i.e., facility non-tactical response) is higher than the proportion of Level B alarms (i.e., emergency response team), continuing a trend first seen in the latter part of 2022.[18] Together, this data indicates that facilities may be using alarms to respond to incidents less often overall, and that incidents are increasingly being resolved by non-tactical teams.

---

438) at pgs. 22 and 71 to 72; Monitor's October 28, 2022 (dkt. 472) at pgs. 71-72, 81, 117; Monitor's April 3, 2023 Report (dkt. 517) at pg. 54 and 138; and Monitor's July 10, 2023 Report (dkt. 557) at pgs. 42 to 43.

[17] The average monthly rate is calculated as follows: (number of events/number of months in period)/ADP*100 = rate.

[18] See Monitor's April 3, 2023 Report at pg. 138.

| Alarms Department-Wide 2020-2023 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | **2020** | | | **2021** | | | **2022** | | | **Jan-Jun 2023** | | |
| | # | ADP | Rate | # | ADP | Rate | # | ADP | Rate | # | ADP | rate |
| **Total** | 9,145 | 4,544 | 16.8 | 6,860 | 5,574 | 10.3 | 4,763 | 5,639 | 7.0 | 1,880 | 5,969 | 5.3 |
| | # | % total | | # | % total | | # | % total | | # | % total | |
| *Level A* | 1,894 | 21% | | 2,264 | 33% | | 2,128 | 45% | | 981 | 52% | |
| *Level B* | 7,249 | 79% | | 4,597 | 67% | | 2,635 | 55% | | 899 | 48% | |

The Monitoring Team's review of all incidents through CODs and a large proportion of Intake Investigations identifies the same reduction demonstrated in the data. This is a significant step in the right direction and is likely the result of work that has been conducted by the Security Operations Manager since he started in May 2022 to better align alarm responses with the needs of the facility. The reduced reliance on Level B alarms and alarms in general appears to mark the beginning of a cultural shift in the jails—a shift to problem solving by on-unit staff and supervisors, versus simply outsourcing incident response to Emergency Response Teams as has been the historical practice. The Monitoring Team and Security Operations Manager meet bi-monthly to discuss a range of relevant security topics and initiatives. The Security Operations Manager's focus on reducing Level B responses has been a constant theme—as he reports he is reinforcing to facility leadership on a routine basis the need for more supervisory and de-escalation responses and less use of Level B alarms. The mentorship and leadership exhibited in this area is promising. The reduction in alarm responses is trending in the right direction. However, the frequency of alarms still creates ample risk for the Emergency Response Teams' concerning practices to result in unnecessary or excessive uses of force.

**Emergency Services Unit ("ESU")**

The Monitoring Team recognizes the need for and supports the utilization of a specialized and highly trained tactical squad within the Department. ESU serves this function—ESU is located centrally outside of any specific facility and serves all facilities. When properly utilized and deployed, such teams can neutralize serious risks of harm to both staff and incarcerated individuals. The practices of ESU have been a long-standing concern of the Monitoring Team—the "Concerns Regarding Emergency Response Teams" listed above are particularly applicable to the conduct and management of ESU.

An overarching concern regarding ESU's management has been the selection of staff for the team, particularly the retention of staff members in the unit after cases of misconduct have been

identified. Department policy does require screening to select and assign staff to the Emergency Services Unit. However, the Department has not adhered to its own screening and selection process.

In early 2021, over 50 staff were removed from the ESU pursuant to Operations Order 24/16 "Special Unit Assignment" because they either had certain pending charges or had discipline imposed as a result of utilizing excessive force and/or failing to report a use of force incident. This action occurred only after the Monitoring Team advised the Department that its *own* policy required the Department to review all staff and to remove any staff who met specified criteria, and that Department was not following the policy. Following this one action in 2021, despite repeated feedback from the Monitoring Team, the Department did not conduct another review for almost two years. In early 2023, the Department conducted a review to identify whether any staff should be removed because they met the criteria specified in Operations Order 24/16. This review had a number of flaws including that the actions indicated by the review were not implemented (e.g., a staff member was recommended for removal, but remained on the ESU). Further, the integrity of the underlying screening considerations was compromised (e.g., misconduct by ESU staff was often not identified by ID and the Trials Division resolved cases in an attempt to excuse the misconduct). *See* Monitor's April 3, 2023 Report at pgs. 140 to 142.

In spring 2023, the Monitoring Team discovered that 26 officers and Captains had been assigned to the Emergency Services Unit earlier in 2023 without any screening. Had the Department conducted the required screening, the results would have prohibited the assignment of at least some of these individuals to ESU.[19] Of the 26 individuals added to ESU in early 2023, 10 of them had previously been removed in 2021 because they either had certain pending charges or had discipline imposed as a result of utilizing excessive force and/or failing to report a use of force incident. Following the Monitoring Team's discovery, all 26 officers and Captains were removed from ESU.

Far from being a bureaucratic requirement, proper screening should exclude individuals who are not fit for this particular duty and who may exacerbate, rather than prevent harm from occurring. The failure to do so has real-world consequences. As reported by the Bronx District Attorney, "on April 4, 2023, members of the DOC Emergency Services Unit, including [Officer Dionisio] Rosario, were conducting a search inside of Robert N. Davoren Center ("RNDC") 5 Upper North housing area. During the search, the defendant [Officer Rosario] was involved in a use of force with an inmate. Following the use of force, the defendant is captured on video surveillance, including his own body worn camera, grasping a sharpened object inside of his right hand, and is seen entering the cell of the person with whom he had the use of force and placing the 4.5-inch piece of sharpened plexiglass underneath a piece of paper by the sink area. The defendant is seen searching other areas of the cell before coming back to the sink area, where he removed the sharpened object from where he had previously planted it. The defendant allegedly stated that he recovered it by the sink area but also stated

---

[19] Notably, the Department conceded that the screening did not take place only after the Monitoring Team requested the screening materials and numerous follow-up communications.

that it was in the inmate's hand and gave other false information in four DOC reports."[20] The Department suspended Officer Rosario after the incident.

Officer Rosario was removed from ESU on March 25, 2021 as he met the criteria for removal pursuant to Operations Order 24/16 "Special Unit Assignment" because he either had certain pending charges or had discipline imposed as a result of utilizing excessive force and/or failing to report a use of force incident.[21] Inexplicably, he was reassigned to ESU in January 2023, along with several other staff who had been previously been removed from ESU. The Department did not screen Officer Rosario (or the other individuals re-assigned to the unit) before reassigning them to ESU, as required by policy. The screening, had it occurred, would have identified that he should have been precluded from assignment to ESU. Officer Rosario was removed from ESU in April 2023 after the Monitoring Team alerted the Department about its findings regarding the lack of screening.

As of October 2023, a total of 95 staff are assigned to ESU. The Department reported its intention to screen all staff assigned to ESU under the revised screening procedures once the Operations Order 24/16 "Special Unit Assignment" has been finalized and approved by the Monitor.

**Conclusion**

During the current Monitoring Period, some progress was evident in reducing the overall number of alarms and the reliance on Level B alarms (i.e., deploying emergency response teams). That said, work remains to address long-standing concerns with the conduct of Emergency Response Team members, to maximize the use of Rapid Reviews to detect and address their inappropriate conduct, and to improve the protocol for screening and assigning staff to ESU. Together, these actions are a critical part of setting the right tone in the entire agency relating to unnecessary and excessive force—that is, a zero-tolerance approach. The Department is therefore in Non-Compliance with this provision.

| | |
|---|---|
| **COMPLIANCE RATING** | **§ A., ¶ 6.**<br>**Development of Protocol**: Non-Compliance<br>**Review of Responses & Documentation**: Partial Compliance<br>**Response to Misconduct**: Non-Compliance |

---

[20] Available at: https://www.bronxda.nyc.gov/downloads/pdf/pr/2023/68-2023%20correction-officer-indicted-evidence-tampering.pdf. Accessed 10/27/23.

[21] This screening in 2021, although required by DOC policy, was only conducted following prompting by the Monitoring Team. *See* Monitor's Eleventh Report at pg. 44-51.

USE OF FORCE POLICY (CONSENT JUDGMENT § IV)

---

**CJ § IV. USE OF FORCE POLICY, ¶ 1 (NEW USE OF FORCE DIRECTIVE)**

¶ 1. Within 30 days of the Effective Date, in consultation with the Monitor, the Department shall develop, adopt, and implement a new comprehensive use of force policy with particular emphasis on permissible and impermissible uses of force ("New Use of Force Directive"). The New Use of Force Directive shall be subject to the approval of the Monitor.

This provision of the Consent Judgment requires the Department to develop, adopt, and implement a comprehensive Use of Force Policy with particular emphasis on permissible and impermissible uses of force. The Department previously achieved Substantial Compliance with the development and adoption of the Use of Force Policy, which received the Monitor's approval prior to the Effective Date of the Consent Judgment in 2015.

**Standalone Policies**

In addition to the Use of Force policy, the Department maintains a number of standalone policies regarding the proper use of security and therapeutic restraints, spit masks, hands-on-techniques, chemical agents, electronic immobilizing devices, kinetic energy devices used by the Department, batons, lethal force, and canines. ESU also maintains approximately 10 Command Level Orders ("CLOs"), including two which govern the use of specialized chemical agent tools (*i.e.*, the Sabre Phantom Fog Aerosol Grenades). Several of these policies require revisions, including the ESU's CLOs as well as the Department's policies on restraints, searches, and Emergency Response Teams. This has been extensively documented in the Monitor's Reports, most recently in the Monitor's November 8, 2023 Report.[22] Furthermore, the Department's failure to consult and/or seek the Monitor's approval of revised policies has also been discussed in various Monitor's Reports.[23] The Department reports it is working to provide revisions to the various policies for consultation with and feedback from the Monitoring Team.

**Implementation of UOF Policy**

The Monitoring Team has provided detailed reporting on the Department's problematic use of force and corresponding security failures throughout 2023 and thus these details will not be repeated. The Monitor's extensive findings during this time period are the basis for the Non-Compliance rating regarding the UOF policy's implementation.[24]  The findings reflect ongoing concerns about poor security practices and pervasive operational failures that result in the widespread unnecessary and excessive use of force and imminent risk of harm to those in custody and to those who work in the jails. As shown in the data Appendix A, the UOF rate to date in 2023 (9.2) is more than twice the rate in 2016 (3.96) when the Consent Judgment went into effect. Substantially reducing the frequency of

---

[22] See Monitor's November 8, 2023 Report at pgs. 12, 14-16, 40-41

[23] See Monitor's November 30, 2023 Report at pgs. 33 and 37.

[24] *See* Monitor's April 3, 2023 Report at pgs. 36 to 63, Monitor's June 8, 2023 Report at pgs. 5 to 14, July 10, 2023 Report at pgs. 12 to 68.

unnecessary and excessive uses of force will require quality training and supervision, strict adherence to sound security practices, and reliable and appropriate staff discipline.

It remains to be seen if the Department can successfully improve the quality of its security practices and reduce the overall frequency with which force is used to meet the overarching goals of the Consent Judgment. In the meantime, the Department remains in Non-Compliance with the implementation of the Use of Force Policy.

| | |
|---|---|
| **COMPLIANCE RATING** | ¶ **1. (Develop)** Substantial Compliance<br>¶ **1. (Adopt)** Substantial Compliance<br>¶ **1. (Implement)** Non-Compliance<br>¶ **1. (Monitor Approval)** Substantial Compliance |

| CJ § V. USE OF FORCE REPORTING AND TRACKING, ¶ 2 (INDEPENDENT STAFF REPORTS) |
|---|

¶ 2. Every Staff Member who engages in the Use of Force, is alleged to have engaged in the Use of Force, or witnesses a Use of Force Incident, shall independently prepare and submit a complete and accurate written report ("Use of Force Report") to his or her Supervisor.

The Department is required to report when force is used accurately and timely as part of their overall goal to manage use of force effectively. The assessment below covers five critical areas related to reporting force: notifying Supervisors that a use of force occurred, submission of complete, independent and timely reports, the classification of UOF incidents, allegations of use of force, and reporting of use of force by non-DOC staff who either witnessed the incident and/or are relaying reports from incarcerated individuals.

### Notifying Supervisor of UOF

From January to June 2023, 3,311 use of force incidents were reported by supervisors to the Central Operations Desk and slightly over 6,400 use of force or use of force witness reports were submitted for incidents occurring in this Monitoring Period. To assess whether staff are timely and reliably notifying a supervisor of a UOF, the Monitoring Team considers whether there is evidence that staff are not reporting force as required. This includes consideration of allegations as well as reports from outside stakeholders (*e.g.*, H+H and LAS) about potential unreported UOF. These sources suggest that unreported uses of force are an infrequent occurrence. In this Monitoring Period, 14 out of the 14 reports from H+H staff alleging UOF were already under investigation by ID before H+H's reports were submitted. In prior Monitoring Periods, the Monitoring Team has also routinely reviewed allegations by LAS and found that most of those allegations were previously reported before the allegation was submitted. This further reinforces that staff are routinely and consistently reporting UOF and there are only a small number of incidents that appear to go unreported. Of those incidents that have gone unreported, many appear to be minor UOF incidents, and instances of unreported excessive or unnecessary force are rare.

### Independent, Complete, and Timely Staff Reports

Staff members are required to submit independent and complete UOF reports. The Department's Use of Force Directive requires staff to independently prepare a staff report or Use of Force Witness Report if they employ, witness, or are alleged to have employed or witnessed force. During this Monitoring Period, over 6,400 reports were submitted, indicating compliance with the requirement to submit reports. The Monitoring Team review of a sample of reports, revealed a general tendency toward independent preparation by the Staff. Nevertheless, consistent with prior findings highlighted in the Ninth Monitor's Report (referenced on pages 89-91), the quality of reports remains inconsistent. The Monitoring Team continues to routinely identify instances of incomplete, incongruent with other evidence, or overly vague reports. For example, the Monitoring Team identified an incident where an individual assaulted another individual with a pen, and despite noting this on a

video, a supervisor omitted this crucial information for their Use of Force report. The Department itself has also identified issues with staff's reporting practices. Of the 2,649 Intake Investigations closed in this Monitoring Period (covering incidents occurring between October 2022 and June 2023), ID identified 326 incidents (12%) with report writing issues. The proportion of incidents identified by ID with report writing issues remains consistent with the prior Monitoring Period, indicating there has been no appreciable improvement in the quality of reports. Further, as noted in other sections of this report, ID's ability to identify potential violations has decreased, and therefore it is likely that additional cases with reporting violations may be present but were not identified. Staff reports play a crucial role in use of force investigations, necessitating staff members to articulate their account of events using their own words. It is imperative for them to provide precise details regarding the tactics employed, the level of resistance or threat and the reason force was necessary.

Staff members are also required to submit their reports as soon as practicable after the use of force incident, or the allegation of the use of force unless the staff member is unable to prepare a report within this timeframe due to injury or other exceptional circumstances. The table below demonstrates the number and timeliness of staff reports for actual and alleged UOF from 2018 to December June 2023.

| Timeliness of Staff Report | | | | | | |
|---|---|---|---|---|---|---|
| | Actual UOF | | | Alleged UOF | | |
| *Year* | *Total Staff Reports Expected* | *Reports Uploaded Timely* | *% Uploaded within 24 Hours* | *Total Staff Reports Expected* | *Reports Uploaded Timely* | *% Uploaded within 72 Hours of the Allegation* |
| **Jan. to Dec. 2018** | 15,172 | 12,709[25] | 83.77% | 139 | 125[26] | 89.93% |
| **Jan. to Dec. 2019** | 21,595 | 20,302 | 94.01% | 190 | 134 | 70.53% |
| **Jan. to Dec. 2020** | 19,272 | 17,634 | 91.50% | 136 | 94 | 69.12% |
| **Jan to Dec. 2021** | 22,103 | 17,064 | 77.20% | 111 | 45 | 40.54% |
| **Jan to Dec. 2022** | 17,700 | 14,776 | 83.48% | 93 | 42 | 45.16% |
| ***Jan to June 2023*** | *7,744* | *6,431* | *83.04%* | *43* | *19* | *44.19%* |

[25] NCU began the process of auditing actual UOF reports in February 2018.

[26] NCU began collecting data for UOF allegations in May 2018.

The Department reports in this Monitoring Period, 83% of all reports were uploaded timely. As the chart above demonstrates, this is a comparable percentage of timely submitted reports to those in 2022, even though fewer total reports were expected. Specifically, in this Monitoring Period, 6,431 (83%) of the expected 7,744 reports for actual UOF incidents were submitted within 24 hours. It is worth noting that the Department has not yet returned to the levels of timely uploads seen in 2019 (94% of 21,595 reports were submitted timely).

As for the reports for allegations of uses of force, fewer reports are being submitted within 72 hours of the allegation as required. 19 (44%) of the 43 reports for alleged UOF incidents were submitted within 72 hours. Obtaining reports for allegations takes longer as the alleged staff members involved must be identified and advised that a report is necessary, and then the report must be produced. The staff member may or may not be working on the day in which the allegation is received and reviewed, so it generally takes longer to obtain reports of allegations. That said, the time to obtain reports for allegations continues to be protracted and must be improved.

The Department maintains a centralized, reliable, and consistent process for submitting and tracking UOF Reports, which has also supported the Department's ability to consistently report on its progress with respect to the submission of UOF reports. The number of reports submitted by staff is significant and most of those reports are submitted and uploaded in a timely fashion. Overall, the Intake Investigations of UOF incidents appeared to generally have access to staff and witness reports with enough time to conduct the investigations.

### **Classification of UOF Incidents**

The Department is required to immediately classify all use of force incidents as Class A, B, C, or P when an incident is reported to the Central Operations Desk ("COD"). Class P is a temporary classification used to describe use of force incidents where there is not enough information available at the time of the report to COD to receive an injury classification of Class A, B, or C.

The chart below identifies the Monitoring Team's assessment of a sample of the Department's incident classifications from March 2016 to June 2023.

| Assessment of UOF Classification | | | | | | | |
|---|---|---|---|---|---|---|---|
| COD Sets[27] Reviewed | Mar. 2016 to July 2017 *2nd to 4th MP* | 2018 *6th & 7th MP* | 2019 *8th & 9th MP* | 2020 *10th & 11th MP* | 2021 *12th & 13th MP* | 2022 *14th & 15th MP* | Jan to June 2023 *16th MP* |
| Total Incidents Reviewed | 2,764 | 929 | 1,052 | 1,094 | 1,644 | 1,585 | *980* |
| Total Incidents Classified Within COD Period[28] | 3,036 (97%) | 909 (98%) | 1,023 (97%) | 1,079 (99%) | 1,226 (75%) | 1,238 (78%) | *872 (89%)* |
| Number of Incidents that were not classified within the COD Period | 88 (3%) | 20 (2%) | 29 (3%) | 15 (1%) | 418 (25%) | 347 (22%) | *108 (11%)* |

The Department has continued to improve its ability to classify incidents in a timely manner following a significant backslide in 2021. The Department reported that the delays in classifying incidents were due to delays by H+H in updating injury reports as well as facilities failing to report within the prescribed five-day time frame. These delays, seen mainly in 2021 and early 2022, appear to generally have decreased most reports are now provided in a timely manner and the Monitoring Team is no longer waiting for final UOF classifications cases as much as it did in the past.

As demonstrated in the chart above, in January to June 2023, 89% of all incidents were classified within the COD period. This reflects improvement compared with the last Monitoring Period in which 84% of incidents were classified within the COD period. While incidents were classified in a timely manner compared to the previous Monitoring Period, the classification timing is not yet consistent with the timeliness of classification seen prior to 2021. The Monitoring Team is cautiously optimistic about the improvement and believes that the Department is in a position to classify incidents in a timely manner at the rate it had in the past. However, this will require the Department to continue to scrutinize all incidents not yet classified and ensure stakeholders are working to address deficiencies where they are found. The Monitoring Team will continue to closely evaluate the classification of UOF incidents.

## Alleged Use of Force

To comprehensively grasp the extent of force employed within the Department, it's crucial to encompass all reported instances of force by staff and substantiated allegations regarding the use of force. Hence, the Department maintains distinct tracking for allegations of force use, representing

---

[27] This audit was not conducted in the First or Fifth Monitoring Periods.

[28] The data is maintained in a manner that is most reasonably assessed in a two-week period ("COD Period"). The Monitoring Team did not conduct an analysis on the specific date of reclassification because the overall finding of reclassification within two weeks or less is sufficient to demonstrate compliance.

instances where staff purportedly used force on an incarcerated individual, which hadn't been previously reported. It's important to note that an allegation of a use of force doesn't inherently confirm the actual utilization of force; that determination is established through the investigative process.

The number of allegations has largely declined since 2016. As demonstrated in the chart below. As of the first six months of 2023, the Department is on pace to have the lowest number of allegations since 2016.



Overall, the number of allegations of force is small compared to the total number of uses of force reported by staff. In the first six months of 2023, there were 77 allegations of force while 3,236 uses of force were reported by staff. The Monitoring Team has found that generally, of the small group of allegations, only a fraction is substantiated, and they are typically for failing to report minor uses of force, and instances of excessive or unnecessary unreported uses of force are rare. That said, all allegations of use of force can and must be appropriately investigated.

**Non-DOC Staff Reporting**

Non-DOC staff members who witness a use of force incident are required to report the incident in writing directly to a supervisor and medical staff are required to report to a supervisor when they have reason to suspect that an Inmate has sustained injuries due to a use of force, but the injury was not identified as such to the medical staff. The reports of non-DOC staff are critical. Sometimes an incident is only identified because of a report by non-DOC staff. Other times such reports provide context and information about an incident that was not provided by others that submitted reports. Even if a report simply corroborates the events reported by others, such a report has value. It is why it is so important for anyone who witnesses a use of force to submit a report.

*DOE Staff Reporting:* The Department of Education ("DOE") previously developed staff training and reporting procedures, in consultation with the Monitoring Team, to address the requirements of this provision and the December 4, 2019, Court Order (dkt. entry 334) clarifying the requirement for DOE

to submit reports. The Monitoring Team has not received any reports from DOE staff that may have witnessed a UOF since school resumed in April 2021 (following a pause from COVID-19). In this Monitoring Period there were 4 use of force incidents in school areas. Although a small number, it does suggest that at least some reports by DOE staff would be expected. Moving forward, the Monitoring Team plans to assess if DOE staff are complying with reporting requirements.

*H+H Reporting*: New York City Health + Hospitals ("H+H") (the healthcare provider for incarcerated individuals in DOC custody) has maintained a process for staff reporting. H+H staff submitted a total of 14 reports in this Monitoring Period; 12 reports were H+H witness reports of UOF incidents and 2 reports relayed UOF allegations from an incarcerated individual. The chart provides an overview of the reports provided by H+H staff since July of 2017.

| Submission of H+H Staff Reports | | | | | | | |
|---|---|---|---|---|---|---|---|
| | July to Dec. 2017 (5th MP) | 2018 (6th & 7th MP) | 2019 (8th & 9th MP) | 2020 (10th & 11th MP) | 2021 (12th & 13th MP) | 2022 (14th & 15th MP) | Jan to June 2023 (16th MP) |
| **Total Reports Submitted** | 2 | 53 | 39 | 56 | 97 | 52 | 14 |
| **Total UOF Incidents Covered** | 2 | 53 | 38 | 46 | 85 | 42 | 14 |
| **Number of witness reports submitted** | 0 | 29 | 18 | 45 | 70 | 36 | 12 |
| **Number of actual or alleged UOF incidents covered by submitted reports** | 0 | 31 | 15 | 36 | 64[29] | 25[30] | 12 |
| *Relayed Allegations from Incarcerated Individuals* | | | | | | | |
| **Number of reports of allegations of UOF relayed from an Incarcerated Individuals** | 2 | 24 | 21 | 11 | 27 | 16 | 2 |
| **Number of actual or alleged UOF incidents covered by submitted reports** | 2 | 22 | 23 | 10 | 22[31] | 19[32] | 2 |

It is difficult to know whether H+H staff submitted reports in every incident witnessed. First, in this Monitoring Period, 157 incidents occurred in clinic areas and 6 of those incidents had a corresponding H+H report. Just because an incident occurred in the clinic area does not mean H+H

---

[29] On one occasion for one use of force incident, we received both a witness report and a relayed allegation report for the same incident.

[30] On two separate occasions for two separate use of force incidents, we received both a witness report and a relayed allegation report for the same incident.

[31] *See id.*

[32] *See id.*

staff witnessed the incident. That said, the number of incidents that occurred in the clinic versus the number of reports received coupled with the overall reduction in the number of reports submitted in this Monitoring Period (n=14) suggests that there is room for improvement in the submission of reports. Further, it is worth noting that H+H submitted reports for 8 incidents that were categorized as occurring in other parts of the jail where a participant was later taken to the clinic and additional force was witnessed or relayed. Accordingly, it appears that at least some H+H staff observed more force than what has been reported. As a result of these findings, the Monitoring Team is conducting a closer analysis of these cases. Further, the Monitoring Team recommends that H+H engage in a renewed effort to ensure staff are reporting as required.

## Conclusion

The requirements related to reporting use of force are multi-faceted. Overall, use of force incidents that occur are being reported as required, but the time to classify incidents can still be improved. Further, thousands of individual staff reports are submitted, most of which are submitted in a timely manner, but the quality, specificity and accuracy of reports must be improved by all staff ranks. The Department is, therefore, in Partial Compliance with this requirement.

| COMPLIANCE RATING | ¶ 2. Partial Compliance |
| --- | --- |

### CJ § V. USE OF FORCE REPORTING AND TRACKING, ¶ 22 (PROVIDING MEDICAL ATTENTION FOLLOWING USE OF FORCE INCIDENT)

¶ 22. All Staff Members and Inmates upon whom force is used, or who used force, shall receive medical attention by medical staff as soon as practicable following a Use of Force Incident. If the Inmate or Staff Member refuses medical care, the Inmate or Staff Member shall be asked to sign a form in the presence of medical staff documenting that medical care was offered to the individual, that the individual refused the care, and the reason given for refusing, if any.

Staff members and incarcerated individuals upon whom force is used, or who used force, are required to receive medical attention by medical staff as soon as practicable following a Use of Force Incident. The Department's progress in providing timely medical care from January 2018 to June 2023 following a UOF is outlined in the table below.

| Wait Times for Medical Treatment Following a UOF | | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | # of Medical Encounters Analyzed | 2 hours or less | Between 2 and 4 hours | % Seen within 4 hours | Between 4 and 6 hours | 6 hours or more |
| 2018 | 9,345 | 37% | 36% | 73% | 16% | 13% |
| 2019 | 11,809 | 43% | 38% | 81% | 11% | 9% |
| 2020 | 10,812 | 46% | 36% | 82% | 10% | 9% |
| 2021 | 14,745 | 39% | 30% | 70% | 11% | 20% |
| 2022 | 12,696 | 51% | 23% | 74% | 9% | 19% |
| 2023 (Jan. to June) | 5,318 | 58% | 24% | 82% | 9% | 9% |

During the 16th Monitoring Period, there were 5,318 medical encounters related to a UOF and the time to provide medical treatment has improved. In this Monitoring Period, 82% of all individuals requiring medical treatment were seen within 4 hours of the incident compared to 74% in 2022 and 70% in 2021. The improvement in providing medical care more quickly is most notable in the decrease in the number of cases in which an individual received care in more than 6 hours, which is down to 9% of cases compared with 19% in 2022 and 20% in 2021.

