Index No.  11 Civ. 5485 (LTS)(JCF)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MARK NUNEZ, et al.,

Plaintiffs,

- against -

CITY OF NEW YORK, et al.,

Defendants.

**MEMORANDUM OF LAW IN OPPOSITION**

***HON. SYLVIA O. HINDS-RADIX***
*Corporation Counsel of the City of New York*
*Attorney for Defendants*
*100 Church Street*
*New York, N.Y.  10007*

*Of Counsel:  Omar J. Siddiqi*
*Tel:  (212) 356-2345*
*Matter No. 2012-025069*

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ........................................................................................ iii

PRELIMINARY STATEMENT ................................................................................. 1

OVERVIEW OF THE DEPARTMENT'S COMMITMENT TO AND PROGRESS
TOWARDS REFORM ............................................................................................... 3

ARGUMENT

    POINT I

        DEFENDANTS ARE NOT IN CONTEMPT OF
        ANY OF THE COURT'S ORDERS ........................................................ 9

        A. Alleged Failure to Implement New Use of Force
           Directive ................................................................................ 11

        B. Alleged Failures Regarding Investigations and
           Discipline ............................................................................. 15

        C. Alleged Failures with Respect to Security .......................... 19

        D. Supervision of Captains, Facility Leadership
           Responsibilities, and Improved Maximized
           Deployment of Staff ............................................................ 20

        E. Alleged Excesses of Emergency Response
           Teams ................................................................................... 23

        F. Allegations Concerning Inmates Under Age 19 ................. 24

        G. DOC is Not in Contempt ..................................................... 25

    POINT II

        A RECEIVERSHIP IS A DRASTIC MEASURE
        THAT IS NOT WARRANTED UNDER THE
        CURRENT CIRCUMSTANCES ........................................................ 26

        A. The Plata Factors ................................................................. 30

           1. The Current State of Affairs in the City's Jails
               Does Not Justify the Appointment of a
               Receiver ...................................................................... 30

**Page**

    2.  Less Extreme Measures of Remediation Have Not Been Exhausted or Proven Futile ................................. 32

    3.  Continued Work to Comply with the Court's Orders Will Not Lead to Confrontation and Delay ............................................................. 34

    4.  The Department Has Strong Leadership ....................................... 35

    5.  There is no Bad Faith ................................................................... 37

    6.  Resources Are Not Being Wasted................................................. 37

    7.  Receivership Will Not Be a Relatively Quick and Efficient Remedy ................................................................. 38

  B.  The PLRA Requires the Court Go No Further Than Necessary to Remedy Constitutional Violations ............................................................................... 38

POINT III

    ARGUMENTS MADE BY AMICI ARE UNAVAILING ....................................................................... 40

CONCLUSION........................................................................................................ 41

## **TABLE OF AUTHORITIES**

**Cases**                                                                                                          **Pages**

A. V. By Versace, Inc. v. Gianni Versace, S.p.A.,
   279 F. Supp. 2d 341 (S.D.N.Y. 2003) ........................................................................... 11

A.V. by Versace, Inc. v Gianni Versace, S.p.A.,
   96 Civ. 9721 (PKL) (THK), 98 Civ. 0123 (PKL) (THK),
   2002 US Dist LEXIS 16323 [S.D.N.Y. Sep. 3, 2002] ...................................................... 11

Brown v. Collier,
   929 F.3d 218 (5th Cir. 2019) ....................................................................................... 37

Brown v. Plata,
   563 U.S. 493 (2011) ...................................................................................................... 37

Cal. Artificial Stone Paving Co. v. Molitor,
   113 U.S. 609 (1885) ........................................................................................................ 9

Chere Amie, Inc. v. Windstar Apparel, Corp.,
   175 F. Supp. 2d 562 (S.D.N.Y. 2001) ......................................................................... 11

In re Chief Executive Officers Clubs, Inc.,
   359 B.R. 527 (S.D.N.Y. 2007) ..................................................................................... 11

Citibank N.A. v Nyland (CF8) Ltd.,
   839 F.2d 93 (2d Cir. 1988) ............................................................................................. 1

Matter of Dickinson,
   763 F.2d 84 (2d Cir. 1985) ........................................................................................... 11

District of Columbia v. Jerry M.,
   738 A.2d 1206 (D.C. 1999) .......................................................................................... 26

Ecopetrol S.A. v. Offshore Exploration & Production LLC,
   172 F. Supp. 3d 691 (S.D.N.Y. 2016) ......................................................................... 10

Frazar v. Ladd,
   457 F.3d 432 (5th Cir. 2006) ....................................................................................... 38

Gucci Am., Inc. v. Weixing Li,
   768 F.3d 122 (2d Cir. 2014) ......................................................................................... 11

Int'l Longshoremen's Ass'n v. Phila. Marine Trade Ass'n,
   389 U.S. 64 (1967) .......................................................................................................... 9

**Cases** **Pages**

Jones v. Gusman,
  296 F.R.D. 416 (E.D. La. 2013)................................................................37

Latino Officers Ass'n City of N.Y. Inc. v. City of New York,
  558 F.3d 159 (2d Cir. 2009).................................................................9

Latino Officers v. City of New York,
  519 F. Supp. 2d 438 (S.D.N.Y. 2007).................................................10

Levin v. Tiber Holding Co.,
  No. 98-CV-8643-SHS, U.S. Dist. LEXIS 13135 (S.D.N.Y. 1999) .........................10

Levin v. Tiber Holding Corp.,
  277 F.3d 243 (2d Cir. 2002)................................................................10

Mingoia v. Crescent Wall Sys.,
  No. 03 Civ 7143 (THK), 2005 U.S. Dist. LEXIS 7463
  (S.D.N.Y. Apr. 26, 2005).................................................................10

Miss Jones LLC v. Stiles,
  No. 17-CV-1450-NSR, 2020 U.S. Dist. LEXIS 224618
  (S.D.N.Y. Dec. 1, 2020)..................................................................10

Missouri v. Jenkins,
  495 U.S. 33, 110 S. Ct. 1651, 109 L. Ed. 2d 31 (1990)...........................26

Mister Softee, Inc. v. Tsirkos,
  No. 14-CV-1975 (LTS) (RLE),
  2014 U.S. Dist. LEXIS 90888 (S.D.N.Y. July 2, 2014) .........................10

Newman v. State of Ala.,
  466 F.Supp. 628 (1979) ....................................................................26

Nunez v. City, et al.,
  No. 11-CV-5845-LTS, ECF No. 511 .................................................25

Perfect Fit Indus. v. Acme Quilting Co.,
  673 F.2d 53 (2d Cir. 1982)...............................................................11

Plata v. Schwarzenegger,
  4:01-CV-01351, 2005 U.S. Dist. LEXIS 43796
  (N.D. Cal. Oct. 3, 2005)................................................26, 27, 29, 31, 32, 34

Plata v. Schwarzenegger,
  603 F.3d 1088 (9th Cir. 2010) ...........................................................26

**Cases**                                                                                   **Pages**

Procunier v. Martinez,
  416 U.S. 396 (1974)...................................................................................................41

Republic of the Philippines v. New York Land Co.,
  852 F.2d 33 (2d Cir. 1988)........................................................................................25

United States v. Chavez
  22-CR303, ECF No. 31 (S.D.N.Y. Jan. 4, 2024).........................................................2

United States v. Hinds County,
  625 F Supp 3d 541 (S.D. Miss. 2022).........................................................29, 30, 33

United States v. N.Y.C. Dist. Council of N.Y.C.,
  229 F. App'x 14 (2d Cir. 2007) .................................................................................10

Zino Davidoff SA v. CVS Corp.,
  No. 06-CV-15332-RJS,(S.D.N.Y Apr. 17, 2008) 2008 U.S. Dist. LEXIS
  36548..........................................................................................................................25

**Statutes**

18 U.S.C. § 3626.................................................................................................29, 37

18 U.S.C. § 3626(a) ....................................................................................................37

**Other Authorities**

Wright & Miller, Federal Practice and Procedure § 2983 ...........................................25

## PRELIMINARY STATEMENT

The City of New York ("the City"), through the New York City Department of Correction ("DOC" or "the Department"), is dedicated to creating a safe and supportive environment while ensuring the rights of the individuals in their care.  With over 6,000 individuals in its custody and more than 6,300 uniformed members of service ("MOS") and some 1,600 non-uniformed employees, DOC operates one of the largest jails in the United States. The Plaintiffs in their motion papers argue that the City and DOC ("Defendants") are in contempt of 18 provisions of the Consent Judgment and subsequent Court Orders in this case.   The Plaintiffs further assert that the appointment of a receiver is necessary to secure relief for the Plaintiff class.  As discussed below, the Plaintiffs are wrong.[1]

A receiver is an extraordinary remedy to be imposed only when no lesser alternatives are adequate to the task.  Citibank N.A.  v Nyland  (CF8) Ltd., 839 F.2d 93, 97 (2d Cir. 1988). As the record shows, that is not the current situation in DOC facilities. DOC has a new Commissioner, Lynelle Maginley-Liddie, who is dedicated to working collaboratively with the Monitor to move the agency forward. She is committed to reform. As the Monitor stated in his February 26, 2024, filing: "[t]he Monitoring Team observed an immediate change in the Department's approach and dynamic in early December 2023 with the appointment of Commissioner Maginley-Liddie. The Department's leadership team is now actively engaging with the Monitor, Deputy Monitor, and the Monitoring Team.  When matters of mutual concern arise, Department leadership seeks input from the Monitor, has been receptive to feedback, and appears open to adapting practices as

---

[1] The Department Of Justice ("DOJ") filed a letter in support of Plaintiffs' motion on November 17, 2023. (ECF No. 604). The instant Opposition is filed in response to the consolidated motion of all Plaintiffs.

necessary." ECF No. 679 at 1-2. Having worked for DOC for eight years, Commissioner Maginley-Liddie knows the agency, its policies, its leaders, and its people.

