UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x

MARK NUNEZ, et. al,

Index No. 11 Civ. 5845 (LTS)(JCF)

Plaintiffs,

**DECLARATION OF
LYNELLE MAGINLEY-
LIDDIE**

-against-

CITY OF NEW YORK, ET AL.,

Defendants.
------------------------------------------------------------------ x

UNITED STATES OF AMERICA,

Plaintiff-Intervenor,

-against-

CITY OF NEW YORK and NEW YORK CITY
DEPARTMENT OF CORRECTIONS,

Defendants.
------------------------------------------------------------------ x

**LYNELLE MAGINLEY-LIDDIE** declares, under penalty of perjury and pursuant to 28 U.S.C.

§ 1746, that the following is true and correct:

1.      I am the Commissioner of the New York City Department of Correction ("the

Department"), having been appointed by Mayor Eric Adams on December 8, 2023. As

Commissioner, I oversee the care, custody, and control of the Department's pre-trial detainees and

city-sentenced individuals.

2.      I am also an attorney with 13 years of legal experience. I have been with the

Department since 2015, first as a lawyer in its Legal Division from 2015 to 2018, then as Deputy

General Counsel from 2018 to 2020, then as acting Senior Deputy Commissioner and Chief

Diversity Officer in 2020, and finally as First Deputy Commissioner from 2021 until my

1

appointment as Commissioner. I know the Department, its policies and leaders well, and am committed to creating a safe and humane environment for our staff and all those in our care.

3.      In this Declaration, I address my relationship with the Monitor, my actions as Commissioner, our initiatives to reduce violence, and challenges to recruitment, along with other topics.

### I.      Relationship with the Monitor

4.      I am committed to maintaining an open line of communication with the Monitor. Transparency -- between the Monitoring Team and the Department's employees and between the Department's employees and the Monitoring Team-- is essential.  To that end, I have posted the Monitor's reports on the Department's intranet and internet sites; disseminated a transcript of the December 2023 court conference to all staff; and held a meeting with senior staff to explain why the Department was held in contempt.  On January 23, 2024, as required by the Court's December 19, 2023 Contempt Order, I issued a video and teletype to staff, emphasizing the need for "full transparency and cooperation [with the Monitor] as we all work towards our shared goal of improving the safety of our facilities for our staff and for those in our care."

5.      I have no doubt that going forward, communication, collaboration, and transparency will be the norm as we advance reform.

6.      Our efforts at strengthening the relationship with the Monitoring Team were recognized in the Monitor's February 26, 2024 Report to the Court.

7.      The Monitor wrote:

> The Monitoring Team observed an immediate change in the Department's approach and dynamic in early December 2023 with the appointment of Commissioner Maginley-Liddie. The Department's leadership team is now actively engaging with the Monitor, the Deputy Monitor, and the Monitoring Team. These interactions reflect greater transparency and interest in working collaboratively. The Monitoring Team is routinely consulted and proactively advised on a wide variety of issues.

When matters of mutual concern arise, Department leadership seeks input from the Monitor, has been receptive to feedback, and appears open to adapting practices as necessary. While more work remains, these early signs of improved transparency and collaboration with the Monitoring Team are promising and help to ensure that the Monitoring Team is properly positioned to do its work pursuant to the *Nunez* Court Orders. (Dkt. 679, pages 1-2)

8.  The Monitor also wrote:

Overall, there is a marked and positive shift in the Department's approach to working with the Monitoring Team. The role and the authority of the *Nunez* Manager has been elevated over the last few months given the Commissioner's clear direction to staff regarding the *Nunez* Manager's role and responsibility and the authority the Commissioner has granted the *Nunez* Manager to do her work. Information is flowing more freely and consultation is occurring more frequently than in the previous two years. Further, since the appointment of Commissioner Maginley-Liddie, although it has only been two months, the Monitoring Team has not identified any situations in which the Department should have consulted the Monitoring Team but did not. In fact, the Department has clearly been erring on the side of caution when consulting with the Monitoring Team, and therefore is consulting on matters both directly related to the *Nunez* Court Orders and those that may be more ancillary. Id. at 4.

9.  The Monitor's comments undercut Plaintiffs' claim that "since January 1, 2022, DOC has altered its management of its compliance efforts with the Monitoring Team to eliminate the proactive and collective approach that previously existed, to reduce its level of cooperation, and to limit information–sharing and access in ways that inhibit the Monitor's work." PPFOF, 938.[1] Whatever may have been true in the past, that cannot be said of my time as Commissioner. I talk to the Monitoring Team frequently, flagging issues and keeping them abreast of developments. I value the Monitor's advice. Having a sounding board with decades of experience in corrections is invaluable, even if we may disagree on certain issues.

---

[1] PPFOF refers to Plaintiffs' Proposed Findings of Fact (Dkt. 605).

## II.    Early Actions as Commissioner

10.    As a demonstration of my commitment to reform, my first appointment as Commissioner was to promote Francis A. Torres to First Deputy Commissioner ("FDC"), effective February 2, 2024.  FDC Torres has worked at the Department for 21 years and was the Deputy Commissioner for Programs and Community Partnerships before her promotion.  She is a main architect of the RNDC Programs Action Plan to reduce violence among our emergent youth, discussed below, and will be crucial in helping the Department move forward with the necessary reforms.

11.    To lead our facilities, leaders need to tour our facilities. That is why one of my first actions as Commissioner was to institute required facility tours by all civilian and uniformed senior leadership. Each senior staff member is asked to tour a different facility two times a month, which means that at least one person is touring every facility each weekday. Importantly, the leadership tours are meant to supplement existing tours required of facility leadership, not a substitute for them.  For example, the Commanding Officer of EMTC is expected to tour her facility regularly, but now also tours other facilities each month. Similarly, her facility is regularly toured by outside civilian and uniformed leadership.  I firmly believe that if our senior leaders do not walk regularly in our facilities, talking to staff and those in our care, they cannot be counted on to develop sound policies.

12.    Following each tour, senior leaders are required to write up their notes, focusing on both positive developments and deficiencies, and to forward their notes to my office. My office then compiles a list of action items that need attention and follows-up to ensure that action is taken. My expectation is that any problem that can be addressed in real time will be addressed.

13.    For example, the Acting Deputy Commissioner ("ADC") of Information Technology toured a facility and heard complaints from staff of broken phones in the control station and from individuals in custody about malfunctioning PIN numbers, which made it impossible to access telephone service. The ADC had the control station phone repaired and had his staff reset the PINs while he was still there. He noticed that there were only three phones in the housing area and directed his staff to add a fourth phone. He also had his staff ascertain what other units were in need of an additional phone. The Department has started running the cabling that will support the additional phones.

14.    On his tour, an Executive Director of Programming spoke with an individual in custody who was grieving the loss of his cousin, and arranged for grief counseling. Small gestures matter. Violence has many causes, but the feeling that no one cares is among them.

15.    I lead by example, touring the facilities frequently. I make it a point to go on unannounced tours on both day and night shifts, providing support to staff who do not normally receive personal visits from leadership. Touring in the evenings also sends a message to our staff, and to those in our care, that they are not alone.

16.    I have also initiated focus groups with staff and incarcerated individuals, along with a facilitator, to discuss working and living conditions at our facilities. As of February 29, 2024, there have been a total of 21 focus groups at GRVC, OBCC, and RMSC -- 12 for incarcerated individuals and 9 for staff. The groups provide a voice for those who feel unheard and should help inform our decision-making. The Department will compile feedback from the focus groups, which are ongoing, and work to address the issues identified. Providing people with a voice has already shown measurable improvement in lessening tension and increasing trust.

