UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- x

MARK NUNEZ, et al.,

                                      Plaintiffs,

-against-

CITY OF NEW YORK, et al.,

                                      Defendants.

**<u>DECLARATION OF
ASSOCIATE
COMMISSIONER
TIMOTHY KEPLER</u>**

11 Civ. 5845 (LTS)(JCF)

-------------------------------------------------------------x

UNITED STATES OF AMERICA,

Plaintiff-Intervenor,

-against-

CITY OF NEW YORK and NEW YORK CITY
DEPARTMENT OF CORRECTION,

                                      Defendants.

-------------------------------------------------------------x

STATE OF NEW YORK    )
                              :SS:
COUNTY OF QUEENS    )

      **TIMOTHY KEPLER**, declares pursuant to 28 U.S.C. Code §1746 under penalty of perjury that the following is true and correct:

      1.      I am an Associate Commissioner in the Office of Management, Analysis, and Planning ("OMAP") at the New York City Department of Correction ("DOC").

2.      I have a master's degree in public administration from Baruch College and worked for seven years at the New York City Fire Department as a Data Analyst and Director of Data Quality before joining DOC in 2022.

3.      OMAP was first established at DOC in 2022. It is designed to provide analysis to inform DOC's operations and to support strategic planning. OMAP is involved in the planning of new initiatives and their evaluation once implemented. For example, we have been tasked with identifying individuals who have a history of violence, and therefore, are candidates for the proposed OBCC Annex program discussed in Commissioner Maginley-Liddie's and Dr. Austen's declarations. We have also created a tracking system to measure whether newly admitted individuals are housed within 24 hours (as required under the Court's orders) and to identify delays in their processing. The formation of OMAP demonstrates DOC's commitment to using quantitative data to advance decision-making and problem-solving.

4.      In their Proposed Findings of Fact, Plaintiffs argue that "the use of force rate and other rates of violence, self-harm and deaths in custody are demonstrably worse than when the Consent Judgement went into effect in 2015," and that "the current rates of use of force, stabbings and slashings, fights, assaults on staff, and in-custody deaths remain extraordinarily high."[1] These "findings" present an incomplete view of the data, resulting in conclusions that are mischaracterized or mistaken. Data is often "cherry-picked" to support desired conclusions.

5.      Citing the Monitor's October 5, 2023 Report, Plaintiffs state that "in a single week from September 11, 2023, to September 17, 2023, 145 uses of force, 12 stabbings/slashings, 74 fights among incarcerated individuals, 48 individuals engaged in self-injurious behavior, three

---

[1] Plaintiffs' Proposed Findings of Facts (PPFOF), paragraph 74.

medical emergencies, five individuals received Narcan, 15 fires, 34 assaults on staff, and 19 serious injuries were reported to DOC's Central Operations Desk (COD)."[2]

6.      The volume of reported incidents during one week, however, is not representative of incidents reported during a larger time frame. For example, analyzing slashing and stabbing incidents from the Incident Reporting System for all of 2023, the average weekly number of reported incidents was 7.3, 40 percent lower than the 12 incidents reported during Plaintiffs' selected time period. The average weekly number of use of force incidents for 2023 was 129.3, 11 percent lower than the 145 incidents reported during Plaintiffs' selected time period. Although the numbers are still high, one cannot make accurate comments about broad trends by focusing on a narrow period.

7.      Plaintiffs fail to report that there were 477 slashings/stabbings in 2022 compared to 383 in 2023, a 19.7 percent reduction.

8.      Similarly, in 2022, there were 1,643 assaults on staff, and in 2023, 1,401, a 14.7 percent reduction.

9.      Plaintiffs make much of the high number of use of force incidents, but their statistics are misleading. Under DOC's policy, use of force is defined broadly: any time an officer makes contact with a non-compliant individual to compel behavior, it counts as a use of force, no matter how slight the contact. The more significant measure is uses of force that result in injury to an incarcerated individual (class A and B uses with A the more serious).  The injury classification of all use of force incidents are reviewed by the Investigation Division (ID) during the course of their investigation. If ID discovers additional information that requires a classification change, the recommendation is sent to the Office of Security, where evidence is reviewed, and incidents are

---

[2] Plaintiffs' Proposed Findings of Facts, paragraph 78.

reclassified if necessary. With the acknowledgement that incidents in the latter months of 2023 may be reclassified, there has been a meaningful decrease in the number of use of force incidents that result in injury. The number of incidents classified as "A" or "B" in the last six months of 2023 are lower than the first six months of 2023 both in the total number and in the proportion of total uses of force. Referencing total uses of force, as Plaintiffs repeatedly do, paints a distorted picture.

