UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- x
MARK NUNEZ, et. al,

                           Index No. 11 Civ. 5845 (LTS)(JCF)

              Plaintiffs,            **DECLARATION OF
                                          RONALD BRERETON**

        -against-

CITY OF NEW YORK, ET AL.,

              Defendants.
-------------------------------------------------------------------- x
UNITED STATES OF AMERICA,

              Plaintiff-Intervenor,

        -against-

CITY OF NEW YORK and NEW YORK CITY
DEPARTMENT OF CORRECTIONS,

              Defendants.
-------------------------------------------------------------------- x

    **RONALD BRERETON** declares, under penalty of perjury and pursuant to 28 U.S.C. § 1746,

that the following is true and correct:

1.   I am the Deputy Commissioner of Security Operations with the New York City

     Department of Correction ("DOC"), a position that I have held since May 2022. In this

     role, I oversee the Special and Central Operations Divisions, the Operational Security

     Intelligence Unit, Correctional Industries Division, Office of Policy and Compliance, and

     the Fire Safety Unit.

2.   Prior to joining the DOC, I served for 33 years with the New York State Department of

     Corrections and Community Supervision (DOCCS). I began as a correction officer at

Sing Sing Correction Facility, and advanced through the ranks to become the Superintendent of Lincoln Correctional Facility. I also held supervisory positions at Queensboro, Taconic, and Fulton Correctional Facility, as well as Edgecombe Residential Treatment Facility. I received a Bachelor of Science in Criminal Justice from Mercy College, and am a Certified Corrections Manager and Auditor with the American Correctional Association.

A.  Use of Force Policy

3.  In 2017, in consultation with the Monitor, the DOC substantially revised its Use of Force Directive ("Directive") to reflect appropriate practices during events where personnel are faced with non-compliance amongst an individual or individuals in custody. Since then, in formal training and at daily roll calls, we have sought to ensure that members of service fully understand what is expected of them.

4.  DOC's Use of Force Directive is now six years old and should be revisited to reflect consistency and standardization with practices instituted across the field. We will initiate this process in the immediate future and will consult with the Monitor about our plans.

5.  Plaintiffs reference a number of incidents in their Memorandum of Law that they say are evidence of "numerous other violations of the Directive." Plaintiffs' Memorandum of Law (P. Mem.) pg. 14. As set for in the chart below, each of the incidents has been or is being investigated, and, with the exception of the two open cases, discipline has been issued in each case. The DOC trains its staff consistent with the UOF Directive and when staff deviates from that Directive appropriate discipline is given.

| UOF No. | Date | ID Investigation (Y/N) | ID Outcome | PPFOF Paragraph |
|---------|------|------------------------|------------|-----------------|
| 2774/23 | 5/31/2023 | Y | Open | 278 |
| 3311/23 | 6/30/2023 | Y | Closed w/ Charges<br><br>Main Officer received Summary Suspension 30 days. (MOC 1112/23)<br><br>Second officer received MOC 1314/23 for reporting violation | 268 |
| 2893/23 | 6/7/2023 | Y | Closed w/ Charges<br><br>Main Officer received Summary Suspension 10 days. (MOC 0927/23)<br><br>Two other Officers received MOCs (1177/23 and 1178/23) for reporting violations. | 272 |
| 1156/23 | 3/3/2023 | Y | Closed w/ Charges<br><br>Main Officer received Summary Suspension 30 days. (MOC 626/23)<br><br>Two other Officer received MOCs (828/23 and 829/23) for reporting violations. | 270 |
| 1910/23 | 4/14/2023 | Y | Closed w/ Charges<br><br>Officer received Summary Suspension 30 days. (MOC 687/23) | 276 |
| 2239/23 | 5/3/2023 | Y | Closed w/ Charges<br><br>Officer received Summary Suspension 30 days. (MOC 787/23) | 277 |

| | | | | |
|---|---|---|---|---|
| 3031/23 | 6/15/2023 | Y | Closed w/ Charges<br><br>Main Officer received Summary Suspension 15 days. (MOC 969/23)<br><br>Three other Officers received MOCs 1320/23, 1321/23, and 1322/23 for reporting violations | 279 |
| 1463/23 | 3/22/2023 | Y | Closed, No Charges<br><br>CD issued; 7 Days penalty | 274 |
| 3246/23 | 6/27/2023 | Y | Open | 267 |

B. <u>Rapid Reviews</u>

6.  Each weekday, I along with two experienced members of my team, conduct "Rapid Reviews" of the prior day's use of force incidents (or on Monday, of the prior three days' incidents). An average day of footage review may comprise of 25 incidents and requires up to four hours to complete.

