UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------- x

MARK NUNEZ, et al.,

                                Plaintiffs,

-against-

CITY OF NEW YORK, et al.,

                                Defendants.

**DECLARATION OF
JAMES AUSTIN**

11 Civ. 5845 (LTS)(JCF)

-------------------------------------------------------------------x

UNITED STATES OF AMERICA,

                         Plaintiff-Intervenor,

-against-

CITY OF NEW YORK and NEW YORK CITY
DEPARTMENT OF CORRECTION,

                             Defendants.

-------------------------------------------------------------------x

STATE OF NEW YORK    )
                          :SS:
COUNTY OF QUEENS    )

    **JAMES AUSTIN**, declares pursuant to 28 U.S.C. Code §1746 under penalty of perjury that the following is true and correct:

    1.    I have been retained by the New York City Department of Correction ("DOC") as an expert in the field of corrections, classification, restricted housing programs, pretrial risk assessment, and rehabilitative program evaluations. I began my career as a correctional sociologist in 1970 at maximum security prisons in Illinois. I received my Ph.D. in sociology in

1980 from the University of California at Davis. In 1991, the American Correctional Association awarded me the Peter P. Lejin's Research Award for my research contributions to the field of corrections. In 1999, I received the Western Society of Criminology Paul Tappin award for outstanding contributions in the field of criminology.

2.      I am currently working in four jurisdictions - - Rhode Island, Alameda County (Oakland) California,  U.S. Virgin Islands, and Santa Clara County - - as either an expert for the federal court or a monitor of a consent decree. In 2021, DOC retained me at the suggestion of the Federal Monitor, to develop a plan to reduce violence on Rikers Island which was published in March 2022 . My full resume is attached as Exhibit A.

## I.   Violence at DOC

3.      In my March 2022 report, I made the following the four recommendations that if implemented would start reducing the level of violence at Rikers:

a.   Establish a single Restricted Housing Program (RHP)

b.   Lower the jail population.

c.   Reform the jail classification system.

d.   Cease the current practice of housing people by gang affiliation.

Three of the four recommendations have been implemented by the DOC, with only the recommendation to lower the jail population not being accomplished. [1]  Many of the most dangerous and disruptive Persons in Custody (PICs) have been in custody for more than a year. But fulfilling this recommendation would require the assistance of the District Attorneys, Legal Aid Society and the Courts.

---

[1] It's important to note that lowering the jail population is not within the Department of Correction's control.

4.    As the three recommendations have been implemented since 2022, there has been an associated decline in the number and rate per 100 jail population of slashing, stabbings and serious assaults.[2]  Based upon data contained in the Department's Incident Reporting System ("IRS") and Master Facility Management Report ("MFMR"), the number of assaults has significantly declined (See Figure 1).[3]  Slashing and stabbing rates  have also declined but remains higher than the rates that existed in 2021.

5.    Specifically, since reaching a peak of 16 per 100 jail population, the overall rate has declined by 50% to 8 per 100 jail population.  The inmate on staff rate has declined from a peak of 6 per 100 to 1 per 100 jail population.

6.    This is not to say that the current level of inmate on inmate assaults is acceptable and cannot be further reduced. More work remains to be done and that is what I am now working to do in close coordination with the Monitor and the DOC.

---

[2] Assault includes any Serious Injury to Inmate where the reason was assault and any Use of Force A that was an assault on staff. Stabbing/Slashing is defined as "the use of a sharp instrument to cut an inmate's body with a sweeping stroke, or the use of a sharp instrument to pierce an inmate's body." This definition has been updated, in consultation with the Monitor.



Figure 1. NYC DOC Assault and Stabbing/Slashing Annualized Rates Per 100 Jail Population January 2019 - January 2024

## II.   RESH

7.      Consistent with the recommendation to implement a more effective restricted housing program, I worked with DOC and in close consultation with the Monitor, to establish its Enhanced Supervision Housing program now referred to as RESH, a restrictive housing program for individuals who have been found by a hearing officer to have committed violent acts. The primary objective of RESH is to protect the safety and security of persons in custody and facilities, while promoting rehabilitation, good behavior, and the psychological and physical well-being of PICs. To accomplish these objectives, RESH is designed to separate from the general population those who pose the greatest threats to the safety and security of staff and other persons in custody. It additionally seeks to promote the rehabilitation of PICs in RESH by

incentivizing good behavior and by providing necessary programs and therapeutic resources consistent with the needs of the PIC.

8.     The program is now housed in the Rose M. Singer Center. Individuals are referred to RESH after being found to have recently committed a violent act - - a slashing or stabbing, assault on staff, or the possession of a dangerous instrument that can be used as a weapon to seriously assault other inmates or staff.  After RESH was implemented, I completed a careful assessment of the referral process and found that that the DOC is properly identifying the individuals who warrant placement in RESH.  Namely, the reason(s) why a referral is being made to the RESH Committee is documented by the RESH Committee. And, as shown later in Table 1,  all of the PICs currently in the RESH program meet the placement criteria set forth in the RESH policies.

