UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x

MARK NUNEZ, et al.,

                            Plaintiffs,

-against-

CITY OF NEW YORK, et al.,

                           Defendants.

**<u>DECLARATION OF
DEPUTY COMMISIONER
JAMES SAUNDERS</u>**

11 Civ. 5845 (LTS)(JCF)

------------------------------------------------------------------x

UNITED STATES OF AMERICA,

                        Plaintiff-Intervenor,

-against-

CITY OF NEW YORK and NEW YORK CITY
DEPARTMENT OF CORRECTION,

                        Defendants.

------------------------------------------------------------------x

      **JAMES SAUNDERS** declares pursuant to 28 U.S.C. Code §1746 under penalty of perjury

that the following is true and correct:

      1.      I am the Deputy Commissioner of Health Affairs, Compliance, and Quality for the

Department of Correction ("DOC"), having been appointed in January 2023.

      2.      My responsibilities include overseeing the coordination of health services for

incarcerated individuals and enhancing the Department's health care processes. I collaborate

closely with Correctional Health Services ("CHS"), a part of NYC Health and Hospitals

Corporation.

3.      Before joining DOC, I served as the Deputy General Counsel/Chief Health Care Compliance Officer and HIPAA Privacy Officer at the New York City Fire Department for eight years and have 28 years of health-care compliance, privacy, and operations experience.

4.      I have worked hard to improve collaboration between DOC and CHS, which is essential to the proper care of the custodial population.

5.      Principal among my responsibilities is working with others to develop systems to reduce and prevent deaths by suicide and self-harm incidents among our incarcerated population.

6.      DOC uses three review mechanisms to analyze self-harm incidents. The first is the In-Custody Death Joint Assessment and Review ("JAR"), which I have led since July 2023. Comprised of senior DOC and CHS leadership, the JAR meets after each death in custody at fixed intervals: two business days, seven days, and 30 days after the death. The goal is to identify deficiencies and opportunities for corrective measures to minimize the recurrence of such tragic events.

7.      Second is the Suicide Prevention Task Force, which is comprised of DOC and CHS leadership, and meets monthly to identify opportunities for improvements in custodial care. Among its recent recommendations were these: gating the stairways in the Program for Accelerated Clinical Effectiveness ("PACE") and Clinical Alternative to Punitive Segregation ("CAPS") units, where individuals requiring the highest level of mental health care are placed; replacing existing ventilation covers with new mesh coverings that are ligature resistant; and installing sprinkler heads that are ligature resistant. Ligature resistant products are designed so that a cord, bed sheet, or clothes cannot be tied to or through them. These recommendations are being implemented in the housing units as they undergo renovation. The Task Force also seeks to improve the reporting of self-harm incidents. Good data is essential for good decision-making.

8.     The third mechanism, the Self-Inflicted Harm Subcommittee under the Task Force, meets weekly to review incidents of self harm from the prior week. Working with CHS mental health professionals, DOC staff examine individual incidents to identify trends and recommend changes.

9.     In 2023, DOC hired Dr. Timothy Belavich, a nationally recognized expert as a consultant to provide technical assistance on the improvement of its suicide prevention activities. (Dr. Belavich's resume is attached.) After studying DOC's policies and attending meetings with DOC and CHS, Dr. Belavich issued a report this January. (Dr. Belavich's report is attached.) Among his recommendations were these: DOC and CHS should develop more specific policies for suicide prevention in its restrictive housing programs; refresher training on suicide prevention should occur annually for at least one hour for all officers and supervisors; tracking of potential corrective actions needs to be improved; and DOC and CHS must continue to identify ways to ensure effective communication during an emergency response. The Task Force has accepted Dr. Belavich's recommendations; they are being implemented and their progress tracked.

10.     Importantly, Dr. Belavich concluded that DOC has made "significant efforts in the area of suicide prevention over the past twelve months," and that it is "making an impact by identifying issues related to self-harm and making recommendations for change." As one example, Dr. Belavich cited the implementation of "daily health care and custody huddles" to share information among DOC and CHS line staff regarding incarcerated individuals who may present a self-harm concern. The practice began in August 2023.

11.     Notably, every DOC recruit receives an eight-hour Mental Health Overview course and an eight-hour Suicide Prevention course as a part of their training. Officers are also expected to complete an annual one-hour refresher training. Facilities are posting a flyer in each

housing unit giving "Suicide Prevention Tips," which are intended to remind members of staff of their responsibilities under our suicide prevention policy. Informational videos are featured at the facilities to serve the same purpose.

12.    In 2023, two individuals in DOC custody died by suicide, down from five in 2022. One death is too many, but our progress reflects the cooperative efforts discussed in this Declaration.

13.    In addition to communicating with the Monitor about acts of violence or serious self-injury, the Department provides daily reports regarding hospitalizations. Beginning in October 2023, the Health Affairs Division added the Monitoring Team to its daily distribution of the Current Outposts Report, which gives the name and location of hospitalized individuals and their date of admission. DOC is working with CHS on ways to improve timely communication of the reasons for hospitalization to the extent privacy laws permit.

14.    In sum, DOC and CHS endeavor to provide safe and effective care to all those in custody.

James Saunders, Esq.

