# Office of the Inspector General

## Matthew L. Cate, Inspector General



# California Prison Health Care Receivership

# Review of Disbursements
# April 2006 through June 2007

**February 2008**

**State of California**



*Matthew L. Cate, Inspector General*                    *Office of the Inspector General*

February 27, 2008


J. Clark Kelso, Receiver
California Prison Health Care Receivership Corporation
501 J Street, Suite 100
Sacramento, California 95814

Dear Mr. Kelso:

Enclosed is the Office of the Inspector General's final report on its review of the
California Prison Health Care Receivership Corporation's expenditures. The purpose of
the review was to satisfy the court order issued by the U.S. District Court for Northern
California requiring the receivership to coordinate the Office of the Inspector General's
periodic review of the receivership's expenditures. This report presents the results of the
first review.

The report revealed that during the 15-month review period, the receivership deposited
over $33 million in state funds and expended $20.6 million for its operating costs and
long-term capital assets purchased on behalf of the California Department of Corrections
and Rehabilitation. The difference between state payments to the receivership and
amounts used by the receivership is mainly attributable to cash in the bank, accounts
payable, and other liabilities at fiscal year end.

The largest expense category incurred by the receivership was personnel services—
comprising the receivership's employees and consultants. Our review found that the
receivership paid 64 percent of its employees salary and other compensation equating to a
projected annual amount of more than $100,000, including 12 employees whose
projected annual compensation exceeded $225,000. The receivership also paid for
employee benefits, such as pension contributions; medical, dental, and life insurance; and
payroll taxes. Finally, the receivership incurred almost $4.9 million in consultant costs.

The receivership also paid more than $350,000 for its employees' and contractors'
reasonable and customary travel-related expenses, including lodging, transportation,
meals, and mileage. During the period reviewed, we found that the receivership paid
numerous travel claims that did not conform to its travel policy that requires original
invoices or receipts and requires employees to substantiate the amount, time, location,
and business purpose of meal expenses.



*Arnold Schwarzenegger, Governor*

P.O. Box 348780, Sacramento, California 95834-8780    Phone (916) 830-3600    Fax (916) 928-5996

J. Clark Kelso, Receiver
February 27, 2008
Page 2

In presenting the receivership's use of state funds, we did not generally include analysis or conclusion on the appropriateness of that use. Nonetheless, we present three recommendations where the receivership can ensure that it uses public funds only for appropriate purposes. Specifically, our recommendations address employee compensation, use of corporate credit cards, and enforcement of the travel policy.

Thank you for the courtesy and cooperation extended to my staff during the review. If you have questions on this report, please do not hesitate to call me at (916) 830-3600.

Sincerely,

*Matthew L. Cate*

MATTHEW L. CATE
Inspector General

Enclosure

cc:  Thelton E. Henderson, United States District Judge

# Contents

Executive Summary ........................................................................1

Introduction

      Background ........................................................................4

      Objectives, Scope, and Methodology.........................................7

Review Results

      Compensation ....................................................................8

      Benefits...........................................................................12

      Professional Fees .............................................................13

      Travel ............................................................................15

      Other Expenses................................................................18

      Capital Assets .................................................................19

Attachments

      Receivership's Agreement

      Receivership's Response

# Executive Summary

In April 2006, the U.S. District Court for the Northern District of California gave the California Prison Health Care Receivership Corporation broad powers over the California Department of Corrections and Rehabilitation's delivery of medical care to prisoners after the court found the department's medical care efforts were "horrifying" and "shocking." The court also found that continued medical malpractice and neglect existed within California prisons. As a result, the court suspended the department secretary's authority over California's prison medical system during the receivership and granted this power to the receiver. The court also ordered the department to pay all costs the receivership incurs in implementing policies, plans, and decisions to carry out its responsibilities. Accordingly, the receivership requested and received from the state more than $33 million between April 2006 and June 2007. To ensure the transparency and accountability of its budget operations, the court required the receivership to coordinate with the Office of the Inspector General to periodically review its expenditures.

Because the receivership is not a state entity encompassed by the Office of the Inspector General's statutory authority, we entered into an agreement with the receiver to perform periodic reviews of the receivership's expenditures—including this first review—to produce a public report for the court that describes how the receivership uses state funds. We included in this agreement a provision for the Office of the Inspector General to report any instances of fraud, waste, or abuse discovered during the review. Therefore, while these reviews are substantially less in scope than a typical audit, they will report any instances of fraud, waste, or abuse that we identify.

During the period April 2006 through June 2007, the receivership spent $20.6 million for its operating costs and long-term capital assets purchased on the department's behalf. As shown in Figure 1, the receivership's largest expense category was personnel services, comprising the receivership's employees and consultants.

During the period we reviewed, the receivership spent $5.9 million on employee compensation and benefits. Compensation that the receivership paid to its employees consisted mainly of salaries and wages, but also included amounts



Figure 1  California Prison Health Care Receivership
Total Disbursements - $20.6 Million
April 2006 through June 2007

Compensation
$4,888,858
24%

Benefits
$1,022,863
5%

Capital Assets
$8,719,171
41%

Professional Fees
$4,891,971
24%

Other Expenses
$742,902
4%

Travel
$352,816
2%

paid in lieu of benefits and amounts paid to its executives for vehicle allowance. The receivership paid 29 of its 45 employees (64 percent) salary and other compensation that equates to a projected annual amount of more than $100,000, including 12 employees whose projected annual compensation exceed the department secretary's $225,000 annual salary. Included in this compensation is $610,642 the receivership paid employees in lieu of receiving benefits. However, the receivership paid $218,790 of this amount even after it began providing benefits. The receivership continued this practice until the judge who created the receivership and oversees its operation ordered the receivership to end the in-lieu-of-benefits compensation program in October 2007.

Besides the compensation the receivership paid to its employees, the receivership also paid for employee benefits, such as pension contributions; medical, dental, and life insurance; and payroll taxes. The receivership made most of its $4.9 million in consultant payments to a single contractor—Maxor National Services Corporation—that provides pharmacy management consulting services. During the period we reviewed, the receivership paid Maxor almost $2.8 million.

