RECEIVERSHIPS IN THE PRISON LITIGATION CONTEXT:
FACTORS NECESSARY FOR AN EFFECTIVE JUDICIAL REMEDY OF LAST RESORT

Copyright (c) 2010 Yeshiva University
Cardozo Public Law, Policy & Ethics Journal

Fall, 2010

9 Cardozo Pub. L. Pol'y & Ethics J. 193

Liat Weingart[1]

## Abstract

This article addresses the most invasive of judicial equitable remedies in institutional reform litigation: the receivership. Unlike other equitable remedies, the receivership completely displaces the leadership of an executive agency in order to force it to comply with its constitutional obligations to the plaintiffs. This article is a comparative analysis of three receiverships in the prison litigation context. It analyzes various aspects of each receivership, including the circumstances that led to it, the mandate of the receiver, the experience of the receivership, and the outcome of the receivership in relation to the Court's stated goals. The article concludes with structural recommendations that courts may institute in order to implement a receivership effectively.

[1] J.D. Candidate 2011, Benjamin N. Cardozo School of Law; MSc London School of Economics; Hon. BA University of Michigan.

Electronic copy available at: http://ssrn.com/abstract=1905159

Table of Contents

I.  Introduction ............................................................................................................... 3
II.  Circumstances Leading to the Imposition of Receiverships ................................. 8
    A.  Alabama Prison Receivership ......................................................................... 8
    B.  District of Columbia Jail Medical Care Receivership ................................... 10
    C.  California Prison Medical Care Receivership ................................................ 12
III.  Desired Outcomes Set Out by the Court in Each Case ....................................... 14
    A.  Alabama Order Appointing Receiver ............................................................ 14
    B.  District of Columbia Order Appointing Receiver ......................................... 15
    C.  California Order Appointing Receiver ........................................................... 16
IV.  Powers Granted to the Receiver ........................................................................... 17
    A.  Alabama Powers Granted to the Receiver ..................................................... 17
    B.  District of Columbia Powers Granted to the Receiver .................................. 17
    C.  California Powers Granted to the Receiver .................................................... 19
V.  The Receivership Experience in Each Case ......................................................... 20
    A.  Alabama Prison System—The Receivership Experience ............................. 20
    B.  District of Columbia Jail—The Receivership Experience ............................ 24
    C.  California Prison Medical System—The Receivership Experience ............... 27
VI.  Outcome of the Receiverships .............................................................................. 34
    A.  Alabama Prison System Receivership—Outcome at Termination ................ 34
    B.  District of Columbia Jail Receivership—Outcome at Termination .............. 34
    C.  California Prison Medical Care Receivership—Current Status ..................... 36
VII.  Analysis ................................................................................................................. 37
    A.  Size of the Prison System ............................................................................. 39
    B.  Executive Agents as Receivers ..................................................................... 40
    C.  Plan of Action Adopted Prior to Appointment of Receiver .......................... 43
    D.  Appointment of Special Master Prior to Appointment of Receiver .............. 46
    E.  Supervisory Structures .................................................................................. 47
    F.  Directives and Powers Enumerated in Orders Appointing Receiver ............ 49
VIII.  Conclusion ............................................................................................................ 52

Electronic copy available at: http://ssrn.com/abstract=1905159

# I. INTRODUCTION

The decades since *Brown v. Board of Education*[2] have seen a flourishing of litigation aimed at protecting the constitutional rights of people whose lives are administered in some way by government agencies.[3]  Regarding the object of the litigation, "there may be individual wrongdoers, but the target of the suit is on a social condition and also on the bureaucratic dynamics that produce that condition."[4]  If the court finds that an executive agency has violated the plaintiff class's constitutional rights, the court often issues a structural injunction, a decree that "reorganize[s] the defendant institution so that it will routinely deal with the plaintiff class in a way that does not deprive them of the rights at issue."[5]  The court inserts itself into the management of a government institution to ensure compliance.

Courts' equitable powers to "fashion . . . relief in civil rights litigation is, in a word, broad."[6]  In fact, the court's "assault on the existing organizational structure" will be more pronounced as the range and extent of violations worsen.[7]  "Except where constrained by constitutional prohibition or self-imposed considerations of comity, the federal courts have applied the full range of doctrines for structuring equitable relief to public as well as to private defendants."[8]

The most invasive of these remedial tactics is a receivership.  Receivership is an equitable remedy that "has its roots in the English Chancery Courts, where receivers were

---

[2] 347 U.S. 483 (1954).
[3] Carolyn Hoecker Luedtke, *Innovation or Illegitimacy:  Remedial Receivership in* Tinsley v. Kemp *Public Housing Litigation*, 65 MO. L. REV. 655, 655 (2000).  This type of litigation has been termed variously, "institutional reform litigation, structural reform litigation, and public law litigation."
[4] Owen M. Fiss, *The Forms of Justice*, 93 HARV. L. REV. 1, 22 (1979)).
[5] James M. Hirschhorn, *Where The Money Is:  Remedies To Finance Compliance With Strict Structural Injunctions*, 1982 MICH. L. REV. 1815, 1815-1817 (1982).
[6] RONALD D. ROTUNDA & JOHN E. NOWAK, 4 TREATISE ON CONST. L. § 19.35(a) (4th ed. 2010).
[7] REMEDIAL LAW:  WHEN COURTS BECOME ADMINISTRATORS 85 (Robert C. Wood, ed., 1990).
[8] Hirschhorn, *supra* note 5, at 1825-26.

Electronic copy available at: http://ssrn.com/abstract=1905159

appointed to protect real property and monetary rents and profits."[9]  Receiverships are used in the commercial context to "preserve property for creditors during bankruptcy, corporate reorganization, or other litigation proceedings where the court finds the corporate fiduciaries can not be trusted with the assets of the company pending a decision by the court."[10]

While courts may appoint special masters or monitors to oversee administrative functions, receivers are the most powerful and independent remedy in a court's arsenal to force an executive agency into compliance with its orders.[11]  "Unlike [the] monitor and special master, the receiver completely displaces the defendants:  the receiver makes large and small decisions, spends the organization's funds, and controls hiring and firing determinations."[12]  Receiverships are strictly a remedy of last resort and have been called, for example, "the nuclear option" in prison reform litigation.[13]  Short of outright closure, it is the most invasive remedial tactic that a court in equity may employ to enforce its decrees.[14]

Case law concerning the receivership remedy for the reform of public institutions has developed a multi-pronged test over the past few decades to guide courts in deciding when to impose a receivership.[15]  Despite the existence of a test concerning a receivership's imposition,

---

[9] Plata v. Schwarzenegger, No. C01-1351 TEH, 2005 U.S. Dist. LEXIS 43796, at *61 (N.D. Cal. Oct. 3, 2005) [hereinafter Plata Findings of Fact] (citing RALPH EWING CLARK, A TREATISE ON THE LAW AND PRACTICE OF RECEIVERS (3d ed. 1959)).

[10] Luedtke, *supra* note 3, at 676.

[11] Catherine Megan Bradley, *Old Remedies Are New Again:  Deliberate Indifference and the Receivership in* Plata v. Schwarzenegger, 2007 NYU ANNUAL SURVEY OF AMERICAN LAW, 703, 706.

[12] *Id.* (citing Donald L. Horowitz, *Decreeing Organizational Change:  Judicial Supervision of Public Institutions*, 1983 DUKE L.J. 1265, 1297 (1983)).

[13] Telephone Interview with Sara Norman, Managing Attorney, Prison Law Office (Sept. 25, 2009).

[14] Luedtke, *supra* note 3, at 676 n.156.  An equity court can impose three categories of measures to ensure compliance with its orders:  first, a civil contempt sanction, in which the court can impose increasing levels of penalties on the defendant to coerce compliance; second, the court can enjoin third parties from aiding the defendant in its non-compliance; and lastly, the court may invoke "*in rem* relief, in which the court or its officers themselves do that which the defendant has refused to do."  Hirschhorn, *supra* note 5, at 1826.

[15] Plata Findings of Fact, *supra* note 9, at *66.  The test asks:
    (1)Whether there is a grave and immediate threat or actuality of harm to the plaintiffs; (2) Whether the use of less extreme measures of remediation have been exhausted or prove futile; (3) Whether

4

Electronic copy available at: https://ssrn.com/abstract=1905159

once a court orders a receivership, it has almost unlimited discretion on whom to appoint, what powers to delegate the receiver, and how to supervise and track the receiver's performance. Although the law restricts considerably the court's ability to order a receivership, once the court decides that the receivership remedy is necessary, it is on its own.  The court has wide latitude in fashioning "the supervision and administration of the receivership."[16]

While courts imposing receiverships in the real property context may draw upon the lengthy history of the remedy to implement it, receiverships remain relatively rare in the structural reform litigation context.  And, even in the real property context, a significant benefit of receiverships has been the wide latitude granted to courts to administer them.  Although a mid-1930s reorganization of the Bankruptcy Act temporarily reduced the amount of receiverships sought and implemented, the remedy has experienced a resurgence in part because, "rooted as they are in equity, receivers may be granted powers that are broader and more flexible than those available under the Bankruptcy Code."[17]  However, the Bankruptcy Code was never intended to allow a court to administer a government agency.[18]  Therefore, while real property receivership cases may draw on a plethora of court decisions, none of this precedent directly applies in the structural reform litigation context.

This paper will illuminate the complications that arise when a court takes over an executive agency.  It undertakes this examination by way of three case studies of receiverships

---

continued insistence that compliance with the Court's orders would lead only to confrontation and delay; (4) Whether there is a lack of leadership to turn the tide within a reasonable period of time; (5) Whether there is bad faith; (6) Whether resources are being wasted; and (7) Whether a receiver is likely to provide a relatively quick and efficient remedy.

[16] 13-66 MOORE'S FEDERAL PRACTICE CIVIL § 66.07 (dealing with real property placed in receivership).

[17] M. COLETTE GIBBONS ET AL., *A Model Statute for Free-and-Clear Sales by Equity Receivers*, 28-2 AMERICAN BANKRUPTCY INSTITUTE JOURNAL 50, 50 (Mar. 2009).

[18] 12 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & RICHARD L. MARCUS, FEDERAL PRACTICE AND PROCEDURE § 2981 (2d ed. 2009).

Electronic copy available at: https://ssrn.com/abstract=1905159

resulting from litigation to protect prisoners' constitutional rights. The three cases are: 1) the Alabama prison system receivership[19], between 1979 and 1983, 2) the D.C. Jail medical care receivership[20], between 1995 and 2000, and 3) the ongoing California medical care receivership in *Plata v. Schwarzenegger*[21], imposed in 2005. The breakdown in each prison system was a result of a breakdown in the ordinary political process. In each case, the ordinary political process yielded hugely increased prison populations without a requisite expenditure of funds to accommodate that increase.[22] In each case, the defendants admitted that they had not met their obligations to prisoners under the Constitution and agreed to the imposition of a receivership. In California and Washington, D.C., "the state basically admitted that it did not have the wherewithal to fix the admitted problems."[23] In Alabama, counsel for the defendants conceded that constitutional violations in the prison system would not be remedied without the "dramatic relief requested by the plaintiffs—the appointment of a receiver."[24]

The starting point of each case is essentially the same: (1) the ordinary political process yielding an increase in the prison population; (2) that same political process failing to allocate the funding necessary to maintain prisons in a condition commensurate with the requirements of the Constitution; (3) a vulnerable population relying on the state for all of its basic needs; and (4)

---

[19] Newman v. Alabama, 349 F. Supp. 278 (M.D. Ala. 1972).

[20] Campbell v. McGruder, No. 1462-71, 1987 WL 8724 (D.D.C. Mar. 11, 1987) was consolidated with Inmates of D.C. Jail v. Jackson, 416 F.Supp. 119 (D.D.C. May 24, 1976) [hereinafter the consolidated case is referred to as Inmates of D.C. Jail].

[21] Plata, *supra* note 9.

[22] *See infra* notes 43, 57, and text accompanying note 108.

[23] Telephone Interview with Dr. Ronald Shansky, Receiver for health care in the D.C. Jail and court expert in California Plata litigation (Jan. 18, 2010).

[24] LARRY W. YACKLE, REFORM AND REGRET: THE STORY OF FEDERAL JUDICIAL INVOLVEMENT IN THE ALABAMA PRISON SYSTEM 183 (1989).

Electronic copy available at: https://ssrn.com/abstract=1905159

an admission by the executive defendants that, without drastic judicial intervention, they would not be able to meet their obligations under the Constitution.[25]

Second, this paper will address some of the structures that a court can establish in order to more effectively manage a receivership and some of the factors influencing its success. For example, the size of a prison system and the enormity of the task at hand can affect, but is not necessarily determinative of, the success of a receivership. In addition, an executive agent cannot function successfully as a receiver and may actually erode the power of the court, making the remedy of last resort no remedy at all.

In general, a receivership will be more successful if the court can set up structures that unchain the receiver from the political process that led to the crisis in the first place. Most critically, the receivership's success depends upon the court's ability to tether the receiver to its supervision. Drastic judicial intervention is the result of the failure of all other methods of democratic decision-making to secure rights guaranteed by the Constitution. Because receiverships are the end of the line for vulnerable populations, a receiver's accountability to the court is vitally important. However, while courts are accustomed to engaging in arms-length supervision of their orders, they are not accustomed to engaging in on-the-ground, hands-on supervision over the functioning of an executive agency. Courts must establish mechanisms, like appointing a Special Master, that enable it to maintain close, informed supervision of a receiver.

