# BEYOND COMMUNITY STANDARDS AND A CONSTITUTIONAL LEVEL OF CARE? A REVIEW OF SERVICES, COSTS, AND STAFFING LEVELS AT THE CORRECTIONS MEDICAL RECEIVER FOR THE DISTRICT OF COLUMBIA JAIL

## HEARING

BEFORE THE

### SUBCOMMITTEE ON THE DISTRICT OF COLUMBIA

OF THE

## COMMITTEE ON GOVERNMENT REFORM

## HOUSE OF REPRESENTATIVES

ONE HUNDRED SIXTH CONGRESS

SECOND SESSION

JUNE 30, 2000

## Serial No. 106–229

Printed for the use of the Committee on Government Reform



Available via the World Wide Web: http://www.gpo.gov/congress/house
http://www.house.gov/reform

U.S. GOVERNMENT PRINTING OFFICE

72–581 DTP                    WASHINGTON : 2001

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov   Phone: (202) 512–1800   Fax: (202) 512–2250
Mail: Stop SSOP, Washington, DC 20402–0001

## COMMITTEE ON GOVERNMENT REFORM

DAN BURTON, Indiana, *Chairman*

BENJAMIN A. GILMAN, New York
CONSTANCE A. MORELLA, Maryland
CHRISTOPHER SHAYS, Connecticut
ILEANA ROS-LEHTINEN, Florida
JOHN M. McHUGH, New York
STEPHEN HORN, California
JOHN L. MICA, Florida
THOMAS M. DAVIS, Virginia
DAVID M. McINTOSH, Indiana
MARK E. SOUDER, Indiana
JOE SCARBOROUGH, Florida
STEVEN C. LATOURETTE, Ohio
MARSHALL "MARK" SANFORD, South
    Carolina
BOB BARR, Georgia
DAN MILLER, Florida
ASA HUTCHINSON, Arkansas
LEE TERRY, Nebraska
JUDY BIGGERT, Illinois
GREG WALDEN, Oregon
DOUG OSE, California
PAUL RYAN, Wisconsin
HELEN CHENOWETH-HAGE, Idaho
DAVID VITTER, Louisiana

HENRY A. WAXMAN, California
TOM LANTOS, California
ROBERT E. WISE, JR., West Virginia
MAJOR R. OWENS, New York
EDOLPHUS TOWNS, New York
PAUL E. KANJORSKI, Pennsylvania
PATSY T. MINK, Hawaii
CAROLYN B. MALONEY, New York
ELEANOR HOLMES NORTON, Washington,
    DC
CHAKA FATTAH, Pennsylvania
ELIJAH E. CUMMINGS, Maryland
DENNIS J. KUCINICH, Ohio
ROD R. BLAGOJEVICH, Illinois
DANNY K. DAVIS, Illinois
JOHN F. TIERNEY, Massachusetts
JIM TURNER, Texas
THOMAS H. ALLEN, Maine
HAROLD E. FORD, JR., Tennessee
JANICE D. SCHAKOWSKY, Illinois
    ———
BERNARD SANDERS, Vermont
    (Independent)

KEVIN BINGER, *Staff Director*
DANIEL R. MOLL, *Deputy Staff Director*
DAVID A. KASS, *Deputy Counsel and Parliamentarian*
ROBERT A. BRIGGS, *Clerk*
PHIL SCHILIRO, *Minority Staff Director*

———

SUBCOMMITTEE ON THE DISTRICT OF COLUMBIA

THOMAS M. DAVIS, Virginia, *Chairman*

CONSTANCE A. MORELLA, Maryland
STEPHEN HORN, California
JOE SCARBOROUGH, Florida

ELEANOR HOLMES NORTON, Washington,
    DC
CAROLYN B. MALONEY, New York
EDOLPHUS TOWNS, New York

EX OFFICIO

DAN BURTON, Indiana

HENRY A. WAXMAN, California

MELISSA WOJCIAK, *Staff Director*
HOWIE DENIS, *Professional Staff Member*
VICTORIA PROCTOR, *Professional Staff Member*
JENNY MAYER, *Clerk*
JON BOUKER, *Minority Counsel*

(II)

# CONTENTS

_____

Page

Hearing held on Juen 30, 2000 ............................................................................ 1
Statement of:
    Ekstrand, Laurie, Director of Administration of Justice Issues, General
        Government Division, U.S. General Accounting Office; Ronald Shansky,
        M.D., corrections medical receiver; Karen Schneider, special officer for
        the U.S. District Court for the District of Columbia; Erik Christian,
        deputy mayor for public health and justice; and John Clark, District
        of Columbia Corrections trustee, accompanied by Odie Washington,
        director, District of Columbia Department of Corrections ........................ 20
Letters, statements, etc., submitted for the record by:
    Christian, Erik, deputy mayor for public health and justice, prepared
        statement of ............................................................................................. 120
    Clark, John, District of Columbia Corrections trustee, prepared statement
        of ............................................................................................................... 128
    Davis, Hon. Thomas M., a Representative in Congress from the State
        of Virginia, prepared statement of ...................................................... 4
    Ekstrand, Laurie, Director of Administration of Justice Issues, General
        Government Division, U.S. General Accounting Office, prepared state-
        ment of ..................................................................................................... 23
    Morella, Hon. Constance A., a Representative in Congress from the State
        of Maryland, prepared statement of ..................................................... 15
    Norton, Hon. Eleanor Holmes, a Delegate in Congress from the District
        of Columbia, prepared statement of ..................................................... 11
    Schneider, Karen, special officer for the U.S. District Court for the Dis-
        trict of Columbia, prepared statement of ............................................. 45
    Shansky, Ronald, M.D., corrections medical receiver, prepared statement
        of ............................................................................................................... 35

(III)

# BEYOND COMMUNITY STANDARDS AND A CONSTITUTIONAL LEVEL OF CARE? A REVIEW OF SERVICES, COSTS, AND STAFFING LEVELS AT THE CORRECTIONS MEDICAL RECEIVER FOR THE DISTRICT OF COLUMBIA JAIL

————

### FRIDAY, JUNE 30, 2000

House of Representatives,
Subcommittee on the District of Columbia,
Committee on Government Reform,
*Washington, DC.*

The subcommittee met, pursuant to notice, at 10:05 a.m., in room 2154, Rayburn House Office Building, Hon. Thomas M. Davis III (chairman of the subcommittee) presiding.

Present: Representatives Davis, Morella, Horn, and Norton.

Staff present: Melissa Wojciak, staff director; Howie Denis and Victoria Procter, professional staff members; David Marin, communications director/counsel; Jenny Mayer, clerk; Jon Bouker, minority counsel; and Jean Gosa, minority assistant clerk.

Mr. Davis. Good morning and welcome.

Today's hearing is the second in a series of oversight hearings examining the status of the D.C. agencies overseen by the court-appointed receivers. Currently, there are three agencies that are still in receivership, the Commission on Mental Health Services, the Corrections Medical Receiver for the District of Columbia Jail, and the Child and Family Services. Concerns about the delivery of services and managerial and financial practices in these agencies persists. The fourth agency in receivership is the District of Columbia Housing Authority, which has successfully recovered from mismanagement and is ready to be returned to the D.C. government's administration.

Today the subcommittee is focused on the corrections medical receiver in the D.C. jail. The receiver was appointed 5 years ago by the U.S. district court in order to address Constitutional violations in the delivery of health care at the jail. It is scheduled to end in September 2000.

The subcommittee wants to examine the status of D.C.'s progress in meeting its court-ordered obligations so the jail may be returned to the city's jurisdiction.

Rampant problems in the D.C. jail were enumerated in two class action lawsuits filed in the city in the early 1970's, in *Campbell* v.

2

*McGruder* and *Inmates of D.C. Jail* v. *Jackson* were filed on behalf of pretrial detainees and sentenced inmates.

The plaintiffs' charged that the conditions and treatment of inmates in jail were unconstitutional. The two suits were consolidated and senior U.S. Judge William B. Bryant presided over them for nearly 30 years.

The time line highlights key court actions and events concerning the D.C. jail. Through the years, Judge Bryant has issued orders requiring the D.C. government to rectify problems with the jail's medical services. Despite assurances from the city that the necessary changes would be implemented, nothing materialized. Instead, the D.C. jail left the medical services program to languish at below-Constitutional levels.

In April 1993, finding the D.C. government in persistent noncompliance with his orders, Judge Bryant appointed a special officer to monitor and report on the city's progress on meeting its court-ordered obligations. The city, however, continued to ignore the orders and the deficiencies in the jail's medical services delivery persisted.

The jail's suicide rate was out of control. In addition, the jail lacked an effective program to prevent the spread of infectious tuberculosis.

On January 5, 1995, the court ordered the implementation of the initial remedial plan. It was designed by the special officer after extensive consultation with the plaintiffs and the defendants and the special officer's own medical and mental health experts. The plan addressed the most immediate and egregious problems with the delivery of medical services at the jail. It also provided the framework for major long-term changes to policies and procedures, staffing, and organizational structure. The initial remedial plan was never implemented. In fact, on June 5, 1995, 5 months to the day after the District was ordered to implement the remedial plan, inmate Richard C. Johnson died. Mr. Johnson was an aged patient in the jail's infirmary who had been neglected for several days by the medical staff. His death highlighted the city's failure to address the severe deficiencies in the delivery of medical services at the jail.

Citing the physical danger that the D.C. government's continued blatant violation of the court's previous order was tragically causing, Judge Bryant placed the jail's medical and mental health services under court-supervised receivership. The receiver was ordered to implement the initial remedial plan.

The D.C. jail medical services have improved significantly under the receiver, Dr. Ronald Shansky. Dr. Shansky's tenure has brought the jail remedial changes to increase the level of medical and mental health services to a Constitutionally acceptable level.

In addition, the D.C. jail's tuberculosis epidemic has been controlled, HIV/AIDS cases are identified and treated, and qualified medical staff have been hired to improve the delivery of care.

The receiver has successfully implemented a suicide prevention program to identify potentially suicidal inmates and provide them with the necessary prevention treatment.

Despite these improvements in the delivery of health care, it is disturbing that the receiver is leaving the D.C. jail with exorbitant

3

medical costs per inmate and high staffing levels. In both cases, the figures far exceed the national average.

The court order creating the receivership essentially gives the receiver carte blanche to spend the District's money freely, without regard to sound financial practices and accountability to the D.C. government. Of course, it is important to provide a Constitutional level of medical and mental health services to D.C. jail inmates, but should the D.C. jail receivership accomplish this by spending at least two to three times the national average per inmate per day? Can a city emerging from bankruptcy really sustain this kind of expenditure?

In addition, the receiver issued a request for proposal for a 1-year contract to manage the medical services at the jail once the receivership ends in September 2000. The contract was awarded to individuals who were employed by the receiver at the time the proposal was submitted, raising the specter of impropriety in the receiver's procurement process. The benefit of the RFP is questionable, since it requests bids that would maintain the same services at the jail and therefore the same cost, thereby perpetuating the already high costs that were expended under the receivership.

D.C. government can't afford these inflated costs and D.C. taxpayers shouldn't be forced to foot the bill if there are other cost-effective alternatives.

Today we will be looking at what reforms, if any, still need to be enacted to comply with the judge's order. Additionally, the hearing will focus on what resources are needed to maintain the reforms which have already been instituted and to enact any additional reforms required for compliance with the court order so that the jail may return to the city's jurisdiction.

We will hear from GAO. We will hear from Dr. Shansky; the receiver, John Clark; the corrections trustee; Erik Christian, the deputy mayor for public safety and justice. Karen Schneider, the special officer appointed by the U.S. district court, who refused to testify, requiring this subcommittee to issue its first ever subpoena mandating her appearance.

I would now yield to Delegate Norton for any opening statement she wishes to make, and then we will move right on to the witnesses.

[The prepared statement of Hon. Thomas M. Davis follows:]

4

ONE HUNDRED SIXTH CONGRESS

# Congress of the United States

## House of Representatives

COMMITTEE ON GOVERNMENT REFORM

2157 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6143

Majority    (202) 225-5074
Minority    (202) 225-5051
TTY         (202) 225-6852

**REPRESENTATIVE TOM DAVIS**
**CHAIRMAN, DISTRICT OF COLUMBIA SUBCOMMITTEE**
**OPENING STATEMENT**
**JUNE 30, 2000**
**OVERSIGHT HEARING ON THE DISTRICT OF COLUMBIA JAIL'S MEDICAL AND**
**MENTAL HEALTH SERVICES**

Good morning and welcome.  Today's hearing is the second in a series of oversight

hearings examining the status of the D.C. agencies overseen by court-appointed receivers.

Currently, there are three agencies that are still in receivership: the Commission on Mental

Health Services, the Corrections Medical Receiver for the District of Columbia Jail, and Child

and Family Services.  Concerns about the delivery of services and managerial and financial

practices in these agencies persist.  The fourth agency in receivership is the District of Columbia

Housing Authority, which has successfully recovered from mismanagement and is ready to be

returned to the D.C. government's administration.

Today, the Subcommittee is focused on the Corrections Medical Receiver for the D.C.

Jail.  The receiver was appointed five years ago by the U.S. District Court in order to address

constitutional violations in the delivery of health care at the Jail.  It is scheduled to end in

September 2000.  The Subcommittee wants to examine the status of the D.C.'s progress in

1

5

meeting its court-ordered obligations so the Jail may be returned to the city's jurisdiction.

Rampant problems at the D.C. Jail were enumerated in two class action lawsuits filed against the city in the early 1970s. *Campbell v. McGruder* and *Inmates of D.C. Jail v. Jackson* were filed on behalf of pretrial detainees and sentenced inmates. The plaintiffs charged that the conditions and treatment of inmates at the Jail were unconstitutional. The two suits were consolidated, and Senior U.S. District Judge William B. Bryant has presided over them for nearly thirty years.

The timeline highlights key court actions and events concerning the D.C. Jail. Through the years, Judge Bryant has issued orders requiring the D.C. government to rectify chronic problems with the Jail's medical services. Despite assurances from the city that the necessary changes would be implemented, nothing materialized. Instead, the D.C. Jail left the medical services program to languish at below-constitutional levels. In April 1993, finding the D.C. government in "persistent non-compliance" with his orders, Judge Bryant appointed a Special Officer to monitor and report on the city's progress in meeting its court-ordered obligations. The city, however, continued to ignore the orders and the deficiencies in the Jail's medical services delivery system persisted. The Jail's suicide rate was out of control. In addition, the Jail lacked an effective program to prevent the spread of infectious tuberculosis.

On January 5, 1995, the Court ordered the implementation of the Initial Remedial Plan. It was designed by the Special Officer after extensive consultation with the plaintiffs and defendants and the Special Officer's own medical and mental health experts. The Plan addressed the most immediate and egregious problems with the delivery of medical services at the Jail. It also provided the framework for major long-term changes to policies and procedure, staffing, and

2

6

organizational structure. The Initial Remedial Plan was never implemented.

In fact, on June 5, 1995, five months to the day after the District was ordered to implement the Remedial Plan, inmate Richard C. Johnson died. Mr. Johnson was an AIDS patient in the Jail's infirmary who had been neglected for several days by the medical staff. His death highlighted the city's failure to address the severe deficiencies in the delivery of medical services at the Jail. Citing the physical danger that the D.C. government's continued blatant violation of the Court's previous orders was tragically causing, Judge Bryant placed the Jail's medical and mental health services under court-supervised receivership. The receiver was ordered to implement the Initial Remedial Plan.

The D.C. Jail medical services have improved significantly under the receiver, Dr. Ronald Shansky. Dr. Shansky's tenure has brought to the Jail remedial changes to increase the level of medical and mental health services to a constitutionally acceptable level. In addition, the D.C. Jail's tuberculosis epidemic has been controlled, HIV/AIDS cases are identified and treated, and qualified medical staff have been hired to improve the delivery of care. The Receiver has successfully implemented a suicide prevention program to identify potentially suicidal inmates and provide them with the necessary prevention treatment. Despite these improvements in the delivery of health care, it is disturbing that the Receiver is leaving the D.C. Jail with exorbitant medical costs per inmate and high staffing levels (in both cases, the figures exceed the national average). The Court order creating the receivership essentially gives the receiver carte blanche to spend the District's money freely without regard to sound financial practices and accountability to the D.C. government. Of course, it is important to provide a constitutional level of medical and mental health services to the D.C. Jail inmates. But must the D.C. Jail receivership

3

7

accomplish this by spending at least two to three times the national average per inmate per day? Can a city emerging from bankruptcy really sustain this kind of expenditure?

In addition, the Receiver issued a Request for Proposal (RFP) for a one-year contract to manage the medical services at the Jail once the Receivership ends in September 2000. The contract was awarded to individuals who were employed by the Receiver at the time their proposal was submitted, raising the specter of impropriety in the Receivership's procurement process. The benefit of the RFP is questionable since it requested bids that would maintain the same services at the Jail, and therefore the same costs, thereby perpetuating the exorbitant costs expended under the Receivership. The D.C. government cannot afford these inflated costs, and the D.C. taxpayers should not be forced to foot the bill if there are cost-effective alternatives.

Today, we'll be looking at what reforms, if any, still need to be enacted to comply with the Judge's orders. Additionally, the hearing will focus on what resources are needed to maintain the reforms which have already been instituted, and to enact any additional reforms required for compliance with the court order so that the Jail may return to the city's jurisdiction. We will hear from the GAO; Dr. Shansky, the Receiver; John Clark, the Corrections Trustee; and Erik Christian, the Deputy Mayor for Public Safety and Justice. Karen Schneider, the Special Officer appointed by the U.S. District Court refused to testify requiring the Subcommittee to issue its first-ever subpoena mandating her appearance.

4

8

Ms. NORTON. Thank you, Mr. Chairman. I very much appreciate your initiative in calling this hearing and the way in which you have worked with me on this matter, in particular.

Over a period of many years, the District of Columbia lost control over four agencies, but only after the courts had seen their orders violated for years. Judicial patience had justifiably run out. Medical services at the D.C. jail before us today were replete with violations and with inhumane conditions. Respect for even minimal levels of Constitutional rights compelled the action Judge William B. Bryant, a distinguished judge of the U.S. district court here, took to relieve the District of control of the medical function at the jail in 1995.

Chairman Tom Davis and I, and the subcommittee, began our oversight of receiverships only in the wake of a precipitating event in one of the receiverships for which none of the actors, including the receiver, had any explanation or took responsibility, the death of an infant, Brianna Blackmond, committed to the care of the Child and Family Services Agency, under a receivership of the U.S. district court.

Shortly after the infant died, Chairman Davis asked me to join him in requesting GAO investigations of all the outstanding receiverships in order to assure that accountability problems had not developed in the absence of regular public oversight to which city agencies in the District are subjected today.

The Chair then commenced this series of hearings on the three receiverships that are still active, all of which have been subject to serious criticisms. Our own preliminary investigation has not been reassuring. We could not find evidence of significant use by our receivers of best practices of the kind required of District and Federal agencies, such as management and fiscal audits; procurement practices that foster fair and open competition; cost controls that reflect generally acceptable national or regional standards; or even Antideficiency Act requirements universally applicable to government agencies to prevent overspending of funds that are not authorized and available.

With the chairman, I then introduced H.R. 3995, the District of Columbia Receivership Accountability Act. The House passed H.R. 3995 unanimously, and the bill will be marked up by the Senate Governmental Affairs committee shortly.

Even before the GAO reports were in, it is clear that, at a minimum, receivers, their court monitors, and special officers who stand in the shoes of agency heads and their supervisors must operate at least at the standards required of those who have been ousted from control of the agencies involved. The agencies were removed from District control to achieve improvements and higher levels of accountability, beginning with the receivers and their supervisors, who, by definition, are setting the example for the District as to how the agencies are to be run in the future.

All of the receivership agencies originally had severe operational and service problems, but the concerns that remain differ. The jail medical receivership now before us has shown sufficient operational improvements to be scheduled to expire in August 2000, at the end of 5 years, pursuant to the court order establishing the receivership. However, the cost associated with these improvements

9

would be astonishing to taxpayers and to any public official charged with responsibility for taxpayer funds.

The GAO investigation Chairman Davis and I have requested is ongoing and unfinished, but three outside experts who looked at the results have raised serious questions concerning cost and pro-curement practices.

First, and most recently, the D.C. Board of Contract Appeals found that challengers to the receivers' RFP had not met the heavy burden necessary to divest the contract under D.C. law, even though the receivers' own employees, while still employed by the receiver, had been awarded the contract to provide future services.

What was significant was the unusually strong language of the board, which wrote, "While the receiver asserts that he took steps that no offer was unfairly advantaged or disadvantaged, and, in particular, the procurement was designed to encourage outside companies, as well as employee-formed groups to participate, such actions are not apparent."

Second, the corrections trustee, a former assistant director for community corrections of the U.S. Bureau of Prisons, the largest in the country, has been charged by this subcommittee with assisting the entire corrections system with systemic management and fi-nancial reforms prior to the expiration of his tenure.

In meetings with the receiver and the special officer, the correc-tions trustee repeatedly objected to the costs of the receivership and the RFP but was successful only in getting the cost lowered from $16 million to $12.5 million, a cost nearly three times the na-tional average for medical services at jails in this country.

Third, Faiver, Campau and Associates, reputable experts in the area of corrections health care, were commissioned by the correc-tions trustee to analyze the potential cost resulting from the RFP and winning bid. These experts found that the RFP issued by the receiver "incorporates an administrative structure akin to that often found in a fairly large State corrections system rather than in a moderately sized jail."

These experts concluded that "Nowhere in the country are we aware of a facility of comparable size that has such a top echelon of staff who are not significantly involved in direct patient care."

Confronted with cost figures so substantially above those found nationally and in similarly situated regional jurisdictions, and with sharply critical evaluations by outside experts, an explanation is necessary. This hearing is being held to give the receiver and the special officer the opportunity to respond and other witnesses the opportunity to elaborate and be questioned. Thus far, the only re-sponse regarding these costs we are aware of from the receivership are a letter from the special officer sent after I wrote to her about our concern, followed by a visit by the special officers receiver, and District correctional officials to my office for a meeting.

In her letter, the special officer justifiably and appropriately warns of the difficulty of doing cost comparisons, but even so con-cedes that, using the available data, the costs of the contract issued by the receiver is almost twice the national average cited in the ap-plicable surveys.

She then cites the high administrative service cost which she as-serts would not be found in the budgets of other jurisdictions. She

10

also cites modifications that would reduce these costs to $12.92 per inmate per day, although that amount is still nearly twice the national average.

I am in full agreement concerning all the problems associated with analyzing the data involved; however, today local governments and especially the District of Columbia, fresh from insolvency, no longer authorize the expenditure of taxpayer funds without even an attempt to justify costs in comparison to others with similar responsibilities.

In the District, health care, in particular, requires our best effort at such attempts because more than 60,000 D.C. residents have no health insurance. Their health care continues to impose an enormous price on them, personally, on the health care indicators of residents, and on the D.C. government. A D.C. resident should not have to go to jail to get adequate health care and jail should not afford health care that far exceeds what is available to the average resident with and without insurance.

The District government, which stands to inherit the costs of the jail medical receivership, has the task of meeting both Constitutional standards for the health care of people charged with crime and the health needs of ordinary citizens, most of whom are from families who work every day but must look to the District to design a way for them to meet basic health care needs.

Ultimately, the District must take its responsibilities for both these sets of its residents more seriously than the city has in the past.

I look forward to hearing today's witnesses and to approaching the issues before us as problems that can be solved with sufficient satisfaction to all concerned.

Thank you, Mr. Chairman.

Mr. DAVIS. Thank you very much.

[The prepared statement of Hon. Eleanor Holmes Norton follows:]

11

ELEANOR HOLMES NORTON
DISTRICT OF COLUMBIA

COMMITTEE ON
TRANSPORTATION AND
INFRASTRUCTURE

SUBCOMMITTEES

AVIATION

ECONOMIC DEVELOPMENT, PUBLIC
BUILDINGS, HAZARDOUS MATERIALS
AND PIPELINE TRANSPORTATION



**Congress of the United States**
**House of Representatives**
**Washington, D.C. 20515**

COMMITTEE ON
GOVERNMENT REFORM

SUBCOMMITTEES

RANKING MINORITY MEMBER,
DISTRICT OF COLUMBIA

CIVIL SERVICE

## STATEMENT OF CONGRESSWOMAN ELEANOR HOLMES NORTON
### D.C. SUBCOMMITTEE HEARING
### MEDICAL RECEIVERSHIP AT THE D.C. JAIL

**June 30, 2000**

Over a period of many years, the District lost control over four agencies, but only after the courts had seen their orders violated for years and judicial patience had justifiably run out. Medical services at the D.C. Jail before us today were replete with such violations and with inhumane conditions. Respect for even minimal levels of constitutional rights compelled the action Judge William B. Bryant, a distinguished judge of the U.S. District Court here, took to relieve the District of control of the medical function at the Jail in 1995.

Chairman Tom Davis and I and the Subcommittee began our oversight of receiverships only in the wake of a precipitating event in one of the receiverships for which none of the actors, including the Receiver, had an explanation or took responsibility: the death of the infant, Brianna Blackmond, committed to the care of the Child and Family Services Agency under a receivership of the U.S. District Court. Shortly after the infant died, Chairman Davis asked me to join him in requesting a GAO investigation of all of the outstanding receiverships in order to assure that accountability problems had not developed in the absence of regular public oversight to which city agencies in the District are subjected today. The chair then commenced this series of hearings on the three receiverships that are still active, all of which have been subject to serious criticisms.

Our own preliminary investigation has not been reassuring. We could not find evidence of significant use by receivers of best practices of the kind required of District and federal agencies, such as management and fiscal audits, procurement practices that foster fair and open competition, cost controls that reflect generally acceptable national or regional standards, or even Anti-deficiency Act requirements universally applicable to government agencies to prevent over spending of funds that are not authorized and available.

With the Chairman, I then introduced H.R. 3995, the District of Columbia Receivership Accountability Act. The House passed H.R. 3995 unanimously and the bill will be marked up by the Senate Government Affairs Committee shortly. Even before the GAO reports were in, it is clear that, at a minimum, receivers, their court monitors and special officers, who stand in the shoes of agency heads and their supervisors, must operate at least at the standards required of those who have been ousted from control of the agencies involved. The agencies

818 15TH STREET, N.W., SUITE 100
WASHINGTON, D.C. 20006-2901
(202) 783-5065
(202) 783-5211 (FAX)

1424 LONGWORTH HOUSE OFFICE BUILDING
WASHINGTON, D.C. 20515-5101
(202) 225-8050
(202) 225-3002 (FAX)
(202) 225-7819 (TDD)
www.house.gov/norton

2041 MARTIN L. KING AVENUE, S.E.
SUITE 300
WASHINGTON, D.C. 20020-5724
(202) 678-8900
(202) 678-8844 (FAX)

Recycled Paper

12

were removed from District control to achieve improvements and higher levels of accountability, beginning with the receivers and their supervisors themselves, who, by definition, are setting the example for the District as to how the agencies are to be run in the future.

All of the receivership agencies originally had severe operational and service problems, but the concerns that remain differ. The Jail medical receivership now before us has shown sufficient operational improvements to be scheduled to expire in August, 2000, at the end of five years pursuant to the court order establishing the receivership. However the costs associated with these improvements would be astonishing to taxpayers and to any public official charged with responsibility for taxpayer funds. The GAO investigation Chairman Davis and I have requested is ongoing, but three outside experts who have looked at the results have raised serious questions concerning costs and procurement practices.

First, and most recently, the D.C. Board of Contract Appeals found that challengers to the Receiver's RFP had not met the heavy burden necessary to divest the contract under D.C. law, even though the Receiver's own employees, while still employed by the Receiver, had been awarded the contract to provide future services. What was significant was the unusually strong language of the Board, which wrote, "While the Receiver asserts that he 'took steps to see that no offeror was unfairly advantaged or disadvantaged [and] [i]n particular, the procurement was designed to encourage outside companies as well as employee formed groups to participate,' such actions are not apparent."

Second, the Corrections Trustee, a former Assistant Director for Community Corrections of the United States Bureau of Prisons, the largest in the country, has been charged by this Subcommittee with assisting the entire D.C. corrections system with systemic management and financial reforms prior to the expiration of his tenure. In meetings with the Receiver and the Special Officer, the Corrections Trustee repeatedly objected to the costs of the receivership, and the RFP was successful only in getting the costs lowered from $16 million to $12.5 million, a cost nearly three times the national average for medical services at jails in this country.

Third, Faiver, Campau and Associates, reputable experts in the area of corrections healthcare, were commissioned by the Corrections Trustee to analyze the potential costs resulting from the RFP and winning bid. These experts found that the RFP issued by the Receiver "incorporates an administrative structure akin to that often found in a a fairly large state corrections system rather than a moderately sized jail." These experts concluded that "[n]owhere in the country are we aware of a facility of comparable size that has such a top echelon of staff who are not also significantly involved in direct patient care."

Confronted with cost figures so substantially above those found nationally and in similarly situated regional jurisdictions and with sharply critical evaluations by outside experts, an explanation is necessary. This hearing is being held to give the Receiver and the Special Officer the opportunity to respond, and other witnesses the opportunity to elaborate and to be

2

13

questioned. Thus far, the only response regarding these costs we are aware of from the receivership are a letter from the Special Officer sent after I wrote to her about my concerns, followed by a visit by the Special Officer, the Receiver, and District correctional officials to my office for a meeting. In her letter, the Special Officer justifiably and appropriately warns of the difficulty of doing cost comparisons but even so concedes that using the available data the costs of the contract issued by the Receiver is almost twice the national average cited in the applicable survey. She then cites the high administrative service costs, which she asserts would not be found in the budgets of other jurisdictions. She also cites modifications that would reduce these costs to $12.92 per inmate per day, although that amount is still nearly twice the national average.

I am in full agreement concerning all the problems associated with analyzing the data involved. However, today, local governments and especially the District of Columbia, fresh from insolvency, no longer authorize the expenditure of taxpayer funds without even an attempt to justify costs in comparison to others with similar responsibilities. In the District, health care, in particular, requires our best effort at such attempts because more than 60,000 D.C. residents have no health insurance and their healthcare continues to impose an enormous price on them personally, on the healthcare indicators of residents, and on the D.C. government. A D.C. resident should not have to go to jail to get adequate healthcare and jails should not afford healthcare that far exceeds what is available to the average resident with and without insurance. The District government, which stands to inherit the costs of the Jail medical receivership, has the task of meeting both constitutional standards for the healthcare of people charged with crime and the health needs of ordinary citizens, most of whom are from families who work everyday, but must look to the District to design a way for them to meet basic health care needs. Ultimately, the District must take its responsibilities for both of these sets of its residents more seriously than the city has in the past.

I look forward to hearing today's witnesses and to approaching the issues before us as problems that can be solved with sufficient satisfaction to all concerned.

14

Mr. DAVIS. Thank you very much.

We have been joined by the vice chairman of this committee, Mrs. Morella, who will make a brief statement, as well.

Mrs. MORELLA. Thank you, Chairman Davis. I appreciate Ranking Member Norton for calling this very important hearing today to examine the status of the receivership of the District of Columbia's jail's medical and mental health services. I am hopeful that this examination will help to enlighten us about how best to deliver this service out of receivership and return it to the control of the D.C. government.

Since Dr. Ronald Shansky was appointed the corrections medical receiver for the D.C. jail 5 years ago, much of the crisis has been averted. I am encouraged that many of the problems that were faced by the receiver have been successfully addressed. When the receivership ends in September, the goal will have been met for attaining for the inmates a Constitutional level of health care. Recognition and treatment of depressed and unstable inmates has turned around a dismal situation in the rates of suicide in the jail, the tuberculosis epidemic has been brought under control, and HIV and AIDS cases are identified and treated.

Dr. Shansky has brought in qualified medical staff and the level of care provided to the inmates has been greatly improved. I am obviously very concerned, though, that the solution to the dire issues that face the jail can be sustained by the District. Are there alternative staffing solutions and resources that can be applied to this situation to sustain the improvements that have been made under the receiver's care?

This level of care has been accomplished with medical costs and staffing levels that far exceed the national average. The receiver has not been held to sound financial practices and has not been accountable to the District government for its budget.

I am further concerned that the request for proposal, the RFP, for a 1-year contract to manage the medical services at the jail once the receiver ends in September 2000, has resulted in a contract being awarded that maintains the staffing levels and medical costs endured under the receivership. If there is a more cost-effective solution, then that needs to be further explored.

And so I hope this hearing today addresses these concerns and that, from what we learn, a suitable long-term solution may be received.

Though the manner of care has improved over the past 5 years in the D.C. jail, it is imperative that the jail be able to sustain a Constitutional level of services to the inmate.

I thank you, Mr. Chairman, and yield back.

Mr. DAVIS. Thank you very much.

[The prepared statement of Hon. Constance A. Morella follows:]

15

**Representative Constance A. Morella**
**Vice-Chair, District of Columbia Subcommittee**
**Opening Statement**
**June 30, 2000**
**Oversight Hearing on the District of Columbia Jail's Medical and Mental Health Services**

I would like to thank Chairman Davis and Ranking Member Norton for calling this hearing today to examine the status of the receivership of the District of Columbia Jail's Medical and Mental Health Services. I am hopeful that this examination will help to enlighten how best to deliver this service out of receivership and returned to the control of the D.C. government.

16

Since Dr. Ronald Shansky was appointed the Corrections Medical Receiver for the D.C. Jail five years ago, much of the crisis has been averted. I am encouraged that many of the problems that were faced by the Receiver have been successfully addressed. When the Receivership ends in September, the goal will have been met of attaining for the inmates a constitutional level of health care.

Recognition and treatment of depressed and unstable inmates have turned around a dismal situation in the rates of suicide in the Jail. The tuberculosis epidemic has been brought under control, and HIV/AIDS cases are identified

17

and treated.  Dr. Shansky has brought in
qualified medical staff, and the level of care
provided to the inmates has been greatly
improved.

I remain concerned, though, that the solution
to the dire issues that face the Jail can be
sustained by the District.  Are there alternate
staffing solutions and resources that can be
applied to this situation to sustain the
improvements that have been made under the
Receiver's care?  This level of care has been
accomplished with medical costs and staffing
levels that far exceed the national average.
The Receiver has not been held to sound

18

financial practices and has not been
accountable to the District government for its
budget.

I am further concerned that the Request for
Proposal (RFP) for a one-year contract to
manage the medical services at the Jail once
the Receivership ends in September 2000 has
resulted in a contract being awarded that
maintains the staffing levels and medical costs
endured under the Receivership.  If there is a
more cost effective solution, then that needs to
be further explored.

I hope that this hearing today addresses these

19

concerns and that from what we learn, a
suitable long term solution may be reached.
Though the manner of care has improved over
the past five years in the D.C. Jail, it is
imperative that the Jail be able to sustain a
constitutional level of services to the inmates.

20

Mr. DAVIS. I want to call now our panel of witnesses and supporting witnesses to testify: Ms. Laurie Ekstrand, the Director of Administration of Justice Issues of the U.S. General Accounting Office; Ronald Shansky, M.D., the receiver; Ms. Karen Schneider, the Special Officer for the U.S. District Court for the District of Columbia; Erik Christian, the deputy mayor for public safety and justice; and Mr. Odie Washington, director, District of Columbia Department of Corrections as a supporting witness; and, of course, John Clark, District of Columbia Corrections trustee.

As you know, it is the policy of our committee that all witnesses and supporting witnesses be sworn before they can testify, so if you would rise and raise your right hands.

[Witnesses sworn.]

Mr. DAVIS. Thank you very much.

To afford sufficient time for questions, if you'd try to limit yourself, we've read the testimony that has been submitted. We were here until 3 a.m., so we didn't have anything else to do. It doesn't always get read, but in this case it did.

All written statements are going to be made part of the permanent record, so if you would try to dwell on the highlights that will give us time for questions and we can get you out of here earlier, as well.

I'll begin starting with Ms. Ekstrand and then move to Dr. Shansky, Ms. Schneider, Mr. Christian, and then Mr. Clark.

**STATEMENTS OF LAURIE EKSTRAND, DIRECTOR OF ADMINISTRATION OF JUSTICE ISSUES, GENERAL GOVERNMENT DIVISION, U.S. GENERAL ACCOUNTING OFFICE; RONALD SHANSKY, M.D., CORRECTIONS MEDICAL RECEIVER; KAREN SCHNEIDER, SPECIAL OFFICER FOR THE U.S. DISTRICT COURT FOR THE DISTRICT OF COLUMBIA; ERIK CHRISTIAN, DEPUTY MAYOR FOR PUBLIC HEALTH AND JUSTICE; AND JOHN CLARK, DISTRICT OF COLUMBIA CORRECTIONS TRUSTEE, ACCOMPANIED BY ODIE WASHINGTON, DIRECTOR, DISTRICT OF COLUMBIA DEPARTMENT OF CORRECTIONS**

Ms. EKSTRAND. Thank you, Mr. Chairman.

