UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------- x

MARK NUNEZ, et al.,

                                            Plaintiffs,        **DEFENDANTS'**
                                                       **STATEMENT OF**

-against-                                               **MATERIAL FACTS**

CITY OF NEW YORK, et al.,

                                           Defendants.        11 Civ. 5845 (LTS)


--------------------------------------------------------------------x


UNITED STATES OF AMERICA,

                                       Plaintiff-Intervenor,

-against-

CITY OF NEW YORK and NEW YORK CITY
DEPARTMENT OF CORRECTION,

                                       Defendants.

--------------------------------------------------------------------x
STATE OF NEW YORK     )
                                  :SS:
COUNTY OF NEW YORK  )

       **MICHAEL VIVIANO,** an attorney duly admitted to practice in the State of New York

and in this Court, and a Senior Counsel in the Office of the Hon. Sylvia O. Hinds-Radix,

Corporation Counsel of the City of New York; as such, I am one of the attorneys for defendant the

City of New York in the above referenced matter. I am familiar with the facts stated below, and

submit Defendants' Statement of Material Facts in Opposition to Plaintiffs' and Plaintiff-

Intervenor's Motion for Contempt and Appointment of a Receiver.

1. Lynelle Maginley-Liddie, was appointed as Commissioner of the New York City Department of Correction ("the Department"), by Mayor Eric Adams on December 8, 2023. As Commissioner, she oversees the care, custody, and control of the Department's pre-trial detainees and city-sentenced individuals <u>See</u> Exhibit A[1] (Declaration of Commissioner Lynelle Maginley-Liddie) at ¶ 1.

2. From the time of her appointment, Commissioner Maginley-Liddie has been actively engaged and working collaboratively with the Monitor, the Deputy Monitor, and the Monitoring Team. In a February 26, 2024 Joint Letter to the Court, the Monitor stated:

   "The Monitoring Team observed an immediate change in the Department's approach and dynamic in early December 2023 with the appointment of Commissioner Maginley-Liddie. The Department's leadership team is now actively engaging with the Monitor, the Deputy Monitor, and the Monitoring Team. These interactions reflect greater transparency and interest in working collaboratively. The Monitoring Team is routinely consulted and proactively advised on a wide variety of issues. When matters of mutual concern arise, Department leadership seeks input from the Monitor, has been receptive to feedback, and appears open to adapting practices as necessary. While more work remains, these early signs of improved transparency and collaboration with the Monitoring Team are promising and help to ensure that the Monitoring Team is properly positioned to do its work pursuant to the *Nunez* Court Orders." (Dkt. 679, pages 1-2)

<u>See</u> Exhibit A at ¶¶ 4-7.

---

[1] All referenced exhibits are annexed to the Declaration of Michael Viviano, dated March 18, 2024, and filed herewith.

3. "Overall, there is a marked and positive shift in the Department's approach to working with the Monitoring Team. The role and the authority of the *Nunez* Manager has been elevated over the last few months given the Commissioner's clear direction to staff regarding the *Nunez* Manager's role and responsibility and the authority the Commissioner has granted the *Nunez* Manager to do her work. Information is flowing more freely and consultation is occurring more frequently than in the previous two years." (Dkt. 679 at 4).  <u>See</u> Exhibit A at ¶ 8.

4. "Further, since the appointment of Commissioner Maginley-Liddie, although it has only been two months, the Monitoring Team has not identified any situations in which the Department should have consulted the Monitoring Team but did not. In fact, the Department has clearly been erring on the side of caution when consulting with the Monitoring Team, and therefore is consulting on matters both directly related to the *Nunez* Court Orders and those that may be more ancillary." (Dkt. 679 at 4) <u>See</u> Exhibit A at ¶ 8.

