UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

MARK NUNEZ, et al.,

    Plaintiffs,

    v.

CITY OF NEW YORK, et al.,

    Defendants.

**11 Civ. 5845 (LTS)(JCF)**

---

UNITED STATES OF AMERICA,

    Plaintiff-Intervenor,

    v.

CITY OF NEW YORK and NEW YORK CITY DEPARTMENT OF CORRECTION,

    Defendants.

---

***AMICI CURIAE* BRIEF OF CORRECTION OFFICERS' BENEVOLENT ASSOCIATION, INC. ("COBA"), AND IN SUPPORT OF DEFENDANTS CITY OF NEW YORK AND NEW YORK CITY DEPARTMENT OF CORRECTION IN OPPOSITION TO THE PLAINTIFF CLASS AND THE UNITED STATES MOTIONS FOR CONTEMPT AND APPLICATION FOR THE APPOINTMENT OF A RECEIVER**

Karasyk & Moschella, LLP
233 Broadway, Suite 2340
New York, New York 10279
John W. Burns, Esq.
Michael A. Palladino, Esq.
*Of Counsel to Amici Curiae COBA*

**TABLE OF CONTENTS**

**STATEMENT OF INTEREST**.................................................................................................1

    **A.**    **BACKGROUND OF COBA**................................................................................1

    **B.**    **THE CONSENT DECREE PERIOD FROM COBA'S PERSPECTIVE**.......................................................................................2

**ARGUMENT**..........................................................................................................................4

**THE APPOINTMENT OF A RECEIVER IS AN EXTRAORDINARY REMEDY AND THE PLAINTIFF'S MOTION SHOULD BE DENIED**...................................................4

    **A.**    **COBA Is Committed to Being Part Of The Solution**..........................................6

    **B.**    **Receiver Appointments Have Not Solved the Issues Facing Correctional Services Across The United States, Including The Federal Jail and Prison Systems**........................................................................7

**CONCLUSION**......................................................................................................................12

**STATEMENT OF INTEREST**

*Amici curiae* Correction Officers' Benevolent Association, Inc., ("COBA") is an incorporated labor union and certified bargaining representative for approximately 5,700 active uniformed correction officers employed by the New York City Department of Correction ("DOC") the New York City government agency responsible for the operation of the jail facilities for the City of New York.

COBA is responsible for protecting the interest of its approximately 5,700 members. COBA's interests include negotiating collective bargaining contracts for and providing various benefits to its members, while also extending to protecting its members' health, safety, well-being, and in general their social welfare.

**A.    BACKGROUND OF COBA.**

Amici COBA was founded in 1901. COBA has 20,000 active and retired members and is the second largest municipal jail union in the nation and the second largest law enforcement union in New York City. COBA represents the most diverse uniformed law enforcement union in New York City. Nearly 50% of New York City Correction Officers are female, 85% of COBA's active members are black or Hispanic, and 65% of our members live within the five (5) boroughs of New York City.

*Amici* has extensive experience in the representation of the interest of its members. COBA's unique position can provide this Court with a prospective of those staffing the jails. The voices of those women and men who work at the Rikers Island jail facilities have yet to be directly heard. The perception that COBA, the longest tenured stakeholder on Rikers Island, is an impediment to meaningful reform rather than a wealth of positive solutions, is a fallacy perpetuated by the Plaintiffs Class.  It is our sincere hope that this submission proves that COBA is an amici to the Court who can assist in ending the consent judgment and naturally improving COBA members'

1

working conditions as well as the living conditions of those we are sworn to protect, administer, and supervise.

### B.   THE CONSENT DECREE PERIOD FROM COBA'S PERSPECTIVE.

On July 1, 2015, the de Blasio Administration entered into a Consent Decree Judgment to settle the complaint in *Nunez* originally commenced in 2011. Additionally, there have been various supplemental reports concerning Remedial Orders and more recent reports on the Action Plan.

Central to the *Nunez* Consent Decree Judgment the City was required to develop a new Use of Force ("UOF") policy within DOC. The new UOF policy set forth prohibited conduct for certain categories of force and provided COBA members with clear direction on how and when force may be used. Additionally, reporting UOF incidents, completion of timely investigations of UOF, and a robust disciplinary process had been envisioned. DOC was mandated to install approximately 7,800 additional video cameras at the Rikers Island facility. In addition to the use of body-worn cameras ("BWCs"), handheld video cameras were also to be implemented. The Consent Decree Judgment contained numerous provisions concerning young Persons in Custody ("PIC") (ie: PIC who are 16 and 17 years old). All of these provisions have been completed and now most PICs under 19 years of age are no longer in the custody of DOC, but are detained by the Administrative of Children Services ("ACS") at two locations off Rikers Island.

