# Status Report
# by the
# *Nunez* Independent Monitor

**April 18, 2024**

### THE NUNEZ MONITORING TEAM

Steve J. Martin
*Monitor*

Kelly Dedel, Ph.D.
*Subject Matter Expert*

Anna E. Friedberg
*Deputy Monitor*

Dennis O. Gonzalez
*Director*

Patrick Hurley
*Subject Matter Expert*

Alycia M. Karlovich
*Associate*

Emmitt Sparkman
*Subject Matter Expert*

**Introduction** ............................................................................................................ 1

- Current State of Affairs ...................................................................... 1

- Monitoring Team's Assessments of Provisions Subject to Motion for Contempt ............ 2

- Monitoring Team's Assessment of Progress ......................................... 4

- Organization of the Report .................................................................. 8

**Leadership, Management, Supervision and Staffing** ........................................ 9

- Leadership ........................................................................................... 9

- Management ........................................................................................ 11

- Supervision ......................................................................................... 12

- Staffing ............................................................................................... 15

- Resources for the Reform Effort ......................................................... 17

- Conclusion .......................................................................................... 19

**Security Practices, Use of Force and Facility Violence** ................................. 20

- Reporting ............................................................................................ 21

- Security Practices & the Department's Internal Assessments ............... 22

- Security Plans ..................................................................................... 26

- Use of Force ....................................................................................... 29

- Interpersonal Violence ....................................................................... 38

- Status of Individual Facilities ............................................................ 41

- Conclusion .......................................................................................... 42

**Managing People with Known Propensity for Violence** ................................. 44

- Enhanced Supervision Housing (located at RMSC, or "RESH") ......... 45

- Use of NIC and Involuntary Protective Custody ................................ 48

- Additional Management Strategies Under Development ...................... 49

- Conclusion .......................................................................................... 50

**17th Monitoring Period Compliance Assessment for Select Provisions of the Consent Judgment and First Remedial Order** ................................................................. **51**

**First Remedial Order § A – Initiatives to Enhance Safe Custody Management, Improve Staff Supervision, and Reduce Unnecessary Use of Force** ................................................. **53**

- First Remedial Order § A., ¶ 1 (Use of Force Reviews) ................................................ 53

  Rapid Reviews ............................................................................................................. 53
  Rapid Review Data ...................................................................................................... 54
  Recommended Corrective Action ............................................................................... 55
  Rapid Review Quality ................................................................................................. 56
  Conclusion ................................................................................................................... 56

- First Remedial Order § A., ¶ 2 (Facility Leadership Responsibilities) ......................... 58

  Conclusion ................................................................................................................... 59

- First Remedial Order § A., ¶ 3 (Revised De-escalation Protocol) ................................ 60

  Use of Force Incident in Intake Areas ....................................................................... 60
  Intake Data Tracking ................................................................................................... 61
  Reduced Reliance on Intake & De-escalation Units ................................................... 62
  Conclusion ................................................................................................................... 63

- First Remedial Order § A., ¶ 4 (Supervision of Captains) ........................................... 64

  Goals of Supervision ................................................................................................... 64
  Scheduling ................................................................................................................... 66
  Organizational Structure and Number of Supervisors ................................................ 66
  Training for Supervisors ............................................................................................. 68
  Conclusion ................................................................................................................... 68

- First Remedial Order § A., ¶ 6 (Facility Emergency Response Teams) ......................... 69

  Concerns Regarding Emergency Response Teams ....................................................... 69
  Frequency of Emergency Response Team Deployments .............................................. 72
  Emergency Services Unit ("ESU") .............................................................................. 73
  Training for Special Teams .......................................................................................... 75
  Conclusion ................................................................................................................... 75

**Consent Judgment § IV - Use of Force Policy** ............................................................ **77**

- CJ § IV. Use of Force Policy, ¶ 1 (New Use of Force Directive) .................................. 77

  UOF Policy ................................................................................................................... 77
  Standalone Policies ...................................................................................................... 77
  Implementation of UOF Policy .................................................................................... 78
  Conclusion ................................................................................................................... 78

**Consent Judgment § V - UOF Reporting and Tracking** ............................................. **79**

- CJ § V. Use of Force Reporting and Tracking, ¶ 2 (Independent Staff Reports) ........... 79

Notifying Supervisor of UOF ................................................................. 79
Independent, Complete, and Timely Staff Reports........................................... 79
Classification of UOF Incidents ............................................................. 82
Alleged Use of Force ........................................................................ 83
Non-DOC Staff Reporting .................................................................... 84
Conclusion .................................................................................. 86

- CJ § V. Use of Force Reporting and Tracking, ¶ 22 (Providing Medical Attention Following Use of Force Incident) ............................................................ 87

**Consent Judgment § VII – Use of Force Investigations ................................... 88**

- CJ § VII. Use of Force Investigations, ¶ 1 (Thorough, Timely, Objective Investigations) & ¶ 9 (a) (Timing of Full ID Investigations) ...................................... 88

Background .................................................................................. 88
ID Leadership and Management of Investigations ........................................... 89
ID Staffing ................................................................................. 90
Status of Investigations ................................................................... 92
Timing of Investigations ................................................................... 92
Law Enforcement Referrals .................................................................. 93
Completion of Intake Investigations and Referrals for Full ID Investigations................ 94
Full ID Investigations ..................................................................... 95
Use of Force Priority Squad................................................................. 95
Quality of Investigations .................................................................. 96
Quality Assurance .......................................................................... 97
Identifying Misconduct and Referrals for Discipline ....................................... 99
Conclusion ................................................................................. 104

**Consent Judgment § X – Risk Management ................................................ 105**

- CJ § X. Risk Management, ¶ 1 (Early Warning System) ................................... 105

**Staff Discipline and Accountability....................................................... 108**

- CJ § VIII. Staff Discipline and Accountability, ¶ 1 (Timely, Appropriate and Meaningful Accountability) ...................................................................... 108

- First Remedial Order § C. (Timely, Appropriate, and Meaningful Staff Accountability), ¶ 1 (Immediate Corrective Action)................................................... 108

- CJ § VIII. Staff Discipline and Accountability, ¶ 3 (c) (Use of Force Violations) ........ 108

Overview of the Department's System for Meaningful Accountability....................... 109
Immediate Corrective Action............................................................... 112
Formal Discipline.......................................................................... 119
Conclusion ................................................................................ 130

- First Remedial Order § C. (Timely, Appropriate, and Meaningful Staff Accountability), ¶ 2 (Monitor Recommendations)........................................................ 132

Monitor Recommendations for Immediate Action, etc. (Remedial Order § C., ¶ 2)...... 132
Expeditious Resolution of Egregious Misconduct (Action Plan § F., ¶ 2) .................... 133
Conclusion ........................................................................................................... 136

- First Remedial Order § C. 4/Third Remedial, ¶ 2 (Expeditious OATH Proceedings) ... 137

- & First Remedial Order § C. (Applicability of Disciplinary Guidelines to OATH Proceedings), ¶ 5 ............................................................................................. 137

  Interagency Collaboration................................................................................... 138

- CJ § VIII. Staff Discipline and Accountability, ¶ 4 (Trials Division Staffing) ............. 143

  Recruitment Efforts............................................................................................. 143
  Staffing Levels ................................................................................................... 143

**Consent Judgment § XII – Screening & Assignment of Staff................................... 146**

- CJ § XII. Screening & Assignment of Staff, ¶¶ 1-3 (Promotions) ................................. 146

  Overview of Staff Promotions from 2017 to July 2023........................................ 147
  Screening Policy ................................................................................................. 147
  Overview of Promotions in This Monitoring Period ........................................... 148
  Assessment of Screening Materials ..................................................................... 149
  Review of Candidates (¶ 1)................................................................................. 149
  Disciplinary History (¶ 2) .................................................................................. 150
  Pending Disciplinary Matters (¶ 3) ..................................................................... 151
  Conclusion ......................................................................................................... 151

**Individuals in Custody Under The Age of 19 .......................................................... 152**

- CJ § XV. Safety and Supervision of Inmates Under the Age of 19, ¶ 1 (Prevent Fight/Assault)....................................................................................................... 152

- CJ § XV. Safety and Supervision of Inmates Under the Age of 19, ¶ 12 (Direct Supervision) ....................................................................................................... 155

- CJ § XV. Safety and Supervision of Inmates Under the Age of 19, ¶ 17 (Consistent Assignment of Staff) ......................................................................................... 156

**Update on the 2023 *Nunez* Court Orders .............................................................. 157**

- June 13, 2023 Order (dkt. 550) ............................................................................ 157

- August 10, 2023 Order (dkt. 564) ........................................................................ 158

- October 10, 2023 Order (dkt. 582)....................................................................... 164

- December 14, 2023 Order (dkt. 656) .................................................................... 164

- December 20, 2023 Order (dkt. 665) .................................................................... 165

- Streamlining the *Nunez* Court Orders ............................................................... 166

**Conclusion** ...................................................................................................... 168

- 2024 Reporting and Compliance Assessments ............................................... 169

**Appendix A:  Data** ......................................................................................... 171

**Number and Rate of UOF** ........................................................................... 172

**January 2022 to December 2023** .................................................................. 172

**Number and Rate of Stabbing and Slashing** ............................................ 175

**January 2022 to December 2023** .................................................................. 175

**Number and Monthly Rate of Fights  January 2022 to December 2023** ........ 178

**Number and Rate of Fires  January 2022 to December 2023** .................... 181

**Facility Searches & Contraband Recovery** ............................................... 185

**Overview of In-Custody Deaths** ................................................................. 187

**Unmanned Posts & Triple Tours** ............................................................... 189

**Uses of Force Involving Incidents When a Staff Member is Not on Post** ........ 191

**Number of ADWs and Captains** ................................................................ 195

**Sick Leave, Medically Monitored/Restricted, AWOL, PE, and FMLA** ........ 199

**Summary of ID Hires and Departures** ....................................................... 205

**OATH Pre-Trial Conferences** .................................................................... 205

**Leadership Appointments – January 2022 to April 15, 2024** ................... 208

**Overtime Spending** ....................................................................................... 212

**Corrected Status of Full ID Investigations Data** ..................................... 214

**Appendix B:  Facility Updates as of December 31, 2023** ......................... 215

**EMTC** ............................................................................................................. 216

**GRVC** ............................................................................................................. 217

**NIC** .................................................................................................................. 217

**OBCC** ............................................................................................................. 218

**RESH** .............................................................................................................. 219

**RMSC** ............................................................................................................. 219

**RNDC** ............................................................................................................. 220

**WF** ................................................................................................................... 221

**Appendix C:  March 2024 NCU Audits** ................................................................. **223**

    **Nunez Compliance Unit Security Audits March 2024** ........................................ **224**

**Appendix D:  Illustrative Examples** ...................................................................... **229**

- Illustrative Example 1: October 24, 2023 ......................................... 230
- Illustrative Example 2: October 26, 2023 ......................................... 235
- Serious Incidents at GRVC - February 2024 ..................................... 240

**Appendix E:  January 2024 RNDC Plan** ............................................................... **254**

    **Update on RNDC Plan Addressing Young Adults** ............................................. **255**

**Appendix F:  Update on Processing New Admissions** ........................................... **259**

    **Update on Processing of New Admissions** ......................................................... **260**

- Length of Stay in Intake for Male New Admissions ........................... 260
- Temporarily Suspending New Admission Processing, a.k.a. Clock-Stoppage ............. 262
- NCU's Audits to Verify Data Entry .................................................. 263
- Conclusion ................................................................................ 264

**Appendix G: Update on Certain Staffing Initiatives** ............................................. **265**

- Awarded Posts (Action Plan § C, ¶ 3, (v)) ......................................... 266
- Maximize Work Schedules (Action Plan § C, ¶ 3(vi)) ......................... 268
- Reduction of Uniformed Staff in Civilian Posts (Action Plan § C, ¶ 3(vii)) ................. 270

# INTRODUCTION

This is the second report filed by the Monitoring Team in 2024. The purpose of this report is to provide a neutral and independent assessment of the current state of affairs and the Department's efforts to achieve compliance with the *Nunez* Court Orders. This report also provides compliance ratings for a limited number of provisions from the *Nunez* Court Orders based on the Department's performance during the current Monitoring Period, which covers July 1, 2023 through December 31, 2023 ("Seventeenth Monitoring Period").

## CURRENT STATE OF AFFAIRS

The jails remain dangerous and unsafe, characterized by a pervasive, imminent risk of harm to both people in custody and staff. This risk of harm is caused by pervasive dysfunction in the jails' management resulting from polycentric and interdependent issues including, but not limited to, a broad failure to utilize sound correctional security practices for even the most basic tasks, limited staff supervision and poor-quality guidance, and a persistent failure to identify misconduct and to apply appropriate accountability. These failures perpetuate a toxic culture and a system in which none of the component parts work well or together. As a result, violence and a persistent pattern and practice of the use of unnecessary and excessive force remain evident in the system.

The new Commissioner's appointment in December 2023 is cause for optimism. There was an immediate and marked shift in the Department's engagement in the reform effort upon her appointment. The Commissioner has encouraged her leadership team to be candid, transparent and forthright with providing information. Department leadership appear to be engaging with one another in a more collaborative manner and collaborating with the Monitoring Team on various initiatives in a constructive and positive manner. The Commissioner's

command of the issues and willingness to collaborate with a variety of stakeholders bodes well for accelerating the pace of progress if the Department has the necessary resources and leadership. The Commissioner alone cannot reform the agency. The Department must have the necessary resources and continuity of leadership lead by a capable, reform-minded ***team*** that possesses the requisite subject matter expertise and ability to support and manage this complex reform effort.

As discussed throughout this report, the work to reform the Department is complex, overwhelming, and daunting. There is so much work to do. The approach to implementing the reforms requires a paradigm shift in order to catalyze the necessary momentum to reform the Department and create a safe environment for those incarcerated and staff. The ongoing risk of harm mandates that immediate steps are taken to bring about safety in the jails even while legal proceedings are pending before this Court. It why it is imperative that the City immediately accelerate the Department's access to funding and resources and remove the bureaucratic red tape regarding budgetary approvals and hiring because the current approval and vetting processes are creating unnecessary and protracted delay in advancing reform.

**MONITORING TEAM'S ASSESSMENTS OF PROVISIONS SUBJECT TO MOTION FOR CONTEMPT**

Listed below are the provisions subject to Plaintiffs' Motion for Contempt. This chart identifies whether this report provides a compliance assessment for July to December 2023 (17th Monitoring Period). If a compliance assessment is <u>not</u> provided in this report, the most recent Monitor's Report that addresses the issue is referenced.

| Provision | Monitor's Most Recent Findings |
|---|---|
| Consent Judgment, § IV, ¶ 1: Implement New Use of Force Directive | The compliance assessment with this provision is addressed in the 17th Monitoring Period Compliance Assessment of this report. |

| Provision | Monitor's Most Recent Findings |
|---|---|
| Consent Judgment, § VII, ¶ 1: Thorough, Timely, Objective Investigations | The compliance assessment with this provision is addressed in the 17th Monitoring Period Compliance Assessment of this report. |
| Consent Judgment, § VII, ¶ 9(a): Timeliness of Full ID Investigations | The compliance assessment with this provision is addressed in the 17th Monitoring Period Compliance Assessment of this report. |
| Consent Judgment, § VII, ¶ 11: ID Staffing | The compliance assessment with this provision is addressed in the 17th Monitoring Period Compliance Assessment of this report. |
| Consent Judgment, § VIII, ¶ 1: Appropriate and Meaningful Discipline | The compliance assessment with this provision is addressed in the 17th Monitoring Period Compliance Assessment of this report. |
| Second Remedial Order, ¶1(i)(a): Interim Security Plan | *See* the Security Practices, Use of Force and Facility Violence section of this report. |
| Action Plan, § A, ¶1(d): Improved Routine Tours | *See* the Security Practices, Use of Force and Facility Violence section of this report. |
| Action Plan, Improved Security Initiatives § D, ¶ 2(a): Interim Security plan | *See* Second Remedial Order, ¶1(i)(a) above. |
| Action Plan, Improved Security Initiatives § D, ¶ (d): Searches | *See* the Update on the 2023 *Nunez* Court Orders section of this Report. |
| Action Plan, Improved Security Initiatives § D, ¶ (e): Identify/Recover contrabands | *See* the Update on the 2023 *Nunez* Court Orders section of this Report and Appendix A of this report. |
| Action Plan, Improved Security Initiatives § D, ¶ (f): Escort holds | *See* the Update on the 2023 *Nunez* Court Orders section of this Report. |
| First Remedial Order, § A, ¶ 2: Facility Leadership Responsibilities | The compliance assessment with this provision is addressed in the 17th Monitoring Period Compliance Assessment of this report. |
| First Remedial Order, § A, ¶ 4: Supervision of Captains | The compliance assessment with this provision is addressed in the 17th Monitoring Period Compliance Assessment of this report. |

| Provision | Monitor's Most Recent Findings |
|---|---|
| Action Plan, § C, ¶ 3(ii) Increased Assignment of Captains in the Facility | *See* First Remedial Order, § A, ¶ 4 above. |
| Action Plan, § C, ¶ (iii): Improved Supervision of Captains | *See* First Remedial Order, § A, ¶ 4 above. |
| Action Plan § C, ¶ 3, (v): Awarded Posts | *See* Appendix G of this Report. |
| Action Plan § C, ¶ 3, (vi): Maximize Work Schedules | *See* Appendix G of this Report. |
| Action Plan § C, ¶ 3, (vii): Reduction of Uniformed Staff in Civilian Posts | *See* Appendix G of this Report. |
| First Remedial Order, § A, ¶ 6: Facility Emergency Response Teams | The compliance assessment with this provision is addressed in the 17th Monitoring Period Compliance Assessment of this report. |
| Consent Judgment § XV, ¶ 1: Prevent Fights/Assaults (Safety and Supervision of Inmates Under the Age of 19) – *18-year-olds* | The compliance assessment with this provision is addressed in the 17th Monitoring Period Compliance Assessment of this report. |
| Consent Judgment § XV, ¶ 12: Direct Supervision (Safety and Supervision of Inmates Under the Age of 19) – *18-year-olds* | The compliance assessment with this provision is addressed in the 17th Monitoring Period Compliance Assessment of this report. |
| Consent Judgment § XV, ¶ 17: Consistent Assignment of Staff (Safety and Supervision of Inmates Under the Age of 19) – *18-year-olds* | The compliance assessment with this provision is addressed in the 17th Monitoring Period Compliance Assessment of this report. |
| First Remedial Order, § D, ¶ 1: Consistent Staff Assignment and Leadership | *See* Consent Judgment § XV, ¶ 12 above. |
| First Remedial Order, § D, ¶ 3; 3(i): Reinforcement of Direct Supervision | *See* Consent Judgment § XV, ¶ 17 above. |

MONITORING TEAM'S ASSESSMENT OF PROGRESS

A comprehensive process for assessing compliance and describing the current state of affairs requires multiple measures to be evaluated in each key area of the *Nunez* Court Orders because no one metric adequately represents the multi-faceted nature of their requirements. While quantitative data is a necessary component of any analysis, relegating a nuanced, complex, qualitative assessment of progress towards achieving compliance with these requirements into a

single, one-dimensional, quantitative metric is not practical or advisable. Data—whether

qualitative or quantitative—cannot be interpreted in a vacuum to determine whether progress has

been made or compliance has been achieved. For example, meeting the requirements of the Use

of Force Policy provision of the Consent Judgment relies on a series of closely related and

interdependent requirements working in tandem to ultimately reduce and, hopefully eliminate,

the use of unnecessary and excessive force. As such, there is no single metric that can determine

whether the Use of Force Policy has been properly implemented. Analogous situations appear

throughout this report, whether focused on discussions about the Department's improving safety

in the facilities, making the process for imposing staff discipline timelier and more effective, or

addressing its staffing needs. The Monitoring Team therefore uses a combination of quantitative

data, qualitative data, contextual factors, and reference to sound correctional practice to assess

progress with the Action Plan's requirements.

      Further, two cautions are needed regarding the use of quantitative metrics. First, the use

of numerical data suggests that there are specific metrics or definitive lines that specify a certain

point at which the Department passes or fails. There are no national standards regarding a "safe"

use of force rate, a reasonable number of "unnecessary or excessive uses of force" nor an

"appropriate" rate at which staff are held accountable.[1] Consequently, the Monitoring Team uses

a multi-faceted strategy for assessing compliance that evaluates all inter-related issues.

      Second, there are infinite options for quantifying the many aspects of the Department's

approach and results. Just because something *can* be quantified, does not mean it is necessarily

---

[1] Notably, this is why neither the Consent Judgment, the underlying *Nunez* litigation, CRIPA investigation, the Remedial Orders, nor the Action Plan include specific metrics the Department must meet with respect to operational and security standards that must be achieved.

useful for understanding or assessing progress. The task is to identify those metrics that actually provide insight into the Department's processes and outcomes and are useful to the task of problem solving. If not anchored to a commitment to advance and improve the processes and outcomes that underpin the requirements of the *Nunez* Court Orders, the development of metrics merely becomes a burdensome and bureaucratic distraction.

It is axiomatic that reform is intended to improve upon the conditions at the time the Court first entered the Consent Judgment and that the initiatives implemented as required by the *Nunez* Court Orders in fact improve practice. It must also be emphasized that the various remedial orders that were entered following the Consent Judgment were all intended to create the capacity to comply with the requirements of the Consent Judgment. None of the *Nunez* Court's Orders "move the goal posts" or materially change the Department's obligation to fully comply with the Consent Judgment. For this reason, the Monitoring Team compares current performance levels and key outcomes to various periods of time, including those at the time the Consent Judgment went into effect as well as other markers such as when a policy was adopted and implemented. The Monitoring Team has taken this same approach throughout the duration of its work.

Since the Consent Judgment was entered, changes to the context within which the jails operate have occurred and these externalities must be recognized. One of the most obvious externalities is the COVID-19 pandemic which began in March 2020, and triggered a staffing crisis that exacerbated decades-long mismanagement of the Department's most important resource—its staff—which then cascaded into even more problems in many of the areas that impact jail safety (*e.g.*, failure to provide mandated services which generates frustration; levels of stress among people in custody and staff which can trigger poor behavior; interruptions in

programming that increase idle time). In addition, recent bail reform enacted by the State has changed the composition of the jails' incarcerated population. Individuals with less serious offenses who previously may have been incarcerated are generally no longer held pending trial. While this has had the effect of reducing the overall jail population, it has resulted in a heavier concentration of detainees with more serious offenses in the jails.

These external factors do not change the City's obligation to provide safe and humane treatment to those within its jails, and while important for understanding shifts in the size and characteristics of the jail population and the resulting dynamics that surround jail safety, they do not excuse failure to comply with the *Nunez* Court Orders. The constitutional minimum of care and safety that must be afforded to all incarcerated individuals has remained the same and continues to be the standard by which all reform must be measured.

The array of quantitative metrics, qualitative assessments, and an appreciation of externalities mean that discussions about the current state of affairs can be cast in many ways, many of which are legitimate strategies for understanding the Department's trajectory. The selected comparison point can lead therefore to different conclusions about the magnitude or pace of progress or the lack thereof. The Monitoring Team has dutifully examined changes in metrics and patterns in staff behavior from multiple angles in order to gain insight into the factors that may be catalyzing or undercutting progress. While such explorations are useful for purposes of understanding and problem solving, they do not replace the overarching requirement for the Department to materially improve the jails' safety and operation relative to the conditions that existed at the time the Consent Judgment went into effect.

**ORGANIZATION OF THE REPORT**

The report includes the following sections:

- Leadership, Management, Supervision and Staffing

- Security Practices, Use of Force and Facility Violence

- Managing People with Known Propensity for Violence

- Compliance Assessment for Select Provisions of the Consent Judgment and First Remedial Order

- Update on the 2023 *Nunez* Court Orders

- Conclusion

The report includes the following appendices:

- Appendix A: Data

- Appendix B: Facility Updates as of December 31, 2023

- Appendix C: March 2024 NCU Audits

- Appendix D: Illustrative Examples

- Appendix E: January 2024 RNDC Plan

- Appendix F: Update on Processing New Admissions

- Appendix G: Update on Certain Staffing Initiatives

## LEADERSHIP, MANAGEMENT, SUPERVISION AND STAFFING

The success of a reform initiative of this magnitude depends to a large extent on the sustained leadership delivered by agency executive staff, facility leaders, and those who supervise officers' work with people in custody. The leaders are the messengers of change and set the tone for whether the change will move beyond the superficial to become the new cultural norms and practices required by the *Nunez* Court Orders. Not only must these leaders have a nuanced understanding of what the *Nunez* Court Orders require, but they must also understand the obstacles and barriers that managers and staff will face as they endeavor to implement new practices. Further, they must have solutions for overcoming the many challenges that arise as that process evolves. While new concepts are introduced to officers during training, it is the leaders and supervisors who transfer that initial introduction into everyday practice through their messaging, guidance, coaching, and role modeling. These three elements—leadership, supervision, and training—are the assets that translate the words on the pages of the *Nunez* Court Orders into improved day-to-day practice that will fundamentally alter staffs' approach to people in custody and maintaining a safe environment.

### LEADERSHIP

Commissioner Maginley-Liddie's appointment in December 2023 represented a refreshing return to a style of agency leadership that is committed both to reform and to the transparency necessary to permit true collaboration with a variety of stakeholders. Most importantly, the Department's internal functioning benefits from this culture of candid, open communication. The Commissioner's candid interaction with the Monitoring Team and frequent requests for consultation and collaboration have restored the functional relationship with the Monitoring Team that is necessary to advance reform.

Implementing the many changes required to reform this system requires *numerous* qualified people in executive and supervisory positions to untangle the morass of problems plaguing the agency. The reform effort requires a significant number of executives with a strong command of sound correctional practice, tenacity to address an entrenched culture, and the patience to work through these obstacles. It also requires a dedicated team to support the overall reform effort. The Nunez Manager, and her team, along with the Acting General Counsel and Acting Deputy General Counsel have been working tirelessly to advance the reform effort by coordinating Department leadership and staff and working collaboratively with the Monitoring Team. As discussed throughout this report, even with these dedicated professionals, there are insufficient resources to instigate and sustain this effort. The Nunez Manager, the Department's Legal Division, and the Policy and Planning Unit and Strategic Operations unit (who both also support the reform effort) require sufficient resources to support this enormous undertaking and currently lack the complete compliment of resources necessary to instigate and sustain the reform effort.

The individuals who serve or have served in the roles of Classification Manager, Staffing Manager, and Security Manager demonstrate the value that true subject matter experts can bring to the task of altering an entrenched culture that frequently seeks to return to how things were done in the past. For this reason, multiple *Nunez* Court Orders require the Department to appoint individuals with specific expertise and permit the Department to recruit external candidates to fill these roles. As occurs in all systems, some of the individuals with external expertise hired to support the reform effort subsequently left their positions, and others have not proven to be a good fit or do not appear capable of bringing about the culture change and infusion of expertise that is so desperately needed.

10

A number of key high-level positions are currently vacant, and additional departures are expected. For example, the Classification Manager and one of the Associate Commissioners of Facility Operations left in early 2024 and both positions remain vacant. The Senior Deputy Commissioner and Staffing Manager also tendered their resignations right before the filing of this report and will leave the Department in the coming weeks. An insufficient number of individuals remain at the executive level and a small number of individuals, with varying degrees of expertise, are currently filling those roles. This is not sustainable. Additional high-level leaders need to be brought into the agency to fill vacant positions and to replace any individuals who have not met the moment.

In many cases, the Department would be well served to recruit leaders from outside the agency, although, at the same time, institutional knowledge needs to be maintained by promoting those within the agency who have demonstrated a commitment **and** the ability to advance the reform. All of these leaders must be able to identify deficient practices and conceptualize and implement the necessary change without being mired in the familiar but dysfunctional practices of the past.

### MANAGEMENT

The Department's various deficiencies, dysfunctions and shortcomings, which have been normalized and embedded in many facets of its operation, continue to impede reform efforts. The issues stymying reform are complex and polycentric, with a number of "problem centers" that are inextricably intertwined and layered. Finding effective and sustainable solutions to such complex problems requires peeling back the layers of dysfunction to uncover the core problems and then developing multilateral and multifaceted approaches to correct them. The Department, thus far, has not been able to do so.

The Department's deeply entrenched culture of dysfunction has persisted across decades and many administrations. The required culture change has stagnated for many reasons, including that the agency remains in a constant state of crisis, lack of continuity in leadership and focus, large numbers of staff who lack elementary skills, the Department's inability to identify and address problems proactively, and the fact that leaders often take action only after public reporting. Each of these dynamics is discussed in depth in the Monitor's July 10, 2023 Report (dkt. 557) at pgs. 142-147, which remains an accurate description of the state of affairs as of the filing of this report. The uncertainty regarding the pending motion practice for contempt and the potential appointment of a Receiver have only made managing the agency more difficult as it impacts recruitment and retention efforts, among other things.

The complicated web of problems facing the current Commissioner are many of the same issues faced by her predecessors. However, some of these problems have become further exacerbated in the last few years by regression in certain areas, a loss of momentum, the current uncertainty due to ongoing legal proceedings in this case, and other extenuating circumstances.

### SUPERVISION

Changing staff practice will require an infusion of correctional expertise in a form that reaches more broadly, deeply, and consistently into staff practice than facility leadership has been able to accomplish to date. This is one of the responsibilities of those recruited to the Department at the executive level (e.g. Senior Deputy Commissioner, Deputy Commissioners, Associate Commissioners, and Assistant Commissioners). In order to increase the presence of executive level staff within the facilities, Commissioner Maginley-Liddie began requiring approximately 60 executive and senior staff to tour at least one alternating facility every 2 weeks and to document and share their observations with the Commissioner's office. The staff required

to conduct these tours include all Deputy Commissioners, Associate Commissioners, and Assistant Commissioners, down to Executive Directors and Commanding Executive Officers and the Nunez Manager. These tours provide opportunities for executive staff to understand and address the concerns and issues amongst their line staff and those in custody, share their expertise directly with the line staff, and convey messages about the culture the leadership intends to promote. However, these executive staff cannot be present in the facilities at all times, so they must be supported by a skilled corps of supervisors.

Improving staff practice requires not only an appropriate number of supervisors but also supervisors who provide *quality* supervision. Increasing staff's ability and willingness to utilize proper security practices rests on the supervisors' ability and willingness to confront poor practices and teach new ones. Definitive steps to ensure that staff are available in sufficient numbers and are properly assigned are important, but it is equally critical that staff *actually do their jobs*, which requires thorough training, skill mastery, and the confidence to implement the expected practices and to enforce rules. Too often, staff are present and yet fail to enact or enforce even the most basic security protocols. Supporting and improving staff's confidence and skill mastery should be a core responsibility of the Department's supervisors, but it is not currently occurring as it must. Improved practice by line staff requires ongoing, direct intervention by well-trained, competent supervisors—guiding and correcting staff practice in the moment as situations arise. Only with this type of hands-on approach will the Department be able to confront and break through staff's inability, resistance, and/or unwillingness to take necessary actions.

Currently, the supervisory ranks are unprepared to support the weight of the strategies that place them at the center of officers' skill development. Compounding the problem of too few

supervisors is the reality that many of those holding the ranks of ADW and Captain have only marginal competence in the skills necessary to provide *effective* supervision. Supervision cannot be passive—these individuals must have an active presence in the housing units, demonstrating the requisite skills, providing opportunities for staff to practice them, and helping staff to understand and eventually overcome what hinders their ability to utilize the skills they are being taught consistently.

The dynamic between Captains and officers is crucial for maintaining order and security within housing areas, yet the dynamic appears fundamentally compromised in this Department. Captains must embody the role of mentors, attentively listen to frontline staff, and actively work towards resolving issues, thereby fostering a supportive environment and effective operation. Unfortunately, the relationship between officers and Captains is too often described in ways suggesting that it subverts progress rather than accelerates it. For example, during monthly meetings with the Monitoring Team, the Department's Training Division disclosed that exit interviews with resigning officers consistently cited strained relationships and lack of support from Captains as the primary factors leading to their departure. Additionally, reports from facility leadership and staff and during the Monitoring Team's observations of operations, Captains often appear to be either unclear about their responsibilities or outright fail to embrace them. This often leads to a superficial execution of duties, where Captains do not appear to routinely conduct substantive tours or, in some instances, fail to conduct tours at all. Too often, Captains conduct tours but often fail to tour the whole unit or address obvious issues within their assigned housing areas. For example, officers report concerns such as incarcerated individuals' frustration over inadequate supplies or service disruptions, but Captains do not investigate the underlying

causes nor seek solutions, choosing instead to move on to the next task. This abdication of responsibility leaves officers feeling unsupported and disinclined to fulfill their own duties.

The Department simply does not have the necessary assets among its current corps of supervisors to provide the type and intensity of hand-to-hand coaching that is required, which is perhaps unsurprising given their tenure in a deeply dysfunctional system that does not adequately select, train, or prepare them for the task at hand. In addition to the Captains' need for intensive guidance, ADWs also need substantial and quality coaching, supervision, and mentoring from their superiors to develop into the type of supervisor that is so desperately needed in this Department. The task of cultivating the ADWs will largely fall to the Deputy Wardens and Wardens/Assistant Commissioner's in each command, which brings yet another layer of complexity to the supervision problem and the task of reforming the Department's practices.

STAFFING

Addressing the Department's staffing problems requires multiple strategies. First, the Department must have adequate controls, procedures, and enforcement mechanisms to manage staff who are on leave or who need to be placed on modified duty. Second, the Department must revamp its staff assignment practices in order to maximize the deployment of staff within the jails and to ensure key housing unit posts are always covered. An update regarding the Department's efforts to address certain staffing provisions required by the Action Plan (and are subject to the pending motion for contempt) is described in Appendix G of this Report.

The Department, via HMD, has made notable progress in reducing the number of staff on sick leave and modified duty and these statuses are now better managed and monitored. That said, the system remains vulnerable to abuse and circumvention by staff and must be constantly and closely monitored to identify and close new loopholes. For instance, facility leaders often

report to the Monitoring Team that staff's use of personal emergency ("PE") days and FMLA leave, some of which may be excessive or used outside of the approved circumstances, impedes appropriate staffing in the jails. The Department reports that the HR Division and the Staffing Manager are in the process of developing strategies to close these loopholes.

As discussed in the Monitor's March 16, 2022 Report (dkt. 438), the Department's staffing conventions—including scheduling, tour and post assignments, and general deployment—are far outside the generally accepted practice in correctional facilities. The findings of the Monitoring Team's staffing expert have been largely echoed by the Department's Staffing Manager (a well-qualified individual with extensive subject matter expertise). Important progress has been made, including implementing an electronic schedule in each facility, streamlining squads and tours, and installing the SMART Unit to provide intensive and ongoing support to facilities. Making these changes to the traditional staffing conventions has not been easy; staff in the facilities continue to try to circumvent the new practices in favor of those that are more familiar and/or those that permitted problems regarding favoritism to flourish in the past. For instance, during site visits, officers have reported their belief that determinations by facility supervisors regarding assignment to a challenging housing unit or assignment of overtime is made based on favoritism.

Furthermore, new obstacles and barriers to efficient staff deployment continue to be identified, which is a critical and necessary step to untangle this process. These issues, of course, all ultimately also need solutions. These complexities mean that the Department's staffing problems and inefficiencies are far from resolved and will continue to need focused attention for the foreseeable future. These issues are incredibly complex given external laws, structures and agreements that are sometimes at odds with the best interest of the Department and facilities. For

this reason, and because staffing is **the** essential element to reform, these areas of the Department's operation must continue to be led by individuals with *bona fide* subject matter expertise and supported by a cadre of people who can provide intensive monitoring at each of the Department's facilities.

### RESOURCES FOR THE REFORM EFFORT

The reform effort is resource intensive. It requires significant human capital in the form of strong executive leadership, qualified supervisors, officers, staff to support the jails' operations (e.g. medical, programs and maintenance), and the variety of ancillary services that are central to the Department's functioning (e.g., legal, human resources, Investigations/Trials). Maintaining the antiquated physical plant also requires a significant maintenance workforce and large financial expenditures.

In order to begin to remedy the current state of affairs, the Department must be able to recruit and hire staff on an expedited time frame. To date, the City's bureaucracy imposes significant burdens that make the already challenging task of hiring staff even more difficult. Obtaining funding and approvals from the Office of Management and Budget, a separate City Agency, and other City requirements appear convoluted and overly complicated. The delays in obtaining necessary funding results in a protracted recruiting and hiring/promotion process where positions often remain vacant for extended periods of time while positions are approved for posting and candidates are interviewed and vetted. The Monitoring Team routinely receives reports from across the agency and from various disciplines (for example, executive leadership, staffing, programming, legal, trials, and ID) that bureaucratic red tape and processing delays is impeding streamlined and efficient recruitment, hiring and promotion. These delays lead to difficulty in even recruiting individuals for positions and, in other cases, well-qualified

candidates withdrawing their applications. In a few recent examples, approvals for hiring/promotion related to ID, the Trials Division, and the Nunez Compliance Unit may not have been obtained but for the repeated inquiries by members of the Monitoring Team. Even when funding is obtained, processing delays can further delay the use of that funding. For instance, Department leadership recently testified before City Council that it would take over a year before it could utilize 14 million dollars it obtained for programming due to processing and vetting requirements. The impact of these delays cannot be understated. As discussed above, without the appropriate funding and approvals, the Department is hindered in its ability to have the sufficient support and materials necessary to actually advance the *Nunez* reforms.

An inefficient and slow-moving bureaucracy is not an acceptable explanation for failing to fund, recruit, and hire the agency and facility leaders who are so desperately needed to change the current faltering trajectory toward reform. It is why the *Nunez* Court Orders include a variety of requirements to ensure the Department has timely access to the necessary resources. The City must streamline its processes and remove obstacles to efficiently obtain funding and hiring staff as necessary. The efforts to date have been insufficient and the City's current practices related to approval for funding and hiring/promotion practices are stymieing the reform efforts.

The City is uniquely situated to ensure that the Department is able to quickly obtain funding, recruit, and hire the executives it needs so the City must deploy its power to act in service of the Department. The very essence of the requirements of the *Nunez* Court Orders requires this type of action. The Monitoring Team strongly encourages the City to take all available steps to provide the proper support to the Department so it has all the necessary resources to support the reform effort.

CONCLUSION

The reform effort necessarily requires strong leadership from the Commissioner who must be surrounded by a leadership team she trusts and that has the requisite expertise. Leaders who work directly in the jails must be empowered to make change and must be supported by capable supervisors who can effectively mentor the officers working directly with people in custody. A robust corps of leaders at all levels is essential to bringing about the culture change necessary to advance the reforms. This is a significant undertaking that won't be addressed immediately, but, the ongoing harm in the jails makes this work all the more important and the need to work with all due haste incredibly significant.

The Department alone cannot fulfill the requirements of the *Nunez* Court Orders. The discussion in this section brings into stark relief the deeply entrenched barriers to compliance. The City and Department are at a critical juncture and it is incumbent on the City to make novel efforts to provide the necessary resources to empower the Department to meet the requirements of the *Nunez* Court Orders and ameliorate the risk of harm. Nearly nine years of Monitoring have demonstrated that the existing barriers have proven insurmountable for the Department. However, the contours of the dysfunction are also better understood, which gives the City an opportunity to facilitate reform if it is willing and capable of meeting the task.

## SECURITY PRACTICES, USE OF FORCE AND FACILITY VIOLENCE

The underlying problem of poor security practices, along with their myriad causes, continues to catalyze both the excessive and unnecessary use of force and to provide opportunities for interpersonal violence to occur. Understanding the precipitating circumstances, characteristics and frequency of the underlying problems requires an assessment of both quantitative metrics and qualitative aspects of practice. As the Monitoring Team has long reported there is no single indicator, qualitative or quantitative, that accurately depicts a problem that can only be fully understood using a constellation of markers and methods. These are further explored in this section.

In this Department, the rates of *all* the violence and use of force metrics remain alarmingly high. These rates are some of the highest rates observed by the Monitoring Team in any of the many systems with which they are familiar. While the rates of nearly every indicator reached an apex in 2021 and then subsequently decreased, the decreases—though obviously necessary—are of little consolation. Qualitative assessments of individual incidents show a continued pattern where staff use force when it is unnecessary and/or in a manner that is excessive and out of proportion to the extant threat. Assessments of individual incidents also show the increasingly aggravated nature of interpersonal violence and the potential for life-altering injury. Many of these incidents continued to be surrounded by poor staff decision making, poor situational awareness, and staff actions that precipitated the event. In many of these cases, had a few things been done differently, the incident/use of force/act of violence/injury/staff discipline likely would not have occurred and, in those cases where they would have occurred, the seriousness of the incident could have been lessened.

20

The conditions of the jails continue to suffer from the lack of comprehensive, articulated Security Plan/initiatives that address the many security failures that create an opportunity for violence and the unnecessary/excessive use of force to flourish. The lack of a cohesive strategy has further allowed the extraordinarily high risk of harm to staff and incarcerated individuals alike to continue unabated. This is why the development of a comprehensive Security Plan is crucial and why it must focus on basic security practices, such as eliminating security breaches, locking doors, reducing congregation in certain areas, etc.

In the remainder of this section, several facets of the Department's operation are discussed. Department-wide security, use of force and violence trend data are described below, along with the Department's internal assessments of these issues. The quantitative data provides useful historical records to show the considerable increases that have occurred across the spectrum of events related to security, use of force and violence. Appendix A of this report includes additional data regarding use of force and security indicators. Because of the significant changes to the size and composition of individual facilities, the interpretation of historical trends at the facility level is of little use. As a result, the status of individual facilities is presented in Appendix B using only the *current* rates of various metrics which provide insight into the problems each facility is now facing.

**REPORTING**

Incident reporting is a basic and essential tool for properly managing a facility and is necessary to identify and solve problems. The integrity of any incident reporting system rests on a foundation that accurate reporting is mandatory, and that staff reflexively report incidents when they occur. The Department has complicated and convoluted reporting structures that make understanding the reporting requirements difficult. In 2023, the Monitoring Team identified a

number of instances when serious incidents (including stabbings and slashings) were not reported or were reported only after a significant delay. These problems were described in detail in the Monitor's November 8, 2023 Report (dkt. 595) at pgs. 29-37. These reporting issues impair the Monitoring Team's ability to confirm whether all incidents occurring in the jails are reported as required. As a result, the Court's December 14, 2023 Order required changes to the Department's incident report policy and procedures. The current status of this work is shared in the Update on the 2023 *Nunez* Court Order section of this report, which highlights the Department's lack of progress in addressing this fundamental aspect of jail operations.

## SECURITY PRACTICES & THE DEPARTMENT'S INTERNAL ASSESSMENTS

The Monitoring Team has established a lengthy, detailed record of the deficiencies in staff's basic security practices and the impact they have on facility safety.[2] The patterns discussed in these reports remain an accurate description of the jails' dysfunction today. The Monitoring Team has not observed any material change to staff's security practices since they became a greater focus of the *Nunez* Court Orders in 2021, which explains why the Department's overall use of force rate and rates of interpersonal violence remain so high. Because staff continue to poorly supervise many housing units and in too many instances abdicate their responsibilities and/or cede control, people in custody consequently exercise an unacceptable level of control within these areas (e.g., flagrantly refusing to follow rules and demanding that

---

[2] *See* Martin Declaration (dkt. 397), Exhibit E "Citations to Monitoring Team Findings re: Security Failures" and Monitor's December 6, 2021 Report (dkt. 431) at pgs. 17-23; Monitor's March 16, 2022 Report (dkt. 438) at pgs. 7-30; Monitor's April 27, 2022 Report (dkt. 452) at pgs. 2-3; Monitor's June 30, 2022 Report (dkt. 467) at pgs. 13-17; Monitor's October 28, 2022 Report (dkt. 472) at pgs. 56-77; Monitor's April 3, 2023 Report (dkt. 517) at pgs. 36-63; and Monitor's July 10, 2023 Report (dkt. 557) at pgs. 12-68.

staff provide access to unauthorized areas). This wholly inappropriate balance of authority is often directly related to safety risks that lead to dangerous incidents and uses of force.

The Department has several internal sources of information about its security practices including information flowing from the *Nunez* Compliance Unit and the Deputy Commissioner of Security's audits. More generally, Department leadership continues to report that during their routine reviews of video footage, security problems continue to be widespread. These are strong internal resources to identify problems, which is important. The Department is therefore well aware of the widespread lapses and failures in security practices. A summary of these findings is listed below:

   o   *Nunez Compliance Unit Audits*: NCU continued to audit security practices by
       randomly selecting a housing unit for a 24-hour period of Genetec review.
       Between July and December 2023, GRVC was audited 9 times, OBCC was
       audited 8 times, RMSC was audited once, and RNDC was audited 12 times. The
       audits revealed the same problems that have been identified by both NCU and the
       Monitoring Team for years. The random audit methodology (rather than selecting
       units/times that are known to be problematic) provides further evidence of the
       widespread nature of the problems. The findings of nearly all audits included a
       combination of the following:

       ▪ Unsecured cell doors throughout the lock-out period;
       ▪ People in custody moving freely in and out of each other's cells;
       ▪ Unenforced 3 p.m. and 9 p.m. lock-ins (although this appeared to improve
         slightly toward the end of the Monitoring Period, especially at OBCC);
       ▪ Staff off post (reported in nearly every audit);
       ▪ People in custody observed smoking in common areas; and

- ▪ Failures to conduct rounds at the required frequency, to use the tour wand, check that cell doors were secured, and/or to look inside of cells while making rounds.

NCU audits from January to March 2024 at OBCC, RNDC, and GRVC revealed essentially the same problems that have been identified and reported for years, with little to no improvement. Appendix C of this report includes a summary of six audits in housing units at these facilities.

- o _Office of the Deputy Commissioner of Security's Audits_: Staff from the office of the Deputy Commissioner of Security conduct audits of the jails using a set of standards drawn from Department policy and directives. RMSC was audited in May/June 2023 (report issued in July 2023), GRVC was audited in September 2023 (report issued in October 2023), and RNDC was audited in October/November 2023 (report issued in February 2024). Low compliance rates were observed at each facility: RMSC was compliant with 39 of 86 standards (45%), GRVC was compliant with only 8 of 20 standards (40%), and RNDC was compliant with only 8 of 22 standards (36%). All the audits identified some combination of the following problems:

  - ▪ Failures to pat frisk, strip search, use transfriskers and BOSS chairs prior to allowing people in custody to enter and exit the facility and its housing units.
  - ▪ Failures to conduct scheduled counts and to maintain count sheets.
  - ▪ Failures to secure cell doors, conduct proper 30-minute tours and inspect locking mechanisms.
  - ▪ Failures of housing unit staff to properly position themselves so that they can see, listen to, and communicate with people in custody.
  - ▪ Failures to prohibit staff without current training from carrying OC.
  - ▪ Failures to properly maintain logbooks, razor/tool inventories and visitor logbooks.

In addition to the NCU and DC of Security Audits, the Department has undertaken a more concerted review of staff compliance with the tour wand procedures. This process has been managed by multiple individuals under different leadership (e.g. the Commissioner's Office, the Office of Facility Operations, and the Senior Deputy Commissioner's Office). The accuracy of these reviews has been questionable given initial findings failed to identify pervasive problems with the lack of availability of tour wands within facilities, which was first identified by the Monitoring Team while conducting a site visit in September 2023.[3] The process of systematically tracking staff compliance with the use of tour wands has been in a state of flux.[4] The Monitoring Team is in the process of trying to assess the available data regarding tour wand compliance, but it has been difficult given the many leadership changes and the multitude of documents and tracking mechanisms which are not streamlined. Given the management of tour wand compliance has recently changed again, the Monitoring Team strongly recommends the Department produce an auditing process that not only identifies issues and produces informative data, but can withstand changes in the team conducting the auditing.

While it is important that the Department has the tools to identify these issues, the information they provide has not been leveraged as it should be. The NCU's audit findings do not appear to be incorporated into the agency or facility leadership's assessment of practice nor have leaders taken concerted steps to ensure the identified problems are addressed. The

---

[3] See the Monitor's November 8, 2023 Report (dkt. 595) at pgs. 74-76.

[4] In October 2023, the team conducting these assessments were assigned to the Commissioner's office and presented its procedures to the Monitoring Team. Those individuals have subsequently either left the Department or been reassigned. Beginning in December 2023, the assessment of compliance with the use of tour wands was transitioned back to the SDC's office. The Monitoring Team met with the SDC's team responsible for this work to discuss the procedures being used and is still in the process of assessing the documentation provided. However, the Department reported that recently, the individual who was assigned to do this work is no longer assigned to this task. The Department reports an ADW has recently been assigned management of this process.

Monitoring Team continues to strongly urge Department leadership to utilize the audits' findings to develop concrete and sustainable solutions.

SECURITY PLANS

The first step to reducing the security and operational failures and, in turn, to increasing facility safety, depends on accurately identifying the contributing factors. The Monitoring Team has observed that underpinning many incidents of violence and use of force are staff's failures to apply sound security practices (e.g., securing cell doors, controlling movement, etc.), to enforce basic rules, and to effectively diffuse tension and solve problems. This is a consistent pattern across facilities, which is why the Monitoring Team encourages—and various *Nunez* Court Orders require—the Department to develop a Security Plan to address these issues. Fundamentally, the plan must be able to withstand changes in leadership, whether at the City, Department or facility level. New leaders should of course add/subtract/modify the specific interventions as needed, but the Security Plan's fundamental targets (i.e., security practices) and intended outcomes (i.e., reducing the use of force and violence) must remain stable and consistent. Too often, this Department develops plans that are abandoned before they are ever fully implemented.[5]

The Department has struggled to develop and implement both short- and long-term Security Plans as well as facility-specific plans. Plans proposed by the Department change frequently and are seldom fully developed and implemented before they change yet again. Case in point, the majority of plans reported by the Department in October and November 2023 (and described in detail in the Monitor's November 8, 2023 Report (dkt. 595) at pgs. 17-23) have either not been implemented or were not effective. The RNDC plan, which was adopted in 2022

---

[5] *See* Monitor's November 8, 2023 Report (dkt. 595) at pgs. 14-23.

and was initially promising, did not sustain the desired effects[6]. Instead of being reformulated, the plan was simply abandoned, and the facility's conditions further deteriorated to the point of crisis. In January 2024, the Department issued a new RNDC plan that includes some promising strategies (discussed in more detail in the compliance assessment section of this report related to the young adult provisions and Appendix E). The Monitoring Team strongly encourages the Department to remove obstacles to implementation, determine which strategies are working and which need to be enhanced, and to stay the course. The GRVC plan, adopted in 2022, does not appear to have been faithfully implemented and has essentially been abandoned, despite increasingly dire facility conditions. A description of recent serious events in February 2024 is included as Appendix D of this report.

The Monitoring Team has repeatedly requested updates on the Department's efforts to devise a more holistic Department-wide Security Plan from the Senior Deputy Commissioner, the Deputy Commissioner of Security and other Department leadership. In response, the Department typically reports that the plans are being developed but are not yet ready to share with the Monitoring Team.[7]

---

[6] See discussion regarding RNDC and GRVC's plans in the Monitor's March 16, 2022 Report (dkt. 438) pgs. 17-30; Monitor's Report June 3, 2022 Report (dkt. 467) pgs. 17-27; Monitor's October 28, 2022 Report (dkt. 472) pgs. 65-71; Monitor's April 3, 2023 Report (dkt. 517) pgs. 52-62; and Monitor's July 10, 2023 Report (dkt. 557) at pgs. 59-61.

[7] The Senior Deputy Commissioner met with the Monitor and Deputy Monitor in December 2023 at which time the SDC articulated general plans, without providing specific details. The general plans discussed by the SDC were essentially a repetition of the plans outlined in the Monitor's October and November Reports. Since then, the Monitoring Team has repeatedly advised of our availability to meet and the importance of producing written plans that would enable us to review them in order to have a constructive discussion of what is being proposed and to provide feedback as necessary. The Monitoring Team subsequently made inquiries about the status of the plans and reiterated our availability to confer. As recently as March 21, 2024, during a meeting with the SDC, the Monitoring Team again requested a "four-corner written plan" upon which we could confer and provide feedback. Despite reports from the SDC to the Monitoring Team that written plans were forthcoming, to date no plans have been provided.

Given the Department's lack of a stable, comprehensive and robust strategy to improve facility security, facility leadership often do not know what is planned or who is doing what or when. The Department's haphazard, piecemeal approach has created confusion about the priorities, focus and initiatives underway. Furthermore, when strategies are implemented, little internal effort is expended to determine whether they were implemented with fidelity and whether they are effective.

The Monitoring Team reiterates its strong recommendation that the Department must develop a comprehensive Security Plan, as required by 1(i)(a) of the Second Remedial Order and §D ¶2(a) of the Action Plan. This plan should include elements to ensure that:

o Staff routinely implement sound security practices by remaining on post, locking doors and cuffing ports, controlling keys and OC spray, not permitting individuals to congregate in cells or vestibules, ensuring individuals remain in the dayroom during lock-out, securing gates, communicating effectively with the A-post and corridor posts and removing and controlling contraband.

o Staff regularly conduct meaningful tours of the units to verify the welfare of those individuals in their cells and *actively* supervise interactions among those in the dayroom;

o Supervisors have a regular, constructive presence on the housing units to both elevate staff skill and to resolve problems;

o Prosocial behavior is incentivized, and rules are properly enforced, including the application of meaningful consequences for misconduct by incarcerated individuals;

o Lock-in times are strictly enforced;

o The introduction of dangerous contraband is minimized, and effective search techniques are used to detect/seize contraband when prevention is unsuccessful;

o Staff utilize a continuum of responses to safety and security threats, from least restrictive to more restrictive, and should refrain from using head-strikes outside of the circumstances under which they are permitted by policy;

o Proper escort techniques are utilized to avoid escalation;

o Emergency response teams are used only in the event of a true emergency; and

o A robust strategy is developed for managing those with a propensity for violence and ensuring an effective, proportionate response to those who commit serious violence while in custody.

Simply reiterating the expectations listed above during roll call or during supervisory tours of the housing units are not viable strategies. The Department has utilized this approach many times and over many years, to no avail. Instead, the Department must develop a clear and accurate understanding of what prevents or disincentivizes staff from meeting the expectations and must develop formal strategies to overcome that resistance. Strategies can and should be adapted when they have either resolved the problem or proven to be ineffective. They may also need to be altered as they are implemented at individual facilities. The Monitoring Team first recommended the need for such plans in fall 2021, and more than two years later, a comprehensive plan has not yet been developed.

**USE OF FORCE**

Unnecessary and excessive uses of force continue to occur too frequently in this system. Staff continue to try to resolve situations by using force when a reasonable solution could be found via verbal interactions (i.e., force was unnecessary), and when they do intervene physically, staff continue to apply force in a manner that goes beyond what is needed to gain control of the situation (i.e., force was excessive). Staff must learn to embrace a philosophy to use the *least restrictive means necessary* to restore safety. To date, the Department has not

devised any sustainable strategies to alter staff's use of force and no material change in staff practice has been observed by the Monitoring Team. Accordingly, an ongoing pattern and practice continues to exist where staff use force when it is not objectively necessary and in a manner that is out of proportion to the extant level of threat.

Staff's use of force practices create an unreasonable risk of harm to both the incarcerated population and to the staff themselves. It is this ***risk of harm*** that is the overarching target of the reform effort related to the use of force. When assessing the Department's use of force, merely focusing on whether an individual involved in the incident[8] sustained a physically injury does not provide a comprehensive picture as it fails to consider the impact of the use of force on the individual regardless of a physical injury. The fact that the individual did not sustain an injury does not negate the fact that the force may have been unnecessary or excessive nor does it avoid the disruption that every use of force creates for the smooth operation of the jails and essential service delivery.[9] In fact, the Monitoring Team routinely observes staff utilizing unnecessary and excessive force in cases where no physical injury occurs.

Of course, preventing and minimizing the risk of physical injury should be paramount in any correctional setting. Preventing the harm that flows from a use of force, including physical injury, can only be accomplished by reducing the use of force when the situation allows, ensuring that staff utilize the minimum amount of force, and ensuring that the intervention is well-timed and properly executed. Appendix D includes two recent illustrative examples of

---

[8] Notably, the Department is unable to adequately and consistently capture all physical injuries that occur to staff during a use of force. Staff may, but are not required to, report to the Department if they are injured during a use of force and thus the veracity of staff injury data largely depends on whether the staff has chosen to report that information to the Department.

[9] *See* Monitor's April 18, 2019 Report (dkt. 327) at pgs. 27-30; Monitor's October 28, 2019 Report (dkt. 332) at pg. 19; and Monitor's October 23, 2020 Report (dkt. 360) at pg. 17.

unnecessary and excessive force incidents in which there was no physical injury, but there was a risk of harm and a variety of security and operational failures. These incidents are not isolated and are representative of the patterns and practices observed by the Monitoring Team since the inception of the Consent Judgment.

Accordingly, the Monitoring Team focuses on *all* uses of force and provides a summary of historical trends below. More detailed data is attached to this report as Appendix A. In general, the historical trends show that the rate of some indicators decreased from the apex in 2021; however, current levels do not meet the obligation to ensure safety and reduce risk of harm.

The Monitoring Team's review of thousands of use of force incidents continues to reveal the following:

- **<u>Unnecessary and Excessive Force</u>**: Staff continue to use force when it is unnecessary, and when their actions/inactions precipitated the need for it. Force is often applied using poor technique/dangerous holds and is often excessive given the nature of the threat. While the current rates may be lower than in the recent past, the use of unnecessary and excessive use of force in the Department remain unacceptably high. Drawing on a sports analogy, a professional football team that has lost a game by 50 points certainly cannot claim victory by only losing by 40 points in the next game. Both games represent a compelling need/imperative for wholesale changes among the ownership, coaches, and players.

  - **<u>Number and Rate of Use of Force</u>**: The Department's average monthly use of force rate in 2023 (9.33) is 24% lower than the average monthly rate at the apex of the crisis (2021; 12.23) but is 135% higher than the average monthly use of force rate at the inception of the Consent Judgment (2016; 3.96) and 58% higher than the average monthly use of

force rate during the first full year of implementation of the new Use of Force policy (2018; 5.9).

While the Monitoring Team's use of a *rate* neutralizes the impact of changes to the size of the population, a rate assumes that all else remains the same and, in this case, does not account for notable changes to the jails' population. The proportions of individuals with a propensity for violence and who suffer from mental illnesses have become significantly larger over time, particularly since 2020. The fact that the jails' populations have changed in these ways heightens the level of concern. High concentrations of people prone to violence or who have significant mental health needs mean that every staff member on every housing unit is faced with a very difficult task— safely managing people with complicated needs. The magnitude of the impact that changes to the population have had on use of force rates is impossible to estimate or quantify, which is why the metrics need to be viewed in concert with qualitative incident reviews.

o **<u>Facility Comparisons</u>:** One of the striking elements of the Department's data related to the use of force is the similarity in the facilities' average monthly use of force rates (with the exception of RESH). While the population in each facility may differ, the disorder and violence are prevalent throughout the jails, as is staff's tendency to respond to situations by using force. This further illustrates the need for the Department to construct a system-wide Security Plan to reduce the use of force and violence. Appendix B includes a summary of the state of affairs in each facility at the end of December 2023.

| Facility Comparisons, 2023 | |
|---|---|
| **Facility** | **Use of Force Rate** |
| EMTC (ADP 1,200) | 9.72 |
| GRVC (ADP 950) | 10.01 |
| NIC (ADP 275) | 9.92 |
| OBCC (ADP 1,430) | 9.58 |
| RESH (ADP 160) | 40.5 |
| RMSC (ADP 220) | 9.8 |
| RNDC (ADP 1,100) | 8.0 |
| WF (ADP 575) | 0.78 |

o **<u>Staff Precipitation and Head Strikes</u>**: The Monitoring Team's observations suggest two key driving forces behind the continued high rates of unnecessary and excessive uses of force: (1) staff action or inaction that precipitates the need to use force and (2) head strikes. Regarding precipitating actions, staff continue their hyper-confrontational behavior, impatience, power struggles, crowding and poorly managed team restraints, and generally fail to utilize the full continuum of responses (from less to more restrictive uses of force), all of which escalate the security concerns rather than resolve them. Conversely, the Monitoring Team frequently observes an apathetic approach to basic security practices and staff failures—and even refusals—to intervene that are all too common in systems where staff feel unsafe and/or inadequately prepared for and supported while on the job, lack adequate oversight and supervision, and lack the skills and confidence to maintain the necessary order without causing an event to escalate.

Regarding head strikes, the Monitoring Team continues to observe staff utilizing this extremely dangerous tactic in situations that do not warrant this type of "last resort" response. In most systems, head strikes are quite rare, in contrast to this Department where staff used head strikes routinely. For instance, in December 2023, ID identified

33

that head-strikes were utilized at least 47 times in the month.[10] By comparison, the Los Angeles County jail system, which is also struggling to reduce its use of force (and is currently subject to litigation), utilized head strikes 52 times during calendar year 2022, and has a population larger than the Department's.[11]

o **Use of OC Spray**: Chemical agents are a necessary tool for intervening in dangerous conduct among people in custody and can guard against staff injury, but they must be used appropriately. If it is used at close range, in large quantities, with gratuitous repeat application, or when a less restrictive physical intervention could be sufficient, the use of OC increases the risk of harm rather than minimizes it. The Monitoring Team observes each of these problems frequently, as has been reported since the inception of the Consent Judgment. In addition, the NYC Board of Correction recently issued a report that analyzed the Department's use of OC spray in October 2023.[12] Findings included the use of OC spray on individuals who were passively resisting staff orders, arguing with staff, or engaging in self-harm with a ligature, rather than following established safer and more proportional de-escalation or intervention protocols. A significant number of incidents also involved the use of OC cannisters permitted only for crowd control on single individuals or small groups, OC deployed at close distances, and a failure to anticipate

---

[10] The investigation for some incidents remain pending at the time this data was developed. It is possible that the number of incidents with a head-strike will increase once additional investigations have been closed.

[11] *See* Meg O'Connor, *LASD Says It Wants to Keep Hitting People in the Head*, THE APPEAL, https://theappeal.org/lasd-los-angeles-jails-aclu-rosas-luna-head-strike/?utm_source=TMP-Newsletter&utm_campaign=404ab2c6ce-EMAIL_CAMPAIGN_2023_06_29_10_58&utm_medium=email&utm_term=0_5e02cdad9d-404ab2c6ce-%5BLIST_EMAIL_ID%5D.

[12] Baily, B. (2024). *An Assessment of the Use of Chemical Agents in New York City Jails*. New York, NY: NYC Board of Correction. Available at: https://www.nyc.gov/assets/boc/downloads/pdf/Reports/BOC-Reports/An-Assessment-of-the-Use-of-Chemical-Agents-in-NYC-Jails-Final.pdf

the use of force and follow anticipated use of force procedures even when it appeared possible to do so. These practice problems were compounded by incident reports that included false statements, lack of BWC footage, and facility administrators' failure to identify the aforementioned problems. The report concluded with a useful set of recommendations to improve practice and the Monitoring Team is working with the Department to implement some of them, including strengthening training programs and revising the policy.

o **<u>Injuries Sustained from Use of Force</u>**: Understanding the nature of injuries sustained via the use of force is important information but, as discussed above, is only tangentially related to determining whether the force was necessary or excessive. The proportion of uses of force that resulted in serious injuries dropped conspicuously during the current Monitoring Period (from 6% in 2022 to 1.3% from July-December 2023). This significant reduction requires further investigation to determine the factors that are driving the change, including possible changes in reporting.

o **<u>Department's Internal Assessments of the Use of Force</u>**: Facility leaderships' Rapid Reviews and ID's investigations evaluate all use of force incidents and have found the following patterns.

  o *<u>Rapid Reviews</u>*: Rapid Reviews detect misconduct close-in-time to the incident, but are not as consistent and reliable as they must be.[13] Although significantly

---

[13] The Monitoring Team's assessment of the findings of the Rapid Reviews has been mixed. While Rapid Reviews conducted in 2022 showed some improvement in identifying misconduct (as noted in the Monitor's April 3, 2023 Report (dkt. 517)), the Monitoring Team's assessment of Rapid Reviews completed in 2023 revealed that certain issues (such as identifying that an incident was avoidable and therefore should not have occurred) are not reliably identified. For this reason, Rapid Review data underestimates the prevalence of misconduct and leaves certain problems undetected and unaddressed. This is described in more detail in the compliance assessment of the First Remedial Order § A, ¶ 1 of this report.

underestimated, the Rapid Review data reveals continued problems with staff's ability to apply the requisite skill set and decision-making needed to effectively decrease the rate at which force is used. For incidents occurring in 2023, facility leadership identified frequent violations of security and operational protocols (at least 38% of all staff actions in uses of force) including staff failures to secure cell doors or food slots, to escort individuals in proper restraints, to properly supervise large groups of people in custody, to remain on post, to enforce mandatory lock-in, and to follow proper guidelines for anticipated uses of force, as well as the improper use of chemical agents at close range or in a retaliatory manner. Staff also frequently exhibited unnecessarily confrontational demeanors (particularly during searches). Some of these failures directly contributed to the circumstances that facilitated the incidents and subsequent uses of force. For instance, cases involving unmanned posts and off-post staff have resulted in a number of uses of force as reported in Appendix A. Facility leadership separately determined that 9% of all uses of force were avoidable, unnecessary or excessive and therefore would not have occurred if staff had utilized sound correctional practices including security-related actions, interpersonal communication and/or conflict resolution skills. While the Rapid Reviews underestimate the size and scope of the problems, the information they do present is reason enough for concern.

o   _ID Findings_: Among ID's closed investigations of use of force incidents occurring between January and December 2023, approximately 12% were deemed

"unnecessary," "excessive," and/or "avoidable."[14] Twelve percent suggests a

significant problem, particularly given that these investigations do not reliably

identify all misconduct that occurred in a given incident. The number of cases in

which the incident was avoidable and/or the staff's behavior was unnecessary or

excessive is certainly higher than this data reflects given what the Monitoring

Team has found in its reviews of thousands of incidents.

o *Egregious Incidents of Force Requiring Suspension or "Fast Tracked"*

*Discipline*: Another indicator that harmful staff practices continue to be endemic

in this Department is the frequency with which staff engage in use of force related

misconduct serious enough to warrant either (a) suspension or (b) fast tracked

discipline via ¶ F2 of the Action Plan. This is particularly notable given the

Department's ongoing inadequacies in identifying misconduct.[15] These cases

include staffs' inappropriate use of head strikes, chokeholds, kicks, and body

slams; use of racial slurs; failures to intervene; and staff having abandoned their

posts. Some of these actions by staff against people in custody were retaliatory,

punitive, and designed to inflict pain. Moreover, there is evidence that staff have

been complicit in causing or facilitating assaults among people in custody. Many

---

[14] The Department and the Monitoring Team have not finalized an agreed upon definition of these categories. The definition of these findings and the development of corresponding data is complex, especially because it requires quantifying subjective information where even slight factual variations can impact an incident's categorization. A concrete, shared understanding of what these categories are intended to capture is necessary to ensure consistent assessment across the board. While efforts were made in summer 2021 to finalize common definitions, they were never finalized, and the effort has since languished given the focus on higher priority items last year. Also, this categorization process has not been expanded to Full ID Investigations.

[15] The Department's use of immediate action improved in 2023 following recommendations from the Monitoring Team that the use of immediate action in egregious cases should be considered and is discussed in more detail in the Discipline and Accountability section of this Report.

of these cases appear to involve misconduct that likely would require the Department to seek termination of these individuals pursuant to § VIII, ¶ 2(d) of the Consent Judgment. Such incidents in well-run systems should be isolated and rare, but they occur frequently in this Department. In the Monitoring Team's experience, the frequency of such serious misconduct is unprecedented. A chart of all suspensions is included in the compliance assessment of accountability and discipline of this report and a more fulsome discussion of ¶ F2 is discussed in the compliance assessment of the First Remedial Order § C, ¶ 2 in this report.

Eliminating the use of unnecessary and excessive force depends on the Department understanding *and* acting upon the ways in which the need to use force materializes, and how staff respond to that need when it occurs. This must remain a focal point for the Department.

### INTERPERSONAL VIOLENCE

Violence, as a key threat to facility safety, must be evaluated when assessing the current state of affairs. As noted above, and throughout this report and others, the current conditions in the facilities cannot be viewed in a vacuum of only certain data and metrics. That said, the violence indicators discussed below reflect the same level of disorder and risks of harm discussed throughout this section. Appendix A of this report includes additional data related to these issues.

The average monthly rate of every safety and violence indicator remains too high, is substantially higher than when the Consent Judgment went into effect in November 2015, and is higher than the rate during each of the subsequent four years (i.e., 2016-2019). While lower than the apex in 2021, the rate of violence remains extremely elevated and clearly illustrates the grave risk of harm faced by people in custody and staff alike. In addition, the aggravated nature of

many of the events—particularly the stabbings/slashings and assaults of a single victim by multiple assailants—have the potential to cause, and have caused, life-changing injury and could be lethal. In addition to the fact of the high rates of interpersonal violence themselves, the fact that there are no readily apparent causes of any of the decreases that have been witnessed is troubling. Sustainable reform is only possible when the reasons for improvement are understood such that they can be maintained or replicated over time. The Department has not developed or implemented any strategic plan to reduce violence, and thus the small decreases that have occurred are likely due to chance, seasonal fluctuations, and other factors outside of the Department's control. The Monitoring Team continues to urge the Department to take steps to understand and address the root causes of violence such that viable prevention strategies can be developed.

- **<u>Stabbing and Slashing</u>**. The Department's average monthly rate of stabbings/slashings during the current Monitoring Period (July-December 2023; 0.59) is only 4% lower than the average monthly rate at the height of the crisis (2021; 0.63) and is about 320% higher than the average monthly rate of stabbings/slashings at the inception of the Consent Judgment (2016; 0.14). The rate of stabbing/slashing increased 25% during the second half of 2023, compared to the first half (0.59 versus 0.47, respectively). The Monitoring Team previously reported that data on the total number of stabbings and slashings in 2023 was unreliable, but that even the number of reported events is cause for concern. The status of efforts to revise the definition of stabbing and slashing is discussed in the Update on 2023 *Nunez* Court Orders section of this report, and very little progress has been made to fortify the relevant reporting practices.

- **Assaults on Staff**: The Department's average monthly rate of assaults on staff in 2023 (0.9) is 46% lower than the average monthly rate at the height of the crisis in 2021 (1.67) but is 25% higher than the average monthly rate of assault on staff at the inception of the Consent Judgment (2016; 0.72).[16]

- **Fights**: The Department's average monthly rate of fights during the current Monitoring Period (July-December 2023; 8.7) is only 6% lower than the apex of the crisis in 2021 (9.28) and is about 70% higher than the average monthly rate of fights at the inception of the Consent Judgment (2016; 5.11).

- **Fire-Setting**: The Monitoring Team recently began to analyze data on the frequency of fire-setting behavior as fires in a custodial setting are particularly dangerous and are typically indicators of discontent among people in custody. This data shows that the Department's average monthly rate of fire-setting during the current Monitoring Period (July-December 2023; 0.95) is 60% lower than the average monthly rate during at the apex of the crisis (2021; 2.36). At the time the Consent Judgment went into effect, the Department reported a very small number of fires at a couple facilities, leading to a rate of fire-setting of 0.0 in 2016. Notably, this behavior is far more prevalent in some facilities (e.g., RESH, RNDC) than others.

- **Serious Injuries to Incarcerated Individuals**: The Department collects data regarding serious injuries sustained by people in custody that is not otherwise reported as part of a use of force or a stabbing/slashing. This reporting designation generally captures injuries that occur during fights among incarcerated individuals (that are not stabbing/slashing

---

[16] These comparisons only include assaults on staff that involve a use of force, because relevant comparison data for assaults on staff without a use of force are not available.

incidents and where staff do not use force) and injuries sustained in other ways (e.g., slip/fall, injuries sustained during recreation). Medical staff designate the severity of an injury following an evaluation. In order for the injury to be attached to a specific incident, facility staff must report the injury to COD once they receive the injury report. Not only is this process convoluted, potentially omitting some injuries from COD reports, but the injury data itself is of limited utility because it does not indicate the *source* of the injury (e.g., an accident, violent altercation or self-inflicted). In 2023, there were approximately 900 incidents in which at least one incarcerated individual obtained a serious injury. The Monitoring Team cannot analyze the frequency of serious injuries related to incidents of violence because the data includes events (e.g., accidents) that are not germane to the issues at hand. However, even without quantitative data, the injuries described in the injury reports that are part of the Monitoring Team's regular incident reviews are often aggravated and, particularly those caused by a sharpened weapon, are potentially lethal.

STATUS OF INDIVIDUAL FACILITIES

In the years since the Consent Judgment went into effect, the Department's constellation of facilities has changed constantly, both in terms of the number of facilities it operates, and the number and characteristics of people housed in each facility. For example, AMKC was closed in August 2023, GMDC was closed in June 2018, and VCBC was closed in October 2023. EMTC and OBCC were both briefly closed and then reopened.

In 2023, as the Department reduced the number of facilities it operates, the size of the population managed in each jail has increased significantly. Four facilities hold 1,000+ people on any given day (EMTC, GRVC, OBCC, RNDC). In addition, the target populations of many of the facilities have changed, which not only makes historical data trends difficult to interpret, but,

more importantly, means that staff must learn to meet the needs of different types of people (e.g., general population, people with mental health needs, those in protective custody, etc.). Given that, interpreting historical data for each facility is not useful. The table below shows the rates of key metrics at each facility in 2023, and additional facility-specific information is provided in Appendix B.

| Facility Comparisons, 2023 | | | | |
|---|---|---|---|---|
| **Facility** | **Use of Force** | **Stabbing/Slashing** | **Fights** | **Fires** |
| EMTC (ADP 1,200) | 9.72 | 0.39 | 14.63 | 0.03 |
| GRVC (ADP 950) | 10.01 | 0.84 | 6.91 | 0.75 |
| NIC (ADP 275) | 9.92 | 0.0 | 3.33 | ** |
| OBCC (ADP 1,430) | 9.58 | 0.66 | 8.91 | 0.29 |
| RESH (ADP 160) | 40.5 | 3.76 | 4.67 | 7.92 |
| RMSC (ADP 220) | 9.8 | 0.0 | 7.5 | 0.11 |
| RNDC (ADP 1,100) | 8.0 | 0.77 | 7.46 | 2.95 |
| WF (ADP 575) | 0.78 | 0.0 | 0.76 | ** |

This data shows the variability of interpersonal violence across facilities. With the exception of NIC and WF, each of the other facilities struggles with certain types of violence. For example, EMTC has a significantly higher rate of fights than other facilities; GRVC has one of the higher rates of stabbings/slashings; OBCC has one of the higher rates of fights; RESH has high rates of stabbings/slashings and fire-setting; RNDC has elevated rates of stabbings/slashings, fights and fire-setting. Overall, this data illustrates the impact of the ongoing deficiencies in staff practice that permeate the system.

CONCLUSION

The pervasive security and operational deficiencies, and the dangerous outcomes that flow from those failures, continue unabated. The types of problems that contribute to the high

risk of harm in the jails have been extensively reported by the Monitoring Team, and the Department's internal structures have also identified many of the same patterns, even if not identified in each and every incident where they occur. While an essential component of problem solving, on its own, simply detecting or labeling the problems does not rectify them. During interviews, agency and facility leadership acknowledge some (but not all) of the issues and their contribution to the unsafe conditions in the jails, but scant attention is given to the fact that conditions are not improving. Unfortunately, regular audits showing deficits in staff's security practices have not catalyzed the development of a specific set of strategies—aside from those to "walk the facilities and talk with staff" or to provide reminders at Roll Call—that address the root causes of the many problems the jails continue to face. An array of concrete strategies must be developed, implemented, and constantly reinforced by supervisors and facility leaders.

## MANAGING PEOPLE WITH KNOWN PROPENSITY FOR VIOLENCE

In order for the Department to improve facility safety, it must improve its response to individuals with a propensity for violence who must be supervised in a manner that is different from that used for the general population. The Department must be able to separate those who have engaged in serious acts of violence from potential victims. This may require certain limits on their time out of cell and/or limits on their freedom of movement while they are engaged in congregate activity. These are standard and sound correctional practices, provided that the limitations are reasonably related to reducing the risk of harm. Reduced out-of-cell time can increase staff's ability to control the environment by improving surveillance, minimizing unsupervised interactions, separating people with interpersonal conflicts within a single housing unit, and allowing staff to better manage out-of-cell activities because fewer individuals congregate at one time.

Specialized housing must be well-designed and properly implemented and the complexity of doing so cannot be overstated. Concentrating people with known propensities for serious violence in the same location requires unique security enhancements, particularly during time spent in congregate activities. In order for specialized housing units to be safe and effective, staff must provide the necessary security and supervision and must provide structured activities and rehabilitative services to decrease idle time and to decrease the likelihood of individuals committing subsequent acts of violence.

The Department has identified several subpopulations among those with propensities for interpersonal violence. Housing strategies to address some of these subpopulations are in place and the Department is in the process of developing housing strategies for others. The Department is currently using two strategies to manage people with a propensity for violence:

44

1) The **Enhanced Supervision Housing** program (located at RMSC, or "RESH") is a restrictive housing unit used as an immediate response to address the safety risks of those who have committed serious interpersonal violence.

2) Certain individuals with a known propensity for violence are also housed in certain **units at NIC** (individuals are also housed at NIC for other reasons).

The Department's use of these two strategies revealed two critical issues. First, while the concept for RESH appears to be sound, its implementation has not been. The RESH units are rife with security and operational failures that jeopardize the safety of individuals and staff on the units. Second, a significant number of people who commit serious violence are excluded from RESH due to medical/mental health contraindications, but the Department's current options (i.e., CAPS, placement at NIC, or remaining in the general population) are not meeting the needs of this population for a variety of reasons. To address these gaps in its continuum of options, the Department is contemplating other strategies, described at the end of this section.

### ENHANCED SUPERVISION HOUSING (LOCATED AT RMSC, OR "RESH")

RESH has been operating in its current location for approximately nine months (since June 2023). The admission process and length of stay procedures appear to generally operate according to policy requirements, but the units continue to have unacceptably high rates of violence. Some of the problems with interpersonal violence are related to the relatively small number of units—four Level 1 and two Level 2 units—which makes it difficult to separate individuals with potentially violent conflicts and disputes. Given that RESH houses people with the most significant propensities for violence, these units are intended to be *highly* structured (particularly in Level 1) in order to reduce the opportunity for violence, but staff's ongoing failure to adhere to the required structure and security features has contributed to the level of violence on the RESH units. As reported by RESH leadership and staff and observed directly by

the Monitoring Team, many of the units' security features have not been properly implemented. A non-exhaustive list of security and operational failures that continue to contribute to violence and the use of force on RESH units includes:

- Staff failures to properly search individuals as they exit their cells and exit/reenter the housing units;

- Staff positioning and/or failure to actively supervise individuals secured in the restraint desks;

- Staff failures to address individuals' efforts to circumvent the limitations of the restraint desks;

- Staff failures to secure restraint devices and/or unauthorized substitutions of restraint devices such that leg irons with excessive length were used to secure individuals to restraint desks, affording sufficient latitude for individuals to reach other individuals.

- Staff failures to address clear violations like smoking and the use of contraband.

The consequences of these failures have resulted in multiple incidents of serious violence. For example, 37 stabbings/slashings occurred in RESH units during the current Monitoring Period (July-December), and another 17 occurred between January and March 2024, many of which were the result of poor security practices among staff.

The difficult and stressful nature of the work itself, coupled with frequent 16-hour shifts, reportedly underlies staff's complacency and failure to adhere to security and operational procedures. Staff's failure to adhere to security and operational protocols is also reportedly linked to friction between the officer and Captain ranks. Further, some staff reportedly do not fully comprehend the policy requirements nor understand how to manage resistance to routine safety protocols. Although RESH has a Security Team, its members are often deployed to

46

perform non-security functions (such as court production, escorts, entering data into Fight Tracker, etc.) which interferes with their ability to provide the type of on-unit support that is essential in a secure unit like RESH. Security Team members also reportedly work overtime nearly every day, a fact that contributes to the reported exhaustion among the staff in the Department's most difficult-to-manage units.

Staffing levels are also a factor and are exacerbated by management and supervision failures. First, RESH leadership reports that they do not have enough staff to sustain the required staffing complement of four B-officers on a consistent basis. On any given day, staffing levels are undercut by staff calling out on Personal Emergency/FMLA, staff needing to escort individuals to medical/visitation, and the inability to hold staff over because many staff members are already working double shifts. These staffing constraints, which are a reality in many correctional operations, are exacerbated here by skill deficits and poor staff supervision. RESH staff consistently fail to adhere to sound correctional practice and follow required security procedures. Further compounding the problem, supervisory staff, including Captains and ADWs, fail to provide adequate supervision and guidance to staff about how to efficiently and effectively perform their duties.

The Monitoring Team has observed that RESH is managed by a leader who has a strong command of the issues, realistically assesses the current state of affairs, and identifies and addresses the various staff security and operations failures. Despite this leadership, one strong leader is insufficient to address the multitude of issues facing RESH. The deficiencies in RESH's operations necessitate a corps of high-quality supervisors who provide consistent on-the-ground supervision and guidance to staff as well as sufficient staffing levels to ensure that this population with a high propensity of violence can be safely and appropriately managed.

Although the RESH concept was well-designed, implementation of that concept has been lacking and its operation remains highly volatile. In January 2024, the Department proposed several revisions to the RESH policy and training program that have the potential to address some of the issues related to inadequate preparation and training of RESH staff. The Monitoring Team shared its feedback with the Department on these revisions and awaits an updated version of the policy.

The persistent level of violence and security failures in RESH's operation must be addressed. The Monitoring Team recently recommended to the Department and its consultant, Dr. James Austin, that an evaluation of the program's outcomes (i.e., individuals' flow through the levels/violent behavior while in RESH/violent behavior following release/RESH re-admission, etc.) be conducted to assess the program and determine whether changes to its design are necessary. As a result of this recommendation, in April 2024, the Department and Dr. Austin began planning an evaluation. The Monitoring will continue to closely monitor the RESH program and the levels of violence occurring within RESH units.

USE OF NIC AND INVOLUNTARY PROTECTIVE CUSTODY

The Department currently utilizes NIC to address a variety of security needs including housing individuals who have been excluded from RESH because of medical/mental health contraindications, housing those who must be isolated until they pass a secreted weapon or housing those who are particularly vulnerable to retaliation. In some cases, individuals have remained in NIC housing for extended periods of time, which is concerning given that the units' unusual physical plant limits social interaction. Just after the end of the current Monitoring Period, the Monitoring Team raised concerns about the length of stay and the lack of clarity for placement on the NIC units. While the use of NIC for short term placement may continue to be necessary, the Monitoring Team provided guidance to the Department, should housing at NIC be

necessary for longer periods of time. The Monitoring Team recommended that NIC placement should be a last resort and suggested (1) various procedures to ensure adherence to specific placement criteria and procedural due process, and (2) various protections to prevent undue isolation of those assigned to NIC and to safeguard against decompensation. Finally, the Monitoring Team recommended that the Department further limit the use of NIC units as the plans for new programs discussed below come on line. The Department must pursue the other strategies for managing individuals with a propensity for violence with all due haste to ensure that such detainees are not housed in NIC for extended periods of time.

### ADDITIONAL MANAGEMENT STRATEGIES UNDER DEVELOPMENT

The Department is in the process of developing two new strategies to address the gaps in its continuum of options for managing those with propensities for violence. Planning is underway for both of the initiatives discussed below:

1) ***Behavioral Health Unit ("BHU")***: The Department is working with its consultant, Dr. Austin, to develop a program that responds to the needs of the significant number of individuals with serious mental illness who engage in violence (e.g., stabbings/slashings, assaults that cause serious injury) but who cannot be admitted to RESH due to their mental health status. The Department, CHS, and Dr. Austin are collaborating with the Monitoring Team to design a program and policy for a Behavioral Health Unit ("BHU"). The program design will include security enhancements and reduced out-of-cell time coupled with intensive psychotherapeutic services to address individuals' mental health symptomatology. Planning was delayed when the DC of Facility Operations resigned his position in early 2024, but planning efforts resumed in April 2024. Key next steps are to develop the program's features and draft the policy.

2) ***General Population-Max ("GP-Max")***: The purpose of the GP-Max program, to be located in the OBCC Annex, is to house those individuals with high classification scores and serious infraction histories in a more structured environment than a regular general population unit. The program design is still being finalized, but the current plan

contemplates that people assigned to the program will receive the same mandated services, tablets and commissary as those in general population, but will be limited to seven hours out-of-cell per day. Individuals in GP-Max will receive services from an Associate Correctional Counselor approximately 10 hours per week. Individuals will be reviewed every 60 days and if they have remained infraction free and have met a threshold of programming hours, they will be transferred to a regular general population unit. The Department expects to open the first GP-Max units in summer 2024.

CONCLUSION

To improve facility safety, the Department must develop effective responses to serious interpersonal violence that address both the security and individual needs of the subpopulations of individuals who engage in these behaviors. The intended continuum will include RESH, BHU and GP-Max. However, as the problems in RESH's implementation—where violence, disorder, and drug use remain prevalent—have underscored it is essential that these programs have leaders with credibility and expertise, have strong staffing complements who provide proper population supervision and management throughout each tour, have functional supervisory relationships between supervisors and officers, and incorporate internal mechanisms to assess their effectiveness and built-in structures for on-going troubleshooting. Without these components, the new programs will simply perpetuate the existing problems and will produce poor outcomes that undercut the Department's efforts to find an effective solution to this critical problem.

# 17ᵀᴴ Monitoring Period Compliance Assessment for Select Provisions of the Consent Judgment and First Remedial Order

This section of the report assesses compliance with a *select group* of provisions from the Consent Judgment and First Remedial Order as required in the Action Plan § G: Assessment of Compliance & Reporting in 2022, ¶ 5(b). This compliance assessment is for the period covering July 1, 2023 to December 31, 2023 ("Seventeenth Monitoring Period").[17] The following standards were applied: (a) Substantial Compliance,[18] (b) Partial Compliance,[19] and (c) Non-Compliance.[20] It is worth noting that "Non-Compliance with mere technicalities, or temporary failure to comply during a period of otherwise sustained compliance, will not constitute failure to maintain Substantial Compliance. At the same time, temporary compliance during a period of sustained Non-Compliance shall not constitute Substantial Compliance."[21]

---

[17] The Monitoring Team did not assess compliance with any provisions of the Consent Judgment or Remedial Orders for the period between July 1, 2021 and December 31, 2021 (the "Thirteenth Monitoring Period"). The Court suspended the Monitoring Team's compliance assessment during the Thirteenth Monitoring Period because the conditions in the jails during that time were detailed to the Court in seven status reports (filed between August and December 2021), a Remedial Order Report (filed on December 22, 2022) as well as in the Special Report filed on March 16, 2022 (dkt. 441). The basis for the suspension of compliance ratings was also outlined in pgs. 73 to 74 of the March 16, 2022 Special Report (dkt. 438).

[18] "Substantial Compliance" is defined in the Consent Judgment to mean that the Department has achieved a level of compliance that does not deviate significantly from the terms of the relevant provision. *See* § XX (Monitoring), ¶ 18, fn. 2. If the Monitoring Team determined that the Department is in Substantial Compliance with a provision, it should be presumed that the Department must maintain its current practices to maintain Substantial Compliance going forward.

[19] "Partial Compliance" is defined in the Consent Judgment to mean that the Department has achieved compliance on some components of the relevant provision of the Consent Judgment, but significant work remains. *See* § XX (Monitoring), ¶ 18, fn. 3.

[20] "Non-Compliance" is defined in the Consent Judgment to mean that the Department has not met most or all of the components of the relevant provision of the Consent Judgment. *See* § XX (Monitoring), ¶ 18, fn. 4.

[21] § XX (Monitoring), ¶ 18.

The Monitoring Team's assessment of compliance for all *other* provisions of the Consent Judgment (required by § XX, ¶ 18 of the Consent Judgment) and the First Remedial Order that are not outlined below have been suspended for the time period covering January 1, 2022 to December 31, 2023. While compliance assessments for these provisions are not included in this report, the Monitoring Team continues to collect and analyze relevant information regarding the Department's obligations under the Consent Judgment and the Remedial Orders on a routine basis. The current conditions suggest that the Department's compliance with these provisions of the Consent Judgment and First Remedial Order, at best, have remained the same and in some cases may have gotten worse.

## FIRST REMEDIAL ORDER § A – INITIATIVES TO ENHANCE SAFE CUSTODY MANAGEMENT, IMPROVE STAFF SUPERVISION, AND REDUCE UNNECESSARY USE OF FORCE

| FIRST REMEDIAL ORDER § A., ¶ 1 (USE OF FORCE REVIEWS) |
| --- |
| § A., ¶ 1. *Use of Force Reviews*. Each Facility Warden (or designated Deputy Warden) shall promptly review all Use of Force Incidents occurring in the Facility to conduct an initial assessment of the incident and to determine whether any corrective action may be merited ("Use of Force Review"). The Department shall implement appropriate corrective action when the Facility Warden (or designated Deputy Warden) determines that corrective action is merited.<br><br>i. The Department, in consultation with the Monitor, shall implement a process whereby the Use of Force Reviews are timely assessed by the Department's leadership in order to determine whether they are unbiased, reasonable, and adequate.<br><br>ii. If a Facility Warden (or Deputy Warden) is found to have conducted a biased, unreasonable, or inadequate Use of Force Review, they shall be subject to either appropriate instruction or counseling, or the Department shall seek to impose appropriate discipline. |

This provision requires facility leadership to conduct a close-in-time review of all use of force incidents ("Rapid Reviews" or "Use of Force Reviews"). Further, this provision requires the Department to routinely assess Rapid Reviews to identify any completed reviews that may be biased, unreasonable or inadequate and address them with appropriate corrective action.

**Rapid Reviews**

Rapid Reviews are intended to identify procedural violations, recommend corrective action for staff misconduct, and also identify incidents that could have been avoidable had staff made different choices in the moment. These findings are relied upon by both the Department and Monitoring Team to identify patterns and trends. That said, Rapid Reviews do not reliably and consistently identify *all* issues that would reasonably be expected to be identified via review of video footage of the incidents. This provision requires the Department to assess whether the reviews are appropriately unbiased, reasonable and adequate and if not, to take affirmative steps to provide instruction/counseling and/or apply discipline to those responsible for a poor-quality review.

Overall, the quality of Rapid Reviews remains inadequate as evidenced by the fact that the Monitoring Team's review of incidents has not found improvement in staff practice or change in the proportion of incidents that involve poor practice and/or misconduct, and yet the proportion of Rapid Reviews identifying poor practice and misconduct has continued to decrease over time. Close-in-time use of force reviews are an essential tool for improving staff practice: they allow facility leadership to identify poor practice and to provide feedback to staff while the circumstances surrounding their decision-making is still fresh in their minds. The Monitoring Team continues to identify a significant number of inadequate Rapid Reviews. Although the Rapid Reviews appear to detect certain violations more frequently (e.g., violations of the OC policy), they continue to overlook other types of poor practice and obvious indicators that incidents were avoidable. As a result, the Rapid Reviews often miss the opportunity to provide much

needed coaching and/or corrective action and thus contribute to the persistence of the operational problems plaguing the jails and the intransigence of the problematic culture.

**Rapid Review Data**

During this Monitoring Period, nearly all use of force incidents (3,515, or 99%) were assessed via a Rapid Review. The table below presents data on the number of reviews and their outcomes since 2018.

| Rapid Review Outcomes, 2018 to December 2023 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** | **Jan.-Jun. 2023** | **Jul.-Dec. 2023** |
| **Incidents Identified as Avoidable, Unnecessary, or with Procedural Violations** | | | | | | | | |
| **Number of Rapid Reviews** | 4,257 (95% of UOF) | 6,899 (97% of UOF) | 6,067 (98% of UOF) | 7,972 (98% of UOF) | 6,889 (98% of UOF) | 6,740 (99% of UOF) | 3,225 (99% of UOF) | 3,515 (99% of UOF) |
| **Avoidable** | 965 (23%) | 815 (12%) | 799 (13%) | 1,733 (22%) | 1,135 (16%) | 630 (9%) | 360 (11%) | 270 (8%) |
| **UOF or Chemical Agent Policy Violations** | | | 345* (11%) | 1,233 (16%) | 835 (12%) | 1,161 (17%) | 273 (8%) | 888 (25%) |
| **Procedural Violations** | 1,644 (39%) | 1,666 (24%) | 1,835 (30%) | 3,829 (48%) | 3,296 (48%) | 2,545 (38%) | 1,281 (40%) | 1,264 (36%) |
| **Corrective Action Imposed by Staff Member** | | | | | | | | |
| **Number of Staff Recommended for Corrective Action[22]** | ~ | ~ | 2,040 | 2,970 | 2,417 | 2,756 | 1,395 | 1,361 |
| *Note: Data for 2020 UOF/Chemical Agent Policy Violations include only July-December.* | | | | | | | | |

In 2023, Rapid Reviews found that at least 38% of all use of force incidents involved either a procedural violation (38%; failures to secure doors, conduct proper searches, etc.), UOF or Chemical Agent policy violation (17%) or were avoidable (9%). Since these categories overlap (i.e., one incident may have one or more issues or violations), the various proportions cannot be totaled because they would

---

[22] This data captures referrals for discipline as recommended by the Rapid Reviews shared with the Monitoring Team. The Rapid Review (and therefore this data) does not include information on whether the discipline referrals were enacted as recommended. Data on enacted discipline, even for past Monitoring Periods, changes frequently because of protracted closures of certain types of disciplinary charges. For example, a Command Discipline can take many months to process, only to be eventually turned into an MOC, and then an MOC can take months to process to reach an NPA, and if the case goes to OATH, it can take several more months for this disciplinary referral to be fully closed out. Furthermore, a staff member can be suspended, only to have the days returned upon a Report & Recommendation from OATH. The protracted nature of enacted discipline for Rapid Review recommendations is further compounded by the various disciplinary backlogs.

be duplicative.[23] That said, the proportion of incidents with problematic practice is likely higher than 38% since some incidents did not involve a procedural violation but did involve a UOF or Chemical Agent violation or may have been avoidable. While the fact that the Department identifies problematic practices in over one-third of its use of force incidents is a concerning outcome on its own, the fact also remains that the Monitoring Team's assessments of these same incidents suggests that the prevalence of problematic practice is even higher.

Concerningly, the proportion of incidents where poor practice is identified by the Rapid Review has decreased over time. The proportion of incidents identified as "avoidable" has been as high as 23% (2018) but was only 8% during the current Monitoring Period. A similar pattern is observed in the portion of incidents in which a procedural violation was identified (from 48% in 2021/2022 to 36% during the current Monitoring Period). These outcomes stand in stark contrast to the Monitoring Team's findings that the proportion of incidents involving poor staff practice is essentially unchanged from 2018.

**Recommended Corrective Action**

In response to identified problems with staff practice, Rapid Reviews can recommend various types of corrective action, including counseling (either 5003 or corrective interviews), re-training, suspension, referral to Early Intervention, Support and Supervision Unit ("E.I.S.S."), Correction Assistance Responses for Employees[24] ("C.A.R.E."), Command Discipline ("CD," as further discussed in the Compliance Assessment (Staff Accountability & Discipline) section of this report, and a Memorandum of Complaint ("MOC"). NCU collects proof of practice to demonstrate that corrective actions have occurred.

The most frequent corrective action recommended is a Command Discipline. Although, the recommendation for a Command Discipline decreased during this Monitoring Period compared to the last (723 compared with 1,007 respectively, a decrease of 28%). At the same time, there was also a decrease in referrals for re-training from Rapid Reviews during this Monitoring Period, although re-trainings were only recommended in a small number of instances (153 compared with 199 respectively, a decrease of 23%). However, there were significantly more 5003 counseling and corrective interviews recommended via Rapid Reviews compared to the previous Monitoring Period (1,140 versus 839, an increase of 36%).

---

[23] The Monitor's last report inadvertently added such proportions together, which should not have occurred, and instead should have evaluated the proportions as done here. *See, e.g.* Monitor's December 22, 2023 Report (dkt. 666) at pg. 7.

[24] C.A.R.E. serves as the Department's Wellness and Employment Assistance Program. C.A.R.E. employs two social workers and two psychologists as well as a chaplain and peer counselors who provide peer support to staff. The services of C.A.R.E. are available to all employees of the Department. The Department reports that the members of the unit are tasked with responding to and supporting staff generally in the day-to-day aspects of their work life as well as when unexpected situations including injuries or serious emergencies occur. C.A.R.E. also works with staff to address morale, productivity, and stress management, and provide support to staff experiencing a range of personal or family issues (*e.g.* domestic violence, anxiety, family crisis, PTSD), job-related stressors, terminal illness, financial difficulties, and substance abuse issues. The C.A.R.E. Unit also regularly provides referrals to community resources as an additional source of support for employees. Staff may be referred to the C.A.R.E. use by a colleague or supervisor or may independently seek assistance support from the unit.

The Monitoring Team has long encouraged the use of close-in-time corrective actions to address problematic conduct in order to support the overall effort to change practice. The imposition of corrective action remains mixed. The adjudication of Command Disciplines is not reliable, as described in other sections of this report. While other forms of corrective action are generally imposed, the process is undercut if issues are not routinely identified as is the case here.

**Rapid Review Quality**

On an ongoing basis, the Monitoring Team reviews video, investigation reports, and other documentation for selected incidents that occurred throughout the facilities. The Monitoring Team's routine assessment of incidents continues to identify a significant number of inadequate Rapid Reviews that overlook poor and/or dangerous practices and fail to acknowledge circumstances that indicate the incident was avoidable and the use of force was unnecessary. And yet, the Department reports that it did not impose *any* discipline or impose corrective action on *any* members of facility leadership for an inaccurate, unreasonable, or biased Rapid Review in 2023.

Throughout 2023, the Monitor's Reports discussed the Department's efforts to improve the quality of its Rapid Reviews.[25] Collectively, these findings establish the ongoing inadequacy of this process and highlight the inconsistency with which corrective action is applied to the staff involved, and most importantly, the ineffectiveness of the process to elevate the quality of staff practice. The Department must take steps to better understand—and then address—the dynamics underlying facility leadership's inability or unwillingness to consistently detect poor practice when it occurs and must apply corrective action when appropriate.

An initial step toward that end was to improve Rapid Reviews' documentation by revising the template. As noted in the Monitor's October 5, 2023 Report (dkt. 581) at pg. 21 and the Monitor's December 22, 2023 Report (dkt. 666) at pg. 8, during the current Monitoring Period, the Department revised the Rapid Review template in consultation with the Monitoring Team to streamline documentation requirements while also providing better guidance on the type of information that should be included. Facility leadership began using the revised Rapid Review template in January 2024.

In addition, the DC of Security Operations reported that beginning in 2024, his office will assume responsibility for determining whether incidents were avoidable and/or anticipated and whether response team deployments were necessary. This shift is intended to more reliably detect these types of problems, and to enable the DC of Security Operations to provide more direct guidance to Facility leadership on the reasoning behind these judgments.

**Conclusion**

The Rapid Reviews conducted during the current Monitoring Period identify endemic levels of poor staff practice, and even so, the Monitoring Team has found that a significant proportion of Rapid

---

[25] *See* Monitor's July 10, 2023 Report (dkt. 557) at pg. 19; Monitor's October 5, 2023 Report (dkt. 581) at pgs. 1, 12 and 21; Monitor's November 8, 2023 Report (dkt. 595) at pgs. 67-68; Monitor's December 22, 2023 Report (dkt. 666) at pgs. 6-9.

Reviews are inaccurate because they do not identify all of the issues present. Their inability to consistently identify misconduct reduces the opportunity to guide staff toward better practices while the recall of the details of their decision-making in the moment is still fresh. As a result, Rapid Reviews have not yet proven to be an effective tool for preventing similar misconduct from reoccurring. Rapid Reviews identify and recommend corrective action for a wide array of security lapses, and yet the same problems have persisted for many years, due, at least in part, to the fact that many of the corrective actions are never imposed or are of questionable substance.

The Rapid Review concept is grounded in sound correctional practice and has elevated the quality of staff practice in other jurisdictions. However, catalyzing improved practice requires facility leadership to possess a strong command of the security protocols and procedures that must be utilized on a daily basis, to develop skills to guide and coach their staff toward sound correctional practice, and to ensure Captains are supervising staff in a manner that allows them to address these issues in real time. While Rapid Reviews provide some insight and benefit into to Department practice, their full potential is not yet realized.

| COMPLIANCE RATING | § A., ¶ 1. Partial Compliance |
|---|---|

57

| FIRST REMEDIAL ORDER § A., ¶ 2 (FACILITY LEADERSHIP RESPONSIBILITIES) |
|---|

§ A., ¶ 2. *Facility Leadership Responsibilities*. Each Facility Warden (or designated Deputy Warden) shall routinely analyze the Use of Force Reviews, the Department leadership's assessments of the Use of Force Reviews referenced in Paragraph A.1(i) above, and other available data and information relating to Use of Force Incidents occurring in the Facility in order to determine whether there are any operational changes or corrective action plans that should be implemented at the Facility to reduce the use of excessive or unnecessary force, the frequency of Use of Force Incidents, or the severity of injuries or other harm to Incarcerated Individuals or Staff resulting from Use of Force Incidents. Each Facility Warden shall confer on a routine basis with the Department's leadership to discuss any planned operational changes or corrective action plans, as well as the impact of any operational changes or corrective action plans previously implemented. The results of these meetings, as well as the operational changes or corrective action plans discussed or implemented by the Facility Warden (or designated Deputy Warden), shall be documented.

The goal of this provision is to ensure that the leadership of each facility is consistently and reliably identifying pervasive operational deficiencies, poor security practices, and trends related to problematic uses of force and that they address these patterns so that supervisors and staff alike receive the guidance and advice necessary to improve their practices. Facility leadership is required to routinely analyze available data regarding uses of force, including the daily Rapid Reviews, to determine whether any operational changes or corrective action plans are needed to reduce the use of excessive or unnecessary force, the frequency of use of force incidents, or the severity of injuries or other harm to incarcerated individuals or staff resulting from use of force incidents.

The level of on-going harm to people in custody and staff cannot be overstated, and the factors contributing to the Department's inability to infuse an appropriate skillset to minimize this risk of harm have been discussed in each of the Monitor's Reports to date. This is one of the problems that the new agency leadership structure and broader pool of candidates for facility leadership positions was intended to address.[26] The Monitoring Team continues to emphasize that jail administrators can and should make improvements to the quality of staff practice by aggregating incident-level data (e.g., Rapid Reviews and other indicators extracted from CODs) to identify patterns in persons, places, times and circumstances that lead to a use of force and in which problematic practices tend to occur, and then should develop strategies that directly target those people, places, times or circumstances in an effort to reduce the likelihood of problematic staff conduct.

Unfortunately, anticipated improvements from the new facility leaders have not been realized. The Department reported that in January 2023, the Deputy Commissioner of Security Operations reinstated daily calls to discuss the prior day's use of force incidents with facility leadership and Assistant Commissioners from the Deputy Commissioner of Facility Operations. Reportedly, the calls focus on Rapid Reviews for specific use of force incidents and any corrective action/immediate discipline that may be necessary. Broader discussions regarding trends and operational changes have occurred sporadically with monthly meetings. In 2023, TEAMS meetings were re-initiated in July 2023, but subsequently suspended at the end of the Monitoring Period for additional retooling. Following the close of the Monitoring Period, the Department consulted with the Monitoring Team on steps it intends to take to improve assessment of use of force, violence and security indicators as

---

[26] *See* Monitor's July 10, 2023 Report (dkt. 557) at pgs. 69-72.

required by the Court's August 10, 2033 Order and December 20, 2033 Orders. This was described in the Monitor's February 26, 2024 Report (dkt. 679) at pgs. 5-7.

The Department reports that agency and facility leadership routinely meet to discuss the various issues facing the facilities. However, these conversations do not appear to identify overarching trends or patterns and rarely appear to lead to operational changes or specific corrective action plans, as required by this provision. Instead, to date, most initiatives from Facility leadership tend to rely on issuing memos to staff, reminders at Roll Call, and corrective action for individual staff, and only rarely included actionable, operations changes that target the root causes of a specific problem. The few documents containing more global or problem-focused strategies are described in the Monitor's November 8, 2023 Report (dkt. 595) at pgs. 17-21 and 80-81, although most were either short-sighted or abandoned before their impact on staff practice could be discerned.

**Conclusion**

Although the Monitoring Team continues to support the recent installation of facility leaders with demonstrated expertise in jail operations and the experience to lead the type of culture change that is required, these appointments have yet to have the intended effect on problem-solving strategies at the facility level. Agency and facility leaders have access to a significant amount of data from CODs, Rapid Reviews and NCU audits that provide clear targets for problem-solving, but those responsible for setting the course of correction have yet to articulate the type of specific, actionable plans to address the identified problems that is required by this provision.

| COMPLIANCE RATING | § A., ¶ 2. Non-Compliance |
| --- | --- |

**FIRST REMEDIAL ORDER § A., ¶ 3 (REVISED DE-ESCALATION PROTOCOL)**

§ A., ¶ 3. *Revised De-Escalation Protocol.* Within 90 days of the date this Order is approved and entered by the Court ("Order Date"), the Department shall, in consultation with the Monitor, develop, adopt, and implement a revised de-escalation protocol to be followed after Use of Force Incidents. The revised de-escalation protocol shall be designed to minimize the use of intake areas to hold Incarcerated Individuals following a Use of Force Incident given the high frequency of Use of Force Incidents in these areas during prior Reporting Periods. The revised de-escalation protocol shall address: (i) when and where Incarcerated Individuals are to be transported after a Use of Force Incident; (ii) the need to regularly observe Incarcerated Individuals who are awaiting medical treatment or confined in cells after a Use of Force Incident, and (iii) limitations on how long Incarcerated Individuals may be held in cells after a Use of Force Incident. The revised de-escalation protocol shall be subject to the approval of the Monitor.

The discussion below provides a compliance assessment of the Department's efforts to reduce its reliance on intake units in general operations pursuant to the requirements of the First Remedial Order § A., ¶ 3. This assessment also includes references to Action Plan § (E) ¶ (3)(a) (which adopts ¶1(c) of the Second Remedial Order regarding tracking of inter/intra facility transfers), and Action Plan § (E) ¶ (3)(b) (which requires the new leadership to address these requirements) given these orders' interplay with the First Remedial Order § A., ¶ 3. These provisions require the Department to identify and address with new procedures the various processes that are negatively impacting intake's orderly operation.

To ascertain the Department's progress in minimizing the use of intake, the Monitoring Team assesses the use of force in intake, available data regarding the time individuals stay in intake areas, and the Department's ability to manage individuals *outside* of intake. The Monitoring Team also makes observations from site visits of intake areas and its assesments of use of force incidents. The Department has made progress on this provision and beginning in 2022, the Department was no longer in non-compliance with the First Remedial Order § A., ¶ 3.[27] An update on the Department's efforts to process new admissions as required by the Second Remedial Order ¶ 1(i)(c) is included in Appendix F of this Report.

**Use of Force Incident in Intake Areas**

The Monitoring Team continues to evaluate the frequency with which use of force occurs in the intake. The Monitoring Team has previously explained that intake's chaotic environment and longer processing times (which are often mutually reinforcing) can result in a greater frequency of the use of force. Therefore, efficient intake processing and reducing the reliance on intake following a use of force are critical. While the Department's use of force rate remains too high, improved conditions within intake have resulted in a reduced number of uses of force in that location. The total number of uses of force in intake from July to December 2023 (n=396) was marginally higher than January to June 2023 (n=371). However, as the table below demonstrates, the total number of uses of force in

---

[27] The Department was in non-compliance with this provision in the Eleventh and Twelfth Monitoring Periods. A compliance assessment was not provided for the Thirteenth Monitoring Period. The Monitoring Team found that the Department was in Partial Compliance with this provision in the Fourteenth Monitoring Period in the Monitor's October 28, 2022 Report (dkt. 472).

intake for all of 2023 (n=767) was lower than each of the past five years. Since 2022, the proportion of all uses of force occurring in intake has decreased, with 2023 being the lowest (11%) and a notable reduction since 2021 (18%). This suggests that improved conditions have contributed to a reduced likelihood of use of force incidents.

| Use of Force in Intake | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **2018** | **2019** | **2020** | **2021** | **2022** | **Jan. to Jun. 2023** | **Jan. to Jun. 2023** | **2023** |
| **# of UOF in Intake** | 913 | 1123 | 992 | 1483 | 963 | 371 | 396 | 767 |
| **Total UOF** | 5901 | 7169 | 6467 | 8194 | 7005 | 3236 | 4705 | 6784 |
| **% of UOF in Intake** | *15%* | *16%* | *15%* | *18%* | *14%* | *11%* | *8%* | *11%* |

## Intake Data Tracking

Inter/intra facility transfers must be tracked pursuant to ¶ 1(c) of the Second Remedial Order. Historically, the Department did not track inter/intra facility transfers in any systematic way. In 2023, the then Deputy Commissioner of Classification, Custody Management & Facility Operations ("DC of Classification") oversaw several initiatives to improve the tracking of inter/intra facility transfers to ensure individuals did not languish in intake for more than 24 hours. The Monitor's December 22, 2023 Report (dkt. 666) at pgs. 12-13 outlined these initiatives in detail, including the requirement for intake staff to use the Inmate Tracking System ("ITS") to track inter/intra facility transfers.

The Department reports that, at all times, one person from the facility operations team monitors the live video feed of intake units in all facilities. Every four hours, a member of the team receives information from each facility about who is in the intake area, as well as a screenshot of the ITS system and a photograph from the Genetec system for each intake pen. The assigned facility operations team member then checks whether individuals present at each four-hour mark have been in the intake area for four hours or more. If so, the monitoring officer contacts the facility for an explanation and takes steps to expedite the individual's movement. The members of this team, as well as all intake supervisors, have been instructed that under no circumstances should any individual remain in an intake area for more than 24 hours. The oversight provided by the facility operations team appears to be valuable toward ensuring compliance, but the Monitoring Team is unsure how practical and sustainable this strategy is. The DC of Classification departed after the close of the Monitoring Period, but the Department reports that the five-person facility operations team that monitors intake areas remains in place and continues to expedite movement in and out of all facility intakes.

Generally, the issue of inter/intra facility transfers languishing in intake is no longer a widespread or a persistent problem and the Monitoring Team's site work confirms that intake areas appear to be more orderly. Further, in interactions with the Monitoring Team, staff working in intake areas continue to be aware of who is in each intake pen and why. However, some issues remain. First,

the Department is not tracking all individuals in ITS, including Court transfers.[28] Second, as noted in the Monitor's December 22, 2023 Report (dkt. 666), some inter/intra facility transfers are still not entered into ITS in a timely manner. For example, during site visits during this Monitoring Period, the Monitoring Team identified individuals who were in intake cells and had not yet entered ITS, and staff often reported that the individual "just got here." Third, now that the DC of Classification has left the Department, it is unclear who will manage intake issues across all commands given that the existing leadership is already inundated with various competing priorities. The Monitoring Team continues to recommend that the Department appoint dedicated leadership to oversee intake to ensure that progress is maintained. Finally, the Department has previously reported that it uses ITS-generated data to produce reports and to evaluate information such as the average time, minimum time, and maximum time in intake as part of its overall effort to evaluate how long individuals are intake. The Monitoring Team is unsure whether or how this data is being leveraged or if the data is accurate.

The Monitoring Team reiterates its recommendations from the Monitor's April 3, 2023 Report (dkt. 517) at pgs. 87-88, including assessing root causes of staff's failure to enter individuals into ITS, appointing dedicated leadership, and developing a practical quality assurance process. The progress in intake areas is notable but at risk of regression if the Department does not take the recommended steps or otherwise pivots its attention away from this issue.

## Reduced Reliance on Intake & De-Escalation Units

As part of its effort to eliminate the reliance on intake areas, the Department opened de-escalation units in each Facility by July 2022. De-escalation units are in unoccupied housing units in each facility with cells with secured doors, a bed, a toilet, and a sink. Showers are available in each housing unit. While the First Remedial Order does not require the use of de-escalation units, the Department opened them as one alternative for staff to use instead of intake. The Department promulgated Directive 5016 "De-escalation Unit," which establishes the Department's policy and procedures for de-escalating individuals outside of facility intakes. The policy prohibits the use of intake pens for post-incident management or violence prevention and indicates that intake should only be used for facility transfers, court processing, discharges, and transfers to medical appointments, cadre searches, body scans, and new admissions.

During the current Monitoring Period, NCU reported that facilities were not regularly using de-escalation units and that on the rare occasions they did, NCU's audits of these de-escalation areas were resource intensive. In this Monitoring Period, the Department reported that certain facilities had stopped using de-escalation units. Specifically, that RMSC stopped using them in August 2022, GRVC stopped using them in October 2022, and RNDC stopped using them in June 2023. It is worth noting that this information was never relayed to NCU, despite NCU conducting resource-intensive de-

---

[28] See Christopher Miller's June 20, 2023 Declaration (dkt. 553-1) at ¶ 15 in which he reports that "[i]ndividuals who go out to court, to work, or to religious services a few times a year are now not recorded in the ITS system. Their movement in and out of intake, however, is captured in other ways, including by the four-hour intake checks…" The Monitoring Team has not yet evaluated these other tracking systems.

escalation audits. The Monitoring Team's site work corroborated the reported decline in the use of de-escalation units, as did the Monitoring Team's review of UOF incidents and conversations with facility and Department leadership. During a recent Monitoring Team site visit, several facilities confirmed they are no longer using de-escalation units (even if they maintain the space). Therefore, in consultation with the Monitoring Team, NCU decided it will no longer audit the de-escalation units as of October 2023.

The discontinuation of facility de-escalation units does not inherently mean that facilities have resumed taking all incarcerated individuals to intake following a UOF incident. NCU's audits and facility leadership indicate that some incarcerated individuals are instead returned to their assigned cell to de-escalate, are immediately rehoused or are taken directly to the clinic for medical care. However, the Department is now in a position where it is no longer enforcing or actively monitoring the requirements of its de-escalation policy. Facility staff have not received formal guidance on post-incident protocols or managing incarcerated individuals following an incident. NCU's audits and the Monitoring Team's incident reviews indicate that still too many people are placed in intake after an incident. Without proper guidance and effective monitoring, the Department risks returning to a pattern where intake becomes the *de facto* post-incident holding area, recreating the problem the *Nunez* Court Orders were designed to address. The lack of clear guidance or effective policy may not have immediate consequences, but over time, regression and an increased risk of harm may result. The Monitoring Team strongly recommends that the Department update its policy to describe the required procedure and reiterate the prohibition on using intake for post-incident management.

### Conclusion

The Department has taken important steps and utilized considerable resources to improve the conditions intake. However, additional work remains to reduce the utilization of intake after the use of force as it is still used more frequently than is necessary. Further, the Department must remain vigilant in ensuring that individuals are tracked consistently when they are brought to and leave facility intake areas.

| COMPLIANCE RATING | § A., ¶ 3. Partial Compliance |
| --- | --- |

| FIRST REMEDIAL ORDER § A., ¶ 4 (SUPERVISION OF CAPTAINS) |
|---|

¶ 4. *Supervision of Captains*. The Department, in consultation with the Monitor, shall improve the level of supervision of Captains by substantially increasing the number of Assistant Deputy Wardens ("ADWs") currently assigned to the Facilities. The increased number of ADWs assigned to each Facility shall be sufficient to adequately supervise the Housing Area Captains in each Facility and the housing units to which those Captains are assigned and shall be subject to the approval of the Monitor.

    i.    Within 60 days of the Order Date, RNDC, and at least two other Facilities to be determined by the Commissioner in consultation with the Monitor, shall satisfy the requirements of this provision.

    ii.    Within 120 days of the Order Date, at least three additional Facilities to be determined by the Commissioner in consultation with the Monitor, shall satisfy the requirements of this provision.

    iii.    By December 31, 2020, all Facilities shall satisfy the requirements of this provision.

This provision requires the Department to improve staff supervision by hiring and deploying additional ADWs within the facilities to better supervise Captains. The goal of this provision is to ensure that Captains are properly managed, coached, and guided in order to elevate their skill set, so that they in turn better supervise the officers on the housing units. Thus, an assessment of adequate supervision requires an examination of both layers of supervision — ADWs and Captains. Given that the state of affairs has essentially remained static or in some places, lost ground during this Monitoring Period, this section incorporates the discussion from the Monitor's November 8, 2023 Report (dkt. 595) at pgs. 25-28 and the Monitor's December 22, 2023 Report (dkt. 666) at pgs. 14-16. The Consent Judgment provisions §XII. ¶¶ 1-3 are designed to ensure that those staff selected for promotion are appropriately screened for selection and are discussed later on in this report.

## Goals of Supervision

The Department's inability to achieve substantial compliance with this provision and other provisions related to its overall management resulted in additional remedial relief, including two provisions in the Action Plan (§ C.3.ii-iii) requiring an increase in the number of Captains and ADWs assigned to the facilities. Furthermore, Action Plan § C.3.ii requires the Department to evaluate the assignments of all Captains and to implement a plan prioritizing Captains' assignments to supervise housing units in the facilities. In addition, Action Plan § C.3.iii further requires the Department to increase the number of ADWs assigned to the facilities to ensure Captains are adequately supervised.

Changing staff practice will require an infusion of correctional expertise in a form that reaches more broadly, deeply, and consistently into staff practice than facility leadership has been able to accomplish to date. This is one of the responsibilities of those recruited to the Department at the executive level (e.g. Senior Deputy Commissioner, Deputy Commissioners, Associate Commissioners, and Assistant Commissioners). In order to increase the presence of executive level staff within the facilities, Commissioner Maginley-Liddie began requiring approximately 60 executive and senior staff to tour at least one alternating facility every 2 weeks and to document and share their observations with the Commissioner's office. The staff required to conduct these tours include all Deputy Commissioners, Associate Commissioners, and Assistant Commissioners, down to Executive Directors

and Commanding Executive Officers and the Nunez Manager. These tours provide opportunities for executive staff to understand and address the concerns and issues amongst their line staff and those in custody, share their expertise directly with the line staff, and convey messages about the culture the leadership intends to promote. However, these executive staff cannot be present in the facilities at all times, so they must be supported by a skilled corps of supervisors.

Improving staff practice requires not only an appropriate number of supervisors but also supervisors who provide *quality* supervision. Increasing staff's ability and willingness to utilize proper security practices rests on the supervisors' ability and willingness to confront poor practices and teach new ones. Definitive steps to ensure that staff are available in sufficient numbers and are properly assigned are important, but it is equally critical that staff *actually do their jobs*, which requires thorough training, skill mastery, and the confidence to implement the expected practices and to enforce rules. Too often, staff are present and yet fail to enact or enforce even the most basic security protocols. Supporting and improving staff's confidence and skill mastery should be a core responsibility of the Department's supervisors, but it is not currently occurring as it must. Improved practice by line staff requires ongoing, direct intervention by well-trained, competent supervisors—guiding and correcting staff practice in the moment as situations arise. Only with this type of hands-on approach will the Department be able to confront and break through staff's inability, resistance, and/or unwillingness to take necessary actions.

Currently, the supervisory ranks are unprepared to support the weight of the strategies that place them at the center of officers' skill development. Compounding the problem of too few supervisors is the reality that many of those holding the ranks of ADW and Captain have only marginal competence in the skills necessary to provide *effective* supervision. Supervision cannot be passive—these individuals must have an active presence in the housing units, demonstrating the requisite skills, providing opportunities for staff to practice them, and helping staff to understand and eventually overcome what hinders their ability to utilize the skills they are being taught consistently.

The dynamic between Captains and officers is crucial for maintaining order and security within housing areas, yet the dynamic appears fundamentally compromised in this Department. Captains must embody the role of mentors, attentively listen to frontline staff, and actively work towards resolving issues, thereby fostering a supportive environment and effective operation. Unfortunately, the relationship between officers and Captains is too often described in ways suggesting that it subverts progress rather than accelerates it. For example, during monthly meetings with the Monitoring Team, the Department's Training Division disclosed that exit interviews with resigning officers consistently cited strained relationships and lack of support from Captains as the primary factors leading to their departure. Additionally, reports from facility leadership and staff and during the Monitoring Team's observations of operations, Captains often appear to be either unclear about their responsibilities or outright fail to embrace them. This often leads to a superficial execution of duties, where Captains do not appear to routinely conduct substantive tours or, in some instances, fail to conduct tours at all. Too often, Captains conduct tours but often fail to tour the whole unit or address obvious issues within their assigned housing areas. For example, officers report concerns such as incarcerated individuals'

frustration over inadequate supplies or service disruptions, but Captains do not investigate the underlying causes nor seek solutions, choosing instead to move on to the next task. This abdication of responsibility leaves officers feeling unsupported and disinclined to fulfill their own duties.

The Department simply does not have the necessary assets among its current corps of supervisors to provide the type and intensity of hand-to-hand coaching that is required, which is perhaps unsurprising given their tenure in a deeply dysfunctional system that does not adequately select, train, or prepare them for the task at hand. In addition to the Captains' need for intensive guidance, ADWs also need substantial and quality coaching, supervision, and mentoring from their superiors to develop into the type of supervisor that is so desperately needed in this Department. The task of cultivating the ADWs will largely fall to the Deputy Wardens and Wardens/Assistant Commissioner's in each command, which brings yet another layer of complexity to the supervision problem and the task of reforming the Department's practices.

## Scheduling

Over the past year, the Department's Staffing Manager has taken several steps to increase the number of ADWs assigned to facilities so that Captains are more directly and robustly supervised. To that end, ADWs' schedules were altered to distribute the number of ADWs more evenly across the three tours and weekdays/weekends. Previously, ADWs were assigned to a "wheel" schedule in which they worked a different tour each week (for example, one week they would work the AM tour, then the next week they would work the PM tour, and then the night tour during the following week, and then the rotation would repeat). More ADWs are now assigned to work a consistent tour week-to-week. This increase in the number of ADWs working stable tours has made it easier for ADWs to be consistently assigned to the same posts, which allows ownership of the area and rapport with their subordinates to develop. The Department reports that currently approximately three ADWs work every tour at each facility (although this number is more difficult to achieve on the night tour). This should allow two ADWs to directly supervise Captains while the other ADW serves as the Tour Commander. The Staffing Manager reported that deploying four ADWs in each facility during each tour would be ideal, along with deploying a fifth ADW to oversee particularly challenging housing areas. The Department does not currently have enough ADWs to do so.

## Organizational Structure and Number of Supervisors

The challenge of providing adequate supervision is compounded by the Department's organizational structure. Most correctional systems have three supervisor ranks (Sergeant, Lieutenant, Captain), but this Department has only two (Captain, Assistant Deputy Warden). Because most ADWs serve as Tour Commanders, the responsibility for supervising officers largely falls to the Captains, who too often go without the necessary supervision to develop the skills needed for their roles.

The problem presented by the Department's truncated chain of command is further exacerbated by the inadequate number of individuals holding the two ranks. The Department does not appear to have a sufficient number of supervisors at either rank. Many of the facilities' leaders have reported during routine updates to the Monitoring Team that they believe they have insufficient numbers of

66

Captains, which is negatively impacting their operations. Two tables that identify the number and assignment of ADWs and Captains at specific points in time from July 18, 2020 to March 2, 2024 are included in Appendix A. Echoing the findings of the previous Monitoring Period (*see* the Monitor's December 22, 2023 Report (dkt. 666) at pgs. 15-16), during the current Monitoring Period, the number of supervisors remained insufficient to provide the type of *intensive* supervision—throughout the chain of command—that is needed to elevate officers' skills.

- **ADWs**: Both First Remedial Order §A., ¶ 4 and Action Plan § C.3.iii require an increase in the number of ADWs. The number of ADWs currently assigned to the facilities (n=73) has increased by almost 40% since the First Remedial Order went into effect (n=52 on July 18, 2020) and by 51% since the Action Plan went into effect (n= 49 as of July 18, 2022). Unfortunately, the increase in the number of ADWs has had limited impact on the quality of staff practice. In large part, the number of ADWs remains insufficient to supervise the requisite number of Captains (i.e., each ADW has too many Captains to provide quality supervision) particularly when most ADWs have traditionally worked as Tour Commanders. Furthermore, although the number of ADWs has increased, the percentage of ADWs assigned to the facilities since the First Remedial Order went into effect has remained the same (79% as of July 18, 2020, compared to 80% as of December 23, 2023. Previously, the Monitoring Team reported its concerns regarding the selection and quality of supervision provided by those ADWs who were promoted in the 15th and 16th Monitoring Periods.[29] These concerns about the quality of supervision further compound the limited impact that the increase in the number of ADWs has had on the quality of staff practice.

- **Captains**: Since 2020, both the number and percentage of Captains assigned to work in the facilities has decreased. The number of Captains decreased by 38% (from 558 as of July 18, 2020 to 346 as of December 23, 2023) and the proportion of Captains assigned to the facilities decreased slightly (from 69% as of July 18, 2020 to 64% as of December 23, 2023). In other words, one-third of all available Captains are *not* assigned to facilities or court commands. This is the lowest proportion assigned to the facilities since July 2020. Between the end of the 16th and 17th Monitoring Periods, 11 Captains left the Department, and 20 fewer Captains were assigned to the facilities and court commands. The Department anticipates promoting additional Captains during the next Monitoring Period, which is a welcomed improvement. However, the overall dearth of supervisors will continue to require significant focus and attention in order to both obtain the necessary numbers and, crucially, to ensure the individuals have the requisite skill set to properly supervise their subordinates.

Notably, the Department has not yet conducted the evaluation of Captains' assignments that is required by Action Plan § C.3.ii. The intent of this provision is to ensure that all Captains,

---

[29] *See* Monitor's April 3, 2023 Report (dkt. 517) at pgs. 210-216; Monitor's July 10, 2023 Report (dkt. 557) at pgs. 74-77; Monitor's August 7, 2023 Report (dkt. 561) at pgs. 13-15 and 33-34; Monitor's November 8, 2023 Report (dkt. 595) at pgs. 3-4 and 99; and Monitor's December 22, 2023 Report (dkt. 666) at pgs. 16 and 78-86.

including new promotional classes, are assigned to positions in which they supervise line staff in the housing units.

**Training for Supervisors**

Ensuring that supervisors have an appropriate skill set to supervise their subordinates begins with training those who are selected for promotion. The Monitoring Team has previously reported on the poor quality of pre-promotional training curricula.[30] From July 2023 to February 2024, the Department worked collaboratively with the Monitoring Team on 22 pre-promotional training modules for the anticipated promotion of Captains during the upcoming Monitoring Period. As of February 2024, the Monitoring Team has approved all 22 of the training modules. The revised training modules are significantly improved and reflect a firm commitment from the Training Division. The previous training materials did not appear to be tailored to the distinct roles of Captains and provided only a superficial treatment of the Captain's duties without any explanation of the standards or expectations in each area, nor did they provide adequate guidance to elevate staff's skill to a new role. The Monitoring Team provided significant feedback to the Training Division, which revised the material to ensure its content was tailored to the role and unique responsibilities of Captains. The revisions also focused on professionalism, operational failures, self-harm, mental health, and reducing the risk of harm. Further, the training materials were revised to include instructor cues, scenarios, group exercises, and proficiency assessments. The overarching goal of the curricula is not only to improve trainees' critical thinking and decision-making skills but also to foster the development of new competencies in leadership and mentorship and to promote exemplary conduct in everyday situations. The approved training modules will be delivered to the new class of Captains.

This new training presents an enormous opportunity for the Department to usher in a class of new leaders who will directly impact the safety and operations in the jails for years to come. It cannot be overstated how important it is for the Department to select suitable candidates, provide the new pre-promotional training with fervor, and ensure existing Captains and ADWs act as nothing short of role models to this next generation of new leadership. Now that the training materials for the pre-promotional Captains are complete, the Department reports it intends to collaborate with the Monitoring Team to improve the training curricula for pre-promotional ADWs.

**Conclusion**

Although the increase in the number of ADWs and the improvements to the Captains' training curricula are constructive, the Department's long-standing supervisory void—in both number and competence—is a leading contributor to the Department's inability to alter staff practice and to make meaningful changes to basic security practices and operations. As a result, the Department remains in Non-Compliance with this provision.

| COMPLIANCE RATING | § A., ¶ 4. Non-Compliance |
|---|---|

---

[30] *See* for example, Monitor's July 10, 2023 Report (dkt. 557) at pgs. 71-83.

| FIRST REMEDIAL ORDER § A., ¶ 6 (FACILITY EMERGENCY RESPONSE TEAMS) |
| --- |
| § A., ¶ 6. *Facility Emergency Response Teams.* Within 90 days of the Order Date, the Department shall, in consultation with the Monitor, develop, adopt, and implement a protocol governing the appropriate composition and deployment of the Facility Emergency Response Teams (i.e., probe teams) in order to minimize unnecessary or avoidable Uses of Force. The new protocol shall address: (i) the selection of Staff assigned to Facility Emergency Response Teams; (ii) the number of Staff assigned to each Facility Emergency Response Team; (iii) the circumstances under which a Facility Emergency Response Team may be deployed and the Tour Commander's role in making the deployment decision; and (iv) de-escalation tactics designed to reduce violence during a Facility Emergency Response Team response. The Department leadership shall regularly review a sample of instances in which Facility Emergency Response Teams are deployed at each Facility to assess compliance with this protocol. If any Staff are found to have violated the protocol, they shall be subject to either appropriate instruction or counseling, or the Department shall seek to impose appropriate discipline. The results of such reviews shall be documented. |

This provision requires the Department to minimize unnecessary or avoidable uses of force by Emergency Response Teams. There are a few types of Emergency Response Teams: a Probe Team, which is a team of facility-based staff; the Emergency Services Unit ("ESU"), an "elite" team of staff specifically dedicated and trained to respond to emergencies across the Department; and Security Response Teams ("SRT") and Special Search Team ("SST"), which function similarly to ESU and are deployed to facilities as part of operational security efforts.

Special Teams are defined, pursuant to the August 10, 2023 Order, ¶ 7 as the Emergency Services Unit and any functional equivalent unit, including, but not limited to the Strategic Response Team and the Special Search Team. The Special Teams are utilized in the facilities in the same manner as a Probe Team. The following discussion summarizes concerns regarding Emergency Response Teams, an update on Emergency Response Team Procedures, the frequency of alarm responses, and an update on ESU-specific matters.

## Concerns Regarding Emergency Response Teams

The Monitoring Team has long raised concerns about the Department's overreliance on Emergency Response Teams, team members' conduct, and the teams' composition—both at the facility-level through the use of Probe Teams and at the Department-level through the use of Special Teams, including ESU SRT and SST, which are now being used in a similar manner to ESU.[31] The Monitoring Team's concerns about all Emergency Response Teams fall into the following categories:

- Overreliance on specialized teams to address issues that could and should be addressed by uniform staff on the housing unit and/or facility supervisors/responding staff.

---

[31] *See* Monitor's May 11, 2021 Report (dkt. 368) at pgs. 38-50 and 116-120; Monitor's December 6, 2021 Report (dkt. 431) at pgs. 49-51; Monitor's June 3, 2021 Report (dkt. 373) at pgs. 3-4; Monitor's April 3, 2023 Report (dkt. 517) at pgs. 137-143; Monitor's July 10, 2023 Report (dkt. 557) at pgs. 34-42; and Monitor's December 22, 2023 Report (dkt. 666) at pgs. 17-22.

- Even with some improvement in calling a Level A Alarm to respond *first,* the practice of an Emergency Team Response via a Level B Alarm continues even if the matter is resolved before their arrival.

- Furthermore, the response time for a Level B Alarm is often protracted, and thus its effectiveness in providing additional support is questionable.

- Overabundance of staff on these teams such that an excessive number of staff arrive on-scene, which often raises tensions (including the chaotic situation that occurs when Probe Teams are summoned using an "all available staff" call for assistance).

  - When an escort is required following an incident, it often occurs with a large number of individuals from the Emergency Response Team when it could be done by one individual.

- Hyper-confrontational approach of response team members, which often exacerbates conflict and leads to the unnecessary and/or excessive use of force.

- Failure to appropriately staff these teams to ensure they are comprised only of those who are qualified, and who do not have a history of unnecessary and/or excessive force.

  - Lack of specific criteria to select those who serve on the Emergency Response teams within the facilities (despite years of recommendations from the Monitoring Team and reports from the Department that they intend to do so).[32]

- Team members' use of concerning security practices such as painful escort holds.

- Utilizing Emergency Response Teams to conduct searches when they are implemented in an inefficient, chaotic manner that often leads to the excessive and unnecessary use of force.

The Department has attempted to assess the appropriateness of alarms and of Emergency Response Teams' tactics during the Rapid Review process. The Rapid Reviews include a prompt to assess whether Level B alarms were necessary. The findings do not appear reliable as they do not consistently identify when a response team was called and when they do, they generally find the response was necessary even with objective evidence to the contrary. As noted above, the Monitoring Team continues to identify a large number of incidents where the Emergency Response Team was summoned unnecessarily via a Level B alarm.

In May 2023, the Department began conducting Rapid Reviews specifically for Special Teams. A separate Rapid Review process is initiated by the ADW who supervises the ESU team to specifically assess UOF incidents involving the Special Teams and their conduct (rather than being considered in concert with facility staff's conduct, which is assessed during the facilities' Rapid Reviews). The template for the Special Teams Rapid Review is slightly different from the template utilized by facilities, and specifically

---

[32] Most recently, the Department reported in August 2023 that it intended to assign specific staff to the Emergency Response Teams based in the facilities. However, as of the filing of this report, the Department has not provided any revised policies or procedures to suggest it has taken any concrete steps to implement this plan.

assesses the conduct of staff assigned to the special teams. The Special Team Rapid Review template includes the date, time, location, and camera information for the incident; the names and shield numbers of staff involved in the incident; an assessment of whether the incident was avoidable and how; identification of any procedural violations, painful escort techniques, or staff actions that were not in compliance with the UOF, chemical agent, or self-harm policies and procedures; and any recommendations for corrective action, discipline, or removal from the special teams for each staff member involved in the incident. The format of the Special Team Rapid Review template is more streamlined, and it did not initially contain a prompt to assess whether the special team deployment was necessary, although this question was added in response to the Monitoring Team's recommendation and is addressed in the 2024 Rapid Reviews.

Rapid Reviews were conducted for 88 special team staff involved in 79 UOF incidents from July 1, 2023 to December 31, 2023. The Monitoring Team's overall findings regarding the quality of Rapid Reviews suggest that results of these reviews should be viewed with caution as they may not capture the full range of staff misconduct. The Monitoring Team intends to evaluate these Rapid Reviews more closely in the future.

- The Rapid Reviewers determined that none of the UOFs were unavoidable.
- The Rapid Reviewers identified procedural errors by eight special team staff involved in six UOFs. One special team staff member made procedural errors in two separate UOF incidents. Errors included:
    - One staff member used an improper takedown technique. They were recommended for a command discipline and retraining.
    - Two staff members used improper wrist holds. Both staff were recommended for command discipline and retraining.
    - Two staff members deployed chemical agents too close to PICs' facial areas. Both staff were recommended for command discipline and retraining.
    - Four staff members failed to activate their BWC. Two staff were recommended for retraining and corrective interviews and two were recommended for command disciplines and retraining.

While the Department is making a concerted effort to better evaluate incidents involving the deployment of Special Teams, the Monitoring Team strongly suspects that the reviews did not identify all misconduct. The fact that none of the incidents were deemed avoidable and the limited number of issues identified do not comport with the Monitoring Team's findings. While it is positive that a separate process has become operational, the reviewers must improve their ability to assess these incidents objectively, identify the full range of misconduct by staff, and respond with appropriate corrective action.

**Emergency Response Team Procedures**

The Department's strategy for addressing the risk of harm via Emergency Response Teams has continued to shift. Going back several years, the Monitoring Team has shared feedback on ways to improve their use. In June 2021, the Monitoring Team shared detailed feedback with the Department which, to date, has not been addressed. During this Monitoring Period, in August 2023, the Department reported it was

considering various possible modifications to its approach to utilizing Emergency Response Teams. Subsequently, the Department shared a revised policy with a few minor revisions. The policy revisions generally did not address the Monitoring Team's feedback and inexplicably did not reflect the changes that the Department previously reported it was intending to make. In October 2023, the Monitoring Team shared extensive feedback and recommendations to the revised policy to which the Department has not yet responded. Later in October and November 2023, Department leadership reported that plans for Emergency Response Teams may be changing yet again. The current status of the draft policy and any corresponding changes in practice (including criteria for selecting team members) is once more in a state of flux and the details are unknown to the Monitoring Team.

The Department's policies and procedures related to searches are intertwined with the actions of the Emergency Response Teams given that the teams often conduct searches. The Monitoring Team has long raised concerns about the Department's search practices and the associated dysfunction. The Monitoring Team provided feedback in June 2021[33] on strategies for improving staff's search techniques to avoid catalyzing a need to use force and to reduce the on-scene chaos that often accompanies search operations.[34] To date, practices related to searches have not improved. The Department reports it is working on policy revisions as required by the Court's August 10, 2023 Order and intends to share proposed revisions in spring 2024.

**Frequency of Emergency Response Team Deployments**

The deployment of Emergency Response Teams most frequently occurs in response to Level B Alarms and in order to conduct searches. Level B alarm responses involve the deployment of an Emergency Response Team, while Level A responses involve supervisors and/or de-escalation teams not outfitted in tactical gear. Emergency Response Teams are summoned in response to Level B alarms. The Department has long defaulted to the use of Emergency Response Teams to address many issues in housing units. The Monitoring Team continues to observe UOF incidents in which an Emergency Response Team responds to an incident, even after it has been resolved, and there doesn't appear to be any need for the Emergency Response Team on the unit.

The Deputy Commissioner of Security reports he has focused on reducing the number of Level B alarms in order to reduce the overall reliance on Emergency Response Teams. The Department maintains

---

[33] In 2021, the Monitoring Team recommended: (1) the span of control for searches should be limited in order to reduce the number of excessive staff involved in searches; (2) a specific plan must be devised before each search takes place; (3) facility leadership must be involved in any planning for a search that includes external teams like ESU; and (4) specific procedures for conducting searches in celled and dormitory housing and common areas so that searches are completed in an organized and efficient manner and are not chaotic and disruptive.

[34] *See*, for example, Monitor's April 3, 2017 Report (dkt. 295) at pgs. 13-14 and 128; Monitor's October 17, 2018 Report (dkt. 317) at pg. 42; Monitor's October 23, 2020 Report (dkt. 360) at pgs. 16, 29, and 75; Monitor's May 11, 2021 Report (dkt. 368) at pgs. 24, 43-44, 48 and 124; Monitor's December 6, 2021 Report (dkt. 431) at pg. 26; Monitor's March 16, 2022 Report (dkt. 438) at pgs. 22 and 71-72; Monitor's October 28, 2022 Report (dkt. 472) at pgs. 71-72, 81, and 117; Monitor's April 3, 2023 Report (dkt. 517) at pgs. 54 and 138; and Monitor's July 10, 2023 Report (dkt. 557) at pgs. 42-43.

data regarding the number of Level A alarms (i.e., facility non-tactical response) and the number of Level B alarms (i.e., Emergency Response Team), which is compiled by each individual facility. The data generally demonstrates an increased use of Level A alarms, a trend that has also been observed by the Monitoring Team's assessment of incidents.[35] However, the Monitoring Team does not provide this data as, in at least some cases, the data does not appear to reflect the complete number of alarms that were initiated in 2023. The Monitoring Team's assessment of incidents reveals an ongoing practice of unnecessarily deploying Emergency Response Teams and the data from at least some facilities regarding the number of Level B Alarms does not reflect the complete number of responses observed by the Monitoring Team. The Monitoring Team has recommended to the Department that it examine these issues to determine the veracity of the large reduction in the number of alarms reported by facilities.

Reducing alarms remains a critical initiative to shift the culture of the jails and continues to be a reported priority for the Department's Security Operations Manager. As noted above, the Monitoring Team still finds instances where Level B alarms are triggered without cause, leading to situations that may escalate to unnecessary or excessive uses of force. Further reduction is necessary, and the Department must continue to mentor and supervise facility leaders and scrutinize instances in which Level B alarms are unnecessarily activated. Ensuring that frontline staff and their supervisors address issues directly and effectively is crucial for lasting reform. The Monitoring Team and Security Operations Manager continue to meet bi-monthly to discuss a range of relevant security topics, including the use of alarms. The Monitoring Team has emphasized the need for prudence when activating alarms, and the Security Operation Manager reports that he continues to prioritize this issue. The Monitoring Team will continue to evaluate the Department's use of alarms, including the veracity of the data reported by certain facilities.

The Department continues to conduct a large number of searches, which are necessary to address the flow of contraband and other issues. The Department's search practices often unnecessarily result in the use of force. The Department does not systematically track the number of use of forces that occur during searches. However, the Monitoring Team's review of initial use of force reports (CODs) suggested a rough estimate of over 700 use of force incidents occurred during searches. In the Monitoring Team's experience, this is an extremely high number of incidents involving searches. This rough data in combination with the Monitoring Team's assessment of specific incidents suggests far too many searches result in the unnecessary use of force.

**Emergency Services Unit ("ESU")**

The Monitoring Team recognizes the need for and supports the utilization of a specialized and highly trained tactical squad within the Department. The Department has stated that ESU is intended to serve this function—ESU is located centrally outside of any specific facility and serves all facilities. When properly utilized and deployed, such teams can neutralize serious risks of harm to both staff and incarcerated individuals. The practices of ESU have been a long-standing concern of the Monitoring Team

---

[35] *See* Monitor's April 3, 2023 Report (dkt. 517) at pg. 138.

given ESU's tendency to escalate situations and the "Concerns Regarding Emergency Response Teams" listed above are particularly applicable to ESU's conduct and management.

An overarching concern regarding ESU's management has been staff selection, particularly the retention of staff members in the unit after their misconduct cases have been identified. Department policy requires screening to select and assign staff to the Emergency Services Unit. However, the Department has not adhered to its own screening and selection process.[36] Far from being a bureaucratic requirement, proper screening should exclude individuals who are not fit for this particular duty and who may exacerbate, rather than prevent, harm from occurring. Case in point, an officer was removed from ESU in March 2021, was inexplicably re-assigned in early 2023 and was involved in a very concerning incident in April 2023. With respect to the April 2023 incident, he was subsequently indicted by the Bronx District Attorney for "evidence tampering, falsifying business records and official misconduct charges for allegedly placing a sharp object in an inmate's cell and then reporting it as recovered contraband. The incident was captured on the Officer's own body-worn camera, which he unintentionally activated."[37] Had the screening taken place prior to his reinstatement in 2023, it would have revealed that this officer was unsuitable for assignment to ESU.[38]

The Department's selection of ESU staff has been fraught with issues. In 2021, the Department removed several ESU staff members only after the Monitoring Team identified their ineligibility according to the Department's own policy. Inexplicably, in 2023, several of these same staff were re-hired by ESU, even though their disciplinary histories continued to render them ineligible. These issues came to light only as a result of the Monitoring Team's scrutiny. During this Monitoring Period, following significant inquiry and focus by the Monitoring Team, the Department essentially suspended new staff assignments to ESU.

In 2023, 33 staff were added to ESU, bringing the number of staff assigned to ESU as of December 2023 to 91. Of the 33 added in 2023, 10 were staff who had been previously removed in 2021 (these staff were added between January and March 2023). Of the 33 staff assigned in 2023, 32 were subsequently removed from ESU (this includes the 10 who had previously been removed in 2021).

Given the Monitoring Team's concerns about the Department's inconsistent and unreliable screening process for ESU, the August 10, 2023 Order § I. ¶ 9 was instituted, requiring the Department to revise and implement a screening and assignment process for ESU and Special Teams to ensure that staff are appropriately fit for the Special Teams and are routinely reassessed to ensure they remain a proper fit. The Department submitted two sets of revisions to the policy related to the screening of staff for Special Teams (one in July 2023 and one in September 2023). The Monitoring Team provided its most recent feedback in October 2023. The Department reports it intends to share a revised version of the policy with the Monitoring Team in Spring 2024. The Department also reported its intention to screen all staff assigned

---

[36] *See* Monitor's December 22, 2023 Report (dkt. 666) at pgs. 20-22.

[37] Available at: https://www.bronxda.nyc.gov/downloads/pdf/pr/2023/68-2023%20correction-officer-indicted-evidence-tampering.pdf

[38] This Officer was removed from ESU in April 2023 after the Monitoring Team alerted the Department about its findings regarding the lack of screening.

to ESU under the revised screening procedures once the Operations Order 24/16 "Special Unit Assignment" has been finalized and approved by the Monitor.

**Training for Special Teams**

In early 2023, the Monitoring Team recommended that Special Teams' staff receive training to improve practice. The Department's training program at the time was inadequate; it failed to address the areas of concern regarding the team's historical practices that had been reported by the Monitoring Team for years. The course content did not adequately address the necessary skill set, and some of the course content was inconsistent with the Department's own policies and procedures (e.g., the discussion of Incident Command was not aligned with the Department's practices regarding Level A/B alarms).[39] The Department worked collaboratively with the Monitoring Team to revise the training modules through many iterations during this Monitoring Period, exchanging feedback and revisions between August 2023 and January 2024. The Monitoring Team approved the training in February 2024. The revised training is intended to address some of the most fundamental issues the Monitoring Team has repeatedly raised with Department leadership. Significantly, the training was revised with three principal guiding factors. First, the training now accurately reflects Department policy, and many of the training modules now include language directly from the relevant policies with additional context, scenarios, and guidance to improve staff's understanding of policy. Second, the training was revised to help staff learn high-level specialized skills, techniques, and concepts tailored to their duties (the initial training was far too rudimentary and rehashed tactics and skills that would not elevate or distinguish these officers from line staff). Finally, the training directly addresses problems identified by the Monitoring Team, including painful escorts, prohibited taken downs, and head strikes. To this end, the material includes examples and scenarios from actual use of force incidents to help staff identify the types of misconduct that must be avoided in the jails they will be working in.

This revised training should increase the skill set and professionalism of the ESU team members. Whether this occurs will depend on various factors, and it is critical for the Department to provide this training with fidelity and to ensure the staff assigned to ESU are invested in self-improvement and being part of the necessary culture change in this Department.

**Conclusion**

While significant concerns remain about the conduct of the members of Emergency Response Teams, the recent reduction and ongoing effort to moderate their use are important foundational steps to improving practice in this area. While at least some marginal progress has been made in reducing the overall number of alarms and the reliance on Level B alarms, significant work remains to eliminate the unnecessary activation of Emergency Response Teams, which still occurs too frequently, to address long-standing concerns about Emergency Response Team members' conduct, to better utilize Rapid Reviews to detect and address their inappropriate conduct, to improve the protocol for screening and assigning staff to ESU, and to ensure the new training curriculum is delivered with fidelity. Together, these actions are a

---

[39] *See* Monitor's July 10, 2023 Report (dkt. 557) at pg. 41.

| | |
|---|---|
| | critical part of setting the right tone in the entire agency relating to unnecessary and excessive force—that is, a zero-tolerance approach. |
| **COMPLIANCE RATING** | **Development of Protocol**: Non-Compliance<br>**Review of Responses & Documentation**: Partial Compliance<br>**Response to Misconduct**: Non-Compliance |

## CONSENT JUDGMENT § IV - USE OF FORCE POLICY

| CJ § IV. USE OF FORCE POLICY, ¶ 1 (NEW USE OF FORCE DIRECTIVE) |
|---|
| ¶ 1. *New Use of Force Directive.* Within 30 days of the Effective Date, in consultation with the Monitor, the Department shall develop, adopt, and implement a new comprehensive use of force policy with particular emphasis on permissible and impermissible uses of force ("New Use of Force Directive"). The New Use of Force Directive shall be subject to the approval of the Monitor. |

This provision of the Consent Judgment requires the Department to develop, adopt, and implement a comprehensive Use of Force Policy with particular emphasis on permissible and impermissible uses of force.

### UOF Policy

The Department previously achieved Substantial Compliance with the development and adoption of the Use of Force Policy, which received the Monitor's approval prior to the Effective Date of the Consent Judgment in 2015. The Use of Force Policy required by the Consent Judgment went into effect on September 27, 2017, with the corresponding New Disciplinary Guidelines effective as of October 27, 2017. The Use of Force Policy is not based on new law, nor does it abandon core principles from its predecessor—the new policy retains core principles of the former policy while providing further explanation, emphasis, detail, and guidance to staff on the steps officers and their supervisors should take in response to threats to safety and security.

### Standalone Policies

In addition to the Use of Force policy, the Department maintains a number of standalone policies regarding the proper use of security and therapeutic restraints, spit masks, hands-on-techniques, chemical agents, electronic immobilizing devices, kinetic energy devices used by the Department, batons, lethal force, and canines. ESU also maintains approximately 10 Command Level Orders ("CLOs"), including two that govern the use of specialized chemical agent tools (*i.e.*, the Sabre Phantom Fog Aerosol Grenades). Several of these policies require revision, including the ESU's CLOs as well as the Department's policies on restraints, searches, and Emergency Response Teams.[40] The need for revision has been extensively documented in prior Monitor's Reports, most recently in the Monitor's November 8, 2023 Report (dkt. 595). Furthermore, the Department's failure to consult and/or seek the Monitor's approval of revised policies has also been discussed in various Monitor's Reports.[41] The Department reports it is in the process of revising the various policies and will submit them to the Monitoring Team for consultation and feedback.

---

[40] *See* other sections of this report and Monitor's November 8, 2023 Report (dkt. 595) at pgs. 12, 14-16, and 40-41.

[41] *See* Monitor's November 30, 2023 Report (dkt. 616) at pgs. 33 and 37.

**Implementation of UOF Policy**

Throughout 2023, the Monitoring Team provided detailed reporting on the Department's problematic use of force and corresponding security failures, many of which are further described in this report. The Monitoring Team's extensive findings during this time period are the basis for the Non-Compliance rating regarding the UOF policy's implementation.[42] The findings reflect ongoing concerns about poor security practices and pervasive operational failures that result in the widespread unnecessary and excessive use of force and imminent risk of harm to those in custody and to those who work in the jails. As noted above, the new UOF Policy went into effect in late 2017, only after all staff were trained to utilize and report uses of force in the manner prescribed by the policy. Thus, 2018 was the first full year in which staff's practice was governed by the new policy. As shown by the data in Appendix A, the 2023 UOF rate (9.33) is 58% higher than the rate in 2018 (5.9) and is more than twice the rate in 2016 (3.96) when the Consent Judgment went into effect. Comparisons to either year indicate that the frequency with which force is used has increased substantially, and the Monitoring Team's qualitative assessments of all use of force incidents further suggest that unnecessary and excessive uses of force remain just as prevalent as they were in 2016 and 2018.

**Conclusion**

Substantially reducing the frequency of unnecessary and excessive uses of force will require quality training and supervision, strict adherence to sound security practices, and reliable and appropriate staff discipline. The Department's ability to materially improve the quality of its security practices and to reduce the prevalence of unnecessary and excessive uses of force has been questioned for many years and remains far from certain. The Department remains in Non-Compliance with the implementation of the Use of Force Policy.

| | |
|---|---|
| **COMPLIANCE RATING** | ¶ 1. **(Develop)** Substantial Compliance |
| | ¶ 1. **(Adopt)** Substantial Compliance |
| | ¶ 1. **(Implement)** Non-Compliance |
| | ¶ 1. **(Monitor Approval)** Substantial Compliance |

---

[42] *See* Monitor's April 3, 2023 Report (dkt. 517) at pgs. 36-63; Monitor's June 8, 2023 Report (dkt. 541) at pgs. 5-14; and Monitor's July 10, 2023 Report (dkt. 557) at pgs. 12-68.

## CONSENT JUDGMENT § V - UOF REPORTING AND TRACKING

| CJ § V. USE OF FORCE REPORTING AND TRACKING, ¶ 2 (INDEPENDENT STAFF REPORTS) |
|---|
| ¶ 2. _Independent Staff Reports._ Every Staff Member who engages in the Use of Force, is alleged to have engaged in the Use of Force, or witnesses a Use of Force Incident, shall independently prepare and submit a complete and accurate written report ("Use of Force Report") to his or her Supervisor. |

The Department is required to report when force is used accurately and timely as part of their overall goal to manage use of force effectively. The assessment below covers five critical areas related to reporting force: notifying Supervisors that a use of force occurred, submission of complete, independent and timely reports, the classification of UOF incidents, allegations of use of force, and reporting of use of force by non-DOC staff who either witnessed the incident and/or are relaying reports from incarcerated individuals.

### Notifying Supervisor of UOF

From July to December 2023, 3,648 use of force incidents were reported by supervisors to the Central Operations Desk and slightly over 5,490 uses of force or use of force witness reports were submitted for incidents occurring in this Monitoring Period. To assess whether staff are timely and reliably notifying a supervisor of a UOF, the Monitoring Team considers whether there is evidence that staff are not reporting force as required. This includes consideration of allegations as well as reports from outside stakeholders (_e.g._, H+H and LAS) about potential unreported UOF. These sources suggest that unreported uses of force are an infrequent occurrence. In this Monitoring Period, 11 out of the 12 reports from H+H staff alleging UOF were already under investigation by ID before H+H's reports were submitted. Further, only 2 of the 46 UOF allegations submitted by LAS in 2023 had not been previously reported.

### **Independent, Complete, and Timely Staff Reports**

Staff members are required to submit independent and complete UOF reports. The Department's Use of Force Directive requires staff to independently prepare a staff report or Use of Force Witness Report if they employ, witness, or are alleged to have employed or witnessed force. Staff reports play a crucial role in use of force investigations, necessitating staff members to articulate their account of events using their own words. It is imperative for them to provide precise details regarding the tactics employed or witnessed, the level of resistance or threat and the reason force was necessary.

The Department maintains a centralized, reliable, and consistent process for submitting and tracking UOF Reports, which has also supported the Department's ability to consistently report on the submission of UOF reports. The number of reports submitted by staff is significant, and most of those reports are still submitted and uploaded in a timely fashion. Overall, the Intake Investigations of UOF incidents appeared to generally have access to staff and witness reports with enough time to conduct the investigations.

During this Monitoring Period, over 5,490 reports were submitted, the high volume of reports submitted generally indicates compliance with the requirement that staff must submit reports. The Monitoring Team's review of a sample of reports, revealed a general tendency toward independent preparation by the Staff. Nevertheless, the quality of reports remains inconsistent, which has long been reported and is consistent with prior findings highlighted in the Monitor's May 29, 2020 Report (dkt. 341) at pgs. 89-91. The Monitoring Team continues to routinely identify instances of incomplete, incongruent with evidence, or overly vague reports. The Department itself has also identified issues with staff's reporting practices. Of the 3,363 Intake Investigations closed in this Monitoring Period (covering incidents occurring between April 2023 and December 2023), ID identified 584 incidents (17%) with report writing issues. Further, as noted in other sections of this report, ID's ability to identify potential violations remains subpar, and therefore, it is likely that additional cases with reporting violations may be present but were not identified.

Staff members are also required to submit their reports as soon as practicable after the use of force incident, or the allegation of the use of force unless the staff member cannot prepare a report within this timeframe due to injury or other exceptional circumstances. The table below demonstrates the number and timeliness of staff reports for actual and alleged UOF from 2018 to December 2023.

| Timeliness of Staff Report | | | | | | |
|---|---|---|---|---|---|---|
| | **Actual UOF** | | | **Alleged UOF** | | |
| *Year* | *Total Staff Reports Expected* | *Reports Uploaded Timely* | *% Uploaded within 24 Hours* | *Total Staff Reports Expected* | *Reports Uploaded Timely* | *% Uploaded within 72 Hours of the Allegation* |
| **Jan. to Dec. 2018** | 15,172 | 12,709[43] | 83.77% | 139 | 125[44] | 89.93% |
| **Jan. to Dec. 2019** | 21,595 | 20,302 | 94.01% | 190 | 134 | 70.53% |
| **Jan. to Dec. 2020** | 19,272 | 17,634 | 91.50% | 136 | 94 | 69.12% |
| **Jan to Dec. 2021** | 22,103 | 17,064 | 77.20% | 111 | 45 | 40.54% |
| **Jan to Dec. 2022** | 17,700 | 14,776 | 83.48% | 93 | 42 | 45.16% |
| **Jan to Dec. 2023** | 14,957 | 11,924 | 79.72% | 82 | 40 | 48.78% |
| ***Jan to June 2023*** | *7,744* | *6,431* | *83.04%* | *43* | *19* | *44.19%* |
| ***Jul to Dec 2023*** | *7,213* | *5,493* | *76.15%* | *39* | *21* | *53.85%* |

During this monitoring period, 76% of reports were submitted within the 24-hour deadline. The submission of timely reports has still not returned to the impressive proportions observed in 2019 and 2020 (94% and 91% respectively) when not only were submissions more punctual, but the volume of reports submitted was also higher. The Department's decline in the production of timely use-of-force reports is largely the result of the GRVC facility. UOF reports from staff at GRVC have the lowest proportion of reports submitted in a timely manner. In this Monitoring Period, only 49% of reports were uploaded timely (down from 72% in the last Monitoring Period). In September 2023, NCU leadership reported its findings to GRVC facility leadership in an effort to instigate improvement. However, to date, no concrete steps have been taken to improve the timeliness of report submissions. Contemporaneous reports are crucial to an

---

[43] NCU began the process of auditing actual UOF reports in February 2018.

[44] NCU began collecting data for UOF allegations in May 2018.

investigation, and so the Department, particularly the staff at GRVC, must renew its efforts to ensure that reports are submitted within the required timeframes.

Obtaining reports for allegations takes longer as the alleged staff members involved must be identified and advised that a report is necessary, and then the report must be produced. The staff member may or may not be working on the day in which the allegation is received and reviewed, so it generally takes longer to obtain reports of allegations. That said, the time to obtain reports for allegations continues too long and must be improved. In this Monitoring Period, fewer reports were submitted within 72 hours of the allegation as required. More specifically, 19 of the 43 (44%) reports for alleged UOF incidents were submitted within 72 hours.

### Classification of UOF Incidents

The Department is required to immediately classify all use of force incidents as Class A, B, C, or P when an incident is reported to the Central Operations Desk ("COD"). Class P is a temporary classification used to describe use of force incidents where there is not enough information available at the time of the report to COD to receive an injury classification of Class A, B, or C.

The chart below identifies the Monitoring Team's assessment of a sample of the Department's incident classifications from March 2016 to December 2023.

| Assessment of UOF Classification | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **COD Sets**[45] **Reviewed** | **Mar. 2016 to July 2017** *2nd to 4th MP* | **2018** *6th & 7th MP* | **2019** *8th & 9th MP* | **2020** *10th & 11th MP* | **2021** *12th & 13th MP* | **2022** *14th & 15th MP* | **2023** *16th & 17th MP* | **Jan. to June 2023** *16th MP* | **July to Dec. 2023** *17th MP* |
| **Total Incidents Reviewed** | 2,764 | 929 | 1,052 | 1,094 | 1,644 | 1,585 | *2,164* | *980* | *1,184* |
| **Total Incidents Classified Within COD Period**[46] | 3,036 (97%) | 909 (98%) | 1,023 (97%) | 1,079 (99%) | 1,226 (75%) | 1,238 (78%) | *1,991 (92%)* | *872 (89%)* | *1,119 (95%)* |
| **Number of Incidents that were not classified within the COD Period** | 88 (3%) | 20 (2%) | 29 (3%) | 15 (1%) | 418 (25%) | 347 (22%) | *173 (8%)* | *108 (11%)* | *65 (5%)* |

---

[45] This audit was not conducted in the First or Fifth Monitoring Periods.

[46] The data is maintained in a manner that is most reasonably assessed in a two-week period ("COD Period"). The Monitoring Team did not conduct an analysis on the specific date of reclassification because the overall finding of reclassification within two weeks or less is sufficient to demonstrate compliance.

The Department has continued to improve its ability to classify incidents in a timely manner following a significant backslide in 2021. The Department previously reported that the delays in classifying incidents were due to delays by H+H in updating injury reports and facilities failing to report within the prescribed five-day time frame. These issues appear to have subsided given that the Monitoring Team is no longer waiting for final UOF classifications cases as much as it did in the past.

As demonstrated in the chart above, from July to December 2023, 95% of all incidents were classified within the COD period. This reflects an improvement compared with the last Monitoring Period in which 88% of incidents were classified within the COD period. For all 2023, 92% of incidents were classified within the COD period. The improvement in classification is notable and appears to be more efficient than it has been in the past. However, the Department must continue to evaluate UOF classifications in a timely manner and sustain or improve any efficiencies created. Further, the Department reports that it reclassified approximately 270 incidents in 2023. The Monitoring Team intends to closely evaluate these reclassifications and incidents to ensure they are reasonable.

**Alleged Use of Force**

In order to evaluate the full extent of force employed within the Department, it's crucial to evaluate both reported instances of force by staff and substantiated *allegations* of the use of force. Hence, the Department maintains distinct tracking for allegations of force use, representing instances where staff purportedly used force on an incarcerated individual, which had not been previously reported. It is important to note that an allegation of a use of force does not inherently confirm the actual utilization of force; that determination is established through the investigative process.

The number of allegations has generally declined since 2016. As demonstrated in the chart below. The Department had the lowest number of allegations in 2023 (n=177) than in any of the previous 7 years.



Overall, the number of allegations of force is small compared to the total number of uses of force reported by staff. In 2023, there were 177 allegations of force while 3,548 uses of force were reported by staff. The Monitoring Team has found that generally, of the small group of allegations, only a fraction is substantiated, and those are typically for failing to report minor uses of force, and instances of excessive or unnecessary unreported uses of force are rare. That said, all allegations of use of force must be appropriately investigated.

**Non-DOC Staff Reporting**

Non-DOC staff members who witness a use of force incident are required to report the incident in writing directly to a supervisor and medical staff are required to report to a supervisor when they have reason to suspect that an Inmate has sustained injuries due to a use of force, but the injury was not identified as such to the medical staff. The reports of non-DOC staff are critical. Sometimes, an incident is only identified because of a report by non-DOC staff. Other times, such reports provide context and information about an incident that was not provided by others who submitted reports. Even if a report simply corroborates the events reported by others, such a report has value. That is why it is so important for anyone who witnesses a use of force to submit a report.

*DOE Staff Reporting:* The Department of Education ("DOE") previously developed staff training and reporting procedures, in consultation with the Monitoring Team, to address the requirements of this provision and the December 4, 2019 Court Order (dkt. 334) clarifying the requirement for DOE to submit reports. The Monitoring Team has not received any reports from DOE staff that may have witnessed a UOF since school resumed in April 2021 (following a pause from COVID-19). In this Monitoring Period there were approximately 10 use of force incidents in school areas. Although a small number, it does suggest that at least some reports by DOE staff would be expected.

*H+H Reporting*: New York City Health + Hospitals ("H+H") (the healthcare provider for incarcerated individuals in DOC custody) has maintained a process for staff reporting. H+H staff submitted a total of 12 reports in this Monitoring Period; 6 reports were H+H witness reports of UOF incidents and 6 reports relayed UOF allegations from an incarcerated individual. The chart provides an overview of the reports provided by H+H staff since July 2017.

| Submission of H+H Staff Reports | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | July to Dec. 2017 (5th MP) | 2018 (6th & 7th MP) | 2019 (8th & 9th MP) | 2020 (10th & 11th MP) | 2021 (12th & 13th MP) | 2022 (14th & 15th MP) | 2023 (16th & 17th MP) | Jan-Jun 2023 (16th MP) | Jul-Dec 2023 (17th MP) |
| *Grand Totals* | | | | | | | | | |
| **Total Reports Submitted** | 2 | 53 | 39 | 56 | 97 | 52 | 26 | 14 | 12 |
| **Total UOF Incidents Covered** | 2 | 53 | 38 | 46 | 85 | 42 | 27 | 14 | 13 |
| *Witness Reports* | | | | | | | | | |
| **# of witness reports submitted** | 0 | 29 | 18 | 45 | 70 | 36 | 18 | 12 | 6 |
| **# of actual or alleged UOF incidents covered by submitted reports** | 0 | 31 | 15 | 36 | 64[47] | 25[48] | 18 | 12 | 6 |
| *Relayed Allegations from Incarcerated Individuals* | | | | | | | | | |
| **# of reports of allegations of UOF relayed from an Incarcerated Individuals** | 2 | 24 | 21 | 11 | 27 | 16 | 8 | 2 | 6 |
| **# of actual or alleged UOF incidents covered by submitted reports** | 2 | 22 | 23 | 10 | 22[49] | 19[50] | 9 | 2 | 7 |

It is difficult to know whether H+H staff submitted reports for every incident witnessed as it is not always clear what incidents an H+H staff may have, in fact, witnessed. In this Monitoring Period, 141 incidents occurred in clinic areas and only 4 of those incidents (3%) had a corresponding H+H report. It is worth noting that just because an incident occurred in the clinic area does not mean H+H staff witnessed the incident. However, the number of incidents that

---

[47] On one occasion for one use of force incident, we received both a witness report and a relayed allegation report for the same incident.

[48] On two separate occasions for two separate use of force incidents, we received both a witness report and a relayed allegation report for the same incident.

[49] *See id*.

[50] *See id*.

occurred in the clinic versus the number of reports received suggests it is possible that additional incidents were observed, but not reported. That said, the number of incidents that occurred in the clinic versus the number of H+H reports received, coupled with an 50% reduction in the number of H+H reports submitted in 2023 (n=26) versus 2022 (n=52), suggests that there is room for improvement in the submission of H+H reports. Further, it is worth noting that H+H submitted reports for 9 incidents that occurred in other parts of the jail where H+H staff either witnessed the use of force themselves, or where the person in custody later relayed the use of force allegation to the H+H staff member. The Monitoring Team recommends that H+H engage in a renewed effort to ensure staff are reporting as required.

**<u>Conclusion</u>**

The requirements related to reporting use of force are multi-faceted. Overall, use of force incidents are being reported as required, but the time to classify incidents can still be improved. Further, thousands of individual staff reports are submitted, but the submission of reports in a timely manner must be improved. Additionally, the quality, specificity, and accuracy of reports must be improved by all staff ranks. The Department is, therefore, in Partial Compliance with this requirement.

| COMPLIANCE RATING | ¶ 2. Partial Compliance |
|---|---|

**CJ § V. USE OF FORCE REPORTING AND TRACKING, ¶ 22 (PROVIDING MEDICAL ATTENTION FOLLOWING USE OF FORCE INCIDENT)**

¶ 22. _Providing Medical Attention Following Use of Force Incident._ All Staff Members and Inmates upon whom force is used, or who used force, shall receive medical attention by medical staff as soon as practicable following a Use of Force Incident. If the Inmate or Staff Member refuses medical care, the Inmate or Staff Member shall be asked to sign a form in the presence of medical staff documenting that medical care was offered to the individual, that the individual refused the care, and the reason given for refusing, if any.

Staff members and incarcerated individuals upon whom force is used, or who used force, are required to receive medical attention by medical staff as soon as practicable following a Use of Force Incident. The Department's progress in providing timely medical care from January 2018 to December 2023 following a UOF is outlined in the table below.

| Wait Times for Medical Treatment Following a UOF | | | | | | |
|---|---|---|---|---|---|---|
| | # of Medical Encounters Analyzed | 2 hours or less | Between 2 and 4 hours | % Seen within 4 hours | Between 4 and 6 hours | 6 hours or more |
| **2018** | **9,345** | **37%** | **36%** | **73%** | **16%** | **13%** |
| **2019** | **11,809** | **43%** | **38%** | **81%** | **11%** | **9%** |
| **2020** | **10,812** | **46%** | **36%** | **82%** | **10%** | **9%** |
| **2021** | **14,745** | **39%** | **30%** | **70%** | **11%** | **20%** |
| **2022** | **12,696** | **51%** | **23%** | **74%** | **9%** | **19%** |
| **2023** | **11,513** | **54%** | **27%** | **80%** | **10%** | **10%** |
| **2023** _(Jan. to June)_ | **5,318** | **58%** | **24%** | **82%** | **9%** | **9%** |
| **2023** _(Jul. to Dec)_ | **6,195** | **50%** | **30%** | **80%** | **10%** | **10%** |

In 2023, there were 11,513 medical encounters related to a UOF, and about 80% of all individuals requiring medical treatment were seen within 4 hours, an improvement compared to 74% in 2022 and 70% in 2021. This improvement is particularly evident in the reduction of cases where individuals received care after more than 6 hours, as such cases have declined to 10% from 19% in 2022 and 20% in 2021. The proportion of timely medical treatment returned to the levels reached in 2019 and 2020. The Department must sustain the forward trajectory, actively building upon the momentum already achieved. The provision of prompt medical treatment is directly related to mitigating the ongoing risk of harm and so the Department must continue to work to ensure staff members and incarcerated individuals receive prompt medical attention.

| COMPLIANCE RATING | ¶ 22. Substantial Compliance |
|---|---|

CONSENT JUDGMENT § VII – USE OF FORCE INVESTIGATIONS

---

**CJ § VII. USE OF FORCE INVESTIGATIONS, ¶ 1 (THOROUGH, TIMELY, OBJECTIVE INVESTIGATIONS) & ¶ 9 (A) (TIMING OF FULL ID INVESTIGATIONS)**

¶ 1. *Thorough, Timely, Objective Investigations.* As set forth below, the Department shall conduct thorough, timely, and objective investigations of all Use of Force Incidents to determine whether Staff engaged in the excessive or unnecessary Use of Force or otherwise failed to comply with the New Use of Force Directive. At the conclusion of the investigation, the Department shall prepare complete and detailed reports summarizing the findings of the investigation, the basis for these findings, and any recommended disciplinary actions or other remedial measures. All investigative steps shall be documented.

¶ 9. *Timing of Full ID Investigations.* All Full ID Investigations shall satisfy the following criteria [. . . as enumerated in the following provisions]:

    a.   *Timeliness* [. . .]

        ii.   Beginning on October 1, 2018, or three years after the Effective Date, whichever is earlier, and for the duration of the Agreement:

           1.   ID shall complete all Full ID Investigations by no later than 120 days from the Referral Date, absent extenuating circumstances outside the Department's control that warrant an extension of this deadline. Any extension of the 120-day deadline shall be documented and subject to approval by the DCID or a designated Assistant Commissioner. Any Full ID Investigation that is open for more than 120 days shall be subject to monthly reviews by the DCID or a designated Assistant Commissioner to determine the status of the investigation and ensure that all reasonable efforts are being made to expeditiously complete the investigation.

           2.   The Department shall make every effort to complete Full ID Investigations of less complex cases within a significantly shorter period than the 120-day time frame set forth in the preceding subparagraph.

---

This compliance assessment provides an overview of the status of investigations for all UOF incidents through December 31, 2023. This includes an update on the changes in ID leadership and the management of investigations, the status of ID staffing, an assessment of the timing of Intake Investigations and Full ID Investigations, the status of law enforcement referrals for potential criminal misconduct, the status of referrals for and completion of Full ID investigations, details about the Use of Force Priority Squad, and an assessment of the quality of investigations, including ID's internal quality assurance initiatives and the identification of staff misconduct within investigations.

**Background**

The gains that the Department made in improving the quality of investigations in 2020 and 2021 were erased in 2022. The regression since the entry of the Action Plan offset the progress the Department had previously made toward compliance to "conduct thorough, timely, and objective investigations of all Use of Force Incidents to determine whether Staff engaged in

the excessive or unnecessary Use of Force or otherwise failed to comply with the New Use of Force Directive," as required pursuant to § VII. ¶ 1 of the Consent Judgment. In 2020, during the 10th Monitoring Period, the Department had moved out of Non-Compliance with this provision and maintained Partial Compliance through the 14th Monitoring Period (January to June 2022).[51] During the 15th Monitoring Period (July to December 2022), as a result of the significant regression in the quality of investigations, the Department returned to Non-Compliance with this requirement and remained in Non-Compliance in the 16th Monitoring Period (January to June 2023) as well.[52]

The decline in quality of ID's work that began in 2022 appears to be related to poor leadership and inappropriate direction[53] by a Deputy Commissioner who was installed in 2022 and who subsequently resigned in March 2023.[54] This was followed by some subsequent leadership changes in fall 2023, imposed by the former Commissioner, that further impacted practice. The regression in ID's work impacted the Department's means to identify and address staff misconduct and thus, such misconduct is not addressed nor met with appropriate accountability measures or discipline and efforts to complete investigations in a timely manner further eroded. The Monitoring Team has also received reports that ID staff note a marked decline in staff morale since 2022, which appears, at least in part, to contribute to the high rate of attrition in the division as discussed in more detail below.

**ID Leadership and Management of Investigations**

Following the resignation of the former Deputy Commissioner in March 2023, a new Deputy Commissioner was appointed. The Monitoring Team has found ID's new Deputy Commissioner to be transparent, candid, and committed to improving the ID Division's work. The City and DOC also touted the Associate Commissioner of ID as a key member of the leadership team to reform the ID Division. However, in September 2023, this well-respected Associate Commissioner was removed from ID by the former Commissioner, causing further

---

[51] A compliance rating for this provision was not awarded in the 13th Monitoring Period because the Monitoring Team did not assess compliance with any provisions of the Consent Judgment or Remedial Orders for the period between July 1, 2021 and December 31, 2021. The Court suspended the Monitoring Team's compliance assessment during the 13th Monitoring Period because the conditions in the jails during that time were detailed to the Court in seven status reports (filed between August and December 2021), a Remedial Order Report (filed on December 22, 2022) as well as in the Special Report filed on March 16, 2022 (dkt. 438). The basis for the suspension of compliance ratings was also outlined in pgs. 73-74 of the March 16, 2022 Special Report (dkt. 438).

[52] *See* Monitor's April 3, 2023 Report (dkt. 517) at pgs. 100-102 and 155-171 and Monitor's April 24, 2023 Report (dkt. 520) at pgs. 1-4.

[53] *See* Monitor's November 8, 2023 Report (dkt. 595) at pg. 56 and Monitor's October 5, 2023 Report (dkt. 581) at pg. 16.

[54] *See* Monitor's April 3, 2023 Report (dkt. 517) at pgs. 100-101 and 157-158 and Monitor's April 24, 2023 Report (dkt. 520) at pgs. 2-3.

destabilization and regression.[55] The abrupt removal of the Associate Commissioner of ID, under questionable circumstances, had a negative impact on the operations of ID that continues to the present.

In August 2023, just prior to the Associate Commissioner's removal, a new Assistant Commissioner was appointed by the former Commissioner to serve as the leader of ID's Intake Unit. The new Assistant Commissioner did not have any experience conducting or managing use of force investigations. The Monitoring Team received reports that after this appointment, the Intake Unit was not functioning properly, the unit's management was not well integrated into the overall work of ID, the quality of the investigations was not improving, and the ability to complete Intake Investigations in a timely manner also began to falter. It was also reported that the Assistant Commissioner reported directly to the former Commissioner, and not the Deputy Commissioner of ID. Following the close of the Monitoring Period, the Assistant Commissioner of ID was removed from his position in March 2024.

In addition to changes in ID's leadership, multiple Supervising Investigators within ID left the Department at the end of 2022 and in early 2023. Most of these supervisory roles have since been filled, but the new supervisors still need some time to complete their training and settle into their new roles.

Overall, the personnel transitions initiated by the former Commissioner regarding the Associate and Assistant Commissioners that occurred in this Monitoring Period compounded the dysfunction within ID that began in 2022. The Monitoring Team remains deeply concerned about the lack of adequate leadership and supervision necessary to correct the significant decline in ID's work product that began in 2022. It is for this reason the Monitoring Team has strongly recommended to the Commissioner and the current leadership within ID that there is a need for strong leadership, guidance, and mentorship to support the necessary revitalization of this unit.

**ID Staffing**

The City is required to ensure that the Department has appropriate resources to conduct timely and quality investigations. Adequate staffing and appropriate case assignment are critical to conducting timely, quality investigations. The Court's August 10, 2023 Order requires DOC to maintain at least 21 supervisors and 85 investigators. The Department previously reported it would initiate a staffing analysis, but now the Department reports it will not proceed with that analysis. The Department reports it will instead focus on recruitment and hiring efforts. As outlined below, while some progress has been made in increasing staffing levels, ID has reported to the Monitoring Team that its current staffing levels are insufficient to manage its workflow.

- Staff Assignments

The table below shows the number of investigators and supervisors assigned to ID at specific times since 2020 and illustrates the precipitous drop in the number of staff since the

---

[55] *See* Monitor's December 8, 2023 Letter (dkt. 639) at pgs. 3-4.

Division was at its most functional in 2020/2021. In particular, the number of Supervisors assigned to Full ID investigations has dropped significantly, as have the number of Investigators assigned to the Intake Squad and to Full ID.

| Supervisors in ID Assigned to UOF Cases | | | | | | | |
|---|---|---|---|---|---|---|---|
| | February 2020 | January 2021 | January 2022 | January 2023 | June 2023 | Dec 2023 | Feb. 2024 |
| Rapid Reviews | | | | | 2 | 2 | 2 |
| Intake Squad | 8 | 10 | 13 | 12 | 8 | 10 | 9 |
| Full ID | 15 | 10 | 7 | 3 | 3 | 5 | 6 |
| UPS | 1 | 1 | 1 | 0 | 1 | 1 | 1 |
| **Totals** | **24** | **21** | **21** | **15** | **14** | **18** | **18** |

| Investigators in ID Assigned to UOF Cases | | | | | | | |
|---|---|---|---|---|---|---|---|
| | February 2020 | January 2021 | January 2022 | January 2023 | June 2023 | Dec 2023 | Feb. 2024 |
| Rapid Reviews | | | | | 8 | 10 | 9 |
| Intake Squad | 32 | 51 | 51 | 51 | 32 | 35 | 37 |
| Full ID | 82 | 58 | 36 | 10 | 12 | 22 | 27[56] |
| UPS | 4 | 3 | 3 | 4 | 5 | 5 | 5 |
| **Totals** | **118** | **112** | **90** | **65** | **57** | **72** | **78** |

- Recruitment Efforts

    The Department reports that it continues to recruit actively and to offer employment to investigators and supervisors. Following the close of the Monitoring Period, the Department initiated a pilot program that will allow certain investigators to work remotely one day per week. Initial reports suggest that this benefit has been well received by staff.

    The significant departure of investigators and supervisors conducting use of force investigations since 2020 (when ID was at its most functional) remains an area of concern. Currently, the number of investigators and supervisors conducting use of force investigations is at least 30% less than early 2020. DOC has not been able to return to its staffing levels in 2020 and its current staffing levels are insufficient to meet the requirements of the *Nunez* Court Orders.

    As of February 2024, ID had hired 114 new investigators, supervisors, and executives. During the same time period, 165 staff departed ID (either because they left the Department, were transferred to SIU or returned to their assigned command). Therefore, there was a net loss

---

[56] DOC reports that 4 of these investigators are on long term leave.

of 51staff. A table with the number of ID staff hired and any net gains to ID's staffing between January 2022 and February 2024 is included in Appendix A.

The high rate of attrition demands that the Department's recruitment effort must continue with vigor. The Monitoring Team continues to recommend that the City utilize its authority to ensure that the Department has the resources it needs to comply with the *Nunez* Court Orders in this area.

## Status of Investigations

The table below provides, *as of February 15, 2024*, the investigation status of all UOF incidents that occurred between January 2020 and December 31, 2023.[57] Given the volume of UOF incidents, ID's workload remains high. All use of force cases receive an Intake Investigation (formerly called a Preliminary Review) and a subset of those cases may then be referred for a Full ID Investigation where a more in-depth investigation occurs. The time to complete investigations, the quality of investigations, and their outcomes are discussed in more detail below.

| Investigation Status of UOF Incidents Occurring Between 2020 and 2023 *as of February 15, 2024* | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Incident Date** | **2020** | | **2021** | | **2022** | | **2023** | |
| **Total UOF Incidents**[58] | **6,399** | | **8,413** | | **7,231** | | **6,959** | |
| **Pending Intake Invest.** | 0 | **0%** | 0 | **0%** | 0 | **0%** | 119 | **2%** |
| **Pending Full ID Invest.** | **0** | **0%** | 0 | 0% | 133 | **2%** | 539 | **8%** |
| **Total Closed Invest.** | 6,399 | **100%** | 8,413 | **100%** | 7,098 | **98%** | 6,301 | **90%** |

## Timing of Investigations

- ### Time to Close Intake Investigations

Intake Investigations are required to be completed within 25 business days of the incident's date, although the Monitoring Team has utilized 30 days as a reasonable time frame when determining "timeliness" as it provides a reasonable grace period, beyond the deadline, in which to complete investigations. During this Monitoring Period, the time to complete Intake Investigations began to increase. For incidents that occurred between July and September 2023, 99% of cases were closed in 30 business days or less. However, beginning in October 2023, the

---

[57] All investigations of incidents that occurred prior to 2020 were closed during previous Monitoring Periods and thus are not included in this table.

[58] Incidents are categorized by the date they occurred, or date they were alleged to have occurred, therefore these numbers fluctuate very slightly across Monitoring Periods as allegations may be made many months after they were alleged to have occurred and totals are updated later.

proportion of Intake Investigations closed within 30 days began to decrease sharply. For incidents that occurred in October 2023, only about 90% of investigations closed within 30 business days. This decreased to 72% for incidents that occurred in November 2023 and 71% for incidents that occurred in December 2023. This is the first time since the inception of Intake Investigations where the proportion of cases meeting the deadline has decreased significantly and is cause for concern. The Monitoring Team has inquired as to the cause of the delays and the Department candidly reported the delays derive from poor leadership and management as well as an influx of new investigators and supervisors who require more time to complete their work as they acquaint themselves with their responsibilities.

- Time to Close Full ID Investigations

Full ID Investigations must be completed within 120 days of the incident's date. The table below shows the status of Full ID Investigations for all incidents that occurred between January 2022 and December 2023. Only 30% (n=454) were closed (or remained pending) within the 120-day timeline, while the remaining 70% were either closed (or remained pending) outside the required time frame. Therefore, the Department remains in Non-Compliance with the timing requirement for Full ID Investigations.

| Status of Full ID Investigations for incidents that *occurred* between January 2022-December 2023 *As of February 15, 2024*[59] | | | | |
|---|---|---|---|---|
| *Pending* less 120 Days or less | *Closed* within 120 Days | *Closed* Beyond 120 Days | *Pending* Beyond 120 Days | Total |
| 140 9% | 314 21% | 518 34% | 532 35% | 1,504 |

The increase in time to close Intake Investigations and the ongoing issues related to protracted Full ID Investigations impedes the Department's ability to impose timely corrective action. It is critical that corrective action is imposed as close in time as possible to the staff's misconduct in order to serve as an effective deterrent and provide an educational opportunity for staff to alter behavior in the future. It must also be noted that investigations must be completed in a manner so that the statute of limitations is not surpassed so the opportunity for corrective action is not missed entirely.

**Law Enforcement Referrals**

ID is required to swiftly refer any staff member whose conduct in a use of force incident appears to be criminal in nature to the Department of Investigation ("DOI"). The Monitoring Team has observed that, despite notable concerns regarding staff's behavior, the majority of cases do not escalate to criminal misconduct. This observation aligns with the small number of criminal prosecutions recorded thus far. ID has promptly made referrals for behavior that appears to be criminal in nature. The Department and the relevant law enforcement agencies routinely

---

[59] The Monitoring Team identified a calculation error in this data previously reported in the December 22, 2023 Monitor's Report (dkt. 666) at pg. 38. The corrected data in included in Appendix A.

collaborate and communicate about the status of cases that are referred for potential prosecution. In the eight years since the effective date of the Consent Judgment, 125 use of force cases have been referred to DOI or DOI has assumed responsibility for the investigation independent of a referral. Of that relatively small group of UOF cases, only **eight** cases have resulted in criminal charges (with another eight still being considered) over the life span of the Consent Judgment as shown in the table below.

| Law Enforcement Referrals As of December 31, 2023 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Date of Incident** | **2014 & 2015** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** | **Total** | |
| **Total** | **9** | **16** | **27** | **19** | **15** | **15** | **7** | **10** | **7** | **125** | |
| Criminal Charges Brought/ Trial Underway or Complete | 0 | 2 | 0 | 2 | 2 | 2 | 1 | 0 | 0 | **8** | **6%** |
| Pending Consideration with Law Enforcement | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 2 | **3** | **2%** |
| Returned to ID for Administrative Processing | 9 | 14 | 27 | 17 | 13 | 13 | 6 | 9 | 5 | **114** | **91%** |

As of December 2023, three cases were pending investigation with law enforcement; two were pending with DOI, and one was pending with the U.S. Attorney's Office for the Southern District of New York ("SDNY").

Historical trends indicate that most of the cases considered for criminal prosecution will not be prosecuted. That said, these cases often include very concerning conduct that can and must be addressed administratively. The Monitoring Team has noticed some improvement in the agencies' timeliness in reviewing a case for criminal charges and continues to encourage them to ensure these cases do not languish in their vast workload. Some overlap exists in the egregious cases identified by via the Action Plan requirement § F., ¶ 2 and cases being considered for criminal prosecution. The Monitoring Team has and will continue to work with law enforcement agencies to advise them of the aggressive timelines set for investigations pursuant to the Action Plan requirement § F., ¶ 2 ("F2").

**Completion of Intake Investigations and Referrals for Full ID Investigations**

All use of force incidents that occurred during this Monitoring Period received an Intake Investigation. In fact, when done properly, most cases can and should be addressed via the Intake Investigation. The majority of cases are closed following an Intake Investigation, but those that merit additional scrutiny, either because they meet specific criteria (e.g., Class A Incidents or Head-strikes) or because additional inquiry is necessitated by the facts of the case, must be referred for a Full ID Investigation. In 2022, ID was not referring cases for Full ID investigations as it was required to do.[60] In 2023, referral practices began to improve and 8% of cases were

---

[60] *See* Monitor's April 3, 2023 Report (dkt. 517) at pgs. 100-101 and 162-164.

referred for Full ID Investigations during this Monitoring Period. While this improvement is notable, the Monitoring Team continues to identify cases that should have been referred for a Full ID Investigation but were not. In addition, during this time, the number of cases identified as Class A or involving a head-strike decreased. The Monitoring Team intends to evaluate these more closely decreases to ascertain whether the change is a result of serious injuries/head-strikes occurring less frequently or whether something changed regarding the Department's reporting practices/incident categorizations.

## Full ID Investigations

When a case merits additional scrutiny beyond an Intake Investigation, a Full ID Investigation must be conducted. ID has long struggled to complete Full ID Investigations in a timely manner and the number of pending Full ID Investigations increased during this Monitoring Period. As of the close of this Monitoring Period, 672 cases were pending Full ID Investigation, compared to a pending caseload of 424 cases at the end of the 16th Monitoring Period. ID reported that the increase in its pending caseload was a result of insufficient staff and increased caseloads. Some Full ID Investigators have been assigned to address the ID lookback audits for cases closed between July 1, 2022 and March 31, 2023 (discussed in further detail later in this section). Given this diversion of resources to the lookback cases, ID has not been able to simultaneously address the *new* Full ID Investigations for incidents that happened more recently. ID reports that the staffing numbers required by the Court's August 10, 2023 Order §I.11 were determined before the lookback began and thus are now insufficient. ID's lack of capacity to timely manage the Full ID Investigation workload is concerning. The Monitoring Team has recommended that the Department take all steps to ensure it has adequate staff to meet its obligations in this area.

## Use of Force Priority Squad

The Use of Force Priority Squad ("UPS") is an important management tool to address some of the most serious and complex use of force cases. Having a dedicated squad for this purpose helps ID ensure these cases obtain the necessary scrutiny and attention. During this Monitoring Period, 36 cases were assigned to UPS and included a variety of egregious incidents, including cases in which staff members were suspended, cases that were returned to ID following an assessment for criminal charges by law enforcement, and 26 recommendations from the Monitoring Team.

UPS closed 26 cases during this Monitoring Period, all of which were referred for formal discipline and closed with charges, and 20 of the 26 (77%) incidents were closed in less than 120 days.[61] As of the end of the current Monitoring Period, UPS had 32 pending cases, including one

---

[61] This includes 14 cases identified as "F2" cases described further in the Compliance Assessment (Staff Discipline & Accountability) section of the report.

case that was identified for expedited closure pursuant to Action Plan, § F ¶ 2. 20 of the 32 cases were pending beyond 120 days.

**Quality of Investigations**

- Intake Investigations

The Monitoring Team reviews thousands of Intake Investigations each Monitoring Period. While the quality of the Intake Investigations do identify certain relevant information and types of policy violations (e.g., identifying Supervisor, line staff and secondary actors' failure to perform duties, reporting issues and BWC issues) in an organized, reader-friendly manner, the Intake Investigations still do not reliably identify all issues and/or misconduct, even when objective evidence is present, and/or fail to refer cases for additional scrutiny via Full ID Investigation when it is warranted. Most concerningly, during this Monitoring Period, Intake Investigations generally failed to identify operational and security failures that led to unnecessary uses of force, did not appear to correctly assess video evidence, failed to interview staff and/or PICs when necessary, and in some cases appeared to dismiss PICs' allegations and/or injuries without proper basis. Too often, evidence of staff misconduct was overlooked, false or incomplete staff reports were not identified, and if staff misconduct was identified in the intake investigation, insufficient corrective action was often recommended. Staff failures in preventing and responding to self-harm events were similarly overlooked. In short, too many Intake Investigations that ignored objective evidence of misconduct were closed and were not referred for appropriate follow-up or a Full ID Investigation when required. The fact that fewer Intake Investigations are completed within the required time frame further compounds the concerns and indicates that improving the quality of Intake Investigations must be a top priority.

- Full ID Investigations

The decline in the quality of Full ID investigations first observed in summer/fall 2022 has essentially remained. Investigations closed during this Monitoring Period (and the previous two Monitoring Periods) were often incomplete, inadequate, and unreasonable. Investigators failed to complete necessary interviews with staff or persons in custody, did not identify all salient issues, disregarded objective evidence of misconduct, discredited allegations from people in custody without evidence, and recommended insufficient employee corrective action. The backlog of pending full ID cases continued to grow larger. Nearly all cases were closed outside the 120-day timeline (perpetuating the Non-Compliance rating in timing), and the quality of many of the investigations was substandard and the findings could easily be discredited. Given the prominence of Full ID Investigations among the Department's tools for ensuring accountability for staff misconduct, this level of performance is concerning. In short, the Department's level of compliance with the requirements for Full ID Investigations continued to stagnate during the current Monitoring Period.

- Monitor Recommendations

Given the concerns with the quality of investigations, the Monitoring Team also submits feedback to the Department regarding certain investigations in which it appears that the objective evidence was not adequately investigated or analyzed and recommends that additional review may be necessary or appropriate. This is not a comprehensive review, but an attempt to mitigate the possibility that certain misconduct may not be addressed due to an insufficient investigation. In 2023, the Monitoring Team sent 74 of these recommendations regarding inadequate investigations for both intake investigations and full ID investigations. The fact that the Monitoring Team continues to identify this many cases that meet this threshold continues to raise concerns about the overall veracity of investigations.

## Quality Assurance

To elevate the veracity of its work product, ID is engaged in two quality assurance initiatives including a quality assurance audit of Intake Investigations and Full ID Investigations as well as a "lookback" at certain cases closed in 2022 with no charges. As discussed in more detail below, these efforts to assess the quality of investigations have identified problems very similar in substance and scope to those identified by the Monitoring Team. While the Monitoring Team has yet to fully assess whether the quality assurance process is sufficiently robust, the initial findings suggest that cases have been closed precipitously without identifying the full range of misconduct and policy violations that occurred.

- Intake and Full ID Investigation Audits

With respect to ID's quality assurance program, each week, the quality assurance team reviewed approximately 30 randomly selected closed intake investigations. In addition, each week in the last half of the Monitoring Period, the Deputy Director of ID reviewed approximately five Full ID cases that were closed with no charges. The audit of Full ID cases was temporarily suspended from June 27, 2023 to September 25, 2023 while the lookback assessment was completed.

*Audit of Intake Investigations.* As of January 12, 2024, a total of 980 Intake Investigations that were closed between January and October 2023 have been audited. The audit identified an issue of some type (ranging from minor to more serious) in 313 of the 980 cases (32%).

*Audit of Full ID Investigations.* As of January 16, 2024, a total of 39 Full ID investigations that were closed between April 2022 and December 2023 had been audited. The incident dates and audit completion dates are listed in the chart below. Of the 39 cases, four needed to be re-opened; 18 of the 39 cases warranted discussions with the assigned investigator team, and 23 of the 39 cases required an update to the Closing Report (in five cases, the update was required to address grammar). The sample size is very small, making it difficult to draw any conclusions from these findings and what it may say regarding the overall quality of Full ID investigations.

In addition to meeting with individual investigators to discuss findings, ID leadership also identified several common issues. The most common issues were presented by the head of the Quality Assurance division at ID's recent town hall on October 24, 2023. These issues include:

- o Failing to mention all injuries (including injuries to staff) and to identify the source of injuries;

- o Failing to preserve Genetec footage and/or failing to include the proper scope (i.e., 30 minutes before and after, until the person in custody is secured);

- o Failing to address problematic conduct captured on BWC (e.g., profanity, allegations made by people in custody) and failing to address staff who do not properly activate their BWC;

- o Failing to include relevant UOF Directive charges on MOCs;

- o Failing to address problematic staff conduct leading up to, during and after incidents (e.g., failing to address complaints from people in custody, failing to call Supervisors, behavior that escalates the issue, unprofessional statements/behavior, deploying OC from a dangerously close distance);

- o Failing to send Facility Referrals or reclassifications;

- o Failing to request staff medical documentation and failing to include all staff injuries in Closing Reports;

- o Failing to conform to the UOF Directive's requirements for photographs, photographing the wrong person, not including photographs of all individuals involved, failing to photograph staff and staff injuries;

- o Failing to verify that the facility took the corrective action indicated by the Rapid Review, failing to include the CD, MOC or Teletype reference number;

- o Failing to differentiate between unmanned posts and staff off post in Closing Reports, and lack of evidence to support unmanned post designation;

- o Inappropriately asserting that a certain investigative step will not change the outcome of an investigation.

- <u>Look Back Audits</u>

The second method for assessing the appropriateness of case closure in Full ID Investigations included a "lookback" audit. The audit's case selection criteria were developed in consultation with the Monitoring Team. These included cases that:

- Closed between July 2022 and December 2022 with no charges, or
- Involved members of ESU or certain staff who are frequently involved in uses of force, or

- Were classified as a Class A use of force or that involved a head-strike.

A total of 468 cases met a combination of these criteria and thus were selected for review. A team of ID's leadership (including the Deputy Commissioner and the former Associate Commissioner) assessed the quality of the investigative process in each case and the appropriateness of the investigations' outcomes.

ID's Leadership determined that 155 of the 468 cases (33%) should be re-opened for further investigation. Of the 155 cases, 20 have subsequently been closed (17 with charges and 3 without) and the rest remain under investigation as of the end of the Monitoring Period.

That ID has initiated a QA process is encouraging, as is its ability to identify consistent areas in need of improvement. ID's own findings demonstrate that additional work remains in order to ensure that the quality of investigations is adequate to meet the requirements of the *Nunez* Court Orders.

## Identifying Misconduct and Referrals for Discipline

The table below depicts the findings of Intake Investigations and Full ID Investigations that were closed as of January 31, 2024. For Intake Investigations, findings included a statement of whether the incident was "unnecessary," "excessive," and "avoidable." For Full ID Investigations, at the end of the Monitoring Period, the Department conducted a retrospective assessment of cases closed to determine if any were unnecessary or excessive and provided a report to the Monitoring Team and the Parties.[62] Given the Monitoring Team's concern about ID's failure to detect and hold staff accountable for misconduct, the continuing decrease in the proportion identified as excessive, unnecessary or avoidable is viewed with skepticism and concern.

---

[62] The Department and the Monitoring Team have not finalized an agreed upon definition of these terms. The categorizing the findings and developing corresponding data is complicated, particularly because qualitative information with slight factual variations must be categorized consistently. A concrete, objective and shared understanding of what each category is intended to capture is necessary to ensure reliable and consistent findings. Efforts were made in summer 2021 to finalize common definitions, but they were never finalized. The project has since languished given the focus on higher priority items.

| Investigations Findings *As of January 31, 2024* | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Incident Date** | *Feb. 3[63] to Jun. 2020 (10th MP)* | *July to Dec. 2020 (11th MP)* | *Jan. to Jun. 2021 (12th MP)* | *July to Dec. 2021 (13th MP)* | *Jan. to Jun. 2022 (14th MP)* | *Jul. to Dec. 2022 (15th MP)* | *Jan. to Jun. 2023 (16th MP)* | *Jul. to Dec. 2023 (17th MP)* |
| **Closed Intake Investigations** | **2,492** | **3,272** | **4,468** | **3,916** | **3,349** | **3,883** | **3,317** | **3,362** |
| - *Referred for Full ID* | 411 | 567 | 781 | 634 | 360 | 110 | 256 | 273 |
| - *Investigations Closed at Intake* | 2,081 | 2,700 | 3,687 | 3,285 | 2,989 | 3,773 | 3,061 | 3,089 |
| *Findings of Investigations Closed at Intake* | | | | | | | | |
| Investigations Closed at Intake | 2,081 | 2,700 | 3,687 | 3,285 | 2,989 | 3,773 | 3,061 | 3,089 |
| • *Excessive, and/or Unnecessary, and/or Avoidable* | *180* | *477* | *734* | *737* | *531* | *543* | *412* | *365* |
| • *Chemical Agent Violation* | *164* | *163* | *260* | *324* | *287* | *245* | *225* | *256* |
| *Findings of Closed Full ID Investigations* | | | | | | | | |
| Referred for Full ID | 411 | 567 | 781 | 634 | 360 | 110 | 256 | 273 |
| • *Excessive, and/or Unnecessary* | *72* | *86* | *75* | *51* | *62* | *59* | *30* | *9* |
| *Findings of Investigations closed after an Intake Investigation and after a Full ID Investigation* | | | | | | | | |
| Closed Investigations | 2,492 | 3,272 | 4,468 | 3,916 | 3,349 | 3,883 | 3,317 | 3,362 |
| • *Excessive, and/or Unnecessary, and/or Avoidable* | *252 (10%)* | *563 (17%)* | *809 (18%)* | *788 (20%)* | *593 (18%)* | *602 (16%)* | *442 (13%)* | *374 (11%)* |

- Intake Investigation Outcomes

Intake Investigations can be closed with no action, by referring the case for further investigation via a Full ID Investigation, or by referring the case for some type of disciplinary or corrective action (*e.g.*, MOC, PDR, Command Discipline, Re-Training, Facility Referral). With respect to cases closed with no action, in some, the violation identified by ID had already been identified by the facility via Rapid Review and ID determined that the recommended action by the Rapid Review was sufficient to address the violation. Therefore, "no action" cases are better

---

[63] Incidents beginning February 3, 2020 received Intake Investigations, so those incidents from the early part of the Tenth Monitoring Period are not included in this data.

understood as cases in which either no violation was identified, or ID *did not identify additional staff behaviors requiring disciplinary or corrective action*.

The number of cases that were resolved with a Facility Referral or Command Discipline increased during this Monitoring Period, with 54% of cases closed in this manner. A corresponding decrease occurred in the number of cases closed with no action. The proportion of incidents closed with no action continued to decrease during the 17th Monitoring Period (from 56% in the 15th Monitoring Period, to 49% in the 16th Monitoring Period, to 32% in the 17th Monitoring Period). The Department reports that it made a greater effort in 2023 to capture cases in the data where ID identified an issue but permitted the Facility to address it. Accordingly, the increased reporting of Facility Referrals and Command Disciplines does not necessarily reflect an increase in the frequency with which misconduct was detected, but rather, at least in part, better tracking. As discussed in prior Monitor's Reports, the Facility Referrals and CDs are not yet reliably effectuated and so the fact that a Facility Referral or CD was generated does not necessarily mean that action was taken. Given the multitude of issues that must be addressed, working to improve the reliability of Facility Referrals has not yet been a priority, but will need to be addressed. As discussed in other sections of this report, improving the adjudication of CDs is a work in progress.

Given the increase in time taken to close Intake Investigations, more investigations were pending at the end of the current Monitoring Period, so additional action may be taken after those cases are closed, and the proportion closed with no action would decrease accordingly.

| | Outcome of Intake Investigations[64] as of January 31, 2024[65] | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| **Incident Date** | *Feb. 3[66] to June 2020 (10th MP)* | *July to Dec. 2020 (11th MP)* | *Jan. to June 2021 (12th MP)* | *July to Dec. 2021 (13th MP)* | *Jan. to June 2022 (14th MP)* | *July to Dec. 2022 (15th MP)* | *Jan. to June 2023 (16th MP)* | *Jul. to Dec. 2023 (17th MP)* |
| Pending Intake Investigation | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 280 |
| **Closed Intake Investigation** | **2,492** | **3,272** | **4,468** | **3,916** | **3,349** | **3,883** | **3,317** | **3,362** |
| *No Action* | *1,060 43%* | *1,279 39%* | *1,386 31%* | *947 24%* | *1,249 37%* | *2,183 56%* | *1,609 49%* | *1,090 32%* |
| *MOC* | *47 2%* | *28 1%* | *48 1%* | *36 1%* | *22 1%* | *60 2%* | *77 2%* | *43 1%* |
| *PDR* | *6* | *2* | *0* | *0* | *1* | *3* | *3* | *3* |
| *Command Disciplines* | | | | | | | *101 3%* | *105 3%* |
| *Re-Training* | *148 6%* | *226 7%* | *342 8%* | *91 2%* | *35 1%* | *39 1%* | *87 3%* | *154 4%* |
| *Facility Referrals* | *820 33%* | *1,159 35%* | *1,903 43%* | *2,208 56%* | *1,646 49%* | *1,466 38%* | *1,179 36%* | *1,689 50%* |
| *Referred for Full ID* | *411 12%* | *567 17%* | *781 17%* | *634 16%* | *360 11%* | *111 3%* | *256 8%* | *273 8%* |
| *Data Entry Errors[67]* | | | | | *36* | *21* | *5* | *5* |
| **Total Intake Investigations** | **2,492** | **3,272** | **4,468** | **3,916** | **3,349** | **3,883** | **3,317** | **3,642** |

- Referrals for Formal Discipline

Most referrals to the Trials Division for formal discipline for use of force misconduct derive from Full ID Investigations, given their focus on serious and complex cases. While Intake Investigations can also lead to such referrals, this occurs less often. Despite many instances in

[64] It is important to note that the results of the Intake Investigations, for the purpose of this chart, only identify the highest level of recommended action for each investigation. For example, while a case may be closed with an MOC *and* a Facility Referral, the result of the investigation will be classified as "Closed with an MOC" in the chart.

[65] Other investigation data is this report is reported *as of* February 15, 2024 while the Intake Investigation data is reported *as of* January 31, 2024 because the data is maintained in two different trackers that were produced on two different dates. The number of pending Intake Investigations therefore varies between data provided "as of January 15, 2024" and "as of January 31, 2024," depending on which tracker was utilized to develop the necessary data.

[66] Incidents beginning February 3, 2020 received Intake Investigations, so those incidents from the early part of the Tenth Monitoring Period are not included in this data.

[67] These investigations had data entry errors in the Intake Squad Tracker. The Monitoring Team is unable to determine the outcome for these cases but is working with the Department to fix these errors.

which formal discipline seemed justified to the Monitoring Team, the overall rate of referral for formal discipline from use of force investigations has decreased since 2022.

Despite a similar number of closed Intake Investigations, the number of cases referred for formal discipline (via an MOC) decreased by 44% from 77 referrals in the 16th Monitoring Period to 43 referrals in the 17th Monitoring Period. This decrease is concerning as there are cases that can and should be referred for formal discipline following the closure of the Intake Investigation.

Combining outcomes for use of force Investigations, from 2016 to 2021, the average proportion of use of force incidents in which at least one staff member was referred for formal discipline was approximately 7%, which should be considered a minimum given the Department's well-documented struggles to identify all staff misconduct. Even so, for 2022 use of force incidents, the proportion in which at least one staff member was referred for formal discipline decreased to 5% and then further decreased to 3% among 2023 incidents.[68] Given the number of pending cases, this proportion may increase marginally, but is likely to remain concerningly low. This is particularly troubling because the Monitoring Team has not identified a change in the pattern and practice of unnecessary and excessive force that would account for the reduction in the frequency of referrals for formal discipline.



These outcomes underscore the Monitoring Team's concerns about the Department's scrutiny of use of force incidents and the overall quality of investigations (discussed more below). The frequency of referral for discipline typically *increases* as the quality of

---

[68] Some investigations of 2022 incidents (~200) and January to June 2023 incidents (~230) were pending when the charge analysis graph was developed, so some additional referrals for discipline may be forthcoming. The resolution of these pending investigations is not expected to alter the findings significantly.

investigations improves and the ability to identify misconduct is more consistent and reliable. and thus, the degradation in investigation quality continues to contribute to the decline in referrals for formal discipline.

## Conclusion

The Investigation Division has been in a state of turmoil for over a year. The poor quality of Intake and Full ID investigations along with the lack of timeliness of Full ID investigations continued during this Monitoring Period. The poor quality of Intake Investigations was particularly pronounced in this Monitoring Period, and the time to close intake investigations began to increase. Therefore, the Department is in Non-Compliance with the Consent Judgment requirements § VII, ¶¶ 1 and 9(a).

The Department has yet to initiate an upward trajectory with the quality of investigations in order to reverse the deterioration that resulted from insufficient staffing and poor leadership and management from the former Deputy Commissioner of ID and the former Assistant Commissioner of ID. The removal of the Assistant Commissioner following the close of the Monitoring Period appears to be an effort to reverse some of the mismanagement and dysfunction of ID's Intake unit. There is no doubt that ID investigators and their immediate supervisors are clearly working hard, but sufficient resources, direction, and staff support is needed to correct the current course of ID. The Division is in desperate need of strong, competent, and experienced leadership with supervisors at all levels who can ensure that investigations are conducted timely in a neutral and independent manner that objectively assesses all evidence without fear or favor.

| COMPLIANCE RATING | ¶ 1. Non-Compliance |
| | ¶ 9 (a). Non-Compliance |

## CONSENT JUDGMENT § X – RISK MANAGEMENT

| CJ § X. RISK MANAGEMENT, ¶ 1 (EARLY WARNING SYSTEM) |
|---|
| ¶ 1. *Early Warning System.* Within 150 days of the Effective Date, in consultation with the Monitor, the Department shall develop and implement an early warning system ("EWS") designed to effectively identify as soon as possible Staff Members whose conduct warrants corrective action as well as systemic policy or training deficiencies. The Department shall use the EWS as a tool for correcting inappropriate staff conduct before it escalates to more serious misconduct. The EWS shall be subject to the approval of the Monitor. |

a.  The EWS shall track performance data on each Staff Member that may serve as predictors of possible future misconduct.

b.  ICOs and Supervisors of the rank of Assistant Deputy Warden or higher shall have access to the information on the EWS. ICOs shall review this information on a regular basis with senior Department management to evaluate staff conduct and the need for any changes to policies or training. The Department, in consultation with the Monitor, shall develop and implement appropriate interventions and services that will be provided to Staff Members identified through the EWS.

On an annual basis, the Department shall review the EWS to assess its effectiveness and to implement any necessary enhancements.

This provision of the Consent Judgment requires the Department to have a system to identify and correct staff misconduct at an early stage, which the Department has elected to do through the Early Intervention, Support and Supervision ("E.I.S.S.") Unit. Further, § A, ¶ (3)(c) of the Action Plan requires the expansion of E.I.S.S. to support staff on disciplinary probation and supervisors during their probationary period. This provision also requires each facility to designate at least one supervisor responsible for working with the E.I.S.S. Unit to support the uniform staff who are in the E.I.S.S. program and to address any supervision deficiencies that are identified.

The goal of E.I.S.S. is to identify and support staff whose use of force practices would benefit from additional guidance and mentorship to improve practice and minimize the possibility that staff's behavior escalates to more serious misconduct. The table below depicts the work of E.I.S.S. between January 2020 and December 2023. Most of the 30 staff selected for monitoring during the 17th Monitoring Period were identified due to their placement on disciplinary probation (n=23)[69], with the remainder screened and selected for monitoring based on referrals from the Rapid reviews, Trials, ID, or the facilities.

---

[69] As required by § A, ¶ (3)(c) of the Action Plan.

| Overview of E.I.S.S. Program | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Jan. to Jun. 2020 (10th MP) | Jul to Dec. 2020 (11th MP) | Jan. to Jun. 2021 (12th MP) | Jul to Dec. 2021 (13th MP) | Jan. to Jun. 2022 (14th MP) | July to Dec. 2022 (15th MP) | Jan. to Jun. 2023 (16th MP) | July to Dec. 2023 (17th MP) |
| *Screening* | | | | | | | | |
| Staff Screened[70] | 158 | 60 | 82 | 35 | 64 | 53 | 66 | 30 |
| Staff Selected for Monitoring[71] | 38 | 35 | 53 | 24 | 50 | 49 | 63 | 26 |
| *Monitoring* | | | | | | | | |
| Staff Began Monitoring Term | 50 | 36 | 38 | 8 | 35 | 34 | 61 | 23 |
| Staff Actively Monitored[72] | 96 | 106 | 91 | 37 | 80 | 97 | 115 | 60 |
| Staff Completed Monitoring | 9 | 29 | 17 | 4 | 12 | 13 | 17 | 8 |

The Monitoring Team conducts monthly meetings with E.I.S.S. Leadership and receives updates on the screening and monitoring of staff. It has been reported that the E.I.S.S. program consistently faces constraints due to limited staffing and resources, an issue that has persisted over several Monitoring Periods without any meaningful change. In October 2023, the Deputy Director of E.I.S.S left the Department. As of April 2024, this position remains vacant and, to date, the Department has not initiated recruitment to fill the position. The delay in posting the position is reportedly due to bureaucratic red tape which is difficult to understand given the Department is simply seeking to backfill a role that already exists. Currently, the E.I.S.S. team consists of the Assistant Commissioner, a Deputy Warden, an Officer, a Captain, and a principal aide. The Action Plan mandates that each facility should appoint a supervisor ("ADW") to serve

---

[70] The number of staff screened for each Monitoring Period may include some staff who were screened in prior Monitoring Periods and were re-screened in the identified Monitoring Period. The "Program to Date" column reflects the total number of individual staff screened. Staff are only counted once in the "Program to Date" column, even if the staff member was screened in multiple Monitoring Periods.

[71] Not all staff selected for monitoring have been enrolled in the program. Certain staff left the Department before monitoring began. Other staff have not yet been placed on monitoring because they are on extended leaves of absence (*e.g.*, sick or military leave) or are serving a suspension. Finally, E.I.S.S. does not initiate a staff's monitoring term if the staff member has subsequently been placed on a no-inmate contact post due to the limited opportunity for mentorship and guidance.

[72] The total number of Actively Monitored Staff for each Monitoring Period includes all staff who began monitoring during the period, remained in monitoring throughout the Monitoring Period, completed monitoring, or had been enrolled in monitoring (but not yet started).

as a mentor to staff undergoing screening or monitoring by E.I.S.S. In this Monitoring Period, there is only one ADW assigned to E.I.S.S. Additionally, the Deputy Director departed during this Monitoring Period and has left a critical vacancy unfilled, further straining the program's capacity. This shortage of staff restricts the program's ability to efficiently screen and monitor staff, as well as provide timely, on-site mentorship, (particularly ADWs). As the chart above indicates, less than half the number of Staff were screened during this Monitoring Period (n=30) compared to the last (n=66). In fact, fewer staff were selected for screening during this Monitoring Period (n=26) than in any of the previous seven Monitoring Periods. E.I.S.S leadership reports the decrease in screening was primarily due to the unit's workload, which was focused on onboarding and monitoring the over 60 Captains and ADWs that were recently promoted. Further, the E.I.S.S leadership reports that facilities are underutilizing the E.I.S.S. referral column in the Rapid Reviews, suggesting that not all eligible candidates are being referred to the program. This indicates a reduction in the use of the Department's principal risk management strategy, despite no significant improvements in staff conduct.

The E.I.S.S. program is currently stagnant. With many competing priorities, it seems that resources and attention have shifted away from E.I.S.S., undermining its role as an early warning system and risk management tool. The program is operating under a sense of complacency, driven by a belief that no further support is forthcoming and, thus, is limited to working within its current constraints. The Department must redirect its focus towards E.I.S.S., by not only bolstering its staff but also ensuring that individuals meeting the criteria receive the necessary referrals and support. E.I.S.S continues to screen and monitor some staff within its resources, but the ongoing challenges in staffing and referrals have significantly hampered the program's ability to fulfill its purpose and maintain its effectiveness, leading to the Department's partial compliance with the requirement.

| COMPLIANCE RATING | ¶ 1. Partial Compliance |
|---|---|

## STAFF DISCIPLINE AND ACCOUNTABILITY

| |
|---|
| **CJ § VIII. STAFF DISCIPLINE AND ACCOUNTABILITY, ¶ 1 (TIMELY, APPROPRIATE AND MEANINGFUL ACCOUNTABILITY)** |
| **FIRST REMEDIAL ORDER § C. (TIMELY, APPROPRIATE, AND MEANINGFUL STAFF ACCOUNTABILITY), ¶ 1 (IMMEDIATE CORRECTIVE ACTION)** |
| **CJ § VIII. STAFF DISCIPLINE AND ACCOUNTABILITY, ¶ 3 (C) (USE OF FORCE VIOLATIONS)** |

| |
|---|
| Consent Judgment, § VIII. ¶ 1. *Timely, Appropriate, and Meaningful Accountability.* The Department shall take all necessary steps to impose appropriate and meaningful discipline, up to and including termination, for any Staff Member who violates Department policies, procedures, rules, and directives relating to the Use of Force, including but not limited to the New Use of Force Directive and any policies, procedures, rules, and directives relating to the reporting and investigation of Use of Force Incidents and video retention ("UOF Violations"). |
| First Remedial Order, § C. ¶ 1. *Immediate Corrective Action*. Following a Use of Force Incident, the Department shall determine whether any involved Staff Member(s) should be subject to immediate corrective action pending the completion of the Use of Force investigation, which may include counseling or re-training, reassignment to a different position with limited or no contact with Incarcerated Individuals, placement on administrative leave with pay, or immediate suspension (collectively, "immediate corrective action"). The Department shall impose immediate corrective action on Staff Members when appropriate and as close in time to the incident as practicable. The Department shall document and track any immediate corrective action taken, the nature of the initial corrective action recommended, the nature of the corrective action imposed, the basis for the corrective action, the date the corrective action is imposed, and the date of the Use of Force Incident resulting in the immediate corrective action. The requirements in this provision are not intended to alter the rights of Staff or the burden of proof in employee disciplinary proceedings under applicable laws and regulations. |
| Consent Judgment, § VIII. ¶ 3. *Use of Force Violations.* In the event an investigation related to the Use of Force finds that a Staff Member committed a UOF Violation:<br><br>. . .<br><br>    c.   The Trials Division shall prepare and serve charges that the Trials Division determines are supported by the evidence within a reasonable period of the date on which it receives a recommendation from the DCID (or a designated Assistant Commissioner) or a Facility, and shall make best efforts to prepare and serve such charges within 30 days of receiving such recommendation. The Trials Division shall bring charges unless the Assistant Commissioner of the Trials Division determines that the evidence does not support the findings of the investigation and no discipline is warranted, or determines that command discipline or other alternative remedial measures are appropriate instead. If the Assistant Commissioner of the Trials Division declines to bring charges, he or she shall document the basis for this decision in the Trials Division file and forward the declination to the Commissioner or designated Deputy Commissioner for review, as well as to the Monitor. The Trials Division shall prosecute disciplinary cases as expeditiously as possible, under the circumstances. |

This compliance assessment evaluates the provisions that require the Department to impose timely, appropriate, and meaningful accountability for use of force related violations (Consent Judgment § VIII., ¶ 1), the Department's use of immediate corrective action (First Remedial Order § C., ¶ 1), as well as the expeditious prosecution of cases for formal discipline

by the Trials Division (Consent Judgment § VIII., ¶3(c)). This compliance assessment covers the period between July through December 2023, the 17th Monitoring Period.

The provisions discussed in this section are distinct, but intrinsically interrelated because they *all* relate to the Department's accountability system. Progress towards compliance with the three provisions discussed in this assessment depends heavily on the Department's success in other areas, particularly in identifying misconduct via Rapid Reviews and investigations and in the imposition of formal discipline via the work of OATH. Discipline, regardless of when it is applied (e.g., as a result of a Rapid Review, following an Intake Investigation or Full ID Investigation, or via the formal discipline process), must be timely and proportional to the seriousness of the offense.

This section first provides an overview of the system for meaningful accountability, including overall data on staff discipline imposed at different points in the process. Next, this section discusses Immediate Action with detailed discussions of Command Discipline and the use of suspensions. Finally, this section discusses Formal Discipline, including the status of cases referred to the Trials Division, case dispositions, penalties imposed, situations where discipline was not applied, and the efficiency of the formal disciplinary process. The conclusion of this section summarizes the compliance assessment for each of the three provisions.

As this section will demonstrate, the Department's approach to managing misconduct faces critical challenges. First, there has been a noticeable decline in the identification of misconduct (discussed in various sections of this report), accompanied by fewer referrals for corrective action (including formal discipline). Second, although the resolution of a substantial backlog in the disciplinary system created an opportunity for more timely case processing, the Department has not yet capitalized on this potential for applying timely, meaningful discipline. The process is further compromised by various issues within OATH, including the logistics of managing cases to potentially questionable decision making on the merits. Overall, Defendants have not yet implemented a system that delivers timely and proportional accountability.

**<u>Overview of the Department's System for Meaningful Accountability</u>**

The Department identifies misconduct via Rapid Reviews, *ad hoc* incident reviews by civilian and uniform leadership, Intake Investigations (formerly Preliminary Reviews), and Full ID investigations. The Department also has various structures for responding to misconduct, including corrective interviews, 5003 counseling, re-training, Command Disciplines ("CD"), suspensions, modified duty, and even termination. Personal Determination Review ("PDRs") are utilized to address misconduct by *probationary* staff. For *tenured* staff, formal discipline is

imposed by the Department's Trials Division, generally via a Negotiated Plea Agreement ("NPA").[73]

As noted in other sections of this report and in prior Monitor's reports, the Monitoring Team continues to identify a decline in the Department's ability or willingness to identify misconduct via Rapid Reviews and ID investigations, perpetuating the enduring trend of unaddressed misconduct. This failure severely undermines the Department's overall accountability structure, which is a necessary component to operate a system that is safe and equitable for staff and incarcerated individuals. The failure to consistently identify misconduct contributes to the compliance ratings in this section because meaningful accountability is impossible in a system where misconduct is identified inconsistently. In other words, reliably identifying misconduct when it occurs is a prerequisite to achieving compliance with accountability-related provisions.

- <u>Staff Accountability</u>

The table below provides an overview of the accountability for use of force related misconduct imposed between January 1, 2019 and December 31, 2023. In 2023, the Department imposed significantly less discipline than the year prior, just over 1,600 cases in the six-month period, compared to nearly 3,000 cases in the previous twelve-month period in 2022. The reduction in cases processed was not entirely unexpected, given that the volume of discipline imposed in 2022 was artificially inflated when an enormous backlog of cases was finally resolved. That said, the decrease in overall cases also appears to be related, in part, to the Department's inability or unwillingness to identify misconduct.

---

[73] A Negotiated Plea Agreement is an agreed upon settlement between the Respondent uniform staff and the Trials Division attorneys.

| Accountability Imposed for Staff's Use of Force Related Misconduct 2019 to 2023 | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 2019[74] | 2020 | 2021 | 2022 | 2023 | Jan-Jun 2023 16th MP | Jul-Dec. 2023 17th MP |
| Support and Guidance Provided to Staff | | | | | | | |
| Corrective interviews and 5003 counseling | 2,700[75] | 1,378[76] | 3,205 | 2,532 | 1,651 | 689 | 962 |
| Corrective interviews (resulting from CDs) | 53 | 32 | 38 | 76 | 71 | 45 | 26 |
| Corrective Action—Command Discipline & Suspensions | | | | | | | |
| CD – Reprimand | 156 | 126 | 270 | 319 | 111 | 53 | 58 |
| CDs (resulting in 1-10[77] days deducted) | 879 | 673 | 794 | 739 | 749 | 431 | 318 |
| Suspensions by date imposed | 48 | 80 | 83 | 66 | 136 | 75 | 61 |
| Total | 1083 | 879 | 1147 | 1124 | 996 | 559 | 437 |
| Formal Discipline | | | | | | | |
| PDRs | 81 | 49 | 2 | 1 | 22 | 10 | 12 |
| NPAs | 218 | 327 | 460 | 1808 | 624 | 262 | 362 |
| Total | 299 | 376 | 453 | 1778 | 646 | 272 | 374 |
| Total Number of Staff Held Accountable | | | | | | | |
| Total | 1381 | 1255 | 1600 | 2902 | 1642 | 831 | 799 |

[74] Counseling that occurred in the Eighth Period was focused on a more holistic assessment of the staff member's conduct pursuant to specific standards set by § X (Risk Management), ¶ 2 that has been subsequently revised. *See* Monitor's October 28, 2019 Report (dkt. 332) at pgs. 172-173.

[75] The identification of staff for counseling was in transition in the Ninth Monitoring Period as a result of a recommendation by the Monitoring Team. *See* Monitor's May 29, 2020 Report (dkt. 341) at pgs. 194-196.

[76] The Department transitioned the process for identifying staff for counseling during this Monitoring Period. *See* Monitor's October 23, 2020 Report (dkt. 360) at pgs. 168-170.

[77] Beginning in October 2022, CDs could be adjudicated for up to 10 compensatory days, but only a very small number of CDs (~88 CDs in total) were adjudicated for 6-10 days for use of force-related misconduct that occurred in January-December 2023.

- <u>Supervisory Accountability</u>

The Department reported the following data on accountability imposed against facility leadership and supervisors for use of force related misconduct, inefficient performance of duties and/or inadequate supervision.

| Accountability for Facility Leadership and Supervisors, June 2022 to December 31, 2023 | | | |
|---|---|---|---|
| | Warden/ Assistant Commissioner | Deputy Warden | Assistant Deputy Warden |
| Formal Discipline | 0 | 1 case (involving 1 DW) | 31 cases (involving 18 ADWs) |
| Suspension | 0 | 0 | 4 |
| Command Discipline | 0 | 0 | 47 |
| 5003 Counseling | 0 | 0 | 22 |
| Corrective Interview | 0 | 1 | 39 |
| Retraining | 0 | 0 | 1 |

Given the volume and pervasiveness of issues regarding the use of force, inefficient performance of duties and inadequate supervision identified by the Monitoring Team during its routine review of incidents, the fact that so few disciplinary actions have been taken against facility leaders and supervisors during an 18-month period is troubling. Not only do facility leaders and supervisors serve as role models for expected practice, but they also have an affirmative duty to supervise and correct poor staff practice when it occurs in their presence. The Monitoring Team frequently identifies situations where leaders and supervisors have not upheld these responsibilities and yet no corrective action has been taken. The Monitoring Team described two such examples in the Monitor's July 10, 2023 Report (dkt. 557) at pgs. 138-139.

**Immediate Corrective Action**

Immediate corrective action (suspension, re-assignment, counseling, and Command Discipline) is essential to ensure that blatant misconduct is addressed swiftly. Immediate corrective action is a necessary tool for addressing misconduct because it allows the Department, close-in-time to the incident, to hold staff to a common standard for utilizing force, particularly when serious deviations from that standard are immediately obvious upon the incident's review. Rapid Reviews, *ad hoc* incident reviews by uniform or civilian leadership, and Intake Investigations are each responsible for identifying misconduct that requires immediate corrective action. Rapid Reviews remain the first opportunity to do so and although they detect some misconduct, since their inception, the Monitoring Team has found that they often fail to identify *all* misconduct observed via the available evidence. Further detail on the corrective actions

imposed via Rapid Reviews is provided in the Compliance Assessment of First Remedial Order § A., ¶ 1 of this Report.

The table below presents data on the immediate corrective action imposed between January 2020 and December 2023.

| Immediate Corrective Action Imposed for UOF Related Misconduct by Incident Date | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Type | Jan.-June 2020 | July-Dec. 2020 | Jan.-June 2021 | July-Dec. 2021 | Jan.-June 2022 | July-Dec. 2022 | Jan.-June 2023 | July – Dec. 2023 |
| Counseling and Corrective Interviews[78] | N/A | 1,337 | 1,509 | 1,733 | *1,661* | *947* | *746* | *1,048* |
| Suspension | 38 | 42 | 58 | 25 | *34* | *41* | *65* | *59* |
| Non-Inmate Contact Post or Modified Duty | 4 | 1 | 3 | 3 | *12* | *4* | *9* | *5* |
| *Suspensions & Non-Inmate Contact Post or Modified Duty* | *42* | *43* | *55* | *26* | *39* | *45* | *74* | *64* |
| CD – Reprimand | 37 | 89 | 150 | 120 | *134* | *185* | *53* | *58* |
| CDs (resulting in 1-10[79] days deducted) | 263 | 410 | 511 | 283 | *291* | *448* | *431* | *318* |
| **Total Immediate Action** | **342** | **1,879** | **2,231** | **2,164** | **2,132** | **1,625** | **1,297** | **1,552** |

- Counseling and Corrective Interviews

Counseling and Corrective Interviews[80] are common outcomes of Rapid Reviews. During this monitoring period, 1,048 counseling and corrective interviews were conducted. This represents an increase from the figures recorded in the previous two periods yet remains substantially below the peak of 1,733 observed in the latter half of 2021. However, as noted in previous Monitor's Reports, gauging the quality of counseling sessions remains difficult. Given the poor quality of in-the-moment supervision in the facilities, it is likely that counseling sessions—delivered by these same Supervisors—are similarly limited in their ability to improve behavior and staff practice. It does not appear that counseling and corrective interviews are a

---

[78] NCU confirmed the number of Counseling and Corrective interviews in the above chart occurred.

[79] In October 2022, the Department promulgated a revised Command Discipline policy which expanded the potential penalty of a command discipline from a maximum of 5 days to 10 days.

[80] Corrective Interviews are considered part of the disciplinary continuum and become part of a Staff Member's personnel file for a specified period of time. Counseling sessions (including 5003 counseling sessions) are not considered disciplinary in nature and are not included in a member's personnel file.

sufficient mechanism to alter staff practice as little to no change in staff practice has been observed despite reports of its frequent use.

- <u>Suspension, No Contact Posts and Modified Duty</u>

The use of suspension, no contact posts and modified duty as immediate corrective actions are critical to the goal of timely, proportional responses to misconduct. During this Monitoring Period, the former Commissioner issued a directive that he must approve all suspensions recommended by the Assistant Commissioners of each facility. It was further reported that the former Commissioner also required his approval for all ID-recommended suspensions. In the Monitoring Team's experience, the fact that Facility leadership cannot effectuate immediate action with staff is unusual. First, it hinders the necessary leadership within each facility by undercutting their authority, and it is also time-consuming to add an additional layer of review, potentially impeding the ability to address issues timely. Further, facility leadership reported that conflicting guidance in this area created uncertainty about who is authorized to initiate a suspension, so some suspensions may not have occurred as a result. The Monitoring Team has recommended to the current Commissioner that revised guidance on the issuance of suspensions be issued.

The Department suspended more staff in 2023 for use of force related violations than in any of the previous 3 years. In fact, slightly over double the number of staff were suspended for use of force misconduct than in the previous year. The number of staff suspended waned in the second half of 2023 compared to 2022. Among incidents that occurred during the current Monitoring Period, 61 staff were suspended for use of force policy violations, which is fewer than the previous Monitoring Period (n=75) but remains higher than each of the Monitoring Periods before 2023(as shown in both the table above, and the table below). The Monitoring Team will closely evaluate whether a downward trend emerges.

The number of staff suspended for use of force misconduct during this Monitoring Period—over 10 staff per month—suggests that harmful staff practices continue to be endemic in this Department. The misconduct that warranted suspension includes staff's inappropriate use of head-strikes, chokeholds, kicks, and body slams; use of racial slurs; failures to intervene; and staff having abandoned their posts. Some of these actions by staff against people in custody were retaliatory, punitive, and designed to inflict pain. Many of these cases appear to involve misconduct that likely will require the Department to seek termination of these individuals pursuant to § VIII, ¶ 2(d) of the Consent Judgment. In a well-run safe jail system, such incidents are isolated and rare, but they appear to be near commonplace in this Department.

The table below shows the number of staff who were suspended for various types of misconduct between January 2020 and December 2023.

| Number of and Reason for Staff Suspensions by Date of Suspension | | | | | | |
|---|---|---|---|---|---|---|
| Reason | 2020 | 2021 | 2022 | 2023 | Jan. to Jun 2023 | July to Dec. 2023 |
| Sick Leave | 39 | 138 | 311 | 110 | *68* | *42* |
| Conduct Unbecoming | 92 | 128 | 100 | 160 | *84* | *76* |
| Use of Force | 78 | 82 | 66 | 136 | *75* | *61* |
| AWOL | 0 | 165 | 99 | 22 | *17* | *5* |
| Arrest | 60 | 70 | 32 | 23 | *9* | *14* |
| Inefficient Performance | 44 | 29 | 39 | 74 | *22* | *52* |
| Electronic Device | 18 | 4 | 10 | 9 | *4* | *5* |
| NPA | 10 | 6 | 17 | 19 | *12* | *7* |
| Other | 6 | 4 | 11 | 22 | *7* | *15* |
| Contraband | 7 | 5 | 0 | 3 | *3* | *0* |
| Erroneous Discharge | 5 | 0 | 2 | 0 | *0* | *0* |
| Abandoned Post | 0 | 0 | 1 | 4 | *1* | *3* |
| **Total** | **359** | **631** | **688** | **582** | *302* | *279* |

- Command Discipline

A Command Discipline ("CD") is a corrective action that can be imposed at the facility-level. It is a necessary accountability tool because it can be completed closer-in-time to when an incident occurs compared to formal discipline. A CD can result in corrective interview, reprimand, or the loss of compensatory days.

The Monitoring Team has long supported the expanded use of CDs. It is a tool that the Department needs, but it must be utilized appropriately and properly managed. To date, the Department has *not* demonstrated an ability to reasonably manage CDs to ensure that they are processed as they should be, as illustrated via the discussion below. This issue has been extensively reported by the Monitoring Team over the years and the current deficiencies continue to undermine the overall disciplinary process.[81]

---

[81] *See*, for example, the Monitor's April 3, 2023 Report (dkt. 517) at pgs. 108 and 180-183.

    o   *Command Discipline Policy*

In order to both expand the use of CDs and to address the processing issues long identified by the Monitoring Team, the CD policy was updated on October 27, 2022.[82] Despite the revisions in policy, which were intended to improve practice, a large number of CDs continued to be dismissed and there was an ongoing overreliance on the lowest level sanctions. In addition, in at least some cases, a CD was issued which precludes the issuance of formal discipline. The issuance of a CD must never undermine the Department's ability to issue formal discipline when it is necessary. As a result, the Department reported it would again revise the policy beginning at the end of 2022. However, the Department did not proceed with the revisions in a timely manner resulting in the Court ordering enhancements to the CD process in its August 10, 2023 Order. While the Department shared a number of draft versions of the policy with the Monitoring Team at the end of 2023 and early 2024, the policy still has not been updated as described in more detail in the Update on the *Nunez* 2023 Court Orders section of this report. In short, the process to revise the CD Directive as required remains unnecessarily protracted and the policy still has not been revised.

    o   *Adjudication of Command Discipline from Rapid Reviews*

CDs are adjudicated in two different ways. First, a CD can be issued and adjudicated by Facility leadership (and following the close of this Monitoring Period, ICDU). Second, the Trials Division can also settle formal disciplinary charges with a CD. A discussion about the Trials Division's use of CDs comes later in this section.

This discussion focuses on the adjudication of CDs following a recommendation from the Rapid Reviews. The table below summarizes the outcome of those CDs since 2019 based on an analysis conducted by NCU. Of the 722 CDs recommended in the current Monitoring Period, 450 (62%) have been adjudicated and resulted in a substantive outcome (*e.g.* days deducted, a reprimand, a corrective interview, or a MOC), while 172 (23%) were dismissed or not processed, and 100 (14%) are still pending.

---

[82] These revisions were made pursuant to Action Plan § F, ¶ 3 and as described in the Monitor's April 3, 2023 Report (dkt. 517) at pgs. 180-181. The revisions were intended to ensure that, among other things: (1) CDs would no longer be dismissed for due process violations and (2) the Department did not automatically defer to the lowest level sanction. Unfortunately, the revised policy has not accomplished either goal.

| Month of Incident/ Rapid Review | Total # of CDs Recommended | Still Pending in CMS | | Resulted in 1-10 Days Deducted[83] | | Resulted in MOC | | Resulted in Reprimand | | Resulted in Retraining | | Resulted in Corrective Interview | | Dismissed at Hearing or Closed Administratively in CMS | | Never Entered into CMS | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *Status and Outcome of Command Disciplines Recommended by Rapid Reviews* *As of December 2023 NCU Report* | | | | | | | | | | | | | | | | | |
| *2019* | *1635* | *7* | *0%* | *879* | *54%* | *122* | *7%* | *156* | *10%* | | | *53* | *3%* | *360* | *22%* | *41* | *3%* |
| *2020* | *1440* | *15* | *1%* | *673* | *47%* | *108* | *8%* | *126* | *9%* | | | *32* | *2%* | *399* | *28%* | *82* | *6%* |
| *2021* | *2355* | *65* | *3%* | *794* | *34%* | *281* | *12%* | *270* | *11%* | | | *38* | *2%* | *744* | *32%* | *162* | *7%* |
| *2022* | *2123* | *64* | *3%* | *739* | *35%* | *128* | *6%* | *319* | *15%* | | | *76* | *4%* | *608* | *29%* | *189* | *9%* |
| *2023* | *1729* | *192* | *11%* | *749* | *43%* | *104* | *6%* | *111* | *6%* | *5* | *0%* | *71* | *4%* | *397* | *23%* | *100* | *6%* |
| *Jan.-Jun. 2023 (16th MP)* | *1007* | *92* | *9%* | *431* | *43%* | *60* | *6%* | *53* | *5%* | *1* | *0%* | *45* | *4%* | *279* | *28%* | *46* | *5%* |
| *Jul.-Dec. 2023 (17th MP)* | *722* | *100* | *14%* | *318* | *44%* | *44* | *6%* | *58* | *8%* | *4* | *1%* | *26* | *4%* | *118* | *16%* | *54* | *7%* |

*\*CDs pending for more than a year are not tracked in the CD reports analyzed for this chart and therefore may still appear pending although it is likely they have since been dismissed.*

- ▪ *Dismissal of CDs*

Data on the adjudication of CDs reveals a number of concerns. Most importantly, CDs are not all processed as they should be. While dismissing a CD may be appropriate at times, the high dismissal/administrative closure/not entered into CMS rate (23%) demonstrates that due process violations and other errors undercut the integrity of the process.

More specifically, of the 172 cases dismissed or not processed during the current Monitoring Period:

o 72% (n=124) were dismissed because of due process violations (meaning the hearing did not occur within the required timeframes outlined in policy), because of a clerical error which invalidated the CD, or because the CD was not entered into CMS at all or not drafted within the required timeframe. These cases reflect a failure to properly manage an essential accountability tool.

o 28% (n=48) were dismissed for factual reasons including in response to a hearing on the merits, or because a staff member resigned/retired/was terminated. Additional scrutiny of these cases is merited as a review of some cases suggests the possibility that the determination that the charges cannot be sustained for factual reasons may not be made in a neutral and objective manner.

During this Monitoring Period, the Department informed the Monitoring Team that it intended to dismiss a large number of CDs (this included CDs referred via Rapid Reviews as noted in the chart above as well as CDs referred from all other sources) because of due process violations. The Department initially reported that 1,300 cases might need to be dismissed.

---

[83] In October 2022, the Department promulgated a revised Command Discipline policy which expanded the potential penalty of a command discipline from a maximum of 5 days to 10 days.

However, in response to subsequent requests, the Department then reported that the number of cases that might need to be dismissed was less than 1,300. The Monitoring Team has been unable to confirm the total number of cases that might need to be dismissed for due process violations. The fact that it has been difficult to ascertain the complete universe of cases only reinforces the concerns related to management of CDs.

Allowing misconduct to go unaddressed is in direct contravention of the *Nunez* Court Orders and highlights the fragile nature of the Department's systems for processing staff discipline. The Monitoring Team has made multiple recommendations to ensure timely processing of CDs by the facilities, but the Department has failed to make the required improvements, resulting in this significant gap in accountability. The Monitoring Team has recommended the Department take steps to mitigate the loss of CDs for due process reasons for many years. The Department is working to identify some options to mitigate the potential loss of cases and consulting with the Monitoring Team on next steps.

> ▪ *CD Penalties*

The penalties imposed via CD suggests that the outcome is not always reasonable. Facility leadership tends to over-rely on reprimands and corrective interviews (on average, about 12% of closed CDs are resolved with either a reprimand, retraining, or corrective interview) and/or have applied penalties at the lowest end of the range in terms of the number of compensatory days taken. While less significant penalties are certainly appropriate in some cases, they must be proportional to the misconduct at issue. The Monitoring Team has identified situations in which these lower-level penalties do not appear proportional to the outcome, therefore scrutiny of these lower-level penalties is warranted.

The Monitoring Team has also identified cases in which a CD was utilized when it should not have been given the severity of the misconduct at issue. Furthermore, the imposition of a CD foreclosed the opportunity to impose formal discipline in these cases. A particularly egregious example occurred during this Monitoring Period: a CD was adjudicated for a use of force policy violation, even though a CD is not permitted by policy for this type of violation *and* ID had issued an order not to proceed with the CD. This case was also identified by the Monitoring Team as an ¶ F2 case, which are cases identified as particularly egregious such that the investigation and formal disciplinary charges should be expedited by the Department pursuant to Action Plan § F., ¶ 2. Despite all of this, the CD was adjudicated and the ability for the Department to seek formal discipline was foreclosed due to double jeopardy.

> o *Centralized Processing of CDs*

The Department determined that creating a centralized unit to process and manage CDs would help to mitigate the issues with processing CDs. The Informal Command Discipline Unit ("ICDU") was created in this Monitoring Period, but only began to adjudicate CDs in 2024 after the close of the Monitoring Period. The goal of the ICDU is to process all CDs going forward.

The ICDU is managed by an Assistant Chief and includes three ADWs who will conduct the CD hearings. The Department reported the unit will also require the assistance of support staff. The ICDU is a promising initiative, but it is critical that the staff of ICDU is aware of and can address the many failures of CD processing in the past. To that end, the Monitoring Team has recommended that the work of ICDU be closely scrutinized by NCU. The results of any audits conducted by the NCU should be routinely evaluated by ICDU to address any deficiencies in practice or procedure that are identified. The Department reported it will consult with the Monitoring Team on this process going forward.

- Overall Status of Immediate Corrective Action

Immediate corrective action is essential to ensure that blatant misconduct is addressed swiftly. It must be acknowledged that a significant amount of immediate action is imposed, as it must be given the rampant violations of security protocols, operational failures, and misuse of force. However, it must be noted that, to date, these actions have not materially altered staff practice. This may be due, in part, to the inconsistent use of immediate action and poor management of these initiatives. At present, the Department's methods for promptly addressing misconduct remain flawed and are significantly underutilized.

**Formal Discipline**

Formal discipline may be imposed for tenured staff once misconduct has been substantiated and the matter is adjudicated. Between November 1, 2015, and December 31, 2023, the Department resolved over 5,180 cases via formal discipline. The table below presents the status of all cases referred for formal discipline (by *incident date*). In 2023, only 318 cases (stemming from 226 use of force incidents occurring in 2023) were referred for formal disciplinary action which is a notable decrease in the number of referrals from prior years. Given the large number of pending investigations, the number of cases referred for discipline from 2023 incidents is likely to increase. However, it must be noted that the current figure reflects the lowest number of referrals of the past seven years, marking a 69% reduction from the peak of 1,027 disciplinary referrals in 2019. Given the expansion of the CD Directive some reduction in case referrals is to be expected but that alone does not account for the significant drop-off observed. The sharp drop in formal discipline referrals is particularly alarming, considering the high frequency of use-of-force incidents and incidents with serious misconduct that have been observed by the Monitoring Team via its incident reviews.

| Status of Disciplinary Cases & Pending Investigations by Date of Incident *As of December 2023* | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2016 | | 2017 | | 2018 | | 2019 | | 2020 | | 2021 | | 2022 | | 2023 | |
| **Total Individual Cases** | 471 | | 620 | | 783 | | 1027 | | 695 | | 715 | | 554 | | 318 | |
| **Closed Cases** | 470 | 99% | 614 | 99% | 772 | 99% | 1011 | 98% | 684 | 98% | 711 | 99% | 441 | 80% | 143 | 45% |
| **Pending Cases** | 1 | 1% | 6 | 1% | 11 | 1% | 16 | 2% | 11 | 2% | 4 | <1% | 113 | 20% | 175 | 55% |
| | | | | | | | | | | | | | | | | |
| **Unique UOF Incidents** | ▉ | | 466 | | 606 | | 450 | | 563 | | 366 | | 226 | | | |
| | | | | | | | | | | | | | | | | |
| **Pending Invests.** | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | 153 | | 1126 | |

While the number of cases pending for long period of times has decreased as a result of significant work to reduce the backlog, 162 cases with incident dates from more than a year ago (*i.e.,* 2022 or earlier) remain pending, and thus the opportunity for *timely* discipline has clearly been lost.

- Backlog of Pending Formal Disciplinary Cases

At the height of the problem in 2021, the Trials Division had a backlog of almost 2,000 cases pending discipline. As a result, the Third Remedial Order required the Trials Division to close a group of 400 priority cases and then to close the rest systematically. To facilitate this effort, the Monitoring Team was required to identify and recommend steps that the City, Department, and OATH should take to close the cases remaining in the backlog.

The Monitoring Team *first* recommended that the Department close all pending cases for incidents that had occurred as of December 31, 2020 ("the 2020 backlog") by the end of 2022 (*see* the Monitor's June 30, 2022 Report (dkt. 467) at pgs. 35-37). At the time, the 2020 backlog included 1,100 cases. As of the end of the current Monitoring Period, all but 45 of these cases (96%) had been resolved.

With the essential elimination of the 2020 backlog, the Monitoring Team recommended that the Department close the backlog of cases with an incident date between January 1, 2021, and June 30, 2022 ("the 2021 backlog"). At that time, the 2021 backlog included 285 cases. As of this Monitoring Period, 246 of the 285 (86%) 2021 backlog cases had been resolved. The Department reports the majority of the 39 cases open involve MOS who are currently out on approved leave or pending criminal prosecution and so the cases cannot currently be adjudicated.

The significant work in addressing the backlog of disciplinary cases and the smaller number of cases referred for formal discipline means that fewer cases were pending at the close of the current Monitoring Period than what has been observed over the past few years. As of the end of 2023, the number of cases pending dropped to its lowest level since December 2018.

| Disciplinary Cases Pending *as of December 2023* | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| As of the last day of… | June 2018 (6th MP) | Dec. 2018 (7th MP) | June 2019 (8th MP) | Dec. 2019 (9th MP) | June 2020 (10th MP) | Dec. 2020 (11th MP) | June 2021 (12th MP) | Dec. 2021 (13th MP) | June 2022 (14th MP) | Dec. 2022 (15th MP) | Jun. 2023 (16th MP) | Dec. 2023 (17th MP) |
| Pending Cases | *146* | *172* | *407* | *633* | *1,050* | *1,445* | *1,917* | *1,911* | *1,129* | *409* | *435* | *337* |

It must be emphasized that the various concerns regarding investigations of UOF by ID will continue to impact the Trials Division. First, ID's ability to timely address cases remains a challenge and has a bottle-neck effect on the pipeline of cases that can reach Trials. Second, ID is not currently referring all cases it should for formal discipline. As ID's ability to address cases timelier improves, the number of cases referred to the Trials Division is expected to increase, given the ongoing staff misconduct that the Monitoring Team continues to identify.

- Timeliness of Formal Discipline

The Trials Division coordinates with multiple stakeholders to resolve a case, including the respondent (and their counsel) as well as OATH (to the extent a pretrial conference or trial is needed). The Department's ability to prosecute cases expeditiously has been of significant concern for many years and its slow rate of progress has resulted in additional requirements in the First Remedial Order (§ C. ¶¶ 3 to 5), the Third Remedial Order, and the Action Plan (§ F). The Monitoring Team's timeliness assessment and data in the tables below begin *after* the investigation has been closed and referred to Trials, examining the time required to process a case once received by the Trials Division.

The time between the incident date and case closure/pending is shown in the table below. Among the 362 cases closed via NPA during this Monitoring Period, 181 (50%) addressed misconduct that occurred within one year of case closure, 137 (38%) addressed misconduct that occurred between 1 and 2 years prior, 41 (11%) addressed misconduct that occurred 2 to 3 years prior, and 3 (1%) addressed misconduct that occurred more than three years before the case was ultimately resolved. Historically, the discipline imposed by the Department occurred many years after the incident, which detracted from the meaningfulness of the discipline (For example, in January 2021, of the 2000 cases that were closed since the Consent Judgement's effective date, 87% were closed after more than one year of the incident date[84]).

---

[84] See Monitor's May 11, 2021 Report (dkt. 368) at pgs. 225-226

| Time Between Incident Date and NPA Case Closure or Pending, as of December 31, 2023 | | | | | | |
|---|---|---|---|---|---|---|
| | Closed Discipline (n=362) | | Pending Discipline (n=337) | | Total (n=699) | |
| 0 to 1 year from incident date | 181 | 50% | 250 | 74% | 431 | 62% |
| 1 to 2 years from incident date | 137 | 38% | 9 | 3% | 146 | 21% |
| 2 to 3 years from incident date | 41 | 11% | 17 | 5% | 58 | 8% |
| More than 3 years from incident date | 3 | 1% | 61 | 18% | 64 | 9% |

- Time that Cases Have Been Pending with Trials

Another way to examine timely prosecution is to examine how long cases have been pending with the Trials Division.

Collectively, a number of changes have significantly expedited the Trials Division's case-handling capabilities over the last few years, although further improvement is necessary.[85] The length of time to case closure—measured from the date the case was referred to Trials from ID—has improved. In 2023, 58% of cases (n=433) were closed within six months of referral, and another 23% (n=174) were closed between six months and one year of referral. In other words, approximately 80% of the cases closed during this Monitoring Period were closed within one year of referral. This is a significant improvement from 2021/2022 when case processing slowed down due to the backlog and subsequent workload for Trials attorneys.

---

[85] See Monitor's June 30, 2022 Report (dkt. 467) at pgs. 27-38 and Monitor's December 22, 2021 Report (dkt. 435) at pgs. 4-12.

| Time from Referral to Trials to Complete Closing Memo 2017 to Dec. 2023 | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2017 | | 2018[86] | | 2019[87] | | 2020 | | 2021 | | 2022 | | 2023 | | Jan to June 2023 | | July to Dec. 2023 | |
| Cases Closed | 492 | | 521 | | 271 | | 387 | | 736 | | 2,052 | | 754 | | 342 | | 412 | |
| 0 to 3 months | 68 | 14% | 282 | 54% | 62 | 23% | 75 | 19% | 40 | 5% | 158 | 8% | 217 | 29% | 114 | 33% | 103 | 25% |
| 3 to 6 months | 64 | 13% | 92 | 18% | 65 | 24% | 65 | 17% | 88 | 12% | 175 | 9% | 216 | 29% | 84 | 25% | 132 | 32% |
| 6 to 12 months | 124 | 25% | 54 | 10% | 89 | 33% | 121 | 31% | 210 | 29% | 400 | 19% | 174 | 23% | 64 | 19% | 110 | 27% |
| 1 to 2 years | 146 | 30% | 51 | 10% | 35 | 13% | 98 | 25% | 284 | 39% | 782 | 38% | 119 | 16% | 61 | 18% | 58 | 14% |
| 2 to 3 years | 70 | 14% | 10 | 2% | 5 | 2% | 14 | 4% | 81 | 11% | 370 | 18% | 18 | 2% | 11 | 3% | 6 | 1% |
| 3+ Years | 20 | 4% | 9 | 2% | 6 | 2% | 2 | 1% | 11 | 1% | 95 | 5% | 6 | 1% | 4 | 1% | 3 | 1% |
| Unknown | 0 | 0% | 23 | 4% | 9 | 3% | 12 | 3% | 22 | 3% | 72 | 4% | 4 | 1% | 4 | 1% | 0 | 0% |

Given the backlog, over 1,000 cases remained opened at the end of each of the Monitoring Periods from 2020 to 2022, with about one-third pending for over one year. At the end of the current Monitoring Period, the Department had far fewer pending cases (n=337) and only 12% were pending for over one year, and about 40% were pending for 120 days or less from the service of charges.

---

[86] Data for 2017 and 2018 was calculated between MOC received date and date closing memo signed.

[87] Data for 2019 and 2020 was calculated between date charges were served and date closing memo signed.

| Number of Cases Pending with Trials and Time Pending | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | July to Dec., 2019 | | Jan. to June, 2020 | | July to Dec., 2020 | | Jan. to June, 2021 | | July to Dec., 2021 | | Jan. to June, 2022 | | July to Dec., 2022 | | Jan. to June, 2023 | | July to Dec., 2023 |
| | *9th MP* | | *10th MP* | | *11th MP* | | *12th MP* | | *13th MP* | | *14th MP* | | *15th MP* | | *16th MP* | | *17th MP* |
| *Pending service of charges* | 37 | 6% | 42 | 4% | 47 | 3% | 64 | 3% | 84 | 4% | 55 | 5% | 36 | 9% | 23 | 5% | 39 | 12% |
| *Pending 120 days or less since service of charges* | 186 | 28% | 373 | 36% | 325 | 22% | 420 | 22% | 217 | 11% | 137 | 12% | 124 | 30% | 214 | 49% | 135 | 40% |
| *Pending 121 to 180 days since service of charges* | 111 | 17% | 115 | 11% | 165 | 11% | 145 | 8% | 64 | 3% | 70 | 6% | 47 | 11% | 41 | 9% | 43 | 13% |
| *Pending 181 to 365 days since service of charges* | 202 | 30% | 278 | 26% | 467 | 32% | 511 | 27% | 501 | 26% | 182 | 16% | 77 | 19% | 64 | 15% | 62 | 18% |
| *Pending 365 days or more since service of charges* | 80 | 12% | 219 | 21% | 413 | 29% | 701 | 37% | 930 | 49% | 616 | 55% | 105 | 26% | 82 | 19% | 42 | 12% |
| *Pending Final Approvals by DC of Trials and/or Commissioner* | 30 | 5% | 9 | 1% | 15 | 1% | 66 | 3% | 109 | 6% | 66 | 6% | 10 | 2% | 0 | 0% | 10 | 3% |
| *Pending with Law Enforcement* | 17 | 3% | 14 | 1% | 13 | 1% | 10 | 1% | 6 | 0% | 3 | 0% | 10 | 2% | 11 | 3% | 6 | 2% |
| **Total** | **663** | | **1,050** | | **1,445** | | **1,917** | | **1,911** | | **1,129** | | **409** | | **435** | | **337** |

- Case Settlements and Trials

   The Monitoring Team encourages the Department to resolve cases directly with the staff member (and their representative) whenever possible, avoiding the need for proceedings before OATH (either a pretrial conference or a trial). An impetus for settling a matter is for a pre-trial conference to be scheduled, which can then be utilized if the matter does not settle first. Accordingly, the number of pre-trial conferences at OATH has increased in the past year, so if the parties cannot settle among themselves, they can address the case with an Administrative Law Judge ("ALJ").

   Certain gains in this area have been made over the years. For instance, the Department has been able to settle more cases directly with the relevant staff members and certain OATH

processes appear to be more efficient than they were in the past. However, some components of the OATH process appear to stymie the overall goal of imposing appropriate and meaningful discipline. For example, questions regarding the sufficiency of pleadings, proceeding with Pre-Trial Conferences in light of procedural concerns, and the ability to create a record regarding procedural decisions by the ALJ all occurred in this Monitoring Period. These issues diverted attention of the Trials Division, required greater scrutiny from the Monitoring Team and, in, at least some cases, appeared to create unnecessary delay and inefficiencies in the process. Further, scheduling matters and conducting trials still take too long. More broadly, an evaluation by the Monitoring Team of the ALJ's application of the disciplinary guidelines is ongoing and will be shared in a future report.

- Case Dispositions in Formal Discipline Cases

The table below shows the number of disciplinary cases closed by the Department every year since 2017 and their dispositions. During this Monitoring Period, the Trials Division closed 411 cases, bringing the total for 2023 to 756. This is significantly fewer cases than were closed in 2022 but is higher than the number closed in prior years. The decrease is reasonable given that many of the cases closed in 2022 had been languishing in the backlog. In terms of disposition, in 2023, % (n=624) of the 756 cases were resolved via NPA. The proportion of cases administratively filed has recently increased slightly (9% in 2020, 6% in 2021, 7% in 2022 and 10% in 2023).

| Disciplinary Cases Closed, by Date of Case Closure | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Date of Formal Closure | 2017 | | 2018 | | 2019 | | 2020 | | 2021 | | 2022 | | 2023 | | Jan.-Jun. 2023 | | Jul.-Dec. 2023 | |
| Number Resolved | 497 | | 518 | | 267 | | 387 | | 585 | | 2,204 | | 756 | | 345 | | 411 | |
| NPA | 395 | 79% | 484 | 93% | 218 | 82% | 327 | 84% | 460 | 79% | 1,808 | 82% | 624 | 83% | 262 | 76% | 362 | 88% |
| Adjudicated/Guilty | 4 | 1% | 3 | 1% | 0 | 0% | 3 | 1% | 16 | 3% | 41 | 2% | 23 | 3% | 21 | 6% | 2 | 0% |
| Administratively Filed | 77 | 15% | 22 | 4% | 34 | 13% | 33 | 9% | 33 | 6% | 148 | 7% | 74 | 10% | 41 | 12% | 34 | 8% |
| Deferred Prosecution | 21 | 4% | 7 | 1% | 13 | 5% | 20 | 5% | 75 | 13% | 203 | 9% | 32 | 4% | 20 | 6% | 12 | 3% |
| Not Guilty | 0 | 0% | 2 | 0% | 2 | 1% | 4 | 1% | 1 | 0% | 4 | 0% | 3 | 0% | 1 | 0% | 1 | 0% |

- Type of Penalties Imposed via Formal Discipline

The Department needs a range of disciplinary measures to match the varying severity of misconduct and allow for escalating disciplinary action in response to repeated misconduct by an individual staff member. As shown in the table below, the Department imposes a broad spectrum of sanctions, including Command Discipline (which can now go up to 10 days), a range of penalty days, and termination.

During this Monitoring Period, and like the previous Monitoring Period, a more significant proportion of NPAs imposed penalty sanctions at the lower end of the range and a smaller proportion at the higher end.

The proportion of penalties exceeding 30 days has varied. During the past seven years, the proportion has varied between 17% and 34%, with 2023 being the lowest year since the Consent Judgment went into effect (17%). This suggests a diminishing reliance on extended sanctions durations for addressing misconduct, which is concerning given the Monitoring Team's observation that the frequency of serious misconduct has not changed. Notably, in 2023, 11% of NPAs (n=69) were closed with Reprimands (the least severe penalty available), which is the largest proportion in the past seven years.

With respect to termination, in 2022, more staff were terminated (n=10) than in the previous five years combined. In 2023, seven staff were terminated for use of force related misconduct.

| Penalty Imposed for UOF Related Misconduct NPAs | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Date of Formal Closure | 2017 | | 2018 | | 2019 | | 2020 | | 2021 | | 2022 | | 2023 | | Jan to June 2023 | | July to Dec. 2023 | |
| Total | 395 | | 484 | | 218 | | 327 | | 460 | | 1,808 | | 624 | | 262 | | 362 | |
| Refer for Command Discipline[88] | 71 | 18% | 67 | 14% | 3 | 1% | 1 | >1% | 0 | 0% | 11 | 1% | 0 | 0% | 0 | 0% | 0 | 0% |
| Reprimand | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 7 | 1% | 77 | 4% | 69 | 11% | 33 | 13% | 36 | 10% |
| 1-5 days | 31 | 8% | 147 | 30% | 52 | 24% | 80 | 24% | 69 | 14% | 462 | 26% | 156 | 25% | 65 | 25% | 91 | 25% |
| 6-9 days | 14 | 4% | 19 | 4% | 6 | 3% | 14 | 4% | 29 | 6% | 163 | 9% | 88 | 14% | 39 | 15% | 49 | 14% |
| 10-19 days | 62 | 16% | 100 | 21% | 56 | 26% | 83 | 25% | 110 | 24% | 447 | 25% | 147 | 24% | 58 | 22% | 89 | 25% |
| 20-29 days | 74 | 19% | 58 | 12% | 42 | 19% | 46 | 14% | 64 | 15% | 157 | 9% | 51 | 8% | 18 | 7% | 33 | 9% |
| 30-39 days | 42 | 11% | 42 | 9% | 21 | 10% | 32 | 10% | 43 | 10% | 170 | 9% | 51 | 8% | 24 | 9% | 27 | 7% |
| 40-49 days | 27 | 7% | 30 | 6% | 3 | 1% | 17 | 5% | 54 | 11% | 96 | 5% | 20 | 3% | 9 | 3% | 11 | 3% |
| 50-59 days | 14 | 4% | 4 | 1% | 17 | 8% | 17 | 5% | 18 | 4% | 80 | 4% | 14 | 2% | 10 | 4% | 4 | 1% |
| 60 days + | 48 | 12% | 12 | 2% | 11 | 5% | 28 | 9% | 43 | 9% | 118 | 7% | 27 | 4% | 6 | 2% | 21 | 6% |
| Demotion | | | | | | | | | | | 6 | 0% | 0 | 0% | 0 | 0% | 0 | 0% |
| Retirement/Resignation | 12 | 3% | 5 | 1% | 7 | 3% | 9 | 3% | 23 | 6% | 22 | 1% | 1 | 0% | 0 | 0% | 1 | 0% |
| Termination (Guilty at OATH or PDR) | 0 | | 1 | | 0 | | 0 | | 5 | | 10 | | 7 | | 5 | | 2 | |

[88] As discussed in the Monitor's April 18, 2019 Report (dkt. 327) at pgs. 42-44, NPAs referred for CDs were previously adjudicated at the Facilities after being referred from the Trials Division which was rife with implementation issues. This problem has been corrected and now the Trials Division will negotiate a specific number of days (1 to 5) to be imposed and those specific days will be treated as a CD, rather than an NPA (the main difference is the case remains on the staff member's record for one year instead of five years).

The Monitoring Team has focused on the use of lower-level sanctions. Specifically, the imposition of 1- to 9-day sanctions has fluctuated over the years, primarily driven by an increase in 1- to 5-day sanctions. This trend continued into 2023, with 39% of the penalties imposing fewer than 10 days (most of which were only 1- to 5-day penalties).

The use of these sanctions increased in 2022 in order to encourage settlement and reduce the backlog, the Department offered specific incentives, such as resolving a case with a provision to either (a) expunge cases from an individual's record after one year[89] or (b) treat the resolution as a CD so the case would be removed from the individuals record after one year. The Trials Division also reports that since 2022 there has also been an increase of cases in which the CD was not processed and so an MOC was issued. The majority of these cases were subsequently resolved by a CD. The table below provides a summary of cases that were resolved with either a provision for expungement or with a CD provision.

| Cases Resolved via NPA with Provisions for Expungement or CD | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Closure Date | 2018 | | 2019 | | 2020 | | 2021 | | 2022 | | 2023 | | Jan to June 2023 | | July to Dec. 2023 | |
| Total NPAs | 484 | | 218 | | 327 | | 460 | | 1808 | | 624 | | 262 | | 362 | |
| NPAs with CD Provision | 187 | *39%* | 45 | *21%* | 76 | *23%* | 74 | *16%* | 535 | *30%* | 253 | *41%* | 106 | *40%* | 147 | *41%* |
| NPAs with Expungement | ~ | ~ | ~ | ~ | 36 | *11%* | 96 | *21%* | 420 | *23%* | 55 | *9%* | 39 | *15%* | 16 | *4%* |
| NPAs with Either CD or Expungement | 187 | *39%* | 45 | *21%* | 112 | *34%* | 170 | *37%* | 955 | *53%* | 308 | *49%* | 145 | *55%* | 163 | *45%* |

As shown above, in 2023, nearly half of all NPAs were settled with a CD or expungement (n=308, 49%), and slightly more than half were settled that way in 2022 (n=955, 53%). Now that the backlog has been largely eliminated and the CD Directive has been expanded to address a broader range of misconduct cases, the need for the Trials Division to resolve cases with these outcomes should decrease. A decrease in the use of expungement cases has already occurred in response to a recommendation from the Monitoring Team. The Trials Division reports that the majority of cases resolved with a CD relate to cases that should have been resolved with a CD in the first place, but were not, so an MOC was issued. The problematic processing of CDs appears to drive this protracted process and reflects yet another reason the procedures related to CDs must be improved.

When evaluating the Department's overall efforts to impose appropriate discipline and to determine whether those actions are consistent with the Disciplinary Guidelines, the Monitoring Team considers: (1) the specific facts of the case (including the aggravating and mitigating

---

[89] The case will not be removed from the staff member's file if during this one-year period, the staff member is served with new charges on a Use of Force incident occurring after the date of signature on the Negotiated Plea Agreement.

factors, the staff's prior history, and other circumstances as appropriate), (2) the time taken to impose discipline, and (3) the proportionality of the sanctions imposed.

During this Monitoring Period, the Monitoring Team assessed 174 cases closed with discipline that occurred after October 27, 2017 to determine whether the discipline imposed was reasonable and appeared to be consistent with the Disciplinary Guidelines (note, additional cases were closed during this Monitoring Period that occurred prior to October 27, 2017, but were not included in the sample of cases assessed). Overall, the outcome of most cases appeared reasonable although a small number of cases had questionable outcomes. This finding, in combination with the Department's increasing use of lower-level sanctions discussed above, create concern about the extent to which discipline may be out of proportion to the severity of the staff's misconduct.

The Monitoring Team plans to continue to evaluate the type and timeliness of discipline closely, both of which are crucial for maintaining the integrity of the disciplinary system, ensuring facility safety and fairness to staff, and upholding the standards set forth in the Consent Judgment.

- <u>Cases in which Formal Discipline was Not Imposed</u>

At times, cases referred for discipline do not ultimately result in a sanction being imposed either because the staff member resigns or retires before the prosecution is complete or because the charges are dismissed.

- o *Deferred Prosecution*: These are cases in which the staff member chose to leave the Department *with charges pending* and before the case was resolved. Such cases are categorized as "deferred prosecution" because no final determination has been rendered but the facts suggest the case should not be dismissed. The proportion of cases disposed in this way increased in 2021 and 2022 (13% and 9%, respectively) and appeared to be related to the large number of staff who left the Department during those years. In 2023, 4% of cases (n=32) were resolved via deferred prosecution. The prosecution of these cases will proceed if the staff member returns to the Department.

- o *Administratively Filed Cases*: Administrative filings occur when the Trials Division determines that the charges cannot be substantiated or pursued (*e.g.*, when the potential misconduct could not be proven by a preponderance of the evidence, or when a staff member resigns before charges are served). In other words, these cases are dismissed. In 2023, 74 cases were closed via administrative filing which represents 10% of cases closed. The Monitoring Team analyzed these 74 cases and found that 38% (n=28) were administratively filed because of insufficient evidence to support the charge, 39% (n=29) were dismissed due to procedural issues, 16% (n=12) were due to unwarranted charges unwarranted, and 7% (n=5) were due to expired statute of limitations. Among the 28 cases administratively filed due to insufficient

evidence, 12 were dismissed because there was not enough evidence to prove the charges (primarily due to lack of video), and 16 were dismissed due to mitigating evidence provided by the respondent (e.g., documentation of an inoperable door, video favored respondent's defense, etc.). Among the 39 cases with procedural issues, about 20 were dismissed because the staff resigned or was already terminated, the charges were duplicative, the wrong person was charged, or the statute of limitations expired. Approximately 12 of the 39 cases were dismissed because the charges were deemed unwarranted by Trials (i.e., the use of force or conduct in question was actually in compliance with UOF directives and reasonable under the circumstances. As an example, a MOS was charged with failing to intervene, but the video showed the MOS was affected by OC and did make an attempt to intervene). Overall, the proportion of administratively filed cases is high and, in some cases, preventable. While it is reasonable for new evidence to alter the outcome of some cases, the Monitoring Team recommends that the Department build efficiencies to minimize the number of cases dismissed for procedural reasons (e.g., duplicate charges/wrong person charged), unwarranted charges, or statute of limitations expiration as these cases unnecessarily burden the disciplinary system.[90]

o  *Appeals*: Another way that cases ultimately close without discipline (or a penalty that varies from that imposed by the Commissioner) is via an appeal. A disciplinary decision made by the Commissioner is appealable to the Civil Service Commission,[91] (which is authorized to make the final disciplinary decision[92]) or as an Article 78 proceeding[93].

In the majority of appeals, the Commissioner's decision is affirmed, but in 2023, the Civil Service Commissioner issued two decisions that modified the disciplinary

---

[90] Administrative filing is not only determined by the Department and Trials Division but can also be an outcome as result of the input from Administrative Law Judges at OATH. I

[91] Pursuant to Section 813 of the New York City Charter, the Civil Service Commission can decide appeals from permanent civil servants who were subject to disciplinary penalties following proceedings held pursuant to section 75 of the Civil Service Law.

[92] The Civil Service Commission opinion notes "[t]his decision constitutes the final decision of the City of New York."

[93] According to § 3-01 to 3-04 of Title 60 of the Rules of the City of New York, any civil service employee who receives a determination of guilty and/or a penalty can appeal to the Civil Service Commissioner within 20 days of the date of notice of the final disciplinary action. After receiving notice of a timely appeal, the Department has 30 days to submit the complete record of the disciplinary proceedings. The Civil Service Commission then reviews the record of the disciplinary proceeding, allows the parties to submit further written arguments, and may schedule a hearing before issuing a final decision. The Civil Service Commission then issues a written decision to affirm, modify, or reverse the determination being appealed. The Civil Service Commission may, at its discretion, direct the reinstatement of the employee or permit transfer to a vacancy in a similar position in another division or department, or direct that the employee's name be placed on a preferred list.

sanction imposed by the Department. The first decision, rendered in June 2023, reversed the Commissioner's decision to terminate a staff member who utilized a deadly chokehold that was found to be both unnecessary and excessive, reinstating the staff's employment.[94] This decision raised serious concerns for the Monitoring Team, given that the reversal runs counter to the very goals of the Consent Judgment and was based on dubious and illogical arguments. The second decision, issued in December 2023, reduced the penalty imposed from a 30-day suspension to a 10-day suspension. This decision requires further assessment by the Monitoring Team, but an initial impression suggests that the decision in this case raises similar concerns to those in the June 2023 decision.

## Conclusion

Establishing an effective accountability system within the Department requires evaluating the interrelation between its critical 3 subparts, — (1) consistently identifying misconduct, (2) promptly applying corrective action, and (3) imposing meaningful and proportionate sanctions. The need to address these components together stems from their collective impact on staff practices, the Department's culture, and, consequently, on overall security and safety within the Department. Each provision addresses different aspects of the disciplinary process, yet their collective aim is to ensure a robust system. The breakdown throughout this section and the ratings below creates a focused analysis, acknowledging that deficiencies in one area can undermine the effectiveness of the whole system. This approach underscores the necessity of establishing a practical accountability framework, where closely related parts require both an in-depth look and a holistic view to address challenges comprehensively. Overall, to establish a sustainable, consistent, and robust accountability system—integral to enhancing security and safety, and elevating staff conduct in alignment with the Nunez Court Orders—the Department must ensure all components of the disciplinary process are implemented reliably.

*Consent Judgment § VIII., ¶ 1:* The Department has long struggled to achieve compliance with this provision. Much of the backlog has been eliminated, but the Department remains unable to promptly impose meaningful discipline for new cases. The Department's regression in identifying misconduct (and therefore failing to hold staff accountable for use of force related violations), failure to hold supervisors accountable, inability to adequately manage Command Disciplines, and tendency to impose discipline is out of proportion to the severity of the staff's misconduct means that the Department remains in Non-Compliance with this provision.

*First Remedial Order § C., ¶ 1:* While the Department does impose some corrective action immediately after an incident, the failure to identify all incidents that merit immediate action

---

[94] *See*, Monitor's April 3, 2023 Report (dkt. 517) at pgs. 105-106 and 192-193; Monitor's July 10, 2023 Report (dkt. 557) at pgs. 139-140 and Appendix G; and Monitor's December 22, 2023 Report (dkt. 666) at pgs. 61-63.

means that the Department does not reliably impose immediate corrective action. The Department is therefore in Partial Compliance with this provision.

*Consent Judgment § VIII., ¶ 3(c):* The Trials Division continues to process a significant number of use of force cases. Further, the amount of time cases that are pending with the Trials Division has decreased significantly. However, additional work remains in order for the Trials Division to efficiently manage all cases and ensure the disposition imposed is proportional to the misconduct. The Department is, therefore, in Partial Compliance with this provision.

| | |
|---|---|
| **COMPLIANCE RATING** | **Consent Judgment § VIII., ¶ 1.** Non-Compliance |
| | **First Remedial Order, § C., ¶ 1.** Partial Compliance |
| | **Consent Judgment § VIII., ¶ 3(c)**<br>• Substantial Compliance (Charges per the 12th Monitor's Report)<br>• Not Rated (Administrative Filing)<br>• Partial Compliance (Expeditiously Prosecuting Cases) |

| FIRST REMEDIAL ORDER § C. (TIMELY, APPROPRIATE, AND MEANINGFUL STAFF ACCOUNTABILITY), ¶ 2 (MONITOR RECOMMENDATIONS) |
|---|
| § C., ¶ 2. *Responding to Monitor Recommendations.* Upon identification of objective evidence that a Staff Member violated the New Use of Force Directive, the Monitor may recommend that the Department take immediate corrective action, expeditiously complete the investigation, and/or otherwise address the violation by expeditiously pursuing disciplinary proceedings or other appropriate action. Within ten business days of receiving the Monitor's recommendation, absent extraordinary circumstances that must be documented, the Department shall: (i) impose immediate corrective action (if recommended), and/or (ii) provide the Monitoring Team with an expedited timeline for completing the investigation or otherwise addressing the violation (if recommended), unless the Commissioner (or a designated Assistant Commissioner) reviews the basis for the Monitor's recommendation and determines that adopting the recommendation is not appropriate, and provides a reasonable basis for any such determination in writing to the Monitor. |

The First Remedial Order, § C., ¶ 2, requires the Department to respond within 10 business days to any recommendations from the Monitor to take immediate corrective action, expeditiously complete the investigation, and/or otherwise address the violation by expeditiously pursuing disciplinary proceedings or other appropriate action. The Action Plan, § F., ¶ 2, introduced an additional requirement for the Department to expedite egregious cases on specific timelines to ensure those cases are closed as quickly as possible. Given these two requirements are inextricably linked, they are addressed together herein.

### Monitor Recommendations for Immediate Action, etc. (Remedial Order § C., ¶ 2)

The use of immediate action is a critical tool to quickly address staff misconduct to provide effective accountability and to deter problematic conduct going forward. The prevalence of cases in which immediate action can and must be taken is a reflection of the endemic harmful staff practices related to the use of force even if the frequency with which the Department actually takes immediate action following a use of force incident has fluctuated over the years. In 2022, the Department elected to limit its use of suspensions and instead preferred utilizing Memorandums of Complaint (*See* Monitor's April 3, 2023 Report (dkt. 517) at pg. 180). Following feedback from the Monitoring Team, the use of suspensions increased significantly in 2023. In 2023, 136 staff were suspended for use of force suspensions, which is over double the number of staff suspended 2022 (N=66).

The Monitoring Team is judicious in the recommendations that it makes to the Department with regard to immediate action cases and only identifies those cases where immediate action should be considered, *and* the incident is not yet stale for *immediate* action to be taken. Given the Monitoring Team's role, it is not often in a position to have contemporaneous information, and so there are inherent limitations on the scope of misconduct the Monitoring Team may identify and recommend for consideration of *immediate* action. For instance, if the Monitoring Team identifies an incident that warranted immediate corrective action (and none was taken), but the incident occurred many months prior, a C2 recommendation is not shared because the appropriate window of opportunity for immediate action has passed. The recommendations shared herein are therefore only a subset of cases

where immediate action was likely warranted but not taken. The Monitoring Team's overall goal is to mitigate lost opportunities for immediate action, but this approach is not failsafe.

Between July and December 2023 (the Seventeenth Monitoring Period), a total of 5 recommendations pursuant to § C., ¶ 2 of the First Remedial Order were submitted to the Department by the Monitoring Team, to take immediate corrective action.[95] Of the five cases, in some the Department took no action, while in a few the Department either conducted a corrective counseling session or interviewed the staff identified in the C2 referrals. In three of the five cases, the investigations are still pending, and two of the investigations have since been closed with additional charges.

- In three cases, the Department concluded no immediate corrective action was feasible because the Monitoring Team notified ID too many months after the incidents occurred, so the incidents were referred for expeditious full ID investigations. As of March 15, 2024, the full ID investigations for all three cases are still pending even though the incidents occurred in March and April 2023, reflecting the ongoing delays in completing full ID investigations discussed in further detail in the "Use of Force Investigations" section of this report. These three cases are an example in which the Department missed the opportunity to impose *immediate* corrective action as a means to address the clear unnecessary and excessive uses of force.
- In two cases, the Department concluded no immediate corrective action was feasible because the Monitoring Team notified ID too many months after the incidents occurred, so the staff were served with formal disciplinary charges. One of these cases was settled with an NPA, and the other is still pending.

As part of this process, the Monitoring Team also submits feedback to the Department regarding certain investigations in which it appears that the objective evidence was not adequately investigated or analyzed and recommends that additional review may be necessary or appropriate. This is not a comprehensive review, but an attempt to mitigate the possibility that certain misconduct may not be addressed due to an insufficient investigation. Further detail about these recommendations is provided in the "Use of Force Investigations" section of this report.

**Expeditious Resolution of Egregious Misconduct (Action Plan § F., ¶ 2)**

The Action Plan § F., ¶ 2 ("F2") sets aggressive timelines for the investigation and prosecution of egregious cases. As discussed above, given the limitations on the Monitoring Team's ability to recommend immediate action, the Monitoring Team has focused on making more recommendations

---

[95] With respect to recommendations to expedite the completion of investigations pursuant to the First Remedial Order § C., ¶ 2, as noted in the Monitor's October 28, 2022 Report (dkt. 472) at pg. 162, were not a fruitful avenue to ensuring those cases were addressed quickly. The Monitoring Team therefore now recommends expedited resolution of cases pursuant to the Action Plan, **§ F., ¶ 2** (the "F2" process) for cases that merit expedited completion of investigations or discipline and investigations.

related to F2. This requirement went into effect in mid-June 2022. Pursuant to the Action Plan, a case identified as needing to be resolved in an expedited manner must be resolved as follows:

- *Investigations*: The investigation(s) of the matter must be completed within 30 business days of identification.
- *Referral for Discipline*: The case must be processed for discipline — including completion of the MOC, referred to the Trials Division, charges served on the Respondent, discovery produced to the Respondent, an offer for resolution must be provided to the Respondent, the case filing with OATH, and a pre-trial conference must be scheduled within 20 business days of the closure of the investigation.
- *Adjudication of Discipline*: Any and all disciplinary proceedings, including, but not limited to, convening a pre-trial conference, conducting a trial before OATH, and submission of a Report and Recommendation from the OATH ALJ must be completed within 35 business days of the case being filed with OATH.
- *Imposition of Discipline*: The Commissioner must impose the final disciplinary action within 15 business days of receiving the Report and Recommendation from OATH.

Between mid-June 2022 and January 2024, a total of 62 cases have been identified for expedited processing as outlined above. These 62 cases cover the conduct of 59 unique staff members, involved in 54 unique use of force incidents. The Monitoring Team identified 25 of the 62 cases and the Department identified the other 37 cases. In most cases, ID closed their investigation within the prescribed timeframes, but beginning in July 2023, ID started taking longer than 30 business days to complete their investigation for many of the F2 cases. Out of the 17 cases identified as F2 cases from July 2023-January 2024, 11 of the investigations took longer than 30 business days to complete. This increase in the time to complete investigations for F2 cases coincides with the overall increase in ID's timing to complete investigations during this same period as discussed in further detail in the "Use of Force Investigations" section of this report.

With respect to the imposition of discipline, the status of the 62 cases as of February 15, 2024, is:

- 51 cases were closed with an NPA:
  - Discipline ranged from the very low end (relinquishment of 6 compensatory days) to the highest end (*e.g.* 93 suspension days; relinquishment of 60 compensatory days, plus two-year's probation; demotion; or irrevocable retirement). Most (38 out of 51) NPAs included suspensions or 30 or more compensatory days. Overall, the discipline imposed in these cases was generally reasonable. While some of the outcomes were questionable, the fact that the case was resolved closer in time to the incident ensures that the discipline is more meaningful. Further, the NPAs on the lower end of the disciplinary range were for staff who while involved in a serious incident but were not the primary actor and so the resolution is not inherently unreasonable.
  - 36 of these 51 NPAs were finalized within two months of identification as an F2 case. This marks significant improvement over the average time to address identified

misconduct prior to the F2 process being in place, though there has recently been an increase in the number of cases that took longer than two months to finalize. 15 of the 51 NPAs were finalized over two months after identification as F2 cases. In most of these 15 cases, the cases settled on either the eve of trial or settled following a trial but before a decision was issued, and in two cases the Department could not prosecute the case until an outside law enforcement agency determined that it did not intend to seek criminal charges.

- Three Cases were resolved following a trial at OATH:
  - In one case, a staff member was terminated following an OATH trial and subsequent Report & Recommendation from the OATH ALJ finding guilt and recommending termination.
  - One case was rendered moot as OATH recommended the individual for termination in a separate case that was tried prior to the identification of the F2 case (the staff member was subsequently terminated).
  - In a third case, an OATH ALJ found guilt and recommended termination in a Report & Recommendation following an OATH trial. A final determination is pending with the Commissioner.
- Three cases where the individuals resigned prior to the finalization of an NPA.
- Two cases (for one staff member) are still pending as of February 2024 because they were only recently referred for F2.
- Three cases were Administratively Filed.[96]
  - In one case the formal disciplinary charges had to dismissed because a Command Discipline had been imposed for the same conduct. This particular case was troubling. Facility leadership proceeded with a Command Discipline despite the fact that ID advised the Facility that they should not proceed with the case. Further, pursuant to the Department's own policy, a Command Discipline should not have been issued because it related to an excessive use of force. Given the Command Discipline was adjudicated, the principles of double jeopardy precluded the ability for the Trials Division to proceed with formal disciplinary charges. In light of this case, the Monitoring Team recommended that (1) DOC hold appropriate facility leadership accountable for the failure to adhere to ID's request, (2) DOC to hold those who conducted the CD hearing/signed off on the CD for failure to adhere to the CD policy, and (3) Provide all staff in ICDU with a summary of the issues that occurred in this case, including, but not limited to, failure to adhere to ID's stand down memo, failure to follow the CD policy, and the impact on formal discipline. We request this is shared to help ensure similar issues do not occur within ICDU. The Department has not yet responded to the Monitoring Team's recommendations.

---

[96] See Monitor's April 3, 2023 Report (dkt. 517) at pg. 197 for more information about the first administratively filed F2 case and Monitor's December 22, 2023 Report (dkt. 666) at pg. 70.

Overall, the F2 process has been proven to be an effective tool in addressing certain egregious cases. However, the delay in ID's completion of these investigations must be addressed as it is increasing the time it takes to pursue formal discipline in these cases, which reduces the efficacy of this process as a means to impose close-in-time discipline and circumvent the protracted processing times that currently characterize most disciplinary matters in the Department. Although most F2 cases are resolved with generally reasonable outcomes, the case that could not be pursued because a CD was adjudicated when it should not have, demonstrates the impact that poor processing in CDs can have on even those most egregious incidents.

It must also be acknowledged that the fact that so many cases of staff misconduct merit resolution through the F2 process is another indicator that harmful staff practices continue to be endemic in this Department.

## Conclusion

The impact of these two provisions is mixed. The requirements with respect to § C., ¶ 2 of the First Remedial Order may not be as fruitful, but it has been a backstop to missing some cases requiring immediate action. As for Action Plan § F., ¶ 2, this process requires ongoing management to ensure it works as designed. It is important that the Department has self-identified cases for expedited treatment and is not relying exclusively on the Monitoring Team, but the Department must also ensure that ID, the Trials Division, and the facilities are internally communicating and coordinating to ensure that misconduct is not only appropriately identified, but timely investigated and properly addressed through close-in-time, adequate discipline.

| COMPLIANCE RATING | **First Remedial Order § C., ¶ 2.** Partial Compliance |
|---|---|

| FIRST REMEDIAL ORDER § C. 4/THIRD REMEDIAL, ¶ 2 (EXPEDITIOUS OATH PROCEEDINGS) & FIRST REMEDIAL ORDER § C. (APPLICABILITY OF DISCIPLINARY GUIDELINES TO OATH PROCEEDINGS), ¶ 5 |
|---|

Third Remedial Order ¶ 2. _Increased Number of OATH Pre-Trial Conferences_. Paragraph C.4 of the First Remedial Order shall be modified to increase the minimum number of pre-trial conferences that OATH must conduct each month for disciplinary cases involving charges related to UOF Violations. Specifically, as of December 15, 2021, Paragraph C.4 shall be revised to read as follows: "All disciplinary cases before OATH involving charges related to UOF Violations shall proceed in an expeditious manner. During each month, Defendants shall hold pre-trial conferences before OATH for at least **150** disciplinary cases involving charges related to UOF Violations, absent extraordinary circumstances that must be documented. If there continues to be delays in conferencing cases despite this calendaring practice, OATH will assign additional resources to hear these cases. The minimum number of case conferences required to be held each month under this Paragraph may be reduced if the Monitor makes a written determination, no earlier than one year after the date of this Order, that disciplinary cases involving UOF Violations can continue to proceed expeditiously with a lower number of conferences being held each month."[97]

§ C., ¶ 5. _Applicability of Disciplinary Guidelines to OATH Proceedings._ The Disciplinary Guidelines developed pursuant to Section VIII, ¶ 2 of the Consent Judgment shall apply to any OATH proceeding relating to the Department's efforts to impose discipline for UOF Violations.

Addressing the various requirements of the _Nunez_ Court Orders related to accountability inherently requires the practices of the Office of Administrative Trials and Hearings ("OATH") to be considered given their role in the formal disciplinary process. To date, compliance with requirements to effectively hold staff accountable has been elusive. The Monitoring Team has long reported on OATH's involvement in the staff disciplinary process, in particular, concerns related to OATH's practices that impact the ability to impose meaningful and adequate discipline as required by Consent Judgment, § VIII, ¶ 1 and other provisions of the _Nunez_ Court Orders.[98] As a result, the First Remedial Order, Third Remedial Order, and the Action Plan include specific requirements for OATH's practices, including requirements to increase the number of pre-trial conferences, improve efficiency, and to properly apply the Disciplinary Guidelines.

[97] The Action Plan requires a compliance assessment with First Remedial Order § C. (Timely, Appropriate, and Meaningful Staff Accountability), ¶ 4. However, this provision was modified by the Third Remedial Order, ¶ 2 so a compliance rating with Third Remedial Order, ¶ 2 is provided instead.

[98] The Monitoring Team's concerns regarding issues with the OATH process have been documented for several years. _See_ Monitor's April 3, 2017 Report (dkt. 295) at pgs. 179-180 and 184-188; Monitor's October 17, 2018 Report (dkt. 317) at pgs. 126-128; Monitor's April 18, 2019 Report (dkt. 327) at pgs. 151-159 and Appendix C; Monitor's October 28, 2019 Report (dkt. 332) at pgs. 183-184 and 186-195; Monitor's May 29, 2020 Report (dkt. 341) at pgs. 206-208; Monitor's October 23, 2020 Report (dkt. 360) at pgs. 66-68 and 175-181; Monitor's December 8, 2020 Report (dkt. 365) at pgs. 5-9; Monitor's May 11, 2021 Report (dkt. 368) at pgs. 99-103, 245-250 and 251-257; Monitor's June 3, 2021 Report (dkt. 373) at pgs. 6-16 and Appendix A; Monitor's December 6, 2021 Report (dkt. 431) at pgs. 96-101 and 113-115; Monitor's December 22, 2021 Report (dkt. 435) at pgs. 4-12; Monitor's June 30, 2022 Report (dkt. 467) at pgs. 31-39; Monitor's October 28, 2022 Report (dkt. 472) at pgs. 94-98 and 162-166; Monitor's April 3, 2023 Report (dkt. 517) at pgs. 189-193; Monitor's July 10, 2023 Report (dkt. 557) at pgs. 135, 139-140 and 230; and Monitor's December 22, 2023 Report (dkt. 666) at pgs. 59, 71-75 and Appendix C.

OATH, an administrative law court, adjudicates any contested discipline for tenured staff, pursuant to New York State Civil Service Laws § 75. OATH is a City agency, but it is separate and independent from the Department of Correction ("DOC"). DOC's Commissioner delegates the adjudication of discipline for tenured staff to OATH and as such, OATH is an intrinsic component of DOC's disciplinary process. OATH is designated by the Commissioner as the "deputy or other person" to hear disciplinary matters for the DOC and stands in the shoes of the Commissioner, with the same powers and constraints as the Commissioner. While OATH is a separate and independent agency from DOC, OATH *is* an agency of the City of New York. The Consent Judgment was entered against the *entire* City of New York and therefore the provisions of the *Nunez* Court Orders apply to OATH, and the agencies must work in concert to achieve compliance with requirements related to staff discipline.[99]

When the Department is unable to settle a disciplinary matter directly with the staff member, the case must be adjudicated. In these cases, an Administrative Law Judge ("ALJ") conducts a pre-trial conference in an attempt to facilitate a settlement. If a settlement still cannot be reached, a trial is scheduled in which an ALJ (a different ALJ than the one who conducted the pre-trial conference) assesses the evidence to evaluate whether or not the staff member has violated policy. The ALJ then issues a written decision with a recommended outcome and proposed penalty (if the ALJ determines that the staff member violated policy). The permissible range of penalties is set by law and includes a reprimand, a fine of up to $100, a suspension without pay of up to 60 days, demotion in title, or termination. Accordingly, most of the discipline imposed by DOC (either through settlement or following a trial) is within this same range of penalties. The Commissioner has the authority to accept the ALJ's factual findings and penalty recommendation or to modify them, as appropriate, in order to resolve the case. The Commissioner's determination (and imposition of discipline as warranted) is subject to appeal to the Civil Service Commission or as an Article 78 proceeding.

The Monitoring Team's assessment of the work completed by OATH during the current Monitoring Period (July to December 2023) is discussed below.

**Interagency Collaboration**

*OATH Proceedings*

Over the last few years, the need for pre-trial conferences increased for several reasons including staff's unwillingness to settle cases without at least first having a pre-trial conference before

---

[99] The Corporation Counsel issued a legal opinion on August 7, 2020 in which the Corporation Counsel advised OATH that: "[t]he Nunez consent judgment was entered against the entire City of New York, not just the DOC. *See* New York City Charter Section 396. OATH, while permitted to exercise independent judgment on a case-by-case basis as to findings of fact and recommended penalties is an agency of the City of New York and therefore is part of the 'City of New York' as described in that judgment. *See* New York City Charter Section 1048. Thus, the provisions of the Nunez consent judgment do, in fact, apply to OATH although, [. . . ], great care has been taken by the Court to preserve OATH's independence."

OATH; the backlog of disciplinary cases; and the Department's efforts to address its high rate of staff absenteeism. Further, OATH precedent often appeared to favor staff (versus a neutral assessment of the facts), which motivated some staff to request a proceeding before OATH.

When pre-trial conferences are needed, they should occur promptly. Further, pre-trial conference dates need to be readily available because simply scheduling a pre-trial conference sometimes encourages the Department and staff member to settle the case outside of OATH. Then, if the case is not successfully resolved, OATH proceedings occur more quickly because the proceeding has already been scheduled. Historically, pre-trial conferences were held only 4 to 6 days per month and their limited availability unreasonably delayed case resolution (both those awaiting a pre-trial conference and those that proceeded to trial). As a result of the First and Third Remedial Orders, the number of pre-trial conferences increased exponentially, and OATH is now required to schedule 150 UOF cases for pre-trial conferences each month. To do so, OATH now conducts pretrial conferences four days per week.

- *Number and Outcomes of Pre-Trial Conferences*

During the current Monitoring Period, the Department scheduled 1,079 pre-trial conferences, which exceeds the 900 conferences required by the Remedial Orders for this six-month period. In 2023, the total number of pre-trial conferences scheduled (including those with UOF) decreased about 20% from the prior year (2,416 in 2023 compared to 3,009 in 2022). The Department anticipated this reduction given that the backlog of disciplinary cases has been largely resolved and because fewer cases are being referred to DOC's Trials Division for formal discipline. As the number of use of force cases requiring a pre-trial conference has decreased, the Department has appropriately repurposed the pre-trial conference time slots to support the resolution of *other* types of cases as required by the *Nunez* Court Orders, such as staff absenteeism. A table showing the number of OATH pre-trial conferences scheduled from July 2020 to December 2023 is included in Appendix A of this report.

The increased availability of pre-trial conferences has supported the Department's ability to facilitate case resolution more expeditiously. First, nearly three-quarters (71%) of the UOF cases scheduled for a pre-trial conference during this Monitoring Period were settled before the individual appeared at the pre-trial conference before OATH, continuing a trend observed over the past few Monitoring Periods. Second, only a small proportion of cases (6%) are scheduled for trial (compared to July through December 2020 when 41% of cases were scheduled for trial). While trials play an important function in any disciplinary system, they are time-consuming and resource intensive, and thus other pathways for resolution greatly contribute to the overall goal of timely discipline.

Interestingly, of the 109 pre-trial conferences that were convened (i.e., conferences that were scheduled and did not settle prior to the pre-trial conference date), only 27% (29 of 109) were settled at the pre-trial conference. The remaining 64% required on-going negotiation, another pre-trial

conference, or were scheduled for trial. The Monitoring Team continues to encourage OATH to help to facilitate case resolution at the pre-trial conference whenever possible. Further, the Department must ensure that staff are notified that they need to appear for OATH pre-trial conferences. Compared to prior Monitoring Periods, this situation has improved somewhat, but many cases still need to be rescheduled because staff are not present and available on the day of the pre-trial conference. The Department should remain vigilant to ensure that pre-trial conference dates are not wasted in this way.

- *Application of Disciplinary Guidelines*

The Monitoring Team is in the process of closely examining pre-trial conference outcomes and Report & Recommendations ("R&Rs") to assess whether the Disciplinary Guidelines are properly applied. Proper application has improved since the Remedial Orders were imposed, although in some cases, questions remained regarding the application of precedent and whether it was consistent with the Disciplinary Guidelines in both pre-trial conferences and the R&Rs. Following the close of the Monitoring Period, OATH leadership provided an internal assessment it completed regarding the application of disciplinary guidelines of the R&Rs issued in 2022 and 2023. A more fulsome assessment is underway, including the information supplied by OATH, and will be included in a future Monitor's Report.

- *OATH Procedures and Protocols*

Over the past several years, the City has taken important steps to unravel the convoluted, inefficient, and problematic practices and procedures at OATH. When these issues were initially identified, OATH resisted recommendations to adapt its practices and procedures, claiming either that requirements of the Consent Judgment did not apply or that practices could not be changed. In response to significant scrutiny by the Monitoring Team and the imposition of two Remedial Orders and the Action Plan, OATH began to reform its practices and the results suggested that OATH was on the path to achieve many of the intended goals. In particular, in cases that cannot be resolved between the Department and the staff member directly, the increase in pre-trial conference availability has facilitated more timely resolution, particularly when the ALJ facilitates a settlement or schedules a trial. Trials at OATH now occur closer in time to the pre-trial conference and are conducted more efficiently than in the past, although in some cases, the process remains protracted. However, additional work remains, which became particularly evident in this Monitoring Period.

The Monitoring Team has long noted rigidity at OATH that, at times, prohibits problem-solving that could bring greater efficiency to the process. For example, in situations where reasonable alterations to practice may be necessary and appropriate, OATH's inflexible stance leads to case outcomes that undermine the very efficiencies the *Nunez* Court Orders were designed to promote. While such situations were few in number during the past few Monitoring Periods, OATH appears to

have become increasingly rigid and wedded to bureaucratic rules without flexibility in this Monitoring Period and has continued this path following the close of the Monitoring Period.

The Monitoring Team learned of a number of issues and concerns regarding OATH's procedures, the overall efficacy and neutrality of OATH proceedings, and the cumulative impact on the Department's efforts to address the requirements of the *Nunez* Court Orders. Beginning in July 2023, a small number of OATH ALJs began to, *sua sponte*, question whether the charges submitted by the Department were sufficiently specific to provide notice to the staff member about the exact violation underlying the charges. In some cases, the ALJ decided charges were insufficient and therefore refused to proceed with scheduled pre-trial conferences. Further, in some cases, when the Department requested that the ALJs put their decision about the sufficiency of charges on the record, the ALJs refused to permit a record to be created. The Department also reported concern that in some cases the ALJs may have engaged in unprofessional behavior. Concerningly, the Department reported to the Monitoring Team that these matters were negatively interfering with their work under the *Nunez* Court Orders. Following the close of the Monitoring Period, the City provided the Monitoring Team with information from OATH regarding these issues in which it provided additional information about its governing rules, its perception that these issues were generally minor and isolated, and that essentially, in their view, there was no basis for concern. While OATH leadership may take a different view on the magnitude and severity of these matters, the fact that such reports were occurring can and must be addressed and cannot be minimized.

The Monitoring Team must conduct additional inquiries to fully unpack the issues at hand. However, it is clear that the current positions of OATH and DOC cannot coexist, with one agency maintaining that problems are infrequent or minimal and the other reporting serious issues that are impeding their ability to comply with the *Nunez* Court Orders.

Candid and cooperative discourse between OATH and DOC is required, not only to function effectively, but also to fulfill the requirements of the *Nunez* Court Orders.[100] The Monitoring Team appreciates the importance of OATH's neutrality and independence, but collaboration between the two agencies does not impede OATH's neutrality and independence. The Monitoring Team urges the City to ensure that both agencies demonstrate the necessary commitment to collaboration and engage in appropriate discourse to resolve these matters. Following the close of the Monitoring Period, the City reported steps are underway to address this recommendation.

Opportunities also continue to exist for OATH to schedule trials more quickly after the pre-trial conference in order to facilitate the timely resolution of each matter and for ALJs to complete their

---

[100] The Monitoring Team is aware that staff from DOC and OATH routinely coordinate to schedule proceedings. This routine communication on scheduling matters does not replace the need for broader collaboration and coordination on proceedings in general.

Report & Recommendations more quickly. If a case does not settle and a trial is needed, *at a minimum*, the OATH process typically requires about five months. More specifically, trials are typically scheduled about 80 days after the initial pre-trial conference, then a trial can take upwards of three weeks to complete, and finally, the Report & Recommendations are issued approximately 45 days after the record is closed. Generally, this is too long.

The Monitoring Team has issued some preliminary recommendations to address the problems outlined in this section and continues to investigate their dimensions and the relevant adjacent issues and case law. Detailed reporting on this issue will be included in future Monitor's Reports.

**Conclusion**

*First Remedial Order § C., ¶ 4 & Third Remedial Order ¶ 2*: OATH has met the requirement to convene 150 pre-trial conferences. Accordingly, Substantial Compliance with this provision has been achieved.

*First Remedial Order § C., ¶ 5*: It appears there has been improvement in the application of the Disciplinary Guidelines to OATH Proceedings since the First Remedial Order was entered, but additional scrutiny by the Monitoring Team is ongoing to determine what additional steps are necessary to achieve Substantial Compliance.

*Third Remedial Order ¶ 3:* OATH's procedures and protocols for UOF related disciplinary matters are more efficient than when the Remedial Orders were first imposed but do not yet result in expeditious processing for use of force related conduct. Further enhancements to the OATH process are needed to support the overall goal of ensuring that discipline is imposed timely. This is particularly true given what appears to be regression in this area following the close of the Monitoring Period.

| | |
|---|---|
| **COMPLIANCE RATING** | **First Remedial Order § C., ¶ 4. & Third Remedial Order ¶ 2.** Substantial Compliance<br>**First Remedial Order § C., ¶ 5.** Partial Compliance<br>**Third Remedial Order ¶ 3.** Partial Compliance |

| CJ § VIII. STAFF DISCIPLINE AND ACCOUNTABILITY, ¶ 4 (TRIALS DIVISION STAFFING) |
|---|
| ¶ 4. *Trials Division Staffing.* The Department shall staff the Trials Division sufficiently to allow for the prosecution of all disciplinary cases as expeditiously as possible and shall seek funding to hire additional staff if necessary. |

This provision requires the City and the Department to ensure the Trials Division has sufficient staff to expeditiously prosecute all disciplinary cases. The Department has long struggled to have sufficient staff to support the Division's caseload. The Action Plan, § F, ¶ 1(a), requires the Department ensure that the Trials Division maintains at least 25 agency attorneys and four directors.

**Recruitment Efforts**

The Department reports it has continued its recruitment efforts for the Trials Division. During this Monitoring Period, the Department reported conducting 12 interviews for trials-related positions. In all, the Department reports conducting 57 interviews in 2021, 68 in 2022, and 36 in 2023. Of the 161 interviews conducted over the past three years, approximately 100 were for agency attorney positions, while the rest were for support staff positions. The number of applicants interviewed decreased from 2022 to 2023, but the Department remains active in its efforts to fill these positions. The process to hire an individual remains protracted, taking many months, and requires a significant amount of various bureaucratic "red tape," and, in at least some cases, persistent follow-up by Department leadership and, at times, inquiries from the Monitoring Team to catalyze the necessary movement.

**Staffing Levels**

The table below provides an overview of the Trials Division's staffing levels at the end of each Monitoring Period from June 2018 to December 2023. Since the inception of the Action Plan, the overall number of Trials staff increased from 19 to 23 but remains below the 25 attorneys required by the Action Plan. The workload within the Trials Division is still at a volume that requires additional attorneys to support timely case processing. As for the Action Plan requirement regarding supervisors, the Department has maintained the requisite four supervisors since December 2022.

| As of… | June 2018 | Dec. 2018 | June 2019 | Dec. 2019 | June 2020 | Dec. 2020 | June 2021 | Dec. 2021 | June 2022 | Dec. 2022 | June 2023 | Dec. 2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Trials Division Staffing** | | | | | | | | | | | | |
| **Supervisors & Leadership** | **4** | **5** | **5** | **5** | **5** | **5** | **4** | **4** | **5** | **6** | **6** | **6** |
| - *Deputy Commissioner* | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 1 |
| - *Associate Commissioner* | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 |
| - *Deputy General Counsel* | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 0 | 0 | 0 |
| - *Executive Manager Director* | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 0 | 0 | 1 |
| - *Director* | 3 | 3 | 3 | 3 | 3 | 3 | 2 | 2 | 2 | 4 | 4 | 4 |
| **Administrative Support** | **6** | **6** | **6** | **6** | **6** | **6** | **6** | **6** | **5** | **5** | **5** | **4** |
| - *Administrative Manager* | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 3 |
| - *Executive Coordinator* | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 0 | 0 | 0 | 0 |
| - *Office Manager* | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| **Attorneys** | **21** | **20** | **20** | **20** | **17** | **18** | **18** | **17** | **19** | **27** | **20** | **23** |
| - *Agency Attorney* | 21 | 20 | 20 | 20 | 17 | 16 | 15 | 14 | 17 | 21 | 19 | 20 |
| - *Agency Attorney Intern* | 0 | 0 | 0 | 0 | 0 | 2 | 3 | 3 | 0 | 1 | 1 | 3 |
| - *Contract Attorney* | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 |
| - *Attorneys on Loan from Other Agencies* | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 0[101] | 0 |
| **Other Support** | **9** | **8** | **8** | **7** | **8** | **7** | **7** | **7** | **5** | **7** | **14** | **10** |
| - *Legal Coordinator* | 4 | 4 | 3 | 2 | 2 | 2 | 2 | 2 | 3 | 5 | 4 | 4 |
| - *Investigator* | 3 | 1 | 0 | 0 | 1 | 1 | 1 | 1 | 0 | 0 | 2 | 2 |
| - *Clerical Associate* | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| - *Program Specialist* | 1 | 1 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| - *Intern* | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 0 | 0 | 4 | 0 |
| - *Front Desk Officer* | 0 | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| - *Community Coordinator* | 0 | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 0 | 0 | 1 | 1 |
| - *Data Analyst* | | | | | | | | | 0 | 0 | 0 | 0 |
| - *City Research Scientists* | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| **Grand Total** | **40** | **39** | **39** | **38** | **36** | **36** | **35** | **34** | **34** | **45** | **45** | **44** |

---

[101] The MOU for attorneys on loan from other City agencies was terminated on February 1, 2023. Further, the attorneys on loan from DOC Legal were transferred back to Legal by April 14, 2023. *See* Monitor's October 28, 2022 Report (dkt. 472) at pg. 14 regarding a discussion on the attorneys on loan.

The Monitoring Team has long recommended that the City and Department remain vigilant in ensuring that the Trials Division maintains adequate staffing levels,[102] and, at a minimum, achieves the levels required by the Action Plan, § F, ¶ 1(a). Even with the significant reduction of the Trials backlog, staffing levels must meet those required by the Action Plan in order to ensure timely case processing, which the Department has not yet achieved. Substantial Compliance will be achieved when the Trials Division staffing complement is sufficient to prosecute cases expeditiously and cases are no longer backlogged at Trials.

| COMPLIANCE RATING | ¶ 4. Partial Compliance |
|---|---|

---

[102] For example, see the Monitor's March 16, 2022 Report (dkt. 438) at pg. 62.

CONSENT JUDGMENT § XII – SCREENING & ASSIGNMENT OF STAFF

### CJ § XII. SCREENING & ASSIGNMENT OF STAFF, ¶¶ 1-3 (PROMOTIONS)

¶ 1. *Promotions.* Prior to promoting any Staff Member to a position of Captain or higher, a Deputy Commissioner shall review that Staff Member's history of involvement in Use of Force Incidents, including a review of the

    (a) [Use of Force history for the last 5 years]

    (b) [Disciplinary history for the last 5 years]

    (c) [ID Closing memos for incidents in the last 2 years]

    (d) [Results of the review are documented]

¶ 2. DOC shall not promote any Staff Member to a position of Captain or higher if he or she has been found guilty or pleaded guilty to any violation in satisfaction of the following charges on two or more occasions in the five-year period immediately preceding consideration for such promotion: (a) excessive, impermissible, or unnecessary Use of Force that resulted in a Class A or B Use of Force; (b) failure to supervise in connection with a Class A or B Use of Force; (c) false reporting or false statements in connection with a Class A or B Use of Force; (d) failure to report a Class A or Class B Use of Force; or (e) conduct unbecoming an Officer in connection with a Class A or Class B Use of Force, subject to the following exception: the Commissioner or a designated Deputy Commissioner, after reviewing the matter, determines that exceptional circumstances exist that make such promotion appropriate, and documents the basis for this decision in the Staff Member's personnel file, a copy of which shall be sent to the Monitor.

¶ 3. No Staff Member shall be promoted to a position of Captain or higher while he or she is the subject of pending Department disciplinary charges (whether or not he or she has been suspended) related to the Staff Member's Use of Force that resulted in injury to a Staff Member, Inmate, or any other person. In the event disciplinary charges are not ultimately imposed against the Staff Member, the Staff Member shall be considered for the promotion at that time.

    Strong leadership and supervision are crucial to the Department's efforts to reform the agency. The requirements of the First Remedial Order § A., ¶ 4 and Action Plan § C., ¶ 3(ii-iii) are designed to increase the number of supervisors working in the facilities and quality of supervision, while this provision (CJ §XII. ¶¶ 1-3) is designed to ensure that those staff selected for promotion are appropriately screened for selection. The Monitoring Team continues to emphasize that the staff the Department chooses to promote sends a message about the leadership's values and the culture it intends to cultivate and promote, and their behavior sets an example for Officers.[103] Given the impact that promotion selections have on the overall departmental culture, the Monitoring Team closely reviews the screening materials and scrutinizes the basis for promoting staff throughout the Department. Active, effective supervision is fundamental to the changes in departmental culture and practice that are needed to effectuate the reforms required by the *Nunez* Court Orders. The long-standing supervisory void—in both number and aptitude—is a leading contributor to the Department's inability to alter staff practice and to make meaningful changes to its security operation.[104]

---

[103] As discussed in detail in Monitor's October 28, 2019 Report (dkt. 332) at pg. 199; Monitor's April 3, 2023 Report (dkt. 517) at pgs. 210-216; Monitor's July 10, 2023 Report (dkt. 557) at pgs. 74-77; and Monitor's December 22, 2023 Report (dkt. 666) at pgs. 78-86.

[104] *See* the Monitor's November 8, 2023 Report (dkt. 595) at pgs. 26-28 for further discussion of the aspects contributing to the Department's supervisory deficit.

This compliance assessment covers the following: the number of staff promoted since 2017, the status of the Department's revision to the pre-promotional screening policy, a summary of all staff promoted from January to December 2023, and the Department's compliance with the screening process for these individuals.

**Overview of Staff Promotions from 2017 to July 2023**

The Department promoted the following number of staff to each rank through December 31, 2023:

|  | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|---|
| Captains | 181 | 97 | 0 | 0 | 0 | 0 | 26 |
| ADWs | 4 | 13 | 3 | 35 | 0 | 26 | 10 |
| Deputy Wardens | 5 | 3 | 8 | 0 | 1 | 0 | 5 |
| Wardens | 2 | 5 | 1 | 2 | 4 | 0 | 1[105] |
| Chiefs | 3 | 2 | 3 | 0 | 4 | 0 | 0 |

**Screening Policy**

The Department addresses the requirements of ¶¶ 1 to 3 in Directive 2230 "Pre-Promotional Assignment Procedures." The Directive has been revised a number of times since it was first updated in the Third Monitoring Period.[106] In March 2023, the Monitoring Team submitted feedback to the Department with recommended revisions to the policy as outlined in the Monitor's December 22, 2023 Report (dkt. 666) at pgs. 80-81. After the Monitoring Team submitted these recommendations, the Department reported they would revise the policy before the next round of promotions but failed to do so and promoted additional staff.[107] As a result, the Court issued its August 10, 2023 Order requiring the Department to update its policy and procedures related to the pre-promotional screening process in consultation with and subject to the approval of the Monitor. The Department reports that in this Monitoring Period it has been working on revisions to the policy governing pre-promotional screening but has not provided any proposed revisions to the Monitoring Team.

In addition to the necessary revisions to the policy, it is critical that the Department fully comply with *its own* pre-promotional screening policies and procedures by ensuring all applicants are screened by all required Divisions. In July 2023, the Department promoted 10 individuals to Assistant Deputy Warden ("ADW") without following its own internal vetting protocols per the policy or completing the screening process or forms as required, which was discussed in detail in various

---

[105] This individual was promoted to the rank of "Acting Warden."

[106] The Directive was previously revised in the 8th Monitoring Period (*see* Monitor's October 28, 2019 Report (dkt. 332) at pg. 198). The Directive was described more generally in the Monitor's April 3, 2017 Report (dkt. 295) at pgs. 190-192. Additional revisions were made in November 2022 (the Fifteenth Monitoring Period) as described in the April 3, 2023 Report (dkt. 517) at pgs. 211-212 and in May 2023 (the Sixteenth Monitoring Period) as described in the December 22, 2023 Report (dkt. 666) at pg. 80.

[107] *See* Monitor's July 10, 2023 Report (dkt. 557) at pg. 162.

Monitor's reports.[108] In October 2023, the Department again promoted three additional staff without following all of the internal vetting protocols and procedures required by the current pre-promotional policy, which is discussed in further detail below.

**Overview of Promotions in This Monitoring Period**

A total of three staff were promoted in this Monitoring Period.[109] There were two staff promoted to Deputy Warden ("DW") and one staff member was promoted to Acting Warden. A brief summary of those promoted is outlined below:

- Promotions to Deputy Warden: Both individuals promoted to DW rank were promoted in October 2023, but both individuals were screened many months prior their actual promotion date. One of the two individuals was screened in September 2022-October 2022 and the other was screened in May 2023. For these two staff, the Monitoring Team received and reviewed some, but not all the screening materials and forms for the Divisions required to conduct pre-promotional screening by DOC's current policy. The Department did not provide the required screening form that accounts for the candidate's attendance, education, assignment, and command discipline history, so it was not clear if these factors were properly considered in the selection process. Additionally, no interview documentation was provided so it does not appear that the candidates were interviewed and assessed by the Promotion Board as required by policy. Furthermore, the Department produced the screening materials nearly 5 months after the staff were promoted, despite repeated requests and follow-up from the Monitoring Team to obtain the information.[110] Despite the Department's lack of adherence to its own policy, the Monitoring Team's assessment of the screening materials and its records revealed that neither of these staff had two Class A/B UOF violations within the past five years pursuant to the Consent Judgment § XII. 2 nor pending UOF-related disciplinary charges pursuant to the Consent Judgment § XII. 3, and they were both recommended by all Divisions who did screen them.

- Promotion to Acting Warden: An individual was appointed to serve as the Acting Warden of RESH in October 2023. This individual had previously been promoted to the DW rank in July 2023, for which she was screened in May 2023. After her promotion to DW in July 2023 and before her promotion to Acting Warden in October 2023, she was not subject to any additional documented screening or Promotion Board interviews and was instead informally interviewed by the former Associate Commissioner of Operations. The former Associate Commissioner of

---

[108] *See* Monitor's July 10, 2023 Report (dkt. 557) at pgs. 74-77; Monitor's November 8, 2023 Report (dkt. 595) at pgs. 3-4; Monitor's November 30, 2023 Report (dkt. 616) at pg. 36; and Monitor's December 22, 2023 Report (dkt. 666) at pgs. 82-86.

[109] This group includes a small number of staff technically promoted during the first few weeks of July but are counted in the promotion class for this Monitoring Period.

[110] This was particularly curious given that the screening forms had already been completed and this information should have been readily available for production.

Operations reported that he interviewed other candidates as well, but the other candidates declined the position. This pre-promotional process failed to follow the pre-promotional policy in several ways:

- o A teletype should have been sent out to staff announcing that promotions to Warden were open. This teletype was not sent.
- o Candidates for promotion to the Warden rank must have held their rank of DW for at least a year. The individual appointed had only served as a DW for a few months.
- o The Department should have completed a screening form that accounts for the candidate's attendance, education, assignment, and command discipline history, but a new form was not completed. All the screening materials, including this form, were the same screening materials used for her earlier promotion to DW.
- o The Promotion Board should have interviewed the candidate. This individual was interviewed by the Promotion Board prior to her appointment to DW but was not interviewed again prior to her appointment as Acting Warden. Only the former AC of Operations interviewed her, and the formal interview documentation forms typically completed by the Promotion Board were not completed by the AC. The former AC merely reported to the Monitoring Team that "she [had] shown interest and leadership qualities that made her the best candidate for RESH in the role of Acting Warden."
- o The Commissioner should have done his own interview of the recommended candidate prior to the final selection. There is no documentation or report that this occurred.

Despite the Department's lack of adherence to its own policy, the Monitoring Team's assessment of the screening materials and its records revealed that this staff member did not have two Class A/B UOF violations within the past five years pursuant to the Consent Judgment § XII. 2 nor pending UOF-related disciplinary charges pursuant to the Consent Judgment § XII. 3, and during the pre-promotional screening and interview process prior to the promotion to DW promotion, the individual was recommended by all Divisions and interviewers who screened this candidate.

### Assessment of Screening Materials

The screening requirements of the Consent Judgment were developed to guide the Department's identification of Supervisors with the proper attributes. In particular, the Consent Judgment requires the Department to consider a staff member's use of force and disciplinary history (¶ 1(a)-(d)) and mandates that staff members may not be promoted if they have guilty findings on certain violations (¶ 2) or pending UOF disciplinary charges (¶ 3). The promotion process itself is guided by multiple factors and is depicted in the Monitor's April 3, 2023 Report (dkt. 517) at Appendix C: Flowchart of Promotions Process.

### Review of Candidates (¶ 1)

The Monitoring Team's review of the screening materials for the two staff promoted to DW and one staff member promoted to Acting Warden found that the Department's assessment of each candidate satisfied the requirements of the "Review" as defined by ¶ 1. However, it is notable that

there were significant delays between the completion of the screening materials (September-October 2022 and May 2023) and the actual promotions of the candidates (October 2023).

The screening for these three staff furthered concerns that the screening process continued to degrade throughout 2023, despite the Department's claims that it was working to enhance the processes. As discussed above, the Department did not follow its own policy for pre-promotional screening for these three staff and again used a truncated process rather than the full assessment of the individuals' background and qualifications required by policy.[111] For all three staff, there were required screening forms regarding attendance, education, assignment, and command discipline history that were not completed, and none of the three were interviewed by the Promotion Board as required. Furthermore, the Acting Warden was not properly interviewed or selected by the Commissioner as required.

The Monitoring Team's concerns about the reasonableness and appropriateness of the screening process have only grown in 2023 as DOC's screening process became less rigorous and the Department failed to follow its own policy, even after receiving feedback from the Monitoring Team regarding necessary enhancements and promising to make changes before future promotions were to occur. Accordingly, given these ongoing issues and further deterioration in the screening process, the Department is in Non-Compliance with this provision.

## Disciplinary History (¶ 2)

Staff members may not be promoted if they have guilty findings on certain violations twice within five years unless the Commissioner finds that there are exceptional circumstances that merit promotion ("2-in-5 assessment"). Both the Department and Monitoring Team assessed the disciplinary history of all staff promoted in October 2023, and both found that none of the staff met this threshold for exclusion.

The Department's 2-in-5 assessment must consider certain violations imposed via a Negotiated Plea Agreements ("NPAs") within the past five years, all relevant Personnel Determination Reviews ("PDRs") imposed within the past five years, and all relevant Command Disciplines ("CDs"). As previously reported, the Department does not appear to be routinely considering PDRs and CDs as part of this assessment.[112] Notably, the majority of cases that likely trigger this requirement are via NPAs imposed by the Trials Division. However, the Trials Division's screening for cases that meet this threshold is limited to NPAs because it does not have access to PDRs or CDs that may *also* trigger the 2-in-5 requirement. No other Division is evaluating PDRs or CDs for this requirement. As a part of the March 2023 feedback on the pre-promotional policy, the Monitoring Team recommended that the policy be revised to ensure that the 2-in-5 assessment also considers CDs and PDRs and to designate

---

[111] *See* Monitor's July 10, 2023 Report (dkt. 557) at pgs. 74-77 and Monitor's November 8, 2023 Report (dkt. 595) at pgs. 3-4.

[112] *See* Monitor's April 3, 2023 Report (dkt. 517) at pgs. 212-215 and Monitor's December 22, 2023 Report (dkt. 666) at pg. 85.

the Division or position that will be responsible for this component, but as noted above, this recommendation has not yet been adopted.

In this Monitoring Period, none of the three staff promoted were identified by the Trials Division to meet the 2-in-5 requirement, but it does not appear an assessment of PDRs and CDs was conducted. Although not evaluated by the Department, the Monitoring Team's evaluation of available documentation and data did not reveal any promotions during this Monitoring Period that would have been called into question because of CDs or PDRs imposed. However, given that the Department's screening procedures fail to ensure compliance with the 2-in-5 requirements, the Department remains in Partial Compliance with this requirement.

## Pending Disciplinary Matters (¶ 3)

The Department's screening process for promotion generally assesses whether the candidate has pending discipline for use of force related misconduct. The Department's screening process identifies if a candidate may have pending discipline for use of force related misconduct at the time of screening, and none of the three staff promoted in October 2023 had pending disciplinary charges at the time of promotion. Accordingly, the Department is in Substantial Compliance with this provision.

## Conclusion

The Monitoring Team remains concerned about the Department's pre-promotional screening process and whether it is sufficiently rigorous. Many of the Monitoring Team concerns are not new and reflect concerns first raised several years ago. To address these long-standing concerns, the Monitoring Team gave the Department multiple recommendations in March 2023 regarding updates to its policy, but these were not incorporated into the pre-promotional screening policy or process before candidates were screened and selected for any 2023 promotions. Furthermore, all three staff were promoted to senior ranks without a fulsome screening or interview process as laid out in the Department's current pre-promotional screening policy. This continues to raise questions about the decision-making at the Department-wide leadership level and whether an adequate process is in place to ensure only candidates who are appropriately qualified are promoted.

Not only must DOC revise its pre-promotional screening policy to create a more thorough and transparent screening process, but DOC must *follow its own policy*.

| COMPLIANCE RATING | ¶ 1. Non-Compliance |
| | ¶ 2. Partial Compliance |
| | ¶ 3. Substantial Compliance |

INDIVIDUALS IN CUSTODY UNDER THE AGE OF 19

| CJ § XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19, ¶ 1 (PREVENT FIGHT/ASSAULT) |
| --- |

¶ 1. *Prevent Fight/Assault.* Young Inmates shall be supervised at all times in a manner that protects them from an unreasonable risk of harm. Staff shall intervene in a manner to prevent Inmate-on-Inmate fights and assaults, and to de-escalate Inmate-on-Inmate confrontations, as soon as it is practicable and reasonably safe to do so.

*The analysis and compliance rating below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old incarcerated individuals. The Monitoring Team will not assess compliance with the Nunez provisions related to 16- and 17-year-olds in this Monitoring Period pursuant to the Stipulation and Order Regarding 16- and 17-Year-Old Adolescent Offenders at Horizon Juvenile Center, ¶ 2 (dkt. 503).*

The Monitoring Team has long been concerned about violence at RNDC, where the majority of young adults aged 18 to 21 are held.[113] For a short period of time, in late 2022 and early 2023, the combination of the Department's RNDC Violence Reduction Plan and effective facility leadership appeared to materially improve the facility's conditions. The Monitoring Team stated that, if the improvements observed in late 2022 were sustained, the Department would move out of Non-Compliance with this provision. Unfortunately, the positive trajectory was not sustained and in fact, marked regression in the level of violence and disorder was observed beginning in spring 2023 and throughout the current Monitoring Period. The Department issued an update to RNDC's Violence Reduction Plan in October 2023 (*see* Monitor's December 22, 2023 Report (dkt. 666) at pgs. 88-89 for a description). However, this update did not appear to lead to any direct action toward implementation, and conditions continued to stagnate through the end of 2023. Following the close of the Monitoring Period another RNDC Plan was issued and is discussed in more detail in Appendix E.

Understanding RNDC's trajectory requires an appreciation of how the facility's composition has changed over time. First, the facility holds many more detainees than it used to. In 2018-2020, RNDC held primarily young adults and the population was approximately 500 people. In early 2021, the size of the facility's population began to increase as more adult detainees were integrated into the facility. In early 2023, RNDC held approximately 800 people and throughout the current Monitoring Period, the population hovered around 1,100 people, most of whom were adults aged 22 and older. These changes to the size and composition of the facility presented significant challenges. A larger number of housing units are open, and many have become more densely populated. This has made both service

---

[113] The Monitor's December 22, 2023 Report (dkt. 666) at pg. 87 includes specific citations to various reports from 2022 and 2023 that discuss in detail RNDC's circumstances and the Department's efforts to address them.

provision and effective supervision by staff more difficult, and as a result, the facility's positive trajectory, overall condition and level of safety have deteriorated.

Beginning in spring 2023, both the Department (via NCU) and the Monitoring Team noted that housing units remain disorderly, with staff failing to exercise their authority to ensure those in custody remained in the dayroom during lock-out periods and failing to execute other critical security practices (e.g., securing doors, ensuring locks/windows are unobstructed, controlling movement, etc.). Incarcerated individuals were observed smoking illicit substances out in the open, fires became more frequent, mandated services were not dependable and sanitation took a notable turn for the worse. NCU's security audits from December 2023 continued to find unsecured doors on the housing units with PIC freely entering/exiting each other's cells; staff who were off post; staff who failed to use the Watch Tour system and/or failed to conduct quality checks of PICs' welfare during lock-in; PICs who were smoking; and staff who did not enforce the 9 p.m. lock-in. The Monitoring Team's site visits in late 2023 revealed these same serious and pervasive problems that compromise the facility's ability to protect individuals from harm, as required by this provision.

The facility's challenges are also reflected in the quantitative data (see Appendix B), although the interpretation requires an understanding of the surrounding circumstances. With regard to the use of force, the facility's UOF rate is difficult to compare over time because the *type* of individuals in custody has changed over time. In 2016/2017, RNDC held a small number of 16- and 17-year-olds, plus a large number of adults. The average monthly UOF rate in 2016 and 2017 was 8.04 and 4.90, respectively. In 2018, GMDC was closed, and its young adults (aged 18 to 21; who have much higher rates of UOF than older populations) were transferred to RNDC. This transfer caused significant upheaval. Average monthly UOF rates skyrocketed to 28.1 in 2018 and 20.9 in 2019. Since then, the facility's UOF rate has gradually decreased as the proportion of adults at the facility has increased. During the current Monitoring Period, when the facility population was about 45% young adults and 55% adults, the facility's average monthly UOF rate (7.9) was the lowest it has been in many years. While lower use of force rates are certainly a welcome development, at RNDC, the improvement appears to be driven in large part by the demographics of the population, rather than by identifiable improvements in security and operational practices. In fact, the Monitoring Team's and NCU's observations, discussed above, suggest the opposite—a pervasive hesitance among staff to utilize sound security practices, properly enforce rules and establish order, resulting in a dangerous environment.

The interpretation of metrics related to interpersonal violence also requires some nuance. Interpersonal violence takes several forms—from simple fistfights to potentially lethal assaults with sharpened weapons. At RNDC during the current Monitoring Period, there was a notable decrease in the rate of fights (7.46), which is the lowest it has been in several years. Simultaneously, there was an increase in the rate of stabbings/slashings (0.92), a 55% increase compared to the previous Monitoring

Period. The facility averaged 10 stabbings/slashings per month during the current Monitoring Period and the rate of stabbings/slashings was significantly higher than most of the other major facilities. In addition, during the current Monitoring Period, the rate of fire-setting (2.95) more than doubled compared to the previous Monitoring Period (1.32) and was over 10 times higher than the other major facilities. The facility averaged about 32 fires per month during the current Monitoring Period. Several sources of information suggest that the fire-setting may be connected to frustration about inconsistent service delivery (e.g., recreation, laundry, commissary, etc.). Root cause analysis must be used to understand the underlying causes of the behaviors (e.g., frustration about unreliable service delivery) and the various circumstances that create the opportunity for the behavior to occur (e.g., availability of sharpened weapons and ignition sources), followed by solutions designed to address these dynamics.

The Department remains in Non-Compliance with this provision. The ongoing concerns related to the conditions at RNDC has resulted in the development of another plan, the *RNDC Programs Action Plan*, issued shortly after the end of the current Monitoring Period, described in the narrative above. The Department's efforts to implement the new plan and its impact on reducing the level of harm at RNDC will be discussed in future reports.

| COMPLIANCE RATING | ¶ 1. (18-year-olds) Non-Compliance |
|---|---|

| **CJ § XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19, ¶ 12 (DIRECT SUPERVISION)** |
|---|
| ¶ 12. _Direct Supervision._ The Department shall adopt and implement the Direct Supervision Model in all Young Inmate Housing Areas. |

_The analysis and compliance rating below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old incarcerated individuals. The Monitoring Team will not assess compliance with the Nunez provisions related to 16- and 17-year-olds in this Monitoring Period pursuant to the Stipulation and Order Regarding 16- and 17-Year-Old Adolescent Offenders at Horizon Juvenile Center, ¶ 2 (dkt. 503)._

To implement Direct Supervision, the Department is required to emphasize proactive and interactive supervision, appropriate relationship building, early intervention to avoid potential confrontations, de-escalation, rewarding positive behavior and consistent operations on each unit, including the implementation of daily unit schedules. The Department did not implement a Direct Supervision model at RNDC during the Monitoring Period and thus the Department remains in Non-Compliance with this provision.

The Department's long-standing inability to implement a Direct Supervision model resulted in the imposition of a related provision in the First Remedial Order (§D. ¶ 3). As part of the additional remedial relief, the Department is required to periodically assess the extent to which these various aspects are being properly implemented, along with adherence to the daily schedule in each housing unit. The NCU consulted with the Monitoring Team to develop a protocol for this assessment in early 2021, but audits were never produced because RNDC was in such disarray. Housing units did not have daily schedules and were not staffed by the same people day-to-day, which precluded the consistency, predictability and relationship development that is at the core of the Direct Supervision model.

Just after the close of the current Monitoring Period, the Department produced the _RNDC Programs Action Plan_. Implementing the core tenets of Direct Supervision is one of the goals of the plan, as described in the narrative above. As the plan is implemented, the Monitoring Team will report the Department's progress toward this goal under this provision.

| **COMPLIANCE RATING** | **¶ 12. (18-year-olds)** Non-Compliance |
|---|---|

| CJ § XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19, ¶ 17 (CONSISTENT ASSIGNMENT OF STAFF) |
|---|

¶ 17. *Consistent Assignment of Staff.* The Department shall adopt and implement a staff assignment system under which a team of Officers and a Supervisor are consistently assigned to the same Young Inmate Housing Area unit and the same tour, to the extent feasible given leave schedules and personnel changes.

*The analysis and compliance rating below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old incarcerated individuals. The Monitoring Team will not assess compliance with the Nunez provisions related to 16- and 17-year-olds in this Monitoring Period pursuant to the Stipulation and Order Regarding 16- and 17-Year-Old Adolescent Offenders at Horizon Juvenile Center, ¶ 2 (dkt. 503).*

At RNDC, where most 18-year-olds are housed, officers and Supervisors are not consistently assigned to the same housing units day-to-day, as required by this provision. In order for the Department to adopt a consistent staff assignment model, staff must reliably report to work as scheduled and the Department must implement a staff deployment strategy that prioritizes the required consistency across units. The Department's inability to achieve substantial compliance with this provision resulted in additional remedial relief, including a provision regarding staff assignments in the First Remedial Order (§D. ¶ 1). In addition to requiring the Department to enhance its efforts to consistently assign staff to the same housing unit day-to-day, the First Remedial Order also requires the Department to implement a quality assurance process to assess the extent to which the consistent staffing requirements are met each month. The last consistent staffing audits occurred in mid/late 2021 and revealed very poor levels of performance (i.e., less than 20% of housing unit posts were staffed by a steady officer). Since 2021, and during the current Monitoring Period, the facility was not utilizing a strategy to consistently assign staff to the same housing unit day-to-day, so a quality assurance audit was not necessary. The Department remains in Non-Compliance with this requirement.

Following the end of the current Monitoring Period, the Department produced the *RNDC Programs Action Plan*, as described in the narrative above. One of the goals of the plan is to achieve consistent staffing in units that house young adults. The Monitoring Team emphasized in its written feedback and verbally during meetings that simply reporting a plan to implement consistent staffing is not sufficient. In order to successfully implement this strategy, the Department must also acknowledge and directly address the obstacles that hindered the implementation of consistent staffing in the past. As the plan is implemented, the Monitoring Team will report on the Department's progress toward that goal in this provision.

| COMPLIANCE RATING | ¶ 17. **(18-year-olds)** Non-Compliance |
|---|---|

# UPDATE ON THE 2023 *NUNEZ* COURT ORDERS

This section of the report provides an update on the Department's work related to five of the Court Orders entered in 2023—June 13, August 10, October 10, December 14, and December 20, 2023. Collectively, these Orders were intended to catalyze improvement in the Department's management of the *Nunez* Court Orders, its work with the Monitor, and its efforts to address fundamental security, reporting, and management practices to bring about some immediate relief to the ongoing risk of harm faced by staff and people in custody on a daily basis.

## JUNE 13, 2023 ORDER (DKT. 550)

The Court entered an Order on June 13, 2023 regarding the City's and Department's obligation to work with the Monitor and his team, including providing relevant information as requested and notifying the Monitor of serious incidents in the jails. The status of each requirement is described briefly below.

- Immediate Notification to the Monitor of Serious Events (§I, ¶3):

    o (a) *Individuals who die in custody*: The Department provides prompt notification of deaths in custody and submits relevant information as it becomes known. The Monitoring Team does not have any reason to believe that information is being withheld as it was in the past.

    o (b) *Individuals who sustain a serious injury or serious condition that requires admission to a hospital*: The Monitoring Team receives daily notifications of individuals in custody who have been admitted to the hospital. The Monitoring Team described the recommendations it shared with the Department to improve its tracking and reporting in the Monitor's November 8, 2023 Report (dkt. 595) at pgs. 34 and 35. The Department's ability to report the circumstances under which an individual was taken and admitted to the hospital remains a work in progress.

    o (c) *Individuals who are compassionately released*: The Department provides the Monitoring Team with a routine report of all clinical release letters submitted by CHS.

- <u>Production of Information, Consultation and Access to Staff (§I, ¶¶ 4, 5, 6)</u>: The Department's approach to providing information, consulting and collaborating with the Monitoring Team shifted noticeably when the current Commissioner was appointed, as described in the Monitor's February 26, 2024 Report (dkt. 679) as well as in other sections of this report. The magnitude of the work the Department must do to advance the reforms is significant. The Department still struggles to respond to requests and feedback timely, and many of the Monitoring Team's requests and feedbacks have been pending for a long period of time. The Department's staff are clearly working very hard, appear very dedicated to the work of the *Nunez* Court Orders, and these delays do not appear to be related to the various issues impeding the Monitor's work that occurred in 2023. The delays appear to simply reflect the larger management issues described in this report (and others) that inhibit the Department's ability to advance reforms.

- <u>Nunez Manager (§I, ¶7)</u>: The *Nunez* Manager continues to be an advantageous and critical player in the Defendant's work. The Monitor's February 26, 2023 Report (dkt. 679) described the *Nunez* Manager's role, authority and sufficiency of resources (see pgs. 2-4). After that report was filed, a Deputy *Nunez* Manager was appointed, and a full-time administrative assistant was added to the team. Both are expected to expand the Department's capacity to properly manage the *Nunez* compliance effort.

- <u>Department-Wide Remedial Steps to Address the Five Incidents Discussed in the May 26, 2023 Special Report (dkt. 533) (§II)</u>: The Department reported that a preventive barrier was installed in the relevant housing unit in GRVC on October 3, 2023 and the Monitoring Team has verified its presence during site visits. In June 2023, the Department reported its intention to: (1) update existing policies to address individuals who are unclothed and (2) revise procedures to require incarcerated individuals who are involved in a violent encounter to be seen at the clinic on an "urgent basis." However, neither issue has been addressed and the policy/procedures remain unchanged. The Department recently reported its intention to include these policies among the others that are slated for revision via other Court's Orders.

**AUGUST 10, 2023 ORDER (DKT. 564)**

The Court entered an Order on August 10, 2023 to address several critical items identified by the Monitoring Team that are needed to reduce the imminent risk of harm but have continuously languished. The purpose of this Order was for the Department to prioritize these actions as other remedial relief is being contemplated. These steps were intended to be

immediate, *interim measures* to ensure a proper focus and pace for initiatives that have direct bearing on the imminent risk of harm.

- <u>UOF, Security and Violence Indicators (§ I, ¶ 1)</u>: The Monitor's February 26, 2024 (dkt. 679) Report describes the Department's efforts to address this requirement (see pgs. 5-7). As of the filing of this report, the new meeting format has not yet been initiated.

- <u>Revised Search Procedures (§ I, ¶ 2)</u>: In the Monitoring Team's reviews of incidents, searches remain chaotic and frequently result in unnecessary uses of force.[114] Search techniques remain poor and result in a relatively low rate of return in terms of the contraband recovered.[115] The Department identified three policies that must be revised to address this requirement. In September 2023, the Department submitted proposed revisions to the first of the three policies for the Monitoring Team's consideration. The Monitoring Team shared extensive feedback and comments in October 2023. The Department reports that it is evaluating the Monitoring Team's feedback and is also working to provide proposed revisions to the other two search policies. As of the filing of this report, the Department has not shared a revised draft of the first policy nor proposed revisions to the other two policies.

- <u>Revised Escort Procedures (§ I, ¶ 3)</u>: Painful escorts have been identified as a contributor to unnecessary uses of force for years, but no substantive efforts have been taken to change staff practice.[116] Beginning in February 2023, and on a monthly basis since, the

---

[114] In 2021, the Monitoring Team recommended: (1) the span of control for searches should be limited in order to reduce the number of excessive staff involved in searches; (2) a specific plan must be devised before each search takes place; (3) facility leadership must be involved in any planning for a search that includes external teams like ESU; and (4) specific procedures for conducting searches in celled and dormitory housing and common areas so that searches are completed in an organized and efficient manner and are not chaotic and disruptive.

[115] *See*, for example, Monitor's April 3, 2017 Report (dkt. 295) at pgs. 13-14 and 128; Monitor's October 17, 2018 Report (dkt. 317) at pg. 42; Monitor's October 23, 2020 Report (dkt. 360) at pgs. 16, 29 and 75; Monitor's May 11, 2021 Report (dkt. 368) at pgs. 24, 43-44, 48 and 124; Monitor's December 6, 2021 Report (dkt. 431) at pg. 26; Monitor's March 16, 2022 Report (dkt. 438) at pgs. 22 and 71-72; Monitor's October 28, 2022 (dkt. 472) at pgs. 71-72, 81 and 117; Monitor's April 3, 2023 Report (dkt. 517) at pgs. 54 and 138; Monitor's July 10, 2023 Report (dkt. 557) at pgs. 42-43; and Monitor's November 8, 2023 Report (dkt. 595) at pgs. 14-16.

[116] *See* Monitor's October 31, 2016 Report (dkt. 291) at pg. 110; Monitor's April 3, 2017 Report (dkt. 295) at pgs. 13 and 149; Monitor's October 10, 2017 Report (dkt. 305) at pg. 8; Monitor's April 18, 2018 Report (dkt. 311) at pgs. 18-21; Monitor's April 18, 2019 Report (dkt. 327) at pg. 24; Monitor's October 28, 2019 Report (dkt. 332) at pgs. 3-4; Monitor's May 29, 2020 Report (dkt. 341) at pgs. 30-31, 39 and 79; Monitor's October 23, 2020 Report (dkt. 360) at pg. 3, 13, 17, 29 and 31; Monitor's May 11, 2021

Department reviews inmate grievance reports to determine whether incarcerated individuals file a grievance regarding the use of painful escorts. The Department reports that, to date, no grievances have been filed regarding painful escorts. The Monitoring Team has advised the Department that it is unclear whether the evaluation of grievances for this issue is useful because the practice is ongoing and has not changed, so an assessment of grievances for this misconduct does not support problem-solving efforts to eradicate its use amongst staff.[117] The Department identified five policies that must be revised to address this requirement, all of which the Department reports are in different stages of internal review. The Monitoring Team has not yet received proposed revisions for any of the five policies.

- <u>Lock-in and Lock-out Procedures (§ I, ¶ 4)</u>: The Department has started to focus on properly implementing the evening lock-in (9:00 p.m.) and has consulted the Monitoring Team on its plans. On October 31, 2023, the Department issued a teletype articulating the requisite procedures and required each facility to devise a lock-in plan. There has been improvement in conducting lock-ins when required as shown in the chart below.



Department Wide 9 p.m. Lock-Ins
*September 2023 - March 2024*

---

Report (dkt. 368) at pgs. 24-25 and 46-47; Monitor's June 8, 2023 Report (dkt. 541) at pg. 6; Monitor's July 10, 2023 Report (dkt. 557) at pg. 45; and Monitor's November 8, 2023 Report (dkt. 595) at pgs. 12 and 14-15.

[117] The fact that no grievances have been filed regarding painful escorts most likely suggests that individuals in custody do not appreciate or know that a grievance should be filed if they are subject to the use of a painful escort, rather than an actual lack of painful escorts used by staff.

Incidents continue to occur following lock-in, which suggests that ongoing vigilance with ensuring individuals remain locked-in during bedtime hours. The Department has elected to first focus on the 9:00 p.m. lock-in before addressing compliance with the 3:00 p.m. lock-in. The Monitoring Team believes this is a reasonable approach given the difficulty the Department experiences in ensuring that staff properly execute basic security procedures.

- <u>Control Station Security (§ I, ¶ 5)</u>: The Monitoring Team remains concerned that control stations are not properly secured. On October 20, 2023, the Department issued a teletype regarding staff's obligations to secure the control station doors, including a set of written requirements very similar to those developed in November 2021. At the time the teletype was issued, the Monitoring Team advised the Department that a plan for monitoring and enforcing the requirements was necessary given the pervasive and long-standing problems in this area and given that prior written protocols have had little impact on staff practice. The Department reported that the Video Monitoring Unit would monitor this issue and track its findings but has not confirmed whether this is actually occurring. The Department also reported its intention to share the methodology for tracking its findings regarding control station security with the Monitoring Team for consideration but has not yet done so.

- <u>Staff Off Post (§ I, ¶ 6)</u>: On October 20, 2023, the Department issued a teletype regarding staff's obligations to remain on post until properly relieved, and that abandoning one's post may result in disciplinary action. NCU assesses this practice as part of its security audits, but the Department does not have a centralized mechanism to track the number of staff who are found to be off post. The Monitoring Team has raised concern that the teletype/audit combination lacks an actual intervention that could impact staff practice. In response, the Department simply stated that NCU's security audits will continue to focus on staff being off post. NCU's security audits have identified this problem since the audits' inception in late 2021. NCU conducted 12 security audits in January and February 2024, with each audit covering one day in one housing unit in a facility (in this case either GRVC, OBCC, or RNDC). In all 12 audits, at least one staff member was found to be off post for at least some period of time during their tour. Although NCU's audits are useful to assess the scope of the problem, auditing and presenting NCU's findings has not generated any appreciable change in practice. The Department reported in fall 2023 that it also plans to reinvigorate its employee scanning process to help identify when a staff member may be off post. The effectiveness of this strategy is questionable given the low likelihood that a staff member would notify the control room that they were leaving their post without being properly relieved.

- <u>Special Teams Training (§ I, ¶ 7)</u>: The Department worked collaboratively with the Monitoring Team to develop the ESU/SRT training and the Monitoring Team approved it in February 2024. The approved training is a vastly improved product over prior iterations and now provides staff with appropriate guidance to address the problematic practices that led to this requirement.

- <u>Special Team Command Level Orders (§ I, ¶ 8)</u>: The Department reports that ESU has nine Command Level Orders ("CLOs") and that the other Special Teams (including SST and SRT) do not have any.[118] The Monitoring Team has provided feedback on three of the nine CLOs, as discussed below. The Department reports that the remaining six CLOs are undergoing internal review, and that proposed revisions will be shared with the Monitoring Team once that review is complete.

  - The Monitoring Team's feedback from August 2021 on two CLOs (related to Aerosol Grenades and Pepperball spray) went unaddressed for almost two years. In July 2023, the Department shared proposed revisions to these CLOs and the Monitoring Team again provided feedback in August 2023. Subsequently, the Department reported that it no longer intends to utilize Pepperball spray and thus will not update the relevant CLO.[119] The Department has not yet provided a revised draft of the Aerosol Grenade CLO.

  - In August 2023, the Monitoring Team provided feedback on the CLO related to Ballistic and Lethal Weapon Teams. The Department has not provided a revised draft of the policy to address this feedback.

- <u>Screening and Assignment of Staff to Special Teams (§ I, ¶ 9)</u>: In September 2023, the Department shared proposed revisions to the policy regarding screening and assigning staff to Special Teams. The Monitoring Team provided feedback in October 2023. The Department has not yet provided a revised draft of the policy to address the Monitoring Team's feedback.

- <u>Revised Pre-Promotional Screening Policies and Procedures (§ I, ¶ 10)</u>: The Department reports it has been working on revisions to the policy governing pre-promotional screening but has not provided proposed revisions to the Monitoring Team for review.

---

[118] As noted elsewhere in this report, it took the Department months to confirm the number of relevant policies related to ESU.

[119] In response to the Monitoring Team's recommendation, on March 4, 2024, the Deputy Commissioner of Security issued a Security Memorandum advising staff that the use of Pepperball Spray is no longer authorized and that the equipment is to be stored indefinitely in the Inactive Inventory Bay.

- <u>ID Staffing (§ I, ¶ 11)</u>: ID staffing levels are addressed in the "Use of Force Investigations" compliance assessment of this report. The Department reports it is continuing to work to recruit and hire the requisite number of investigators and supervisors as required by the Order.

- <u>Command Discipline ("CD") Directive (§ I, ¶ 13)</u>: The Department's process to develop the CD Directive has been unduly protracted. The Department has provided several versions of the proposed policy, and the Monitoring Team has provided extensive feedback on each version, including feedback shared in August 2022, November 2022, January 2023, March 2023, August 2023, October 2023, December 2023, and February 2024. The Monitoring Team's understanding is that during this process, the unions have been afforded multiple opportunities to comment on both the current policy and the contemplated revisions. The Monitoring Team identified several concerns during this revision process. First, in some cases, the Department's proposed revisions repeated prior proposals that were previously discussed extensively with the Monitoring Team and ultimately rejected, and yet the same proposal was subsequently reintroduced without basis. Further, nearly all successive versions of the policy have proposed revisions that look to further expand the use of CDs in response to more serious misconduct and to limit the extent to which less serious misconduct may be subject to a CD. In addition, since the current version of the CD policy was issued in October 2022, the Department's performance in certain key areas related to CDs has deteriorated. This includes a decrease in the quality of Rapid Reviews and Investigations (through which staff can be referred for CDs) as well as the timeliness of formal discipline.[120] Notably, the compliance rating for Consent Judgment § VII., ¶ 1 and § VIII., ¶ 1 were both downgraded to Non-Compliance in 2023. Finally, a substantial number of CDs were dismissed for due process violations, despite NCU's detailed quality assurance work to prevent this outcome and the Monitoring Team's repeated concerns about processing issues.

- <u>External Assessment (§ I, ¶ 14)</u>: Dr. Belavich completed his assessment of the Department's suicide prevention practices in January 2024. Dr. Belavich consulted with the Monitoring Team during his assessment. A copy of his final report was filed with the Court on March 19, 2024 as Exhibit A to the Saunders Declaration (dkt. 689-12). The report includes several recommendations that the Monitoring Team intends to help the Department implement.

---

[120] See, for example, the Monitor's December 22, 2023 Report (dkt. 666) at pgs. 7-8 (Rapid Reviews), 33-45 (Investigations) and 48-66 (Accountability and Discipline).

**OCTOBER 10, 2023 ORDER (DKT. 582)**

On October 10, 2023, the Court issued an Order directing Defendants to engage with the Monitoring Team on immediate initiatives to address the risk of harm and reporting issues identified in the Monitor's October 5, 2023 Report and reminded Defendants of their obligations to collaborate with the Monitor and to comply with the *Nunez* Court Orders.

- **Immediate Security Plan**: The Court has issued a number of Orders requiring the Department to develop a Security Plan.[121] The Monitor's November 8, 2023 Report (dkt. 595) at pgs. 17-21 described the plans developed since September 2021 when the Second Remedial Order was entered, extending through November 2023. Since then, the Monitoring Team has not received any substantive updates on the plans discussed in that report. Various agency leaders have reported to the Monitoring Team that plans are under development, but none have been produced. As discussed in the Security section of this report, the Monitoring Team strongly recommends that the Department develop and implement a comprehensive Security Plan.

- **Immediate Reporting Initiatives**: The Department issued two teletypes, on October 6 and 20, 2023, that reminded staff of their reporting obligations. The teletypes also rescinded the January 31, 2023 memo that permitted undue subjectivity and discretion in reporting (*see* Monitor's November 8, 2023 Report (dkt. 595) at pgs. 29-37). Department representatives also met with the Monitoring Team on October 16, 2023 to provide background and context for various long-term technology enhancements currently underway to improve its tracking processes. Additional work related to the Department's reporting obligations is discussed in the section below regarding the December 14, 2023 Order.

**DECEMBER 14, 2023 ORDER (DKT. 656)**

On December 14, 2023, the Court issued an Order related to changes the Defendants must make to its reporting practices in light of the Monitoring Team's findings in the Monitor's October 4, 2023 and November 8, 2023 Reports.

---

[121] *See also* Second Remedial Order, ¶ 1(i)(a) (dkt. 398); Action Plan § D, ¶ 2(a) (dkt. 465); July 18, 2023 Order at pg. 2 (dkt. 558).

- <u>List of Reporting Policies (§ 1, ¶ a)</u>: On December 15, 2023, the Department provided the Monitoring Team with a list of over 90 Department policies that must be reviewed for potential consolidation into a comprehensive Incident Reporting policy.

- <u>Stabbing and Slashing Definition (§ 1, ¶ b)</u>: The Department and Monitoring Team collaborated to revise the definition for "stabbing/slashing," which was approved by the Monitor on February 16, 2024. The approved definition has not yet been integrated into incident reporting practices.

- <u>Definitions of Incident Categories (§ 1, ¶ c)</u>: The definition of incident categories will be addressed as part of the development of the comprehensive Incident Reporting policy.

- <u>Comprehensive COD Policy (§ 1, ¶ d)</u>: The Department reports that a comprehensive Incident Reporting policy is being developed.

DECEMBER 20, 2023 ORDER (DKT. 665)

On December 20, 2023, the Court found the Department in contempt of Action Plan § D, ¶ 3 and § E, ¶ 4 (dkt. 465) and § I, ¶ 5 of the June 13, 2023, Order (dkt. 550). In order for Defendants to purge their contempt, the Court further ordered that the Department was required, by February 27, 2024, to comply with three requirements related to: (1) the sufficiency of the role, authority, and resources dedicated to the *Nunez* Manager, (2) developing and implementing a high profile communications program to make clear the responsibility—shared by Department leadership and staff alike—to proactively collaborate with the Monitoring Team, and (3) developing a set of data and metrics for use of force, security, and violence indicators that will be routinely evaluated by Department leadership to identify trends regarding unnecessary and excessive uses of force and violence in order to identify their root causes and to develop effective strategies to reduce their occurrence.

The Monitoring Team submitted a report to the Court on February 26, 2024 (dkt. 679) on the status of the Department's efforts to purge contempt. On February 27, 2024 (dkt. 680), the Court found that the Department complied with the three requirements of the December 20, 2023 Order and therefore purged its contempt.

STREAMLINING THE *NUNEZ* COURT ORDERS

The Department has not been able to keep pace with the many requirements of the *Nunez* Court Orders. The Monitoring Team has provided extensive reporting on the enormous volume of requirements imposed by the *Nunez* Court Orders.[122] The sheer number of orders and requirements in this case have created a dizzying array of interrelated requirements that are difficult to prioritize and that make tracking progress very challenging. While the Action Plan and supplementary 2023 Court Orders have stimulated some movement in discrete areas, none of them have been achieved in full and the overarching goal to create momentum for reform has not yet been realized.

The importance of clear, current and prescriptive policies to a reform effort cannot be understated, and the long list of policies that require revision is discouraging. Furthermore, the continued failure to develop and implement a comprehensive Security Plan, despite an extensive record of these failures and how they create unsafe conditions for both incarcerated individuals and staff, is inexplicable.

The array of requirements under the Nunez Court Orders are voluminous and complicated, which may account for at least some of the delay in advancing reform. However, the inability to move forward with the bulk of these requirements is also at least partly attributable to the fact that the Department simply does not have a sufficient number of qualified

---

[122] The Consent Judgment includes over 300 provisions with distinct and overlapping requirements. Between August 2020 and November 2021, three subsequent Remedial Orders imposed supplementary requirements in areas that required additional focus. Given that the Consent Judgment and three Remedial Orders did not catalyze the contemplated reforms, the Action Plan was entered in June 2022, which aimed to lay the necessary groundwork for reform and to assist the Department in focusing on priority areas upon which to build. In 2023, as a result of the ongoing risk of harm and issues related to Defendants' collaboration and consultation with the Monitor, the Court imposed at least five additional orders with substantive requirements and deadlines to address emergent issues with the goal of prioritizing and resolving certain immediate problems expeditiously.

individuals to manage and implement the required changes. As discussed in other parts of this report, this is yet another consequence of the Department's insufficient leadership team. The lack of a substantial, dedicated team with requisite expertise is inhibiting the ability to move forward with the reforms.

The current approach of the *Nunez* Court Orders, which require compliance with hundreds of interconnected provisions, is not sustainable, and a thoughtful approach to streamlining the requirements of the *Nunez* Court Orders is needed. While a strategy must be formulated, the Monitoring Team acknowledges that attempting to formulate that strategy at this juncture would be premature in light of the pending motion practice. Streamlining these orders is best suited to occur as either part of the Court's determination in the pending motion practice, or shortly thereafter once the question of the jails' management has been resolved. The Monitoring Team is eager to lead and/or support this process once the appropriate time has come. The Monitoring Team highlights this important issue because it must remain at the forefront of considerations about the path forward.

## CONCLUSION

The Department remains in a state of flux with new leadership and the pending motion practice that may impact the operations of the jails going forward. This, compounded by decades of mismanagement and an endemic, dysfunctional culture, makes the problems facing the Department that much more challenging. The Monitoring Team continues to believe that reform is achievable but will require concrete and sustained efforts in both planning and execution. The new Commissioner inspires confidence and optimism, but without sufficient support from a capable and stable executive team that can develop and sustain effective initiatives, and vast improvements in the quality of on-the-ground supervision that can provide direct, consistent, and appropriate guidance to staff, the kind of material changes needed to improve facility safety will remain elusive.

More than eight years after the Consent Judgment was entered, the need to reform the Department could not be more urgent. To date, Defendants in the main, have not made substantial and demonstrable progress in implementing the reforms, initiatives, plans, systems, and practices outlined in the *Nunez* Court Orders. Furthermore, the risk of harm currently facing incarcerated individuals and Department staff has not been substantially and materially reduced to date. The Department has not made meaningful progress towards reducing the use of excessive and unnecessary force and achieving substantial compliance with this seminal provision of the *Nunez* Court Orders than when the Consent Judgment went into effect.

To be certain, sustainable institutional reform in a complex, large-scale agency like the New York Department of Correction requires methodical and well-reasoned incremental advancement of material reforms. While time is of the essence to reduce harm to the detainee population and staff, Defendants in such cases, in this instance the City and the Department,

168

must first and foremost create a management scheme that ensures continuity of leadership so that formative steps can be taken to begin to generate forward progress. Such progress may not be at the pace desired by all stakeholders, but it is necessary to instill reasonable confidence that there is indeed a commitment to reform and that measurable and sustainable progress will ensue.

The opportunity to advance the reform must harness the needed expertise and deploy capable leaders to spearhead the resolution of what, to date, have been intractable problems and to persist with those efforts until the problems have been addressed. A paradigm shift in the reform effort is necessary so that durable strategies to resolve key foundational problems are developed and sustained over time.

### 2024 REPORTING AND COMPLIANCE ASSESSMENTS

This report is filed during a time when complex motion practice — Plaintiffs' motion for contempt and appointment of a Receiver — is pending before the Court. Depending on how the issues are decided by the Court, this motion practice has serious implications for the jails' management going forward. The timeline for resolving this legal matter is unknown but, at a minimum, the matter will be pending for at least a few more months as motion practice continues, the Parties meet and confer, proceedings occur before the Court, and the Court renders its decision. Given these unknowns, the Monitoring Team recommends the following course of action in the near term until there is greater clarity on the pathway forward.

1. Extension of Limited Compliance Ratings through June 2024: Under the Action Plan § G, ¶ 5 (b), the Court directed the Monitoring Team to limit its compliance assessments to certain key provisions of the Consent Judgment and First Remedial Order beginning in June 2022. This approach, intended to focus compliance assessments on a more limited group of provisions, expired on December 31, 2023 (dkt. 656). The Monitoring Team recommends extending this approach to compliance assessment through June 2024 as it will help to ensure that appropriate focus and attention remain on the priority issues and

the more recent *Nunez* Court Orders. The Monitoring Team therefore respectfully requests that Action Plan §G, ¶ 5(b) is modified to extend through June 30, 2024.

2. <u>Reporting in 2024</u>: The Monitoring Team recommends the following reporting schedule for 2024.

   a. *June 27, 2024*: This report will provide an update on the current state of affairs, the ongoing work related to the *Nunez* Court's Orders and any new issues that emerge after the current report is filed. The Monitor's June 27, 2024 Report will not include compliance ratings.

   b. *November 21, 2024*: This report will include a discussion of the current state of affairs and, the ongoing work related to the *Nunez* Court's Orders, and will provide compliance ratings for the limited group of provisions from the Consent Judgment and First Remedial Order as outlined in Action Plan §G, ¶ 5(b), covering the period from January to June 2024.

   c. *Other Reports*: The Monitoring Team will issue additional reports to the extent necessary and when directed to do so by the Court.

The Monitoring Team intends to consult with the Parties about the proposed reporting schedule and will submit a proposed Order to the Court for consideration and approval in the near term.

# APPENDIX A:
# DATA

# NUMBER AND RATE OF UOF
# JANUARY 2022 TO DECEMBER 2023



| Systemwide Use of Force January 2022 to December 2023 | | | | |
|---|---|---|---|---|
| Months | Total # UOF | Average/month | ADP | Rate |
| January-June 2022 | 3241 | 540.2 | 5491 | 9.8 |
| July-December 2022 | 3764 | 627.3 | 5787 | 10.9 |
| January-June 2023 | 3236 | 539.3 | 5969 | 9.0 |
| July-December 2023 | 3548 | 591.3 | 6151 | 9.61 |

| Use of Force at AMKC<br>January 2022 to July 2023 (facility closed) | | | | |
|---|---|---|---|---|
| Months | Total # UOF | Average/month | ADP | Rate |
| January-June 2022 | 682 | 113.7 | 1975 | 5.74 |
| July-December 2022 | 1094 | 182.3 | 2073 | 8.79 |
| January-June 2023 | 1049 | 174.8 | 1944 | 8.99 |
| July 2023 (then closed) | 138 | 138 | 1577 | 8.75 |

| Use of Force at EMTC<br>January 2022 to December 2023 | | | | |
|---|---|---|---|---|
| Months | Total # UOF | Average/month | ADP | Rate |
| January-June 2022 | 485 | 80.8 | 594 | 13.61 |
| July-December 2022 | 613 | 102.2 | 733 | 13.94 |
| January-June 2023 | 533 | 88.8 | 873 | 10.18 |
| July-December 2023 | 677 | 112.8 | 1202 | 9.39 |

| Use of Force at GRVC<br>January 2022 to December 2023 | | | | |
|---|---|---|---|---|
| Months | Total # UOF | Average/month | ADP | Rate |
| January-June 2022 | 621 | 103.5 | 622 | 16.7 |
| July-December 2022 | 824 | 137.3 | 743 | 18.5 |
| January-June 2023 | 508 | 84.7 | 829 | 10.2 |
| July-December 2023 | 532 | 88.7 | 887 | 10.0 |

| Use of Force at NIC/West January 2022 to December 2023 | | | | |
|---|---|---|---|---|
| Months | Total # UOF | Average/month | ADP | Rate |
| January-June 2022 | 217 | 36.2 | 335 | 10.8 |
| July-December 2022 | 133 | 22.2 | 346 | 6.4 |
| January-June 2023 | 193 | 32.2 | 355 | 9.1 |

| Use of Force at OBCC January 2022 to December 2023 | | | | |
|---|---|---|---|---|
| Months | Total # UOF | Average/month | ADP | Rate |
| January-June 2022 | 165 | 27.5 | 291 | 9.46 |
| July-December 2022 | Facility was closed. | | | |
| January-June 2023 | Facility was closed. | | | |
| Aug.-December 2023 | 696 | 139.2 | 1453 | 9.58 |

*Data from July 2023 is excluded because it is an extreme outlier*

| Use of Force at RESH July-December 2023 | | | | |
|---|---|---|---|---|
| Months | Total # UOF | Average/month | ADP | Rate |
| July-December 2023 | 398 | 66.3 | 164 | 40.5 |

| Use of Force at RNDC January 2022 to December 2023 | | | | |
|---|---|---|---|---|
| Months | Total # UOF | Average/month | ADP | Rate |
| January-June 2022 | 653 | 108.8 | 727 | 15.1 |
| July-December 2022 | 478 | 79.7 | 812 | 9.9 |
| January-June 2023 | 413 | 68.8 | 848 | 8.1 |
| July-December 2023 | 516 | 86.0 | 1089 | 7.9 |

# NUMBER AND RATE OF STABBING AND SLASHING
# JANUARY 2022 TO DECEMBER 2023



| Systemwide Stabbings/Slashings January 2022 to December 2023 | | | | |
|---|---|---|---|---|
| Months | Total # S/S | Average/month | ADP | Rate |
| January-June 2022 | 254 | 42.3 | 5491 | 0.77 |
| July-December 2022 | 214 | 35.7 | 5787 | 0.62 |
| January-June 2023 | 168 | 28.0 | 5969 | 0.47 |
| July-December 2023 | 216 | 36.0 | 6151 | 0.59 |

| Stabbing/Sashing at AMKC<br>January 2022 to July 2023 (facility closed) | | | | |
|---|---|---|---|---|
| Months | Total # S/S | Average/month | ADP | Rate |
| January-June 2022 | 49 | 8.2 | 1975 | 0.41 |
| July-December 2022 | 49 | 8.2 | 2073 | 0.39 |
| January-June 2023 | 58 | 9.7 | 1944 | 0.50 |
| July 2023 (then closed) | 4 | 4.0 | 1577 | 0.25 |

| Stabbing/Sashing at EMTC<br>January 2022 to December 2023 | | | | |
|---|---|---|---|---|
| Months | Total # S/S | Average/month | ADP | Rate |
| January-June 2022 | 31 | 5.2 | 594 | 0.87 |
| July-December 2022 | 20 | 3.3 | 733 | 0.45 |
| January-June 2023 | 25 | 4.2 | 873 | 0.48 |
| July-December 2023 | 23 | 3.8 | 1202 | 0.32 |

| Stabbing/Sashing at GRVC<br>January 2022 to December 2023 | | | | |
|---|---|---|---|---|
| Months | Total # S/S | Average/month | ADP | Rate |
| January-June 2022 | 58 | 9.7 | 622 | 1.55 |
| July-December 2022 | 99 | 16.5 | 743 | 2.22 |
| January-June 2023 | 47 | 7.8 | 829 | 0.94 |
| July-December 2023 | 40 | 6.7 | 887 | 0.75 |

| Stabbing/Slashing at NIC/West January 2022 to December 2023 | | | | |
|---|---|---|---|---|
| Months | Total # S/S | Average/month | ADP | Rate |
| January-June 2022 | 1 | 0.16 | 335 | 0.05 |
| July-December 2022 | 3 | 0.5 | 346 | 0.14 |
| January-June 2023 | 0 | 0 | 355 | 0.0 |
| July-December 2023 | 0 | 0 | 553 | 0.0 |

| Stabbing/Sashing at OBCC January 2022 to December 2023 | | | | |
|---|---|---|---|---|
| Months | Total # S/S | Average/month | ADP | Rate |
| January-June 2022 | 35 | 5.8 | 291 | 2.0 |
| July-December 2022 | Facility was closed. | | | |
| January-June 2023 | Facility was closed. | | | |
| Aug.-December 2023 | 48 | 9.6 | 1452 | 0.66 |

*Data from July 2023 is excluded because it is an extreme outlier*

| Stabbings/Slashings at RESH July-December 2023 | | | | |
|---|---|---|---|---|
| Months | Total # S/S | Average/month | ADP | Rate |
| July-December 2023 | 37 | 6.17 | 164 | 3.76 |

| Stabbings/Slashings at RNDC January 2022 to December 2023 | | | | |
|---|---|---|---|---|
| Months | Total # S/S | Average/month | ADP | Rate |
| January-June 2022 | 70 | 11.7 | 727 | 1.6 |
| July-December 2022 | 37 | 6.2 | 812 | 0.76 |
| January-June 2023 | 30 | 5.0 | 848 | 0.59 |
| July-December 2023 | 60 | 10.0 | 1089 | 0.92 |

# NUMBER AND MONTHLY RATE OF FIGHTS
## JANUARY 2022 TO DECEMBER 2023



Systemwide Number and Rate of Fights, 2016 - December 2023

| Systemwide Fights January 2022 to December 2023 | | | | |
|---|---|---|---|---|
| Months | Total # Fights | Average/month | ADP | Rate |
| January-June 2022 | 2764 | 460.7 | 5491 | 8.39 |
| July-December 2022 | 3071 | 511.8 | 5787 | 8.84 |
| January-June 2023 | 2953 | 492.2 | 5969 | 8.25 |
| July-December 2023 | 3210 | 535.0 | 6151 | 8.7 |

| Fights at AMKC<br>January 2022 to July 2023 (facility closed) | | | | |
|---|---|---|---|---|
| Months | Total #<br>Fights | Average/month | ADP | Rate |
| January-June 2022 | 676 | 112.7 | 1975 | 5.70 |
| July-December 2022 | 925 | 154.2 | 2073 | 7.44 |
| January-June 2023 | 1050 | 175.0 | 1944 | 9.00 |
| July 2023 (then closed) | 127 | 127.0 | 1577 | 8.05 |

| Fights at EMTC<br>January 2022 to December 2023 | | | | |
|---|---|---|---|---|
| Months | Total #<br>Fights | Average/month | ADP | Rate |
| January-June 2022 | 753 | 125.5 | 594 | 21.13 |
| July-December 2022 | 957 | 159.5 | 733 | 21.76 |
| January-June 2023 | 796 | 132.67 | 873 | 15.2 |
| July-December 2023 | 1024 | 170.67 | 1202 | 14.2 |

| Fights at GRVC<br>January 2022 to December 2023 | | | | |
|---|---|---|---|---|
| Months | Total #<br>Fights | Average/month | ADP | Rate |
| January-June 2022 | 275 | 45.8 | 622 | 7.37 |
| July-December 2022 | 330 | 55.0 | 743 | 7.40 |
| January-June 2023 | 273 | 45.5 | 829 | 5.49 |
| July-December 2023 | 437 | 72.8 | 887 | 8.21 |

| Fights at NIC/West January 2022 to December 2023 | | | | |
|---|---|---|---|---|
| Months | Total # Fights | Average/month | ADP | Rate |
| January-June 2022 | 42 | 7.0 | 335 | 2.1 |
| July-December 2022 | 57 | 9.5 | 346 | 2.8 |
| January-June 2023 | 67 | 11.2 | 355 | 3.2 |
| July-December 2023 | 60 | 10.0 | 553 | 1.8 |

*\*\*No fights reported at WF in 2022*

| Fights at OBCC January 2022 to December 2023 | | | | |
|---|---|---|---|---|
| Months | Total # Fights | Average/month | ADP | Rate |
| January-June 2022 | 143 | 23.83 | 291 | 8.19 |
| July-December 2022 | Facility was closed. | | | |
| January-June 2023 | Facility was closed. | | | |
| Aug.-December 2023 | 647 | 129.4 | 1452 | 8.91 |

*\*Data from July 2023 is excluded because it is an extreme outlier*

| Fights at RESH July-December 2023 | | | | |
|---|---|---|---|---|
| Months | Total # Fights | Average/month | ADP | Rate |
| July-December 2023 | 46 | 7.67 | 164 | 4.67 |

| Fights at RNDC January 2022 to December 2023 | | | | |
|---|---|---|---|---|
| Months | Total # Fights | Average/month | ADP | Rate |
| January-June 2022 | 455 | 75.83 | 727 | 10.43 |
| July-December 2022 | 451 | 75.17 | 812 | 9.26 |
| January-June 2023 | 358 | 59.67 | 848 | 7.04 |
| July-December 2023 | 509 | 84.83 | 1089 | 7.79 |

# NUMBER AND RATE OF FIRES
# JANUARY 2022 TO DECEMBER 2023



| Systemwide Fires January 2022 to December 2023 | | | | |
|---|---|---|---|---|
| Months | Total # Fires | Average/month | ADP | Rate |
| January-June 2022 | 444 | 74.0 | 5491 | 1.35 |
| July-December 2022 | 273 | 45.5 | 5787 | 0.79 |
| January-June 2023 | 210 | 35.0 | 5969 | 0.59 |
| July-December 2023 | 351 | 58.5 | 6151 | 0.95 |

| Fires at AMKC<br>January 2022 to July 2023 (facility closed) | | | | |
|---|---|---|---|---|
| Months | Total # Fires | Average/month | ADP | Rate |
| January-June 2022 | 39 | 6.0 | 1975 | 0.30 |
| July-December 2022 | 15 | 2.5 | 2073 | 0.12 |
| January-June 2023 | 15 | 2.5 | 1944 | 0.13 |
| July 2023 (then closed) | 1 | 1.0 | 1577 | 0.0 |

| Fires at EMTC<br>January 2022 to December 2023 | | | | |
|---|---|---|---|---|
| Months | Total # Fires | Average/month | ADP | Rate |
| January-June 2022 | 6 | 1.0 | 594 | 0.17 |
| July-December 2022 | 5 | 0.83 | 733 | 0.11 |
| January-June 2023 | 1 | 0.17 | 873 | 0.02 |
| July-December 2023 | 3 | 0.5 | 1202 | 0.04 |

| Fires at GRVC<br>January 2022 to December 2023 | | | | |
|---|---|---|---|---|
| Months | Total # Fires | Average/month | ADP | Rate |
| January-June 2022 | 151 | 25.17 | 622 | 4.05 |
| July-December 2022 | 137 | 22.83 | 743 | 3.07 |
| January-June 2023 | 71 | 11.83 | 829 | 1.43 |
| July-December 2023 | 6 | 1.0 | 887 | 0.11 |

| Fires at NIC/West<br>January 2022 to December 2023 | | | | |
|---|---|---|---|---|
| Months | Total #<br>Fires | Average/month | ADP | Rate |
| January-June 2022 | 128 | 21.3 | 335 | 6.36 |
| July-December 2022 | 50 | 8.3 | 346 | 2.4 |
| January-June 2023 | 51 | 8.5 | 355 | 2.39 |
| July-December 2023 | 46 | 7.7 | 553 | 1.39 |

*\*\*In July-Dec 2023, part of AMKC was being considered WF, which increased the ADP from ~80 to ~280*

| Fires at OBCC<br>January 2022 to December 2023 | | | | |
|---|---|---|---|---|
| Months | Total #<br>Fires | Average/month | ADP | Rate |
| January-June 2022 | 30 | 5.0 | 291 | 1.72 |
| July-December 2022 | Facility was closed. | | | |
| January-June 2023 | Facility was closed. | | | |
| Aug.-December 2023 | 20 | 4.0 | 1452 | 0.28 |

*\*Data from July 2023 is excluded because it is an extreme outlier*

| Fires at RESH<br>July-December 2023 | | | | |
|---|---|---|---|---|
| Months | Total #<br>Fires | Average/month | ADP | Rate |
| July-December 2023 | 78 | 13.0 | 164 | 7.92 |

| Fires at RNDC<br>January 2022 to December 2023 | | | | |
|---|---|---|---|---|
| Months | Total #<br>Fires | Average/month | ADP | Rate |
| January-June 2022 | 86 | 14.33 | 727 | 1.97 |
| July-December 2022 | 59 | 9.83 | 812 | 1.21 |
| January-June 2023 | 67 | 11.17 | 848 | 1.32 |
| July-December 2023 | 193 | 32.17 | 1089 | 2.95 |

# NUMBER AND RATE OF ASSAULT ON STAFF, WITH AND WITHOUT UOF





*The Department began tracking assaults on staff that did not involve a use of force in 2020. Prior years' data is not available.*

## FACILITY SEARCHES & CONTRABAND RECOVERY

In 2022, DOC conducted a total of 196,738 searches (195,348 completed by the Facility and 1,390 special searches[123]). In 2023, DOC conducted a total of 135,982 searches (135,324 completed by the Facility and 658 special searches[124]). Through February of this year, DOC conducted a total of 13,845 searches (13,822 completed by the Facility and 23 special searches[125]).

| Contraband Recovery, 2021-2024[126] | | | | |
|---|---|---|---|---|
| | **2021** | **2022** | **2023** | **Jan.-Feb. 2024** |
| Drugs | 1,049 | 1,421 | 1,245 | 64 |
| Weapons | 3,144 | 5,507 | 2,061 | 123 |
| Escape-Related Item | 196 | 525 | 292 | 27 |
| Other | 878 | 1,145 | 794 | 73 |
| **Total** | **5,267** | **8,598** | **4,392** | **287** |

The Department has installed body scanners at the staff entrances for RNDC, OBCC, and EMTC and plans to install body scanners at staff entrances to GRVC, RMSC, NIC, and WF in that order. The Department is also planning on using Rapiscan Drug Detection to scan incoming mail, and reports that it is waiting on funding approval to proceed with procurement.

Any successful effort to remove weapons from a facility is obviously positive but the decreased number of searches, combined with the relatively low rate of return (*i.e.,* contraband

---

[123] This includes searches by the Emergency Services Unit, the Special Search Team, the Canine Use and/or Tactical Search operations.

[124] *Id.*

[125] *Id.*

[126] The calculation of the data for contraband recovery varies depending on the type of contraband that is recovered. For example, drug contraband is counted by incident, not the actual number of items seized. For example, if three different types of drugs were recovered in one location, this is counted as a single seizure. In contrast, when weapons are seized, each item recovered is counted separately. For example, if three weapons were seized from a single individual, all three items are counted.

seized per searches conducted) and observations of videotaped footage of poor search technique and procedure suggests to the Monitoring Team that additional work to refine practice search remains necessary. The status of the Monitoring Team's feedback regarding searches is provided in the Update on 2023 *Nunez* Court Orders section of this Report.

## OVERVIEW OF IN-CUSTODY DEATHS

The number of people who have died while in custody is tragic and is related, at least in part, to the poor conditions and security practices in the jails as set forth herein.

In 2023, nine individuals died in custody or shortly after their release.[127] An updated table on the number of people who have died, and their causes of death is provided below. As of the date of this report, three people have died in 2024, and the cause of their deaths remains pending by OCME. The Monitoring Team remains gravely concerned about the underlying causes of deaths in custody, in particular those cases in which improved operational practice may have prevented these tragic outcomes from occurring. For instance, it is concerning that eight people have died by suicide or suspected suicide (seven of whom died since the Action Plan was entered in June 2022) since the Court required the Department to improve its practices regarding self-harm in September 2021.

---

[127] If an incarcerated individual has a health condition that may merit release, the process has a few steps and must be ordered by the Court. The Department does not have any authority to release an individual because of a health condition although it may certainly identify and recommend individuals that should be considered for potential release. To the extent an individual has a health condition that may merit release, CHS may issue a clinical condition letter, with the patient's consent, which is then provided to the individual's defense counsel. Counsel then may petition the Court to release the individual. Release is not automatic, and an individual determination must be made by the Court. If the court determines release is appropriate, the Department is notified via a court order that the individual is being released on their own recognizance ("ROR"). However, the order does not specify a medical reason for the release.

| NYC DOC Causes of Death, *2015 to April 18, 2024* | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** | **2024** | **Total** |
| Accidental | | | | | | | | 2 | | | 2 |
| COVID-19 | | | | | | 3 | 2 | | | | 5 |
| Medical Condition | 9 | 11 | 4 | 7 | 3 | 2 | 4 | 5 | 2 | | 47 |
| Overdose | | 2 | 1 | | | | 4 | 6 | 2 | | 15 |
| Suicide | 2 | 2 | | 1 | | 1 | 4 | 5 | 2 | | 17 |
| Drowned | | | | | | | | 1 | | | 1 |
| Pending OCME Confirmation | | | | | | | | | 3 | 3 | 6 |
| Undetermined Due to Death Outside of DOC Custody | | | | | | 4 | 2 | | | | 6 |
| Undetermined by OCME | | | 1 | | | 1 | | | | | 2 |
| **Total** | **11** | **15** | **6** | **8** | **3** | **11** | **16** | **19** | **9** | **3** | **101** |

The table below shows the Department's mortality rate from January 2010 to April 18, 2024. The sharp increase between 2020 and 2022 is troubling. The mortality rate in 2022 was the highest in over a decade and more than double the rate in 2016 at the inception of the Consent Judgment. Notably, the mortality rate in 2023 dropped significantly. A mortality rate for 2024 cannot be developed because the year is not yet complete.

| Mortality Rate | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **2010** | **2011** | **2012** | **2013** | **2014** | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** | **2024** |
| **Annual ADP** | 13,026 | 12,421 | 12,083 | 11,692 | 10,913 | 9,890 | 9,802 | 9,224 | 8,397 | 7,388 | 4,543 | 5,574 | 5,639 | 6,054 | 6,204 |
| **Number of Deaths** | 17 | 12 | 21 | 24 | 10 | 11 | 15 | 6 | 8 | 3 | 11 | 16 | 19 | 9 | 3 |
| **Mortality Rate** | 1.31 | 0.97 | 1.74 | 2.05 | 0.92 | 1.11 | 1.53 | 0.65 | 0.95 | 0.41 | 2.42 | 2.87 | 3.37 | 1.49 | ~ |
| *Note: The Mortality Rate is per 1000 people in custody and uses the following formula: Rate = (# of deaths/average # of people in custody)\*1000* | | | | | | | | | | | | | | | |

## UNMANNED POSTS & TRIPLE TOURS

The table below provides the monthly total and daily average from January 2021 to February 2024 of the total uniform staff headcount, unmanned posts (a post in which a staff member is not assigned), and triple tours. This data does not account for a staff member who is assigned, but then leaves the post without unauthorized.

The total number and daily average of unmanned posts and triple tours have both decreased since January 2022 and from their prior peak in 2021. The total number of both unmanned posts and triple tours was 0 in February 2023, which also marks the first month the Department reported no unmanned posts. The Department reported its last triple tour in September 2023, and has reported no triple tours since that month. These reductions are due, at least in part, to the efforts of the Deputy Commissioner of Administration and the scheduling and roster management team ("SMART"), who have been using digital scheduling software to identify and fill unmanned posts and have coordinated with facilities to assign staff more efficiently to reduce the number of overtime hours worked by staff.

| Month | Average Headcount per Day | Average Unmanned Posts per Day | Total Unmanned Posts per Month | Average Triple Tours per Day[128] | Total Triple Tours per Month |
|---|---|---|---|---|---|
| January 2021 | 8,872 | | | 0 | 6 |
| February 2021 | 8,835 | | | 3 | 91 |
| March 2021 | 8,777 | | | 5 | 169 |
| April 2021 | 8,691 | | | 4 | 118 |
| May 2021 | 8,576 | | | 4 | 109 |
| June 2021 | 8,475 | | | 4 | 108 |
| July 2021 | 8,355 | | | 15 | 470 |
| August 2021 | 8,459 | | | 25 | 764 |

---

[128] This column contains data for the number of staff who worked over 3.75 hours of their third tour. This chart does not contain data for staff who have worked 3.75 hours or less of their third tour.

| Month | Average Headcount per Day | Average Unmanned Posts per Day | Total Unmanned Posts per Month | Average Triple Tours per Day[128] | Total Triple Tours per Month |
|---|---|---|---|---|---|
| September 2021 | 8,335 | | | 22 | 659 |
| October 2021 | 8,204 | | | 6 | 175 |
| November 2021 | 8,089 | | | 6 | 174 |
| December 2021 | 7,778 | | | 23 | 706 |
| January 2022 | 7,708 | 59 | 1825 | 24 | 756 |
| February 2022 | 7,547 | 23 | 638 | 3 | 90 |
| March 2022 | 7,457 | 29 | 888 | 1 | 41 |
| April 2022 | 7,353 | 13 | 385 | 0 | 3 |
| May 2022 | 7,233 | 31 | 972 | 1 | 33 |
| June 2022 | 7,150 | 27 | 815 | 2 | 67 |
| July 2022 | 7,138 | 20 | 615 | 2 | 58 |
| August 2022 | 7,068 | 24 | 735 | 2 | 50 |
| September 2022 | 6,994 | 22 | 649 | 4 | 105 |
| October 2022 | 6,905 | 26 | 629 | 2 | 63 |
| November 2022 | 6,837 | 16 | 486 | 2 | 50 |
| December 2022 | 6,777 | 13 | 395 | 4 | 115 |
| January 2023 | 6,700 | 13 | 391 | 1 | 38 |
| February 2023 | 6,632 | 15 | 419 | 0 | 8 |
| March 2023 | 6,661 | 17 | 525 | 0 | 7 |
| April 2023 | 6,590 | 16 | 491 | 0 | 11 |
| May 2023 | 6,516 | 22 | 671 | 0 | 7 |
| June 2023 | 6,449 | 15 | 456 | 1 | 26 |
| July 2023 | 6,406 | 20 | 617 | 1 | 26 |
| August 2023 | 6,427 | 13 | 393 | 1 | 27 |
| September 2023 | 6,418 | 5 | 144 | 0 | 1 |
| October 2023 | 6,340 | 4 | 131 | 0 | 0 |
| November 2023 | 6,336 | 2 | 66 | 0 | 0 |
| December 2023 | 6,278 | 1 | 28 | 0 | 0 |
| January 2024 | 6,199 | 0 | 9 | 0 | 0 |
| February 2024 | 6,151 | 0 | 0 | 0 | 0 |

## USES OF FORCE INVOLVING INCIDENTS WHEN A STAFF MEMBER IS NOT ON POST

The tables below provide the number and proportion of uses of force involving "unmanned posts" as identified by the Department during four time periods (January-June 2022, July-December 2022, January-June 2023, July-December 2023). These incidents involve posts to which no staff member was assigned *and* instances where the assigned officer left their post without being relieved (collectively "unmanned posts"). The first two columns list the number of uses of force involving unmanned posts and the proportion of <u>all</u> uses of force that this number represents. The third and fourth columns identify the number and proportion of uses of force that involved unmanned posts **and** were avoidable (as identified by the Department) specifically due to the lack of staff on post. In other words, the Department determined that these incidents likely could have been avoided had a staff member been present.

| Uses of Force Incidents When a Staff Member is Not on Post: January-June 2022 | | | | |
|---|---|---|---|---|
| Facility | # of Total UOF Incidents involving Unmanned Posts | % of Total UOF Incidents involving Unmanned Posts[129] | # of UOF Incidents that UOF incidents involving Unmanned Posts & Were Avoidable | % of Total UOF Incidents involving Unmanned Posts & Were Avoidable |
| AMKC | 48 | 1.48% | *39* | *81.25%* |
| EMTC | 22 | 0.68% | *10* | *45.45%* |
| GRVC | 13 | 0.40% | *6* | *46.15%* |
| NIC | 2 | 0.06% | *1* | *50.00%* |
| OBCC | 19 | 0.59% | *7* | *36.84%* |
| RMSC | 6 | 0.19% | *2* | *33.33%* |
| RNDC | 40 | 1.23% | *22* | *55.00%* |
| VCBC | 1 | 0.03% | *1* | *100.00%* |
| **TOTAL** | **151** | **4.66%** | ***88*** | ***58.28%*** |

---

[129] There were 3,240 total actual uses of force in January-June 2022. This number does not include alleged uses of force because the Department does not provide avoidable reasons for alleged uses of force.

| | Uses of Force Incidents When a Staff Member is Not on Post: July-December 2022 | | | |
|---|---|---|---|---|
| Facility | # of Total UOF Incidents involving Unmanned Posts | % of Total UOF Incidents involving Unmanned Posts[130] | # of UOF Incidents that UOF incidents involving Unmanned Posts & Were Avoidable | % of Total UOF Incidents involving Unmanned Posts & Were Avoidable |
| AMKC | 51 | 1.35% | 33 | 64.71% |
| EMTC | 24 | 0.64% | 12 | 50.00% |
| GRVC | 35 | 0.93% | 13 | 37.14% |
| NIC | 4 | 0.11% | 2 | 50.00% |
| RMSC | 32 | 0.85% | 15 | 46.88% |
| RNDC | 10 | 0.27% | 4 | 40.00% |
| VCBC | 3 | 0.08% | 1 | 33.33% |
| TOTAL | 159 | 4.22% | 80 | 50.31% |

---

[130] There were 3,765 total actual uses of force in July-December 2022. This number does not include alleged uses of force because the Department does not provide avoidable reasons for alleged uses of force.

| | Uses of Force Incidents When a Staff Member is Not on Post: January-June 2023 | | | |
|---|---|---|---|---|
| Facility | # of Total UOF Incidents involving Unmanned Posts | % of Total UOF Incidents involving Unmanned Posts[131] | # of UOF Incidents that UOF incidents involving Unmanned Posts & Were Avoidable | % of Total UOF Incidents involving Unmanned Posts & Were Avoidable |
| AMKC | 45 | 1.39% | 28 | 62.22% |
| EMTC | 19 | 0.59% | 9 | 47.37% |
| GRVC | 19 | 0.59% | 9 | 47.37% |
| NIC | 2 | 0.06% | 1 | 50.00% |
| RMSC | 15 | 0.46% | 5 | 33.33% |
| RNDC | 10 | 0.31% | 4 | 40.00% |
| VCBC | 2 | 0.06% | 1 | 50.00% |
| TOTAL | 112 | 3.46% | 57 | 50.89% |

---

[131] There were 3,237 total actual uses of force in January-June 2023. This number does not include alleged uses of force because the Department does not provide avoidable reasons for alleged uses of force.

| Uses of Force Incidents When a Staff Member is Not on Post: July-December 2023 | | | | |
|---|---|---|---|---|
| Facility | # of Total UOF Incidents involving Unmanned Posts | % of Total UOF Incidents involving Unmanned Posts[132] | # of UOF Incidents that UOF incidents involving Unmanned Posts & Were Avoidable | % of Total UOF Incidents involving Unmanned Posts & Were Avoidable |
| AMKC | 8 | 0.25% | 6 | 75.00% |
| BHPW | 1 | 0.03% | 1 | 100.00% |
| EMTC | 10 | 0.31% | 4 | 40.00% |
| GRVC | 12 | 0.37% | 4 | 33.33% |
| NIC | 4 | 0.12% | 3 | 75.00% |
| OBCC | 8 | 0.25% | 6 | 75.00% |
| RESH | 3 | 0.09% | 0 | 0.00% |
| RMSC | 6 | 0.18% | 2 | 33.33% |
| RNDC | 12 | 0.37% | 3 | 25.00% |
| VCBC | 1 | 0.03% | 0 | 0.00% |
| **TOTAL** | **65** | **1.99%** | **29** | **44.62%** |

---

[132] There were 3,263 total actual uses of force in July-December 2023. This number does not include alleged uses of force because the Department does not provide avoidable reasons for alleged uses of force.

## NUMBER OF ADWS AND CAPTAINS

The two tables below identify the number and assignment of ADWs and Captains at specific points in time from July 18, 2020 to March 2, 2024. This data is discussed further in the compliance box for Remedial Order § A., ¶ 4 (Supervision of Captains).

| Facility | # of ADWs As of July 18, 2020 | # of ADWs As of Jan. 2, 2021 | # of ADWs As of June 26, 2021 | # of ADWs As of Jan. 1, 2022 | # of ADWs As of June 18, 2022 | # of ADWs As of Dec. 31, 2022 | # of ADWs As of June 16, 2023 | # of ADWs As of Dec. 23, 2023 | # of ADWs As of Mar. 2, 2024 |
|---|---|---|---|---|---|---|---|---|---|
| AMKC[134] | 9 | 21 | 13 | 12 | 9 | 12 | 16 | 0 | 0 |
| EMTC[135] | 0 | 0 | 0 | 0 | 0 | 8 | 10 | 11 | 12 |
| GRVC | 6 | 10 | 11 | 9 | 8 | 12 | 11 | 11 | 11 |
| MDC[136] | 6 | 2 | 1 | 1 | 0 | 1 | 1 | 1 | 1 |
| NIC | 6 | 8 | 8 | 5 | 7 | 8 | 9 | 12 | 10 |
| OBCC[137] | 6 | 8 | 8 | 14 | 7 | 0 | 0 | 11 | 11 |
| RMSC | 5 | 6 | 6 | 5 | 4 | 5 | 6 | 14 | 15 |
| RNDC | 7 | 15 | 15 | 10 | 7 | 12 | 12 | 10 | 11 |
| VCBC[138] | 4 | 6 | 5 | 5 | 4 | 5 | 5 | 0 | 0 |
| Court Commands (BKDC, BXDC, QDC) | 3 | 4 | 3 | 3 | 3 | 3 | 2 | 3 | 3 |
| **Total # of ADWs in Facilities & Court Commands** | **52** | **80** | **70** | **64** | **49** | **66** | **72** | **73** | **74** |
| **Total # of ADWs Available Department-wide** | **66** | **95** | **88** | **80** | **67** | **82** | **89** | **91** | **91** |

Number of ADWs & Assignments in the Department[133]

[133] The specific post assignments of ADWs within the Facility is not available so this data simply demonstrates the number of ADWs assigned per facility.

[134] AMKC was closed in August 2023.

[135] EMTC has been closed and opened in these Monitoring Periods. Until late 2022, staff that worked at EMTC were technically assigned to AMKC.

[136] MDC was utilized in a limited capacity at the end of the Twelfth Monitoring Period and was closed by June 2021. The staff currently assigned to MDC are in fact assigned to the Manhattan Courts (Criminal, Supreme, and Family).

[137] OBCC was closed by July 2022. Staff were then reassigned to other commands. OBCC was then reopened in July 2023.

[138] VCBC was closed in October 2023, but staff are still assigned to the facility in order to maintain the barge such that it does not physically deteriorate.

| Number of ADWs & Assignments in the Department[133] | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Facility | # of ADWs As of July 18, 2020 | # of ADWs As of Jan. 2, 2021 | # of ADWs As of June 26, 2021 | # of ADWs As of Jan. 1, 2022 | # of ADWs As of June 18, 2022 | # of ADWs As of Dec. 31, 2022 | # of ADWs As of June 16, 2023 | # of ADWs As of Dec. 23, 2023 | # of ADWs As of Mar. 2, 2024 |
| % of ADWs in Facilities & Court Commands | 79% | 84% | 80% | 80% | 73% | 80% | 81% | 80% | 81% |

| Number of Captains & Assignments in the Department[139] | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Facility | # of Captains As of July 18, 2020 | # of Captains As of Jan. 2, 2021 | # of Captains As of June 26, 2021 | # of Captains As of Jan. 1, 2022 | # of Captains As of June 18, 2022 | # of Captains As of Dec. 31, 2022 | # of Captains As of Jun 16, 2023 | # of Captains As of Dec. 23, 2023 | # of Captains As of Mar. 2, 2024 |
| AMKC[140] | 91 | 111 | 97 | 87 | 81 | 80 | 65 | 13 | 13 |
| EMTC[141] | 0 | 0 | 0 | 0 | 0 | 38 | 37 | 37 | 37 |
| GRVC | 75 | 72 | 86 | 86 | 81 | 90 | 61 | 43 | 44 |
| MDC[142] | 72 | 39 | 15 | 12 | 11 | 11 | 11 | 12 | 12 |
| NIC | 51 | 45 | 45 | 56 | 45 | 50 | 44 | 58 | 55 |
| OBCC[143] | 85 | 81 | 78 | 77 | 38 | 7 | 7 | 54 | 50 |
| RMSC | 51 | 50 | 49 | 36 | 34 | 31 | 27 | 55 | 56 |
| RNDC | 58 | 56 | 60 | 63 | 70 | 70 | 68 | 45 | 46 |

---

[139] The specific post assignments of Captains within the Facility is not available so this data demonstrates the number of Captains assigned per facility.

[140] AMKC was closed in August 2023.

[141] EMTC has been closed and opened in these Monitoring Periods. Until late 2022, staff that worked at EMTC were technically assigned to AMKC.

[142] MDC was utilized in a limited capacity at the end of the Twelfth Monitoring Period and was closed by June 2021. The staff currently assigned to MDC are in fact assigned to the Manhattan Courts (Criminal, Supreme, and Family).

[143] OBCC was closed by July 2022. Staff were then reassigned to other commands. Due to a locker room shortage at other facilities, some staff used the locker room at OBCC. OBCC was then reopened in July 2023. DOC reported that these the Captains assigned to OBCC between July 2022 and July 2023 were on medically monitored status and were assigned to OBCC to monitor the staff locker room.

| Number of Captains & Assignments in the Department[139] | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Facility | # of Captains As of July 18, 2020 | # of Captains As of Jan. 2, 2021 | # of Captains As of June 26, 2021 | # of Captains As of Jan. 1, 2022 | # of Captains As of June 18, 2022 | # of Captains As of Dec. 31, 2022 | # of Captains As of Jun 16, 2023 | # of Captains As of Dec. 23, 2023 | # of Captains As of Mar. 2, 2024 |
| VCBC[144] | 27 | 25 | 27 | 25 | 23 | 22 | 21 | 3 | 3 |
| Court Commands (BKDC, BXDC, QDC) | 39 | 37 | 35 | 32 | 33 | 28 | 25 | 29 | 29 |
| Total # of Captains in Facilities and Court Commands | 558 | 523 | 499 | 474 | 416 | 427 | 366 | 346 | 342 |
| Total # of Captains Available Department-wide | 810 | 765 | 751 | 670 | 607 | 573 | 550 | 539 | 532 |
| % of Captains in Facilities and Court Commands | 69% | 68% | 66% | 71% | 69% | 75% | 67% | 64% | 64% |

---

[144] VCBC was closed in October 2023, but staff are still assigned to the facility in order to maintain the barge such that it does not physically deteriorate.

## SICK LEAVE, MEDICALLY MONITORED/RESTRICTED, AWOL, PE, AND FMLA

The tables below provide the monthly average from January 1, 2019 to February 29, 2024 of the total staff headcount, the average number of staff out sick, the average number of staff on medically monitored/restricted duty level 3, the average number of staff who were AWOL, the average number of staff who were on Personal Emergency leave, and the average number of staff on FMLA leave.[145]

---

[145] The AWOL, PE, and FMLA data is only available for August 1, 2021-January 26, 2022 and April 2022-February 29, 2024.

| 2019 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Month | Head-count | Average (Avg.) Daily Sick | Avg. Daily % Sick | Avg. Daily MMR3 | Avg. Daily % MMR3 | Avg. Daily AWOL | Avg. Daily % AWOL | Avg. Daily PE | Avg. Daily % PE | Avg. Daily FMLA | Avg. Daily % FMLA |
| January 2019 | 10577 | 621 | 5.87% | 459 | 4.34% | | | | | | |
| February 2019 | 10482 | 616 | 5.88% | 457 | 4.36% | | | | | | |
| March 2019 | 10425 | 615 | 5.90% | 441 | 4.23% | | | | | | |
| April 2019 | 10128 | 590 | 5.83% | 466 | 4.60% | | | | | | |
| May 2019 | 10041 | 544 | 5.42% | 501 | 4.99% | | | | | | |
| June 2019 | 9953 | 568 | 5.71% | 502 | 5.04% | | | | | | |
| July 2019 | 9859 | 538 | 5.46% | 496 | 5.03% | | | | | | |
| August 2019 | 10147 | 555 | 5.47% | 492 | 4.85% | | | | | | |
| September 2019 | 10063 | 557 | 5.54% | 479 | 4.76% | | | | | | |
| October 2019 | 9980 | 568 | 5.69% | 473 | 4.74% | | | | | | |
| November 2019 | 9889 | 571 | 5.77% | 476 | 4.81% | | | | | | |
| December 2019 | 9834 | 603 | 6.13% | 463 | 4.71% | | | | | | |
| **2019 Average** | **10115** | **579** | **5.72%** | **475** | **4.71%** | | | | | | |

| 2020 | | | | | | | | | | | |
|------|------|------|------|------|------|------|------|------|------|------|------|
| Month | Head-count | Average (Avg.) Daily Sick | Avg. Daily % Sick | Avg. Daily MMR3 | Avg. Daily % MMR3 | Avg. Daily AWOL | Avg. Daily % AWOL | Avg. Daily PE | Avg. Daily % PE | Avg. Daily FMLA | Avg. Daily % FMLA |
| January 2020 | 9732 | 586 | 6.02% | 367 | 3.77% | | | | | | |
| February 2020 | 9625 | 572 | 5.94% | 388 | 4.03% | | | | | | |
| March 2020 | 9548 | 1408 | 14.75% | 373 | 3.91% | | | | | | |
| April 2020 | 9481 | 3059 | 32.26% | 278 | 2.93% | | | | | | |
| May 2020 | 9380 | 1435 | 15.30% | 375 | 4.00% | | | | | | |
| June 2020 | 9302 | 807 | 8.68% | 444 | 4.77% | | | | | | |
| July 2020 | 9222 | 700 | 7.59% | 494 | 5.36% | | | | | | |
| August 2020 | 9183 | 689 | 7.50% | 548 | 5.97% | | | | | | |
| September 2020 | 9125 | 694 | 7.61% | 586 | 6.42% | | | | | | |
| October 2020 | 9079 | 738 | 8.13% | 622 | 6.85% | | | | | | |
| November 2020 | 9004 | 878 | 9.75% | 546 | 6.06% | | | | | | |
| December 2020 | 8940 | 1278 | 14.30% | 546 | 6.11% | | | | | | |
| **2020 Average** | **9302** | **1070** | **11.49%** | **464** | **5.02%** | | | | | | |

| 2021 | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Month | Head-count | Average (Avg.) Daily Sick | Avg. Daily % Sick | Avg. Daily MMR3 | Avg. Daily % MMR3 | Avg. Daily AWOL | Avg. Daily % AWOL | Avg. Daily PE | Avg. Daily % PE | Avg. Daily FMLA | Avg. Daily % FMLA |
| January 2021 | 8872 | 1393 | 15.70% | 470 | 5.30% | | | | | | |
| February 2021 | 8835 | 1347 | 15.25% | 589 | 6.67% | | | | | | |
| March 2021 | 8777 | 1249 | 14.23% | 676 | 7.70% | | | | | | |
| April 2021 | 8691 | 1412 | 16.25% | 674 | 7.76% | | | | | | |
| May 2021 | 8576 | 1406 | 16.39% | 674 | 7.86% | | | | | | |
| June 2021 | 8475 | 1480 | 17.46% | 695 | 8.20% | | | | | | |
| July 2021 | 8355 | 1488 | 17.81% | 730 | 8.74% | | | | | | |
| August 2021 | 8459 | 1416 | 16.74% | 767 | 9.07% | 90 | 1.05% | 58 | 0.69% | 128 | 1.51% |
| September 2021 | 8335 | 1703 | 20.43% | 744 | 8.93% | 77 | 0.92% | 46 | 0.55% | 36 | 0.43% |
| October 2021 | 8204 | 1558 | 18.99% | 782 | 9.53% | 30 | 0.37% | 25 | 0.30% | 46 | 0.56% |
| November 2021 | 8089 | 1498 | 18.52% | 816 | 10.09% | 42 | 0.52% | 27 | 0.33% | 47 | 0.58% |
| December 2021 | 7778 | 1689 | 21.72% | 775 | 9.96% | 42 | 0.54% | 30 | 0.39% | 44 | 0.57% |
| **2021 Average** | **8454** | **1470** | **17.46%** | **699** | **8.32%** | **56** | **0.68%** | **37** | **0.45%** | **60** | **0.73%** |

| 2022 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Month | Head-count | Average (Avg.) Daily Sick | Avg. Daily % Sick | Avg. Daily MMR3 | Avg. Daily % MMR3 | Avg. Daily AWOL | Avg. Daily % AWOL | Avg. Daily PE | Avg. Daily % PE | Avg. Daily FMLA | Avg. Daily % FMLA |
| January 1-26 2022 | 7708 | 2005 | 26.01% | 685 | 8.89% | 42 | 0.55% | 19 | 0.25% | 41 | 0.53% |
| February 2022 | 7547 | 1457 | 19.31% | 713 | 9.45% | | | | | | |
| March 2022 | 7457 | 1402 | 18.80% | 617 | 8.27% | | | | | | |
| April 2022 | 7353 | 1255 | 17.07% | 626 | 8.51% | 23 | 0.31% | 33 | 0.45% | 49 | 0.67% |
| May 2022 | 7233 | 1074 | 14.85% | 634 | 8.77% | 24 | 0.34% | 39 | 0.54% | 47 | 0.66% |
| June 2022 | 7150 | 951 | 13.30% | 624 | 8.73% | 16 | 0.22% | 28 | 0.40% | 50 | 0.70% |
| July 2022 | 7138 | 875 | 12.26% | 608 | 8.52% | 19 | 0.26% | 33 | 0.47% | 54 | 0.76% |
| August 2022 | 7068 | 831 | 11.76% | 559 | 7.91% | 17 | 0.24% | 34 | 0.48% | 54 | 0.76% |
| September 2022 | 6994 | 819 | 11.71% | 535 | 7.65% | 6 | 0.09% | 33 | 0.48% | 58 | 0.83% |
| October 2022 | 6905 | 798 | 11.56% | 497 | 7.20% | 6 | 0.09% | 36 | 0.51% | 56 | 0.81% |
| November 2022 | 6837 | 793 | 11.60% | 476 | 6.96% | 7 | 0.09% | 21 | 0.31% | 48 | 0.70% |
| December 2022 | 6777 | 754 | 11.13% | 452 | 6.67% | 7 | 0.10% | 21 | 0.30% | 48 | 0.70% |
| 2022 Average | 7181 | 1085 | 14.95% | 586 | 8.13% | 17 | 0.23% | 30 | 0.42% | 51 | 0.71% |

| 2023 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Month | Head-count | Average (Avg.) Daily Sick | Avg. Daily % Sick | Avg. Daily MMR3 | Avg. Daily % MMR3 | Avg. Daily AWOL | Avg. Daily % AWOL | Avg. Daily PE | Avg. Daily % PE | Avg. Daily FMLA | Avg. Daily % FMLA |
| January 2023 | 6700 | 692 | 10.33% | 443 | 6.61% | 9 | 0.13% | 37 | 0.55% | 44 | 0.66% |
| February 2023 | 6632 | 680 | 10.25% | 421 | 6.35% | 9 | 0.14% | 30 | 0.46% | 47 | 0.70% |
| March 2023 | 6661 | 639 | 9.59% | 401 | 6.02% | 11 | 0.17% | 34 | 0.51% | 46 | 0.69% |
| April 2023 | 6590 | 595 | 9.03% | 393 | 5.96% | 10 | 0.15% | 41 | 0.62% | 45 | 0.68% |
| May 2023 | 6516 | 514 | 7.89% | 403 | 6.18% | 10 | 0.15% | 35 | 0.54% | 47 | 0.73% |
| June 2023 | 6449 | 466 | 7.23% | 399 | 6.19% | 10 | 0.16% | 30 | 0.47% | 45 | 0.70% |
| July 2023 | 6406 | 443 | 6.92% | 394 | 6.15% | 9 | 0.14% | 29 | 0.45% | 45 | 0.70% |
| August 2023 | 6427 | 437 | 6.80% | 386 | 6.01% | 17 | 0.26% | 56 | 0.86% | 86 | 1.33% |
| September 2023 | 6418 | 424 | 6.61% | 378 | 5.89% | 20 | 0.31% | 45 | 0.70% | 112 | 1.74% |
| October 2023 | 6340 | 414 | 6.54% | 352 | 5.55% | 18 | 0.28% | 40 | 0.62% | 114 | 1.80% |
| November 2023 | 6336 | 412 | 6.50% | 327 | 5.17% | 14 | 0.22% | 39 | 0.61% | 115 | 1.81% |
| December 2023 | 6278 | 425 | 6.77% | 316 | 5.03% | 11 | 0.18% | 39 | 0.62% | 121 | 1.93% |
| **2023 Average** | **6479** | **512** | **7.87%** | **384** | **5.93%** | **12** | **0.19%** | **38** | **0.58%** | **72** | **1.12%** |

| 2024 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Month | Head-count | Average (Avg.) Daily Sick | Avg. Daily % Sick | Avg. Daily MMR3 | Avg. Daily % MMR3 | Avg. Daily AWOL | Avg. Daily % AWOL | Avg. Daily PE | Avg. Daily % PE | Avg. Daily FMLA | Avg. Daily % FMLA |
| January 2024 | 6199 | 417 | 6.73% | 301 | 4.86% | 12 | 0.19% | 39 | 0.63% | 118 | 1.90% |
| February 2024 | 6151 | 392 | 6.37% | 292 | 4.75% | 11 | 0.18% | 40 | 0.65% | 112 | 1.82% |

## SUMMARY OF ID HIRES AND DEPARTURES

The table below includes the number of ID staff hired and any net gains to ID's staffing between January 2022 and February 2024. A more fulsome discussion regarding the recruitment and hiring process is included in the compliance box for Consent Judgment § VII., ¶¶ 1 and 9(a) (Use of Force Investigations).

| Summary of ID Hires & Departures Net Gain and Losses[146] | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| January 2022 to February 2024 | | | | | | | | | | | |
|  | Total Investigator | Civilian Investigator | Uniform Investigator | Total Supervisor | Civilian Supervisor | Uniform Supervisor | Administrative/ Clerical | Deputy Director | Director | Agency Attorney | Assistant Commissioner | Total |
| Total Hired | 76 | 72 | 4 | 23 | 13 | 10 | 2 | 9 | 1 | 0 | 3 | 114 |
| Resigned | 63 | 59 | 4 | 14 | 14 | 0 | 2 | 7 | 4 | 1 | 1 | 92 |
| Retired | 8 | 0 | 8 | 3 |  | 3 | 0 | 0 | 0 | 0 | 0 | 11 |
| Promoted to New Position in ID | 13 | 13 | 0 | 7 | 7 | 0 | 0 | 0 | 0 | 0 | 0 | 20 |
| Transferred to SIU | 15 | 10 | 5 | 0 | 0 | 0 | 1 | 1 | 2 | 1 | 2 | 22 |
| Terminated | 3 | 3 |  | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| TDY Rescinded | 2 | 0 | 2 | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 4 |
| Return to Command | 5 | 0 | 5 | 8 | 0 | 8 | 0 | 0 | 0 | 0 | 0 | 13 |
| Total | 109 | 85 | 24 | 34 | 21 | 13 | 3 | 8 | 6 | 2 | 3 | 165 |
| Total Departed | 109 | 85 | 24 | 34 | 21 | 13 | 3 | 8 | 6 | 2 | 3 | 165 |
| Net Gain or Loss | -33 | -13 | -20 | -11 | -8 | -3 | -1 | 1 | -5 | -2 | 0 | -51 |

## OATH PRE-TRIAL CONFERENCES

---

[146] This data has been updated from the data previously included in the Monitor's December 22, 2023 Report (dkt. 666) at pgs. 42-43. The data produced here includes additional information provided by the Department that was not originally included in the December 22, 2023 Report. The data also includes any hires or departures that have occurred since December 2023.

The table below presents the number of *use of force* related pre-trial conferences that were scheduled in each Monitoring Period since July 1, 2020 and the results of those conferences. This data is discussed further in the compliance box for First Remedial Order § C., ¶¶ 4 and 5 (OATH).

| Pre-Trial Conferences Related to UOF Violations | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Results of Pre-Trial Conferences for UOF Cases | | | | | | | UOF Matters & Staff | |
| # Required | Total # Scheduled | # of UOF PTC Scheduled | Settled Pre-OATH | Settled at OATH | On-Going Negotiation | Another Conference | Trial | Other | Admin Filed | # UOF Incidents | # Staff Members |
| July to December 2020 (11th MP) | | | | | | | | | | | |
| 225[147] | 372 | 303 | 0 | 111 | 10 | 44 | 124 | 12 | 2 | 274 | 198 |
| | | 100% | 0% | 37% | 3% | 15% | 41% | 4% | 1% | | |
| January to June 2021 (12th MP) | | | | | | | | | | | |
| 300 | 670 | 541 | 0 | 282 | 4 | 85 | 136 | 33 | 1 | 367 | 331 |
| | | 100% | 0% | 52% | 1% | 16% | 25% | 6% | 0% | | |
| July to December 2021 (13th MP) | | | | | | | | | | | |
| 350 | 575 | 379 | 185 | 87 | 4 | 18 | 58 | 26 | 1 | 284 | 239 |
| | | 100% | 49% | 23% | 1% | 5% | 15% | 7% | 0% | | |
| January to June 2022 (14th MP) | | | | | | | | | | | |
| 900 | 1447 | 989 | 612 | 76 | 3 | 174 | 105 | 3 | 16 | 574 | 417 |
| | | 100% | 62% | 8% | 0% | 18% | 11% | 0% | 2% | | |
| July to December 2022 (15th MP) | | | | | | | | | | | |
| 900 | 1562 | 902 | 621 | 42 | 0 | 153 | 74 | 0 | 12 | 584 | 466 |
| | | 100% | 69% | 5% | 0% | 17% | 8% | 0% | 1% | | |
| January to June 2023 (16th MP) | | | | | | | | | | | |
| 900 | 1337 | 310 | 203 | 40 | 2 | 29 | 29 | 0 | 7 | 214 | 232 |
| | | 100% | 65% | 13% | 1% | 9% | 9% | 0% | 2% | | |
| July to December 2023 (17th MP) | | | | | | | | | | | |
| 900 | 1079 | 373 | 264 | 29 | 14 | 32 | 24 | 1 | 9 | 254 | 264 |
| | | 100% | 71% | 8% | 4% | 9% | 6% | 0% | 2% | | |

---

[147] The Remedial Order requirement came into effect on August 14, 2020 so was applicable for four and a half months in the Monitoring Period.

## LEADERSHIP APPOINTMENTS – JANUARY 2022 TO APRIL 15, 2024

The table below identifies the leadership positions that were filled between January 2022 and April 15, 2024, including the date of appointment and the departure date, if applicable. The Department's leadership is discussed in the Leadership, Management, Supervision and Staffing section of the Report.

| TITLE | DIVISION/BUREAU | APPOINTMENT DATE | END DATE |
|-------|-----------------|------------------|----------|
| Deputy Commissioner | Administration (Staffing Manager)[148] | 9/6/2022 | |
| Assistant Commissioner | Advancement and Enrichment Program | 4/7/2022 | |
| Assistant Commissioner | AIU | 6/16/2022 | |
| Assistant Commissioner | Budget & Finance | 9/8/2020 | |
| Deputy Commissioner | Budget & Finance | 9/11/2023 | |
| Agency Chief Contracting Officer (ACCO) | Central Office of Procurement | 9/18/2023 | |
| Assistant Commissioner | CIB | 7/11/2022 | |
| Deputy Commissioner | Classification & Population Management (Classification Manager) | 7/25/2022 | 2/5/2024 |
| Deputy Chief Of Staff | Commissioner's Office | 4/11/2022 | |
| Chief Of Staff | Commissioner's Office[149] | 2/14/2022 | 1/12/2024 |
| Assistant Commissioner | Data Analytics and Research | 8/29/2022 | |
| Associate Commissioner | Data Quality & Metrics | 7/3/2022 | |
| Assistant Commissioner | Early Intervention, Supervision, & Support | 11/13/2018 | |
| Assistant Commissioner | Equal Employment Opportunity | 8/2/2021 | |
| Associate Commissioner | Facilities & Fleet Administration | 9/11/2023 | |
| Deputy Commissioner | Facilities & Fleet Administration | 5/22/2023 | |
| Director, Energy Mgt Strategy | Facilities & Fleet Administration | 7/17/2023 | |
| Assistant Commissioner | Facility Operations | 11/13/2023 | |
| Assistant Commissioner | Facility Operations - EMTC | 4/24/2023 | |
| Assistant Commissioner | Facility Operations - GRVC | 4/24/2023 | |
| Assistant Commissioner | Facility Operations - OBCC | 4/24/2023 | 10/7/2023 |
| Assistant Commissioner | Facility Operations - OBCC | 5/24/2023 | |

[148] This individual has tendered his resignation and will be departing the Department in the coming weeks.

[149] The Chief of Staff position is vacant as of the filing of this report.

| TITLE | DIVISION/BUREAU | APPOINTMENT DATE | END DATE |
|---|---|---|---|
| Assistant Commissioner | Facility Operations - RMSC | 4/24/2023 | |
| Assistant Commissioner | Facility Operations - RNDC | 6/20/2023 | |
| Assistant Commissioner | Facility Operations - VCBC | 4/24/2023 | 10/21/2023 |
| Assistant Commissioner | Health Affairs | 11/17/2023 | |
| Deputy Commissioner | Health Affairs | 1/30/2023 | |
| Assistant Commissioner | Health Management Division | 10/10/2023 | |
| Chief Surgeon | Health Management Division | 4/18/2023 | 8/11/2023 |
| Assistant Commissioner | Human Resources | 6/16/2022 | 4/9/2023 |
| Assistant Commissioner | Human Resources | 8/8/2022 | |
| Assistant Commissioner | Human Resources | 10/1/2023 | |
| Associate Commissioner | Human Resources | 4/7/2022 | 4/1/2023 |
| Deputy Commissioner | Human Resources | 10/16/2023 | |
| Executive Director | Intergovernmental Affairs | 8/8/2022 | |
| Assistant Commissioner | Investigations | 12/11/2022 | 3/1/2023 |
| Deputy Commissioner | Investigations | 5/9/2022 | 4/1/2023 |
| Associate Commissioner | Investigations | 12/15/2021 | 9/5/2023 |
| Assistant Commissioner | Investigations | 8/8/2023 | 3/25/2024 |
| Deputy Commissioner | Investigations | 8/3/2023 | |
| Acting Deputy Commissioner | IT | 4/10/2023 | 4/9/2024 |
| Associate Commissioner | IT | 8/8/2022 | |
| Associate Commissioner/ Deputy CIO IT Division | IT | 7/3/2023 | 4/9/2024 |
| Deputy Commissioner | IT | 9/24/2017 | 6/1/2023 |
| Deputy Commissioner | IT | 4/9/2024 | |
| Acting Deputy General Counsel | Legal | 12/12/2023 | |
| Acting General Counsel | Legal | 12/12/2023 | |
| Deputy Commissioner | Legal | 8/8/2022 | 9/2/2023 |
| Deputy General Counsel | Legal[150] | 8/14/2023 | 11/5/2023 |
| Assistant Commissioner | Management Analysis & Planning | 1/17/2023 | 9/1/2023 |
| Assistant Commissioner | Management Analysis & Planning | 11/27/2023 | |
| Deputy Commissioner | Management Analysis & Planning | 4/18/2022 | |
| Assistant Commissioner | Nunez Compliance Unit | 4/17/2023 | |
| Agency Counsel and Senior Advisor to the Commissioner | Office of the Commissioner | 1/22/2024 | |
| Commissioner | Office of the Commissioner | 1/1/2022 | 12/8/2023 |
| Commissioner | Office of the Commissioner | 12/8/2023 | |

[150] The Legal Division has authority for two Deputy General Counsels. However, there is currently only one Acting Deputy General Counsel and the other position is vacant as of the filing of this report.

| TITLE | DIVISION/BUREAU | APPOINTMENT DATE | END DATE |
|-------|-----------------|------------------|----------|
| First Deputy Commissioner | Office of the FDC | 3/5/2021 | 12/8/2023 |
| First Deputy Commissioner | Office of the FDC | 2/2/2024 | |
| Senior Deputy Commissioner | Office of the SDC | 10/31/2022 | 2/3/2023 |
| Senior Deputy Commissioner | Office of the SDC[151] | 10/26/2023 | |
| Associate Commissioner | Operations | 8/22/2022 | |
| Associate Commissioner | Operations[152] | 11/9/2022 | 1/16/2024 |
| Assistant Commissioner | Operations Research | 9/12/2022 | 6/16/2023 |
| Assistant Commissioner | Preparedness and Resilience | 4/11/2022 | |
| Assistant Commissioner | Program Operations | 3/18/2022 | 6/24/2023 |
| Acting Associate Commissioner | Programs and Community Partnerships | 4/15/2024 | |
| Assistant Commissioner | Programs and Community Partnerships[153] | 1/20/2020 | |
| Assistant Commissioner | Programs and Community Partnerships | 12/5/2023 | |
| Associate Commissioner | Programs and Community Partnerships | 3/14/2022 | 9/29/2023 |
| Associate Commissioner | Programs and Community Partnerships | 11/13/2023 | |
| Deputy Commissioner | Programs and Community Partnerships[154] | 9/6/2021 | 2/2/2024 |
| Assistant Commissioner | Public Information | 1/30/2023 | |
| Deputy Commissioner | Public Information | 7/1/2022 | 4/14/2023 |
| Deputy Commissioner | Public Information | 5/3/2023 | |
| Assistant Commissioner | Security Operations | 4/3/2023 | |
| Deputy Commissioner | Security Operations (Security Manager) | 5/16/2022 | |
| Assistant Commissioner | Special Investigations Unit/PREA | 12/19/2022 | |
| Assistant Commissioner | Strategic Initiatives | 11/13/2023 | |
| Deputy Commissioner | Strategic Operations | 4/8/2024 | |
| Deputy Commissioner | Training | 12/5/2022 | 1/16/2024 |
| Acting Deputy Commissioner | Training Academy | 1/17/2024 | |

[151] This individual has tendered his resignation and will be departing the Department in the coming weeks.

[152] The leadership structure contemplates that there are two Associate Commissioners of Operation. One of two positions remains vacant and has been vacant since January 16, 2024.

[153] The Assistant Commissioner of Programs and Community Partnerships is serving as the Acting Associate Commissioner of Programs and Community Partnerships.

[154] The Deputy Commissioner of Programs and Community Partnership position is vacant as of the filing of this report.

| TITLE | DIVISION/BUREAU | APPOINTMENT DATE | END DATE |
|-------|-----------------|------------------|----------|
| Assistant Commissioner | Training Academy | 9/6/2022 | 9/17/2022 |
| Assistant Commissioner | Training Academy | 1/30/2023 | |
| Associate Commissioner | Trials | 8/8/2022 | 8/2/2023 |
| Deputy Commissioner | Trials | 5/31/2022 | |

## OVERTIME SPENDING

An important indicator of efficient workforce management is the level of an agency's use of overtime. Given the Department's problems with inefficient staff scheduling and deployment and abuse of leave benefits, overtime has become a routine strategy to increase staff availability on any given shift. Overtime can of course be used efficiently to address temporary staff shortages and unusual situations. However, using overtime to address chronic staffing issues, as this Department does, has significant fiscal consequences and an obvious negative impact on staff wellness and morale. The table below shows the Department's monthly overtime costs for uniform staff since January 2022.

| Overtime Data for Uniform Staff[155] *January 2019-February 2024* | | | | | | |
|---|---|---|---|---|---|---|
| **Month** | **2019** | **2020** | **2021** | **2022** | **2023** | **2024** |
| **January** | $12,860,000 | $9,800,000 | $12,066,000 | $18,847,000 | $22,893,000 | $21,227,000 |
| **February** | $12,392,000 | $7,983,000 | $14,037,000 | $18,226,000 | $20,819,000 | $19,936,000 |
| **March** | $14,194,000 | $8,426,000 | $15,218,000 | $20,969,000 | $23,855,000 | |
| **April** | $13,941,000 | $13,340,000 | $15,394,000 | $20,783,000 | $22,414,000 | |
| **May** | $14,135,000 | $7,926,000 | $15,850,000 | $21,423,000 | $23,358,000 | |
| **June** | $11,894,000 | $5,647,000 | $15,887,000 | $21,721,000 | $22,490,000 | |
| **July** | $14,273,000 | $5,817,000 | $18,860,000 | $22,064,000 | $23,758,000 | |
| **August** | $14,592,000 | $6,815,000 | $19,719,000 | $22,453,000 | $22,434,000 | |
| **September** | $11,714,000 | $6,022,000 | $20,137,000 | $22,006,000 | $18,871,000 | |
| **October** | $12,146,000 | $7,168,000 | $21,485,000 | $22,901,000 | $19,712,000 | |
| **November** | $11,458,000 | $8,268,000 | $19,514,000 | $22,215,000 | $19,462,000 | |
| **December** | $11,439,000 | $11,687,000 | $19,546,000 | $22,276,000 | $20,261,000 | |
| **Annual Overtime Spending** | **$155,038,000** | **$98,899,000** | **$207,713,000** | **$255,884,000** | **$260,327,000** | **$41,163,000** |
| **Average # of Staff** | **10,115** | **9,302** | **8,454** | **7,181** | **6,479** | **6,175** |

---

[155] There can be lags in the reporting and payment of overtime. Staff must submit overtime paperwork and there is a processing lag that can result in overtime paid weeks and potentially months after it was worked. On occasion there are instances (i.e. collective bargaining settlements) that call for substantial retroactive overtime payments. Because of this, overtime data is never truly static and is subject to real-time changes. Because these changes are so frequent, they are not reflected in the data produced above.

## CORRECTED STATUS OF FULL ID INVESTIGATIONS DATA

The Monitoring Team identified a calculation error in this data previously reported in the Monitor's December 22, 2023 Report (dkt. 666) at pg. 38. The corrected data and updated data is included below. This data is discussed further in the compliance box for Consent Judgment § VII., ¶¶ 1 and 9(a) (Use of Force Investigations).

### *Incorrect* Data reported in the 12/22/23 Monitor's Report:

| Status of Full ID Investigations for incidents that *occurred* between January 2022- June 2023 *As of October 16, 2023* | | | | |
|---|---|---|---|---|
| *Pending* less 120 Days or less | *Closed* within 120 Days | *Closed* Beyond 120 Days | *Pending* Beyond 120 Days | Total |
| 15<br>1% | 219<br>13% | 841<br>51% | 571<br>35% | 1,646 |

### *Corrected* Data from the 12/22/23 Monitor's Report

| Status of Full ID Investigations for incidents that *occurred* between January 2022-June 2023 *As of October 16, 2023* | | | | |
|---|---|---|---|---|
| *Pending* less 120 Days or less | *Closed* within 120 Days | *Closed* Beyond 120 Days | *Pending* Beyond 120 Days | Total |
| 19<br>2% | 301<br>26% | 447<br>38% | 405<br>35% | 1,172 |

214

# APPENDIX B:
# FACILITY UPDATES AS OF
# DECEMBER 31, 2023

This section provides a brief summary of each facility at DOC. For each facility, a summary of the current population and housing unit types[156] are discussed, and for some, recent data and specific security/violence-related initiatives are briefly described.

## EMTC

- **EMTC**: At the end of December 2023, EMTC housed approximately 1,200 people, most of whom are age 22 or older. The facility has 12 units for New Admissions, seven General Population units, two mental health ("MO") units, and five units for those who are City Sentenced. All of the facility's housing units are dormitories with about 50 beds. Recently, the Monitoring Team shared feedback with DOC regarding its ability to manage new admissions and the need in dorm housing as celled housing had been off line for some time. The Monitoring Team recommended the celled housing is brought on line quickly and it was re-opened in early April.

  o  In 2023, EMTC's average monthly rates of the following metrics were as follows:

| EMTC Rates of Key Metrics | |
|---|---|
| Use of Force | 9.72 |
| Stabbing/Slashing | 0.39 |
| Fights | 14.63 |
| Fires | 0.03 |

  o  EMTC has the highest rate of fights of any facility, and the third highest use of force rate. There are no specialized initiatives targeting this facility.

---

[156] For example, General Population ("GP") for both Young Adults and Adults, mental health units (e.g., MO, CAPS, PACE), units for those who are City Sentenced, Infirmary Units, and Protective Custody units.

## GRVC

- **<u>GRVC</u>**: At the end of December 2023, GRVC housed approximately 950 people, most of whom are age 22 or older. The facility has 12 GP units, 12 units for people with mental health issues (six MO units, one CAPS unit, five PACE units), along with one unit for people designated as CMC/Max and one for Civil commitments. All of these are celled housing units. This facility now has a similar composition to AMKC's when it was open.

  - In 2023, GRVC's average monthly rates of the following metrics were as follows:

    | GRVC's Rates of Key Metrics | |
    |---|---|
    | Use of Force | 10.01 |
    | Stabbing/Slashing | 0.84 |
    | Fights | 6.91 |
    | Fires | 0.75 |

  - GRVC has the highest UOF rate and rate of stabbings/slashings of any facility (outside of RESH). There are no specialized initiatives targeting this facility.

## NIC

- **<u>NIC</u>**: At the end of December 2023, NIC housed approximately 275 people. The facility has nine General Population units (three are celled housing units, six are dormitories), two Infirmary units (both dormitories), a PACE unit (dormitory), a celled unit for people with Civil/Intermittent Sentences, and a celled housing unit for people designated as CMC/Max. A discussion about the Department's use of celled housing units at NIC is discussed in the Managing People with Known Propensity for Violence section of this Report.

o  In 2023, NIC's average monthly rates of the following metrics were as follows:

| NIC's Rates of Key Metrics | |
|---|---|
| Use of Force | 9.92 |
| Stabbing/Slashing | 0.0 |
| Fights | 3.33 |
| Fires | ** |

o  The Department's data on fires combines NIC with WF (because they are under the same command), and thus is not reported here.

## OBCC

- **OBCC**: OBCC reopened in July/August, 2023. At the end of December 2023, OBCC housed approximately 1,430 people. The facility has 21 General Population units (13 are celled housing, eight are dormitories), six units for people with mental health issues (five mental health programs, one substance use program), three program units (2 celled, 1 dormitory), and one Protective Custody unit (celled). OBCC was designated as the site for the OBCC Annex initiative because its physical plant is well-suited for the program (i.e., celled housing units with operable locks/doors). This strategy is discussed in the Managing People with Known Propensity for Violence section of this Report.

  o  From August-December 2023, OBCC's average monthly rates of the following metrics were as follows:

| OBCC's Rates of Key Metrics | |
|---|---|
| Use of Force | 9.58 |
| Stabbing/Slashing | 0.66 |
| Fights | 8.91 |
| Fires | 0.29 |

  o  OBCC has the second highest rate of fights among the facilities and is one of the facilities with an elevated rate of stabbings/slashings.

## RESH

- **RESH**: In July 2023, RESH was established as its own "facility" when the Enhanced Supervision Housing units were moved from GRVC to RMSC. At the end of December 2023, approximately 160 people were in RESH. There are four ESH Level 1 units (two tiers of 16-17 cells each), and two ESH Level 2 units (two tiers of 18 cells each)—all of which are celled housing units. RESH houses those who have engaged in serious violence and their tendency toward violence. The operation of RESH is discussed in the Managing People with Known Propensity for Violence section of this Report.

  o During July to December 2023 (RESH opened in July 2023), RESH's average monthly rates of the following metrics were as follows:

| RESH's Rates of Key Metrics | |
|---|---|
| Use of Force | 40.5 |
| Stabbing/Slashing | 3.76 |
| Fights[157] | 4.67 |
| Fires | 7.92 |

  o RESH has the highest rate of UOF, stabbings/slashings and fires among the facilities.

## RMSC

- **RMSC**: At the end of December 2023, RMSC housed approximately 220 people. It is the only facility that houses female detainees. The facility has five General Population units (two celled, three dormitory), three new admission units (all dormitory; one for people

---

[157] The Monitoring Team previously reported that Fight Tracker data was not being contemporaneously entered. See, Monitor's November 8, 2023 Report (dkt. 595) at pgs. 33-34. The Department reports that these incidents have since been entered retrospectively, but the Monitoring Team has not verified this report.

who are transgender), three program units (one of which is a nursery), one Protective

Custody unit, three units for people with mental health issues (two MO and one

PACE/CAPS combined), and one unit for those who are city sentenced.

- o During the current Monitoring Period, RMSC's average monthly rates of the

  following metrics were as follows:

| RMSC's Rates of Key Metrics | |
|---|---|
| Use of Force | 9.8 |
| Stabbing/Slashing | 0.0 |
| Fights | 7.5 |
| Fires | 0.11 |

- o RMSC's UOF rate is very similar to all of the other facilities. RMSC has a rate of

  fights that is in the mid-range of its facility counterparts, but very few fires and no

  stabbings/slashings.

## RNDC

- **RNDC**: At the end of December 2023, RNDC housed approximately 1,100 people. Since

  the inception of the Consent Judgment, the Monitoring Team has focused on this facility

  because it originally housed 16- and 17-year-olds (and a large population of adults).

  Since GMDC closed in 2018, RNDC has housed most of the Young Adults aged 18 to 21

  years old.

  - o 23 of RNDC's units house Young Adults: 11 are General Population (all but one

    is celled), two are units for people with mental health issues (MO), nine are

    Program units (both celled and dormitory), and one is Protective Custody.

  - o 21 of RNDC's units house adults: 12 are General Population (all but four are

    celled), seven are Protective Custody (both celled and dormitory), one is for

people with mental health issues (PACE), and one is for those who are City
sentenced.

o During the current Monitoring Period, RNDC's average monthly rates of the
following metrics were as follows:

| RNDC's Rates of Key Metrics | |
|---|---|
| Use of Force | 8.0 |
| Stabbing/Slashing | 0.77 |
| Fights | 7.46 |
| Fires | 2.95 |

o RNDC has one of the highest rates of stabbings/slashings compared to the other
facilities, and the second highest rate of fires. The dynamics contributing to these
problems are discussed throughout this report. The Department's plan to increase
programming/reduce disorder, which was developed just after the close of the
current Monitoring Period is described in Appendix E.

## WF

- **WF**: At the end of December 2023, WF housed approximately 575 people. A significant
number of these individuals are actually housed in AMKC's "annex" which has remained
open and was brought under WF's command in October 2023. Prior to that date, WF
housed about 70-80 people.

    o WF has six Infirmary units ("sprungs" with 14 cells each), one unit for
    CMC/Max/Court-Ordered lock down, and 12 General Population dormitories
    with 50 beds each (i.e., the AMKC annex).

o   During the current Monitoring Period, WF's average monthly rates of the

following metrics were as follows:

| WF's Rates of Key Metrics | |
|---|---|
| Use of Force | 0.78 |
| Stabbing/Slashing | 0.0 |
| Fights | 0.76 |
| Fires | ** |

o   The Department's data on fires combines NIC with WF (because they are under

the same command), and thus is not reported here.

o   All of the events listed in the table above occurred after the AMKC annex was

added to the WF command in Oct/Nov/Dec 2023.

222

# APPENDIX C:
# MARCH 2024 NCU AUDITS

## NUNEZ COMPLIANCE UNIT SECURITY AUDITS MARCH 2024

The Nunez Compliance Unit (NCU) conducts security audits of housing areas, during which NCU staff review the live Genetec video feed from a facility's housing area for an entire day to identify security issues. After each audit, NCU generates a security report with its findings. The summaries *prepared by NCU* of its Security Audits for three facilities between March 1 and 31, 2024, are provided below.

| GRVC Audit: <br> March 4 to 5, 2024 |
|---|
| *NCU conducted an audit of [one housing unit] at GRVC for a 24-hour period spanning March 4 to 5, 2024. NCU summarized its findings by stating the following*: <br> The following are NCU's findings throughout the 24-hour period: <br> • Cell doors and pantry at times remained unsecured and incarcerated individuals freely entered cells throughout the audit. <br><br> • Staff were observed off post on a few occasions. <br><br> • The lights in the housing area were not turned on during the morning Institutional feeding. <br><br> • Housing area tours were not conducted every thirty (30) minutes until 2100 hours. Although staff utilized tour pipes and conducted visual inspections while touring, the security checks of cell doors were rarely conducted during housing area tours. <br><br> • The supervisors were observed in the area eight (8) times within a 24-hour period. Although supervisors were observed assisting with 2100 lock-in, PICs were observed out of their cells after the fact. |

| **OBCC Audit:**<br>**March 4 to 5, 2024** |
|---|
| *NCU conducted an audit of [one housing unit] at OBCC for a 24-hour period spanning March 4 to 5, 2024. NCU summarized its findings by stating the following:*<br><br>The following are NCU's findings throughout the 24-hour period:<br><br>• There was no Genetec coverage from 07:00 hours until 11:04 hours.<br><br>• The officer did not conduct active supervision tours from 13:04 hours until 15:00 hours.<br><br>• 1500 & 2100-hour lock-in enforced.<br><br>• Supervisors were present five (5) times within a 24-hour period. |

| **RNDC Audit:**<br>**March 6 to 7, 2024** |
|---|
| *NCU conducted an audit of [one housing unit] at RNDC for a 24-hour period spanning March 6 to 7, 2024. NCU summarized its findings by stating the following:*<br><br>The following are NCU's findings throughout the 24-hour period:<br><br>• The officers were observed frequently leaving their post and entering the control station for an extended period.<br><br>• Individuals entered each others' cells when officers were not in the immediate area or off-post.<br><br>• The 700-, 1500- and 2100-hours lock-ins were enforced.<br><br>• While staff routinely conducted tours, sometimes they focused more on utilizing the tour pipe, rather than conducting a proper tour of area or security inspection.<br><br>• Supervisors toured the area a total of eight (8) times throughout the 24-hour period; the tour pipe was not observed being utilized. |

| **RNDC Audit:** |
| :---: |
| **March 11 to 12, 2024** |

*NCU conducted an audit of [one housing unit] at RNDC for a 24-hour period spanning March 11 to 12, 2024. NCU summarized its findings by stating the following*:

The following are NCU's findings throughout the 24-hour period:

- The officers frequently left their post and entered the control station for an extended period.

- Multiple individuals were observed throughout the lock-out periods entering and exiting each others' cells.

- Staff rarely conducted tour of area even when on post. When conducted, a proper and completed tour of area or security inspection was seldom performed.

- The usage of the tour pipe was not observed throughout this assessment.

- PICs were observed smoking and inhaling unknown substances.

- PICs were often observed engaging in horse-play within close proximity of staff uninterrupted.

- Supervisors toured the area a total of six (6) times throughout the 24-hour period, which included the Deputy Warden. During the tour of area, the tour pipe was not observed being utilized.

| GRVC Audit: |
| --- |
| March 15 to 16, 2024 |

*NCU conducted an audit of [one housing unit] at GRVC for a 24-hour period spanning March 15 to 16, 2024. NCU summarized its findings by stating the following:*

The following are NCU's findings throughout the 24-hour period:

- Cell doors were observed unsecured and incarcerated individuals freely entered cells throughout the audit.

- During the evening tour, the officer was off post for over twenty minutes.

- The lights in the housing area were not turned on during the morning feeding.

- Housing area tours were regularly conducted by staff, tour wands were utilized, and visual inspections were conducted while touring. However, security checks of cell doors were almost never conducted during those tours.

- Although supervisors conducted security check of cell doors at 2100-hour lock in and at 2200 hours, PICs still exited cells and moved freely about the tier.

- The supervisors were present in the area eight (8) times within a 24-hour period. However, the supervisors only toured the housing area 7 times, with the first Supervisor tour being conducted at 17:51 hours. During 3 of the 7 tours the supervisors only toured the bottom tier and not the entire housing area.

| OBCC Audit:<br>March 19 to 20, 2024 |
|---|

*NCU conducted an audit of [one housing unit] at OBCC for a 24-hour period spanning March 19 to 20, 2024. NCU summarized its findings by stating the following:*

The following are NCU's findings throughout the 24-hour period:

- Officers observed off post on two occasions during the morning and evening tours.

- 1500 hours/2100 hours lock-ins were enforced.

- Although housing area tours were conducted by staff, they were not conducted every 30 minutes.

- Supervisors were present in the area eight (8) times within a 24-hour period, inclusive of Senior Deputy Commissioner, Deputy Warden, and Assistant Deputy Warden for Senior Deputy Commissioner.

# APPENDIX D:
# ILLUSTRATIVE EXAMPLES

This section of the report includes a number of illustrative examples of the various serious and violent incidents that occur in the New York City Jails.

**ILLUSTRATIVE EXAMPLE 1: OCTOBER 24, 2023**

On October 24, 2023, in an adult Mental Observation housing area at RMSC, several female detainees were out in the dayroom when an altercation occurred between an officer and a detainee.



*Image 1: After allegedly splashing the officer, a detainee and the officer argue near the front of the day room.*



*Image 2: The argument moved toward the housing area door, where the Officer and detainee became more animated and raised fingers toward each other's faces.*



Image 3: The Officer walks away from the detainee and sits at the B-post desk.



*Image 4: The argument proceeds when the detainee approaches the B-post. However, rather than de-escalate the situation, the officer stood up and got in the detainee's face.*



*Image 5: The officer escalated the situation again and pushed the detainee.*



*Image 6: After pushing the detainee, the detainee spits at the officer, and the officer tries to*

*charge the detainee.*



*Image 7: Another officer has to physically hold the officer to prevent her from further engaging with the detainee.*



*Image 8: This conflict terminates when the officer leaves the area.*

This incident is yet another example of how staff escalate an incident and resort to using unnecessary force. The facility conducted a Rapid Review and found this incident was unavoidable, but recommended a Command Discipline for the Officer for unprofessional behavior. Another officer was also recommended for a corrective interview for unprofessionalism, and a Captain who arrived in the area to try and calm the detainee was

recommended for Command Discipline for failure to supervise and not activating their BWC. ID concurred with these recommendations.

**ILLUSTRATIVE EXAMPLE 2: OCTOBER 26, 2023**

Around 10:00 p.m. on October 26, 2023 in OBCC, supervisory staff were conducting tours of housing units to confirm that the nightly lock-in was occurring. Three Captains entered the housing unit, which was also staffed by a B post officer on the floor of the housing unit. One PIC was speaking with the staff, but all the other PICs appeared to be locked in their cells as required. The Captains were knocking on cell doors to confirm that PICs were responsive.

The Captains knocked on one cell with a covered window and the PIC inside did not respond. The floor officer had reported that this PIC was "banging on his cell over a mattress" prior to the cell checks. All three Captains and the floor officer were present when the cell door was opened. When the cell door was opened, the PIC immediately exited his cell and a Captain started shouting multiple conflicting orders. First, the Captain ordered him to "stay back" in his cell, but then he abruptly changed his orders, telling the PIC to place his hands behind his back, and the PIC immediately complied.



*Image 1: The PIC began to walk backwards towards the Captain with his hands still behind his back, at which point the Captain then told the PIC to "stay right there."*



*Image 2: It appears the PIC took a very slight step backwards. Multiple staff then begin shouting at the PIC to "step forward," at which point, the Captain giving most of the orders sprayed the PIC in the face with chemical agents.*

At no point can the Captain or any other staff member be heard on video giving any warning that chemical agents would be used. However, in his use of force report, this Captain reported that he gave verbal warning to the PIC that chemical agents would be deployed.



*Image 3: The PIC immediately reacted to the chemical agents and fell to the ground, making pained noises and coughing for a few seconds.*



*Image 4: Staff gave the PIC orders to again put his hands behind his back and the PIC complied as soon as he recovered from the initial effects of the chemical agents, at which point he began walking backwards down the stairs towards staff with his hands behind his back.*

Staff then rear-cuffed the PIC and escorted him out of the housing area to intake. Throughout the escort, the PIC complained that he was unable to see and cried out in pain.



*Image 5: The PIC was first escorted by an officer and two Captains to the search area within intake, where his emotions continued to escalate as staff told him to "stop resisting."*

237

The PIC threw himself on the ground sobbing, at which point staff decided to escort the PIC to the shower area without completing the search. The PIC was secured in a shower pen for decontamination. The PIC did not receive medical attention until the following morning at approximately 8:46 a.m., despite his prompt escort to intake and Department policy that PICs receive medical attention within 4 hours of a use of force. The facility documented that the reasons the medical attention was delayed was due to "short medical staff" and "multiple UOFs." The clinician documented that the PIC did not sustain any injuries, and as a result, DOC correctly classified this incident as a "Class C" incident.

The facility Rapid Review of the incident found the Captain failed to provide verbal warning and used the chemical agents within 3 feet and for longer than 2 seconds. The Facility also found the use of force was "unavoidable." Such a finding is in direct contrast with the objective evidence and the ID Investigation that determined that "the force utilized in this incident was avoidable and unnecessary due to chemical agents being utilized on a PIC who complied with orders to place his hands behind his back to be secured."

In terms of corrective measures, the Rapid Review recommended the Captain receive a Corrective Interview. While ID recommended that the Captain who unnecessarily deployed the chemical agents without warning receive a command discipline for this reason, as well as for submitting a misleading use of force report with generalized language.

The facility proceeded with its corrective interview, and the Captain was counseled on giving proper verbal warning prior to the use of chemical agents and ensuring chemical agents are used at the proper distance (at least 3 feet) and for the proper duration of time (less than 2 seconds). The interview was categorized as an Inefficient Performance of Duties violation, as opposed to a Use of Force violation, and there was no mention of the force being unnecessary or avoidable in the interview documentation. Although ID recommended a CD for this incident, the CD could not be generated as the Captain had already received the corrective interview for the same violation, and any CD charges would then be subject to "double jeopardy."

This use of force incident is illustrative of the myriad of problems that the Monitoring Team has described in this report and others, including hyper confrontational behavior by staff, concerning judgment by supervisors, poor reporting practices, inaccurate assessment of the incident by facility in the Rapid Review, and an ongoing misuse of CDs. It must also be emphasized that while this case may not have resulted in a physical injury to the incarcerated

individual, there was a risk of harm, and the video evidence suggests that the individual involved did appear to suffer harm.

SERIOUS INCIDENTS AT GRVC - FEBRUARY 2024

This section describes six serious incidents that occurred at GRVC in February. Notably, four of these incidents occurred in a two-day period.

### GRVC Incident # 1– Slashing/Stabbing Resulting in Serious Injury

On February 6, 2023, in an adult population housing unit for individuals requiring Mental Observation, detainees were out in the day room while the officer was seated at the B-post desk.



*Image 1: Detainees are out in the day room. The Officer is seated at the B post desk, and a detainee in an orange beanie (victim) walks to a door leading to the pantry.*



*Image 2: Inside the pantry, detainees work, including a detainee in orange beanie and shorts (perpetrator).*

240



*Image 3: The victim enters the pantry.*



*Image 4: The perpetrator, for no apparent reason, begins to stab the victim and pin him against the wall.*



*Image 5: About one minute after the assault commenced, a detainee looks inside the pantry and tells the Officer sitting at the B post that an incident is occurring in the pantry.*



*Image 6: The Officer immediately gets up, looks in the pantry, and opens the door.*



*Image 7: After continuously stabbing the victim for approximately one minute and fifteen seconds, the perpetrator concludes his assault.*



*Image 8: The victim and the perpetrator exit the pantry. A significant amount of blood covers the floor and wall.*



*Image 9: The victim exits the housing area covered in blood.*

The victim of this incident was transported to the hospital, where it was revealed that he was stabbed over 25 times. The perpetrator was indicted on attempted murder as a result of this incident. The perpetrator entered Department custody in May 2023 and had engaged in violent and problematic behavior resulting in (39) reportable incidents, including (5) stabbings, (3) slashings, (2) Serious Injuries to other individuals in custody, (18) Uses of Force with DOC staff, and was found to be in possession of contraband twice (narcotics). He had received 20 infractions in connection with that conduct. The Department sought and received a lockdown order for the perpetrator on February 14, 2024.

### GRVC Incident #2 – Slashing/Stabbing and Use of Force

On February 12, 2024, in a general population housing unit for individuals with maximum classification scores, numerous detainees were dispersed across the housing area, spanning the top tier, the day room area, and next to the B post desk. Multiple detainees were also in one cell. Several cell doors and food slots were unsecured, and towels or clothing were used to prop cell doors open so they do not lock. Two detainees began fighting in the top tier. One detainee was observed making swiping motions toward the other. The officer assigned to the area left the B-post desk and attempted to enter the top tier, but other detainees blocked his path. The fight was terminated when other detainees intervened. Shortly thereafter, the victim from the slashing and stabbing was in the bottom tier near the B-post desk when multiple detainee began assaulting him.

As the officer approached the assault near the B-post desk, detainees again stood in front of him to prevent him from intervening. Instead of taking further action, the officer remained passive. Detainees from the top tier then ran to the B-post area to participate in the assault. The assault continued until the officer in the A station unlocked the vestibule door, allowing the victim to exit the area. According to the injury report, the victim suffered puncture wounds to his hands and injuries to his face as well a clinical fracture to his nose.

This incident reflects various deficiencies, including an inadequate span of control and supervision, lax security with unsecured doors, failure to manage the incarcerated population when they were out of cell, and a failure to intervene promptly in an escalating and dangerous situation. Later, a security team entered the area exhibiting hyper-confrontational behavior where they unnecessarily deployed OC spray on numerous occasions and attempted a prohibited and unnecessary takedown. The incident presents textbook examples of an officer who has surrendered control of the housing area and how a security team's response increases the risk of harm rather than minimizing it.

### GRVC Incident #3 – Slashing/Stabbing and Use of Force

On February 13, 2024, in a Clinical Alternative to Punitive Segregation ("CAPS") housing area, detainees were out in the dayroom. Multiple staff were on the unit, including an officer at the B-post desk in front of the day room. One detainee walked aggressively to the front of the dayroom, where he assaulted another detainee and made swiping motions to the detainee's face. The victim immediately started bleeding and became irate. The victim attempted to pursue the perpetrator. As a result, the floor officer deployed OC to the victim and escorted him out of the area. According to the injury report, the victim sustained two lacerations requiring Urgi-care.

### GRVC Incident #4 – Slashing/ Stabbing

On February 13, 2024, two detainees were working in the kitchen area when they began to argue. Their argument escalated into a physical altercation, and one detainee made stabbing motions toward the other. The victim ran away from the perpetrator, and staff entered the area and separated the two detainees. According to the injury report, the victim suffered puncture wounds to his back, right shoulder, and under his clavicle, as well as a long scratch across his stomach. The area was searched, and staff recovered a 6-inch sharpened screw wrapped in white linen.

245

**GRVC Incident #5 – Slashing/Stabbing**

On February 13, 2024, in a general population housing unit for individuals with maximum classification scores, detainees were out in the dayroom area. Multiple doors were unsecured or obstructed, or towels and clothing were used to prop cell doors open so they do not lock. The floor officer was seated at the B-post desk. On the top tier, two detainees stood by a closed cell door. One of the detainees entered the cell. Shortly thereafter, a shirtless detainee tried to exit as the two detainees tried to hold him back. The shirtless detainee managed to break away and ran to the front of the housing area. He was bleeding profusely from the side of his face and exited the area. A security team arrived to secure all detainees in their cells. According to the injury report, the victim suffered deep lacerations to the neck, face, and left ear and was referred to the hospital.

**GRVC Incident # 6 – Slashing/Stabbing Resulting in Serious Injury**

On February 22, 2024, in a general population housing unit for individuals with maximum classification scores, detainees were in various parts of the dayroom. Detainees were walking freely in and out of unsecured doors.



*Image 1: Several detainees are in the dayroom. The doors are unsecured, and the detainees walk freely in and out of cells.*



*Image 2: The detainee holding a broom (victim) talks to a taller detainee (perpetrator) in front of the cell. They then enter the cell together.*



*Image 3: After about three minutes inside the cell, the victim falls out of the cell onto the floor.*



*Image 4: Detainees push the victim back inside the cell.*



*Image 5: Approximately six minutes after the victim was pushed back inside the cell, the officer*
*bends down and looks inside the cell but takes no further action.*



*Image 6: The officer swipes the tour wand near the cell but does not look inside the cell or address any issues. The officer then went to another part of the dayroom and tapped another tour wand censor.*



*Image 7: Approximately three minutes after first looking inside the cell, the officer suddenly runs back to the cell, looks inside, and opens the door. Detainees began to look through the door slot of the cell and crowded around it. The officer went to the cell again and opened the door.*



Image 8: The perpetrator, at the far right of the frame, runs out of the cell naked. The officer directed the perpetrator back into the cell with the victim.



Image 9: Detainees then dragged the victim out of the cell. The victim lay flat on his stomach and appeared disoriented. His pants appeared to be pulled down to his knees.



Image 10: While the officer watched, detainees dragged the victim to another cell. Shortly thereafter, a Captain and additional staff arrived.



Image 11: The victim is escorted out of the area with visible injuries to the face.

The victim was taken to the clinic, where clinic staff noted the victim sustained post-concussion syndrome, requiring a CT scan, and referred the victim to the emergency room for further evaluation.

The Department reports that the incident was reported as a fight on the day it occurred in the fight tracker. The incident was only reported to the Central Operations Desk as a Serious Injury incident five days after it occurred. The report generically described the incident as an "inmate-on-inmate fight" even though additional details about the incident had been included in the facility's internal paperwork on the day the incident occurred. It is unclear why a more

detailed description of the incident was not provided when the incident was called into the Central Operation Desk. The chart below includes the two different reports.

| Reports of Incident | |
|---|---|
| **Internal Report from ADW on February 22, 2024** | **COD Report from ADW on February 27, 2024** |
| On Thursday, February 22, 2024, at approximately 1815 hours in the confines of housing area 4A inmates Nunez and Saunders were observed via Genetec entering cell #6 assigned to inmate Saunders. At approximately 1827 hours officer Duplessy opened cell #6. Both inmates were observed under the influence of an unknown substance and was engaged in an inmate fight. Inmate Saunders was observed exiting cell #6 without clothing and inmate Nunez was observed exiting cell #6 limp along with visible injuries to the facial area. At approximately 1836hours inmate Nunez was escorted out the area by staff and escorted to the main clinic. Medical personnel referred inmate Nunez to the hospital via EMS (bus #1299) BHPW. | AT 1447 HOURS, THE FACILITY REPORTED THE FOLLOWING: ON 02/22/24, AT 1830 HOURS, IN HOUSING AREA 4A (ADULT/GP), INMATES NUNEZ (TRINI, ICR., CL. 16) AND SAUNDERS (NSRG, CL. 24) WERE INVOLVED IN A FIGHT. OFFICER DUPLESSY (#19907, DOA 02/11/19) GAVE THE INMATES DIRECT ORDERS TO STOP FIGHTING, WHICH THEY COMPLIED. INMATE NUNEZ WAS ESCORTED TO THE CLINIC, SEEN BY MEDICAL STAFF WHO REFERRED HIM TO BELLEVUE HOSPITAL. AT 1930 HOURS, EMS DEPARTED THE FACILTY WITH INMATE NUNEZ ENROUTE TO BELLEVUE HOSPITAL VIA EMS VEHICLE #99. INMATE NUNEZ SUSTAINED POST CONCUSSIVE SYNDROME REQUIRING CT-SCAN IMAGINING. VIDEO SURVEILLANCE (Y/N): YES. |

This incident only came to the attention of the Monitoring Team from an anonymous source. Upon request, the Department informed the Monitoring Team that the investigation into this incident was being handled by the PREA unit of the Special Investigation Unit. The PREA investigation found that the incident did not meet the criteria for a PREA investigation and recommended the facility consider additional searches of the individuals involved for potential contraband. The investigation by SIU did not raise any other issues with this incident and no further investigation into this incident was conducted, including any security lapses or procedural errors by staff.

The Associate Commissioner of GRVC reported that the detainees inside the cell were smoking illicit drugs and that the perpetrator acted irrationally and assaulted the victim for no apparent reason.

The Monitoring Team shared feedback with the Department regarding this incident and the many outstanding questions regarding the security and operational failures, reporting concerns and the status of the investigation. The Senior Deputy Commissioner requested a meeting with the Monitoring Team after receipt of this feedback. The Senior Deputy Commissioner reported that while he reviews all incidents with serious injuries, he was not aware of this incident until it was raised by the Monitoring Team on March 18th (almost a month after it was reported to COD).

The SDC reported that after he reviewed the incident, the officer involved was suspended for his inefficient performance of duty and for not properly controlling the incident. However, the Department's routine suspension reports do not reflect that a suspension occurred, so it is unclear if a suspension was effectuated. It does not appear that this incident would have been closely scrutinized but for the Monitoring Team drawing the Department's attention to this incident.

# APPENDIX E:
# JANUARY 2024 RNDC PLAN

## UPDATE ON RNDC PLAN ADDRESSING YOUNG ADULTS

The Department produced a plan designed to improve conditions and safety at RNDC in early January 2024 ("RNDC Programs Action Plan"). This plan was issued following the close of the 17th Monitoring Period for which compliance ratings are provided in this report. Since the *RNDC Programs Action Plan* was issued, the Monitoring Team has engaged closely with the team involved in designing it and has provided significant feedback intended to strengthen key aspects and to help the Department avoid the pitfalls of past efforts when implementing some of the same strategies. The Department has been receptive to this input and has begun to identify the reasons that previous efforts did not succeed and to develop appropriate safeguards.

The *RNDC Programs Action Plan* describes an intentional vision for improving the conditions of confinement for young adults (ages 18 to 21) at RNDC. Key elements of the plan include:

1. **Facility Composition/Housing for Young Adults**: The Department plans to consolidate the number of units that house young adults and to reduce the maximum unit size from 25 to 15 individuals for this age group. Living units will be renovated prior to rehousing each cohort of young adults, who are assigned to units in consultation with the Classification Division to ensure appropriate balancing for security risk groups. Furthermore, in order to shift the culture of the facility toward rehabilitation, the adults assigned to RNDC will be those who have committed to program engagement.

2. **Consistent Staffing**: The Department plans to consistently assign staff (i.e., officers, Captains and ADWs) to the same housing units day-to-day. RNDC staff will be surveyed to identify those interested in working with the young adult population. The Young Adult Response Team ("YART") will be re-established, and security staff will be assigned to

young adult areas for extra support and to improve weekend coverage. Consistent

assignment is intended improve rapport building, ownership and a problem-solving

approach to managing people in custody.

3. **Unit Management with Increased Programming**: The Department intends to utilize a

Unit Management structure as the overarching framework for operating young adult

housing units. This structure should help to leverage the benefits of the program offerings

that were expanded in late 2023 (e.g., credible messengers, additional Program

Counselors, additional CBO services, congregate events, mobile libraries) and to increase

the consistency of service delivery. The plan also expands the PEACE Center's hours and

increases Program Counselor/Intervention Specialists/Social Worker services to certain

populations.

4. **Training**: The Department intends to provide a two-day training to staff assigned to work

with the young adult population at RNDC. Modules include refresher training on Use of

Force, Chemical Agents, Suicide Prevention, PREA, and Narcan administration, along

with longer modules on *Unit Management*, *Working with Emerging Adults in a*

*Correctional Environment* and *Procedural and Restorative Justice*. The initial classroom

training will be fortified by a six-month mentorship/technical assistance phase to

reinforce key concepts, followed by structured efforts to promote ownership of problems,

solutions and results.

The Monitoring Team has provided feedback to the Department on this plan and

continues to be actively engaged with those responsible for its design. The central themes of the

Monitoring Team's feedback on the *RNDC Programs Action Plan* are discussed below.

- **Address Known Obstacles to Consistent Staffing and Unit Management**: The Monitoring Team recommended that the Department dissect and understand the reasons why similar attempts to implement consistent staffing and unit management/direct supervision did not succeed, such that these pitfalls may be prevented in the future. In response to this feedback, the Department identified several dynamics that undercut the success of prior efforts: competing priorities, lack of communication between agency leaders, significant changes to staff scheduling, increased census on young adult housing units, the retirement of the previous Warden without an adequate transition plan to the new Assistant Commissioner, unveiling projects too quickly and without dedicated resources, and failing to reinforce expectations and to provide guidance on how new strategies should be put into practice. It's important that the Department has acknowledged these barriers and obstacles, but it now must fortify its plans to ensure these problems are not replicated.

- **Address Potential Threats to Efficient Deployment of Consistently Assigned Staff**: The Department's plan includes reintroducing certain strategies (i.e., 5x2 schedules, Awarded Posts, split tours) that were previously suspended because they were identified as conventions that interfered with, rather than enhanced, the efficient deployment of staff. The Monitoring Team recommended that any reintroduction of these strategies must be examined closely to determine if their use is appropriate, and if so, what protocols will be put in place to ensure they are not abused as they were in the past. The Department should also identify strategies to address the problems identified by NCU's 2021 consistent staffing audits which revealed mutuals (i.e., shift trading), posts for

which no staff were assigned, and staff absence (e.g., various forms of staff leave) as prevalent dynamics undercutting consistent staffing.

- **<u>Focused Security Initiatives</u>**: The Monitoring Team suggested that the Department incorporate efforts to enhance basic security practices into the responsibilities for Unit Managers and staff assigned to young adult housing units. Furthermore, the various elements of Direct Supervision (see ¶ 12, below) should be specifically integrated into staff expectations under the Unit Management framework.

- **<u>Physical Inspections</u>**: The Monitoring Team recommended that the Department develop a protocol for regular physical plant inspections and ongoing maintenance, particularly one that can incentivize staff and people in custody to take responsibility for their units' upkeep. Too often, the Department expends significant time and money to renovate housing units, only to have them deteriorate shortly thereafter.

- **<u>Assessment of Progress</u>**: The Monitoring Team recommended that the Department identify a strategy to monitor and measure the progress of implementation, along with a method to assess the plan's effectiveness. The Department is encouraged to utilize NCU's expertise and resources for this purpose.

Implementation of the *RNDC Programs Action Plan* is currently underway, and the Monitoring Team will continue to both support the Department's efforts and to report on the quality of the plan's implementation and the extent to which it effectively reduces violence and improves the conditions of confinement at RNDC.

# APPENDIX F:
# UPDATE ON PROCESSING NEW ADMISSIONS

## UPDATE ON PROCESSING OF NEW ADMISSIONS

The procedures for processing people newly admitted to the Department remain as described in the Monitor's February 3, 2023 Report (dkt. 504) at pgs. 15-18 and Monitor's April 3, 2023 Report (dkt. 517) at pgs. 74-75. The New Admission policy was updated in early 2023 but rescinded in June 2023 because the Department had not consulted with the Monitoring Team on the changes. Revisions to the policy have not been prioritized, given the Department's need to focus on other higher-priority initiatives.

## LENGTH OF STAY IN INTAKE FOR MALE NEW ADMISSIONS

New admission processing data from 2023 identifies the proportion of male new admissions who were processed through new admission intake within the required 24-hour timeline. Two different data points can be utilized as the "start time" when tracking length of stay: the time that an individual is transferred from NYPD to NYC DOC custody, which typically occurs in a court setting ("custody time") *or* the time that an individual arrives at the intake unit at EMTC facility on Rikers Island ("arrival time"). Both are considered separately in the analysis below.[158] The "end time" at which intake processing is considered complete is the time that the individual is either transferred to a housing unit or is discharged from custody (for those who make bail or are not returned to custody following a return to court or a hospital visit).

As shown in the section under the orange bar in the tables below, whether using custody time or arrival time as the starting point, nearly all individuals from July to December 2023 were

---

[158] As noted in the Monitor's February 3, 2023 Special Report on Intake (dkt. 504), the Monitoring Team assesses the time each person arrives in the intake unit (*i.e.*, "arrival time") compared to the time the individual is transported to their assigned housing unit when calculating whether the 24-hour requirement has been met. Counsel for the Plaintiff Class has advised the Monitoring Team that it believes that the assessment of compliance should be based on the time an individual is taken into custody (*i.e.*, "custody time"). Discussions about the appropriate compliance standard will occur in conjunction with the discussion related to clock stoppages. Given that, this report provides outcomes using both data points for the Court's consideration.

processed within a 24-hour period. Using "custody time" as the starting point, 94% of new admissions were processed through intake in under 24 hours. Using "arrival time" as the starting point, 96% of new admissions were processed through intake in under 24 hours[159]. These calculations were made using a continuously running clock, *without deducting time for clock stoppages*, which are described in more detail below.

| Intake Processing Times for New Admissions Arriving at EMTC Intake July to December 2023 | | | | |
|---|---|---|---|---|
| **Outcome** | **Per Custody Time** | | **Per Arrival Time** | |
| | **n=9,263** | **%** | **n=9,263** | **%** |
| Housed/Discharged within 24 hours | 8668 | 94% | 8848 | 96% |
| Housed/Discharged beyond 24 hours | 595 | 6% | 415 | 4% |
| **Length of Stay ("LOS") Beyond 24 Hours** | | | | |
| **LOS (# hrs. overdue)** | **n=595** | **%** | **n=415** | **%** |
| 24-27 hours (≤ 3 hrs.) | 138 | 23.20% | 124 | 29.90% |
| 27-30 hours (3-6 hrs.) | 159 | 26.70% | 126 | 30.40% |
| 30-33 hours (6-9 hrs.) | 110 | 18.50% | 80 | 19.30% |
| 33-36 hours (9-12 hrs.) | 81 | 13.60% | 34 | 8.20% |
| 36-48 hours (12-24 hrs.) | 66 | 11.10% | 31 | 7.50% |
| More than 48 hours (≥24 hrs.) | 41 | 6.90% | 20 | 4.80% |

The data beneath the green bar in the table above shows the total length of stay for the small proportion of individuals whose processing did not meet the 24-hour timeline. In this Monitoring Period, of those individuals who did not meet the 24-hour timeline, most were

---

[159] These outcomes were sustained throughout 2023.

housed within 3 hours, specifically, 407 of the 595 (68%) using custody time and 330 of 415 (80%) using arrival time.

**TEMPORARILY SUSPENDING NEW ADMISSION PROCESSING, A.K.A. CLOCK-STOPPAGE**

Historically, the Department has identified circumstances in which new admission intake processing is interrupted and has tolled its accounting of the processing time (*i.e.*, "stopped the clock") until the circumstance is resolved and processing can resume.[160] The situations in which the Department temporarily suspends its intake processing clock include when:

- An individual is returned to court before the intake process is completed.

- An individual refuses to participate in intake processing.

- An individual is transferred to a hospital or Urgi-Care (a clinic in another facility on Rikers Island) before the intake process is complete.

- An individual makes bail and is released from custody before the intake process is complete.

Suspending intake processing appears logical (*e.g.*, processing cannot occur if the person is not physically present) and may also be functional (*e.g.*, Department or CHS staff need to know that an individual will not be presented for a certain procedure). Although the Department tracks all clock stoppages, the data presented above regarding the 24-hour timeline utilized a continuously running clock, *without deducting any time when processing was suspended.*

In 2023, nearly all individuals newly admitted to the Department (90%; 16,622 of 18,580 people) were processed through intake without the process being suspended for any reason. Further, the fact that the process was suspended sometimes did not necessarily mean that the

---

[160] *See* Monitor's February 3, 2023 Report (dkt. 504) at pgs. 17 and 19-20 and Monitor's April 3, 2023 Report (dkt. 517) at pgs. 79-81.

individual was not processed within 24 hours. In fact, among the 1,958 individuals whose intake process was suspended for some period, a significant portion were housed within 24 hours (48% using custody time, 64% using arrival time). Among those whose intake process was temporarily suspended and whose processing lasted more than 24 hours (n=411 using custody time, n=279 using arrival time), the largest category of suspensions occurred when the individual was required to return to court (68% of those in intake longer than 24 hours per custody time; 73% of those in intake longer than 24 hours per arrival time).

**NCU's Audits to Verify Data Entry**

Concurrent with the implementation of the improved New Admission Dashboard, the *Nunez* Compliance Unit ("NCU") continued its audit strategy to corroborate time entries using Genetec footage.[161] Audit results from July to December 2023 are summarized for the 147 people who were newly admitted during the audits' sampling frames.[162]

- 143 of 147 people (97%) arrived in intake and were processed and transferred to a housing unit within the 24-hour timeline (confirmed via Genetec review).

- 137 of 147 arrival time entries (93%) were generally accurate (*i.e.*, within 20 minutes of the time shown on Genetec). Among the 10 inaccuracies, four stated a time *before* the person actually arrived, and six stated a time *after* the person actually arrived. One inaccuracy was simply reported as a "data entry error."

---

[161] *See* Monitor's February 3, 2023 Report (dkt. 504) at pgs. 20-22 and Monitor's April 3, 2023 Report (dkt. 517) at pgs. 78-79.

[162] NCU confirms the status of all individuals in the intake to determine whether they are a new admission or if the individual may already have been in custody and is therefore in intake as an inter/intra facility transfer. Upon confirmation of the new admissions, the audit is limited to those individuals.

- 124 of 138[163] housing time entries (90%) were generally accurate (*i.e.*, within 20 minutes of the time shown on Genetec). Among the 14 inaccuracies, seven stated a time *before* the person was actually transferred to a housing unit, and seven stated a time *after* the person was actually transferred to a housing unit.

- 19 of the 147 people (13%) had "clock stoppages" during the intake process. Of these, 15 people were housed within 24 hours of their arrival time in intake and 10 people were not.

The Department continues to ensure staff are accurately entering data regarding the person's arrival time in intake and the time the person was transferred to a housing unit. With respect to the small number of cases in which errors in data entries were found, the Department reports that staff members received corrective interviews, counseling, and retraining.

## CONCLUSION

The Department has taken important steps to ensure New Admissions are processed in a timely manner. The vast majority of individuals are processed within 24 hours, including in instances when a clock stop is appropriate. As demonstrated by NCU's audit, the Department also continues to track New Admissions using the New Admissions Dashboard in a generally reliable and accurate manner. The Department needs to remain alert and proactive regarding the New Admissions procedures to effectively address the evolving challenges and fluctuations in population.

---

[163] Nine individuals were excluded from the Housing Time calculation because they were discharged during their admission process and thus the housing time was not applicable.

# APPENDIX G:
# UPDATE ON
# CERTAIN STAFFING INITIATIVES

This section provides an update on three discrete staffing initiatives from the Action Plan – § C, ¶ 3, (v); C, ¶ 3(vi); § C, ¶ 3(vii) – given they are subject to the pending motion practice before the Court.

**AWARDED POSTS (ACTION PLAN § C, ¶ 3, (V))**

The Action Plan requires the Department to reduce the use of awarded posts because it limits flexibility in deploying staff to places where they are most needed. In most correctional systems, staff may bid for a particular tour/shift, but not for a specific post within the facility. In this Department however, staff may bid for a specific post assignment and be awarded that posts which means they may not be assigned to work in any other location.[164]

In Fall 2022, the Department reported that it will no longer award specific posts to staff so only staff who had an awarded post as of the date of suspension will maintain an awarded post.

- Department's Ability to Reduce Use of Awarded Posts: The Department's efforts to reduce the number of staff with awarded posts has been mired in unnecessary confusion, lack of internal coordination and bureaucracy. The City and Department have repeatedly claimed that the Department has the unilateral ability to reduce awarded posts. Despite these repeated claims, the individuals tasked with doing the work to reduce awarded posts have maintained that they are not able to take such action. To date, the Monitoring Team is not aware that the Department has reconciled these divergent views.

---

[164] Staff on awarded posts may be redeployed on a short-term basis, such as for overtime, during emergencies or as part of the official HQ redeployment program which currently occurs one day per week.

- <u>Plans to Reduce the Use of Awarded Posts</u>: In late 2022 and early 2023, the Department submitted multiple plans to reduce awarded posts, but none were implemented. The Monitoring Team requested an update on these plans and information in May, 2023, but, despite repeated follow-up, the Monitoring Team have still not received any further information. In spring 2024, Department leadership engaged the Monitoring Team to discuss the possible reintroduction of the use of awarded posts. The Monitoring Team has recommended that the Department must have a clear and consistent view on the use of awarded posts and that any plan for the reintroduction of awarded posts must address the various deficiencies in the process that have been identified and how they will be eliminated should the process be reintroduced. Such plans should be accompanied with a reasonable explanation of why the use of awarded posts is necessary given the Department's inability to date to manage this process reliably.

- <u>Number of Staff with Awarded Posts</u>: The Department reports it does not have an internal mechanism to monitor the use of awarded posts so it is difficult to determine the veracity of any claims that the number of staff with awarded posts has decreased. The ability to determine what staff may have awarded posts has been unnecessarily protracted. In summer 2023, the Department reported the data related to awarded posts, that was provided to both the Monitoring Team and the staffing analyst for multiple years, was inaccurate despite repeated claims at the time of production that the data was accurate and reliable. The Department also reported that individuals who were not officially designated with an awarded post were nonetheless treated as such (meaning the facility continued to assign the individual to a specific post, even when it was not required to do so). The status of individuals with "unofficial" awarded posts remains unknown. Almost

a year after requesting clarification about the data, the Department reported to the Monitoring Team in late March that it now has reliable data regarding the number of staff with awarded posts. The Monitoring Team followed-up with a number of questions in order to assess the new information provided. Additional information was provided the day before the filing of this report so the Monitoring Team has not yet had a chance to evaluate the information. It must also be noted that given the significant issues in managing the use of awarded posts, the Monitoring Team cautions against any comparison of the newly created data with any historical data because there are significant questions about the veracity of the historical data.[165]

## MAXIMIZE WORK SCHEDULES (ACTION PLAN § C, ¶ 3(VI))

The Department must maximize staff work schedules as required by Action Plan § C, ¶ 3(vi). The purpose of this requirement is for the Department to optimize staff scheduling by implementing alternatives to the work schedule for uniform staff assigned to work in the facilities to increase the number of days a staff member works. Specifically, the Department is required to minimize the use of the 4x2 schedule in order to increase the number of days that a staff member works during the year.

There are a number of ways in which staff schedules can be set. Most correctional systems utilize a 5x2 schedule where staff work five consecutive 8.5-hour workdays, followed by two consecutive days off, resulting in a total of 261 workdays per year. In this Department, a

---

[165] The Monitoring Team is not aware of any way that data can be retroactively developed from a prior date certain (e.g., June 14, 2022). Even if retroactive data could be developed, the development of such data is overly burdensome, and the Monitoring Team believes that such an exercise would be futile given that there is no evidence the Department is capable of reliably identifying those staff with awarded posts by policy versus posts awarded for other reasons.

large number of Staff work on a 4x2 schedule, which means they work less days a year. On the 4x2 schedule, Staff work four consecutive 8.5-hour workdays, followed by two consecutive days off. This schedule results in staff being assigned to work 243 days.

The goal of the Action Plan is to reduce the reliance on the 4x2 schedule in order to improve scheduling. Here in lies the conundrum. The 5x2 schedule, which would be the alternative to the 4x2 schedule, as applied by DOC, does not actually improve scheduling, and in fact, may create greater inefficiencies in staff scheduling then the 4x2 schedule. The traditional 5x2 schedule utilized by most correctional systems across the country **is not the same** as the 5x2 schedule utilized by this Department.

The Department's version of the 5x2 schedule has been altered by labor agreements between the Department and uniform staff (including agreements dating back to 1979) and Operations Orders dating back to the 1990s. The Department's version of the 5x2 schedule negates the benefits of this scheduling practice because:

- Staff assigned to the Department's 5x2 schedule receive 16 additional compensatory days each year and two additional vacation days, for a total of 18 days off. As a result, instead of the traditional 261 days, DOC staff on a 5x2 schedule work the same number of days a year, 243, as staff on a 4x2 schedule.

- Staff on the Department's 5x2 schedule are afforded at least one weekend day/two consecutive days off (i.e., Friday/Saturday, Saturday/Sunday, or Sunday/Monday).

The Department's version of the 5x2 schedule impedes the Department's ability to maximize staff working days and to have adequate staffing on the weekends. Confoundingly, under the Department's scheduling structure, the 4x2 schedule provides for a larger proportion of

staff to be present on any given day. A more detailed discussion about these scheduling conventions is described in the Monitor's August 7, 2023 Report at pgs. 16-18.

Essentially, the two current schedules available to the Department are the same, but arguably, the 5x2 schedule may be worse. Accordingly, should the Department reduce its use of the 4x2 schedule and utilize its version of the 5x2 schedule the ability to maximize staffing may be worse. This of course cannot and should not serve as a defense to reducing the reliance on the 4x2 schedule. This only heightens the need for the Department to untangle the morass of staffing agreements in place so that it can maximize the scheduling of staff. To date, the City and Department have not reported on any concrete steps that have been taken to alter these scheduling practices or to engage the unions on this issue. The City contends that it has taken many other steps to address the assignment of staff to lessen the practical impact of this scheduling pattern, including promoting more Captains and ADWs, and increasing supervisory presence across shifts and on weekends. The Department's overtime data (provided in Appendix A of this report) suggests that meaningful change in the ability to maximize staff within the Facilities has not yet been achieved.

### REDUCTION OF UNIFORMED STAFF IN CIVILIAN POSTS (ACTION PLAN § C, ¶ 3(VII))[166]

There has been very little progress in the Department's efforts to reduce the use of uniform staff assigned to posts with duties that can be reasonably accomplished by a civilian as required by Action Plan § C, ¶ 3(vii). The Department previously reported that it has transferred 7 uniform positions at HMD to civilian posts and that it intends to transfer additional uniform staff engaged in timekeeping to civilian posts. Uniformed staff continue to serve in a myriad of

---

[166] As required by Action Plan § C, ¶ 3(vii).

roles that can be fulfilled by a civilian work-force (e.g. assistants to the Wardens/Assistant Commissioners, landscaping and sanitation work, etc.)

The Department reported under the prior Commissioner that Human Resources, the Chief of Staff, and the Office of Administration has been meeting with facilities bi-weekly to identify posts that are currently manned by uniformed staff and should be civilianized. Despite this reported work, the Department has not reported it identified any such posts (such as those responsible for administrative tasks) and nor have any such posts been identified in the many other divisions within the Department.

The Department also continues to report that via budget cuts, the number of civilian staffing lines has been reduced. If the Department maintains that the relevant duties remain necessary, it appears the Department may be suggesting that a budget-driven reduction in civilian staff may require the Department to use uniformed staff to fulfill the relevant duties. Further, despite claims that the Department's staffing assessment identified certain administrative posts in the facilities (that have historically been filled by uniform staff) to be altogether superfluous, the Department has not taken any action to eliminate these unnecessary posts, and thus they remain filled by uniform staff.

271