OFFICE OF THE MONITOR
*NUNEZ, ET AL. V. CITY OF NEW YORK, ET AL.*

**Steve J. Martin**
Monitor

**Anna E. Friedberg**
Deputy Monitor

+1 646 895 6567 | afriedberg@tillidgroup.com

May 24, 2024

**VIA ECF**
The Honorable Chief Judge Laura Taylor Swain
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10006

*Re: Nunez, et al. v. City of New York, et al., 11-cv-5845 (LTS) (JCF)*

Dear Chief Judge Swain,

We write to provide the Court and the Parties with information that counsel for the Plaintiff class and the Southern District of New York recently requested of the Monitoring Team so that Plaintiffs may have an opportunity to review and evaluate the information in advance of their filings with the Court next week. The Monitoring Team shares the attached document that responds to specific questions or updates regarding the following topics: (1) awarded posts, (2) staff tours and tour wands, and (3) leadership tours of DOC facilities.

The Monitoring Team notes that while this submission is focused on discrete topics requested by counsel, we remain deeply concerned about the conditions in the jails. The risk of harm to those incarcerated and those who work in the jails remains high. Reforms must be advanced at an urgent pace which necessitates adequate leadership and support. A significant number of key leadership positions and support team positions remain vacant. These individuals provide critical oversight and support of important initiatives required to advance the reform as discussed in the Monitor's April 18, 2024 Report (pgs. 9-11). Budgetary constraints and a slow-moving bureaucracy have made filling them particularly challenging. During the past few weeks,

the City appears to be working to make some accommodations to speed up approvals and to allow the Department to hire at a quicker rate. Such initiatives are critical and must continue given that the Department's need to fill key positions is anticipated for the foreseeable future. The Monitoring Team will continue to attend closely to this issue.

We appreciate the Court's attention to this matter.

Sincerely,

s/ Steve J. Martin
Steve J. Martin, *Monitor*
Anna E. Friedberg, *Deputy Monitor*

# Update
# by the
# *Nunez* Independent Monitor

**May 24, 2024**

**Department Executive Leadership's Tours of Facilities**..................................................**2**

**Routine Staff Tours of Housing Units**.................................................................**3**

- Background ................................................................................................. 3
- DOC's Assessment of Staff Tours................................................................. 4
- Corrective Action ....................................................................................... 6
- Conclusion & Next Steps ............................................................................ 8
- Detailed Breakdown of Corrective Action For Staff Tours............................. 9

**Awarded Posts** ........................................................................................**15**

- Background ................................................................................................ 15
- Concerns Regarding the Department's Practice of Awarded Posts.................. 16
- Data on Awarded Posts............................................................................... 19
- Department's Efforts to Reduce the Use of Awarded Posts ........................... 22
- Next Steps ................................................................................................. 23
- Collective Bargaining Agreement................................................................ 26

## DEPARTMENT EXECUTIVE LEADERSHIP'S TOURS OF FACILITIES

Plaintiffs requested any notes/reports generated as a result of the facility tours conducted by the Department's senior leaders, the list of action items generated by the Commissioner's Office based on these tours, and the follow-up/status of those action items (Declaration of Commissioner Maginley-Liddie, ¶ 12).

By way of background, beginning on January 22, 2024, the Commissioner required Executive and Senior staff to conduct regular tours of the jails (separate and apart from any tours conducted by Facility Management). The Department reports that the Commissioner requested that leadership conduct meaningful tours, mitigate issues as they are identified, and report to the Commissioner's Office about action items that need to be addressed. Since the inception of these tours, the individual leadership reports to the Commissioner's Office have been provided in an *ad hoc* manner in a number of different formats. Given the breadth and volume of reports, it is too burdensome for the Department to collate and produce those reports. The Department's Office of Strategic Initiatives is working to streamline leadership's reports from their tours so that the action items can be tracked in a streamlined and efficient manner going forward. The Assistant Commissioner of Strategic Initiatives has spoken with the Deputy Monitor about this initiative and sought input on how this information can be collected and utilized going forward. The Monitoring Team provided the schedule of tours from January 22 to April 26, 2024 to the Parties.

# ROUTINE STAFF TOURS OF HOUSING UNITS

Plaintiffs requested updated information regarding the Department's efforts to achieve and demonstrate compliance with requirements for officers and Captains to conduct regular tours of the housing units. This update is intended to supplement the Monitoring Team's prior reports regarding staff touring.[1]

## BACKGROUND

Routine and adequate touring of housing units is a fundamental component of sound correctional practice. Staff must visually inspect the housing units, particularly when incarcerated individuals are confined to their cells, to ensure the welfare of people in custody, to respond to their concerns and to address any problems that arise. These tours should occur at regular intervals throughout each shift, every 30 minutes for officers and three times (each at least one hour apart) per 8-hour shift for Captains.

For years, the Monitoring Team has found that officers and Captains do not tour the units as often as required and that their tours are often not meaningful (e.g., they do not look into the cell door windows to verify the safety of the individual).  Staff's failure to adequately tour the housing units has contributed to the units' overall state of dysfunction and has resulted in the use of unnecessary and excessive force and serious acts of violence. The lack of adequate touring has also been identified as a contributing factor to several deaths in custody. As a result of the deficiencies in staff tours, the Action Plan includes requirements to improve routine housing unit tours § A, ¶ 1(d).

---

[1] *See* the Monitor's October 28, 2022 Report at pgs. 72-74; the Monitor's April 3, 2023 Report at pgs. 42-44; the Monitor's July 10, 2023 Report at pgs. 32, 80-81; the Monitor's October 5, 2023 Report at pg. 7; the Monitor's November 8, 2023 Report at pgs. 11, 13-14, 20, 73-79; and the Monitor's April 18, 2024 Report at pgs. 14-15, 23-25, 65-66, 249.

