UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MARK NUNEZ, ET AL.

               Plaintiffs,

     -against-

THE CITY OF NEW YORK, ET AL.

           Defendants.

Case No. 11-cv-5845 (LTS)

**MEMORANDUM OF LAW IN REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CONTEMPT AND APPLICATION FOR APPOINTMENT OF A RECEIVER**

The Legal Aid Society
Prisoners' Rights Project
49 Thomas Street, 10th Floor
New York, New York 10013
(212) 577-3300

Emery Celli Brinckerhoff Abady
Ward & Maazel LLP
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

## TABLE OF CONTENTS

PAGE NO.

TABLE OF AUTHORITIES ................................................................................................ iv

I.     INTRODUCTION ............................................................................................1

II.    DEFENDANTS ASK THE COURT TO IGNORE THE CURRENT
       REALITY IN FAVOR OF ANOTHER WAVE OF PROMISES ABOUT
       THE FUTURE ..................................................................................................3

       A.     Defendants Have Not Complied with this Court's Core Orders..................3

       B.     Defendants' Claimed Successes Mask Failures or are Insignificant ..........4

       C.     Defendants Rely on Plans and Policies, Not Actual Progress ....................7

       D.     Objective Data Demonstrate the Persistence of Misuse of Force.............11

       E.     The Appointment of Yet Another New Commissioner Is Not the
              Sea Change Needed to Protect the Plaintiff Class ....................................13

III.   DEFENDANTS ARE IN CONTEMPT OF EVERY COURT ORDER ON
       WHICH PLAINTIFFS MOVED ...................................................................17

       A.     Defendants Have Not Implemented the Use of Force Directive ..............18

       B.     Defendants Do Not Properly Investigate or Hold Staff Accountable
              for Misconduct ........................................................................................20

       C.     Defendants Have Not Made Mandated Changes to Their Security
              and Basic Correctional Practices .............................................................24

       D.     Defendants Lack Adequate Facility Leadership and Supervision of
              Staff..........................................................................................................29

       E.     Defendants Have Not Curbed the Excesses of Emergency Response
              Teams ......................................................................................................31

       F.     Defendants Have Not Corrected Harmful Staffing Practices ...................32

       G.     Defendants Do Not Protect Young Adults in Their Custody ...................35

IV.    RECEIVERSHIP IS THE ONLY REMEDY THAT WILL GIVE EFFECT
       TO THIS COURT'S ORDERS .......................................................................36

       A.     Receiverships Have Improved Troubled Jails and Prisons After
              Other Measures Failed ............................................................................37

ii

B.    Analysis of the *Plata* Factors Overwhelmingly Supports the
      Appointment of a Receiver ..................................................................41

C.    The Proposed Receivership Complies with the PLRA Because it
      is Tailored to the Scope of Defendants' Violations of the
      Constitution and this Court's Orders .......................................................49

V.    CONCLUSION..................................................................................................50

## TABLE OF AUTHORITIES

**Cases**

*Aspira of New York v. Bd. of Educ. of the City of New York*,
    423 F. Supp. 647 (S.D.NY. 1976). ................................................................ 7

*Chere Amie, Inc. v. Windstar Apparel, Corp.*,
    175 F. Supp. 2d 562 (S.D.N.Y. 2001) ........................................................... 18

*Jimmy Doe v. Cook County*,
    No. 99 Civ. 3945 (N.D. Ill.) .......................................................................... 40

*Jones v. Gusman*,
    296 F.R.D. 416 (E.D. La. 2013) ..................................................................... 39

*Jones v. Gusman*,
    No. 12 Civ. 859 (E.D. La.), ............................................................................ 39

*Lehman Brothers Holdings Inc.*,
    526 B.R. 481(S.D.N.Y. 2014) ........................................................................ 33

*Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Techs., Inc.*,
    369 F.3d 645 (2d Cir. 2004) ........................................................................... 17

*Plata v. Schwarzenegger*,
    2005 U.S. Dist. LEXIS 43796
    (citing Gary W, 1990 U.S. Dist. LEXIS 1746, 1990 WL 17537) ....... 37,38,39,41,44,45,50

*United States v. Miami-Dade County, et al*,
    No. 13 Civ. 21570 (S.D. Fla.) ........................................................................ 39

*Zino Davidoff  SA v. CVS Corp.*,
    No. 06 Civ. 15332,
    2008 WL 1775410 (S.D.N.Y. Apr. 17, 2008) ................................................ 18

**Statutes**

18 U.S.C. 3626 ..................................................................................................... 49

**Other Authorities**

DOC Directive 3376R-A
    https://www.nyc.gov/assets/doc/downloads/directives/Directive_3376R-A.pdf ............ 28

*NYC Department of Correction Closes Mental Health Assessment Unit for Infracted Inmates*,
    Jan. 6, 2014 (closing MHAUII, opening CAPS and RHU),
    https://www.nyc.gov/assets/doc/downloads/press-release/jan6-2014.pdf ......................... 9

iv

## I.    INTRODUCTION

Year after year people in New York City's jails are faced with the same—or worse—brutality, living with daily violence and harm. Report after report the Monitor bemoans that the City's jails are in crisis, even as DOC still is not complying with basic remedial orders: the "same problems have persisted for many years," the Monitor reported just last month. Dkt. 706 at 57. "[U]nnecessary and excessive uses of force remain just as prevalent as they were" when the Consent Judgment was entered. *Id.* at 78. Commissioner Maginley-Liddie concedes, "violence in Department facilities is at unacceptable levels." Dkt. 689-1 ("Maginley-Liddie Decl.") ¶ 23. In the face of this persistent, enduring harm, Defendants ask this Court to accept a future that promises more of the same.

Defendants do not dispute the evidence that they have violated the Court's orders, because they cannot: their many years of non-compliance are undeniable. The most recent Monitor's Reports—like many before—highlight *again* the harm to the Plaintiff Class and how far DOC is from the constitutional minimum: head strikes are routine. OC spray is used gratuitously. People in restraints who pose no threat are beaten.

But Defendants still do not appreciate the scope of the constitutional violations. They tell this Court that "this is not a Department in crisis." Dkt. 688 at 35. False. Ask the Monitor: "the agency remains in a constant state of crisis." Dkt. 706 at 12. DOC leaders' sworn statements to this Court whitewash the state of their jails and laud non-existent accomplishments, showing a disturbing lack of insight into the problems DOC is facing.

Eight years in, reform basics are still lacking. When line staff use excessive force, they receive insufficient and delayed consequences. Supervisors, in turn, do not face consequences for ignoring misconduct on their watch. Fundamental jail operations are ignored: cell doors are unlocked; posts are not staffed.

Defendants ask this Court to *again* trust their plans and promises instead of their actual track record. They point to a new Commissioner who—like commissioners before her—says she is committed to change. But, as this Court observed when the City last trotted out this argument, we cannot "[r]estart the clock on reform because a new administration has taken office." Dkt. 456 at 8:14-15. Defendants promise they will implement steady staff assignment, they promise tours will actually occur, they promise to improve discipline. Promises abound. Dysfunction remains the reality. The Court must decide based not on the City's hopes, but on the truth of what the Plaintiff Class is experiencing right now, every day: jails that "remain dangerous and unsafe, characterized by a pervasive, imminent risk of harm to both people in custody and staff." Dkt. 605 ¶ 75; *infra* § II (discussing the faulty principles underlying Defendants' response).

This Court should hold Defendants in contempt of every provision on which Plaintiffs have moved: the undisputed record establishes pervasive violations of this Court's orders. Policies that were supposed to be implemented long ago are still not even drafted. Other policies exist on paper but are ignored in practice. Defendants cannot escape accountability for years of violating this Court's orders. *See infra* § III. In the face of the ongoing, severe harm, the Plaintiff Class cannot endure the violent status quo any longer. They need a leadership structure that is accountable to the Court. Receiverships in other systems have meaningfully changed conditions for incarcerated people and implemented reforms years of remedial court orders could not. The attached declarations concerning the California, Cook County, and Miami-Dade systems demonstrate that the right receiver, empowered by this Court's orders, offers the best chance of righting this ship. Defendants offer no concrete alternative for anything short of receivership that would protect the Plaintiff Class. *See infra* § IV.

The documentary and testimonial record—including the wealth of information from the Monitor's reports—establishes that Plaintiffs' motion should be granted. The material facts are either undisputed or, to the extent the City has attempted to raise factual disputes, those disputes are immaterial or no reasonable factfinder would credit the City's version.

## II.    DEFENDANTS ASK THE COURT TO IGNORE THE CURRENT REALITY IN FAVOR OF ANOTHER WAVE OF PROMISES ABOUT THE FUTURE

While we address Defendants' specific arguments about contempt and receivership below, *infra* §§ III, IV, we address here global and fundamental flaws in their response. Defendants ignore flagrant non-compliance and instead seek credit for meager or immaterial effort, attempt to shift blame with baseless excuses, rebrand failed efforts as new initiatives, and vest all hopes in new leadership who cannot cure the constitutional harm in DOC.

### A.    Defendants Have Not Complied with this Court's Core Orders

Since Plaintiffs filed their opening brief demonstrating contempt, the Monitor's subsequent findings have confirmed Defendants' non-compliance. The chart below lists formal ratings the Monitor issued on the provisions for which Plaintiffs seek contempt (the "Contempt Provisions"). According to the Monitor, Defendants failed to comply with every rated provision.[1]

| Contempt Provision | Monitor's Dec. 2023 Rating | Monitor's Apr. 2024 Rating |
|---|---|---|
| Consent Judgment § IV, ¶ 1: **Implement Use of Force Directive** | **Non-Compliance**. Dkt. 666 at 24. | **Non-Compliance**. Dkt. 706 at 78. |
| Consent Judgment § VII, ¶ 1: **Thorough, Timely, Objective Investigations** | **Non-Compliance**. Dkt. 666 at 45. | **Non-Compliance**. Dkt. 706 at 104. |

---

[1] The Monitor does not provide formal compliance ratings for the remainder of the Contempt Provisions. SRO, ¶1(i)(a); Action Plan, §§ A, ¶ 1(d), C, ¶ 3(ii--iii), (v-vii); D, ¶ 2(a), (d-f). However, in April 2024 the Monitor reiterated his general finding tracking the language of Action Plan § G, ¶ 6, that the City had not made substantial and demonstrable progress in implementing the reforms, initiatives, plans, systems, and practices outlined in the *Nunez* Court Orders, and his findings are sufficient to demonstrate non-compliance on each contempt provision, even where a formal rating was not made. *See infra*, §§ III (C), (D), (F).

| Consent Judgment § VII, ¶ 9(a): **Timeliness of Full ID Investigations** | **Non-Compliance**. Dkt. 666 at 45. | **Non-Compliance**. Dkt 706 at 104. |
|---|---|---|
| Consent Judgment § VIII, ¶ 1: **Appropriate and Meaningful Discipline** | **Non-Compliance**. Dkt. 666 at 66. | **Non-Compliance**. Dkt 706 at 131. |
| First Remedial Order, § A, ¶ 2: **Facility Leadership Responsibilities** | **Non-Compliance**. Dkt. 666 at 11. | **Non-Compliance**. Dkt. 706 at 59. |
| First Remedial Order, § A, ¶ 4: **Supervision of Captains** | **Non-Compliance**. Dkt. 666 at 17. | **Non-Compliance**. Dkt. 706 at 68. |
| First Remedial Order, § A, ¶ 6: **Facility Emergency Response Teams (Development of Protocol)[2]** | **Non-Compliance.** Dkt. 666 at 22. | **Non-Compliance.** Dkt. 706 at 76. |
| Consent Judgment § XV, ¶ 1: **Prevent Fights/Assaults (18 Year Olds)** | **Non-Compliance**. Dkt. 666 at 89. | **Non-Compliance**. Dkt. 706 at 154. |
| Consent Judgment § XV, ¶ 12: **Direct Supervision (18 Year Olds)** | **Non-Compliance**. Dkt. 666 at 89. | **Non-Compliance**. Dkt. 706 at 155. |
| Consent Judgment § XV, ¶ 17: **Consistent Assignment of Staff (18 Year Olds)** | **Non-Compliance**. Dkt. 666 at 90. | **Non-Compliance**. Dkt. 706 at 156. |

The Monitor's ratings belie the City's claims of progress and reasonably diligent efforts. There is only one reasonable way to interpret this information: whatever efforts Defendants have made to comply with the Court's orders have been an utter failure.

