# Status Report by the *Nunez* Independent Monitor

June 27, 2024

### THE NUNEZ MONITORING TEAM

Steve J. Martin
*Monitor*

Kelly Dedel, Ph.D.
*Subject Matter Expert*

Anna E. Friedberg
*Deputy Monitor*

Dennis O. Gonzalez
*Director*

Patrick Hurley
*Subject Matter Expert*

Alycia M. Karlovich
*Associate*

Emmitt Sparkman
*Subject Matter Expert*

## Table of Contents

**Introduction** ..................................................................................................................1

**Current State of Affairs** ................................................................................................1

**Updates on Various Operational Matters** ..................................................................4

- Suspension of Body Worn Cameras ................................................................... 4
- Revised Security Plan .......................................................................................... 5
- Post Analysis........................................................................................................ 5
- COBA Contract Ratified...................................................................................... 6
- Meet and Confers ................................................................................................. 6

**Next Steps**......................................................................................................................6

**Conclusion**.....................................................................................................................7

# INTRODUCTION

This is the fourth report filed by the Monitoring Team in 2024. The purpose of this report is to provide a neutral and independent assessment of the current state of affairs in order to update the Court in advance of the status conference on July 9, 2024. Given the Monitor's frequent reporting during the past six months, there are no significant updates regarding the Department's progress. The Monitor's Reports filed on February 26, 2024 (dkt. 679), April 18, 2024 (dkt. 706), and May 24, 2024 (dkt. 712) continue to accurately describe the current state of affairs.

# CURRENT STATE OF AFFAIRS

The work to reform the Department is complex, overwhelming, and daunting. As the Monitoring Team has repeatedly reported, implementing the necessary reforms requires a paradigm shift to catalyze the necessary momentum to change practice and create a safe environment for those incarcerated and staff. The Department has tried to implement many of the reforms outlined in the *Nunez* Court Orders but thus far these efforts have moved at a glacial pace and, consequently, the Department has only successfully remediated a very small number of its fundamental deficiencies. The past eight years of monitoring have consistently revealed that the Department continues to face critical barriers, both internal and external, in its effort to improve the conditions of the jails. Its decades of poor practice have produced and solidified a maladaptive culture in which deficiencies are normalized and embedded in every facet of day-to-day operations, trapping the Department in a state of persistent dysfunction. Many of the core, basic requirements of correctional management are simply absent.

The Department's lack of transparency, reticence and failure to consult and collaborate with the Monitoring Team that characterized much of 2023 (and parts of 2022) have essentially

been eliminated with the current Commissioner's appointment. The Department is actively engaged with the Monitoring Team. Importantly, the Commissioner and the current leadership team appear to be focused on the most salient issues. The Commissioner and her team have also identified several initiatives that they hope to develop to further advance the reforms and that appear promising if implemented with fidelity.

Nevertheless, the jails remain dangerous and unsafe, characterized by a pervasive, imminent risk of harm to both people in custody and staff. This risk of harm is caused by widespread dysfunction in the jails' management resulting from polycentric and interdependent issues including, but not limited to, a broad failure to utilize sound correctional security practices for even the most basic tasks, limited staff supervision and poor-quality guidance, and a persistent failure to identify misconduct and to apply appropriate accountability. These failures perpetuate a toxic culture and a system in which none of the component parts work well or together. As a result, violence and a persistent pattern and practice of the use of unnecessary and excessive force remain evident in the system.

