# Exhibit B

[Redacted]

| Paragraph in Plaintiffs' Proposed Finding of Fact | Text of Proposed Fact | Nature of Dispute |
|---|---|---|
| 13 | The Monitor has filed at least 50 reports with the Court covering the period of October 22, 2015 to November 8, 2023. 11/9/2023 Martin Decl. at ¶ 8 & Ex. G. The reports are drafted by the Monitor and his team, reflecting his professional judgment and expertise in monitoring the jails, and include facts and information provided by DOC and analyses by the Monitor and his team. *Id.* The reports detail the steps taken by the Monitoring Team to assess compliance and the factual basis for the Monitor's findings. *Id.* Their observations and the supporting facts and information relating to these observations are developed after careful review and consideration to provide a proper basis for establishing the level of compliance and any recommendations for appropriate remedial action necessary to fulfill the aims of the Court's Orders. *Id.* | Legal Dispute - Materiality |
| 16 | The Monitor's written submissions to the Court via letters and reports reflect his work, along with the Monitoring Team's, that to the best of his ability is accurate, neutral, independent, balanced, objective, fair, reasonable, and presents reasonable and responsible assessments of the work of DOC. 11/9/2023 Martin Decl. at ¶ 9. | Legal Dispute - Materiality |
| 29 | On June 3, 2021, the Monitor filed a Second Remedial Order Report confirming that the non-compliance had continued, and that, "in nearly every substantive area of the Consent Judgment, the Department's practices remain problematic, and progress remains insufficient." *See* Dkt. 373 at 4. | Legal Dispute - Monitor Opinion |
| 45 | The Eleventh Monitor's Report (Dkt. 368), the Second Remedial Order Report (Dkt. 373), and the Status Report on Use of Force Discipline dated September 30, 2021 (Dkt. 399), detailed DOC's ongoing failure to achieve substantial compliance with the Consent Judgment's requirement to "impose appropriate and meaningful discipline" (Section VIII, Paragraph 1), and the First Remedial Order's requirements regarding "timely, meaningful, and appropriate staff accountability" (Section C). | Legal Dispute - Monitor Opinion |
| 54 | On December 6, 2021, the Monitor submitted a Twelfth Report (Dkt. 431) covering the period of January 1, 2021 to June 30, 2021 ("Monitor's Twelfth Rep."); on December 22, 2021, the Monitor submitted a Third Remedial Order Report (Dkt. 435); and on March 16, 2022, the Monitor submitted a Special Report (Monitor's Mar. 16, 2022 Rep.) (Dkt. 438). These three reports continued to report DOC's longstanding noncompliance with key provisions of the Consent Judgment and Remedial Orders. | Legal Dispute - Monitor Opinion |
| 55 | The Monitor's Twelfth Rep. identified four foundational patterns and practices that created an unsafe environment for incarcerated individuals and DOC staff: (a) Security practices and procedures—including failure to secure doors, poor situational awareness, frequent and excessive use of emergency response teams, overreliance on intake—that are deeply flawed, inconsistent with best practice and, in some cases, illogical; (b) inadequate supervision of line staff and facility leadership who do not possess the requisite expertise and ability to lead; (c) staffing practices and procedures that have resulted in ineffective deployment across the agency; and (d) Limited, and extremely delayed, accountability for staff misconduct. Monitor's Twelfth Rep. at 12. To ensure that the Consent Judgment could be implemented, and to eliminate the unsafe conditions of confinement, the Monitor recommended that DOC improve security practices; appoint facility leaders, including a security operations manager, with deep correctional expertise; improve management and deployment of staff; eliminate the backlog of disciplinary cases; and ensure timely accountability for staff misconduct. *Id.* at 13-14. | Legal Dispute - Monitor Opinion |
| 56 | Within three months of the Twelfth Rep., the Monitor's March 16, 2022 report noted that, despite the entry of the Second Remedial Order in September 2021, DOC's attempts to implement the required remedial steps faltered, and in some instances regressed. Monitor's Mar. 16, 2022 Rep. at 1. The Monitor noted that DOC's staffing crises, excessive staff absenteeism, and dysfunctional staff management and deployment practices, if left unaddressed, made systemic reform elusive, if not impossible, to obtain. *Id.* The Monitor found that DOC staff and supervisors lacked elementary skills and did not adequately supervise subordinates, did not implement security plans intended to address the immediate security problems, and incarcerated individuals remained in intake for lengthy periods of time. Since January 2022, DOC essentially eliminated a proactive and collaborative approach with the Monitoring Team in its compliance efforts, reduced its level of cooperation, and limited its information-sharing and access in ways that inhibited the work of the Monitoring Team. *Id.* at 25. | Legal Dispute - Monitor Opinion |
| 76 | High rates of violence, high use of force rates, the continued prevalence of excessive and unnecessary force, and apathetic and slipshod security practices frequently produce chaos, trauma, injuries, and, in some cases, death. *See* Monitor's Nov. 8, 2023 Rep. at 2. | Legal Dispute - Monitor Opinion |
| 77 | The unsafe and dangerous conditions in the jails, characterized by unprecedented rates of use of force and violence, have become normalized despite the fact that they are clearly abnormal. Monitor's Oct. 5, 2023 Rep. at 24-25; Monitor's Nov. 8, 2023 Rep. at 1 (problems remain pervasive and rampant in the jails). | Legal Dispute - Monitor Opinion |
| 78 | In a single week from September 11, 2023 to September 17, 2023, 145 uses of force, 12 stabbings/slashings, 74 fights among incarcerated individuals, 48 individuals engaged in self-injurious behavior, 3 medical emergencies, 5 individuals that received Narcan, 15 fires, 34 assaults on staff, and 19 serious injuries were reported to DOC's Central Operations Desk (hereinafter "COD"). Monitor's Oct. 5, 2023 Rep. at 17 & App. C. One incarcerated individual was left unattended in a recreation yard. *Id.* And a significant amount of contraband, including weapons, drugs, and cell phones, was recovered. *Id.* | Legal Dispute - Materiality |
| 79 | DOC quantitative indicators are likely an undercount because staff reporting of serious incidents is unreliable. Monitor's October 5, 2023 Rep. at 10; Monitor's Nov. 8, 2023 Rep. at 3 (significant incidents unreported or reported only after delay); *id.* (Monitor no longer has confidence in accuracy of DOC data on stabbings/slashings). | Legal Dispute - Monitor Opinion |

| | | |
|---|---|---|
| 84 | In November 2023, the Monitor found that DOC's problems with defining and categorizing incidents, the protocols for reporting incidents, and the integrity of several incident tracking systems had critically undercut the Monitor's confidence in the accuracy of DOC's quantitative data such that the accuracy of past findings regarding changes to the rates of key metrics cannot be assured. *See* Monitor's Nov. 8, 2023 Rep. at 35. The Court ordered DOC, by September 30, 2023, to develop a set of data and metrics for use of force, security and violence indicators, and to permit the Monitoring Team to observe meetings where such information is evaluated. Dkt. 564 at § I, ¶ 1. | Legal Dispute - Materiality |
| 85 | In 2016, there were 4,652 use of force incidents, which climbed to 8,184 incidents in 2021, 7,005 incidents in 2022, and 2,718 incidents in the first five months of 2023. *See* Monitor's July 10, 2023 Rep. at 181. | Legal Dispute - Materiality |
| 86 | The use of force rate – adjusted for average daily population – was 3.96 uses of force per 100 incarcerated people in 2016, and 10.34 in 2022. *Id.* | Legal Dispute - Materiality |
| 87 | DOC's average monthly use of force rate from the most recent five-month period (January-May 2023) was 9.13, which is 131% higher than the average monthly use of force rate at the inception of the Consent Judgment in 2016, which was 3.96. *See* Monitor's July 10, 2023 Rep. at 15, 181.[1] | Legal Dispute - Materiality |
| 92 | In 2016, 74 use of force incidents (or about 2% of total reported use of force incidents that year) were classified as Class A incidents. *See* Monitor's Apr. 3, 2023 Rep. at 49. By contrast, in 2022, 434 use of force incidents (or about 6% of total use of force incidents that year) were classified as Class A incidents. *See* Monitor's Apr. 3, 2023 Rep. at 49. | Legal Dispute - Materiality |
| 96 | These statistics are likely an undercount because serious injuries are often unreported or only reported after a significant delay. Monitor's Oct. 5, 2023 Rep. at 11. First, staff do not reliably report to the COD the underlying incident during which an injury is sustained at the time the incident occurred. *Id.* Second, COD reports are not reliably or timely amended to include a serious injury upon receiving an injury assessment from Correctional Health Services (hereinafter "CHS"). *Id.* at 11-12. Third, DOC does not separately report to COD when incarcerated people are transported to the hospital, such that no centralized, electronic record exists of these events. *Id.* at 12. | Legal Dispute - Monitor Opinion |
| 97 | DOC has no failsafe to ensure that all incidents with serious injuries are reported. *Id.* | Legal Dispute - Monitor Opinion |
| 104 | DOC's average monthly rate of stabbings/slashings during the most recent five-month period (January-May 2023) was 0.48, which is 243% higher than the average monthly rate of stabbings/slashings at the inception of the Consent Judgment in 2016, which was 0.14. *See* Monitor's July 10, 2023 Rep. at 55, 184. | Legal Dispute - Monitor Opinion |
| 105 | COD's definition of "slashing" as "slashing injuries sustained by inmates," and the definition of "stabbing" as "stabbing injuries sustained by inmates," are circular and do not permit proper categorization of incidents. *See* Monitor's Nov. 8, 2023 Rep. at 31. These definitions are also inconsistent with the definitions developed in response to the Consent Judgment, which defines stabbing/slashing as "the use of a sharp instrument to cut an inmate's body with a sweeping stroke, or the use of a sharp instrument to pierce an inmate's body." *Id.* | Legal Dispute - Monitor Opinion |
| 107 | After issuance of this memorandum, the number of reported stabbings/slashings dropped 49% from January to February 2023, with no corresponding change in security practices or operations that would explain such a drop. *Id.* at 32. | Legal Dispute - Monitor Opinion |
| 108 | The number of reported stabbings/slashings in DOC should be seen as a floor, not a ceiling, given that DOC's definitions of stabbings/slashings are poorly drawn and leave much to the discretion of individual staff. *Id.* at 36. | Legal Dispute - Monitor Opinion |
| 111 | In 2016, there were 6,006 fights among incarcerated people systemwide, while, in 2021, there were 6,204 fights and, in 2022, there were 5,835 fights. During the first five months of 2023 (January-May), there were 2,396 fights, putting DOC on track for 5,750 fights this year. *See* Monitor's July 10, 2023 Rep. at 187. | Legal Dispute - Materiality |
| 112 | DOC's average monthly rate of fights during the most recent five-month period (January-May 2023) was 8.05, which is 58% higher than the average monthly rate of fights at the inception of the Consent Judgment in 2016, which was 5.11. *See* Monitor's July 10, 2023 Rep. at 56, 187. | Legal Dispute - Materiality |
| 113 | However, data from RESH was not entered in the Fight Tracker in August and September 2023. *See* Monitor's Nov. 8, 2023 Rep. at 34. DOC was unaware of this problem until the Monitor requested the data and DOC learned that it did not exist. *Id.* | Legal Dispute - Monitor Opinion |
| 114 | Even at GRVC, where DOC has been implementing a violence reduction plan, there has been no reduction in violence. In 2016, there were 556 use of force incidents, while in 2022, there were 1,445 use of force incidents, and for the first five months of 2023, there were 442 use of force incidents. In 2016, there were 12 stabbings/slashings, in 2022, there were 157 stabbings/slashings, and for the first five months of 2023, there were 42 stabbings/slashings. In 2016, there were 267 fights, in 2022, there were 605 fights, and in the first five months of 2023, there were 228 fights. Thus far in 2023, the monthly average use of force rate is 10.7, the monthly average rate of stabbings/slashings is 1.01, and the monthly average rate of fights is 5.5. These indicators in 2016 consisted of the following: UOF = 6.91; Stabbings/Slashings = 0.15; Fights =3:32. *See* Monitor's July 10, 2023 Rep. at 60, 182, 184, 187. | Legal Dispute - Materiality |
| 115 | Though the Action Plan required DOC to create a violence reduction plan for AMKC, DOC did not do so. *See* Monitor's Nov. 8, 2023 Rep. at 64. In 2016, there were 643 use of force incidents at AMKC, while in 2022, there were 1,776 use of force incidents, and for the first five months of 2023, there were 889 use of force incidents. In 2016, there were 27 stabbings/slashings; in 2022 there were 98 stabbings/slashings; and for the first five months of 2023, there were 52 stabbings/slashings. In 2016, there were 1,303 fights; in 2022, there were 1,601 fights; and in the first five months of 2023, there were 880 fights. Thus far in 2023, the average monthly use of force rate is 9.13 (compared to 2.42 in 2016 and 7.27 in 2022), the average monthly rate of stabbings/slashings is 0.53 (compared to 0.10 in 2016 and 0.4 in 2022), and the average rate of fights is 9.01 (compared to 4.91 in 2016 and 6.59 in 2022). *See* Monitor's July 10, 2023 Rep. at 60, 182, 185, 188. | Legal Dispute - Materiality |

