*Introduction*

The City Council passed Council Bill 549-A on December 20, 2023. The bill seeks to ban the use of solitary confinement and set standards for the use of restrictive housing, de-escalation, emergency lock-ins, the use of restraints and housing special populations (*e.g.,* mental health units, contagious disease units, housing for people who are transgender or gender non-conforming, housing for voluntary protective custody, and housing for purposes of school attendance). A copy of the bill is included as Appendix A.

The Commissioner of the Department of Correction, pursuant to the *Nunez* Court Orders,[1] requested that the Monitoring Team advise and provide feedback to the Department on how the requirements of this bill may impact the Department's ability to comply with the *Nunez* Court Orders. This document provides the Monitoring Team's assessment of the implications this bill will have on the City's and Department's efforts to address the unsafe conditions in the jails, protect individuals from harm, and implement sound correctional practices all of which are necessary to comply with the *Nunez* Court Orders.

*Summary and Discussion of Council Bill 549-A*

Council Bill 549-A is a well-intentioned effort to ensure that no person in the Department's custody is subjected to solitary confinement. This bill also includes a significant number of operational requirements that go beyond eliminating solitary confinement and that would impact the day-to-day management of the City's jails. The majority of these provisions directly relate to requirements of the *Nunez* Court Orders in which the Department is required to consult[2] and seek the Monitor's approval on many issues including, but not limited to, matters relating to security practices,[3] the use of restraints,[4] escorts,[5] lock-in and lock-out time,[6] de-

---

[1] *See*, Consent Judgment, § XX, ¶¶ 24 and 25 and June 13, 2023 Order, § I, ¶ 5.

[2] Consultation with the Monitor is required by over 80 provisions in the *Nunez* Court Orders. Consultation is also required by the Court's June 13, 2023 Order, § I, ¶ 5.

[3] *See* Action Plan § D, ¶ 3 in which the Monitor may direct the Department to refine certain security initiatives to ensure compliance with security requirements of the Action Plan.

[4] *See* Consent Judgment, § IV, ¶ 3(p).

[5] *See* Action Plan, § D, ¶ 2(f) and August 10, 2023 Order, § I, ¶ 3.

[6] *See* August 10, 2023 Order, § I, ¶ 4.

escalation,[7] initial management following a serious act of violence[8] and subsequent housing strategies.[9]

The Monitoring Team believes that eliminating solitary confinement is necessary and important. However, the Monitoring Team has deep concerns about many of the bill's provisions related to the use of restrictive housing, de-escalation, emergency lock-ins, and the use of restraints and escort procedures. Many of the provisions, as currently drafted, could inadvertently undermine the overall goals of protecting individuals from harm, promoting sound correctional practice and improving safety for those in custody and jail staff. Consequently, this could impede the Department's ability to comply with the *Nunez* Court Orders. These issues are described in detail below. Further, a listing of the provisions from the *Nunez* Court Orders that are immediately impacted by Council Bill 549-A, as well as the implications and related concerns to the Monitor's work, is included as Appendix B.

<u>*Managing Individuals Following Serious Acts of Violence*</u>

When evaluating the contents of the bill, important background and context are necessary to understand how individuals are managed following serious acts of violence. The Monitoring Team has repeatedly and consistently reported that the City and Department must have targeted initiatives to address the underlying causes of violence, protect individuals from harm, and ensure that staff use sound correctional practices. An essential component of the effort to ensure the safety and well-being of people in custody and staff working in correctional facilities is having a reliable, safe, and effective response to serious interpersonal violence. Those who engage in serious violence while in custody must be supervised in manner that is ***different*** from that used for the general population. Separating violent individuals from the general population, properly managing congregate time out-of-cell, and limiting out-of-cell time are standard and sound correctional practice, as long as the limitations are reasonably related to the reduction of harm. In this context, reducing out-of-cell time to less than 14 hours per day is necessary to protect individuals from harm and reflects sound correctional practice. The Department must be able to effectively separate those who have engaged in serious acts of violence from potential

---

[7] *See* First Remedial Order, § A, ¶ 3 and Action Plan, § D, ¶ 2(b).

[8] *See* Second Remedial Order ¶ 1(i)(e), Action Plan, § D, ¶ 2(h)

[9] *See* Action Plan, § E, ¶ 4.

victims and, to some degree, limit their freedom of movement when they are engaged in congregate activity outside their cells. Reduced out-of-cell time increases staff's ability to control the environment, improves surveillance, minimizes unsupervised interactions, permits people with interpersonal conflicts to be separated within a single housing unit, and allows staff to better manage out-of-cell activities because fewer individuals are congregating at one time. The Department must also provide the necessary structure and supervision to ensure the safety of the individuals housed in a restrictive setting and should provide rehabilitative services that decrease the likelihood of the individual committing subsequent violent acts.

**It must be emphasized that solitary confinement and restrictive housing are not the same and thus their operational requirements and constraints must be different**. Outlined below are the distinctions between the two housing models.

- Solitary confinement limits out-of-cell time from between 1 to 4 hours a day,[10] for prolonged periods of time (e.g. 15 days or more), affords little human contact and no congregate engagement, and does not provide access to programming.
- Restrictive housing programs include some restrictions on out-of-cell time and other privileges (e.g. limited commissary funds) in comparison to that afforded to the general population but *do not* involve the type of social deprivation that is characteristic of solitary confinement and, as a result, does not place detainees at risk of the significant psychological and physiological deterioration that is associated with solitary confinement.

Given the high level of serious violence in the New York City jails and the high risk of harm faced daily by both those in custody and staff, the Department must be able to operate a restrictive housing program. The goal of restrictive housing programs is to provide safe forms of congregate engagement for those who have committed serious acts of violence while in custody, without placing those housed in general population settings at risk of harm. Such a program clearly must be both well-designed and properly implemented. The distinction between restrictive housing programs and solitary confinement is worth repeating. Restrictive housing enables the Department to safely manage violence-prone individuals in a congregate setting

---

[10] There is no standard definition of solitary confinement. Appendix C includes a summary of definitions of solitary confinement from various reputable sources.

wherein they also retain some access to privileges and programming; while solitary confinement seeks to manage individuals through complete isolation and severe and onerous restrictions.

New York is at the forefront of the nation's efforts to develop restrictive housing models as alternatives to solitary confinement. Restrictive housing models in correctional settings are still relatively new as only a few jurisdictions have attempted to *wholly eliminate* solitary confinement. Restrictive housing models offer alternatives to solitary confinement appropriately balancing the need to preserve order in the general population with the well-being of violence-prone individuals. Viewed on a continuum, there is a point between solitary confinement and general population housing that can accommodate both interests.

The Monitoring Team conducted a review of restrictive housing practices from across the United States (many of these programs have been cited by the City Council and other stakeholders in various public forums as promising alternatives to reduce the reliance on solitary confinement).[11] This review included programs in the following jurisdictions: Alameda County, Cook County Illinois, Colorado, Mississippi, Maine, Nebraska, New York state, and Washington D.C. These programs vary considerably with regard to the qualifying infractions, methods of referral and placement in the units, exclusions, use of isolation, privileges afforded, the role of programming and frequency with which an individual is reviewed. However, one component that was consistent across all programs with which the Monitoring Team is familiar is that they **all** include limitations on out-of-cell time that are more restrictive than that afforded to the general population.[12]

The complexity of developing appropriate restrictive housing programs cannot be overstated—programs for people with known propensities for serious violence who are

---

[11] *See* "A Local Law to amend the administrative code of the city of New York in relation to banning solitary confinement in city jails," Committee Report of the Governmental Affairs Division, New York City Council, September 28, 2022, at pg. 15.; and Statement of Basis and Purpose for Notice of Rulemaking Concerning Restrictive Housing in Correctional Facilities, Board of Correction for the City of New York, March 5, 2021, at pg. 24.

[12] For instance, restrictive housing models in Colorado and Cook County, Illinois have been at the forefront of eliminating solitary confinement *and* developing viable alternative housing programs. These two jurisdictions have been held up as models for reforms to DOC practice. It must be noted the restrictive housing programs in these jurisdictions only permit 4 hours out-of-cell per day, with no limit on the duration that an individual may be housed in such a program, and restraint desks are used for any congregate out-of-cell time. Further, Colorado permits out-of-cell time to be revoked for 7 days as an immediate consequence for subsequent misconduct.

concentrated in a specific location necessitate unique and essential security requirements, particularly during time spent out-of-cell in congregate activities. It is also critical to provide programming and services that focus on reducing the risk of subsequent violence, which requires collaboration among multiple divisions and agencies.

