**OFFICE OF THE MONITOR**
*NUNEZ, ET AL. V. CITY OF NEW YORK, ET AL.*

Steve J. Martin
Monitor

Anna E. Friedberg
Deputy Monitor

1+1 646 895 6567 | afriedberg@tillidgroup.com

July 17, 2024

<u>**Via Email**</u>

Commissioner Lynelle Maginley-Liddie
Department of Correction
75-20 Astoria Boulevard, Suite 350
East Elmhurst, NY 11370

Dear Commissioner Maginley-Liddie,

      We write in response to your request, pursuant to the *Nunez* Court Orders,[1] for updated advice and feedback from the Monitoring Team on how the requirements of Local Law 42 ("LL42") may impact the Department's ability to comply with the *Nunez* Court Orders. This letter shares some additional advice and feedback since the Monitoring Team's January 12, 2024 letter, but as described below, we believe further consultation is necessary in order to create a more detailed framework for considering LL42's implications for the *Nunez* Court Orders.

---

[1] *See*, Consent Judgment, § XX, ¶¶ 24 and 25 and June 13, 2023 Order, § I, ¶ 5. Combined, these provisions: (1) permit the Department to request the Monitor provide technical assistance or consultation on the Department's efforts to implement the requirements of the *Nunez* Court Orders, (2) permit the Department to request the Monitor provide a written response to a request regarding the Department's compliance with the *Nunez* Court Orders, and (3) requires the Department to proactively consult with the Monitor on any policies or procedures that relate to the compliance with the *Nunez* Court Orders in order to obtain the Monitor's feedback on these initiatives. The Monitor has addressed similar issues in the past. *See*, for example, the Monitor's March 5, 2018 Report (dkt. 309), the Monitor's October 31, 2018 (dkt. 319) letter to the Court, and the Monitor's June 30, 2022 Report (dkt. 467) at pgs. 22 to 27.

Collectively, the Monitoring Team has over 100 years' experience in developing *safe* alternatives to solitary confinement and in helping jurisdictions to formulate reasonable operational practices that ensure adequate protection from harm for incarcerated individuals and staff who work in carceral settings. The Monitoring Team also has extensive expertise and understanding of the Department's operations. As you know, the *Nunez* Court Orders require the Monitor to approve policies that impact on a variety of issues, many of which are affected by the various requirements of LL42. The Monitoring Team believes more detailed discussions are necessary before the Monitor can make any final determinations regarding which policies and procedures required by LL42 (and the corresponding Board of Correction rules that were recently passed) would or would not receive Monitor approval as required by the *Nunez* Court Orders.

This letter first includes background on LL42, followed by a candid assessment of the current limitations that, in our view, indicate that attempting to implement LL42 at this time would be ill-advised as it would be dangerous and would subject incarcerated individuals and staff to further risk of harm. Next, this letter addresses potential conflicts between LL42 and the *Nunez* Court Orders and advises that further analysis is needed to provide a fulsome account of each of LL42's requirements that may conflict with the Monitoring Team's expert opinions regarding sound correctional practice, facility safety, and management of persistently violent detainees. Finally, the letter recommends next steps for addressing any potential conflicts and potential motion practice before the Court.

<u>Background</u>

The City Council passed Local Law 42 on December 20, 2023. The bill was subsequently vetoed by the Mayor of New York on January 19, 2024, but was then signed into law by the City

Council on January 30, 2024, overriding the Mayor's veto. LL42 bans the use of solitary confinement, imposes 14-hours of mandatory out of cell time for all incarcerated individuals, and sets additional requirements for the use of restrictive housing, de-escalation, emergency lock-ins, and restraints and specific conditions for special housing units (*e.g.,* mental health units, contagious disease units, housing for people who are transgender or gender non-conforming, protective custody units, and housing to promote school attendance). The implementation deadline for LL42 is July 28, 2024.

      In early January 2024, pursuant to the *Nunez* Court Orders,[2] you requested the Monitoring Team's advice and feedback on how the requirements of LL42 may impact the Department's ability to comply with the *Nunez* Court Orders. On January 12, 2024, the Monitoring Team provided its assessment of LL42's implications for the City's and Department's efforts to address the unsafe conditions in the jails, to protect individuals from harm, and to implement sound correctional practices, all of which are necessary to comply with the *Nunez* Court Orders. Subsequently, the Monitoring Team has had multiple discussions with your office and other Department officials regarding these matters.

