# Exhibit B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARK NUNEZ, ET AL.<br><br>                      Plaintiffs,<br><br>   -against-<br><br>THE CITY OF NEW YORK, ET AL.<br><br>                   Defendants. | Case No. 11-cv-5845 (LTS) |

**UPDATED[1] PROPOSED FINDINGS OF FACT IN SUPPORT OF PLAINTIFFS'
MOTION FOR CONTEMPT AND APPOINTMENT OF A RECEIVER**


**REVISED– JULY 30, 2024**

---

[1] This updated Proposed Findings of Fact is intended to replace Dkts. 605 and 610, filed publicly and under seal, respectively, as a result of a meet and confer process between the Parties as ordered by the Court at Dkt.725.

## TABLE OF CONTENTS

I.   The Court Has Entered a Consent Judgment and Several Remedial Orders
     To Remedy Defendants' Violation of the Law ......................................................1

     A.   Consent Judgment and Appointment of Monitor .....................................1

     B.   Entry of First Remedial Order ..................................................................5

     C.   Entry of Second Remedial Order ..............................................................8

     D.   Entry of Third Remedial Order ...............................................................11

     E.   Entry of Action Plan and Subsequent Court Orders ...............................13

II.  The Plaintiff Class Continues to Suffer Extreme Levels of Harm in DOC's
     Custody .............................................................................................................18

     A.   Use of Force Incidents ............................................................................21

     B.   Serious Injuries to Incarcerated Individuals ..........................................23

     C.   Stabbings and Slashings ..........................................................................26

     D.   Fights .......................................................................................................28

     E.   GRVC, RNDC, AMKC Violence Reduction Plans ................................30

     F.   Deaths in Custody ...................................................................................35

          1.   Deaths in DOC Custody in 2023 .................................................36

          2.   Deaths in DOC Custody in 2022 .................................................44

III. DOC Uses Unnecessary and Excessive Force in Violation of the Consent
     Judgment and UOF Directive ...........................................................................55

     A.   UOF Directive Section II - Unnecessary and Excessive Force .............55

          1.   Rapid Reviews Document Avoidable or Unnecessary Uses of
               Force in Violation of UOF Directive Section II .........................57

          2.   ID Investigations Document Excessive, Unnecessary, and
               Avoidable Uses of Force in Violation of UOF Directive Section II..........60

     B.   UOF Directive Section II(G) – High Impact Force and Prohibited
          Techniques ..............................................................................................63

     C.   UOF Directive Section V(B)(1) – Punitive and Retaliatory Force .......64

D.     UOF Directive Section V(B)(2) – Offensive Language, Provocatory Conduct, and Instigating Violence ........................................................64

IV.     DOC Security Failures and Poor Staff Practice Lead to Use of Force ............................75

A.     Background on Remedial Orders Addressing Security Failures and Poor Staff Practice ...........................................................................76

1.     Entry of the Second Remedial Order's Security Initiatives......................80

2.     Entry of the Action Plan's Security Initiatives ...........................................83

B.     DOC Has Failed to Comply with the Second Remedial Order's and the Action Plan's Provisions That Address Security Lapses ................................84

1.     DOC Has Failed to Implement the Interim Security Plan ........................87

2.     DOC Has Failed to Secure Doors. ..............................................................90

3.     Abandoned Posts and Staff Off-Post .........................................................91

4.     Failure to Tour .............................................................................................92

5.     Improper and Painful Escort Practices.......................................................97

6.     Improper Search Practices. .........................................................................99

7.     Deficient Efforts to Detect and Remove Weapons and Contraband.................................................................................................100

8.     Poor Security Practices in Vestibule Areas .............................................101

9.     Poor Key Control and Failure to Secure OC Spray ................................102

C.     DOC's Own Reviews Establish Staff Breaches of Safety Protocols, Leading to Violence and Disorder. .......................................................................102

V.     DOC's Failure To Staff and Deploy Emergency Response Teams Appropriately, Leading to Unnecessary and Excessive Force .................................................................124

A.     History of ESU...................................................................................................124

B.     ESU Engages in Unnecessary and Excessive Force ............................................125

C.     Emergency Response Teams Are Inappropriately Large ....................................131

D.     ESU's Use of Tactical Weaponry .......................................................................131

E.    DOC Fails to Screen Out Violent or Problematic Staff from Emergency
      Response Teams..........................................................................................132

F.    DOC Has Delayed Updating ESU Screening Policies ..........................135

G.    DOC's Appointment of New ESU Leadership ......................................136

H.    DOC Did Not Revise ESU Policies ......................................................137

VI.    DOC Has Not Ensured Adequate Supervision of Its Staff & Operations.......................139

A.    DOC's Supervisory Structure ...............................................................139

B.    Supervisory Failures at Multiple Levels of Uniform Leadership Have
      Led to Multiple Remedial Orders .........................................................139

      1.    Entry of the First Remedial Order regarding Facility-Level and
            Line-Level Supervision...............................................................143

C.    DOC Has Not Complied with the First Remedial Order § A, ¶ 2,
      regarding Facility Leadership ...............................................................144

      1.    Longstanding Failures to Identify Misconduct: Rapid Reviews.............148

      2.    Failures to Use Available Information to Address UOF
            Deficiencies................................................................................152

D.    DOC Has Not Complied with First Remedial Order § A, ¶ 4,
      Action Plan § C, ¶¶ 3(ii), 3(iii) regarding Sufficient and Adequate
      Supervision by ADWs and Captains......................................................157

      1.    The Number of ADWs and Captains Assigned to Facilities
            Has Not Meaningfully Increased. ...............................................158

      2.    ADWs Provide Inadequate Supervision .....................................160

      3.    Deficient and Improper Promotions Limit the Number of
            ADWs Available for Supervision and Hamper the Delivery
            of Adequate and Appropriate Supervision.................................167

VII.    DOC Has Not Improved and Maximized the Deployment of Staff To Work
        with Incarcerated People.........................................................................173

A.    The Department's Staffing Framework is Dysfunctional and
      Institutionalizes its Poor Staffing Practices and is Directly Linked
      to Escalating Use of Force ....................................................................175

B.    DOC Has Not Deployed Sufficiently Experienced Uniform Staff to
      Housing Units and Has Not Sufficiently Addressed Absence Policies ..............177

C.      DOC Has Not Reduced Awarded Posts.................................................180

D.      DOC Has Not Maximized Work Schedules for Optimal Staffing.....................182

E.      DOC Has Not Reduced Uniform Staff in Civilian Posts.....................................185

F.      DOC Has Not Conducted a Post Analysis...........................................................187

VIII.    Failure to Conduct Thorough, Timely, and Objective Investigations and to
         Hold Staff Accountable for Misconduct ........................................................188

A.      DOC Has Failed to Conduct Objective, Thorough Investigations ....................191

B.      DOC Has Not Issued Discipline for Biased, Incomplete, or Inadequate
         Investigations. ...................................................................................................203

C.      DOC Has Failed to Complete Investigations in a Timely Manner.....................203

D.      Staffing at ID Remains Inadequate ...................................................................206

E.      Even When Misconduct is Detected, DOC Frequently Fails to
         Respond with Appropriate Discipline................................................................208

        1.      Formal Discipline.....................................................................................209

        2.      Command Discipline ................................................................................215

IX.     The City Has Failed in its Obligations to Young Adults in its Custody.........................218

A.      Failure to Protect 18-Year-Old People in Custody from an Unreasonable
         Risk of Harm......................................................................................................219

B.      Failure to Implement Direct Supervision...........................................................222

C.      Failure to Implement Consistent Assignment of Staff.......................................227

X.      Self-Harm...............................................................................................................231

XI.     DOC's Failure To Consult, Cooperate, and Provide Accurate Information...................236

A.      DOC Promulgates *Nunez*-Related Policies and Protocols Without
         Consulting or Receiving Approval from the Monitor..........................................237

B.      The City Promulgates *Nunez*-Related Trainings Without Consulting
         the Monitor........................................................................................................240

C.      The City Withholds Essential Information and Provides Inaccurate
         Information .........................................................................................................241

1.   May 26, 2023 Report Regarding Five Serious Incidents .........................242

2.   Withholding and Delayed Production of *Nunez* Related
     Information .................................................................................................245

3.   Inaccurate information regarding Intake .................................................246

4.   Inaccurate information regarding the promotion of ADWs ..................250

5.   Inaccurate Information regarding ESU ..................................................250

6.   Inaccurate Information regarding Awarded Posts ..................................251

7.   Notifications about serious hospital cases .............................................252

8.   Conflicting Information Regarding Submachine Guns and
     De-Escalation Units ..................................................................................252

D.   Obstructing Access to DOC Staff .......................................................................253

E.   DOC Withholds Information from and Obstructs Other Oversight
     Bodies ...................................................................................................................254

XII.  Defendants Are Unwilling or Unable to Undertake the Reforms Necessary
      to Achieve Substantial Compliance with the Court's Orders ...........................257

A.   Numerous Lawsuits, Injunctions, Settlements, and Remedial Orders
     Have Failed to Stop DOC's Use of Excessive and Unnecessary Force .............257

B.   Accepting DOC's Pace of Reform Leads Only to Further Delay .......................261

C.   DOC Has Launched and Abandoned Numerous Reform Plans, Pilots, and
     Initiatives Over the Years, Wasting Resources and Leading to Delay ...............262

D.   DOC's Executive Leadership Is Inadequate and Does Not Use
     Existing Data for Reform Efforts .......................................................................268

1.   Executive and Facility Leadership Constantly Changes .........................268

2.   Commissioners' Failures to Issue Appropriate Discipline .....................270

3.   Executive Leadership Is Inadequate to the Task of Reform ...................272

4.   DOC Resists External Candidates for Facility Leadership
     Positions ....................................................................................................274

5.   The Correctional Officer Unions Have Repeatedly Opposed and
     Challenged the Use of Force Directive and Consent Judgment .............279

6

6.      The Unions Successfully Advocated For The Termination of The Disciplinary Manager ....................................................................285

E.      Monitor's Conclusions Regarding DOC's Ability to Implement Reform ..............................................................................................289

F.      November 15, 2023 Update from Monitor ........................................293

Chart of Substantive Filings By the *Nunez* Monitor ....................................................296

List of Acronyms and Definitions..................................................................................300

I.    **The Court Has Entered a Consent Judgment and Several Remedial Orders To Remedy Defendants' Violation of the Law[2]**

    A.    **Consent Judgment and Appointment of Monitor**

1.    On May 24, 2012, the Plaintiff Class filed this action against Defendants. *See* Dkt. 15. In their Second Amended Complaint, the Plaintiff Class alleged that DOC engaged in a pattern and practice of using unnecessary and excessive force against people in DOC's custody in violation of the Eighth and Fourteenth Amendments to the U.S. Constitution as well as the Constitution and laws of the State of New York. *See* Dkt. 34.

2.    Beginning in 2012, the United States Attorney's Office for the Southern District of New York ("SDNY") conducted an investigation into the treatment of young male individuals, between the ages of 16 and 18, incarcerated at jails on Rikers Island pursuant to the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. § 1997, and Section 14141 of the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S. § 14141.

3.    On August 4, 2014, the SDNY and Department of Justice ("DOJ") issued a findings letter pursuant to CRIPA that concluded that young male individuals between the ages of 16 and 18 were being subjected to unconstitutional conditions of confinement. In particular, the findings letter asserted that the City had engaged in a pattern and practice of: (a) subjecting these individuals to excessive and unnecessary force; (b) failing to adequately protect them from violence inflicted by other incarcerated individuals; and (c) placing them in punitive segregation at an alarming rate and for excessive periods of time. *See* Dkt. 178 at ¶ 19.

---

[2] All exhibits and declarations are attached to the Declaration of Mary Lynne Werlwas dated November 17, 2023, with the exception of items filed on the case docket such as the Monitor's reports, the Monitor's letters, and transcripts of status conferences. An index of the Monitor's filings can be found at the end of this document. A table of acronyms can also be found at the end of this document.

4.    On December 23, 2014, the Court granted the United States' motion to intervene in this action. *See* Dkt. 181.

5.    On October 21, 2015, the Court entered a Consent Judgment in this matter requiring the Defendants to take specific actions to remedy a pattern and practice of excessive and unnecessary use of force by staff against incarcerated individuals, and to develop and implement new practices, policies, and procedures designed to reduce violence in the jails and ensure the safety and well-being of incarcerated individuals. *See* Dkt. 249 [hereinafter "Consent Judgment"].

6.    The purpose of the Consent Judgment is to protect the constitutional rights of the individuals confined in jails operated by DOC. The terms and requirements of the Consent Judgment are to be interpreted consistent with the measures necessary to protect the constitutional rights of incarcerated individuals and are not meant to expand or contract the constitutional rights of individuals incarcerated in the jails operated by DOC. *See* Consent Judgment at 1.

7.    The Parties stipulated and agreed, and the Court found, that (a) the Consent Judgment complies in all respects with the provisions of 18 U.S.C. 3626(a); and (b) the prospective relief in the Consent Judgment is narrowly drawn, extends no further than is necessary to correct the violations of federal rights as alleged by the United States and the Plaintiff Class, is the least intrusive means necessary to correct these violations, and will not have an adverse impact on public safety or the operation of a criminal justice system. *Id.* at Section XXII, ¶ 1.

8.    Pursuant to Section XX, ¶ 1 of the Consent Judgment, Steven J. Martin was appointed as the Court's Monitor (the "Monitor") and is responsible for providing the parties and

the Court with neutral and independent assessments of DOC's compliance with the Consent

Judgment. Declaration of Steve J. Martin dated Nov. 9, 2023 ("11/9/2023 Martin Decl.") at 3,

Dkt. 596. The Monitor is responsible for assessing compliance by independently verifying any

representations by DOC regarding its progress towards compliance and examining any

supporting documentation. *Id.* The Monitor must provide the factual basis for his findings in his

reports to the Court. *Id.*

9.      The Monitor hired a team of subject matter experts and staff (the "Monitoring

Team") to assist him in assessing compliance with the Consent Judgment. *See* Monitor's July 10,

2023 Rep. at 2 (listing members of the *Nunez* Monitoring Team); 11/9/2023 Martin Decl. at 1.

10.     The Monitoring Team has conducted countless site visits, observed operations via

video and other information, and met with staff of all levels and leadership in the jails. 11/9/2023

Martin Decl. at ¶ 4. The Monitoring Team receives significant amounts of information from

DOC, including routine data, information, and reports on a weekly, bi-weekly, and monthly

basis. The Monitoring Team has also reviewed thousands of videos, reports, and investigations

(including Facility Investigations, Preliminary Reviews, Intake Investigations, and Full ID

Investigations) related to use of force, other violent incidents, and other DOC operations. It has

also reviewed material related to in-custody deaths (or deaths of individuals shortly after release

in 2022 and 2023).

11.     The Monitor and his team routinely provide technical assistance and

recommendations to DOC. The Monitoring Team provides support at a basic level, as well as

ensuring that new policies, protocols, and training curricula comport with generally accepted

practice and the requirements of the *Nunez* court orders, and identifying targets that are ripe for

root cause analysis. 11/9/2023 Martin Decl. at ¶ 5. The Monitoring Team has shared with DOC

over 700 separate feedbacks with recommendations, comments, and questions on a variety of topics, including use of force practices, security practices and protocols, identifying and addressing use of force, supervision, and training. *Id.*

12. Pursuant to Section XX, ¶ 16 of the Consent Judgment, the Monitor is required to file reports with the Court each Reporting Period describing the efforts DOC has taken to implement the requirements of the Consent Judgment and evaluating the extent to which DOC has complied with each substantive provision of the Consent Judgment.

13. The Monitor has filed at least 50 reports with the Court covering the period of October 22, 2015 to November 8, 2023. 11/9/2023 Martin Decl. at ¶ 8 & Ex. G. The reports are drafted by the Monitor and his team, reflecting his professional judgment and expertise in monitoring the jails, and include facts and information provided by DOC and analyses by the Monitor and his team. *Id.* The reports detail the steps taken by the Monitoring Team to assess compliance and the factual basis for the Monitor's findings. *Id.* Their observations and the supporting facts and information relating to these observations are developed after careful review and consideration to provide a proper basis for establishing the level of compliance and any recommendations for appropriate remedial action necessary to fulfill the aims of the Court's Orders. *Id.*

14. The Monitoring Team's method of assessing compliance, as reflected in its reports, consists of evaluating multiple measures in each key area of the Consent Judgment, Remedial Orders, and Action Plan (i.e., staffing, safety and security, managing people in custody, and staff discipline) because no one metric adequately represents the multi-faceted nature of these requirements. 11/9/2023 Martin Decl. at ¶ 6. The Monitoring Team does not interpret data—whether qualitative or quantitative—in a vacuum to determine whether progress

has been made or compliance has been achieved. *Id.* The Monitoring Team uses a combination of quantitative data, qualitative data, contextual factors, and reference to sound correctional practice to assess progress with the court orders. *Id.*

15.      Until December 2021, when the Monitor's reports became more frequent, the Monitor routinely provided all Parties with drafts of the reports prior to their publication, and accepted the Parties' comments to the drafts for consideration.

16.      **The Monitor's written submissions to the Court via letters and reports reflect his work, along with the Monitoring Team's, that to the best of his ability is accurate, neutral, independent, balanced, objective, fair, reasonable, and presents reasonable and responsible assessments of the work of DOC. 11/9/2023 Martin Decl. at ¶ 9.**

> **Nature of Dispute**:          Legal Dispute-Materiality
> **Position of Defendants**:    Defendants do not object that this is an accurate recitation of the Monitor's Declaration; defendants submit that the Monitor's motivations, intentions, and efforts are not material to the instant motion practice.
> **Position of Plaintiffs**:     The Monitor's extensive efforts and the reliability of those efforts are highly relevant and material to this motion practice. First, Plaintiffs have argued that the Court should credit the Monitor's expert opinions when considering Plaintiffs' motion for contempt, and the objectivity and accuracy of the Monitor's work is highly relevant to those arguments. Second, this information is relevant to Plaintiffs' arguments that measures of remediation less than the appointment of a receiver are futile, because even with the years of active, reliable, and objective Monitoring, Defendants have not achieved substantial compliance. *See* Dkt. 603 at 74-78.

**B.      Entry of First Remedial Order**

17.      The Monitor filed nine monitoring reports with the Court that covered the period of October 22, 2015 to December 31, 2019. *See* Dkt. 269, 291, 295, 305, 311, 317, 327, 332, 341.

18.      In those nine reports, the Monitor repeatedly found Defendants to be in non-compliance with Section IV, ¶ 1 (Implementation of Use of Force Directive); Section VII, ¶ 1 (Thorough, Timely, Objective Investigations); Section VII, ¶ 7 (Timeliness of Preliminary

5

Reviews); Section VII, ¶ 9 (Timeliness of Full ID Investigations); Section VIII, ¶ 1 (Appropriate

and Meaningful Staff Discipline); Section XV, ¶ 1 (Inmates Under the Age of 19, Protection

from Harm); and Section XV, ¶ 12 (Inmates Under the Age of 19, Direct Supervision). *See* Dkt.

350 at 2.

19.    By letter dated June 25, 2019 and as required by Section XXI, ¶ 2 of the Consent

Judgment, counsel for the United States and counsel for the Plaintiff Class provided Defendants

with written notice that they believed Defendants were not in compliance with the following

provisions of the Consent Judgment: Section IV, ¶ 1 (Implementation of Use of Force Directive);

Section VII, ¶ 1 (Thorough, Timely, Objective Investigations); Section VII, ¶ 7 (Timeliness of

Preliminary Reviews); Section VII, ¶ 9 (Timeliness of Full ID Investigations); Section VII, ¶ 11

(ID Staffing); Section VIII, ¶ 1 (Appropriate and Meaningful Staff Discipline); Section XV, ¶ 1

(Inmates Under the Age of 19, Protection from Harm); Section XV, ¶ 12 (Inmates Under the Age

of 19, Direct Supervision); and Section XV, ¶ 17 (Inmates Under the Age of 19, Consistent

Assignment of Staff). *See* Ex. 48.

20.    Counsel for the United States and the Plaintiff Class drafted a proposed Remedial

Order with specific steps for DOC to take to remedy its non-compliance with the Consent

Judgment. *See* Dkt. 343 at 3. DOC discussed the proposed Remedial Order with the Monitor at

length, and a counterproposal was shared with counsel for the Plaintiff Class and counsel for the

United States on June 5, 2020. *Id.* The parties then spoke on multiple occasions and exchanged

multiple drafts of the proposed remedial order. *Id.*

21.    DOC reached a joint agreement with the Plaintiff Class and the United States

regarding the content of the proposed remedial order. *See* Dkt. 347.

22.     The Monitor submitted a Declaration setting forth the rationale and basis for his belief that remedial measures outlined in a first remedial order were necessary, and explaining the approach taken in tailoring the proposal to properly address the implicated rights and interests. *See* Dkt. 348-1.

23.     Defendants agreed that the measures in the proposed remedial order were necessary to correct the violation of Plaintiffs' constitutional rights, were narrowly drawn, and were the least intrusive means of correcting the violation. *See* Dkt. 350 at 2.

24.     Defendants agreed that the measures in the order would not have an adverse impact on public safety. *Id.* at 10.

25.     On August 14, 2020, the Court entered a Remedial Consent Order Addressing Non-Compliance (the "First Remedial Order"). *See* Dkt. 350.

26.     The First Remedial Order was designed to address Defendants' ongoing non-compliance with several sections of the Consent Judgment. It required DOC to (a) implement initiatives to enhance safe custody management, improve staff supervision, and reduce unnecessary use of force, including (i) ensure facility leadership reviewed each use of force promptly and implemented prompt corrective action when needed, (ii) generate operational changes or corrective action plans for facilities after reviewing use of force incidents in the facility, (iii) ensure sufficient assignment of Assistant Deputy Wardens (hereinafter "ADWs")s to supervise captains, (iv) revise the way in which staff are selected for emergency response teams, and how emergency response teams are deployed; (b) conduct improved and prompt use of force investigations, including by creating an "Intake Investigation Unit" to review each use of force investigation and determine whether a Full ID Investigation is required; (c) provide timely, appropriate, and meaningful staff accountability; (d) ensure appropriate supervision of

18-year-old incarcerated individuals at the Robert N. Davoren Center (hereinafter "RNDC"), including consistent staff assignments and leadership. *See* Dkt. 350.

27.     The Parties stipulated and agreed, and the Court found, that the First Remedial Order complies in all respects with the provisions of 18 U.S.C. 3626(a). *Id.* at § F, ¶ 4.

C.     **Entry of Second Remedial Order**

28.     In the Monitor's Eleventh Report filed on May 11, 2021, the Monitor reported that Defendants were in non-compliance with Consent Judgment and Remedial Order provisions, including: Consent Judgment § IV, ¶ 1 (Implement the New Use of Force Directive), § VII ¶ 9(a) (Timely Full ID Investigations), § VIII, ¶ 1 (Timely, Appropriate, and Meaningful Accountability), § VIII. ¶ 4 (Trials Division Staffing), § XV, ¶ 1 (Prevent Fights/Assaults—18-year-olds), § XV. ¶ 12 (Direct Supervision—18-year-olds), § XV, ¶ 17 (Consistent Assignment of Staff—18-year-olds); Remedial Order § A ¶ 2 (Facility Leadership Responsibilities), § A, ¶ 3 (Revised De-escalation Protocol), § A, ¶ 6 (Facility Emergency Response Teams), § D, ¶ 1 (Consistent Staffing), § D, ¶ 2 (ii) (Tracking of Incentives and Consequences), and § D, ¶ 3 (Direct Supervision). *See* Monitor's Eleventh Rep. at 121-122, 222-227, 195-196, 257-258, 289, 301-307, 108-110, 317-320. The Monitor found that "the pervasive level of disorder and chaos in the Facilities is alarming [and the] conditions that gave rise to the Consent Judgment have not been materially ameliorated," noting that DOC's progress toward the use of force reforms required by the Consent Judgment and First Remedial order had "stagnated in key areas." *Id.* at 4-5.

29.     On June 3, 2021, the Monitor filed a Second Remedial Order Report confirming that the non-compliance had continued, and that, "in nearly every substantive area of the Consent Judgment, the Department's practices remain problematic, and progress remains insufficient." *See* Dkt. 373 at 4.

30.     On August 24 and September 2, 2021, the Monitor filed Special Reports with the Court identifying emergency conditions in the jails affecting the Plaintiff Class. See Dkts. 378 at 4 (referencing a "state of seriously compromised safety [which] has spiraled to a point at which, on a daily basis, there is a manifest risk of serious harm to both detainees and staff"); 380 at 1 (outlining steps the Monitor advised the City "take *immediately* to address the ongoing dangerous and unsafe conditions in New York City jails.") (emphasis in original).

31.     The Monitor filed another report on September 23, 2021. *See* Dkt. 387. The Monitor reported that "[t]he current state of affairs is nothing short of an emergency posing an immediate threat to the safety and well-being of Inmates and Staff;" that the current "harmful conditions in the jails are directly linked to DOC's failure to comply with the foundational requirements of the Consent Judgment and the Remedial Order;" and that the "use of force rate remains extremely high." *Id.* at 2-3.

32.     The Monitor's September 23, 2021 report set forth a number of recommended steps to address what the Monitor called "unsafe conditions" and "failure to comply with the foundational requirements of the Consent Judgment and Remedial Order." *See* Dkt. 387 at 1-2, 13-14.

33.     On September 24, 2021, this Court held a conference with the Monitor and the parties to discuss the Monitor's recommendations in its September 23, 2021 report and DOC's ongoing noncompliance with the Consent Judgment and Remedial Order. *See* Dkt. 407 (transcript of proceedings).

34.     Plaintiffs withdraw this proposed fact.

35.     The Plaintiff Class and the United States moved for the entry of a second remedial order that fully incorporated the recommendations the Monitor made in his September 23, 2021 report, which they asserted were necessary to achieve compliance with the requirements of the Consent Judgment and First Remedial Order. *See* Dkt. 391.

36.     The parties worked together to reach an agreement on the content of the second remedial order. *See* Dkt. 394 at 1. DOC did not dispute the content or need for a remedial order. *See* Dkt. 393 at 1.

37.     The Monitor submitted a Declaration setting forth the rationale and basis for his belief that the remedial measures included in the proposed second remedial order were necessary, and explaining the approach taken in tailoring the proposal to properly address the implicated rights and interests. *See* Dkt. 397-2 at 2.

38.     Defendants agreed that the measures in the proposed second remedial order were necessary to correct the violation of Plaintiffs' constitutional rights, were narrowly drawn, and were the least intrusive means of correcting the violation. *See* Dkt. 398 at 5.

39.     Defendants agreed that measures in the proposed second remedial order would not have an adverse impact on public safety. *Id.*

40.     The parties jointly requested that the Court approve the proposed second remedial order. *See* Dkt. 394 at 1-2.

41.     On September 29, 2021, the Court entered a Second Remedial Consent Order Addressing Non-Compliance (the "Second Remedial Order"). *See* Dkt. 398.

42.     The Second Remedial Order contained several specific steps for DOC to implement that would address the areas of non-compliance with the Consent Judgment and First

Remedial Order, and adopted the recommendations set forth in the Monitor's September 23, 2021 report. Dkt. 398 at 3; *id.* at 3-5.

43.     The Parties stipulated and agreed, and the Court found, that the Second Remedial Order complies in all respects with the provisions of 18 U.S.C. § 3626(a). *Id.* at § 3.

44.     On June 3, 2021, the Monitor submitted the Second Remedial Order Report to the Court, which detailed, among other things, the flaws in DOC's disciplinary processes and procedures, the lengthy delays in resolving disciplinary proceedings, and the insufficient number of Trials Division staff to prosecute the large volume of pending disciplinary cases. *See* Dkt. 373.

**D.     Entry of Third Remedial Order**

45.     The Eleventh Monitor's Report (Dkt. 368), the Second Remedial Order Report (Dkt. 373), and the Status Report on Use of Force Discipline dated September 30, 2021 (Dkt. 399), detailed DOC's ongoing failure to achieve substantial compliance with the Consent Judgment's requirement to "impose appropriate and meaningful discipline" (Section VIII, Paragraph 1), and the First Remedial Order's requirements regarding "timely, meaningful, and appropriate staff accountability" (Section C).

46.     In particular, the Monitor found DOC to be non-compliant with Section VIII, ¶ 1 of the Consent Judgment. Dkt. 399 at 2. The Monitor noted that DOC's non-compliance was prolonged, over four years by that point in time, and had a significant negative impact on DOC's ability to progress toward compliance with other components of the Consent Judgment. *See Id.*; Dkt. 423-1 at 4. He said that DOC's non-compliance had resulted in a significant backlog of cases of over 1,900 disciplinary cases pending resolution. *Id.* at 3.

47.     The Monitor developed recommendations to address the backlog that were contained in his September 30, 2021 status report. Monitor's Sept. 30, 2023 Rep at 4-5. From those recommendations, the parties extensively negotiated a third remedial order, mindful of the

operational challenges and burdens associated with implementing the relief and agreeing that the relief was appropriately tailored to address such concerns while still serving the goal of reducing excessive and unnecessary use of force and violence in the City jails. *Id.*

48.     Defendants agreed that the measures in the proposed third remedial order were necessary to correct the violation of Plaintiffs' constitutional rights, were narrowly drawn, and were the least intrusive means of correcting the violation. *See* Dkt. 424 at ¶ 7.

49.     Defendants agreed that the measures in the proposed third remedial order would not have an adverse impact on public safety. *Id.*

50.     The parties jointly agreed to the content of the third remedial order, and jointly requested that the Court enter the order. *See* Dkt. 423 at 1-2.

51.     On November 22, 2021, the Court entered a Third Remedial Consent Order (the "Third Remedial Order"). *See* Dkt. 424.

52.     The Third Remedial Order contained several provisions designed to bring DOC into compliance with Section VIII, ¶ 1 of the Consent Judgment, including: (a) identifying priority cases among the backlog for closure; (b) increasing the number of Office of Administrative Trials and Hearings ("OATH") pre-trial conferences; (c) developing policies and procedures to streamline and enhance the timeliness of OATH procedures; (d) increase staffing in DOC's Trials Division; and (e) appointing a Disciplinary Manager to manage DOC's efforts to comply with the staff accountability provisions of the Consent Judgment, First Remedial Order, and Third Remedial Order. *Id.*

53.     The Parties stipulated and agreed, and the Court found, that the Third Remedial Order complies in all respects with the provisions of 18 U.S.C. 3626(a). Dkt. 424 at § 7.

### E.     Entry of Action Plan and Subsequent Court Orders

54.     On December 6, 2021, the Monitor submitted a Twelfth Report (Dkt. 431) covering the period of January 1, 2021 to June 30, 2021 ("Monitor's Twelfth Rep."); on December 22, 2021, the Monitor submitted a Third Remedial Order Report (Dkt. 435); and on March 16, 2022, the Monitor submitted a Special Report (Monitor's Mar. 16, 2022 Rep.) (Dkt. 438). These three reports continued to report DOC's longstanding noncompliance with key provisions of the Consent Judgment and Remedial Orders.

55.     The Monitor's Twelfth Rep. identified four foundational patterns and practices that created an unsafe environment for incarcerated individuals and DOC staff: (a) Security practices and procedures—including failure to secure doors, poor situational awareness, frequent and excessive use of emergency response teams, overreliance on intake—that are deeply flawed, inconsistent with best practice and, in some cases, illogical; (b) inadequate supervision of line staff and facility leadership who do not possess the requisite expertise and ability to lead; (c) staffing practices and procedures that have resulted in ineffective deployment across the agency; and (d) Limited, and extremely delayed, accountability for staff misconduct. Monitor's Twelfth Rep. at 12. To ensure that the Consent Judgment could be implemented, and to eliminate the unsafe conditions of confinement, the Monitor recommended that DOC improve security practices; appoint facility leaders, including a security operations manager, with deep correctional expertise; improve management and deployment of staff; eliminate the backlog of disciplinary cases; and ensure timely accountability for staff misconduct. *Id.* at 13-14.

56.     Within three months of the Twelfth Rep., the Monitor's March 16, 2022 report noted that, despite the entry of the Second Remedial Order in September 2021, DOC's attempts to implement the required remedial steps faltered, and in some instances regressed. Monitor's Mar. 16, 2022 Rep. at 1. The Monitor noted that DOC's staffing crises, excessive staff

absenteeism, and dysfunctional staff management and deployment practices, if left unaddressed, made systemic reform elusive, if not impossible, to obtain. *Id.* The Monitor found that DOC staff and supervisors lacked elementary skills and did not adequately supervise subordinates, did not implement security plans intended to address the immediate security problems, and incarcerated individuals remained in intake for lengthy periods of time. Since January 2022, DOC essentially eliminated a proactive and collaborative approach with the Monitoring Team in its compliance efforts, reduced its level of cooperation, and limited its information-sharing and access in ways that inhibited the work of the Monitoring Team. *Id.* at 25.

57.    The Monitor's March 16, 2022 Report set forth a series of recommendations to address the four foundational issues identified by the Monitor, including (a) creation of adequate staffing practices, (b) addressing security practices, and (c) increasing staff accountability. *Id.* at 67-74.

58.    Between March 16, 2022 and April 20, 2022, the Monitoring Team convened at least 15 meetings with counsel for the Plaintiff Class, counsel for the United States, counsel for the City, and counsel and representatives from DOC. The Monitoring Team also met with the DOC Commissioner on at least three occasions to discuss the appointment of the Disciplinary Manager and Staffing Manager; to provide a briefing on the Monitoring Team's staffing analysis; and to discuss significant security concerns at RNDC. The Monitoring Team also facilitated two meetings with all parties together. DOC agreed in principle with the Monitoring Team's recommendations, with some modifications to address various operational issues and considerations. *See* Dkt. 445 at 5; Dkt. 450 at 1.

59.    The Commissioner and the City represented at an April 26, 2022 status conference that DOC was in general agreement with the Monitoring Team on all of its

recommendations, and that it was working with the Monitoring Team to develop an implementation plan to be submitted to the Court for approval. *See* Dkt. 456 at 23:8-13, 24:25-25:5.

60.     The Monitor submitted a proposed fourth remedial order (the "Action Plan") that reflected the recommendations in its March 16, 2022 Special Report. The Action Plan identified "specific immediate steps the City and DOC must take to reduce the risk of harm in the City's jails *now* and to lay the groundwork that begins to disentangle the decades of dysfunction and mismanagement that characterizes this agency." *See* Dkt. 454 at 1.

61.     The Action Plan was the product of numerous, lengthy, and substantive discussions among the parties. *See* Dkt. 458 at 1; Dkt. 462 at 1. The Commissioner noted at a May 2022 status conference that DOC had provided "significant input" to the development of the Action Plan, and that the Action Plan outlined the work needed to address the four foundational issues raised by the Monitor. *See* Dkt. 460 at 48:14-25.

62.     The City supported the Court's entry of the Action Plan, describing it as a "road map to sustainable reform and to the stabilization of [DOC]," that would "ensure the safety of all those who live and work at Rikers." *See* Dkt. 463 at 1. The City stated in May 2022 that "there are no legal impediments to us fulfilling our obligations under the Action Plan." Tr. of May 24, 2022 Status Conference at 70:5-6, Dkt. 460.

63.     Defendants agreed that the measures in the Action Plan were necessary to correct the violation of Plaintiffs' constitutional rights, were narrowly drawn, and were the least intrusive means of correcting the violation. *See* Dkt. 350 at 2.

64.     Defendants agreed that the measures in the Action Plan would not have an adverse impact on public safety. *Id.*

15

65.    On June 14, 2022, the Court entered the Action Plan. *See* Dkt. 465.

66.    The Action Plan set forth a series of remedial measures designed to address the Defendants' ongoing non-compliance with the Consent Judgment and the First, Second, and Third Remedial Orders, including (a) immediate initiatives to address harm, including ensuring routine tours were conducted, ensuring sufficient staff were working with incarcerated individuals, ensuring that appropriate supervision and leadership were in place at the facility level and at the executive level; (b) citywide initiatives to support reform, including convening a citywide task force that could help DOC timely and meaningfully address the requirements of the remedial orders, expediting cases of individuals incarcerated for more than a year; (c) uniform staffing practices, such as the appointment of a staffing manager, the creation of a roster management unit, the modification of staffing practices to maximize the deployment of uniform staff within the facilities, and the adoption of department-wide scheduling software; (d) security practices, including hiring a security operations manager and improving security issues identified in prior remedial orders; (e) management of people in custody, including the appointment of a classification manager and the development of a centralized custody management unit; (f) staff accountability, including ensuring sufficient staff for DOC's Trials Division, quickly resolving certain serious cases involving egregious conduct or multiple violations, revising the command discipline policy, and addressing the disciplinary backlog. *Id.*

67.    The Court found that the Action Plan complies in all respects with the provisions of 18 U.S.C. § 3626(a). *See id.* at § H.

68.    On June 13, 2023, the Court entered an order (the "June 13, 2023 Order") that, among other things, required the City and DOC to provide the Monitor with timely access to information. *See* Dkt. 550.

69.     On July 10, 2023, the Monitor's assessment was "that the City and Department have not made substantial and demonstrable progress in implementing the reforms, initiatives, plans, systems, and practices outlined in the Action Plan." Monitor's July 10, 2023 Rep. at 173.

70.     The Monitor further assessed that under the Action Plan, there had not been a substantial reduction in the risk of harm facing incarcerated individuals and Department staff. *Id.*

71.     The Monitor recommended short-term, interim measures for DOC to implement by December 31, 2023 to address DOC's non-compliance with certain requirements of the Consent Judgment and Remedial Orders. *Id.* at 178-79 & Appendix E. Those recommendations included: the development of metrics and data for use as indicators of use of force, security, and violence; revised procedures and protocols on searches, escorts, and lock-in in housing areas, command level orders for ESU, screening and assignment of staff to special teams, pre-promotional screening policies and procedures, door security, and command discipline; ensuring staff remain on post; revised trainings for ESU; hiring staff for ID; reporting on intake; and conducting an assessment of DOC and H+H's policies on self-harm. *Id.* at 236-39.

72.     On August 10, 2023, the Court entered an order largely adopting the Monitor's July 10, 2023 recommendations. *See* Dkt. 564.

73.     After the Monitor filed an additional status report on October 5, 2023, the Court issued another order regarding DOC's "unacceptable" attempts to "unduly influence or interfere with the work of the Monitor." *See* Dkt. 582. The Court required Defendants to "devise a plan that can be implemented immediately to ameliorate the unacceptable levels of harm in the New York City jails" and address reporting deficiencies. *See id.*

**II.    The Plaintiff Class Continues to Suffer Extreme Levels of Harm in DOC's Custody**

74.    The use of force rate and other rates of violence, self-harm, and deaths in custody are demonstrably worse than when the Consent Judgment went into effect in 2015. The current rates of use of force, stabbings and slashings, fights, assaults on staff, and in-custody deaths remain extraordinarily high. Throughout the eight-year period, the jails' safety has deteriorated in an alarming fashion, producing negative outcomes that occur far more often than in 2016. Monitor's July 10, 2023 Rep. at 12; Monitor's Nov. 8, 2023 Rep. at 1.

75.    There has been no substantial reduction in the risk of harm currently facing incarcerated individuals and DOC staff. As the Monitor recently concluded, "[t]he jails remain dangerous and unsafe, characterized by a pervasive, imminent risk of harm to both people in custody and staff," Monitor's Oct. 5, 2023 Rep. at 1, such that "both people in custody and staff in the jails continue to face a grave risk of harm *on a daily basis.*" Monitor's Nov. 8, 2023 Rep. at 2; Monitor's July 10, 2023 Rep. at 173. Both incarcerated individuals and staff continue to face a grave risk of harm on a daily basis. *See* Monitor's Nov. 8, 2023 Rep. at 2.

76.    High rates of violence, high use of force rates, the continued prevalence of excessive and unnecessary force, and apathetic and slipshod security practices frequently produce chaos, trauma, injuries, and, in some cases, death. *See* Monitor's Nov. 8, 2023 Rep. at 2.

77.    The unsafe and dangerous conditions in the jails, characterized by unprecedented rates of use of force and violence, have become normalized despite the fact that they are clearly abnormal. Monitor's Oct. 5, 2023 Rep. at 24-25; Monitor's Nov. 8, 2023 Rep. at 1 (problems remain pervasive and rampant in the jails).

78.    **In a single week from September 11, 2023 to September 17, 2023, 145 uses of force, 12 stabbings/slashings, 74 fights among incarcerated individuals, 48 individuals engaged

in self-injurious behavior, 3 medical emergencies, 5 individuals that received Narcan, 15 fires,

34 assaults on staff, and 19 serious injuries were reported to DOC's Central Operations Desk

(hereinafter "COD"). Monitor's Oct. 5, 2023 Rep. at 17 & App. C. One incarcerated individual

was left unattended in a recreation yard. *Id.* And a significant amount of contraband, including

weapons, drugs, and cell phones, was recovered. *Id.***

> **Nature of Dispute**:        Legal Dispute-Materiality
> **Position of Defendants**:    Not Disputed insofar as the proposed finding reflects what is
> stated on the cited pages of the Monitor's report. Disputed, insofar as the volume of
> reported incidents during the week of September 11- September 17, 2023, is not
> representative of incidents reported during a larger time frame, and is misleading as
> presented. For example, the average weekly number of slashings/stabbings in 2023 was
> 7.3 (40% lower than the 12 incidents reported during 9/11-9/17). These statements ignore
> the decrease in volume of violent incidents and the reported in and general trends in
> relations to previous months and years. See Declaration of Associate Commissioner
> Timothy Kepler, March 15, 2024, ¶¶4-7.
> **Position of Plaintiffs**: Notably, Defendants do not challenge the accuracy of the
> Monitor's statement regarding the volume of reported incidents in the specified week,
> which are relevant in and of themselves to demonstrate the risk of harm to Plaintiffs. That
> in itself is sufficient reason for the Court to adopt this finding of fact. Plaintiffs also note
> that far from ignoring general trends of violence and use of force over time, they have
> explained in detail in their briefing how those patterns demonstrate Defendants' contempt
> and the need for appointment of a receiver. *See* Dkt. 603 at 5-6,14, 67-69; Dkt. 716 at 11-
> 13. Finally, Plaintiffs note that Defendants' reliance here and elsewhere on the supposed
> decrease in the number of stabbings/slashings in 2023 is unfounded, as the Monitor found
> DOC's reporting on the number of stabbings/slashings during that time period to be so
> unreliable that he retracted his findings regarding the number of such incidents in 2023.
> Dkt. 595 at 36; Dkt. 716 at 11, n. 7.

79.     DOC quantitative indicators are likely an undercount because staff reporting of

serious incidents is unreliable. Monitor's October 5, 2023 Rep. at 10; Monitor's Nov. 8, 2023

Rep. at 3 (significant incidents unreported or reported only after delay); *id.* (Monitor no longer

has confidence in accuracy of DOC data on stabbings/slashings).

80.     For example, between January and June 2023, the Monitor identified at least five

stabbings/slashing incidents that were not reported as such. Monitor's Oct. 5, 2023 Rep. at 11.

After the Monitor told DOC about these five incidents, DOC reclassified only two of the five

incidents as stabbings/slashings, but advised that the other three incidents would not be reclassified despite clear evidence showing that they too were stabbings/slashings. *Id.*

81.    The Monitor identified another six incidents that occurred between April 8, 2023 and October 8, 2023 in which stabbings/slashings occurred, but were not reported to COD as such. Monitor's Nov. 8, 2023 Rep. at 130-131. These incidents resulted in injuries such as lacerations on head, face, and scalp, as well as contusions, scratches, and bites. *Id.*

82.    On September 11, September 14, and September 19, 2023, three serious assaults on incarcerated people occurred, including one in an unstaffed housing unit. Monitor's Oct. 5, 2023 Rep. at 18, 43-49. The individuals suffered serious injuries requiring admission to the hospital, including second degree burns, a fracture to the face, a fractured nose, injury to the eye, and post-concussive syndrome. *Id.* The incidents were not reported to COD until several days after they occurred, and one was reported only after the Monitor raised concerns with DOC. *Id.*

83.    DOC's improper review, judgment, and classification of these incidents indicates that the violence indicators below are likely an undercount. *Id.*; Monitor's Nov. 8, 2023 Rep. at 33.

84.    In November 2023, the Monitor found that DOC's problems with defining and categorizing incidents, the protocols for reporting incidents, and the integrity of several incident tracking systems had critically undercut the Monitor's confidence in the accuracy of DOC's quantitative data such that the accuracy of past findings regarding changes to the rates of key metrics cannot be assured. See Monitor's Nov. 8, 2023 Rep. at 35. The Court ordered DOC, by September 30, 2023, to develop a set of data and metrics for use of force, security and violence indicators, and to permit the Monitoring Team to observe meetings where such information is evaluated. Dkt. 564 at § I, ¶ 1.

**A.    Use of Force Incidents**

85.    **In 2016, there were 4,652 use of force incidents, which climbed to 8,184

incidents in 2021, 7,005 incidents in 2022, and 2,718 incidents in the first five months of 2023.

*See* Monitor's July 10, 2023 Rep. at 181.**

> **Nature of Dispute**:        Legal Dispute-Materiality
> **Position of Defendants**:    Not Disputed, insofar as the proposed finding reflects what is
> stated on the cited pages on the Monitor's report. Disputed, insofar as "plaintiffs'
> comparison of 2016 to recent years fails to account for changes in policy that have had a
> significant impact on observed trends." Declaration of Associate Commissioner Timothy
> Kepler, March 15, 2024, ¶11.
> **Position of Plaintiffs**:        The number of use of force incidents that occur each year in
> DOC is material to Plaintiffs' motion for contempt regarding Defendants' failure to
> implement the Use of Force Directive, as well as to the risk of harm to the Plaintiff class.
> As Plaintiffs have explained in detail in their briefing, comparisons to 2016 are a useful
> metric, but the extraordinary rates of use of force in recent years represent a significant
> increase from 2018 (after the policy changes Associate Commissioner Kepler refers to) as
> well, and are also material in and of themselves, regardless of how they compare to other
> years. *See* Dkt. 716 at 11-13. Plaintiffs also note that Defendants have provided no
> objective evidence to support Associate Commissioner Kepler's assertion that policy
> changes made in 2017 had the impact that he claims. As there was no prior definition of
> Use of Force with which to compare the current definition, Defendants would have to
> demonstrate through admissible evidence of prior practice that there was a material
> difference between what was understood to be a "use of force" before and after the policy
> changes. Defendants have not done so, offering only a declaration from a Data Analyst
> who joined DOC in 2022 and who can provide neither a historical perspective nor an
> expert opinion on use of force practices in DOC in 2016. *See* Kepler Decl., Dkt. 689-2, ¶
> 2.

86.    **The use of force rate – adjusted for average daily population – was 3.96 uses of

force per 100 incarcerated people in 2016, and 10.34 in 2022. *Id.***

> **Nature of Dispute**:        Legal Dispute-Materiality
> **Position of Defendants**:    Not Disputed, insofar as the proposed finding reflects what is
> stated on the cited pages on the Monitor's report. Disputed, insofar as "plaintiffs'
> comparison of 2016 to recent years fails to account for changes in policy that have had a
> significant impact on observed trends. Prior to the promulgation of Directive 5006R-D,
> DOC had no specified definition of use of force… the revision of the Department's
> policy [occurred in] September of 2017" Declaration of Associate Commissioner
> Timothy Kepler, March 15, 2024, ¶11.
> **Position of Plaintiffs**:        The rate of use of force incidents in DOC is material to
> Plaintiffs' motion for contempt regarding Defendants' failure to implement the Use of

Force Directive, as well as to the risk of harm to the Plaintiff class. As Plaintiffs have explained in detail in their briefing, comparisons to 2016 are a useful metric, but the extraordinary rates of use of force in recent years represent a significant increase from 2018 (after the promulgation of Directive 5006R-D) as well, and are also material in and of themselves, regardless of how they compare to other years. *See* Dkt. 716 at 11-13. Plaintiffs also note that Defendants have provided no objective evidence to support Associate Commissioner Kepler's assertion that the introduction of the use of force definition in Directive 5006R-D expanded the types of incidents that were reported as uses of force. As there was no prior definition of Use of Force with which to compare the current definition, Defendants would have to demonstrate through admissible evidence of prior practice that there was a material difference between what was understood to be a "use of force" before and after the policy changes. Defendants have not done so, offering only a declaration from a Data Analyst who joined DOC in 2022 and who can provide neither a historical perspective nor an expert opinion on use of force practices in DOC in 2016. *See* Kepler Decl., Dkt. 689-2, ¶ 2.

87.     **DOC's average monthly use of force rate from the most recent five-month period (January-May 2023) was 9.13, which is 131% higher than the average monthly use of force rate at the inception of the Consent Judgment in 2016, which was 3.96. *See* Monitor's July 10, 2023 Rep. at 15, 181.[3]**



**Nature of Dispute**:          Legal Dispute-Materiality
**Position of Defendants**:     Not Disputed, insofar as the proposed finding reflects what is stated on the cited pages on the Monitor's report. Disputed, insofar as "plaintiffs' comparison of 2016 to recent years fails to account for changes in policy that have had a significant impact on observed trends. Prior to the promulgation of Directive 5006R-D, DOC had no specified definition of use of force… the revision of the Department's

---

[3] Use of force rates are the most useful metric because the fluctuation in the size of the incarcerated population. Throughout the Monitor's reports, average monthly rates of uses of force per 100 people in custody were calculated using the following formula: average monthly rate = ((total # events in the time period/number of months in time period)/average daily population for the time period) *100. *See* Monitor's Apr. 3, 2023 Rep. at 48 n.52.

policy [occurred in] September of 2017" Declaration of Associate Commissioner Timothy Kepler, March 15, 2024, ¶11.

**Position of Plaintiffs**: The rate of use of force incidents in DOC is material to Plaintiffs' motion for contempt regarding Defendants' failure to implement the Use of Force Directive, as well as to the risk of harm to the Plaintiff class. As Plaintiffs have explained in detail in their briefing, comparisons to 2016 are a useful metric, but the extraordinary rates of use of force in recent years represent a significant increase from 2018 (after the promulgation of Directive 5006R-D) as well, and are also material in and of themselves, regardless of how they compare to other years. *See* Dkt. 716 at 11-13. Plaintiffs also note that Defendants have provided no objective evidence to support Associate Commissioner Kepler's assertion that the introduction of the use of force definition in Directive 5006R-D expanded the types of incidents that were reported as uses of force. As there was no prior definition of Use of Force with which to compare the current definition, Defendants would have to demonstrate through admissible evidence of prior practice that there was a material difference between what was understood to be a "use of force" before and after the policy changes. Defendants have not done so, offering only a declaration from a Data Analyst who joined DOC in 2022 and who can provide neither a historical perspective nor an expert opinion on use of force practices in DOC in 2016. *See* Kepler Decl., Dkt. 689-2, ¶ 2.

88.    October 2023 had the highest number and rate of use of force in 2023 (655 and 10.61, respectively). *See* Monitor's Nov. 8, 2023 Rep. at 7.

## B.    Serious Injuries to Incarcerated Individuals

89.    A key metric regarding harm to incarcerated people and facility safety is the frequency of serious injuries resulting from use of force incidents. *See* Monitor's Apr. 3, 2023 Rep. at 48.

90.    In DOC, a use of force's injury classification is derived from the most serious injury sustained by anyone involved in an incident (person in custody or staff). *Id.* at 48-49. The injury classification, therefore, does not count all injuries sustained in an incident but rather classifies the incident by the most serious one. *Id.* at 49.

91.    Class A use of force incidents are defined as those that require medical treatment beyond the prescription of over-the counter analgesics or minor first aid, including those that result in multiple abrasions and/or contusions; chipped, cracked, or lost teeth; lacerations; punctures; factures; loss of consciousness; concussions; sutures; internal injuries; or hospital

admissions. DOC Directive 5006R-D, Use of Force [hereinafter "UOF Directive"], § IV(G), Ex.

1.[4]

92.     **In 2016, 74 use of force incidents (or about 2% of total reported use of force

incidents that year) were classified as Class A incidents. *See* Monitor's Apr. 3, 2023 Rep. at

49. By contrast, in 2022, 434 use of force incidents (or about 6% of total use of force incidents

that year) were classified as Class A incidents. *See* Monitor's Apr. 3, 2023 Rep. at 49.**

> **Nature of Dispute**:          Legal Dispute-Materiality
> **Position of Defendants**:   Not Disputed, insofar as the proposed finding reflects
> what  is stated on the cited pages on the Monitor's report. Disputed, insofar as the data is
> mischaracterized and does not appropriately present DOC's use of force policy. Under
> DOC's policy, use of force is defined broadly: any time an officer makes contact with a
> non-compliant individual to compel behavior, it counts as a use of force, no matter how
> slight the contact. The more significant measure is uses of force that result in injury to an
> incarcerated individual (class A and B uses with A the more serious). In the six-month
> period September 2023 to January 2024, there were 3,059 uses of force, but 18 class A
> uses (0.6 percent), and 110 class B uses (3.6 percent). Referencing total uses of force, as
> Plaintiffs repeatedly do, paints a distorted picture. Declaration of Associate
> Commissioner Timothy Kepler and Declaration of Commissioner Lynelle Maginley-
> Liddie.
> **Position of Plaintiffs**: Total use force incidents are a material piece of evidence with
> regard to risk of harm to the Plaintiff Class. Regardless, this proposed finding of fact does
> not make any claims regarding total uses of force, but rather discusses the number and
> rate of Class A use of force incidents, which are accurately defined in paragraph 91, and
> are material to both the risk of harm to the Plaintiff Class and Defendants' contempt of
> the requirement to implement the Use of Force Directive.

93.     ███████████████████████████████████████████

████████████████████████████████████

94.     For the first five months of 2023 (January-May), 4% of use of force incidents

resulted in serious injuries. Monitor's July 10, 2023 Rep. at 15.

---

[4] While an unredacted version of the UOF Directive has been filed under seal as Exhibit 1, the content from the
UOF Directive that is discussed in this document is available publicly on DOC's website at
https://www.nyc.gov/assets/doc/downloads/directives/Directive_5006R-D_Final.pdf.

95.     According to the COD reports provided by DOC to the Monitoring Team, there were 683 incidents coded as serious injury to inmate between January 1, 2023 and September 30, 2023. *See* Monitor's Nov. 8, 2023 Rep. at 68. An incident may have more than one individual who has obtained an injury. *Id.* Given the delay in reporting, some of these reports include incidents that occurred prior to January 1, 2023.

96.     These statistics are likely an undercount because serious injuries are often unreported or only reported after a significant delay. Monitor's Oct. 5, 2023 Rep. at 11. First, staff do not reliably report to the COD the underlying incident during which an injury is sustained at the time the incident occurred. *Id.* Second, COD reports are not reliably or timely amended to include a serious injury upon receiving an injury assessment from Correctional Health Services (hereinafter "CHS"). *Id.* at 11-12. Third, DOC does not separately report to COD when incarcerated people are transported to the hospital, such that no centralized, electronic record exists of these events. *Id.* at 12.

97.     DOC has no failsafe to ensure that all incidents with serious injuries are reported. *Id.*

98.     Over a two-day period, September 18 and 19, 2023, a total of 19 incidents involving serious injuries that occurred in multiple facilities were first reported to the COD. Monitor's Oct. 5, 2023 Rep. at 17 & App. D. The date of the COD report was between 5 and 110 days after the incidents actually occurred. *Id.* It does not appear that centralized reporting was made on any of the 19 incidents at the time they occurred. *Id.* In at least one case, it is unclear whether the incident would have been reported at all without the Monitoring Team bringing the incident to the Department's attention. *Id.*

99.     DOC's claim in August 2023 that fewer incarcerated people have sustained serious injuries cannot be verified. Id. at 12. When the Monitor attempted to verify the City's claim that serious injuries to incarcerated individuals declined by 39% during two periods, the Monitor had difficulty doing so, and required multiple requests and repeated follow-up--after which DOC ultimately reported that the statement was not accurate as the underlying data related to incidents, not individuals. Id at 12, n.16. The Monitor urged that "conclusions about the potential decrease in the number of incidents must be viewed with extreme caution." *Id*.

100.     Neither a decrease in incidents resulting in serious injuries nor a decrease in individuals sustaining serious injuries can be substantiated. *Id.*

### C.     Stabbings and Slashings

101.     A total of 420 and 468 stabbings/slashings occurred in the jails in 2021 and 2022, respectively. There were 144 stabbings/slashings in the first five months of 2023 (January-May) and 91 stabbings/slashings in August and September 2023. Monitor's July 10, 2023 Rep. at 55; Monitor's Oct. 5, 2023 Rep. at 5.

102.     There were 43 recorded stabbings and slashings in October 2023 alone, putting the Department on a trajectory to report almost 400 stabbings and slashings in 2023. Monitor's Nov. 8, 2023 Rep. at 7. Between August and October 2023, there were 134 stabbing/slashings, more than the total number of stabbing/slashings in 2020. *Id.*

103.     In 2016, there were 159 stabbings and slashings systemwide. Monitor's July 10, 2023 Rep. at 184.

104.     DOC's average monthly rate of stabbings/slashings during the most recent five-month period (January-May 2023) was 0.48, which is 243% higher than the average monthly rate of stabbings/slashings at the inception of the Consent Judgment in 2016, which was 0.14. *See* Monitor's July 10, 2023 Rep. at 55, 184.



105.    COD's definition of "slashing" as "slashing injuries sustained by inmates," and the definition of "stabbing" as "stabbing injuries sustained by inmates," are circular and do not permit proper categorization of incidents. *See* Monitor's Nov. 8, 2023 Rep. at 31. These definitions are also inconsistent with the definitions developed in response to the Consent Judgment, which defines stabbing/slashing as "the use of a sharp instrument to cut an inmate's body with a sweeping stroke, or the use of a sharp instrument to pierce an inmate's body." *Id.*

106.    In January 2023, DOC issued a memorandum permitting staff to forego reporting certain incidents of violence if mitigating factors are present. *Id.* at 32. Staff can use their discretion to avoid reporting a stabbing/slashing if the injury sustained is superficial or an abrasion. *Id.* at 31.

107.    After issuance of this memorandum, the number of reported stabbings/slashings dropped 49% from January to February 2023, with no corresponding change in security practices or operations that would explain such a drop. *Id.* at 32.

108.    **The number of reported stabbings/slashings in DOC should be seen as a floor, not a ceiling, given that DOC's definitions of stabbings/slashings are poorly drawn and leave much to the discretion of individual staff. *Id.* at 36.**

> **Nature of Dispute**:        Legal Dispute-Monitor Opinion
> **Position of Defendants**:    Defendants object to the conclusion entering the record of this motion as an expert conclusion, and respectfully submit that the conclusion falls outside of the scope of the Monitor's realm of expertise. Defendants respectfully refer the court to the parties Joint Status Report dated July 3, 2024, ECF No. 742, for Defendants position on the scope of the Monitor's expertise. (ECF No. 742).
> **Position of Plaintiffs**: Defendants concede that the Monitor is "appropriately qualified as an expert on corrections systems and best practices." July 3, 2024 Joint Report of the Parties, Dkt. 742 at 3, 5. Opining on appropriate definitions of a stabbing and slashing within a correctional system, finding that definitions within this particular correctional system are largely dependent on staff discretion, and then making the common-sense inference that the reported number of stabbings and slashings is therefore likely higher than what DOC reports is entirely within the scope of expertise about corrections systems and best practices. The Court should credit the Monitor's opinion and adopt this proposed finding.

109.    The Monitor cannot reliably verify any purported decreases in stabbings/slashings in 2023. *Id.*

110.    To the extent that the Monitor had previously made any findings or drawn any conclusions about purported decreases in the number of stabbings or slashings in 2023, the Monitor retracted those findings and conclusions in his November 8, 2023 Report. Monitor's Nov. 8, 2023 Rep. at 36.

### D.    Fights

111.    **In 2016, there were 6,006 fights among incarcerated people systemwide, while, in 2021, there were 6,204 fights and, in 2022, there were 5,835 fights. During the first five months of 2023 (January-May), there were 2,396 fights, putting DOC on track for 5,750 fights this year. *See* Monitor's July 10, 2023 Rep. at 187.**

> **Nature of Dispute**:        Legal Dispute-Materiality
> **Position of Defendants**:    Not Disputed, insofar as the proposed finding reflects what is stated on the cited pages on the Monitor's report. Disputed insofar as, "plaintiff's

comparison of 2016 to recent years fails to account for changes in policy and have had a significant impact on the observed trends." Declaration of Associate Commissioner Timothy Kepler, March 15, 2024, ¶8.

**Position of Plaintiffs**: The number of fights in DOC is material to the risk of harm to the Plaintiff class. Associate Commissioner Kepler's assertions regarding changes in the use of force policy that took place in 2017 are not relevant to this fact, because he does not assert that those policy changes discussed or in any way impacted what incidents are categorized as "fights" (in contrast to his assertion, with which Plaintiffs disagree, that the policy did impact which incidents were categorized as uses of force). Moreover, the cited paragraph of Associate Commissioner Kepler's declaration does not discuss fights at all, but rather assaults on staff, an entirely different metric.

112.     **DOC's average monthly rate of fights during the most recent five-month period (January-May 2023) was 8.05, which is 58% higher than the average monthly rate of fights at the inception of the Consent Judgment in 2016, which was 5.11. *See* Monitor's July 10, 2023 Rep. at 56, 187.**



**Nature of Dispute**:          Legal Dispute-Materiality
**Position of Defendants**:    Not Disputed insofar as the proposed finding reflects what is stated on the cited pages of the Monitor's report. Disputed, insofar as, misleading data is being used "to support desired conclusions."
Declaration of Associate Commissioner Timothy Kepler, March 15, 2024, ¶4.
**Position of Plaintiffs**: The rate of fights in DOC is material to the risk of harm to the Plaintiff class. Associate Commissioner Kepler's declaration makes an assertion (with which Plaintiffs disagree) that Plaintiffs' descriptions of use of force numbers and rates are misleading, but makes no such assertion regarding the number or rate of fights, which is the only metric discussed here. Defendants provide no objective evidence whatsoever to support the notion that these statistics, reported by the Monitor, are "misleading."

113.    However, data from RESH was not entered in the Fight Tracker in August and September 2023. *See* Monitor's Nov. 8, 2023 Rep. at 34. DOC was unaware of this problem until the Monitor requested the data and DOC learned that it did not exist. *Id.*

### E.    GRVC, RNDC, AMKC Violence Reduction Plans

114.    **Even at GRVC, where DOC has been implementing a violence reduction plan, there has been no reduction in violence. In 2016, there were 556 use of force incidents, while in 2022, there were 1,445 use of force incidents, and for the first five months of 2023, there were 442 use of force incidents. In 2016, there were 12 stabbings/slashings, in 2022, there were 157 stabbings/slashings, and for the first five months of 2023, there were 42 stabbings/slashings. In 2016, there were 267 fights, in 2022, there were 605 fights, and in the first five months of 2023, there were 228 fights. Thus far in 2023, the monthly average use of force rate is 10.7, the monthly average rate of stabbings/slashings is 1.01, and the monthly average rate of fights is 5.5. These indicators in 2016 consisted of the following: UOF = 6.91; Stabbings/Slashings = 0.15; Fights =3:32. *See* Monitor's July 10, 2023 Rep. at 60, 182, 184, 187.**

> **Nature of Dispute**:        Legal Dispute-Materiality
> **Position of Defendants**:    Not Disputed insofar as the proposed finding reflects what is stated on the cited pages of the Monitor's report. Disputed, insofar as "plaintiffs' comparison of 2016 to recent years fails to account for changes in policy that have had a significant impact on observed
> trends." Declaration of Associate Commissioner Timothy Kepler, March 15, 2024, ¶11.
> **Position of Plaintiffs**: Associate Commissioner Kepler's assertions regarding changes in policy involve only use of force incidents, not stabbings/slashings or fights, and are therefore not relevant to much of this proposed finding of fact. With regard to uses of force, as Plaintiffs have explained in detail in their briefing, comparisons to 2016 are a useful metric, but the extraordinary rates of use of force in recent years represent a significant increase from 2018 (after the promulgation of Directive 5006R-D) as well, and are also material in and of themselves, regardless of how they compare to other years. *See* Reply Brief, Dkt. 716 at 11-13. Plaintiffs also note that Defendants have provided no objective evidence to support Associate Commissioner Kepler's assertion that the introduction of the use of force definition in Directive 5006R-D expanded the types of incidents that were reported as uses of force. As there was no prior definition of Use of Force with which to compare the current definition, Defendants would have to

demonstrate through admissible evidence of prior practice that there was a material difference between what was understood to be a "use of force" before and after the policy changes. Defendants have not done so, offering only a declaration from a Data Analyst who joined DOC in 2022 and who can provide neither a historical perspective nor an expert opinion on use of force practices in DOC in 2016. *See* Kepler Decl., Dkt. 689-2, ¶ 2.







115.     **Though the Action Plan required DOC to create a violence reduction plan for AMKC, DOC did not do so. *See* Monitor's Nov. 8, 2023 Rep. at 64. In 2016, there were 643 use of force incidents at AMKC, while in 2022, there were 1,776 use of force incidents, and for the first five months of 2023, there were 889 use of force incidents. In 2016, there were 27 stabbings/slashings; in 2022 there were 98 stabbings/slashings; and for the first five months of 2023, there were 52 stabbings/slashings. In 2016, there were 1,303 fights; in 2022, there were 1,601 fights; and in the first five months of 2023, there were 880 fights. Thus far in 2023, the average monthly use of force rate is 9.13 (compared to 2.42 in 2016 and 7.27 in 2022), the average monthly rate of stabbings/slashings is 0.53 (compared to 0.10 in 2016 and 0.4 in 2022), and the average rate of fights is 9.01 (compared to 4.91 in 2016 and 6.59 in 2022). *See* Monitor's July 10, 2023 Rep. at 60, 182, 185, 188.**

**Nature of Dispute**:          Legal Dispute-Materiality
**Position of Defendants**:     Not Disputed insofar as the proposed finding reflects what is stated on the cited pages of the Monitor's report. Disputed, insofar as "plaintiffs' comparison of 2016 to recent years fails to account for changes in policy that have had a significant impact on observed trends." Declaration of Associate Commissioner Timothy Kepler, March 15, 2024, ¶11.
**Position of Plaintiffs**: Associate Commissioner Kepler's assertions regarding changes in policy involve only use of force incidents, not stabbings/slashings or fights, and are therefore not relevant to much of this proposed finding of fact. With regard to uses of force, as Plaintiffs have explained in detail in their briefing, comparisons to 2016 are a

useful metric, but the extraordinary rates of use of force in recent years represent a significant increase from 2018 (after the promulgation of Directive 5006R-D) as well, and are also material in and of themselves, regardless of how they compare to other years. *See* Reply Brief, Dkt. 716 at 11-13. Plaintiffs also note that Defendants have provided no objective evidence to support Associate Commissioner Kepler's assertion that the introduction of the use of force definition in Directive 5006R-D expanded the types of incidents that were reported as uses of force. As there was no prior definition of Use of Force with which to compare the current definition, Defendants would have to demonstrate through admissible evidence of prior practice that there was a material difference between what was understood to be a "use of force" before and after the policy changes. Defendants have not done so, offering only a declaration from a Data Analyst who joined DOC in 2022 and who can provide neither a historical perspective nor an expert opinion on use of force practices in DOC in 2016. *See* Kepler Decl., Dkt. 689-2, ¶ 2.







116.    OBCC was re-opened in July 2023 to replace AMKC, and it too has been volatile and chaotic. *See* Monitor's Nov. 8, 2023 Rep. at 10. In October 2023, there were 13 reported stabbings/slashings, the highest among DOC's facilities. OBCC has the highest population of all the facilities, operating almost at capacity. *Id.* OBCC began operating "blended units," combining individuals so that there is no dominant gang affiliation in a housing unit. *Id.* This strategy has led to unrest because staff do not have the strong security practices needed to properly manage and prevent violence in these kinds of units. *Id.*

117.    With respect to RNDC (as well as GRVC), although the Department targeted these two facilities with intensive violence reduction strategies, their initially positive impact has eroded and both facilities are again mired in high rates of violence and disorder; in continued challenges to ensuring that the facility is properly staffed; and in surrounding degradation in sanitation. Monitor's Oct. 5, 2023 Rep. at 5.

118.    Although the RNDC and GRVC Violence Reduction Plans initially catalyzed some improvement, they were not sustained, and the safety of both facilities has significantly worsened. Monitor's Nov. 8, 2023 Rep. at 3.

119. The RNDC and GRVC violence reduction plans were ultimately abandoned with seemingly little attention to which parts were effective and why. Monitor's Nov. 8, 2023 Rep. at 17.

120. In June 2023, DOC opened new restrictive housing units (RESH) in a new physical plant, with a new policy that emphasizes extensive security protocols and programming engagement, an allocation of leadership positions precisely for the units, specifically selected uniformed and programming staff, a specialized training curriculum, and low staffing ratios. Monitor's Oct. 5, 2023 Rep. at 6. In July and August, RESH had the highest UOF rate in the Department and the largest number of stabbings and slashings of any command. *Id.* The physical plant has deteriorated, sanitation is poor, staffing is inadequate, programming does not occur as planned, contraband and weapons are pervasive, open drug use occurs, and the high levels of violence and fear lead people to choose to stay in their cells throughout the day. *Id.* at 6-7; Monitor's Nov. 8, 2023 Rep. at 4.

### F.    Deaths in Custody

121. Nineteen people died in Defendants' custody in 2022, the highest number since 2013, when 24 individuals died in custody. *See* Monitor's Apr. 3, 2023 Rep. at 65.

122. There was a sharp increase in the mortality rate between 2020 and 2022. The mortality rate in 2022 (3.46) was the highest in over a decade and more than double the rate in 2016 (1.53), at the inception of the Consent Judgment. *Id.* at 65-67.

123. As of November 17, 2023, nine people have died in Defendants' custody this year. "In August 2023, [t]he Monitor observed a review of video footage related to five of the seven deaths [in 2023] revealed that the surrounding circumstances were not particularly unusual or unique, but instead were typical of the variety of security problems that plague all the Department's housing units. These include security lapses like unsecured doors, individuals in

unauthorized areas, superficial Officer and Supervisor tours, and staff being off-post or providing inadequate supervision. Alarmingly, many of these practices appear to have become normalized and staff seemingly fail to recognize the resulting safety risks or the ways in which these practices elevate the likelihood of a tragic outcome." Monitor's Aug. 7, 2023 Rep. at 10.

### 1.    Deaths in DOC Custody in 2023

124.    The New York City Board of Correction (hereinafter "BOC") is required to investigate the circumstances of deaths in custody, see N.Y.C. Charter § 626, as defined in § 3-10(c)(2) of Title 40 of the Rules of the City of New York.

125.    BOC issued a report regarding some of the individuals who died in DOC custody in 2023. *See* BOC, *First Report and Recommendations on 2023 Deaths in New York City Department of Correction Custody* [hereinafter "BOC First Rep. (Nov. 9, 2023)"], Ex. 53.

126.    BOC found that insufficient rounding and supervision by correctional staff requires immediate attention by DOC. *Id.* at 19. While certain measures such as tour wands are commendable, staff's poor policy execution has hindered the effectiveness of these measures. *Id.*

127.    BOC also found that incomplete or inaccurate logbook entries were prevalent across the examined incidents and that officers did not make logbook entries accurately and in some cases, created logbook entries for tours that did not occur. *Id.* at 21-22.

128.    BOC's other concerns included delays and lack of quality of medical care, and delays in timely notification to the Board about in-custody deaths. *Id.* at 24. For example, the Board only learned of Marvin Pines' and Rubu Zhao's deaths through the COD reports, which can be delayed and has only scant preliminary information. BOC only learned of Joshua Valles' death through media articles. Finally, DOC issued a COD regarding Felix Taveras at 3:00 a.m. on July 4, 2023 (a holiday) and did not follow up with a communication to ensure that BOC was aware of this notification. *Id.* at 24-25.

129.     **Marvin Pines** died on February 4, 2023. He was found unresponsive in the bathroom of a housing area in NIC. Monitor's Aug. 7, 2023 Rep. at 38. His official cause of death was a seizure of unknown etiology, with cardiovascular disease as a contributor. *Id.*

130.     BOC's review of surveillance footage confirmed that a B post officer was not present in Mr. Pines' unit for almost three hours before Mr. Pines' death. While logbook entries reflected routine touring, surveillance footage indicates that these tours did not occur. BOC First Rep. (Nov. 9, 2023), Ex. 53 at 4-5.

131.     Shortly after a B post officer signed onto post, Mr. Pines went to the bathroom and did not return. The officer failed to tour every 30 minutes. Instead, the officer waited an hour and 40 minutes to tour again (50 minutes after Mr. Pines entered the bathroom). The officer did not check the bathroom during his tour. The officer also left the unit for nine minutes without making any notes of a personal break in the logbook. *Id.* at 6-7.

132.     Finally, a person in custody entered the bathroom, saw Mr. Pines, and called for assistance. The B post officer entered and called for a medical emergency. *Id.* at 6.

133.     DOC suspended two officers, one captain, and two ADWs in relation to Mr. Pines's death. Monitor's Aug. 7, 2023 Rep. at 38. One officer was suspended for six days for not conducting tours of the entire housing area including the bathroom, and for abandoning his post. Monitor's Nov. 8, 2023 Rep. at 72. The other officer was suspended for six days for not conducting regular tours of the housing area. The captain was suspended for fifteen days for failing to conduct proper tours of inspection, failing to enter the housing area to conduct tours of supervision, and making a false logbook entry that the housing unit tour occurred. *Id.* Both ADWs were suspended, one for thirty days and one for six days, for failing to conduct proper tours of inspection of specialized housing, failing to ensure that the housing area was manned

and supervised by officers at all times, and failing to ensure that the supervisor assigned to the post conducted meaningful and efficient tours. *Id.*

134.    **Rubu Zhao** died on May 16, 2023. BOC First Rep. (Nov. 9, 2023), Ex. 53 at 8. Two days earlier, on May 14, 2023, Mr. Zhao jumped from the upper tier of his housing unit in GRVC and landed on the floor of the bottom tier. *See* Monitor's May 26, 2023 Rep. at 4. He was taken to Elmhurst Hospital, where he later died.

135.    BOC's evaluation of the incident found that on the day of Mr. Zhao's death, corrections officers did not look inside cell windows during tours. Only five tours were conducted in the hours leading up to Mr. Zhao's death. BOC First Rep. (Nov. 9, 2023), Ex. 53 at 10-11.

136.    At 1 p.m., the B post officer and Suicide Watch Officer left the unit and were relieved by a third officer. The new B post officer never toured the unit and instead socialized with others in the dayroom. *Id.*

137.    At 1:40 p.m., another officer B post officer joined the other B post officer but also never toured the unit and remained in the dayroom. The next tour did not occur until 2:07 p.m., when a captain toured only the bottom tier of the unit. *Id.*

138.    **Mr. Zhao began pacing along the top tier, around 2:13 p.m., during the captain's insufficient tour. *Id.* at 10-11.**

> **Nature of Dispute**:        Legal Dispute-Materiality
> **Position of Defendants**:    Not Disputed insofar as the proposed finding reflects what is stated on the cited pages of the relevant report. Disputed insofar as this statement is not material and is not indicative that a receivership or a contempt finding is warranted.
> **Position of Plaintiffs**: This information is material as evidence of non-compliance regarding routine touring, a responsibility required by the Action Plan, § A, ¶ 1(d), and one of the provisions on which Plaintiffs moved for contempt. *See* Dkt. 603 at 28-30. It is also relevant to the ongoing harm and risk of harm to the Plaintiff Class.

139.    While DOC claimed that two officers were present on the floor of Mr. Zhao's housing unit, the Monitor reported that, at the time Mr. Zhao jumped from the second tier, the second officer appeared to be seated at a desk inside of a cell that had been converted to an office on the top tier with the door closed and therefore he was not supervising people in custody. Monitor's June 8, 2023 Rep. at 41; Monitor's June 12, 2023 Rep. at 5.

140.    The Monitor further reported that "at the time of the incident, a number of cells were unsecured, raising questions about whether proper security procedures were being followed during lock-out." Monitor's June 12, 2023 Rep. at 5.

141.    DOC did not record the self-harm incident via COD when it occurred, but only 33 hours later when Mr. Zhao died. Id. at 12. DOC did not notify the Monitor of the self-harm incident within 24 hours of its occurrence, as it had in the past; the Monitor learned of it through a news article published the day after Mr. Zhao's death. Monitor's Jun. 8, 2023 Rep. at 28.

142.    "On May 23, 2023, DOC reported to the Monitoring Team that because [Mr. Zhao] was housed on a unit with a higher level of mental health service and custodial oversight, no immediate corrective actions were required or taken." Monitor's May 26, 2023 Rep. at 5. As of August 7, 2023, no corrective action for staff involved in this incident had been reported. Monitor's Aug. 7, 2023 Rep. at 39.

143.    **Joshua Valles** died on May 27, 2023. BOC First Rep. (Nov. 9, 2023), Ex. 53 at 12. He had been transported from AMKC to the hospital on May 20, 2023 for a medical evaluation for a "non-incident related condition or injury." *See* Monitor's May 26, 2023 Rep. at 8.

144.    BOC's review of the incident indicates that though tours were required every 30 minutes, tours took place an hour apart and when they occurred, corrections officers did not consistently check the cell Mr. Valles occupied. BOC First Rep. (Nov. 9, 2023), Ex. 53 at 20.

145.    For example, in the morning of May 19, 2023, in the week before Mr. Valles' death, a B post officer passed by Mr. Valles' cell and connected their tour wand to the nearby station without checking Mr. Valles' cell. An hour later, at 12:02pm, the B post officer did the same thing. At 12:40pm, another B post officer checked Mr. Valles' cell, while a captain passed by without looking inside, and connected their tour wand to the nearby station. At around 1pm, the B post officer conducted a tour and paused by Mr. Valles' cell for only two seconds. Shortly thereafter, a person in custody who had been checking on Mr. Valles spoke to the B post officer who checked Mr. Valles' cell and called for medical staff. *Id*. at 13-14.

146.    After medical staff was called for Mr. Valles, a B post officer conducted a tour without checking Mr. Valles' cell. *Id.* at 14.

147.    Mr. Valles was rushed to Elmhurst Hospital Center, had a seizure episode in the ambulance, and later went into cardiac arrest. Mr. Valles had extensive brain injury and was pronounced deceased on May 27, 2023. *Id.* at 14-15. He was compassionately released by DOC on May 24, 2023. Monitor's June 8, 2023 Rep. at xvii.

148.    No COD was entered for this medical transport or need for medical attention. *Id.* at 9. The Monitor first learned of the incident on May 22, 2023, when the Monitor received an external allegation that this individual was in the hospital and on life support. Monitor's May 26, 2023 Rep. at 8.

149.    DOC initially told the Monitor that Mr. Valles appeared to have sustained a heart attack and that DOC did not suspect any foul play. *Id.* at 9. The Commissioner stated on May 26,

40

2023 that there was "no official wrongdoing" in relation to Mr. Valles's death. *Id.* The Monitor questioned how DOC was able to reach this conclusion given "the limited information available about the underlying incident" at that time. *Id.*

150.    On May 30, 2023, DOC General Counsel informed the Monitoring Team that an autopsy revealed that Mr. Valles had died as a result of a fractured skull. Monitor's May 31, 2023 Rep. at 1. The Monitor described this revelation as "in stark contrast to the headache or 'non-incident related condition or injury' that was reported in the unit logbook." *Id.* The General Counsel further reported that DOC was "unsure how the individual obtained the fatal injury." *Id.* at 1-2.

151.    As of August 7, 2023, no staff discipline had been reported. Monitor's Aug. 7, 2023 Rep. at 39.

152.    **Felix Tavares** died on July 4, 2023 in AMKC, allegedly after a drug overdose. Monitor's July 10, 2023 Rep. at 44; BOC First Rep. (Nov. 9, 2023), Ex. 53 at 15.

153.    On the day before Mr. Taveras' death, the B post officer exited the floor and remained in the A station on five separate occasions. *Id.* at 16. When the B officer was present inside the dorm, they failed to conduct any tours after 7:30 p.m. and sat by the B post desk instead. *Id.* However, the B post officer documented 30 minute tours in logbook entries in the hours leading to Mr. Taveras' medical emergency. The B officer did not document personal breaks or meals in the logbook whenever they vacated the B post. *Id.* At 8:02 p.m., two individuals in custody began rolling pieces of paper on their beds. At 9:24 p.m., Mr. Taveras began to do the same. At that same moment, the B post officer returned from the A station and checked that the dayroom door was locked but did not conduct a tour of the unit. At 9:26 p.m., Mr. Taveras exited the bathroom with a string-like object and began smoking with three other

41

people in custody. The B post officer was present and sitting by the B post desk at that time. Mr. Taveras continued smoking until 9:32 p.m. and went to bed. *Id.* at 17. At 11:13 p.m., Mr. Taveras awoke with chest pain and died several hours later. *Id.* at 18.

154.    Video of Mr. Taveras's housing unit in the hours leading up to Mr. Taveras's death revealed a number of security and operational failures including, but not limited to, failure to enforce lock-in, individuals' use of contraband (smoking) on the housing unit, failure to provide timely medical treatment, and failure by the captain to tour. Monitor's July 10, 2023 Rep. at 61; BOC First Rep. (Nov. 9, 2023), Ex. 53 at 17-18.

155.    DOC suspended two officers, one captain, and one Acting Warden in relation to Mr. Taveras's death. Monitor's Aug. 7, 2023 Rep. at 39. The two officers were suspended for failing to enforce lock-in and allowing individuals in custody to smoke on the housing unit. The captain was suspended for failing to tour and not conducting a proper tour. The acting warden was suspended for failing to identify significant misconduct by the uniformed staff. Monitor's Nov. 8, 2023 Rep. at 72.

156.    **Ricky Howell** died on July 6, 2023 at the Bellevue Prison Ward. *See* Jan Ransom & Jonah E. Bromwich, *Tracking the Deaths in New York City's Jail System*, N.Y. Times, Oct. 19, 2023 [hereinafter "*Deaths in NYC's Jails*"], Ex. 64.

157.    In response to the incident, DOC disciplined a captain with "counseling" for failing to report an unusual incident timely and according to policy. Monitor's Nov. 8, 2023 Rep. at 72; Monitor's Aug. 7, 2023 Rep. at 39.

158.    **William Johnstone** died on July 15, 2023. *See Deaths in NYC's Jails*, Ex. 64.

159.    Mr. Johnstone was found unconscious in his cell and a correction officer gave him Narcan. He was taken to the hospital and pronounced dead. *Id.* at 3.

160. DOC suspended two officers and one captain in response to the incident. One officer was suspended for 15 days for permitting an officer on their post and for failure to supervise. Monitor's Nov. 8, 2023 Rep. at 72; Monitor's Aug. 7, 2023 Rep. at 39. Another officer was suspended for thirty days for abandoning post. Monitor's Nov. 8, 2023 Rep. at 72. The captain was suspended for seven days for inefficient performance of duties and failing to inspect every cell. *Id.*; Monitor's Aug. 7, 2023 Rep. at 39; Monitor's Nov. 8, 2023 Rep. at 72.

161. **Curtis Davis** died on July 23, 2023. *Deaths in NYC's Jails*, Ex. 64.

162. Mr. Davis was found with a ligature tied around his neck and to the vent hook in his cell. Monitor's Aug. 7, 2023 Rep. at 39.

163. DOC suspended an officer for thirty days for failing to ensure he remained on his assigned post for the duration of his tour. Monitor's Nov. 8, 2023 Rep. at 72. DOC suspended another officer for fifteen days for permitting an unauthorized person to enter their assigned post. *Id.*; Monitor's Aug. 7, 2023 Report at 39. DOC also suspended an ADW for seven days for negligence in performing duties for failing to conduct proper tour. Monitor's Nov. 8, 2023 Rep. at 72; Monitor's Aug. 7, 2023 Report at 39. This ADW was promoted in early 2023 despite recommendations against his promotion, and is now in the process of retiring from DOC. Monitor's Nov. 8, 2023 Rep. at 99.

164. **Donny Ubiera** died on August 22, 2023. *Deaths in NYC's Jails*, Ex. 64.

165. Mr. Ubiera was found unconscious in his cell in a mental observation unit in GRVC. *Deaths in NYC's Jails*, Ex. 64.

166. As of November 8, 2023, no corrective action for staff has been reported in connection with Mr. Ubiera's death. Monitor's Nov. 8, 2023 Rep. at 72.

167. **Manish Kunwar** died on October 5, 2023. Monitor's Nov. 8, 2023 Rep. at 72.

168.    DOC suspended one officer and one captain for failing to conduct meaningful tours. Monitor's Nov. 8, 2023 Rep. at 72.

169.    DOC suspended another officer for disobeying a direct order to relieve a fellow correction officer. *Id.*

## 2.    Deaths in DOC Custody in 2022

170.    BOC issued three reports regarding the deaths in custody of nineteen individuals in 2022. *See* BOC, *February & March 2022 Deaths in DOC Custody Report and Recommendations* (May 9, 2022) [hereinafter "BOC 2022 First Rep."], Ex. 54; BOC, *Second Report and Recommendations on 2022 Deaths in New York City Dep't of Correction Custody* (Nov. 16, 2022) [hereinafter "BOC 2022 Second Rep."], Ex. 55; BOC, *Third Report and Recommendations on 2022 Deaths in New York City Dep't of Correction Custody* (Apr. 12, 2023) [hereinafter "BOC 2022 Third Rep."], Ex. 56.

171.    BOC found that, in thirteen of the 2022 deaths, correction officers "did not tour or supervise people in custody in accordance with [DOC] policy." BOC 2022 Third Rep., Ex. 56 at 2; BOC 2022 First Rep., Ex. 54 at 7 ("DOC staff's failure to regularly check on the status of every person every thirty minutes (particularly at night) is a chronic and life-threatening issue.").

172.    BOC noted that "insufficient rounding and supervision by correctional staff is a pressing issue that requires DOC's immediate attention. . . Correction officers consistently failed to tour and supervise people in their care in accordance with DOC policy, whether it be every 30 minutes in general population housing or 15 minutes in mental observation housing. Even when correction officers and captains did walk through the unit, they often did not check each cell to ensure the people within were alive and breathing." BOC 2022 Second Rep., Ex. 55, at 21.

173.    In six of the deaths in 2022, there were inaccurate or incomplete logbook entries. BOC 2022 Third Rep., Ex. 56 at 2; BOC 2022 Second Rep., Ex. 55 at 23. In four cases, a B post

officer was not assigned to a housing unit. BOC 2022 Third Rep., Ex. 56 at 2; BOC 2022 First

Rep., Ex. 54 at 6 ("Maintaining housing areas open without floor officers is a dangerous practice

that puts the safety and lives of people in custody at risk.").

174.    And in five instances, officers failed to render immediate first aid to unresponsive

individuals. BOC 2022 Third Rep., Ex. 56 at 2; BOC 2022 Second Rep., Ex. 55 at 21-22.

175.    BOC also noted that "DOC and CHS do not seem to have an acceptably

functioning system for providing emergency care to persons in life-threatening situations." BOC

2022 First Rep., Ex. 54 at 7.

176.    **Tarz Youngblood** died on February 27, 2022. BOC 2022 First Rep., Ex. 54 at 2.

Although the housing unit where his death occurred was staffed with both an A and B post

officer, the officers did not round the area for over an hour before this incident, the officers did

not check the cell in which Mr. Youngblood was in for over three hours before his death, and the

window was obstructed by some sort of white or grey covering. *Id*. at 3. The Video Monitoring

Unit did not notify on-duty staff of any security breaches. *Id*.

177.    The New York Attorney General investigated Mr. Youngblood's death and found

that the floor officer failed to keep people from congregating in a cell, to keep the window to the

cell clear, and to conduct tours every 30 minutes. OSI Third Report (Oct. 1, 2023), Ex. 52 at 32.

178.    **George Pagan** died on March 17, 2022. BOC 2022 First Rep., Ex. 54 at 4. Prior

to his death, DOC failed to produce Mr. Pagan for nine scheduled medical appointments over a

six-day period to assess alcohol withdrawal symptoms or medication administration. *Id.* at 5. A

B post officer arrived in Mr. Pagan's dormitory at only 2:30 p.m. and spent their shift within the

A station control room instead of touring the housing area floor. *Id.* at 4. DOC claimed that the A

post officer called in a medical emergency regarding Mr. Pagan at 5:35 p.m., while CHS

reported receiving the call at 6:12 p.m. *Id.* at 4. Ultimately people in custody carried Mr. Pagan out of the unit and down the steps to the main floor to await medical staff at around 6:17 p.m. *Id.* at 4.

179.    **Herman Diaz** died on March 18, 2022. *Id.* at 5. There was no B post officer in Mr. Diaz's housing unit on March 17 or March 18, 2022. *Id.* at 5. When Mr. Diaz began choking on an orange, people in his dorm knocked on the A officer's station window to notify the officer that he needed medical assistance. Neither the A officer, nor the multiple officers who opened doors while people in custody carried Mr. Diaz to the clinic, rendered first aid to Mr. Diaz. *Id.* DOC claimed that the A officer called CHS twice, but CHS did not receive any calls. *Id.*

180.    **Dashawn Carter** died on May 7, 2022. BOC 2022 Second Rep., Ex. 55 at 4-5. Since at least 6:00am on the day of Mr. Carter's death, officers did not conduct tours every 30 minutes, including a stretch of almost four hours between 6:39 a.m. and 10:10 a.m. when no officer or captain toured the unit. *Id.* at 4-5. When the tours did occur, officers did not check individual cells to ensure those inside were alive and breathing. *Id.* There is evidence of false logbook entries claiming that tours occurred, while the officer in fact was behind the gate or inside the A station. *Id.*

181.    Two captains and two officers were suspended, three for thirty days each, for failing to make proper tours and making false entries in logbooks. Monitor's Nov. 8, 2023 Rep. at 71.

182.    The New York Attorney General investigated Mr. Carter's death and found that corrections officers assigned as floor officers in the area of Mr. Carter's cell failed to conduct many of their tours, failed to conduct required standing counts and, when they did conduct tours, failed to look into Mr. Carter's cell. OSI Third Report (Oct. 1, 2023), Ex. 52 at 33-34.

183.    The investigation further confirmed that corrections officers made false entries in logbooks and false incident reports and permitted Mr. Carter to cover the window in his cell's door. *Id.*

184.    One of the involved corrections officers resigned after the incident. *Id.*

185.    **Mary Yehudah** died on May 18, 2022. BOC 2022 Second Rep., Ex. 55 at 6. In the two days before Ms. Yehudah's death, officers were not touring consistently, and the B officer remained inside the A station rather than within the housing unit. *Id.*

186.    The New York Attorney General confirmed that corrections officers did not conduct rounds consistently and did not consistently look into Ms. Yehudah's cell in the hours leading up to her death. OSI Third Report (Oct. 1, 2023), Ex. 52 at 34.

187.    **Emanuel Sullivan** died on May 28, 2022. BOC 2022 Second Rep., Ex. 55 at 8. On the day that Mr. Sullivan died, DOC officers mostly conducted tours of the housing area, but they looked inside his cell only one time during the three hours before he was found dead. *Id.*

188.    The New York Attorney General found that officers allowed Mr. Sullivan's cell door window to be covered in the hours leading up to his death. OSI Third Report (Oct. 1, 2023), Ex. 52 at 36.

189.    **Antonio Bradley** died on June 18, 2022. BOC 2022 Second Rep., Ex. 55 at 11. On June 10, 2022, while in a holding pen at the Bronx Hall of Justice, Mr. Bradley used his sweater to place a noose around his neck, tied it to a gate, and fell to his knees. *Id.* at 11. He was taken to Lincoln Hospital. On June 15, he was compassionately released from DOC custody after suffering brain death; he was taken off life support on June 18. *Id.* DOC did not notify BOC of Mr. Bradley's death, nor did it issue a COD notification because it did not consider a death after discharge to be an in-custody death. *Id.*

190.    **Anibal Carrasquillo** died on June 20, 2022. *Id.* at 12-13. On the evening before Mr. Carrasquillo's death, a B officer was present on the floor of the housing area but did not check individual cells every 30 minutes. *Id.* Between 9 p.m. and 11:45 p.m., the B officer left the unit three times but did not include entries in the logbook explaining why he did so. *Id.* At 11:23 p.m., the officer toured the housing area but did not look inside the individual cells. *Id.* Only at 12:53 p.m., an hour and a half later, did a captain tour the housing area with the officer and notice Mr. Carrasquillo slumped forward in his cell. *Id.* A medical emergency was activated a minute later, though a logbook entry incorrectly noted that the emergency was activated earlier. *Id.*

191.    One officer was suspended for thirty days for failing to conduct a proper tour, while another officer was suspended for thirty days for failing to conduct a proper tour and being off post. Monitor's Nov. 8, 2023 Rep. at 72.

192.    The New York Attorney General confirmed that a correction officer did not conduct proper tours, failing to look into cells during the tours for the two and a half hours directly before Mr. Carrasquillo's was discovered unresponsive in his cell by a captain and another officer. The medical examiner's office deemed the death an overdose and found no rigor in Mr. Carrasquillo's body roughly three hours after he was discovered--but as the medical examiner would not opine as to time of death, investigators could not conclude that the deficient tours contributed to the death. OSI Third Report (Oct. 1, 2023), Ex. 52 at 36.

193.    **Albert Drye** died on June 21, 2022 of medical complications. BOC 2022 Second Rep., Ex. 55 at 14.

194.    **Elijah Muhammad** died on July 10, 2022. *Id.* at 15-16. During the night prior to Mr. Muhammad's death, officers failed to tour every thirty minutes; only six completed tours

48

occurred over six hours and during those tours, the B officer failed to check each individual cell. *Id.* During the afternoon of July 10, Mr. Muhammad was sluggish and escorted to his cell by fellow individuals in custody and the B officer. While he requested medical help, the B officer did not activate a medical emergency or transport Mr. Muhammad to the clinic. *Id.* Later that afternoon, Mr. Muhammad's unit was placed on lockdown. *Id.* No officer noticed that Mr. Muhammad needed assistance, though a fellow person in custody with a view into his cell could see something was wrong. *Id.* Before Mr. Muhammad was found unresponsive, the B post officer abandoned his post for the hour and a half and remained in the bubble for extended periods of time. *Id.* There were no tours conducted by a captain between 4 p.m. and 9:45 p.m., when Mr. Muhammad was found unresponsive. *Id.*

195.    One officer was eventually terminated for failing to notify a supervisor or medical staff. Monitor's Nov. 8, 2023 Rep. at 71.

196.    **Michael Lopez** died on July 15, 2022. BOC 2022 Second Rep., Ex. 55 at 17. Beginning on the evening of July 14, 2022, Mr. Lopez and multiple other individuals were observed smoking and rolling pieces of paper in view of officers, who did nothing to intervene. *Id.* at 18. The B officer not only failed to conduct tours every 15 minutes, as required in mental observation units, but also entered false logbook entries claiming to tour every 30 minutes. *Id.* Overnight, these deficiencies persisted: the B officer entered false logbook entries claiming to tour every thirty minutes, but in fact only eleven tours occurred. *Id.*

197.    Two officers and a captain were suspended for thirty days each for failing to make proper tours and making false entries in a logbook. Monitor's Nov. 8, 2023 Rep. at 71.

198.    **Ricardo Cruciani** died on August 15, 2022. BOC 2022 Second Rep., Ex. 55 at 19. No B post officers were assigned to Mr. Cruciani's open dormitory-style unit the day before

or the day of his death. *Id.* at 20. Only two tours of the unit were conducted the entire day of August 14: at 11:29am and 11:24pm No captains toured the unit on August 14 or the morning of August 15. *Id.* Mr. Cruciani was able to collect linen and enter the bathroom. At 5:36a.m., a person in custody notified the A station officer that Mr. Cruciani was inside the bathroom with a sheet around his neck. *Id.* While the A station officer called in a medical emergency, the officer did not render first aid. *Id.*

199.    One captain was suspended for thirty days for failing to conduct a tour. Monitor's Nov. 8, 2023 Rep. at 71.

200.    The New York Attorney General report similarly found that there was no floor officer assigned to Mr. Cruciani's housing area at the time of his death. OSI Third Report (Oct. 1, 2023), Ex. 52 at 38.

201.    **Michael Nieves** died on August 30, 2022. BOC 2022 Third Rep., Ex. 56 at 11-12. The day of Mr. Nieves' death, he requested an institutional razor. At approximately 10:30 a.m., an officer requested that Mr. Nieves return the razor but Mr. Nieves stated that he could not find it. An officer and captain searched Mr. Nieves' cell but did not locate it. *Id.* Even though the captain instructed the C officer to take Mr. Nieves to the intake area for a full body scan, the captain subsequently told the officer to leave Mr. Nieves in his cell and close it since the captain would return to get him. *Id.* The cell door was closed around 11:28 a.m. At 11:41 a.m., the cell door was opened, and the C post officer found Mr. Nieves bleeding from his neck. *Id.* The logbook entry made by the C post officer omitted several crucial details. *Id.* Neither the officer nor the captain rendered first aid to Mr. Nieves in the nine minutes they waited for medical staff, despite having received specialized training. *Id.*

202.    One captain was suspended for thirty days for failure to supervise, and two officers were suspended for thirty days each for failing to render aid and failing to provide a timely report. Monitor's Nov. 8, 2023 Rep. at 71.

203.    **Kevin Bryan** died on September 14, 2022. BOC 2022 Third Rep., Ex. 56 at 12-14. No B post officer was present during the early morning hours of the day that Mr. Bryan died. *Id.* When a captain toured the housing area at around 3 a.m., the captain did not check the dayroom where Mr. Bryan was smoking under a blanket. *Id.* After Mr. Bryan had an altercation with another individual in custody, the A officer permitted Mr. Bryan to sleep in the vestibule outside of the housing area gate, in contravention of DOC policies. *Id.*

204.    The New York Attorney General found that during the time of Mr. Bryan's death, no officer was assigned as the floor officer of Mr. Bryan's housing area. OSI Third Report (Oct. 1, 2023), Ex. 52 at 39.

205.    **Gregory Acevedo** died on September 20, 2022. BOC 2022 Third Rep., Ex. 56 at 16, 26. Mr. Acevedo was able to climb a 30-foot metal fence and jump off the roof into the water alongside VCBC. *Id.* Though there were three officers assigned to the recreation yard at the time that Mr. Acevedo jumped, they were already inside the facility and no one stayed behind to supervise those that remained in the yard. *Id.*

206.    **Robert Pondexter** died on September 22, 2022. *Id.* at 17-18. Mr. Pondexter was hospitalized on September 18, 2022. On September 21, 2022, he was compassionately released from DOC custody. *Id.* DOC did not notify BOC of his death nor did they issue a COD notification. *Id.* While initially refusing to count Mr. Pondexter's death as an in-custody death, DOC recognized that he died in its custody. *Id.*

207.    **Erick Tavira** died on October 22, 2022. *Id.* at 22. Beginning at 9 p.m. the night before Mr. Tavira's death, the B officer continually left his post on the housing area floor to enter the A station or leave the area entirely. *Id.* The B officer did not tour every 15 minutes, as required in mental observation housing. *Id.* No Suicide Prevention Aide was present on the unit after 2 p.m. on October 21. *Id.* At 1:55 a.m., approximately one hour after last checking Mr. Tavira's cell, the B officer discovered Mr. Tavira inside his cell with a sheet around his neck. *Id.*

208.    One officer was suspended for seven days for failing to make proper tours and making false entries in a logbook. Monitor's Nov. 8, 2023 Rep. at 71.

209.    The New York Attorney General found that corrections officers missed a required tour before finding Mr. Tavira hanging. OSI Third Report (Oct. 1, 2023), Ex. 52 at 40.

210.    **Gilberto Garcia** died on October 31, 2022. BOC 2022 Third Rep., Ex. 56 at 23-24. On the day that Mr. Garcia died, the B officer did not look inside every cell while touring, and frequently left the B post to enter the A station for several extended periods that morning. *Id.* None of these personal breaks were entered in the logbook. *Id.* Mr. Garcia's cell had an obscured view. *Id.* Cells in the housing area were not secured, meaning that people were able to enter and exit cells without correctional officer authorization or intervention. *Id.* The A post logbook contained a false entry that DOC staff called a medical emergency at 12:10 p.m., when in fact people in custody alerted officers about Mr. Garcia at 12:18 p.m. *Id.* When BOC investigators arrived at the unit after Mr. Garcia's death, they found multiple people in custody smoking an unknown substance within feet of correction officers without intervention. *Id.*

211.    One officer was suspended for seven days for failing to conduct a tour. Monitor's Nov. 8, 2023 Rep. at 72.

212.   **Edgardo Mejias** died on December 11, 2022. BOC 2022 Third Rep., Ex. 56 at

25. On the day of his death, the B post officer failed to tour the dormitory every 30 minutes, as

required. *Id.* Moreover, the B post officer left the dormitory and entered the A station twice

without explanation. *Id.* There were multiple inaccurate entries in the B post logbook regarding

the time when the medical emergency was activated, when the B officer left the unit with Mr.

Mejias, and when the B post officer returned to the unit. *Id.*

213.   In sum, DOC administered the following immediate corrective action related to

people who died in its custody in 2022 and 2023:

**Chart of Corrective Action Taken by DOC Related to In-Custody Deaths - 2022-2023**

| Staff Member | Penalty | Reason for Suspension |
|---|---|---|
| **Death of Dashawn Carter on 5/7/2022** | | |
| CO 1 | Suspended, resigned | Failed to make proper tours and made false entries in the logbook |
| CO 2 | Suspended - 30 days | Failed to make proper tours and made false entries in the logbook |
| Captain 3 | Suspended - 30 days | Failed to make proper tours and made false entries in the logbook |
| Captain 4 | Suspended - 30 days | Failed to make proper tours and made false entries in the logbook |
| **Death of Elijah Muhammad on 7/11/2022** | | |
| CO 5 | Terminated | Failed to notify supervisor or medical staff |
| **Death of Michael Lopez on 7/15/2022** | | |
| CO 6 | Suspended - 30 days | Failed to make proper tours and made false entries in the logbook |
| CO 7 | Suspended - 30 days | Failed to make proper tours and made false entries in the logbook |
| Captain 8 | Suspended - 30 days | Failed to make proper tours and made false entries in the logbook |
| **Death of Ricardo Cruciani on 8/15/2022** | | |
| Captain 9 | Suspended - 30 days | Failed to conduct tour |
| **Death of Michael Nieves on 8/30/2022** | | |
| CO 10 | Suspended - 30 days | Failed to render aid |
| CO 11 | Suspended - 30 days | Failed to render aid and provide timely report |
| Captain 12 | Suspended - 30 days | Failed to supervise |
| **Death of Erick Tavira on 10/22/2022** | | |

| CO 13 | Suspended - 7 days | Failed to make proper tours and made false entries in the logbook |
|---|---|---|
| **Death of Gilberto Garcia on 10/31/2022** | | |
| CO 14 | Suspended - 7 days | Failed to conduct tour |
| **Death of Marvin Pines on 2/4/2023** | | |
| CO 15 | Suspended - 6 days | Failed to conduct tours/off post |
| CO 16 | Suspended - 6 days | Failed to conduct tour |
| Captain 17 | Suspended - 15 days | Failed to make proper tours and made false entries in the logbook |
| ADW 18 | Suspended - 30 days | Failed to conduct tours/supervise |
| ADW 19 | Suspended - 6 days | Failed to supervise |
| **Death of Anibal Carrasquillo on 6/20/2023** | | |
| CO 20 | Suspended - 30 days | Failed to conduct proper tour |
| CO 21 | Suspended - 30 days | Failed to conduct proper tour/Off post |
| **Death of Felix Taveras on 7/4/2023** | | |
| CO 22 | Suspended - 30 days | Failed to intervene and lock in |
| CO 23 | Suspended - 15 days | Failed to intervene |
| CO 24 | Suspended - 30 days | Failed to conduct tour |
| ADW 25 | Suspended - 15 days | Failed to identify misconduct |
| **Death of Ricky Howell on 7/6/2023** | | |
| Captain 26 | Documented Counseling | Failed to call incident into COD within required time frame |
| **Death of William Johnstone on 7/15/2023** | | |
| Captain 27 | Suspended - 7 days | Failed to conduct proper tour |
| CO 28 | Suspended - 15 days | Permitted unauthorized person or employee on their post |
| CO 29 | Suspended - 30 days | Abandoned Post |
| **Death of Curtis Davis on 7/23/2023** | | |
| CO 30 | Suspended - 30 days | Off post |
| CO 31 | Suspended - 15 days | Failed to secure post |
| ADW 32 | Suspended - 7 days | Failed to conduct proper tour |
| **Death of Manish Kunwar on 10/5/2023** | | |
| Captain 33 | Suspended - 30 days | Failed to conduct meaningful tours |
| CO 34 | Suspended - 30 days | Failed to conduct meaningful tours |
| CO 35 | Suspended - 30 days | Disobeyed a direct order to relieve fellow CO |

*See* Monitor's Nov. 8, 2023 Rep. at 71-72.

**III.    DOC Uses Unnecessary and Excessive Force in Violation of the Consent Judgment and UOF Directive**

214.    Consent Judgment Section IV, ¶ 1 requires DOC, in consultation with the Monitor, to develop, adopt, and implement a new comprehensive use of force policy with particular emphasis on permissible and impermissible uses of force ("Use of Force Directive"). The same provision requires the Use of Force Directive to be approved by the Monitor.

215.    Since July 2017, the Monitor has found the Defendants to be in continuous non-compliance with Consent Judgment Section IV, ¶ 1's requirement to implement the Use of Force Directive. *See* Monitor's Fifth Rep. at 40-41; Monitor's Sixth Rep. at 40-41; Monitor's Seventh Rep. at 52-54; Monitor's Eighth Rep. at 68-69; Monitor's Ninth Rep. at 79-80; Monitor's Tenth Rep. at 74-76; Monitor's Eleventh Rep. at 121-122; Monitor's Twelfth Rep. at 52-54; Monitor's Apr. 3, 2023 Rep. at 145-145.

216.    The Monitor reiterated in July 2023 that "it must also be emphasized that the Department remains in non-compliance with the implementation of the Use of Force policy, as required by § IV, ¶ 1 of the Consent Judgment, which is a seminal provision of the *Nunez* Court Orders." Monitor's July 10, 2023 Rep. at 174.

**A.    UOF Directive Section II - Unnecessary and Excessive Force**

217.    Under the UOF Directive, "excessive and/or unnecessary force is expressly prohibited," and DOC "has a zero tolerance policy for excessive and unnecessary force." UOF Directive §§ II(D), II(F), Ex. 1. The UOF Directive requires DOC staff to "use practical techniques to prevent Use of Force situations and/or resolve them without physical force." *Id.* at §§ II(A), II(B). Further, the UOF Directive requires DOC staff, when using force, to use the minimum amount necessary to stop or control the resistance or threat encountered, that the force

55

must be proportional to the resistance or threat encountered, and that force must end when control of the incarcerated individual has been established. *Id.* at §§ II(C), II(E).

218.    The pattern and practice of excessive and unnecessary use of force that brought about the Consent Judgment remains pervasive and evident. *See* Monitor's Nov. 8, 2023 Rep. at 3; Monitor's July 10, 2023 Rep. at 14.

219.    In July 2023, the Monitor stated that his "assessment of recent use of force incidents also indicates that the proportion of incidents involving the excessive and/or unnecessary use of force is currently the same, if not higher, than the proportion of incidents involving the excessive and/or unnecessary use of force that was observed at the time the Consent Judgment went into effect[.]" Monitor's Jul. 10, 2023 Rep. at 16.

220.    **Neither the seriousness nor the frequency of the excessive use of force has abated since 2016. *See* Monitor's Nov. 8, 2023 Rep. at 3; Monitor's July 10, 2023 Rep. at 15-16; Monitor's June 8, 2023 Rep. at 8-9.**

**Nature of Dispute**:        Legal Dispute - Monitor Opinion; Legal Dispute - Materiality
**Position of Defendants**:    Not Disputed insofar as the proposed finding reflects what is stated on the cited pages of the Monitor's report. Disputed, insofar as characterization of the events. "Plaintiff's comparison of 2016 to recent years fails to account for changes in policy that have had a significant impact on observed trends. Prior to the promulgation of Directive 5006R-D, DOC had no specified definition for use of force…the revision of the Department's policy [having occurred in September 2017]". See Declaration of Associate Commissioner Timothy Kepler, March 15, 2024.
**Position of Plaintiffs**: This proposed finding of fact does not discuss the number of uses of force overall, but rather the frequency of *excessive* force. Associate Commissioner Kepler does not assert that the policy changes made with the promulgation of Directive 5006R-D impacted what uses of force were considered excessive. Defendants provide no evidence to rebut the Monitor's clear findings regarding continued seriousness and frequency of excessive force, as cited in this paragraph. *See* Monitor's Nov. 8 Rep. at 3 ("pattern and practice of unnecessary and excessive force that brought about the Consent Judgment remains pervasive"); Monitor's July 10, 2023 Rep. at 15-16 ("ongoing, contemporaneous review of all use of force incidents in 2023 indicates that neither the seriousness nor the frequency of the excessive use of force has abated...[t]his finding is present in each of the Monitor's Reports to date which are replete with descriptions of staff's pervasive excessive and unnecessary use of force," and noting the Monitor's

"assessment of recent use of force incidents also indicates that the *proportion* of incidents involving the excessive and/or unnecessary use of force is currently the same, if not higher, than the proportion of incidents involving the excessive and/or unnecessary use of force that was observed at the time the Consent Judgment went into effect in 2016") (emphasis in original).

221.    DOC staff's use of force-related misconduct resulted in nearly 60 suspensions during the first five months of 2023, and 31 suspensions in July and August 2023. Monitor's July 10, 2023 Rep. at 18-19; Monitor's Oct. 5, 2023 Rep. at 6. These suspensions reflect not only the existence of significant staff misconduct and facility mismanagement, but that it has become commonplace. *Id.* at 6; Monitor's July 10, 2023 Rep. at 18-19.

### 1.    Rapid Reviews Document Avoidable or Unnecessary Uses of Force in Violation of UOF Directive Section II

222.    The First Remedial Order § A, ¶ 1, requires leaders of DOC facilities to conduct close-in-time reviews, known as "Rapid Reviews," of all reported use of force incidents in their commands. Monitor's Apr. 3, 2023 Rep. at 124.

223.    Rapid Reviews "are intended to identify incidents that are (or should be) deemed avoidable when staff fail to utilize sound security practices or otherwise take action that escalates tensions rather than resolves problems or prevents violence. Similarly, policy violations are (or should be) cited when staff fail to utilize the authorized protocols or techniques when using force." Incidents deemed avoidable "are an amalgam of the many poor security practices that the Monitor routinely cites (e.g., unsecured doors/gates, poor supervision/failure to tour, failure to intervene, abandoned posts, poorly controlled movement, improper escorts, etc.) and the subsequent unnecessary/excessive use of force." *See* Monitor's Nov. 8, 2023 Rep. at 12.

224.    In 2022, there were 7,005 reported incidents of use of force. Facility leaders conducted Rapid Reviews of 6,889 incidents (98% of all use of force incidents). *See* Monitor's Apr. 3, 2023 Rep. at 125.

225.    Through these Rapid Reviews, facility leaders determined that 16% of the 6,889 incidents reviewed, or more 1,135 total use of force incidents in 2022, were "avoidable." Monitor's Apr. 3, 2023 Rep. at 125.

226.    Facility leaders also determined that 12% of the incidents reviewed, or 835 total use of force incidents in 2022, involved violations of the use of force or chemical agent policies. Monitor's Apr. 3, 2023 Rep. at 125.

227.    Facility leaders further determined 48% of the incidents reviewed, or more than 3,000 total use of force incidents in 2022, involved "procedural violations" of basic security tasks such as failure to secure cell doors or to apply restraints correctly. Monitor's Apr. 3, 2023 Rep. at 125.

228.    Rapid Reviews determined that 17 percent of incidents were "avoidable" and 43 percent involved procedural violations during the Fifteenth Monitoring Period (July through December 2022).  The Monitor found that this demonstrates 'that staff are not applying the requisite skill set and decision-making needed to decrease the use of force rate.' Monitor's Apr. 3, 2023 Rep. at 125.

229.    From January through June 2023, facility leaders determined via Rapid Reviews that 360 use of force incidents, or 11% of the total incidents reviewed, were "avoidable." Monitor's Nov. 8, 2023 Rep. at 135; Monitor's July 10, 2023 Rep. at 19-20, 191. That is, they "would not have occurred if staff had utilized sound correctional practices including security-related actions, interpersonal communication and conflict resolution skills." *Id.* at 19-20.

230.    During the same January through June 2023 period, facility leaders determined that 273 incidents involved violations of use of force or chemical agent policies, and more than

1,200 incidents involved procedural violations such as failure to secure doors or apply restraints correctly. Monitor's Nov. 8, 2023 Rep. at 135; Monitor's July 10, 2023 Rep. at 19.

231.    The following chart shows the outcomes of facility Rapid Reviews from January 1, 2018 to June 2023. Monitor's Nov. 8, 2023 Rep. at 135.

| Rapid Review Outcomes, 2018 to June 2023 | | | | | | |
|---|---|---|---|---|---|---|
| | **2018** | **2019** | **2020** | **2021** | **2022** | **Jan.-Jun. 2023** |
| **Incidents Identified as Avoidable, Unnecessary, or with Procedural Violations** | | | | | | |
| **Number of Rapid Reviews** | 4,257 (95% of all UOF) | 6,899 (97% of all UOF) | 6,067 (98% of all UOF) | 7,972 (98% of all UOF) | 6,889 (98% of all UOF) | 3,225 (99% of all UOF) |
| **Avoidable** | 965 (23%) | 815 (12%) | 799 (13%) | 1,733 (22%) | 1,135 (16%) | 360 (11%) |
| **Violation of UOF or Chemical Agent Policy** | | | 345 (11%) (July-December 2020 Only) | 1,233 (16%) | 835 (12%) | 273 (8%) |
| **Procedural Violations** | 1,644 (39%) | 1,666 (24%) | 1,835 (30%) | 3,829 (48%) | 3,296 (48%) | 1,281 (40%) |
| **Corrective Action Recommended by Staff Member** | | | | | | |
| **Number of Staff with Recommended Corrective Action[73]** | N/A | N/A | 2,040 | 2,970 | 2,417 | 1,395 |

232.    "The number of incidents deemed avoidable . . . has dropped . . . (almost 50%) compared to previous years." *See* Monitor's Nov. 8, 2023 Rep. at 12. "This appears to be due to inadequate assessments of use of force incidents as there is no evidence of a corresponding change in practice that would explain the decline." *Id.*; Monitor's Apr. 3, 2023 Report at 125-126 ("Rapid Reviews do not always reliably and consistently identify *all* issues that would reasonably be expected to be identified," and "some Rapid Reviews are *patently* biased, unreasonable, or inadequate.").

233.    Therefore, the true number of use of force incidents which were avoidable, involved a violation of the use of force policy, or involved procedural violations, is likely higher

than the number detected by facility leaders via Rapid Reviews. *See* Monitor's Nov. 8, 2023 Rep. at 12.

234.    Even though the proportion of incidents found to be "avoidable" or to violate the UOF Directive in the facility Rapid Reviews is likely an undercount, the current data is "evidence of an ongoing pattern and practice of unnecessary and excessive force." *Id.* at 13.

### 2.    ID Investigations Document Excessive, Unnecessary, and Avoidable Uses of Force in Violation of UOF Directive Section II

235.    DOC's Investigation Division conducts "Intake Investigations" regarding every reported use of force incident. Monitor's Apr. 3, 2023 Rep. at 155.

236.    From January to April of 2023, the Investigation Division found that 14% of its closed Intake Investigations involved "unnecessary," "excessive," and/or "avoidable" uses of force. Monitor's July 10, 2023 Rep. at 20. In absolute numbers, that means Intake Investigations identified 268 cases involving excessive, unnecessary, or avoidable force during that four-month period. *Id.* at 200.

237.    In 2022, the Investigation Division determined that there were excessive, unnecessary, and/or avoidable uses of force in more than 1,000 Intake Investigations. In 2021, that number was more than 1,400. Monitor's July 10, 2023 Rep. at 200.

238.    The chart below demonstrates the findings of closed ID Intake Investigations from February 3, 2020 through April 2023. July 10, 2023 Rep. at 200.

| Investigations Status<br>*As of May 31, 2023* | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Incident Date** | *Feb. 3 to June 2020* (10th MP) | *July to Dec. 2020* (11th MP) | *Jan. to June 2021* (12th MP) | *July to Dec. 2021* (13th MP) | *Jan. to June 2022* (14th MP) | *July to Dec. 2022* (15th MP) | *Jan. to Apr. 2023* (Partia l 16th MP) |

| Closed Intake Investigations | 2,492 | 3,272 | 4,468 | 3,916 | 3,349 | 3,883 | 2,098 |
|---|---|---|---|---|---|---|---|
| *Referred for Full ID* | 411 | 567 | 781 | 634 | 360 | 110 | 149 |
| *Investigations Closed at Intake* | 2,081 | 2,700 | 3,687 | 3,285 | 2,989 | 3,773 | 1,949 |
| *Findings of Investigations Closed at Intake* | | | | | | | |
| Investigations Closed at Intake | 2,081 | 2,700 | 3,687 | 3,285 | 2,989 | 3,773 | 1,949 |
| *Excessive, and/or Unnecessary, and/or Avoidable* | *180 (9%)* | *477 (18%)* | *734 (20%)* | *737 (22%)* | *531 (18%)* | *543 (14%)* | *268 (14%)* |
| *Chemical Agent Violation* | *164 (8%)* | *163 (6%)* | *260 (7%)* | *324 (10%)* | *287 (10%)* | *245 (6%)* | *146 (7%)* |

239.    Below are the findings of all closed ID Investigations, including both those that are closed after an Intake Investigation and those that are closed after a Full ID Investigation.[5]

[5] ID conducts two main types of investigations for use of force incidents. The first type—an "Intake Investigation"—is a relatively brief investigation that ID conducts with regard to every use of force incident. *See* Monitor's Apr. 3, 2023 Rep. at 160.  The second type of investigation that ID conducts, called a "Full ID Investigation," is a more detailed and thorough investigation that is conducted only for a subset of particularly concerning use of force incidents, after the intake investigation (previously known as a preliminary review) is complete. Monitor's Ninth Rep. at 44-45; *see infra* ¶¶ 711-713.

| Findings of Closed ID Investigations (includes those closed at Intake Investigations and following a Full ID Investigation) as of September 30, 2023 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Finding | Incident Date | | | | | | |
| | Feb 3 to Jun. 2020 (10th MP)[53] | July to Dec. 2020 (11th MP) | Jan. to Jun. 2021 (12th MP) | July to Dec. 2021 (13th MP) | Jan. to Jun. 2022 (14th MP) | July to Dec. 2022 (15th MP) | Jan. to June 2023 (16th MP) |
| Total | 2,492 | 3,272 | 4,468 | 3,916 | 3,349 | 3,883 | 3,281 |
| Excessive, Unnecessary, or Avoidable | 252 (10%) | 563 (17%) | 809 (18%) | 797 (20%) | 585 (17%) | 575 (15%) | 421 (13%) |
| Chemical Agent Violation | 164 (7%) | 163 (5%) | 260 (6%) | 324 (8%) | 287 (9%) | 245 (6%) | 224 (7%) |

Monitor's Nov. 8, 2023 Rep. at 94.

240.    The Monitor has found that "the prevalence of misconduct" that is reflected in outcomes of Intake Investigations and Full ID Investigations must be "considered a floor, not a ceiling" because "ID does not consistently or reliably identify all misconduct." Monitor's Nov. 8, 2023 Rep. at 12-13, 93-94; July 10, 2023 Rep. at 20. "This is particularly true for the proportion of cases deemed problematic in 2022 and 2023 due to a concerning decline in the quality of investigations produced by ID." Monitor's Nov. 8, 2023 Rep. at 94.

241.    Even though the proportion of incidents found to be "avoidable" or to violate of the UOF Directive by ID is likely an undercount, the current data is evidence of an ongoing pattern and practice of unnecessary and excessive force. *See* Monitor's Nov. 8, 2023 Rep. at 13.

242.    ID's Intake Investigations of use of force incidents reveal several recent examples of serious injuries to incarcerated individuals, demonstrating the use of excessive and unnecessary force. *See infra* ¶¶ 266-267; 276-277; 443.

**B.    UOF Directive Section II(G) – High Impact Force and Prohibited Techniques**

243.    The Use of Force Directive "strictly prohibits the use of high impact force, including: strikes or blows to the head, face, groin, neck, kidneys, and spinal column; kicks; and choke holds... and other neck restraints." UOF Directive, § II(G), Ex. 1.

244.    The only exception is "where a Staff Member or other person is in imminent danger of serious bodily injury or death, and where lesser means are impractical or ineffective." *Id*.

245.    Since the Consent Judgment was entered, DOC have used, and continue to use, prohibited use of force techniques on incarcerated individuals in violation of the Use of Force Directive. *See infra* ¶¶ 246-252.

246.    DOC has an "extensive history of utilizing head strikes in situations where it is not merited." *See* Monitor's July 10, 2023 Rep. at 17. In October 2023, the Monitor found that uses of head strikes and other high-impact force techniques "continue to occur with alarming frequency." Monitor's Oct. 5, 2023 Rep. at 5.

247.    "Such hard impact tactics create a high degree of unnecessary risk of harm and more often than not do in fact cause injury." Monitor's Oct. 5, 2023 Rep. at 5.

248.    Between January 1, 2022 and May 2023, the Monitor "identified 587 UOF incidents involving head strikes." *See* Monitor's Nov. 8, 2023 Rep. at 68.

249.    In 2022, uniformed "staff utilized head strikes almost 400 times." *See* Monitor's July 10, 2023 Rep. at 17.

250.    "In a recent two-month period [in 2023], staff used head strikes 69 times." *Id.* at 18.

251.    Of the nearly 60 staff suspended for use of force misconduct in the first five months of 2023, some of those suspensions were due to their use of prohibited techniques such as head strikes, chokeholds, kicks, and body slams. *Id.*

252.    The Monitor documented several "illustrative examples" in which prohibited use of force techniques were used in the July 10, 2023 report. *See* Monitor's July 10, 2023 Rep. at 24-28. The incidents exemplify "recent poor practices that mirror those observed throughout the duration of the Consent Judgment and that continue unabated… these cases are not unique, but rather illustrate the *typical* patterns and trends observed by the Monitoring Team over the last eight years." *Id.* at 23 (emphasis in original); *see infra* ¶¶ 260-280.

**C.      UOF Directive Section V(B)(1) – Punitive and Retaliatory Force**

253.    The UOF Directive prohibits using "force to punish, discipline, assault, or retaliate" against a person in custody. UOF Directive, § V(B)(1)(a), Ex. 1.

254.    Some of the use of force violations which resulted in suspensions during the first five months of 2023 "were retaliatory, punitive, and designed to inflict pain." *See* Monitor's July 10, 2023 Rep. at 18.

255.    There are several examples of such UOF incidents in 2022 and 2023. *See infra* ¶¶ 260, 268, 270, 272, 484, 620, 637.

**D.      UOF Directive Section V(B)(2) – Offensive Language, Provocatory Conduct, and Instigating Violence**

256.    The Use of Force Directive further prohibits staff from "provoking inmates to commit an assault," "using racial, ethnic, homophobic or otherwise derogatory slurs or obscenities towards any inmate," or "causing, instigating, or facilitating inmate-on-inmate violence." UOF Directive, § V(B)(2), Ex. 1.

257.    Use of force violations that resulted in suspensions during the first five months of
2023 reflected the use of racial slurs. Monitor's July 10, 2023 Rep. at 18.

258.    In addition, "there is evidence that staff have been complicit in causing or
facilitating assaults among people in custody." Monitor's July 10, 2023 Rep. at 18.

259.    **There are several examples of UOF incidents involving provocatory language,
offensive language, or complicit conduct among staff in 2022 and 2023. *See infra* ¶¶ 270-272,
276, 278, 411, 443-445, 448, 455, 458, 509, 622-623.**

> **Nature of Dispute**:      Legal Dispute-Other
> **Position of Defendants**:    Not Disputed, insofar as the proposed finding reflects
> information contained on the cited pages of the Monitor's Report. Disputed, insofar as
> this is a conclusion or opinion rather than a factual statement that doesn't require a
> response.
> **Position of Plaintiffs**: This is not an opinion, but rather a fact the Court can reasonably
> find based on the details described in paragraphs 270-272, 276, 278, 411, 443-445, 448,
> 455, 458, 509, and 622-623, as cited herein.

## Descriptions of Use of Force Incidents

260.    In its May 26, 2023 Report, the Monitor documented officers using force that
caused an incarcerated individual, later identified as Mr. Carlton James, to suffer paralysis from
the neck down ("Incident #1," UOF 2389/23). *See* Declaration of Carlton James dated Nov. 10,
2023 (identifying himself as the person described in Incident #1); Monitor's May 26, 2023 Rep. at
2-4; *see also* Monitor's June 8, 2023 Rep. at 45-46; Monitor's June 12, 2023 Letter to the Court at
2-4, 10-11; Monitor's July 10, 2023 Rep. at 21. On May 11, 2023 at VCBC, DOC staff left Mr.
James unattended in an elevator during an escort. *See* Monitor's July 10, 2023 Rep. at 21. Mr.
James moved through an unsecured gate and past a group of over 10 officers, including two
captains. *Id*. Staff encircled Mr. James and then "descended and swarmed the individual and very
forcibly took him to the floor." *Id*. He was restrained and then escorted by a Probe Team to the
intake search area. *Id*. Following a search, staff assisted him with his shoes, which he could not

put on because he was rear-cuffed and in leg shackles. *Id.* Mr. James's leg jerked towards an officer who was in full protective gear. *Id*. Multiple staff responded by forcing Mr. James to the floor, face down. *Id*. When the probe team lifted him, "his head hit a plastic container, the leg of a partition, and then the concrete floor." *Id.* Mr. James was limp as the probe team shoved him roughly onto a gurney. *Id*. He sustained a spinal cord injury in his neck as a result of the trauma caused by this incident, and now has quadriplegia and no use of his limbs. James Decl. ¶ 10. He underwent multiple surgeries on his neck, has had a feeding tube placed, and was on a ventilator. *Id*.

261.    The Monitor identified procedural and security failures across ranks that contributed to this incident or failed to properly document it afterward. The Monitor stated that an officer was disciplined for "improper escort;" two additional officers were disciplined for "failure to secure a door;" a captain was disciplined for not reporting the second use of force incident in which the serious injuries occurred; and an ADW was disciplined for failing to report Mr. James's transport via EMS and the seriousness of his injuries. *See* Monitor's June 12, 2023 Letter to the Court at 4 , 10-11.. One officer was suspended by the facility on May 11, 2023 for 10 days. Monitor's Nov. 8, 2023 Rep. at 98. The ID Investigation is pending; DOI appears to be investigating. *Id.*

262.    DOC told the Monitor that Mr. James' paralysis was a result of his falling while he tried to tie or put on his shoes. Given the video evidence showing that he was in fact subject to the above-described serious uses of force just before his injury, the Monitor described this assertion as "questionable at best." Monitor's May 26, 2023 Rep. at 4.

263.    The Monitor raised concerns about the Commissioner's public statement that no misconduct had occurred during the incident. The Monitor concluded that "the Commissioner's

premature conclusions…not only appear inconsistent with the available objective evidence but also suggest an attempt to excuse or avoid responsibility for a very serious event." Monitor's June 12 Letter to the Court at 4.

264.    The Monitor also voiced his concern "regarding the Monitoring Team's ability to trust the information provided" by DOC. Monitor's June 8, 2023 Rep. at 44.

265.    The Monitor first became aware of this incident via an external allegation; while seeking additional information from DOC, "a story about the incident was released by the media, including a statement" from DOC. Monitor's May 26, 2023 Rep. at 3-4.

266.    On April 16, 2023, Joshua Gonzalez told an officer who was escorting him from the clinic back to his housing unit that he wanted to talk to a different officer about getting a shower that day, as it was getting late and he hadn't yet been permitted to shower. *See* Declaration of Joshua Gonzalez dated Nov. 9, 2023. Mr. Gonzalez was in handcuffs, with his hands behind his back. *Id.* at ¶ 9. As Mr. Gonzalez moved toward the different officer to try to talk to that officer about getting a shower, the officer escorting Mr. Gonzalez lifted Mr. Gonzalez's body up and slammed him to the ground. *Id.* at ¶ 10. Mr. Gonzalez's face hit the floor hard, as he could not brace himself due to his hands being cuffed behind his back. *Id.* Mr. Gonzalez felt pinned down and that he was suffocating. *Id.* at ¶¶ 11, 13. While still on the ground, Mr. Gonzalez felt his teeth with his tongue, and believed they had been shattered. *Id.* at ¶ 12. He had difficulty eating due to the pain, and was prescribed medication to numb his mouth. *Id.* at ¶¶ 14-16. Eventually, one of his teeth was extracted after it was deemed fractured and non-restorable. *Id.* ¶ 17. ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████████

██

267.    On June 27, 2023, Joseph Myers was in a recreation yard of AMKC when he noticed something was going on between COs and other people in his housing unit. *See* Declaration of Joseph Myers dated November 9, 2023. He and other incarcerated people were directed by a captain to stand against the wall. *Id.* at ¶ 8. Although Mr. Myers and others complied, the captain nonetheless sprayed them. *Id.* at ¶ 9. Mr. Myers was sprayed on his back and his face, including directly in his eyes, had difficulty breathing, and felt intense burning all over his body, which spread every time he had to touch a new part of his body that had not been sprayed, including when he needed to use the restroom. *Id.* at ¶¶ 10-23. Mr. Myers avoided showering for a few days to avoid re-activating the spray. *Id.* at ¶ 24. ████████████

██████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████

268.    On June 30, 2023, James Bradley was arraigned and transported to Rikers Island for incarceration. *See* Declaration of James Bradley dated November 9, 2023. After spending an extended period of time on a bus in handcuffs and shackles, he was escorted into the EMTC new admissions intake area, where he asked to have his restraints removed several times. *Id.* at ¶¶ 4-5. When Mr. Bradley extended his hands toward an officer as the officer approached him, the officer punched Mr. Bradley in the face twice, shocking and confusing Mr. Bradley, and causing soreness and pain in his jaw, head, and ear. *Id.* at ¶¶ 5-7. ██████████████████████

██████████████████████████████████████████████

████████████████

269.    On February 3, 2023 in RMSC, a group of officers struggled with a woman, aggressively pushed her against a wall, and sprayed her in the face with chemical agent. Monitor's July 10, 2023 Rep. at 26 (Illustrative Example #3, UOF 683/23). As the OC spray took effect, two officers aggressively took the woman to the floor, fell on top of her, and applied restraints. *Id.* The woman suffered post concussive syndrome requiring a CT scan. *Id.* DOC did not take immediate corrective action. Monitor's Nov. 8, 2023 Rep. at 98. One officer received a command discipline, and was referred for retraining on defensive tactics. *Id.* Another officer was the subject of formal disciplinary charges, and signed a negotiated plea agreement("NPA") on 9/25/2023. *Id.*

270.    On March 3, 2023, at the Brooklyn courthouse, an individual wearing both front cuffs and leg shackles refused to enter a search pen. *See* Monitor's July 10, 2023 Rep. at 24 (Illustrative Example # 1, UOF 1156/23). A captain directed officers to push the individual into the pen. *Id.* As officers were pushing him into the pen, one officer wrapped his arm around the incarcerated person's neck in a chokehold. *Id*. The officer took the individual to the ground and "continued to hold and hit the [individual's] head while he was on the ground" despite the captain and multiple other officers telling him to stop repeatedly. *Id*. After the incident, one officer was repeatedly heard saying "Good job." *Id*. None of the staff reported the chokehold and the Facility Rapid Review "only noted that the officer used an 'unauthorized force technique' and did not specifically mention the chokehold or head strikes; the Rapid Reviewer also reported that the staffs' actions were in compliance" with DOC's Use of Force Directive. *Id*. at 24-25. The officer was suspended for 30 days for using the chokehold and received additional

disciplinary charges for failing to turn on his body-worn camera. *Id.* at 24. The other officers at the incident received formal disciplinary charges for failing to report the chokehold and head strikes. *Id.* at 24-25; *see also* ID Packet for UOF 1156/23, Ex. 37. On April 8, 2023, one officer was suspended by ID for 30 days. Monitor's Nov. 8, 2023 Rep. at 98. Formal charges were brought against that officer, another officer, and a captain. *Id.* The first officer signed an NPA on 5/30/2023 for 15 compensatory days and 30 suspension days, while charges are pending for the second officer and the captain. *Id.*

271.    On April 18, 2023, two officers observed an incident involving an incarcerated individual in an AMKC dayroom. Monitor's Aug. 7, 2023 Rep. at 12-13. Body worn camera captures one officer bragging about beating up the individual on prior occasions, including one time when the individual was in a designated mental observation unit. The officer swore at the individual, threatened to "fuck [him] up again," and antagonized him on and off for ten minutes until the individual was removed from the area. The officer told a captain that a 10-day suspension would have no meaningful effect on him as he would simply take a trip somewhere. Formal charges were brought against the officer, who signed an NPA on 9/19/2023. *See* Monitor's Nov. 8, 2023 Rep. at 98. A facility referral was also made for delay in medical attention. *Id.*

272.    In another example, on June 7, 2023, in GRVC, an officer attacked an individual in a barber shop. Monitor's July 10, 2023 Rep. at 27 (Illustrative example #4). The individual was in full restraints, including front cuffs with mitts and leg shackles, and had officers standing on either side of him. When the individual appeared to make a spitting motion, a third officer charged towards him, punching his head and pushing him into the chair. The officer continued to punch the individual's head and torso while the individual was in the chair. Other staff had to

70

pull the officer away from the individual. *Id.* The officer in question did not report the head

strikes. *Id.* at 28. The officer was suspended for ten days after DOC's initial review concluded

that "the officer's use of force was avoidable as he had a means of egress after the [individual]

spat at him." *Id.* Disciplinary charges were brought against that officer, who signed an NPA.

Monitor's Nov. 8, 2023 Rep. at 98. Disciplinary charges were brought against another officer,

who signed an NPA. *Id.* Disciplinary charges were brought against a third officer, who is

awaiting pretrial conference. *Id.* Several other officers were referred for retraining on restraints,

bodyworn camera policy, and failure to document refusal. *Id.*; *see also* ID Packet for UOF

2893/23, Ex. 41.

273.     On August 9, 2023, an officer escorted "a restrained incarcerated individual down

a tier when the officer suddenly and violently" threw the individual "into a railing, hitting his

head with full force into the railing." Monitor's Oct. 5, 2023 Rep. at 5. "The individual's

resistance, which consisted of defensively twisting and turning, was in all likelihood in response

to a painful bent wrist being applied by the officer." *Id.* "The officer then grabbed the restrained

individual by the neck and threw him to the floor." *Id.*

274.     ████████████████████████████████

████████████████████████████████

████████████████████████████████████

████████████████████████████

████████████████████████████████

████████████████████████████

██████████████████

275.



276.

277.



278.

279. ███████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████

280. ███████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████.

**IV.    DOC Security Failures and Poor Staff Practice Lead to Use of Force**

281.    Since the entry of the Consent Judgment, DOC staff has routinely failed to follow basic security protocols and has used poor practices. Monitor's Twelfth Rep. at App. B at iv-v.

282.    The security failures and poor staff practice both contribute to the high level of use of force and the overall levels of violence and disorder in DOC facilities and render DOC unable to implement the Use of Force Directive. *See* Monitor's Nov. 8, 2023 Rep. at 6; Monitor's July 10, 2023 Rep. at 16; Monitor's Oct. 28, 2022 Rep. at 2; *see also* Monitor's Seventh Rep. at 25; Monitor's June 30, 2022 Rep. at 15 (noting "the very high incidence of force associated with security lapses, *i.e.*, avoidable incidents of force" and "both the sheer number of incidents and the frequency of use of force violations" associated with those lapses); Monitor's Apr. 3, 2023 Rep. at 144-145. A large proportion of uses of force are related to fights among people in custody, attempts to search people in custody, and during escorts. Monitor's July 10, 2023 Rep. at 50. Many of these events may have been successfully avoided if staff had the requisite skill set in basic correctional practice, interpersonal communication and conflict resolution, if lock-in time was enforced by staff, and if out-of-cell time was more structured and/or enriched with programming. *Id.*

283.    DOC's security failures contribute to the high risk of harm facing the Plaintiff Class, unsafe conditions, and, combined with the failure to deliver services consistently, the high levels of frustration for incarcerated individuals. Monitor's Oct. 5, 2023 Rep. at 4. High levels of violence inside the jails inevitably lead to high rates of use of force. As the Monitor has explained, "when the level of violence is high, so too will be staff applications of force as staff must intervene to interrupt an assault. Furthermore, when Staff are threatened (regardless of the level of threat or whether the threat is generated by a legitimate grievance), applications of force further increase." Monitor's Twelfth Rep. at 19. "[F]ear, threat, and violence is the inevitable

outcome of a pervasively unsafe setting manifested by extraordinarily high levels of assaults and incidents of use of force." Monitor's Twelfth Rep. at 19. "The jails' unsafe environments . . . trigger a vicious cycle of fear, stress, trauma and violence." Monitor's Twelfth Rep. at 21. For that reason, significantly reducing the level of both violence and use of force in the jails is "a precondition to the maintenance of a normalized and predictable setting in which both staff and incarcerated individuals can function." Monitor's Twelfth Rep. at 19.

284.    In the three-month period of April through June 2023, there were 82 emergency lock-ins of housing areas due to stabbings/slashings and 122 emergency lock-ins of housing areas due to UOF investigations. DOC Quarterly Emergency Lock-In Report, FY23 Quarter 4 (April 1st - June 30th), Ex. 34 at 2. Twenty-seven lock-ins for UOF investigations lasted over 24 hours each, while on average lock-ins ranged from two to six hours in length. *Id.* at 4, 7. Depending on housing area and facility, each lock-in affected dozens of individuals and resulted in the delay or cancellation of dozens of mandated services such as education, law library, recreation, religious services, sick calls, and visits. *Id.* at 3, 5.

**A.    Background on Remedial Orders Addressing Security Failures and Poor Staff Practice**

285.    Across the Fifth to Eleventh Monitoring Periods, rates of UOF rose to their highest levels since entry of the Consent Judgment. Monitor's Ninth Rep. at 3, 26-32; Monitor's Eleventh Rep. at 23-25, 40-42, 122.

286.    **DOC's staff's failure to adhere to basic safety measures, including failing to secure doors, allowing incarcerated people in restricted areas, and applying restraints improperly, created or contributed to the need to use of force. Monitor's Fifth Rep. at 21-22. The poor operational procedures, including failure to secure doors and failing to adhere to lock-in times, created a state of turmoil in the facilities, including violence and physical encounters between

and among people in custody and staff. Monitor's Eleventh Rep. at 23-25, 40-42, 122; Monitor's

Twelfth Rep. at 19.**

> **Nature of Dispute**:        Legal Dispute-Monitor Opinion
> **Position of Defendants**:    Defendants object to the conclusion entering the record of this
> motion as an expert conclusion, and respectfully submit that the conclusion falls outside
> of the scope of the Monitor's realm of expertise. Defendants respectfully refer the court
> to the parties Joint Status Report dated July 3, 2024, ECF No. 742, for Defendants
> position on the scope of the Monitor's expertise. (ECF No. 742).
> **Position of Plaintiffs**: Defendants concede that the Monitor is "appropriately qualified as
> an expert on corrections systems and best practices." July 3, 2024 Joint Report of the
> Parties, Dkt. 742 at 3, 5. Familiarity with what constitutes best practices as to "basic
> security measures" in a correctional setting, assessing correctional staff's adherence or
> lack of adherence to those measures, and opining on the effect of security failures in a
> correctional setting are squarely within the scope of the expertise Defendants concede the
> Monitor possesses. Moreover, Defendants offer no evidence to rebut the Monitor's expert
> finding made here. The Court should credit the Monitor's opinion and adopt this
> proposed finding.

287.    Between the Fifth Monitoring Period and the Eleventh Monitoring Period (July

2017 through December 2020), DOC staff used practices that had plagued the facilities since

2015, including hyper-confrontational demeanor that escalated incidents with incarcerated

individuals and needlessly painful escort tactics. *See* Monitor's Fifth Rep. at 4; Monitor's Sixth

Rep. at 8, 11-14; Monitor's Seventh Rep. at 7, 19, 23-24; Monitor's Eighth Rep. at 3-4, 29-30;

Monitor's Ninth Rep. at 3, 26-32; Monitor's Tenth Rep. at 3, 22-25, 30-32; Monitor's Eleventh

Rep. at 23-25, 40-42, 122.

288.    DOC staff were hyper-confrontational, aggressive, lack effective interpersonal

communication skills and do not exhaust non-physical interventions before resorting to force.

Monitor's Ninth Rep. at 3, 26-32.

289.    **Too often and for no justifiable reason, DOC staff utilized painful escort

techniques (e.g., bent wrist lock or overextension of the shoulder) when escorting incarcerated

individuals to intake or the clinic following a UOF. Painful escort techniques provoked the

incarcerated individual, did not provide effective control, and did not prevent the need for additional force if the individual becomes resistant. Monitor's Seventh Rep. at 23-24; *see also* Monitor's Fourth Rep. at 8; Monitor's Fifth Rep. at 19; Monitor's Eighth Rep. at 4; Monitor's Tenth Rep. at 13; Monitor's Eleventh Rep. at 25. In other cases, the painful escort does not result in a use of force, but was an unnecessary infliction of pain. Monitor's Ninth Rep. at 31.\*\*

> **Nature of Dispute**:        Legal Dispute-Monitor Opinion
> **Position of Defendants**:    Defendants object to the conclusion entering the record of this motion as an expert conclusion, and respectfully submit that the conclusion falls outside of the scope of the Monitor's realm of expertise. Defendants respectfully refer the court to the parties Joint Status Report dated July 3, 2024, ECF No. 742, for Defendants position on the scope of the Monitor's expertise. (ECF No. 742).
> **Position of Plaintiffs**: Defendants concede that the Monitor is "appropriately qualified as an expert on corrections systems and best practices." July 3, 2024 Joint Report of the Parties, Dkt. 742 at 3, 5. Familiarity with what constitutes best practices as to escort techniques in a correctional setting, assessing correctional staff's escort techniques, and opining on the effect of painful techniques in a correctional setting are squarely within the scope of the expertise Defendants concede the Monitor possesses. Moreover, Defendants offer no evidence to rebut the Monitor's expert finding made here. The Court should credit the Monitor's opinion and adopt this proposed finding.

290.    The UOF Directive prohibits the use of unnecessarily painful escort techniques. UOF Directive, § V(B)(1)(d), Ex. 1.

291.    To address these causes of the increasing rates of UOF, and to remedy DOC's non-compliance with the Consent Judgment, the Monitor recommended and the Court entered the First Remedial Order on August 14, 2020. *See* Dkt. 350; *supra* Section I(B).

292.    The First Remedial Order contained several remedial measures to redress the rampant deficiencies in staff practice—enhancing safe custody management, improving staff supervision, and reducing unnecessary use of force, including improvements to  Rapid Reviews by facility wardens of use of force incidents, a revised de-escalation protocol, increased and adequate supervision of captains, and development of a protocol governing the use and composition of emergency response teams. First Remedial Order § A.

293.    The provisions in the First Remedial Order first received compliance ratings in the Eleventh Monitoring Period, and as of this writing were last rated in the Fifteenth Monitoring Period.[6] Monitor's Eleventh Rep. at 104-120; Monitor's Twelfth Rep. at 37-51; Monitor's Oct. 28, 2022 Rep. at 105-119; Monitor's Apr. 3, 2023 Rep. at 124-143. During that period, Defendants have never achieved substantial compliance with any First Remedial Order § A provisions, and indeed have been rated in noncompliance with provisions relating to facility leadership responsibilities, supervision of captains, and facility emergency response teams. *See infra* Sections V(B); VI(C); VI(D).

294.    On August 24 and September 2, 2021, the Monitor filed Special Reports with the Court identifying emergency threats to the Plaintiff Class. Dkt. 378, 380. DOC facilities were marked with a pervasive and high level of disorder and chaos stemming from unchecked breaches and failures of basic security protocols, including (a) door security (failing to secure doors, gates, and cells, failing to prevent incarcerated individuals from entering prohibited areas); (b) poor situational vigilance (abandoning posts, using hyper-confrontational behavior); (c) overreliance on probe teams; (d) failing to act in self-harm events; and (e) failing to provide basic services. Dkt. 378 at 1, 7-8; Dkt. 380 at 1-2. As a result of these failures, individuals in DOC custody died or sustained serious injuries from slashing and burns, while DOC staff were assaulted. Dkt. 378 at 2; Dkt. 380 at 1 n.1.

295.    The Monitor filed another report on September 23, 2021. Dkt. 387. The conditions in DOC facilities represented an emergency posing an immediate threat to the safety and well-being of incarcerated individuals and staff. *Id.* at 2. The harm to incarcerated individuals was directly linked to and caused by DOC's failure to address a wide range of

---

[6] The Monitor did not provide ratings for the Thirteenth Monitoring Period.

security failures including: failures to properly secure doors on cells, vestibules and control stations; poor situational awareness and lack of vigilance while on post; overreliance on probe teams; failures in adequately securing incarcerated individuals following violent assaults; and failures to respond to self-harming behavior. *Id.* at 2.

296.    The Monitor's September 23, 2021 report set forth a set of recommended immediate security initiatives to address the lapses in security management. *See* Dkt. 387 at 13-14. After discussion, those recommendations were adopted in large part as the Second Remedial Order, on consent of the Parties. *Supra* Section I(C).

### 1.    Entry of the Second Remedial Order's Security Initiatives

297.    On September 29, 2021, the Court entered the Second Remedial Order. *See* Dkt. 398.

298.    The Second Remedial Order contained several "immediate security initiatives" to "address the current lapses in security management." Second Remedial Order § 1(i). In particular, Section 1(a)(i) required DOC to develop and implement an interim security plan that describes, in detail, how various security breaches will be addressed by October 11, 2021. The interim security plan was required to address, among other things, the following issues: unsecured doors, abandonment of a post, key control, post orders, escorted movement with restraints when required, control of undue congregation of detainees around secure ingress/egress doors, proper management of vestibules, and properly securing officer keys and OC spray. *Id.*

299.    In the Twelfth Monitoring Period (January to June 2021, report filed December 2021), DOC continued to fail to implement basic security protocols resulting in a significant proportion of use of force incidents being problematic in some way. Monitor's Twelfth Rep. at 52. The lack of basic security procedures creates a negative cycle of violence and chaos. *Id.* at

11, 12, 17. The security lapses and poor staff behavior omnipresent among the thousands of UOF incidents reviewed by the Monitor include:

(a) Door Security • Failing to secure the doors for the A-Station, unit gates and individual cells. • Failing to properly control entrance and egress through doors, gates and cells to prevent people in custody from entering unauthorized areas or to gain access to other individuals for the purpose of doing harm.

(b) Poor Situational Awareness and Lack of Vigilance While on Post • Neglecting to maintain a safe distance from incarcerated individuals and utilizing a defensive stance when interacting. • Failing to listen to and observe the population to recognize escalating tensions or frustrations and/or failing to address problems that are well within staff's control. • Choosing a passive, stationary supervision style. Staff are rarely mobile throughout the housing units, do not intervene early in signs of horseplay or tensions among people in custody, and often fail to disperse groups of incarcerated individuals when clustered together in the housing units. • Abandoning an assigned post without relief or permission. • Failing to establish and reiterate clear expectations in the assigned area, including a published, structured daily schedule and behavioral expectations. The lack of clear expectations is compounded by a failure to hold either staff or people in custody accountable when basic expectations are not met. • Utilizing an unprofessional demeanor. Staff frequently use profanity, an aggressive tone and/or threatening non-verbal communication, and also make derogatory comments to those in their care.

(c) Overreliance on Probe Teams • Allowing events on the housing units to escalate out of control even when sufficient staff are on hand to address an event quickly. • Failing to

intervene in interpersonal violence where harm is likely while awaiting the arrival of the Probe Team.

(d) Failure to Act in Self-Harm Events • Being slow-to-act when confronted with an emergency self-harm situation (e.g., person in custody has secured an object around his or her neck).

(e) Failure to Provide Basic Services • Inability to provide basic services while staff attend to an incident or during a lockdown and failing to communicate about and later to provide compensatory services once the emergency has passed. *Id.* at 17-18.

300.    Within three months of the Twelfth Report, the Monitor's March 16, 2022 report noted that, despite the entry of the Second Remedial Order in September 2021, DOC's attempts to implement the required remedial steps faltered, and in some instances regressed. Monitor's Mar. 16, 2022 Rep. at 1.

301.    DOC staff's inability or unwillingness to utilize basic security practices led directly to violence among people in custody and uses of forces that were completely preventable. *Id.* at 15. In January 2022, DOC reported at least 40 incidents in which incarcerated individuals exited unauthorized from cells, pens, housing units or other areas and approximately 60 instances of security breaches resulting in incidents of force and violence among people in custody. Security breaches included basic errors such as unsecured doors, leaving incarcerated individuals unsupervised, allowing individuals to congregate in vestibules, officers going off post, A-station breaches, improper use of restraints, and failing to intervene as tensions escalated. *Id.* at 15-16.

302.    As a result of these security breaches, incarcerated individuals were able to gain entry to adjacent housing units or corridors, leading to Class A injuries, stabbings and slashings, and gratuitous use of force against incarcerated individuals. *Id.* at 16-19.

303.    While DOC initially developed an interim security plan required by the Second Remedial Order § 1(i)(a), DOC failed to meaningfully implement solutions to any of the immediate problems such as unsecured doors, post abandonment, poor key control, outdated post orders, escorted movement with restraints when required, incarcerated individuals congregating around secure ingress/egress doors, poorly managed vestibules, and poorly secured OC spray. *Id.* at 22.

304.    The Monitor's March 16, 2022 Report set forth a series of recommendations to further address the ongoing security and operational lapses, including the appointment of a Security Operations Manager, revising practices for emergency response teams and search procedures. *Id.* at 67-74. These recommendations served as the basis for the Action Plan, which the Monitor developed in consultation with DOC. *See* Monitor's May 17, 2022 Ltr. to the Court.

## 2.    Entry of the Action Plan's Security Initiatives

305.    The Court entered the Action Plan on June 14, 2022. Dkt. 465.

306.    The Action Plan § A(1)(d) requires DOC to conduct routine tours, including but not limited to tours of housing units every 30 minutes. DOC must immediately institute improved practices to ensure that routine touring is occurring, including the use of the "tour wand" by officers during each tour they conduct. The Office of the Commissioner shall audit the electronic records of tours conducted by uniform staff to ensure compliance with the touring requirements.

307.    The Action Plan § D(2) requires DOC to implement improved security practices and procedures, including but not limited to the following items outlined below: (a) the interim

Security Plan required by ¶ 1(i)(a) of the Second Remedial Order . . . (d) improved procedures on how searches are conducted, including addressing the Monitor's feedback that was provided in 2021; (e) enhanced efforts to identify and recover weapons and other contraband; (f) improved escort techniques to eliminate the unnecessary use of painful escort holds.

308.    Action Plan §§ A(3)(b)(ii)(2)(b) and D(1) also required both the appointment of an sufficiently experienced candidate to be a Security Operations Manager, and the infusion of expertise through hiring of external candidates to serve as Assistant Commissioners supporting facility leaders. Dkt. 465 at 5-6, 13. The Security Operations Manager is required to implement critical security initiatives, including the interim Security Plan required by the Second Remedial Order.

**B.    DOC Has Failed to Comply with the Second Remedial Order's and the Action Plan's Provisions That Address Security Lapses**

309.    The Second Remedial Order ¶ 1(i)(a) and Action Plan §§ A(1)(d), D(2)(a), D(2)(d), D(2)(e), and D(2)(f) required the City to implement improved security, touring, search, contraband, and escort practices as described above, *supra* §§ 298, 306-307. Though the Monitor has not given compliance ratings for Second Remedial Order or Action Plan provisions, the Monitor's findings indicate the City has not implemented the required improved practices. *See infra* ¶¶ 310-459.

310.    In July 2023, the Monitor found that (1) the City and Department have not made substantial and demonstrable progress in implementing the reforms, initiatives, plans, systems, and practices outlined in the Action Plan; and (2) there has not been a substantial reduction in the risk of harm currently facing incarcerated individuals and Department staff. July 10, 2023 Rep. at 173. That finding remains true as of November 8, 2023. *See* Monitor's Nov. 8, 2023 Rep. at 1 n.2, 6. The Monitor concluded that Department's passivity represents an "alarming failure to

84

recognize staff's poor security practices for what they are: a tragic failure to protect people in custody from harm." *Id.* at 59.

311.    To date, DOC has not meaningfully implemented sustainable solutions to any of the immediate problems such as unsecured doors, post abandonment, poor key control, outdated post orders, escorted movement with restraints when required, incarcerated individuals congregating around secure ingress/egress doors, poorly managed vestibules, and poorly secured OC spray. *See* Monitor's Nov. 8, 2023 Rep. at 3 (DOC has been "unable to alter its deficient security practices and operations"); *Id.* at 17 (DOC has been unable "to implement any immediate or short-term initiatives to ameliorate harm"); Monitor's Oct. 5, 2023 Rep. at 4; Monitor's July 10, 2023 Rep. at 31; Monitor's June 8, 2023 Rep. at 6; Monitor's Mar. 16, 2022 Rep. at 21-22 (despite the interim security plan required by the Second Remedial Order, DOC "has failed to meaningfully implement solutions to any of the immediate [security] problems"); Monitor's June 30, 2022 Rep. at 15-17 (listing ongoing security failures and reporting that those issues "continue, unabated"); Monitor's Oct. 28, 2022 Rep. at 61-62 (detailing that a "comprehensive review of uses of force in 2022 continued to reveal problems similar in scope and magnitude to what has been observed and reported extensively over the past 7 years," including "[p]ractices that lack adherence to basic security protocols…poor situational awareness…[and a]n overreliance on [emergency] response teams"); Monitor's Apr. 3, 2023 Rep. at 38 ("The Monitoring Team's extensive findings regarding poor security practices and troubling use of force practices are essentially unchanged Department-wide, despite some pockets of progress on individual initiatives and at individual jails").

312.    A side-by-side comparison of NCU security audits for two different facilities from December 2021/January 2022 and August/September 2023, conducted twenty months

apart, reveals little to no improvement in security practices. Monitor's Oct. 5, 2023 Rep. at 19 &
App. G. The August 2023 and September 2023 audits show unsecured doors, visible obstructions
to locking mechanisms, individuals openly smoking, lock-in violations, officers off-post, and
touring failures from both supervisors and line staff. *Id*. Moreover, the 2023 security audits
appear to show certain issues—such as a failure to conduct tours or a failure to inspect while
touring—have increased. *Id.* at 55-56.

313.    The Deputy Commissioner of Security's office conducted an audit of security
practices at one DOC facility and found that many security issues noted by the Monitor in its
Oct. 5, 2023 Report were present. Monitor's Oct. 5, 2023 Rep. at 20. The Deputy Commissioner
of Security also found that the facility leadership's response to the audit was inadequate. *Id.*

314.    In at least 5 deaths of individuals in 2023, poor staff practice precipitated and/or
exacerbated these events, including poor touring practices, being off-post, failing to enforce
lock-in, allowing individuals to smoke prohibited substances, and allowing staff to enter the A-
station area. Monitor's Oct. 5, 2023 Rep. at 5; Monitor's Aug. 7, 2023 Rep. at 10. Many of these
practices appear to have become normalized. *Id.*; *see supra* ¶¶ 124-169 (2023 deaths in custody).

315.    Similarly, security failures likely contributed to the deaths of individuals in DOC
custody in 2022. Monitor's Oct. 28, 2022 Rep. at 21. It appears that many of these deaths were at
least partly attributable to poor security practices (including inadequate touring by staff,
ineffective searching, failures in securing of doors, and failures in ensuring the removal of sight
obstructions, such as cell window coverings), staff mismanagement (including posts that are
unmanned), operational deficiencies, failed suicide prevention measures, and potential staff
inaction. *Id*.

316.    Sixteen DOC uniformed staff were formally disciplined for their role in the seven deaths in 2023: eight officers were suspended for a variety of reasons including poor touring practices, being off-post, failing to enforce lock-in, allowing individuals to smoke prohibited substances, and allowing staff to enter the A-station area; four captains were suspended for reasons including failing to conduct proper tours, falsifying logbook entries, failing to timely report an unusual incident and failing to inspect cells; Assistant Deputy Wardens were suspended for failing to conduct proper tours, failing to ensure that a housing area was always manned and supervised by Officers, and failing to ensure that the supervisor assigned to the post conducted meaningful and efficient tours; and an Acting Warden was suspended for failing to identify significant misconduct of two members of service. Monitor's Aug. 7, 2023 Rep. at 10-11.

317.    DOC leadership has told the Monitor that staff "would rather be disciplined that do their job as expected," and the Monitoring Team "frequently observes an apathetic approach to basic security practices or a failure to intervene." Monitor's June 8, 2023 Rep. at 7.

318.    Videos of DOC jails reflect "too-frequent occurrence where staff cede control of a housing unit to the people in custody housed" therein. Monitor's July 10, 2023 Rep. at 12; *see also* Monitor's Oct. 5, 2023 Rep. at 8.

319.    Recent examples of incidents in GRVC and RNDC illustrate the dangerous incidents and uses of force that can occur when staff cede control of housing units. *See infra* ¶¶ 330; 444-445.

### 1.    DOC Has Failed to Implement the Interim Security Plan

320.    **DOC has not implemented the Interim Security Plan required by Second Remedial Order ¶1(i)(a) and Action Plan § D(2). *See infra* ¶¶ 321-327.**

**Nature of Dispute**:        Legal Dispute-Monitor Opinion
**Position of Defendants**:    Defendants object to the conclusion entering the record of this motion as an expert conclusion, and respectfully submit that the conclusion falls outside

of the scope of the Monitor's realm of expertise. Defendants respectfully refer the court to the parties Joint Status Report dated July 3, 2024, ECF No. 742, for Defendants position on the scope of the Monitor's expertise. (ECF No. 742).

**Position of Plaintiffs**: Defendants concede that the Monitor is "appropriately qualified as an expert on corrections systems and best practices." July 3, 2024 Joint Report of the Parties, Dkt. 742 at 3, 5. The Monitor utilized that expertise to assess security failures in DOC and recommend the development and implementation of an Interim Security Plan—including describing the issues that such a plan should address—a recommendation that became a court order in Second Remedial Order ¶1(i)(a) and Action Plan § D(2). *See* September 23, 2021 Letter of the Monitor, Dkt. 387, at 5-6, v. The Monitor's opinions about what a security plan in DOC should address, and his resulting assessments of whether DOC has adequately developed and implemented that plan (contained in the cited paragraphs), are squarely within the scope of the expertise Defendants concede the Monitor possesses. Moreover, Defendants have offered no evidence to rebut the Monitor's expert finding. The Court should credit the Monitor's opinion and adopt this proposed finding.

321.    While DOC developed an interim facility-wide security plan in 2021, it was never fully implemented before it was abandoned in 2022. *See* Monitor's Nov. 8, 2023 Rep. at 3, 17.

322.    In March 2022, the Monitor found that DOC's implementation of the Interim Security Plan "has been sporadic and of such poor quality that unsafe staff practices remain rampant." Monitor's Mar. 16, 2022 Rep. at 44. Teletypes, Post Orders, and memo book inserts either reinforced poor practices or were unavailable to staff. *Id.* at 45. Tour checklists went unused, while supervisors conducted "perfunctory" tours. *Id.*

323.    In spring 2022, individual violence reduction plans for RNDC and GRVC were devised and implemented. *See* Monitor's Nov. 8, 2023 Rep. at 17. Although the strategies initially had a positive impact, they were eventually abandoned with no assessment of which parts were effective and why. *Id.*

324.    Some initial improvements in the levels of harm at RNDC and GRVC were not sustained, and conditions have significantly worsened. *See* Monitor's Nov. 8, 2023 Rep. at 3; *supra* ¶¶ 118-119.

325.    DOC asserts that the Interim Security Plan required by Second Remedial Order ¶1(i)(a) and Action Plan § D(2) are the RNDC and GRVC "violence reduction plans." *Sees* Monitor's Nov. 8, 2023 Rep. at 64. █████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████

326.    The security plans proposed by DOC in October 2023 lack adequate detail, and many components are substantially similar to what has been attempted in the past, without a corresponding discussion of how implementation failures of the past will be avoided. *See* Monitor's Nov. 8, 2023 Rep. at 22. Additional training will likely suffer from deficiencies identified over the last year in recently developed training programs. *See* Monitor's Nov. 8, 2023 Rep. at 22. The video monitoring unit relied on by DOC has already been in operation for years, without actually changing staff practice. *Id.* The promised Anti-Violence Response Team is "ad hoc" and has only eight members and targets only a few housing units in a few facilities, meaning that its presence will "likely be too sporadic, insufficiently intensive, and of inadequate duration to catalyze the type of wholesale behavior change that is needed on each housing unit in every jail." *Id.* at 23. During a court-ordered meeting in October 2023 to develop a plan to ameliorate harm, DOC leadership "focused primarily on gang interdiction efforts and the failures of the prior administration." *Id.* at 44.

327.    "Given the Department's lack of a stable, comprehensive and robust strategy, facility leadership often does not know what is planned or who is doing what or when." Monitor's Nov. 8, 2023 Rep. at 6. **. There remain "pervasive and rampant security and operational deficiencies in staff practice and the corresponding harm that flows from them" which DOC has been "unable to alter...despite repeated recommendations by the Monitor and multiple Court Orders" *Id.* at 3, 6. DOC "has yet to develop and fully implement and sustain a coherent strategy for improving staffs' security practices [which] contributes significantly to the unabated level of violence in the jails." *Id.* at 18. The Monitor found DOC had a "continuing lack of urgency to address basic security practices" and noted "the alarming conditions reported to the Court during the August 10, 2023 Status Conference have only worsened." Monitor's Oct. 5, 2023 Rep. at 1.

### 2.    DOC Has Failed to Secure Doors.

328.    Most DOC facilities are unable to conduct the 3:00 p.m. and 9:00 p.m. lock-ins consistently or reliably across all housing units. Monitor's Oct. 5, 2023 Rep. at 8, 21.

329.    During the week of September 11, 2023, there were at least 15 incidents involving use of force, violence, and self-harm that occurred while incarcerated individuals should have been locked in (9:00 p.m. to 6:00 a.m.). Monitor's Oct. 5, 2023 Rep. at 8 & App. A.

330.    During a September 27, 2023 site visit, the Monitor observed cell doors open and unsecured, cell doors obstructed, and food slots open and manipulated in RESH, RNDC, OBCC, and GRVC. Monitor's Oct. 5, 2023 Rep. at 58-61.

331.    DOC acknowledged that its lack of progress at reducing violence at AMKC was linked to the fact that the cell doors at AMKC did not properly close. *See* Dkt. 562 at 5. DOC chose to close AMKC and move the individuals there to OBCC instead of installing new cell doors at AMKC, which DOC stated would "take years." *Id.*

332.    Yet the presence of operable doors is insufficient to curb violence. Even though OBCC has operable cell doors, the facility has experienced rampant violence in part because staff do not enforce lock-in or secure the operable doors, allowing people to move freely around the housing units. *See* Monitor's Nov. 8, 2023 Rep. at 16.

333.    The Monitor has reported numerous incidents where unsecured doors contributed to unnecessary use of force. *See supra* ¶¶ 134-142; 260; 301; *infra* ¶¶ 342; 443; 446-447; 453-454; 459*.

### 3.    Abandoned Posts and Staff Off-Post

334.    Staff frequently leave their assigned post unattended for some period of time without contacting the control room to obtain relief. Monitor's July 10, 2023 Rep. at 91-92 (observing abandoned posts during routine reviews of use of force incidents); Monitor's Oct. 5, 2023 Rep. at 10.

335.    Numerous NCU audits have found abandoned posts or staff off-post. *See infra* ¶¶ 406;409-413; 417-419; 421-422; 427-431.

336.    Numerous in-custody deaths have involved abandoned posts or staff off-post. *See supra* ¶¶ 123; 152-153; 161-163. In four cases, a "B" post officer was not assigned to a housing unit. BOC 2022 Third Rep. at 2, Ex. 56; BOC 2022 First Rep. at 6, Ex. 54 ("Maintaining housing areas open without floor officers is a dangerous practice that puts the safety and lives of people in custody at risk."); BOC 2022 Second Rep. at 21, Ex. 55.

337.    The City does not track the frequency with which posts are abandoned. *See* Monitor's Nov. 8, 2023 Rep. at 42. It relies on security audits and teletypes to identify and "focus" on the problem, but they have "not effectuated any appreciable change in practice." *Id*.

338.    Other examples of abandoned posts creating dangerous circumstances are described *infra* ¶¶ 442, 453, 455.

339.    DOC has suspended only two staff members between January 1, 2022 and May 31, 2023 for abandoning their posts. Monitor's July 10, 2023 Rep. at 201.

### 4.    Failure to Tour

340.    DOC staff do not consistently or routinely tour the housing units. *See* Monitor's Nov. 8, 2023 Rep. at 13 (DOC's most recent data indicates that only half of required tours are occurring); *id.* at 25 (even when staff are on post, they often do not "actually do their jobs"); Monitor's Oct. 5, 2023 Rep. at 7; July 10, 2023 Rep. at 80 (facility leaders report to Monitor that routine tours of housing units are not occurring); BOC 2022 Second Rep. at 21, Ex. 55 (noting insufficient and inadequate touring).

341.    In some instances, DOC staff make logbook entries such as "no issues noted" even though they did not actually conduct a tour. Monitor's Oct. 5, 2023 Rep. at 7.

342.    In February 2022 in OBCC, following a serious slashing, the unit logbook showed "many concerning entries from officers prior to the incident. One entry claimed that there was not an officer on post until after the incident occurred. Further, throughout the day prior, multiple entries stated that multiple cell doors were unsecured, all cameras were covered, and the staff phone was inoperable. In two entries, the writer reported feeling 'unsafe' and notified their supervisor. Despite these logbook entries, within 10 minutes of the incident occurring, a logbook entry indicated a captain conducted an unannounced tour and stated, "no incidents [were] reported."" Monitor's Mar. 16, 2022 Rep. at 13-14.

343.    Even when tours do occur, they are often perfunctory, officers do not look in the cell door windows, or officers cannot look inside cell windows because of obstructions that are not removed. *See* Monitor's Nov. 8, 2023 Rep. at 13; Monitor's Oct. 5, 2023 Rep. at 7. These obstructions make it impossible for staff to visually confirm the well-being of individuals, which renders the tour pointless. *Id.*; Monitor's Mar. 16, 2022 Rep. at 45 (monitor observing

"perfunctory tours while on site" in March 2022, such as "multiple unsecured doors and covered cell windows" even after a supervisor completed a tour).

344.    During a September 27, 2023 site visit, the Monitoring Team observed that in the GRVC Adult General Population Maximum Security Housing Area, nearly every single door was manipulated with a towel or had a window obstructed, which would prevent staff from conducting a proper tour. Monitor's Oct. 5, 2023 Rep. at 60-61. The captain accompanying the Monitoring Team conducted an inadequate tour, banging on the cell doors, and if the person inside responded, moving to the next door without visually confirming their wellbeing. *Id.* at 61.

345.    Numerous NCU audits have found failure to tour and "repeatedly revealed that the tours are not particularly meaningful." Monitor's Nov. 8, 2023 Rep. at 13. *See infra* ¶¶ 419; 422; 424-431. Between December 2021 and October 2023, NCU issued 132 security reports. In 2021, five reports were issued, and problems with staff tours were found in each report. In 2022, NCU issued 96 reports, and in 57% of these reports (N=55 reports), issues with staff tours were found. From January to October 2023, NCU issued 31 reports, and 81% (N=25 reports), identified issues with staff tours. Overall, out of the 132 reports NCU has generated since 2021, 64% (N=85 reports) have found issues with staff tours. Monitor's Nov. 8, 2023 Rep. at 76.

346.    Numerous in-custody deaths have involved failures to tour. *See supra* ¶¶ 129-130; 143-144; 152-153; 167-168; 171. BOC found that, in thirteen of the deaths in 2022, correction officers "did not tour or supervise people in custody in accordance with Department policy." BOC 2022 Third Rep. at 2, Ex. 56; BOC 2022 First Rep. at 7, Ex. 54 ("DOC staff's failure to regularly check on the status of every person every thirty minutes (particularly at night) is a chronic and life-threatening issue.").

347.    In June 2022, DOC reinstated use of a tour wand. Monitor's June 30, 2022 Report at 17; Monitor's Oct. 28, 2022 Rep. at 72. The tour wand is a device that staff must tap/swipe against an electronic sensor positioned in critical spots in the housing unit to ensure that staff physically walk around the housing unit at least every 30 minutes as required by DOC policy. *Id.*

348.    While tour wands are a tool to verify whether the required tours are occurring, they do not and cannot assess whether tours are of adequate quality. Monitor's Nov. 8, 2023 Rep. at 73; *see also infra* ¶¶ 425, 427.

349.    DOC issued a revised policy, effective in March 2023, that requires electronic tour wands to be used not only by correction officers by also by captains in all celled housing units (including ESH units), as well as any de-escalation units, for all shifts. Monitor's Nov. 8, 2023 Rep. at 74. Under the revised policy, COs working "B" and "C" posts must conduct tours of their assigned housing unit at least twice per hour with a maximum duration of 30 minutes between tours. *Id.* During their eight-hour shifts, captains must conduct three tours (at least one hour apart) of each housing unit they are assigned. *Id.* Correction officers and captains must upload the data from the tour wands before the final hour of their shift. *Id.* During the final hour of their shift, the Tour Commander must review the data generated by the tour wands for any late or missed tours and document any missed or late swipes within the Tour Commander logbook. *Id.* If there are missed or late tours, the Tour Commander must obtain a written memo from staff explaining the discrepancy, and upon review of the written memo, the Tour Commander must determine whether discipline is warranted. *Id.* The Tour Commander must forward daily data reports, with appropriate action for missed or late tours, to the Warden or designee. *Id.* The Office of the Deputy Commissioner for Facility Operations must audit facility compliance on at

least a quarterly basis. Ex. 50 at 12; DOC Operations Order 01/23, Ex. 4; Operations Order

11/17, Ex. 5.

350.    After three missed or late tours within a 3-week period, staff should be given a

Command Discipline. Monitor's Nov. 8, 2023 Rep. at 74; *see also* Memorandum #14/23 re:

Watch Tour Compliance/Discipline, Ex. 6.

351.    A Monitoring Team visit to DOC facilities in September 2023 revealed that tour

wands are not always readily available to staff, ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

██████  Monitor's Oct. 5, 2023 Rep. at 7; Operations Order 01/23, § V(A)(1), Ex. 4. The

Monitoring Team also observed during the site visit that the sensors for swiping the wands were

not always installed. Monitor's Nov. 8, 2023 Rep. At 13. The Monitor noted that "but for the

Monitoring Team's site work it does not appear these issues would have been identified despite

the Department's reports that this was an area of focus and attention." *Id*. at 13-14.

352.    The Commissioner's Office asserted that they had conducted daily audits of data

regarding tour wand swipes between mid-July 2022 and April 30, 2023. Monitor's Nov. 8, 2023

Rep. at 75. The Commissioner's office did not provide information to support its claims that it

had used the tour wand data to determine whether to issue discipline for staff members who had

not complied with the tour wand policies. *Id.*

353.    Though the tour wand policy has been in effect for over six months, the Office of

the Deputy Commissioner for Facility Operations has not conducted the quarterly audits of

facility compliance required by Operations Order 01/23. Monitor's Nov. 8, 2023 Rep. at 75-76.

354.    Though DOC has a "dashboard populated with tour wand data for both officers and Captains," as of July 10, 2023 "DOC [was] still devising a method to analyze trends or otherwise conduct analyses to support a quality assurance strategy or ensure staff compliance with these requirements." Monitor's July 10, 2023 Rep. at 81. DOC said that it would do so in July 2023, but had not as of November 8, 2023. *Id*.; Monitor's Nov. 8, 2023 Rep. at 74-75.

355.    **DOC has also mismanaged revisions of supervisory touring protocols as set forth in paragraphs 356 to 358 below.**

>    **Nature of Dispute**:          Legal Dispute-Other
>    **Position of Defendants**:    Defendants incorporate by reference their responses to paragraphs 356 through 358 of Plaintiffs' PFOF, but dispute insofar as this PFOF is a conclusion and not a factual statement for which a response is required.
>    **Position of Plaintiffs**: This is a factual finding the Court is entitled to make based on the Monitor's findings contained in paragraphs 356-358, as cited herein.

356.    On March 9, 2022, the Monitor found that "DOC had materially altered instructions for supervisory tours" that had originally been developed in consultation with the Monitoring Team—and that not only did DOC fail to consult with the Monitor regarding the revisions, but the revisions themselves "ran afoul of *Nunez* requirements [and] created an imminent risk of harm." Monitor's Mar. 16, 2022 Rep. at 27.

357.    The revised policy "inexplicably removed requirements for supervisory tours on housing units that were unmanned or a staff member was off post…[and] also removed the requirements that supervisors ensure that doors were properly secured." *Id*. at 6. The Monitor found that these revisions "directly *contradicted* efforts to address one of the basic safety concerns, seemingly sanctioning Supervisors abdication of responsibility for these issues…[t]his simply defies sound correctional practice." *Id*. at 7 (emphasis in original).

358.    The policy was not rescinded in the five days after Department leadership "themselves recognized that the revised teletype ran afoul of *Nunez* requirements, created an

imminent risk of harm, and needed to be rescinded," but only after the Monitoring Team

"expressed significant concerns about the imminent risk of harm the revised policy presented."

*Id*. at 27-28.

359.    Given the frequency of failures to tour and violations of DOC policy—and the

harms that flow from them—the number of corrective measures, and in particular formal

discipline, is not commensurate with the number of violations observed. Monitor's Nov. 8, 2023

Rep. at 76, 78.

360.    From January 2022 to July 2023, only 15 staff were recommended for corrective

action via Rapid Reviews for touring failures, two of which were dismissed or not processed, and

five of which resulted in corrective interviews. *Id.* at 77. Eight staff members were suspended for

failures to tour in connection with individuals' deaths in custody. *Id.* Only 11 staff were charged

with formal discipline as part of Use of Force incidents for failures to tour. *Id.* at 78-79.

### 5.    Improper and Painful Escort Practices.

361.    **DOC continues to use improper and painful escort techniques as of November

2023, as set forth in paragraphs 362 to 37.**

> **Nature of Dispute**:        Legal Dispute-Other
> **Position of Defendants**:    Defendants incorporate by reference their responses to
> paragraphs 362 through 371 of Plaintiffs' PFOF; Defendants do not object to the fact that
> this statement was made by the Monitor and is therefore admissible for the purpose of the
> motion. Defendants object to the conclusion entering the record of this motion as fact,
> and respectfully submit that the conclusion at issue is part of the subject matter to be
> resolved by the Court.
> **Position of Plaintiffs**: This is a factual finding the Court is entitled to make based on the
> Monitor's findings described in paragraphs 362-371, as cited herein.

362.    As of July 10, 2023, there has not been any improvement to staff escort

techniques, and the pattern of unnecessarily painful escort holds continues unabated. Monitor's

July 10, 2023 Rep. at 45; Monitor's Nov. 8, 2023 Rep. at 14-15 (despite years-long knowledge

that escorts contribute to use of force, DOC made no substantive effort to change staff practice).

363.    The COD reports of UOF incidents for the two-week period of June 2-15, 2023 reflected 89 uses of force—37% of all uses of force in that period—occurring during escorts. This extraordinarily high number indicates a significant level of basic security failures. Monitor's July 10, 2023 Rep. at 16.

364.    That a routine escort so often escalates to an additional use of physical force suggests that the application of this basic correctional skill requires significant remediation. *Id*.

365.    Despite the prevalence of painful escorts visible via video of use of force incidents, DOC's Rapid Reviews only rarely identify this as an issue. *Id*.

366.    Despite conveying "numerous" occasions to the Monitor that DOC intended to consult with the Monitoring Team on this issue, the Monitor reports that DOC never actually did so. *Id*.

367.    The Monitor asked the court in July 2023 to once again order DOC to address this issue. *Id*.

368.    In response to the Monitor's concerns about DOC's escort practices and procedures that lead to unnecessary and excessive force, DOC suggested that its escort practices are appropriate because other law enforcement agencies have asked DOC to provide training on these very procedures. Monitor's Aug. 7, 2023 Rep. at 5. DOC's response is a sign that it "ignores the fact that improper escort procedures in the agency [lead to] numerous cases of unnecessary and excessive force." *Id*. at 5-6.

369.    Other examples of painful escort practices leading to use of force are described *infra* ¶¶ 456; 488; 563; 619.

370.    On August 10, 2023, the Court ordered DOC to revise its escort procedures and practices to eliminate the use of painful escort holds by October 30, 2023. *See* Dkt. 564 at ¶ 3.

371.    DOC has identified five policies that must be revised to address the Court's August 120, 2023 order. DOC has not yet provided the Monitor with proposed drafts for revisions of any of the five policies. *See* Monitor's Nov. 8, 2023 Rep. at 41.

**6.    Improper Search Practices.**

372.    DOC continues to utilize deficient search practices as set forth below, *infra* ¶¶ 373-380.

373.    DOC staff regularly fail to recover weapons during many searches of housing units and individuals following violent incidents involving weapons. Individuals in custody often hide weapons after an incident occurs, and responding staff fail to find these items during their searches. Monitor's July 10, 2023 Rep. at 42.

374.    These improper search practices lead to unnecessary uses of force. Monitor's Apr. 18, 2024 Rep. at 73.

375.    The Monitor's analysis of COD reports of UOF incidents for the two-week period of June 2-15, 2023 identified 30 uses of force occurring during searches. Monitor's July 10, 2023 Rep. at 16. This is a very high number that indicates security management failures. *Id.*

376.    In February 2021, the Monitor provided written feedback to DOC to promote improved search practices. Monitor's Mar. 16, 2022 Rep. at 22. The feedback recommended: (1) the span of control for searches should be limited in order to reduce the number of excessive staff involved in searches; (2) a specific plan must be devised before each search takes place; (3) facility leadership must be involved in any planning for a search that includes external teams like ESU; and (4) specific procedures for conducting searches in celled and dormitory housing and common areas so that searches are completed in an organized and efficient manner and are not chaotic and disruptive. Monitor's Nov. 8, 2023 Rep. at 15.

377.    DOC then "began some initial work" on addressing search procedures, but ceased that work in spring 2021. Monitor's Mar. 16, 2022 Rep. at 22.

378.    As of March 2022, about a year later, DOC had yet to renew efforts to respond to the Monitor's feedback regarding search procedures. *Id*.

379.    As of July 2023, the Monitor had not observed any change in practice that would suggest the process or effectiveness of search procedures have improved. Monitor's July 10, 2023 Rep. at 42.

380.    Given the Monitoring Team's findings about ongoing failures during searches, the Court ordered DOC to revise its search procedures by October 30, 2023. *See* Dkt. 564 at ¶ 2. DOC shared policy revisions with the Monitor in 2023, but these "did not address most of the Monitoring Team's feedback" provided two years earlier. *See* Monitor's Nov. 8, 2023 Rep. at 16, 40-41. The policy revision "remain[s] incomplete." *Id.*

### 7.    Deficient Efforts to Detect and Remove Weapons and Contraband.

381.    In assessing DOC's efforts to recover contraband, the Monitor found that the "relatively low rate of return (i.e., contraband seized per searches conducted) and observations of videotaped footage of search technique and procedure suggests to the Monitoring Team that additional work to refine practice remains necessary." Monitor's July 10, 2023 Rep. at 44.

382.    The Monitor notes that "routine video observations also include situations in which individuals in custody are observed smoking." *Id*.

383.    Numerous NCU audits have found failure to detect and remove contraband from housing areas. *See supra* ¶ 312; *infra* ¶¶ 405, 407-408, 416, 431.

384.    During a site visit on August 9, 2023, the Monitoring Team observed incarcerated individuals "actively smoking an illicit substance and burning joints were on the floor." Tr. of Aug. 10, 2023 Status Conference at 18:10-11, Dkt. 566. These individuals, who were "clearly

100

suffering and highly intoxicated," were together in intake following their alleged involvement in a slashing, meaning that DOC staff should have searched and confiscated contraband prior to escorting them to intake. *Id.* at 18:13-19.

385.    During a site visit in late September 2023, the Monitoring Team observed open drug use in the jails. Monitor's Oct. 5, 2023 Rep. at 7.

### 8.    Poor Security Practices in Vestibule Areas

386.    Vestibules have historically been among the most common locations for uses of force as set forth below, *infra* ¶¶ 387-391.

387.    The Monitor raised concerns about vestibule control leading to uses of force in 2017. Monitor's Fourth Rep. at 28. In that monitoring period, vestibules accounted for 3% of uses of force. *Id*. at 27.

388.    The percentage of uses of force occurring in vestibules have remained of concern to the Monitor, as set forth in paragraphs 389 to 391 below.

389.    In the Ninth Monitoring Period, the Monitor found that vestibules were the fifth most common location for uses of force in all of 2019, at 5% of all incidents. Monitor's Ninth Rep. at 18.

390.    In the Eleventh Monitoring Period, the Monitor found that vestibules were the fifth most common location for uses of force in all of 2020, at 5% of all incidents. Monitor's Eleventh Rep. at 35.

391.    In the Twelfth Monitoring Period, vestibules were the fifth most common location for uses of force, at 5% of all incidents. Monitor's Twelfth Rep. at 54.

392.    Several examples in RNDC in the Twelfth Monitoring Period illustrate the connection between poor vestibule management and avoidable uses of force. *See* Monitor's Twelfth Rep. at 24-25.

393.    Over twenty months since the Second Remedial Order was entered, DOC has not implemented a meaningful solution to poor vestibule management. *See* Monitor's July 10, 2023 Rep. at 31.

394.    NCU Audits show that individuals continue to be allowed to congregate in unsecured vestibules, often with contraband. *See infra* ¶¶ 401; 403; 405; 413; 416; 419-420.

### 9.    Poor Key Control and Failure to Secure OC Spray

395.    As of July 2023, "and over 20 months since the Second Remedial Order...was entered, the Department ha[d] not meaningfully implemented sustainable solutions to... properly securing officer keys and OC spray." Monitor's July 10, 2023 Rep. at 31. These findings remain true as of this filing in November 2023. *See supra* ¶¶ 310-311.

396.    Several examples of incarcerated people obtaining OC spray have occurred in recent months. *See infra* ¶¶ 403; 443.

### C.    DOC's Own Reviews Establish Staff Breaches of Safety Protocols, Leading to Violence and Disorder

397.    <u>Rapid Reviews</u>. Rapid Reviews conducted by the facilities have identified a "significant portion" of incidents as avoidable had staff followed proper security protocols. *See supra* ¶ 231.

398.    Facility-level Rapid Reviews reveal "pervasive problems with staff's ability to apply the requisite skill set and decision-making needed to effectively decrease the rate at which force is used." Monitor's July 10, 2023 Rep. at 19. Staff fail to secure cell doors or food slots, to escort individuals in proper restraints, to supervise large groups of people in custody, to remain on post, to enforce mandatory lock-in, and to follow proper guidelines for anticipated uses of force, as well as the improper use of chemical agents at close range or in a retaliatory manner, and unnecessarily confrontational demeanors (particularly during searches). *Id.*

399.    In May 2022, Rapid Reviews revealed an "astonishing" number of avoidable incidents with an "equally astonishing" array of security lapses. Monitor's June 30, 2022 Rep. at 15. The reviews detail people in custody left unsupervised and unsecured with officers off-post, failures to intervene, undue escalation, improper restraints, failure to secure control stations, using chemical agents on passive people in custody, and unsecured doors, gates, and equipment. *Id.* at 15-16. The Monitor found that these security lapses were typical of his observations every month. *Id.*

400.    <u>Nunez Compliance Unit (NCU) Audits</u>. Audits conducted by the Nunez Compliance Unit, an internal DOC office tasked with monitoring compliance with Nunez orders, also show ongoing security failures. The Nunez Compliance Unit (NCU) is a unit within DOC that, among other duties, "develop[s] and analyze[s] data to show the nature and extent of various operational issues that contribute to the interrelated problems of violence and excessive and unnecessary uses of force." Monitor's Seventh Rep. At 4.

401.    Beginning in December 20, 2021, NCU began conducting audits of practices in DOC housing areas through Genetec, the DOC video monitoring system. The NCU audits each span 24 hours. They were intended to review whether supervisors are conducting required tours and purport to note "any apparent operational or security failures that could potentially lead to additional violence," including door security, congregation in vestibules, and staff failing to remain on post. NCU notes in the audit summary that information contained therein is "not exhaustive." The audits frequently note that "[m]any of the ongoing issues that have been referenced by the Nunez [sic] Monitor were apparent." *See, e.g.*, Summaries of NCU Security Audits at 2, 3, Supervisor Tours and Security Issues – AMKC, Quad 12 Lower Review, December 22, 2021, Ex. 16.

402.    NCU has issued 132 reports of the security practices at various housing units in different facilities for a 24-hour period between December 2021 and October 2023. *See* Monitor's Nov. 8, 2023 Rep. at 11 n.6; Index of NCU Security Audits as of Sept. 25, 2023, Ex. 15. In 2022, NCU issued 96 reports, 69% of which found staff off post, 70% found unsecured doors, 57% found issues with staff tours, 53% found lock-in was not enforced, and 27% found crowding or unauthorized areas. Monitor's Nov. 8, 2023 Rep. at 11 n.6. From January to October 2023, NCU audited various housing areas in four facilities and issued 31 reports. *Id.* These reports identified numerous security issues. *Id.* Specifically, 71% of reports found staff off post, 84% found unsecured doors, 81% found issues with staff tours, 26% found lock-in was not enforced, and 35% found crowding/access to unauthorized areas. *Id.* While only 31 reports have been issued in 10 months of 2023, many of the findings, specifically staff off post, cell door security, issues with staff tours, and movement of people in custody, have increased from those reports issued in 2022. These audits may indicate that security practices in the facility may be worsening compared to last year. *Id.*

403.    NCU observed that the security failures identified by the Monitor—unsecured doors, post abandonment, poor key control, outdated post orders, escorted movement with restraints when required, incarcerated individuals congregating around secure ingress/egress doors, poorly managed vestibules, and poorly secured OC spray—were present across every facility and in multiple housing areas. *See* Summaries of NCU Security Audits, Ex. 16.

404.    <u>Representative Examples of NCU Audits</u>. The following are representative examples of the NCU audits' findings between December 2021 and August 2023.

405.    In the December 22, 2021 audit conducted of operations in AMKC Quad Lower 12 from 12:00 a.m. to 11:59 p.m., NCU found: "[c]ell doors remained unsecured and

incarcerated individuals freely entered cells together without any intervention from staff," observed people in custody "smoking blatantly and rolling up substances," saw "no staff on post consistently," noted that "staff allow individuals onto the vestibule without supervision from the A station[, after which an i]ndividual passed items under the door to others in the main corridor [which] could likely be contraband exchanges," and saw that "lock-in was not enforced." Ex. 16 at 3 (Summaries of NCU Audits - AMKC, Quad 12 Lower Review, December 22, 2021); Ex. 17 (Full NCU Audit - AMKC, Quad 12 Lower Review, December 22, 2021).[7]

406.    In the February 20-21, 2022 audit conducted of operations in OBCC 3 South and 3 Southwest, NCU found: both units lacked floor officers for over 24 hours in what were apparently unstaffed posts, "[c]ontraband was easily passed through [the] housing area entrance right by [the] A station," cell doors and janitor's closets were unsecured throughout the 24 hour period, and lock-in was not enforced. Ex. 16 at 221 (Summaries of NCU Audits - OBCC, 3 South and 3 Southwest Review, February 20, 2022); Ex. 18 (Full NCU Audit - OBCC, 3 South and 3 Southwest Review, February 20, 2022).

407.    In the March 3-4, 2022 audit conducted of operations in GRVC Building 10B, NCU found: "[d]oor security issues throughout the day," staff allowed people in custody to enter the pantry "[d]espite tension between Building 10A and Building 10B," "[t]ampering with the electrical structure in [the] housing area to kindle a flame for contraband use," and that supervisors were "inconsistent with addressing issues" when they were present. Ex. 16 at 137 (Summaries of NCU Audits - GRVC, Building 10B Review, March 3, 2022); Ex. 19 (Full NCU Audit – GRVC, Building 10B Review, March 3, 2022).

---

[7] The content from the NCU security audits that is referenced in paragraphs 405-432 is contained in Exhibit 16, the Summaries of NCU Audits, which has been filed publicly.

408.    In the March 14-15, 2022 audit conducted of operations in VCBC 2D-AA, NCU found: officers on the floor did not consistently conduct tours, a 90-minute period with no floor officer, failure to adhere to lock-in protocols, and possession of contraband and smoking after lock-in. Ex. 16 at 361 (Summaries of NCU Audits - VCBC, 2D-AA Review, March 14, 2022).

409.    In the April 4-5, 2022 audit conducted of operations in NIC Dorm 5 North, NCU found: officers were not on post consistently, and were off post for significant periods of time. Ex. 16 at 215 (Summaries of NCU Audits - NCU Audit – NIC, Dorm 5 North, April 4, 2022); Ex. 20 (Full NCU Audit – NIC, Dorm 5 North, April 4, 2022).

410.    In the May 5-6, 2022 audit conducted of operations in OBCC 2 Upper, NCU found: there no staff on post consistently leaving significant periods of time where there were no staff on the floor, lock-in was not enforced, and "[i]ndividuals were able to manipulate the main entrance door to the housing area and exit the location without authorization." Ex. 16 at 233 (Summaries of NCU Audits - OBCC, 2 Upper Review, May 5, 2022); Ex. 21 (Full NCU Audit – OBCC, 2 Upper Review, May 5, 2022).

411.    In the May 13-14, 2022 audit conducted of operations in AMKC Quad Upper 6, NCU found: "[c]ell doors remained unsecured and incarcerated individuals freely entered their cells" allowing multiple to congregate in one cell," that "[a] fight occurred while staff were off post after lock-in," obstructed cell windows "throughout the day, despite different supervisors and a probe team coming to the area," staff off-post for "periods of time without proper relief," and that multiple lock-ins were not enforced. Ex. 16 at 42 (Summaries of NCU Audits – AMKC, Quad Upper 6 Review, May 13, 2022).

412.    In the July 7-8, 2022 audit conducted of operations in RNDC 4 Central South, NCU found: staff were on and off post without proper relief throughout the 24-hour period, cell

doors were unsecured, "staff (particularly on the midnight tour), appeared to go off post and only reenter the housing area to conduct tours with a tour wand," and supervisors were present only five times within the 24-hour period. Ex. 16 at 271 (Summaries of NCU Audits – RNDC, 4 Central South, July 7, 2022).

413.    In the July 18-19, 2022 audit conducted of operations in AMKC Quad Upper 20, NCU found: "[s]taff did not remain on post consistently…there were still significant periods of time where no staff member was on the floor[, t]hey remained in the A station," that "officers never secured cell doors," that both the A station door and the vestibule gate were unsecured at times, allowing individuals to congregate in the vestibule, that the 9:00 p.m. lock-in was not enforced, and that "[s]upervisors [were] present four (4) times within the 24-hour period and did not address issues," even when they "appeared to catch staff in the A Station." Ex. 16 at 54 (Summaries of NCU Audits – AMKC, Quad Upper 20 Review, July 18, 2022).

414.    In the August 8-9, 2022 audit conducted of operations in EMTC Building 4 Main, NCU found: there was apparently no 'B' officer for "most of the day" until 6:20 p.m., Genetec cameras were obstructed, and "lock-in did not appear to be enforced." These failures happened despite NCU observing Warden Harvey and other supervisors in the housing area. Ex. 16 at 99 (Summaries of NCU Audits - EMTC Building 4 Main Review, August 8, 2022); Ex. 22 (Full NCU Audit – EMTC Building 4 Main Review, August 8, 2022).

415.    In the August 24-25, 2022 audit conducted of operations in EMTC 1 Upper, NCU found: no 'B' officer assigned until 4:45 p.m., "Staff did not consistently conduct a physical count or thorough security inspections," "Staff lacked security awareness-failed to ensure the main housing area doors were secured," and lock-in did not appear to be enforced. Ex. 16 at 102 (Summaries of NCU Audits – EMTC 1 Upper Review, August 24, 2022).

416.    In the September 2-3, 2022 audit conducted of operations in GRVC Building 3A, NCU found: staff were not properly relieved, staff conducted "improper pat-frisking," cell doors were unsecured allowing multiple individuals to freely enter and exit, "[s]taff assigned to 3A were consistently on/off post," incarcerated individuals were observed in the vestibule area, and individuals were seen smoking an unknown substance. Ex. 16 at 164 (Summaries of NCU Audits – GRVC Building 3A, September 2, 2022).

417.    In the October 5-6, 2022 audit conducted of operations in AMKC Quad Upper 16, NCU found: "[c]ell doors at times remained unsecured and incarcerated individuals freely entered cells throughout the audit," multiple lock-ins were not enforced, there were "no staff on post" from 6:56 a.m. until the end of the audit (nearly 24 hours), a supervisor was present "only three (3) times within a 24-hour period," and people in custody obstructed the cameras several times throughout the audit." Ex. 16 at 78 (Summaries of NCU Audits – AMKC Quad Upper 16 Review, October 5, 2022).

418.    In the November 18-19, 2022 audit conducted of operations in EMTC 6 Main, NCU found: "[n]o staff on 'B' post;" and a supervisor was observed "only one (1) time during the 24-hour period." Ex. 16 at 111 (Summaries of NCU Audits – EMTC 6 Main Review, November 18, 2022).

419.    In the December 5-6, 2022 audit conducted of operations in GRVC Building 4A, NCU found: "[c]ell doors consistently unsecured" allowing multiple individuals to enter and exit cells freely," failure to enforce a lock-in, "[n]o watch tours were conducted," staff observed off-post, incarcerated people in the vestibule, and supervisors present "only five times…within a 24-hour period." Ex. 16 at 176 (Summaries of NCU Audits – GRVC Building 4A Review, December 5, 2022).

108

420.     In the February 8-9, 2023 audit conducted of operations in AMKC Quad Lower 14, NCU found: "[c]ell doors at times remained unsecured and incarcerated individuals freely entered cells throughout the audit," multiple lock-ins were not enforced, the lights were not turned on, people in custody were observed manipulating the front entrance gate and "congregating on the vestibule area," and a supervisor was present "only five (5) times within a 24-hour period." Ex. 16 at 87 (Summaries of NCU Audits – AMKC Quad Lower 14 Review, February 8, 2023).

421.     In the February 21-22, 2023 audit conducted of operations in RNDC 2 Upper South, NCU found: "officers did not remain consistently on the floor during all three tours," unsecured cell doors, people in custody with contraband when officers were both on and off post, and a supervisor present "only four [sic] (5) times within a 24-hour period." Ex. 16 at 313 (Summaries of NCU Audits - RNDC 2 Upper South Review, February 21, 2023); Ex. 23 (Full NCU Audit – RNDC 2 Upper South Review, February 21, 2023).

422.     In the April 6-7, 2023 audit conducted of operations in AMKC Quad Upper 13 from 5:58 a.m. to April 7, 2023 at 6:44 a.m., NCU found: "[c]ell doors at times remained unsecured and incarcerated individuals freely entered cells throughout the audit," multiple lock-ins were not enforced, "[t]he watch tours were not conducted," and "Staff did not remain on post consistently throughout the audit." Ex. 16 at 93 (Summaries of NCU Audits - AMKC Quad Upper 13 Review, April 6, 2023); Ex. 24 (Full NCU Audit – AMKC Quad Upper 13 Review, April 6, 2023).

423.     In the April 26-27, 2023 audit conducted of operations in EMTC 4 Upper from 6:00 a.m. to April 27, 2023 at 6:00 a.m., NCU found: "the area was unmanned" until the 3:00 p.m. to 11:00 p.m. tour; and that "[a]fter the institutional lock-in at 2300 hours, the officer was

observed constantly leaving the floor; she often did not return until a supervisor came to the area." Ex. 16 at 117 (Summaries of NCU Audits – EMTC 4 Upper Review, April 26, 2023).

424.    In the May 7-8, 2023 audit conducted of operations in GRVC Housing Unit 9A, NCU found that cell doors were unsecured such that incarcerated individuals freely entered cells; no officer was on the floor for the majority of the three tours that day; and supervisors toured only four times within the 24-hour period. Ex. 16 at 188 (Summaries of NCU Audits - GRVC 9A, May 7, 2023); Ex. 25 (Full NCU Audit – GRVC 9A, May 7, 2023).

425.    In the May 8-9, 2023 audit conducted of operations in RNDC 1 Lower South, NCU found: the cross gate and several cell doors were unsecured throughout the audit, and though officers and supervisors toured with "watch tour pipes," about 75% of officer tours and 45% of supervisor tours failed to actually look inside of the cells while touring. Ex. 16 at 328 (Summaries of NCU Audits - RNDC 1 Lower South Review, May 8, 2023).

426.    In the June 25-26, 2023 audit conducted of operations in EMTC 9 Lower, NCU found: "the post was unmanned" during the 7:00 a.m. to 3:00 p.m. and 11:00 p.m. to 7:31 a.m. tours; while on post, the 3:00 p.m. to 11:00 p.m. officer "did not conduct enough tours of the area [and] was observed mostly sitting at his desk." Ex. 16 at 120 (Summaries of NCU Audits - EMTC 9 Lower Review, June 25, 2023); Ex. 26 (Full NCU Audit – EMTC 9 Lower Review, June 25, 2023).

427.    In the July 10-11, 2023 audit conducted of operations in RNDC 4 Central North, NCU found: while officers conducted tours, they did not look inside cells when touring; staff were observed "off post"; supervisors conducted tours eight times during the 24-hour period, but there was a gap of several hours in the afternoon between supervisor tours. Ex. 16 at 337 (Summaries of NCU Audits – RNDC 4 Central North, July 10, 2023).

428.    In the July 14-15, 2023 audit conducted of operations in RNDC 4 Central South, NCU found: officers were not looking inside cells when conducting tours; officers were observed "off post"; while supervisors toured eight times during a 24-hour period, there was a 6 ½ hour gap in the morning when supervisors did not tour. Ex. 16 at 340 (Summaries of NCU Audits – RNDC 4 Central South, July 14, 2023).

429.    In the August 15-15, 2023 audit conducted of operations in RNDC 3 Lower South, officers conducted only 15 tours during the 24-hour period (5 of which occurred with supervisors), and did not use tour wands at all; officers were observed off post on multiple occasions; there was a 4-hour and a 5-hour gap in supervisor tours of the housing area, and supervisors did not use tour wands. Ex. 16 at 346 (Summaries of NCU Audits - RNDC 3 Lower South – 08/15/2023); Ex. 27 (Full NCU Audit – RNDC 3 Lower South – 08/15/2023).

430.    In an audit conducted in a GRVC housing area from September 24 to 25, 2023, officers left cell doors unsecured and let individuals freely enter cells; staff were off post on multiple occasions; officers did not tour consistently and did not use tour wands; lock in was not enforced; and supervisors toured only 5 times during the 24-hour period. Monitor's Nov. 8, 2023 Rep. at 118.

431.    In an audit conducted in an RNDC housing area from October 1 to 2, 2023, officers left several doors unsecured throughout the period, letting multiple individuals enter and exit each others' cells; individuals were permitted to smoke on the housing area tier; officers were off post; officers did not tour consistently, and did not use tour wands when they did; lock in was not enforced; while tour wands were used, there was a five ½ hour gap in supervisors' tours. Monitor's Nov. 8, 2023 Rep. at 119.

432.    There was only one audit in the 125 conducted from December 2021 to August 2023 in which NCU did not observe security, operational, or supervisory failures. Ex. 16 at 114 (Supervisor Tours and Security Issues – EMTC 1 Main – 01/02/2023).

433.    NCU COD Assessments. Beginning in August 2021, the NCU started to conduct assessments of serious incidents (slashings, stabbings, or serious assaults) occurring at RNDC ("NCU COD Assessments"). *See* Ex. 29. The purpose of these assessments is to analyze DOC's practices to ensure that they are managing potentially dangerous individuals in a safe manner to protect both staff and persons in custody.

434.    

435.

436.

437.

████████████████████████████████████████████████

████████████████████████

438.    **RNDC leaders failed to take meaningful corrective action in response to these

findings. ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

**Nature of Dispute**:    Legal Dispute-Other

**Position of Defendants**:    Defendants dispute the first sentence since it is Plaintiffs' own conclusion not supported by the record. The remaining statements are not Disputed insofar as they reflect what is stated on the cited pages of the relevant report but they are disputed insofar as the statements are not material and not indicative that a receivership or a contempt finding is warranted.

**Position of Plaintiffs**: This is a factual finding the Court is entitled to make based on the information contained in this paragraph and in paragraphs 438-439, as well as the findings of the Monitor as regards to RNDC found *infra* ¶¶ 862, 865, 867-877. RNDC facility leadership's failure to utilize and respond appropriately to NCU findings is evidence of non-compliance with provisions on which Plaintiffs have moved for contempt, including: the Consent Judgment § XV, ¶ 1 requirement to supervise 18-year-olds in custody at all times in a manner that protects them from an unreasonable risk of harm; the Second Remedial Order ¶1(i)(a) and Action Plan § D(2) requirement to develop and implement a systemwide security plan (addressing, among other issues, unsecured doors cited in this paragraph); and the First Remedial Order § A(2) requirement for facility leaders to review available data and information to develop "operational changes or corrective action plans...to reduce the use of excessive or unnecessary force, the frequency of Use of Force Incidents, or the severity of injuries or other harm" (*see* Plaintiffs' Opening Brief, Dkt. 609, at 33-34; ████████████████████

█████████████████████████████████████████████
███████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████). This proposed finding is also material to arguments about Defendants' lack of reasonable diligence more broadly, *see* Plaintiffs' Opening Brief at 57-58, and analysis of *Plata* factors such as that continued lesser measures of remediation are futile and will lead to further confrontation and delay.

██

439. ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████

***Examples of Security Failures Leading to Use of Force and Harm***

440.    On February 3, 2023 at RMSC, a captain responding to a person in custody in a vestibule area left the A Station door open while the person was unsecured there. Monitor's July 10, 2023 Rep. at 26, Illustrative Example #3, February 3, 2023 incident (UOF 0683/23). The situation escalated into multiple uses of force, in which officers deployed chemical agents, aggressively pushed her into the wall, aggressively took her to the floor, and applied pressure to her wrists even though she did not appear to resist the escort. The breaker gate was left open during the incident. The person in custody sustained post-concussive syndrome and required a CT scan. Monitor's July 10, 2023 Rep. at 26.

441.    On April 8, 2023, in a celled adult General Population housing area, individuals were standing on the tier and an individual was in the dayroom area on the phone. Monitor's Nov. 8, 2023 Rep. at 130. The B post officer on the floor went off post and entered the A station. Immediately after the officer went off post, a individual entered the dayroom area, advanced toward the individual who was on the phone, and struck the individual with his fist. The B post officer emerged from the A station and deployed OC to terminate the fight. The ID Investigation noted that medical staff reported that the victim sustained visible injuries including a 2-3 cm laceration to the right cheek. A CHS update noted that the victim sustained a head/face laceration that required sutures, staples, or Dermabond.

114

442.    On May 2, 2023, in a New Admissions dormitory housing area, a individual was walking in front of the bathroom area when another individual standing nearby suddenly pulled out a shirt filled with what ID later identified as a rock and began to swing and swipe it in a violent motion at the victim's body and head. Monitor's Nov. 8, 2023 Rep. at 130. Video revealed that the B post officer was not on the floor at the time, and the officer in the A station failed to intervene. Three minutes after the assault, two officers and three supervisors arrived on the unit and used OC spray when the two individuals originally involved re-engaged and began to fight again. The ID Investigation noted that in the injury report, medical staff noted that the victim sustained a scalp laceration, left-hand contusion, and bites to the 3rd and 5th fingers of his right hand.

443.    On May 14, 2023, at approximately 8:58 p.m., in a housing area at GRVC, a major disturbance occurred that involved security and supervisory failures leading to a stabbing/slashing and multiple uses of force. The "B" post officer was stationed on the floor, while the "A" post officer was located in the A station. The individuals in the housing area freely opened and closed unsecured cell doors. Two individuals grabbed, then released, the B officer by the torso and took his OC canister. The individuals then began a fight inside a cell, which expanded throughout the housing unit. As the fights ensued, with weapons, the B post officer walked around the floor, secured a hot water cannister, and otherwise did nothing to stop the fighting or regain control of the housing area. Some individuals attempted to protect themselves by barricading in a small gated area at the front of the housing area. Though they banged on the A station to be allowed into the vestibule and away from the weapons and fights inside the housing area, the A station officer did not do so. The A station officer also did not alert officers and a captain of the fight ensuing on the A side of the housing area, even though several staff

members were responding to a UOF incident and fight on the B side of the housing area. None of these staff members assisted the people who were barricaded in the gated area. A supervisor sprayed MK9 on individuals who were exiting the B side of the housing area into the vestibule. Eventually the B post officer ran to the housing area door and left the housing area without any staff. The individuals inside the housing area continued to threaten other individuals, and smoke. The probe team arrived over thirty minutes later, and used OC spray on an individual who did not enter his cell. Individuals sustained injuries requiring emergency transport to the hospital, including multiple stab wounds, multiple slash wounds, and puncture wounds. The facility leadership conducting the Rapid Review, as well as the ID Intake Investigation, failed to address multiple issues, including staff members' failure to respond to the A side of the housing unit and intervene in the violence. Neither the facility Rapid Review or the ID Intake Investigation mentioned the delayed response by the probe team that allowed violence to continue. While the B post officer was recommended for formal discipline, immediate corrective action should have considered for the officer's multiple security breaches. The incident was closed by ID at the intake stage even though a referral for a Full ID Investigation was merited given the magnitude of the issues. Monitor's Nov. 8, 2023 Rep. at 121-128.

444.    On May 31, 2023 in GRVC, doors were visibly open and unsecured shortly after midnight, during a lock-in time. Monitor's July 10, 2023 Rep. at 53-54, Illustrative Example #7, May 31, 2023 incident. Nine people in custody pushed an individual into a cell and closed the door, in view of an officer who departed the housing area, leaving it unsupervised. The nine individuals were in the cell with the tenth individual (the victim) for 16 minutes after forcing their way in. The victim wasn't evaluated in the clinic until 18 hours after the incident occurred. The victim "alleged sexual assault with penetration and medical staff found orbital swelling,

tenderness, ecchymosis, bilateral subconjunctival hemorrhage, nasal bridge swelling, and tenderness." Monitor's July 10, 2023 Rep. at 53-54; *see also* COD 1779/23, Ex. 39.

445.    On June 8, 2023, at RNDC, several young adults appeared to direct the A-Station officer to open a cell door, after which they assaulted the person inside and then shut the cell door again, locking him in. Monitor's July 10, 2023 Rep. at 54, Illustrative Example #8, June 8, 2023 incident (COD 1860/23). "The Officer appeared to interact with the [individual] that was assaulted inside the cell but does not take him out. Over the next several hours, multiple Officers and DOC supervisors toured the area and interacted with the [individual] that was assaulted, but none took action. Over seven hours after the incident, the [individual] was taken out of his cell and evaluated in the clinic." The person had to go to Urgicare with lacerations. Monitor's July 10, 2023 Rep. at 54.

446.    On June 19, 2023, in a celled Protective Custody housing area, one individual stood in front of a cell talking to someone inside the cell. An officer walked down the tier past multiple unsecured doors and opened a cell behind where the individual was standing. Suddenly, an individual ran out of a cell that had just been opened, holding a weapon in his hand, and attacked the individual who was standing by the other cell talking. The officer deployed OC spray to terminate the assault. The ID investigation noted that medical staff reported an injury on the victim's left ear, with posterior and interior lacerations, and recommended treatment in the form of Urgicare for laceration repair. Monitor's Nov. 8, 2023 Rep. at 131.

447.    On July 17, 2023, in an intake area, two individuals begin fighting until staff separated them using control holds and OC to terminate the incident. The ID Investigation noted that medical staff reported that the victim sustained a 0.75" deep scratch to his forehead and was treated with wound cleaning. ID also noted that the captain failed to supervise court production,

that staff neglected to secure individuals based on security classification/protocol, multiple individuals in the area were unsecured. The bodyworn camera audio/video of the captain said, "Did you see him drop the uh, did he use a pen?" An officer then showed the captain a pen. The captain responded by saying, "You sure there was nothing in it?" The officer responded by saying, "There's nothing in it right now." The captain then said, "But he still used it as a weapon. But the thing is that means they didn't search him well, he could of….". The ID Investigation found that the captain failed to document in the Use of Force report that a weapon/instrument was used to cut the victim's head, and a Facility Referral was generated. Despite the captain's observation of the weapon after the incident and acknowledging it on video, the incident was not reported as slashing or stabbing. Further, despite ID acknowledging the captain's failure to document the use of a weapon, ID did not take any action to have the facility correctly classify the incident as a slashing or stabbing. Monitor's Nov. 8, 2023 Rep. at 131.

448.    In July 2023, at GRVC, a group of incarcerated individuals congregated on the top tier of the housing unit and moved downstairs into the cell of an individual, remaining there for a full three minutes before exiting. A victim whose face was bloodied and swollen then emerged from the cell. During the assault, the officer stood passively at the opposite end of the unit, watched, and did *nothing*. Monitor's Aug, 7, 2023 Report at 12.

449.    In August 2023, a "painful bent wrist" escort technique caused a person in custody to twist in response, after which the officer "suddenly and violently threw [him] into a railing" and then "grabbed the restrained individual by the neck and threw him to the floor." *See* Monitor's Oct. 5, 2023 Rep. at 5.

450.    On August 14, 2022, Andre Brown was attacked by two incarcerated people who followed him into his cell and stabbed and slashed him with sharpened plexiglass and a razor

numerous times. Declaration of Andre Brown dated Nov. 9, 2023. The door closed behind Mr. Brown and his attackers, meaning that Mr. Brown was trapped in his cell with them. *Id.* ¶ 9. Mr. Brown was stabbed and slashed repeatedly all over his body with a razor blade and a piece of plexiglass. *Id.* ¶ 10. Although an officer was on the floor and another officer was in the A Bubble, neither intervened to protect Mr. Brown or stop the attack until, after some time during which his attackers were attempting to corner him in the back of his cell, Mr. Brown was finally able to reach the door and kick at it, screaming for his cell to be opened. *Id.* ¶ 11. At that point, the cell finally opened and Mr. Brown was able to escape. *Id.* Mr. Brown was brought to the hospital where he was treated for numerous lacerations and stab wounds, receiving stitches all over his body, staples in his head, and even having surgery on his ear due to part being almost detached. *Id.* ¶ 13.

451.    On September 11, 2023, in a New Admissions dormitory unit at EMTC, incarcerated individuals were left unsupervised because there was no B post officer on post. Monitor's Oct. 5, 2023 Rep. at 43. An individual was sitting in his bed when another individual approached him with a green cup and dumped hot water on him. *Id.* The injured individual immediately stood up, removed his shirt, and showed signs of distress and pain. *Id.* About a minute later, an officer entered the housing area and escorted the injured individual to a vestibule, where a captain arrived and took him to the clinic. The individual suffered second-degree burns to his back and neck, and was taken to the hospital where he remained for at least six days. *Id.* An incident report was also completed on September 11, 2023, at 2:40 p.m. by the officer assigned to the housing area. *Id.* DOC staff did not report the incident to COD at the time it occurred. *Id.* On September 13, 2023, the Department received a second report from CHS (the first was the injury report on September 11) that the victim sustained serious injuries. *Id.* On

September 18, 2023, DOC staff reported the incident for the first time to COD. DOC did not notify the Monitoring Team of this incident as required by the June 13, 2023, Order, despite the fact that the individual sustained serious injuries and was admitted to the hospital.

452.    On September 19, 2023, at GRVC, a staff member opened an incarcerated individual's cell and then immediately left the housing unit. Monitor's Oct. 5, 2023 Rep. at 18. While the unit was unstaffed, the individual was assaulted in his cell. *Id.* Following the assault, a staff member entered the unit, but did not tour the housing unit or otherwise address the victim. *Id.* The original staff member returned to his post about 25 minutes after the assault and did not tour the housing unit or appear to address the victim. Id. The victim finally received medical care on September 19, two days after the assault. *Id.* Medical staff determined that the victim sustained a fracture to the left side of his face. *Id.* The incident was not reported to COD until 4 days after it occurred. *Id.*

453.    ███████████████████████████████████████
█████████████████████████████████████████████
███████████████████████████████████████████
██████████████████████████████████████████
███████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
███████████████████████████████████████
██████████████████████████████████.

454.    ████████████████████████████████████████
██████████████████████████████████████████



455.

456.



457.

458.

459. 

V.    **DOC's Failure To Staff and Deploy Emergency Response Teams Appropriately, Leading to Unnecessary and Excessive Force**

460.    DOC relies on at least three types of Emergency Response Teams: a Probe Team, which is a team of facility-based Staff; the Emergency Services Unit (ESU), a separate command specifically dedicated and trained to respond to emergencies across DOC; and Special Search Teams (SST), which are part of a separate unit that conduct searches. Monitor's Eleventh Rep. at 38-39. Probe Teams, ESU, SST, and similar units are collectively referred to as "Emergency Response Teams" by the Monitor and throughout this document. *Id.*

461.    Emergency response teams generally consist of staff suited in full protective gear who arrive *en masse* to a location where staff have requested assistance via an alarm. *Id.* at 38-39, 119-120.

A.    **History of ESU**

462.    DOC has long maintained a special response team to conduct paramilitary or special operations throughout the facilities. Initially named the Correction Emergency Response Team (CERT) and then the Emergency Response Unit, in the life of the Consent Judgment it has been called the Emergency Services Unit (ESU), or more recently, the Strategic Response Team (SRT) and Special Search Teams (SST) (collectively "ESU"). Monitor's Nov. 8, 2023 Rep. at 107 n.56. These teams are not confined to one facility, but are deployed systemwide to conduct searches and respond to reported disturbances or violence. *Id.*; Monitor's Apr. 3, 2023 Rep. at 137.

463.    **In a previous class action challenging excessive force in DOC's Correctional Institute for Men, now called the Eric M. Taylor Center, the court found a pattern of excessive force by DOC emergency response teams. *Fisher v. Koehler*, 692 F. Supp. 1519, 1538 (S.D.N.Y. 1988), injunction entered, 718 F. Supp. 1111 (S.D.N.Y. 1989), *aff'd*, 902 F.2d 2 (2d Cir. 1990).

124

Emergency response teams have long resisted efforts to curb misuse of force. For example, in October 1986, the jails experienced riots and disorder, during which CERT officers were reported to have beaten numerous handcuffed incarcerated individuals on a DOC bus. A day after then-Commissioner Koehler demanded the resignation of three wardens, over 100 CERT officers threatened to quit *en masse* to protest the resignations. Todd S. Purdum, *100 Jail Guards Reportedly Quit Emergency Unit*, N.Y. Times, Oct. 22, 1986, at B1, Ex. 65.**

> **Nature of Dispute**:        Legal Dispute-Materiality
> **Position of Defendants**:    Not Disputed insofar as the proposed finding reflects what is stated on the cited pages of the relevant reports and cases. Disputed insofar as this statement is not material and is not indicative that a receivership or a contempt finding is warranted.
> **Position of Plaintiffs**: The first sentence describes a ruling of which this Court can take judicial notice. The remaining information is material to Plaintiffs' motion to appoint a receiver because it shows the longstanding, structural nature of the problems underlying DOC's inability to reform, demonstrating that no relief less than the appointment of a receiver will be sufficient to achieve compliance. *See* Dkt. 603 at 4, 85-90.

464.    In a settlement of a prior case involving allegations that the ESU had been involved in problematic use of force incidents, the City agreed to require ESU teams to bring a handheld camera to all searches and to record searches and related uses of force. *Ingles v. Toro*, 438 F. Supp. 2d 203, 208 (S.D.N.Y. 2006).

### B.    ESU Engages in Unnecessary and Excessive Force

465.    For years, the Monitoring Team repeatedly raised concerns regarding the impact of emergency response teams on the Department's failure to comply with the Consent Judgment, finding that uniform staff often over-relies on special emergency response teams that needlessly exacerbate situations, are often over-staffed, and often respond to incidents with a show of force that is disproportionate to what triggered the incident. Monitor's Fifth Rep. at 19; Monitor's Seventh Report at 23; Monitor's Eighth Report at 29-30; Monitor's Ninth Report at 27-28.

466.    The First Remedial Order was intended to rectify these long-standing practices. Specifically, § A, ¶ 6 requires DOC, in consultation with the Monitor, to develop, adopt, and implement a protocol governing the appropriate composition and deployment of the Facility Emergency Response Teams in order to minimize unnecessary or avoidable Uses of Force. The new protocol must address: (i) the selection of staff assigned to Facility Emergency Response Teams; (ii) the number of staff assigned to each Facility Emergency Response Team; (iii) the circumstances under which a Facility Emergency Response Team may be deployed and the Tour Commander's role in making the deployment decision; and (iv) de-escalation tactics designed to reduce violence during a Facility Emergency Response Team response.

467.    The Action Plan reiterated this requirement, again requiring DOC to "implement improved security practices and procedures, including . . . reduced reliance and appropriate composition of Emergency Response Teams required by § A, ¶ 6 of the First Remedial Order and to address the Monitor's feedback that was provided in 2021." *See* Dkt. 465, ¶ 2(c).

468.    The protocols developed in response to the First Remedial Order § A, ¶ 6 are Facility Response Team Policy (Operations Order 25/19: Facility Response Teams, dated August 22, 2019) and the Special Unit Assignment Policy (Operations Order 24/16: Special Unit Assignments, dated December 20, 2016), which governs the screening of staff to ESU and other special teams. Monitor's Nov. 8, 2023 Rep. at 88-89; Ex. 7; Ex. 8.

469.    Since entry of the First Remedial Order in August 2020, DOC has not complied with § A, ¶ 6. Monitor's Eleventh Rep. at 116-120; Monitor's Twelfth Rep. at 49-51; Monitor's Oct. 28, 2022 Rep. at 116-119; Monitor's Apr. 3, 2023 Rep. at 137-143.

470.    In April 2023, the Monitor explained that "the concerning practices of emergency response teams remain static." Monitor's Apr. 3, 2023 Rep. at 138.

471.    In July 2023, the Monitor reiterated that Defendants remained in non-compliance with § A, ¶ 6. Monitor's July 10, 2023 Rep., at 37.

472.    Emergency Response Teams presume force will be required and abandon the requirement to use the minimum amount of force necessary to control a threat as required by the Consent Judgment and First Remedial Order. Monitor's Eleventh Rep. at 120.

473.    The monitor found that over-reliance on Emergency Response Teams was directly related to "significant management failures by Facility Leadership and their Staff who appear to have abdicated their basic duty to manage potential use of force situations." *Id*. at 40.

474.    These teams regularly utilize excessive and unnecessary force and hyper confrontational tactics when responding to incidents, resulting in injuries. Monitor's Tenth Rep. at 30-32; Eleventh Report at 38-50, 116-120; Monitor's June 3, 2021 Rep. at 3-4; Twelfth Report at 49-51; Apr. 3, 2023 Rep. at 136-137.

475.    While the Department's policy requires an emergency response team ███████ ██████████████████████████████████████████████████████████████████ ███████████████████████████ this protocol has not translated into meaningful changes on the ground.

476.    ESU, in particular, has a pattern of using unnecessary and excessive force. Monitor's Apr. 3, 2023 Rep. at 138-40; Monitor's Eleventh Rep. at 38-50, 116-120; Monitor's Twelfth Rep. at 51.

477.    The arrival of ESU/SRT/SST to the scene of an incident "typically guarantees that force will be used." Monitor's July 10, 2023 Rep. at 38.

478.    ESU/SRT/SST staff's hyper-confrontational tactics escalate conflicts and
precipitate uses of force. Monitor's July 10, 2023 Rep. at 35-36, 38; Monitor's Eleventh Rep. at
38-50, 116-20; Monitor's Twelfth Rep. at 49-51; Monitor's Apr. 3, 2023 Rep. at 137-143.

479.    ESU's conduct results in unnecessary, excessive and/or avoidable uses of force,
many of which also result in serious injury. Monitor's Twelfth Rep. at 51.

480.    ESU/SRT/SST staff often engage in painful escort holds and other poor security
practices that unnecessarily escalate conflicts. Monitor's July 10, 2023 Rep. at 38.

481.    ESU searches are often chaotic and disorganized, leading to uses of force that
would be avoidable if the teams' approach were more coordinated. Monitor's July 10, 2023 Rep.
at 38.

482.    ESU staff are not transparent about their activities, as they frequently file
incomplete or false reports and fail to properly utilize handheld cameras, especially during in-cell
applications of force. Monitor's Eleventh Rep. at 47.

483.    In its Eleventh Report, the Monitor described "three ESU case examples, rife with
abuses, [that] illustrate both ESU's concerning practices and their link to Facility management
failures . . . In each case, ESU's operations were disorderly, chaotic, and unsafe and ultimately
resulted in unnecessary and excessive force." *Id.*

484.    In the first incident, ESU was conducting a "security inspection" of two cells on a
housing unit. An incarcerated individual refused to lock-in and threw a closed fist punch towards
one ESU officer. Four ESU officers responded using multiple holds (including a prohibited neck
hold) to restrict the individual's movement. While these four ESU officers attempted to gain
control, a fifth ESU officer, out of nowhere, and with no discernable provocation or threat,
reached over these officers and struck the individual in the head with a closed fist. An ESU

128

Supervisor was on scene "but the quality of supervision was debatable." Monitor's Eleventh Rep. at 48. The mere presence of ESU for this type of basic management issue was questionable and the sheer number of ESU Staff present to conduct this security inspection was unnecessary. Finally, the use of a head strike by an out-of-control ESU officer was unnecessary and appeared retaliatory. *Id.* at 48.

485.    In the second incident, the Monitor found that during a search of a dormitory-style unit, ESU Staff provoked a group of individuals who were otherwise passive and non-disruptive. One of these individuals was subjected to a dangerous body slam followed by repeated closed-fist head-strikes. The search resulted in multiple uses of excessive force and, lasted many hours; during that time ESU conducted at least 28 strip searches while services for the housing unit were disrupted s. ESU did not uncover any contraband during the search, though ultimately a bag of cigarettes was discovered by a different search team. *Id.*

486.    In the third incident, the Monitor described a chaotic and unnecessary intervention by the ESU that resulted in "multiple uses of unnecessary and excessive force, including continuous, vicious and malicious striking of passive residents with batons." *Id.* at 48.

487.    The Monitor found that the above three examples were "by no means, isolated cases." *Id.* at 47.

488.    In late 2022, a very large cadre of ESU personnel entered a housing unit and began a disorganized and chaotic search. As the many ESU officers present gave multiple conflicting commands to which incarcerated individuals attempted to comply, multiple officers suddenly began spraying OC spray at the individuals, causing them to try to move away. Monitor's Apr, 24, 2023 Rep. at 15-16. ESU staff put a rear-cuffed individual in a dangerous neck/chokehold and takedown in which the individual landed on his head, and then harshly

shoved that person's head into a door. ESU staff used painful escort holds on multiple people, leaving an individual experiencing seizures unattended for a substantial period of time and filing incomplete reports about the incident. There was also at least one allegation of a head strike. *Id.* at 16.

489.    The Monitor described this incident as "rife with flawed, harmful, inappropriate and incompetent tactics" and stated that it was "emblematic of the types of incidents that continue to alarm the Monitoring Team but, that to date, have not received meaningful action from the Department." *Id.*

490.    In 2022, ESU began to use "OC grenades" (devices that can be thrown into an area and emit pepper spray) more frequently. Monitor's July 10, 2023 Rep. at 39.

491.    ESU does not follow standard practice in the use of "OC grenades." *Id.* Instead of lobbing the device into an enclosed area, closing the door/port, and giving time for the chemical agent to take effect, ESU squads toss the device and enter the unit simultaneously. *Id.* Not only has the chemical agent not yet taken effect, but people in custody are able to  toss the device back toward staff. *Id.* Subsequent efforts to apply mechanical restraints and gain control of the situation are thus made more difficult. *Id.*

492.    On February 26, 2023, a special response team entered a housing unit in GRVC in response to individuals refusing orders to lock in. *Id.* at 36 (Illustrative Example #5, UOF 1069/23). SRT members deployed chemical agents repeatedly, and a captain used an OC grenade on individuals who were walking away from the SRT staff. *Id.* The team did not assist an incarcerated individual who had been lying on the tier and moving slightly, but whom the Monitor said may have been somewhat unresponsive. Instead of assisting this person, who was grasping his chest and coughing, SRT staff sprayed him and someone assisting him, despite,

according to the Monitor, no observable threat. The individual who had been lying on the tier then got up and an officer sprayed his face and back as he was running away. Staff secured both individuals and then escorted them into cells. While being secured in cells, one individual was screaming and the other was complaining about a wrist hold used by an officer. *Id.* at 37; *see also* ID Packet for UOF 1069/23, Ex. 36.

### C.    Emergency Response Teams Are Inappropriately Large

493.    There remain large numbers of staff assigned to emergency response teams resulting in an excessive number of staff arriving on the scene to which they are called, thus raising tensions. Monitor's Oct. 28, 2022 Rep. at 117; Monitor's Apr. 3, 2023 Rep. at 137; Monitor's July 10, 2023 Rep. at 15-16, 38, 108 (problems with emergency response teams' performance "appear to be triggered by the large number of staff who respond, creating a chaotic situations and an excessive show of force.").

### D.    ESU's Use of Tactical Weaponry

494.    In 2016, DOC authorized ESU supervisors to use tasers in the facilities. Monitor's Third Report at 38-39. The Monitoring Team reviewed the use of tasers and concluded tasers were used only where there was an objective "compelling need." Monitor's Fourth Rep. at 40.

495.    However, ESU usage of tasers "increased significantly between December 2021 and summer 2022." July 10, 2023 Rep. at 38; Apr. 3, 2023 Rep. at 137-143; Monitor's Twelfth Rep. at 49-51. In at least some of these cases, the taser was being displayed or used where there was no need and where de-escalation attempts had not been exhausted. Monitor's Oct. 28, 2022 Rep. at 118.

496.    The frequencies of taser usage diminished after the Monitoring Team intervened, but ESU did use tasers again in August 2022, and displayed a taser in January 2023. July 10, 2023 Rep. at 38-39.

497.    In its August 7, 2023 Report, the Monitor reported that the ESU had been provided with sub-machine guns. *See* Dkt. 561 at 8. When the Monitor inquired about DOC's plans for the sub-machine guns, DOC told the Monitor that they were for exclusive use by ESU should there be an issue at the airport. Monitor's Oct. 5, 2023 Rep. at 14. DOC subsequently reported that this was inaccurate. *Id.* In September 2023, however, DOC again reported that the submachine guns were for first responders, including for events at the airport. *Id.* DOC has still not clarified the circumstances in which the submachine guns may be used or the staff that may use them. *Id.* To date, none of DOC's policies permit staff to use submachine guns. *Id.*; Monitor's Nov. 8, 2023 Rep. at 54-55.

**E.    DOC Fails to Screen Out Violent or Problematic Staff from Emergency Response Teams**

498.    DOC Operations Order 24/16 regarding Special Unit Assignments sets out the process for screening staff for assignment to an ESU post. ███████████████

███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
██████████████████████████████████
█████████████████████████████████
████████████████████████████████████

[redacted]

499. Operations Order 25/19 states: [redacted]

[redacted]

500. For many years, DOC did not adequately follow these requirements and its own policy to screen and assign staff to ESU. Monitor's July 10, 2023 Rep. at 39-40; Monitor's Apr. 3, 2023 Rep. at 139-140; Monitor's Eleventh Rep. at 44-51.

501. In 2021, at the Monitor's urging, an assessment was done of 200 staff members and over 50 staff were removed from ESU because they either had certain pending charges or had discipline imposed as a result of utilizing excessive force and/or failing to report a use of force incident. Monitor's Nov. 8, 2023 Rep. at 107; Monitor's Apr. 3, 2023 Rep. at 140.

502. Following this removal in 2021, despite repeated feedback from the Monitor, DOC did not conduct another review for almost two years. Monitor's Nov. 8, 2023 Rep. at 107.

503. In early 2023, DOC conducted a review to ascertain whether any staff should be removed from ESU because they met the criteria specified in Operations Order 24/16. Monitor's Nov. 8, 2023 Rep. at 107. The process was compromised because certain misconduct was not identified by ID, and the Trials Division resolved cases in an attempt to excuse the misconduct. *Id.* Further, several staff members identified for removal during this process were not actually removed. *Id.*; Monitor's Apr. 3, 2023 Rep. at 141.

504. DOC uses "semantic loopholes" in an effort to avoid triggering removal requirements, "even when the available circumstances would require removal by policy." For

example, DOC for the first time in 2023 relied on a new definition of misconduct—
"impermissible force"—which it claims does not trigger removal because it is not unnecessary or
excessive. Monitor's Apr. 3, 2023 Rep. at 141-142.

505.    For example, one staff member was not removed from a special team due to
DOC's delay in timely screening that staff, and DOC stated that "expunged" misconduct could
not be considered in the review. *Id.*

506.    In early 2023, DOC assigned 26 officers and captains to ESU without any
screening. Monitor's Nov. 8, 2023 Rep. at 107. Had they been screened, some of the individuals
could not have been assigned to ESU. *Id.* at 107-108. Further, 10 of these individuals were
among those previously of the same group that had been removed. *Id.* at 108; Monitor's Apr. 3,
2023 Rep. at 142. The staff members had signed Non-Prosecution Agreements in disciplinary
proceedings in late 2021 or 2022 that precluded their appointment to the ESU. *Id.* Because of the
Monitor's intervention, all 26 were removed from ESU. *Id.* at 108.

507.    The screening process also suffers because ID does not consistently or reliably
identify misconduct by ESU staff. Monitor's Apr. 3, 2023 Rep. at 141.

508.    For example, a recent screening identified 64 members of ESU as involved in 141
UOF incidents, but ID anticipated charges for only 2 staff of those staffmembers. *Id.* ID's under-
identification of misconduct permits ESU staff to remain assigned to the unit and allows them to
act with impunity. *Id.*

509.    One of the officers who was removed from the ESU in 2021 pursuant to a
misconduct screening, but then reinstated in early 2023 as discussed above, was Dionisio
Rosario. Monitor's Nov. 8, 2023 Rep. at 108. Mr. Rosario has since been indicted for an April 4,
2023 incident in which he, as part of an ESU operation, was allegedly captured on video

surveillance planting a weapon in an incarcerated person's cell, which he then falsely claimed to discover. *Id.*; ID Packet for UOF 1703/23, Ex. 38.

### F.    DOC Has Delayed Updating ESU Screening Policies

510.    Screening requirements support DOC's efforts to identify supervisors who embody and demonstrate the qualities and conduct of leaders who will support and create the culture change needed to reform the department. Monitor's Eleventh Rep. at 261.

511.    The Monitor reported in October 2022 that he had provided a comprehensive document to the Security Operations Manager regarding his concerns about emergency response teams, including screening failures. Monitor's Oct. 28, 2022 Rep. at 119.

512.    The Monitor later specifically recommended that DOC's procedures be revised to eliminate loopholes, ensure adequate screening, and ensure that misconduct would not be tolerated in the unit. Monitor's Apr. 3, 2023 Rep. at 142. DOC has not done so. Monitor's July 10, 2023 Rep. at 40-41. The Monitoring Team repeatedly offered to consult with the Department on how it could best revise its procedures, but DOC did not engage. *Id.* at 40.

513.    DOC provided the Monitoring Team with the results of its most recent screening without underlying documentation to ensure its quality and integrity. *Id.*

514.    On August 10, 2023, the Court ordered DOC to revise the screening process for ESU assignment, receive the approval of the Monitor, and then implement that revised process. *See* Dkt. 564 at 3.

515.    The Department shared proposed revisions to the policy at the end of September 2023, and the Monitoring Team provided feedback in October 2023. Additional revision is needed before this policy can be finalized. Monitor's Nov. 8, 2023 Rep. at 43.

### G.    DOC's Appointment of New ESU Leadership

516.    **After the Monitor filed its Apr. 3, 2023 Report stating "significant concerns about the adequacy of the leadership within ESU," Monitor's Apr. 3, 2023 Rep. at 140, on April 17 DOC transferred an ADW to ESU on April 17 to serve as its new commander. Monitor's June 8, 2023 Rep. at 29. DOC did not tell the Monitor about this transfer. *Id.* **

> **Nature of Dispute**:    Legal Dispute-Monitor's Opinion
> **Position of Defendants**:    Defendants object to the conclusion entering the record of this motion as an expert conclusion, and respectfully submit that the conclusion falls outside of the scope of the Monitor's realm of expertise. Defendants respectfully refer the court to the parties Joint Status Report dated July 3, 2024, ECF No. 742, for Defendants position on the scope of the Monitor's expertise. (ECF No. 742).
> **Position of Plaintiffs**: Both the second clause of the first sentence and the second sentence are not conclusions, but rather factual statements regarding specific events that the Monitor has reported. They are admissible as fact testimony from the Monitor, who is a credible witness. As to the first clause of the first sentence: Defendants concede that the Monitor is "appropriately qualified as an expert on corrections systems and best practices." July 3, 2024 Joint Report of the Parties, Dkt. 742 at 3, 5. The Monitor's opinion regarding deficiencies in correctional emergency response teams in DOC and the leaders responsible for managing them is squarely within the scope of the expertise Defendants concede the Monitor possesses. Moreover, Defendants have offered no evidence to rebut the Monitor's expert finding. The Court should credit the Monitor's opinion and adopt this proposed finding.

517.    On April 21, 2023, the DOC reversed course and instead claimed that no final decision had been made on ESU leadership. *Id.*

518.    In May 2023, in response to the Monitor's subsequent inquiries to determine whether this ADW had been transferred out of the unit, the Monitoring Team received two different responses on the same day. DOC stated both that the ADW was still assigned to ESU and that the ADW had been transferred back to work in a facility during the prior week. *Id.*

519.    On June 5, 2023, DOC reported that the ADW had been removed from ESU. *Id.*

520.    **News reports identified the ADW who had been appointed to lead ESU as Vaughn Grinnage, the officer seen in a videotape beating Kalief Browder, whose hands appear

cuffed behind his back. Graham Rayman, *New head of NYC Correction Department unit criticized for Rikers Island violence was accused in caught-on-video assault of Kalief Browder*, N.Y. Daily News ,Apr. 20, 2023, Ex. 66; Jennifer Gonnerman, *Exclusive Video: Violence Inside Rikers*, The New Yorker, Apr. 23, 2015), Ex. 67. **

> **Nature of Dispute**:        Legal Dispute-Materiality
> **Position of Defendants**:    Not Disputed insofar as the proposed finding reflects what is stated on the cited pages of the news report. Disputed insofar as this statement is not material and is not indicative that a receivership or a contempt finding is warranted.
> **Position of Plaintiffs**:        The information provided in paragraphs 516-520 is material because the appointment or attempted appointment of someone with a problematic use of force history to lead ESU demonstrates Defendants' lack of reasonable diligence to implement the Court's order to minimize unnecessary force by emergency response teams, on which Plaintiffs moved for contempt (*See* Dkt. 603 at 43-48), as well as the lack of leadership within DOC to turn the tide without the appointment of a receiver.

### H.    DOC Did Not Revise ESU Policies

521.    In August 2021, the Monitor informed DOC that it needed to revise several ESU policies related to use of force, because several Command Level Orders did not provide sufficient guidance on use of force. Monitor's July 10, 2023 Rep. at 37.

522.    Since then, the Monitor repeatedly raised again the need to revise these policies and included specific recommendations to do so in its April 2023 report. *Id.*; Monitor's Apr. 3, 2023 Rep. at 139-143.

523.    As of July 10, 2023 – nearly two years after the initial recommendation – DOC had not provided the Monitor with revisions of these policies. Monitor's July 10, 2023 Rep. at 37-38.

524.    After a Court Order dated July 18, 2023 ordered DOC to cooperate with the Monitor, DOC provided the Monitor with draft policies on screening for ESU and Command Level Orders regarding Pepperball Spray and Grenades, as well as other policies. The Monitor

found that some of the policies appeared to be hastily drafted and directly contrary to agency

policy. Monitor's Aug. 7, 2023 Rep. at 3.

525.    **When DOC eventually did supply proposed revisions, they "did not address

most of the Monitoring Team's feedback and inexplicably did not reflect the changes that the

Department reported it was intending to make." Monitor's Nov. 8, 2023 Rep. at 15. As a result,

no revised version is complete. *Id*. DOC may be changing its plans for ESU once again and so

the status of the draft policy and any corresponding changes is unknown. *Id*. **

> **Nature of Dispute**:        Legal Dispute-Materiality
> **Position of Defendants**:    Disputed insofar as this statement is not material and is not
> indicative that a receivership or a contempt finding is warranted. Not Disputed insofar as
> the proposed finding reflects what is stated on the cited pages of the Monitor's report.
> Disputed insofar as this statement is not material and is not indicative that a receivership
> or a contempt finding is warranted.
> **Position of Plaintiffs**:        This information is material to Plaintiffs' claim that
> Defendants are in contempt of the Court's orders to "minimize [emergency response
> teams'] unnecessary or avoidable uses of force" by developing in consultation with
> Monitoring team policies that address "the selection of Staff assigned" to emergency
> response teams, and "de-escalation tactics designed to reduce violence" by such teams.
> *See* Dkt. 603 at 43-47. It is also material to Plaintiffs' argument that no remedy other than
> the appointment of a receiver will achieve substantial compliance, because it
> demonstrates that Defendants do not appropriately utilize the Monitoring Team's
> expertise, resulting in a lack of substantial compliance even after eight years of active
> monitoring. *See* Dkt. 603, at 75-78.

## VI.    DOC Has Not Ensured Adequate Supervision of Its Staff & Operations

### A.    DOC's Supervisory Structure

526.    DOC has the following supervisory ranks in each facility, in ascending order: Captain, Assistant Deputy Warden ("ADW"), Deputy Warden ("DW"), and Warden.

527.    Correction officers are supervised by captains, captains are supervised by one or two Assistant Deputy Wardens. Each Facility then has Deputy Wardens who supervise the ADWs and then there is one Warden assigned to each Facility. Monitor's Ninth Rep. at 24.

528.    As of April 2023, the position of warden, which was previously filled by a uniformed member of DOC staff, was replaced by Assistant Commissioners of Operations, which can now be filled by civilian staff members. Monitor's Apr. 3, 2023 Rep. at 4. This structure emerged after a failed attempt to create a dual leadership structure in which Assistant Commissioners were intended to work alongside wardens. *See infra* ¶¶ 1118-1124.

529.    Captains, ADWs, and DWs are all represented by unions.

### B.    Supervisory Failures at Multiple Levels of Uniform Leadership Have Led to Multiple Remedial Orders

530.    **Since the entry of the Consent Judgment, supervisory failures at multiple levels of uniform leadership have been and remain a consistent and pervasive malfunction within DOC. The failure of DOC supervisors to detect and correct the violations of the UOF Directive, lax security practices, and other systemic issues among their subordinates contribute to chaos and violence in the jails, harm to incarcerated individuals, and the excessive and unnecessary use of force. Monitor's July 10, 2023 Rep. at 39, 73; *see also* Monitor's Oct. 28, 2022 Rep. at 78. **

> **Nature of Dispute**:        Legal Dispute-Monitor Opinion
> **Position of Defendants**:    Defendants object to the conclusion entering the record of this motion as an expert conclusion, and respectfully submit that the conclusion falls outside of the scope of the Monitor's realm of expertise. Defendants respectfully refer the court

to the parties Joint Status Report dated July 3, 2024, ECF No. 742, for Defendants position on the scope of the Monitor's expertise. (ECF No. 742).

**Position of Plaintiffs**: Defendants concede that the Monitor is "appropriately qualified as an expert on corrections systems and best practices." July 3, 2024 Joint Report of the Parties, Dkt. 742 at 3, 5. The Monitor's opinion regarding deficiencies in the supervisors responsible for managing a correctional system, and how those supervisory deficiencies undermine efforts to implement required reforms and correct excessive and unnecessary force, is squarely within the scope of the expertise Defendants concede the Monitor possesses. Moreover, Defendants offer no evidence to rebut the Monitor's expert finding. The Court should credit the Monitor's opinion and adopt this proposed finding.

531.    From its initial reports, the Monitor has emphasized that DOC's ability to comply with the Consent Judgment, including proper implementation of the UOF Directive, depends on strong leadership through DOC and consistent messaging to DOC staff through supervision. Monitor's Third Rep. at 11; Monitor's Fourth Rep. at 6.

532.    <u>At a facility leadership level</u>, DOC supervisors must scrutinize situations in which policies and procedures were not followed to determine what went wrong and how it could be corrected. Monitor's Fourth Rep. at 6. That includes conducting a facility-level Rapid Review of UOF incidents that allows facility leaders to identify misconduct and take immediate action to respond to that misconduct. Monitor's Fifth Rep. at 28; Monitor's Seventh Rep. at 6-7. In addition, facility leadership must analyze their facility's UOF data, refine potential initiatives to address the specific contours of their facility, and champion initiatives that will advance the reforms within their command. Monitor's Ninth Rep. at 16.

533.    However, facility leaders struggled to use the Rapid Review process to identify misconduct consistently, including whether and when force is necessary/unnecessary, avoidable/ unavoidable, or excessive/proportional. Monitor's Ninth Rep. at 41; Monitor's Eighth Rep. at 7, 34; Monitor's Sixth Rep. at 21. Accordingly, the misuse of force often goes undetected, unaddressed, and therefore unchecked. Monitor's Ninth Rep. at 41; Monitor's Eighth Rep. at 7, 9, 34 (leaders cannot "discriminate between permissible, necessary force and unnecessary or

excessive force," and as a result "essentially sanction[ed]" staff misconduct); *id.* ("revolving door of leadership" where constantly replaced facility leaders "obstruct[ed] progress in developing and implementing solutions to the particular issues facing each Facility."). Failure to timely identify and address deficiencies and wrongdoing allows staff misconduct to be reinforced, and ultimately an entrenched, institutionalized pattern of misconduct. Monitor's Ninth Rep. at 24-25.

534.    At a line supervision level, DOC supervisors must supervise staff in a manner that encourages and rewards those who implement the UOF Directive properly and that guides and influences those who are slower to adapt to the new ways of managing people in custody. Monitor's Fourth Rep. at 6. That includes providing consistent messaging from supervisors at all levels, as well as helping staff identify alternatives to using force to create a safe environment. Monitor's Seventh Rep. at 6-7.

535.    Those supervising line staff, and those supervising the supervisors, must teach their subordinates how to improve their practice. Practice enhancements are needed not only with regard to using force appropriately, but also in basic operational tasks (e.g., ensuring doors are locked, hallways are clear, etc.), as these failures often catalyze a use of force. Monitor's Eighth Rep. at 10. In order to change staff behavior, it is critical that Supervisors actively and deliberately reinforce skills taught in training by issuing clear expectations before ("You are scheduled for refresher training and we are going to discuss what you learned when you return to the Facility"), after (by asking staff during one-on-one supervision to discuss how they applied the skills they were taught; reinforcing skills via the Department's broad staff communication strategy and during group convenings such as roll calls) and particularly *in the moment* (by having a constructive supervisory presence on scene whose primary task is to resolve the

141

situation without using force, or to ensure that the type and amount of force used is appropriate to the situation). *Id*.; Monitor's Sixth Rep. at 11.

536.    DOC's decisions on providing tangible rewards, verbal accolades, assignments, and promotions to these supervisors signal to line staff about the leadership's values and the culture they intend to promote. Monitor's Fourth Rep. at 9.

537.    Between the Fourth and Eighth Monitoring periods (January 2017 to December 2019), adequate line supervision did not occur. Monitor's Eighth Rep. at 11; Monitor's Ninth Rep. at 24-25.

538.    At the scene of an incident, supervisors often failed to intervene, allowing subordinate staff to escalate incidents or become part of the problem themselves by antagonizing, using profanity, and otherwise behaving inappropriately. Monitor's Ninth Rep. at 24-25. A disturbing number of captains were frequently and repeatedly involved in problematic UOF incidents, and then left in place to engage in subsequent misconduct. Monitor's Fourth Rep. at 9.

539.    Captains were not actively and effectively supervised to hone their skills in coaching line staff. That is because there were insufficient ADWs to supervise captains. There were only one or two ADWs assigned per shift and they were generally assigned the duty of Tour Commander (the sole point of contact for managing the tour for the entire Facility), which results in little to no supervision of captains. Monitor's Ninth Rep. at 25; Monitor's Eighth Rep. at 11.

540.    A UOF Improvement Plan—developed late in the Sixth Monitoring Period (April 2018) and aimed at improvement staff skill and performance when using force—failed due to a lack of continued support by DOC. Monitor's Seventh Rep. at 53. Uniformed leadership were

not held accountable for their failure to effectively manage, supervise, coach or discipline line staff. Monitor's Eighth Rep. at 7.

541.    The Monitor made a series of recommendations in the Monitor's Ninth Rep. (July – December 2019), including increasing the number of ADWs to adequately supervise captains. *See* Monitor's Ninth Rep. at 25.

### 1.    Entry of the First Remedial Order regarding Facility-Level and Line-Level Supervision

542.    Entered in August 2020, the First Remedial Order contained provisions to enhance the ability of leadership within the facilities to identify and address staff conduct and remedy the problems underlying DOC's non-compliance with certain provisions of the Consent Judgment.

543.    First, the First Remedial Order § A, ¶ 2 regarding "Facility Leadership Responsibilities" requires "Each Facility Warden (or designated Deputy Warden) [to] routinely analyze the Use of Force Reviews, the Department leadership's assessments of the Use of Force Reviews referenced in Paragraph A.1(i) above, and other available data and information relating to Use of Force Incidents occurring in the Facility in order to determine whether there are any operational changes or corrective action plans that should be implemented at the Facility to reduce the use of excessive or unnecessary force, the frequency of Use of Force Incidents, or the severity of injuries or other harm to Incarcerated Individuals or staff resulting from Use of Force Incidents. Each Facility Warden shall confer on a routine basis with the Department's leadership to discuss any planned operational changes or corrective action plans, as well as the impact of any operational changes or corrective action plans previously implemented. The results of these meetings, as well as the operational changes or corrective action plans discussed or implemented

143

by the Facility Warden (or designated Deputy Warden), shall be documented." *See* Dkt. 596-3 at 3 (Decl. of Steve J. Martin dated Aug. 12, 2020).

544.    In a declaration filed in support of this provision of the First Remedial Order, the Monitor noted that "[n]ot only must the misuse of force be identified, but an effective response to the poor practice must *occur*." *Id.* at 3 (emphasis added).

545.    Second, the First Remedial Order § A, ¶ 4 requires DOC, in consultation with the Monitor, to "improve the level of supervision of captains by substantially increasing the number of Assistant Deputy Wardens ("ADWs") currently assigned to the Facilities. The increased number of ADWs assigned to each Facility shall be sufficient to adequately supervise the Housing Area Captains in each Facility and the housing units to which those captains are assigned, and shall be subject to the approval of the Monitor." Dkt. 350.

546.    The Monitor assessed that DOC failed to comply with Remedial Order § A, ¶ 4, described *infra*. The Court then entered an Action Plan in June 2022, of which § C, ¶ 3(iii) requires DOC to substantially increase the number of Assistant Deputy Wardens currently assigned to the facilities or a reasonable alternative to ensure that there is adequate supervision of captains.

**C.    DOC Has Not Complied with the First Remedial Order § A, ¶ 2, regarding Facility Leadership**

547.    The goal of First Remedial Order § A, ¶ 2 is to ensure that the leadership of each facility is consistently and reliably identifying operational deficiencies, poor security practices, and problematic uses of force and that they address these issues so that supervisors and staff alike receive the guidance and advice necessary to improve their practices. Facility leadership is required to routinely analyze available data and information regarding uses of force, including the daily Rapid Reviews, to determine whether any operational changes or corrective action

plans may be needed to reduce the use of excessive or unnecessary force, the frequency of use of force incidents, or the severity of injuries or other harm to incarcerated individuals or staff resulting from use of force incidents. Monitor's April 3, 2023 Rep. at 127; Monitor's Nov. 8, 2023 Rep. at 80.

548.    DOC is not in compliance with the First Remedial Order § A, ¶ 2.

549.    DOC has received four consecutive non-compliance ratings on this provision. *See* Monitor's Eleventh Rep. at 110; Monitor's Twelfth Rep. at 43; Monitor's Oct. 28, 2022 Rep. at 108; Monitor's Apr. 3, 2023 Rep. at 129.

550.    DOC conceded on November 30, 2022 that the Monitor continued to find it in noncompliance with the requirements of this provision. *See* Dkt. 485 at ¶ 5 (Nov. 30, 2022 Decl. of Kimberly M. Joyce).

551.    Persistent operational issues, including the use of inadequate or unreasonable security protocols, occur consistently across all facilities and contribute to the use of excessive or unnecessary force and the frequency of UOF incidents in general. Monitor's Twelfth Rep. at 42.

552.    DOC leadership and facility leaders meet regularly to discuss various operational issues facing the department, but do not maintain minutes from these meetings. It is unknown whether any action plans were developed through these meetings. Monitor's Nov. 8, 2023 Rep. at 80.

553.    **The meetings among DOC leadership rarely appear to lead to operational changes or corrective action plans. *Id.* **

Nature of Dispute:          Legal Dispute-Monitor Opinion
Position of Defendants:    Defendants object to the conclusion entering the record of this motion as an expert conclusion, and respectfully submit that the conclusion falls outside of the scope of the Monitor's realm of expertise. Defendants respectfully refer the court to the parties Joint Status Report dated July 3, 2024, ECF No. 742, for Defendants position on the scope of the Monitor's expertise. (ECF No. 742).

**Position of Plaintiffs**: First, this proposed finding is not a conclusion but rather an objective fact, demonstrated by the material on the page cited: that when Plaintiffs requested evidence of the results of operational changes and corrective action plans, which First Remedial Order A(2) requires to be documented, the Defendants provided the "few" listed on Monitor's Nov. 8, 2023 Rep. at 80-81 (also indicating that the "few that have been developed have not been effective, and the problems related to the frequency of uses of force, serious injuries and unnecessary/excessive uses of force continue unabated....[DOC's] plans tend to rely on issuing memos to staff, reminders at Roll Call and corrective action for specific staff, but only rarely include an operational change that targets the root causes of a specific problem"). Further, Defendants concede that the Monitor is "appropriately qualified as an expert on corrections systems and best practices." July 3, 2024 Joint Report of the Parties, Dkt. 742 at 3, 5. The Monitor's opinion regarding deficiencies in (or the absence of) correctional leadership's operational changes and corrective action plans to address use of force issues and harm within DOC is squarely within the scope of the expertise Defendants concede the Monitor possesses. Moreover, Defendants offer no evidence to rebut the Monitor's finding. The Court should credit the Monitor's opinion and adopt this proposed finding.

554. **DOC's mismanagement—the lack of sufficient supervision of captains, the lack of adequate security protocols and procedures, the constant change in priorities and focus, and the frequent change of facility leadership—means that DOC has not developed adequate operational changes or corrective action plans that may change practice. Monitor's Oct. 28, 2022 Rep. at 108; Monitor's Twelfth Rep. at 42. **

**Nature of Dispute**: Legal Dispute-Monitor Opinion
**Position of Defendants**: Defendants object to the conclusion entering the record of this motion as an expert conclusion, and respectfully submit that the conclusion falls outside of the scope of the Monitor's realm of expertise. Defendants respectfully refer the court to the parties Joint Status Report dated July 3, 2024, ECF No. 742, for Defendants position on the scope of the Monitor's expertise. (ECF No. 742).
**Position of Plaintiffs**: Defendants concede that the Monitor is "appropriately qualified as an expert on corrections systems and best practices." July 3, 2024 Joint Report of the Parties, Dkt. 742 at 3, 5. The Monitor's opinion regarding DOC leaders' mismanagement of a correction system—including correctional supervisory deficiencies and failures to adequately adhere to security protocols—and how that mismanagement has affected the ability to implement necessary use of force reforms, is squarely within the scope of the expertise Defendants concede the Monitor possesses. Moreover, Defendants have offered no evidence to rebut the Monitor's expert finding. The Court should credit the Monitor's opinion and adopt this proposed finding.

555.    **The few operational changes or corrective action plans that have been developed are not effective at reducing use of force, serious injuries, or excessive or unnecessary use of force. Monitor's Nov. 8, 2023 Rep. at 80-81 (few rigorous attempts to utilize the large volume of information that DOC possesses to address the underlying causes of unnecessary and excessive uses of force and facility violence and the few plans that have been devised are either ineffective, or shortly abandoned before their impact on staff practice can be discerned). DOC tends to rely on issuing memos to staff, reminders at roll call, and corrective action for specific staff, but only rarely include an operational change that targets the root causes of a specific problem. *Id.* **

> **Nature of Dispute**:        Legal Dispute-Monitor Opinion
> **Position of Defendants**:    Defendants object to the conclusion entering the record of this motion as an expert conclusion, and respectfully submit that the conclusion falls outside of the scope of the Monitor's realm of expertise. Defendants respectfully refer the court to the parties Joint Status Report dated July 3, 2024, ECF No. 742, for Defendants position on the scope of the Monitor's expertise. (ECF No. 742).
> **Position of Plaintiffs**:        Defendants concede that the Monitor is "appropriately qualified as an expert on corrections systems and best practices." July 3, 2024 Joint Report of the Parties, Dkt. 742 at 3, 5. The Monitor's opinion regarding deficiencies in (or the absence of) correctional leadership's operational changes and corrective action plans to address use of force issues and harm, and findings about how DOC's efforts have failed to address excessive and unnecessary uses of force and facility violence within DOC, is squarely within the scope of the expertise Defendants concede the Monitor possesses. Moreover, Defendants have offered no evidence to rebut the Monitor's expert finding. The Court should credit the Monitor's opinion and adopt this proposed finding.

556.    In November 2023, the Monitor found there were a few documents containing more global or problem-focused strategies, including six responses by facilities to NCU's security audits. *Id*. These responses addressed only a few of the many NCU security audits conducted by that time: AMKC provided a written response to 1 of the 32 NCU audits, RNDC provided a written response to 4 of the 38 NCU audits, and VCBC provided a written response to 1 of the 8 NCU audits. *Id*. No other written responses were provided by any of the facilities. *Id*.

557.    Facility leaders have been unable to abate the persistent issues contributing to the risk of harm, including the use of inadequate or unreasonable security protocols, the use of excessive or unnecessary force, and the frequency of use of force incidents. Monitor's Apr. 3, 2022 Rep. at 128.

558.    **Facility leadership, such as Wardens and Deputy Wardens, have not been successful in dismantling the culture that gave rise to the Consent Judgment despite the significant efforts that have been outlined in every Monitor's report to date. Monitor's Oct. 28, 2022 Rep. at 108; Monitor's Twelfth Rep. at 42; Monitor's Eleventh Rep. at 8-9, 109. **

> **Nature of Dispute**:        Legal Dispute-Monitor Opinion
> **Position of Defendants**:    Defendants object to the conclusion entering the record of this motion as an expert conclusion, and respectfully submit that the conclusion falls outside of the scope of the Monitor's realm of expertise. Defendants respectfully refer the court to the parties Joint Status Report dated July 3, 2024, ECF No. 742, for Defendants position on the scope of the Monitor's expertise. (ECF No. 742).
> **Position of Plaintiffs**: Defendants concede that the Monitor is "appropriately qualified as an expert on corrections systems and best practices." July 3, 2024 Joint Report of the Parties, Dkt. 742 at 3, 5. The Monitor's opinion regarding deficiencies in correctional facility leadership to address use of force issues and harm within DOC is squarely within the scope of the expertise Defendants concede the Monitor possesses. Moreover, Defendants offer no evidence to rebut the Monitor's expert finding. The Court should credit the Monitor's opinion and adopt this proposed finding.

### 1.    Longstanding Failures to Identify Misconduct: Rapid Reviews

559.    The First Remedial Order § A, ¶ 1 requires facility leadership to promptly review all use of force incidents in the facility to conduct an initial assessment of the incident and determine whether corrective action is necessary.

560.    Close-in-time assessments of use of force incidents are critical to properly managing any facility and appropriately managing uniformed staff. Monitor's Tenth Rep. at 40.

561.    Rapid Reviews do not consistently identify whether a use of force incident is necessary/unnecessary, avoidable/unavoidable, or appropriate/excessive, and whether uniformed

staff engaged in misconduct. *See* Monitor's Nov. 8, 2023 Rep. at 4; Monitor's Ninth Rep. at 53;

Monitor's Twelfth Rep. at 39. Rapid Reviews do "not reliably and consistently identif[y] all

issues that would reasonably be expected to be identified through a close in time assessment of

the video." Monitor's Oct. 28, 2022 Rep. at 107; *see also* April 3, 2023 Rep. at 125.

562.    Rapid Reviews do not reliably or consistently identify all staff members involved,

they do not appear to comprehensively assess the available facts and evidence related to an

incident, and there are some biased, unreasonable, or inadequate reviews that fail to identify

clear, objective evidence of wrongdoing. Monitor's Nov. 8, 2023 Rep. at 67; Monitor's July 10,

2023 Rep. at 19 n.21 (Monitor noted that certain issues—like determining that an incident was

avoidable—are not reliably identified); Monitor's Oct. 5, 2023 Rep. at 1, 12, 21; Monitor's

Eleventh Rep. at 67; Monitor's Tenth Rep. at 43 (Monitoring Team identified at least ten

examples of "egregiously inadequate, biased, or incomplete Rapid Reviews conducted this

Monitoring Period, which were shared with [DOC]"); Monitor's Eleventh Rep. at 106, n.95

(Monitoring Team shared eight examples of Rapid Reviews "that appeared biased, unreasonable,

or inadequate."); Monitor's Oct. 28, 2022 Rep. at 107 (Monitor found that Rapid Reviews

"often" fail to identify whether self-harm procedures were followed appropriately and whether

the presence of the Probe Team was necessary or its practices appropriate).

563.    For example, facility leadership rarely detects painful escort techniques even

though video evidence clearly illustrates the painful escort. Monitor's Ninth Rep. at 32.

564.    Facility leadership does not always recommend reasonable and appropriate

corrective action in response to misconduct or procedural violations identified in Rapid Reviews.

Monitor's Twelfth Rep. at 39, 42.

565.    While the First Remedial Order, Section A, Paragraph 1(ii) requires appropriate instruction, counseling, or discipline to be sought and imposed where a facility leader conducts a biased, unreasonable, or inadequate Rapid Review, no systematic process to engage in this accountability exists and it has occurred only on an ad hoc basis on a few occasions. *See* Monitor's Nov. 8, 2023 Rep. at 67.

566.    DOC relies "exclusively" on counseling for inadequate, biased, or incomplete Rapid Reviews, even when facility leaders have conducted numerous biased, unreasonable, inadequate or very problematic Rapid Reviews and "a more severe response [wa]s warranted." Monitor's Tenth Rep. at 43, n.32; Monitor's Eleventh Rep. at 107.

567.    In sum, the Rapid Review process has been insufficient to prevent misconduct from reoccurring. Monitor's Apr. 3, 2023 Rep. at 127; Monitor's Oct. 28, 2022 Rep. at 107; Monitor's Twelfth Rep. at 42.

568.    **Several examples illustrate the systemic problems noted by the Monitor in the Rapid Review process as set forth in paragraphs 569 to 572 below.**

> **Nature of Dispute**:        Legal Dispute-Other
> **Position of Defendants**:   Defendants incorporate by reference their responses to paragraphs 569 through 572 of Plaintiffs' PFOF, but dispute insofar as this PFOF is a conclusion and not a factual statement for which a response is required.
> **Position of Plaintiffs**: This is a factual finding the Court is entitled to make based on the information provided in paragraphs 569 through 572, as cited herein.

569.    **In March 2023, after an officer used a prohibited chokehold, head strikes, and took a person in custody to the ground while he was handcuffed and in leg shackles, the facility supervisor who conducted the Rapid Review failed to specifically mention the chokehold or head strikes, noting only an "unauthorized force technique," and found the staff member to have been in compliance with DOC's Use of Force Directive. Monitor's July 10, 2023 Rep. at 24-25.**

> **Nature of Dispute**:        Legal Dispute-Other

**Position of Defendants**:    Not Disputed, insofar as the proposed finding reflects what is stated on the cited pages of the Monitor's report, and further aver that as noted on the cited pages of the Monitor's report, formal disciplinary charges were issued for failure to report and one for failure to tum on body worn camera.

**Position of Plaintiffs**:        Defendants' statement does not contradict the factual finding that Plaintiffs propose the Court make: that the facility supervisor who was entrusted to conduct this rapid review incident failed to note the use of force misconduct that took place. Moreover, although Defendants note charges for reporting and camera issues, they do not claim any disciplinary charges were ever issued for the prohibited chokehold and head strikes used on a person in restraints.

570.    When an ADW conducted a "hostage drill" that used people in custody to stage the event and resulted in an unnecessary deployment of OC spray directly on a person in custody who was obeying the ADW's direction to participate in the drill, the Rapid Review failed to detect concerns about the origin of the incident and the behavior of the ADWs, but focused only on the officer who deployed the OC spray. Monitor's Aug. 7, 2023 Rep. at 34.

571.    ██████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████████████████████████
████████████████████████████████████████
████████████████████

572.    ████████████████████████████████
████████████████████████████████████
████████████████████████████████████
██████████████████████████████████████████
████████████████████████████

151

## 2.    Failures to Use Available Information to Address UOF Deficiencies

573.    As of July 2023, there is significant data and information is available to DOC and facility leaders, but they have not effectively utilized that information to identify and address the underlying causes of the unnecessary and excessive force and violence occurring in the agency. Monitor's July 10, 2023 Rep. at 64.

574.    DOC does not appear to engage in basic analysis of the factors driving the high rates of use of force and what steps could be taken to reduce those rates. DOC has not identified targeted solutions to address the concerns over leadership and supervision. Monitor's July 10, 2023 Rep. at 65-66.

575.    There are several examples of DOC's failures to avail itself of critical, timely, and readily available information upon which it could base its remedial actions. Monitor's Mar. 16, 2022 Rep. at 45-46.

576.    Even a cursory review of use of force data reveals that an unnecessarily high number of uses of force occur during searches and escorts. Correctional practice is replete with a variety of strategies that could be used to better understand and then address the typical dynamics that characterize each of these factors, but DOC has not taken any steps to address either issue. Monitor's July 10, 2023 Rep. at 66.

577.    Facility leaders have access to ID Quickstats Weekly Reports, Facility Risk Dashboards, and NCU audit materials, internal reporting (I.e., CODs), the Office of Policy Compliance, Rapid Reviews, ID Intake Investigations, and information flowing from the live video monitoring unit to help identify use of force trends. *See* Monitor's Nov. 8, 2023 Rep. at 10; Monitor's Ninth Rep. at 201.

578.    ID Quickstats Weekly Reports are reports in which ID shares a summary of incidents that occurred at the Facility the previous week, descriptions of specific incidents and

relevant data, and a summary of how ID's assessment intersects with the Facility Rapid Review findings. *Id*. at 49, n.40.

579.    In the Ninth Monitoring Period, the Monitor noted that the value of these reports is dependent on how facility leadership uses them and found that "[a] gap remains between the Facilities' conception of 'problematic uses of force' and that of ID and Trials." *Id*. at 201. ID Quickstats did not translate to noticeable changed practice in the Facility Leadership's Rapid Reviews; where ID identified deficiencies with Rapid Reviews, the facilities did not appear to consistently adopt these findings and there was no indication that leadership was held accountable for inadequate or biased Rapid Reviews. *Id*. at 55-56.

580.    The findings of NCU audits are shared with facility leadership, but there is no evidence that the serious issues identified are addressed or incorporated into problem-solving going forward. Monitor's Mar. 16, 2022 Rep. at 45-46. It is another example of DOC's failure to avail itself of critical, timely, and readily available information upon which it could base its remedial actions. *Id.*

581.    The Monitor has urged DOC to utilize the information provided by NCU. Monitor's Oct. 28, 2022 Rep. at 78; Apr. 3, 2023 Rep. at 46-47.

582.    The findings of the more than 100 NCU security audits have been shared with facility leadership, but there is no evidence that the serious security lapses identified were adequately addressed or incorporated into problem-solving going forward. See Monitor's Nov. 8, 2023 Rep. at 14; Monitor's Mar. 16, 2022 Rep. at 45-46.

583.    In most instances, facility leaders failed to provide any written response or corrective action plan in response to security deficiencies identified in the NCU security audits. For instance, GRVC facilities failed to respond in writing to 24 NCU audits identifying security

failures at that facility. Monitor's Nov. 8, 2023 Rep. at 80; Ex. 15 (Index of NCU Security Audits as of Sept. 25, 2023).



584.

585.

586.

587.     In May 2023, the officer of the Deputy Commissioner of Security began conducting separate security audits of facilities to assess whether facilities comply with various directives, operation orders, and minimum standards. Monitor's Oct. 5, 2023 Report at 20; Ex. 33 (16th Compliance Report at 40).

Recently, the Deputy Commissioner of Security found a facility leader's response to the findings of a security audit initiated by his office to be "inadequate." Monitor's Oct. 5, 2023 Rep. at 20.

588.    DOC and facility leaders rarely appear to have knowledge of UOF information and when asked about elements of the operation that are not going well, offer only superficial observations or platitudinous statements. Only rarely is a problem-solving approach discussed with a level of detail that makes clear how and why a certain initiative to improve practice should be developed and implemented. Monitor's July 10, 2023 Rep. at 66.

589.    An "effective problem-solving effort" should include not only tracking macro-statistics, but also "a basic 'hot-spot analysis' (i.e., where do most fights occur (location/housing unit), during what situation, at what time of day, among which people in custody, which staff are present)" in order to "generate[s] a root-cause analysis to understand why each of those trends is present." Monitor's July 10, 2023 Rep. at 66.

590.    As an example, the Monitor listed a series of questions about why fights are "prevalent on the Mental Observation units," on a particular nighttime tour, as well as what procedural failures and staff barriers to following policies exist to produce the "opportunity for violence to occur." *Id*.

591.    This analysis should be ongoing and should address the persistent issues DOC is facing, including use of force, fights, stabbings and slashings, problems during lock-in hours, failure to utilize tour wands, failure to provide daily recreation, head strikes, failures to secure doors, presence of illicit drugs. Monitor's July 10, 2023 Rep. at 66.

592.    The perpetual state of dysfunction will simply continue unless and until DOC identifies the salient data necessary and then correctly analyzes and interprets the data so that it can be used to inform solutions to its entrenched problems. *Id*. at 67.

593.    **"The Monitoring Team has consistently reported that significant data and information is available to Department and faculty leaders, but they have not effectively utilized

that information to identify and address the underlying causes of the unnecessary and excessive force and violence occurring in the agency." Monitor's Jul. 10, 2023 Rep. at 64. DOC "has ample information—from both internal and external sources, generated for years—on the types of problems that contribute to the high risk of harm in the jails. However, while it is an essential component of problem-solving, on its own, simply detecting or identifying the problems does nothing to actually rectify them. As noted above, in interviews with facility leadership and staff they generally acknowledge these issues and their contribution to the unsafe conditions in the jails. However, discussions with facility leadership, NCU staff and observations of various Department meetings (e.g., TEAMS) reveal that scant attention is subsequently given to the findings and implications of these internal audits, and thus, despite their value and potential, these internal assessments have done little to advance the reform." Monitor's Nov. 8, 2023 Rep. at 14.**

> **Nature of Dispute**:        Legal Dispute-Monitor Opinion
> **Position of Defendants**:   Defendants object to the conclusion entering the record of this motion as an expert conclusion, and respectfully submit that the conclusion falls outside of the scope of the Monitor's realm of expertise. Defendants respectfully refer the court to the parties Joint Status Report dated July 3, 2024, ECF No. 742, for Defendants position on the scope of the Monitor's expertise. (ECF No. 742).
> **Position of Plaintiffs**: Defendants concede that the Monitor is "appropriately qualified as an expert on corrections systems and best practices." July 3, 2024 Joint Report of the Parties, Dkt. 742 at 3, 5. The Monitor's opinion regarding what information and data is available in this correctional system to aid in addressing excessive and unnecessary force, and his assessment of DOC leaders' failures to give adequate attention to the information available to them, is squarely within the scope of the expertise Defendants concede the Monitor possesses. Moreover, Defendants offer no evidence to rebut the Monitor's expert finding. The Court should credit the Monitor's opinion and adopt this proposed finding.

594.    Given this long-standing problem, the Monitor recommended that the Court order DOC to develop a set of data and metrics for use of force and violence indicators so that Department leadership can assess causes and develop strategies to address them. Monitor's July 10, 2023 Rep. at 67; 238. On August 10, 2023, the Court did so. *See* Dkt. 564 at 2.

156

**D.    DOC Has Not Complied with First Remedial Order § A, ¶ 4, Action Plan §**
**C, ¶¶ 3(ii), 3(iii) regarding Sufficient and Adequate Supervision by ADWs**
**and Captains**

595.    The First Remedial Order § A, ¶ 4, Action Plan § C, ¶ 3(ii), and Action Plan § C,

¶ 3(iii) require DOC to substantially increase the number of ADWs to ensure adequate

supervision of captains, and to increase captains on the housing units. DOC has not done so.

Monitor's Eleventh Rep. at 113; Monitor's Twelfth Rep. at 44-45; Monitor's Mar. 16, 2022

Report at 5 n.3; Monitor's Oct. 28, 2022 Rep. at 112-115; Monitor's Apr. 3, 2023 Rep. at 133-

136; Monitor's July 10, 2023 Rep. at 78-79.

596.    The Monitor rated the Department in Non-Compliance with First Remedial Order

§ A, ¶ 4 in the two of the last three applicable reports. Monitor's Twelfth Rep. at 45 (noting

increased but "not sufficient" numbers of ADWs and concerns about supervisors' poor

practices); Monitor's Oct. 28, 2022 Rep. at 115 (number of ADWs remains insufficient). A year

and a half after the First Remedial Order was entered, the Monitor noted that few, if any,

additional ADWs had been deployed to supervise staff on the housing units. Monitor's Mar. 16,

2022 Rep. at 4-5.

597.    When the Department received a Partial Compliance rating for First Remedial

Order § A, ¶ 4 in April 2023, the Monitor based the rating on an increase in the number of

ADWs, but did not find an improvement in supervision provided. Monitor's Apr. 3, 2023 Rep. at

133-136. That increase in itself was insufficient to provide "adequate supervision" because the

newly promoted ADWs are drawn from the same corps of captains who have generally struggled

with these essential skills. *Id*.

1. **The Number of ADWs and Captains Assigned to Facilities Has Not Meaningfully Increased.**

598.    The percentage of supervisors in the housing units has not meaningfully increased. Monitor's Nov. 8, 2023 Rep. at 26-27.

599.    In most correctional systems, there is an additional level of supervision between line correction officers and captains, such as sergeants or lieutenants. Monitor's Oct. 28, 2022 Rep. at 78; Monitor's Nov. 8, 2023 Rep. at 26.

600.    Instead, in the Department's system, captains are the only line supervisors because most ADWs serve as Tour Commanders. This means that there is only one line of supervisors and captains often go unsupervised. Monitor's Nov. 8, 2023 Rep. at 26.

601.    As of April 2023, the Action Plan requirement to develop and implement a plan to prioritize assignment of captains in housing units and ADWs to posts to ensure adequate supervision had not been met—DOC had reportedly "begun" an "evaluation" that had yet to be completed. Monitor's Apr. 3, 2023 Rep. at 23.

602.    As of October 21, 2023, DOC has 88 ADWs available department-wide, but only 72 of those ADWs (or 82%) are deployed in facilities and court commands.

| Number of ADWs & Assignments in the Department[61] | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Facility | # of ADWs As of July 18, 2020 | # of ADWs As of Jan. 2, 2021 | # of ADWs As of June 26, 2021 | # of ADWs As of Jan. 1, 2022 | # of ADWs As of June 18, 2022 | # of ADWs As of Dec. 31, 2022 | # of ADWs As of May 20, 2023 | # of ADWs As of Oct. 21, 2023 |
| AMKC[62] | 9 | 21 | 13 | 12 | 9 | 12 | 16 | 0 |
| EMTC[63] | 0 | 0 | 0 | 0 | 0 | 8 | 9 | 12 |
| GRVC | 6 | 10 | 11 | 9 | 8 | 12 | 12 | 11 |
| MDC[64] | 6 | 2 | 1 | 1 | 0 | 1 | 0 | 1 |
| NIC | 6 | 8 | 8 | 5 | 7 | 8 | 9 | 10 |
| OBCC[65] | 6 | 8 | 8 | 14 | 7 | 0 | 0 | 12 |
| RMSC | 5 | 6 | 6 | 5 | 4 | 5 | 5 | 13 |
| RNDC | 7 | 15 | 15 | 10 | 7 | 12 | 10 | 10 |
| VCBC[66] | 4 | 6 | 5 | 5 | 4 | 5 | 6 | 1 |
| Court Commands (BKDC, BXDC, QDC) | 3 | 4 | 3 | 3 | 3 | 3 | 2 | 2 |
| Total # of ADWs in Facilities & Court Commands | 52 | 80 | 70 | 64 | 49 | 66 | 69 | 72 |
| Total # of ADWs Available Department-wide | 66 | 95 | 88 | 80 | 67 | 82 | 90 | 88 |
| % of ADWs in Facilities & Court Commands | 79% | 84% | 80% | 80% | 73% | 80% | 77% | 82% |

See Monitor's Nov. 8, 2023 Rep. at 110.

603.    There was no increase at all in the aggregate number of ADWs from January 2, 2021 (after First Remedial Order) to October 21, 2023. See Monitor's Nov. 8, 2023 Rep. at 26-27, 110. The absolute number has decreased. Id.

604.    As of July 10, 2023, DOC does not have enough ADWs to ensure that each tour has both a Tour Commander as well as ADWs to supervise captains.

605.    As of November 8, 2023, additional ADWs are needed to meet the supervision requirements of the First Remedial Order and Action Plan. Monitor's Nov. 8, 2023 Rep. at 26-27 ("There are plainly insufficient numbers of supervisors to provide the type of intensive supervision that is needed to elevate officers' skills.").

606.    As of November 8, 2023, while the number of ADWs assigned to work in facilities increased by almost 38%, this has limited impact given the significant deficit in the number of captains. Monitor's Nov. 8, 2023 Rep. at 27.

607. Since 2020, the number of captains assigned to work in the facilities has decreased by about 33% (558 as of July 18, 2020, compared to 371 as of October 21, 2023). Monitor's Nov. 8, 2023 Rep. at 26-27, 111.

| Number of Captains & Assignments in the Department[67] | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Facility | # of Captains As of July 18, 2020 | # of Captains As of Jan. 2, 2021 | # of Captains As of June 26, 2021 | # of Captains As of Jan. 1, 2022 | # of Captains As of June 18, 2022 | # of Captains As of Dec. 31, 2022 | # of Captains As of May 20, 2023 | # of Captains As of Oct. 21, 2023 |
| AMKC[68] | 91 | 111 | 97 | 87 | 81 | 80 | 67 | 12 |
| EMTC[69] | 0 | 0 | 0 | 0 | 0 | 38 | 39 | 40 |
| GRVC | 75 | 72 | 86 | 86 | 81 | 90 | 66 | 48 |
| MDC[70] | 72 | 39 | 15 | 12 | 11 | 11 | 1 | 12 |
| NIC | 51 | 45 | 45 | 56 | 45 | 50 | 45 | 48 |
| OBCC[71] | 85 | 81 | 78 | 77 | 38 | 7 | 7 | 55 |
| RMSC | 51 | 50 | 49 | 36 | 34 | 31 | 27 | 70 |
| RNDC | 58 | 56 | 60 | 63 | 70 | 70 | 66 | 53 |
| VCBC[72] | 27 | 25 | 27 | 25 | 23 | 22 | 22 | 4 |
| Court Commands (BKDC, BXDC, QDC) | 39 | 37 | 35 | 32 | 33 | 28 | 26 | 29 |
| Total # of ADWs in Facilities & Court Commands | 558 | 523 | 499 | 474 | 416 | 427 | 411 | 371 |
| Total # of ADWs Available Department-wide | 810 | 765 | 751 | 670 | 607 | 573 | 553 | 541 |
| % of ADWs in Facilities & Court Commands | 69% | 68% | 66% | 71% | 69% | 75% | 74% | 69% |

608. This number is insufficient to supervise thousands of officers. Monitor's Nov. 8, 2023 Rep. at 26-27; *see also* Monitor's July 10, 2023 Rep. at 78-79.

609. As of November 8, 2023, additional captains are needed to meet the supervision requirements of the First Remedial Order and Action Plan. Monitor's Nov. 8, 2023 Rep. at 26-27; Monitor's Apr. 3, 2023 Rep. at 23 (DOC evaluation has "begun" to assess ADW and captain assignments across facilities and to ensure captains have appropriate span of control).

## 2. ADWs Provide Inadequate Supervision

610. ADWs in DOC do not adequately supervise captains. *See* Monitor's Mar. 16, 2022 Rep. at 5. Supervision is fundamental to changing practice and sustaining those changes, but the longstanding supervisory void in both number in competency is a leading contributor to

160

the Department's lack of meaningful change to basic security practices and operations. Monitor's Nov. 8, 2023 Rep. at 28; *see also id.* at 4.

611.    Supervision of line staff remains insufficient to provide skill development and oversight needed to ensure the workforce functions skillfully and responsibly. Monitor's Oct. 5, 2023 Rep. at 8; Monitor's Nov. 8, 2023 Rep. at 4, 27 (supervisors have only marginal competence in the skills necessary to provide effective supervision). Although DOC has attempted to ensure supervisors are present across tours through the week, actual supervision is sporadic and inconsistent. Monitor's Oct. 5, 2023 Rep. at 8. Supervisors do not provide coaching and support, so poor practice by line staff persists. Id. at 8; Monitor's Nov. 8, 2023 Rep. at 4 ("Supervisors lack the willingness or skill to effectively support, guide, and coach staff practice, which is perhaps unsurprising given their tenure in a deeply dysfunctional system that does not adequately select, train or prepare them for the task at hand. In addition to being poorly equipped for or resistant to their role and responsibilities, supervisors are far too few in number to be able to provide the type of hands-on coaching needed for this workforce"); id. at 26-28 (supervisors do not provide the hand-to-hand, active coaching that is required). When line staff report issues to supervisors (e.g., an individual who is waiting for sick call, an individual without a mattress, or an issue with services), the issues often go unattended, leaving line staff fatigued and disheartened. Monitor's Oct. 5, 2023 Rep. at 8-9.

612.    Supervisors at all levels have a limited command of the restrictions and prohibitions of the Use of Force Directive, appear to act precipitously, and many ultimately end up contributing to or catalyzing the poor outcomes that are of concern. They also fail to detect and then fail to correct the lax security practices among their subordinates that contribute to

problems consistently observed and identified by the Monitoring Team in many incidents. Monitor's July 10, 2023 Rep. at 73; Monitor's Apr. 3, 2023 Rep. at 39.

613.    **Elevating supervisory practice is difficult to achieve because the number of supervisors is limited and because the supervisors generally lack the requisite perspective and experience to guide their subordinates toward better practice. Monitor's July 10, 2023 Rep. at 73. **

> **Nature of Dispute**:        Legal Dispute-Monitor Opinion
> **Position of Defendants**:    Defendants object to the conclusion entering the record of this motion as an expert conclusion, and respectfully submit that the conclusion falls outside of the scope of the Monitor's realm of expertise. Defendants respectfully refer the court to the parties Joint Status Report dated July 3, 2024, ECF No. 742, for Defendants position on the scope of the Monitor's expertise. (ECF No. 742).
> **Position of Plaintiffs**: Defendants concede that the Monitor is "appropriately qualified as an expert on corrections systems and best practices." July 3, 2024 Joint Report of the Parties, Dkt. 742 at 3, 5. The Monitor's opinion regarding deficiencies in the practices of correctional supervisors, what supervisory staffing levels are sufficient to adequately supervise staff, and how supervisory deficiencies pose barriers to elevating supervisory practice is squarely within the scope of the expertise Defendants concede the Monitor possesses. Moreover, Defendants offer no evidence to rebut the Monitor's expert finding. The Court should credit the Monitor's opinion and adopt this proposed finding.

614.    A large proportion of DOC's uniformed supervisors either do not have the aptitude and/or willingness to properly supervise their subordinates, have limited engagement with staff on the housing units and do not provide adequate supervision. Monitor's Mar. 16, 2022 Rep. at 5.

615.    Supervisory skill deficits are exacerbated by the fact that DOC has fewer levels of supervisors in its chain of command than is seen in most correction systems. Monitor's July 10, 2023 Rep. at 73; Monitor's Apr. 3, 2023 Rep. at 40; *see also* Monitor's Oct. 28, 2022 Rep. at 78.

616.    Simply increasing the number of ADWs is not in itself effective to comply with the requirement to provide adequate supervision. Because newly promoted ADWs are drawn

from the same corps of captains who struggle with these essential skills, simply promoting

additional ADWs does not solve the problem in its entirety. Monitor's Apr. 3, 2023 Rep. at 136.

617.    Thirty six recently promoted ADWs offer an example. In late 2022, 26 ADWs

were promoted, of which 12 were not recommended based on an internal DOC screening. In

2023, 10 additional ADWs were promoted and 4 were subsequently demoted. Monitor's Nov. 8,

2023 Rep. at 27, n.20.

618.    **Several examples illustrate supervisors engaging in use of force or other

conduct that promotes poor staff practice, security failures, and unnecessary and excessive force,

as set forth in paragraphs 619 to 627 below. **

> **Nature of Dispute**:        Legal Dispute-Other
> **Position of Defendants**:    Defendants incorporate by reference their responses to
> paragraphs 619 through 627 of Plaintiffs' PFOF, but dispute insofar as this PFOF is  a
> conclusion and not a factual statement for which a response is required.
> **Position of Plaintiffs**: This is a factual finding the Court is entitled to make based on the
> information contained in paragraphs 619 to 627 as cited herein.

619.    During one incident in the Tenth Monitoring Period, passive resistance to a search

during a period of excessive heat escalated when the Probe Team entered and immediately

forced a confrontation, ultimately resulting in a deployment of OC spray when staff gathered

people in custody into the vestibule and used a chemical agent to secure incarcerated individuals

as a result of too few flex cuffs. Dkt. 360 at 29. In another incident in the Tenth Monitoring

Period, passive resistance to a search escalated when an ADW pushed a person in custody,

setting off a chain reaction of multiple uses of force, people being taken to the floor, staff using

prohibited holds and aggressive tactics, the overly close positioning of a canine, and painful

escort techniques (i.e. "excessively ben[ding] and twist[ing individuals'] wrists," elevating their

arms, and "unsafely" carrying them by their arms from gurneys to intake cells). "One Probe

Team Officer raised and slammed a resident to the floor, while another dragged a person in

restraints across the floor as a captain sprayed him at point blank range in the face with an MK-9." The Monitor found that "[n]either the ADW nor Captain properly supervised or controlled the scene." *Id.*

620.    On January 3, 2023 in NIC, an officer used chemical agents on a person in a cell in what ID determined was an excessive, unnecessary, and retaliatory manner. The officer re-entered the cell twice after spraying the person in custody, and a captain accompanied the officer on the second occasion but "quickly [left] the cell, failing to supervise by leaving the officer unattended in the [cell]." Monitor's July 10, 2023 Rep. at 25. The staff member then used force on the person in custody, and the situation continued until 6 ESU officers came to remove the person from his cell. *Id.*

621.    On February 3, 2023 at RMSC, a captain responding to a person in custody in a vestibule area left the A Station door open while the person was unsecured there. The situation escalated into multiple uses of force, in which officers deployed chemical agents, aggressively pushed her into the wall, aggressively took her to the floor, and applied pressure to her wrists even though she did not appear to resist the escort. The breaker gate was left open during the incident. The person in custody sustained a post concussive syndrome and required a CT scan. Monitor's July 10, 2023 Rep. at 26.

622.    On May 31, 2023 in GRVC, doors were visibly open and unsecured shortly after midnight, during a lock-in time. Nine people in custody pushed an individual into a cell and closed the door, in view of an officer who left the housing area unsupervised two and a half minutes later. The nine individuals left sixteen minutes after forcing their way in. Later that morning, a DOC supervisor and an officer toured and interacted with the victim through the cell's food slot, and the supervisor appeared to take no action despite serious injuries seemingly

apparent on the victim's face. The victim wasn't evaluated in the clinic until 18 hours after the

incident occurred. He "alleged sexual assault with penetration and medical staff found orbital

swelling, tenderness, ecchymosis, bilateral subconjunctival hemorrhage, nasal bridge swelling,

and tenderness." Monitor's July 10, 2023 Rep. at 53-54.

623.    On June 8, 2023, at RNDC, several young adults appeared to direct the A-Station

officer to open a cell door, after which they assaulted the person inside and then shut the cell

door again, locking him in. "The Officer appeared to interact with the PIC that was assaulted

inside the cell but does not take him out. Over the next several hours, multiple Officers and DOC

supervisors toured the area and interacted with the PIC that was assaulted, but none took action.

Over seven hours after the incident, the PIC was taken out of his cell and evaluated in the clinic."

The person had to go to Urgicare with lacerations. Monitor's July 10, 2023 Rep. at 54.

624.    ██████████████████████████

██████████████████████████████

█████████████████████████

████████████████████████

█████████████████████████

██████████████████████████

████████████████████████

████████████████████████

██████████████████████████

██████████████████████████

████████████████████████████

████████

625.    

626.

627. 

### 3. Deficient and Improper Promotions Limit the Number of ADWs Available for Supervision and Hamper the Delivery of Adequate and Appropriate Supervision

628.    DOC's promotion decisions contribute to the lack of adequate supervision because DOC has promoted people to positions of captain and ADW that do not have the skills to provide adequate supervision. Monitor's July 10, 2023 Rep. at 87.

629.    DOC's promotion decisions also send a message to staff about the leadership's values, the culture it intends to cultivate and promote, and the behavior to emulate. Monitor's Eighth Rep. at 199.

630.    In the Fourth Monitoring Period, five of the 20 promotions to captain that were reviewed by the Monitoring Team raised concerns. Monitor's Fourth Rep. at 187. Three officers had been recently disciplined for use of force-related misconduct, and the Monitoring Team raised concerns about the candidates' fitness for supervisory roles given the "objective evidence"

of each. *Id.* Two other candidates were involved in use of force incidents in which the charges were administratively filed (functionally dismissed) just prior to promotion, one of which the Monitor assessed as "questionable…given the objective evidence available." *Id.*

631.    In the Fifth Monitoring Period, the Monitor found that "a small number of Staff were promoted who, although screened appropriately, raised concern about their fitness to serve as Supervisors" and that because "these concerns would not be identified through the reviews required by the Consent Judgment…strongly recommend[ed] [DOC] consider leveraging other sources of information, including EWS assessments, to ensure that Staff who are selected for supervisory roles have the leadership capacity to be role models." Monitor's Fifth Rep. at 131.

632.    In the Seventh Monitoring Period, DOC promoted a candidate to ADW that it had sought to terminate before OATH a year prior, a proceeding in which the candidate was adjudicated guilty of using excessive force and making false and misleading statements about the incident. Monitor's Seventh Rep. at 174.

633.    In the Eighth Monitoring Period, DOC promoted a candidate who had pled guilty to three cases in the preceding five years of use of force misconduct, had five formal disciplinary charges pending during the screening process (that were resolved with "relatively light penalties" or administratively filed on the eve of promotion), and at least one investigation pending for a use of force incident that could have resulted in discipline. Monitor's Eighth Rep. at 200. Of the 14 candidates for ADW, DW, Warden, and Chief in the Eighth Monitoring Period, two were not recommended for promotion by ID or Trials; DOC promoted them against that negative recommendation and provided no explanation in the screening documents. *Id.* at 202. DOC also promoted an individual to Deputy Warden despite pending disciplinary charges, in contravention of the prohibition against doing so set forth in Consent Judgment § XII, ¶ 3. *Id.* at 203.

634.    The Monitor audited 12 staff members who were promoted despite concerns in previous monitoring periods and found that of the 54 use of force incidents in which they were involved, 30% raised concerns about their supervision of the incident or the force they used themselves. *Id.* at 200-201.

635.    DOC reported in April 2019 that it revised the screening process to correct the failure in the Eighth Monitoring Period to identify a candidate with two or more use of force violations in the preceding five years as required by Consent Judgment § XII, ¶ 2. Monitor's Tenth Rep. at 208. In the Tenth Monitoring Period, DOC again promoted a candidate to ADW in contravention of this requirement. *Id.* After the Monitoring Team alerted DOC to the concerns about the promotion, Commissioner Brann provided an explanation of exceptional circumstances that the Monitor found "questionable." *Id*.

636.    Three of the ten staff promoted to ADW during the Tenth Monitoring Period had pending disciplinary cases at the time they were screened for promotion, two of which "had discipline imposed close in time to promotion…in which the identified misconduct raised concerns [from the Monitor] about the individual's fitness as a supervisor." *Id.* at 209.

637.    In the Eleventh Monitoring Period, the Monitor continued to assess 14 staff members who were promoted despite concerns raised in previous monitoring periods. One of those 14, an ADW, engaged in "serious misconduct." Monitor's Eleventh Rep. at 262. The Intake Investigation "outlined evidence that the ADW was hyper-confrontational, precipitated the need for force, and utilized head strikes where there was no evidence of imminent danger of death or serious bodily injury—in fact, the head strikes appeared to be punitive, retaliatory, or designed to inflict pain on an incarcerated individual, and constituted a needless risk of serious injury to the incarcerated individual." *Id*.

638.    In early 2023, DOC's internal screening process identified 12 of the 26 ADWs promoted in January 2023 as being unsuitable for promotion, but DOC advanced them anyway without a specific or individualized explanation as to the basis for that decision. July 10, 2023 Rep. at 75. One individual was promoted despite being previously demoted from ADW in 2021, and another was promoted with against negative recommendations from three divisions and a "concerning disciplinary history raised by a fourth division"—including being repeatedly disciplined for inefficient performance and being a named defendant in multiple lawsuits. Apr. 3, 2023 Rep. at 212, 215.

639.    At an April 27, 2023 status conference, DOC asserted that the Commissioner had appropriately exercised his discretion and judgment to promote these 12 ADWs notwithstanding the internal screening process identifying them as unsuitable for promotion. Tr. of Apr. 27, 2023 Status Conference at 58:23-61:4, Dkt. 530. DOC characterized these 12 ADWs as having "a good record of doing their job with integrity." *Id.* at 60:12.

640.    One of the 12 ADWS promoted in January 2023 despite being unsuitable for promotion was demoted in February 2023. She had been previously promoted to ADW in 2020, then demoted to captain in 2021, promoted again to ADW in December 2022, and again demoted to captain in February 2023. Monitor's Aug. 7, 2023 Rep. at 14.

641.    A second one of the 12 ADWs that were promoted in January 2023 despite being found unsuitable for promotion was suspended in relation to Curtis Davis's death on July 23, 2023. Monitor's Nov. 8, 2023 Rep. at 99; Monitor's Aug. 7, 2023 Rep. at 13, 39. The ADW was suspended for failing to conduct a proper tour. *Id*. at 39. That ADW is in the process of retiring from DOC. Monitor's Nov. 8, 2023 Rep. at 99.

642.    A third one of the 12 ADWs that were promoted in January 2023, despite four

different divisions declining to recommend promotion, organized a "hostage drill" on May 8,

2023 involving people in custody. The ADW directed incarcerated individuals to obstruct

cameras and barricade the unit's door. The ADW failed to communicate their plans to use real

people to execute an unsanctioned drill to others, resulting in an uninvolved officer deploying

her OC spray and subjecting multiple incarcerated individuals to its effects. Aug. 7, 2023 Report

at 14. The ADW appeared to "smile and laugh" in response to the OC spray deployment, and

"individual who had been sprayed directly did not receive prompt medical attention or

decontamination and alleges that staff told him not to provide a formal statement." *Id*. at 34. No

immediate corrective action was taken following this incident. *Id.* at 34. Formal charges were

served on three ADWs, along with a recommendation to demote two of them. Monitor's Nov. 8,

2023 Rep. at 98. This ADW is in the process of being demoted. *Id.*

643.    Subsequently, in 2023, DOC promoted 10 additional ADWs without following its

internal vetting policies. *See id.*

644.    Of the 36 ADWs promoted in 2023, four have since been demoted, and two

resigned their position within the first year. *Id*.

645.    DOC did not revise its screening practices to comport with recommendations

made by the Monitor in April 2023, despite "assurances from a senior Department executive that

it would do so." Monitor's July 10, 2023 Rep. at 75-76.

646.    Even after the Monitor raised concerns regarding its promotion process, DOC did

not follow its pre-promotional screening process for six ADW promotion candidates identified in

June 2023: DOC used a truncated screening process instead of the full assessment of the

individuals' background and qualifications required by policy. Monitor's July 10, 2023 Rep. at

75. One of the six ADW candidates identified for promotion had formal disciplinary charges pending with the Trials Division for two "violent incidents." *Id.* at 76.

647.     As of July 10, 2023, DOC does not follow its own pre-promotion screening process. DOC has also not addressed the deficiencies in the pre-promotional screening process identified by the Monitor. *Id.* Defendants have failed to comply with the court's August 10, 2023 order to revise pre-promotional procedures by October 30, 2023, as DOC has not yet even provided draft revisions to the Monitor. Monitor's Nov. 8, 2023 Rep. at 43.

VII.    **DOC Has Not Improved and Maximized the Deployment of Staff To Work with Incarcerated People**

648.    DOC has one of the richest staffing ratios in the country. Monitor's Oct. 5, 2023 Rep. at 9.

649.    Plaintiffs withdraw this proposed fact.

650.    DOC has historically employed more correction officers than the average daily jail population since 2016. In 2015, the ratio of uniformed staff to incarcerated individuals was .86; by 2019, the ratio was 1.25 officers to incarcerated people; and by 2021, the ratio was 1.68. *See* Ex. 84 at 4.

651.    **The violence and disorder in the jail creates poor working conditions for staff, which contributes to absenteeism, complacency, fatigue, and poor staff morale. Monitor's Oct. 5, 2023 Rep. at 9; Monitor's Nov. 8, 2023 Rep. at 3. **

> **Nature of Dispute**:        Legal Dispute-Monitor Opinion
> **Position of Defendants**:    Defendants object to the conclusion entering the record of this motion as an expert conclusion, and respectfully submit that the conclusion falls outside of the scope of the Monitor's realm of expertise. Defendants respectfully refer the court to the parties Joint Status Report dated July 3, 2024, ECF No. 742, for Defendants position on the scope of the Monitor's expertise. (ECF No. 742).
> **Position of Plaintiffs**:    Defendants concede that the Monitor is "appropriately qualified as an expert on corrections systems and best practices." July 3, 2024 Joint Report of the Parties, Dkt. 742 at 3, 5. The Monitor's opinion regarding how conditions within a correctional setting impact the correctional workforce is squarely within the scope of the expertise Defendants concede the Monitor possesses. Moreover, Defendants offer no evidence to rebut the Monitor's expert finding. The Court should credit the Monitor's opinion and adopt this proposed finding.

652.    A large number of DOC staff are absent on any given day, despite DOC's changes to sick leave and modified duty policies and practices and the Commissioner's claim that DOC "doesn't have a staffing crisis anymore." Monitor's Oct. 5, 2023 Rep. at 9; Monitor's Nov. 8, 2023 Rep. at 7 (DOC struggles to provide proper staff coverage given problems with absenteeism); Mayor's Management Report at 447 (Sept. 2023) (DOC has significantly higher

rate of paid absences compared to New York City Policy Department or the Fire Department of New York), *available at*

www.nyc.gov/assets/operations/downloads/pdf/mmr2023/2023_mmr.pdf.

653.    Those who report to work continue to work many hours of overtime. *Id.* Since the inception of the Consent Judgment, the Department has spent over $1.5 billion on uniform staff overtime. *Id* at 10. In 2022, the Department spent $255 million in overtime, the highest spent on overtime payments since the start of the Consent Judgment. *Id.* The Department is on track to exceed that amount in 2023, as $180 million has already been spent on overtime during just the first eight months of the year. *Id.*; *cf.* Ex. 84 at 5 (overtime costs per incarcerated individual rising from $19,166 in 2015 to $30,788 in 2021). See also Monitor's Nov. 8, 2023 Rep. at 3 ("Facilities attempt to work around endemic staff shortages by using overtime, but too often, sufficient staff resources are not available to deliver mandated services, leading to high levels of stress, frustration, and violence among people in custody").

654.    **DOC remains unwilling to engage in difficult decisions regarding personnel hiring, promotion, discipline, and assignment, largely due to perceived opposition by labor unions. *See infra* ¶¶ 696, 1135-1136, 1146-1156. **

> **Nature of Dispute**:         Legal Dispute-Monitor Opinion
> **Position of Defendants**:    Defendants object to the conclusion entering the record of this motion as an expert conclusion, and respectfully submit that the conclusion falls outside of the scope of the Monitor's realm of expertise. Defendants respectfully refer the court to the parties Joint Status Report dated July 3, 2024, ECF No. 742, for Defendants position on the scope of the Monitor's expertise. (ECF No. 742).
> **Position of Plaintiffs**:        This is a proposed finding the Court is entitled to make based on the paragraphs cited in this paragraph, which include Monitor findings about DOC's failure to engage the union on relevant issues, fact and lay witness testimony from former DOC Commissioner Michael Jacobson, and facts demonstrating union pressure to terminate former Deputy Commissioner Sarena Townsend due to union perception that DC Townsend disciplined DOC staff too severely and describing her as a "puppet of a remote fed monitor." Regarding the Monitor opinions cited herein: Defendants concede that the Monitor is "appropriately qualified as an expert on corrections systems and best

practices." July 3, 2024 Joint Report of the Parties, Dkt. 742 at 3, 5. The Monitor's conclusions regarding 1) best staffing assignment practices and assessing correctional leadership's reports about barriers to addressing poor staffing practices, and 2) the quality of DC Townsend's work in correctional investigations and discipline and relaying the City's vague reported justification for terminating her, are squarely within the scope of the expertise Defendants concede the Monitor possesses. In the alternative, the Monitor is a credible fact witness, and further his impressions of how DOC officials responded to reported labor agreements are admissible as lay opinions under Federal Rule of Evidence 701. The Court should credit the Monitor's opinion and adopt this proposed finding.

### A.    The Department's Staffing Framework is Dysfunctional and Institutionalizes its Poor Staffing Practices and is Directly Linked to Escalating Use of Force

655.    The sheer level of dysfunction within the DOC's staffing framework is "unmatched by any jurisdiction with which the Monitoring Team has had experience" making even a basic post analysis impossible to conduct. Monitor's Mar. 16, 2022 Rep. at 32.

656.    As of March 2022, the dysfunction included the inability to accurately identify staff assignments, tour assignments, and their leave status. *Id.* at 32-33. DOC lacked any roster management software to track assignments or assess staffing needs, and instead relied on inefficient, unreliable, and ad hoc manual practices. *Id.* at 33. Nor did DOC have a system for identifying critical assignments that must be filled before others; that resulted in non-essential assignments being filled before those required to fulfill DOC's responsibilities—a practice "unheard of in a correctional setting" because it creates a risk of imminent danger. *Id.* DOC used outdated sick leave, medically restricted, and unexcused absence policies, and did not enforce those policies consistently. *Id.* at 34.

657.    DOC's most critical resource—its staff—is so poorly administered that even the most basic aspects of workforce management have been neglected and/or circumvented for decades. This mismanagement directly caused a sea of inadequacies and impediments to reform. DOC cannot support its workforce with training and supervision, leaving staff stressed,

overworked, and despondent. It contributes to poor staff conduct including lack of adherence to

rules, going off post, and hyper confrontational behavior. Monitor's Mar. 16, 2022 Rep. at 38-39.

658.    DOC's mismanagement of staff is inextricably linked to high rates of force and

violence in the jails. Over deployment and under deployment create circumstances for

unnecessary and excessive force. In some cases, large numbers of staff respond to alarms,

needlessly escalating situations and in others, staffing shortages lead to overreliance on

confrontational emergency response teams. *Id.* at 39-41.

659.    The Action Plan contains various initiatives to address the Department's staffing

dysfunction. Specifically, the Action Plan § C, ¶ 3 required the Department to maximize the

deployment of uniform staff within the facilities by implementing modified staffing practices,

including, but not limited to: (iv) create and implement an assignment process in which

sufficiently experienced uniform staff are deployed to housing units; (v) reduce the use of

awarded posts so they are primarily utilized for those positions in which a particular skill set is

required; (vi) maximize work schedules by creating and implementing alternatives to the work

schedule for uniform staff assigned to work in the facilities in order to minimize the use of a 4 by

2 schedule and optimize staff scheduling; (vii) reduce the assignment of uniform staff to civilian

posts, including Temporary Duty Assignment, in order to minimize the reliance on uniform staff

for tasks that can and should be reasonably completed by civilians; and (viii) conduct a post

analysis, in consultation with the Monitor, that is rooted in correctional best practices and

addresses the lapses in DOC's current staffing practices. The analysis should consider and

coordinate staffing determinations DOC has made to revise and improve security practices, in

order to staff posts based on reasonable operational need and avoid inefficient staffing practices

currently in place (*e.g.*, the "all available" response to all alarms). DOC's post assignments must be revised based on the results of the post analysis.

### B. DOC Has Not Deployed Sufficiently Experienced Uniform Staff to Housing Units and Has Not Sufficiently Addressed Absence Policies

660.    \*\*DOC has not implemented an assignment process in which sufficiently experienced uniform staff are deployed to housing units, as required by Action Plan, § C, ¶ 3(iv). \*\*

> **Nature of Dispute**:        Legal Dispute-Other
> **Position of Defendants**:    Defendants do not object to the fact that this statement was made by the Monitor and is therefore admissible for the purpose of the motion. Defendants object to the conclusion entering the record of this motion as fact, and respectfully submit that the conclusion at issue is part of the subject matter to be resolved by the Court.
> **Position of Plaintiffs**: This is a factual finding the Court is entitled to make based on the Monitor's findings described in paragraphs 661-662.

661.    The Monitoring Team does not have any evidence that this requirement has been implemented. Monitor's Nov. 8, 2023 Rep. at 83.

662.    As of October 2023, DOC continued to have instances where housing unit posts were unstaffed, even though large numbers of staff respond when an incident occurs. Monitor's Oct. 5, 2023 Rep. at 10. In November 2023, DOC continued to have insufficient staffing to deliver mandated services, leading to high levels of stress, frustration, and violence among people in custody. Monitor's Nov. 8, 2023 Rep. at 3.

663.    The most recent data shows that an even greater proportion of staff are currently on sick leave and MMR compared to pre-pandemic levels.

664.    The tables below provide the monthly average from January 1, 2023 to September 30, 2023 of the total staff headcount, the average number of staff out sick, the average number of staff on medically monitored/restricted duty, and the average number of staff who were AWOL.

| 2023 | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Month** | **Headcount** | **Average Daily Sick** | **Average Daily % Sick** | **Average Daily MMR3** | **Average Daily % MMR3** | **Average Daily AWOL** | **Average Daily % AWOL** |
| **January 2023** | 6700 | 692 | 10.33% | 443 | 6.61% | 9 | 0.13% |
| **February 2023** | 6632 | 680 | 10.25% | 421 | 6.35% | 9 | 0.14% |
| **March 2023** | 6661 | 639 | 9.59% | 401 | 6.02% | 11 | 0.17% |
| **April 2023** | 6590 | 595 | 9.03% | 393 | 5.96% | 10 | 0.15% |
| **May 2023** | 6516 | 514 | 7.89% | 403 | 6.18% | 10 | 0.15% |
| **June 2023** | 6449 | 466 | 7.23% | 399 | 6.19% | 10 | 0.16% |
| **July 2023** | 6406 | 443 | 6.92% | 394 | 6.15% | 9 | 0.14% |
| **August 2023** | 6427 | 437 | 6.80% | 386 | 6.01% | 17 | 0.26% |
| **September 2023** | 6418 | 424 | 6.61% | 378 | 5.89% | 20 | 0.31% |
| **2023 Average** | 6533 | 543 | 8.29% | 402 | 6.15% | 12 | 0.18% |

Monitor's Nov. 8, 2023 Rep. at 103.

665.    In January 2019, only 6% of staff were out sick and 4% of staff were designated MMR on any given day. Monitor's Apr. 3, 2023 Rep. at 16.

| Sick Leave, Medically Modified Duty and AWOL, January 2019 to February 2023 | | | | |
|---|---|---|---|---|
| Month | Total Headcount | Avg. # Sick (%) | Avg. # MMR (%) | Avg. # AWOL (%) |
| January 2019 <br> *Pre-COVID-19* | 10,577 | 621 (6%) | 459 (4%) | Not Available |
| April 2020 <br> *Apex of COVID-19* | 9,481 | 3,059 (32%) | 278 (3%) | Not Available |
| September 2021 <br> *Apex of Staffing Crisis* | 8,081 | 1,703 (21%) | 744 (9%) | 77 (1%) |
| January 2022 <br> *New Commissioner* | 7,668 | 2,005 (26%) | 685 (9%) | 42 (1%) |
| June 2022 <br> *Action Plan Effective Date* | 7,150 | 951 (13%) | 624 (9%) | 16 (<1%) |
| December 2022 <br> *End of 15th Monitoring Period* | 6,777 | 754 (11%) | 452 (7%) | 7 (<1%) |
| February 2023 <br> *Most Recent Data* | 6,632 | 680 (10%) | 421 (6%) | 9 (<1%) |

666.    This results in inefficient deployments of scarce resources, such as the assignment of seven captains on MMR status to a then-closed facility, OBCC, which, as the City explained, at that time operated as an overflow staff locker room. *Id*. at 135.

667.    In order to discourage staff from utilizing an unreasonable number of sick days, staff may be designated "chronic absent" (i.e., those out sick for 12 days or more in a rolling 12-month period). This designation triggers limits on various discretionary benefits and privileges and impacts the staff's ability to be promoted, thus serving as a deterrent to excessive sick leave. *Id*. at 28.

668.    As of April 3, 2023, DOC has identified 1,029 staff as "chronic absentee[s]." That number appears unchanged from October 2022. *Compare* Monitor's Apr. 3, 2023 Rep. at 33 *with* Monitor's Oct. 28, 2022 Rep. at 53.

669.    Facilities must process staff with this designation so that they are actually designated as chronic absent in their personnel file. Monitor's Nov. 8, 2023 Rep. at 99.

670.    Facilities cannot appropriately administer and track the chronic absent designation. Only 70% of the staff identified as chronic absent in 2023 have been processed as such. *Id*. at 100. For the staff designated as chronic absent in 2022, only 79% have been processed as such by the end of June 2023. *Id.* This means that many staff will never suffer any consequences for the chronic absent designation because the 6-month applicability of the designation expires before the processing occurs. *Id.*

671.    DOC has not said whether any of these individuals who should have the designation "chronic absent" have, in fact, suffered limitations on "various discretionary benefits and privileges" that would serve "as a deterrent to excessive sick leave." Apr. 3, 2023 Rep. at 28-29; Monitor's Nov. 8, 2023 Rep. at 100.

179

672.    Further, DOC's recent changes to the sick leave and MMR policy have resulted in staff beginning to misuse other mechanisms, including Personal Emergency Days and FMLA, in order to avoid coming to work as scheduled. *See* Monitor's Nov. 8, 2023 Rep. at 3 (these mechanisms are "equally disruptive" to proper staffing); Monitor's Oct. 5, 2023 Rep. at 9. Defendants still "struggle to ensure that staff report to work as expected and are deployed as they should be" and have failed to correct the loopholes in the "weak administration" of the various absence mechanisms. *Id.* at 9-10. DOC does not have data available to quantify exactly how many staff do not come to work because of these statuses (e.g., Personal Emergency Data), so does not know how widespread this problem is. Monitor's Nov. 8, 2023 Rep. at 3.

### C.    DOC Has Not Reduced Awarded Posts

673.    **DOC has not reduced awarded posts, in which staff may bid for an exclusive assignment within a facility, so they are primarily utilized for those positions in which a particular skill set is required, as required by Action Plan ¶ C(3)(v). **

**Nature of Dispute**:        Legal Dispute-Other
**Position of Defendants**:    Defendants do not object to the fact that this statement was made by the Monitor and is therefore admissible for the purpose of the motion. Defendants object to the conclusion entering the record of this motion as fact, and respectfully submit that the conclusion at issue is part of the subject matter to be resolved by the Court.
**Position of Plaintiffs**: This is a factual finding the Court is entitled to make based on the information in paragraphs 674-683.

674.    In most correctional systems, staff can bid for a particular tour/shift, but not for a specific post within a facility. However, in the Department, staff may bid for a specific post assignment which means that they cannot be assigned to work in other locations. This practice inhibits the flexibility to assign staff where they are needed. Monitor's Mar. 16, 2022 Rep. at 36.

180

675.     Because posts are awarded based on seniority, the high number of awarded posts

within DOC means that "the most experienced staff [are awarded] posts where they do not

supervise housing units." *Id.*

676.     To ensure consistent and steady staffing, the Monitor has recommended the

reduction in awarded posts to ensure that adequate and experienced staff are available to

supervise the housing units. *See* Dkt. 454 at 9.

677.     Between the Action Plan and the Monitor's July 10, 2023 Rep., DOC submitted

multiple plans to reduce awarded posts, but these plans have not been implemented. *See*

Monitor's July 10, 2023 Rep. at 103; Monitor's Nov. 8, 2023 Rep. at 82 (noting that DOC claims

that it intends to develop and implement a plan for reducing the use of awarded posts, but no

substantive plans had been produced as of November 2, 2023).

678.     DOC reported that as of March 2023, the number of staff on awarded posts was

essentially the same as September 2022, and even higher than in August 2021: 1,663 staff versus

1,661 staff versus 1,650 staff respectively. Monitor's Apr. 3, 2023 Rep. at 21; Monitor's Mar.

16, 2022 Rep. at 36; Monitor's Nov. 8, 2023 Rep. at 82.

679.     DOC then claimed in mid-2023 that its data regarding awarded posts is inaccurate

and that individuals who were not officially designated with an awarded post were nonetheless

treated as such. Monitor's July 10, 2023 Rep. at 103.

680.     DOC has not provided any data since May 2022 regarding the current number of

staff with awarded posts nor the number of awarded posts that have been eliminated since June

14, 2022. Monitor's Nov. 8, 2023 Rep. at 82.

681.    DOC claims to have new data but the Monitor cannot assess the veracity of the data; nor can the Monitor assess the veracity of DOC's claim that staff with "unofficial" assignments to awarded posts have been removed from those assignments. *Id.*

682.    Although DOC has repeatedly claimed they have the power to reduce awarded posts, on at least four occasions, the staff tasked with doing this work have stated that they cannot do so because of collective bargaining agreements. Monitor's July 10, 2023 Rep. at 103; Monitor's Apr. 24, 2023 Rep. at 19-20.

683.    The collective bargaining agreements do not prevent DOC from reducing awarded posts. Monitor's Apr. 24, 2023 Rep. at 19-20.

**D.    DOC Has Not Maximized Work Schedules for Optimal Staffing**

684.    DOC has not optimized staff scheduling by creating and implementing alternative work schedules, as required by Action Plan § C, ¶ 3(vi). Monitor's Jul. 10, 2023 Rep. at 104-105.

685.    **DOC has failed to modify work schedules to optimize staff scheduling since the Action Plan went into effect. *See infra* ¶¶ 686-696. **

> **Nature of Dispute**:        Legal Dispute-Other
> **Position of Defendants**:   Disputed insofar as the proposed finding is the Plaintiff's own opinion rather than a factual statement requiring a response.
> **Position of Plaintiffs**:        This is a factual finding the Court is entitled to make based on the information in paragraphs 686-696, the deleterious effects of which are demonstrated by ongoing failures to ensure staffing levels to adequately staff units and deliver mandated services, *see supra* ¶ 662.

686.    On any given day in May 2023, 22 posts were unstaffed. Monitor's July 10, 2023 Rep. at 91, 205 ("the number of unstaffed posts per day has been steadily rising in 2023"). On any given day in June 2023, 15 posts were unstaffed. Monitor's Aug. 7, 2023 Rep. at 18; Monitor's Nov. 8, 2023 Rep. at 82. DOC staff are required to work fewer days per year than the

industry standard, resulting in pervasive, insufficient coverage particularly on weekends."
Monitor's Aug. 7, 2023 Rep. at 18.

687.    The majority of DOC staff are assigned 4x2 schedules, where they work four
consecutive 8.5 hour workdays, followed by two days off, resulting in 243 workdays per year.
Monitor's Aug. 7, 2023 Rep. at 16; Monitor's Nov. 8, 2023 Rep. at 82.

688.    Most correctional systems utilize a 5x2 schedule where staff work five 8.5-hour
workdays, followed by two days off, which results in 261 workdays per year. Monitor's Aug. 7,
2023 Rep, at 16.

689.    In order to illustrate the practical impact of these two different schedules, 300
staff working 4x2 schedules are able to fill 2,800 posts over the course of two weeks, but 300
staff working 5x2 schedules are able to fill 3,000 posts over two weeks. *Id*. This difference is due
solely to the varying work schedules and assigned days off. *Id.* If DOC assigned the majority of
its staff to a traditional 5x2 schedule instead of a 4x2 schedule, it would automatically increase
the number of staff available to cover facility posts on any given day. *Id.*

690.    In April 2023, the Monitor requested updated data regarding the number of staff
on 4x2 schedules. DOC produced this data three months later but did not provide additional
context necessary for the Monitor to verify its results. Monitor's July 10, 2023 Rep. at 105.

691.    DOC has assigned a number of its staff to a 5x2 schedule. Monitor's Aug. 7, 2023
Rep. at 16.

692.    However, the shift of some DOC staff from a 4x2 to a 5x2 schedule has not
resulted in additional posts being filled by the same number of staff. That is because staff
assigned to a 5x2 schedule receive 16 additional compensatory days each year and two additional
vacation days, for a total of 18 days off. Monitor's Aug. 7, 2023 Rep. at 17. This means that staff

183

on a 5x2 schedule end up working the same number of days per year as staff on a 4x2 schedule,
negating the advantage of a 5x2 schedule. *Id.*

693.    DOC staff on a 5x2 schedule receive at least one weekend day/two consecutive
days off (i.e., Friday/Saturday, Saturday/Sunday, or Sunday/Monday). *Id.* at 17. As a result, the
Department's version of the 5x2 schedule negatively impacts the Department's ability to have
adequate staffing on the weekends. *Id.* For example, out of 99 employees on a 4x2 schedule, 66
would be working on a Saturday and a Sunday, and 33 would be off. *Id.* However, those 99
people on the Department's 5x2 schedule would result in only 50% of staff working on the
weekends which, given current trends in leave/modified duty, limits both flexibility and the
ability to ensure all posts are properly manned. *Id.*

694.    Thus, the Department's scheduling structure limits the availability of staff
compared to scheduling structures across the country under the 5x2 structure. *Id*.

695.    DOC asserts that the additional vacation days and the weekend day off given to
staff assigned to a 5x2 schedule is required by collective bargaining agreements and Operations
Orders. *Id.*

696.    **The collective bargaining agreements obstruct DOC's ability to maximize staff
scheduling despite the City's assertion that the requirements of the "Action Plan [are] entirely
within the power of the Commissioner and more broadly the Mayor, to execute." *Id.* at 17-18.
The "current union contracts impede the ability to maximize the scheduling of staff as required
by the Action Plan" and "the agreements the City and Department have entered contribute to its
continued inability to properly staff its facilities." *Id*. at 18. Defendants had yet to even begin
sessions with the labor unions to attempt to address this issue, nor sought from the Court a
waiver of applicable laws. Monitor's Aug. 7, 2023 Rep. at 18. **

**Nature of Dispute**:        Legal Dispute-Monitor Opinion

**Position of Defendants**:    Defendants object to the conclusion entering the record of this motion as an expert conclusion, and respectfully submit that the conclusion falls outside of the scope of the Monitor's realm of expertise. Defendants respectfully refer the court to the parties Joint Status Report dated July 3, 2024, ECF No. 742, for Defendants position on the scope of the Monitor's expertise. (ECF No. 742).

**Position of Plaintiffs**: Defendants concede that the Monitor is "appropriately qualified as an expert on corrections systems and best practices." July 3, 2024 Joint Report of the Parties, Dkt. 742 at 3, 5. The Monitor's findings regarding best staffing assignment practices and assessing and conveying correctional leadership's reports about barriers to addressing poor staffing practices are squarely within the scope of the expertise Defendants concede the Monitor possesses. In the alternative, the Monitor is a credible fact witness, relaying reports from Defendants regarding the effect of labor agreements on their ability to implement court-ordered reforms and best staffing practices, and conveying that Defendants had not begun sessions with the unions to address the labor agreements Defendants identified. Further, those impressions are also admissible as lay opinions under Federal Rule of Evidence 701. Moreover, Defendants have offered no evidence to rebut these Monitor findings. The Court should credit the Monitor's assertions and adopt this proposed finding.

### E.    DOC Has Not Reduced Uniform Staff in Civilian Posts

697.    DOC has not reduced the assignment of uniform staff to civilian posts, as required by Action Plan ¶ C(3)(vii). This provision is important because: "[DOC] assigns uniform staff to positions that can reasonably be undertaken by civilians . . . This is true for both positions within facilities (e.g., administrative and clerical positions in the jails) and those outside the facilities (e.g., Data input operators, data analytics, receptionists, administrative support, timekeeping, public information). While it is reasonable that some uniformed staff may be required to hold certain roles typically held by civilians, the number of staff that hold such roles (over 700) is significant and higher than is typically seen in other systems. This is because these are positions that do not typically require the special training or match the specialized duties of a correctional officer, which is to maintain security within correctional facilities and is responsible for the custody, control, care, job training and work performance of inmates in detention and sentenced correctional facilities." Monitor's Mar. 16, 2022 Rep. at 36-37.

698.    Over 700 uniform staff hold "civilian" posts, which are positions that do not require special training or match specialized correctional officer duties. Monitor's Mar. 16, 2022 Rep. at 37. Because uniformed staff are frequently assigned to such posts, fewer uniformed staff are available to be assigned to posts that require trained staff, such as housing areas, compounding staffing difficulties and "squandering an essential resource." Monitor's Mar. 16, 2022 Rep. at 36.

699.    The number of uniform staff in DOC that hold civilian posts is significantly higher than what is typically seen in other correctional systems. *Id*.

700.    Although DOC has claimed that it has identified certain administrative posts in the facilities that have historically been filled by uniform staff to be superfluous, DOC has not "reduced" or eliminated these unnecessary posts, and thus they remain filled by uniform staff. Monitor's July 10, 2023 Rep. at 105-106.

701.    Although DOC has claimed that its leadership is meeting bi-weekly with facilities to identify posts that are currently filled with uniformed staff that could be filled with civilians instead, DOC has not identified any such posts in either the facilities or in the many other divisions of DOC. *Id.*

702.    Either DOC's reported biweekly meetings are not occurring or the process has been ineffective given the lack of results. *Id.*

703.    DOC asserts that it has transferred 7 uniform positions at HMD to civilian posts and that it intends to transfer 16 uniform staff engaged in timekeeping to civilian posts, this has not yet occurred. *Id.* at 105.

704.    A shift of only 23 positions to be filled by civilians is insufficient to meet the requirements of the Action Plan ¶ C(3)(vii). *Id.* at 105.

## F.    DOC Has Not Conducted a Post Analysis

705.    DOC has not conducted the post analysis required by Action Plan § C, ¶ 3(viii).

Monitor's July 10, 2023 Rep. at 106.

## VIII.   Failure to Conduct Thorough, Timely, and Objective Investigations and to Hold Staff Accountable for Misconduct

706.    The Monitor describes accountability for staff misconduct as "a critical tool to address the patterns and practices of excessive, unnecessary, and avoidable uses of force that continue unabated in this system." Monitor's Apr. 3, 2023 Rep. at 100. This is because "timely detection of misconduct and adequate and timely responses to those identified issues are essential for the Department to successfully reduce its use of unnecessary and excessive force and to encourage the safe and proportional use of force. *Id.*

707.    In order to achieve accountability, DOC must both identify misconduct, and appropriately address it or respond to it. *Id*.

708.    The function of detecting or identifying use of force misconduct is largely performed by the Investigation Division ("ID"), a component of DOC that specializes in investigating all actual and alleged uses of force and use of force related misconduct.

709.    ID conducts two main types of investigations for use of force incidents. The first type—currently called an "Intake Investigation" and previously a "Preliminary Review"—is a relatively brief investigation that ID conducts with regard to every use of force incident. *Id.* at 160.

710.    The Intake Investigation includes a review of all staff and witness reports, an Injury to Inmate Report, and any available video. It does not include interviews of staff members. It rarely includes an interview with the incarcerated individual or incarcerated witnesses. Monitor's Ninth Rep. at 44.

711.    The second type of investigation that ID conducts, called a "Full ID Investigation," is a more detailed and thorough investigation that is conducted only for a subset of particularly concerning use of force incidents, after the Intake Investigation (previously

known as a Preliminary Review) is complete. *Id.* at 45-46. Full ID Investigations are generally required to include additional investigatory steps such as interviews with the impacted incarcerated person, the staff accused of misconduct, and any other relevant witnesses. Consent Judgment, Dkt. 249, § VII(9)(c).

712.    Originally, cases were referred for a Full ID Investigation if they fell into certain categories outlined by the Consent Judgment § VII, ¶ 8, including: (1) conduct that is classified as a Class A use of force; (2) a strike or blow to the head of an incarcerated person; (3) kicking an incarcerated person; (4) the use of instruments of force other than OC spray; (5) a Staff Member who has entered into a negotiated plea agreement or been found guilty before OATH for a violation of the Use of Force Policy within 18 months of the date of the incident where the incident involves a Class A or Class B Use of Force or otherwise warrants a Full ID Investigation; (6) the Use of Force against an incarcerated person in restraints; (7) the use of a prohibited restraint hold; (8) an instance where the incident occurred in an area subject to video surveillance but the video camera allegedly malfunctioned; (9) any unexplained facts that are not consistent with the materials available to the Preliminary Reviewer; or (10) a referral to ID by a Facility for another reason that similarly warrants a Full ID Investigation. Consent Judgment § VII, ¶ 8.

713.    Later, under a new plan supported by the Monitor, the following cases were referred for Full ID: (1) cases with Class A injuries, (2) cases involving head strikes, (3) when it is necessary to conduct interviews of staff members to complete a thorough investigation and determine whether staff used excessive or unnecessary force or otherwise failed to comply with the New Use of Force Directive; and (4) when, due to the complexity of the incident or investigation, the nature of the conduct, or the evidence collected, it is necessary to conduct

further investigative steps to determine whether staff engaged in excessive or unnecessary force. Monitor's Ninth Rep. at 46.

714.    The Trials Division is responsible for the discipline of uniformed members of service who violate any of DOC's Rules and Regulations or New York State and City laws, whether on or off duty. Monitor's Ninth Rep. at 65.

715.    Facility leaders are also responsible for both identifying and responding to misconduct through various means. *See supra* ¶¶ 222-224.

716.    The Consent Judgment § VII, ¶ 1 requires DOC to conduct thorough, timely, and objective investigations of all Use of Force Incidents to determine whether staff engaged in the excessive or unnecessary Use of Force or otherwise failed to comply with the Use of Force Directive. Dkt. 249.

717.    The Consent Judgment § VII, ¶ 9(a) requires all Full ID Investigations after October 1, 2018 to be completed within 120 days. Dkt. 249.

718.    The Consent Judgment, § VII, ¶ 11 requires DOC to hire a sufficient number of additional qualified ID Investigators to maintain ID Investigator caseloads at reasonable levels so that they can complete Full ID Investigations in a manner that is consistent with the Consent Judgment, including by seeking funding to hire additional staff as necessary.

719.    Consent Judgment § VIII, ¶ 1 requires DOC to "take all appropriate steps to impose appropriate and meaningful discipline, up to and including termination, for any Staff Member who violates Department policies, procedures, rules and directives relating to the Use of Force." Dkt. 249.

### A.    DOC Has Failed to Conduct Objective, Thorough Investigations

720.    Defendants have never achieved substantial compliance with the Consent Judgment requirement to conduct "thorough, timely, and objective investigations of all use of force incidents." Consent Judgment, § VII, ¶ 1.

721.    The Monitor has identified problems with regard to the quality of ID's investigations since the early days of the Consent Judgment. *See infra* ¶¶ 722-730.

722.    Although the Monitor did not assess compliance with Consent Judgment § VII, ¶ 1 during the Second Monitoring Period, the Monitor noted that during that timeframe, "some Investigators failed to address all outstanding questions, particularly in relation to Inmate allegations, or failed to interview relevant Inmate witnesses;" and also "did not consider remedial measures for all individuals involved in problematic uses of force." Monitor's Second Rep. at 98.

723.    During the Third Monitoring Period, the Monitor stated that its "review of Full ID investigations revealed that Inmate statements were too often discredited without adequate explanation," while simultaneously "inaccurate or underreporting by Staff was often ignored." Monitor's Third Rep. at 131.

724.    Full ID Investigations "often lacked a critical analysis of the evidence, including failures to identify and address gaps in Staff or witness interviews," and weighing Staff Reports more heavily than other available evidence. Monitor's Third Rep. at 126-127.

725.    Due to such deficiencies, investigators "unreasonably failed to pursue disciplinary action" even where there was objective evidence of wrongdoing, such as video footage. Monitor's Third Rep. at 127.

726.    The Monitor rated compliance with Consent Judgment, § VII, ¶ 1 for the first time during the Fifth Monitoring Period (January-December 2017), and found DOC non-compliant. Monitor's Fifth Rep. at 92-93.

727.    More specifically, the Monitor found that "ID investigations still suffer from serious deficiencies including: (1) failure to address all evidence; (2) failure to reconcile conflicting evidence; (3) failure to neutrally assess evidence and therefore close calls in the assessment of evidence are decided in favor of Staff; (4) failure to consistently use inmate witness statements as evidence; (5) inconsistent supervisory reviews that sometimes ignore the presence of evidence contrary to investigative findings that the investigator failed to address." Monitor's Fifth Rep. at 93.

728.    During the Sixth Monitoring Period, DOC was found non-compliant with Consent Judgment § VII, ¶ 1. Monitor's Sixth Rep. at 94.

729.    The Monitor identified additional issues with ID investigations, including: "(1) investigators failed to properly evaluate evidence and disregarded evidence that appeared to contradict their findings and conclusions; (2) investigators did not identify or address that Staff Reports lacked the necessary detail as to what occurred in [use of force] incidents; and (3) on multiple occasions, video evidence contradicted the investigators' conclusions, or video evidence depicted issues simply not addressed by the investigation." Monitor's Sixth Rep. at 94.

730.    DOC was found non-compliant with Consent Judgment § VII, ¶ 1 in the Seventh, Eighth, and Ninth Monitoring periods. Monitor's Seventh Rep. at 106-107; Monitor's Eighth Rep. at 136-137; Monitor's Ninth Rep. at 156-157.

731.    During the Tenth Monitoring Period, DOC transitioned from conducting Preliminary Reviews of every incident to having ID conduct Intake Investigations using the "Intake Squad" to investigate all use of force incidents that occurred beginning February 3, 2020. Monitor's Tenth Rep. at 40, 140-141. This transition coincided with the elimination of Facility Investigations, so ID became solely responsible for conducting investigations of use of force

incidents, and Intake Investigations are a more streamlined and efficient investigation than

Preliminary Reviews. *Id.* at 40. ID referred only the most serious or complex incidents for more

thorough Full ID Investigations.

732.    The Monitor found that these Intake Investigations were mostly reliable and near-

timely, and largely for that reason found Defendants to be in partial compliance with Consent

Judgment § VII, ¶ 1. Monitor's Tenth Rep. at 140-141; Monitor's Eleventh Rep. at 181-182;

Monitor's Twelfth Rep. at 80-81; Monitor's Oct. 28, 2022 Rep. at 140.

733.    Although the Monitor found that "ID has improved in conducting thorough,

timely, and objective investigations" in the Twelfth Monitoring Period, he also recognized that

"more work is needed" before substantial compliance would be achieved." Monitor's Twelfth

Rep. at 81.

734.    In particular, the Monitor noted that there were still significant issues with the

more thorough Full ID Investigations that were conducted for particularly complex and/or severe

incidents, describing the quality of Full ID Investigations as "mixed," explaining that some Full

ID investigations "fail to properly analyze the available evidence, or take necessary investigative

steps," and also stated the "quality of Full ID Investigations must be improved." Monitor's Oct.

28, 2022 Rep. at 131, 136-37.

735.    During the Fourteenth Monitoring Period, the Monitor recommended that five

Full ID Investigations be re-opened because they were inadequate or incomplete. Monitor's Oct.

28, 2022 Rep. at 136.

736.    The Monitor explained that these five cases were "egregious instances of

inadequate investigations," but that "many other investigations . . . do not represent best

practice." Monitor's Oct. 18, 2022 Rep. at 136.

737.    During the Fifteenth Monitoring Period (July-December 2022), there was a "discernible deterioration in the quality of investigations conducted by ID," including both Intake and Full ID Investigations. Apr. 3, 2023 Rep. at 101.

738.    As a result of this significant regression in the quality of investigations, the Monitor found DOC again non-compliant with Consent Judgment § VII, ¶ 1 during the Fifteenth Monitoring Period, "erasing its prior progress." July 10, 2023 Rep. at 130; Monitor's Nov. 8, 2023 Rep. at 4 (gains achieved in 2020 and 2021 were erased in 2022).

739.    More specifically, the Monitor found that during the Fifteenth Monitoring Period, "there was evidence that ID was not consistently addressing or analyzing available evidence and their conclusions did not appear to be objective." Apr. 3, 2023 Rep. at 101.

740.    With regard to Intake Investigations, the Monitor found that their quality "dramatically declined" during the Fifteenth Monitoring Period, and that Intake Investigations "generally failed to identify operational and security failures that led to an unnecessary use of force." *Id.* at 164.

741.    A greater number of Intake Investigations were closed with no action and a significantly smaller number of cases were referred to Full ID during the Fifteenth Monitoring Period than in prior periods. Specifically, 56% of Intake Investigations were closed with no action, while only 2% were referred for a Full ID Investigation. During prior monitoring periods, an average of only 42% of Intake Investigations were closed with no action, and an average of 15% of Intake Investigations were referred for a Full ID Investigation. *Id.* at 162.

742.    In absolute numbers, this meant that hundreds more use of force cases were closed with no action, and hundreds fewer received thorough Full ID Investigations during the Fifteenth Monitoring Period. Monitor's July 10, 2023 Rep. at 199.

743. "The Monitoring Team did not identify a corresponding change in staff practices that would warrant or explain the decrease in the volume of use of force related misconduct identified by ID." Apr. 3, 2023 Rep. at 157.

744. Too many Intake Investigations that ignored objective evidence of misconduct were closed and failed to refer cases for Full ID Investigations when required. *Id.* at 164.

745. The chart below describes the outcomes of Intake Investigations from February 3, 2020 through April 2023. Monitor's July 10, 2023 Rep. at 199.

| | Outcome of Intake Investigations[251] as of May 31, 2023[252] | | | | | | |
|---|---|---|---|---|---|---|---|
| **Incident Date** | Feb. 3[253] to June 2020 (10th MP) | July to Dec. 2020 (11th MP) | Jan. to June 2021 (12th MP) | July to Dec. 2021 (13th MP) | Jan. to June 2022 (14th MP) | July to Dec. 2022 (15th MP) | Jan. to Apr. 2023 (Partial 16th MP) |
| Pending Intake Investigation | 0 | 0 | 0 | 0 | 0 | 0 | 90 |
| **Closed Intake Investigation** | **2,492** | **3,272** | **4,468** | **3,916** | **3,349** | **3,883** | **2,098** |
| *No Action* | 1,060 43% | 1,279 39% | 1,386 31% | 947 24% | 1,249 37% | 2,183 56% | 1,018 49% |
| *MOC* | 47 2% | 28 1% | 48 1% | 36 1% | 22 1% | 60 2% | 44 2% |
| *PDR* | 6 <1% | 2 <1% | 0 0% | 0 0% | 1 <1% | 3 <1% | 1 <1% |
| *Re-Training* | 148 6% | 226 7% | 342 8% | 91 2% | 35 1% | 38 1% | 40 2% |
| *Facility Referrals* | 820 33% | 1,159 35% | 1,903 43% | 2,208 56% | 1,641 49% | 1,464 38% | 602 29% |
| *Command Discipline*[254] | | | | | 5 <1% | 2 <1% | 64 3% |
| *Referred for Full ID* | 411 12% | 567 17% | 781 17% | 634 16% | 360 11% | 110 3% | 149 7% |
| *Data Entry Errors*[255] | | | | | 36 | 22 | 180 |
| **Total Intake Investigations** | **2,492** | **3,272** | **4,468** | **3,916** | **3,349** | **3,883** | **2,188** |

746. The Monitor found similar quality concerns with regard to Full ID Investigations during the Fifteenth Monitoring Period. *See infra* ¶¶ 747-750.

747. **The progress ID investigators made during previous Monitoring Periods in conducting quality investigations ceased. The Monitor found the decline in the quality of Use of

Force investigations "alarming," and based on his review of hundreds of investigation files

reported that "a substandard approach was often taken in assessing evidence such that the

ultimate quality of the investigations was compromised." Monitor's Apr. 3, 2023 Rep. at 157,

159, 165. **

> **Nature of Dispute**:      Legal Dispute-Other
> **Position of Defendants**:    Not Disputed, insofar as the proposed finding reflects what is
> stated on the cited pages of the Monitor's report. Disputed, insofar as this provision does
> not completely or accurately capture what the Monitor stated on the cited page.
> Specifically, the PFOF leaves out that in response to the Monitor's concerns, the
> Department took several "steps to mitigate any further decline in the quality of
> investigations and to restore the Division's previous progress towards achieving
> compliance." Monitor's April 3, 2023 Report at 159. As discussed by the Monitor, these
> steps included first, the appointing a new interim Deputy Commissioner of ID; second,
> having a "group of well-qualified ID supervisors conduct[] a re-assessment of certain
> cases to identify any that may merit additional scrutiny," and having those cases re-
> opened for investigations; third, having the Associate Commissioner of ID, "a well-
> respected and seasoned investigator and supervisor," to directly oversee use of force
> investigations going forward;" finally, revising training and creating a quality assurance
> division to asses UOF investigations that are closed with no action. *See Id.* at 158-59. The
> Monitor concluded in the report that "the Monitoring Team is encouraged that the
> Department has taken steps to mitigate any further decline in the quality of investigations
> and to restore the Division's previous progress towards achieving compliance… The
> steps being taken are concrete and appropriate." *Id.* at 159. Defendants respectfully refer
> the court to the Monitor's April 3, 2023 Report at 159, 165, for the Monitor's complete
> assessment.
> **Position of Plaintiffs**:     None of the information Defendants cite above contradicts the
> proposed finding or renders it inaccurate: the fact that Defendants eventually took some
> steps intended to mitigate the alarming decline in the quality of the Investigation
> Division's work does not change the fact that the alarming decline took place. Moreover,
> Defendants fail to note, as Plaintiffs explain in detail in their reply brief, that the steps
> they took have failed, in that the quality of investigations remains substandard and
> Defendants remain in non-compliance with the Consent Judgment requirement to conduct
> thorough, timely, objective investigations. *See* Dkt. 716 at 20-23. The Court should adopt
> this proposed finding.

748.    Intake Investigations regularly "ignored objective evidence of misconduct" and

improperly closed cases. *Id.* at 164.

749.    In the rare instances where cases were referred for Full ID Investigation, those

investigations were "often incomplete, inadequate, and unreasonable." *Id.*

750.     The Monitor found Full ID Investigations closed during the Fifteenth Monitoring Period to be "often incomplete, inadequate, and unreasonable." *Id*. (emphasis in original). Investigators failed to complete necessary interviews with staff or persons in custody, failed to identify salient issues, disregarded objective evidence of misconduct, discredited allegations from people in custody without evidence, and recommended insufficient employee corrective action. *Id.*

751.     ID's Quality Assurance team held a town hall in October 2023 to address many of the common investigative issues identified during an audit of Intake and Full ID Investigations, including failing to mention all injuries and identify the source of injuries, failing to preserve video footage of the proper length, failing to address problematic conduct captured on body worn cameras (including profanity and allegations made by incarcerated people), failing to include relevant UOF Directive charges on memoranda of complaint, failing to take proper photographs, failing to verify that the facility took the corrective action indicated by the Rapid Review, and inappropriately asserting that a certain investigative step would not change the outcome of the investigation. Monitor's Nov. 8, 2023 Rep. at 84.

752.     The Monitoring Team noted the deterioration in ID's work occurred under the leadership of the Deputy Commissioner of ID, Manuel Hernandez. Apr. 3, 2023 Rep. at 101; Monitor's Nov. 8, 2023 Rep. at 4; Ex. 68 (DOC press release).

753.     During Hernandez's tenure, the Monitoring Team "observed a disturbing trend that suggested . . . staff had been influenced or prompted, either overtly or implicitly, to adopt a more lenient approach when assessing cases and to change their practice in ways that compromised the quality of investigations." Monitor's Apr. 3, 2023 Rep. at 101.

754.    Oversight of investigations and supervisors under Hernandez was not as rigorous as it should be, and morale within the Investigation Division deteriorated. *Id.* at 158.

755.    \*\*Staff reported that they did not feel comfortable speaking openly and candidly with the Monitor because of fear of reprisal by Deputy Commissioner Hernandez were he to learn of such communications. *Id*. \*\*

> **Nature of Dispute**:       Legal Dispute-Other
> **Position of Defendants**:    Not Disputed, insofar as the proposed finding reflects what is stated on the cited pages of the Monitor's report. Disputed, insofar as this provision does not completely or accurately capture what the Monitor stated on the cited page. Specifically, the PFOF fails to note that the Deputy Commissioner resigned during this period, and that the Department appointed a new interim Deputy Commissioner, regarding whom the Monitor stated the following: "The Monitoring Team has worked with the interim Acting Deputy Commissioner of ID over the last year in various capacities. She has proactively engaged with the Monitoring Team on numerous issues. It is expected that this leadership change will result in a more collaborative and transparent relationship between the Monitoring Team and ID's staff." Monitor's April 3, 2023 Report at 158, n. 142. Defendants respectfully refer the court to the Monitor's April 3, 2023 Report at 158. Defendants furthermore object to this PFOF on the grounds that the staff members comments, which were made sometime in early 2023, are not relevant to the issues in dispute in the instant motion considering, as the Monitor reported, the circumstances reported in this PFOF subsequently changed.
> **Position of Plaintiffs**:       The Monitor's expectations regarding the Acting Deputy Commissioner of ID who replaced Hernandez do not contradict the Monitor's statement regarding DOC staff's fear of reprisal from Hernandez during his tenure. The proposed finding is accurate, and the Court should adopt it.

756.    Deputy Commissioner Hernandez was appointed after the Commissioner dismissed Deputy Intelligence, Investigation and Trials Commissioner Sarena Townsend from her position as the Disciplinary Manager and head of both the Trials Division and Investigation Division in January 2022. Ex. 68 (DOC press release).

757.    The Commissioner dismissed Towsend less than two months after she was appointed Department Disciplinary Manager, a position that the Court ordered DOC to create under the Third Remedial Order. Dkt. 424 at ¶ 5.

758.    The Monitor recognized and reported Deputy Commissioner Townsend's commitment, strong leadership, and creative thinking in late December 2021 and in reports before. Monitor's Dec. 22, 2021 Rep. at 8 & n.3. Less than two weeks after the Monitor expressed that view, Commissioner Molina dismissed Townsend on January 3, 2022, the first business day of his tenure. Monitor's March 16, 2022 Rep. at 58.

759.    The Commissioner did not consult with nor advise the Monitor about this decision until after it was made. Monitor's Mar. 16, 2022 Rep. at 59-60.

760.    Although the Third Remedial Order required that, if DOC replaced the Disciplinary Manager, it had to provide a "bona fide reason" for doing so, the Commissioner's explanation for the decision to dismiss Townsend did not contain any specific information, instead relying on vague assertions regarding the necessity for "new leadership" and "new perspectives." *Id.* at 59. The Department's response, in its entirety, reads: "In order to facilitate reforms, including improvements to the Department's disciplinary process, the new administration has a critical interest in implementing certain policy, operational, and personnel changes. These changes include bringing new leadership with new perspectives to our disciplinary work and rethinking how it is organized. As a result, the Disciplinary Manager position will be replaced. This decision was the product of a thoughtful and focused process which looked at both the Division and the Department as a whole. At our upcoming meeting on January 11, the Commissioner intends to share additional information about his plans to restructure the Division. Per the Third Remedial Order, the Department is committed to working with the Monitor to identify an appropriate replacement with adequate experience and credentials to serve in the Disciplinary Manager role." *Id.*

761.    The Commissioner did not present evidence of a bona fide reason for his

dismissal of Townsend. *Id.* at 60; *See supra*, ¶ 760.

762.    \*\*The Commissioner then installed Manuel Hernandez as the head of the

Investigation Division in May 2022, resulting in the deterioration described above. Ex. 68 (DOC

press release) \*\*

> **Nature of Dispute**:    Legal Dispute-Materiality
> **Position of Defendants**:    Not Disputed insofar as the proposed finding reflects what is
> stated on the cited pages of the relevant reports. Disputed insofar as this statement is not
> material and is not indicative that a receivership or a contempt finding is warranted.
> **Position of Plaintiffs**: This is a factual finding the Court is entitled to make based on the
> information in paragraphs 737-762. The context that precedes this proposed finding helps
> illustrate materiality. The termination of a leader (former Deputy Commissioner
> Townsend) amidst union pressure and absent a bona fide reason in violation of the Third
> Remedial Order, followed by the appointment of a leader who then undermined court-
> ordered reforms (in the form of serious deterioration of investigations of use of force
> misconduct) is material as evidence of noncompliance with Consent Judgment § VII ¶
> 9(a) and § VIII, ¶ 1 regarding investigations and accountability. The proposed finding is
> also evidence relevant to analysis of *Plata* factors such as a lack of leadership to turn the
> tide in a reasonable time, failures of lesser remedial measures, and that continued
> insistence on adherence to court orders will only lead to confrontation and delay.

763.    Although the Monitor informed DOC of its findings regarding the regression in

the quality of investigations at ID under Hernandez's tenure, DOC gave a "protracted and

lackluster response" which "failed to propose reasonable solutions." Monitor's July 10, 2023

Rep. at 129.

764.    After the Monitoring Team first shared its concerns with the Commissioner in

December 2022, DOC did not respond for two months. When DOC finally did respond, it merely

provided a two-page superficial letter that did not grapple with "the gravity of issues under

discussion." Monitor's Apr. 24, 2023 Rep. at 2.

765.    Ultimately, Hernandez resigned from DOC shortly before the Monitor publicly filed its report describing the significant deterioration of the Investigation Division's work on April 3, 2023. July 10, 2023 Rep., at 129.

766.    The Monitor's assessment of investigations completed in early 2023 revealed the same patterns previously reported, reinforcing the Monitor's finding that investigators' practices had regressed and substantively changed for the worse. Monitor's July 10, 2023 Rep. at 129.

767.    ID reviewed cases closed between July 1, 2022 and March 31, 2023 in order to determine whether cases were closed precipitously under Hernandez's tenure without identifying the full range of misconduct and policy violations. Monitor's Nov. 8, 2023 Rep. at 83.

768.    ID's Quality Assurance team audited 650 Intake Investigations that were closed during the first six months of 2023, and identified an issue of some type (ranging from minor to more serious) in 45% of the cases. *Id.* The Quality Assurance team audited 22 Full ID Investigations that were closed between April 2022 and June 2023; the team determined that of these, three cases needed re-opening, seventeen cases warranted a discussion with the assigned investigator team, and sixteen cases required an update to the closing report. *Id.* Through these reviews, ID "identified problems very similar in substance and scope to those identified by the Monitoring Team." *Id.*

769.    Separately, ID reviewed 468 Full ID Investigations and determined that 33% should be re-opened for further investigation. Of these, 119 were re-opened because the look-back auditors found that the violations were not appropriately addressed. *Id.* at 85.

770.    In September 2023, the Commissioner demoted the Associate Commissioner of ID, who the Monitor called "a well-respected and seasoned leader" and "instrumental in the

subsequent attempt at course correction" after Hernandez's departure. Monitor's Nov. 8, 2023 Rep. at 4; Monitor's Oct. 5, 2023 Rep. at 13.

771.    The Monitoring Team had worked closely with this leader for years and found him "to be forthright and credible and to possess a keen acumen for assessing use of force incidents in a neutral and independent manner," and explained that this leader's work was credited for ID's successes prior to its deterioration under Manuel Hernandez. *Id.*

772.    Moreover, after Manuel Hernandez resigned, this leader was "essential" to efforts to repair the damage done to ID under Hernandez's tenure. *Id.*

773.    Nonetheless, while the Commissioner reported to the Monitor that the basis for this leader's demotion was not related to Nunez matters, "the Monitoring Team [was not] made privy to the factors that provided the basis for the Commissioner's decision." *Id.* Moreover, the Monitoring Team requested the written basis for this determination, but the Commissioner refused to produce it to the Monitoring Team. *Id.* The Monitor raised "grave concerns that the removal of the Associate Commissioner will compromise the revitalization effort and morale within" ID. *Id.*

774.    To date, ID still cannot consistently identify misconduct when it occurs, which means that certain DOC staff are not held accountable and corrective action is not always applied. *See* Monitor's Nov. 8, 2023 Rep. at 4. That inconsistency in applying corrective action undermines legitimate efforts for accountability when corrective action does occur because DOC staff feel they are not being treated fairly when held accountable. Monitor's Oct. 5, 2023 Rep. at 12.

775.    "For the past two years, at each turn, the Department's ability to properly identify staff misconduct has degraded and remains on a downward trajectory." Monitor's Nov. 8, 2023 Rep. At 4.

### B.    DOC Has Not Issued Discipline for Biased, Incomplete, or Inadequate Investigations

776.    At the time of the filing of the Monitor's November 8, 2023 Report, DOC had not subjected any ID investigators or supervisors to formal disciplinary charges since January 1, 2022 for any reason, including for conducting a biased, incomplete, or inadequate investigation of a use of force incident, or reviewing and approving such an investigation. Monitor's Nov. 8, 2023 Rep. at 104.

777.    At the time of the filing of the Monitor's November 8, 2023 Report, DOC had not subjected any ID investigators or supervisors to informal discipline for any reason since January 1, 2022, including for conducting a biased, incomplete, or inadequate investigation of a use of force incident, or reviewing and approving such an investigation. *Id.*

778.    In 2022, DOC subjected investigators in ID to corrective action such as corrective interviews, counseling, or re-training on three occasions. DOC subjected supervisors in ID to such corrective action on three occasions. Id. at 105.

779.    From January to September 2023, DOC subjected investigators to corrective action on seven occasions, and supervisors on four occasions. *Id.*

780.    Plaintiffs withdraw this proposed fact.

### C.    DOC Has Failed to Complete Investigations in a Timely Manner

781.    DOC has been found non-compliant with Consent Judgment § VII, ¶ 9(a) regarding timely investigations in eight consecutive monitoring periods, beginning in the Seventh Monitoring Period (July-December 2018), and continuing until the most recent ratings

in the Fifteenth Monitoring Period (July-December 2022). Monitor's Seventh Rep. at 125; Monitor's Eighth Rep. at 136-7; Monitor's Ninth Rep. at 170; Monitor's Tenth Rep. at 153; Monitor's Eleventh Rep. at 196; Monitor's Twelfth Rep. at 86; Monitor's Oct. 28, 2022 Rep. at 140; Monitor's Apr. 3, 2023 Rep. at 171.

782.    The Consent Judgment § VII, ¶ 9(a) requires all Full ID Investigations after October 1, 2018 to be completed within 120 days. Dkt. 249.

783.    This is important because long delays in the completion of investigations impact the quality of those investigations. For example, "the quality of evidence is negatively impacted," such as when interviewees can no longer recall the specifics about an incident. Monitor's Sixth Rep. at 94.

784.    **The Monitor has repeatedly documented problems with the timeliness of investigations. *See infra* ¶¶ 785-793. **

> **Nature of Dispute**:        Legal Dispute-Other
> **Position of Defendants**:    Defendants incorporate by reference their responses to paragraphs 785 through 793 of Plaintiffs' PFOF, but dispute insofar as this PFOF is a conclusion and not a factual statement for which a response is required.
> **Position of Plaintiffs**:       This is a factual finding the Court is entitled to make based on the information in paragraphs 785-793, cited herein.

785.    The volume of use of force incidents and DOC's delay in creating a structure to enable a more rapid pace of compliance created a backlog of Preliminary Reviews. Full ID Investigations took too long to close. The Monitor found that the Defendants were in non-compliance with the requirement to conduct "thorough, timely, and objective investigations." Monitor's Seventh Rep. at 106.

786.    In its Eighth Report the Monitor reported that "investigations at all levels are not conducted in a reasonable timeframe, impacting the ability of DOC to evaluate the use of force within the agency and discipline Staff when necessary." Monitor's Eighth Rep. at 136.

787.    At the end of the Eighth Monitoring Period (July-December 2019), 6,815 investigations of use of force incidents (including both Preliminary Reviews and Full ID Investigations) from January 2018 to June 2019 remained pending. Monitor's Eighth Rep. at 136. "Almost all of these investigations [were] pending beyond the prescribed deadline for completion." *Id.* at 136.

788.    This backlog resulted in over 2,000 Full ID Investigations not being completed before the expiration of the statute of limitations for the imposition of discipline, meaning that "any potential misconduct could not be addressed." *Id*.

789.    The Monitoring Team reported that the backlog of pending investigations (including both Preliminary Reviews and Full ID Investigations) continued to grow in the following Monitoring Period, with 8,656 investigations of use of force incidents from January 2018 to December 2019 remaining pending at that time, again with almost all pending beyond the prescribed deadline for completion. Monitor's Ninth Report at 156-157.

790.    While ID was able to improve the speed of its Intake Investigations, (formerly Preliminary Reviews) in 2021, by 2022, the timing of Full ID Investigations remained protracted and in need of improvement. Monitor's Oct. 28, 2022 Rep. at 136.

791.    93% of the Full ID Investigations (522 investigations) that were closed during the Fourteenth Monitoring Period (January-June 2022) were closed after the 120-day deadline set by the Consent Judgment. *Id*.

792.    The situation did not significantly improve during the Fifteenth Monitoring Period (July-December 2022). During that Monitoring Period, 92% of the Full ID Investigations (902 investigations) that were closed fell outside of the 120-day timeline required by the Consent Judgment. Monitor's Apr. 3, 2023 Rep. at 165.

793.    On November 8, 2023, the Monitor reported:

| | Number of Full ID Investigations Closed and Time to Case Closure As of July 17, 2023 | | | | |
|---|---|---|---|---|---|
| | **Number of Full ID Investigations closed since January 1, 2022** | **Closed within 120 days of the Referral Date** | **Closed within 121-180 days of the Referral Date** | **Closed within 181-365 days of the Referral Date** | **Closed more than 365 days after the Referral Date** |
| **Number** | 1822 | 150 | 141 | 652 | 879 |
| **%** | ███████ | 8% | 8% | 36% | 48% |

| Status of Full ID Investigations for incidents that *occurred* between January 2022- June 2023 As of October 16, 2023 | | | | |
|---|---|---|---|---|
| *Pending* less 120 Days or less | *Closed* within 120 Days | *Closed* Beyond 120 Days | *Pending* Beyond 120 Days | **Total** |
| 15 | 219 | 841 | 571 | |
| 1% | 13% | 51% | 35% | 1,646 |

Monitor's Nov. 8, 2023 Rep. at 85.

### D.    Staffing at ID Remains Inadequate

794.    Adequate staffing is critical to conducting timely and quality investigations. Apr. 3, 2023 Rep. at 167.

795.    "An assessment of the ID's staffing needs found that . . . at least 21 supervisors and at least 85 investigators are necessary, which ha[d] not been achieved" as of July 10, 2023. Monitor's July 10, 2023 Rep. at 130-31. .

796.    Staffing numbers in ID are insufficient to manage the workload. July 10, 2023 Rep. at 131; Monitor's Aug. 7, 2023 Rep. at 22-23.

797.    The number of investigators assigned specifically to conduct Full ID Investigations decreased from 82 in February 2020 to only 23 in October 2023. Monitor's Nov. 8, 2023 Rep. at 88. The number of ID supervisors assigned specifically to Full ID Investigations decreased from 15 in February 2020 to 5 in October 2023. Monitor's Nov. 8, 2023 Rep. at 88.

798.    As of October 20, 2023, there were only 15 supervisors and 67 investigators assigned to UOF investigations generally. Monitor's Nov. 8, 2023 Rep at 87-88.

799.    ID reported to the Monitor that there are an additional seven new investigators in training that are not assigned to teams, and that 16 hires of investigators are pending with HR. Monitor's Nov. 8, 2023 Rep. at 87.

800.    On November 8, 2023, the Monitor reported:

| Supervisors in ID Assigned to UOF | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | February 2020 | January 2021 | January 2022 | January 2023 | April 2023 | June 2023 | July 2023 | August 2023 | October 2023 |
| Rapid Reviews | | | | | 1 | 2 | 2 | 2 | 2 |
| Intake Squad | 8 | 10 | 13 | 12 | 9 | 8 | 8 | 6 | 6 |
| Full ID | 15 | 10 | 7 | 3 | 3 | 3 | 4 | 5 | 5 |
| UPS | 1 | 1 | 1 | 0 | 1 | 1 | 1 | 1 | 1 |
| Total | 24 | 21 | 21 | 15 | 14 | 14 | 15 | 14 | 15 |

| Investigators in ID Assigned to UOF | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | February 2020 | January 2021 | January 2022 | January 2023 | April 2023 | June 2023 | July 2023 | August 2023 | October 2023 |
| Rapid Reviews | | | | | 4 | 8 | 8 | 7 | 8 |
| Intake Squad | 32 | 51 | 51 | 51 | 42 | 32 | 36 | 34 | 30 |
| Full ID | 82 | 58 | 36 | 10 | 10 | 12 | 19 | 18 | 23 |
| UPS | 4 | 3 | 3 | 4 | 4 | 5 | 5 | 5 | 5 |
| Total | 118 | 112 | 90 | 65 | 60 | 57 | 68 | 64 | 67 |

Monitor's Nov. 8, 2023 Rep. at 88.

801.    There was a mass exodus of investigators in early 2023, with approximately 25 investigators leaving the Investigation Division altogether. Apr. 3, 2023 Rep. at 169.

802.    DOC's efforts to assign more ID staff to use of force investigations have been undercut by attrition. While DOC has hired 66 people to join ID between January 2022 through October 2023, 30 people have left the agency during that time period, resulting in only a net gain of 30 people. Monitor's Nov. 8, 2023 Rep. at 87.

803.    An assessment of ID's staffing needs found that ID needs at least 21 supervisors and 85 investigators. Monitor's July 10, 2023 Rep. at 130-131.

804.    DOC would not agree to meet the specific target of 21 supervisors within a specific timeframe, insisting that they first required the results of an ongoing staffing analysis

207

and would accept only a target range of supervisors, from 16 to 21. Monitor's Aug. 7, 2023 Rep. at 22-23. The court overruled that objection. *See* August 10, 2023 Order §I, ¶ 11.

805.    The Court entered an order on August 10, 2023 directing ID to maintain at least 85 investigators and 21 supervisors to conduct use of force investigations by the end of this year, unless and until the Department could demonstrate to the Monitor that fewer staff are necessary to conduct thorough, timely, and objective investigations. Dkt. 564, § I(11). DOC has  failed to correct low ID staffing levels, reporting undergoing an "internal staffing analysis" but providing "vague or unresponsive" answers about the nature of that analysis. Monitor's Nov. 8, 2023 Rep. at 43.

### E.    Even When Misconduct is Detected, DOC Frequently Fails to Respond with Appropriate Discipline

806.    In its July 10, 2023 Report, the Monitor found that the deterioration of the Investigation Division (and thus DOC's ability to detect misconduct) had "resulted in a reduction in the level of the Department's imposition of meaningful and timely accountability for misconduct that occurred during the pendency of the Action Plan" and "undercut DOC's ability to ensure appropriate and meaningful accountability[.]" July 10, 2023 Rep. at 131, 140. The Monitor also found that "overall accountability for misconduct [had] demonstrably suffered during the Action Plan's first year of implementation." *Id.* at 132. DOC has never achieved substantial compliance with the requirement of Consent Judgment, § 8, ¶ 1, to "take all necessary steps to impose appropriate and meaningful discipline, up to and including termination, for any Staff Member who violates Department policies, procedures, rules, and directives relating to the Use of Force."

807.    The Monitor found that DOC was continuously non-compliant with Consent Judgment, § 8, ¶ 1 from the Fourth through Twelfth Monitoring Periods. Monitor's Fourth Rep.

at 174; Monitor's Fifth Rep. at 120; Monitor's Sixth Rep. at 126; Monitor's Seventh Rep. at 161;

Monitor's Eighth Rep. at 186; Monitor's Ninth Rep. at 210; Monitor's Tenth Rep. at 184;

Monitor's Eleventh Rep. at 227; Monitor's Twelfth Rep. at 101.

808.    Formal discipline and command discipline are two of the options for imposing

discipline on staff members under Defendants' current policies.

809.    Formal discipline is pursued via administrative charges that are brought against

staff members by DOC's Trials Division, and can result in punishments up to and including

termination. *See* Monitor's Fourth Rep. at 162-3.

810.    Formal discipline typically occurs after an incident is referred to the Trials

Division by the Investigation Division, usually after a Full ID Investigation has been completed.

Monitor's Second Rep. at 101; Monitor's Apr. 3, 2023 Rep. at 166.

811.    Command discipline is imposed by the leaders of individual facilities on their

own staff via an abbreviated, informal process, and the maximum available punishment is ten

days of lost compensatory or vacation time. Monitor's Apr. 3, 2023 Rep. at 180-181; DOC

Directive 4257R-B, Section V.

### 1.    Formal Discipline

812.    There have been serious problems with DOC's formal disciplinary processes

since the early days of the Consent Judgment's implementation**.**

813.    During the Fourth Monitoring Period, the Monitor determined that "compared to

the volume of misconduct detected by the Monitoring Team during its assessment of use of force

incidents, DOC does not impose corrective action nearly often enough." Monitor's Fourth Rep.

at 173.

814.    The Monitor explained that part of the reason for this failure to impose meaningful accountability was the failure of DOC's investigations to reliably detect misconduct in the first place. *Id.* at 173.

815.    Delays in the investigation process also led to delays in the ability to impose discipline. *Id.*

816.    In 2017, only 2% of formal disciplinary cases were closed within six months of the incident. During the same year, 90% of formal disciplinary cases were not completed until more than a year after the incident. Monitor's Fifth Rep. at 37.

817.    The Monitor observed in the Third Monitoring Period "undue delay" in the formal disciplinary process, and found that these delays "extended the overall time to impose discipline to a point that undermines the integrity of the entire process." Monitor's Third Rep. at 175.

818.    For many monitoring periods, DOC continued to fail to impose a reasonable amount of discipline (or other meaningful corrective action) in comparison to the objective amount of misconduct the Monitor observed. See Monitor's Fifth Rep. at 120; Monitor's Sixth Rep. at 125; Monitor's Seventh Rep. at 160; Monitor's Eighth Rep. at 185; Monitor's Ninth Rep. at 209 (noting that "the reduction in the amount of formal discipline is alarming"); Monitor's Tenth Rep. at 183 (noting that DOC imposed slightly more NPAs during the Tenth Monitoring Period than it had during the Ninth, but less than during the Fifth through Seventh).

819.    The formal disciplinary process also continued to be extremely delayed, with the vast majority of formal disciplinary cases closing more than a year after the incident occurred. *See* Monitor's Fourth Rep. at 173; Monitor's Fifth Rep. at 37; Monitor's Ninth Rep. at 209; Monitor's Tenth Rep. at 182-3.

820.    During the Eleventh Monitoring Period, the Monitor noted that improvements in the Investigation Division led to a large increase in the number of cases referred to the Trials Division for formal discipline. Monitor's Eleventh Rep. at 225.

821.    While this was positive, it also "compounded problems related to timeliness that existed at the time the Consent Judgment went into effect." Monitor's Eleventh Rep. at 224.

822.    As of January 15, 2021, of all the formal disciplinary cases closed since the Effective Date of the Consent Judgment, 87% were closed more than one year after the incident, and 44% were closed more than two years after the incident. Monitor's Eleventh Rep. at 225.

823.    Of all the disciplinary cases that were still pending on January 15, 2021, 85% were already more than one year out from the date of the incident, and 49% were already more than two years out. Monitor's Eleventh Rep. at 225.

824.    As the Monitor has repeatedly observed, when there is a long delay between an incident of misconduct and the imposition of punishment, it undermines the meaningfulness of accountability and contributes to the culture of impunity pervading DOC. *See* Monitor's Eleventh Rep. at 94-95, 240; Monitor's Twelfth Rep. at 108; Monitor's Oct. 28, 2022 Rep. at 146; Monitor's Apr. 3, 2023 Rep. at 177.

825.    Thus, despite the positive increase in cases referred to the Trials Division for formal discipline, due to these extreme delays, DOC remained in non-compliance with Consent Judgment § VII, ¶ 1 during the Eleventh Monitoring Period. Monitor's Eleventh Rep. at 227.

826.    During the Twelfth Monitoring Period (January-June 2021), DOC "remain[ed] in abject and sustained non-compliance with imposing timely discipline." Monitor's Twelfth Rep. at 96.

827.    During the Fourteenth Monitoring Period (January-June 2022), DOC issued more discipline that it had in the past, but it was "likely that additional accountability was also warranted in a significant number of cases." Monitor's Oct. 28, 2022 Rep. at 146.

828.    Significant delays in the processing of formal disciplinary cases also remained, with 23% of NPAs imposed during the Fourteenth Monitoring Period addressing incidents from between 1 and 2 years ago, 32% addressing incidents from between 2 and 3 years ago, and 33% addressing incidents from more than three years before the case was resolved. *Id.* at 152.

829.    During the Fourteenth Monitoring Period, the Monitor found that DOC had moved from non-compliance to partial compliance with Consent Judgment § VIII, ¶ 1, but noted that "the meaningfulness of the discipline is undercut by many of the backlogs" and that "significant and sustained work is needed[.]" *Id.* at 158.

830.    During the Fifteenth Monitoring Period (July-December 2022), the Trials Division made significant progress in clearing its backlog of cases by closing a large number of formal disciplinary cases. Apr. 3, 2023 Rep. at 102-104.

831.    Even so, in December 2022, approximately 275 formal disciplinary cases in which the incident took place more than one year prior remained pending. *Id.* at 184.

832.    Moreover, the Monitor found that "while many accountability actions were taken during the current Monitoring Period, additional accountability was also warranted in a significant number of cases and was not effectuated." *Id.* at 177.

833.    In 2022, the overall proportion of use of force incidents in which at least one staff member was referred for formal discipline, from any type of investigation, significantly decreased to 5% of incidents, despite the Monitoring Team having detected no contemporaneous

change in the pattern and practice of unnecessary and excessive force that would account for this change. Monitor's Nov. 8, 2023 Rep. at 94-95; July 10, 2023 Rep., at 136-7.

834.    This was the lowest number of formal disciplinary charges brought since 2016. *Id.*

835.    By way of comparison, in 2019, when the number of uses of force was similar to that in 2022, DOC brought 1,027 cases for formal discipline, which is more than double the number of cases brought in 2022. *Id.* at 137.

836.    The Monitor explained that this decline in the number of formal disciplinary charges was "a signal of continuing dysfunction," given that "use of force related misconduct did not itself decline in 2022." *Id.*

837.    Since the beginning of the Consent Judgment, and since a peak in 2019, the proportion of UOF incidents resulting in formal disciplinary charges has declined. On November 8, 2023, the Monitor reported:



Monitor's Nov. 8, 2023 Rep. at 96.

838.    \*\*During the 15th Monitoring Period, the discipline imposed via NPA was for lesser compensatory days as compared to the previous Monitoring Period. For instance, 40% of cases closed with a sanction of 1 to 9 days compared with 27% in the last Monitoring Period.

Further, a sanction or 30 days or more was utilized in 21% of cases in this Monitoring Period compared with 30% in the previous Monitoring Period. **Apr. 3, 2023 Rep. at 186.

> **Nature of Dispute**:       Legal Dispute-Other
> **Position of Defendants**:    Not Disputed, insofar as the proposed finding reflects what is stated on the cited pages of the Monitor's report, except disputed insofar as the proposed finding does not completely capture the entirety of the Monitor's discussion, which also states "Of course, the underlying misconduct must drive the sanction imposed and so these data does not necessarily mean the discipline is unreasonable. Further, given the need and focus on eliminating the backlog, some cases may be resolved with lesser sanctions."
> **Position of Plaintiffs**:       The quote Defendants cite does not rebut the proposed finding. The Court should adopt it.

839.    **Along the same lines, the use of sanctions of 30 days or more decreased, from 30% in the Fourteenth Monitoring Period to only 21% during the Fifteenth. *Id.***

> **Nature of Dispute**:       Legal Dispute-Other
> **Position of Defendants**:    In response to this proposed finding, Defendants reiterate and incorporate their response to PFOF 838.
> **Position of Plaintiffs**:       The quote Defendants cite does not rebut the proposed finding. The Court should adopt it.

840.    **The Monitoring Team reviewed 397 incidents resulting in formal disciplinary sanctions in 2022, and found that 23% of the sanctions imposed were "questionable," while 4% were unreasonable. *Id.* at 187. **

> **Nature of Dispute**:       Legal Dispute-Other
> **Position of Defendants**:    Not Disputed, insofar as the proposed finding reflects what is stated on the cited pages of the Monitor's report. Disputed, insofar as this provision does not completely or accurately capture what the Monitor stated on the cited page. Specifically, the PFOF fails to note that regarding his assessment of 397 cases, the Monitor found that the "majority of discipline imposed was reasonable." Regarding the cases that the Monitor found discipline imposed to be "questionable," the Monitor stated that "this is not to say that the discipline in these cases was blatantly disproportional, but rather that a more severe penalty may have been appropriate, but mitigating factors may have favored closure of the case with a lower sanction." *See* Monitor's April 3, 2023 Report at 187. Defendants respectfully refer the court to the Monitor's April 3, 2023 report at 187 for the Monitor's complete discussion.
> **Position of Plaintiffs**:       None of the Monitor's statements that Defendants cite contradict the proposed finding. Rather, they are in harmony with it, as the finding clearly

states that the "questionable" and "unreasonable" sanctions constituted 23% and 4% of the reviewed total, respectively, not a majority. The proposed finding is accurate, and the Court should adopt it.

841.    Although DOC remained in partial compliance with Consent Judgment § VIII, ¶ 1 in the Fifteenth Monitoring Period and the Monitor acknowledged gains made in 2022, the Monitor made clear that "much more work remains to achieve the ultimate goal of the reform effort, which is to impose timely and meaningful discipline." *Id.* at 103.

### 2.    Command Discipline

842.    Command Discipline is a form of discipline that is imposed at the facility level and can be completed closer in time to when an incident occurs than formal discipline. *Id.* at 180.

843.    In the first several years of the Consent Judgment, the sanctions imposed via command discipline could range from a verbal reprimand up to the forfeiture of five vacation or compensatory days. Monitor's Eighth Rep. at 55.

844.    During the Fifteenth Monitoring Period, in October 2022, the scope of the command discipline process was expanded to cover more misconduct, including some excessive or unnecessary uses of force. Monitor's Apr. 24, 2023 Rep. at 20-21. Previously a Command Discipline could not be utilized to address use of force related misconduct at all. Monitor's Apr. 24, 2023 Rep. at 20-21.

845.    At the same time, the possible penalties associated with command discipline were expanded to include the loss of up to ten vacation or compensatory days. Apr. 3, 2023 Rep. at 181.

846.    DOC has a long history of failing to appropriately and reliably manage and adjudicate command disciplines. Monitor's Apr. 3, 2023 Rep. at 181; Monitor's July 10, 2023 Rep. at 133 n.167.

215

847.    In the Fifteenth Monitoring Period, 69% of the command discipline cases that were dismissed, were dismissed because of due process violations (meaning the hearing did not occur within the required timeframes outlined in policy), because of a clerical error which invalidated the CD, or because the CD was not entered into CMS at all or not drafted within the required timeframe. Monitor's Apr. 3, 2023 Rep. at 182-83. The Monitor found this 69% of dismissed cases to be an "area of concern" because they "reflect a lack of proper management" of command disciplines. Monitor's Apr. 3, 2023 Rep. at 183.

848.    During the Fifteenth Monitoring Period (July to December 2022), 25% of command discipline cases were dismissed due to such procedural violations. Monitor's July 10, 2023 Rep. at 133.

849.    During the Fifteenth Monitoring Period, facility leaders imposed a "substantive outcome," defined broadly as including any form of sanction, in fewer than half of the cases in which command discipline was recommended. Apr. 3, 2023 Rep. at 182.

850.    Facility leaders imposed a loss of compensatory days in a mere 29 percent of command discipline cases during the Fifteenth Monitoring Period, instead favoring the use of reprimands and corrective interviews, which carry no concrete or quantifiable consequences. *Id.*

851.    As the Monitor explained, "Facility leadership have long exhibited an over reliance on the use of a reprimand and corrective interview[.]" *Id.* at 183; *see also* Monitor's Ninth Rep. at 67.

852.    This problem is getting worse over time. The proportion of cases resulting in 1-5 days deducted has decreased from 52% in the Eighth Monitoring period to 29% in the most recent. Apr. 3, 2023 Rep. at 182.

216

853.    The proportion of cases that resulted in a reprimand increased from 9% to 14% in the same periods. *Id*.

854.    The Monitor recommended safeguards to DOC in August 2022 that would rectify flaws in the Command Discipline system, including recommendations to ensure that cases are processed correctly and not dismissed for procedural reasons, that cases reach appropriate outcomes rather than defaulting to the most lenient option, and that cases which require more serious formal discipline are in fact referred for such discipline. *Id.* at 108. But as of July 10, 2023, DOC had made no progress in implementing those recommendations, despite repeated follow-up from the Monitoring Team. Monitor's July 10, 2023 Rep. at 134.

855.    The Monitor found that the lack of safeguards with regard to Command Discipline, combined with the low number of formal disciplinary charges in 2022, had a direct and negative impact on DOC's ability to impose appropriate and meaningful discipline as required by § VIII, ¶ 1 of the Consent Judgment. Monitor's July 10, 2023 Rep. at 141.

856.    The Monitor further explained that "the regression in accountability for incidents that have occurred since 2022 is concerning and calls into question the City's and Department's level of commitment and ability to achieve compliance with the requirements regarding investigation and accountability of the Nunez Court Orders." *Id*.

857.    The changes to the Command Discipline process are not expected to improve the consistency with which misconduct is identified. *See* Monitor's Nov. 8, 2-23 Rep. at 21 n.16. The significant number of backlogged command discipline cases means that the processing speed will not improve for some time. *Id*. After yet another court order in August 2023, DOC provided proposed revisions to the applicable directive in September 2023—and further revision is still needed. Monitor's Nov. 8, 2023 Rep. at 43.

858.    Even though facility Rapid Reviews sometimes recommend disciplinary action for staff members, the data does not reflect whether these discipline referrals were all enacted as recommended. Data on enacted discipline is subject to continued changes based on the protracted closures of certain types of disciplinary charges, including the many months it takes to process a command discipline, a memorandum of complaint, a nonprosecution agreement, and an OATH proceeding. Further, a staff member can be suspended, only to have the days returned upon a Report and Recommendation from OATH. *Id.* at 135.

## IX.    The City Has Failed in its Obligations to Young Adults in its Custody

859.    The Monitor has observed that "[w]hen poorly managed and when staff do not have the necessary skills, facilities housing younger people often see higher use of force rates, which historically has been true in this Department." Monitor's Twelfth Rep. at 23.

860.    During the Twelfth Monitoring Period, for example, young adults (ages 18 to 21) comprised approximately 8% of the average daily population but were involved in 22% of uses of force. Monitor's Twelfth Rep. at 22.

861.    A significant portion of the young adults in custody are housed at RNDC. *Id.* at 23.

862.    The Monitor has closely scrutinized RNDC, "where a large portion of violence, disorder, poor practice, and avoidable uses of force continues to occur." Monitor's Mar. 16, 2023 Rep. at 17. The Monitor has found that "the condition of this facility has been of grave concern since the inception of the Consent Judgment and has only increased as, time after time, strategies to quell violence, increase programming and incentives, properly manage young adults' behavior, and improve staff practice have failed or been abandoned with the revolving door of agency and facility leaders." *Id.* at 17.

218

A.      **Failure to Protect 18-Year-Old People in Custody from an Unreasonable Risk of Harm**

863.    Consent Judgment § XV, ¶ 1 requires 18-year-olds in custody to be supervised at all times in a manner that protects them from an unreasonable risk of harm. Staff shall intervene in a manner to prevent Inmate-on-Inmate fights and assaults, and to deescalate Inmate-on-Inmate confrontations, as soon as it is practicable and reasonably safe to do so.

864.    The Department has not supervised 18-year-olds in custody at all times in a manner that protects them from an unreasonable risk of harm; nor have DOC staff intervened in a timely manner to prevent fights and assaults, and to de-escalate confrontations between people in custody, as soon as it is practicable and reasonably safe to do so—as required by Consent Judgment § XV, ¶ 1. *See infra* ¶¶ 865-877.

865.    The Monitor has given the Department eight consecutive Non-Compliance ratings over four years. Monitor's Seventh Rep. at 212; Monitor's Eighth Rep. at 255; Monitor's Ninth Rep. at 288; Monitor's Tenth Rep. at 251; Monitor's Eleventh Rep. at 289; Monitor's Twelfth Rep. at 124; Monitor's Oct. 28, 2022 Rep. at 171; Monitor's Apr. 3, 2023 at 218.

866.    RNDC is the facility that houses the majority of 18-year-olds in DOC custody. *See* Monitor's Eleventh Rep. at 3.

867.    Though "[c]ertain RNDC indicators reflect significant improvement over historical high points…[RNDC] continue[s] to rank among the highest in the Department on most indicators," meaning continuing high levels of danger. Monitor's July 10, 2023 Rep. at 59;

███████████████████████████████████████████████████

███████████████████████████████████

868.    The Monitor's "assessment of recent incidents at RNDC continues to reveal poor security practices and that staff and persons in custody are exposed to harm daily." Monitor's

July 10, 2023 Rep. at 59; Monitor's Nov. 8, 2023 Rep. at 7 (between January 1 and October 31, 2023, DOC reported over 400 fires, with most at RNDC).

869.    The Monitor has found that "while certain data points viewed in isolation suggest that some progress has been made at RNDC…the fact remains that none of these decreases are of the magnitude needed to achieve the reform required by the Consent Judgment." Monitor's July 10, 2023 Rep. at 60.

870.    The Monitor reports that "quantitative metrics show that violence and the use of force are exponentially higher than they were in 2016." *Id.*

871.    "Security breaches and operational failures [at RNDC] continue to be prevalent," with "[s]everal NCU audits…during a few randomly selected days in May 2023… found operations to be in disarray, including unsecured cell doors and incarcerated individuals freely entering and exiting their cells, no staff on post throughout various tours, inadequate supervisor tours, and incarcerated individuals smoking contraband." *Id*. at 60-61; Monitor's Nov. 8, 2023 Report at 11 (summarizing September and October NCU Security Audits with similar findings, including at RNDC).

872.    One recent incident is illustrative of the problems that persist at RNDC.

873.    On June 8, 2023, at RNDC, several young adults congregated in the tier and unauthorized areas like the staff desk, at which time the floor officer entered the A-station, leaving the area unsupervised. Monitor's July 10, 2023 Rep. at 54. "Video appears to capture the young adults directing the A station Officer to unlock cell doors…[after which a] cell door near where the young adults congregated opened, which allowed six [individuals] to enter and engage in an assault on the [individual] housed in the cell as depicted above." *Id*. When the officer re-entered the area shortly after, all six [individuals] "exited the cell and closed the cell door,

leaving the victim inside, [after which t]he Officer appeared to interact with the [individual] that was assaulted inside the cell but does not take him out." *Id*. Over the next several hours, "multiple Officers and DOC supervisors toured the area and interacted with the [individual] that was assaulted, but none took action. Over seven hours after the incident, the [individual] was taken out of his cell and evaluated in the clinic [and] was transferred to the Urgicare with bilateral lacerations." *Id*.

874.    Rapid Reviews conducted by the Investigation Division in recent months indicate that Department staff in RNDC continue to commit security failures and use excessive and unnecessary force, causing injury to plaintiffs.[8]

875.    

---

[8] In addition to the incidents cited here, additional incidents referenced throughout plaintiffs' proposed findings of fact have occurred at RNDC. *See, e.g.*, Monitor's July 10, 2023 Rep. at 54 (indicating that individuals held at RNDC directed an officer to open a cell door in order to assault another individual; the victim did not receive medical attention until seven hours after the incident, despite multiple officers and DOC supervisors touring the area in that time);

876.    .

877.    Several NCU audits of practice during in 2022 and 2023 at RNDC found operations to be in disarray, including unsecured cell doors and incarcerated individuals freely entering and exiting their cells, no staff on post throughout various tours, inadequate supervisor tours, and incarcerated individuals smoking contraband. *See supra* ¶¶ 412, 421, 425, 427-419, 431, 871.

**B.    Failure to Implement Direct Supervision**

878.    Direct Supervision is a style of housing area supervision that reflects correctional best practices. The Direct Supervision curriculum was developed by the National Institute of Corrections, and the model has a "long-standing history of proven effectiveness." Monitor's First Rep. at 54. The core practices of Direct Supervision are:

    1.    "Achieving consistent assignment of Staff to housing units;

2. Providing an orientation to each youth that describes the Officer's role in ensuring safety, providing rewards and imposing sanctions;

3. Ensuring Staff have the authority, autonomy and options to reward compliant and pro-social behavior;

4. Expecting Staff to deliberately select a lower level of engagement when tensions arise;

5. Occupying youth with structured activities throughout the day; and

6. Engaging in proactive and interactive supervision." Monitor's Seventh Rep. at 223.

879.    Consent Judgment § XV, ¶ 12 requires the Department to adopt and implement the Direct Supervision Model in all Young Inmate Housing Areas housing 18-year-olds.

880.    In the Seventh Monitoring Period, the Monitor "had several discussions with uniformed leadership and NCU" and "tried several avenues to encourage the Department to make demonstrable progress but, to date, the Department ha[d] not made any substantive effort to implement the key aspects of Direct Supervision in a holistic fashion or to demonstrate proof of practice for the few fragments that reportedly exist," such as "allowing Staff to set up special activities to reward inmates for positive behavior." Monitor's Seventh Rep. at 223.

881.    In the Eighth Monitoring Period, the Monitor reiterated those findings. Monitor's Eighth Rep. at 268-269.

882.    In the Ninth Monitoring Period, the Monitor gave a Partial Compliance rating not for adequate implementation of the model, but because "the Department now ha[d] a *framework* for addressing this provision [and] ha[d] taken *initial steps* to emphasize the core concepts during roll-call." Monitor's Ninth Report at 223 (emphasis added).

883.    Recognizing these compliance issues, the First Remedial Order, § D, ¶ 3; § D, ¶ 3(i) was entered, requiring that for all housing units at RNDC that may house 18-year-old Incarcerated Individuals, the Department, including RNDC Supervisors, shall take necessary steps to improve the implementation of the Direct Supervision Model with an emphasis on the development of proactive and interactive supervision; appropriate relationship building; early intervention to avoid potential confrontations; de-escalating conflicts; rewarding positive behavior; and the consistent operation of the unit. The Department, including RNDC Supervisors, shall reinforce the implementation of the Direct Supervision Model with staff through, among other things, appropriate staff supervision, coaching, counseling, messaging strategies, or roll call training.

884.    The Department has not met the requirements of Consent Judgment § XV, ¶ 12 and First Remedial Order, § D, ¶ 3; § D, ¶ 3(i). *See infra* ¶¶ 885-896.

885.    In four of the last six Monitoring Periods in which Consent Judgment § XV, ¶ 12 has been rated, the Monitor has rated the Department in Non-Compliance. Monitor's Seventh Rep. at 223; Monitor's Eighth Rep. at 268; Monitor's Eleventh Rep. at 304; Monitor's Twelfth Rep. at 129.

886.    The Department has never been rated in Substantial Compliance for Consent Judgment § XV, ¶ 12.

887.    Sections D, ¶ 3 and D, ¶ 3(i) of the First Remedial Order have only been rated twice since the order was entered, and on both occasions the Monitor rated the Department in Non-Compliance. Monitor's Eleventh Rep. at 303; Monitor's Twelfth Rep. at 129.

888.    In the Tenth Monitoring Period, after the First Remedial Order was entered, the Monitor gave a Partial Compliance rating for Consent Judgment XV, ¶ 12. Monitor's Tenth Rep.

at 265. In explaining his rating, the Monitor did not state that DOC adequately implemented the model, but found that "the Department now has a framework for addressing this provision and these concepts have been integrated into the Unit Management training," that the Department "will develop a strategy for measuring the extent to which housing units are operated according to the daily schedule," and that a sanctions component called "Informal Resolutions" had been developed, but not fully implemented. Monitor's Tenth Rep. at 250, 264-265 (emphasis added).

889.    In the Eleventh Monitoring Period, the Department "intended to pilot Unit Management in one building at RNDC and then to roll out the program sequentially to the other five RNDC buildings," and intended to train "the entire RNDC workforce…in Unit Management by the end of 2020. Monitor's Eleventh Rep. at 303. The "initial pace of training for RNDC Staff was not sufficient to meet this goal," however, "so the Department modified its training approach in November 2020." *Id*. As of the end of the Monitoring Period, "many of the Facility's supervisors had not yet participated in the training (i.e., only 45% of the ADWs and only 7% of the captains had received the training by 1/15/21), which undercuts their ability to effectively supervise the officers' performance." *Id*.

890.    The pilot "[i]mplementation… was further stymied by inadequate levels of consistent staff assignments[,] the lack of daily unit schedules needed to provide a consistent, predictable unit environment[,] COVID-related limitations on structured programming[,] the poor implementation of Informal Resolutions[,] and faltering implementation of the universal rewards/incentives that were part of the original design." *Id*. at 303.

891.    The Monitor found that "the only segment of Direct Supervision that has reportedly been properly implemented is the housing unit orientation, and that occurs only for

225

young adults assigned to the initial [Unit Management] building. The Department reports they are addressing these problems sequentially, focusing first on consistent staff assignments." *Id*.

892.    The Monitor further reported that "[b]y design, weekly Unit meetings would be the main vehicle for reinforcing key concepts and coaching Staff to properly implement…Direct Supervision," but that "the effectiveness of these meetings is undercut by the lack of consistent staffing and the fact that many of RNDC's supervisors have not received [the relevant] training." *Id*. at 304.

893.    In the Twelfth Monitoring Period, "the program's implementation . . . faltered." Monitor's Twelfth Rep. at 128. The Monitor found that "the facility has not established a staffing structure to support the model (e.g., long delays to appoint Unit Managers and then turnover among those who had been selected; staff assignments to housing units that changed constantly and thus the team concept could not be achieved)." *Id*. at 128-129. Despite completing Direct Supervision and Unit Management training for "nearly all Staff," "[s]uch a significant period of time passed since Staff were originally trained that the information imparted has likely gone stale, regular reinforcement of key concepts does not occur and thus, few Staff are likely to be prepared to implement the core practices." *Id*.

894.    In the Twelfth Monitoring Period, "[p]revious challenges to Staff assignments, dependable daily unit schedules, programming and universal incentives/consequences (all core components of the Unit Management strategy) were only magnified," and "[t]he absence of unit teams and the failure to properly implementation the key program elements mean[t] that the Department…made little, if any, progress in this area." *Id*. at 129.

895.    A rating was not provided after the Twelfth Monitoring Period given the immediate focus on the Action Plan, including the Violence Reduction Plan for RNDC. *See* Monitor's Oct. 28, 2022 Rep. at 172; Monitor's Apr. 3, 2023 Rep. at 218.

896.    The Department has not made progress in implementing the Direct Supervision model since the Twelfth Monitoring Period. Ex. 50 at 6 (stating that RNDC staff underwent training).

### C.    Failure to Implement Consistent Assignment of Staff

897.    The purpose of consistently assigning staff to the same housing unit is to "facilitate constructive Staff-youth relationships[; it] is a hallmark of Direct Supervision and is particularly important in units with youth who are difficult to manage and those who struggle with mental illness." Monitor's Eleventh Rep. at 305.

898.    This purpose, and the "benefit of developing relationships in order to change behavior…applies to consistent assignment of captains as well, given their essential role in helping Staff to improve practice." *Id*. Additionally, consistent assignments "ensure that Staff know the unit's daily routine, are able to facilitate the smooth operation of the unit and ensure that all services are provided…[and] helps to create a sense of ownership and investment in the unit's outcomes." *Id*.

899.    Consent Judgment § XV, ¶ 17 requires the Department to adopt and implement a staff assignment system under which a team of Officers and a supervisor are consistently assigned to the same Young Inmate Housing Area unit (housing 18-year-olds) and the same tour, to the extent feasible given leave schedules and personnel changes.

900.    First Remedial Order, § D, ¶ 1 requires the Department to, for all housing units at RNDC that may house 18-year-old Incarcerated Individuals, enhance the implementation of a staff assignment system under which the same correction officers, captains, and ADWs are

consistently assigned to work at the same housing unit and on the same tour, to the extent feasible given leave schedules and personnel changes.

901.    The Department is not complying with Consent Judgment § XV, ¶ 17 or First Remedial Order, § D, ¶ 1. Monitor's Nov. 8, 2023 Rep. at 92 (staff are not consistently assigned to the same housing unit day-to-day at RNDC).

902.    The Monitor has given the Department four consecutive Non-Compliance ratings for Consent Judgment § XV, ¶ 17. Monitor's Eleventh Rep. at 307; Monitor's Twelfth Rep. at 131; Monitor's Oct. 28, 2022 Rep. at 172; Monitor's Apr. 3, 2023 Rep. at 219.

903.    First Remedial Order, § D, ¶ 1 has only been rated twice since the order was entered, and on both occasions the Monitor rated the Department in non-compliance. Monitor's Eleventh Rep. at 307; Monitor's Twelfth Rep. at 131.

904.    In the Eleventh Monitoring Period, RNDC's consistent assignment of staff "degraded, largely because the Facility was not properly managing staff assignments." Monitor's Eleventh Rep. at 305. Though "on paper" posts were assigned to particular staff members, "in practice, posts were worked by the assigned person only about half the time" because facility leaders "pull[ed] assigned Staff off of housing unit posts to fill gaps in coverage elsewhere and fail[ed] to re-assign posts when the assigned officer transferred, left the Department or otherwise became unavailable to work." *Id*. The Monitor said that in order to achieve a compliance rating, "60% of posts must be worked by the assigned [officer] in [General Population] units and 70% of posts must be worked by the assigned [officer] in [specialty] units. This threshold was not met in any month for the [General Population] or [specialty] units." *Id*. at 305-306.

905.    In the Eleventh Monitoring Period, captains worked the posts to which they were assigned "fewer than half" the time. *Id*. at 306.

906.    In the Twelfth Monitoring Period, RNDC's performance level "degraded even further below the levels observed in the previous Monitoring Period." Monitor's Twelfth Rep. at 129. The Monitor found that "[o]n average, only 27% of [General Population] housing unit posts were worked by the assigned Staff person and only 15% of housing unit posts in specialized units …were worked by the assigned Staff person. During the latter part of the Monitoring Period, the [specialty] units' performance was below 10%." *Id.*

907.    Consistent assignment of captains likewise degraded in the Twelfth Monitoring Period, with only 30% of captains working the post to which they were assigned. *Id.* at 130.

908.    Though NCU had not yet begun to audit consistent assignment of ADWs in the Twelfth Monitoring Period, the Monitor noted that of the 15 ADWs assigned to RNDC, 6 were unavailable to work and 6 more were not assigned to any particular zones or buildings. *Id.*

909.    In January 2022, NCU "conducted an assessment of staff resources at RNDC using a one-day snapshot from January 2022 to illustrate why the Department was demonstrating so little progress with the consistent staffing requirements of the Consent Judgment and Remedial Order for this facility." Monitor's Mar. 16, 2022 Rep. at 20.

910.    NCU could only provide a "best estimate" of the number of officers assigned to RNDC because there were "a number of discrepancies…relating to the status of the officers and the number of officers actually assigned to RNDC," which the Monitor reported was "consistent with the Monitoring Team's staffing analysis which found that the Department cannot accurately identify where staff are assigned or their status at any given time." *Id.*

911.    Of the 929 officers the NCU believed to be assigned to RNDC, at least 49% were unavailable to be assigned to a post engaging with people in custody due to various leaves or temporary assignment to another command. *Id.*

912.    NCU has not conducted audits of consistent staffing at RNDC since January

2022. Monitor's Nov. 8, 2023 Rep. at 92; Monitor's Mar. 16, 2022 Report at 20.

913.    The fundamental issues stymieing reform that the Action Plan seeks to address—

including adequate tracking, managing, and deployment of staff—continue to prevent the

Department from complying with this provision. *See* Monitor's Oct. 28 2022 Rep. at 172

(finding that "[o]nly when the Department has a coherent structure for assigning, tracking and

scheduling staff can efforts to consistently assign officers and Captains to the same housing units

day-to-day be accomplished and assessed"); Monitor's Apr. 3, 2023 Rep. at 219. Defendants'

response to Plaintiffs' non-compliance notice notes only efforts to reduce department-wide

staffing outages in general and claims "it's not necessarily about the consistency of staff but

about the consistent delivery of services by staff, regardless of who is assigned to the post." Ex.

50 at 7.

X.    **Self-Harm**

914.    The Monitor has raised concerns about DOC's supervision of and response to people at risk of self-harm since at least the Ninth Monitoring Period, documenting problems in areas such as safety and welfare checks, rescue efforts and first aid, and screening and management of individuals at risk, and noting that deaths due to self-harm "are related, at least in part, to the convergence of poor operational and clinical practices, inadequate supervision, and management failures that have characterized the day-to-day operations of the jail for decades." Monitor's Oct. 28, 2022 Rep. at 27-28 & n. 31.

915.    At the emergency court conference held September 24, 2021, the Monitor described having reviewed two days earlier an incident "in which officers literally within six feet of a hanging inmate that was in their direct line of sight did not detect that." Tr. of Sept. 24, 2021 Status Conference at 6, Dkt. 407. The Monitor further observed that the pressing issue with regards to self-harm was staff's "failure to intervene immediately" when they observe indicators of self harm. The Monitor said it was "in my experience, unprecedented, where an officer will observe gesturing or the preparation of a ligature or possession of a ligature and not immediately intervene. That must be stopped. It must be stopped now. If it requires active, very, very active superintendents and direction by supervisors and by personnel, they must do it." *Id*. at 7.

916.    With respect to tracking attempted suicide or individuals engaging in self-harm, DOC has a category for "Self-Injurious Behavior" in IRS, its data tracking system, that was first utilized on April 6, 2023. Between April 6, 2023 and September 30, 2023, approximately 560 incidents of self-injurious behavior or attempted suicides were reported. Monitor's Nov. 8, 2023 Rep. at 68.

917.    Incidents tracked in IRS may fall under multiple categories, but must be tracked by the "main" category so it is possible that some self-injurious behavior is reported in under a

231

different category (*e.g.*, in-custody death or logbook entries) so the IRS category of "Self-Injurious Behavior" may produce an underestimate. *Id.* at 68-69.

918.    Prior to April 6, 2023, self-harm incidents were generally reported as "Logbook Entry" in IRS along with a variety of other incidents. Between January 1, 2022 and June 30, 2023, over 1,900 incidents were coded as "Logbook Entry." The majority of those incidents involved some type of self-injurious behavior. *Id.*

919.    Between January 1, 2022 and September 30, 2023, 17 suicide attempts were reported via COD under the category "Suicide Attempt." This is likely an undercount because some suicide attempts were reported under the category of "Self-Injurious Behavior." *Id.*

920.    According to data collected by Correctional Health Services, there were 125 self-harm incidents in April 2023 alone *See* NYC Health + Hospitals, Corr. Health Services, *CHS Injury Reporting: April 2023* at 12 (Apr. 25, 2023), Ex. 51.

921.    The Second Remedial Order ¶ 1(i)(b) requires DOC to communicate to Staff their obligations under the Suicide Prevention and Intervention Policy ("Suicide Prevention Policy") by ordering staff to respond timely to self-harming behavior via teletype, roll call and other forms of on-the-job supervision and guidance. This communication was required immediately upon entry of the Second Remedial Order, and then routinely (*e.g.*, weekly) thereafter. The Second Remedial Order also requires DOC to take necessary steps to ensure that staff follow the Suicide Prevention Policy.

922.    The Action Plan § D, ¶ 2(g) again required DOC to implement improved security practices and procedures, including the self-harm procedures and policies as required by ¶ 1(i)(b) of the Second Remedial Order.

923.    In October 2022, the Monitor reported that there were still significant concerns about self-harm practices, and created a list of "immediate steps" that "must be taken" to reduce risk of harm, including steps to eliminate barriers between health care providers and DOC that impeded efforts to respond to self-harm, initiating morbidity-mortality reviews, eliminating the use of the phrase "manipulative gestures" in reference to self-harm, initiating weekly reviews of self-harm incidents by facility and Department leadership, and more. Monitor's Oct. 28, 2022 Rep. at 28-31. The Monitor recommended that a qualified expert be retained to conduct an external assessment. *Id.* at 30-31.

924.    Despite engaging an expert consultant, Dr. Timothy Belavich, in late 2022 and early 2023, DOC did not utilize the expert as the Monitor recommended in October 2022 for several months. Monitor's July 10, 2023 Rep. at 48. Dr. Belavich "recently" observed a Morbidity + Mortality review meeting. Monitor's Aug. 7, 2023 Rep. at 5.

925.    In July 2023, more than nine months since the Monitor made those recommendations, the Monitor reported that DOC was "no closer to improving practice and reducing the risk of self-harm." Monitor's July 10, 2023 Rep. at 45, 48.

926.    DOC generally fails to urgently respond to events of self-harm and fails to supervise individuals following a suicide attempt. Monitor's Oct. 5, 2023 Rep. at 6. Apart from issuing a teletype in June 2022 reminding staff of their obligations following a self-harm event and screening an instructional video on self-harm incidents, DOC has made little progress rectify poor staff practice. *Id.* As of September 11, 2023, 67% of staff have received the annual training on suicide prevention. *Id.*

927.    Between the entry of the Second Remedial Order in September 2021 and October 31, 2022, seven people died by suicide or suspected suicide (six of whom died after the Action

Plan was entered in June 2022: (1) Dashawn Carter (date of death May 7, 2022); (2) Antonio Bradley (June 18, 2022); (3) Ricardo Cruciani (August 15, 2022); (4) Michael Nieves (August 30, 2022); (5) Kevin Bryan (September 14, 2022); (6) Gregory Acevedo (September 20, 2022); (7) Erick Tavira (October 22, 2022).

928.    An eighth person, Rubu Zhao, died on May 16, 2023, after sustaining injuries from reportedly jumping off a higher tier of a housing unit and landing on the lower tier.

929.    The Board of Correction identified that correction officers did not tour or supervise people in custody in accordance with policy in 13 of 19 deaths that occurred in DOC custody in 2022. This includes all of the incidents described *supra* ¶¶ 171, 346; BOC 2022 Second Rep. at 21, 24, 30, Ex. 55; BOC 2022 Third Rep. at 26-27, Ex. 56.

930.    The BOC has repeatedly found that insufficient rounding and supervision is a pressing issue and that most of the investigations described in its reports illustrated poor touring and observation practices within housing units. BOC 2022 Second Rep. at 21, Ex. 55; BOC 2022 Third Rep. at 26, Ex. 56. For example, an officer assigned to Erick Tavira's mental observation cell unit frequently left the post and failed to tour every 15 minutes, after which he was discovered dead.

931.    DOC's and Health + Hospital's policies related to suicide prevention have been referred to the City's Law Department to review whether they reflect generally accepted practice. As of the Monitor's report of July 10, 2023, no date for the completion of policy development had been provided. *See* Monitor's July 10, 2023 Rep. at 47.

932.    The status of the assessments recommended by the Monitor on the following issues is unknown: Assessing the adequacy of H+H protocols for screening, assessing, and treating the risk of suicide and Department protocols for responding to suicidal ideation, making

referrals and monitoring those who are on suicide precautions; Assessing Department staff's practices and responses to self-harm incidents to identify problem areas; Assessing current H+H and Department practices to identify where performance is subpar. *Id*. at 47-48.

933.     The Suicide Prevention Task Force has not taken tangible action on the following initiatives: (1) reviewing policy and procedures; (2) evaluating and reviewing training; (3) improving follow-up on mental health referrals; (4) improving information sharing during the new admissions process; (5) increasing video surveillance coverage; (6) improving tracking of 15-minute tours; (7) rotating individuals assigned to Suicide Watch Officer duty. *See* Monitor's July 10, 2023 Rep. at 49.

**XI.    DOC's Failure To Consult, Cooperate, and Provide Accurate Information**

934.    Transparency, proactive coordination, and cooperation between the Department and the Monitoring Team are necessary to advance the reforms and facilitate compliance with the Consent Judgment and for the Monitoring Team to do its work. Monitor's Mar. 16, 2022 Rep. at 24-25.

935.    The Consent Judgment and Remedial Orders require DOC to consult with the Monitoring Team, and in some cases obtain approval from the Monitor, on a significant number of provisions in the Consent Judgment and Remedial Orders, which requires coordination and document sharing. *See* Monitor's June 8, 2023 Rep. at 16-18.

936.    Consent Judgment § XX, ¶ 8 requires DOC to provide the Monitor with access to, among other things, non-privileged documents and information, and the right to conduct confidential interviews of staff members outside the presence of other staff members. Consent Judgment § XX, ¶ 13 requires DOC to encourage all staff members to cooperate fully with the Monitor and his staff.

937.    These requirements support a transparent and candid relationship between DOC and the Monitoring Team and are intended to advance reforms as efficiently as possible.

938.    From January 1, 2022 to this filing in November 2023, DOC has altered its management of its compliance efforts with the Monitoring Team to eliminate the proactive and collaborative approach that previously existed, to reduce its level of cooperation, and to limit information-sharing and access in ways that inhibit the Monitor's work. Monitor's Mar. 16, 2022 Rep. at 25; Monitor's June 8, 2023 Rep. at 19.

939.    Some improvements occurred, but they were not sustained as of this filing in November 2023, as similar problems began to reemerge in late 2022 and early 2023, resulting in

a lack of transparency, consultation, and collaboration that has impacted the Monitor's work. Monitor's June 8, 2023 Rep. at 19.

940.    On July 10, 2023, the Monitor reported that at that time key problems included DOC's failure to provide the Monitor with necessary information; providing inconsistent, inaccurate, incomplete, or misleading information; data errors and poorly vetted information; failing to consult with the Monitor on Nunez-related policies and practices; and poor internal coordination on Nunez matters, among other things. Monitor's July 10, 2023 Rep. at 158-9.

941.    Despite the appointment of a Nunez manager, DOC could not provide the Monitor with information in a proactive, timely, consistent, and complete manner as of October 2023. Monitor's Oct. 5, 2023 Rep. at 13, 23. As of November 2023, the Monitor experienced difficulties in verifying data and information and staying apprised of DOC's activities. *Id*. at 12-13; Monitor's Nov. 8, 2023 Rep. at 4, 48 ("Defendants are attempting to hamper the Monitor's work.").

A.    **DOC Promulgates *Nunez*-Related Policies and Protocols Without Consulting or Receiving Approval from the Monitor**

942.    The Consent Judgment § IV, ¶ 1 required the UOF Directive to be approved by the Monitor.

943.    The Action Plan § D, ¶ 3 requires DOC to consult with the Monitor on the systems, plans, and initiatives to improve security practices set forth in Action Plan §D., ¶ 2, and requires the Monitor to specifically determine the plans' sufficiency, and requires DOC to implement any additional requirement from the Monitor.

944.    The Action Plan § E, ¶ 4 required DOC to consult with and receive approval from the Monitor in developing a restrictive housing strategy to manage incarcerated individuals that have engaged in serious acts of violence and pose a heighted security risk.

237

945.    The June 13, 2023 Order, § 1, ¶ 5 requires DOC to proactively consult with the Monitor in advance of promulgating any new policies or procedures that relate to compliance with the *Nunez* court orders. It requires DOC to provide the Monitor with reasonable notice and information of any such new policy and practice, at least three weeks prior to planned implementation, in order to afford the Monitor an opportunity to provide meaningful feedback and for DOC to consider and reasonably incorporate any feedback from the Monitor prior to implementing any new policy and practice.

946.    DOC had not consulted with the Monitor or received the Monitor's approval prior to promulgating several policies and procedures as set forth in paragraphs 947 to 959 below.

947.    In May 2023, DOC issued a directive requiring Enhanced Supervision Housing (ESH) staff to utilize three-point restraints when securing Level 1 participants to restraint desks, in response to an incident where *staff* failed to follow appropriate procedures. Monitor's July 10, 2023 Rep. at 125.

948.    DOC implemented this policy without consulting the Monitor, despite the fact that DOC's restraints policy, as well as its restrictive housing strategy, are subject to consultation with and approval of the Monitor. *See* Action Plan § D, ¶ 3 (security practices); Action Plan § E, ¶ 4 (restrictive housing strategy).

949.    The Monitoring Team only learned about the revised ESH three-point restraints policy through an anonymous source. Monitor's July 10, 2023 Rep. at 125.

950.    When the Monitor learned of the policy and requested a copy, DOC rescinded the policy, only to reinstate it on July 4, 2023, at the direction of the Commissioner. *Id.* The Monitoring Team was advised of the policy's reinstatement after the fact. *Id.*

951.    In April 2023, DOC promulgated a New Admission policy related to intake procedures, despite previously agreeing to hold that policy in abeyance until a determination about the scope of "clock stoppages" (an issue with calculating length of time in intake) had been made. Monitor's June 8, 2023 Rep. at 23-24.

952.    The Monitor was only informed about the new policy 42 days after it was issued. *Id.* DOC also failed to disclose this new policy in its April or May 2023 status reports to the Court regarding intake. Monitor's June 8, 2023 Rep. at 23; Dkt. 519; Dkt. 532.

953.    In 2023, DOC began using "soft-hand force" with individuals who refuse to go to court. Monitor's June 8, 2023 Rep. at 34.

954.    DOC implemented this soft-hand policy without receiving approval from the Monitor, despite the fact that DOC's UOF Directive is subject to the approval of the Monitor. *See* Consent Judgment § IV, ¶ 1.

955.    DOC reported that it was simply reverting to a practice that was, unbeknownst to the Monitoring Team, in use before late 2022. Monitor's June 8, 2023 Rep. at 34.

956.    DOC promulgated policies related to screening staff for promotion, without consulting the Monitoring Team. *See supra* ¶¶ 512-513; Monitor's June 8, 2023 Rep. at 35.

957.    In March 2022, DOC also materially altered instructions for supervisory tours that had originally been developed in consultation with the Monitoring Team. The revisions themselves ran afoul of *Nunez* requirements and created an imminent risk of harm. The policy was not rescinded until the Monitor expressed significant concerns about the revised policy. *See supra* ¶¶ 356-358; Monitor's Mar. 16, 2022 Rep. at 27.

958.    DOC implemented this policy without consulting the Monitor. *Id.* at 27-28.

959.    In October 2023, the Department sought the Monitor's input on revisions to an ESH policy and advised that any feedback had to be provided in less than 24 hours, despite the fact that proposed revisions were based on feedback from a state oversight body that had been provided to the Commissioner over two months earlier. Monitor's Nov. 8, 2023 Rep. at 55-56.

### B.    The City Promulgates *Nunez*-Related Trainings Without Consulting the Monitor

960.    The Action Plan § D, ¶ 3 requires DOC to consult with the monitor regarding systems, plans, and initiatives to improve security practices, including reduced reliance on, and appropriate composition of, Emergency Response Teams.

961.    In April 2023, the Monitor recommended that DOC re-train all ESU/SRT staff. In response, DOC began to develop the training material. On April 25, 2023, the Monitor provided detailed written feedback on considerations for inclusion in the training. On June 2, 2023, DOC provided an outline of the course without any detailed or substantive information that would be conveyed to the trainees. On June 6, 2023, the Monitor provided initial feedback based on the limited information provided by DOC and requested more fulsome materials to permit proper evaluation of the course. Monitor's July 10, 2023 Rep. at 85.

962.    On June 14, 2023, DOC proceeded with the ESU/SRT training despite having not provided the requested training materials to the Monitor. *Id.* at 85, 155.

963.    After June 15, 2023, after the training had already begun, DOC provided the training materials to the Monitor. *Id.* at 85. The Monitor found that the training materials were inadequate to address ESU's dangerous practices, failed to address the Monitoring Team's concerns, and ignored problematic circumstances that needed to be remediated (e.g., "do not take a rear-cuffed individual to the floor face-first"). *Id.* at 85-86.

964.    DOC failed to consult with the Monitoring Team on ADW Pre-Promotional Trainings despite the Monitor's repeated requests to review them in advance. *Id.* at 86.

965.    These training materials were provided on June 15 and June 16, 2023 and the Monitoring Team was advised that training would begin on June 19, 2023, after the weekend, precluding meaningful collaboration between DOC and the Monitoring Team. *Id.*

966.    These training materials were also wholly inadequate and included only superficial treatment of ADW duties. *Id.*

967.    The Monitoring Team provided initial feedback on training materials related to the Consent Judgment on June 6, 2023, noting that the materials were outdated and insufficient and that the Monitoring Team would connect with training staff the following week. *Id.*

968.    However, the Monitoring Team learned that a video by senior executive delivering an overview of the Consent Judgment was presented on June 14 and 15 at ESU trainings and others without consultation with the Monitoring Team. *Id.* Parts of that video contained questionable messaging and were misleading. *Id.*

969.    DOC issued a revised conflict resolution training and implemented new forms for its restrictive housing unit (RESH)—both of which require Monitor approval—without even consulting the Monitor. Monitor's Oct. 5, 2023 Rep. at 15.

970.    In 2023, the quality of training curricula and lesson plans—key to improved staff practice—were significantly flawed. Supervisory training and ESU training require significant revision to reach an adequate level. *See* Monitor's Nov. 8, 2023 Rep. at 3.

C.    **The City Withholds Essential Information and Provides Inaccurate Information**

971.    Consent Judgment § XX, ¶ 8 requires DOC to provide the Monitor with access to, among other things, non-privileged documents and information, and the right to conduct

confidential interviews of staff members outside the presence of other staff members. Consent

Judgment § XX, ¶ 13 requires DOC to encourage all staff members to cooperate fully with the

Monitor and his staff.

972.    **DOC has withheld information, has provided inaccurate, misleading, or

incomplete information, and has obstructed the Monitor's ability to collect information from

DOC staff. **

> **Nature of Dispute**:        Legal Dispute-Other
> **Position of Defendants**:    Defendants object to this statement on the basis that it is
> overbroad and not contained to a specific period of time.
> **Position of Plaintiffs**: This is a factual finding the Court is entitled to make based on the
> information cited in paragraphs 973-1032, which contain citations with relevant dates.

973.    In early 2022, DOC refused to provide data to the Monitor on staff absenteeism

(which had previously been shared with the Monitor); interfered with the Monitor's ability to

have an unimpeded conversation with the recently-appointed Interim Deputy Commission of ID;

and refused to provide a briefing on safety and security initiatives underway at that time.

Monitor's Mar. 16, 2022 Rep. at 26-28.

974.    As of November 8, 2023, over 80 of the Monitoring Team's requests for

information and feedback are were outstanding, with more than 50 of them outstanding over 30

days. Monitor's Nov. 8, 2023 Rep. at 56.

### 1.    May 26, 2023 Report Regarding Five Serious Incidents

975.    On May 26, 2023, the Monitor filed a Special Report with the Court regarding

five serious incidents, including an incident which led to an incarcerated individual being

paralyzed, a self-harm incident that resulted in an incarcerated individual's death, another

incident which led to an incarcerated individual's death, and two other incidents resulting in

injuries serious enough to require hospitalization.

976.    DOC had not notified the Monitor of these incidents, and the Monitor learned of them only through allegations received from external stakeholders and media reports. Monitor's May 26, 2023 Rep. at 15.

977.    Despite the severity of these incidents, DOC provided information about them to the Monitor, with very few exceptions, only upon request, requiring significant and repeated follow-up, and left certain requests for information outstanding. Monitor's May 26, 2023 Rep. at 12.

978.    Though the Commissioner advised the Court that he "support[s] the monitoring team being able to speak to any employee or staff member that they feel they need to speak to understand," the Commissioner subsequently told the Monitor that his team could not speak with DOC staff to receive briefings about these incidents. Monitor's June 8, 2023 Rep. at 25.

979.    The Commissioner had advised the Court that "the monitor will not hesitate to report to the Court if they feel that we've refused to do something that's obviously required and feasible," but this amenability shifted when the Commissioner suggested that the Monitoring Team not file its May 26, 2023 Special Report because it would cause "great harm" to DOC and would "fuel the flames of those who believe [DOC] cannot govern [itself]." Monitor's May 26, 2023 Rep. at 14; Monitor's June 8, 2023 Rep. at 25.

980.    With respect to two of the incidents described in paragraph 975, *supra*, which resulted in the death of incarcerated individuals, the Commissioner asserted that there was "no departmental wrongdoing," when objective evidence in fact suggested at a minimum that an investigation into the circumstances was necessary. Monitor's June 8, 2023 Rep. at 44.

981.    With respect to the self-harm incident that resulted in an individual's death, *supra* ¶ 975, DOC originally asserted that staff behaved according to policy, when in reality there were

questions as to whether self-harm reporting occurred pursuant to policy as well as whether there was active supervision at the time of the incident. *Id*.

982.    With respect to another incident in which an incarcerated individual was transported to the hospital for treatment and later died, *supra* ¶ 975, DOC originally stated that the individual "appeared to sustain a heart attack" and that DOC did not suspect any foul play. Monitor's May 26, 2023 Rep. at 9. Monitor's May 31, 2023 Rep. at 1. The Commissioner reported that "there was no official wrongdoing" with regard to the incident. Monitor's May 26, 2023 Rep. at 9. An autopsy later revealed that this individual had a fractured skull, and DOC stated it was unsure how he obtained this injury. Monitor's May 31, 2023 Rep. at 1-2 An investigation was then opened into the incident. *Id.* at 2.

983.    With respect to the incident which resulted in an incarcerated person (later identified as Mr. Carlton James, *supra* ¶ 260) being paralyzed, *supra* ¶ 975, a Deputy Commissioner unequivocally reported to the Monitor that the individual was injured due to a pre-existing condition that was exacerbated when he fell trying to put on his shoes. Monitor's June 8, 2023 Rep. at 45. The Monitor noted that this explanation as not consistent with the video evidence, and underlying information later provided to the Monitoring Team revealed that the individual had hit his head and that there were a litany of operational concerns that were not originally disclosed. *Id*.

984.    This underlying information was available to the Deputy Commissioner at the time he reported to the Monitor that these injuries were the result of a fall while tying shoes. *Id.* The Deputy Commissioner thus did not provide all the medical and situational detail available at the time the Monitor requested this information, and instead obfuscated the extent of the issues involved. *Id.* The Commissioner publicly claimed that video of this incident showed Department

staff did not act inappropriately, when in fact a facility Rapid Review had already determined that the incident was avoidable, and five staff had received immediate corrective actions related to the incident. Monitor's July 10, 2023 Rep. at 23.

985.    The Mayor and Commissioner made public comments regarding the Monitor's May 26, 2023 Special Report describing the five serious incidents, stating the Monitor's concerns were "absurd," and that the incidents discussed reflected "great discipline" and "professionalism" on the part of Department staff. *Id.* at 154. The Monitor found that these comments reflected a failure to appreciate not only the objective evidence, but also DOC's own findings of wrongdoing. *Id.*

## 2.    Withholding and Delayed Production of *Nunez* Related Information

986.    In September and October 2023, the Commissioner (and in one case, the City) refused to provide information in response to the Monitor's request for: (1) underlying information related to the Department's compliance with discipline for biased, inadequate or incomplete use of force investigations; (2) written documentation regarding the demotion of the Associate Commissioner of ID; and (3) the Commissioner's February 2022 referral letter to the Department of Investigation regarding *Nunez* matters referenced in the Department's Compliance Report. Monitor's Nov. 8, 2023 Rep. at 49.

987.    In response, DOC advised that it would not respond to these requests because it was the Commissioner's position that these requests were "not within the scope of the Nunez Consent Judgment and Remedial Orders and he does not intend to respond, absent a court order to do so." *Id.* The Monitoring Team engaged in repeated follow up and lengthy discussions to advocate for production of the requested materials. *Id.*

988.    With respect to Request 1, in mid-October, 40 days after the information was originally requested, the Department finally produced responsive material. *Id.* at 50. As part of

its response, the Department noted that there was an "infrequency of discipline" during 2018-2022 due to prior ID leadership which "permitted over 2000 cases to be summarily dismissed without any discipline for staff." *Id.* The Department thus admitted that it was well-aware of its prior non-compliance with discipline requirements and yet, the Monitor noted the Department did not take any meaningful action since 2022 to address this. *Id.* at 50 (noting DOC's "persistent non-compliance").

989.    With respect to Request 2, responsive material was only produced 49 days after the initial request was made. The Department claimed that documentation regarding the demotion of the Associate Commissioner of ID was beyond the scope of *Nunez* despite advising the Court on April 25, 2023 that this same individual's leadership role was intended to improve ID and address the Monitor's findings. *Id.* at 50.

990.    On September 5, 2023, the Commissioner further advised the Monitor that he would engage in a back and forth if the Monitor included "glowing representations" about the individual in future reports. The baseless refusal and protracted debate appeared to be "an attempt to interfere with the Monitor's ability to conduct a thorough examination of the issues." *Id.* at 50-51.

991.    With respect to request 3, the responsive material--the February 2022 referral letter--was only produced after the Court compelled production on October 30, 2023, over 50 days after the request was made and after debate over baseless objections. *Id.* at 51. This is well beyond the 14-day deadline required by the *Nunez* Court Orders. *Id.* at 51 n. 39.

### 3.    Inaccurate information regarding Intake

992.    DOC uses intake areas in dedicated facilities to hold individuals entering Department custody while they are being processed and assigned to a housing area (i.e., new admissions). DOC also uses intake areas to hold individuals who are being transferred within a

facility ("intra-facility transfers") and to hold individuals who are being transferred between Department facilities ("inter-facility transfers"). Monitor's Mar. 16, 2022 Rep. at 46.

993.    As of February 2023, intake areas continue to be the second most frequent location for uses of force. Monitor's Feb. 3, 2023 Rep. at 3-4.

994.    The Second Remedial Order ¶ 1(i)(c) required DOC to develop and implement, by November 15, 2021, a reliable system to track and record the amount of time any incarcerated individual is held in intake and any instance when an individual remains in intake for more than 24 hours (the "Inmate Tracking Clause"). DOC is required to process all incarcerated individuals, including but not limited to new admissions and intra-facility transfers, through Intake and place them within a housing unit within 24 hours. Dkt. 398.

995.    The Action Plan § E, ¶ 3(a) required DOC to implement the requirements of the Second Remedial Order ¶ 1(i)(c) and to process incarcerated individuals through intake within 24 hours.

996.    On February 8, 2023, Christopher Miller, Deputy Commissioner for Classification, Custody Management and Facility Operations, testified that the inmate tracking system ("ITS") can be used track the time that individuals subject to intra/inter facility transfers spend at each stage in the process, including in Intake units. *See* Dkt. 505-1 at ¶ B(4).

997.    DC Miller testified that DOC was "in the process of taking the following steps," all of which would be "fully implemented by the end of February [2023]": all persons in custody entering or exiting an intake area will be manually scanned and tracked by ITS. *Id.*

998.    As of mid-February 2023, DOC had not yet implemented a systemwide tracking mechanism to monitor stays in inter/intra facility Intake units. Dkt. 511 at 22 (citing facts in record).

999.    On March 13, 2023, the Court found that there was clear and convincing evidence that DOC was noncompliant with the Inmate Tracking Clause with respect to inter/intra facility transfers. *See* Dkt. 511 at 22-23. The Court declined to hold Defendants in contempt for this non-compliance, noting that DOC was reportedly "on the brink" of implementing the relevant tracking plan, which was now to be rolled out by March 15, 2023, according to Miller's most recent submissions. Dkt. 511 at 26. The Court stated that "only if the recent sense of urgency and dedication shown by the Department continues can the Defendants expect to . . . avoid a finding of civil contempt." Dkt. 511 at 29.

1000.    By declaration dated April 17, 2023, DC Miller testified that a March 27, 2023 Memorandum directed each facility to record the time an individual enters and leaves an intake area in ITS using the bar code on the individual's accompanying card. *See* 519-1 at ¶ 10. Nonetheless, because "staff [were] still not entering data in the ITS system as consistently as they should be," it could not provide daily report data on intra-facility intake stays. Dkt. 519-1 at ¶ 11.

1001.    In June 2023, the Monitor reported that its recent site work revealed at least some situations in which an individual was in intake but was not being tracked according to the Action Plan's requirements. Monitor's June 8, 2023 Rep. at 30. For example, intake staff stated that certain individuals did not need to be entered into ITS despite being physically present in intake. *Id.*

1002.    When the Monitor informed DOC of its findings on May 30, 2023, DOC advised the Monitoring team, for the first time, that "certain individuals in intake are not being tracked because their placement in intake was 'not a *Nunez* issue.'" Monitor's June 8, 2023 Rep. at 30.

1003.   By declaration dated June 20, 2023, DC Miller confirmed that not every individual present in an Intake unit was tracked in ITS. *See* Dkt. 553-1 at ¶ 14.

1004.   DC Miller noted that his March 23, 2023 Memorandum was intended to direct that all individuals in the facility Intake areas be entered into ITS, but that he "orally modified [his] directive" so that it applied only to people "changing beds," and *not* to individuals "go[ing] to court, the hospital, a clinic in a different facility, or religious services [in a different facility] are not now recorded in the ITS system." *Id.* at ¶ 15.

1005.   The City now contends that its court submissions unintentionally "left the impression that every individual passing through intake was being recorded in the ITS system" and that DOC now belatedly understands the unambiguous requirements of the Second Remedial Order that requires reliable tracking of *all* individuals in *all* Intake areas. Dkt. 553-1 at ¶¶ 16-17.

1006.   On June 21, 2023, counsel for Defendants submitted a letter to the Court explaining that "Prior to the Monitoring Team's observations on this issue, the Law Department attorneys assigned to this matter had no reason to believe that all persons going through the Intake areas in various Department facilities (but not in new admissions Intake) were not being tracked in the ITS system." Dkt. 553 at 1.

1007.   As of September 2023, DOC reported that the percentage of intra-facility intake stays properly entered into ITS on any given day ranged from 60% to 89%, with median of 78%, according to "DOC data quality analysts." Dkt. 571-1 at ¶ 16.

1008.   During a September 27, 2023 site visit, the Monitoring Team found individuals in intake in RNDC and OBCC who were not entered into ITS. Monitor's Oct. 5, 2023 Rep. at 59-60.

### 4.    Inaccurate information regarding the promotion of ADWs

1009.    DOC committed to providing the Monitoring Team with routine updates regarding promotions, but the Monitor reported in July 2023 that DOC did not do so. Monitor's July 10, 2023 Rep. at 76.

1010.    At the June 13, 2023 Emergency Court Conference, the Commissioner represented that "if I believe even that there is even a 1 percent chance that it might intersect with the work of the core mission of [the Consent Judgment], I have encouraged my staff to confer with the monitor or a member of the monitoring team. That is still ongoing." *Id.* at 155.

1011.    The next day, the Monitoring Team learned that DOC was promoting the newest ADW class without consulting the Monitoring Team. *Id.*

1012.    When the Training Division notified the Monitor that pre-promotion training would commence shortly, the Monitor asked DOC for more information, and was belatedly advised that six individuals were promoted to ADW and provided with documentation regarding those individuals. *Id.* at 76.

1013.    Shortly afterward, the Monitor learned through DOC's social media page that ten ADWs, rather than 6, were recently promoted. *Id.* at 77.

### 5.    Inaccurate Information regarding ESU

1014.    In January 2023, the Monitor told DOC that several staff who had been removed from ESU in 2021 (pursuant to screening practices intended to keep staff who have been disciplined for misconduct out of the unit) were improperly reinstated to ESU. *Id.* at 39-40.

1015.    After the Monitoring Team identified this problem, DOC reported that it had again removed these individuals from the ESU. *Id.*

1016.    However, this information was not accurate, as at least some of these individuals in fact remained on ESU or similar teams. *Id.*; Monitor's June 8, 2023 Rep. at 24.

1017.  Even after this troubling failure, DOC never engaged with the Monitoring Team regarding its offer to consult with DOC on how it could revise ESU screening procedures. July 10, 2023 Rep. at 40.

1018.  Indeed, during a recent round of screening, DOC provided the Monitor only with the outcome, and not with the underlying documentation that would enable the Monitor to assess the quality of the screening. *Id*.

1019.  After three months, DOC provided the Monitoring Team with a list of the ESU Command Level Orders ("CLOs") that was inconsistent with information the Department provided in 2021. Monitor's Nov. 8, 2023 Rep. at 54. When the Monitoring Team inquired about this, DOC responded that given the change in ESU leadership, it mistakenly believed that only two CLOs were in effect, when in fact, there are 9 CLOs in effect. *Id.*

### 6.     Inaccurate Information regarding Awarded Posts

1020.  The Action Plan requires DOC to "reduce the use of awarded posts so they are primarily utilized for those positions in which a particular skill set is required." Action Plan § C(3)(v).

1021.   Despite DOC's repeated statements that it has the unilateral managerial authority to reduce awarded posts, the Monitoring Team had been advised on at least four separate occasions to the contrary by Department Staff, including the Staffing Manager who claimed that the collective bargaining agreement remains an impediment to changing practices around awarded posts. Monitor's Jun. 8, 2023 Rep. at 31; July 10, 2023 Rep. at 103.

1022.  Despite repeated prior claims to the contrary, DOC has now determined that the data on awarded posts it previously provided to the Monitor was inaccurate. *Id*.

1023.  DOC also recently reported for the first time, after the subject of awarded posts had been under discussion for more than a year, that there were staff who had been "informally

251

assigned" to awarded posts, such that the award was not documented, but that those individuals had now been removed from these assignments. *Id*.

1024.   DOC claimed to have updated its data regarding awarded posts, but as of July 2023 had not provided the Monitoring Team with its methodology for generating this data, nor provided documentation related to informal awarded post assignments, which made it impossible for the Monitor to assess the veracity of the data provided. *Id*.

### 7.      Notifications about serious hospital cases

1025.   Even after the Court's June 13, 2023 Order, the Monitor found as of October 5, 2023 that DOC failed to report at least 12 cases (and likely others as yet unidentified) to the Monitor of individuals being admitted to the hospital because of serious injuries or serious conditions ("Serious Hospital Cases"). Monitor's Oct. 5, 2023 Rep. at 12, 22.

1026.   As of November 2023, DOC had not yet devised a satisfactory process to notify the Monitor of Serious Hospital Cases. While DOC had sufficient information to identify cases that meet the criteria for notification, it had not done so reliably. The Monitor has met with DOC several times to discuss how to strengthen its protocol for notifying the Monitor of Serious Hospital Cases. As of November 2023, DOC had only notified the Monitor of fewer than 10 Serious Hospital Cases. *See* Monitor's Nov. 8, 2023 Rep. at 34.

### 8.      Conflicting Information Regarding Submachine Guns and De-Escalation Units

1027.   In November 2023, four months after the Monitoring Team first requested that DOC identify which staff are authorized to use submachine guns and policies governing their use, DOC had provided conflicting information, leaving the Monitor in the dark about the answers to its questions. Monitor's Nov. 8, 2023 Rep. at 54-55.

1028.  DOC provided conflicting reports about whether de-escalation units are currently in use and whether they will be utilized in the future. Monitor's Nov. 8, 2023 Rep. at 55. Recently, DOC officials informed the Monitoring Team that some facilities halted the use of de-escalation units. *Id.* NCU leadership advised the Monitoring Team that NCU had not been notified that certain facilities were no longer using de-escalation units. *Id.* DOC continued to provide conflicting information, despite follow up. *Id.*

### D.    Obstructing Access to DOC Staff

1029.  During Commissioner Molina's tenure, DOC asked its leadership to notify the Legal Division of all of their communications with the Monitor. This raised concerns that staff had been given the false impression that they are not permitted to speak confidentially with the Monitoring Team, which is clearly permitted under the Court's June 13, 2023 Order, § I, ¶ 6. *See* Monitor's Aug. 7, 2023 Rep. at 9.

1030.  In April and June 2023, the Monitor noted that DOC staff reported that they did not feel comfortable speaking to the Monitor because of fear of reprisal by the then-Deputy Commissioner of ID were he to learn of such communications. Monitor's April 3, 2023 Rep. at 158; Monitor's June 8, 2023 Rep. at 30.

1031.  In October 2023, the Monitor stated that he continued to receive reports that staff were afraid to be forthright in conversations with the Monitor, for fear of reprisal. Monitor's Oct. 5, 2023 Rep. at 16.

1032.  **On October 23, 2023, a senior Department leader threatened the Monitor with legal action to deflect from the issues being discussed and to intimidate the Monitor after the Monitor challenged the Department's proposed plans and confronted that leader's decision to

repeat assertions about the failures of prior administrations rather than address the reality of current deficiencies. Monitor's Nov. 8, 2023 Rep. at 53-54. **

> **Nature of Dispute**:          Legal Dispute-Other
> **Position of Defendants**:    Not disputed insofar as the proposed finding reflects what is said on the cited pages of the Monitor's Report, and avers that the Monitor's impressions of the reasons for the statement made by the senior Department leader is not reflected in the quoted language used by the senior Department leader on the cited page of the Monitor's Report - specifically: that the senior Department leader said he was "prepared to have legal counsel address this matter with the courts if you refuse to extend the professional courtesy we have earned and deserve,"  after the Monitor challenged the Department's proposed plans and confronted that leader's decision to repeat assertions about the failures of prior administrations rather than address the reality of current deficiencies.
> **Position of Plaintiffs**:       The Monitor's impressions of the statements made to him are admissible as lay opinions under Federal Rule of Evidence 701.

### E.     DOC Withholds Information from and Obstructs Other Oversight Bodies

1033.   In January 2023, the Commissioner Molina revoked the Board of Correction's access to independently view video footage and forbade the recording and use of such video in BOC's oversight work, in violation of the NYC Charter. BOC, *Statement on Loss of Access to Jail Video* (Jan. 18, 2023), Ex. 69.

1034.   The BOC sued the City, DOC, and the Commissioner over the Commissioner's decision to revoke BOC access to video footage. *See New York City Bd. of Correction v. New York City Dep't of Correction, et al.*, Index No. 812184/2023 (N.Y. Sup. Ct. Bx. Cnty.), Verified Petition, NYSECF No. 1. The BOC alleged that Commissioner Molina's decision was arbitrary and capricious because it lacked any security or safety basis and relied only on four incidents in which the Commissioner believed the BOC acted unfairly to DOC. *Id.* at ¶ 3. The BOC alleged that "Commissioner Molina's arbitrary exercise of authority is of a piece with DOC's pattern and practice of attempting at any cost to evade oversight, transparency, and accountability. *Id.* at ¶ 4.

1035.   The BOC's November 2022 report states that in certain instances, the DOC did not notify the Board of in custody deaths and that the Board only learned of an individual's passing when they were contacted by the Office of the Chief Medical Examiner. *See* BOC 2022 Second Rep. at 11-12, Ex. 55.

1036.   DOC also stopped sharing officer timesheet data with the Board of Corrections. Reuven Blau, *Correction Department Stops Sharing Timesheet Data with Oversight Board*, The City (July 18, 2023), Ex. 70.

1037.   Timesheet data is important given DOC's ongoing issues with staff absenteeism and the risks posed by staff working double and triple shifts, both of which fall under BOC's purview. BOC, *October 18, 2022 Public Meeting Minutes,* (Oct. 18, 2022), Ex. 57.

1038.   **In May, DOC declared that it would no longer notify the media when an incarcerated person dies in custody, stating that previous notifications were "practice, not a policy." Reuven Blau, *City Jails No Longer Announcing Deaths Behind Bars, Angering Watchdogs*, (May 31, 2023), Ex. 71. **

> **Nature of Dispute**:        Legal Dispute-Materiality
> **Position of Defendants**:   Not Disputed, insofar as the proposed finding reflects what is stated on the cited pages of the newspaper article. Disputed, insofar as this statement is not material and is not indicative that a receivership or a contempt finding is warranted.
> **Position of Plaintiffs**: This information is material to Defendants' lack of transparency and resistance to public oversight. Transparency and reporting problems are relevant to Plaintiffs' request to appoint a receiver because they undermine the current remedial structure, which relies on full and honest reporting of information by DOC to the Monitor and the Court. This is one reason why the current remedial structure has not achieved substantial compliance even after eight years, and why no remedy other than the appointment of a receiver will do so.

1039.   **On June 30, 2023, Commissioner Molina suspended Captain Lawrence Bond, assigned as an investigator to work for the Department of Investigation, for failure to sign in when entering a DOC facility. Graham Rayman, *NYC Correction Commissioner Louis Molina*

*suspends captain working as investigator for not signing jail logbook (Exclusive)*, N.Y. Daily

News (July 4, 2023), Ex. 72. Commissioner Molina's decision appears to violate DOC Directive

7000R, which states investigators "shall have immediate and unrestricted access to all DOC

facilities." The Directive states that "This right to immediate access cannot be restricted for

any reason and failure to provide immediate access is cause for disciplinary action." **

**Nature of Dispute**:        Legal Dispute-Materiality

**Position of Defendants**:   Not Disputed, insofar as the proposed finding reflects what is
stated on the cited pages of the newspaper article. Disputed, insofar as this statement is
not material and is not indicative that a receivership or a contempt finding is warranted.

**Position of Plaintiffs**:      This information is relevant to Defendants' lack of
transparency and resistance to public oversight. Transparency and reporting problems are
relevant to Plaintiffs' request to appoint a receiver because they undermine the current
remedial structure, which relies on full and honest reporting of information by DOC to
the Monitor and the Court. This is one reason why the current remedial structure has not
achieved substantial compliance even after eight years, and why no remedy other than the
appointment of a receiver will do so.

**XII.    Defendants Are Unwilling or Unable to Undertake the Reforms Necessary to Achieve Substantial Compliance with the Court's Orders**

    **A.    Numerous Lawsuits, Injunctions, Settlements, and Remedial Orders Have Failed to Stop DOC's Use of Excessive and Unnecessary Force**

1040.   \*\*DOC has a decades-long history of failure to correct rampant excessive and unnecessary uses of force. \*\*

    **Nature of Dispute**:    Legal Dispute-Other
    **Position of Defendants**:    Defendants object to this statement on the basis that it is overbroad and not contained to a specific period of time.
    **Position of Plaintiffs**:    The Court is entitled to make this finding based on the information in paragraphs 1041-1049, which contain citations with dates.

1041.   The instant case is the sixth class action lawsuit challenging a pattern and practice of excessive and unnecessary force in New York City's jails.

1042.   \*\**Reynolds v. Sielaff*, No. 81 Civ. 101 (S.D.N.Y.), challenged excessive force in the "prison wards" of the hospitals housing people in Department of Correction custody. The case was settled with a consent judgment. Order and Consent Judgment Approving Class Action Settlement, Reynolds v. Sielaff, No. 81 Civ. 101 (S.D.N.Y. Oct. 1, 1990). The consent judgment, *inter alia,* removed correction officers from escort responsibilities. *Id.* ¶¶ 43-44*.* It further required officers to be screened personally by the respective wards' commanding officer before assignment, and excluded officers with pending disciplinary charges or recent administrative discipline related to the use of force. *Id.* ¶¶ 43-48.\*\*

    **Nature of Dispute**:    Legal Dispute-Materiality
    **Position of Defendants**:    Not Disputed, insofar as the proposed finding reflects what is stated on the cited pages of the newspaper article. Disputed, insofar as this statement is not material and is not indicative that a receivership or a contempt finding is warranted.
    **Position of Plaintiffs**:    The information in paragraphs 1041-1049 is material because it shows that despite successive class action lawsuits and related relief spanning decades, the use of excessive and unnecessary force has persisted at DOC, demonstrating that remedial measures less than the appointment of a receiver are futile, and will lead only to further confrontation and delay, as well as DOC's lack of leadership to turn the tide without the appointment of a receiver.

1043.   **In 1988, in *Fisher v. Koehler,* 83 Civ. 2128 (S.D.N.Y.), the Court found New York City to have engaged in an unconstitutional pattern and practice of use of force in the Correctional Institution For Men, a Rikers Island jail now called the Eric M. Taylor Center. *Fisher v. Koehler*, 692 F. Supp. 1519 (S.D.N.Y. 1988), *injunction entered,* 718 F. Supp. 1111 (S.D.N.Y. 1989), *aff'd*, 902 F.2d 2 (2d Cir. 1990). The Court found that "systematic deficiencies in the operation of CIFM . . . have led to a world where inmates suffer physical abuse, both by other inmates and by staff, in a chillingly routine and random fashion." *Id.* at 1521. The court found a recurrent pattern of use of force in response to offensive but non-dangerous verbal interactions with incarcerated people; officers' use of excessive force as a means of obtaining obedience and keeping order; force used as a first resort in reaction to any behavior that might possibly be interpreted as aggressive; and serious examples of excessive force by emergency response teams. *Id.* at 1538. It concluded that the jail's "failure to guide and train its officers in the correct use of force and its failure to monitor, investigate and discipline misuse of force have allowed—and indeed even made inevitable—an unacceptably high rate of misuse of force by staff on inmates." *Id.* at 1558. The court ordered the agency to reform their written policies regarding use of force, training, investigation of uses of force, and discipline of staff members found to have used excessive or unnecessary force. *Fisher*, 718 F. Supp. at 1113. **

> **Nature of Dispute**:        Legal Dispute-Materiality
> **Position of Defendants**:   Disputed, insofar as this statement is not material and is not indicative that a receivership or a contempt finding is warranted.
> **Position of Plaintiffs**:      The information in paragraphs 1041-1049 is material because it shows that despite successive class action lawsuits and related relief spanning decades, the use of excessive and unnecessary force has persisted at DOC, demonstrating that remedial measures less than the appointment of a receiver are futile, and will lead only to further confrontation and delay, as well as DOC's lack of leadership to turn the tide without the appointment of a receiver.

1044.   **\*\*Jackson v. Montemagno,* No. 85 Civ. 2384 (E.D.N.Y.), a class action alleging excessive force in DOC's Brooklyn House of Detention, was filed while *Fisher* was pending. *Jackson* settled on similar terms to *Fisher*, with the added requirement of installing video cameras in the jail's intake area, where the brutality had been concentrated. Order Approving Stipulation of Settlement and Entry as Consent Judgment ¶ 16, *Jackson v. Montemagno*, 85 Civ. 2384 (E.D.N.Y. Nov. 26, 1991). \*\*

> **Nature of Dispute**:        Legal Dispute-Materiality
> **Position of Defendants**:    Disputed, insofar as this statement is not material and is not indicative that a receivership or a contempt finding is warranted.
> **Position of Plaintiffs**:        The information in paragraphs 1041-1049 is material because it shows that despite successive class action lawsuits and related relief spanning decades, the use of excessive and unnecessary force has persisted at DOC, demonstrating that remedial measures less than the appointment of a receiver are futile, and will lead only to further confrontation and delay, as well as DOC's lack of leadership to turn the tide without the appointment of a receiver.

1045.   **\*\*In 1991, *Sheppard v. Phoenix,* 91 Civ. 4148 (S.D.N.Y.) challenged excessive force in the Central Punitive Segregation Unit on Rikers Island. *Sheppard v. Phoenix,* 210 F. Supp. 2d 450 (S.D.N.Y. 2002). The Department agreed to a detailed consent decree imposing substantial obligations on the Department to address the systemic causes of staff brutality and to revise use of force policies regarding training, supervision, investigation and staff discipline as well as administration of the segregation unit. Stipulation of Settlement, *Sheppard v. Phoenix*, No. 91 Civ. 4148 (S.D.N.Y. July 10, 1998); *see also Sheppard v. Phoenix*, No. 91 Civ. 4148, 1998 WL 397846 (S.D.N.Y. July 16, 1998). \*\*

> **Nature of Dispute**:        Legal Dispute-Materiality
> **Position of Defendants**:    Disputed, insofar as this statement is not material and is not indicative that a receivership or a contempt finding is warranted.
> **Position of Plaintiffs**:        The information in paragraphs 1041-1049 is material because it shows that despite successive class action lawsuits and related relief spanning decades, the use of excessive and unnecessary force has persisted at DOC, demonstrating that remedial measures less than the appointment of a receiver are futile, and will lead only to

further confrontation and delay, as well as DOC's lack of leadership to turn the tide without the appointment of a receiver.

1046.   **Ten years later, the fifth class action, *Ingles v. Toro,* No. 01 Civ. 8279 (S.D.N.Y.), challenged excessive force systemwide, on behalf of a class of all people detained in DOC facilities not subject to court order governing use of force. *Ingles v. Toro,* No. 01 Civ. 8279, 2003 WL 402565 (S.D.N.Y. Feb. 20, 2003). In 2004, during the pendency of the *Ingles* class action, DOC reported 974 use of force incidents systemwide, despite an average daily jail population of 13,709—approximately twice the current population. *See* New York City Mayor's Office of Criminal Justice, Average Daily Jail Population in NYC, *available at* https://criminaljustice.cityofnewyork.us/individual_charts/average-daily-jail-population-in-nyc/).**

> **Nature of Dispute**:        Legal Dispute-Materiality
> **Position of Defendants**:   Disputed, insofar as this statement is not material and is not indicative that a receivership or a contempt finding is warranted.
> **Position of Plaintiffs**:      The information in paragraphs 1041-1049 is material because it shows that despite successive class action lawsuits and related relief spanning decades, the use of excessive and unnecessary force has persisted at DOC, demonstrating that remedial measures less than the appointment of a receiver are futile, and will lead only to further confrontation and delay, as well as DOC's lack of leadership to turn the tide without the appointment of a receiver.

1047.   **The City settled *Ingles* in 2006, agreeing to a slate of reforms including revision of the use of force directive, improved training, improved supervision of staff, changes to the investigation of use of force incidents and widespread installation of video cameras throughout the jails. *Ingles*, 2003 WL 402565. **

> **Nature of Dispute**:        Legal Dispute-Materiality
> **Position of Defendants**:   Disputed, insofar as this statement is not material and is not indicative that a receivership or a contempt finding is warranted. Disputed, insofar as this is a legal conclusion and not a statement of fact.
> **Position of Plaintiffs**:      The information in paragraphs 1041-1049 is material because it shows that despite successive class action lawsuits and related relief spanning decades, the use of excessive and unnecessary force has persisted at DOC, demonstrating that

remedial measures less than the appointment of a receiver are futile, and will lead only to further confrontation and delay, as well as DOC's lack of leadership to turn the tide without the appointment of a receiver.

1048.   **DOC has also been subject to numerous lawsuits by individual plaintiffs alleging injuries in use of force incidents pursuant to a City custom and practice of misusing force in the jails. The City has settled scores of such cases for monetary damages. In FY2022, the City paid $37.2 million for claims brought against DOC. *See*

https://comptroller.nyc.gov/reports/annual-claims-report/#ii-tort-claims. **

> **Nature of Dispute**:        Legal Dispute-Materiality
> **Position of Defendants**:   Disputed, insofar as this statement is not material and is not indicative that a receivership or a contempt finding is warranted.
> **Position of Plaintiffs**:    The information in paragraphs 1041-1049 is material because it shows that despite successive class action lawsuits and related relief spanning decades, the use of excessive and unnecessary force has persisted at DOC, demonstrating that remedial measures less than the appointment of a receiver are futile, and will lead only to further confrontation and delay, as well as DOC's lack of leadership to turn the tide without the appointment of a receiver.

1049.   **In this Action, the Consent Judgment and four remedial orders have proven insufficient to remedy DOC's use of excessive and unnecessary force. *See supra* ¶¶ 74-77. **

> **Nature of Dispute**:        Legal Dispute-Materiality
> **Position of Defendants**:   Disputed, insofar as this statement is not material and is not indicative that a receivership or a contempt finding is warranted.
> **Position of Plaintiffs**:    The information in paragraphs 1041-1049 is material because it shows that despite successive class action lawsuits and related relief spanning decades, the use of excessive and unnecessary force has persisted at DOC, demonstrating that remedial measures less than the appointment of a receiver are futile, and will lead only to further confrontation and delay, as well as DOC's lack of leadership to turn the tide without the appointment of a receiver.

**B.    Accepting DOC's Pace of Reform Leads Only to Further Delay**

1050.   As early as 2018, the Monitor had already recognized the slow pace of DOC's reform efforts, commenting that "the two-and-a-half year record of reform that has been established portends a pace that will become intolerable at some point in the future." Monitor's Sixth Rep. at 4.

1051.   In 2019, the Monitor indicated that DOC's lack of significant progress to date represented a watershed moment, and that the pace of reform was "glacial" and "difficult to tolerate." Monitor's Seventh Rep. at 8-9, 16.

1052.   The pace of reform has not accelerated, and indeed has slowed in some areas—and even regressed in others. Monitor's July 10, 2023 Rep. at 143. "The pace of reform has not accelerated and appears to have stagnated despite direct Orders from the Court in the April 2023 Status Conference, four successive Orders in June, July, August and October 2023 . . . and repeated and ongoing recommendations from the Monitoring Team to address the current conditions." Monitor's Nov. 8, 2023 Rep. at 2.

1053.   The Monitoring Team concluded in July 2023 that there is not sufficient evidence to suggest that the pace of reform will accelerate within the confines of current structures. Monitor's July 10, 2023 Rep. at 143.

### C.    DOC Has Launched and Abandoned Numerous Reform Plans, Pilots, and Initiatives Over the Years, Wasting Resources and Leading to Delay

1054.   While DOC has made progress in some areas, it has "lurch[ed] from one hastily developed and/or ill-conceived plan to another," Monitor's Nov. 8, 2023 Rep. at 28, and "stalled initiatives and regression in other areas have neutralized any real sustained momentum toward reform." Monitor's July 10, 2023 Rep. at 142.

1055.   The Monitor has also noted the existence of a "complex and often circular cycle of management dysfunction that has prevented [DOC] from advancing along the trajectory of reform." *Id*.

1056.   The Monitoring Team has repeatedly seen a cycle wherein initiatives are created, changed in some material way, and then must be restarted, and has noted that "perpetually restarting the clock is antithetical to advancing reform and accelerating progress." *Id.* at 144;

Monitor's Nov. 8, 2023 Rep. at 6 ("Plans proposed by [DOC] alter so frequently that they are

seldom fully developed before they are changed [] again."); *id.* at 17 (plans are "too often . . .

abandoned prior to implementation or . . . discontinued without first attempting to understand

which components may have been effective").

1057.   These patterns are concretely demonstrated by DOC's continued launching and

subsequent abandonment of numerous plans, pilots, and facilities over the last eight years.

1058.   In March 2015, DOC adopted a 14-point anti-violence reform plan focused on

"safety, reducing violence and supporting culture change." Monitor's First Rep. at 2 n.2. DOC

never completed that plan.

1059.   In late May 2016, DOC developed and launched a "Commissioner's Twelve," in

which facility wardens reviewed on a weekly basis all Preliminary Reviews that identified a

problematic use of force, and they developed an action plan to address any trends. Monitor's

Second Rep. at 108-109.

1060.   The data collected during this process was "neither comprehensive nor reliable,"

and associated plans of action "had become more of a perfunctory exercise, rather than a strategy

with the potential to affect cultural change within [DOC]," so this process was suspended in

2017. Monitor's Fourth Rep. at 150-151.

1061.   In April 2017, the Monitor reported that a "wristband pilot" had been initiated at

RNDC, where incarcerated individuals scanned a wristband every time they entered and exited a

location. Monitor's Third Rep. at 68 n.30.

1062.   The wristband pilot has been used on and off since it was initially piloted, but at

the current time, incarcerated individuals at RNDC are not currently using the wristbands.

Monitor's Nov. 8, 2023 Rep. at 91. Though many incarcerated individuals currently have a

wristband, they are not used because some of the scanners on the monitor machines located in the corridor and intake appear inoperable. *Id.* Additionally, DOC reports that the machine that generates new wristbands when an incarcerated individual is transferred from facility to facility also malfunctions frequently. *Id.* DOC reports that when the scanning machines are inoperable (as they are now), that staff manually enter the incarcerated individuals into the monitor machine (which is connected to computers and filters to the Inmate Tracking System) for the intake, the clinic, housing area A station, and medication windows. *Id.* The Monitor has not verified that such tracking is occurring or that it is completed consistently. *Id.*

1063.   The Use of Force Auditor position was created to identify systemic patterns and trends in use of force. Two people held the role for six months each, but the role was never continuously filled for a significant period of time. *See* Monitor's Second Rep. at 119; Monitor's Fifth Rep. at 115; Monitor's Sixth Rep. at 119-120.

1064.   Ultimately the position was not filled because DOC decided to use the combined weekly reviews of ID Preliminary Reviews and Facility-level Rapid Reviews to attempt to identify patterns and trends in use of force. *See* Monitor's Sixth Rep. at 120.

1065.   The Investigation Division Auditor began providing reports of randomly selected samples of closed ID Investigations and Preliminary Reviews to assess quality of work. The first such report was completed in February 2017. Monitor's Fourth Rep. at 141.

1066.   This process was eventually deemed "burdensome" and "not contributing to improvement in needed areas," and it ended. Monitor's Sixth Rep. at 107.

1067.   In the Third Monitoring Period, DOC created a new process to identify "avoidable" use of force incidents. Eventually, the "avoidable" review was merged into the

facility-level "Rapid Review" of use of force incidents for which there was video of the incident available. *See* Monitor's Sixth Rep. at 21-22.

1068.   Despite revising the "Rapid Review" template four times in one year, the facilities did not appropriately identify avoidable uses of force or staff misconduct. *See* Monitor's Tenth Rep. at 43-45; First Remedial Order Report at 2; Monitor's Eleventh Report at 66-68; Monitor's Twelfth Report at 41-42.

1069.   In the Third Monitoring Period, DOC began a Medical Triage pilot program to address its failure to ensure that incarcerated people received medical attention promptly after a use of force incident. *See* Monitor's Third Report at 67.

1070.   This program was only used twice during the Fifth Monitoring Period and ultimately suspended. *See* Monitor's Fifth Report at 56; Monitor's Sixth Rep. at 56.

1071.   In the Fourth Monitoring Period, DOC began the Satellite Intake initiative to hold people in custody who need to be seen by clinic but cannot be taken there directly, so they are taken to Satellite Intake to await escort to the clinic. Monitor's Fourth Report at 64.

1072.   The practice ceased at the end of the Sixth Monitoring Period. Monitor's Ninth Report at 20.

1073.   In April 2018 (Sixth Monitoring Period), DOC initiated a two-part Use of Force Improvement Plan, including an initiative focused on providing consistent, routine operational guidance to improve Staff's understanding of when force is appropriate and how to avoid using force when it is not necessary, as well as assigning training captains within each facility to coach staff to avoid using force. Monitor's Seventh Rep. at 53.

1074.   By September 2018, none of these initiatives continued to be delivered. "Many components of the UOF Improvement Plan failed, simply from a lack of continued support

within [DOC] and lost momentum towards the end of the Monitoring Period." Monitor's Seventh Rep. at 53.

1075.   In Spring 2019 (Eighth Monitoring Period), DOC began a "Transfer of Learning" initiative designed to provide education and training to staff during facility roll calls. *See* Monitor's Eighth Rep. at 31.

1076.   The initiative was not effective in achieving its goal to improve Staff practice and was discontinued. *See* Monitor's Ninth Rep. at 40.

1077.   During the Ninth Monitoring Period, DOC began to develop a computerized dashboard to allow certain data to be available contemporaneously and reviewable facility- and department-wide. Monitor's Ninth Rep. at 38.

1078.   **As the Monitor observed in July 2023, even though DOC has a broad array of data that could be useful in reducing the risk of harm to persons in custody, DOC leadership and staff do not analyze or understand the implications of DOC's own data. See Monitor's July 10, 2023 Rep. at 65-67.**

> **Nature of Dispute**:        Legal Dispute-Monitor Opinion
> **Position of Defendants**: Defendants object to the conclusion entering the record of this motion as an expert conclusion, and respectfully submit that the conclusion falls outside of the scope of the Monitor's realm of expertise. Defendants respectfully refer the court to the parties Joint Status Report dated July 3, 2024, ECF No. 742, for Defendants position on the scope of the Monitor's expertise. (ECF No. 742).
> **Position of Plaintiffs**: Defendants concede that the Monitor is "appropriately qualified as an expert on corrections systems and best practices." July 3, 2024 Joint Report of the Parties, Dkt. 742 at 3, 5. The Monitor's opinion regarding what information and data is available in this correctional system to aid in reducing risk of harm to persons in custody, and his assessment of DOC leaders' failures to give adequate attention to the information available to them, is squarely within the scope of the expertise Defendants concede the Monitor possesses. Moreover, Defendants offer no evidence to rebut the Monitor's expert finding. The Court should credit the Monitor's opinion and adopt this proposed finding.

1079.   In January 2020, DOC appointed an Assistant Chief of Strategic Partnerships to serve as a uniform staff liaison to the *Nunez* team and help manage the *Nunez* requirements. Monitor's Tenth Rep. at 216.

1080.   The status and composition of DOC's facilities constantly changes. In 2023, OBCC was re-opened, AMKC was closed, VCBC was closed, and ESH was relocated from GRVC to RMSC. Monitor's Oct. 5, 2023 Rep. at 7. The sizes of the facilities have changed (with multiple facilities now nearing/above 1,000 people in custody) as well as their composition (e.g., adults now comprise the majority of people housed at RNDC; GRVC has a significant population of people who need an increased level of mental health services), with apparently little planning or coordination. *Id.*

1081.   The City spends an enormous amount of money on running DOC, with DOC's budget for fiscal year 2021 amounting to $1.25 billion, or a $556,539 cost per incarcerated person per year, an all-time high. Monitor's Mar. 16, 2022 Report at 11. The Monitor has described the Department's budget as "extraordinary." *Id.* at 12.

1082.   New York City's Comptroller, in a Fiscal Year 2023 "Agency Watch List," reported that by FY 2021, the amount of money New York City spent on per-person incarceration—half a million dollars to incarcerate one person for one year—had quadrupled since 2011. New York City Comptroller, Agency Watch List, Ex. 58. Among the significant drivers of increased per-person spending were, in FY 2022, a $15 million increase "for evaluating staff who call out sick" and overtime costs exceeding $132 million. *Id.* at 5.

1083.   DOC paid over $20 million to McKinsey between 2018 and 2021 to develop the 14-point violence reduction plan jettisoned in 2021. S*ee supra* ¶ 1058; Ex. 59 (McKinsey Contract Information). In 2023, the City entered into a contract with KPMG for "Implementation

of the Nunez Action Plan." It has since paid KMPG over a million dollars. Ex. 60 (N.Y.C.

Comptroller, KMPG Contract Information).

### D. DOC's Executive Leadership Is Inadequate and Does Not Use Existing Data for Reform Efforts

1084.   In addition to the numerous historical and structural problems that have prevented

DOC from complying with the Court's orders, the Monitor has also documented specific failures

of DOC's recent executive leadership. *See* Monitor's Nov. 8, 2023 Rep. at 48, n.35: (noting that

the Monitor "routinely finds that Department leadership and staff lack the institutional

knowledge and history of certain issues...In some cases, []staff appear unaware of their own

policy requirements until the Monitoring Team reminds them.").

#### 1. Executive and Facility Leadership Constantly Changes

1085.   \*\*At any correctional facility and system, in order for the demands, positions and

requirements set by senior leadership to be respected and habitually complied with, all staff—

whether uniformed or otherwise—must credibly believe that the leadership will be there for the

long term. Jacobson Decl. ¶ 14.\*\*

> **Nature of Dispute**:        Legal Dispute-FRE 701, 703
> **Position of Defendants**:   Defendants object on the basis that Jacobson is not an expert,
> pursuant to FRE 703, qualified to make broad opinions or conclusions concerning
> correctional practices in City jails at any time other than when he was the Commissioner
> of DOC. Defendants respectfully submit that Jacobson should not be credited as an
> expert, and also that his opinion should not be credited as an expert opinion.
> **Position of Plaintiffs**:        Plaintiffs do not claim that this is an expert opinion, but rather
> that this is a lay opinion admissible under Federal Rule of Evidence 701, in that it is a
> conclusion rationally drawn on the basis of Mr. Jacobson's observations and perceptions
> during his time as DOC Commissioner and based on his perception of conversations with
> DOC officials since that time. *See* Jacobson Decl., Dkt. 602-84, ¶ 9.

1086.   Between 1998 and 2023, there have been 11 DOC Commissioners and Interim

Commissioners, with each serving an average term of less than 2.3 years. Jacobson Decl. ¶ 15.

1087.   In the same time period of 1998 to 2023, there have been just three presidents of the Correction Officers' Benevolent Association ("COBA"). *Id.* ¶ 15.

1088.   Within just the past two and half years, DOC has had three Commissioners. *See* Monitor's Nov. 8, 2023 Rep. at 2.

1089.   In October 2023, the City reported that Commissioner Molina would no longer serve as Commissioner. *Id.* No transition plan accompanied this report. *Id.*

1090.   Over the last eight years, DOC has frequently transferred leaders from one jail to another, and key leaders have either left the agency or are planning to leave. Monitor's Oct. 5, 2023 Rep. at 7. Two Assistant Commissioners responsible for managing facilities have resigned. *See* Monitor's Nov. 8, 2023 Rep. at 8. OBCC and RESH (restricted housing units), both opened in the summer of 2023, and each has had at least three leaders in the past three to four months. *Id.*

1091.   **The pattern of frequent and expected turnover of DOC leadership has undermined the various Commissioners' ability to curb staff violence and other malfeasance within the DOC. Jacobson Decl. ¶ 15.**

> **Nature of Dispute**:        Legal Dispute-FRE 703
> **Position of Defendants**:    Defendants object on the basis that Jacobson is not an expert, pursuant to FRE 703, qualified to make broad opinions or conclusions concerning correctional practices in City jails at any time other than when he was the Commissioner of DOC. Defendants respectfully submit that Jacobson should not be credited as an expert, and also that his opinion should not be credited as an expert opinion.
> **Position of Plaintiffs**:    Plaintiffs do not submit this proposed finding as an expert opinion from Mr. Jacobson. Rather, this is Mr. Jacobson's factual testimony based on what he directly observed during his time as Commissioner of DOC and based on his conversations with DOC officials since that time. *See* Jacobson Decl., Dkt. 602-84, ¶ 9.

1092.   The frequent changes to the executive leadership team mean that priorities shift and corresponding plans are not realized before they change yet again. *See* Monitor's Nov. 8,

2023 Rep. at 2, 6, 14 ("revolving door of leadership" hinders "full and faithful implementation of both short- and long-term security initiatives").

1093.    Individual facilities are destabilized by a constant revolving door of leadership. *See* Monitor's Nov. 8, 2023 Rep. at 2.

1094.    **Uniformed staff have ignored and/or refused to comply with directives issued by DOC leadership at least in part because of an understanding among uniformed staff and COBA leadership that they can effectively "wait out" senior DOC leadership before any real repercussions of their noncompliance will occur. Jacobson Decl. ¶ 16.**

> **Nature of Dispute**:        Legal Dispute-FRE 703
> **Position of Defendants**:    Defendants object on the basis that Jacobson is not an expert, pursuant to FRE 703, qualified to make broad opinions or conclusions concerning correctional practices in City jails at any time other than when he was the Commissioner of DOC. Defendants respectfully submit that Jacobson should not be credited as an expert, and also that his opinion should not be credited as an expert opinion.
> **Position of Plaintiffs**:       Plaintiffs do not submit this proposed finding as an expert opinion from Mr. Jacobson. Rather, this is Mr. Jacobson's factual testimony based on what he directly observed during his time as Commissioner of DOC and based on his conversations with DOC officials since that time. *See* Jacobson Decl., Dkt. 602-84, ¶ 9.

1095.    In order to bring about the changes necessary to the DOC, there must be leadership that serves until sustainable progress is achieved, and that the relevant stakeholders credibly believe will serve until that goal is reached. Jacobson Decl. ¶ 16.

## 2.    Commissioners' Failures to Issue Appropriate Discipline

1096.    During the pendency of the action plan, DOC reported the following data on accountability imposed against supervisors for use of force-related misconduct, inefficient performance of duties, or inadequate supervision:

| Accountability for Facility Leadership and Supervisors, June 2022 to June 2023 | | | |
|---|---|---|---|
| | **Warden** | **Deputy Warden** | **Assistant Deputy Warden** |
| Formal Discipline | 0 | 1 case (involving 1 DW) | 31 cases (involving 18 ADWs) |
| Command Discipline | 0 | 0 | 33 |
| 5003 Counseling | 0 | 0 | 15 |
| Corrective Interview | 0 | 1 | 17 |

Monitor's July 10, 2023 Rep. at 137.

1097.   The fact that DOC has taken so few disciplinary actions against facility leaders and supervisors is troubling given the volume and pervasiveness of issues regarding the use of force, inefficient performance of duties, and inadequate supervision identified by the Monitor in its routine review of incidents. *Id*.

1098.   For example, a Deputy Warden, a captain, and three officers did not follow sound practice of required procedures when responding to an individual engaging in self-harm. ID investigated the incident and concluded—consistent with available evidence, DOC policy, and sound correctional practices—that disciplinary charges were warranted against these staff members. After charges were filed against these staff members, the Commissioner dismissed the charges and absolved them of discipline. *Id.* at 138.

1099.   The Monitor did not find this reversal to be reasonable and found that the decision "[did] not bode well for the prospect of reform." *Id.* The Deputy Warden was subsequently promoted to an Assistant Commissioner of Operations, which was also troubling. *Id.*

1100.   Similarly, after the Captains' Union objected to the 2021 suspension of a captain who had ordered officers not to perform potentially lifesaving measures when an incarcerated person hanged himself (ultimately resulting in the captain's criminal conviction for negligent homicide), the Commissioner rescinded the suspension, and the captain was provided with back pay. *Id.*

1101.   The Monitor found that this decision called into question DOC's commitment to imposing meaningful accountability or in certain cases, any accountability at all. *Id.* at 138-139.

### 3.     Executive Leadership Is Inadequate to the Task of Reform

1102.   DOC leadership deflects ownership of and responsibility for the problems in the jails, and the ways in which current decisions, actions, and inactions perpetuate and, in some areas, worsen the problems. Monitor's Oct. 5, 2023 Rep. at 4, 25; Monitor's Nov. 8, 2023 Rep. at 2 (DOC continues "to spend significant time engaged in a concerted effort to create a narrative that is misleading and wholly inconsistent with the reality of the conditions at [DOC]"). "The consequence of this approach is that the City and Department have normalized the dangerous and chaotic conditions that permeate the jails"; DOC "continues to focus on the failures of prior administrations as pretext for its current actions and inactions [when] the Department's proposals are often substantially similar to those of prior administrations, with little to no apparent awareness that the plans were ineffective in the original incarnation or why." Monitor's Nov. 8, 2023 Rep. at 54.

1103.   The Monitor found that DOC had demonstrated that it did not have the "capacity, ability and/or desire" to leverage available information to improve the reform effort. Monitor's July 10, 2023 Rep. at 64-65.

1104.   The state of DOC facilities and public concerns about DOC's management and leadership undercut DOC's ability to attract and retain staff and leaders. Monitor's Oct. 5, 2023 Rep. at 10. A number of individuals have elected not to work with DOC given its reputation and the potentially critical media reports that could be associated with their appointment. *Id.*

1105.   DOC possesses a broad array of data useful to analyzing and curbing use of force, as well as a number of structures and forums that could effectively house such a problem-solving approach (e.g., TEAMS, *Nunez* meetings, OMAP, the NCU). Monitor's July 10, 2023 Rep. at 67.

1106.    However, DOC leadership does not identify the salient data to understand the underlying causes of use of force and violence in DOC, does not correctly analyze and interpret the data, and does not use the data to inform solutions. *Id.* DOC does not engage in a basic analysis of the factors driving the high rates of use of force and what steps could be taken to reduce those rates. *Id.* at 65; Monitor's Nov. 8, 2023 Rep. at 16-17 (despite wealth of information that identifies specific practices that individually and cumulatively contribute to risk of harm, DOC does not take steps to understand the dynamics that underlie poor practice).

1107.    Though the Monitor has encouraged DOC to develop strategies to leverage the available information and data, DOC does not have the capacity, ability, and/or desire to do so. Monitor's July 10, 2023 Rep. at 64. When DOC does finally engage and propose revisions, "they are "frequently internally inconsistent, may not address previous feedback[,] . . . ..may not always be consistent with sound correctional practice, may not reflect the practices the Department reported the revisions were intended to address, and paradoxically, may even reintroduce the very practices the policies were intended to curtail." Monitor's Nov. 8, 2023 Rep. at 55-56. As the Monitor put it, DOC leaders tend to be "myopic," and "rarely emerge as champions of an idea or new practice" because "they simply do not know other ways to solve problems besides 'how we've always done it.'" Monitor's Eleventh Rep. at 9-10.

1108.    For example, the use of force data reveals that an unnecessarily high number of uses of force occur during searches and escorts. Despite available strategies to understand and address the typical dynamics that characterizes each of these factors, DOC has not taken any steps to address either issue. *Id.* at 66; Monitor's Nov. 8, 2023 Rep. at 17 (when provided with specific recommendations to address deficient practices, DOC takes few concrete actions to adopt these recommendations).

1109.   DOC leaders focus on particular indicators and metrics to pinpoint areas of progress, but that limited approach is incomplete and inaccurate. Monitor's July 10, 2023 Rep. at 64.

1110.   **DOC leadership also lack institutional knowledge and awareness of their own policy requirements. *See* Monitor's Nov. 8, 2023 Rep. at 48 n.35. For example, DOC did not follow its policies regarding screening staff for ESU/Special Teams in 2021 or 2023, purportedly because leadership did not know of the requirements. *Id.***

      **Nature of Dispute**:      Legal Dispute-Monitor Opinion
      **Position of Defendants**:   Defendants object to the conclusion entering the record of this motion as an expert conclusion, and respectfully submit that the conclusion falls outside of the scope of the Monitor's realm of expertise. Defendants respectfully refer the court to the parties Joint Status Report dated July 3, 2024, ECF No. 742, for Defendants position on the scope of the Monitor's expertise. (ECF No. 742).
      **Position of Plaintiffs**: Defendants concede that the Monitor is "appropriately qualified as an expert on corrections systems and best practices." July 3, 2024 Joint Report of the Parties, Dkt. 742 at 3, 5. The Monitor's opinion regarding what policies and institutional knowledge are available in this correctional system, and his assessment of DOC leaders' failures to demonstrate understanding of those policies and institutional knowledge, is squarely within the scope of the expertise Defendants concede the Monitor possesses. Moreover, Defendants offer no evidence to rebut the Monitor's finding. The Court should credit the Monitor's opinion and adopt this proposed finding.

1111.   Significant concerns remain about DOC leadership's ability and approach to managing the reform initiative and the extent to which they have fully embraced the requirements of the Nunez Court Orders. Monitor's July 10, 2023 Rep. at 72.

      **4.**      **DOC Resists External Candidates for Facility Leadership Positions**

1112.   The Monitor explained in 2021 that problematic dynamics "circulating from and around Facility leadership, are a major factor undercutting the success of reform," and specifically named the failures of Wardens and Deputy Wardens. Monitor's Eleventh Rep. at 9-10.

1113.   For DOC to function effectively, DOC must be able to hire effective managers who possess the skills and temperament needed to maintain order and safety for staff and incarcerated individuals to fill its supervisory positions such as captains, deputy wardens, wardens, chiefs, and others. Jacobson Decl. ¶ 17.

1114.   The Monitor recommended in May 2021 that DOC "must" begin to consider candidates external to DOC for facility leadership teams, including Wardens and Deputy Wardens. Monitor's Eleventh Rep. at 15.

1115.   The Monitor said that failure to do so "creates a narrow field without many choices, selects from those with DOC-only experience, perpetuates DOC's culture, and excludes well-qualified candidates who have served in similar positions in other jurisdictions." *Id*. The City "committed to consulting with the Monitoring Team before . . . June 30, 2021 on the various options." *Id.*; *see also* Jacobson Decl. ¶¶ 17-18 (DOC's position results in supervisory positions being filled by individuals immersed in DOC's organizational culture and unable or reluctant to control exceedingly high levels of violence and disorder).

1116.   The City made no appreciable progress toward adopting or implementing the recommendation; asserting the view that it is constrained by New York City Administrative Code § 9-117(a) to maintain the five levels of uniform ranks—Correction Officer, Captain, Assistant Deputy Warden, Deputy Warden, and Warden—and further reportedly constrained by § 9-117(b) to only promote from within the agency's uniform ranks. *See also* Monitor's Oct. 28, 2022 Rep. at 79.

1117.   The Second Remedial Order then required the City to "confer with relevant State leadership" to determine how the recommendation would be adopted and by October 14, 2021,

deliver to the Monitor a proposed approach to adopting and implementing the recommendation. *See* Dkt. 398 at § 1(ii).

1118.    The City did not adopt that recommendation nor seek to abrogate those state and local laws that it assessed as a barrier to doing so. The City stated that hiring external warden candidates was "not a popular move with the current rank and file" because it was perceived as limiting advancement opportunities. Tr. of May 24, 2022 Status Conference at 52:24-53:8, Dkt. 460. The City instead proposed a dual leadership structure, with both civilian leaders and uniformed wardens having shared responsibilities and separate chains of command. Dkt. 450 at 5.

1119.    Deputy Monitor Anna Friedberg noted in the May 24, 2022 court conference that "the workaround developed is simply insufficient at this stage." Dkt. 460 at 18:19-21.

1120.    In a letter on June 10, 2022, the Monitor said he "continues to believe that fortifying the Warden role by having the ability to seek the most capable and qualified candidates, including those from outside DOC, is necessary to ensure the success of the reform effort." Monitor's June 10, 2022 Rep. at 3.

1121.    Despite these articulated concerns, the City advised in June 2022 that they were not willing to seek a Court order pursuant to 18 U.S.C. § 3626(a)(1)(b) to permit external hiring of wardens. *Id.* at 3.

1122.    The dual reporting structure was ordered as part of the Action Plan. *Id.* at 2-3; Action Plan § A(3)(b)(ii)(2)(b), Dkt. 465 at 5-6.

1123.    As of October 2022, DOC had not hired any Assistant Commissioners to serve in the dual facility leadership role. Monitor's Oct. 28, 2022 Rep. at 15-16. The Monitor continued to recommend that DOC expand the pool of candidates for warden positions. *Id.* at 81.

1124.   In November 2022, 18 months after the Monitor made his initial recommendation, the City agreed to seek a joint order to expand the pool of candidates for warden positions. Monitor's Nov. 14, 2022 Rep. at 2. The order does not include consideration of external candidates for deputy warden positions.

1125.   Following entry of the Court's order, five Assistant Commissioners of Operations were hired and "slated to begin serving as the Wardens in the facilities" in April 2023—nearly two full years after the Monitor's initial recommendation and ten months after the Action Plan was ordered. Monitor's Apr. 3, 2023 Rep. at 4. Two of the five Assistant Commissioners were candidates internal to DOC. Ex. 73 (DOC Press Release Apr. 24, 2023).

1126.   The Monitor reviewed the Trials Closing Memo for the charges brought against one of the Assistant Commissioners prior to their promotion and concluded that the Commissioner's conclusion was not reasonable in light of the available objective evidence. Monitor's July 10, 2023 Rep. at 138.

1127. ████████████████████████████████████████

████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████



1128.

1129.   Two additional Assistant Commissioners had been appointed as of July 10, 2023. Monitor's July 10, 2023 Rep. at 71. Both new Assistant Commissioners are external candidates.

1130.   The purpose of hiring external candidates for facility leadership positions was to identify and rectify "deficient and entrenched practices and staff behaviors." Monitor's July 10, 2023 Rep. at 71.

1131.   The Monitoring Team has "observed in discussions with some of the newly appointed leaders that they do not appear to have sufficient insight into ongoing and/or recurring deficiencies and problems, which is critical for the formulation of appropriate solutions." *Id.* at 72.

1132.   Two of the five Assistant Commissioners who were hired from outside of DOC are no longer employed by DOC. One of those Assistant Commissioners was reassigned due to poor performance and/or judgment. Monitor's Nov. 8, 2023 Rep. at 113.

1133.   **DOC's refusal to consider hiring for other supervisory positions from outside the uniformed ranks impedes cultural change within the facilities and results in underperforming

supervisors not being removed simply due to the lack of qualified candidates within the system

to replace them. Jacobson Decl. ¶ 18; *see* Monitor's Eleventh Rep. at 15 (Monitor recommended

expanding the hiring pool for Deputy Wardens).**

> **Nature of Dispute**:        Legal Dispute-Materiality/Other
> **Position of Defendants**:
> Defendants object on the basis that Jacobson is not an expert, pursuant to FRE 703,
> qualified to make broad opinions or conclusions concerning correctional practices in City
> jails at any time other than when he was the Commissioner of DOC. Defendants
> respectfully submit that Jacobson should not be credited as an expert, and also that his
> opinion should not be credited as an expert opinion. Additionally, the PFOF is disputed
> insofar as this statement is not material and is not indicative that a receivership or a
> contempt finding is warranted.
> **Position of Plaintiffs**: This is a factual statement regarding the obstacles to cultural
> change in DOC, not a legal conclusion or opinion. Plaintiffs thus do not offer this finding
> as an expert opinion from Mr. Jacobson, but rather as Mr. Jacobson's factual testimony
> based on what he directly observed during his time as Commissioner of DOC and based
> on his conversations with DOC officials since that time. *See* Jacobson Decl., Dkt. 602-84,
> ¶ 9. Alternatively, this is a lay opinion admissible under Federal Rule of Evidence 701, in
> that it is a conclusion rationally drawn on the basis of Mr. Jacobson's observations and
> perceptions during his time as DOC Commissioner and based on his perception of
> conversations with DOC officials since that time. *See* Jacobson Decl., Dkt. 602-84, ¶ 9.

### 5.    The Correctional Officer Unions Have Repeatedly Opposed and Challenged the Use of Force Directive and Consent Judgment

1134.    **The reforms required by the Nunez court orders have been the subject of

extensive union opposition.**

> **Nature of Dispute**:        Legal Dispute-Materiality
> **Position of Defendants**:    Disputed insofar as this statement is not material and is not
> indicative that a receivership or a contempt finding is warranted.
> **Position of Plaintiffs**: The scope of the impact of labor unions on the reform effort is
> material. It has been litigated in various filings, *see* ¶¶ 1137-1146, discussed by the
> Monitor at various points in the case, *see* ¶ 696 (and the Monitor's April 18, 2024 Report
> at 136 and May 24, 2024 report at 23, 26-27), and included in analysis of the *Plata*
> factors discussed at length in the briefs by both Plaintiffs and Defendants.

1135.    **Former DOC Commissioner Michael Jacobson stated, "[b]ased on [his]

informal discussions with multiple DOC commissioners, including those who served in the DOC

in the past five years," that pressure from the Unions "chill[s] effective decision making by DOC

leadership and has contributed to the Department's inability to implement the difficult but

necessary fundamental policy changes required to change the culture and environment at the

Department's facilities." Jacobson Decl. ¶¶ 19-20.**

> **Nature of Dispute**:        Legal Dispute-FRE 703
> **Position of Defendants**:    Defendants object on the basis that Jacobson is not an expert,
> pursuant to FRE 703, qualified to make broad opinions or conclusions concerning
> correctional practices in City jails at any time other than when he was the Commissioner
> of DOC. Defendants respectfully submit that Jacobson should not be credited as an
> expert, and also that his opinion should not be credited as an expert opinion.
> **Position of Plaintiffs**:        Plaintiffs do not submit this proposed finding as an expert
> opinion from Mr. Jacobson. Rather, this is Mr. Jacobson's factual testimony based on
> what he directly observed during his time as Commissioner of DOC and based on his
> conversations with DOC officials since that time. *See* Jacobson Decl., Dkt. 602-84, ¶ 9.

1136.    **Specifically, former Commissioner Jacobson testified that Union pressure is a

cause of the DOC's "persistent staffing issues." *Id.* ¶ 19. Union pressure also "has [] prevented

DOC from appropriately disciplining uniformed personnel who engage in egregious

misconduct." *Id.* ¶ 21. "[W]hen leadership attempts to impose discipline despite these systemic

issues, there is consistent pushback from the Unions." *Id.* ¶ 22. "[B]eyond any formal limits or

restrictions on the Department's ability to suspend officers accused of serious misconduct, I

understand that lengthier suspensions do not occur based on informal agreements between DOC

leadership and the Unions, even where such suspensions may otherwise be permissible." *Id.* ¶ 21.

**

> **Nature of Dispute**:        Legal Dispute-FRE 703
> **Position of Defendants**:    Disputed, insofar as this is a conclusion or opinion rather than
> a factual statement that doesn't require a response. Defendants object on the basis that
> Jacobson is not an expert, pursuant to FRE 703, qualified to make broad opinions or
> conclusions concerning correctional practices in City jails at any time other than when he
> was the Commissioner of DOC. Defendants respectfully submit that Jacobson should not
> be credited as an expert, and also that his opinion should not be credited as an expert
> opinion.
> **Position of Plaintiffs**:        Plaintiffs do not submit this proposed finding as an expert
> opinion from Mr. Jacobson. Rather, this is Mr. Jacobson's factual testimony based on

what he directly observed during his time as Commissioner of DOC and based on his conversations with DOC officials since that time. *See* Jacobson Decl., Dkt. 602-84, ¶ 9.

1137.   **COBA, the Assistant Deputy Wardens/Deputy Wardens Association ("ADW/DWA") and Correction Captains' Association ("CCA") each filed petitions before the Office of Collective Bargaining challenging reforms enacted pursuant to the Nunez Consent Judgment and remedial orders (collectively, "The Union Proceedings"). The Unions lost those challenges after 12 days of hearings.**

> **Nature of Dispute**:         Legal Dispute-Materiality
> **Position of Defendants**:    Disputed insofar as this statement is not material and is not indicative that a receivership or a contempt finding is warranted.
> **Position of Plaintiffs**:        The scope of the impact of labor unions on the reform effort is material. It has been litigated in various filings, *see* ¶¶ 1137-1146, discussed by the Monitor at various points in the case, *see* ¶ 696 (and the Monitor's April 18, 2024 Report at 136 and May 24, 2024 report at 23, 26-27), and included in analysis of the *Plata* factors discussed at length in the briefs by both Plaintiffs and Defendants.

1138.   **COBA repeatedly opposed the rollout of the revised UOF Directive required by the Consent Judgment, which had an intended effective date of November 20, 2015. 14 OCB2d 10, at 7-9, Ex. 62. COBA insisted to DOC officials that it would be unfair to its members to be held accountable for violating the revised directive unless DOC spent more time informing employees about the policy changes. COBA further opposed DOC information sessions to inform officers about the revised Directive; "Union officials protested that the meetings were an improper form of training." *Id.* at 10. "[D]ue to the protests," DOC did not complete the planned information sessions. *Id.* DOC agreed to substantially delay the rollout of the revised UOF Directive to allow time for officers to learn about the revised UOF Directive; ultimately the revised UOF Directive did not become effective until September 27, 2017, two years after originally planned. *Id.* at 7-11.**

> **Nature of Dispute**:         Legal Dispute-Materiality

**Position of Defendants**:    Disputed insofar as this statement is not material and is not indicative that a receivership or a contempt finding is warranted.

**Position of Plaintiffs**:        The scope of the impact of labor unions on the reform effort is material. It has been litigated in various filings, *see* ¶¶ 1137-1146, discussed by the Monitor at various points in the case, *see* ¶ 696 (and the Monitor's April 18, 2024 Report at 136 and May 24, 2024 report at 23, 26-27), and included in analysis of the *Plata* factors discussed at length in the briefs by both Plaintiffs and Defendants.

1139.   \*\*The Unions further opposed the substance of the revised UOF directive and objected to reforms to protect incarcerated people from excessive force. The President of the ADW union testified during the proceeding that the current use of force directive was "unrealistic." *Id.* at 22. The President of the ADW/DWA testified that: "If you take out your [pepper] spray and spray too close you lose vacation days. If they feel you sprayed too soon and it wasn't fully required yet, you're penalized. So it's safer for them, for their jobs, their vacation days, their records, it is safer in that capacity and it is safer for them physically to avoid the use of force." COBA, 14 OCB2d 10, at 22-23, Ex. 62. The Unions claimed that officers "cannot defend [themselves] effectively," and, as a result, do not "physically engage" incarcerated people at all, which risks officers' safety. *Id.* at 22.\*\*

**Nature of Dispute**:          Legal Dispute-Materiality

**Position of Defendants**:    Disputed, insofar as Defendants aver this statement is not material and is not indicative that a receivership or a contempt finding is warranted.

**Position of Plaintiffs**:      The scope of the impact of labor unions on the reform effort is material. It has been litigated in various filings, *see* ¶¶ 1137-1146, discussed by the Monitor at various points in the case, *see* ¶ 696 (and the Monitor's April 18, 2024 Report at 136 and May 24, 2024 report at 23, 26-27), and included in analysis of the *Plata* factors discussed at length in the briefs by both Plaintiffs and Defendants.

1140.   The Unions also opposed the UOF Directive's prohibitions on "kicking or striking an inmate with institutional equipment and employing a choke hold or head locks" and "[s]trikes or blows to the head, face, groin, neck, kidneys and spinal column." The Unions insisted these are "effective techniques," and some are "instinctive." COBA, 14 OCB2d 10, at 24, 60-61, Ex. 62.

1141.   COBA objected that its officers were "no longer being able to use force in response to verbal taunting from inmates." *Id.* at 38, 62 n.106. The Unions further asserted that the use of force directive's prohibitions on using racial, ethnic or homophobic slurs, and on provoking incarcerated people to assault them, rendered them less able to protect themselves. *Id* at 62 n.106.

1142.   The OCB rejected these claims by the Unions, stating: There is "no support in the record" that "using racial, ethnic, homophobic, or otherwise derogatory slurs; and harassing or publicly humiliating inmates result in a practical impact on safety by rendering COs less able to protect themselves." *Id.* at 62 n.106. It found that "we cannot condone UOF for an unlawful purpose," rejecting the Unions' claim that prohibitions on "'unnecessarily' painful escort or restraint techniques without a lawful purpose have a practical impact on officer safety." *Id.* At bottom, it held there was "no evidence that new mandates to use non-violent techniques or de-escalation have had a direct impact on officer safety." *Id.* at 62; *see also id.* at 30.

1143.   The Unions have also opposed "greater scrutiny of staff actions," and accountability for misconduct. COBA, 14 OCB2d 10, at 31-32, 64, Ex. 62. The Unions opposed the "increased risk of discipline for engaging in improper UOFs." *Id.* at 64. They opposed a zero-tolerance policy for certain excessive force.

1144.   On March 20, 2017, COBA filed new labor proceedings challenging the Consent Judgment's provisions requiring screening of staff on special units like the Emergency Services Unit (Consent Judgment XII) on the grounds that they "chang[ed] the role of seniority in awarding job assignments." 11 OCB 2d 17 (BCB 2018) at 2, Ex. 63. Specifically it opposed a requirement that DOC review "the CO's disciplinary history for the prior five years, including whether the CO has been found guilty or pleaded guilty to charges relating to a Use of Force

Incident," as well as the officer's' UOF history, Command Discipline, and Investigation

Divisions Closing Memoranda for alleged uses of force and "evaluate" and document whether

"the staff member should be reassigned to a position with more limited inmate contact." *Id.* at 6-

8. The Union insisted that the review was inappropriate because "the number of uses of force[] a

CO has increases with seniority as purely a function of the length of service." *Id.* at 12. Instead,

the Union position is that seniority should be the governing criteria.  11 OCB2d 17 (BCB 2018)

at 5-6. This Union attempt also failed.

      1145.   On April 24, 2017, COBA initiated labor practice proceedings before the BCB

challenging the Consent Judgment's requirements governing a pre-promotional review of use of

force histories before promoting officers to captains. 11 OCB2d 33 (BCB 2018), Ex. 83. The

union objected to DOC's consideration of misconduct that had resulted in command discipline,

which is expunged after one year, or use of force practices that did not result in formal discipline,

in choosing supervisors. *Id.* at 5-6. The Board dismissed the petition. *Id.* at 18.

      1146.   On September 11, 2020, COBA initiated another improper labor practice

proceeding challenging numerous provisions of the Court's First Remedial Order. 14 OCB2d 19

at 1, Ex. 61. The Union opposed accountability, challenging that it would "increase the number

of disciplinary cases prosecuted, the penalty outcomes, and the likelihood that a UOF will be

deemed improper, which will alter COs' expectations." *Id.* at 15. The Union complained in that

proceeding that the Monitor had authority to "publish public criticism on individual use of force

cases" and "near dictatorial powers" over the investigation of use of force. *Id.* at 16. The Board

dismissed COBA's petition. *Id.* at 28.

### 6. The Unions Successfully Advocated For The Termination Of The Disciplinary Manager

1147.   **For over a year before her termination, the correctional staff unions sought to have the Department terminate Deputy Commissioner Sarena Townsend. According to reporting by the New York Times, in May 2021, after Commissioner Brann resigned, COBA put out a video ending with the words "Who's Next?" overlaid on photos of five other administrators, including Deputy Commissioner Townsend. Commissioner Brann and Timothy Farrell—who had both resigned—had red Xs across their faces. *See* Jan Ransom, *Jail Unions Gain a Powerful Supporter: The New Mayor*, N.Y. Times (Jan. 14, 2022), Ex. 75; Ex. 80 (Who's Next? Image). **

> **Nature of Dispute**:        Legal Dispute-Materiality
> **Position of Defendants**:    Not Disputed insofar as the proposed finding reflects what is stated on the cited pages of the relevant reports. Disputed insofar as this statement is not material and is not indicative that a receivership or a contempt finding is warranted.
> **Position of Plaintiffs**:        The unions' opposition to former Deputy Commissioner Townsend—given the dispute in this case about whether DOC terminated Ms. Townsend absent a bona fide reason, in violation of the Third Remedial Order—is material as evidence that continued insistence on compliance with the Court's orders would lead only to confrontation and delay, and also of a lack of leadership to turn the tide in a reasonable time.

1148.   **At a rally held by the Unions in summer 2021, the COBA President led a chant saying, "Sarena Townsend's got to go," where the attendees responded, chanting "Sarena's gotta go, Sarena's gotta go." Ex. 81 (video of the rally).**

> **Nature of Dispute**:        Legal Dispute-Materiality
> **Position of Defendants**:    Disputed, insofar as Defendants aver this statement is not material and is not indicative that a receivership or a contempt finding is warranted.
> **Position of Plaintiffs**:        The unions' opposition to former Deputy Commissioner Townsend—given the dispute in this case about whether DOC terminated Ms. Townsend absent a bona fide reason, in violation of the Third Remedial Order—is material as evidence that continued insistence on compliance with the Court's orders would lead only to confrontation and delay, and also of a lack of leadership to turn the tide in a reasonable time.

1149.   **The New York Times also reported that the "the unions launched an online petition calling for Ms. Townsend's firing, recording at least 290 signatures." Ex. 75.**

> **Nature of Dispute**:      Legal Dispute-Materiality
> **Position of Defendants**:   Disputed, insofar as Defendants aver this statement is not material and is not indicative that a receivership or a contempt finding is warranted.
> **Position of Plaintiffs**:      The unions' opposition to former Deputy Commissioner Townsend—given the dispute in this case about whether DOC terminated Ms. Townsend absent a bona fide reason, in violation of the Third Remedial Order—is material as evidence that continued insistence on compliance with the Court's orders would lead only to confrontation and delay, and also of a lack of leadership to turn the tide in a reasonable time.

1150.   **The New York Times reported (based on information from Mr. Ferraiuolo, president of the CCA), that "Mr. Molina met with the union leaders for a four-hour lunch at a Queens restaurant" in mid-December 2021. *Id.* During that meeting, the Unions shared concerns about "the disciplinary actions taken against staff under the de Blasio administration." *Id.***

> **Nature of Dispute**:      Legal Dispute-Materiality
> **Position of Defendants**:   Disputed, insofar as Defendants aver this statement is not material and is not indicative that a receivership or a contempt finding is warranted.
> **Position of Plaintiffs**:      The unions' opposition to former Deputy Commissioner Townsend—given the dispute in this case about whether DOC terminated Ms. Townsend absent a bona fide reason, in violation of the Third Remedial Order—is material as evidence that continued insistence on compliance with the Court's orders would lead only to confrontation and delay, and also of a lack of leadership to turn the tide in a reasonable time.

1151.   On January 3, 2023, the Department terminated Deputy Commissioner Sarena Townsend without a bona fide reason. *See supra* ¶¶ 760-761.

1152.   **When publicly questioned as to why he terminated Deputy Commissioner Townsend, Commissioner Molina responded by saying there were two distinct issues as related to her: the first was a "personnel matter," and the second was about the disciplinary system. With respect to the disciplinary system as it related to Townsend, Former Commissioner Molina stated that accountability in the disciplinary system was essential, and that "**improving staff morale is**

**also essential.**" January 11, 2022 Public Meeting, New York City Board of Correction, (Jan. 11, 2022), available at https://www.nyc.gov/site/boc/meetings/january-11-2022.page (at 23:45-26:550 (emphasis supplied).**

> **Nature of Dispute**:    Legal Dispute-Other
> **Position of Defendants**:     Not Disputed insofar as the proposed finding reflects what is stated on the cited pages of the relevant reports. Disputed insofar as this statement is not material and is not indicative that a receivership or a contempt finding is warranted. Defendants further state that emphases in this paragraph were added by plaintiffs.
> **Position of Plaintiffs**:      That Plaintiffs use a common bolding convention to draw the attention of the reader to a particular segment of a quotation—with a notation that emphasis is supplied to make clear to the reader that Plaintiffs have done so—is not a colorable basis for a legal objection. The Court can and should, of course, place weight on some or all of the proposed findings offered as the Court deems appropriate. Further, evidence of former Commissioner Molina's motivations for terminating former Deputy Commissioner Townsend, and whether union pressure played a role, is material. The unions' opposition to former Deputy Commissioner Townsend—given the dispute in this case about whether DOC terminated Ms. Townsend absent a bona fide reason, in violation of the Third Remedial Order—is material as evidence that continued insistence on compliance with the Court's orders would lead only to confrontation and delay, and also of a lack of leadership to turn the tide in a reasonable time.

1153.   **After the Department terminated Deputy Commissioner Townsend without a bona fide reason, the Unions took credit for the termination. The COBA President told The New York Post he had asked Molina to terminate her: "We basically told the new commissioner what the problems were out of the gate that we saw morale-wise. He basically took our issues, the issues that we brought to him, and he made his own assessment." He said: "But we absolutely pushed for that. She was not fair in negotiating with us when it came to discipline and we're not sad to see her go." Nolan Hicks & Craig McCarthy, *Eric Adams Defends Firing of Top Internal Jails Cop After Union Pressure*, N.Y. Post (Jan. 5, 2022), Ex. 76.**

> **Nature of Dispute**:    Legal Dispute-Materiality
> **Position of Defendants**:    Disputed, insofar as Defendants aver this statement is not material and is not indicative that a receivership or a contempt finding is warranted.
> **Position of Plaintiffs**:     The unions' opposition to former Deputy Commissioner Townsend—given the dispute in this case about whether DOC terminated Ms. Townsend absent a bona fide reason, in violation of the Third Remedial Order—is material as

evidence that continued insistence on compliance with the Court's orders would lead only to confrontation and delay, and also of a lack of leadership to turn the tide in a reasonable time.

1154.   **The New Yorker reported: "When I [the New Yorker reporter, Eric Lach] brought up Townsend's dismissal, and the reports that it had been done at the union's behest, [COBA President] Boscio didn't argue. 'We understand that we're a paramilitary organization and discipline exists,' he said. 'But it's the amount of discipline that's the problem.'" Eric Lach, *What is Eric Adams's Plan for the Rikers Island Crisis?*, The New Yorker (Jan. 23, 2022), Ex. 77.**

    **Nature of Dispute**:     Legal Dispute-Materiality
    **Position of Defendants**:   Disputed, insofar as Defendants aver this statement is not material and is not indicative that a receivership or a contempt finding is warranted.
    **Position of Plaintiffs**:    The unions' opposition to former Deputy Commissioner Townsend—given the dispute in this case about whether DOC terminated Ms. Townsend absent a bona fide reason, in violation of the Third Remedial Order—is material as evidence that continued insistence on compliance with the Court's orders would lead only to confrontation and delay, and also of a lack of leadership to turn the tide in a reasonable time.

1155.   **On January 4, 2022, COBA and the CCA sent a letter to their members explaining that they had already met with Commissioner Molina and "thank[ed]" him for "taking decisive action" by removing Ms. Townsend, stating they "look forward to his new appointee, whomever that may be, addressing disciplinary action in a more fair and open manner." *See* Ex. 78.**

    **Nature of Dispute**:     Legal Dispute-Materiality
    **Position of Defendants**:   Disputed, insofar as Defendants aver this statement is not material and is not indicative that a receivership or a contempt finding is warranted.
    **Position of Plaintiffs**:    The unions' opposition to former Deputy Commissioner Townsend—given the dispute in this case about whether DOC terminated Ms. Townsend absent a bona fide reason, in violation of the Third Remedial Order—is material as evidence that continued insistence on compliance with the Court's orders would lead only to confrontation and delay, and also of a lack of leadership to turn the tide in a reasonable time.

1156.   **On January 4, 2022, the COBA account on X (formerly Twitter) posted a story about Deputy Commissioner Townsend's termination and wrote: "Serena [sic] Townsend had one single mission- to serve as the puppet of a remote fed monitor hellbent on destroying the moral of our essential workforce by writing them up on frivolous charges. Good riddance!" *See* Ex. 79.**

> **Nature of Dispute**:       Legal Dispute-Materiality
> **Position of Defendants**:   Disputed, insofar as Defendants aver this statement is not material and is not indicative that a receivership or a contempt finding is warranted.
> **Position of Plaintiffs**:    The unions' opposition to former Deputy Commissioner Townsend—given the dispute in this case about whether DOC terminated Ms. Townsend absent a bona fide reason, in violation of the Third Remedial Order—is material as evidence that continued insistence on compliance with the Court's orders would lead only to confrontation and delay, and also of a lack of leadership to turn the tide in a reasonable time.

### E.    Monitor's Conclusions Regarding DOC's Ability to Implement Reform

1157.   Since entry of the Consent Judgment, DOC has had four Commissioners: Joseph Ponte (April 2014 to May 2017); Cynthia Brann (October 2017 to May 2021); Vincent Schiraldi (May 2021 to December 2021); and Commissioner Louis Molina (January 2022 to November 2023).

1158.   None of these Commissioners have been able to achieve compliance with the most critical Consent Judgment and Remedial Order provisions, including the core requirement to implement the Use of Force Directive. *See supra* ¶¶ 214-216.

1159.   As the Monitor has noted, DOC has a "deeply entrenched culture of dysfunction that has persisted across decades and many administrations." Monitor's July 10, 2023 Rep., at 142; Jacobson Decl. ¶ 11 (describing "multi-year decline in safety conditions at the City's jails").

1160.   This Court entered three remedial orders based on the Monitor's findings that Defendants had not complied with key provisions of the Consent Judgment and prior remedial orders. *See supra* ¶¶ 17-73.

1161.    The Monitor observed in its Eleventh Report, filed in May 2021, that articulating a desired change to DOC, even via an order from the Court, was "not sufficient to actually *catalyze* the change in practice." Monitor's Eleventh Rep. at 5.

1162.    In its Third Remedial Order Report, filed on December 22, 2021, the Monitor stated that DOC "as currently structured, has been unable to fully implement and institutionalize the remedial measures." Monitor's Dec. 12, 2022 Rep. at 3.

1163.    Several months later, the Monitor noted that "the current conditions—six years after the Consent Judgment went into effect—bring into stark relief that the agency has shown itself, to date, incapable of implementing the changes in practice necessary to achieve the goals of the Consent Judgment and the First and Second Remedial Orders." Monitor's Mar. 16, 2022 Rep. at 4.

1164.    In response to these failures, a fourth remedial order, known as the "Action Plan," was entered, with the goal of "addressing the foundational deficiencies that inhibit [DOC's] ability to build sustainable reforms." Monitor's June 10, 2022 Letter to the Court, Dkt. 462 at 2.

1165.    On July 10, 2023, more than a full year after the Action Plan was entered, the Monitor found that Defendants had not made substantial and demonstrable progress in implementing the Action Plan's requirements. Monitor's July 10, 2023 Rep. at 172. That finding remains true as of November 8, 2023. *See* Monitor's Nov. 8, 2023 Rep. at 1 n.2.

1166.    The Monitor also found that during that year, Defendants had not achieved a substantial reduction in the risk of harm currently facing incarcerated individuals and Department staff. Monitor's July 10, 2023 Rep. at 173. That finding remains true as of November 8, 2023. *See* Monitor's Nov. 8, 2023 Rep. at 1 n.2.

1167.   After eight years of monitoring and one year of the Action Plan's implementation, the Monitor concluded that his prior cautious optimism regarding DOC's ability to comply with the Court's orders could no longer be maintained. Monitor's July 10, 2023 Rep. at 171.

1168.   The Monitor explained that "the current trajectory is sorely inadequate to the task of untangling the dysfunction in this agency." *Id.* at 174; *See* Monitor's Nov. 8, 2023 Rep. at 5 ("[o]n this present trajectory, the current state of affairs will continue, and likely worsen.").

1169.   The Monitor concluded that "the City and Department have repeatedly and consistently demonstrated they are incapable of effectively directing the multilayered and multifaceted reform effort and continuing on the current path is not likely to alter the present course in any meaningful way." July 10, 2023 Rep. at 177; *see also* Jacobson Decl. ¶ 12 ("the pervasive culture of violence and disorder that permeates the DOC can only be meaningfully addressed through drastic, fundamental changes at every level within the Department").

1170.   As of October 2023, the Monitor concluded that DOC has repeatedly and consistently demonstrated they are incapable of effectively directing and managing the multilayered and multifaceted reform effort, and continuing on the current path is not likely to alter the present course in any meaningful way. Monitor's Oct. 5, 2023 Rep. at 25.

1171.   As of October 2023, DOC's efforts at reform have been limited and ineffective. Monitor's Oct. 5, 2023 Rep. at 2. DOC has proposed few concrete plans to address its noncompliance. *Id.* "Most of the initiatives the City and Department have identified so far merely focus on revising policy, issuing memorandums and reading teletypes at roll call (which, notably, not all staff attend) or reiterating existing practices or trainings." Monitor's Oct. 5, 2023 Rep. at 23; Monitor's Nov. 8, 2023 Rep. at 16-17, 80 (because DOC "has failed to take the necessary steps to understand the dynamics that actually underlie poor practice [so as to] move

beyond superficial actions," the Monitor regularly provides DOC with recommendations that would improve their compliance and offers extraordinary technical assistance). DOC "has taken few concrete actions to adopt these recommendations (or devise reasonable alternatives)." *Id.* at 17; Monitor's July 10, 2023 Rep. at 161, 163 (DOC did not provide "fulsome information" or "detailed plan" to Monitoring Team on how it would implement over thirty recommendations made by the Monitor in April 2023); Ex. 50 at 10 (describing implementation of violence reduction plan as policy revision to key control, standardized roll calls, roll call binder).

1172.    DOC's efforts are haphazard, tepid, insubstantial. Monitor's Oct. 5, 2023 Rep. at 2-3. 23. They are insufficient to create the culture change and practice improvements necessary to effectuate reform. *Id.* at 2-3, 23. In line with a "diminishing sense of urgency to address the gravity of the problems in the jails," DOC's initiatives are in ongoing "flux or are never fully implemented," and absent "the Monitor's insistence, critical problems were not being recognized or addressed." Monitor's Nov. 8, 2023 Rep. at 56 & n.48.

1173.    DOC's response to the Court's June 13, 2023 and August 10, 2023 Orders has been mediocre and fails to address the gravity of the current situation with solutions of equal magnitude. Monitor's Oct. 5, 2023 Rep. at 24. DOC lacks the urgency to address basic security practices, continued and emerging problems with staff availability, a growing abdication of control on the housing units, a failure to adequately identify misconduct when it occurs (via Rapid Reviews and investigations), lapses in timely internal incident reporting and Monitoring Team notification, and continued efforts to impede transparency and obfuscate the work of the Monitoring Team. *Id.*

1174.    Instead of a reform trajectory characterized by incremental progress, DOC's path has recently been dominated by deteriorating practices, failures to utilize policies and procedures

that had previously been in place, and the inability to effectively implement the few new

strategies that have been developed. Sustained and chronic institutional resistance and

recalcitrance toward court ordered reform is an insurmountable impediment to any Monitorship.

*See* Monitor's Nov. 8, 2023 Rep. at 2 ("pace of reform has not accelerated and appears to have

stagnated").

1175.    The Monitor has described a "depth of dysfunction, created over decades of

mismanagement, that permeates the entire system," which has led to "a number of interrelated

'problem centers' for which the solution to each is dependent upon finding the solution to some,

if not at all, of the others." Monitor's Mar. 16, 2022 Rep. at 2; Monitor's Nov. 8, 2023 Rep. at 18

(DOC "is destined to remain in a persistent state of dysfunction").

### F.    November 15, 2023 Update from Monitor

1176.    On November 13, 2023, DOC opened an Arson Reduction Housing Unit

("AHRU") and placed five people in it. Monitor's Nov. 15, 2023 Ltr. at 1-2.

1177.    The operations guide for the unit was "poorly written, vague, and ambiguous." *Id.*

at 2. The written procedures for the unit, which were not signed by any DOC leadership,

reference "Operation Restore Order," but DOC has not provided information to the Monitor

about any such operation. *Id.* at 3. The unit has a number of restrictions that may trigger due

process rights that are not afforded to the individuals housed there. *Id.* at 3. While people housed

in this unit supposedly are given access to mandated services on the unit, it is unclear how it

would occur in practice. *Id.* AHRU lacked a robust program design, and the selection of

individuals to be housed in the unit appeared to have an "element of arbitrariness." *Id.* at 2-3.

The staff assigned to the unit do not appear to be screened to assess their suitability to manage

the individuals housed there, nor did they appear to receive training on the unit's operation. *Id.* at

3.

1178.   On November 14, 2023, an anonymous source told the Monitoring Team that DOC had opened AHRU. DOC had not consulted or notified the Monitoring Team prior to opening AHRU despite a commitment to do so prior to opening such a unit, and its obligations under the Consent Judgment to do so. *Id.* at 1-2 & n.2.

1179.   DOC appears to have opened the housing unit "on short notice, with little planning, little to no guidance to staff, unclear admission criteria, and poorly defined rules and restrictions," which was "unwise, at best, and is the antithesis of restoring order." *Id.* at 4. DOC does not appear to have engaged its expert on restricted housing units when developing or opening ARHU. *Id.* at 4.

1180.   DOC's opening of the unit without prior consultation with or notification to the Monitor is consistent with their poor planning and operation of RESH, where in October 2023, the use of force rate (62.84) was an "astronomically high." *Id.* at 4. Haphazardly and furtively opening a specialized restrictive housing unit is likely to *increase* the risk of harm rather than diminish it. *Id.* at 6.

1181.   On November 14, 2023, DOC reported that it had disbanded the unit less than 24 hours after it opened. *Id.* at 4. The hasty closure of the unit "replicates the erratic, chaotic, and dysfunctional management practices frequently cited by the Monitor." *Id.* at 5.

1182.   Gilberto Garcia's brother, Gilson Garcia, was also in DOC custody on October 31, 2022 and Gilson's cell was next door to Gilberto's. Declaration of Gilson Garcia dated November 9, 2023 at ¶ 3, Ex. 90. At one point, Gilson saw Gilberto—who he called Fuli—sitting with his head down and thought he might be asleep; but when Gilson saw Gilberto some time later in the exact same position, Gilberto became concerned. *Id.* ¶ 5. Gilson approached Gilberto, realized something was very wrong, and Gilson screamed "medical emergency." *Id.* A CO who

was on-post several cells down moved slowly toward Gilberto; Gilson had to run to her to grab her Narcan to try to revive his brother. *Id.* ¶ 6. While waiting for the medical emergency team to arrive, Gilson administered Narcan to Gilberto and attempted to perform CPR, though he has no CPR training and had not administered Narcan before. *Id.* ¶ 7. A clinic employee helped with CPR; after the medical emergency team arrived, they could not help Gilberto and placed a sheet over him, signaling he had died. *Id.* ¶ 8-11. Gilson explained that while an officer doing rounds is supposed to knock on each person's cell and wait for a response, that did not happen: "I never heard the officer in our housing unit knock on our cells on the day of my brother's death." *Id.* ¶ 14. After the death, Gilson remained housed in the cell right next to where his brother died for weeks, though he repeatedly asked to be moved; each time he passed Gilberto's former cell he "kept expecting him to be there." *Id.* ¶ 15. Now he is experiencing immense grief and feels unsafe, explaining: "It does not matter where I am housed, anything can happen here. Our mental and physical health do not get taken seriously here." *Id.* ¶ 17-18.

Original Filing Date:  November 17, 2023
Updated Filing Date:  July 30, 2024
                      New York, New York

THE LEGAL AID SOCIETY                  EMERY CELLI BRINCKERHOFF
                                           ABADY WARD & MAAZEL LLP

By: /s/ Mary Lynne Werlwas            By: /s/ Jonathan S. Abady
Mary Lynne Werlwas                      Jonathan S. Abady
Kayla Simpson                             Debra L. Greenberger
Katherine Haas                          Vasudha Talla
49 Thomas Street, 10th Floor         Sana Mayat
New York, New York 10013           600 Fifth Avenue, 10th Floor
(212) 577-3300                           New York, New York 10020
                                           (212) 763-5000

*Attorneys for Plaintiff Class*

**Chart of Substantive Filings By the *Nunez* Monitor**

| Filing Date | Dkt. | Monitor's Report | Monitoring Period |
|---|---|---|---|
| 5/31/2016 | 269 | First Report of the *Nunez* Independent Monitor | 1st – 10/22/15-2/29/16 |
| 10/31/2016 | 291 | Second Report of the *Nunez* Independent Monitor | 2nd – 3/1/16-7/31/16 |
| 4/3/2017 | 295 | Third Report of the *Nunez* Independent Monitor | 3rd – 8/1/16-12/31/16 |
| 10/10/2017 | 305 | Fourth Report of the *Nunez* Independent Monitor | 4th – 1/1/17-6/30/17 |
| 3/5/2018 | 309 | Special Report of the *Nunez* Independent Monitor re: Locking Mechanisms at RNDC | N/A |
| 4/18/2018 | 311 | Fifth Report of the *Nunez* Independent Monitor | 5th – 7/1/17-12/31/17 |
| 10/17/2018 | 317 | Sixth Report of the *Nunez* Independent Monitor | 6th – 1/1/18-6/31/18 |
| 10/31/2018 | 318 | Letter from the Office of the Monitor to the Court re: Update on Operation of Horizon Juvenile Center | N/A |
| 12/4/2018 | 320 | Letter from the Office of the Monitor to the Court re: Update on Operation of Horizon Juvenile Center | N/A |
| 2/19/2019 | 325 | Letter from the Office of the Monitor to the Court re: Update on Operation of Horizon Juvenile Center | N/A |
| 4/18/2019 | 327 | Seventh Report of the *Nunez* Independent Monitor | 7th – 7/1/18-12/31/18 |
| 10/28/2019 | 332 | Eighth Report of the *Nunez* Independent Monitor | 8th – 1/1/19-6/30/19 |
| 5/6/2020 | 338 | Letter from the Office of the Monitor to the Court (re: COVID-19 Update) | N/A |

| Filing Date | Dkt. | Monitor's Report | Monitoring Period |
|---|---|---|---|
| 5/29/2020 | 341 | Ninth Report of the *Nunez* Independent Monitor | 9th – 7/1/19-12/31/19 |
| 10/23/2020 | 360 | Tenth Report of the *Nunez* Independent Monitor | 10th – 1/1/20-6/30/20 |
| 12/8/2020 | 365 | First Remedial Order Report of the *Nunez* Independent Monitor | First Remedial Order – 8/14/20-9/30/20 |
| 5/11/2021 | 368 | Eleventh Report of the *Nunez* Independent Monitor | 11th – 7/1/20-12/31/20 |
| 6/3/2021 | 373 | Second Remedial Order Report of the *Nunez* Independent Monitor | Second Remedial Order – 1/1/21-3/31/21 |
| 8/24/2021 | 378 | Status Report Letter from the Office of the Monitor to the Court | N/A |
| 9/2/2021 | 380 | Status Report Letter from the Office of the Monitor to the Court | N/A |
| 9/23/2021 | 387 | Status Report Letter from the Office of the Monitor to the Court | N/A |
| 9/30/2021 | 399 | Letter from the Office of the Monitor to the Court re: Use of Force Discipline | N/A |
| 10/14/2021 | 403 | Status Report Letter from the Office of the Monitor to the Court | N/A |
| 10/18/2021 | 409 | Monitor's First Report on the Conditions of Confinement for 16- and 17-Year-Old Adolescent Offenders at the Horizon Juvenile Center (HOJC) | HOJC 1st – 11/12/20-6/30/21 |
| 11/17/2021 | 420 | Status Report Letter from the Office of the Monitor to the Court | N/A |
| 12/1/2021 | 429 | Status Report Letter from the Office of the Monitor to the Court | N/A |
| 12/6/2021 | 431 | Twelfth Report of the *Nunez* Independent Monitor | 12th – 1/1/21-6/30/21 |

| Filing Date | Dkt. | Monitor's Report | Monitoring Period |
|---|---|---|---|
| 12/22/2021 | 435 | Third Remedial Order Report of the *Nunez* Independent Monitor | N/A |
| 3/16/2022 | 438 | Special Report of the *Nunez* Independent Monitor | N/A |
| 4/20/2022 | 445 | Status Report of the *Nunez* Independent Monitor | N/A |
| 4/25/2022 | 448 | Letter from the Office of the Monitor to the Court re: Monitoring Team's Recommendations | N/A |
| 4/27/2022 | 452 | Monitor's Second Report on the Conditions of Confinement for 16- and 17-Year-Old Adolescent Offenders at the Horizon Juvenile Center (HOJC) | HOJC 2nd – 7/1/21-12/31/21 |
| 5/17/2022 | 454 | Letter from the Office of the Monitor to the Court re: City & DOC's Action Plan | N/A |
| 6/10/2022 | 462 | Letter from the Office of the Monitor to the Court re: Updated Action Plan | N/A |
| 6/30/2022 | 467 | Status Report of the *Nunez* Independent Monitor | N/A |
| 10/25/2022 | 471 | Monitor's Third Report on the Conditions of Confinement for 16- and 17-Year-Old Adolescent Offenders at the Horizon Juvenile Center | HOJC 3rd – 1/1/22-6/30/22 |
| 10/28/2022 | 472 | Second Status Report on DOC's Action Plan by the *Nunez* Independent Monitor | 14th – 1/1/22-6/30/22 |
| 11/14/2022 | 475 | Letter from the Office of the Monitor to the Court re: Proposed Next Steps | N/A |
| 2/3/2023 | 504 | Special Report on Intake by the *Nunez* Independent Monitor | N/A |
| 4/3/2023 | 517 | Status Report on DOC's Action Plan by the *Nunez* Independent Monitor | 15th – 7/1/22-12/31/22 |
| 4/24/2023 | 520 | Status Report on DOC's Action Plan by the *Nunez* Independent Monitor | N/A |

| Filing Date | Dkt. | Monitor's Report | Monitoring Period |
|---|---|---|---|
| 4/26/2023 | 525 | Monitor's Fourth Report on the Conditions of Confinement for 16- and 17-Year-Old Adolescent Offenders at the Horizon Juvenile Center | HOJC 4th – 7/1/22-12/31/22 |
| 5/26/2023 | 533 | Special Report of the *Nunez* Independent Monitor | N/A |
| 5/31/2023 | 537 | Letter from the Office of the Monitor to the Court re: Update on Monitor's May 26th Report | N/A |
| 6/8/2023 | 541 | Special Report by the *Nunez* Independent Monitor | N/A |
| 6/12/2023 | 544 | Letter from the Office of the Monitor to the Court re: Update for June 13th Emergency Conference | N/A |
| 6/12/2023 | 546 | Letter from the Office of the Monitor to the Court re: Monitor's June 12th Proposed Order | N/A |
| 7/10/2023 | 557 | Special Report by the *Nunez* Independent Monitor | N/A |
| 8/07/2023 | 561 | Status Report by the *Nunez* Independent Monitor | N/A |
| 10/5/2023 | 581 | Status Report by the *Nunez* Independent Monitor | N/A |
| 11/8/2023 | 595 | Status Report by the *Nunez* Independent Monitor | N/A |
| 11/15/2023 | 599 | Letter from the Office of the Monitor to the Court re: Update regarding ARHU | N/A |

**List of Acronyms and Definitions**

| Acronym or Term | Definition |
|---|---|
| A.C.T. | Advanced Correctional Techniques |
| ADP | Average Daily Population |
| ADW | Assistant Deputy Warden |
| AIU | Application Investigation Unit |
| ALJ | Administrative Law Judge |
| AMKC | Anna M. Kross Center |
| Associate Commissioner of Operations | Positions reporting to the Deputy Commissioner of Operations that oversee groupings of facilities. |
| Assistant Commissioner of Operations | New position to serve as Warden of each facility, the selection of which is **not limited** to uniform staff. This role will report to an Associate Commissioner of Operations. |
| Avoidable Incidents | Incidents that could have been avoided altogether if Staff had vigorously adhered to operational protocols, and/or committed to strategies to avoid force rather than too quickly defaulting to hands-on force (*e.g.,* ensuring doors are secured so incarcerated individuals do not pop out of their cells, or employing better communication with incarcerated individuals when certain services may not be provided in order to mitigate rising tensions). |
| AWOL | Absent without Leave |
| BHPW | Bellevue Hospital Prison Ward |
| BKDC | Brooklyn Detention Center |
| BWC | Body-worn Camera |
| CASC | Compliance and Safety Center |
| CD | Command Discipline |
| CHS | Correctional Health Services |
| CityTime | Staff Member's official time bank of compensatory/vacation days etc. |
| CMS | Case Management System |
| CO | Correction Officer |
| COD | Central Operations Desk |
| CLU | Complex Litigation Unit |
| CLO | Command Level Order |
| CMU | Custody Management Division |
| DA | District Attorney |
| DCAS | Department of Citywide Administrative Services |
| DOC or Department | New York City Department of Correction |
| DOI | Department of Investigation |
| DWIC | Deputy Warden in Command |

| Acronym or Term | Definition |
| --- | --- |
| EAM | Enterprise Asset Management |
| Emergency Response Teams | There are at least three types of Emergency Response Teams: (1) Probe Teams, which consist of facility-based Staff ("Facility Emergency Response Teams"); (2) the Emergency Services Unit ("ESU") which is a separate and dedicated unit outside of the facility; and (3) the Special Search Team ("SST"), a separate and dedicated unit associated with the Special Operations Division that conducts searches. |
| EMTC | Eric M. Taylor Center |
| E.I.S.S. | Early Intervention, Support, and Supervision Unit |
| ESH | Enhanced Security Housing |
| ESU | Emergency Service Unit |
| Full ID Investigations | Investigations conducted by the Investigations Division |
| GMDC | George Motchan Detention Center |
| GRVC | George R. Vierno Center |
| H+H | New York City Health and Hospitals |
| HOJC | Horizon Juvenile Center |
| HUB | Housing Unit Balancer |
| ID | Investigation Division |
| In-Service training | Training provided to current DOC Staff |
| Intake Squad | A new dedicated unit within ID to conduct Intake Investigations of all use of force incidents |
| IRS | Incident Reporting System |
| JARs | Joint Assessment and Reviews |
| LOS | Length of Stay |
| LMS | Learning Management System—advanced training tracking platform |
| MDC | Manhattan Detention Center |
| MMR | Medically Modified/Restricted Duty Status in which Staff may not have direct contact with incarcerated individuals. |
| MO Unit | Mental Observation Unit |
| MOC | Memorandum of Complaint |
| NCU | *Nunez* Compliance Unit |
| New Directive or New Use of Force Directive | Revised Use of Force Policy, effective September 27, 2017 |
| Non-Compliance | "Non-Compliance" is defined in the Consent Judgment to mean that the Department has not met most or all of the components of the relevant provision of the Consent Judgment. |
| NPA | Negotiated Plea Agreement |
| OATH | Office of Administrative Trials and Hearings |
| OBCC | Otis Bantum Correctional Facility |

| Acronym or Term | Definition |
|---|---|
| OC Spray | Chemical Agent |
| OMAP | Office of Management Analysis and Planning |
| OSIU | Operations Security Intelligence Unit |
| Parties to the *Nunez* Litigation | Plaintiffs' Counsel, SDNY representatives, and counsel for the City |
| Partial Compliance | "Partial Compliance" is defined in the Consent Judgment to mean that the Department has achieved compliance on some components of the relevant provision of the Consent Judgment, but significant work remains |
| PC | Protective Custody |
| PDR | Personnel Determination Review—disciplinary process for probationary Staff Members |
| PMO | Project Management Office |
| PREA | Prison Rape Elimination Act |
| Intake Investigations | All use of force incidents receive an initial investigation, or "Intake Investigation," which is a more streamlined version of the predecessor "Preliminary Review." |
| Intake Squad | ID investigators conducting Intake Investigations |
| Pre-Service or Recruit training | Mandatory Training provided by the Training Academy to new recruits |
| Rapid Review / Avoidables Process | For every actual UOF incident captured on video, the facility Warden must identify: (1) whether the incident was avoidable, and if so, why; (2) whether the force used was necessary; (3) whether Staff committed any procedural errors; and (4) for each Staff Member involved in the incident, whether any corrective action is necessary, and if so, for what reason and of what type |
| RMSC | Rose M. Singer Center |
| RNDC | Robert N. Davoren Complex |
| SCM | Safe Crisis Management |
| SDNY | Southern District of New York |
| Service Desk | Computerized re-training request system |
| S.R.G. | Security Risk Group (gang affiliation) |
| S.T.A.R.T. | Special Tactics and Responsible Techniques Training |
| Staff or Staff Member | Uniformed individuals employed by DOC |
| Substantial Compliance | "Substantial Compliance" is defined in the Consent Judgment to mean that the Department has achieved a level of compliance that does not deviate significantly from the terms of the relevant provision |
| TEAMS | Total Efficiency Accountability Management System |
| TDY | Temporary Duty |
| TRU | Transitional Restorative Unit |

| Acronym or Term | Definition |
|---|---|
| Trials Division | Department's Trials & Litigation Division |
| TTS | Training Tracking Software system |
| UOF | Use of Force |
| VCBC | Vernon C. Bain Center |
| WF | West Facility |
| Young Incarcerated Individuals | Incarcerated individuals under the age of 19 |