# EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X

MARK NUNEZ, et al.,

                                             Plaintiffs,        **DEFENDANTS' UPDATED STATEMENT OF MATERIAL FACTS**

-against-

CITY OF NEW YORK, et al.,

                                          Defendants.        11 Civ. 5845 (LTS)

------------------------------------------------------------------x

UNITED STATES OF AMERICA,

                                    Plaintiff-Intervenor,

-against-

CITY OF NEW YORK and NEW YORK CITY
DEPARTMENT OF CORRECTION,

                                    Defendants.

------------------------------------------------------------------x

STATE OF NEW YORK     )
                           :SS:

COUNTY OF NEW YORK  )

      **OMAR SIDDIQI,** an attorney duly admitted to practice in the State of New York and in this Court, and a Senior Counsel in the Office of Muriel Goode-Trufant, Acting Corporation Counsel of the City of New York; as such, I am one of the attorneys for Defendants the City of New York and the New York City Department of Correction in the above referenced matter. I am

1

familiar with the facts stated below, and submit Defendants' Updated[1] Statement of Material Facts in Opposition to Plaintiffs' and Plaintiff-Intervenor's Motion for Contempt and Appointment of a Receiver.

1. Lynelle Maginley-Liddie, was appointed as Commissioner of the New York City Department of Correction ("the Department"), by Mayor Eric Adams on December 8, 2023. As Commissioner, she oversees the care, custody, and control of the Department's pre-trial detainees and city-sentenced individuals See Exhibit A[2] (Declaration of Commissioner Lynelle Maginley-Liddie) at ¶ 1.

2. From the time of her appointment, Commissioner Maginley-Liddie has been actively engaged and working collaboratively with the Monitor, the Deputy Monitor, and the Monitoring Team.  In a February 26, 2024 Joint Letter to the Court, the Monitor stated:

> "The Monitoring Team observed an immediate change in the Department's approach and dynamic in early December 2023 with the appointment of Commissioner Maginley-Liddie. The Department's leadership team is now actively engaging with the Monitor, the Deputy Monitor, and the Monitoring Team. These interactions reflect greater transparency and interest in working collaboratively. The Monitoring Team is routinely consulted and proactively advised on a wide variety of issues. When matters of mutual concern arise, Department leadership

---

[1] This Updated Statement of Material Facts is submitted following a meet and confer process with counsel for Plaintiffs and Plaintiff-Intervenor which was conducted with the goal of minimizing disputes between the parties.  This document updates the Statement of Facts filed as Docket 692.

[2] All referenced exhibits are annexed to the Declaration of Michael Viviano, dated March 18, 2024 (Dkt. 689).

seeks input from the Monitor, has been receptive to feedback, and appears open to adapting practices as necessary. While more work remains, these early signs of improved transparency and collaboration with the Monitoring Team are promising and help to ensure that the Monitoring Team is properly positioned to do its work pursuant to the *Nunez* Court Orders." (Dkt. 679, pages 1-2)

See Exhibit A at ¶¶ 4-7.

3. "Overall, there is a marked and positive shift in the Department's approach to working with the Monitoring Team. The role and the authority of the *Nunez* Manager has been elevated over the last few months given the Commissioner's clear direction to staff regarding the *Nunez* Manager's role and responsibility and the authority the Commissioner has granted the *Nunez* Manager to do her work. Information is flowing more freely and consultation is occurring more frequently than in the previous two years." (Dkt. 679 at 4). See Exhibit A at ¶ 8.

4. On February 26, 2024 the Monitor stated as follows: "[f]urther, since the appointment of Commissioner Maginley-Liddie, although it has only been two months, the Monitoring Team has not identified any situations in which the Department should have consulted the Monitoring Team but did not. In fact, the Department has clearly been erring on the side of caution when consulting with the Monitoring Team, and therefore is consulting on matters both directly related to the *Nunez* Court Orders and those that may be more ancillary." (Dkt. 679 at 4) See Exhibit A at ¶ 8.

5. ***DOC's efforts have led to the completion of fifty-two (52) of the tasks required by the *Nunez* Action Plan and the subsequent Orders in 2023. As stated by Commissioner Lynelle Maginley-Liddie in her Declaration, DOC has completed provisions (A)(1)(c), (A)(2)(a),

(A)(2)(b), (A)(2)(c), (A)(2)(d)(i), (A)(2)(d)(ii), (A)(2)(d)(iii), (A)(2)(e), (A)(2)(f), (A)(2)(f)(i), (A)(3)(a), (A)(3)(b)(ii), (A)(3)(b)(ii)(1), (A)(3)(b)(ii)(2), (A)(3)(b)(ii)(2)(a), (A)(3)(b)(ii)(2)(b), (A)(3)(b)(ii)(3), (A)(3)(b)(ii)(3)(iii), (A)(3)(c), (B)(1), (B)(2), (B)(4), (C)(1), (C)(2), (C)(5), (D)(1), (D)(5), (E)(1), (E)(2), (E)(2)(a), (E)(2)(b), (E)(2)(c), (E)(3)(a), (F)(1), (F)(1)(a), (F)(1)(b), (F)(2)(a)(i)-(iv), (F)(5), (F)(6), (F)(7), and (G)(1) of the Action Plan; provisions (I)(1)(a), (I)(2), (I)(5), (I)(6), (I)(7), (I)(7)(a), (II)(2) of the June 13, 2023 Order; provisions (I)(11), (I)(12), (I)(14) of the August 10, 2023 Order; and provision 1(a) of the December 14, 2023 Order. See Exhibit A at ¶ 22, and Appendix B thereto. ***

**Nature of Dispute**:      Accuracy Disputed/Legal Dispute – Other

**Position of Plaintiffs**: The dispute remains. Defendants have not completed all 52 of these tasks. *See* Plaintiffs' Reply Brief ("Reply Brief"), Dkt. 716, at 4-7; SFOF ¶¶ 51-54 (regarding unsecured doors and staff off-post), 88 (regarding unsecured doors and staff off-post), 326-328 (regarding vacant high-level positions), 340-343 (regarding failures to expand and appropriately staff E.I.S.S.). In addition, this is a legal opinion and the assertion that all of these requirements have been met has no factual basis in record. To the extent Defendants seek to file additional proposed findings of fact or declarations that include new information regarding the subject matter in this proposed finding of fact, Plaintiffs reserve the right to object to the filing consistent with the Court's July 9, 2024 order (Dkt. No. 751) and our position as reflected in the July 30, 2024 Joint Report.

**Position of Defendants**: Defendants aver that the Declaration of Commissioner Maginley-Liddie provided accurate information regarding the progress made on the completion of these 52 tasks; Defendants respectfully refer the Court to paragraph 22 of the Commissioner's Declaration for an accurate recitation of completed tasks. Further, with regard to the three specific disputes raised by Plaintiffs in their response:

a.  Unsecured Doors and Staff Off-Post: Plaintiffs do not specifically state which tasks they object to as not having been completed as they relate to unsecured doors and staff off-post. Defendants maintain the related tasks referenced as completed, have in fact been completed. See Exhibit A at ¶ 22.

b.  High-Level Position Vacancies: Defendants note their supplemental proposed findings of fact to be provided to the Monitor and Plaintiffs on August 23 will include their updates regarding the subject matter in this proposed finding of fact.[3]

---

[3] As noted in the Parties July 30, 2024 Joint Status Report, Defendants will be submitting supplemental proposed findings of facts pursuant to the Court's instructions, as ordered at

     c.  E.I.S.S. Staffing: Defendants note that their supplemental proposed findings of fact to be provided to the Monitor and Plaintiffs on August 23 will include their updates regarding the subject matter in this proposed finding of fact.

6.  In February 2024, Commissioner Maginley-Liddie selected an individual to act as Deputy *Nunez* Manager. The individual will support the *Nunez* Manager and the Department's work. <u>See</u> Exhibit A at ¶ 17.

7.  As required by the Court's Orders, DOC, in consultation with the Monitor, developed a set of metrics for use of force, security, and violence. These were intended to allow DOC to better identify trends and patterns and develop anti-violence strategies <u>See</u> Exhibit A at ¶ 18.

8.  Further, the Office of Management, Analysis, and Planning ("OMAP") was established at DOC in 2022. It is designed to provide analysis of department data to inform DOC's operations and to support strategic planning. OMAP is involved in the planning of new initiatives and their evaluation once implemented. The formation of OMAP is intended to assist DOC in using quantitative data to advance decision-making and problem-solving. <u>See</u> Exhibit B (Declaration of Associate Commissioner Timothy Kepler) at ¶ 3.

