# EXHIBIT E

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MARK NUNEZ, ET AL.,

                    Plaintiffs,                          Case No. 11-cv-5845 (LTS)

      -against-

THE CITY OF NEW YORK, ET AL.,

                    Defendants.

## UPDATED PLAINTIFFS' PROPOSED SUPPLEMENTAL FINDINGS OF FACT

## REVISED – JULY 30, 2024

## I.    The Court Has Entered a Consent Judgment and Several Remedial Orders To Remedy Defendants' Violation of the Law

1.    In response to a letter filed by the Monitor, the Court ordered the Department of Correction ("DOC") to provide information regarding the opening of the Arson Reduction Housing Unit ("AHRU"). *See* Dkt. 599; Dkt. 600. The Court subsequently found DOC in contempt of Action Plan § D, ¶ 3, Action Plan § E ¶ 4, and the June 13 Order § I ¶ 5, and ordered it to take certain actions in order to purge the contempt. *See* Dkt. 665. After the Monitor submitted a status report regarding DOC's efforts in response to the contempt order, the Court found that DOC had purged the contempt. *See* Dkt. 679; Dkt. 680.

2.    On December 15, 2023, the Court ordered DOC to develop and implement "a comprehensive and streamlined policy and procedures for all incidents and events that must be reported (New COD Policy)," among other issues. *See* Dkt. 656 at 2; *infra* at ¶¶ 297-317.

## II.    The Plaintiff Class Continues to Suffer Extreme Levels of Harm in DOC's Custody

### A.    General

3.    The grave conditions in the jails have continued, without any significant changes in DOC practice. Monitor's Dec. 22, 2023 Rep. at 1.

4.    DOC has not substantially and materially reduced the risk of harm currently facing incarcerated individuals and DOC staff. Monitor's Apr. 18, 2024 Rep. at 16, 168. The risk of harm "is caused by pervasive dysfunction in the jails' management resulting from polycentric and interdependent issues including, but not limited to, a broad failure to utilize sound correctional security practice for even the most basic tasks, limited staff supervision and poor-quality guidance, and a persistent failure to identify misconduct and to apply appropriate accountability. These failures perpetuate a toxic culture and a system in which none of the

1

component parts work well or together. As a result, violence and a persistent pattern of the use of unnecessary and excessive force remain evident in the system." *Id.*

5.      "[T]he level of on-going harm to people in custody and staff cannot be overstated." Monitor's Dec. 22, 2023 Rep. at 10. The jails remain dangerous, unsafe, and characterized by pervasive, imminent risk of harm to both people in custody and staff. Monitor's Apr. 18, 2024 Rep. at 1.

6.      "Staff's use of force practices create an unreasonable risk of harm to both the incarcerated population and to the staff themselves." Monitor's Apr. 18, 2024 Rep. at 30; Monitor's May 24, 2024 Rep. at i.

7.      DOC has "not developed or implemented any strategic plan to reduce violence, and thus the small decreases that have occurred are likely due to chance, seasonal fluctuations, and other factors outside of the Department's control." Monitor's Apr. 18, 2024 Rep. at 39.

8.      Rates of all violence and use of force metrics remain "alarmingly high." *Id.* at 20.

9.      The average monthly rate of every safety and violence indicator remains too high, is substantially higher than when the Consent Judgment went into effect in November 2015, and is higher than the rate during each of the subsequent four years (*i.e.*, 2016-2019). *Id.* at 38. There has been a dramatic reduction in the jail population between 2016 and 2024. *Id.* at 6-7.

10.     DOC has not addressed the complicated and convoluted reporting structures that result in staff not reporting all incidents that occur in the jail as required. *Id.* at 21-22.

### B.  The Use of Force Directive

11.     The current Use of Force Directive "is not based on new law, nor does it abandon core principles from its predecessor." *Id.* at 77. The current Directive provides "further explanation, emphasis, detail, and guidance to staff." *Id.*

12.     In 2016, there were 4,652 use of force incidents, and there were 5,901 in 2018. This number climbed to 8,184 incidents in 2021, 7,005 incidents in 2022, and 6,784 incidents in 2023. *Id.* at 172.

13.     DOC's average monthly use of force rate in 2023, at 9.33, is 135% higher what it was in 2016, at 3.96, when the Consent Judgment went into effect, and 58% higher than the rate during 2018, the first full year of implementation of the current Use of Force policy, at 5.9. *Id.* at 31-32. The charts set forth at page 172 of the Monitor's April 18, 2024 Report depict the Systemwide Number and Rate of Force reported to the Monitor by DOC from 2016 to 2023.

### C. Stabbings and Slashings

14.     A total of 420, 468, and 384 reported stabbings/slashings occurred in the jails in 2021, 2022, and 2023, respectively. *Id.* at 175.

15.     In 2023, there were 384 reported stabbing/slashings—three times the number of stabbing/slashings in 2020. *Id.* at 175.

16.     DOC's average monthly rate of reported stabbings/slashings in the most recent Monitoring Period (July-December 2023) was 0.59, about 320% higher than the average monthly rate of stabbings/slashings at the inception of the Consent Judgment (2016; 0.14), and represented a 25% increase from the first half of 2023, when the rate was 0.47. *Id.* at 39. The charts set forth at page 175 of the Monitor's April 18, 2024 Report depict the Systemwide Number and Rate of Stabbings/Slashings reported to the Monitor by DOC from 2016 to 2023.

17.     While the rates of reported slashings in 2023 may not be reliable due to reporting problems at DOC, "even the number of reported events is cause for concern." *Id.*

18.     **Although DOC collaborated with the Monitor to revise the definition for "stabbing/slashing" to address the Monitor's concerns about accurate reporting, and the Monitor

approved a new definition in February 2024, the approved definition has not yet been integrated into DOC's incident reporting practices. *Id.* at 165.**

> **Nature of Dispute**:          Legal Dispute – Other
> **Position of Defendants**:      Defendants note that their supplemental proposed findings of fact to be provided to the Monitor and Plaintiffs on August 23 will include their updates regarding the subject matter in this proposed finding of fact.
> **Position of Plaintiffs**:       To the extent Defendants seek to file additional proposed findings of fact or declarations that include new information regarding the subject matter in this proposed finding of fact, Plaintiffs reserve the right to object to the filing consistent with the Court's July 9, 2024 order (Dkt. No. 751) and our position as reflected in the July 30, 2024 Joint Report.

### D. Fights

19.     In 2016, there were 6,006 fights among incarcerated people systemwide, while in 2021, there were 6,204 fights, and in 2022, there were 5,835 fights. In 2023, there were 6,164 reported fights. *Id.* at 178.

20.     DOC's average monthly rate of fights during the most recent Monitoring Period (July – December 2023) was 8.7, which was about 70% higher than the average monthly rate of fights at the inception of the Consent Judgment in 2016, which was 5.11. *Id.* at 40. The charts set forth at page 178 of the Monitor's April 18, 2024 Report depict the Systemwide Number and Rate of Fights reported to the Monitor by DOC from 2016 to 2023.

### III.    DOC Uses Unnecessary and Excessive Force in Violation of the Consent Judgment and UOF Directive

21.     DOC continues to have an "ongoing pattern and practice of staff using force when it is not objectively necessary and in a manner that is out of proportion to the extant level of threat." Monitor's Apr. 18, 2024 Rep. at 30; *see also id.* at 1 ("violence and a persistent pattern and practice of the use of unnecessary and excessive force remain evident in the system"); *id.* at

78 (qualitative assessments of all use of force incidents suggest that "unnecessary and excessive uses of force remain just as prevalent as they were in 2016 and 2018").

22.    The Monitor continues to find Defendants in noncompliance with the Consent Judgment Section IV, ¶ 1 requirement to implement the Use of Force Directive. *See* PFOF ¶¶ 215-16; Monitor's Dec. 22, 2023 Rep. at 24; Monitor's Apr. 18, 2024 Rep. at 78.

23.    DOC staff "often" apply force "using poor technique/dangerous holds" that are "often excessive." Monitor's Apr. 18, 2024 Rep. at 31.

24.    Staff utilize head strikes, an "extremely dangerous tactic," in situations that do not warrant that type of response, which is one of the "key driving forces behind [DOC's] continued high rates of unnecessary and excessive uses of force." *Id.* at 33.

25.    DOC staff use head strikes "routinely," including at least 47 times in the month of December 2023 alone, as opposed to most other systems in which head strikes are "quite rare." *Id.* at 33-34.

26.    DOC staff "frequently" use OC spray at close range, in large quantities, and with gratuitous repeat application, when less restrictive physical intervention could be sufficient. This type of application of OC spray "increases the risk of harm rather than minimizes it." *Id.* at 34.

27.    Rapid reviews by facility leaders indicate that at least 38% of use of force incidents during 2023 (and likely more) involved a procedural violation, a violation of the use of force or chemical agents policies, or were avoidable. While the fact that DOC identifies problematic practices in over one-third of its use of force incidents is a concerning outcome on its own, the Monitoring Team's assessments of these same incidents suggests that the prevalence of problematic practice is even higher. *Id.* at 54-55.

28.     The number of investigations that resulted in a finding of excessive, unnecessary and/or avoidable force by ID during the 16th Monitoring Period (January to June 2023) was 421 as of September 30, 2023. While this was a decrease from the 15th Monitoring Period, the Monitor treated this supposed decrease with "skepticism and concern" given the ongoing deterioration of ID's work. Monitor's Dec. 22, 2023 Rep. at 39-40.

29.     Similarly, the number of investigations that resulted in a finding of excessive, unnecessary and/or avoidable force by ID during the 17th Monitoring Period (July to December 2023) was 374 as of January 31, 2024. The Monitor again treated this supposed decrease "skepticism and concern," given "the Monitoring Team's concern about ID's failure to detect and hold staff accountable for misconduct." Monitor's Apr. 18, 2024 Rep. at 99.

30.     Focusing on whether or not an individual sustained a physical injury as a result of a use of force fails to consider the full impact of the use of force incident on an individual and that staff uses unnecessary and excessive force where no physical injury occurs. The Monitoring Team "routinely observes staff utilizing unnecessary and excessive force in cases where no physical injury occurs." *Id.* at 30. The Monitor "intends to closely evaluate" reclassifications of incidents and "intends to evaluate" the number of incidents classified as "Class A," and has not yet reported the results of these evaluations. *Id.* at 83, 95.

31.     On December 30, 2023, in RESH, a number of incarcerated people became uncooperative, spoke aggressively, and covered their faces. Multiple staff responded to the area and began deploying chemical agents on multiple incarcerated people's faces and securing them in restraints. One incarcerated individual, who had already been secured in restraints, made a spitting motion toward an officer. In response, the officer struck the incarcerated person in the face three times with a closed fist punch, and then secured the individual to the floor with

another officer. While the incarcerated individual was on the floor, a captain walked up to the

individual and deployed a burst of chemical agents toward his face, immediately in front of his

face. The individual was then escorted out of the area. The captain failed to mention his

utilization of chemical agents on the individual in his use of force report regarding the incident.

Ex. 152, Preliminary Review, UOF 6946/23.

32.     On December 13, 2023, in RESH, after an incarcerated person attempted to pull

away from an officer during an escort, the officer swung the individual into the wall, causing his

face to hit the wall. The officer then placed his forearm on the incarcerated individual's upper

shoulder blade area/neck area and pushed him up against the staircase door/gate as his face made

contact with the door. Additional officers then responded and escorted the incarcerated

individual to RESH intake, where he was secured. Ex. 152, Preliminary Review, UOF 6638/23.

33.     In NIC on February 6, 2024, during a verbal altercation with a captain, an

incarcerated individual pointed his finger at the captain's face and refused to go back to his bed

as the captain ordered. In response, the captain deployed chemical agent to the individual's face

from a distance of less than three feet, grabbed the individual by the torso, and took him to the

ground with the assistance of another officer. After the incarcerated individual was secured in

restraints, the probe team came and removed the individual from the housing area, escorting him

to intake and securing him inside of the decontamination pen. Ex. 152, Preliminary Review UOF

0726/24.

## IV.    DOC Security Failures and Poor Staff Practice Continue to Lead to Uses of Force

34.     Basic failures in security and operations remain pervasive throughout all facilities.

The deficiencies in basic staff security practice, impact on facility safety, and patterns observed

in prior Monitor's reports "remain an accurate description of the jails' dysfunction today." Monitor's Apr. 18, 2024 Rep at 22; Monitor's Dec. 22, 2023 Rep. at 3.

35.    There has not been any material change to staff's security practices since they became a greater focus of the *Nunez* Court Orders in 2021. Monitor's Apr. 18, 2024 Rep. at 22; *id.* at 12 ("large numbers of staff [] lack elementary skills"); *id.* at 13 ("Too often, staff are present and yet fail to enact or enforce even the most basic security protocols.").

36.    Poor security practices continue to lead to excessive and unnecessary force. *Id.* at 20, 22.

37.    The "alarmingly high" rates of violence and use of force metrics are driven by incidents that "continu[e] to be surrounded by poor staff decision making, poor situational awareness, and staff actions that precipitated the event. In many of these cases, had a few things been done differently, the incident/use of force/act of violence/injury/staff discipline likely would not have occurred and, in those cases where they would have occurred, the seriousness of the incident could have been lessened." *Id.* at 20.

38.    DOC staff continue to poorly supervise units, abdicate their responsibilities, and cede control, leading directly to safety risks that often result in dangerous incidents and uses of force. *Id.* at 22.

A.    **DOC Continues to Fail to Comply with the Second Remedial Order's and the Action Plan's Provisions That Address Security Lapses**

39.    The City continues to fail to comply with the Second Remedial Order ¶ 1(i)(a) and Action Plan §§ A(1)(d), D(2)(a), D(2)(d), D(2)(e), and D(2)(f) requirements to improve security, touring, search, contraband, and escort practices. The Monitor has not given compliance ratings for Second Remedial Order or Action Plan provisions.

40.     In April 2024, the Monitor found that "Defendants in the main, have not made substantial and demonstrable progress in implementing the reforms, initiatives, plans, systems, and practices outlined in the *Nunez* Court Orders. Furthermore, the risk of harm currently facing incarcerated individuals and Department staff has not been substantially and materially reduced to date." Monitor's Apr. 18, 2024 Rep. at 168.

### 1. DOC Continues to Fail to Develop or Implement the Interim Security Plan

41.     A comprehensive, cohesive Security Plan—with a focus on basic security practices like locking doors and eliminating other security risks—is essential because an absence of such a plan has allowed "unnecessary/excessive force to flourish" and the "extraordinarily high risk of harm to staff and incarcerated individuals alike to continue unabated" in DOC. *Id.* at 21; *id.* at 26 (DOC must implement a security plan that can withstand changes in leadership and address the security failures that underpin uses of force and are a "consistent pattern across facilities"). Over two and a half years after the Second Remedial Order required a system-wide security plan to address basic security failures, DOC continues to lack such a plan. *Id.* at 21.

42.     DOC struggles to develop and implement both short- and long-term Security Plans as well as facility-specific plans, because they change frequently and are seldom fully developed and implemented before they change yet again. *Id.* at 26.

43.     The majority of the plans DOC reported in October and November 2023 have "either not been implemented or were not effective." *Id.* at 26-27.

44.     The two facility-specific security plans required by the Action Plan to reduce violence and risk of harm at RNDC and GRVC, both adopted in 2022, were not faithfully implemented and then were subsequently "simply abandoned" despite "increasingly dire facility

conditions" in GRVC and "deteriorat[ion] to the point of crisis" in RNDC. Action Plan §§ A(1)(a) and A(1)(b); *id.* at 27.

45.     **The Monitor has repeatedly requested updates on a holistic DOC-wide Security Plan from the Senior Deputy Commissioner, the Deputy Commissioner of Security and other DOC leadership. The Monitor reported in April 2024 that DOC typically responded only "that the plans are being developed but are not yet ready to share with the Monitoring Team." *Id.* at 27.**

> **Nature of Dispute**:        Legal Dispute – Other
> **Position of Defendants**:        The proposed finding is disputed insofar as it does not reflect the current status of the plans. On June 24, 2024, the Department submitted the Deputy Commissioner of Security's Security Action Plan to the Monitor for consultation, feedback, and approval. June 27, 2024 Monitor's Report p. 5.
> **Position of Plaintiffs**:        That Defendants submitted a "Security Action Plan" in June 2024 does not contradict the proposed finding, which conveys DOC's typical responses over a specific time period as reported by the Monitor. The Court should adopt it.

46.     In December 2023 meeting with the Monitor, the Senior Deputy Commissioner "articulated general plans, without providing specific details," which were "essentially a repetition of the plans outlined in the Monitor's October and November Reports." *Id.* at 27 n.7.

47.     Since December 2023, the Monitor has "repeatedly advised of our availability to meet and the importance of producing written plans that would enable us to review them in order to have a constructive discussion of what is being proposed and to provide feedback as necessary," and thereafter inquired about the status of the plans and availability to confer—as recently as March 21, 2024. **Id.** at 27 n.7.

