<u>Monitor's Sixth Report on the Conditions of Confinement
for 16- and 17-Year-Old Adolescent Offenders
at the Horizon Juvenile Center</u>

Sixth Reporting Period
July 1, 2023 - June 30, 2024

### The Monitoring Team

Steve Martin, J.D.—*Monitor*

Kelly Dedel, Ph.D.—*Subject Matter Expert*

Anna Friedberg, J.D.—*Deputy Monitor*

Dennis Gonzales—*Director*

Pat Hurley—*Subject Matter Expert*

Alycia Karlovich—*Associate*

Emmitt Sparkman—*Subject Matter Expert*

## Table of Contents

Introduction ...................................................................................................................... 4

   Background ..................................................................................................................... 4

   The Voluntary Agreements .............................................................................................. 5

Compliance Summary ......................................................................................................... 6

Broader Considerations ....................................................................................................... 8

   Facility Management ....................................................................................................... 8

      Agency and Facility Leadership ................................................................................... 9

      Staffing Levels ........................................................................................................... 9

   Facility Safety ............................................................................................................... 13

      Data on Youth Violence and Injuries to Youth and Staff ................................................ 14

      Incidents Involving Serious Youth Violence .................................................................. 18

      Restraints ................................................................................................................. 20

      Ongoing Challenges ................................................................................................... 21

   ACS' Efforts to Address Safety and Security Issues ........................................................... 23

   Summary ..................................................................................................................... 25

Assessment of Compliance with the Substantive Provisions of the Third Agreement .................. 26

   ¶2(a). Protection from Unreasonable Risk of Harm ........................................................... 26

   ¶2(b). Incident Report Review and Referral ...................................................................... 29

   ¶2(c). Programming. ..................................................................................................... 35

   ¶2(d). Behavior Management. ......................................................................................... 39

Appendix A: Monthly Data on Youth-on-Youth and Youth-on-Staff Violence .............................. 47

Appendix B: Monthly Data on Physical and Mechanical Restraints ........................................... 49

Appendix C: Fourth Voluntary Agreement ............................................................................ 51

# Introduction

This is the Monitoring Team's sixth report on the conditions of confinement for 16- and 17-year-old Adolescent Offenders at the Horizon Juvenile Center (Horizon), as required by the Voluntary Agreements ("the Agreements") between the Monitor, the City of New York (the "City"), and the Administration of Children Services ("ACS") (dkt. entries 364, 502 and 672 of 11-cv-5845 (LTS)). This report provides a summary and assessment of the good faith efforts and work completed by the City and ACS to achieve compliance and advance the reforms required by the Agreement from July 1, 2023 to June 30, 2024 ("current monitoring period") as well as a summary of data, trends and patterns from the entire 42-month period during which the Agreements have been in effect (January 1, 2021 to June 30, 2024).

This report has three sections. The first provides background on the Monitoring Team's work with respect to 16- and 17-year-old incarcerated youth, followed by a description of the Agreements and a summary of the current state of affairs. The second section discusses the facility's management, safety and operation, which provides important context for discussing the progress that has occurred and the challenges that remain to achieve compliance with the provisions of the Third Voluntary Agreement. The final section presents a detailed compliance assessment for each of the provisions of the Third Voluntary Agreement.

## *Background*

The Monitoring Team first began to evaluate the conditions of detained 16- and 17-year-olds under the *Nunez* Consent Judgment (dkt. entry 249 of 11-cv-5845 (LTS)).[1] When the Consent Judgment went into effect in November 2015, incarcerated 16- and 17-year-olds were legally classified as adults and detained in an adult jail on Rikers Island, which is managed by the New York City Department of Correction ("the Department"). The Consent Judgment includes specific provisions regarding the management of this age group (§ XV ("Safety and Supervision of Inmates Under the Age of 19") and § XVI ("Inmate Discipline")) and separately requires the Department to seek off-island housing for youth younger than 18 ((§XVII "Housing Plan for Inmates Under the Age of 18", ¶1-3)). In 2017, New York State passed the Raise the Age law ("RTA") that raised the age of criminal responsibility to 18-years-old and created a new legal status for youth called "Adolescent Offenders," (AOs), which is defined as 16- and 17-year-olds who are charged with a felony-level offense. RTA was implemented in stages, with the AO category applying to any 16-year-old charged on or after October 1, 2018, and any 17-year-old

---

[1] *See* Monitor's First *Nunez* Report at pgs. 87 to 111, Second *Nunez* Report at pgs. 123 to 155, Third *Nunez* Report at pgs. 196 to 238, Fourth Nunez Report at pgs. 203 to 252, Fifth *Nunez* Report at pgs. 140 to 180, Sixth *Nunez* Report at pgs. 149 to 196, Seventh *Nunez* Report at pgs. 192 to 207, Eighth *Nunez* Report at pgs. 218 to 247, Ninth *Nunez* Report at pgs. 253 to 282, Tenth *Nunez* Report at pgs. 221 to 237.

charged on or after October 1, 2019. RTA also prohibited housing 16- and 17-year-olds on Rikers Island as of October 1, 2018.

By October 1, 2018, all 16- and 17-year-olds who were incarcerated on Rikers Island were transferred to the Horizon Juvenile Center, which, at the time, was jointly operated by the Department and ACS, where the Department was responsible for the care and custody of the 16- and 17- year-olds and ACS was responsible for programming and managing the provision of medical and mental health services. All 16- and 17-year-olds who were charged prior to the RTA effective dates for their age group were called, collectively, "Pre-Raise the Age (RTA) Youth." All Pre-RTA Youth remained at Horizon until they were sentenced, released to the community or residential programs, or they turned 18-years-old, at which time they were transferred to Rikers Island. The day-to-day management of Horizon also gradually shifted to become the sole responsibility of ACS. Since October 1, 2019, all 16- and 17-year-olds prosecuted pursuant to RTA are held in ACS custody if detained by the courts.

By the end of 2019, ACS had assumed full operational control of Horizon, save for a small number of Department staff who operated the front security gate and held transportation positions.[2] By July 27, 2020, the last Pre-RTA Youth was transferred out of Horizon, and the *Nunez* Monitoring Team suspended its monitoring activities under the Consent Judgment while the City, ACS, the Monitoring Team, and the Parties to the *Nunez* litigation determined the appropriate path forward given the change in circumstances.

### The Voluntary Agreements

In 2021, the City and ACS voluntarily entered into an agreement with the Monitoring Team concerning the supervision of 16- and 17-year-old AOs at Horizon during an 18-month period, January 2021 through June 2022 ("First Voluntary Agreement"). The First Voluntary Agreement included 10 substantive areas. In late 2022, the City and ACS extended the work with the Monitoring Team and entered into a second agreement for an additional 12 months (through June 2023) for continued monitoring of a subset of six of the original 10 substantive provisions ("Second Voluntary Agreement"). In late 2023, the City and ACS extended the work with the Monitoring Team and entered into a third agreement for an additional 12 months (through June 2024—the current monitoring period) for continued monitoring of a subset of four of the original 10 substantive provisions ("Third Voluntary Agreement").

During the time that the Third Voluntary Agreement is in effect (as with the previous Voluntary Agreements), the Monitoring Team will not assess compliance with the *Nunez* Consent Judgment's provisions pertaining to 16- and 17-year-olds. In addition, the *Nunez* Plaintiffs and

---

[2] As of August 2021, no DOC staff were deployed to Horizon.

the United States have agreed not to seek judicial action to enforce the portions of the *Nunez* Consent Judgment pertaining to this age group (*see* dkt. entry 673).

Per the terms of the Third Voluntary Agreement, the Monitoring Team is required to file a single report describing ACS' efforts during the reporting period, July 1, 2023 to June 30, 2024. The Third Voluntary Agreement includes four substantive provisions, all of which are discussed in detail in this report. For each provision, the Monitoring Team assesses current practice and applies a compliance rating.

The Monitoring Team and the City have agreed to voluntarily extend the agreement ("the Fourth Agreement," attached as Appendix C to this report) for an additional year, through June 30, 2025. Recognizing ACS' success in meeting the requirements related to programming (discussed in detail below), the Fourth Agreement includes only three provisions—those related to protecting youth from an unreasonable risk of harm, incident report review, and behavior management. The Monitoring Team will file a single report on the status of compliance after the monitoring period has concluded.

## Compliance Summary

Since January 2021, the Monitoring Team has worked closely with ACS and facility leaders at multiple levels to assess compliance, to discuss the various dynamics and potential obstacles that make reform challenging, and to supply information and examples from other jurisdictions that have confronted similar problems. ACS has worked in good faith with the Monitoring Team and the collaboration has been both transparent and productive.

When assessing ACS' level of compliance with the substantive provisions of the Third Voluntary Agreement, as required by ¶ 5(c), the Monitoring Team considered and described the broader context for our findings, including the challenges and obstacles presented to implementing the requirements of the Third Voluntary Agreement as well as the generally accepted practices for 16- and 17-year-old youth. Further, the Monitoring Team also gave due consideration to ACS' diligent and good faith efforts to implement the requirements of the Third Voluntary Agreement within the totality of the circumstances. For each of the substantive provisions enumerated in ¶ 2 of the Third Voluntary Agreement, ACS' efforts to implement the required practices are described, generally accepted practices are referenced, and key challenges and obstacles are highlighted. The compliance standard as defined in the Third Voluntary Agreement, ¶ 5, is whether "ACS has consistently complied with the relevant requirement and any violations of the relevant requirement are only minor or occasional and not systemic, material or recurring."

❖ **Protection from Harm (¶ 2(a)).** The facility's progress toward protecting youth from harm is mixed. Continued reductions in the overall *frequency* of youth violence were observed during the current monitoring period, with the rate of youth-on-youth assault and youth-on-staff assault approximately 45-65% lower than the rates at the time the Agreement went into effect. Staff continue to generally exhibit patience and to use force appropriately and proportionately, although there are still signs of correctional fatigue and some staff fail to enforce basic security practices which increases the risk of harm. The Monitoring Team also remains concerned about the risk of harm to youth due to the number of assaults involving sharpened weapons. Once the facility has fully implemented the incident review process and has shored up the behavior management program in key areas, its efforts to protect youth from an unreasonable risk of harm will be aligned with the generally accepted practice in the field of juvenile justice.

❖ **Incident Review (¶ 2(b)).** This provision requires ACS to timely and thoroughly review incidents that involve physical intervention to assess whether the intervention was appropriate and whether staff complied with policy. ACS has drafted policies for reporting and reviewing incidents and has a consistent record of coaching staff to improve practice and disciplining staff when appropriate. Although ACS and facility administrators reported that multiple levels of incident review occur (and the coaching/corrective action documentation suggests the same), the incident reviews and their substance are not documented systematically and the relevant policy has not been finalized. Other than a few summary reports and a spreadsheet with very brief entries for a small subset of incidents, ACS was unable to provide documentation that would offer evidence of compliance. Such documentation is important to ensure that appropriate follow up occurs and to be able to track patterns of misconduct across staff, locations, and circumstances. Just after the close of the monitoring period, ACS introduced a new tool for managers to record the substance of their incident reviews. If properly implemented, this tool should accelerate the trajectory toward compliance during the next monitoring period.

❖ **Programming (¶ 2(c)).** ACS continues to make substantial efforts to provide an array of developmentally appropriate programming to youth at Horizon by dedicating significant resources for ACS staff and vendors to provide structured activities. While data indicated that ACS' ambitious internal goal for program hours is achieved a little more than half the time, these same data reveal that even when the internal target is not met, the volume of programming delivered is within the generally accepted

practice in juvenile justice facilities throughout the country. Importantly, the facility has the necessary structures to monitor the volume of programming delivered and a consistent record of using that information to troubleshoot obstacles to program delivery. ACS has achieved compliance with this provision.

❖ **Behavior Management Program (¶ 2(d))**. ACS made important progress toward compliance with this provision via: (1) the deployment of Practice Improvement Coordinators and other managers to oversee and improve practice related to the mechanics of the behavior management system (STRIVE) and (2) the implementation of interdisciplinary Hall Meetings that review youths' progress in STRIVE and develop individualized supports for those who are struggling to succeed. Toward the end of the monitoring period, the completeness and accuracy of point card entries improved somewhat, although additional steps are needed to ensure the consistency and fairness of the system. Horizon continues to refresh and broaden the array of incentives that youth can earn when they meet behavioral expectations. Advances were also evident in the consequences for misconduct (i.e., Restorative Status) to improve proportionality and relevance to the nature of the misconduct. ACS plans to introduce a new tool to track restorative task completion which should enhance the fidelity of the system.

## Broader Considerations

During the current monitoring period (July 1, 2023 to June 30, 2024), facility safety and stability continued to benefit from the vision and approach of the current ACS and facility leaders. In addition, important hires at the middle management level (particularly the Executive Director of Operations, several Operations Managers and key positions within the ACS Police) made during the previous monitoring period have infused the vision of the agency's leadership further down into the ranks. During the current monitoring period, many of these new leaders hit their stride, shoring up the facility's security operation and advancing the facility's behavior management program. Staffing levels have improved somewhat and incremental progress in addressing the incidence of very serious violence and youth's access to contraband weapons and drugs is evident. The dynamics surrounding these issues are discussed in more detail below.