In the first six months of 2023, the proportion of timely medical treatment returned to the levels reached in 2019 and 2020. This improvement is considerable and welcomed. However, it remains imperative that the Department not only sustain this but improve upon it.  The provision of prompt medical treatment is critical, and so the Department must continue to work to ensure staff members and incarcerated individuals receive prompt medical attention.

| COMPLIANCE RATING | ¶ 22. Partial Compliance |
|---|---|

<u>**USE OF FORCE INVESTIGATIONS (CONSENT JUDGMENT § VII)**</u>

**CJ § VII. USE OF FORCE INVESTIGATIONS, ¶ 1 (THOROUGH, TIMELY, OBJECTIVE INVESTIGATIONS) & ¶ 9 (A) (TIMING OF FULL ID INVESTIGATIONS)**

¶ 1. As set forth below, the Department shall conduct thorough, timely, and objective investigations of all Use of Force Incidents to determine whether Staff engaged in the excessive or unnecessary Use of Force or otherwise failed to comply with the New Use of Force Directive. At the conclusion of the investigation, the Department shall prepare complete and detailed reports summarizing the findings of the investigation, the basis for these findings, and any recommended disciplinary actions or other remedial measures. All investigative steps shall be documented.

¶ 9. All Full ID Investigations shall satisfy the following criteria [. . . as enumerated in the following provisions]:

    a.   *Timeliness* [. . .]

        ii.   Beginning on October 1, 2018, or three years after the Effective Date, whichever is earlier, and for the duration of the Agreement:

            1.   ID shall complete all Full ID Investigations by no later than 120 days from the Referral Date, absent extenuating circumstances outside the Department's control that warrant an extension of this deadline. Any extension of the 120-day deadline shall be documented and subject to approval by the DCID or a designated Assistant Commissioner. Any Full ID Investigation that is open for more than 120 days shall be subject to monthly reviews by the DCID or a designated Assistant Commissioner to determine the status of the investigation and ensure that all reasonable efforts are being made to expeditiously complete the investigation.

            2.   The Department shall make every effort to complete Full ID Investigations of less complex cases within a significantly shorter period than the 120-day time frame set forth in the preceding subparagraph.

        This compliance assessment provides an overview of the status of investigations for all UOF incidents through June 30, 2023. This includes an assessment of the quality and timing of Intake Investigations and Full ID Investigations, the status of ID staffing, the status of law enforcement referrals for potential criminal misconduct, and details about the Use of Force Priority Squad.

*<u>ID Leadership and Management of Investigations</u>*

        Largely due to poor division management, the gains that the Department made in improving the quality of investigations in 2020 and 2021 were erased in late 2022. This regression during the pendency of the Action Plan offset the progress the Department had previously made toward compliance to "conduct thorough, timely, and objective investigations of all Use of Force Incidents to determine whether Staff engaged in the excessive or unnecessary Use of Force or otherwise failed to comply with the New Use of Force Directive," as required pursuant to § VII. ¶ 1 of the Consent Judgment. In 2020, during the 10th Monitoring Period, the Department had moved out of Non-Compliance with this provision and maintained Partial Compliance through the 14th Monitoring Period (January to June 2022).[33] In the 15th Monitoring Period (July to December 2022), as a result of

---

[33] A compliance rating for this provision was not awarded in the 13th Monitoring Period because the Monitoring Team did not assess compliance with any provisions of the Consent Judgment or Remedial Orders for the period between July 1, 2021 and December 31, 2021 as the Court suspended the Monitoring Team's compliance assessment during the Thirteenth Monitoring Period because the

the significant regression in the quality of investigations, the Department returned to Non-Compliance with this requirement, thus erasing its prior progress.[34] The quality of the Investigation Division's work product has deteriorated such that staff misconduct is not being properly identified and thus is not corrected or met with proper accountability measures or discipline. The decline appears to be related to poor leadership by a Deputy Commissioner who was installed in 2022 (and subsequently resigned in March 2023). In April 2023, the Department then reported a number of steps it intended to take to improve the quality of investigations and to address the Monitor's Recommendations.[35]  Following the close of the 16th Monitoring Period in September 2023, a well-respected individual who was instrumental in the subsequent attempt at course correction was removed from ID.[36]

*Status of Investigations*

The table below provides, *as of November 15, 2023*, the investigation status of all UOF incidents that occurred between January 2020 and June 30, 2023.[37] ID continues to investigate an enormous volume of cases. All use of force cases receive an Intake Investigation (formerly called Preliminary Reviews) and a subset of those cases are then referred for Full ID Investigations where a more in-depth investigation occurs. The time to complete investigations, the quality of investigations, and their outcomes are discussed in more detail below.

| Investigation Status of UOF Incidents Occurring Between January 2020 and December 2022 *as of November 15, 2023* | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Incident Date** | **2020** | | **2021** | | **2022** | | **Jan. to June 2023 (16th MP)** |
| **Total UOF Incidents[38]** | **6,399** | | **8,413** | | **7,231** | | **3,316** |
| **Pending Intake Invest.** | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% |
| **Pending Full ID Invest.** | **0** | **0%** | 0 | 0% | 186 | 3% | 241 | 7% |
| **Total Closed Invest.** | 6,399 | 100% | 8,413 | 100% | 7,045 | 97% | 3,075 | 93% |

conditions in the jails during that time were detailed to the Court in seven status reports (filed between August and December 2021), a Remedial Order Report (filed on December 22, 2022) as well as in the Special Report filed on March 16, 2022 (dkt. 441). The basis for the suspension of compliance ratings was also outlined in pgs. 73 to 74 of the March 16, 2022 Special Report (dkt. 438).

[34] *See* Monitor's April 3, 2023 Report at pgs. 100 to 102 and 155 to 171 and Monitor's April 24, 2023 Report at pgs. 1 to 4.

[35] *See* Monitor's April 24, 2023 Report at pgs. 3 to 9 and City's April 25, 2023 Letter at pg. 5.

[36] *See* Monitor's December 8, 2023 Letter at pgs. 3 to 4.

[37] All investigations of incidents that occurred prior to 2020 were closed during previous Monitoring Periods and thus are not included in this table.

[38] Incidents are categorized by the date they occurred, or date they were alleged to have occurred, therefore these numbers fluctuate very slightly across Monitoring Periods as allegations may be made many months after they were alleged to have occurred and totals are updated later.

*Intake Investigations*

All use of force incidents that occurred during this Monitoring Period received an Intake Investigation. An assessment of those Intake Investigations is described below.

- <u>Timing to Close Intake Investigations</u>: Intake Investigations are required to be completed within 25 business days of the incident date. During this Monitoring Period, all but a handful of cases were closed within 30 business days of the incident, which is beyond the deadline, but is only a minor deviation from the 25-business day deadline, so it is not cause for concern. Only about 1% of all Intake Investigations were closed beyond 30 business days.

- <u>Intake Investigation Outcomes</u>: Intake Investigations can be closed with no action, by referring the case for further investigation via a Full ID investigation, or by referring the case for some type of disciplinary or corrective action (*e.g.*, MOC, PDR, Re-Training, Facility Referral). With respect to cases closed with no action, in some, the violation identified by ID had already been identified by the facility via Rapid Review and ID determined that the recommended action by the Rapid Review was sufficient to address the violation. Therefore, "no action" cases are better understood as cases in which *ID took no action*. [39] The proportion of incidents closed with no action decreased slightly during the current Monitoring Period (49%, compared to 56% in the 15th Monitoring Period), but remained high.

---

[39] Cases that close with no action may have been addressed by the Facility through Rapid Reviews.

| Incident Date | Outcome of Intake Investigations[40] as of September 30, 2023[41] | | | | | | |
|---|---|---|---|---|---|---|---|
| | Feb. 3[42] to June 2020 (10th MP) | July to Dec. 2020 (11th MP) | Jan. to June 2021 (12th MP) | July to Dec. 2021 (13th MP) | Jan. to June 2022 (14th MP) | July to Dec. 2022 (15th MP) | Jan. to June 2023 (16th MP) |
| Pending Intake Investigation | 0 | 0 | 0 | 0 | 0 | 0 | 36 |
| Closed Intake Investigation | 2,492 | 3,272 | 4,468 | 3,916 | 3,349 | 3,883 | 3,281 |
| No Action | 1,060 43% | 1,279 39% | 1,386 31% | 947 24% | 1,249 37% | 2,183 56% | 1,594 49% |
| MOC | 47 2% | 28 1% | 48 1% | 36 1% | 22 1% | 60 2% | 77 2% |
| PDR | 6 | 2 | 0 | 0 | 1 | 3 | 3 |
| Re-Training | 148 6% | 226 7% | 342 8% | 91 2% | 35 1% | 39 1% | 86 3% |
| Facility Referrals | 820 33% | 1,159 35% | 1,903 43% | 2,208 56% | 1,646 49% | 1,466 38% | 1,267 39% |
| Referred for Full ID | 411 12% | 567 17% | 781 17% | 634 16% | 360 11% | 111 3% | 254 8% |
| Data Entry Errors | | | | | 36[43] | 21[44] | |
| Total Intake Investigations | 2,492 | 3,272 | 4,468 | 3,916 | 3,349 | 3,883 | 3,317 |

- <u>Referrals for Formal Discipline</u>: While the number of Intake Investigations that were referred for formal discipline (via an MOC) was higher in this Monitoring Period compared to July 2020 to June 2022, this does not reflect an overall increase in the frequency of disciplinary referrals from ID (i.e., still 2%). Furthermore, the number of referrals for formal discipline via Intake Investigations has not offset the

[40] It is important to note that the results of the Intake Investigations, for the purpose of this chart, only identify the highest level of recommended action for each investigation. For example, while a case may be closed with an MOC *and* a Facility Referral, the result of the investigation will be classified as "Closed with an MOC" in the chart.

[41] Other investigation data is this report is reported *as of* November 15, 2023 while the Intake Investigation data is reported *as of* September 30, 2023 because the data is maintained in two different trackers that were produced on two different dates. The number of pending Intake Investigations therefore varies between data provided "as of November 15, 2023" and "as of September 30, 2023," depending on which tracker was utilized to develop the necessary data.

[42] Incidents beginning February 3, 2020 received Intake Investigations, so those incidents from the early part of the Tenth Monitoring Period are not included in this data.

[43] These investigations had data entry errors in the Intake Squad Tracker. The Monitoring Team is unable to determine the outcome for these cases but is working with the Department to fix these errors.

[44] These investigations had data entry errors in the Intake Squad Tracker. The Monitoring Team is unable to determine the outcome for these cases but is working with the Department to fix these errors.

significant decrease in referrals for formal discipline following the conclusion of Full ID cases—as discussed in more detail later in this section of the report.

- <u>Referral for Full ID Investigations</u>: Intake Investigations were closed following completion for (92%) of the 3,281 incidents from this Monitoring Period, and 8% of cases were referred for a Full ID Investigation. As shown in the table above, this is a slight increase in referrals for Full ID Investigations from the previous Monitoring Period (from 3% to 8%). In the previous Monitoring Period, a sharp decline in Full ID Referrals occurred because cases such as Class A incidents, incidents involving head strikes, and those involving more investigation, were not being referred for Full ID investigations as required. During this Monitoring Period, the Monitoring Team found that cases are generally being referred for Full ID investigations as required.  The overall decline in the overall number of referrals for Full ID cases from prior Monitoring Periods (an average of 15% of cases were referred for a Full ID Investigation in the 10th through 14th Monitoring Periods)[45] may be the result of the fact that there are fewer Class A use of force and incidents identified as involving head strikes. Going forward, the Monitoring Team intends to examine the decline in the number of Class A incidents and incidents involving head strikes to determine whether there has been a legitimate change in the frequency of this type of event or whether the decline is related to the accuracy of reporting these types of incidents.

- *Overall Assessment of Intake Investigations*: The Monitoring Team reviews thousands of Intake Investigations each Monitoring Period. While the quality of the Intake Investigations do include and identify certain relevant information and findings (e.g., identifying Supervisor, line staff and secondary actors' failure to perform duties, reporting issues and BWC issues, and the information is better organized and more reader-friendly), the investigations still do not reliably identify misconduct, even when objective evidence is present, and/or fail to refer cases for additional scrutiny via Full ID Investigation when it is warranted. Most concerningly, Intake Investigations generally failed to identify operational and security failures that led to unnecessary use of force, did not correctly assess video evidence, and dismissed PICs' allegations and/or injuries without proper basis. Staff failures in preventing and responding to self-harm events were similarly overlooked. In short, too many Intake Investigations that ignored objective evidence of misconduct were closed and were not refer for a Full ID Investigation when required.

<u>*Full ID Investigations*</u>

When a case merits additional investigation beyond the Intake Investigation, a Full ID Investigation must be conducted. ID has long struggled to complete Full ID Investigations in a timely manner, although the number of pending cases has decreased steadily over time. As of the close of this Monitoring Period, ID had only 332 pending Full ID cases, compared to a pending caseload of 586 cases at the end of the last Monitoring Period and over 1,000 cases at the end of each of the three Monitoring Periods before that (n=1,026, 1,194 and 1,182, respectively). The currently low pending caseload is the direct result of two things, both of which are concerning: (1) fewer Full ID referrals from the Intake Squad, as discussed above and (2) an increased rate of closure of Full ID Investigations during this Monitoring Period (1,021 Full ID Investigations closed during this Monitoring Period, compared to 907 cases closed in the 15th Monitoring Period when this increase was first observed, and 522

---

[45] *See* Monitor's April 3, 2023 Report at pgs. 101, 157, and 161-164.

cases closed during the 14th Monitoring Period). Unfortunately, the accelerated rate of case closure occurred at the expense of the quality of the investigation, as discussed in more detail below.

- Timeliness: ID is required to complete Full ID Investigations within 120 days of an incident. The table below shows the status of Full ID Investigations for all incidents that occurred between January 2022 and June 2023. Only 14% (n=234) were closed (or remained pending) within the 120-day timeline, while the remaining 86% were either closed (or remained pending) outside the required time frame. Therefore, the Department remains in Non-Compliance with the timing requirement for Full ID Investigations.

| Status of Full ID Investigations for incidents that *occurred* between January 2022- June 2023 As of October 16, 2023 | | | | |
|---|---|---|---|---|
| *Pending* less 120 Days or less | *Closed* within 120 Days | *Closed* Beyond 120 Days | *Pending* Beyond 120 Days | Total |
| 15 1% | 219 13% | 841 51% | 571 35% | 1,646 |

- Quality of Full ID Investigations: The decline in quality of Full ID investigations first observed in the summer/fall of 2022 continued. Prior to that marked decline, the Monitoring Team found the quality of investigations to be mixed: some were thorough and complete, and some were inadequate. In contrast, investigations closed during this Monitoring Period (and the previous one) were **often** incomplete, inadequate, and unreasonable. Investigators failed to complete necessary interviews with staff or persons in custody, did not identify all salient issues, disregarded objective evidence of misconduct, discredited allegations from people in custody without evidence, and recommended insufficient employee corrective action.

- Overall Assessment of Full ID Investigations: In summary, the Department's level of compliance with the requirements for Full ID Investigations continued to regress during the current Monitoring Period. ID closed more cases compared to the previous Monitoring Period, but nearly all cases were closed outside the 120-day timeline (perpetuating the Non-Compliance rating in timing), and the quality of many of the investigations was substandard and the findings could easily be discredited. Given the prominence of Full ID Investigations among the Department's tools for ensuring accountability for staff misconduct, this level of performance is extremely concerning.

*Quality Assurance*

Given the significant issues with the quality of investigations, the Monitoring Team recommended that ID review cases closed between July 1, 2022 and March 31, 2023 to assess their adequacy using two methods (1) quality assurance audits and (2) look-back audits. In summary, these efforts to assess the quality of investigations have identified problems very similar in substance and scope to those identified by the Monitoring Team. While the Monitoring Team has yet to fully assess whether the quality assurance process is sufficiently robust, the initial findings suggest that cases have been closed precipitously without identifying the full range of misconduct and policy violations that occurred.  More details regarding these initial findings are described in the Monitor's November 8, 2023 Report at pgs. 83 to 85.

_Identification of Misconduct and Referrals for Discipline_

The table below depicts the findings of Intake Investigations and Full ID Investigations that were closed as of September 30, 2023.  For Intake Investigations, findings included a statement of whether the incident was "unnecessary," "excessive," and "avoidable." For Full ID investigations, at the end of the Monitoring Period, the Department conducted a retrospective assessment of cases closed to determine if any were unnecessary or excessive and provided a report to the Monitoring Team and the Parties.[46] Given the Monitoring Team's concern about ID's failure to detect and hold staff accountable for misconduct discussed above, the recent decrease in the proportion identified as excessive, unnecessary or avoidable is viewed with skepticism and concern.

---

[46] The Department and the Monitoring Team have not finalized an agreed upon definition of these terms. The categorizing the findings and developing corresponding data is complicated, particularly because qualitative information with slight factual variations must be categorized consistently. A concrete, objective and shared understanding of what each category is intended to capture is necessary to ensure reliable and consistent findings. Efforts were made in summer 2021 to finalize common definitions, but they were never finalized. The project has since languished given the focus on higher priority items.

| Investigations Findings<br>*As of September 30, 2023* | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Incident Date** | *Feb. 3[47] to June 2020* (10th MP) | *July to Dec. 2020* (11th MP) | *Jan. to June 2021* (12th MP) | *July to Dec. 2021* (13th MP) | *Jan. to June 2022* (14th MP) | *July to Dec. 2022* (15th MP) | *Jan. to June 2023* (16th MP) |
| **Closed Intake Investigations** | **2,492** | **3,272** | **4,468** | **3,916** | **3,349** | **3,883** | **3,281** |
| - *Referred for Full ID* | 411 | 567 | 781 | 634 | 360 | 110 | 254 |
| - *Investigations Closed at Intake* | 2,081 | 2,700 | 3,687 | 3,285 | 2,989 | 3,773 | 3,027 |
| *Findings of Investigations Closed at Intake* | | | | | | | |
| Investigations Closed at Intake | 2,081 | 2,700 | 3,687 | 3,285 | 2,989 | 3,773 | 3,027 |
| • *Excessive, and/or Unnecessary, and/or Avoidable* | *180* | *477* | *734* | *737* | *531* | *543* | *405* |
| • *Chemical Agent Violation* | *164* | *163* | *260* | *324* | *287* | *245* | *224* |
| *Findings of Closed Full ID Investigations* | | | | | | | |
| Referred for Full ID | 411 | 567 | 781 | 634 | 360 | 110 | 254 |
| • *Excessive, and/or Unnecessary* | *72* | *86* | *75* | *50* | *54* | *32* | *16* |
| *Findings of Investigations closed after an Intake Investigation and after a Full ID Investigation* | | | | | | | |
| Closed Intake Investigations | 2,492 | 3,272 | 4,468 | 3,916 | 3,349 | 3,883 | 3,281 |
| • *Excessive, and/or Unnecessary, and/or Avoidable* | *252 (10%)* | *563 (17%)* | *809 (18%)* | *787 (20%)* | *585 (17%)* | *575 (15%)* | *421 (13%)* |

From 2016 to 2021, the average proportion of use of force incidents in which at least one staff member was referred for formal discipline was 7%. However, in 2022, the proportion of use of force incidents in which at least one staff member was referred for formal discipline slightly decreased to 5%. For incidents that occurred in January-June 2023, the proportion of use of force incidents in which at least one staff member was referred for formal discipline was 4%.[48] The Monitoring Team has not identified a contemporaneous change in the pattern and practice of unnecessary and excessive force that would account for the reduction in the number of referrals for formal discipline and concerns regarding investigation quality are relevant here.  The number of such referrals typically *increases* as the quality of investigations improves and the ability to identify misconduct is more

---

[47] Incidents beginning February 3, 2020 received Intake Investigations, so those incidents from the early part of the Tenth Monitoring Period are not included in this data.

[48] Some investigations of 2022 incidents (~200) and January to June 2023 incidents (~230) were pending when the graph related to charges analysis was developed, so some additional referrals for discipline may be forthcoming. The resolution of these pending investigations is not expected to alter the findings significantly.

consistent and reliable and thus the degradation in investigation quality discussed above likely contributed to the decline in referrals for formal discipline.



Nearly all referrals to the Trials Division for formal discipline for use of force related misconduct are made following a completed Full ID Investigation. This is unsurprising given that the more egregious and complex cases are referred for Full ID Investigations. That said, with sufficient evidence, Intake Investigations can also result in formal disciplinary referrals to the Trials Division (although likely not at the same rate as those flowing from a Full ID Investigation). The Monitoring Team's review of use of force incidents continues to identify a significant number of cases where referrals for formal discipline appear to be appropriate, but, incongruously, beginning in 2022, the overall proportion of cases referred for formal discipline (via any type of UOF investigation) significantly decreased.

*ID Staffing*

The City is required to ensure that the Department has appropriate resources to conduct timely and quality investigations. Specific requirements for ID's staffing were enumerated in the August 10, 2023 Order as well. Adequate staffing and appropriate case assignment are critical to conducting timely, quality investigations. The table below provides the number of investigators and supervisors at specific times since 2020, showing the precipitous drop in the number of Supervisors and investigators.

| Supervisors in ID Assigned to UOF | | | | | | |
|---|---|---|---|---|---|---|
| | February 2020 | January 2021 | January 2022 | January 2023 | June 2023 | Dec 2023 |
| Rapid Reviews | | | | | 2 | 2 |
| Intake Squad | 8 | 10 | 13 | 12 | 8 | 10 |
| Full ID | 15 | 10 | 7 | 3 | 3 | 5 |
| UPS | 1 | 1 | 1 | 0 | 1 | 1 |
| **Totals** | **24** | **21** | **21** | **15** | **14** | **18** |

| Investigators in ID Assigned to UOF | | | | | | |
|---|---|---|---|---|---|---|
| | February 2020 | January 2021 | January 2022 | January 2023 | June 2023 | Dec 2023 |
| Rapid Reviews | | | | | 8 | 10 |
| Intake Squad | 32 | 51 | 51 | 51 | 32 | 35 |
| Full ID | 82 | 58 | 36 | 10 | 12 | 22 |
| UPS | 4 | 3 | 3 | 4 | 5 | 5 |
| **Totals** | **118** | **112** | **90** | **65** | **57** | **72** |

- <u>Recruitment</u>: The Department reports that it continues to actively recruit and make offers to investigators and supervisors. Following the close of the Monitoring Period, the Department initiated a pilot program that will allow certain investigators to work remotely one day per week. It is too soon to determine the impact of this policy on both employee satisfaction and work product. The chart below shows the number of ID staff hired and any net gains between January 2022 and October 2023. As demonstrated in the chart, as of October 2023, ID has hired 66 new investigators, supervisors, and executives but 30 of those individuals have since departed ID (either because they left the Department, were transferred to SIU or returned to their facility) during this time for a net gain of 36 staff.

| Summary of ID Hires & Net Gains<br>January 2022 to October 2023 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **Total Investigator** | *Civilian Investigator* | *Uniform Investigator* | **Total Supervisor** | *Civilian Supervisor* | *Uniform Supervisor* | Deputy Director | Assistant Commissioner | **Total** |
| Jan-22 | 2 | *2* | *0* | 0 | *0* | *0* | 0 | 0 | **2** |
| Feb-22 | 1 | *1* | *0* | 0 | *0* | *0* | 0 | 0 | **1** |
| Mar-22 | 0 | *0* | *0* | 0 | *0* | *0* | 0 | 0 | **0** |
| Apr-22 | 2 | *2* | *0* | 0 | *0* | *0* | 0 | 0 | **2** |
| May-22 | 2 | *2* | *0* | 0 | *0* | *0* | 0 | 0 | **2** |
| Jun-22 | 0 | *0* | *0* | 0 | *0* | *0* | 0 | 0 | **0** |
| Jul-22 | 0 | *0* | *0* | 0 | *0* | *0* | 0 | 0 | **0** |
| Aug-22 | 4 | *4* | *0* | 0 | *0* | *0* | 0 | 0 | **4** |
| Sep-22 | 0 | *0* | *0* | 0 | *0* | *0* | 0 | 0 | **0** |
| Oct-22 | 2 | *2* | *0* | 0 | *0* | *0* | 0 | 0 | **2** |
| Nov-22 | 0 | *0* | *0* | 0 | *0* | *0* | 1 | 0 | **1** |
| Dec-22 | 9 | *9* | *0* | 0 | *0* | *0* | 0 | 0 | **9** |
| Jan-23 | 10 | *6* | *4* | 0 | *0* | *0* | 0 | 0 | **10** |
| Feb-23 | 0 | *0* | *0* | 0 | *0* | *0* | 0 | 0 | **0** |
| Mar-23 | 0 | *0* | *0* | 0 | *0* | *0* | 0 | 0 | **0** |
| Apr-23 | 2 | *2* | *0* | 0 | *0* | *0* | 0 | 0 | **2** |
| May-23 | 8 | *8* | *0* | 0 | *0* | *0* | 0 | 0 | **8** |
| Jun-23 | 1 | *1* | *0* | 9 | *0* | *9* | 0 | 0 | **10** |
| Jul-23 | 0 | *0* | *0* | 0 | *0* | *0* | 0 | 0 | **0** |
| Aug-23 | 1 | *1* | *0* | 0 | *0* | *0* | 0 | 1 | **2** |
| Sep-23 | 6 | *6* | *0* | 0 | *0* | *0* | 0 | 0 | **6** |
| Oct-23 | 5 | *5* | *0* | 0 | *0* | *0* | 0 | 0 | **5** |
| **Total Hired** | **55** | *51* | **4** | **9** | **0** | **9** | **1** | **1** | **66** |
| **Total Departed** | **20** | *16* | *4* | **9** | *0* | *9* | **1** | **0** | **30** |
| **Net Gain** | **35** | *35* | *0* | **0** | *0* | *0* | **0** | **1** | **36** |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Resigned** | 9 | 9 | 0 | 0 | 0 | 0 | 0 | 0 | **9** |
| **Transferred to SIU** | 10 | 6 | 4 | 0 | 0 | 0 | 1 | 0 | **11** |
| **Terminated** | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | **1** |
| **Return to Command** | 0 | 0 | 0 | 0 | 0 | 9 | 0 | 0 | **0** |
| **Total** | **20** | **16** | **4** | **9** | **0** | **9** | **1** | **0** | **30** |

- <u>Overall Assessment of ID Staffing</u>: The significant departure of investigators and supervisors conducting use of force investigations since 2020 is extremely concerning (a 52% decrease in the number of investigators and 41% decrease of supervisors comparing February 2020 and June 2023). The increased rate of attrition demands that the Department's recruitment effort must continue with vigor.