At the outset, it bears emphasis that the Department's diligent efforts have led to the completion of 52 of the tasks required by the Action Plan and the subsequent Orders in 2023. [2] See Declaration of Commissioner Maginley-Liddie, hereinafter referred to as the "Maginley-Liddie Declaration," annexed to the Declaration of Michael Viviano (hereinafter "Viviano Decl.") as Exhibit A.[3] These efforts are a clear indication that Plaintiffs' allegations of non-compliance and non-diligence have no basis in fact, and that the relief Plaintiffs seek is not warranted.

We recognize, of course, that much work remains to be done to bring DOC up to the standard that we all want. Violence is still high. But jails and prisons across the country are struggling to provide safe and humane conditions for those in their care. Only recently, a Judge in this District lamented the conditions in the Metropolitan Detention Center ("MDC") and the now closed Metropolitan Correctional Center ("MCC"). See United States v. Chavez 22-CR303, ECF No. 31 at 19 (S.D.N.Y. Jan. 4, 2024) (Furman, J) ("[f]or years, the conditions in the federal jails that serve this District…have seen a major, growing, and widely understood problem"). Judge

---

[2] As stated in Exhibit B to the Maginley-Liddie Declaration, DOC has completed provisions (A)(1)(c), (A)(2)(a), (A)(2)(b), (A)(2)(c), (A)(2)(d)(i), (A)(2)(d)(ii), (A)(2)(d)(iii), (A)(2)(e), (A)(2)(f), (A)(2)(f)(i), (A)(3)(a), (A)(3)(b)(ii), (A)(3)(b)(ii)(1), (A)(3)(b)(ii)(2), (A)(3)(b)(ii)(2)(a), (A)(3)(b)(ii)(2)(b), (A)(3)(b)(ii)(3), (A)(3)(b)(ii)(3)(iii), (A)(3)(c), (B)(1), (B)(2), (B)(4), (C)(1), (C)(2), (C)(5), (D)(1), (D)(5), (E)(1), (E)(2), (E)(2)(a), (E)(2)(b), (E)(2)(c), (E)(3)(a), (F)(1), (F)(1)(a), (F)(1)(b), (F)(2)(a)(i)-(iv), (F)(5), (F)(6), (F)(7), and (G)(1) of the Action Plan; provisions (I)(1)(a), (I)(2), (I)(5), (I)(6), (I)(7), (I)(7)(a), (II)(2) of the June 13, 2023 Order; provisions (I)(11), (I)(12), (I)(14) of the August 10, 2023 Order; and provision 1(a) of the December 14, 2023 Order.

[3] All referenced exhibits are annexed to the Declaration of Michael Viviano, dated March 19, 2024, and filed herewith.

Furman called it "ironic, to say the least that even as the [federal government] fails to do what it needs to tend to its own house," it has sought the appointment of an outside receiver to oversee New York City's jail system.  A federal takeover is no magic bullet.  Only hard work will achieve the needed reforms, and, under Commissioner Maginley-Liddie and with the Monitor's input, DOC has been doing, and will continue to do, the work.

## OVERVIEW OF THE DEPARTMENT'S COMMITMENT TO AND PROGRESS TOWARDS REFORM[4]

As detailed below and in the accompanying Declarations of members of the Department's Senior leadership, as well as Dr. James Austin, an outside corrections expert approved by the Monitor, a receivership is not required, as significant progress has been made by DOC to achieve substantial compliance with the Court's Orders.

Commissioner Maginley-Liddie is committed to taking the necessary steps to ensure the safety of the staff and people in the Department's care. At the Commissioner's direction, additional funding has been secured for programs to serve individuals in custody; senior department leadership have begun touring the facilities daily; initiatives to reduce violence are in active development in consultation with both the Monitor and outside experts; and efforts to recruit and train new employees are being enhanced. Working with the Monitor, the Department has developed a set of metrics for use of force, security, and violence that will help better identify

---

[4] For a complete statement of the facts relevant to Defendants' opposition to Plaintiffs' motion, Defendants respectfully refer the Court to Defendants' Statement of Material Facts, dated March 19, 2024 ("Def. SOMF"), submitted concurrently herewith.

trends and patterns and develop anti-violence strategies. See, generally, Maginley-Liddie Declaration, Exhibit A.

The Department's focus on using quantitative data to advance decision-making and problem solving is discussed in the Declaration of Timothy Kepler, Associate Commissioner ("AC") in the Office of Management, Analysis, and Planning ("OMAP"). See, generally, AC Timothy Kepler, hereinafter referred to as the "Kepler Declaration," annexed to the Viviano Decl. as Exhibit B. OMAP, which was first established at DOC in 2022, conducts data analysis to inform DOC's operations and to support strategic planning. Among other things, OMAP tracks data regarding violence in DOC's facilities. OMAP's analyses unequivocally demonstrate that violence is on a downward trend with 20 percent fewer slashings and stabbings in 2023 when compared to 2022 and 14.7 percent fewer assaults on staff comparing the same periods. See, generally, id.

The Department's commitment to further reducing violence is detailed in many of the accompanying Declarations. Through enhanced training efforts, DOC is developing its supervisory ranks and reinforcing the skills of all staff. In partnership with the Monitor, Acting Deputy Commissioner of Training and Development Jeremiah Johnson has overseen the development of DOC's curriculum for training new captains. Fifty new captains are expected to have completed this training by the end of April. Similar training modules are being developed for new Assistant Deputy Wardens ("ADWs") and will be submitted to the Monitor for approval in June. DOC is also the first correctional system to receive assistance from the Collaborative Reform Initiative Technical Assistance Center of the Department of Justice ("CRI-TAC") to further develop training for supervisors and leaders. Monitor approved curriculum for DOC's Use of Force ("UOF") policy and Defensive Tactic field training has been in use since August 2023 with more than 600 members of service having already completed this refresher training. Numerous

other requests for retraining have been fulfilled. See, generally, Declaration of Jeremiah Johnson, Ph.D., hereinafter referred to as the "Johnson Declaration," annexed to the Viviano Decl. as Exhibit D.

Each day, DOC staff conduct safety inspections and identify items that need to be addressed by the Department's Facility Maintenance and Repair Division ("FMRD"). Among the highest priority repairs are those to cell doors and locks. Since January 1, 2023, FMRD has repaired over 1,700 doors and locks across four facilities, in addition to numerous other facility security upgrades. See, generally, Declaration of Patrick Benn, Deputy Commissioner of the FMRD, hereinafter referred to as the "Benn Declaration," annexed to the Viviano Decl. as Exhibit K.

Staff deployment is more effective and efficient due to the work of Deputy Commissioner ("DC") of Administration Ronald Edwards and his Scheduling Management and Redeployment ("SMART") unit. Using a new electronic scheduling system, this team can readily see unstaffed posts and redeploy officers as needed. As a result, unstaffed priority posts have been eliminated. The Department has also increased the presence of supervisors in the housing units by redeploying the Deputy Wardens ("DWs") and ADWs to increase coverage in the evenings and on weekends. See, generally, Declaration of DC Ronald Edwards, hereinafter referred to as the "Edwards Declaration," annexed to the Viviano Decl. as Exhibit I.

DOC recognizes that emergent adults – those between 18 and 21 years old - need additional support. First Deputy Commissioner ("FDC") Francis Torres has served in several positions with the Department and has dedicated much of her time to the emergent adult population. Her focus has been on developing and implementing a direct supervision model where emergent adults are supervised by steady staff. Currently the Department is beginning to implement the Monitor-

approved RNDC Programs Action plan which is based on the direct supervision model and will have, among other things, targeted programming, and specially trained staff. See, generally, Declaration of FDC Francis Torres, hereinafter referred to as the "Torres Declaration," annexed to the Viviano Decl. as Exhibit J.

Another priority is developing systems to prevent deaths by suicide and to reduce self-harm incidents among the incarcerated population. Deputy Commissioner for Health Affairs, Compliance and Quality James Saunders works with Correctional Health Services ("CHS") (a part of the New York City Health and Hospitals Corporation) to achieve these goals through three working groups: the In-Custody Death Joint Assessment and Review ("JAR"), comprised of DOC, CHS, and Law Department leadership who meet at two, seven, and thirty day intervals post in-custody death; the Suicide Prevention Task Force, which is also comprised of DOC and CHS leadership, and meets monthly to identify opportunities for improvements in custodial care; and the Self-Inflicted Harm Subcommittee under the Task Force, which meets weekly to review incidents of self-harm from the prior week. Further, in 2023, after receiving approval from the Monitor, DOC hired Dr. Timothy Belavich, a nationally recognized expert as a consultant to provide technical assistance on the improvement of its suicide prevention initiatives. Dr. Belavich concluded that DOC has made significant efforts in suicide prevention over the past twelve months and made several recommendations which are being implemented. See, generally, Declaration of DC James Saunders, hereinafter referred to as the "Saunders Declaration," annexed to the Viviano Decl. as Exhibit L.

Working with Dr. James Austin, an expert in the field of correction, classification, restricted housing programs, pretrial risk assessments, and rehabilitation programs, the Department has successfully implemented the new and more effective Enhanced Supervision

Housing program (now referred to as RESH). RESH is a housing program for individuals who have been found by a hearing officer to have committed a violent act. Those individuals pose a threat to the safety and security of staff and other incarcerated individuals and need to be separated from the general population. DOC is also working with Dr. Austin to develop two new violence reduction programs: the first is a pilot housing program in the Otis Bantum Correctional Center ("OBCC") Annex for individuals with a demonstrated propensity for violence; the second, in conjunction with CHS, is a program to house individuals who have committed a violent offense and do not meet the criteria for placement in RESH because of their serious mental illness. See Declaration of James Austin, Ph.D., hereinafter referred to as the "Austin Declaration," annexed to the Viviano Decl. as Exhibit H.