17.     In February 2024, I selected an individual to act as Deputy *Nunez* Manager. The individual will support the *Nunez* Manager and the Department's work. The creation of the position demonstrates my commitment to relationship building with the Monitoring Team and recognizes the importance of the work done by our *Nunez* Team.

18.     As required by the Court's Orders, the Department, in consultation with the Monitor, developed a set of metrics for use of force, security, and violence that will help us to better identify trends and patterns and develop anti-violence strategies.

19.     Recently, I engaged with other City agencies – agencies which are part of the Rikers Interagency Task Force – to secure funding of $14.1 million for programs as a new need to serve the individuals in custody.    See Exhibit A. The funding will be used for substance misuse programs, educational programs, transition planning, and trauma-informed programs, among others.  In the past, the Department has not tracked the effectiveness of its programs as closely as it should, leaving them open to criticism. Going forward, that will not be the case.

20.     I have also obtained a commitment from the Osborne Association and Fortune Society, two highly regarded non-profits, to provide services to our population, including discharge planning, employment-focused workshops, and support for fathers.  Their return to Rikers Island (they were with us for many years) is a salutary development.

21.     Increased programming is essential to the well-being of those in our custody and is a critical part of an anti-violence program.  Idle hands can all too easily become violent hands as disputes among individuals fester.

22.     I am committed to taking the necessary steps to bring the Department into compliance with the *Nunez* Court Orders. While continued progress must be made, the Department

has completed a significant number of tasks required by the Action Plan and the subsequent Orders. See Exhibit B.

### III.     Violence and Initiatives to Reduce Violence

#### A.     Comparing 2016 and 2023

23.     I recognize that violence in Department facilities is at unacceptable levels. But the story plaintiffs tell of jail safety deteriorating at an alarming rate is not substantiated by evidence.

24.     In their papers, plaintiffs repeatedly compare data from 2023 with that from 2016 to show that violence in DOC facilities has increased greatly. But there are reasons to question the comparison. The first factor is bail reform legislation that went into effect January 2020. With bail reform, the Department now houses individuals who are in its custody predominantly on charges of committing violent crimes. As of February 27, 2024, 28.6 percent of pre-trial detainees are being held on homicide charges; 11.8 percent on serious assault charges; 14.1 percent on robbery charges; and 7.8 percent on weapons charges. That is a total of 62.3 percent. By comparison on January 1, 2016, those held on homicide charges comprised 14.1 percent of detainees; serious assault charges, 9.1 percent; robbery charges, 14.4 percent; and weapons charges, 6.3 percent – a total of 43.9 percent. Gone in 2024 are recidivist shoplifters, low level drug dealers and fraudsters, who populated Rikers jails in earlier years.

25.     Supervising a housing unit that is comprised almost entirely of violent individuals presents significantly greater challenges than one in which a significant portion of offenders are there for non-violent crimes. The latter group have one principal objective: to resolve their cases, do their time, and go home. They dilute the propensity for violence. A housing unit populated with largely violent offenders can become "us" (incarcerated individuals) against "them"

(correction officers). Individuals seek to prove their toughness, and those who are not aggressive fashion weapons for self-defense. A correction officer may have few allies in such a unit.

26.    The second factor that has changed correctional practices since 2016 is the lack of serious consequences for misconduct by incarcerated individuals now compared to then. Since 2016, the Department eliminated punitive segregation ("PSEG"), where individuals were locked in a cell for 23 hours a day. In 2019 the State Commission of Correction modified its standards so that four-hours out-of-cell time was required. Today, the Department operates an Enhanced Supervision Housing ("ESH") unit in which individuals are out-of-cell seven hours a day. Placement there is the Department's most serious sanction. I am not recommending a return to PSEG, which was inhumane. There is little doubt, however, that reducing the punishment for violence has contributed to its spread.

27.    Moreover, the change in population has had another effect. Individuals facing charges for serious felonies know that if they are prosecuted for an assault on another individual or on staff, they are likely to get concurrent time. A person facing 15 years (or more) to life for murder may not be concerned if an assault charge is added to their record. As a result, the criminal justice system has ceased to be as effective a deterrent for in-custody crimes.

28.    Yet another factor is the presence of surveillance cameras in our facilities. In 2016, cameras were few and far between; today, they are omnipresent. Their importance cannot be overstated. They enable senior staff to review use of force incidents shortly after the incidents occur ("Rapid Reviews") and give an objective view of conduct with which to make disciplinary and other decisions. Moreover, without video footage, the Monitoring Team could not perform its duties effectively.

29.    That said, I believe that reported increases in the use of force from 2016 to 2023 are explained, at least in part, by the omnipresence of the cameras. Today little goes unseen and, therefore, little is unreported. That is as it should be, but it counsels caution in making comparisons with 2016 as a start date.

30.    Finally, detainees are spending considerably more time in our care. In 2016, the average length of stay was 59 days while in January 2024, it is 101 days. As of March 1, 2024 there are 508 detainees who have been in custody for more than two years. New York City's jails were not meant for such long-term stays, and the inevitable anxiety that comes from being in legal limbo contributes to the tension that breeds violence. Grievances and rivalries fester. This factor is not in our control (DOC cannot move cases faster) and is one a receiver could not alleviate.

31.    All of this casts doubt on comparing data from 2016 to today.

**B.    RNDC Programs Action Plan**

32.    As Plaintiffs correctly note, violence at the Robert N. Davon Complex ("RNDC") has recently increased after sharply declining. RNDC houses our youngest individuals, including emergent adults 18 to 21 years old. In the first half of 2023, slashings and stabbings were at low rates (two to five a month), but later in the year increased significantly.[2]

33.    At my direction, the Department has developed a RNDC Programs Action Plan aimed at emerging adults in our custody. The plan has several notable components. We will house 18-to-21-year-olds together to create more cohesive housing units. The Department's prior experience shows that housing 18-year-olds separately leads to increased violence and management challenges. Second, we will increase the number of programming staff assigned to

---

[2] In 2021, the Department began to use the term "emergent adults" to refer to 18 to 21 year-olds, which is in line with the practice in other jurisdictions.

RNDC. Third, we will have steady uniformed staff assigned to the units to build rapport between staff and incarcerated individuals and serve as role models for them. And fourth, we have revised our training program to focus on working with emergent adults, including units on brain development, conflict resolution, restorative justice, behavior modeling, early intervention, and rewarding positive behavior. Further details about the RNDC Programs Action Plan are contained in the Declaration of FDC Torres.

34.     The Monitor has approved the program, and the Department has begun implementation. All 18-year-olds have been consolidated into five RNDC units in Building 2, except those who were doing well in other units. The ratio of staff to emerging adults has been reduced to 1 to 15. (It was as high as 1 to 25.) Steady staff, including two captains, have been selected and assigned, and an Assistant Deputy Warden has been chosen with staff input. Weekend coverage has been increased. Training, which has been approved by the Monitor, has recently begun. The Department will evaluate the new program carefully.

## C.     Behavioral Health Unit (BHU) and OBCC Annex Pilot Program

35.     In consultation with the Monitor, the Department is at work on two initiatives designed to reduce violence. The first is a Behavioral Health Unit (BHU). At present, an individual who stabs or slashes another individual or assaults staff is excluded from the Enhanced Security Housing (ESH) program if they have been diagnosed with a serious mental illness. There is no deterrence and no focused rehabilitation.