**Use of Force by Injury Class January 2023 - December 2023**

| Month | A | | B | | C | | Total |
|---|---|---|---|---|---|---|---|
| | Count | % | Count | % | Count | % | |
| Jan-23 | 4 | 0.6% | 42 | 6.8% | 570 | 92.5% | 616 |
| Feb-23 | 9 | 2.0% | 27 | 5.9% | 423 | 92.2% | 459 |
| Mar-23 | 13 | 2.4% | 40 | 7.3% | 492 | 90.3% | 545 |
| Apr-23 | 9 | 1.7% | 31 | 6.0% | 475 | 92.2% | 515 |
| May-23 | 12 | 2.1% | 36 | 6.2% | 535 | 91.8% | 583 |
| Jun-23 | 11 | 2.1% | 38 | 7.3% | 469 | 90.5% | 518 |
| Jul-23 | 16 | 2.8% | 24 | 4.2% | 525 | 92.9% | 565 |
| Aug-23 | 6 | 1.1% | 17 | 3.1% | 518 | 95.7% | 541 |
| Sep-23 | 4 | 0.7% | 21 | 3.7% | 542 | 95.6% | 565 |
| Oct-23 | 3 | 0.5% | 20 | 3.1% | 632 | 96.5% | 655 |
| Nov-23 | 3 | 0.5% | 22 | 3.5% | 597 | 96.0% | 622 |
| Dec-23 | 4 | 0.7% | 25 | 4.2% | 569 | 95.2% | 598 |

10.    Plaintiffs argue that "DOC's quantitative indicators are likely an undercount because staff reporting of serious incidents is unreliable."[3] That is an unfair characterization.[4] The Monitor has identified some slashings and stabbings that were not properly reported, but there is no reason to believe that underreporting is significant or that is affects trends. It would require a level of manipulation for which I find no evidence in the data.

---

[3] Plaintiffs' Proposed Findings of Facts, paragraph 79.
[4] OMAP is currently working with the Monitor to establish better definitions and to redefine certain protocols for reporting incidents to ensure confidence in the accuracy of its data.

11.    Importantly, Plaintiffs' comparison of 2016 to recent years fails to account for changes in policy that have had a significant impact on observed trends. Prior to the promulgation of Directive 5006R-D, DOC had no specified definition of use of force. As noted above, with the revision of the Department's policy in September 2017, use of force is now defined broadly. Under the new definition, escorting a resistant individual counts as a use of force even if there is no injury. This definition greatly expands the number of use of force incidents, well beyond those previously reported. Because of the change in definition, any comparison of 2016 and today is flawed.

12.    Plaintiffs also assert that, according to the Monitor's July 10, 2023 Report, DOC's average monthly rate of stabbing and slashing incidents between January and May 2023 was 243 percent higher than the average rate at the inception of the Consent Judgment in 2016. Comparing 2016 and 2023 is problematic. It ignores how the population has changed since 2016. An analysis of historical data from the Inmate Information System shows that in 2016, DOC's average daily population was 9,461 with 1,051 individuals having a top charge of a homicide crime (approximately 11 percent of the population). In 2023, the average daily population decreased to 6,066 with 1,626 individuals having a top charge for a homicide crime (approximately 27 percent of the total population) See Figure 1. The data shows that incarcerated individuals with a homicide charge are more likely to be involved in a slashing or stabbing incident. In 2016, individuals with a homicide charge were involved in 35 percent of such incidents. In 2023, that number has increased to 69 percent.

**Figure 1: Average Daily Population and Proportion of Individuals with a Homicide Charge**



13.     The increase in reporting use of force and violent incidents can also be attributed to the increased surveillance camera coverage in our facilities. Prior to the Consent Judgment, DOC had a limited number of stationary surveillance cameras in its facilities. Now, activity in nearly all areas of the jails is captured on camera. Surveillance cameras offer an objective view of each incident, encouraging staff to be honest about their actions and affording supervisors the opportunity to observe events and identify misconduct. What occurred "off camera" in 2016 is now seen on camera.

14.     In short, violence at DOC is still high, but recent trends demonstrate that progress is being made.

Dated: 3/18/24

TIMOTHY KEPLER