7.  During our preliminary review, we assess if the incident was avoidable/unavoidable, or otherwise excessive based on an analysis of staff actions and compliance with policies. Facility Leadership is also required to complete a review and assessment prior to our daily call.

8.  During the Rapid Review calls with Facility Leadership, we are provided with granular specifics on the incident including the events which took place prior to. While human behavior may be unpredictable, the dialogues held with Leadership allows us to pinpoint critical actions personnel must consistently practice. It is imperative for us, as a collective, to proactively eliminate variables which increase opportunities for force to transpire. This is a part of the intent and purpose of the Rapid Reviews where Facility

Leaders are aligned with the standards, and held accountable to applying such across their commands and with subordinates.

9. For all avoidable Uses of Force, Facility Leadership promptly remediates actions through progressive discipline to reduce the likeliness of repeat occurrences. As it pertains to nonavoidable Uses of Force, while the situation may have warranted force, we critique the application of force and adherence with the policy. Additionally, we analyze personnel's actions prior to the incident, during the incident and in the aftermath for lack of compliance with other policies or protocols. For example, a review of one incident showed personnel failing to activate body-worn cameras during escort and will result in a corrective interview. Regarding a separate incident, personnel did not escort the incarcerated individual to decontamination in the required timeframe. Personnel will receive counseling to ensure those actions are never repeated.

10. Incidents which are a clear violation of policy and deemed egregious are referred to the Investigations Division; Facility Leadership will promptly suspend personnel upon their review.

11. Aside from the Rapid Reviews, I maintain frequent and constant communication with Facility Leadership to offer guidance and support. We have weekly meetings to discuss the dynamics of an ever-evolving jail setting and to problem-solve. I am hands-on with personnel in efforts to refine their Supervisory skills. My presence is visible in Facilities where I speak with front-line staff, listen to their concerns, and provide feedback. I am adamant on breaking through the resistance through accessibility and modeling best practices.

C.  Use of Emergency Services Unit (ESU) and Strategic Response Team (SRT)

12. Historically, before 2023, there has been a culture of hyper-reliance on the Emergency
Response Teams—the Emergency Services Unit ("ESU") and the Strategic Response
Team ("SRT")—for responding to events which could otherwise be resolved through the
use of interpersonal communication skills, de-escalation tactics, and/or Facility resources.
I continue to enforce this practice and do not allow the deployment of ESU for those
purposes. DOC has proposed a restructuring of the Facility Alarms where the activation
of ESU only occurs for serious disturbances such as a hostage or bomb discovery (Level
D alarms). In those situations, ESU would engage in de-escalation tactics, if appropriate
and time permits. In consultation with the Monitor, we hope for the final approval of our
updated practice in the near term.

13. Additionally, DOC is revising its screening process for special team assignments, which
includes ESU and SRT. This is being done in consultation with the Monitoring Team. The
goal of the revised screening is to ensure that only those who should be assigned to these
units – in accordance with the requirements of Nunez – are assigned to these units.
Further, since the Summer of 2023 no members of service have been added to ESU; there
have only been removals from ESU since the Summer of 2023.

D.  Use of OC Spray

14. The Board of Corrections ("BOC") recently issued a Report indicating that DOC officers
were using chemical agents (OC spray) unnecessarily. Although I disagree with several
aspects of the report, its central point is sound: at times, chemical spray was used when
other approaches to resolving situations, including the use of interpersonal skills, would
have been preferable. Chemical spray is the only device that officers charged with

controlling a housing unit have at their disposal. The DOC is revising its policies related to chemical agents, including OC Spray, and a draft will be shared with the Monitor following internal review.

E.  Escort Procedures

15. The Monitor has raised concerns about our escort procedures, in particular that restraints are being applied in a manner that is painful. DOC is currently revising its escort procedures to address the Monitor's feedback, and such revisions will be shared with the Monitor for further feedback and approval.

16. The Office of Constituent and Grievance Services ("OCGS") has produced monthly reports of painful escort complaints since October 2022. To date, we have not received any complaints of painful escorts.

17. Each facility has a monthly binder of Roll Call topics and talking points. Proper escort techniques is one of the topics communicated with personnel to serve as a reminder on the proper application of restraints.

F.  Searches

18. Searches for weapons and other contraband are a critical component of any security plan. Contraband search and recovery is a standardized operation across all correctional institutions. The quality of those searches improves safety and security for our population and personnel. I have increased the amount of searches to acquaint commands with my expectations that post-incident, or upon receipt of credible intel, we shall take action on. Aside from scheduled tactical search operations, the commands also complete randomized searches.

19. As a result of our increased search efforts, from January 1 2023 to December 31, 2023, the following items were found in searches: 1,075 improvised jail weapons, 55 cell phones, 273 dangerous articles, and 4 496 drug recoveries, inclusive of fentanyl.