9.     RESH requires a minimum stay of 60-day program with two levels, Level I and Level II, each of 30 days with the former being the more restrictive.

10.     Admission to, movement between Levels I and II and release from RESH is governed by the RESH committee. PICs with severe mental illnesses are precluded from admission to RESH.

11.     Out-of-cell time is limited to seven hours (as compared to 14 hours in general population). Each inmate is given a case plan by Program Services which lists programs needed to be completed, which will serve to reduce their tendency to commit violent acts. Only those who are compliant with being free of major disciplinary incidents and are participating in the program(s) listed in the case plan are able to graduate from RESH and return to the General Population.

**Table 1.  RESH Admissions, Releases and Other Key Indicators**

| Attribute | Admissions | Releases |
|---|---|---|
| Jan-23 | 96 | 85 |
| Feb-23 | 61 | 64 |
| Mar-23 | 103 | 82 |
| Apr-23 | 90 | 70 |
| May-23 | 90 | 88 |
| Jun-23 | 100 | 121 |
| Jul-23 | 86 | 79 |
| Aug-23 | 127 | 96 |
| Sep-23 | 109 | 102 |
| Oct-23 | 114 | 113 |
| Nov-23 | 106 | 113 |
| Dec-23 | 75 | 88 |
| Jan-24 | 95 | 98 |
| Total | 1,252 | 1,199 |
| Monthly Average | 96 | 92 |
| LOS for Releases | 56 days | |
| Current Pop | 168 | |
| Level 1 | 114 | |
| Level 2 | 58 | |
| Average LOS to Date | 46 days | |
| Percent SRG | 78% | |
| Percent Admitted Slash/Stab/Assault/ Persistent Violence | 97% | |

12.     A comprehensive data system has been implemented that allows RESH administrative staff to track the status and current progress of each RESH resident. I expect to conduct a "recidivism" study in the next 90 days to determine how many RESH graduates have remained free of subsequent major disciplinary incidents and have not returned to RESH while in the custody of the DOC. The initial study will be completed by July 1, 2024.

13.     As shown in Table 1, since January 2023, there have been 1,252 RESH admissions and 1,199 releases.  The current population is stable at about 170 with 144 assigned to Level 1 and 58 assigned to Level II.  It should be noted that about 150 releases were triggered

because the PIC was released from custody by the courts. The vast majority of these releases were due to being sentenced to state prison, time served, or secured pretrial release. These other releases reduce the average length of stay (LOS) in RESH for PICs released from RESH to an average of 54 days. In terms of long the current RESH population has been in RESH to date, the average LOS is 46 days, which shows the PICs are progressing through the program.

14.     In terms of the reason for placement in RESH, 97% have been involved in recent violence against other PICs or staff. The other 3% are due to possession of a weapon that can cause injury. A high percentage (78%) are affiliated with violent gangs.

15.     Currently the number of slashings/stabbings and fights occurring in RESH are very low.

16.     Overall, these data show the DOC has successfully implemented the program as I intended it to be.

III.     **Changes in the Classification System**

16.     In my 2022 report, I found several deficiencies with the classification system that were resulting in the mis-housing of PICs and contributing to the level of violence. In particular there were excessive delays in the reclassification process and the Classification unit was not fully controlling PIC movement. I also found that classification instruments were not properly assigning PICs to the proper custody level.

17.     All of these deficiencies have been corrected by the DOC. The classification system is now working as designed and is appropriately housing the jail population by the proper custody level.

**IV.    Housing PICs by Gang Affiliation**

18.    I also found in 2022 that the DOC had a practice housing PICs by their gang affiliation. Such a practice only serves to re-enforce the negative influence of these gangs and their use of violence to maintain their influence and power with the DOC.

19.    That practice has been discontinued by the DOC. Today the Classification unit constantly monitors the housing units to ensure no particular gang dominates the population by "blending" the population.

20.    Collectively these three reforms completed by the DOC have contributed to the reduction of violence at Rikers. But there are two additional initiatives that will be implemented in the next few months that will further serve to reduce violence – the Annex Program and the Behavioral Health Unit (BHU) Program.

**V.    The Proposed Annex Program**

21.    Working with the Monitor and DOC senior staff, I am developing a program for individuals in the General Population who have shown a propensity for violence but do not qualify for placement in the other three restricted housing programs (Enhanced Supervision Housing ("RESH"), North Infirmary Command ("NIC"), and Clinical Alternative to Punitive Segregation "CAPS")). This program will serve as a "step-down" program for PICs gradating from the RESH program and people admitted to this program will have the following attributes:

- Classified as maximum custody with an average score of 16 points;

- Have  history of institutional violence and/or other serious disciplinary infractions (possession of a weapon or other serious contraband); and

- Do not have serious mental health condition.

22.     The program will be a general population program located in the Otis Bantum Correctional Center ("OBCC") with a total bed capacity of 300. A 90 day pilot test of the Annex program first will be conducted in two of the six Annex housing units to determine how best to operate it.  If that pilot test is successful, the program will be expanded to the other four housing units for a total program capacity of 300 beds.