Date: 3/13/2024

4

# EXHIBIT A

**DOC and CHS Summary Feedback of Suicide Prevention Activities**

# Status Report

NYDOC

## JANUARY 2024

PREPARED BY:

**Timothy Belavich, Ph.D.**
**Timber Psychological Consultation, Inc.**
**Chatsworth, CA**



**Timothy Belavich, Ph.D.**
Timber Psychological Consultation, Inc.
Chatsworth, CA

## DOC AND CHS SUMMARY FEEDBACK OF SUICIDE PREVENTION ACTIVITIES

For the past twelve months I have worked collaboratively with the leadership of DOC and CHS in evaluating and providing technical assistance on the improvement of suicide prevention activities. This has included meetings with leadership and staff, policy and training curriculum review, attendance at suicide prevention activities, and review of emergency response to health care crises. Both CHS and DOC have shared information and been receptive to making modifications in their processes throughout this period. I appreciate the opportunity to work with these dedicated professionals and share a summary of our work together. It should be noted that some of the recommendations made here have already been started by DOC and CHS and are presented here to continue to reinforce their ongoing development and implementation. The work that DOC and CHS have done this year is an important start but, as with any organization implementing changes of this magnitude, there remains work to be done to fully develop the suicide prevention and emergency response activities of the agencies to meet the evolving needs of those incarcerated in the NYC jails. What follows is a summary of the work accomplished as well as important next steps in developing and strengthening the process.

## Policy

Both DOC and CHS supplied policies on suicide prevention and intervention, supervision of suicidal incarcerated persons, as well as samples of the suicide risk assessment performed by DOC staff (form 330) and CHS staff (modified Columbia Suicide Severity Rating Scale (C-SSRS)). DOC reported that custody staff complete form 330 and this information is shared with CHS clinical staff. CHS confirmed this happens on a regular basis. Overall, the policies reviewed by Dr. Robert Canning, a clinical psychologist with expertise in the area of suicide prevention, and myself were found to be sound and include clear expectations of the roles of health care and custody staff. Feedback was provided to the agencies during meetings. Recommendations regarding suicide prevention in restrictive housing are below. In terms of additional revisions, recommendations made in this document will need to be incorporated into policy once developed and implemented (e.g., psychological autopsies, training frequency).

Through discussion with CHS and DOC the following is recommended:

- DOC and CHS need to ensure there is a formal process for review of each other's policies if one agency includes requirements of the other in its policy.  This is an essential feature when two agencies provide care and services to the same population as do CHS and DOC and should be immediately implemented to ensure polices of each agency align with the others, given the interdependence between the agencies. It is also recommended that leadership from each agency countersign each other's policies when the policy refers to a requirement for the other agency.

- Restrictive Housing poses a specific challenge to correctional systems, especially regarding the mentally ill and suicide prevention. Although CHS reports they have processes and protocols for mitigating suicide risk in these settings, DOC and CHS need to include specific sections in their policies on suicide prevention in these housing areas to reinforce the

importance of these interventions in these settings. Nationally, restrictive housing areas are settings of higher suicides and self-harm events in correctional settings and specific guidance in these housing areas is warranted.

- CHS and DOC should continue networking through established correctional organizations. National Commission on Correctional Health Care (NCCHC), National Institute of Corrections (NIC), American Jail Association (AJA), and American Correctional Association (ACA) are all good resources for information, problem-solving, and identifying best practices in corrections and correctional health care. These organizations hold multiple conferences and educational opportunities each year and attendance by custody and health care staff is of great value.

## Training

Training materials were also provided by DOC and appear to be comprehensive. These included Mental Health First Aid, Crisis Intervention Training (5-day), Online Suicide Prevention Training, and Mental Health 8 Hour Recruit Training. These materials are part of over 20 hours that DOC reports new DOC correctional officers receive. DOC also reported periodic refresher training is required for all DOC custody staff.

Additionally, as part of Suicide Prevention and Self-Harm Task Force DOC reports they have begun monitoring compliance with suicide prevention training for custody staff working A and B posts, which have direct and indirect incarcerated person interaction. This monitoring of compliance with training requirements is important and also reflected in a recommendation below.

CHS also reports focused training and education on suicide prevention with clinical staff which includes clinicians being required to discuss the care of anyone on suicide watch daily with their supervisors, as well as case conference anyone being removed from suicide watch. In this capacity supervisors serve as mentors and trainers for clinicians as part of their regular duties, providing guidance and feedback as needed. Clinical leadership also reported that there is regular communication with supervisors to discuss changes to workflows as needed (e.g. CHS reports that since the pandemic clinicians have been instructed to lower their clinical threshold for placing patients in therapeutic housing units).

Although a suicide risk assessment document was provided, a structured training curriculum was not. CHS reports this is due to suicide prevention training primarily occurring at the supervisor-clinician level. This appears to be a non-standardized process since it was not included in the policies shared during this review. At this time there is no formal, periodic, and required suicide prevention training provided to all healthcare clinicians or specifically mental health clinicians. It was reported by CHS that training occurs at orientation, but a curriculum was not shared for review to verify this.

CHS also reported that in the past it has provided DOC leadership training on suicide and self-injury as well as created a quick reference guide for custody officers on health services information. These inter-agency activities are positive processes in strengthening the suicide prevention program of the organization and need to continue.