The receivership also paid more than $350,000 for its employees' and contractors' reasonable and customary travel-related expenses, including lodging, transportation, meals, and mileage. Although the receivership created a travel policy in February 2007 to guide its staff in incurring travel expenses, the receivership does not always enforce this policy. In our sample of lodging expenses, we found that the receivership had failed to require staff members to provide proper support before paying $10,500 in lodging expenses. Therefore, we could not determine whether the charges were appropriate. Similarly, in our limited review of 23 travel-related expenses, we found 11 instances of meal charges that exceeded the receivership's policy limit or lacked the proper documentation. These expense claims totaled $1,800. We also found that the receivership does not always require its contractors to follow its travel policies. In one instance, the receivership paid a consultant $125 a day for meals, totaling $12,000 during our review period. Had the receivership restricted this consultant to the limits included in its travel policy, it would have only compensated the consultant up to $4,800—a difference of $7,200.

Finally, the receivership spent more than $8.7 million on capital assets, which are assets the receivership purchased to carry out its responsibilities over a long period, such as buildings, office equipment, and information systems. Although a small portion of this amount was for the receivership itself, it made most of its capital asset purchases on the department's behalf.

In this report, we present information on the receivership's use of state funds, in accordance with our agreement with the receiver. Therefore, we generally do not include analysis or conclusions on the appropriateness of the receivership's use of state funds. Nonetheless, we present the following recommendations to help the receivership ensure that it uses public funds only for appropriate purposes.

The Office of the Inspector General recommends that the receivership take the following actions:

- To ensure that the level of compensation paid to employees is an appropriate use of state funds, regularly reevaluate the salary and wage package it provides to staff members.

- To help the receivership ensure that it uses public funds only for appropriate business purposes:

  o Ensure that employees and contractors properly support all travel expense claims with original receipts or invoices and include a description of the business purpose, and verify that the amounts are within established policy limits.

  o Ensure that employees properly support charges appearing on corporate credit card accounts before paying the bill.

# Introduction

## Background

**The court created a receivership to correct the state's failure to provide the constitutionally required level of inmate medical care.** In April 2001, California prisoners filed a class action lawsuit[1] against the state alleging that California officials inflicted cruel and unusual punishment by being deliberately indifferent to serious inmate medical needs. The state settled the lawsuit in 2002, agreeing to overhaul its medical care policies and procedures and to significantly increase resources in prisons to ensure timely access to adequate medical care. However, in 2005, the U.S. District Court for the Northern District of California, which oversees the case, found that the California Department of Corrections and Rehabilitation's inmate medical care was "horrifying" and "shocking," and that medical malpractice and neglect continued.[2]

Therefore, in June 2005, the court decided to establish a receivership to control the delivery of medical services to California prisoners. In its order, the court stated:

> *By all accounts, the California prison medical care system is broken beyond repair. The harm already done in this case to California's prison inmate population could not be more grave, and the threat of future injury and death is virtually guaranteed in the absence of drastic action. The Court has given defendants every reasonable opportunity to bring its prison medical system up to constitutional standards, and it is beyond reasonable dispute that the State has failed. Indeed, it is an uncontested fact that, on average, an inmate in one of California's prisons needlessly dies every six to seven days due to constitutional deficiencies in the* [department's] *medical delivery system. This statistic, awful as it is, barely provides a window into the waste of human life occurring behind California's prison walls due to the gross failures of the medical delivery system.*

> *It is clear to the Court that this unconscionable degree of suffering and death is sure to continue if the system is not dramatically overhauled. Decades of neglecting medical care while vastly expanding the size of the prison system has led to a state of institutional paralysis. The prison system is unable to function effectively and suffers a lack of will with respect to prisoner medical care.*

> *Accordingly, through the Court's oral ruling and with this Order, the Court imposes the drastic but necessary remedy of a Receivership in anticipation that a Receiver can reverse the entrenched paralysis and dysfunction and bring the delivery of health care in California prisons up to constitutional standards. Once the system is stabilized and a constitutionally adequate medical system is established, the Court will remove the Receiver and return control to the State.*

---

[1] *Plata v. Schwarzenegger,* C01-1351 TEH.
[2] *Plata v. Schwarzenegger,* C01-1351 TEH, May 10, 2005, Order to Show Cause RE Civil Contempt and Appointment of Interim Receiver.

**The court gave the receiver broad powers over prison medical care.** Effective April 17, 2006, the court appointed Robert Sillen[3] to serve as the receiver over the department's delivery of medical care to prisoners. The court suspended the department secretary's exercise of power related to the administration, control, management, operation, and financing of the prison medical system during the receivership and granted these powers to the receiver. The court also provided the receivership the power to acquire, dispose of, modernize, repair, and lease property, equipment, and other tangible goods as necessary to carry out its duties under the order. To carry out these duties, the court provided the receivership unlimited access to all records, files, and facilities maintained by the department, as well as access to prisoners and department staff, as deemed necessary by the receiver.

The court established the following duties of the receivership:

- Provide leadership and executive management of the California prison medical care delivery system.

- Develop a detailed plan of action designed to restructure and develop a constitutionally adequate medical care delivery system.

- Determine the annual medical care budget and implement an accounting system that meets professional standards.

- Provide the court with bimonthly reports addressing the receivership's progress made, particular problems encountered, successes achieved, and an accounting of its expenditures and all other matters deemed relevant.

In carrying out his responsibilities, the court stated that the receiver should make all reasonable efforts to exercise his powers in a manner consistent with California laws, regulations, and contracts—including labor contracts. However, if the receiver finds that a state law, regulation, contract, or other state action or inaction is clearly preventing the receivership from developing or implementing a constitutionally adequate medical health care system, the receiver may ask the court to waive the state or contractual requirement causing the impediment.

The court ordered the state to pay all costs the receivership incurs in carrying out its responsibilities. As discussed above, the receiver controls the administration, management, operation, and financing of California's prison

| Table 1 | |
| :-- | :-- |
| **State Payments to the Receivership Through June 30, 2007** | |
| **Date** | **Amount** |
| 3/16/2006 | $    750,000 |
| 6/16/2006 | 2,000,000 |
| 7/31/2006 | 1,200,000 |
| 10/17/2006 | 7,571,555 |
| 2/7/2007 | 3,168,000 |
| 5/2/2007 | 18,622,000 |
| ***Total*** | **$33,311,555** |

---

[3] In January 2008, the court terminated Robert Sillen as the receiver and appointed J. Clark Kelso in that role.

medical system. For fiscal year 2006–07, the department spent $925 million for its adult medical services. The receivership expends most of these funds through the state's control agencies, including the State Controller's Office. However, the department also makes payments directly to the receivership to fund the receivership's operations. As shown in Table 1, between the date of the receivership's inception and June 2007, the department paid the receivership $33.3 million. The receivership's office maintains these funds in its own bank account, out of which it makes disbursements to pay its operating costs.