---

[25] The political process has failed in decision-making regarding corrections and prisoners. In 1994, Carl Stenberg wrote that, "the costs of imprisonment, as well as overall state corrections spending, will likely continue to be driven by judicial decisions. About two-thirds of the states are under court order to reduce prison overcrowding." Carl W. Stenberg, *Recent Trends in State Spending:  Patterns, Problems, Prospects*, 24-3 PUBLIUS 135, 147 (Summer 1994).

Electronic copy available at: https://ssrn.com/abstract=1905159

## II. Circumstances Leading to the Imposition of Receiverships

### A. Alabama Prison Receivership

In the early seventies, Alabama prisoners sued state officials to enforce their rights under the Eighth and Fourteenth Amendments.[26]  Presiding over the prisoners' rights cases was Judge Frank M. Johnson, who former Alabama Governor George Wallace called "an integrating, carpet-bagging, scalawagging, race-mixing, bald-faced liar."[27]  Judge Johnson had previously presided over a number of civil rights cases, including *Browder v. Gayle*[28], ordering the integration of the Montgomery public transportation system, and *Carr v. Montgomery County Board of Education*[29], ordering the first statewide desegregation of public schools.  Two cases, *Pugh v. Locke* and *James v. Wallace*[30], were combined for trial and merged for some purposes with an earlier case, *Newman v. Alabama*[31], about inadequacies in the prison medical system.[32]  "The trial concluded with the admission by defendants' lead counsel, in open court, that the evidence conclusively established aggravated and existing violations of plaintiffs' Eighth

---

[26] The Alabama Board of Corrections operated four large institutions for male prisoners, one institution for young men, another for women prisoners, six road camps, one pre-release center, and eight work-release centers.  The total population of all facilities was five thousand prisoners.  Each of the four large institutions was "horrendously overcrowded," housing nearly twice as many inmates for which they were designed.  James v. Wallace, 406 F. Supp. 318, 322 (M.D. Ala. 1976).  In 1972, Alabama prisoners filed a pro se action against state officials alleging violations of their rights under the Eighth and Fourteenth Amendments for failure to provide adequate medical care.  Newman, *supra* note 19.  In 1974, prisoners filed two separate class action suits alleging violations of prisoners' Eighth and Fourteenth Amendment rights.  *See generally* James, 406 F. Supp. 318.  Class members in Pugh v. Locke sued state officials for failing to protect them against violent attacks by other prisoners.  In James v. Wallace, prisoners sued state officials for failing to provide them with any meaningful opportunities for rehabilitation.  *Id.*

[27] Jody Carlson, George C. Wallace and the Politics of Powerlessness 23 (1981).

[28] 142 F. Supp. 707 (M.D. Ala. 1956).

[29] 232 F. Supp. 705 (M.D. Ala. 1964), *aff'd sub nom.* United States v. Montgomery County Board of Education, 395 U.S. 225 (1969).

[30] James, *supra* note 26.

[31] *See supra* note 19.

[32] For Alabama prisoner class members in the Pugh and James cases, Judge Johnson appointed counsel for the prisoners and appointed the ACLU's National Prison Project as amicus curiae with full authority to participate in the litigation.  Yackle, *supra* note 24, at 63.

Electronic copy available at: https://ssrn.com/abstract=1905159

Amendment rights."[33]  Judge Johnson's opinion reviewed a wide range of violations of prisoners' rights, including overcrowding, lack of sanitation and medical care, and defendants' interference with prisoners' efforts at self-rehabilitation.[34]

In 1979, Judge Johnson stated, "time does not stand still, but the Board of Corrections and the Alabama Prison System have for six years."[35]  Judge Johnson ruled that the Alabama Board of Corrections was not in "substantial compliance" with the Court's orders.[36]  The Alabama Board of Corrections excused its lack of compliance by stating that the Alabama legislature failed to provide it with adequate funds to ameliorate the system's failings.[37]  Judge Johnson concluded that the "only alternative to non-compliance" was to appoint a receiver to take over the Alabama prison system.[38]

Alabama Gov. Fob James requested that Judge Johnson appoint him receiver of the prison system.[39]  Although he could have worked through the ordinary political process and asked the legislature to hand him control over the prison system, James instead turned to "federal judicial power," persuading Judge Johnson to appoint him.[40]  Judge Johnson agreed to the arrangement "but only on condition that James state explicitly that the Alabama prison system

---

[33] James, *supra* note 26, at 322.  Extensive pre-trial discovery and amicus curiae from the National Prison Project and the U.S. Attorney's Office produced over 1,000 stipulated facts.

[34] James, *supra* note 26.  Judge Johnson determined that the constitutional violations taking place in the Alabama prison system were endemic to that entire system and were not solely restricted to the prison medical delivery.

[35] Newman, *supra* note 19, at 635.

[36] *Id.* at 629.

[37] *Id.*

[38] *Id.* at 635.  Judge Johnson noted that the court was entitled to appoint a receiver when it acts in the presence of an outstanding injunction.  Moreover, he concluded that receivership was the less drastic of the available remedies, stating that the court had already put the defendants on notice that failure to comply with the court's orders would result in closure of prison facilities.

[39] YACKLE, *supra* note 24, at 181-82.  Gov. James was required to implement changes that would resolve the "indefensible conditions involving overcrowding; segregation and isolation; inadequate classification; physical and mental health care; protection from violence; inmate living conditions; unsanitary food service; unmeaningful work, recreation and education opportunities; and physical facilities and staff."  Newman, *supra* note 19, at 636.

[40] YACKLE, *supra* note 24, at 182.

Electronic copy available at: https://ssrn.com/abstract=1905159

had not been brought into compliance under the supervision of the board and that the governor himself would implement" the Court's orders in the Pugh and James cases.[41]  Gov. James agreed to admit that the state had not been in compliance, and Judge Johnson agreed to his appointment.

### B.  District of Columbia Jail Medical Care Receivership

The D.C. Jail medical care receivership was the result of two class action lawsuits brought by detainees at the D.C. Jail.[42]  Federal District Court Judge William B. Bryant, who presided over both cases, held that the Jail's practices constituted cruel and unusual punishment.[43]  With rare exception, during the more than twenty years of litigation regarding the D.C. Jail, Judge Bryant did not sanction the D.C. Department of Corrections.[44]  Instead, when confronted with the Department of Corrections' non-compliance, Judge Bryant made the Court's orders increasingly more specific in the hopes of keeping its scrutiny on the defendants.[45]

---

[41] Id.

[42] Jonathan Smith, Enforcing Corrections Related Court Orders in the District of Columbia, 2 D.C. L. REV. 237, 242 (1994) (internal citations omitted).

> The two oldest of the District of Columbia prison reform cases are Campbell v. McGruder and Inmates of D.C. Jail v. Jackson.  These consolidated class action lawsuits challenge the totality of the conditions at the District of Columbia Detention Facility.  Campbell was filed in 1971 on behalf of a class that consists of all pre-trial detainees confined to the Jail.  In 1974, Inmates was filed on behalf of the class that consists of the sentences prisoners in the Jail. . . . During the twenty years of litigation regarding conditions in the D.C. Jail, all nine District correctional institutions were either "the subject of pending litigation or governed in some significant respect by consent decree."

[43] By 1985, mid-way through the litigation, Judge Bryant concluded that "extreme overcrowding" was the root cause of the unconstitutional violations in the Jail.  At that time, its population was more than 3,500 prisoners, and Judge Bryant ordered the number be reduced to "1,684 prisoners within 40 days."  While the court was ordering the Jail to decrease its population, mandatory minimum sentencing caused the population of the prison to grow by one-third. In 1985, the parties entered into a Remedial Stipulation, which required the Department of Corrections to reduce the prison population by nearly one-half and improve physical and mental health services to inmates.  Smith, supra note 42, at 242-43 (1993-1994).  Instead of a reduction in population, the number of men and women incarcerated in the District's nine correctional facilities rose from 7,400 to 11,000 between 1985 and 1994.  Id. at 240, n. 18.

[44] Telephone Interview with Jonathan Smith, Former Executive Director of D.C. Prisoners' Legal Services (Oct. 20, 2009).

[45] Id.

Electronic copy available at: https://ssrn.com/abstract=1905159

Judge Bryant's strategy changed in 1993[46], when he decided to appoint Grace Lopes[47] as Special Master.[48]  Lopes thereafter issued a report, explaining that, "the defendants are in substantial non-compliance with virtually every order issued in this case that relates to medical care at the District of Columbia Jail.  The defendants have violated these orders with impunity."[49]  In January 1995, the Special Master, "after extensive consultation with the plaintiffs and the defendants and the [Special Master's] own medical and mental health experts" created a remedial plan to be implemented by the defendants.[50]

The remedial plan was not implemented and the Court's breaking point took place in July 1995, when a prisoner with full-blown AIDS was left to die in the hallway of the Jail after several days during which his deteriorating condition was ignored by prison guards.[51]  The story was front-page news in D.C. papers, and the D.C. AIDS community held protests outside of the

---

[46] The defendants failed to meet their obligations under the 1985 Remedial Plan and had already been held in contempt once.  Smith, *supra* note 42, at 244.

[47] Grace Lopes served as a Special Master in five other cases involving the District's prison system and then assisted D.C. Mayor Tony Williams to end several receiverships.  Telephone Interview with Grace Lopes, Special Master for Inmates of D.C. Jail v. Jackson and Campbell v. McGruder (Feb. 10, 2010).

[48] The term used by the court was "Special Officer," but in Inmates of D.C. Jail, this term is identical to "Special Master" as is described under FED. R. CIV. P. 53.  *Beyond Community Standards and a Constitutional Level of Care?  A Review of Services, Costs, and Staffing Levels at the Corrections Medical Receiver for the District of Columbia Jail:  Hearing Before the Subcomm. on the District of Columbia of the Comm. on Government Reform*, 106th Cong. 43 (2000) [hereinafter Hearings] (testimony of Inmates of D.C. Jail Special Master Karen Schneider).  In this paper, all iterations of "Special Officer" have been replaced with "Special Master" to avoid confusion.

[49] Smith, *supra* note 42, at 247 (citing the Special Officer's Report on Medical Care at the District of Columbia Jail 1-2 (Feb. 2, 1994)).  The report also explained that defendants "continually provided the court with inaccurate and misleading information about their compliance with the court's orders."  *Id.*

[50] *Id.* at 2.

[51] Colbert I. King, *Death Without Dignity in D.C. Jail*, THE WASHINGTON POST, July 15, 1995.

For 10 days, Richard Johnson lay curled up on his D.C. Jail bunk in soiled bedding, his body ravaged with AIDS.  He urinated in milk cartons that were left on the floor of his cell because he was too weak to walk to the toilet. . . . At one point, corrections staff, for reasons that defy comprehension, decided this severely ill man should be sent back to Maximum Security.  Johnson had to crawl to the door of his cell before he was placed in a makeshift wheelchair for transfer. . . . Johnson was dying; he couldn't care for himself.  Yet, because of his stench, no medical staff would treat him.  . . . Richard Johnson died tied to a wheelchair with a urine-stained sheet. He had been left seated there for two hours, unmedicated, leaning to one side, saliva dripping from his mouth, limbs limp, and eyes open in a blank stare.

Electronic copy available at: https://ssrn.com/abstract=1905159

federal courthouse.[52]  Judge Bryant reacted by "seiz[ing] control of the Jail's medical and mental health services."[53]

One month later the parties agreed to appoint Dr. Ronald Shansky, former medical director of the Cook County Jail and expert to Special Master Grace Lopes, as receiver.[54]  Dr. Shansky stated that he reluctantly agreed to the appointment and did so in part because the District, the defendants, "wanted [him] to assume the responsibility."[55]

### C.  California Prison Medical Care Receivership

In 2001 the Prison Law Office filed what has become the largest prisoners' rights class action lawsuit in U.S. history to challenge the state's neglect of prison medical care.[56]  Judge Henderson, a 1980 Carter appointee to the federal bench who has overseen the case since its inception, explained that the rapid growth of the prisoner population without accompanying organizational changes contributed to the crisis in prisoner medical care.[57]

---

[52] Smith Interview, *supra* note 44.

[53] King, *supra* note 51.
> Senior U.S. District Judge William Bryant has been presiding over civil lawsuits involving the jail for more than 20 years—and with the patience of Job.  But this week he'd had enough.  At Monday's hearing on a special master's report about the horrific conditions at the jail, Judge Bryant seized control of the jail's medical and mental health services.  Some corrections officials, he concluded just 'don't give a damn.'  'They have jobs, titles, they get paid, and they do nothing,' he said.

[54] Lopes Interview, *supra* note 47; Hearings, *supra* note 48, at 86.

[55] *Id.* at 33.

[56] Major Cases and Achievements, Prison Law Office, http://www.prisonlaw.com/cases.php (last visited Feb. 20, 2010).

[57] In 2005, Judge Henderson explained that, "since 1980, the inmate population has grown well over 500 percent and the number of institutions has nearly tripled from 12 to 33. … Currently, the [prison system] has approximately 164,000 inmates, 114,000 parolees, and 45,200 employees." Plata Findings of Fact, *supra* note 9, at *8.  The cost of prison health care in California has also increased as a result of the average age of prisoners increasing.  "Aging inmates cost two to three times as much to incarcerate as younger prisoners, an average $98,000 to $138,000 a year."  Don Thompson, *Aging Inmates Add to Prison Strain in California*, SAN FRANCISCO CHRONICLE, July 5, 2008.