I am very pleased to be here today to discuss several issues concerning the District of Columbia receivership contract for medical and mental health services at the D.C. jail. Without further ado, let me get right to the four issues that we were asked to review.

The first one is cost. Our comparison of budget data for medical services at the D.C. jail and comparable facilities in Baltimore City and Prince George's County indicated that D.C. jail's per capita costs are higher. Indeed, the officials to whom we spoke during our review agreed that D.C. jail provided certain medical services and had staffing levels that exceed those of other facilities. Of course, this drives cost.

In relationship to staffing, the inmate-to-staff ratios, as reported by the Office of the Corrections Trustee, is 13-to-1 at the D.C. jail, 74-to-1 in Baltimore, and 48-to-1 in Prince George's County.

The fact that the D.C. jail provides fully staffed pharmacy and both mental and dental services onsite, whereas Baltimore and

21

Prince George's County do not, provides some context for understanding some of the differences in the inmate-to-staff ratios.

Most of the officials to whom we spoke cited the court-ordered remedial plan as the primary reason why the D.C. jail provides enhanced medical services and has higher staffing levels than other jurisdictions. The trustee, however—and I'm sure he will address this himself—feels that adequate medical services could be provided with fewer staff and at lower cost.

The next issue you asked us to review concerned acceptable levels of care for jail inmates. We found that there is no single threshold that determines what an acceptable level of medical services is at the jail. According to experts, this is the case because the acceptable level is related to the medical circumstances and situations that need to be addressed. It can also be a function of specific constraints such as court orders placed on a specific jail facility.

Accreditation standards have been developed by several organizations, including the National Commission on Correctional Health Care. These standards define minimum recommended medical service requirements for jail to voluntarily obtain accreditation. When a facility seeks accreditation, experts review a broad range of factors related to the health of inmates and facility-related issues to make a decision concerning accreditation based on the application of standards to the specific jail setting. The standards then cannot be used as a simple check list to assess whether a facility provides an acceptable level of medical care.

You also asked us to look at the effects of the contracting process on medical service costs. As you know, the current contract maintains the level of medical services and staffing at the levels already in place at the D.C. jail, but the current contract can be modified at any time. In addition, it can be re-competed at its current or scaled-back levels of service and staffing when the base year ends in March 2001.

The solicitation that resulted in the current contract requested that offerors submit proposals that would maintain existing levels of service and staffing. These were referred to as comparison proposals.

According to officials we spoke to, the District sought to maintain existing levels of service to ensure that the receivership is successfully terminated in August 2000, and control of the jail is returned to the District. The solicitation also encouraged offerors to submit alternative proposals for providing health services differently or more economically than they were currently provided.

The Evaluation Committee rated all of the proposals and determined that none of the alternate proposals provided specific enough information to ensure that they would maintain the same level of medical services as would the comparison proposals; thus, the final recommendation of the committee was to endorse a comparison proposal. The committee's recommendation was sent to the receiver, who selected the contractor.

Finally, let me turn to the issue of whether the failure of the receiver's employees to resign from their positions prior to being awarded the contract violates D.C. law or regulations.

Under District personnel regulations, a District employee may make an offer on a contract, but generally cannot be awarded the

22

contract while still in D.C. employment status. The firm that was awarded the contract to provide medical services at the D.C. jail was constituted of employees working for the receiver, not for the District government, thus they were not subject to these provisions of District law.

We would note that the D.C. Contract Appeals Board ruled in May 2000, on a protest by a losing offeror to this procurement. The protestor asserted that the receiver showed bias in favor of the awardee, which was a company formed by the incumbent medical director. The issue of employees' failure to resign prior to the award was not raised in this protest. The Board denied the protest, finding that there was not proof of bias sufficient to challenge the award; however, the Board noted that certain of the receiver's actions gave an appearance not conducive to confidence in the fairness of the procurement.

This concludes my oral statement, and I would be glad to answer any questions you may have.

[The prepared statement of Ms. Ekstrand follows:]

23

**GAO**

United States General Accounting Office

Testimony

Before the Subcommittee on the District of Columbia
Committee on Government Reform
House of Representatives

For Release on Delivery
Expected at
10:00 a.m. EDT
on Friday
June 30, 2000

# DISTRICT OF COLUMBIA RECEIVERSHIP

## Selected Issues Related to Medical Services at the D.C. Jail

Statement by Laurie E. Ekstrand
Director, Administration of Justice Issues
General Government Division





GAO
Accountability * Integrity * Reliability

GAO/T-GGD-00-173

24

# District of Columbia Receivership: Selected Issues Related to Medical Services at the D.C. Jail

Mr. Chairman and Members of the Subcommittee:

I am pleased to be here today to discuss selected topics concerning the District of Columbia Medical Receiver's contract for medical and mental health services[1] at the D.C. Jail. As you know, the D.C. Jail's medical care facility was placed under court-ordered receivership in August 1995, after the District was held in contempt for repeatedly failing to implement court orders. These orders emanated from long-standing litigation intended to ensure adequate medical services to jail inmates. The Receivership is scheduled to expire in August 2000. In January 2000, the Receiver awarded a 1-year contract, with 4 option years, to a private, not-for-profit firm to provide medical services to individuals housed at the D.C. Jail. Performance on the contract began in March 2000.

Based on your request, our work has focused on four questions: (1) What are the costs of providing medical services at the D.C. Jail as compared with jurisdictions said to be similar? (2) What would constitute an acceptable level of medical service and staffing at the jail? (3) What effect did the contracting process have on medical service costs? (4) Did the failure of the Receiver's employees to resign from their positions prior to being awarded the contract violate D.C. law or regulations? As you know, we have been conducting our work for only a matter of a few weeks, so we do not have complete answers to all of these questions.

To answer these questions, we analyzed available cost, staffing, and contracting information and conducted interviews with cognizant officials. Specifically, we spoke with officials from the Office of the Receiver for Medical and Mental Health Services, the Office of the Corrections Trustee, the Office of Corporation Counsel, and the Department of Corrections (DOC). We also spoke with the District's Deputy Mayor for Public Safety and Justice. Further, we spoke with counsels for both the Receiver and for the plaintiffs whose suit resulted in the D.C. Jail's being placed in receivership. In addition, we spoke with officials of all three private companies that made offers on the contract. The Special Officer—appointed by the U.S. District Court for the District of Columbia and charged with overseeing the Receiver's activities—cited constraints placed on her by the Code of Judicial Conduct and declined to be interviewed. We performed our review from May 17 to June 27, 2000, in accordance with generally accepted government auditing standards. We did not independently verify the cost and staffing data or the other information we

---

[1] The term "medical services" will be used in the remainder of the testimony to refer to both medical and mental health services.

25

obtained, nor did we evaluate the individual proposals submitted in response to the solicitation.

In this statement, I would like to make the following points:

- Our comparison of contract budget data for medical services at the D.C. Jail and two reportedly comparable facilities--in Baltimore and Prince George's County, Maryland--indicated that the D.C. Jail's per capita costs were higher. Officials with whom we spoke during our review agreed that the D.C. Jail provided certain medical services—and had staffing levels—usually not provided by other jurisdictions. Accordingly, the cost differences between the D.C. Jail and those in Baltimore and Prince George's County are likely due, in part, to differences in staffing levels, which in turn are likely due, in part, to the types of medical services provided. For example, the inmate to staff ratio, as reported by the Office of the Corrections Trustee, at the D.C. Jail's medical facility is 13.4 to 1; compared with 74 to 1 in Baltimore and 48 to 1 in Prince George's County. The fact that the D.C. Jail provides a fully staffed on-site pharmacy and mental health and dental services, whereas Baltimore and Prince George's County provide these services differently, offers a context for understanding some of the differences in the inmate to staff ratios. Officials with whom we spoke and documents we reviewed indicated that a court-ordered Remedial Plan is the primary reason why the D.C. Jail provides medical services and has higher staffing levels than other jurisdictions. The Trustee felt, however, that adequate medical services could be provided with fewer staff and at lower cost.

- There is no single specific threshold that determines what an acceptable level of medical service and staffing is at a jail. According to correctional medicine experts, generally, the level of service and staffing is a function of many factors, including the situation and circumstances to be addressed. It is also a function of the specific constraints and demands placed on the service delivery system at a particular location. Standards, such as those developed by the National Commission on Correctional Health Care (NCCHC), define minimum recommended medical service requirements for jails to voluntarily obtain accreditation. For example, the standards include "essential" requirements, such as inmate receiving screening, and "important" requirements, such as pregnancy counseling for female inmates. While the standards recommend at least 1 full-time equivalent (FTE) physician in jails with an average daily population of 500 or greater, they also state that the staffing level at a facility depends on a range of factors, including the type and scope of the medical services being offered.

26

- The current contract maintains levels of medical service and staffing that were already in place at the D.C. Jail, but possibilities exist to reduce future contract costs. The current contract can be modified at any time. In addition, it can be recompeted at its current or scaled-back levels of service and staffing when its first year ends. The solicitation that resulted in the current contract did not preclude offerors from submitting proposals that would reduce staffing and costs over the existing levels, as long as quality health care services would be provided. The solicitation encouraged offerors to submit such "alternate" proposals for providing quality medical services differently or more economically than they were currently being provided. In addition, the Receiver decided, in consultation with District officials, to require offerors to submit "comparison" proposals that maintained the current levels of service and staffing at the jail. According to officials we spoke with, the District sought to maintain services at their current level in order to ensure that the Receivership is successfully terminated in August 2000 and control of the jail is returned to the District. Each of the three offerors submitted a comparison and an alternate proposal. The evaluation committee rated all of the proposals. The Receiver and the committee determined that none of the alternate proposals provided specific enough information to ensure that the alternative approach would maintain the same level of medical services as did the comparison proposals. Thus, the final recommendation of the committee was to endorse a comparison proposal.

- The Receiver employees that were awarded the contract were not subject to D.C. Personnel Regulations because they were not D.C. employees. According to these personnel regulations, a District employee can make an offer on a contract, but generally cannot be awarded one when still in District employment status. Separately, the D.C. Contract Appeals Board (CAB)—in a May 24, 2000, ruling on the protest of one of the losing offerors—stated that, while there was not proof sufficient to challenge the award, certain actions by the Receiver gave an appearance not conducive to confidence in the fairness of the procurement. CAB nevertheless denied the protest and, in June 2000, denied the protester's motion to reconsider.

## Background

In 1971, pretrial detainees at the D.C. Jail filed suit in U.S. District Court alleging that, in violation of their civil and constitutional rights,[1] they and others were denied minimally adequate medical care and treatment while in custody. In 1975, a group of post-trial inmates at the jail brought suit on

[1] See Campbell v. McGruder, C.A. No. 14-62-71 (D.D.C.).

27

similar grounds, and the cases were eventually consolidated.[3]  Between 1971 and 1994, the Court entered several remedial orders, including a detailed Initial Remedial Plan submitted to the court in 1994 by the Special Officer. In July 1995, the court determined that DOC was in continued noncompliance with the 1994 Remedial Plan and entered an order to remove control and operation of medical and mental health services at the D.C. Jail from DOC and place them in receivership under the Court's supervision.  The Receivership commenced in August 1995 and is set to expire in August 2000 unless the court finds cause to extend the appointment.

The court order appointing the Receiver required that the Receiver establish procedures and systems within DOC to ensure that compliance with court orders would be maintained after the receivership was terminated. In 1998, the Receiver decided to issue a solicitation to acquire the services of a private company in providing ongoing medical services at the D.C. Jail after the Receivership ends.

A five-member committee—consisting of the Court's Special Officer, two DOC representatives, and one representative each for the Corrections Trustee and the plaintiffs' counsel—evaluated the proposals.  The committee recommended to the Receiver that one of three firms that had submitted proposals be selected as the awardee. The Receiver independently evaluated all three proposals; concurred with the recommendation of the committee; and, as the contracting officer, made the decision to award the contract to that firm.

## D.C. Jail Medical Costs Higher than Other Jurisdictions, But Caution Needed in Interpreting Differences

We compared available reported budget and staffing data for the D.C. Jail with budget and staffing data for the Baltimore City Detention Center (BCDC) and the Prince George's County Correctional Center (PGCCC). According to information provided by the Corrections Trustee, these jurisdictions are said to be comparable to the D.C. Jail. This comparison serves as an illustration only, because, as discussed below, correctional medicine experts—including those retained by the Office of the Corrections Trustee—strongly caution against comparing costs across correctional systems.  It is important to note, however, that officials with whom we spoke and documents we reviewed during our review indicated that the D.C. Jail provides certain medical services not usually provided by other jurisdictions.

[3] See Inmates of D.C. Jail v. Jackson, C.A. No. 75-1668 (D.D.C.).

28

Statement
District of Columbia: Contracting for Medical Services at the D.C. Jail

Our comparison of information provided to us showed that the reported per capita costs at the D.C. Jail—at $20.56 per day—were higher than at BCDC ($8.66 per day) and at PGCCC ($5.48 per day). These cost differences reflected, among other things, differences in staffing levels and in the types of medical services offered by these jurisdictions. Specifically, in terms of staffing, the D.C. Jail contract has 125.2 FTE positions for an average population of 1,650 inmates,[1] while BCDC's has 44.04 FTE positions for an average population of 3,100 inmates, and PGCCC's has 26.2 FTE positions for an average population of 1,258 inmates. The Trustee reported that these staffing levels result in inmate-to-staff ratios of 13.4 to 1, 74 to 1, and 48 to 1 for the D.C. Jail, BCDC, and PGCCC facilities, respectively. In terms of the reported number of physicians, the D.C. Jail has 10.85 FTE physician positions, while BCDC has 2.3 FTE physician positions, and PGCCC has 1 FTE physician position.

In terms of medical services, we judgmentally identified and compared the broad level of mental health, dental, and pharmaceutical services offered at these jurisdictions. The D.C. Jail offers fully staffed, on-site mental health, dental, and pharmaceutical services. BCDC offers on-site mental health services, emergency dental services, and pharmaceutical services through a regional pharmacy that serves other jurisdictions. PGCCC offers access to mental health services but does not have an on-site facility; it also offers limited on-site dental services and pharmaceutical services through its own pharmacy located in another state.

Several officials we spoke with and documents we reviewed indicated that the D.C. Jail's current budget—and thus its relatively high per capita cost—reflects the level of medical services and staffing required by the 1994 court-ordered Remedial Plan, as amended by annual budgets submitted by the Receiver. The Remedial Plan is a detailed document developed by the Court's Special Officer in consultation with medical experts and the parties to the litigation. The Plan required the defendants to provide a wide range of medical services, such as mental health (including suicide prevention), dental, and pharmaceutical services. The Plan also established the policies, procedures, and staffing structure needed to accomplish its requirements. To provide the medical services, the Plan required an original staffing level of 152.4 FTE positions, including 16.5 FTE physician positions. The privatization contract reduced the number of positions to 125.2 FTEs. The Trustee, however, has

[1] The number of FTE positions is obtained by dividing the total number of hours worked by 2,080 hours (40 hours per week times 52 weeks per year). The source of the average population of inmates is from an analysis prepared by the Office of the Corrections Trustee.

29

indicated that the current levels of staffing and costs are above what is required to provide adequate medical services at the D.C. Jail.

Our review of information on correctional costs revealed that comparing cost data across jurisdictions could be highly problematic. Recent publications, including The Corrections Yearbook, published by the not-for-profit Criminal Justice Institute, caution that jail medical cost figures may not be easily comparable across jurisdictions. This is because jurisdictions may include (or exclude) the cost of different types of services in their medical cost figures. For example, some jurisdictions may include costs for mental health services and for inpatient hospitalization, while others may not. Also, they may or may not include items such as employee fringe benefits and renovations of medical services' space. Finally, there may be different ways of tabulating and reporting costs

## No Single Threshold Defines Acceptable Levels of Medical Service and Staffing

There is no single factor or specific threshold that delineates the point at which an acceptable level of medical care is achieved in a jail. According to correctional medicine experts—including two consultants retained by the Office of the Corrections Trustee—the acceptable level of service and staffing is a function of many factors, including the medical situation and circumstances to be addressed. It is also, according to the Office of Corrections Trustee, a function of the specific constraints and demands placed on the service delivery system at a particular location.

Regarding "constitutional" standards of medical care, pursuant to the Eighth Amendment, the government has an obligation to provide medical care to prisoners. The U.S. Supreme Court, in Estelle v. Gamble,[1] concluded that "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." The Estelle Court noted that negligence alone did not amount to a constitutional violation. However, such cases tend to arise in the negative, when deficiencies in a correctional operation, such as the failure to deliver services to a prisoner in a reasonable time, reflect an unconstitutional level of care in particular situations.

Accreditation standards developed by NCCHC for medical services at jails set the minimum recommended requirements to achieve voluntary

---

[1] 429 U.S. 97 (1976).

30

accreditation.[8]  The standards we reviewed include 33 "essential" requirements, such as inmate receiving screening, diet and exercise, and suicide prevention.  They also include 36 "important" requirements, such as hospital and specialized ambulatory care, and pregnancy counseling for female inmates.  In terms of staffing, the standards recommend that there be at least one FTE physician in jails with an average daily population of 500 or greater. However, the standards also state that the numbers and types of health care professionals required at a facility depend on a range of factors, including the type and scope of the medical services being offered.

The contract requires the D.C. Jail to be accredited by NCCHC or JCAHO within 12 months of the contract's inception.  BCDC and PGCCC are currently accredited by NCCHC, according to the Office of Corrections Trustee.

## Possibilities Exist to Reduce Future Contract Costs

The current contract maintains levels of medical service and staffing that were already in place at the D.C. Jail, but possibilities exist to reduce future contract costs. The contract includes a provision under which the contractor is to return on a quarterly basis any unused funding to the District. In addition, the contract can be modified at any time or recompeted at existing or scaled-back levels when the first year ends.

The solicitation to acquire medical services for the D.C. Jail did not preclude offerors from submitting proposals that would reduce staffing and costs over the existing levels, as long as quality health care services would be provided. The solicitation encouraged each offeror to submit an "alternate" proposal for providing quality health care services differently or more economically than that specified in the comparison proposal.  The solicitation indicated that the offerors should not feel constrained by the parameters of the comparison proposal, including the FTE levels and positions.  Accordingly, each of the three offerors submitted an alternate proposal.

The Receiver, in consultation with District officials, made it a requirement that each offeror also submit a "comparison" proposal that would maintain the existing staffing levels and positions for at least 1 year.  According to

---

[8] NCCHC is a not-for-profit accreditation association that includes the American Medical Association and the American Jail Association. There also exist other accreditation organizations, such as the American Correctional Association and the Joint Commission on Accreditation of Health Care Organizations (JCAHO). We focused on NCCHC's standards because, as noted in the text, the D.C. Jail contract requires the jail to be accredited by NCCHC or JCAHO, and we were only able to obtain the NCCHC standards within the time frame of this review.

31

the DOC Director and the Office of Corporation Counsel, they supported this decision because they felt that maintaining the existing service levels offered the best means for obtaining court approval to end the Receivership in August 2000 and return control of the Jail's medical facility to the District. The decision also sought to ensure that the quality of medical care would not decline and again result in litigation, according to District officials.

The evaluation committee initially rated all six of the proposals (three comparison and three alternate). The Receiver and committee concluded that none of the alternate proposals provided specific enough information to ensure that the alternate approaches would maintain the same level of medical services as did the comparison proposals. Accordingly, the alternate proposals were not evaluated by the committee in its final review of proposals. The committee recommended to the Receiver that he issue the contract to the top-rated company to implement its comparison proposal.

## Receiver Employees Were Not Subject to D.C. Personnel Regulations

The firm that was awarded the contract to provide medical and mental health services at the D.C. Jail was constituted of employees working for the Receiver, not for the District government. Under D.C. Personnel Regulations, a District employee may not be a party to a contract with the District government unless a written determination has been made by the head of the procuring agency that there is a compelling reason for contracting with the employee. A District employee can make an offer on a contract, but generally cannot be awarded the contract while still in D.C. employment status. In this case, however, the winning firm was made up of employees of the Receiver rather than the District government, and they were awarded a contract with the Receiver. Therefore, the personnel regulation did not apply in this context.

We would note that the D.C. Contract Appeals Board (CAB) ruled in May 2000 on a protest by a losing offeror in this procurement. The protester asserted, among other things, that the Receiver showed bias in favor of the company (the awardee) formed by the incumbent Medical Director. The protestor did not specifically raise the issue of the employees' failure to resign prior to the award. CAB denied the protest, finding that there was not proof of bias sufficient to challenge the award. However, CAB noted that certain of the Receiver's actions gave an appearance not conducive to confidence in the fairness of this procurement.

32

**Statement**
District of Columbia: Contracting for Medical Services at the D.C. Jail

## Contacts and Acknowledgements

For further information regarding this statement, please contact Laurie E. Ekstrand or Evi L. Reznovic on (202) 512-8777. Individuals making key contributions to this statement included Seto J. Bagdoyan, John Brosnan, Niambi Carter, Carole Hirsch, Jan B. Montgomery, and Kristen Plungas.

33

Mr. DAVIS. Dr. Shansky.

Dr. SHANSKY. I, too, would like to indicate I appreciate the opportunity to appear before you, and I will try to be brief. I have submitted my written statement to you, as you indicated.

At the time the receivership was created, I was contacted, and only after several phone calls reluctantly agreed to accept the responsibility. One of the reasons I agreed was that the District wanted me to assume that responsibility.

When I took over in September 1995, the jail was a very chaotic place. In fact, it was in some ways very frightening, not just to me but to the medical staff and to the officer staff, especially, and to the inmates. Numerous officers came to me indicating that they were concerned that if they got injured or something happened there would be no response.

As a result of my concerns and my overwhelming sense of responsibility, I chose to stay in the jail. I took a cell and I stayed there in order to make sure that nobody died.

Over the course of the next couple years, slowly but surely we were able to recruit a staff that was able to provide services consistent with my mandate, which was the previous court orders.

The entire process that I have been involved in has been a collaborative one with the District. This has not been a receivership that has in any way forced anything down the throat of the District. Quite the opposite. The District wanted me to assume this responsibility. I took it. I never felt this was my program or the court's program, it's the District's program. I am a temporary housekeeper trying to put things in order.

The District indicated to me that it wanted to maintain services after I departed through a procurement process with a contractor. I agreed to do a procurement and drafted an RFP in complete collaboration with corporation counsel's office, the Department of Corrections, plaintiffs, special officers, and with input from the trustee's office. In fact, this RFP was about 6 months in the drafting, with comments included in it from probably a total of 10 or 12 different individuals, most of whom were lawyers.

The procurement selection process we were very careful about. We wanted to make sure that the evaluation was a fair and objective one. As a result, a committee was put together completely independent of me. I had no say on who sat on that committee. I had no say in who they selected to assist them in their evaluation process. My only suggestion was that that committee, when it was created, have a majority of District Department of Corrections appointed people.

The committee met. The RFP—the proposals were evaluated, and ultimately a not-for-profit group created by employees was selected. I did my own evaluation and I concurred. This was the lowest bidder. For many reasons we thought that this would guarantee the best value for the dollars spent.

With regard to is the District getting its bang for its buck, which is a very legitimate question, the process is set up, first of all, so that, literally beginning now, the District can begin negotiating with the vendor on a second year, and if it chooses to reduce some services, eliminate some services, change how it wants the services staffed, it is able to do that.

34

With a not-for-profit vendor, the unexpended moneys will be returned to the District, just as I returned them over the previous 5 years. We have always come in under budget, and I have every reason to believe that this contract will also come in under budget.

With regard to the issue of employees being able to submit a proposal, that somehow it is unfair, every procurement that I am familiar with, once you are in the second round of procurements, has an incumbent, and that incumbent is never excluded from participating because they currently have the contract. That's not the way contracting is done.

This group, because it was a first time for them, was at certain disadvantages in terms of their skills at writing proposals, etc. The particular group that was selected partnered with an experienced for-profit company to handle fiscal management. I believe that the District and I believe the Department of Corrections believes that the District has gotten the best value it could out of its procurement process, and I look forward to the termination of my receivership, hopefully within the next 60 days, so I can get on to other things in my life, but also so that the District can then assume direct responsibility and make whatever modifications, changes it wishes to based on changes in disease, based on changes in responsibilities.

For instance, the sentenced felons are supposed to be going to the Bureau of Prisons. When that happens one of the two mental health units will be able to close down and there will be a substantial savings of at least a half a million to $1 million. All of that is in process. When all of the prison inmates are ultimately sent to the Bureau of Prisons, there may be additional changes just based on that reality. So I have no doubt in my mind that over the next several years the budget and per capita costs of this particular contract are going to diminish significantly.

I thank you for your time.

Mr. DAVIS. Thank you very much.

[The prepared statement of Dr. Shansky follows:]

35

RONALD SHANSKY, M.D.
RECEIVER FOR MEDICAL AND MENTAL HEALTH SERVICES
FOR THE UNITED STATES DISTRICT COURT
CENTRAL DETENTION FACILITY
1901 D STREET, S.E.
WASHINGTON, D.C.   20003
(202) 673-8003

June 27, 2000

Honorable Tom Davis
Chairman, D.C. Subcommittee of the
 Committee on Government Reform
2157 Rayburn House Office Building
Washington, DC  20515-6143

Dear Congressman Davis:

In response to your letter of June 12, 2000, I am writing to address each of the issues that you have raised.

**1. *Briefly compare the type and quality of care provided at the Jail before and after the Receiver's administration began.***

As you may be aware, in January 1995, approximately 23 years into the *Campbell v. McGruder* litigation, after a series of very critical findings, a remedial plan was ordered to correct deficiencies in services. These deficiencies related to mental health care, medical care, intake processing, etc.  The remedial plan was drafted by the Special Officer after extensive consultation with medical staff from the Department of Corrections and experts provided by the Special Officer of the court.  After approximately 4-5 months, the Special Officer had her experts reassess the program, and they identified little or no progress having been made in the areas of concern.  Not long thereafter, in June 1995, a terminally ill patient entered the D.C. Jail and was placed in a cell without his dire medical problems having been identified.  Over the course of six or seven days, he apparently starved to death, and this incident reached the public's attention.  Within a month after that event, Judge William B. Bryant, who had been involved in this case since the beginning, ordered the creation of a receivership.  The parties agreed that I was their choice to assume that task.  Quite reluctantly, and after a great deal of convincing, I agreed to accept the responsibility.  I began my work at the jail the first week of September 1995.

At the time I started, the medical program was in total disarray.  The intake process was so defective that approximately half of the 1700 inmates housed in the jail had either had no intake process or an incomplete intake evaluation.  The sick call program in which the medical program responded to inmates' requests for health service was non-functional.  The dental program was non-functional.  The emergency response system was non-functional.  The jail had no money to purchase supplies, medications, or equipment.  I was informed by officers on a daily

36

basis that they had real concerns for their own safety in that if they would get injured, they felt the medical program was completely unresponsive.

Many medical positions at the jail were unfilled. Those that were filled were filled either by people detailed to the jail from other assignments against their will, or by people hired through an agency; frequently different people would show up to work every day of the week. I had my own cell with a bed at the jail, and felt the need to stay there because there were so many emergencies taking place and I had so few people I could depend on. The court records, prior to the receivership, document an unprecedented epidemic of successful suicides, a TB epidemic, the lack of follow-up on numerous common problems, and a program that was essentially unresponsive.

The responsibility I accepted was a very clearly defined one. It was my mandate to implement the remedial plan approved by the Court, and to ensure that policies and procedures and staffing as dictated in the remedial plan were in fact implemented.

In order to accomplish my mandate, I had to work closely with the parties, especially the Defendants, that is, the Director of Corrections and the Warden of the facility, along with the Special Officer and Plaintiffs' counsel. After lengthy negotiations, an order was issued in September 1995 that laid the ground rules by which I would carry out my mandate. The agreement was that I would attempt to work through the D.C. Government machinery with the assistance of a liaison appointed by the Department of Corrections. After working closely with the liaison for a number of months, she informed me and the parties that the D.C. Government machinery was not able to respond with regard to personnel, procurement, and contracting issues within the time frames that were required. It was on this basis that the parties agreed that we would develop a budget and I would begin to directly provide for personnel, contracts, and commodities.

Over the course of the next few years, I was gradually able to put in place a team of professionals and a set of policies and procedures which enabled us to comply with the court mandates and to create a program which was consistent with the Department's expectations. Since the beginning of my receivership, according to the prior court orders, my program has been reviewed by the Department of Consumer and Regulatory Affairs (now the Department of Health) at least three times per year. I would like to take this opportunity to describe some of our accomplishments.

1. Our program is able to complete an intake evaluation on all inmates who enter the jail prior to the time that they are assigned to a cell.

2. We have implemented a TB control program, including both skin testing and chest x-ray, which has resulted in not only an elimination of the past TB epidemic at the jail, but contributed to the decrease in TB rates throughout the District of Columbia.

3. We have put together a mental health program which has not only diminished the number of individuals transferred to St. Elizabeth's Hospital, but has reduced the suicide experience from one every other month to no suicides in more than 21 months.

2

37

4. We have developed an HIV program that allows us to not only diagnose and treat HIV disease, but facilitates the follow-up treatment of these patients after their release.

5. We have implemented a dental program which not only has eliminated the numerous grievances about dental services, but has resulted in dental education and preventive services education for the inmates.

6. We have implemented an automated information system, utilizing U.S. Marshall Services grant monies, that will allow us to transfer data to the Federal Bureau of Prisons electronically as needed as inmates are sent from the D.C. system to the Federal Bureau of Prisons.

7. We have implemented a health education program dealing with issues such as chronic diseases, HIV, sexually transmitted diseases, and handgun violence. We believe the program is making some contribution to the reduction of these problems in the District.

8. We have implemented a quality improvement program that has monitored each of our services and redesigned them as needed in response to identified problems.

9. In conjunction with the Department, we have funded a physician and nurse at D.C. General who are in control of the corrections patients admitted to that hospital. This has greatly reduced the total number of bed days at the hospital, and decreased costs for the Department not just for D.C. Jail inmates but also for inmates from Lorton and the Correctional Treatment Facility.

10. We have worked with the Centers for Disease Control to implement new sexually transmitted disease screening programs that allow for earlier identification and treatment of those individuals who enter with sexually transmitted diseases.

11. We have implemented with the support of the local substance abuse agency a substance abuse treatment program for females and are in the process of implementing a similar program for males.

12. We are in the process of physical renovation of the medical unit to conform with Department of Health requirements and upgrade the unit's ability to provide services.

**2.  *In what significant ways is the health of the D.C. Jail inmate population similar to that of jail populations nationally, and in what ways does it differ?***

The jail population in the District of Columbia is overwhelmingly poor, which is similar to other jail populations. It is also overwhelmingly African American, approximately 97%. The ways in which it differs somewhat is in the incidence of various diseases. The last sero-prevalence HIV study revealed that HIV sero-prevalence was approximately 9%. The average sero-prevalence in jails across the country is probably between 1 and 2%. The District of

3

38

Columbia has one of the highest TB rates in the country and therefore TB is a much bigger problem among jail inmates. In addition, there is a high incidence of chronic illnesses, higher than has been seen in other populations, including diabetes, hypertension, epilepsy, and asthma. Also, between 20-25% of the inmates have suffered prior gunshot wounds, some of which resulted in chronic disabilities.

When one takes into account the epidemiology of diseases within a population, one also has to look at the services available to that population. The District historically has had problems with both its community health center program and its community mental health center program. The incidence of mental illness in the D.C. Jail population approaches 20%, which is higher than is found in the average jail. In addition, the jail houses the only acute mental health unit for the entire jail and prison system. Thus, a larger percentage of the inmates in the D.C. Jail suffer from serious mental illness.

**3. *Are the D.C. Jail's medical and mental health costs comparable to those of corrections facilities of similar size offering the same services?***

The medical and mental health costs of the D.C. Jail are approximately 1-1/2 times the average cost of jails of comparable size, although it is very difficult to make comparisons because of differences in the incidence of diseases and in the services provided. As previously alluded to, the D.C. Jail houses two 80-bed mental health inpatient units which serve not just the jail but the 8,000 to 10,000 sentenced felons who are part of the D.C. Department of Corrections prison system. There is no other jail that I'm familiar with that has this type of mental health responsibility for prison inmates. Thus a combination of atypical epidemiology and service requirements results in higher costs when compared to "an average urban jail."

**4. *What is a constitutional level of care and what would be the minimum acceptable standard of services and staffing necessary in order to meet this level?***

A constitutional level of care as defined by the courts is one that provides the services that allow inmates with serious medical problems to have them adequately addressed. It is impossible to define a minimum acceptable staffing level because each facility has different logistical realities. Ultimately, the District and its Director of Corrections will decide what services they believe are necessary in order to meet the needs of this population. Both Directors of Corrections in the District of Columbia that I have worked with have indicated to me that they are aware of the problems in providing mental health and public health services in the District, and have taken that into consideration when they have described to me what type of services should be provided at the jail. They have both indicated to me that they appreciate the legal requirements with regard to what is minimally necessary; but they also view the District as having an opportunity through the jail medical program to address medical needs at the time of incarceration in order to prevent more costly complications or spread of disease once people are released. The current arrangement with a vendor to provide services will allow the District to negotiate with the vendor exactly what services the District believes are necessary, and that evolve over time, which is one of the reasons the District asked me to utilize a contracting strategy. As disease epidemiology changes with time, the Department of Corrections of the District of Columbia will be able to renegotiate staffing levels and services offered based on their assessment of what the needs are.

4

39

**5.  *What is the budget requirement of the Jail in order to provide a constitutional level of medical services?***

This question is very difficult to answer.  We believe that at this point the services are constitutional.  The question leads to speculation as to how much of a reduction would be possible in staffing and services without violating what is constitutionally mandated.  This is a matter that the Department of Corrections will address over time.

**6.  *Are the on-site and off-site staffing levels comparable to those in jails with similar inmate populations offering the same services?  Specifically, address why employees of the Receiver work off-site.  Also, address the number of physicians employed and the services they are performing compared to similar jurisdictions.  Is this a cost-effective arrangement?***

With regard to off-site services, we provide a physician and nurse at the D.C. General Hospital so that our physician can be totally in control of the care of inmates who are admitted to D.C. General from either the Jail, any of the Lorton prisons, or the Correctional Treatment Facility.  This has resulted in the Department now being able to control the length of stay of these patients and allows us to ensure that patients are returned to the appropriate facility in the most cost-effective time frame.  The decision to employ a physician and nurse at D.C. General was made by me jointly with the Department of Corrections.  We implemented this knowing that the D.C. General administration was changing to become a public benefits corporation and was beginning to bill the Department of Corrections for these off-site services.  Without our team controlling patient care at D.C. General, we had found that corrections patients seemed to stay long periods of time in the inpatient units under the supervision of a variety of residents who in general did not view their corrections patients as their main focus.  We believe that the current approach is an extremely cost-effective strategy for the District because it allows the Jail to avoid unnecessary in-patient days; however, it is something that the District may want to reconsider when the prison population is no longer its responsibility.

With regard to the staffing level of physicians at the jail, we have since the beginning attempted to recruit a mix of physicians and physician assistants or nurse practitioners to provide primary care, chronic care, and urgent care services.  We have had extreme difficulty recruiting both physician assistants and nurse practitioners.  Even when we've been successful in recruiting physician assistants, we have identified problems with their practice which at times has resulted in us having to make personnel changes.  The mix of physician and physician extender staffing is in a constant state of revision.  When we are able to identify qualified and competent physician extenders, we tend to substitute them where possible for physician staffing.  I believe this is a dynamic and ongoing process which will continue as the vendor continues to recruit for these positions.

**7.  *Does the phrasing of the Request for Proposal (RFP) issued by the Receiver ensure that the city will continue to incur high medical costs and maintain high staffing levels at the Jail?  Specifically, address the request for "comparative" proposals.***

The phrasing of the RFP, which included a requirement for a comparison and an alternate proposal, meant that the city would have an opportunity to evaluate all the vendors on one basis in which they were all submitting the same type of program, and on another basis in which they

40

would present areas that they felt they could do differently or better. None of the alternate proposals from the vendors provided the type of responses with justifications that would have enabled the Evaluation Committee to support the particular alternate proposals. The current arrangement in no way requires the City to incur on an ongoing basis costs that it does not feel are appropriate. The contract is awarded for one year; in fact, the contract will expire in early March of next year. Prior to that, the City can and, I am certain, will negotiate with the vendor any changes in the configuration of staffing and services it feels would be more appropriate. Thus once the contract is assigned to the District, its leadership will have a large amount of flexibility to design and tailor a program that specifically meet its needs and at the same time satisfies constitutional requirements.