5. DOC's efforts have led to the completion of fifty-two (52) of the tasks required by the *Nunez* Action Plan and the subsequent Orders in 2023. As stated by Commissioner Lynelle Maginley-Liddie in her Declaration, DOC has completed provisions (A)(1)(c), (A)(2)(a), (A)(2)(b), (A)(2)(c), (A)(2)(d)(i), (A)(2)(d)(ii), (A)(2)(d)(iii), (A)(2)(e), (A)(2)(f), (A)(2)(f)(i), (A)(3)(a), (A)(3)(b)(ii), (A)(3)(b)(ii)(1), (A)(3)(b)(ii)(2), (A)(3)(b)(ii)(2)(a), (A)(3)(b)(ii)(2)(b), (A)(3)(b)(ii)(3), (A)(3)(b)(ii)(3)(iii), (A)(3)(c), (B)(1), (B)(2), (B)(4), (C)(1), (C)(2), (C)(5), (D)(1), (D)(5), (E)(1), (E)(2), (E)(2)(a), (E)(2)(b), (E)(2)(c), (E)(3)(a), (F)(1), (F)(1)(a), (F)(1)(b), (F)(2)(a)(i)-(iv), (F)(5), (F)(6), (F)(7), and (G)(1) of the Action Plan; provisions (I)(1)(a), (I)(2), (I)(5), (I)(6), (I)(7), (I)(7)(a), (II)(2) of the June 13, 2023 Order; provisions (I)(11), (I)(12), (I)(14) of the August 10, 2023 Order; and

provision 1(a) of the December 14, 2023 Order. <u>See</u> Exhibit A at ¶ 22, and Appendix B thereto.

6. In February 2024, Commissioner Maginley-Liddie selected an individual to act as Deputy *Nunez* Manager. The individual will support the *Nunez* Manager and the Department's work. The creation of the position demonstrates the Commissioner's commitment to relationship building with the Monitoring Team and recognizes the importance of the work done by DOC's *Nunez* Team. <u>See</u> Exhibit A at ¶ 17.

7. As required by the Court's Orders, DOC, in consultation with the Monitor, the Department developed a set of metrics for use of force, security, and violence that will help DOC to better identify trends and patterns and develop anti-violence strategies <u>See</u> Exhibit A at ¶ 18.

8. Further, the Office of Management, Analysis, and Planning ("OMAP") was established at DOC in 2022. It is designed to provide analysis of department data to inform DOC's operations and to support strategic planning. OMAP is involved in the planning of new initiatives and their evaluation once implemented. The formation of OMAP demonstrates DOC's commitment to using quantitative data to advance decision-making and problem-solving.  <u>See</u> Exhibit B  (Declaration of Associate Commissioner Timothy Kepler) at ¶ 3.

9. As an initial matter, as demonstrated in the Kepler Declaration, the definition of "use of force" has shifted considerably since 2016. <u>See</u> Exhibit B at  ¶¶ 9-10.

10. Indeed, "[u]nder DOC's policy, use of force is defined broadly: any time an officer makes contact with a non-compliant individual to compel behavior, it counts as a use of force, no matter how slight the contact…. This definition greatly expands the number of use of force

4

incidents, well beyond those previously reported. Because of the change in definition, any comparison of 2016 and today is flawed." See Exhibit B at ¶¶ 9-11.

11.  Moreover, as Associate Commissioner Kepler notes, "[t]he more significant measure is uses of force that result in injury to an incarcerated individual (class A and B uses with A the more serious).  See Exhibit B at ¶ 9.

12. The injury classification of all use of force incidents are reviewed by the Investigation Division (ID) during the course of their investigation. If ID discovers additional information that requires a classification change, the recommendation is sent to the Office of Security, where evidence is reviewed, and incidents are reclassified if necessary. See Exhibit B at ¶ 9.

13. With the acknowledgement that incidents in the latter months of 2023 may be reclassified, there has been a meaningful decrease in the number of Use of Force incidents that result in injury. The number of incidents classified as "A" or "B" in the last six months of 2023 are lower than the first six months of 2023 both in the total number and in the proportion of total uses of force.  See Exhibit B at ¶ 9.