However, since 2015, as COBA members have witnessed from the front lines, the New York City jail population has changed and has become more violent. This change, unfairly, renders some of DOC's progress less noticeable overall. As Commissioner Lynelle Maginley-Liddie stated: "Gone in 2024 are recidivist shoplifters, low-level drug dealers, and fraudsters, who populated Rikers jails in earlier days." (*See*, Exhibit A, Viviano Decl., Declaration of DOC Commissioner Lynelle Maginley-Liddie, ¶ 24, Dkt # 689-1, pg. 7). The Commissioner provided a profile of today's Rikers jail population in comparison to 2016. In 2024, 28.6% of PICs are

awaiting trial on a homicide charge, which is more than double the 2016 rate of 14.1%. PICs detained on charges of serious assault in 2024 are 11.8% in comparison to 9.1% in 2016.  PICs facing charges of robbery or weapons charges are 21.9% in 2024, compared to 20.7% in 2016.  However, the overall percentage of PICs detained on these four most serious and violent charges is where the cumulative dramatic rise is found; in 2024, they made up 62.3% of Rikers populations, while in 2016, they only represented 43.9 % of the PICs.

Added to this mix of violent individuals is the overlay of PICs with a mental illness diagnosis.  In Fiscal Year ("FY") 2023, 51% of PICs had some mental illness diagnosis, and in the first four months of FY '24 the rate climbed more to 53%. Similarly, in FY '23 18.9% of PICs had a serious mental health diagnosis and in the first quarter of FY '24 the rate increased to 20.2%.

While the PIC population was becoming more violent, uniformed staff drastically decreased and no new Correction Officers were hired to backfill, leaving thousands of vacancies that still exist today.  From 2020 – 2024, COBA's active membership decreased from approximately 8,900 to around 5,700, a decrease of approximately 35% in just a 4-year period. From FY '17 to FY '23 there has been a 42% decline in the number of uniformed DOC employees. *See, Mayor's Management Report 2020*, Department of Correction, pages 71-78, September 2020; *2024 Preliminary Mayor's Management Report*, pages 67-73, January 2024.

Retention and recruitment of Correction Officers is not keeping pace with normal attrition rates.  Projection of possible retirements from now through 2026 is overwhelming; approximately 1,050 Correction Officers will have hit their 20th year of service and be eligible for full retirement. That is 20% of current Correction Officer staff.

COBA members have suffered through a staffing crisis since 2021.  The current DOC administration has done everything possible to recruit new Correction Officers, sparing no

expense. However, a 3-year hiring freeze cannot be undone in a few months. Reversing the impact of attrition will take time, especially with the recruitment issues being experienced across all correction facilities nationwide.

This perfect storm obscures some of the meaningful and positive progress that DOC, COBA, and COBA members have collectively achieved since 2022.

Given all that COBA members have already endured during the 8 years of the consent judgment, the absolute last thing COBA members need now is yet another restart in the form of a Receivership. COBA members need the continuity and stability of the current DOC administration, led by Commissioner Maginley-Liddie. Ordering a Receiver to displace Commissioner Maginley-Liddie will not lead to positive reform, it will lead to chaos. It will be the tipping point that erases all recent hard-earned progress, permanently exacerbates the staffing crisis, and destroys morale. For the foregoing reasons, installing a Receiver will condemn all Rikers Island stakeholders to endure another prolonged, indefinite cycle of regression.

## ARGUMENT

### THE APPOINTMENT OF A RECEIVER IS AN EXTRAORDINARY REMEDY AND THE PLAINTIFF'S MOTIONS SHOULD BE DENIED

*Amici* COBA believes that the Court must deny the Plaintiff's Motion to Appoint a Receiver. The appointment of a Receiver is an extreme and extraordinary remedy. But, the less dramatic alternative of having the DOC Commissioner continue to work collaboratively and transparently with the Monitoring Team will provide a far more manageable road to realizing the goals of all concerned parties.

COBA endorses the opposition filed by the City and DOC. The appointment of a Receiver will essentially place DOC into a state of suspended animation. The DOC jails will be there, but the meaningful progress of the past few years will evaporate.

The declarations filed by Commissioner Maginley-Liddle clearly demonstrate that she is personally committed to achieving improvements and reforms at Rikers Island for COBA members and the PICs at the jail facility.

As the Commissioner accurately stated under oath "…The Unions have never prevented the Department from instituting needed reforms – I have made it a practice to share policy changes with the current union leadership and to solicit their input." (*see*, Dkt No. 689-1 ¶ 60 Commissioner Maginley-Liddle Decl.)