As part of the effort to ensure that touring occurs as required, the Department procured the Watch Tour system that includes tour wands, sensors installed in key locations on the housing units, and a software package to monitor the extent to which tours occur at the required frequency. Tour wand data simply confirms that the staff member moved throughout the unit but cannot verify whether the tour was meaningful. The NCU's security audits of random housing units on random days are replete with examples of staff who were off post (and thus could not tour), who failed to tour, and who tapped the sensor with the tour wand but took no action to verify the individuals' safety in their cells.[2]  This is consistent with the Monitoring Team's findings via observations of staff practice and its routine review of use of force incidents, violent incidents, and in-custody deaths. Since the inception of the Action Plan, even with its specific requirements related to housing unit tours, the Monitoring Team has not observed any meaningful change in staff practice in this area.

**DOC's Assessment of Staff Tours**

The Department has a few protocols to assess whether staff are conducting tours as required. The electronic information produced by the tour wands is used by the Department in a few ways, but it has not yet been maximized to develop a reliable quality assurance program or to make meaningful conclusions about the current performance level and whether any progress is being made. The data from the tour wands is available on a dashboard (developed by DOC) that can be viewed in real time by facility leadership. The Department recently produced samples of the dashboard to the Court as Exhibits A and B to the Declaration of Captain Gamien Batchelor (dkt. 689-7). This functionality permits leadership to identify close in time whether a tour

---

[2] For example, of the 24 audits conducted between January and April 2024, the NCU audits found staff were off post for at least a portion of the 24-hour audit period in 20 of the 24 audits. The 24 audits also included a variety of examples in which staff failed to complete all required tours and/or that the tours were not meaningful.

occurred as it should or whether staff failed to conduct the tour. Retrospectively, the dashboard also permits a visual inspection of the tours completed on a set of housing units for a particular day/shift (which are represented by a series of dots and Xs), although the dashboard is limited in terms of the lookback window because of the large volume of data that must be processed. The dashboard also includes variables for whether the frequency of tours met the intended "target," the number of tours that were late and the longest duration between tours. However, to date, the Department is not able to produce aggregate data regarding the proportion of housing units that met the "target" on any given day/shift nor does it compute other performance metrics. As a result, there is currently no reliable data to assess compliance and whether progress has been made or not.

The Department also utilizes the data from the tour wands as part of a quality assurance initiative to determine if tours have occurred as required. To date, the Department's quality assurance program is inefficient, burdensome and does not produce results that support the overall goal of ensuring that tours occur as required. First, the overall management of this initiative has not had the consistent, sustained leadership needed to develop and implement an adequate quality assurance program. Over the past two years, the management of this process has changed multiple times across at least three different offices (the Office of Commissioner, the Office of the Senior Deputy Commissioner, and the Office of the Deputy Commissioner of Facility Operations).  Currently, the process is managed by the Office of the Senior Deputy Commissioner ("SDC").[3]

---

[3] Most recently, DOC reported to the Monitoring Team that Captain Batchelor, who submitted a declaration to the Court on March 18, 2024 as the individual in charge of the Tour Wand Compliance Unit, has been reassigned and is no longer in charge of this unit. The Department reports that an ADW has been recently assigned to manage the unit.

The current quality assurance process is cumbersome and time consuming for both the entity that conducts the audit and the facilities. The Office of the SDC has a laborious process for reviewing the tour wand dashboard and creating a table containing an entry for every tour that identifies whether the tour was in compliance or not, which is then shared with each facility. Each facility then investigates each tour deemed "not in compliance" to determine whether the SDC's assessment is accurate, or if there were reasonable, mitigating factors that prevented the officer or captain from using the tour wand as required. Genetec surveillance video footage is reviewed for this purpose, which is incredibly time consuming. Additionally, the Department has not aggregated the information developed in any way to determine the overall results of each audit. Further, to the extent that tours are determined to be out of compliance, any corrective action applied to staff is documented in a logbook within each individual facility. The logbook entries cannot be aggregated and do not generally appear to be subject to oversight to ensure that the proposed corrective action actually occurred. While this process is ostensibly comprehensive, it is burdensome and inefficient, and therefore of limited value.

**CORRECTIVE ACTION**

The Department's recordkeeping regarding staff's failure to tour, as described above, does not permit the development of aggregate data (in particular because most of the data is maintained in logbooks and/or is otherwise not amenable to aggregation). The Monitoring Team continues to review various disciplinary records produced by the Department to identify discipline related to the failure to conduct meaningful housing unit tours.

From January 2022 to April 2024, the Monitoring Team has identified the following corrective action related to potentially deficient touring practices.[4] More detailed data is provided at the end of this section.

- o **First Remedial Order § A., ¶ 1 (Use of Force Reviews) Rapid Reviews**: Facility leadership recommended, via Rapid Reviews, in total, 30 staff (one ADW, 10 Captains, and 19 officers) for corrective action related to potentially deficient touring practices. More specifically, one staff member was suspended, nine staff received Command Discipline, ten[5] staff received a corrective interview, one staff[6] received 5003 counseling, one staff received a verbal reprimand, MOCs were issued for five staff (and two could not be confirmed), three corrective actions were dismissed, and one corrective action was not processed because of due process violations.

- o **Suspensions**: 21 staff (two ADWs, seven Captains, and twelve officers) were suspended, due at least in part to deficiencies in their touring practices in cases where an individual died in custody.

- o **Formal Discipline**: The Department brought charges against 17 staff members for issues related to touring. Of these 17 cases, 11 were resolved with an NPA, one was administratively filed due to the MOS resigning and six remain pending.

---

[4] This summary is intended to update the information previously reported in the Monitor's November 8, 2023 Report at pgs. 76 to 79

[5] The Monitoring Team did not confirm that all recommended Corrective Interviews in fact occurred so it is possible that this number may be over inclusive as some corrective interviews may not have occurred.

[6] The Monitoring Team did not confirm that all recommended 5003 counseling in fact occurred so it is possible that this number may be over inclusive as some 5003 counseling may not have occurred.

Given the frequency with which touring deficiencies occur, and the frequency with which serious incidents occur from staff's failure to conduct proper tours, a larger number of corrective actions would be expected.

## CONCLUSION & NEXT STEPS

Overall, tours by officers and Captains do not appear to be occurring as required and the processes in place contribute little to the effort to improve staff practice. Further, given the frequency with which these deficiencies are observed, and the harm that flows from them, the number of corrective measures does not appear commensurate with the number of violations observed.