### B. Defendants' Claimed Successes Mask Failures or are Insignificant

As their principal defense, Defendants laud their supposed completion of 52 tasks required by the Action Plan. Defendants' Opposing Brief ("Opp. Br."), Dkt. 688 at 2; Dkt. 689-1 (Maginley-Liddle Decl., Ex. B) at 21-29. But Plaintiffs did not move for contempt on these requirements, most of which represent basic bureaucratic tasks Defendants should have

---

[2] In December 2023, the Monitor for the first time split his rating for the First Remedial Order, § A, ¶ 6 into three categories: (1) Development of Protocol; (2) Review of Responses & Documentation; and (3) Response to Misconduct. The focus of Plaintiffs' contempt argument in our November 2023 opening brief was Defendants' failure to develop and implement the required protocol. Therefore, only the rating regarding "Development of Protocol" is included in this chart. The Monitor's ratings for "Review of Responses & Documentation" were "partial compliance" in both December 2023 and April 2024. The Monitor's ratings for "Response to Misconduct" were "non-compliance" in both December 2023 and April 2024. Dkt. 666 at 22; Dkt. 706 at 76.

accomplished long ago.[3] Compliance with *other* court orders is not a defense to contempt of the orders at issue here. Moreover, a closer look at the record demonstrates that Defendants' claims of success even as to these "52 tasks" are not credible. Four examples are illustrative.

    ***Cell Doors*** (Section A(1)(c)): Defendants seek credit for a provision that requires ensuring people in custody are assigned to cells with functioning locks, but still fail to ensure their cell doors are actually locked or functioning, with "little to no improvement." Plaintiffs' Proposed Supplemental Findings of Fact ("SFOF") ¶¶ 87-88. Both the Monitor's most recent report and Defendants' own audits and Preliminary Reviews continue to demonstrate "widespread" failures to secure cell doors and inspect locking mechanisms. SFOF ¶¶ 51, 87-89.

    ***Post Priority*** ((Section A(2)(a)):  Defendants still have not "ensure[d] that all mandatory posts on the post priority list are staffed." SFOF ¶ 53. When the City claims there are now zero unstaffed posts, they fail to account for instances in which staff are assigned to posts but then abandon them. Dkt. 689-9 ("Edwards Decl.") ¶ 5; SFOF ¶¶ 52-54; Opp. Br. at 21; *see infra* § III(C)(1). Defendants' own audits show the pervasiveness of staff off-post. *See infra* § III(C)(1). Despite this, Defendants submission does not meaningfully address abandoned posts. *Id.*

    ***Appointment of Top Leadership*** (Section A(3)(b)(ii)(2), A(3)(b)(ii)(2)(a), C(1), E(1)): Defendants seek credit for appointing key leadership, despite the fact that many of these positions have not been reliably filled with competent individuals throughout the life of the Action Plan, and in fact, remain vacant at the time of this filing. SFOF ¶¶ 49, 323-330. As the Monitor explained just last week, "a significant number of key leadership positions" that are "critical" to the reform effort remain vacant. SFOF ¶ 327.

---

[3] For example: creating a list of available staff ((A)(2)(b)); modifying sick leave policies ((A)(2)(d)(iii)), creating units and a task force ((B)(1); (C)(2); (E)(2)(a)); and leadership simply "reporting to the Monitor" (G)(1)).

For example, Defendants have not reliably maintained the Senior Deputy Commissioner position. Defendants appointed their first Senior Deputy Commissioner four months after entry of the Action Plan, but he was forced to resign after three months. SFOF ¶ 328. Defendants did not fill the post for nearly nine months, and that individual resigned within six months. *Id.* Defendants have failed to maintain a Senior Deputy Commissioner for 13 of the 23 months the Action Plan has been in effect and the position remained empty as of recent reports. *Id*.

Similarly, the positions of Deputy Commissioner of Classification, Classification Manager, Associate Commissioner of Facility Operations, and Staffing Manager required by the Action Plan remain vacant as of recent reports, some for over four months. SFOF ¶¶ 326-328. Moreover, two years after the Action Plan was entered, the Staffing Manager has utterly failed to make progress on the many central staffing reforms specifically required by the Action Plan, such as ensuring adequate staffing, reducing awarded posts, and civilianizing the workforce. *See infra* § III(F). To call this "appropriately prioritized" strains the term, yet the City asks the Court to conclude they have completed these provisions.

***Expanded Early Intervention Unit*** (Section A(3)(c)): The Monitor found that Defendants shifted resources away from the Early Intervention, Support, and Supervision Unit ("E.I.S.S.") and left key E.I.S.S. Leadership positions vacant. SFOF ¶¶ 341-343. In his April report, the Monitor noted that "[t]he E.I.S.S. program is currently stagnant." *Id.* ¶ 343. Moreover, Defendants have only assigned *one* ADW to E.I.S.S. *Id.* ¶ 342. Despite these findings, Defendants claim they have complied with the Action Plan requirements to "expand" E.I.S.S. and assign a supervisor at each facility to assist E.I.S.S.

In addition to the 52 Action Plan tasks, Defendants point to their purging of contempt after the Court's December 2023 order as a sign that they are "capable of complying with

remedial orders." Opp. Br. at 33. It is anything but. First, the contempt order only existed

because Defendants violated this Court's repeated prior commands to cooperate with the

Monitor. Dkt. 660, Dec. 14, 2023 Tr. at 29:1-23. Moreover, the order's requirements were

extremely modest, essentially requiring Defendants to consult the Monitoring Team and create

long-overdue metrics, not to do the difficult work of improving daily jail operations. *See* Dkt.

665. Defendants' purging of that contempt is therefore not probative of their broader will or

ability to comply. This is demonstrated by Defendants' abysmal compliance with the Court's

August and October 2023 orders, which required progress on more substantive items like

security plans and escort procedures. *See infra* § IV(B)(2). And of course, Defendants have gone

eight years without complying with core provisions of the Consent Judgment. *See infra* § III.

To date, Defendants simply have not demonstrated the "energetic" compliance required

to avoid contempt, instead having "borne with seeming equanimity" years of cajoling from the

Monitor, the Plaintiffs, and the Court, without ever achieving what they must. *Aspira of New

York v. Bd. of Educ. of the City of New York*, 423 F. Supp. 647, 654 (S.D.N.Y. 1976).

### C.    Defendants Rely on Plans and Policies, Not Actual Progress

Defendants do not seek to avoid a contempt finding with evidence of current compliance,

but instead rely on plans and intentions for the future, which they claim amount to diligent

efforts. But plans are not actions, and the record demonstrates that such plans and promises will

not lead to progress. Defendants' deflection from today's facts to future hopes takes several

forms.

Often, the City simply re-brands past failed efforts. The RNDC Programs Action Plan,

heavily featured in Defendants' response as a "new" plan, is one illustration. The Second

Remedial Order required Defendants to create a systemwide security plan, but they did not. *Infra*

§ III(C)(1). Instead, Defendants proffer the RDNC Programs Action Plan (and even then,

concede its implementation is just starting, Opp. Br. at 19),[4] an initiative that largely recycles

past, failed plans—without explaining how implementation will succeed this time.

Predecessor plans targeting RNDC and Young Adults include the Young Adult Plan (first

introduced in 2015), the RNDC Plan (2020), and the RNDC Violence Reduction Plan (2022).

SFOF ¶¶ 259, 270-275, 315; Dkt. 689-10 ("Torres Decl.") ¶ 9. Together, these plans involved all

the core features of the current RNDC Programs Action Plan: consistent assignment of staff,

Unit Management and Direct Supervision models, housing Young Adults together, a lower unit

census to improve staff ratios, trainings, and increased focus on programming. SFOF ¶¶ 270-

275; Torres Decl. ¶ 13 (noting that ratios will "again" be lower). Some of these components, like

consistent assignment of staff, Direct Supervision, and housing Young Adults together, were

*already required for years* by court orders[5] or local regulations.[6] But defendants abandoned

elements of these plans over the years or failed to implement them. *See* Plaintiffs' Proposed

Findings of Fact, ("PPFOF"), Dkt. 605, ¶¶ 117-119; SFOF ¶¶ 270-275, 315-316; *infra* § III(G).

As a predictable result, these plans have failed. *Id.*

What is troubling is not that Defendants propose the RNDC Programs Action Plan, but

that they describe it as a "new" effort (Torres Decl. ¶ 12), never acknowledging that much of it is

*already required*, nor explaining *how* it will succeed where prior similar plans have failed. The

plan merely serves to create an illusion of diligent activity when the reality is more of the same.

Other initiatives named by Defendants are likewise echoes of past attempts that have not

cured DOC's pattern and practice of excessive and unnecessary force. Highly restrictive units for

---

[4] For clarity, given that DOC recycles terms: the RNDC Programs Action Plan refers to a different initiative than the Action Plan and the RNDC Violence Reduction Plan.

[5] Direct Supervision at Consent Judgment § XV, ¶ 12 and First Remedial Order, § D, ¶ 3; 3(i); Consistent Assignment of Staff at Consent Judgment § XV, ¶ 17 and First Remedial Order, § D, ¶ 1.

[6] House young adults, ages 18- to 21-year-old, separately and apart. New York City Board of Correction Minimum Standard § 1-02(b)(3)(ii).

people accused of misconduct have been a mainstay in DOC: Enhanced Supervision Housing ("ESH") has existed for nearly a decade. SFOF ¶¶ 283-285. Now it is re-named RMSC Enhanced Supervision Housing ("RESH"), but it shares components with ESH (*Id.*; Dkt. 689-8 ("Austin Decl.") ¶¶ 7-11) and—contrary to the City's claims that it is being successfully implemented (Austin Decl. ¶ 16)—the Monitor has found that RESH implementation has not been sound. SFOF ¶ 288. The use of force rate in RESH is extraordinarily high; stabbings, slashings, and fires are prevalent; and security and operational failures create dangerous conditions. SFOF ¶¶ 286-293. Defendants also tout the Behavioral Health Unit ("BHU") as an innovative alternative unit for people with mental illness who have committed infractions. Austin Decl. ¶¶ 25-28. This is not new: the City has for years opened and shuttered similar units deploying much the same rhetoric. *See, e.g.*, DOC Press Release, *NYC Department of Correction Closes Mental Health Assessment Unit for Infracted Inmates*, Jan. 6, 2014 (closing MHAUII, opening CAPS and RHU), https://www.nyc.gov/assets/doc/downloads/press-release/jan6-2014.pdf. Defendants assert that the new BHU will be a more "treatment-intensive setting," but do not explain how BHU differs from the current unit Defendants have, which they describe in virtually identical terms. *Id.*; SFOF ¶ 339; Austin Decl. ¶¶ 25-28.

Defendants also reiterate their policies, but do not reckon with their longstanding failure to actually comply with those policies. Defendants' representations about Emergency Response Teams ("ERTs") and Rapid Reviews offer two illustrations.

Every example Defendants give for how they will control their violent ERTs is a promise of change that turns a blind eye to findings the Monitor has made for years. For example, Deputy Commissioner ("DC") Brereton asserts that he "do[es] not allow" ERTs to be deployed for "events which could otherwise be resolved through the use of interpersonal communication

skills, de-escalation tactics, and/or Facility resources." Dkt. 689-3 ("Brereton Decl.") ¶ 12. But that conflicts with the Monitor's repeated findings that DOC over-relies on ERTs and that ERT misconduct exacerbates tense situations. Indeed, Defendants are in noncompliance with the orders designed to remediate these problems. *Infra* § III(E). That Defendants assert otherwise, while pointing to no actions taken to address the dangerous misconduct of these ERT members, demonstrates their unwillingness or inability to address this serious problem. Defendants' vague idea to "restructur[e] . . . facility alarms" for ESU (Opp. Br. at 23; Dkt 689-3 ("Brereton Decl."). ¶ 12), does not explain how other facility response teams avoid committing the same abuses.

Similarly, Defendants' description of Rapid Reviews simply reiterates policies that DOC has never been able to follow. In their submission, Defendants state that "if a use of force is outside of policy, the involved staff are held accountable"—but completely ignore that, in *practice,* facility leaders do no such thing. Opp. Br. at 14; Brereton Decl. ¶¶ 6-10. The Monitor finds that Rapid Reviews fail to reliably identify misconduct and that the process has deteriorated under DC Brereton's leadership. SFOF ¶¶ 146-150. Defendants ignore the "significant number" of "inadequate" Rapid Reviews that overlook dangerous practices and fail to identify when force was avoidable, as well as DOC's failure to discipline "*any* member of facility leadership for an inaccurate, unreasonable, or biased Rapid Review" in 2023, as the First Remedial Order requires. First Remedial Order, Dkt. 350, § A, ¶ 1(ii); SFOF ¶ 150.