Implementing basic foundational practices is the first step to successfully achieving reform. The most <u>basic</u> elements of care and custody, including rudimentary practices necessary to minimize the risk of harm in the system, remain elusive. It is impossible for the Department to improve the practices targeted by the Consent Judgment (and other *Nunez* Court Orders) without first addressing four foundational issues: (1) ineffective staff management, supervision, and deployment; (2) poor security practices; (3) inadequate management of persons in custody; and (4) limited and protracted discipline for staff misconduct. Further, the *Nunez* Court Orders collectively require compliance with hundreds of interconnected provisions. It is challenging for Department leadership to prioritize initiatives, consolidate resources, and track progress given

the breadth and number of requirements. The current framework is not sustainable, and a more carefully designed and targeted approach to streamlining the requirements of the *Nunez* Court Orders is needed.[1]

The requirements of the *Nunez* Court Orders, and the overarching goals of the Consent Judgment, will not be achieved until the Department has a stable and secure foundation upon which subsequent improvements can be built. Advancements are unlikely without a robust corps of leaders at all levels who possess the necessary expertise and commitment to reform. While the Department has made some progress in recruiting and hiring individuals for leadership positions, many critical posts remain vacant, and retention remains a challenge. As noted in prior reports, the reform effort necessarily requires significant support and expertise and the number of qualified individuals to develop, manage, and implement the many reforms required by the *Nunez* Court Orders remains insufficient. Further, the limited and poor quality of staff supervision provided by the facilities' Captains and ADWs and the fact that the Department has fewer supervisory ranks than most systems continue to stymie the reform effort.[2] Supervisors must be equipped, capable, and willing to provide high-quality coaching to staff to ensure accountability for good practices related to proactive supervision of persons in custody, basic security procedures and de-escalation.

There is no question that elevating practice in the jails to meet constitutionally adequate safety and care is a significant undertaking, and for this Department, even addressing the most basic foundational elements is exceedingly difficult. Crucially, the additional work to implement

---

[1] This is described in more detail in the Streamlining the *Nunez* Court Orders section of the Monitor's April 18, 2024 Report at pgs. 166-167.

[2] This is described in more detail in the Monitor's April 18, 2024 Report at pgs. 13-14 and 64-68.

3

and institutionalize the reforms required by the Consent Judgment cannot begin or be sustained without these foundational elements. Reforming the system will take far longer than the urgency of the situation demands. The City and Department must focus on the foundational elements and must accelerate their trajectory. Once on solid footing, the Department can begin to expand the reform effort to address the additional requirements of the *Nunez* Court Orders and other necessary reforms.

## UPDATES ON VARIOUS OPERATIONAL MATTERS

The following is provided to update the Court on a few discrete matters that have evolved since the Monitor's May 24, 2024 Report.

- **<u>Suspension of Body Worn Cameras</u>**: The use of body worn cameras ("BWC") to capture incidents in the jails is critical because the video footage and audio recordings have proven invaluable to determining what occurred. Unfortunately, staffs' use of BWC has not always been consistent. Beginning in late 2022, the Department's Rapid Reviews and Intake Investigations frequently identified that staff were not utilizing BWC as required, due at least in part to an insufficient inventory of camera backings such that officers could not attach them to their uniforms. The effort to obtain additional backings remains quite protracted, but the Department has reported it now has funding to ensure that each staff member can be assigned their own personal backing. Even as the supply of backings has increased, BWC practices continued to falter as staff do not always wear or activate their BWC when required. Separate from those issues, the Department suspended the use of BWC on May 3, 2024 following an incident where a BWC unit caught fire and injured a staff member. As a result of this incident, the Department requested that the manufacturer evaluate each BWC to determine whether it should still be in service. The

4

evaluation is ongoing, and it has already revealed hundreds of cameras that must be removed from service because they have exceeded the manufacturer's recommended life span. The manufacturer is expected to require at least 10 more weeks to review the entire inventory of BWCs. Given the value of BWC in the prevention, detection and response to the excessive use of force, the Monitoring Team has strongly encouraged the Department to reinstate the use of BWC as soon as possible,[3] to ensure a sufficient inventory of backings, and to continue to hold staff accountable for using them properly.

- **Revised Security Plan**: On June 24, 2024, the Department produced an updated Security Plan to the Monitoring Team for review and feedback.[4] The Monitoring Team intends to share feedback once it has closely evaluated the plan.