| | | |
|---|---|---|
| 117 | With respect to RNDC (as well as GRVC), although the Department targeted these two facilities with intensive violence reduction strategies, their initially positive impact has eroded and both facilities are again mired in high rates of violence and disorder; in continued challenges to ensuring that the facility is properly staffed; and in surrounding degradation in sanitation. Monitor's Oct. 5, 2023 Rep. at 5. | Legal Dispute - Monitor Opinion |
| 118 | Although the RNDC and GRVC Violence Reduction Plans initially catalyzed some improvement, they were not sustained, and the safety of both facilities has significantly worsened. Monitor's Nov. 8, 2023 Rep. at 3. | Legal Dispute - Monitor Opinion |
| 119 | The RNDC and GRVC violence reduction plans were ultimately abandoned with seemingly little attention to which parts were effective and why. Monitor's Nov. 8, 2023 Rep. at 17. | Legal Dispute - Monitor Opinion |
| 120 | In June 2023, DOC opened new restrictive housing units (RESH) in a new physical plant, with a new policy that emphasizes extensive security protocols and programming engagement, an allocation of leadership positions precisely for the units, specifically selected uniformed and programming staff, a specialized training curriculum, and low staffing ratios. Monitor's Oct. 5, 2023 Rep. at 6. In July and August, RESH had the highest UOF rate in the Department and the largest number of stabbings and slashings of any command. *Id.* The physical plant has deteriorated, sanitation is poor, staffing is inadequate, programming does not occur as planned, contraband and weapons are pervasive, open drug use occurs, and the high levels of violence and fear lead people to choose to stay in their cells throughout the day. *Id.* at 6-7; Monitor's Nov. 8, 2023 Rep. at 4. | Legal Dispute - Monitor Opinion |
| 123 | As of November 17, 2023, nine people have died in Defendants' custody this year. In August 2023, the Monitor observed "a review of video footage related to five of the seven deaths [in 2023] revealed that the surrounding circumstances were not particularly unusual or unique, but instead were typical of the variety of security problems that plague all the Department's housing units. These include security lapses like unsecured doors, individuals in unauthorized areas, superficial Officer and Supervisor tours, and staff being off-post or providing inadequate supervision. Alarmingly, many of these practices appear to have become normalized and staff seemingly fail to recognize the resulting safety risks or the ways in which these practices elevate the likelihood of a tragic outcome." Monitor's Oct. 5, 2023 Rep. at 4-5. | Legal Dispute - Monitor Opinion |
| 138 | Mr. Zhao began pacing along the top tier, around 2:13 p.m., during the captain's insufficient tour. *Id.* at 10-11. | Legal Dispute - Materiality |
| 219 | In July 2023, the Monitor stated that his "assesessment of recent use of force incidents also indicates that the proportion of incidents involving the excessive and/or unnecessary use of force is currently the same, if not higher, than the proportion of incidents involving the excessive and/or unnecessary use of force that was observed at the time the Consent Judgment went into effect[.]" Monitor's Jul. 10, 2023 Rep. at 16. | Legal Dispute - Monitor Opinion |
| 220 | Neither the seriousness nor the frequency of the excessive use of force has abated since 2016. *See* Monitor's Nov. 8, 2023 Rep. at 3; Monitor's July 10, 2023 Rep. at 15-16; Monitor's June 8, 2023 Rep. at 8-9. | Legal Dispute - Monitor Opinion; Legal Dispute - Materiality |
| 228 | Rapid Reviews determined that 17 percent of incidents were "avoidable" and 43 percent involved procedural violations during the Fifteenth Monitoring Period (July through December 2022). The Monitor found that this demonstrates "that staff are not applying the requisite skill set and decision-making needed to decrease the use of force rate." Monitor's Apr. 3, 2023 Rep. at 125 | Legal Dispute - Monitor Opinion |
| 240 | The Monitor has found that "the prevalence of misconduct" that is reflected in outcomes of Intake Investigations and Full ID Investigations must be "considered a floor, not a ceiling" because "ID does not consistently or reliably identify all misconduct." Monitor's Nov. 8, 2023 Rep. at 12-13, 93-94; July 10, 2023 Rep. at 20. "This is particularly true for the proportion of cases deemed problematic in 2022 and 2023 due to a concerning decline in the quality of investigations produced by ID." Monitor's Nov. 8, 2023 Rep. at 94. | Legal Dispute - Monitor Opinion |
| 245 | Since the Consent Judgment was entered, DOC have used, and continue to use, prohibited use of force techniques on incarcerated individuals in violation of the Use of Force Directive. *See infra* ¶¶ 246-252. | Legal Dispute - Monitor Opinion |
| 259 | There are several examples of UOF incidents involving provocatory language, offensive language, or complicit conduct among staff in 2022 and 2023. *See infra* ¶¶ 270-272, 276, 278, 411, 443-445, 448, 455, 458, 509, 622-623. | Legal Dispute - Other |
| 261 | The Monitor identified procedural and security failures across ranks that contributed to this incident or failed to properly document it afterward. The Monitor stated that an officer was disciplined for "improper escort;" two additional officers were disciplined for "failure to secure a door;" a captain was disciplined for not reporting the second use of force incident in which the serious injuries occurred; and an ADW was disciplined for failing to report Mr. James's transport via EMS and the seriousness of his injuries. *See* Monitor's June 12, 2023 Letter to the Court at 4, 10-11. One officer was suspended by the facility on May 11, 2023 for 10 days. Monitor's Nov. 8, 2023 Rep. at 98. The ID Investigation is pending; DOI appears to be investigating. *Id.* | Legal Dispute - Monitor Opinion |
| 283 | DOC's security failures contribute to the high risk of harm facing the Plaintiff Class, unsafe conditions, and, combined with the failure to deliver services consistently, the high levels of frustration for incarcerated individuals. Monitor's Oct. 5, 2023 Rep. at 4. High levels of violence inside the jails inevitably lead to high rates of use of force. As the Monitor has explained, "when the level of violence is high, so too will be staff applications of force as staff must intervene to interrupt an assault. Furthermore, when Staff are threatened (regardless of the level of threat or whether the threat is generated by a legitimate grievance), applications of force further increase." Monitor's Twelfth Rep. at 19. "[F]ear, threat, and violence is the inevitable outcome of a pervasively unsafe setting manifested by extraordinarily high levels of assaults and incidents of use of force." Monitor's Twelfth Rep. at 19. "The jails' unsafe environments . . . trigger a vicious cycle of fear, stress, trauma and violence." Monitor's Twelfth Rep. at 21. For that reason, significantly reducing the level of both violence and use of force in the jails is "a precondition to the maintenance of a normalized and predictable setting in which both staff and incarcerated individuals can function." Monitor's Twelfth Rep. at 19. | Legal Dispute - Monitor Opinion |

| | | |
|---|---|---|
| 286 | DOC's staff's failure to adhere to basic safety measures, including failing to secure doors, allowing incarcerated people in restricted areas, and applying restraints improperly, created or contributed to the need to use of force. Monitor's Fifth Rep. at 21-22. The poor operational procedures, including failure to secure doors and failing to adhere to lock-in times, created a state of turmoil in the facilities, including violence and physical encounters between and among people in custody and staff. Monitor's Eleventh Rep. at 23-25, 40-42, 122; Monitor's Twelfth Rep. at 19. | Legal Dispute - Monitor Opinion |
| 287 | Between the Fifth Monitoring Period and the Eleventh Monitoring Period (July 2017 through December 2020), DOC staff used practices that had plagued the facilities since 2015, including hyper-confrontational demeanor that escalated incidents with incarcerated individuals and needlessly painful escort tactics. *See* Monitor's Fifth Rep. at 4; Monitor's Sixth Rep. at 8, 11-14; Monitor's Seventh Rep. at 7, 19, 23-24; Monitor's Eighth Rep. at 3-4, 29-30; Monitor's Ninth Rep. at 3, 26-32; Monitor's Tenth Rep. at 3, 22-25, 30-32; Monitor's Eleventh Rep. at 23-25, 40-42, 122. | Legal Dispute - Monitor Opinion |
| 288 | DOC staff were hyper-confrontational, aggressive, lack effective interpersonal communication skills and do not exhaust non-physical interventions before resorting to force. Monitor's Ninth Rep. at 3, 26-32. | Legal Dispute - Monitor Opinion |
| 289 | Too often and for no justifiable reason, DOC staff utilize painful escort techniques (*e.g.*, bent wrist lock or overextension of the shoulder) when escorting incarcerated individuals to intake or the clinic following a UOF. Painful escort techniques provoked the incarcerated individual, did not provide effective control, and did not prevent the need for additional force if the individual becomes resistant. Monitor's Seventh Rep. at 23-24; *see also* Monitor's Fourth Rep. at 8; Monitor's Fifth Rep. at 19; Monitor's Eighth Rep. at 4; Monitor's Tenth Rep. at 13; Monitor's Eleventh Rep. at 25. In other cases, the painful escort does not result in a use of force, but an unnecessary infliction of pain. Monitor's Ninth Rep. at 31. | Legal Dispute - Monitor Opinion |
| 301 | DOC staff's inability or unwillingness to utilize basic security practices led directly to violence among people in custody and uses of forces that were completely preventable. *Id.* at 15. In January 2022, DOC reported at least 40 incidents in which incarcerated individuals exited unauthorized from cells, pens, housing units or other areas and approximately 60 instances of security breaches resulting in incidents of force and violence among people in custody. Security breaches included basic errors such as unsecured doors, leaving incarcerated individuals unsupervised, allowing individuals to congregate in vestibules, officers going off post, A-station breaches, improper use of restraints, and failing to intervene as tensions escalated. *Id.* at 15-16. | Legal Dispute - Monitor Opinion |
| 309 | The Second Remedial Order ¶ 1(i)(a) and Action Plan §§ A(1)(d), D(2)(a), D(2)(d), D(2)(e), and D(2)(f) required the City to implement improved security, touring, search, contraband, and escort practices as described above, *supra* §§ 298, 306-307. Though the Monitor has not given compliance ratings for Second Remedial Order or Action Plan provisions, the Monitor's findings indicate the City has not implemented the required improved practices. *See infra* ¶¶ 310-459. | Legal Dispute - Monitor Opinion |
| 319 | Recent examples of incidents in GRVC and RNDC illustrate the dangerous incidents and uses of force that can occur when staff cede control of housing units. *See infra* ¶¶ 330; 444-445. | Legal Dispute - Monitor Opinion |
| 320 | DOC has not implemented the Interim Security Plan required by Second Remedial Order ¶1(i)(a) and Action Plan § D(2), *infra* ¶¶ 321-327. | Legal Dispute - Monitor Opinion |
| 322 | In March 2022, the Monitor found that DOC's implementation of the Interim Security Plan "has been sporadic and of such poor quality that unsafe staff practices remain rampant." Monitor's Mar. 16, 2022 Rep. at 44. Teletypes, Post Orders, and memo book inserts either reinforced poor practices or were unavailable to staff. *Id.* at 45. Tour checklists went unused, while supervisors conducted "perfunctory" tours. *Id.* | Legal Dispute - Monitor Opinion |
| 324 | Some initial improvements in the levels of harm at RNDC and GRVC were not sustained, and conditions have significantly worsened. *See* Monitor's Nov. 8, 2023 Rep. at 3; *supra* ¶¶ 118-119. | Legal Dispute - Monitor Opinion |
| 325 | DOC asserts that the Interim Security Plan required by Second Remedial Order ¶1(i)(a) and Action Plan § D(2) are the RNDC and GRVC "violence reduction plans." *See* Monitor's Nov. 8, 2023 Rep. at 64. ███████████████████████████████████████████████████████████████████████████████████████████████████████████ | Legal Dispute - Monitor Opinion; Legal Dispute - Other |
| 326 | The security plans proposed by DOC in October 2023 lack adequate detail, and many components are substantially similar to what has been attempted in the past, without a corresponding discussion of how implementation failures of the past will be avoided. *See* Monitor's Nov. 8, 2023 Rep. at 22. Additional training will likely suffer from deficiencies identified over the last year in recently developed training programs. *See* Monitor's Nov. 8, 2023 Rep. at 22. The video monitoring unit relied on by DOC has already been in operation for years, without actually changing staff practice. *Id.* The promised Anti-Violence Response Team is "ad hoc" and has only eight members and targets only a few housing units in a few facilities, meaning that its presence will "likely be too sporadic, insufficiently intensive, and of inadequate duration to catalyze the type of wholesale behavior change that is needed on each housing unit in every jail." *Id.* at 23. During a court-ordered meeting in October 2023 to develop a plan to ameliorate harm, DOC leadership "focused primarily on gang interdiction efforts and the failures of the prior administration." *Id.* at 44. | Legal Dispute - Monitor Opinion |