### *Evaluation of Provisions of City Council Bill 549-A*

The members of the Monitoring Team have over 100 years of experience in correctional management and have also been at the forefront of the national effort to reduce and eliminate the use of solitary confinement in adult and juvenile systems. As such, the Monitoring Team is well positioned to evaluate the requirements of this bill and its impact on the Department's ability to address the requirements of the *Nunez* Court Orders and to advance the necessary reforms in the City's jails.

While Council Bill 549-A includes certain important requirements, such as eliminating solitary confinement, many of the provisions of Council Bill 549-A do not provide the City or Department the necessary discretion to safely respond to the immediate aftermath of a serious act of violence, create undue restrictions on management following serious acts of violence as well as on the use of restraints and escorted movement. Further, many of these requirements are not consistent with sound correctional practice or support the overall goal of protection from harm. Outlined below is a summary of the provisions in the bill that create the greatest concerns to safety and impact on the *Nunez* Court Orders. This is not intended to be an exhaustive list of the potential impact of the bill's many requirements.

- **Definition of Solitary Confinement**. The definition of solitary confinement in this bill is not aligned with any definition of solitary confinement known to the Monitoring Team. While there is no standard definition of solitary confinement, there are common parameters which include limiting out-of-cell time from 1 to 4 hours a day, for prolonged periods of time, affording little human contact and no congregate engagement, and denying access to programming. Notably, one of the most frequently cited definitions, the United Nations' "Mandela Rules," defines solitary confinement as an approach where individuals are limited to 2 hours out-of-cell per day *and* deems the

use of solitary confinement for more than 15 days as torture.[13] The definition of solitary confinement in this bill appears to conflate solitary confinement with attempts to address out-of-cell time more generally. Eliminating solitary confinement must be addressed separately from any provisions regarding alternatives to such practice, such as restrictive housing models. It is important the definition of solitary confinement comport with the standard description of that practice to disentangle this practice from others, such as restrictive housing, that are critical and necessary in responding to serious acts of violence. A list of definitions of solitary confinement from a number of reputable sources is provided in Appendix C.

- **Out-of-Cell Time.** The bill requires that, in each 24-hour period, *all* incarcerated individuals must be afforded 14 hours out-of-cell with no restraints or barriers to physical contact with other persons in custody. The two minor exceptions (de-escalation confinement and emergency lock-ins) are limited to 4 hours and so they do not provide the meaningful distinction to this out-of-cell requirement that is needed. **A global approach to out-of-cell time for all individuals in custody significantly endangers both persons in custody and staff and is not consistent with sound correctional practice.** Those with a demonstrated propensity for serious violence must be supervised in a manner that is safe and effectively mitigates the risk of harm they pose to others. Some reduction in out-of-cell time to less than 14 hours per day, with appropriate safeguards, is necessary. For instance, seven hours out-of-cell time in a congregate setting may be appropriate in some cases and *does not* constitute solitary confinement under any correctional standard with which the Monitoring Team is familiar. Limitations on the 14 hours out-of-cell (such as limitations of seven to 10 hours) would, however, minimize the opportunity for violent and/or predatory individuals to visit harm on other persons in custody and staff. Without question, the Department must be permitted some degree of flexibility in order for it to be able to safely manage individuals following serious acts of violence and to protect potential victims, both other incarcerated persons and staff. In fact, the Monitoring Team

---

[13] *See*, UN General Assembly, *United Nations Standard Minimum Rules for the Treatment of Prisoners (the Nelson Mandela Rules): resolution / adopted by the General Assembly*, 17 December 2015, A/RES/70/175, Rules 43 and 44 available at: https://documents-dds-ny.un.org/doc/UNDOC/GEN/N15/443/41/PDF/N1544341.pdf

suggested that such a violence control strategy was necessary to address the current dangerous conditions in the Monitor's November 8, 2023 Report at pgs. 23-24.

- **Restrictive Housing Model.** While Council Bill 549-A describes its alternative housing models as "restrictive housing," it does not appear to actually create or include any discernible restrictions. First, the bill does not permit graduated out-of-cell time for the individuals placed in restrictive housing, which eliminates an important incentive for prosocial conduct. Second, the bill sets arbitrary timeframes for discharge from restrictive housing (e.g., an individual must be removed from the unit if the individual "has not engaged in behavior that presents a specific, significant, and imminent threat" in a 15-day period and must be discharged within 30 days, with no exceptions regardless of the individual's behavior) that do not account for whether an individual continues to pose a risk of harm to others' safety. Third, the required procedures relating to placement on these units are protracted, including significant procedural requirements that provide myriad opportunities for undue delay by the perpetrator of violence before the Department can act to address the underlying conduct. Further, during the time in which this placement decision is being made, the bill includes an impractical standard for pre-hearing detention that could permit the perpetrator of serious violence to remain in general population while awaiting a determination for placement in restrictive housing. Finally, the programming requirements for restrictive housing are at odds with the reality of evidence-based practice. None of the evidence-based curricula with which the Monitoring Team is familiar can be completed within the proposed 15/30-day maximum length of stay in restrictive housing.[14] The constraints this bill places on the design of a restrictive housing model create or exacerbate unsafe conditions because the bill does not permit adequate opportunity for separating those who engage in serious violence from potential victims, which is not consistent with sound correctional practice and support the overall goal of protection from harm.

- **De-Escalation Confinement and Emergency Lock-ins.** Council Bill 549-A limits the duration of de-escalation confinement and emergency lock-in to 4 hours in a 24-hour

---

[14] *See* Monitor's June 30, 2022 Report at pg. 25 which includes a discussion regarding the inability to address behavior change with set time periods for graduation.

period, without exception. It is unclear how this 4-hour standard was determined as the Monitoring Team is not aware of any evidence that de-escalation or the need for emergency lock-in will *always* be resolved in this set time period. While the imminent risk of harm these practices are intended to address *may be* abated in 4 hours, in the Monitoring Team's experience, that is not always the case for each individual or scenario. The goal of these management tools is to de-escalate an individual who has committed a serious act of violence, not a minor infraction, and to mitigate broader risks to other persons in custody or staff triggered by a serious incident that requires a temporary lock-in. Ensuring the individual has de-escalated or the situation that created the need for a lock-in has been addressed must be the guiding principle, not simply an arbitrary passage of time. The 4-hour maximum duration for de-escalation and emergency lock-in provides no flexibility to address a continued risk of harm. Setting an arbitrary time period within which de-escalation and emergency lock-ins must conclude is not sound correctional practice and can create or exacerbate unsafe conditions. The guiding principle for concluding the use of de-escalation and emergency lock-ins must be the extent to which the risk of harm has been abated and safe operations can resume and therefore some degree of flexibility in the duration to conclude these practices is critical and necessary.

- o  The bill contains specific requirements for de-escalation. Some are important, such as requiring that de-escalation does not occur in decontamination showers, but others do not appear to be relevant to the goal of de-escalating an individual following a serious event, such as requiring that the perpetrator of violence must have access to shaving equipment during the de-escalation period. De-escalation occurs when staff constructively engage with the individual to ensure the threat to others has abated. Permitting unfettered access to things such as the telephone (another requirement in the bill) could facilitate dangerous access to individuals who may perpetuate the threat to others' safety rather than reduce it.