      In late May/early June 2024, the Department advised the Monitoring Team (and subsequently the Parties to the *Nunez* litigation) that it was considering seeking relief from LL42's requirements via the Court in the *Nunez* matter given the Department's concerns that LL42's requirements may impede the Department's ability to comply with the *Nunez* Court Orders in a number of key areas. Likewise, the City advised the Court of its intentions in a letter dated June 5, 2024 (dkt. 724). Following the submission of the City's letter to the Court, the

---

[2] *Id.*

Monitoring Team and the *Nunez* Parties met and conferred on June 18, 2024. Subsequently, the Monitoring Team has had numerous discussions with the Department and representatives for the Plaintiff Class and the Southern District of New York regarding these matters.[3]

*Summary of Local Law 42 & Department's Ability to Implement Local Law 42*

Local Law 42 is a well-intentioned effort to ensure that no person in the Department's custody is subjected to solitary confinement.[4] Eliminating solitary confinement is unquestionably necessary and important for ensuring the humane treatment of people in custody. LL42 also includes many operational requirements that go beyond eliminating solitary confinement. Moreover, LL42 includes unprecedented provisions regarding the management of incarcerated individuals following serious acts of violence and eliminates necessary discretion by correctional management in a manner that could actually result in an increased risk of harm to other incarcerated individuals and staff. The Monitoring Team has grave concerns about the Department's ability to safely implement LL42, particularly given the timeline. Among these concerns are:

1. **Eliminates Essential and Critical Managerial Discretion.** An overarching concern of the Monitoring Team is that the requirements of LL42 impose absolute prohibitions on correctional management that remove all discretion in a number of particularized circumstances where *some* degree of latitude and discretion in judgement to manage immediate threats to security are in fact necessary. For

---

[3] Lawyers for the City Council have scheduled a meeting with the Monitoring Team that will take place in the coming days.

[4] For purposes of this communication, the Monitoring Team adopts the United Nations definition of solitary confinement as 22 hours or more per day without meaningful human contact. *See*, the United Nations Standard Minimum Rules for Treatment of Prisoners, Rule 44.

example, unqualified release from de-escalation confinement in 4 hours; a universal 4-hour limitation on emergency lock-ins; and a requirement that, "in all circumstances" the Department must discharge an incarcerated person from restrictive housing within 30 days. Other provisions in LL42 are ostensibly intended to provide safeguards to those placed in restrictive housing, but absolutely bar correctional managers from exercising necessary discretion to address the risk of harm that may be present to the incarcerated individual in question, other incarcerated individuals, and staff.  There is simply no question that situations arise in correctional settings where an immediate risk of harm must be addressed regardless of arbitrarily imposed limitations that preclude management from addressing the immediate security threat. In application, these provisions that preclude any discretion will in some instances put other incarcerated individuals and staff at greater risk of harm.

2. **Lack of a Proper Foundation to Support Implementation**. The Monitor's Reports to date have repeatedly found that the Department does not have the necessary foundation to support the *basic* reforms required by the *Nunez* Court Orders.  Without reliable adherence to basic security practices, robust protocols for properly deploying and supervising staff, strategies to appropriately manage the incarcerated population, and effective staff accountability, the Department is at present not equipped to safely implement LL42.

3. **Truncated Implementation Timeline**. As the current state of compliance with the *Nunez* Court Orders has brought into stark relief, simply articulating a set of requirements does not create the capacity to properly implement those requirements. In the Monitoring Team's experience, it is not uncommon for jurisdictions to need a

considerable amount of time to lay the groundwork to develop and implement more complex reforms. For example, the Use of Force Directive required by the Consent Judgment was finalized over a year before it was implemented in order to ensure that ancillary supports were properly prepared, and that staff received necessary training on any resulting changes to procedures. Even with a lengthy implementation timeline, the Department has struggled to properly implement the Use of Force Directive's requirements. Whether preparing to implement a court-ordered requirement or a new law, the planning tasks remain the same: evaluating the operational impact, updating policies and procedures, updating the physical plant, determining the necessary staffing complement, developing training materials, and providing training to thousands of staff, all of which must occur before the changes in practice actually go into effect. Rules supporting LL42's implementation were passed by the Board of Correction on June 25, 2024, just one month before LL42 is scheduled to go into effect. As noted above, the Department does not have the requisite foundation to undertake most of the necessary planning tasks, and attempting to do so in just one month's time all but guarantees that the planning will not be as comprehensive or thoughtful as the scope and magnitude of the changes require. Further, the necessary training simply cannot be developed and deployed within such a time frame. The Monitoring Team has long advised that attempting to make significant changes within unreasonable time frames does not support the development of sustainable reforms and often creates a greater risk of harm.

4. **The Department is Not Prepared**. Given the Department's lack of foundation to implement LL42 and the truncated timeline for implementation outlined above,

unsurprisingly, the Department's leadership has reported the Department is not ready to implement this law. More specifically, the Department has not developed the necessary policies, procedures or training to support the requirements of LL42 and thus is not in a secure position to attempt implementation. The fact that those who operate the facilities state they are unprepared and also believe certain aspects of LL42 to be unsafe cannot be ignored, and only serves to further heighten the Monitoring Team's concerns regarding the ongoing risk of harm and the safety of those in the Department's custody and those working in the Department's facilities.

Although the nuances in each jurisdiction differ, the universal reality is that increasing facility safety is a complicated endeavor rife with potential pitfalls. When efforts to reform practices are subject to unreasonably short and absolute timelines and include other requirements that may run counter to standard and sound correctional practice, well-intended reforms can lead to unintended consequences that jeopardize, rather than protect, the safety of incarcerated individuals and staff. Under the current conditions and level of readiness, attempting to implement a complex law that fundamentally changes many of the Department's standard practices and that requires changes that conflict with standard sound correctional practices would increase the risk of harm to incarcerated individuals and staff and therefore would be dangerous for those incarcerated and work in the jails.