9.  ***As an initial matter, as demonstrated in the Kepler Declaration, the definition of "use of force" has shifted considerably since 2016. <u>See</u> Exhibit B at ¶¶ 9-10. ***

**Nature of Dispute**:    Accuracy Disputed
**Position of Plaintiffs**: The dispute remains. The modification of the Use of Force Directive in 2017 did not result in a major or material change to the definition of "use of force" and is not based on new law. The Monitor—who had been closely involved in drafting the prior use of force directive and the new directive—has never suggested a material difference between the two directives. *See* First Monitor's Report, Dkt. 269, at 27 (describing the Monitor's extensive involvement in developing the Use of Force directive); SFOF ¶ 11 citing Monitor's Apr. 18, 2024 Rep. at 77 ("The Use of Force Policy is not based on new

---

the July 9, 2024 conference, and the Parties agreement, rather than submitting such additional facts through their responses in this document.

law, nor does it abandon core principles from its predecessor—the new policy retains core principles of the former policy while providing further explanation, emphasis, detail, and guidance to staff on the steps officers and their supervisors should take in response to threats to safety and security."). Indeed, the City also took this position in litigation with its unions over the 2017 policy, stating in a verified petition that "the obligations of Correction Officers in the event of a use of force incident ***are not materially changed*** by the updates contained in Directive 5006R-D." Exhibit 153 to Werlwas Decl. ¶ 2, Verified Ans. to Pet. for Inj. Relief, BCB-4142-15 (INJ), ¶¶ 218, 223-227 (emphasis supplied). Moreover, Defendants' assertion that a wider swath of incidents were deemed "uses of force" after the introduction of the new policy is unsupported by any objective evidence. As there was no prior definition of Use of Force with which to compare the definition introduced in 2017, Defendants would have to demonstrate through admissible evidence of prior practice that the types of incidents they describe below (guiding a person to the wall, using control holds to separate people, etc.) were not considered uses of force prior to 2017. Defendants have not done so, instead offering only a declaration from a Data Analyst who joined DOC in 2022 and who can provide neither a historical perspective nor an expert opinion on what was considered a use of force in DOC in 2016, and indeed does not even discuss the specific examples of types of incidents that Defendants use below. *See* Kepler Decl., Dkt. 689-2, ¶ 2.

**Position of Defendants**: Defendants respectfully refer the Court to the Kepler Declaration, Exhibit B, and further state that Plaintiffs are mixing terms. While the shift in Use of Force definition did not change the *obligations* of correction officers, it did change the scope of incidents that could be referred to as use of force incidents. Defendants' statement here refers to the wider swath of data that was collected and termed "use of force" after the change in 2017, and note, per the Kepler Declaration, that this definition contributed to a rise in the collection of data regarding incidents now termed "uses of force." Defendants provide the following information by way of example: Prior to implementation of the Nunez UOF directive, staff actions such as guiding a person-in-custody to the wall or re-affirming grip or control during an escort was not a UOF. If a person-in-custody was resisting during escort and he was guided to the wall and grip was re-affirmed it was not determined to be a UOF. Now any movement or pull by a member of service of a person-in-custody is considered a UOF. Under the prior UOF directive, during a fight, if staff guided the two persons-in-custody away or used control holds to minimally separate them, it was not considered a UOF. Under the Nunez UOF Directive, guiding or using control holds to separate individuals fighting is considered a UOF.

10. ***Indeed, "[u]nder DOC's policy, use of force is defined broadly: any time an officer makes contact with a non-compliant individual to compel behavior, it counts as a use of force, no matter how slight the contact…. This definition greatly expands the number of use of force incidents, well beyond those previously reported. Because of the change in definition, any comparison of 2016 and today is flawed." <u>See</u> Exhibit B at ¶¶ 9-11. ***

**Nature of Dispute**:    Accuracy Disputed

**Position of Plaintiffs**: Plaintiffs dispute for the reasons given in response to ¶ 10 above. There is no evidence in the record demonstrating that uses of force were defined *differently* in the two time periods, nor that a broader range of conduct is now considered use of force. The modification of the Use of Force Directive cannot explain why the 2023 average monthly rate of use of force is 135% higher than in 2016. *See* SFOF ¶¶ 11-13. Moreover, Defendants' assertion that a wider swath of incidents were deemed "uses of force" after the introduction of the new policy is unsupported by any objective evidence. As there was no prior definition of Use of Force with which to compare the definition introduced in 2017, Defendants would have to demonstrate through admissible evidence of prior practice that the types of incidents they describe below (guiding a person to the wall, using control holds to separate people, etc.) were not considered uses of force prior to 2017. Defendants have not done so, instead offering only a declaration from a Data Analyst who joined DOC in 2022 and who can provide neither a historical perspective nor an expert opinion on what was considered a use of force in DOC in 2016, and indeed does not even discuss the specific examples of types of incidents that Defendants use below. *See* Kepler Decl., Dkt. 689-2, ¶ 2.

**Position of Defendants**: Defendants respectfully refer the Court to the Kepler Declaration, Exhibit B, and further state that Plaintiffs are mixing terms. While the shift in Use of Force definition did not change the *obligations* of correction officers, it did change the scope of incidents that could be referred to as use of force incidents. Defendants' statement here refers to the wider swath of data that was collected and termed "use of force" after the change in 2017, and note, per the Kepler Declaration, that this definition contributed to a rise in the collection of data regarding incidents now termed "uses of force." Defendants provide the following information by way of example: Prior to implementation of the Nunez UOF directive, staff actions such as guiding a person-in-custody to the wall or re-affirming grip or control during an escort was not a UOF. If a person-in-custody was resisting during escort and he was guided to the wall and grip was re-affirmed it was not determined to be a UOF. Now any movement or pull by a member of service of a person-in-custody is considered a UOF. Under the prior UOF directive, during a fight, if staff guided the two persons-in-custody away or used control holds to minimally separate them, it was not considered a UOF. Under the Nunez UOF Directive, guiding or using control holds to separate individuals fighting is considered a UOF.

11. Pursuant to Department policy, Use of Force are classified as follows:

- Class A Use of Force: a classification used to describe Use of Force Incidents that require medical treatment beyond the prescription of over-the-counter analgesics or the administration of minor first aid, including those resulting in one or more of the following treatments/injuries: multiple abrasions and/or contusions, chipped or

cracked tooth, loss of tooth, laceration, puncture, fracture, loss of consciousness, concussion, suture, internal injuries (e.g., ruptured spleen, perforated eardrum, etc.), or admission to a hospital.

- Class B Use of Force: a classification used to describe Use of Force Incidents that: (1) Do not require hospitalization or medical treatment beyond the prescription of over-the-counter analgesics or the administration of minor first aid (e.g., Use of Force Incidents that result in a superficial bruise, scrape, scratch, or minor swelling); or (2) Involve the forcible use of mechanical restraints in a confrontational situation that results in minor injury;

- Class C Use of Force: a classification used to describe Use of Force Incidents that result in no injury to Staff Members or Inmates, including, but not limited to, Use of Force Incidents where the use of chemical agents spray results in no injury beyond irritation that can be addressed through decontamination.

- Class P Use of Force: a temporary classification used to describe Use of Force Incidents where there isn't enough information available at the time of report to the Central Operations Desk (COD) to be classified as Class A, B, or C.

12. ***The injury classification of all use of force incidents are reviewed by the Investigation Division (ID) during the course of their investigation. If ID discovers additional

information that requires a classification change, the recommendation is sent to the Office

of Security, where evidence is reviewed, and incidents are reclassified if necessary. See

Exhibit B at ¶ 9. ***

**Nature of Dispute**:        Accuracy Disputed
**Position of Plaintiffs**: Disputed that "incidents are reclassified if necessary." The Monitor stated in April 2024 that a reported decrease in the number of cases identifying head strikes or "Class A" incidents necessitated an evaluation of "whether the change is a result of serious injuries/head-strikes occurring less frequently or whether something changed regarding the Department's reporting practices/incident categorizations." Monitor's Apr. 18, 2024 Rep. at 95. The Monitor also specifically noted his intent to complete a "close[] evaluat[ion]" of the 270 reclassifications of incidents in 2023 to "ensure they are reasonable." Monitor's Apr. 18, 2024 Rep. at 83. He has not yet reported the results of these evaluations. *See* SFOF ¶¶ 29-30. We remain concerned about the accuracy of reclassifications and their reasonableness.
**Position of Defendants**: The Monitor's intention to review something more closely is not indicative of inaccuracy. Additionally, Defendants' paragraph 12 relates to injury classification, while Plaintiffs' objection relates to Full ID upgrade criteria (Class A and Headstrikes) and is therefore comparing two different data sets.  Moreover, Defendants aver that the majority of reclassifications from "A" to "B" and "C" are not a result of seriousness of injury but how the injury was caused. For many of these Uses of Force, the injuries sustained were in fact serious, but not as a result of the use, but rather as a result of a preceding PIC on PIC fight. In these cases, a downgrade of a Use of Force A, should be accompanied by the addition of a Serious Injury to Inmate incident. In such cases, the number of serious injuries should be maintained. Defendants further state that Plaintiffs have not refuted Defendants' asserted fact through any admissible evidence.