48.     Despite repeated inquiries from the Monitor and reports from the Senior Deputy Commissioner that "written plans were forthcoming," no plans had been provided to the Monitor as of April 18, 2024. *Id.*

> **Nature of Dispute**:          Legal Dispute – Other
> **Position of Defendants**:      As reported in the Monitor's June 27, 2024 Report at pg. 5, on June 24, 2024, the Department submitted the Deputy Commissioner of Security's Security Action Plan to the Monitor for consultation, feedback, and approval.  The proposed finding is disputed insofar as it does not reflect the current status of the plans. Additionally, whether the Monitor has evaluated the plan is irrelevant to the SFOF, which concerns whether the Department has created a plan. Finally, As noted by the Monitor in his June 27, 2024 Report, the Monitor is evaluating the plan and preparing feedback. See Monitor's June 27, 2024 Report at 5.
> **Position of Plaintiffs**:          That Defendants submitted a "Security Action Plan" in June 2024 does not contradict the proposed finding, but rather conveys responses from DOC over a specific time period as reported by the Monitor. The Court should adopt it.

49.     Given DOC's lack of a stable, comprehensive and robust strategy to improve facility security, facility leadership often do not know what is planned or who is doing what or when. DOC's haphazard, piecemeal approach has created confusion about the priorities, focus and initiatives underway. Furthermore, when strategies are implemented, little internal effort is expended to determine whether they were implemented with fidelity and whether they are effective. *Id.* at 28.

50.     DOC has been told repeatedly by the Monitor to find more "robust strateg[ies]" to change staff practice than teletypes, roll calls, and corrective action for specific staff because these plans "rarely include an operational change that targets the root causes of a specific problem." Monitor's Nov. 8, 2023 Rep. at 80; Monitor's Apr. 18, 2024 Rep. at 29. It is ineffective for DOC to "[s]imply reiterat[e] expectations [of a security plan] during roll call or during supervisory tours of the housing units," as DOC has "many times and over many years, to no avail." *Id.*

### 2. Unsecured Doors

51.     Staff failing to secure doors or check locking mechanisms continues to persist. *See infra* ¶¶ 88-109, 130. While doors' operability may be part of the problem, merely ensuring that the doors are in working condition has not resolved the issue of ensuring that doors are actually locked and secured. Monitor's Nov. 8. 2023 Rep. at 16.

### 3. Abandoned Posts and Staff Off-Post

52.     DOC data about "unmanned" posts fails to account for instances in which a staff member is assigned, but then leaves the post without authorization. Monitor's Apr. 18, 2024 Rep. at 189; *id.* at 98 (ID investigators commonly fail to differentiate between unmanned posts and staff off-post in Closing Reports, affecting their assessments).

53.     Staff off-post or abandoning posts persists. DOC has not "ensure[d] that all mandatory posts on the post priority list are staffed." *Id.* at 24, 193; s*ee infra* ¶¶ 88-109.

54.     Only 2 individuals were suspended for abandoning their posts between January and June 2023. 3 staff were suspended for abandoning posts between July 2023 and December 2023. Monitor's Dec. 22, 2023 Rep. at 56; Monitor's Apr. 18, 2024 Rep. at 115.

### 4. Failure to Tour

55.     "[O]fficers and Captains do not tour the units as often as required and . . .  their tours are often not meaningful (e.g., they do not look into the cell door windows to verify the safety of the individual). Staff's failure to adequately tour the housing units has contributed to the units' overall state of dysfunction and has resulted in the use of unnecessary and excessive force and serious acts of violence. The lack of adequate touring has also been identified as a contributing factor to several deaths in custody."  Monitor's May 24, 2024 Rep. at 3.

56. The Board of Correction ("BOC") found serious touring failures while investigating the October 2023 death of Manish Kunwar. *See* BOC, Second Report and Recommendations on 2023 Deaths in New York City Department of Correction Custody (Feb. 9, 2024), *available at* https://www.nyc.gov/assets/boc/downloads/pdf/Reports/BOC-Reports/Second-Report-and-Recommendations-on-2023-Deaths-in-DOC-Custody-with-CHS-comments-FINAL.pdf. The Board reported that a floor officer had used two tour wands—his and a captain's—to falsify tours that did not occur. *Id*. at 15. The officer also failed to look inside cells as he toured. *Id*.

57. DOC procured the Watch Tour system that includes tour wands, sensors installed in key locations on the housing units, and a software package to monitor the extent to which tours occur at the required frequency. Monitor's May 24, 2024 Rep. at 4.

58. The DOC mechanisms for assessing compliance with tour wand usage has been in "a state of flux" and assessing data regarding tour wand compliance "has been difficult given the many leadership changes and the multitude of documents and tracking mechanisms which are not streamlined." Monitor's Apr. 18, 2024 Rep. at 25; Monitor's May 24, 2024 Rep. at 4-7.

59. In October 2023, a team in the Commissioner's office was responsible for tour wand assessments and presented its procedures to the Monitor. The individuals on that team subsequently either left DOC or were reassigned. In December 2023, the office of the Senior Deputy Commissioner became responsible for tour wand assessments again. The team responsible met with the Monitor to discuss the procedures being used, and the Monitor was still assessing the documentation provided as of April 2024. DOC then reported that recently, DOC again reassigned the individual responsible for the assessments, and that an ADW was then assigned to the task. Monitor's Apr. 18, 2024 Rep. at 25; Monitor's May 24, 2024 Rep. at 5.

60.     The many leadership changes, large number of documents, and lack of streamlined compliance mechanisms has made it difficult for the Monitor to even assess available data regarding tour wand compliance. Monitor's Apr. 18, 2024 Rep. at 25.

61.     The Commissioner claimed that based on tours by executive staff, her office would create reports and compile a list of action items to ensure follow up action is taken. But while these tours began in January 2024, in May, the Office of Strategic Initiatives was still "working to streamline leadership's reports from their tours so that action items can be tracked . . . going forward." *Id.* at 2. These reports "have been provided in an ad hoc manner in a number of different formats" and were not produced to Plaintiffs upon request because it would be "too burdensome" for the Department to collate and produce those reports. *Id.*

62.     Failures to tour persist. *See infra* ¶¶ 88-109, 130.

63.     Captains often "do not appear to routinely conduct substantive tours or, in some instances, fail to conduct tours at all." Monitor's Apr. 18, 2024 Rep. at 14. When they do conduct tours, captains often do not tour the whole unit or address obvious issues within their assigned housing areas. *Id.*

64.     When staff are found not to have complied with touring requirements, any corrective action is documented in a logbook in each individual facility. The logbook entries cannot be aggregated and there is not a mechanism to determine whether corrective action actually occurred. Monitor's May 24, 2024 Rep. at 6.

65.     DOC may have taken the following corrective action related to potentially deficient touring practices. From January 2022 to April 2024, DOC brought charges against 17 staff members for issues related to touring; 11 were resolved with a Negotiated Plea Agreement ("NPA"), one was administratively filed due to retirement, and six remain pending. Twenty-one

staff (2 ADWs, 7 Captains, and 12 officers) were suspended, due at least in part to deficiencies in their touring practices where an individual died in custody. Via Rapid Reviews, facility leadership recommended corrective action for 30 staff related to potentially deficient touring practices, though the Monitor could not verify that corrective interviews and 5003 counseling actually occurred. *Id.* at 7.

66.     The number of corrective measures taken by DOC does not appear "commensurate with the number of violations" of touring policy that are observed and the harm that flows from them. *Id.* at 8.

67.     Between January 2022 and May 2024, 21 staff were suspended for 7-30 days for touring failures in incidents involving deaths in custody, for which the following staff were suspended for 7-30 days: 2 ADWs; 7 Captains; and 12 correction officers. *Id.* at 11.

### 5.  Improper and Painful Escort Practices

68.     DOC has not made substantive efforts to change staff use of painful escorts though they have contributed to unnecessary uses of force for years. Monitor's Apr. 18, 2024 Rep. at 159.

69.     While DOC asserts that incarcerated individuals have not filed grievances regarding painful escorts, the lack of grievances most likely suggests that individuals in custody do not appreciate or know that a grievance should be filed if they are subject to the use of a painful escort, rather than an actual lack of painful escorts used by staff. Monitor's Apr. 18, 2024 Rep. at 160 & n.117. The Monitor advised DOC that assessment of grievances also does not support problem-solving efforts to eradicate its use among staff, which is "ongoing and has not changed." *Id.*

70.     Emergency Response Teams continue to use painful escort holds. *Id.* at 70.

**6.   Improper Search Practices and Deficient Efforts to Detect and Remove Weapons and Contraband.**

71.     Searches by DOC staff "remain chaotic and frequently result in unnecessary uses of force." The search techniques remain poor and result in a relatively low rate of return in terms of the contraband recovered. Monitor's Apr. 18, 2024 Rep. at 159.

72.     Poor search practices persist. *See infra* at ¶¶ 88-109, 289.

73.     7 staff were suspended for contraband (this includes possession of electronic devices) in the 16th Monitoring Period, and 5 staff were suspended for contraband (this includes possession of electronic devices) in the 17th Monitoring Period. Monitor's Apr. 18, 2024 Rep. at 115.

**7.   Poor Security Practices in Vestibule Areas**

74.     The Monitor expressed concerns in November 2023 that not all appropriate locations have actually completed painting no-go zones. Monitor's Nov. 8, 2023 Rep. at 65.

**8.   Use of OC Spray**

75.     Staff frequently use chemical agents at close range, in large quantities, with gratuitous repeat application, when a less restrictive physical intervention could be sufficient, thereby increasing the risk of harm rather than minimizing it. Monitor's Apr. 18, 2024 Rep. at 34.

76.     BOC audited the use of chemical agents in October 2023, focusing on incidents in which staff used OC spray in the absence of interpersonal violence. *See* BOC, An Assessment of the Use of Chemical Agents in New York City Jails (Feb. 2024), *available at*

https://www.nyc.gov/assets/boc/downloads/pdf/Reports/BOC-Reports/An-Assessment-of-the-Use-of-Chemical-Agents-in-NYC-Jails-Final.pdf.

77.    **In 32% of incidents, staff appeared to spray people in custody from unsafe distances. In 10% of incidents, "staff sprayed an individual with MK-9, a very powerful form of OC that is designed for crowd management and is prohibited from being used against a single individual presenting passive resistance." *Id.* In four of the five incidents, the person in custody was sprayed with MK-9 for refusing to obey direct orders. In the fifth incident, the person was sprayed with MK-9 for attempting to hang himself. *Id.* at 4. In 16% of the cases, staff sprayed a person with a ligature around their neck. *Id.***

> **Nature of Dispute**:        Legal Dispute - Other
> **Position of Defendants**:        Defendants respectfully direct the Court to the original report for an accurate account of the purpose and scope of BOC's audit.
> **Position of Plaintiffs**:        The proposed finding relays these BOC findings as BOC has reported them, and Defendants have not identified any specific material that is incorrect or missing from the proposed finding. The Court is of course free to review the full BOC report as it sees fit, but given that Defendants have failed to specify any inaccuracy in this proposed finding, the Court should adopt it.

78.    **In nearly half of the incidents captured on body-worn cameras, DOC staff did not warn people in custody before deploying chemical agents as required. *Id.* at 4. In the incidents captured on body-worn cameras with audio, "people in custody who were sprayed with chemical agent for passively resisting direct orders were frequently heard articulating important reasons for their resistance, including the desire to access medical care, mental health care, medication, and fears for their safety." *Id.* at 5.**

> **Nature of Dispute**:        Legal Dispute - Other
> **Position of Defendants**:        Defendants respectfully direct the Court to the original report for an accurate account of the purpose and scope of BOC's audit.
> **Position of Plaintiffs**:        The proposed finding relays these BOC findings as BOC has reported them, and Defendants have not identified any specific material that is incorrect or missing from the proposed finding. The Court is of course free to review the

full BOC report as it sees fit, but given that Defendants have failed to specify any inaccuracy in this proposed finding, the Court should adopt it.

79.     **In 90% of the incidents, facility leadership determined in Rapid Reviews that the incident was not avoidable. *Id.* at 5.**

> **Nature of Dispute**:          Legal Dispute - Other
> **Position of Defendants**:          Defendants respectfully direct the Court to the original report for an accurate account of the purpose and scope of BOC's audit.
> **Position of Plaintiffs**:          The proposed finding relays these BOC findings as BOC has reported them, and Defendants have not identified any specific material that is incorrect or missing from the proposed finding. The Court is of course free to review the full BOC report as it sees fit, but given that Defendants have failed to specify any inaccuracy in this proposed finding, the Court should adopt it.

80.     BOC staff found "misreporting" by staff in over half of the incidents audited. Staff made false statements that at the time they sprayed the chemical agent, the person in custody was advancing toward them—when in fact video shows that the person "stood stationary or moved only slightly in an unprovocative manner, or retreated from staff." *Id.* at 16-17.

> **Nature of Dispute**:          Legal Dispute - Other
> **Position of Defendants**:          Defendants respectfully direct the Court to the original report for an accurate account of the purpose and scope of BOC's audit.
> **Position of Plaintiffs**:          The proposed finding relays these BOC findings as BOC has reported them, and Defendants have not identified any specific material that is incorrect or missing from the proposed finding. The Court is of course free to review the full BOC report as it sees fit, but given that Defendants have failed to specify any inaccuracy in this proposed finding, the Court should adopt it.

81.     The Monitor summarized the BOC findings in his most recent report, including failure to "follow . . . established safer and more proportional de-escalation or intervention protocols," and "failure to anticipate the use of force and follow anticipated use of force procedures even when it appeared possible to do so," compounded by "incident reports that included false statements, lack of BWC footage, and facility administrators' failure to identify

the aforementioned problems." Monitor's Apr. 18, 2024 Rep. at 34-35. The Monitor found that

the BOC report produced a useful set of recommendations. *Id*.

### B. DOC's Own Reviews Establish Staff Breaches of Safety Protocols, Leading to Violence and Disorder.

82.    DOC is well-aware of "widespread lapses and failures in security practices" due

to its routine video review of incidents. Monitor's Apr. 18, 2024 Rep. at 23.

### 1.    Rapid Reviews Identify Security Deficiencies and Poor Staff Practice

83.    Rapid Reviews continue to identify "endemic levels of poor staff practice."

Monitor's Dec. 22, 2023 Rep. at 9.

84.    In the 16th Monitoring Period, Rapid Reviews found that 40% of all use of force

incidents involved "procedural violations" such as the failure to secure doors or poor restraint

technique, among others. Monitor's Dec. 22, 2023 Rep. at 7. While that proportion is

"concerning on its own," the Monitor's "assessments of these same incidents suggests that the

prevalence of problematic practice is even higher." *Id*.

85.    In January 2022-June 2023, between 112 and 159 use of force incidents involved

unmanned posts. 50% of these incidents were deemed avoidable. *Id.* at 109-10.

### 2.    NCU Security Audits

86.    Between July and December 2023, OBCC was audited 8 times, RMSC was

audited once, and RNDC was audited 12 times. Monitor's Apr. 18, 2024 Rep. at 23. GRVC was

audited 10 times. Stipulated by Defendants.

87.    NCU audits conducted between July 2023 and March 2024 "revealed the same

problems that have been identified by both NCU and the Monitoring Team for years," finding

"little to no improvement." *Id.* at 23-24 (also noting the "random audit methodology (rather than

selecting units/times that are known to be problematic) provides further evidence of the widespread nature of the problems").

88.     The findings of nearly all the NCU audits conducted between July and December 2023 included a combination of the following failures: unsecured cell doors throughout the lock-out period; people in custody moving freely in and out of each other's cells; unenforced 3 p.m. and 9 p.m. lock-ins (although this appeared to improve slightly toward the end of the Monitoring Period, especially at OBCC); staff off post (reported in nearly every audit); people in custody observed smoking in common areas; and failures to conduct rounds at the required frequency, to use the tour wand, check that cell doors were secured, and/or to look inside of cells while making rounds. *Id.* at 23-24; Monitor's May 24, 2024 Rep. at 4 (NCU audits replete with examples of staff off post (and could not tour) and those who tapped the sensor with the tour wand but took no action to verify individuals' safety in their cells).

89.     The findings of NCU audits are consistent with the Monitoring Team's observations of staff practice and its routine review of use of force incidents, violent incidents and in-custody deaths. Monitor's May 24, 2024 Rep. at 4.

90.     NCU's audit findings still do not appear to be incorporated into the agency or facility leadership's assessment of practice, nor have leaders taken concerted steps to ensure the identified problems are addressed. *Id.* at 25.

91.     In the March 11-12, 2024 audit of a RNDC housing unit, NCU found officers frequently leaving their post, individuals freely entering each others' cells during the lockout periods, individuals smoking and inhaling unknown substances, officers' failure to tour as required, and inadequate tours that did not utilize the tour wand or perform proper security inspections. Monitor's Apr. 18, 2024 Rep. at 226.

92.    In the March 6-7, 2024 audit of a RNDC housing unit, NCU found officers frequently leaving their post and entering the control station for an extended period, incarcerated individuals entering each others' cells when officers were off post, and tours that did not properly inspect for security issues. *Id.* at 225.