### *Facility Management*

An understanding of the dynamics surrounding compliance with the Agreement's provisions requires an overview of agency and facility leadership, and staffing trends.

- ### Agency and Facility Leadership

An important aspect of any reform effort is ensuring that the right leaders are in place, those who possess a safety- and youth-focused vision and those who recognize that staff wellness is an essential underpinning to achieve that vision. Horizon's operation has benefitted from consistent leadership at both the agency and the facility levels—and from the significant expertise and deep compassion of those leaders—for over two years. This has permitted the deepening and broadening of the vision for reform across facility managers, supervisors and line staff. In addition, deeper collaboration between Group Services (e.g., YDS, AYDS, TC and OM) and ACS Police has helped to push the security initiatives forward. Not only have various facility initiatives been sustained over time, but they have gradually brought staff at other levels into the fold—this is the essence of culture change and Horizon appears to be well on its way to success in this area.

- ### Staffing Levels

The provisions of the Third Voluntary Agreement address several of the key elements known to improve facility safety (*i.e.*, adequate youth supervision, programming, and behavior management practices; procedures to direct, guide and coach staff to improve skill mastery via incident reviews). As is detailed throughout this report, ACS is making substantial efforts to improve each of these areas of facility functioning and recognizes that the precursor to successfully implementing them is having an adequate number of staff. Like most juvenile justice agencies across the nation, ACS is having significant difficulty retaining sufficient numbers of direct care staff, a challenge that is compounded by concerns about facility safety. Solving this challenge is key to ACS' success.

Although ACS has hired many staff during the three and a half years since the Agreement went into effect, continuous attrition has undercut commensurate gains in staffing levels. The more gradual net accumulation of staff underlies many of the areas with slower progress toward compliance with the Agreement. Constant staff turnover not only presents a significant recruitment/training burden to the agency, but also undercuts efforts toward a gestalt of skill mastery among Horizon's staff. During the current Monitoring Period, ACS reported that attrition had slowed somewhat, and that the facility was continuing to make incremental progress toward its staffing goals, particularly retaining sufficient numbers of YDS/AYDS to control overtime and improve staff wellness and morale. Facility administrators often reported that "our staff are *tired,*" referring to the challenging nature of the job and the number of hours of overtime that most staff work.

During the current monitoring period, the Monitoring Team shifted its data collection strategy for assessing staffing levels to a format aligned with what ACS provides to other stakeholders, rather than the *ad hoc* format/metrics that were developed when the Agreement first went into effect in 2021. Although shifting to ACS' standard reporting format disrupts the ability to look at historical trends as reported by the Monitoring Team, the data is sufficient to assess current staffing levels. Not only does the change in reporting format reduce the burden of data collection on ACS, it also appropriately shifts the monitoring strategy toward one focused on ACS' internal capacity for oversight and sustainability. In addition to increasing facility safety, an overarching goal of the agreement is to create confidence that ACS has an internal capacity to identify and solve problems, which makes external oversight by the Monitoring Team less critical.

ACS has 300 budgeted YDS positions for Horizon.[3] During a 12-month period, August 2023 to July 2024, Horizon averaged about 207 YDS on the payroll (69% of the budgeted 300 positions). During July 2024, Horizon had the largest number of YDS on the payroll than at any period during the monitoring of the Agreements (236 YDS, or 79% of the 300 budgeted YDS positions for Horizon Group Services). As reported previously, the significant proportion of YDS on the payroll who are "inactive" (i.e., mostly work-related injury leave, but also sick leave) and thus are unable to work further stretches the workforce thin. In addition to an increasing number of YDS on the payroll during the current monitoring period, the proportion of inactive YDSs also decreased to 27%, compared to 34% in the previous monitoring period. Facility leaders reported that staff are returning to work more quickly following work-related injury leave. These improvements have led to greater YDS availability day-to-day (e.g., in July 2024, the facility had 180 active YDS, compared to only 142 in August 2023). Even so, most staff continue to work overtime multiple times each week to cover vacancies and call-outs by staff who were scheduled to work. Tour Commanders reported that of the ~35 YDS who are scheduled per shift, between 7 to 10 staff typically call-out and so staff must either be held over or brought in early.

The supervisory ranks have similar issues with vacancies and availability. As of July 2024, 49% of the facility's budgeted AYDS 1 positions, 82% of the facility's budgeted AYDS 2 positions, and 70% of the facility's Operations Managers positions were filled. These data somewhat overstate the issue of vacancies among AYDS 1s. During the current monitoring period, ACS added additional budgeted supervisory positions in an effort to increase the intensity of coaching

---

[3] In early 2021, ACS identified 337 as the target number of YDS needed to fully staff the facility, but this included YDS who were not assigned to group services/supervising youth on the housing units. The 300 budgeted positions cited in the new data focuses specifically on group services staff. ACS reports it has sufficient budgeted positions for ongoing hiring and will reevaluate its needs should the facility approach its budgeted headcount.

and guidance provided to its relatively new workforce. ACS does not intend to fill all of the AYDS 1 positions immediately, but instead gradually and over time as existing YDS gain the experience and skill set needed for the AYDS 1 position. That said, vacant supervisory positions coupled with call-outs by those who were scheduled to work cause the facility's supervisors to work significant amounts of overtime. That a segment of group services staff remains committed to the job even under these difficult conditions is laudable and speaks to the commitment and culture change that ACS and facility leaders are building. Fully staffing the facility to minimize the need for staff and supervisors to work overtime will have obvious benefits to staff wellness and morale.

The new staffing data provided to the Monitoring Team offers insight into the reasons for attrition among YDS. As shown in the table below, a total of 109 YDS were separated from the agency during the current monitoring period, 55% of whom resigned, 20% were terminated, and 22% were separated for other reasons. The number of resignations decreased 29% between the first half of the monitoring period (n=35, or an average of 5.8 per month) and the second half (n=25, or an average of 4.2 per month) which contributed to the increasing number of YDS who were available to work day-to-day. ACS attributes the improvements in retention to the facility's focus on staff coaching, guidance and supervision and the resulting increase in staff morale. Also, ACS, the NYC Office of Labor Relations and Office of Management and Budget extended and incorporated a retention bonus into the collective bargaining agreement ($5,000 twice annually for YDS/AYDS staff who meet the 90% attendance threshold for the duration of the newly signed labor agreement).

| Attrition Among YDS, July 2023 to June 2024 | | | | |
|---|---|---|---|---|
| Month | Total # | # Resigned | # Terminated | # Other* |
| July 2023 | 10 | 7 | 2 | 1 |
| August 2023 | 14 | 4 | 2 | 8 |
| September 2023 | 8 | 7 | 1 | 0 |
| October 2023 | 16 | 8 | 3 | 5 |
| November 2023 | 11 | 5 | 3 | 3 |
| December 2023 | 8 | 4 | 2 | 2 |
| January 2024 | 7 | 5 | 1 | 1 |
| February 2024 | 7 | 1 | 2 | 4 |
| March 2024 | 10 | 6 | 3 | 1 |
| April 2024 | 10 | 7 | 2 | 1 |
| May 2024 | 5 | 3 | 1 | 1 |

| Attrition Among YDS, July 2023 to June 2024 | | | | |
|---|---|---|---|---|
| Month | Total # | # Resigned | # Terminated | # Other* |
| June 2024 | 3 | 3 | 0 | 0 |
| TOTAL | 109 | 60 | 22 | 27 |
| % of total | 100% | 55% | 20% | 22% |
| *Includes Workers Compensation terminations (n=13), title changes (n=8), promotions (n=5) and individuals determined as not qualified for title (n=1).* | | | | |

ACS reports that staffing remains a key priority, and several initiatives reported in previous monitoring periods have continued:

- ACS revised the YDS job description to depict the job more accurately, particularly the unique combination of security and counseling skills required. However, the internal approval process has progressed more slowly than anticipated and the new job description is not yet in use.

- ACS developed a new training curriculum for supervisors to emphasize "soft skills" such as encouraging supervisors to recognize staff as people who may have problems outside the workplace and/or who may need individualized solutions in order to report to work with the appropriate mindset.

- ACS reports that Academy training for new recruits still needs to better recognize how Raise the Age changed the nature of the work and needs to revise its curricula accordingly. For example, hypotheticals and learning exercises should focus on developmental tasks, behaviors and effective responses for 18 to 20-year-olds, rather than those associated with much younger adolescents. Additionally, ACS reports that the Academy trainers could benefit from more direct interaction with facility leaders so that the requirements of the job and necessary skills are described accurately and with the appropriate emphasis and nuance. DYFJ has begun leadership-level conversations to update the content and instruction of ACS' Academy for new recruits to improve the preparation of YDS for the current dynamics in the facility.

- The facility's new Director of Performance and Learning has helped to bridge the gap in recruit training by focusing on acclimating new staff to the facility and facilitating skill mastery. Recent changes to On-the-Job Learning (OJL) are particularly compelling: instead of a group debriefing at the beginning/end of a shift, the Director checks in with new staff at much shorter intervals and helps

them to practice new skills (e.g., searching, youth movement), offering guidance to refine technique. In addition, prior to the beginning of each new staff's shift, the Director provides background on the Hall they've been assigned to, introduces the new YDS and the AYDS and holds a "circle-up" on the unit to introduce the new YDS and the youth. When interviewed by the Monitoring Team, several veteran staff commented that the onboarding process is much better now than when they began working at the facility.

- The facility continues to work on creating a sense of ownership and teamwork by consistently assigning YDSs, AYDSs and OMs to the same Hall day-to-day. This has reportedly created an opportunity for rapport to develop among staff, which helps them to better support the youth on their Hall since staff can collaborate on the support being delivered. Cohesiveness among staff was also identified as an important avenue for staff becoming more comfortable exercising their authority, enforcing rules, and holding youth accountable.

It is notable that ACS' various strategies to improve staff retention have been sustained and refined over several years when in other jurisdictions, such initiatives often lose steam and are abandoned. Furthermore, Horizon's demonstrable progress toward compliance with the provision related to behavior management (discussed later in this report) is particularly impressive considering that the improvements have been made by a workforce that regularly works double shifts in an incredibly difficult job.

## *Facility Safety*

This section first discusses data related to protecting youth from an unreasonable risk of harm, including important reductions in the rates of youth-on-youth assault and youth-on-staff assault and the larger proportions of incidents in which no injuries occurred among youth. Compared to when the Agreement first went into effect (January 2021), a significant decrease in the average monthly rate of physical restraint is evident, although it began to trend slightly upward toward the end of the current monitoring period. These improvements are very encouraging and are evidence of ACS's ability to sustain and build upon incremental improvements over a period of years. That said, the Monitoring Team remains concerned about incidents of serious violence, particularly those involving weapons. The types of serious violence that continue to occur at Horizon are described below (*e.g.*, youth's use of weapons, group assaults, serious assaults on staff). Next, various management challenges are discussed including those presented by youth's increasing length of stay, the presence of contraband, and the

relatively infrequent but serious signs of correctional fatigue among staff. Finally, ACS' efforts to address security vulnerabilities in partnership with ACS Police are discussed.

- ▪ Data on Youth Violence and Injuries to Youth and Staff

The data on youth violence and restraints is encouraging, with significant decreases evident across most of the key metrics.

- o *Youth-on-Youth Assault and Youth-on-Staff Assault*

As shown in the table below, the recent average monthly rate of **youth-on-youth assault** remains significantly lower than it was during the first year of monitoring (CY 2021). During the most recent 12-month period (FY 24), the average monthly rate was 0.58 (0.61 + 0.54 = 1.15/2 = 0.58) which is **48% lower** than the average monthly rate during CY 2021 (1.06 + 1.13 = 2.19/2 = 1.10). In fact, the average monthly rate of youth-on-youth assault has steadily declined throughout the time that the Agreement has been in effect.

Further, the recent average monthly rate of **youth-on-staff assault** remains significantly lower than it was during the first year of monitoring (CY 2021). During the most recent 12-month period (FY 24), the average monthly rate was 0.28 (0.19 + 0.36 = 0.55/2 = 0.28) which is **64% lower** than the average monthly rate during the CY 2021 (1.02 + 0.51 = 1.53/2 = 0.77).

| Average Monthly Rate of Youth Violence, January 1, 2021- June 30, 2024 [4] | | |
|---|---|---|
| Date | Youth-on-Youth Assault | Youth-on-Staff Assault |
| January-June 2021 | 1.06 | 1.02 |
| July-December 2021 | 1.13 | 0.51 |
| January-June 2022 | 1.06 | 0.77 |
| July-December 2022 | 0.64 | 0.30 |
| January-June 2023 | 0.72 | 0.39 |
| **July-December 2023** | **0.61** | **0.19** |
| **January-June 2024** | **0.54** | **0.36** |

These same data are shown in the line graph below to visually represent the significant reduction in the frequency of youth violence that has occurred. Appendix A provides monthly data on the number and rate of youth-on-youth and youth-on-staff assaults.

---

[4] Rate = ((# of incidents/# days in month)/ADP) * 100. See Appendix A for monthly data on the number and rate of youth-on-youth assault and youth-on-staff assault.



The continued reduction in the frequency of youth violence appears to be the result of various improvements that ACS continues to layer on its foundation. For example, improved collaboration between Group Services staff and ACS Police, more focused radio transmissions, and tighter youth movement have improved the security of the units and corridors and have begun to reduce the number of large-scale events. Deeper implementation of STRIVE (ACS' behavior management program) has brought a multi-disciplinary approach to supporting youth, more compelling incentives and more proportional consequences for misconduct. Program offerings are increasingly defined by their appeal to youth and age-appropriate focus. These developments are discussed in detail later in this report.