*Law Enforcement Referrals*

ID is required to promptly refer to the Department of Investigation ("DOI") any staff member whose conduct in a use of force incident appears criminal in nature. The Monitoring Team has consistently found that while there is significant concern about staff conduct, most staff conduct does not appear to rise to the level of criminal in nature. This is consistent with the very small number of criminal prosecutions brought to date. In those cases that do require a referral, ID has promptly made these referrals. The Department and the relevant law enforcement agencies routinely collaborate and communicate about the status of cases that are referred for potential prosecution. In the eight years since the effective date of the Consent Judgment, 123 use of force cases have been referred to DOI or DOI has taken them over independent of a referral. Of that already small group of

UOF cases, only **_eight_** cases have resulted in criminal charges (with another eight still being considered) over the life span of the Consent Judgment as demonstrated in the chart below.

| Law Enforcement Referrals<br>As of March 1, 2023 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date of Incident | 2014 & 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | Total | |
| **Total** | **9** | **16** | **27** | **19** | **15** | **15** | **7** | **10** | **5** | **123** | |
| Criminal Charges Brought/ Trial Underway or Complete | 0 | 2 | 0 | 2 | 2 | 1 | 1 | 0 | 0 | **8** | **7%** |
| Pending Consideration with Law Enforcement | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 4 | 3 | **9** | **7%** |
| Returned to ID for Administrative Processing | 9 | 14 | 27 | 17 | 13 | 13 | 5 | 6 | 2 | **106** | **86%** |

As of June 2023, nine cases were pending investigation with law enforcement: five with DOI, three with the Bronx District Attorney ("DA"), and one with the U.S. Attorney's Office for the Southern District of New York ("SDNY").

Most of the cases considered for criminal prosecution will not be prosecuted. That said, these cases often represent concerning conduct that can and must be addressed administratively. The Monitoring Team continues to find that a small number of cases languish as they are passed from agency to agency for consideration of potential criminal charges. Typically, no charges are brought, and, in the meantime, there is no accountability for the misconduct. There has been some overlap in the egregious cases identified by via the Action Plan requirement § F., ¶ 2 and cases being considered for criminal prosecution. The Monitoring Team has and will continue to work with law enforcement agencies to advise them of the aggressive timelines set for investigations pursuant to the Action Plan requirement § F., ¶ 2 ("F2").

_Use of Force Priority Squad_

One small bright spot in the work of ID this Monitoring Period is that the Use of Force Priority Squad ("UPS") has successfully closed serious cases of misconduct close-in-time to the incident via the process identified in the Action Plan, § F ¶ 2 (described in more detail in the Compliance Assessment (Staff Discipline & Accountability) section of this report). The UPS is an important management tool to address some of the most serious and complex use of force cases. Having a dedicated squad for this purpose helps ID ensure these cases obtain the necessary scrutiny and attention. During this Monitoring Period, 51 cases were assigned to UPS and included a variety of egregious incidents, including cases in which staff members were suspended, cases that were returned to ID following an assessment for criminal charges by law enforcement, and 24 recommendations from the Monitoring Team.

UPS closed 44 cases during this Monitoring Period, 39 of which (89%) were closed with charges, and 29 of the 44 (66%) incidents were closed in less than 120 days.[49] Of these 29 cases, 24 were referred for formal

---

[49] This includes 14 cases identified as "F2" cases described further in the Compliance Assessment (Staff Discipline & Accountability) section of the report.

discipline. As of the end of the current Monitoring Period, UPS had 22 pending cases, including one case that was identified for expedited closure pursuant to Action Plan, § F ¶ 2.

*Conclusion*

The concerning decline in the quality of Intake Investigations and Full ID investigations continued during this Monitoring Period, and the Department continues to be in Non-Compliance. The Department has yet to enter an upward trajectory where the quality of investigations begins to improve from their concerning level of deterioration. Further, the number of Full ID referrals from Intake Investigations remains low, Full ID Investigations are still not completed timely, and staffing problems have persisted. It is critical that ID immediately address the issues identified in this section so that practice is aligned with the requirements of the Consent Judgment and investigations are conducted with integrity and result in timely and reliable outcomes. The Monitoring Team's initial optimism regarding the remedial steps taken within the 16th Monitoring Period to address ID's regression was diminished with the September 2023 removal of the Associate Commissioner of ID, who was expected to have a significant impact on improving the regressions within the Division. Going forward, ID's leadership must be committed to improving the quality of investigation determinations, the reliability in conducting investigations timely, and the consistency of referrals for staff discipline.

| **COMPLIANCE RATING** | ¶ **1.** Non-Compliance |
| | ¶ **9 (a).** Non-Compliance |

RISK MANAGEMENT (CONSENT JUDGMENT § X)

| CJ § X. RISK MANAGEMENT, ¶ 1 (EARLY WARNING SYSTEM) |
|---|

¶ 1. Within 150 days of the Effective Date, in consultation with the Monitor, the Department shall develop and implement an early warning system ("EWS") designed to effectively identify as soon as possible Staff Members whose conduct warrants corrective action as well as systemic policy or training deficiencies. The Department shall use the EWS as a tool for correcting inappropriate staff conduct before it escalates to more serious misconduct. The EWS shall be subject to the approval of the Monitor.

    a.    The EWS shall track performance data on each Staff Member that may serve as predictors of possible future misconduct.

    b.    ICOs and Supervisors of the rank of Assistant Deputy Warden or higher shall have access to the information on the EWS. ICOs shall review this information on a regular basis with senior Department management to evaluate staff conduct and the need for any changes to policies or training. The Department, in consultation with the Monitor, shall develop and implement appropriate interventions and services that will be provided to Staff Members identified through the EWS.

    c.    On an annual basis, the Department shall review the EWS to assess its effectiveness and to implement any necessary enhancements.

This provision of the Consent Judgment requires the Department to have a system to identify and correct staff misconduct at an early stage, which the Department has elected to do through the Early Intervention, Support and Supervision ("E.I.S.S.") Unit. Further, § A, ¶ (3)(c) of the Action Plan requires the expansion of E.I.S.S. to support staff on disciplinary probation and supervisors during their probationary period. This provision also requires each facility to designate at least one supervisor responsible for working with the E.I.S.S. Unit to support the uniform staff who are in the E.I.S.S. program and to address any supervision deficiencies that are identified.

The goal of E.I.S.S. is to identify and support staff whose use of force practices would benefit from additional guidance and mentorship in order to improve practice and minimize the possibility that staff's behavior escalates to more serious misconduct. The table below depicts the work of E.I.S.S. between January 2020 and June 2023, the last seven Monitoring Periods, with a tally of E.I.S.S.'s overall caseload since its inception in August 2017 in the last column. Most of the 63 staff selected for monitoring during the 16th Monitoring Period were identified due to their placement on disciplinary probation (n=45)[50], with the remainder screened and selected for monitoring based on referrals from the Trials Division, ID, or the facilities.

---

[50] As required by § A, ¶ (3)(c) of the Action Plan.

| Overview of E.I.S.S. Program | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Jan. to Jun. 2020 (10th MP) | Jul to Dec. 2020 (11th MP) | Jan. to Jun. 2021 (12th MP) | Jul to Dec. 2021 (13th MP) | Jan. to Jun. 2022 (14th MP) | July to Dec. 2022 (15th MP) | Jan. to Jun. 2023 (16th MP) | TOTAL Aug. 2017 to June 2023 |
| *Screening* | | | | | | | | |
| Staff Screened[51] | 158 | 60 | 82 | 35 | 64 | 53 | 66 | 949 |
| Staff Selected for Monitoring[52] | 38 | 35 | 53 | 24 | 50 | 49 | 63 | 413 |
| *Monitoring* | | | | | | | | |
| Staff Began Monitoring Term | 50 | 36 | 38 | 8 | 35 | 34 | 61 | 376 |
| Staff Actively Monitored[53] | 96 | 106 | 91 | 37 | 80 | 97 | 115 | |
| Staff Completed Monitoring | 9 | 29 | 17 | 4 | 12 | 13 | 17 | 190 |

E.I.S.S. continues to actively screen, select, and onboard staff who require additional support and supervision, and E.I.S.S. staff provide a useful source of support to those being monitored. However, E.I.S.S.'s capacity for expansion has been notably hindered by recent limited staffing and organizational changes including facility closures, changes in leadership, and the Department's budget constraints. E.I.S.S. has been limited by the resources dedicated to the unit. Additional resources are necessary for the benefits of this unit to be fully realized. These staffing obstacles have made it difficult for the E.I.S.S. program to meet its intended scope and effectiveness. Therefore, the Department remains in Partial Compliance with this requirement.

| **COMPLIANCE RATING** | **¶ 1.** Partial Compliance |
|---|---|

---

[51] The number of staff screened for each Monitoring Period may include some staff who were screened in prior Monitoring Periods and were re-screened in the identified Monitoring Period. The "Program to Date" column reflects the total number of individual staff screened. Staff are only counted once in the "Program to Date" column, even if the staff member was screened in multiple Monitoring Periods.

[52] Not all staff selected for monitoring have been enrolled in the program. Certain staff left the Department before monitoring began. Other staff have not yet been placed on monitoring because they are on extended leaves of absence (*e.g.*, sick or military leave) or are serving a suspension. Finally, E.I.S.S. does not initiate a staff's monitoring term if the staff member has subsequently been placed on a no-inmate contact post due to the limited opportunity for mentorship and guidance.

[53] The total number of Actively Monitored Staff for each Monitoring Period includes all staff who began monitoring during the period, remained in monitoring throughout the Monitoring Period, completed monitoring, or had been enrolled in monitoring (but not yet started).

**STAFF DISCIPLINE AND ACCOUNTABILITY (**
**CONSENT JUDGMENT § VIII & REMEDIAL ORDER § C)**

---

**CJ § VIII. STAFF DISCIPLINE AND ACCOUNTABILITY, ¶ 1**
**(TIMELY, APPROPRIATE AND MEANINGFUL ACCOUNTABILITY)**

**FIRST REMEDIAL ORDER § C. (TIMELY, APPROPRIATE, AND MEANINGFUL STAFF**
**ACCOUNTABILITY), ¶ 1 (IMMEDIATE CORRECTIVE ACTION)**

**CJ § VIII. STAFF DISCIPLINE AND ACCOUNTABILITY, ¶ 3 (C) (USE OF FORCE VIOLATIONS)**

Consent Judgment, § VIII. ¶ 1. The Department shall take all necessary steps to impose appropriate and meaningful discipline, up to and including termination, for any Staff Member who violates Department policies, procedures, rules, and directives relating to the Use of Force, including but not limited to the New Use of Force Directive and any policies, procedures, rules, and directives relating to the reporting and investigation of Use of Force Incidents and video retention ("UOF Violations").

First Remedial Order, § C. ¶ 1. *Immediate Corrective Action*. Following a Use of Force Incident, the Department shall determine whether any involved Staff Member(s) should be subject to immediate corrective action pending the completion of the Use of Force investigation, which may include counseling or re-training, reassignment to a different position with limited or no contact with Incarcerated Individuals, placement on administrative leave with pay, or immediate suspension (collectively, "immediate corrective action"). The Department shall impose immediate corrective action on Staff Members when appropriate and as close in time to the incident as practicable. The Department shall document and track any immediate corrective action taken, the nature of the initial corrective action recommended, the nature of the corrective action imposed, the basis for the corrective action, the date the corrective action is imposed, and the date of the Use of Force Incident resulting in the immediate corrective action. The requirements in this provision are not intended to alter the rights of Staff or the burden of proof in employee disciplinary proceedings under applicable laws and regulations.

Consent Judgment, § VIII. ¶ 3. In the event an investigation related to the Use of Force finds that a Staff Member committed a UOF Violation:

. . .

    c.    The Trials Division shall prepare and serve charges that the Trials Division determines are supported by the evidence within a reasonable period of the date on which it receives a recommendation from the DCID (or a designated Assistant Commissioner) or a Facility, and shall make best efforts to prepare and serve such charges within 30 days of receiving such recommendation. The Trials Division shall bring charges unless the Assistant Commissioner of the Trials Division determines that the evidence does not support the findings of the investigation and no discipline is warranted, or determines that command discipline or other alternative remedial measures are appropriate instead. If the Assistant Commissioner of the Trials Division declines to bring charges, he or she shall document the basis for this decision in the Trials Division file and forward the declination to the Commissioner or designated Deputy Commissioner for review, as well as to the Monitor. The Trials Division shall prosecute disciplinary cases as expeditiously as possible, under the circumstances.

---

      This compliance assessment evaluates the provision that requires the Department to impose timely, appropriate, and meaningful accountability for use of force related violations (Consent Judgment § VIII., ¶ 1), the Department's use of immediate corrective action (First Remedial Order § C., ¶ 1), as well as the expeditious prosecution of cases for formal discipline

by the Trials Division (Consent Judgment § VIII., ¶3(c)). This compliance assessment covers the 16th Monitoring Period, January through June 2023.

The provisions discussed in this section are distinct from each other, but the provisions are also interrelated because they all relate to the Department's accountability system. Furthermore, progress toward compliance with these three provisions depends heavily on the Department's success in other areas, particularly in identifying misconduct when it occurs via Rapid Reviews and Investigations. No matter at what point in the process the discipline is imposed (e.g., as a result of a Rapid Review, following a Full ID Investigation, or via the formal discipline process), meaningful discipline requires proportionality to the severity of the misconduct and timely imposition.

This section first provides an overview of the system for meaningful accountability, including overall data on staff discipline imposed at different points in the process. Next, this section discusses Immediate Action with detailed discussions of Command Discipline and the use of suspensions. Finally, this section discusses Formal Discipline, including the status of cases referred to the Trials Division, case dispositions, penalties imposed, situations where discipline was not applied, and the efficiency of the formal disciplinary process. The conclusion of this section summarizes the compliance assessment for each of the three provisions.

_Overview of the Department's System for Meaningful Accountability_

The Department identifies misconduct via Rapid Reviews, _ad hoc_ incident reviews by civilian and uniform leadership, Intake Investigations (formerly Preliminary Reviews), and via Full ID investigations. The Department also has various structures to respond to misconduct, including corrective interviews, 5003 counseling, re-training, Command Disciplines ("CD"), suspensions, and modified duty. Personal Determination Review ("PDRs") are utilized to address misconduct by _probationary_ staff. For _tenured_ staff, formal discipline is imposed through the Department's Trials Division, generally via a Negotiated Plea Agreement ("NPA").[54]

As noted in other sections of this report, the Monitoring Team has identified a discernible decline in the Department's identification of misconduct via Rapid Revies and ID investigations, perpetuating the longstanding trend where misconduct remains unaddressed. This failure severely undermines the overall accountability structure within the Department, which weakens the Department's internal integrity and jeopardizes its ability to ensure a safe and accountable system for staff and incarcerated individuals. This failure contributes to the compliance ratings in this section because meaningful accountability is impossible in a system where misconduct is

---

[54] A Negotiated Plea Agreement is an agreed upon settlement between the Respondent uniform staff and the Trials Division attorneys.

identified haphazardly. In other words, reliable identification of misconduct when it occurs is a prerequisite to achieving compliance with accountability-related provisions.

- <u>Staff Accountability</u>

The table below provides an overview of the accountability for use of force related misconduct imposed between January 1, 2019 and June 30, 2023. For 2023, the Department is on pace to impose significantly less discipline than the year prior,  just over 800 cases in the six month period, compared to nearly 3,000 cases in the previous 12 month period in 2022. A decline in discipline this year was expected, given that the volume of discipline in 2022 was artificially inflated when an enormous backlog of cases was finally resolved. That said, this decrease, also appears to be due to a decrease in the Department's ability to identify misconduct.

| Staff Accountability for Use of Force Related Misconduct Imposed, 2019 to 2023 | | | | | |
|---|---|---|---|---|---|
| | **2019**[55] | **2020** | **2021** | **2022** | **Jan–Jun 2023 16th MP** |
| **Support and Guidance Provided to Staff** | | | | | |
| Corrective interviews and 5003 counseling | 2,700[56] | 1,378[57] | 3,205 | 2,532 | 689 |
| Corrective interviews (resulting from CDs) | 53 | 32 | 38 | 76 | 45 |
| **Corrective Action—Command Discipline & Suspensions** | | | | | |
| CD – Reprimand | *156* | *126* | *270* | *319* | 49 |
| CDs (resulting in 1-10[58] days deducted) | *879* | *673* | *794* | *739* | 428 |
| Suspensions by date imposed | *48* | *80* | *83* | *66* | 75 |
| *Total* | *1083* | *879* | *1147* | *1124* | *552* |
| **Formal Discipline** | | | | | |
| PDRs | 81 | 49 | 2 | 1 | 10 |
| NPAs | 218 | 327 | 451 | 1774 | 262 |
| *Total* | *299* | *376* | *453* | *1778* | *272* |
| **Total Number of Staff Held Accountable** | | | | | |
| *Total* | *1381* | *1255* | *1600* | *2902* | *824* |

- Supervisory Accountability

During the pendency of the Action Plan, the Department also reported the following data on accountability imposed against supervisors for use of force related misconduct, inefficient performance of duties or inadequate supervision.

---

[55] Counseling that occurred in the Eighth Period was focused on a more holistic assessment of the staff member's conduct pursuant to specific standards set by § X (Risk Management), ¶ 2 that has been subsequently revised. *See* Eighth Monitor's Report at pgs. 172-173.

[56] The identification of staff for counseling was in transition in the Ninth Monitoring Period as a result of a recommendation by the Monitoring Team. *See* Ninth Monitor's Report at pgs. 194-196.

[57] The Department transitioned the process for identifying staff for counseling during this Monitoring Period. *See* Tenth Monitor's Report at pgs. 168 to 170.

[58] Beginning in October 2022, CDs could be adjudicated for up to 10 compensatory days, but only a very small number of CDs (~40 CDs in total) were adjudicated for 6-10 days for use of force-related misconduct that occurred in January-June 2023.

| Accountability for Facility Leadership and Supervisors, June 2022 to June 15, 2023 | | | |
|---|---|---|---|
| | **Warden** | **Deputy Warden** | **Assistant Deputy Warden** |
| Formal Discipline | 0 | 1 case (involving 1 DW) | 31 cases (involving 18 ADWs) |
| Command Discipline | 0 | 0 | 33 |
| 5003 Counseling | 0 | 0 | 15 |
| Corrective Interview | 0 | 1 | 17 |

Given the volume and pervasiveness of issues regarding the use of force, inefficient performance of duties and inadequate supervision identified by the Monitoring Team during its routine review of incidents, the fact that so few disciplinary actions have been taken against facility leaders and supervisors is troubling. Not only do facility leaders and supervisors serve as role models for expected practice, but they also have an affirmative duty to supervise and correct poor staff practice when it occurs in their presence. The Monitoring Team frequently identifies situations where leaders and supervisors have not upheld these responsibilities and yet no corrective action has been taken. The Monitoring Team described two such examples in the July 10, 2023 Report at pgs. 138 to 139.

*Immediate Corrective Action*

Immediate corrective action is essential to ensure that blatant misconduct is addressed swiftly. Rapid Reviews, *ad hoc* reviews by uniform or civilian leadership through routine assessment of incidents, and Intake Investigations are responsible for identifying misconduct for immediate corrective action. Rapid Reviews remain the first opportunity to identify immediate corrective action. Though they detect some misconduct, since their inception, the Monitoring Team has found that Rapid Reviews often fail to identify all misconduct observed via the available evidence. Further elaboration on the corrective actions suggested by Rapid Reviews is available in the Compliance Assessment section (First Remedial Order § A., ¶ 1) of this report. Immediate corrective action (suspension, re-assignment, counseling, and Command Discipline) is a necessary tool for addressing misconduct because it allows the Department, close-in-time to the incident, to hold staff to a common standard for utilizing force, particularly when deviations from that standard are immediately obvious upon the incident's review.

The table below presents data on the immediate corrective actions imposed from January 2020 through June 2023.

| Immediate Corrective Action Imposed for UOF Related Misconduct by Incident Date | | | | | | | |
|---|---|---|---|---|---|---|---|
| Type | Jan.-June 2020 | July-Dec. 2020 | Jan.-June 2021 | July-Dec. 2021 | Jan.-June 2022 | July-Dec. 2022 | Jan.-June 2023 |
| Counseling and Corrective Interviews | N/A | 1,337 | 1,509 | 1,733 | *1,661* | *947* | *734* |
| CD – Reprimand | 37 | 89 | 150 | 120 | *134* | *185* | *49* |
| CDs (resulting in 1-10[59] days deducted) | 263 | 410 | 511 | 283 | *291* | *448* | *428* |
| Suspension | 38 | 42 | 58 | 25 | *34* | *41* | *65* |
| Non-Inmate Contact Post or Modified Duty | 4 | 1 | 3 | 3 | *12* | *4* | *9* |
| *Suspensions & Non-Inmate Contact Post or Modified Duty* | *42* | *43* | *55* | *26* | *39* | *45* | *74* |
| **Total Immediate Action** | **342** | **1,879** | **2,231** | **2,164** | **2,132** | **1,625** | **1,285** |

- <u>Counseling and Corrective Interviews</u>

     Counseling and Corrective Interviews are common outcomes of Rapid Reviews. However, as noted in previous Monitor Reports, gauging the quality of counseling sessions remains a challenging task. Given the poor quality of in-the-moment supervision in the facilities, it is likely that counseling sessions—delivered by these same Supervisors—are limited in their ability to improve behavior and staff practice. That said, the Department is identifying some staff who require counseling, and these meetings are a critical step in improving staff management.

- <u>Command Discipline</u>

     A Command Discipline ("CD") is a corrective action that can be imposed at the facility-level. It is a necessary accountability tool because it can be completed closer-in-time to when an incident occurs compared to formal discipline. A CD can result in corrective interviews, reprimands or the deduction of days. The Department promulgated a revised Command Discipline Policy in October 2022,[60] that expanded the violations subject to a CD as the number of days that may be imposed. Despite these revisions, additional revisions were necessary, but

---

[59] In October 2022, the Department promulgated a revised Command Discipline policy which expanded the potential penalty of a command discipline from a maximum of 5 days to 10 days.

[60] As required by the Action Plan § F, ¶ 3 and as described in the Monitor's April 3, 2023 Report at pgs.180-181.

were not made so the Court ordered enhancements to the CD process in its August 10, 2023 Order.

The table below summarizes the outcomes of all CDs imposed via Rapid Reviews since 2019, based on an analysis conducted by NCU. Of the 1,007 CDs recommended in the 16th Monitoring Period, 581 (58%) have been adjudicated and resulted in a substantive outcome (*e.g.* days deducted, a reprimand, a corrective interview, or a MOC), while 320 (32%) were dismissed or not processed, and 105 (10%) are still pending.

| Status and Outcome of Command Disciplines Recommended by Rapid Reviews *As of August 2023 NCU Report* | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Month of Incident/Rapid Review | Total # of CDs Recommended | Still Pending in CMS | | Resulted in 1-10 Days Deducted[61] | | Resulted in MOC | | Resulted in Reprimand | | Resulted in Corrective Interview | | Dismissed at Hearing or Closed Administratively in CMS | | Never Entered into CMS | |
| *2019* | *1635* | *7* | *0%* | *879* | *54%* | *122* | *7%* | *156* | *10%* | *53* | *3%* | *360* | *22%* | *41* | *3%* |
| *2020* | *1440* | *15* | *1%* | *673* | *47%* | *108* | *8%* | *126* | *9%* | *32* | *2%* | *399* | *28%* | *82* | *6%* |
| *2021* | *2355* | *65* | *3%* | *794* | *34%* | *281* | *12%* | *270* | *11%* | *38* | *2%* | *744* | *32%* | *162* | *7%* |
| *2022* | *2123* | *64* | *3%* | *739* | *35%* | *128* | *6%* | *319* | *15%* | *76* | *4%* | *608* | *29%* | *189* | *9%* |
| *Jan -June 2023 (16th MP)* | *1007* | *105* | *10%* | *428* | *43%* | *59* | *6%* | *49* | *5%* | *45* | *4%* | *274* | *27%* | *46* | *5%* |
| *Jan-23* | 181 | 26 | 14% | 76 | 42% | 5 | 3% | 10 | 6% | 4 | 2% | 51 | 28% | 9 | 5% |
| *Feb-23* | 142 | 5 | 4% | 81 | 57% | 9 | 6% | 9 | 6% | 6 | 4% | 24 | 17% | 7 | 5% |
| *Mar-23* | 223 | 7 | 3% | 118 | 53% | 20 | 9% | 3 | 1% | 10 | 4% | 59 | 26% | 6 | 3% |
| *Apr-23* | 141 | 9 | 6% | 62 | 44% | 12 | 9% | 11 | 8% | 12 | 9% | 27 | 19% | 8 | 6% |
| *May-23* | 196 | 27 | 14% | 62 | 32% | 10 | 5% | 14 | 7% | 2 | 1% | 73 | 37% | 8 | 4% |
| *Jun-23* | 124 | 31 | 25% | 29 | 23% | 3 | 2% | 2 | 2% | 11 | 9% | 40 | 32% | 8 | 6% |
| *CDs pending for more than a year are not tracked in the CD reports analyzed for this chart and therefore may still appear pending although it is likely they have since been dismissed. | | | | | | | | | | | | | | |

While dismissing a CD may be appropriate at times, the high dismissal/not processed rate (32%) demonstrates that the process is not working as intended. Of the 320 cases dismissed or not processed during the current Monitoring Period:

o   34% (n=108) were dismissed for factual reasons including in response to a hearing on the merits, or because a staff member resigned/retired/was terminated.

o   66% (n=211) were dismissed because of due process violations (meaning the hearing did not occur within the required timeframes outlined in policy), because of a clerical error which invalidated the CD, or because the CD was not entered into CMS at all or not drafted within the required timeframe. It is this 66% of dismissals that are of concern to the Monitoring Team because they reflect a failure to properly manage an essential accountability tool.

---

[61] In October 2022, the Department promulgated a revised Command Discipline policy which expanded the potential penalty of a command discipline from a maximum of 5 days to 10 days.