Under the leadership of Ronald Brereton, Deputy Commissioner of Security Operations, DOC has initiated enhanced screening initiatives to assist in stemming the flow of contraband into the facilities, including front entrance staff body scanning at three facilities with more to follow, and cell phone detection systems at each facility. Robust searches for weapons and contraband are occurring in the facilities: in 2023 the searches resulted in the recovery of 1,075 improvised jail weapons, 55 cell phones, 273 dangerous articles, and 4,496 drug seizures, including fentanyl. Active work is underway with respect to key control policies (to ensure all keys in circulation are accounted for and operational), upgrading cell doors so that they are properly secured, ensuring staff remain on-post, and preventing crowding in vestibules. See, generally, Declaration of DC Ronald Brereton, hereinafter referred to as the "Brereton Declaration", annexed to the Viviano Decl. as Exhibit C. Tours of housing units are improving, as demonstrated by increased usage of Tour Wands (which are a tool used by staff to track and log housing unit tours). See, generally,

Declaration of Captain Gamien Batchelor, hereinafter referred to as the "Batchelor Declaration," annexed to the Viviano Decl. as Exhibit G.

Finally, significant work is being done to ensure that staff are held accountable and, when necessary, timely and appropriate discipline is imposed. Use of Force incidents are reviewed close in time to the incidents to track trends and identify any potential need for discipline, and referrals are made to the UOF Investigations Division ("ID") as necessary. See Brereton Declaration, Exhibit C. Under the leadership of Deputy Commissioner Yvonne Pritchett of the Department's UOF Investigations Division, all UOF incidents are independently reviewed by an investigatory team. ID leadership regularly reinforces to its staff the importance of investigations being thorough, fair and objective – conducted "without fear or favor' - through interactive learning sessions and other training initiatives. In addition, quality assurance teams review completed investigations. See, generally, Declaration of DC Yvonne Pritchett, hereinafter referred to as the "Pritchett Declaration," annexed to the Viviano Decl. as Exhibit E.

In some cases, following the completion of an investigation, a matter will be referred to DOC's Trials Division to pursue formal discipline. The backlog of disciplinary cases that existed when current Deputy Commissioner for Trials Solange Grey began her tenure in 2022 has now been significantly reduced, with the small percentage of unresolved backlog cases being against members of service who are currently on leave. See, generally, Declaration of DC Solange Grey, hereinafter referred to as the "Grey Declaration," annexed to the Viviano Decl. as Exhibit F.

As the Monitor has acknowledged, reform in correctional facilities is challenging, and when changes are made, they must be incremental, well-reasoned, and allow for steady improvements that accumulate over time. See Monitor April 3, 2023, Report, ECF No. 517, at 1.

Well-reasoned improvements in the City's jails are underway. The imposition of a receiver would introduce uncertainty and potentially remove an effective Commissioner from her role, frustrating DOC's current progress.

## ARGUMENT

## POINT I

## DEFENDANTS ARE NOT IN CONTEMPT OF
## ANY OF THE COURT'S ORDERS

Contempt is not a remedy for a court to use lightly, nor is it a remedy that a court should impose when a party is making efforts to comply with Court Orders. Indeed, a contempt order is a "potent weapon" that is inappropriate if "there is a fair ground of doubt as to the wrongfulness of the defendant's conduct." Latino Officers Ass'n City of N.Y. Inc. v. City of New York, 558 F.3d 159, 164 (2d Cir. 2009) (quoting Int'l Longshoremen's Ass'n v. Phila. Marine Trade Ass'n, 389 U.S. 64, 76 (1967); Cal. Artificial Stone Paving Co. v. Molitor, 113 U.S. 609, 618 (1885)). The District Court's discretion is limited and should be reserved for appropriate circumstances. See Levin v. Tiber Holding Co., No. 98-CV-8643-SHS, (S.D.N.Y. 1999) U.S. Dist. LEXIS 13135; see also Miss Jones LLC v. Stiles, No. 17-CV-1450-NSR, (S.D.N.Y. Dec. 1, 2020) 2020 U.S. Dist. LEXIS 224618; Ecopetrol S.A. v. Offshore Exploration & Production LLC, 172 F. Supp. 3d 691 (S.D.N.Y. 2016); Latino Officers v. City of New York, 519 F. Supp. 2d 438 (S.D.N.Y. 2007).   As this Court recently noted, where the alleged contemnor makes efforts to comply with Court Orders, even if those efforts are delayed or spurred by external actors, the Court may properly exercise its discretion to decline to find the alleged contemnor in civil contempt. See ECF No. 511 at 27.

The movant seeking a contempt of court order bears the burden of demonstrating that "(1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of

noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner." Id. (quoting United States v. N.Y.C. Dist. Council of N.Y.C., 229 F. App'x 14, 18 (2d Cir. 2007)).  The burden of proof is on the party seeking to hold the other in civil contempt and is satisfied by the production of "clear and convincing" evidence, requiring a quantum of proof adequate to demonstrate a 'reasonable certainty' that a violation has occurred."  See Levin v. Tiber Holding Corp., 277 F.3d 243, 250 (2d Cir. 2002); see also Mister Softee, Inc. v. Tsirkos, No. 14-CV-1975-LTS-RLE, (S.D.N.Y. July 2, 2014), 2014 U.S. Dist. LEXIS 90888.

Courts in this district have made findings of contempt in those situations where the movant shows evidence that the alleged contemnor made no good faith effort to comply with the underlying Order, offered no reasonable excuse for their non-compliance, and gave no assurances as to future compliance. See Mingoia v. Crescent Wall Sys., No. 03 Civ. 7143 (THK), 2005 U.S. Dist. LEXIS 7463 (S.D.N.Y. Apr. 26, 2005); Chere Amie, Inc. v. Windstar Apparel, Corp., 175 F. Supp. 2d 562, 567 (S.D.N.Y. 2001).

The primary purpose of a finding of civil contempt, and the imposition of related remedies, is to coerce the contemnor into future compliance and to remedy past non-compliance, rather than to punish the contemnor. Matter of Dickinson, 763 F.2d 84, 87 (2d Cir. 1985); In re Chief Executive Officers Clubs, Inc., 359 B.R. 527, 534 (S.D.N.Y. 2007).  Any sanction imposed by this Court for contempt must be calculated with those goals in mind. See A. V. By Versace, Inc. v. Gianni Versace, S.p.A., 279 F. Supp. 2d 341, 354 (S.D.N.Y. 2003); see also Perfect Fit Indus. v. Acme Quilting Co., 673 F.2d 53, 56-57 (2d Cir. 1982). Importantly, "constitutional considerations limit the Court's ability to award sanctions that may be deemed punitive in nature." A.V. by Versace, Inc. v Gianni Versace, S.p.A., 96 Civ. 9721 (PKL) (THK), 98 Civ. 0123 (PKL) (THK))

2002 US Dist LEXIS 16323, at *23 (S.D.N.Y. Sep. 3, 2002); see also Gucci Am., Inc. v. Weixing Li, 768 F.3d 122, 144 (2d Cir. 2014).

With these legal principles in mind, we now address each of the provisions of the Court's Orders that Plaintiffs allege Defendants have failed to obey. As fully detailed below, Plaintiffs have not established that the Defendants are in contempt of any of those provisions of the Court's Orders. Thus, the Court should deny Plaintiffs' motion for contempt.

A. Alleged Failure to Implement New Use of Force Directive

Plaintiffs first allege that Defendants are in contempt of the Consent Judgment's requirement in § IV, ¶ 1 to Implement a New Use of Force Directive. While acknowledging that in 2017 Defendants developed and adopted a comprehensive UOF Directive, Plaintiffs assert that this Directive has not been properly implemented, leading the Monitor to consistently find that Defendants are non-compliant with this requirement of the Consent Decree. In support of this allegation, Plaintiffs point to the quantity of uses of force by the Department, as well as the nature of force used. See Memorandum of Law in Support of Plaintiffs' Motion for Contempt and Appointment of a Receiver ("Pl. Mem."), ECF No. 603 at 14.

As an initial matter, as demonstrated in the Kepler Declaration, the definition of "use of force" has shifted considerably since 2016. See Kepler Declaration, Exhibit B at ¶¶ 9-10. Indeed, "[u]nder DOC's policy, use of force is defined broadly: any time an officer makes contacts a non-compliant individual to compel behavior, it counts as a use of force, no matter how slight the contact…. This definition greatly expands the number of uses of force incidents, well beyond those previously reported. Because of the change in definition, any comparison of 2016 and today is flawed." See id. at ¶¶ 9-13. The more significant measure is uses of force that result in injury to an

incarcerated individual (class A and B uses with A the more serious). The injury classification of all use of force incidents are reviewed by the ID during the course of their investigation. If ID discovers additional information that requires a classification change, the recommendation is sent to the Office of Security, where evidence is reviewed, and incidents are reclassified if necessary. With the acknowledgement that incidents in the latter months of 2023 may be reclassified, there has been a meaningful decrease in the number of Use of Force incidents that result in injury. The number of incidents classified as "A" or "B" in the last six months of 2023 are lower than the first six months of 2023 both in the total number and in the proportion of total uses of force.  Referencing total uses of force, as Plaintiffs repeatedly do, paints a distorted picture." Id. at ¶ 9.

The increase in the reported number of uses of force can also be associated with the increased surveillance cameras in the facilities. In 2016, DOC had a limited number of stationary surveillance cameras in its facilities. Now, activity in nearly all areas of the jails is captured on stationary camera. Surveillance cameras offer an objective view of each incident, encouraging staff to be candid about their actions and affording supervisors the opportunity to observe events and identify misconduct. What occurred "off camera" in 2016 is now seen on camera. Id. at ¶ 13. For this reason as well, any comparison between uses of force prior to 2017 and those occurring now is flawed.