36.     BHU is intended to fill that void. The Department recognizes that developing such a program requires collaboration between mental health and correctional professionals, and we are working closely with Correctional Health Services (CHS). Such individuals require a high-level of care. Dr. James Austin, the Department's consultant and a nationally recognized expert, is

10

leading our efforts. Our hope is to have the Monitor's approval for the program this Spring and begin operationalizing it.

37.    The second initiative, also being discussed with the Monitor, involves using space in the Otis Bantum Correctional Center ("OBCC") to house individuals who have shown a propensity for violence ("OBCC Annex Pilot Program"). The plan involves a reduced population, increased staffing, and limited out-of-cell time to seven hours, as compared to 14 hours in general population. The individuals would have the same privileges as those in general population, and all minimum standards would be met. We have consulted with the State Commission of Correction ("SCOC") and have received its support and anticipate approval upon final submission.

38.    I should note that these initiatives, and our current ESH program, run afoul of Intro. 549-A, the recently passed City law that effectively eliminates all restrictive housing.    (Mayor Adams vetoed the bill, but his veto was overridden.) If the law goes into effect -- its effective date is July 28, 2024 -- all individuals in our custody would be allowed out of cell 14 hours a day, regardless of recent or persistent violent acts. The Monitor has already expressed his deep concern about Intro. 549-A, which he believes could "undermine the overall goals of protecting individuals from harm, promoting sound correctional practice and improving safety for those in custody and jail staff." Monitor Guidance, dated January 12, 2024. I share those concerns. Intro. 549-A is at odds with the *Nunez* requirements. On March 3, 2024, I sent the Monitoring team a list of the programs, initiatives, and policies that would be adversely affected by Intro. 549-A and requested its analysis. We are prepared to seek relief from this Court if necessary.

IV.    **Deaths in Custody**

39.    The Plaintiffs emphasize that 19 individuals died in Department custody in 2022 and nine in 2023.[3] In some of the cases, tragedy may have been averted had officers responded prompter or better. Discipline, including termination, has been imposed on officers for their failures, where appropriate.

40.    Although it is no answer, it bears emphasis that the Department is not alone in experiencing a substantial number of in-custody deaths. This month, the Department of Justice issued a report finding that 187 people had died of suicide inside Bureau of Prison ("BOP") facilities between 2014 and 2021; that many of these could have been prevented if proper protocols were followed; that 89 individuals were victims of homicides; and that BOP consistently failed to impose effective discipline on staff for misconduct that contributed to the deaths.[4] Other jurisdictions report large numbers of deaths as well.

41.    As Commissioner, I am committed to reducing the number of deaths in our custody. That means focusing on keeping fentanyl out of the jails and preventing suicides. Fentanyl kills. It enters our facilities through visitors and mail (paper laced with the drug). The Department continues to devote resources to investigating staff working closely with the Department of Investigation ("DOI") and prosecutorial offices.

42.    There have been several instances in the past year of the Department confiscating illegal drugs, including fentanyl, from visitors and mail packages. To stop fentanyl from entering through the mail, the Department is meeting with three vendors, each of which has a product aimed

---

[3] There have been two deaths in 2024; the Medical Examiner's Office has yet to determine cause of death.
[4] Evaluation of Issues Surrounding Inmate Deaths in Federal Bureau of Prisons Institutions (justice.gov),
https://oig.justice.gov/sites/default/files/reports/24-041.pdf

at detecting fentanyl-laced mail. Two of the three receive mail at an outside location and scan it to the incarcerated individuals' tablets. With the State Commission of Correction's approval, 42 of New York State's 62 counties now employ such scanning technology to considerable effect. Regrettably, the Department cannot follow suit due to a Board of Correction rule from which it has declined to grant a variance.

43.     As a backstop, our officers must be ready to administer Narcan whenever an incarcerated individual overdoses. Narcan is now available in every housing area, and 91 percent of our officers have now been trained in its use. Incarcerated individuals also have access to Narcan and have used it in emergencies.

44.     Additionally, the Department has taken affirmative steps with CHS to prevent suicides. In the summer of 2023, the Department began working with Dr. Timothy Belavich as a consultant to review our anti-suicide policies and recommend measures to strengthen them. In January 2024, Dr. Belavich submitted a report to the Department and Monitor which included recommendations that we intend to implement. The Department meets regularly with CHS staff after each death to identify failures and opportunities for improvement. The two agencies now engage in weekly mock emergency drills to enhance responders' skills and reduce response times. (Additional initiatives are detailed in the Declaration of James Saunders, the Department's Deputy Commissioner of Health Affairs).

## V.     Recruitment, Retention, and Staff

45.     The Department currently has more than 6,000 uniformed staff and more than 1,600 civilian staff, with a daily census as of today, March 18, 2024, of 6,357 individuals in custody. The Department needs to increase staffing to better manage its facilities. We have lost a significant

amount of staff to retirement and will lose more in upcoming years.[5] The Department was also under a hiring freeze for two years from May 2019 to May 2021, during which we were unable to replenish the uniformed ranks. Over the past four years, the Department has lost 3,500 uniformed staff members to attrition. This decline in staff plays into our difficulty in managing a highly concentrated violent population; has contributed to demoralization among our workforce; and contributes to a greater sense of frustration among those in our care.

46.     Recruitment must therefore be among the Department's highest priorities. Earlier this year, I gave applicants additional time to fulfill the requirement that they have a driving learner's permit, which added 11 recruits to the class. Having a driver's license is a requisite for all correction officers, but having a learner's permit at the outset of recruit training is a barrier to entry. The recruit class began on March 7, 2024, with 82 recruits.

47.     The Department has also increased its spending on advertisements to encourage qualified individuals to apply. In May 2023, 1,435 people registered for the correction officer exam. Through hard work, 2,264 people are registered for the March 5, 2024 exam. Advertising has helped make the difference. Between December 7, 2023, and February 7, 2024 -- the window period for registration -- the Department spent $750,000 on advertising in radio, television and print media. Moreover, we were able to obtain free advertisement from numerous sources valued at more than $500,000.[6] The increase in registrants is a crucial first step in growing our staff.

---

[5] The statistics are these: 375 uniformed staff retired in 2020; 404 in 2021; 368 in 2022; and 166 in 2023. As of February 28, 2024, there are 193 uniformed staff eligible for retirement with another 713 eligible for retirement in the next two years.

[6] Sources include: Taxi TV, Staten Island Ferry Ads, Bus Shelters, LINK NYC, 311 hold messages, and NYC Life + Gov.

48.     The Department must continue to make heightened recruitment efforts despite the challenges, including the steady stream of negative publicity and the local law requirement that Rikers Island jail facilities close, which make job security seem uncertain.

49.     While the Department works to recruit staff, it has also made strides in retaining staff and getting staff back to work. For example, in January 2022, the average number of officers out sick was 2,096. In June 2023, the number was 449, a 78 percent reduction. On average, seven percent of staff are now out sick on a given day (in January 2024) as compared to 28.7 percent in January 2022. Importantly, getting officers to return to work has meant a substantial reduction in triple tours. In January 2022, 1,237 officers worked a full or partial third tour, with 756 working more than 3.75 hours on the third tour. In June 2023, the number was reduced to 152, with only 26 working more than 3.75 hours on the third tour. The last time the facilities reported a triple tour was in September 2023 (1 full tour). This dramatic turnaround was attributable to the improved management of the Department's Health Management Division ("HMD"), to changes in policies, and to concerted efforts to hold staff accountable for abuses of sick leave and modified duty.