20. Additionally, the DOC has search initiatives underway that will help stem the flow of contraband into our facilities, including:

    a. Front Entrance Staff Body Scanning.  There are new body scanners at the Robert N. Davoren Center ("RNDC"), Otis Bantum Correctional Center ("OBCC"), and Eric M. Taylor Center ("EMTC") facilities. The DOC is working on installing a body scanner at George R. Vierno Center ("GRVC"). The Rose M. Singer Center ("RMSC"), North Infirmary Command ("NIC"), and West Facility ("WF") will follow.  DOC is also working to upgrade all our existing Leidos Body Scanners to their newest version and purchase seven additional Body scanners so we can have two at every facility and scan everyone all the time.

    b. Rapiscan drug detection.  The DOC is currently working on procuring these for each Jail facility's mail processing room and the main mail processing room.

    c. Cell Phone Detection. This system is setup at each facility and has successfully been detecting unauthorized cell phone usage. Reports are generated daily of locations of cell phone usage and then targeted searches are scheduled. At least two cell phones have been discovered so far.

    d. Narcan. After each use of Narcan the DOC initiates a search of the entire housing area to locate any contraband.

G. Key Control

21. Upon my arrival, I proposed revisions to the Key Control policy that aligned with best correctional practices. The revisions were provided to the Monitor and feedback received. DOC is further revising the policy to address the Monitor's feedback. An updated draft will be provided to the Monitor for feedback and approval. The updated policy will feature a uniform reporting structure for facilities to follow.

22. Until the policy and respective forms are approved by the Monitor and promulgated, I have required annual audits to ensure the keys in present circulation are accounted for and functional. This is a standardized practice and not unique to a correctional setting. The audits enforce this practice which was missing from DOC's operational process.

H. Unsecured Doors

23. When I began at DOC, I immediately recognized the absence of industry-grade cell doors. The cell doors were constructed in a fashion which increases the successful attempt of kicking the door outward as well as, easy manipulation of the lock. A number of initiatives such as the RNDC Cell Door Project, allowed the DOC to meaningfully address this matter and upgrade the cell-doors to meet correctional standards.

24. Each facility has a monthly binder of Roll Call topics and talking points. Unsecured Doors is one of the topics communicated with personnel to serve as a reminder on the proper locking of cell doors.

I. Post Orders

23. Command posts are associated with unique duties and responsibilities for an assigned Officer. The contents of a post order provide an overview of the post assignment and offer a description of duties and responsibilities the Officer is held accountable for. Facilities were required to complete an audit of all active post orders, and update if necessary. All facilities completed the audit of post orders by early 2023; OBCC, RESH, and West Facility completed.  The post orders are displayed at each post and also accessible through the agency's Share drive.

J. Post Abandonment

24. Across the DOC, multiple strategies, such as the Employee Post Attendance System ("EPAS") and In-Time, were instituted to address post abandonment.

25. While the messaging originates across various channels, I emphasize to Commands the importance of remaining on post until properly relieved.

26. Each facility has a monthly binder of Roll Call topics and talking points. Post Abandonment is one of the topics communicated with personnel to serve as a reminder that departure from a post without authorization is not permitted and discipline shall be issued.

27. If, during my Rapid Reviews, I find a staff member who was off-post or otherwise abandoned their post, progressive discipline is issued accordingly.

K. Management of Crowding in Vestibules

28. The crowding in vestibule areas, corridors, doorways, and other spaces may pose a security risk. Those areas can become "hotspots" for congregation, disruptive behavior, and/or actions which are unauthorized. To minimize those chances and restore compliant order, Facilities updated their "no-go zones" with red STOP signs and

10

visible signage. These updates apprise persons in custody of areas they are not permitted to enter or congregate near and supplements personnel's verbal instruction. The repainting of no-go zones started in October 2022; with the exception of a few yet to be painted areas in RESH, the facilities have fulfilled this order.

29. Expectations on "no go zones" were shared with persons in custody across formal settings such as the "Inmate Council Meeting."

30. Additionally, in December 2021, the DOC issued a teletype to staff regarding not congregating near doors and vestibules, which continues to be enforced today.

L. Facility Support

31. The Commissioner recently instituted a program whereby one senior operational stakeholder is assigned to oversee one jail facility, to provide additional support to the Assistant Commissioners of those facilities. I am assigned to oversee OBCC; Acting Assistant Chief Lemon oversees EMTC; Associate Commissioner Pace oversees GRVC; Assistant Chief Rembert oversees RNDC; Deputy Commissioner Edwards oversees RMSC and RESH; and Senior Deputy Commissioner Charles Daniels oversees NIC and the West Faciilty.

Dated: New York, New York
       March 15, 2024

RONALD BRERETON