23.     All PICs assigned to the program by the Classification Unit will be single celled. Out-of-cell time will be seven hours, but the amount of recreation time offered per day will be increased  from one hour to two hours per day.  Each PIC will have a case plan and the opportunity to participate in structured risk reduction programs consistent with the case plan on at least a weekly basis.  When the PICs are out of their cells, security staffing will be enhanced to ensure a safe environment for PICs and DOC staff. Specifically, there will be officers posted on the floor when the PICs are out of their cells.

24.     I, and the DOC, have discussed the proposed Annex plan with the Monitoring Team and the New York State Commission of Correction ("SCOC"), both of which are supportive of the concept. DOC noted the Monitor's approval of the Annex Plan in a letter to the SCOC dated January 11, 2024. See January 11, 2024 letter to the SCOC.

## VI.   Behavioral Health Unit (BHU)

25.     The current RESH program exempts those who, despite their violent conduct, have a serious mental health condition. These individuals contribute to the level of violence on Rikers Island yet are ineligible for RESH and the proposed Annex program, the very programs designed to stem violence. At present, these individuals are housed in the Clinical Alternative to Punitive Segregation ("CAPS") and even General Population. DOC,

Correctional Health Service (CHS) and the Monitor agree that a more treatment-intensive setting is required.

26.    The new unit, which will be called the Behavioral Health Unit ("BHU") will be located at the GRVC, and will have a bed capacity of 45 and can house as many as 40 individuals diagnosed with a serious mental illness ("SMI") by Mental Health Services at any given time.

27.    The referral process will be the same as for the RESH program using the same committee structure, admission criteria, and the two program levels.  The primary difference between RESH and BHU is that CHS will be the primary service provider.

28.    DOC and CHS are collaborating with the Monitoring Team to develop a model program for this unit, which will protect other individuals in custody and staff and maintains an appropriate level of mental health care to address each individual's needs. It is expected that program design and required staffing levels will be completed in the next 90 days and that the BHU can be implemented this summer after final approval of the Monitor.

## VIII.  Violence Reduction Housing Program Summary

29.    When these Annex and BHU programs become operational, the total housing bed capacity will be 675 with a maximum population capacity of 530 (Table 2).  This is a sufficient number and appropriate type of programs to safely manage and treat those people who are disproportionately involved in violent behavior toward others; this number is about 10 percent of the jail population, which is a typical percentage of individuals in restrictive housing in other major jail systems. I also completed several tests with the DOC's OMAP staff to determine who needs to be in the RESH, Annex, and BHU units.  There is no question that implementing the Annex and BHU will further reduce the declining rates of violence at Rikers.

Table 2.  Planned Violence Reduction Housing Bed and Population Capacities

|  | Facility | Available Beds | Maximum Population |
|---|---|---|---|
| ESH | RMSC | 200 | 160 |
| Annex | OBCC | 300 | 240 |
| BHU | GRVC | 45 | 35 |
| CAPS | GRVC | 46 | 35 |
| NIC |  | 84 | 60 |
|  |  |  |  |
| Totals |  | 675 | 530 |

## IX.    Receivership

30.    It is my understanding that there are recommendations to appoint a receiver who would supersede the authority of the Commissioner. My considerable concern is that such a step will jeopardize the progress that DOC is now making in reducing violence. A receiver starts the DOC at zero and people in custody and staff will suffer even longer by waiting for a receiver to get up to speed and develop their own initiatives, which is unnecessary when we have initiatives supported by the Monitor already underway.

31.    The use of a receivership for a City or County jail system is rarely if ever used.

32.    The only receivership for a major city or county jail system was the one imposed in the Washington DC jail system in 1995, was limited to medical and mental health care, and only after an agreed upon remedial plan failed to produce any progress in the medical and mental health care system for a number of years (Inmates of D.C, v. Delbert Jackson, C.A. No. 75-1618).

33.    The most recent example with which I am familiar was the Orleans Parish jail system, where the Federal court replaced the administrative authority of the sheriff with an

"Independent Compliance Director" in 2016.[4] That person resigned in 2018 due to an inability

to make improvements to meet compliance with the Consent Decree. Merely replacing the

Sheriff with an outside and external administrator had no positive impact on the jail system.

34.    I understand the frustration expressed by many on the slow pace of reform that

predates my work with the DOC and the Monitor. But I strongly believe considerable

progress will be achieved in the next few month for the following reasons:

- With the appointment of Commissioner Maginley-Liddie, prior conflicts with the
  Monitor have been eliminated and both are working in a very positive and
  cooperative manner;

- The DOC administrative, legal and operational staff assigned to work with me in
  implementing the Annex and BHU are a) highly competent and b) supportive of
  these two next initiatives;

- With the experience of the Monitor and his subject matter experts, all of whom I
  worked with before for many years in other jurisdictions, there is enough
  correctional expertise and leadership to guide the agency going forward;

35.    I do not see how the appointment of a Receiver, which may take many months to

complete followed by further delays in hiring his/her own staff, will help contribute to or

facilitate the work that is now underway – it may even detract from the progress being made.