The following is recommended:

- CHS needs to develop and require that all health care staff participate in training on suicide prevention on an annual basis. Regular formal training on suicide prevention is a well-accepted practice in corrections. Additionally, mental health clinicians will benefit from structured clinical training on the C-SSRS for clinicians new to CHS along with continued mentoring by supervisors as a correctional population differs from a community population and has different needs. Ongoing education and feedback by supervisors and seasoned clinicians is a worthwhile activity that should continue but does not replace regular, structured training. CHS

recognizes the potential value of this additional layer of staff education, and is in the process of developing a NYC jail-specific annual suicide prevention training for all mental health staff.

- Refresher training on suicide prevention should occur for at least one hour annually for DOC correctional staff, supervisors, and managers.

- The inter-agency training described above is a positive activity both for sharing knowledge and building relationships. This should continue not just for training on suicide prevention and self-harm but for other areas such as mental health signs and symptoms, de-escalation, and other topics of mutual concern for the agencies.

- Training should be well documented and continually monitored for compliance by both CHS and DOC for their respective agencies. Training compliance rates should also be monitored through quality management meetings for transparency.

## Joint Assessment and Review (JAR)

In 2016, CHS established and began to regularly convene the Joint Assessment and Review (JAR) committee with the goal of DOC and CHS sharing relevant findings and insights from their independent reviews of significant adverse events, and jointly identifying opportunities for system reform that could reduce the likelihood of recurrence of such events. Over the past 12 months DOC and CHS have worked to develop stronger communication through the JAR both in terms of its structure and function. Currently, the JAR process, after the death of an incarcerated person, includes a two day, seven day, and thirty-day review. These meetings include leadership from both DOC and CHS and have been sessions of active information sharing, identification of areas for improvement, and plan development. The meetings continue to include a structured agenda that has also developed through consistent participation of DOC leadership, which it was reported, had not always been the case previously. During my participation in this project DOC staff have displayed an investment in this process that allows both CHS and DOC to now have more robust dialogue about issues surrounding an incarcerated person's death in custody. These are all important developments in the improvement of this process although work must continue in this area.

Although DOC has immediate access to review available video of the incident and emergency response, access to the video for CHS has been only upon request and CHS often has not had an opportunity to review this critical information prior to the two day JAR. CHS has requested more direct and immediate access to the video to view after an incident and indicates that DOC is investigating this possibility.

The JAR discussion includes a presentation of relevant findings from CHS' internal review including its mortality review and, for suicides, a targeted mental health review of the care provided. The health care information shared by CHS is provided verbally and a hard copy report, supplied by CHS, is not included with the documents compiled by DOC for each death.

Custody staff present information gathered by DOC regarding operations and security including information on security checks, attendance at health care appointments, and any preliminary information relevant to the death. Both agencies verbally share their findings and information during the JAR discussion. Most importantly, both CHS and DOC engage in self-critical reviews of all the information presented as a means of identifying potential corrective actions that may prevent deaths in the future. Through my participation in several of these meetings these discussions have been thoughtful and thorough. Over the past year, tracking of potential corrective actions discussed during these meetings has started but must be improved.

The following is recommended:

- When two agencies provide care for the same population it is essential to develop and maintain strong avenues of transparent and collegial communication. This should take place in the meetings described in this document as well as an identified periodic executive meeting (e.g., monthly or quarterly) to be held among leadership with the goal of identifying mutually held goals, progress toward their completion, and challenges to their realization. With recent additions and changes in DOC leadership these meetings will ensure the progress that has occurred over the past year in this area continues.

- CHS needs the same immediate access to review video of the incident that DOC has. This will allow CHS the same ability as DOC to form initial impressions of the incident itself as well as its response, and to interview its staff and obtain pertinent information so that both CHS and DOC can share impressions and information in the initial JAR meeting and possibly lead to the development of potential corrective actions during the initial meeting.

- Although CHS completes a report after a suicide that includes relevant information on the individual's psychiatric history and care, for incarcerated persons who die by suicide CHS needs to complete a psychological autopsy. The NCCHC includes this requirement as part of their standards for jail health services (standard J-A-10). A psychological autopsy, often completed by a psychologist or other qualified mental health professional, includes at least a summary of the individual's history and time in custody, services provided while incarcerated, and an exploration of factors that may have led up to or contributed to the death. If available, community records are also reviewed. Additionally, it often includes a review of the site of the suicide as well as interviews with staff and other incarcerated persons who interacted with the deceased. Ultimately, the goal of the psychological autopsy is to identify potential corrective actions that can prevent suicides in the future. CHS reports it recognizes the potential value of this additional layer of documentation and data synthesis and is in the process of developing a workflow for psychological autopsies. A sample of the review currently prepared by CHS was provided and included some of these areas but did not fully meet the needs of a psychological autopsy.

- The issue of sharing relevant protected health information and security information must be resolved. My discussions with both CHS and DOC revealed that both agencies are open to increasing the amount and timeliness with which information is shared and both CHS and DOC leadership are open to outlining in an MOU the specific types of information that each agency is requesting to be shared as a means of improving their correctional system and providing better care to the incarcerated population. It was reported in fall 2023 that the issue of information sharing continues to be examined by the agencies' legal departments. The resolution of this issue needs to be a top priority for the agencies as it impacts multiple aspects of a well-run correctional system.