To ensure the transparency and accountability of its budget operations, the court required the receivership to coordinate with the Office of the Inspector General to complete periodic reviews of its operations. To carry out these responsibilities, we reached agreement with the receiver to perform periodic reviews of the receivership's expenditures—including this first review—to produce a public report for the court that describes how the receivership uses state funds. We included in this agreement a provision for the Office of the Inspector General to report any instances of fraud, waste, or abuse uncovered during the review. We plan to complete similar efforts annually until the receivership is terminated. Our agreement with the receiver is included in the Attachments section of this report.

**The receivership expends state funds to finance its operations.** To carry out its court-ordered mandate, the receivership hires employees, executes contracts, and otherwise incurs costs of doing business. As shown in Table 2, for the period April 2006 through June 2007, the receivership spent $11.9 million on operating expenses. Most of the receivership's operating costs relate to personnel services. These costs include the salaries and benefits for the receivership's employees and the amounts that the receivership paid to consultants providing professional services.

The receivership also spent a significant amount—$8.7 million—to acquire capital assets. Although this amount includes the costs of establishing and equipping the receivership's offices, it primarily comprises costs of an information technology project the receivership is developing on the department's behalf and construction costs the receivership incurred at San Quentin State Prison.

**Table 2**

### How the Receivership Used State Funds
### April 2006 through June 2007

| Description | Amount |
| --- | --- |
| Salaries and Wages | $ 4,888,858 |
| Benefits | 1,022,863 |
| Rent or Lease | 198,146 |
| Professional Fees | 4,891,971 |
| Insurance | 55,737 |
| Office Expenses | 70,618 |
| Travel | 352,816 |
| Telephone and Network Lines | 60,012 |
| Other Expenses | 358,390 |
| *Total Operating Expenses* | *$11,899,411* |
| | |
| Capital Assets | $ 8,719,171 |
| Deposits | 353,220 |
| Cash/Prepaid Balances | 15,907,890 |
| | |
| *Total* | *$36,879,692** |

\* Difference between state payments to the receivership and amounts used by receivership is mainly attributable to $3.3 million in accounts payable and other liabilities at fiscal year end.

## Objectives, Scope, and Methodology

Under a February 2006 order from the U.S. District Court for the Northern District of California, the Office of the Inspector General periodically reviews the receivership's expenses. The purpose of these reviews is to issue a public report that describes how the receivership uses state funds. Although these reviews are substantially less in scope than a typical audit, they will report any instances of fraud, waste, or abuse that the Office of the Inspector General becomes aware of during its review.

In conducting this review, we performed the following procedures:

1. To gain an understanding of the receivership's operations and the nature and scope of projects undertaken, we reviewed documents related to the receivership's creation and interviewed key receivership staff members.

2. To verify the amount of state funds that the department paid to the receivership between its inception and June 30, 2007, we reviewed relevant documents and interviewed key staff members from the receivership, the department, and the California Department of Finance. We then reconciled this amount to the amounts the receivership reported in its financial statements.

3. To learn about the goods and services for which the receivership expended state funds during the review period, we obtained detailed accounting reports and identified significant expense accounts. We then reviewed a sample of transactions from each expense category and learned the purpose of the expense.

4. To determine whether duplicate payments occurred during the period of our review, we obtained a list of payments made by the department to any receivership employees or contractors.

5. To determine whether there were any potential instances of fraud, waste, or abuse at the receivership, we contacted the public accounting firm that audited the receivership's financial statements. The firm told us that it did not become aware of any instances of fraud, waste, or abuse, either as a result of its audit procedures performed or through discussions with the receivership's management during its audit of the receivership's financial statements.

6. To develop the information for this report, we analyzed the data gathered in the above procedures.

# Review Results

In its first 15 months of operation, the California Prison Health Care Receivership spent $20.6 million in state funds. The receivership spent almost $11 million of these funds for personnel services, from both its own employees and from consultants. The receivership also spent almost $9 million on capital assets, most of which were for the benefit of the California Department of Corrections and Rehabilitation's adult prisons. As shown in Figure 1 of the Executive Summary, the receivership spent $20.6 million in six general categories. In this report, we describe how the receivership used state funds in each of the general categories.

## Compensation

To carry out its court-ordered responsibilities, the receivership hires employees who work out of three different offices. The compensation each employee receives varies depending on the employee's designation. But compensation may include salaries and wages, compensation in lieu of benefits, and a vehicle allowance. As shown in Figure 2, during the period of our review, the receivership incurred almost $4.9 million in compensation-related expenses, amounting to 24 percent of the receivership's total disbursements.



**Figure 2**

**California Prison Health Care Receivership Compensation April 2006 - June 2007**

Compensation $4,888,858 24%

| Compensation | Amount |
|---|---|
| • Salaries and Wages | $ 4,209,550 |
| • Compensation in Lieu of Benefits | 610,642 |
| • Vehicle Allowance | 68,666 |
| **Total** | **$4,888,858** |

The receivership designates employees as either executive or non-executive. Between April 2006 and June 2007, the receivership employed 45 people—21 executives and 24 non-executives—including both full- and part-time employees who the receivership paid either on an hourly or salary basis. The receivership also provided some employees an option of receiving additional compensation—30 percent of base salary—in lieu of receiving benefits. In addition, the receivership provided some employees a vehicle allowance of $500 a month.

The receivership obtains advice from human resources consultants to identify competitive compensation levels and to determine the salary or wage it will pay each employee. During the period of our review, the receivership spent $4.2 million on employee salaries and wages. Table 4 at the end of this section summarizes the salaries and wages the

receivership paid to each staff member during the review period, as well as any additional items of compensation the employees received. As shown on this table, the receivership paid 29 of its 45 employees (64 percent) salary and other compensation that equates to a projected annual amount of more than $100,000, including 12 employees whose projected annual compensation exceed the department secretary's $225,000 annual salary.