Electronic copy available at: https://ssrn.com/abstract=1905159

Judge Henderson appointed a number of experts to help him supervise a series of consent decrees, which the parties entered into in 2002.[58]  However, by 2004, not a single prison had complied with the decrees.[59]  Judge Henderson ordered a receivership in October 2005.[60]  At first, he sought to institute a temporary limited receivership only to improve physician quality.[61]  The parties initially agreed that the judge would issue a Request for Proposal to solicit a receiver for the medical delivery system, and a national search began.[62]  In the meantime, Judge Henderson went to the governor's office to discuss the budget to set up the new receiver's office.[63]  He explained that he would need about five million dollars to establish the new office. He received a shocking reaction.[64]  The governor's office stated that the receivership would command control of the entire health care services budget.[65]  Judge Henderson had not anticipated running a $1.1 billion operation[66] and was taken off guard by the governor's response

---

[58] Plata, No. C01-1351 TEH, 2005 U.S. Dist. LEXIS 8878, at *4 (N.D. Cal. May 10, 2005) (order to show cause re civil contempt and appointment of interim receiver).

[59] In February 2005, Judge Henderson went on a tour of San Quentin and found that "the main medical examining room lacked any means of sanitation—there was no sink and no alcohol gel—where roughly one hundred men per day undergo medical screening, and the Court observed that the dentist neither washed his hands nor changed his gloves after treating patients into whose mouths he had placed his hands."  Plata Findings of Fact, *supra* note 9, at *42.

[60] In ordering a receivership, Judge Henderson blasted the California Department of Corrections and Rehabilitation's ("CDCR") systematic failure to provide constitutionally adequate medical care.  He stated, "it is an uncontested fact that, on average, an inmate in one of California's prisons needlessly dies every six to seven days due to constitutional deficiencies in the CDCR's medical delivery system.  This statistic, awful as it is, barely provides a window into the waste of human life occurring behind California's prison walls due to the gross failures of the medical delivery system."  Plata Findings of Fact, *supra* note 9, at *3.

[61] Shansky interview, *supra* note 23.  The plaintiffs' attorneys saw the temporary receivership only as an interim measure and had consistently pressed for a permanent receiver.  Email from Alison Hardy, Staff Attorney, Prison Law Office, to Liat Weingart (Feb. 9, 2010, 19:23 EST).

[62] Shansky Interview, *supra* note 23.

[63] *Id.*

[64] *Id.*

[65] *Id.*

[66] Jennifer Waren, *State Urged to Act on Prison Healthcare*, LOS ANGELES TIMES, Nov. 15, 2005, *available at* http://articles.latimes.com/2005/nov/15/local/me-prison15.

Electronic copy available at: https://ssrn.com/abstract=1905159

to his comparatively modest budget request.[67]  The result was the largest judicial takeover of a state agency.[68]

After a headhunting firm conducted a search for a receiver and candidates were selected, the judge gave the plaintiffs and defendants an opportunity to interview them.[69]  Judge Henderson selected Robert Sillen, who had spent twenty-seven years running the Santa Clara County's public hospital and health system.[70]  Two years later, Sillen would be fired and replaced by the current receiver, J. Clark Kelso, a Sacramento law professor and state bureaucrat.[71]

III.    DESIRED OUTCOMES SET OUT BY THE COURT IN EACH CASE

A.  Alabama Order Appointing Receiver

In 1979, when Judge Johnson agreed to appoint Alabama Governor Fob James as the Alabama Department of Corrections receiver, he set out a broad framework for what constitutional compliance entailed.[72]  The Court also described the eight end goals that it expected Governor James to achieve.  Some of these goals appear clear in their meanings and reference earlier court orders that could be used to gather meaning if confusion arose.  For example, the Court ordered the Governor to create a meaningful classification system so as to

---

[67] Shansky Interview, *supra* note 23.
[68] Solomon Moore, *Using Muscle to Improve Health Care for Prisoners*, NEW YORK TIMES, Aug. 27, 2007.  In 2010, the California prison system included thirty-three adult prisons, including Pelican Bay State Prison near the Oregon border and R.J. Donovan Correctional Facility near the border with Mexico.  Centerforce Prison Map, *available at* http://www.centerforce.org/prisonMap/.
[69] Email from Alison Hardy, Staff Attorney, Prison Law Office, to Liat Weingart (Feb. 15, 2010, 19:00 EST).
[70] Jim Boren, *It's Not Surprising Robert Sillen Makes Lawmakers Angry*, SCRIPPS NEWS, Apr. 6, 2007, *available at* http://www.scrippsnews.com/node/20953.
[71] Bob Egelko, *New Overseer for Prison Health Care System*, SAN FRANCISCO CHRONICLE, Jan. 24, 2008, at B-3.
[72] These three standards included (1) the creation of a meaningful prison work program, (2) "protection of the inmates from physical and sexual assault," and (3) "availability of a basic education program.  Newman, *supra* note 19, at 637.

14

Electronic copy available at: https://ssrn.com/abstract=1905159

protect prisoners from assaults and reduce the need for additional guards.[73]  However, some of the goals are attached to no specific measurable outcomes, including that the Governor should "promptly institute measures, including the prompt construction of needed facilities . . . to eliminate overcrowding in state prisons."[74]  Overcrowding is not defined elsewhere in the Court's order, nor is a timetable described concerning what "prompt" means.[75]  Judge Johnson's order regarding medical care established the means by which the Governor should achieve unknown ends.  Specifically, it ordered the Gov. James to coordinate prisoner medical care with state medical schools.[76]  At the same time, the order did not articulate when the system would be in compliance with court orders.[77]

### B.  District of Columbia Order Appointing Receiver

By the time Judge Bryant appointed a receiver for the D.C. Jail medical system, the Court had spent nearly twenty years entering increasingly specific orders.  As a result, by 1995, the Court's Remedial Plan was hundreds of pages in length.[78]  The D.C. Jail's Order Appointing Receiver charged Dr. Shansky had one concrete task:  to implement that Remedial Plan.[79]  The Order Appointing Receiver directs the receiver to work with the Special Master and report to the Court.

Judge Bryant also articulated the larger, overriding goal of the receivership, that the receiver shall "correct all deficiencies in the delivery of medical and mental health services at the

---

[73] Newman, *supra* note 19, at 638.
[74] *Id.*
[75] Newman, *supra* note 19, at 630, 638.
[76] Newman, *supra* note 19, at 638-39.
[77] *Id.*
[78] Smith Interview, *supra* note 44.
[79] Inmates of D.C. Jail, Findings and Order Appointing Receiver, No. 75-1668, at 8 (D.D.C. Jul. 11, 1995), *available at* http://www.clearinghouse.net/chDocs/public/JC-DC-0002-0019.pdf [hereinafter D.C. Jail Order Appointing Receiver]; Smith Interview, *supra* note 44.

Electronic copy available at: https://ssrn.com/abstract=1905159

Jail and to operate the program for the delivery of medical and mental health in a manner

consistent with the orders of this Court and the Constitution of the United States."[80]  The one

central goal of the receivership was to implement a highly detailed program to get the Jail's

medical delivery system into compliance with the Constitution.

### C.  California Order Appointing Receiver

In the Order Appointing Receiver, the Court states that, "this Receivership is

unprecedented in scope and dimension."[81]  The goals in the Order Appointing Receiver are

broadly stated indeed:

> The receiver shall provide leadership and executive management of the California
> prison medical health care delivery system with the goals of restructuring day-to-
> day operations and developing, implementing, and validating a new, sustainable
> system that provides constitutionally adequate medical care to all class members
> as soon as practicable.[82]

It charges Sillen, the new receiver, with the task of creating a plan of action within 180-210 days

of his appointment.[83]  Sillen would be responsible for proposing to the Court, *inter alia*, its goals,

budget, and timeline.[84]  For example, the receiver's plan of action would provide the Court with

recommendations about what parts of the initial Stipulation for Injunctive Relief of 2002 and

Stipulated Order re Quality of Patient Care and Staffing Order and Injunction of 2004 should be

implemented.[85]  These orders spell out at what point the prison medical care delivery system

---

[80] D.C. Jail Order Appointing Receiver, *supra* note 79, at 7-8.
[81] Plata, Order Appointing Receiver, No. C01-1351 TEH, at 9 (N.D. Cal. Feb. 14, 2006), *available at* http://www.cprinc.org/docs/court/PlataOrderAppointingReceiver0206.pdf [hereinafter Plata Order Appointing Receiver].
[82] Plata Order Appointing Receiver, *supra* note 81, at 2.
[83] *Id.*
[84] *See generally*, Plata Order Appointing Receiver, *supra* note 81.
[85] Plata Order Appointing Receiver, *supra* note 81, at 2.

Electronic copy available at: https://ssrn.com/abstract=1905159

would be in compliance with the minimum requirements of the Eighth Amendment to the U.S. Constitution.[86]

## IV. POWERS GRANTED TO THE RECEIVER

### A. Alabama Powers Granted to the Receiver

When Gov. Fob James became the temporary receiver of the Board of Corrections of the State of Alabama, he in effect became the supervisor of the Commissioner of Corrections. He was granted "all of [the Board of Corrections'] functions, duties, powers and authority to manage, supervise and control all penal and correctional institutions in the State of Alabama."[87] Although the Governor was granted power to spend money granted to the Board of Corrections by the legislature, the Alabama legislature retained the power to develop the prison system's overall budget. Insofar as meeting minimum constitutional requirements mandated an increase in spending for corrections, Judge Johnson granted Gov. James no power to increase the prison system's appropriations.

### B. District of Columbia Powers Granted to the Receiver

In the D.C. Jail litigation, the Court granted the receiver wide-ranging powers, including "[a]ll powers currently held by the Mayor, City Administrator, Director of the Department of Corrections, Assistant Director for Health Services and Chief Medical Officer regarding the delivery of medical and mental health services at the District of Columbia Jail."[88] According to Jonathan Smith, former Executive Director of the D.C. Prisoners' Legal Services and plaintiffs'

---

[86] *See* Plata v. Davis, Stipulation for Injunctive Relief, No. C01-1351 TEH, at 10-12 (N.D. Cal. 2002), *available at* http:// www.prisonlaw.com/pdfs/Platastip.pdf.

[87] The Governor's new role granted him "power to hire, discharge, suspend, and supervise the Commissioner of Corrections, deputy commissioners, and any other personnel employed by the Board." Newman, *supra* note 19, at 636.

[88] D.C. Jail Order Appointing Receiver, *supra* note 79, at 8.

Electronic copy available at: https://ssrn.com/abstract=1905159

counsel in *Inmates of D.C. Jail v. Jackson*, the receivership was structured so as to untether the receiver, Dr. Shansky, from the District of Columbia's procurement processes.[89]

Although the Order Appointing Receiver theoretically gave Dr. Shansky a free hand to act, a subsequent order reigned in that power. At the end of September of 1995, after lengthy negotiations between Dr. Shansky, the Special Master, the Department of Corrections, and plaintiffs' counsel, the Court entered an order providing a detailed process by which the receiver was to work through a District liaison to procure supplies and personnel.[90] Not surprisingly, this liaison process broke down after a few months when the liaison "informed [Dr. Shansky] and the parties that the D.C. government machinery was not able to respond with regard to personnel, procurement, and contracting issues within the time frames that were required."[91] The parties then agreed that Dr. Shansky would develop a budget in order for the receiver to "directly provide for personnel, contracts, and commodities."[92]

The receivership contained some additional significant structural limitations on the receiver's power. For example, the Order Appointing Receiver specified that the receivership was slated to end five years after its inception, "unless the Court [found] good cause to extend

---

[89] Over the course of the lawsuit, the Department of Corrections did not have purchase authority; rather it had to go through the procurement processes of the city. Smith Interview, *supra* note 44. The Order Appointing Receiver granted the receiver "[t]he power to procure such supplies, equipment or services as are necessary to obtain compliance with this Court's orders, the cost of such procurement to be borne by the defendants." D.C. Jail Order Appointing Receiver, *supra* note 79, at 9. Also, because the D.C. Jail's systems were so dysfunctional, Jonathan Smith reported that there was a need for a nearly one hundred percent change in personnel. Smith Interview, *supra* note 44. The Order Appointing Receiver granted the receiver the "power to contract" for services and consultants necessary to comply with the court's orders. D.C. Jail Order Appointing Receiver, *supra* note 79, at 9.

[90] Hearings, *supra* note 48, at 75 (Inmates of D.C. Jail, Order Regarding Procedures for the Receiver to Exercise Powers, No. 75-1668 (D.D.C. Sept. 26, 1995)). Dr. Shansky explained that he was to make every effort to use the "levers of government to accomplish the things required" and that the D.C. government would appoint a liaison to facilitate [his] working with it. But if the receiver determined that things can't be done or done timely, then the receiver could work to be given the money outright and do things directly." Shansky Interview, *supra* note 23.

[91] Hearings, *supra* note 48, at 36 (Letter from Dr. Ronald M. Shansky to Rep. Tom Davis, Chairman, D.C. Subcommittee of the Committee on Government Reform, June 27, 2000).

[92] *Id.*

Electronic copy available at: https://ssrn.com/abstract=1905159

the appointment."[93]  Another significant limitation on the receiver's authority was that he was to

implement his work in coordination with the Special Master.[94]

### C.  California Powers Granted to the Receiver

In *Plata*, the power of the receiver was demarcated by the power of the Secretary of the

California Department of Corrections and Rehabilitation.[95]  The receiver was granted power over

personnel decisions, including hiring and firing, as well as decisions over property, including

modernizing, repairing, and leasing equipment.[96]  If California state laws or employment

contracts conflicted with the receiver's exercise of power, the receiver could petition the Court to

"waive the state or contractual requirement that is causing the impediment."[97]

The power granted to the receiver fell significantly short of the powers of the defendants.