**8. *Briefly address the process for choosing the proposal. What factors were considered in awarding the contract? Who made the decision?***

The parties to the litigation met early on in order to develop a process for handling this particular procurement. My input was only to recommend that when an evaluation committee was created, the District should have a majority of the participants selected. The parties ultimately agreed to create a committee in which the Department was given three votes. Plaintiffs were given one vote, and the Special Officer of the court, one vote. This particular decision was done independent of myself, and the individuals who actually were appointed by each of the parties were appointed independent of any input from me. The Director of Corrections chose on his own to give one of his votes to the Corrections Trustee. The factors that were considered in selecting the successful offeror included the proposal that provided the best value for the dollars, the lowest cost proposal, the best leadership team submitted, the proposal most responsive to the RFP, the best quality improvement program, the best proposal regarding automated information systems, and finally, the best references. Each of these categories was weighted, and the Committee reviewed both a comparison proposal from each of the three offerors as well as an alternate proposal from each of the three offerors. The Committee scored all of the proposals and then made a recommendation based on a total of the scores. Independent of the Committee's evaluation and recommendation, I performed my own evaluation utilizing the same criteria. I had indicated that if my conclusion was different than the Committee's, I would have to have overwhelming justification for rejecting the Committee's recommendation. In fact, both the five-person Committee and myself were in concurrence with regard to the best proposal. The process was thorough, objective, fair, and from what I understand, included very serious and intense deliberations by the members of the Committee. I did not participate in any of the Committee's deliberations. After receiving the Committee's recommendation and performing my own evaluation, I made the final decision to select the offeror that had been recommended.

**9. *The Receiver's employees were awarded the contract despite the fact that they did not resign from their positions in the Receiver's office prior to submitting their proposal, and they have no experience administering a contract like this. Does this present a conflict of interest?***

In discussions with the District, both the District of Columbia and myself as well as other parties to the litigation felt that it was important to have as open a competitive process as possible. I did not feel nor did the District feel that it would be fair to exclude any offeror from the process. Each of the proposals—not just the one selected—included current Jail employees in

6

41

key leadership positions. To have required them to resign prior to submission of a proposal would have meant (since they could not have provided services at the jail), they would have had to make a choice to either submit a proposal, in which case I would have been left with large vacancies in my leadership team, or not submit a proposal and not be afforded the opportunity to compete. I did not feel that such a requirement would be fair. More importantly, such an exclusion either would have disqualified all the offerors or forced them to make less-attractive proposals.

With regard to the offer ultimately chosen, since there was going to be a completely independent Evaluation Committee making a recommendation to me, I did not feel that a proposal generated by a not-for-profit company created by employees who had contracts with me resulted in a conflict of interest. As to this group's experience administering the contract, all of the leadership people have had many years of experience running medical programs in correctional facilities with regard to medical director experience, administrator experience, mental health director experience, and nursing director experience. It is true that they did not have fiscal administrative experience, and they realized this and made a decision to subcontract for those responsibilities with a for-profit corporation called Addus Correctional Health Care. This particular company has contracts to provide medical services in several facilities. The Committee that evaluated the proposals concluded that this arrangement of a not-for-profit group led by highly qualified individuals with a great deal of program experience partnered with a for-profit company that had a great deal of fiscal experience was a viable combination. The committee and I also concluded that that proposal provided to the District the best value for the dollars proffered.

***

In summary, when I accepted the appointment from Judge Bryant, the jail medical program was in a state of total disarray. My responsibilities included bringing the jail medical program into compliance with prior court orders and designing a process by which the District could ultimately assume control and maintain the progress that had been accomplished. I believed from day one that, even though I was responsible for this program, it was not "my" program, nor was it the court's program, but it was, is and always will be the District's program. On that basis I have worked collaboratively with the Directors of Corrections and Corporation Counsel's office as well as the Special Officer of the court and Plaintiffs' counsel. It is through this collaborative process of ongoing discussions, ongoing refinements of the program, and ongoing changes, that over the course of the previous years we have been able to continually reduce the budget expenditures while in addition returning monies to the District that were unspent each year. The District has had a great say, in fact the major say, in determining precisely what services would or would not be provided. Once the contract is assigned to the District, it can begin the process of negotiating a second year contract with this vendor and reshape the program to the design specifications it prefers for the next year. This contract being with the lowest-cost vendor, a not for profit company, additionally will allow the District to incur savings of unspent monies in a variety of categories including commodities, personnel, etc. Thus I have every expectation that there will be monies returned again this year short of the total bottom line expenditure which is allowed under this contract.

42

Finally, the program as designed is in an excellent position to work cooperatively with the Federal Bureau of Prisons in providing health information on all those inmates who are going to be transferred from the District of Columbia to the Federal Bureau of Prisons. The leadership of the D.C. Jail medical program has already had discussions with the medical leadership of the Federal Bureau of Prisons. I believe the District can be proud of the medical program that provides services to its residents who are housed in the D.C. Jail. I believe the mechanisms are in place for the quality that has been achieved to be sustained for the foreseeable future under the leadership of the Washington, D.C. Department of Corrections.

Sincerely,

Ronald Shansky, M.D.
Receiver

8

43

Mr. DAVIS. Ms. Schneider.

Ms. SCHNEIDER. Mr. Chairman, Ranking Member Norton, and other Members, my name is Karen Schneider. I hold the position of the special officer, which is the special master, as that term is used in Federal rule of civil procedure 53. Judge William Bryant of the U.S. district court for the District of Columbia appointed my predecessor, Grace Lopes, to the position of special officer in 1993 for the purpose of assisting the court in the consolidated action captioned *Campbell* v. *McGruder* and *Inmates of D.C. Jail* v. *Jackson.*

In *Campbell,* Judge Bryant had issued orders governing conditions and practices of confinement and care at the District of Columbia Jail. I was substituted as special officer in November 1997.

Judge Bryant's order appointing a special officer in *Campbell* found that the District of Columbia had a long history of noncompliance with court orders regarding medical and mental health care at the D.C. jail, and that a special officer was necessary in order to assist the court to assure future compliance.

I ask that Judge Bryant's order appointing a special officer be made part of the record. The responsibilities, powers, and limitations of the special officer in *Campbell* are detailed in this order. The special officer is a judicial officer whose principal responsibilities are to monitor and facilitate the District of Columbia's compliance with the remedial orders of the court and to report and make recommendations to the court regarding compliance.

The order authorizes the special officer to informally confer with the parties on compliance issues and to attempt to fashion compromises among the parties, much as a judge might seek to mediate or settle disputes among parties.

The order authorizes the special officer to conduct hearings and to submit proposed findings of fact and recommendations to the court.

Following her appointment in April 1993, the special officer, with the assistance of experts, evaluated the medical and mental health services at the D.C. jail, and in September 1993, issued a report regarding the compliance of those services with the court's earlier orders. In March 1994, the court, relying on the special officer's report, found the District in contempt. In January 1995, the court ordered the District to implement a remedial plan.

On July 11, 1995, when the District continued in its state of noncompliance, the court ordered the appointment of a receiver to correct the deficiencies in the delivery of medical and mental health services at the jail. I ask that that order be made part of the record.

Mr. DAVIS. Without objection, that will be made a part of the record.

Ms. SCHNEIDER. The court's order detailed the history of the District's noncompliance and states that over the more than 20 years of this litigation the court has attempted all measures, short of the appointment of a receiver, to obtain the defendant's compliance with its orders. The court finds that no other less-intrusive remedial measures will succeed in compelling the defendants to satisfy their court-ordered obligations.

The July 11, 1995, order provides that the receivership shall expire 5 years from the date the receiver is appointed unless the

44

court finds good cause to extend the appointment. The court also reserved the discretion to terminate the receivership at an earlier date if the special officer certified that the defendants are in compliance with all the orders of the court concerning medical and mental health services at the jail, and that management structures are in place to assure that there is no foreseeable risk of non-compliance.

In August 1995, Judge Bryant appointed Ronald Shansky, and in September Judge Bryant entered a detailed order regarding the procedures for the receivership's exercise of power. I also ask that that order be included in the record. That order has governed the receivership over the last 5 years, and unless the receivership is extended by the court it will expire within 2 months of this hearing.

Since Dr. Shansky is a witness before this subcommittee, he is available to detail the specific activities in exercising the powers given by the court.

I understand that this subcommittee is interested in the contract awarded by the receiver to the Center for Correctional Health and Policy Studies for the provision of health care services at the D.C. jail.

My March 15, 2000, report to Judge Bryant regarding the receivership sets forth the process which led to the development of a request for proposal for that contract and the selection of the vendor for the award of that contract. I ask that that report be made part of the record.

I understand that the members of the subcommittee wish to ask me questions. I previously have informed the subcommittee that there are constraints on the comments I can make which are imposed by the Code of Judicial Conduct for U.S. Judges. That code very clearly states that it is applicable to special masters like me. Decisions of the U.S. court of Appeals for the District of Columbia circuit, the U.S. Supreme Court, and other courts also have determined that a special master is a judicial officer and that there are limits on what judicial officers can say about a pending case.

As I am sure this subcommittee knows, in most circumstances a judge would violate the ethical cannons of the Code of Conduct if she makes public comment about a case that is still pending before her. One of the reasons for that rule is that a judge's comments might suggest some pre-judgment or the appearance of pre-judgment of an issue that may later come before the judge for decision in the case.

Since the *Campbell* case is still pending and I may be called upon to address issues in that case in the future, I may not be at liberty to answer all of the questions that are addressed to me. My counsel has submitted a letter to the subcommittee staff in which he elaborates on the legal authority imposing those restrictions on me. I ask that the letter be made part of the record.

However, I will try, to the best of my ability, within those legal constraints, to be responsive and answer the subcommittee's questions.

Thank you.

Mr. DAVIS. Thank you very much.

[The prepared statement of Ms. Schneider follows:]

45

ZUCKERMAN, SPAEDER, GOLDSTEIN, TAYLOR & KOLKER, LLP.

ATTORNEYS AT LAW
1201 CONNECTICUT AVENUE, N.W.
WASHINGTON, D.C. 20036-2638
(202) 778-1800
TELECOPIER
(202) 822-8106
WWW.ZUCKERMAN.COM

BLAIR G. BROWN
(202) 778-1829
bgbrown@zuckerman.com

BALTIMORE, MD
MIAMI, FL
TAMPA, FL
NEW YORK, NY

June 30, 2000

**BY HAND**
Honorable Tom Davis
Chairman
District of Columbia Subcommittee
 of the Committee on Government Reform
U.S. House of Representatives
2157 Rayburn House Office Building
Washington, D.C.  20515

Re:    Hearing on the Medical Receiver for the D.C. Jail,
        D.C. Subcommittee (June 30, 2000)

Dear Congressman Davis:

Enclosed please find the corrected Statement of Karen Schneider, Special Officer Appointed by the U.S. District Court for the District of Columbia, at the above referenced hearing and the items which Ms. Schneider asked be included in the record.

Sincerely yours,

Blair G. Brown

Enclosures
cc:    Karen Schneider

46

**STATEMENT OF KAREN SCHNEIDER, SPECIAL OFFICER
APPOINTED BY THE U.S. DISTRICT COURT FOR THE DISTRICT OF COLUMBIA,
TO THE DISTRICT OF COLUMBIA SUBCOMMITTEE
OF THE HOUSE COMMITTEE ON GOVERNMENT REFORM**

**June 30, 2000**

Mr. Chairman, Ranking Member Norton, and other Members of the Subcommittee, my name is Karen Schneider. I hold the position of Special Officer, which is a special master as that term is used in Federal Rule of Civil Procedure 53. Judge William Bryant of the United States District Court for the District of Columbia appointed my predecessor Grace Lopes to the position of Special Officer in 1993 for the purpose of assisting the Court in the consolidated action captioned *Campbell v. McGruder* and *Inmates of D.C. Jail v. Jackson.* (I will refer to the action as *"Campbell")*. In *Campbell*, Judge Bryant has issued orders governing conditions and practices of confinement and care at the District of Columbia Jail. I was substituted as Special Officer in November 1997.

Judge Bryant's order appointing a Special Officer in *Campbell* found that the District of Columbia had a long history of noncompliance with the Court's orders regarding medical and mental health care at the D.C. Jail and that a Special Officer was necessary to assist the Court in assuring future compliance. I ask that Judge Bryant's order appointing a Special Officer be made a part of the record. The responsibilities, powers, and limitations of the Special Officer in *Campbell* are detailed in the order. The Special Officer is a judicial officer whose principal responsibilities are to monitor and facilitate the District of Columbia's compliance with the remedial orders of the Court and to report and make recommendations to the Court regarding compliance. The order authorizes the Special Officer to informally confer with the parties on compliance issues and to attempt to fashion compromises among the parties, much as a judge might seek to mediate or settle disputes among parties. The order also authorizes the Special Officer to conduct hearings and to submit proposed findings of fact and recommendations to the Court.

Following her appointment in April 1993, the Special Officer, with the assistance of experts, evaluated the medical and mental health services at the D.C. Jail, and in September 1993 issued a report regarding the compliance of those services with the Court's earlier orders. In March 1994, the Court, relying on the Special Officer's reports, found the District in contempt of the court based on non-compliance with the Court's orders and ordered the development of a remedial plan to achieve compliance. In January 1995, the Court ordered the District to implement the remedial plan.

On July 11, 1995, when the District continued its state of non-compliance, the Court ordered the appointment of a Receiver to correct the deficiencies in the delivery of medical and mental health services at the Jail. I ask that that order be made part of the record. The Court's order detailed the history of the District's noncompliance and stated that "[o]ver the more than 20 year history of this litigation the Court has attempted all measures short of the appointment of a receiver to obtain the defendants' compliance with its orders. The Court finds that no other less intrusive remedial measure will succeed in compelling the defendants to satisfy their court-

47

ordered obligations." The July 11, 1995, order provided that the receivership "shall expire five years from the date the receiver is appointed, unless the Court finds good cause to extend the appointment." The Court also reserved the discretion to terminate the receivership at an earlier date if "the Special Officer certifies that the defendants are in compliance with all orders of th[e] Court concerning medical and mental health services at the Jail and that management structures are in place to ensure that there is no foreseeable risk of future non-compliance."

In August 1995, Judge Bryant appointed Ronald M. Shansky, M.D. as Receiver, and in September 1995, Judge Bryant entered a detailed order regarding the procedures for the receivership's exercise of powers. I ask that that order be included in the record. That order has governed the receivership over the last five years, and unless the receivership is extended by the court, it will expire within two months of this hearing. Since Dr. Shansky is a witness before this Subcommittee, he is available to detail his specific activities in exercising the powers given him by the Court.

I understand that the Subcommittee is interested in the contract awarded by the Receiver to the Center for Correctional Health and Policy Studies for the provision of health care services at the D.C. Jail. My March 15, 2000, Report to Judge Bryant regarding the Receivership sets forth the process which led to the development of a Request for Proposal for that contract and the selection of the vendor for the award of that contract. I ask that that report be made part of the record.

I understand that members of the Subcommittee wish to ask me questions. I previously have informed the Subcommittee's staff that there are constraints on the comments I can make, which are imposed by the Code of Conduct for United States Judges. That Code very clearly states that it is applicable to special masters like me. Decisions of the United States Court of Appeals for the District of Columbia Circuit, the United States Supreme Court, and other courts also have determined that a special master is a judicial officer and that there are limits on what a judicial officer can say about a pending case. As I am sure the Subcommittee knows, in most circumstances, a judge would violate the ethical canons of the Code of Conduct if she made public comments about a case that is still pending before her. One of the reasons for that rule is that a judge's comments might suggest some prejudgment or the appearance of prejudgment of an issue that may later come before the judge for decision in the case. Since the *Campbell* case is still pending and I may be called upon to address issues in that case in the future, I am not at liberty to answer all questions that may be addressed to me. My counsel has submitted a letter to the staff of the Subcommittee in which he elaborates on the legal authority imposing those restrictions on me. I ask that that letter be made part of the record.

However, I will try, to the best of my ability within those legal constraints, to be responsive and answer the Subcommittee's questions.

48

**DOCUMENTS TO BE INCLUDED IN THE RECORD WITH THE
STATEMENT OF KAREN SCHNEIDER, SPECIAL OFFICER
APPOINTED BY THE U.S. DISTRICT COURT FOR THE DISTRICT OF COLUMBIA,
TO THE DISTRICT OF COLUMBIA SUBCOMMITTEE
OF THE HOUSE COMMITTEE ON GOVERNMENT REFORM**

**June 30, 2000**

A. Consent Order Modifying Appointment of Special Officer (Nov. 6, 1997), and Order Appointing Special Officer (April 20, 1993), Campbell v. McGruder, C.A. No. 1462-71 (D.D.C.) and Inmates of D.C. Jail v. Jackson, C.A. No. 75-1668 (D.D.C.) (hereinafter "Campbell").

B. Findings and Order Appointing Receiver (July 11, 1995) in Campbell.

C. Order Regarding Procedures For The Receiver To Exercise Powers (Sept. 26, 1995) in Campbell.

D. Special Officer's Report On The D.C. Jail Receivership For Medical and Mental Health Services (March 15, 2000) in Campbell.

E. Letter of Blair G. Brown, Counsel for Karen M. Schneider, to James Wilson, Chief Counsel, Committee on Government Reform, et al. (June 27, 2000).

49

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

LEONARD CAMPBELL, et al.,          )
                                   )
             Plaintiffs,           )
                                   )        Civil Action No. 1462-71
        v.                         )
                                   )
ANDERSON McGRUDER, et al.,         )        **FILED**
                                   )
             Defendants.           )        NOV - 6 1997
                                   )
INMATES OF D.C. JAIL, et al.,      )        Clerk, U.S. District Court
                                   )        District of Columbia
             Plaintiffs,           )
                                   )
        v.                         )        Civil Action No. 75-1668
                                   )        (Cases consolidated before
DELBERT C. JACKSON, et al.,        )         Judge William B. Bryant)
                                   )
             Defendants.           )

CONSENT ORDER MODIFYING APPOINTMENT OF SPECIAL OFFICER

        On consideration of the request of Grace M. Lopes to
be relieved of most of her responsibilities, the parties'
Joint Motion for Entry of Consent Orders Modifying Appointment
of Special Officer, the entire record, and the agreement of
the parties, it is

        ORDERED that, effective November 1, 1997, the
Court's Order Appointing Special Officer of April 20, 1993, is
modified to provide that the duties previously assigned to
Grace M. Lopes are assigned to Karen M. Schneider.  The
foregoing Order otherwise shall continue in full force and
effect.  Ms. Schneider is authorized to consult with and seek

50

assistance from Ms. Lopes with regard to any matter within the
scope of the Special Officer's duties.

        IT IS SO ORDERED.

                            *William B. Bryant*
                          William B. Bryant
                       United States District Judge

        Dated: *November 5, 1997*

- 2 -

51

Copies to:

Jonathan Smith, Esq.
D.C. Prisoners' Legal Services Project, Inc.
1400 - 20th Street, N.W.
Suite 117
Washington, D.C.  20036

Richard S. Love, Esq.
Office of the Corporation Counsel
Sixth Floor South
441 Fourth Street, N.W.
Washington, D.C. 20001

Grace M. Lopes, Esq.
Karen M. Schneider, Esq.
1130 17th Street, N.W.
Suite 400
Washington, D.C. 20036

J. Patrick Hickey, Esq.
Shaw, Pittman, Potts & Trowbridge
2300 N Street, N.W.
Washington, D.C.  20037

52



FILED

APR 2 0 1993

CLERK, U.S. DISTRICT COURT,
DISTRICT OF COLUMBIA

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LEONARD CAMPBELL, <u>et al.</u>,<br><br>        Plaintiffs,<br><br>        v.<br><br>ANDERSON McGRUDER, <u>et al.</u>,<br><br>        Defendants. | Civil Action No. 1462-71<br>(WBB) |
| INMATES OF D.C. JAIL, <u>et al.</u>,<br><br>        Plaintiffs,<br><br>        v.<br><br>DELBERT C. JACKSON, <u>et al.</u>,<br><br>        Defendants. | Civil Action No. 75-1668<br>(WBB) |

<u>ORDER APPOINTING SPECIAL OFFICER</u>

Hearings were held in these consolidated cases on April 6,
April 8, and April 13, 1993 in response to plaintiffs' Motion for
an Order to Show Cause Why Defendants Should not be Held in Con-
tempt of Court.  Based on the documents and deposition testimony
received into evidence, the admissions contained in defendants'
Memorandum in Opposition to Plaintiffs' Motion and in the Decla-
rations of William Hall, M.D., Robert Morin, Psy.D. and Carolyn
Groom, the arguments of counsel and the record as a whole, this
Court finds that the plaintiffs have established by clear and

53

convincing evidence that the defendants were, until recently, in
substantial non-compliance with the June 9, 1980 and
August 22, 1985 Orders and that the defendants failed to comply
with portions of the March 5, 1993 Order.

The Court finds that, among other things, the defendants
have:

(1) failed to employ a full-time clinical
psychologist on the mental health units
at the Jail from January 1991 through
April 5, 1993, although required to do
so under the 1985 Order;

(2) failed to implement procedures to ensure
that only correctional officers with
specialized training in psychiatric care
procedures worked on the mental health
units, in contravention of the 1980
Order;

(3) dramatically reduced by one-third the
hours of the mental health program on
the mental health units in August 1990,
in contravention of the 1985 Order;

(4) employed less than the fifteen required
forensic psychiatric technicians (also
known as mental health technicians) on
the mental health units on several occa-
sions over the last two years, including
the period from July 11, 1992 through
April 15, 1993, in contravention of the
1985 Order;

(5) employed only two psychiatric nurses on
the mental health units at the Jail,
rather than the three required, for a
period of almost five months in 1992, in
contravention of the 1985 Order;

(6) failed to provide sick call services to
each housing unit each weekday from mid-
December 1992 to mid-March 1993, in con-
travention of the 1985 Order;

-2-

54

(7)  failed for a significant period of time
     to provide a full-time, on-site health
     administrator at the Jail, even though
     required to do so under the 1985 Order;

(8)  failed to establish and implement a for-
     mal, functioning quality assurance pro-
     gram, in contravention of the 1985
     Order; and

(9)  discontinued chronic disease clinics
     until ordered by the Court to reinstate
     such clinics, even though the clinics
     were required to be maintained under the
     1985 Order.

There appear to be serious deficiencies in medical and men-
tal health care at the Jail associated with these violations.
Indeed, thirteen years after defendants offered their initial
plan for improving mental health services at the Jail, inmates on
the mental health units appear to receive very little, if any,
treatment for their illness beyond the prescription of psychiat-
ric medication.  See Declaration of Robert Morin, Psy.D. dated
April 7, 1993.

Significantly, the Court finds that defendants concealed the
above-referenced violations of the 1985 Order from the Court by
not reporting them within 48 hours of their occurrence, as
expressly required, and by not reporting them in the bi-weekly
reports to the Court which defendants continued to file.  The
reporting requirement was developed precisely to inform plain-
tiffs and the Court of instances of non-compliance.  The failure
to report in the required manner has unnecessarily prolonged the
discovery and proceedings in this case, and has hampered

55

plaintiffs' ability to seek to enforce the orders of this Court, to the detriment of the plaintiff class.

The Court also finds that the defendants initially failed to provide the certification expressly required by this Court's March 5, 1993 Order regarding the length and extent of any non-compliance with the 1980 Order, the 1985 Mental Health Plan and the recommendations of the medical experts.  This failure to file the required certification demonstrates, once again, how difficult it is for even this Court to obtain from the defendants reliable information necessary to monitor compliance with its orders.  In this regard, the Court also finds that the defendants failed to produce in a timely manner numerous documents requested in discovery which evidenced significant problems in the delivery of medical and mental health care at the Jail.  This was so even though many of these documents were clearly responsive to plain-tiffs' document requests and were ordered to be produced pursuant to this Court's August 7, 1992 discovery Order.

This is not the first time that this Court has found that the defendants have failed to comply with its orders.  See e.g., Campbell v. McGruder, 416 F. Supp. 106, 108-09 (D.D.C. 1975); Memorandum Opinion (September 30, 1983)(finding defendants in contempt of Court).  In light of the defendants' history of non-compliance, and given the complicated and factually intensive nature of the matters at issue, this Court determines that a

56

Special Officer is necessary to assist the Court in effecting future compliance with its orders. This step is not taken lightly, and is based on this Court's more than twenty years experience in this litigation. This Court also determines, based on the record presented, that the appointment of independent medical and mental health experts is necessary and appropriate.

Accordingly, it is by the Court this _20th_ day of April, 1993

ORDERED that the Court shall, pursuant to its inherent authority to enforce its orders and Rule 53(b) of the Federal Rules of Civil Procedure, appoint Grace M. Lopes as Special Master (hereinafter "Special Officer") to monitor and ensure defendants' compliance with the Court orders and Consent Decrees in these consolidated cases (hereinafter "Orders"); and it is

ORDERED that the defendants shall, pursuant to Rule 53, pay the reasonable fees and expenses incurred by the Special Officer in carrying out her assigned duties. The Special Officer shall be paid a fee of $85.00 per hour, plus expenses, unless otherwise ordered by the Court. She shall be available to perform her duties as the needs of the Court require; and it is

ORDERED that the duties of the Special Officer shall be to observe, monitor, submit proposed findings of fact, and make recommendations to the Court and to the parties concerning steps that should be taken to achieve compliance with the Orders of

-5-

57

this Court. The Special Officer should endeavor to assist the defendants in achieving compliance in whatever way possible, and should confer informally with the parties on matters affecting compliance with the Orders; and it is

ORDERED that the Special Officer shall assist the Court in monitoring defendants' compliance with the Orders by, among other things, reporting to the Court regularly, and no less than every ten months, concerning the state of defendants' compliance with the Orders of the Court; and it is

ORDERED that the Special Officer shall be granted access by the defendants to the D.C. Detention Facility and the records of the District of Columbia, to the extent necessary to permit the Special Officer to monitor and report fully on defendants' compliance with the Orders of this Court; and it is

ORDERED that the Special Officer shall have the power to require reports by the defendants concerning matters affecting compliance with Orders of this Court; and it is

ORDERED that the Special Officer shall have the power to conduct hearings, to require the attendance of witnesses and the production of documents, and to examine witnesses under oath. The expenses of any reporter hired to transcribe such hearings before the Special Officer shall be paid for by the District of Columbia; and it is

-6-

58

ORDERED that the Special Officer shall be authorized to employ such experts and consultants, including but not limited to medical and mental health experts, as are reasonably necessary to assist the Special Officer in monitoring and reporting on defendants' compliance with the Orders.  The Special Officer shall notify counsel for the parties at least two weeks in advance of her intention to employ an expert or consultant.  The plaintiffs and defendants shall have the opportunity to raise with the Special Officer any objection they may have to the employment of such an expert or consultant, and make alternative recommendations for who should be employed as the expert or consultant.  In the event of a continued disagreement between a party and the Special Officer concerning the employment of any expert or consultant, the party shall have the opportunity to file a motion with the Court to resolve the dispute.  In the event that a party does not file a motion within two weeks of receipt of a notice from the Special Officer of the intent to employ an expert or consultant, the Special Officer shall be deemed authorized to employ such expert or consultant.  The fees and expenses of any expert or consultant hired by the Special Officer pursuant to this paragraph shall be paid for by the District of Columbia, and any such expert or consultant shall be granted access to the D.C. Detention Facility and the records of the District of Columbia to the extent necessary to assist the Special Officer in monitoring defendants' compliance with the Orders of this Court; and it is

-7-

59

ORDERED that the Special Officer shall be authorized to employ an investigative assistant to assist the Special Officer in fact-finding and investigations concerning defendants' compliance.  The investigative assistant shall be granted access to the D.C. Detention Facility and the records of the District of Columbia to the extent necessary to assist the Special Officer in monitoring the compliance of defendants with the Orders of this Court.  The fees and expenses of the Special Officer's investigative assistant shall be paid for by the District of Columbia; and it is

ORDERED that the Special Officer, the investigative assistant, and any experts or consultants employed by the Special Officer shall have the right to conduct confidential interviews with officials and staff of the District of Columbia Department of Corrections.  The Special Officer shall be authorized to confer and to correspond with either plaintiffs or defendants on an ex parte basis; and it is

ORDERED that the Special Officer shall not be empowered to direct the defendants to take or refrain from taking any specific action to achieve compliance; and it is

ORDERED that the Special Officer shall promptly select medical and mental health experts to evaluate the medical and mental health services being provided at the Jail, including those areas of concern identified in plaintiffs' Memorandum in Support of

-8-

60

Motion for Order to Show Cause Why Defendants Should Not be Held in Contempt. The experts shall issue reports and make specific recommendations for the improvement of medical and mental health services, including recommended staffing levels, as soon as possible but in no event later than 60 days from the date of this Order; and it is

ORDERED that the defendants shall file a detailed written report to the Court within 15 days after the issuance of an expert report responding to each recommendation contained in the report, indicating whether the defendants intend to implement the recommendation and the timeframe for implementation, and, if the defendants object to implementation, the basis for their objection; and it is

ORDERED that the Special Officer shall, within 30 days after the expert reports are issued, submit a report to the Court evaluating the state of defendants' compliance with the Orders respecting medical and mental health care and setting forth any additional concerns that the Special Officer might deem appropriate to bring to the attention of the Court; and it is

ORDERED that effective April 26, 1993, the bi-weekly reports filed by the defendants with the Court shall be certified, in the manner set forth in 28 U.S.C. 1746, by an official (or officials) with personal knowledge and shall state, in addition to the information currently being provided, the following:

61

1.     The medical and mental health staff providing services at the Detention Facility during the two week period.  The reports shall indicate the number of full-time equivalent employees, by job title (certified and licensed physician assistants shall be so designated) and shift, who actually worked during the time period.  The defendants shall also state the number of over-time hours worked by individuals in each job category.

2.     Whether sick leave was available on all housing units each weekday, without limitation on the number of prisoners who could be seen on any particular unit.  The report shall list dates on which sick leave was not held on each housing unit, or on which sick leave was limited, and the housing unit or units which were effected.

3.     Whether a chronic disease clinic was maintained by an appropriate health care provider, the type of health care pro-vider or providers who delivered services at the clinic, and the number of inmates who attended the clinic in the reporting period.

4.     The number of correctional officers assigned to each mental health cellblock during the reporting period, whether each officer employed on the unit had received specialized training in mental health issues and, if not, the dates and shifts on which untrained officers were used.

-10-

62

    5.  The number of psychiatric screening clinics held at the Jail during the reporting period, the approximate length of each clinic and the number of inmates seen.

    6.  The number of the following during the reporting period:  deaths, suicides, positive PPD tests for tuberculosis infection, cases of active tuberculosis diagnosed and positive tests for HIV infection; and it is

    ORDERED that the parties shall negotiate in good faith and attempt to agree on a format for more detailed, certified, reporting to be used by the defendants in their reports to the Court, which shall include such information, in addition to that which is set forth above, as is necessary for the Court, the plaintiffs and the Special Officer to assess the defendants' compliance with Court Orders; and it is

    ORDERED that if the parties are unable to agree by May 15, 1993 on a format for future reporting, the parties shall submit proposed reporting forms to the Court, and the Court shall mandate the form of reporting; and it is

63

FURTHER ORDERED that the defendants may, at any time, move
to vacate the appointment of the Special Officer.

William B. Bryant
United States District Judge

64

Copies to:

David Flyer, Esq.
Assistant Corporation Counsel
Correctional Litigation Section
Government of the District of Columbia
Suite NLL-3
1923 Vermont Avenue, N.W.
Washington, D.C.  20001

J. Patrick Hickey, Esq.
Shaw, Pittman, Potts & Trowbridge
2300 N Street, N.W.
Washington, D.C.  20036

Jonathan M. Smith, Esq.
Executive Director
D.C. Prisoners' Legal Services
 Project, Inc.
1400 20th Street, N.W.
Suite 117
Washington, D.C.  20036

Edward I. Koren
National Prison Project of the
 American Civil Liberties Union
1875 Connecticut Avenue, N.W.
Suite 410
Washington, D.C.  20009

0222:089jhs.93

-13-

65



UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

LEONARD CAMPBELL, _et al._,        )
                                   )
            Plaintiffs,            )
                                   )
        v.                         )   C.A. No. 1462-71 (WBB)
                                   )
ANDERSON McGRUDER, _et al._,       )
                                   )
            Defendants.            )
                                   )
_____)
                                   )
INMATES OF D.C. JAIL, _et al._,    )
                                   )
            Plaintiffs,            )
                                   )
        v.                         )   C.A. No. 75-1668 (WBB)
                                   )
DELBERT JACKSON, _et al._,         )
                                   )
            Defendants.            )
_____)

**FILED**

JUL 11 1995

Clerk, U.S. District Court
District of Columbia

### FINDINGS AND ORDER APPOINTING RECEIVER

The Court, having considered the plaintiffs' Motion for the
Appointment of a Receiver, the defendants' opposition thereto,
the Special Officer's Report on Defendants' Compliance with the
Initial Remedial Plan and the November 9, 1993 Order ("Report"),
and the record in this case, the Court finds that the appointment
of a receiver to ensure the provision of medical and mental
health care, and to obtain compliance with the orders of this
Court, is appropriate and necessary.

Over the more than 20 year history of this litigation the
Court has attempted all measures short of the appointment of a
receiver to obtain the defendants' compliance with its orders.
The Court finds that no other less intrusive remedial measure

66

will succeed in compelling the defendants to satisfy their court-ordered obligations.

A brief history of this case reveals that the defendants have failed to take advantage of repeated opportunities to satisfy the requirements of the court's orders as far back as the 1979 mental health plan.

On August 22, 1985, the parties entered into a remedial Stipulation which required, _inter alia_:

> Within 30 days, the Plaintiffs and the Defendants shall each respectively appoint one medical expert whose reasonable costs and fees will be paid by defendants, to review the health services delivery system at the D.C. Jail and make recommendations for improvements in a report to be submitted to the Court and the parties by Nov[ember] 1, 1985 and implemented by March 1, 1986, unless good cause is shown by either party why they should not be.

Over the next eight years the defendants were in persistent non-compliance and on April 20, 1993, the Court appointed a Special Officer to monitor and report on the District's efforts to meet its court-ordered obligations.  Pursuant to the Court's Order, on September 15, 1993, the Special Officer issued the reports of her experts on medical and mental health services at the District of Columbia Jail.[1]  These reports describe very serious deficiencies in the delivery of basic services that violate this Court's prior orders and the defendants' obligations under the United States Constitution.

---

[1] Expert Reports on Medical and Mental Health Services at the District of Columbia Jail (September 15, 1993).

- 2 -

67

In response to the reports of the Special Officer's experts, on November 9, 1993, this Court granted the plaintiffs' motion for interim relief. The interim relief was designed to address the most serious problems identified in the delivery of medical and mental health services. The defendants have failed to implement material provisions of the November 9, 1993 Order, including the provisions that address measures to prevent the spread of tuberculosis, and the identification and treatment of prisoners at risk for suicide.[2]

On February 2, 1994, the Special Officer issued her own report on the District's Compliance. The Special Officer found significant problems with the delivery of health care that violated material provisions of this Court's orders. These violations include core provisions of Court orders designed to improve health care at the Jail. The Special Officer concluded:

> [T]he defendants have violated this Court's orders with impunity, including the Orders of March 5, 1993 and November 9, 1993 granting interim relief. Among other violations, they have failed to properly conduct sick call, failed to operate a chronic disease clinic, failed to implement a quality assurance program, failed to maintain a full-time health services administrator at the Jail, failed to properly conduct intake, failed to properly provide meaningful access to specialty services, failed to appropriately and professionally respond to life threatening emergencies, failed to properly

---

[2] In the nine months since the November 9, 1993 Order, six prisoners have committed suicide at the Jail. Based on the findings of the Special Officer's experts, many of these suicides would have been preventable had the procedures contemplated by the November 9, 1995 Order been implemented.