14. Use of Force by Injury Class from January 2023 – December 2023 is as follows:

| Month | A | | B | | C | | Total |
|---|---|---|---|---|---|---|---|
| | Count | % | Count | % | Count | % | |
| Jan-23 | 4 | 0.6% | 42 | 6.8% | 570 | 92.5% | 616 |
| Feb-23 | 9 | 2.0% | 27 | 5.9% | 423 | 92.2% | 459 |
| Mar-23 | 13 | 2.4% | 40 | 7.3% | 492 | 90.3% | 545 |
| Apr-23 | 9 | 1.7% | 31 | 6.0% | 475 | 92.2% | 515 |
| May-23 | 12 | 2.1% | 36 | 6.2% | 535 | 91.8% | 583 |
| Jun-23 | 11 | 2.1% | 38 | 7.3% | 469 | 90.5% | 518 |
| Jul-23 | 16 | 2.8% | 24 | 4.2% | 525 | 92.9% | 565 |
| Aug-23 | 6 | 1.1% | 17 | 3.1% | 519 | 95.8% | 542 |
| Sep-23 | 4 | 0.7% | 21 | 3.7% | 540 | 95.6% | 565 |
| Oct-23 | 3 | 0.5% | 20 | 3.0% | 633 | 96.5% | 656 |
| Nov-23 | 3 | 0.5% | 22 | 3.5% | 599 | 96.0% | 624 |
| Dec-23 | 4 | 0.7% | 25 | 4.2% | 565 | 95.1% | 594 |

See Exhibit B at ¶ 9.

15. OMAP analysis shows that certain key trends are moving in the right direction. There were 477 slashings/stabbings in 2022 compared to 383 in 2023, a 19.7 percent reduction. See Exhibit B at ¶ 7.

16. Similarly, in 2022, there were 1,643 assaults on staff, and in 2023, 1,401, a 14.7 percent reduction. See Exhibit B at ¶ 8.

17. Among the trends DOC has observed is a dramatic shift in the composition of the population of Rikers following New York State bail reform in January 2020. With bail reform, the DOC now houses individuals who are in its custody predominantly on charges of committing violent crimes. As of February 27, 2024, 28.6 percent of pre-trial detainees are being held on homicide charges; 11.8 percent on serious assault charges; 14.1 percent on robbery charges; and 7.8 percent on weapons charges. That is a total of

62.3 percent.  By comparison on January 1, 2016, those held on homicide charges

comprised 14.1 percent of detainees; serious assault charges, 9.1 percent; robbery

charges, 14.4 percent; and weapons charges, 6.3 percent – a total of 43.9 percent. Gone in

2024 are recidivist shoplifters, low level drug dealers and fraudsters, who populated

Rikers jails in earlier years. <u>See</u> Exhibit A at ¶ 24.

18. Assistant Commissioner Kepler's Declaration provides a chart demonstrating the fact of

the increasing percentage of population of those held on homicide charges.

**Figure 1: Average Daily Population and Proportion of Individuals with a Homicide Charge**



(<u>See</u> Exhibit B at ¶ 12.)

19. Supervising a housing unit that is comprised almost entirely of violent individuals presents

significantly greater challenges than one in which a significant portion of offenders are

there for non-violent crimes.  The latter group have one principal objective: to resolve their

cases, do their time, and go home.  They dilute the propensity for violence. <u>See</u> Exhibit A at ¶ 25.

20. The shift in the population due to bail reform is not the only notable factor that distinguishes DOC today from DOC of 2016. In 2016, surveillance cameras were few and far between; today, they are omnipresent. <u>See</u> Exhibit A at ¶ 28.

21. Reported increases in the use of force from 2016 to 2023 are explained, at least in part, by the omnipresence of the cameras. Today little goes unseen, and therefore little is unreported. <u>See</u> Exhibit A at ¶ 29.