The Plaintiff Class has made baseless and false allegations against the unions. Moreover, these allegations are irrelevant to the issue of the appointment of a Receiver. (*See*, City's Response to Plaintiff Class's Proposed Findings of Fact, Dkt # 690, pgs. 236-241).

Further, in a back-handed fashion Dr. Michael Jacobson's Declaration, filed in support of the Plaintiff Class's Motion to Appoint a Receiver, highlights how important COBA is as an organization and an essential stakeholder. COBA clearly has the greatest institutional knowledge of all stakeholders on Rikers Island, certainly far greater than the Plaintiff Class. COBA's knowledge is invaluable. COBA should be included in the solution, not be excluded based on the fallacy perpetuated, but never accurately supported, by Plaintiff class that COBA is somehow an impediment to improvement, reform, and change. Such an allegation defies common sense, no one wants to live or work in a harmful and threatening environment!

Dr. Jacobson correctly pointed out that over the lifetime of the Consent Decree Judgment there have been eleven (11) DOC Commissioners and only three (3) COBA Presidents.

COBA and the DOC, under Commissioner Maginley-Liddie, have a cooperative relationship and looking forward COBA believes improvement will continue. COBA looks forward to continuing to work with Commissioner Maginley-Liddle. In her almost nine (9) years

with DOC she has held positions that have prepared her for the position of Commissioner and to lead DOC. The Commissioner has earned our respect, and we believe, she truly respects and understands our members.

Reviewing the Declarations of the other executive leaders of DOC clearly shows that they too acknowledge COBA and its members as key stakeholders essential to the improvement of Rikers Island.

### A. COBA is Committed to Being Part of The Solution.

Amici COBA would welcome and commit to opening a joint dialogue with the monitoring team and DOC. COBA wants to be a part of the solution instead of being viewed as the impediment of change. COBA's inclusion in the process is an essential component of the path forward. COBA welcomes participation in periodic labor-management-monitoring team forums where major reforms can be workshopped with all essential parties.

COBA has always been ready, willing, and able to engage in the process of bringing about meaningful improvements to ensure the safety and security of not just COBA members, but all persons on Rikers Island.  COBA members have stepped up to the challenges they have faced. They have overcome the COVID-19 Pandemic and the resulting staffing crisis. COBA members on a daily, 24/7, basis have contributed to the recent improvements at Rikers Island.  COBA brings an important and helpful voice that has been ignored for over eight years by the Monitoring team. Had the current COBA Executive Board been elected in 2015, it would have sought intervener status to assert a positive influence and share its institutional knowledge for the past eight years.

COBA has never been an impediment to change. Through the proposed joint forums, three essential parties can discuss and potentially resolve policy and personnel issues before they negatively impact all stakeholders. The proposed forums would also provide a space to establish

programs to support COBA members in their jobs and find effective ways to address recruitment and retention issues.

The inclusion of COBA would have the goal of working towards the termination of the Consent Decree Judgment and to work with DOC leadership and the Monitoring Team to formulate a program to make Rikers a safer and more secure place for all. Bringing COBA to the table is a change that will accelerate the improvements which have already occurred at Rikers over the past two (2) years.  Moreover, it is a recognition of the hard work and sacrifices of our members working towards a day when Your Honor will certify that the terms and conditions of the Consent Decree Judgment have been satisfied, the Monitor is no longer needed, and the Court's supervision can end.

**B.     Receiver Appointments Have Not Solved the Issues Facing Correctional Services Across The United States, Including the Federal Jail And Prison Systems.**

(i)     DOC is not the only correctional system that has found itself in a staffing crisis.  Over the past four (4) years jails and prisons across the United States have been caught up in a confluence of events that is beyond their control.  Long term planning is required to address the countless challenges that face correction systems.  Challenges come in all forms; for example, the COVID-19 Pandemic, the mass resignation and retirement of Correction Officers, and the rising population of PICs, many of whom suffer from mental illness, drug addiction, and are prone to be more violent.  Bringing in a Receiver and a new leadership team is not a plan for making improvements, it will only turn the clock back on the current conditions and improvements already achieved.

Looking at other recent receiverships it is obvious that the current momentum will stall as the transition to a Receiver begins. As a practical matter, a Receiver needs an extended familiarization and evaluation period before they can make an intelligent plan.  "It took me the

7

first three years just to get my feet on the ground and be able to work around all the barriers and obstacles and the stones that were thrown up[1]." A direct quote from Earl Dunlap, the Receiver of the Cook County Juvenile Temporary Detention Center. ("Cook County").