The Monitoring Team is in the process of developing comprehensive written feedback to the Department that includes recommendations for bringing greater efficiency, clarity and utility to its audit process so that the Department can produce valid metrics that assess compliance and progress over time and tracks and confirms any corrective action that may be taken for any deficiencies.

**DETAILED BREAKDOWN OF CORRECTIVE ACTION FOR STAFF TOURS**

*Corrective Action Identified Via Rapid Reviews*: The chart below identifies the facilities' recommended corrective actions[7] related to staff's touring practices via the Rapid Reviews of use of force incidents that occurred between January 1, 2022 and April 30, 2024.

| Facility Recommendations for Corrective Actions for Touring Deficiencies via Rapid Review Assessments of UOF Incidents Occurring Between January 1, 2022 and April 30, 2024 | | | | | |
|---|---|---|---|---|---|
| Date | Facility | Rank | Reason for Corrective Action | Recommended Corrective Action | Outcome |
| 2/6/22 | OBCC | Captain | Failure to conduct a tour | Command Discipline | Command discipline was not processed because of a due process violation. |
| 10/18/22 | AMKC | Captain | Failure to conduct a proper tour | Command Discipline and 5003 Counseling | CD issued for 5 days. The Monitoring Team could not confirm whether the 5003 counseling took place. |
| 4/14/22 | AMKC | Captain | Failure to conduct a tour | Suspension | Suspended from 4/24-4/30/22 for inefficient performance of duties |
| 6/14/22 | RNDC | CO | Failure to conduct a meaningful tour | Corrective Interview | Monitoring Team could not confirm whether the Corrective Interview took place. |
| 8/21/22 | AMKC | CO | Failure to conduct a proper tour | Command Discipline | The command discipline was converted to an MOC. The MOC was closed with an NPA for 5 compensatory days and a command discipline. |
| 1/2/23 | AMKC | Captain | Failure to conduct a proper tour | Command Discipline | CD issued for 5 days |
| 2/15/23 | AMKC | CO | Failure to conduct proper tours | Command Discipline | CD issued for 5 days |
| 3/16/23 | AMKC | Captain | Failure to conduct a proper tour | Command Discipline | Dismissed |
| 3/25/23 | AMKC | CO | Failure to conduct a proper tour | Corrective Interview | Monitoring Team could not confirm whether the Corrective Interview took place. |

---

[7] These staff may also have received discipline for other actions or misconduct in addition to discipline for their failure to conduct proper tours. For example, if a staff failed to conduct proper tours, failed to secure a door, and failed to turn on their body worn camera, the discipline could cover all three violations.

| 3/30/23 | VCBC | CO | Failure to tour | Command Discipline | Corrective Interview |
|---|---|---|---|---|---|
| 3/30/23 | VCBC | CO | Failure to tour | Command Discipline | Corrective Interview |
| 4/9/23 | AMKC | CO | Failure to conduct a proper tour | MOC | The MOC was closed with an NPA for 7 compensatory days and a return to command. |
| 4/17/23 | AMKC | CO | Failure to conduct tours | Corrective Interview | Monitoring Team could not confirm whether the Corrective Interview took place. |
| 4/20/23 | AMKC | CO | Failure to conduct proper tours | Command Discipline | CD issued for 5 days |
| 4/20/23 | AMKC | CO | Failure to conduct proper tours | Command Discipline | CD issued for 5 days |
| 8/13/23 | OBCC | CO | Conducting improper tours | MOC | The Monitoring Team could not confirm that an MOC was generated for this CO. |
| 8/13/23 | OBCC | CO | Conducting improper tours | MOC | The MOC is currently pending. |
| 9/13/23 | GRVC | Captain | Failure to tour a housing area with an unstaffed post | Command Discipline | Dismissed |
| 9/13/23 | OBCC | CO | Failure to conduct proper tours | Command Discipline | Reprimand |
| 9/24/23 | RNDC | CO | Failure to conduct a proper tour | Corrective Interview | Monitoring Team could not confirm whether the Corrective Interview took place. |
| 10/12/23 | GRVC | Captain | Failure to conduct a meaningful tour | Command Discipline | CD issued for 4 days |
| 10/13/23 | OBCC | CO | Failure to conduct proper tours | Corrective Interview | Monitoring Team could not confirm whether the Corrective Interview took place. |
| 10/13/23 | OBCC | CO | Failure to conduct proper tours | Corrective Interview | Monitoring Team could not confirm whether the Corrective Interview took place. |
| 11/19/23 | OBCC | Captain | Failure to conduct a meaningful tour | Command Discipline | CD issued for 5 days |
| 12/24/23 | RNDC | CO | Failure to conduct a proper tour | Corrective Interview | Monitoring Team could not confirm whether the Corrective Interview took place. |
| 1/18/24 | GRVC | Captain | Failure to conduct a meaningful tour | Command Discipline | CD issued for 5 days |
| 1/19/24 | GRVC | ADW | Failure to conduct a | Command Discipline | Dismissed |

| | | | meaningful tour | | |
|---|---|---|---|---|---|
| 2/14/24 | ETMC | Captain | Failure to conduct multiple tours | Command Discipline | Corrective Interview |
| 4/4/24 | OBCC | CO | Conducting improper tours | Command Discipline | CD issued for 5 days |
| 4/20/24 | GRVC | CO | Failure to conduct a tour | MOC | The Monitoring Team could not confirm the MOC was issued. |

***Suspensions Related to Touring Deficiencies and In-Custody Deaths***: The chart below identifies any staff that were suspended between January 2022 and May 2024 due at least in part to deficiencies in their touring practices in cases where an individual died in custody.