Defendants' response is replete with other examples of how they are unable to convert plans and policies to meaningful progress. The City reverses course on reforms that it had deemed necessary to cure constitutional harms (*infra* § IV(B)(6)), and in other instances points to actions that are plainly insufficient for the task (*infra* § III). In sum, Defendants' response— recycling past initiatives that failed or they could not implement and proposing haphazard or

unconnected pilot plans—fails to offer a credible explanation for how DOC will implement any

new measures with success. This repeats the cycle of dysfunction that has plagued the city jails

over the life of this case and even before.

### D. Objective Data Demonstrate the Persistence of Misuse of Force

The Court should reject Defendants' suggestion that the data supporting Plaintiffs'

motion is misleading or inaccurate. The data is largely DOC's internal data, analyzed by the

Monitor, a neutral party with a deep understanding—both quantitative and qualitative—of DOC.

Indeed, if there is any inaccuracy in the data streams regarding violence and use of force, it is

likely to be an *underestimation* of the number of troubling incidents, due to DOC's well-

documented difficulties with detecting and reporting misconduct and violence.[7] PPFOF ¶¶ 79-

84, 96-100, 106-110, 113, 232-3, 240; SFOF ¶¶ 10, 18. The data is clear: levels of violence and

use of force inside the jails are "alarmingly high," incarcerated people face a serious risk of

harm, and the pattern and practice of excessive or unnecessary force continues. SFOF ¶¶ 8, 3-10,

21.

Defendants deflect accountability by arguing that comparisons between now and 2016

(the first full year in which the Consent Judgment was in effect, and thus a proxy for the

unconstitutional conditions that led the Court to impose the Consent Judgment in the first place)

are not reliable. Their reasoning is unsound.

Defendants first contend that because the Use of Force Directive was modified in 2017

pursuant to this Court's order, one cannot reliably compare the number of uses of force in 2016

to today. Opp. Br. at 11. This directly contradicts the City's position in litigation with its unions

---

[7] For example, the Monitor found DOC's reporting regarding stabbings and slashings to be so unreliable that he retracted his findings regarding the number of such incidents in 2023, which were based on DOC's reported data. Dkt. 595 at 36; PPFOF ¶¶ 106-110. Nonetheless, Defendants repeatedly cite to the supposed reduction in the number of stabbings and slashings in 2023 as evidence of their so-called improvement.

over the 2017 policy, in which the City asserted that "the obligations of Correction Officers in the event of a use of force incident ***are not materially changed*** by the updates contained in Directive 5006R-D." Ex. 153, Verified Ans. to Pet. for Inj. Relief, BCB-4142-15 (INJ), ¶¶ 218, 223-227 (emphasis supplied). Moreover, the Monitor (who was deeply involved in drafting the prior directive and approved the 2017 revisions) has found comparisons between 2016 and recent years useful enough to report on, for good reason: the current Directive "is not based on new law, nor does it abandon core principles from its predecessor," but instead provides "further explanation, emphasis, detail, and guidance to staff." SFOF ¶ 11; *see also* Ex. 154, DOC's First Compliance Report at 5.

Policy revisions certainly cannot explain away the fact that the 2023 average monthly rate of use of force was 135% higher than in 2016. *See* SFOF ¶ 13. Furthermore, Defendants ignore that there has been a significant increase in the rate of use of force even since 2018, the first full year of implementation of the revised Use of Force Directive. The average monthly rate of use of force in 2023 was 58% higher than in 2018. *Id.*

Second, Defendants point to the broad expansion of cameras inside the jails since 2016. By suggesting that the increase in cameras since 2016 is responsible for the more than two-fold increase in reported uses of force, Defendants imply that their staff were covering up an enormous amount of violence until cameras forced them to be more truthful. If this is accurate, both the dimensions of the constitutional problem and the culture of misconduct and dishonesty inside DOC were even more profound than the Court knew.

Third, Defendants assert that changes to bail laws since 2016 have resulted in a shift in the proportion of people in custody facing serious criminal charges. Defendants misunderstand their duties. As the Monitor explained, external factors such as this "do not change the City's

obligation to provide safe and humane treatment to those within its jails" and "do not excuse failure to comply with the *Nunez* Court Orders." Dkt. 706 at 7. "The constitutional minimum of care and safety that must be afforded to all incarcerated individuals has remained the same and continues to be the standard by which all reform must be measured." *Id*. Bail reform did not cause Defendants' *myriad* failures to comply with the Court's orders—to run the jails competently, use force correctly, and investigate and discipline wrongdoing.

At bottom, Defendants cannot dispute that the Monitor continues to find a pattern and practice of excessive and unnecessary force—the constitutional violation at the heart of this case. Small positive or negative changes in various data indicators (which may be the result of chance, seasonal fluctuations, or reporting deficiencies, *see* SFOF ¶ 7) have not altered this finding. The only solution to that persistent constitutional violation is a "paradigm shift" at DOC. SFOF ¶ 348.

### E.    The Appointment of Yet Another New Commissioner Is Not the Sea Change Needed to Protect the Plaintiff Class

The appointment of a new Commissioner is neither sufficient to address the City's systemic violations of this Court's orders, nor an adequate substitute for the appointment of an independent Receiver. As the Court observed at the outset of the *previous* Commissioner's tenure, "[r]estarting the clock on reform because a new administration has taken office . . . can't be the answer[.]"[8] Dkt. 456 at 8:14-15.

***First***, the history of *Nunez* demonstrates that even an experienced Commissioner who collaborates closely with the Monitor is insufficient to move the needle on reform. Opp. Br. at 1,

---

[8] The Court further explained that such a restarting of the clock was inappropriate "when a crisis such as this has been inherited and legal standards and expectations have been put in place by court orders, especially when thousands of hours of expert analysis and advice have enabled the monitor to identify root problems and develop specific recommended approaches that are ripe for implementation." Dkt. 456 at 8:16-211.

3-4. Indeed, every Commissioner appointed during the life of the Consent Judgment was similarly lauded at the start of his or her term.

- Joseph Ponte had "a strong, collaborative relationship" with the Monitoring Team, and the Monitor said that he "set a tone for the Department that reform is necessary, committed essential resources, and established some key strategies." SFOF ¶ 318.

- The Monitor described Cynthia Brann as "competent, committed, and reform-minded," explaining that "even during a period of transition, [she] maintained [her] commitment to reform and . . . also appointed several key personnel to critical positions," praising her honesty, transparency, and forthrightness. SFOF ¶ 319.

- Both Brann and Vincent Schiraldi had "significant experience and expertise in corrections and a demonstrated commitment to reform, and support from a team of committed individuals." SFOF ¶¶ 319-320.

- Louis Molina reportedly entered his position "work[ing] closely" with the Monitor, "proactively flagg[ing] issues and engag[ing] in substantive discussions." *See* Dkt. 450, Defs.' Apr. 25, 2022 Letter to Court at 1-2. The City touted his familiarity with *Nunez* requirements as former head of NCU, and claimed his early actions represented "tremendous strides," "bold reforms," and a "commitment to make the necessary and tough decisions required to institute needed change and move the DOC past this monitorship." *Id.*

The City offers no reason why the most recent Commissioner's experience with DOC or commitment to collaboration will succeed in bringing DOC into compliance where past Commissioners with similar credentials have failed. Maginley-Liddie Decl. ¶¶ 4-9. These claims of a new chapter in City government, *see* Opp. Br. at 31, have already been cast into doubt as the

14

City failed to keep the Monitor informed regarding its negotiations with COBA over a labor contract, despite the contract's relevance to compliance with relief in this case, instead alerting the Monitor *after* a contract had been offered. *Infra* § IV(B)(6).

**Second**, DOC's actions over the last six months repeat the problems of the past, lack detail, or are marginal at best. Defendants point to the RNDC Programs Action Plan, the BHU, and OBCC Annex Pilot Program, but do not explain how these efforts differ from similar, prior efforts that failed. *See supra*, § II(C). Regular touring by senior leaders is nothing more than basic correctional practice. Maginley-Liddie Decl. ¶¶ 11-15; Monitor's Apr. 18, 2024 Rep. at 13 (tours by executive staff insufficient without "skilled corps of supervisors" as support). Defendants state that based on these tours, the central office "compiles a list of action items that need attention and follows-up to ensure that action is taken." Maginley-Liddie Decl. ¶ 12. But when Plaintiffs requested the list of action items DOC claimed it already compiles, the list was not provided; instead, it was revealed that although these tours began in January 2024, in May the Office of Strategic Initiatives was still "working to streamline leadership's reports from their tours so that the action items can be tracked . . . going forward." SFOF ¶ 61.

Other initiatives DOC cites are irrelevant to the Contempt Provisions, remain unfinished, or lack key details. *See* Maginley-Liddie Decl. ¶ 16 (no description of feedback provided during focus groups or concrete steps taken to address feedback); *id.* ¶¶ 19-20 (touting programming funding that will not be available for over a year, *see* SFOF ¶ 333).

The leadership are silent on the far more critical issues driving unnecessary use of force and violence, such as staff walking off their posts in housing areas, supervisors failing to provide effective coaching to subordinates, and staffing practices that limit the number of experienced officers in housing areas. And they do not explain why, even though they tout supposed success

on a number of minor Action Plan provisions, the core aspects of the Action Plan remain incomplete. Maginley-Liddie Decl. ¶ 22.

**Third and finally**, the Commissioner can make only limited progress where, as here, she lacks the "dedicated team" of senior leaders required for reform. SFOF ¶ 325. Many "key high-level positions" are vacant, additional departures are expected, and many of the remaining leaders "have not met the moment" and "do not appear capable of bringing about the culture change and infusion of expertise that is so desperately needed." *Id.* ¶¶ 326-330. These leaders' declarations demonstrate that they do not appreciate the scale of the problem. For example:

- The First Deputy Commissioner does not explain how the RNDC Programs Action Plan will avoid the tremendous failure of prior, similar efforts. *See supra* § II(C).

- The Security Manager says *nothing* about action to comply with the Court order to develop and implement a system-wide security plan. His strategies rely almost entirely on roll calls and teletypes despite the Monitor's finding that they are ineffective, SFOF ¶¶ 50, 153, 157, and he generally recites policies without reckoning with pervasive practice failures that have occurred during his tenure. *See supra* § III(A), (E).

- The former Staffing Manager, who has since left DOC, reverses course on staffing reforms that Defendants contended were necessary, including reducing 4x2 schedules and the number of awarded posts, and describes a startling lack of effort toward civilianizing a meaningful number of positions. Edwards Decl. ¶¶ 8-9, 16-17; *infra* § III(F); IV(B)(6).

- The Associate Commissioner in the Office of Management, Analysis, and Planning ("OMAP") lacks the correctional background to contradict the Monitor's conclusions on the significance of non-injurious uses of force. Dkt. 689-2 ("Kepler Decl.") ¶ 9;

Monitor's Apr. 18, 2024 Rep. at 30.[9] His claim that pre-2017 use of force directives (*id.* ¶ 11) materially differ from later ones is contrary to the City's position. *Supra* § II(D).

Moreover, **none** of the declarations adequately address the "long-standing supervisory void . . . in both number and competence" or the pervasive issue of staff abandoning their posts—which are associated with deaths in custody, violence in the facilities, and unnecessary and excessive force. PPFOF ¶¶ 123, 213, 282-283, 334-339, 595-627; SFOF ¶ 156.

This lack of insight by senior leadership stymies reform, as the Monitor has repeatedly highlighted. *See* Monitor's Apr. 18, 2024 Rep. at 38 ("Eliminating the use of unnecessary and excessive force depends on the Department understanding and acting upon the ways in which the need to use force materializes, and how staff respond to that need when it occurs.").

## III. DEFENDANTS ARE IN CONTEMPT OF EVERY COURT ORDER ON WHICH PLAINTIFFS MOVED

Plaintiffs have met their burden to demonstrate that this Court's orders are unambiguous, Defendants have failed to comply, and have not diligently attempted to comply in a reasonable manner. *Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 655 (2d Cir. 2004). Defendants are thus in contempt.

The Monitor found Defendants non-compliant with every Contempt Provision he rated in December 2023 and April 2024. Because they cannot dispute compliance, Defendants instead claim their various haphazard and ineffective efforts constitute reasonable diligence. Courts, however, reject "grudging, half-hearted or foot dragging attempt[s] at compliance" as

---

[9] The City has long addressed total use of force rates (*i.e.*, injurious and non-injurious force) — for example, citing the decline in total use of force. *See Ingles v. Toro*, 438 F. Supp. 2d 203, 207 (S.D.N.Y. 2006) ("[T]he City has argued, and provided statistical evidence to show, that the number of reported use of force incidents declined substantially prior to and during the pendency of this lawsuit. (*See, e.g.*, Larkin Decl. ¶ 6 (decline of 33% from 1,463 incidents in 2000 to 974 incidents in 2004)"). It cannot be gainsaid that the increase from 974 uses of force in 2004, with an average jail population of 12,821 (https://nyassembly.gov/comm/Correct/2004Annual/#link4), to the numbers prevailing today reflects just how aberrational the current status quo is.