- **Post Analysis**: The Department, after a two-year delay, has finally begun *planning* for a post analysis as required by Action Plan § C ¶ 3 (viii), ordered in June of 2022. The purpose of the post analysis is to identify the specific posts that require a uniform staff member in order to operate the jails safely and efficiently. This analysis will require the individuals conducting it to develop a nuanced understanding of the Department's inner workings, including its staffing conventions, posts, and positions that need coverage by a certain number of people at a given time, union contracts, etc. In particular, the analysis will need to confront the various ways in which the Department's practices differ from typical correctional staffing conventions (e.g., that a 5x2 schedule currently provides staff additional days off to equalize it with the 4x2 schedule) and ways in which practices may

---

[3] For instance, the use of BWC could return on a rolling basis to critical areas as the manufacturer assesses the remaining inventory.

[4] The Department first shared an updated Security Plan on May 23, 2024, but shortly after its submission the Department reported the plan was being revised. Consequently, the Monitoring Team did not provide feedback on the May 23, 2024 Security Plan.

depart from what is present in policy (e.g., the disparity between the awarded post policy and how it is practiced). This understanding is needed for a reliable and credible analysis and to help the Department unpack its deeply entrenched staffing practices, many of which are convoluted, complicated and dysfunctional. The Department has not yet reported a timeline for initiating the post analysis and the Monitoring Team has requested consultation prior to beginning the analysis. The Monitoring Team is gathering information in order to both support this process and to ensure the Monitoring Team can adequately monitor the progress of the analysis.

- **COBA Contract Ratified**: The membership of the Correction Officers' Benevolent Association (the union that represents Correction Officers) ratified its contract with the City of New York and the contract is now in effect. The contract covers the period March 1, 2022 through April 30, 2027.

- **Meet and Confers**: The Monitoring Team has facilitated a number of meet and confers among the Parties in an attempt to resolve the disputes related to Plaintiffs' motion for contempt, to identify those matters that will require resolution by the Court, and to otherwise address the issues outlined in the Court's June 6, 2024 Order (dkt. 725). The Monitoring Team has also been actively engaged with the Parties regarding the City's proposed motion related to Local Law 42 and potential next steps. These discussions have identified a number of issues that require further discussion and evaluation. This work remains ongoing.

## NEXT STEPS

Complex motion practice— Plaintiffs' motion for contempt and appointment of a Receiver — remains pending before the Court. Depending on how the issues are decided by the

Court, this motion practice has serious implications for the jails' management going forward. The timeline for resolving this legal matter and ultimate resolution is unknown. The omni-present uncertainty of these issues impacts all facets of the Department's operations.

Regarding the work to be undertaken in advance of the Status Conference, the Monitoring Team will continue to actively engage with the Parties to facilitate the meet and confer process regarding the Motion for Contempt, per the Court's June 6, 2024 Order. A joint status report on the outstanding matters in dispute will be filed on July 2, 2024, pursuant to the Court's June 6, 2024 Order. On July 3, 2024, the Monitoring Team will submit a proposed agenda for the Court Conference on July 9, 2024.

With respect to future reporting and proceedings before the Court, the Monitoring Team recommends the following schedule:

- September 26, 2024: Status Report to the Court by the Monitoring Team
- November 21, 2024: Monitor's Report pursuant to Court's April 29, 2024 Order (dkt. 709)
- Early December 2024: Status Conference before the Court

The Monitoring Team intends to consult with the Parties about the proposed schedule in advance of the status conference on July 9, 2024.

## CONCLUSION

The Monitoring Team remains deeply concerned about the conditions in the jails and the Department's slow progress toward reform. A focused and directed plan for building the necessary foundation for the Department and managing the necessary resources to implement any such plan is imperative. The resolution of the pending litigation regarding the motion for

contempt will be critical to charting that path forward. The Monitoring Team remains committed to supporting the reform efforts with all stakeholders and the Court.