| | | |
|---|---|---|
| 327 | Given the Department's lack of a stable, comprehensive and robust strategy, facility leadership often does not know what is planned or who is doing what or when." Monitor's Nov. 8, 2023 Rep. at 6. There remain "pervasive and rampant security and operational deficiencies in staff practice and the corresponding harm that flows from them" which DOC has been "unable to alter...despite repeated recommendations by the Monitor and multiple Court Orders." *See* Monitor's Nov. 8, 2023 Rep. at 3, 6. DOC "has yet to develop and fully implement and sustain a coherent strategy for improving staffs' security practices [which] contributes significantly to the unabated level of violence in the jails." *Id.* at 18. The Monitor found DOC had a "continuing lack of urgency to address basic security practices" and noted "the alarming conditions reported to the Court during the August 10, 2023 Status Conference have only worsened." Monitor's Oct. 5, 2023 Rep. at 1. | Legal Dispute - Monitor Opinion |
| 355 | DOC has also mismanaged revisions of supervisory touring protocols as set forth in paragraphs 356 to 358 below. | Legal Dispute - Other |
| 359 | Given the frequency of failures to tour and violations of DOC policy—and the harms that flow from them—the number of corrective measures, and in particular formal discipline, is not commensurate with the number of violations observed. Monitor's Nov. 8, 2023 Rep. at 76, 78. | Legal Dispute - Monitor Opinion |
| 361 | DOC continues to use improper and painful escort techniques as of November 2023, as set forth in paragraphs 362 to 371. | Legal Dispute - Other |
| 369 | Other examples of painful escort practices leading to use of force are described *infra* ¶¶ 456; 488; 563; 619. | Legal Dispute - Monitor Opinion |
| 372 | DOC continues to utilize deficient search practices as set forth below, *infra* ¶¶ 373-380. | Legal Dispute - Monitor Opinion |
| 374 | These improper search practices lead to unnecessary uses of force. April 18, 2024 Rep at 73 | Legal Dispute - Monitor Opinion |
| 386 | Vestibules have historically been among the most common locations for uses of force as set forth below, *infra* ¶¶ 387-391. | Legal Dispute - Monitor Opinion |
| 388 | The percentage of uses of force occurring in vestibules have remained of concern to the Monitor, as set forth in paragraphs 389 to 391 below. | Legal Dispute - Monitor Opinion |
| 395 | As of July 2023, "and over 20 months since the Second Remedial Order...was entered, the Department ha[d] not meaningfully implemented sustainable solutions to... properly securing officer keys and OC spray." Monitor's July 10, 2023 Rep. at 31. These findings remain true as of this filing in November 2023. *See supra* ¶¶ 310-311. | Legal Dispute - Monitor Opinion |
| 438 | RNDC leaders failed to take meaningful corrective action in response to these findings. ███████████████████████████████████████████████████████████████████████████ | Legal Dispute - Other |
| 463 | In a previous class action challenging excessive force in DOC's Correctional Institute for Men, now called the Eric M. Taylor Center, the court found a pattern of excessive force by DOC emergency response teams. *Fisher v. Koehler*, 692 F. Supp. 1519, 1538 (S.D.N.Y. 1988), injunction entered, 718 F. Supp. 1111 (S.D.N.Y. 1989), *aff'd*, 902 F.2d 2 (2d Cir. 1990). Emergency response teams have long resisted efforts to curb misuse of force. For example, in October 1986, the jails experienced riots and disorder, during which CERT officers were reported to have beaten numerous handcuffed incarcerated individuals on a DOC bus. A day after then-Commissioner Koehler demanded the resignation of three wardens, over 100 CERT officers threatened to quit *en masse* to protest the resignations. Todd S. Purdum, *100 Jail Guards Reportedly Quit Emergency Unit*, N.Y. Times, Oct. 22, 1986, at B1, Ex. 65. | Legal Dispute - Materiality |
| 469 | Since entry of the First Remedial Order in August 2020, DOC has not complied with § A, ¶ 6. Monitor's Eleventh Rep. at 116-120; Monitor's Twelfth Rep. at 49-51; Monitor's Oct. 28, 2022 Rep. at 116-119; Monitor's Apr. 3, 2023 Rep. at 137-143. | Legal Dispute - Monitor Opinion |
| 472 | Emergency Response Teams presume force will be required and abandon the requirement to use the minimum amount of force necessary to control a threat as required by the Consent Judgment and First Remedial Order. Monitor's Eleventh Rep. at 120. | Legal Dispute - Monitor Opinion |
| 479 | ESU's conduct results in unnecessary, excessive and/or avoidable uses of force, many of which also result in serious injury. Monitor's Twelfth Rep. at 51. | Legal Dispute - Monitor Opinion |
| 480 | ESU/SRT/SST staff often engage in painful escort holds and other poor security practices that unnecessarily escalate conflicts. Monitor's July 10, 2023 Rep. at 38. | Legal Dispute - Monitor Opinion |
| 481 | ESU searches are often chaotic and disorganized, leading to uses of force that would be avoidable if the teams' approach were more coordinated. Monitor's July 10, 2023 Rep. at 38. | Legal Dispute - Monitor Opinion |
| 482 | ESU staff are not transparent about their activities, as they frequently file incomplete or false reports and fail to properly utilize handheld cameras, especially during in-cell applications of force. Monitor's Eleventh Rep. at 47. | Legal Dispute - Monitor Opinion |
| 493 | There remain large numbers of staff assigned to emergency response teams resulting in an excessive number of staff arriving on the scene to which they are called, thus raising tensions. Monitor's Oct. 28, 2022 Rep. at 117; Monitor's Apr. 3, 2023 Rep. at 137; Monitor's July 10, 2023 Rep. at 15-16, 38, 108 (problems with emergency response teams' performance "appear to be triggered by the large number of staff who respond, creating a chaotic situations and an excessive show of force."). | Legal Dispute - Monitor Opinion |
| 500 | For many years, DOC did not adequately follow these requirements and its own policy to screen and assign staff to ESU. Monitor's July 10, 2023 Rep. at 39-40; Monitor's Apr. 3, 2023 Rep. at 139-140; Monitor's Eleventh Rep. at 44-51. | Legal Dispute - Monitor Opinion |
| 510 | Screening requirements support DOC's efforts to identify supervisors who embody and demonstrate the qualities and conduct of leaders who will support and create the culture change needed to reform the department. Monitor's Eleventh Rep. at 261. | Legal Dispute - Monitor Opinion |

| | | |
|---|---|---|
| 516 | After the Monitor filed its Apr. 3, 2023 Report stating "significant concerns about the adequacy of the leadership within ESU," Monitor's Apr. 3, 2023 Rep. at 140, on April 17 DOC transferred an ADW to ESU on April 17 to serve as its new commander. Monitor's June 8, 2023 Rep. at 29. DOC did not tell the Monitor about this transfer. *Id.* | Legal Dispute - Materiality |
| 520 | News reports identified the ADW who had been appointed to lead ESU as Vaughn Grinnage, the officer seen in a videotape beating Kalief Browder, whose hands appear cuffed behind his back. Graham Rayman, *New head of NYC Correction Department unit criticized for Rikers Island violence was accused in caught-on-video assault of Kalief Browder* , N.Y. Daily News, Apr. 20, 2023, Ex. 66; Jennifer Gonnerman, *Exclusive Video: Violence Inside Rikers* , The New Yorker, Apr. 23, 2015), Ex. 67. | Legal Dispute - Materiality |
| 525 | When DOC eventually did supply proposed revisions, they "did not address most of the Monitoring Team's feedback and inexplicably did not reflect the changes that the Department reported it was intending to make." Monitor's Nov. 8, 2023 Rep. at 15. As a result, no revised version is complete. *Id* . DOC may be changing its plans for ESU once again and so the status of the draft policy and any corresponding changes is unknown. *Id* . | Legal Dispute - Monitor Opinion |
| 530 | Since the entry of the Consent Judgment, supervisory failures at multiple levels of uniform leadership have been and remain a consistent and pervasive malfunction within DOC. The failure of DOC supervisors to detect and correct the violations of the UOF Directive, lax security practices, and other systemic issues among their subordinates contribute to chaos and violence in the jails, harm to incarcerated individuals, and the excessive and unnecessary use of force. Monitor's July 10, 2023 Rep. at 39, 73; *see also*  Monitor's Oct. 28, 2022 Rep. at 78. | Legal Dispute - Monitor Opinion |
| 532 | At a facility leadership level, DOC supervisors must scrutinize situations in which policies and procedures were not followed to determine what went wrong and how it could be corrected. Monitor's Fourth Rep. at 6. That includes conducting a facility-level Rapid Review of UOF incidents that allows facility leaders to identify misconduct and take immediate action to respond to that misconduct. Monitor's Fifth Rep. at 28; Monitor's Seventh Rep. at 6-7. In addition, facility leadership must analyze their facility's UOF data, refine potential initiatives to address the specific contours of their facility, and champion initiatives that will advance the reforms within their command. Monitor's Ninth Rep. at 16. | Legal Dispute - Monitor Opinion |
| 539 | Captains were not actively and effectively supervised to hone their skills in coaching line staff. That is because there were insufficient ADWs to supervise captains. There were only one or two ADWs assigned per shift and they were generally assigned the duty of Tour Commander (the sole point of contact for managing the tour for the entire Facility), which results in little to no supervision of captains. Monitor's Ninth Rep. at 25; Monitor's Eighth Rep. at 11. | Legal Dispute - Monitor Opinion |
| 548 | DOC is not in compliance with the First Remedial Order § A, ¶ 2. | Legal Dispute - Monitor Opinion |
| 553 | The meetings among DOC leadership rarely appear to lead to operational changes or corrective action plans. *Id.* | Legal Dispute - Monitor Opinion |
| 554 | DOC's mismanagement—the lack of sufficient supervision of captains, the lack of adequate security protocols and procedures, the constant change in priorities and focus, and the frequent change of facility leadership—means that DOC has not developed adequate operational changes or corrective action plans that may change practice. Monitor's Oct. 28, 2022 Rep. at 108; Monitor's Twelfth Rep. at 42. | Legal Dispute - Monitor Opinion |
| 555 | The few operational changes or corrective action plans that have been developed are not effective at reducing use of force, serious injuries, or excessive or unnecessary use of force. Monitor's Nov. 8, 2023 Rep. at 80-81 (few rigorous attempts to utilize the large volume of information that DOC possesses to address the underlying causes of unnecessary and excessive uses of force and facility violence and the few plans that have been devised are either ineffective, or shortly abandoned before their impact on staff practice can be discerned). DOC tends to rely on issuing memos to staff, reminders at roll call, and corrective action for specific staff, but only rarely include an operational change that targets the root causes of a specific problem. *Id.* | Legal Dispute - Monitor Opinion |
| 556 | In November 2023, the Monitor found there were a few documents containing more global or problem-focused strategies, including six responses by facilities to NCU's security audits. Id. These responses addressed only a few of the many NCU security audits conducted by that time: AMKC provided a written response to 1 of the 32 NCU audits, RNDC provided a written response to 4 of the 38 NCU audits, and VCBC provided a written response to 1 of the 8 NCU audits. *Id* . No other written responses were provided by any of the facilities. *Id* . | Legal Dispute - Monitor Opinion |
| 557 | Facility leaders have been unable to abate the persistent issues contributing to the risk of harm, including the use of inadequate or unreasonable security protocols, the use of excessive or unnecessary force, and the frequency of use of force incidents. Monitor's Apr. 3, 2022 Rep. at 128. | Legal Dispute - Monitor Opinion |
| 558 | Facility leadership, such as Wardens and Deputy Wardens, have not been successful in dismantling the culture that gave rise to the Consent Judgment despite the significant efforts that have been outlined in every Monitor's report to date. Monitor's Oct. 28, 2022 Rep. at 108; Monitor's Twelfth Rep. at 42; Monitor's Eleventh Rep. at 8-9, 109. | Legal Dispute - Monitor Opinion |
| 561 | Rapid Reviews do not consistently identify whether a use of force incident is necessary/unnecessary, avoidable/unavoidable, or appropriate/excessive, and whether uniformed staff engaged in misconduct. *See*  Monitor's Nov. 8, 2023 Rep. at 4; Monitor's Ninth Rep. at 53; Monitor's Twelfth Rep. at 39. Rapid Reviews do "not reliably and consistently identif[y] all issues that would reasonably be expected to be identified through a close in time assessment of the video." Monitor's Oct. 28, 2022 Rep. at 107; see also April 3, 2023 Rep. at 125. | Legal Dispute - Monitor Opinion |
| 563 | For example, facility leadership rarely detects painful escort techniques even though video evidence clearly illustrates the painful escort. Monitor's Ninth Rep. at 32. | Legal Dispute - Monitor Opinion |
| 566 | DOC relies "exclusively" on counseling for inadequate, biased, or incomplete Rapid Reviews, even when facility leaders have conducted numerous biased, unreasonable, inadequate or very problematic Rapid Reviews and "a more severe response [wa]s warranted." Monitor's Tenth Rep. at 43, n.32; Monitor's Eleventh Rep. at 107 | Legal Dispute - Monitor Opinion |
| 568 | Several examples illustrate the systemic problems noted by the Monitor in the Rapid Review process as set forth in paragraphs 569 to 572 below. | Legal Dispute - Other |