- **Use of Restraints and Escorts.** Council Bill 549-A sets a standard for the use of *any* restraints requiring the presence of an imminent risk of harm, which is more restrictive than any standard with which the Monitoring Team has experience. While such a standard does not appear appropriate in many cases, it is further unclear how this

standard could even be operationalized. Of greatest concern is that the bill does not differentiate between the *routine* use of restraints and the use of *enhanced* restraints. The requirements for the use of routine restraints (e.g., the use of restraints for escorts such as transportation to court or movement within the facility) are burdensome, not operationally feasible, and are not aligned with sound correctional practice. Therefore, these restrictions and requirements will in all likelihood create or exacerbate the unsafe conditions. The requirements for using routine restraints also create situations in which one individual may be placed in restraints while others are not, thus placing that individual at unnecessary risk of harm and creating additional complications for staff in trying to manage such a system. Further, while additional procedures are necessary to determine the use of *enhanced* restraints, the standards promulgated in the bill and the process for the evaluating the use of enhanced restraints are burdensome, complicated, and appear to create undue delay, all of which will impede their proper use and potentially create additional risk of harm within the jails. Finally, the bill includes separate requirements for the use of restraints for adults versus individuals under the age of 22 and exceptions for that population that are not permitted for adults (e.g., regarding transportation, it is unclear why individuals under 22 may be restrained when being transported to Court, but adults cannot without meeting a high standard). There does not appear to be any basis for such a distinction, particularly since it is both routine and consistent with sound correctional practice to restrain individuals during transportation to Court and elsewhere. In summary, the bill places unnecessary restrictions on the use of routine restraints and creates overly burdensome procedural hurdles for the use of enhanced restraints, both of which are at odds with sound correctional practice and will potentially increase the risk of harm for detainees and staff.

This bill must also be evaluated through the lens of the current conditions in the City's jails. A myriad of dysfunctional practices and management problems have plagued the City's and Department's management and operation of the jails, as the Monitoring Team has thoroughly documented. The Department remains unable to consistently implement and sustain basic security practices or to manage the jails safely and effectively. Requiring the Department to

implement the provisions of Council Bill 549-A discussed above, particularly given the bill's deficiencies, will only exacerbate the current dysfunction, will impede the goals of promoting the use of sound correctional practices and enhancing jail safety, and impact the Department's ability to comply with the *Nunez* Court Orders.

In summary, Council Bill 549-A includes absolute prohibitions in areas where at least some discretion is necessary, contains requirements that are both vague and ambiguous, contains multiple internal inconsistencies, and sets standards that are not consistent with sound correctional practice. These issues directly impact various Department policies and procedures addressed by the *Nunez* Court Orders and which require the Monitor's approval. In particular, the Monitor must approve procedures regarding managing individuals following serious acts of violence,[15] de-escalation protocols,[16] emergency lock-in protocols,[17] the use of restraints and escorts,[18] and security practices.[19] The Monitor will not approve policies and procedures that include the problematic requirements outlined above because they do not reflect sound correctional practice and would further exacerbate the extant unsafe conditions. Consequently, the Monitoring Team must reiterate its concern that the bill's requirements, as discussed herein, will create situations that will impair, if not prevent, the Department from being able to comply with the *Nunez* Court Orders. An assessment of the impact on the *Nunez* Court Orders is included in Appendix B.

*Conclusion*

The Monitoring Team fully supports the effort to eliminate the practice of solitary confinement. Banning the practice of solitary confinement is an important expression of the value the City places on all of its residents. The goal is laudable and is one we support. Accordingly, the Monitoring Team recommends that the Department immediately ensure that solitary confinement[20] is eliminated in Department policy and practice. This includes

---

[15] *See* Second Remedial Order ¶ 1(i)(e), Action Plan, § D, ¶ 2(h).

[16] *See* First Remedial Order, § A, ¶ 3 and Action Plan, § D, ¶ 2(b).

[17] *See* August 10, 2023 Order, § I, ¶ 4.

[18] *See* Consent Judgment, § IV, ¶ 3(p), Action Plan, § D, ¶ 2(f), and August 10, 2023 Order, § I, ¶ 3.

[19] *See* Action Plan § D, ¶ 3 in which the Monitor may direct the Department to refine certain security initiatives to ensure compliance with security requirements of the Action Plan.

[20] As discussed above, and demonstrated in Appendix C, no standard definition of solitary confinement exists. For purposes of this recommendation, the Monitoring Team recommends the most inclusive

eliminating the use of cells in NIC with extended alcoves, and any other cells or housing units that contain similar physical properties, that do not permit adequate congregate engagement and access to programming. Further, the Department must ensure that decontamination showers may not be locked or utilized for de-escalation or any other form of confinement.

The Monitoring Team strongly believes, based on its many years of experience and expertise, that the various operational requirements and constraints that accompany the elimination of solitary confinement in Council Bill 549-A will likely exacerbate the already dangerous conditions in the jails, intensify the risk of harm to both persons in custody and Department staff, and would seriously impede the City's and Department's ability to achieve compliance with the requirements of the *Nunez* Court Orders. As such, the Monitoring Team recommends significant revisions to Council Bill 549-A are necessary to address the issues outlined in this document and to support the overall goal of managing a safe and humane jail system and advancing the reforms of the *Nunez* Court Orders.

definition of solitary confinement is adopted which would prohibit the confinement of individuals for 20 hours or more a day.

## Appendix XXX – Council Bill 549-A – Passed December 20, 2023

By the Public Advocate (Mr. Williams) and Council Members Rivera, Cabán, Hudson, Won, Restler, Hanif, Avilés, Nurse, Sanchez, Narcisse, Krishnan, Abreu, Louis, Farías, De La Rosa, Ung, Ossé, Gutiérrez, Richardson Jordan, Joseph, Brannan, Menin, Schulman, Barron, Moya, Williams, Powers, Marte, Stevens, Brooks-Powers, Bottcher, Dinowitz, Ayala, Riley, Feliz, Brewer and The Speaker (Council Member Adams) (by request of the Brooklyn Borough President)

A Local Law to amend the administrative code of the city of New York, in relation to banning solitary confinement in city jails and establishing standards for the use of restrictive housing and emergency lock-ins

Be it enacted by the Council as follows:

1    Section 1. Chapter 1 of title 9 of the administrative code is amended by adding a new

2  section 9-167 to read as follows:

3    § 9-167 Solitary confinement. a. Definitions. For the purposes of this section, the following

4  terms have the following meanings:

5    Advocate. The term "advocate" means a person who is a law student, paralegal, or an

6  incarcerated person.

7    Cell. The term "cell" means any room, area or space that is not a shared space conducive

8  to meaningful, regular and congregate social interaction among many people in a group setting,

9  where an individual is held for any purpose.

10    De-escalation confinement. The term "de-escalation confinement" means holding an

11  incarcerated person in a cell immediately following an incident where the person has caused

12  physical injury or poses a specific risk of imminent serious physical injury to staff, themselves or

13  other incarcerated persons.

14    Emergency lock-in. The term "emergency lock-in" means a department-wide emergency

15  lock-in, a facility emergency lock-in, a housing area emergency lock-in, or a partial facility

16  emergency lock-in as defined in section 9-155.

1

1      Out-of-cell. The term "out-of-cell" means being in a space outside of, and in an area away

2    from a cell, in a group setting with other people all in the same shared space without physical

3    barriers separating such people that is conducive to meaningful and regular social interaction and

4    activity or being in any space during the time of carrying out medical treatment, individual one-

5    on-one counseling, an attorney visit or court appearance.

6      Pre-hearing temporary restrictive housing. The term "pre-hearing temporary restrictive

7    housing" means any restrictive housing designated for incarcerated persons who continue to pose

8    a specific risk of imminent serious physical injury to staff, themselves, or other incarcerated

9    persons after a period of de-escalation confinement has exceeded time limits established by this

10   section and prior to a hearing for recommended placement in restrictive housing has taken place.

11      Restraints. For the purposes of this section, the term "restraints" means any object, device

12   or equipment that impedes movement of hands, legs, or any other part of the body.

13      Restrictive housing. The term "restrictive housing" means any housing area that separates

14   incarcerated persons from the general jail population on the basis of security concerns or discipline,

15   or a housing area that poses restrictions on programs, services, interactions with other incarcerated

16   persons or other conditions of confinement. This definition excludes housing designated for

17   incarcerated persons who are: (1) in need of medical or mental health support as determined by

18   the entity providing or overseeing correctional medical and mental health, including placement in

19   a contagious disease unit, (2) transgender or gender non-conforming, (3) in need of voluntary

20   protective custody, or (4) housed in a designated location for the purpose of school attendance.

21      Solitary confinement. The term "solitary confinement" means any placement of an

22   incarcerated person in a cell, other than at night for sleeping for a period not to exceed eight hours

23   in any 24-hour period or during the day for a count not to exceed two hours in any 24-hour period.

2

1   Suicide prevention aide. For the purposes of this section, the term "suicide prevention aide"

2 means a person in custody who has been trained to identify unusual and/or suicidal behavior.

3   Violent grade I offense. The term "violent grade I offense" shall have the same meaning as

4 defined by the rules of the department of correction as of January 1, 2022.