*LL42's Potential Conflicts with Nunez Requirements*

Under the *Nunez* Court Orders, the Department has an obligation to implement sound correctional practices and to obtain the Monitor's approval of key policies and procedures. This

includes requirements related to security practices,[5] the use of restraints,[6] escorts,[7] lock-in and lock-out time,[8] de-escalation,[9] initial procedures following a serious act of violence[10] and subsequent housing strategies.[11]

The question of whether the Department can implement LL42 safely and comply with the *Nunez* Court Orders is of the utmost importance because of the direct impact on the safety of all those incarcerated and working in the jails. With respect to the elimination of solitary confinement, the Department reports that it does not utilize solitary confinement (i.e., 22 hours or more per day in a locked cell and without meaningful human contact), but a number of the provisions in LL42 would drastically alter many of the Department's practices. For instance, several of LL42's requirements would impact the Department's core strategy for addressing violent misconduct—its restrictive housing program. Furthermore, the Department routinely utilizes practices (e.g., restraint, de-escalation, mental health units, protective custody, to name a few) that currently include requirements aligned with standard sound correctional practice but that differ from the requirements of LL42, in some cases significantly and dangerously. Certain programs and practices currently in use or that are under development at the Department would require significant alteration, or in some instances would need to be eliminated, as a result of the requirements of LL42.

---

[5] *See* Action Plan § D, ¶ 3 in which the Monitor may direct the Department to refine certain security initiatives to ensure compliance with security requirements of the Action Plan.

[6] *See* Consent Judgment, § IV, ¶ 3(p).

[7] *See* Action Plan, § D, ¶ 2(f) and August 10, 2023 Order, § I, ¶ 3.

[8] *See* August 10, 2023 Order, § I, ¶ 4.

[9] *See* First Remedial Order, § A, ¶ 3 and Action Plan, § D, ¶ 2(b).

[10] *See* Second Remedial Order ¶ 1(i)(e), Action Plan, § D, ¶ 2(h)

[11] *See* Action Plan, § E, ¶ 4.

In January 2024, the Monitoring Team provided the Department with a list of potential conflicts between the requirements of LL42 and the requirements of *Nunez* Court Orders, stressing that implementing LL42's requirements could undercut the Department's ability to achieve compliance in *Nunez*. Given the breadth and complexity of LL42's requirements, extensive consultation with, and ultimately approval from, the Monitor is necessary in order to ensure that the Department's approach to satisfying the *Nunez* requirements is aligned with sound correctional practice.[12]

Recently, the City and the Department engaged the Monitoring Team to explore these issues and potential conflicts in more detail. Fully understanding LL42's requirements and the BOC's respective rules (which were only just passed) in each of the areas listed above (and others that the Monitoring Team may yet identify) and then comparing them to the respective requirements of the *Nunez* Court Orders is an exceedingly complicated undertaking. Each facet is complex and nuanced and must be dissected among those with operational expertise and experience with advancing reform in order to determine where conflicts may exist. If LL42 requires a certain practice that the Monitor determines is not consistent with the requirements of the *Nunez* Court Orders (e.g. the practice is not consistent with sound correctional practice or creates heightened risk of harm), the Monitor may not approve the relevant Department policy, and thus the Department will remain out of compliance with the relevant aspect of the *Nunez* Court Orders.

---

[12] Consultation with the Monitor is required by over 80 provisions in the *Nunez* Court Orders. Consultation is also required by the Court's June 13, 2023 Order, § I, ¶ 5.

*Recommended Next Steps*

The work to identify the practices at issue has started, but extensive discussion and additional time are needed to complete this assessment. The Department and the Monitoring Team must continue to work to identify the requirements of LL42 that, if implemented, may conflict with the *Nunez* Court Orders. Once a more detailed framework of the LL42 requirements that conflict with the *Nunez* Court Orders has been created, the *Nunez* Parties, counsel for the City Council, and the Monitoring Team must meet and confer to determine how to best address the divergence. Given the complexity of the task and the fact that the practices at issue have a direct impact on facility safety, the process must go forward using a detailed, methodical approach. This process will take time in order to arrive at decisions that are grounded in sound correctional expertise and that navigate the complex jurisdictional issues. In addition, several other important legal matters are currently pending before the Court that require the attention of the Department, the *Nunez* Parties, and the Monitoring Team, which must be recognized and accounted for as part of this process.[13] Accordingly, the Monitoring Team recommends that the work outlined in this letter is undertaken between now and October 24, 2024, at which time the Court can be updated on the status of these issues and the necessity for any potential motion practice.

We look forward to working with you and your team on these important matters.

Sincerely,

s/ Steve J. Martin
Steve J. Martin, *Monitor*
Anna E. Friedberg, *Deputy Monitor*

---

[13] For example, the Court has directed the Parties and the Monitoring Team to meet and confer in late August and early September on matters related to the Motion for Contempt. *See* July 11, 2024 Court Order (dkt. 751).