13. ***With the acknowledgement that incidents in the latter months of 2023 may be

reclassified, there has been a meaningful decrease in the number of Use of Force incidents

that result in injury. The number of incidents classified as "A" or "B" in the last six months

of 2023 are lower than the first six months of 2023 both in the total number and in the

proportion of total uses of force.  See Exhibit B at ¶ 9. ***

**Nature of Dispute**:      Accuracy Disputed/Legal Dispute - Other
**Position of Plaintiffs**: This dispute remains, both as to accuracy and a lack of credible evidence to support the proposed finding. DOC is unable to adequately and consistently capture all physical injuries that occur to staff during a use of force. *See* SFOF ¶¶ 10; 28-30 (discussing failures in reporting structures for incidents and injuries). A reported

decrease in incidents resulting in serious injuries and a decrease in individuals sustaining serious injuries cannot be substantiated because serious injuries after a serious incident are often unreported or only reported after a significant delay. *See* PPFOF ¶¶ 95-100. Moreover, as noted above, the Monitor specifically stated in April 2024 that he intended to evaluate the reported decrease in Class A incidents "more closely" in order "to ascertain whether the change is a result of serious injuries/head-strikes occurring less frequently or whether something changed regarding the Department's reporting practices/incident categorizations." Monitor's Apr. 18, 2024 Rep. at 95. Until the Monitor completes that review, it is premature to conclude that the decrease Class A incidents reported by Defendants equates to an actual decrease in the number of serious injuries.

**Position of Defendants**: Defendants respectfully refer the Court to the cited paragraph of the Kepler Declaration. Furthermore, the Monitor's intention to review something more closely is not indicative of inaccuracy. In addition, the majority of reclassifications from "A" to "B" and "C" are not a result of how the injury was caused. For many of these Uses of Force, the injuries sustained were in fact serious, but not as a result of the use, but rather as a result of a preceding PIC on PIC fight. In these cases, a downgrade of a Use of Force A, should be accompanied by the addition of a Serious Injury to Inmate incident. In such cases, the number of serious injuries should be maintained.

14. \*\*\*Use of Force by Injury Class from January 2023 – December 2023 is as follows:

| Month | A | | B | | C | | Total |
|---|---|---|---|---|---|---|---|
| | Count | % | Count | % | Count | % | |
| Jan-23 | 4 | 0.6% | 42 | 6.8% | 570 | 92.5% | **616** |
| Feb-23 | 9 | 2.0% | 27 | 5.9% | 423 | 92.2% | **459** |
| Mar-23 | 13 | 2.4% | 40 | 7.3% | 492 | 90.3% | **545** |
| Apr-23 | 9 | 1.7% | 31 | 6.0% | 475 | 92.2% | **515** |
| May-23 | 12 | 2.1% | 36 | 6.2% | 535 | 91.8% | **583** |
| Jun-23 | 11 | 2.1% | 38 | 7.3% | 469 | 90.5% | **518** |
| Jul-23 | 16 | 2.8% | 24 | 4.2% | 525 | 92.9% | **565** |
| Aug-23 | 6 | 1.1% | 17 | 3.1% | 519 | 95.8% | **542** |
| Sep-23 | 4 | 0.7% | 21 | 3.7% | 540 | 95.6% | **565** |
| Oct-23 | 3 | 0.5% | 20 | 3.0% | 633 | 96.5% | **656** |
| Nov-23 | 3 | 0.5% | 22 | 3.5% | 599 | 96.0% | **624** |
| Dec-23 | 4 | 0.7% | 25 | 4.2% | 565 | 95.1% | **594** |

<u>See</u> Exhibit B at ¶ 9. \*\*\*

**Nature of Dispute**:    Accuracy Disputed

**Position of Plaintiffs**: This dispute remains. The number of Class A use of force incidents between January and June 2023 set forth in Associate Commissioner Kepler's declaration

does not match the number of Class A use of force incidents during the same period of time set forth in DOC's 16th Compliance Report. *See* PPFOF ¶ 93. To the extent that Defendants contend that reclassifications account for the discrepancy, Plaintiffs dispute the reliability of those classifications as set forth in our response to ¶ 12.

**Position of Defendants**: Defendants submit that the reason for the discrepancy between the number of Uses of Force by Injury Class remains consistent as stated in the Kepler Declaration. The breakdown from the 16th Compliance Report and the breakdown from Exhibit B were pulled from the relevant system at two different points in time. During such time, some incidents were reclassified.

15. \*\*\*OMAP analysis shows that certain key trends are moving in the right direction. There were 477 slashings/stabbings in 2022 compared to 383 in 2023, a 19.7 percent reduction. <u>See</u> Exhibit B at ¶ 7. \*\*\*

**Nature of Dispute**:     Accuracy Disputed

**Position of Plaintiffs**: Plaintiffs dispute the accuracy of DOC's data regarding stabbings and slashings, including those that occurred in 2023. *See* PPFOF ¶¶ 79-81, 83-84, 105-110; SFOF ¶¶ 14-17; *see also* Monitor's Nov. 8, 2023 Rep. at 36 (Monitor retracts findings about decreases in stabbings and slashings in 2023 given unreported incidents "erod[ing]...confidence in the accuracy of the Department's stabbing/slashing data [such that the Monitor] cannot reliably verify purported decreases," noting the Monitor "does not take such a step lightly").

**Position of Defendants**: Defendants respectfully refer the Court to the cited paragraph of the Kepler Declaration, and aver that the Incident Reporting System has been reviewed and the numbers reported in the Declaration are accurate. Moreover, as Assistant Commissioner Kepler stated in his Declaration: "Plaintiffs argue that "DOC's quantitative indicators are likely an undercount because staff reporting of serious incidents is unreliable."[4] That is an unfair characterization.[5] The Monitor has identified some slashings and stabbings that were not properly reported, but there is no reason to believe that underreporting is significant or that is affects trends. It would require a level of manipulation for which I find no evidence in the data." *Kepler* Decl. ¶10.

16. Similarly, in 2022, there were 1,643 assaults on staff, and in 2023, 1,401, a 14.7 percent reduction. <u>See</u> Exhibit B at ¶ 8.

---

[4] Plaintiffs' Proposed Findings of Facts, paragraph 79.

[5] OMAP is currently working with the Monitor to establish better definitions and to redefine certain protocols for reporting incidents to ensure confidence in the accuracy of its data.

17. \*\*\*Among the trends DOC has observed is a dramatic shift in the composition of the population of Rikers following New York State bail reform in January 2020.  With bail reform, the DOC now houses individuals who are in its custody predominantly on charges of committing violent crimes.  As of February 27, 2024, 28.6 percent of pre-trial detainees are being held on homicide charges; 11.8 percent on serious assault charges; 14.1 percent on robbery charges; and 7.8 percent on weapons charges. That is a total of 62.3 percent.  By comparison on January 1, 2016, those held on homicide charges comprised 14.1 percent of detainees; serious assault charges, 9.1 percent; robbery charges, 14.4 percent; and weapons charges, 6.3 percent – a total of 43.9 percent. Gone in 2024 are recidivist shoplifters, low level drug dealers and fraudsters, who populated Rikers jails in earlier years. <u>See</u> Exhibit A at ¶ 24. \*\*\*

**Nature of Dispute**:      Legal Dispute – Materiality

**Position of Plaintiffs**: Plaintiffs dispute that there is any evidentiary basis to conclude that the charges faced by individuals in DOC custody bear a relationship to excessive or unnecessary use of force. Plaintiffs further dispute that the charges faced by people in its custody change the City's obligations to provide safe and humane treatment to those within its jails and its obligation to comply with the *Nunez* Court Orders. *See* Monitor's Apr. 18, 2024 Rep. at 7. Plaintiffs further dispute that the change in percentages is material given the dramatic reduction in the jail population as a whole between 2016 and 2024. *See* SFOF ¶ 9.