93.    In the March 4-5, 2024 audit of a GRVC housing unit, NCU found unsecured cell doors, incarcerated individuals freely entering cells, staff off post, failure to conduct housing tours every thirty minutes, and failure to check the security of cell doors. *Id.* at 224.









### 3. NCU Assessments of COD Incidents







116.    NCU conducted these resource-intensive audits without being informed by DOC that certain facilities stopped using de-escalation units. Monitor's Apr. 18, 2024 Rep. at 62-63.

117.    DOC opened de-escalation units in each facility by July 2022. *Id.* at 62.

118.    RMSC stopped using de-escalation units in August 2022, GRVC stopped using them in October 2022, and RNDC stopped using them in June 2023. *Id.* at 62. Other facilities confirmed that they no longer use the de-escalation units. *Id.* at 63.

119.    DOC no longer enforces or actively monitors the requirements of its de-escalation policy. *Id.* at 63.

120.    **The Deputy Commissioner of Classification has departed the agency, and DOC has not yet appointed dedicated leadership to oversee intake, as the Monitor has recommended. *Id.* at 62.**

> **Nature of Dispute**:        Legal Dispute – Other
> **Position of Defendants**:        Defendants note that their supplemental proposed findings of fact to be provided to the Monitor and Plaintiffs on August 23 will include their updates regarding the subject matter in this proposed finding of fact.
> **Position of Plaintiffs**:        To the extent Defendants seek to file additional proposed findings of fact or declarations that include new information regarding the subject matter

in this proposed finding of fact, Plaintiffs reserve the right to object to the filing consistent with the Court's July 9, 2024 order (Dkt. No. 751) and our position as reflected in the July 30, 2024 Joint Report.

121.    DOC still does not track all individuals in intake in ITS, including Court transfers. *Id.* at 61-62.

122.    DOC still does not enter inter/intra facility transfers in ITS in a timely manner. *Id.* at 62.

123.    Without proper guidance and effective monitoring, DOC risks returning to a pattern where intake becomes the *de facto* post-incident holding area, recreating the problem that the Court's remedial orders were designed to address. *Id.* at 63.

### 4.    Audits by the Office of the Deputy Commissioner of Security

124.    The office of the Deputy Commissioner of Security also began conducting audits, using an internal set of standards drawn from DOC policy and directives. *Id.* at 24.

125.    The office audited RMSC in May/June 2023 (report issued in July 2023), GRVC in September 2023 (report issued in October 2023), and RNDC in October/November 2023 (report issued in February 2024). *Id.* at 24.

126.    Low compliance rates were observed at each facility: GRVC was compliant with only 8 of 20 standards (40%), and RNDC was compliant with only 8 of 22 standards (36%). *Id.* at 24. RMSC was compliant with 44 of the 86 standards (54%). Stipulated by Defendants.

127.    ** All 28 NCU Security audits conducted during July and December 2023 indicated the following problems, individually or in combination: failures to pat frisk, strip search, use transfriskers and BOSS chairs prior to allowing people in custody to enter and exit the facility and its housing units; failures to conduct scheduled counts and to maintain count sheets; failures to secure cell doors, conduct proper 30-minute tours and inspect locking

mechanisms; failures of housing unit staff to properly position themselves so that they can see,

listen to, and communicate with people in custody; failures to prohibit staff without current

training from carrying OC; and failures to properly maintain logbooks, razor/tool inventories and

visitor logbooks. *Id.* at 24.**

> **Nature of Dispute**:    Legal Dispute - Other
> **Position of Defendants**:    Not disputed insofar as the proposed finding provides
> examples of various findings made by NCU during 28 different audits, disputed insofar
> as the proposed finding does not accurately capture the complete results of the audits.
> Defendants respectfully direct the court to the NCU audits.
> **Position of Plaintiffs**:    The proposed finding relays the Monitor's observations
> about the referenced audits as the Monitor reported them, and does not purport to
> describe the complete audit results. Defendants have not identified what necessary
> material is missing from the proposed finding. The Court is of course free to review all of
> the NCU audits as it sees fit, but given that Defendants have failed to identify any
> inaccuracy in this proposed finding, the Court should adopt it.

### C.    Illustrative Examples of Serious Incidents

128.    **On October 24, 2023, an officer and incarcerated individual in an adult mental

observation housing unit in RMSC were involved in an altercation. Rather than de-escalating the

situation, the officer got in the individual's face and pushed them; the individual spit at the

officer; and the officer tried to charge the individual, with another officer intervening to hold the

first officer back. *Id.* at 230-234.**

> **Nature of Dispute**:    Legal Dispute - Other
> **Position of Defendants**:    Defendants do not object to the fact that this incident
> occurred and was cited in the Monitor's Report, defendants object on the grounds that the
> PFOF provides an incomplete narrative of the incident and therefore lacks context.
> Defendants respectfully refer the Court to the relevant section of the Monitor's Report.
> **Position of Plaintiffs**:    The proposed finding relays the details of the incident as
> the Monitor has reported it, and Defendants have not identified what necessary material is
> missing from the proposed finding. The Court is of course free to review the entire
> Monitor's report as it sees fit, but given that Defendants have failed to identify any
> inaccuracy in this proposed finding, the Court should adopt it.

129.    **On October 26, 2023, as captains conducted a supervisory tour of an OBCC

housing area, they opened a cell door of an individual who had been reportedly banging on the

door. When the individual stepped out of the cell, he complied with orders to place his hands

behind the back but was still sprayed with chemical agents in close range by a captain without

warning. The individual expressed his pain but did not receive medical attention for hours

beyond DOC's policy requirements, and the use of force was eventually classified as a Class C

use of force incident. Even though ID recommended that the captain receive a CD for the

chemical agents as well as filing a subsequent misleading use of force report, the facility

proceeded with the corrective interview recommended by the Rapid Review. The interview was

not characterized as a Use of Force violation, there was no mention of force being unnecessary

or avoidable in the interview documentation, and the interview precluded CD charges from being

lodged. *Id.* at 235-39.**

> **Nature of Dispute**:        Legal Dispute - Other
> **Position of Defendants**:        Defendants do not object to the fact that this incident
> occurred and was cited in the Monitor's Report, defendants object on the grounds that the
> PFOF provides an incomplete narrative of the incident and therefore lacks context.
> Defendants respectfully refer the Court to the relevant section of the Monitor's Report.
> **Position of Plaintiffs**:        The proposed finding relays the details of the incident as
> the Monitor has reported it, and Defendants have not identified what necessary material is
> missing from the proposed finding. The Court is of course free to review the entire
> Monitor's report as it sees fit, but given that Defendants have failed to identify any
> inaccuracy in this proposed finding, the Court should adopt it.

130.    **Six serious incidents occurred at GRVC in February 2024. *See* Monitor's Apr.

18, 2024 Rep. at 240-253. At least three incidents involved the B-post officer failing to manage

individuals appropriately when they were out of cells, unsecured cell doors and individuals freely

entering others' cells, and failing to manage an escalating and dangerous situation. One incident

involved a security team exhibiting hyper-confrontational behavior, unnecessarily deploying OC

spray on numerous occasions, and attempted a prohibited and unnecessary takedown. *Id.* at 245. In another incident, an officer saw an assault occurring inside a cell, did not intervene, and simply tapped his tour wand sensor despite his failure to conduct a proper tour. After the individual committing the assault exited the cell, the officer directed him back into the cell. The victim sustained a post-concussion syndrome, requiring a CT scan, and was taken to the emergency room. The incident was initially reported as a fight, and only reported as a Serious Injury incident five days after it occurred, and the report left out significant details about the incident. The PREA Unit of the Special Investigations Unit concluded that the incident did not meet the criteria for a PREA investigation, and no further investigation of any security lapses or procedural errors occurred. Only after being alerted to the incident by the Monitor did the Senior Deputy Commissioner ("SDC") review the incident. While the SDC reported that the officer involved was suspended, it is unclear whether the suspension was effectuated.**

> **Nature of Dispute**:        Legal Dispute - Other
> **Position of Defendants**:        Defendants do not object to the fact that this incident occurred and was cited in the Monitor's Report, defendants object on the grounds that the PFOF provides an incomplete narrative of the incident and is hence misleading
> **Position of Plaintiffs**:        The proposed finding relays the details of the incident as the Monitor has reported it. Defendants have not identified what necessary material is missing from the proposed finding, nor have Defendants indicated in what way the proposed fact is misleading. The Court is of course free to review the entire Monitor's report as it sees fit, but given that Defendants have failed to identify any inaccuracy in this proposed finding, the Court should adopt it.

## V.    DOC's Failure to Staff and Deploy Emergency Response Teams Appropriately, Leading to Excessive and Unnecessary Force

### A.    Emergency Response Teams Engage in Unnecessary and Excessive Force

131.    In the 16th and 17th Monitoring Periods, the Monitor again rated Defendants in Non-Compliance with the First Remedial Order § A, ¶ 6 Emergency Response Teams

requirements regarding development of policy and responses to misconduct. Monitor's Dec. 22,

2023 Rep. at 22; Apr. 18, 2024 Rep. at 76.

132.    Emergency response team members still engage in a "hyper-confrontational

approach . . . which often exacerbates conflict and leads to the unnecessary and/or excessive use

of force." Monitor's Apr. 18, 2024 Rep. at 70.

133.    **As of April 2024, DOC had still not addressed the Monitor's feedback, first

delivered in June 2021, on how to improve the use of emergency response teams.  While DOC

shared a revised policy with the Monitor in August 2023, the revisions "generally did not address

the Monitoring Team's feedback and inexplicably did not reflect the changes that the

Department previously reported it was intending to make."  *Id.* at 72. The Monitor provided

additional extensive feedback in October 2023, but as of April 2024 the "status of the draft

policy and any corresponding changes in practice . . . [wa]s once more in a state of flux and the

details [we]re unknown to the Monitoring Team." *Id.* at 71-72.**

> **Nature of Dispute**:         Legal Dispute – Other
> **Position of Defendants**:    Defendants note that their supplemental proposed findings
> of fact to be provided to the Monitor and Plaintiffs on August 23 will include their
> updates regarding the subject matter in this proposed finding of fact.
> **Position of Plaintiffs**:    To the extent Defendants seek to file additional proposed
> findings of fact or declarations that include new information regarding the subject matter
> in this proposed finding of fact, Plaintiffs reserve the right to object to the filing
> consistent with the Court's July 9, 2024 order (Dkt. No. 751) and our position as reflected
> in the July 30, 2024 Joint Report.

134.    In May 2023, DOC began to conduct Rapid Reviews specifically for Special

Teams, including ESU, to assess the conduct of staff in Special Teams. The quality of Rapid

Reviews suggest that the results of these reviews should be viewed with caution, as they may not

capture the full range of staff misconduct and "do not comport with the Monitoring Team's

findings." *Id.* at 71. They also "do not appear reliable as they do not consistently identify when a

response team was called and when they do, they generally find the response was necessary even with objective evidence to the contrary." *Id.* at 70-71.

### B. Emergency Response Teams Are Inappropriately Large

135.    Emergency Response Teams still have an "overabundance of staff," such that "an excessive number of staff arrive on-scene, which often raises tensions." *Id.* at 70.

### C. DOC Fails to Screen Out Violent or Problematic Staff from Emergency Response Teams

136.    The Monitor has recommended for years that DOC create specific criteria for who may be assigned to Emergency Response Teams. DOC has "not provided any revised policies or procedures to suggest it has taken any concrete steps to implement this plan." *Id.* at 70; Monitor's Dec. 22, 2023 Rep. at 18.

> **Nature of Dispute**:        Legal Dispute – Other
> **Position of Defendants**:    Defendants note that their supplemental proposed findings of fact to be provided to the Monitor and Plaintiffs on August 23 will include their updates regarding the subject matter in this proposed finding of fact.
> **Position of Plaintiffs**:    To the extent Defendants seek to file additional proposed findings of fact or declarations that include new information regarding the subject matter in this proposed finding of fact, Plaintiffs reserve the right to object to the filing consistent with the Court's July 9, 2024 order (Dkt. No. 751) and our position as reflected in the July 30, 2024 Joint Report.

### D. DOC Has Delayed Updating ESU Screening Policies

137.    The Court ordered Defendants to revise and implement a screening and assignment process for ESU and Special Teams more broadly in August 2023, in response to the Monitoring Team's concerns that the process was inconsistent and unreliable. DOC submitted proposed revisions to the Monitor in July 2023 and September 2023, and the Monitor provided his most recent feedback in October 2023. DOC "reports it intends to share a revised version of the policy with the Monitoring Team in Spring 2024." Monitor's Apr. 18, 2024 Rep. at 74.

### VI.    DOC Has Not Ensured Adequate Supervision of its Staff and Operations

#### A.  DOC's Supervisory Structure

138.    DOC has only two supervisor ranks (Captain, Assistant Deputy Warden), while most correctional systems have three (Sergeant, Lieutenant, Captain). Monitor's Dec. 22, 2023 Rep. at 15. This "truncated chain of command" contributes to "inadequate supervision." *Id*. at 15-16.

#### B.  Supervisory Failures at Multiple Levels of Uniform Leadership Continue

139.    DOC's supervisory ranks remain "unprepared to support the weight of the strategies that place them at the center of officers' skill development." Monitor's Apr. 18, 2024 Rep. at 13.

140.    **Not only do there remain too few supervisors in DOC, "many of those holding the ranks of ADW and Captain have only marginal competence in the skills necessary to provide *effective* supervision." *Id.* at 13-14 (emphasis in original).**

> **Nature of Dispute**:          Legal Dispute – Other
> **Position of Defendants**:     Defendants note that their supplemental proposed findings of fact to be provided to the Monitor and Plaintiffs on August 23 will include their updates regarding the subject matter in this proposed finding of fact.
> **Position of Plaintiffs**:     To the extent Defendants seek to file additional proposed findings of fact or declarations that include new information regarding the subject matter in this proposed finding of fact, Plaintiffs reserve the right to object to the filing consistent with the Court's July 9, 2024 order (Dkt. No. 751) and our position as reflected in the July 30, 2024 Joint Report.

141.    DOC "simply does not have the necessary assets among its current corps of supervisors to provide the type and intensity of hand-to-hand coaching that is required, which is perhaps unsurprising given their tenure in a deeply dysfunctional system that does not adequately select, train, or prepare them for the task at hand." *Id.* at 15.

142.    Executive staff tours are insufficient absent "a skilled corps of supervisors." *Id.* at 13.

### C. DOC Has Not Complied with the First Remedial Order § A, ¶ 2, regarding Facility Leadership

143.    The Monitor continues to rate Defendants in noncompliance with First Remedial Order § A, ¶ 2, and as of December 2023 had done so five consecutive times. Monitor's Dec. 22, 2023 Rep. at 11. The Monitor again rated Defendants noncompliant in the 17th Monitoring Period. Monitor's Apr. 18, 2024 Rep. at 59.

144.    The "anticipated improvements from the new facility leaders have not been realized." Monitor's Apr. 18, 2024 Rep. at 58.

145.    NCU audit findings, CODs, and Rapid Reviews "provide clear targets for problem-solving" into "specific, actionable plans," but facility leadership give "scant attention . . . to the fact that conditions are not improving." *Id.* at 43, 59. Simply detecting or labeling the problems does not rectify them. *Id.* at 43. While "agency and facility leadership routinely meet to discuss the various issues facing the facilities. However, these conversations do not appear to identify overarching trends or patterns and rarely appear to lead to operational changes or specific corrective action plans." *Id.* at 59.

#### 1. Longstanding Failures to Identify Misconduct: Rapid Reviews

146.    The quality of Rapid Reviews has declined. Staff practice has not improved, nor has the proportion of incidents involving poor practice or misconduct changed; yet the proportion of Rapid Reviews identifying misconduct has continued to decrease over time (86% in 2021, 76% in 2022, and 59% in the first half of 2023). Monitor's Dec. 22, 2023 Rep. at 6-7; Monitor's Apr. 18, 2024 Rep. at 53.

147.     The Rapid Review concept "is grounded in sound correctional practice and has elevated the quality of staff practice in other jurisdictions." Monitor's Dec. 22, 2023 Rep. at 9. DOC, however, has failed to prove capable of using Rapid Reviews as an effective tool for addressing and preventing use of force misconduct that has persisted "for many years." *Id*.

148.     The lack of close-in-time reviews, resulting in insufficient responses to poor practice or misconduct, "is a significant contributor to the persistence of the operational problems plaguing the jails." Monitor's Dec. 22, 2023 Rep. at 6, 8. DOC is inconsistent in imposing corrective action in the Rapid Review process, holds Wardens and Deputy Wardens accountable for inadequate Rapid Reviews in "very few instances," and in general has failed to correct the "ineffectiveness of the process to elevate the quality of staff practice." *Id*. at 8.

149.     A significant number of Rapid Reviews conducted in the second half of 2023 "overlook poor and/or dangerous practices and fail to acknowledge the circumstances that indicate . . . the incident was avoidable and the use of force was unnecessary." Monitor's Apr. 18, 2024 Rep. at 56. A significant proportion of Rapid Reviews are inaccurate because they do not identify all of the issues present. *Id*. at 56-57; Monitor's Dec. 22, 2023 Rep. at 8 (Rapid Reviews fail to "reliably and consistently identify all issues that would reasonably be expected to be identified").