Undergirding all of these strategies are improved relationships between staff and youth and among staff of all disciplines who appear to be functioning more holistically as a team. When interviewed, most youth remarked on the care and support they receive from Horizon staff, believing that staff had their best interest in mind. When interviewed, staff commonly reported that certain aspects of the facility, especially the improved security practices and STRIVE have made them feel safer and have made their work with youth more interesting and less reactive.

    o   *Injuries Among Youth and Staff*

The intersection between the frequency of violence and the severity of violence is illustrated in the charts below. The first chart shows the proportion of assaults that resulted in each level of injury to AOs housed at the facility.[5] The different colored bars represent the type

---

[5] This injury data is *incident based*, meaning that it shows the number of incidents in which a certain type of injury occurred, not the number of youth who sustained each type of injury. It also includes only incidents/injuries involving AOs and does not include incidents/injuries among youth of other legal statuses.

of injury (blue = no injury, orange = less serious/Injury B, grey = more serious/Injury A).[6] Over time, the proportion of assaults involving *no injury* has generally increased, and rose to 71% during the first half of 2024. The proportion of assaults that involve a *serious injury* has fluctuated a bit but is typically between 5-10% of all incidents of violence.



The Monitoring Team watches the number/rate of A Injuries closely because of the connection to assaults involving the use of sharpened weapons. The table below presents data on youth injuries from a slightly different angle. A *rate* that controls for the size of the population shows that the frequency of A Injuries is the same as it was at the time the Agreement went into effect (average monthly rate was 0.05 during both the first 12 months and during the most recent 12 months). The *number* of A Injuries has increased during the period of time that the Agreement has been in effect (from an average of 0.66 per month in the first 12 months to an average of 1.25 per month in the most recent 12 months). However, the size of the facility's population has also increased during that time, which is why the rate has remained the same. The risk of harm involved makes ACS' continued efforts to prevent and detect the presence of contraband in the facility that much more essential.

---

[6] Injury A includes injuries requiring clinical treatment beyond what can be provided by a layperson with over-the-counter products. Injury B includes injuries that are treatable by a layperson with over-the-counter products such as ibuprofen, antibiotic ointment, ice packs, etc. All injury classifications are made by medical staff.

Both the *number* and the *rate* of B Injuries has decreased since January 2021 when the Agreement first went into effect. The average number of B Injuries per month decreased from 6.92 during the first 12 months to 4.08 during the most recent 12 months. Controlling for the increase in the youth population at Horizon, the average monthly rate of B Injuries was 0.45 during the first 12 months and 0.15 during the most recent 12 months. Concerns about the use of sharpened weapons notwithstanding, these data provide evidence that the facility has become safer for youth.

| Rate and Number of Injury A and Injury B, January 1, 2021- June 30, 2024 | | | | |
|---|---|---|---|---|
| Date | Number Injury A | Rate Injury A | Number Injury B | Rate Injury B |
| January-June 2021 | 6 | 0.08 | 32 | 0.45 |
| July-December 2021 | 2 | 0.02 | 51 | 0.46 |
| January-June 2022 | 6 | 0.05 | 52 | 0.42 |
| July-December 2022 | 8 | 0.06 | 29 | 0.21 |
| January-June 2023 | 16 | 0.10 | 32 | 0.21 |
| **July-December 2023** | **10** | **0.06** | **29** | **0.18** |
| **January-June 2024** | **5** | **0.03** | **20** | **0.12** |

As noted above, the rate of youth-on-staff assault has declined significantly compared to the earliest monitoring periods. However, a little more than half of youth-on-staff assaults continue to result in staff injury (i.e., the orange bars in the chart below), some of them serious.



The table below shows staff injury data from a slightly different perspective. The *rate* of staff injury per capita decreased significantly—from 0.31 during the first 12 months to 0.15 during the most recent 12 months. Regarding the *number* of injuries, the average number of staff injuries per month during the first 12 months after the Agreement went into effect was 4.3, which is very similar to the average during the most recent 12 months, 4.1.

| Number and Rate of Staff Injuries, January 2021-June 2024 | | |
|---|---|---|
| Date | Number of Injuries | Rate of Injuries |
| January-June 2021 | 28 | 0.41 |
| July-December 2021 | 24 | 0.21 |
| January-June 2022 | 50 | 0.41 |
| July-December 2022 | 20 | 0.14 |
| January-June 2023 | 33 | 0.22 |
| **July-December 2023** | **17** | **0.11** |
| **January-June 2024** | **32** | **0.20** |

In summary, both youth and staff were injured via youth violence significantly less often during the most recent 12 months as compared to the 12-month period when the Agreement first went into effect. This has obvious benefits for youth and staff wellness, and also allows the facility to operate in a more predictable fashion given the increased order and safety.

- ### Incidents Involving Serious Youth Violence

While the overall rate of youth violence has been significantly reduced since monitoring began, the Monitoring Team remains concerned about the frequency of serious violence, particularly incidents involving dangerous weapons and serious assaults on staff (including strangulation holds) that continue to occur. A similar number of serious incidents with equally troubling circumstances occurred during the previous three monitoring periods. The facility's continued efforts to reduce the availability of weapons and to prevent group disturbances by better controlling door access and youth movement will have substantial preventative value. The list below describes events that occurred at Horizon during the current monitoring period.

- <u>Multiple incidents occurred in which youth used sharp weapons to slash or stab the victim</u>. For example, a youth was cut on the face, requiring 11 stitches to close the laceration. Another youth was kicked, punched and dragged across the floor by multiple assailants and during the barrage, received a 10cm laceration to his back. In another attack on a youth by multiple assailants, a youth received deep lacerations to his face and

back, each requiring 20 stitches. A major disturbance between two housing units resulted in deep lacerations to one youth's arm and abdomen and multiple lacerations to another youth's forehead, hand, eyebrow, ear and wrist. A fight between two youth resulted in one youth receiving 10 stitches to his neck and three staples to his head as a result of cuts from a scalpel. While staff attempted to intervene in each event, they were simply overwhelmed by the cascade of events.

- <u>Serious assaults on staff continued to occur</u>. Youth have assaulted staff during youth's attempts to get staff's keys or to breach a door and during staff's attempts to break up an altercation. At times, youth have deliberately targeted staff and assaulted them without warning. In one incident, the staff was lured into a room and was assaulted, resulting in a broken finger and brief period of unconsciousness. Staff have been punched, headbutted, placed in strangulation holds, and hit in the head with objects. While many staff were not seriously injured by the assault and remained on shift, a significant number of others needed to leave work to seek medical attention, and some remained on injury leave for a significant period of time. When interviewed, staff reported that youth threaten harm when they refuse to procure contraband and, in some cases, have threatened harm to staff's family members. The resulting fear and uncertainty reportedly cause some staff to adopt a passive supervision style and to refrain from intervening even when necessary.

- <u>Youth continued to attack staff to access keys and/or aggressively pushed past staff when housing unit and hallway doors were unlocked in order to access rivals from other housing units</u>. Although the facility appears to have reduced the frequency of these events compared to previous monitoring periods, they continue to occur, and some have led to large scale disturbances in which both staff and youth were injured.

All juvenile facilities with which the Monitoring Team is familiar confront the problem of youth violence. What distinguishes the violence at Horizon is the frequency with which youth utilize sharpened weapons in their altercations, the frequency with which staff are deliberately assaulted, and the prevalence of large group disturbances. These are serious situations, and the frequency of critical injury would be even higher without the heroic efforts of some staff to protect the youth who are the targets of the assaults. The Monitoring Team observed video footage of multiple events where large numbers of staff responded quickly and jumped into the fray to shield the victim from further attack, often jeopardizing their own safety in the process of protecting youth.

▪ Restraints

The facility achieved compliance with the provision related to the appropriate use of physical intervention/restraints in early 2023. The provision was not included in the Third Agreement and the issue is not actively monitored. However, the need for physical intervention by staff continues to be part of the ethos of the facility and provides important commentary on changes to the facility's level of disorder.

| Average Monthly Rate of Physical and Mechanical Restraint, January 2021-June 2024 [7] | | |
|---|---|---|
| Date | Physical Intervention | Mechanical Restraint |
| January-June 2021 | 2.51 | 0.43 |
| July-December 2021 | 1.69 | 0.28 |
| January-June 2022 | 1.55 | 0.37 |
| July-December 2022 | 0.53 | 0.18 |
| January-June 2023 | 0.44 | 0.26 |
| **July-December 2023** | **0.39** | **0.11** |
| **January-June 2024** | **0.73** | **0.32** |

As shown in the table above, the recent average monthly rate of **physical intervention** remains significantly lower than it was during the first year of monitoring (CY 2021). During the most recent 12-month period (FY 2024), the average monthly rate was 0.42 (0.39 + 0.73 = 1.12/2 = 0.56) which is **73% lower** than the average monthly rate during the first 12-months of monitoring (2.51 + 1.69 = 4.20/2 = 2.10). Similarly, the recent average monthly rate of **mechanical intervention** remains significantly lower than it was during the first year of monitoring (CY 2021). During the most recent 12-month period (FY 2024), the average monthly rate was 0.19 (0.11 + 0.32 = 0.43/2 = 0.22) which is **38% lower** than the average monthly rate during the first 12-months of monitoring (0.43 + 0.28 = 0.71/2 = 0.36).

---

[7] Rate = ((# of incidents/# days in month)/ADP) * 100. Accurately interpreting the data regarding the use of restraints requires some important context and considerations. First, ACS maintains restraint data that tabulates the number of *youth* who were restrained (in contrast to data on youth violence reviewed in the Introduction above, which tabulates the number of *incidents)*. This means if six youth were involved in an assault and all six were restrained, the data related to that incident would include <u>one</u> assault and <u>six</u> restraints. Second, it is also important to recognize that not all acts of violence lead to a restraint (*e.g.*, the youth involved could cease their activity based on staff's verbal commands). Further, restraints are also used to respond to youth behaviors other than acts of violence (*e.g.*, a youth who is physically aggressive and posing an imminent risk of physical harm to another's safety may be restrained prior to an assault actually occurring). Finally, ACS's physical restraint data only includes a very specific category of physical intervention used by staff on residents—known as Emergency Safety Physical Interventions ("ESPIs") under the Safe Crisis Management ("SCM") framework

Notably, the monthly average rate of physical intervention nearly doubled from the first half of the current monitoring period (0.39) to the second half (0.73). ACS attributes this increase to increasing housing density and staff becoming more confident in the assertive application of restraints (rather than passively observing an incident unfold without intervention). While this may not explain the entire increase, the Monitoring Team's routine review of incidents continued to reveal that staff generally used physical restraint only when necessary and in a manner that was proportional to the risk of harm in order to regain operational control. During the current monitoring period, ACS reported that only two youth sustained injury (both very minor) during the application of restraints. Finally, when viewed from the broader perspective of assessing improvement during the time the Agreement has been in effect, the overall decreasing rates of restraint indicate that the facility's environment has calmed considerably since the tumultuous times of 2021.

- ▪ Ongoing Challenges

ACS faces a number of challenges to the safe operation of the facility resulting from both external and internal dynamics. First, COVID-related delays in case processing and the severity of most youth's charges result in extended stays in detention for many youth, a significant number of whom remain at Horizon for more than one year.[8] Youth's long lengths of stay have pushed the facility's population higher (from an ADP of 105 previously, to an ADP of 115 during the current monitoring period) which directly impacts the density, composition and interpersonal dynamics on the housing units, restricts housing flexibility and presents challenges for providing services to a larger number of youth.

Second, an alarming volume of contraband continues to be detected/recovered at the facility. For example, per the GOALS reports, during a two-week period in March 2024, approximately 30 razors/scalpels/sharpened objects were recovered during routine searches. Furthermore, searches routinely detect and seize marijuana (at times, apparently packaged for distribution), tobacco, cell phones and chargers, cash and other evidence of financial transactions (*i.e.*, numbers connected to electronic payment accounts). ACS reports that both visitors and staff are complicit and that several arrests/terminations have occurred as a result. The presence of weapons and drugs in any facility—particularly when staff are responsible, even in part—has serious consequences for the quality of supervision, staff-youth dynamics, and the extent to which staff trust each other and are able to work as a cohesive unit. As discussed in more detail below, the facility has taken important steps to prevent the introduction of

---

[8] In June 2024, approximately two-thirds of Horizon's youth were being detained on Murder or Attempted Murder, and the remainder were in custody on Assault, Weapons or Robbery charges.

contraband, to detect and seize contraband, and to identify and address staff who are complicit in the contraband trade. Interviews with staff during the Monitoring Team's June 2024 site visit revealed that staff believe that the administration takes the issue seriously and takes quick action on intelligence it receives. Facility administrators confirmed that the contraband problem remains one of its top priorities.