Relatedly, after the close of the Monitoring Period, the Department informed the Monitoring Team that it intended to dismiss an additional 1,300 CDs (this included CDs refenced via Rapid Reviews (in the chart above) as well as CDs referred from all other sources) because of due process violations. Allowing misconduct to go unaddressed in this way is in direct contravention of the *Nunez* Court Orders and highlights the fragile nature of the Department's systems for processing staff discipline. The Monitoring Team has made multiple recommendations to ensure timely processing of CDs by the facilities, but the Department has failed to make the required improvements, resulting in this significant gap in accountability.

In addition, adjudicated cases must be scrutinized to ensure the outcome is reasonable. Facility leadership tend to over-rely on reprimands and corrective interviews (on average, about 15% of closed CDs are resolved with either a reprimand or corrective interview) and/or have applied penalties at the lowest possible end of the range in terms of the number of days. While less significant penalties are certainly appropriate in some cases, they must be proportional to the misconduct at issue. The oversight of CDs must improve to ensure that CD outcomes are proportionate and consistent with the policy. Following the close of the Monitoring Period, the Department consulted the Monitoring Team on the development of a centralized unit to process CDs, revisions to the CD Policy, and its QA practices.

- Suspension, No Contact Posts and Modified Duty

Finally, the Department's use of suspension, no contact posts and modified duty as an immediate corrective action are also critical, given the importance of a timely response to misconduct and the otherwise protracted disciplinary process. In summer 2022, the Monitoring Team found that ID was recommending suspension less often than has been typical. In response to feedback from the Monitoring Team, the Department began to use suspensions more often towards the end of the 15th Monitoring Period. For incidents that occurred in the current Monitoring Period, a larger number of staff (n=75) were suspended for use of force policy violations, which is more than the number suspended in each of the previous six Monitoring Periods (as shown in both the table above, and the table below). The Department's improvement in utilizing suspension via immediate action is laudable but does not abate the overall concern that misconduct continues to go unidentified and unaddressed.

Staff engaged in use of force misconduct serious enough to warrant the high number of suspension imposed in this Monitoring Period (even with the Department's ongoing inadequacies in identifying misconduct) is another indicator that harmful staff practices continue to be endemic in this Department. The misconduct that resulted in these suspensions reflects staffs' inappropriate use of head strikes, chokeholds, kicks, and body slams; use of racial slurs; failures to intervene; and staff having abandoned their posts. Some of these actions by staff against people in custody were retaliatory, punitive, and designed to inflict pain. Moreover, there is evidence that staff have been complicit in causing or facilitating assaults among people in custody. Many of these cases appear to involve misconduct that likely would require the Department to seek termination of these individuals pursuant to § VIII, ¶ 2(d) of the Consent

Judgment. Such incidents in well-run systems should be isolated and rare, but they appear to be near commonplace in this Department. The table below shows the number of staff who were suspended for various types of misconduct between January 2020 and June 2023.

| Number of and Reason for Staff Suspensions by Date of Suspension | | | | | | | |
|---|---|---|---|---|---|---|---|
| Reason | Jan. to June 2020 | July to Dec. 2020 | Jan. to June 2021 | July to Dec. 2021 | Jan. to Jun 2022 | July to Dec. 2022 | Jan. to Jun 2023 |
| Sick Leave | 27 | 12 | 48 | 90 | 162 | 149 | 68 |
| Conduct Unbecoming | 32 | 60 | 44 | 84 | 44 | 56 | 84 |
| Use of Force | 36 | 42 | 52 | 30 | 36 | 30 | 75 |
| AWOL | 0 | 0 | 0 | 165 | 34 | 65 | 17 |
| Arrest | 21 | 39 | 38 | 32 | 19 | 13 | 9 |
| Inefficient Performance | 25 | 19 | 24 | 5 | 16 | 23 | 22 |
| Electronic Device | 4 | 14 | 2 | 2 | 5 | 5 | 4 |
| NPA | 5 | 5 | 3 | 3 | 8 | 9 | 12 |
| Other | 2 | 4 | 1 | 3 | 3 | 8 | 7 |
| Contraband | 4 | 3 | 4 | 1 | 0 | 0 | 3 |
| Erroneous Discharge | 5 | 0 | 0 | 0 | 2 | 0 | 0 |
| Abandoned Post | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| **Total** | **161** | **198** | **216** | **415** | **329** | **359** | **302** |

Thus, while the Department has made some important improvements in its use of immediate action, particularly using suspensions more often to address serious misconduct detected via immediately available objective evidence, significant problems remain with managing and processing Command Discipline. In addition to the failure to reliably detect misconduct at this point in the process (i.e., Rapid Review and Intake Investigations), these problems prevent the Department from substantially complying with this provision.

*Formal Discipline*

Overall, between November 1, 2015, and June 30, 2023, the Department resolved over 4,800 cases with formal discipline. The table below presents the status of all cases referred for formal discipline (by *incident date*). For incidents that occurred in the first six months of 2023, 98 individual cases were referred from 78 unique incidents. This number is expected to rise throughout 2023 as 942 use of force investigations for incidents from 2022 and 2023 are pending with ID, some of which will likely be referred for formal discipline. It is important to note that of

the 892 investigations pending, 205 are Full ID investigations, and therefore a referral for formal discipline is more likely given that these cases met criteria for a more thorough investigation. However, as discussed in other sections of this report, the Monitoring Team has found that ID is not referring cases for discipline at the same rate it has in the past.

| Status of Disciplinary Cases & Pending Investigations by Date of Incident _As of June 2023_ | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2016 | | 2017 | | 2018 | | 2019 | | 2020 | | 2021 | | 2022 | | January to June 2023 | | Total | |
| **Total Individual Cases** | 471 | | 620 | | 783 | | 1027 | | 695 | | 714 | | 461 | | 98 | | **4,869** | |
| **Closed Cases** | 470 | 99% | 614 | 99% | 772 | 99% | 1007 | 98% | 683 | 98% | 614 | 86% | 262 | 57% | 12 | 17% | **4,433** | **91%** |
| **Pending Cases** | 1 | 1% | 6 | 1% | 11 | 1% | 20 | 2% | 12 | 2% | 100 | 14% | 199 | 76% | 86 | 87% | **435** | **10%** |
| | | | | | | | | | | | | | | | | | | |
| **Unique UOF Incidents** | | | | | 466 | | 606 | | 450 | | 563 | | 340 | | 78 | | | |
| | | | | | | | | | | | | | | | | | | |
| **Pending Invests.** | 0 | | 0 | | 0 | | 0 | | 0 | | 1 | | 51 | | 892 | | **942** | |

These data illustrate that about 150 cases with incident dates from more than a year ago (*i.e.,* 2021 or earlier) remain pending, and thus the opportunity for *timely* discipline has clearly been lost.

- Backlog of Pending Formal Disciplinary Cases

At its height in 2021, the Trials Division had a backlog of almost 2,000 cases pending discipline. As a result, the Third Remedial Order required the Trials Division to first close a group of 400 priority cases and then to systematically close the rest. To facilitate this effort, the Monitoring Team was required to identify and recommend steps that the City, Department, and OATH should take to close the cases remaining in the backlog. The Monitoring Team recommended that the Department close all pending cases for incidents that had occurred as of December 31, 2020 ("the 2020 backlog") by the end of 2022 (*see* the Monitor's June 30, 2023 Report at pgs. 35 to 37). At the time, the 2020 backlog consisted of 1,100 cases. As of the end of the current Monitoring Period, all but 50 of these cases had been resolved.

The elimination of the 2020 backlog was a critical step toward imposing timely discipline, but it did not eliminate the entire backlog. The Monitoring Team recommended the Department then work to close the backlog of cases with an incident date between January 1, 2021 and June 30, 2022, by July 15, 2023. Most of these have closed as of the end of the current Monitoring Period, but 166 of those cases remained open. As the backlogs of cases within ID and the Trials Division have essentially been cleared, the speed with which cases are addressed

must be improved. Further, the Trials Division must now also process disciplinary cases closer in-time to when incidents occur.

The significant work in addressing the backlog of disciplinary cases, as well as the smaller number of cases referred for formal discipline, means the number of cases pending has remained relatively low compared to those numbers from the past few years.  As of the end of June 2023, the number of pending cases slightly increased from the previous Monitoring Period but is 77% lower than the number of cases pending at the end of 2021 (435 versus 1,911).

| Disciplinary Cases Pending *as of June 2023* | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **As of the last day of…** | **June 2018 (6th MP)** | **Dec. 2018 (7th MP)** | **June 2019 (8th MP)** | **Dec. 2019 (9th MP)** | **June 2020 (10th MP)** | **Dec. 2020 (11th MP)** | **June 2021 (12th MP)** | **Dec. 2021 (13th MP)** | **June 2022 (14th MP)** | **Dec. 2022 (15th MP)** | **Jun. 2023 (16th MP)** |
| **Pending Cases** | *146* | *172* | *407* | *633* | *1,050* | *1,445* | *1,917* | *1,911* | *1,129* | *409* | *435* |

- Case Dispositions of Formal Discipline Cases

The table below shows the number of disciplinary cases closed by the Department every year since 2017 and the disposition. During this Monitoring Period, the Trials Division closed 344 cases and is likely to close a significantly smaller number of cases than in 2022, but is on track to close more cases by the end of the year than were closed in each year from 2017 to 2021. This decrease is reasonable given that many of the cases closed in 2022 were part of those languishing from a backlog. In terms of outcome, while 76% of the 344 (n=262) cases were resolved by an NPA, there was an increase in the proportion of cases that were administratively filed (n=40; 12%). The Monitoring Team intends to focus on this issue in future Monitoring Periods.

| Disciplinary Cases Closed, by Date of Case Closure | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Date of Formal Closure** | **2017** | | **2018** | | **2019** | | **2020** | | **2021** | | **2022** | | **Jan to Jun 2023** | |
| **Total Cases Resolved** | **497** | | **518** | | **267** | | **387** | | **576** | | **2,172** | | **344** | |
| NPA | 395 | 79% | 484 | 93% | 218 | 82% | 327 | 84% | 451 | 78% | 1,777 | 82% | 262 | 76% |
| Adjudicated/Guilty | 4 | 1% | 3 | 1% | 0 | 0% | 3 | 1% | 16 | 3% | 41 | 2% | 21 | 6% |
| Administratively Filed | 77 | 15% | 22 | 4% | 34 | 13% | 33 | 9% | 33 | 6% | 148 | 7% | 40 | 12% |
| Deferred Prosecution | 21 | 4% | 7 | 1% | 13 | 5% | 20 | 5% | 75 | 13% | 203 | 9% | 20 | 6% |
| Not Guilty | 0 | 0% | 2 | 0% | 2 | 1% | 4 | 1% | 1 | 0% | 3 | 0% | 1 | 0% |

- Initiatives to achieve a prompt agreed-upon resolution of disciplinary cases when appropriate

The Monitoring Team continues to encourage the Department to resolve cases directly with the staff member (and their representative) whenever possible, avoiding the need for a trial. As a result, the number of pre-trial conferences at OATH has increased exponentially (as discussed in more detail below) so that, if a settlement could not be reached among the Parties, the Parties could address the cases with an Administrative Law Judge ("ALJ). The increased scheduling of pre-trial conferences ensures that less cases go to trial and suffer from protracted scheduling and delays.

- Type of Penalties Imposed for Formal Discipline

The Department must have a continuum of disciplinary options because the severity of misconduct varies, and so that discipline can become progressively more severe for subsequent misconduct by an individual staff member. As shown in the table below, the Department imposes a broad spectrum of sanctions including Command Disciplines (which can now go up to 10 days), and more significant penalty days via formal discipline, and termination.

During this Monitoring Period, a larger proportion of NPAs imposed penalty days at the lower end of the range, and a smaller proportion of NPAs imposed penalty days at the higher end of the range. For instance, during this Monitoring Period, 40% of cases closed with a sanction of 1 to 9 days compared to 34% in 2022. Further, a sanction for 30 days or more was utilized in only 18% of cases during this Monitoring Period, compared to 26% in 2022.  Notably, 13% of NPAs (n=33) were closed as Reprimands which is one of the least severe penalties available. The chart below illustrates how the frequency of various sanctions has varied over the years. The nature of the underlying misconduct primarily dictates the level of sanction, so it is expected that penalties would vary accordingly.

Additionally, certain initiatives were utilized as part of the overall effort to reduce the backlog such as offering to expunge cases from an individual's record after one year[62] or utilizing CDs in order to encourage settlement[63]. However, with the decrease of the backlog and the expansion of the CD Directive to cover a broader range of cases, the number of lower-level sanctions and expungements utilized by the Trials Division should decrease. It is for these reasons, the Monitoring Team recommends that the Trials Division revise its protocols, in consultation with the Monitoring Team, to limit the circumstances in which low-level sanctions and expungement may be utilized

With respect to termination, no staff were terminated for the use of force misconduct during this Monitoring Period. In 2022, more staff were terminated (n=10) than in the last five years combined (i.e., 5 staff were terminated between 2017 and 2021).

---

[62] The case will not be removed from the staff member's file if during this one-year period, the staff member is served with new charges on a Use of Force incident occurring after the date of signature on the Negotiated Plea Agreement.

[63] See the Eleventh Monitor's Report (at pgs. 81-82).

| Penalty Imposed for UOF Related Misconduct NPAs | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Date of Formal Closure | 2017 | | 2018 | | 2019 | | 2020 | | 2021 | | 2022 | | Jan. to June 2023 | |
| **Total** | **395** | | **484** | | **218** | | **327** | | **451** | | **1,777** | | **262** | |
| Refer for Command Discipline[64] | 71 | 18% | 67 | 14% | 3 | 1% | 1 | >1% | 0 | 0% | 7 | >1% | 0 | 0% |
| Reprimand | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 4 | 1% | 71 | 4% | 33 | 13% |
| 1-5 days | 31 | 8% | 147 | 30% | 52 | 24% | 80 | 24% | 63 | 14% | 439 | 25% | 65 | 25% |
| 6-9 days | 14 | 4% | 19 | 4% | 6 | 3% | 14 | 4% | 29 | 6% | 163 | 9% | 39 | 15% |
| 10-19 days | 62 | 16% | 100 | 21% | 56 | 26% | 83 | 25% | 110 | 24% | 447 | 25% | 58 | 22% |
| 20-29 days | 74 | 19% | 58 | 12% | 42 | 19% | 46 | 14% | 64 | 15% | 157 | 9% | 18 | 7% |
| 30-39 days | 42 | 11% | 42 | 9% | 21 | 10% | 32 | 10% | 43 | 10% | 170 | 9% | 24 | 9% |
| 40-49 days | 27 | 7% | 30 | 6% | 3 | 1% | 17 | 5% | 54 | 11% | 96 | 5% | 9 | 3% |
| 50-59 days | 14 | 4% | 4 | 1% | 17 | 8% | 17 | 5% | 18 | 4% | 80 | 5% | 10 | 4% |
| 60 days + | 48 | 12% | 12 | 2% | 11 | 5% | 28 | 9% | 43 | 9% | 118 | 7% | 6 | 2% |
| Demotion | | | | | | | | | | | 6 | 6% | 0 | 0% |
| Retirement/Resignation | 12 | 3% | 5 | 1% | 7 | 3% | 9 | 3% | 24 | 6% | 23 | 1% | 0 | 0% |
| Termination | 0 | | 1 | | 0 | | 0 | | 4 | | 10 | | 0 | |

In order to evaluate the Department's overall efforts to impose appropriate discipline and to determine whether actions are consistent with the Disciplinary Guidelines, the Monitoring Team considers: (1) the specific facts of the case (including the aggravating and mitigating factors, the staff's prior history, and other circumstances as appropriate), (2) the time taken to impose discipline (discussed throughout the report), and (3) the proportionality of the sanctions imposed.

During this Monitoring Period, the Monitoring Team assessed 131 cases closed with discipline that occurred after October 27, 2017 to determine whether the discipline imposed was reasonable and appeared consistent with the Disciplinary Guidelines (note, additional cases were closed during this Monitoring Period that occurred prior to October 27, 2017, but were not considered as part of this assessment). Overall, while the outcome of the majority of cases appeared reasonable, the number of cases identified as reasonable decreased compared to the

---

[64] As discussed in the Seventh Monitor's Report (at pgs. 42-44), NPAs referred for CDs were previously adjudicated at the Facilities after being referred from the Trials Division which was rife with implementation issues. This problem has been corrected and now the Trials Division will negotiate a specific number of days (1 to 5) to be imposed and those specific days will be treated as a CD, rather than an NPA (the main difference is the case remains on the staff member's record for one year instead of five years).

Monitoring Team's findings in prior Monitoring Periods. This shift, in combination with the Department's increased use of lower-level sanctions, raises questions about whether the discipline imposed is proportional to the misconduct.

The effectiveness of a disciplinary system is fundamentally anchored to its ability to administer actions that are proportional to misconduct. Inconsistencies or unreasonableness in discipline fail to deter future misconduct, potentially leading to a more volatile and unsafe environment. The Monitoring Team plans to continue to closely evaluate the discipline imposed as it is crucial for maintaining the integrity of the disciplinary system and ensuring facility safety and fairness to staff, and upholding the standards set forth in the Consent Judgement.

- <u>Cases in which Formal Discipline was Not Imposed</u>

At times, cases referred for discipline may not ultimately result in a sanction being imposed either because the staff member resigns or retires before the prosecution is complete or because the charges are dismissed.

- o *Deferred Prosecution*: These are cases in which the staff member chose to leave the Department *with charges pending* and before the case was resolved. Such cases are categorized as "deferred prosecution" because no final determination has been rendered but the facts suggest the case should not be dismissed. This disposition has become increasingly common since 2021 and appears to be related to the large number of staff who have left the Department in recent years. When this occurs, the Department defers prosecution, which would then proceed if the staff member were to return to the Department in the future. During this Monitoring Period, 6% of cases (n=20) were resolved with via deferred prosecution, which is similar to the proportion of cases closed with deferred prosecution in 2022 (9%), and similar to years prior.

- o *Administratively Filed Cases*: Administrative filings occur when the Trials Division determines that the charges cannot be substantiated or pursued (*e.g.*, when the potential misconduct could not be proven by a preponderance of the evidence, or when a staff member resigns before charges are served). In other words, these cases are dismissed. During this Monitoring Period, 40 cases were closed via Administrative Filing, which represents about 12% of case closures. In 2022, 148 cases were closed with Administrative Filings, which represented about 7% of case closures. The Monitoring Team plans to evaluate the closing memos for 2023 Administrative Filed cases and will provide a detailed update in the next Monitor's Report.

- o *Appeals*: Another way in which cases can ultimately close without discipline (or a varied penalty from that imposed by the Commissioner) is via an appeal. The number of appeals has increased with the increase in the number of cases resolved. A disciplinary decision made by the Commissioner is appealable to the Civil Service

Commission[65] which is authorized to make the final disciplinary decision[66] or as an Article 78 proceeding. According to § 3-01 to 3-04 of Title 60 of the Rules of the City of New York, any civil service employee who receives a determination of guilty and/or a penalty can file an appeal with the Civil Service Commissioner within 20 days of the date of notice of the final disciplinary action. Upon a timely appeal, DOC has 30 days to submit the complete record of the disciplinary proceedings after receiving the notice of the appeal. The Civil Service Commission then reviews the record of the disciplinary proceeding, allows the parties to submit further written arguments, and can schedule a hearing before issuing a final decision. The Civil Service Commission then issues a written decision to affirm, modify, or reverse the determination being appealed. The Civil Service Commission may, at its discretion, direct the reinstatement of the employee or permit transfer to a vacancy in a similar position in another division or department, or direct that the employee's name be placed on a preferred list.

While in the majority of appeals the Commissioner's decision is affirmed, in June 2023, the Civil Service Commission reversed the Commissioner's decision to terminate a staff member who utilized a deadly chokehold that was found to be both unnecessary and excessive.[67] The Department appealed the Civil Service Commissions' decision. The Civil Service Commission found on motion for reconsideration that the staff member's "record overall is truly exceptional, such that it warrants a penalty short of termination." [68] That staff member must now be reinstated. The Civil Service Commission's original determination and subsequent decision on the Motion for Reconsideration raise a number of concerning issues. As an initial matter, the Commissioner's efforts to take the steps required by the Consent Judgment have been undermined by another agency.[69] Further, the question raised by

---

[65] Pursuant to Section 813 of the New York City Charter, the Civil Service Commission can decide appeals from permanent civil servants who were subject to disciplinary penalties following proceedings held pursuant to section 75 of the Civil Service Law.

[66] The Civil Service Commission opinion notes "[t]his decision constitutes the final decision of the City of New York."

[67] *See*, also, Monitor's April 3, 2023 Report at 105 to 106 and 192 to 193.

[68] The Civil Service Commission agreed that the Respondent engaged in unnecessary and excessive force and falsified his involvement in the case, so there is no dispute about the facts. Further, in its decision on the Motion for Reconsideration, the Civil Service Commission clarified that the lack of injury to the individuals in the incident is "irrelevant to evaluation" of the penalty.

[69] Counsel for the City of New York has reported to the Monitoring Team that the Civil Service Commission is <u>not</u> a City agency despite the fact that the opinion notes it is the "final decision of the City of New York." The City reported that "the CSC is a legally distinct and independent entity. <u>New York v. City Civil Serv. Com.</u>, 60 N.Y.2d 436, 470 N.Y.S.2d 113, 458 N.E.2d 354 (1983). CSC decisions pursuant to CSL 76 are final and are not subject to judicial review. The only way to reverse them is to prove that they are "purely arbitrary," and to show that the decision "contravene statutes or constitutional

the Civil Service Commission as to whether or not the disciplinary guidelines were in place when the incident occurred (the incident occurred on September 11, 2017 prior to the implementation of the disciplinary guidelines on October 17, 2017) does not absolve the City and Department from implementing a zero-tolerance policy for unnecessary and excessive force, and the Use of Force Policy *was* in effect at the time this misconduct occurred. *See* Consent Judgment, § IV. (Use of Force Policy), ¶ 3(a). Finally, in an egregious case of use of force misconduct such as this one, the fact that the staff member may not have engaged in misconduct previously should not preclude termination. That is illogical. In addition to this individual's return to duty notwithstanding the person's questionable fitness for the job, the reversal of discipline (and particularly, for such dubious and illogical reasons) runs counter to the very goals of the Consent Judgment. The relevant decisions were attached as Appendix G to the Monitor's July 10, 2023 Report (dkt. 557).

- <u>Timeliness of Formal Discipline</u>

The Trials Division coordinates with multiple stakeholders to resolve a case, including the respondent (and their counsel) as well as OATH (to the extent a pre-trial conference or trial is needed). The Department's ability to prosecute cases expeditiously has been of significant concern for years and the slow rate of progress has resulted in requirements to address the many facets of the disciplinary process through the First Remedial Order (§ C. ¶¶ 3 to 5), the Third Remedial Order, and now the Action Plan (§ F). For this analysis, the Monitoring Team's timeliness assessment (and data in the tables below) begins *after* the investigation has been closed and referred and examines the time required to process a case once received by the Trials Division.

- <u>Time to Resolve Formal Disciplinary Cases</u>

A number of collective changes have significantly expedited the Trials Division's case-handling capabilities[70]. The impact of this work can be seen in the time it took to close cases in this Monitoring Period. The length of time to case closure—measured from the date the case was referred to Trials from ID—has improved. During this Monitoring Period, 54% of cases (n=178) were closed within six months of referral, and another 20% (n=68) were closed between six months and one year of referral. About one-quarter of cases (23%, n=73) were closed more than a year after the referral. In other words, nearly 75% of the cases closed during this Monitoring Period were closed within one year of referral. This is a significant improvement.

---

provisions, or countenance their contravention" N.Y.C. Dep't of Envtl. Prot. v. N.Y.C. Civil Serv. Comm'n, 78 N.Y.2d 318, 323, 574 N.Y.S.2d 664, 666, 579 N.E.2d 1385, 1387 (1991)."

[70] See Monitor's June 30, 2022 Status Report (pgs. 27-38) and Monitor's Third Remedial Order Report (pgs. 4 to 12).

| Time from Referral to Trials to Complete Closing Memo 2017 to Jun. 2023 | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2017 | | 2018[71] | | 2019[72] | | 2020 | | 2021 | | 2022 | | Jan to June 2023 | |
| Cases Closed | 492 | | 521 | | 271 | | 387 | | 736 | | 2,052 | | 332 | |
| 0 to 3 months | 68 | 14% | 282 | 54% | 62 | 23% | 75 | 19% | 40 | 5% | 158 | 8% | 116 | 35% |
| 3 to 6 months | 64 | 13% | 92 | 18% | 65 | 24% | 65 | 17% | 88 | 12% | 175 | 9% | 62 | 19% |
| 6 to 12 months | 124 | 25% | 54 | 10% | 89 | 33% | 121 | 31% | 210 | 29% | 400 | 19% | 68 | 20% |
| 1 to 2 years | 146 | 30% | 51 | 10% | 35 | 13% | 98 | 25% | 284 | 39% | 782 | 38% | 55 | 17% |
| 2 to 3 years | 70 | 14% | 10 | 2% | 5 | 2% | 14 | 4% | 81 | 11% | 370 | 18% | 13 | 4% |
| 3+ Years | 20 | 4% | 9 | 2% | 6 | 2% | 2 | 1% | 11 | 1% | 95 | 5% | 5 | 2% |
| Unknown | 0 | 0% | 23 | 4% | 9 | 3% | 12 | 3% | 22 | 3% | 72 | 4% | 13 | 4% |

Another way to assess timeliness is the time between the incident date and case closure/pending, as shown in the table below. Among the 262 NPAs imposed during this Monitoring Period, 115 (44%) addressed misconduct that occurred within one year of case closure, 121 (46%) addressed misconduct that occurred between 1 and 2 years prior, 24 (9%) addressed misconduct that occurred 2 to 3 years prior, and 2 (1%) addressed misconduct that occurred more than three years before the case was ultimately resolved. Historically, the discipline imposed by the Department occurred many years after the incident which detracted from the meaningfulness of the discipline. As the chart below demonstrates, in this Monitoring Period, about half of the closed/pending cases are within one year of the incident date.

---

[71] Data for 2017 and 2018 was calculated between MOC received date and date closing memo signed.