A significant shift in the population in the Department's care further explains why any comparison to 2016 is misguided. As the Commissioner states in her Declaration: "[i]n their papers, plaintiffs repeatedly compare data from 2023 with that from 2016 to show that violence in DOC facilities has increased greatly.  But there are reasons to question the comparison.  The first factor is bail reform legislation that went into effect January 2020.  With bail reform, the

Department now houses individuals who are in its custody predominantly on charges of committing violent crimes.  As of February 27, 2024, 28.6 percent of pre-trial detainees are being held on homicide charges; 11.8 percent on serious assault charges; 14.1 percent on robbery charges; and 7.8 percent on weapons charges. That is a total of 62.3 percent.  By comparison on January 1, 2016, those held on homicide charges comprised 14.1 percent of detainees; serious assault charges, 9.1 percent; robbery charges, 14.4 percent; and weapons charges, 6.3 percent – a total of 43.9 percent. Gone in 2024 are recidivist shoplifters, low level drug dealers and fraudsters, who populated Rikers jails in earlier years." <u>See</u> Commissioner Maginley-Liddie Declaration, Exhibit A, at ¶ 24.  This sea change in the population must be factored into any comparison that is made with regard to indicators of violence in DOC facilities.

Another important factor is the time detainees are spending in DOC's care now as compared to 2016. In 2016 the average length of stay was 59 days, while in January 2024, it is 101 days. As of March 1, 2024, there are 508 detainees who have been in custody for more than two years. <u>See</u> <u>id.</u> at ¶ 30. Lengthy stays in custody can breed violence, as grievances and rivalries fester; of course the time that pre-trial detainees spend in custody is not in the Department's control. <u>See</u> <u>id</u>.

Significantly, when comparing the apex of the COVID-19 staffing crisis to today, uses of force are decreasing. For example, in his July 10, 2023, Report, the Monitor indicated that the Department's average monthly use of force rate from January-May 2023 was 25 percent lower than at the apex of the COVID-19 and Staffing "crisis" in 2021. <u>See</u> ECF No. 557 at 15-16.

In his December 22, 2023 Report, the Monitor stated that "[s]ubstantially reducing the frequency of unnecessary and excessive uses of force will require quality training and supervision,

strict adherence to sound security practices, and reliable and appropriate staff discipline." ECF No. 666 at 23-24. As Deputy Commissioner Brereton states in his Declaration, Department leadership is engaged in conducting Rapid Reviews of uses of force within 24 to 48 hours of their occurrence. Brereton Declaration, Exhibit C, at ¶ 6. If a use of force is outside of policy, the involved staff are held accountable. See id. at ¶ 10. As to the nine uses of force that were specifically mentioned by Plaintiffs in their memorandum of law,[5] "each of the incidents has been or is being investigated, and, with the exception of two open cases, discipline has been issued in each case." Id. at ¶ 10.

Furthermore, as Acting Deputy Commissioner Jeremiah Johnson states, since August 2023, DOC has been doing in-service training on its UOF policy and defensive tactics. This training program, which is Monitor-approved, is substantial and 600 Members of Service have completed this training. See Johnson Declaration, Exhibit D at ¶ 7. The Department has also, since May 2023, been conducting a field training program for probationary officers to immerse them in real-life situations so they are better prepared for their jobs. See id. at ¶ 8. Finally, and significantly, on February 28, 2024, the Monitor approved refresher training for the Emergency Services Unit ("ESU"), which will be conducted quarterly to ensure that ESU officers are re-trained on search and escort procedures. See id. at ¶ 9.

There is no question that DOC is working diligently to further comply with the Use of Force provisions of the Consent Judgment and reduce excessive, unnecessary, and avoidable uses of force. Key control is being improved; post orders are being audited; multiple strategies are being implemented across DOC, such as the Employee Post Attendance System ("E.P.A.S.") and In-

---

[5] P. Mem., ECF No. 603 at 15-16.

Time, to address post abandonment; and solutions to the problem of crowding in vestibules and other "hotspots" zones are being implemented. <u>See</u> Brereton Declaration, Exhibit C, at ¶¶ 21-30.

B. <u>Alleged Failures Regarding Investigations and Discipline</u>[6]

As demonstrated herein, Defendants have been working in good faith to comply with the provisions of the Court's Orders regarding the imposition of timely and meaningful discipline. Plaintiffs allege that Defendants do not conduct thorough and objective use of force investigations. Specifically, they cite to the Monitor's Reports between 2015 and 2022 to demonstrate what they allege is a pattern of backsliding ending in a "non-compliance" rating in the Fifteenth Monitoring Period. Pl. Mem. at 19. At times, Plaintiffs appear to argue that it is lack of disciplinary action that is the problem, not the investigative process itself, and in other places they appear to attack the investigative process. Pl. Mem. at 18-19. Regardless of which standard they are advocating, Plaintiffs cannot rebut the actual evidence regarding DOC's efforts at improving the thorough, timely, and objective conducting of investigations.

ID is responsible for the independent review of all UOF incidents and tasked with conducting fair and impartial investigations to ensure that its conclusions are in accordance with DOC policy. <u>See</u> Pritchett Declaration, Exhibit E at ¶ 5.  DOC has been striving to improve the operations of ID. The Declaration of Deputy Commissioner Yvonne Pritchett sets forth the steps DOC has taken to ensure the quality of investigations. As DC Pritchett explains, the leadership of

---

[6] Plaintiffs allege that Defendants are in contempt of: 1) Consent Judgment, § VII, ¶ 1: Thorough, Timely, Objective Investigations; 2) Consent Judgment, § VII, ¶ 9(a): Timeliness of Full ID Investigations; 3) Consent Judgment, § VII, ¶ 11: ID Staffing; and 4) Consent Judgment, § VIII, ¶ 1: Appropriate and Meaningful Discipline.

the division continuously emphasizes that investigations should be thorough, objective, timely, and conducted "without fear or favor." Id. at ¶ 12.

ID reviews UOF incidents based on complaints received from a number of sources. See id. at ¶ 5. Its Intake Unit reviews all UOF incidents and is charged with completing investigations within 25 days. See id. at ¶ 6. Full ID investigations are required in the more serious cases of uses of force. See id. at ¶ 8. Under DC Pritchett, DOC has initiated a process for compiling and tracking a significant number of UOF reports. This process has been praised by the Monitor, who stated that "the Department maintains a centralized, reliable, and consistent process for submitting and tracking UOF Reports, which has also supported the Department's ability to consistently report on its progress with respect to the submission of UOF reports." Monitor's December 22, 2023, Report, ECF No. 666 at 27.

Further, DC Pritchett has taken steps to establish quality assurance teams to review completed investigations and make sure that they were properly resolved. See id. at ¶ 14. To maintain quality investigations, one third of all cases closed with no charges are reviewed by a senior supervisor.  In the past three months, ID reviewed 40 percent of the investigations that were closed with no charges. See id. at ¶ 15.  Where an investigation was deemed to have been closed incorrectly, the investigation was closed properly. Since the inception of the quality reviews, seven out of forty-six cases were sent back for further investigation. See id. DOC continues to strive to ensure that these investigations are of a high quality. See id. at ¶ 11.

Tellingly, within the last Monitoring period, an intake investigation was conducted for every use of force incident, and 99 percent of all intake investigations were closed within 30

business days of the incident, a positive step toward DOC's goal of a 25-day timeline for investigations. See id. at ¶ 13; Monitor December 22, 2023, Report, ECF No. 666 at 35.

In her Declaration, DC Grey provides further insight into DOC's commitment to accountability and timely and meaningful discipline. The Trials Division is responsible for bringing formal charges and seeking the discipline of uniformed members of service who violate any of DOC's Rules and Regulations or New York State and City laws, whether on or off duty. See Declaration Grey, Exhibit F, at ¶ 4. After the First Remedial Order, there was a backlog of 750 cases requiring immediate attention, and thereafter the Monitor identified an additional 285 backlogged cases in which the underlying incident occurred between January 2021 to June 2022. See id. at ¶¶ 18, 20. DOC has processed and adjudicated 95 percent of the 750 backlogged cases; the only cases remaining are those held in abeyance due to members of service being out on approved leave. See id. at ¶ 18, 20. 98 percent of the 285 cases identified have been resolved. See id. at ¶ 21. Of the 386 cases involving staff on extended medical leave, DOC has resolved 96 percent of those cases that were identified by the Monitor. See id. at ¶¶ 22-23. With regard to the 341 medical incompetence cases identified as a priority by the Monitor, DOC has resolved 98 percent of those cases. See id. at ¶ 25. Trials has reduced the total number of outstanding cases at DOC by 43 percent from November 2022 to November 2023. See id. at ¶ 26. Furthermore, in 2023, Trials calendared an average of 201 pre-trial conferences at the Office of Administrative Trials and Hearings ("OATH") each month, which goes beyond the Court's Order of 150 cases a month. See id. at ¶ 27. This has been no small task. Although Plaintiffs choose to omit this clear metric of compliance, it makes abundantly clear that there is no possible rational basis for finding contempt regarding the timeliness of discipline.

As to the allegations of staffing shortages made by Plaintiffs (Pl. Mem at 21), those too fall far below the threshold level for finding contempt. Plaintiffs state that Defendants are in contempt because they have not staffed ID with 85 investigators and 21 supervisors as recommended by the Monitor. But ID has: (1) increased the number of ID investigators to 77; (2) increased the number of supervisors to 18; and (3) promoted five investigators to supervising investigators. See Pritchett Declaration, Exhibit E at ¶ 14.  Furthermore, it has been making concerted efforts to recruit more individuals to work within ID. See id. Trials has hired ten new attorneys, five directors, one managing director, three investigators, three principal administrative assistants, and four legal coordinators. See Grey Declaration, Exhibit F, at ¶ 28.