50.     When I was FDC, I oversaw HMD. During that time, the Department hired new HMD leaders and worked to increase civilian staff by returning officers to posts in the facilities.

51.     In collaboration with the Monitoring Team, the Department revised and promulgated new Sick/Leave and Absence Control Policies, by May 15, 2023, and the Medically Modified/Restricted ("MMR") Policies, on July 20, 2023.

52.     HMD and the Office of Trials and Litigation work in collaboration to ensure that all staff identified for Medical Incompetence and/or Medical Separation are held accountable. This

joint effort between the divisions has prompted the return to active duty or permanent removal of uniformed staff from our rolls.

53.     Relatedly, I have engaged with the Monitor on staffing issues. As discussed in Deputy Commissioner Edward's Declaration, DOC currently maintains two work schedules - - (i) a 4x2 work schedule in which members of service work four consecutive days before returning to work and (ii) a 5x2 schedule in which members of service work five consecutive days and are off two consecutive days each week. (Edwards Declaration ¶ 6 – 7). The Action Plan requires DOC to minimize the use of the 4x2 schedule. The issue is not as clear as it appeared at the time of the Action Plan. Id. at ¶ 7. My hope is that continued discussions with the Monitor will result in a well-conceived plan. As I told the Monitor, we will be enlisting an outside expert to conduct a post analysis to help analyze the issues.

## VI.     **Command Discipline**

54.     Plaintiffs write that "DOC has a long history of failing to appropriately and reliably manage and adjudicate command disciplines." PPFOF ¶ 846. In 2023, while still First Deputy Commissioner, I was tasked with addressing this issue. Command Discipline is the Department's process for adjudicating lower-level violations of Department policies by members of service, from lateness to permitting incarcerated individuals to congregate in an unauthorized area. It had been our policy to assign responsibility for adjudicating such matters and imposing sanctions to the individual facilities. If an officer in GRVC permitted individuals to congregate in an unauthorized area, an Assistant Deputy Warden in GRVC acted as the hearing officer, and the Commanding Officer of the facility imposed the sanction, if one was warranted. (The sanction is typically loss of vacation days or accrued compensation time.) The process did not work well.

16

There was no uniformity in sanctions among facilities and, more importantly, many violations were never adjudicated. They lingered and were eventually dismissed.

55.    At my direction when I was FDC, the Department developed a new command discipline policy. In 2023, that new policy centralized command discipline in a new unit -- the Informal Charges and Discipline Unit ("ICDU") -- with a senior supervisor (Assistant Chief Rembert) and three Assistant Deputy Wardens, who will conduct the disciplinary hearings. No longer are the facilities involved in the process. The new policy increases the available sanctions to 10 days of vacation or compensatory time, and it shortens the time from incident to adjudication.

56.    The Department continues to roll out the new approach: it is operating in three facilities, and others will soon be added. In those facilities, adjudications are being conducted expeditiously, and cases are not being dismissed. Complaints of favoritism and disparity have largely disappeared.

57.    The Monitoring Team has received the Department's new Command Discipline Directive and is generally supportive. There are remaining issues that I need to address with them.

### VII.    Board of Correction

58.    Plaintiffs write that the Department has attempted to evade the oversight of the Board of Correction. PPFOF, ¶1033-1039. In the recent past, the Department has had a fraught relationship with the Board, but I have worked hard in my short time as Commissioner to strengthen the relationship. The Department has restored the Board's access to video footage, so that Board staff can view all video footage at any time from their offices. In addition, the Department now notifies the Board promptly of deaths in custody.

17

59.     Since becoming Commissioner, I have met with the Board's Executive Director and some Board members and am in the process of extending invitations to others. I have attended the Board's January and February meetings, and have requested all Department attendees stay for the full meeting.

## VIII.     Unions

60.     Plaintiffs believe that a receiver is necessary because the labor unions have been an obstacle to reform and "the desire to satisfy this key constituency has been a motivator for DOC's poor personnel-related decisions." Plaintiffs' Memorandum of Law (P. Mem.) 88 (Dkt. 603). That is a canard. In my time as First Deputy Commissioner and now as Commissioner, the unions have never prevented the Department from instituting needed reforms. I have made it a practice to share policy changes affecting members with union leadership and to solicit their input.

61.     Similarly, the unions have had no role in what Plaintiffs call "DOC's utter failure to reduce the number of awarded posts." P. Mem. 89 (Dkt. 603). Awarded posts can serve a salutary purpose. Take one example: the same officers are assigned to new admission intake on a steady basis, which has contributed to the Department's success in processing new admissions in the required 24 hours. Notably, there is no mention of the Department's new admission intake procedures in Plaintiffs' papers, an issue they have raised for years and as to which there was motion practice. New admission intake is not mentioned because it is no longer a problem. The Department focused on the issue and dedicated resources to resolve it. In the period January 1, 2024, to February 18, 2024, 2,431 men were admitted at EMTC, and only one exceeded the 24 hours. And 249 women were admitted at RMSC, and none exceeded 24 hours.

62.     One of the reasons for the Department's success is that the same officers are assigned to new admission intake on a steady basis.  Steady posts promote consistency.  An officer knows their assignment and can anticipate problems before they ripen.  Having steady officers on housing area posts has the same advantages.  As discussed above, steady posts are a vital component of the new RNDC initiative. Reducing awarded posts is a requirement of the Action Plan, but it may warrant modification.  I am engaged with the Monitor on the issue and am hopeful that we can find common ground.

IX.    **Receivership**

63.     Plaintiffs write that their "proposed receivership is narrowly drawn [and extends] no further than necessary."  P. Mem. 94 (Dkt. 603).  Again, I disagree. In arguing that their proposed remedy is narrow, Plaintiffs assert that the receiver would have "no power to act" "unless necessary to fulfill the Mandate."  P. Mem. 97 (Dkt. 603). However, virtually every aspect of the Department's business (and certainly its most important aspects, such as security, investigations, trials and personnel) fall within the *Nunez* orders.  A receiver would leave a commissioner no meaningful role in charting the Department's future course.  Inevitably, the receiver would be the commissioner.

64.     Plaintiffs argue for a partial receivership, but it would only sow confusion amongst staff about who was in charge. The Department experienced this when, in 2022, it eliminated the rank of Chief and created a facility reporting structure that had one civilian and one uniformed leader at the head of each facility. This structure indeed caused confusion among uniformed staff and has since been replaced by one clear leader at each facility.

65.     Plaintiffs argue that a receiver would be "bound by applicable state and local laws, regulations, and contracts," although "if necessary, the Receiver could ask the Court to order that a particular legal or contractual requirement be waived." P. Mem. 97 (Dkt. 603).    As Commissioner, I am bound by those same provisions and have the same power to request a waiver from the Court.  The power has been exercised once to bring on leadership from outside the uniformed ranks, and I am likely to exercise it again as we implement new plans to reduce violence. Plaintiffs also contend that the receivership would terminate quickly, apparently in less than 24 months. Id.  No one should expect a receiver to achieve a rapid transformation and then quickly depart the scene. I am not aware of a successful short-term receivership.

66.     In the past three years, the Department has experienced a rapid turn over in leadership. I believe that this turnover has contributed to the Department's difficulties. Consistency and routine are the building blocks for achieving buy-in from staff and getting it right. Making yet another leadership change will not yield the results that everyone is hoping for.