36.    For reforms to be successful, there must be stability in the leadership and

direction of the agency's initiatives at the Commissioner level. As noted by former

Commissioner Michael Jacobson, one of major problems for the DOC has been the frequent

---

[4] https://clearinghouse-umich-production.s3.amazonaws.com/media/doc/89114.pdf

change in the Commissioner position. Since I have been employed by the DOC in 2021, there have been three different Commissioners. Appointing a Receiver would in effect be a fourth appointment change which will serve to deflate the stature of the Commissioner and Monitor. The DOC's workforce will be further confused and discouraged not knowing who is in charge of the jails and for how long.

37.    Undoubtedly, a Receiver will bring with them their own key administrative staff who may have their own ideas about what reforms are needed although I cannot see what other initiatives are needed that are not now being recommended by the Monitor and the DOC.

38.    Depending on who is selected for the Receivership, there may well be a loss of leadership with institutional knowledge. Officers may question the authority of the receiver, and needed reforms may be delayed or go unmet while the Receiver tries to get up to speed. There will be an inevitable delay between when the receiver is ordered, when they are selected and when they actually begin their work.


_____                    Date: 3/13/2024
James Austin, Ph.D.

# EXHIBIT A

# James Austin, Ph.D.

## MAJOR POSITIONS HELD

| | |
|---|---|
| 2003 – Present | *Founder, The JFA Institute*, Washington, D.C. |
| 1999 -2003 | *Research Professor and Director, Institute for Crime, Justice, and Corrections*, Department of Sociology, The George Washington University, Washington, D.C. |
| 1982 - 1998 | *Executive Vice President*<br>National Council on Crime and Delinquency<br>San Francisco and Washington, D.C. |
| 1974 - 1982 | *Research Associate*<br>National Council on Crime and Delinquency<br>San Francisco |
| 1970 - 1974 | *Correctional Sociologist*<br>Illinois Department of Corrections<br>Joliet, Illinois |

## EDUCATION

| | |
|---|---|
| B.A. | 1970, Wheaton College, Wheaton, Illinois, Sociology |
| M.A. | 1975, De Paul University, Chicago, Illinois, Sociology |
| Ph.D. | 1980, University of California, Davis, California, Sociology |

## RELEVANT PROFESSIONAL EXPERIENCE

| | |
|---|---|
| 2022 – present | *Federal Court Appointed Consultant, NY City Department of Corrections,* to design and implement restricted housing programs and classification systems and policies on Rikers Island to reduce inmate violence. |

1

| | |
|---|---|
| 2022 – present | *Federal Court Appointed Consultant, Rhode Island Department of Corrections* to design and implement restricted housing program to meet Consent Decree requirements. |
| 2019 – 2023 | *Director*, Cost benefit analysis of the Los Angeles County Jail System to determine how best to lower the county jail population to allow closure of the Men's Central jail facility. (funded by Los Angles County Auditor-Controller). |
| 2019 – 2022 | *Director*, implementation of an objective jail classification system and restricted housing program for the Alameda County Sheriff (funded by Alameda County). In 2021 Dr. Austin was appointed by the Federal Court to monitor compliance with the consent decree in the areas of classification and restricted housing. |
| 2015 – present | *Co-Director,* MacArthur Foundation Safety and Justice Challenge in which JFA is responsible for working with 20 local counties to design and implement plans to lower current jail populations by 15-30%. |
| 2013 - 2014 | *Consultant*, Review and Assessment of the Bureau of Prisons Special Housing Units, completed by CNA and funded by National Institute of Corrections. |
| 2012 - 2020 | *Director,* Orleans Parish Prison Population Projections and Jail Reduction Strategic Plan (City of New Orleans). |
| 2016 – 2019 | *Director,* Maryland Department of Public Safety and Correctional Services, Technical Assistance (Open Society Institute-Baltimore). |
| 2015 | *Director*, Court Services and Offender Supervision Agency  (CSOSA) Best Practices Evaluation. (CSOSA). |
| 2014 - 2018 | *Director,* Validation study of the San Francisco Adult Probation Risk and Needs Assessment System (COMPAS), San Francisco County. |

| | |
|---|---|
| 2005 – 2014 | *Director*, Design and Evaluation of the Maryland Department of Public Safety and Corrections (MDPSC) Risk and Case Management System (Parole, Probation and Prison).  MDPSC and Open Society Institute-Baltimore. |
| 2021 – present | *Monitor*, Alameda County Jail System, California. |
| 2022 – present | *Monitor*, U.S. Virgin Islands, St. Thomas Island Jail System. |
| 2011 – 2016 | *Monitor*, Consent Decree, Walnut Group Correctional Facility, Mississippi Department of Corrections (adult and juvenile populations) |
| 2010 – 2014 | *Consultant*. Technical Assistance on Reducing Solitary Confinement in Maryland, New Mexico, and Illinois prison systems. Vera Institute. |
| 2013-2014 | *Director*, Evaluation of the Contra Costa Probation Department's Response to AB 109- Realignment. |
| 2012-2013 | *Director,* Evaluation of Alternatives to Incarceration, San Diego County. |
| 2012 – 2013 | *Director,* Evaluation of the Short-Term Technical Violation Pilot Study. U.S. Parole Commission. |
| 2012 | *Co-Director,* Evaluation of the Oklahoma Administrative Segregation System. Oklahoma Department of Corrections. |
| 2011 - 2012 | *Consultant*, Study of Colorado Administrative Segregation System. Colorado Department of Corrections and National Institute of Corrections, U.S. Department of Justice. |
| 2010 – 2011 | *Director*, Revalidation of the Texas Pardon and Parole Board System. Texas Pardon and Parole Board. |
| 2009 – 2012 | *Director*, Prison Population-Justice Re-investment Initiative. Pew Charitable Trusts. |
| 2010 – 2011 | *Special Consultant*, Jail Population Projection Study, US Department of Justice and Orleans Parish. |