- In several JAR, subcommittee and task force meetings that I attended, participants raised previously identified corrective actions for follow-up. The JAR agenda does include identification and follow-up of corrective actions related to the death. It is recommended that CHS and DOC track in a centralized way all corrective actions from the JAR, Suicide Prevention Task Force, and Self-Inflicted Harm Subcommittee so that both agencies utilize these in assessing both aggregate trends as well as individual responses for each death. Examining the aggregate recommended corrective actions trends will help identify whether completing a particular corrective action or obtaining support or funding for doing so is a greater priority over certain other recommendations. The tracking should include all recommended corrective actions and the determination on whether or not to implement the

recommendation. If a recommendation is not implemented, the reason why should be documented.

-   As stated previously, networking and collaborating with peers through NCCHC, AJA, ACA, and NIC will play an important part in the further development of both the JAR process as well as the identification of corrective actions and solutions to issues identified through the JAR process.

## Suicide Prevention Task Force and Self-Inflicted Harm Subcommittee

The Self-Inflicted Harm Subcommittee meets weekly and is a subcommittee of the Suicide Prevention Task Force. This subcommittee reviews self-harm incidents from the previous week with the goal, similar to the JAR, of evaluating the incident and response by custody and health care staff ultimately to identify corrective actions or to reinforce best practices. This meeting includes DOC and CHS managerial and line level staff with specific knowledge of the incident and the practices within the facility. I have attended these meetings, and the discussion reflected an effective inter-disciplinary approach among both CHS and DOC. Additionally, some of the more recent added participants from DOC bring similar experiences in participating in these meetings based on their prior correctional careers in other jurisdictions.

I have also consulted with the Monitoring Team on its observations of self-harm incidents that involve use of force incidents and they reported that their reviews reveal: concerns that DOC staff do not respond timely to self-harm incidents, that DOC staff do not immediately remove items that may permit the individual to re-engage in self-harm following an event (e.g. taking away a ligature following an attempt to self-harm), and that presentation to medical for treatment is often delayed. These issues are appropriate for further investigation through the Suicide Prevention Task Force.

The larger Suicide Prevention Task Force discusses aggregate data on self-harm, compiled by month. This allows for trends in self-harm activities to be evaluated and for potential corrective actions to be identified. The data reviewed in the subcommittee was initially based on reports received by DOC and did not always include all records of self-harm. The committee recognized that CHS has more inclusive data of self-harm events so that now a reconciliation occurs between DOC and CHS when looking at monthly occurrences of self-harm in order to ensure the most accurate data set possible.

From my attendance at the meetings, I have observed that the subcommittee is making an impact by identifying issues related to self-harm events and making recommendations for change. An example of this is the identification of a need for daily healthcare and custody "huddles" to share information among line staff regarding incarcerated persons who may present as a concern in each housing unit. These huddles were identified as a means of increasing communication among disciplines with the goal of reducing self-harm and it was reported they were launched in August 2023.

The Suicide Prevention Task Force is the main body overseeing suicide prevention activities. It is comprised of DOC and CHS leadership and meets monthly. As part of its mission the task force reviews the work of the Self-Inflicted Harm Subcommittee but also monitors the implementation of corrective actions identified through the JAR and through their own committee. Over the past year this task force has also become an important part of DOC and CHS' suicide prevention program. I have also attended these meetings and been part of effective discussions that have had a positive impact on the organization.

Examples of the positive results of the task force and responses to JAR findings within the past six months include installation of additional physical barriers to prevent suicide and self-harm, expansion

of the suicide aide program which is a structured work assignment for incarcerated persons where they receive training in the recognition of self-harm warning signs and are then assigned to housing units as monitors to alert DOC staff when an individual displays a warning sign of self-harm with the goal of early intervention, and a proposal to use technology to identify those at increased risk for suicide such as obtaining the ability to monitor telecommunications for statements of potential self-harm.

The following is recommended:

- The subcommittee and task force have evolved both with the designed structure and addition of participants who have prior experience with these suicide prevention activities. Reinforcing the required participation of facility leadership, line staff, and representatives of the investigation division to be included in these meetings will only serve to allow them to develop further.

- The subcommittee and task force must continue tracking identified corrective actions and their status regardless of whether the corrective action is able to be immediately implemented. These should be in a centralized file that can be utilized at any meetings dealing with suicide and self-harm as well as quality assurance meetings. Some identified corrective actions may require construction or funding and should not be removed or discarded due to lack of current funding or an inability to immediately implement them. All identified corrective actions should be revisited periodically to determine whether additional data has been gathered and an effort should be made to request the resources for the corrective action again.

- A joint policy outlining the roles and responsibilities of each of the JAR, Self-Inflicted Harm Subcommittee, and Suicide Prevention Task Force needs to be completed so that both DOC and CHS understand the unique role of each committee as well as their inter-dependence. If there are barriers that preclude a joint policy each agency can develop alike policies and ensure concordance.

- The subcommittee should consult with the Monitoring Team on its findings related to its review of self-harm incidents to determine how to address the concerning staff practices in order to eliminate the concerns identified in those reviews. The Monitoring Team findings and recommendations should also be discussed through the subcommittee with the goal of identifying those that can be immediately fulfilled and those that will need additional resources for successful implementation.