The receivership did not provide benefits to its employees the first nine months of its operation. Rather, the receivership provided its employees additional compensation— 30 percent of their base salary—in lieu of benefits, such as medical insurance and pensions. Accordingly, from April 2006 through December 2006, the receivership paid 17 of its staff members $391,852 in lieu of benefits.

| Table 3 |  |
| --- | --- |
| **Example of Executive Compensation In Lieu of Benefits Payment** (annual amounts) | |
| *Salary* | *$150,000* |
| In-lieu Benefit (30 percent of salary) | 45,000 |
| Cost of Medical Insurance | (20,000) |
| Cost of Pension Benefit | (15,000) |
| **Residual In-lieu Amount Paid to Employee** | **$ 10,000** |

In January 2007, the receivership began offering health-related benefits to its employees. At that time, the receivership gave its executive employees the option of either continuing to receive their complete in-lieu payment or receiving health benefits and having the in-lieu payment reduced by the receivership's cost of providing medical benefits. The receivership did not provide this option to non-executive employees, electing to discontinue the in-lieu-of-benefits compensation for these employees. In March 2007, the receivership also began offering pension benefits to its employees. Again, the receivership gave its executive employees the option of either continuing to receive the in-lieu payment or adding the pension benefit and having the in-lieu payment reduced by the receivership's cost of providing the pension benefit (see example in Table 3). Similar to health benefits, the receivership did not provide this option to non-executive staff members. From January 2007 through June 2007, the receivership paid its executives $218,790 in lieu of benefits.

Therefore, between April 1, 2006, and June 30, 2007, the receivership paid 18 of its 45 employees (12 executives and 6 non-executives) $610,642 in payments in lieu of benefits. For example, the receiver, Robert Sillen, received $12,500 each month as compensation in lieu of benefits in addition to his $41,666 monthly salary. In January 2007, the receivership began providing medical benefits to Mr. Sillen and reduced his in-lieu-of-benefits payment by the monthly cost of the insurance, $259. In March, the receivership began providing a 401(k) retirement contribution for Mr. Sillen, and it again reduced his monthly in-lieu-of-benefits payment by the cost of the retirement contribution, $2,344. Thus, between March and June 2007, Mr. Sillen received $9,897 each month as compensation in lieu of benefits, even though he received medical and

retirement benefits. We detail the in-lieu-of-benefits payments in Table 4 at the end of this section.

The receivership continued its in-lieu-of-benefits payments to its executives until October 2007. We do not include in this review the in-lieu-of-benefits payments the receivership paid its executives between July 2007 and October 2007 because our current scope is limited to the period April 2006 through June 2007. In October 2007, the judge who created the receivership and oversees its operation ended the receivership's in-lieu-of-benefits compensation program. In his communication to the receiver, the judge stated that he was "under the impression that once an employee benefit package became available that [receivership] employees would transition to the employee benefit package." The judge added that the "practice of paying [receivership] employees 'cash in lieu of benefits' in addition to providing a benefit package was unacceptable given that these are publicly funded salaries.…" Accordingly, he directed the receivership to discontinue in-lieu-of-benefit payments effective October 31, 2007.

The final component of the receivership's employee compensation was vehicle allowance. The receivership provides an allowance, normally $500 a month, to executive staff members. As indicated in Table 4, the receivership paid 18 employees, one of whom was non-executive, a total of $68,666 during the period April 2006 through June 2007.

## Recommendation

To ensure that the level of compensation paid to employees is an appropriate use of state funds, the Office of the Inspector General recommends that the receivership regularly reevaluate the salary and wage package it provides to staff members.