The defendants in *Plata* included California's Governor and Director of Finance.  Significantly,

the Director of Finance's role is to create and administer California's budget, which is presented

to the California Legislature each January for approval.[98]  Insofar as the deficiencies in medical

care to prisoners resulted from a lack of funding, the receiver would need to turn to either the

executive or to the Court to allocate funds to prison health care projects.

The Order Appointing Receiver imposed some time constraints on the receiver.  As stated

above, the receiver was required to submit a Plan of Action within 180-210 days of his

---

[93] D.C. Jail Order Appointing Receiver, *supra* note 79, at 9.

[94] *Id.* at 8.  One example of the Special Master's supervisory power concerned budgeting.  Although the intent behind the Order Appointing Receiver was to give the receiver "free reign to hire, fire and purchase," money would be made available after the Special Master scrutinized the budgets.  Smith Interview, *supra* note 44.

[95] The Plata Order Appointing Receiver conveyed "all powers vested by law in the Secretary of the CDCR as they relate to the administration, control, management, operation, and financing of the California prison medical health care system" to the new receiver.  Plata Order Appointing Receiver, *supra* note 81, at 4.

[96] *Id.*

[97] *Id.*, at 5.

[98] California Department of Finance, http://www.dof.ca.gov/.

Electronic copy available at: https://ssrn.com/abstract=1905159

appointment.[99]  This Plan of Action was to contain recommendations regarding which provisions of two prior orders "should be carried forward, and which, if any, should be modified or discontinued due to changed circumstances."[100]  The deadline for the Plan of Action was the only concrete time limit placed on the receiver, since the Court did not impose an upper time limit on the receivership in general.  The Court explained that the receivership would last "no longer than the conditions which justify it make necessary."[101]

Although not stated directly, the Order Appointing Receiver outlines a primarily direct mode of supervision of the receiver:  he would submit bimonthly progress reports and a Plan of Action, and the Court would supervise him directly.[102]  However, the Court did explicitly state one additional mode of outside supervision:  the appointment of an Advisory Board.[103]  The Court stated that it would appoint an Advisory Board, in consultation with the receiver, "of no more than five members to assist and advise the Court with respect to achieving the goals of the receivership."[104]

## V.  THE RECEIVERSHIP EXPERIENCE IN EACH CASE

### A.  Alabama Prison System—The Receivership Experience

The Alabama prison system receivership ultimately failed to resolve major issues in the prison system because of the conflict of interest inherent in appointing an executive officer as a

---

[99] Plata Order Appointing Receiver, *supra* note 81, at 2.
[100] *Id.*; Plata, Stipulation for Injunctive Relief, *supra* note 86; *see* Plata, *supra* note 58, at *5 (discussing the Stipulated Order Re Quality of Patient Care and Staffing, entered into by parties on September 17, 2004).
[101] The court explained that the receivership would end when the court found, "in consultation with the Receiver, that the Defendants have the will, capacity, and leadership to maintain a system of providing constitutionally adequate medical health care services to class members."  Plata Order Appointing Receiver, *supra* note 81, at 7.
[102] *See generally id.*
[103] *Id.* at 9.
[104] *Id.*

Electronic copy available at: https://ssrn.com/abstract=1905159

receiver, i.e. as an arm of the Court.  Judge Varner, who took the case over from Judge Johnson

shortly after the latter took a position on the Fifth Circuit Court of Appeals, made clear that he

understood Gov. James to be not solely an arm of the Court. In a hearing regarding releasing

prisoners to put the prison system into compliance with orders regarding overcrowding, he

stated:

> I think the Governor has a very tough job and he has got something that I don't
> have, and that is politics. . . . For that reason I can certainly understand why he
> would not favor a mass release of prisoners. My duties are a little different.  I
> have a duty to protect anybody whose constitutional rights are violated.[105]

Arguably, as an arm of the Court, Gov. James's job was to implement Judge Varner's orders.

However, even Judge Varner acknowledged throughout the litigation that this was not the case

because of Gov. James's job as Alabama's Chief Executive.[106]

Some of Gov. James's policies undermined or conflicted directly with the objectives of

the Court.  For example, James made it clear that he intended to reduce the size of state

government and keep agency budgets to a minimum.[107]  Satisfying the Court's orders would

require, if anything, an increase in spending.  Also, James favored changing the age at which

young people could be tried as adults from sixteen to fourteen, which would significantly

increase the number of prisoners and further exacerbate the overcrowding crisis.  He also favored

lengthening prisoners' sentences in general.[108]  In his power as Chief Executive of Alabama,

Gov. James's objectives and views of what would be beneficial to the state as a whole made it

impossible for him to unreservedly prioritize the Court's orders.

---

[105] YACKLE, *supra* note 24, at 211.
[106] *Id.*
[107] *Id.* at 189.
[108] *Id.*

Electronic copy available at: https://ssrn.com/abstract=1905159

The summer of 1981 brought a conflict on the overcrowding issue to a head, and that conflict made the faults of Gov. James's receivership clear. Alabama, listed as one of the poorest states in the union, came into possession of $450 million by opening its coastal areas to oil companies in 1981.[109] Instead of siphoning off some newfound wealth to the prison system, however, the Alabama legislature reduced the prisons' budget by $7 million.[110] Needing to solve the overcrowding problem and unwilling to either touch the state treasury directly or hold state executives in contempt, Judge Varner decided instead to issue a release order for hundreds of prisoners.[111] Gov. James initially welcomed the release order, but, responding to furor in the newspapers, he flip-flopped positions and "joined the crusade to avert the release of prisoners at all cost."[112] Nonetheless, Judge Varner ordered the release, and "Gov. James would not contest it on appeal."[113]

When Alabama's Attorney General did contest the release order on appeal, Justice Powell of the Eleventh Circuit rejected issuing a stay. His response is illustrative. He reasoned that because Gov. James was responsible for the prison system both as receiver and as governor, the Attorney General had no reason to interfere because Gov. James had not opposed Judge Varner's order.[114] On its face, Justice Powell's statement makes sense: since Gov. James was ultimately responsible in two capacities over the prison system's welfare, his views should hold sway. However, a receiver is an arm of the Court, not the other way around. Gov. James was appointed as receiver to enforce the will of the Court, not his own will.

---

[109] *Id.* at 195.
[110] *Id.*
[111] *Id.* at 196.
[112] *Id.* at 197.
[113] *Id.* at 199.
[114] *Id.* at 195.

Electronic copy available at: https://ssrn.com/abstract=1905159

Towards the fall of 1981, another release order for an additional several hundred prisoners revealed the conflict of interest in appointing the governor as receiver. By mid-1981 it was clear to Gov. James that the prisons would be out of compliance with the parties' October 9, 1980 consent decree deadline. Gov. James began traveling to Washington to talk with newly appointed Reagan administration Justice Department officials, hoping to get them to side with him against another potential release order by Judge Varner.[115] In other words, an officer of the Court was conducting back-door negotiations with the Justice Department to oppose the will of the Court.

The winter 1981 release order also illustrated that the Court had made itself impotent by appointing the governor as receiver. When the Alabama Attorney General and Gov. James filed separate motions opposing Judge Varner's release order, the justices of the Eleventh Circuit responded in an unexpected way. Judge Tjoflat wrote for a unanimous panel in stating that if the Attorney General and the Governor objected to the requirements of the October 9 order, by which they were bound, they should have objected to it earlier. Now, their lack of compliance with it "left them open to contempt."[116] The Eleventh Circuit rejected Judge Varner's release order, citing "Varner's failure to employ the contempt process [as] decisive."[117] Judge Varner was not at liberty to "involve the Court in the operation of the State's system of criminal justice to a greater extent than necessary to remedy the constitutional violation."[118] The Court could not issue a release order without employing the contempt process to force the governor's hand.

---

[115] *Id.* at 207.
[116] *Id.* at 220.
[117] *Id.*
[118] *Id.*

Electronic copy available at: https://ssrn.com/abstract=1905159

Whereas Justice Powell was confused about who retained power over the ultimate objectives in litigation, Judge Tjoflat was oblivious to the political realities of appointing the governor as receiver. Judge Varner was unwilling to risk confrontation with Gov. James because he felt that the fault lay with the Alabama legislature, which reduced the funding to the Alabama prisons by $7 million despite the $450 million windfall. [119] Furthermore, he did not wish to impose heavy fines on state officials because he felt it would be unfair to force them to pay those fines personally or draw those funds from the state treasury. Even the prisoners' lawyers did not favor the Eleventh Circuit's conclusion because a contempt order left state officials with no safety valve.[120] While a contempt order might have been able to compel state officials to solve a discreet problem, it would have been ineffectual to compel state officials to solve long-term and systemic problems like overcrowding.

## B. District of Columbia Jail—The Receivership Experience

When he assumed responsibility at the D.C. Jail, Dr. Shansky had part of the Jail outfitted as his office and temporary sleeping quarters. He explained, "In a jail, you have a lot of medical activity between 5 p.m. and 2 a.m. . . . I intend—not every day, but at times—to be a presence there to make sure I know what's happening."[121] Shansky not only had physical proximity to the problems when he agreed to step in as receiver. Prior to his appointment, he had served as an expert to the Special Master, Grace Lopes.[122] She explained that the major challenge in

---

[119] *Id.* at 219.
[120] *Id.*
[121] Toni Lucy, "The Doctor Is In to Cure District's Jail; Receiver Plans to Diagnose Problems From Inside Out," WASHINGTON POST at B1 (Aug. 21, 1995).
[122] Lopes Interview, *supra* note 47.

24

Electronic copy available at: https://ssrn.com/abstract=1905159

receivership cases is "the ability to work cooperatively with public and private partners," and that Shansky's status as an insider gave him a significant advantage.[123]

Lopes explained that when an outsider eviscerates executive control, this can garner great resistance that must be countered by a person who appreciates the complex relationships at stake with public actors (like the defendants) and private actors (like health care providers).[124] Shansky was able to function more like an insider when he assumed the responsibility of receiver for several reasons.  First, the parties already knew him, since he served as the Special Master's court expert.  Second, as court expert, Shansky assisted the Special Master to develop the Remedial Plan, which later served as the backbone of his job responsibilities.  Third, as medical director of Cook County Jail, he knew what it was like to be a defendant and could appreciate the defendants' perspective.[125]  Lastly, as Lopes explained, he had been a plaintiffs' expert in many other cases, so he understood and appreciated the concerns of the plaintiffs.[126]

Not surprisingly, Shansky's relationships with the parties were characterized by mutual trust.[127]  The plaintiffs' trust in him is evident in the powers the plaintiffs' worked to confer on him.  Shansky reported that Jonathan Smith, plaintiffs' attorney, was instrumental in crafting the

---

[123] *Id.*
[124] *Id.*
[125] *Id.*
[126] *Id.*
[127] Plaintiffs' attorney Eric Lotke, who served as Executive Director of D.C. Prisoners' Legal Services during the end of the receivership, reported that his experience with Dr. Shansky was "highly cooperative." Telephone Interview with Eric Lotke, Former Executive Director of D.C. Prisoners' Legal Services Project and plaintiffs' attorney in Inmates of D.C. Jail (Oct. 10, 2009).  Jonathan Smith echoed those sentiments. Smith Interview, *supra* note 44.  Deborah Golden, plaintiffs' attorney during the termination of the receivership, agreed. Telephone Interview with Deborah Golden, Staff Attorney with D.C. Prisoners' Legal Services and plaintiffs' attorney in Inmates of D.C. Jail (Oct. 9, 2009).

Electronic copy available at: https://ssrn.com/abstract=1905159

Order Appointing Receiver such that it would allow the receiver to obtain necessary budgets and act directly if working through the District led to insufficient outcomes.[128]

Like the plaintiffs, the defendants also agreed to confer great power on the receiver. Shansky explained to Congress in June 2000 that he accepted the post of receiver because the "District wanted [him] to assume that responsibility."[129]  As Lopes explained, Shansky forged excellent relationships with management of the facility and of the Department of Corrections.[130] Another aspect illustrating Shansky's productive working relationship with defendants was the relatively smooth budgeting process.  Together, Shansky and the District's counsel developed a budget based on the existing court orders.[131]  Throughout the course of the receivership, there were only a few minor disputes with the District about the budget.[132]

As explained above, Shansky was appointed after a Special Master had already been working on the D.C. Jail case for two years.  Federal Rule of Civil Procedure 53 conferred substantial quasi-judicial power on her, including fact-finding, subpoena power, and authority to contract, so she was empowered to act, not merely to monitor.[133]  She also had a great deal of credibility with public and private stakeholders.  Lopes stated that one of her critical roles was to

---

[128] Shansky Interview, *supra* note 23. Smith, in turn, reported that a key factor in the success of the receivership was Dr. Shansky's ability to "take control" of matters, instead of needing to get approval for every action.  Smith Interview, *supra* note 44.

[129] Dr. Shansky explained, "At the time the receivership was created, I was contacted, and only after several phone calls reluctantly agreed to accept the responsibility [of receiver].  One of the reasons I agreed was that the District wanted me to assume that responsibility. … The entire process that I have been involved in has been a collaborative one with the District.  This has not been a receivership that has in any way forced anything down the throat of the District.  Quite the opposite. The District wanted me to assume this responsibility.  I took it.  I never felt this was my program or the court's program, it's the District's program.  I am a temporary housekeeper trying to put things in order."  Hearings, *supra* note 48, at 33.

[130] Lopes Interview, *supra* note 47.

[131] Shansky Interview, *supra* note 23.