68

provide medical diets and failed to keep
their own kitchen and medical clinic clean.[3]

In response to the Special Officer's findings, on March 16, 1994, the defendants consented to a finding of contempt and to a consent order that required them to implement a remedial plan.[4] The defendants admitted, as they had previously, their ongoing violations of the Court's Orders and the need for significant corrective action to provide medical and mental health services which met the legal requirements od the United States Constitution and this Court's orders. The remedial plan was to be drafted by the Special Officer with input from the parties. Pursuant to the Order, the remedial plan was to contain a specific timetable to achieve compliance as well as a schedule of automatic fines for non-compliance.

---

[3]  Special Officer's Report at 124-125.

[4]  The March 16, 1994, Consent Order provided, <u>inter alia</u>:

> ORDERED that the Special Officer shall, within 120 days of this Order submit a plan to cure the defendants' contempt and that will insure that the defendants render medical and mental health care in a manner consistent with the United States Constitution, and it is further

> ORDERED that the Special Officer's remedial plan shall address all issues raised in her reports, the Expert Reports on Medical and Mental Health Services, as well as any additional issue that may come to the attention of the Special Officer or the Court that adversely impacts on the defendants' compliance with the Court's orders concerning the delivery of medical and mental health services at the Jail in a manner consistent with the United States Constitution.

- 4 -

69

On May 4, 1994, the Special Officer filed an Interim Remedial Plan that addressed the District's failure to properly isolate prisoners with infectious tuberculosis as was required by the Court's November 9, 1993 Order.[5]  The Special Officer also recommended that the District be fined up to $10,000 per day for any future violation and $1,000 for each future false report or failure to report.[6]

Following the Interim Plan on tuberculosis, an initial Remedial Plan[7] addressing the range of medical and mental health issues was drafted by the Special Officer.  The plan was prepared over a several month period and after lengthy discussions with the defendants about its contents and the time table for implementation.  The Initial Remedial Plan was filed with the Court on October 11, 1994.  According to the Special Officer, "substantial revisions were made in order to ensure that the defendants could meet the substantive requirements as well as the deadline requirements set forth [in the plan]."  Remedial Plan at 6.  After considering objections from the defendants, on January

---

[5]  The Special Officer's Interim Remedial Plan Regarding Isolation of Inmates with Suspected and Diagnosed Tuberculosis, May 4, 1994.

[6]  Id. at 13-14.  As is clear from the Special Officer's Report, the defendants have ignored the requirements of the plan and their responsibilities to prisoners, the public and staff. Even the threat of significant fines has not deterred these violations.

[7]  Given the seriousness of the deficiencies in the defendants' system to deliver medical and mental health care, the Special Officer concluded that the remedial process must be undertaken in phases.  [cite to initial remedial plan]

70

27, 1995, this Court ordered the defendants to implement the plan.

The defendants have failed to implement the Remedial Plan as ordered. They are in non-compliance with numerous material provisions of the plan and the Court finds that the defendants are in contempt of court. As are described in the Special Officer's report the defendants' non-compliance with the plan has resulted in significant harm to prisoners and places prisoners at unreasonable risk for injury.

On July 3, 1995, the Special Officer submitted a report describing the defendants' refusal to comply with the orders of this Court. The Special Officer found:

> Instead of improving [since the Court ordered the implementation of the remedial plan], the medical and mental health system has deteriorated. Among other serious deficiencies, there is an absence of medical leadership; a chronic shortage of life saving supplies, medication and equipment; and a failure to provide consistent access to sick call services. The defendants have not yet implemented an effective tuberculosis control program. They have failed to conduct timely tuberculosis screening, failed to provide appropriate treatment, and failed to properly isolate inmates with suspected and/or diagnosed tuberculosis. This substantial risk to the health of staff, inmates, and the community into which inmates are released is exacerbated by defendants' failure to practice basic infection control principles and to implement even a rudimentary housekeeping and preventive maintenance program.

Report at 2.

- 6 -

71

The evidence in the Special Officer's thoroughly documented report is extensive, persuasive and unchallenged by the defendants.

Therefore, it is this ___ day of _____, 1995

ORDERED that the plaintiffs' motion for the appointment of a receiver is granted; and it is further

ORDERED that the Court adopts the findings contained in the Special Officer's Report on Defendants' Compliance with the Initial Remedial Plan and the November 9, 1993 Order as its own; and it is further

ORDERED that a receiver will be appointed with responsibility to implement the Remedial Plan and other orders of this court relating to the delivery of medical and mental health services at the District of Columbia Jail; and it is further

ORDERED that the parties and the Special Officer shall confer regarding the selections of the receiver.  If the parties cannot agree within 30 days on the person to be appointed as a receiver, the parties and the Special Officer shall submit nominations to the Court and the Court will appoint the receiver; and it is further

ORDERED that the receiver shall have the following duties and responsibilities:

1.  To correct all deficiencies in the delivery of medical and mental health services at the Jail and to operate the program for the delivery of medical and mental health services in a

- 7 -

72

manner consistent with the orders of this Court and the Constitution of the United States.

2. To implement, in coordination with the Special Officer, the Remedial Plan in accordance with this Court's January 27 1995 Order.

3. To establish procedures and systems within the Department of Corrections in order to ensure that compliance with Court orders is maintained after the receivership has been terminated.

4. To work with the Special Officer and the parties to ensure compliance with all Court ordered obligations.

5. To report periodically to the Court, the Special Officer and the parties regarding the receiver's efforts and any obstacles encountered by the receiver to performing her or his responsibilities; and it is further

ORDERED that the receiver shall have the following powers:

1. All powers currently held by the Mayor, City Administrator, Director of the Department of Corrections, Assistant Director for Health Services and Chief Medical Officer regarding the delivery of medical and mental health services at the District of Columbia Jail.

2. The power to create, modify, abolish or transfer positions; to hire, terminate, promote, transfer, evaluate and set compensation for staff to the extent necessary to obtain compliance with this Court's orders, the cost of such activity to be borne by the defendants.

- 8 -

73

   3.  The power to procure such supplies, equipment or
services as are necessary to obtain compliance with this Court's
orders, the cost of such procurement to be borne by the
defendants.

   4.  The power to contract for such services as are necessary
to obtain compliance with this Court's orders, the cost of such
contracts to be borne by the defendants.

   5.  The power to hire such consultants, or to obtain such
technical assistance as he or she deems necessary to perform her
or his functions, the cost of such consultants or technical
assistance to be borne by the defendants.

   6.  The power to petition the Court for such additional
powers as are necessary to obtain compliance with this Court's
orders; and it is further

   ORDERED that within 30 days of the appointment of the
receiver, the receiver, after consultation with the Special
Officer and the parties, shall submit a plan to the Court that
contains the procedures for the receiver to exercise these
powers.  These procedures shall ensure that the receiver shall
not be unreasonably impeded in her or his work by District
procedures, regulations or laws.  If an agreement cannot be
reached regarding the exercise of these powers, the parties shall
submit suggested procedures to the Court; and it is further

   ORDERED that the District shall provide the receiver with
the following:

   1.  compensation at a rate to be determined by the Court;

- 9 -

74

   2.  an appropriate office, and such equipment and support staff as are deemed necessary by the receiver;

   3.  unrestricted access to all records of the Department of Corrections deemed necessary by the receiver to perform her or his duties; and

   4.  access to all areas of the Jail; and it is further

ORDERED that the defendants shall instruct all personnel that they are to cooperate with and assist the receiver in the performance of her or his duties, and it is further

ORDERED that this receivership shall expire five years from the date that the receiver is appointed, unless the Court finds good cause to extend the appointment.  The Court may terminate the receivership prior to the expiration of five years if the Special Officer certifies that the defendants are in compliance with all orders of this Court concerning medical and mental health services at the Jail and that management structures are in place to ensure that the there is no foreseeable risk of future non-compliance.

William B. Bryant
United States District
Judge

July 11, 1995

- 10 -

75

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**FILED**

**SEP 2 6 1995**

Clerk, U.S. District Court
District of Columbia

| | | |
|---|---|---|
| LEONARD CAMPBELL, _et al._, | : | |
| Plaintiffs. | : | |
| v. | : | Civil Action No. 1462-71 |
| ANDERSON MCGRUDER, _et al._, | : | (WBB) |
| Defendants. | : | |

| | | |
|---|---|---|
| INMATES OF D.C. JAIL, _et al._, | : | |
| Plaintiffs. | : | |
| v. | : | Civil Action No. 75-1668 |
| DELBERT JACKSON, _et al._, | : | (WBB) |
| Defendants. | : | |

<u>ORDER REGARDING PROCEDURES FOR THE RECEIVER TO EXERCISE POWERS</u>

This Order sets forth the procedures for the operation of the Receiver appointed pursuant to this Court's July 11, 1995, Order.

Upon consideration of procedures proposed by the Receiver, the consent of the parties[1] and the entire record herein, it is by the Court, this 26th day of September , 1995,

ORDERED: That the procedures set forth below shall govern the actions of the Receiver in performance of his duties in accordance with this Court's July 11, 1995 Order, and it is

---

[1]    Defendants have appealed from the order appointing a Receiver and that order is presently binding on the parties. By agreeing to the form of this order, defendants do not waive or otherwise qualify their objections to the order appointing and defining the powers of the Receiver.

76

FURTHER ORDERED: That defendants shall take the actions directed below to facilitate the Receiver's successful performance of his duties.

I.  Liaison

1.  Within five (5) business days of receipt of this Order, the District of Columbia shall, with the approval of the Receiver, designate an official to act as a liaison between the Receiver and other officials and offices in the District government regarding procurement and personnel matters.

2.  The liaison shall ensure that requested procurements, personnel actions and any other proposed actions are expedited through the Department of Administrative Services, the Office of Personnel, the Office of the City Administrator, the Department of Corrections and all other government agencies and offices.

3.  The liaison shall be of sufficient rank and authority to accomplish the tasks required.  The City Administrator shall issue a directive to all relevant personnel that all procurement and personnel actions initiated by, or at the request of, the Receiver must be expedited and completed within the time specified by the Receiver.  The City Administrator shall designate a staff member to assist the liaison in order to ensure compliance with the directive.

77

II.    <u>General Procedures</u>

1.    The Receiver shall notify the liaison in writing[1] of all proposed personnel and procurement actions and shall specify the date and/or time within which the action is intended to be accomplished.[2] Deadlines for completion shall be as reasonable as possible consistent with the Receiver's obligations.  The notice required for procurements exceeding $10,000 or requiring formal contract documents under D.C. law shall, except in unforseen emergencies, be a minimum of ten (10) business days , as specified in Part IV.

2.    The Receiver, with the assistance of the liaison and consistent with his obligations under the Court's orders, shall cooperate in efforts to accomplish all such actions that are necessary to deliver medical and mental health services at the Jail pursuant to and in compliance with applicable District of Columbia law.  In the event that the liaison notifies the Receiver that the action cannot be accomplished within the specified time frame, or the Receiver determines after appropriate inquiry that an action cannot be accomplished within the specified time frame, the

---

[1]    As the staff of Jail health services develop the capability, proposed procurement, personnel action, or other documents shall be prepared by the Jail health services staff in consultation with the liaison.

[2]    Subsequent to the establishment of a budget for the Office of the Receiver, as specified in Part V., procurements of goods and services, including personal services, for operation of the Receiver's Office, to be paid for from the Receiver's Office Fund referred to in Part VI, and that are consistent with the budget for operation of the Receiver's Office, need not be called to the attention of the parties, except through the accountings required under Part VI.

3

78

Receiver may, upon notice specified below, execute the personnel action, procurement or other action and such action shall be binding upon defendants.

3.    If the Receiver determines to execute the action, as specified in paragraph 2 above, he shall deliver written notice to the parties and the liaison five (5) business days in advance of the proposed action.    In emergency situations, as reasonably determined by the Receiver, the notice period may be shortened, but, except in an extraordinary emergency, shall be at least two full business days.    Notice shall be provided to defendants by physical delivery directly, or facsimile transmittal with verbal notice by telephone, to the liaison, or, if the liaison is unavailable, to defendants' designated counsel.    The parties may challenge any such action by filing written objections with the Court.    The pendency of an objection shall not, in itself, prevent the Receiver from completing the action.    Contracts for the procurement of goods or services executed under this paragraph shall contain a clause that provides that the term of the contract will expire if the court so orders.    In that event payment will be made only for services performed and goods received prior to the expiration of the contract.

III.    Personnel - Jail Health Services

1.    The Receiver shall exercise the full authority of the Mayor and subordinate officials, including the Director of the Department of Corrections, with respect to personnel employed by the District government to deliver medical and mental health

79

services at the Jail.

2.    The Receiver shall whenever possible cooperate with defendants' attempts to hire personnel for Jail Health Services through the District's personnel process, but ultimately shall have the sole discretion to determine whether a position required by court order to be in Jail Health Services shall be filled through the District's personnel process or through issuance of a personal services contract.    Procurements to provide personal services required to be performed by Department of Corrections employees as specified in court orders shall be done consistent with the General Provisions specified in Part II., and the budget for personal services for Jail Health Services described in Part V of this Order.

3.    The District of Columbia shall indemnify the Receiver and all staff hired by the Receiver on personal services contracts to fill positions specified by court orders to the same extent that it indemnifies employees of the District of Columbia government.

4.    Any District of Columbia employee that the Receiver deems to be unqualified or unsuitable for employment to provide medical or mental health services at the Jail shall be removed from duty pursuant to the General Provisions specified in Part II.    If the Receiver deems it necessary, he may prohibit such an employee from providing such services pending the removal.    Following removal of an employee from a position required by court order, the Receiver shall fill the position pursuant to the procedures set forth herein.    Any employee removed from duty pursuant to this paragraph

5

80

shall not return to duty in Jail Health services without the approval of the Receiver. The Department of Corrections shall retain responsibility for any discipline of such employees. The Receiver shall cooperate in the presentation of any disciplinary charges so long as such cooperation does not prevent him from discharging his responsibilities.

IV.     Procurement - Jail Health Services

1.   The Receiver may, consistent with the General Provisions in Part II, and the budget for Jail Health Services referred to in Part V., exercise the contracting authority of the Mayor and the Director of the Department of Corrections. Procurements, for both goods and services, may be paid with regular Department of Corrections funds maintained for such purposes or the funds deposited in the Operating Fund referred to in Part VI., whichever is determined by the Receiver to best facilitate timely procurement.

2.   Procurements that require formal contract documents, including, where applicable, sole source or emergency procurement justifications, shall be the subject of notification to the liaison, as specified in the General Provisions, Part II., at least ten (10) business days before the proposed procurement action.

3.   Because the Receiver has identified two physicians, to be retained on personal service contracts, whose services are critical to the delivery of medical and mental health care at the Jail, and it is imperative that those physicians begin work as soon as possible, the notification requirement of paragraph 2 above shall

81

not apply to the procurement of their services. The District shall, promptly enter into personal services contracts with Dr. Rosalyn Miles and Dr. Raymond Paterson.[4] The contracts shall specify duties and compensation negotiated by the Receiver.

4. Procurements that do not require formal contract documents, e.g. purchase of goods or supplies from a vendor that maintains a price agreement or schedule with any federal agency, and that exceed $10,000.00, shall be the subject of notification to the liaison as specified in the General Provisions, Part II., at least ten (10) business days before the proposed procurement action.

5. If unforseen emergencies result in a need for procurements covered by paragraphs 2 and 4 of this part within the notice time required, the Receiver shall immediately notify the liaison and designated counsel for defendants. The Receiver, the liaison and the defendants shall use their best efforts to expedite the procurement action and/or identify alternative or temporary measures to meet the procurement need, prior to resorting to a procurement pursuant to Part II, paragraph 2.

V.    <u>Budget</u>

1. The Receiver shall submit budgets for the District's then current fiscal year (October 1, 1995 through September 30, 1996) for personal and non-personal services for both the Office of the Receiver and the program to deliver medical and mental health

---

[4] It is understood that Doctors Miles and Paterson will fill positions specified in the Remedial Plan.

7

82

services at the Jail. The budget for the Office of the Receiver shall be submitted within sixty (60) days and the budget for the program shall be submitted within one hundred and twenty (120) days. The Fiscal Year 1996 budget for personal services shall be based on the staff specified in the orders of the court.[5] Thereafter, the Receiver shall submit annual budgets no later than thirty days in advance of each fiscal year. (October 1 through September 30). Any party may raise objections to a proposed budget within ten days and may file objections to a proposed budget with the Court. Prior to the filing of objections with the Court, the parties shall attempt to resolve objections with the Receiver and the Special Officer.

2. The Receiver may modify the budgets subject to the procedures for notice and opportunity to object set forth above, in order to ensure compliance with the Court's orders. The modification will not be effective until twenty one (21) days following notice to the parties, unless the parties consent.

3. The Receivership shall arrange for an independent financial audit of the Receiver's Office Fund and the Operating Fund specified in Part VI., on an annual basis.

VI.     Operating Funds

1. Defendant, District of Columbia, shall within five (5) working days of the receipt of this Order, by any reasonable method

---

[5]    It is understood that all positions identified in the Remedial Plan may not be filled immediately. The Receiver will independently assess the staffing needs of medical and mental health services at the Jail and may make appropriate recommendations to the Court.

8

83

of its choosing, provide fifty thousand dollars ($50,000.00) to the Receiver, Dr. Ronald Shansky, who shall deposit the funds into two interest bearing checking accounts, as described below, with respect to which he shall be the signatory and fiduciary. By October 16, 1995, Defendant District of Columbia shall provide a second sum of two hundred and fifty thousand dollars ($250,000.00) for deposit into said accounts.

2.    Receiver's Office Fund:  One of the accounts, designated as the Receiver's Office Fund account, shall be maintained for the expenses associated with the operation of the Receiver's office, including the purchase of supplies and equipment and the payment of the salary or fee of the Receiver, staff and consultants such as an accountant and bookkeeper.  This fund shall be maintained with an operating balance of fifty thousand dollars ($50,000) and shall be replenished monthly as specified below.

3.    Operating Fund:  The second account, designated as the Operating Fund account, shall be maintained by the Receiver for contract procurements and other expenditures for the delivery of medical and mental health services at the Jail that are not paid directly with Department of Corrections funds.  This fund shall be maintained with an operating balance of two hundred and fifty thousand dollars ($250,000) and shall be replenished monthly as specified below.[6]

---

[6]    The budget may require an increase or decrease in the amount of the fund and may also impact upon the frequency of required reimbursements.

9

84

4.  The Receiver shall submit monthly accounts of expenditures from both funds to the Court, the Special Officer and the parties.  Beginning with receipt of the accountings for the month of October 1995, the District shall replenish both funds on a monthly basis within fifteen (15) business days following receipt of the accountings.  The Receiver may maintain a line of credit on the Operating Fund account up to $100,000 and may draw upon that credit in the event that the account is not replenished within 15 business days.

_____
U.S. District Court Judge

Copies to:

Richard S. Love
Chief, Correctional Litigation Sec.
Office of the Corporation Counsel
441 Fourth Street, N.W.
Sixth Floor, South
Washington, D.C. 20001

Jonathan Smith, Esq.
D.C. Prisoners' Legal Services
1400 ● 20th Street, N.W.
Suite 117
Washington, D.C. 20036

Graca M. Lopes, Esq.
Special Officer
1130 - 17th Street, N.W.
Suite 400
Washington, D.C. 20036

J. Patrick Hickey, Esq.
Shaw, Pittman, Potts & Trowbridge
2300 N Street, N.W.
Washington, D.C. 20037

10

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LEONARD CAMPBELL, <u>et</u> <u>al</u>., ) | C.A. No. 1462-71 |
| Plaintiffs, ) | (WBB) |
| v. ) | |
| ANDERSON McGRUDER, <u>et</u> <u>al</u>., ) | |
| Defendants. ) | |
| ) | |
| INMATES OF D.C. JAIL, <u>et</u> <u>al</u>., ) | |
| Plaintiffs, ) | |
| v. ) | C.A. No. 75-1668 |
| ) | (Cases consolidated before |
| DELBERT C. JACKSON, <u>et</u> <u>al</u>., ) | Judge William B. Bryant) |
| Defendants. ) | |

**SPECIAL OFFICER'S REPORT ON THE D.C. JAIL**
**RECEIVERSHIP FOR MEDICAL AND MENTAL HEALTH SERVICES**

Special Officer Karen M. Schneider files the following report to inform the Court of the status of the D.C. Jail Receivership for medical and mental health services.

**I. Background**

On July 11, 1995, this Court found that the appointment of a Receiver to ensure the provision of medical and mental health care, and to obtain compliance with the orders of the Court, was appropriate, necessary and the least intrusive remedial measure to compel the defendants to satisfy their court-ordered obligations.[1]  This action was taken due to the defendants'

_____

[1]  <u>See</u> July 11, 1995 Findings and Order Appointing Receiver at 1-2, attached hereto as Exhibit 1.

86

repeated failure to take advantage of opportunities to satisfy the requirements of the Court's orders as far back as the 1979 mental health plan.[2]  The July 11, 1995 order provided that the receivership "shall expire five years from the date the receiver is appointed, unless the Court finds good cause to extend the appointment."[3]

On August 2, 1995, the Court issued an order appointing Ronald M. Shansky, M.D., who had been jointly proposed by Special Officer Lopes and the parties, as the Receiver effective August 21, 1995.  The Receiver was charged with implementing the Initial Remedial Plan for Mental Health Care and Medical Care ordered by the Court on January 27, 1995.  This plan set forth specific programmatic, staffing and policy requirements.

## II.  Receiver's Tenure

During the course of the Receiver's tenure, medical and mental health care at the D.C. Jail has improved dramatically. Dr. Shansky has been successful in recruiting and retaining highly qualified medical and mental health professionals who, under the guidance of the Receiver, have established a comprehensive medical and mental health program.  Some of the significant accomplishments of the medical and mental health program are as follows:

_____

[2]  See attached July 11, 1995 Court Order for a history of the failures and violations, which led to the appointment of the Receiver.

[3]  July 11, 1995 Order at 10.

2

87

1.  The initiation of effective tuberculosis screening at the Jail and linkage with community health centers, which have resulted in a decline in the tuberculosis rate at the Jail and citywide;

2.  The development of protocols for the treatment of chronic illnesses, including HIV/AIDS, asthma, hypertension, etc.;

3.  The development and implementation of a suicide prevention policy and intake screening, resulting in a significant decline in the inmate suicide rate, which had reached epidemic proportions prior to the appointment of the Receiver;

4.  The development of comprehensive mental health programs to treat inmates with chronic and acute mental illnesses;

5.  The implementation of an intake health assessment, which includes screening for serious mental health and other illnesses, including communicable diseases;

6.  The development of a comprehensive computerized management information system;

7.  The development of a comprehensive continuous quality improvement plan and an infectious control program; and,

8.  The significant reduction of inmate grievances and civil lawsuits relating to medical and mental health care.

The Receivership has been surveyed regularly by the District of Columbia Department of Health (formerly the Department of Consumer and Regulatory Affairs) medical inspector pursuant to the Court's November 9, 1993 Order.  In addition, Special Officer

3

88

Schneider has brought in medical and mental health experts to review quality-of-care issues. Limited quality-of-care deficiencies have been noted, and those cited have been addressed promptly.

The Receivership staffing levels have also been reviewed by outside consultants in order to assist in finding effective means of reducing staff without affecting the quality of care. Some of the consultants' recommendations have been instituted.

Each fiscal year the Receiver has developed a budget which, after negotiations with the parties, has been submitted to the Court for approval. After approving the budget, the Court ordered that the defendants provide monthly payments to the Receiver. Pursuant to the Court's September 26, 1995 Order Regarding Procedures for the Receiver to Exercise Powers[4], these payments are deposited into the Receiver's operating account to pay Jail medical operating costs and transferred periodically into the Receiver's Office Fund to pay expenses and salaries of the Receiver and his staff. Any funds not spent during the fiscal year have been returned to the defendants. Both budget and staffing levels have decreased each fiscal year.

**III. Request for Proposal (RFP) Process**

Due to the defendants' decision to privatize medical and mental health care after the expiration of the Receivership, a Request for Proposal (RFP) was developed by the Receiver. In

---

[4] See September 26, 1995 Order Regarding Procedures for the Receiver to Exercise Powers at 9, attached hereto as Ex. 4.

4

89

December 1998 and January 1999, drafts of the RFP were circulated to the parties and the Corrections Trustee.  Comments on the draft RFP were submitted by the Special Officer, plaintiffs' counsel, the Procurement Section of the Office of the Corporation Counsel, the Bureau of Prisons' staff, and a consultant to the Corrections Trustee.

In March 1999, a meeting was held between former Corporation Counsel John Ferren, Assistant Corporation Counsel Richard Love, Receiver Ronald Shansky, Special Officer Schneider, Mayor Anthony Williams and his counsel.  The purpose of the meeting was to set forth the strategy for termination of the Receivership and transfer of responsibility back to the District of Columbia.

During the spring and early summer of 1999, several meetings were convened to discuss the RFP.  Corrections Trustee John Clark, in a June 9, 1999 letter to Special Officer Schneider, expressed objections to the RFP format and the cost of health care in the D.C. Jail.[5]  Special Officer Schneider responded to Mr. Clark in a letter dated June 17, 1999.[6]

The RFP was released to the vendors on June 17, 1999 and subsequently released again on December 3, 1999, after the deadline was extended and the RFP was amended.  The Office of the Corporation Counsel reviewed both RFPs.  Notices of the RFP appeared in local newspapers, and an internet posting was done in

---

[5] See June 9, 1999 letter from Clark to Schneider attached as Exhibit 2.

[6] See June 17, 1999 letter from Schneider to Clark attached as Exhibit 3.

5

90

the Commerce Business Daily.  Three proposals were submitted for
consideration prior to the final deadline of December 17, 1999.

An evaluation committee was established consisting of the
following members:  Special Officer Schneider (in consultation
with an expert), plaintiffs' counsel (in consultation with an
expert), two representatives from the Department of Corrections
and one representative from the Corrections Trustee's office.
The role of the evaluation committee was to evaluate the
proposals and submit rankings to the Receiver who would perform
an independent review and selection.

The committee met on December 21, 1999 to review the
proposals and on January 11, 2000 to review the best and final
offers.  The evaluation committee rated a proposal from the
Center for Correctional Health and Policy Studies (CCHPS) with
the highest overall ranking under the prescribed evaluation
criteria.  After considering the Committee's evaluation report,
the Receiver independently evaluated the proposals and reached
the conclusion that CCHPS offered the best value and should
receive the award.

Written notice of the award was given by the Receiver to all
offerors on January 13, 2000.  An offeror that was not awarded
the contract, Prison Health Services (PHS), filed a protest with
Dr. Shansky.  That protest was denied on January 27, 2000 and is
currently before the D.C. Contract Appeals Board.  The contract
between the Receiver and CCHPS was signed on January 28, 2000 and
took effect on March 12, 2000.  On March 14, 2000, U.S. District

6

Court Judge Henry H. Kennedy denied PHS's motion for a temporary restraining order to enjoin the continuation of the contract between Dr. Shansky and CCHPS.[7]

The selected vendor is a minority firm established as a not-for-profit corporation in the District of Columbia. The corporation is composed of staff employed at the Jail who have partnered with an Illinois firm with correctional health care experience. The understanding with the vendor is that both staffing and commodities that are unspent by the vendor will be reconciled each quarter and subtracted from the amount the District will provide to the vendor.

It is expected that Dr. Shansky will monitor the contract and that the contract will be assigned to the District of Columbia in three to six months. This will result in the successful termination of the Receivership and the return of the provision of services to the District with a mechanism in place to ensure constitutional health care.

Karen M. Schneider
Bar No. 369622
Special Officer of the Court
1130 - 17th Street, N.W.
Washington, D.C. 20036
(202) 778-1168

Date: March 15, 1999

---

[7] _Prison Health Services, Inc. v. Dr. Ronald M. Shansky_, C.A. No. 00-CV-00528 (D.D.C.).

92

<u>Certificate of Service</u>

I hereby certify that a copy of the foregoing Special
Officer's Report on the D.C. Jail Receivership for Medical and
Mental Health Services and accompanying exhibits was hand-
delivered on the 15th day of March , 2000 to the following:

Richard Love, Esq.
Senior Counsel
Sixth Floor South
441 4th Street, N.W.
Washington, D.C.  20001

Eric Lotke, Esq.
D.C. Prisoners' Legal
  Services Project, Inc.
1400 - 20th St., NW
Suite 117
Washington, D.C.  20036

J. Patrick Hickey, Esq.
Shaw, Pittman, Potts &
  Trowbridge
2300 N Street, N.W.
Washington, D.C. 20037

Ronald M. Shansky, M.D.
Receiver, D.C. Jail
1901 D. Street, S.E.
Washington, D.C. 20003

Karen M. Schneider

8

93

**EXHIBITS**

No.

1.   July 11, 1995 Findings and Order Appointing Receiver

2.   June 9, 1999 letter from John Clark to Karen Schneider

3.   June 17, 1999 letter from Karen Schneider to John Clark

4.   September 26, 1995 Order Regarding Procedures for the
     Receiver to Exercise Powers

94



**District of Columbia**
**Office of the Corrections Trustee**

John L. Clark                                                    800 K Street, NW, Suite 450
Corrections Trustee                                             Washington, D.C. 20001

June 9, 1999

Ms. Karen M. Schneider
Special Officer
U.S. District Court
for the District of Columbia
1130 17th Street, N.W., Suite 400
Washington, D.C. 20036

Dear Ms. Schneider:

In follow up to my comments at our meeting on June 4, 1999, regarding the proposed Request for Proposals (RFP) for medical services at the D.C. Jail, I want to reiterate several concerns, particularly with respect to the issues of fiscal responsibility and good government.

I recognize the medical receiver, Dr. Ronald Shansky, has developed a draft RFP which has many excellent qualities and in many ways will form the basis for a good procurement. Also, I do not wish to significantly hold up the release of the RFP and the progress of the procurement process since there is a lot to accomplish prior to the end of the Receiver's court mandated tenure next September. I continue to believe that we can accomplish this process in a collaborative fashion.

However, as I mentioned in our meeting, I have some fundamental concerns. Primarily, I want to reiterate my concern that, as crafted, the RFP's requirement that a standardized "comparative" bid be submitted seems to require a level of staffing that is exceedingly high by any standard. It sends a message about the basic level of services expected of all bidders and will lead to bids that are much more expensive to the District and its taxpayers than is currently necessary or warranted. Additionally, the RFP does not give adequate proportion to pricing in the evaluation factors, which are only proposed to give a weight of 26 percent to cost versus 74 percent to quality of services. These factors should be in roughly equal proportions.

As I reiterated on June 4, the enormous past expenditure of resources deemed necessary by the Federal court appointed medical receiver to bring the previously substandard D.C. Jail medical system up to acceptable community standards, i.e., at least three times the national average per inmate medical cost per day, should not be set out in the RFP as the paradigm staffing arrangement in the "comparative" proposal which every bidder is required to replicate. That kind of strategy in the proposed RFP, as I said on June 4, will unduly memorialize a system that was brought in to ameliorate an emergency, and, despite a disclaimer, sends the

95

unmistakable message to the potential bidders that it is the preferred course, or at least the minimum required level of services necessary to the winning bid, and an acceptable status quo for the foreseeable future. I acknowledge that, after my repeated urging, the Court appointed medical receiver has reduced his expenditures -- from approximately $15 million per year to approximately $12 million per year. However, $12 million per year is not an acceptable non-emergency ongoing level of expenditure for this size inmate population for the foreseeable future.

Over the past four fiscal years ending this year, the Receiver's total expenditures will have been over $46 million, whereas the national average for state correctional systems for a population of 1,670 would have been about $16 million over the same period, a difference of about $30 million. While the Constitution and good correctional management require services at a level which I might characterize as a well tuned compact car, the current operation has been funded, pursuant to court order, at a luxury car level. I am concerned that the draft RFP, particularly by seeming to set up the current operation as a comparative baseline or as the expected standard, gives bidders the impression that a luxury sedan operation, or something close to it, is what is expected in the proposals.

The recent study completed by Moore and Associates, which your office and the parties to the case agreed to have conducted, found that the level of staffing and the cost of medical services at the Jail are almost unprecedented in the country and are far beyond those of the comparative localities in the study, including the neighboring jurisdictions of Baltimore and Prince Georges County, both of which are accredited by the National Commission on Correctional Health Care.

For instance, the report found that whereas the national average daily cost for health care for 1997 was $6.60 per inmate day, the cost at the Jail this year is $19.03. The cost in Baltimore where the correctional medical program was under Federal court supervision, is $5.18 per inmate per day, and in Prince Georges County, $7.65. The report found similar disparities in the levels of staffing, i.e., approximately 15 M.D.'s in D.C. (with responsibility for 1,670 inmates) versus five in Baltimore (with responsibility for 3,100 inmates) and one in P.G. County (with responsibility for 1,400 inmates) .

I have urged repeatedly that the RFP be based on proposals being able to perform at a specified level of medical service. Instead, you seem ready to reject that common practice and promulgate a very high set of norms to emulate. Although my position was not created by Congress until 1997 and I am not a party to this case, review of such expenditures in the District's correctional system is my Congressionally mandated statutory responsibility and is within the direct scope of my official duties. I may be wrong, but it appears to me that the structure of this RFP not only will elicit unrealistically expensive proposals, but it will also lead inexorably to the rejection, by comparison, of good and much less expensive alternative proposals which offer very acceptable, but nonetheless lesser, standards of service and levels of staffing. The proof of whether or not the RFP approach has worked well will ultimately be reflected in the quality of services and the reasonableness of the price of the proposals elicited by this procurement process.

2

96

The Federal courts in this District never mandated, and there is no Federal controlling precedent that requires, that the prisoners in the District of Columbia are entitled to more than three times more expensive medical care than another Federal court found sufficient for prisoners in the Baltimore jail. Indeed, as constructed, the "comparative" proposal requires bids on a medical standard that far exceeds on average both what is being made available at public expense to, and what is being purchased privately by, law abiding citizens of the District, or in any state for that matter. The national average for all citizens, $10.75 per person per day, is only about half (56 percent) of the "comparative" proposal that this RFP requires bidders to bid on.

If the parties take the proposed course of action over my clear objection, it will be no surprise to me if the result of this RFP process is that the District receives not a single acceptable bid within the range of costs paid by any of the surrounding jurisdictions or, for that matter, other comparable jurisdictions in the nation. Again, as I cautioned at the June 4 meeting, this is an unacceptable way to obligate or expend such an enormous quantity of public resources. Consequently, I again urge all the parties to drop completely the requirement for bidders to submit two proposals. There is nothing pre-ordained or, as far as I can tell, particularly useful about the requirement for a bid on the "comparative" proposal. If bidders wish to submit a bid based on what is now in place, that should be their option. But to require every bidder to bid on replicating the current status quo, whether or not they think that is the best way to deliver the required services, is most likely to skew the bidding process and be counterproductive.

Let me be clear. I am committed to having medical services provided to Jail prisoners at a level of quality which meets community standards and which will give the courts and the public confidence that there will be no return to the troubles of the past. However, those goals can be reached while at the same time maintaining fiscal responsibility, as is done in many other systems all over the country. I am concerned that the current process and discussions leading to the imminent issuance of an RFP seem to give very little, if any, priority to the issue of the commitment of the District's financial resources over the five year course of the proposed contract. Good government requires a balancing of legitimate concerns for the quality of services with the realities of limited fiscal resources.

We are now at a critical juncture. The Federal Court's current five year role in the correction of the much improved medical situation at the D.C. Jail is set to lapse in September 2000. Since the District's and my role overseeing these and related functions of the D.C. Department of Corrections will continue for quite some time thereafter, the executive branch of the District of Columbia government must, by necessity, occupy a central place in the evaluation, selection and monitoring process for this RFP. As I expect you will agree, this is necessary both to facilitate the timely and orderly transfer of responsibility from the Court to the regular custodians of those duties, and to obtain the formal approval and assumption of this contract responsibility by the Financial Control Board, the City Council, and the Mayor. At our last meeting, we raised but did not have time to reach a meeting of the minds on this issue.

Since the draft RFP is being promulgated as a judicially backed request, I have no official power to dictate its terms. Nevertheless, I question whether the serious flaws now present in it can be overcome, and I believe that this RFP will consume unnecessary time and money.

3

97

It is my hope that without delaying the issuance of this RFP, we can quickly find common ground on these critical issues.