22. Detainees are also spending considerably more time in DOC's care. In 2016, the average length of stay was 59 days while in January 2024, it is 101 days. As of March 1, 2024 there are 508 detainees who have been in custody for more than two years. New York City's jails were not meant for such long-term stays, and the inevitable anxiety that comes from being in legal limbo contributes to the tension that breeds violence. This factor is not in DOC's control (DOC cannot move cases faster). <u>See</u> Exhibit A at ¶ 30.

23. DOC is committed to further reducing violence in its facilities.  One demonstration of that commitment is enhanced training efforts.  In partnership with the Monitor, Acting Deputy Commissioner Jeremiah Johnson has overseen the development of DOC's curriculum for training new captains. Twenty-one training modules were submitted to the Monitoring Team for review, all of which were approved as of February 21, 2024. <u>See</u> Exhibit D (Declaration of Acting Deputy Commissioner Jeremiah Johnson) at ¶ 4.

24. In March 2024, DOC will commence training for a cohort of 25 new captains using a Monitor-approved curriculum. The classroom training will last five weeks, followed by two weeks of facility-based training. A second cohort of 25 will begin training in April, so

that by the summer there will be 50 new captains on the job. Most of these individuals will be assigned to positions in the facilities working directly with incarcerated individuals. The training is designed to provide these new captains with the technical knowledge needed to be successful in their new roles. See Exhibit D at ¶ 5.

25. Training for new Assistant Deputy Wardens ("ADWs") is being revised and will be resubmitted to the Monitor in June.  See Exhibit D at ¶ 6.

26. In August 2023, DOC commenced in-service training on its Use of Force policy and Defensive Tactics. The Monitor-approved curriculum consists of two days of instruction, four hours on Use of Force policy and 12 hours in defensive tactics. DOC is required to provide this training on an annual basis. To date, more than 600 members of staff have received this refresher training, which is typically offered two times a week.  See Exhibit D at ¶ 7.

27. On February 28, 2024, the Monitor approved refresher training for the Department's Emergency Services ("ESU"). This curriculum was developed in coordination with the Monitor to address specified concerns regarding ESU. The training will be conducted quarterly and includes modules on search and escort procedures. See Exhibit D at ¶ 9.

28. DOC's commitment to violence reduction also is demonstrated by daily safety inspections of facilities.  Among the highest priority repairs are those to cell doors and locks. Since January 1, 2023, Facility Maintenance and Repair Division staff have repaired 204 cell doors/locks at the Eric M. Taylor Center ("EMTC"); 400 at the George R. Vierno Center ("GRVC"); more than 100 in the Enhanced Supervision Housing units at the Rose M. Singer Center ("RMSC") and 400 elsewhere in RMSC; and 607 at the Robert N. Davoren

Complex ("RNDC").  <u>See</u> Exhibit K (Declaration of Deputy Commissioner Patrick Benn) at ¶¶ 3-5.

29. DOC has various programs an initiatives designed to care for emergent adults – those wo are between 18 and 21 years of age. <u>See</u>, Exhibit J (Declaration of First Deputy Commissioner Francis Torres) generally and at ¶ 2.

30. Principal among the programs that First Deputy Commissioner Torres helped oversee was the RNDC Violence Reduction Plan, which was unveiled in February 2022. RNDC houses DOC's youngest individuals, including emergent adults 18 to 21 years old. Among the RNDC Violence Reduction Plan components were: the assignment of "credible messengers" to work with the population; the assignment of counselors to reduce idle time and address rehabilitative needs; congregate events; the introduction of mobile libraries; and the emphasis on officers using interpersonal skills to diffuse conflict. <u>See</u> Exhibit J at ¶¶ 8-9.

31. Following the introduction of the RNDC Violence Reduction Plan, in a review of data from the Incident Reporting System, showed there was a 57% decrease between the first six months of 2023 compared to the first six months of 2022. <u>See</u> Exhibit J at ¶ 10.