The California Receivership, which was limited to reforming the medical care for state prisoners, resulted in the United States District Judge removing the first Receiver after two (2) years of failed attempts.

In Mississippi, the appointment of a Receiver for the Hinds County Detention Center in July 2022 has been stayed by the Fifth Circuit while appeals are being decided. Hinds County is a mere 500 bed facility.

The Cook County Receivership commenced in 2007 and was ended in 2015. Through the application of some legislative and legal gymnastics the Federal Receivership ended, and the appointment of a committee headed by the Chief Cook County Judge replaced the Receiver. Thus, placing Cook County into state control. However, recent reports have shown that the conditions of this under-200 bed facility have deteriorated. A committee appointed by the Chief Cook County Judge, composed of juvenile justice experts found that in Cook County, which has on average 175 youths in custody, life for the detained youths is isolating and deprivational rather than rehabilitative. Most of these youths spent at least 13 hours a day locked in their small cells[2].

The Plaintiff Class relies on the two (2) recent Federal Receiverships of Cook County, a less than 200 bed juvenile facility; and Hinds County, an approximately 500-person detention center. Rikers current average daily population of PICs is 6,000, approximately 12x larger than Hinds County and a staggering 30x larger than Cook County. It appears that in the Hinds County

---

[1] Reuven Blau, Rikers Could Soon Have A Federal Receiver – How Have Take-Overs Worked in Other U.S. Jails, The City (Sept. 29, 2023) (https://www.thecity.nyc/2022/09/29/rikers-federal-receiver-takeovers-in-other-u-s-jails/)
[2] https://injusticewatch.org/juvenile-courts/youth-incarceration/2022/juvenile-detention-center-room-confinement-report/

8

Receivership the appointment of a Receiver is under appeal and in Cook County the new state-controlled management committee has been a failure.

The Plaintiff Class, by offering these two examples, hooks itself on its own petard. By what tortured logic can the experience of two (2) Receiverships of institutions smaller than DOC and far less complex to manage, which have been complete failures, serve as a positive example which bodes well for the success of the Receivership concept? If it could not work with 500 PICs what chance with 5,700?

A Receivership is not a realistic solution to the issues facing DOC at the Rikers Island jail facilities. COBA respectfully requests that the Court reject the Receivership motion in its entirety so that COBA members, and all others in DOC custody, are not subjected to the prolonged suffering experienced in Hinds and Cook Counties. The book on Receiverships is being written. They do not work.

(ii)   The Staffing Crisis Is Real and Must Be Fixed.

The United States Census Bureau has shown an overall trend in government employment, which has seen a decrease in workers in all sectors. However, the data shows that corrections has experienced a greater decline than in any other category of state government employment in recent years.

The Marshall Project recently reported, "in 2022, the number of people working in state prisons hit its lowest mark in over two decades."[3]

In Georgia, half of its Correction Officer jobs were vacant last year [2023]. In Wisconsin, the New York Times reported staffing ratios kept a prison in lockdown, confining people to their

---

[3] Shannon Heffernan and Weihueli, New Data Shows How Dire the Prison Staffing Shortage Really Is: The Stubborn Aspect of Life in Prison, For Employees and the Incarcerated Alike. The Marshall Project (January 10, 2024), - (https://www.themarshallproject.org/2024/01/10/prison-correctional-officer-shortage-overtime-data#:~:text=Prisons%20across%20the%20country%20have,mark%20in%20over%20two%20decades.).

9

cells for months on end without visits from family, no access to the law library and little or no time outdoors for recreation. That same article described nights where 10 correction officers were responsible for 900 prisoners at the Waupun prison[4].

Across the nation, less staff leads to a downward spiral. Fewer Correction Officers leads to more violence by PICs; greater mandatory overtime requirements for the Correction Officers, less family time and overall reduction in quality of life for Correction Officers, resulting in even more Correction Officers leaving the job due to deteriorating conditions. DOC was caught in this conundrum, exacerbated by a refusal to hire new staff, until 2021. The impact of this problem is still being felt in 2024 and continues to work against the progress that more recent DOC administrations have made.

The downward spiral also negatively impacts PICs because less staff means diminished ability to run programs that benefit PICs; fewer staff to dedicate to escorts for medical appointments; and less visits with family; which in turn leads to negative emotions and more violence.