| Date | Rank | Penalty | Reason |
|---|---|---|---|
| 5/7/2022 | Captain | Suspended - 30 days | Failed to conduct tours/False logbook entry |
| 5/7/2022 | Captain | Suspended - 30 days | Failed to conduct tours/False logbook entry |
| 5/7/2022 | CO | Suspended, resigned | Failed to conduct tours/False logbook entry |
| 5/7/2022 | CO | Suspended - 30 days | Failed to conduct tours/False logbook entry |
| 6/20/2022 | CO | Suspended - 30 days | Failure to conduct proper tour/Off post |
| 6/20/2022 | CO | Suspended - 30 days | Failure to conduct proper tour |
| 7/15/2022 | Captain | Suspended - 30 days | Failed to conduct tours/False logbook entry |
| 7/15/2022 | CO | Suspended - 30 days | Failed to conduct tours/False logbook entry |
| 7/15/2022 | CO | Suspended - 30 days | Failed to conduct tours/False logbook entry |
| 8/15/2022 | Captain | Suspended - 30 days | Failed to conduct tour |
| 10/22/2022 | CO | Suspended - 7 days | Failed to conduct tours/False logbook entry |
| 10/31/2022 | CO | Suspended - 7 days | Failed to conduct tour |
| 2/4/2023 | ADW | Suspended - 30 days | Failed to conduct tours/supervise |
| 2/4/2023 | Captain | Suspended - 15 days | Failed to conduct tours/False logbook entry |
| 2/4/2023 | CO | Suspended - 6 days | Failed to conduct tours/off post |
| 2/4/2023 | CO | Suspended - 6 days | Failed to conduct tours |
| 7/4/2023 | CO | Suspended - 30 days | Failed to tour |
| 7/15/2023 | Captain | Suspended - 7 days | Failure to conduct proper tour |
| 7/23/2023 | ADW | Suspended - 7 days | Failed to conduct proper tour |
| 10/5/2023 | Captain | Suspended - 30 days | Failed to conduct meaningful tours |
| 10/5/2023 | CO | Suspended - 30 days | Failed to conduct meaningful tours |

*Formal Discipline*:
The chart below identifies the formal discipline charges related at least in part to touring deficiencies that have been brought for use of force incidents that occurred between January 1, 2022 and April 30, 2024.

| Date | DOC CASE DESCRIPTION (*Identifying Information Removed*) | Case Status |
|---|---|---|
| 08/05/22 | ON AUGUST 5, 2022 AT APPROXIMATELY 1715 HOURS IN HOUSING AREA SEVERAL INMATES WERE INVOLVED IN A UOF INCIDENT. UPON REVIEW OF GENETEC SURVEILLANCE SEVERAL CELL DOORS WERE LEFT UNSECURED ON THE TOP AND BOTTOM TIER AND THE MOS FAILED TO PROPERLY SECURE THE CELL DOORS DURING HER TOUR. INJURY CLASS C | NPA - COMPENSATORY TIME (9) DAYS + RETURN TO COMMAND |
| 08/27/22 | ON 8/27/2022 THE MOS WAS ASSIGNED TO HOUSING AREA POST, TOUR 1800 X 0631 HOURS. AT 2101 HOURS THERE WAS AN INSTITUTIONAL LOCK IN. GENETEC VIDEO REVEALED THE MOS CONDUCTING A SECURITY INSPECTION AND NOT CHECKING IF ALL THE CELLS WERE SECURE. THIS LEAD TO AN INMATE ON INMATE FIGHT. | NPA - COMPENSATORY TIME (20) DAYS + EXPUNGEMENT (12) MONTHS |
| 10/10/22 | ON 10/10/22 MOS WAS INSTRUCTED TO CONDUCT TOURS IN HOUSING AREA. A LEVEL B WAS ACTIVATED FOR THE POST, WHILE THE SOUTHSIDE WAS CONDUCTING LUNCH, AND LED TO THE UOF TO OCCUR. UPON REVIEW OF THE LOGBOOKS, IT WAS DISCOVERED THAT THE MOS FAILED TO CONDUCT A TOUR IN THE AREA OR SUPERVISE LUNCH. | NPA - COMPENSATORY TIME (3) DAYS + SUSPENSION (7) DAYS |
| 10/28/22 | ON 10/28/2022, THE RESPONDENT WAS ASSIGNED TO THE "C'" POST WHICH WAS OBSERVED WITH UNSECURED CELLS AND JANITOR'S CLOSET. THE RESPONDENT FAILED TO MAINTAIN EFFICIENT PERFORMANCE OF DUTY BY NOT CHECKING ALL BARS, LOCKS, WINDOWS, DOORS, AND OTHER SECURITY AREAS OF THE ASSIGNED POST AT LEAST TWICE DURING THE TOUR OF DUTY TO ENSURE THAT THEY HAVE NOT BEEN TAMPERED WITH AND ARE IN GOOD CONDITION. ANY UNUSUAL CONDITIONS OF SECURITY WITHIN THE FACILITY MUST BE REPORTED IMMEDIATELY TO A SUPERIOR OFFICER. INJURY CLASS: C. | NPA - COMPENSATORY TIME (10) DAYS + RETURN TO COMMAND |
| 11/17/22 | ON 11/17/22, THE MOS WAS ASSIGNED AS THE FLOOR OFFICER ON THE 1300X2131 HOUR TOUR. IN HOUSING AREA, 5 PIC'S WERE INVOLVED IN A FIGHT IN A CELL, 4 OF THEM WERE OBSERVED MAKING STABBING AND SLASHING MOTIONS TOWARDS THE OTHER ONE'S FACIAL AREA AND UPPER TORSO. ANOTHER OFFICER ORDERED THE PIC'S TO STOP FIGHTING AND THEY REFUSED TO COMPLY SO THEY DEPLOYED CHEMICAL AGENTS TO THE PIC'S FACE. THE MOS UTILIZED UPPER BODY CONTROL HOLDS TO ONE OF THE PIC'S TO PUSH THEM BACK TERMINATING THE INCIDENT. GENETEC ANGLES SHOWED THAT THE MOS DID NOT ENSURE THE PERSONS IN CUSTODY WERE NOT GATHERING IN AN UNAUTHORIZED GROUP ON THE TIER. ALSO, THE MOS DID NOT CONDUCT SECURITY INSPECTIONS OF THE HOUSING AREA TO ENSURE THE PANTRY AND ALL CELL DOORS WERE | NPA - Compensatory time (7) days + Return to command |