Defendants have (at best) done here. *Chere Amie, Inc. v. Windstar Apparel, Corp.*, 175 F. Supp. 2d 562, 565 (S.D.N.Y. 2001). Rather, Defendants must "energetically police the effectiveness of [their] compliance measures, and, when advised that such measures have fallen short . . . modify them accordingly."[10] *Zino Davidoff SA v. CVS Corp.*, No. 06 Civ. 15332, 2008 WL 1775410, at *8 (S.D.N.Y. Apr. 17, 2008) (cleaned up). They have not.

### A.    Defendants Have Not Implemented the Use of Force Directive

In the last Monitoring Period, for the eleventh consecutive time, Defendants remained in non-compliance with the Consent Judgment's command to implement the Use of Force Directive. Given the overwhelming evidence, it is no surprise that Defendants did not dispute many of Plaintiffs' proposed facts demonstrating that excessive force is pervasive, that dangerous, unnecessary head strikes are frequent, and that staff use force designed to punish and inflict pain. *See*, *e.g.*, Dkt. 691 ¶¶ 218, 246-7, 254, 258.

The Monitor's newest findings are unchanged. In April 2024, the Monitor found that "an ongoing pattern and practice continues to exist where staff use force when it is not objectively necessary and in a manner that is out of proportion to the extant level of threat." Monitor's Apr. 18, 2024 Rep. at 30; SFOF ¶ 21. The Monitor's reviews of use of force incidents suggest that unnecessary and excessive uses of force remain just as prevalent as they were in 2016 and 2018. *Id.* And DOC staff still often engage in harmful conduct such as "routine" use of head strikes, the

---

[10] Indeed, this was the gravamen of this Court's decision in March 2023 declining to hold Defendants in contempt for failing to track intake stays. There, Defendants had "taken substantial steps to remedy the deficiencies of [their] prior approaches," leading the Monitor to report "concrete progress within the Intake units." Dkt. 511 at 27-28. The Monitor had no further recommendations for intake tracking. *Id.* Contempt for that one provision, the Court explained, would not aid the goal of "focus[ing] on the foundational issues at the core of the Department's historic pattern of excessive use of force[.]" *Id.* at 28. The situation here is entirely different. Plaintiffs have now moved for contempt on core provisions of this Court's orders, and the Monitor continues to find non-compliance or even backsliding on every one of those fundamental provisions, as described below.

use of dangerous holds, and gratuitous use of chemical agents. SFOF ¶¶ 23-30. Recent individual

incidents support the Monitor's findings:

- In December 2023, an officer threw three punches to an incarcerated individual's face
  while he was in restraints, and a captain then sprayed chemical agents "immediately in
  front of [the incarcerated individual's] face," though the individual was "secured . . . to
  the floor." Ex. 152, UOF 6946/23 at 4-5; SFOF ¶ 31.

- In December 2023, an officer swung an incarcerated individual into the wall during an
  escort, causing the individual's face to hit the wall. The officer then pushed the
  individual's face into the door. Ex. 152, UOF 6638/23 at 1-3; SFOF ¶ 32.

- In February 2024, a captain responded to an incarcerated individual pointing his finger at
  the captain during a verbal altercation by spraying the individual in the face with a
  chemical agent, grabbing him by the torso, and taking him to the ground. Ex. 152, UOF
  0726/24 at 10-12; SFOF ¶ 33.

Defendants' arguments as to why they should not be held in contempt on this

overwhelming record fall flat. *First*, Defendants point to facility leaders' "Rapid Reviews,"

without acknowledging the Monitor's repeated findings that these reviews are often a whitewash,

as wardens "overlook poor and/or dangerous practices and fail to acknowledge circumstances

that indicate . . . the use of force was unnecessary." SFOF ¶ 149. DOC does not hold leaders

accountable for such failures: it did not discipline a single facility leader for an inaccurate or

biased Rapid Review in 2023. *Id.* ¶ 150. This faulty process, which DOC has not taken even the

most obvious steps to improve, cannot constitute reasonable diligence.

*Second*, Defendants point to some discipline imposed for the use of force violations

Plaintiffs documented in their opening brief. Brereton Decl. ¶ 5. This is unsurprising given the

now-public nature of these incidents. More broadly, the notion that Defendants' disciplinary sanctions systematically address their failure to implement the Use of Force Directive is belied by the Monitor's finding that DOC is not compliant with the requirement to impose meaningful discipline for use of force-related misconduct. *See infra* § III(B).

*Third*, Defendants tout training as evidence of their diligent efforts, citing an in-service Use of Force training, Defensive Tactics, and a refresher ESU training. Opp. Br. at 14; Dkt. 689-4 ("Johnson Decl.") at ¶¶ 7, 9. Not only are some of these trainings *already required* by Consent Judgment XIII (provisions on which Plaintiffs have not sought contempt), but also the Monitor has long found that trainings fail to translate to improved staff practice at DOC because of the agency's deficient supervisory corps. SFOF ¶¶ 294-296.

### B.    Defendants Do Not Properly Investigate or Hold Staff Accountable for Misconduct

In December 2023 and April 2024, the Monitor found Defendants in non-compliance with all three accountability-related Contempt Provisions that were formally rated: 1) Consent Judgment, § VII, ¶ 1: Thorough, Timely, Objective Investigations; 2) Consent Judgment, § VII, ¶ 9(a): Timeliness of Full ID Investigations; and 3) Consent Judgment, § VIII, ¶ 1: Appropriate and Meaningful Discipline. Defendants do not dispute key facts which demonstrate their contempt, including the recent deterioration in quality of ID investigations, the related decline in DOC's ability to identify misconduct, and the resulting decline in disciplinary charges. *See* Dkt. 691, ¶¶ 737, 753, 775, 836.

The situation has not improved in recent months; in some cases, it has worsened. In December 2023, the Monitor moved Defendants from "partial compliance" to "non-compliance" on Consent Judgment, § VIII, ¶ 1 (Appropriate and Meaningful Discipline) due to DOC's "regression in identifying misconduct (and therefore failing to hold staff accountable for certain

violations), failure to hold supervisors accountable, inability to adequately manage Command Disciplines, and tendency to impose discipline that may not be proportional to the severity of the staff's misconduct." SFOF ¶ 253. Defendants remained non-compliant in the most recent Monitoring Period. *Id.*

In 2023 there were only 318 use of force cases referred for formal discipline, the lowest number in the past seven years. SFOF ¶ 246. This "sharp drop" is "particularly alarming, considering the high frequency of . . . incidents with serious misconduct that have been observed by the Monitoring Team[.]" *Id.* As of April 2024, "the decline in the quality of Full ID investigations first observed in summer/fall 2022 has essentially remained," *id.* ¶ 223, "current staffing levels are insufficient to manage [ID's] workflow," *id.* ¶ 228, and "the number of pending Full ID Investigations increased[.]" *id.* ¶ 222.

DOC is moving backward in properly investigating and imposing meaningful discipline for use of force violations, more than eight years after the Consent Judgment was entered. In the face of this reality, none of the factors identified by Defendants are sufficient to avoid contempt.

*First*, Defendants point to the establishment of "quality assurance teams" in ID to review a fraction of completed investigations. But returning to previously closed investigations and attempting to retroactively fix them will not ensure "thorough, *timely*, and objective investigations" because it introduces even more delay into an already slow system. With the vast majority of Full ID investigations not closed within the 120-day deadline, heavy reliance on a re-opening process that may add months is unlikely to move Defendants toward compliance. Moreover, these "quality assurance teams" do not prophylactically prevent problems from occurring in the first place. A full year after DOC established these teams, Dkt. 689-5 ("Pritchett

Decl.") ¶ 14, the Monitor described the quality of "many investigations" as "substandard," with "findings [that] could easily be discredited." SFOF ¶ 223.

*Second*, Defendants assert that intake investigations are conducted for nearly all use of force incidents, and claim the vast majority of these intake investigations are completed within 30 business days.[11] But the picture with regard to intake investigations is nowhere near as rosy as Defendants suggest. The longstanding "poor quality of Intake Investigations" was "particularly pronounced in [the latest] Monitoring Period." *Id.* ¶ 218. Moreover, it is no longer true, as Defendants asserted, that 99% of intake investigations are completed within 30 business days. DOC completed only 71% of intake investigations for December 2023 incidents within 30 business days. *Id.* ¶ 216. And despite claiming that intake investigations are an area of success, Defendants admitted to the Monitor that the reason for this slow-down is "poor leadership and management," among other causes. *Id.*

*Third*, Defendants point to the speed with which the Trials Division closes disciplinary cases. But they do not mention that speed has come at the cost of quality. Staff are not being disciplined proportionally to the seriousness of their actions. In December 2023, the Monitor found that a lower percentage of formal disciplinary cases resulted in "reasonable" sanctions as compared to prior monitoring periods, and was concerned that "discipline may be out of proportion to the severity of the staff's misconduct." SFOF ¶¶ 251-252. These concerns continued in the most recent Monitoring Period. *Id.* ¶ 252. During 2023, the proportion of formal penalties exceeding 30 days loss of vacation or compensatory days (a relatively strong sanction) was the lowest it had been in the history of the Consent Judgment, while the proportion of formal

---

[11] "Intake investigations" are short, preliminary reviews and, for the most concerning incidents, merely result in the referral of the case for a more thorough Full ID investigation. PPFOF ¶¶ 709-713. Even if ID were completing these screening investigations in a timely manner (which it is not), that would be the lowest hanging fruit, and certainly not enough to comply with the Consent Judgment.

disciplinary settlements resulting in mere reprimands (the lightest sanction) was the highest it has been in the past seven years. *Id.* ¶ 250. Prioritizing speed over quality is not a success story.

*Fourth*, Defendants ask the Court to overlook staffing shortages in ID because of recent, slight increases in the number of investigators and supervisors. While ID staffing has improved somewhat since the June 2023 nadir, there was still a net loss of 51 staff between January 2022 and February 2024. SFOF ¶ 229. The number of investigators and supervisors is 30% less than it was in 2020. Dkt. 706 at 91. ID itself reported to the Monitor that its staffing levels are insufficient to manage its workflow, *id.* ¶ 227, in clear violation of the Consent Judgment requirement to hire a "sufficient number of additional qualified ID Investigators." Dkt. 284, Consent Judgment, § VII, ¶ 11. Defendants refuse to streamline bureaucratic processes around hiring, thus preventing efficient recruitment for many positions, including in ID. SFOF ¶ 331.

*Fifth*, Defendants point to their adoption of one, limited new directive related to command discipline. Opp. Br. at 18. But the Monitor found that the broader policy, which remains in place, has caused serious problems, including overreliance on the lowest level sanctions, dismissal of a large number of cases, and the use of command disciplines to preclude more serious, formal discipline for severe incidents. SFOF ¶¶ 237-245; Dkt. 564, § I, ¶ 13. This Court required Defendants to revise the policy by November 30, 2023, but to date, Defendants have not complied. *Id.* ¶ 310. This failure is due to Defendants' own intractability: the Monitor has offered feedback on revisions seven separate times, but Defendants continue to propose policies with the same problems. *Id.* The Monitor found in April 2024 that command discipline's "current deficiencies continue to undermine the overall disciplinary process." *Id.* ¶ 240.

### C.    Defendants Have Not Made Mandated Changes to Their Security and Basic Correctional Practices

The record is clear that Defendants have failed to comply with the security-related Contempt Provisions,[12] and that their efforts fall short of reasonable diligence. Though the Monitor does not formally rate Defendants' compliance with these provisions, in April 2024 he found that Defendants had not made substantial and demonstrable progress in implementing the reforms, initiatives, plans, and practices outlined in the *Nunez* Court Orders, a finding that mirrors the language of the assessment in Action Plan § G, ¶ 6. SFOF ¶ 345. And despite the Monitor explicitly noting six months ago that roll calls, binders, and teletypes are insufficient to change staff practice, Defendants continue to feature them as their key intervention. *Id.* ¶ 153. Ignoring these findings—and failing to elevate a reasonable strategy to fix the identified problems—cannot be reasonable diligence.