| | | |
|---|---|---|
| 569 | In March 2023, after an officer used a prohibited chokehold, head strikes, and took a person in custody to the ground while he was handcuffed and in leg shackles, the facility supervisor who conducted the Rapid Review failed to specifically mention the chokehold or head strikes, noting only an "unauthorized force technique," and found the staff member to have been in compliance with the Use of Force Directive. Monitor's July 10, 2023 Rep. at 24-25. | Legal Dispute - Other |
| 575 | There are several examples of DOC's failures to avail itself of critical, timely, and readily available information upon which it could base its remedial actions. Monitor's Mar. 16, 2022 Rep. at 45-46. | Legal Dispute - Monitor Opinion |
| 576 | Even a cursory review of use of force data reveals that an unnecessarily high number of uses of force occur during searches and escorts. Correctional practice is replete with a variety of strategies that could be used to better understand and then address the typical dynamics that characterize each of these factors, but DOC has not taken any steps to address either issue. Monitor's July 10, 2023 Rep. at 66. | Legal Dispute - Monitor Opinion |
| 580 | The findings of NCU audits are shared with facility leadership, but there is no evidence that the serious issues identified are addressed or incorporated into problem-solving going forward. Monitor's Mar. 16, 2022 Rep. at 45-46. It is another example of DOC's failure to avail itself of critical, timely, and readily available information upon which it could base its remedial actions. *Id.* | Legal Dispute - Monitor Opinion |
| 582 | The findings of the more than 100 NCU security audits have been shared with facility leadership, but there is no evidence that the serious security lapses identified were adequately addressed or incorporated into problem-solving going forward. See Monitor's Nov. 8, 2023 Rep. at 14; Monitor's Mar. 16, 2022 Rep. at 45-46. | Legal Dispute - Monitor Opinion |
| 588 | DOC and facility leaders rarely appear to have knowledge of UOF information and when asked about elements of the operation that are not going well, offer only superficial observations or platitudinous statements. Only rarely is a problem-solving approach discussed with a level of detail that makes clear how and why a certain initiative to improve practice should be developed and implemented. Monitor's July 10, 2023 Rep. at 66. | Legal Dispute - Monitor Opinion |
| 592 | The perpetual state of dysfunction will simply continue unless and until DOC identifies the salient data necessary and then correctly analyzes and interprets the data so that it can be used to inform solutions to its entrenched problems. *Id* . at 67. | Legal Dispute - Monitor Opinion |
| 593 | The Montioring Team has consistently reported that singificant data and information is availble to Department and facilty leaders, but they have not effectively utilized that information to identify and address the underlying causes of the unnecessary and excessive force and violence occurring in the agency." Monitor's Juy 10, 2023 Rep. at 64. DOC "has ample information—from both internal and external sources, generated for years—on the types of problems that contribute to the high risk of harm in the jails. However, while it is an essential component of problem-solving, on its own, simply detecting or identifying the problems does nothing to actually rectify them. As noted above, in interviews with facility leadership and staff they generally acknowledge these issues and their contribution to the unsafe conditions in the jails. However, discussions with facility leadership, NCU staff and observations of various Department meetings (e.g., TEAMS) reveal that scant attention is subsequently given to the findings and implications of these internal audits, and thus, despite their value and potential, these internal assessments have done little to advance the reform." Monitor's Nov. 8, 2023 Rep. at 14. | Legal Dispute - Monitor Opinion |
| 595 | The First Remedial Order § A, ¶ 4, Action Plan § C, ¶ 3(ii), and Action Plan § C, ¶ 3(iii) require DOC to substantially increase the number of ADWs to ensure adequate supervision of captains, and to increase captains on the housing units. DOC has not done so. Monitor's Eleventh Rep. at 113; Monitor's Twelfth Rep. at 44-45; Monitor's Mar. 16, 2022 Report at 5 n.3; Monitor's Oct. 28, 2022 Rep. at 112-115; Monitor's Apr. 3, 2023 Rep. at 133-136; Monitor's July 10, 2023 Rep. at 78-79. | Legal Dispute - Monitor Opinion; Legal Dispute - Other |
| 597 | When the Department received a Partial Compliance rating for First Remedial Order § A, ¶ 4 in April 2023, the Monitor based the rating on an increase in the number of ADWs, but did not find an improvement in supervision provided. Monitor's Apr. 3, 2023 Rep. at 133-136. That increase in itself was insufficient to provide "adequate supervision" because the newly promoted ADWs are drawn from the same corps of captains who have generally struggled with these essential skills. Id. | Legal Dispute - Monitor Opinion |
| 604 | As of July 10, 2023, DOC does not have enough ADWs to ensure that each tour has both a Tour Commander as well as ADWs to supervise captains. | Legal Dispute - Monitor Opinion |
| 608 | This number is insufficient to supervise thousands of officers. Monitor's Nov. 8, 2023 Rep. at 26-27; *see also* Monitor's July 10, 2023 Rep. at 78-79. | Legal Dispute - Monitor Opinion |
| 610 | ADWs in DOC do not adequately supervise captains. See Monitor's Mar. 16, 2022 Rep. at 5. Supervision is fundamental to changing practice and sustaining those changes, but the longstanding supervisory void in both number in competency is a leading contributor to the Department's lack of meaningful change to basic security practices and operations. Monitor's Nov. 8, 2023 Rep. at 28; *see also id.* at 4. | Legal Dispute - Monitor Opinion |
| 611 | Supervision of line staff remains insufficient to provide skill development and oversight needed to ensure the workforce functions skillfully and responsibly. Monitor's Oct. 5, 2023 Rep. at 8; Monitor's Nov. 8, 2023 Rep. at 4, 27 (supervisors have only marginal competence in the skills necessary to provide effective supervision). Although DOC has attempted to ensure supervisors are present across tours through the week, actual supervision is sporadic and inconsistent. Monitor's Oct. 5, 2023 Rep. at 8. Supervisors do not provide coaching and support, so poor practice by line staff persists. *Id.* at 8; Monitor's Nov. 8, 2023 Rep. at 4 ("Supervisors lack the willingness or skill to effectively support, guide, and coach staff practice, which is perhaps unsurprising given their tenure in a deeply dysfunctional system that does not adequately select, train or prepare them for the task at hand. In addition to being poorly equipped for or resistant to their role and responsibilities, supervisors are far too few in number to be able to provide the type of hands-on coaching needed for this workforce"); *id.* at 26-28 (supervisors do not provide the hand-to-hand, active coaching that is required). When line staff report issues to supervisors (*e.g.* , an individual who is waiting for sick call, an individual without a mattress, or an issue with services), the issues often go unattended, leaving line staff fatigued and disheartened. Monitor's Oct. 5, 2023 Rep. at 8-9. | Legal Dispute - Monitor Opinion |

| | | |
|---|---|---|
| 612 | Supervisors at all levels have a limited command of the restrictions and prohibitions of the Use of Force Directive, appear to act precipitously, and many ultimately end up contributing to or catalyzing the poor outcomes that are of concern. They also fail to detect and then fail to correct the lax security practices among their subordinates that contribute to problems consistently observed and identified by the Monitoring Team in many incidents. Monitor's July 10, 2023 Rep. at 73; Monitor's Apr. 3, 2023 Rep. at 39. | Legal Dispute - Monitor Opinion |
| 613 | Elevating supervisory practice is difficult to achieve because the number of supervisors is limited and because the supervisors generally lack the requisite perspective and experience to guide their subordinates toward better practice. Monitor's July 10, 2023 Rep. at 73. | Legal Dispute - Monitor Opinion |
| 614 | A large proportion of DOC's uniformed supervisors either do not have the aptitude and/or willingness to properly supervise their subordinates, have limited engagement with staff on the housing units and do not provide adequate supervision. Monitor's Mar. 16, 2022 Rep. at 5. | Legal Dispute - Monitor Opinion |
| 615 | Supervisory skill deficits are exacerbated by the fact that DOC has fewer levels of supervisors in its chain of command than is seen in most correction systems. Monitor's July 10, 2023 Rep. at 73; Monitor's Apr. 3, 2023 Rep. at 40; *see also* Monitor's Oct. 28, 2022 Rep. at 78. | Legal Dispute - Monitor Opinion |
| 616 | Simply increasing the number of ADWs is not in itself effective to comply with the requirement to provide adequate supervision. Because newly promoted ADWs are drawn from the same corps of captains who struggle with these essential skills, simply promoting additional ADWs does not solve the problem in its entirety. Monitor's Apr. 3, 2023 Rep. at 136. | Legal Dispute - Monitor Opinion |
| 618 | Several examples illustrate supervisors engaging in use of force or other conduct that promotes poor staff practice, security failures, and unnecessary and excessive force, as set forth in paragraphs 619 to 627 below. | Legal Dispute - Other |
| 619 | During one incident in the Tenth Monitoring Period, passive resistance to a search during a period of excessive heat escalated when the Probe Team entered and immediately forced a confrontation, ultimately resulting in a deployment of OC spray when staff gathered people in custody into the vestibule and used a chemical agent to secure incarcerated individuals as a result of too few flex cuffs. Dkt. 360 at 29. In another incident in the Tenth Monitoring Period, passive resistance to a search escalated when an ADW pushed a person in custody, setting off a chain reaction of multiple uses of force, people being taken to the floor, staff using prohibited holds and aggressive tactics, the overly close positioning of a canine, and painful escort techniques (i.e. "excessively ben[ding] and twist[ing individuals'] wrists," elevating their arms, and "unsafely" carrying them by their arms from gurneys to intake cells). "One Probe Team Officer raised and slammed a resident to the floor, while another dragged a person in restraints across the floor as a captain sprayed him at point blank range in the face with an MK-9." The Monitor found that "[n]either the ADW nor Captain properly supervised or controlled the scene." *Id* . | Legal Dispute - Monitor Opinion |
| 628 | DOC's promotion decisions contribute to the lack of adequate supervision because DOC has promoted people to positions of captain and ADW that do not have the skills to provide adequate supervision. Monitor's July 10, 2023 Rep. at 87. | Legal Dispute - Monitor Opinion |
| 629 | DOC's promotion decisions also send a message to staff about the leadership's values, the culture it intends to cultivate and promote, and the behavior to emulate. Monitor's Eighth Rep. at 199. | Legal Dispute - Monitor Opinion |
| 651 | The violence and disorder in the jail creates poor working conditions for staff, which contributes to absenteeism, complacency, fatigue, and poor staff morale. Monitor's Oct. 5, 2023 Rep. at 9; Monitor's Nov. 8, 2023 Rep. at 3. | Legal Dispute - Monitor Opinion |
| 654 | DOC remains unwilling to engage in difficult decisions regarding personnel hiring, promotion, discipline, and assignment, largely due to perceived opposition by labor unions. | Legal Dispute - Monitor Opinion |
| 655 | The sheer level of dysfunction within the DOC's staffing framework is "unmatched by any jurisdiction with which the Monitoring Team has had experience" making even a basic post analysis impossible to conduct. Monitor's Mar. 16, 2022 Rep. at 32. | Legal Dispute - Monitor Opinion |
| 656 | As of March 2022, the dysfunction included the inability to accurately identify staff assignments, tour assignments, and their leave status. *Id.* at 32-33. DOC lacked any roster management software to track assignments or assess staffing needs, and instead relied on inefficient, unreliable, and ad hoc manual practices. *Id.* at 33. Nor did DOC have a system for identifying critical assignments that must be filled before others; that resulted in non-essential assignments being filled before those required to fulfill DOC's responsibilities—a practice "unheard of in a correctional setting" because it creates a risk of imminent danger. *Id.* DOC used outdated sick leave, medically restricted, and unexcused absence policies, and did not enforce those policies consistently. *Id.* at 34. | Legal Dispute - Monitor Opinion |
| 657 | DOC's most critical resource—its staff—is so poorly administered that even the most basic aspects of workforce management have been neglected and/or circumvented for decades. This mismanagement directly caused a sea of inadequacies and impediments to reform. DOC cannot support its workforce with training and supervision, leaving staff stressed, overworked, and despondent. It contributes to poor staff conduct including lack of adherence to rules, going off post, and hyper confrontational behavior. Monitor's Mar. 16, 2022 Rep. at 38-39. | Legal Dispute - Monitor Opinion |
| 658 | DOC's mismanagement of staff is inextricably linked to high rates of force and violence in the jails. Over deployment and under deployment create circumstances for unnecessary and excessive force. In some cases, large numbers of staff respond to alarms, needlessly escalating situations and in others, staffing shortages lead to overreliance on confrontational emergency response teams. *Id.* at 39-41. | Legal Dispute - Monitor Opinion |
| 660 | DOC has not implemented an assignment process in which sufficiently experienced uniform staff are deployed to housing units, as required by Action Plan, § C, ¶ 3(iv). | Legal Dispute - Other |
| 662 | As of October 2023, DOC continued to have instances where housing unit posts were unstaffed, even though large numbers of staff respond when an incident occurs. Monitor's Oct. 5, 2023 Rep. at 10. In November 2023, DOC continued to have insufficient staffing to deliver mandated services, leading to high levels of stress, frustration, and violence among people in custody. Monitor's Nov. 8, 2023 Rep. at 3." For updated information on staff off-post, we respectfully refer the Court to our reply brief and the Monitor's April 18, 2024 Report at 23-24, 161. | Legal Dispute - Monitor Opinion |