5   b. Ban on solitary confinement. The department shall not place an incarcerated person in a

6 cell, other than at night for sleeping for a period not to exceed eight hours in any 24-hour period

7 or during the day for count not to exceed two hours in any 24-hour period, unless for the purpose

8 of de-escalation confinement or during emergency lock-ins.

9   c. De-escalation confinement. The department's uses of de-escalation confinement shall

10 comply with the following provisions:

11   1. De-escalation confinement shall not be located in intake areas and shall not take place

12 in decontamination showers. Spaces used for de-escalation confinement must, at a minimum, have

13 the features specified in sections 1-03 and 1-04 of title 40 of the rules of the city of New York and

14 be maintained in accordance with the personal hygiene and space requirements set forth in such

15 sections;

16   2. Department staff must regularly monitor a person in de-escalation confinement and

17 engage in continuous crisis intervention and de-escalation to support the person's health and well-

18 being, attempt de-escalation, work toward a person's release from de-escalation confinement and

19 determine whether it is necessary to continue to hold such person in such confinement;

20   3. The department shall conduct visual and aural observation of each person in de-

21 escalation confinement every 15 minutes, shall refer any health concerns to medical or mental

22 health staff, and shall bring any person displaying any indications of any need for medical

23 documentation, observation, or treatment to the medical clinic. Suicide prevention aides may

3

1   conduct check-ins with a person in de-escalation confinement at least every 15 minutes and refer

2   any health concerns to department staff who will get medical or mental health staff to treat any

3   reported immediate health needs. No suicide prevention aide shall face any retaliation or other

4   harm for carrying out their role;

5       4. Throughout de-escalation confinement, a person shall have access to a tablet or device

6   that allows such person to make phone calls outside of the facility and to medical staff in the

7   facility;

8       5. A person shall be removed from de-escalation confinement immediately following when

9   such person has sufficiently gained control and no longer poses a significant risk of imminent

10   serious physical injury to themselves or others;

11       6. The maximum duration a person can be held in de-escalation confinement shall not

12   exceed four hours immediately following the incident precipitating such person's placement in

13   such confinement. Under no circumstances may the department place a person in de-escalation

14   confinement for more than four hours total in any 24-hour period, or more than 12 hours in any

15   seven-day period; and

16       7. In circumstances permitted in subdivision g of this section, the department may transfer

17   a person from de-escalation confinement to pre-hearing temporary restrictive housing.

18       (a) The department shall not place any incarcerated person in a locked decontamination

19   shower nor in any other locked space in any facility that does not have, at a minimum, the features

20   specified in sections 1-03 and 1-04 of title 40 of the rules of the city of New York and maintained

21   in accordance with the personal hygiene and space requirements as set forth in such sections.

22       (b) The department shall not maintain any locked decontamination showers. Any other

23   locked spaces in any facility for holding incarcerated people must at least have the features

4

1   specified in and maintained in accordance with the personal hygiene and space requirements set

2   forth in 40 RCNY § 1-03 and § 1-04.

3       d. Reporting on de-escalation confinement. For each instance an incarcerated person is

4   placed in de-escalation confinement as described in subdivision c of this section, the department

5   shall prepare an incident report that includes a detailed description of why isolation was necessary

6   to de-escalate an immediate conflict and the length of time the incarcerated person was placed in

7   such confinement. Beginning on July 15, 2024, and within 15 days of the end of each subsequent

8   quarter, the department shall provide the speaker of the council and the board of correction all such

9   reports for the preceding quarter and post all such reports on the department's website. The

10   department shall redact all personally identifying information prior to posting such reports on the

11   department's website. Beginning July 31, 2024, and within 30 days of the end of each subsequent

12   quarter, the department shall provide to the speaker of the council and the board of correction, and

13   post on the department's website, a report with data for the preceding quarter on the total number

14   of people placed in such confinement, disaggregated by race, age, gender identity and mental

15   health treatment level, as well as the total number of people held in such confinement

16   disaggregated by whether confinement lasted less than one hour, between one and two hours,

17   between two and three hours, and between three and four hours.

18       e. Use of restraints. 1. The department shall not place an incarcerated person in restraints

19   unless an individualized determination is made that restraints are necessary to prevent an imminent

20   risk of self-injury or injury to other persons. In such instances, only the least restrictive form of

21   restraints may be used and may be used no longer than is necessary to abate such imminent harm.

22   Restraints shall not be used on an incarcerated person under the age of 22 except in the following

23   circumstances: (i) during transportation in and out of a facility, provided that during transportation

5

1    no person shall be secured to an immovable object; and (ii) during escorted movement within a

2    facility to and from out-of-cell activities where an individualized determination is made that

3    restraints are necessary to prevent an immediate risk of self-injury or injury to other persons. The

4    department is prohibited from engaging in attempts to unnecessarily prolong, delay or undermine

5    an individual's escorted movements.

6        2. The department shall not place an incarcerated person in restraints beyond the use of

7    restraints described in paragraph 1 of this subdivision, or on two consecutive days, until a hearing

8    is held to determine if the continued use of restraints is necessary for the safety of others. Such

9    hearing shall comply with the rules of the board of correction as described in paragraph 1 of

10   subdivision f of this section. Any continued use of restraints must be reviewed by the department

11   on a daily basis and discontinued once there is no longer an imminent risk of self-injury or injury

12   to other persons. Continued use of restraints may only be authorized for seven consecutive days.

13       f. Restrictive housing hearing. Except as provided in subdivision g of this section, the

14   department shall not place an incarcerated person in restrictive housing until a hearing on such

15   placement is held and the person is found to have committed a violent grade I offense. Any required

16   hearing regarding placement of a person into restrictive housing shall comply with rules to be

17   established by the board of correction.

18       1. The board of correction shall establish rules for restrictive housing hearings that shall,

19   at a minimum, include the following provisions:

20       (i) An incarcerated person shall have the right to be represented by their legal counsel or

21   advocate;

22       (ii) An incarcerated person shall have the right to present evidence and cross-examine

23   witnesses;

6

1        (iii) Witnesses shall testify in person at the hearing unless the witnesses' presence would

2    jeopardize the safety of themselves or others or security of the facility. If a witness is excluded

3    from testifying in person, the basis for the exclusion shall be documented in the hearing record;

4        (iv) If a witness refuses to provide testimony at the hearing, the department must provide

5    the basis for the witness's refusal, videotape such refusal, or obtain a signed refusal form, to be

6    included as part of the hearing record;

7        (v) The department shall provide the incarcerated person and their legal counsel or

8    advocate written notice of the reason for proposed placement in restrictive housing and any

9    supporting evidence for such placement, no later than 48 hours prior to the restrictive housing

10   hearing;

11       (vi) The department shall provide the legal counsel or advocate adequate time to prepare

12   for such hearings and shall grant reasonable requests for adjournments;

13       (vii) An incarcerated person shall have the right to an interpreter in their native language if

14   the person does not understand or is unable to communicate in English. The department shall take

15   reasonable steps to provide such interpreter;

16       (viii) A refusal by an incarcerated person to attend any restrictive housing hearings must

17   be videotaped and made part of the hearing record;

18       (ix) If the incarcerated person is excluded or removed from a restrictive housing hearing

19   because it is determined that such person's presence will jeopardize the safety of themselves or

20   others or security of the facility, the basis for such exclusion must be documented in the hearing

21   record;

22       (x) A restrictive housing disposition shall be reached within five business days after the

23   conclusion of the hearing. Such disposition must be supported by substantial evidence, shall be

1    documented in writing, and must contain the following information: a finding of guilty or not

2    guilty, a summary of each witness's testimony and whether their testimony was credited or rejected

3    with the reasons thereof, the evidence relied upon by the hearing officer in reaching their finding,

4    and the sanction imposed, if any; and

5        (xi) A written copy of the hearing disposition shall be provided to the incarcerated person

6    and their counsel or advocate within 24 hours of the determination.

7        2. Failure to comply with any of the provisions described in paragraph 1 of this subdivision,

8    or as established by board of correction rule, shall constitute a due process violation warranting

9    dismissal of the matter that led to the hearing.

10        g. Pre-hearing temporary restrictive housing. In exceptional circumstances, the department

11    may place a person in pre-hearing temporary restrictive housing prior to conducting a restrictive

12    housing hearing as required by subdivision f of this section.