**Position of Defendants**: Defendants respectfully submit that the Declaration of Commissioner Maginley-Liddie is accurate and respectfully refer the Court to that Declaration ¶23-31. Further, Defendants aver that the Commissioner's Declaration is not in any way implying that the change in population justifies unnecessary use of force or that it changes the Department's core obligation to provide safe and humane treatment to PICs and comply with the *Nunez* Court Orders. Defendants submit that the changes recited in the Commissioner's Declaration are material when considering the Department's good-faith efforts to comply with Court Orders in light of material changes to the population at Rikers.

18. Assistant Commissioner Kepler's Declaration provides a chart demonstrating the fact of the increasing percentage of population of those held on homicide charges.

**Figure 1: Average Daily Population and Proportion of Individuals with a Homicide Charge**



(See Exhibit B at ¶ 12.)

19. ***Supervising a housing unit that is comprised almost entirely of violent individuals presents significantly greater challenges than one in which a significant portion of offenders are there for non-violent crimes. The latter group have one principal objective: to resolve their cases, do their time, and go home. They dilute the propensity for violence.

See Exhibit A at ¶ 25. ***

**Nature of Dispute**:    Legal Dispute – Other
**Position of Plaintiffs**: Disputed. Commissioner Maginley-Liddie provides no factual basis for the opinions set forth in ¶ 25 of her declaration, does not possess the appropriate qualifications as an individual with direct experience supervising and managing incarcerated individuals in detention facilities to opine on the challenges presented by different groups of individuals, and presents only conclusory statements. Furthermore, there is no evidentiary basis to conclude that people presumed innocent are "violent individuals" because prosecutors have lodged serious charges. Plaintiffs reiterate that the charges faced by people in its custody do not change the City's obligations to provide safe and humane treatment to those within its jails and its obligation to comply with the *Nunez* Court Orders. *See* Monitor's Apr. 18, 2024 Rep. at 7.
**Position of Defendants**: Defendants respectfully submit that the Court should consider the Commissioner an expert in corrections and correction practices. Commissioner Maginley-Liddie lays out her extensive background in corrections at ¶1-3 of her Declaration. Courts

in this District have broadly accepted DOC Commissioners as experts during their tenure. *See Ramsay-Nobles v. Keyser*, 2019 U.S. Dist. LEXIS 147693, *38 (S.D.N.Y. 2019). Defendants submit that there is no credible reasons the Plaintiffs can possibly assert that would lead the Court to not consider the Commissioner an expert in corrections for the purpose of this motion. Further, Defendants aver that the Commissioner's Declaration is not in any way implying that the change in population justifies unnecessary use of force or that it changes the Department's core obligation to provide safe and humane treatment to PICs and comply with the *Nunez* Court Orders. Defendants submit that the changes recited in the Commissioner's Declaration are material when considering the Department's good-faith efforts to comply with Court Orders in light of material changes to the population at Rikers.

20. The shift in the population due to bail reform is not the only notable factor that distinguishes DOC today from DOC of 2016. As of August 19, 2015 there were 3,592 surveillance cameras in Department facilities, as of June 30, 2024 that number is 12,469. See Exhibit A at ¶ 28.

21. ***Reported increases in the use of force from 2016 to 2023 are explained, at least in part, by the omnipresence of the cameras. Today little goes unseen, and therefore little is unreported. See Exhibit A at ¶ 29. ***

**Nature of Dispute**:    Accuracy Dispute/Legal Dispute – Other
**Position of Plaintiffs**: Disputed. Commissioner Maginley-Liddie provides no factual basis for the opinions set forth in ¶ 29 of her declaration. Moreover, DOC continues to underreport serious incidents. *See* SFOF ¶¶ 10, 80, 130, 317; PPFOF ¶¶ 79-84.
**Position of Defendants**: Defendants respectfully refer the Court to the Commissioner's Declaration. Additionally, Defendants respectfully submit that the Court should consider the Commissioner an expert in corrections and correction practices. Commissioner Maginley-Liddie lays out her extensive background in corrections at ¶1-3 of her Declaration. Courts in this District have broadly accepted DOC Commissioners as experts during their tenure. *See Ramsay-Nobles v. Keyser*, 2019 U.S. Dist. LEXIS 147693, *38 (S.D.N.Y. 2019). Defendants submit that there is no credible reasons the Plaintiffs can possibly assert that would lead the Court to not consider the Commissioner an expert in corrections for the purpose of this motion. Further, Defendants aver that the Commissioner's Declaration is not in any way implying that the change in population justifies unnecessary use of force or that it changes the Department's core obligation to provide safe and humane treatment to PICs and comply with the *Nunez* Court Orders. Defendants submit that the changes recited in the Commissioner's Declaration are material when considering the Department's good-faith efforts to comply with Court Orders in light of material changes to the population at Rikers.

22. ***Detainees are also spending considerably more time in DOC's care. In 2016, the average length of stay was 59 days while in January 2024, it is 101 days. As of March 1, 2024 there are 508 detainees who have been in custody for more than two years. New York City's jails were not meant for such long-term stays, and the inevitable anxiety that comes from being in legal limbo contributes to the tension that breeds violence. This factor is not in DOC's control (DOC cannot move cases faster). See Exhibit A at ¶ 30. ***

**Nature of Dispute**:     Legal Dispute – Other
**Position of Plaintiffs**: Disputed as to the last two sentences. Commissioner Maginley-Liddie provides no factual basis for the opinions set forth in ¶ 30 of her declaration, does not possess the appropriate qualifications to opine on the mental state of incarcerated individuals or the causes of violence in the jails, and presents only conclusory statements.
**Position of Defendants**: Defendants respectfully submit that the Court should consider the Commissioner an expert in corrections and correction practices. Commissioner Maginley-Liddie lays out her extensive background in corrections at ¶1-3 of her Declaration. Courts in this District have broadly accepted DOC Commissioners as experts during their tenure. *See Ramsay-Nobles v. Keyser*, 2019 U.S. Dist. LEXIS 147693, *38 (S.D.N.Y. 2019). Defendants submit that there is no credible reasons the Plaintiffs can possibly assert that would lead the Court to not consider the Commissioner an expert in corrections for the purpose of this motion. Further, Defendants aver that the Commissioner's Declaration is not in any way implying that the change in population justifies unnecessary use of force or that it changes the Department's core obligation to provide safe and humane treatment to PICs and comply with the *Nunez* Court Orders. Defendants submit that the changes recited in the Commissioner's Declaration are material when considering the Department's good-faith efforts to comply with Court Orders in light of material changes to the population at Rikers.

23. ***DOC is committed to further reducing violence in its facilities. One demonstration of that commitment is enhanced training efforts. In partnership with the Monitor, Acting Deputy Commissioner Jeremiah Johnson has overseen the development of DOC's curriculum for training new captains. Twenty-one training modules were submitted to the Monitoring Team for review, all of which were approved as of February 21, 2024. See Exhibit D (Declaration of Acting Deputy Commissioner Jeremiah Johnson) at ¶ 4. ***

**Nature of Dispute**:     Legal Dispute – Other

**Position of Plaintiffs**: Plaintiffs do not dispute the last two sentences. Plaintiffs dispute the first two sentences insofar as they are a conclusion or opinion rather than a factual statement.

**Position of Defendants**: Defendants respectfully submit that current and future initiatives are material to the motion based on the relevant contempt and receivership standards that will be evaluated by the Court.

24. \*\*\*In March 2024, DOC will commence training for a cohort of 25 new captains using a Monitor-approved curriculum. The classroom training will last five weeks, followed by two weeks of facility-based training. A second cohort of 25 will begin training in April, so that by the summer there will be 50 new captains on the job. Most of these individuals will be assigned to positions in the facilities working directly with incarcerated individuals. The training is designed to provide these new captains with the technical knowledge needed to be successful in their new roles. See Exhibit D at ¶ 5. \*\*\*

**Nature of Dispute**:   Legal Dispute – Other

**Position of Plaintiffs**: This is a statement about future intentions rather than a statement of currently existing facts. To the extent Defendants seek to file additional proposed findings of fact or declarations that include new information regarding the subject matter in this proposed finding of fact, Plaintiffs reserve the right to object to the filing consistent with the Court's July 9, 2024 order (Dkt. No. 751) and our position as reflected in the July 30, 2024 Joint Report.

**Position of Defendants**: Defendants note that their supplemental proposed findings of fact to be provided to the Monitor and Plaintiffs on August 23 will include their updates regarding the subject matter in this proposed finding of fact.