150.     Despite these numerous problems with Rapid Reviews, in 2023, DOC did not impose any discipline or corrective action whatsoever on any member of facility leadership for an inaccurate unreasonable, or biased Rapid Reviews. Monitor's Apr. 18, 2024 Rep. at 56.

### 2.  Failures to Use Available Information to Address UOF Deficiencies

151.     **Despite finally broadening the pool for facility leadership candidates (see FOF ¶¶ 1112-1132), facility leaders continue to fail to adequately use information to address

problematic use of force practices. Monitor's Dec. 22, 2023 Rep. at 10-11 ("these appointments have yet to have the intended effect on problem-solving strategies at the facility level").**

> **Nature of Dispute**:          Legal Dispute – Other
> **Position of Defendants**:          Defendants submit that in accordance with the 8/10/23 Court Order #1, the Department developed security and violence metrics as described in the Monitor's February 26, 2024 Report at pgs. 5 to 7. Defendants note that their supplemental proposed findings of fact to be provided to the Monitor and Plaintiffs on August 23 will include their updates regarding the subject matter in this proposed finding of fact.
> **Position of Plaintiffs**:          That Defendants have developed a set of security and violence metrics after the Court ordered them to do so "to redress practices causing imminent harm and to remediate the Department's non-compliance with certain provisions of the prior *Nunez* Court Orders," *see* Dkt. 564 at 2, does not contradict the proposed finding, which concerns how even allowing DOC to broaden its facility leader candidate pool failed to improve the extent to which facility leaders actually use the information available to them. To the extent Defendants seek to file additional proposed findings of fact or declarations that include new information regarding the subject matter in this proposed finding of fact, Plaintiffs reserve the right to object to the filing consistent with the Court's July 9, 2024 order (Dkt. No. 751) and our position as reflected in the July 30, 2024 Joint Report.

152.    Even when agency and facility leaders participated in routine meetings, "these conversations [still] rarely appea[r] to lead to operational changes or specific corrective action plans, as required by [First Remedial Order § A, ¶ 2]." Monitor's Apr. 18, 2024 Rep at 59; Monitor's Dec. 22, 2023 Rep. at 10.

153.    Defendants' strategies continued to rely on issuing memoranda, Roll Call reminders, and individual corrective actions, but "only rarely included actionable, operations changes that target the root causes of a specific problem." Monitor's Apr. 18, 2024 Rep at 59; Monitor's Dec. 22, 2023 Rep. at 10. Even the "few" documents describing more global or targeted strategies were mostly "either short-sighted or abandoned before their impact on staff practice could be discerned." *Id*.

154.    **Agency and facility leadership's assessments of practice do not appear to incorporate NCU audit findings, "nor have leaders taken concerted steps to ensure the identified

problems are addressed." Monitor's Apr. 18, 2024 Rep. at 25. The Monitor continues to

"strongly urge" DOC to "utilize the audits' findings to develop concrete and sustainable

solutions." *Id*. at 25-26.**

> **Nature of Dispute**:        Legal Dispute – Other
> **Position of Defendants**:        See City's Response to Paragraph 151, which is
> incorporated by reference herein.
> **Position of Plaintiffs**:        To the extent Defendants seek to file additional proposed
> findings of fact or declarations that include new information regarding the subject matter
> in this proposed finding of fact, Plaintiffs reserve the right to object to the filing
> consistent with the Court's July 9, 2024 order (Dkt. No. 751) and our position as reflected
> in the July 30, 2024 Joint Report.

**D.    DOC Has Not Complied with First Remedial Order § A, ¶ 4, Action Plan §
       C, ¶¶ 3(ii), 3(iii), regarding Sufficient and Adequate Supervision by ADWs
       and Captains**

155.    The Monitor has rated Defendants in noncompliance with First Remedial Order §

A, ¶ 4. Monitor's Apr. 18, 2024 Rep at 68. Though the Monitor provides no formal rating for

Action Plan provisions, he found that "[t]o date, Defendants in the main, have not made

substantial and demonstrable progress in implementing the reforms, initiatives, plans, systems,

and practices outlined in the Nunez Court Orders." *Id*. at 168.

156.    The "long-standing supervisory void . . . in both number and competence"

remains a leading contributor to DOC's inability to alter staff practice and to make meaningful

changes to basic security practices and operations. Monitor's Dec. 22, 2023 Rep. at 16.

157.    **Deficits in number and competency of supervisors render "[t]he Department's

plans as proposed to date, and those required by the various Nunez Court Orders . . . unlikely to

be sufficient because they do not address key dynamics that underlie staff's inability or

unwillingness to utilize proper security practices." Monitor's Dec. 22, 2023 Rep. at 15

("Definitive measures to ensure that staff are available in sufficient numbers and that they stay

on post are obviously necessary. It is equally critical that staff *actually do their jobs*, which

requires thorough training, mastering the essential skills, having the confidence to implement the

expected practices, and that they utilize those skills when they are needed. Too often, staff are

present and yet fail to enact or enforce even the most basic security protocols and Roll Call

talking points are unlikely to catalyze the type of skill development that is necessary. Instead,

officers' skill mastery should be a core responsibility of the Department's Captains. . . .

Unfortunately, the Department does not appear to have a sufficient number of supervisors who

possess the necessary proficiencies to fulfill this need." (emphasis in original)); Monitor's Apr.

18, 2024 Rep. at 13.**

> **Nature of Dispute**:        Legal Dispute – Other
> **Position of Defendants**:        Defendants note that their supplemental proposed findings
> of fact to be provided to the Monitor and Plaintiffs on August 23 will include their
> updates regarding the subject matter in this proposed finding of fact.
> **Position of Plaintiffs**:        To the extent Defendants seek to file additional proposed
> findings of fact or declarations that include new information regarding the subject matter
> in this proposed finding of fact, Plaintiffs reserve the right to object to the filing
> consistent with the Court's July 9, 2024 order (Dkt. No. 751) and our position as reflected
> in the July 30, 2024 Joint Report.

158.    The Monitor continued to rate Defendants in noncompliance with First Remedial

Order § A, ¶ 4 in the 16th and 17th Monitoring Periods. Monitor's Dec. 22, 2023 Rep. at 17;

Monitor's Apr. 18, 2024 Rep. at 68.

## 1. The Number of ADWs and Captains Assigned to Facilities Has Not Meaningfully Increased

159.    **DOC does not appear to have a sufficient number of supervisors at either rank

of ADW or captain. Monitor's Apr. 18, 2024 Rep. at 66; Monitor's Dec. 22, 2023 Rep. at 15

(DOC's efforts to hire adequate number of captains unsuccessful). There are plainly insufficient

numbers of supervisors to provide the type of *intensive* supervision—throughout the chain of command—that is needed to elevate officers' skills. *Id.* at 16.**

> **Nature of Dispute**:          Legal Dispute – Other
> **Position of Defendants**:          Defendants note that their supplemental proposed findings of fact to be provided to the Monitor and Plaintiffs on August 23 will include their updates regarding the subject matter in this proposed finding of fact.
> **Position of Plaintiffs**:          To the extent Defendants seek to file additional proposed findings of fact or declarations that include new information regarding the subject matter in this proposed finding of fact, Plaintiffs reserve the right to object to the filing consistent with the Court's July 9, 2024 order (Dkt. No. 751) and our position as reflected in the July 30, 2024 Joint Report.

160.     **While the number of ADWs in the facilities has increased since the First Remedial Order went into effect, "the small number of ADWs has had limited impact, particularly given the significant deficit in the number of Captains and the fact that most ADWs work as Tour Commanders." Monitor's Dec. 22, 2023 Rep. at 16. The number of ADWs "remains insufficient to supervise the requisite number of Captains." Monitor's Apr. 18, 2024 Rep. at 67.**

> **Nature of Dispute**:          Legal Dispute – Other
> **Position of Defendants**:          Defendants note that their supplemental proposed findings of fact to be provided to the Monitor and Plaintiffs on August 23 will include their updates regarding the subject matter in this proposed finding of fact.
> **Position of Plaintiffs**:          To the extent Defendants seek to file additional proposed findings of fact or declarations that include new information regarding the subject matter in this proposed finding of fact, Plaintiffs reserve the right to object to the filing consistent with the Court's July 9, 2024 order (Dkt. No. 751) and our position as reflected in the July 30, 2024 Joint Report.

161.     Since 2020, both the number and percentage of Captains assigned to work in the facilities has decreased. The number of Captains decreased by 38% (from 558 as of July 18, 2020, to 346 as of December 23, 2023) and the proportion of Captains assigned to the facilities decreased (from 69% as of July 18, 2020, to 64% as of December 23, 2023). *Id.*

162.     The number of Captains available and assigned to facilities and court commands as of March 2, 2024 was 342. *Id.* at 198.

163.     Many facility leaders have reported to the Monitor that "they have insufficient numbers of Captains, which is negatively impacting their operations." *Id.* at 66-67.

164.     **DOC has not yet conducted the evaluation of Captains' assignments required by Action Plan § C.3.ii. *Id.* at 67.**

> **Nature of Dispute**:          Legal Dispute – Other
> **Position of Defendants**:     Defendants note that their supplemental proposed findings of fact to be provided to the Monitor and Plaintiffs on August 23 will include their updates regarding the subject matter in this proposed finding of fact.
> **Position of Plaintiffs**:      To the extent Defendants seek to file additional proposed findings of fact or declarations that include new information regarding the subject matter in this proposed finding of fact, Plaintiffs reserve the right to object to the filing consistent with the Court's July 9, 2024 order (Dkt. No. 751) and our position as reflected in the July 30, 2024 Joint Report.

## 2.  ADWs Provide Inadequate Supervision

165.     The external correctional leaders hired by DOC are "insufficient in number to fully address the problems at hand and to materially elevate the skillset of Department's uniformed workforce of approximately 6,400 staff." Monitor's Dec. 22, 2023 Rep. at 15.

166.     Supervisors in the rank of both Captain and Assistant Deputy Warden remain in need of intensive guidance, coaching, supervision, "and mentoring from their superiors to develop into the type of supervisor that is so desperately needed in this Department." Monitor's Apr. 18, 2024 Rep at 15; Monitor's Dec. 22, 2023 Rep. at 16.

167.     Not only are there insufficient numbers of supervisors, but the supervisors lack core competencies to provide adequate supervision. Monitor's Dec. 22, 2023 Rep. at 16 ("Compounding the problem of too few supervisors is the reality that many of those holding one

of these two ranks have only marginal competence in the skills necessary to provide effective supervision.").

168.    ADWs are responsible for supervising Captains, yet the dynamic between Captains and officers "appears fundamentally compromised in this Department" and is "described in ways suggesting that it subverts progress rather than accelerates it." Monitor's Apr. 18, 2024 Rep. at 14. Officers that have resigned have "consistently cited strained relationships and lack of support from Captains as the primary factors leading to their departure." *Id*. Captains "often appear to be either unclear about their responsibilities or outright fail to embrace them . . . [which] leads to a superficial execution of duties." *Id*. Captains often fail to "address obvious issues within their assigned housing areas. . . [f]or example, officers report concerns such as incarcerated individuals' frustration over inadequate supplies or service disruptions, but Captains do not investigate the underlying causes nor seek solutions, choosing instead to move on to the next task." *Id.* at 14-15. "This abdication of responsibility leaves officers feeling unsupported and disinclined to fulfill their own duties." *Id*. at 15.

### 3.  Deficient and Improper Promotions Limit the Number of ADWs Available for Supervision and Hamper the Delivery of Adequate and Appropriate Supervision

169.    DOC continues to promote and assign staff to supervisory positions "with questionable fitness for the roles." Monitor's Dec. 22, 2023 Rep. at 16.

170.    Of the 36 ADWs promoted in 2022 and 2023—twelve of whom were promoted against internal recommendations, and ten of whom were promoted without following DOC's own pre-promotional screening policy—four were demoted and two put in for retirement within a year of their promotion. *Id.* at 16. Of the four ADWs promoted, Commissioner Molina

reinstated one. Stipulated by Defendants. Of the two ADWs who put in retirement papers, one rescinded her retirement application and remains an ADW. Stipulated by Defendants.

171.    In December 2023, the Monitor "remain[ed] concerned about the Department's pre-promotional screening process and whether it is sufficiently rigorous." *Id.* at 151. Many of these concerns were first raised several years ago. *Id.*

172.    **As of December 2023, only one small change had been made to the pre-promotional screening policy, with "many" of the Monitor's recommendations remaining outstanding. DOC had not yet provided proposed revisions to the Monitoring Team. *Id.* at 80-81.**

> **Nature of Dispute**:        Legal Dispute – Other
> **Position of Defendants**:    Defendants note that their supplemental proposed findings of fact to be provided to the Monitor and Plaintiffs on August 23 will include their updates regarding the subject matter in this proposed finding of fact.
> **Position of Plaintiffs**:    To the extent Defendants seek to file additional proposed findings of fact or declarations that include new information regarding the subject matter in this proposed finding of fact, Plaintiffs reserve the right to object to the filing consistent with the Court's July 9, 2024 order (Dkt. No. 751) and our position as reflected in the July 30, 2024 Joint Report.

173.    In the 16th and 17th Monitoring Periods, the Monitor rated Defendants in noncompliance with the Consent Judgment § XII, ¶ 1 requirement to adequately review candidates for promotion. *Id.* at 86; Monitor's Apr. 18, 2024 Rep. at 151.

## VII.    DOC Has Not Improved and Maximized the Deployment of Staff to Work with Incarcerated People

174.    The Monitoring Team believes that "staffing is the essential element to reform." Monitor's Apr. 18, 2024 Rep. at 17 (emphasis in original).

175.    Not only are DOC's staffing problems "far from resolved," "new obstacles and barriers to efficient staff deployment continue to be identified." *Id.* at 16.

176.    "[E]xternal laws, structures and agreements that are sometimes at odds with the best interest of the Department and facilities" make resolving the Department's staffing problems and inefficiencies "incredibly complex." *Id.* at 16.

177.    DOC's overtime data "suggests that meaningful change in the ability to maximize staff within the Facilities has not yet been achieved." *Id.* at 270 & App. A (containing overtime data).

178.    DOC's leave system "remains vulnerable to abuse and circumvention by staff and must be constantly and closely monitored to identify and close new loopholes." *Id.* at 15. Facility leaders often report to the Monitor that "staff's use of personal emergency ("PE") days and FMLA leave, some of which may be excessive or used outside of the approved circumstances, impedes appropriate staffing in the jails." *Id.* at 15-16.

### A.    The Department's Staffing Framework is Dysfunctional and Institutionalizes its Poor Staffing Practices and is Directly Linked to Escalating Use of Force

179.    DOC's staffing conventions, "including scheduling, tour and post assignments, and general deployment," remain "far outside the generally accepted practice in correctional facilities." *Id.* at 16.

180.    Staff in the facilities are resisting progress from problematic staffing practices, trying to "circumvent the new practices in favor of those that are more familiar and/or those that permitted problems regarding favoritism to flourish in the past." *Id.* at 16.

181.    Staff report that they believe facility supervisors make determinations regarding assignments—including assignment to challenging housing units—based on favoritism. *Id.* at 16.

182.    DOC must revamp its staff assignment practices to maximize the deployment of staff within the jails and to ensure key housing unit posts are always covered. *Id.* at 15.

### B.  DOC Has Still Not Reduced Awarded Posts

183.  ** Action Plan ¶ C(3)(v) requires DOC to reduce the use of awarded posts. DOC

has not done so. *See* PFOF ¶¶ 310; 673-683; infra ¶¶ 185-203; 345.**

> **Nature of Dispute**:        Legal Dispute - Other
> **Position of Defendants**:        Defendants object to this fact and respectfully submit that
> there has been no finding from either the Court or the Monitor regarding the
> Department's compliance with the Action Plan.
> **Position of Plaintiffs**:        This is a factual finding the Court is entitled to make based
> on PFOF ¶¶ 310; 673-683; *infra* ¶¶ 185-203; 345. Notably, PFOF ¶ 310 and ¶ 345, *infra*,
> include citations to Monitor findings in July 2023 and April 2024 that Defendants have
> not made substantial and demonstrable progress in implementing the Action Plan and
> Nunez Orders, respectively.

184.  On June 10, 2022, Defendants wrote to the Court in support of the Action Plan,

stating that "[t]he City is fully committed to taking all of the actions detailed in the [Action

Plan]," and assuring the Court that the plan is "entirely within the power of the Commissioner,

and more broadly the Mayor, to execute." Dkt. 463 at 1.