Finally, the difficult work of direct care staff cannot be understated and is even more demanding in a facility where so many youth have histories involving perpetrating, witnessing and being the victim of serious violence. This combination leads to complex peer dynamics and challenging behavioral health profiles that can test the patience of even the most skilled staff, all of whom regularly work long hours to fill the gaps created by staffing shortages and call-outs. Some staff are showing signs of corrections fatigue,[9] evidenced by their inappropriate responses to a variety of events, either failing to intervene in situations where decisive action was clearly warranted or responding aggressively to youth's provocations. During the current monitoring period, a number of incidents were exacerbated by staff whose frustration and/or antagonistic demeanor led to their mistreatment of youth, and in some cases, led to their employment being terminated.

Facility administrators work to minimize the risk of staff losing their composure and behaving unprofessionally. Administrators have deep compassion for the demands placed on their staff. They regularly check-in with staff and provide additional support, accommodations and respite when they see staff have not arrived to work with the necessary mindset and patience. During the Monitoring Team's site visit in June 2024, multiple supervisors commented that part of their responsibility is to assess staff's readiness, day-to-day, to perform the difficult jobs they are tasked to do. That this responsibility has trickled down from the highest levels of administration to line-level supervisors is encouraging. Continued efforts to implement the tools required by the Agreement will facilitate the goal of protecting youth from an unreasonable risk of harm (particularly, documenting the findings of incident reviews to ensure appropriate coaching and corrective action occurs when necessary to improve staff's skill mastery).

---

[9] "Corrections Fatigue," or burnout among those who work in correctional settings, refers to staff's loss of caring about the people they work with and inability to sustain the kind of care and commitment that is the essence of the work. Corrections fatigue can manifest in a variety of different ways, commonly including the development of negative attitudes about the work, the failure to act when necessary as well as taking actions that are excessive, unnecessary and/or abusive. The perceived or actual threat of violence increases the risk of burnout.

## ACS' Efforts to Address Safety and Security Issues

One of the Deputy Commissioner's priorities has been to enhance the security operation at Horizon. Various consultants have been engaged to assist in this area, and a number of new and/or fortified practices have been developed.

- **Improved Supervisor Tours.** An important step toward infusing the ranks with agency and facility leaders' safety- and youth-focused vision has been ensuring that supervisors of all levels make frequent tours of the housing units to offer support and to guide staff practice, to model constructive responses to youth's concerns and strategies for resolving interpersonal conflict and to facilitate the delivery of programming. These tours, and the supervisors' findings, are now documented on a "Tour of Inspection Form" which brings greater accountability to the expectation that supervisors maintain a strong presence on the housing units. The forms collect information on basic security practices such as whether room doors are secure, whether vision panels are obstructed, physical plant issues, etc. When interviewed, supervisors described the interactive nature of their tours by sharing the types of guidance they thought was most helpful to YDS (e.g., "show them how to diffuse tension rather than matching the youth's level of escalation" and "you need to be an hour ahead of the Hall's schedule so that you know what is coming next and can start preparing for that transition earlier than you think you'd need to").

- **Improvements Within ACS Police and Collaboration with Group Services.** ACS Police were reorganized in June 2023 and their training has been both lengthened and enhanced. Approximately 20 officer positions remain vacant, but overtime is significantly reduced compared to past monitoring periods. When interviewed, both group services' staff (YDS, AYDS, TC and OM) and ACS Police commented on the strength of the relationship and that their more functional collaboration allows them to bring incidents under control more quickly and has improved the fruitfulness of various search operations. They also observed less "finger pointing" and better efforts to unpack the problem in order to find a solution. While ACS police have constructive relationships with youth, they are not overly familiar because youth must recognize that their presence on the units indicates that a serious situation has occurred. ACS' internal law enforcement presence is an important aspect of incident response and is aligned with the generally accepted practice for juvenile facilities in which the need for involvement from external law enforcement agencies should be minimized.

- **Improved Search Procedures at the Front Gate.** Search procedures for staff, vendors and visitors entering through the facility's front gate have improved. A larger number of ACS

Police are now available which means that the front gate has additional manpower to ensure that all search functions (*e.g.*, observation, line scan, magnometer and wanding) are given proper attention. Several staff reported to the Monitoring Team that front gate search procedures are more thorough than they have been in the past.

- **Improved Search Technology and Search Protocol**. In October 2023, ACS issued an Operations Order for "Enhanced Youth Search Procedures" as a supplement to the existing "Contraband Searches" policy. It requires all youth entering and exiting the facility to undergo a personal search (i.e., strip search), to sit and place each side of the face on the Body Orifice Security Scanner ("BOSS Chair"), to be wanded with the handheld transfrisker when clothed and while in their undergarments, to have their clothing searched by hand, transfrisker and BOSS Chair, and to clear the magnetometers. These searches are completed by ACS Police Sergeants/designee and Tour Commander/OM. Assigning staff at the supervisory level to this task and requiring the searches to be done collaboratively is intended to increase the efficacy of the searches. ACS is also procuring state-of-the-art Rohde Schwarz millimeter wave body scanners for this purpose, which ACS anticipates will be available for use during the next monitoring period.

- **Improved Facility Searches**. Facility searches are reportedly more frequent and more thorough. Unannounced searches occur at least weekly and on varying shifts, and search teams are also quickly assembled in response to incidents or information. Contraband recovery incidents have reportedly increased 40%. Among the GOALS reports from early 2024, the Monitoring Team noted several early morning search operations of the housing units that recovered a significant volume of contraband.

- **Improved Facility Movement**. Hallway movement continues to improve with more specific radio transmissions, vigilance from control room operators, and consistent reminders/guidance during Roll Call and incident debriefings. The Monitoring Team has also observed staff being more thoughtful about containing large-scale incidents by keeping doors secured to limit an incident's expansion.

- **Improved Key Control**. Key control strategies have become more nuanced. Decisions about how keys should be distributed are constantly reassessed depending on the day's schedule and where/how groups could intersect in hallways. Focusing on these "pinch points" in the building where incidents tend to occur, facility leaders ensure keys are distributed in a more limited fashion and increase the presence of supervisors/ACS

Police. Incident trends among certain housing units and groups of youth also inform how keys are distributed to staff.

These are important improvements to the security functions at the facility that appear to be incrementally enhancing youth and staff safety.

## Summary

In summary, compelling reductions in the *frequency* of youth violence were sustained during the current monitoring period, particularly as compared to the levels witnessed when the Agreement first went into effect. However, serious incidents involving group assaults of a single victim—some involving sharpened weapons—continue, presenting a high risk of serious injury or disfigurement. ACS continues to develop and implement strategies to improve overall security, address operational vulnerabilities, improve staff support and response time, and to reduce the availability of weapons and illicit substances. These efforts are essential to mitigate the risk of harm to youth and staff, and to create a safer facility. The expanded corps of facility managers who provide on-going guidance and coaching is an important strategy for ensuring that essential security precautions are implemented with fidelity.

The scope and quality of information shared with the Monitoring Team, ACS' openness to feedback, and the various steps ACS has undertaken or plans to undertake to elevate the level of performance in each of the substantive areas demonstrated ACS' deliberate good faith efforts to improve its practice (as required by ¶ 1 of the Agreement). These good faith efforts demonstrate ACS's potential and willingness to remediate the remaining practice and performance gaps, stabilize the facility, and reduce the risk of harm from serious violence.

Throughout the remainder of this report, current practice in each area of the four provisions of the Third Voluntary Agreement is assessed. The Monitoring Team's assessment was informed by the analysis of a variety of documents, incident reports and video footage; collaborative discussions with ACS leadership who responded to questions and provided important details about their steps toward compliance and facility improvement plans; observations and interviews conducted while on-site in June 2024; and ACS' written assessment of practice in each area. This methodology provided a multi-faceted vantage point from which both progress and areas in need of continued improvement could be identified. ACS has been both transparent and candid about its journey toward implementing its vision for providing quality care.

## Assessment of Compliance with the Substantive Provisions of the Third Agreement

**¶2(a). Protection from Unreasonable Risk of Harm**. AO Youth shall be supervised at all times in a manner that protects them from an unreasonable risk of harm. Staff shall intervene in a timely manner to prevent youth-on-youth fights and assaults, and to de-escalate youth-on-youth confrontations, as soon as it is practicable and reasonably safe to do so.

**ACS Policy & Practice.**
- As a Specialized Secure Detention Facility that is authorized to house Adolescent Offenders (AOs), Horizon must abide by OCFS Regulation 9 CRR-NY 180-3.11 "Staffing and Supervision of Youth."
  - This regulation requires a 1:6 ratio of YDSs to youth and requires a minimum of two staff in each area except when a staff is escorting an individual youth within the building.
  - The regulation also requires a sufficient number of supervisors to adequately supervise direct care staff and to provide relief coverage when needed on the units.
  - The regulation also requires facilities to have a separate unit of staff to respond to emergency situations that require additional de-escalation and crisis intervention. At Horizon, the ACS Police provide reinforcement for the YDSs, as the ACS Police can apply mechanical restraints when necessary and have arrest powers (in addition to other duties such as managing the front gate, live video monitoring, perimeter security, transportation, etc.).
- ACS Policy #2014/10 "Safe Intervention Policy for Secure and Non-Secure Detention" provides guidelines for staff to follow "when they are required to contain the acute physical behavior of youth." It emphasizes that the primary purpose of emergency interventions is to protect the safety of youth and staff. While staff must utilize the least amount of force necessary, the policy also reinforces that staff have a duty to act to protect youth or staff from harm due to assaultive or violent behavior.
  - ACS utilizes Safe Crisis Management (SCM) to promote safety and to guide physical interventions when needed.
  - SCM's practice guidelines include more than the use of physical intervention. They also require staff to utilize "primary strategies" to prevent incidents from occurring (*e.g.*, structured daily schedule, behavior management system that teaches necessary skills, etc.); a range of non-verbal and verbal "secondary strategies"; and trained physical intervention techniques.
  - SCM requires both youth and staff to engage in a de-briefing protocol within 24 hours of a physical intervention.
- ACS Policy #2018/09 "Behavior Management in Secure and Specialized Secure Detention" articulates the importance of a pathway toward physical and emotional safety:

- o §V ¶A "When youth sense that they are at risk of harm, the entire rehabilitative process is undermined."
- o §V ¶C "Staff shall be deployed in a manner that maximizes visibility and maintains a high degree of supervision throughout the facility, maintaining appropriate staff ratios at all times…"
- o §V ¶D "Predictability and structure are hallmarks of a safe and therapeutic environment. Staff of multiple disciplines and varying levels of seniority shall work together to develop daily programming and activities that are meaningful to youth and minimize idle time on the living unit."
- ACS Policy #01/2012 "Reporting of Incidents and Data Management for Group Oriented Analysis Leadership Strategies (GOALS)" outlines procedures necessary for comprehensive, accurate reporting of incidents that occur in ACS facilities. This type of information is essential for creating an accurate record of what occurred, and it is also critical to ensure uniform, valid data on key indicators regarding facility safety.
  - o An "incident" is defined as "any event which might adversely affect the health, safety, and/or security of residents, staff, or the communication or with impacts on a facility, the agency, or agency property."
- ACS maintains quantitative data regarding youth-on-youth assaults, youth-on-staff assaults, physical aggression, threats, physical intervention and mechanical restraints along with narrative summaries of all incidents occurring at Horizon.
- The Deputy Commissioner and facility leadership continue to work to ensure that all direct care staff at Horizon (*i.e.*, YDS, AYDS, TC, OM and ACS Police) collaborate effectively to improve safety and security at the facility.

**Monitoring Team's Analysis**.

Assessing the risk of harm must necessarily examine the totality of the circumstances in the facility. At Horizon, a risk of harm in the facility remains, but several positive trends are evident as discussed in the Introduction to this report. The rate of youth violence has remained relatively low for the past 24 months which, importantly, reduces the level of chaos, disorder and fear among both staff and youth. Fewer disruptions also make it more likely that programming, school, and efforts to develop trust and constructive rapport among youth and staff can occur. In making the compliance assessment, the Monitoring Team reflected on the issues discussed the *Facility Safety* section above and the details are not repeated here. Compliance with the remaining provisions of the Agreement is required to demonstrate that the facility's approach to protecting youth from an unreasonable risk of harm lies within the generally accepted practice in the field.

Staffing, the most important aspect of any facility's operation, has slowly improved over time, with July 2024 having the largest number of YDS on the payroll and the largest proportion who are "active" since the Agreement went into effect. Staff at all levels frequently work overtime, but the facility leaders' focus on staff wellness appears to be well received by staff and may be reducing staff turnover. Newly expanded ranks of supervisors (AYDSs and OMs) are providing shoulder-to-shoulder guidance to the relatively new corps of YDSs, which

is helping to increase their skill set and confidence. A more thoughtful approach to on-the-job learning and onboarding by the facility's Director of Performance and Learning appears to be reducing the frequency of turnover among new recruits. In short, the facility's staffing situation is steadily becoming an asset to the facility's operation, rather than an obstacle to achieving compliance as was the case in the past.

The Monitoring Team remains concerned about a few key aspects of the facility's operation that directly relate to the risk of harm. One is related to the quality of youth supervision by YDSs and one is related to the frequency of serious violence via the use of sharpened weapons, both of which are directly related to the risk of harm. Regarding youth supervision, the concern is primarily about some staff's *inaction* or failure to address circumstances on the housing units that led directly to the risk of harm (e.g., unsecured cell doors, obstructed cell door windows, permitting multiple youth to congregate in a cell, failing to intervene in a disruption on the unit, other basic security lapses). This passivity by staff is not uncommon among those newer to the job, as they must develop the skills and confidence to properly exercise their authority. Staff inaction is one of the main practice problems that a robust incident review process could, and should, detect. As noted in ¶ 2(b) below, ACS has yet to systematically document the substance of its reviews such that it would be possible to determine (among other things) whether staff's inaction or failure to supervise is being detected when it occurs.