[72] Data for 2019 and 2020 was calculated between date charges were served and date closing memo signed.

| Time Between Incident Date and NPA Case Closure or Pending, as of June 30, 2023 | Closed Discipline (n=262) | | Pending Discipline (n=435) | | Total (n=697) | |
|---|---|---|---|---|---|---|
| 0 to 1 year from incident date | 115 | 44% | 220 | 51% | 335 | 48% |
| 1 to 2 years from incident date | 121 | 46% | 128 | 29% | 249 | 36% |
| 2 to 3 years from incident date | 24 | 9% | 41 | 9% | 65 | 9% |
| More than 3 years from incident date | 2 | 1% | 46 | 11% | 48 | 7% |

- <u>Time that Cases Have Been Pending with Trials</u>

Another way to examine timely prosecution is to examine how long cases have been pending with the Trials Division. Over 1,000 cases remained opened at the end of each of the previous five monitoring periods, with many pending for over one year. At the end of the current Monitoring Period, the Department had 435 pending cases pending and only about one-fifth (19%) were pending for over one year, and nearly half were pending for 120 days or less from the service of charges. Trials' processing of cases has become far more expeditious.

| Number of Cases Pending with Trials and Time Pending | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | July to Dec., 2019 | | Jan. to June, 2020 | | July to Dec., 2020 | | Jan. to June, 2021 | | July to Dec., 2021 | | Jan. to June, 2022 | | July to Dec., 2022 | | Jan. to June, 2023 | |
| | *9th MP* | | *10th MP* | | *11th MP* | | *12th MP* | | *13th MP* | | *14th MP* | | *15th MP* | | *16th MP* | |
| *Pending service of charges* | 37 | 6% | 42 | 4% | 47 | 3% | 64 | 3% | 84 | 4% | 55 | 5% | 36 | 9% | 23 | 5% |
| *Pending 120 days or less since service of charges* | 186 | 28% | 373 | 36% | 325 | 22% | 420 | 22% | 217 | 11% | 137 | 12% | 124 | 30% | 214 | 49% |
| *Pending 121 to 180 days since service of charges* | 111 | 17% | 115 | 11% | 165 | 11% | 145 | 8% | 64 | 3% | 70 | 6% | 47 | 11% | 41 | 9% |
| *Pending 181 to 365 days since service of charges* | 202 | 30% | 278 | 26% | 467 | 32% | 511 | 27% | 501 | 26% | 182 | 16% | 77 | 19% | 64 | 15% |
| *Pending 365 days or more since service of charges* | 80 | 12% | 219 | 21% | 413 | 29% | 701 | 37% | 930 | 49% | 616 | 55% | 105 | 26% | 82 | 19% |
| *Pending Final Approvals by DC of Trials and/or Commissioner* | 30 | 5% | 9 | 1% | 15 | 1% | 66 | 3% | 109 | 6% | 66 | 6% | 10 | 2% | 0 | 0% |
| *Pending with Law Enforcement* | 17 | 3% | 14 | 1% | 13 | 1% | 10 | 1% | 6 | 0% | 3 | 0% | 10 | 2% | 11 | 3% |
| **Total** | **663** | | **1,050** | | **1,445** | | **1,917** | | **1,911** | | **1,129** | | **409** | | **435** | |

*Conclusion*

To effectively impose appropriate and impactful accountability—thereby influencing staff practices and culture—three critical elements must be proficiently managed: (1) consistently identifying misconduct, (2) promptly processing corrective action, and (3) imposing meaningful and proportionate corrective action. To establish a sustainable, consistent, and robust accountability system—integral to modernizing the jails, enhancing security and safety, and elevating staff conduct in alignment with the *Nunez* Consent Judgment and Remedial Orders—the Department must ensure all three components are implemented reliably.

*Consent Judgment § VIII., ¶ 1:* The Department has long struggled with this provision. While much of the backlog has been eliminated, the Department has not been able to build upon this momentum in terms of promptly imposing meaningful discipline for new cases. The Department's regression in identifying misconduct (and therefore failing to hold staff accountable for certain violations), failure to hold supervisors accountable, inability to adequately manage Command Disciplines, and tendency to impose discipline that may not be proportional to the severity of the staff's misconduct means that the Department is Non-Compliance with this provision.

*First Remedial Order § C., ¶ 1:* The Department has improved its use of suspension in response to objective and egregious misconduct of use of force incidents. The Department does impose some corrective action immediately after an incident, however, the failure to reliably identify all incidents that merit immediate action means that the Department does not reliably impose immediate corrective action. The Department is therefore in Partial Compliance with this provision.

*Consent Judgment § VIII., ¶ 3(c):* The Trials Division has continued to process a large number of use of force cases (and the number of staff absenteeism cases has increased substantially) and is on track this year to close more use of force cases than any prior year since the Consent Judgment went into effect, except 2022. Further, the time cases are pending with the Trials Division has decreased significantly with less than 30% of cases pending for over a year (compared to 65% of cases pending with Trials for over a year in 2022). One area of focus for the Trials Division must be to ensure that cases are resolved with discipline that is proportional to the violation, to reduce the use of CDs and to reduce the number of cases that are expunged. The Trials Division remains in Partial Compliance with this provision.

| **COMPLIANCE RATING** | **Consent Judgment § VIII., ¶ 1.** Non-Compliance |
| --- | --- |
| | **First Remedial Order, § C., ¶ 1.** Partial Compliance |
| | **Consent Judgment § VIII., ¶ 3(c)**<br>• Substantial Compliance (Charges per the 12th Monitor's Report)<br>• Not Rated (Administrative Filing)<br>• Partial Compliance (Expeditiously Prosecuting Cases) |

<table>
<tr><td><strong>FIRST REMEDIAL ORDER § C. (TIMELY, APPROPRIATE, AND MEANINGFUL STAFF ACCOUNTABILITY), ¶ 2 (MONITOR RECOMMENDATIONS)</strong></td></tr>
</table>

§ C., ¶ 2. Responding to Monitor Recommendations. Upon identification of objective evidence that a Staff Member violated the New Use of Force Directive, the Monitor may recommend that the Department take immediate corrective action, expeditiously complete the investigation, and/or otherwise address the violation by expeditiously pursuing disciplinary proceedings or other appropriate action. Within ten business days of receiving the Monitor's recommendation, absent extraordinary circumstances that must be documented, the Department shall: (i) impose immediate corrective action (if recommended), and/or (ii) provide the Monitoring Team with an expedited timeline for completing the investigation or otherwise addressing the violation (if recommended), unless the Commissioner (or a designated Assistant Commissioner) reviews the basis for the Monitor's recommendation and determines that adopting the recommendation is not appropriate, and provides a reasonable basis for any such determination in writing to the Monitor.

The First Remedial Order, § C., ¶ 2, requires the Department to respond within 10 business days to any recommendations from the Monitor to take immediate corrective action, expeditiously complete the investigation, and/or otherwise address the violation by expeditiously pursuing disciplinary proceedings or other appropriate action. The Action Plan, § F., ¶ 2, introduced an additional requirement for the Department to expedite egregious cases on specific timelines to ensure those cases are closed as quickly as possible. Given these two requirements are inextricably linked, they are addressed together herein.

*Monitor Recommendations for Immediate Action, etc. (Remedial Order § C., ¶ 2)*

The Department's efforts to take immediate action has generally been mixed.  In 2022, the Department elected to limit its use of suspensions and instead preferred utilizing Memorandums of Complaint. *See* Monitor's April 3, 2023 Report at pg. 180. Following feedback from the Monitoring Team, the use of suspensions increased in 2023. In the Sixteenth Monitoring Period, 75 Staff were suspended for use of force violations which is more than all Staff suspended for use violations in all of 2022 (n=66). It is important to note that while the use of suspensions has increased, the fact that such a large number of staff engaged in use of force misconduct serious enough to warrant suspension during this Monitoring Period, despite the Department's ongoing inadequacies in identifying misconduct, is another indicator that harmful staff practices continue to be endemic in this Department.

The Monitoring Team is judicious in the recommendations that it makes to the Department with regard to immediate action cases and only identifies those cases where immediate action should be considered *and* the incident is not yet stale for *immediate* action to be taken. Given the Monitoring Team's role it is simply not often in a position to have contemporaneous information, and so there are inherent limitations on the scope of misconduct the Monitoring Team may identify and recommend for consideration of *immediate* action. For instance, if the Monitoring Team identifies an incident that warranted immediate corrective action (and none was taken), but the incident occurred many months prior, a recommendation is not shared because the appropriate window of opportunity for immediate action has passed. The recommendations shared herein are therefore only a subset of cases where

immediate action was likely warranted but not taken. The Monitoring Team's overall goal is to mitigate lost opportunities for immediate action, but this approach is not failsafe.

Between January and June 2023 (the Sixteenth Monitoring Period), a total of 2 **recommendations pursuant to § C., ¶ 2** of the First Remedial Order were submitted to the Department by the Monitoring Team, to take immediate corrective action.[73]

- In one case, the Department imposed immediate corrective action in light of the recommendation (one modified duty). This case was also submitted as an F2 case, and the individual was terminated following an OATH trial and subsequent Report & Recommendation from the OATH ALJ finding guilt and recommending termination.
- In one case, the Department concluded no immediate corrective action was feasible because the Monitoring Team notified ID nearly 4 months after the incident occurred, so the incident was referred for an expeditious full ID investigation. As of November 15, 2023, the full ID investigation for this case is still pending. This case is an example in which the Department not only missed the opportunity to impose *immediate* corrective action but also failed to address the clear unnecessary and excessive use of force with any corrective action (immediate or otherwise) had the Monitoring Team not raised it through the C2 process.

The Monitoring Team also submits feedback to the Department regarding certain investigations in which it appears that the objective evidence was not adequately investigated or analyzed.

*Expeditious Resolution of Egregious Misconduct (Action Plan § F., ¶ 2)*

The Action Plan § F., ¶ 2 ("F2") sets aggressive timelines for the investigation and prosecution of egregious cases. As discussed above, given the limitations on the Monitoring Team's ability to recommend immediate action, the Monitoring Team has focused on making more recommendations related to F2. This requirement went into effect in mid-June 2022. Pursuant to the Action Plan, a case identified as needing to be resolved in an expedited manner must be resolved as follows:

- *Investigations*: The investigation(s) of the matter must be completed within 30 business days of identification.
- *Referral for Discipline*: The case must be processed for discipline — including completion of the MOC, referred to the Trials Division, charges served on the Respondent, discovery produced to the Respondent, an offer for resolution must be provided to the Respondent, the case filing with OATH, and a pre-trial conference must be scheduled within 20 business days of the closure of the investigation.

---

[73] With respect to recommendations to expedite the completion of investigations pursuant to the First Remedial Order § C., ¶ 2, as noted in the Monitor's October 28, 2022 Report at pg. 162, were not a fruitful avenue to ensuring those cases were addressed quickly. The Monitoring Team therefore now recommends expedited resolution of cases pursuant to the Action Plan, **§ F., ¶ 2** (the "F2" process) for cases that merit expedited completion of investigations or discipline and investigations.

- *Adjudication of Discipline*: Any and all disciplinary proceedings, including, but not limited to, convening a pre-trial conference, conducting a trial before OATH, and submission of a Report and Recommendation from the OATH ALJ must be completed within 35 business days of the case being filed with OATH.
- *Imposition of Discipline*: The Commissioner must impose the final disciplinary action within 15 business days of receiving the Report and Recommendation from OATH.

Between mid-June 2022 and October 2023, a total of 58 cases have been identified for expedited processing as outlined above. These 58 cases cover the conduct of 56 unique staff members, involved in 50 unique use of force incidents. The Monitoring Team identified 22 of the 58 cases and the Department identified the other 36. In most cases, ID closed their investigation within the prescribed timeframes, but in 6 cases, ID took longer than 30 days to complete their investigation, but 5 of the 6 were closed in less than 2 weeks after the deadline. With respect to the imposition of discipline, the status of the 58 cases as of November 15, 2023, is:

- 45 cases closed with an NPA.
  - Discipline ranged from the very low end (relinquishment of 6 compensatory days) to the highest end (*e.g.* 90 suspension days; relinquishment of 60 compensatory days, plus two-year's probation; demotion; or irrevocable retirement). Most (32 out of 45) NPAs included suspensions or 30 or more compensatory days. Overall, the discipline imposed in these cases was generally reasonable. While some of the outcomes were questionable, the fact that the case was resolved closer in time to the incident ensures that the discipline is more meaningful. Further, the NPAs on the lower end of the disciplinary range were for staff who while involved in a serious incident, but was not the primary actor and so the resolution is not inherently unreasonable.
  - 35 of these 45 NPAs were finalized within two months of identification as an "F2" case. This marks significant improvement over the average time to address identified misconduct prior to the "F2" process being in place. Ten cases took longer to prosecute. In those 10 cases, the cases settled on either the eve of trial or settled following a trial but before a decision was issued, and in one case the Department could not prosecute the case until an outside law enforcement agency determined that it did not intend to seek criminal charges.
- Two Cases were Resolved Following a Trial at OATH
  - One case a staff member was terminated following an OATH trial and subsequent Report & Recommendation from the OATH ALJ finding guilt and recommending termination.
  - One case was rendered moot as OATH recommended the individual for termination in a separate case that was tried prior to the identification of the F2 case.
- Three cases the individuals resigned prior to the finalization of an NPA.
- One case is pending with law enforcement and the Department has been advised it cannot proceed with administrative proceedings at this time.

- o The Monitoring Team worked with these outside agencies to ensure these cases are efficiently evaluated so that if criminal charges are not pursued, the cases are cleared back to DOC as soon as possible—that work resulted in one other case being cleared back to ID during this Monitoring Period.
- Seven cases are still pending as of November 2023 because they were only recently referred for F2.
- Finally, two cases were Administratively Filed.[74] One of these cases was administratively closed in June 2023. After the Trials Division attended pretrial conferencing in this matter, the OATH Administrative Law Judge ("ALJ") did not find the officer at fault, so the Trials Division administratively filed the case as they believed they would not prevail at trial in establishing that the officer had a reasonable alternative to the force used.

Overall, the F2 process has been fruitful. Cases that require expedited treatment are being addressed in an expedited manner, especially compared to the protracted processing times that currently characterize most disciplinary matters. This approach supports the overall goal to resolve cases closer in time to the incident. As for the overall resolutions, they are generally reasonable and are an important step towards imposing close-in-time meaningful discipline for the most egregious incidents.

_Conclusion_

The impact of these two provisions is mixed. The requirements with respect to § C., ¶ 2 of the First Remedial Order may not be as fruitful, but it has been a backstop to missing some cases requiring immediate action. Regarding Action Plan § F., ¶ 2, this process appears to be working as designed. The Department has self-identified cases for expedited treatment, and is not relying exclusively on the Monitoring Team, which is a positive step. It is clear ID, OATH, and the Trials Division are working diligently towards expediting these cases and ensuring that they are addressed as they should be.

| COMPLIANCE RATING | First Remedial Order § C., ¶ 2. Partial Compliance |
| --- | --- |

---

[74] _See_ the Monitor's April 3, 2023 Report at pg. 197 for more information about the first administratively filed F2 case.

**FIRST REMEDIAL ORDER § C. 4/THIRD REMEDIAL, ¶ 2 (EXPEDITIOUS OATH PROCEEDINGS) & FIRST REMEDIAL ORDER § C. (APPLICABILITY OF DISCIPLINARY GUIDELINES TO OATH PROCEEDINGS), ¶ 5**

Third Remedial Order ¶ 2. _Increased Number of OATH Pre-Trial Conferences_. Paragraph C.4 of the First Remedial Order shall be modified to increase the minimum number of pre-trial conferences that OATH must conduct each month for disciplinary cases involving charges related to UOF Violations. Specifically, as of December 15, 2021, Paragraph C.4 shall be revised to read as follows: "All disciplinary cases before OATH involving charges related to UOF Violations shall proceed in an expeditious manner. During each month, Defendants shall hold pre-trial conferences before OATH for at least **150** disciplinary cases involving charges related to UOF Violations, absent extraordinary circumstances that must be documented. If there continues to be delays in conferencing cases despite this calendaring practice, OATH will assign additional resources to hear these cases. The minimum number of case conferences required to be held each month under this Paragraph may be reduced if the Monitor makes a written determination, no earlier than one year after the date of this Order, that disciplinary cases involving UOF Violations can continue to proceed expeditiously with a lower number of conferences being held each month."[75]

§ C., ¶ 5. Applicability of Disciplinary Guidelines to OATH Proceedings. The Disciplinary Guidelines developed pursuant to Section VIII, ¶ 2 of the Consent Judgment shall apply to any OATH proceeding relating to the Department's efforts to impose discipline for UOF Violations.

When the Department is unable to settle a disciplinary matter directly with the staff member, the case must be adjudicated. The Office of Administrative Trials and Hearings ("OATH"), an administrative law court, adjudicates any contested discipline for _tenured_ staff, pursuant to New York State Civil Service Laws § 75. OATH is designated by the Commissioner as the "deputy or other person" to hear disciplinary matters for the Department of Correction and stands in the shoes of the Commissioner, with the same powers and constraints as the Commissioner. Accordingly, OATH's work must comply with Consent Judgment, Remedial Orders, and Action Plan.

If a case cannot be settled between the respondent and the Department directly, an ALJ conducts a pre-trial conference in an attempt to facilitate a settlement. If a settlement still cannot be reached, then a trial is scheduled so an ALJ (a different ALJ from the one who conducted the pre-trial conference) can assess the evidence to evaluate whether or not the staff member has violated policy. The ALJ then issues a written decision with a _recommendation_ for the outcome. If the ALJ determines that a violation occurred, the decision also includes a proposed penalty. The range of penalties that the ALJ may recommend are set by law and include a reprimand, a fine of up to $100, a suspension without pay of up to 60 days, demotion in title, or termination.[76] Accordingly, most of the discipline imposed by DOC (either through settlement or following a trial) is within this same range of penalties. The Commissioner has the authority to accept the factual findings and penalty recommendation of the ALJ or to modify them, as appropriate, in order to resolve the case. The Commissioner's determination

---

[75] The Action Plan requires a compliance assessment with First Remedial Order § C. (Timely, Appropriate, and Meaningful Staff Accountability), ¶ 4. However, this provision was modified by the Third Remedial Order, ¶ 2 so a compliance rating with Third Remedial Order, ¶ 2 is provided instead.

[76] New York State Civil Service Laws § 75 (removal and other disciplinary action), ¶ 3.

(and imposition of discipline as warranted) is subject to appeal to the Civil Service Commission or as an Article 78 proceeding.

The Monitoring Team has raised a number of concerns in the past regarding OATH's inefficient practices, and also cautioned that the application of OATH precedent to current cases appeared to result in disciplinary outcomes that were not always proportionate to the severity of staff's misconduct and also were not consistent with the New Use of Force Directive or the Disciplinary Guidelines.[77] The Monitoring Team's assessment of the work completed by OATH during this Monitoring Period (January to June 2023) is discussed below.[78]

_OATH Pre-Trial Conferences_

Over the last few years, the need for pre-trial conferences increased for several reasons including staff's unwillingness to settle cases without at least first having a pre-trial conference before OATH;[79] the increase in the number of cases referred to the Trials Division from ID (especially as it resolved the backlog); and the Department's efforts to address its high rate of staff absenteeism. Previously, conferences were held only 4 to 6 days per month and their limited availability delayed the resolution of cases that were awaiting a pre-trial conference and any subsequent OATH proceedings. Further, OATH precedent often appeared more favorable to staff (versus a neutral assessment of the facts), which motivated some staff to request a proceeding before OATH. While cases can and should be resolved without pre-trial conferences, if a pre-trial conference is needed, it should occur promptly. As a result of the First and Third Remedial Orders, the number of pre-trial conferences increased exponentially, and OATH is now required to schedule 150 UOF cases for pre-trial conferences each month. OATH conducts pre-trial conferences _four days per week_. The increased availability of pre-trial conferences has supported the Department's ability to facilitate resolution of cases when it cannot settle the case directly with the staff member.

Simply _scheduling_ a pre-trial conference can encourage the Department and staff member to settle the case outside of OATH, so it is important for pre-trial conference dates to be readily available. During the current Monitoring Period, the Department scheduled 1,337 pre-trial conferences, which is 49% more conferences than the 900 conferences required by the Remedial Orders.

During the current Monitoring Period, the number of _UOF cases_ scheduled for a pre-trial conference was about one-third the number in each of the prior two Monitoring Periods (310 versus 902 and 989, respectively). The Department advised this would occur as the UOF case disciplinary

---

[77] _See_, for example, Ninth Monitor's Report at pg. 206.

[78] This includes the requirements pursuant to Action Plan, § F, ¶ 10.

[79] _See_ Ninth Monitor's Report at pgs. 205 to 206 (dkt. entry 341), Tenth Monitor's Report at pgs. 179 to 181 (dkt. entry 360), First Remedial Order Report at pg. 7 (dkt. entry 365), Eleventh Monitor's Report at pgs. 99 to 102 and 245 (dkt. entry 368).

backlog was cleared and a smaller number of cases was being referred to Trials for formal discipline. The Department reported that pre-trial conferences will be repurposed to support the resolution of other types of cases as required by the *Nunez* Court Orders, such as staff absenteeism. A chart of the OATH Pre-Trial conferences that have been scheduled from July 2020 to June 2023 is included in Appendix A of this Report.

As in 2022, during the current Monitoring Period, about two thirds (65%) of UOF cases that were scheduled for a pre-trial conference were settled before the individual appeared before OATH. This is an enormous and important change in practice for DOC given that in late 2020, *none* of the UOF related cases settled prior to the individual's appearance at OATH. In other words, in 2020, *all* of the cases required some type of OATH proceeding, and resources were consumed accordingly.

In the previous Monitoring Period, a number of pre-trial conferences needed to be rescheduled because the facilities did not reliably notify staff that they needed to appear. This problem appears to have been largely corrected during this Monitoring Period (i.e., only 9% of cases required an additional pre-trial conference, compared to 17% in the previous Monitoring Period), but the Department should remain vigilant to ensure that pre-trial conference dates are not wasted in this way.

Compared to late 2020 and thereafter, significantly fewer cases now proceed to trial for resolution. In late 2020, 41% of cases proceeded to trial, while in early 2023, that proportion was only 9%. This suggests that formal disciplinary matters are being resolved through more expeditious means than in the past.

However, as noted below, several problems have arisen since the close of the current Monitoring Period that raise questions about the overall efficacy and neutrality of OATH proceedings. The Monitoring Team will provide its assessment of OATH's 2023 pre-trial conferences, trials, and corresponding Report & Recommendations in the Monitor's March 2024 report.

*Assessment of Disciplinary Guidelines*

In 2022, the Monitoring Team observed that ALJs (during pre-trial conferences) and their Report & Recommendations (following trial) appeared to be applying the Disciplinary Guidelines more consistently with the facts of the case, which is an improvement since the time the Remedial Orders were imposed. That said, in some cases, questions remained regarding the application of precedent and whether it was consistent with the Disciplinary Guidelines in both pre-trial Conferences and the R&Rs. The Monitoring Team is in the process of conducting a more fulsome assessment of case outcomes from 2023, including cases that were dismissed or the sanction recommended by OATH differed from the sanction sought by DOC.

*OATH Procedures and Protocols*

The process for reforming OATH's many convoluted, inefficient, and problematic practices and procedures took several years to unravel. When these issues were initially identified, OATH resisted revisions to its practices and procedures, claiming either that requirements of the Consent Judgment did not apply or that practices could not be changed. Following significant scrutiny by the Monitoring Team and the imposition of two Remedial Orders and the Action Plan, OATH agreed to the proposed reforms, and the results suggest that many of the intended goals were on the path to being achieved.

To be sure, the increased availability of OATH pre-trial conferences has facilitated more timely resolution of matters when the ALJ facilitates a settlement (or schedules a trial) in cases that cannot be resolved between the Department and the staff member directly. Trials at OATH are occurring closer in time to the pre-trial conference and are conducted more efficiently than they were in the past. OATH recommended termination for 12 staff for UOF-related misconduct in 2022, double the number recommended for this reason in 2021. This is particularly noteworthy as OATH did not recommend termination for *any* staff for UOF related misconduct for the first five years after the Consent Judgment went into effect, despite circumstances that merited such a recommendation.

However, the Monitoring Team's findings from the Monitor's April 3, 2023 Report remain relevant. Opportunities continue to exist for OATH to schedule trials more quickly after the pre-trial conference in order to facilitate the timely resolution of each matter and for ALJs to complete their Report & Recommendations more quickly. If a case does not settle and a trial is needed, *at a minimum*, the OATH process typically requires about five months. More specifically, trials are typically scheduled about 80 days after the initial pre-trial conference, a trial can take upwards of three weeks to complete, and the Report & Recommendations are issued approximately 45 days after the record is closed. Further, the Monitoring Team has noted OATH's continued rigidity that, at times, prohibits problem-solving that could bring greater efficiency to the process. For instance, in cases where reasonable alterations to practice may be necessary and appropriate, OATH's failure to utilize reasonable flexibility results in outcomes that undermine the very efficiencies the *Nunez* Court Orders were designed to promote. While such situations were few in number during the last few Monitoring Periods, increasingly, OATH appears to be overly rigid and wedded to bureaucratic rules without flexibility, even when warranted. This is particularly concerning given the issues that have arisen following the close of the Monitoring Period. Several problems have since emerged that suggest the previously reported gains in efficiency may not have been sustained.[80] This will be an area of significant focus for the Monitoring Team in 2024.

---

[80] *See* December 14, 2023 Status Conference Transcript at pgs. 23, line 17 to 25, line 17

*Conclusion*

*First Remedial Order § C., ¶ 4 & Third Remedial Order ¶ 2*: The requirement to convene 150 pre-trial conferences has been met. Accordingly, Substantial Compliance has been achieved with this provision.

*First Remedial Order § C., ¶ 5*: The Disciplinary Guidelines appear to be applied appropriately, however delays in OATH proceedings (and other issues during proceedings) suggest there is room for improvement in ensuring that discipline imposed is both timely and proportional. A more systematic assessment of OATH's findings is necessary before substantial compliance can be achieved.

*Third Remedial Order ¶ 3*: OATH's procedures and protocols for UOF related disciplinary matters are more efficient than when the Remedial Orders were imposed, but are not yet at a level suggesting expeditious processing for use of force related conduct. Further enhancements to the OATH process are needed to support the overall goal of ensuring that discipline is imposed timely. This is particularly true given what appears to be regression in this area following the close of the Monitoring Period.

| | |
|---|---|
| **COMPLIANCE RATING** | **First Remedial Order § C., ¶ 4. & Third Remedial Order ¶ 2.** Substantial Compliance<br>**First Remedial Order § C., ¶ 5.** Partial Compliance<br>**Third Remedial Order ¶ 3.** Partial Compliance |

## CJ § VIII. STAFF DISCIPLINE AND ACCOUNTABILITY, ¶ 4 (TRIALS DIVISION STAFFING)

¶ 4. The Department shall staff the Trials Division sufficiently to allow for the prosecution of all disciplinary cases as expeditiously as possible and shall seek funding to hire additional staff if necessary.