Plaintiffs make several allegations concerning DOC's use of command disciplines, alleging that they are a lenient form of punishment used in lieu of actual discipline in an effort to let MOS go unpunished. Pl. Mem. at 22-24. At the Commissioner's direction, however, DOC has developed a new command discipline policy which centralizes command discipline in a new unit, the Informal Charges and Discipline Unit ("ICDU"). See Maginley-Liddie Declaration, Exhibit A, at ¶ 50. This new policy will have ADWs assigned to the unit conduct disciplinary hearings rather than the facilities. See id. at ¶ 49. This approach is already operating in three facilities. See id. at ¶ 51. It has been reviewed by the Monitoring team, which has been generally supportive See id. at ¶ 52.

C.  Alleged Failures with Respect to Security[7]

Plaintiffs focus on Nunez Compliance Unit (hereinafter "NCU") audits conducted from January to October 2023, which point out security lapses in facilities. Defendants do not contest those findings but submit that the findings do not relate to the sections of the Second Remedial Order and Action Plan that Defendants have supposedly violated. Further, DOC is working to address the NCU findings.

DOC is engaged in a multi-pronged approach to address the challenges to security presented in its facilities.  As an initial matter, there is a plan to reduce violence at RNDC, where the Department's youngest incarcerated individuals are housed. See Exhibit A, at ¶¶ 32-34. Importantly, the Monitor has approved this program, and the Department has begun implementation. See id., at ¶ 34.

DOC is also improving its search procedures. As DC Brereton states, DOC has improved the number and quality of searches that it is conducting. See Brereton Declaration, Exhibit C at ¶ 18. As a result of those increased efforts, from January 1, 2023, to December 31, 2023, the following items were found in searches: 1,075 improvised jail weapons, 55 cell phones, 273 dangerous articles, and 4,496 drug seizures, many including fentanyl. See id., at ¶ 19. The Department has also undertaken other initiatives to stem the flow of contraband into the facilities. See id., at ¶ 20.

_____

[7] Plaintiffs allege that Defendants are in contempt of the following provisions: 1) Second Remedial Order, ¶1(i)(a): Interim Security Plan; 2) Action Plan, § D, ¶ 2(a), (d), (e), and (f): Improved Security Initiatives; and 3) Action Plan, § A, ¶1(d): Improved Routine Tours.

Captain Gamien Batchelor sets forth in her Declaration the steps DOC has taken to improve its touring practices. DOC utilizes a tool called a Tour Wand to track and log housing unit tours. See Batchelor Declaration, Exhibit G at ¶ 2. Captain Batchelor and her team operate a Tour Wand Report Dashboard that allows them to create daily reports to determine the integrity of tours that were conducted at each facility. See id., at ¶ 3. DOC also engages in Tour Wand audits, which consists of a team reviewing whether an officer completed their tour based not only on the Tour Wand data, but also on Gentec video footage. See id., at ¶ 4. Officers who are failing to engage in required touring are held accountable. See id., at ¶ 5.

Moreover, the Commissioner has instituted a policy requiring all non-uniformed and uniformed senior leadership to tour facilities each weekday. See Maginley-Liddie Declaration, Exhibit A at ¶¶ 11-12. This policy has already led to improvements in the lives of incarcerated individuals as evidenced by the actions of the Acting Deputy Commissioner ("ADC") of Information Technology's demonstrated during his facility tour. Id. at 13. When he learned that incarcerated individuals were not able to make phone calls, he solved the problem by having the pins reset and an additional phone added. Id. at 13.

In 2021, the Department hired Dr. James Austin to assist its efforts to reduce violence. In collaboration with Dr. Austin and the Monitoring Team, the Department has restructured its classification system to ensure incarcerated individuals are placed in the correct housing unit and instituted a blended housing approach. The blended housing approach ensures that no gang is dominant in a housing area. See, Austin Declaration, Exhibit H at ¶¶ 1-3, 18-20. As noted, Dr. Austin is working with the Department to develop the OBCC Annex Pilot Program and the BHU.

D.  <u>Supervision of Captains, Facility Leadership Responsibilities, and Improved Maximized Deployment of Staff</u>

Plaintiffs allege that DOC has failed to take critical steps to ensure that its supervisory and leadership regimes are adequate to comply with the Court's Orders. They ground their arguments in the provisions of the First Remedial Order, § A, ¶¶ 2&4 and Action Plan, § C, ¶ 3 (ii), (iii), (v), (vi), and (vii). As the Declaration of Deputy Commissioner Ronald Edwards demonstrates, however, these allegations are not rooted in the reality on the ground at DOC facilities. <u>See</u>, <u>generally</u>, Edwards Declaration, Exhibit I. There has been a steady pace of work to comply with these provisions of the Court Orders.

In his Declaration, DC Edwards sets forth the steps DOC has taken to maximize deployment of staff.  To better track those who can work and those who are on leave, and to engage in advanced planning, DOC has moved away from a paper-based system and invested in technologically advanced platforms to facilitate effective scheduling. <u>See</u> Edwards Declaration, Exhibit I, at ¶ 3. It also has instituted an attendance scanning system to monitor staff who report daily for duty, which allows for increased coverage of assigned daily posts. <u>See</u> <u>id.</u> at ¶ 4. This effort has allowed DOC to optimize staff deployment, help control overtime, and ensure that proper coverage is maintained. <u>See</u> <u>id.</u>  As a result of these efforts, there has been a significant decrease in the number of unstaffed priority posts per day: that number was at 31 per day in May 2022, and is now none. <u>See</u> <u>id.</u> at ¶ 5.

DOC is seeking to address the Monitor's concerns regarding awarded posts. Since May of 2023, the total number of awarded posts has decreased by 30 percent.  <u>See</u> <u>id.</u>, at ¶ 9. The analysis of, and reduction in awarded posts is a matter that the Commissioner is engaging with the Monitor

on in an attempt to come to a shared position. <u>See</u> Maginley-Liddie Declaration, Exhibit A, at ¶ 58.

Furthermore, regarding civilian posts, DOC identified 10 uniformed officers that were previously assigned to purely civilian timekeeping roles and reassigned them to incarcerated individual facing posts within facilities. <u>See</u> <u>id.</u> at ¶ 16.

As to the Action Plan's requirement that DOC enhance leadership supervision within facilities by increasing the presence of Captains and ADWs, DOC has made considerable strides. <u>See</u> Edwards Declaration, Exhibit I at ¶¶ 11-14. DWs that were previously assigned 5x2 schedules in which they had weekends off now are required to work at least one weekend day. <u>Id.</u> at ¶ 11. Additionally, ADWs have been redeployed in a manner that ensures an equal number of supervisors are assigned to morning and night shifts. <u>See</u> <u>id.</u> at ¶ 12. This modification means that supervisory staff are in the housing facilities at night and on weekends when especially needed. <u>See</u> <u>id.</u>

Moreover, the Department's supervisory ranks are growing. Since June 2022, the Department has increased the number of ADWs from 67 to 91. Since March 15, 2023, the Department has promoted 24 officers to Captain (the first promotions in five years), and 50 more officers are slated to be promoted this spring. In addition, since June 2022, 44 Captains previously in non-facility assignments have been redeployed to posts in the jails. <u>See</u> <u>id.</u>, at ¶ 14. In an effort to better integrate supervisors into the operations of facilities, DOC has moved the Tour Commander into the facilities Control Centers, where they can better provide direct supervision. <u>See</u> <u>id.</u>, at ¶ 15.

DOC is also making efforts to better train Captains. Acting Deputy Commissioner Jeremiah Johnson has overseen the development of DOC's curriculum for training new Captains. <u>See</u>

Johnson Declaration, Exhibit D at ¶ 4.  This training must be completed before any individual is promoted to the rank of Captain. Comprised of 21 training modules, it was approved in its entirety by the Monitor on February 21, 2024. See id. Twenty-five new captains will be trained on this curriculum this month, with a second cohort of 25 being trained in April. See id. at ¶ 5. By summer 2024, there should be 50 new Captains on the job. See id. DOC is now working with the Monitor on finalizing training for new ADWs. See id. at ¶ 6.

E.   Alleged Excesses of Emergency Response Teams

DOC has taken steps to improve the deployment and use of its Emergency Response Teams (the Emergency Services Unit ("ESU") and the Strategic Response Team ("SRT"). As Deputy Commissioner Brereton explains in his Declaration, DOC is committed to resolving issues through the use of interpersonal communication skills, de-escalation tactics, and facility resources before resorting to the use of an extra-facility Emergency Response Team.  See Brereton Declaration, Exhibit C, at ¶ 13. Moreover, DOC has proposed to the Monitor a restructuring of facility alarms where the activation of ESU only occurs for the most serious disturbances. DOC, in consultation with the Monitoring Team, is also revising its screening process for assignments to ESU and SRT. See id. at ¶ 14. The goal of the revised screening is to ensure that those who are assigned to these units are experienced and trustworthy. See id. Further, since the Summer of 2023 no members of service have been added to ESU.  See id.

F.   Allegations Concerning Inmates Under Age 19[8]

Plaintiffs argue that Defendants are in contempt regarding several provisions having to do with 18-year-olds in custody; these allegations are not supported by the record.

As FDC Torres explains in her Declaration, DOC has undertaken efforts to enhance conditions and services for this segment of its population. See, generally, Torres Declaration, Exhibit J. For example, in November 2021, DOC opened School Houses for emergent adults who are dedicated to advancing their formal education, which now include courses with Columbia University. See id. at ¶ 4. In June 2022, DOC sponsored a Fatherless No More Initiative which lasted five months to address fatherhood issues among emergent adults. See id. at ¶ 5.