67.     Rather than turn the Department over to a receiver, I ask for the opportunity to make the necessary reforms with the team I am putting in place. The learning-curve for an outsider would inevitably be steep. I know the Department and what needs to be accomplished. I am invested in our staff. I would not have taken this job if I thought a receiver could do it better or faster.

Dated: New York, New York
         March 18, 2024

_____
LYNELLE MAGINLEY-LIDDIE

20

# EXHIBIT A

Skip Main Navigation

Menu

The Official Website of the City of New York

Text Size

Select Language

Powered by Google Translate

Search Search     Search

## Secondary Navigation

MayorBiographyNewsOfficials

# Mayor Adams Announces Progress to Improve Care and Services for People in Custody, Advances Plans for Future Uses of Rikers Island

March 4, 2024

*Adams Administration Announces $14 Million for Enhanced Programming Initiatives to Support People in Custody as They Return to Their Communities*

*NYC Health + Hospitals to Move Forward with Construction of More than 350 Outposted Therapeutic Housing Beds*

*Administration Announces Completion of Feasibility Studies on Potential of Building Renewable Energy Infrastructure on Rikers Island*

NEW YORK – New York City Mayor Eric Adams today announced progress on several jails-focused initiatives to provide greater care and enhanced programming for people in custody and released two feasibility studies on potential sustainability uses of Rikers Island. The city will invest $14 million to enhance programing initiatives for people in custody. Mayor Adams also directed NYC Health + Hospitals to move forward with construction of more than 350 outposted therapeutic housing beds that will increase access to specialty health care services for people in custody while moving those who are most clinically vulnerable off of Rikers. Additionally, the administration announced the completion of the Feasibility Study for a New Wastewater Resource Recovery Facility on Rikers Island and the Renewable Rikers Feasibility Study Report, required under local law, that assess the potential building of renewable energy infrastructure on Rikers Island.

"Ensuring dignity, safety, and care of all justice-involved New Yorkers is a top priority for our administration and today's announcement will provide greater access to specialized medical care for people in our custody, as well as delivering much-needed resources to support those who are preparing to return to their communities," said **Mayor Adams**. "While our commitment to the success of our jails is unwavering, we are also planning for the future of Rikers by releasing these studies that asses the feasibility of bringing renewable energy infrastructure to the Island."

"As we implement plans to house incarcerated New Yorkers with greater dignity and care, we must also envision a future for Rikers Island — one that supports New York's significant energy and sustainability needs," said **Deputy Mayor for Operations Meera Joshi**. "This is an opportunity not only to reimagine a better criminal justice landscape in this city, but a better environmental justice landscape too."

"The investments announced today show the administration's commitment to support the whole-person through difficult life transitions and thereby strengthening our communities overall," said **Deputy Mayor for Health and Human Services Anne Williams-Isom**. "As New Yorkers engage with and transition from the justice system, they will receive support ranging from workforce development, transportation, community connections, educational opportunities, housing assistance, and health care, among others. Additionally, we will open hundreds of beds in outposted housing units that will serve those with specialized clinical needs. Thank you to all involved in this multi-agency effort to walk with people as they build productive, fulfilling lives."

"Programs providing education, health and wellness, and transitional services are essential for improving the safety of our jails and creating better outcomes for those in our care and custody," said **New York City Department of Correction (DOC) Commissioner Lynelle Maginley-Liddie**. "Investments in programming can lead to reductions in violence, lower rates of recidivism, and pathways to higher education and employment."

**Enhanced Programming on Rikers Island**

Mayor Adams today announced $14 million in funding for DOC to increase programming initiatives for people in custody in New York City jails. Building on the department's commitment to addressing the needs of individuals in its care, DOC identified five key areas to bolster support for people in custody. Initiatives to receive funding include:

- **Trauma-Informed Programming**: DOC will ensure improved access to trauma-informed care for people in custody through the creation of a social work, mental health, and creative arts therapy team that supports learning opportunities for graduate-level students. Trauma-informed programming will be available to sentenced individuals and detainees with specialized needs.
- **Transition Planning Programming**: DOC will invest in transition planners who will be assigned to each general population housing area and at intake at a higher frequency to ensure consistent assistance to navigate reentry challenges and establish a foundation for long-term stability. Transition planners stationed at the facility's intake will serve as a crucial point of contact prior to discharge, mirroring a hospital model for a seamless transition to the community. Transition planners will facilitate reentry workshops, assist in resume development, and support individuals transitioning to state prisons.
- **Substance Misuse Programming:** Funding for substance misuse programming will ensure the provision of substance use education and support groups, as well as support transition planning specific to substance misuse. Substance misuse programming will be available to sentenced individuals and detainees with substance misuse needs. In 2023, 4,266 individuals self-reported drug use.
- **Supplemental Educational Programming:** Funding for supplemental educational programming will ensure the provision of basic literacy, numeracy, general education diploma preparation, and English Language Learner services and college readiness, as well as tutoring for people in custody.
- **Transportation Programming:** DOC will offer transportation to community-based services to people upon discharge, making it easier for people to access emergency housing, employment, substance misuse services, and family reunification. Discharge transportation will enable DOC to

provide critical support during the at-risk period immediately following incarceration, decreasing the likelihood of recidivism.

## Outposted Therapeutic Housing Units

The Adams administration is also moving forward with construction of outposted therapeutic housing units at NYC Health + Hospitals/Woodhull and North Central Bronx as part of its commitment to increasing access to specialty care services for people in custody while moving the most clinically vulnerable people off of Rikers. The units will house patients who have serious medical, mental health, and substance-use needs and would benefit from a more structured, clinical environment. DOC will provide security and custody management in the units, and NYC Health + Hospitals/Correctional Health Services (CHS) will continue to be the primary provider of care, in closer coordination with hospital specialists.

Construction is already underway at NYC Health + Hospitals/Bellevue, the first of the three units, with anticipated completion by spring 2025. Construction of the units at NYC Health + Hospitals/Woodhull and North Central Bronx will be completed in summer 2027, assuming timely completion of design and barring significant unforeseen field conditions. Construction of all units is fully funded, with a total capital investment of $718 million, and will comprise approximately 360 beds, depending on final designs. All three hospitals will benefit from an infusion of funds to renovate and repurpose hospital space to create the outposted therapeutic housing units. NYC Health + Hospitals/Woodhull recently relocated and renovated its inpatient pediatrics unit, and upgraded other clinical and administrative spaces, to prepare for the construction of the outposted unit.

## Studying The Future Use of Rikers Island

As the Adams administration continues to explore the future development of Rikers Island, the New York City Department of Environmental Protection (DEP) and the Mayor's Office of Climate and Environmental Justice (MOCEJ) today released two feasibility studies assessing the possibility of using the island's available buildable land to help the city and state achieve shared clean energy goals, while investing in the city's infrastructure and repurposing Rikers Island to advance climate justice. Both studies offer an alternative to older wastewater infrastructure and present solutions that would contribute significantly to the city's climate and energy transition goals.

As required by Local Law 31 of 2021, DEP completed the "Feasibility Study for a New Wastewater Resource Recovery Facility on Rikers Island," which concludes that the construction of a new state-of-the-art Wastewater Resource Recovery Facility (WRRF) on Rikers Island to consolidate operations of four existing facilities is both viable and presents a unique and transformational opportunity for DEP's operations.

As required by Local Law 17 of 2021, MOCEJ completed the "Renewable Rikers Feasibility Study Report," which assesses siting of renewable energy infrastructure on Rikers Island. It includes an evaluation of five different scenarios to achieve cost savings, emissions reductions, and energy performance goals, and presents a preferred scenario that includes a combination of solar, battery storage, offshore wind interconnections, and a WRRF.