3

| | |
|---|---|
| 2008 – 2009 | *Special Consultant*, Administrative Segregation/Super Max Parchment Study. Mississippi Department of Corrections and ACLU |
| 1998 – 2011 | *Director,* Correctional Options Program (Bureau of Justice Assistance,  U.S. Department of Justice) |
| 2007 – 2008 | *Director*, Harris County Pretrial Services Re-Validation Risk Assessment Study. (Harris County, Texas). |
| 2006 | *Director,* Evaluation of the District of Columbia Department of Corrections Prisoner Classification System (DC DOC). |
| 2005 – 2008 | *Director,* Montgomery Pretrial Services Risk Assessment Validation Study. (Bureau of Justice Assistance,   U.S. Department of Justice). |
| 2003 – 2006 | *Director*, Assessment of Sexual Assault in the Texas Prison System. (National Institute of Justice). |
| 2003 – 2006 | *Director*, Validation Study of the Alameda County Juvenile Detention Risk Assessment System (Alameda County, California). |
| 2002—2006 | *Independent Expert,* Office of Youth Development, Louisiana Department of Public Safety and Corrections, Jointly Appointed by State of Louisiana and U.S. Department of Justice, Civil Rights Division |
| 2003-2004 | *Director,* Evaluation and Redesign Of Systems For Berks County Pretrial and Sentenced Populations. (Berks County, PA). |
| 2002 – 2003 | *Director*, Validation of the Pennsylvania Parole Guidelines. Pennsylvania Board of Probation and Parole. (Pennsylvania Commission on Crime and Delinquency). |
| 2001 – 2003 | *Director,* Development of the Kentucky Parole Risk Assessment System.  Kentucky Parole and Pardon Board. |

| | |
|---|---|
| 1998 – 2004 | *Monitor*, Georgia Juvenile Justice Corrections System, Jointly Appointed by State of Georgia and U.S. Department of Justice, Civil Rights Division. |
| 1997 - 2002 | *Director*, National Technical Assistance Program for External Prison Classification Systems (Oregon, Wisconsin, Virginia, Tennessee, Texas, Oklahoma, and Montana) (National Institute of Corrections) |
| 1996 - 2002 | *Director,* National Technical Assistance Program for Internal Prison Classification Systems (Washington State, Oregon, Missouri, South Dakota, Connecticut, Colorado, and Florida) |
| 1996 - 1999 | *Director*, National Survey of Juveniles in Adult Correctional Facilities (Bureau of Justice Assistance), GWU. |
| 1996 - 1999 | *Director,* National Multi-Site Boot Camp Evaluation (Adult and Juvenile) (National Institute of Justice), GWU. |
| 1995 - 1999 | *Director*, Evaluation of "Three Strikes and You're Out" Laws in California and Nationally, (National Institute of Justice), NCCD |
| 1996 - 1999 | *Director*, National Survey of Privatization in Corrections (adult and juvenile facilities) (Bureau of Justice Assistance), NCCD. |
| 1992 - 1997 | *Director*, Correctional Options Evaluation (National Institute of Justice and Bureau of Justice Assistance), NCCD |
| 1997 | *Director*, Congressionally mandated evaluation of the D.C. Department of Youth Services Agency (YSA) operations, classification system, staffing levels, physical plant, mental health, information services and program services, (National Institute of Corrections, Bureau of Prisons), NCCD |
| 1992 - 1997 | *Director*, National Structured Sentencing Evaluation (Bureau of Justice Assistance), NCCD |
| 1995 - 1997 | *Director*, Congressionally mandated evaluation of the D.C. Department of Corrections operations, |