- The recommendations outlined throughout this document need to be tracked for successful implementation in order to maintain the momentum that the agencies have developed in this area over the past year. Multiple essential recommendations are made here and their tracking, along with identification of responsible parties, will contribute to their successful completion.

## Emergency Response

The emergency response policies for DOC and CHS were reviewed, video review of several incidents, and meetings were held to better understand the emergency response procedure of the organizations. Both agencies play a critical role in successfully carrying out an emergency response to a health care event. Responses often begin by identification of a healthcare emergency and initiation of basic life support by custody staff in housing units. Custody staff on the housing unit communicate directly with custody staff located in clinics who then notify health care staff of the event.

CHS reported that they predesignate a set rotation of staff to initially respond to health care emergencies that includes at least two nursing staff and one medical staff member (during overnight shifts the initial response team is comprised of two nursing staff). Additionally, all building-based response teams have access to emergency-boarded physicians in Urgicare who are available for remote and in-person consultation 24/7. Custody staff are responsible for escorting CHS staff to the site of the incident and assisting in the response. It was reported that DOC does not predesignate clinic escort officers responsible for initial response to emergencies, thus potentially delaying the emergency response of CHS.

Both CHS and DOC report that their own staffing response to emergencies is adequate and there is no expectation that incarcerated persons play a role in an emergency response such as transporting of a patient to a clinic for further care. However, review of an emergency response showed an incarcerated person was assisted by other incarcerated persons to a clinic for care. The agencies reported that this occurs at times, per DOC, voluntarily by the participation of the other incarcerated persons, but is not part of emergency response protocols or expectations. Although well-meaning, untrained individuals may inadvertently injure an individual requiring medical care and this practice needs to cease.

CHS reported that they monitor response time to arrive on scene and their recent data review showed that median response time in 2023 was six minutes for staff to arrive on scene. In meetings I have attended CHS raised the issue of connectivity for communication between CHS first responding team and CHS clinical back-up personnel due to CHS no longer having access to the DOC radio system. Both agencies are working to identify more reliable means such as dual-banded cellular phones for CHS emergency response team members although a solution has not been identified at this time.

Shortly upon its transition to Health+Hospitals in 2016, CHS reported negotiating an arrangement with NYC Emergency Medical Services (EMS) for two units to be stationed on and dedicated to Rikers Island to facilitate the emergency transport of patients to the hospital. This arrangement is a significant asset that most correctional systems do not benefit from. These resources can only be diverted from Rikers in rare instances and serve to reduce the overall EMS response time to the scene to transport an individual experiencing a medical emergency to a higher level of care. DOC estimates that the EMS performs an average of at least 90 responses on a monthly basis.

Both CHS and DOC report they currently participate in regular weekly mock emergency response drills to assist in improving responder skills and have a minimum requirement that drills occur on at least a monthly basis. CHS also has a Simulation Center where clinical staff receive additional specific training as needed. From review of JAR minutes, there has been identification of employees who need additional training in emergency response or who fail to carry out their required roles. Both agencies shared that these individuals either receive additional training or are disciplined for their failure to respond adequately.

Based on the information shared regarding emergency responses the following is recommended:

- The agencies must continue to work to identify ways to ensure consistent effective communication during an emergency response. Discussions I attended included a concern that because of "dead spots" for service in the facility there is a possibility for communication not to be successful during an emergency.

- DOC must ensure that incarcerated persons are not part of emergency response activities. DOC's priority must be to initiate emergency response, appropriately notify CHS staff of a medical emergency, and escort the CHS response team to the secured location so that appropriately trained staff can perform their required duties.

**Conclusion**

Both agencies have made significant effort in the area of suicide prevention over the past twelve months, and I feel fortunate to have been a part of this. More work remains to ensure that there are adequate systems in place. The recommendations in this document are intended to work towards that goal. Given the momentum of change that has occurred, the recommendations made here should be monitored monthly through the Suicide Prevention Task Force. Again, thank you for the opportunity to work with CHS and DOC on these issues critical to incarcerated persons' safety in a correctional setting.

# EXHIBIT B

*Curriculum Vitae*

**Timothy G. Belavich**
California License # PSY17697
Illinois License # 071-005931

Home Address:
20306 Coraline Circle
Chatsworth, CA 91311
(415) 819-6942

*Education*

California State University- Long Beach, Long Beach, CA          8/06-7/08
Executive Master's in Health Care Administration
Degree: Master of Science
Major: Health Care Administration

Bowling Green State University, Bowling Green, OH          8/92-8/98
APA-Accredited Clinical Psychology Program
Degree: Ph.D. 8/98
Degree: Master of Arts 12/94
Major: Clinical Psychology

Dissertation: The Role of Religious Coping as a Moderator of Religious
Attachment and Outcome
Chairperson: Kenneth I. Pargament, Ph.D.

Master's Thesis: The Role of Religion in Coping with Daily Hassles
Chairperson: Kenneth I. Pargament, Ph.D.

Honors: Departmental Commendation 12/96

Niagara University, Niagara Falls, NY          8/88-5/92
Degree: Bachelor of Arts, Honors in Psychology, 5/92
Major: Psychology and French

Honors Thesis: The Impact of Physical Fitness and High School Sport Participation
Chairperson: Donna Fisher-Thompson, Ph.D.