| Table 4 | Total Compensation Received by Receivership Staff Between April 2006 and June 2007 | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | **Compensation** | |
| **Employee** | **Position** | **No. of Mos.** | **Salary & Wages** | **C-I-L Benefit** | **Vehicle Allowance** | **Average Monthly** | **Projected Annual** | **Total Received** |
| Sillen | Receiver | 15.0 | $ 605,468 | $ 170,322 | $ 0 | $ 51,719 | $ 620,628 | $ 775,790 |
| Hill | Chief Medical Officer | 12.5 | 364,751 | 98,398 | 6,250 | 37,552 | 450,624 | 469,399 |
| Kagan | Director of Communications | 15.0 | 219,285 | 47,111 | 7,250 | 18,243 | 218,916 | 273,646 |
| McGrath | Director, Custody Support | 12.0 | 261,521 | 0 | 0 | 21,793 | 261,516 | 261,521 |
| Goldman | Staff Attorney | 15.0 | 185,546 | 37,447 | 7,250 | 15,350 | 184,200 | 230,243 |
| Wood | Chief Financial Officer | 8.5 | 189,719 | 32,873 | 4,162 | 26,677 | 320,124 | 226,754 |
| Graham | Chief Medical Information Officer | 8.5 | 184,988 | 37,609 | 4,069 | 26,667 | 320,004 | 226,666 |
| Hummel | Chief Information Officer | 8.0 | 179,104 | 32,321 | 3,911 | 26,917 | 323,004 | 215,336 |
| Buzzini | Staff Attorney | 13.0 | 163,281 | 42,500 | 6,500 | 16,329 | 195,948 | 212,281 |
| Estrada | Special Assistant | 15.0 | 123,101 | 26,005 | 7,250 | 10,424 | 125,088 | 156,356 |
| Russell | Health Care Project Officer | 9.5 | 116,206 | 25,818 | 0 | 14,950 | 179,400 | 142,024 |
| Turner | Statewide Nursing Officer | 5.0 | 114,583 | 0 | 2,500 | 23,417 | 281,004 | 117,083 |
| Hector | Inmate Prison Relations Manager | 12.5 | 98,257 | 14,969 | 0 | 9,058 | 108,696 | 113,226 |
| Clark | Director of Nursing Ops | 5.0 | 104,167 | 0 | 2,500 | 21,333 | 255,996 | 106,667 |
| Ha | Chief Nurse Executive | 4.0 | 97,885 | 0 | 2,000 | 24,971 | 299,652 | 99,885 |
| Scott | Nursing Director | 5.0 | 93,450 | 2,700 | 2,500 | 19,730 | 236,760 | 98,650 |
| Rea | Nursing Director | 5.0 | 93,750 | 0 | 2,500 | 19,250 | 231,000 | 96,250 |
| Robinson | Nursing Director | 5.0 | 93,750 | 0 | 2,500 | 19,250 | 231,000 | 96,250 |
| Weston | Special Assistant | 7.0 | 95,410 | 0 | 0 | 13,630 | 163,560 | 95,410 |
| Saich | Coordinator | 12.0 | 81,000 | 12,000 | 0 | 7,750 | 93,000 | 93,000 |
| Kirkland | Director, Plata Support | 6.0 | 84,718 | 0 | 3,000 | 14,620 | 175,440 | 87,718 |
| Meier | Custody Support Services | 6.5 | 78,405 | 0 | 0 | 12,062 | 144,744 | 78,405 |
| Honey | Construction Analyst | 9.5 | 76,313 | 0 | 0 | 8,033 | 96,396 | 76,313 |
| Marengo | Director of Facilities | 4.0 | 51,923 | 15,577 | 1,909 | 17,352 | 208,224 | 69,409 |
| Whittaker | Manager, Program Management Office | 4.5 | 58,558 | 0 | 0 | 13,013 | 156,156 | 58,558 |
| Bartle | Administrative Assistant | 11.0 | 47,278 | 6,211 | 0 | 4,863 | 58,356 | 53,489 |
| Hill | Custody Support Services | 7.0 | 49,855 | 0 | 0 | 7,122 | 85,464 | 49,855 |
| Huber | Administrative Assistant | 9.5 | 38,258 | 4,082 | 0 | 4,457 | 53,484 | 42,340 |
| Cameron | Controller | 4.0 | 41,667 | 0 | 0 | 10,417 | 125,004 | 41,667 |
| Uhler | Administrative Assistant | 9.0 | 19,768 | 3,618 | 0 | 2,705 | 32,460 | 23,386 |
| Sampson | Manager, Medical Records | 4.5 | 21,757 | 0 | 2,000 | 5,279 | 63,348 | 23,757 |
| Sandoval | Administrative Aide | 7.0 | 21,776 | 1,081 | 0 | 3,265 | 39,180 | 22,857 |
| Moy | Director, Health Information Integration | 2.0 | 22,788 | 0 | 0 | 11,394 | 136,728 | 22,788 |
| McPherson | Personnel Specialist | 4.5 | 22,635 | 0 | 0 | 5,030 | 60,360 | 22,635 |
| Norcio | Director, Clinical Integration | 1.5 | 18,462 | 0 | 615 | 12,718 | 152,616 | 19,077 |
| Lerner | Staff Attorney | 6.0 | 16,647 | 0 | 0 | 2,775 | 33,300 | 16,647 |
| Stuart | Administrative Assistant | 3.5 | 14,905 | 0 | 0 | 4,259 | 51,108 | 14,905 |
| Knox | Administrative Assistant | 3.5 | 14,730 | 0 | 0 | 4,209 | 50,508 | 14,730 |
| Dovey | Custody Support Specialist | 1.0 | 12,093 | 0 | 0 | 12,093 | 145,116 | 12,093 |
| Lucas | Investigation & Discipline Coordinator | 1.0 | 9,083 | 0 | 0 | 9,083 | 108,996 | 9,083 |
| Sgro | Administrative Manager | 1.5 | 8,513 | 0 | 0 | 5,675 | 68,100 | 8,513 |
| Matranga | Receptionist | 3.5 | 6,969 | 0 | 0 | 1,991 | 23,892 | 6,969 |
| Cambra Jr. | Custody Support Specialist | 0.5 | 6,047 | 0 | 0 | 12,094 | 145,128 | 6,047 |
| Dunn | Administrative Assistant | 0.5 | 225 | 0 | 0 | 450 | 5,400 | 225 |
| Durocher | Administrative Assistant | 2.5 | 150 | 0 | 0 | 60 | 720 | 150 |
| **TOTALS** | | | ***$4,208,745** | **$610,642** | **$68,666** | **$610,029** | **$7,320,348** | ***$4,888,053** |

\* Amount does not agree with total presented at the beginning of this section because of an immaterial difference of $805, which we did not pursue.

## Benefits

In addition to the compensation the receivership paid to its employees, the receivership also paid for certain employee benefits. Although the receivership provided some of the benefits during the entire period of our review, such as payroll taxes and paid time off, it offered other benefit items for only a part of the period. As discussed in the previous section, the receivership began providing health-related benefits to its employees in January 2007 and pension benefits in March 2007. Nonetheless, as shown in Figure 3, during our review period the receivership spent over $1 million on benefits for its employees.



Figure 3

California Prison Health Care Receivership Benefits
April 2006 - June 2007

| Benefits | Amount |
|---|---|
| • Payroll Taxes | $ 309,558 |
| • 401(k) Contributions | 217,050 |
| • Insurance | 216,882 |
| • Paid Time Off | 215,459 |
| • Workers' Compensation | 54,456 |
| • Relocation Expenses | 9,458 |
| **Total** | **$1,022,863** |

Benefits
$1,022,863
5%

Payroll taxes represented the largest benefit expense during the review period. This benefit included the employer portion of Social Security and Medicare payments, totaling $309,558. The receivership also recognized a liability of just over $215,000 at June 30, 2007, for the earned but unused vacation its employees had accrued.

In addition, the receivership paid a little under $217,000 for medical, dental, and life insurance for its staff members electing to receive the benefit between January 2007 and June 2007. The receivership pays the entire cost of these insurance items for its employees.

Finally, the receivership contributed $217,050 to its employees' 401(k) pension accounts between March 2007 and June 2007. The receivership makes monthly 401(k) contributions equal to 12.5 percent of base salary for executive employees and 7.5 percent for non-executive employees.

## Professional Fees

The receivership has entered into contracts to obtain the services of certain professionals to carry out its duties under the court mandate. Accordingly, as shown in Figure 4, the receivership spent $4.9 million on professional fees during the period of our review. Most of these payments are to a single contractor that provides pharmacy management consulting services. However, the receivership also included costs related to its chief of staff, legal, and recruitment services.