[132] Shansky explained that, within a budget of fifteen million dollars, the District disputed one million, and the dispute was resolved with a hearing before the court. Over the course of the five-year receivership, only two hearings took place disputing the budget.  *Id.*

[133] FED. R. CIV. P. 53; Lopes Interview, *supra* note 47.

Electronic copy available at: https://ssrn.com/abstract=1905159

set limits on the authority of the receiver.[134]  She felt that this role was critical for three reasons:

(1) the executive and legislature are unable to supervise the receiver directly; (2) the receiver

cannot be expected to understand and appreciate the bounds of his own power; and (3) a

receivership in the structural reform litigation context does not involve bright line ethical

rules.[135]  As a result of her views, Lopes tended to take a conservative approach to problem-

solving, meaning that she would, first and foremost, seek the agreement of the parties and ensure

that the receiver was held accountable.[136]

### C.  California Prison Medical System—The Receivership Experience

The California medical care receivership cannot be understood without taking into

account simultaneous litigation under *Plata* to reduce the prison population.  Not unlike the

Alabama prison system and the D.C. Jail, the California prison system has been suffering from

severe overcrowding.[137]  Under the Prison Litigation Reform Act ("PLRA"), only a specially

convened three-judge court has the power to order the reduction of the prison population.[138]  In

2007, six years after the start of the *Plata* litigation, plaintiffs' lawyers moved for such a court.[139]

Litigation before the three-judge panel to reduce overcrowding has taken place simultaneously

with the receivership.

---

[134] As an attorney and Special Master, she also appreciated the legal and ethical issues involved in bringing in a receiver, an actor who would have great power and would be immune from suit.  Lopes Interview, *supra* note 47.

[135] *Id.*

[136] *Id.*

[137] Robert Sillen reported to the court in 2007 that, "overcrowding—and the State's inadequate and inconsistent responses to that overcrowding—are currently interfering with the Receiver's mission to bring the medical care delivery system up to constitutional standards."  Plata, Receiver's Supplemental Report Re Overcrowding, No. C01-1351 TEH, at 1-2 (N.D. Cal. Jun. 6, 2007), *available at* http://www.cprinc.org/docs/court/ReceiverSupReportReOvercrowding061107.pdf.

[138] 18 U.S.C. § 3626(a)(3) (1997).

[139] Plata v. Schwarzenegger, 2007 U.S. Dist. LEXIS 56031 (N.D. Cal. July 23, 2007) (order granting plaintiffs' motion to convene three-judge court).  Under the PLRA, a court may not enter a release order unless it finds by "clear and convincing evidence" that "(i) crowding is the primary cause of the violation of a Federal right; and (ii) no other relief will remedy the violation of the Federal right."  18 U.S.C. §§ 3626(a)(3)(E)(i), (ii).

Electronic copy available at: https://ssrn.com/abstract=1905159

*i. Receivership Under Robert Sillen*

In October 2005 the Court ordered the receiver to submit his Plan of Action by November 15, 2006, nine months after assuming his duties. One month after the Court's deadline, Sillen petitioned for an extension of time.[140] A health care management expert for the plaintiffs explained that, "to approach the vast [medical] delivery system which encompasses the California prison medical care system without careful and creative strategic planning borders on a suicidal mission."[141] Nonetheless, the Court granted the extension of time, and Sillen finally submitted a Plan of Action fifteen months after assuming his duties.[142] However, his submitted plan contained no timeline or metrics.[143] The Court ordered him to articulate his timelines and metrics of evaluation by November 15, 2007, two years after the start of the receivership.[144] "When people ask me how long and how much," said Sillen, "I have a stock answer: Long. Much."[145]

---

[140] Plata, Receiver's Motion for an Extension of Time to File Plan of Action and Establish Advisory Board; Motion to Modify Provision of June 13, 2002 Stipulation re Injunctive Relief, No. C01-1351 TEH (N.D. Cal. Nov. 13, 2006), *available at* http://www.cprinc.org/docs/court/ReceiverMotionExtension111306.pdf [hereinafter Plata Receiver's Motion for an Extension of Time]. The plaintiffs, in their motion opposing Sillen's request for an extension of time, explained that, "recognizing the magnitude of the task, the Court granted the Receivership a generous 180-210 days to complete the Plan. … The Receiver did not submit the Plan [on the due date]. Instead, the Receiver now requests an additional six months to submit a proposed plan and a full year to submit his final plan." Plata, Plaintiffs' Response to Receiver's Motion for an Extension of Time to File a Plan of Action and Establish an Advisory Board, No. C01-1351 THE, at 1-2 (N.D. Cal. Nov. 30, 2006), *available at* http://www.cprinc.org/docs/court/ReceiverMotionExtension111306.pdf [hereinafter Plata Plaintiffs' Response].

[141] Plata Plaintiffs' Response, *supra* note 140, at 5-6 (quoting Dr. Bruce Spivey, "a physician with three decades of management experience including stints as the CEO of hospitals and multi-hospital organizations").

[142] Plata, Order Re (1) Receiver's May 2007 Preliminary Plan of Action, and Motion for Order Modifying Stipulated Injunction and Orders Entered Herein, and (2) Plaintiffs' Motion for Order Directing Receiver to Comply with April 4, 2003 Order Etc., No. C01-1351 TEH, at 2 (N.D. Cal. Sept. 6, 2007) *available at* http://www.cprinc.org/docs/court/OrderRePlanAction090607.pdf [hereinafter Plata September 2007 Order].

[143] *Id.* at 3.

[144] *Id.* at 3-4.

[145] Moore, *supra* note 68.

Electronic copy available at: https://ssrn.com/abstract=1905159

The Court reduced its supervisory capacity over the receiver by nullifying its initial requirement that it would, in consultation with the receiver, appoint an Advisory Board.[146]  Sillen stated that, "mandating the creation of an Advisory Board to assist and advise the receiver and the Court is premature at this time."[147]  The Court agreed to the receiver's reframe of the Advisory Board's nature.  It stated, "the receiver is in the best position to determine how to make the most effective use of an Advisory Board."[148]  The Court's decision upended the language in its initial order.  Instead of viewing the Advisory Board as a body that would assist *the Court* to ensure that the receivership met its goals, the Court adopted the receiver's reframe that the Advisory Board would exist primarily to assist *the receiver*.[149]

In the media, one frequently cited reason for Sillen's replacement was his rocky relationship with state executive and legislature.  "Some of Sillen's problems stemmed from a predictable turf battle with legislators, who usually hold sway over prison policies and spending."[150]  Sillen is widely quoted as saying that, he would "back up the Brink's truck" to the state's treasury to finance his plan for better medical care for prisoners.[151]  Shortly after coming

---

[146] Plata, Order, No. C01-1351 TEH, at 3 (N.D. Cal. Dec. 19, 2006), *available at* http://www.cprinc.org/docs/court/PlataOrderREmotionExtension121906.pdf [hereinafter Plata Order Re Extension and Advisory Board].  The purpose of the Advisory Board was to "assist and advise the Court with respect to achieving the goals of the receivership."  Order Appointing Receiver, Plata, at 9, No. C01-135 (N.D. Cal. Feb. 14, 2006).

[147] Plata Receiver's Motion for an Extension of Time, *supra* note 140, at 19.

[148] Plata Order Re Extension and Advisory Board, *supra* note 146, at 3.

[149] Sillen never agreed to an Advisory Board, and the court did not appoint one until after it had removed Sillen and replaced him with J. Clark Kelso.  Plata, Order Appointing New Receiver, No. C01-1351 TEH, at 5 (N.D. Cal. Jan. 23, 2008), *available at* http://www.cprinc.org/docs/court/OrderAppointingNewReceiver012308.pdf.

[150] "Assemblyman Todd Spitzer, R-Orange, chairman of the Assembly Select Committee on Prison Construction and Operations, said Wednesday that Sillen 'is a one-man show who had utter disdain for the Legislature. He would constantly threaten us that if we didn't do it his way.'"  Bob Egelko, *New Overseer for Prison Health Care System*, *supra* note 71, at B-3.

[151] Tom Chorneau, *Spending by Prison Care Overseer Questioned*, SAN FRANCISCO CHRONICLE, Feb. 28, 2008, *available at* http://articles.sfgate.com/2008-02-28/news/17141311_1_health-care-care-system-inmate-lawsuit; Moore, *supra* note 68.

Electronic copy available at: https://ssrn.com/abstract=1905159

into office as receiver, Sillen told cabinet officials in the governor's office, "every one of you is subject to being in contempt of court if you thwart my efforts or impede my progress."[152]

In May 2007, when Sillen filed his Plan of Action without a timeline or metrics and contended that an Advisory Board was premature, he also petitioned to eliminate the plaintiffs' monitoring role.[153]  The Court stated, "this request is at least in large part an unfortunate consequence of the deterioration of the relationship between the receiver and plaintiffs' counsel."[154]  Donald Specter, plaintiffs' counsel and head of the Prison Law Office, explained his office's relationship with Sillen, stating, "we haven't spoken in many months. . . . We really didn't have much of an idea what he was doing."[155]

On January 23, 2008, the Court replaced Sillen with J. Clark Kelso.  While noting that the medical delivery system had not yet met constitutionally minimum standards, the Court acknowledged some significant achievements that had taken place under Sillen.[156]  However, despite improvements, the Court decided to terminate Sillen's tenure.[157]  The Court explained that, although Sillen had "put into practice critical short-term measures," one of the ongoing difficulties with the receivership was the lack, two years into its tenure, of a comprehensive Plan

---

[152] Moore, *supra* note 68.

[153] He sought to replace the plaintiffs' monitoring role with monitoring by the California Office of Inspector General.  Plata September 2007 Order, *supra* note 142, at 9.

[154] The court responded to Sillen's request by refusing to eliminate the plaintiffs' monitoring role but appointed a "Pro Bono Special Advisor" to "facilitate discussions between the Receiver and the parties for the purpose of developing a new monitoring system that reflects the fact that this case is now in a new receivership phase."  These facilitated discussions led the court to the conclusion that a new receiver was needed.  *Id.*

[155] Michael Rothfeld, *State Prison Health Czar Is Fired*, LOS ANGELES TIMES, Jan. 24, 2008, *available at* http://articles.latimes.com/2008/jan/24/local/me-prisons24.

[156] "[V]acancy rates among clinical staff in prisons have been dramatically reduced as a result of increased salaries and improved hiring processes. Similarly, many clinically appropriate changes have been made, including the replacement of medical technical assistants with licensed vocational nurses, and several necessary clinical construction projects have been initiated. In its first two years, the Receivership has also resolved the CDCR specialty care contracting crisis, which was preventing inmates from receiving needed care from clinical specialists, and established a successful prison improvement pilot project at San Quentin State Prison."  Plata, Order Appointing New Receiver, *supra* note 149, at 2.

[157] The court explained its decision by stating that, "the Receivership has reached a critical juncture at which it must now move from a primarily investigative and evaluative phase … into an implementation phase.  *Id.* at 4.

Electronic copy available at: https://ssrn.com/abstract=1905159

of Action, with benchmarks and timelines.[158]  Sillen's replacement was J. Clark Kelso, a law

professor at McGeorge School of Law in Sacramento who had "held several state government

posts, including interim state insurance commissioner."[159]

### ii.  Receivership Under J. Clark Kelso

In replacing Sillen with Kelso, the Court made two additional decisions reinstating

supervision methods for the new receiver.  First, the Court decided to continue using the services

of a Pro Bono Special Assistant, which it had appointed in September 2007, to "assist the

receiver in reworking the November 15, 2007 Plan of Action so that it is a more useful

leadership document."[160]  Second, the Court decided that it would reinstate its initial order

appointing an Advisory Board.[161]

The tenure of J. Clark Kelso has mostly been characterized by massive political battles

with the California Legislature and Gov. Schwarzenegger's office.  Soon after taking office,

Kelso produced a draft strategic plan, which he released for public comment.[162]  This strategic

plan included the building of seven regional prison medical centers and the refurbishment of

existing sites,[163] at a cost of $7 billion, to be funded through lease bond revenues over a period of

twenty-five years.[164]  A month later, Gov. Schwarzenegger went to the Legislature asking for the

---

[158] *Id.*

[159] Bob Egelko, *New Overseer for Prison Health Care System*, *supra* note 71, at B-3.

[160] Plata, Order Appointing New Receiver, *supra* note 149, at 5.

[161] The Order Appointing New Receiver mimicked the language of the Order Appointing Receiver, stating that the "court will shortly be appointing an advisory board to assist and advise the Court and Receiver as this case moves forward."  *Id.*

[162] Plata, Order Approving Receiver's Turnaround Plan of Action, C01-1351 TEH, at 2 (N.D. Cal. Jun. 16, 2008), *available at* http://www.cprinc.org/docs/court/OrderTurnaroundPOA_061608.pdf.

[163] Plata, Federal Receiver's Draft Strategic Plan (2.0), No. C01-1351, at 24 (N.D. Cal. Apr. 21, 2008) *available at* http://www.cprinc.org/docs/court/ReceiverStrategicPlan04212008.pdf.

[164] *Id.* at 34.

Electronic copy available at: https://ssrn.com/abstract=1905159

$7 billion, despite the $15.2 billion budget gap.[165]  On two separate occasions, Gov.