Sincerely,

John L. Clark
Corrections Trustee

cc:   U.S.D.J. William B. Bryant
      Monty Wilkinson, Special Assistant, Mayor's Office
      Valerie Holt, Chief Financial Officer
      Director Odie Washington, Department of Corrections
      Eric Lotke
      J. Patrick Hickey
      Richard S. Love

4

98

*Special Officer of the U.S. District Court*
*for the District of Columbia*

*by Orders of Judge June L. Green*
*and Judge William B. Bryant*

*1130 17th Street, N.W. - Suite 400*
*Washington, D.C. 20036*
*Office (202) 778-1168*
*Fax (202) 296-3644*

*Karen M. Schneider*
*Special Officer*

*Judith Sandalow*
*Ed Wiley III*
*Deputy Monitors*

June 17, 1999

John L. Clark
Corrections Trustee
800 K Street, N.W.
Suite 450
Washington, D.C.  20001

Dear John:

I am writing in response to your June 9, 1999 letter
regarding the proposed Request for Proposals (RFP) for medical
and mental health care at the D.C. Jail.  Specifically, I want to
respond to your concerns about the RFP, but of greater concern to
me is the quality of information upon which you base your
conclusions.

Regarding the RFP, I am aware of your stated concerns;
however, I concur with the decision to submit the RFP as written,
which was expressed by the Receiver, Dr. Ronald Shansky,
Department of Corrections Director Odie Washington and
plaintiffs' attorneys at the June 4, 1999 meeting.  The reasons
for the comparative proposal and the alternative proposal are
clearly set forth in the RFP.  The RFP also clearly states that
bidders are not bound by the comparative proposal and strongly
encourages an alternative proposal.  Variations of this proposed
methodology have been used throughout the country in correctional
facilities, and Dr. Shansky, who has 17 years of experience in
correctional health care, has personal experience with similar
methodologies.

It is important for you to realize that the current medical
and mental health program and corresponding staffing levels are
the result of extensive negotiations between the parties.  After
the Department was found in contempt of court, the parties
entered into a Consent Order on March 16, 1994.  The Consent
Order mandated the development of a remedial plan designed to
cure defendants' contempt and to ensure that inmates incarcerated
at the Jail receive medical and mental health services that meet
constitutional standards.  After extensive consultation with the
parties, the Remedial Plan was developed and the defendants were
ordered to implement it.  After the Department failed to
implement the plan, and medical and mental health care

99

John Clark
June 17, 1999
Page two

deteriorated further, Judge Bryant appointed as Receiver,
Dr. Shansky, a nationally known correctional medical expert
recommended by plaintiffs, defendants and Special Officer Lopes.

During Dr. Shansky's tenure as Receiver, he has cooperated
fully with the Department, plaintiffs' attorneys and the Special
Officer to reduce costs. Similarly, Dr. Shansky has initiated
voluntary cost reductions throughout the years. Many of these
reductions were not a result of your repeated urging, but were
the result of continued negotiations amongst the parties and
occurred prior to your involvement with the Department. The
Receiver's budget has decreased from $16,223,415 in FY 1997, to
$14,827,243 in FY 1998, to $12,824,700 in FY 1999, and Dr.
Shansky has returned unspent money to the Department. With the
proposed staffing reductions in the RFP, an additional $722,065
savings may be realized.

In your June 9, 1999 letter, you base your conclusions
regarding budget and staffing issues on Jacqueline Moore and
Associates' Report on the Medical Receivership. However, I have
serious concerns about the accuracy of the information and
conclusions in her report. As I expressed in my November 6, 1998
letter, I objected to the hiring of Ms. Moore due to information
I had received from correctional health care experts regarding
the quality of her work and her lack of expertise in the area of
cost analysis. Her first draft of the report, which was
circulated by you for comments regarding "inadvertent objective
factual, typographical or grammatical errata only," was replete
with errors, many of them substantive. Although some of the
substantive errors in the draft report were corrected in the
final report, many of them were not corrected.[1] As you can see,
there are more than 15 numerical/mathematical errors, at least a
dozen other major errors and another dozen unexplained
substantive changes between the initial draft and the final
report. The significant number of errors in this report renders
the entire report suspect, including the statistics you quote.

In your letter, you state that Ms. Moore's report found that
the "national" average daily cost for health care for 1997 was
$6.60 per inmate per day. However, Ms. Moore never noted a

_____

[1]  As you recall, in my February 25, 1999 letter, I informed
you that I would not comment due to the numerous errors in the
draft report, but that I would comment instead after the final
report was circulated.

[2]  Attachment 1 contains a listing of the identified errors
contained in Ms. Moore's final report and inconsistencies between
the draft and final report.

100

John Clark
June 17, 1999
Page three

national average, but cited a March 30, 1998 Metropolitan
Washington Council of Governments (COG) study comparing facility
costs in the Greater Metropolitan Washington area.[3] Her use of
these data is quite disturbing. Conversations with various COG
staff and committee members reveal that this "study" was never
released due to its unreliability and the misleading nature of
the information gathered.[4] The data collected were
characterized by COG staff and committee members as "terribly
flawed," "not accurate enough to release to the public," and
"comparing grapes to grapefruits." In fact, your current deputy,
Devon Brown, acting in his capacity as Director of the Montgomery
County Department of Correction and Rehabilitation, expressed his
concerns regarding the reliability of the data to COG's Public
Safety Coordinator in a March 30, 1998 memorandum.[5] The
inclusion of this information in a report distributed by you to
an officer of the Court and parties to litigation, when your own
deputy was aware of the serious flaws in the data, is
incredulous. Furthermore, how Ms. Moore obtained this
information concerns me greatly.

    In light of Ms. Moore's inclusion of the COG study and the
numerous errors evident in her collection and analyses of data
regarding the Receiver's program, I cannot credit her comparisons
of other jurisdictions' correctional health care costs.
Comparisons of other facilities' budgets or staffing levels poses
a particular challenge, and meaningful comparisons are hard to
make. For example, two of the facilities which Ms. Moore
included in her staffing comparison include no pharmacy staff.
Clearly, there must be costs associated with this function.
Furthermore, the Jail's current budget has decreased since 1997
and it is likely that other jurisdictions' budgets have
increased. Given the many identified errors in Ms. Moore's
report, making any policy decisions based upon that information
would be clearly imprudent.

    A significant example of one of Ms. Moore's errors is her
analysis of the Jail's nursing staff. Ms. Moore stated that the
combined medical and mental health nursing staff consists of 36
RNs and 21 LPNs, but the medical and mental health nursing

---

[3]  The local average quoted in Ms. Moore's report was $8.26,
although Ms. Moore also reported the average as $7.60 per day
after inexplicably excluding Montgomery County.

[4]  Included as Attachment 2 is a memorandum to me from
Judith Sandalow of my staff memorializing her conversations with
members of the COG staff and committees.

[5]  The memorandum is included as Attachment 3.

101

John Clark
June 17, 1999
Page four

staffing at the Jail is 26 RNs and 16 LPNs.  Due to her
misconception of the nursing staff that exists, Ms. Moore
recommended a reduction of 14 nursing full-time equivalents.
However, if the correct staffing levels were acknowledged, her
recommendation would actually be an increase of one nursing full-
time equivalent.

    Although you contend that the level of staffing in the RFP's
"comparative bid" is exceedingly high, if you compare Ms. Moore's
recommended staffing reductions to the current RFP, Ms. Moore
actually recommends a reduction of 14.5 positions - 50% of which
are clerical positions.[6]  Although your letter states that
the Jail's current number of physicians far exceeds that of other
jurisdictions, Ms. Moore only recommends a reduction of 5.65
physicians.  With her recommendation for an increase of 2.4
physician assistants, there is a recommendation for a net
reduction of 2.25 advanced providers.  Ms. Moore's
recommendations regarding advanced care providers is very close
to the number of advanced care providers in the comparative
proposal of the RFP.

    I question whether Ms. Moore's final report reflects an
independent evaluation of the Receiver's medical and mental
health program.  Ms. Moore's draft report contained numerous
favorable comments regarding the Receiver's program which were
deleted in the final draft.[7]  Since there is no explanation from
Ms. Moore regarding the reason for the deletion of these
comments, I can only assume that she was influenced by your well-
known criticisms of the Jail's current medical and mental health
program.

    You have expressed concern regarding the weight of pricing
in the evaluation factors.  The pricing point value was raised
after you expressed your initial concern.  However, it should be
noted that the ultimate price will be derived through
negotiations with the bidder of the top quality proposal.

    I am confident that the competitive nature of the RFP
process will result in further cost reductions as appropriate and
that the language we have added to the RFP is adequate to address
your concerns.  I look forward to discussions regarding the award
process and a successful transition of medical and mental health
services back to the District of Columbia.

_____

    [6]  This reduction includes a decrease of 19.9 positions and
an increase of 5.4 positions.

    [7]  Attachment 4 contains a listing of many of the comments
deleted.

102

John Clark
June 17, 1999
Page five

Sincerely,

Karen M. Schneider

cc:  Honorable William B. Bryant
     Valerie Holt, Chief Financial Officer
     Monty Wilkinson, Special Assistant, Mayor's Office
     Richard Love, Esq.
     Eric Lotke, Esq.
     J. Patrick Hickey, Esq.
     Odie Washington, Director, DOC
     Ronald Shansky, M.D.

103

'ACHMENT 1

**ERRORS IN JACQUELINE MOORE AND ASSOCIATES'**
**FINAL REPORT ON THE MEDICAL RECEIVERSHIP**
**AND DISCREPANCIES BETWEEN THE FIRST AND FINAL DRAFT**

**Page 6**

Table 1 - Number of Inmates Released Within the First Seven
Days of Incarceration (3 math errors)
    May total equals 385 not 387, based on numbers reported
    June total equals 438 not 458, based on numbers
        reported
    September total equals 333 not 353, based on numbers
        reported

Draft report stated that the Warden estimated his budget to
be 20 million citing a December 13, 19998 (sic)
conversation with Warden. Final report says Warden
estimates his budget to be 38 million; cites same
December 13, 19998 (sic) conversation. Draft report
stated that medical budget was 60% of Jail's overall
budget. Final report says medical budget is 31% of
Jail's overall budget; Correct percentage is 24%;
38+12 = 50; 12/50 = 24%

Report states that emergency room is staffed with 2 nurses;
it is actually staffed with 1 nurse

**Page 11**

In chart regarding PPDs and TB prophylaxis - 366 is listed
as the 6 month average; it is actually the 6 month
total

**Page 13**

Sick Call/Chronic Disease Clinics Section (2 math errors)
    Number of sick call requests reviewed daily should be
        108, not 105, based on numbers reported
    Number of detainees seen by nurses alone should be 63,
        not 62, based on numbers reported

Draft report stated an average of 26 inmates were seen
    daily by nurses alone; final report changed to 30
Draft report stated there were 53.5 inmates seen daily
    by both physician and nurse; final report changed
    to 53

**Page 14**

Table 2 - Sick Call Utilization 1998 (2 math errors)
    Report states average per month seen by nurse is 790;
        correct average based on numbers reported is 895
    Report states average per day seen by nurse is 26;
        correct average based on numbers reported is 30

104

**Page 14 continued**

Draft report stated there were 106.5 sole nursing visits daily; final report changed to 30

Draft report stated there were 80.5 physician and nurse visits daily; final report changed to 53

**Page 22**

Specialty clinic chart (4 math errors, based on numbers reported)

Dermatology - 40 should be 54
Opthalmology - 61 should be 62
Optometry - 201 should be 97
General Surgery - 89 should be 78

Report states that Opthalmology and Optometry costs are paid by DOC not the Receiver; the costs are paid by the Receiver

Report cites the inmate refusal rate for D.C. General Hospital visits to be 31%; the correct percentage based on numbers reported is 14% (468/3259)

**Page 23**

Table 3 - Off-Site Encounters 1998 (1 math error)
Total of "taken encounters" is 1585 not 1586

**Page 26**

Report states that the cost for the computerized medical record printer cartridges are $70 per week; cost reported by Jail staff is $8.99 per cartridge which prints 120,000 characters and lasts approximately one month

**Page 44**

Draft report stated there were 129.53 FTE positions in 12/1/98; final report states there are 134.1 FTE positions

Report states that general nursing staff consisted of 26 RNs, 16 LPNs, 1 Director of Nursing and 2 nursing assistants and that there are 10 RNs and 5 LPNs assigned to mental health unit. This is incorrect. The correct staff is:

| | |
|---|---|
| Medical | 16 RNs |
| | 11 LPNs |
| Mental health | 10 RNs |
| | 5 LPNs |
| Total | 26 RNs |
| | 16 LPNs |

105

**Page 44 continued**

Report lists 5.0 staff assistants; correct number is .5

**Page 47**

Table 5 - Comparison of Selected County Jails and Central
Detention Facility Staffing  (1 math error)
    Population of Salt Lake County is 1310 not 1410, based
    on numbers reported

**Page 48**

Lists CDF RN staff as 26; correct number is 16
Lists CDF LPN staff as 16; correct number is 11
Lists CDF NA staff as 0; correct number is 1

First draft listed P.G. County RNs as 5.6; final report has
    7 RNs
First draft listed PG County LPNs as 3; final report has 4

**Page 49**

Lists 8.5 records clerks; correct number is 9.56 (includes
    director)
Lists 5.5 radiology staff; correct number is 5.05

Lists total staff as 107.78; correct number is 94.33
With RFP reductions; correct number is 86.6

**Page 50**

The report states that the remedial plan called for 28 RN
    and LPN staff, and that the CDF is staffed with 42
    nursing positions, with a compared overage of 14 FTEs;
    in fact, the correct numbers are: The remedial plan
    called for 28 RN and LPN staff **for medical services
    only** and 15 mental health nurses for a total of 42
    nursing positions

The report states that an acceptable guideline is 1 nurse
    per 35 inmates (a total of approximately 49 nurses)
    and, with the additional task of inpatient mental
    health setting, that the current 60 nurses are
    sufficient coverage.  CDF only has 42 nursing FTEs.

**Page 51**

The report states that PAs and Nurse Practitioners have full
    prescriptive authority in D.C.  This is an error.  PAs
    prescriptions must be countersigned by a physician.

-3-

106

**Page 52**

The draft report proposed a reduction of 41.75 positions.
Final report proposes a reduction of 44.75 positions.

Both reports recommend an increase of 4.3 positions.

The draft report proposed a final reduction of 37.45.
Final report proposes a final reduction of 40.4
    positions

Page 54

The draft report recommended the pharmacists' hours to be
    32 hours per day, Monday through Saturday for a total
    FTE of 4.8.  Final report decreases pharmacist hours
    from 32 to 16 and changes total pharmacist FTEs from
    4.8 to 2.8 without explanation.

The draft report recommended pharmacist technician hours to
    be 32 hours per day, Monday - Friday for a total FTE of
    4.8.  Final report decreases pharmacy technician hours
    from 32 to 24 and changes total pharmacy technician
    FTEs from 4.8 to 3.8

107

`\CHMENT 2`

## MEMORANDUM

To: Karen Schneider
Fr: Judith Sandalow
Re: Council of Governments' Correctional Health Survey
Da: 6-16-99

In Jacqueline Moore and Associates' Report on the Medical Receivership, she writes that "[t]he Metropolitan Washington Council of Governments (COG) released a study dated March 30, 1998 that was the comparison of the cost of facility medical costs in the Greater Metropolitan Washington area."

On June 16 and 17, 1999, I spoke with several people at COG who informed me that no such study was released by COG. Instead, I was informed that data was initially collected with the intention of assisting jurisdictions in comparing costs, but that COG determined that the data was too inaccurate and inconsistent to be used for this purpose. Therefore, the decision was made not to release the information publicly.

I interviewed Joe Zelinka, COG's Public Safety Coordinator; his assistant, Steve Dickstein; Major Michael Jackson, a member of COG's Corrections Chief Committee; and Ms. Marnie Schuster-Walker, chair of COG's Correctional Health Care Subcommittee. The committee and subcommittee are part of COG, but its members are area corrections chiefs and directors of nursing, respectively. Following is a summary of my conversations.

Joe Zelinka

Joe Zelinka is COG's Public Safety Coordinator.

Mr. Zelinka said that the Correctional Health Care Subcommittee developed a survey which was distributed to area correctional facilities in an effort to compare health care costs. The information which was received, according to Mr. Zelinka, was terribly flawed. He said that he and the Corrections Chiefs Committee had "no faith or confidence" in the data, that "the numbers [were] all over the place," and that the "corrections chiefs killed it."

Mr. Zelinka gave as one example that COG could not be sure whether the costs of such services as radiology and opthalmology were included by every jurisdiction.

Mr. Zelinka said that he did not believe that the data was ever condensed into a draft report format, although he said the data might have been sent to the Corrections Chief Committee with a cover letter discussing the problems. Mr. Zelinka said that the data was certainly never released by COG as a report or in any other format.

108

### Major Michael Jackson

Major Michael Jackson is the jail administrator for Fairfax County Jail and a member of COG's Corrections Chiefs Committee.

According to Major Jackson, there were too many inconsistencies in the survey data and that it couldn't be used to compare "apples to apples." In fact, he said, the report "didn't even compare apples to oranges, it compared grapes to grapefruits."

Major Jackson said that Devon Brown, a member of the Corrections Chiefs Committee from Montgomery County, raised the issue of comparison problems because he was concerned that the data would be used by his board to require inappropriate cost cutting.

The Corrections Chiefs Committee, according to Major Jackson, discussed not releasing the data because it was so misleading and might cause problems if it was used to compare jurisdictions.

Major Jackson gave the following examples of problems in comparing the data:

> (1) Some jurisdictions included mental health costs, others didn't.
> (2) Some jurisdictions didn't include their contract health care.
> (3) Some jurisdictions only gave their contract costs, but didn't include costs which were not contracted.

### Marmie Schuster-Walker

Ms. Schuster-Walker is the chair of the Correctional Health Care Subcommittee and is the Director of Nursing at the Manassas Detention Facility.

Ms. Schuster-Walker said that she and the members of the subcommittee and full committee questioned the accuracy of the data. She said that they determined that it was not accurate enough to release to the public. In particular, she said the reporting mechanism was not specific nor accurate enough to rely on.

Ms. Schuster-Walker stated that they learned that even the average daily population of the facilities was calculated differently by different facilities. In addition, she said that some jurisdictions, such as Arlington and Alexandria, used managed care. The survey results did not include costs not covered by the managed care organization, such as the costs of pre-existing conditions. Also, some facilities have extensive mental health programs while others do not, some mental health programs are paid for by the county, others by the detention facility themselves.

Ms. Schuster-Walker said that D.C. was specifically left out of the survey because of problems comparing costs at the Jail, CTF and Lorton, which included contract services and long-term prison populations.

109

<u>Steve Dickstein</u>

Mr. Dickstein is Mr. Zelinka's assistant.

At my request, Mr. Dickstein provided the tables which showed the results of the survey. However, he was very concerned about providing the information and wanted assurances that the information would not be further disseminated. He reiterated that COG had decided the information was misleading and inaccurate and should not be used or released. Mr. Dickstein was very disturbed to learn that the information had been cited and used in a report.

110



ATTACHMENT  3

**DEPARTMENT OF CORRECTION AND REHABILITATION**

Douglas M. Duncan
*County Executive*

Devon Brow
M.A., M.P.A., J
*Director*

MEMORANDUM

March 30, 1998

TO:        Joseph Zelinka, Public Safety Coordinator
           Council of Governments

FROM:      Devon Brown, Director
           Department of Correction and Rehabilitation

SUBJECT:   Annual Reports on Facility Medical Costs

     I have recently had the opportunity to review the 1998 Fiscal Year report presented to the Corrections Chiefs Committee of the Council of Governments by the Correctional Health Care Sub-committee of the various regional institutions. This report purports to analyze the medical costs of the various institutions for the purpose of enabling a comparison of medical costs amongst the jurisdictions involved. The purpose of this memorandum is to present to you the thesis that this document in its present form does not enable an accurate analysis of jurisdictional costs because it is not at all certain that it is an "applies to applies" comparison. I attached with this a copy of the most recent Fiscal Year Report for 1997. The report creates as many questions as answers. I say this for the following reasons

     First, there are four (4) jurisdictions that provide medical services through a contract with a private provider. These jurisdictions, except for one, report only the total cost for medical services citing that the cost data by category is not available from the contractor. Curiously enough, one jurisdiction which provides services by contract is able to provide the data and even more curious is the fact that it is from the same contractor as the others. This is not intended to be a criticism. It is only to point out that accurate comparisons among jurisdictions can not be made where one locality submits detailed costs by category and others do not.

     Secondly, an examination of the back-up sheets for the cost data which is provided creates questions as well. For example, some jurisdictions have mental health staff, some do not. It is not at all certain that all jurisdictions report mental health staff as part of their staffing costs. Moreover, there is a wide variety of staffing configurations for mental health

111

Joseph Zelinka
March 30, 1998
Page Two

services. Some have full time staff while others have part time or contractual staff. It is n
known for certain across the jurisdictions whether contractual service staff is consistently
in Item number 2 on the table or not. Also, the personnel costs should be separated to refl
contractual staff vs. full time staff vs. part time staff.

     Thirdly, an examination of the table reveals that some categorical costs are
included with others. I believe that an effort should be made to separate out these costs. I
again, when looking at an aggregate figure which represents the costs for more than one ite
mix among items is not known. One cannot tell, for example, how much all jurisdictions
medical supplies yet the institutions within the COG group have spent a large amount of th
formulating one service contract for all facilities in the region. It is believed that there is re
to do this from a cost perspective but the table does not necessarily support this.

     These are but a few of the questions which I have about this table. My conce
simply this. leaders within the various jurisdictions rely on data such as this to make decisi
and adjust their operations. Each jurisdiction should use this data to compare itself against
for the purpose of perhaps learning where savings might be achieved. However, in order to
accomplish this, we have to be certain that we are comparing like items. Based upon the ab
concerns, I am not certain that we are in fact doing this.

DB:eh

Attachment

cc: Jon Galley, Warden, MCDC

112

TTACHMENT 4

**OMISSIONS FROM MOORE AND ASSOCIATES FINAL
REPORT ON THE MEDICAL RECEIVERSHIP
WHICH WERE INCLUDED IN FIRST DRAFT**

(Statements in bold are those statements that were deleted.
Except when indicated, page references are to the final report)

**Page 12 (Draft report)**

[Ms Moore proposed the following staffing recommendation in
her draft report which was deleted in the final report]:

Additional staff has also been added to the pharmacy.  The
**pharmacy will operate 16 hours per day, six days per week.**

**Page 30**

In addition to redrafting, retraining and implementing **so
many successful new procedures, ...**

What is evident is the drastic reduction in suicidal events
and deaths at the facility over the past four years.

**Page 33**

The facility does not offer therapeutic supervision.... They
do use the infirmary safe rooms a time out space for patients who
do not require either restraint or seclusion but could benefit
from being placed in a quiet environment away from stress or
other agitating factors.  **This is an entirely acceptable plan for
their facility.**

**Page 35**

It was also mentioned that correctional officers were
assigned to the mental health units who had not received
prescribed mental health training.  **Again, through receivership
the situation has improved greatly.**

**Page 36**

The staffing pattern on the acute care unit included a
psychiatrist (0.60 FTE), two RNs (one charge nurse and one staff
nurse).  The current staffing pattern is complete **and sufficient.**

**Page 39**

Dr. Weisman is to be commended in the development of this
**program which also reflects the staff's desire not only to
respond to those deficient situations identified in the
receivership documents but also to begin to look at other mental
health issues upon which they can make a favorable impact.**

113

Page 39 continued

This is an outstanding medical software program that specializes in medical systems for hospitals and large medical complexes.

One of the greatest problems in large Jails is the mass of medical information, which is generated, with a high volume of admissions and discharges. Without an adequate staff or superior systems it is almost impossible, as was the case in the Washington Jail, to create a record that was complete, timely and accurate. Oftentimes reports that were completed were never filed in the record. At other times results were written down on scraps of paper. The chart had no regular or defined division of topics.

The Medicalogic system, which is one of the premiere automated systems in the country, has ...

By example the encounter form editor package which comes with the program allows the staff to customize its encounter notes almost to a limitless degree. This applies to other programs as well. With this automated system they have moved from a record in which almost nothing could be found to a system in which all information is available to all staff in a timely manner and at the touch of a button. As with any new computer system that's going to take a period of time before all of the bugs are worked out and the program offers all of its potential. I applaud Dr. Shansky and Dr. Weisman for having the courage and foresight to set an example to other jails around the country which are experiencing similar problems to their medical records system utilizing a "hand record."

Page 40

It appears that sometime ago there was a liaison outreach worker with the Commission on Mental Health who worked primarily with prisoners and did quite an effective job in helping them. However, she was only one person and unfortunately she passed away and the person who has replaced her has many other duties and does not have the time to give to this project. It would behoove the powers that be to do whatever is necessary to enhance discharge planning and the continuity of care of patients from the jail as they return to the community- particularly those that are receiving medications.

Page 41

[Dr. Weisman] has proven to be an excellent clinician, leader and administrator.

114

**Page 41 continued**

Thus far all of the subsequently hired staff have provided **excellent medical** (changed to "good") care and have...

Prior to receivership, all services whether good, poor or very bad quality were basis crisis intervention given and putting out the proverbial fires. All clinical treatment was on a hit or miss basis. With the increased staffing and problematic adjustments and the quality of administrative personnel, the staff has corrected a majority of the very serious problems that were causing such chronic difficulties and instead have shifted their focus now to try and prevent crisis rather than react to it. A good example was given in the section on suicide. The rate dropped from nine suicides in a little over a year to three in three and a half years under receivership. In the past anybody who participated in self-injury was automatically placed on thee mental health unit. Now there is a very careful assessment of each of these cases and those in which there is no distinct mental illness are managed in open population.

This has been addressed earlier in this report and will not be repeated here, but suffice it to say the current automated system which is highly efficient and highly responsive will accomplish more good and quicker improvement in the medical records system than any other possible solution. The medical record system at the Washington D.C. Jail will become a model for other systems to follow.

3

115

ZUCKERMAN, SPAEDER, GOLDSTEIN, TAYLOR & KOLKER, L.L.P.

ATTORNEYS AT LAW

1201 CONNECTICUT AVENUE, N.W.

WASHINGTON, D.C. 20036-2638

(202) 778-1800

TELECOPIER

(202) 822-8106

WWW.ZUCKERMAN.COM

BLAIR G. BROWN
(202) 778-1929
bgbrown@zuckerman.com

BALTIMORE, MD
MIAMI, FL
TAMPA, FL
NEW YORK, NY

June 27, 2000

**BY FAX:**
**(202) 225-3974**
James Wilson, Chief Counsel
Committee on Government Reform

**(202) 225-4784**
Kristin Amerling, Deputy Chief Counsel
Committee on Government Reform

**(202) 225-4960**
Victoria Proctor, Staff Member
David L. Marin, Communications Director
Subcommittee on the District of Columbia
    Of the Committee on Government Reform

**(202) 225-3002**
Jon Bouker, Legislative Director
Matt Morrison, Legislative Assistant
Congresswoman Eleanor Holmes Norton

**(202) 225-3974**
David Cass, Deputy Counsel
Congressman Tom Davis

**(202) 226-1360**
Michael L. Stern
Senior Counsel
U.S. House of Representatives
Washington, D.C. 20515

Re:    Karen Schneider, Special Officer Appointed By the
        U.S. District Court For the District of Columbia

Dear Gentlemen and Ladies:

    Thank you for meeting with Leslie Kiernan and me yesterday to discuss the request of the
Subcommittee for the District of Columbia that my client Karen Schneider provide testimony at the
Subcommittee's June 30, 2000, hearing regarding the Medical Corrections Receiver for the D.C. Jail.

116

James Wilson, et al.
June 27, 2000
Page 2

In order to assist you with your evaluation of the issues raised in our meeting, I have enclosed the orders appointing a Special Officer and substituting Ms. Schneider as Special Officer in *Campbell v. McGruder* and *Inmates of D.C. Jail v. Jackson*, C.A. No.'s 1462-71 and 75-1668 (D.D.C.) The order of appointment finds, at page 5, that a "Special Officer is necessary to assist the Court in assuring future compliance," sets forth the powers and duties of the Special Officer, which include, at pages 5 and 6, the powers to conduct hearings and to submit proposed findings of fact and recommendations to the Court and "to confer informally with the parties on matter affecting compliance with the Orders," and details the limitations on the Special Officer, including, at page 8, "the Special Officer shall not be empowered to direct the defendants to take or refrain from taking any specific action to achieve compliance."

I also direct your attention to the following judicial decisions:

1. *Jenkins v. Sterlacci*, 849 F.2d 627 (D.C. Cir. 1988), which holds, *inter alia*, that a special master must adhere to the Code of Judicial Conduct and "scrupulously avoid any undertaking . . . that would tend or appear to compromise his impartiality as a decision maker." *Jenkins*, 849 F.2d at 630, 632. The D.C. Circuit rejected an argument that a special master should be held to some lesser standard of conduct than that applicable to a judge, noting that in recommending factual findings, "the special master occupies a position functionally equivalent to that of a trial judge." *Id.* at 631. (Canon __ of the Code of Judicial Conduct prohibits a judicial officer like Ms. Schneider from publicly commenting on pending proceedings, because, among other reasons, she may be called upon in those proceedings to make findings of fact on the subject of her public comments. The Subcommittee's request for her testimony would require her to make public comments regarding a pending proceeding and, more specifically, regarding the issue of medical care at the D.C. Jail on which she may have to make findings of fact in the future.)

2. *Gary W. v. State of Louisiana*, 861 F.2d 1366 (5th Cir. 1988), in which the Fifth Circuit upheld an order quashing a subpoena served by a party on a special master appointed by the federal district court to ensure compliance with the court's remedial decree regarding institutionalized mentally retarded and emotionally disturbed children. The Court held that the special master "was performing a quasi-judicial function when, as special master, she submitted her formal recommendation," and that "[a]n examination of her mental processes in making that recommendation would have been inappropriate." *Gary W.*, 861 F.2d at 1369.

3.. *Morgan v. United States*, 313 U.S. 409 (1941), in which the Supreme Court held that it was improper for a court to permit questioning of the Secretary of Agriculture regarding the basis of a decision he had made in an adjudicative administrative proceeding that "has a quality resembling that of a judicial proceeding." *Morgan*, 313 U.S. at 422. The Court noted that "[s]uch an examination of a judge would be destructive of judicial responsibility" and "a judge cannot be subjected to such scrutiny." *Id.*

117

James Wilson, et al.
June 27, 2000
Page 3

4. *Pillsbury v. FTC*, 354 F.2d 952 (5th Cir. 1966), in which the Fifth Circuit applied the principles of *Morgan* to a Congressional hearing. In *Pillsbury*, the Court held that the Pillsbury Co. had been deprived of a fair administrative hearing because FTC Commissioners, who were to adjudicate in a pending proceeding whether the Pillsbury Co. had violated the antitrust laws, had responded to questions posed in Congressional hearings about the application of the antitrust laws in the Pillsbury Co. proceeding. The Court held that "the proceedings [before Congress] . . . constituted an improper intrusion into the adjudicatory processes of the Commission." *Pillsbury*, 354 F.2d at 963.

5. *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211 (1995), in which the Supreme Court held that an act passed by Congress violated the Constitution's separation of powers between the judiciary and the Congress because the act had the effect of requiring federal courts to reopen final judgments. Justice Scalia's majority opinion contains an extensive historical analysis of the framers' desire to delineate the legislative and judicial powers in the Constitution as a response to British and colonial practices of legislative interference with pending and adjudicated cases before the courts.

I hope these materials are of assistance in reaching a decision.

Sincerely yours,

Blair G. Brown

Enclosures

cc: Karen Schneider
    Leslie Kiernan

118

Mr. DAVIS. Mr. Christian.

Mr. CHRISTIAN. Thank you. Good morning. My name is Erik Christian, the Mayor's deputy for public safety and justice. Good morning, Chairman Davis, Delegate Norton, Congresswoman Morella, and Congressman Horn. Thank you for the opportunity to testify before you today on the status of the current reform efforts undertaken by the D.C. Department of Corrections to improve medical and mental health services at the D.C. jail.

In the first 15 months of the Williams administration, the District government has made great strides in instituting improvements to introduce accountability for each and every agency and employee in order to transform the government into one that is responsive to its citizens. This approach has already shown promising results in the first year and will continue to drive changes in years to come.

When Mayor Williams took office, the management challenges the administrator inherited were daunting. Accountability for the District work force was rare, if not nonexistent. A deeply entrenched culture existed that was resistant to change, and, as we all know, there was infrastructure decimated by deferred maintenance and disinvestment and technology needs that were grossly inadequate.

Now, the mental and medical health delivery system was no different. It was in need of repair. In fact, medical and mental health services, as well as other conditions at the D.C. jail, have been under court supervision for over 25 years.

More recently, in 1993, a medical expert retained pursuant to court order to conduct an investigation and report on medical services at the D.C. jail concluded, "The quality of medical services is deplorable, the physical condition of the medical area horrible, and the infirmary is a disgrace."

At the same time, significant deficiencies were also found by a mental health expert retained pursuant to the court's order to investigate and report on mental health services. These reports led to the development of a remedial plan the defendants were ordered to implement in January 1995.

Unable to implement the remedial plan, U.S. District Judge Bryant, on July 11th, entered an order appointing a receiver to run medical and mental health services at the jail. In its order appointing a receiver, the court found that the District had violated the court's order and, among other violations, they had failed to properly conduct sick call, failed to operate a chronic disease clinic, failed to implement a quality assurance program, failed to maintain a full-time health services administrator at the jail, failed to properly conduct intake, failed to properly provide meaningful access to specialty services, failed to appropriately and professionally respond to life-threatening emergencies, failed to properly provide medical guides, and failed to keep their own kitchen and medical clinic clean.

Moreover, the population the District is serving at the jail has a high rate of HIV/AIDS, a high rate of tuberculosis and other infectious and chronic illnesses such as hypertension, heart disease, epilepsy, diabetes, and asthma, and a significant percentage of inmates requiring treatment for preexisting injuries such as prior

119

gunshot wounds and chronic disabilities. Moreover, the jail had experienced a rash of suicides, and there is a high percentage of inmates who suffer a series of mental health problems.

But what is the solution for these problems? The solution is to instate the same solid management practices that this administration is applying to other troubled areas.

Throughout his campaign for Mayor, Mayor Anthony Williams repeated the mantra, "One government, good government, and self government." These six simple words comprised his vision for the city. One government is a government where all functions that have been placed by the courts under the control of a receiver are returned to the control of this government under the Mayor's leadership an with oversight of the District's City Council. This administration is working to create one government and commit it to terminating court-imposed receiverships. Good government is an efficient and effective government. Good government facilitates the goal of one government and will ensure that the city can and does provide human and proper treatment to its jail population; that it complies with the law; and that a structure is instituted that not only makes sure that we end this receivership but assures that we do not in the future revert back into receiverships in the dictates of the court order.

This government is committed to exploring all ways to maximize efficiency and effectiveness. If this contract or any government contract of service is not efficient or effective, we will work to correct, modify, or replace it.

The District wants to work with the Congress, the GAO, and the court to identify ways to continue to reduce costs while maintaining the improved quality of health services required by the law and recommended by correctional health experts to address the unique medical and mental health needs of our population.

Ending receivership is a clear priority of this administration. As this administration continues to apply the principles of good government, we must be successful in our efforts to bring this receivership and all receiverships back under the authority of a Mayor with oversight from the District City Council.

The District is one city and our citizens deserve a unified government. This city deserves the democracy and home rule that receiverships prevent. We need to continue to perform at this high level so that we, as the District government, can demonstrate that we can provide all of our citizens, even those that are incarcerated, the highest and finest level of professional services at competitive rates.

Plain and simple, we need to return to one unified municipal government in the District under the leadership of officials that are accountable to our voters. By returning District agencies that are currently under receivership back to local control, democracy will be driving government here in the Nation's capital.

Thank you, Mr. Davis and committee members.

Mr. DAVIS. Thank you very much.

[The prepared statement of Mr. Christian follows:]

120

United States House of Representatives
Committee on Government Operations
Subcommittee on the District of Columbia

Oversight Hearing

Testimony

Of

Erik Christian
Deputy Mayor for Public Safety and Justice

June 30, 2000
10:00 A.M.