32. In the fall of 2023, DOC's identification of trends revealed the need for new initiatives at RNDC.  At the direction of Commissioner Maginley-Liddie and with the approval of the Monitor, DOC has developed a new RNDC Programs Action Plan aimed at emerging adults in custody. Exhibit A at ¶¶ 32-34.  <u>See</u> <u>also</u>, Exhibit J at ¶¶ 12-14.

33. This new initiative is the most recent program for emergent adults.  Other initiatives include School Houses, opened in November 2021 for those emergent adults who are dedicated to advancing their formal education. DOC now has additional classrooms where college prep

and GED courses are offered, including courses with Columbia University. See Exhibit J at ¶ 4.

34. In June 2022, DOC sponsored a Fatherless No More Initiative led by former NFL player and now Pastor Tim Johnson. The goal of the program, which lasted five months, was to address fatherhood issues through steps from confession to forgiveness to reconciliation. Pastor Johnson continues to come to RNDC monthly to conduct sessions, for a complete week, to serve emergent adults who continue to express interest in the program. The Program continues to be supported by the two original officers. See Exhibit J at ¶ 5.

35. SCO Family of Services, a not for profit, provides a Young Adult Working Program (YA WP), which focuses on pre- and post-release work readiness. It also provides Therapeutic Case Managers (TCM) for individuals in need. See Exhibit J at ¶ 6.

36. Safety initiatives within DOC also include the development of systems to reduce and prevent deaths by suicide and self-harm among persons in custody. See Exhibit L (Declaration of Deputy Commissioner James Saunders) at ¶ 5.

37. DOC uses three review mechanisms to analyze self-harm incidents. The first is the In-Custody Death Joint Assessment and Review ("JAR"), which Deputy Commissioner Saunders has led since July 2023. Comprised of senior DOC and CHS leadership, the JAR meets after each death in custody at fixed intervals: two business days, seven days, and 30 days after the death. The goal is to identify deficiencies and opportunities for corrective measures to minimize the recurrence of such tragic events. See Exhibit L at ¶ 6.

38. The second mechanism is the Suicide Prevention Task Force, which is comprised of DOC and Correctional Health Services ("CHS") leadership, and meets monthly to identify opportunities for improvements in custodial care.  See Exhibit L at ¶ 7.

39. The third mechanism, the Self-Inflicted Harm Subcommittee under the Task Force, meets weekly to review incidents of self-harm from the prior week. Working with CHS mental health professionals, DOC staff examine individual incidents to identify trends and recommend changes. See Exhibit L at ¶ 8.

40. In 2023, DOC hired Dr. Timothy Belavich, a nationally recognized expert as a consultant to provide technical assistance on the improvement of its suicide prevention activities. After studying DOC's policies and attending meetings with DOC and CHS, Dr. Belavich issued a report in January 2024. See Exhibit L at ¶ 9 and Exhibits A (Belavich Resume) and B (Belavich January 2024 Report) to the Saunders Declaration.

41. In the report, Dr. Belavich concluded that DOC has made "significant efforts in the area of suicide prevention over the past twelve months," and that it is "making an impact by identifying issues related to self-harm and making recommendations for change." As one example, Dr. Belavich cited the implementation of "daily health care and custody huddles" to share information among DOC and CHS line staff regarding incarcerated individuals who may present a self-harm concern. The practice began in August 2023. See Exhibit L at ¶ 10 and Exhibit B (Belavich January 2024 Report) to the Saunders Declaration.

42. At the suggestion of the Monitor, in 2021, DOC retained the services of James Austin, Ph.D.  In addition to work for DOC, Dr. Austin is currently working in four jurisdictions - - Rhode Island, Alameda County(Oakland) California, U.S. Virgin Islands, and Santa Clara County - - as either an expert for the federal court or a monitor of a consent decree. See Exhibit H (Declaration of James Austin) at ¶¶ 1-2.

43. In a March 2022 report, Dr. Austin made the following the four recommendations that if implemented would start reducing the level of violence at Rikers:

a. Establish a single Restricted Housing Program (RHP)

b. Lower the jail population.

c. Reform the jail classification system.

d. Cease the current practice of housing people by gang affiliation.