Colorado's prisons are also understaffed. A report published in January of 2024, examined the impacts of the labor shortages upon incarcerated people in the state prison system. In this unique perspective of over 400 incarcerated individuals, it is not surprising that they overwhelmingly reported that the staff shortage has impacted every aspect of their lives. Access to basic services like mental healthcare, medical care, dental care, as well as educational programs, rehabilitation, and re-entering to society programs. The lack of staff increased their sense of danger

---

[4] Mario Koran and Justin Mayo, 10 Guards, 900 Inmates and the Dire Results of Warnings Ignored: An Extreme Shortage of Guards at Wisconsin's Prisons Has Slowed Basic Operations to a Crawl. Inmates escaped, Prisons Locked Down and Conditions Deteriorated, New York Times, (February 2, 2024) – (https://www.nytimes.com/2024/02/02/us/wi-prison-staffing-shortage.html#:~:text=north%20of%20Madison.-,10%20Guards%2C%20900%20Inmates%20and%20the%20Dire%20Results%20of%20Warnings,locked%20down%20and%20conditions%20deteriorated.).

10

and impacted mental health conditions and again contributed to violence. In fact, living under these conditions led to the overwhelming realization among PICs that hiring more Correction Officers was beneficial to them[5]!

Four weeks ago, the United States Director of the Bureau of Prisons ("BOP") Colette Peters, testified along with the Inspector General ("IG") Michael Horowitz of the BOP before the U.S. Senate Judiciary Committee. Both Director Peters and IG Horowitz said the federal prison system is in a staffing crisis in recruitment and retention. Due to salary limits they cannot compete with the private sector and the other law enforcement agencies. The IG also slammed BOP for 344 inmate deaths over an eight (8) year period, 187 of those deaths were suicides.

Closer to home, the Metropolitan Detention Center ("MDC") in Brooklyn has also come under judicial scrutiny. The MDC has a current population of approximately 1,544 PIC; however it is operating with only 55% of its staff[6]. Judge Furman in *USA v. Chavez*, 22-cr.-303 (JMF), in a nineteen (19) page decision, refused to send defendant Chavez to the MDC for pre-sentencing detention. Judge Furman found conditions at MDC to be dreadful in many respects: inmates at the MDC spend an inordinate amount of time in lockdown; MDC is egregiously slow in providing necessary medical and mental health treatment for inmates; there have been power outages that have left inmates without lights or heat for a full week[7]. The Court also cited to other Judges in the

---

[5] Vitello and Donner, Crisis in Correction: The DOC Staff Shortage and the Inmate Experience; Colorado Criminal Justice Reform Coalition, Special Report, January 2024; www.ccjrc.org

[6] Harry Siegal,: There's No Magic Justice Fix For Jails, Just Us. New York Daily News, (January 6, 2024) – (https://www.nydailynews.com/2024/01/06/harry-siegel-theres-no-magic-justice-fix-for-jails-just-us/).

[7] Just this Sunday, March 31, 2024, the New York Daily News reported that the food at MDC is infested with maggots. John Annese, Maggots Are Part of Jail's Diet – Lawyers: Detainee at Brooklyn Federal lock up allegedly served infested food and grub he is allergic to, and he's not the only one to complain. New York Daily News, (March 31, 2024) – (https://www.nydailynews.com/2024/03/30/maggot-infested-meals-being-served-inmates-at-brooklyn-federal-jail-lawyers-say/#:~:text=Brooklyn's%20troubled%20federal%20jail%20has,detainees%2C%20according%20to%20defense%20lawyers.).

SDNY and EDNY who refused to send a criminal defendant to the MDC. At page 18, FN 20, Judge Furman stated:

> "It is ironic, to say the least, that even as the Executive Branch fails to do what needs to be done to tend to its own house, it has – through the United States Attorney's Office – sought the appointment of an outside Receiver to address "unsafe, dangerous, and chaotic conditions in New York City's jail systems." (*See*, ECF #604)

When considering removing DOC from the City's control, proper weight must be given to the capability, or lack thereof, of the agency assuming the responsibility. Due to DOC's vast size and complexity, a Receiver was always going to have a steep learning curve. No Rikers Island stakeholders benefit from a Receiver that lacks institutional experience that DOC already has.

## **CONCLUSION**

COBA urges this Court to deny the Plaintiff Class and the United States's Motion for Contempt and to Appoint a Receiver. Additionally, by including COBA's voice in the conversation going forward, DOC Commissioner Lynelle Maginley-Liddie has everything necessary to successfully end the Consent Decree Judgment. The best path to reform is to leave DOC in the Commissioner's able hands.

Dated: New York, New York
April 2, 2024

By: */s/ John W. Burns*
John W. Burns, Esq.
Michael A. Palladino, Esq.
*General Counsel for COBA*
Woolworth Building
233 Broadway, Suite 2340
New York, New York 10279
212-233-3800
jburns@kmattorneys.com
mpalladino@kmattorneys.com