| Date | DOC CASE DESCRIPTION (*Identifying Information Removed*) | Case Status |
|---|---|---|
| | SECURED. | |
| 12/5/22 | ON DECEMBER 5, 2022 IN HOUSING AREA SEVERAL INMATES WERE INVOLVED IN A FIGHT. THE MOS FAILED TO CONDUCT A MEANINGFUL TOUR OF THE AREA TO ENSURE THAT ALL CELL DOORS WERE SECURED. HE OBSERVED MULTIPLE INMATES IN AND OUT OF CELLS AND DID NOT HAVE HIS BODY WORN CAMERA. INJURY CLASS C | NPA - COMPENSATORY TIME (3) DAYS + RETURN TO COMMAND |
| 12/25/22 | ON 12/25/22 AT APPROX 0800 HOURS IN HOUSING AREA, 4 PIC'S WERE INVOLVED IN A FIGHT OUTSIDE A CELL. THE MOS WHO WAS ASSIGNED AS THE FLOOR OFFICER ON THE 0500X1331 HOUR TOUR GAVE THE PIC'S ORDERS TO STOP FIGHTING AND THEY REFUSED TO COMPLY. A PIC WAS SLASHED AND WAS ESCORTED TO THE CLINIC WITH SEVERAL CUTS AND A SHARPENED PIECE OF PLASTIC WAS RECOVERED. UPON REVIEW OF GENETEC ANGLES, THE MOS FAILED TO CONDUCT A PROPER SECURITY INSPECTION TO ENSURE ALL CELL DOORS WERE SECURED AND FAILED TO UTILIZE CHEMICAL AGENTS IN ORDER TO STOP THE FIGHT. INJURY CLASS: C. | CHARGES PENDING FOR 1 STAFF,  NPA - Compensatory time (1) DAY + Return to command for other Staff |
| 01/28/23 | ON 1/28/2023, SEVERAL PICS ENTERED A PIC'S CELL AND ASSAULTED HIM. THE RESPONDENT ORDERED THE PIC TO STOP AND DEPLOYED CHEMICAL AGENTS. PIC SUSTAINED MULTIPLE STAB WOUNDS FROM THE ASSAULT. THE RESPONDENT FAILED TO CONDUCT TOURS AND INSPECTIONS. | Closed - Administratively Filed (MOS resigned) |
| 01/28/23 | ON 1/28/2023, THE RESPONDENT WAS IN THE HOUSING AREA. THERE WERE PHYSICAL ALTERCATIONS BETWEEN SEVERAL PICS. THE RESPONDENT AND OTHER MOS USED CHEMICAL AGENTS TO TERMINATE THE INCIDENT. GENETEC VIDEO REVEALED THE RESPONDENT FAILED TO CONDUCT TOURS, HAD MULTIPLE CELL DOORS UNSECURE AND HAD SANITATION SUPPLIES UNSECURE WHICH LEAD TO A PIC FACE LACERATION. | CHARGES PENDING FOR 1 STAFF |
| 02/07/23 | ON 2/7/23, THE RESPONDENT WAS ASSIGNED TO THE QUAD LOWER POST ON THE 0600X1431 HR TOUR. UPON REVIEW OF GENETEC VIDEO, BETWEEN 1400-1430 HRS, THE RESPONDENT FAILED TO CONDUCT TOURS AND FAILED TO ENSURE ALL CELL DOORS WERE SECURED IN HOUSING AREA. | NPA - Compensatory time (2) days + Return to command |
| 02/10/23 | ON 2/10/23 RESPONDENT FAILED TO SECURE CELL DOORS DURING HIS TOUR OF HIS ASSIGNED AREA, WHICH LED TO A UOF INCIDENT OCCURRING. | NPA - Compensatory time (2) days + Return to command |
| 02/23/23 | ON 2/23/23, THE MOS WAS ASSIGNED TO THE QUAD LOWER. UPON REVIEW OF GENETEC VIDEO, THE MOS FAILED TO CONDUCT TOURS AND FAILED ENSURE THAT ALL CELL DOORS WERE SECURED. | NPA - Reprimand + Return to command |
| 03/8/23 | ON 3/8/23 RESPONDENT FAILED TO CONDUCT VIGILANT TOURS WHICH LED TO A UOF OCCURRING. | CHARGES PENDING FOR 1 STAFF |
| 04/27/23 | ON 4/27/23 RESPONDENT FAILED TO CONDUCT A PROPER TOUR AS SHE WALKED PAST MULTIPLE UNSECURED CELL DOORS AND OBSTRUCTIONS ON CELL DOORS WHICH PREVENTED | CHARGES PENDING FOR 1 STAFF |

| Date | DOC CASE DESCRIPTION *(Identifying Information Removed)* | Case Status |
|------|-----------------------------------------------------------|-------------|
|  | PROPER VIEW INTO THE CELLS. |  |
| 08/13/23 | ON 08/13/2023 RESPONDENT WAS SEEN NOT CONDUCTING PROPER TOURS OF THE ASSIGNED AREA WHERE TWO PICS WERE INVOLVED IN AN ALTERCATION THAT LED TO ONE OF THE PIC'S GETTING STABBED ON HIS LEFT AND RIGHT UPPER ARM. | CHARGES PENDING FOR 1 STAFF |
| 12/3/23 | ON 12/3/2023 RESPONDENT FAILED TO CONDUCT TOURS AND FAILED TO ENSURE THAT ALL CELL DOORS WERE SECURED DURING A UOF INCIDENT. | CHARGES PENDING FOR 1 STAFF |

## AWARDED POSTS

Plaintiffs requested an update on the Department's use of awarded posts. The Monitoring Team last filed information related to awarded posts in the Monitor's April 18, 2024 Report at Appendix G. This update is intended to describe more recent events and to summarize information recently received by the Monitoring Team. This includes data regarding the number and placement of staff with awarded posts, the contrast between what the Department's policy requires and how the practice has been administered, the Monitoring Team's recently issued recommendations regarding the Department's use of awarded posts, and the Department's announcement that it has entered into an agreement with the union representing Correction Officers (i.e., COBA) that addresses job assignments, among other issues.

### BACKGROUND

A fundamental component of *safely* managing the incarcerated population is to ensure that an adequate number of qualified staff are assigned to work with persons in custody ("PIC") in the housing units. Historically, the Department has lacked an appropriate framework and basic tools to properly administer and manage staff assignments, particularly because of poor scheduling and deployment practices. More specifically, the Department's *staff deployment practices* do not make the best use of its workforce because, among other practices, the use of awarded posts has limited flexibility in deploying staff to places where they are most needed. The Department's use of a post that is "awarded" is governed by policy, but as discussed in more detail below, a number of *practices,* not codified in policy, have become entrenched and impede the Department's overall ability to maximize the deployment of its staff.