### 1.    System-wide Security Plan: SRO, ¶1(i)(a), Action Plan, § D, ¶2(a)

The Second Remedial Order ("SRO") requirement to develop and implement a Security Plan was intended to be an "interim" measure, a basic and "immediate" step taken on an emergency basis. SRO, ¶1(i)(a). Over two and a half years later, Defendants do not dispute the Monitor's findings that they have failed to develop a sufficient plan. SFOF ¶ 314; Dkt. 691 at ¶¶ 303, 309-310, 322, 326-327. Even now, six months after Plaintiffs sought contempt, DOC still has not complied despite urgent emphasis from the Monitor that absence of such a plan allows "unnecessary/excessive force to flourish" and the "extraordinarily high risk of harm . . . to continue unabated" in DOC. SFOF ¶¶ 41, 314.

---

[12] Second Remedial Order, ¶1(i)(a), and Action Plan, §§ A, ¶ 1(d); D, ¶¶ 2(a), (d), (e), and (f).

In April 2024, the Monitor found that most of DOC's fall 2023 security plans were either not implemented or ineffective, and DOC abandoned the 2022 facility-specific plans for RNDC and GRVC. *Id.* ¶¶ 44, 313-316. Despite the Monitor's repeated requests for a complete plan, DOC offered only repetitions of the failed fall 2023 initiatives and multiple promises that specific, written plans were coming. *Id*. Yet Defendants still have provided no such plan—and, indeed, their brief does not even address one. *Id*.; Opp. Br. at 19-20. Given the abundant data known to Defendants about rampant security failures, and that the Security Plan is the centerpiece of any response, this a shocking lack of diligence. SFOF ¶¶ 44, 86-115, 313-316.

The Security Plan is required to address specific security breaches. Defendants' response makes clear that, in the absence of such a plan, they rely on demonstrably failed approaches to correct them. *See* Brereton Decl. ¶¶ 24, 28-30 (responding to unsecured doors with roll call binders, and to vestibule management with conclusory statements that a teletype "continues to be enforced"). These include:

*Abandoned Posts*. Defendants response regarding abandoned posts, a critical safety issue the Security Plan *must* address, fails to grapple with the gravity of this problem. SRO, ¶ 1(i)(a). DOC's own analysis—audits conducted by their *Nunez* Compliance Unit ("NCU")[13] and the Office of the Deputy Commissioner of Security—still regularly find that staff are off-post. PPFOF ¶¶ 311-316, 334-339, 400-439; SFOF ¶¶ 86-109, 111. Defendants do not dispute the Monitor's findings about pervasive abandoned posts, which compelled the Court to again order DOC to address the problem in August 2023. August 10, 2023 Order § I, ¶ 6; PPFOF ¶¶ 334-

---

[13] Defendants note that they do not dispute the findings of their own NCU audits. Opp. Br. at 19. Defendants do, however, assert that those "findings do not relate to the sections of the Second Remedial Order and Action Plan that Defendants have supposedly violated." *Id*. This is a concerning representation given that the plain language of these provisions clearly implicates findings made repeatedly by NCU, such as abandoned posts, touring failures, failures to address contraband in plain view, and unsecured doors. Defendants' failure to grasp the scope of failures and to connect available information to court-ordered obligations is one of the many reasons they have not made necessary progress in the reform effort.

339. Despite this endemic problem, DOC lacks a centralized mechanism to track staff off-post and simply issued a teletype in October 2023. SFOF ¶¶ 306. When the Monitor expressed concern about whether these measures could change staff practice, DOC stated only that NCU's security audits (which DOC leaders fail to utilize) will "continue to focus on staff being off post." *Id.* Defendants articulate no concrete plan to ensure that supervisors detect, correct, and discipline abandonment of posts.

Neither does the Security Manager contend with the gravity of the problem in his declaration, which says only that he "emphasize[s] to Commands the importance of remaining on post;" that facilities have "a monthly binder of Roll Call topics and talking points," which are patently inadequate to change staff practice, SFOF ¶ 306; that he issues discipline in his own personal (but necessarily limited) Rapid Reviews; and references a software that is not designed to address post *abandonment*, just gaps in *assignment*. Brereton Decl. ¶¶ 24-27.[14]

*Key Control.* DC Brereton represents that he turned his attention to key control policies "upon [his arrival] in May 2022." Brereton Decl. ¶¶ 1, 21. Nearly two years later, he acknowledges that the policy is still in draft stages—conceding non-compliance. *Id.* ¶ 21.

*Use of Chemical Agents.* The Monitor continues to observe staff use OC spray at close range, in large quantities, with gratuitous repeat application, or when a less restrictive physical intervention could be sufficient, which "increases the risk of harm rather than minimizes it." SFOF ¶ 26. The Board of Correction's October 2023 audit of DOC's use of chemical agents reinforced the Monitor's finding of dangerous OC spray use, found facility leaders failed to identify misconduct or policy violations, and found that a significant number of staff reports

---

[14] The Monitor expressed concerns about "effectiveness of this strategy [to rely on the scanning system] . . . given the low likelihood that a staff member would notify the control room that they were leaving their post without being properly relieved." SFOF ¶ 306; Brereton Decl. ¶¶ 24-27 (referencing the scanning system in Edwards Decl. ¶ 4).

contained false statements. *Id.* ¶¶ 76-81. Yet DC Brereton minimizes these findings, characterizing the "central point" as "at times, chemical spray was used when other approaches to resolving situations . . . would have been preferable." Brereton Decl. ¶ 14. The City is silent on how DOC intends to address the findings about staff misconduct, gratuitous harm inflicted on people in custody, and leadership's failure to identify policy violations.

## 2.    Touring: Action Plan, § A, ¶ 1(d)

Defendants do not dispute the Monitor's findings that DOC staff do not tour as they should. PPFOF ¶¶ 340-360. Defendants assert that "significant improvement" was made recently, but offer only two printouts of a single day—from a captain who has since resigned after five months of supervising tour wand compliance, SFOF ¶ 59—which still show many missed tours. Dkt 689-7 ("Batchelor Decl.") ¶ 6, Exs. A, B. The Monitor's findings and NCU audits are "replete with examples of staff who were off post (and could not tour), who failed to tour, and who tapped the sensor with the tour wand but took no action to verify the individuals' safety in their cells." SFOF ¶¶ 62-64, 88-109, 130.[15] Touring failures contributing to deaths of people in custody—and attendant public scrutiny and investigation by external agencies—have resulted in temporary suspensions of supervisors and staff.  But where deaths did not occur, DOC has disciplined only a very small number of staff for touring failures—not "commensurate with the number of violations." *Id.* ¶¶ 66-67. DOC simply has not meaningfully changed staff practice since the Action Plan was entered. *Id.*; *see also* SFOF ¶¶ 97-98.

---

[15] The Monitor recently reported that captains—who are responsible for ensuring officers tour—themselves fail to tour adequately or at all. SFOF ¶¶ 55, 63. The Board of Correction, too, offered a recent example—uncovered while investigating Manish Kunwar's death—where a floor officer used two wands (his and a captain's) to falsify captain tours that did not occur. *Id.* ¶ 56. While Defendants assert that staff are disciplined for failures to tour, they offer no such evidence—and do not dispute the Monitor's recent findings that very few staff were formally disciplined. Opp. Br. at 20; Batchelor Dec. ¶ 5; Dkt. 05 ¶ 360; SFOF ¶¶65-66. Defendants lack even a reliable tracking mechanism for assessing tour wand compliance, as the responsible entities are "in a state of flux." SFOF ¶ 58.

### 3.    Searches/Contraband Detection Efforts: Action Plan, § D, ¶¶ 2(d), (e)

The Monitor continues to find that searches "remain chaotic and frequently result in unnecessary uses of force." SFOF ¶ 71. When Defendants did not address the Monitor's 2021 recommendations on search procedures, the Court ordered them to do so in August 2023. August 10, 2023 Order, § I, ¶ 2. Yet three years after the Monitor made recommendations and far past the August Order's October 30, 2023 deadline, Defendants have failed to revise all three of the search policies DOC identified—and have not even proposed initial revisions on two. *Id.*; SFOF ¶ 303. Failures to detect and remove contraband also continue. SFOF ¶¶ 71-73.

### 4.    Escorts: Action Plan, § D, ¶ 2(f)

The Monitor continues to find that painful escorts have been identified as a contributor to unnecessary uses of force for years, but no substantive efforts have been taken to change staff practice. SFOF ¶ 68. In its response, Defendants assert their grievance system shows no complaints of painful escorts. Brereton Decl. ¶ 16. This is disingenuous: their grievance directive makes clear that uses of force, or other staff misconduct, are not grievable. S*ee* DOC Directive 3376R-A, § II(A)(3), (5).[16] As the Monitor found, painful escort practices are "ongoing and ha[ve] not changed." SFOF ¶ 69. Defendants offer no effective strategies to alter staff escort practices, once again relying on ineffective binders of Roll Call topics and intended policy revisions. Brereton Decl. ¶¶ 15, 17. Even these policy changes are long overdue: this Court ordered revisions by October 30, 2023, but DOC has still failed to provide the Monitor with any proposed policy revisions. August 10, 2023 Order, § I, ¶ 3; SFOF ¶ 304.

---

[16] *Available at* https://www.nyc.gov/assets/doc/downloads/directives/Directive_3376R-A.pdf.

###### D.    Defendants Lack Adequate Facility Leadership and Supervision of Staff

Defendants continue to be in noncompliance with Contempt Provisions to improve supervision of line staff. First Remedial Order, § A, ¶ 2, 4; Action Plan, § C, ¶ 3(ii), (iii); SFOF ¶ 143, 158. In his recent report, the Monitor maintains his prior findings, summarizing deficiencies: DOC "simply does not have the necessary assets among its current corps of supervisors to provide the type and intensity of hand-to-hand coaching that is required, which is perhaps unsurprising given their tenure in a deeply dysfunctional system that does not adequately select, train, or prepare them for the task at hand." SFOF ¶ 141.

###### 1.    Facility Leadership Responsibilities: First Remedial Order, § A, ¶ 2

Defendants are in contempt of the requirement that facility leadership utilize data available to them and create strategies to address problems. SFOF ¶¶ 143-145. This is an agency awash in data, yet leaders simply ignore it: facility leaders still do not adequately incorporate NCU audit findings, CODs, and Rapid Reviews "that provide clear targets for problem-solving" into "specific, actionable plans," and facility leadership give "scant attention . . . to the fact that conditions are not improving." *Id.* ¶ 145. When meetings between central office and facility leaders occur, those conversations still "do not appear to identify overarching trends or patterns and rarely appear to lead to operational changes[.]" *Id.* The City does not address these dynamics or offer solutions, but briefly asserts that "one senior operational stakeholder is assigned to oversee one jail facility"—though two of the six senior leaders listed have now resigned. Opp. Br. at 21-22; Brereton Decl. ¶ 31; SFOF ¶¶ 326-328. These efforts are not reasonable diligence.

###### 2.    Supervision of Captains: First Remedial Order, § A, ¶ 4; Action Plan, § C, ¶ 3(iii)

The City does not dispute the Monitor's findings that they failed to substantially increase the number of ADWs and ensure the ADWs adequately supervise captains, as required by the

Court's orders. Defendants' Response to PPFOF ¶¶ 530-540, 595-601, 603-616, Dkt. 690. The Monitor continues to rate DOC noncompliant with First Remedial Order, § A, ¶ 4, and found it failed to make substantial and demonstrable progress in implementing the Action Plan requirements. SFOF ¶¶ 155-173. In general, the Monitor continues to find that "the supervisory ranks are unprepared" for their roles at "the center of officers' skill development." *Id.* ¶ 139. Compounding the problem of too few supervisors is the reality that "many of those holding the ranks of ADW and Captain have only marginal competence in the skills necessary to provide *effective* supervision." *Id.* ¶ 140.

Defendants have failed to meaningfully increase the number of ADWs, which "remain[s] insufficient to supervise the requisite number of Captains." *Id.* ¶ 160. The ADWs themselves also require substantial and quality coaching, supervision, "and mentoring from their superiors to develop into the type of supervisor that is so desperately needed in this Department"—which renders them unable to provide the required adequate supervision. *Id.* ¶ 166.

The inadequacy of the supervisory structure is apparent in the ongoing deficiency of DOC captains. In his most recent report, the Monitor highlighted the captain-officer dynamic as "fundamentally compromised" in a way that "subverts progress rather than accelerates it." *Id.* ¶ 168. DOC leadership, staff, and the Monitoring Team report that captains "appear to be either unclear about their responsibilities or outright fail to embrace them. . . . [which] often leads to a superficial execution of duties." *Id*. Captains fail to tour adequately or at all, and often "do not investigate the underlying causes nor seek solutions" to problems that emerge. *Id*.