| | | |
|---|---|---|
| 666 | This results in inefficient deployments of scarce resources, such as the assignment of seven captains on MMR status to a then-closed facility, OBCC, which, as the City explained, at that time operated as an overflow staff locker room. *Id*. at 135. | Legal Dispute - Monitor Opinion |
| 670 | Facilities cannot appropriately administer and track the chronic absent designation. Only 70% of the staff identified as chronic absent in 2023 have been processed as such. *Id*. at 100. For the staff designated as chronic absent in 2022, only 79% have been processed as such by the end of June 2023. *Id.* This means that many staff will never suffer any consequences for the chronic absent designation because the 6-month applicability of the designation expires before the processing occurs. *Id.* | Legal Dispute - Monitor Opinion |
| 671 | DOC has not said whether any of these individuals who should have the designation "chronic absent" have, in fact, suffered limitations on "various discretionary benefits and privileges" that would serve "as a deterrent to excessive sick leave." Apr. 3, 2023 Rep. at 28-29; Monitor's Nov. 8, 2023 Rep. at 100. | Legal Dispute - Monitor Opinion |
| 672 | Further, DOC's recent changes to the sick leave and MMR policy have resulted in staff beginning to misuse other mechanisms, including Personal Emergency Days and FMLA, in order to avoid coming to work as scheduled. *See* Monitor's Nov. 8, 2023 Rep. at 3 (these mechanisms are "equally disruptive" to proper staffing); Monitor's Oct. 5, 2023 Rep. at 9. Defendants still "struggle to ensure that staff report to work as expected and are deployed as they should be" and have failed to correct the loopholes in the "weak administration" of the various absence mechanisms. *Id.* at 9-10. DOC does not have data available to quantify exactly how many staff do not come to work because of these statuses (*e.g.*, Personal Emergency Data), so does not know how widespread this problem is. Monitor's Nov. 8, 2023 Rep. at 3. | Legal Dispute - Monitor Opinion |
| 673 | DOC has not reduced awarded posts, in which staff may bid for an exclusive assignment within a facility, so they are primarily utilized for those positions in which a particular skill set is required, as required by Action Plan ¶ C(3)(v). | Legal Dispute - Other |
| 675 | Because posts are awarded based on seniority, the high number of awarded posts within DOC means that "the most experienced staff [are awarded] posts where they do not supervise housing units." *Id*. | Legal Dispute - Monitor Opinion |
| 676 | To ensure consistent and steady staffing, the Monitor has recommended the reduction in awarded posts to ensure that adequate and experienced staff are available to supervise the housing units. *See* Dkt. 454 at 9. | Legal Dispute - Monitor Opinion |
| 684 | DOC has not optimized staff scheduling by creating and implementing alternative work schedules, as required by Action Plan § C, ¶ 3(vi). Monitor's July 10, 2023 Rep. at 104-105. | Legal Dispute - Monitor Opinion |
| 685 | DOC has failed to modify work schedules to optimize staff scheduling since the Action Plan went into effect. | Legal Dispute - Other |
| 686 | On any given day in May 2023, 22 posts were unstaffed. Monitor's July 10, 2023 Rep. at 91, 205 ("the number of unstaffed posts per day has been steadily rising in 2023"). On any given day in June 2023, 15 posts were unstaffed. Monitor's Aug. 7, 2023 Rep. at 18; Monitor's Nov. 8, 2023 Rep. at 82. DOC staff are required to work fewer days per year than the industry standard, resulting in pervasive, insufficient coverage particularly on weekends." Monitor's Aug. 7, 2023 Rep. at 18. | Legal Dispute - Monitor Opinion |
| 690 | In April 2023, the Monitor requested updated data regarding the number of staff on 4x2 schedules. DOC produced this data three months later but did not provide additional context necessary for the Monitor to verify its results. Monitor's July 10, 2023 Rep. at 105. | Legal Dispute - Monitor Opinion |
| 696 | The collective bargaining agreements obstruct DOC's ability to maximize staff scheduling despite the City's assertion that the requirements of the "Action Plan [are] entirely within the power of the Commissioner and more broadly the Mayor, to execute." *Id.* at 17-18. The "current union contracts impede the ability to maximize the scheduling of staff as required by the Action Plan" and "the agreements the City and Department have entered contribute to its continued inability to properly staff its facilities." *Id*. at 18. Defendants had yet to even begin sessions with the labor unions to attempt to address this issue, nor sought from the Court a waiver of applicable laws. Monitor's Aug. 7, 2023 Rep. at 18. | Legal Dispute - Monitor Opinion |
| 697 | DOC has not reduced the assignment of uniform staff to civilian posts, as required by Action Plan ¶ C(3)(vii). | Legal Dispute - Monitor Opinion |
| 698 | Over 700 uniform staff hold "civilian" posts, which are positions that do not require special training or match specialized correctional officer duties. Monitor's Mar. 16, 2022 Rep. at 37. Because uniformed staff are frequently assigned to such posts, fewer uniformed staff are available to be assigned to posts that require trained staff, such as housing areas, compounding staffing difficulties and "squandering an essential resource." Monitor's Mar. 16, 2022 Rep. at 36. | Legal Dispute - Monitor Opinion |
| 699 | The number of uniform staff in DOC that hold civilian posts is significantly higher than what is typically seen in other correctional systems. *Id* . | Legal Dispute - Monitor Opinion |
| 700 | Although DOC has claimed that it has identified certain administrative posts in the facilities that have historically been filled by uniform staff to be superfluous, DOC has not "reduced" or eliminated these unnecessary posts, and thus they remain filled by uniformed staff. Monitor's July 10, 2023 Rep. at 105-106. | Legal Dispute - Monitor Opinion |
| 701 | Although DOC has claimed that its leadership is meeting bi-weekly with facilities to identify posts that are currently filled with uniformed staff that could be filled with civilians instead, DOC has not identified any such posts in either the facilities or in the many other divisions of DOC. *Id.* | Legal Dispute - Monitor Opinion |
| 702 | Either DOC's reported biweekly meetings are not occurring or the process has been ineffective given the lack of results. *Id.* | Legal Dispute - Monitor Opinion |
| 703 | DOC asserts that it has transferred 7 uniform positions at HMD to civilian posts and that it intends to transfer 16 uniform staff engaged in timekeeping to civilian posts, this has not yet occurred. *Id.* at 105. | Legal Dispute - Monitor Opinion |
| 704 | A shift of only 23 positions to be filled by civilians is insufficient to meet the requirements of the Action Plan ¶ C(3)(vii). *Id.* at 105. | Legal Dispute - Monitor Opinion |
| 710 | The Intake Investigation includes a review of all staff and witness reports, an Injury to Inmate Report, and any available video. It does not include interviews of staff members. It rarely includes an interview with the incarcerated individual or incarcerated witnesses. Monitor's Ninth Rep. at 44. | Legal Dispute - Monitor Opinion |

| | | |
|---|---|---|
| 715 | Facility leaders are also responsible for both identifying and responding to misconduct through various means. *See supra* ¶¶ 222-224. | Legal Dispute - Other |
| 720 | Defendants have never achieved substantial compliance with the Consent Judgment requirement to conduct "thorough, timely, and objective investigations of all use of force incidents." Consent Judgment, § VII, ¶ 1. | Legal Dispute - Monitor Opinion |
| 721 | The Monitor has identified problems with regard to the quality of ID's investigations since the early days of the Consent Judgment. *See infra* , 722-730. | Legal Dispute - Other |
| 734 | In particular, the Monitor noted that there were still significant issues with the more thorough Full ID Investigations that were conducted for particularly complex and/or severe incidents, describing the quality of Full ID Investigations as "mixed," explaining that some Full ID investigations "fail to properly analyze the available evidence, or take necessary investigative steps," and also stated the "quality of Full ID Investigations must be improved." Monitor's Oct. 28, 2022 Rep. at 131, 136-37. | Legal Dispute - Monitor Opinion |
| 736 | The Monitor explained that these five cases were "egregious instances of inadequate investigations," but that "many other investigations . . . do not represent best practice." Monitor's Oct. 18, 2022 Rep. at 136. | Legal Dispute - Monitor Opinion |
| 746 | The Monitor found similar quality concerns with regard to Full ID Investigations during the Fifteenth Monitoring Period. *See infra* ¶¶ 747-750. | Legal Dispute - Other |
| 747 | The progress ID investigators made during previous Monitoring Periods in conducting quality investigations ceased. The Monitor found the decline in the quality of Use of Force investigations "alarming," and based on his review of hundreds of investigation files reported that "a substandard approach was often taken in assessing evidence such that the ultimate quality of the investigations was compromised." Monitor's Apr. 3, 2023 Rep. at 157, 159, 165. | Legal Dispute - Materiality |
| 748 | Intake Investigations regularly "ignored objective evidence of misconduct" and improperly closed cases. *Id.* at 164. | Legal Dispute - Monitor Opinion |
| 749 | In the rare instances where cases were referred for Full ID Investigation, those investigations were "often incomplete, inadequate, and unreasonable." *Id* . | Legal Dispute - Monitor Opinion |
| 750 | The Monitor found Full ID Investigations closed during the Fifteenth Monitoring Period to be "often incomplete, inadequate, and unreasonable." Id. (emphasis in original). Investigators failed to complete necessary interviews with staff or persons in custody, failed to identify salient issues, disregarded objective evidence of misconduct, discredited allegations from people in custody without evidence, and recommended insufficient employee corrective action. Id. | Legal Dispute - Monitor Opinion |
| 755 | Staff reported that they did not feel comfortable speaking openly and candidly with the Monitor because of fear of reprisal by Deputy Commissioner Hernandez were he to learn of such communications. *Id* . | Legal Dispute - Other |
| 758 | The Monitor recognized and reported Deputy Commissioner Townsend's commitment, strong leadership, and creative thinking in late December 2021 and in reports before. Monitor's Dec. 22, 2021 Rep. at 8 & n.3. Less than two weeks after the Monitor expressed that view, Commissioner Molina dismissed Townsend on January 3, 2022, the first business day of his tenure. Monitor's March 16, 2022 Rep. at 58. | Legal Dispute - Monitor Opinion |
| 760 | Although the Third Remedial Order required that, if DOC replaced the Disciplinary Manager, it had to provide a "bona fide reason" for doing so, the Commissioner's explanation for the decision to dismiss Townsend did not contain any specific information, instead relying on vague assertions regarding the necessity for "new leadership" and "new perspectives." *Id.* at 59. The Department's response, in its entirety, reads:<br>"In order to facilitate reforms, including improvements to the Department's disciplinary process, the new administration has a critical interest in implementing certain policy, operational, and personnel changes. These changes include bringing new leadership with new perspectives to our disciplinary work and rethinking how it is organized. As a result, the Disciplinary Manager position will be replaced. This decision was the product of a thoughtful and focused process which looked at both the Division and the Department as a whole. At our upcoming meeting on January 11, the Commissioner intends to share additional information about his plans to restructure the Division. Per the Third Remedial Order, the Department is committed to working with the Monitor to identify an appropriate replacement with adequate experience and credentials to serve in the Disciplinary Manager role." *Id.* | Legal Dispute - Monitor Opinion |
| 761 | The Commissioner did not present evidence of a bona fide reason for his dismissal of Townsend. *Id.* at 60. *See supra* , paragraph 760. | Legal Dispute - Monitor Opinion |
| 762 | The Commissioner then installed Manuel Hernandez as the head of the Investigation Division in May 2022, resulting in the deterioration described above. Ex. 68 (DOC press release) | Legal Dispute - Materiality |
| 765 | Ultimately, Hernandez resigned from DOC shortly before the Monitor publicly filed its report describing the significant deterioration of the Investigation Division's work on April 3, 2023. July 10, 2023 Rep., at 129. | Legal Dispute - Monitor Opinion |
| 771 | The Monitoring Team had worked closely with this leader for years and found him "to be forthright and credible and to possess a keen acumen for assessing use of force incidents in a neutral and independent manner," and explained that this leader's work was credited for ID's successes prior to its deterioration under Manuel Hernandez. *Id.* | Legal Dispute - Monitor Opinion |
| 773 | Nonetheless, while the Commissioner reported to the Monitor that the basis for this leader's demotion was not related to Nunez matters, "the Monitoring Team [was not] made privy to the factors that provided the basis for the Commissioner's decision." Id. Moreover, the Monitoring Team requested the written basis for this determination, but the Commissioner refused to produce it to the Monitoring Team. Id. The Monitor raised "grave concerns that the removal of the Associate Commissioner will compromise the revitalization effort and morale within" ID. *Id.* | Legal Dispute - Monitor Opinion |
| 784 | The Monitor has repeatedly documented problems with the timeliness of investigations. *See infra* paragraphs 785-793 | Legal Dispute - Other |
| 794 | Adequate staffing is critical to conducting timely and quality investigations. Apr. 3, 2023 Rep. at 167. | Legal Dispute - Monitor Opinion |