13        1. Such placement shall only occur upon written approval of the Commissioner or a Deputy

14    Commissioner, or another equivalent member of department senior leadership over the operations

15    of security. Such written approval shall include: the basis for a reasonable belief that the

16    incarcerated person has committed a violent grade I offense, and whether such person has caused

17    serious physical injury or poses a specific and significant risk of imminent serious physical injury

18    to staff or other incarcerated persons.

19        2. A restrictive housing hearing shall occur as soon as reasonably practicable following

20    placement in pre-hearing temporary restrictive housing, and must occur within five days of such

21    placement, unless the person placed in such restrictive housing seeks a postponement of such

22    hearing.

8

1      3. If a person is found guilty at a restrictive housing hearing, time spent in pre-hearing

2  temporary restrictive housing prior to such hearing determination shall be deducted from any

3  sentence of restrictive housing and such time shall count toward the time limits in restrictive

4  housing.

5      4. Pre-hearing temporary restrictive housing shall comply with all requirements for

6  restrictive housing, including but not limited to those established in subdivision h of this section.

7      5. During the first day of placement in pre-hearing temporary restrictive housing,

8  department staff must regularly monitor the person and engage in continuous crisis intervention

9  and attempt de-escalation, work toward a person's release from pre-hearing temporary restrictive

10  housing and determine whether it is necessary to continue to hold the person in pre-hearing

11  temporary restrictive housing.

12      h. Restrictive housing regulations. The department's use of restrictive housing must

13  comply with the following provisions:

14      1. The department shall not place an incarcerated person in restrictive housing for longer

15  than necessary and for no more than a total of 60 days in any 12 month period.

16      2. Within 15 days of placement of an incarcerated person in restrictive housing, the

17  department shall meaningfully review such placement to determine whether the incarcerated

18  person continues to present a specific, significant and imminent threat to the safety and security of

19  other persons if housed outside restrictive housing. If an individual is not discharged from

20  restrictive housing after review, the department shall provide in writing to the incarcerated person:

21  (i) the reasons for the determination that such person must remain in restrictive housing and (ii)

22  any recommended program, treatment, service, or corrective action. The department shall provide

23  the incarcerated person access to such available programs, treatment and services.

9

1    3. The department shall discharge an incarcerated person from restrictive housing if such

2    person has not engaged in behavior that presents a specific, significant, and imminent threat to the

3    safety and security of themselves or other persons during the preceding 15 days. In all

4    circumstances, the department shall discharge an incarcerated person from restrictive housing

5    within 30 days after their initial placement in such housing.

6    4. A person placed in restrictive housing must have interaction with other people and access

7    to congregate programming and amenities comparable to those housed outside restrictive housing,

8    including access to at least seven hours per day of out-of-cell congregate programming or activities

9    with groups of people in a group setting all in the same shared space without physical barriers

10   separating such people that is conducive to meaningful and regular social interaction. If a person

11   voluntarily chooses not to participate in congregate programming, they shall be offered access to

12   comparable individual programming. A decision to voluntarily decline to participate in congregate

13   programming must be done in writing or by videotape.

14   5. The department shall utilize programming that addresses the unique needs of those in

15   restrictive housing. The department shall provide persons in restrictive housing with access to core

16   educational and other programming comparable to core programs in the general population. The

17   department shall also provide persons in restrictive housing access to evidence-based therapeutic

18   interventions and restorative justice programs aimed at addressing the conduct resulting in their

19   placement in restrictive housing. Such programs shall be individualized and trauma-informed,

20   include positive incentive behavior modification models, and follow best practices for violence

21   interruption. Staff that routinely interact with incarcerated persons must be trained in de-escalation

22   techniques, conflict resolution, the use of force policy, and related topics to address the unique

23   needs of those in restrictive housing units.

1    6. The department shall use positive incentives to encourage good behavior in restrictive

2    housing units and may use disciplinary sanctions only as a last resort in response to behavior

3    presenting a serious and evident danger to oneself or others after other measures have not alleviated

4    such behavior.

5    7. All housing for medical or mental health support provided to persons recommended to

6    receive such support by the entity providing and,or overseeing correctional medical and mental

7    health, including placement in contagious disease units, housing for people who are transgender

8    or gender non-conforming, housing for voluntary protective custody, and housing for purposes of

9    school attendance, shall comply with subdivisions (b), (c), (e), (i), (j) and (k) of this section and

10    paragraphs 4, 5, and 6 of this subdivision.

11    8. For purposes of contagious disease units, after a referral from health care staff, a person

12    may be held in a medical unit overseen by health care staff, for as limited a time as medically

13    necessary as exclusively determined by health care staff, in the least restrictive environment that

14    is medically appropriate. Individuals in a contagious disease unit must have comparable access as

15    individuals incarcerated in the general population to phone calls, emails, visits, and programming

16    done in a manner consistent with the medical and mental health treatment being received, such as

17    at a physical distance determined appropriate by medical or mental health staff.Such access must

18    be comparable to access provided to persons incarcerated outside of restrictive housing units.

19    9. Reporting on restrictive housing. For each instance a disciplinary charge that could result

20    in restrictive housing is dismissed or an incarcerated individual is found not guilty of the

21    disciplinary charge, the department shall prepare an incident report that includes a description of

22    the disciplinary charge and the reasons for the dismissal or not guilty determination. For each

23    instance an incarcerated person is placed in restrictive housing, the department shall prepare an

11

1   incident report that includes a detailed description of the behavior that resulted in placement in

2   restrictive housing and why restrictive housing was necessary to address such behavior, including

3   if a person was placed in pre-hearing temporary restrictive housing and the reasons why the

4   situation met the requirements in paragraph 1 of subdivision g of this section. For each instance in

5   which confinement in restrictive housing is continued after a 15-day review of an incarcerated

6   person's placement in restrictive housing, the department shall prepare an incident report as to why

7   the person was not discharged, including a detailed description of how the person continued to

8   present a specific, significant and imminent threat to the safety and security of the facility if housed

9   outside restrictive housing and what program, treatment, service, and/or corrective action was

10  required before discharge. Beginning on July 15, 2024, and within 15 days of the end of each

11  subsequent quarter, the department shall provide the speaker of the council and the board of

12  correction all such reports for the prior quarter and post all such reports on the department's

13  website. The department shall redact all personally identifying information prior to posting the

14  reports on the department's website. Beginning July 31, 2024, and within 30 days of the end of

15  each subsequent quarter, the department shall provide to the speaker of the council and the board

16  of correction, and post on the department's website, a report with data for the preceding quarter on

17  the total number of people placed in restrictive housing during that time period, disaggregated by

18  race, age, gender identity, mental health treatment level and length of time in restrictive housing,

19  and data on all disposition outcomes of all restrictive housing hearing during such time period,

20  disaggregated by charge, race, age, gender identity and mental health treatment level.

21      i. Out-of-cell time. 1. All incarcerated persons must have access to at least 14 out-of-cell

22  hours every day except while in de-escalation confinement pursuant to subdivision c of this section

23  and during emergency lock-ins pursuant to subdivision j of this section.

12

1       2. Incarcerated persons may congregate with others and move about their housing area

2    freely during out-of-cell time and have access to education and programming pursuant to section

3    9-110 of the administrative code.

4       j. Emergency lock-ins. 1. Emergency lock-ins may only be used when the Commissioner,

5    a Deputy Commissioner, or another equivalent member of department senior leadership with

6    responsibility for the operations of security for a facility determines that such lock-in is necessary

7    to de-escalate an emergency that poses a threat of specific, significant and imminent harm to

8    incarcerated persons or staff. Emergency lock-ins may only be used when there are no less

9    restrictive means available to address an emergency circumstance and only as a last resort after

10   exhausting less restrictive measures. Emergency lock-ins must be confined to as narrow an area as

11   possible and limited number of people as possible. The department shall lift emergency lock-ins

12   as quickly as possible. The Commissioner, a Deputy Commissioner, or another equivalent member

13   of department senior leadership over the operations of security shall review such lock-ins at least

14   every hour. Such lock-ins may not last more than four hours.