25. \*\*\*Training for new Assistant Deputy Wardens ("ADWs") is being revised and will be resubmitted to the Monitor in June.  See Exhibit D at ¶ 6. \*\*\*

**Nature of Dispute**:   Legal Dispute – Other

**Position of Plaintiffs**: This is a statement about future intentions rather than a statement of currently existing facts—of particular concern given the longstanding history in DOC of protracted policy development and abandoned initiatives. *See* PPFOF ¶¶ 1054-1083; SFOF ¶¶ 297-317.

**Position of Defendants**: Defendants respectfully submit that current and future initiatives are material to the motion based on the relevant contempt and receivership standards that will be evaluated by the Court.

26. In August 2023, DOC commenced in-service training on its Use of Force policy and Defensive Tactics. The Monitor-approved curriculum consists of two days of instruction, four hours on Use of Force policy and 12 hours in defensive tactics. DOC is required to provide this training on an annual basis. To date, more than 600 members of staff have received this refresher training, which is typically offered two times a week.  See Exhibit D at ¶ 7.

27. ***On February 28, 2024, the Monitor approved refresher training for the Department's Emergency Services ("ESU"). This curriculum was developed in coordination with the Monitor to address specified concerns regarding ESU. The training will be conducted quarterly and includes modules on search and escort procedures. See Exhibit D at ¶ 9. ***

    **Nature of Dispute**:    Legal Dispute – Other
    **Position of Plaintiffs**: This is a statement about future intentions rather than a statement of currently existing facts. To the extent Defendants seek to file additional proposed findings of fact or declarations that include new information regarding the subject matter in this proposed finding of fact, Plaintiffs reserve the right to object to the filing consistent with the Court's July 9, 2024 order (Dkt. No. 751) and our position as reflected in the July 30, 2024 Joint Report.
    **Position of Defendants**: Defendants note that their supplemental proposed findings of fact to be provided to the Monitor and Plaintiffs on August 23 will include their updates regarding the subject matter in this proposed finding of fact.

28. Among the highest priority repairs are those to cell doors and locks. Since January 1, 2023, Facility Maintenance and Repair Division staff have repaired 204 cell doors/locks at the Eric M. Taylor Center ("EMTC"); 400 at the George R. Vierno Center ("GRVC"); more than 100 in the Enhanced Supervision Housing units at the Rose M. Singer Center ("RMSC") and 400 elsewhere in RMSC; and 607 at the Robert N. Davoren Complex ("RNDC").  See Exhibit K (Declaration of Deputy Commissioner Patrick Benn) at ¶¶ 3-5.

29. DOC has various programs and initiatives designed to care for emergent adults – those who are between 18 and 21 years of age. See, Exhibit J (Declaration of First Deputy Commissioner Francis Torres) generally and at ¶ 2.

30. Principal among the programs that First Deputy Commissioner Torres helped oversee was the RNDC Violence Reduction Plan, which was unveiled in February 2022. RNDC houses DOC's youngest individuals, including emergent adults 18 to 21 years old. Among the RNDC Violence Reduction Plan components were: the assignment of "credible messengers" to work with the population; the assignment of counselors to reduce idle time and address rehabilitative needs; congregate events; the introduction of mobile libraries; and the emphasis on officers using interpersonal skills to diffuse conflict. See Exhibit J at ¶¶ 8-9.

31. ***Following the introduction of the RNDC Violence Reduction Plan, in a review of data from the Incident Reporting System, showed there was a 57% decrease between the first six months of 2023 compared to the first six months of 2022. See Exhibit J at ¶ 10. ***

**Nature of Dispute**:    Accuracy Dispute

**Position of Plaintiffs**: Disputed. DOC's count of stabbings and slashings are likely an undercount because staff reporting of such incidents is unreliable for several reasons, including the relevant definitions, categorization of incidents, the protocol for reporting incidents, and the integrity of several incident tracking systems. *See* PPFOF ¶¶ 79-84; SFOF ¶¶ 16-18; *see also* Monitor's Nov. 8, 2023 Rep. at 36 (Monitor retracts findings about decreases in stabbings and slashings in 2023 given unreported incidents "erod[ing]...confidence in the accuracy of the Department's stabbing/slashing data [such that the Monitor] cannot reliably verify purported decreases," noting the Monitor "does not take such a step lightly"). DOC's lack of progress in developing and implementing a system-wide strategic plan to reduce violence indicates that any small decrease in violence that may have occurred is likely due to chance, seasonal fluctuations, or other factors outside DOC's control. SFOF ¶ 7.

**Position of Defendants**: Defendants respectfully refer the Court to Exhibit J at ¶ 10 and respectfully submit that their recitation of the data is accurate. As Assistant Commissioner Kepler stated in his Declaration: "Plaintiffs argue that "DOC's quantitative indicators are

likely an undercount because staff reporting of serious incidents is unreliable."[6] That is an unfair characterization.[7] The Monitor has identified some slashings and stabbings that were not properly reported, but there is no reason to believe that underreporting is significant or that is affects trends. It would require a level of manipulation for which I find no evidence in the data." *Kepler* Decl. ¶10.

32. In the fall of 2023, DOC's identification of trends revealed the need for renewed initiatives at RNDC. At the direction of Commissioner Maginley-Liddie and with the approval of the Monitor, DOC has developed the RNDC Programs Action Plan aimed at emerging adults in custody. Exhibit A at ¶¶ 32-34. See also, Exhibit J at ¶¶ 12-14.

33. The RNDC Programs Action plan is the most recent program for emergent adults. Other initiatives include School Houses, opened in November 2021 for those emergent adults who are dedicated to advancing their formal education. DOC now has additional classrooms where college prep and GED courses are offered, including courses with Columbia University. See Exhibit J at ¶ 4.

34. In June 2022, DOC sponsored a Fatherless No More Initiative led by former NFL player and now Pastor Tim Johnson. The goal of the program, which lasted five months, was to address fatherhood issues through steps from confession to forgiveness to reconciliation. Pastor Johnson continues to come to RNDC monthly to conduct sessions, for a complete week, to serve emergent adults who continue to express interest in the program. The Program continues to be supported by the two original officers. See Exhibit J at ¶ 5.

---

[6] Plaintiffs' Proposed Findings of Facts, paragraph 79.

[7] OMAP is currently working with the Monitor to establish better definitions and to redefine certain protocols for reporting incidents to ensure confidence in the accuracy of its data.

35. SCO Family of Services, a not for profit, provides a Young Adult Working Program (YA WP), which focuses on pre- and post-release work readiness. It also provides Therapeutic Case Managers (TCM) for individuals in need. See Exhibit J at ¶ 6.

36. Safety initiatives within DOC also include the development of systems intended to reduce and prevent deaths by suicide and self-harm among persons in custody. See Exhibit L (Declaration of Deputy Commissioner James Saunders) at ¶ 5.

37. DOC uses three review mechanisms to analyze self-harm incidents. The first is the In-Custody Death Joint Assessment and Review ("JAR"), which Deputy Commissioner Saunders has led since July 2023. Comprised of senior DOC and CHS leadership, the JAR meets after each death in custody at fixed intervals: two business days, seven days, and 30 days after the death. The goal is to identify deficiencies and opportunities for corrective measures to minimize the recurrence of such tragic events. See Exhibit L at ¶ 6.

38. The second mechanism is the Suicide Prevention Task Force, which is comprised of DOC and Correctional Health Services ("CHS") leadership, and meets monthly to identify opportunities for improvements in custodial care. See Exhibit L at ¶ 7.

39. The third mechanism, the Self-Inflicted Harm Subcommittee under the Task Force, meets weekly to review incidents of self-harm from the prior week. Working with CHS mental health professionals, DOC staff examine individual incidents to identify trends and recommend changes. See Exhibit L at ¶ 8.

40. In 2023, DOC hired Dr. Timothy Belavich, a nationally recognized expert as a consultant to provide technical assistance on the improvement of its suicide prevention activities. After studying DOC's policies and attending meetings with DOC and CHS, Dr. Belavich

issued a report in January 2024. <u>See</u> Exhibit L at ¶ 9 and **Exhibits A (Belavich Resume) and B (Belavich January 2024 Report)** to the Saunders Declaration.