185.  DOC has a practice of awarding posts, and restricting how staff may be

subsequently assigned, that is not actually required by its internal policy. "Awarded post" is just

"parlance" and is not a term of art in DOC policy. Monitor's May 24, 2024 Rep. at 16-18. That

practice includes: awarding hundreds of posts outside of housing units "unofficially" to staff who

have curried favor with facility leadership; poor recordkeeping of posts that have been advertised

and the current list of staff in awarded posts; refusing to reassign staff in awarded posts to any

other post in need of staffing, except in very limited circumstances (e.g., when working overtime

or during emergencies); awarding posts in specific physical location, even if there are subsequent

changes to the housing unit location; and maintaining the majority of awarded posts outside of

facilities (in the courts or Special Operations Division), not on the housing units, and for job

assignments that do not actively engage with the incarcerated population throughout the day. *Id.*

186.    It is impossible to quantify the number of "unofficial" awarded posts due to DOC's poor recordkeeping practices. There are at least "hundreds" of unofficial awarded posts. *Id.* at 17 n.10.

187.    **DOC has not articulated a strategy to eliminate "unofficial" awarded posts or to ensure that the practice of unofficially awarding posts does not reoccur in the future. *Id.* at 19. The status of individuals with "unofficial" awarded posts—i.e., individuals not officially designated with an awarded post but "nonetheless treated as such (meaning the facility continued to assign the individual to a special post, even when it was not required to so do)"—remains unknown. Monitor's Apr. 18, 2024 Rep. at 267.**

> **Nature of Dispute**:        Legal Dispute – Other
> **Position of Defendants**:        Defendants note that their supplemental proposed findings of fact to be provided to the Monitor and Plaintiffs on August 23 will include their updates regarding the subject matter in this proposed finding of fact.
> **Position of Plaintiffs**:        To the extent Defendants seek to file additional proposed findings of fact or declarations that include new information regarding the subject matter in this proposed finding of fact, Plaintiffs reserve the right to object to the filing consistent with the Court's July 9, 2024 order (Dkt. No. 751) and our position as reflected in the July 30, 2024 Joint Report.

188.    As for official awarded posts, DOC reported that, as of April 30, 2024, 844 posts have been "officially" awarded to staff members. Monitor's May 24, 2024 Rep. at 19. About two-thirds of the official awarded posts are within the facilities and about one-third were posts outside the facilities. Only half of the official awarded posts were posts characterized as "PIC-facing posts." *Id.* at 20. Less than one-quarter of the official awarded posts were assignments to a specific housing unit. *Id.* These practices ensure that hundreds of staff members are consistently assigned outside of facilities or to posts within facilities that do not address the critical need for proper supervision and support to incarcerated individuals on housing units. *Id.*

189.    While DOC claimed in fall 2022 that it would no longer award staff posts, DOC did not suspend the practice. *Id.* at 23 & n.13. DOC awarded 39 posts in 2023. *Id.* at 23.

190.    **Other than reductions in awarded posts due to attrition, DOC has taken no affirmative steps to eliminate posts that were formally assigned to staff. *Id.* at 23.**

> **Nature of Dispute**:          Legal Dispute – Other
> **Position of Defendants**:    Defendants note that their supplemental proposed findings of fact to be provided to the Monitor and Plaintiffs on August 23 will include their updates regarding the subject matter in this proposed finding of fact.
> **Position of Plaintiffs**:     To the extent Defendants seek to file additional proposed findings of fact or declarations that include new information regarding the subject matter in this proposed finding of fact, Plaintiffs reserve the right to object to the filing consistent with the Court's July 9, 2024 order (Dkt. No. 751) and our position as reflected in the July 30, 2024 Joint Report.

191.    In late 2022 and early 2023, DOC submitted multiple plans to reduce awarded posts, but none were implemented. Monitor's Apr. 18, 2024 Rep. at 267. DOC did not provide the Monitoring Team with an update on these plans, despite the Monitoring Team requesting such information repeatedly over the past 12 months. *Id.*

192.    The Monitor reported in April 2024 "[t]he City and Department [] repeatedly claimed that the Department has the unilateral ability to reduce awarded posts," yet those individuals tasked with reducing awarded posts maintained they did not actually have the ability to do so. *Id.* at 266.

193.    In May 2024, DOC said it has the discretion to reduce and eliminate awarded posts if it determines the post award to be unnecessary. Monitor's May 24, 2024 Rep. at 23.

194.    **The Monitor reports that "[t]he Department's efforts to reduce the number of staff with awarded posts has been mired in unnecessary confusion, lack of internal coordination and bureaucracy." Monitor's Apr. 18, 2024 Rep. at 266.**

> **Nature of Dispute**:          Legal Dispute – Other

**Position of Defendants**:    Defendants note that their supplemental proposed findings of fact to be provided to the Monitor and Plaintiffs on August 23 will include their updates regarding the subject matter in this proposed finding of fact.
**Position of Plaintiffs**:    To the extent Defendants seek to file additional proposed findings of fact or declarations that include new information regarding the subject matter in this proposed finding of fact, Plaintiffs reserve the right to object to the filing consistent with the Court's July 9, 2024 order (Dkt. No. 751) and our position as reflected in the July 30, 2024 Joint Report.

195.    The Monitor finds it "difficult to determine the veracity of any claims that the number of staff with awarded posts has decreased" and "cautions against any comparison of the newly created data with any historical data because there are significant questions about the veracity of the historical data." *Id.* at 267-268.

196.    The Monitor reports that in "summer 2023, the Department reported the data related to awarded posts, that was provided to both the Monitoring Team and the staffing analyst for multiple years, was inaccurate despite repeated claims at the time of production that the data was accurate and reliable." *Id.* at 267.

197.    DOC has no internal mechanism to monitor the use of awarded posts. *Id.*

198.    **The RNDC Programs Action Plan (January 2024) includes reintroducing awarded posts. *Id.* at 257.**

**Nature of Dispute**:    Legal Dispute – Other
**Position of Defendants**:    Defendants note that their supplemental proposed findings of fact to be provided to the Monitor and Plaintiffs on August 23 will include their updates regarding the subject matter in this proposed finding of fact.
**Position of Plaintiffs**:    To the extent Defendants seek to file additional proposed findings of fact or declarations that include new information regarding the subject matter in this proposed finding of fact, Plaintiffs reserve the right to object to the filing consistent with the Court's July 9, 2024 order (Dkt. No. 751) and our position as reflected in the July 30, 2024 Joint Report.

199.    Awarded posts included in the RNDC Programs Action Plan are among those that "were previously suspended because they were identified as conventions that interfered with,

rather than enhanced, the efficient deployment of staff." Monitor's Apr. 18, 2024 Rep. at 257.

DOC admits that awarded posts are an incentive for staff because they "promote[] staff morale as

those members awarded posts are consistently at work, have better and stronger behavioral

dispositions, and minimize the disruptions to the work; they are eager to schedule their annual

leaves around the needs of the team, rather than selves. Members who are awarded posts provide

stability, have a sense of ownership, are more accountable for their actions, show increased job

satisfaction and feel valued by the Department, among many other benefits." Monitor's May 24,

2024 Rep. at 24.

200.    **DOC can accomplish the steady staffing required by the RNDC Programs

Action Plan without using awarded posts to do so. Monitor's May 24, 2024 Rep. at 24.**

> **Nature of Dispute**:    Legal Dispute – Other
> **Position of Defendants**:    Defendants note that their supplemental proposed findings
> of fact to be provided to the Monitor and Plaintiffs on August 23 will include their
> updates regarding the subject matter in this proposed finding of fact.
> **Position of Plaintiffs**:    To the extent Defendants seek to file additional proposed
> findings of fact or declarations that include new information regarding the subject matter
> in this proposed finding of fact, Plaintiffs reserve the right to object to the filing
> consistent with the Court's July 9, 2024 order (Dkt. No. 751) and our position as reflected
> in the July 30, 2024 Joint Report.

201.    No awarded officer posts are listed for EMTC, where new admissions processing

occurs. *Id.* at 22.

202.    On May 13, 2024, the City of New York Correction Officers Benevolent

Association ("COBA") sent an official notice to COBA members regarding the ratification of a

new collective bargaining agreement between the union and the City, including a summary of the

terms of the proposed agreement. *COBA Contract 2024*, Corrections Officers' Benevolent

Association, https://www.cobacontract2024.com/home#contract.

203.    **COBA has announced that the terms of the proposed contract include "Guaranteed and Contractually Protected Post Awards. For the first time ever!," and specifically that "COBA negotiated mandatory post awards into the Contract for the first time in COBA's history. DOC must post and award posts going forward. DOC is also required to meet with COBA in the event that any of the post awarding factors are not followed. Factors are as follows – Seniority, work performance, attendance record, special skills or required clearances." *COBA Contract 2024,* Corrections Officers' Benevolent Association, https://www.cobacontract2024.com/home# contract. The proposed contract guarantees posting positions that become vacant. Monitor's May 24, 2024 Rep. at 26.**

> **Nature of Dispute**:        Legal Dispute – Other
> **Position of Defendants**:        Not disputed insofar as Defendants acknowledge that on May 13, 2024, COBA and the City entered into a bargaining agreement. Additionally, Defendants do not dispute that the quoted language is contained in COBA's announcement to its members regarding the agreement. However, Defendants dispute that the COBA agreement guarantees awarded posts. Defendants respectfully refer the court to the letter from the NYC Office of Labor Relations (OLR) dated May 10, 2024 detailing the terms of the agreement, which is available to view here: https://www.nyc.gov/assets/olr/downloads/pdf/collectivebargaining/2021-2026/coba-2022-2027-unit-agreement.pdf
> **Position of Plaintiffs**:        Though Plaintiffs understand the term "awarded posts" does not appear in the new COBA bargaining agreement—which is unsurprising as it is "parlance" rather than an official term (*see supra* ¶ 185)—we set forth in our brief how the COBA agreement at best fails to further compliance with Action Plan requirements, and at worst violates the City's obligations. *See* Reply Br. Dkt. 716, at 32-34, 48-49.

204.    The City and DOC did not engage the Monitor on substantive negotiations with regards to the COBA contract and the staffing issues therein. The City and DOC told the Monitor on April 15, 2024 that the last such negotiation was on November 20, 2023 and that no future meetings were planned. On May 13, 2024, DOC advised the Monitor that an agreement in principle was reached with COBA. At the time the agreement was reached, the Monitoring Team

was not aware that the negotiation of agreement was in progress and was unaware of the topics being considered for incorporation. Monitor's May 24, 2024 Rep. at 26.

### C. DOC Continues to Fail to Maximize Work Schedules for Adequate Staffing

205.    The Department has failed to maximize staff work schedules as required by Action Plan § C, ¶ 3(vi). Monitor's Apr. 18, 2024 Rep. at 270.

206.    DOC does not use the 5x2 schedule utilized by most correctional systems, and its version of the 5x2 schedule impedes its ability to maximize staff working days and to have adequate staffing on the weekend. *Id.* at 269.

207.    DOC should not increase its use of the 4x2 schedule to address the weaknesses of its 5x2 schedule. *Id.* at 270.

208.    DOC has not reported "any concrete steps that have been taken to alter these scheduling practices or to engage the unions on this issue." *Id.*

209.    Despite offering a proposed labor agreement to COBA in April 2024, the City did not address the labor agreements that prevent DOC from operating a standard 5x2 scheduling system. Ex. 170 (May 22, 2024 Email from City Counsel regarding Proposed COBA Contract).

### D. DOC Has Still Not Reduced Uniform Staff in Civilian Posts

210.    "There has been very little progress in the Department's efforts to reduce the use of uniform staff assigned to posts with duties that can be reasonably accomplished by a civilian as required by Action Plan § C, ¶ 3(vii)." Monitor's Apr. 18, 2024 Rep. at 270.

211.    7 posts in Health and Management Division have been filled by civilians.  *Id.*

212.    "Uniformed staff continue to serve in a myriad of roles that can be fulfilled by a civilian work-force (e.g. assistants to the Wardens/Assistant Commissioners, landscaping and sanitation work, etc.)." *Id.* at 270-71.

213.    **Though DOC claims it has biweekly meetings to identify posts that may be filled by civilians, as of April 2024 DOC had not actually identified any posts currently manned by uniformed staff that should be civilianized. *Id.* at 271.**

> **Nature of Dispute**:        Legal Dispute – Other
> **Position of Defendants**:    Defendants note that their supplemental proposed findings of fact to be provided to the Monitor and Plaintiffs on August 23 will include their updates regarding the subject matter in this proposed finding of fact.
> **Position of Plaintiffs**:    To the extent Defendants seek to file additional proposed findings of fact or declarations that include new information regarding the subject matter in this proposed finding of fact, Plaintiffs reserve the right to object to the filing consistent with the Court's July 9, 2024 order (Dkt. No. 751) and our position as reflected in the July 30, 2024 Joint Report.

214.    DOC has suggested certain upcoming budget-driven staffing changes will result in the *increase* of uniformed staff fulfilling duties that can and should be performed by civilian staff. *Id.* at 271. DOC has also not taken any action to eliminate the administrative posts its own staffing analysis deemed superfluous, and therefore uniform staff still occupy those posts. *Id.*

215.    DOC's ability to civilianize staff, and thus comply with Action Plan § C, ¶ 3(vii), depends on its ability to "recruit and hire staff on an expedited time frame." *Id.* at 17, 271.

## VIII.    Failure to Conduct Thorough, Timely, and Objective Investigations and to Hold Staff Accountable for Misconduct

216.    During the second half of 2023, the time it took ID to complete intake investigations began to increase, with only 72% and 71% of intake investigations completed within 30 business days in November and December 2023, respectively, compared to 99% for incidents that occurred between July and September 2023. Monitor's Apr. 18, 2024 Rep. at 92-93. DOC "candidly reported the delays derive from poor leadership and management as well as an influx of new investigators and supervisors who require more time to complete their work as they acquaint themselves with their responsibilities." *Id* at 93.

217.    Intake investigations still do not reliably identify misconduct, even when there was objective evidence of such misconduct, and still do not reliably refer cases for Full ID investigations where warranted. Monitor's Dec. 22, 2023 Rep. at 37; Monitor's April 18, 2024 Rep. at 96.

218.    During the 17th  Monitoring Period (July – December 2023), intake investigations generally failed to identify operational and security failures that led to unnecessary uses of force, did not appear to correctly assess video evidence, failed to interview staff and/or PICs when necessary, and in some cases appeared to dismiss [incarcerated people's] allegations and/or injuries without proper basis. *Id.* at 96. False or incomplete staff reports were not identified, and if staff misconduct was identified in the intake investigation, insufficient corrective action was often recommended. *Id.* The "poor quality of Intake Investigations" was "particularly pronounced in this Monitoring Period," and the time to close intake investigations began to increase. *Id.* at 104.

219.    As of November 15, 2023, there were still 186 Full ID investigations pending regarding incidents that took place in 2022. Monitor's Dec. 22, 2023 Rep. at 34.

220.    While the speed of closure of Full ID investigations appeared to increase during the 16th Monitoring Period, this came at the expense of the quality of Full ID investigations. *Id.* at 37-38.

221.    Even with this increased speed of Full ID investigations, 70% of Full ID investigations for incidents that occurred between January 2022 and December 2023 (or more than 1,000 investigations total) were either closed or remained pending after the 120-day deadline imposed by the Consent Judgment. Monitor's Apr. 18, 2024 Rep. at 93.

222.    ID has long struggled to complete Full ID investigations in a timely manner, and "the number of pending Full ID investigations increased" during the 17th Monitoring Period. In December 2023, 672 Full ID cases were pending, as compared to 424 cases at the end of the 16th Monitoring Period. ID reported that the increase in its pending caseload was due to insufficient staff and increased caseloads. *Id.* at 95.

223.    The "decline in the quality of Full ID investigations first observed in summer/fall 2022 has essentially remained" in the 16th and 17th Monitoring Periods. The results of such investigations were often incomplete, inadequate, and unreasonable, due to issues including investigators' failure to complete necessary interviews, their disregard for objective evidence, and their recommendations for insufficient employee corrective action. The quality of many of the investigations was substandard and the findings could easily be discredited." Monitor's Apr. 18, 2024 Rep. at 96; Monitor's Dec. 22, 2023 Rep. at 38.

224.    When the Monitoring Team identifies an investigation where the objective evidence was not adequately investigated or analyzed, they may submit feedback to DOC and recommend additional review. The Monitoring Team sent 74 of these recommendations regarding inadequate investigations (both intake and Full ID) in 2023, a number which "continues to raise concerns about the overall veracity of investigations." Monitor's Apr. 18, 2024 Rep. at 97.

225.    From January-June 2023, the proportion of use of force incidents in which at least one staff member was referred to discipline was only 4%, even lower than the 5% referred in 2022, though there was no contemporaneous change in the pattern and practice of excessive and unnecessary force that would merit this continued reduction in referrals. This led the Monitor to

conclude that "the degradation in investigation quality . . . likely contributed to the decline in referral for formal discipline. Monitor's Dec. 22, 2023 Rep. at 40-41.