Second, as noted in the Introduction, the Monitoring Team is concerned about the frequency with which youth assault others using sharpened weapons. ACS has implemented a prevention strategy with several security-related components, also described in the Introduction to this report. Staff's actions when an episode of violence does erupt are reasonable and appropriate, including protective actions when staff put themselves in harm's way by shielding the intended victim with their own body. That said, a standard element of an effective violence prevention strategy is the effort to deter youth from this behavior via a compelling behavior management program that both incentivizes non-violent behavior and responds consistently and proportionally to violent behavior when it occurs. As discussed in ¶ 2(d) below, the facility has made important progress toward implementing a robust behavior management system, but a few key steps remain to ensure the accuracy of staff's behavior assessments via point cards and the fidelity and proportionality of the response to misconduct via Restorative Status.

Finally, part of the impetus to remove youth from Rikers Island via the Consent Judgment was to better protect young people from the dangers of staff's excessive use of force. Although rare, instances of aggressive staff responses to youth have occurred at Horizon. ACS took corrective action in each case, but vigilance to ensure the response is proportional to the severity of what occurred is essential, particularly among staff who have repeated such behavior. Even when deference to correctional fatigue is warranted, corrective action must still be sufficient to change staff's behavior and reduce the risk of subsequent harm to youth. This is part of what a robust incident review process should consider, as described in more detail in ¶ 2(b), below.

In summary, ACS continues to make progress toward the overall goal of supervising youth in a manner that protects them from an unreasonable risk of harm, and its plans to address the remaining issues regarding incident reviews and the behavior management program should align the facility with the generally accepted practices for protecting youth from an unreasonable risk of harm.

**Compliance Rating**. Progress Made, but Compliance not yet Achieved

**¶2(b). Incident Report Review and Referral.** ACS shall conduct timely and thorough reviews of incidents involving Physical Restraints to determine whether the intervention was appropriate and whether ACS staff complied with the ACS Physical Restraint Policies.

**ACS Policy & Practice.**
- ACS Policy #01/2012 "Reporting of Incidents and Data Management for Group Oriented Analysis Leadership of Strategies (GOALS)" creates a procedure for comprehensive, accurate reporting of incidents that occur in ACS facilities. GOALS reports are created for every incident occurring in the facility, including physical restraints, mechanical restraints, etc. as noted in ¶ 2(a), above.
- ACS Policy #2014/10 "Safe Intervention Policy for Secure and Non-Secure Detention" requires that:
  (1) any use of an ESPI on a resident must be immediately reported to a supervisor or Tour Commander, and each staff member involved in or who witnessed the event must submit an Incident Report form.
  (2) a supervisor must complete the "Supervisory Follow-Up" portion of the Incident Report Form.
  (3) Executive Directors must review all Incident Report Forms involving an ESPI within 48 hours.
- ACS Policy #2022/03 "Incident Review in Secure and Specialized Secure Detention" was revised and submitted to the Office of Children and Families for approval in mid-July 2023. The draft policy:
  o Requires staff who were involved in or who witnessed the event to complete an incident report. The Incident Report Form has required fields including basic information such as date, time, and youth involved; a general narrative section; and an ESPI-specific portion where staff must identify the type of physical restraint utilized, its duration, and other information specific to the physical restraint.
  o Identifies responsible parties and provides guidance for the compilation of incident report packages.
  o Establishes layers of supervisory review for all incidents, and heightened scrutiny for "critical" incidents.

- ▪ These procedures, among other things, require supervisors to review all staff incident reports to ensure they are detailed and complete, and to complete the "Supervisory Follow-Up" section of the incident report. This section includes information regarding restraints, injury and medical follow-up, youth and staff debriefing, and any necessary reporting to the Justice Center. This section of the form also requires a short narrative of the supervisor's findings which according to policy must "include any disciplinary action or recommendation, as well as commendations."
    - ▪ Once the incident report package is compiled and finalized by a supervisor, the policy requires the Operations Manager to complete a Manager's Report for all critical incidents, significant incidents, child abuse allegations and any incidents that resulted in serious injury.[10] This report must include, among other things, a description of the incident including what is learned from a review of video footage, follow-up actions, and any recommendations for staff training or disciplinary action. A Manager's Report should also identify any issues that the initial supervisor's review failed to detect.
  - ○ Articulates a process and related forms for documenting any required corrective action, including ELU referrals.
    - ▪ These actions have been tracked in a "Corrective Action Tracker" since November 2022.
    - ▪ If any corrective action is recommended, the Executive Director of Operations or the Associate Commissioner must approve and then document any facility-based corrective actions and must prepare the necessary Employment Law Unit ("ELU") referrals for formal discipline. All ELU referrals must be approved by the Deputy Commissioner. The Deputy Commissioner must also review incidents involving child abuse allegations, other egregious acts or injuries and must approve any arrests (of youth or staff) related to an incident.
- • In response to OCFS' feedback on the draft policy, ACS recognized a need to better categorize/define some of the incident types discussed in the policy. In addition, ACS' planned transition to a new incident reporting platform to replace GOALS may also result in some modification to the policy. This may present an opportunity to retool certain components to better address the requirements of this provision.

---

[10] Policy defines a Critical Incident as "any occurrence or event in a facility or involving staff, volunteers, youth or visitors that has an impact on the safety, well-being, functioning or security of the facility or staff, volunteers, youth or visitors." Attachment A of the policy lists and defines the following critical incident types: attempted escape, birth, child abuse allegation-external, child abuse allegation-internal, contraband, death, employee misconduct, escape, fire, fractures, group action, head injuries, hostage situations, loss of consciousness, lost keys, lost shields/identification, major disorder, miscarriage, natural/civil emergency, physical altercation with injury, physical assault, sexual abuse/assault, and suicide attempt.

- For all incidents reported to GOALS, ACS reports additional layers of supervisory review:
  - o Operations Managers review each incident on their assigned tour in order to complete incident reporting requirements, to view and preserve video, initiate corrective action for staff and advise facility leadership.
  - o A subject-matter expert from the National Partnership for Juvenile Services (NPJS) convenes reviews of selected incidents in conjunction with senior staff to support ongoing learning and to provide coaching to the staff involved.
  - o The Director of Performance and Learning reviews incidents to identify the strengths and skill deficits of new staff in order to individualize the coaching, training and support new staff receive.
  - o Facility leadership reviews incidents to follow up on prior levels of review, to provide necessary information to oversight entities and to make decisions regarding corrective action and discipline.

**Monitoring Team's Analysis**.

As discussed in previous Monitor's Reports, ACS' effort to develop a practical policy that meets the requirements of this provision of the Agreement is requiring considerable time and multiple revisions. The most recent draft policy was submitted to OCFS for approval in July 2023 but has not yet been approved and is pending additional revision. Many of the steps appear to be in place, but the substance of the various reviews is not documented in a manner that provides evidence of the procedures to meet the requirements of this provision. In addition, the Monitoring Team has seen little evidence that staff's reporting practices (i.e., providing incident reports that are specific and offer detailed descriptions of staff's actions) are receiving the necessary attention. ACS reports that it intends to revise the July 2023 version of the draft policy to clarify some of the definitions and procedures. This may be an opportunity to further retool the procedures to ensure that the policy reflects the procedures for documentation discussed here.

The value of assessing and guiding staff practice via a formal review of incidents involving physical intervention, assaultive behaviors and security failures cannot be understated, particularly for a facility with an inexperienced workforce like Horizon. Furthermore, a robust review of such incidents is the first step of an essential procedure to detect staff misconduct and to apply corrective action when warranted. Finally, a robust incident review process is essential evidence of the facility's *internal* ability to recognize and address staff's policy violations, potential mistreatment and/or inappropriate relationships, thereby making *external* oversight by the Monitoring Team less critical.

- *The Generally Accepted Practice in Juvenile Facilities*

The generally accepted practice for juvenile facilities includes that all incidents must be reported, in detail, to permit responses to both youth misconduct (discussed in the Behavior Management section of this report, below) and to address any staff practices in need of remediation or that may warrant corrective action. ACS has an adequate mechanism for

reporting incidents internally, including all physical restraints, via staff incident reports and the GOALS summaries of those incidents.

Further, the generally accepted practice requires supervisors to conduct a systematic review of incident reports, with the more serious incidents moving further up the chain of command. These reviews provide an opportunity to understand the underlying dynamics of the event, to ensure that youth received any necessary follow-up services and, importantly, to assess staff practice. On an individual level, an incident review provides an opportunity to recognize and provide accolades for staff's sound decision-making during stressful situations and also provides an opportunity to offer guidance when practices need to be refined. In addition, when corrective action is warranted, documenting the review provides a useful feedback loop to ensure that corrective actions are actually imposed and to easily identify those staff with repeated performance issues. When viewed in the aggregate, incident reviews provide an opportunity to detect systemic operational vulnerabilities that need to be addressed and procedures that need to be fortified.

o   *Horizon's Incident Review Process*

The first step in Horizon's incident review is the responsibility of Supervisors/AYDS 1s. While they do complete the "Supervisory Follow-Up" section of the incident report, most reviews are quite narrow, focusing primarily on whether the youth was transported to medical and advising that the youth "will be assessed on STRIVE" to apply consequences for misconduct. Supervisors very rarely critique staff's handling of the event, even when security issues and staff practice errors are evident. Their ability to do so may be compromised by the fact that they do not access videotaped footage of the event, and their impressions must rely on staff's incident reports.

Unfortunately, staff's incident reports are often vague and/or incomplete, with some omitting critical details. While staff appear to accurately detail the actions of youth, staff's reports are often vague or inaccurate regarding their own actions and/or those of other staff. Furthermore, a significant number of the incident report packets did not include staff reports from all of the staff who participated in or witnessed the incident. If these failures are detected by the supervisors, they are not documented in the Supervisory Follow Up section, and it is unclear whether any action is being taken to improve the quality of staff reports.

Second, ACS reports that Manager's Reports are created for the small number of events in which ACS refers a youth for arrest and for those incidents in which child abuse is alleged and referred to the Justice Center. The small sample of Manager's Reports reviewed by the Monitoring Team were generally well-written and detailed and offered useful insight into staff practice. Policy appears to require a Manager's Report for *all critical incidents* which, as defined, should include a far larger swath of incidents than what is currently included. As practiced, the narrow application of the Manager's Reports means that a significant volume of incidents needs an additional review to expand upon the brief comments by the Supervisors and to meet the requirements of this provision.

This gap is the Monitoring Team's primary concern, given that the facility has been unable to provide evidence of an incident review that assessed staff practice for a large

segment of incidents. Although facility administrators and managers consistently report that OMs, NPJS, the Director of Performance and Learning and facility administrators review and discuss incidents with the staff involved, few of these reviews are documented in a systematic fashion. This may be an area that ACS chooses to retool in its Incident Review policy.

The one exception to the paucity of documentation is the Weekly Incident Review meetings conducted by two Operation Managers in partnership with an NPJS consultant. These reviews were not intended to be universal (i.e., were only intended to be applied to a subset of incidents) and the documentation confirms that a small segment of incidents is being reviewed to assess staff practice. The documentation showed that an average of five incidents per month were reviewed between July 2023 and April 2024, whereas data submitted to the Monitoring Team showed an average of about 20 restraints per month. The Weekly Reviews are intended to be a teaching tool, not a disciplinary review, and are designed to provide feedback to improve staff's situational awareness, environmental awareness, positioning and proximity. While it could benefit from additional detail about staff's action or inaction, the Weekly Review log does show that constructive feedback was offered to staff involved in the subset of incidents that was reviewed.

While on site in June 2024, the Weekly Incident Review team showcased the outcome of its review of two serious incidents. The reviews were comprehensive, constructive, and multi-faceted and resulted in a trove of useful feedback to improve staff practice. Several times during the current monitoring period, the Monitoring Team and ACS have discussed incidents together, using descriptions/video footage/screenshots from a handful of incidents to inform the discussion. In nearly all cases, facility managers displayed a keen ability to utilize video review to dissect incidents in order to identify opportunities to improve staff practice when managing violent youth. As noted above, the Monitoring Team has received consistent verbal reports from administrators, managers and supervisors that additional incident reviews do occur, but to date, ACS has been unable to provide documentation that would allow the Monitoring Team to assess the quality of the reviews in order to demonstrate compliance with this provision.

Additional evidence that at least a segment of incidents is reviewed exists via the Corrective Action Tracker, which shows that ACS imposed a range of coaching, guidance, retraining and corrective action in response to staff's action/inaction and decision-making during incidents (these actions are discussed in more detail below). That said, because this information is not currently connected to the substance of the incident review itself, the specific behavior at issue was often hard to discern as was other contextual information needed to fully understand how managers conduct these assessments of staff practice.