This provision requires the City and the Department to ensure the Trials Division has sufficient staff to expeditiously prosecute all disciplinary cases. The Department has long struggled to have a sufficient number of staff to support the caseload within the Trials Division. The Action Plan, § F, ¶ 1(a), created specific requirements to hire additional staff and maintain certain staffing levels. As a result, the number of staff within the Trials Division appreciably increased following the issuance of the Action Plan in June 2022. While the overall number of staff assigned to the Trials Division remained the same in this Monitoring Period compared with the last (a total of 45 staff), the number of attorneys assigned to the Trials Division during this time decreased by 7 from 27 to 20. Pursuant to the Action Plan, § F, ¶ 1(a), the Trials Division must have 25 attorneys and, as of the end of the Monitoring Period, had only 20, essentially the same number of attorneys it had when the Action Plan was entered in June 2022.  This change in the number of attorneys is due at least in part to the fact that the attorneys on loan from other City Agencies and the Department's Legal Division left the Trials Division during this Monitoring Period.  The number of Supervisors (Directors) remained at 4 since December 2022 and is the number required by Action Plan, § F, ¶ 1(a).

The chart below provides an overview of the staffing for the Trials Division at the end of each Monitoring Period from June of 2018 to June 2023.

| Trials Division Staffing | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| As of… | June 2018 | Dec. 2018 | June 2019 | Dec. 2019 | June 2020 | Dec. 2020 | June 2021 | Dec. 2021 | June 2022 | Dec. 2022 | June 2023 |
| **Supervisors & Leadership** | **4** | **5** | **5** | **5** | **5** | **5** | **4** | **4** | **5** | **6** | **6** |
| - *Deputy Commissioner* | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 1 |
| - *Associate Commissioner* | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| - *Deputy General Counsel* | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 0 | 0 |
| - *Executive Manager Director* | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 0 | 0 |
| - *Director* | 3 | 3 | 3 | 3 | 3 | 3 | 2 | 2 | 2 | 4 | 4 |
| **Administrative Support** | **6** | **6** | **6** | **6** | **6** | **6** | **6** | **6** | **5** | **5** | **5** |
| - *Administrative Manager* | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 |
| - *Executive Coordinator* | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 0 | 0 | 0 |
| - *Office Manager* | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| **Attorneys** | **21** | **20** | **20** | **20** | **17** | **18** | **18** | **17** | **19** | **27** | **20** |
| - *Agency Attorney* | 21 | 20 | 20 | 20 | 17 | 16 | 15 | 14 | 17 | 21 | 19 |
| - *Agency Attorney Intern* | 0 | 0 | 0 | 0 | 0 | 2 | 3 | 3 | 0 | 1 | 1 |
| - *Contract Attorney* | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 |
| - *Attorneys on Loan from Other Agencies* | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 0[81] |
| **Other Support** | **9** | **8** | **8** | **7** | **8** | **7** | **7** | **7** | **5** | **7** | **14** |
| - *Legal Coordinator* | 4 | 4 | 3 | 2 | 2 | 2 | 2 | 2 | 3 | 5 | 4 |
| - *Investigator* | 3 | 1 | 0 | 0 | 1 | 1 | 1 | 1 | 0 | 0 | 2 |
| - *Clerical Associate* | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| - *Program Specialist* | 1 | 1 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| - *Intern* | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 0 | 0 | 4 |

---

[81] The MOU for attorneys on loan from other City agencies was terminated on February 1, 2023. Further, the attorneys on loan from DOC Legal were transferred back to Legal by April 14, 2023. *See* Monitor's October 28, 2022 Report at pg. 14 regarding a discussion on the attorneys on loan.

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| - *Front Desk Officer* | 0 | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| - *Community Coordinator* | 0 | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 0 | 0 | 1 |
| - *Data Analyst* | | | | | | | | | 0 | 0 | 0 |
| - *City Research Scientists* | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| **Grand Total** | **40** | **39** | **39** | **38** | **36** | **36** | **35** | **34** | **34** | **45** | **45** |

The Monitoring Team has long recommended that the City and Department remain vigilant in ensuring that the Trials Division maintains adequate staffing levels,[82] and, at a minimum, those required by the Action Plan, § F, ¶ 1(a). Even with the significant reduction of the backlog, staffing levels must meet those of the Action Plan because the Trials Division caseload is still high and disciplinary cases are still not being processed in a timely manner. Substantial Compliance will be achieved when the Trials Division staffing complement is in a position to expeditiously prosecute cases and there are no further backlog cases within the Trials Division.

| COMPLIANCE RATING | ¶ 4. Partial Compliance |
|---|---|

---

[82] For example, see the Monitor's March 16, 2022 Report at pg. 62.

SCREENING & ASSIGNMENT OF STAFF (CONSENT JUDGMENT § XII)

## CJ § XII. SCREENING & ASSIGNMENT OF STAFF, ¶¶ 1-3 (PROMOTIONS)

¶ 1. Prior to promoting any Staff Member to a position of Captain or higher, a Deputy Commissioner shall review that Staff Member's history of involvement in Use of Force Incidents, including a review of the

(a) [Use of Force history for the last 5 years]

(b) [Disciplinary history for the last 5 years]

(c) [ID Closing memos for incidents in the last 2 years]

(d) [Results of the review are documented]

¶ 2. DOC shall not promote any Staff Member to a position of Captain or higher if he or she has been found guilty or pleaded guilty to any violation in satisfaction of the following charges on two or more occasions in the five-year period immediately preceding consideration for such promotion: (a) excessive, impermissible, or unnecessary Use of Force that resulted in a Class A or B Use of Force; (b) failure to supervise in connection with a Class A or B Use of Force; (c) false reporting or false statements in connection with a Class A or B Use of Force; (d) failure to report a Class A or Class B Use of Force; or (e) conduct unbecoming an Officer in connection with a Class A or Class B Use of Force, subject to the following exception: the Commissioner or a designated Deputy Commissioner, after reviewing the matter, determines that exceptional circumstances exist that make such promotion appropriate, and documents the basis for this decision in the Staff Member's personnel file, a copy of which shall be sent to the Monitor.

¶ 3. No Staff Member shall be promoted to a position of Captain or higher while he or she is the subject of pending Department disciplinary charges (whether or not he or she has been suspended) related to the Staff Member's Use of Force that resulted in injury to a Staff Member, Inmate, or any other person. In the event disciplinary charges are not ultimately imposed against the Staff Member, the Staff Member shall be considered for the promotion at that time.

Strong leadership and supervision are crucial to the Department's efforts to reform the agency. The Monitoring Team continues to emphasize that the staff the Department chooses to promote sends a message about the leadership's values, the culture it intends to cultivate and promote, and their behavior sets an example for Officers.[83] Given the impact that promotion selections have on the overall departmental culture, the Monitoring Team closely reviews the screening materials and scrutinizes the basis for promoting staff throughout the Department. Active, effective supervision is fundamental to the changes in departmental culture and practice that are needed to effectuate the reforms required by the *Nunez* Court Orders. The long-standing supervisory void—in both number and aptitude—is a leading contributor to the Department's inability to alter staff practice and to make meaningful changes to its security operation.[84]

This compliance assessment covers the following: the number of staff promoted since 2017, a summary and update on the staff promoted during the previous (Fifteenth) Monitoring Period, the status of the Department's response to the Monitoring Team's feedback on the pre-promotional screening policy, a summary of all staff promoted from January to July 2023, and the Department's compliance with the screening process for these individuals.

*Overview of Staff Promotions from 2017 to July 2023*

---

[83] As discussed in detail in the Monitoring Team's Eighth Report (dkt. 332, at pg. 199).

[84] *See* the Monitor's November 8, 2023 Report at pgs. 26 to 28 for further discussion of the aspects contributing to the Department's supervisory deficit.

The Department promoted the following number of staff to each rank through July 31, 2023:

|  | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | Jan.-Jul. 2023 |
|---|---|---|---|---|---|---|---|
| Captains | 181 | 97 | 0 | 0 | 0 | 0 | 26 |
| ADWs | 4 | 13 | 3 | 35 | 0 | 26 | 10 |
| Deputy Wardens | 5 | 3 | 8 | 0 | 1 | 0 | 3 |
| Wardens | 2 | 5 | 1 | 2 | 4 | 0 | 0 |
| Chiefs | 3 | 2 | 3 | 0 | 4 | 0 | 0 |

_Summary and Update of Promotions Made During the Previous (Fifteenth) Monitoring Period_

The Monitoring Team identified a number of concerns with the promotions that occurred during the last Monitoring Period (the Fifteenth) during which 26 staff were promoted to ADW. The Monitoring Team reviewed the screening materials for all 26 staff and discovered that the screening materials for 12 of those ADWs raised concerns about their fitness for promotion. Eleven staff were not recommended for promotion by at least one Division involved in the pre-promotional screening, but the individuals were promoted anyway. There was no written explanation as to why these negative recommendations were apparently disregarded.[85] Some of these staff may not have been recommended for promotion for reasons beyond those related to the specific requirements of the Consent Judgment. The Monitoring Team identified one other concerning promotion, although the Department's screening materials did not identify this issue. In this case, the staff member was previously promoted to ADW in 2020, then demoted to Captain in 2021. The 2021 demotion was not identified in the screening materials. Following her second promotion to ADW in December 2022, this individual was again demoted to Captain in February 2023. It is noteworthy that all of the Divisions involved in pre-promotional screening recommended this individual for promotion to ADW in 2022, suggesting that the substance of the individual's history, and specifically her PDR disciplinary history, was not carefully considered by any Division. More information about these promotions is included in the Monitor's April 3, 2023 Report at pgs. 210-216.

Eleven candidates were deemed unsuitable for promotion based on the Department's own screening process, and a twelfth was previously demoted from the same rank, but all 12 were promoted nonetheless. These promotions were questionable, especially in light of the fact that two of these 12 were subsequently demoted, and a third resigned following involvement in an in-custody death.[86] The Monitoring Team's concerns about this group of new ADWs, and subsequent promotions of other staff, have subsequently increased. As noted above, one of the ADWs who was previously demoted in 2020, promoted again in 2022, was _again_ demoted in 2022. A second ADW was suspended in connection to an in-custody death incident for failing to conduct proper tours of a specialized housing area, failing to ensure that the housing area was staffed and supervised by officers at all times, and

---

[85] In 2020, the Department reported that it would provide the basis for the decision to promote a staff member if they had not originally been recommended for promotion, but that did not occur during the Fifteenth Monitoring Period. _See_ the Monitoring Team's Eighth Report (dkt. 332, at pg. 201) and the Monitor's April 3, 2023 Report at pgs. 215-216.

[86] _See_ the Monitor's August 7, 2023 Report at pg. 10 to 11, 13, and 39.

failing to ensure that the supervisor assigned to the post conducted meaningful and efficient tours.[87] A third ADW with concerning pre-promotional screening results coordinated an unsanctioned "hostage drill" that inexcusably placed both staff and persons in custody at serious risk of harm, and resulted in an actual use of force against persons in custody. Another ADW promoted in 2022 who was recommended by all Divisions was also involved in this drill. As of mid-September 2023, of the 36 ADWs promoted in 2022, four ADWs had subsequently been demoted and two had resigned.[88]

_Screening Policy_

The Department addresses the requirements of ¶¶ 1 to 3 in Directive 2230 "Pre-Promotional Assignment Procedures." The Directive has been revised a number of times since it was first updated in the Third Monitoring Period.[89] Directive 2230 has been updated twice in the Fifteenth and Sixteenth Monitoring Periods. First, as described in the April 3, 2023 Report at pgs. 211 to 212, the policy was revised in November 2022 (the Fifteenth Monitoring Period). In May 2023, the Department revised the policy again to address just one of Monitoring Team's many recommendations to enhance the policy. The one revision was to _reinsert_ a requirement that a Deputy Warden candidate could not be ranked "outstanding" in the Performance Appraisal ranking if they were found guilty in a disciplinary proceeding in the past six months. The Department reported that this provision was accidentally deleted as part of the November 2022 revisions, The policy language was corrected in May 2023, only after the Monitoring Team inquired about the change and recommended fixing the error in April 2023.[90] No other changes to the policy were made during this Monitoring Period although a number of the Monitoring Team's recommendations to enhance the policy remain outstanding.

Additional revisions to the policy are still needed to address the Monitoring Team's March 2023 feedback, along with additional recommendations shared following the assessment of the most recent screening materials. Notably, the majority of recommended revisions repeat suggestions that the Monitoring Team made in years past and the Department reported were resolved, but the same issues have since re-emerged or the Monitoring Team's recommendations were not adequately implemented the first time. Outlined below are the changes to policy that the Monitoring Team has recommended:

- <u>Document the Basis for Staff Promoted with Negative Recommendations from a Division</u>: Any candidate who is not recommended for promotion on one or more screening forms should be appropriately scrutinized and, if the Department determines that they should be promoted despite the negative recommendation, then appropriate documentation explaining such a decision should be created and available for Monitoring Team's review. The Monitoring Team

---

[87] _See_ Monitor's August 7, 2023 Report at pgs. 14 and 33 to 34.

[88] _See_ Monitor's November 8, 2023 Report at pg. 4.

[89] The Directive was previously revised in the 8th Monitoring Period (_see_ the Monitor's Eighth Report, at pg. 198). The Directive was described more generally in the 3rd Monitor's Report at pgs. 190 to 192. Additional revisions were made in November 2022 (the Fifteenth Monitoring Period) as described in the April 3, 2023 Report at pgs. 211 to 212.

[90] The effective date of the policy, November 2022, was not updated in May 2023 when this change was made and so the policy is still dated November 2022.

made a similar recommendation in May 2019 and in January 2020. The Department reported that the Chief of Department would notify the Monitoring Team via phone call to explain their rational in these circumstances, but this did not occur during the 2022 screening process, so the Monitoring Team again submitted this recommendation in March 2023.[91]

- Review PDR Records: The Department should further improve its pre-promotional screening process by designating a specific Division to conduct a holistic review of PDR records.[92]

- Consult Both ID Units: The Department should consult with both the ID SIU unit and the ID UOF unit in future pre-promotional screening processes and document the review and recommendations of both units.

- Conduct a Holistic 2-in-5 Assessment: Currently, it appears the Trials Division is conducting the 2-in-5 assessment, but the Trials Division only has access to records for formal MOC charges. The Department should designate a central person or Division to evaluate PDRs and Command Disciplines, in addition to formal charges with the Trials Division, when conducting the 2-in-5 assessment pursuant to Consent Judgment §XII, ¶ 2.[93] The Monitoring Team first made this recommendation in May 2019, and while the Department reported that the Legal Division would conduct the assessment going forward, this was never formally documented in policy. Practice did change for some period of time, but the Legal Division stopped conducting this assessment in 2022, so the Monitoring Team again submitted this recommendation in March 2023.[94]

- Comply with Directive 2230 when Conducting Pre-Promotional Screening: The Department must comply with its own pre-promotional screening policies and procedures by ensuring all applicants are screened by all required Divisions.[95]

The Monitoring Team made these recommendations to the Department in March 2023, and the Department reported they would revise the policy before the next round of promotions but failed to do so.[96] Instead, 12 staff were promoted to various ranks in 2023 without fortifying the screening procedures as recommended.[97] Furthermore, those staff most recently promoted to ADW were promoted without the Department complying with *its own* policy.

---

[91] *See* the Monitoring Team's Eighth Report at pg. 201 and the Monitor's April 3, 2023 Report at pgs. 215-216.

[92] *See* the Monitor's April 3, 2023 Report at pg. 213.

[93] "2-in-5" refers to two Class A/B UOF violations within the past five years pursuant to the Consent Judgment § XII. 2.

[94] *See* the Monitor's Seventh Report, pgs. 174-175, the Monitor's Eighth Report at pg. 203, the Monitor's April 3, 2023 Report at pgs. 214-215, and the Monitor's July 10, 2023 Report at pg. 76.

[95] *See* the Monitor's July 10, 2023 Report at pg. 75-76 and the Monitor's August 7, 2023 Report at pg. 15.

[96] *See* Monitor's July 10, 2023 Report at pg. 162.

[97] One ADW and 26 Captains promoted in this Monitoring Period were promoted before the Monitoring Team shared its feedback.

The policy and procedures related to the pre-promotional screening process must be revised in consultation with and subject to the approval of the Monitor pursuant to the August 10, 2023 Order. As noted in the Monitor's November 8, 2023 Report at pg. 43, the Department reports that it has been working on revisions to the policy governing pre-promotional screening but has not provided any proposed revisions to the Monitoring Team.

*Overview of Promotions in This Monitoring Period*

A total of 39 staff were promoted in this Monitoring Period.[98] There were 26 staff promoted to Captain, 10 staff promoted to ADW, and three staff promoted to DW. A brief summary of those promoted is outlined below:

- Promotions to Captain: The 26 individuals who were promoted to Captain were screened in November and December 2022, and were promoted in March 2023. The Monitoring Team received all the screening materials and forms for these staff for all Divisions required by DOC's current policy. Five of these staff were promoted despite one or more Divisions not recommending the individual for promotion. However, none of the staff promoted to Captain had two Class A/B UOF violations within the past five years pursuant to the Consent Judgment § XII. 2.

- Promotions to ADW: Ten individuals were promoted to ADW in July 2023. Six of these 10 staff were screened in March 2023, but the other four staff were screened in late June 2023, within days of their date of promotion. The Monitoring Team's efforts to gain information about these promotions prior to the date of promotion were arduous, and the Department provided conflicting information. For example, on a single day in mid-May 2023, three different individuals within the agency provided three different accounts of whether the promotions would actually occur.[99] In June 2023, the Department advised the Monitoring Team that it had selected six individuals for promotion to ADW, but they had not been promoted yet. The Monitoring Team ultimately learned that these six candidates had indeed been promoted via the Training Division advising the Monitoring Team that pre-promotional training was scheduled to commence shortly. After the Monitoring Team made yet another request for information, the Monitoring Team was finally advised about the promotions and provided the requested documentation for these six individuals. On the afternoon of July 7, 2023, the Monitoring Team learned, through the Department's public social media page, that in fact ten, not six, ADWs had recently been promoted. The Monitoring Team immediately asked the Department to confirm how many people had been promoted. In response to this request, the Department reported that four additional candidates were in fact promoted to ADW "at the very last minute" so there could be a "bigger" promotional class. It is unclear why the Department

---

[98] This group includes a small number of staff technically promoted during the first few weeks of July but are counted in the promotion class for this Monitoring Period.

[99] *See* Monitor's June 8, 2023 Report at pgs. 24 to 25.

did not advise the Monitoring Team about the promotion of these individuals given the repeated and long-standing requests for this information.

The Monitoring Team's concerns with the screening process for these 10 ADWs have been discussed in multiple reports to date[100], and will be discussed in further detail below, but it is clear that the Department conducted a truncated screening process and did not follow its own internal vetting protocols per DOC policy. A full set of screening materials by all required Divisions were not completed for any of the ten staff promoted to ADW. ID and the Trials Division were the only Divisions to screen the ADW candidates. Furthermore, two of the individuals were initially not recommended for promotion due to pending charges but were later recommended after these charges were dropped.

- <u>Promotions to Deputy Warden</u>: One of the three individuals who were promoted to DW was screened in September 2022-October 2022 and promoted in February 2023, while the other two were screened in May 2023 and promoted in June 2023. For these three staff, the Monitoring Team received and reviewed all of the screening materials and forms for all Divisions required by DOC's current policy, as well as interview documentation. None of these staff had two Class A/B UOF violations within the past five years pursuant to the Consent Judgment § XII. 2, and all three were recommended by all Divisions and by the interviewers.

*Assessment of Screening Materials*

The screening requirements of the Consent Judgment were developed to guide the Department's identification of Supervisors with the proper attributes. In particular, the Consent Judgment requires the Department to consider a staff member's use of force and disciplinary history (¶ 1(a)-(d)) and mandates that staff members may not be promoted if they have guilty findings on certain violations (¶ 2) or pending UOF disciplinary charges (¶ 3). The promotion process itself is guided by multiple factors and is depicted in the Monitor's April 3, 2023 Report (dkt. 517) at *Appendix C: Flowchart of Promotions Process*.

*Review of Candidates* (¶ 1)

The Monitoring Team's review of the screening materials for the 26 staff promoted to Captain and three staff promoted to DW found that the Department's assessment of each candidate satisfied the requirements of the "Review" as defined by ¶ 1. These screenings primarily took place at the end of 2022 (although the promotions occurred in 2023). Five of the staff promoted to Captain were promoted despite the fact that at least one Division did not recommend the individual for promotion during the screening process.

The screening completed for the 10 staff promoted to ADW, all of which occurred in 2023, raised significant concerns that the screening process degraded during this Monitoring Period despite the Department's claim that it was working to enhance the processes. For these 10 promotions, the Department did not follow its own policy for pre-promotional screening and used a truncated process

---

[100] *See* Monitor's July 10, 2023 Report at pgs. 74 to 77, Monitor's November 8, 2023 Report at pgs. 3-4, and Monitor's November 30, 2023 Report at pg. 36.

rather than the full assessment of the individuals' background and qualifications required by policy.[101] The only screening forms completed for these staff were completed by ID's UOF unit (and not ID's SIU) and the Trials Division. The candidates' formal disciplinary history and ID closing memos for UOF investigations were presumably reviewed, but their full disciplinary and use of force history (required to be reviewed by these provisions and DOC's own pre-promotional screening policy) presumably were not.[102] It must be noted that the Department's production of these materials languished and repeated follow-up to obtain the information was required. This was particularly curious given most screening forms had already been completed and this information should have been readily available for production. Of additional concern is the fact that the screening forms for the four "last minute" promotions were completed within days of their date of promotion.

Additionally, seven staff were promoted despite one or more Divisions not recommending the individuals for promotion on their screening form(s) as occurred during the 2022 pre-promotional screening process.[103] Two of the staff were ultimately recommended for promotion after their charges were dropped.

It remains of great concern that the Monitoring Team's recommendations to strengthen the screening process continue to be ignored, as stated in the Monitor's April 3, 2023 report at pg. 213. The fact that individuals were not recommended for promotion by at least one Division but were promoted anyway with no explanation for the deviation is problematic. The lack of a documented rationale in such cases raises concerns about oversight and ultimate decision-making and the veracity of the screening process is called into question when recommendations appear to be summarily ignored or dismissed. Decisions that are at odds with a recommendation not to promote should be a rare exception and should be justified in writing.

---

[101] *See* the Monitor's July 10, 2023 Report at pgs. 74 to 77 and the Monitor's November 8, 2023 Report at pgs. 3 to 4.

[102] For these staff, the Monitoring Team did not receive screening forms from the following Divisions and agencies: the DOI Inspector General and DOC's Health Management Division, Equal Employment Office, Correction Assistance Response for Employees, Early Intervention, Support, and Supervision Unit, Legal Division, and the 22-R Form completed by the facility.

[103] One staff member who was promoted to Captain was not recommended by two Divisions, and four staff who were promoted to Captain were not recommended by one Division. The Captain who was not recommended for promotion by two Divisions was not recommend for promotion by the facility's Commanding Officer on the 22-R form and the Trials Division did not recommend the individual for promotion because of 10 non-UOF cases, most of them attendance related. Additionally, two staff who were promoted to ADW were not recommended by one Division. One of these was initially screened but was not selected for the 2022 promotions after receiving a negative recommendation from ID because of pending UOF charges. ID followed up in November 2022 stating that at the conclusion of the investigation, the staff member was not charged, and thus ID changed its recommendation and now recommended the individual for promotion. As reported in the Monitor's July 10, 2023 Report at pg. 76, the other ADW candidate with a negative recommendation was initially not recommended due to discipline related to two violent incidents. One of those two incidents also had corresponding criminal charges, which were subsequently dropped. As a result, six weeks later, the Trials Division recommended the individual for promotion but continued to note the individual still had formal disciplinary charges with the Trials Division for two violent incidents.

The Monitoring Team's concerns about the reasonableness and appropriateness of the screening process have only grown in this Monitoring Period as DOC's screening process became less rigorous and the Department failed to follow its own policy, even after receiving feedback from the Monitoring Team regarding necessary enhancements and promising to make changes before future promotions were to occur. Accordingly, given these ongoing issues and further deterioration in the screening process, the Department is in Non-Compliance with this provision.

*Disciplinary History* (¶ 2)

Staff members may not be promoted if they have guilty findings on certain violations twice within five years unless the Commissioner finds that there are exceptional circumstances that merit promotion ("2-in-5 assessment"). Both the Department and Monitoring Team assessed the disciplinary history of all staff promoted in 2023, and both found that none of the staff met this threshold for exclusion.

The Monitoring Team examined the Department's 2-in-5 assessment, which must consider certain violations imposed via a Negotiated Plea Agreements ("NPAs") within the past five years, all Personnel Determination Reviews ("PDRs") imposed within the past five years, and all relevant Command Disciplines ("CDs"). As noted for the Fifteenth Monitoring Period, the Department does not appear to be routinely considering PDRs and CDs as part of this assessment.[104] The majority of cases that likely trigger this requirement are via NPAs imposed by the Trials Division who does screen for this requirement. However, the Trials Division only has access to staff records for NPAs, but not for PDRs or CDs that may *also* trigger the 2-in-5 requirement. No other Division is evaluating PDRs or CDs for this requirement. Earlier this year, the Monitoring Team recommended that the policy be revised to ensure that the 2-in-5 assessment also considers CDs and PDRs and to designate the Division or position that will be responsible for this component, but as noted above, this recommendation has not yet been adopted. Initially the Department reported these revisions would be made before the next set of promotions, but that did not occur.

In this Monitoring Period, none of the 39 staff promoted were identified by the Trials Division to meet the 2-in-5 requirement. Although not evaluated by the Department, the Monitoring Team's evaluation of available documentation and data did not reveal any promotions during this Monitoring Period that would have been called into question because of CDs or PDRs imposed. However, given that the Department's screening procedures fail to ensure compliance with the 2-in-5 requirements, the Department cannot sustain its prior Substantial Compliance rating and is in Partial Compliance with this requirement.

*Pending Disciplinary Matters* (¶ 3)

The Department's screening process for promotion generally assesses whether the candidate has pending discipline for use of force related misconduct. The Department's screening process identifies if a candidate may have pending discipline for use of force related misconduct at the time of screening. Accordingly, the Department is in Substantial Compliance with this provision.

---

[104] *See* the Monitor's April 3, 2023 Report at pgs. 212 to 215.

*Conclusion*

The Monitoring Team remains concerned about the Department's pre-promotional screening process and whether it is sufficiently rigorous. As demonstrated by the conduct of staff promoted during the previous Monitoring Period, faulty screening procedures can result in the promotion of staff who are not qualified for the position. Many of the Monitoring Team concerns are not new and reflect concerns first raised several years ago. To address these long-standing concerns, the Monitoring Team gave the Department multiple recommendations in 2023 regarding updates to its policy, but these were not incorporated into the pre-promotional screening policy or process before candidates were screened and selected for promotion.