In February 2022, DOC unveiled the RNDC Violence Reduction Plan. See id. at ¶¶ 8-9. As described in FDC Torres' Declaration, the plan resulted in a 57 percent decrease in stabbings and slashings at RNDC when comparing the first six months of 2023 to the first six months of 2022. See id. at ¶ 10. In the fall of 2023, however, slashings and stabbings at RNDC increased, partly because staffing was reduced due to other organizational needs. See id. at ¶¶ 11. DOC has now taken steps to address this increase through the development of the RNDC Programs Action Plan, which has been approved by the Monitor and is now being implemented. See id. at ¶12. Importantly, the program is based on the Direct Supervision Model and seeks to create cohesive housing units with a steady cadre of staff regularly assigned to the same emerging adults repeatedly to build rapport and trust.  See id.. The ratio of staff to emergent adults in the new units will again

---

[8] Specifically, Plaintiffs state that Defendants are in contempt of 1) Consent Judgment § XV, ¶ 1; 2) Consent Judgment § XV, ¶ 12; Consent Judgment § XV, ¶ 17; 3) First Remedial Order, § D, ¶ 1; and 4) First Remedial Order, § D, ¶ 3; 3(i).

be 1 to 15. Only those staff who expressed interest have been chosen to be part of this program after a careful selection process. See id. at ¶¶ 13.

G. DOC is Not in Contempt

As set forth above, Plaintiffs have not made the requisite showing to demonstrate that Defendants are in contempt of any of the Court Orders. Rather, the record makes clear that Defendants have made, and continue to make, improvements to move towards compliance with the terms of the Consent Judgment and its subsequent Orders.

Defendants submit that the instant situation is akin to when the Court declined to find contempt pertaining to DOC's Intake Tracking Clause. In that Opinion, the Court stated that "[g]iven the Department's recent progress in working toward compliance (on the relevant issue), while also prioritizing the larger foundational issues underpinning the Department's historic mismanagement of the City's jails, the Court declines to use its discretion to find Defendants in civil contempt at this time….Although the Department's efforts to implement (the relevant reforms was) delayed, and seem[s] to  have been spurred, in part, by notification from external actors, the Department has now taken substantial steps to remedy the deficiencies of its prior approach…. See, e.g., Zino Davidoff SA v. CVS Corp., No. 06-CV-15332-RJS,(S.D.N.Y Apr. 17, 2008) 2008 U.S. Dist. LEXIS 36548, at *23 (finding that plaintiff "failed to demonstrate that [defendant] has not been making reasonably diligent and energetic attempts to comply with the [c]ourt's orders" where defendant took affirmative steps upon learning that its "instituted compliance measures" may not have been effective)." See Nunez v. City, et al., No. 11-CV-5845-LTS, ECF No. 511 at 27. It is important to note that Plaintiffs, whom the Court allowed to renew their intake contempt motion, have not done so -- not in a new filing or in their instant motion papers.

We respectfully submit that the record shows DOC has been making good faith and diligent attempts to comply with the Court's Orders. For these reasons, as well as those in the accompanying Declarations, we respectfully submit that the Defendants are not in civil contempt as to any provisions which Plaintiffs have raised.

## POINT II

## A RECEIVERSHIP IS A DRASTIC MEASURE THAT IS NOT WARRANTED UNDER THE CURRENT CIRCUMSTANCES

Plaintiffs' Memorandum of Law sets forth arguments for receivership that miscast the history of this litigation and are grounded neither in case law nor in the facts of this case. Plaintiffs present a narrative to the Court that overlooks the diligent efforts of DOC to comply with Court Orders, as well as the facts indicating improvements for incarcerated individuals since 2021.

The appointment of a Receiver has long been established as an "extraordinary remedy" of last resort to be exercised with restraint and granted only when it is necessary to protect Plaintiffs' interests. Citibank, N.A. v. Nyland (CF8), Ltd., 839 F.2d at 97. The Second Circuit has directed courts to employ the "utmost caution" in ordering a receivership. Republic of the Philippines v. New York Land Co., 852 F.2d 33, 36 (2d Cir. 1988) (quoting Wright & Miller, Federal Practice and Procedure § 2983). "[B]efore intruding on local authority, [the] district court must assure itself that no lesser alternatives are adequate to the task." Missouri v. Jenkins, 495 U.S. 33, 51, 110 S. Ct. 1651, 109 L. Ed. 2d 31 (1990). Violation of prior court orders alone is insufficient to warrant appointment of a receiver and a determination based solely on such violations is an abuse of discretion. District of Columbia v. Jerry M., 738 A.2d 1206, 1213 (D.C. 1999).

While the receivership remedy has long been established as a tool available to courts pursuant to their equity jurisdiction, its use in the context of government and institutional reform is more recent. See, generally, Plata v. Schwarzenegger, 4:01-CV-01351, 2005 U.S. Dist. LEXIS 43796 (N.D. Cal. Oct. 3, 2005) ("Plata") (detailing the history of the receivership remedy, including its use, starting in the civil rights era, in institutional reform cases). In 1979, the Alabama State Prison appears to have been the first government correctional system to be subject to a court-ordered receiver. See id. See also, generally, Newman v. State of Ala., 466 F.Supp. 628 (1979) (appointing a receiver upon consent of the parties). Since Alabama, there have been very few instances where a federal court has ordered a receiver to take over all or part of a government run jail or prison. See Plata v. Schwarzenegger, 603 F.3d 1088 (9th Cir. 2010) (noting only three other receiverships since Alabama).

Moreover, a survey of receiverships imposed on correctional systems make clear that receivership is not a panacea. Receiverships tend to last longer than expected, come with high costs, and have less than satisfactory results.

For example, in 2006, a District Court in California ordered a receiver to take control over the delivery of medical services to California state prisoners.  See, Plata, 4:01-CV-01351, ECF No. 1063 (N.D. Cal. Jan. 23, 2008). To serve as the receiver, the court appointed Robert Sillen, whose term proved to be inefficacious, fraught with controversy, and expensive. One of his initial duties was to draft a Plan of Action. It came late and the Court found it was unrealistic and "failed to contain adequate metrics and timelines." Id.  Not only did the receiver move at a slower pace than expected, but his tenure proved problematic. During his tenure, several reports were made of his taking a confrontational approach with, and even at times, threatening government officials. See, e.g., Exhibit M, annexed to the Viviano Decl., Michael Rothfeld, State Prison Health Czar is

27

Fired, Los Angeles Times, Jan. 24, 2008; see also Exhibit N, annexed to the Viviano Decl., Solomon Moore, Using Muscle to Improve Health Care for Prisoners, NY Times, Aug. 27, 2007. Just two years later, the court replaced him, expressing frustration with his approach and pace. See Plata, 4:01-CV-01351, ECF No. 1063 (N.D. Cal. Jan. 23, 2008). In its decision, the court expressed frustration with the receiver's approach and slower than expected pace. Id. at 4 (the Court acknowledged that the receivership had not furnished the type of hands-on leadership that, in retrospect, it wished it had).

The California prison receiver also brought with him exceptionally high costs and mismanagement of funds. Immediately after his appointment, the receiver dramatically increased salaries for medical staff. See Exhibit O, annexed to the Viviano Decl., Gabriel Petek, Overview and Update on the Prison Receivership, Cal. Legis. Analyst's Off., at 4 (Nov. 2008). Doctors who were paid $150,000 prior to the receivership, were now paid nearly $300,000. Id. The increased salaries and other spending by the receiver resulted in $33.3 million in tax-payer funds in just the first 15 months of receivership. See Exhibit P, annexed to the Viviano Decl., California Prison Health Care Receivership: Review of Disbursements April 2006 through June 2007, Off. Of the Inspector Gen., at 6 (Feb. 2008). The funds under the receiver's control were also mismanaged. A report from the prison system's inspector general revealed that during the first 15 months of operation, the receiver overpaid employees in benefits by $218,790. Id. at 9-10.

Today, the California prison receivership continues to operate at a high cost and with no end in sight. A recent report from California's Legislative Analyst Office revealed that prior to the receivership, the state spent about $1.3 billion on medical care (adjusted for inflation) -- $7,400 per person. Exhibit O Petek, at 5-6. In contrast, in 2021-2022, the state spent about $3.3 billion

(more than double) and $32,700 per person (four times more). Id. at 6. The report also noted that there is no timeline for the end of the receivership, which is currently in its 18th year. Id. at 8.

California is not alone. Receiverships in other jurisdictions have also proven ineffective and costly. For instance, the Alabama Prison System receivership is considered to have "failed to resolve major issues in the prison system." See Exhibit Q, annexed to the Viviano Decl. Receiverships in the Prison Litigation Context: Factors Necessary for an Effective Judicial Remedy of Last Resort, 9 Cardozo Pub. L. Pol'y & Ethics J. 193, 211. Similarly, in Washington D.C. and Fulton County, receiverships were exceptionally costly and lasted longer than expected. See Exhibit R, annexed to the Viviano Decl., Beyond Community Standards and a Constitutional Level of Care? A Review of Services, Costs, and Staffing Levels at the Corrections Medical Receiver for the District of Columbia Jail: Hearing Before the Subcomm. On the Dist. of Columbia of the Comm. On Government Reform, 106th Cong. 43 (2000) (noting that "the receiver is leaving the D.C. jail with exorbitant medical costs per inmate and high staffing levels"). See Exhibit S, annexed to the Viviano Decl., Rhonda Cook, Fulton Jail No Longer Under Court Oversight, The Atlanta Journal-Constitution (April 23, 2015) (noting that the Fulton County Prison litigation cost tax-payers upward of $1 billion).

Against this backdrop, we turn to the factors considered in Plata,[9] as well as the analysis required under the Prison Litigation Reform Act ("PLRA"), 18 U.S.C.S. § 3626, that should inform the Court's decision.

_____

[9] To date, courts in this circuit have not had the occasion to decide on whether to appoint a receiver over a jail or prison. In the absence of directly controlling decisions, decisions in other jurisdictions deciding whether to appoint a receiver for a jail or prison provide meaningful guidance.