"The city has an opportunity to reimagine how Rikers Island can serve New Yorkers," said **New York City Chief Climate Officer and DEP Commissioner Rohit T. Aggarwala**. "The DEP and MOCEJ studies present options that would turn Rikers Island into a center of state-of-the-art green technologies that would help us achieve our energy, air quality, and water quality improvement goals."

"'Renewable Rikers' was born out of the idea that the future of Rikers Island can contribute to a sustainable and resilient New York City and provide benefits to New Yorkers who have been most impacted by our criminal justice system," said **MOCEJ Executive Director Elijah Hutchinson**. "Our research found Rikers Island has the potential to be a home for solar installations, battery storage systems, and offshore wind interconnection infrastructure, helping New York City reach its world-leading, ambitious climate goals. We look forward to working with the Rikers Island Advisory Committee and stakeholders, who first put forward the vision of a renewable Rikers."

"The Outposted Therapeutic Housing Units are an innovative approach to carceral health care, and we are thrilled to advance this groundbreaking model," said **Dr. Patsy Yang, senior vice president for correctional health services, NYC Health + Hospitals**. "The initiative is also a testament to the strength and commitment of the NYC Health + Hospitals system in caring for all New Yorkers, particularly the most vulnerable."

"Investments in programming and therapeutic beds are essential components of an overall commitment to safety for staff, people in custody, and the broader public," said **Mayor's Office of Criminal Justice Director Deanna Logan.** "I look forward to working with my colleagues at the Department of Correction, NYC Health + Hospitals, and all other city agencies that are dedicated to realizing Mayor Adams' vision of a safe and fair criminal justice system in New York City."

###

## Media Contact

pressoffice@cityhall.nyc.gov
(212) 788-2958

# EXHIBIT B

## Exhibit B

| Action Plan | |
|---|---|
| (A)(1)(c) | Cell Doors: By July 29, 2022, the Department shall install 75 new cell doors to complete the installation of new cell doors in all housing units that house young adults at RNDC. The Department shall ensure that incarcerated individuals assigned to celled housing units are assigned to cells with doors where the locking mechanisms are functioning properly. |
| (A)(2)(a) | Interim Post-Priority List: Within 30 days of the Order, the Department must develop an interim post-priority list to ensure that the posts most directly related to the safety of the incarcerated population are prioritized and duly designated as mandatory posts. The list of mandatory posts shall include, but not be limited to, housing areas. The Department shall ensure that all mandatory posts on the postpriority list are staffed. |
| (A)(2)(b) | Interim List of Uniform Staff Available to Work: By August 1, 2022, the Department must develop an interim list of uniform staff that are available to work a shift. |
| (A)(2)(c) | Scanning of Post Assignment: By September 1, 2022, the Department shall pilot at RNDC an electronic scanning system to ensure uniform staff assigned to priority posts in the facility are on post. The Department shall evaluate the effectiveness and feasibility of the pilot during the first 90 days the scanning system is in use in order to determine whether the use of the electronic scanning system shall be discontinued or expanded to other Facilities. If it is determined that the electronic scanning system shall be expanded, then the Department must provide the Monitor with a list and timeline for expansion 30 days after the evaluation of the pilot project. |
| (A)(2)(d)(i) | Revised Home Confinement Visits: The Department shall implement revised practices and procedures for home confinement visits to make the home confinement visits more reasonable and efficient by reducing the burden on investigators, including reducing the number of knocks needed to ascertain if an individual is home and reducing the number of rings for a phone call to ascertain if an individual is home. |
| (A)(2)(d)(ii) | Medically Modified/Restricted Duty Status: Within 60 days of the Order, the Department shall implement a process to significantly reduce the use of Medically Modified/Restricted Duty Status and eliminate the abuse of this designation by revising policies and procedures, implementing a strategic plan to significantly limit the use of this status going forward, and seeking medical separation of at least 170 staff on this status. |

| (A)(2)(d)(iii) | Revised Sick Leave & Absence Control: Within 90 days of the Order, the Department, in consultation with the Monitor, shall revise its policies and procedures regarding sick leave and absence control. The revised policies and procedures shall be implemented thereafter. |
| --- | --- |
| (A)(2)(e) | Improved Management of the Health Management Division: Within 90 days of this Order, the Department shall complete an assessment of the Health Management Division ("HMD") in order to identify any deficiencies or inefficiencies in practices. The Department shall then implement any changes in practices that are needed based on the assessment to ensure the work of HMD is efficient, accurate, and reliable. Further, the Department shall utilize civilian staff to conduct the work of HMD. |
| (A)(2)(f) | Evaluation of Current Uniform Staff on Sick Leave & Medically Restricted Status: Within 120 days of this Order, the Department must evaluate all uniform staff currently out on sick leave more than 30 days, in the status of chronic sick, and medically restricted duty level 3, as of the date of this order, in order to identify those staff who must return to work, and/or to initiate proceedings to separate staff, and/or initiate disciplinary proceedings for any potential abuse, and/or make any referrals to DOI because the abuse is potentially criminal in nature. |
| (A)(2)(f)(i) | Expedited Discipline: The Department shall seek expeditious processing of at least 20 medical incompetence cases before OATH, which were identified on May 23, 2022. OATH shall expeditiously process these cases so that they are resolved as quickly as possible with an agreed upon settlement or a report and recommendation is issued following a trial. |
| (A)(3)(a) | Re-assignment of Captains to Supervision of Correction Officers: Within 30 days of this Order, the Department will evaluate the approximately 45 Captains on Temporary Duty Assignment and re-assign most, if not all, of these Captains to posts that supervise officers assigned to housing unit posts. |
| (A)(3)(b)(ii) | Department Leadership: The Department shall revise the executive leadership structure as follows: The Commissioner shall appoint a Senior Deputy Commissioner who shall report to the Commissioner. The following positions will report to the Senior Deputy Commissioner: |
| (A)(3)(b)(ii)(1) | Deputy Commissioner of Security – this position will include, at a minimum, the responsibilities of the Security Operations Manager outlined in Section D (Security Practices) of this Order. |
| (A)(3)(b)(ii)(2) | Deputy Commissioner of Classification, Custody Management, and Facility Operations – this position will include, at a minimum, the responsibilities of the Deputy Commissioner of Classification outlined in Section E (Prioritize the Management of People in Custody) of this Order. Note: This DC has since resigned, and the position is open. |