5

|  | classification system, staffing levels, and physical plant, including, comprehensive cost analysis of long-term options for the Lorton Complex, (National Institute of Corrections, Bureau of Prisons), NCCD |
|---|---|
| 1991 - 1997 | *Director*, Design and Implementation of the New York City Department of Corrections Objective Jail Classification System (Consent Decree, New York City Department of Corrections), NCCD |
| 1991 - 1995 | *Director*, Philadelphia Prison System Classification and Population Projections Project (Consent Decree, City of Philadelphia), NCCD |
| 1991 - 1994 | *Director*, Evaluation of Jail Drug Treatment Programs (National Institute of Justice), NCCD |
| 1991 - 1993 | *Director*, Design and Implementation of the Cook County Objective Jail Classification System (Cook County Sheriff's Department), NCCD |
| 1990 - 1991 | *Director*, California Assessment of the Overrepresentation of Minority Youth in Juvenile Justice (Office of Criminal Justice Planning), NCCD |
| 1988 - 1992 | *Director*, Experimental Test of Electronic Monitoring Program, Oklahoma Department of Corrections (National Institute of Justice), NCCD |
| 1987 - 1992 | *Director*, Experimental Test of the Prison Management Classification System (National Institute of Corrections and Washington Department of Corrections), NCCD |
| 1986 - 1990 | *Director*, National Jail Classification Project (NIC), NCCD |
| 1984 - 1986 | *Co-Director*, Study of Institutional Violence at San Quentin (Consent Decree, California Department of Corrections, NCCD |
| 1982 - 1987 | *Co-Director*, Experimental Study of Juvenile Court Probation Services, Salt Lake City, Utah (OJJDP), NCCD |

| 1983 - 1985 | *Co-Director*, Illinois Department of Corrections Early Release Evaluation (NIJ), NCCD |
| 1980 - 1984 | *Co-Director*, Supervised Pretrial Release Test Program (NIJ/LEAA), NCCD |
| 1981 - 1983 | *Co-Director*, Evaluation of California AB2 Bail Reform Act (OCJP), NCCD |
| 1980 | *Senior Research Associate*, California Alternatives to Incarceration Study (State Legislature), NCCD |

## SPECIAL APPOINTMENTS

| 2006 – 2007 | Expert Panel on Adult Offender and Recidivism Reduction Programming, California Department of Corrections and Rehabilitation |
| 2003 | Advisory Committee, The Little Hoover Commission Report on California Prison System |
| 1999- 2003 | Chair, National Policy Committee, American Society of Criminology |
| 1987 - 1994 | Trustee, Robert Presley Institute of Corrections Research and Training |
| 1991 | Governor's Task Force on Prison Crowding, State of Nevada |
| 1988 | Governor's Task Force on Corrections, State of Oregon |
| 1981, 1986 | National Academy of Sciences, National Panels on Sentencing and Prison Overcrowding |

## EXPERT WITNESS/LITIGATION

| 2022- present | <u>Babu v. Ahern. Case No. 5:18-cv-07677-NC</u><br>Appointed Monitor to assist the Alameda County Sheriff's Office reach compliance with Consent Decree regarding classification and restricted housing programs and policies. |

| | |
|---|---|
| 2022- present | _Carty v. Bryan_<br>Appointed Monitor to assist the U.S. Department of Corrections reach compliance with Consent Decree regarding classification and restricted housing programs and policies. |
| 2022-2023 | _Flores, et al. v. Stanford, et al._, No. 18-cv-02468 (VB) (JCM)<br><br>Retained by New York State Attorney General to examine the review of juveniles tried as adults by the New York Board of Parole and Pardons. |
| 2016 - 2023 | Stephen Rudisill v. Charles Ryan<br>Appointed as expert to monitor stipulated agreement where the Arizona Department of Corrections agrees to desegregate their inmate population in housing and program assignments. |
| 2019 | Orange County (California) Jail DOJ Investigation<br>Retained by the U.S. Department of Justice Civil Rights Division to conduct an evaluation of the Orange County Jail Inmate Classification System. |
| 2016 - 2019 | Mark Duke, et al., vs. Jefferson S. Dunn<br><br>Expert declaration on behalf of plaintiffs on proper classification of inmates at the St. Clair prison facility (Alabama). Stipulated agreement designated Dr. Austin as expert for the DOC to implement reforms. |
| 2013 - 2014 | Coleman v. Brown<br><br>Expert declaration, deposition and court testimony in support of plaintiff's motion regarding mentally ill inmates in segregation. |
| 2012 | Louis Henderson, et al., v. Kim Thomas<br><br>Expert declaration and testimony on behalf of plaintiffs on the appropriateness of segregating inmates based on HIV status (Alabama). Court ruled in favor of plaintiffs. |

2008-2012              Plato and Coleman v. Schwarzenegger.

                       Retained by plaintiffs to develop plan to depopulate the
                       California Prison Population. Reports submitted and
                       deposed by defendants, two expert reports submitted
                       and court testimony.

2001 - 2005            Austin, et al., v. Wilkinson, et al.

                       Retained by defendants to examine the classification
                       process used to assign inmates to the Ohio State
                       Penitentiary – a high maximum security prison.
                       Expert report but no deposition or testimony.

2001                   Gartrell et al., v. Ashcroft et al.

                       Retained by plaintiffs to examine if BOP inmates
                       placed in Virginia Department of Corrections are
                       unnecessarily having their expression of religious
                       freedoms unnecessarily restricted? Report submitted
                       but no deposition or court testimony.

1998 - 1999            Southern Ohio Correctional Facility (Civil Action No.
                       C-1-93-436).

                       Retained by the Ohio Department of Rehabilitation
                       and Correction to serve as an expert witness on
                       classification issues as they pertain to the Lucasville
                       riot.