Honors: Summa Cum Laude, Psi Chi, Phi Sigma Iota, Delta Epsilon Sigma

*Work Experience*

Los Angeles County Department of Health Services
Director, Integrated Correctional Healthcare Services

Responsibilities: *04/21 - present*
- Managing and directing the healthcare services for Los Angeles County Jail which houses 15,000 inmates (13,000 males and 2,000 females).

- Management of the correctional healthcare delivery system entails oversight of medical, mental health, nursing, dental, ancillary, and specialty services. This involves ensuring that program delivery is consistent with community standards and legal mandates. It includes oversight of approximately 2500 staff members.
- Managing a $320 million annual healthcare budget.
- Participating in strategic planning efforts and steering and subcommittees at the county and statewide level.
- Interacting with county partners and community stakeholders regarding care provided in correctional settings and identification of best practices.
- Partnering with custody counterparts to ensure high quality and timely services are provided.  ·
- Ensuring compliance with mental health and ADA consent decrees.

Los Angeles County Department of Health Services
Director, Jail Mental Health

Responsibilities: *1/16 – 04/21*
- Managing and directing the Jail Mental Health Services for Los Angeles County Jail which houses 17,000 inmates, of these approximately 6,300 are participants in the mental health system.
- Management of the program entails oversight of inpatient and outpatient services, chronic care coordination, release planning and case management; and ensuring that program delivery is consistent with community standards, and legal mandates. This includes oversight of approximately 400 staff members.
- Participating in strategic planning efforts and steering and subcommittees.
- Ensuring compliance with mandated court orders in the mental health arena as well as maintaining coordination of the court ordered mandates under the Department of Justice.
- Overseeing the development of and approving creative programmatic approaches to assessing and treating mental health disorders, as well as developing and approving clinical policies and treatment protocols related to the delivery of mental health services.

National Institute of Corrections (NIC), Department of Justice
Consultant and Instructor

Responsibilities: *11/16 - present*
- Develop and Instruct 40-hour course for healthcare and correctional leadership on Restrictive Housing and managing inmates.
- Provide on-site assessment for correctional systems seeking to improve mental health delivery and reduce the use of restrictive housing.
- Identify and promote best practices within correctional healthcare at state prisons and county jails receiving technical assistance through NIC.
- Work in conjunction with custody consultants to assist team building efforts within identified correctional organizations.

California Department of Corrections and Rehabilitation
Director (A), Division of Correctional Health Care Services

Responsibilities: *2/13-1/16*
- Directing the administration of the Department's statewide Mental Health Services Delivery System and Dental Health Services Program as well as determining health care priorities, plans, policies, and programs for the Department. This includes ensuring that the Department delivers care consistent with constitutional mandates and in conformance with federal court orders and state laws.
- Developing and directing the implementation of strategic and operational initiatives that improve the efficiency of the healthcare system.
- Managing the allocation of resources to address programmatic needs and/or deficiencies across multiple programs, balancing the needs of a variety of institutions presenting a complex network of clinical missions.
- Serving as a member of the Department's executive staff; representing the Department on issues involving sensitive and complex mental and dental health care concerns with a variety of stakeholder groups including the Governor's Office, the Department of Finance, the Legislature, the Legislative Analyst Office, the Bureau of State Audits, regulatory agencies, the Federal courts, private health care organizations, the media, and unions.

California Department of Corrections and Rehabilitation
Deputy Director, Statewide Mental Health Program

Responsibilities: *3/12-1/16*
- Managing and directing the statewide Mental Health Services Delivery System at CDCR institutions, including inpatient and outpatient services, chronic care coordination, and case management; and ensuring that program delivery is consistent with community standards, legal mandates, and CDCR goals. This includes serving as the primary Mental Health Program liaison for the Division, establishing and maintaining relationships with the Chief Executive Officers and the Chiefs of Mental Health in the institutions and with a wide variety of public and private stakeholder groups. This also includes management of a $400 million budget and oversight of over 2,000 employees.
- Participating in strategic planning efforts and steering and subcommittees, including the performance management committee and quality management committee, and providing input into the evaluation and improvement of all CDCR health care programs.
- Serving as the primary transition manager and liaison with the Office of the Receiver on all matters pertinent to the Division, including health care policies and administrative and mental health care issues.
- Serving as lead adviser on Mental Health Program implementation and improvement for the Chiefs of Mental Health and the Chief Executive Officers in the institutions and advising of opportunities for improvement as well as the effective implementation of statewide policies, procedures, programs, and processes.
- Ensuring compliance with mandated court orders in the mental health arena as well as maintaining coordination of the court ordered mandates under the Coleman Special Master, Receivership, and with all stakeholders including the Department of State Hospitals.
- Overseeing the development of and approving creative programmatic approaches to assessing and treating mental health disorders, as well as developing and approving

clinical policies and treatment protocols related to the delivery of mental health services. This includes development of a Continuous Quality Improvement Tool.
- Representing the Department as the primary liaison for mental health with outside stakeholders on matters involving the DHCS before the Legislature, the courts, national forums, and meetings with legislators, the Governor's Office, the Department of Finance, and regulatory agencies.
- Providing leadership to staff in an effort to design and initiate processes to improve efficiency in the use of mental health resources; evaluating, hiring, training, and motivating high level executives in the Division, including Regional Administrators, and having administrative oversight for mental health practices for all 35 institutions.
- Facilitating and leading inter-disciplinary teams involving staff from a wide range of classifications that perform strategic planning, data collection and analysis, and other program evaluation and improvement activities.