**Figure 4**

**California Prison Health Care Receivership Professional Fees April 2006 - June 2007**

| Professional Fees | Amount |
|---|---|
| • Pharmacy Consulting | $2,796,459 |
| • Chief of Staff | 605,526 |
| • Legal | 481,100 |
| • Recruitment | 362,269 |
| • Nursing | 195,600 |
| • Physicians | 115,700 |
| • Human Resources | 93,551 |
| • Information Technology | 87,586 |
| • Other Professional Fees | 79,458 |
| • Temporary Agencies | 74,722 |
| **Total** | **$4,891,971** |

Professional Fees $4,891,971 24%

The single largest recipient of professional fees is Maxor National Services Corporation, which is helping the receivership to improve the department's prison pharmacy system. From April 2006 through June 2007, the receivership paid Maxor almost $2.8 million. According to its contract with the receivership, Maxor has seven specific goals:

1. Develop meaningful and effective centralized oversight, control, and monitoring over the pharmacy services program.
2. Implement and enforce clinical pharmacy management processes.
3. Establish a comprehensive program to review, audit, and monitor pharmaceutical contracting and procurement processes.
4. Develop a meaningful pharmacy human resource program.
5. Redesign and standardize overall institution level pharmacy drug distribution operations.
6. Design and implement a uniform pharmacy information management system.
7. Develop a process to assure the department's pharmacy meets accreditation standards.

The receivership also included in this category payments to its chief of staff, John Hagar, who is an independent contractor to the receivership rather than an employee. Under his agreement with the receivership, Mr. Hagar is responsible for (1) coordinating the receiver's activities, (2) ensuring the flow of accurate information to and from the receiver and the receivership, and (3) providing integrated policy analysis and strategic consultation to the receiver and the receivership. The receivership compensates Mr. Hagar $250 an hour for his services and pays for his ordinary and reasonable expenses—such as travel expenses—incurred in performing his services. During our review period, the receivership paid Mr. Hagar $605,526 for his services. The

receivership accounts for Mr. Hagar's expenses in its "travel" category, which we discuss in the next section.

The receivership also spent $481,100 on legal services during the period under review. For example, it paid the law firm Futterman & Dupree LLP just over $183,000 to serve as the receivership's attorney. According to its agreement with the receivership, Futterman & Dupree LLP provides general legal services, including representation in federal receivership proceedings involving the California prison health care system. The agreement calls for the receivership to pay the firm's attorneys rates that range from $225 to $350 an hour and the firm's legal assistants rates that range from $75 to $160 an hour.

Finally, the receivership included in this category $362,269 in costs of recruiting its staff members. The receivership paid just over $344,000 of this amount to one firm, Korn/Ferry International. This firm recruited candidates for executive positions, including the receivership's chief financial officer, chief information officer, chief nurse executive, and chief quality officer. In its contract with Korn/Ferry, the receivership agreed to pay the firm a fee equal to 33 1/3 percent of the first year's estimated cash compensation of the positions being filled, with a minimum fee of $65,000 per position. In addition to this fee, the receivership also agreed to pay Korn/Ferry's direct, out-of-pocket expenses plus an amount equal to 12 percent of the fee to cover the firm's other search-related expenses.

## Travel

The receivership's policy is to pay for its employees' and contractors' reasonable and customary travel expenses incurred for authorized travel away from their home or designated office to conduct official business. These costs include lodging, transportation, meals and entertainment,



Figure 5

**California Prison Health Care Receivership Travel**
**April 2006 - June 2007**

| Travel | Amount |
|---|---|
| • Lodging | $132,413 |
| • Transportation | 103,736 |
| • Meals and Entertainment | 57,095 |
| • Mileage | 53,499 |
| • Other | 6,073 |
| **Total** | **$352,816** |

mileage, and other minor expenses. As shown in Figure 5, the receivership spent $352,816 on travel during our review period.

Lodging was the receivership's largest category of travel expense incurred during the period of our review, totaling $132,413. The receivership's February 2007 travel policy requires employees to substantiate the amount, time, location, and business purpose of lodging expenses incurred while traveling away from home. Prior to this policy, the receivership had not issued any policies guiding its staff members' travel expenses. The February 2007 policy states that the purpose of the lodging must be related to receivership business, and that the employee must submit an expense report with receipts to obtain reimbursement. The policy also specifies that expense reports must contain "**original invoices or receipts** and not photo copies [*sic*]" [*emphasis in original*]. Further, instructions on the receivership's travel expense form specify that credit card statements are not acceptable as a receipt.

However, the receivership does not always enforce this policy. Two of the lodging expense claims we reviewed amounting to just over $10,500 did not include proper documentation. In one instance, the receivership paid a December 2006 corporate credit card bill that included a charge for $4,271 from Hotels.Com. The charge was for lodging expenses incurred by five receivership employees and the department's director of correctional health care services. Even though this charge occurred before the receivership travel policy was in place, we evaluated the charge using the provisions of the subsequently issued policy because the court order creating the receivership required it to make all reasonable efforts to operate within California state regulations. The state regulations contain even more stringent controls over travel than the receivership's February 2007 policy. When we asked the receivership for support for the charges, it provided us a series of e-mailed room confirmations for a hotel in Houston that a receivership employee had received from Hotels.Com. However, the date of the e-mails is November 6, 2007—nearly a year after the receivership had paid the charge. Moreover, the documents are merely confirmations, not receipts, and the documents do not indicate the business purpose of the expense. Therefore, although the charges were likely for

legitimate receivership business purposes, the receivership paid this item of expense without adequate documentation. This practice increases the risk of the receivership paying for improper travel or other expenses.

Similarly, the receivership paid an October 2006 corporate credit card bill that included two charges for lodging: one for $5,862 in Corte Madera and another for $432 in Hanford. When we asked for support for these charges, the receivership again provided us with faxed copies of receipts from the hotels, both dated February 11, 2008—more than one year after the receivership paid the charges. The support for the $5,862 charge appeared to be for a conference, but the invoice does not indicate who participated in the conference or the business purpose the conference served. The support for the $432 charge indicated that it was for a one-night stay for five receivership employees. However, it did not include a description of the business purpose of the expense. According to the receivership's accountant, she often must pay credit card bills without proper supporting documentation to avoid finance charges. She told us that she makes efforts to obtain proper documentation after she has paid the bill, but she does not always receive it from receivership staff members. Again, while we found no evidence of fraud, this practice increases the risk of the receivership paying for improper travel or other expenses.

The receivership also paid $103,700 in transportation charges claimed by its employees and contractors. This amount includes charges for items such as airline and train tickets, rental cars, taxicabs, and parking. We reviewed a sample of five separate claims totaling $6,917 in transportation charges and found that the employees or contractors had adequately supported the claimed costs.