Schwarzenegger "asked the state Legislature to approve bonds to cover the cost.  Both times, the

Legislature rejected those bonds."[166]  Kelso then asked the Governor to use emergency powers to

redirect already appropriated funding for the construction.[167]  Instead, Schwarzenegger had what

Judge Henderson called an "eleventh hour change of heart" and opposed the building of prison

facilities.[168]

When Schwarzenegger refused to appropriate the necessary funding for a plan that his

administration had participated in creating and for which it had twice sought approval, Kelso

asked Judge Henderson to order the State to provide the funding and hold Schwarzenegger and

the State Comptroller in contempt.[169]  Judge Henderson granted the first request, requiring the

State to provide funding, and denied the latter, holding state officials in contempt.[170]

Schwarzenegger then went to war with the receiver, subsequently refusing to turn over the initial

$250 million installment to begin construction[171] and petitioning Judge Henderson to terminate

the receiver, arguing for the first time receivership had been illegal.[172]

---

[165] Don Thompson, *California Senate Rejects $7 Billion Bond for Inmate Health*, SAN FRANCISCO CHRONICLE, May 29, 2008.

[166] Judy Campbell, *Schwarzenegger Risks Contempt On Prison Reform*, NATIONAL PUBLIC RADIO, Nov. 7, 2008, *available at* http://www.npr.org/templates/story/story.php?storyId=96705616; Michael Rothfeld, *Governor Urged to Intervene on Care for Inmates*, LOS ANGELES TIMES, Jun. 10, 2008, *available at* http://articles.latimes.com/2008/jun/10/local/me-prisons10.

[167] Rothfeld, *supra* note 166.

[168] Don Thompson, *Judge: Calif. Must Pay for Prison Health Care*, USA TODAY, Oct. 7, 2008, *available at* http://www.usatoday.com/news/nation/2008-10-07-2070872830_x.htm.

[169] *Id.*

[170] *Id.*

[171] In refusing to turn over the initial $250 million installment, Gov. Schwarzenegger argued that only the State Legislature has the power to approve a construction plan.  Bob Egelko, *State Ready to Defy Judge on Prison Hospitals*, SAN FRANCISCO CHRONICLE, Oct. 28, 2008, at B-2.

[172] In seeking to terminate the receivership, Schwarzenegger argued that Kelso's plan, which he had sought legislative approval for twice, "was too lavish and costly and that his appointment had been illegal."  Bob Egelko, *Judge Rejects Returning Prison Care to State*, SAN FRANCISCO CHRONICLE, Mar. 25, 2009, at B-3.

Electronic copy available at: https://ssrn.com/abstract=1905159

In May 2009 Schwarzenegger and Kelso "agreed to the framework of a legal settlement" to downscale the initial building plan to a $1.9 billion plan that would include two new hospitals and the refurbishment of existing prison medical facilities.[173]  A month later Schwarzenegger backed out of this plan as well.  Corrections Secretary Matthew Cate explained the reasoning in a letter to Kelso:  "The state's precarious financial condition will result in severe and significant cuts to vital State programs. . . . The state cannot at this time become further indebted for correctional healthcare."[174]

In 2009 and 2010, the three-judge panel moved forward in ordering a reduction in the prison population while the Corrections Secretary and Kelso continued to negotiate.  In August 2009, a three-judge panel gave the State a month and a half to "provide the Court with a population reduction plan" to reduce the prison population to 137.5% of design capacity within three years.[175]  Meanwhile, Kelso explained that if his downscaled $1.9 billion plan to build two health care facilities took shape, he would consider asking Judge Henderson to terminate the receivership.[176]

---

[173] Bob Egelko, *Tentative Deal on State Prison Medical Care*, SAN FRANCISCO CHRONICLE, May 29, 2009, at B-4.
[174] Andy Furillo, *Schwarzenegger Rejects Inmate Health Care Plan*, SACRAMENTO BEE, Jun. 25, 2009, *available at* http://www.sacbee.com/2009/06/25/1976952/schwarzenegger-rejects-inmate.html.
[175] Coleman v. Schwarzenegger, No. S-90-0520, 2009 WL 2430820, at *116 (E.D.Cal. Aug. 4, 2009).  The three-judge panel stated that, "by late 2006 it became apparent that the overcrowding in California's prisons rendered the efforts of the courts … and the Plata Receiver utterly insufficient."  *Id.* at *2.
[176] Cate explained that, "he and his staff had been 'laboring on an MOU' with the receiver's people for the past four to six months.  He said they've worked out a framework and only need to finalize details and get 'the signatures on the page' before they can take the plan to the federal courts for approval."  Andy Furillo, *Proposal Cut Back to Reduce Prison Expenses*, SACRAMENTO BEE, Oct. 19, 2009, *available at* http://www.sacbee.com/2009/05/29/1900909/proposal-cut-back-to-reduce-prison.html.

Electronic copy available at: https://ssrn.com/abstract=1905159

VI.    Outcome of the Receiverships

### A.  Alabama Prison System Receivership—Outcome at Termination

As the elections of 1982 approached, Gov. Fob James made it clear that he would be backing out of his role as receiver of the Alabama prison system.  He wanted to leave behind a legacy of success, especially given that it was unlikely that he would win re-election against former Governor George Wallace.  However, he "not only failed to improve prison conditions but had actually contributed to continuing difficulties . . . by pressing the legislature to lengthen criminal sentences (thus exacerbating crowding in the prisons)."[177]  Gov. James's receivership was actually marked by successes in discrete areas, including improved medical care for prisoners and the computerization of the prisoner classification system.[178]  However, on the sunset of Gov. James's receivership, the prison system was plagued by overcrowded conditions, in direct violation of the Court's orders.

### B.  District of Columbia Jail Receivership—Outcome at Termination

On Friday, June 30, 2000, the House of Representatives Subcommittee on the District of Columbia, Committee on Government Reform held a hearing on the status of the D.C. Jail, in part to evaluate the receivership.[179]  Representative Thomas M. Davis, a Republican from

---

[177] On January 3, 1983, two weeks before George Wallace assumed the post of Governor of Alabama, Gov. James tendered his resignation as Receiver to Judge Varner.  James told Judge Varner that he "believed with all his heart that the prison system no longer violated the constitutional rights of its inmate population by any stretch of the imagination" and that he "now had serious reservations about the court's jurisdiction in these cases."  Judge Varner responded by threatening to hold him and Attorney General Graddick in contempt.  Yackle, *supra* note 24, at 232-33 (internal quotations omitted).

[178] *Id.* at 257-58.

[179] *See generally* Hearings, *supra* note 48.

Electronic copy available at: https://ssrn.com/abstract=1905159

Virginia, explained that the receiver's tenure had in fact brought the standards in the D.C. Jail up to a constitutionally acceptable level.[180]

Although the June 2000 Congressional hearing on the receivership acknowledged that the receivership met its goals, a major concern cited by members of Congress was the high cost of providing medical and mental health care to D.C.'s prisoners.[181]  To illustrate the "extravagance," John Clark, the District of Columbia Corrections Trustee[182] noted that "national averages for correctional health care are consistently reported at about $7.50 a day per inmate," while it cost the District "in excess of $20 a day."[183]  The budget of health care at the Jail and the overall percentage of District corrections funds going to D.C. Jail health increased significantly over the course of the receivership.[184]

---

[180] Hearings, *supra* note 48, at 14 (Testimony of Rep. Constance Morella, a Republican from Maryland).
> When the receivership ends in September, the goal will have been met for attaining for the inmates a constitutional level of health care.  Recognition and treatment of depressed and unstable inmates has turned around a dismal situation in the rates of suicide in the jail, the tuberculosis epidemic has been brought under control, and HIV and AIDS cases are identified and treated.  Dr. Shansky has brought in qualified medical staff and the level of care provided to the inmates has been greatly improved.

[181] *See generally* Hearings, *supra* note 48.  On the subject of the high cost of health care at the Jail at the end of the receivership, the committee report opens by stating, "it is important to provide a constitutional level of medical and mental health services to D.C. jail inmates, but should the D.C. Jail receivership accomplish this by spending at least two to three times the national average per inmate per day?  Can a city emerging from bankruptcy really sustain this kind of expenditure?"  Hearings, *supra* note 48, at 3.  Jonathan Smith noted that the quality of care decreased after Dr. Shansky's tenure in part because of the lack of funding provided to the Jail by the District.  Smith Interview, *supra* note 44.

[182] "The D.C. Revitalization Act requires the Attorney General to appoint a Corrections Trustee to oversee financial operations of the D.C. Department of Corrections until the [Bureau of Prisons] assumes responsibility for all felony offenders sentenced to prison under the D.C. Code."  Justice Department, Attorney General Reno Appoints Corrections, Supervision Trustees, http://www.justice.gov/opa/pr/1997/September97/405ag.htm.html (last visited Mar. 18, 2010).

[183] Clark compared the budget of the D.C. Jail at the end of the receivership to a Miami institution in which he had served as warden.  Although the Miami institution was three-quarters the size of the D.C. Jail, the budget of the Miami institution was $4 million whereas the D.C. Jail's budget was $16 million.  Furthermore, the D.C. Jail was staffed at a rate four and a half times higher than the Miami institution.  Hearings, *supra* note 48, at 125.

[184] Before the appointment of the Receiver, the D.C. Jail had a medical services budget of $4.1 million.  In 2001, that budget increased to $12.3 million.  In addition, the total percentage of District corrections medical funding going to the D.C. Jail increased from 17.4% prior to Shansky's appointment to 54.5% after the termination of the receivership.  District of Columbia Office of the Chief Financial Officer, Corrections Medical Receiver, http://app.cfo.dc.gov/budget/budget/pdf/rr.pdf (last visited Feb. 19, 2010).

Electronic copy available at: https://ssrn.com/abstract=1905159

In general, however, the D.C. Jail receivership was a success by all accounts.[185] Plaintiffs' attorneys, the Special Master, and the receiver believe that it met its goals. Congressional representatives who investigated the receivership in its final months agreed that D.C. Jail medical and mental health services met constitutionally minimum standards.

### C. California Prison Medical Care Receivership—Current Status

The number of preventable deaths in California prisons rose fifty percent between 2006 and 2008.[186] Alison Hardy, plaintiffs' attorney at the Prison Law Office, stated that her office has consistently criticized the receiver for overstating the improvements in prison health care.[187] One aspect of poor health care quality is the lack of available practitioners, which, by the receiver's own admission, results in long delays for some prisoners to see a primary care provider.[188] However, "only a small fraction of available nursing jobs in the prisons were even advertised on the receiver's recruitment Web site," and several job seekers were incorrectly

---

[185] As the receivership was coming to a close, Shansky came under severe public criticism when he awarded the bid for medical services at the Jail to the nonprofit Center for Correctional Health and Policy Studies ("CCHPS"), which was "formed by employees of [] Shansky, the federal receiver, and is headed by the jail's medical director, Stanley M. Harper." Shansky came under fire in part because of the power that his role as receiver conferred upon him. "Although Shansky worked with an independent evaluation team assessing the bids, he had the final word on selecting the contract." Serge F. Kovaleski, *Jail Health Care Deal Stirs Questions in D.C.*, WASHINGTON POST, Nov. 3, 2000, at B1. Nonetheless, the Government Accounting Office conducted a study of health care quality and cost at the Jail in 2004 and concluded that, in general, CCHPS "generally met the contract's requirements for access to care and quality" but that the District was insufficiently stringent in its oversight of CCHPS.

[186] Julie Small, *Report Indicates Rise in Number of Preventable California Prison Deaths Since 2006*, SOUTHERN CALIFORNIA PUBLIC RADIO, Dec. 14, 2009, *available at* http://www.scpr.org/news/2009/12/14/report-fewer-inmates-dying-california-prisons.

[187] Telephone Interview with Alison Hardy, Staff Attorney, Prison Law Office (Feb. 19, 2010). The receiver's office has also engaged in heavy-handed tactics to reduce public scrutiny on his performance. Kelso's office "sent a communications employee with a digital recorder to capture every interview" conducted by Piller at the Sacramento Bee, prompting a highly critical response from the paper's editor. Melanie Sill, *From the Editor: Prison Receiver Tries to Put a Chill on Scrutiny*, SACRAMENTO BEE, Dec. 20, 2009, *available at* http://www.sacbee.com/2009/12/20/2407686/from-the-editor-prison-receiver.html. Also, while the Receiver had continually posted relevant court orders on his office's website, these postings ceased starting in late March 2009. My own many attempts to interview someone from his office were met with silence.

[188] Charles Piller, *California Prisons' Medical Czar Cites Budget, Management Woes*, SACRAMENTO BEE, Dec. 15, 2009, *available at* http://www.sacbee.com/2009/12/15/2395809/california-prisons-medical-czar.html.

Electronic copy available at: https://ssrn.com/abstract=1905159

informed that there was a hiring freeze.[189]  Meanwhile, providers are allowed and sometimes

forced to take overtime, resulting in health dangers and skyrocketing costs.[190]

Kelso has attributed some of his office's failures to "unrealistic state budgets."[191]  In

explaining the increase in preventable deaths, Kelso blamed the lack of health records, lack of

appropriate facilities, and overcrowding.[192]  At the same time, he recently supported a partial

budget passed by the California Senate that would include an $811 million budget cut to

prisoners' health, despite his earlier agreement with defendants to increase funding to prisoners'

health by $1.9 billion.[193]  Kelso explained that the budget cut would not derail his downscaled

plan to build two medical facilities for under three thousand prisoners.[194]

Meanwhile, as of this writing, the U.S. Supreme Court "ruled that it had no jurisdiction,

at this point" to review the three-judge panel's prisoner release order.[195]  That order still stands,

pending further appeal by the State.