Rayburn House Office Building
ROOM 2154

121

Good morning, Chairman Davis, Delegate Norton, thank you for the opportunity to testify before you today on the status of the current reform efforts undertaken by the DC Department of Corrections to improve medical and mental health services at the D.C. Jail. In the first fifteen months of the Williams Administration, the District government has made great strides in instituting improvements to introduce accountability for each and every agency and employee in order to transform the government into one that is responsive to citizens. This approach has already shown promising results in the first year and will continue to drive change in years to come. When Mayor Williams took office, the management challenges the administration inherited were daunting:

    1. Accountability for the District workforce was rare, if not non-existent.

    2. A deeply entrenched culture resistant to change.

    3. An infra-structure decimated by deferred maintenance and disinvestment and

    4. Technology needs that were grossly inadequate.

The mental and medical health delivery system was no different, it was in need of repair. In fact, medical and mental health services as well as other conditions at the D.C. Jail have been under Court supervision for over twenty-five years. More recently, in 1993, a medical expert retained pursuant to a Court order to conduct an investigation and report on medical services at the D.C. Jail concluded, "[T]he quality of medical services is deplorable, the physical condition of the medical area are horrible, and the infirmary is a disgrace." At the same time, significant deficiencies were also found by a mental health

122

expert retained pursuant to the Court's order to investigate and report on mental health

services. These reports led to the development a remedial plan that defendants were

ordered to implement. Unable to implement the remedial plan, U.S. District Judge

William B. Bryant on July 11, 1995 entered an Order appointing a Receiver to run

medical and mental health services at the Jail.

In its Order Appointing Receiver, the Court found that the District had violated

the Court's orders and:

> Among other violations, they have failed to
> properly conduct sick call, failed to operate
> a chronic disease clinic, failed to implement a quality
> assurance program, failed to maintain a full-time health
> services administrator at the Jail, failed to properly conduct
> intake, failed to properly provide meaningful access to
> specialty services, failed to appropriately and professionally
> respond to life threatening emergencies, failed to properly
> provide medical diets and failed to keep their own kitchen
> and medical clinic clean.

Moreover, the population the District is serving at the Jail has a high rate of HIV-AIDS, a

high rate of tuberculosis and other infectious and chronic illnesses, such as hypertension,

epilepsy, diabetes and asthma, and a significant percentage of inmates requiring treatment

for prior gunshot wounds and chronic disabilities. Moreover, the Jail had experienced a

rash of suicides and there is a high percentage of inmates who suffer with serious mental

health problems.

But what is the solution for these problems. The solution is to instate the same

solid management practices that this Administration is applying to other troubled areas.

**Vision      One Government-Good Government-Self-Government**

Throughout his campaign for Mayor, Anthony Williams repeated the mantra: **One

Government-Good Government-Self-Government**. These six simple words comprise

3

123

his vision for the city. One government is a government where all functions that have been placed by the courts under the control of a Receiver are returned to the control of this government under the Mayor's leadership and with the oversight of the District's City Council. This administration is working to create one government and committed to terminating court-imposed receiverships. Good government is an efficient and effective government. Good government facilitates the goal of one government and will ensure that the city can and does provide humane and proper treatment to its Jail population, that it complies with the law and that a structure is instituted that not only makes sure that we end this receivership but ensures that we do not in the future revert back into receivership. This government is committed to exploring all ways to maximize efficiency and effectiveness. If this contract, or any government contract or service is not efficient or effective, we will work to correct, modify or replace it. The District wants to work with the Congress, the GAO and the Court to identify ways to continue to reduce costs while maintaining the improved quality of health services required by the law and recommended by correctional health experts to address the unique medical and mental health needs of our population.

Ending receiverships is a clear priority of this administration. As this administration continues to apply the principles of good government, we must be successful in our efforts to bring this receivership - and all receiverships - back under the authority of the Mayor, with oversight from the District's City Council. The District is one city and our citizens deserve a unified government. This City deserves the democracy and home rule that receiverships prevent.

4

124

We need to continue to perform at this high level so that we, as a District government, can demonstrate that we can provide all of our citizens, even those that are incarcerated, the highest and finest level of professional services at competitive rates

**Conclusion**

Plain and simple, we need to return to one unified municipal government in the District under the leadership of the officials that are accountable to our voters. By returning District agencies that are currently under receivership back to local control, democracy will be driving government here in the nation's capital.

125

Mr. DAVIS. Mr. Clark.

Mr. CLARK. Good morning. Thank you, Mr. Chairman, Ranking Member Norton, members of the committee. It is a privilege to appear before the committee today at this important hearing. Of course, I have submitted a detailed statement and I will try to just briefly summarize that here.

It is not any secret that for 2½ years I have been very concerned on behalf of the District about the exorbitant costs of the receiver's operation. I've made my views known to all the appropriate parties and tried to work to resolve matters. I have not been particularly successful.

So what are my concerns?

To summarize, when I assumed this new position I was charged, Mr. Chairman, and directed by various authorities in the District and the Congress, including this committee, to take seriously my role of financial oversight in protecting the funds provided for corrections operations both by the District government and the Congress. I assure you I've taken that charge very seriously. Therefore, I was stunned when I first visited the jail and reviewed its budget in the fall of 1997 and compared it to my experience as a warden of a similar facility, a Federal facility in Miami about three-quarters the size, and also my experience as Assistant Director of the Federal Bureau of Prisons for 6 years, where I had policy oversight for all BOP urban jails.

In short, the receiver had about 150 FTEs, compared to about 33 at my facility in Miami, and a $16 million budget compared to the equivalent of about a $4 million budget at my similar facility. Further, I was puzzled that when national averages for correctional health care are consistently reported at about $7.50 a day per inmate, it had cost in the District's jail in excess of $20 a day.

As I show in my testimony, in my written testimony, on the chart on page 6, if this contract runs its full length, the price to the District of the receiver's tenure and the follow-on contract that he has awarded will be over $120 million versus the national average for that period of about $45 million.

So the question now arises as to whether it is useful or fair to make comparisons of the receiver's costs and staffing to other jails. Some have said that we cannot make such comparisons. I assert that of course we can, although certainly it is important to make proper allowances for unique variables.

Every manager, whether in private business or public management, has to subject themselves to comparisons. We have to be held accountable to explain differences and discrepancies. That is particularly true in the face of such differences as we face here, which are not, Mr. Chairman, differences at the margins but are an order of magnitude problem.

The District simply cannot afford such extravagance. I'm not here to question that the receiver has remedied the former crisis and has installed at the jail a Constitutional level of care for the prisoners, but at what cost to the District?

Apart from the past 5 years, my other concerns, primary concerns, at least, are that the District is now stuck with an expensive contract in the amount of $68 million over the next 5 years unless some action is taken.

126

The RFP, further, is not performance based, requiring the vendor to supply a certain level of service and care, giving only lip service to cost containment in certain narrative statements. But, where it counts, in the evaluation factors delineated in the RFP, de minimis value was given to cost containment.

I would refer the committee to table five on page 13 of my testimony, which is reproduced from the RFP. As one could see, the total weight of price is listed at 26 percent of the total score. Itself, a low weight but not unprecedented.

However, on closer inspection it is clear that element A, overall price, was only one of five elements scored in the price category, worth approximately 5 to 10 percent of the total score of the bid proposal, to be given little more weight than such vague elements as rational budget, salary structure, and fringe benefits or budget presentation. In other words, the lowest price could easily be more than counterbalanced by a much higher bid—just in this price category—which was simply more rational or showed a better package of benefits or was presented more attractively.

In my extensive experience overseeing Federal Government contracts, price is price. Here the issue was totally blurred.

Where it counted, the real message was that price is not that critical, and so the message went out. Everyone wanted to please the receiver, and to do that a rich staffing level was expected.

The message was heard by the bidders in the form of $12 to $14 million bids for a 1,650 bed operation. The well, indeed, had been poisoned against mainstream price and staffing bids.

In fact, to allow for a true comparison to contracts awarded by other jurisdictions, about $2.5 million should be added to the receiver's contract cost to account for outside medical expenses covered by other contracts but here borne by the DOC. Therefore, making a true comparative cost figure for medical services at the jail, it's about $15.2 million. But getting away from averages and rates to more recent comparable examples of actual contracts for medical services, I think Mrs. Morella would be interested to know that in Baltimore and in the Baltimore Detention Center—and several surrounding Maryland facilities, a contract was procured recently for all the services, all-inclusive services for those facilities, for 6,500 inmates, for $19 million. That's $19 million for four times the number of prisoners that here in the District we are paying $15 million to provide services.

Again, this week in the clips I noticed in Delaware a contract was awarded for more than 6,000 prisoners for $14.2 million. Again, the same money for four times the number of prisoners.

A final example I'd give, in a recent report, another report by GAO in April noted that the Federal Bureau of Prisons, in its only private contract award in a facility—actually, several facilities together in Texas—awarded a contract for $10 million for 5,400 prisoners. That's several million dollars less for three times the number of prisoners.

Compared with the jail, these are differences in the order of magnitude of three or four times, not at the margins.

I am not asserting that these jurisdictions are identical to the District's needs or that we should be among the cheapest in the country, but we should be somewhere near the mainstream.

127

Finally, everyone has to be concerned, in my estimation, that the receiver did not voluntarily recuse himself from being the sole procurement official in what turned out to be a $68 million award, particularly when it became clear that his professional associates and employees were forming a group to bid.

Now, I've never objected that the employee group was bidding, but I did strongly suggest that the entire procurement be turned over to the D.C. Office of Contracts and Procurement. This was declined by the receiver and the special officer—in my estimation a violation of the most fundamental principles of public contracting, the perception of a fair and level playing field.

In summary, a wonderful opportunity has been missed for the District over these past 5 years, as the receiver's legacy leaves no appropriate or usable template for the future of medical services at the jail. I'm afraid that the city must start from scratch to rebuild this mishandled jail medical services operation. Since we cannot change the past, in my estimation the District must immediately, since the clock is ticking, begin the development of a new procurement process to replace the current contract at the first option date next March.

Thank you, Mr. Chairman. I look forward to the committee's questions.

Mr. DAVIS. Thank you.

[The prepared statement of Mr. Clark follows:]

128

Testimony of

John L. Clark
Corrections Trustee for the District of Columbia

Before the United States House of
Representatives
Committee on Government Reform
Subcommittee on the District of Columbia

June 30, 2000

129

Testimony of John L. Clark

Corrections Trustee for the District of Columbia

Before the United States House of Representatives

Committee on Government Reform

Subcommittee on the District of Columbia

June 30, 2000

Good morning Chairman Davis, Congresswoman Norton and Members of the Subcommittee.  It is a privilege to appear before the Committee today in this important oversight hearing examining correctional health care costs of the Court-appointed Medical Receiver at the District of Columbia's Central Detention Facility, commonly known as the D.C. Jail.  I am glad to have the opportunity to explain why my initial concerns about the unwarranted cost and extravagant staffing of the Medical Receiver have evolved to the much stronger view that the Medical Receiver has shown continuing disregard for the principles of sound public management and accountability.

**Summary of Trustee's Concerns**

In my professional judgement, the Jail's Court-appointed Medical Receiver has wasted an important five year opportunity to set in place for the District a health care program at the Jail which would be a template for mainstream care at a realistic cost to the taxpayers.  I do not question that the Receiver has remedied the former crisis and has installed a constitutional level of care for the Jail prisoners – but at considerable cost to the District.  In addition to failing to provide a permanent, usable template for the future and thereby causing the District soon to have to repeat this reorganization exercise at considerable trouble, the Receiver has performed a major disservice to the District over these five years by expending $30 million in unsupportable operating expenses with exorbitant levels of staffing.  The District simply cannot afford or condone an added

130

expenditure of $5 to $7 million per year for a level of prisoner health care far beyond the requirements of the Constitution or above the community standards for the law-abiding general public.

The Receiver's term has almost expired, but his legacy continues in the form of a five year contract, setting in place an expensive and inefficient model of medical services for the District. The contracting process for what ultimately became a $68 million award was suspect at best. The Receiver's most critical omission is that, instead of using the common practice of requiring "performance-based" bids which offer to deliver a specified level of health services, the Receiver constructed an RFP with detailed requirements simply replicating the staffing pattern and other operational features he instituted during his tenure. The result was a contract that mirrored the departing Receiver's elaborately top-heavy administration and staffing levels.

The procurement process for this award, which was made to a new company composed of the Receiver's former handpicked employees and professional associates at the Jail, was unnecessarily controlled in an almost single-handed manner by the Receiver and was severely flawed, creating the appearance of cronyism. Once the Receiver became aware that his associates were planning to bid on this large contract, sound procurement practice and a sense of fair play would have called for the Receiver to recuse himself from voting as the primary procurement officer. His role, at most, should have been limited to review and providing advice to District officials on behalf of the Court. Commenting upon the process fashioned by the Receiver, the D.C. Contract Appeals Board stated that the Receiver's actions "give an appearance not conducive to confidence in the fairness of the procurement." They characterize his actions as giving "the outward impression of protecting the competitive position of [the group led by] the incumbent Jail Director."

2

131

The costs to the District of the Receiver's term and the recently awarded contract are immense and ongoing. If the new contract and its option years are exercised through 2005, District and Federal taxpayers will have spent over $120 million since 1995 on these services. By comparison, the national average for that period for a similar sized facility operation would have been about $45 million, a difference of over $75 million.

**Trustee's Financial Oversight Responsibility and Professional Background**

I was appointed to the newly created position of Corrections Trustee for the District of Columbia soon after it was established by the National Capital and Self-Government Improvement Act of 1997 ("Revitalization Act") in September 1997. In this role, I was commissioned by Congress with responsibility for implementing the correctional aspects of the Revitalization Act, particularly the timely closure of the Lorton complex and the movement of the 8,000 felons to the Federal Bureau of Prisons. The Revitalization Act, as drafted and approved by this Subcommittee under your leadership, Mr. Chairman, also charged me with financial oversight of all operations of the D.C. Department of Corrections, which includes the medical operations of the Jail.

Prior to this appointment, I was employed for 23 years by the Federal Bureau of Prisons (BOP). My career included six years as Assistant Director, where my responsibilities covered many major areas, including evaluating resource needs for more than a dozen Federal urban detention centers in cities such as Manhattan and Brooklyn, New York; Chicago, Illinois; Los Angeles and San Diego, California; San Juan, Puerto Rico; and Miami, Florida. This was a logical sequel to my having served as warden at the large Federal jail in Miami, Florida, holding primarily a population of legal and illegal immigrants from the Caribbean basin, who typically arrived with extensive unmet health care needs. Later, as Assistant Director of the BOP, I also had responsibility for the Bureau's large contracts for correctional services, giving me extensive knowledge of the current trends in government contracting.

3

132

I have never claimed medical treatment expertise at the same level as a physician or medical administrator.  Nevertheless, in the course of my career, I have gathered extensive in-depth experience in the management and oversight of multiple aspects of correctional operations, including contracts for health services for prisoners and the budget operations associated with them.  In addition, seven of my staff collectively have more than a half century of professional experience either directly providing or supervising inmate health care in a variety of correctional capacities.

## I.   Issues Related to Receiver's Past 5 Year Operation

**A.   Startling Size of the Receiver's Budget, Staff**:  With that background, in the fall of 1997, when I first toured the D.C. Jail and reviewed the budget of the D.C. Department of Corrections (DOC) and the Jail, I was astounded to learn that the 1997 medical budget for the Receiver at the Jail of over $14 million was between three and four times the national average.  The Receiver had a medical staff of over 150 as compared to a medical staff of approximately 35 which I had supervised at the Miami Metropolitan Correctional Center, a similar facility about three quarters the size of the D.C. Jail.  I knew that Miami's level of staffing was typical of similar-sized Federal jails. There were 21 staff physicians at the D.C. Jail, compared to two physicians at the Miami Federal facility.  Many of the physicians at the D.C. Jail appeared to be performing duties which would normally be assigned to mid-level practitioners.

**Table 1.  Medical Receiver Costs at the Jail**

| | |
|---|---|
| FY 1996 | $10,157,199 |
| FY 1997 | $14,286,565 |
| FY 1998 | $13,731,581 |
| FY 1999 | $12,605,000* |
| FY 2000 | $13,300,000* |
| | |
| Total Medical Costs | $64,080,345 |

\* Estimates from the District of Columbia FY 2001 Proposed Operating and Financial Plan.

4

133

## B. Cost Comparisons with Other Jurisdictions

Despite Caveats, Comparisons are Valid and Useful:  It should be understood that the unmet health needs of District residents may be higher than the norm in many areas of the country, and even moderately higher than many other urban areas.  It is also conceded that, for comparison purposes, no two cities are exactly identical, either economically or demographically.  Further, existing data on various jail populations is not always collected or presented utilizing the same scientific procedures, methodology, or parameters.  Nevertheless, the usefulness of examining comparable situations is widely recognized as critical in most private and public industries alike.

No Demonstration of Excessive Acuity Levels at Jail to Justify Expenditures Significantly Above Comparable Facilities: Granting  the cautions mentioned above which might hypothetically make the D.C. Jail population not marginally, not moderately, but even for argument's sake 25 to 50% more unhealthy than the roughly comparable jail populations elsewhere, such an assumption still cannot explain staffing numbers and overall spending at 250 to 300% of the national average and averages of similar jurisdictions.  Despite my requests since 1997, the Receiver has never provided data on acuity rates of the illnesses of inmates at the Jail to document any abnormal level of illness compared to comparable jail populations.  Certainly, there has been no evidence showing that the acuity levels of Jail inmates are "off the charts."

Since the Medical Receiver presented no sufficient justification for his inexplicably extravagant and unaudited expenditure of District funds, we were forced to independently seek comparable data.  Comparisons were made to other State and local jurisdictions around the country, using a soon to be published study by the National Institute of Corrections and the National Commission on Correctional Health Care.  This study compared medical costs among all state prison systems and among a number of

5

134

large urban jails, including the D.C. Jail. It showed the cost of the Jail to be three times the national average. Below, we have compared the annual budget of the Receiver and the follow-on contract with the national averages for those years.

**Table 2. Comparison of Medical Costs at the D.C. Jail with National Averages**

| Medical Costs under the Receiver | | Comparable Costs Based on National Averages |
|---|---|---|
| FY 1996 | $10,157,199 | $4,257,588 |
| FY 1997 | $14,286,565 | $4,385,316 |
| FY 1998 | $13,731,581 | $4,516,875 |
| FY 1999 | $12,605,000 | $4,652,381 |
| FY 2000 through 3/5/2000 | $5,541,667 | $1,996,649 |
| Total, Receiver Costs | $56,322,012 | $19,808,809 |

| Jail Medical Contract Costs | | Comparable Costs Based on National Averages |
|---|---|---|
| FY 2000 3/6 through 9/30/2000 | $7,118,624 | $2,715,440 |
| FY 2001 | $12,775,837 | $4,935,711 |
| FY 2002 | $13,159,112 | $5,083,783 |
| FY 2003 | $13,553,885 | $5,236,296 |
| FY 2004 | $13,960,502 | $5,393,385 |
| FY 2005 | $6,126,880 | $2,407,247 |
| Total, Jail Contract Medical | $66,694,840 | $25,771,862 |
| Total Jail Medical Costs, FY 1996-2005 | $123,016,852 | $45,580,671 |
| **Total above National Average** | **$77,436,181** | |

Notes:  1.  The amounts for the Medical Receiver and the Jail Medical Contract do not include external medical costs such as outside hospital costs that are included in most other jurisdictions. This would increase the amount being spent on behalf of the Jail inmates by about $2.5 million per year.

2.  A completed study to be published soon by the National Institute of Corrections reports that the daily costs on a national average was $7.49 for 1998. The levels for the comparable national average have been adjusted for inflation from the 1998 daily costs reported in the study.

6

135

The Baltimore City Detention Center is highly comparable to the D.C. Jail in operations, inmate demography, health issues, and urban location. Like the D.C. Jail, it has been the subject of long-term litigation. The facility remains under a Federal consent decree, although since 1997 it has not been under active supervision of a court monitor. A contract is in place with a private vendor to provide medical and mental health services, as part of a larger contract with the State of Maryland for several facilities in Baltimore. This all-inclusive contract provides the Detention Center with all services, including medical and mental health, pharmaceuticals, and administration. Unlike the Receiver's contract at the D.C. Jail, the Baltimore contract also provides for the cost of outside medical treatment with no catastrophic limit. Both in-patient hospitalization and out-patient clinic are included. For D.C. Jail, those costs impose an additional annual burden of over $2.5 million on the DOC beyond the budget of the Receiver and his contractor.

This all inclusive contract provides for services at several facilities in Baltimore with a total population of 6,500 for a overall contract cost of $19 million, or an average per day cost of $8.01. The specific per diem cost of the Detention Center is reported to be $8.66. By comparison, the total health care cost for only 1650 prisoners at the D.C. Jail is over $15.2 million, including the costs of outside treatment not included in the Receiver's budget, resulting in a per diem costs of about $25.23.

Table 3.  Comparison of 1998 Medical Costs for 2 Nearby Jurisdictions

|  | Inmates | Inmate/Staff Ratio | Daily per Capita Costs |
|---|---|---|---|
| District of Columbia | 1,670 | 13 to 1 | $25.23 |
| Baltimore | 3,100 | 42 to 1 | $8.66 |
| Prince Georges County | 1,400 | 48 to 1 | $5.48 |

**C.  Why does the cost of medical care at the Jail significantly exceed the national average?**    The primary reasons for the high cost are the level of staffing and the high degree of administrative overhead, including numerous staff whose job description

7

136

requires them to provide no clinical services. ( See Table 4 below.)   A respected consultant advised this office that the administration of this mid-sized jail resembles that of an entire state correctional system.

**Table 4. Budgeted Cost of Key Staff Positions With No or Limited Designated Direct Patient Care Responsibilities Identified in Bid Proposal Position Descriptions**

| Category | Salary | Salary and Fringe | Comments | |
|---|---|---|---|---|
| Medical Director | $166,500 | $192,857 | No identified direct patient care responsibility | |
| Mental Health Director | $106,704 | $123,595 | " | " |
| Health Services Administrator | $80,040 | $92,710 | " | " |
| Director of Nursing | $87,400 | $101,235 | " | " |
| Dental Director | $94,500 | $109,459 | " | " |
| Pharmacy Director | $75,900 | $87,915 | " | " |
| Quality Improvement Coordinator | $66,500 | $77,027 | " | " |
| Intake Coordinator | $110,700 | $128,224 | " | " |
| Infection Control Coordinator | $65,075 | $75,376 | " | " |
| Chief Psychiatrist | $129,500 | $182,800 | 10% to 20% of time in direct patient care | |
| Radiology Director | $63,650 | $73,726 | Occasionally assists in more complex procedures | |
| Medical Record Director | $61,750 | $71,525 | Mostly supervisory responsibilities | |
| **Total** | **$1,108,219** | **$1,316,449** | | |

**D.  What is a constitutional, community standard level of medical care for the Jail?**  In Estelle v. Gamble, 429 U.S. 98 (1976), the Supreme Court stated that "deliberate indifference to serious medical needs of prisoners" violates the Eighth Amendment. Generally, this means that inmates must be able to make their medical needs known and have the opportunity to be treated by competent in-house or out-sourced staff in a timely manner.  Courts are not normally involved in certifying the constitutionality of a particular level of inmate medical care, since there are many alternative medical organizational schemes capable of satisfying this constitutional standard.  Rather, courts are typically

8

137

called upon to determine if a specific prison medical operation has fallen below this minimum level, exhibiting "deliberate indifference to serious medical needs," and therefore violates the constitution and requires some kind of remediation. Whatever the state of the D.C. Jail's medical operation two decades ago when the local Federal Court first took cognizance of it or in 1995 when the Receiver was commissioned, no one today maintains that deliberate indifference to the serious medical needs of prisoners continues to exist at the D.C. Jail. The principle issue now is the cost of the excess staff and supplemental inmate services being provided at the Jail.

Routine assessments of the adequacy of specific ongoing inmate medical services are performed by various accrediting organizations specific to this discipline, such as the National Commission on Correctional Health Care and the Joint Commission on the Accreditation of Healthcare Organizations. The American Correctional Association also requires that minimal standards in the delivery of inmate medical care must be met in order for a facility to be accredited by that body. Although the Receiver at the D.C. Jail has required that the follow-on contractor gain accreditation by one of these accrediting organizations, over the nearly five years of his direct management of the medical services operation, the Receiver never subjected his own medical services operation to the widely accepted industry accreditation review he has mandated upon his replacement.

Internally, correctional systems traditionally look to local community standards as a model for guidance regarding the specific kinds and amounts of medical services to offer. In operational terms, inmates are offered approximately the same levels and kinds of medical services that they would find in the local community if they were not inmates. This standard does not require the provision of medically unnecessary care, such as elective surgery, and services that exceed those available in the local community.

9

138

The Receiver here explicitly premises his admittedly excessive expenses on the grounds that the supplemental special medical services provided at the Jail are significantly better than the medical services commonly available in the local community.

**E.  What is a reasonable level of budget requirement for the Jail?**

Mr. Chairman, in your letter of invitation for this hearing, you raised a critical but difficult issue, asking:  What is the budget requirement of the Jail in order to provide a constitutional level of care?  While no simple mechanical answer is possible and acknowledging the caveats mentioned above, I will advance an informed professional opinion.  Understanding that the Receiver's current budget for in-house medical operations is over $12M and a contract is in place beginning at $12.6M, I nevertheless suggest that a budget of $5.5 to $6 million should be more than adequate.  It is reasonable to expect that an even lower figure should be feasible, given astute contracting and oversight.

Using the national average cost for State prison systems at $7.49 per inmate day and the average of similar urban jails at $7.68 cited above from the National Institute of Corrections study, then the annual cost of the Jail medical/mental health services would be approximately $4.6 million.  Even assuming a generous expense here of 33% above the average, the budget would be about $6 million.  Since the cost data from the Baltimore Detention Center is very close to the national average, an estimation using that jurisdiction as a basis would be similar or slightly more.

To make this comparison even more striking, the contract budget at the Baltimore facility includes all the general areas of expense in the Jail contract, as well as outside medical costs for hospitalization and specialty clinics, costs not covered by the Receiver's budget or the newly awarded contract in the District, but rather requiring the DOC to expend an additional $2.5 million or more per year.

10

139

## II. Issues Related to Award of Follow-on 5 Year Contract

### A. Concerns about RFP's Excessive Built-in Cost and Staffing Pattern:

From the beginning of my association as Trustee with the Special Officer's and the Receiver's planning for a potential contract to succeed the Receiver, I expressed concerns that the manner of the procurement would lock the District into a contract with unnecessary, excessively high levels of staffing and cost. Unfortunately for the District's taxpayers, that prophecy has now been fulfilled. In meetings, telephone calls, and finally in a letter to the Special Officer in June, 1999, I expressed my concern that no one was taking seriously the need to give sufficient attention to cost-effectiveness.

Performance-based RFP Ruled Out: From the outset, I pushed hard for a performance-based RFP as I had grown used to in my extensive experience with Bureau of Prisons' contracts. This manner of contracting is wide-spread in the Federal government and is strongly advocated by the Office of Federal Procurement Practices in the Office of Management and Budget. Such contracts specify a level of service, but let the market-based ingenuity of the competing vendors sort out the most efficient manner of providing the specified level of services. I offered to provide examples of such an RFP, since the BOP had recently awarded a similar medical services contract for its four-prison complex in Beaumont, Texas, at a daily rate of under $6.00 per day. The offer was declined.

Excessive Staffing Levels Locked In: With no explanation given except that the Special Officer and the Receiver did not agree, my recommendation for a performance-based RFP was overruled. The resultant draft RFP spelled out in great detail the requirements for 125 staff, approximately the same exorbitant level then in place in the Receiver's operation. It was clear to me that this approach would not lead to cost-effectiveness. At my strong insistence, the Receiver finally agreed to allow the vendors to submit an alternate proposal. However, any expectation for significantly reduced cost had

11

140

been undercut by the overall expectations for 125 staff requested in the RFP, and the requirement for the so-called comparative proposal bid which required a staffing level of 125, elaborating in painstaking detail each medical function.

The process proceeded over my objections, and I was assured that the Receiver's long experience and expertise in awarding such contracts would result in a high quality, yet economical contract. I said the proof would be in the pudding. I awaited the results.

Despite distribution of the RFP to more than 30 qualified providers, the RFP only elicited three proposals, and all were extremely expensive, with none even being close to an acceptable price range, in my estimation. My worst fears for the District were confirmed.

**B. Concerns with Low Emphasis on Overall price in Evaluation Process:** The Office of the Corrections Trustee has continually expressed concern with the minimal emphasis placed on cost containment in this process of this procurement. As an example, reference is made to the weight of price in the evaluation factors. The total weight of price is 35 of 135 points, or approximately 26%. However, on closer inspection it is clear that *Overall Price* was only one of five elements scored in the price category, worth approximately only 5 to 6%, to be given no more weight than such vague elements as *Rational Budget, Salary Structure/Fringe Benefits* or *Budget Presentation*. In other words, the bid score with the lowest price could easily be more than counter-balanced by a much higher bid which simply was "more rational," "better presented" or showed a better package of salary and benefits. Again, the interests of the District government and taxpayers in containing costs were disregarded.

12

141

**Table 5.  Evaluation Elements for Price Proposals**
**(26% of Total Score for Bid Evaluation)**

| |
|---|
| a.  Overall Price |
| b.  Rational Budget |
| c.  Salary Structure / Fringe Benefits |
| d.  Demonstrated Cost Controls / Innovations |
| e.  Budget Presentation |

**C.  Receiver's Problematic Role in Procurement:**  There was significant concern about the all-encompassing role of the Receiver in the procurement process, particularly after it became clear that a group of his employees and close business associates would bid on the contract.  Further, since the Receiver was scheduled to terminate his five year commission in September of 2000, only a few months after the five year contract would be awarded, there was concern that the District government would be stuck with an expensive multi-million dollar contract it had not itself awarded and which had never been approved by the City Council, as required by law.  I repeatedly urged that the procurement be handled by the D.C. Office of Contracting and Procurement, even if subject to some kind of review by the Receiver, to ensure the appearance and reality of fairness and to assure that the contract could be ultimately approved by the City Council.  The Special Officer and the Receiver declined my suggestions and even appointed the Receiver as the sole appeal authority on the procurement over his very own decisions, a position later overturned by the D.C. Contract Appeals Board.

**D.  First RFP Award Seriously Flawed by Actions of Receiver:**  The initial contract bid for the follow-on health care contract at the D.C. Jail submitted by the group then composed of the Receiver's handpicked employees at the Jail (hereafter CCHPS) was not received by the closing date set by the Receiver.  Nonetheless, without providing any disclosure to his own first procurement evaluation committee or justification in writing to any of the other timely bidders excusing the late bid, the Receiver sought to select that untimely bid as the winning bid.  On review, the D.C. Contract Appeals Board, whose

13

142

jurisdiction the Receiver unsuccessfully contested, concluded in a written opinion filed May 24, 2000, that "There appears to be little question that, in accordance with generally accepted government procurement practice, the initial late proposal of CCHPS was improperly handled. . . . The proper procedure would have been to hold the proposal unopened." [p.3]

The Appeals Board goes on to state, "the Receiver gives no basis for his statement that the 'proposal was dispatched in time.' . . . . The record is clear that the proposal was not dispatched at a reasonable time to insure timely delivery [p.6]. . . . Regardless of the correctness of the decision, the failure of the Receiver to make a written finding supported by any record as to his reasons for considering a late proposal gives the appearance of impropriety." [p.7]

The Appeals Board also made findings critical of the Receiver on two additional points. The Board stated that the "Receiver concedes that the [CCHPS officials then in the Receiver's employ] used District equipment and facilities to prepare the proposal." The Receiver, who claimed ignorance because he was on-site only one or two days a week, nonetheless "had an obligation to insure that his subordinate did not operate a private business, particularly one competing for a contract, out of their government offices." [pp. 9-10] The Contract Appeals Board also points out that the Receiver restricted access by other bidders to his current employees, even though it concerned information that "should have been made available to all offerors" and was available to the CCHPS group. [p.9] This led the Contract Appeals Board to state that "the Receiver's withholding of government information available to the incumbent Medical Director from other offerors, restricting access to current employees, and failure to supervise the Director's improper use of government facilities, give an appearance not conducive to confidence in the fairness of this procurement." [p.10]

14

143

Finally, in an earlier opinion dated March 27, 2000, the Contract Appeals Board criticized the Receiver's decision, contrary to District procurement law, to proceed with implementation of the award to CCHPS before the timely bid protest was resolved. By terminating his former employees whom he then immediately retained in another capacity as the winning contractors, the Receiver created a self-inflicted emergency and alleged that he absolutely could not postpone initiation of the new contract. He successfully relied upon this unnecessary self-orchestrated staff crisis to defeat the normal judicial and administrative postponement of the award, pending resolution of the bid challenge.

E. **Unexplained Reversal on Outside Medical Costs:**

Medical Provider to be Responsible for Outside Costs in First RFP: One aspect of the first RFP with which I strongly agreed was that it included a requirement that the winning vendor be responsible for the cost of outside medical expenses, both hospitalization and out-patient clinics. This method of responsibility is normally built into a provision of good contracts for correctional health care, as it provides a strong incentive for the vendor to handle all reasonable procedures in-house. During the first four and a half years of the Receiver's operation, his budget had not been responsible for these outside costs, thus eliminating his financial incentive to minimize his outside costs by handling all such appropriate cases with in-house staff, rather than referring them to D.C. General Hospital or another outside provider at the expense of the DOC.

At least the two top-rated proposals received in response to the first RFP committed to provide this outside care at an overall cost considerably below the previous actual cost experience of the District.

Second RFP Returns Responsibility for All Outside Costs to the District: During the period between the two RFP's a fundamental change in responsibility occurred, as the

15

144

second RFP removed the requirement for the vendor to absorb outside medical costs, and returned that responsibility to the District. This change occurred without notice or explanation to this office. In fact, it has never been satisfactorily justified to this day. This change undoubtedly cost the District from $500,000 to $1 million dollars or more per year, as I detailed in my letter to the GAO.

**Table 6. Bid Comparisons for External (Hospital and Clinic) Medical Costs**

| | |
|---|---|
| Other Bidder | $1,311,651 |
| CCHPS | $2,000,000 |
| Medical Receiver Estimate of Current DOC Usage | $2,571,000 |

This significant change, clearly to the economic disadvantage of the District, was later used by the Receiver as a rationale to justify to the Contract Appeals Board the issuance of an amended RFP, which action allowed the current contractor composed of the Receiver's former handpicked employees, to get back into the bidding, after effectively becoming ineligible due to the late submission of its proposal in the first round RFP.

F. **Participation in the Competitive Bidding Process by the Receiver's Employees and Associates**: I have repeatedly stated that I have no problem with CCHPS, the employee group, being awarded the follow-on contract, if it is awarded at a reasonable price, after an open competitive process that can be perceived by the public and all bidders to be fair and conducted on a level playing field. In fact, I have acknowledged that there are operational advantages to the District to awarding the contract to the current employees. However, the current award fails on both the grounds of cost and appearance of fairness.

At the same time, I was fully prepared to raise grave objections if any of the other bidders were to be awarded the contract at a terribly exorbitant cost. My essential concern

16

145

is with the process of the procurement, both the manner of the expensively built-in RFP requirements and the involvement and actions of the Receiver which undercut the perception of fairness.

   **G.  Net Effect: District Left with Seriously Flawed Template for Future Services**: Unfortunately, this new emergency utilization of scarce District resources is part of the very dear price the City must pay because it was saddled with a Court-appointed Medical Receiver who allowed no joint participation by this Congressionally established Trustee in his operation and initiated no regularly performed audits. The result is that the Receiver provided no appropriate or useable template for the future of the medical services operation at the D.C. Jail and the City must start from scratch to rebuild this mis-handled and unresponsive Court-supervised Jail medical services operation.

**III. Receiver's Non-Responsiveness to Scrutiny and Review**

   **A.  General Unresponsiveness**: After an initial meeting with the Receiver and the Special Officer of the Court who supervises him in which I attempted to learn more about the reasons for the size of this operation, I have found the Receiver to be insufficiently responsive to requests for information, despite being a more highly paid public official in the District than the Mayor. In spite of promises at our initial meeting in December 1997, I have never received information on the acuity levels of inmates at the D.C. Jail which the receiver indicated would help explain his extensive resource needs. Neither was anything more than minimal data provided to a consultant engaged by my office and selected after a joint process including the Receiver, the Special Officer of the Court and plaintiff's counsel, to look into such issues in 1999.

   **B.  $57 Million in Expenditures not Fully Audited**: In 1997, when I requested to review the annual audits required by the 1995 Federal Court order establishing the Receiver's authority, I was informed that there had been no such audit.