<u>See</u> Exhibit H at ¶ 3.

44. Three of the four recommendations have been implemented by DOC, with only the recommendation to lower the jail population not being accomplished. Many of the most dangerous and disruptive incarcerated persons have been in custody for more than a year. But fulfilling this recommendation would require the assistance of the District Attorneys, Legal Aid Society and the Courts. <u>See</u> Exhibit H at ¶ 3.

45. As the three recommendations have been implemented since 2022, there has been an associated decline in the number and rate per 100 jail population of slashing, stabbings and serious assaults. Based upon data contained in the Department's Incident Reporting System and Master Facility Management Report, the number of assaults has significantly declined. <u>See</u> Exhibit H at ¶ 4 and Figure 1 (below).



Figure 1. NYC DOC Assault and Stabbing/Slashing Annualized Rates Per 100 Jail Population January 2019 - January 2024

46. Consistent with the recommendation to implement a more effective restricted housing program, Dr. Austin worked with DOC and in close consultation with the Monitor, to establish its Enhanced Supervision Housing program now referred to as RESH, a restrictive housing program for individuals who have been found by a hearing officer to have committed violent acts. The primary objective of RESH is to protect the safety and security of incarcerated individuals and facilities, while promoting rehabilitation, good behavior, and the psychological and physical well-being of incarcerated individuals. To accomplish these objectives, RESH is designed to separate from the general population those who pose the greatest threats to the safety and security of staff and other incarcerated individuals. See Exhibit H at ¶ 7.

47. According to Dr. Austin, the data concerning RESH demonstrates that DOC has successfully implemented the program. <u>See</u> Exhibit H at ¶ 16.

48. Dr. Austin is also working with the Monitor and DOC senior staff to develop a program for individuals in General Population who have shown a propensity for violence but do not qualify for placement in the other restrictive housing programs (the OBCC Annex Program) as well as the Behavioral Health Unit (BHU) which will be a program for individuals who contribute to violence on Rikers Island yet are ineligible for RESH and the proposed Annex program. <u>See</u> Exhibit H at ¶¶ 21-28.

49. Implementing the OBCC Annex Program and BHU will further reduce the declining rates of violence at Rikers.  <u>See</u> Exhibit H at ¶ 29.

50. Under the leadership of Ronald Brereton, Deputy Commissioner of Security Operations, DOC has initiated enhanced screening initiatives to assist in stemming the flow of contraband into the facilities including front entrance staff body scanning at three facilities, and cell phone detection systems at each facility. <u>See</u> Exhibit C (Declaration of Deputy Commissioner Ronald Brereton) at ¶ 20.

51. Robust searches for weapons and contraband occurred in the facilities in 2023 resulting in the recovery of 1,075 improvised jail weapons, 55 cell phones, 273 dangerous articles, and 4,496 drug recoveries, inclusive of fentanyl. <u>See</u> Exhibit C at ¶¶ 18-19.

52. Active work is underway with respect to key control policies (to ensure all keys in circulation are accounted for and operational), upgrading cell doors and ensuring they are properly secured, ensuring staff remain on-post, and preventing crowding in vestibules. <u>See</u> Exhibit C at ¶¶ 21-30.

53. A further initiative implemented in order to maintain safety in DOC is the use of Tour Wands to effectively track the compliance with staff members conducting their tours. <u>See</u> Exhibit G (Declaration of Captain Gamien Batchelor) at ¶¶ 3-6.

54. A Tour Wand is a tool utilized by staff to track and log housing unit tours. Staff utilize a Tour Pipe which they touch to a pinpoint at various locations in a housing area to demonstrate touring is occurring. <u>See</u> Exhibit G at ¶ 2.

55. DOC utilizes technology such as a Tour Wand Report Dashboard, the Dashboard allows DOC to create daily reports that break down by facility and housing area and includes information about whether the Tour Wand was or was not "swiped" by the Officer and the longest time in between swipes. <u>See</u> Exhibit G at ¶ 3.