Department policy requires that, when available, job assignments must be posted indicating the position is available and its responsibilities so that uniform staff may apply. The

Department must consider various criteria when selecting a candidate (e.g., seniority, work performance, attendance record, special skills, or required clearances) and thereafter assigns the specific post to the selected staff member. In *practice*, once staff are assigned or "awarded" the post, they essentially maintain the post in perpetuity and can only be moved out of the position under limited circumstances. Collectively, this staffing convention is called "awarded posts" in Department parlance.

The Department itself recognized that its practice of awarding posts runs counter to the goal of efficient, responsible staff scheduling and deployment practices and thus incorporated a relevant provision to reduce the use of awarded posts in the Action Plan.[8] Accordingly, Action Plan §C, ¶ 3 (v) requires the Department to reduce the use of awarded posts so that they are primarily utilized for positions that require a specific skill set.

CONCERNS REGARDING THE DEPARTMENT'S PRACTICE OF AWARDED POSTS

The Department's *practice* of awarding posts goes beyond what is required by policy and introduces several restrictions on how staff may be subsequently assigned. Below is a summary of the concerns regarding the practice of awarded posts.

  o **Poor Management**: The awarded post process has not been properly managed, allowing ample opportunity for favoritism and cronyism to the point that in some

---

[8] The Action Plan reflects actions the City and Department committed to taking. During the May 27, 2022 Status Conference, counsel for the City reported that they "not only developed [the Action] plan…[but are also] ready, willing and able to continue the hard work of taking the department in a new and different direction" (Transcript p. 43, lines 15-21). Counsel further reported that "[t]he City's action plan...lays out the steps necessary to achieve [our] mutual goals." (emphasis added, Transcript, p.40 lines 3-5). In its June 10, 2022 letter to the Court requesting the Court enter the Action Plan, the City stated it "is fully committed to taking all of the actions detailed in the Plan" and noted that "we firmly believe [it] will achieve our collective goal of safe and humane jails."

commands, leadership has created "unofficial" awarded posts,[9] numbering in the hundreds,[10] that offer consistent assignment to posts outside of the housing units to staff who have reportedly curried favor. This has had an adverse impact on staff morale. When facility leadership exhibits favoritism by assigning preferential posts to certain staff, other staff members may feel marginalized and confined to less desirable positions. The perception of an unfair system leads to decreased enthusiasm and motivation among the workforce which may result in diminished work performance that contributes to unsafe conditions within the jails.

o **Poor Record Keeping**: The Department's poor recordkeeping has rendered it unable to address key fundamentals such as regularly producing an accurate list of posts that have been advertised and a current list of staff to whom posts have been awarded. It has taken several years for the Department to produce a reportedly accurate list of staff who have awarded posts.

o **Limited Flexibility**: In practice, once a staff member is awarded a post, they are not assigned to any other post, except in very limited situations (e.g., when working overtime or during emergencies). This means that even when the facility needs staff in other locations, those with awarded posts are not reassigned to the location in need. This is not codified in Department policy, but has been an entrenched practice.

---

[9] "Unofficial" awarded posts are those where a staff member is treated as if they had an awarded post with the same restrictions and protections afforded to those with formally awarded posts, but the post was not formally awarded pursuant to the Department's policy requirements.

[10] The Department's poor record keeping practices are such that it is impossible to quantify the number of unofficially awarded posts. Comparisons among the data reports submitted to the Monitoring Team between May 2023 and April 30, 2024 suggest that hundreds of positions that were initially reported as awarded posts were in fact "unofficial."

- **Location-Specific Posts**: When staff are awarded a post, it is to a specific location. If the job assignment is to a housing unit post, the staff remains at that location even if the housing unit is transferred elsewhere, which is not only illogical but also subverts the goal of attracting staff with identified skillsets to work with a specific population in order to develop constructive rapport. Awarding a post to a certain *physical* location is not required by policy, but has been an entrenched practice.

- **Posts with No/Limited Contact with the Incarcerated Population**: Most awarded posts are not on the housing units and the majority are for job assignments that do not actively engage with the incarcerated population throughout the day. In fact, a large portion of awarded posts are not even located within a facility, but rather in one of the courts or the Special Operations Division. Data regarding the distribution of awarded posts across various locations is provided below.

It must be emphasized that the multiple restrictions on how staff can be assigned are simply entrenched Department *practice*. The Monitoring Team has not identified any Department policy that codifies these restrictions. In other words, the manner in which awarded posts are *administered* by the Department has taken root via tradition and has been perpetuated by inertia. The Monitoring Team has long observed and reported on the Department's resistance to improving this practice which centered on the convention being encumbered by policy requirements.  However, in fact, the Monitoring Team's most recent efforts to untangle the morass suggest that the pathway toward correcting the problem has relatively few policy obstacles. As with many of the agency's dysfunctional practices, the problem lies in the agency's inability to differentiate policy from practice and to develop appropriate safeguards.  An

18

analogous situation occurred with the Department's management of sick leave, resulting in widespread abuse of the benefit that significantly contributed to severe staffing shortages.[11]

DATA ON AWARDED POSTS

The Department's attempts to produce accurate data on the number of staff with awarded posts goes back several years. Between late 2021 and mid 2023, the Department produced several sets of data and repeatedly asserted that the data was reliable. However, in May 2023, the Department reported that its data did not accurately reflect the number of staff with awarded posts because the data erroneously included "unofficial" awarded posts. The Monitoring Team repeatedly sought to clarify the number of staff with awarded posts, and nearly a year later, in March 2024, the Department reported that it had reliably identified the number of staff with awarded posts via "a review and accounting of the memorandums that a [Member of Service] is provided when a post is awarded. The Office of Administration requested that the facilities/commands forward all hard copies of every memo of every uniform member with an awarded post […]. This was done for every facility/command and every rank."