Defendants fail to reckon with the Monitor's findings. They offer as solutions only modified ADW tour schedules, insufficient hiring intentions, *see infra* § III(D)(3), and pre-promotional training, but these ideas cannot cure the "long-standing supervisory void" and

endemic deficiencies apparent in the current captain and ADW ranks. Opp. Br. at 22-23; SFOF ¶ 156. This is not a reasonably diligent approach.

### 3. Increased Assignment of Captains to Housing Areas: Action Plan, § C, ¶ 3(ii)

Defendants do not dispute the Monitor's findings regarding inadequate numbers of captains in housing units and remain noncompliant. Defendants' Response to PPFOF ¶¶ 607-609. Though they celebrate promoting 24 officers to captain, the number of captains assigned to facilities and court commands actually decreased in recent months (342 as of March 2, 2024, down from 371 as of October 2023). Opp. Br. at 22; PPFOF at ¶ 607; SFOF ¶ 162. Even Defendants' promises to promote 50 more officers to captain would not elevate the number of captains to the number at the time the Action Plan was entered, which required DOC to increase captains in the housing units (416 in facilities and court commands as of June 2022). Opp. Br. at 22; PPFOF at ¶ 607.

DOC's own facility leaders affirm these deficiencies, reporting to the Monitor that "they have insufficient numbers of Captains, which is negatively impacting their operations." SFOF ¶ 163. And DOC has not yet conducted the evaluation of captains' assignments that is required by Action Plan § C(3)(ii). *Id.* ¶ 164. This failure to increase the number of captains or even evaluate their assignments falls far short of reasonable diligence.

### E. Defendants Have Not Curbed the Excesses of Emergency Response Teams

Defendants do not dispute the Monitor's findings about abusive ERT practices, Defendants' Response to PPFOF ¶¶ 460-462; 465-525, and are non-compliant with orders to correct these abuses. SFOF ¶¶ 131-137.

Defendants promise that they will revise their special teams screening process. Brereton Decl. ¶ 13; Opp. Br. at 23. But that screening process has been so deficient for so long that it

became a subject of the August 2023 remedial order, which required DOC to both revise the screening policy and implement it by October 2023. As of April 2024, Defendants had done neither, and could only promise that they "intend" to share more proposed revisions in "Spring 2024." Aug. 10, 2023 Order, ¶ 9; PPFOF ¶¶ 498-525; SFOF ¶ 137. Defendants have similarly failed to revise policies about how ERTs are utilized. SFOF ¶ 133. This inability to comply with the discrete obligation to revise policy, much less implement it, is startling and unacceptable.

More importantly, the City ignores its obligation to correct the well-established, dangerous misconduct of ERT members. Brereton Decl. ¶¶ 12-13; Opp. Br. at 23. Rapid Reviews are not fixing the problem: "they do not consistently identify when a response team was called and when they do, they generally find the response was necessary even with objective evidence to the contrary." SFOF ¶ 134.

Thus, Defendants still fail to address their long-deficient policies regarding ERTs and their use of unnecessary force, and the efforts they describe are anything but diligent.

### F.    Defendants Have Not Corrected Harmful Staffing Practices

Though the Monitor has explained that staffing is "**the** essential element to reform," and the Commissioner laments staffing and attrition challenges, Defendants' response demonstrates they continue to violate critical provisions of the Action Plan necessary to address the Department's deeply dysfunctional staffing and deployment practices. Action Plan, § C, ¶ 3(v), (vi), (vii); SFOF ¶ 174 (emphasis in original); Maginley-Liddie Decl. ¶ 45.

### 1.    Awarded Posts: Action Plan, § C ¶ (3)(iv)

When Defendants sought the Court's approval of the Action Plan, they claimed it was a "road map to sustainable reform," Dkt. 463 at 1, and agreed that its terms were necessary to correct the violations of Plaintiffs' federal rights. Dkt. 712, at 16 n.8; SFOF ¶ 184. Yet the City now seeks to backtrack on the Action Plan's order to reduce awarded posts, describing it as an

initiative "the Monitor has favored" and claiming, "the benefits of doing so are questionable."[17] Edwards Decl. ¶ 8; SFOF ¶ 199). Regardless of the retraction of the City's position—which notably arose amidst union bargaining, *infra* § IV(B)(6)—the Court order requires them to reduce such posts and they have demonstrated neither compliance nor diligent efforts to do so.

Defendants failed to implement multiple plans to reduce awarded posts in 2022 and 2023 and failed to provide updated data to the Monitor despite repeated requests until April 2024. SFOF ¶¶ 187-193. In their response, Defendants now claim to have reduced the number of awarded posts by 30%, Edwards Decl. ¶ 8; SFOF ¶ 188, but the Monitor's reports cast doubt on the accuracy of that figure, as historical DOC data on this issue has been inaccurate. SFOF ¶ 186, 195-196. The Monitor has found that DOC has taken no affirmative steps to eliminate posts that were formally assigned to staff other than to rely on attrition (SFOF ¶ 190) and has asked DOC to suspend awarding more posts (which DOC claimed to have done in Fall of 2022, but the Monitor recently discovered that was not true). SFOF ¶¶ 189, 201. Defendants have likewise taken no action to reduce their "hundreds" of "unofficial" awarded posts. SFOF ¶ 186-187.

Inexplicably given the Action Plan's requirements, in May 2024, the City offered the Correction Officers' Benevolent Association ("COBA") a contract that COBA describes as providing "guaranteed and contractually protected" awarded posts "for the first time ever." SFOF ¶¶ 202-204. While the City refused to provide the contract to Plaintiffs, the City characterizes its offer differently, and minimizes its relevance by saying that it does not use the word "awarded posts." Dkt. 712 at 27; Ex. 170 at 1. Of course it does not—that is just "parlance," not a DOC policy term. SFOF ¶ 185. The relevant question is the *effect* of the labor

---

[17] Defendants never sought relief from the Order they now disfavor. *See In re Lehman Brothers Holdings Inc.*, 526 B.R. 481, 496 (S.D.N.Y. 2014) ("Contempt is willful when the contemnor had actual notice of the order, could have complied, did not seek modification, and did not make a good faith effort to comply.")

agreement on the Court's requirement to reduce awarded posts. The City certainly does not contend the new contract *furthers* the Court order by reducing awarded posts, Ex. 170 at 1; the question remains whether it *undermines* the Court orders (for example, does the new contractual requirement to post vacant positions eliminate future attrition reductions, the only source of prior progress in shrinking the number of formally awarded posts?). SFOF ¶ 190. The Monitor was not informed the City was engaged in substantive negotiations, nor that it had made an offer regarding how job assignments are posted and filled. SFOF ¶ 204. Given that the City now says it seeks to backtrack on compliance with this Court order, and the officers' union's claim that it has, in fact, changed awarded post policy in negotiations unknown to the Monitor, Defendants' commitment to complying with the Court's order rings hollow—as do their claims of diligence.

## 2.    Minimize 4x2 Schedules: Action Plan § C, ¶ 3(vi)

In the same vein, Defendants now wish to jettison another part of the Action Plan they previously submitted was necessary: the requirement to reduce 4x2 schedules in favor of 5x2, offering no basis in sound correctional practice for their about-face. SFOF ¶¶ 205-209; Maginley-Liddie Decl. ¶ 53. Defendants have not yet addressed the labor agreements that render DOC's particular 5x2 schedule inefficient and are an "imped[iment to] the Department's ability to maximize staff working days"—barriers the City once assured the Court did not exist. PPFOF ¶ 62; SFOF ¶ 206. They have not, as they promised to do when the Action Plan was entered, "promptly [sought] appropriate relief" upon "encounter[ing] an unforeseen legal barrier." Dkt. 463 at 1. As of April 2024, Defendants had not reported on "any concrete steps that have been taken to alter these scheduling practices." SFOF ¶ 208.

## 3.    Civilianization: Action Plan § C ¶ (3)(vii)

The City asserts that the civilianizing of positions, as required under Action Plan ¶ C(3)(vii), is "slow but underway" (Edwards Decl. ¶ 16), but even this characterization is wildly

generous. The pace is glacial. Uniformed staff still serve a "myriad of roles that can be fulfilled by a civilian work staff," including administrative assistants, landscaping, and sanitation. SFOF ¶ 212. The Monitor reports "very little progress" and is concerned that Defendants' upcoming budget-driven staffing changes will result in *more* uniformed staff fulfilling duties that can be performed by civilians. SFOF ¶¶ 210, 214.[18] This is plainly insufficient.

### G.    Defendants Do Not Protect Young Adults in Their Custody

Defendants do not dispute the Monitor's findings of noncompliance with the order to protect 18-year-olds from fights and assaults, Consent Judgment § XV, ¶ 1; PPFOF ¶¶ 859-877. As of last month, the City remained in noncompliance, after a brief period of improvement gave way to marked regression in the "level of violence and disorder" and DOC failed to implement its October 2023 plans. SFOF ¶¶ 255-262. NCU RNDC audits continue to find staff off-post, unsecured doors, open use of illicit substances, frequent fires, failure to deliver mandated services, poor sanitation, and general disorder. *Id*. ¶ 260. Defendants' proposed RNDC Programs Action Plan, which merely re-packages the same policies the City has failed to implement, cannot constitute reasonable diligence. *See supra* § II(C).

Nor does the City dispute the Monitor's findings about their noncompliance with requirements to implement the Direct Supervision model. Consent Judgment § XV, ¶ 12; First Remedial Order, § D, ¶ 3; 3(i)); PPFOF ¶¶ 878-896. The City concedes that they are in the *beginning* stages of a plan to implement these years-old orders. SFOF ¶ 264; Maginley-Liddie Decl. ¶ 34; Torres Decl. ¶ 12. In their response, DOC leaders describe the Direct Supervision

---

[18] A March 2022 staffing analysis showed that over 700 uniform staff held civilian posts, PPFOF ¶ 698. In the two years since, the only reported effort in the City's response to civilianize staff is: 1) 7 civilian staff positions in HMD, 2) an intention to transfer "additional" uniform timekeeping staff of unknown quantity, 3) a single hiring initiative for civilian investigative positions of an undisclosed number, and 4) making a vague promise of further "civil service pools being scheduled," with no indication as to hiring timeline or the number of posts Defendants seek to fill. Edwards Decl. ¶ 16; SFOF ¶¶ 210-215. Meanwhile, DOC leaders claim to be meeting "biweekly" to identify positions that can be civilianized but have reported no such positions to the Monitor. SFOF ¶ 213.

model within the RNDC Programs Action Plan as if it were an innovative concept and not an original part of the Consent Judgment. Torres Decl. ¶¶ 2-3; Consent Judgment § XV, ¶ 12. The City neither reckons with previous failed attempts to implement Direct Supervision nor offers plans to overcome those past failures, but simply states a broad intention to implement it in the future. Torres Decl. at ¶ 12. SFOF ¶¶ 263-270. This cannot constitute reasonable diligence.

Finally, Defendants do not dispute the Monitor's findings that they failed to comply with requirements to ensure consistent assignment of staff, with which they remained non-compliant in April 2024. Consent Judgment § XV, ¶ 17; First Remedial Order, § D, ¶ 1; PPFOF ¶¶ 897-913; SFOF ¶¶ 278-282. They merely assert that DOC will implement consistent assignment of staff as a component of its RNDC Programs Action Plan, without acknowledging that they have been required to do so for years, and offer no concrete plan as to how they will change years-long implementation failures. PPFOF ¶¶ 899-913; Torres Decl. ¶¶ 2-3, 12. For example, Defendants do not explain how they will change the fact, documented by NCU, that staff assigned to a steady position on paper frequently did not actually work the shift—on average, at least *one third* of shifts assigned. SFOF ¶ 282. This was commonly due to a "mutual," which is "a practice—protected by the union—wherein staff trade their shift with another staff person." *Id.* Defendants ignore this, offering no indication that they have engaged labor leadership or have otherwise taken any reasonable steps to eliminate this well-established practice. Defendants' failure to address barriers identified years ago falls far short of reasonable diligence.

In the face of this overwhelming record, a contempt finding is necessary and appropriate.

## IV.    RECEIVERSHIP IS THE ONLY REMEDY THAT WILL GIVE EFFECT TO THIS COURT'S ORDERS

The only remedy with any realistic likelihood of curing Defendants' contempt, or translating this Court's orders into reality, is the appointment of a Receiver. Receivers are an

appropriate, useful mechanism for addressing years-long non-compliance in complex bureaucracies like New York City and its jail system.

### A.    Receiverships Have Improved Troubled Jails and Prisons After Other Measures Failed

Successful models around the country show that receiverships can improve unconstitutional conditions in jails and prisons that have failed to comply with monitored federal consent judgments. While the City dismisses these models as "ineffective and costly," Opp. Br. at 29, each receiver discussed below achieved measurably better conditions for incarcerated people after other steps failed. A common thread uniting these successful receiverships is that the receivers had (or could obtain) broad, independent authority and flexibility to implement remedial measures that no other stakeholder could. These receiverships provide important lessons for what is possible here.