| | | |
|---|---|---|
| 795 | An assessment of the ID's staffing needs found that . . . at least 21 supervisors and at least 85 investigators are necessary, which ha[d] not been achieved" as of July 10, 2023. Monitor's July 10, 2023 Rep. at 130-31. | Legal Dispute - Monitor Opinion |
| 796 | Staffing numbers in ID are insufficient to manage the workload. July 10, 2023 Rep. at 131; Monitor's Aug. 7, 2023 Rep. at 22-23. | Legal Dispute - Monitor Opinion |
| 815 | Delays in the investigation process also led to delays in the ability to impose discipline. *Id.* | Legal Dispute - Monitor Opinion |
| 833 | In 2022, the overall proportion of use of force incidents in which at least one staff member was referred for formal discipline, from any type of investigation, significantly decreased to 5% of incidents, despite the Monitoring Team having detected no contemporaneous change in the pattern and practice of unnecessary and excessive force that would account for this change. Monitor's Nov. 8, 2023 Rep. at 94-95; July 10, 2023 Rep. at 136-7. | Legal Dispute - Monitor Opinion |
| 838 | During the 15th Monitoring Period, the discipline imposed via NPA was for lesser compensatory days as compared to the previous Monitoring Period. For instance, 40% of cases closed with a sanction of 1 to 9 days compared with 27% in the last Monitoring Period. Further, a sanction or 30 days or more was utilized in 21% of cases in this Monitoring Period compared with 30% in the previous Monitoring Period. Apr. 3, 2023 Rep. at 186. | Legal Dispute - Other |
| 839 | Along the same lines, the use of sanctions of 30 days or more decreased, from 30% in the Fourteenth Monitoring Period to only 21% during the Fifteenth. *Id.* | Legal Dispute - Other |
| 840 | The Monitoring Team reviewed 397 incidents resulting in formal disciplinary sanctions in 2022, and found that 23% of the sanctions imposed were "questionable," while 4% were unreasonable. *Id.* at 187. | Legal Dispute - Other |
| 841 | Although DOC remained in partial compliance with Consent Judgment § VIII, ¶ 1 in the Fifteenth Monitoring Period and the Monitor acknowledged gains made in 2022, the Monitor made clear that "much more work remains to achieve the ultimate goal of the reform effort, which is to impose timely and meaningful discipline." *Id.* at 103. | Legal Dispute - Monitor Opinion |
| 842 | Command Discipline is a form of discipline that is imposed at the facility level and can be completed closer in time to when an incident occurs than formal discipline. *Id.* at 180. | Legal Dispute - Monitor Opinion |
| 847 | In the Fifteenth Monitoring Period, 69% of the command discipline cases that were dismissed, were dismissed because of due process violations (meaning the hearing did not occur within the required timeframes outlined in policy), because of a clerical error which invalidated the CD, or because the CD was not entered into CMS at all or not drafted within the required timeframe. Monitor's Apr. 3, 2023 Rep. at 182-83. The Monitor found this 69% of dismissed cases to be an "area of concern" because they "reflect a lack of proper management" of command disciplines. Monitor's Apr. 3, 2023 Rep. at 183. | Legal Dispute - Monitor Opinion |
| 850 | Facility leaders imposed a loss of compensatory days in a mere 29 percent of command discipline cases during the Fifteenth Monitoring Period, instead favoring the use of reprimands and corrective interviews, which carry no concrete or quantifiable consequences. *Id.* | Legal Dispute - Monitor Opinion |
| 852 | This problem is getting worse over time. The proportion of cases resulting in 1-5 days deducted has decreased from 52% in the Eighth Monitoring period to 29% in the most recent. Apr. 3, 2023 Rep. at 182. | Legal Dispute - Monitor Opinion |
| 857 | The changes to the Command Discipline process are not expected to improve the consistency with which misconduct is identified. *See* Monitor's Nov. 8, 2-23 Rep. at 21 n.16. The significant number of backlogged command discipline cases means that the processing speed will not improve for some time. *Id*. After yet another court order in August 2023, DOC provided proposed revisions to the applicable directive in September 2023—and further revision is still needed. Monitor's Nov. 8, 2023 Rep. at 43. | Legal Dispute - Monitor Opinion |
| 858 | Even though facility Rapid Reviews sometimes recommend disciplinary action for staff members, the data does not reflect whether these discipline referrals were all enacted as recommended. Data on enacted discipline is subject to continued changes based on the protracted closures of certain types of disciplinary charges, including the many months it takes to process a command discipline, a memorandum of complaint, a nonprosecution agreement, and an OATH proceeding. Further, a staff member can be suspended, only to have the days returned upon a Report and Recommendation from OATH. *Id.* at 135. | Legal Dispute - Monitor Opinion |
| 864 | The Department is not in compliance with Consent Judgment § XV, ¶ 1. | Legal Dispute - Other |
| 872 | One recent incident is illustrative of the problems that persist at RNDC. | Legal Dispute - Monitor Opinion |
| 884 | The Department has not met the requirements of Consent Judgment § XV, ¶ 12 and First Remedial Order, § D, ¶ 3; § D, ¶ 3(i).. | Legal Dispute - Other |
| 888 | In the Tenth Monitoring Period, after the First Remedial Order was entered, the Monitor gave a Partial Compliance rating for Consent Judgment XV, ¶ 12. Monitor's Tenth Rep. at 265. In explaining his rating, the Monitor did not state that DOC adequately implemented the model, but found that "the Department now has a framework for addressing this provision and these concepts have been integrated into the Unit Management training," that the Department "will develop a strategy for measuring the extent to which housing units are operated according to the daily schedule," and that a sanctions component called "Informal Resolutions" had been developed, but not fully implemented. Monitor's Tenth Rep. at 250, 264-265 (emphasis added). | Legal Dispute - Monitor Opinion |
| 890 | The pilot "[i]mplementation… was further stymied by inadequate levels of consistent staff assignments[,] the lack of daily unit schedules needed to provide a consistent, predictable unit environment[,] COVID-related limitations on structured programming[,] the poor implementation of Informal Resolutions[,] and faltering implementation of the universal rewards/incentives that were part of the original design." *Id*. at 303. | Legal Dispute - Monitor Opinion |
| 926 | DOC generally fails to urgently respond to events of self-harm and fails to supervise individuals following a suicide attempt. Monitor's Oct. 5, 2023 Rep. at 6. Apart from issuing a teletype in June 2022 reminding staff of their obligations following a self-harm event and screening an instructional video on self-harm incidents, DOC has made little progress rectify poor staff practice. *Id.* As of September 11, 2023, 67% of staff have received the annual training on suicide prevention. *Id.* | Legal Dispute - Monitor Opinion |
| 937 | These requirements support a transparent and candid relationship between DOC and the Monitoring Team and are intended to advance reforms as efficiently as possible. | Legal Dispute - Monitor Opinion |

| | | |
|---|---|---|
| 938 | From January 1, 2022 to this filing in November 2023, DOC has altered its management of its compliance efforts with the Monitoring Team to eliminate the proactive and collaborative approach that previously existed, to reduce its level of cooperation, and to limit information-sharing and access in ways that inhibit the Monitor's work. Monitor's Mar. 16, 2022 Rep. at 25; Monitor's June 8, 2023 Rep. at 19. | Legal Dispute - Monitor Opinion |
| 939 | Some improvements occurred, but they were not sustained as of this filing in November 2023, as similar problems began to reemerge in late 2022 and early 2023, resulting in a lack of transparency, consultation, and collaboration that has impacted the Monitor's work. Monitor's June 8, 2023 Rep. at 19. | Legal Dispute - Monitor Opinion |
| 940 | On July 10, 2023, the Monitor reported that at that time key problems included DOC's failure to provide the Monitor with necessary information; providing inconsistent, inaccurate, incomplete, or misleading information; data errors and poorly vetted information; failing to consult with the Monitor on Nunez-related policies and practices; and poor internal coordination on Nunez matters, among other things. Monitor's July 10, 2023 Rep. at 158-9. | Legal Dispute - Monitor Opinion |
| 941 | Despite the appointment of a Nunez manager, DOC could not provide the Monitor with information in a proactive, timely, consistent, and complete manner as of October 2023. Monitor's Oct. 5, 2023 Rep. at 13, 23. As of November 2023, the Monitor experienced difficulties in verifying data and information and staying apprised of DOC's activities. *Id.* at 12-13; Monitor's Nov. 8, 2023 Rep. at 4, 48 ("Defendants are attempting to hamper the Monitor's work."). | Legal Dispute - Monitor Opinion |
| 946 | DOC had not consulted with the Monitor or received the Monitor's approval prior to promulgating several policies and procedures as set forth in paragraphs 947 to 959 below. | Legal Dispute - Monitor Opinion |
| 959 | In October 2023, the Department sought the Monitor's input on revisions to an ESH policy and advised that any feedback had to be provided in less than 24 hours, despite the fact that proposed revisions were based on feedback from a state oversight body that had been provided to the Commissioner over two months earlier. Monitor's Nov. 8, 2023 Rep. at 55-56. | Legal Dispute - Monitor Opinion |
| 965 | These training materials were provided on June 15 and June 16, 2023 and the Monitoring Team was advised that training would begin on June 19, 2023, after the weekend, precluding meaningful collaboration between DOC and the Monitoring Team. *Id.* | Legal Dispute - Monitor Opinion |
| 970 | In 2023, the quality of training curricula and lesson plans—key to improved staff practice—were significantly flawed. Supervisory training and ESU training require significant revision to reach an adequate level. *See* Monitor's Nov. 8, 2023 Rep. at 3. | Legal Dispute - Monitor Opinion |
| 972 | DOC has withheld information, has provided inaccurate, misleading, or incomplete information, and has obstructed the Monitor's ability to collect information from DOC staff. | Legal Dispute - Other |
| 981 | With respect to the self-harm incident that resulted in an individual's death, *supra* ¶ 975, DOC originally asserted that staff behaved according to policy, when in reality there were questions as to whether self-harm reporting occurred pursuant to policy as well as whether there was active supervision at the time of the incident. *Id* . | Legal Dispute - Monitor Opinion |
| 983 | With respect to the incident which resulted in an incarcerated person (later identified as Mr. Carlton James, *supra* ¶ 260) being paralyzed, *supra* ¶ 975, a Deputy Commissioner unequivocally reported to the Monitor that the individual was injured due to a pre-existing condition that was exacerbated when he fell trying to put on his shoes. Monitor's June 8, 2023 Rep. at 45. The Monitor noted that this explanation as not consistent with the video evidence, and underlying information later provided to the Monitoring Team revealed that the individual had hit his head and that there were a litany of operational concerns that were not originally disclosed. *Id* . | Legal Dispute - Monitor Opinion |
| 988 | With respect to Request 1, in mid-October, 40 days after the information was originally requested, the Department finally produced responsive material. *Id.* at 50. As part of its response, the Department noted that there was an "infrequency of discipline" during 2018-2022 due to prior ID leadership which "permitted over 2000 cases to be summarily dismissed without any discipline for staff." *Id.* The Department thus admitted that it was well-aware of its prior non-compliance with discipline requirements and yet, the Monitor noted the Department did not take any meaningful action since 2022 to address this. *Id.* at 50 (noting DOC's "persistent non-compliance"). | Legal Dispute - Monitor Opinion |
| 990 | On September 5, 2023, the Commissioner further advised the Monitor that he would engage in a back and forth if the Monitor included "glowing representations" about the individual in future reports. The baseless refusal and protracted debate appeared to be "an attempt to interfere with the Monitor's ability to conduct a thorough examination of the issues." *Id.* at 50-51. | Legal Dispute - Monitor Opinion |
| 991 | With respect to request 3, the responsive material--the February 2022 referral letter--was only produced after the Court compelled production on October 30, 2023, over 50 days after the request was made and after debate over baseless objections. *Id.* at 51. This is well beyond the 14-day deadline required by the *Nunez* Court Orders. *Id.* at 51 n. 39. | Legal Dispute - Monitor Opinion |
| 1032 | On October 23, 2023, a senior Department leader threatened the Monitor with legal action to deflect from the issues being discussed and to intimidate the Monitor after the Monitor challenged the Department's proposed plans and confronted that leader's decision to repeat assertions about the failures of prior administrations rather than address the reality of current deficiencies. Monitor's Nov. 8, 2023 Rep. at 53-54. | Legal Dispute - Other |
| 1038 | In May, DOC declared that it would no longer notify the media when an incarcerated person dies in custody, stating that previous notifications were "practice, not a policy." Reuven Blau, *City Jails No Longer Announcing Deaths Behind Bars, Angering Watchdogs* , (May 31, 2023), Ex. 71. | Legal Dispute - Materiality |
| 1039 | On June 30, 2023, Commissioner Molina suspended Captain Lawrence Bond, assigned as an investigator to work for the Department of Investigation, for failure to sign in when entering a DOC facility. Graham Rayman, *NYC Correction Commissioner Louis Molina suspends captain working as investigator for not signing jail logbook (Exclusive)* , N.Y. Daily News (July 4, 2023), Ex. 72. Commissioner Molina's decision appears to violate DOC Directive 7000R, which states investigators "shall have immediate and unrestricted access to all DOC facilities." The Directive states that "This right to immediate access cannot be restricted for any reason and failure to provide immediate access is cause for disciplinary action." | Legal Dispute - Materiality |
| 1040 | DOC has a decades-long history of failure to correct rampant excessive and unnecessary uses of force. | Legal Dispute - Other |