15      2. Throughout an emergency lock-in, the department shall conduct visual and aural

16   observation of every person locked in every fifteen (15) minutes, shall refer any health concerns

17   to medical or mental health staff, and shall bring any person displaying any indications of any need

18   for medical documentation, observation, or treatment to the medical clinic. Throughout an

19   emergency lock-in, other than in a department-wide emergency lock-in or a facility emergency

20   lock-in, each person locked in shall have access to a tablet or other device that allows the person

21   to make phone calls both outside of the facility and to medical staff in the facility.

13

1    3. The department shall immediately provide notice to the public on its website of an

2  emergency lock-in, including information on any restrictions on visits, phone calls, counsel visits

3  or court appearances.

4    4. For each instance an emergency lock-in is imposed, the department shall prepare an

5  incident report that includes:

6    (a) A description of why the lock-in was necessary to investigate or de-escalate an

7  emergency, including the ways in which it posed a threat of specific, significant and imminent

8  harm;

9    (b) A description of how other less restrictive measures were exhausted;

10    (c) The number of people held in lock-in;

11    (d) The length of lock-in;

12    (e) The areas affected and the reasons such areas were subject to the emergency lock-in;

13    (f) The medical and mental health services affected, the number of scheduled medical and

14  or mental health appointments missed and requests that were denied;

15    (g) Whether visits, counsel visits or court appearances were affected;

16    (h) What programs, if any, were affected;

17    (i) All actions taken during the lock-in to resolve and address the lock-in; and

18    (j) The number of staff diverted for the lock-in.

19    Beginning July 15, 2024, and within 15 days of the end of each subsequent quarter, the

20  department shall provide the speaker of the council and the board of correction all such reports for

21  the preceding quarter and shall post all such reports on the department's website with any

22  identifying information redacted. Beginning July 15, 2024, and within 15 days of the end of each

23  subsequent quarter, the department shall provide to the speaker of the council and the board of

14

1   correction a report on the total number of lock-ins occurring during the preceding quarter, the areas

2   affected by each such lock-in, the length of each such lock-in and number of incarcerated people

3   subject to each such lock-in, disaggregated by race, age, gender identity, mental health treatment

4   level and length of time in cell confinement.

5      k. Incarcerated persons under the age of 22 shall receive access to trauma-informed, age-

6   appropriate programming and services on a consistent, regular basis.

7      § 2. This local law takes effect 180 days after it becomes law. The board of correction shall

8   take any actions necessary for the implementation of this local law, including the promulgation of

9   rules relating to procedures and penalties necessary to effectuate this section before such date.

10

Session 12
AM
LS # 7797
6/2/22

Session 11
AM
LS # 2666/2936/12523/12658/12676/12913
Int. # 2173– 2020

## Appendix B - *Nunez* Implications of the City Council Bill 549-A

This document provides an assessment of the implications of Bill 549-A to the *Nunez* Court Orders. This document identifies areas where Bill 549-A may diverge from the requirements of the Nunez Court Orders. This document is intended to be evaluated in conjunction with the Monitoring Team's analysis of the bill provided in the main document. This is not intended to be an exhaustive list.

- **Management of Incarcerated Individuals Following Serious Incidents of Violence**: The provisions of the bill include requirements that will not permit DOC to safely and adequately manage those incarcerated individuals that have engaged in serious acts of violence and pose a heightened security risk to the safety of other incarcerated individuals and staff, are not consistent with sound correctional practice, and do not permit adequate protections from harm.
  - o The requirements of Bill 549-A do not comply with:
    - Action Plan, § E, ¶ 4 *Management of Incarcerated Individuals Following Serious Incidents of Violence*;
    - Second Remedial Order ¶ 1(i)(e) *Immediate Security Protocols—Post-Incident Management*;
    - Action Plan, § D, ¶ 2(h) *Improved Security Protocols—Post-Incident Management Protocol*.
  - o Approval of the Monitor:
    - Action Plan, § E, ¶ 4 requires the approval of the Monitor. The Monitor cannot approve any programs by the Department related to the management of incarcerated individuals following serious incidents of violence that include the problematic requirements of Bill 549-A because they are not consistent with sound correctional practice and are unsafe.
  - o Direction of the Monitor:
    - If a Post-Incident Management Protocol (Action Plan, § D, ¶ 2(h)) were to be developed incorporating the problematic requirements of Bill 549-A, the Monitor, pursuant to Action Plan § D, ¶ 3 (*Consultation & Direction of the Monitor*), will require and direct the Department to, among other requirements, ensure the individual is separated from other potential victims until they no longer pose a security threat, ensure that these programs place some limitation on out-of-cell time that differs from that afforded to the general population, and ensure that continued placement in the housing unit is based on the individual's engagement in programming and an assessment of their continued risk of harm. Pursuant to Action Plan § D, ¶ 3, the Department must implement the requirements from the Monitor.

- **Restraints and Escorts**: The provisions of the bill include requirements that do not reflect the proper use of restraints or escort procedures and are not consistent with sound correctional practice and do not permit adequate protections from harm.

- o The requirements of 549-A do not comply with:
    - Consent Judgment, § IV, ¶ 3(p) *Use of Force Policy—Restraints*;
    - Second Remedial Order ¶ 1(i)(a) *Security Plan (escorted movement with restraints when required)*;
    - Action Plan, § D, ¶ 2(a) *Improved Security Initiatives—Security Plan*;
    - Action Plan, § D, ¶ 2(f) *Improved Security Initiatives—Escort Techniques*;
    - August 10, 2023 Order, § I, ¶ 3 *Revise Escort Procedures*.
- o Approval of the Monitor:
    - Consent Judgment, § IV, ¶ 3(p) and August 10, 2023 Order, § I, ¶ 3 require the approval of the Monitor. The Monitor cannot approve the use of restraints or escorted movement that include the problematic requirements of Bill 549-A because they are not consistent with sound correctional practice and are unsafe.
- o Direction of the Monitor:
    - If the use of restraints and escorted movement (Action Plan § D, ¶ 2(a) and (f)) were to be developed incorporating the requirements of Bill 549-A, the Monitor, pursuant to Action Plan § D, ¶ 3 (*Consultation & Direction of the Monitor*), will require and direct the Department to, among other things, ensure proper use of routine restraints, ensure that there is a distinction between the use of routine and enhanced restraints, ensure that reasonable and sound correctional standards for the use of restraints are imposed, and ensure that an individual in restraints is not placed in a vulnerable situation with individuals who are not in restraints. Pursuant to Action Plan § D, ¶ 3, the Department must implement the requirements from the Monitor.

- **De-escalation**: The provisions of the bill include requirements that reflect (a) arbitrary limitations on the use of de-escalation, (b) conditions that are not conducive to the de-escalation, and (c) do not promote adequate protections from harm.
    - o The requirements of 549-A do not comply with:
        - First Remedial Order, § A, ¶ 3 *Revised De-escalation Protocol*;
        - Action Plan, § D, ¶ 2 (b) *Improved Security Initiatives* (first sentence);
        - Action Plan § E, ¶ (4) *Management of Incarcerated Individuals Following Serious Incidents of Violence,* and therefore cannot be approved by the Monitor.
    - o Approval of the Monitor:
        - First Remedial Order, § A, ¶ 3 and Action Plan § E, (4) require the approval of the Monitor. The Monitor cannot approve the use a de-escalation protocol that includes the problematic requirements of Bill 549-

A because they are not consistent with sound correctional practice and are unsafe.

- o  Direction of the Monitor:
  - ▪ If the use of de-escalation protocols (Action Plan, § D, ¶ 2 (b)) were to be developed incorporating the requirements of Bill 549-A, the Monitor, pursuant to Action Plan § D, ¶ 3 (*Consultation & Direction of the Monitor*), will require and direct the Department to, among other things, (a) set reasonable limitations on de-escalation which can be extended beyond 4 hours should there be a continuing risk of imminent harm and (b) ensure the conditions of the de-escalation unit do not pose a risk of harm to the individual or others. Pursuant to Action Plan § D, ¶ 3, the Department must implement the requirements from the Monitor.

- **Emergency Lock-Ins**: The provisions of the bill include requirements that reflect arbitrary limitations on the use of emergency lock-ins create dangerous and unsafe conditions and are not consistent with sound correctional practice and do not permit adequate protections from harm.
  - o  The requirements of 549-A do not comply with:
    - ▪ August 10, 2023 Order, § I, ¶ 4 *Lock-in and Lock-out Procedures*.
  - o  Approval of the Monitor:
    - ▪ August 10, 2023 Order, § I, ¶ 4 requires the approval of the Monitor. The Monitor cannot approve the emergency lock-in procedures that include the problematic requirements of Bill 549-A because they are not consistent with sound correctional practice and are unsafe.