41. \*\*\*In the report, Dr. Belavich concluded that DOC has made "significant efforts in the area of suicide prevention over the past twelve months," and that it is "making an impact by identifying issues related to self-harm and making recommendations for change." As one example, Dr. Belavich cited the implementation of "daily health care and custody huddles" to share information among DOC and CHS line staff regarding incarcerated individuals who may present a self-harm concern. The practice began in August 2023. <u>See</u> Exhibit L at ¶ 10 and **Exhibit B (Belavich January 2024 Report)** to the Saunders Declaration. \*\*\*

> **Nature of Dispute**:    Legal Dispute – Other
> **Position of Plaintiffs**: Disputed, as this proposed finding represents an opinion. Furthermore, while it is not disputed that Dr. Belavich made such recommendations, it is disputed that there is any evidence that DOC has implemented these recommendations, or that these changes have or will reduce violence.
> **Position of Defendants**: Defendants respectfully refer the Court to Exhibit L and Exhibit B; further, defendants submit that Dr. Belavich, is an expert and respectfully refer the Court to his highly credentialed background. *See* Saunders Decl., Ex. A (Dkt. No. 689-12). Defendants respectfully submit that pursuant to the framework laid out in *Ramsay-Nobles v. Keyser*, Dr. Belavich should be deemed an expert by this Court. *Ramsay-Nobles v. Keyser*, 2019 U.S. Dist. LEXIS 147693, \*38 (S.D.N.Y. 2019).

42. At the suggestion of the Monitor, in 2021, DOC retained the services of James Austin, Ph.D.  In addition to work for DOC, Dr. Austin is currently working in four jurisdictions - - Rhode Island, Alameda County(Oakland) California, U.S. Virgin Islands, and Santa Clara County - - as either an expert for the federal court or a monitor of a consent decree. <u>See</u> Exhibit H (Declaration of James Austin) at ¶¶ 1-2.

43. In a March 2022 report, Dr. Austin made the following the four recommendations that if implemented would start reducing the level of violence at Rikers:

a. Establish a single Restricted Housing Program (RHP)

b. Lower the jail population.

c. Reform the jail classification system.

d. Cease the current practice of housing people by gang affiliation.

See Exhibit H at ¶ 3.

44. ***Three of the four recommendations have been implemented by DOC, with only the recommendation to lower the jail population not being accomplished. Many of the most dangerous and disruptive incarcerated persons have been in custody for more than a year. But fulfilling this recommendation would require the assistance of the District Attorneys, Legal Aid Society and the Courts. See Exhibit H at ¶ 3.***

**Nature of Dispute**:    Accuracy Disputed
**Position of Plaintiffs**: Plaintiffs dispute the accuracy of the first sentence. DOC has not implemented the recommendation to establish a single restricted housing program because its implementation of RMSC Enhanced Supervision Housing ("RESH") has not been sound: the use of force rate is extraordinarily high; stabbings, slashings, and fires are prevalent; and security and operational failures have created dangerous conditions. SFOF ¶¶ 285-293.
**Position of Defendants**:   Plaintiffs do not dispute that the RMSC Enhanced Supervision Housing ("RESH") is currently up and running, thus Defendants have implemented this recommendation and continue to work on improving the operation of the unit.

45. ***As the three recommendations have been implemented since 2022, there has been an associated decline in the number and rate per 100 jail population of slashing, stabbings and serious assaults. Based upon data contained in the Department's Incident Reporting System and Master Facility Management Report, the number of assaults has significantly declined.

See Exhibit H at ¶ 4 and Figure 1 (below). ***



Figure 1. NYC DOC Assault and Stabbing/Slashing Annualized Rates Per 100 Jail Population January 2019 - January 2024

**Nature of Dispute**:    Accuracy Disputed

**Position of Plaintiffs**: Disputed. First, DOC has not implemented the recommendation to establish a single restricted housing program. *See supra* Response to ¶ 44. Second, RESH was not implemented "since 2022," as DOC claims, as it was initiated only in June 2023. *See* SFOF ¶ 288. Third, DOC's incident reporting and data collection practices, in particular with respect to stabbings and slashings, are unreliable and undercount serious incidents and use of force in the jails. *See supra* Response to ¶ 31.

**Position of Defendants**:    Plaintiffs do not dispute that the RMSC Enhanced Supervision Housing ("RESH") is currently up and running, thus Defendants have implemented this recommendation and continue to work on improving the operation of the unit. Additionally, with respect the objection in the second sentence of Plaintiffs' response, Defendants submit that the Enhanced Supervision Housing ("ESH") program was implemented in 2022 and then re-named to RESH in June 2023 when the unit was moved to the Rose M. Singer Center ("RMSC").    Finally with respect to the third objection, Defendants respectfully refer the court to the Declaration of Associate Commissioner Kepler, Exhibit B, wherein he explained that "there is no reason to believe that underreporting is significant or that is affects trends. It would require a level of manipulation for which I find no evidence in the data." *Kepler* Decl. ¶10.

46. ***Consistent with the recommendation to implement a more effective restricted housing program, Dr. Austin worked with DOC and in close consultation with the Monitor, to establish its Enhanced Supervision Housing program now referred to as RESH, a restrictive housing program for individuals who have been found by a hearing officer to have committed violent acts. The primary objective of RESH is to protect the safety and security of incarcerated individuals and facilities, while promoting rehabilitation, good behavior, and the psychological and physical well-being of incarcerated individuals. To accomplish these objectives, RESH is designed to separate from the general population those who pose the greatest threats to the safety and security of staff and other incarcerated individuals.

See Exhibit H at ¶ 7. ***

**Nature of Dispute**:    Legal Dispute – Other
**Position of Plaintiffs**: Disputed for the reasons set forth in Responses to ¶¶ 44-45. It is further disputed because RESH does not "promote the psychological and physical well-being of incarcerated individuals." *See* SFOF ¶¶ 286-293. In addition, RESH does not, in operation, protect safety and security and/or promote rehabilitation, good behavior, and well-being, given the Monitor's findings regarding the very troubling conditions in RESH. SFOF 286-293. Plaintiffs further object that the assertion is an opinion that lacks a factual basis in the record.
**Position of Defendants**: Defendants respectfully submit that this is an expert opinion by Dr. Austin and respectfully refer the Court to his Declaration. Defendants submit that Dr. Austin is an expert and respectfully refer the Court to his highly credentialed background. *See* Austin Decl., (Dkt. No. 689-8). Defendants respectfully submit that pursuant to the framework laid out in *Ramsay-Nobles v. Keyser*, Dr. Austin should be deemed an expert by this Court. *Ramsay-Nobles v. Keyser*, 2019 U.S. Dist. LEXIS 147693, *38 (S.D.N.Y. 2019).

47. ***According to Dr. Austin, the data concerning RESH demonstrates that DOC has successfully implemented the program. See Exhibit H at ¶ 16. ***

**Nature of Dispute**:    Accuracy Disputed/Legal Dispute – Other
**Position of Plaintiffs**: Plaintiffs dispute the accuracy of this statement for the reasons set forth in Responses to ¶¶ 44-45. Plaintiffs further object that the assertion is an opinion that lacks a factual basis in the record.
**Position of Defendants**: Defendants respectfully submit that this is an expert opinion by Dr. Austin and respectfully refer the Court to his Declaration. Defendants submit that Dr.

Austin is an expert and respectfully refer the Court to his highly credentialed background. *See* Austin Decl., (Dkt. No. 689-8). Defendants respectfully submit that pursuant to the framework laid out in *Ramsay-Nobles v. Keyser*, Dr. Austin should be deemed an expert by this Court. *Ramsay-Nobles v. Keyser*, 2019 U.S. Dist. LEXIS 147693, *38 (S.D.N.Y. 2019).

48. Dr. Austin is also working with the Monitor and DOC senior staff to develop a program for individuals in General Population who have shown a propensity for violence but do not qualify for placement in the other restrictive housing programs (the OBCC Annex Program) as well as the Behavioral Health Unit (BHU) which will be a program for individuals who contribute to violence on Rikers Island yet are ineligible for RESH and the proposed Annex program. See Exhibit H at ¶¶ 21-28.

49. Implementing the OBCC Annex Program and BHU are intended to reduce the rates of violence at Rikers.  See Exhibit H at ¶ 29.