226.    The rate of discipline referrals from use of force investigations has now dropped even further, to only 3%, for the year of 2023 as a whole. Monitor's Apr. 18, 2024 Rep. at 103. This trend is "particularly troubling because the Monitoring Team has not identified a change in the pattern and practice of unnecessary and excessive force that would account for the reduction in the frequency of referrals for formal discipline." *Id.*

227.    As of February 2024, there were 18 ID supervisors assigned to use of force cases, and 78 ID investigators assigned to use of force cases. *Id.* at 91. The number of investigators and supervisors conducting use of force investigations is at least 30% less than in 2020 when ID was at its most functional, and ID's staffing levels are insufficient to meet the requirements of the Nunez court orders. *Id.*

228.    In April 2024, the Monitor stated that "ID has reported to the Monitoring Team that its current staffing levels are insufficient to manage its workflow." *Id.* at 90.

229.    There was a net loss of 51 ID staff in January 2022-February 2024. *Id.* at 205.

230.    In April 2024, the Monitor stated that ID reports that the staffing numbers required by the Court's August 10, 2023 order are now insufficient to cover their workload. *Id.* at 95.

231.    A number of personnel transitions in ID that took place in the second half of 2023, including the abrupt removal of an Associate Commissioner under what the Monitor described as "questionable circumstances" in August 2023, and the replacement of that leader with someone who had no experience conducting or managing use of force investigations, "compounded the dysfunction within ID that began in 2022." *Id.* at 90. The Monitoring Team is

"deeply concerned about the lack of adequate leadership and supervision necessary to correct the significant decline in ID's work product that began in 2022." *Id.*

232.    For the 16th and 17th Monitoring Periods, DOC remained in non-compliance with the Consent Judgment requirements to conduct thorough, timely, and objective investigations of all use of force incidents (Section VII(1)) and to conduct Full ID investigations within specific timeframes (Section VII(9)(a)). Monitor's Dec. 22, 2023 Rep. at 45; Monitor's Apr. 18, 2024 Rep. at 104.

233.    The decline in DOC's identification of misconduct through both rapid reviews and ID investigations perpetuates the longstanding trend of failure to address misconduct, and severely undermines the overall accountability structure within DOC. Monitor's Dec. 22, 2023 Rep. at 49; Monitor's Apr. 18, 2024 Rep. at 110.

234.    During 2023, DOC imposed accountability for use of force-related misconduct in just over 1,600 cases, compared to nearly 3,000 cases in the previous 12-month period in 2022. This decrease was due at least in part to DOC's inability to identify misconduct. Monitor's Dec. 22, 2023 Rep. at 50-51; Monitor's Apr. 18, 2024 Rep. at 110.

235.    Between June 2022 and December 31, 2023, only 1 Deputy Warden and 18 ADWs were subjected to formal discipline. The Monitor found this low volume of discipline for supervisors to be "troubling" given the "pervasiveness" of issues involving inadequate supervision he had identified. The Monitor "frequently" identifies situations where supervisors do not uphold their responsibilities and yet no corrective action is taken. Monitor's Apr. 18, 2024 Rep. at 112.

236.    During the 17th Monitoring Period, the then-Commissioner created new requirements that he must approve all suspensions of DOC staff, whether recommended by

facility leaders or ID. Due to these requirements' negative impacts on the use of suspensions, the Monitor has recommended to the current Commissioner that revised guidance on the use of suspensions be issued. *Id.* at 114.

237.   **Of the 1,007 command disciplines recommended by facility leaders via rapid reviews during the 16th Monitoring Period, 192 were dismissed due to DOC's failure to timely comply with due process requirements or due to clerical error. Monitor's Dec. 22, 2023 Rep. at 54-55; stipulated by Defendants.**

238.   Of the 722 command disciplines recommended during the 17th Monitoring Period, 124 were dismissed because of failures to meet due process requirements or clerical errors. Monitor's Apr. 18, 2024 Rep. at 116-17. DOC also reported to the Monitor that it intended to dismiss a large number of command disciplines because of due process errors, initially estimating the number to be around 1,300, and then later claiming the number was smaller. The Monitor has not been able to confirm with DOC how many command disciplines it intends to dismiss because of due process violations. As the Monitor explained, "the fact that it has been difficult to ascertain the complete universe of cases only reinforces the concerns related to management of CDs." *Id*. at 118.

239.   Problems with both the policy and practice surrounding command discipline remain, including dismissal of a large number of command disciplines, an ongoing overreliance on the lowest level of sanctions, and in at least some cases, the issuance of command disciplines that preclude later formal discipline. Monitor's Apr. 18, 2024 Rep. at 116.

240.   In April 2024, the Monitor explained that "To date, the Department has *not* demonstrated an ability to reasonably manage CDs [command discipline] to ensure that they are

processed as they should be," and that "the current deficiencies continue to undermine the overall disciplinary process." *Id.* at 115 (emphasis in original).

241.    **The Monitoring Team has made multiple recommendations to ensure timely processing of CDs by the facilities, but DOC has not made required improvements. *Id.* at 118.**

> **Nature of Dispute**:    Legal Dispute – Other
> **Position of Defendants**:    Defendants note that their supplemental proposed findings of fact to be provided to the Monitor and Plaintiffs on August 23 will include their updates regarding the subject matter in this proposed finding of fact.
> **Position of Plaintiffs**:    To the extent Defendants seek to file additional proposed findings of fact or declarations that include new information regarding the subject matter in this proposed finding of fact, Plaintiffs reserve the right to object to the filing consistent with the Court's July 9, 2024 order (Dkt. No. 751) and our position as reflected in the July 30, 2024 Joint Report.

242.    DOC has utilized command discipline in cases where they should not have given the severity of the misconduct, including in response to use of force violations. When DOC misuses command disciplines in this way, it then will not proceed with more appropriate formal disciplinary charges, reportedly because of "double jeopardy." *Id.* During the most recent Monitoring Period, this took place for an incident that the Monitor identified as "particularly egregious" such that formal disciplinary charges should be expedited. *Id.*

243.    DOC reported it would revise its command discipline policy to address these problems at the end of 2022, but as of April 2024, no new policy was in place. *See infra* ¶ 310.

244.    Facility leadership continues to over-rely on reprimands and corrective interviews when adjudicating command discipline cases. Monitor's Dec. 22, 2023 Rep. at 55.

245.    Approximately 150 cases in which the incident took place more than one year earlier remained pending in the formal discipline process as of June 2023, meaning that the opportunity for timely discipline had been lost. *Id.* at 57.

246.    **In 2023, only 318 unique staff actions related to potential misconduct regarding Use of Force incidents were referred for formal discipline. This was the lowest number of referrals in the past seven years. This "sharp drop" in disciplinary referrals is "particularly alarming, considering the high frequency of use-of-force incidents and incidents with serious misconduct that have been observed by the Monitoring Team via its incident reviews." Monitor's Apr. 18, 2024 Rep. at 119.**

247.    There was an increase in the proportion of formal disciplinary cases that were "administratively filed," or in other words, dismissed, from 7% to 12% between the 15th and 16th Monitoring Periods. Monitor's Dec. 22, 2023 Rep. at 58. In April 2024, the Monitor reported that the proportion of administratively filed cases remains high and was, in some cases, preventable by avoiding procedural errors. Monitor's Apr. 18, 2024 Rep. at 129.

248.    During the 16th Monitoring Period, a larger proportion of formal discipline cases that resolved via negotiated plea agreements resulted in penalties of low severity, and a smaller proportion resulted in penalties of high severity. From January-June 2023, 40% of formal disciplinary cases closed with a sanction of 1 to 9 days, compared to 34% in 2022. A sanction of 30 days or more was imposed in 18% of cases from January-June 2023, compared to 26% in 2022. Monitor's Dec. 22, 2023 Rep. at 59.

249.    The proportion of penalties exceeding 30 days in 2023 was only 17%, the lowest it has been in any year over the past seven years. The Monitoring Team found this "concerning given the Monitoring Team's observation that the frequency of serious misconduct has not changed." Monitor's Apr. 18, 2024 Rep. at 126.

250.    From January to June 2023, 13% of formal use of force disciplinary cases that resolved via negotiated plea agreement resulted in a penalty of only a reprimand, with no

compensatory or vacation days lost, compared to only 4% in 2022 and 1% in 2021. Monitor's

Dec. 22, 2023 Rep. at 59-60. In 2023 as a whole, 11% of use of force cases resolved via a

negotiated plea agreement resulted in only a reprimand. Monitor's Apr. 18, 2024 Rep. at 126.

This was the largest proportion of cases resulting in only a reprimand in the past seven years. *Id.*

251.    The Monitor assessed 131 cases closed with formal discipline in the 16th

Monitoring Period and found that the number of cases in which the outcome was "reasonable"

had decreased from prior monitoring periods, and that shift "raises questions about whether the

discipline imposed is proportional to the misconduct." Monitor's Dec. 22, 2023 Rep. at 60-61.

252.    In April 2024, the Monitor expressed "concern about the extent to which

discipline may be out of proportion to the severity of the staff's misconduct." Monitor's Apr. 18,

2024 Rep. at 128.

253.    During the 16th Monitoring Period, DOC moved from partial compliance to non-

compliance with the Consent Judgment's requirement to impose meaningful discipline for use of

force-related misconduct (Section VIII(1)) due to DOC's "regression in identifying misconduct

(and therefore failing to hold staff accountable for certain violations), failure to hold supervisors

accountable, inability to adequately manage Command Disciplines, and tendency to impose

discipline that may not be proportional to the severity of the staff's misconduct." Monitor's Dec.

22, 2023 Rep. at 66. DOC remained in non-compliance with this provision in the second half of

2023. Monitor's Apr. 18, 2024 Rep. at 130-131.

254.    The workload within the Trials Division is still at a volume that requires

additional attorneys to support timely case processing. The process to hire individuals "remains

protracted, taking many months, and requires a significant amount of various bureaucratic 'red

tape,'" and "inquiries from the Monitoring Team to catalyze the necessary movement."
Monitor's Apr. 18, 2024 Rep. at 143.

### IX.    The City has Failed in its Obligation to Young Adults in its Custody

#### A.    Failure to Protect 18-Year-Old People in Custody from an Unreasonable Risk of Harm

255.    Beginning in spring 2023 and continuing through the 17th Monitoring Period,
DOC has been unable to sustain what marginal improvements had been made in RNDC
regarding staff control and provision of services, returning to "a concerning level of disorder and
lack of control." Monitor's Dec. 22, 2023 Rep. at 88, Monitor's Apr. 18, 2024 Rep. at 152.

256.    In mid-2023, RNDC staff failed to exercise proper control in housing units, failed
to complete basic security obligations such as securing doors, and ensuring locks and windows
were unobstructed, failed to provide basic services, permitted people in custody to visibly use
illicit substances, failed to prevent fires with more frequency, and permitted sanitation to decline.
Monitor's Dec. 22, 2023 Rep. at 87-88.

257.    The security audits performed by NCU in RNDC from May and June 2023
continued to find unsecured doors on the housing units allowing people in custody to freely enter
and exit one another's cells; staff off post; staff failing to use the tour wand system and/or failing
to conduct quality welfare checks during lock-in; illicit substances smoked openly; and a failure
to enforce 9 p.m. lock-in. *Id.*

258.    The Monitoring Team's site visits in 2023 "have observed these same serious and
pervasive problems that compromise the facility's ability to protect [people in custody] from
harm, as required by Consent Judgment § XV, ¶ 1." *Id.*

259.    In response to worsening conditions, DOC issued updates to the RNDC Violence
Reduction Plan in October 2023, but the update "did not appear to lead to any direct action

toward implementation, and conditions continued to stagnate through the end of 2023.
Monitor's Apr. 18, 2024 Rep. at 152.

260.    Beginning in spring 2023, both NCU audits and the Monitoring Team noted that "housing units remain disorderly, with staff failing to exercise their authority to ensure those in custody remained in the dayroom during lock-out periods and failing to execute other critical security practices (e.g., securing doors, ensuring locks/windows are unobstructed, controlling movement, etc.)." NCU and the Monitor found that "Incarcerated individuals were observed smoking illicit substances out in the open, fires became more frequent, mandated services were not dependable and sanitation took a notable turn for the worse." NCU's security audits from December 2023 "continued to find unsecured doors on the housing units with PIC freely entering/exiting each other's cells; staff who were off post; staff who failed to use the Watch Tour system and/or failed to conduct quality checks of PICs' welfare during lock-in; PICs who were smoking; and staff who did not enforce the 9 p.m. lock-in." The Monitoring Team's late 2023 site visits "revealed these same serious and pervasive problems that compromise the facility's ability to protect individuals from harm, as required by this provision." The Monitor found that any lower UOF rates were not driven by improved staff practice, but that "the Monitoring Team's and NCU's observations, discussed above, suggest the opposite— a pervasive hesitance among staff to utilize sound security practices, properly enforce rules and establish order, resulting in a dangerous environment." Monitor's Apr. 18, 2024 Rep. at 153.

261.    RNDC averaged 10 stabbings/slashings per month during the 17th Monitoring Period and the rate of stabbings/slashings was significantly higher than most of the other major facilities. The rate of fire-setting (2.95) more than doubled compared to the Sixteenth Monitoring Period (1.32) and was over 10 times higher than the other major facilities. RNDC averaged about

32 fires per month during the 17th Monitoring Period. "Several sources of information suggest that the fire-setting may be connected to frustration about inconsistent service delivery (e.g., recreation, laundry, commissary, etc.)." *Id.* at 154.

262.    The Monitor continued to rate Defendants in noncompliance with the Consent Judgment § XV, ¶ 1 requirement to prevent fights and assaults among 18-year-olds in the 16th and 17th Monitoring Periods. *Id.* at 154; Monitor's Dec. 22, 2023 Rep. at 89.

### B.    RNDC Programs Action Plan and Prior RNDC or Young Adult Programs

263.    The RNDC Programs Action Plan was issued in the early months of 2024, and targets individuals 18-21 years old in RNDC. It contains the following key elements: reducing the census of housing units; housing 18-21-year-olds together who are interested in programming; consistent assignment of officers, captains, and ADWs; the Unit Management model; increased programming; and training specific to the young adult population. Monitor's Apr. 18, 2024 Rep. at 255-56.

264.    Implementing the core tenets of Direct Supervision is one of the goals of the RNDC Programs Action Plan. *Id.* at 155.

265.    When DOC provided the RNDC Programs Action Plan to the Monitor, it lacked "the reasons why similar attempts to implement consistent staffing and unit management/direct supervision did not succeed." DOC then identified several dynamics that undercut the success of prior efforts: competing priorities, lack of communication between agency leaders, significant changes to staff scheduling, increased census on young adult housing units, the retirement of the previous Warden without an adequate transition plan to the new Assistant Commissioner, unveiling projects too quickly and without dedicated resources, and failing to reinforce expectations and to provide guidance on how new strategies should be put into practice. After

DOC acknowledged those dynamics, the Monitor then recommended that DOC develop strategies to ensure those prior failures are not replicated—which the plan lacked. *Id.* at 257.

266.    The RNDC Programs Action Plan "includes reintroducing certain strategies (i.e., 5x2 schedules, Awarded Posts, split tours) that were previously suspended because they were identified as conventions that interfered with, rather than enhanced, the efficient deployment of staff." The Monitor expressed concern about the reintroduction of these strategies, and urged DOC to "examin[e them] closely to determine if their use is appropriate, and if so, what protocols will be put in place to ensure they are not abused as they were in the past." *Id.*

267.    As of April 2024, the RNDC Programs Action Plan lacked strategies to address "the problems identified by NCU's 2021 consistent staffing audits which revealed mutuals (i.e., shift trading), posts for which no staff were assigned, and staff absence (e.g., various forms of staff leave) as prevalent dynamics undercutting consistent staffing." The Monitor then recommended those strategies be developed. *Id.* at 257-58.

268.    The RNDC Programs Action Plan did not "incorporate efforts to enhance basic security practices into the responsibilities for Unit Managers and staff assigned to young adult housing units," nor did it specifically integrate "the various elements of Direct Supervision . . . into staff expectations under the Unit Management framework." The Monitor then recommended the plan do so. *Id.* at 258.

269.    The Monitor expressed concern that "[t]oo often, the Department expends significant time and money to renovate housing units, only to have them deteriorate shortly thereafter." The Monitor recommended DOC develop an adequate "protocol for regular physical plant inspections and ongoing maintenance." *Id.* at 258.

270.    The Programs Action Plan lacked "a strategy to monitor and measure the progress of implementation, along with a method to assess the plan's effectiveness," which the Monitor urged should include NCU's expertise and resources. *Id.*

271.    DOC has had prior plans targeting the young adult population and/or RNDC.

272.    DOC presented a Young Adult Plan in 2015, which was updated in 2016, 2018, and 2019. Key features of the 2015 plan included housing 18-21-year-olds together, a focus on programming and education, and training steady officers on Safe Crisis Management and Cognitive Behavioral Therapy. *See* BOC, Young Adult Plan Update 2016, https://www.nyc.gov/assets/boc/downloads/pdf/NYC%20Department%20of%20Correction%20-%20Young%20Adult%20Plan%20Update%202016.pdf.