Following the close of the current monitoring period (July 2024), ACS introduced a tool/process for documenting the substance of the incident reviews conducted by the various actors responsible for this task. A digital form can be utilized by any reviewer either on a computer or smartphone and captures a range of data including the staff and youth involved, whether and what type of restraints were used, whether staff and youth debriefing has occurred, and any recommended corrective actions for staff. The data populates a spreadsheet in real time that is accessible to various stakeholders (e.g., facility leadership,

OMs, the Director of Performance and Learning and the Compliance Team). The process prompts and records recommended corrective action close-in-time to the incident and identifies follow up activities that need to occur (e.g., registering staff for retraining). The consolidation of this information into a single location will be a significant improvement over the *ad hoc* processes utilized since the Agreement has been in effect, but ACS must also ensure that *the substance* of the staff debriefing is documented (here or elsewhere) such that policy violations and/or poor practice are clearly identified, as required by this provision.

ACS reported that data from the first month of use (July 2024) revealed that incident review forms were submitted an average of 2.1 days post-incident and that 30 of 41 incident reviews (73%) led to a corrective action recommendation, such as coaching, conferences, documented discussions, retraining, roll call reminders and reissuing policy. That guidance and corrective action is offered in such a large number of incidents suggests vigilance in assessing staff practice. The Monitoring Team has not yet verified this data but will do so during the next monitoring period.

o   *Response to Identified Misconduct*

Coaching, mentoring, and training are important tools for enhancing staff skill in response to less serious policy violations. This type of response may enhance staff morale and may also help to stem the tide of staff turnover. ACS and facility leaders have emphasized cultivating skill development in response to less serious departures from policy, rather than imposing disciplinary measures. ACS reports that it wants to maximize the use of facility-based corrective actions to support improved staff practice and does not simply want to default to immediately terminating staff (particularly probationary staff) if it appears that staff are in a position to improve their practice going forward. ACS attributes some of the perceived improvement in staff morale to the administrators' philosophy.

From the incidents listed in the GOALS reports during the current monitoring period, the Monitoring Team selected 64 incidents for in depth review. This review had several purposes: to understand the facility's environment and to provide important context to the provisions of the Agreement; to gain insight into the types of errors that staff make and thus the types of issues that an incident review would be expected to detect; and to assess ACS' response to the staff practice errors that were detected. Several incidents were referred to the ELU for formal discipline, resulting in at least three staff being terminated. The more frequent accountability measure was corrective action at the facility level. Corrective action was taken in 23 of the 64 incidents, typically in the form of a formal, written conference addressing securing keys, securing doors, situational awareness and proper supervision. Also, a few staff were required to attend SCM retraining in response to their misuse of physical interventions. Another segment of staff involved in 17 of the 64 incidents received guidance/coaching to help them master the necessary skill set. ACS was able to produce the requested information regarding corrective actions, and it appears that the new incident review form/process described above will make this task easier and more dependable.

o   *Conclusion*

ACS has procedures at each end of the continuum for reporting and reviewing incidents in order to identify and then respond to policy violations related to the use of physical intervention. But the facility lacks documentation of the review and the actions taken in between. On the front end, GOALS reports and staff incident reports document the particulars of an incident shortly after it occurs (concerns about the quality of staff reports notwithstanding). Supervisors do review the incident report packet and comment on the next steps for youth, but they also need to comment on the completeness of the reports and actions of staff to the extent possible. On the back end, ACS was able to produce information about the facility's/agency's response to identified staff practice errors. In order to achieve compliance with this provision, ACS must develop and implement a procedure to document the substance of the assessments of staff practice that reportedly occur, including a description of the staff practice errors that are detected. The form/process implemented in July 2024 appears to put the facility on a trajectory toward compliance, but the quality of the information entered by supervisors and facility managers will be determinative.

**Compliance Rating**. Progress Made, but Compliance not yet Achieved

## ¶2(c). Programming. ACS shall develop, track, and maintain a sufficient level of programming for AO Youth, consistent with best practices for adolescents and young adults.

**ACS Policy & Practice.**
- ACS Policy #2019/04 "Exercise, Recreational and Leisure Activities in Secure and Specialized Secure Detention" remains in effect. It requires a balance of structured recreational, exercise and leisure activities that are posted on a daily unit schedule.
  - This policy requires one hour of large muscle activity per day.
  - Policy requires at least 2.5 hours of programming per day during the school year and 3 hours of programming per day during the summer months. These targets were set beginning with the 2022-2023 school year to accommodate the later school start time that was implemented to encourage attendance.
- ACS Policy #2019/31 "Educational Services in Secure and Specialized Secure Detention" remains in effect.
  - Youth of compulsory education age (*i.e.*, age 16 or younger) are to receive educational programming for 5.5 hours per day, Monday through Friday when school is in session.
  - Youth with a diploma/GED are to receive 5.5 hours of instruction per weekday, which includes literacy, math, life skills and workforce development.
  - YDS are required to facilitate timely arrival and attendance.
- Programming at Horizon is provided by Program Counselors, vendors, behavioral health staff and the YDS assigned to each housing unit. Most of the programming facilitated by YDS consists of semi-structured leisure time activities (*e.g.*, card games, video games, movies), while Program Counselors and vendors provide workforce and vocational programming, programming that supports rehabilitation and personal

growth, and skills-based programs such as creative arts, performing arts, cooking, personal fitness, goal setting, decision making and conflict resolution. Behavioral health staff provide group psychotherapy.

- Both Horizon's Program Team and contracted vendors are providing more hours of programming per day than in the past. ACS reports that between April and June 2024, the facility delivered an average of 3 hours of programming per day to each Hall.

- The Program Team also facilitates a variety of building-wide events available to youth on the highest levels of the behavior management program. During the current monitoring period, incentive programs included movie nights, mobile kitchen carts, Superbowl Flag Football, Valentine's Day treats, Staff vs Resident Basketball, Black History Museum, Jeopardy!, concerts, Nail Care and Facial lessons, Women's History Museum, Drama Club presentation, Juneteenth Celebration, Build Your Own School contest, Ice Cream Social, Video Game/Arcade, Hair Braiding, and Taco Time, among others.

- The Program Team includes a Director of Programs and two Program Supervisor positions (one of which vacant, but the position has been posted. Of the 12 Program Counselor positions that provide on-unit services, three are currently vacant and one Counselor is out on leave. Program Counselors are deployed to units according to where the gaps in vendor-led programming lie. Program Counselors also conduct other stand-alone programming such as holiday and birthday celebrations, Family Days and the Elite Lounge (available to youth at the highest level of the behavior management program).

- Horizon operates an accredited education program for youth who have not yet graduated from high school or earned an equivalent diploma. Horizon expanded its tutoring/mentoring program to ensure that tutors/mentors have a strong presence in the facility each day. In addition, Horizon provides live instruction, credit-bearing courses to graduates via CUNY/Hunter College, along with 34 introductory college-level courses that are available on-line through the College Level Examination Program (CLEP). During the 2023-2024 academic year, 36 youth earned a Regents Diploma or High School Equivalency Degree or completed middle school (compared to 16 youth in the prior school year).

- ACS has identified a candidate for an Assistant Commissioner of Workforce Development position, but they have not yet been onboarded as approval has been pending with the City for over a year.

- ACS has refined its vendor-led program model to better address the needs and interests of the older population of youth at Horizon since Raise the Age went into effect. In 2023, ACS awarded a $4.5 million contract to The Children's Village to deliver workforce programming and tutoring to youth in secure detention, which began in October 2023. This partnership builds on existing efforts and requests by youth for programming that focuses on career exploration, work and labor market readiness, vocational education and training, academic tutoring, and life skills. Vocational courses include Spackling & Taping, Painting, Guest Relations & Customer Service, Physical Therapy and Tutoring.

- Other vendors also provide programming to Horizon youth, including CONBODY (a fitness program) and Defy Ventures (which coaches youth in entrepreneurship, employment readiness and personal development and also offers re-entry support). Youth are particularly excited about the Horticulture program and several of the vocational offerings.
- A robust Chaplain program delivers faith-based programming for youth and has also become an important part of Horizon's approach to staff and youth wellness by providing support and refuge to staff and youth who may need it.
- During the current monitoring period, the Programs team created a toolbox of activities for YDS to facilitate on the housing units. Staff sign out the activity at roll call for use during their shift. Activities include how to start a Circle-Up, brain teasers, scully court/shuffleboard, and other high-interest activities. Administrators report that these materials are helping staff to build their confidence in running activities and are further minimizing idle time on the units.
- ACS continues to utilize the Program Assessment Tracking System ("PATS") to effectively manage program delivery. A Senior Program Impact Coordinator provides training, coaching and quality assurance support to the facility's Program Team. A Program Liaison provides data management and analytical support to Program Counselors to ensure all data is properly entered.

## Monitoring Team's Analysis

Implementing a robust daily schedule full of engaging, structured activities to reduce idle time is a powerful strategy for reducing facility violence and disorder. ACS' internal targets for daily programming hours exceed those of most jurisdictions and are ambitious given the other things that must be accomplished (*e.g.*, school, meals, mental health and medical services, phone calls, visitation, showers, etc.).[11] A review of daily schedules from Summer 2024 suggested that youth have very little unstructured free time. Overall, if the unit/programming schedules are not disrupted and staff avail themselves of the structured activities in the newly created toolbox, youth have little idle time. When interviewed, youth universally reported an interest in programming, but many were frustrated by the frequent disruptions to the daily program schedule. All reported a higher level of interest in vocational/job development programs compared to some of the other programs Horizon offered in the past.

Historically, the Monitor's Reports have calculated the proportion of days on which internal daily program targets were met in each unit. Previously, ACS' internal targets were met slightly less than half the time (e.g., 47% for the January-June 2023 monitoring period). Outcomes were presented in this way because the PATS data was provided to the Monitoring Team in a binary fashion (i.e., internal target met? yes/no), rather than with a numerical

---

[11] The Agreements do not include provisions related to educational programming at Horizon and thus it is not part of the Compliance Assessment. The Monitoring Team strongly supports ACS' actions taken to improve attendance and engagement.

value.[12] ACS emphasized that a "no" value did *not* mean that youth did not receive *any* programming on a particular unit/particular day; the "no" value meant only that the ambitious internal target was not met. During the current monitoring period, the performance level improved slightly, to 53% during April/May/June 2024.

For the current monitoring period, the Monitoring Team also requested more detailed PATS data that would permit an analysis of the actual volume of programming delivered. During April/May/June 2024, across the 10 housing units, the internal programming target of 2.5/3 hours per day was met or exceeded 53% of the time. Of particular interest was the amount of programming delivered on those units/days when the target was *not* met (i.e., the other 47%). On average, units not meeting the target received approximately 1.5 hours of programming—short of ACS' ambitious internal target, but within the generally accepted practice in the field. Furthermore, the proportion of units/days that received *no* programming at all was only about 5%, which is a reasonable level of exception.

Discussions with ACS and facility leaders revealed that certain realities slow program delivery, particularly the facility's physical plant (e.g., programming spaces that are not particularly close to the housing units, connected by narrow hallways where intersections between housing units must be avoided) and typical adolescent behavior (e.g., being slow to prepare for movement or refusing). In combination, these dynamics make it very difficult to transport youth off the unit for programming faster or more often. When youth movement stalls, subsequent programming for all units is thrown off schedule which is frustrating for both youth and staff. An opportunity may exist for vendors to deliver their programming on-unit, but this is not a panacea given that many vendors do not want to enter the housing units or prefer to do so only when accompanied by a Program Counselor. ACS also reports that program offerings are sometimes in competition with other activities (e.g., visitation, barber services, Hall activities) and thus may not be well attended. In a way, this is a good problem to have—a plethora of programs such that it is difficult to fit them all into the waking hours of a certain day—but also highlights the need for precise and *realistic* scheduling to avoid frustrations among all parties involved.

Taken together, the detailed PATS data and contextual information suggest that the facility may have reached maximum capacity in terms of the volume of programming that can be delivered reliably. While PATS data indicate that ACS' heightened standard for program hours is achieved a little more than half the time, these same data reveal that the volume of programming that is provided, even on units that do not meet the target, is within the generally accepted practice in the field. Importantly, the facility has the necessary structures to monitor the volume of programming delivered and a consistent record of using that information to troubleshoot obstacles to program delivery. The newly created toolbox of activities for YDS should also help to minimize youth's unstructured idle time on the housing units.

---

[12] ACS has an electronic scheduling and tracking system for program data, the Program Assessment Tracking System ("PATS").

ACS has made significant investments, both financial and personnel, to better align its program offerings with the interests and developmental needs of the youth in its custody and has achieved compliance with the requirements of this provision. In terms of sustainability, ACS has all of the tools necessary to monitor the volume of programming delivered to each unit, each day, by Program Counselors, vendors and YDSs. It also has a process for comparing what was scheduled to what actually occurred, and importantly, has a consistent record of identifying and addressing barriers. These elements form the foundation of a solid internal quality assurance strategy and bode well for the sustainability of program delivery.

**Compliance Rating**. Compliance

## ¶2(d). Behavior Management. ACS shall maintain systems, policies and procedures for AO Youth that: (i) reward and incentivize positive conduct and (ii) sanction negative conduct. The application of these procedures shall be individualized, consistent with any treatment needs for AO Youth and shall not compromise the safety of other AO Youth or ACS staff.