During this Monitoring Period, at least seven staff were promoted despite the fact that they were not initially recommended for promotion. Furthermore, 10 staff were promoted to ADW without a fulsome screening by all Divisions, as required by Department policy. This continues to raise questions about the decision-making at the Department leadership level and whether an adequate process is in place to ensure only candidates who are appropriately qualified are promoted.

Not only must DOC revise its pre-promotional screening policy to create a more thorough and transparent screening process, but DOC must *follow its own policy*. The Monitoring Team recommends that, before any additional staff are promoted, the Department must improve the rigor of its pre-promotional screening and explicitly revise its pre-promotional screening policy to address the concerns noted above. This is critical so that the Department can ensure that only the most skilled staff are selected to lead other staff in the effort to elevate practice.

| COMPLIANCE RATING | ¶ 1. Non-Compliance<br>¶ 2. Partial Compliance<br>¶ 3. Substantial Compliance |
|---|---|

| CJ § XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19, ¶ 1 (PREVENT FIGHT/ASSAULT) |
|---|
| ¶ 1. Young Inmates shall be supervised at all times in a manner that protects them from an unreasonable risk of harm. Staff shall intervene in a manner to prevent Inmate-on-Inmate fights and assaults, and to de-escalate Inmate-on-Inmate confrontations, as soon as it is practicable and reasonably safe to do so. |

*The analysis and compliance rating below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old incarcerated individuals. The Monitoring Team will not assess compliance with the Nunez provisions related to 16- and 17-year-olds in this Monitoring Period pursuant to the Stipulation and Order Regarding 16- and 17-Year-Old Adolescent Offenders at Horizon Juvenile Center, ¶ 2 (dkt. 503).*

The Monitoring Team has long been concerned about violence at RNDC, where the majority of young adults aged 18 to 21 are held. Previous reports by the Monitoring Team have discussed RNDC's serious incidents, management problems and staffing issues (*see e.g.*, Monitor's March 2022 Report, pgs. 17-21). The early implementation of the Commissioner's Violence Reduction Plan and RNDC's de-escalation units (which have since been decommissioned) have also been discussed in various Monitor's Reports (*See* Monitor's June 30, 2022 Report at pgs. 18-20; Monitor's October 28, 2022 Report at pgs. 65-67 and pg. 171; Monitor's April 3, 2023 Report pgs. 53-58 and 271-218; Monitor's June 8, 2023 Report at pgs. 11-12; Monitor's July 10, 2023 Report at pgs. 59-61; Monitor's October 5, 2023 Report at pg. 5; Monitor's November 8, 2023 Report at pg. 3 and pgs. 64-65*)*.

At the end of 2021, the Department developed a post-incident management protocol for RNDC to better isolate the perpetrators of acts of violence, limit the potential to exchange/abandon contraband, efficiently search the individuals involved, and transfer those involved to more secure locations as appropriate. While the facility's response to these incidents has improved from early 2022, NCU's audits continue to suggest these improvements are often offset by the failure to follow the basic steps of the policy.[105]

In late 2022 and early 2023, the combination of the Commissioner's Violence Reduction Plan and effective facility leadership seemed to have materially improved RNDC's conditions such that the Monitor's April 3, 2023 Report stated that if the improvements were sustained, the Department would move out of Non-Compliance with this provision. While some of the use of force and violence metrics continue to show improvements, others do not. As the number of individuals incarcerated at RNDC

---

[105] *See* Monitor's March 16, 2022 Report (dkt. 438) at pg. 53; Monitor's June 30, 2022 Report (dkt. 467) at pg.20; Monitor's April 3, 2023 Report (dkt. 517) at pg. 54; Monitor's July 10, 2023 Report (dkt. 557) at pgs. 49 to 50.

began to increase in mid-2023, the facility's positive trajectory was reversed, along with the ability to sustain improvements regarding staff's authority, control and dependable service provision.

Beginning in spring 2023, the facility returned to a concerning level of disorder and lack of control that stood in stark contrast to the period of time in late 2022 when conditions had improved. Housing units were far more disorderly, with staff failing to exercise their authority to ensure those in custody remained in the dayroom and failing to execute other critical security practices (e.g., securing doors, ensuring locks/windows are unobstructed, controlling movement, etc.). Incarcerated individuals were observed smoking illicit substances out in the open, fires became more frequent, mandated services were not dependable and sanitation took a notable turn for the worse. NCU's security audits from May and June 2023 continued to find unsecured doors on the housing units with PIC freely entering/exiting each other's cells; staff were off post; staff failed to use the Watch Tour system and/or failed to conduct quality checks of PICs' welfare during lock-in; PICs were observed smoking; and the 9p lock-in was not being enforced. The Monitoring Team's site visits in 2023 have observed these same serious and pervasive problems that compromise the facility's ability to protect PIC from harm, as required by this provision.

As for the data, the facility's use of force rate remains high, but is lower than it has been in several years and while the rate of fights also remains high, similar reductions are evident. Concerningly, following the close of the Monitoring Period, the rate of stabbings/slashings has increased, and increased 30% from the first part of 2023 to the second.

Significantly, the size of the facility's population increased substantially during the past two years. In early 2023, RNDC held approximately 800 people but, following the close of the Monitoring Period, by late 2023, the population had increased 38%, to just over 1,100 people, most of whom are adults aged 22 and older. In contrast to several years ago when RNDC held only young adults and the population was generally less than 500 people, the recent change in the size and composition of the facility has been a significant challenge. A larger number of housing units are open, and many have become more densely populated. This presents challenges for both service provision and effective supervision by staff.

Taken together, the facility appears to have returned to a situation where staff are not adequately in control and not exercising sound security practices, and thus are not adequately protecting young adults from harm. The Department appears to have recognized this deterioration and, in October 2023, issued an update to RNDC's Violence Reduction Plan that includes: (1) meetings with PIC to discuss violence reductions and incentives; (2) tactical search operations supplemented by additional facility-wide searches by RNDC staff in early October 2023; (3) additional tours by Captains and ADWs in problematic young adult housing units and ensuring that each problematic unit has an assigned Captain; (4) reassessing the SRG blending strategy; (5) deploying ESU, SST and SRT and K9 Unit to conduct routine rounds and special operations, with these supplemental staff maintaining a presence in

| | the housing areas; and (6) assigning those PIC found to possess weapons to temporary keep-lock status on their assigned unit for up to 12 hours. This plan includes several of the elements that appeared to have a positive impact on violence reduction when first initiated. The Monitoring Team will continue to assess the level of order, safety and control at RNDC. |
|---|---|
| **COMPLIANCE RATING** | **¶ 1. (18-year-olds)** Non-Compliance |

**CJ § XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19, ¶ 12 (DIRECT SUPERVISION)**

¶ 12. The Department shall adopt and implement the Direct Supervision Model in all Young Inmate Housing Areas.

*The analysis and compliance rating below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old incarcerated individuals. The Monitoring Team will not assess compliance with the Nunez provisions related to 16- and 17-year-olds in this Monitoring Period pursuant to the Stipulation and Order Regarding 16- and 17-Year-Old Adolescent Offenders at Horizon Juvenile Center, ¶ 2 (dkt. 503).*

To implement Direct Supervision, the Department is required to emphasize proactive and interactive supervision, appropriate relationship building, early intervention to avoid potential confrontations, de-escalation, rewarding positive behavior and consistent operations on each unit, including the implementation of daily unit schedules. The Department did not implement a Direct Supervision model at RNDC during the Monitoring Period and thus the Department remains in Non-Compliance with this provision.

The Department's long-standing inability to implement a Direct Supervision model resulted in the imposition of a related provision in the First Remedial Order (§D. ¶ 3). As part of the additional remedial relief, the Department is required to periodically assess the extent to which these various aspects are being properly implemented, along with adherence to the daily schedule in each housing unit. The NCU consulted with the Monitoring Team to develop a protocol for this assessment in early 2021, but audits were never produced because RNDC was in such disarray. Housing units did not have daily schedules and were not staffed by the same people day-to-day, which precluded the consistency, predictability and relationship development that is at the core of the Direct Supervision model. Notably, the various points of emphasis of the Direct Supervision model would be useful to the facility's violence reduction efforts, although none were regularly and demonstrably in practice during the current Monitoring Period.

| **COMPLIANCE RATING** | **¶ 12. (18-year-olds)** Non-Compliance |
|---|---|

## CJ § XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19, ¶ 17 (CONSISTENT ASSIGNMENT OF STAFF)

¶ 17. The Department shall adopt and implement a staff assignment system under which a team of Officers and a Supervisor are consistently assigned to the same Young Inmate Housing Area unit and the same tour, to the extent feasible given leave schedules and personnel changes.

*The analysis and compliance rating below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old incarcerated individuals. The Monitoring Team will not assess compliance with the Nunez provisions related to 16- and 17-year-olds in this Monitoring Period pursuant to the Stipulation and Order Regarding 16- and 17-Year-Old Adolescent Offenders at Horizon Juvenile Center, ¶ 2 (dkt. 503).*

At RNDC, where most 18-year-olds are housed, officers and Supervisors are not consistently assigned to the same housing units day-to-day, as required by this provision. In order for the Department to adopt a consistent staff assignment model, staff must reliably report to work as scheduled and the Department must implement a staff deployment strategy that prioritizes the required consistency across units. The Department continues to struggle with both of these elements and therefore consistent staffing within RNDC is not occurring and the Department is in Non-Compliance with this requirement.

The Department's inability to achieve substantial compliance with this provision resulted in additional remedial relief, including a provision regarding staff assignments in the First Remedial Order (§D. ¶ 1). In addition to requiring the Department to enhance its efforts to consistently assign staff to the same housing unit day-to-day, the First Remedial Order also requires the Department to implement a quality assurance process to assess the extent to which the consistent staffing requirements are met each month.

Consistent staffing audits were last conducted during mid/late 2021 and continued to show very poor levels of performance (e.g., less than 20% of housing unit posts were staffed by a steady officer). As noted in the Monitor's March 16, 2022 Report (at pgs. 20-21), the NCU assessed staff resources at RNDC using a one-day snapshot from January 2022 to illustrate why the Department was demonstrating so little progress with the consistent staffing requirements. In addition to finding discrepancies in the various sources of information regarding which staff were assigned to RNDC and their status, NCU's assessment demonstrated that a significant proportion of RNDC's workforce had been deemed "unavoidable to work." Prerequisites to restarting the audit process required by the First Remedial Order include RNDC having sufficient numbers of staff who are available to work and specific assignments to the same housing unit posts day-to-day.

| COMPLIANCE RATING | ¶ 17. (18-year-olds) Non-Compliance |
|---|---|

·End·

# APPENDIX A:
# SUPPLEMENTARY DATA

*Annual Number and Average Monthly Rate of UOF*





*Note: AMKC was closed in July 2023.*



*Note: EMTC was closed from July-October 2020 and from June-August 2021.*





*Note: OBCC was closed in June 2022 and then reopened in July 2023.*



*Number and Average Monthly Rate of UOF*

| Systemwide Use of Force January 2022 to October 2023 | | | | |
|---|---|---|---|---|
| Months | Total # UOF | Average/month | ADP | Rate |
| January-June 2022 | 3241 | 540.2 | 5491 | 9.8 |
| July-December 2022 | 3764 | 627.3 | 5787 | 10.9 |
| January-June 2023 | 3236 | 539.3 | 5969 | 9.0 |
| July-October 2023 | 2328 | 582.0 | 6172 | 9.43 |

| Use of Force at AMKC January 2022 to July 2023 | | | | |
|---|---|---|---|---|
| Months | Total # UOF | Average/month | ADP | Rate |
| January-June 2022 | 682 | 113.7 | 1975 | 5.74 |
| July-December 2022 | 1094 | 182.3 | 2073 | 8.79 |
| January-June 2023 | 1049 | 174.8 | 1944 | 8.99 |
| July 2023 (then closed) | 138 | 138 | 1577 | 8.75 |

| Use of Force at EMTC January 2022 to October 2023 | | | | |
|---|---|---|---|---|
| Months | Total # UOF | Average/month | ADP | Rate |
| January-June 2022 | 485 | 80.8 | 594 | 13.61 |
| July-December 2022 | 613 | 102.2 | 733 | 13.94 |
| January-June 2023 | 533 | 88.8 | 873 | 10.18 |
| July-October 2023 | 443 | 110.75 | 1200 | 9.23 |

| Use of Force at GRVC<br>January 2022 to October 2023 | | | | |
|---|---|---|---|---|
| Months | Total #<br>UOF | Average/month | ADP | Rate |
| January-June 2022 | 621 | 103.5 | 622 | 16.7 |
| July-December 2022 | 824 | 137.3 | 743 | 18.5 |
| January-June 2023 | 508 | 84.7 | 829 | 10.2 |
| July-October 2023 | 331 | 82.8 | 855 | 9.6 |

| Use of Force at OBCC<br>January 2022 to October 2023 | | | | |
|---|---|---|---|---|
| Months | Total #<br>UOF | Average/month | ADP | Rate |
| January-June 2022 | 165 | 27.5 | 291 | 9.46 |
| July-December 2022 | Facility was closed. | | | |
| January-June 2023 | Facility was closed. | | | |
| July-October 2023 | 439 | 109.8 | 1124 | 9.77 |

| Use of Force at RNDC<br>January 2022 to October 2023 | | | | |
|---|---|---|---|---|
| Months | Total #<br>UOF | Average/month | ADP | Rate |
| January-June 2022 | 653 | 108.8 | 727 | 15.1 |
| July-December 2022 | 478 | 79.7 | 812 | 9.9 |
| January-June 2023 | 413 | 68.8 | 848 | 8.1 |
| July-October 2023 | 333 | 83.25 | 1077 | 7.7 |

*Annual Number and Average Monthly Rate of Stabbing and Slashing*[106]





*Note: AMKC was closed in July 2023.*

---

[106] The Monitoring Team has determined that it cannot reliably verify purported decreases in stabbings or slashings in 2023 for the reasons outlined in the Monitor's November 8, 2023 Report at pgs. 31 to 33 and 35 to 36.



*Note: EMTC was closed from July-October 2020 and from June-August 2021.*





*Note: OBCC was closed in June 2022 and then reopened in July 2023.*



*Number and Average Monthly Rate of Stabbing and Slashing*[107]

| Systemwide Stabbings/Slashings January 2022 to October 2023 | | | | |
|---|---|---|---|---|
| Months | Total # S/S | Average/month | ADP | Rate |
| January-June 2022 | 254 | 42.3 | 5491 | 0.77 |
| July-December 2022 | 214 | 35.7 | 5787 | 0.62 |
| January-June 2023 | 164 | 27.3 | 5969 | 0.46 |
| July-October 2023 | 160 | 40.0 | 6172 | 0.65 |

| Stabbing/Sashing at AMKC January 2022 to July 2023 | | | | |
|---|---|---|---|---|
| Months | Total # S/S | Average/month | ADP | Rate |
| January-June 2022 | 49 | 8.2 | 1975 | 0.41 |
| July-December 2022 | 49 | 8.2 | 2073 | 0.39 |
| January-June 2023 | 57 | 9.5 | 1944 | 0.49 |
| July 2023 (then closed) | 3 | 3.0 | 1577 | 0.19 |

| Stabbing/Sashing at EMTC January 2022 to October 2023 | | | | |
|---|---|---|---|---|
| Months | Total # S/S | Average/month | ADP | Rate |
| January-June 2022 | 31 | 5.2 | 594 | 0.87 |
| July-December 2022 | 20 | 3.3 | 733 | 0.45 |
| January-June 2023 | 25 | 4.2 | 873 | 0.48 |
| July-October 2023 | 19 | 4.8 | 1200 | 0.40 |

---

[107] The Monitoring Team has determined that it cannot reliably verify purported decreases in stabbings or slashings in 2023 for the reasons outlined in the Monitor's November 8, 2023 Report at pgs. 31 to 33 and 35 to 36.

| Stabbing/Sashing at GRVC January 2022 to October 2023 | | | | |
|---|---|---|---|---|
| Months | Total # S/S | Average/month | ADP | Rate |
| January-June 2022 | 58 | 9.7 | 622 | 1.55 |
| July-December 2022 | 99 | 16.5 | 743 | 2.22 |
| January-June 2023 | 46 | 7.7 | 829 | 0.92 |
| July-October 2023 | 29 | 7.3 | 855 | 0.85 |

| Stabbing/Sashing at OBCC January 2022 to October 2023 | | | | |
|---|---|---|---|---|
| Months | Total # S/S | Average/month | ADP | Rate |
| January-June 2022 | 35 | 5.8 | 291 | 2.0 |
| July-December 2022 | Facility was closed. | | | |
| January-June 2023 | Facility was closed. | | | |
| July-October 2023 | 34 | 8.5 | 1124 | 0.76 |

| Stabbings/Slashings at RNDC January 2022 to October 2023 | | | | |
|---|---|---|---|---|
| Months | Total # S/S | Average/month | ADP | Rate |
| January-June 2022 | 70 | 11.7 | 727 | 1.6 |
| July-December 2022 | 37 | 6.2 | 812 | 0.76 |
| January-June 2023 | 30 | 5.0 | 848 | 0.59 |
| July-October 2023 | 43 | 10.8 | 1077 | 1.0 |

*Annual Number and Average Monthly Rate of Fights*





*Note: AMKC was closed in July 2023.*



*Note: EMTC was closed from July-October 2020 and from June-August 2021.*





*Note: OBCC was closed in June 2022 and then reopened in July 2023.*



*Number and Average Monthly Rate of Fights*

| Systemwide Fights January 2022 to October 2023 | | | | |
|---|---|---|---|---|
| Months | Total # Fights | Average/month | ADP | Rate |
| January-June 2022 | 2764 | 460.7 | 5491 | 8.39 |
| July-December 2022 | 3071 | 511.8 | 5787 | 8.84 |
| January-June 2023 | 2953 | 492.2 | 5969 | 8.25 |
| July-October 2023 | 2111 | 527.8 | 6172 | 8.55 |

| Fights at AMKC January 2022 to July 2023 | | | | |
|---|---|---|---|---|
| Months | Total # Fights | Average/month | ADP | Rate |
| January-June 2022 | 676 | 112.7 | 1975 | 5.70 |
| July-December 2022 | 925 | 154.2 | 2073 | 7.44 |
| January-June 2023 | 1050 | 175.0 | 1944 | 9.00 |
| July 2023 (then closed) | 127 | 127.0 | 1577 | 8.05 |

| Fights at EMTC January 2022 to October 2023 | | | | |
|---|---|---|---|---|
| Months | Total # Fights | Average/month | ADP | Rate |
| January-June 2022 | 753 | 125.5 | 594 | 21.13 |
| July-December 2022 | 957 | 159.5 | 733 | 21.76 |
| January-June 2023 | 796 | 132.67 | 873 | 15.2 |
| July-October 2023 | 672 | 168.0 | 1200 | 14.0 |

| Fights at GRVC<br>January 2022 to October 2023 | | | | |
|---|---|---|---|---|
| Months | Total # Fights | Average/month | ADP | Rate |
| January-June 2022 | 275 | 45.8 | 622 | 7.37 |
| July-December 2022 | 330 | 55.0 | 743 | 7.40 |
| January-June 2023 | 273 | 45.5 | 829 | 5.49 |
| July-October 2023 | 266 | 66.5 | 855 | 7.78 |

| Fights at OBCC<br>January 2022 to October 2023 | | | | |
|---|---|---|---|---|
| Months | Total # Fights | Average/month | ADP | Rate |
| January-June 2022 | 143 | 23.83 | 291 | 8.19 |
| July-December 2022 | Facility was closed. | | | |
| January-June 2023 | Facility was closed. | | | |
| July-October 2023 | 377 | 94.25 | 1124 | 8.39 |

| Fights at RNDC<br>January 2022 to October 2023 | | | | |
|---|---|---|---|---|
| Months | Total # Fights | Average/month | ADP | Rate |
| January-June 2022 | 455 | 75.83 | 727 | 10.43 |
| July-December 2022 | 451 | 75.17 | 812 | 9.26 |
| January-June 2023 | 358 | 59.67 | 848 | 7.04 |
| July-October 2023 | 322 | 80.5 | 1077 | 7.47 |

*Number and Average Monthly Rate of Assault on Staff,*
*with and without UOF*





**The Department began tracking assaults on staff that did not involve a use of force in 2020. Prior years' data are not available.*

*Facility Searches & Contraband Recovery*

In 2022, DOC conducted a total of 196,738 searches (195,348 completed by the Facility and 1,390 special searches[108]). Through November of this year, DOC has conducted a total of 131,520 searches (130,864 completed by the Facility and 656 special searches[109]).

Any successful effort to remove weapons from a facility is obviously positive but the decreased number of searches, combined with the relatively low rate of return (*i.e.,* contraband seized per searches conducted) and observations of videotaped footage of poor search technique and procedure suggests to the Monitoring Team that additional work to refine practice remains necessary.

| Contraband Recovery, 2021-2023[110] | | | |
|---|---|---|---|
| | **2021** | **2022** | **Jan.-Nov. 2023** |
| Drugs | 1,049 | 1,421 | 1,180 |
| Weapons | 3,144 | 5,507 | 1,939 |
| Escape-Related Item | 196 | 525 | 273 |
| Other | 878 | 1,145 | 628 |
| **Total** | **5,267** | **8,598** | **4,020** |

---

[108] This includes searches by the Emergency Services Unit, the Special Search Team, the Canine Use and/or Tactical Search operations.

[109] *Id.*

[110] The calculation of the data for contraband recovery varies depending on the type of contraband that is recovered. For example, drug contraband is counted by incident, not the actual number of items seized. For example, if three different types of drugs were recovered in one location, this is counted as a single seizure. In contrast, when weapons are seized, each item recovered is counted separately. For example, if three weapons were seized from a single individual, all three items are counted.

*Overview of In-Custody Deaths*

The number of people who have died while in custody is tragic and is related, at least in part, to the poor conditions and security practices in the jails as set forth herein. Thus far in 2023, nine individuals have died in custody or shortly after their release.[111] An updated table on the number of people who have died and their causes of death is provided below. It is particularly concerning that eight people have died by suicide or suspected suicide (seven of whom died since the Action Plan was entered in June 2022) since the Court required the Department to improve its practices regarding self-harm in September 2021.

| NYC DOC Causes of Death, *2015 to December 21, 2023* | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | Total |
| Accidental | | | | | | | | 1 | | 1 |
| COVID-19 | | | | | | 3 | 2 | | | 5 |
| Medical Condition | 9 | 11 | 4 | 7 | 3 | 2 | 4 | 4 | 2 | 46 |
| Overdose | | 2 | 1 | | | | 4 | 6 | | 13 |
| Suicide | 2 | 2 | | 1 | | 1 | 4 | 5 | | 15 |
| Drowned | | | | | | | | 1 | | 1 |
| Pending OCME Confirmation | | | | | | | | | 7 | 7 |
| Undetermined Due to Death Outside of DOC Custody | | | | | | 4 | 2 | 2 | | 8 |
| Undetermined by OCME | | | 1 | | | 1 | | | | 2 |
| **Total** | **11** | **15** | **6** | **8** | **3** | **11** | **16** | **19** | **9** | **98** |

---

[111] If an incarcerated individual has a health condition that may merit release, the process has a few steps and must be ordered by the Court. The Department does not have any authority to release an individual because of a health condition although it may certainly identify and recommend individuals that should be considered for potential release. To the extent an individual has a health condition that may merit release, CHS may issue a clinical condition letter, with the patient's consent, which is then provided to the individual's defense counsel. Counsel then may petition the Court to release the individual. Release is not automatic, and an individual determination must be made by the Court. If the court determines release is appropriate, the Department is notified via a court order that the individual is being released on their own recognizance ("ROR"). However, the order does not specify a medical reason for the release.

The table below shows the Department's mortality rate from January 2010 to December 2022. The sharp increase in the mortality rate between 2020 and 2022, is troubling. The mortality rate in 2022 was the highest in over a decade and more than double the rate in 2016, at the inception of the Consent Judgment. The mortality rate in 2023 was not computed because it is not comparable to previous years, as the year has not yet elapsed.

| Mortality Rate | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **2010** | **2011** | **2012** | **2013** | **2014** | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** |
| **Annual ADP** | 13,026 | 12,421 | 12,083 | 11,692 | 10,913 | 9,890 | 9,802 | 9,224 | 8,397 | 7,388 | 4,543 | 5,574 | 5,639 | 5,958 |
| **Number of Deaths** | 17 | 12 | 21 | 24 | 10 | 11 | 15 | 6 | 8 | 3 | 11 | 16 | 19 | 9 |
| **Mortality Rate** | 1.31 | 0.97 | 1.74 | 2.05 | 0.92 | 1.11 | 1.53 | 0.65 | 0.95 | 0.41 | 2.42 | 2.87 | 3.37 | ~ |
| *Note: Mortality Rate per 1000 people in custody uses the following formula: Rate = (# of deaths/average # of people in custody)*1000* | | | | | | | | | | | | | | |

<u>*Use of Force Involving Unmanned Posts*</u>

The tables below provide the number and proportion of uses of force involving "unmanned posts" as identified by the Department during three time periods (January-June 2022, July-December 2022, January-June 2023). These incidents involve posts to which no staff member was assigned *and* instances where the assigned officer left their post without being relieved (collectively "unmanned posts"). The first two columns list the number of uses of force involving unmanned posts and the proportion of <u>all</u> uses of force that this number represents. The third and fourth columns identify the number and proportion of uses of force that involved unmanned posts **and** were avoidable (as identified by the Department) specifically due to the lack of staff on post. In other words, had a staff member been present, these incidents likely could have been avoided.

| Uses of Force involving Unmanned Posts: January-June 2022 | | | |
|---|---|---|---|
| Facility | # of Total UOF Incidents involving Unmanned Posts | % of Total UOF Incidents involving Unmanned Posts[112] | # of UOF Incidents that UOF incidents involving Unmanned Posts & Were Avoidable | % of Total UOF Incidents involving Unmanned Posts & Were Avoidable |
| AMKC | 48 | 1.48% | *39* | *81.25%* |
| EMTC | 22 | 0.68% | *10* | *45.45%* |
| GRVC | 13 | 0.40% | *6* | *46.15%* |
| NIC | 2 | 0.06% | *1* | *50.00%* |
| OBCC | 19 | 0.59% | *7* | *36.84%* |
| RMSC | 6 | 0.19% | *2* | *33.33%* |
| RNDC | 40 | 1.23% | *22* | *55.00%* |
| VCBC | 1 | 0.03% | *1* | *100.00%* |
| **TOTAL** | **151** | **4.66%** | ***88*** | ***58.28%*** |

---

[112] There were 3,240 total actual uses of force in January-June 2022. This number does not include alleged uses of force because the Department does not provide avoidable reasons for alleged uses of force.

| Uses of Force involving Unmanned Posts: July-December 2022 | | | | |
|---|---|---|---|---|
| Facility | # of Total UOF Incidents involving Unmanned Posts | % of Total UOF Incidents involving Unmanned Posts[113] | # of UOF Incidents that UOF incidents involving Unmanned Posts & Were Avoidable | % of Total UOF Incidents involving Unmanned Posts & Were Avoidable |
| AMKC | 51 | 1.35% | *33* | *64.71%* |
| EMTC | 24 | 0.64% | *12* | *50.00%* |
| GRVC | 35 | 0.93% | *13* | *37.14%* |
| NIC | 4 | 0.11% | *2* | *50.00%* |
| RMSC | 32 | 0.85% | *15* | *46.88%* |
| RNDC | 10 | 0.27% | *4* | *40.00%* |
| VCBC | 3 | 0.08% | *1* | *33.33%* |
| **TOTAL** | **159** | **4.22%** | ***80*** | ***50.31%*** |

| Uses of Force involving Unmanned Posts: January-June 2023 | | | | |
|---|---|---|---|---|
| Facility | # of Total UOF Incidents involving Unmanned Posts | % of Total UOF Incidents involving Unmanned Posts[114] | # of UOF Incidents that UOF incidents involving Unmanned Posts & Were Avoidable | % of Total UOF Incidents involving Unmanned Posts & Were Avoidable |
| AMKC | 45 | 1.39% | *28* | *62.22%* |
| EMTC | 19 | 0.59% | *9* | *47.37%* |
| GRVC | 19 | 0.59% | *9* | *47.37%* |
| NIC | 2 | 0.06% | *1* | *50.00%* |
| RMSC | 15 | 0.46% | *5* | *33.33%* |
| RNDC | 10 | 0.31% | *4* | *40.00%* |
| VCBC | 2 | 0.06% | *1* | *50.00%* |
| **TOTAL** | **112** | **3.46%** | ***57*** | ***50.89%*** |

---

[113] There were 3,765 total actual uses of force in July-December 2022. This number does not include alleged uses of force because the Department does not provide avoidable reasons for alleged uses of force.