A.  The Plata Factors

Plata set forth the following seven factors to be considered in determining whether a receivership is appropriate, including 1) whether there exists grave and immediate harm; 2) whether all alternative remedies have been exhausted; 3) whether continued insistence on compliance with court orders would only lead to confrontation and delay; 4) whether there is a lack of leadership; 5) whether the Defendants are acting in bad faith; 6) whether resources are being wasted; and 7) whether a receivership would realistically provide an expeditious remedy. Plata, 4:01-CV-01351, 2005 U.S. Dist. LEXIS 43796, *66.

1.  *The Current State of Affairs in the City's Jails Does Not Justify the Appointment of a Receiver*

The first factor set forth in Plata is whether the current situation at the facility presents a "grave and immediate threat or actuality of harm." Id. at 66.  The Plata Court found this factor satisfied because of the ongoing crisis in healthcare in the California prison system. In analyzing this factor, the Court found a receivership is to be contemplated by the Court if the "*only* viable means of saving lives and creating a stable and effective" situation is a receivership. Id. (emphasis added).

Similar circumstances existed in Hinds County, where the District Court imposed a receivership on a Mississippi jail. See United States v. Hinds County, 625 F Supp 3d 541, 546 (S.D. Miss. 2022) (citing Plata)). The Court found that "terror reigned" in the jail as a result of gang violence, abysmally low staffing levels and incarcerated individuals taking control of housing

_____

areas. Id. at 546. In discussing their opinion, the Court stated that because the conditions of Hinds County Jail had not improved and because the situation had not become any less unconstitutional, it could find grave and immediate harm. Id. at 548. This implies that if conditions *have* improved grave and immediate harm cannot be found.

Far different from the chaotic circumstances existing in Plata and Hinds County, conditions at DOC have *improved* since the end of the pandemic. Moreover, since Plaintiffs filed their motion, the Department has new leadership with promising results. Importantly, the Monitor has noted "a marked and positive shift in the Department's approach to working with the Monitoring Team." Monitor, February 26, 2024 filing, ECF 679 at 4. No situations have been identified "in which the Department should have consulted with the Monitoring Team but did not." Id. What was said about the facilities in Plata and Hinds cannot be said about DOC's facilities at this time.

Much of what has been said before bears repetition. There has been a nearly 20 percent decline in slashings/stabbings in 2023 as compared to 2022 (379 as compared to 478). See Kepler Declaration, Exhibit B, at ¶7. Uses of force resulting in injury to an incarcerated individual are down significantly. See id., at ¶9. The Enhanced Supervision Housing program [RESH] is in place and has contributed to the decline in violence. See Austin Declaration, Exhibit H, at ¶¶ 7-16. A new anti-violence initiative is under development, the OBCC Annex Pilot Plan, where individuals with a propensity for violence will be housed. Id. In collaboration with CHS and the Monitoring Team, the Department is developing a Behavioral Health Unit [BHU] specifically designed for persons in custody who commit acts of violence and have a serious mental illness. See id. at ¶¶ 25-28. This is a cutting-edge innovation that is part of the Department's continued effort to manage the large number of individuals in its custody who suffer from serious mental illness. Id.

Moreover, the Department's new RNDC Programs Action Plan for the emergent adult population is designed to afford more counseling and programming to these individuals to better prepare them to reintegrate into society. See Maginley-Liddie Declaration, Exhibit A at ¶¶ 32-34; Torres Declaration, Exhibit J at ¶¶ 12-14.  The supporting Declarations set forth details of these efforts and many others: the positive changes and efforts to prevent self-harm and suicides, see Saunders Declaration, Exhibit L; the construction projects to secure doors and implement better lighting, and the myriad other facilities improvements, see Benn Declaration, Exhibit K; and the initiatives to detect illegal contraband, including fentanyl, and keep them out of our jails, Maginley-Liddie Declaration, Exhibit A.

In sum, there is positive momentum.  Improvements have and continue to occurr.  Under these circumstances a receivership should not be imposed.

2. _Less Extreme Measures of Remediation Have Not Been Exhausted or Proven Futile_

In imposing a receiver, the Plata court observed:

> defendants have not only shown no capacity to implement corrective plans previously submitted, but also that they either are no longer willing or able to even devise remedial programs to address the clearly identified barriers to compliance with the Orders of the Court… Given the history of this case, including the past efforts of this Court to facilitate, cajole, and even coerce compliance, the demonstrated inability of defendants to comply substantially with this Court's previous Orders (despite many opportunities to do so), and the flawed organizational structure [of defendants], this Court concludes that an Order holding the defendants in contempt is not an adequate remedy… [S]uch measures 'promise only confrontation and delay.'

Plata v. Schwarzenegger, 2005 U.S. Dist. LEXIS 43796, *77-78 (citing Gary W, 1990 U.S. Dist. LEXIS 1746, 1990 WL 17537 at *29-30).

There the Court stated that it had "exhausted all reasonable coercive measures at its disposal." Plata v. Schwarzenegger, 2005 U.S. Dist. LEXIS 43796, *81. As shown *infra*, this is not the case in the circumstances before the Court

DOC has demonstrated repeatedly that it is capable of complying with remedial orders. Among the examples are these: (1) its efforts to comply with Court Orders regarding the Intake Tracking Clause; (2) the efforts of ID to clear all backlogs in coordination with the Monitor; (3) the efforts of the Trials Division to clear all backlogs in coordination with the Monitor; and (4) its purging of contempt following the opening of the Arson Reduction Housing Unit.

In the latter instance, the Court's December 19, 2023 Order set forth these requirements needed to purge contempt by February 27, 2024: (1) evaluate the role, functions and responsibilities of the Nunez Manager and the resources dedicated to the Nunez Manager needed to facilitate compliance with the Nunez Orders, (2) develop a high-profile communication campaign in which the Commissioner makes clear the responsibility to collaborate with the Monitoring Team, and (3) develop a set of data and metrics for use of force, security, and violence that Department leadership will routinely evaluate to identify trends regarding unnecessary and excessive uses of force and violence, and their root causes, and to develop effective strategies to reduce their occurrence. See ECF No. 665. The Department worked diligently to comply with these purge requirements within the deadline.  The three conditions were met. This is an example of the way the Department is capable of operating, and how it will continue to operate in the future.

What happened this February echoes what happened in March 2023, when the Court denied Plaintiffs' motion to find the Department in contempt over the alleged failure to comply with the

Consent Judgment's Intake Tracking Clause. The Department remedied any non-compliance, and the Court declined to find contempt. ECF No. 511.

Plaintiffs suggest that the receivership can be discretely cabined and that a partial receivership would make sense. It would not. A partial receivership would result in inefficiency, confusion, and failure because the challenges at DOC are interwoven and interconnected. Unified leadership, with a clear command structure, is required. The Department experienced splintered leadership in 2022 when it eliminated the rank of Chief and created a reporting structure that had one civilian and one uniformed leader at the head of each facility. The structure caused confusion and has since been replaced by one clear leader at each facility. Maginley-Liddie Declaration, Exhibit A at ¶ 67. It would hardly make sense to have a receiver in charge of security, staffing, discipline, and promotions, and leave the Commissioner responsible for whatever little remains. The role of the Commissioner would be purely ceremonial. In short, a partial receiver is not the least intrusive measure; it is a recipe for chaos.

3. *Continued Work to Comply with the Court's Orders Will Not Lead to Confrontation and Delay*

In <u>Hinds County</u>, the plaintiffs accused the county of having a culture of inertia so severe that it was unable to provide tables and chairs for persons in custody to eat on. That is clearly not the case here. Progress has not always been rapid and not every new initiative has been successful, but progress is steady. Where initiatives have proven unsuccessful, they have been adjusted or replaced. Maginley-Liddie Declaration, Exhibit A at ¶ 32-34; Torres Declaration, Exhibit J at ¶ 8-14. What will undoubtedly cause delay is the appointment of a receiver whose learning curve will be steep and even whose hiring will take time. Finding an outside experienced and capable jail administrator willing to oversee one of the country's largest jail systems would be challenging at

best. Reform will occur much more quickly if Commissioner Maginley-Liddie continues on course.

As described *supra*, indicators of violence are *down*. Stabbings and slashings went down nearly 20% between 2022 to 2023. See Kepler Declaration, Exhibit B, at ¶7. There was a 14.7% reduction in assaults on staff between 2022 and 2023. See id., at ¶ 8.  The physical state of the facilities is *improving*. See generally, Benn Declaration, Exhibit K.  The training of Captains and other supervisors is of a quality that is *improving*. See, generally, Johnson Declaration, Exhibit D and; Edwards Declaration, Exhibit I. The quality and timeline of investigations and discipline is *improving*. See, generally, Pritchett Declaration, Exhibit E and Grey Declaration, Exhibit F.  Plans for the specific betterment of emerging adults are being developed and *implemented*. See, generally, Torres Declaration, Exhibit J. This is not a Department in crisis; rather, with its leadership team, it is a Department that is on the path to being a success for the people in its custody. Receivership is an inappropriate remedy. As illustrated, the Department is doing the work that needs to be done to comply with Nunez Orders.

4. *The Department Has Strong Leadership*

As set forth in the annexed declarations of the Department's leadership team, the Department is comprised of leaders with decades of experience in correctional operations and administration. The Department will be initiating monthly facility leadership meetings where agency stakeholders will have the opportunity to collaboratively analyze and review incidents and discuss considerations for viable solutions. Joint Letter ECF 680. In Plata, a lack of leadership was found where the leaders of the prison system "failed to take the bold measures necessary to protect

the lives of prisoners, to find solutions to the impediments posed by the State bureaucracy, and to make systemic improvements." Plata at *83.