| | |
|---|---|
| (A)(3)(b)(ii)(2)(a) | At least two Associate Commissioners of Operations will report to the Deputy Commissioner of Classification, Custody Management, and Facility Operations. Note: One AC has since resigned, and the position is open. |
| (A)(3)(b)(ii)(2)(b) | An individual Assistant Commissioner of Operations will be appointed to each facility to partner with and assist departmental Correctional Wardens in monitoring all aspects of facility operations. The Assistant Commissioners of Operations will report to the Associate Commissioner of Operations. |
| (A)(3)(b)(ii)(3) | Deputy Commissioner of Administration – this position will include, at a minimum, the responsibilities of the Staffing Manager outlined in Section C (Uniform Staffing Practices) of this Order. |
| (A)(3)(b)(ii)(3)(iii) | The individual responsible for the Health Management Division shall report to the First Deputy Commissioner. |
| (A)(3)(c) | Expanded Use of Early Intervention, Support and Supervision Unit: The Early Intervention, Support and Supervision Unit ("E.I.S.S.") shall be expanded to also support any staff on disciplinary probation (for any reason) and Supervisors during their probationary period. The Department shall also develop an initiative in which each facility has at least one supervisor responsible for working with the E.I.S.S. Unit to support the uniform staff that are in the E.I.S.S. program and address any deficiencies in supervision of those staff that are identified. |
| (B)(1) | Citywide Task Force: The City shall continue to routinely convene representatives from all City agencies1 that support the Department's budget and funding, the Department's physical plant and any corresponding repairs, the Department's accountability process for staff and incarcerated individuals, and the Department's labor issues to ensure that the Department timely and meaningfully addresses the requirements of this Order, the Consent Judgment, and three Remedial Orders. |
| (B)(2) | Recruitment Efforts for DOC: Within 30 days of this Order, the City and Department shall launch a new, full scale recruitment campaign focused on attracting and identifying qualified candidates for the following positions: (1) individuals with correctional expertise to serve in leadership positions, (2) attorneys and support staff for the Trials and Legal Division, (3) staff to backfill civilian roles previously held by uniform staff, with priority on staff for the Health Management Division, and (4) physicians to evaluate whether uniform staff who are out on leave are able to return to active duty. The recruiting campaign must include unique, creative measures to attract qualified candidates. In order to recruit qualified candidates, the City and Department shall offer incentives and other measures not previously utilized by the City and Department. |
| (B)(4) | Routine Coordination with Law Enforcement Agencies to Expedite Case Processing of Individuals Incarcerated 365 Days or More: The |

| | |
|---|---|
| | Department shall develop a list every month of all incarcerated individuals that have been incarcerated for at least one year or more. This list shall be produced to the Mayor's Office of Criminal Justice and, in turn, provided to representatives of each District Attorney's Office and the Office of Court Administration in order to facilitate efforts for these cases to be processed as quickly as possible. The City shall advise the Monitor on a monthly basis of which cases identified on this list have been expedited for prosecution and their status. |
| (C)(1) | Appointment of Staffing Manager: Within 90 days of this Order, the Department must select a Staffing Manager to develop a sound correctional staffing management scheme, including oversight of the Roster Management Unit and authority to implement initiatives to maximize the deployment of uniform staff as outlined in § C., ¶ 3 of this order below. The Staffing Manager must have significant expertise in correctional operations and correctional staffing administration in other systems outside of the New York City Department of Correction. The Department must consult with the Monitor on the selection of the Staffing Manager. The Staffing Manager shall ensure that the strategies and initiatives related to staffing are appropriately sequenced and prioritized with corresponding timelines for implementation. |
| (C)(2) | Roster Management Unit: The Department shall create a dedicated and centralized Roster Management Unit to manage the schedules for uniform staff across the agency. The Roster Management Unit must be equipped with appropriately trained personnel to manage the number of staff authorized to work and the assignment of uniform staff. |
| (C)(5) | Single Source Tracking System of Staff: By September 1, 2022, the Department shall procure appropriate software and technology to automate uniform staff scheduling and create a central repository of information related to uniform staff assignments, status (e.g. active, restricted, in-active, long-term inactive and restricted), and scheduling across all facilities. This system must also have the capability for tracking, collecting, and securing data designed to identify a reasonable and reliable relief factor. The automated system should be based on the collection of internal data and take into consideration operating days, work schedules, post frequency, off-post time, and leave-time. The system shall be configured for Department-wide use by June 1, 2023 so it may be implemented by that date. |
| (D)(1) | Security Operations Manager: The Department must maintain the appointment of an individual with significant expertise in correctional operations and security as the Security Operations Manager. The Department must consult with the Monitor before any |

| | |
|---|---|
| | individual is appointed to serve in this position. The Security Operations Manager must have appropriate authority to manage and implement the requirements enumerated in § D., ¶ 2 and adequate resources to conduct their work. |
| (D)(5) | Cell Doors: The Department shall install at least 950 new and upgraded cell doors at RNDC and AMKC by July 31, 2024.<br><br>a. At Least 20% Complete (190 doors) shall be installed by December 31, 2022.<br><br>b. At Least 50% Complete (475 doors) shall be installed by October 31, 2023.<br><br>c. At Least 75% Complete (713 doors) shall be installed by April 30, 2024. |
| (E)(1) | Classification Manager: By August 1, 2022, the Department shall appoint a Classification Manager to oversee the Custody Management Unit. The Classification Manager must have appropriate authority to manage and implement the requirements enumerated in § E., ¶ 2 and adequate resources to conduct their work. |
| (E)(2) | Responsibilities of the Classification Manager: The Department shall implement improved practices and procedures regarding housing of incarcerated individuals, including, but not limited to, the following items outlined below. |
| (E)(2)(a) | Centralized Unit: a centralized Custody Management Unit ("CMU") for all classification functions. The CMU shall centrally manage inter-facility and intra-facility transfers to ensure people are housed in units that are commensurate with their custody level and to ensure adherence to the Department's strategy for widely dispersing people who are affiliated with a Security Risk Group ("SRG"). CMU may include staff who are located at individual facilities, but they must report directly to CMU leadership. |
| (E)(2)(b) | Reclassification: a reclassification process in which people in custody are reclassified at 60-day intervals following their initial classification. |
| (E)(2)(c) | Modifying Tracking System: improve reclassification form in the Inmate Information System ("IIS") to address and resolve the concerns identified by the Classification Consultant, James Austin. |
| (E)(3)(a) | Processing Incarcerated Individuals Through Intake Within 24 Hours: The Department shall implement the requirements of ¶ 1(i)(c) of the Second Remedial Order. |
| (F)(1) | Staffing for Trials Division: By July 29, 2022, the Defendants must assign at least thirteen additional agency attorneys, two additional legal coordinators, four additional support staff and two additional directors to the Trials Division. |
| (F)(1)(a) | Staffing Levels of Trials Division: The City shall thereafter ensure that the Department's Trials Division maintains at least 25 agency |

| | attorneys and 4 directors, unless and until the Department can demonstrate to the Monitor with an internal staffing analysis that fewer agency attorneys and directors are necessary to timely address the disciplinary matters pending with the Trials Division. |
|---|---|
| (F)(1)(b) | Disciplinary Manager: The Department shall maintain a Disciplinary Manager required by ¶ 5 of the Third Remedial Order. |
| (F)(2)(a)(i)-(iv) | Expeditious Resolution of Egregious Conduct and/or Multiple Serious Violations: The City, Department and OATH shall develop, in consultation with the Monitor, a process by which appropriate and meaningful discipline, up to and including termination, for any staff member can be expeditiously imposed in any case involving: (1) conduct that would merit the Department seeking termination pursuant to the Disciplinary Guidelines, or (2) egregious conduct that resulted in the risk of serious harm to an incarcerated individual. The Monitor may refer cases to the Department for resolution in this expedited manner.<br>(a) A case identified to be resolved in an expedited manner must be resolved as follows:<br>　　i. Investigations: The investigation(s) of the matter must be completed within 30 business days of identification.<br>　　ii. Referral for Discipline: The case must be processed for discipline — including completion of the MOC, referred to the Trials Division, charges served on the Respondent, discovery produced to the Respondent, an offer for resolution must be provided to the Respondent, the case filing with OATH, and a pre-trial conference must be scheduled within 20 business days of the closure of the investigation.<br>　　iii. Adjudication of Discipline: Any and all disciplinary proceedings, including, but not limited to, convening a pre-trial conference, conducting a trial before OATH, and submission of a Report and Recommendation from the OATH ALJ must be completed within 35 business days of the case being filed with OATH.<br>　　iv. Imposition of Discipline: The Commissioner must impose the final disciplinary action within 15 business days of receiving the Report and Recommendation from OATH. |
| (F)(5) | Addressing Future Incidents of Misconduct: By August 15, 2022, the Trials Division shall assign a dedicated group of attorneys to exclusively prosecute disciplinary referrals made as of that date, and going forward, to ensure expeditious prosecution of these future cases. |
| (F)(6) | Evaluation of Disciplinary Procedures: The Department, in consultation with the Monitor, shall conduct a comprehensive evaluation of the Department's disciplinary practices and |