1998 - 1999            Busey et al. v.  Corrections Corporation of America

                       Retained by CCA to develop an objective
                       classification system for the Youngstown facility and
                       have all inmate's properly classified according to the
                       classification criteria. No expert report, deposition or
                       court testimony.

1998 - 2000            Holloway, et al., v. King County

                       Retained by plaintiff's counsel to examine the validity
                       of client's claims that sexual harassment of female

9

correctional officers by male inmates was being
encouraged by male correctional officers and
departmental policy. Declaration and deposition.

1997                    <u>Carlos Morales Feliciano v. Pedro Rossello Gonzales</u>
                        Consent Decree, Puerto Rico

                        Retained by Special Master to conduct a
                        comprehensive assessment of the inmate
                        classification system that was designed and partially
                        implemented by the Administration of Corrections.

1996                    <u>Rentschler v. Carnahan et al.</u>

                        Retained by Defendants to evaluate the impact of
                        crowding at the Colorado maximum security prison.

1995 - 1996             <u>Montoya v. Gunter, et al.</u>

                        Retained by Defendants to determine whether inmate
                        who was killed while incarcerated had been properly
                        classified and housed.

1995 - 1997             <u>Inmates A,B,C and D v. Illinois Department of
                        Corrections</u>
                        Consent Decree

                        Appointed by Court to produce evaluation of the level
                        of control of housing and job assignments by gangs.
1995 - 2002             <u>USA v. Michigan</u> and <u>Cain v. Michigan</u> Consent
                        Decrees

                        Expert witness retained by Defendants to help
                        Department of Corrections reach compliance with
                        court order regarding classification system.

1995                    <u>International Fidelity Insurance Co. et al. v. Charles
                        Nobel et al:</u> In the United States District Court of the
                        Southern District of Texas, Houston Division.

                        Expert Witness Retained by Defendants to determine
                        the Failure to Appear rates for defendants released
                        on surety bond versus O.R.

1995                    <u>Sandra Herrera, et al., v Pierce County, et al.</u>

10

|  | Retained by Plaintiffs to evaluate whether inmates were being properly classified and housed in the local jail. |
|---|---|
| 1991 - 1992 | U.S. Department of Justice, Civil Rights Division, <u>U.S. v. The Parish of Orleans Criminal Sheriff's Office</u> |
|  | Expert Witness Retained by Plaintiffs to determine the appropriateness of excluding all females from certain security post positions within the jail. |
| 1991 - 1994 | <u>Calvin R. vs. Illinois Department of Corrections</u>. Consent Decree. |
|  | Appointed by Court to produce evaluation of classification system and to implement internal classification system to reduce inmate violence. |
| 1991 | Office of the Attorney General, State of Texas, <u>Alberti v. Sheriff of Harris County, et al.</u>, No. CA-H-72-1094 |
|  | Expert Witness Retained by Defendants to determine if use of local incarceration rates by selected counties was appropriate. |
| 1990 - 1991 | Office of the Attorney General, State of Texas, <u>Lamar v. Collins</u> |
|  | Expert Witness Retained by Defendants to determine if use of local incarceration rates by selected counties was appropriate. |
| 1990 - 1991 | King County (Seattle, Washington) District Attorney's Office, <u>Hammer v. King County</u> |
|  | Expert Witness Retained by Defendants to determine if minority staff was being discriminated against. |

11

| | |
|---|---|
| 1989 - 1991 | U.S. Department of Justice, Civil Rights Division, <u>U.S. v. State of Florida: Florida Department of Corrections, et al.</u>, Case No. TCA 86-7330 (N.D. Fla) |
| | Expert Witness Retained by Plaintiffs to determine whether women should be excluded from certain post positions in the DOC. |
| 1987 - 1989 | Office of the Special Masters, <u>Ruiz v. Lynaugh</u>, Evaluation of the TDC Classification System and Inmate Violence |
| | Appointed by Court to produce evaluation report of classification system to determine if inmate violence had been reduced. |

# MAJOR PUBLICATIONS

## Books

| | |
|---|---|
| 2011 | <u>It's About Time: America's Imprisonment Binge</u> (with John Irwin), 4th Edition, Cengage, Publishing. |
| 1993 | <u>Reinventing Juvenile Justice</u> (with Barry Krisberg), Beverly Hills, CA: Sage Publications. |
| 1978 | <u>The Children of Ishmael: Critical Perspectives on Juvenile Justice</u> (with Barry Krisberg), |

## Articles

| | |
|---|---|
| 2010 | "Reducing America's Correctional Populations", 2001. Justice Research and Policy, Vol, 12, No. 1, pp,1-32. |
| 2009 | "Prisons and the Fear of Terrorism."  August 2009. Criminology and Public Policy. Vol., Issue 3: 641-649. |
| 2009 | "Beyond Supermax Administrative Segregation: Mississippi's Experience Rethinking Prison Classification and Creating Alternative Mental Health Programs." 2009. Criminal Justice and Behavior. Vol. 36, No. 10: 1025-1037. |
| 2006 | "How Much Risk Can We Take?  The Misuse of Risk Assessment in Corrections."  2006.  Federal Probation. Vol. 70, No. 2: 58-63. |

2004                          Richards, Stephen C., James Austin, and Richard S.
                              Jones. 2004. "Thinking About Prison Release and
                              Budget Crisis in the Blue Grass State." Critical
                              Criminology: An International Journal, Vol. 12, No.3:
                              243-263.