California Department of Corrections and Rehabilitation
San Quentin State Prison and California State Prison- Los Angeles County
Chief Executive Officer, Healthcare

Responsibilities: *2/05-9/12*
- Manage all aspects of Health Care Department including staffing, personnel, program implementation, corrective action plan development and monitoring, a $26 million budget and custody relations in terms of health care delivery for a staff of 250+ clinicians and support staff for two prisons of approximately 5800 men.
- Chair of Institutional Quality Management Committee.
- Monitor compliance with court orders for all health care programs and ongoing litigation.

California Department of Corrections and Rehabilitation
San Quentin State Prison and California State Prison- Los Angeles County
Chief of Mental Health

Responsibilities: *6/04-2/06*
- Manage all aspects of Mental Health Department including receiving of new inmates, Administrative Segregation, Condemned, and Mainline programs consisting of a staff of 45 clinicians and support staff.
- Chair of Mental Health Quality Management Committee and member of Institutional Quality Management Committee.
- Monitor compliance with court order for mental health programs.
- Meet with federal court monitors who evaluate compliance with court orders.

California Department of Corrections and Rehabilitation
San Quentin State Prison
Senior Psychologist-Supervisor

Responsibilities: *12/02-6/04*
- Supervise staff providing psychological services to inmates at medium security and condemned facility.

- Supervise computer system established to monitor all inmates involved in mental health programs and communicate this information to headquarters.
- Quality management coordinator for institution.
- Monitor compliance with court order for mental health programs and ongoing court case.

California Department of Corrections and Rehabilitation
San Quentin State Prison
Staff Psychologist

Responsibilities: *7/01-12/02*
- Provide psychological services to inmates newly arrived in the correctional system.
- Conduct evaluation of cognitive and emotional functioning for new inmates.
- Provide brief psychotherapy for inmates (1-12 sessions).
- Complete evaluations to remand inmates over to state mental health system post-release.
- Coordinator of involuntary medication program.
- Make recommendations regarding potential for violence, ability to function in prison setting housing and need for medication evaluation.

Rehabilitation Associates of the Midwest. S.C., Palatine, IL
Clinical Psychologist- Geriatrics and Physical Rehabilitation

Responsibilities: *10/99-4/01*
- Provide psychological services to patients undergoing sub-acute physical rehabilitation and long term care residents at several facilities

### *Post-Doctoral Fellowship*
Rush-Presbyterian-St. Luke's Medical Center, Chicago, IL
Post-Doctoral Fellow- Geropsychology and Rehabilitation Psychology
Supervisor: Martita Lopez, Ph.D.; Bruce Rybarczyk, Ph.D.

### *Internship*
- VA Chicago Health Care System, West Side Division, Chicago, IL
- Health Psychology Intern (PRIME)
- Training Director: Janet Willer, Ph.D.
- APA Accredited

ATTACHMENT SOW

Scope of Work

## Scope of Work

The New York City Department of Correction ("DOC") is conducting an evaluation of its current efforts and standards regarding provision for the care and safety of mentally ill incarcerated individuals. Specifically, DOC is focusing on an evaluation of DOC and H+H/Correctional Health Services policies and procedures regarding the prevention of self-harm among its incarcerated population as well as the provision of access to mental health services for the incarcerated population. In conducting this evaluation, DOC is seeking the assistance of an outside Consultant with relevant professional qualifications to assist.

**Deliverables:**

In working closely with DOC and CHS staff, both uniform and non-uniform, the Consultant will be expected to provide the following services:

1. Remotely assess DOC and CHS policies related to Self-harm and Suicide Prevention to ascertain whether they reflect generally accepted practice with the goal of assisting DOC and CHS in identifying and prioritizing needed changes and implementing plans for those changes;.

2. Remotely assess current CHS protocols, procedures and practices for screening, assessing, and treating the risk of suicide and DOC protocols, procedures and practices for responding to suicidal ideation/referrals and for monitoring those who are on suicide precautions to determine whether they are adequate.

3. Assessing DOC staff's practices and responses to self-harm incidents.

4. Assessing current CHS and DOC protocols and practices to identify where performance is subpar and prioritizing needed improvement and implementing plans for those improvement;

5. Assessing the CHS Morbidity-Mortality Review process to ensure that it reflects the generally accepted practice and relevant professional standards.

6. Remotely conduct clinical reviews of DOC and CHS records of identified individuals who have committed suicide or engaged in significant self-harm events with the goal of identifying appropriate and necessary changes in policies or practices;

7. Remotely attend regularly scheduled DOC and CHS meetings pertaining to deaths, suicides, and significant healthcare events with the goal of assisting in the development of a robust and meaningful internal review system; and

8. Remotely conduct meetings with DOC and CHS staff to identify barriers to both policy best practices and correctional best practices and implement timelines for systemic changes.

Contractor will be awarded a purchase order for 60 hours of work, billed at a rate of $325/hour for a total purchase order award of $19,500. Contractor and DOC agree that travel is not included in this agreement and will not be covered or reimbursed by DOC to Contractor as all work will be conducted remotely. The term date of registration will extend to June 30, 2024.