However, we found that the receivership does not always follow its travel policy when it pays its employees' and contractors' meals and entertainment expenses. Between April 2006 and June 2007, the receivership paid $57,095 for meals and entertainment. Similar to lodging expenses, the receivership's policy requires employees to substantiate the amount, time, location, and business purpose of meal expenses incurred while traveling away from home. It states that the purpose of the meals must be related to receivership business, and that the employee must submit an expense report with original receipts to obtain reimbursement. Further, the policy limits meal expenses to $50 a day during overnight travel. The policy does allow the executive staff to pay for other business guests' meals with prior receiver approval.

Nonetheless, the receivership did not follow these guidelines in several instances that we reviewed. For example, the receiver, Robert Sillen, claimed a February 2007 meal expense of $740 from a Sacramento steakhouse and provided no original receipt, business purpose, or listing of other business guests joining him at the meal. The sole support accompanying the documentation was a credit card statement showing the charge. This same expense claim had two other charges for meals that exceeded the $50 policy limit. One charge was for $127 and the other was for $109. Similar to the $740 charge, Mr. Sillen provided only a credit card statement to support both of these charges. In our limited review of 23 travel-related expenses, we found 11 instances of meal

charges made by several receivership employees that exceeded the receivership's policy limit or lacked the proper documentation. These expense claims totaled $1,847. Again, this practice increases the risk of the receivership paying for improper travel or other expenses.

Finally, the receivership included in the meals and entertainment category $12,000 that it paid to a contractor for per diem payments in her work for the receivership as a corrections health consultant. The contract with the consultant calls for the receivership to pay her an hourly rate for her services and travel time, actual expenses incurred in carrying out her work, and a per diem amount of $125. The receivership reimbursed the consultant for actual expenses such as airfare, lodging, car rental, mileage, and parking. The only normal cost of travel for which the receivership did not reimburse the consultant for actual expenses was meals. As discussed above, the receivership limits its own staff to $50 a day for meals during authorized travel. Therefore, if the receivership had held this consultant to the same standard as its own employees, the receivership would have only compensated the consultant up to $4,800—a difference of $7,200 from the amount it actually paid the consultant in per diem. According to a staff attorney at the receivership's office, the receivership revised the terms of its agreement with this consultant effective July 1, 2007, to eliminate the per diem amount. The staff attorney told us that the receivership revised the contract because it was not its normal practice to pay per diem to its consultants.

## Recommendations

To help the receivership ensure that it uses public funds only for appropriate business purposes, the Office of the Inspector General recommends that the receivership take the following actions to make sure its staff members adhere to its current travel reimbursement policy:

- Ensure that employees and contractors properly support all travel expense claims with original receipts or invoices and include a description of the business purpose, and verify that the amounts are within established policy limits.

- Ensure that employees properly support charges appearing on corporate credit card accounts before paying the bill.

## Other Expenses

We include in the other expenses category all the remaining minor expenses incurred by the receivership. As indicated in Figure 6, a wide range of items is included in this category, totaling $742,902.

The largest item in this category was expenses related to conferences and seminars attended by the receivership's employees. The receivership spent



**Figure 6**  **California Prison Health Care Receivership Other Expenses April 2006 - June 2007**

| Other Expenses | Amount |
|---|---|
| • Conferences/ Seminars | $271,278 |
| • Rent or Lease | 198,146 |
| • Office Expenses | 70,618 |
| • Telephone | 60,012 |
| • Insurance | 55,737 |
| • Leasing – Modulars | 27,019 |
| • Dues and Subscriptions | 17,763 |
| • Miscellaneous | 16,769 |
| • Employee Development | 12,934 |
| • Minor Equipment | 12,626 |
| **Total** | **$742,902** |

$271,278 on these expenses during our review period. The receivership paid $263,750 of this amount to the Association of California Nurse Leaders, which provided training to nurses in supervisory and leadership capacities to learn key competencies and enhance their communication effectiveness. According to the association's summary of the trainings, 212 nurses participated in the training program between November 2006 and May 2007.

The receivership also spent almost $13,000 on employee development. This entire amount was for the receivership's purchase of 1,875 tote bags for department nursing staff in May 2006. According to the receivership's chief nursing executive, the receivership purchased these tote bags and provided them to nurses as recognition during the national nurses appreciation week. The nursing executive added that the bags were custom printed with the department logo and a message stating "Correctional Nursing – Excellence Begins with Caring." The nursing executive also told us that the receivership included in each bag a letter of thanks signed by the receiver, the chief nurse, and the statewide nursing officer.

We did not review examples of expenses in the rent/lease, office expenses, telephone, insurance, or minor equipment categories because of the low-risk nature of the expenses or their relatively small amounts.

## Capital Assets

During our review period, the receivership spent $8.7 million on capital assets, as shown in Figure 7. Capital assets—sometimes called fixed assets—are assets the receivership purchased to carry out its responsibilities over a long period, such as buildings, office equipment, and information systems. The receivership capitalizes asset purchases exceeding $1,000 and depreciates the cost over the assets' useful lives.



**Figure 7**

California Prison Health Care Receivership
Capital Assets
April 2006 - June 2007

Capital Assets
$8,719,171
41%

| Receiver Capital Assets | Amount * |
|---|---|
| • Furniture & Fixtures | $ 180,582 |
| • Computer Equipment | 126,025 |
| • Office Equipment | 110,845 |
| • Leasehold Improvements | 13,388 |
| **Total** | **$430,840** |
| **Capital Assets Receiver Held for the Department** | **Amount *** |
| • Information Systems | $5,068,379 |
| • Construction/ Capital Projects | 2,875,686 |
| • Building and Improvements | 296,091 |
| • Furniture & Fixtures | 32,917 |
| • Vehicles | 15,258 |
| **Total** | **$8,288,331** |
| *Amounts shown net of depreciation* | |

The receivership includes in this expense category two major subcategories: assets held for receivership use and assets held for the department. The receivership includes in the first subcategory long-term assets needed to carry out its court-ordered responsibilities. Asset acquisitions the receivership made for its use included leasehold improvements, cubicle/modular furnishings, office equipment including a comprehensive telephone system, and computer hardware and software applications. From April 2006 through June 2007, the receivership spent $430,840 on capital assets in this subcategory. The receivership incurred almost all the furniture and fixtures expenses with one company, Inter Form, which provided and set up the receivership's office furniture. As an example of the purchases the receivership made for office equipment, it paid VoicePro $42,378 to provide and install a phone system at the receivership's San Jose offices. The receivership incurred almost all its computer equipment expenses with ZAG Technical Services to provide computer-related equipment and services.

The receivership made most of its capital asset purchases on behalf of the department rather than itself. Although the receivership made these purchases—amounting to nearly $8.3 million—out of its own fund, the items or services it purchased were for the direct benefit of a particular department institution or for all the department's institutions. Therefore, because the asset is not for the direct use of the receivership, it accounts for them separately from those discussed above. Most of the receivership's expenses in this category were for an information system the receivership is developing for the department and construction that the receivership began at San Quentin State Prison. In the information systems expenses, almost $4.8 million went to Unisys Corporation to implement an electronic medical contract and invoice processing system for the department. The receivership also paid OVERRA Construction Company almost $966,000 to renovate the triage and treatment building at San Quentin. In addition, the receivership paid Ghilotti Brothers Contractors just over $233,000 for paving projects at San Quentin.

# Receivership's Agreement

*Matthew L. Cate, Inspector General*



*Office of the Inspector General*

March 2, 2007

Robert Sillen, Receiver
California Prison Health Care Receivership Corporation
1731 Technology Drive, Suite 700
San Jose, California 95110

Dear Mr. Sillen:

In accordance with Judge Thelton E. Henderson's February 2006 order in *Plata v. Tilton* establishing the California Prison Health Care Receivership Corporation (CPR), I am submitting to you a proposal to fulfill the Office of the Inspector General's responsibility to ensure the transparency and accountability of your office's budget operations. My staff and I have met with Richard Wood and Jared Goldman from your office to discuss these responsibilities. Based on this discussion and our review of the court's order, I believe that the activities proposed below would fulfill the responsibilities envisioned by the court for the Office of the Inspector General.

**Procedures proposed by the Office of the Inspector General to ensure the transparency and accountability of the CPR's budget operations:**

1. The CPR has advised the Office of the Inspector General that with the assistance of a consultant it is in the process of developing a system of internal controls over its financial operations. Prior to the CPR's final approval or implementation of the system of internal controls, the Office of the Inspector General will review the draft and provide comment. The CPR will then have an opportunity to respond to all comments and concerns raised by the Office of the Inspector General in its review of the draft.

2. The CPR has expressed its intent to engage a certified public accountant to audit and express an opinion on its annual financial statements. The CPR will include in its engagement letter with the accounting firm, a reporting relationship between the accounting firm and the Office of the Inspector General. The purpose of the reporting relationship is not to provide the Office of the Inspector General an opportunity to influence the scope or methodology of the audit, but rather to establish a direct line of communication by which the auditor could report irregularities or improprieties detected during its audit work.

*Proposal to Receiver*
*March 2, 2007*
*Page 2 of 2*

> 3. The Office of the Inspector General will periodically perform or will contract with a qualified consulting firm to perform a review of the CPR's expenditures. The purpose of these reviews will be to issue a public report to the United States District Court for the Northern District of California that provides a description of how the CPR is using state funds, including any instances of fraud, waste, or abuse the Office of the Inspector General becomes aware of during its review. Prior to issuing its report, the Office of the Inspector General will provide an opportunity for the CPR to review and respond to a draft copy of the report describing the results of the review.

We appreciate your cooperation in helping us establish the scope of our activities in carrying out Judge Henderson's February 2006 order. Please provide your response to this proposal by March 16, 2007. If you have any questions, please contact me at (916) 830-3600.

Sincerely,

MATTHEW L. CATE
Inspector General

    cc:    Thelton E. Henderson, United States District Judge

# Receivership's Response

CALIFORNIA
PRISON HEALTH CARE
RECEIVERSHIP CORP.

J. Clark Kelso
Receiver

February 25, 2008

Matthew L. Cate
Inspector General
Office of the Inspector General
P.O. Box 348780
Sacramento, CA 95834-8780

Dear Mr. Cate:

My staff and I have reviewed the draft Office of the Inspector General, California Prison
Health Care Receivership, Review of Disbursements April 2006 through June 2007.   We
agree with the recommendations presented in the review and intend to implement them as we
proceed with our activities.

I recognize that the reporting period of the review runs only through June 2007.  It is worth
noting, however, that several significant changes have been made within the California
Prison Health Care Receivership (CPR) in the last month, including the imminent closure of
CPR's San Jose office, the separation of several of CPR's highest paid executives, and the
consolidation of the Receivership's leadership team in Sacramento.  As a result of these
changes, CPR will reduce its annual operating expenses by approximately four million
dollars (22% of CPR's Fiscal Year 07-08 Budget Outlook) and reap the rewards of a more
closely coordinated organization.

It is also worth noting that the salaries and wages of CPR's employees are now lower than
the figures in the report.   As described in the review, CPR employees received no health or
retirement benefits during 2006.  Instead, employees received "cash in lieu of benefits" (CIL)
payments of 30% of salary—an amount roughly proportionate to the state's benefit package.
After CPR established a formal benefit program in 2007, CPR executive employees
continued to receive CIL payments equaling the difference between the original 30% CIL
payment and the value of the formal benefit program.  All CIL payments ended effective
October 31, 2007.  Currently, CPR employees receive only salary, formal benefits and, in the
case of executives, a car allowance.  For example, on page nine, the review reports that 12
CPR employees had projected annual compensation exceeding the department secretary's
salary.  Now only 8 employees—CPR's seven executive medical professionals and one
executive manager—earn salaries, including car allowance, equal or greater than the
secretary's.  As recommended in the review, I plan to regularly reevaluate the compensation
provided to CPR employees.  Over time, CPR will achieve greater consistency between the
compensation of CPR and state employees.  A caveat is in order, however.  My ultimate
charge is to bring the prison's healthcare system into compliance with federal constitutional
standards as quickly as practicable. If I determine that the only way to accomplish that
charge is by retaining experts at levels of compensation exceeding the state's, I will of course
take the steps that are necessary to meet my constitutional obligations.

Letter to Matthew L. Cate
February 25, 2008
Page 2 of 2

Thank you for preparing the review. Your efforts have advanced our mutual objective of ensuring transparency and accountability in CPR's operations.

Sincerely,

J. Clark Kelso
Receiver

c: Honorable Thelton E. Henderson