## VII. ANALYSIS

The three prison receiverships featured here span four decades and three distinctly

different regions of the United States.  They vary tremendously in size and scope.  Nonetheless,

---

[189] Id.
[190] Sacramento Bee reporter Charles Piller explained that "lax recruitment, worsened by the state budget crisis, and programs such as one for the suicidal that's exploited by savvy inmates, have contributed to extreme staff work schedules."  Charles Piller, *Extreme Overtime Puts California's Prison Health Overhaul at Risk*, SACRAMENTO BEE Dec. 13, 2009, *available at* http://www.sacbee.com/investigations/story/2391456.html.
[191] Charles Piller, *California Prisons' Medical Czar Cites Budget*, *supra* note 188 (discussing in particular the Receiver's dependence on high cost temporary employees and dangerous levels of overtime).
[192] Small, *supra* note 186.
[193] *Senate Passes Partial Budget Package, Cuts to Prison Health Care*, CALIFORNIA HEALTHLINE, Feb. 19, 2010, *available at* http://www.californiahealthline.org/articles/2010/2/19/senate-passes-partial-budget-package-cuts-to-prison-health-care.aspx.
[194] Scott Smith, *Proposed Cuts Won't Halt Prison Hospital Projects*, STOCKTON RECORD, Feb. 27, 2010, *available at* http://www.recordnet.com/apps/pbcs.dll/article?AID=/20100227/A_NEWS/2270351/-1/NEWSMAP.
[195] SCOTUS Blog, Orders Analysis 1/19/10—Part I, http://www.scotusblog.com/2010/01/asian-carp-plea-denied-no-new-grants/#more-15142 (last visited Feb. 20, 2010).

Electronic copy available at: https://ssrn.com/abstract=1905159

useful and distinct conclusions may be drawn from examining them in concert. In each case the executive and legislature passed tougher sentencing laws, causing the population of prisons to skyrocket, while not allocating necessary funds to meet prisoners' minimum constitutional rights. In all three cases, the defendants admitted that they would not be able to meet their obligations under the Constitution without drastic judicial intervention. In all three cases, none of the defendants contested the imposition of a receivership when the Court imposed it. The resort to a judicially imposed solution was the result of the failure of the ordinary democratic process to provide human beings with the minimum basic rights guaranteed them in the Constitution. Despite differences in size, scope, and context, these three cases shed light on what factors may cause a receivership to function well or badly. More broadly, because a receivership is a remedy used only when all others fail, examining its functioning sheds light on how the judiciary can be better equipped to handle the crises for which it is the last resort.

First, although the size of the prison system and the enormity of the task at hand can affect the success of a receivership, small size is not necessarily determinative of success. Second, a court cannot maintain supervision over an executive agent who has been appointed as the receiver, resulting in the erosion of the court's power. Most importantly, the success of a receivership depends on many factors that, on one hand, untether the receiver from the political process and, on the other hand, tether the receiver to the supervision of the court. Effective supervision may require the appointment of a Special Master, to be the court's eyes and ears in the executive agency itself. It may also entail the development of a concrete plan of action that the receiver will begin to implement immediately upon assuming her post. Because the receivership is the end of the line for vulnerable populations, the court needs to ensure that it engages in effective supervision, holding the receiver accountable to goals set by the court.

Electronic copy available at: https://ssrn.com/abstract=1905159

### A.  Size of the Prison System

The scale of a receivership, in terms of prison population and budget, can affect every aspect of its functioning.  The small size of the class in *Inmates of D.C. Jail* and the enormity of the class in *Plata* can explain many of the differences between the two cases.  *Inmates of D.C. Jail* dealt only with one institution whose population, at the point when Judge Bryant declared that overcrowding was the root cause of the unconstitutional violations, numbered only 3,500.[196]  By contrast, when a receivership was ordered in California, the California prison system was forty-six times more populous than the D.C. Jail.[197]  *Plata* is the largest prison class action in U.S. history, and its scope includes approximately 165,000 prisoners and thirty-three institutions.[198]

Because of the small size of the D.C. Jail receivership, the receiver was able to forge an immediate intimacy with the problems.  The receiver's first act was to set up an office and sleeping quarters in a jail cell.[199]  He did this because medical problems often take place after normal working hours, and he wanted proximity to the problems.  Even if the receiver in *Plata* wanted physical proximity to the problems at the institutions, he would not have been able to set up shop at each institution simultaneously.

The difficulty faced by Kelso, California's second receiver, to have the budget for his plan approved can be explained also by the monstrous size of the requested appropriation.  His initial budget was $7 billion, at a time when California faced a $15.2 billion budget gap.[200]  In sharp contrast, although the budget allocated to D.C. Jail medical services increased by three

---

[196] *See supra* note 43 and accompanying text.
[197] *See supra* note 57 and accompanying text.
[198] *See supra* notes 56-57, 68 and accompanying text.
[199] *See supra* note 121 and accompanying text.
[200] *See supra* text accompanying notes 163-165.

Electronic copy available at: https://ssrn.com/abstract=1905159

times over the course of the receivership, the budget shortly after its termination was $12.3 million.[201]  To put this into some kind of perspective, the proposed budget for new construction and refurbishment of California prison medical services was 577 times larger than the annual budget for D.C. Jail medical services.[202]

Of course, the small size of a prison system and the availability of funds do not guarantee a successful receivership.  The Alabama prison system contained only four large, overcrowded institutions, and the total population of the prison system was 5,000 prisoners.[203]  Furthermore, midway through the receivership, although the state acquired a windfall of $450 million, the Alabama legislature voted that year to decrease the prison system's budget by $7 million, and Judge Varner refused to enter an order tapping into the state treasury.[204]

### B.  Executive Agents as Receivers

Executive agents cannot function effectively as receivers.  Constitutional violations in prisons can result in part because of a breakdown in the democratic process whereby neither the executive nor legislators are willing to expend political capital to remedy constitutional violations plaguing prisons.  The unwillingness to spend money on prisoners, politically unpopular people, led to the constitutional violations in Alabama, California, and the District of Columbia as prison conditions deteriorated.  At the same time, legislators and the executive are vulnerable to the accusation of being soft on crime and often make decisions to increase the prison population, even when prisons are suffering from severe overcrowding.  The failure of the

---

[201] *See supra* text accompanying note 184.

[202] One might ask why the proposed budget for California is 577 times the size of the annual budget for the D.C. Jail when the population of the California prison system is only 47 times larger than the population of the D.C. Jail. However, the budget of $7.1 billion would have been spent over a period of 25 years.  Also, a comparative analysis of the relative states of disrepair of the prisons is not one dealt with in this paper.

[203] *See supra* note 26.

[204] *See supra* text accompanying notes 109-110.

Electronic copy available at: https://ssrn.com/abstract=1905159

political process to protect prisoners led the court, in each case, to decide that a remedy of last resort was warranted. This failure makes it impossible for an executive agent to serve effectively as a receiver.

A receiver is an arm of the court who is appointed to achieve goals established by the court. A receiver must be able to submit to the authority of the court. During his tenure as receiver, many of Gov. James's priorities as governor conflicted with the will of the Court.[205] As governor he favored tougher sentencing laws and reducing the budget of state agencies.[206] This set of priorities is the mirror image of the priorities held by the Court, namely to increase government spending on improving prison conditions and reducing the prison population. With respect to solving the issue of overcrowding, Gov. James actively sought to undermine the will of the Court by recruiting the Reagan Justice Department to oppose a potential release order by Judge Varner.[207]

The executive is vulnerable to being swayed by public opinion and political pressures from the legislature in a way that the judiciary is not. This pressure, in addition to personal changes of heart, can lead to the executive changing her position during the course of litigation. The governors of Alabama and California changed their respective positions during the course of litigation, leading to massive disruption in the cases.

In California, Schwarzenegger lobbied the California legislature twice to support bond measures to cover the $7 billion cost of prison health facility construction and improvement.[208] When Judge Henderson ordered Schwarzenegger to turn over the first $250 million installment,

---

[205] *See* discussion *supra* Part V.A.
[206] *See supra* text accompanying notes 107-108.
[207] YACKLE, *supra* note 24, at 207.
[208] *See supra* text accompanying note 166.

Electronic copy available at: https://ssrn.com/abstract=1905159

Gov. Schwarzenegger did an about-face, arguing that the construction plan was too lavish and that the receiver's appointment, which until then he had not opposed, had been illegal.[209]  Gov. Schwarzenegger's about-face as a defendant was totally disruptive to the progress in *Plata*, derailing the construction plan and sending the receiver and the defendants back to the drawing board.[210]

Gov. James's flip-flopping positions on overcrowding led to a series of illuminating but conflicting decisions from the Eleventh Circuit regarding the role of the judiciary in supervising the receiver.[211]  Gov. James initially gave tacit support to Judge Varner's order to release prisoners.[212]  Public outrage about a release of prisoners caused him to change his stance.[213]  Instead of responding to public outrage about a release order in a way that would be consistent with his role as an arm of the Court, Gov. James directly opposed Judge Varner's release order.

Matters concerning the release order issue were reviewed twice by the Eleventh Circuit.[214]  Justice Powell's opinion stated that the Attorney General had no grounds to intervene to oppose a release order so long as the governor/receiver sided with Judge Varner.[215]  Powell, in his opinion, affirmed the idea that had been in practice during the Alabama receivership:  that Gov. James as receiver and governor was entitled to oppose the will of the Court.  On the other hand, Judge Tjoflat's later opinion lacked sensitivity to the precarious role of the judiciary in a situation where an executive agent was appointed as receiver.[216]  Judge Tjoflat ruled that Judge Varner was not at liberty to issue a release order without first holding Gov. James in contempt,

---

[209] *See supra* note 172.
[210] *See supra* text accompanying notes 173-174.
[211] *See* discussion *supra* Part V.A.
[212] *See supra* text accompanying notes 112-113.
[213] *See supra* text accompanying notes 112-113, 115.
[214] *See supra* text accompanying notes 114, 116-118.
[215] *See supra* text accompanying note 114.
[216] *See supra* text accompanying notes 116-118.

Electronic copy available at: https://ssrn.com/abstract=1905159

i.e. exercising authority over his receiver.[217]  However, Judge Varner felt incapable of

sanctioning Gov. James with a contempt order, showing the judiciary's complete lack of

supervisory authority over the executive/receiver.  In the end, Gov. James's receivership ended

with overcrowding still a persistent issue in the Alabama prisons.[218]

Appointing the governor as receiver left the Court impotent to redress its own lack of

authority.  When the executive is a defendant, like in California, this alone is enough to make

enforcement of court orders difficult.  The executive is subject to political pressures and shifts in

public opinion, making her susceptible to shifting positions in order to quell public scrutiny.

However, when the governor is merely a defendant, the court still retains the option to exert

outside pressure on her, for example by threatening to hold her in contempt.  On the other hand,

when the governor is the receiver, the court inherently lacks supervisory power.  The

arrangement is a set-up for the governor to exercise her own will rather than the will of the court.

The court retains little power to supervise the governor/receiver other than the drastic solution of

holding her in contempt.

### C.  Plan of Action Adopted Prior to Appointment of Receiver

One significant advantage that the D.C. Jail receivership had over the receivership in

*Plata* was the existence of a detailed plan of action, drafted by a Special Master in consultation

with the parties, which the receiver was to implement upon assuming his post.[219]  Two years

prior to appointing a receiver, Judge Bryant appointed a Special Master to monitor the

defendants' progress in implementing the court's orders in *Inmates of D.C. Jail*.[220]  The Special

---

[217] *See supra* text accompanying note 117.
[218] *See* discussion *supra* Part VI.A.
[219] *See* Part III.B.
[220] *See supra* text accompanying notes 46-48.

Electronic copy available at: https://ssrn.com/abstract=1905159

Master, in consultation with the parties, drafted a Remedial Plan that was hundreds of pages in length and was based on prior court orders.[221]  Once the receiver was appointed, he had one central task:  to implement the Remedial Plan.[222]  The existence of a concrete and specific plan enabled the receiver to begin his work without great delay.  The receiver was able to capitalize on a crisis:  he began work shortly after an outburst of public outrage regarding conditions in the Jail and did so with the agreement of the defendants.[223]

In stark contrast, during Robert Sillen's tenure, the *Plata* receivership did not develop a plan of action with timelines or metrics at all.[224]  The Court gave the incoming receiver up to seven months to decide on a plan and then gave him a six-month extension of time.[225]  Fifteen months into the receivership, Sillen produced a plan with no timeline or metrics, and the Court gave him another six months to produce those benchmarks.[226]  The first receiver's philosophy regarding concrete and measurable goals was summarized by statement that "when people ask me how long and how much, . . . I have a stock answer:  Long.  Much."[227]  The lack of a plan of action allowed public criticism to center upon the question of whether or not to spend tax dollars fulfilling the state's constitutional obligation to prisoners.  If a plan had been agreed upon by the parties prior to the institution of a receivership, perhaps public criticism would have been blunted somewhat, even during a time of severe budget shortfalls.

In *Plata* there was no reason for such great delay in producing a working plan of action. The parties had already agreed to two stipulated injunctions, one in 2002 and another in 2004,

---

[221] *See supra* text accompanying note 78.
[222] *See supra* Part III.B.
[223] *See supra* notes 51, 55 and accompanying text.
[224] *See* Part V.C.i.
[225] *See supra* text accompanying notes 140, 142.
[226] *See supra* text accompanying notes 142-144.
[227] *See supra* text accompanying note 152.

Electronic copy available at: https://ssrn.com/abstract=1905159

each one spelling out in great detail what changes were needed in order to remedy the constitutional failings of the prison medical delivery system.[228]  However, the work that went into agreeing upon these orders was lost in the Court's appointment and supervision of the receiver.  The Court tasked the incoming receiver with making recommendations as to which portions of those orders needed to be implemented.[229]  Because two years had passed between the last order and the institution of a receivership, the Court quite reasonably only wanted to implement portions of the orders that were still relevant.  However, the lack of an immediate and concrete plan of action for the receiver enabled political battles to concretize around spending tax dollars for prisoners during a budget crisis.[230]  It also enabled the defendants to evade their earlier agreements.[231]

A receiver working on improving prison conditions is a politically vulnerable creature. She reports to the court and implements orders that will likely be unpopular with the legislature, the general public, and the executive defendants.  In fact, a court will only appoint a receiver when the executive and legislature have essentially abdicated their constitutional obligations to the judiciary.  Because the court is shielded from political scrutiny, it makes sense that the executive would prefer that a receiver make the difficult but necessary choices to get prisons up to par with the Constitution.  According to Shansky, court expert in *Plata* and receiver in the D.C. Jail, Judge Henderson initially went to the Gov. Schwarzenegger's office to request a small budget for a temporary receiver to improve physician quality.  Instead, the governor's office indicated that he would have the entire prison health services budget. [232]  This can be seen as an

---

[228] *See supra* text accompanying notes 85-86.
[229] *See supra* text accompanying note 85.
[230] *See supra* Part V.C.ii.
[231] *See supra* text accompanying notes 168, 174.
[232] *See supra* text accompanying notes 63-67.

Electronic copy available at: https://ssrn.com/abstract=1905159

abdication of responsibility to the judiciary or a vote of confidence, or both.  Regardless, this interaction with the executive demands that the court capitalize on the moment.  For Judge Henderson, the first step was to institute a receivership.  However, in comparison with the much smaller D.C. Jail, instituting a receivership without a clear plan can make the court subject to the same kind of political scrutiny as the executive and legislature.  The lack of a clear plan of action enables public and political pressure to solidify against spending public funds to meet constitutional obligations to prisoners.

### D.  Appointment of Special Master Prior to Appointment of Receiver

By appointing a receiver, a court endows her with director-like responsibilities over an executive agency.  As a director, she will naturally become more expert than the judge in administering a state agency.  Although a judge's work requires that she become an expert the subject of each case, her expertise is inherently limited by her role of overseeing matters from the courtroom and by the many cases that she must oversee.  At the same time, the court's power to supervise the receiver depends on the court's understanding of the facts on the ground.  When an informational imbalance ensues, the court loses its ability to effectively supervise.  The court can prevent such an informational imbalance by appointing a Special Master prior to the appointment of a receiver.[233]

In the D.C. Jail, a Special Master was brought in to ensure that the District met its court-ordered obligations.[234]  Between 1993 and 1995, the Special Master, in monitoring the defendants' progress and working with the parties, developed director-level expertise.[235]  Unlike a judge who must divide her attention between many cases and must rely on the reporting of

---

[233] *See supra* text accompanying notes 133-136.
[234] *See supra* text accompanying notes 46-48.
[235] *See supra* note 94 and text accompanying notes 49-50, 133-136.

Electronic copy available at: https://ssrn.com/abstract=1905159

others, a Special Master oversees matters from the ground and can focus her attention narrowly on a few cases at a time.  Once the Court ordered a receiver in D.C. Jail, the Special Master held supervisory authority not only because the Court's orders commanded her to do so but because the scope of her knowledge and expertise gave her this authority.  Furthermore, because D.C. Jail actually involved only one institution, the Special Master was in frequent contact with the receiver, making supervision feasible.

*Plata*, by contrast, involves thirty-three institutions spread across the state of California.[236]  Supervision of a receiver with such a gargantuan task no doubt could have benefited from appointing one or more Special Masters to monitor and oversee the court's orders from the ground.  Prior to the appointment of the receiver in *Plata*, the Court appointed a number of experts to help it understand and navigate the issues.[237]  However, it never appointed a person with the powers of a Special Master, including the capacity to hold evidentiary hearings or enter the prisons.[238]  As such, it reserved a certain base of expertise for the receiver alone, which created an informational gap between the Court itself and the receiver.  A gap in information between the receiver and the judge makes meaningful supervision unlikely.

### E.  Supervisory Structures

The receivership remedy is not inherently structured with checks and balances.[239]  The judiciary, the politically shielded branch of government, is able to appoint and supervise a receiver as part of its exercise of equitable powers, which are not easily challenged.[240]  As a result, efficient supervisory structures are necessary to ensure that the receiver is implementing

---

[236] *See supra* note 68.
[237] *See supra* text accompanying note 58.
[238] *See supra* text accompanying note 133.
[239] *See supra* text accompanying notes 15-16.
[240] *See supra* Part I.

Electronic copy available at: https://ssrn.com/abstract=1905159

the will of the court.  In *Plata*, the court created an ineffective supervisory structure for the receiver in three ways.  First, it tasked the receiver with developing his own strategic plan.[241]  Second, it permitted the receiver to distance himself from plaintiffs' counsel.[242]  Third, the Court did not follow through on its initial order to appoint an Advisory Board to assist it in supervising the receivership.[243]

   As stated earlier, when the Court in *Plata* appointed the receiver, it did so without a concrete plan of action, embarking on what a plaintiffs' expert called a "suicidal mission."[244]  In itself, the lack of a concrete plan of action made supervision of the receiver ineffective.  The Court could not possibly have measured the progress of the receiver, since it did not have metrics against which to measure it.  However, the Court made supervision of the receiver all the more unlikely by tasking the receiver himself with creating the plan.  The receiver's day-to-day work with the operations of the prison medical delivery system created an informational gap between himself and the Court.  Through his work the receiver was becoming an expert in a field from which the Court was, by its nature, distant.  Without informational proximity to the issues at hand, the Court made itself powerless to supervise the receiver.

   The receiver also widened the informational distance between himself and the Court by ceasing his contact with the plaintiffs and by attempting to limit the plaintiffs' monitoring role.[245]  By the time he was replaced, the plaintiffs had not spoken to the receiver in many months.[246]  The plaintiffs' counsels' role is to protect the interests of the plaintiff class.  Because the court lacks on the ground expertise, it is essential that the court actively involve the plaintiffs in

---

[241] *See supra* text accompanying notes 83-85.
[242] *See supra* text accompanying notes 153-155.
[243] *See supra* text accompanying notes 146-149.
[244] *See supra* note 142 and accompanying text.
[245] *See supra* text accompanying notes 153-155.
[246] *See supra* text accompanying note 155.

Electronic copy available at: https://ssrn.com/abstract=1905159

monitoring the progress of the receivership.  If the court abdicates power over information, it also abdicates its supervisory capacity.

In *Plata*, the Court's initial Order Appointing Receiver required the formation of an Advisory Board that would assist the Court to achieve the goals of the receivership.[247]  This board would have enabled the Court itself to maintain expertise over the operations of the receiver.  Instead of following through on this idea, the Court dropped it.  Poignantly, the Court explained its decision, stating, "the receiver is in the best position to determine how to make the most effective use of an Advisory Board."[248]  The Court itself should have been in the best position to determine how to make use of such a Board, but it abdicated that position to the receiver.

### F.  Directives and Powers Enumerated in Orders Appointing Receiver

The structures established by the court in the Order Appointing Receiver ("OAR") affect the success of the receivership.  In each case, the OARs and addendum orders[249] establish the goals that the receiver is expected to achieve and the powers that he is granted.  All the OARs here list the broad goals that the receivership should achieve.[250]  Some, like in Alabama and *Plata*, list specific tasks that need accomplishing.

Providing specificity for tasks enumerated in the OAR may have some impact upon whether those tasks are or were eventually achieved.  In Alabama the one concrete outcome of the receivership was the implementation of a classification system, and this goal was one of the

---

[247] *See supra* note 146 and accompanying text.
[248] *See supra* text accompanying note 148.
[249] There is only one addendum order, and it is the D.C. Jail's Order Regarding Procedures for the Receiver to Exercise Powers.  *See supra* note 90.
[250] *See supra* Part III.

49

Electronic copy available at: https://ssrn.com/abstract=1905159

few specific and concrete goals stated in the OAR.[251]  In contrast, the OAR discussed overcrowding with neither specificity nor plans for achieving its reduction.  Not surprisingly, overcrowding was not resolved during the receiver's term.

Likewise, providing the reasoning behind certain objectives may influence whether those objectives are achieved.  Although Judge Johnson ordered that medical care be resolved by the receiver forming a partnership with Alabama medical schools, Gov. James never followed up on the establishment of this partnership.[252]  In the Alabama OAR, the Court did not explain the origin of the partnership idea.  If the Court had determined, using some kind of investigative procedure, that such a partnership was the best way to resolve the medical compliance issue, perhaps the Court would have insisted on its implementation.  However, perhaps because it was an order without reasoning, the Court, the parties, and receiver never followed up on it.

The success of a receivership may also be affected by whether the OAR points to a comprehensive plan of action.  In the D.C. Jail, the OAR itself did not list the many specific objectives that the receiver was expected to achieve.  Instead, it merely pointed to the Remedial Plan, which was hundreds of pages in length and was developed by the Special Master in consultation with the parties.[253]  However, the fact that this Remedial Plan formed the backbone of the receiver's work plan was instrumental in the success of the receivership.  In contrast, one of the only concrete tasks conferred on the receiver in *Plata* was the development of a concrete plan of action.  In *Plata*, while two specific court orders already existed which could have formed the backbone of a plan of action, the OAR instead points to the development of a new

---

[251] *See supra* notes 73, 178.
[252] Associated Press, *Prison Contract Delayed*, GADSEN TIMES (Mar. 3, 1982), at 36.
[253] *See supra* text accompanying note 78.

50

Electronic copy available at: https://ssrn.com/abstract=1905159

plan.  The lack of a concrete plan of action upon the inception of a receivership puts the success of the receivership in question.[254]

The power granted to the receiver to budget for her projects also impacts heavily upon the success of a receivership.[255]  According to the D.C. Jail OAR, the receiver could exercise all powers held by the highest executive of D.C., the Mayor.[256]  A subsequent order delineated a process by which the receiver was to work with a District liaison prior to being given necessary funds outright and working directly to implement changes.[257]  When the liaison process broke down, the receiver was able to budget and act directly, although the defendants held the power to object to the budgets and call for a hearing.[258]

Had the *Plata* receiver been granted all powers held by California's highest executive, the Governor, this may have been seen as significant overreaching by the judiciary.  Instead, the *Plata* receiver's power was limited by all powers held by the Secretary of the prison system.[259]  Although Gov. Schwarzenegger had assumed emergency powers that could have enabled him to spend state funds on prison medical system construction, Kelso was not able to exercise that power himself.[260]  Kelso's tenure in early 2008 began with his releasing his strategic plan for public comment and responding to legislators' concerns regarding his plan.[261]  Opposition to his plan from the executive and legislature have also caused him to significantly downscale it, from an original proposal to build seven regional health care facilities at a cost of $7 billion to a $1.9

---

[254] *See supra* Part VII.C.
[255] *See supra* Part IV.B.
[256] *See supra* text accompanying note 88.
[257] *See supra* note 90 and text accompanying notes 90-92.
[258] *See supra* text accompanying notes 131-132.
[259] *See supra* Part IV.C.
[260] *See supra* text accompanying note 167.
[261] *See supra* text accompanying note 162.

Electronic copy available at: https://ssrn.com/abstract=1905159

billion plan to build two new hospitals.[262]  No plan has actually been carried out yet, two years

into his term.[263]  The plaintiffs' attorneys and Special Master in D.C. Jail attempted to untether

the receiver from the Jail's procurement processes.[264]  The California receivership could have

benefited from being likewise untethered from the state's budgeting process.  However, in a state

as large as California, it is unclear how Judge Henderson could have structured this.

The time limit set for a receivership in the OAR may influence its success.  Amongst the

three cases studied here, only the D.C. Jail receiver had a term limit.  The D.C. Jail's OAR stated

that the receivership would expire in five years, unless the Court sought to extend it.[265]  The

*Plata* and Alabama receiverships had no upper time limit.  A time limit may serve to make the

necessity of a concrete strategic plan obvious to all stakeholders.  In *Plata*, if Robert Sillen

understood his term as bounded, perhaps he would have acted immediately to draft a concrete

strategic plan.  Likewise, perhaps the Court would have closely supervised him to ensure that

such a plan was being drafted within a short time frame.  Within the inherently unstructured

remedy of a receivership, time limitations can provide another aspect of structure to assist the

court with supervision.


VIII. CONCLUSION

The ability of the court to enforce its orders in a situation of last resort, when the

democratic process has failed a vulnerable population, depends upon its ability to effectively

supervise the receiver.  Because executive agencies vary tremendously from one another,

---

[262] *See supra* text accompanying notes 163, 173.
[263] *See supra* Part V.C.ii, VI.C.
[264] *See supra* text accompanying note 89.
[265] *See supra* Part IV.

Electronic copy available at: https://ssrn.com/abstract=1905159

appropriate oversight cannot be exercised through a rigid set of rules to be imposed on all receiverships. Each agency exists within its own unique context and faces distinctive challenges. As a result, solutions to the myriad problems facing courts in overseeing receiverships will not arise from the development of standard rules governing all receiverships.

Judicial flexibility is necessary to success of receivership. Courts currently retain broad equity powers that enable them to act with this flexibility. However, because judicial takeover is a remedy of last resort, the court must maintain close supervision to ensure that the receivership meets its goals. An effective receivership requires the appointment of a receiver who will be shielded from the political struggles that required the receivership in the first place. It also demands that the court implement robust supervisory structures capable of providing day-to-day oversight of the receivership.

Electronic copy available at: https://ssrn.com/abstract=1905159