17

146

(See <u>Campbell v McGruder</u>, Civil Action No 1462-71, September 26, 1995 court order at p.8.) Through the Office of the Corporation Counsel, I requested that a financial audit be performed. After some time, a minimal two page cash balance audit was prepared, which contains the disclaimer that "the schedules are not intended to present the Receivership's overall financial position or results of operation in conformity with generally accepted accounting principles." To my knowledge, no generally acceptable proper audit has been performed for any of the period of the Receiver's existence over the last five years during which he has expended over $57 million dollars appropriated by the Congress and the District. In my 28 years of government experience, I am not aware of any ongoing government operation of this size anywhere which has not been subject to an audit of its use of appropriated funds.

Prior to the completion of the Receiver's commission in September, I cannot endorse strongly enough the importance of subjecting the Receiver's financial operations to an in-depth financial accounting, justification, and scrutiny, pursuant to generally accepted accounting principles similar to that applied to every large government operation. Such an independent audit should commence immediately.

   **C.  <u>Services Not Accredited</u>:** As mentioned, I do not question that the Receiver has installed a constitutional level of care at the Jail, and likely a level considerably above those requirements. However, he has not sought outside review in the form of voluntary accreditation, a normal process today for correctional medical operations. For instance, all Federal Bureau of Prisons facilities are accredited by the Joint Commission on Accreditation of Healthcare Organizations. Large numbers of state and local facilities have been accredited by the National Commission on Correctional Health Care. In sum, even today there is no independent confirmation that the Receiver's extravagant expenditures at the Jail ensured that the facility met the minimum standards of the independent accrediting organizations.

18

147

IV.  <u>Recommendations for the Committee:</u>

The Office of the Corrections Trustee strongly recommends that the following actions commence immediately:

**1.  Perform a complete audit of expenditures over the past five years**.  The expenditure of over **$57 million** over the past five years necessitates a thorough audit, conducted under the generally accepted accounting principles.  Such an audit is entirely consistent with the accountability of the Medical Receiver to the taxpayers and to the Government of the District of Columbia.

**2.  Immediately begin development of a procurement process to replace the current contract on the first option date, March 6, 2001.**  A new medical procurement must be redone by the District, using a performance-based approach.  The process should begin immediately since the Supreme Court's June 19, 2000, decision in <u>Miller v. French</u>, No. 99-224, makes the termination of the Federal Court's control over the medical services at the D.C. Jail even more certain.

Consequently, setting aside the very disadvantageous cost/benefit impact on the District of the current medical services contract, now is the time that the District government must immediately begin planning for the March 2001 follow-on medical operations at the D.C. Jail.

There should be no dispute that a fresh executive branch-based analysis of the D.C. Jail's medical requirements, which would put the District back in the mainstream of similar programs across the country, must be reflected in this follow-on March 2001 medical services operation.  To accomplish that goal, the preparation of the relevant plans and supporting paperwork should have commenced already and therefore needs to

19

148

commence immediately so that the DOC will be able to prepare an appropriate RFP that includes outside medical costs, can be timely published, allows for a sufficient evaluation period, provides time to negotiate a best and final offer, and – since it is virtually certain that this will be a multi-million dollar contract – allows time to secure City Council approval, and if then required, Financial Control Board approval of the contract, all before implementation nine months from now.

Mr. Chairman, this concludes my testimony.  I would be pleased to respond to questions.

20

149

Mr. DAVIS. We'll have a number of them. I'm going to start, I think, with Mr. Horn, who has another commitment. He has come in. We'll start the questions with him.

Let me just make one comment. I think, Dr. Shansky, my impression, just sitting here and listening to everything, is you were brought into a very, very tough job and you turned the place around in terms of meeting the criteria and everything else. You are a doctor. I mean, you're not a manager. That's not your job, and so on. And when it came to the bid, you wanted to make sure you could get some people in place that knew how to do the job and they were bidding. If they got it, great. If they didn't, at least you knew you had somebody competent. That's my take on it, and that's appropriate.

Now, I think you had some cost problems that go beyond what you perceived or what your expertise is, and that's always the difficulty when courts take over these is that courts are not managers, they are not administrators, and as we get ready to transition we've got some tough questions to ask.

That's my perspective on it, if it makes you feel better.

Ms. NORTON. Would the gentleman yield on that point?

Mr. DAVIS. I'd be happy to.

Ms. NORTON. I think the chairman makes an important point. If we are showing concern—and this is before we get to our colleagues who are going to ask questions, because I want to simply make a point and not ask a question. In a real sense, we in the Congress are confronted with the same problem when it comes to HMO and managed care, and one of the reasons that doctors have lost control of medical services is that if, in fact, you turn over the bank to them, they will exercise the best of their professional judgment, and what has happened as a result is all of us who are not in jail are now in HMOs and managed care precisely because we are trying to press costs down, and we've taken these costs from medical judgment, alone, and that turns out apparently not to have been the case here.

Mr. DAVIS. I'm going to yield to Mr. Horn for questions.

Mr. HORN. Thank you, Mr. Chairman. I hope I haven't disrupted the committee too much, but I have two questions, and I'd be particularly interested in all of your views on this.

To what extent in the D.C. jail do we have literacy education? That's one.

To what extent do we have appropriate mental health services in the jail and when they are out of jail in the community? Can you just give me a thumbnail of what you experts have looked at there—literacy and mental health.

Ms. EKSTRAND. Sir, I'm afraid I can't answer the question about literacy because it was outside the scope of what we were asked to look at.

In terms of mental health, they do have onsite facilities at the jail for mental health care.

Mr. HORN. Well, how good it is? I think Dr. Shansky is probably the expert, isn't he, on this?

Ms. EKSTRAND. I'm sure that he is more expert than I am.

Mr. HORN. Well, Dr. Shansky, I think you are the expert. What is the answer to it?

150

Dr. SHANSKY. First of all, with regard to literacy, there are literacy problems, but I am—and we have a health educator who works with the inmates trying to teach them at different levels of literacy skills how to take responsibility for their own health.

I think the Director of Corrections would be better able to comment on literacy, overall.

With regard to mental health, the D.C. jail is a unique facility in the country. The D.C. system is a combined prison and jail system. There are only five jurisdictions that I am aware of that are combined prison and jails under one single Department of Corrections.

The District, long before I came, decided to put its only inpatient mental health services at the D.C. jail, so if you were an inmate and became unstable you got transferred to the inpatient unit at the D.C. jail, and when I came on board not only were there a lot of legitimately mentally ill people, but there are also individuals who would manipulate in seriously destructive ways, maybe to come from Lorton, VA, into the District.

We had to put together a program that identified mental illness at intake, and we've done that successfully. I am pleased to report we've had no successful suicides in over a year-and-a-half, compared to, before I took over, an average of a successful suicide every other month.

Mr. HORN. Can I ask how many unsuccessful suicides you had?

Dr. SHANSKY. Actually, the number of serious attempts has been dramatically reduced. Those instances are pretty occasional now.

The thing that you need to remember is——

Mr. DAVIS. Dr. Shansky, let me just stop you. Mr. Horn health as got to leave, but what we'd like you to do is provide this for the record, because I think he'd like to have this on the record and I think it is an important piece of information.

Dr. SHANSKY. The thing that you need to be aware of is, as you are aware, the mental health program for the District is also under receivership. There are many people who are released from jail who, were they to be maintained adequately in an outpatient program in the community, would not, in all likelihood, come into the jurisdiction of the criminal justice system. In fact, my staff have participated with others in an effort to create a mental health court that will divert some of these individuals away from incarceration, provided that they maintain their therapeutic program that has been prescribed by the appropriate professionals.

There is no question, because we service the prison system, also, that the number of mentally ill inmates, seriously mentally ill inmates at the jail is dramatically higher than anywhere else in the country.

We know that when the Federal Bureau of Prisons ultimately takes responsibility for all of the sentenced felons the number of seriously mentally ill inmates in the jail is going to dramatically go down, because we have a substantial number of inmates who are in the mental health units at the jail who are sentenced felons.

In fact, we proposed early on that if the chronically mentally ill who were stable and were sentenced felons were to be transferred to the Bureau of Prisons—and at one point they had agreed to take

151

them 2 years ago—that would result in an immediate reduction in cost of between a half a million and $1 million.

We know that by the end of 2001 all of the sentenced felons will be the responsibility of the Federal Bureau of Prisons, and clearly the contract situation we've created allows the District to negotiate with its vendor literally at will to reduce staffing levels in services provided based on the population needs that it is responsible for at any given point in time.

Mr. DAVIS. Thank you.

Does anyone else want to address that?

[No response.]

Mr. DAVIS. Let me ask Ms. Schneider a question. You received a letter inviting you to testify. You refused. You stated that to do so would be a violation to the Code of Judicial Conduct.

After consultation with the U.S. House of Representatives Office of the General Counsel, the subcommittee concluded that you were not prohibited from testifying at this hearing.

We made it abundantly clear to you that we really had no intention of influencing any judicial proceedings or discussing any quasi-judicial functions you could exercise in your role as special officer. We repeatedly offered to meet with you to dispel any concerns you had about testifying. Finally, on Monday your attorneys came to this subcommittee for what we thought was to be a meeting in good faith. It turned out to be anything but that. Present at the meeting were the House general counsel, the majority and minority counsel for the Committee on Government Reform, subcommittee counsel, and majority and minority subcommittee staff. They agreed that your presence at this hearing was imperative.

Your attorneys were uncooperative, and therefore this subcommittee issued its first subpoena in the 6-years that I have chaired this, mandating your appearance today. You know how hard it is to get Mr. Waxman and Mr. Burton to agree on a subpoena.

Ms. Schneider, you've gone to incredible lengths to avoid this hearing, and yet it has come to my attention that during the 2-weeks since you received the invitation letter you have been consulting with the media. From the subcommittee's conversations with you, we couldn't ascertain what your relationship to the receiver is, but in this article in the Post today you have been quoted as saying that Shansky has not been a Lone Ranger.

How could you talk to the media and yet say you couldn't talk to Congress?

Ms. SCHNEIDER. Mr. Chairman, I first must say that my concerns about publicly commenting on this matter relate to my belief that I am bound as a judicial officer to the Code of Judicial Conduct. I did not talk to the press about that. That is apparently taken from a letter that I wrote to Mr. Odie Washington. I have made no comments to the press and have never spoken to the press about this matter due to my concerns about the Code of Judicial Conduct and my publicly speaking.

I do not want to be in a position to compromise this litigation. This litigation is almost 30 years old. I may be called upon by the judge or by the parties to make recommendations to the judge. It

152

will compromise my ability to do that to comment publicly about the merits of this case.

Mr. DAVIS. So you are testifying here under oath that you have not spoken to any Post reporters about this?

Ms. SCHNEIDER. I have not spoken to the Post reporter. I did not state that comment to the Post reporter. I was contacted by a Washington Post reporter and I informed him that I could not discuss the matter with him.

Mr. DAVIS. So let me just understand this. The only comment you made to the Post reporter was that you couldn't discuss this matter with him?

Ms. SCHNEIDER. That's correct.

Mr. DAVIS. OK. Thank you.

Ms. Norton.

Ms. NORTON. Dr. Shansky, you have repeatedly noted that one of the problems with the—that you encountered in the D.C. jail necessitating greater expenditures is that there are problems relating to the medical condition of these inmates greater than in other jurisdictions. What is your evidence that the District jail inmates are sicker than inmates in New York, Baltimore, L.A., and other large cities in the United States?

Dr. SHANSKY. Well, for instance, just to take one example, HIV's seral prevalence. The District's seral prevalence rate is about 10 percent, 9 to 10 percent at last survey. New York is similar—actually, a little higher. Baltimore's I'm not familiar with. L.A. County is substantially lower.

Ms. NORTON. What is it in Chicago?

Dr. SHANSKY. Chicago, it is about 1 to 2 percent.

Ms. NORTON. That's HIV/AIDS?

Dr. SHANSKY. That's correct. That's just one.

Ms. NORTON. You know, we have a somewhat higher HIV/AIDS rate than some other cities, but your testimony is that you have evidence that the costs that were required in D.C. are so much greater because the inmates are substantially sicker than they are in other large American cities.

Dr. SHANSKY. What my statement is that the reasons for the increase in cost are multifactorial. Epidemiology of disease and prevalence of disease is just one factor. Another factor is the decision by the District to house all of its acutely mentally ill, even from the prison system, at the D.C. jail. Had it chosen not to do that——

Ms. NORTON. If you took the acutely mentally ill out, what would be the cost of this contract?

Dr. SHANSKY. The mental health program, as described, that would probably reduce the program by a couple million.

Ms. NORTON. You have testified—well, let me ask you concerning your testimony. The contract that has been let, is a contract that could last as long as 5 years?

Dr. SHANSKY. Well, it is a 1-year contract with a possibility of four option years, each of which is to be negotiated between the Department of Corrections, the city administration really, and the vendor. And, as I indicated, the city is the appropriate jurisdiction, I think, to determine what kinds of services, what types of services should be needed.

153

As I indicated, we know that when the Bureau of Prisons takes all the sentenced felons the whole mental health program is going to be dramatically scaled down. Even if that is done in the middle of the year, the Department can renegotiate with a vendor and change in the middle of the year the staffing and other expenditures that are in the contract.

So we set it up flexibly enough so that the Department and the city administration will taper the services and expenditures to its perceived needs.

Ms. NORTON. Indeed, that is certainly the case. One of the reasons why collaboration with Mr. Clark was important—and you seem to have been willing to collaborate with the District, which seems to have been willing to do anything you said—but one of the reasons that collaboration with Mr. Clark was necessary is precisely the kind of transition that you speak of with respect to mental health.

For example, if you were to take the couple of million dollars out, you'd still be left with the cost of these services twice the national average, but if the point was to collaborate because we are in transition, I can't understand why an objective observer who comes from the Bureau of Prisons would have been somebody you didn't even want to hear nor did Ms. Schneider apparently want to hear, because it is hard to detect any oversight by her of you.

Dr. SHANSKY. Let me——

Ms. NORTON. So if there is no oversight by her, and Clark comes in as somebody charged by us and a Presidential appointee to look at management and financial reform, I cannot understand why the District of Columbia and Ms. Schneider and you, Dr. Shansky, wouldn't have used that opportunity, an opportunity that comes precisely from the Congress, to try to collaborate and perhaps go back to the court with a revised notion of what might be necessary here.

Dr. SHANSKY. Let me correct the record. Neither the District nor the special officer of the court have done everything that I wanted. That is not the way the process has worked. We have negotiated from day one how to implement, how to design services, how to create the proper program that the District wants. It has been a very fair and open and candid series of discussions we've had over 5 years.

I did not get everything. Everything is not done exactly the way I wanted. I realized from the beginning this is not my program, it is the District's program, and I have worked very closely——

Ms. NORTON. Dr. Shansky, you gave us no indication until you've just spoken of how those negotiations resulted in your getting less than you wanted. Would you care to give some examples?

Dr. SHANSKY. Initially we talked about providing certain kinds of services in certain ways when we proposed the budget, based on what the remedial plan required. There were different interpretations. We participated with the corporation counsel's office, and the budgets each year, in essence, were negotiated around what needed to be required.

Each year the process took place. And, as you can see, each year the budget was scaled back, and each year we returned moneys to the District.

154

Ms. NORTON. How did the budget go down from $16 million to $12 million? Was that a voluntary act on your part? Did you cut back on your part by yourself in your own judgment?

Dr. SHANSKY. It was a collaborative effort between myself, the corporation counsel's office, the Department of Corrections, special officer, and plaintiffs.

Ms. NORTON. Mr. Clark, what role did you play in that process?

Mr. CLARK. Well, as I mentioned, when I first came in I was quite stunned by this level, although I think, you know, to be fair to Dr. Shansky, the $16 million level in 1997 included $1.5 million or an extensive amount of a 1-year grant, I think, money from the Marshals for some equipment and some other factors there, so I think his true budget was somewhere in the $14.5 million range that year.

But, on the other hand, there hadn't been that much of a reduction, and I don't know why he made decisions. But I know that when I came in and learned of this, I started to raise serious concerns with both him and particularly with Ms. Schneider and with the District, and I think that had some significant influence on lowering that budget.

Ms. NORTON. Dr. Shansky and Ms. Schneider have indicated that the District can always contract for services for a lower amount. This receivership for 5 years was supposed to be returned to the District so that the District could take it off the shelf and run it, and if that is not the case then I don't understand what a receivership is about.

Dr. SHANSKY. Just to set the record straight, that is the case.

Ms. NORTON. All right, but——

Dr. SHANSKY. At the end of August——

Ms. NORTON. But when this matter goes before the City Council of the District of Columbia I can guarantee you that it will be very hard to justify this level of cost, given the other pressures on the D.C. government.

Both of you have indicated that the District is free to reduce the cost. This, of course, will take some considerable re-engineering to make sure that the new contract takes into account the very quality concerns that resulted in the District being ousted from jurisdiction, while at the same time meeting the District's budget requirements.

This is precisely the expertise that the D.C. government lacks, and I submit that Mr. Washington clearly lacks now when he says, "We're getting all we paid for," and clearly shows no indication that he wants to reduce these costs at all. He loves these costs. He loves this contract.

So I don't understand why, after 5 years, you are giving the District back a contract that almost surely will have to be re-engineered, unless the Mayor of the District of Columbia is willing to pay considerably more for jail costs than he has shown a willingness to pay above the national average for costs for other residents. I do not understand how you have spent your time, if it is to say, "You can take what I've done, throw it out, re-engineer it, and bring the cost down." Why do we need you in the first place?

Dr. SHANSKY. I believe that——

Ms. NORTON. That was your job, to——

155

Dr. SHANSKY. Let me just indicate——

Ms. NORTON [continuing]. Give us back a cost-efficient——

Dr. SHANSKY. Let me just indicate I believe I was needed in order to save lives, and I tried to do that, and I believe I was successful.

With regard to the competence of the city administration, I have every confidence that they have the expertise, the know-how, and the commitment to tailor a program based on their perception, the city's perception of what needs and what services should be provided. I have every confidence in them, and I will so report that to the judge.

Ms. NORTON. Well, of course you have confidence. One of the reasons I would have confidence in them is they're getting a re-engineered program, a program that has been fixed. It is hard for us to understand how you can fix a program that leaves us this for out of the range of average services.

Mr. Chairman, I will pass and come back.

Mr. DAVIS. Thank you very much.

Mrs. Morella.

Mrs. MORELLA. Thank you.

I'd like to first of all direct a question to Ms. Ekstrand—and this was picked up by Mr. Clark—the differences, the disparity with regard to Baltimore, Prince George's County, and the District of Columbia. Could you tell me, from the GAO study, what are the differences in the kinds of medical services and problems that you found in Baltimore and Prince George's County compared to the District?

Ms. EKSTRAND. We do know that there is 24-hour-a-day pharmacy onsite at the D.C. jail and that is not the case in Baltimore City, not the case in Prince George's County.

We did also focus on mental health services, and again mental health services are enhanced in D.C. compared to Prince George's County and Baltimore City.

We did not have the opportunity in the time we had to do this review to go through item-by-item to make that comparison, but those are two of the larger items.

Mrs. MORELLA. Are you kind of in that statement sort of justifying the fact that the District of Columbia costs that much more, the pharmacy and the mental health?

Ms. EKSTRAND. Well, I'm just making the point that the enhanced services and enhanced staff means that it costs more money. We did not have the opportunity in the few weeks that we looked at this program to determine whether there were other aspects that affected costs, such as efficiency or salary levels. Those were outside the scope of what we could look at since the end of May. But at least we were able to identify some factors, and those factors had to do with enhanced services.

Mrs. MORELLA. Thank you.

Let me ask Mr. Clark to pick up on that. With all the experience that you have had with the Federal system and in Miami, do you see—I know the difference is, like, four times the difference in terms of price, and we know it is basically because it is staffing, but can you see an equation between the kinds of services provided and the cost? Does that make up for it?

156

And then I'm curious. Has anybody looked at, like, recidivism rates? I mean, can you show something for this difference?

Mr. Clark, would you like to comment? And then if anyone else would like to comment?

Mr. CLARK. Well, two or three points.

I think everybody would agree that one difference, one legitimate difference, is the service provided to the sentenced felons, which is a group which will go to the Federal Bureau of Prisons within the next year or so. I think Dr. Shansky, while he noted that the total mental health cost may be $2 million, I think he testified a couple of times that when the felons go that would reduce the cost by a half a million to possibly $1 million. I wouldn't argue with that. Other than that, I don't see any—the services that the inmates are being provided in Baltimore, whether it is pharmacy, mental health, or all the other services, meet Constitutional standards. They meet accreditation standards. They've all been accredited in those facilities. So the total package of services I don't think is a problem in those facilities in Baltimore or in many other places around the country.

And I'd like to make what I think is an important distinction. Higher staffing levels do not equate directly to improved services. At a certain point you reach a point of diminishing returns, and adding more staff members on the evening shift or adding additional nurses, pharmacists, or whatever, does not significantly improve the services. So once you've met a basic level, adding additional staff has marginal benefits, in my estimation.

Mrs. MORELLA. I have kind of confirmation of what you are saying, and that is a quote from a company, Faiver, Campau and Associates, "Nowhere in the country are we aware of a facility of comparable size that has such a top echelon of staff who are not also significantly involved in direct patient care." That's quite a——

Dr. SHANSKY. Congresswoman Morella, could I respond to that?

Mrs. MORELLA. Of course, Dr. Shansky.

Dr. SHANSKY. That particular consultation, which was solicited by the trustee, was done purely by paper. There was no interviewing. In fact, that particular consultation was completely inaccurate.

All of the staff, virtually all of the staff that he refers to as being 100 percent administrative are spending a significant percentage, 50 percent or more of their time, providing direct services. So it isn't the case that these people are purely doing administrative functions. He never found that out because he never interviewed anybody.

Mrs. MORELLA. Have you—recognizing all of that, do you feel— and knowing that you have made some reductions, putting this all together, do you feel you could reduce the number of staff?

Dr. SHANSKY. It is my view——

Mrs. MORELLA. And enhance efficiency.

Dr. SHANSKY. It is my view—right now we are in the process of completing the renovation, so efficiencies just physically are difficult. That should be finished by the end of October. And it is my view that, in fact, there can be some reductions, and we've already talked about it with the vendor. The District has talked about it. And I have every expectation that for the next contract there will be significant reductions in expenditures.

157

But I believe those are the District's decisions, and I have attempted to take, to a great extent, besides taking leadership from the court, also from the District because it is ultimately their program.

Mrs. MORELLA. We have a Government Performance and Results Act, you know, where we require our agencies and say, "OK, now what have you accomplished, not so much what your mission is and what your modus operandi are." It seems to me that the system could certainly use a Performance and Results Act requirement.

Dr. SHANSKY. We have built exactly those performance measures into this request for proposal. It is the first one that I am aware of—and I was responsible for issuing request for proposals for 12 years for the Illinois State prison system, the first system ever to privatize. The reality is that we have put in performance measures, not just ensuring that certain processes are completed, like intake processing, but that the degree of control of chronic illnesses is such that morbidity and hospitalization are prevented. All of that is built into this RFP. It is unquestionably performance based.

Mrs. MORELLA. OK. I know my time has elapsed, and I thank you.

Mr. DAVIS. Let me try to put a perspective. I would much rather be here talking now about overstaffing and high salaries than I would a situation that we couldn't correct. I just put that in perspective.

This looked like an impossible situation at the time you took it over and you turned that around, so that is understood and that is good.

But, for those of us that have to operate within the confines of government, which is transparent, which has limited salaries and everything else, you know, this violates all the rules, and it violates all of the traditional rules of government because we were not—you didn't have political oversight. You had oversight from a judiciary branch. And that's where you go back into the political spectrum and it goes back to the city that is not ready to transition, and that's why we are asking these questions.

Dr. SHANSKY. I believe it is ready for transition. The contract is in the midst of its first year. The Department can, beginning to work right now with the vendor, restructure or shift or move or——

Mr. DAVIS. It's a lot more ready to transition now than it was when you took it over. No question about it.

Dr. SHANSKY. There's no question.

Mr. DAVIS. So I'd put that in perspective.

Dr. SHANSKY. There is no question about that.

Mr. DAVIS. But I think you would concede and I think Mr. Clark and the GAO and others who have testified make it very clear that the payment for what were getting is very, very high by any normal governmental standard.

Dr. SHANSKY. And the District has the opportunity to make decisions about what it wants to pay for and what value it is getting for the dollar.

Mr. DAVIS. Of course.

Dr. SHANSKY. And that's why I think this is a perfect situation in terms of the closure of this receivership within the next——

158

Mr. DAVIS. And that's why we are holding the hearing. We need to understand that, and if the city had these costs in every part of its government and couldn't afford it, it would be a lot better run city, but that's a different issue.

I'm just trying to put it in perspective, and you don't need to be overly defensive, but I just—and I can understand why you are that way. The main mission was accomplished, and it looked almost impossible when you took it over.

My wife is a doctor, too, so I understand. She's tighter on finances than I am, but I just want to put that in perspective for you.

Now, let me ask a few questions here for Ms. Schneider.

What are the major duties you perform on a regular basis as the special officer?

Ms. SCHNEIDER. My duties as a special officer is to ensure the compliance of the court's orders. That can be done through mediation with the parties on various issues, through observing and reporting to the court, and making recommendations.

Mr. DAVIS. When you look at your priorities, cost has not been at the top in terms of trying to do it within the restrained budget. You're really looking at turning this around and——

Ms. SCHNEIDER. Well, my mandate is precisely to ensure that the court orders that are in existence are followed, and that is by the order that appoints me. It requires me to ensure that those orders are followed.

Mr. DAVIS. OK. So the court orders, no staffing levels are required? That's a judgment call that you would make?

Ms. SCHNEIDER. There were staffing levels required in the initial remedial plan, and there has been a process in this litigation where those staffing levels have been reduced each year through negotiations with the party and a budget that was submitted to Judge Bryant each year for consideration.

Mr. DAVIS. But did you ever make any comparisons to other jurisdictions' costs and services while the plan was being worked out among the parties, for example?

Ms. SCHNEIDER. Well, my mandate was to ensure that the court order, as it existed, was followed.

Mr. DAVIS. All right. Now, I think I understand how we got to where we are, and I don't know that anybody is culpable or anything, I just want to try to understand that cost was really the kind of last thing you'd look at as you try to work your way through a very, very difficult situation when you took this over, and I can appreciate that.

The corrections trustee reports that you appointed the receiver as the sole appeal authority on the procurement over his very own decision. Can you explain that decision?

Ms. SCHNEIDER. Excuse me, that was not my decision to appoint the receiver as the sole——

Mr. DAVIS. Whose decision was that?

Dr. SHANSKY. When we drafted the RFP, we had discussion with counsel on a variety of things. One of the issues that came up was to what extent we could parallel, if you will, D.C. procurement law.

Now, the reality is D.C. procurement law refers to and is applicable to D.C. agencies. I was clearly not a D.C. agency head, so,

159

strictly speaking, D.C. procurement law wasn't applicable to a procurement that I was going to do, and I couldn't, in my procurement, somehow require the chief of procurement to be responsible. I had to accept that responsibility myself.

Mr. DAVIS. And your argument now is, as the city transitions they can renegotiate.

Dr. SHANSKY. Yes. Exactly.

Mr. DAVIS. Then that makes my next question for Mr. Christian and Mr. Washington. What mechanisms do you have in place to renegotiate the contract and control costs at this point?

Mr. WASHINGTON. Thank you, Mr. Davis.

First of all, I want to simply say that I, like many in the District, love the services that are currently being provided, but we all have a problem with cost, as has been the case for the last 5 years, but I have been impressed by the fact that the cost continues to go down every year and I am convinced that costs will continue to go down.

The best way to do that is to return control of medical services and mental health services back to the District, where we will be able to negotiate specific services and further reduce the cost. I am confident the that District of Columbia will be able to do that.

Mr. DAVIS. If you don't do that, don't come running to Congress. You'll have to go somewhere else to find the money. I'll let you make that argument with the Mayor, but I think that's—and that's really the bottom line at the end of the day.

Mr. WASHINGTON. And clearly that is understood, Mr. Chairman.

Mr. DAVIS. Do you have any mechanisms in place right now? Can you give us any idea where you might be headed on that, what cost controls you put in effect, what some of the services are being provided that you might not be able to provide, or anything?

Mr. WASHINGTON. Well, one of the things that we will be doing is to hire our own medical expert to oversee the contract. That will be our person to evaluate the services that are being provided and to determine what services can be reduced. That is a position that will be established.

Mr. DAVIS. I'll tell you what. Instead of putting you on the spot today with that, maybe you can get back with the committee and talk to us as you transition about what some of your thoughts are with specificity. Would that be amenable?

Mr. WASHINGTON. Yes.

Mr. DAVIS. I think that would be helpful to us.

Mr. Christian, do you have anything to add on that?

Mr. CHRISTIAN. Again, Mr. Chairman and Council members, we are trying to maintain the quality of services that have already been provided at the most efficient and effective manner, so we would be looking at that contract during this period and when it expires.

Mr. DAVIS. Why don't you try, let's say in the next—within 10 days could you get us back something in terms of your thoughts on transitioning this back to something that is affordable?

I would just say one thing: the city—I mean, not you, personally—you weren't probably with the city then—but the city had this thing really messed up. It has been fixed from a services point of view, but now we have to contain costs, and we are just eager to

160

understand how you are going to do that, how you are going to get there, because if these costs continue it just doesn't mesh with the culture of this city or any other city when you take a look at the other staffing ratios. So we want to see how we make this transition.

If I have to put an emphasis anywhere, it is on making sure the city isn't sued again and that we are fulfilling our Constitutional obligations, so you have to do that. You can pick and choose, and I think you have a better system here than you have in Baltimore or you have in Prince George's or the others, but you are paying a lot more for it, too, and what that balance is, we're just eager to know what your thoughts are on that. That's all I'm trying to get at.

Let me now yield to my ranking member, Ms. Norton, for a few more questions.

Ms. NORTON. Mr. Christian and Mr. Washington, you are aware that, as this hearing is going on, the Appropriation Committee is having a hearing in which it is looking precisely into whether or not the District is not only improving its services but is improving the management of those services. The Appropriation Committee is very much in sympathy with what this committee is doing and has made that known.

Are you prepared, when the appropriation comes before the Appropriation Committee next year, to come forward with a contract with these costs in it?

I ask that of you, Mr. Washington, because you said to the Washington Post, "I think we are getting what we are paying for," therefore I don't see any inclination on your part even to begin to reduce costs, and so must assume that when you go before next year's appropriation you will not be recommending to the Mayor that any changes be made. Therefore it would be the Appropriation Committee or the Council that would have to do the oversight here.

Mr. WASHINGTON. Well, actually, Congresswoman Norton, I think it would be just the opposite. I think we will very much be prepared to discuss cost reductions.

One of my primary concerns, as a relatively new director of this department, is to ensure that the D.C. Department of Corrections does not revert back to 30 years of neglect in our department. We have a wonderful opportunity to get from under a 30-year court mandate and oversight of the D.C. Department of Corrections and return control to——

Ms. NORTON. When this program comes back, who will be the officer who has control over it?

Mr. WASHINGTON. Well, the Director of the Department of Corrections will be responsible for medical and mental health services.

Ms. NORTON. That's you, isn't it?

Mr. WASHINGTON. That's correct.

Ms. NORTON. And you want control over this and you want it back from the receiver?

Mr. WASHINGTON. Absolutely.

Ms. NORTON. So you have been cooperating with the receiver in order to make sure that you, in fact, get this program back.

Mr. WASHINGTON. Yes. I think the quickest way to reduce cost is to return control to the Department of Corrections and negotiate

161

future contracts. I think we have a good level of services. That's important to ensure that we do not have continued court oversight, and further reduce costs.

Ms. NORTON. Dr. Shansky and you have said the same thing. That's a dangerous thing to say to this Congress. You know, the chairman and I have kept this matter before this committee. In doing so, we have made sure that we focus not on the courts. Neither of us believe it is inappropriate for courts to take over functions that are in the shape these functions are in, but there are many who disagree with us. To the extent that there is testimony before the Congress that courts don't have any obligation to contain costs when trying to reform matters in receiverships, you endanger the whole notion of court receiverships and non-interference by the Congress of the United States. I think you should be told that.

This matter could just as easily be in the Judiciary Committee, and if it were there would be a very different kind of hearing. Indeed, the Congress has already intervened into receiverships. You do not help those of us who believe that the courts, particularly with respect to jails and to prisons, have done a service to the country in taking over such systems. You do not do a service when you say that it is quite all right for the receivers to rack up any costs they want to and then give it back to the people who couldn't manage in the first place to bring down the cost, and that is what I am hearing from you, Mr. Washington, and that is what I'm hearing from the two receivership officers.

Dr. SHANSKY. Let me correct what may be a misperception on your part. My mandate was to put the program together and to save lives, but it was also to be fiscally responsible. We have been audited. We will be audited again at the end of the receivership. The audits were court mandated and arranged by the city. We negotiated and discussed each budget, literally at times every position and every service. We have returned money to the District each year that was unspent. I don't think that is a record of someone who feels that a receiver has no responsibility to look at cost factors. Quite the contrary. We have been sensitive to the cost concerns, and I think the District has also been sensitive, as has the special officer.

Ms. NORTON. Dr. Shansky, it was precisely because there was no audit of the kind that D.C. agencies are required to engage in and only a two-page audit spreadsheet presented that this House unanimously passed a bill requiring that full-scale audits be done not after the receiver is through but on an annual basis while there is a receiver so that the receiver is not held to a standard less than the agency who has given up the function would be held.

Dr. SHANSKY. Once again let me correct the record. The audit that was to be performed was determined by the city it was supposed to be done under the existing city contract by a firm, Peat Marwick, which was doing all the city agencies. I had no say in determining how that audit was done, who was doing it, or what it consisted of.

Ms. NORTON. Just a moment. Did not the court require an audit?

Dr. SHANSKY. Yes. That's correct.

Ms. NORTON. Ms. Schneider.

Ms. SCHNEIDER. That's correct.

162

Ms. Norton. Did you regard that as the kind of audit that was satisfactory?

Ms. Schneider. There was a court order requirement for the audit, and the audit was——

Ms. Norton. Do you know what an audit is, Ms. Schneider? Do you know the kind of audit that District agencies, in fact, routinely have to go through?

Ms. Schneider. This was an audit that was done. It was organized by the city, by the agency that was doing the city audits.

Ms. Norton. Mr. Washington, are you aware of the kind of audit—who organized it? Who was the officer? Was it Mr. Washington?

Dr. Shansky. I believe this preceded Mr. Washington.

Ms. Norton. Are you aware of the kind of audits that the new auditor requires when he does an audit of D.C. agencies?

Dr. Shansky. I wasn't made aware——

Ms. Norton. Do you think that this is representative of the kind of audit that agencies should go through?

Dr. Shansky. Let me indicate, after approximately 2 weeks of providing all financial records, all invoices, all bank statements, etc.—and, again, this was an audit arranged by the city by the contractor with a contract to audit city agencies—no one was more disappointed than we were to get, for the cost of that audit, which I'm told was about $40,000, that two-or three-page statement, believe me.

Ms. Norton. Again, I'm not sure what Ms. Schneider's job is, but obviously the District wants to get out of the receivership. The District apparently felt it had no stake in the kind of audit these agencies have to go through.

I repeat, I am concerned if the District now has to figure out how to reduce these costs, because the District is going to have to, in fact, design an RFP that meets quality concerns and also the cost concerns that the Council and the Mayor will raise.

When I look at the number of physicians, no matter how we get into this contract, questions are raised that any public official—you, Mr. Christian; you, Mr. Washington; you, Ms. Schneider; you, Mr. Shansky; and certainly the GAO—should have wanted to question.

For example, 15 doctors serving something over 1,600 inmates here, five serving something over 3,000 inmates in Baltimore——

Dr. Shansky. Those figures, by the way, are inaccurate. We do not have 15 physicians, and I'm not sure——

Ms. Norton. How many do you now have?

Dr. Shansky. We have——

Ms. Norton. You obviously had it at one point. How many do you have now?

Dr. Shansky. We have, I believe, nine.

Ms. Norton. Compared to five for more than twice as many in Baltimore, three times as many as these now——

Dr. Shansky. Again, you are quoting figures from a report in which the data was demonstrated to be inaccurate. Now, it is very hard to have a discussion——

Ms. Norton. Give me the accurate data. I'm giving you the data you told me. It was nine. Prince George's, same size as D.C.——

163

Dr. SHANSKY. Again, inaccurate data.

Ms. NORTON [continuing]. One M.D. for 78 compared with one for 15 here. What are your figures now?

Dr. SHANSKY. When we talked with the officials at these agencies, they told us, first of all, in the Baltimore contract they said the numbers were part of an overall contract and it was very difficult for them to attribute the costs related to the jail part of that contract.

Ms. NORTON. I'm just asking you about doctors now.

Dr. SHANSKY. I don't recall the specifics of the doctors, but——

Ms. NORTON. I'm just saying that Prince George's, which is the same size as we are, the same kind of population, one doctor for 78 inmates compared with one for 15 inmates here, and we're supposed to say, "That's fine. The quality has improved, so don't ask any more questions."

Mr. DAVIS. Let me recognize Mrs. Morella.

Mrs. MORELLA. Picking up on our discussion today, I notice another difference probably among many of the correctional institutions in health care is the on-and offsite staffing, and I note in your testimony, Dr. Shansky, you mentioned that the offsite consists of, like, a physician and a nurse at D.C. hospital.

Dr. SHANSKY. Yes.

Mrs. MORELLA. I'm wondering whether this—and I'm going to get to you in a minute, Mr. Clark, whether this occurs in other hospitals, too. But it was interesting, as I was re-reading your statement, where you indicated that they are there also to make sure that they don't stay there too long, to control. And I was thinking of the problems that patients have with HMOs, you know, where you've got a gatekeeper that says, "You can only stay 3 days," or whatever it may be. That's the same kind of thing you're doing.

Would you like to just comment on how effective you think it is having a——

Dr. SHANSKY. That's a very legitimate concern. We added this, because when I came on board—and all of the Lorton facility, as well as the jail and the Correctional Treatment Facility use D.C. General as its main resource. One of the things that I found was corrections patients admitted to D.C. General were distributed among a variety of house officers, most of whom had their major focus on their non-incarcerated patients, and so the concern wasn't that people were being sent out too quickly, as might be the case with an HMO, but they were literally forgotten or neglected and allowed to stay way, way too long.

We talked to the District. The District felt that it would be a cost-effective investment to make sure that we had one doctor in control of all of the patients admitted to D.C. General from Lorton, from CTF, as well as the jail.

There is no question we dramatically reduced the length of stay because our doctor focuses on those patients and gets them out in as timely a manner as possible.

Now, when the prisons close down the city may decide, because there are fewer patients in the hospital, maybe it doesn't want to support that service. But, given the number of admissions from all of the Department of Corrections facilities, it made sense to put a

164

doctor in charge of that care, and therefore reduce the length of stay.

This was particularly important because the D.C. General Hospital became a public benefits corporation and began billing the Department of Corrections. Up until that time, which was roughly 1998, there was no transfer of funds, as far as I understood. But when they began doing that we talked with the Department, and the Department said, "Yes, we don't want to be paying for unnecessary services, for people who are just laying around after they've received maximum hospital benefit." It was on that basis that we instituted this program.

Mrs. MORELLA. Mr. Clark, would you like to comment on whether this is being done any other place and what you think about the efficiency? I mean, it is a pretty convincing case if you are reducing the time and you are watching them.

And then I would like to also ask you about this pharmacy. Have you found that there are other places where—I mean, is it common to have a pharmacy connected with a jail of that size? And then would it be better to—I mean, more cost effective to have a contract with a vendor for that kind of service? I don't know much about it.

Mr. CLARK. Three issues, I guess, Mrs. Morella.

The first one: I generally agree with Dr. Shansky on the advisability of having a physician or—well, principally a physician—whose loyalty or whose concern is primarily directed to the Department of Corrections providing some oversight to those cases at D.C. General or any of the other outside hospitals.

On the other hand, I have a significant problem, as I mention in my written testimony, with the way the RFP, the second RFP was restructured to remove the responsibility for outside medical from the vendor so that the incentive, which had been built in and which is common in these contracts everywhere, as far as I can tell—and within the last few days we've contacted eight or nine States who contract out all or part of their services, and they all require the vendor who is providing the jail or prison health care to also be responsible for the outside medical care. If you don't do that, you reduce the incentive or there is a reverse incentive in terms of providing the treatment in-house. And there is almost an incentive on marginal cases to move that case to the local hospital when then it becomes an expense to the Department of Corrections.

That was our experience in the Federal system under contract facilities, and we went to total outside contracts, first with a catastrophic limit of $5,000 or $10,000, and then I know more recently they have removed that catastrophic limit.

So I have, as I have testified in my written statement, a major concern that it was not in the economic interest of the District to remove that responsibility from the vendor.

Your next question was about the pharmacy. It is not uncommon to have in-house pharmacy operations. I think in these contracts that is more of a market question. In other words, you ask to have a certain level of pharmacy services provided, and in some cases it is done more on an operation, in-house operation, sometimes more on a regional kind of a basis.

165

Again, the problem that I have with the requirements in this contract are not that it is in-house; it is that they have, in my estimation, much exceeded the numbers of staff who are commonly needed to run a pharmacy in a correctional facility.

I forget your third question, ma'am.

Dr. SHANSKY. Could I respond on the—I think it needs edification, the offsite service responsibility.

The usual arrangement that I have seen is where you build in some sort of risk sharing, as alluded to by Mr. Clark, with the vendor. We had every intention of doing that, and we intended to negotiate with the selected vendor the conditions of that risk sharing.

Some time in the fall of 1999 we were informed by corporation counsel's office that, if we were to want this contract to be assigned to the District, we could not engage in those kinds of discussions with a vendor at the time of selection, so that we were locked into whatever was in the RFP if we're going to leave this in, No. 1.

No. 2, the vendors came up with per diem rates in their proposals that were, in fact, not as good as the per diem rate that the District had at that time, so we felt this was not in the district's interest.

The other thing is that the vendor's proposals were very divergent. One vendor was very low on the outpatient side, very high on the inpatient side. Another vendor was very low on the inpatient side, very high on the outpatient side. None of them justified their numbers.

We felt the wisest thing to do, particularly since we had a doctor in place and that doctor controls both admissions and discharges, so the risks that Mr. Clark is alluding to are taken care of by our having our person in control of those patients, which isn't the case with most contracts with correctional facilities, and on that basis we felt the wise thing to do, the thing that was most prudent, was to take the offsite services out in the first year and then, for the second year, the Department of Corrections and the Mayor and the director of Corrections could, if they chose to, negotiate the kind of risk-sharing and offsite responsibilities that they felt were in the District's best interest. That's why we made those decisions.

Mr. CLARK. I'd like to respond to that.

One of the issues here is on this performance-based contracting and whether or not there was an incentive built into the contracting for the bidders to be innovative and creative. In this area, a couple of the bidders bid significantly below the District's cost, one of them way below. I would call that innovation or creativity. In this case, Dr. Shansky chooses to say that the companies were confused and somehow didn't understand. Well, these companies bid on these contracts all over the country. They understand. They knew what they were doing. And for some reason—again, I've got a chart, I think, that compares the bids on page 16 of my testimony that makes that point.

Dr. SHANSKY. Let me respond that the numbers were not justified. There was no basis for the numbers.

Mr. DAVIS. Dr. Shansky, let Mr. Clark finish before you interject, OK?

Dr. SHANSKY. OK.

166

Mr. CLARK. Again, I think this is another example where creativity and innovation were removed or not rewarded, and whether or not the receiver in his role as the procurement official, understood or felt that the background development of how these numbers came to be may have been justified, the company bid, in one case, was $1.3 million, which was about half the District's estimated cost.

When you bid, if the bid is accepted, then you are going to have to live with that, and to me that's innovation. It's not confusion.

Dr. SHANSKY. Let me just indicate we selected the lowest bidder, No. 1. Within the finance category, lowest bid was considered the determining factor, and that was the largest single factor of any of the factors considered.

With regard to the offsite services, had we been able to negotiate with a vendor at the time of selection, we would have stuck with it. When we were told by corporation counsel contract lawyers that we could not do that, we felt it was potentially dangerous for the District to enter into a contract based on numbers that had no justification.

What we didn't want was a vendor not hospitalizing people in order to meet the bottom line, which was inappropriate, that they had proposed and the District suffer the consequences of that sort of gatekeeping.

Mrs. MORELLA. Dr. Shansky, I just want to say that I think that this hearing has brought together a lot of the issues that have been smoldering, and I hope that what will happen is not only we will continue to be updated as we move along and get out of the receivership but that there will be some compromises worked out so that, you know, I think some of the things we've said and that we've listened to could be worked out, so I guess in that sense of moving ahead for the correction system and the accountability and all, this has been a great meeting.

I yield back the remainder of my nothing time.

Mr. DAVIS. Mrs. Morella, thank you.

Let me make a couple of comments, and then I'm going to—I mean, I think we get the gist of what has happened. I think everybody has had their say here and we understand.

What concerns me now looking ahead is, is the city ready for prime time? Are they ready to take this over, because I've seen very little oversight from the city during this time except that they are eager to take back the control, and, frankly, I'm not sure I am comfortable with that.

Mr. Clark, what is your judgment on that? Is the city—can they innovate these—have they shown the oversight initiatives and the like that show they have any understanding of how they can reduce these costs and maintain a level of service that will be acceptable Constitutionally?

Mr. CLARK. Well, I know that Director Washington is working to step into the—to have the Department step into the role of oversight of the contract, but what I—and I guess this is partly why I got into the uncomfortable position that——

Mr. DAVIS. Let me just interject, obviously they can spend what they are spending and it will be fine, but that has other ramifications city-wide at this point.

167

Mr. CLARK. Absolutely. I mean, this is money that could be spent for schools or police or pot holes.

Mr. DAVIS. Well, you have people that are working two jobs trying to support kids that have no medical care, and the people who are in jail are getting much, much better care, and if that is the city's priority, but I don't think it is.

Mr. CLARK. I think what I found when I came in almost 3 years ago was that the city felt impotent in the face of this receivership. This is what—this was the sense that I got from the Department of Corrections director and other officials there, and, frankly, from the corporation counsel. That in the face of this long suit and so on, which had many legitimate aspects, obviously, they didn't feel that they could stand up to the receiver on these issues, and that's, frankly, why I, in my independent position, felt that I had to.

Mr. DAVIS. Frankly, I don't think they could have stood up to him. I don't think they had the knowledge and I don't think they had the background or they had the competence to do it, and if you look at what had happened, you know, to this previously when they had it and took a look at what was happening around the rest of the city and the priorities, the city had to develop it. I understand that. I mean, it cost a lot of money to turn this around, probably more than if we had been a little more cost conscious. We could have done this a little cheaper. But we are here where we are today and we have something we are not worried about in terms of meeting the Constitutionality test and the like.

The difficulty now is, from a budgetary point of view, making this transition, and I am, frankly, concerned about the city's—I've asked them for some guidelines and they are going to send union something within 10 days, and the proof of the pudding is in the eating. I hope we see something of a substantive nature.

But that's our concern. Let me just say that if you think this hearing is tough, you want to go see Mr. Istook and the appropriators. I guarantee you—Ms. Norton is not going to be there. She's your friend. I think at the end of the day she wants this thing to work out. You just won't get the money, and then we could be right back to where we were. We want to get this stuff solved here at the authorization level, and the way you do that is you show us a plan, you show us it is not going to be the same program you have today because you are not going to have the money, but we just want to see it. I just don't get the sense here that we are ready to do that as a city.

Mr. CLARK. No. I think the focus—I mean, I think, unfortunately, you are right. The focus within the Department has been to be ready to take over the oversight of the contract, but I don't know that there is—that anybody—again, and this feeling of sort of impotence, that anyone has felt that they were in a position to start trying to re-engineer this receivership's operation.

Mr. DAVIS. Well, just for——

Ms. NORTON. Mr. Chairman, could I just comment on just that point?

Mr. DAVIS. Sure.

Ms. NORTON. The lost opportunity here, it seems to me, why the committee and the President and the Congress insinuated Mr. Clark into the matter was that there was a management and fi-

168

nancial expert, so that you had, on the one hand, a doctor, and the
doctor's job is to deal with patients, you had a receiver, a monitor.
She also isn't in the management business, and we understood
that. And we were clear, and I have been clear with Mr. Washing-
ton that the way to round this out was to take this expert who had
the second-highest position in the BOP and make a synergy and it
could all have worked.

What is most disturbing to me, Mr. Chairman, is that somehow
or the other an adversarial relationship developed there and his
suggestions were considered not to be relevant, and therefore your
question as to whether the District prepared to do it is an impor-
tant one because Mr. Clark's tenure is running out and I'm not
sure who then is to be the expert, except that the city is going to
have to hire some experts. Mr. Washington has already said they're
going to have to hire a physician to help them monitor it, whereas
I wanted something off the shelf, because we sure paid a lot for
what we are getting back here.

Mr. DAVIS. And I don't want to dwell on what we paid. I think
we have been through that. We don't need to beat a dead horse.

The bottom line is we took an agency here that was in awful
shape, terrible shape, and that at least has turned around. Fun-
damentally, that's what the task was. That's what the court want-
ed to do. I just don't think we need to go back on all the money
that was spent and those kind of issues. I don't think that serves
any purpose except transitioning now. The city has to have a little
bit more than just taking it over, and "we think we can do it."
They've got to show some vision. They need to show some account-
ability. That's what we're going to be waiting to see, and we're
going to watch it very closely.

Ms. Norton.

Ms. NORTON. Well, I just want to be clear that what the chair-
man said about the appropriation hearing—and I mentioned it be-
fore—is a shot across the bow. There is no question that if the
Council gets these costs there will be many questions raised, and
the time to deal with them is now.

Mr. Shansky, what is your current position?

Dr. SHANSKY. With regard to the District?

Ms. NORTON. No. Your full-time position?

Dr. SHANSKY. I consult on correctional health care around the
country, both——

Ms. NORTON. What was your professional position before that?

Dr. SHANSKY. I was the Medical Director of the Illinois prison
system.

Ms. NORTON. I asked because I thought that was your position.
I certainly regard you as an expert, and I certainly accept the no-
tion that these services have been reformed and meet Constitu-
tional standards. I would hate to think that they hadn't at this
point.

Apparently, appropriate services or similar services are being
provided in the State of Illinois Correction Department, at only 63
percent of the national average, $4.80, compared to $7.68. I can't
understand why some of that expertise, where in Illinois you are
below the national average, wasn't brought to bear here in the Dis-
trict of Columbia so that we not only got it fixed but got it fixed

169

at costs comparable to what apparently you have contributed to in Illinois.

Dr. SHANSKY. The Illinois numbers you are referring to are our prison system. This is a jail. The services designed to be provided at this jail are unique in terms of certain responsibilities. We have brought the budget down and it is now in a position where the Department and the city administration will tailor it in any way it chooses. And the fact is that I had 12 years of opportunity to work with the Illinois Department of Corrections and create the system that I left there.

Ms. NORTON. And you had 5 years here. And if we took mental health services out, for example, we are still left with twice the national average.

The outside experts said, "Nowhere in the country are we aware of a facility of comparable size that has such a top echelon of staff who are not also significantly involved in direct patient care. With these salaries, with a medical director of $192,857, the Mayor should resign and take this job," on down. And these salaries are very high.

Dr. SHANSKY. Those are not salaries. That's salary plus fringe.

Ms. NORTON. We say salary plus fringe.

Dr. SHANSKY. You just said salaries.

Ms. NORTON. Well, it says salary plus fringe.

Dr. SHANSKY. OK. thank you.

Ms. NORTON. The point is that they are compared, however, with facilities of comparable size.

I point this out only to say, and certainly to say to Mr. Christian and Mr. Washington, if I'm pointing this out to the receiver, you can bet your bottom—I don't know if you speak for the Mayor. Do you, Mr. Washington, when you say you are satisfied with this contract?

Mr. WASHINGTON. I'm satisfied with the services that have been provided for the D.C. Department of Corrections to remediate a 30-year court oversight.

Ms. NORTON. Yes. I——

Mr. WASHINGTON. I'm confident that——

Ms. NORTON. This is not about that, sir. We're not doing an oversight hearing on the services, and we haven't questioned the quality of the services. The City Council is not going to be asking you about the services. They're going to be asking you about the cost of the services. I'm asking if you are speaking for the Mayor when you say you are satisfied with the cost of the services, not the quality of the services. No question has been raised about the quality of the services.

Mr. WASHINGTON. I've never said I was satisfied with the cost of the service. I'm satisfied with the services. I believe very strongly that the costs will continue to go down, and I also feel very strongly that——

Ms. NORTON. Are they automatically going to go down? What are you going to do to bring the cost down?

Mr. WASHINGTON. We are going to evaluate all the services that have been provided. We will have staffing positions, and I will provide a plan to this committee to show exactly how the Department

170

of Corrections will be prepared to take over this contract and further reduce costs.

Mr. DAVIS. Let me just say in the next 10 days you are going to give us an outline. It doesn't need to be detailed, but just kind of a path.

Ms. NORTON. That would be very helpful.

Mr. DAVIS. I don't know how you want to do that.

Ms. NORTON. That will be very helpful.

Mr. DAVIS. And rather than try to sit here and go off the top of your head, we'd rather have you go back and do something that is a little reflective and send it back.

Ms. NORTON. My concern, Mr. Chairman, is that these costs will go down. Costs never go down. You've got to make costs go down.

Costs always go up, Mr. Washington. Making costs go down or maintaining quality is an art, and it is going to take real craftsmanship to do that, given the level of cost here.

Mr. Shansky, I note that your own requirement will be that the contractor of these very same services you have designed now go forward and get accreditation. Why did you not get accreditation, since you've had them for 5 years?

Dr. SHANSKY. First of all, I sit on the board of the National Commission on Correctional Health Care.

Ms. NORTON. You can recuse yourself, just as you could have with respect to the procurement.

Dr. SHANSKY. Would you like my answer?

Ms. NORTON. Don't tell me it is because you sit on the board. Is there a reason other than a reason that you could have easily been released from why you didn't ask for accreditation to be—so that you could have handed us back fully accredited services.

Dr. SHANSKY. Would you like an answer?

Mr. DAVIS. Yes. Give us the reason why you didn't get it.

Dr. SHANSKY. The reason why we didn't go for accreditation was very simple: the accreditation process, when we talked with the District, was something that the District wanted to do and to take responsibility for. An accreditation of a receiver program has nothing to do with whether the program run by the District is accredited, and we decided jointly with the District to wait for that accreditation process until the District had responsibility, and that's why it was written into the contract as well as the RFP that by the end of the contract year the vendor would achieve accreditation.

Am I confident that we could have achieved accreditation? Unquestionably. I have also been a surveyor for the Joint Commission on Accreditation of Health Care Organizations and have surveyed 20 of the Federal Bureau of Prison facilities. I know how to achieve accreditation. I don't think it proves much when I achieve accreditation.

Ms. NORTON. Well, one thing it might prove is that we really do have a level of services that anybody can have confidence in.

I think you should be given the opportunity to reply to the way in which the Board of Contract Appeals regarded the procurement. Apparently the D.C. Contract Appeal Board says, "There appears to be little question that, in accordance with generally accepted government procurement practice, the initial late proposal of the

171

bidder, the person who was successful, was improperly handled. The proper procedure would have been to hold the proposal unopened, apparently because it was late."

They also say that you restricted access by other bidders to your current employees, even though they had information that should have been made available to all offerors. That's from the Appeals Board. They say you gave no basis for your statement that the proposal of your employees was dispatched in time, and they go on to say the record is clear that the proposal was not dispatched at a reasonable time.

"Regardless of the correctness of the decision, the failure of the receiver to make a written finding supported by a record as to his reasons for considering a late proposal gives the appearance of impropriety."

I think it is only fair that you be allowed to respond to that.

Dr. SHANSKY. Thank you.

First of all, I put into the RFP a time deadline to ensure that no vendor would be advantaged by having more time to work on their proposal. When I was informed by my consultant that one proposal was received late, I asked the circumstances. I was told that the vendor had arranged to fly—deliver the proposal to Atlanta, where the proposals were to be received. The vendor's roughly noon flight was canceled, was delayed, then the next one was canceled. They put the proposal on Delta Dash. The electrical storms in Atlanta then knocked out the computers, so Delta Dash couldn't find it for 6 hours. To me that seemed like no situation in which any vendor was advantaged. The proposal was finished well in advance for delivery several hours in advance of the deadline.

I also felt that it was in the District's interest to have three proposals considered rather than two.

I was advised later on that, according to CAB decisions, any deadline can be extended, even in the event of a late proposal, especially where the number of proposals is small and where there is no unfair advantage.

I felt all of those things obtained.

The reality is we ended up, because we had to amend the contract because the offsite service situation was a problem and was not going to be in the District's interest, we ended up amending the RFP anyway and sending out a new one. All vendors had a completely fair and open process.

Look, the reality is one of the vendors, the vendor who protested, in fact, had my CFO working with them, so they had a person who knew more about my finances and salaries than any of the vendors. That's No. 1. So, in terms of them being disadvantaged, it's just not true.

Second of all, all of the salaries and budgets were available. They're filed with the court. Anyone had access to them.

The third thing is some of the other vendors proposed leadership people that were similar to the or the same as the group who had actually ultimately won the contract. We provided more data with regard to services, types, utilization, costs, etc., than in any RFP I've ever seen. This was as open and competitive a process—and remember, the committee that did the evaluation and made the rec-

172

ommendation was not created by me. I had no say in who was appointed and I had no contact with that committee during their deliberations. So the recommendation came completely independent of anything that I had to do with it.

Ms. NORTON. At bottom finally let me say I think the fact that the costs found in this contract are out of line with any comparisons that we have been able to come up with or anyone else has been able to come up with and no cost comparisons were made by you, if, in fact, even with the difficulty of making such comparisons, such attempts had been made, I believe that we probably would not be sitting here today, because we have fully accepted the notion that it is very, very difficult to make those comparisons. What we cannot accept is that no attempt should be made; that attempts have to be made by other agencies of the District of Columbia, but not by the Department of Corrections when it comes to the D.C. jail.

I was particularly interested to read in Mr. Clark's testimony that he had offered to provide examples of RFPs from the BOP—and here I am looking at page 11 of his testimony—awarding a similar medical service contract for its four-prison complex in Beaumont, TX, at a rate of under $6 a day, and the offer was declined. You see, that is what we cannot understand. I don't know why you, Mr. Shansky, or you, Ms. Schneider——

Dr. SHANSKY. I never received such an offer.

Ms. NORTON. Well, it is in his testimony.

Dr. SHANSKY. Well, he can testify, but I never——

Ms. NORTON. He said the offer was declined.

Dr. SHANSKY [continuing]. Received such an offer.

Ms. NORTON. What do you have to say to that, Mr. Clark? At bottom, this is my concern: that nobody looked to see what anybody else was doing, not necessarily that you cost more.

Dr. SHANSKY. I have looked at prisons and jails in between 30 and 40 States, between 100 and 200 facilities. There is no one with more experience looking at facilities and issuing RFPs in the country than me.

Ms. NORTON. And we haven't found a single one at the cost you have left the District with.

Now, Mr. Clark, you say the offer was declined. What does that mean?

Mr. CLARK. This was an offer that I made in the course of meetings during the 6-months that was referred to in the preparation and detailing of the RFP, I think going back to some time in 1998, in meetings with a number of the parties in that process that was mentioned.

Ms. NORTON. Clearly what we didn't have here was the kind of collegial relationship you say you had with the District government. We needed it with you to do that. I really am tough, but I'm tough because it is better for me to be tough than the folks you all are going to meet next year, and because I think that this still can be done.

I want to say first, as one whose former life was as a Constitutional lawyer, spent her early years doing nothing but writing briefs to Courts of Appeals and to the Supreme Court on cases not unlike the case before us, that I do not want to be misunderstood

173

as to the job you had before you or the lack of respect I have for the District of Columbia for what it took to finally get this thing under control, and that they, themselves, did not get it under control and it took outside experts to do so.

I believe that the District is ready to receive this function back, but I don't believe it because of anything I've heard from Mr. Washington or Mr. Christian here today. I believe it because I know the way the Mayor is right-sizing the rest of the government. I know that in some detail. I have seen what he has required of his department heads. I know that, in taking this back, he will put on the task experts that will, in fact, right-size this while keeping the quality necessary. I say that because there is precedent for his doing it.

At the same time, I must say that I regret that the city will have to spend money on the cost control, and cost efficiency aspects of the medical jail receivership. This should have been part and parcel of what the medical receiver gave us back. I hold not only Dr. Shansky responsible for that. It is hard to hold him entirely responsible because he acted the way that doctors always act. I hold Ms. Schneider responsible for that, since she was to mediate. When she saw that Mr. Clark, an outside expert who didn't have a dime in this dollar except he was commissioned by us to make sure that this was cost efficient, it was your job as the mediator, a role you have defined for yourself, to bring Mr. Clark sufficiently into this so that there would be cost controls, to help Mr. Washington and Mr. Christian understand that this was not a stick-up, that they had to do whatever Shansky said or else they didn't get it back, and to do for Dr. Shansky what managers are having to do for doctors all over the country. It is very painful, but unless we do it this way what we will say is that those who already have health care can eat up all the health care dollars and those such as the residents of the District that the Mayor is going to have to get health care for simply get left out in the cold.

Yes, I think you are ready, but I think you are ready largely because of the management structure of the D.C. government, not because of anything I've heard here today.

Thank you, Mr. Chairman.

Mr. DAVIS. Thank you, Ms. Norton.

We have 10 days to hear from you, Mr. Washington and Mr. Christian.

Anyone want to add anything? I don't want anybody to feel they didn't get the last word, if they wanted to make a comment.

[No response.]

Mr. DAVIS. I'm going to enter into the record a briefing, a memo distributed to the subcommittee members.

We'll hold the record open for 2 weeks from this date, for those who might want to forward any other submissions for possible inclusion.

I want to again thank all the witnesses for taking the time to come today and for your dedication to this.

These proceedings are closed.

[Whereupon, at 12:27 p.m., the subcommittee was adjourned.]

[Additional information submitted for the hearing record follows:]

174

# "Nowhere in the country are we aware of a facility of comparable size that has such a top echelon of staff who are not also significantly involved in direct patient care."

Faiver, Campau & Associates, L.L.C.

| D.C. Jail Medical Staff | Salary and Fringe Benefits |
|---|---|
| Medical Director | $192,857 |
| Mental Health Director | $123,595 |
| Health Services Administrator | $92,710 |
| Director of Nursing | $101,235 |
| Dental Director | $109,459 |
| Pharmacy Director | $87,915 |
| Quality Improvement Coordinator | $77,027 |
| Intake Coordinator | $128,224 |
| Infection Control Coordinator | $75,376 |
| Chief Psychiatrist* | $182,800 |
| Radiology Director* | $73,726 |
| Medical Record Director* | $71,525 |
| **TOTAL** | **$1,316,449** |

*Limited direct patient care responsibilities

175

---

Proctor, Victoria

From:        Stern, Michael
Sent:        Thursday, June 29, 2000 4:46 PM
To:          Proctor, Victoria; Bouker, Jon
Cc:          Gennet, Geraldine; Wilson, Jim
Subject:     Special Officer

Jon had asked me to take a look at the appropriate limits of questioning for Karen Schneider. This e-mail is to provide some general thoughts on this issue, and I will also attend the hearing tomorrow in case specific questions arise.

At the outset, it should be noted that there is little authority on the existence or scope of a judicial testimonial privilege. The principal case to address the question, In re Certain Complaints under Investigation by an Investigating Committee of the Judicial Council of the Eleventh Circuit, 783 F.2d 1488, 1519 (11th Cir. 1986), concluded that "there exists a privilege (albeit a qualified one) protecting confidential communications among judges and their staffs in the performance of their judicial duties." (The Eleventh Circuit's conclusion rested primarily upon analogy to the qualified executive privilege recognized by the Supreme Court in US v. Nixon). To the extent that this privilege applies to Congress, it would presumptively protect confidential communications between the Special Officer and Judge Bryant. It would not, however, in any way justify a blanket refusal to testify by the Special Officer. See 783 F.2d at 1518 ("It is well settled that a witness whose testimony is subpoenaed cannot simply refuse to appear altogether on grounds of privilege, but rather must appear, testify, and invoke the privilege in response to particular questions."). Indeed, even an Article III judge (for whom particular considerations of comity would apply) cannot properly refuse to testify before Congress on matters other than judicial proceedings. See Statement of the Judges, 14 F.R.D. 335 (N.D. Ca. 1953). Cf. Forrester v. White, 484 U.S. 219, 229 (1988) (in considering judicial immunity from suit, it is "the nature of the functioned performed, not the identity of the actor who performed it, that inform[s] our immunity analysis.").

Moreover, the Special Officer and her counsel are incorrect to suggest that she is the equivalent of an Article III judge. The mere fact that she is considered to be a judicial or quasi-judicial officer for some purposes (such as for portions of the Code of Judicial Conduct) hardly elevates her to the status of an Article III judge. The receiver is also considered a judicial officer for some purposes, yet the Special Officer acknowledges that it is appropriate for the receiver to testify. See Miller v. Carson, 563 F.2d 741, 753 n. 24 (5th Cir. 1977) ("The most common forms of judicial officer are the receiver and the master.").

It is also not the case that a special master's functions are necessarily judicial in nature. See, e.g., In re United States, 185 F.3d 879 (Fed. Cir. 1998) (unpublished decision) ("[S]pecial master . . . will fill a management and administrative, not a judicial, role."). This is particularly true of a remedial special master, who generally performs a different role than a traditional Rule 53 master. Instead of simply conducting quasi-judicial functions such as holding hearings and making findings of fact based upon the evidence submitted, the remedial special master also performs an investigative and consultative function which is "not inherently judicial in nature." Armstrong v. O'Connell, 416 F. Supp. 1325, 1339 (E.D. Wisc. 1976). A special master who monitors and reports upon a defendant's compliance with a remedial decree is performing functions like that of a court-appointed expert or amicus curiae, not a judge. See Ruiz v. Estelle, 679 F.2d 1115, 1161 (5th Cir. 1982) ("Insofar as the special master is to report on [prison system's] compliance with the district court's decree and to help implement the decree, he assumes one of the plaintiff's traditional roles, except that, because he is the court's agent, he can and should perform his duties objectively.").

It appears that remedial special masters are sometimes appointed as an initial step that is less drastic than appointing a receiver. See Dixon v. Barry, 967 F. Supp. 535 (D.D.C. 1997). In Dixon, the court noted in appointing a receiver that it had previously "taken a number of different tacks in an effort to force the District to comply with the Dixon Decree, including general consent orders, specific implementation plans with numerical targets, the appointment of an expert technical assistant, and the appointment of a special master." Id. at 554. Similarly, Judge Bryant here first appointed a special master and thereafter concluded that a receiver was also needed. It seems clear, therefore, that the Special Officer, like the receiver, has the administrative or executive function of actually implementing the court's orders, even though the Special Officer may formally have the power only to recommend, rather than to direct, the taking of specific actions. This is perhaps most clearly

1

176

demonstrated by the order appointing the receiver, which states that the receiver is "[t]o implement, in coordination with the Special Officer, the Remedial Plan" and "[t]o work with the Special Officer and the parties to ensure compliance with all Court ordered obligations." Similarly, the order appointing the Special Officer states that she "should endeavor to assist the defendants in achieving compliance in whatever way ͏ossible."

In short, to the extent that the Special Officer is entitled to any type of privilege from questioning, it should be limited to questions that go to her judicial or quasi-judicial functions, such as conducting formal hearings. She should not have a privilege as to observations she has made in the course of monitoring compliance with the court's orders. Moreover, her reporting to the court, unless based upon a formal hearing record, is not a judicial function; for example, there would be no legal presumption of correctness in the facts set forth in such reports (see Ruiz, 679 F.2d at 1163). Such reports would be functionally more like those submitted by the receiver. (However, it might be prudent to avoid questions which focus specifically on statements made by the Special Officer in reports to the court). Finally, the Special Officer should have no privilege to avoid testifying about her role in implementing the decree, such as recommendations or suggestions that she has given to the receiver or the parties as to how to achieve compliance.

2

177

Subpena to Testify (Hearing)

# By Authority of the House of Representatives of the Congress of the United States of America

————————

*To* Karen Schneider, Special Officer, US District of Columbia Serve: Karen Schneider

You are hereby commanded to be and appear before the Sub- Committee on

The District of Columbia of the House of Representatives

of the United States, of which the Hon. Dan Burton is chairman, in

Room 2154 of the Rayburn Building, in the city

of Washington, on June 30th, 2000, at the hour of 10:00 am,

then and there to testify touching matters of inquiry committed to said Committee; and you

are not to depart without leave of said Committee.

*To* Maria Pia Tamburri or the US Marshal Service

to serve and make return.

Witness my hand and the seal of the House of Representatives

of the United States, at the city of Washington, this

22nd day of June, 2000

*Chairman.*

Attest:

*Clerk.*

178

Subpena for Karen Schneider, Special Officer, US District Court for

District of Columbia    Serve: Karen Schneider

1130 17th Street, NW  Suite400

Washington, DC 20036

before the Committee on the ___

Sub-Committee on the District of Columbia

Served by: MariaTandDill
TO: Blair G. Brown
6/27/00  4:35pm
, via facsimile and
First Class mail

House of Representatives

GPO 1986 31-287 (v)

179

**Oversight Hearing on the Corrections Medical Receiver for the D.C. Jail**

**Key Court Orders and Events**

- 1971; 1975:  Two class action law suits, *Campbell v. McGruder, et al.* and *Inmates of D.C. Jail v. Jackson, et al.*, are filed on behalf of pretrial detainees and sentenced inmates, respectively.  The two cases are later consolidated.

- August 22, 1985:  The parties enter into a Remedial Stipulation requiring plaintiffs and defendants to appoint a medical expert to review the delivery of medical services at the D.C. Jail and make recommendations for improvement.

- April 20, 1993:  The Court finds that during the past eight years, the defendants have been in "persistent non-compliance" of its orders.  Therefore, the Court appoints a Special Officer to monitor the Jail's efforts to meet the court-ordered obligations.  The Special Officer is required to make periodic reports to the Court regarding the City's progress.

- September 15, 1993:  The Special Officer issues the reports prepared by her medical and mental health experts.  The reports indicate that the District continues to violate the Court's order regarding the delivery of a constitutional level of health care.

- November 9, 1993:  The Court grants the plaintiff's request for interim relief to address the most immediate problems in the Jail: the tuberculosis epidemic and the high suicide rate.

- February 2, 1994:  The Special Officer's report regarding the delivery of health care in the Jail indicates that the District still fails to comply with core provisions of the Court.

- March 16, 1994:  In response to the Special Officer's report, the Court found the city in contempt and orders that it consent to a remedial plan.  The city admits that it has consistently violated the Court's Orders.  The remedial plan is to be drafted by the Special Officer in consultation with the parties.

- May 4, 1994:  The Special Officer files an Interim Remedial Plan that addresses the city's failure to properly handle the tuberculosis problem in the Jail as required by the November 9, 1993 order.  The Special Officer also proposes fines for future violations of the Court's orders.

- October 11, 1994:  Initial Remedial Plan, prepared by the Special Officer, is filed with the Court.  The Special Officer reports that revisions were made in order to facilitate the District's compliance with the plans requirements by the deadline.

- January 5, 1995:  The Court orders the City to implement the plan.

180

- June 5, 1995: Inmate Richard C. Johnson, a patient in the Jail's infirmary, dies after being neglected by the staff for several days.

- July 3, 1995: The Special Officer reports that the City continues to be non-complaint with major aspects of the remedial plan such as the implementation of procedures to contain the tuberculosis epidemic.

- July 11, 1995: The Court finds the District failed to comply with the provisions of the Initial Remedial Plan. The Court cites the Special Officer's report which indicated that the District's non-compliance with the Remedial Plan has harmed the prisoner's. As a result, the Court states that it has no choice but to appoint a receiver to manage the medical and mental health services at the D.C. Jail. The Receiver is granted broad authority to implement the necessary changes to bring the level of medical services to a constitutional standard. The cost of the Receiver and his administration is to be incurred wholly by the D.C. government.

- September 1995: Dr. Ronald Shansky begins work as the Corrections Medical Receiver.

- June 17, 1999: The Receiver issues a Request for Proposal (RFP) for medical and mental health services at the D.C. Jail.

- December 3, 1999: The RFP is amended and reissued.

- January 14, 2000: Department of Corrections announces that the contract is awarded to the Center for Correctional Health and Policy studies (CCHPS). CCHPS is a non-profit entity comprised of health care professionals employed by the Receiver.

- January 28, 2000: One of the RFP bidders, Prison Health Services, Inc., files a protest of the Department of Corrections's award decision with the District of Columbia Contract Appeals Board.

- May 24, 2000: Contract Appeals Board denies the protest. However, the Administrative Judges found some aspects of the procurement process suspect.