56. The Dashboard also permits DOC to create daily Captain Tour Wand Reports which indicate how many tours were conducted by Captains using a Tour Wand. <u>See</u> Exhibit G at ¶ 3.

57. Tour wand audits are generated and provided for leadership to review, and recommend discipline if there are not mitigating factors for failed tours. Since this procedure has begun, there has been significant improvement in staff compliance with Tour Wand usage Departmentwide. <u>See</u> Exhibit G at ¶¶ 5-6.

58. The Investigation Division ("ID") is responsible for the independent review of all Use of Force incidents and tasked with conducting fair and impartial investigations to ensure that its conclusions are in accordance with DOC policy.  ID's sole focus is Use of Force ("UOF") incidents. ID is responsible for the independent review of all actual and alleged UOF incidents from reports made to DOC's Central Operations Desk.  <u>See</u> Exhibit E (Declaration of Deputy Commissioner Yvonne Pritchett), at ¶ 5.

59. Deputy Commissioner Yvonne Pritchett oversees investigations of members of service engaged in Use of Force incidents. Deputy Commissioner Pritchett also acts as liaison with other outside investigative agencies, including the Department of Investigation and the Bronx County District Attorney's Office; she has been in her current position since April 2023. See Exhibit E at ¶¶ 1-2.

60. ID is divided into an Intake Unit and a Full Investigation Unit. The Intake Unit reviews all use of force incidents and has 25 business days to complete its investigation. See Exhibit E at ¶ 6.

61. At the conclusion of the investigation, the case is either closed without action (the officer's conduct was not inappropriate), closed with action (the officer's conduct was inappropriate), or referred for a full investigation. See Exhibit E at ¶ 6.

62. To achieve the goal of immediate and meaningful staff accountability for egregious use of force incidents, ID leadership increased the Intake Unit's Rapid Review team from one to two teams the week of April 30, 2023. The purpose of the Rapid Review Teams is to review incidents daily for possible immediate action and identify use of force incidents involving the Emergency Response Team and the Strategic Response Team at the request of the Federal Monitor. See Exhibit E at ¶ 6.

63. Investigations are performed in a timely manner, prior to October 1, 2018, Full ID investigations were required to be completed within 180 days. Full ID Investigations are now required to be completed within 120 days. See Exhibit E at ¶ 9.

64. Between January 1, 2023 and December 31, 2023, 494 Full ID investigations were closed. 182 (37 percent) of those investigations were closed within 120 days.  ID is working to

increase staffing levels to improve the timeliness of these investigations. <u>See</u> Exhibit E at ¶ 9.

65. Upon the appointment of Deputy Commissioner Pritchett in April 2023, the Use of Force Investigation Division Leadership has made diligent efforts to comply with the provisions of the Consent Judgment. The Use of Force Investigation Division Leadership developed a plan for improving the UOF investigations, adopting the Monitoring Team's suggestions while incorporating several additional initiatives. <u>See</u> Exhibit E at ¶¶ 11-12.

66. In its December 22, 2023 Report, the Monitor observed that the Intake Unit was now closing 99 percent of the cases that it receives in 30 business days. As noted, the established deadline is 25 business days. <u>See</u> Exhibit E at ¶¶ 13.

67. Upon the recommendation of ID, DOC Trials and Litigation Division ("Trials") evaluates, and where appropriate brings disciplinary charges against DOC's uniformed force for violation of DOC's Rules and Regulations or of New York State and City laws. <u>See</u> Exhibit F, (Declaration of Deputy Commissioner) Solange Grey at ¶¶ 4-5.

68. Upon receipt of a recommendation for disciplinary action from ID, Trials conducts an independent review of the matter. If appropriate, Trials then prepares a petition with formal charges for filing with the New York City Office of Administrative Trials and Hearings ("OATH"), a municipal agency that is separate from DOC. <u>See</u> Exhibit F at ¶ 5.

69. For DOC, the Nunez guidelines, developed with the Monitor, establish the parameters for discipline. <u>See</u> Exhibit F at ¶ 9.

70. At the start of Deputy Commissioner Grey's tenure in 2022, DOC was faced with a substantial backlog of disciplinary cases. That circumstance has changed dramatically. <u>See</u> Exhibit F at ¶¶ 14-27.

71. Trials processed and resolved 95 percent of the 750 cases with incident dates prior to 2021. The remaining five percent are being held in abeyance due to members of service being out on approved leave. Trials has resolved 98 percent of the 285 additional UOF cases that the Monitor identified with incident dates between January 2021 and June 2022. See Exhibit F at ¶¶ 20-21.

72. Moreover, Trials maintains a spreadsheet that includes all cases opened since January 1, 2021, and each case open or pending as of January 1, 2023. Overall, the number of outstanding disciplinary cases has been reduced from 2,430 in November 2022 to 1,372 in November 2023, a 43 percent reduction. See Exhibit F at ¶ 26.

73. Trials has substantially met the Action Plan's requirements with regard to staffing. The Action Plan requires Trials to maintain 25 agency attorneys and four directors; Trials has one Deputy Commissioner, 24 agency attorneys, five directors, one managing director, five legal coordinators, one executive assistant to the Deputy Commissioner, one office manager, one city research scientist, three administrative managers, three principal administrative assistants, two investigators, one clerical associate, one front desk officer, and two externs - a total of 49 full-time employees and two part-time law student externs. See Exhibit F at ¶ 29.

74. Commissioner Maginley-Liddie has senior leadership in place to lead DOC to success. Significantly, the Commissioner requires facility tours by all civilian and uniformed senior leadership. Each senior staff member is asked to tour a different facility two times a month, which means that at least one person is touring every facility each weekday. See Exhibit B at ¶ 11.

75. Following each tour, senior leaders are required to write up their notes, focusing on both positive developments and deficiencies, and to forward their notes to the Commissioner's Office. <u>See</u> Exhibit B at ¶ 12.

76. The Commissioner's Office then compiles a list of action items that need attention and follows-up to ensure that action is taken. <u>See</u> Exhibit B at ¶ 12.

77. The Commissioner also conducts personal, unannounced, day and night shift tours. <u>See</u> Exhibit B at ¶ 15.

78. The Commissioner has initiated focus groups with staff and incarcerated individuals, along with a facilitator, to discuss working and living conditions at our facilities. As of February 29, 2024, there have been a total of 21 focus groups at GRVC, OBCC, and RMSC -- 12 for incarcerated individuals and 9 for staff. <u>See</u> Exhibit B at ¶ 16.

79. The Commissioner secured $14.1 million for programs as a new need to serve the individuals in custody. The funding will be used for substance abuse programs, educational programs, transition planning, and trauma-informed programs, among others. <u>See</u> Exhibit B at ¶ 19.

80. The Commissioner also secured commitment from the Osborne Association and Fortune Society, two highly regarded non-profits, to provide services to population in care of DOC. <u>See</u> Exhibit B at ¶ 20.

81. Further, Commissioner Maginley-Liddie has restored the Board of Correction's access to video footage, so that Board staff can view all video footage at any time from their offices. In addition, the DOC now notifies the Board promptly of deaths in custody. <u>See</u> Exhibit B at ¶ 58.

82. The Commissioner must be permitted to finish the work of bringing DOC into substantial

compliance with the Nunez Orders. <u>See</u> Exhibit B at ¶¶ 60-67.


Dated:       New York, New York
             March 19, 2024

                              HON. SYLVIA O. HINDS-RADIX
                              Corporation Counsel of the City of New York
                              *Attorney for Defendants*
                              100 Church Street
                              New York, New York 10007


                       By:   /s/  *Michael Viviano*
                              _____
                              MICHAEL VIVIANO
                              *Senior Counsel*