The Department reported that as of April 30, 2024, 844 posts have been awarded to staff members. The data produced on April 30, 2024 reflects all staff who have a formally awarded post. Staff members with "unofficial" awarded posts were removed from the data, although the Department has not yet articulated a strategy to eliminate the "unofficial" awarded post awards or to ensure that the practice of unofficially awarding posts does not reoccur in the future.

---

[11] The Department's sick leave was often characterized as "unlimited," when in fact, New York Civil Service Laws and DOC policy actually do provide some constraints on the use of leave. The Department failed to recognize and enforce these constraints consistently, so in practice, the benefit certainly appeared to be "unlimited." A long history of mismanagement and a lack of policy enforcement resulted in staff obtaining unlimited sick leave benefit, however, the practice of unlimited sick leave was never actually codified in policy. *See* the Monitor's October 28, 2022 Report at pgs. 44-45 and the Monitor's April 3, 2023 Report at pgs. 24-25.

Of the 844 staff with awarded posts, about two-thirds (n=575, 68%) were posts awarded within the facilities and one-third (n=269, 32%) were posts outside the facilities (i.e., court facilities, Special Operations Division, and Transportation Division). This data is provided in the first table below. Among the posts awarded, the Department identified that 430 of these 844 assignments (51%) were "PIC-facing posts" (a designation that includes housing units, along with corridor, clinic, front gate, fire safety, food service, activity, law library, education, meal relief, security and visitation posts, among others). The 49% identified as "non-PIC facing posts" included assignments to patrol, perimeter security, control rooms, gate security, and sanitation, as well as posts outside of the facilities. This data is provided in the second table below. Importantly, the Monitoring Team identified that less than *one-quarter* of the total 844 awarded posts were assignments to a specific housing unit.[12] This data is provided in the third, and final, table below. In other words, the current practice for awarding posts ensures that hundreds of staff members are consistently assigned *outside* of the facilities and/or to posts within the facilities that do not address the critical need for proper supervision and support to incarcerated individuals on the housing units.

The tables below show how the 844 awarded posts are distributed across location, by rank, and whether PIC-facing or housing unit job assignments.

---

[12] The proportion of posts on housing units was determined via the Monitoring Team's analysis. The location of some posts appeared obvious, but some of the others may or may not be in housing units. Accordingly, the data may not be precise but is certainly a well-informed estimate of the proportion.

| Location of Awarded Posts | | | | |
|---|---|---|---|---|
| | **ADW** | **Captain** | **CO** | **Total** |
| Facility | | | | |
| AMKC | ~ | 2 | 1 | 3 |
| BHPW | ~ | 4 | 56 | 60 |
| EMTC | ~ | 13 | ~ | 13 |
| GRVC | ~ | 11 | 79 | 90 |
| NIC | ~ | 18 | 61 | 79 |
| RMSC | ~ | 18 | 182 | 200 |
| RNDC | 1 | 24 | 105 | 130 |
| SUBTOTAL | 1 | 90 | 484 | 575 |
| Non-Facility Location | | | | |
| BKCT | 1 | | 7 | 8 |
| BXDC | 1 | 4 | 45 | 50 |
| MNCTS | 1 | 3 | 34 | 38 |
| QNCTS | 1 | | 41 | 42 |
| SOD | 1 | 9 | 65 | 75 |
| TD | 1 | 11 | 44 | 56 |
| SUBTOTAL | 6 | 27 | 236 | 269 |
| **TOTAL** | **7** | **117** | **720** | **844** |
| **% Facility Posts** | **14%** | **77%** | **67%** | **68%** |
| **% Non-Facility Posts** | **86%** | **23%** | **33%** | **32%** |

The following tables provide additional detail for the subset of awarded posts that are located in the facilities.

| PIC-Facing Posts, by Facility As Identified by the Department | | | | |
|---|---|---|---|---|
| | **ADW** | **Captain** | **CO** | **Total** |
| Facility | | | | |
| AMKC | ~ | 2 | 1 | 3 |
| BHPW | ~ | 4 | 36 | 40 |
| EMTC | ~ | 8 | ~ | 8 |
| GRVC | ~ | 3 | 15 | 18 |
| NIC | ~ | 14 | 59 | 73 |
| RMSC | ~ | 16 | 154 | 170 |
| RNDC | 1 | 22 | 95 | 118 |
| **TOTAL** | **1** | **69** | **360** | **430** |

| Housing Unit Posts, by Facility As Identified by Monitoring Team analysis | | | | |
|---|---|---|---|---|
| | **ADW** | **Captain** | **CO** | **Total** |
| Facility | | | | |
| AMKC | ~ | ~ | ~ | ~ |
| BHPW | ~ | 2 | 6 | 8 |
| EMTC | ~ | 8 | ~ | 8 |
| GRVC | ~ | 3 | 19 | 22 |
| NIC | ~ | 4 | 41 | 45 |
| RMSC | ~ | 2 | 44 | 46 |
| RNDC | 1 | 11 | 25 | 37 |
| **TOTAL** | **1** | **30** | **135** | **166** |
| *\*\*This table includes posts in which the location on a housing unit was not 100% certain, but is possible, in order to illustrate the maximum possible value.* | | | | |

## DEPARTMENT'S EFFORTS TO REDUCE THE USE OF AWARDED POSTS

Since the entry of the Action Plan in June 2022, the Department has taken a few initial steps to reduce the use of awarded posts. Beginning in 2023, the Department curtailed its use of

awarded posts.[13]  39 posts were awarded in 2023 compared with over 130 posts awarded in 2022.  Finally, the Department worked to clean up its data in order to produce accurate statistics on the number of staff with awarded posts and the location of those posts.

Other than reductions in awarded posts caused by attrition, the Department has taken no affirmative steps to eliminate posts that were formally assigned to staff. In 2022, the City and the Department repeatedly claimed that the Department has the unilateral ability to reduce awarded posts. However, in early 2023, despite these repeated claims, the individuals tasked with doing the work to reduce awarded posts maintained that they were not able to do so because awarded posts were subject to collective bargaining. The Monitoring Team's subsequent inquiries related to the status of the Department's authority and any steps taken to address this issue remained unaddressed for over a year. In May 2024, Department leadership reported that it does have the sole discretion to reduce and eliminate awarded posts if it determines the post award to be unnecessary and reported that, in the coming months, it intends to evaluate the posts that are currently awarded to staff members and eliminate those awarded posts that are not necessary.

Overall, the steps the Department has taken to reduce the use of awarded posts are only initial starting points and additional work is necessary to meaningfully comply with the requirement to reduce the use of awarded posts and to ensure that awarded posts are managed in a manner that maximizes the deployment of staff.

NEXT STEPS

In early 2024, Department leadership reported to the Monitoring Team that it would like to reintroduce the practice of awarding posts on housing units in order to promote consistent

---

[13] The Monitoring Team previously reported that the Department had suspended the use of awarded posts beginning in the Fall of 2022.  Recently produced data suggests that while the Department has limited its use of awarded posts since the Fall of 2022, the Department did not in fact suspend the practice of awarding posts altogether.

staffing. While it is the Monitoring Team's understanding that staff may be consistently assigned to a post without the post being "awarded," the Department has opined that awarding posts has certain benefits. Agency leadership reports that they want to ensure a level playing field for staff such that in practice, available posts are advertised to all staff and that everyone has an equal opportunity to apply. The Department has also suggested that awarding posts "promotes staff morale as those members awarded posts are consistently at work, have better and stronger behavioral dispositions, and minimize the disruptions to the work; they are eager to schedule their annual leaves around the needs of the team, rather than selves. Members who are awarded posts provide stability, have a sense of ownership, are more accountable for their actions, show increased job satisfaction and feel valued by the Department, among many other benefits." There certainly are benefits to consistently assigning staff to a unit, although, as noted above, conflating consistent assignment of staff and awarding the post doesn't appear necessary. The tension with the Department's current position is that to date the way in which the facilities have *administered* awarded posts has had negative consequences for staff deployment (and even morale in some cases) as outlined above.

Transparency in available positions coupled with clear selection criteria would certainly help to promote a sense of fairness in the work environment. However, in order for awarded posts to achieve the stated benefits, the Department must eliminate the current practices that siphon staff out of the facilities, that create an opportunity for favoritism and that place unnecessary and adverse restrictions on how those with job assignments can be deployed. In short, the Department's protocols for managing and strategy for ultimately reducing the use of awarded posts require a number of improvements.

First, the most essential step is for the Department to clarify exactly what Department policy requires and does not require in the administration of awarded posts such that all unnecessary restrictions currently imposed in practice are eliminated. Most significantly, regulations for how those with awarded posts can be subsequently assigned to different job assignments must be clarified and communicated to the various commands.

Second, the Department must properly manage and impose appropriate authority on the facilities' administration of the practice to eliminate the *ad hoc* restrictions, cronyism and favoritism that have morphed the practice into a force that is antithetical to good staff deployment practice. This includes the ability to identify and track the posts that have been awarded to staff members. Further, staff deployment must be managed in a way that eliminates the facilities' ability to operate in contravention of the direction by leadership or to impose a set of restrictions or protections that are not currently contained in policy.

Finally, recent data on awarded posts indicates that a significant proportion of awarded posts are in locations *outside of the facilities' housing units*. Given that proper coverage and supervision of the housing units are essential for the safety of both staff and people in custody, the Department is encouraged to implement awarded posts in a manner that incentivizes housing unit placements to attract those with specific skills, experience and/or interest to improve the interpersonal dynamics between staff and the incarcerated population. The Commissioner and other Department leadership have recently indicated their interest in exploring the use of awarded posts in this way.

In light of these issues, the Monitoring Team has recently recommended to the Department that it suspend the use of awarded posts, with limited exceptions,[14] until the Department: (1) evaluates the 844 staff with awarded posts and eliminates those determined to be unnecessary, (2) eliminates "unofficial" awarded posts, (3) improves and centralizes the management of awarded posts, and (4) revises its policies and procedures regarding awarded posts to eliminate the practices described in this report.

## COLLECTIVE BARGAINING AGREEMENT

The Department reported to the Monitoring Team that it reached an agreement in principle with the Correction Officers Benevolent Association ("COBA") on May 10, 2024. At the time the agreement was reached, the Monitoring Team was not aware that the negotiation of the collective bargaining agreement with COBA was in progress and was unaware of the topics being considered for incorporation. About a month before the agreement was reached, on April 15, 2024, the Department advised the Monitoring Team that the last substantive negotiation on the collective bargaining agreement with COBA was on November 20, 2023 and that no future meetings were planned. The Monitoring Team was then advised by the Department on May 13, 2024 that an agreement in principle was reached with COBA. The agreement has not been ratified by the union membership, so the agreement is not yet public.

On May 14, 2024, COBA's website announced that the new contract will include, among other things, "guaranteed and contractually protected post awards."[15] COBA further reported it "negotiated mandatory post awards into the Contract for the first time in COBA's history. DOC must post and award posts going forward. DOC is also required to meet with COBA in the event

---

[14] These exceptions should be limited, generally related to housing unit posts, and must be approved by the Commissioner after consulting with the Monitor.

[15] *See*, https://cobanyc.org/cobacontract2024/

26

that any of the post awarding factors are not followed. Factors are as follows – Seniority, work performance, attendance record, special skills or required clearances." [16]

With respect to the issue of job assignments within the agreement, the City has reported that "when the Department is filling a vacant position, it must be posted to allow interested officers the ability to apply and that assignments will be made in accordance with Department policy…[which was] already required by the COBA contract, and the Department policy already required posting of vacant positions. The May 10, 2024 agreement does not use the term 'awarded posts' and the purpose of the agreement is to make clear that the Department will, in fact, post vacant positions when they are available. The determination of how to fill a vacancy after the position is posted and people apply is in the Department's discretion and the May 10, 2024 agreement states that the determination of the Department as to assignments is not grievable."

The Monitoring Team is not in a position to opine on the terms of the collective bargaining agreement given that the agreement has not been finalized. In the meantime, the Monitoring Team is developing a detailed feedback to the Department with its recommendations regarding potential policy revisions and other enhancements to the awarded post process to eliminate the problematic practices outlined in this report.

---

[16] *See*, https://cobanyc.org/cobacontract2024/