#### 1.    The *Plata* Receivership Transformed Medical Care in California Prisons

*Plata* demonstrates how receivers can transform complex, recalcitrant systems and save lives. Defendants critique *Plata* for high costs and mismanagement but focus misleadingly on the receivership's first two years. Opp. Br. at 27-28. The reality is that under the receivership, California's previously broken system has transformed how the state provides medical care to incarcerated people. Most of those changes have occurred because of receivership, as set forth in the attached declaration from plaintiffs' counsel in *Plata*. Decl. of Donald Specter ("Specter Decl"), ¶¶ 12-14.

Since the current *Plata* receiver, J. Clark Kelso, was appointed (replacing the original receiver who served for only a few years), "the receivership has been successful in substantially improving access to medical care and the quality of that care." *Id.* ¶ 11. From 2006 to 2013, the likely preventable deaths in the system declined from 18 to 0. *Id.* ¶ 14. The receiver's powers

have allowed him to overhaul the delivery of medical care, secure funding, hire more staff, and respond to crises. For example, the receiver helped introduce critical prevention programs when opioid overdoses became a leading cause of prison deaths. In 2019, the overdose death rate in California's prisons was 52 per 100,000; in 2021 it fell by more than 50 percent. *Id*. The receiver's ability to act decisively and expeditiously has made the difference: "There is no question in my mind that if the implementation of this program was left to the [State], it would never have been implemented this quickly nor produced anywhere near the same result." *Id.*

The *Plata* receiver has improved conditions largely without the need for court orders. Early on, "the Receiver requested and received a waiver of state laws to avoid the incredibly complex and bureaucratic task of contracting for certain services and raising salaries." *Id*. But since then, "the Receiver's authority as an agent of the federal court has ensured the cooperation of the state government." *Id.* ¶ 15.

Defendants are wrong when they criticize the *Plata* receivership as expensive and with "no end in sight." Opp. Br. at 28. First, *Plata* has not resulted in excessive costs: constitutional healthcare costs what it does. "In *Plata*, no party has ever suggested that Mr. Kelso's budget is excessive or that the funds are not being spent wisely." Specter Decl. ¶ 17. Far from no end in sight, the receiver has now returned two-thirds of the state prisons back to the State's operation— 24 of the 33 prisons originally under his control. *Id.* ¶ 13.

*Plata* shows that a receiver can succeed where a monitor's efforts alone could not. *Id.* ¶ 16. Based on Mr. Specter's assessment:

> The Receivership is not a magic bullet that solves all the problems in reforming a rigid and ineffective bureaucracy. But, having a person with experience in managing government agencies who has the authority of the federal court can make a world of difference in promoting compliance with court orders. In *Plata*, the receivership has taken time, financial resources, skill, and perseverance, but ultimately it has been enormously effective. Many of my clients are alive because of it.

¶ 14.

> ### 2.    Receiverships in New Orleans, Cook County, and Miami-Dade Have Succeeded

*Plata'*s successes are not unique. Other receivers have brought complex jail systems into compliance with federal consent judgments when monitors alone could not.

In New Orleans, the "Independent Jail Compliance Director", a role akin to a receiver, succeeded in implementing a federal consent judgment in the Orleans Parish Jail, which had long been an "indelible stain on the community." *Jones v. Gusman*, 296 F.R.D. 416 (E.D. La. 2013). After sustained failures to comply with a 2013 consent judgment addressing use of force and other violations despite the oversight of federal monitors, the "Independent Jail Compliance Director" position was created in 2016 with "final authority to operate the Orleans Parish Jail (OJC) and all related jail facilities." *Jones v. Gusman,* No. 12 Civ. 859 (E.D. La.), "Order & Reasons," Dkt. 1311 at 2; *see also* Dkt. 1082. In 2020, after four years under the receiver had improved conditions, the Court granted an unopposed motion to terminate the position, finding "[a]ll parties agree that the Compliance Director has enabled the Orleans Parish jail to achieve material progress . . . with all provisions of the Consent Judgment[.]" *Id.* at 3.

In Miami-Dade County, the appointment of an "Independent Jail Compliance Director" in 2023 improved conditions in the 4,700-person jail. Even under a monitoring team, Miami-Dade County had failed to maintain substantial compliance with two 2013 federal consent agreements. *United States v. Miami-Dade County*, *et al*, No. 13 Civ. 21570 (S.D. Fla.). In late 2022, the parties agreed to appoint an Independent Compliance Director, Gary Raney, with "the authority to act in a wide range of areas," and this "broad authority" has been "critical in moving the right people into new positions in the jail." Decl. of Gary Raney ("Raney Decl."), ¶ 6. Mr. Raney has used his powers "to create new systems," "to direct changes in policy and practice,"

"accelerate[] the pace of reforms," and introduce an "intentionally aggressive implementation timeline for compliance." *Id.* ¶¶ 6-7. Miami-Dade is now in substantial compliance with the consent agreements. *See United States v. Miami-Dade County, et. al.*, No. 13 Civ. 21570 (S.D. Fl.), Dkt. 269-1 & 269-2 (May 1, 2024) (describing "resoundingly positive outlook" on compliance). "The Independent Compliance Director was necessary to achieve important reforms in the MCRD in short order. These changes could not be accomplished with the Monitors alone, and certainly not on the rapid timeline that we pursued." Raney Decl. ¶ 9.

The receivership over the Cook County Juvenile Temporary Detention Center ("JTDC") from 2007 to 2015 also achieved important reforms. Earl L. Dunlap was court-appointed as the Transitional Administrator ("TA") in 2007 as part of a long-running lawsuit about conditions for juveniles at the JTDC. *Jimmy Doe v. Cook County*, No. 99 Civ. 3945 (N.D. Ill.). The parties had entered into a court-approved 2002 Memorandum of Agreement ("MOA") and other reform agreements, including a "clean-up plan" to remediate failures to implement the MOA. A monitoring team supervised those agreements. But the County had cycled through several leaders and failed to make the required changes at the JTDC.

According to Mr. Dunlap, the TA succeeded in bringing the JTDC into compliance because of the unique powers he possessed as the court-appointed receiver. Decl. of Earl L. Dunlap ¶¶ 6-12. "[B]y virtue of the court orders entered in this case, the TA had significant flexibility to operate the facility," and "could overcome the incredible amount of red tape in Cook County's bureaucracy to make reforms and changes." *Id.* ¶ 8. The TA had the backing of the federal court to usher in changes and the ability "to bypass the County's lengthy and sometimes-byzantine procurement and contracting procedures." *Id.* ¶ 10. In May 2015, the court approved the end of the Transitional Administrator position, recognizing that substantial

improvements had occurred over the past seven and a half years, and that the facility was ready to be transferred to the control of the usual authority, and administered by a new Superintendent. *Id.* ¶ 12.

### 3.    Defendants' Criticisms of Receiverships Are Unpersuasive

No party believes that receivership is a "panacea" in this case. Opp. Br. 27. Receivership is a remedy of last resort that could last longer than expected, take time to improve conditions, involve unanticipated expense, or require re-alignment of leadership, as Defendants hypothesize. Opp. Br. 26-27. There are no quick or easy fixes here. Like the underlying problems that it tackles, receivership is complex and challenging. But Defendants' brief does not engage seriously with the solid record of reforms achieved in *Plata* and other systems, described above by the lawyers and receivers who implemented them. Defendants propose a continuation of the status quo, a certain path to continued failure that will be costly and dangerous. Federal courts nationwide have imposed receivers in remarkably similar cases, after years of promises by government entities and monitorships failed to achieve constitutional jails or prisons. What *Plata*, Miami, New Orleans, and Cook County (to name a few) demonstrate is that an empowered, focused receiver with the authority of the court — and the flexibility to force change that is resisted by embedded interests — is the best alternative to the chaos in the City's jails.

### B.    Analysis of the *Plata* Factors Overwhelmingly Supports the Appointment of a Receiver

Defendants' arguments regarding the *Plata* factors are also unpersuasive. Every factor continues to point toward the benefits of appointing a receiver in this case.

### 1.    Enormous Harm is Occurring to Class Members

There can be no reasonable debate about the extraordinary harm and imminent risk of harm that the Plaintiff Class faces every day.[19] The Monitor confirmed in reports last month and last week that harm is ongoing, stating that "the jails remain dangerous and unsafe, characterized by a pervasive, imminent risk of harm to both people in custody and staff," and that "staff's use of force practices create an unreasonable risk of harm[.]" Dkt. 706, at 1, 30; SFOF ¶¶ 5-6.

Defendants' attempts to challenge the Monitor's conclusions on this point are scattershot and weak. They point to a supposed decline in slashings/stabbings in 2023 compared to 2022 (which the Monitor found to be highly dubious due to reporting issues, *see* Dkt. 595 at 36; PPFOF ¶¶ 106-110); the establishment of the RESH unit (which is highly violent and dangerous, *see supra* § II(C)); and the creation of the inadequate RNDC Programs Action Plan (*id.*), among other things. They conspicuously do not point to any finding by the Monitor, or other evidence, that the Plaintiff Class is no longer experiencing severe harm and risk of harm.

The reality inside the jails is ongoing harm "caused by pervasive dysfunction in the jails' management," which "perpetuate[s] a toxic culture and a system in which none of the component parts work well or together." For this reason, "violence and a persistent pattern and practice of the use of unnecessary and excessive force"—or in other words, harm and risk of harm to the Plaintiff Class— "remain evident in the system." SFOF ¶ 4.

### 2.    Continued Lesser Measures of Remediation Are Futile and Will Lead to Further Confrontation and Delay

The City's response makes clear that lesser remedial measures are futile and will only lead to further delay. Defendants' claim that "progress is steady," Opp. Br. at 34, defies

---

[19] Indeed, Defendants did not dispute Plaintiffs' proposed finding of fact stating that: "There has been no substantial reduction in the risk of harm currently facing incarcerated individuals and DOC staff," citing to the Monitor's October and November 2023 reports. Dkt. 691 ¶ 75.

explanation given the robust record of failure before the Court. Over the life of the Consent

Judgment, the Court has been asked to credit a 14-Point Anti-Violence Reform Plan, the

Commissioner's Twelve, Mission Critical Aims, the UOF Improvement Plan, the Transfer of

Learning Initiative, the RNDC Plan, the Action Plan, RNDC and GRVC Violence Reduction

Plans, the RNDC Programs Action Plan, and myriad other policies. PPFOF ¶¶ 60-67; 117-119;

1057-1060; 1073-1076; SFOF ¶¶ 44, 263-275, 315-316. All have promised progress. None have

cured the pattern and practice of excessive and unnecessary force. *Id.* Instead, Defendants

"lurch[] from one . . . ill-conceived plan to another," never following through, a pattern most

evident in their failure to even *develop* an adequate system-wide Security Plan over two and a

half years, despite two remedial orders. PPFOF at ¶ 1054; *supra* § III(C)(1). In the six months

since Plaintiffs' opening submission, Defendants have yet to *produce* written plans they

repeatedly promise are on the horizon—much less implement them. SFOF ¶¶ 297-317.

     Nor does the record show Defendants can be trusted to sustain improvements. After

briefly moving into partial compliance with requirements to investigate and discipline use of

force misconduct, DOC backslid into noncompliance. *Supra* § III(B). Levels of force and

violence in RNDC appeared to briefly improve in 2022 but Defendants did not sustain progress,

"simply abandoned" their violence reduction plan, and conditions further "deteriorated to the

point of crisis." SFOF ¶ 44. In other instances, DOC backtracks on reforms it asked the Court to

enter as necessary relief, such as requirements to reduce awarded posts and 4x2 schedules,

offering dubious or inaccurate justifications. *Infra* § IV(B)(6).

     Defendants suggest their compliance with several basic Action Plan provisions, their

purging of the Court's December 2023 contempt order, or their improvement of intake tracking

after Plaintiffs moved for contempt, are enough to show broader substantial compliance on the

horizon. Opp. Br. at 33. But it strains credulity to claim these events are evidence of a reliable path forward to correct endemic, excessive, and unnecessary force, especially when the City has fallen so far short of other requirements—even narrow ones. Defendants' compliance with the Court's August 10, 2023 Order, for instance, has been dismal: failure to complete seven of the eight policy revisions required, failure to institute new meeting formats, recycling proposals that have proven ineffective (relying on NCU audits as a solution for staff off-post) or have previously been rejected (revisions for the Command Discipline Directive). SFOF ¶¶ 301-310. Some provisions were essentially repeats of prior court orders—such as the requirements regarding search and escort procedures, on which the Action Plan had already ordered improvement—and yet Defendants still failed to comply. *Id.* ¶¶ 303-304. These failures are all the more troubling given that the August order consisted of "immediate, *interim measures*" aided by discrete deadlines, which Defendants did not meet. *Id.* ¶ 301 (emphasis in original).[20]

Defendants attempt to distinguish this case from the decisions appointing receivers in *Plata* and *Hinds*, but in doing so quote passages that could have been written about New York City's failures here. Opp. Br. at 32. *Plata* notes that "defendants have not only shown no capacity to implement corrective plans previously submitted, but also that they either are no longer willing or able to even devise remedial programs to address the clearly identified barriers to compliance with the Orders of the Court," noting "past efforts of this Court to facilitate, cajole, and even coerce compliance, the demonstrated inability of defendants to comply substantially with this Court's previous Orders (despite many opportunities to do so), and the flawed organizational structure [of defendants]." *Plata v. Schwarzenegger*, 2005 U.S. Dist.

---

[20] Similarly, in October 2023, this Court ordered Defendants to engage with the Monitoring Team on initiatives to address risk of harm and reporting issues, and reminded Defendants of their obligations, including their obligation to develop a Security Plan. Dkt. 582. Defendants have not done so. *Supra* § III(C)(1).

LEXIS 43796, *77-78 (citing Gary W, 1990 U.S. Dist. LEXIS 1746, 1990 WL 17537 at *29-30). *Hinds* discusses "a culture of inertia so severe" that the county could not provide tables and chairs. Here, the Defendants similarly fail in basic obligations to lock cell doors, have staff tour facilities, or ensure posts are staffed. Opp. Br. at 34; *supra* § III(C).

Defendants do not point to any relief other than receivership that would remedy their ongoing noncompliance. The Action Plan was intended to be a major shift in the City's approach, to focus their resources and prioritize core issues—and it has failed. Now, Defendants merely suggest that the Court permit DOC to continue with the status quo, Opp. Br. 3, 8-9, in which they perpetually use the same deficient materials to build foundations that soon crumble. In other words, they suggest there should be *no remedy at all* for nearly a decade of non-compliance. The Court must reject this passivity and take action to protect the Plaintiff Class from ongoing harm.

### 3.        Defendants Lack the Leadership Needed to Turn the Tide

Equally problematic is the lack of adequate leadership at the executive and operational levels, which the Monitor has repeatedly identified, and Defendants have not seriously disputed. *See supra* §§ II(D), III(D). Defendants have not articulated a "bold vision," much less one that is actually "being implemented," as they claim. Opp. Br. at 36. As discussed above, the plans, meetings, focus groups, tours, and other steps that Defendants tout as "new" are, in fact, previously-failed initiatives relaunched under a new name or are long-overdue, basic measures. Senior leaders have not demonstrated that they grasp the seriousness, complexity, and underlying causes of use of force and violence in the jails. *See supra* § II(D)*.* Without leaders that can engage with the massive amount of available information to generate solutions, Defendants cannot comply with the Consent Judgment.

Moreover, Defendants' promises of full collaboration with the Monitor have already proven overblown. Five months into the new Commissioner's tenure, the City offered COBA a labor agreement, which implicates this Court's orders regarding staffing reform, without engaging with the Monitor or providing timely updates. *Infra* § IV(B)(6). In one of the first opportunities to make bold strides with a new Commissioner toward compliance on longstanding issues, Defendants demonstrate deficient leadership that is not up to the task of reform.

### 4.     Defendants Have Not Been Consistently Transparent

The Court need not find Defendants have acted in bad faith in order to appoint a receiver. Pl.'s Opening Br. at 79-82. The Court should, however, consider that Defendants' obstruction and lack of transparency led them to be found in contempt less than six months ago. *See* Dkt. 665. Though Defendants claim a newfound spirit of collaboration with the Monitor, Opp. Br. at 37, promising starts have fallen aside before. *See supra* §§ II(D), IV(B)(3).

### 5.     The Status Quo Results in a Significant Waste of Resources

Defendants do not counter Plaintiffs' showing of the myriad ways that resources are wasted by DOC's current dysfunction, including through an endless cycle of scrapping and restarting similar plans. *See* Dkt. 691 ¶¶ 652-653, 1054-1083. Instead, they say they "should not be faulted for sometimes needing to try things and pivot and shift when they are at first not successful." Opp. Br. at 38. These "pivots," however, are "antithetical to advancing reform and accelerating progress." PPFOF at ¶ 1056. Defendants' plans "alter so frequently that they are seldom fully developed before they are changed [] again." *Id.*

In a recent example, DOC created new de-escalation units to hold individuals immediately after violent incidents, but within *months*, two facilities had stopped using the units and others soon followed. SFOF ¶¶ 117-118. No one at DOC told NCU, which continued to

conduct "resource intensive" audits of the units, not realizing they were no longer in use. *Id.* ¶ 116. This is a clear example of mismanagement and waste.

Defendants waste exorbitant resources on overtime spending as a routine strategy to increase staff availability and avoid solving problems with inefficient staff scheduling and deployment and abuse of leave benefits. *Id.* ¶¶ 335-336. Defendants' use of overtime to address chronic staffing issues has significant fiscal consequences and a negative impact on staff wellness and morale. *Id.* The City's overtime spending continues to climb: for example, in 2019 the cost was $155 million; in 2023 it was $260 million. *Id.* ¶ 336. The leave system "remains vulnerable to abuse and circumvention by staff and must be constantly and closely monitored to identify and close new loopholes," including abuse of Personal Emergency and FMLA statuses, which DOC leaders report "impedes appropriate staffing in the jails." *Id.* ¶ 178.

Another waste of resources is illustrated by DOC's "Watch Tour" system of tour wands, sensors and software described in the Monitor's May 24 Report. Dkt. 712 at 4. That the City had to purchase electronics because its staff will not  perform a basic correctional task is wasteful enough. But DOC's failure to use the system to assess compliance (*id.* at 6-7) or change practice and hold staff accountable for failing to tour (*id.* at 6-14) renders the entire purchase useless.

### 6. The Appointment of a Receiver is a Relatively Efficient Remedy

The City's claim that its deference to unions is not an "impediment to reform" is belied by the record. Opp. Br. at 38. In addition to the longstanding resistance to expansion of hiring pools to external candidates and other examples detailed in Plaintiffs' opening brief (at 88), more recently, the Monitor described the unions' intervention in DOC's revision of the Command Discipline directive. SFOF ¶ 310. DOC afforded the unions multiple opportunities to comment on the current policy. *Id.* After DOC removed certain changes to the policy, those changes

reappeared in subsequent drafts without basis. *Id.* As the Monitor noted, nearly all successive versions of the CD Directive proposed revisions that would further expand the use of CDs in response to more serious misconduct. *Id.*

The most recent example of the effect of political and union influence is the issue of awarded posts and 4x2 versus 5x2 scheduling. First, Defendants' formal position to the Court and Monitor was that labor agreements posed no impediment to reducing awarded posts and 4x2 schedules, even as DOC managers internally said the opposite and refused to reduce awarded posts. SFOF ¶¶ 184, 189-194. Then the City suddenly reversed course on awarded posts and 5x2 schedules, reforms they once claimed necessary. *Supra* § III(F).

As to 5x2 scheduling, the City simply took no steps to engage whatever labor agreements made 5x2 schedules functionally worse in DOC than 4x2 schedules after identifying those agreements, which "cannot and should not serve as a defense to reducing the reliance on the 4x2 schedule." Monitor Apr. 18, 2023 Rep. at 270. As to awarded posts, the City would have the Court believe that contrary to its position at the time the Action Plan was entered, awarded posts are now necessary for steady staffing, a view with which the Monitor disagrees.[21] Maginley-Liddie Decl. ¶¶ 61-62; Edwards Decl. ¶ 8; SFOF ¶¶ 199-200. Indeed, DOC's data belies that claim: though the purpose of this Court's steady staffing orders is to meet the "critical need for proper supervision and support to incarcerated individuals on housing units," *Id.* ¶ 188, that is not how DOC uses awarded posts—the majority are not in housing units or interacting with people in custody. *Id.* Defendants have another motivation: as they admit, awarded posts are an incentive for staff. *Id.* ¶ 199.

---

[21] Moreover, the City cites officers in new admission intake (in EMTC) as an example of awarded post successes Maginley-Liddie Decl. ¶ 61. But as the Monitor's May 2024 report reveals, there are no officers with awarded posts in EMTC—and the 8 EMTC captains with awarded posts appear to be in housing units, not intake. SFOF ¶ 201.

Next, Defendants squandered their opportunity to fix these key staffing issues through the new labor contract. They offered COBA a contract that was reportedly silent on labor barriers that may impede employing industry-standard 5x2 schedules and, it appears, did not reduce awarded posts. Ex. 170 at 1. Defendants also left the Monitor out of the loop: after telling the Monitor in April 2024 that the last substantive negotiation with COBA had been months prior and that no future meetings were planned, in May 2024 Defendants abruptly informed him that an agreement in principle had been reached. SFOF ¶ 204. By leaving the Monitor in the dark about labor negotiations and then failing to use the contract re-negotiation to address important *Nunez* issues, Defendants have made clear they cannot overcome political barriers to reform.

A receiver could avoid this political influence and unduly protracted process by still consulting with the unions, but ultimately taking the action that best furthers compliance with the Court's orders, whether or not it is politically convenient. *See, e.g.*, Dunlap Decl. ¶¶ 9, 11. Independence from the City's political concerns will enable a receiver to more efficiently implement Monitor recommendations and Court orders, such as those surrounding staffing reforms, that the City has not.

Furthermore, various forms of bureaucracy and red tape have been obstacles to important tasks like hiring key leaders, hiring sufficient Investigation Division and Trials Division staff, and making funding available for programming. SFOF ¶¶ 254, 331, 333, 341. These are exactly the types of obstacles a receiver is best suited to overcome. *See* Raney Decl.¶¶ 6-7; Specter Decl. ¶ 18, Dunlap Decl. ¶¶ 8-11; *supra* § IV(A).

### C.    The Proposed Receivership Complies with the PLRA Because it is Tailored to the Scope of Defendants' Violations of the Constitution and this Court's Orders

Defendants claim that the scope of receivership goes beyond what is permitted under the PLRA, 18 U.S.C. 3626(a)(1), when in reality, the breadth of this remedy is specifically tailored

to the extraordinary record here. In describing the breadth of powers granted to the receiver in Plaintiffs' Proposed Order, Defendants omit the key limitation: that the receiver's powers would extend *only* as far as necessary to achieve substantial compliance with the existing Court's orders (Dkt. 606, I.A, II.A, II.B)—something Defendants have been unable to do despite seven remedial orders and eight years of Monitoring.

The receiver must have authority to change many agency functions, including policy, procurement, and personnel, because DOC is in a "depth of dysfunction, created over decades of mismanagement, that permeates the entire system" leading to "a number of interrelated 'problem centers' for which the solution to each is dependent upon finding the solution to some, if not all, of the others." PPFOF at ¶ 1175. When the *Plata* court confronted this precise situation, it concluded that a powerful receivership was consistent with the PLRA because "[i]f the system is not dramatically overhauled," an "unconscionable degree of suffering and death is sure to continue." *Plata*, 603 F. 3d 1088, 1092-98 (9th Cir. 2010).

Defendants' only alternative proposal is for the Court to turn a blind eye to years of constitutional violations and wait to see if Commissioner Maginley-Liddie can single-handedly bring the Defendants into compliance where every other Commissioner has failed. The Court has heard this proposal before and has given Defendants every opportunity for this approach to bear fruit—to no avail. It is time for more comprehensive change.

## V.    CONCLUSION

After eight years of entrenched dysfunction and harm to the Plaintiff Class, Defendants have shown they are unwilling or unable to implement this Court's Orders. This Court should grant Plaintiffs' motion, find Defendants in civil contempt, and appoint a receiver to take the steps necessary for lasting change.

Dated:  May 30, 2024
        New York, New York

THE LEGAL AID SOCIETY

By: /s/_____
Mary Lynne Werlwas
Kayla Simpson
Katherine Haas
Sophia Gebreselassie
49 Thomas Street, 10th Floor
New York, New York 10013
(212) 577-3300


*Attorneys for Plaintiff Class*

EMERY CELLI BRINCKERHOFF
ABADY WARD & MAAZEL LLP

By: /s/_____
Jonathan Abady
Debra L. Greenberger
Katherine Rosenfeld
Vasudha Talla
Sana Mayat
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000