| | | |
|---|---|---|
| 1042 | *Reynolds v. Sielaff*, No. 81 Civ. 101 (S.D.N.Y.), challenged excessive force in the "prison wards" of the hospitals housing people in Department of Correction custody. The case was settled with a consent judgment. Order and Consent Judgment Approving Class Action Settlement, Reynolds v. Sielaff, No. 81 Civ. 101 (S.D.N.Y. Oct. 1, 1990). The consent judgment, *inter alia,* removed correction officers from escort responsibilities. *Id.* ¶¶ 43-44. It further required officers to be screened personally by the respective wards' commanding officer before assignment, and excluded officers with pending disciplinary charges or recent administrative discipline related to the use of force. *Id.* Para 43-48. | Legal Dispute - Materiality |
| 1043 | In 1988, in *Fisher v. Koehler*, 83 Civ. 2128 (S.D.N.Y.), the Court found New York City to have engaged in an unconstitutional pattern and practice of use of force in the Correctional Institution For Men, a Rikers Island jail now called the Eric M. Taylor Center. *Fisher v. Koehler*, 692 F. Supp. 1519 (S.D.N.Y. 1988), *injunction entered,* 718 F. Supp. 1111 (S.D.N.Y. 1989), *aff'd*, 902 F.2d 2 (2d Cir. 1990). The Court found that "systematic deficiencies in the operation of CIFM . . . have led to a world where inmates suffer physical abuse, both by other inmates and by staff, in a chillingly routine and random fashion." *Id.* at 1521. The court found a recurrent pattern of use of force in response to offensive but non-dangerous verbal interactions with incarcerated people; officers' use of excessive force as a means of obtaining obedience and keeping order; force used as a first resort in reaction to any behavior that might possibly be interpreted as aggressive; and serious examples of excessive force by emergency response teams. *Id.* at 1538. It concluded that the jail's "failure to guide and train its officers in the correct use of force and its failure to monitor, investigate and discipline misuse of force have allowed—and indeed even made inevitable—an unacceptably high rate of misuse of force by staff on inmates." *Id.* at 1558. The court ordered the agency to reform their written policies regarding use of force, training, investigation of uses of force, and discipline of staff members found to have used excessive or unnecessary force. *Fisher*, 718 F. Supp. at 1113. | Legal Dispute - Materiality |
| 1044 | *Jackson v. Montemagno,* No. 85 Civ. 2384 (E.D.N.Y.), a class action alleging excessive force in DOC's Brooklyn House of Detention, was filed while *Fisher* was pending. *Jackson* settled on similar terms to *Fisher*, with the added requirement of installing video cameras in the jail's intake area, where the brutality had been concentrated. Order Approving Stipulation of Settlement and Entry as Consent Judgment ¶ 16, *Jackson v. Montemagno*, 85 Civ. 2384 (E.D.N.Y. Nov. 26, 1991). | Legal Dispute - Materiality |
| 1045 | In 1991, *Sheppard v. Phoenix,* 91 Civ. 4148 (S.D.N.Y.) challenged excessive force in the Central Punitive Segregation Unit on Rikers Island. *Sheppard v. Phoenix,* 210 F. Supp. 2d 450 (S.D.N.Y. 2002). The Department agreed to a detailed consent decree imposing substantial obligations on the Department to address the systemic causes of staff brutality and to revise use of force policies regarding training, supervision, investigation and staff discipline as well as administration of the segregation unit. Stipulation of Settlement, *Sheppard v. Phoenix*, No. 91 Civ. 4148 (S.D.N.Y. July 10, 1998); *see also Sheppard v. Phoenix*, No. 91 Civ. 4148, 1998 WL 397846 (S.D.N.Y. July 16, 1998). | Legal Dispute - Materiality |
| 1046 | Ten years later, the fifth class action, Ingles v. Toro, No. 01 Civ. 8279 (S.D.N.Y.), challenged excessive force systemwide, on behalf of a class of all people detained in DOC facilities not subject to court order governing use of force. Ingles v. Toro, No. 01 Civ. 8279, 2003 WL 402565 (S.D.N.Y. Feb. 20, 2003). In 2004, during the pendency of the Ingles class action, DOC reported 974 use of force incidents systemwide, despite an average daily jail population of 13,709—approximately twice the current population. See New York City Mayor's Office of Criminal Justice, Average Daily Jail Population in NYC, available at https://criminaljustice.cityofnewyork.us/individual_charts/average-daily-jail-population-in-nyc/). | Legal Dispute - Materiality |
| 1047 | The City settled *Ingles* in 2006, agreeing to a slate of reforms including revision of the use of force directive, improved training, improved supervision of staff, changes to the investigation of use of force incidents and widespread installation of video cameras throughout the jails. *Ingles*, 2003 WL 402565. | Legal Dispute - Materiality |
| 1048 | DOC has also been subject to numerous lawsuits by individual plaintiffs alleging injuries in use of force incidents pursuant to a City custom and practice of misusing force in the jails. The City has settled scores of such cases for monetary damages. In FY2022, the City paid $37.2 million for claims brought against DOC. See https://comptroller.nyc.gov/reports/annual-claims-report/#ii-tort-claims. | Legal Dispute - Materiality |
| 1049 | In this Action, the Consent Judgment and four remedial orders have proven insufficient to remedy DOC's use of excessive and unnecessary force. *See supra* ¶¶ 74-77. | Legal Dispute - Monitor Opinion |
| 1051 | In 2019, the Monitor indicated that DOC's lack of significant progress to date represented a watershed moment, and that the pace of reform was "glacial" and "difficult to tolerate." Monitor's Seventh Rep. at 8-9, 16. | Legal Dispute - Monitor Opinion |
| 1052 | The pace of reform has not accelerated, and indeed has slowed in some areas—and even regressed in others. Monitor's July 10, 2023 Rep. at 143. "The pace of reform has not accelerated and appears to have stagnated despite direct Orders from the Court in the April 2023 Status Conference, four successive Orders in June, July, August and October 2023 . . . and repeated and ongoing recommendations from the Monitoring Team to address the current conditions." Monitor's Nov. 8, 2023 Rep. at 2. | Legal Dispute - Monitor Opinion |
| 1053 | The Monitoring Team concluded in July 2023 that there is not sufficient evidence to suggest that the pace of reform will accelerate within the confines of current structures. Monitor's July 10, 2023 Rep. at 143. | Legal Dispute - Monitor Opinion |
| 1054 | While DOC has made progress in some areas, it has "lurch[ed] from one hastily developed and/or ill-conceived plan to another," Monitor's Oct. 5, 2023 Rep. at 28, and "stalled initiatives and regression in other areas have neutralized any real sustained momentum toward reform." Monitor's July 10, 2023 Rep. at 142. | Legal Dispute - Monitor Opinion |
| 1055 | The Monitor has also noted the existence of a "complex and often circular cycle of management dysfunction that has prevented [DOC] from advancing along the trajectory of reform." *Id*. | Legal Dispute - Monitor Opinion |
| 1056 | The Monitoring Team has repeatedly seen a cycle wherein initiatives are created, changed in some material way, and then must be restarted, and has noted that "perpetually restarting the clock is antithetical to advancing reform and accelerating progress." *Id.* at 144; Monitor's Nov. 8, 2023 Rep. at 6 ("Plans proposed by [DOC] alter so frequently that they are seldom fully developed before they are changed [] again."); *id.* at 17 (plans are "too often . . . abandoned prior to implementation or . . . discontinued without first attempting to understand which components may have been effective"). | Legal Dispute - Monitor Opinion |

| | | |
|---|---|---|
| 1057 | These patterns are concretely demonstrated by DOC's continued launching and subsequent abandonment of numerous plans, pilots, and facilities over the last eight years. | Legal Dispute - Monitor Opinion |
| 1076 | The initiative was not effective in achieving its goal to improve Staff practice and was discontinued. *See* Monitor's Ninth Rep. at 40. | Legal Dispute - Monitor Opinion |
| 1078 | As the Monitor observed in July 2023, even though DOC has a broad array of data that could be useful in reducing the risk of harm to persons in custody, DOC leadership and staff do not analyze or understand the implications of DOC's own data. See Monitor's July 10, 2023 Rep. at 65-67. | Legal Dispute - Monitor Opinion |
| 1080 | The status and composition of DOC's facilities constantly changes. In 2023, OBCC was re-opened, AMKC was closed, VCBC was closed, and ESH was relocated from GRVC to RMSC. Monitor's Oct. 5, 2023 Rep. at 7. The sizes of the facilities have changed (with multiple facilities now nearing/above 1,000 people in custody) as well as their composition (e.g., adults now comprise the majority of people housed at RNDC; GRVC has a significant population of people who need an increased level of mental health services), with apparently little planning or coordination. *Id.* | Legal Dispute - Monitor Opinion |
| 1084 | In addition to the numerous historical and structural problems that have prevented DOC from complying with the Court's orders, the Monitor has also documented specific failures of DOC's recent executive leadership. *See* Monitor's Nov. 8, 2023 Rep. at 48, n.35: (noting that the Monitor "routinely finds that Department leadership and staff lack the institutional knowledge and history of certain issues...In some cases, []staff appear unaware of their own policy requirements until the Monitoring Team reminds them."). | Legal Dispute - Monitor Opinion |
| 1085 | At any correctional facility and system, in order for the demands, positions and requirements set by senior leadership to be respected and habitually complied with, all staff—whether uniformed or otherwise—must credibly believe that the leadership will be there for the long term. Jacobson Decl. ¶ 14. | Legal Dispute - FRE 703 |
| 1091 | The pattern of frequent and expected turnover of DOC leadership has undermined the various Commissioners' ability to curb staff violence and other malfeasance within the DOC. Jacobson Decl. ¶ 15. | Legal Dispute - FRE 703 |
| 1092 | The frequent changes to the executive leadership team mean that priorities shift and corresponding plans are not realized before they change yet again. *See* Monitor's Nov. 8, 2023 Rep. at 2, 6, 14 ("revolving door of leadership" hinders "full and faithful implementation of both short- and long-term security initiatives"). | Legal Dispute - Monitor Opinion |
| 1093 | Individual facilities are destabilized by a constant revolving door of leadership. *See* Monitor's Nov. 8, 2023 Rep. at 2. | Legal Dispute - Monitor Opinion |
| 1094 | Uniformed staff have ignored and/or refused to comply with directives issued by DOC leadership at least in part because of an understanding among uniformed staff and COBA leadership that they can effectively "wait out" senior DOC leadership before any real repercussions of their noncompliance will occur. Jacobson Decl. ¶ 16. | Legal Dispute - FRE 703 |
| 1097 | The fact that DOC has taken so few disciplinary actions against facility leaders and supervisors is troubling given the volume and pervasiveness of issues regarding the use of force, inefficient performance of duties, and inadequate supervision identified by the Monitor in its routine review of incidents. *Id* . | Legal Dispute - Monitor Opinion |
| 1099 | The Monitor did not find this reversal to be reasonable and found that the decision "[did] not bode well for the prospect of reform." *Id.* The Deputy Warden was subsequently promoted to an Assistant Commissioner of Operations, which was also troubling. *Id.* | Legal Dispute - Monitor Opinion |
| 1102 | DOC leadership deflects ownership of and responsibility for the problems in the jails, and the ways in which current decisions, actions, and inactions perpetuate and, in some areas, worsen the problems. Monitor's Oct. 5, 2023 Rep. at 4, 25; Monitor's Nov. 8, 2023 Rep. at 2 (DOC continues "to spend significant time engaged in a concerted effort to create a narrative that is misleading and wholly inconsistent with the reality of the conditions at [DOC]"). "The consequence of this approach is that the City and Department have normalized the dangerous and chaotic conditions that permeate the jails"; DOC "continues to focus on the failures of prior administrations as pretext for its current actions and inactions [when] the Department's proposals are often substantially similar to those of prior administrations, with little to no apparent awareness that the plans were ineffective in the original incarnation or why." Monitor's Nov. 8, 2023 Rep. at 54. | Legal Dispute - Monitor Opinion |
| 1104 | The state of DOC facilities and public concerns about DOC's management and leadership undercut DOC's ability to attract and retain staff and leaders. Monitor's Oct. 5, 2023 Rep. at 10. A number of individuals have elected not to work with DOC given its reputation and the potentially critical media reports that could be associated with their appointment. *Id.* | Legal Dispute - Monitor Opinion |
| 1108 | For example, the use of force data reveals that an unnecessarily high number of uses of force occur during searches and escorts. Despite available strategies to understand and address the typical dynamics that characterizes each of these factors, DOC has not taken any steps to address either issue. *Id.* at 66; Monitor's Nov. 8, 2023 Rep. at 17 (when provided with specific recommendations to address deficient practices, DOC takes few concrete actions to adopt these recommendations). | Legal Dispute - Monitor Opinion |
| 1109 | DOC leaders focus on particular indicators and metrics to pinpoint areas of progress, but that limited approach is incomplete and inaccurate. Monitor's July 10, 2023 Rep. at 64. | Legal Dispute - Monitor Opinion |
| 1110 | DOC leadership also lack institutional knowledge and awareness of their own policy requirements. *See* Monitor's Nov. 8, 2023 Rep. at 48 n.35. For example, DOC did not follow its policies regarding screening staff for ESU/Special Teams in 2021 or 2023, purportedly because leadership did not know of the requirements. *Id.* | Legal Dispute - Monitor Opinion |
| 1111 | Significant concerns remain about DOC leadership's ability and approach to managing the reform initiative and the extent to which they have fully embraced the requirements of the Nunez Court Orders. Monitor's July 10, 2023 Rep. at 72. | Legal Dispute - Monitor Opinion |
| 1116 | The City made no appreciable progress toward adopting or implementing the recommendation; asserting the view that it is constrained by New York City Administrative Code § 9-117(a) to maintain the five levels of uniform ranks—Correction Officer, Captain, Assistant Deputy Warden, Deputy Warden, and Warden—and further reportedly constrained by § 9-117(b) to only promote from within the agency's uniform ranks. *See also* Monitor's Oct. 28, 2022 Rep. at 79. | Legal Dispute - Monitor Opinion |
| 1119 | Deputy Monitor Anna Friedberg noted in the May 24, 2022 court conference that "the workaround developed is simply insufficient at this stage." Dkt. 460 at 18:19-21. | Legal Dispute - Monitor Opinion |

| | | |
|---|---|---|
| 1132 | Two of the five Assistant Commissioners who were hired from outside of DOC are no longer employed by DOC. One of those Assistant Commissioners was reassigned due to poor performance and/or judgment. Monitor's Nov. 8, 2023 Rep. at 113. | Legal Dispute - Monitor Opinion |
| 1133 | DOC's refusal to consider hiring for other supervisory positions from outside the uniformed ranks impedes cultural change within the facilities and results in underperforming supervisors not being removed simply due to the lack of qualified candidates within the system to replace them. Jacobson Decl. ¶ 18; Monitor's Eleventh Rep. at 15 (Monitor recommended expanding the hiring pool for Deputy Wardens). | Legal Dispute - Materiality |
| 1134 | The reforms required by the Nunez court orders have been the subject of extensive union opposition. | Legal Dispute - Materiality |
| 1135 | Former DOC Commissioner Michael Jacobson stated, "[b]ased on [his] informal discussions with multiple DOC commissioners, including those who served in the DOC in the past five years," that pressure from the Unions "chill[s] effective decision making by DOC leadership and has contributed to the Department's inability to implement the difficult but necessary fundamental policy changes required to change the culture and environment at the Department's facilities." Jacobson Decl. ¶¶ 19-20. | Legal Dispute - FRE 703 |
| 1136 | Specifically, former Commissioner Jacobson testified that Union pressure is a cause of the DOC's "persistent staffing issues." *Id.* ¶ 19. Union pressure also "has [] prevented DOC from appropriately disciplining uniformed personnel who engage in egregious misconduct." *Id.* ¶ 21. "[W]hen leadership attempts to impose discipline despite these systemic issues, there is consistent pushback from the Unions." *Id.* ¶ 22. "[B]eyond any formal limits or restrictions on the Department's ability to suspend officers accused of serious misconduct, I understand that lengthier suspensions do not occur based on informal agreements between DOC leadership and the Unions, even where such suspensions may otherwise be permissible." *Id.* ¶ 21. | Legal Dispute - FRE 703 |
| 1137 | COBA, the Assistant Deputy Wardens/Deputy Wardens Association ("ADW/DWA") and Correction Captains' Association ("CCA") each filed petitions before the Office of Collective Bargaining challenging reforms enacted pursuant to the Nunez Consent Judgment and remedial orders (collectively, "The Union Proceedings"). The Unions lost those challenges after 12 days of hearings. | Legal Dispute - Materiality |
| 1138 | COBA repeatedly opposed the rollout of the revised UOF Directive required by the Consent Judgment, which had an intended effective date of November 20, 2015. 14 OCB2d 10, at 7-9, Ex. 62. COBA insisted to DOC officials that it would be unfair to its members to be held accountable for violating the revised directive unless DOC spent more time informing employees about the policy changes. COBA further opposed DOC information sessions to inform officers about the revised Directive; "Union officials protested that the meetings were an improper form of training." *Id.* at 10. "[D]ue to the protests," DOC did not complete the planned information sessions. *Id.* DOC agreed to substantially delay the rollout of the revised UOF Directive to allow time for officers to learn about the revised UOF Directive; ultimately the revised UOF Directive did not become effective until September 27, 2017, two years after originally planned. *Id.* at 7-11. | Legal Dispute - Materiality |
| 1139 | The Unions further opposed the substance of the revised UOF directive and objected to reforms to protect incarcerated people from excessive force. The President of the ADW union testified during the proceeding that the current use of force directive was "unrealistic." *Id.* at 22. The President of the ADW/DWA testified that: "If you take out your [pepper] spray and spray too close you lose vacation days. If they feel you sprayed too soon and it wasn't fully required yet, you're penalized. So it's safer for them, for their jobs, their vacation days, their records, it is safer in that capacity and it is safer for them physically to avoid the use of force." COBA, 14 OCB2d 10, at 22-23, Ex. 62. The Unions claimed that officers "cannot defend [themselves] effectively," and, as a result, do not "physically engage" incarcerated people at all, which risks officers' safety. *Id.* at 22. | Legal Dispute - Materiality |
| 1147 | For over a year before her termination, the correctional staff unions sought to have the Department terminate Deputy Commissioner Sarena Townsend. According to reporting by the New York Times, in May 2021, after Commissioner Brann resigned, COBA put out a video ending with the words "Who's Next?" overlaid on photos of five other administrators, including Deputy Commissioner Townsend. Commissioner Brann and Timothy Farrell—who had both resigned—had red Xs across their faces. *See* Jan Ransom, *Jail Unions Gain a Powerful Supporter: The New Mayor*, N.Y. Times (Jan. 14, 2022), Ex. 75; Ex. 80 (Who's Next? Image). | Legal Dispute - Materiality |
| 1148 | At a rally held by the Unions in summer 2021, the COBA President led a chant saying, "Sarena Townsend's got to go," where the attendees responded, chanting "Sarena's gotta go, Sarena's gotta go." Ex. 81 (video of the rally). | Legal Dispute - Materiality |
| 1149 | The New York Times also reported that the "the unions launched an online petition calling for Ms. Townsend's firing, recording at least 290 signatures." Ex. 75. | Legal Dispute - Materiality |
| 1150 | The New York Times reported (based on information from Mr. Ferraiuolo, president of the CCA), that "Mr. Molina met with the union leaders for a four-hour lunch at a Queens restaurant" in mid-December 2021. *Id.* During that meeting, the Unions shared concerns about "the disciplinary actions taken against staff under the de Blasio administration." *Id.* | Legal Dispute - Materiality |
| 1151 | On January 3, 2023, the Department terminated Deputy Commissioner Sarena Townsend without a bona fide reason. *See supra* ¶¶ 760- 761. | Legal Dispute - Monitor Opinion |
| 1152 | When publicly questioned as to why he terminated Deputy Commissioner Townsend, Commissioner Molina responded by saying there were two distinct issues as related to her: the first was a "personnel matter," and the second was about the disciplinary system. With respect to the disciplinary system as it related to Townsend, Former Commissioner Molina stated that accountability in the disciplinary system was essential, and that "**improving staff morale is also essential**." January 11, 2022 Public Meeting, New York City Board of Correction, (Jan. 11, 2022), available at https://www.nyc.gov/site/boc/meetings/january-11-2022.page (at 23:45-26:55 (emphasis supplied))." | Legal Dispute - Other |

| | | |
|---|---|---|
| 1153 | After the Department terminated Deputy Commissioner Townsend without a bona fide reason, the Unions took credit for the termination. The COBA President told The New York Post he had asked Molina to terminate her: "We basically told the new commissioner what the problems were out of the gate that we saw morale-wise. He basically took our issues, the issues that we brought to him, and he made his own assessment." He said: "But we absolutely pushed for that. She was not fair in negotiating with us when it came to discipline and we're not sad to see her go." Nolan Hicks & Craig McCarthy, *Eric Adams Defends Firing of Top Internal Jails Cop After Union Pressure*, N.Y. Post (Jan. 5, 2022), Ex. 76. | Legal Dispute - Materiality |
| 1154 | The New Yorker reported: "When I [the New Yorker reporter, Eric Lach] brought up Townsend's dismissal, and the reports that it had been done at the union's behest, [COBA President] Boscio didn't argue. 'We understand that we're a paramilitary organization and discipline exists,' he said. 'But it's the amount of discipline that's the problem.'" Eric Lach, *What is Eric Adams's Plan for the Rikers Island Crisis?*, The New Yorker (Jan. 23, 2022), Ex. 77. | Legal Dispute - Materiality |
| 1155 | On January 4, 2022, COBA and the CCA sent a letter to their members explaining that they had already met with Commissioner Molina and "thank[ed]" him for "taking decisive action" by removing Ms. Townsend, stating they "look forward to his new appointee, whomever that may be, addressing disciplinary action in a more fair and open manner." *See* Ex. 78. | Legal Dispute - Materiality |
| 1156 | On January 4, 2022, the COBA account on X (formerly Twitter) posted a story about Deputy Commissioner Townsend's termination and wrote: "Serena [sic] Townsend had one single mission- to serve as the puppet of a remote fed monitor hellbent on destroying the moral of our essential workforce by writing them up on frivolous charges. Good riddance!" *See* Ex. 79. | Legal Dispute - Materiality |
| 1158 | None of these Commissioners have been able to achieve compliance with the most critical Consent Judgment and Remedial Order provisions, including the core requirement to implement the Use of Force Directive. *See supra*, 214-216. | Legal Dispute - Monitor Opinion |
| 1159 | The Monitor has found that DOC has a "deeply entrenched culture of dysfunction that has persisted across decades and many administrations." Monitor's July 10, 2023 Rep., at 142; Jacobson Decl. ¶ 11 (describing "multi-year decline in safety conditions at the City's jails"). | Legal Dispute - Monitor Opinion |
| 1172 | DOC's efforts are haphazard, tepid, insubstantial. Monitor's Oct. 5, 2023 Rep. at 2-3. 23. They are insufficient to create the culture change and practice improvements necessary to effectuate reform. *Id.* at 2-3, 23. In line with a "diminishing sense of urgency to address the gravity of the problems in the jails," DOC's initiatives are in ongoing "flux or are never fully implemented," and absent "the Monitor's insistence, critical problems were not being recognized or addressed." Monitor's Nov. 8, 2023 Rep. at 56 & n.48. | Legal Dispute - Monitor Opinion |
| 1173 | DOC's response to the Court's June 13, 2023 and August 10, 2023 Orders has been mediocre and fails to address the gravity of the current situation with solutions of equal magnitude. Monitor's Oct. 5, 2023 Rep. at 24. DOC lacks the urgency to address basic security practices, continued and emerging problems with staff availability, a growing abdication of control on the housing units, a failure to adequately identify misconduct when it occurs (via Rapid Reviews and investigations), lapses in timely internal incident reporting and Monitoring Team notification, and continued efforts to impede transparency and obfuscate the work of the Monitoring Team. *Id.* | Legal Dispute - Monitor Opinion |
| 1174 | Instead of a reform trajectory characterized by incremental progress, DOC's path has recently been dominated by deteriorating practices, failures to utilize policies and procedures that had previously been in place, and the inability to effectively implement the few new strategies that have been developed. Sustained and chronic institutional resistance and recalcitrance toward court ordered reform is an insurmountable impediment to any Monitorship. *See* Monitor's Nov. 8, 2023 Rep. at 2 ("pace of reform has not accelerated and appears to have stagnated"). | Legal Dispute - Monitor Opinion |
| 1175 | The Monitor has described a "depth of dysfunction, created over decades of mismanagement, that permeates the entire system," which has led to "a number of interrelated 'problem centers' for which the solution to each is dependent upon finding the solution to some, if not at all, of the others." Monitor's Mar. 16, 2022 Rep. at 2; Monitor's Nov. 8, 2023 Rep. at 18 (DOC "is destined to remain in a persistent state of dysfunction"). | Legal Dispute - Monitor Opinion |
| 1177 | The operations guide for the unit was "poorly written, vague, and ambiguous." *Id.* at 2. The written procedures for the unit, which were not signed by any DOC leadership, reference "Operation Restore Order," but DOC has not provided information to the Monitor about any such operation. *Id.* at 3. The unit has a number of restrictions that may trigger due process rights that are not afforded to the individuals housed there. *Id.* at 3. While people housed in this unit supposedly are given access to mandated services on the unit, it is unclear how it would occur in practice. *Id.* AHRU lacked a robust program design, and the selection of individuals to be housed in the unit appeared to have an "element of arbitrariness." *Id.* at 2-3. The staff assigned to the unit do not appear to be screened to assess their suitability to manage the individuals housed there, nor did they appear to receive training on the unit's operation. *Id.* at 3. | Legal Dispute - Monitor Opinion |
| 1180 | DOC's opening of the unit without prior consultation with or notification to the Monitor is consistent with their poor planning and operation of RESH, where in October 2023, the use of force rate (62.84) was an "astronomically high." *Id.* at 4. Haphazardly and furtively opening a specialized restrictive housing unit is likely to *increase* the risk of harm rather than diminish it. *Id.* at 6. | Legal Dispute - Monitor Opinion |