3

## <u>Appendix C – Definitions of Solitary Confinement</u>

      The chart below contains a number of definitions of solitary confinement from various reputable sources. There is no universal, standard definition of solitary confinement, and the practice can be described by various different names (including restrictive housing).  However, it is critical to note that the term solitary confinement includes three basic elements regardless of how it is labeled: (1) confinement in cell for 20-24 hours, (2) for prolonged periods of time (e.g. 15 days), (3) affords little human contact and no congregate engagement, and (4) does not provide access to programming.

| Source | Definition |
|---|---|
| UN General Assembly, *United Nations Standard Minimum Rules for the Treatment of Prisoners (the Nelson Mandela Rules) : resolution / adopted by the General Assembly*, Dec. 17 2015, A/RES/70/175, available at: https://documents-dds-ny.un.org/doc/UNDOC/GEN/N15/443/41/PDF/N1544341.pdf | "Rule 43: 1. In no circumstances may restrictions or disciplinary sanctions amount to torture or other cruel, inhuman or degrading treatment or punishment. The following practices, in particular, shall be prohibited: (a) Indefinite solitary confinement; (b) Prolonged solitary confinement; (c) Placement of a prisoner in a dark or constantly lit cell; (d) Corporal punishment or the reduction of a prisoner's diet or drinking water; (e) Collective punishment. 2. Instruments of restraint shall never be applied as a sanction for disciplinary offences. 3. Disciplinary sanctions or restrictive measures shall not include the prohibition of family contact. The means of family contact may only be restricted for a limited time period and as strictly required for the maintenance of security and order."<br><br>"Rule 44: For the purpose of these rules, solitary confinement shall refer to the confinement of prisoners for 22 hours or more a day without meaningful human contact. Prolonged solitary confinement shall refer to solitary confinement for a time period in excess of 15 consecutive days." |
| HALT Solitary Confinement Act, N.Y. Consol. Laws, Corr. Law § 2.23 | "'Segregated confinement' means the confinement of an incarcerated individual in any form of cell confinement for more than seventeen hours a day other than in a facility-wide emergency or for the purpose of providing medical or mental health treatment. Cell confinement that is implemented due to medical or mental health treatment shall be within a clinical area in the correctional facility or in as close proximity to a medical or mental health unit as possible." |
| Isolated Confinement Restriction Act, N.J. Rev. Stat. § 30:4-82.7 | "'Isolated confinement' means confinement of an inmate in a correctional facility, pursuant to disciplinary, administrative, protective, investigative, medical, or other classification, in a cell or similarly confined holding or living space, alone or with other inmates, for approximately 20 hours or more per day in a State correctional facility or 22 hours or more per day in a county correctional facility, with severely restricted activity, movement, and social interaction. Isolated confinement shall not include confinement due to a facility-wide or unit-wide lockdown that is required to ensure the safety of inmates and staff. 'Less restrictive intervention' means a placement or conditions of confinement, or both, in the current or an alternative correctional facility, under conditions less restrictive of an inmate's movement, privileges, activities, or social interactions." |
| Conn. Gen. Stat. § 18-96b(7) | "'Isolated confinement' means any form of confinement of an incarcerated person within a cell, except during a facility-wide health treatment, with less than the following time out of cell: (A) For all incarcerated persons, four hours per day, on and after July 1, 2022; (B) For all incarcerated persons in the general population, four and a half hours per day, on and after October 1, 2022; and (C) For all incarcerated persons in the general population, five hours per day, on and after April 1, 2023" |

| Source | Definition |
|---|---|
| Mass. Gen. Laws ch. 127, § 1 | "'Restrictive Housing', a housing placement where a prisoner is confined to a cell for more than 22 hours per day; provided, however, that observation for mental health evaluation shall not be considered restrictive housing." |
| Va. Code. § 53.1-39.2 | "'Restorative housing' means special purpose bed assignments operated under maximum security regulations and procedures and utilized for the personal protection or custodial management of an incarcerated person… B. No incarcerated person in a state correctional facility shall be placed in restorative housing unless (i) such incarcerated person requests placement in restorative housing with informed voluntary consent, (ii) such incarcerated person needs such confinement for his own protection, (iii) there is a need to prevent an imminent threat of physical harm to the incarcerated person or another person; or (iv) such person's behavior threatens the orderly operation of the facility, provided that: 1. When an incarcerated person makes a request to be placed in restorative housing for his own protection, the facility shall bear the burden of establishing a basis for refusing the request; 2. An incarcerated person who is in restorative housing for his own protection based on his request or with his informed voluntary consent may opt out of restorative housing by voluntarily removing his consent to remain in restorative housing by providing informed voluntary refusal; 3. An incarcerated person placed in restorative housing for his own protection (i) shall receive similar opportunities for activities, movement, and social interaction, taking into account his safety and the safety of others, as are provided to incarcerated persons in the general population of the facility and (ii) his placement shall be reviewed for assignment into protective custody; 4. An incarcerated person who has been placed in restorative housing for his own protection and is subject to removal from such confinement, not by his own request, shall be provided with a timely and meaningful opportunity to contest the removal; and 5. An incarcerated person who has been placed in restorative housing shall be offered a minimum of four hours of out-of-cell programmatic interventions or other congregate activities per day aimed at promoting personal development or addressing underlying causes of problematic behavior, which may include recreation in a congregate setting, unless exceptional circumstances mean that doing so would create significant and unreasonable risk to the safety and security of other incarcerated persons, the staff, or the facility." |
| Colo. Rev. Stat. § 17-26-302 and § 17-26-303 | § 17-26-302 (6): "'Restrictive housing' means the state of being involuntarily confined in one's cell for approximately twenty-two hours per day or more with very limited out-of-cell time, movement, or meaningful human interaction whether pursuant to disciplinary, administrative, or classification action." § 17-26-303 (i)(II): "If a local jail wants to hold an individual placed in restrictive housing pursuant to subsection (2)(a) of this section for more than fifteen days in a thirty-day period, the local jail must obtain a written court order. A court shall grant the court order if the court finds by clear and convincing evidence that: (A) The individual poses an imminent danger to himself or herself or others; (B) No |

| Source | Definition |
|---|---|
|  | alternative less-restrictive placement is available; (C) The jail has exhausted all other placement alternatives; and (D) No other options exist, including release from custody." |
| Council of Europe: Committee of Ministers, *Recommendation Rec(2006)2 of the Committee of Ministers to Member States on the European Prison Rules*, 11 January 2006, Rec(2006)2, https://search.coe.int/cm/Pages/result_details.aspx?ObjectID=09000016809ee581 | "60.6.a *Solitary confinement, that is the confinement of a prisoner for more than 22 hours a day without meaningful human contact*, shall never be imposed on children, pregnant women, breastfeeding mothers or parents with infants in prison." [emphasis added] |
| Alison Shames et al., Solitary Confinement: Common Misconceptions and Emerging Alternatives, Vera Institute of Justice (May 2015), https://www.vera.org/downloads/publications/solitary-confinement-misconceptions-safe-alternatives-report_1.pdf | "All prisons and many jails in the United States use some form of solitary confinement. Whatever the label, the experience for the person is the same—confinement in an isolated cell (alone or with a cellmate) for an average of 23 hours a day with limited human interaction, little constructive activity, and in an environment that ensures maximum control over the individual. When sources cited in this report refer to the practice as solitary confinement, the authors do as well. Otherwise, consistent with American Bar Association standards, 'segregated housing' is used as the generic term for the practice." |
| Am. Academy of Child & Adolescent Psychiatry, Juvenile Justice Reform Comm., *Solitary Confinement of Juvenile Offenders* (Apr. 2012), https://www.aacap.org/AACAP/Policy_Statements/2012/Solitary_Confinement_of_Juvenile_Offenders.aspx | "Solitary confinement is defined as the placement of an incarcerated individual in a locked room or cell with minimal or no contact with people other than staff of the correctional facility. It is used as a form of discipline or punishment…Solitary confinement should be distinguished from brief interventions such as "time out," which may be used as a component of a behavioral treatment program in facilities serving children and/or adolescents, or seclusion, which is a short term emergency procedure, the use of which is governed by federal, state and local laws and subject to regulations developed by the Joint Commission, CARF and supported by the National Commission of Correctional Healthcare (NCHHC), the American Correctional Association (ACA) and other accrediting entities.  The Joint Commission states that seclusion should only be used for the least amount of time possible for the immediate physical protection of an individual, in situations where less restrictive interventions have proven ineffective. The Joint Commission specifically prohibits the use of seclusion "as a means of coercion, discipline, convenience or staff retaliation." A lack of resources should never be a rationale for solitary confinement." |

| Source | Definition |
|---|---|
| Am. Civ. Liberties Union, *The Dangerous Overuse of Solitary Confinement in the United States* (Aug. 2014), https://www.aclu.org/publications/dangerous-overuse-solitary-confinement-united-states | "Solitary confinement is the practice of placing a person alone in a cell for 22 to 24 hours a day with little human contact or interaction; reduced or no natural light; restriction or denial of reading material, television, radios or other property; severe constraints on visitation; and the inability to participate in group activities, including eating with others. While some specific conditions of solitary confinement may differ among institutions, generally the prisoner spends 23 hours a day alone in a small cell with a solid steel door, a bunk, a toilet, and a sink." |
| Am. Civ. Liberties Union of Maine, *Change is Possible: A Case Study of Solitary Confinement Reform in Maine* (March 2023), https://www.aclumaine.org/sites/default/files/field_documents/aclu_solitary_report_webversion.pdf | "Solitary confinement is the practice of isolating a prisoner in a cell for 22-24 hours per day, with extremely limited human contact; reduced (sometimes nonexistent) natural lighting; severe restrictions on reading material, televisions, radios, or other physical property that approximates contact with the outside world; restrictions or prohibitions on visitation; and denial of access to group activities, including group meals, religious services, and therapy sessions." |
| Amnesty Int'l., *Solitary Confinement in the USA* (Nov. 2013), https://www.amnesty.org/en/documents/amr51/076/2013/en/ | "Amnesty International uses the terms 'solitary confinement' and 'isolation' to refer to prisoners who are confined to cells for 22-24 hours a day with minimal contact with other human beings, including guards and prison staff." |
| Andreea Matei, *Solitary Confinement in US Prisons*, Urban Institute (Aug. 2022), https://www.urban.org/sites/default/files/2022-08/Solitary%20Confinement%20in%20the%20US.pdf | "Although solitary confinement differs between institutions, it is commonly defined as the isolation of a person in a cell for an average of 22 or more hours a day… People in solitary are typically allowed to leave their cells only to shower and for one hour of recreation and are separated during both from the general prison population." |
| Ass'n. for the Prevention of Torture, Solitary Confinement, https://www.apt.ch/knowledge-hub/dfd/solitary-confinement [last visited 1/10/24] | "Solitary confinement consists in keeping an inmate alone in a cell for over 22 hours a day.  Because of the harmful effect on the person's physical and mental well-being, solitary confinement should only be used in exceptional circumstances. It should be strictly supervised and used only for a limited period of time." |
| Int'l. Psychological Trauma Symposium, *The Istanbul Statement on the Use and Effects of Solitary Confinement* (Dec. 9, 2007), | "Solitary confinement is the physical isolation of individuals who are confined to their cells for twenty-two to twenty-four hours a day. In many jurisdictions prisoners are allowed out of their cells for one hour of solitary exercise. Meaningful contact with other people is typically reduced to a minimum. The |

| Source | Definition |
|---|---|
| https://www.solitaryconfinement.org/_files/ugd/f33fff_74566ecc98974f8598ca852e854a50cd.pdf | reduction in stimuli is not only quantitative but also qualitative. The available stimuli and the occasional social contacts are seldom freely chosen, are generally monotonous, and are often not empathetic." |
| Nat'l. Comm'n. on Corr. Health Care, *Position Statement: Solitary Confinement* (Apr. 2016), https://www.ncchc.org/wp-content/uploads/Solitary-Confinement-Isolation.pdf | "Solitary confinement is the housing of an adult or juvenile with minimal to rare meaningful contact with other individuals. Those in solitary confinement often experience sensory deprivation and are offered few or no educational, vocational, or rehabilitative programs. Different jurisdictions refer to solitary confinement by a variety of terms, such as isolation; administrative, protective, or disciplinary segregation; permanent lockdown; maximum security; supermax; security housing; special housing; intensive management; and restrictive housing units. Regardless of the term used, an individual who is deprived of meaningful contact with others is considered to be in solitary confinement." |
| Penal Reform Int'l., Solitary Confinement, https://www.penalreform.org/issues/prison-conditions/key-facts/prison/solitary-confinement/ [last visited 1/10/24] | "While there is no universally agreed definition of solitary confinement – often also called 'segregation', 'isolation', 'lockdown' or 'super-max' – it is commonly understood to be the physical isolation of individuals who are confined to their cells for 22 to 24 hours a day, and allowed only minimal meaningful interaction with others." |
| Ryan Labrecque, *The Effect of Solitary Confinement on Institutional Misconduct: A Longitudinal Evaluation* (2015), https://www.ojp.gov/pdffiles1/nij/grants/249013.pdf | "Although the physical conditions and routines of SC vary by setting and situation, the practice typically includes 22-23 hour a day lockdown with few physical amenities and treatment services made available to inmates… By comparison, inmates living in the general prison population have greater access to various activities (i.e., programming, recreation), which affords them a degree of meaningful social interaction." |
| Ryan Sakoda and Jessica Simes, *Solitary Confinement and the U.S. Prison Boom*, 32(1) Criminal Justice Policy Review, 1 (2019) | "A particularly harsh form of captivity, solitary confinement involves confining an individual to a prison cell for 22 to 24 hours a day and isolating them from the prison's general population. Individuals in solitary confinement have highly restricted access to visitation, phone calls, showers, programs, and free movement outdoors." |
| Sharon Shalev, *A Sourcebook on Solitary Confinement*, Mannheim Centre for Criminology (2008), https://www.solitaryconfinement.org/_files/ugd/f33fff_18782e47330740b28985c5fe33c92378.pdf?index=true | "For the purpose of the Sourcebook, solitary confinement is defined as a form of confinement where prisoners spend 22 to 24 hours a day alone in their cell in separation from each other." |
| Solitary Watch, Solitary Confinement in the United States: | "Solitary confinement is the practice of isolating people in closed cells for as much as 24 hours a day, virtually free of human contact, for periods of time ranging from days to decades." |

| Source | Definition |
|---|---|
| The Facts, https://solitarywatch.org/facts/faq/ [last visited 1/10/24] | |
| U.S. Dep't. of Justice, *Report and Recommendations Concerning the Use of Restrictive Housing: Executive Summary* (Jan. 2016), https://www.justice.gov/archives/dag/file/815551/download | "The most recognizable term for inmate segregation—'solitary confinement'—is disfavored by correctional officials, in part because it conjures a specific, and in some cases misleading, image of the practice.  Not all segregation is truly 'solitary,' at least in the traditional sense of the word.  Many prison systems, including the Bureau, often house two segregated inmates together in the same cell, a practice known as 'double-celling.' To avoid this confusion, the Report adopts the more general terms, "restrictive housing" and 'segregation.' For the purposes of this Report, we define 'restrictive housing' as any type of detention that involves three basic elements:<br>• Removal from the general inmate population, whether voluntary or involuntary;<br>• Placement in a locked room or cell, whether alone or with another inmate; and<br>• Inability to leave the room or cell for the vast majority of the day, typically 22 hours or more." |
| World Med. Ass'n. Statement on Solitary Confinement (Sep. 28, 2020), https://www.wma.net/policies-post/wma-statement-on-solitary-confinement/ | "Solitary confinement is a form of confinement used in detention settings where individuals are separated from the general detained population and held alone in a separate cell or room for upwards of 22 hours a day. Jurisdictions may use a range of different terms to refer to the process (such as segregation, separation, isolation or removal from association) and the conditions and environment can vary from place to place. However, it may be defined or implemented, solitary confinement is characterised by complete social isolation; a lack of meaningful contact; and reduced activity and environmental stimuli… Solitary confinement can be distinguished from other brief interventions when individuals must be separated as an immediate response to violent or disruptive behaviour or where a person must be isolated to protect themselves or others. These interventions should take place in a non-solitary confinement environment." |