50. ***Under the leadership of Ronald Brereton, Deputy Commissioner of Security Operations, DOC has initiated enhanced screening initiatives to assist in stemming the flow of contraband into the facilities including front entrance staff body scanning at three facilities, and cell phone detection systems at each facility. See Exhibit C (Declaration of Deputy Commissioner Ronald Brereton) at ¶ 20. ***

**Nature of Dispute**:    Accuracy Disputed
**Position of Plaintiffs**: This dispute remains. At a hearing on May 14, 2024, the Board of Correction noted that the more sophisticated L3 body scanner is randomized and is not used for every individual. When pressed on why all individuals entering the facilities are not scanned using the best available technology, the Department of Corrections cited vague "timing" concerns. *See* NYC Board of Correction Public Meeting (May 14, 2024), available at https://www.youtube.com/watch?v=Gq0RK8h9JD4&t=660s. To the extent Defendants seek to file additional proposed findings of fact or declarations that include new information regarding the subject matter in this proposed finding of fact, Plaintiffs reserve the right to object to the filing consistent with the Court's July 9, 2024 order (Dkt. No. 751) and our position as reflected in the July 30, 2024 Joint Report.
**Position of Defendants**: Defendants respectfully submit that this information is accurate. and further aver that the Department now has L3 Body Scanners at four facilities: RNDC, OBCC, GRVC, and EMTC. See Monitor's April 18, 2024, Status Report at 185. Plaintiffs'

objection does not dispute the facts set forth in the Brereton Declaration, rather, they imply that Defendants' position was that all facilities had the screening technology referred to therein. That is not Defendants' position. Defendants' position is that it has been engaged in ongoing efforts to enhance its screening procedures, which is accurate. Additionally, Defendants note that their supplemental proposed findings of fact to be provided to the Monitor and Plaintiffs on August 23 will include their updates regarding the subject matter in this proposed finding of fact.

51. Searches for weapons and contraband occurred in the facilities in 2023 resulted in the recovery of 1,075 improvised jail weapons, 55 cell phones, 273 dangerous articles, and 4,496 drug recoveries, inclusive of fentanyl. See Exhibit C at ¶¶ 18-19.

52. ***Active work is underway with respect to key control policies (to ensure all keys in circulation are accounted for and operational), upgrading cell doors and ensuring they are properly secured, ensuring staff remain on-post, and preventing crowding in vestibules. See Exhibit C at ¶¶ 21-30. ***

**Nature of Dispute**:    Accuracy Disputed
**Position of Plaintiffs**: Disputed. The Monitor found that, as of April 2024, Defendants continue to fail to secure cell doors and inspect locking mechanisms, and Defendants still have not "ensure[d] that all mandatory posts on the post priority list are staffed." *See* SFOF ¶¶ 51, 53. Far from being "active work," the efforts described by DC Brereton to address unsecured doors, abandoned posts, and crowding in vestibules rely almost entirely on strategies—roll calls, talking points in binders, teletypes—that the Monitor has found to be ineffective. Brereton Decl. ¶¶ 24-27, 30; SFOF ¶¶ 49-54, 74, 153, 157; *see* Reply Brief, Dkt. 716, at 24-26. Plaintiffs further dispute the characterization that "[a]ctive work is underway with respect to key control policies." Revising key control policies was a task identified by DC Brereton upon his arrival in May 2022. Dkt. 689-3 ¶¶ 1, 21. Nearly two years later, he concedes that the key control policy is still in draft stages and is not yet complete. *Id*. In addition, the phrase "active work is underway" is impermissibly vague. To the extent Defendants seek to file additional proposed findings of fact or declarations that include new information regarding the subject matter in this proposed finding of fact, Plaintiffs reserve the right to object to the filing consistent with the Court's July 9, 2024 order (Dkt. No. 751) and our position as reflected in the July 30, 2024 Joint Report.
**Position of Defendants**: Defendants respectfully submit that this information is accurate. Further, Plaintiffs' objections do not dispute that active work has been done in the areas of cell door security and key control; at best Plaintiffs' objection merely states that more work remains to be done. Plaintiffs fail to rebut Defendants' core assertion that they are engaged in ongoing, good-faith efforts to comply with the relevant Court Orders. Additionally, Defendants note that their supplemental proposed findings of fact to be provided to the

Monitor and Plaintiffs on August 23 will include their updates regarding the subject matter in this proposed finding of fact.

53. DOC has also instituted a Tour Wand initiative, intended to maintain safety by seeking to track staff members' compliance with conducting their tours. <u>See</u> Exhibit G (Declaration of Captain Gamien Batchelor) at ¶¶ 3-6.

54. A Tour Wand is a tool utilized by staff to track and log housing unit tours. Staff utilize a Tour Pipe which they touch to a pinpoint at various locations in a housing area to demonstrate touring is occurring. <u>See</u> Exhibit G at ¶ 2.

55. DOC utilizes technology such as a Tour Wand Report Dashboard, the Dashboard allows DOC to create daily reports that break down by facility and housing area and includes information about whether the Tour Wand was or was not "swiped" by the Officer and the longest time in between swipes. <u>See</u> Exhibit G at ¶ 3.

56. The Dashboard also permits DOC to create daily Captain Tour Wand Reports which indicate how many tours were conducted by Captains using a Tour Wand. <u>See</u> Exhibit G at ¶ 3.

57. ***Tour wand audits are generated and provided for leadership to review, and recommend discipline if there are not mitigating factors for failed tours. Since this procedure has begun, there has been significant improvement in staff compliance with Tour Wand usage Departmentwide. <u>See</u> Exhibit G at ¶¶ 5-6. ***

**Nature of Dispute**:    Accuracy Disputed/Legal Dispute – Other
**Position of Plaintiffs**: This proposed finding is inaccurate and states a conclusion with no factual basis in the record. First, the Monitor found that the process of systematically tracking compliance with the use of tour wands "has been in a state of flux" and assessing data regarding tour wand compliance "has been difficult given the many leadership changes and the multitude of documents and tracking mechanisms which are not streamlined." *See* SFOF ¶ 58. Second, "significant improvement in staff compliance" has not occurred given findings from the Monitor, the New York City Board of Correction, and Defendants' own audits by NCU and the Office of the Deputy Commissioner of

Security. *See* SFOF ¶¶ 55-67. Third, Defendants do not consistently discipline staff for failures to tour: they do not offer evidence thereof and do not dispute the Monitor's findings that a very small number of staff were formally disciplined for such failures during a recent monitoring period. *See* SFOF ¶ 66. Instead, the Monitor found that DOC has not aggregated the information developed through the audit process to determine the overall results of each audit; any corrective action applied to staff for failure to tour is documented in a logbook kept within each facility, cannot be aggregated, and does not appear to reviewed to ensure that the proposed corrective action occurred. SFOF ¶¶ 64-66. There is currently no reliable data to assess compliance with touring requirements and whether progress has been made. *Id*. Plaintiffs object to the second sentence as a conclusion or opinion with no basis in the factual record.

**Position of Defendants**:  Defendants respectfully refer the Court to the Declaration of Captain Batchelor, Exhibit G, regarding the Defendants' ongoing work with respect to tour wand compliance.

58. The Investigation Division ("ID") is responsible for the independent review of all Use of Force incidents and tasked with conducting fair and impartial investigations to ensure that its conclusions are in accordance with DOC policy.  ID's sole focus is Use of Force ("UOF") incidents. ID is responsible for the independent review of all actual and alleged UOF incidents from reports made to DOC's Central Operations Desk.  <u>See</u> Exhibit E (Declaration of Deputy Commissioner Yvonne Pritchett), at ¶ 5.

59. Deputy Commissioner Yvonne Pritchett oversees investigations of members of service engaged in Use of Force incidents. Deputy Commissioner Pritchett also acts as liaison with other outside investigative agencies, including the Department of Investigation and the Bronx County District Attorney's Office; she has been in her current position since April 2023. <u>See</u> Exhibit E at ¶¶ 1-2.

60. ID is divided into an Intake Unit and a Full Investigation Unit. The Intake Unit reviews all use of force incidents and has 25 business days to complete its investigation under the Consent Judgment and First Remedial Order. <u>See</u> Exhibit E at ¶ 6.

61. At the conclusion of the investigation, the case is either closed without action (the officer's conduct was not inappropriate), closed with action (the officer's conduct was inappropriate), or referred for a full investigation. See Exhibit E at ¶ 6.

62. To advance the goal of immediate and meaningful staff accountability for egregious use of force incidents, ID leadership increased the Intake Unit's Rapid Review team from one to two teams the week of April 30, 2023. The purpose of the Rapid Review Teams is to review incidents daily for possible immediate action and identify use of force incidents involving the Emergency Response Team and the Strategic Response Team at the request of the Federal Monitor. See Exhibit E at ¶ 6.

63. Prior to October 1, 2018, Full ID investigations were required to be completed within 180 days. Full ID Investigations are now required to be completed within 120 days. See Exhibit E at ¶ 9.

64. ***Between January 1, 2023 and December 31, 2023, 494 Full ID investigations were closed. 182 (37 percent) of those investigations were closed within 120 days. ID is working to increase staffing levels to improve the timeliness of these investigations. See Exhibit E at ¶ 9. ***

**Nature of Dispute**:    Legal Dispute – Other
**Position of Plaintiffs**: Plaintiffs dispute the third sentence. The Monitor reported that the number of investigators and supervisors to conduct use of force investigations is at least 30 percent less than in 2020 when ID was at its most functional and ID's staffing levels are insufficient to meet the requirements of the Nunez court orders. *See* SFOF ¶¶ 227, 230. In April 2024, the Monitor conveyed that ID has reported to the Monitoring Team that its current staffing levels are insufficient to manage its workflow and the Monitoring Team reported that there was a net loss of 51 ID staff between January 2022 and February 2024. *See* SFOF ¶¶ 228-230. To the extent Defendants seek to file additional proposed findings of fact or declarations that include new information regarding the subject matter in this proposed finding of fact, Plaintiffs reserve the right to object to the filing consistent with the Court's July 9, 2024 order (Dkt. No. 751) and our position as reflected in the July 30, 2024 Joint Report.

**Position of Defendants**:   Defendants maintain the accuracy of the 3rd sentence. Additionally, Defendants have indicated that their supplemental proposed findings of fact to be provided to the Monitor and Plaintiffs on August 23 will include their updates regarding the subject matter in this proposed finding of fact.

65. ***Upon the appointment of Deputy Commissioner Pritchett in April 2023, the Use of Force Investigation Division Leadership has made diligent efforts to comply with the provisions of the Consent Judgment. The Use of Force Investigation Division Leadership developed a plan for improving the UOF investigations, adopting the Monitoring Team's suggestions while incorporating several additional initiatives. See Exhibit E at ¶¶ 11-12. ***

**Nature of Dispute**:    Accuracy Disputed/Legal Dispute – Other
**Position of Plaintiffs**: Insofar as the statement that the Use of Force Investigation Division Leadership has made "diligent efforts to comply" refers to the reasonable diligence prong of contempt, it is a legal conclusion. Plaintiffs' full argument as to Defendants' lack of reasonable diligence regarding investigations is set forth in our briefing. See Dkt. 603 at 17-22, Dkt. 716 at 20-24. Insofar as the statement is a factual conclusion about what leadership has done, Plaintiffs dispute that the Use of Force Investigation Division Leadership has made "diligent efforts to comply" with the Consent Judgment. The Monitoring Team found in April 2024 that ID investigations were not timely and did not reliably identify misconduct, even when there was objective evidence of misconduct. According to the Monitor, the Department "candidly reported that delays derive from poor leadership and management as well as an influx of new investigators and supervisors who require more time to complete their work as they acquaint themselves with their responsibilities." See SFOF ¶ 216. The absence of timely and reliable investigations, and the failures to secure leadership and management, demonstrate that diligent efforts have not been made.
**Position of Defendants**:   Defendants respectfully refer the Court to the Declaration of Deputy Commissioner Pritchett, Exhibit E, regarding the Defendants' ongoing work with respect to Use of Force Investigations, as well as to the Defendants' Memorandum of Law [Dkt. 688] at p. 15-18, with regard to Defendants not being in contempt of requirements regarding investigations.

66. In its December 22, 2023 Report, the Monitor observed that the Intake Unit was now closing 99 percent of the cases that it receives in 30 business days. As noted, the established deadline is 25 business days. See Exhibit E at ¶¶ 13.

67. Upon the recommendation of ID, DOC Trials and Litigation Division ("Trials") evaluates, and may bring disciplinary charges against DOC's uniformed force for violation of DOC's Rules and Regulations or of New York State and City laws. See Exhibit F, (Declaration of Deputy Commissioner) Solange Grey at ¶¶ 4-5.

68. Upon receipt of a recommendation for disciplinary action from ID, Trials conducts an independent review of the matter. If appropriate, Trials then prepares a petition with formal charges for filing with the New York City Office of Administrative Trials and Hearings ("OATH"), a municipal agency that is separate from DOC. See Exhibit F at ¶ 5.

69. For DOC, the Nunez guidelines, developed with the Monitor, establish the parameters for discipline. See Exhibit F at ¶ 9.

70. At the start of Deputy Commissioner Grey's tenure in 2022, DOC was faced with a substantial backlog of disciplinary cases. See Exhibit F at ¶¶ 14-27.

71. Trials processed and resolved 95 percent of the 750 cases with incident dates prior to 2021. The remaining five percent are being held in abeyance due to members of service being out on approved leave. Trials has resolved 98 percent of the 285 additional UOF cases that the Monitor identified with incident dates between January 2021 and June 2022. See Exhibit F at ¶¶ 20-21.

72. Moreover, Trials maintains a spreadsheet that includes all cases opened since January 1, 2021, and each case open or pending as of January 1, 2023. Overall, the number of outstanding disciplinary cases has been reduced from 2,430 in November 2022 to 1,372 in November 2023, a 43 percent reduction. See Exhibit F at ¶ 26.

73. The Action Plan requires Trials to maintain 25 agency attorneys and four directors; Trials has one Deputy Commissioner, 24 agency attorneys, five directors, one managing director,

five legal coordinators, one executive assistant to the Deputy Commissioner, one office manager, one city research scientist, three administrative managers, three principal administrative assistants, two investigators, one clerical associate, one front desk officer, and two externs - a total of 49 full-time employees and two part-time law student externs. <u>See</u> Exhibit F at ¶ 29.

74. Commissioner Maginley-Liddie requires facility tours by all civilian and uniformed senior leadership. Each senior staff member is asked to tour a different facility two times a month, which means that at least one person is touring every facility each weekday. <u>See</u> Exhibit B at ¶ 11.

75. Following each tour, senior leaders are required to write up their notes, focusing on both positive developments and deficiencies, and to forward their notes to the Commissioner's Office. <u>See</u> Exhibit B at ¶ 12.

76. ***The Commissioner's Office then compiles a list of action items that need attention and follows-up to ensure that action is taken. <u>See</u> Exhibit B at ¶ 12. ***

**Nature of Dispute**:    Accuracy Disputed
**Position of Plaintiffs**: Plaintiffs requested to see the "list of action items," but it was not provided. SFOF ¶ 61. In addition, the Monitor reported that the Department's Office of Strategic Initiatives was still "working to streamline leadership's reports from their tours so that the action items can be tracked . . . going forward" (SFOF ¶ 61). Based on the fact that the list was not provided and that the Monitor reported the items would be tracked "going forward," rather than that they are already tracked, the Court should draw the inference that the list did not exist. Further disputed because the Monitor has not yet assessed whether the Commissioner's Office follows up to ensure that any recommended actions are taken.
**Position of Defendants**: Defendants respectfully submit that the statement of fact is accurate as presented. Defendants further submit that drawing the inference requested by Plaintiffs would be prejudicial and that plaintiffs have presented no basis upon which the Court could draw any such inference.

77. The Commissioner also conducts personal, unannounced, day and night shift tours. <u>See</u> Exhibit B at ¶ 15.

78. The Commissioner has initiated focus groups with staff and incarcerated individuals, along with a facilitator, to discuss working and living conditions at our facilities. As of February 29, 2024, there have been a total of 21 focus groups at GRVC, OBCC, and RMSC -- 12 for incarcerated individuals and 9 for staff. See Exhibit B at ¶ 16.

79. ***The Commissioner secured $14.1 million for programs as a new need to serve the individuals in custody. The funding will be used for substance abuse programs, educational programs, transition planning, and trauma-informed programs, among others. See Exhibit B at ¶ 19. ***

    **Nature of Dispute**:    Legal Dispute – Other
    **Position of Plaintiffs**: Disputed. This is a statement about future intentions rather than a statement of currently existing facts. Also, the Monitor found that DOC leadership testified that it would take over a year before it could utilize this funding for programming due to processing and vetting requirements and that such delays will hinder DOC's ability to actually advance the Nunez reforms. *See* SFOF ¶ 333.
    **Position of Defendants**: Defendants respectfully submit that current and future initiatives are material to the motion based on the relevant contempt and receivership standards that will be evaluated by the Court.

80. The Commissioner also secured commitment from the Osborne Association and Fortune Society, two highly regarded non-profits, to provide services to population in care of DOC. See Exhibit B at ¶ 20.

81. Further, Commissioner Maginley-Liddie has restored the Board of Correction's access to video footage, so that Board staff can view all video footage at any time from their offices. In addition, the DOC now notifies the Board promptly of deaths in custody. See Exhibit B at ¶ 58.

82. [intentionally omitted]

Dated:    New York, New York
              July 30, 2024

MURIEL GOODE-TRUFANT
Acting Corporation Counsel of the City of New York
*Attorney for Defendants*
100 Church Street
New York, New York 10007


By:    /s/  ***Omar Siddiqi***

        OMAR SIDDIQI
        *Senior Counsel*