273.    Updates to the Young Adult Plan in 2018 included another stated intention to expand programming, focus on education, more training modules (Motivational Interviewing, Non-Coercive Approaches to Resolving Conflict; Creating Regulation and Resiliency; Dialectical Behavior Therapy; Conflict Resolution/Crisis Intervention; Safe Crisis Management, Direct Supervision, and Effective Communication/Motivational Strategies), and intentions to employ incentive-based strategies such as the PEACE Center. *See* BOC, Young Adult Plan Update 2018, https://www.nyc.gov/assets/boc/downloads/pdf/Meetings/2018/October-9-2018/Young%20Adult%20Plan%20Update.pdf.

274.    Updates to the Young Adult Plan in 2019 included another stated intention to expand programming, focus on education, continue to provide training, and intentions to shift away from housing 18-21-year-olds together in favor of combining them with adults. *See* BOC, Young Adult Plan Update 2019,

https://www.nyc.gov/assets/boc/downloads/pdf/Meetings/2019/February/Young%20Adult%20Plan%20Update%20February%202019.pdf.

275.    DOC introduced the RNDC Plan in 2020. The RNDC Plan included four main components: (1) consistently assigning Staff to the same housing unit day-to-day; (2) implementing Unit Management; (3) bolstering incentives for positive behavior; and (4) fortifying the sanctions for misconduct. Monitor's Ninth Rep. at 285. A "a long-term goal of the RNDC Plan [wa]s to revitalize the way in which programming is delivered to young adults at RNDC." *Id*. at 294-95.

### C.  Failure to Implement Direct Supervision

276.    The Monitor continued to rate Defendants in noncompliance with the requirements in Consent Judgment § XV, ¶ 12 and the First Remedial Order § D, ¶ 3, to implement a Direct Supervision model in the 16th and 17th Monitoring Periods. Monitor's Dec. 22, 2023 Rep. at 89; Monitor's Apr. 18, 2024 Rep. at 155.

277.    In the 16th Monitoring Period, "housing units did not have daily schedules and were not staffed by the same people day-to-day, which precluded the consistency, predictability and relationship development that is at the core of the Direct Supervision model." Monitor's Dec. 22, 2023 Rep. at 89.

### D.  Failure to Implement Consistent Assignment of Staff

278.    DOC continues to fail to consistently assign officers and supervisors to housing units in RNDC during the 16th and 17th Monitoring Periods as required by Consent Judgment § XV, ¶ 17, and First Remedial Order § D, ¶ 1. Monitor's Dec. 22, 2023 Rep. at 89; Monitor's Apr. 18, 2024 Rep. at 156.

279.    DOC continues to fail to consistently assign staff as required in the 16th and 17th

Monitoring Periods because staff do not reliably come to work as assigned, nor does DOC

"implement a staff deployment strategy that prioritizes the required consistency across units."

Monitor's Dec. 22, 2023 Rep. at 89; Monitor's Apr. 18, 2024 Rep. at 156.

280.    The Monitor continued to rate Defendants in noncompliance with the Consent

Judgment § XV, ¶ 17 requirement to consistently assign staff in the 16th and 17th Monitoring

Periods. Monitor's Dec. 22, 2023 Rep. at 90; Monitor's Apr. 18, 2024 Rep. at 156.

281.    Though the RNDC Programs Action Plan intends to use steady staffing, the

Monitor "emphasized in its written feedback and verbally during meetings that simply reporting

a plan to implement consistent staffing is not sufficient . . . [T]o successfully implement this

strategy, the Department must also acknowledge and directly address the obstacles that hindered

the implementation of consistent staffing in the past." Monitor's Apr. 18, 2024 Rep. at 156.

282.    In the past, NCU audits found that staff who were assigned to a steady position on

paper frequently did not actually work the shift for a variety of reasons—on average, at least

*one-third* of shifts assigned. Monitor's Tenth Rep. at 267; Monitor's Ninth Rep. at 306-307. One

of the most common reasons such a failure occurred was a "mutual," which is "a practice—

protected by the union—wherein staff trade their shift with another staff person." *Id.* at 307.

### X.    Restrictive Housing: ESH and RESH

283.    DOC first proposed Enhanced Supervision Housing ("ESH") as a new restrictive

housing unit in 2014, and DOC began operation in 2015 after BOC adopted rules codifying it.

*See* BOC, An Assessment of Enhanced Supervision Housing (April 2017),

https://www.nyc.gov/assets/boc/downloads/pdf/Reports/BOC-Reports/FINAL-BOC-

ESH_Assessment-Adults-2017.04.26.pdf at 3.

284.    Components of the original ESH model included: a separate unit with a tiered progression system requiring programming engagement, placement after serious acts of violence, a stated focus on rehabilitation, and seven hours out-of-cell time. *Id.* at iii-iv.

285.    Two years after implementation, BOC issued a report identifying many implementation failures in ESH, including: frequent lockdowns; failure to afford out-of-cell time; high rates of violence and injury; a lack of guidance for staff; failure to consistently assign staff; poor execution of programming; confusion from incarcerated people about placement in or how to progress out of ESH; poor execution of ESH hearings and periodic reviews; and a lack of benchmarks for progress or success of the model. *Id.* at v-x.

286.    In 2023, RESH (RMSC Enhanced Supervision Housing) had the highest UOF rate at 40.5 (four times higher than every other facility in DOC). Monitor's Apr. 18, 2024 Rep. at 33.

287.    RESH has high rates of stabbings, slashings, and fire-setting. *Id.* at 42.

288.    Implementation of RESH since June 2023 has not been sound; as "RESH units are rife with security and operational failures that jeopardize the safety of individuals and staff on the units." *Id.* at 45. Though RESH is "intended to be *highly* structured (particularly in Level 1) in order to reduce the opportunity for violence...staff's ongoing failure to adhere to the required structure and security features has contributed to the level of violence on the RESH units." *Id.*

289.    Many of the security features of RESH have not been properly implemented. "Security and operational failures that continue to contribute to violence and the use of force on RESH units include:" staff failures to properly search individuals as they exit their cells and exit/reenter the housing units; staff positioning and/or failure to actively supervise individuals secured in the restraint desks; staff failures to address individuals' efforts to circumvent the

limitations of the restraint desks; staff failures to secure restraint devices and/or unauthorized

substitutions of restraint devices such that leg irons with excessive length were used to secure

individuals to restraint desks, affording sufficient latitude for individuals to reach other

individuals; and staff failures to address clear violations like smoking and the use of contraband.

*Id.* at 45-46.

290.    37 stabbings/slashings occurred in RESH units during the 17th Monitoring

Period, "and another 17 occurred between January and March 2024, many of which were the

result of poor security practices among staff." *Id.* at 46.

291.    Several additional factors contribute to security and operational failures in RESH:

frequency of double shifts and overtime; friction between officers and captains due to staff

failures to follow security and operational protocols; staff failures to "fully comprehend the

policy requirements [or] understand how to manage resistance to routine safety protocols;" the

RESH "Security Team" being "often deployed to perform non-security functions (such as court

production, escorts, entering data)." *Id.* at 46-47.

292.    Staffing failures likewise contribute to security and operational failures in RESH:

RESH leadership reports that they do not have enough staff to sustain the required staffing

complement of four B-officers on a consistent basis; on any given day, staffing levels are

undercut by staff calling out on Personal Emergency/FMLA statuses, staff needing to escort

individuals to medical/visitation, and the inability to hold staff over because many staff members

are already working double shifts. These staffing constraints are "exacerbated here by skill

deficits and poor staff supervision . . . . RESH staff consistently fail to adhere to sound

correctional practice and follow required security procedures." Exacerbating the staffing issues,

"supervisory staff, including Captains and ADWs, fail to provide adequate supervision and guidance to staff about how to efficiently and effectively perform their duties." *Id.* at 47.

293.    Even one strong leader in command of issues in RESH "is insufficient to address the multitude of issues . . . [which] necessitate a corps of high-quality supervisors who provide consistent on-the-ground supervision and guidance to staff as well as sufficient staffing levels to ensure that this population with a high propensity of violence can be safely and appropriately managed." *Id.* at 47.

## XI.    Training is an Inadequate Answer for Entrenched Poor Staff Practice

294.    DOC has offered use-of-force training for years. For example, the Monitor reported that DOC "committed significant resources to training all Staff on the UOF policy through S.T.A.R.T. and . . . providing a refresher UOF Policy course through Advanced Correctional Techniques Training ("A.C.T")." Eighth Monitor's Rep., Dkt. 332, at 68-69

295.    While new concepts are introduced to officers during training, DOC supervisors must ensure transfer of those concepts into daily practice through their messaging, guidance, coaching, and role modeling. Monitor's Apr. 18, 2023 Rep. at 9.

296.    The Monitor has emphasized the critical role of supervisors in translating training to practice for years. In the Eighth Monitoring Period, the Monitor recognized that training introduces concepts, but change in day-to-day practice requires "an intentional, person-directed program of reinforcement and shaping. This type of skill refinement is only possible when those supervising line Staff, and those supervising the supervisors, are expected to teach their subordinates how to improve their practice. Practice enhancements are needed not only with regard to using force appropriately, but also in basic operational tasks (e.g., ensuring doors are

locked, hallways are clear, etc.), as these failures often catalyze a use of force." Monitor's Eighth Rep. at 10.

## XII.    DOC's Failure to Consult, Cooperate, and Provide Accurate Information

297.    The Court issued five orders in 2023 (June 13, August 10, October 10, December 14, and December 20) to catalyze improvement in the Department's management of the Nunez Court Orders, its work with the Monitor, and its efforts to address fundamental security, reporting, and management practices to bring about some immediate relief to the ongoing risk of harm faced by staff and people in custody on a daily basis.

### A.    June 13, 2023 Order (Dkt. 550)

298.    The Court ordered DOC to provide "immediate notification" to the Monitor of certain "serious events." Dkt. 550 at § I, ¶ 3. While DOC provides daily notifications to the Monitoring Team of individuals in custody who have been admitted to the hospital, DOC's ability to report the relevant circumstances on the admission "remains a work in progress." Monitor's Apr. 18, 2024 Rep. at 157.

299.    The Court ordered DOC to provide information to the Monitoring Team, consult with the Monitoring Team, and ensure that the Monitoring Team has access to DOC staff. Dkt. 550 at § I, ¶¶ 4-6. While DOC's approach to information-sharing and collaborating with the Monitoring Team has improved, DOC still struggles to respond to requests and feedback in a timely manner, and many of the Monitoring Team's requests have been pending for a long period of time. Monitor's Apr. 18, 2024 Rep. at 158.

300.    The Court ordered DOC to take certain department-wide remedial steps to address concerns related to five serious incidents that occurred in the first half of 2023, and to present a plan for doing so by June 27, 2023. Those steps included updating existing policies to address

individuals who are unclothed, and revising procedures to require individuals who are involved in a violent encounter to be seen at the clinic on an "urgent basis." Dkt. 550 at § II. As of April 2024, neither issue had been addressed and the policies and procedures remained unchanged. Monitor's Apr. 18, 2024 Rep. at 158.

### B.    August 10, 2023 Order (Dkt. 564)

301.    The August 10, 2023 Order was intended to require DOC to prioritize and implement a set of "immediate, interim measures" on a select number of critical items that would reduce the imminent risk of harm but have languished. Monitor's Apr. 18, 2024 Rep. at 159.

302.    \*\*The Court ordered DOC, by September 30, 2023, to develop a set of data and metrics for use of force, security and violence indicators, and to permit the Monitoring Team to observe meetings where such information is evaluated. Dkt. 564 at § I, ¶ 1. After Commissioner Maginley-Liddie was appointed, DOC informed the Monitor that it intended to "rebrand" the monthly TEAMS meetings as Action, Collaboration and Transformation ("ACT") meetings and change the format of those meetings. February 26, 2024 Rep. at 6-7. As of April 18, 2024, DOC has not initiated the new meeting format. Monitor's Apr. 18, 2024 Rep. at 159.\*\*

> **Nature of Dispute**:        Legal Dispute – Other
> **Position of Defendants**:    Defendants note that their supplemental proposed findings of fact to be provided to the Monitor and Plaintiffs on August 23 will include their updates regarding the subject matter in this proposed finding of fact.
> **Position of Plaintiffs**:        To the extent Defendants seek to file additional proposed findings of fact or declarations that include new information regarding the subject matter in this proposed finding of fact, Plaintiffs reserve the right to object to the filing consistent with the Court's July 9, 2024 order (Dkt. No. 751) and our position as reflected in the July 30, 2024 Joint Report.

303.    The Court ordered DOC, by October 30, 2023, to reconstitute its search procedures and practices to ensure searches are conducted in an efficient, timely, safe manner and to reduce the possibility of a use of force, in consultation with and approved by the Monitor.

Dkt. 564 at § I, ¶ 2. Although DOC has identified three policies that must be revised to address this requirement, DOC has not proposed revisions to two of those policies. DOC proposed revisions to the third policy, received feedback from the Monitoring team on those proposed revisions, but DOC has not provided a revised draft. Monitor's Apr. 18, 2024 Rep. at 159.

304.    The Court ordered DOC, by October 30, 2023, to revise its escort procedures and practices to eliminate the use of painful escort holds, in consultation with and approved by the Monitor. Dkt. 564 at § I, ¶ 3. Although DOC has identified five policies that must be revised to address this requirement, DOC has not provided the Monitoring Team with proposed revisions for any of the policies. Monitor's Apr. 18, 2024 Rep. at 159.

305.    The Court ordered DOC, by September 25, 2023, to revise and implement a protocol to ensure Control Station Doors are secured at all times and to ensure that a Control Station Door is never opened when a housing unit door is opened or an incarcerated individual is in the vestibule, approved by the Monitor. Dkt. 564 at § I, ¶ 5. After DOC issued a teletype in October 2023 reminding staff of their obligations to secure Control Station Doors, the Monitoring Team advised DOC that it must monitor and enforce compliance given the pervasive and long-standing problems and the failure of prior written protocols in affecting staff practice. Monitor's Apr. 18, 2024 Rep. at 161. DOC has not confirmed whether any monitoring of staff practice is actually occurring and has not shared any methodology for tracking its findings. *Id.*

306.    The Court ordered DOC staff not to leave their post or place of assignment without the permission of a superior; staff assigned to work a housing post cannot leave their post until they have been properly relieved or exigent circumstances exist. Dkt. 564 at § I, ¶ 6. DOC continues to have no centralized mechanism to track the number of staff who are found off post. Monitor's Apr. 18, 2024 Rep. at 161. Apart from a teletype issued in October 2023, which

proved ineffective at changing staff practice, DOC has not engaged in any other measures to track or create change in staff being off post. Monitor's Apr. 18, 2024 Rep. at 161. When the Monitor raised concern about whether the teletype/audit combination will impact staff practice, DOC stated that NCU's security audits "will continue to focus on staff being off post." *Id.* The Department also reported that it plans to "reinvigorate its employee scanning process to help identify when a staff member may be off post" but "[t]he effectiveness of this strategy is questionable given the low likelihood that a staff member would notify the control room that they were leaving their post without being properly relieved." *Id.* at 161.

307.    The Court ordered DOC, by November 30, 2023, to revise as necessary all of Special Teams command level orders related to the use of force, approved by the Monitor. Dkt. 564 at § I, ¶ 8. Of the nine command level orders ("CLOs") subject to this provision, DOC has received the Monitoring Team's feedback on DOC's proposed revisions to three CLOs, but has not yet provided drafts of revised policies. Monitor's Apr. 18, 2024 Rep. at 162. DOC has not provided proposed revisions for the remaining six CLOs. *Id.*

308.    The Court ordered DOC, by October 30, 2023, revise and implement its screening and assignment process for the initial assignment to Special Teams and routine reassessment of Special Teams staff to ensure the staff assigned to Special Teams are appropriately fit for duty, in consultation with and approved by the Monitor. Dkt. 564 at § I, ¶ 9. Although the Monitoring Team provided DOC with feedback on proposed revisions to this policy, DOC has not yet provided a revised draft of the policy. Monitor's Apr. 18, 2024 Rep. at 162.

309.    The Court ordered DOC, by October 30, 2023, to revise its pre-promotional screening policies and procedures to address the issues identified by the Monitor in each of its

Court filings in 2023, in consultation with the Monitor. Dkt. 564 at § I, ¶ 10. DOC has not provided any proposed revisions to the policy. Monitor's Apr. 18, 2024 Rep. at 147.

310.    The Court ordered DOC, by November 30, 2023, to develop and implement appropriate controls and procedures regarding the adjudication of Command Discipline, in consultation with and approved by the Monitor. Dkt. 564 at § I, ¶ 13. The revision process has been unduly protracted. Monitor's Apr. 18, 2024 Rep. at 163. DOC has produced several versions of a revised CD Directive, permitting the unions multiple opportunities to comment on the current policy and contemplated revisions. *Id.* During the revision process, DOC removed certain proposed changes to the CD Directive after consultation with the Monitoring Team only to reinsert those proposals in subsequent drafts without basis. *Id.* Nearly all successive versions of the CD Directive propose revisions that would further expand the use of CDs in response to more serious misconduct and limit the extent to which less serious misconduct may be subject to a CD. *Id.* DOC's performance in certain key areas related to CDs has deteriorated. *Id.*

### B.  October 10, 2023 Order (Dkt. 582)

311.    The Court ordered DOC to engage with the Monitoring Team on immediate initiatives to address the risk of harm and other issues regarding reporting.

312.    The Court ordered DOC's Executive Leadership, by October 18, 2023, to meet with the Monitor and devise a plan to be implemented immediately to ameliorate the unacceptable levels of harm in the jails. Dkt. 582 at 2.

313.    The majority of DOC's security plans from October and November 2023 have either not been implemented or were not effective. Monitor's Apr. 18, 2024 Rep. at 26.

314.    **As of April 2024, DOC had not yet developed a comprehensive security plan even though the Monitor first recommended the need for such a plan in fall 2021. Monitor's Apr.

18, 2024 Rep. at 29. Despite repeated inquiries from the Monitoring Team for a holistic department-wide Security Plan, as of April 2024 the executive leadership reported that it was being developed but had not provided one. *Id.* at 27.**

> **Nature of Dispute**:         Legal Dispute – Other
> **Position of Defendants**:      Disputed.  On June 24, 2024, the Department submitted the Deputy Commissioner of Security's Security Action Plan to the Monitor for consultation, feedback, and approval. June 27, 2024 Monitor's Report p. 5. Defendants note that their supplemental proposed findings of fact to be provided to the Monitor and Plaintiffs on August 23 will include their updates regarding the subject matter in this proposed finding of fact.
> **Position of Plaintiffs**:         The fact that the Department submitted a plan to the Monitor on June 27, 2024 does not contradict this proposed finding, which states that they had not yet developed a comprehensive security plan as of April 2024.  To the extent Defendants seek to file additional proposed findings of fact or declarations that include new information regarding the subject matter in this proposed finding of fact, Plaintiffs reserve the right to object to the filing consistent with the Court's July 9, 2024 order (Dkt. No. 751) and our position as reflected in the July 30, 2024 Joint Report.

315.    The RNDC violence reduction plan adopted in 2022 was abandoned, instead of being reformulated, when it did not sustain the desired effects. Monitor's Apr. 18, 2024 Rep. at 26-27. DOC has issued a new RNDC plan as of January 2024. *Id.* at 27.

316.    DOC did not faithfully implement the GRVC violence reduction plan, first introduced in 2022, and has essentially abandoned it despite dire facility conditions. Monitor's Apr. 18, 2024 Rep. at 27.

317.    The Court ordered DOC, by October 25, 2023, to immediately develop and implement protocols to address deficiencies in DOC's internal reporting structures and notifications to the Monitor regarding incident reporting. Dkt. 582 at 2. DOC has not made progress regarding this requirement. Monitor's Apr. 18, 2024 Rep. at 21-22.

**XIII.   Prior Commissioners with Similar Credentials Have Also Failed to Reform DOC**

318.    Commissioner Joseph Ponte regularly met and communicated with the Monitor in the First Monitoring Period, and under his leadership DOC reportedly took "significant strides" during that early time and "demonstrat[ed] their commitment to reform." First Monitor's Report, Dkt. 269 at 6-7, 121-122. DOC had a "strong, collaborative relationship" with the Monitoring Team. Second Monitor's Report, Dkt. 291 at 2, 5. DOC was said to have "committed significant resources and conducted a considerable amount of work," and was "very responsive to the Monitor's requests." Third Monitor's Report, Dkt. 295 at 2-3; 5. When he resigned, the Monitor reported that he "set a tone for the Department that reform is necessary, committed essential resources, and established some key strategies for the Department." Fourth Monitor's Report, Dkt. 305 at 5.

319.    Commissioner Cynthia Brann succeeded Commissioner Ponte, and the Monitor described her as "competent, committed, and reform-minded," expressing optimism about her early actions in that "even during a period of transition, [she] maintained [her] commitment to reform and demonstrated an increased vigor . . . [and] also appointed several key personnel to critical positions." Fourth Monitor's Report, Dkt. 305 at 5; Fifth Monitor's Report, Dkt. 311 at 3-4. When Commissioner Brann resigned, the Monitor praised her commitment, honesty, transparency, and forthrightness. Eleventh Monitor's Report, Dkt. 368 at 7.

320.    When Commissioner Vincent Schiraldi replaced Commissioner Brann, the Monitor again described his "significant experience and expertise in corrections and a demonstrated commitment to reform, and support from a team of committed individuals." Twelfth Monitor's Report, Dkt. 431 at 8-9.

### XIV.    Defendants Are Unwilling or Unable to Undertake the Reforms Necessary to Achieve Substantial Compliance

321.    The dysfunctional culture and other dynamics in DOC that impede reform efforts continue to persist, as described by the Monitor's July 10, 2023 Report at pgs. 142-147. *See* Monitor's Apr. 18, 2024 Rep. at 12.

322.    DOC has insufficient resources to instigate and sustain the reform efforts required by the Consent Judgment and *Nunez* court orders. *Id.* at 10.  The Nunez Manager, the Department's Legal Division, and the Policy and Planning Unit and Strategic Operations Unit require sufficient resources to support this enormous undertaking and currently lack the complete complement of resources necessary to instigate and sustain the reform effort. *Id.*

323.    In late 2022, the early days of the Action Plan, the Monitor expressed optimism about the appointment of a Senior Deputy Commissioner, eight Deputy Commissioners, eleven Assistant Commissioners, six Associate Commissioners, one Executive Director, a Chief of Staff and a Deputy Chief of Staff—noting their experience in other jurisdictions. Monitor's Oct. 28, 2022 Rep. at 6-7 ("Both individually and collectively, these 28 Department leaders reflect a sea-change that bodes well for the development of solutions that fit the contours of the complex problems.").

324.    In his most recent report, the Monitor emphasized that, "Finding effective and sustainable solutions to such complex problems requires peeling back the layers of dysfunction to uncover the core problems and then developing multilateral and multifaceted approaches to correct them. The Department, thus far, has not been able to do so." Monitor's Apr. 18, 2024 Rep. at 11.

325.    The reform effort requires a "dedicated team." *Id.* at 10.

326.    **As of April 2024, DOC had several "key high-level positions" vacant, including the Classification Manager and two of the Associate/Assistant Commissioners of

Facility Operations, who ended their tenure with DOC in February 2024 and October 2023,

respectively. *Id.* at 11, 208-09. The Chief of Staff in the Commissioner's Office left in January

2024, and as of April 2024 had not been filled. *Id.* at 208. An Assistant Commissioner of

Investigations left in March 2024. *Id.* at 209. Both the Deputy Commissioner of Training and the

Deputy Commissioner of Programs and Community Partnerships positions became vacant in

2024. *Id.* at 210. Additional departures are expected. *Id*. at 11.**

> **Nature of Dispute**:        Legal Dispute – Other
> **Position of Defendants**:        Defendants note that their supplemental proposed findings
> of fact to be provided to the Monitor and Plaintiffs on August 23 will include their
> updates regarding the subject matter in this proposed finding of fact.
> **Position of Plaintiffs**:        To the extent Defendants seek to file additional proposed
> findings of fact or declarations that include new information regarding the subject matter
> in this proposed finding of fact, Plaintiffs reserve the right to object to the filing
> consistent with the Court's July 9, 2024 order (Dkt. No. 751) and our position as reflected
> in the July 30, 2024 Joint Report.

327.        **Several other DOC senior-level executives have tendered their resignations,

including the Senior Deputy Commissioner and the Staffing Manager. *Id.* at 11, 210. Even as of

May 24, 2024, "a significant number of key leadership positions" that are "critical" to the reform

effort remain vacant. Monitor's May 24, 2024 Rep. at i.**

> **Nature of Dispute**:        Legal Dispute – Other
> **Position of Defendants**:        Defendants note that their supplemental proposed findings
> of fact to be provided to the Monitor and Plaintiffs on August 23 will include their
> updates regarding the subject matter in this proposed finding of fact.
> **Position of Plaintiffs**:        To the extent Defendants seek to file additional proposed
> findings of fact or declarations that include new information regarding the subject matter
> in this proposed finding of fact, Plaintiffs reserve the right to object to the filing
> consistent with the Court's July 9, 2024 order (Dkt. No. 751) and our position as reflected
> in the July 30, 2024 Joint Report.

328.        The first Senior Deputy Commissioner was appointed on October 31, 2022,

approximately four months after the Court entered the Action Plan. He resigned on February 3,

2023. The second Senior Deputy Commissioner was appointed on October 26, 2023, and tendered his resignation at the time the Monitor's April 18, 2024 report was filed. Monitor's Apr. 18, 2024 Rep. at 210, n.151.

329.    While some of senior DOC officials have left their positions, others "have not proven to be a good fit or do not appear capable of bringing about the culture change and infusion of expertise that is so desperately needed." *Id.* at 10.

330.    An "insufficient number of individuals remain at the executive level" and "a small number of individuals, with varying degrees of expertise, are currently filling those roles. This is not sustainable." DOC must hire additional executive level officials, both to fill vacant positions and "to replace any individuals who have not met the moment." *Id.* at 11.

331.    **The City's current practices related to approval for funding and hiring and promotion practices are stymieing the reform efforts. *Id.* at 18. The City's Office of Management and Budget agency must provide approval for funding of new positions, which delays the posting of those positions. *Id.* at 17. These delays result in difficulty in recruiting individuals for positions and well-qualified candidates withdrawing their applications. *Id.* at 17-18. The Monitor notes that "it is imperative that the City immediately accelerate the Department's access to funding and resources and remove the bureaucratic red tape regarding budgetary approvals and hiring because the current approval and vetting processes are creating unnecessary and protracted delay in advancing reform." *Id*. at 2.**

> **Nature of Dispute**:        Legal Dispute – Other
> **Position of Defendants**:        Defendants note that their supplemental proposed findings of fact to be provided to the Monitor and Plaintiffs on August 23 will include their updates regarding the subject matter in this proposed finding of fact.
> **Position of Plaintiffs**:        To the extent Defendants seek to file additional proposed findings of fact or declarations that include new information regarding the subject matter in this proposed finding of fact, Plaintiffs reserve the right to object to the filing

consistent with the Court's July 9, 2024 order (Dkt. No. 751) and our position as reflected in the July 30, 2024 Joint Report.

332.    In a few recent examples, approvals for hiring/promotion related to ID, the Trials Division, and the Nunez Compliance Unit may not have been obtained but for the repeated inquiries by members of the Monitoring Team. *Id.* at 18.

333.    Even when funding is obtained, processing delays can further delay the use of that funding. DOC leadership recently testified before City Council that it would take over a year before it could utilize 14 million dollars it obtained for programming due to processing and vetting requirements. "The impact of these delays cannot be understated." *Id.* at 18.

334.    Overtime spending is an important indicator of efficient workforce management. *Id.* at 212.

335.    Because of DOC's problems with inefficient staff scheduling and deployment and abuse of leave benefits, DOC uses overtime as a routine strategy to increase staff availability on any given shift. *Id.* at 212. Using overtime to address chronic staffing issues negatively impacts DOC's budget and staff wellness and morale. *Id.*

336.    Between 2019 and 2023, DOC has increased its annual overtime spending from approximately $155 million to approximately $260 million even as the average number of staff has decreased from 10,115 to 6,479. *Id.* at 213. In 2024, DOC has continued to spend tens of millions of dollars each month on overtime while the number of staff decreases. *Id.*

337.    DOC abandons or frequently changes short- and long-term security plans and facility-specific plans before they are fully developed and implemented. *Id.* at 26.

338.    In July 2023, TEAMS meetings were re-initiated, but subsequently suspended at the end of the 17th Monitoring Period for additional retooling. *Id.* at 58.

339.    DOC has operated units for people with serious mental illness who have engaged in serious acts of violence. DOC has described those units with therapeutic language, as "modeled on inpatient forensic wards" where "clinical staff [are] on the units at all times during the day and evening tours engaging the inmates in individual and group therapy and supervised activities." *See* DOC, Clinical Alternatives to Incarceration, https://www.nyc.gov/site/doc/media/caps-rhu.page.

340.    The Action Plan requires DOC to expand the Early Intervention, Support and Supervision ("E.I.S.S.") Unit to support staff on disciplinary probation and supervisors during their probationary period. Action Plan § A, ¶ (3)(c); Monitor's Apr. 18, 2024 Rep. at 105.

341.    **In October 2023, the Deputy Director of E.I.S.S. left DOC. As of April 18, 2024, that position remained vacant and DOC had not initiated recruitment to fill the position. DOC delayed posting the position "due to bureaucratic red tape which is difficult to understand given the Department is simply seeking to backfill a role that already exists." *Id.* at 106.**

> **Nature of Dispute**:    Legal Dispute – Other
> **Position of Defendants**:      Defendants note that their supplemental proposed findings of fact to be provided to the Monitor and Plaintiffs on August 23 will include their updates regarding the subject matter in this proposed finding of fact.
> **Position of Plaintiffs**:        To the extent Defendants seek to file additional proposed findings of fact or declarations that include new information regarding the subject matter in this proposed finding of fact, Plaintiffs reserve the right to object to the filing consistent with the Court's July 9, 2024 order (Dkt. No. 751) and our position as reflected in the July 30, 2024 Joint Report.

342.    Though the Action Plan also requires that each facility designate at least one supervisor (ADW) responsible for working with the E.I.S.S. Unit to support the uniform staff who are in the E.I.S.S. program and to address any supervision deficiencies that are identified, in the 17th Monitoring Period only one ADW was assigned to E.I.S.S. Action Plan § A, ¶ (3)(c); Monitor's Apr. 18, 2024 Rep. at 106-107.

343.    The "E.I.S.S. program is currently stagnant . . . . With many competing priorities, it seems that resources and attention have shifted away from E.I.S.S., undermining its role as an early warning system and risk management tool." E.I.S.S. is "operating under a sense of complacency, driven by a belief that no further support is forthcoming and, thus, is limited to working within its current constraints." Monitor's Apr. 18, 2024 Rep. at 107.

344.    DOC has had additional prior plans to address use of force. One such plan was "Mission Critical Aims" in the Fifth Monitoring Period, which included: (1) developing and implementing an aggressive and formalized approach to complete less complex Full ID cases more quickly; (2) buttressing the process for identifying misconduct based on the Preliminary Review so it can be fast-tracked for disposition and discipline; and (3) supporting the Department's relocation of 16-, 17-, and 18-year-old inmates, focusing initially on staffing, use of force techniques, and ensuring appropriate responses for inmates involved in serious institutional violence; (4) addressing operational deficiencies that contribute to the use of force; (5) improving Facilities' ability to detect and respond to the misuse of force; (6) fortifying the responses to violence among Young Inmates; and (7) continuing to refine and fully implement the Early Warning System ("EWS"). Fifth Monitor's Rep., Dkt. 311, at 6-7.

## XV.    Monitor's Conclusions Regarding DOC's Ability to Implement Reform

345.    In April 2024, the Monitor found that DOC has not made substantial and demonstrable progress in implementing the reforms, initiatives, plans, systems, and practices outlined in the Nunez Court Orders. Monitor's Apr. 18, 2024 Rep. at 168.

346.    In April 2024, the Monitor found that DOC has not made meaningful progress towards reducing the use of excessive and unnecessary force and achieving substantial

compliance with this seminal provision of the Nunez Court Orders than when the Consent Judgment went into effect. Id.

347.    The Monitor found in April 2024 that DOC's "deeply entrenched culture of dysfunction has persisted across decades and many administrations. The required culture change has stagnated for many reasons, including that the agency remains in a constant state of crisis, lack of continuity in leadership and focus, large numbers of staff who lack elementary skills, the Department's inability to identify and address problems proactively, and the fact that leaders often take action only after public reporting." *Id.* at 12.

348.    "The approach to implementing the reforms requires a paradigm shift in order to catalyze the necessary momentum to reform the Department and create a safe environment for those incarcerated and staff." Apr. 18, 2024 Rep. at 2; *id.* at 169 ("A paradigm shift in the reform effort is necessary so that durable strategies to resolve key foundational problems are developed and sustained over time.").

349.    "The Department's various deficiencies, dysfunctions and shortcomings, which have been normalized and embedded in many facets of its operation, continue to impede reform efforts. The issues stymying reform are complex and polycentric, with a number of 'problem centers' that are inextricably intertwined and layered." DOC has been unable to "[f]ind . . . effective and sustainable solutions to such complex problems [which] requires peeling back the layers of dysfunction to uncover the core problems and then developing multilateral and multifaceted approaches to correct them." *Id.* at 11.

Dated:  Originally filed: May 30, 2024
        Updated filing: July 30, 2024
        New York, New York

THE LEGAL AID SOCIETY

By: ____/s/_____
Mary Lynne Werlwas
Kayla Simpson
Katherine Haas
Sophia Gebreselassie
49 Thomas Street, 10th Floor
New York, New York 10013
(212) 577-3300


*Attorneys for Plaintiff Class*

EMERY CELLI BRINCKERHOFF
ABADY WARD & MAAZEL LLP

By:
____/s/_____
Jonathan Abady
Debra L. Greenberger
Katherine Rosenfeld
Vasudha Talla
Sana Mayat
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000