**ACS Policy & Practice.**
- ACS Policy #2018/09 "Behavior Management in Secure and Specialized Detention" remains in effect. It guides the delivery of a multi-tiered behavior management system that cultivates a "therapeutic institutional culture." The policy states that staff interactions with youth should teach youth self-regulation and problem-solving skills and emphasizes that youth with aggressive behaviors are the ones most in need of positive relationships with staff rather than punitive approaches to behavior management. These are important philosophical underpinnings to the facility's approach to behavior management. The policy specifically requires:
  - Safety Plans.
  - Level System with incentives and consequences, that is consistent with each youth's Safety Plan (which is consistent with the requirements of this provision).
  - Therapeutic groups, individual interventions and opportunities for youth empowerment and self-advocacy.
- In 2020, the National Partnership for Juvenile Services (NPJS) helped ACS to strengthen its behavior management system's design (STRIVE), particularly regarding youth skill development, the reliability of incentives for desirable, prosocial behavior and ensuring meaningful consequences for negative behavior.
- ACS developed an excellent manual to guide the implementation of Restorative Justice activities that includes restorative circles, an array of group-based activities, and individual worksheets. Important improvements to the process and substance of Restorative Status have been made, discussed in more detail below.
- Prior to the current monitoring period, ACS relied on NPJS consultants to facilitate in-service staff training sessions and to train instructors at the Academy for new recruits. During the current monitoring period, ACS assumed these responsibilities and now

utilizes the consultants to make ongoing refinements to STRIVE's substance and structure.

- Staff training includes the mechanics of the program (strategies to increase appropriate behaviors such as praise, point cards and privilege levels; strategies to decrease inappropriate behaviors using a continuum of interventions that are calibrated to the severity of misconduct) and Restorative Justice activities. Scenario-based activities are included to facilitate the application of the various concepts.
- Nearly all Horizon leaders, managers, supervisors and staff have been trained in STRIVE (90+ %). Training is delivered to newly hired YDS as part of Academy training, and full training is delivered regularly to newly hired managers and staff returning from leave. At roll call, key concepts are reviewed (*e.g.*, behavior expectations, point cards, circle-ups, tier infractions, restorative status). Individual and small group coaching is also provided by Practice Improvement Coordinators (see below).
- All living units implemented the basic components of STRIVE on December 12, 2022. Various efforts to strengthen implementation were applied throughout 2023/2024.
- ACS hired a Behavior Management Specialist in late 2023, but this individual has since resigned. Thereafter, ACS' Director of Learning and Performance stepped in to lead STRIVE's implementation. He supervises several staff dedicated to shoring up STRIVE's implementation:
  - o Three YDSs were selected to serve as "Practice Improvement Coordinators." These individuals support day-to-day implementation, distribute and process restorative assignments, and coach staff to refine their skill in using STRIVE. Their close attention to the point sheets has reportedly improved their fidelity and accuracy.
  - o Two Supervisors (AYDSs) focus their housing unit rounds on STRIVE implementation.
  - o A Tour Commander is dedicated to supporting youth on Restorative Status, helping youth to complete their task assignments.
  - o Another Tour Commander audits the point cards to ensure they are complete and individualized and also provides feedback to YDSs to improve their skill set in this area.
- Hall Leadership Meetings (previously called "Core Leadership Teams") are now functional for each housing unit and include managers, supervisors, YDS and staff from other disciplines (e.g., programs, school, case management, mental health, ombudsman). These individuals are convened weekly to review STRIVE's implementation on their housing units and to make plans to address identified deficiencies and to support youth who are struggling to succeed.
- Three STRIVE Champions (staff in all job titles who demonstrate a depth of understanding or particular interest in behavior management) have received supplemental STRIVE training and Train-the-Trainer style support. They lead the "learning bursts" at roll call and will ultimately be able to lead the full STRIVE training. Two additional Champions were recently identified.

- ACS is developing an app that will automate many of the tasks commonly completed manually by staff. This unique and sophisticated approach to implementation may help Horizon to avoid many of the "operator errors" that undercut the delivery of behavior management programs in other jurisdictions.
- ACS has identified "Power Source" as its overarching skill-based curriculum and began pilot testing the program on one housing unit in August 2024. Through a partnership with the Lionheart Foundation, ACS has trained several staff in multiple job titles to facilitate the groups. Both youth and staff are reportedly enthusiastic about the program, and ACS plans to expand the program to the remaining housing units throughout 2025.
- The facility worked to address the problem of youth obtaining access to the point cards and providing their own scores. Point card forgery is now a Tier 2 infraction and point cards are monitored closely by the Practice Improvement Coordinators.
- ACS is working to increase the power of the incentives available through Commissary by ordering name-brand food items that are more appealing to the youth. The facility has also added incentive programs requested by youth (e.g., facials and nail care).
- Judges in Family Court and some in the Youth Part Court have begun to recognize and ask youth about their STRIVE level, which can be an effective motivator for youth.

**Monitoring Team's Analysis.**

A robust behavior management program is an essential element of a safe facility. Such a program should teach skills that promote prosocial behavior (e.g., skills for resolving interpersonal conflict, managing anger and resisting impulsive actions) and should incentivize and reinforce positive behavior with an array of meaningful rewards. A behavior management program should also provide for appropriate, proportional, skill-based responses to negative behaviors that hold youth accountable in an effort to reduce the likelihood of subsequent misconduct. In addition to having a sufficient number of well-trained staff and an engaging array of programming, a well-designed and consistently implemented behavior management program is a cornerstone of a safe facility.

As noted above, nearly all Horizon staff have now been trained, and all 10 housing units implemented the basic components of STRIVE on December 12, 2022. These accomplishments were years in the making and are important milestones in bringing a consistent approach to facilitating positive behavior among youth at Horizon.

Important elements of the STRIVE program include:

- Clear **behavior expectations** for each component of the youth's day (e.g., morning routine, restrooms, movement, school, meals, group, leisure time, recreation, etc.) that are understood by youth and consistently reinforced by staff.
- Overarching **skill development**, using a structured curriculum for teaching youth the skills they need to refrain from negative behaviors.

- ▪ **Point cards** where staff rate youth's behavior throughout the day, by awarding points when youth meet expectations or providing explanatory feedback/comments when they do not.
- ▪ **Tiered incentive levels** (i.e., Bronze, Silver, Gold, Independent) that provide an array of rewards and incentives in response to sustained positive behavior. These include phone calls, commissary, letter writing supplies, playing cards, radios, special meals and events.
- ▪ A **Restorative Process** during which proportional sanctions are imposed in response to discrete categories of misconduct. Sanctions include a drop in level, and activities that must be completed to return to point-earning status (restorative tasks, a reentry interview with Hall leadership).
- ▪ Newly implemented **Hall Meetings** during which a multi-disciplinary team convenes to discuss youth who are struggling to succeed in STRIVE.

The Monitoring Team assessed each of these program components.

### o Behavior Expectations

Behavior expectations are clearly stated in STRIVE program materials. Facility leaders reported the expectations are frequently reviewed with staff to promote consistent application across staff and housing units, although additional efforts are required as discussed in the "Point Cards" section below.

### o Skill Development

As noted above, ACS has begun to pilot and intends to widely implement a group intervention, Power Source, which is a cognitive-behavioral based intervention and is rated as a Promising Program on the NIJ Crime Solutions website.[13] The intervention is designed to assist youth in modulating their physiological responses to stressful and risky situations and to encourage prosocial responses—in other words, it is focused on emotional regulation. Exposing youth to a skill-based curriculum is an essential part of a behavior management program, as it allows staff to cue youth to utilize these skills to refrain from violence and to reward/reinforce their use.

### o Point Cards

The quality of the point cards' implementation was assessed by reviewing point cards from various periods of time (January/February/March and May/June 2024). Point cards from the January/February/March 2024 sample continued to reveal problems discussed in previous Monitor's Reports including: cards with only a portion of the eight rating periods completed; evidence of forgery (i.e., youth filling the cards out themselves), no differentiation across youth (i.e., all youth receiving the same number of points, identical comments), lack of congruence between behavioral problems noted and points awarded, and supervisors' signatures/approval without noting any of these problems. However, point cards from the May/June 2024 sample were noticeably improved—more of the point cards were complete, fewer youth forgeries were evident, staff entered individualized comments on some of the

---

[13] *See* https://crimesolutions.ojp.gov/ratedprograms/641.

cards for youth on Restorative/Independent status (points are not required for these youth), youth's level progression was evident, and Restorative Status appeared to last longer than in the past, suggesting better proportionality.

These improvements are very encouraging, but the point card implementation still has several areas in need of improvement:

- A significant number of the cards were incomplete, with points entered for only some of the 8 grading periods. Policy requires that youth receive the full point award in the event that staff leave the grading period blank, but this does not appear to occur. This compromises the fairness of the system, as youth on units staffed by those who complete the point cards as required will receive more points than those on units staffed by those who do not, even when their behavior is the same.
- Staff do not use the same standards when awarding points. For some, a grading period during which the youth is "in compliance" results in 13 points, but for others, only 8 points. Clearer standards are needed to ensure consistency across staff.
- Staff need to indicate the reason why Bonus Points are awarded in the comment section. This helps to ensure that staff are not using the bonus points as a default but rather to recognize and reward exceptional behavior. Some staff appear to award bonus points to all youth, while others rarely do—again, this creates differences in point earning that are driven by staff's behavior rather than youth's.
- Staff need to individualize their comments about youth's behavior. More often than not, staff entered the exact same comment for every youth on a unit. In the Monitoring Team's experience, staff often need specific guidance about what types of comments are helpful to the overall goal of behavior management.
- Supervisors frequently signed point cards that had obvious errors. While it is positive that supervisors are signing the cards more frequently than before, the purpose of the signature is to indicate that the supervisor reviewed the card for errors and provided guidance to staff when necessary.

ACS implemented several strategies in an effort to elevate the quality of the point card entries. These included peer-to-peer guidance from the Practice Improvement Coordinators to assist staff in completing point cards correctly; explaining to staff how to complete the cards during Roll Call and reminding staff to complete the cards via radio transmissions; and encouraging the AYDSs to confront obvious mistakes when they sign the point cards. In addition, a new procedure was implemented in June 2024 whereby the Tour Commander on each shift collects the point cards an hour before the end of the shift and provides feedback to staff if their entries are not of the expected caliber. Another Tour Commander continues to audit the point cards, sharing the results with STRIVE Champions and Practice Improvement Coordinators in order to align on-going training. ACS and facility leadership reported their

perceptions that the point cards' integrity has improved and were also receptive to the Monitoring Team's feedback about how to further strengthen the fidelity of the system.

The importance of fair and accurate point card completion cannot be understated. The points earned are the foundation for the incentive program and the levels should properly categorize youth according to whether their behavior meets expectations and their involvement in misconduct. Filling out the point cards completely and using standards that are consistent across staff is essential to the fairness, accuracy and usefulness of the system.

 o Tiered Incentive Levels

The design of the tiered incentive program is well conceptualized, with a robust and interesting array of rewards that increase at each level. Youth reported that the incentive of highest value to them is phone calls, and the number of minutes increases as youth's tier increases. Recently, ACS also made changes to its commissary ordering to include name-brand items that are more compelling to Horizon youth. When interviewed, all youth reported that they typically received the incentives attached to their assigned level.

A noticeable shift occurred in the distribution of youth across the incentive tiers since the previous monitoring period when about 30% of the youth were on Restorative Status and 40% were on Independent Status. The fact that so many youth were on Independent Status suggested to the Monitoring Team that either the status was too easy to achieve, or that youth were not being properly held accountable for their misconduct. Based on the January/February/March 2024 point cards, the proportion of youth on Independent Status decreased to about 20%, which seems more plausible given the current state of affairs and may be the result of greater control of the point cards and more accurate behavior assessments (i.e., not awarding points unless they were actually earned). Documents, staff and youth interviews indicated that youth are held accountable for their negative behaviors, which were more regularly noted on the point card summaries, along with the requisite drop in level.

 o Consequences for Misconduct

The facility made important improvements to the Restorative Process during the current monitoring period. First, additional structure was imposed to ensure proportionality. The response to Tier 3 and 3A infractions (the most serious/violent) now begins with a 5-day cool-off period, which effectively delays the youth's return to point-earning status. Previously, youth were able to complete a packet of worksheets very quickly and then returned to point-earning status, which was perceived as unduly lenient by both staff and youth. Now, following the 5-day cool-off period, restorative tasks are assigned by facility managers to include written assignments, worksheets, mediation, community service, etc. A renewed effort to ensure that written assignments are relevant to the problem behavior has helped to improve the linkage to the desired behavior. Youth who are not comfortable writing may express themselves verbally instead. A Tour Commander has been designated to meet with each youth who commits an infraction to introduce the Restorative Process, assign tasks, facilitate mediation,

assess completion, and conduct the reentry interview to return the youth to point-earning status.

ACS is in the process of developing a Restorative Process tracker to ensure youth are held accountable and that all assigned tasks are completed. Each day, overnight staff send an email to facility leadership, TCs, OMs, Programs staff, Case Managers, the Ombudsman and the STRIVE team, listing all youth who were involved in a Tier 2, 3 or 3A infraction. This information is entered into an Excel spreadsheet by the Practice Improvement Coordinators or the Director of Performance and Learning. The spreadsheet includes the youth's name, date, infraction, specific tasks required and date of completion. The tracker is expected to be introduced in late 2024. These improvements will address the Monitoring Team's prior concerns about proportionality, reliability, the division of labor, and procedural integrity in the restorative process. The tracker will also provide a valuable tool for identifying youth who frequently engage in serious misconduct and for identifying changes in their behavior after certain interventions are applied.

- o Weekly Hall Meetings

The implementation of weekly hall meetings is an important and exciting development in STRIVE's evolution. Each week, a multi-disciplinary team convenes for each Hall to discuss youth who are struggling to succeed in STRIVE. While on site in June 2024, the Monitoring Team observed the G/A Hall meeting in which group services staff (YDS, AYDS, TC and OM), case managers, mental health, programming, and school staff convened. The meeting was well structured and organized with an agenda and unit rosters with STRIVE and other behavioral information for each youth. Each discipline contributed meaningfully to the discussion of each youth. Their comments revealed deep compassion for youth and specific knowledge of their individual challenges and family circumstances, mixed with an appropriate focus on accountability and skill development. The discussion about each youth led off with a discussion of the incident that resulted in Restorative Status, a summary of their mediation and their responses to restorative assignments. Each team member discussed the youth's dynamics from their unique perspective and also what they were able to contribute to the plan for additional support. The group also discussed ways to intervene in common behavior issues (e.g., holding up movement, program or school refusals), how to use STRIVE to better incentivize desired behaviors, and solutions to operational problems (e.g., the flow of paperwork for youth on 1x1 observation status). The substance of the group's conversation was an exceptional example of multi-disciplinary behavior support, bringing STRIVE's implementation to a new level.

In summary, the trajectory of STRIVE's implementation accelerated rapidly during the current monitoring period. Point card accuracy and completion has begun to improve, Restorative Status has better proportionality, relevance and integrity, and multi-disciplinary teams have been effectively deployed to support youth who are struggling to succeed in STRIVE. The recent/upcoming deployment of new tools to improve the integrity of the process (e.g., quality assurance audits of point cards, the Restorative Status tracker) should help to solidify the program as a cornerstone of efforts to improve facility safety. Importantly, the addition of the overarching skills-based group, Power Source, will transition the program in

important ways, from one based on the observation of behavior to one grounded in teaching the youth the skills they need to navigate the difficult circumstances they confront. Facility managers report that they are contemplating an additional tool to promote individualization—the ability to adapt STRIVE for certain youth in order to stimulate motivation or target specific behaviors. Once fully implemented and stabilized, STRIVE will include all of the components necessary for a program that reflects the generally accepted practice.

**Compliance Rating**. Progress Made, but Compliance Not Yet Achieved

# APPENDIX A: MONTHLY DATA ON YOUTH-ON-YOUTH AND YOUTH-ON-STAFF VIOLENCE





### Rate of Youth-on-Youth and Youth-on-Staff Assaults
#### January 2021 - June 2024

1st MP | 2nd MP | 3rd MP | 4th MP | 5th MP | 6th MP

| | J21 | F | M | A | M | J | J | A | S | o | N | D | J22 | F | M | A | M | J | J | A | S | o | N | D | J23 | F | M | A | M | J | J | A | S | o | N | D | J24 | F | M | A | M | J |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| YOYA | 0.8 | 0.5 | 0.5 | 1.1 | 1.3 | 2.2 | 1.9 | 0.7 | 0.9 | 1.1 | 1.1 | 1.1 | 1.1 | 0.4 | 1.2 | 0.8 | 1.8 | 1.2 | 1.2 | 0.7 | 0.5 | 0.6 | 0.4 | 0.4 | 0.7 | 0.7 | 0.8 | 0.6 | 0.8 | 0.7 | 0.6 | 0.5 | 0.4 | 0.5 | 0.8 | 0.7 | 0.8 | 0.4 | 0.7 | 0.5 | 0.4 | 0.5 |
| YOSA | 0.5 | 1.4 | 0.5 | 1 | 1.7 | 1.1 | 0.9 | 0.4 | 0.4 | 0.6 | 0.6 | 0.1 | 0.5 | 0.6 | 0.6 | 1.1 | 1.2 | 0.5 | 0.5 | 0.4 | 0.2 | 0.2 | 0.2 | 0.3 | 0.3 | 0.4 | 0.4 | 0.4 | 0.5 | 0.4 | 0.1 | 0.2 | 0.2 | 0.1 | 0.2 | 0.3 | 0.7 | 0.2 | 0.3 | 0.3 | 0.4 | 0.3 |

## APPENDIX B: MONTHLY DATA ON PHYSICAL AND MECHANICAL RESTRAINTS



### Number of Physical and Mechanical Restraints
January 2021 - June 2024

| | J21 | F | M | A | M | J | J | A | S | o | N | D | J22 | F | M | A | M | J | J | A | S | o | N | D | J23 | F | M | A | M | J | J | A | S | o | N | D | J24 | F | M | A | M | J |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Physical | 16 | 25 | 15 | 30 | 40 | 44 | 52 | 27 | 20 | 39 | 26 | 25 | 31 | 21 | 37 | 48 | 32 | 20 | 13 | 16 | 8 | 21 | 13 | 3 | 14 | 8 | 15 | 8 | 16 | 6 | 8 | 7 | 7 | 5 | 21 | 15 | 28 | 18 | 24 | 15 | 9 | 24 |
| Mechanical | 3 | 3 | 1 | 5 | 8 | 11 | 7 | 2 | 5 | 5 | 3 | 10 | 7 | 5 | 8 | 13 | 8 | 4 | 2 | 5 | 3 | 9 | 5 | 1 | 8 | 9 | 3 | 7 | 7 | 6 | 0 | 1 | 1 | 4 | 7 | 5 | 12 | 5 | 10 | 8 | 6 | 10 |



### Rate of Physical and Mechanical Restraints
January 2021 - June 2024

|  | J21 | F | M | A | M | J | J | A | S | o | N | D | J22 | F | M | A | M | J | J | A | S | o | N | D | J23 | F | M | A | M | J | J | A | S | o | N | D | J24 | F | M | A | M | J |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Physical | 1.5 | 2.7 | 1.5 | 2.8 | 3.3 | 3.2 | 3.2 | 1.5 | 1 | 2 | 1.3 | 1.2 | 1.4 | 1.1 | 1.8 | 2.4 | 1.6 | 1.1 | 0.7 | 0.7 | 0.4 | 0.8 | 0.5 | 0.1 | 0.5 | 0.3 | 0.6 | 0.3 | 0.6 | 0.2 | 0.3 | 0.3 | 0.2 | 0.2 | 0.8 | 0.6 | 1.1 | 0.7 | 0.9 | 0.6 | 0.3 | 0.9 |
| Mechanical | 0.3 | 0.3 | 0.1 | 0.5 | 0.6 | 0.8 | 0.4 | 0.1 | 0.3 | 0.3 | 0.2 | 0.5 | 0.3 | 0.3 | 0.4 | 0.6 | 0.4 | 0.2 | 0.1 | 0.2 | 0.1 | 0.4 | 0.2 | 0 | 0.3 | 0.4 | 0.1 | 0.3 | 0.3 | 0.2 | 0 | 0 | 0 | 0.1 | 0.3 | 0.2 | 0.5 | 0.2 | 0.4 | 0.3 | 0.2 | 0.4 |

1st MP   2nd MP   3rd MP   4th MP   5th MP   6th MP

Appendix C: Fourth Voluntary Agreement

**Fourth Agreement with Monitoring Team Panel
to Monitor 16- and 17-Year-Old Adolescent Offenders at Horizon Juvenile Center**

This Agreement ("Agreement") is voluntarily entered into by the Monitor appointed in the *Nunez* Consent Decree (11-cv-5845, docket entry 249) as defined in § XX, ¶ 1 & 6 (the "Monitoring Team Panel" or "Monitor"), the City of New York (the "City"), and the Administration of Children Services ("ACS"), for the period from July 1, 2024 to June 30, 2025. This Agreement concerns the management and supervision of Adolescent Offenders, as defined under Criminal Procedure Law § 1.20(44), who are or will be housed at the Horizon Juvenile Center ("AO Youth"), and the operation of that facility.

(1) ACS will make deliberate and good faith efforts to improve its practices regarding the enumerated provisions in ¶ 2 below.

(2) ACS agrees to the following:

    a. AO Youth shall be supervised at all times in a manner that protects them from an unreasonable risk of harm. Staff shall intervene in a timely manner to prevent youth-on-youth fights and assaults, and to de-escalate youth-on-youth confrontations, as soon as it is practicable and reasonably safe to do so.

    b. ACS shall conduct timely and thorough reviews of Physical Restraints to determine whether the intervention was appropriate and whether ACS staff complied with the ACS Physical Restraint Policies.

    c. ACS shall maintain systems, policies, and procedures for AO Youth that: (i) reward and incentivize positive conduct and (ii) sanction negative conduct. The application of these procedures shall be individualized, consistent with any treatment needs for AO Youth and shall not compromise the safety of other AO Youth or ACS staff.

(3) ACS agrees, in the spirit of collaboration and in recognition of the deep mutual commitment to improving program and practice goals, to continue to consult with the Monitoring Team Panel regarding the areas set forth above in Paragraphs 2(a)-(c). The Monitoring Team Panel may, as necessary, meet on a quarterly basis with the ACS Commissioner and relevant associated senior staff, to discuss the Monitoring Team Panel's observations and assessment of ACS program and practice at Horizon Juvenile Center, improvements made or not, and to relate any other information that the Monitoring Team Panel deems relevant and appropriate for enhancing ACS' practice at Horizon Juvenile Center.

(4) During the period of this Agreement, the Monitoring Team Panel may, as necessary, provide technical assistance to ACS regarding the terms of this Agreement.

(5) The Monitor will assess compliance with the requirements set forth above in Paragraphs 2(a)-(c). For purposes of this Agreement, the Monitor shall find ACS to be in "Compliance" with a provision if the Monitor finds that ACS has consistently complied with the relevant requirement and any violations of the relevant requirement are only minor or occasional and not systemic, material, or recurring. The Monitor will file one public

report ("Monitor's Report") on the docket 11-cv-5845 (LTS) (S.D.N.Y.) assessing ACS' compliance with these requirements during the reporting period.

    a.    There shall be one reporting period during the term of this Agreement. The reporting period shall cover July 1, 2024 to June 30, 2025.

    b.    The Monitor shall issue a report within 90 business days following the reporting period. Within 45 days from the end of the reporting period, detailed in subdivision (a) of this Section, ACS will share a Written Compliance Assessment, followed by a presentation/meeting with the Monitoring Team describing ACS efforts, successes and challenges in meeting the expectations detailed in Paragraphs 2(a-c) of this Agreement. The Monitor's Report shall be provided to the City and ACS in draft form for comment at least 30 business days prior to its issuance. The City and ACS shall provide the Monitor with their comments, if any, within 15 business days after receipt of the draft Monitor's Report. The Monitor shall consider the comments, and make any changes deemed appropriate, before issuing the final report. The Monitor's Report shall be written with due regard for the privacy interests of individual AO Youth and ACS staff members; federal, state and local laws regarding the privacy of such information; and the interest of ACS in protecting against the disclosure of non-public or privileged information. Consistent with such interests and laws, the Monitor shall redact individual-identifying information from the Monitor's Report and any documents submitted with that report, and shall give due consideration to ACS's requests to edit or redact any other information. The Monitor shall provide the final report and redline comparing the final report with the draft Monitor's Report to ACS 5 business days prior to issuing the final report. To the extent the Monitor declines to make the edits or redactions requested by ACS, ACS can append any comments to the Monitor's Report that is submitted by providing such appendix to the Monitor by noon the day the final report is to be issued.

    c.    The Monitor's Report shall provide relevant and appropriate context for its findings and give due consideration to the totality of the circumstances. Further, as appropriate and relevant, the Monitor's Report shall describe: (1) ACS' diligent and good faith efforts to implement ¶ 2 (a)-(c) of this Agreement, (2) generally accepted practice for 16- and 17-year old youth as it relates to this Agreement, and (3) any challenges or obstacles related to implementing ¶ 2 (a)-(c) of this Agreement.

    d.    ACS will be afforded the opportunity to append a response to the final Monitor's Report filed with the Court.

(6) In furtherance of this Agreement, the City shall bear all reasonable fees, costs, and expenses of the Monitor, including payments to the Monitor's staff as required under the *Nunez* Consent Judgment § XX, ¶ 5 and consistent with the Monitoring Team Panel's payment structure with the City that is in place for the *Nunez* Consent Judgment.

(7) ACS will provide the Monitoring Team Panel reasonable and timely access to relevant information and documents in order to perform the responsibilities of this Agreement. The January 7, 2021 confidentiality agreement between the Monitoring Team Panel and ACS, which delineates the acquisition and appropriate use by the Monitoring Team Panel of confidential information, prohibitions on secondary dissemination, record retention during the period of this Agreement, and destruction of records provided to the Monitoring Team Panel at the end of the period of this Agreement, remains in effect.

Date: September 23, 2024

**FOR THE CITY OF NEW YORK AND**
**THE ADMINISTRATION FOR CHILDREN'S SERVICES:**
MURIEL GOODE-TRUFANT
Acting Corporation Counsel for the City of New York

Sheryl Neufeld

**FOR THE MONITOR:**

s/ Steve J. Martin
Steve J. Martin, *Monitor*
Anna E. Friedberg, *Deputy Monitor*

4