[114] There were 3,237 total actual uses of force in January-June 2023. This number does not include alleged uses of force because the Department does not provide avoidable reasons for alleged uses of force.

*Number of ADWs and Captains*

The two tables below identify the number and assignment of ADWs and Captains at specific points in time from July 18, 2020 to October 21, 2023. This data is discussed further in the compliance box for Remedial Order § A., ¶ 4 (Supervision of Captains).

| Number of ADWs & Assignments in the Department[115] | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Facility | # of ADWs As of July 18, 2020 | # of ADWs As of Jan. 2, 2021 | # of ADWs As of June 26, 2021 | # of ADWs As of Jan. 1, 2022 | # of ADWs As of June 18, 2022 | # of ADWs As of Dec. 31, 2022 | # of ADWs As of June 16, 2023 | # of ADWs As of Oct. 21, 2023 |
| AMKC[116] | 9 | 21 | 13 | 12 | 9 | 12 | 16 | 0 |
| EMTC[117] | 0 | 0 | 0 | 0 | 0 | 8 | 10 | 12 |
| GRVC | 6 | 10 | 11 | 9 | 8 | 12 | 11 | 11 |
| MDC[118] | 6 | 2 | 1 | 1 | 0 | 1 | 1 | 1 |
| NIC | 6 | 8 | 8 | 5 | 7 | 8 | 9 | 10 |
| OBCC[119] | 6 | 8 | 8 | 14 | 7 | 0 | 0 | 12 |
| RMSC | 5 | 6 | 6 | 5 | 4 | 5 | 6 | 13 |
| RNDC | 7 | 15 | 15 | 10 | 7 | 12 | 12 | 10 |
| VCBC[120] | 4 | 6 | 5 | 5 | 4 | 5 | 5 | 1 |
| Court Commands (BKDC, BXDC, QDC) | 3 | 4 | 3 | 3 | 3 | 3 | 2 | 2 |
| Total # of ADWs in Facilities & Court Commands | 52 | 80 | 70 | 64 | 49 | 66 | 72 | 72 |
| Total # of ADWs Available Department-wide | 66 | 95 | 88 | 80 | 67 | 82 | 89 | 88 |
| % of ADWs in Facilities & Court Commands | 79% | 84% | 80% | 80% | 73% | 80% | 81% | 82% |

[115] The specific post assignments of ADWs within the Facility is not available so this data simply demonstrates the number of ADWs assigned per facility.

[116] AMKC was closed in August 2023.

[117] EMTC has been closed and opened in these Monitoring Periods. Until late 2022, staff that work at EMTC were technically assigned to AMKC.

[118] MDC was utilized in a limited capacity at the end of the Twelfth Monitoring Period and was closed by June 2021. The staff currently assigned to MDC are in fact assigned to the Manhattan Courts (Criminal, Supreme, and Family).

[119] OBCC was closed by July 2022. Staff were then reassigned to other commands. OBCC was then reopened in July 2023.

[120] VCBC was closed in October 2023.

| | Number of Captains & Assignments in the Department [121] | | | | | | | |
| Facility | # of Captains As of July 18, 2020 | # of Captains As of Jan. 2, 2021 | # of Captains As of June 26, 2021 | # of Captains As of Jan. 1, 2022 | # of Captains As of June 18, 2022 | # of Captains As of Dec. 31, 2022 | # of Captains As of June 16, 2023 | # of Captains As of Oct. 21, 2023 |
|---|---|---|---|---|---|---|---|---|
| AMKC [122] | 91 | 111 | 97 | 87 | 81 | 80 | 65 | 12 |
| EMTC [123] | 0 | 0 | 0 | 0 | 0 | 38 | 37 | 40 |
| GRVC | 75 | 72 | 86 | 86 | 81 | 90 | 61 | 48 |
| MDC [124] | 72 | 39 | 15 | 12 | 11 | 11 | 11 | 12 |
| NIC | 51 | 45 | 45 | 56 | 45 | 50 | 44 | 48 |
| OBCC [125] | 85 | 81 | 78 | 77 | 38 | 7 | 7 | 55 |
| RMSC | 51 | 50 | 49 | 36 | 34 | 31 | 27 | 70 |
| RNDC | 58 | 56 | 60 | 63 | 70 | 70 | 68 | 53 |
| VCBC [126] | 27 | 25 | 27 | 25 | 23 | 22 | 21 | 4 |
| Court Commands (BKDC, BXDC, QDC) | 39 | 37 | 35 | 32 | 33 | 28 | 25 | 29 |
| **Total # of Captains in Facilities and Court Commands** | **558** | **523** | **499** | **474** | **416** | **427** | **366** | **371** |
| **Total # of Captains Available Department-wide** | **810** | **765** | **751** | **670** | **607** | **573** | **550** | **541** |
| **% of Captains in Facilities and Court Commands** | **69%** | **68%** | **66%** | **71%** | **69%** | **75%** | **67%** | **69%** |

---

[121] The specific post assignments of Captains within the Facility is not available so this data demonstrates the number of Captains assigned per facility.

[122] AMKC was closed in August 2023.

[123] EMTC has been closed and opened in these Monitoring Periods. Until late 2022, staff that work at EMTC were technically assigned to AMKC.

[124] MDC was utilized in a limited capacity at the end of the Twelfth Monitoring Period and was closed by June 2021. The staff currently assigned to MDC are in fact assigned to the Manhattan Courts (Criminal, Supreme, and Family).

[125] OBCC was closed by July 2022. Staff were then reassigned to other commands. Due to a locker room shortage at other facilities, some staff used the locker room at OBCC. OBCC was then reopened in July 2023. DOC reported that these the Captains assigned to OBCC between July 2022 and July 2023 were on medically monitored status and were assigned to OBCC to monitor the staff locker room.

[126] VCBC was closed in October 2023.

| Facility | # of Captains As of July 18, 2020 | # of Captains As of Jan. 2, 2021 | # of Captains As of June 26, 2021 | # of Captains As of Jan. 1, 2022 | # of Captains As of June 18, 2022 | # of Captains As of Dec. 31, 2022 | # of Captains As of June 16, 2023 | # of Captains As of Oct. 21, 2023 |
|---|---|---|---|---|---|---|---|---|
| AMKC[128] | 91 | 111 | 97 | 87 | 81 | 80 | 65 | 12 |
| EMTC[129] | 0 | 0 | 0 | 0 | 0 | 38 | 37 | 40 |
| GRVC | 75 | 72 | 86 | 86 | 81 | 90 | 61 | 48 |
| MDC[130] | 72 | 39 | 15 | 12 | 11 | 11 | 11 | 12 |
| NIC | 51 | 45 | 45 | 56 | 45 | 50 | 44 | 48 |
| OBCC[131] | 85 | 81 | 78 | 77 | 38 | 7 | 7 | 55 |
| RMSC | 51 | 50 | 49 | 36 | 34 | 31 | 27 | 70 |
| RNDC | 58 | 56 | 60 | 63 | 70 | 70 | 68 | 53 |
| VCBC[132] | 27 | 25 | 27 | 25 | 23 | 22 | 21 | 4 |
| Court Commands (BKDC, BXDC, QDC) | 39 | 37 | 35 | 32 | 33 | 28 | 25 | 29 |
| **Total # of Captains in Facilities and Court Commands** | **558** | **523** | **499** | **474** | **416** | **427** | **366** | **371** |
| **Total # of Captains Available Department-wide** | **810** | **765** | **751** | **670** | **607** | **573** | **550** | **541** |
| **% of Captains in Facilities and Court Commands** | **69%** | **68%** | **66%** | **71%** | **69%** | **75%** | **67%** | **69%** |

Table title: **Number of Captains & Assignments in the Department[127]**

[127] The specific post assignments of Captains within the Facility is not available so this data demonstrates the number of Captains assigned per facility.

[128] AMKC was closed in August 2023.

[129] EMTC has been closed and opened in these Monitoring Periods. Until late 2022, staff that work at EMTC were technically assigned to AMKC.

[130] MDC was utilized in a limited capacity at the end of the Twelfth Monitoring Period and was closed by June 2021. The staff currently assigned to MDC are in fact assigned to the Manhattan Courts (Criminal, Supreme, and Family).

[131] OBCC was closed by July 2022. Staff were then reassigned to other commands. Due to a locker room shortage at other facilities, some staff used the locker room at OBCC. OBCC was then reopened in July 2023. DOC reported that these the Captains assigned to OBCC between July 2022 and July 2023 were on medically monitored status and were assigned to OBCC to monitor the staff locker room.

[132] VCBC was closed in October 2023.

*Unmanned Posts & Triple Tours*

The table below provides the monthly total and daily average from January 2021 to November 2023 of the total uniform staff headcount, unmanned posts (a post in which a staff member is not assigned), and triple tours. The total number and daily average of unmanned posts and triple tours have both decreased since January 2022 and from their prior peak in 2021. On average, there were 57 fewer unstaffed posts per day in November 2023 compared to the previous peak in January 2022. There were also 25 fewer triple tours on average in November 2023 compared to the previous peak in August 2021, and the average number of triple tours per day remained low throughout 2023. On the other hand, the number of unstaffed posts per day remained higher in 2023, though there was a significant decrease in September-November 2023.

| Month | Average Headcount per Day | Average Unmanned Posts per Day | Total Unmanned Posts per Month | Average Triple Tours per Day[133] | Total Triple Tours per Month |
|---|---|---|---|---|---|
| January 2021 | 8,872 | | | 0 | 6 |
| February 2021 | 8,835 | | | 3 | 91 |
| March 2021 | 8,777 | | | 5 | 169 |
| April 2021 | 8,691 | | | 4 | 118 |
| May 2021 | 8,576 | | | 4 | 109 |
| June 2021 | 8,475 | | | 4 | 108 |
| July 2021 | 8,355 | | | 15 | 470 |
| August 2021 | 8,459 | | | 25 | 764 |
| September 2021 | 8,335 | | | 22 | 659 |
| October 2021 | 8,204 | | | 6 | 175 |
| November 2021 | 8,089 | | | 6 | 174 |
| December 2021 | 7,778 | | | 23 | 706 |
| January 2022 | 7,708 | 59 | 1825 | 24 | 756 |
| February 2022 | 7,547 | 23 | 638 | 3 | 90 |
| March 2022 | 7,457 | 29 | 888 | 1 | 41 |

---

[133] This column contains data for the number of staff who worked over 3.75 hours of their third tour. This chart does not contain data for staff who have worked 3.75 hours or less of their third tour.

| Month | Average Headcount per Day | Average Unmanned Posts per Day | Total Unmanned Posts per Month | Average Triple Tours per Day[133] | Total Triple Tours per Month |
|---|---|---|---|---|---|
| April 2022 | 7,353 | 13 | 385 | 0 | 3 |
| May 2022 | 7,233 | 31 | 972 | 1 | 33 |
| June 2022 | 7,150 | 27 | 815 | 2 | 67 |
| July 2022 | 7,138 | 20 | 615 | 2 | 58 |
| August 2022 | 7,068 | 24 | 735 | 2 | 50 |
| September 2022 | 6,994 | 22 | 649 | 4 | 105 |
| October 2022 | 6,905 | 26 | 629 | 2 | 63 |
| November 2022 | 6,837 | 16 | 486 | 2 | 50 |
| December 2022 | 6,777 | 13 | 395 | 4 | 115 |
| January 2023 | 6,700 | 13 | 391 | 1 | 38 |
| February 2023 | 6,632 | 15 | 419 | 0 | 8 |
| March 2023 | 6,661 | 17 | 525 | 0 | 7 |
| April 2023 | 6,590 | 16 | 491 | 0 | 11 |
| May 2023 | 6,516 | 22 | 671 | 0 | 7 |
| June 2023 | 6,449 | 15 | 456 | 1 | 26 |
| July 2023 | 6,406 | 20 | 617 | 1 | 26 |
| August 2023 | 6,427 | 13 | 393 | 1 | 27 |
| September 2023 | 6,418 | 5 | 144 | 0 | 1 |
| October 2023 | 6,340 | 4 | 131 | 0 | 0 |
| November 2023 | 6,336 | 2 | 66 | 0 | 0 |

*Sick Leave, Medically Monitored/Restricted, AWOL, PE, and FMLA*

The tables below provide the monthly average from January 1, 2019 to November 30, 2023 of the total staff headcount, the average number of staff out sick, the average number of staff on medically monitored/restricted duty level 3, and the average number of staff who were AWOL, the average number of staff who were on Personal Emergency leave, and the average number of staff on FMLA leave.[134]

| 2019 | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Month | Head-count | Average (Avg.) Daily Sick | Avg. Daily % Sick | Avg. Daily MMR3 | Avg. Daily % MMR3 | Avg. Daily AWOL | Avg. Daily % AWOL | Avg. Daily PE | Avg. Daily % PE | Avg. Daily FMLA | Avg. Daily % FMLA |
| January 2019 | 10577 | 621 | 5.87% | 459 | 4.34% | | | | | | |
| February 2019 | 10482 | 616 | 5.88% | 457 | 4.36% | | | | | | |
| March 2019 | 10425 | 615 | 5.90% | 441 | 4.23% | | | | | | |
| April 2019 | 10128 | 590 | 5.83% | 466 | 4.60% | | | | | | |
| May 2019 | 10041 | 544 | 5.42% | 501 | 4.99% | | | | | | |
| June 2019 | 9953 | 568 | 5.71% | 502 | 5.04% | | | | | | |
| July 2019 | 9859 | 538 | 5.46% | 496 | 5.03% | | | | | | |
| August 2019 | 10147 | 555 | 5.47% | 492 | 4.85% | | | | | | |
| September 2019 | 10063 | 557 | 5.54% | 479 | 4.76% | | | | | | |
| October 2019 | 9980 | 568 | 5.69% | 473 | 4.74% | | | | | | |
| November 2019 | 9889 | 571 | 5.77% | 476 | 4.81% | | | | | | |
| December 2019 | 9834 | 603 | 6.13% | 463 | 4.71% | | | | | | |
| 2019 Average | 10115 | 579 | 5.72% | 475 | 4.71% | | | | | | |

---

[134] The AWOL, PE, and FMLA data is only available for August 1, 2021-January 26, 2022 and April 2022-November 30, 2023.

| 2020 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Month | Head-count | Average (Avg.) Daily Sick | Avg. Daily % Sick | Avg. Daily MMR3 | Avg. Daily % MMR3 | Avg. Daily AWOL | Avg. Daily % AWOL | Avg. Daily PE | Avg. Daily % PE | Avg. Daily FMLA | Avg. Daily % FMLA |
| January 2020 | 9732 | 586 | 6.02% | 367 | 3.77% | | | | | | |
| February 2020 | 9625 | 572 | 5.94% | 388 | 4.03% | | | | | | |
| March 2020 | 9548 | 1408 | 14.75% | 373 | 3.91% | | | | | | |
| April 2020 | 9481 | 3059 | 32.26% | 278 | 2.93% | | | | | | |
| May 2020 | 9380 | 1435 | 15.30% | 375 | 4.00% | | | | | | |
| June 2020 | 9302 | 807 | 8.68% | 444 | 4.77% | | | | | | |
| July 2020 | 9222 | 700 | 7.59% | 494 | 5.36% | | | | | | |
| August 2020 | 9183 | 689 | 7.50% | 548 | 5.97% | | | | | | |
| September 2020 | 9125 | 694 | 7.61% | 586 | 6.42% | | | | | | |
| October 2020 | 9079 | 738 | 8.13% | 622 | 6.85% | | | | | | |
| November 2020 | 9004 | 878 | 9.75% | 546 | 6.06% | | | | | | |
| December 2020 | 8940 | 1278 | 14.30% | 546 | 6.11% | | | | | | |
| **2020 Average** | **9302** | **1070** | **11.49%** | **464** | **5.02%** | | | | | | |

118

| 2021 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Month | Head-count | Average (Avg.) Daily Sick | Avg. Daily % Sick | Avg. Daily MMR3 | Avg. Daily % MMR3 | Avg. Daily AWOL | Avg. Daily % AWOL | Avg. Daily PE | Avg. Daily % PE | Avg. Daily FMLA | Avg. Daily % FMLA |
| January 2021 | 8872 | 1393 | 15.70% | 470 | 5.30% | | | | | | |
| February 2021 | 8835 | 1347 | 15.25% | 589 | 6.67% | | | | | | |
| March 2021 | 8777 | 1249 | 14.23% | 676 | 7.70% | | | | | | |
| April 2021 | 8691 | 1412 | 16.25% | 674 | 7.76% | | | | | | |
| May 2021 | 8576 | 1406 | 16.39% | 674 | 7.86% | | | | | | |
| June 2021 | 8475 | 1480 | 17.46% | 695 | 8.20% | | | | | | |
| July 2021 | 8355 | 1488 | 17.81% | 730 | 8.74% | | | | | | |
| August 2021 | 8459 | 1416 | 16.74% | 767 | 9.07% | 90 | 1.05% | 58 | 0.69% | 128 | 1.51% |
| September 2021 | 8335 | 1703 | 20.43% | 744 | 8.93% | 77 | 0.92% | 46 | 0.55% | 36 | 0.43% |
| October 2021 | 8204 | 1558 | 18.99% | 782 | 9.53% | 30 | 0.37% | 25 | 0.30% | 46 | 0.56% |
| November 2021 | 8089 | 1498 | 18.52% | 816 | 10.09% | 42 | 0.52% | 27 | 0.33% | 47 | 0.58% |
| December 2021 | 7778 | 1689 | 21.72% | 775 | 9.96% | 42 | 0.54% | 30 | 0.39% | 44 | 0.57% |
| 2021 Average | 8454 | 1470 | 17.46% | 699 | 8.32% | 56 | 0.68% | 37 | 0.45% | 60 | 0.73% |

| 2022 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Month** | **Head-count** | **Average (Avg.) Daily Sick** | **Avg. Daily % Sick** | **Avg. Daily MMR3** | **Avg. Daily % MMR3** | **Avg. Daily AWOL** | **Avg. Daily % AWOL** | **Avg. Daily PE** | **Avg. Daily % PE** | **Avg. Daily FMLA** | **Avg. Daily % FMLA** |
| January 1-26 2022 | 7708 | 2005 | 26.01% | 685 | 8.89% | 42 | 0.55% | 19 | 0.25% | 41 | 0.53% |
| February 2022 | 7547 | 1457 | 19.31% | 713 | 9.45% | ■ | ■ | ■ | ■ | ■ | ■ |
| March 2022 | 7457 | 1402 | 18.80% | 617 | 8.27% | ■ | ■ | ■ | ■ | ■ | ■ |
| April 2022 | 7353 | 1255 | 17.07% | 626 | 8.51% | 23 | 0.31% | 33 | 0.45% | 49 | 0.67% |
| May 2022 | 7233 | 1074 | 14.85% | 634 | 8.77% | 24 | 0.34% | 39 | 0.54% | 47 | 0.66% |
| June 2022 | 7150 | 951 | 13.30% | 624 | 8.73% | 16 | 0.22% | 28 | 0.40% | 50 | 0.70% |
| July 2022 | 7138 | 875 | 12.26% | 608 | 8.52% | 19 | 0.26% | 33 | 0.47% | 54 | 0.76% |
| August 2022 | 7068 | 831 | 11.76% | 559 | 7.91% | 17 | 0.24% | 34 | 0.48% | 54 | 0.76% |
| September 2022 | 6994 | 819 | 11.71% | 535 | 7.65% | 6 | 0.09% | 33 | 0.48% | 58 | 0.83% |
| October 2022 | 6905 | 798 | 11.56% | 497 | 7.20% | 6 | 0.09% | 36 | 0.51% | 56 | 0.81% |
| November 2022 | 6837 | 793 | 11.60% | 476 | 6.96% | 7 | 0.09% | 21 | 0.31% | 48 | 0.70% |
| December 2022 | 6777 | 754 | 11.13% | 452 | 6.67% | 7 | 0.10% | 21 | 0.30% | 48 | 0.70% |
| **2022 Average** | **7181** | **1085** | **14.95%** | **586** | **8.13%** | **17** | **0.23%** | **30** | **0.42%** | **51** | **0.71%** |

| 2023 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Month | Head-count | Average (Avg.) Daily Sick | Avg. Daily % Sick | Avg. Daily MMR3 | Avg. Daily % MMR3 | Avg. Daily AWOL | Avg. Daily % AWOL | Avg. Daily PE | Avg. Daily % PE | Avg. Daily FMLA | Avg. Daily % FMLA |
| January 2023 | 6700 | 692 | 10.33% | 443 | 6.61% | 9 | 0.13% | 37 | 0.55% | 44 | 0.66% |
| February 2023 | 6632 | 680 | 10.25% | 421 | 6.35% | 9 | 0.14% | 30 | 0.46% | 47 | 0.70% |
| March 2023 | 6661 | 639 | 9.59% | 401 | 6.02% | 11 | 0.17% | 34 | 0.51% | 46 | 0.69% |
| April 2023 | 6590 | 595 | 9.03% | 393 | 5.96% | 10 | 0.15% | 41 | 0.62% | 45 | 0.68% |
| May 2023 | 6516 | 514 | 7.89% | 403 | 6.18% | 10 | 0.15% | 35 | 0.54% | 47 | 0.73% |
| June 2023 | 6449 | 466 | 7.23% | 399 | 6.19% | 10 | 0.16% | 30 | 0.47% | 45 | 0.70% |
| July 2023 | 6406 | 443 | 6.92% | 394 | 6.15% | 9 | 0.14% | 29 | 0.45% | 45 | 0.70% |
| August 2023 | 6427 | 437 | 6.80% | 386 | 6.01% | 17 | 0.26% | 56 | 0.86% | 86 | 1.33% |
| September 2023 | 6418 | 424 | 6.61% | 378 | 5.89% | 20 | 0.31% | 45 | 0.70% | 112 | 1.74% |
| October 2023 | 6340 | 414 | 6.54% | 352 | 5.55% | 18 | 0.28% | 40 | 0.62% | 114 | 1.80% |
| November 2023 | 6336 | 412 | 6.50% | 327 | 5.17% | 14 | 0.22% | 39 | 0.61% | 115 | 1.81% |
| 2023 Average | 6498 | 520 | 7.97% | 391 | 6.01% | 12 | 0.19% | 38 | 0.58% | 68 | 1.05% |

*OATH Pre-Trial Conferences*

The table below presents the number of *use of force* related pre-trial conferences that were scheduled in each Monitoring Period since July 1, 2020 and the results of those conferences. This data is discussed further in the compliance box for First Remedial Order § C., ¶¶ 4 and 5 (OATH).

| Pre-Trial Conferences Related to UOF Violations | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Results of Pre-Trial Conferences for UOF Cases | | | | | | | UOF Matters & Staff | |
| # Required | Total # Scheduled | # of UOF PTC Scheduled | Settled Pre-OATH | Settled at OATH | On-Going Negotiation | Another Conference | Trial | Other | Admin Filed | # UOF Incidents | # Staff Members |
| July to December 2020 (11th MP) | | | | | | | | | | | |
| 225[135] | 372 | 303 | 0 | 111 | 10 | 44 | 124 | 12 | 2 | 274 | 198 |
| | | 100% | 0% | 37% | 3% | 15% | 41% | 4% | 1% | | |
| January to June 2021 (12th MP) | | | | | | | | | | | |
| 300 | 670 | 541 | 0 | 282 | 4 | 85 | 136 | 33 | 1 | 367 | 331 |
| | | 100% | 0% | 52% | 1% | 16% | 25% | 6% | 0% | | |
| July to December 2021 (13th MP) | | | | | | | | | | | |
| 350 | 575 | 379 | 185 | 87 | 4 | 18 | 58 | 26 | 1 | 284 | 239 |
| | | 100% | 49% | 23% | 1% | 5% | 15% | 7% | 0% | | |
| January to June 2022 (14th MP) | | | | | | | | | | | |
| 900 | 1447 | 989 | 612 | 76 | 3 | 174 | 105 | 3 | 16 | 574 | 417 |
| | | 100% | 62% | 8% | 0% | 18% | 11% | 0% | 2% | | |
| July to December 2022 (15th MP) | | | | | | | | | | | |
| 900 | 1562 | 902 | 621 | 42 | 0 | 153 | 74 | 0 | 12 | 584 | 466 |
| | | 100% | 69% | 5% | 0% | 17% | 8% | 0% | 1% | | |
| January to June 2023 (16th MP) | | | | | | | | | | | |
| 900 | 1337 | 310 | 203 | 40 | 2 | 29 | 29 | 0 | 7 | 214 | 232 |
| | | 100% | 65% | 13% | 1% | 9% | 9% | 0% | 2% | | |

---

[135] The Remedial Order requirement came into effect on August 14, 2020 so was applicable for four and a half months in the Monitoring Period.