Commissioner Maginley-Liddie has laid out a bold vision for DOC's future that is not just words on paper, but is being implemented. She has emphasized the importance of working with the Monitor and demonstrated that commitment through her extensive communication with him. She has ensured that all staff are familiar with the Nunez Court Orders and remain in open and transparent communication with the Monitoring Team. She has released a video, visible to staff and incarcerated individuals and emailed to the unions, about the importance of complying with the Nunez Consent Judgment. See Maginley-Liddie Declaration, Exhibit B, at ¶ 4. She has required her senior staff – both uniformed and non-uniformed - to tour facilities, a requirement unprecedented at DOC. Id. at ¶¶ 11-12. She has initiated separate focus groups for staff and incarcerated individuals to discuss how to improve conditions at DOC facilities. See id., at ¶ 16. She has appointed a Deputy Nunez Manager to better comply with the Court's Orders. See id., at ¶ 17. She has pursued and obtained $14.1 million in new needs funding to expand programming services. See id., at ¶ 19. She has obtained commitments from highly regarded non-profits to provide additional programming. See id., at ¶ 20. She has expanded recruitment efforts and adjusted requirements to help bring on new officers. See id., at ¶¶ 45-48. And, with the assistance of Dr. Austin, she is developing two new programs – the OBCC Annex Pilot Plan and the Behavioral Health Unit – to further stem violence. Austin Declaration, Exhibit H at ¶¶ 21-28.

The Department is not in a crisis of leadership. The current leadership team, with the assistance of the Monitor and the Court, is fully capable of moving the Department forward.

5. _There is no Bad Faith_

On this record, any suggestion that the Defendants are acting in bad faith is baseless. As noted above, progress has sometimes been slow or even stalled; initiatives have sometimes been less than successful; and violence remains high.  But no one can seriously question that DOC's leadership has worked tirelessly to improve the conditions of all those who live and work in its facilities.  The record reflects Defendants willingness to address concerns as they arise, modify policies and programs as needed, retain outside experts where helpful, and collaborate with the Monitor to institute best correctional practices.  Simply put, this fifth factor militates strongly against the appointment of a receiver.

6. _Resources Are Not Being Wasted_

Plaintiffs' arguments notwithstanding, DOC has not wasted resources trying different ways to come into substantial compliance with the requirements of this Court's orders to make its facilities safer for all. DOC is committed to finding solutions that work to serve its population. For example, consistent with the recommendation to implement a more effective restrictive housing program, DOC has devoted resources working with Dr. Austin to develop its RESH program for those who commit violent acts and will be devoting resources to the OBCC Annex Pilot Program for persistent violent offenders and the BHU program for violent individuals with serious mental illness who are excluded from RESH due to their mental health issues.  See Austin Declaration, Exhibit H, at ¶¶ 7-16, 21-28.  While prior efforts may not have been as successful, Dr. Austin's review of the current RESH program has led him to conclude that "[overall] . . . DOC has successfully implemented the program as [he] intended it to be.'" Id.at ¶ 16.  Similarly, to address prior scheduling inefficiencies, DOC has devoted resources to moving from a paper-based

scheduling system to an electronic platform and integrating it with other computerized systems so as to better control overtime, redeploy officers as needed, and ensure that proper coverage is maintained. <u>See</u> Edwards Declaration, Exhibit I at ¶¶ 3-4. Defendants should not be faulted for sometimes needing to try things and pivot and shift when they are at first not successful.

### 7. *Receivership Will Not Be a Relatively Quick and Efficient Remedy*

On this point, Plaintiffs argue that a receiver is necessary because the unions are an impediment to reform and only a receiver can eliminate their undue influence. In her Declaration, Commissioner Maginley-Liddie provides a full answer to this concern: "the unions have never prevented the Department from instituting needed reforms.  I have made it a practice to share policy changes affecting members with union leadership and to solicit their input." <u>Id.</u> at ¶ 55. The unions represent the hardworking members of the Department, and union leadership, quite properly, advocate for their members. A receiver who did not listen to staff's concerns and grievances would not succeed.   Like the receiver in <u>Plata</u> who took a confrontational approach with government officials, a receiver at war with staff would fail miserably.

### B. <u>The PLRA Requires the Court Go No Further Than Necessary to Remedy Constitutional Violations</u>

Prior to granting any remedial relief to Plaintiffs, the Court must determine whether granting the relief would violate the PLRA, 18 U.S.C.S. § 3626.  Here, this means that in addition to looking at the <u>Plata</u> factors, the Court must weigh whether the appointment of a receiver is the least restrictive way to address asserted constitutional violations. Congress enacted the PLRA to "extricate [federal courts] from managing state prisons." <u>Brown v. Collier</u>, 929 F.3d 218, 228 (5th Cir. 2019) (citation omitted); <u>Brown v. Plata</u>, 563 U.S. 493, 530 (2011) ("The PLRA states that no prospective relief shall issue with respect to prison conditions unless it is narrowly drawn, extends

no further than necessary to correct the violation of a federal right, and is the least intrusive means necessary to correct the violation." (18 U.S.C. § 3626(a))). Thus, federal courts are prevented "from providing more than the constitutional minimum necessary" when courts attempt to exercise control over state-run prisons and detention facilities. Jones v. Gusman, 296 F.R.D. 416, 429 (E.D. La. 2013) (emphasis added) (citing Frazar v. Ladd, 457 F.3d 432, 438 n.19 (5th Cir. 2006)). Imposition of a receivership at this juncture would be far too broad and intrusive of a remedy.

Simply stated, what Plaintiffs seek is contrary to the PLRA's constraints on prospective relief. Although Plaintiffs suggest that theirs is a limited receiver, it is not like the one in Plata, where the receiver had control over a specific area of the prison's operations. Here, Plaintiffs are asking the Court to have the receiver effectively *take over* DOC in whole. In their Proposed Order, they state that the receiver would have the ability to change or enact policies, procedures, protocols, systems, and practices; to establish personnel policies and direct personnel actions; to hire, fire, transfer, and promote; to negotiate and re-negotiate contracts; to procure and contract for supplies; and to review, investigate, and take disciplinary measures. In their proposed Order, Plaintiffs state that the Commissioner's powers related to the Consent Judgment and Remedial Orders would be suspended while the receivership was in place. See Pl. Proposed Order, at 6, ¶C. To call this a "limited" receiver is to give new meaning to the word.

Plaintiffs want to strip control of the Department from the Commissioner and the City's elected leaders. They want to impose a receiver in addition to the Monitor; they want the City to indemnify the Receiver for any liability (therefore, if violence increased during the receivership, the City's taxpayers would have to pay); and they want the City to pay the Receiver with no end in sight. This request does not meet the stringent PLRA standards.

There is a clearly less intrusive remedy available to the Court: to allow Commissioner Maginley-Liddie, working with the Monitor, to bring the Department into compliance with the Court's Orders.

## POINT III

## ARGUMENTS MADE BY AMICI ARE UNAVAILING

Amici's arguments for receivership are largely similar to Plaintiffs' arguments, which have been addressed above.  To the extent that amici raise new arguments, Defendants respond to them as follows.

Amici The Bronx Defenders, Brooklyn Defenders Services, Neighborhood Defenders Services of Harlem, New York County Defender Services, and Queens Defenders (hereinafter "Amici Bronx Defenders") present several stories of individual experiences that they claim, "shed light on the depth of the humanitarian crisis."[10] As Amici Bronx Defenders acknowledge, however, many of these incidents were, or currently are, the subject of an investigation or disciplinary action, reflecting that the Department has procedures in place to hold staff accountable. In any event, isolated incidents do not provide a basis for the extraordinary relief that Plaintiffs are seeking. Bronx Defenders also provide instances where incarcerated individuals were purportedly not provided timely medical care. Again, by focusing on specific instances, Bronx Defenders ignore the total circumstances. The Monitor's recent reports reflect no undue delay in providing medical care to individuals involved in UOF incidents.

---

[10] Bronx Defenders Amici do not reveal the identities of these individuals so the City cannot respond to these specific instances directly.

The case law and the PLRA make it clear that the appointment of a receiver should not turn on a handful of incidents.

Other Amici cite to other aspects of the Department's operations in support of a receiver and similarly mischaracterize the current situation at DOC facilities. Amicus NYLCU point to the Department's data collection and information sharing practices as the reason to appoint a receiver. It argues that the Department does not collect useful data and does not share its information with the Monitor and other sources. That is far from the reality. The Department regularly collects and reports to the Monitor data on all facets of its operations, including UOFs, population, and medical care, just to name a few. The Department's creation of OMAP demonstrates its commitment to using quantitative data to advance decision-making and problem solving. Similarly, its Division of Health Affairs, Compliance and Quality has focused on improving data collection practices to support data-driven decision making. Finally, under the current leadership, there has been greater transparency, engagement, and collaboration with the Monitoring Team, as its recent submission to the Court indicates.

None of Amici's arguments support the appointment of a receiver.

## **CONCLUSION**

As the Supreme Court has written, the "problems of prisons in America are complex and intractable." See Procunier v. Martinez, 416 U.S. 396, 404 (1974). DOC's operations are no exception to that rule. Problems continue to exist that require ongoing work to resolve. But, as set forth above, conditions are not such that the Department should be held in contempt or a receiver appointed. Now is not the time to bring in an outsider who has **no** knowledge of DOC's facilities and would be learning on the job. DOC's policies, staff, incarcerated individuals, and infrastructure

would be foreign to any outsider. Receivers are appointed when there is little, if any, reason to believe that a facility's leaders are capable of reform. Because that is not true here, Plaintiffs' motion should be denied.

Dated:      New York, New York
              March 19, 2024

**HON. SYLVIA O. HINDS-RADIX**
*Corporation Counsel of the City of New York*
*Attorney for City Defendants*
100 Church Street
New York, New York 10007-2601

By:    */s/ Omar J. Siddiqi*
       Omar J. Siddiqi
       *Senior Counsel, Special Federal Litigation*
       *Division*
       Shekera Algarin
       Asia Gentry
       Joseph Hiraoka, Jr.
       Mariam Khan
       Michael Viviano