| | |
|---|---|
| | procedures, including, but not limited to, the processes for identifying violations, providing notice to Staff and an opportunity to be heard, and the ultimate imposition of discipline to identify concrete and specific practices that can be refined in order to expedite the prosecution of disciplinary cases. The Monitor's Report, to be filed on October 28, 2022, shall provide the Court with a report of the steps that must be taken to remove the barriers that delay the imposition of appropriate and meaningful discipline and a timeline to implement such steps. |
| (F)(7) | Addressing Discipline for Abuse of Staff Leave or Restricted Duty Policies: The Department shall take all necessary steps to impose appropriate and meaningful discipline, up to and including termination, for any staff member who violates Department policies, procedures, rules, and directives relating to sick leave, restricted or modified duty, or absence without official leave. |
| (G)(1) | Manager Reporting to the Monitor: The Disciplinary Manager, the Security Operations Manager, the Staffing Manager, the Classification Manager, and the leader of the Nunez Compliance Unit (or comparable unit) (collectively the "Managers") must regularly provide updates to the Monitor regarding their work. The Managers will collaborate with the Monitor on the format and frequency of the updates, allowing for changes in such format and frequency as the work progresses. |
| June 13, 2023 Order | |
| (I)(1)(a) | Communicate Obligations Under the Nunez Court Orders to All Department Leadership and Staff: Within 7 days of this Order: (a) All Department leadership and staff must be advised that they must engage with the Monitor and must be candid, transparent, forthright, and accurate in their communications with the Monitor. This communication must be approved by the Monitor prior to its dissemination. Within 14 days of this Order, the Department must provide the Monitor with verification that this communication was provided to all Department leadership and staff. |
| (I)(2) | Notification of Deaths In-Custody and Compassionate Releases in 2023: Within 10 days of this Order, the Department shall advise the Monitor of all available information regarding individuals who have: (a) died in custody or (b) were compassionately released between January 1, 2023, and the date of this Order. At a minimum, to the extent it has not already been provided, the Department shall advise the Monitor of the name of each individual, the date and time of death or compassionate release, any report to the Central Operations Desk regarding either the death or compassionate release, the cause and circumstances surrounding the event, and current investigative findings. Any additional information the Monitor may request about these incidents, to the extent available, |

| | shall be provided by the Department to the Monitor within 5 business days of the request. |
|---|---|
| (I)(5) | Engage in Proactive Communication with the Monitor Related to the Nunez Court Orders: The Department shall proactively consult with the Monitor in advance of promulgating any new policies or procedures that relate to compliance with the Nunez Court Orders. The Department shall provide the Monitor reasonable notice and information of any such new policy and practice, at least three weeks prior to planned implementation, in order to afford the Monitor an opportunity to provide meaningful feedback and for the Department to consider and reasonably incorporate any feedback from the Monitor prior to implementing any new policy and practice. |
| (I)(6) | Provide the Monitor Unfettered Access to Department Leadership and Staff: The Monitor shall have unencumbered, direct access to communicate with and seek information from all Department leadership and staff to fulfill his responsibilities under the Nunez Court Orders. The Monitor shall be permitted to have confidential communications with Department leadership and staff outside the presence of other Department personnel. |
| (I)(7) | Appoint Nunez Manager: Within 30 business days of the Order, the Department shall designate a senior official to serve as the Department's internal Nunez Manager. The Nunez Manager's responsibilities shall be limited to the areas covered by the Nunez Court Orders. The Nunez Manager shall serve as a point of contact for the Monitor, ensure that the Monitor timely receives the information he needs to fulfill his responsibilities under the Nunez Court Orders, coordinate the Department's responses to requests from the Monitor, and ensure that any recommendations or feedback provided by the Monitor concerning requirements or areas covered by the Nunez Court Orders are timely conveyed to the appropriate and relevant Department personnel. Selection of the Nunez Manager, and any subsequent Nunez Manager in the event the individual selected leaves or is removed from the position, shall be subject to the approval of the Monitor. |
| (I)(7)(a) | The Nunez Manager shall have unfettered access to all Department records and information necessary to perform these responsibilities, and the City and Department shall provide the Nunez Manager with sufficient resources to allow them to perform these responsibilities. |
| (II)(2) | The Department shall produce a concrete and specific plan of action related to its stated intention to (2) consider installing a preventative barrier in the housing unit where the individual jumped from the top tier. |
| August 10, 2023 Order | |
| (I)(11) | ID Staffing: By, December 31, 2023, the City shall ensure that the Department's ID Division maintains at least 21 supervisors and 85 |

| | investigators to conduct use of force investigations unless and until the Department presents an internal staffing analysis and can demonstrate to the Monitor that fewer staff are necessary to conduct thorough, timely, and objective investigations of all Use of Force Incidents as required by the Nunez Court Orders. |
|---|---|
| (I)(12) | Additional Reporting by the City and Department Regarding Intake: On September 15, 2023 and November 15, 2023, the City and Department shall file two additional reports on the Court docket regarding the status of their continued efforts to implement reliable Intake tracking systems for new admissions and inter/intra facility transfers. |
| (I)(14) | External Assessment of Procedures for Preventing and Responding to Self-Harm: The City and Department shall authorize, and the Department and CHS shall engage, a consultant (and any necessary staff) who is a qualified expert in the prevention and response to self-harm in correctional settings to conduct the assessment outlined below. The Monitor has approved of the selection of Dr. Timothy Belavich. If Dr. Belavich proves to be unavailable or becomes unavailable or his continued service becomes otherwise unfeasible in the future, the Department will retain an appropriate replacement subject to approval of the Monitor. The consultant shall conduct the following assessment in consultation with the Monitor: a. DOC and H+H policies related to Suicide Prevention to ascertain whether they reflect generally accepted practice. b. H+H protocols for screening, assessing, and treating the risk of suicide and DOC protocols for responding to suicidal ideation/referrals and for monitoring those who are on suicide precautions to determine whether they are adequate. c. DOC staff's practices and responses to self-harm incidents. d. Current H+H and DOC protocols and practices to identify where performance is subpar. e. DOC and H+H's Morbidity-Mortality Review process to ensure that it reflects the generally accepted practice and relevant professional standards. The consultant shall provide the Monitor with a report of his findings by December 31, 2023. |
| December 14, 2023 | |
| (1)(a) | Department's Incident Reporting Practices: The Department shall develop and implement a comprehensive and streamlined policy and procedures for all incidents and events that must be reported (New COD Policy). The policy and procedures shall be subject to the approval of the Monitor. Accordingly, by the dates set forth below, the Department, in consultation with the Monitor, shall: a. By December 15, 2023: Provide the Monitoring Team will the full list of Department policies that must be reviewed for potential consolidation into the new COD policy. |