2004                          Richards, Stephen C., James Austin, and Richard S.
                              Jones. 2004. "Kentucky's Perpetual Prisoner
                              Machine: It's All about Money." Review of Policy
                              Research, Vol. 24, No. 1 (at press).

2003                          "Why Criminology Is Irrelevant", Criminology and
                              Public Policy, Vol. 2, No.3: 557-564

2003                          "Three Strikes Laws", in Current Controversies in
                              Criminology, Ronald Weitzer, ed., Prentice Hall:
                              Upper Saddle River, NJ.

2003                          "The Use of Science to Justify The Imprisonment
                              Binge", Convict Criminology, Jeffrey Ian Ross and
                              Stephen C. Richards, eds., Wadsworth: Belmont, CA.

2003                          "Its About Time:  America's Imprisonment Binge",
                              Punishment and Social Control, Aldine De Gruyter:
                              New York, NY.

1999                          "Are We Better Off? Comparing Private and Public
                              Prisons in the United States", Current Issues in
                              Criminal Justice. Vol. 11 (2): 177-201.

1999                          "The Impact of 'Three Strikes and You're Out'",
                              Punishment and Society, Vol 1(2): 131-162.

1998                          "The Limits of Prison Drug Treatment", Corrections
                              Management Quarterly, Vol. 2, Issue 4, Fall 1998, pp.
                              66-74.

1996                          "The Effect of 'Three Strikes and You're Out' on
                              Corrections" in Three Strikes and You're Out:
                              Vengance as Public Policy, David Shichor and Dale
                              K. Sechrest, eds., Sage Publications: Thousand
                              Oaks, CA.

1996                          "Are Prisons A Bargain? The Case of Voodoo
                              Economics", Spectrum, Spring 1996, pp. 6-24.

13

1995                          "The Overrepresentation of Minority Youths in the
                              California Juvenile Justice System:  Perceptions and
                              Realities" in Minorities in Juvenile Justice, Kimberly
                              Kempf Leonard, Carle E. Pope, and William H.
                              Fyerherm, eds., Sage Publications: Thousand Oaks,
                              CA.

1994                          "Three Strikes and You're Out: The Likely
                              Consequences".  St. Louis University Public Law
                              Review, 14, 1, pp. 239-258.

1993                          "Classification for Internal Purposes: The Washington
                              Experience" (with Chris Baird, and Deborah
                              Nuenfeldt), Classification: A Tool for Managing
                              Today's Offenders, Laurel, MD: American
                              Correctional Association.

1993                          "Objective Prison Classification Systems: A Review",
                              Classification: A Tool for Managing Today's
                              Offenders, Laurel, MD: American Correctional
                              Association.

1986                          "Using Early Release to Relieve Prison Crowding:
                              A Dilemma in Public Policy,"  Crime and Delinquency
                              (October):404-501

1986                          "Evaluating How Well Your Classification System Is
                              Operating,"  Crime and Delinquency (July):302-321

1985                          "Incarceration in the United States:  The Extent and
                              Future of the Problem," The Annals (March):15-30

1983                          "Assessing the New Generation of Prison
                              Classification Models," Crime and Delinquency
                              (October):561-576

1982                          "Do We Really Want to Get 'Tough on Crime'?"
                              Corrections Today, Vol. 44, No. 6:50-52

1982                          "Bail Reform in California:  The Passage of AB2" (with
                              E. Lemert), Pretrial Services Annual Journal, 1982,
                              Vol V:4-23

1982                          "Review of Fatal Remedies:  The Ironies of Social
                              Intervention" (Sam D. Seiber) in Crime and
                              Delinquency, Vol. 20, No. 4:639-641

14

| 1982 | "The Unmet Promise of Alternatives to Incarceration" (with B. Krisberg), <u>Crime and Delinquency</u>, Vol. 28, No. 3:374-409 |

1982       "Promises and Realities of Jail Classification," <u>Federal Probation</u>, Vol. 46, No. 1:58-67

1981       "Wider, stronger, and different nets:  the dialectics of criminal justice reform" (with B. A. Krisberg), <u>Journal of Research in Crime and Delinquency</u>, Vol. 18, No. 1:165-196

1980       <u>Instead of Justice:  Diversion</u>, Ph.D. Dissertation, University of California, Davis

## AWARDS

2009       Recipient of the Marguerite Q. Warren and Ted B. Palmer Differential Intervention Award, American Society of Criminology, Corrections and Sentencing Division

1999       Recipient of the Paul Tappin award for outstanding contributions in the field of criminology, Western Society of Criminology

1991       Recipient of the Peter P. Lejins Research Award, American Correctional Association