# PURCHASE ORDER

**THE CITY OF NEW YORK**
**FINANCIAL MANAGEMENT SYSTEM**

FMS FORM ENC 200 (12/09)

DOI-Delivery ☐  POC-Commodity ☐  SI-Ship ☐  PON1-Non ☐
Order    ☒ Purchase Order    Inst    Blanket ☐ NON-COMMODITY    Commodity PO
    POC-Commodity ☒            Order ☐ PURCHASE ORDER

**ORDER ID**

PAGE | 1 | OF | 5

ORDER NO. | 160

**VENDOR** ☐  NONE/TBD ☐  AGENCY TITLE ☒  INSPECTORS ☐  DELIVERY LOCATION ☐  DELIVERY FINAL RECEIPT ☐

CHECK ONE | NEW ☒ MODIFICATION ☐ CANCEL ☐

**ORDER ACTION** | DEPT CD

## Vendor Information

| VEND CUST # | VS00081357 | TEL. # | 415-819-6942 |

VENDOR NAME | TIMOTHY BELAVICH

ATTENTION |

ADDRESS | 20306 Coraline Circle

CITY, STATE & ZIP | Chatsworth, CA 91311

| ACCTG LINE NO. | BFY | FUND | DEPT | APPR. UNIT | REF LINE # | BUDGET CODE | DETAIL OBJECT | SUB OBJECT | REF/CAT/QUICK | CAPITAL PROJECT ID | DELIVERY DATE | UNIT | SUB UNIT | TASK |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 24 | 001 | 072 | | | | | | 19,500 | | | | | |

DATE PREPARED | 9-8-2023

DATE APPROVED |

CONTRACT # |

## Deliver To Information

DEPT | Department of Correction | RM. # | 110

ADDRESS 1 | Health Affairs Division

ADDRESS 2 | 75-20 Astoria Blvd

CITY, STATE & ZIP | East Elmhurst, NY 11370

ATTN | Tricia Mullin | TEL. # | 718-546-0340

PERIOD/FY | 24

DATE SENT TO VENDOR |

INSPECTION DIV TEL. # | (24 Hr Notice Prior To Delivery)

## Invoice to Information ☐ If Same as Delivery, check this box.

DEPT | Department of Correction | RM. # | 160

ADDRESS 1 | Financial Services Division

ADDRESS 2 | 75-20 Astoria Blvd

CITY, STATE & ZIP | East Elmhurst, NY 11370

ATTN | Payment Unit | TEL. # | 718-546-0785

TERMS |

**COMMODITY**

**REFERENCE/REQUISITION**

**EXTENDED DESCRIPTION**

The New York City Department of Correction is seeking a contractor to conduct an evaluation of its self-harm prevention protocols and access to mental health services for the incarcerated population.

**COMMENTS**

LINE AMOUNT $ |

REFERENCE CODE |

TOTAL ORDER AMOUNT $ | 19,500 | 19,500

**VENDOR INSTRUCTIONS**
THIS ORDER IS NOT VALID WITHOUT APPROVAL SIGNATURE.

DELIVERIES: THE FOLLOWING MUST APPEAR ON EACH PACKAGE -
PURCHASE ORDER #, SI # (if any)
IDENTIFICATION OF CONTENTS AND
QUANTITY. A PACKING SLIP MUST
ACCOMPANY EACH DELIVERY. UNLESS
OTHERWISE SPECIFIED IN THE ORDER,
PRICES INCLUDE DELIVERY UNLOADED,
INSIDE AND ASSEMBLED. AGENCY REQ
ID AND PURCHASE ORDER ID # MUST BE
SHOWN ON ALL INVOICES.
INVOICES IN PENCIL NOT ACCEPTABLE

## AGENCY APPROVAL

PREPARED BY _(signature)_ TITLE Co

APPROVED BY _(signature)_ TITLE DC 17488

NOTE ALONGSIDE ANY ITEM WHERE TOTAL QUANTITY
DELIVERED DIFFERS FROM QUANTITY ORDERED, CROSS
OUT QUANTITY ORDERED AND WRITE IN TOTAL
QUANTITY DELIVERED.

**DELIVERY/INSPECTION CERTIFICATIONS**
"I HAVE RECEIVED THE GOODS SPECIFIED ABOVE, IN
THE QUANTITIES SHOWN, AND WHERE REQUIRED, THE
GOODS HAVE BEEN INSTALLED BY THE VENDOR."

Certified by: _____ Date: _____
DATE GOODS RECEIVED _____

**AGENCY CERTIFICATION**
"I certify that the listed items have been charged
to the correct accounting codes which are under
the jurisdiction of this agency."

Certified by: _____ Date: _____

CERTIFICATE OF ACCEPTANCE INTO FMS
Certified by: _____
Date Accepted by FMS: _____
SIGNATURE _____ Date Accepted by FMS _____

# PURCHASE ORDER SUMMARY
## ITEMIZED LIST

**ORDER ID**

DEPT CD  72    ORDER NO.

VEND CUST #  VS00081357

PAGE ___ OF ___

| COMMODITY CODE | DESCRIPTION | QUANTITY | UNIT(S) | $ UNIT PRICE | $ TOTAL |
|---|---|---|---|---|---|
| | The New York City Department of Correction is seeking a contractor to conduct an evaluation of its self-harm prevention protocols and access | | 60 | 325 | 19,500 |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |