# Status Report
# by the
# *Nunez* Independent Monitor

**November 22, 2024**

### THE NUNEZ MONITORING TEAM

Steve J. Martin
*Monitor*

Elly Davis
*Junior Analyst*

Kelly Dedel, Ph.D.
*Subject Matter Expert*

Anna E. Friedberg
*Deputy Monitor*

Dennis O. Gonzalez
*Director*

Patrick Hurley
*Subject Matter Expert*

Alycia M. Karlovich
*Associate*

Emmitt Sparkman
*Subject Matter Expert*

Table of Contents

**Introduction** ............................................................................................................... 1

- Executive Summary ............................................................................................. 1
- Monitoring Team's Compliance Assessment ...................................................... 3
- Organization of the Report .................................................................................. 6

**Current State of Affairs** ............................................................................................ 8

- Department Leadership ........................................................................................ 8
  - Agency Leadership ......................................................................................... 8
  - Leadership Appointments ............................................................................... 8
  - Filling Vacancies ............................................................................................ 9
  - Staff Retention, Morale, Wellness and Executive Training ........................... 10
  - Training ........................................................................................................... 10
- Security Practices ............................................................................................... 11
  - Poor Security Practices .................................................................................. 11
  - Ongoing Unnecessary and Excessive Force ................................................... 11
  - Supervision. .................................................................................................... 12
  - Interpersonal Violence ................................................................................... 13
  - Updated Security Plan .................................................................................... 14
  - Incident Reporting .......................................................................................... 16
  - Managing Individuals Who Commit Serious Acts of Violence ...................... 16
  - Routine Touring of Housing Units. ................................................................. 16
  - Reintroduction of Body Worn Cameras ("BWC") .......................................... 17
- Uniform Staffing ................................................................................................. 18
  - Staff Absenteeism ........................................................................................... 18
  - Post Analysis .................................................................................................. 19
  - Awarded Posts ................................................................................................ 19
  - Maximizing Work Schedules .......................................................................... 20
  - Reduction of Uniformed Staff in Civilian Roles ............................................ 21
- Investigations and Accountability ...................................................................... 22
  - Investigations ................................................................................................. 22
  - Staff Discipline ............................................................................................... 22

- Assessing Progress with the *Nunez* Court Orders .......................................................... 23
  - Monitor's 18th Compliance Assessment.......................................................................23
  - Court's 2023 Orders .....................................................................................................24
- Monitoring Team's Assessments of Provisions Subject to Motion for Contempt ....... 24

**Managing People with Known Propensity for Violence.....................................28**
- Enhanced Supervision Housing at RMSC ("RESH")................................................. 28
- Security Practices & Rates of UOF and Violence....................................................... 30
  - Physical Plant Improvements.......................................................................................32
  - Considering Pre-Existing Conflicts When Assigning Level 2 Housing .......................32
  - Elevating Staff's Skillset.............................................................................................32
  - Providing Mandated Services ......................................................................................33
  - Emphasizing Program Engagement..............................................................................33
  - Advocating for Transfer to Units that Address Unmet Mental Health Needs................34
- Use of NIC and Involuntary Protective Custody ....................................................... 34
- Local Law 42 and the *Nunez* Court Orders .............................................................. 36
- Conclusion ................................................................................................................ 39

**18th Monitoring Period Compliance Assessment for Select Provisions ...........41**
- First Remedial Order § A., ¶ 1 (Use of Force Reviews) ............................................. 41
  - Rapid Reviews .............................................................................................................41
  - Rapid Review Data ......................................................................................................42
  - Recommended Corrective Action .................................................................................43
  - Quality of Rapid Reviews ............................................................................................44
  - Conclusion ..................................................................................................................45
- First Remedial Order § A., ¶ 2 (Facility Leadership Responsibilities) .......................46
  - Facility Leadership's Communication with Monitoring Team .......................................46
  - ACT Dashboard and Meetings......................................................................................47
  - Weekly Operational Leadership Meetings.....................................................................48
  - Meetings between Facility Leadership and the Deputy Commissioner of Security Operations 48
  - Executive Leadership Tours ..........................................................................................48
  - Conclusion ..................................................................................................................49
- First Remedial Order § A., ¶ 3 (Revised De-escalation Protocol) ..............................51
  - Use of Force Incidents in Intake Areas .........................................................................52
  - Intake Data Tracking....................................................................................................52

Reduced Reliance on Intake & De-Escalation Units ................................................. 54

Conclusion ............................................................................................................... 55

- First Remedial Order § A., ¶ 4 (Supervision of Captains) ........................................ 56

Goals of Supervision................................................................................................ 56

Scheduling................................................................................................................ 58

Organizational Structure and Number of Supervisors ............................................. 58

Training for Supervisors .......................................................................................... 60

Conclusion ............................................................................................................... 61

- First Remedial Order § A., ¶ 6 (Facility Emergency Response Teams)...................... 62

Concerns Regarding Emergency Response Teams .................................................... 62

Rapid Reviews of Probe Teams & Special Teams .................................................... 63

Facility Response/Probe Team Procedures ............................................................... 65

Frequency of Facility Response/Probe Team Deployments....................................... 66

Composition of Emergency Services Unit ("ESU") and Security Response Teams ("SRT") ... 66

Training for Special Teams ...................................................................................... 67

Conclusion ............................................................................................................... 68

- CJ § IV. Use of Force Policy, ¶ 1 (New Use of Force Directive)................................ 70

UOF Policy .............................................................................................................. 70

Standalone Policies .................................................................................................. 70

Implementation of UOF Policy................................................................................ 71

Conclusion ............................................................................................................... 72

- CJ § V. Use of Force Reporting and Tracking, ¶ 2 (Independent Staff Reports) ......... 73

Notifying Supervisor of UOF .................................................................................. 73

Independent, Complete, and Timely Staff Reports ................................................... 73

Classification of UOF Incidents............................................................................... 76

Alleged Use of Force ............................................................................................... 77

Non-DOC Staff Reporting ....................................................................................... 78

Conclusion ............................................................................................................... 80

- CJ § V. Use of Force Reporting and Tracking, ¶ 22 (Providing Medical Attention Following Use of Force Incident) ............................................................................. 81

- CJ § VII. Use of Force Investigations, ¶ 1 (Thorough, Timely, Objective Investigations) & ¶ 9 (a) (Timing of Full ID Investigations)...................................... 82

Background............................................................................................................... 82

ID Staffing............................................................................................................... 84

Status of Investigations ................................................................................... 86

Timeliness of Investigations ........................................................................... 87

Law Enforcement Referrals ............................................................................ 90

Use of Force Priority Squad ........................................................................... 91

Completion of Investigations .......................................................................... 91

Quality of Investigations ................................................................................ 98

Conclusion ...................................................................................................... 102

- CJ § X. Risk Management, ¶ 1 (Early Warning System) ............................ 104

Staff Actively on E.I.S.S. Monitoring ........................................................... 104

Screening Staff for E.I.S.S. Monitoring ........................................................ 105

E.I.S.S. Meetings with Staff ........................................................................... 106

Management of E.I.S.S. ................................................................................... 107

Conclusion ...................................................................................................... 108

- CJ § VIII. Staff Discipline and Accountability, ¶ 1 (Timely, Appropriate and Meaningful Accountability) ........................................................................... 109

Data on Accountability for Staff Misconduct ................................................ 110

Immediate Corrective Action .......................................................................... 113

Formal Discipline ............................................................................................ 123

Conclusion ...................................................................................................... 133

- First Remedial Order § C. (Timely, Appropriate, and Meaningful Staff Accountability), ¶ 2 (Monitor Recommendations) ....................................... 135

Monitor Recommendations for Immediate Action, etc. (First Remedial Order § C, ¶ 2) ........ 135

Expeditious Resolution of Egregious Misconduct (Action Plan § F, ¶ 2) ............................... 137

Conclusion ...................................................................................................... 140

- First Remedial Order § C. 4/Third Remedial, ¶ 2 (Expeditious OATH Proceedings) & First Remedial Order § C. (Applicability of Disciplinary Guidelines to OATH Proceedings), ¶ 5 ............................................................................................. 141

OATH's Role in DOC's Disciplinary Process ................................................ 142

OATH Internal Operating Procedures and Guidelines ................................... 143

Background on *Nunez* Reform Efforts with OATH ...................................... 144

OATH's Procedures and Protocols ................................................................. 146

OATH Proceedings .......................................................................................... 148

Conclusion ...................................................................................................... 155

- CJ § VIII. Staff Discipline and Accountability, ¶ 4 (Trials Division Staffing) .......... 157

Recruitment Efforts ......................................................................................... 157

Staffing Levels ........................................................................................................ 157

- CJ § XII. Screening & Assignment of Staff, ¶¶ 1-3 (Promotions) ............................ 160

Overview of Staff Promotions from 2017 to June 2024 ........................................ 161

Screening Policy .................................................................................................... 161

Overview of Promotions in This Monitoring Period ............................................. 162

Assessment of Screening Materials ...................................................................... 163

Review of Candidates (¶ 1) ................................................................................... 163

Disciplinary History (¶ 2) ..................................................................................... 164

Pending Disciplinary Matters (¶ 3) ....................................................................... 165

Conclusion ............................................................................................................. 165

- CJ § XV. Safety and Supervision of Inmates Under the Age of 19, ¶ 1 (Prevent Fight/Assault) ....................................................................................................... 166

RNDC's History and Current Facility Population/Composition ........................... 166

RNDC's Rates of Use of Force and Violence ...................................................... 166

RNDC's Programs Action Plan ............................................................................. 167

Monitoring Team Recommendations ..................................................................... 169

Conclusion ............................................................................................................. 169

- CJ § XV. Safety and Supervision of Inmates Under the Age of 19, ¶ 12 (Direct Supervision) ......................................................................................................... 170

- CJ § XV. Safety and Supervision of Inmates Under the Age of 19, ¶ 17 (Consistent Assignment of Staff) ........................................................................................... 172

**Update on the 2023 *Nunez* Court Orders ........................................................... 174**

- June 13, 2023 Order (dkt. 550) ........................................................................... 174

  - Immediate Notification to the Monitor of Serious Events (§I, ¶3) ................. 175

  - Production of Information, Consultation and Access to Staff (§I, ¶¶ 4, 5, 6) ................ 175

  - *Nunez* Manager (§I, ¶7) ................................................................................ 176

  - Department-Wide Remedial Steps to Address the Five Incidents Discussed in the May 26, 2023 Special Report (dkt. 533) (§II) ........................................................................ 176

- August 10, 2023 Order (dkt. 564) ....................................................................... 176

UOF 177

Revised Search Procedures (§ I, ¶ 2) ................................................................... 177

Revised Escort Procedures (§ I, ¶ 3) .................................................................... 178

Lock-in and Lock-out Procedures (§ I, ¶ 4) .......................................................... 179

Control Station Security (§ I, ¶ 5) ........................................................................ 180

Staff Off Post (§ I, ¶ 6) ........................................................................................ 181

Special Teams Training (§ I, ¶ 7) ................................................... 182

Special Teams Command Level Orders (§ I, ¶ 8) .............................. 182

- Screening and Assignment of Staff to Special Teams (§ I, ¶ 9) ..................... 183
- Revised Pre-Promotional Screening Policies and Procedures (§ I, ¶ 10) ...... 183
- ID Staffing (§ I, ¶ 11) ............................................................... 183
- Command Discipline ("CD") Directive (§ I, ¶ 13) ............................ 184
- External Assessment (§ I, ¶ 14) ................................................... 184
- October 10, 2023 Order (dkt. 582) ................................................... 184
  - Immediate Security Plan .......................................................... 185
  - Immediate Reporting Initiatives .............................................. 186
- December 14, 2023 Order (dkt. 656) ................................................ 187
  - List of Reporting Policies (§ 1, ¶ a) ....................................... 187
  - Stabbing and Slashing Definition (§ 1, ¶ b) ............................. 187
  - Definitions of Incident Categories (§ 1, ¶ c) .......................... 187
  - Comprehensive COD Policy (§ 1, ¶ d) .................................... 187
- December 20, 2023 Order (dkt. 665) ................................................ 188

**Conclusion** ........................................................................................ **189**

- Priority Areas of Focus .................................................................. 189
  - Management of the *Nunez* Reforms .......................................... 190
  - Reducing the Risk of Harm ....................................................... 190
  - Engaging Staff in the Reform Effort ........................................ 191
  - Supervisory Structure ............................................................ 191
  - Accountability for Staff Misconduct ......................................... 191
  - Management of Incarcerated Individuals Following Serious Incidents of Violence ...... 192
  - Streamlining the *Nunez* Court Orders ...................................... 192
- Upcoming Monitor's Reports ............................................................ 193

**Appendix A: Data** ............................................................................ **194**

**Number and Rate of UOF - January 2022 to June 2024** ............................ **195**

**Number and Rate of Stabbing and Slashing - January 2022 to June 2024** ....... **199**

**Number and Monthly Rate of Fights  - January 2022 to June 2024** ................ **202**

**Number and Rate of Serious Injury to Inmates - January 2023 to June 2024** .... **205**

**Number and Rate of Fires - January 2022 to June 2024** ............................ **208**

Number and Rate of Assault on Staff, with and without UOF ...............................211

Facility Searches & Contraband Recovery .......................................................... 212

Overview of In-Custody Deaths ........................................................................... 214

Triple Tours ......................................................................................................... 216

Uses of Force Involving Incidents When a Staff Member is Not on Post ........................... 219

Number of ADWs and Captains ........................................................................... 224

Sick Leave, Medically Monitored/Restricted, AWOL, PE, and FMLA ................... 228

Summary of ID Hires and Departures ................................................................... 234

OATH Pre-Trial Conferences ............................................................................... 235

Leadership Appointments – January 2022 to November 15, 2024 ......................... 237

Overtime Spending .............................................................................................. 240

**Appendix B: Updated CD Dismissal Data from Past Monitor's Reports ......245**

Corrected CD Dismissal Data from Prior Monitor's Reports ................................. 246

**Appendix C: Update on Processing New Admissions ...................................249**

Update on Processing of New Admissions ............................................................ 250

- Length of Stay in Intake for Male New Admissions .................................................. 250

- Length of Stay in Intake for Female New Admissions ............................................. 251

- Temporarily Suspending New Admission Processing, a.k.a. Clock-Stoppage .......... 252

- NCU's Audits to Verify Data Entry ........................................................................ 253

- Conclusion ........................................................................................................... 254

**Appendix D: Routine Staff Tours of Housing Units .....................................255**

**Appendix E: Streamlining of *Nunez* Court Orders .....................................262**

- Considerations for a Framework to Streamline the *Nunez* Court Orders .................. 263

- Recommendation to the Court .............................................................................. 265

**Appendix F: Monitor's January 12, 2024 Letter re: LL42 ............................266**

Monitor's January 12, 2024 Communication to DOC Commissioner ....................... 267

Appendix A – Council Bill 549-A – Passed December 20, 2023 ............................ 278

Appendix B - *Nunez* Implications of the City Council Bill 549-A ........................... 293

Appendix C – Definitions of Solitary Confinement ................................................ 296

**Appendix G: Monitor's July 17, 2024  Letter re:  LL42 ...............................304**

**Appendix H: Proposed Order for Monitor's April 2025 Report .....................315**

# INTRODUCTION

This report is the Monitor's 18th compliance assessment, covering select provisions from the Consent Judgment and Remedial Orders.[1] In addition to gathering, analyzing and synthesizing the information needed for these assessments, since its April 18, 2024 Report, the Monitoring Team has been actively engaged by the Department to consult and collaborate on policies, procedures, and trainings, among other things, in order to advance progress on a variety of initiatives. The Monitoring Team has also engaged with the Parties for various meetings and discussions related to Plaintiffs' motion for contempt and appointment of a receiver including, at the Court's direction, working closely with the Parties regarding potential remedial relief. In addition, the Monitoring Team also continues its work to identify the intersection between the *Nunez* Court Orders and Local Law 42, and to identify areas that may be in conflict. This report is focused on the conditions underlying the motion practice and at the heart of the *Nunez* Court Orders, which continue to warrant serious concern.

## EXECUTIVE SUMMARY

The risk of harm in the jails remains very high, often punctuated by acute spikes in violence that further intensify the concern about safety for people in custody and staff. For example, during the first two weeks of November 2024, 18 stabbings/slashings occurred within the City's jails, a disturbing number by any standard. The Monitoring Team's routine site work continues to find the management of the jails' housing units to be fraught with security problems that create a significant risk of harm, and continuing failures to properly supervise, guide and coach staff. These deficiencies permit the opportunity for violence to occur, sometimes inside of

---

[1] *See* Court's April 29, 2024 Order (dkt. 709).

cells that have not been properly secured by staff, and often lead to unnecessary uses of force. Unnecessary and excessive uses of force also remain prevalent during searches and escorts, and head strikes continue to be used in situations where they are prohibited. Unfortunately, the first opportunities to detect these problems—Rapid Reviews and Intake Investigations—too often fail to identify staff's poor practice. Even with a significant volume of poor practice going undetected, the number of staff suspended for use of force ("UOF") policy violations/conduct unbecoming is very high, underscoring the danger within the system and suggesting that the volume of discipline reflects only a small portion of a much larger problem, that of staffs' marginal levels of competency and poor performance directly related to harm. These deficiencies are omnipresent and permeate every assessment of compliance discussed in this report.

The Department remains mired in dysfunction as it attempts to address a variety of polycentric problems where each element is intertwined with others. Untangling the morass requires both commitment and continuity of leadership, and a corps of supervisors and officers who follow their lead and embrace the imperative for reform. Without both commitment and competence among all members of the Department's staff, the reform effort will continue to advance at a glacial pace.

Within these distressing conditions, some signs of progress exist. In this report, the Monitoring Team seeks to identify where and how progress is occurring so that it can be replicated and amplified over time. Elements of progress are evident in both the overarching framework for reform and in the more granular aspects of certain Department functions. The Commissioner is providing solid and steady leadership, has appointed a well-qualified leadership team, and has restored the Department's functional collaboration with the Monitoring Team. The City has demonstrated its ability to remove certain obstacles to reform by waiving hiring

restrictions so that the Department can fill vacancies more quickly. In certain areas, the Department has sustained a focus on planning and implementing a key initiative (*i.e.*, the RNDC Action Plan), has begun to elevate staff practice (*i.e.*, facility leadership and RESH operation), and has begun to address previous regression (*i.e.*, the Investigations Division).

The pace of the reform is nowhere near what the urgency of the situation demands. Many of the Department's current actions comprise only basic steps and yet are essential building blocks. Each element must be expanded, deepened and amplified in order to begin to ameliorate the dangerous conditions in the jails.

MONITORING TEAM'S COMPLIANCE ASSESSMENT

A comprehensive process for assessing compliance and describing the current state of affairs requires multiple measures to be evaluated in each key area of the *Nunez* Court Orders because no one metric adequately represents the multi-faceted nature of their requirements. While quantitative data is a necessary component of any analysis, relegating a nuanced, complex, qualitative assessment of progress towards achieving compliance with these requirements into a single, one-dimensional, quantitative metric is not practical or advisable. Data—whether qualitative or quantitative—cannot be interpreted in a vacuum to determine whether progress has been made or compliance has been achieved. For example, meeting the requirements of the Use of Force Policy provision of the Consent Judgment relies on a series of closely related and interdependent requirements working in tandem to ultimately reduce and, hopefully eliminate, the use of unnecessary and excessive force. As such, there is no single metric that can determine whether the Use of Force Policy has been properly implemented. Analogous situations appear throughout this report, whether focused on discussions about the Department's improving safety in the facilities, making the process for imposing staff discipline timelier and more effective, or

addressing its staffing needs. The Monitoring Team therefore uses a combination of quantitative data, qualitative data, contextual factors, and references to sound correctional practice to assess progress with the requirements of the *Nunez* Court Orders.

Further, two cautions are needed regarding the use of quantitative metrics. First, the use of numerical data suggests that there are specific metrics or definitive lines that specify a certain point at which the Department passes or fails. There are no national standards regarding a "safe" use of force rate, a reasonable number of "unnecessary or excessive uses of force" nor an "appropriate" rate at which staff are held accountable.[2] Consequently, the Monitoring Team uses a multi-faceted strategy for assessing compliance that evaluates all inter-related issues.

Second, there are infinite options for quantifying the many aspects of the Department's approach and results. Just because something *can* be quantified, does not mean it is necessarily useful for understanding or assessing progress. The task is to identify those metrics that actually provide insight into the Department's processes and outcomes and are useful to the task of problem solving. If not anchored to a commitment to advance and improve the processes and outcomes that underpin the requirements of the *Nunez* Court Orders, the development of metrics merely becomes a burdensome and bureaucratic distraction.

It is axiomatic that reform is intended to improve upon the conditions at the time the Court first entered the Consent Judgment and that the initiatives implemented as required by the *Nunez* Court Orders in fact improve practice. It must also be emphasized that the various Remedial Orders that were entered following the Consent Judgment were all intended to create

---

[2] Notably, this is why neither the Consent Judgment, the underlying *Nunez* litigation, CRIPA investigation, the Remedial Orders, nor the Action Plan include specific metrics the Department must meet with respect to operational and security standards that must be achieved.

the capacity to comply with the requirements of the Consent Judgment. None of the *Nunez* Court's Orders "move the goal posts" or materially change the Department's obligation to fully comply with the Consent Judgment. For this reason, the Monitoring Team compares current performance levels and key outcomes to various periods of time, including those at the time the Consent Judgment went into effect as well as other markers such as when a policy was adopted and implemented. The Monitoring Team has taken this same approach throughout the duration of its work.

Since the Consent Judgment was entered, changes to the context within which the jails operate have occurred and these externalities must be recognized. One of the most obvious externalities is the COVID-19 pandemic which began in March 2020, and triggered a staffing crisis that exacerbated decades-long mismanagement of the Department's most important resource—its staff—which then cascaded into even more problems in many of the areas that impact jail safety (*e.g.*, failure to provide mandated services which generates frustration; levels of stress among people in custody and staff which can trigger poor behavior; interruptions in programming that increase idle time). In addition, recent bail reform enacted by the State has changed the composition of the jails' incarcerated population. Individuals with less serious offenses who previously may have been incarcerated are generally no longer held pending trial. While this has had the effect of reducing the overall jail population, it has resulted in a heavier concentration of detainees with more serious offenses in the jails.

These external factors do not change the City's obligation to provide safe and humane treatment to those within its jails, and while important for understanding shifts in the size and characteristics of the jail population and the resulting dynamics that surround jail safety, they do not excuse failure to comply with the *Nunez* Court Orders. The constitutional minimum of care

and safety that must be afforded to all incarcerated individuals has remained the same and continues to be the standard by which all reform must be measured.

The array of quantitative metrics, qualitative assessments, and an appreciation of externalities mean that discussions about the current state of affairs can be cast in many ways, many of which are legitimate strategies for understanding the Department's trajectory. The selected comparison point can lead therefore to different conclusions about the magnitude or pace of progress or the lack thereof. The Monitoring Team has dutifully examined changes in metrics and patterns in staff behavior from multiple angles in order to gain insight into the factors that may be catalyzing or undercutting progress. While such explorations are useful for purposes of understanding and problem solving, they do not replace the overarching requirement for the Department to materially improve the jails' safety and operation relative to the conditions that existed at the time the Consent Judgment went into effect.

## ORGANIZATION OF THE REPORT

This report includes the following sections:

- Current State of Affairs

- Compliance Assessment for Select Provisions of the Consent Judgment and First Remedial Order

- Update on the 2023 *Nunez* Court Orders

- Managing People with Known Propensity for Violence

- Update on Staffing Initiatives

- Streamlining the *Nunez* Court Orders

- Conclusion

This report includes the following appendices:

- Appendix A: Data

- Appendix B: Updated CD Dismissal Data from Past Monitor's Reports

- Appendix C: Update on Processing New Admissions

- Appendix D: Routine Staff Tours of Housing Units

- Appendix E: Streamlining of *Nunez* Court Orders

- Appendix F: Monitor's January 12, 2024 Letter to the Commissioner re: LL42

- Appendix G: Monitor's July 17, 2024 Letter to the Commissioner re: LL42

- Appendix H: Proposed Order for Monitor's April 2025 Report

# CURRENT STATE OF AFFAIRS

The Monitoring Team has reported extensively on the current state of affairs. Given both the frequency of reporting and the time required for the Department to implement reforms, much of the information discussed in prior reports remains relevant today.

## DEPARTMENT LEADERSHIP

The current Commissioner was appointed nearly one year ago. Her appointment brought an immediate change to the tenor of the agency and the relationship with the Monitoring Team. The Commissioner faced a variety of daunting challenges upon her appointment, including a need to fill multiple vacancies on her leadership team, as described in more detail below.

- **Agency Leadership.** The Department's current Commissioner has brought both a candid and honest view of the Department's problems and critical transparency to the reform process. Her leadership has influenced many facets of the Department's work, and her subordinates have begun to embrace the mandate for reform. She has approached the need for change with a composure that allows her staff to pursue improved practice in a deliberate and thoughtful manner and has returned the Department's posture with the Monitoring Team to one of consultation and collaboration. The Commissioner also invited the Monitoring Team to meet with prospective candidates for key leadership positions to gauge their understanding of the challenges that confront the Department and to offer input regarding their candidacy.

- **Leadership Appointments.** The Commissioner has filled a number of critical vacancies, which now allows the agencies' top leaders to establish their authority and to begin to take action. Since taking office, the Commissioner has appointed at least 30 individuals to executive and leadership positions, including among others: Senior Deputy

Commissioner, Deputy Commissioner of Facility Operations and Classification, Deputy Commissioner of Security, Deputy Commissioner of Administration, Associate Commissioner of ID, Senior Deputy Chief of Staff, General Counsel, and Administrative Director of Facility Operations. A full list of leadership appointments can be found in Appendix A: Leadership Appointments. These individuals appear to be reform-minded, with solid resumes and backgrounds that fit the contours of their responsibilities. Some of these appointments include individuals who previously worked for the Department and a person who worked for the NYC Board of Corrections, each of whom have background in the reform effort and possess an understanding of the Department's culture and challenges that allow them to immediately grasp the current situation and the issues. Notably, the Commissioner reinstated the Associate Commissioner of ID, a well-respected and seasoned leader who has been an integral part of the Department's reform effort and attempts to comply with the *Nunez* Court Orders.[3] The Monitoring Team has also found that a few of the facilities' Wardens have proven to be effective leaders of the supervisors and staff in their commands. Ensuring that all of the jails have effective leaders who can advance the commitment to reform down into the ranks, thereby elevating the quality of staff supervision and proper management of the housing units, is an ongoing and pervasive need.

- **Filling Vacancies.** As discussed at length in the Monitor's April 18, 2024 Report (dkt. 706), the City's bureaucracy imposes significant burdens that make the already challenging task of hiring staff even more difficult.[4] The Department continues to have

---

[3] *See* Monitor's December 8, 2023 Report (dkt. 639) at pgs. 3 to 4.

[4] *See* Monitor's April 18, 2024 Report (dkt. 706) at pgs. 17-18.

many vacancies that need to be filled across all areas of the Department, including but not limited to the Investigations Division, Trials Division, Legal Division, Strategic Initiatives, and Programs Division. Fortunately, on October 28, 2024, the City waived its previous 2-for-1 hiring restrictions which will make it easier for the Department to hire and onboard staff to fill critical vacancies. This action by the City is important because it removes a barrier to the reform effort in order to permit the Department to hire critical staff.

- **<u>Staff Retention, Morale, Wellness and Executive Training</u>**. One of the Commissioner's key priorities is staff retention, morale, wellness and training demonstrated by the return of various staff appreciation activities (e.g., Medal Day to recognize uniform and civilian staff members who provide exceptional public service), sending certain Wardens to external training on leadership and supporting both a Women's and Men's Conference (focused on wellness, morale, and mental health). She also has focused on supporting staff's wellness by facilitating mental health services to staff following engagement in possible traumatic events.

- **<u>Training</u>**. During the current Monitoring Period, the Training Development Division maintained a collaborative relationship with the Monitoring Team and has incorporated much of the Monitoring Team's feedback to align training materials with sound correctional practice. Between January and September 2024, the Division successfully finalized six major training programs (ESU, Conflict Resolution, Use of Force for Supervisors, Captain's Promotional Training, Field Officers Training, and Captain's Leadership Training). The Division is currently working with the Monitoring Team to develop two additional critical trainings (ADW Training and Chemical Agents). Finally,

the Division is focused on broader initiatives, such as improving staff retention to support

probationary officers and enhancing the efficiency and engagement of re-training

programs.

**SECURITY PRACTICES**

Violence and the excessive/unnecessary use of force remain overarching concerns in the

jails.  All of the key metrics reveal higher rates of violence and uses of force than in 2018 when

the new Use of Force Policy went into effect. However, among these disturbing statistics and

comparisons are some incremental improvements. More detailed data is provided in Appendix A.

- **<u>Poor Security Practices</u>.** Many of the harms befalling people in custody are the result of

  poor security practices in which staff do not properly utilize security hardware (*e.g.*, locks

  and gates), supervise and control the environment, or search and escort people according

  to sound correctional practice. Security audits conducted by the *Nunez* Compliance Unit

  between April and September 2024 at OBCC, RNDC, GRVC, and EMTC revealed

  essentially the same problems that have been identified and reported for years, with little

  to no improvement. The Monitoring Team has expounded upon these deficiencies at

  length in every compliance assessment to date, most recently in the Monitor's April 18,

  2024 Report (dkt. 706) at pgs. 22-26 which continue to reflect the current state of affairs.

- **<u>Ongoing Unnecessary and Excessive Force</u>.** During its routine review of use of force

  incidents, the Monitoring Team continues to find pervasive unnecessary and excessive

  uses of force, including staff actions and inactions that precipitate the use of force, head

  strikes delivered during circumstances that do not warrant this type of "last resort"

  response, OC spray used excessively and/or gratuitously, and uses of force that result in

  serious injuries to people in custody. These are described in detail in the Monitor's April

18, 2024 Report (dkt. 706) at pgs. 29-38 and continue to reflect the current state of affairs. Critically, the Department remains in Non-Compliance with the provision requiring implementation of the new Use of Force Policy.

- **<u>Supervision.</u>** Elevating and changing staff practice will require an infusion of correctional expertise in a form that reaches more broadly, deeply, and consistently into staff practice than facility leadership has been able to accomplish to date. The Department simply does not have the necessary assets among its current corps of supervisors to provide the type and intensity of hand-to-hand coaching that is required, which is perhaps unsurprising given their tenure in a deeply dysfunctional system that does not adequately select, train, or prepare them for the task at hand as described in detail in the April 18, 2024 Monitor's Report at pgs. 12-15.  The challenge of providing adequate supervision is compounded by the Department's organizational structure. Most correctional systems have three supervisory ranks (a first line supervisor who supervisors the officers, then a second line supervisor who serves as the conduit between the first line supervisor and the Tour Commander).  In this Department, there is not an additional supervisory rank between the first line supervisor (Captains) the Tour Commanders (ADWs).  The problem presented by the Department's truncated chain of command is further exacerbated by the inadequate number of individuals holding each of the two ranks. [5]

---

[5] *See* Monitor's Ninth Report (dkt. 341) at pgs. 22-24, Monitor's Tenth Report (dkt. 360) at pgs. 25-30, Monitor's Eleventh Report (dkt. 368) at pgs. 104-113, Monitor's Twelfth Report (dkt. 431) at pgs. 37-42 and 44-45, Monitor's October 28, 2022, Report (dkt. 472) at pgs. 133-136, Monitor's November 8, 2023, Report (dkt. 595) at pgs. 25-28, Monitor's December 22, 2023, Report (dkt. 666) at pgs. 14-17, and Monitor's April 18, 2024 (dkt. 706) report at pgs. 66-68.

- **<u>Interpersonal Violence</u>.** The current level of interpersonal violence is antithetical to a safe and orderly jail operation. The rates of various metrics, including stabbings and slashings, fights and fire-setting, are substantially higher than those observed at the time the Consent Judgment went into effect and continue to illustrate the need for drastic changes to the jails' operations targeting the underlying causes of violence and interpersonal conflict, not the least of which is officers' commitment and ability to effectively supervise the housing units. The thumbnail graphs below illustrate that while the rates of certain forms of interpersonal violence have decreased from their apex, widespread violence continues to plague the jail system.









- **<u>Updated Security Plan.</u>** The Department updated its comprehensive Security Plan in June 2024 and the Monitoring Team provided extensive feedback. The Security Plan included many of the same components included in prior iterations of the Security Plan, which never gained traction nor proved to be effective. The Monitoring Team has long reported on the need for a comprehensive Security Plan. However, the June 2024 Security Plan, developed by the former Deputy Commissioner of Security, was broad in scope but lacked discrete and practical strategies. In evaluating both the deficiencies in the Security Plan and the Department's current capacity, the Monitoring Team recommended the Department adopt an approach to addressing various security deficiencies by focusing on discrete and basic elements of sound correctional management such that each deficiency can be approached more directly and intensively. Doing so may create the ability to ameliorate individual deficiencies such that more sustainable, universal improvements can be achieved.

  The Commissioner has recently appointed three critical and experienced leaders (the Senior Deputy Commissioner, the Deputy Commissioner of Security, and the Deputy Commissioner of Classification and Facility Operations) to manage the operations of the jails, one of whom (the Senior Deputy Commissioner) is also the chair of the newly created Security Council.[6] The Security Council has been charged with devising and

---

[6] The Commissioner created a Security Council that is charged with developing a plan to identify and address security issues that permit or contribute to violence in the jails and that impede compliance with the *Nunez* Court Orders. The Security Council will be chaired by the Senior Deputy Commissioner. The Deputy Commissioner of Security and the Deputy Commissioner of Classification and Facility Operations will serve as members of the Security Council, as well as a number of other Department leaders.

implementing strategic security initiatives to advance the *Nunez* reforms. Although newly minted, this initiative has promise.

- o *Door Security Initiative*. The first discrete initiative is to focus on properly securing cell doors and offering options for lockout in accordance with Department policy. In September 2024, a pilot program was launched in three housing areas at GRVC, OBCC and RNDC which involved assigning an additional officer to the units who are specifically responsible for securing doors, removing cell obstructions, enforcing lock-in/lock-out procedures, and ensuring that individuals in custody are properly assigned to cells. The Assistant Commissioner/Warden and Deputy Wardens make frequent tours, and Tour Commanders are required to document deficiencies and corrective actions. In October 2024, the Monitoring Team provided feedback on the initiative, recommending targeted improvements in staffing, communication, oversight and audits. Initial results indicate some decline in incidents resulting from unsecured cell doors, but widespread problems with door security and cell obstructions remain. The Monitoring Team has encouraged the Department to maintain the pilot and to explore additional strategies for improving compliance, such as a more structured approach to providing options to people in custody for locking in/locking out, incentives, and improving rapport and cooperation among staff and people in custody. Additional strategies must be explored to identify those that are most effective, and then to expand the pilot to additional housing units.

- **<u>Incident Reporting</u>**. The problems of underreporting and inaccurate incident reporting observed in 2023 do not appear to have continued into 2024, but reporting practices still need to be reconfigured to ensure comprehensive, consistent, and accurate reporting. This issue is discussed in more detail in the Update on the 2023 *Nunez* Court Orders section of this report.

- **<u>Managing Individuals Who Commit Serious Acts of Violence</u>**.  A safe jail system must have a safe, effective strategy for managing individuals who commit serious acts of violence while in custody. Since its launch in June 2023, the Department's Enhanced Supervision Housing program ("RESH") has been plagued by poor security practices that permit interpersonal violence to continue, even in these more restrictive settings. However, RESH's leadership has taken important steps to improve safety in its housing units, largely by providing the type of intensive, one-on-one coaching with staff needed to elevate practice and improve skill mastery and by making service delivery more dependable. A more detailed assessment of RESH (and the Department's use of NIC to manage individuals who cannot be placed in RESH) is discussed in the "Managing People Following Serious Acts of Violence" section of this report, along with an update on the Monitoring Team's work to evaluate the intersection of the *Nunez* Court Orders with Local Law 42.

- **<u>Routine Touring of Housing Units</u>**. Staff's routine and adequate touring of housing units is a fundamental component of sound correctional practice. Staff must visually inspect the housing units, particularly when incarcerated individuals are confined to their cells, to ensure the welfare of people in custody, to respond to their concerns and to address any problems that arise. Routine touring still does not occur as required and the

Department continues to work to devise both reliable data and to improve its quality assurance efforts in this area. A detailed discussion regarding the Department's touring practices and the Department's internal assessments of whether touring occurs as required is included in Appendix D of this report.

- **Reintroduction of Body Worn Cameras ("BWC").** The use of BWC to capture incidents in the jails is critical because the video footage and audio recordings have proven invaluable to determining exactly what occurred. Unfortunately, staffs' use of BWC is not always consistent (e.g., failures to activate, failures to wear the BWC, etc.). The Monitoring Team strongly encouraged the Department to reintroduce BWCs back into the facilities as soon as possible following their suspended use in May 2024 after a BWC caught fire while a staff member was wearing it. Beginning in July 2024, after the manufacturer cleared the BWCs for use, the Department began to redeploy BWCs for use by staff. The BWCs were first redeployed to posts in RESH, followed by GRVC (in August 2024), the Transportation Division, RNDC, and OBCC. The existing inventory of BWCs is both insufficient in number and many are also projected to be decommissioned after December 2024, as they will have reached their five-year manufacturer-recommended lifespan. Accordingly, the Department has procured 6,200 *new* BWCs, which are scheduled for distribution beginning in December 2024. The Department sought and received a grant of almost $2 million to support the expanded use of the BWC program. The rollout will begin in RMSC and NIC/West Facility, followed by monthly deployments to other facilities. Each officer and Captain will be assigned an individual BWC along with a personal magnetic backing, making the device part of their uniform. Staff members will be responsible for maintaining their assigned BWCs. The

Department is also in the process of finalizing policies, training programs, staff communication plans, and docking station installations to support the expanded use of the new BWCs.

**UNIFORM STAFFING**

A fundamental component of *safely* managing the incarcerated population is to ensure that an adequate number of qualified staff are assigned to work with persons in custody in the housing units. Historically, the Department has lacked an appropriate framework and basic tools to properly administer and manage staff assignments, particularly because of poor scheduling and deployment practices. Accordingly, the *Nunez* Court Orders include various requirements with the common goal of increasing the number of staff who are available to work in the facilities by creating efficiencies, preventing abuses, and rethinking some of the conventions that have been used historically to deploy staff to the facilities. Updates on various requirements are provided below.

- **Staff Absenteeism.** Among the uniformed ranks, the Department continues to have a large workforce but has endured significant attrition since the effective date of the Consent Judgment. Between 2019 and 2024, the size of the Department's uniformed staff workforce decreased from about 10,155 to 5,848 as of November 8, 2024. The impact of this high level of attrition is partially offset by decreases in the size of the incarcerated population, from an average daily population of approximately 9,900 in 2015 to approximately 6,300 in 2024.

    Separate from the size of the uniformed workforce is the problem of staff availability, which is exacerbated by staff absenteeism (*e.g.*, sick leave, FMLA, Personal Emergency, etc.) and staff on modified duty who cannot be assigned to posts that involve

the direct supervision of people in custody. The Department made significant progress curbing the abuse of sick leave and modified duty (*i.e.*, Medically Monitored/Restricted or "MMR"). In 2021, an average of 18% of uniformed staff were out sick each day, and an average of 8% were on MMR. To date in 2024, the proportion out sick each day has decreased to an average of 6% and an average of 5% are on MMR. While the Department appears to have effectively curbed abuses in these areas, a problem involving potential abuses of Family Medical Leave Act ("FMLA") and Personal Emergency leave has emerged. With respect to FMLA, in 2021, an average of 0.7% on FMLA leave and in 2024, the proportion of staff on FMLA leave has more than doubled, to 1.9%. Further, it has been reported that staff are also not utilizing Personal Emergency time as designed. Consequently, efforts to combat staff absenteeism and ensure that leave benefits are used appropriately remain critical to the Department's effort to ensure that facilities are properly staffed day-to-day. Data regarding staff absenteeism are provided in Appendix A: Sick Leave, Medically Monitored/Restricted, AWOL, PE, and FMLA.

- **<u>Post Analysis</u>.** The purpose of a post analysis is to identify the specific posts that require a uniform staff member to operate the jails safely and efficiently. The Department requested that the State Commission on Correction ("SCOC") conduct the post analysis required by Action Plan § C ¶ 3 (viii). The SCOC's work on the post analysis began in October 2024 with a focus on one facility so that the Department and the SCOC could work together on this initial assessment before expanding it.

- **<u>Awarded Posts</u>.** The use of awarded posts inhibits the Department's flexibility in deploying staff, which is why the *Nunez* Court Orders require the Department to reduce its reliance on them. The Department's use of a post that is "awarded" is governed by

policy but a number of inflexible *practices,* not codified in policy, have become entrenched and impede the Department's overall ability to maximize the deployment of its staff.  Awarded Post data is included in Appendix A. The background and concerns about this issue are described in detail in the Monitor's May 24, 2024 Report at pgs. 15 - 18. Some progress has been made in this area. First, the practice of awarding posts to specific staff members remains suspended except in a few select cases in which the Commissioner determines there is a specific need for an awarded post. The Monitor is consulted prior to a final determination by the Commissioner. Second, the Department now maintains a reliable list of all staff who have been awarded a post. As shown in Appendix A, the number of staff with an awarded post has continued to decrease. Third, the Department has procedures in place to mitigate the possibility that staff have an "unofficial" awarded post. Fourth, the Office of Administration is evaluating each awarded post to determine whether the staff should maintain the post or if the post should be eliminated.  These are useful and concrete steps, but significant work remains to finish the tasks currently underway as well as to address additional steps (*e.g.* updating policies and procedures related to Awarded Posts) to ensure that this process is managed with fidelity.

- **<u>Maximizing Work Schedules</u>.** The Department must maximize staff work schedules as required by Action Plan § C, ¶ 3(vi). The purpose of this requirement is for the Department to optimize staff scheduling to increase the number of days a staff member works per year by implementing alternatives to the current work schedule for uniform staff assigned to work in the facilities. Specifically, the Department is required to minimize the use of the 4x2 schedule. The Department has not made any progress toward

this requirement since the previous Monitoring Period, and thus the findings in the Monitor's April 18, 2024 Report (pgs. 268-270) continue to apply. Further, despite reporting that their ability to modify the 5x2 schedule (as a potential alternative to the 4x2 schedule) is limited by the collective bargaining agreement, the most recent contract with the Correction Officer union signed in May 2024 did not address this issue.

- **<u>Reduction of Uniformed Staff in Civilian Roles</u>.** To date, the Department has made little progress in reducing the number of uniform staff assigned to posts with duties that can be reasonably accomplished by a civilian as required by Action Plan § C, ¶ 3(vii). A few discrete actions have been taken or initiated to address this issue: (1) Seven uniformed positions at HMD were transferred to civilian positions, and the selected candidates began working in early November 2024, (2) all uniform staff working in the Timekeeping office were transferred back to their commands in September 2023.[7] Just after the end of the Monitoring Period, the Department made an important step forward by articulating a strategy, with concrete steps and responsible parties, to broadly identify appropriate posts for conversion. The strategy was developed by an interdepartmental group that meets bi-weekly, which may avoid the pitfalls of past efforts conducted by a single division that was not coordinated with other relevant Departments. Furthermore, in fall 2024, the new Staffing Manager reported that the Office of Administration is in the process of evaluating the list of Awarded Posts (described above) to ascertain whether any of those posts could be converted to civilian positions, which would address two Action Plan requirements simultaneously (§ C, ¶ 3(vii) to limit the use of uniformed staff

---

[7]OMB denied the request to backfill the positions with civilians. Properly staffing the Timekeeping office to ensure a backlog does not accumulate has required several part-time staff to be onboarded, the use of temporary employees from an agency, and temporarily assigning three officers to perform these functions.

in duties that could be addressed by civilians and § C, ¶ 3(v) to reduce the use of awarded posts). This strategy appears promising.

**INVESTIGATIONS AND ACCOUNTABILITY**

Proper accountability for staff misconduct is a cornerstone of the *Nunez* Court Orders, and rests on the Department's ability to effectuate robust investigations and timely, proportional staff discipline.

- **<u>Investigations</u>.** The previous leaders of the Investigation Division, who acted in a fashion that compromised and impeded progress that had been achieved in these areas, have been replaced. The new leaders must rebuild both the staff resources and commitment to improved practice within the Division which will require both tenacity and technical assistance to regain lost ground and improve the quality of the work product. A few signs that the Division is on the right course have emerged, including making referrals for Full ID Investigations when warranted and conducting investigations that identify a more complete range of misconduct. The reinstatement of the Associate Commissioner of ID as part of the leadership team is an important and critical step to revitalizing the unit. Nonetheless, further improvements to investigation quality (particularly, with regard to identifying misconduct when it occurs, identifying all misconduct and drawing appropriate conclusions from the available evidence) and timely completion of investigations remain critical.

- **<u>Staff Discipline</u>.** Small improvements in the disciplinary process have emerged, particularly the Department's new process for utilizing and managing Command Disciplines. However, the Monitoring Team remains concerned that Command Disciplines are being overused in situations where formal discipline appears more

appropriate. Furthermore, given the deficiencies in the investigatory process, referrals for formal discipline are at an all-time low which is in direct conflict with the fact that the Monitoring Team has not observed a concurrent decrease in misconduct during its routine reviews of incidents. The Trials Division has closed its cases more quickly than in the past, but its ability to move the Department toward compliance is substantially hindered by the failure of other components of the process to detect misconduct when it occurs and to refer those cases for discipline. Finally, the Monitoring Team has significant concern about the efficacy of delegating cases to be adjudicated by OATH and whether this structure impedes the goal of timely prosecution.

Each of these issues is discussed in detail in this report in the compliance assessments for Consent Judgment, § VII, Use of Force Investigations and Consent Judgment, § VIII, Staff Discipline & Accountability.

**ASSESSING PROGRESS WITH THE *NUNEZ* COURT ORDERS**

This report includes compliance assessments for the 18th Monitoring Period.  It provides compliance assessments and/or updates on certain requirements of the *Nunez* Court Orders, including select provisions of the Consent Judgment and First Remedial Order as well as the 2023 *Nunez* Court Orders.

- **Monitor's 18th Compliance Assessment.** This report represents the Monitor's 18th Compliance Assessment, which assesses progress on a selected group of provisions at the direction of the Court.[8] For the vast majority of provisions, the compliance ratings did not

---

[8] *See* Court's April 29, 2024 Order (dkt. 709).

change from the 17th Compliance Assessment. Compliance ratings improved in four areas:

- Consent Judgment, § XII, ¶ 1, Screening Staff for Promotion;

- Consent Judgment, § XV, ¶ 1, Protecting Young Inmates from an Unreasonable Risk of Harm;

- First Remedial Order, § A, ¶ 2, Facility Leadership Responsibilities; and

- First Remedial Order, § A, ¶ 6, Facility Emergency Response Teams.

- **<u>Court's 2023 Orders.</u>** The Court issued five substantive orders in 2023, intended to catalyze improvement in the Department's management of the *Nunez* Court Orders. The Department continues to work on various components of these requirements and an update is included in the Update on the 2023 *Nunez* Court Orders section of this report.

**MONITORING TEAM'S ASSESSMENTS OF PROVISIONS SUBJECT TO MOTION FOR CONTEMPT**

On November 17, 2023, counsel for the Plaintiff class filed a Motion for Contempt and Application for Appointment of a Receiver.[9] Counsel for Defendants filed their opposition on March 19, 2024. On May 30, 2024, counsel for the Plaintiff class filed a reply papers.[10] Following the filing of the reply papers, the Parties, engaged in an extensive meet and confer process, facilitated by the Monitoring Team, in order to resolve as many potential disputes as possible. On July 30, 2024, the Parties filed a joint status report regarding the outcome of these discussions and also filed updated proposed statements of facts. Oral argument regarding the motion for contempt was held on September 25, 2024. On September 26, 2024, the Court issued

---

[9] Counsel for the Southern District of New York submitted a letter in support of the Motion for Contempt and Application for Appointment of a Receiver filed by the Plaintiff Class.

[10] Counsel for the Southern District of New York submitted a letter in support of the reply briefing.

an order directing the Monitoring Team to engage with the Parties regarding potential remedial proposals. The Monitoring Team updated the Court on this work in its November 13, 2024 Report (dkt. 796). On November 14, 2024, the Court directed the Monitoring Team to provide a more detailed update regarding the Parties' positions on proposed remedial relief 15 business days after the issuance of the Court's determination on the motion for contempt. *See* Court's November 14, 2024 Order (dkt. 798).

The table below identifies where the Monitoring Team addresses the provisions subject to the Motion for Contempt for the current Monitoring Period, January-June 2024.

| Provision | Location |
|-----------|----------|
| Consent Judgment, § IV, ¶ 1: Implement New Use of Force Directive | The compliance assessment for this provision is addressed in the "18th Monitoring Period Compliance Assessment" section of this report. |
| Consent Judgment, § VII, ¶ 1: Thorough, Timely, Objective Investigations | The compliance assessment for this provision is addressed in the "18th Monitoring Period Compliance Assessment" section of this report. |
| Consent Judgment, § VII, ¶ 9 (a): Timeliness of Full ID Investigations | The compliance assessment for this provision is addressed in the "18th Monitoring Period Compliance Assessment" section of this report. |
| Consent Judgment, § VII, ¶ 11: ID Staffing | The compliance assessment for this provision is addressed in the "18th Monitoring Period Compliance Assessment" section of this report. |
| Consent Judgment, § VIII, ¶ 1: Timely, Appropriate and Meaningful Discipline | The compliance assessment for this provision is addressed in the "18th Monitoring Period Compliance Assessment" section of this report. |
| Second Remedial Order, ¶1 (i)(a): Interim Security Plan | *See* the "Current State of Affairs" section of this report and the "Update on the 2023 *Nunez* Court Orders" section of this report |

| Provision | Location |
|---|---|
| Action Plan, § A, ¶1 (d): Improved Routine Tours | *See* the "Current State of Affairs" section of this report and Appendix D. |
| Action Plan, Improved Security Initiatives § D, ¶ 2 (a): Interim Security plan | *See* Second Remedial Order, ¶1(i)(a) above. |
| Action Plan, Improved Security Initiatives § D, ¶ (d): Searches | *See* the "Update on the 2023 *Nunez* Court Orders" section of this report and Appendix A: Facility Searches and Contraband Recovery |
| Action Plan, Improved Security Initiatives § D, ¶ (e): Identify/Recover contrabands | *See* the "Update on the 2023 *Nunez* Court Orders" section of this report and Appendix A: Facility Searches and Contraband Recovery of this report. |
| Action Plan, Improved Security Initiatives § D, ¶ (f): Escort holds | *See* the "Update on the 2023 *Nunez* Court Orders" section of this report. |
| First Remedial Order, § A, ¶ 2: Facility Leadership Responsibilities | The compliance assessment for this provision is addressed in the "18th Monitoring Period Compliance Assessment" section of this report. |
| First Remedial Order, § A, ¶ 4: Supervision of Captains | The compliance assessment for this provision is addressed in the "18th Monitoring Period Compliance Assessment" section of this report. |
| Action Plan, § C, ¶ 3 (ii) Increased Assignment of Captains in the Facility | *See* First Remedial Order, § A, ¶ 4 above. |
| Action Plan, § C, ¶ (iii): Improved Supervision of Captains | *See* First Remedial Order, § A, ¶ 4 above. |
| Action Plan, § C, ¶ 3, (v): Awarded Posts | *See* the "Current State of Affairs" section of this report |
| Action Plan, § C, ¶ 3, (vi): Maximize Work Schedules | *See* the "Current State of Affairs" section of this report |
| Action Plan, § C, ¶ 3, (vii): Reduction of Uniformed Staff in Civilian Posts | *See* the "Current State of Affairs" section of this report |
| First Remedial Order, § A, ¶ 6: Facility Emergency Response Teams | The compliance assessment for this provision is addressed in the "18th Monitoring Period Compliance Assessment" section of this report. |

| Provision | Location |
|---|---|
| Consent Judgment, § XV, ¶ 1: Prevent Fights/Assaults (Safety and Supervision of Inmates Under the Age of 19) – *18-year-olds* | The compliance assessment for this provision is addressed in the "18th Monitoring Period Compliance Assessment" section of this report. |
| Consent Judgment, § XV, ¶ 12: Direct Supervision (Safety and Supervision of Inmates Under the Age of 19) – *18-year-olds* | The compliance assessment for this provision is addressed in the "18th Monitoring Period Compliance Assessment" section of this report. |
| Consent Judgment, § XV, ¶ 17: Consistent Assignment of Staff (Safety and Supervision of Inmates Under the Age of 19) – *18-year-olds* | The compliance assessment for this provision is addressed in the "18th Monitoring Period Compliance Assessment" section of this report. |
| First Remedial Order, § D, ¶ 1: Consistent Staff Assignment and Leadership | *See* Consent Judgment, § XV, ¶ 12 above. |
| First Remedial Order, § D, ¶ 3; 3(i): Reinforcement of Direct Supervision | *See* Consent Judgment, § XV, ¶ 17 above. |

## MANAGING PEOPLE WITH KNOWN PROPENSITY FOR VIOLENCE

Operating and safely managing a program for detainees with a known and recent propensity to engage in violent predatory behavior is a challenging but necessary endeavor. The concentration of people who may respond to interpersonal conflict with violence against both other people in custody and staff underscores the importance of sound security practices in programs of this type. The approach must recognize the substantial and sometimes life-threatening harm already inflicted and the mandate to prevent further victimization.

Housing and programming for individuals with a known propensity for violence must be well-designed and security practices must be properly implemented; the complexity of achieving an appropriate balance between these two components cannot be overstated. Concentrating people with known propensities for violence in the same location requires unique security enhancements, particularly during time spent in congregate activities. In order for these housing units to be secure, safe and effective, staff must provide necessary and active security and supervision and must provide structured activities and rehabilitative services to decrease idle time and the likelihood of individuals committing subsequent acts of violence.

This section includes a detailed discussion of the Department's primary restricted housing program, Enhanced Supervision Housing at RMSC ("RESH"), along with an update on the use of NIC/Involuntary Protective Custody, and a brief summary of the Monitoring Team's work regarding Local Law 42 ("LL42").

### ENHANCED SUPERVISION HOUSING AT RMSC ("RESH")

RESH houses those who have engaged in serious institutional violence and its goal is to prevent the subsequent victimization of other people in custody and staff. It appears that RESH's design is sound, but its implementation has been challenging. In July 2023, RESH was

established as its own "facility" when the Enhanced Supervision Housing units were moved from GRVC to RMSC. As of October 2024, approximately 170 people were in RESH. There are four ESH Level 1 housing units (two tiers of 16-17 cells each), and two ESH Level 2 housing units (two tiers of 18 cells each).

Since December 2023, RESH has been managed by a leader with a strong grasp of sound security practice, a command of the issues that have undercut the safe operation of RESH, a realistic assessment of the current state of affairs, and who consistently identifies and addresses staff's poor practice. As discussed in more detail below, this appears to have had a positive impact on RESH's operations. The Department is in the process of updating the RESH policy to address feedback from the SCOC's assessment of the program as well as feedback from the Monitoring Team shared in July 2024.

The Department has taken important steps to improve the operation of RESH since the Monitoring Team's last report and, as discussed throughout this section, there are indications that RESH's operation has improved. In addition, Dr. James Austin is in the process of completing a process evaluation, as recommended by the Monitoring Team, of whether the RESH program has been implemented as designed. Dr. Austin has consulted with the Monitoring Team on this work. The assessment provides data regarding the attributes of people admitted to RESH, their qualifying offenses, and length of stay; attributes of RESH staff; the type and volume of programming provided along with participation rates; trends in the rates of violence and use of force in RESH; and the frequency with which those who complete the RESH program are returned to the program for a subsequent qualifying offense. The preliminary findings from this assessment suggest that the program has been operating at capacity since its inception, that people are admitted only following a qualifying offense, that a significant volume of

programming is provided to those in RESH and that most individuals attend at least some of the

program offerings, and that on average the length of stay has conformed to design (*i.e.*, 60 days).

The process evaluation also found that approximately 20% of those who complete the RESH

program are readmitted for a subsequent qualifying offense.

### SECURITY PRACTICES & RATES OF UOF AND VIOLENCE

The Monitor's April 18, 2024 Report (dkt. 706) highlighted various security and

operational failures that appeared to be contributing to the elevated level of violence in the

RESH program. These included inadequate searches, poor staff positioning, failures to secure

restraint devices and to properly supervise individuals secured in the restraint desks, among

others. Facility leaders reported that some staff did not fully comprehend the policy

requirements, nor did they understand how to manage resistance to routine safety protocols.

Facility leadership also reported that staffing challenges contributed to these issues given both

staff absenteeism and a staffing allocation that did not account for important functions (*e.g.*,

counsel visits, barbershop, escort staff for medication and adjudication, the RESH control room,

laundry and sanitation), causing housing unit staff to be redeployed to these duties. The

Monitoring Team's assessment of incidents from spring and summer 2024 revealed that staff

continue to struggle with a variety of important security practices, which echoes the challenges

faced by the Department's other facilities.

Rates of various metrics reflect these operational difficulties and security failures,

particularly during RESH's first year of operation. That said, during the most recent three-month

period, the rates of key metrics decreased significantly, as shown in the table below.

| Rates of Key Metrics in RESH, 2024 | | | | | |
|---|---|---|---|---|---|
| Month | UOF | Stabbing/Slashing | Fights | Assault on Staff | Fires |
| July 2023 | 30.4 | 5.8 | 9.4 | 8.0 | 7.2 |
| August 2023 | 21.5 | 6.9 | 8.2 | 3.2 | 6.3 |
| September 2023 | 34.3 | 5.1 | 5.1 | 8.0 | 5.7 |
| October 2023 | 62.7 | 3.8 | 6.0 | 13.6 | 12.5 |
| November 2023 | 47.2 | 0.0 | ~ | 9.1 | 4.0 |
| December 2023 | 39.5 | 1.2 | ~ | 8.6 | 11.1 |
| *Average J-D 2023* | *39.2* | *3.8* | *7.2[11]* | *8.4* | *7.8* |
| January 2024 | 46.9 | 1.9 | 3.8 | 13.9 | 15.2 |
| February 2024 | 46.3 | 2.5 | 3.8 | 7.6 | 15.8 |
| March 2024 | 50.6 | 6.6 | 9.2 | 10.5 | 15.1 |
| April 2024 | 44.5 | 2.7 | 3.3 | 7.3 | 8.6 |
| May 2024 | 40.7 | 3.9 | 4.6 | 7.9 | 10.5 |
| June 2024 | 27.9 | 1.3 | 4.7 | 8.6 | 6.0 |
| *Average J-J 2024* | *42.8* | *3.2* | *4.9* | *9.3* | *11.9* |
| July 2024 | 24.4 | 1.3 | 2.6 | 6.4 | 3.2 |
| August 2024 | 19.0 | 1.8 | 3.7 | 6.1 | 3.7 |
| September 2024 | 20.8 | 0.6 | 2.9 | 4.0 | ~ |
| *Average J-S 2024* | *21.4* | *1.2* | *3.0* | *5.5* | *2.3* |

These reductions are encouraging, and understanding *how* they were achieved is essential so that effective strategies can be sustained. The Monitoring Team routinely consults with both facility leadership and the Programs Division in order to better understand the practices and dynamics that underlie the data. These discussions have revealed the following factors that appear to be contributing to the recent reduction in violence and use of force:

---

[11] Data on fights for November/December 2023 was not available; the average for this period includes data from only the first four months of the Monitoring Period.

- **Physical Plant Improvements**. In response to identified security vulnerabilities, the Department reinforced various aspects of the units' physical plant, including new cell doors, gates in the shower areas, reinforced light fixtures, and installed panels/grates between restraint desks to limit PICs' ability to come in contact with each other when secured in them.

- **Considering Pre-Existing Conflicts When Assigning Level 2 Housing**. When individuals satisfy program requirements for promotion, they must be transferred from each of the four Level 1 housing areas to one of two Level 2 housing areas. Facility leaders report that a joint effort with CIB to better identify pre-existing conflicts and current SRG related risks and tensions among people in Level 2 housing has led to housing transfers that effectively separate those with potential conflicts. This has resulted in fewer incidents of violence in the Level 2 housing areas.

- **Elevating Staff's Skillset**. RESH's Warden has embraced a core responsibility of leadership by working to elevate the skill level of her subordinates. For the past several months, the Warden has provided intensive 1x1 coaching to staff following significant incidents wherein the Warden and staff member watch the video of the event together, and then dissect precursor events, how staff handled the incident and other actions that could have been taken to achieve a different outcome (*e.g.*, to avoid a use of force, to prevent an act of violence). The Warden has also paid particular attention to escort procedures and search protocols, because many of RESH's uses of force occur during these events. Encouraging staff to slow down, reinforcing use of proper procedure, reminding staff of the limited situations in which force may be used, and providing hands-on training on strip search and pat search procedures have reportedly improved the

effectiveness of search and escort procedures and has reportedly improved staff's response when confronted with resistance. Fully remediating these performance problems is a long-term project and will require consistent support and vigilance from leaders and supervisors at all levels.

- **Providing Mandated Services**. The Warden has focused on providing mandated services, particularly recreation, more consistently. While the service may not always be afforded at the exact time it appears on the daily schedule, mandated services are reportedly being provided more dependably. Given RESH's struggles with staff absenteeism, a significant amount of overtime is required to accomplish this essential component of sound operational practice. In an effort to reduce the frustration that sometimes leads to aggression, the Warden has been meeting individually with those in RESH who exhibit problematic behavior to ensure they are receiving services dependably and/or to troubleshoot service delivery problems.

- **Emphasizing Program Engagement**. In early 2024, the Department's Programs Division rolled out a Programs Tracking Database that captures data on program offerings and individuals' engagement. A snapshot of these data from July-September 2024 revealed that during the 4-hour programming blocks afforded to each unit/tier each day, Programs staff provided a significant volume of programming that included evidence-based curricula and other group counseling (*e.g.*, Cognitive Behavioral Therapy, Anger Management, Communication Skills, Healthy Relationships, Goal Setting, etc.), enrichment activities (*e.g.*, creative arts, music, health and wellness), structured activities (*e.g.*, community meetings, leisure time activities), religious services, and other supportive services (*e.g.*, social services and wellness checks).

Individual records provide objective data on the level of program engagement for each person admitted to RESH, used to determine whether an individual has met requirements for promotion/program exit. While the Programs Division continues to suffer from significant staff vacancies, rehabilitative programs are consistently made available to those in RESH during each day's 4-hour programming block through the use of overtime. This programming provides daily opportunities for out-of-cell social interaction and rehabilitative activity to all individuals in RESH.

- **<u>Advocating for Transfer to Units that Address Unmet Mental Health Needs</u>**. The Warden has effectively advocated for the transfer of certain individuals to the CAPS program, where they are able to receive additional care that appears better suited for their particular needs. The Department reported that these individuals' problematic behaviors decreased after being transferred.

Thus, while the RESH program continues to suffer from the chronic problem of staff absenteeism and corresponding staff burnout that make proper supervision and service provision difficult, facility leadership's efforts to target skill deficits among staff in order to fortify their security practices and to provide the programming and services that individuals are entitled to receive appear to be improving the conditions and safety of the RESH units. Obviously, these improvements need to be amplified and sustained to provide an adequate level of safety, but the recent trends are encouraging.

## USE OF NIC AND INVOLUNTARY PROTECTIVE CUSTODY

The Department currently utilizes four celled housing units at NIC to house certain individuals with a variety of security needs including housing those who must be isolated until they pass a secreted weapon, those who are particularly vulnerable to retaliation, those subject to

Court-ordered lockdowns and some individuals who pose acute security risks. The Monitoring Team previously raised concerns about the length of stay and the lack of clarity for placement on the NIC units given the units' unusual physical plant that limits social interaction. While there may be certain discrete situations where these housing units are needed, the Monitoring Team recommended that the Department limit its use of NIC as much as possible and provide better guidance about the circumstances under which someone may be placed in these housing units.

With respect to placement at NIC, the Monitoring Team recommended that NIC placement should be a last resort and also recommended: (1) various procedures to ensure adherence to specific placement criteria and procedural due process, and (2) various protections to prevent undue isolation of those assigned to NIC and to safeguard against decompensation. In addition, the Monitoring Team recommended that the Department further reduce the use of NIC units once new programs such as the Behavioral Health Unit and the Special Management Unit (formerly referred to as General Population-Max ("GP-Max")) are established.[12] Finally, the Monitoring Team recommended that NCU conduct random audits of the NIC housing units to assess staff's management of the unit and service provision.

In response to the feedback, the Department has begun to reduce its reliance on the use of the NIC housing units. As of early November 2024, the number of people placed in these units has been reduced by half compared to early 2024 (*e.g.,* 20 individuals versus 40 individuals) and a smaller proportion is housed at NIC for more than a few days. The Department further reports it is working on updated policy and procedures for these NIC units.

---

[12] *See* Monitor's April 18, 2024 Report (dkt. 706) at pgs. 49-50.

**LOCAL LAW 42 AND THE *NUNEZ* COURT ORDERS**

The City Council passed Local Law 42 on December 20, 2023. The bill was subsequently

vetoed by the Mayor of New York on January 19, 2024, but was then signed into law by the City

Council on January 30, 2024, overriding the Mayor's veto. LL42 amends the New York City

Administrative Code and bans the use of solitary confinement, imposes 14-hours of mandatory

out of cell time for all incarcerated individuals, and sets additional requirements for the use of

restrictive housing, de-escalation, emergency lock-ins, and restraints and specific conditions for

special housing units (*e.g.,* mental health units, contagious disease units, housing for people who

are transgender or gender non-conforming, protective custody units, and housing to promote

school attendance).

In early January 2024, pursuant to the *Nunez* Court Orders,[13] the Commissioner requested

the Monitoring Team's advice and feedback on how the requirements of LL42 may impact the

Department's ability to comply with the *Nunez* Court Orders. On January 12, 2024, the

Monitoring Team provided its assessment of LL42's implications for the City's and Department's

efforts to address the unsafe conditions in the jails, to protect individuals from harm, and to

implement sound correctional practices, all of which are necessary to comply with the *Nunez*

Court Orders. A copy of the Monitor's January 12, 2024 letter is attached as Appendix F of this

Report.

In late May/early June 2024, the Department advised the Monitoring Team (and

subsequently the Parties to the *Nunez* litigation) that it was considering seeking relief from

LL42's requirements via the Court in the *Nunez* matter given the Department's concerns that

LL42's requirements may impede the Department's ability to comply with the *Nunez* Court

---

[13] *Id.*

Orders in a number of key areas. Likewise, the City advised the Court of its intentions in a letter dated June 5, 2024 (dkt. 724). Following the submission of the City's letter to the Court, the Monitoring Team and the *Nunez* Parties met and conferred in June 2024. The Monitoring Team subsequently provided a letter to the Commissioner pursuant to the *Nunez* Court Orders,[14] for updated advice and feedback from the Monitoring Team on how the requirements of LL42 may impact the Department's ability to comply with the *Nunez* Court Orders.  A copy of the Monitor's July 17, 2024 letter is attached to this report as Appendix G.

 The Court has directed the Monitoring Team to engage in focused analytical work, to meet and confer with the Defendants and the Parties about these issues, and to provide status updates on this work.[15] The Monitoring Team most recently updated the Court on the work to assess the intersection between LL42 and the *Nunez* Court Orders on October 24, 2024 (dkt. 789).

 Given the similarities between the law and the *Nunez* Court Orders, the Monitoring Team must assess the extent to which LL42 and the BOC's respective rules are either compatible with or in conflict with the requirements of the *Nunez* Court Orders. This is an exceedingly complicated undertaking. The Monitoring Team is committed to conducting a fulsome, comprehensive and integrated assessment of the aspects of LL42 that may conflict with the

---

[14] *See* Consent Judgment, § XX, ¶¶ 24 and 25 and June 13, 2023 Order (dkt. 550), § I, ¶ 5. Combined, these provisions: (1) permit the Department to request the Monitor provide technical assistance or consultation on the Department's efforts to implement the requirements of the *Nunez* Court Orders, (2) permit the Department to request the Monitor provide a written response to a request regarding the Department's compliance with the *Nunez* Court Orders, and (3) requires the Department to proactively consult with the Monitor on any policies or procedures that relate to the compliance with the *Nunez* Court Orders in order to obtain the Monitor's feedback on these initiatives.  The Monitor has addressed similar issues in the past.  *See, for example,* Monitor's March 5, 2018 Report (dkt. 309), Monitor's October 31, 2018 Letter to the Court (dkt. 319), and Monitor's June 30, 2022 Report (dkt. 467) at pgs. 22-27.

[15] *See* the Court's June 7, 2024 Order (dkt. 726), July 23, 2024 Order (dkt. 759), July 25, 2024 Order (dkt. 761), and October 25, 2024 Order (dkt. 791).

Monitor's duty to approve various Department policies and cannot do so in a piecemeal fashion which would undermine the integrity of the overall process. Each facet is complex and nuanced and must be carefully and thoroughly analyzed by those with operational expertise and experience with large-scale reform efforts. In addition, the Monitoring Team has sought input from the Parties and counsel for the City Council.

As is evident throughout this report, the Monitoring Team is currently dividing its time addressing several important issues in addition to LL42 (*e.g.*, facilitating the Meet & Confer process about the motion for contempt and potential remedies, providing ongoing technical assistance to help the Department improve its practice, routine monitoring and assessment of the many requirement of the *Nunez* Court Orders) and thus must be judicious about the amount of time dedicated to each matter. The Monitoring Team is currently evaluating information and perspectives shared by the Department, counsel for the City Council,[16] counsel for the Plaintiff Class, and SDNY.[17] The Monitoring Team has also continued to consult and examine a variety

---

[16] During these exchanges, the City Council requested that the Monitoring Team address three matters in this report: (1) identify which sections of LL42 fall beyond the Monitor's approval authority; (2) identify which provisions of LL42 the Monitor can approve now; and (3) confirm whether the portions of LL42 that were not suspended [by the Mayor's Emergency Executive Order] have actually been implemented. With regard to the first two requests, as noted above, a piecemeal assessment is not advisable. As for the third request, the Monitor's obligations for the assessment of compliance are outlined in the *Nunez* Court Orders. To the extent that the requirement of LL42 overlap with the *Nunez* Court Orders, information will be provided in the Monitor's reports as necessary and appropriate.

[17] As part of this process, the Monitoring Team has requested various information from the Parties and counsel for the City Council. The information sought includes, but is not limited to the following categories: (1) information, evidence or relevant research regarding the correctional practice underpinning LL42's requirements, (2) clarification regarding the provisions related to restraints, (3) positions with respect to the Mayor's Executive Order suspending certain portions of LL42, (4) the purpose or intent of specific provisions of LL42, (5) how certain time limitations in LL42 were derived, (6) considerations for how to address potential conflicts with the *Nunez* Court Orders, (7) considerations for potential situations where the Department may not be able to safely implement provisions of LL42, (8) and questions regarding the Monitor's approval authority.

of other resources to understand the basis for and purpose of each of LL42's requirements and to develop a comprehensive understanding of how the law may impact the Department's operation.

The Monitoring Team has significant experience with strategies to safely manage individuals following acts of violence and expertise in developing programs that safely eliminate the risks inherent in solitary confinement. Designing a safe program for those who commit serious violence while in custody is not an easy task and poses complicated security concerns for all involved. This work must proceed in a focused and concerted manner because moving forward precipitously and without appropriate planning and deliberation carries the unintended consequence of exacerbating the risk of harm to both incarcerated individuals and staff. Consequently, the Monitoring Team is taking the necessary time to consider all aspects of the pathway forward. The Monitoring Team intends to provide an update on its work and any proposed next steps to the Court on or before January 17, 2025.

## CONCLUSION

Creating safe and secure programs for detainees with a known propensity for and recent incidents of engaging in violence is a necessity for this agency. This is a challenging endeavor in any correctional system. This is even more difficult in this agency because of the significant level of dysfunction and problematic practices embedded in its routine operations. DOC is continuing to struggle with the management of this population and operating an appropriate housing model. Accordingly, significant work remains across all levels of the Department from ensuring appropriate policies and practices are in place, evaluating operations and refining them as issues arise, and consistent and routine supervision to ensure newly developed practices are embedded in everyday operations. This is both complex and time-consuming. It is important that key steps have been taken to address the needs of this challenging population, including the

installation of strong leadership at RESH. However, as with most work across the agency,

concerted efforts to elevate overall staff practice and to reduce the level of harm in RESH remain

critical along with ensuring that the progress achieved to date is sustained and built upon.

# 18ᵀᴴ Monitoring Period Compliance Assessment for Select Provisions

| First Remedial Order § A., ¶ 1 (Use of Force Reviews) |
| --- |
| § A., ¶ 1. *Use of Force Reviews*. Each Facility Warden (or designated Deputy Warden) shall promptly review all Use of Force Incidents occurring in the Facility to conduct an initial assessment of the incident and to determine whether any corrective action may be merited ("Use of Force Review"). The Department shall implement appropriate corrective action when the Facility Warden (or designated Deputy Warden) determines that corrective action is merited.<br><br>i. The Department, in consultation with the Monitor, shall implement a process whereby the Use of Force Reviews are timely assessed by the Department's leadership in order to determine whether they are unbiased, reasonable, and adequate.<br><br>ii. If a Facility Warden (or Deputy Warden) is found to have conducted a biased, unreasonable, or inadequate Use of Force Review, they shall be subject to either appropriate instruction or counseling, or the Department shall seek to impose appropriate discipline. |

This provision requires facility leadership to conduct a close-in-time review of all use of force incidents ("Rapid Reviews" or "Use of Force Reviews"). Further, this provision requires the Department to routinely assess Rapid Reviews to identify any completed reviews that may be biased, unreasonable, or inadequate and address them with appropriate corrective action.

## Rapid Reviews

Rapid Reviews are intended to identify procedural violations, recommend corrective action for staff misconduct, and also identify incidents that could have been avoidable had staff made different choices in the moment. Close-in-time use of force reviews are an essential tool for improving staff practice: they allow facility leadership to identify poor practice and to provide feedback to staff while the circumstances surrounding their decision-making is still fresh in their minds. These findings are relied upon by both the Department and Monitoring Team to identify patterns and trends. That said, as the Monitoring Team stated in its last report,[18] the Rapid Reviews do not reliably and consistently identify *all* issues that would reasonably be expected to be identified via review of video footage of the incidents. This provision requires the Department to assess whether the reviews are appropriately unbiased, reasonable and adequate and if not, to take affirmative steps to provide instruction/counseling and/or apply discipline to those responsible for a poor-quality review.

The Monitoring Team continues to identify a significant number of inadequate Rapid Reviews. Although there has been an increase in the number of staff recommended for corrective action, the Rapid Reviews continue to overlook various types of poor practice, violations, and obvious indicators that incidents were avoidable. In fact, the proportion of incidents found to avoidable continues to decrease despite the fact that the Monitoring Team has not identified any improved change in staff practice. As a

---

[18] *See* the Monitor's April 18, 2024 Report (dkt. 706) at pgs. 53-54.

result, the Rapid Reviews often continue to miss opportunities to provide much needed coaching and/or corrective action and thus contribute to the persistence of the operational problems plaguing the jails and the intransigence of the problematic culture.

**Rapid Review Data**

During this Monitoring Period, nearly all use of force incidents (3,494, or greater than 99%) were assessed via a Rapid Review. The table below presents data on the number of reviews and their outcomes since 2018.

| Rapid Review Outcomes, 2018 to June 2024 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** | **Jul.-Dec. 2023** | **Jan.-Jun. 2024** |
| Incidents Identified as Avoidable, Unnecessary, or with Procedural Violations | | | | | | | | |
| **Number of Rapid Reviews** | 4,257 (95% of UOF) | 6,899 (97% of UOF) | 6,067 (98% of UOF) | 7,972 (98% of UOF) | 6,889 (98% of UOF) | 6,740 (99% of UOF) | 3,515 (99% of UOF) | 3,494 (>99% of UOF) |
| **Avoidable** | 965 (23%) | 815 (12%) | 799 (13%) | 1,733 (22%) | 1,135 (16%) | 630 (9%) | 270 (8%) | 163 (5%) |
| **UOF or Chemical Agent Policy Violations** | | | 345* (11%) | 1,233 (16%) | 835 (12%) | 1,161 (17%) | 888 (25%) | 1,799 (51%)[19] |
| **Procedural Violations** | 1,644 (39%) | 1,666 (24%) | 1,835 (30%) | 3,829 (48%) | 3,296 (48%) | 2,545 (38%) | 1,264 (36%) | |
| Corrective Action Imposed by Staff Member | | | | | | | | |
| **Number of Staff Recommended for Corrective Action[20]** | ~ | ~ | 2,040 | 2,970 | 2,417 | 2,756 | 1,361 | 1,616 |
| *Note: Data for 2020 UOF/Chemical Agent Policy Violations include only July-December.* | | | | | | | | |

[19] The Rapid Review template was revised so that staff now enter *all* violations in one place, including UOF Policy violations, Chemical Agent Policy violations, and Procedural Violations. This revision was intended to improve the accuracy of information entered into the Rapid Reviews by streamlining the entry of information and removing staff's need to distinguish between the types of violations at this stage of an incident review. This revised template went into effect in January 2024.

[20] This data captures referrals for corrective action as recommended by the Rapid Reviews shared with the Monitoring Team. The Rapid Review (and therefore this data) does not include information on whether the corrective action referrals were enacted as recommended. Data on enacted corrective action referral to be fully closed out. Furthermore, a staff member can be suspended, only to have the days returned upon a Report & Recommendation from OATH. The protracted nature of enacted discipline for Rapid Review recommendations is further compounded by the various disciplinary backlogs.

During the current Monitoring Period, the Department identified violations and/or errors in practice in 51% of its use of force incidents. This data cannot be compared with past Monitoring Periods given the current data is tracked differently from previous Monitoring Periods,[21] but it remains cogent that the Department identified problematic practices in over half its use of force incidents. The number of staff recommended for corrective action (n=1,616) increased in this Monitoring Period compared with the last (n=1,361). The proportion of incidents where an incident has been identified as avoidable by the Rapid Review has decreased over time. In this Monitoring Period, only 5% of incidents were deemed avoidable during the current Monitoring Period (compared with a proportion of 23% in 2018). The Monitoring Team's review of incidents suggests that additional incidents were avoidable and were not appropriately categorized during this process.

### Recommended Corrective Action

In response to identified problems with staff practice, Rapid Reviews can recommend various types of corrective action, including counseling (either 5003 or corrective interviews), re-training, suspension, referral to Early Intervention, Support and Supervision Unit ("E.I.S.S."), Correction Assistance Responses for Employees[22] ("C.A.R.E."), Command Discipline ("CD") as further discussed in the compliance assessment in this report for Consent Judgment, § VIII, Staff Discipline & Accountability, and a Memorandum of Complaint ("MOC"). NCU collects proof of practice to demonstrate that corrective actions have occurred.

The most frequent corrective action recommended is a Command Discipline. The recommendation for a Command Discipline essentially doubled during this Monitoring Period compared to the last (1,455 compared with 723 respectively). The increased number of Command Disciplines is a reflection both an overall increase in the number of staff referred for corrective action and that leadership are referring staff for Command Discipline more frequently than other types of corrective action such as corrective interviews. There has also been an increase in referrals for re-training from Rapid Reviews during this Monitoring Period, although re-trainings were only recommended in a small number of instances (200

---

[21] *See* the Monitor's April 18, 2024 Report (dkt. 706) at pgs. 54-55 for more information on why this data from previous Monitoring Periods is not easily compiled in a way that could be compared over time.

[22] C.A.R.E. serves as the Department's Wellness and Employment Assistance Program. C.A.R.E. employs two social workers as well as a chaplain and peer counselors who provide peer support to staff. The services of C.A.R.E. are available to all employees of the Department. The Department reports that the members of the unit are tasked with responding to and supporting staff generally in the day-to-day aspects of their work life as well as when unexpected situations including injuries or serious emergencies occur. C.A.R.E. also works with staff to address morale, productivity, and stress management, and provide support to staff experiencing a range of personal or family issues (*e.g.* domestic violence, anxiety, family crisis, PTSD), job-related stressors, terminal illness, financial difficulties, and substance abuse issues. The C.A.R.E. Unit also regularly provides referrals to community resources as an additional source of support for employees. Staff may be referred to the C.A.R.E. use by a colleague or supervisor or may independently seek assistance support from the unit.

compared with 153 respectively, an increase of 31%). Meanwhile, the number of 5003 counseling and corrective interviews recommended via Rapid Reviews remained relatively steady between this Monitoring Period and the last (1,146 versus 1,140).

The Monitoring Team has long encouraged the use of close-in-time corrective actions to address problematic conduct in order to support the overall effort to change practice. The imposition of corrective action remains mixed. The adjudication of Command Disciplines is not reliable, as described in the compliance assessment in this report for Consent Judgment, § VIII, Staff Discipline & Accountability. While other forms of corrective action are generally imposed, the process is undercut if issues are not routinely identified as is the case here.

**Quality of Rapid Reviews**

The prior Monitor's Reports have discussed the Department's efforts to improve the quality of its Rapid Reviews.[23] On an ongoing basis, the Monitoring Team reviews video, investigation reports, and other documentation for selected incidents that occurred throughout the facilities. The Monitoring Team's routine assessment of incidents continues to identify a significant number of inadequate Rapid Reviews that overlook poor and/or dangerous practices and fail to acknowledge circumstances that indicate the incident was avoidable and the use of force was unnecessary. And yet, the Department reports that it only imposed one command discipline on one DW for inaccurate, unreasonable, or biased Rapid Reviews in January-June 2024, and this command discipline was closed with a corrective interview.

The Department has continued to work to refine the template for the Rapid Reviews in order to improve the quality as noted in the Monitor's October 5, 2023 Report (dkt. 581) at pg. 21 and the Monitor's December 22, 2023 Report (dkt. 666) at pg. 8. During the current Monitoring Period, the Department revised the Rapid Review template in consultation with the Monitoring Team to streamline documentation requirements while also providing better guidance on the type of information that should be included. Facility leadership began using the revised Rapid Review template in January 2024. The revisions to the template have been beneficial. Information entry and referrals for corrective action are more streamlined, which appears to permit improved assessment of those staff that require corrective action as demonstrated by the increase in referrals. That said, an improved template on its own does not mean that the judgment of leadership themselves will inherently improve. The individuals conducting the reviews must have a strong command of Department policy and assess the objective evidence in a neutral and independent manner.

The Deputy Commissioner of Security Operations reported that beginning in 2024, his office assumed responsibility for determining whether incidents were avoidable and/or anticipated and whether

---

[23] *See* Monitor's July 10, 2023 Report (dkt. 557) at pg. 19; Monitor's October 5, 2023 Report (dkt. 581) at pgs. 1, 12 and 21; Monitor's November 8, 2023 Report (dkt. 595) at pgs. 67-68; Monitor's December 22, 2023 Report (dkt. 666) at pgs. 6-9.

response team deployments were necessary. This shift was intended to more reliably detect these types of problems, and to enable the DC of Security Operations to provide more direct guidance to facility leadership on the reasoning behind these judgments. Following this transfer of work, the number of incidents identified as avoidable *decreased* during the current Monitoring Period, despite no noticeable change in avoidable incidents the Monitoring Team has observed through its various levels of incident reviews. This raises concerns about whether sufficient scrutiny is applied to these cases to ensure that objective evidence that an incident is avoidable is in fact being identified.

The Department must take steps to better understand—and then address—the dynamics underlying facility and Department leadership's inability or unwillingness to consistently detect poor practice when it occurs and must apply corrective action when appropriate.

### Conclusion

The Rapid Reviews conducted during the current Monitoring Period identify endemic levels of poor staff practice, and even so, the Monitoring Team has found that a significant proportion of Rapid Reviews do not fully identify all the issues present. Their inability to consistently identify misconduct reduces the opportunity to guide staff toward better practices while the recall of the details of their decision-making in the moment is still fresh. As a result, Rapid Reviews have not yet proven to be an effective tool for preventing similar misconduct from reoccurring. Rapid Reviews identify and recommend corrective action for a wide array of security lapses, and yet the same problems have persisted for many years, due, at least in part, to the fact that many of the corrective actions are never imposed or are of questionable substance.

The Rapid Review concept is grounded in sound correctional practice and has elevated the quality of staff practice in other jurisdictions. However, catalyzing improved practice requires both Department and facility leadership to possess a strong command of the security protocols and procedures that must be utilized on a daily basis, to develop skills to guide and coach their staff toward sound correctional practice, and to ensure Captains are supervising staff in a manner that allows them to address these issues in real time. While Rapid Reviews provide some insight and benefit into Department practice, their full potential is not yet realized.

| COMPLIANCE RATING | § A., ¶ 1. Partial Compliance |
|---|---|

| FIRST REMEDIAL ORDER § A., ¶ 2 (FACILITY LEADERSHIP RESPONSIBILITIES) |
|---|

§ A., ¶ 2. *Facility Leadership Responsibilities*. Each Facility Warden (or designated Deputy Warden) shall routinely analyze the Use of Force Reviews, the Department leadership's assessments of the Use of Force Reviews referenced in Paragraph A.1(i) above, and other available data and information relating to Use of Force Incidents occurring in the Facility in order to determine whether there are any operational changes or corrective action plans that should be implemented at the Facility to reduce the use of excessive or unnecessary force, the frequency of Use of Force Incidents, or the severity of injuries or other harm to Incarcerated Individuals or Staff resulting from Use of Force Incidents. Each Facility Warden shall confer on a routine basis with the Department's leadership to discuss any planned operational changes or corrective action plans, as well as the impact of any operational changes or corrective action plans previously implemented. The results of these meetings, as well as the operational changes or corrective action plans discussed or implemented by the Facility Warden (or designated Deputy Warden), shall be documented.

The goal of this provision is to ensure that the leadership of each facility is consistently and reliably identifying pervasive operational deficiencies, poor security practices, and trends related to problematic uses of force and that they address these patterns so that supervisors and staff alike receive the guidance and advice necessary to improve practices. Facility leadership is required to routinely analyze available data regarding uses of force, including the daily Rapid Reviews, to determine whether any operational changes or corrective action plans are needed to reduce the use of excessive or unnecessary force, the frequency of use of force incidents, serious injuries or other harm to incarcerated individuals or staff resulting from use of force incidents.

Jail administrators can and should identify staff practices and other operational issues that merit attention by utilizing incident-level data (*e.g.*, Rapid Reviews and other indicators extracted from the COD reports) to identify patterns in persons, places, times and circumstances that lead to a use of force and in which problematic practices tend to occur, and then should develop strategies that directly target those people, places, times or circumstances to reduce the likelihood of problematic staff conduct.

### Facility Leadership's Communication with Monitoring Team

The Monitoring Team's direct engagement with facility leadership has increased over the last year in order to foster improved communication and transparency. Members of the Monitoring Team and facility leadership meet routinely to create a platform for discussing each individual jail's operations. During these meetings, facility leaders and the Monitoring Team discuss data, specific incidents, initiatives, and ongoing and emerging challenges. While the format and content of these discussions vary based on the particular approach of each facility's leadership, the Monitoring Team has consistently found leadership to be candid and forthright about operations in each jail.

Over the last year, these meetings have led to a more effective flow of information, with some facility leaders proactively highlighting emerging issues. Facility leaders also appear to be utilizing available data tools, such as the ACT Dashboard and other data reports, to inform operational decisions. While leaders are informed about their metrics regarding violence and the use of force, they tend to gravitate toward familiar explanations and solutions. Additional efforts are essential to better

understand the root causes of these issues, how they can be addressed, and to develop and faithfully implement effective, sustainable solutions. Awareness of data alone is insufficient; the Monitoring Team continues to encourage leaders to explore underlying factors more thoroughly and to devise innovative, resource-conscious strategies that can be consistently applied for long-term impact.

### ACT Dashboard and Meetings

In the Monitor's February 26, 2024 Report (dkt. 679) at pgs. 5-7, the Monitoring Team reported that the Department reviewed the type of information and data used in monthly meetings with facility leadership, and developed a plan to revise the meetings' format and substance.[24] The monthly meetings were rebranded as "Action, Collaboration, and Transformation" ("ACT") under the guidance of the Commissioner and aim to address the limitations of the former TEAMs meetings, such as the lack of context, defensive dialogue, and restricted participation.

As part of this work, the Department also developed and introduced the ACT Dashboard to facility leadership. This dashboard integrates data from multiple systems into a single, interactive, and visually intuitive platform. It allows facility leadership to track key metrics—such as the use of force, slashing and stabbings, serious injuries, Narcan deployments, and fires by location, individuals involved, and time of day. The goal of this system is to help leadership to identify trends and make informed operational decisions to reduce violence and prevent incidents. The Monitoring Team's monthly meetings with facility leadership have indicated that their use of the ACT Dashboard varies, as some prefer the legacy systems for tracking data. Facility leaders may benefit from additional training on how the Dashboard can be utilized to develop concrete action plans.

Routine ACT meetings began in June 2024. The first half of ACT meetings are dedicated to reviewing recent data from the ACT Dashboard, with a focus on specific topics (*e.g.*, stabbings/slashings, self-harm). The second half shifts to case studies, where staff analyze incident footage to evaluate whether alternative practices could have prevented or more effectively addressed the situation. The Monitoring Team attends these meetings regularly and has observed improvements. Department leadership has been proactive in directly addressing policy violations and procedural errors and have used a Socratic approach to guide discussions that identify alternative strategies for solving problems. In these meetings, the Commissioner has also set clear expectations for staff about various topics, modeling strong leadership and a command of Department policy and practice. In response to

---

[24] The Department engaged in this work in response to the Court's December 20, 2023 Order (dkt. 665) that found the Department in contempt of § D, ¶ 3 and § E, ¶ 4 of the Action Plan (dkt. 465) and § I, ¶ 5 of the June 13, 2023 Order (dkt. 550). The Court ordered that in order for Department to purge their contempt, the Department was required, to comply with three requirements including a requirement to develop a set of data and metrics for use of force, security, and violence indicators that will be routinely evaluated by Department leadership to identify trends regarding unnecessary and excessive uses of force and violence in order to identify their root causes and to develop effective strategies to reduce their occurrence.

these meetings, some facility leaders have demonstrated a willingness to engage in open dialogue and to take ownership of their role in improving security and safety. However, the Monitoring Team believes these meetings still have room to improve by tackling more directly each facility's persistent issues and to better articulate the role of procedural errors and poor practice in creating an opportunity for violence and the use of force to occur. Overall, ACT meetings show promise, and the Monitoring Team will continue collaborating with the Department to enhance their effectiveness.

### Weekly Operational Leadership Meetings

Operational Leadership meetings between Executive staff and facility leaders are held weekly. These meetings are informational and chaired primarily by the Commissioner's Chief of Staff. These meetings serve as an opportunity for executive staff and facility leaders consisting of Deputy Commissioners, Associate Commissioners, Assistant Commissioners, Directors, Wardens and, at times, Assistant Deputy Wardens, Captains, and Officers, to discuss critical topics and Department updates. During each session, key leaders share insights and presentations and provide briefings on essential issues, discuss policy changes, and highlight ongoing projects and initiatives. Additionally, representatives from various divisions—such as Early Intervention, Support and Supervision ("E.I.S.S."), Trials, and Correction Intelligence Bureau ("CIB")—may discuss their work, fostering inter-departmental awareness and collaboration. The Department reports the meetings' engaging format is regarded as more valuable than traditional methods of communication such as teletypes.

### Meetings between Facility Leadership and the Deputy Commissioner of Security Operations

The Department reports that agency and facility leadership routinely meet to discuss the various operational issues facing the facilities. During the previous Monitoring Period, the former Deputy Commissioner of Security Operations reported conducting daily calls with facility leadership to review the prior day's uses of force. During this Monitoring Period, the former Deputy Commissioner also reported conducting regular tours and town halls with facility leadership to address operational concerns and needed improvements to staff practice. While some facilities have experienced improvement to staff practice due to strong leadership and direct engagement with staff, most facilities continue to rely on issuing memos, reminders at Roll Call, "walking and talking," and corrective action for individual staff. These reactive, isolated, and unsystematic approaches are rarely incorporated into coordinated, actionable, operational changes that target the root causes of specific problems.[25]

### Executive Leadership Tours

Changing staff practice will require an infusion of correctional expertise in a form that reaches more broadly, deeply, and consistently into staff practice than most facility leaders have been able to

---

[25] The few documents containing more global or problem-focused strategies are described in the Monitor's November 8, 2023 Report (dkt. 595) at pgs. 17-21 and 80-81, although most were either short-sighted or abandoned before their impact on staff practice could be discerned.

accomplish to date. This is one of the responsibilities of those recruited to the Department at the executive level (*e.g.* Senior Deputy Commissioner, Deputy Commissioners, Associate Commissioners, and Assistant Commissioners). In order to increase the presence of executive level staff within the facilities, beginning in December 2023, the Commissioner began requiring approximately 60 executive and senior staff to tour at least one alternating facility every two weeks and to document and share their observations with the Commissioner's office. All Deputy Commissioners, Associate Commissioners, and Assistant Commissioners, Executive Directors, Commanding Executive Officers and the *Nunez* Manager are required to conduct these tours. These executive leadership tours continued throughout the current Monitoring Period and were expanded to include all Directors as well. These tours provide opportunities for executive staff to better understand and address the concerns and issues amongst line staff and those in custody, to share their expertise directly with the line staff, and to convey messages about the culture the agency leadership intends to promote. Following their tours, all staff are required to provide a summary of their findings and observations to the Bureau Chief/Chief of Staff's office. Executive staff are also encouraged to incorporate their observations and findings into their respective work and any broader strategic plans being crafted at the executive level.

These executive tours serve an important role in ensuring that all Department leadership understand the current obstacles, dynamics and culture that compromise safety in the jails. While they cannot and do not serve as a replacement direct supervision of line staff by more immediate supervisors in the jails, this ongoing immersion of agency leaders into daily jail operations is a valuable management tool.

**<u>Conclusion</u>**

Agency and facility leaders have extensive access to data and insights from Central Operations Desk ("COD") reports, various data dashboards, Rapid Reviews, and *Nunez* Compliance Unit ("NCU") audits, which offer clear problem-solving targets. During this Monitoring Period, the transparency and initiative of facility leaders to evaluate and better manage their jail's operations has demonstrably improved. Further, substantive engagement between facility leaders and Department leadership has increased. There is no question that more is needed to solve the jails' intractable problems, but important steps have been taken during this Monitoring Period. Although there are notable exceptions, those responsible for setting the strategic direction for each jail have not yet consistently developed and implemented specific, actionable plans to eliminate the ongoing operational failures driving the risk of harm in the agency. The appointment of facility leaders with proven expertise in jail operations, along with the skills and experience necessary to drive the required cultural transformation, remains a crucial priority. Further, facility and Department leadership must fully leverage the information available to enhance overall problem-solving efforts. That said, the Department's efforts during this Monitoring Period are a necessary first step to altering the current trajectory of operations. As a result, the Department is now in Partial Compliance with this provision.

| **COMPLIANCE RATING** | § A., ¶ 2. Partial Compliance |
|---|---|

| FIRST REMEDIAL ORDER § A., ¶ 3 (REVISED DE-ESCALATION PROTOCOL) |
|---|

§ A., ¶ 3. *Revised De-escalation Protocol.* Within 90 days of the date this Order is approved and entered by the Court ("Order Date"), the Department shall, in consultation with the Monitor, develop, adopt, and implement a revised de-escalation protocol to be followed after Use of Force Incidents. The revised de-escalation protocol shall be designed to minimize the use of intake areas to hold Incarcerated Individuals following a Use of Force Incident given the high frequency of Use of Force Incidents in these areas during prior Reporting Periods. The revised de-escalation protocol shall address: (i) when and where Incarcerated Individuals are to be transported after a Use of Force Incident; (ii) the need to regularly observe Incarcerated Individuals who are awaiting medical treatment or confined in cells after a Use of Force Incident, and (iii) limitations on how long Incarcerated Individuals may be held in cells after a Use of Force Incident. The revised de-escalation protocol shall be subject to the approval of the Monitor.

The discussion below provides a compliance assessment of the Department's efforts to reduce its reliance on intake units in general operations pursuant to the requirements of the First Remedial Order (dkt. 350), § A, ¶ 3. This assessment also includes references to the Action Plan (dkt. 465), § E, ¶ 3 (a) (which adopts ¶ 1 (c) of the Second Remedial Order regarding tracking of inter/intra facility transfers), and Action Plan (dkt. 465), § E ¶ 3 (b) (which requires the new leadership to address these requirements) given these orders' interplay with the First Remedial Order (dkt. 350), § A, ¶ 3. These provisions require the Department to identify the various processes that are negatively impacting intake's orderly operation and address them with new procedures.

De-escalation serves an important harm-reducing function. These provisions underscore the need for the Department to establish a robust process for de-escalating those involved in incidents of violence and/or use of force ("UOF") to ensure that the risk of harm they may present to themselves or others' physical safety has been abated. When an individual is agitated to the point that they present an imminent risk of harm to another person's safety or when they have engaged in behavior that has physically harmed another person, that individual needs to be separated from potential victims so that the *risk* of harm to others can be abated and the person can safely return to the milieu. The risk of harm must necessarily consider the *potential* infliction of pain and/or injuries to others and should not be limited to only assessing the risk of serious injuries[26].

Historically, the Department has transported incarcerated individuals to intake for this purpose, a practice which creates additional chaos and subverts the intended function of intake units. As a result, the Monitoring Team has focused on reducing the use of intake units for this purpose but also emphasizes the need for the Department to develop routine procedures to properly de-escalate those involved in use of force incidents and other acts of violence.

To ascertain the Department's progress in minimizing the use of intake, the Monitoring Team assesses the use of force in intake, available data regarding the time individuals stay in intake areas, and the Department's ability to manage individuals *outside* of intake. The Monitoring Team also makes observations

---

[26] Notably, while a risk of harm can be ascertained, it is unclear how a risk of *serious injury* could even be reasonably ascertained.

from site visits of intake areas and its assessments of use of force incidents. The Department has made progress on this provision and beginning in 2022, the Department was no longer in non-compliance with the First Remedial Order (dkt. 350), § A, ¶ 3.[27] An update on the Department's efforts to process new admissions as required by the Second Remedial Order (dkt. 398), ¶ 1 (i) (c) is included in Appendix C of this Report.

**Use of Force Incidents in Intake Areas**

The Monitoring Team continues to evaluate the frequency with which use of force occurs in the intake areas. The Monitoring Team has previously noted that intake's chaotic environment and longer processing times (which are often mutually reinforcing) can result in a greater frequency of the use of force. Therefore, efficient intake processing and reducing the reliance on intake following uses of force are critical.

As shown in the chart below, there were 427 uses of force in intake areas from January to June 2024, slightly higher than the number from the previous Monitoring Period (n=396). A closer look at the 427 uses of force in intake during this Monitoring Period revealed that 63% (n=296) occurred in EMTC (n=143) and OBCC (n=153). While these facilities have the highest population of all facilities, and therefore may have more active intake areas, the number of uses of force in intake is concerning and necessitates greater scrutiny and focus on security and active supervision from facility leadership. Overall, the number of incidents within the intakes remains higher than it should, and further reductions are necessary.

The Department must remain vigilant in evaluating whether the force occurring in intake areas is necessary and unavoidable and whether intake operations are orderly and secure.

| *Use of Force in Intakes (Department-wide)* | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** | **Jan. to Jun. 2023** | **July. to Dec. 2023** | **Jan to June 2024** |
| **# of UOF in Intakes** | 913 | 1123 | 992 | 1483 | 963 | 767 | 371 | 396 | 472 |
| **Total UOF** | 5901 | 7169 | 6467 | 8194 | 7005 | 6784 | 3236 | 4705 | 3,496 |
| **% of UOF in Intakes** | *15%* | *16%* | *15%* | *18%* | *14%* | *11%* | *11%* | *8%* | *13%* |

**Intake Data Tracking**

Inter/intra facility transfers must be tracked pursuant to ¶ 1 (c) of the Second Remedial Order (dkt. 398). Historically, the Department did not track inter/intra facility transfers in any systematic way. In 2023, the then Deputy Commissioner of Classification, Custody Management & Facility Operations ("DC of Classification") oversaw several initiatives to improve the tracking of inter/intra facility transfers to ensure

---

[27] The Department was in non-compliance with this provision in the 11th and 12th Monitoring Periods (July 2020 to June 2021). A compliance assessment was not provided for the 13th Monitoring Period. The Monitoring Team found that the Department was in Partial Compliance with this provision in the 14th Monitoring Period (January to June 2022) in the Monitor's October 28, 2022 Report (dkt. 472).

individuals did not languish in intake for more than 24 hours. The Monitor's December 22, 2023 Report (dkt. 666) at pgs. 12-13 outlined these initiatives in detail, including the requirement for intake staff to use the Inmate Tracking System ("ITS") to track inter/intra facility transfers.

The Department reports that the quality assurance process developed in 2023 to track inter/intra-facility transfers in ITS and prevent individuals from languishing in intake is still in effect and under management of facility operations. As part of this process, a facility operations team member monitors the live video feed of all intake units. Every four hours, they receive an update from each facility, including the names of those in intake, a screenshot of the ITS system, and a Genetec photo for each pen. They then verify whether any individuals have been in intake for four hours or more and, if necessary, contact the facility to expedite their movement. In August 2024, the Monitoring Team visited the facility operations trailer, spoke with staff and supervisors, and confirmed the continued use of this quality assurance process. The audit process is resource-intensive, so the Department may want to explore ways to make it more efficient and streamline the process.

In addition to a quality assurance process, the Department has reported its intention to utilize data to assess and optimize intake tracking. The Department reports it uses ITS-generated data to produce reports and to evaluate information such as the average time, minimum time, and maximum time in intake as part of its overall effort to evaluate how long individuals are intake. This information is currently shared with facility and Department leadership daily to monitor overall performance. The Monitoring Team has seen a sample of these data updates but has not yet analyzed the underlying data. The availability of this information to facility leadership is important and the Monitoring Team encourages the use of data to evaluate operations and drive decision-making so long as the Department ensures the data is accurate and reliable.

Generally, the issue of inter/intra facility transfers languishing in intake is no longer a widespread or a persistent problem. However, the Department is not tracking all individuals in ITS, including Court transfers. The Department maintains a list of all individuals who are required to be produced to Court but there still does not appear to be a process to track how long these individuals may wait in an intake pen. Second, as noted in the Monitor's December 22, 2023 Report (dkt. 666), some inter/intra facility transfers are still not entered into ITS in a timely manner. During site visits, the Monitoring Team has consistently observed individuals in intake cells who have not yet been entered into the ITS. Staff frequently explain that the individuals have only recently arrived, and that staff were diverted to more urgent tasks, assuring that they will update the system promptly.

The Monitoring Team maintains its recommendations from the Monitor's April 3, 2023 Report (dkt. 517) at pgs. 87-88 suggesting that the Department would benefit from taking additional steps to manage the use of intake, including assessing root causes of staff's failure to enter individuals into ITS, and developing a practical quality assurance process. While individuals languishing in intake does not appear to be as great a

risk, the ongoing (and increased) use of force in intake suggests that ongoing oversight is necessary to ensure that these units are managed in a safe manner.

**Reduced Reliance on Intake & De-Escalation Units**

As part of its effort to eliminate the reliance on intake areas, the Department opened de-escalation units in each facility by July 2022. While the First Remedial Order does not require the use of de-escalation units, the Department opened them as one alternative for staff to use instead of intake. De-escalation units are in unoccupied housing units in each facility with cells with secured doors, a bed, a toilet, and a sink. Showers are available in each housing unit. The Department promulgated Directive 5016 "De-escalation Unit," which establishes the Department's policy and procedures for de-escalating individuals outside of facility intakes. The policy prohibits the use of intake pens for post-incident management or violence prevention and indicates that intake should only be used for facility transfers, court processing, discharges, and transfers to medical appointments, cadre searches, body scans, and new admissions.

The Department did not faithfully implement the use of de-escalation units. The Department ceased utilization of de-escalation units at RMSC in August 2022, GRVC in October 2022, and RNDC in June 2023. No de-escalation units were created at NIC/WF, nor at OBCC when it was re-opened in July 2023. EMTC leadership reports that it maintains a de-escalation unit. Given the limited use of de-escalation units, in October 2023, in consultation with the Monitoring Team, the *Nunez* Compliance Unit ("NCU") decided it would no longer audit the de-escalation units.

The limited use and subsequent discontinuation of facility de-escalation units does not inherently mean that facilities take all incarcerated individuals to intake following a UOF incident. NCU's audits and reports from facility leadership indicate that some incarcerated individuals are instead returned to their assigned cell to de-escalate, are immediately rehoused, or are taken directly to the clinic for medical care.[28] However, despite de-escalation units not being used since October 2023, the policy governing de-escalation units remains in effect. Facility staff have not received formal guidance on post-incident protocols or managing incarcerated individuals following an incident without the use of de-escalation units. Appropriate guidance regarding how best to manage the de-escalation process is necessary.

The Monitoring Team strongly recommends that the Department update its policy to describe required de-escalation procedures and reiterate the prohibition on using intake for post-incident management.

---

[28] The NCU audits covering January to June 2023 (the 16th Monitoring Period) found that 49 of 84 individuals (58%) (compared with 71% in July to December 2022) were not taken to intake and instead were taken back to their assigned cell to de-escalate, immediately rehoused, taken directly to the clinic for medical care, or were placed in a de-escalation unit (specifically, six individuals were placed in a de-escalation pen during this time). 35 of 84 individuals (42%) were brought to intake areas. *See* the Monitor's December 22, 2023 Report at pgs.13-14.

**Conclusion**

      The Department has made significant strides in improving the conditions of intake, which are no longer as chaotic and disorderly as they were in 2021. However, further work is needed, such as consistent tracking of individuals in ITS, ongoing efforts to reduce the use of force in intake areas, and updated guidance for de-escalating those involved in use of force incidents. The Department has not developed a consistent strategy for de-escalation. The de-escalation process must allow for the identification of the individual's distress, to offer various strategies to address the interpersonal conflict or tension, and to continually re-assess the person to determine whether the risk of harm has subsided. The time required for the risk of harm to subside depends both on the individual (*i.e.*, some have more well-developed skills for coping with emotional dysregulation than others) and the situation (*i.e.*, some types of situations cause a higher level of distress than others), and thus the duration must be individually determined for each de-escalation period. Because the Department has improved the functioning of intake units but has several remaining challenges, the Department remains in partial compliance with this provision.

| COMPLIANCE RATING | § A., ¶ 3. Partial Compliance |
|---|---|

| FIRST REMEDIAL ORDER § A., ¶ 4 (SUPERVISION OF CAPTAINS) |
|---|

¶ 4. *Supervision of Captains*. The Department, in consultation with the Monitor, shall improve the level of supervision of Captains by substantially increasing the number of Assistant Deputy Wardens ("ADWs") currently assigned to the Facilities. The increased number of ADWs assigned to each Facility shall be sufficient to adequately supervise the Housing Area Captains in each Facility and the housing units to which those Captains are assigned and shall be subject to the approval of the Monitor.

    i.    Within 60 days of the Order Date, RNDC, and at least two other Facilities to be determined by the Commissioner in consultation with the Monitor, shall satisfy the requirements of this provision.

    ii.    Within 120 days of the Order Date, at least three additional Facilities to be determined by the Commissioner in consultation with the Monitor, shall satisfy the requirements of this provision.

    iii.    By December 31, 2020, all Facilities shall satisfy the requirements of this provision.

This provision, in conjunction with Action Plan (dkt. 465), § C, ¶ 3 (ii-iii), requires the Department to improve staff supervision by hiring and deploying additional ADWs within the facilities to better supervise Captains. The goal of these provisions is to ensure that Captains are properly managed, coached, and guided in order to elevate their skill set, so that they in turn better supervise the officers on the housing units. Thus, an assessment of adequate supervision requires an examination of both layers of supervision — ADWs and Captains. Given that the state of affairs has essentially remained static or in some places, lost ground during this Monitoring Period, this section incorporates the discussion from the Monitor's November 8, 2023 Report (dkt. 595) at pgs. 25-28, the Monitor's December 22, 2023 Report (dkt. 666) at pgs. 14-16, and the Monitor's April 18, 2024 Report (dkt. 706) at pgs. 64-68. The Consent Judgment provisions § XII, ¶¶ 1-3 are designed to ensure that those staff selected for promotion are appropriately screened for selection and are discussed later on in this report.

## Goals of Supervision

The Department's inability to achieve substantial compliance with this provision and other provisions related to its overall management resulted in additional remedial relief, including two provisions in the Action Plan (dkt. 465) (§ C, ¶ 3 (ii-iii)) requiring an increase in the number of Captains and ADWs assigned to the facilities. Furthermore, Action Plan (dkt. 465), § C, ¶ 3 (ii) requires the Department to evaluate the assignments of all Captains and to implement a plan prioritizing Captains' assignments to supervise housing units in the facilities. In addition, Action Plan (dkt. 465), § C, ¶ 3 (iii) further requires the Department to increase the number of ADWs assigned to the facilities to ensure Captains are adequately supervised.

In this report, the Monitoring Team reiterates the concerns and goals shared in prior reports in order to emphasize their importance and that these concerns and goals have not substantially changed since this provision went into effect. Changing staff practice will require an infusion of

correctional expertise in a form that reaches more broadly, deeply, and consistently into staff practice than facility leadership has been able to accomplish to date.

Improving staff practice requires not only an appropriate number of supervisors but also supervisors who provide *quality* supervision. Increasing staff's ability and willingness to utilize proper security practices rests on the supervisors' ability and willingness to confront poor practices and teach new ones. Definitive steps to ensure that staff are available in sufficient numbers and are properly assigned are important, but it is equally critical that staff *actually do their jobs*, which requires thorough training, skill mastery, and the confidence to implement the expected practices and to enforce rules. Too often, staff are present and yet fail to enact or enforce even the most basic security protocols. Supporting and improving staff's confidence and skill mastery should be a core responsibility of the Department's supervisors, but it is not currently occurring as it must. Improved practice by line staff requires ongoing, direct intervention by well-trained, competent supervisors—guiding and correcting staff practice in the moment as situations arise. Only with this type of hands-on approach will the Department be able to confront and break through staff's inability, resistance, and/or unwillingness to take necessary actions.

Currently, the supervisory ranks are unprepared to support the weight of the strategies that place them at the center of officers' skill development. Compounding the problem of too few supervisors is the reality that many of those holding the ranks of ADW and Captain have only marginal competence in the skills necessary to provide *effective* supervision. Supervision cannot be passive—these individuals must have an active presence in the housing units, demonstrating the requisite skills, providing opportunities for staff to practice them, and helping staff to understand and eventually overcome what hinders their ability to utilize the skills they are being taught consistently.

The dynamic between Captains and officers is crucial for maintaining order and security within housing areas, yet the dynamic appears fundamentally compromised in this Department. Captains must embody the role of mentors, attentively listen to frontline staff, and actively work towards resolving issues, thereby fostering a supportive environment and effective operation. Unfortunately, the relationship between officers and Captains is too often described in ways suggesting that it subverts progress rather than accelerates it. For example, during monthly meetings with the Monitoring Team, the Department's Training Division disclosed that exit interviews with resigning officers consistently cited strained relationships and lack of support from Captains as the primary factors leading to their departure. Additionally, reports from facility leadership and staff and during the Monitoring Team's observations of operations, Captains often appear to be either unclear about their responsibilities or outright fail to embrace them. This often leads to a superficial execution of duties, where Captains do not appear to routinely conduct substantive tours or, in some instances, fail to conduct tours at all. Too often, Captains conduct

tours but often fail to tour the whole unit or address obvious issues within their assigned housing areas. For example, officers report concerns such as incarcerated individuals' frustration over inadequate supplies or service disruptions, but Captains do not investigate the underlying causes nor seek solutions, choosing instead to move on to the next task. This abdication of responsibility leaves officers feeling unsupported and disinclined to fulfill their own duties.

The Department simply does not have the necessary assets among its current corps of supervisors to provide the type and intensity of hand-to-hand coaching that is required, which is perhaps unsurprising given their tenure in a deeply dysfunctional system that does not adequately select, train, or prepare them for the task at hand. In addition to the Captains' need for intensive guidance, ADWs also need substantial and quality coaching, supervision, and mentoring from their superiors to develop into the type of supervisor that is so desperately needed in this Department. The task of cultivating the ADWs will largely fall to the Deputy Wardens and Wardens/Assistant Commissioner's in each command, which brings yet another layer of complexity to the supervision problem and the task of reforming the Department's practices.

## Scheduling

Last year, the Department's former Staffing Manager took several steps to increase the number of DWs and ADWs assigned to facilities so that Captains are more directly and robustly supervised. To that end, ADWs' schedules were altered to distribute the number of ADWs more evenly across the three tours and weekdays/weekends. In addition, the DWs are scheduled consistently, including on the weekends and across tours, whereas previously they were scheduled for 7am-3pm tours, excluding weekends. The Department reports that these scheduling changes have been maintained through the current Monitoring Period during which a new Staffing Manager resumed management of the Office of Administration. Each week, the Office of Administration's Scheduling and Roster Management Unit develops a template schedule for each facility, which includes required weekend and evening tours for ADWs. While the Office of Administration assigns officers to their weekly tours, each facility is responsible for assigning the ADWs to their tours. Altering the schedule to increase the number of supervisors present during the facilities at all times is an important step. Given the historical issues that occur with the scheduling process at the facility level, the Monitoring Team recommends that the Office of Administration closely scrutinize the scheduling of supervisors to ensure that ADWs are scheduled for their shifts as designed.

## Organizational Structure and Number of Supervisors

The challenge of providing adequate supervision is compounded by the Department's organizational structure. Most correctional systems have three supervisor ranks, but this Department has only two (Assistant Deputy Warden and Captain). Because most ADWs serve as

Tour Commanders, there is only one line of supervision.  In this system, Captains supervise the Officers, but there is no active supervision of Captains.  In most systems, there is a level of supervision between the first line supervisors and the Tour Commanders. Without this additional level of supervision, Captains are left without the necessary active supervision to develop the skills needed for their roles.

The problem presented by the Department's truncated chain of command is further exacerbated by the inadequate number of individuals holding the two ranks. The Department does not appear to have a sufficient number of supervisors at either rank. Many of the facilities' leaders have reported during routine updates to the Monitoring Team that they believe they have insufficient numbers of Captains, which is negatively impacting their operations. Two tables that identify the number and assignment of ADWs and Captains at specific points in time from July 18, 2020 to September 28, 2024 are included in Appendix A: Number of ADWs and Captains. Echoing the findings of the previous two Monitoring Periods (*see* the Monitor's December 22, 2023 Report (dkt. 666) at pgs. 15-16 and the Monitor's April 18, 2024 Report (dkt. 706) at pgs. 64-68), during the current Monitoring Period, the number of supervisors remained insufficient to provide the type of *intensive* supervision—throughout the chain of command—that is needed to elevate officers' skills.

- **ADWs**: Both First Remedial Order (dkt. 350), § A, ¶ 4 and Action Plan (dkt. 465), § C, ¶ 3 (iii) require an increase in the number of ADWs. The number of ADWs currently assigned to the facilities (n=67) has increased by almost 29% since the First Remedial Order went into effect (n=52 on July 18, 2020) and by 37% since the Action Plan went into effect (n= 49 as of July 18, 2022). However, the number of ADWs assigned to the facilities has gone down 8% since the last Monitoring Period (n=73 as of December 23, 2023), which corresponds with a decrease in the overall number of ADWs Department-wide. Unfortunately, the overall increase in the number of ADWs since the First Remedial Order/Action Plan has had limited impact on the quality of staff practice. In large part, this is because the number of ADWs remains insufficient to supervise the requisite number of Captains (*i.e.*, each ADW has too many Captains to provide quality supervision) particularly when most ADWs work as Tour Commanders. Furthermore, although the number of ADWs has increased, the percentage of ADWs assigned to the facilities since the First Remedial Order went into effect has remained the same (79% as of July 18, 2020 and 79% as of June 22, 2024). Previously, the Monitoring Team reported its concerns regarding the selection and quality of supervision provided by those ADWs who were

promoted in the 15th and 16th Monitoring Periods.[29] These concerns about the quality of supervision further compound the limited impact that the increase in the number of ADWs has had on the quality of staff practice.

- **Captains**: Since 2020, both the number and percentage of Captains assigned to work in the facilities has decreased. The number of Captains decreased by 38% (from 558 as of July 18, 2020 to 354 as of June 22, 2024) and the proportion of Captains assigned to the facilities decreased slightly (from 69% as of July 18, 2020 to 66% as of June 22, 2024). In other words, one-third of all available Captains are *not* assigned to facilities or court commands. This is one of the lowest proportions assigned to the facilities since July 2020. As for the overall number of Captains, the Department promoted 50 Captains during this Monitoring Period, but this only increased the number of Captains assigned to the facility by 2% (from 346 as of December 23, 2023 to 354 in June 22, 2024) given the Department's report that the promotion of Captains simply back-filled those Captains that had previously left the Department. The overall dearth of supervisors will continue to require significant focus and attention in order to both obtain the necessary numbers and, crucially, to ensure the individuals have the requisite skill set to properly supervise their subordinates.

**Training for Supervisors**

Ensuring that supervisors have an appropriate skill set to supervise their subordinates begins with training those who are selected for promotion. The Monitoring Team has previously reported on the poor quality of pre-promotional training curricula.[30] In this Monitoring Period, the Monitoring Team approved 22 pre-promotional training modules for the anticipated promotion of Captains following extensive consultation and collaboration as described in the Monitor's April 18, 2024 Report (dkt. 706) at pg. 68. The revised training modules are significantly improved and reflect a firm commitment from the Training Division. The new training materials are better tailored to the distinct roles of Captains and provide guidance to elevate staff's skill to a new role. The approved training modules were provided to the two new classes of Captains prior to their promotion.

In June 2024, the Training and Development Division shared lesson plans for a 3-day in-service leadership training series for Captains. The material focused on effective communication, transformational leadership, and principles for building and leading teams. The purpose of this

---

[29] *See* Monitor's April 3, 2023 Report (dkt. 517) at pgs. 210-216; Monitor's July 10, 2023 Report (dkt. 557) at pgs. 74-77; Monitor's August 7, 2023 Report (dkt. 561) at pgs. 13-15 and 33-34; Monitor's November 8, 2023 Report (dkt. 595) at pgs. 3-4 and 99; and Monitor's December 22, 2023 Report (dkt. 666) at pgs. 16 and 78-86.

[30] *See, for example,* Monitor's July 10, 2023 Report (dkt. 557) at pgs. 71-83.

training is to improve leadership among current Captains, aligning with the broader objective of reforming the culture of responsibility within jail management. After incorporating feedback from the Monitoring Team, the Training Division started the training in October 2024, with the goal of completing training for all Captains by the end of 2025.

The new training presents an enormous opportunity for the Department to usher in a class of new leaders who will directly impact the safety and operations in the jails for years to come. It cannot be overstated how important it is for the Department to select suitable candidates, provide the new pre-promotional training with fervor, and ensure existing Captains and ADWs act as nothing short of role models to this next generation of new leadership. Following the close of the Monitoring Period, the Department began to consult the Monitoring Team on updated training curricula for pre-promotional ADWs and that work is ongoing.

## <u>Conclusion</u>

Although the overall increase in the number of ADWs (since the First Remedial Order) and the promotion of Captains who received the improved Captains' training curricula are constructive, the Department's long-standing supervisory void—in both number and competence—is a leading contributor to the Department's inability to alter staff practice and to make meaningful changes to basic security practices and operations. As a result, the Department remains in Non-Compliance with this provision.

| COMPLIANCE RATING | § A., ¶ 4. Non-Compliance |
|---|---|

| FIRST REMEDIAL ORDER § A., ¶ 6 (FACILITY EMERGENCY RESPONSE TEAMS) |
|---|
| § A., ¶ 6. *Facility Emergency Response Teams.* Within 90 days of the Order Date, the Department shall, in consultation with the Monitor, develop, adopt, and implement a protocol governing the appropriate composition and deployment of the Facility Emergency Response Teams (*i.e.*, probe teams) in order to minimize unnecessary or avoidable Uses of Force. The new protocol shall address: (i) the selection of Staff assigned to Facility Emergency Response Teams; (ii) the number of Staff assigned to each Facility Emergency Response Team; (iii) the circumstances under which a Facility Emergency Response Team may be deployed and the Tour Commander's role in making the deployment decision; and (iv) de-escalation tactics designed to reduce violence during a Facility Emergency Response Team response. The Department leadership shall regularly review a sample of instances in which Facility Emergency Response Teams are deployed at each Facility to assess compliance with this protocol. If any Staff are found to have violated the protocol, they shall be subject to either appropriate instruction or counseling, or the Department shall seek to impose appropriate discipline. The results of such reviews shall be documented. |

This provision requires the Department to minimize unnecessary or avoidable uses of force by Emergency Response Teams. There are two types of Emergency Response Teams: a Facility Response Team or Probe Team, which is a team of facility-based staff and Special Teams[31] which includes the Emergency Services Unit ("ESU"), an "elite" team of staff specifically dedicated and trained to respond to emergencies across the Department; a Security Response Teams ("SRT") and Special Search Team ("SST")[32], which function similarly to ESU and are deployed to facilities as part of operational security efforts. The following discussion summarizes concerns regarding responses by Emergency Response Teams, the Rapid Reviews conducted for Emergency Response Teams, an update on revisions to Probe Team Procedures, the frequency of alarm responses, as well as the selection and training for Special Teams.

**Concerns Regarding Emergency Response Teams**

The Monitoring Team has long raised concerns about the Department's overreliance on Emergency Response Teams generally, team members' conduct, and the teams' composition.[33] The Monitoring Team's ongoing concerns about all Emergency Response Teams (both Probe Teams and Special Teams) fall into the following categories:

---

[31] Special Teams are defined, pursuant to the August 10, 2023 Order (dkt. 564), ¶ 7 as the Emergency Services Unit and any functionally equivalent unit, including, but not limited to the Strategic Response Team and the Special Search Team. The Special Teams are generally utilized in the facilities in the same manner as a Probe Team.

[32] The Department reports that Special Search Teams "SST" is comprised of any available Facility Based staff that are only convened if there is a need for a special search.

[33] *See* Monitor's May 11, 2021 Report (dkt. 368) at pgs. 38-50 and 116-120; Monitor's December 6, 2021 Report (dkt. 431) at pgs. 49-51; Monitor's June 3, 2021 Report (dkt. 373) at pgs. 3-4; Monitor's April 3, 2023 Report (dkt. 517) at pgs. 137-143; Monitor's July 10, 2023 Report (dkt. 557) at pgs. 34-42; Monitor's December 22, 2023 Report (dkt. 666) at pgs. 17-22; and Monitor's April 18, 2024 report (dkt. 706) at pgs. 69-75.

- Overreliance on these teams to address issues that could and should be addressed by uniform staff on the housing unit and/or facility supervisors/responding staff.

    - Even with some improvement in calling a Level A Alarm to respond *first,* the practice of an Emergency Team Response via a Level B Alarm continues even if the matter is resolved before their arrival.

    - Furthermore, the response time for a Level B Alarm is often protracted, and thus its effectiveness in providing additional support is questionable.

- Overabundance of staff on these teams such that an excessive number of staff arrive on-scene, which often raises tensions (including the chaotic situation that occurs when Probe Teams are summoned using an "all available staff" call for assistance).

    - When an escort is required following an incident, it often occurs with a large number of individuals from the Emergency Response Team when it could be done by one individual.

- Hyper-confrontational approach of response team members, which often exacerbates conflict and leads to the unnecessary and/or excessive use of force.

- Failure to appropriately staff these teams to ensure they are comprised only of those who are qualified, and who do not have a history of unnecessary and/or excessive force.

    - Lack of specific criteria to select those who serve on the Emergency Response teams within the facilities (despite years of recommendations from the Monitoring Team and reports from the Department that they intend to do so).[34]

- Team members' use of concerning security practices such as painful escort holds.

- Utilizing Emergency Response Teams to conduct searches when they are conducted in an inefficient, chaotic manner that often leads to the excessive and unnecessary use of force.

**Rapid Reviews of Probe Teams & Special Teams**

The Rapid Reviews evaluate the work of the Emergency Response Teams in two ways.  First, the facility evaluates the appropriateness of alarms and the tactics used by the Probe Teams during the Rapid Review process. These reviews include an assessment of whether the deployment of the Probe Team was necessary. From January to June 2024, nearly 3,500 incidents underwent a Rapid Review by facility leadership, which identified 1,100 incidents involving the deployment of the Probe Team. Only

---

[34] The Department reported in August 2023 that it intended to assign specific staff to the Emergency Response Teams based in the facilities. However, as of the filing of this report, the Department has not provided any revised policies or procedures to suggest it has taken any concrete steps to implement this plan.

14 of the 1,100 incidents with Probe Team responses found the deployment was unnecessary. The high volume of deployments and leadership's consistent inability to identify misconduct and procedural errors in its various forms suggests that more deployments may have been unnecessary but were not identified as such, further underscoring a need for more rigorous Rapid Reviews. A more fulsome discussion regarding the overall quality of Rapid Reviews is discussed in the compliance assessment of the First Remedial Order (dkt. 350), § A, ¶ 1.

In May 2023, the Department began conducting Rapid Reviews specifically for Special Teams (*i.e.* ESU, SST, and SRT). The Rapid Reviews for Special Teams are assessed by an Assistant Deputy Warden ("ADW") who supervises the ESU team to evaluate force used specifically by the Special Teams (rather than being considered in concert with facility staff's conduct, which is assessed during the facilities' Rapid Reviews). The Special Team Rapid Review template includes the date, time, location, and camera information for the incident; the names and shield numbers of staff involved in the incident; an assessment of whether the incident was avoidable and/or anticipated and why; identification of any procedural violations, painful escort techniques, or staff actions that were not in compliance with the use of force ("UOF"), chemical agent, or self-harm policies and procedures; and any recommendations for corrective action, discipline, or removal from the Special Teams for each staff member involved in the incident. The format of the Special Team Rapid Review template was revised during this Monitoring Period for data entry to be more streamlined, and while the 2023 Rapid Reviews did not initially contain a prompt to assess whether the Special Team deployment was necessary, this question was added in response to the Monitoring Team's recommendation and is addressed in all the 2024 Rapid Reviews.

Rapid Reviews were conducted for 419 Special Team staff involved in 89 UOF incidents from January 1, 2024 to June 30, 2024. The Special Team Rapid Reviews conducted in this Monitoring Period:

- determined that all of the UOFs involving the Special Teams were unavoidable.

- identified procedural errors or policy violations for only one officer.

    o In this case, the one staff member was observed using profanity on body worn camera and was recommended for a corrective interview.

While the creation of a separate review process for Special Teams is a positive development, the process has not yet realized its full potential. The Monitoring Team's overall findings regarding the quality of the Special Team Rapid Reviews suggest that results are inconsistent with the Monitoring Team's review of incidents and so they may not capture the full range of staff misconduct. The Monitoring Team intends to evaluate these Rapid Reviews more closely in the future.

For Rapid Reviews to be effective, they must be conducted with objectivity and thoroughness. Simply having a review process in place is insufficient to drive cultural or behavioral change. This process requires rigorous and thoughtful scrutiny of staff conduct in order to accurately detect misconduct and hold individuals accountable.

**Facility Response/Probe Team Procedures**

The Department has struggled to make meaningful progress in revising its policies and practices for Emergency Response Teams (including criteria for selecting team members), leaving this ongoing issue unresolved.

The Monitoring Team has previously provided feedback to address the risks posed by poorly managed Facility Response Teams/Probe Teams. In June 2021, the Monitoring Team shared specific concerns regarding the use of Probe Team teams, along with recommendations for policy and practice revisions. Again, in July 2022, the Monitoring Team provided a comprehensive summary of feedback to the Department. Despite this, when the Department shared revisions to its Facility Response Team policy in July 2023, the changes failed to incorporate the Monitoring Team's feedback and did not reflect the updates the Department had previously indicated it would make.  In October 2023, the Monitoring Team again provided extensive feedback and recommendations on the revised policy and has yet to receive a revised policy. In March 2024, the Department reported that updates to the facility alarm response were under review as part of a violence reduction plan, but no further updates have been provided.

The Department's policies and procedures related to searches are intertwined with the actions of the Emergency Response Teams given that the teams often conduct searches. The Monitoring Team has long raised concerns about the Department's search practices and the associated dysfunction. The Monitoring Team provided feedback in June 2021[35] on strategies for improving staffs' search techniques to avoid catalyzing a need to use force and to reduce the on-scene chaos that often accompanies search operations.[36] The Monitoring Team again provided feedback to the Department on

---

[35] In 2021, the Monitoring Team recommended: (1) the span of control for searches should be limited in order to reduce the number of excessive staff involved in searches; (2) a specific plan must be devised before each search takes place; (3) facility leadership must be involved in any planning for a search that includes external teams like ESU; and (4) specific procedures for conducting searches in celled and dormitory housing and common areas so that searches are completed in an organized and efficient manner and are not chaotic and disruptive.

[36] *See, for example,* Monitor's April 3, 2017 Report (dkt. 295) at pgs. 13-14 and 128; Monitor's October 17, 2018 Report (dkt. 317) at pg. 42; Monitor's October 23, 2020 Report (dkt. 360) at pgs. 16, 29, and 75; Monitor's May 11, 2021 Report (dkt. 368) at pgs. 24, 43-44, 48 and 124; Monitor's December 6, 2021 Report (dkt. 431) at pg. 26; Monitor's March 16, 2022 Report (dkt. 438) at pgs. 22 and 71-72; Monitor's October 28, 2022 Report (dkt. 472) at pgs. 71-72, 81, and 117; Monitor's April 3, 2023 Report (dkt. 517) at pgs. 54 and 138; and Monitor's July 10, 2023 Report (dkt. 557) at pgs. 42-43.

the search and contraband directive in October 2023. The Department previously reported it is working on policy revisions as required by the Court's August 10, 2023 Order (dkt. 564) and intended to share revisions in Spring 2024. However, the Monitoring Team has not received any revised policies during this Monitoring Period.

To date, practices related to searches have not improved. The Department continues to conduct many searches, which are necessary to address the flow of contraband and other issues. However, the Department's search practices often unnecessarily result in the use of force. The Department does not systematically track the number of uses of force that occur during searches. However, the Monitoring Team's review of initial use of force reports (COD reports) in this Monitoring Period suggested a rough estimate of about 500 use of force incidents occurred during searches. In the Monitoring Team's experience, this is an extremely high number of incidents involving searches. This rough data in combination with the Monitoring Team's assessment of specific incidents suggests far too many searches result in the unnecessary use of force.

Finally, the review and revisions to CLOs related to ESU's practices remain outstanding as described in more detail in the compliance assessment of Consent Judgment, § IV, ¶ 1, Use of Force Policy.

### Frequency of Facility Response/Probe Team Deployments

The deployment of Facility Response/Probe Teams most frequently occurs in response to Level B Alarms and in order to conduct searches. Level B alarm responses involve the deployment of a Facility Response/Probe Team (and in some instances Special Teams) while Level A responses involve supervisors and/or de-escalation teams not outfitted in tactical gear. The Department has long defaulted on the use of Probe Teams to address many issues that occur in the housing units.

The former Deputy Commissioner of Security reported that he focused on reducing the overall reliance on Facility Response/Probe Teams and hence the number of Level B alarms. Overall, the number of Level A alarms (*i.e.*, facility non-tactical response) has increased while the number of Level B alarms (*i.e.*, Emergency Response Team) has decreased. However, the Monitoring Team still identifies instances where Level B alarms are triggered without cause, leading to situations that may escalate and result in unnecessary or excessive uses of force. The Department must continue to mentor facility leaders and scrutinize instances in which Level B alarms are unnecessarily activated. Ensuring that frontline staff and their supervisors address issues directly and effectively is crucial for lasting reform.

### Composition of Emergency Services Unit ("ESU") and Security Response Teams ("SRT")

The Monitoring Team recognizes the need for and supports the utilization of a specialized and highly trained tactical squad within the Department. In this Department, ESU and SRT serve this function. ESU and SRT are located centrally outside any specific facility and serve all facilities. When

properly utilized and deployed, such teams can neutralize serious risks of harm to both staff and incarcerated individuals. The practices of ESU and SRT have been a long-standing concern of the Monitoring Team given their tendency to escalate situations as described in the "Concerns Regarding Emergency Response Teams" listed above.

Over the last year, the Department's reliance on ESU and SRT has decreased, and the overall size of the teams are smaller than they have been in the past. However, they are still utilized unnecessarily. For example, in August 2024, after a staff-precipitated use of force incident involving multiple security failures, an SRT of nearly thirty staff members arrived in a housing area, despite the incident already being terminated and the area secured by at least six officers and three supervisors.

An overarching historical concern regarding the management of the Special Teams is staff selection, particularly the retention of staff members in ESU after their misconduct cases have been identified. Department policy requires screening to select and assign staff to the Emergency Services Unit. Historically the Department has not adhered to its own screening and selection process.[37] The Department's selection of ESU staff has been fraught with issues as most recently described in the April 18, 2024 Report (dkt. 706) at pgs. 74-75. In September 2023, the Department shared proposed revisions to the policy regarding screening and assigning staff to Special Teams. The Monitoring Team provided feedback in October 2023. The Department has not yet provided a revised draft of the policy to address the Monitoring Team's feedback.

With respect to staffing the Special Teams, the number of staff assigned to ESU has decreased. Between January and June 2024, no staff were added to ESU, and five staff were removed, bringing the number of staff assigned to ESU as of June 2024 to 86, less than half of the roster at its peak. The Department has recently started to more closely track the staff assigned to the SRT.  As of June 2024, there were 46 individuals on SRT (five captains and 41 COs; 34 of which are active members and 12 are support team members). Between January and June 2024, one support team CO was added and one active CO was removed.

**Training for Special Teams**

In early 2023, the Monitoring Team recommended that Special Teams' staff receive training to improve practice. The Department's training program at the time was inadequate; it failed to address the areas of concern regarding the team's historical practices that had been reported by the Monitoring Team for years. The course content did not adequately address the necessary skill set, and some of the course content was inconsistent with the Department's own policies and procedures (*e.g.*, the discussion of Incident Command was not aligned with the Department's practices regarding Level A/B alarms).

---

[37] *See* Monitor's December 22, 2023 Report (dkt. 666) at pgs. 20-22.

Between August 2023 and February 2024, the Department worked collaboratively with the Monitoring Team to revise the training modules through many iterations, exchanging feedback and revisions. The Monitoring Team approved the training in February 2024. The revised training is intended to address some of the most fundamental issues the Monitoring Team has repeatedly raised with Department leadership, including policy compliance, real world scenarios, the need for high-level specialized skills and concepts, and directly addressing issues like painful escort, prohibited holds, and head strikes. The training is expected to be provided routinely.

The Department began to deploy the training in April 2024. The training requires the completion of seven modules:[38] De-escalation, Proportional UOF, Documentation, Security Devices, Restraints and Escorts, Investigations, and Trials and Litigation. The Department's Training and Development Division reported that the ESU would deliver the training, and it would take place at the ESU compound. The training is being tracked in LMS.[39] As of October 2024, the Department shared a list of 112 ESU staff that have taken the ESU training.  All 112 staff members have completed the operational modules, however, 25% have not completed one or both of the Trials or Investigation training modules.[40] The Department reports that it intends to deploy the training to the SRT in the upcoming Monitoring Period (July to December 2024).

While the development of this training marks a positive step in the Department's efforts to reform and improve the practices of its Emergency Response Teams, it is important that the Department ensure the training is consistently delivered with integrity and effectiveness.

## Conclusion

The Department's reduced reliance on the use of Emergency Response Teams and the ongoing efforts to moderate their deployment represent an important foundational step toward improving practices in this area. While progress has been made in reducing the overall reliance on Level B alarms, further efforts are required to eliminate unnecessary activations of Emergency Response Teams entirely. Once deployed, the Department must address the persistent concerns regarding the conduct of

---

[38] The full curriculum consists of eight modules. However, the Monitoring Team recommended temporarily excluding Module 5, as it pertains to searches, and the Department is currently revising its policies on search procedures.

[39] Based on Feedback from the Monitoring Team in June 2024, the Department reported that ESU would work with the Training and Development Division to log all training in the Department's Learning Management System ("LMS"). Staff members would be required to scan their ID cards electronically and sign in on paper to record attendance. It is unclear if there is an individual or division that is responsible for reviewing and analyzing the training data to ensure all staff are attending the training as required.

[40] The delay in completing these modules is due to scheduling limitations, as the Trials and Investigation training sessions are delivered by leadership from the ID and Trials divisions. Unlike the operational training, which is taught by in-house ESU leadership, these sessions can only be scheduled at specific times and require greater coordination to ensure that both the students and teachers are available.

Emergency Response Team members, whose actions frequently result in unnecessary and excessive use of force. This includes, enhancing the effectiveness of Rapid Reviews to identify and address misconduct, updating Emergency Response Team policies, refining the protocols for screening and assigning staff to the Emergency Services Unit (ESU), and ensuring the consistent and thorough delivery of the new training curriculum. Together, these actions are a critical part of setting the right tone in the entire agency relating to unnecessary and excessive force—that is, a zero-tolerance approach.

| | |
|---|---|
| **COMPLIANCE RATING** | **Development of Protocol**: Partial Compliance<br>**Review of Responses & Documentation**: Partial Compliance<br>**Deployment of Teams**: Partial Compliance<br>**Response to Misconduct**: Non-Compliance |

| CJ § IV. USE OF FORCE POLICY, ¶ 1 (NEW USE OF FORCE DIRECTIVE) |
|---|

¶ 1. _New Use of Force Directive._ Within 30 days of the Effective Date, in consultation with the Monitor, the Department shall develop, adopt, and implement a new comprehensive use of force policy with particular emphasis on permissible and impermissible uses of force ("New Use of Force Directive"). The New Use of Force Directive shall be subject to the approval of the Monitor.

This provision of the Consent Judgment requires the Department to develop, adopt, and implement a comprehensive Use of Force Policy with particular emphasis on permissible and impermissible uses of force.

**UOF Policy**

The Department maintains a Use of Force ("UOF") Policy and then a number of standalone policies that address additional requirements related to the use of force and the requirements of the _Nunez_ Consent Judgment. The Department previously achieved Substantial Compliance with the development and adoption of the Use of Force Policy, which received the Monitor's approval prior to the Effective Date of the Consent Judgment in 2015. The Use of Force Policy required by the Consent Judgment went into effect on September 27, 2017, with the corresponding New Disciplinary Guidelines effective as of October 27, 2017. The Use of Force Policy is not based on new law, nor does it abandon core principles from its predecessor—the new policy retains core principles of the former policy while providing further explanation, emphasis, detail, and guidance to staff on the steps officers and their supervisors should take in response to threats to safety and security.

**Standalone Policies**

In addition to the Use of Force Policy, the Department must consult and obtain Monitor approval on a number of standalone policies regarding the proper use of security and therapeutic restraints, spit masks, hands-on-techniques, chemical agents, electronic immobilizing devices, kinetic energy devices used by the Department, batons, lethal force, and canines.[41] The Emergency Services Unit ("ESU") also maintains approximately 10 Command Level Orders ("CLOs"), including two that govern the use of specialized chemical agent tools (_i.e._, the Sabre Phantom Fog Aerosol Grenades). Several of these policies require revision, including the ESU's CLOs as well as the Department's policies on restraints, searches, and Emergency Response Teams.[42] The need for revision has been extensively documented in prior Monitor's Reports, most recently in the Monitor's November 8, 2023

---

[41] The Department's failure to consult and/or seek the Monitor's approval of revised policies has also been discussed in various Monitor's Reports. _See, for example,_ Monitor's November 30, 2023 Report (dkt. 616) at pgs. 33 and 37.

[42] _See_ other sections of this report and Monitor's November 8, 2023 Report (dkt. 595) at pgs. 12, 14-16, and 40-41.

Report (dkt. 595) at pgs. 42-43. The Department reports that it is in the process of revising a number of policies that it then plans to submit to the Monitoring Team for consultation and feedback.

**Implementation of UOF Policy**

The Monitoring Team has long provided detailed reporting on the Department's problematic use of force and corresponding security failures, many of which are further described in this report and prior reports.[43] The Monitoring Team's ongoing findings are the basis for the Non-Compliance rating regarding the UOF policy's implementation.[44] The findings reflect ongoing concerns about poor security practices and pervasive operational failures that result in the widespread unnecessary and excessive use of force and imminent risk of harm to those in custody and to those who work in the jails.

Unnecessary and excessive uses of force continue to occur too frequently in this system. Staff continue to try to resolve situations by using force when a reasonable solution could be found via verbal interactions (*i.e.,* force was unnecessary), and when they do intervene physically, staff continue to apply force in a manner that goes beyond what is needed to gain control of the situation (*i.e.*, force was excessive). The staff's use of force practices create an unreasonable risk of harm to both the incarcerated population and to the staff themselves. It is this ***risk of harm*** that is the overarching target of the reform effort related to the use of force.

The new UOF Policy went into effect in late 2017, only after all staff were trained to utilize and report uses of force in the manner prescribed by the policy. Thus, 2018 was the first full year in which staff's practice was governed by the new policy. As shown by the data in Appendix A, the UOF rate for January to June 2024 (9.3) is 58% higher than the rate in 2018 (5.9) and is more than twice the rate in 2016 (3.96) when the Consent Judgment went into effect. Comparisons to either year indicate that the frequency with which force is used has increased substantially, and the Monitoring Team's qualitative assessments of all use of force incidents further suggest that unnecessary and excessive uses of force remain just as prevalent as they were in 2016 and 2018. The Department has not made sufficient progress in reducing the use of unnecessary and excessive force.

---

[43] *See* Martin Declaration (dkt. 397) Exhibit E "Citations to Monitoring Team Findings re: Security Failures" and Monitor's December 6, 2021 Report (dkt. 431) at pgs. 17-23; Monitor's March 16, 2022 Report (dkt. 438) at pgs. 7-30; Monitor's April 27, 2022 Report (dkt. 452) at pgs. 2-3; Monitor's June 30, 2022 Report (dkt. 467) at pgs. 13-17; Monitor's October 28, 2022 Report (dkt. 472) at pgs. 56-77; Monitor's April 3, 2023 Report (dkt. 517) at pgs. 36-63; Monitor's July 10, 2023 Report (dkt. 557) at pgs. 12-68; Monitor's October 10, 2024 Report (dkt. 581) at pgs. 4-19; Monitor's November 8, 2023 Report (dkt. 595) at pgs. 2-3 and 6-28; Monitor's December 12, 2023 Report at pgs. 6-22 (dkt. 666); Monitor's April 18, 2024 Report at pgs. 29-38 (dkt. 706).

[44] *See* Monitor's April 3, 2023 Report (dkt. 517) at pgs. 36-63; Monitor's June 8, 2023 Report (dkt. 541) at pgs. 5-14; and Monitor's July 10, 2023 Report (dkt. 557) at pgs. 12-68; Monitor's April 18, 2024 Report (dkt. 706) at pgs. 29-40.

**Conclusion**

      Substantially reducing the frequency of unnecessary and excessive uses of force will require quality training and supervision, strict adherence to sound security practices, and reliable and appropriate staff discipline. The Department's ability to materially improve the quality of its security practices and to reduce the prevalence of unnecessary and excessive uses of force has been questioned for many years and remains far from certain. The Department remains in Non-Compliance with the implementation of the Use of Force Policy.

| COMPLIANCE RATING | ¶ 1. (Develop) Substantial Compliance |
| --- | --- |
| | ¶ 1. (Adopt) Substantial Compliance |
| | ¶ 1. (Implement) Non-Compliance |
| | ¶ 1. (Monitor Approval) Substantial Compliance |

| CJ § V. USE OF FORCE REPORTING AND TRACKING, ¶ 2 (INDEPENDENT STAFF REPORTS) |
|---|
| ¶ 2. _Independent Staff Reports._ Every Staff Member who engages in the Use of Force, is alleged to have engaged in the Use of Force, or witnesses a Use of Force Incident, shall independently prepare and submit a complete and accurate written report ("Use of Force Report") to his or her Supervisor. |

The Department is required to report when force is used accurately and timely as part of their overall goal to manage use of force effectively. The assessment below covers five critical areas related to reporting force: notifying Supervisors that a use of force ("UOF") occurred, submission of complete, independent, and timely reports, the classification of UOF incidents, allegations of use of force, and reporting of use of force by non-DOC staff who either witnessed the incident and/or are relaying reports from incarcerated individuals.

**Notifying Supervisor of UOF**

From January to June 2024, 3,589 use of force incidents were reported by supervisors to the Central Operations Desk, and slightly over 6,608 uses of force or use of force witness reports were submitted for incidents occurring in this Monitoring Period. To assess whether staff are timely and reliably notifying a supervisor of a UOF, the Monitoring Team considers whether there is evidence that staff are not reporting force as required. This includes consideration of allegations as well as reports from outside stakeholders (_e.g._, H+H and LAS) about potential unreported UOF. These sources suggest that unreported uses of force are an infrequent occurrence. In this Monitoring Period, all 26 out of the 26 reports from New York City Health + Hospitals ("H+H") staff alleging UOF were already under investigation by ID before H+H's reports were submitted. Further, all 15 of the 15 UOF allegations submitted by Legal Aid Society ("LAS") in this Monitoring Period had already been previously reported before receipt of the allegation via LAS.

**Independent, Complete, and Timely Staff Reports**

Staff members are required to submit independent and complete UOF reports. The Department's Use of Force Directive requires staff to independently prepare a staff report or Use of Force Witness Report if they employ, witness, or are alleged to have employed or witnessed force. Staff reports are essential to use of force investigations, requiring staff members to describe events in their own words. Staff must provide accurate details about the tactics used or observed, the level of resistance or threat, and the reasons why force was necessary.

The Department maintains a centralized, reliable, and consistent process for submitting and tracking UOF Reports. The number of reports submitted by staff is significant and most of those reports are submitted and uploaded in a timely fashion. Overall, the Intake Investigations

of UOF incidents appeared to generally have access to staff and witness reports with enough time to conduct the investigations.

During this Monitoring Period, over 6,608 reports were submitted. The high volume of reports submitted generally indicates compliance with the requirement that staff must submit reports. The Monitoring Team's review of reports revealed a general tendency toward independent preparation by the staff. However, the quality of reports remains inconsistent, which has long been reported and is consistent with prior findings highlighted in the Monitor's May 29, 2020 Report (dkt. 341) at pgs. 89-91. The Monitoring Team continues to routinely identify reports that are incomplete, vague, or inconsistent with the evidence. The Department itself continues to identify issues with staff reporting practices. For the 3,346 Intake Investigations closed in this Monitoring Period (covering incidents occurring between October 2023 and June 2024), the Investigation Division ("ID") identified 705 incidents (21%) with report writing issues. Further, as noted in other sections of this report, ID's ability to identify potential violations remains subpar, and therefore, it is likely that additional cases with reporting violations may be present but were not identified.

Staff members are also required to submit their reports as soon as practicable after the use of force incident, or the allegation of the use of force unless the staff member cannot prepare a report within this timeframe due to injury or other exceptional circumstances. The table below demonstrates the number and timeliness of staff reports for actual and alleged UOF from 2018 to June 2024.

| Timeliness of Staff Report | | | | | | |
|---|---|---|---|---|---|---|
| | Actual UOF | | | Alleged UOF | | |
| *Year* | *Total Staff Reports Expected* | *Reports Uploaded Timely* | *% Uploaded within 24 Hours* | *Total Staff Reports Expected* | *Reports Uploaded Timely* | *% Uploaded within 72 Hours of the Allegation* |
| **Jan. to Dec. 2018** | 15,172 | 12,709[45] | 83.77% | 139 | 125[46] | 89.93% |
| **Jan. to Dec. 2019** | 21,595 | 20,302 | 94.01% | 190 | 134 | 70.53% |
| **Jan. to Dec. 2020** | 19,272 | 17,634 | 91.50% | 136 | 94 | 69.12% |
| **Jan to Dec. 2021** | 22,103 | 17,064 | 77.20% | 111 | 45 | 40.54% |
| **Jan to Dec. 2022** | 17,700 | 14,776 | 83.48% | 93 | 42 | 45.16% |
| **Jan to Dec. 2023** | 14,957 | 11,924 | 79.72% | 82 | 40 | 48.78% |
| ***Jan to June 2023*** | *7,744* | *6,431* | *83.04%* | *43* | *19* | *44.19%* |
| ***Jul to Dec 2023*** | *7,213* | *5,493* | *76.15%* | *39* | *21* | *53.85%* |
| ***Jan to June 2024*** | *8,392* | *6,608* | *78.74%* | *52* | *26* | *50.00%* |

During this monitoring period, 78% of reports were submitted within the 24-hour deadline. The submission of timely reports has still not returned to the high proportions observed in 2019 and 2020 (94% and 91% respectively) when submissions were not only more punctual, but the volume of reports submitted was higher. UOF reports from staff at GRVC have the lowest proportion of reports submitted in a timely manner. In this Monitoring Period, only 56% of reports at GRVC were uploaded timely (this is slightly up from the 49% last Monitoring Period). The consistent delay in timely reporting of incidents at GRVC is unacceptable and indicates a failure by the facility leadership to address this critical issue. Timely reporting is crucial to any

---

[45] NCU began the process of auditing actual UOF reports in February 2018.

[46] NCU began collecting data for UOF allegations in May 2018.

investigation. Therefore, the Department, especially the leadership at GRVC, must renew efforts to ensure that reports are submitted within the required timeframes.

Obtaining reports for allegations takes longer as the alleged staff members involved must be identified and advised that a report is necessary, and then the report must be produced. The staff member may or may not be working on the day when the allegation is received and reviewed, so it generally takes longer to obtain reports for allegations. That said, the time to obtain reports for allegations continues to be too long and must be improved. In this Monitoring Period, fewer reports were submitted within 72 hours of the allegation as required. More specifically, 26 of the 50 (50%) reports for alleged UOF incidents were submitted within 72 hours.

## Classification of UOF Incidents

The Department is required to immediately classify all use of force incidents as Class A, B, C, or P when an incident is reported to the Central Operations Desk ("COD"). Class P is a temporary classification used to describe use of force incidents where there is not enough information available at the time of the report to COD to receive an injury classification of Class A, B, or C.

The chart below identifies the Monitoring Team's assessment of a sample of the Department's incident classifications from March 2016 to June 2024.

| Assessment of UOF Classification | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **COD Sets**[47] **Reviewed** | **Mar. 2016 to July 2017** *2nd to 4th MP* | **2018** *6th & 7th MP* | **2019** *8th & 9th MP* | **2020** *10th & 11th MP* | **2021** *12th & 13th MP* | **2022** *14th & 15th MP* | **2023** *16th & 17th MP* | **2024** Jan. to June 18th MP |
| **Total Incidents Reviewed** | 2,764 | 929 | 1,052 | 1,094 | 1,644 | 1,585 | *2,164* | 1,116 |
| **Total Incidents Classified Within COD Period**[48] | 3,036 (97%) | 909 (98%) | 1,023 (97%) | 1,079 (99%) | 1,226 (75%) | 1,238 (78%) | *1,991 (92%)* | 1,036 (93%) |
| **Number of Incidents that were not classified within the COD Period** | 88 (3%) | 20 (2%) | 29 (3%) | 15 (1%) | 418 (25%) | 347 (22%) | *173 (8%)* | 80 (7%) |

---

[47] This audit was not conducted in the First or Fifth Monitoring Periods.

[48] The data is maintained in a manner that is most reasonably assessed in a two-week period ("COD Period"). The Monitoring Team did not conduct an analysis on the specific date of reclassification because the overall finding of reclassification within two weeks or less is sufficient to demonstrate compliance.

The Department has maintained its ability to classify incidents in a timely manner following a backslide in 2021. The Department reported that the 2021 delay in classifying incidents was due to delays by H+H in updating injury reports and facilities failing to report within the prescribed five-day time frame. These issues appear to have subsided given that the Monitoring Team is no longer waiting for final UOF classifications cases as much as it did in the past.

As demonstrated in the chart above, from January to June 2024, 93% of all incidents audited were classified within the COD period. This is consistent with the 92% of incidents that were audited and reclassified timely in 2023. The Department must continue to evaluate UOF classifications and sustain the efficiencies and practices that have resulted in timely classification. Ideally, the Department should aim to return to the high rates of timely classification from 2016 to 2020 (ranging from 97% to 99%). The Monitoring Team intends to closely evaluate the timing and accuracy of reclassifications.

### Alleged Use of Force

In order to evaluate the full extent of force employed within the Department, it is crucial to evaluate both reported instances of force by staff and substantiated *allegations* of the use of force. Hence, the Department maintains distinct tracking for allegations of force use, representing instances where staff purportedly used force on an incarcerated individual which had not been previously reported. It is important to note that an allegation of a use of force does not inherently confirm the actual utilization of force; that determination is established through the investigative process.

The number of allegations has generally declined since 2016. As demonstrated in the chart below, 93 UOF allegations were reported from January to June 2024.



Overall, the number of allegations of force is small compared to the total number of uses of force reported by staff. In the first six months of 2024, there were 93 allegations of force while 3,589 uses of force were reported by staff. The number of allegations this year is on track to slightly exceed the 177 reported in 2023 but is still expected to be lower than any year from 2016 to 2022. The Monitoring Team has found that generally, of the small group of allegations, only a fraction are substantiated, and those are typically for failing to report minor uses of force, and instances of excessive or unnecessary unreported uses of force are rare. That said, all allegations of use of force must be appropriately investigated and all instances of an unreported use of force are cause for concern.

**Non-DOC Staff Reporting**

Non-DOC staff members who witness a use of force incident are required to report the incident in writing directly to a supervisor and medical staff are required to report to a supervisor when they have reason to suspect that an Inmate has sustained injuries due to a use of force, but the injury was not reported as such to the medical staff. Reports from non-DOC staff are vital, as they can sometimes identify incidents that would otherwise go unreported. They often provide additional context or information not captured in other reports, and even when they simply corroborate other accounts, they add significant value. This underscores the importance of anyone who witnesses a use of force submitting a report.

*DOE Staff Reporting:* The Department of Education ("DOE") previously developed staff training and reporting procedures, in consultation with the Monitoring Team, to address the requirements of this provision and the December 4, 2019 Order (dkt. 334) clarifying the requirement for DOE to submit reports. The Monitoring Team has never received any reports from DOE staff that may have witnessed a UOF. In this Monitoring Period, there were at least three use of force incidents in school areas. Although a small number, it does suggest that at least some reports by DOE staff would be expected.

*H+H Reporting*: H+H (the healthcare provider for incarcerated individuals in DOC custody) has maintained a process for staff reporting. H+H staff submitted a total of 26 reports in this Monitoring Period; 22 reports were H+H witness reports of UOF incidents and four reports relayed UOF allegations from an incarcerated individual. The chart provides an overview of the reports provided by H+H staff since July 2017.

| Submission of H+H Staff Reports | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Jul-Dec 2017 (5th MP) | 2018 (6th & 7th MP) | 2019 (8th & 9th MP) | 2020 (10th & 11th MP) | 2021 (12th & 13th MP) | 2022 (14th & 15th MP) | 2023 (16th & 17th MP) | Jul-Dec 2023 (17th MP) | Jan-Jun 2024 (18th MP) |
| *Grand Totals* | | | | | | | | | |
| **Total Reports Submitted** | 2 | 53 | 39 | 56 | 97 | 52 | 26 | 12 | 26 |
| **Total UOF Incidents Covered** | 2 | 53 | 38 | 46 | 85 | 42 | 27 | 13 | 17 |
| *Witness Reports* | | | | | | | | | |
| **# of witness reports submitted** | 0 | 29 | 18 | 45 | 70 | 36 | 18 | 6 | 22 |
| **# of actual or alleged UOF incidents covered by submitted reports** | 0 | 31 | 15 | 36 | 64[49] | 25[50] | 18 | 6 | 14 |
| *Relayed Allegations from Incarcerated Individuals* | | | | | | | | | |
| **# of reports of allegations of UOF relayed from an Incarcerated Individuals** | 2 | 24 | 21 | 11 | 27 | 16 | 8 | 6 | 4 |
| **# of actual or alleged UOF incidents covered by submitted reports** | 2 | 22 | 23 | 10 | 22[51] | 19[52] | 9 | 7 | 3 |

It is difficult to know whether H+H staff submitted reports for every incident witnessed as it is not always clear what incidents an H+H staff may have, in fact, witnessed. In this Monitoring Period, 147 incidents occurred in clinic areas and only seven of those incidents (5%) had a corresponding H+H report. It is worth noting that just because an incident occurred in the clinic area does not mean H+H staff witnessed the incident. However, the number of incidents that occurred in the clinic versus the number of reports received suggests it is possible that additional incidents were observed, but not reported. As noted in the April 18, 2024 Monitor's Report (dkt. 706) at pgs. 85-86, there was also a 50% reduction in the number of H+H reports submitted in 2023, suggesting room for improvement in H+H staff reporting practices. There has been an increase in H+H reports submitted in 2024 so far, suggesting that there has been

---

[49] On one occasion for one use of force incident, we received both a witness report and a relayed allegation report for the same incident.

[50] On two separate occasions for two separate use of force incidents, we received both a witness report and a relayed allegation report for the same incident.

[51] *See id*.

[52] *See id*.

improvement in H+H staff practices. However, the fact that H+H staff reported only 5% of incidents that occurred in the clinic suggests that there is still further room for improvement.

Given these findings, at the end of the 18th Monitoring Period, the Monitoring Team shared feedback with H+H leadership recommending that they engage in a renewed effort to ensure staff are reporting as required. The Monitoring Team also shared examples of incidents in which it appeared H+H witnessed the use of force, and a corresponding witness report was not submitted. H+H leadership reviewed the example incidents and took corrective action for 22 staff (covering six incidents) that witnessed or engaged in uses of force without submitting a report. There were three other incidents in which objective evidence suggested an H+H staff member may have witnessed DOC staff use force, but H+H leadership's review of the incident determined that a staff member did not witness the incident (so no report was necessary) and so no follow-up with staff was necessary. In order to improve overall staff reporting practices, H+H reported that they are now facilitating three types of reminders to staff regarding their *Nunez* reporting obligations – verbal reminders to staff at quarterly leadership meetings, quarterly email reminders to all staff, and a new pop-up message in the electronic medical records system that appears each time a staff member logs in. H+H reported that they believe this frequency of reminders is sufficient as they believe further reminders may diminish the overall message.

## **Conclusion**

The requirements related to reporting use of force are multi-faceted. Overall, use of force incidents are being reported as required and classified on time. Further, thousands of individual staff reports are submitted, but the timeliness of these submissions must be improved, particularly in GRVC. Additionally, the quality, specificity, and accuracy of reports has not seen marked improvement as staff continue to struggle with issues of accuracy and sufficient detail in their reports. Overall, the Department's reporting practices remain the same as they did in the last Monitoring Period. The Department, therefore, remains in Partial Compliance with this requirement.

| COMPLIANCE RATING | ¶ 2. Partial Compliance |
| --- | --- |

**CJ § V. USE OF FORCE REPORTING AND TRACKING, ¶ 22 (PROVIDING MEDICAL ATTENTION FOLLOWING USE OF FORCE INCIDENT)**

¶ 22. *Providing Medical Attention Following Use of Force Incident.* All Staff Members and Inmates upon whom force is used, or who used force, shall receive medical attention by medical staff as soon as practicable following a Use of Force Incident. If the Inmate or Staff Member refuses medical care, the Inmate or Staff Member shall be asked to sign a form in the presence of medical staff documenting that medical care was offered to the individual, that the individual refused the care, and the reason given for refusing, if any.

Staff members and incarcerated individuals upon whom force is used, or who used force, are required to receive medical attention by medical staff as soon as practicable following a use of force ("UOF") incident. The Department's progress in providing timely medical care from January 2018 to June 2024 following a UOF is outlined in the table below.

| | | Wait Times for Medical Treatment Following a UOF | | | | |
|---|---|---|---|---|---|---|
| | # of Medical Encounters Analyzed | 2 hours or less | Between 2 and 4 hours | % Seen within 4 hours | Between 4 and 6 hours | 6 hours or more |
| **2018** | 9,345 | 37% | 36% | 73% | 16% | 13% |
| **2019** | 11,809 | 43% | 38% | 81% | 11% | 9% |
| **2020** | 10,812 | 46% | 36% | 82% | 10% | 9% |
| **2021** | 14,745 | 39% | 30% | 70% | 11% | 20% |
| **2022** | 12,696 | 51% | 23% | 74% | 9% | 19% |
| **2023** | 11,513 | 54% | 27% | 80% | 10% | 10% |
| **2024 (Jan. to June)** | 5,373 | 46% | 35% | 81% | 10% | 8% |

The 2024 data (January to June) shows that the overall percentage of encounters seen within four hours remained relatively steady at 81%. Although there has been a decrease in the percentage of medical encounters seen within two hours (46% in 2024 versus 54% in 2023) the overwhelming majority of individuals are seen within four hours. Additionally, the percentage of encounters seen in more than six hours slightly decreased, suggesting a trend toward a reduction in longer wait times for medical treatment following a use of force incident.

Overall, in this Monitoring Period, most individuals needing medical attention after a use of force incident received care timely. However, there is still room for improvement, and the Department must continue to enhance and maintain a systematic and orderly process for delivering timely medical care to those who need it.

| **COMPLIANCE RATING** | **¶ 22.** Substantial Compliance |
|---|---|

**CJ § VII. USE OF FORCE INVESTIGATIONS, ¶ 1 (THOROUGH, TIMELY, OBJECTIVE INVESTIGATIONS) & ¶ 9 (A) (TIMING OF FULL ID INVESTIGATIONS)**

¶ 1. _Thorough, Timely, Objective Investigations._ As set forth below, the Department shall conduct thorough, timely, and objective investigations of all Use of Force Incidents to determine whether Staff engaged in the excessive or unnecessary Use of Force or otherwise failed to comply with the New Use of Force Directive. At the conclusion of the investigation, the Department shall prepare complete and detailed reports summarizing the findings of the investigation, the basis for these findings, and any recommended disciplinary actions or other remedial measures. All investigative steps shall be documented.

¶ 9. _Timing of Full ID Investigations._ All Full ID Investigations shall satisfy the following criteria [. . . as enumerated in the following provisions]:

  a.    _Timeliness_ [. . .]

    ii.    Beginning on October 1, 2018, or three years after the Effective Date, whichever is earlier, and for the duration of the Agreement:

      1.    ID shall complete all Full ID Investigations by no later than 120 days from the Referral Date, absent extenuating circumstances outside the Department's control that warrant an extension of this deadline. Any extension of the 120-day deadline shall be documented and subject to approval by the DCID or a designated Assistant Commissioner. Any Full ID Investigation that is open for more than 120 days shall be subject to monthly reviews by the DCID or a designated Assistant Commissioner to determine the status of the investigation and ensure that all reasonable efforts are being made to expeditiously complete the investigation.

      2.    The Department shall make every effort to complete Full ID Investigations of less complex cases within a significantly shorter period than the 120-day time frame set forth in the preceding subparagraph.

This compliance assessment provides an overview of the status of investigations for all use of force ("UOF") incidents through June 30, 2024. This includes background on the changes to the Investigation Division's ("ID") leadership and the management of investigations, the status of ID staffing, an assessment of the status and timing of Intake Investigations and Full ID Investigations, the status of law enforcement referrals for potential criminal misconduct, details about the Use of Force Priority Squad, the outcomes of investigations, including referrals for Full ID investigations, identification of staff misconduct, and referrals for corrective action, and an assessment of the quality of investigations, including ID's internal quality assurance initiatives.

**Background**

The ID Division is working to regain the forward momentum that was lost in 2022 and 2023. By way of background, the Department significantly improved the quality of investigations in 2020 and 2021. For the first time, in 2020 during the 10th Monitoring Period, the Department achieved Partial Compliance with the requirement to "conduct thorough, timely, and objective investigations of all Use of Force Incidents to determine whether Staff engaged in the excessive or unnecessary Use of Force or otherwise failed to comply with the New Use of

Force Directive," as required pursuant to Consent Judgment, § VII, ¶ 1. The Department maintained this rating through the 14th Monitoring Period (January to June 2022).[53] However, beginning in mid-2022 (following the entry of the Action Plan in June 2022), that progress was offset by significant regression in the quality of investigations. As a result, in the 15th Monitoring Period (July to December 2022), the Department returned to Non-Compliance with this requirement, where it has remained.[54]

The decline in the quality of ID's work that began in 2022 appeared to be related to poor leadership and inappropriate direction[55] by a Deputy Commissioner who was installed in 2022 and who subsequently resigned in March 2023.[56] Following this resignation, a new Deputy Commissioner was appointed. The Monitoring Team found ID's new Deputy Commissioner to be transparent, candid, and committed to improving ID's work. At that time, the Associate Commissioner of ID, a well-respected reformer, leader, and investigator, was a key member of the leadership team to reform ID. However, in September 2023, the former Commissioner abruptly removed the Associate Commissioner, causing further destabilization and regression.[57] The abrupt removal of the Associate Commissioner of ID, under questionable circumstances, had a negative impact on the operations of ID that has persisted to the present.

In August 2023, just prior to the Associate Commissioner's removal, a new Assistant Commissioner was appointed by the former Commissioner to serve as the leader of ID's Intake Unit. The new Assistant Commissioner did not have any experience conducting or managing use of force investigations. The Monitoring Team received reports from multiple sources that after this appointment, the Intake Unit was no longer functioning properly, the unit's management was not well integrated into the overall work of ID, the quality of the Intake Investigations was no

---

[53] A compliance rating for this provision was not awarded in the 13th Monitoring Period because the Monitoring Team did not assess compliance with any provisions of the Consent Judgment or Remedial Orders for the period between July 1, 2021 and December 31, 2021. The Court suspended the Monitoring Team's compliance assessment during the 13th Monitoring Period because the conditions in the jails during that time were detailed to the Court in seven status reports (filed between August and December 2021), a Remedial Order Report filed on December 22, 2021 (dkt. 435) as well as in the Special Report filed on March 16, 2022 (dkt. 438). The basis for the suspension of compliance ratings was also outlined in the Monitor's March 16, 2022 Report (dkt. 438) at pgs. 73-74.

[54] *See* Monitor's April 3, 2023 Report (dkt. 517) at pgs. 100-102 and 155-171, Monitor's April 24, 2023 Report (dkt. 520) at pgs. 1-4, Monitor's December 22, 2023 (dkt. 666) at pgs. 33-45, and Monitor's April 18, 2024 Report (dkt. 706) at pgs. 88-104.

[55] *See* Monitor's November 8, 2023 Report (dkt. 595) at pg. 56 and Monitor's October 5, 2023 Report (dkt. 581) at pg. 16.

[56] *See* Monitor's April 3, 2023 Report (dkt. 517) at pgs. 100-101 and 157-158, and Monitor's April 24, 2023 Report (dkt. 520) at pgs. 2-3.

[57] *See* Monitor's December 8, 2023 Letter (dkt. 639) at pgs. 3-4.

longer improving, and the ability to complete Intake Investigations in a timely manner began to falter. It was also reported that the Assistant Commissioner reported directly to the former Commissioner, and not to the Deputy Commissioner of ID. In March 2024, the current Commissioner removed the Assistant Commissioner of ID from his position.

Not surprisingly, as a result of this instability and dysfunction, ID experienced a high level of attrition among both investigators and supervisors. While steps have since been taken to ensure adequate staffing for ID, the number of investigators and supervisors remains inadequate. Further, the large number of newly hired investigators and supervisors need both time and attention to become acclimated to the job. Supervisors must also work to reverse the poor guidance previously given to staff. The Monitoring Team has also received reports that ID's staff morale has noticeably declined since 2022, which likely contributed to the high rate of attrition in the Division, as discussed in more detail below.

Overall, the personnel changes made by the former Commissioner over the course of his tenure created significant dysfunction and regression within ID that must be reversed. The Monitoring Team does not have the same concerns about ID's *current* leadership. The focus and priority of ID's current leadership is to return ID to the right course. This work is underway, but the Division requires additional strong leaders to guide and support the effort, adequate resources to manage the caseload, and skilled supervisors to provide the necessary guidance and mentorship to support the revitalization of this unit. Following the close of this Monitoring Period, the Commissioner reinstated the former Associate Commissioner of ID (who was removed in September 2023 by the former Commissioner[58]). The Monitoring Team believes that this is a promising step towards ensuring ID has strong and experienced leadership to revitalize and reform the Division, reverse the regression, and bring it into compliance with the *Nunez* Court Orders.

The regression in ID's work negatively impacted the Department's ability to identify and address staff misconduct in a variety of ways. At times, misconduct was not addressed at all, or was addressed with insufficient accountability measures. Finally, efforts to complete investigations in a timely manner further eroded.

### **ID Staffing**

The City is required to ensure that the Department has appropriate resources to conduct timely and quality investigations. Adequate staffing and appropriate case assignment are critical to conducting timely, quality investigations. This is why the Consent Judgment, § VII, ¶ 11 requires ID to have a sufficient number of investigators. Further, the Court's August 10, 2023

---

[58] *See* Monitor's December 8, 2023 Report (dkt. 639) at pgs. 3 to 4.

Order (dkt. 564) requires the Department to maintain *at least* 21 supervisors and 85 investigators so that it may be able to meet the requirements of the *Nunez* Court Orders. As outlined below, while some progress has been made in increasing staffing levels since the Court's August 10, 2023 Order (dkt. 564), ID still does not have adequate staffing levels to manage its workflow.

- Staff Assignments

The table below shows the number of investigators and supervisors assigned to ID at specific times since 2020 and illustrates the precipitous drop in the number of staff since the Division was at its most functional in 2020/2021. Currently, the number of investigators and supervisors conducting use of force investigations is at least 35% less than it was in early 2020.

Following the end of the current Monitoring Period, in September 2024, the Division assigned three additional supervisors, bringing the number of supervisors in ID to 21. Even with these additions, ID reports that the number of supervisors remains insufficient to manage the current caseload. The number of investigators assigned to UOF cases is also insufficient and has not yet met the minimum threshold of staff required by the Court's August 10, 2023 Order (dkt. 564).

| ID Supervisors Assigned to UOF Cases | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Feb 2020 | Jan 2021 | Jan 2022 | Jan 2023 | Jun 2023 | Dec 2023 | Jun 2024 | Sept 2024 |
| Rapid Reviews | | | | | 2 | 2 | 2 | 2 |
| Intake Squad | 8 | 10 | 13 | 12 | 8 | 10 | 10 | 12 |
| Full ID | 15 | 10 | 7 | 3 | 3 | 5 | 5 | 6 |
| UPS | 1 | 1 | 1 | 0 | 1 | 1 | 1 | 1 |
| **Total** | **24** | **21** | **21** | **15** | **14** | **18** | **18** | **21** |

| ID Investigators Assigned to UOF Cases | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Feb 2020 | Jan 2021 | Jan 2022 | Jan 2023 | Jun 2023 | Dec 2023 | Jun 2024 | Sept 2024 |
| Rapid Reviews | | | | | 8 | 10 | 10 | 8 |
| Intake Squad | 32 | 51 | 51 | 51 | 32 | 35 | 31 | 33 |
| Full ID | 82 | 58 | 36 | 10 | 12 | 22 | 21 | 24 |
| UPS | 4 | 3 | 3 | 4 | 5 | 5 | 4 | 4 |
| **Total** | **118** | **112** | **90** | **65** | **57** | **72** | **66** | **69[59]** |

---

[59] The Department reports that in September 2024, an additional seven investigators were on long-term leave, and seven new investigators in training were waiting to be assigned to a team.

- Recruitment Efforts

The Department reports that it continues to actively recruit and offer employment to investigators and supervisors. As of October 2024, ID reported 17 active vacancies (13 investigators, two supervisors, one Deputy Director of Investigation, and one Director). Ten individuals have been identified to fill some of these positions and are currently pending Office of Management and Budget ("OMB") and/or HR hiring process approval. ID has also requested approval from OMB to fill an additional five positions (three investigators, one Deputy Director of Investigation, and one Director). In October 2024, ID hosted a two-day hiring event to fill the vacant investigator positions and invited 30 individuals back for second-round interviews.

To improve staff retention, the Department initiated a pilot program allowing certain investigators, supervisors and managers to work remotely one day per week. ID reports a slowing of resignations since this program began, and it continues to be well-received by staff. These efforts remain important because ID's attrition rate since 2020/2021 (when ID was at its most functional) is a continuing concern.

Between January 2022 and July 2024, ID hired 128 new investigators, supervisors, and executives but lost 177 staff (either because they left the Department, were transferred, or returned to their assigned command), resulting in a net loss of 49 staff. A table with the number of ID staff hired and any net gains (or losses) to ID's staffing between January 2022 and July 2024 is included in Appendix A: Summary of ID Hiring and Departures.

The high rate of attrition demands that the Department's recruitment and retention efforts continue with vigor. As noted in the Monitoring Team's previous compliance assessment,[60] these staffing issues directly impact the work of ID. For instance, ID's lack of capacity to timely manage the Full ID Investigation workload remains concerning. The Monitoring Team continues to recommend that the City utilize its authority to ensure that the Department has the resources it needs to comply with the *Nunez* Court Orders in this area. ID has not been able make substantial gains in its staffing level and its current level is insufficient to meet the requirements of the *Nunez* Court Orders.

**Status of Investigations**

The table below provides, *as of September 16, 2024*, the status of all investigations of UOF incidents that occurred between January 2020 and June 30, 2024.[61] Given the volume of UOF incidents, ID's workload remains high. All use of force cases receive an Intake

---

[60] *See* Monitor's April 18, 2024 Report (dkt. 706) at pg. 95.

[61] All investigations of incidents that occurred prior to 2020 were closed during previous Monitoring Periods and thus are not included in this table.

Investigation (formerly called a Preliminary Review) and a subset of those cases may then be referred for a Full ID Investigation where a more in-depth investigation occurs. The time required to complete investigations, the quality of investigations, and their outcomes are discussed in more detail below.

| Status of Investigations of UOF Incidents Occurring Between 2020 and June 2024 *as of September 16, 2024* | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Incident Date** | **2020** | | **2021** | | **2022** | | **2023** | | **Jan.-Jun. 2024 (18th MP)** | |
| **Total UOF Incidents**[62] | 6,399 | | 8,413 | | 7,231 | | 6,959 | | 3,590 | |
| **Pending Intake Invest.** | 0 | 0% | 0 | 0% | 0 | 0% | 10 | <1% | 330 | 9% |
| **Pending Full ID Invest.** | 0 | 0% | 0 | 0% | 0 | 0% | 475 | 7% | 345 | 10% |
| **Total Closed Invest.** | 6,399 | 100% | 8,413 | 100% | 7,231 | 100% | 6,474 | 93% | 2,915 | 81% |

**Timeliness of Investigations**

Completing investigations in a timely and reasonable manner is critical to better understand what occurred during an incident and to take appropriate action to the extent it is necessary. Corrective action must be imposed as close in time as possible to the staff's misconduct in order to serve as an effective deterrent and to provide an educational opportunity for staff to alter their behavior in the future. Investigations must also be completed with sufficient time available to meet the statute of limitations so that the opportunity for corrective action is not missed entirely. As discussed in more detail below, the time to close Intake Investigations and Full ID Investigations has started to increase, which impedes the Department's ability to impose timely corrective action. As reported during the previous Monitoring Period, the faltering performance level in this area remains cause for concern and must be a priority focus for remediation.

- Time to Close Intake Investigations

Intake Investigations are required to be completed within 25 business days of the incident's date, although the Monitoring Team has utilized 30 business days as the applicable time frame when determining "timeliness" as it provides a reasonable grace period beyond the deadline. During this Monitoring Period, the proportion of Intake Investigations closed beyond the deadline continued to increase. The time to close intake investigations increased abruptly

---

[62] Incidents are categorized by the date they occurred or were alleged to have occurred, and therefore these numbers fluctuate very slightly across Monitoring Periods as allegations are sometimes made many months after the incident is alleged to have occurred. The data are updated thereafter.

during the last Monitoring Period for the first time since the inception of Intake Investigations.[63] For incidents that occurred between July and September 2023, 99% of cases were closed in 30 business days or less. However, for incidents that occurred in October 2023, only about 90% of investigations were closed within 30 business days. This decreased to 72% for incidents that occurred in November 2023 and 71% for incidents that occurred in December 2023. Among incidents that occurred between January and June 2024, only 61% were closed within 30 business days or less. Furthermore, 28% were closed outside the 30-business day period, and 10% remained pending as of August 31, 2024 (which is past the 30-business day period for all cases that occurred during the 18th Monitoring Period).

The Monitoring Team has inquired about the cause of these delays. The Department candidly reported that the initial delays derived from poor leadership and management as well as an influx of new investigators and supervisors who required more time to complete their work as they acquainted themselves with their responsibilities. ID's leadership has reported that beginning in spring 2024, an additional cause for delay was that supervisors were taking some additional time to work with investigators to elevate the quality of investigations by providing feedback, guidance, and mentorship to improve the assessment and analysis of the evidence.

- Time to Close Full ID Investigations

When a case merits additional scrutiny beyond an Intake Investigation, a Full ID Investigation must be conducted. ID has long struggled to complete Full ID Investigations in a timely manner and the number of pending Full ID Investigations continued to increase during this Monitoring Period. Full ID Investigations must be completed within 120 days of the incident's date. The table below shows the status of Full ID Investigations for all incidents that occurred between January 2023 and June 2024 (n=1,061).[64] Only 16% (n=172) were closed (or remained pending) within the 120-day timeline, and the remaining 84% were either closed (or remained pending) outside the required time frame. Therefore, the Department remains in Non-Compliance with the timing requirement for Full ID Investigations.

---

[63] *See* the April 18, 2024 Report (dkt. 706) at pgs. 92-93.

[64] The period of incident dates of January 2023-June 2024 was selected as it captures *all* pending full ID investigations as of the end of this Monitoring Period. All investigations, including full ID investigations, have been completed for uses of force that occurred prior to January 2023. Given that full ID investigations can take months to complete, it is common that a full ID investigation will be completed in a different Monitoring Period than the Monitoring Period in which it occurred.

| Status of Full ID Investigations<br>for incidents that *occurred* between January 2023-June 2024<br>*As of September 16, 2024* | | | | |
|---|---|---|---|---|
| *Pending* 120 Days or Less | *Closed* within 120 Days | *Closed* Beyond 120 Days | *Pending* Beyond 120 Days | Total |
| 73<br>7% | 99<br>9% | 142<br>13% | 747<br>71% | 1,061 |

As of September 16, 2024 (over two months after the end of the Monitoring Period), 820 cases are pending for incidents that occurred between January 2023 and June 2024. Of the 820 pending cases, 747 (71%) are pending beyond the deadline of 120 days and so they will be closed beyond the required deadline. ID reported that the increase in the size of its pending caseload was the result of insufficient staff and larger caseloads for each investigator. Further, some Full ID investigators had been assigned to address the ID lookback audits (discussed in more detail later in this section), which further diverted resources from addressing more contemporaneous cases.[65]

ID reported that Full ID investigations were also delayed because of a backlog of MEO-16 interviews[66] which is due, at least in part, to the lack of availability of union counsel. To address the MEO-16 interview backlog and ensure that scheduling MEO-16 interviews does not slow down pending investigations, the Department has taken a few steps. First, ID is now conducting MEO-16 interviews for officers on multiple days. In order to accommodate these additional interview slots, DOC worked with the Office of Administrative Trials and Hearings ("OATH") to *temporarily* reduce the number of days that OATH pre-trial conferences are convened to three days per week instead of four (this is discussed in more detail in this report in the compliance assessment for First Remedial Order (dkt. 350), § C) so that counsel could be available for both MEO-16 interviews and OATH pre-trial conferences. Further, the Department worked with the Captain's union to increase the number of MEO-16 interviews involving Captains each week. This process was slow to begin, but the number of interviews conducted each week has increased and will need to remain a top priority to ensure that the backlog is eliminated.

---

[65] ID completed the lookback on July 1, 2024 so the staff assigned to these cases are again available to carry caseloads of recent incidents requiring Full ID Investigations. However, ID reports that it has insufficient staffing to address the backlog of full ID investigations that accumulated while the lookback was conducted.

[66] MEO-16 interviews are conducted by ID investigators and are intended to gather more information from the staff involved in the incident, as well as the staffs' perspective on whether they engaged in misconduct. If they so choose, staff may be represented by counsel, including union counsel, at these MEO-16 interviews.

## Law Enforcement Referrals

The timing to complete an investigation is tolled if a law enforcement agency is investigating the incident for potential criminal misconduct. ID is required to swiftly refer any staff member whose conduct in a use of force incident appears to be criminal in nature to the Department of Investigation ("DOI"). The Monitoring Team has observed that, despite serious concerns about the inappropriateness of staffs' behavior, the majority of cases do not appear to rise to the level of criminal misconduct. This observation aligns with the small number of criminal prosecutions recorded thus far. ID has promptly made referrals for behavior that appears to be criminal in nature. The Department and the relevant law enforcement agencies routinely collaborate and communicate about the status of cases that are referred for potential prosecution. In the nine years since the effective date of the Consent Judgment, 125 use of force cases have been referred to DOI or DOI has assumed responsibility for the investigation independent of a referral from ID. Of that relatively small subset of UOF cases, only **eight** cases have resulted in criminal charges (with one still being considered) over the life span of the Consent Judgment as shown in the table below. As of June 2024, the one case pending investigation with law enforcement is with the Manhattan District Attorney's Office.

| Law Enforcement Referrals<br>As of June 30, 2024 | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Date of Incident** | **2014 & 2015** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** | **Jan.–Jun. 2024** | **Total** | |
| **Total** | 9 | 16 | 27 | 19 | 15 | 15 | 7 | 10 | 7 | 0 | 126 | |
| Criminal Charges Brought/ Trial Underway or Complete | 0 | 2 | 0 | 2 | 2 | 2 | 1 | 0 | 0 | 0 | 8 | 6% |
| Pending Consideration with Law Enforcement | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | <1% |
| Returned to ID for Administrative Processing | 9 | 14 | 27 | 17 | 13 | 13 | 6 | 9 | 5 | 0 | 117 | 93% |

Historical trends indicate that most of the cases considered for criminal prosecution will not be prosecuted. That said, cases that are rejected for criminal prosecution often include very concerning conduct that the Department can and must address administratively. The Monitoring Team has noticed some improvement in the law enforcement agencies' timeliness in reviewing a case for criminal charges and continues to encourage that these cases not be allowed to languish in their vast workload. Some overlap exists between cases being considered for criminal prosecution and the egregious cases identified via the Action Plan requirement § F, ¶ 2. The Monitoring Team has and will continue to work with law enforcement agencies to advise them of the aggressive timelines set for investigations pursuant to the Action Plan requirement § F, ¶ 2 ("F2").

**Use of Force Priority Squad**

The Use of Force Priority Squad ("UPS") is an important management tool to address some of the most serious and complex use of force cases. Having a dedicated squad for this purpose helps ID to ensure these cases receive the necessary scrutiny and attention. During this Monitoring Period, 30 cases were assigned to UPS and included a variety of egregious incidents, including cases in which staff members were suspended, cases that were returned to ID following an assessment for criminal charges by law enforcement, and four recommendations from the Monitoring Team.

UPS closed 11 cases during the current Monitoring Period, nine of which were referred for formal discipline and closed with charges, however only four of the 11 (36%) incidents were closed within 120 days of the incident date.[67] This is less than half as many cases than were closed during the last Monitoring Period (n=26).[68] Further, during the last Monitoring Period, most cases (n=30, 77%) were closed within 120 days of the incident date.[69] As of the end of the current Monitoring Period, UPS had 51 pending cases, none of which were identified for expedited closure pursuant to Action Plan, § F ¶ 2. This is 60% more cases than UPS had pending at the close of the last Monitoring Period (n=32).[70] Of the 51 cases currently pending, 35 cases (69%) were pending beyond 120 days of the incident date.

ID reported that UPS closed fewer investigations during this Monitoring Period because two of the five investigators assigned to the UPS team left the Department. Additionally, ID changed the supervisor in charge of the unit. ID has reported that two investigators have since been added back into UPS, bringing UPS's staffing level back to its prior number, which should allow the team to complete more investigations in a timelier manner. Furthermore, the limited number of UPS staff were also helping with the Lookback Audit, which has since been completed, allowing the UPS staff to focus on their assigned cases.

**Completion of Investigations**

As discussed in the Background section above, changes to ID's leadership in 2022 and 2023 had a significant negative impact on the quality of ID's work, and the Department has yet to fully recover. The current Deputy Commissioner of ID has reported that steps are being taken to improve the quality of investigations by recruiting additional investigators and supervisors,

---

[67] This includes four cases identified as "F2" cases described further in this report in the compliance assessment for Consent Judgment, § VIII, ¶ 1, Staff Discipline and Accountability. These were the four incidents closed in less than 120 days of the incident date.

[68] *See* Monitor's April 18, 2024 Report (dkt. 706) at pg. 95.

[69] *Id.*

[70] *Id.*

engaging with investigators and supervisors directly on cases, conducting trainings and town hall meetings, and conducting internal quality assurance of investigations. While significant work remains, there are signs that the quality of some investigations is improving insofar as their ability to identify cases that merit more scrutiny and identify misconduct.

- **Referrals for Full ID Investigations**

All use of force incidents that occurred during this Monitoring Period received or have a pending Intake Investigation. In fact, when conducted properly, most cases can and should be addressed via the Intake Investigation and should not require a Full ID investigation. Accordingly, the majority of cases are closed following an Intake Investigation, but those that merit additional scrutiny, either because they meet specific criteria (*e.g.*, Class A Incidents or Head-strikes) or because additional inquiry is necessitated by the facts of the case, must be referred for a Full ID Investigation. In 2022, ID was not referring cases for Full ID investigations as required, with only 3% of cases being referred for Full ID investigations.[71] In 2023, referral practices began to improve, and those improvements have continued.[72]  During the current Monitoring Period, 10% of cases were referred for Full ID Investigations. While the Monitoring Team continues to identify a small number of cases that should have been referred for a Full ID Investigation but were not, it appears that ID's referral process for Full ID Investigations is showing improvement.

---

[71] *See* Monitor's December 22, 2023 Report (dkt. 666) at pgs. 36-37. The number and percentages of Full ID referrals for past Monitoring Periods are also reflected in the charts below titled "Investigations Findings" and "Outcome of Intake Investigations."

[72] In 2024, 8% of cases were referred for Full ID investigations. *See* Monitor's December 22, 2023 Report (dkt. 666) at pgs. 36-37 and Monitor's April 18, 2024 Report (dkt. 706) at pgs. 94-95. This is also reflected in the charts below titled "Investigations Findings" and "Outcome of Intake Investigations."

- **Identifying Misconduct and Referrals for Discipline**

The table below depicts the findings of Intake Investigations and Full ID Investigations that were closed as of August 31, 2024. For Intake Investigations, findings included a statement of whether the incident was "unnecessary," "excessive," and "avoidable." For Full ID Investigations the Department conducted an assessment of cases closed to determine if any were unnecessary or excessive and provided a report to the Monitoring Team and the Parties.[73] Based on the data, ID determined that 13% of investigations closed for uses of force that occurred in 2023 and 10% of uses of force that occurred between January-June 2024 were excessive and/or unnecessary and/or avoidable. These findings reflect a reduction in the proportion of findings of excessive, unnecessary, and/or avoidable force compared to incidents that occurred prior to 2023. First, it is expected that this proportion of cases found to involve unnecessary and/or excessive force will likely increase as additional cases are closed, particularly pending full ID investigations that often reflect more egregious incidents. Further, this percentage does not capture all excessive, unnecessary, and/or avoidable incidents given the Monitoring Team's assessment that ID does not consistently detect and hold staff accountable for misconduct as discussed in the "Quality of Investigations" section below.

---

[73] The Department and the Monitoring Team have not finalized an agreed upon definition of these terms. The categorizing the findings and developing corresponding data is complicated, particularly because qualitative information with slight factual variations must be categorized consistently. A concrete, objective and shared understanding of what each category is intended to capture is necessary to ensure reliable and consistent findings. Efforts were made in summer 2021 to finalize common definitions, but they were never finalized. The project has since languished given the focus on higher priority items.

| Incident Date | Feb. 3[74] to Jun. 2020 (10th MP) | July to Dec. 2020 (11th MP) | Jan. to Jun. 2021 (12th MP) | July to Dec. 2021 (13th MP) | Jan. to Jun. 2022 (14th MP) | Jul. to Dec. 2022 (15th MP) | Jan. to Jun. 2023 (16th MP) | Jul. to Dec. 2023 (17th MP) | Jan. to Jun. 2024 (18th MP) |
|---|---|---|---|---|---|---|---|---|---|
| **Investigations Findings** *As August 31, 2024* | | | | | | | | | |
| **All Incidents** | **2,492** | **3,272** | **4,468** | **3,916** | **3,349** | **3,883** | **3,313** | **3,631** | **3,218** |
| - *Investigations Closed at Intake* | 2,081 | 2,700 | 3,687 | 3,285 | 2,989 | 3,773 | 3,057 | 3,333 | 2,890 |
| - *Referred for Full ID* | 411 | 567 | 781 | 634 | 360 | 110 | 256 | 298 | 328 |
| - *Closed Full ID Investigations* | 411 | 567 | 781 | 634 | 360 | 110 | 149 | 34 | 30 |
| *Findings of Investigations Closed at Intake* | | | | | | | | | |
| Investigations Closed at Intake | 2,081 | 2,700 | 3,687 | 3,285 | 2,989 | 3,773 | 3,057 | 3,333 | 2,890 |
| • *Excessive, and/or Unnecessary, and/or Avoidable* | *180* | *477* | *734* | *737* | *531* | *543* | *412* | *406* | *271* |
| • *Chemical Agent Violation* | *164* | *163* | *260* | *324* | *287* | *245* | *225* | *281* | *328* |
| *Findings of Closed Full ID Investigations* | | | | | | | | | |
| Closed Full ID Investigations | 411 | 567 | 781 | 634 | 360 | 110 | 134 | 34 | 30 |
| • *Excessive, and/or Unnecessary* | *72* | *86* | *75* | *51* | *62* | *70* | *45* | *10* | *7* |
| *Findings of Closed Investigations* | | | | | | | | | |
| Closed Investigations | 2,492 | 3,272 | 4,468 | 3,916 | 3,349 | 3,883 | 3,191 | 3,367 | 2,920 |
| • *Excessive, and/or Unnecessary, and/or Avoidable* | *252 (10%)* | *563 (17%)* | *809 (18%)* | *788 (20%)* | *593 (18%)* | *613 (16%)* | *457 (14%)* | *416 (12%)* | *278 (10%)* |

---

[74] Incidents beginning February 3, 2020 received Intake Investigations, so those incidents from the early part of the Tenth Monitoring Period are not included in this data.

o   <u>Intake Investigation Outcomes</u>

Intake Investigations can be closed with no action, by referring the case for further investigation via a Full ID Investigation, or by referring the case for some type of disciplinary or corrective action (*e.g.*, MOC, PDR, Command Discipline, Re-Training, Facility Referral). With respect to cases closed with no action, in some, the violation identified by ID had already been identified by the facility via Rapid Review and ID determined that the action recommended in the Rapid Review was sufficient to address the violation. Therefore, "no action" cases are better understood as cases in which either no violation was identified, or ID *did not identify additional staff behaviors requiring disciplinary or corrective action beyond what had already been identified and taken by the facilities*. The table below identifies the outcome of Intake Investigations from February 3, 2020 (the inception of Intake Investigations) through June 2024.

| Incident Date | Feb. 3[77] to June 2020 (10th MP) | July to Dec. 2020 (11th MP) | Jan. to June 2021 (12th MP) | July to Dec. 2021 (13th MP) | Jan. to June 2022 (14th MP) | July to Dec. 2022 (15th MP) | Jan. to June 2023 (16th MP) | Jul. to Dec. 2023 (17th MP) | Jan. to June 2024 (18th MP) |
|---|---|---|---|---|---|---|---|---|---|
| **Outcome of Intake Investigations[75]** _as of August 31, 2024[76]_ | | | | | | | | | |
| Pending Intake Investigation | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 9 | 370 |
| **Closed Intake Investigations** | **2,492** | **3,272** | **4,468** | **3,916** | **3,349** | **3,883** | **3,313** | **3,631** | **3,218** |
| _No Action_ | _1,060_ _43%_ | _1,279_ _39%_ | _1,386_ _31%_ | _947_ _24%_ | _1,249_ _37%_ | _2,183_ _56%_ | _1,609_ _49%_ | _1,170_ _32%_ | _933_ _29%_ |
| _MOC_ | _47_ _2%_ | _28_ _1%_ | _48_ _1%_ | _36_ _1%_ | _22_ _1%_ | _60_ _2%_ | _77_ _2%_ | _50_ _1%_ | _12_ _<1%_ |
| _PDR_ | _6_ | _2_ | _0_ | _0_ | _1_ | _3_ | _3_ | _3_ | _3_ |
| _Corrective Interview_ | | | | | | | | _2_ | _5_ |
| _Command Discipline_ | | | | | | | _101_ _3%_ | _114_ _3%_ | _240_ _7%_ |
| _Re-Training_ | _148_ _6%_ | _226_ _7%_ | _342_ _8%_ | _91_ _2%_ | _35_ _1%_ | _39_ _1%_ | _87_ _3%_ | _164_ _5%_ | _89_ _3%_ |
| _Facility Referral_ | _820_ _33%_ | _1,159_ _35%_ | _1,903_ _43%_ | _2,208_ _56%_ | _1,646_ _49%_ | _1,466_ _38%_ | _1,179_ _36%_ | _1,830_ _50%_ | _1,608_ _50%_ |
| _Referred for Full ID_ | _411_ _12%_ | _567_ _17%_ | _781_ _17%_ | _634_ _16%_ | _360_ _11%_ | _111_ _3%_ | _256_ _8%_ | _298_ _8%_ | _328_ _10%_ |
| _Data Entry Errors[78]_ | | | | | _36_ | _21_ | _1_ | _0_ | _0_ |
| **Total Intake Investigations** | **2,492** | **3,272** | **4,468** | **3,916** | **3,349** | **3,883** | **3,313** | **3,640** | **3,588** |

[75] It is important to note that for the purpose of this chart, the results of the Intake Investigations only identify the highest level of recommended action for each investigation. For example, while a case may be closed with an MOC _and_ a Facility Referral, the result of the investigation will be classified as "Closed with an MOC" in the chart.

[76] Other investigation data is this report is reported _as of_ February 15, 2024 while the Intake Investigation data is reported _as of_ January 31, 2024 because the data is maintained in two different trackers that were produced on two different dates. The number of pending Intake Investigations therefore varies between data provided "as of September 16, 2024" and "as of August 31, 2024," depending on which tracker was utilized to develop the necessary data.

[77] Incidents beginning February 3, 2020 were the first to receive Intake Investigations, so those incidents from the early part of the Tenth Monitoring Period are not included in this data.

[78] These investigations had data entry errors in the Intake Squad Tracker. The Monitoring Team was unable to determine the outcome for these cases but is working with the Department to fix these errors.

As shown in the table above, the increase in the proportion of cases that were resolved with a Facility Referral or Command Discipline[79] observed in the previous Monitoring Period continued during the current Monitoring Period. Notably, there is an ongoing decrease in the number of cases closed with no action.[80]

Finally, it must be noted that given that a significant number of investigations remained pending at the end of the current Monitoring Period, additional action may eventually be taken once those cases are closed.

> o   Referrals for Formal Discipline

Most referrals to the Trials Division for formal discipline for use of force related misconduct derive from Full ID Investigations, given their focus on serious and complex cases. While Intake Investigations can also lead to such referrals, this occurs less often. The overall rate of referral for formal discipline from use of force investigations has decreased since 2022. Some of this was to be expected given the expansion of the CD policy to permit a broader scope of cases to be addressed with a CD, which the Monitoring Team approved. Further, some reduction may be the result of investigation backlogs in which the cases most likely to result in referrals for formal discipline (*e.g.,* Full ID investigations) are taking longer to close. However, it must be emphasized that there are still instances in which the objective evidence appears to suggest that a referral for formal discipline would be appropriate but a referral for formal discipline was not made.

For incidents occurring between 2016 and 2021, the average proportion of use of force incidents in which at least one staff member was referred for formal discipline was approximately 7%. This proportion should be considered a bare minimum given the Department's well-documented struggles to identify all staff misconduct. The proportion of use of force incidents in which at least one staff member was referred for formal discipline decreased

---

[79] As discussed in prior Monitor's Reports and in the compliance assessment for Consent Judgment, § VIII, ¶ 1, Staff Discipline and Accountability in this report, Facility Referrals and CDs are not yet reliably effectuated and so the fact that a Facility Referral or CD was *generated* does not necessarily mean that action was taken. Given the multitude of issues that must be addressed, working to improve the reliability of Facility Referrals has not yet been a priority, but will need to be addressed. As discussed in other sections of this report, improving the adjudication of CDs is a work in progress as well, but steps are underway to improve the adjudication of CDs under management by the Informal Charges and Disciplinary Unit.

[80] Beginning in 2023, the Department reports making a greater effort to capture cases in the data where ID identified an issue but permitted the facility to address it. Accordingly, the increased reporting of Facility Referrals and Command Disciplines from 2022 to 2023 does not necessarily reflect an increase in the frequency with which misconduct was detected between those two time periods, but rather, may reflect at least in part, improved tracking through inclusion of cases handled by the facilities that had previously been omitted.

in 2022 (6%) and 2023 (5%).[81]  The decrease in the proportion of cases with disciplinary referrals is concerning given the Monitoring Team has not observed any discernable change in the frequency of inappropriate/excessive uses of force.



These outcomes underscore the Monitoring Team's concerns about the Department's scrutiny of use of force incidents and the overall quality of investigations which are essential precursors of a system that applies discipline when warranted. Without the ability to reliably detect misconduct when it occurs or to produce sound investigations, the Department continues to lack the necessary foundation for a robust disciplinary process.

**Quality of Investigations**

- <u>Monitor's Recommendations to ID to Review and Reevaluate Selected Investigations</u>

The Monitoring Team routinely submits feedback to the Department recommending that additional review may be necessary or appropriate regarding certain investigations where it appears that the objective evidence was not adequately investigated or analyzed. This is not intended to be a comprehensive review, but rather an attempt to mitigate the possibility that staff are not held responsible for certain misconduct because the investigation was inadequate. In January-June 2024, the Monitoring Team made 72 such recommendations regarding inadequate

---

[81] The data for 2022 and 2023 incidents includes referrals that were made as part of the lookback initiative in which the original case findings did not identify misconduct, but the subsequent review resulted in a finding that merited the referral for charges.  Further, data for investigations of 2024 is not yet available given the significant number of pending investigations.

Intake Investigations and Full ID Investigations. The fact that the Monitoring Team continues to identify this many cases meeting this threshold is a troubling commentary on the reliability and accuracy of investigations.

- **ID's Quality Assurance Program**

To elevate the veracity of its work product, ID engaged in two quality assurance initiatives including an audit of Intake Investigations and Full ID Investigations as well as a "lookback" at certain cases closed in 2022 without charges. That ID initiated a QA process is encouraging, as is its ability to identify consistent areas in need of improvement. ID's own findings demonstrate that additional work is necessary to ensure that the quality of investigations is adequate to meet the requirements of the *Nunez* Court Orders.

Beginning in spring 2023, ID began a quality assurance program to assess the quality of completed investigations, and if needed, to reopen cases for further investigation. A dedicated Quality Assurance team consisting of one attorney and two senior investigators was created to specifically review completed Intake Investigations. Each week, the Intake Investigation quality assurance team reviews approximately 30 randomly selected closed intake investigations. In addition, each month, the Deputy Director of ID reviews approximately three to five Full ID cases that were closed with no charges.[82]

*Audit of Intake Investigations.* As of October 29, 2024, a total of 1,934 Intake Investigations that were closed between January 2023 and July 2024 had been audited. The audit identified an issue of some type (ranging from minor to more serious) in 582 of the 1,934 cases (30%).

*Audit of Full ID Investigations.* As of October 9, 2024, a total of 68 Full ID Investigations that were closed between April 2022 and October 2024 had been audited. Of the 68 cases, nine (13%) needed to be re-opened and underwent additional investigative actions; 20 of the 68 cases (29%) warranted discussions with the assigned investigator team, and 36 of the 68 cases (53%) required an update to the Closing Report (in six cases, the update was required only to address grammatical or identification errors).

*Lookback Audits.* The second method for assessing the appropriateness of case closure in Full ID Investigations included a "lookback" audit.[83] A total of 468 cases met a combination of

---

[82] The audit of Full ID cases was temporarily suspended from June 27, 2023 to September 25, 2023 while the lookback assessment was completed.

[83] The purpose of this audit is to "look back" at cases completed during the period where the Monitoring Team noted a decline in quality of ID investigations under poor leadership and inappropriate direction by a Deputy Commissioner installed in 2022. This is described in further detail in the Background section

the selection criteria and thus were selected for review. A team of ID's leadership (including the
Deputy Commissioner and the former Associate Commissioner) assessed the quality of the
investigative process in each case and the appropriateness of the investigations' outcomes. The
team determined that 155 of the 468 cases (33%) should be re-opened for further investigation.
All 155 cases have subsequently been closed, 44 with charges (28%) and 111 without charges
(72%). The Department reported that as of July 2, 2024, the lookback audit has been completed
and the ID staff who had been reviewing the lookback cases have now been returned to their
normal duties as Full ID/UPS Investigators.

*Findings of Quality Assurance Audits.* Via the audit process, ID leadership identified
several common issues across the work of ID staff. As described in the Monitor's April 18, 2024
Report (dkt. 706) at pg. 98, these issues include:

- o  Failing to mention all injuries (including injuries to staff) and to identify the
     source of injuries;

- o  Failing to preserve Genetec footage and/or failing to include the proper scope
     (*i.e.*, 30 minutes before and after, until the person in custody is secured);

- o  Failing to address problematic conduct captured on BWC (*e.g.*, profanity,
     allegations made by people in custody) and failing to address staff who do not
     properly activate their BWC;

- o  Failing to include relevant UOF Directive charges on MOCs;

- o  Failing to address problematic staff conduct leading up to, during and after
     incidents (*e.g.*, failing to address complaints from people in custody, failing to call
     Supervisors, behavior that escalates the issue, unprofessional statements/behavior,
     deploying OC from a dangerously close distance);

- o  Failing to send Facility Referrals or injury reclassifications;

- o  Failing to request staff medical documentation and failing to include all staff
     injuries in Closing Reports;

- o  Failing to conform to the UOF Directive's requirements for photographs,
     photographing the wrong person, not including photographs of all individuals
     involved, failing to photograph staff and staff injuries;

---

above. The audit's case selection criteria were developed in consultation with the Monitoring Team. These
included cases that: (1) closed between July 2022 and December 2022 with no charges, or (2) involved
members of ESU or certain staff who are frequently involved in uses of force, or (3) were classified as a
Class A use of force or that involved a head-strike. *See also* the Monitor's April 18, 2024 Report (dkt.
706) at pgs. 88-89.

- o   Failing to verify that the facility took the corrective action indicated by the Rapid Review, failing to include the CD, MOC or Teletype reference number;

- o   Failing to differentiate between unmanned posts and staff off post in Closing Reports, and lack of evidence to support unmanned post designation; and/or

- o   Inappropriately asserting that a certain investigative step will not change the outcome of an investigation.

These findings are consistent with the Monitoring Team's ongoing reviews and continue to be reflected in more recent investigations.

- • <u>Monitoring Team's Assessment of Quality of Investigations</u>

The Monitoring Team reviews thousands of Intake Investigations each Monitoring Period. Intake Investigations do identify certain relevant information and types of policy violations (*e.g.*, identifying Supervisors', line staffs' and secondary actors' failure to perform duties, reporting issues and BWC issues) in an organized, reader-friendly manner, and they have improved in terms of referring cases for Full ID Investigations. However, too many Intake Investigations continue to fail to identify operational and security failures that led to unnecessary uses of force, do not appear to correctly assess video evidence, fail to interview staff and/or PICs when necessary, and in some cases appear to dismiss PICs' allegations and/or injuries without proper basis. Too often, evidence of staff misconduct was overlooked, false or incomplete staff reports were not identified, and if staff misconduct was identified in the Intake Investigation, the recommended corrective action was insufficient. Staff failures to prevent and respond to self-harm events were similarly overlooked. Further compounding the concern is that the timeframe for completing Intake Investigations has increased (as described above).[84]

The decline in the quality of Full ID investigations first observed in 2022 has essentially continued. During the current Monitoring Period, the focus of Full ID Investigators was on the lookback of cases and so a backlog of contemporaneous pending Full ID cases continued to grow larger. Nearly all cases (84%) were closed/pending outside the 120-day timeline (perpetuating the Non-Compliance rating for timeliness). Full ID Investigations closed during this Monitoring Period (and during the previous three Monitoring Periods) were often incomplete, inadequate, or unreasonable.[85] Investigators often failed to complete necessary interviews with staff or persons in custody, did not identify all salient issues, disregarded objective evidence of misconduct,

---

[84] As discussed above, some delays in closure may continue to occur as part of ID's efforts to provide more guidance and mentorship to staff in order to improve the quality of their work.

[85] *See* Monitor's April 3, 2023 Report (dkt. 517) at pg. 165, Monitor's December 22, 2024 Report (dkt. 666) at pg. 38, and Monitor's April 18, 2024 Report (dkt. 706) at pg. 96.

discredited allegations from people in custody without evidence, and recommended insufficient employee corrective action.

<u>Conclusion</u>

The Investigation Division has been in a state of turmoil since 2022 which has resulted in regression in the quality of investigations, and a new backlog of cases has begun to emerge. The Division does not have enough staff to perform the work, and due to the ongoing impact of poor management under the previous leadership, it must retrain and support existing staff to ensure investigations are conducted in a neutral and independent manner. Addressing the damage from ID's mismanagement from 2022 to spring 2024 will take time. The removal of problematic leadership was an important step. Further, ID Leadership has reported that it is taking steps to address the quality of investigations, but limited staffing, staff turnover, and the emerging backlog are significant barriers to turning things around. Improving the quality of investigations will require ID supervisors to provide guidance, mentorship, and close scrutiny of investigations, all of which are necessary but time-consuming, and can only be undertaken by experienced ID staff. This work is essential to support and properly educate the new investigators and supervisors that have joined the Department.

Small pockets reflect some positive change that has started to take place (*e.g.,* increasing referrals for Full ID investigations and more frequently identifying cases in which corrective action should be taken). While ID's current leadership is taking important initial steps to eliminate the problems created by prior management, the investigations closed during this Monitoring Period reflect Non-Compliance with the Consent Judgment requirements § VII, ¶¶ 1 and 9(a). While the work necessary to reverse the regression that occurred within ID will take time, it is promising that the current Commissioner has reinstated the former Associate Commissioner of ID. The Monitoring Team has worked closely with the Associate Commissioner of ID since the inception of the Consent Judgment and found him to be forthright and credible and to possess a keen acumen for assessing use of force incidents in a neutral and independent manner. His leadership and experience, in conjunction with that of a few others, was credited for the Investigation Division's various successes prior to the regression that began in 2022.[86]

There is no doubt that ID investigators and their immediate supervisors are working hard, but sufficient resources, direction, and staff support are needed for a full course correction. The

---

[86] *See* Monitor's 12th Report (dkt. 431) at pgs. 79 to 80 noting that he and the then-Deputy Commissioner of ID were "smart, creative, dedicated and reform-minded leaders who have successfully guided the significant reform of the ID Division and have helped identify and support initiatives to elevate the level of practice needed in the facilities." Note, at the time the Monitor's 12th Report was filed, the Associate Commissioner of ID held the title of Assistant Commissioner of the Investigation Division.

Division has a critical need for strong, competent, and experienced supervisors at all levels who can ensure that investigations are conducted timely and in a neutral and independent manner that objectively assesses and documents all evidence without fear or favor.

| COMPLIANCE RATING | ¶ 1. Non-Compliance<br>¶ 9 (a). Non-Compliance |
|---|---|

| CJ § X. RISK MANAGEMENT, ¶ 1 (EARLY WARNING SYSTEM) |
|---|
| ¶ 1. *Early Warning System.* Within 150 days of the Effective Date, in consultation with the Monitor, the Department shall develop and implement an early warning system ("EWS") designed to effectively identify as soon as possible Staff Members whose conduct warrants corrective action as well as systemic policy or training deficiencies. The Department shall use the EWS as a tool for correcting inappropriate staff conduct before it escalates to more serious misconduct. The EWS shall be subject to the approval of the Monitor. |
|     a.    The EWS shall track performance data on each Staff Member that may serve as predictors of possible future misconduct. |
|     b.    ICOs and Supervisors of the rank of Assistant Deputy Warden or higher shall have access to the information on the EWS. ICOs shall review this information on a regular basis with senior Department management to evaluate staff conduct and the need for any changes to policies or training. The Department, in consultation with the Monitor, shall develop and implement appropriate interventions and services that will be provided to Staff Members identified through the EWS. |
| On an annual basis, the Department shall review the EWS to assess its effectiveness and to implement any necessary enhancements. |

This provision of the Consent Judgment requires the Department to have a system to identify and correct staff misconduct at an early stage, which the Department has elected to do through the Early Intervention, Support and Supervision ("E.I.S.S.") Unit. Further, § A, ¶ (3)(c) of the Action Plan (dkt. 465) requires the expansion of E.I.S.S. to support staff on disciplinary probation and supervisors during their probationary period. This provision also requires each facility to designate at least one supervisor responsible for working with the E.I.S.S. Unit to support the uniform staff who are in the E.I.S.S. program and to address any supervision deficiencies that are identified.

**Staff Actively on E.I.S.S. Monitoring**

The goal of E.I.S.S. is to identify and support staff whose use of force ("UOF") practices would benefit from additional guidance and mentorship to improve practice and minimize the possibility that staff's behavior escalates to more serious misconduct. In total, during this Monitoring Period, 143 staff were on E.I.S.S. monitoring. Below is a chart of the number of individuals on Monitoring in each Monitoring Period since 2020.

| Staff Actively Monitored[87] on E.I.S.S. Program | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Jan. to Jun. 2020 (10th MP) | Jul to Dec. 2020 (11th MP) | Jan. to Jun. 2021 (12th MP) | Jul to Dec. 2021 (13th MP) | Jan. to Jun. 2022 (14th MP) | July to Dec. 2022 (15th MP) | Jan. to Jun. 2023 (16th MP) | July to Dec. 2023 (17th MP) | Jan. to Jun. 2024 (18th MP) |
| 96 | 106 | 91 | 37 | 80 | 97 | 137 | 135 | 143 |

---

[87] The total number of Actively Monitored Staff for each Monitoring Period includes all staff who began monitoring during the period, remained in monitoring throughout the Monitoring Period, completed monitoring, or had been enrolled in monitoring (but not yet started).

## Screening Staff for E.I.S.S. Monitoring

When an individual is referred to E.I.S.S. for potential monitoring, the E.I.S.S. team conducts a screening of the staff member's history over the past few years to determine whether they would benefit from monitoring. This screening includes reviewing the staff member's disciplinary records and the related use of force incident investigations, reports, and videos, culminating in a synopsis of the findings. If E.I.S.S. determines that monitoring is appropriate, they schedule a placement meeting to discuss the individual's participation in the program and outline the support E.I.S.S. will provide.

Once placed under monitoring, any subsequent use of force incidents involving the individual are reviewed by the E.I.S.S unit. Staff members in the monitoring program meet once every other month with E.I.S.S. leadership to discuss incidents and address any performance-related issues. The program model has evolved over time.  Most recently, the program intended for these meetings to occur monthly with an Assistant Deputy Warden ("ADW") Liaison assigned to the individual's facility, however, staffing challenges due to a limited number of ADWs have resulted in the need to reduce the number of meetings.

41 staff were selected for monitoring during the 18th Monitoring Period, and most were identified due to their placement on disciplinary probation (n=31)[88], with the 10 other staff having been screened and selected for monitoring based on referrals from the Rapid Reviews, the Bureau Chief's Office, Trials, the Investigation Division ("ID"), or facility leadership. The table below depicts the work of E.I.S.S. between January 2020 and June 2024.

---

[88] As required by § A, ¶ (3)(c) of the Action Plan (dkt. 465).

| Overview of E.I.S.S. Program | | | | | | |
|---|---|---|---|---|---|---|
| | **2020** | **2021** | **2022** | **2023** | **Jan. to Jun. 2023 (16th MP)** | **July to Dec. 2023 (17th MP)** | **2024 (Jan. to June 2024)** |
| *Screening* | | | | | | |
| Staff Screened[89] | 218 | 117 | 117 | 96 | 66 | 30 | 59 |
| Staff Selected for Monitoring[90] | 75 | 77 | 99 | 89 | 63 | 26 | 41 |
| *Monitoring* | | | | | | |
| Staff Began Monitoring Term | 86 | 46 | 69 | 84 | 61 | 23 | 21 |
| Staff Completed Monitoring | 38 | 21 | 25 | 25 | 17 | 8 | 4 |

As the table above shows, the Department screened more staff this Monitoring Period (n=59) compared to the last Monitoring Period (n=30 total). Additionally, a greater number of staff were selected for monitoring in this period (n=41) than in the last (n=26). The increase in screening and assignment for monitoring is due to E.I.S.S. shifting its focus away from onboarding newly promoted supervisors and non-UOF violations, which took up a significant amount of time and resources. Since E.I.S.S. no longer screens and monitors these staff, it has allowed them to focus on UOF-related referrals. As a result, E.I.S.S. was able to board more staff for UOF monitoring this month than in the previous.

**E.I.S.S. Meetings with Staff**

For the 143 staff actively monitored, E.I.S.S. schedules three to four individuals for check-in meetings every day. Under this schedule staff are expected to meet with E.I.S.S once every two months. E.I.S.S. reports that scheduling is tracked internally by the unit's principal administrative aid. To notify staff of their meetings, E.I.S.S. sends an email notification to the staff members facility. The facility is then responsible for giving the notification to the staff and requiring them to sign it before the facility emails it back E.I.S.S. On the day of the meeting, the

---

[89] The number of staff screened for each Monitoring Period may include some staff who were screened in prior Monitoring Periods and were re-screened in the identified Monitoring Period.

[90] Not all staff selected for monitoring have been enrolled in the program. Certain staff left the Department before monitoring began. Other staff have not yet been placed on monitoring because they are on extended leaves of absence (*e.g.*, sick or military leave) or are serving a suspension. Finally, E.I.S.S. does not initiate a staff's monitoring term if the staff member has subsequently been placed on a no-inmate contact post due to the limited opportunity for mentorship and guidance.

facility is expected to relieve the staff member so they can attend the E.I.S.S. meeting. However, E.I.S.S. has reported significant inefficiencies in the scheduling[91] process so staff do not attend the original meeting and the meetings must be rescheduled. For instance, in the month of September, almost 50 meetings were scheduled and E.I.S.S. reported that only 25 meetings were in fact able to occur. While some scheduling issues may occur from time to time, the fact that only about 50% of scheduled meetings in fact occurred is unreasonable. Moreover, when an individual does not show up for their meeting, they are not immediately rescheduled due to E.I.S.S.'s full schedule. Instead, the meetings are rescheduled for the next available slot, which can be 30 to 60 days later, resulting in some staff effectively meeting as far as on a bi-annual basis.

**Management of E.I.S.S.**

The Monitoring Team routinely meets with E.I.S.S. leadership to receive updates on the screening and monitoring of staff. According to E.I.S.S. leadership, long-standing staffing and resource constraints have remained an ongoing problem. The Deputy Director position, vacant since October 2023, remains unfilled. After a lengthy delay (attributed to bureaucratic red tape) and repeated follow-up by the Monitoring Team, the position was posted publicly in April of 2024, but no qualified candidate was identified. E.I.S.S. leadership reports it is considering revising the title and removing the attorney requirement for the role and exploring alternative civilian titles in order to expand the candidate pool. This work has taken months and appears to be unnecessarily protracted. As a result, the Monitoring Team flagged the delay to Department Leadership following the close of the Monitoring Period and it appears additional steps are now being taken to expedite this process. As for the rest of the staff on the unit, E.I.S.S. currently has one ADW assigned to support the work of the division. The unit is also staffed by an Associate Commissioner, one Captain, one principal administrative aide, and one Officer who is currently on leave, further impacting the unit's resources.

E.I.S.S.'s staffing shortages have significantly affected E.I.S.S. operations. First, without a Deputy Director and a supporting Officer, there is insufficient support for the Assistant Commissioner to manage many of the essential tasks of the unit including preparing for meetings, screening staff, and updating monthly reports, which decreases overall efficiency. Second, the limited ADW support reduces contemporaneous and experienced mentorship for staff undergoing screening or monitoring.

---

[91] E.I.S.S. leadership report a variety of scheduling issues from the fact that notices to appear may not be appropriately served, the facility does not arrange for relief for the staff member, the scheduled meeting does not comport with the staff member's schedule or the staff member simply does not appear.

Given these staffing issues, the Monitoring Team recommended that E.I.S.S. prioritize its work to focus on staff that could most benefit from the program. As a result, E.I.S.S. has narrowed its focus to screening staff specifically referred for UOF violations. This means E.I.S.S. is not working with newly promoted captains or screening staff for non-UOF violations such as issues related to staff absenteeism or undue familiarity.

Additionally, E.I.S.S. leadership also reports a significant amount of their time goes to reviewing incident videos to screen staff and also to prepare for meetings with staff. The Monitoring Team believes that this process should be closely scrutinized to determine where efficiencies can be built into the process to ensure the process for screening and preparing for meetings is as efficient as possible.

Overall, it appears that E.I.S.S. continues to be underutilized as a tool for addressing and correcting challenging staff behavior. Following the close of the Monitoring Period, the Monitoring Team provided feedback to the Department recommending steps to enhance E.I.S.S.'s effectiveness despite the limited staffing and resources. The Monitoring Team recommended the Department expedite the process for filling the vacant Deputy Director position, resolve scheduling conflicts for staff meetings, clarify E.I.S.S.'s position within the Department's organizational structure, and ensure there is adequate oversite of the E.I.S.S. program by Department Leadership, and finally that an examination of the program's priorities is necessary to maximize its impact.

## Conclusion

Despite its limited resources, E.I.S.S. continues to screen, select, onboard, and meet with staff. However, due to its restricted capacity, its impact on addressing inappropriate staff conduct is materially underperforming. For several Monitoring Periods, E.I.S.S. has operated without sufficient initiative to innovate its processes or catalyze the long-term investment needed to reach its intended goal. To address these challenges, the Department must not only reinvest resources in E.I.S.S. but also expand its use and referrals to benefit all staff whose conduct warrants ongoing support. As a result of the program's declining resources, underutilization, and unmet goals the Department may result in a downgrade of the compliance rating if proactive and concrete steps are not taken to ensure this program is utilized as it should be even with its limited resources.

| COMPLIANCE RATING | ¶ 1. Partial Compliance |
|---|---|

**CJ § VIII. Staff Discipline and Accountability, ¶ 1 (Timely, Appropriate and Meaningful Accountability)**

**First Remedial Order § C. (Timely, Appropriate, and Meaningful Staff Accountability), ¶ 1 (Immediate Corrective Action)**

**CJ § VIII. Staff Discipline and Accountability, ¶ 3 (c) (Use of Force Violations)**

Consent Judgment, § VIII. ¶ 1. *Timely, Appropriate, and Meaningful Accountability.* The Department shall take all necessary steps to impose appropriate and meaningful discipline, up to and including termination, for any Staff Member who violates Department policies, procedures, rules, and directives relating to the Use of Force, including but not limited to the New Use of Force Directive and any policies, procedures, rules, and directives relating to the reporting and investigation of Use of Force Incidents and video retention ("UOF Violations").

First Remedial Order, § C. ¶ 1. *Immediate Corrective Action.* Following a Use of Force Incident, the Department shall determine whether any involved Staff Member(s) should be subject to immediate corrective action pending the completion of the Use of Force investigation, which may include counseling or re-training, reassignment to a different position with limited or no contact with Incarcerated Individuals, placement on administrative leave with pay, or immediate suspension (collectively, "immediate corrective action"). The Department shall impose immediate corrective action on Staff Members when appropriate and as close in time to the incident as practicable. The Department shall document and track any immediate corrective action taken, the nature of the initial corrective action recommended, the nature of the corrective action imposed, the basis for the corrective action, the date the corrective action is imposed, and the date of the Use of Force Incident resulting in the immediate corrective action. The requirements in this provision are not intended to alter the rights of Staff or the burden of proof in employee disciplinary proceedings under applicable laws and regulations.

Consent Judgment, § VIII. ¶ 3. *Use of Force Violations.* In the event an investigation related to the Use of Force finds that a Staff Member committed a UOF Violation:

. . .

    c.    The Trials Division shall prepare and serve charges that the Trials Division determines are supported by the evidence within a reasonable period of the date on which it receives a recommendation from the DCID (or a designated Assistant Commissioner) or a Facility, and shall make best efforts to prepare and serve such charges within 30 days of receiving such recommendation. The Trials Division shall bring charges unless the Assistant Commissioner of the Trials Division determines that the evidence does not support the findings of the investigation and no discipline is warranted, or determines that command discipline or other alternative remedial measures are appropriate instead. If the Assistant Commissioner of the Trials Division declines to bring charges, he or she shall document the basis for this decision in the Trials Division file and forward the declination to the Commissioner or designated Deputy Commissioner for review, as well as to the Monitor. The Trials Division shall prosecute disciplinary cases as expeditiously as possible, under the circumstances.

This compliance assessment evaluates the provisions that require the Department to impose timely, appropriate, and meaningful accountability for use of force ("UOF") related violations (Consent Judgment, § VIII, ¶ 1), the Department's use of immediate corrective action (First Remedial Order (dkt. 350), § C, ¶ 1), as well as the expeditious prosecution of cases for formal discipline by the Trials Division (Consent Judgment, § VIII, ¶3 (c)). This compliance assessment covers the period between January through June 2024, the 18th Monitoring Period.

The provisions discussed in this section are each distinct, but intrinsically interrelated because they all relate to the Department's accountability system. Progress towards compliance with the three provisions discussed in this assessment depends heavily on the Department's success in other areas, particularly in identifying misconduct via Rapid Reviews and investigations and in imposing formal discipline. Discipline, whether resulting from the findings of an *ad hoc* review, Rapid Review, an Intake Investigation, a Full ID Investigation, or via the formal disciplinary process, must be both timely and proportional to the severity of the misconduct in order to drive meaningful change.

This section has three parts. First, it reviews overall data on staff discipline imposed at different points in the process. Next, it discusses Immediate Action with detailed discussions of Command Disciplines, suspensions and modified duty. Finally, it discusses various aspects of formal discipline, including the timeliness of the discipline and the outcomes of cases referred to the Trials Division. The conclusion of this section summarizes the compliance assessment for each of the three provisions.

## Data on Accountability for Staff Misconduct

The Department identifies misconduct via Rapid Reviews, *ad hoc* incident reviews by civilian and uniform leadership, Intake Investigations (formerly Preliminary Reviews), and Full ID investigations. The Department uses various responses to misconduct, including corrective interviews, 5003 counseling, re-training, Command Disciplines ("CD"), suspensions, modified duty, and termination. Personnel Determination Review ("PDRs") are utilized to address misconduct by *probationary* staff. For *tenured* staff, formal discipline is imposed by the Department's Trials Division, generally via a Negotiated Plea Agreement ("NPA").[92]

As noted in other sections of this report and in prior Monitor's Reports, the Department continues to struggle to consistently identify all relevant misconduct via Rapid Reviews and ID investigations, perpetuating the chronic problem of unaddressed misconduct. This failure severely undermines the Department's overall accountability structure, which is an essential component of a disciplinary system that is effective and equitable. Although identifying misconduct is the subject of a separate set of provisions, the Department's failure to consistently identify misconduct also impacts the compliance ratings in this section because meaningful accountability is impossible in a system where misconduct is not consistently and accurately identified. In other words, reliably identifying misconduct when it occurs is a prerequisite to achieving compliance with accountability-related provisions.

---

[92] A Negotiated Plea Agreement is an agreed upon settlement between the Respondent uniform staff and the Trials Division attorneys.

- Data on Accountability for Staff Misconduct

The table below provides an overview of accountability for use-of-force-related misconduct imposed between January 1, 2019, and June 30, 2024. Each year, the Department provides various types of support and guidance to staff to correct poor practice (*e.g.*, corrective interviews and 5003 counseling). These are not considered disciplinary in nature, but it is important to recognize that the need to modify and refine staff practice goes well beyond the number of cases in which discipline is imposed, averaging over 2,000 such interventions per year.

In 2022, the Department saw the highest number of case resolutions (n=2,933), with 1,809 (62%) cases resulting in formal discipline and 1,124 (39%) resulting in corrective action (CDs and suspensions). The large number of formal discipline cases resolved in 2022 was artificially inflated due to the resolution of a significant portion of the backlog of cases. In 2023, the Department continued to address cases in the backlog, but the number of cases resolved decreased to 1,700, with 652 (38%) resulting in formal discipline and 1,048 (62%) resulting in corrective action. During the current Monitoring Period, of the 1,147 cases resolved, 319 resulted in formal discipline (29%) and 828 resulted in corrective action (72%).

| Accountability Imposed for Staff's Use of Force Related Misconduct 2019 to June 2024 | | | | | | |
|---|---|---|---|---|---|---|
| | **2019**[93] | **2020** | **2021** | **2022** | **2023** | **Jan.- Jun. 2024 18th MP** |
| **Support and Guidance Provided to Staff** | | | | | | |
| Corrective interviews and 5003 counseling | 2,700[94] | 1,378[95] | 3,205 | 2,532 | 1,723 | 1,073 |
| Corrective interviews (resulting from CDs) | 53 | 32 | 38 | 76 | 78 | 269 |
| **Corrective Action—Command Discipline & Suspensions** | | | | | | |
| CD – Reprimand | 156 | 126 | 270 | 319 | 114 | 282 |
| CDs (resulting in 1-10[96] days deducted) | 879 | 673 | 794 | 739 | 798 | 517 |
| Suspensions by date imposed | 48 | 80 | 83 | 66 | 136 | 29 |
| *Total* | *1,083* | *879* | *1,147* | *1,124* | *1,048* | *828* |
| **Formal Discipline** | | | | | | |
| PDRs | 81 | 49 | 2 | 1 | 22 | 14 |
| NPAs | 218 | 327 | 460 | 1,808 | 630 | 305 |
| *Total* | *299* | *376* | *462* | *1,809* | *652* | *319* |
| **Total Number of Staff Held Accountable** | | | | | | |
| ***Total*** | ***1,382*** | ***1,255*** | ***1,609*** | ***2,933*** | ***1,700*** | ***1,147*** |

The 1,147 cases resolved during the current Monitoring Period represents a 34% increase in case resolutions from the previous Monitoring Period, when 856 cases were resolved (data not shown). This increase suggests that misconduct was identified more frequently during this Monitoring Period given that much of the corrective action imposed (Command Discipline and Suspensions) was for conduct occurring during this Monitoring Period (or just before the

---

[93] Counseling that occurred in the 8th Monitoring Period was focused on a more holistic assessment of the staff member's conduct pursuant to specific standards set by Consent Judgment, § X, ¶ 2, Risk Management that has been subsequently revised. *See* Monitor's October 28, 2019 Report (dkt. 332) at pgs. 172-173.

[94] The identification of staff for counseling was in transition in the Ninth Monitoring Period as a result of a recommendation by the Monitoring Team. *See* Monitor's May 29, 2020 Report (dkt. 341) at pgs. 194-196.

[95] The Department completed the transition to its new process for identifying staff for counseling during this Monitoring Period. *See* Monitor's October 23, 2020 Report (dkt. 360) at pgs. 168-170.

[96] Beginning in October 2022, CDs could be adjudicated for up to 10 compensatory days.

Monitoring Period began). A more detailed discussion of the Department's use of each of these types of disciplinary responses is discussed later in this section.

- Accountability for Supervisors

The Department reported the following data on accountability imposed against facility leadership and supervisors for use of force related misconduct, inefficient performance of duties and/or inadequate supervision.

| Accountability for Facility Leadership and Supervisors, January 2023 to June 30, 2024, | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Jan. 2023 to June 2023 | | | July 2023 to Dec. 2023 | | | Jan. 2024 to June 2024 | | |
| | Warden/Assistant Commissioner | Deputy Warden | Assistant Deputy Warden | Warden/Assistant Commissioner | Deputy Warden | Assistant Deputy Warden | Warden/Assistant Commissioner | Deputy Warden | Assistant Deputy Warden |
| Formal Discipline | 0 | 0 | 4 | 0 | 0 | 1 | 0 | 0 | 2 |
| Suspension | 0 | 0 | 5 | 0 | 0 | 5 | 0 | 0 | 1 |
| Command Discipline | 0 | 0 | 0 | 0 | 0 | 21 | 0 | 3 | 20 |
| 5003 Counseling | 0 | 0 | 1 | 0 | 0 | 6 | 0 | 0 | 4 |
| Corrective Interview | 0 | 0 | 5 | 0 | 0 | 17 | 0 | 0 | 10 |
| Retraining | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 |
| **Total** | **0** | **0** | **15** | **0** | **0** | **51** | **0** | **3** | **37** |

Given the volume and pervasiveness of issues regarding the use of force, inefficient performance of duties and inadequate supervision identified by the Monitoring Team during its routine review of incidents, the number of supervisors disciplined has been historically low. In the last year, it appears that the Department has taken some steps to hold more leadership accountable as demonstrated in the chart above. Facility leaders and supervisors serve as role models for expected practice and have an affirmative duty to supervise and correct poor staff practice when it occurs in their presence. The Monitoring Team has identified situations where leaders and supervisors have not upheld these responsibilities and yet no corrective action was imposed.[97] Further, the Monitoring Team's assessment of accountability suggests that the Department often defaults to seeking corrective action for Officers and Captains, leaving similar failures among ADWs, DWs and Wardens unaddressed.

**Immediate Corrective Action**

Immediate corrective action (suspension, re-assignment, counseling, and Command Discipline) is a necessary tool for addressing misconduct because it allows the Department, close-in-time to the incident, to hold staff to a common standard for utilizing force, particularly when serious and egregious deviations from that standard are obvious upon the incident's review.

---

[97] The Monitoring Team described two such examples in the Monitor's July 10, 2023 Report (dkt. 557) at pgs. 138-139.

Rapid Reviews (*i.e.*, *ad hoc* incident reviews by uniform or civilian leadership) and Intake Investigations are both utilized to identify misconduct that requires immediate corrective action. Rapid Reviews are the first opportunity to do so and although they detect some misconduct, the Monitoring Team has found that they continue to fail to identify *all* misconduct observed via the available evidence.[98] Intake Investigations also provide an opportunity to identify misconduct close-in-time to the incident and although they detect some misconduct, the Monitoring Team has found that they too continue to fail to identify *all* misconduct observed via the available evidence.[99]

The table below presents data on the immediate corrective action imposed between January 2020 and June 2024. Significantly more immediate action was taken during this Monitoring Period (n=2,182) compared to the last (n=1,540) and ranks among the highest since tracking began in January 2020.

---

[98] Additional detail on the corrective actions imposed via Rapid Reviews is provided in the compliance assessment of First Remedial Order (dkt. 350), § A, ¶ 1 in this report.

[99] Additional detail on the corrective actions identified by Intake Investigations is provided in the compliance assessment of Consent Judgment, § VII, ¶ 1 in this report.

| Type | Jan.–June 2020 | | July–Dec. 2020 | | Jan.–June 2021 | | July–Dec. 2021 | | Jan.–June 2022 | | July–Dec. 2022 | | Jan.–June 2023 | | July – Dec. 2023 | | Jan.–June 2024 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Immediate Corrective Action Imposed for UOF Related Misconduct by Incident Date** | | | | | | | | | | | | | | | | | | |
| Counseling and Corrective Interviews[100] | N/A | | 1,337 | 71% | 1,509 | 68% | 1,733 | 80% | 1,661 | 78% | 947 | 58% | 746 | 57% | 1,055 | 69% | 1,342 | 62% |
| Suspension | 38 | 11% | 42 | 2% | 58 | 3% | 25 | 1% | 34 | 2% | 41 | 3% | 65 | 5% | 59 | 4% | 27 | 1% |
| Non-Inmate Contact Post or Modified Duty | 4 | 1% | 1 | <1% | 3 | <1% | 3 | <1% | 12 | 1% | 4 | <1% | 9 | 1% | 5 | <1% | 14 | 1% |
| *Total Suspensions & Modified Duty (Including No Inmate contact)* | *42* | *12%* | *43* | *2%* | *55* | *2%* | *26* | *1%* | *39* | *2%* | *45* | *3%* | *74* | *6%* | *64* | *4%* | *41* | *2%* |
| CD – Reprimand | 37 | 11% | 89 | 5% | 150 | 7% | 120 | 6% | 134 | 6% | 185 | 11% | 53 | 4% | 61 | 4% | 282 | 13% |
| CDs (resulting in 1-10[101] days deducted) | 263 | 77% | 410 | 22% | 511 | 23% | 283 | 13% | 291 | 14% | 448 | 28% | 438 | 33% | 360 | 23% | 517 | 24% |
| **Total Immediate Action** | **342** | | **1,879** | | **2,231** | | **2,164** | | **2,132** | | **1,625** | | **1,311** | | **1,540** | | **2,182** | |

- **Counseling and Corrective Interviews**

Counseling and Corrective Interviews[102] are the most common outcomes of Rapid Reviews. During this Monitoring Period, 1,342 Counseling and Corrective interviews were imposed, accounting for 62% of all immediate actions. As noted in previous Monitor's Reports, gauging the quality of counseling sessions remains difficult. Given the poor quality of in-the-moment supervision in the facilities, it is likely that counseling sessions—delivered by these same supervisors—are similarly limited. As a result, counseling and corrective interviews are likely insufficient mechanisms, at least insofar as they are the only action taken, to alter staff practice, as evidenced by the fact that few changes in staff practice have been observed, despite the frequent use of these accountability measures.

---

[100] NCU confirmed that the Counseling and Corrective Interviews reported actually occurred.

[101] In October 2022, the Department promulgated a revised Command Discipline policy which expanded the allowable penalty from a maximum of five days to 10 days.

[102] Corrective Interviews are considered part of the disciplinary continuum and become part of a staff member's personnel file for a specified period of time. Counseling sessions (including 5003 counseling sessions) are not considered disciplinary in nature and are not included in a staff member's personnel file.

- <u>Suspension, No Contact Posts and Modified Duty</u>

The use of suspension, assignment to posts with no contact with PIC and/or modified duty as immediate corrective actions is critical to the goal of timely, proportional responses to serious misconduct.

During the current Monitoring Period, 41 staff were either suspended or placed on no contact/modified duty (27 staff were suspended and 14 staff were placed on modified duty/no contact). Although the number of staff placed on no contact/modified duty is higher than in the past, the number of staff suspended is lower than in the previous four Monitoring Periods.

The Department's use of suspensions has been mixed. During the previous monitoring period, the former Commissioner required his approval for suspensions recommended by facility leadership and the Investigation Division ("ID"). This process limited facility leadership's ability to take immediate action, undermined their authority, and added delays to the process of imposing discipline. Conflicting guidance also created uncertainty about who could initiate suspensions, potentially resulting in missed opportunities for disciplinary action. The Department reports that the continued confusion created under the former Commissioner likely underlies some of the decrease in the use of suspensions that occurred during this Monitoring Period. The Monitoring Team recommended that the current Commissioner issue revised guidance to clarify the suspension process, but to date, the Department has not reported that such guidance has been issued.

The misconduct leading to suspensions often includes inappropriate use of head strikes, chokeholds, kicks, and body slams, use of racial slurs, failure to intervene, failure to provide immediate aid during medical emergencies, and abandoning posts. Some of these actions are retaliatory, punitive, and intended to inflict pain on those in custody.  During this Monitoring Period, the Monitoring Team shared recommendations on incidents that warranted immediate action, pursuant to the First Remedial Order (dkt. 305), § C, ¶ 2, with the Department's Investigation Division, which is discussed below in the compliance assessment for that provision. The incidents warranting immediate corrective action involved misconduct or negligence by staff, including excessive use of force, failure to prevent or appropriately respond to violence, improper supervision, inadequate security measures, failure to intervene during self-harm, unprofessional behavior, and improper documentation or reporting. These actions reflect a lack of adherence to professional standards, contributing to unsafe environments and harm to individuals in custody. In at least some cases, the conduct of staff likely warrant termination under the Consent Judgment, § VIII, ¶ 2 (d).

The table below shows the number of staff who were suspended for various reasons (not just use of force related misconduct) from January 2020 and June 2024.

| Reason for Staff Suspension, by Date of Suspension | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Reason | 2020 | | 2021 | | 2022 | | 2023 | | Jan. to Jun 2024 | |
| Sick Leave | 39 | *11%* | 138 | *22%* | 311 | *45%* | 110 | *19%* | 16 | *12%* |
| Conduct Unbecoming | 92 | *26%* | 128 | *20%* | 100 | *15%* | 160 | *28%* | 64 | *48%* |
| Use of Force | 78 | *22%* | 82 | *13%* | 66 | *10%* | 136 | *23%* | 29 | *22%* |
| AWOL | 0 | *0%* | 165 | *26%* | 99 | *14%* | 22 | *4%* | 0 | *0%* |
| Arrest | 60 | *17%* | 70 | *11%* | 32 | *5%* | 23 | *4%* | 4 | *3%* |
| Inefficient Performance | 44 | *12%* | 29 | *5%* | 39 | *6%* | 73 | *13%* | 6 | *5%* |
| Electronic Device | 18 | *5%* | 4 | *1%* | 10 | *1%* | 9 | *2%* | 1 | *1%* |
| NPA | 10 | *3%* | 6 | *1%* | 17 | *2%* | 19 | *3%* | 4 | *3%* |
| Other | 6 | *2%* | 4 | *1%* | 11 | *2%* | 22 | *4%* | 0 | *0%* |
| Contraband | 7 | *2%* | 5 | *1%* | 0 | *0%* | 3 | *1%* | 0 | *0%* |
| Erroneous Discharge | 5 | *1%* | 0 | *0%* | 2 | *0%* | 0 | *0%* | 0 | *0%* |
| Abandoned Post | 0 | *0%* | 0 | *0%* | 1 | *0%* | 4 | *1%* | 2 | *2%* |
| **Total** | **359** | | **631** | | **688** | | **581** | | *132* | |

Over time, the Department has suspended fewer staff. In some cases, this may signal a decrease in staff behavior that violates certain policies. For instance, the Department's efforts to curtail the abuse of sick leave has improved, which has reportedly reduced the frequency of the behavior and the Department's need to respond to it (*e.g.*, there were 311 suspensions for this reason in 2022, and only 16 during the current Monitoring Period). As for the use of suspensions for use of force related misconduct, while the proportion of suspensions for use of force reasons in this Monitoring Period was consistent with previous Monitoring Periods, the *number* of suspensions for use of force related suspensions has decreased. This is concerning given that the underlying staff practices do not appear to have improved.

The Department has expanded the use of suspensions in response to conduct unbecoming. The Monitoring Team reviewed a sample of memorandums detailing the basis for these suspensions, which include instances of staff facilitating contraband, engaging in inappropriate relationships with persons in custody, or failing to adhere to fundamental correctional practices, such as conducting counts or properly securing firearms. The increase in suspensions for conduct unbecoming reflects improved identification and accountability for behaviors that compromise the safety and operational integrity of facilities and are thus

important. However, the Monitoring Team continues to identify cases where it appears the use of suspensions would be appropriate in light of the misconduct, but a suspension was not utilized.

- Command Discipline

A Command Discipline ("CD") is a corrective action that can be imposed at the facility-level. It is a necessary accountability tool because it can be completed closer-in-time to when an incident occurs compared to formal discipline. A CD can result in a corrective interview, reprimand, or the loss of compensatory days.

The Monitoring Team has long supported the expanded use of CDs. It is a tool that the Department needs, but it must be utilized appropriately and managed properly. The Department has struggled to properly manage CDs to ensure that they are processed as they should be. This issue has been extensively reported by the Monitoring Team over the years and deficiencies continue to undermine the overall disciplinary process.[103] In this Monitoring Period, the Department has taken steps to improve the processing of CDs, as described in detail below.

   o *Command Discipline Policy*

In order to both expand the use of CDs and to address the processing issues long identified by the Monitoring Team, the CD policy was updated on October 27, 2022.[104] The revisions to the policy intended to improve practice, but a large number of CDs continued to be dismissed and there was an ongoing overreliance on the lowest level sanctions. In addition, in at least some cases, CDs were issued that precluded the issuance of formal discipline, which should never occur. As a result of these shortcomings, at the end of 2022, the Department reported its intention to revise the policy but did not proceed with the revisions in a timely manner, resulting in a requirement to do so as part of the Court's August 10, 2023 Order (dkt. 564). The Department shared several drafts of the revisions with the Monitoring Team in late 2023 and throughout 2024. In general, the revisions include improvements to the processing of CDs and align the penalty grid with the severity of misconduct. Following the end of the Monitoring Period, the Department shared some additional revisions to further enhance practice. The Monitoring Team shared some additional feedback and encouraged the Department to finalize and adopt the policy as soon as possible.

---

[103] *See*, for example, the Monitor's April 3, 2023 Report (dkt. 517) at pgs. 108 and 180-183, the Monitor's December 22, 2024 Report (dkt. 666) at pgs. 53-55, and the Monitor's April 18, 2024 Report (dkt. 706) at pgs. 115-119.

[104] These revisions were made pursuant to Action Plan (dkt. 465), § F, ¶ 3 and as described in the Monitor's April 3, 2023 Report (dkt. 517) at pgs. 180-181. The revisions were intended to ensure that, among other things: (1) CDs would no longer be dismissed for due process violations and (2) the Department did not automatically defer to the lowest level sanction.

  o *Centralized Processing of CDs*

   The Department determined that creating a centralized unit to process and manage CDs would help to mitigate the issues discussed above. The Informal Command Discipline Unit ("ICDU") was created during the previous Monitoring Period and began to adjudicate CDs during the current Monitoring Period.  As of the end of the Monitoring Period, ICDU now adjudicates CDs from all facilities (except the hospitals and court commands).[105] The ICDU is managed by the Bureau Chief/Chief of Staff and includes three ADWs who conduct the CD hearings. The Department reported that the unit will also require the assistance of support staff.

   The ICDU is a promising initiative. The centralized processing of CDs should assist in ensuring that CDs are properly processed and eliminating the dismissal of CDs for due process violations.  Further, ICDU should also help ensure that CDs are utilized only when appropriate, permitting formal discipline to occur when necessary.[106] As part of this effort, DOC reports that ICDU routinely coordinates with ID to ensure that CDs are not processed when they should not be.

   As reflected in the data below, it appears that there has been some improvement in processing CDs which appears to be at least partly attributable to the ICDU. The Monitoring Team recommended that NCU closely scrutinize the processing of CDs by ICDU to ensure they are managed appropriately. NCU's audits are shared with the ICDU for review and consideration.

  o *Adjudication of Command Discipline from Rapid Reviews*

   CDs are adjudicated in two different ways. First, a CD can be issued and adjudicated by ICDU or facility leadership (for those facilities where the ICDU has not assumed responsibility, such as the Court Commands or Elmhurst and Bellevue Hospital Prison Wards). Second, the Trials Division can also settle formal disciplinary charges with a CD, which is discussed later in this section.

   This discussion focuses on the adjudication of CDs recommended via a Rapid Review of a use of force incident. The table below summarizes the outcome of those CDs since 2019 based

---

[105] ICDU began conducting the CD hearings for all misconduct that occurred on or after January 1, 2024 for NIC, WF, OBCC, and RESH, for all misconduct that occurred on or after April 4, 2024 for GRVC, and for all misconduct that occurred on or after June 24, 2024 for EMTC, RMSC, and RNDC. ICDU is now conducting hearings for all incidents that occurred in these facilities or that was identified by HMD (*i.e.,* out of residence violations and missed medical appointments).

[106] In the last Monitoring Period, there was one particularly egregious example where the Department was precluded from seeking formal discipline on a serious case of misconduct because a CD was processed for the same event and so the ability to seek formal discipline was foreclosed due to double jeopardy.  *See* Monitor's April 18, 2024 Report (dkt. 706) at pg. 118.

on an analysis conducted by NCU. There were 1,431 CDs recommended via Rapid Reviews during the current Monitoring Period, which, in just six months, is almost as many CDs as were adjudicated for incidents that occurred during all of last year (n=1,730).

| | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Status and Outcome of Command Disciplines Recommended by Rapid Reviews** *As of June 2024 NCU Report* | | | | | | | | | | | | | | | | |
| Month of Incident/ Rapid Review | Total # of CDs Recommended | Still Pending in CMS | | Resulted in 1-10 Days Deducted[107] | | Resulted in MOC | | Resulted in Reprimand | | Resulted in Retraining | | Resulted in Corrective Interview | | Dismissed at Hearing or Closed Administratively in CMS | | Never Entered into CMS |
| *2019* | *1635* | *7* | *0%* | *879* | *54%* | *122* | *7%* | *156* | *10%* | | | *53* | *3%* | *360* | *22%* | *41* | *3%* |
| *2020* | *1440* | *15* | *1%* | *673* | *47%* | *108* | *8%* | *126* | *9%* | | | *32* | *2%* | *399* | *28%* | *82* | *6%* |
| *2021* | *2355* | *65* | *3%* | *794* | *34%* | *281* | *12%* | *270* | *11%* | | | *38* | *2%* | *744* | *32%* | *162* | *7%* |
| *2022* | *2123* | *64* | *3%* | *739* | *35%* | *128* | *6%* | *319* | *15%* | | | *76* | *4%* | *608* | *29%* | *189* | *9%* |
| *2023* | *1730* | *98* | *6%* | *798* | *46%* | *110* | *6%* | *114* | *7%* | *11* | *1%* | *78* | *5%* | *421* | *24%* | *100* | *6%* |
| *Jan.-Jun. 2024 (18th MP)* | *1431* | *53* | *4%* | *517* | *36%* | *42* | *3%* | *282* | *20%* | *44* | *3%* | *269* | *19%* | *171* | *12%* | *53* | *4%* |
| *\*CDs pending for more than a year are not tracked in the CD reports analyzed for this chart and therefore may still appear pending although it is likely they have since been dismissed.* | | | | | | | | | | | | | | | | |

Of the 1,431 CDs recommended during the current Monitoring Period, 1,154 (80%) have been adjudicated and resulted in a substantive outcome (*e.g.*, days deducted, a reprimand, a corrective interview, or a Memorandum of Complaint ("MOC")), while 224 (16%) were dismissed or not processed, and 53 (4%) are still pending. These outcomes are an improvement over previous years.

- ▪ *CD Penalties*

When considering the proportion of CDs that resulted in various outcomes, the increased *number* of CDs issued during this Monitoring Period must be recognized. For example, in this Monitoring Period, 517 CDs were resolved with a loss of compensatory time. While this was the outcome for only 36% of all CD adjudications (a reduction in proportion from prior years), DOC is on track to issue more CDs with lost compensatory time in 2024 than in any year since the tracking began in 2019.

Historically, the Monitoring Team has been concerned about facility leadership's overreliance on resolving CDs with reprimands, retraining, and corrective interviews.[108] During this Monitoring Period, those outcomes were still observed but must be contextualized in light of

---

[107] In October 2022, the Department promulgated a revised Command Discipline policy which expanded the potential penalty of a command discipline from a maximum of five days to 10 days.

[108] *See* the Monitor's April 18, 2024 Report (dkt. 706) at pg. 118.

the larger number of CDs that were issued.  Of course, while less significant penalties are certainly appropriate in some cases, they must be proportional to the misconduct at issue.

This Monitoring Period was one of transition from the facilities to ICDU for the adjudication of CDs.  In the next Monitoring Period, scrutinizing ICDU's work will be important to better understand its impact on the adjudication of CDs and the penalties imposed.

■ *Dismissal of CDs*

CDs may be dismissed following a hearing on the CD, and dismissal may be appropriate at times. However, dismissing CDs because of due process violations and other preventable errors undercuts the integrity of the process. The Monitoring Team has long raised concerns about dismissing CDs for these reasons. While errors can and do occur, they should be limited, and the Department must ensure its practices minimize the possibility that the opportunity to adjudicate a CD is lost due to such errors. During the current Monitoring Period, the proportion of CDs that were dismissed as a result of due process violations or other preventable errors significantly decreased (16% compared to 30% in 2023).[109] This is particularly notable given the corresponding increase in the number of CDs that required processing. The fact that there were fewer errors when the Department had more cases to process is a welcome improvement.

With respect to the 224 cases dismissed/not processed during this Monitoring Period:[110]

o 47% (n=106) were dismissed because of due process violations (meaning the hearing did not occur within the required timeframes outlined in policy), because of a clerical error which invalidated the CD, or because the CD was not entered into CMS at all or not drafted within the required timeframe. These cases reflect a failure to properly manage an essential accountability tool. This proportion is significantly lower than in previous Monitoring Periods (69% in the 17th MP, 60% in the 16th MP, 66% in the 15th MP, 61% in the 14th MP). [111]

o 53% (n=118) were dismissed for factual reasons including in response to a hearing on the merits, or because a staff member resigned/retired/was terminated. Additional scrutiny is merited as to whether the determination that the charges could not be sustained for factual reasons was made in a neutral and objective manner or not. This will be subject to future monitoring.

---

[109] *See* the Monitor's April 18, 2024 Report (dkt. 706) at pg. 117, Monitor's December 22, 2023 Report (dkt. 666) at pg. 54, Monitor's April 3, 2023 Report (dkt. 517) at pg. 182, and Monitor's October 28, 2023 Report (dkt. 472) at pgs. 148-149.

[110] The Monitoring Team identified a calculation error in its past Monitor's reports regarding the dismissal of command disciplines. These calculation errors and their corrections are listed in Appendix B.

[111] *See* Appendix B with the revised data for previous Monitoring Periods.

Allowing misconduct to go unaddressed is in direct contravention of the *Nunez* Court Orders and highlights the fragile nature of the Department's systems for processing staff discipline. This is why it is essential to ensure CDs are managed with integrity and fidelity and must remain a priority as ICDU assumes responsibility for the CD adjudication process.

- ▪ *Rejection of CDs and Appeals*

If a staff member does not agree with the CD penalty imposed, they have two options: (1) refuse the CD penalty, which means the CD charges will be converted into a Memorandum of Complaint for formal discipline and will be processed through the Trials Division, or (2) appeal the CD penalty with the Legal Division. The Monitoring Team has been working with the Department to better understand the appeal process and how it is tracked. The Department recently provided tracking information regarding appeals and their outcomes which will be analyzed for future Monitoring Periods.

- **Overall Status of Immediate Corrective Action**

Immediate corrective action is an essential tool to ensure that certain misconduct is addressed swiftly. During the current Monitoring Period, the Department's use of Immediate Action showed some improvements but also some persistent problems. While all misconduct does not get identified, the volume of immediate action imposed is significant. The fact that so much immediate action occurs demonstrates that rampant violations of security protocols, operational failures, and misuses of force continue to occur in the facilities.

On the positive side, 40% more Immediate Action was imposed, which suggests that the Department is improving its ability to detect and respond to misconduct when it occurs. However, the penalty in over half of the cases was at the lighter end of the continuum (*i.e.*, counseling and corrective interview) and a much smaller number of suspensions were imposed. The Monitoring Team has not seen any evidence in its routine review of incidents to suggest that the severity of staff misconduct has lessened that would account for this decrease in the number of suspensions. That said, the Department has taken important steps to improve the processing of CDs. A larger number of CDs were imposed (which again suggests improvement in detecting and responding to misconduct) and more CDs with compensatory days were issued than any Monitoring Period to date.  Proportionally fewer CDs were dismissed and within that subset, proportionally fewer were dismissed for preventable reasons.

These incremental signs of improvement do reflect forward movement.  Unfortunately, to date, even the large volume of immediate action has not materially altered staff practice. This may be due, in part, to the inconsistent use of immediate action, that the penalty imposed is not a significant deterrent, and/or the poor management of these actions.

**Formal Discipline**

Formal discipline is imposed for tenured staff once misconduct has been substantiated and the matter has been adjudicated. The imposition of formal discipline requires the work of multiple DOC divisions (*i.e.*, ID and the Trials Division), two City agencies (*i.e.*, DOC and OATH), and engagement with the staff member and their counsel. Accordingly, ensuring that disciplinary matters are prosecuted expeditiously requires each stakeholder to do its work efficiently and with fidelity and for all parts to work together collaboratively and effectively.

Between November 1, 2015 and June 30, 2024, the Department's Trials Division resolved over 5,236 cases via formal discipline.

- Status of Cases Referred for Formal Discipline

As noted throughout this section, misconduct must be appropriately identified for it to be adjudicated, and the Monitoring Team continues to identify staff misconduct that would warrant formal discipline during its routine incident reviews. The challenges related to ID's investigations of use of force incidents (discussed in the compliance assessment for Consent Judgment, § VII, Use of Force Investigations in this report) have a negative impact on the Trials Division and the Department's responsibility to apply discipline when warranted. ID's failure to close cases in a timely manner and failure to consistently identify all misconduct means that the Trials Division receives cases on a delayed timeline and that some cases that warrant formal discipline may not even be referred. As ID works to improve its efficiency and reliability in handling investigations and identifying misconduct, the number of referrals to the Trials Division is expected to increase.

The table below presents the status of all cases referred for formal discipline by incident date since 2016.

| Status of Disciplinary Cases & Pending Investigations by Date of Incident *As of June 2024* | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2016 | | 2017 | | 2018 | | 2019 | | 2020 | | 2021 | | 2022 | | 2023 | | 2024 | |
| **Total Individual Cases** | 471 | | 621 | | 784 | | 1027 | | 695 | | 715 | | 662 | | 465 | | 37 | |
| **Closed Cases** | 470 | 100% | 616 | 99% | 773 | 99% | 1011 | 98% | 685 | 99% | 712 | 99% | 614 | 93% | 348 | 74% | 7 | 18% |
| **Pending Cases** | 0 | 0% | 5 | 1% | 11 | 1% | 16 | 2% | 10 | 1% | 3 | <1% | 48 | 7% | 117 | 25% | 30 | 82% |
| | | | | | | | | | | | | | | | | | | |
| **Unique UOF Incidents** | | | | | 466 | | 606 | | 450 | | 563 | | 416 | | 323 | | 35 | |
| | | | | | | | | | | | | | | | | | | |
| **Pending Investigations.** | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | 14 | | 567 | | 1,390 | |

Only 37 cases (stemming from 35 unique UOF incidents) were referred for formal discipline regarding incidents that occurred in 2024. Given there are 1,390 pending investigations as of June 2024 (and additional cases will occur in the second half of the year), the number of cases referred for discipline in 2024 is likely to increase. Given that 567 investigations remain pending for incidents that occurred in 2023, it is also possible that additional referrals for formal discipline for incidents that occurred in 2023 may occur as well. The concerns regarding the decrease in referrals for formal discipline, primarily the result of the ID Division, are discussed in the compliance assessment for Consent Judgment, § VII, Use of Force Investigations in this report. It nonetheless impacts Trials' case outcomes.

- Backlog of Pending Formal Disciplinary Cases

The Trials Division has taken significant steps to eliminate its backlog of cases over the last few years. At the end of 2021, the Trials Division had a backlog of almost 2,000 cases that were pending discipline. As a result, the Third Remedial Order (dkt. 424) required the Trials Division to close a group of 400 priority cases and then to systematically close the rest. To facilitate this effort, the Monitoring Team was required to identify and recommend steps that the City, DOC, and OATH should take to close the cases remaining in the backlog.

First, the Monitoring Team recommended that the Department close pending cases for all incidents that had occurred as of December 31, 2020 ("the 2020 backlog") by the end of 2022 (*see* the Monitor's June 30, 2022 Report (dkt. 467) at pgs. 35-37). At the time, the 2020 backlog included 1,100 cases. As of the end of the current Monitoring Period, all but 43 of these cases (99%) have been resolved. With the 2020 backlog essentially eliminated, the Monitoring Team recommended that the Department proceed to closing the backlog of cases with an incident date between January 1, 2021 and June 30, 2022 ("the 2021 backlog"). At the time, the 2021 backlog included 285 cases. As of the end of the current Monitoring Period, 258 of the 285 (91%) of the 2021 backlog cases have been resolved. The Department reports that the small number of cases that remain pending from both backlog periods generally involve MOS who are currently out on some type of leave or are pending criminal prosecution and so the cases cannot be adjudicated at this time.

The success in resolving the backlog of disciplinary cases and the very small number of cases referred for formal discipline in 2024 means that fewer cases were pending with the Trials Division at the close of the current Monitoring Period than the past few years. As shown in the table below, at the end of June 2024, the number of pending cases (n=240) was at its lowest level since December 2018.

| Disciplinary Use of Force Cases Pending *as of December 2023* | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| As of the last day of… | June 2018 (6th MP) | Dec. 2018 (7th MP) | June 2019 (8th MP) | Dec. 2019 (9th MP) | June 2020 (10th MP) | Dec. 2020 (11th MP) | June 2021 (12th MP) | Dec. 2021 (13th MP) | June 2022 (14th MP) | Dec. 2022 (15th MP) | Jun. 2023 (16th MP) | Dec. 2023 (17th MP) | June 2024 (18th MP) |
| Pending Cases | 146 | 172 | 407 | 633 | 1,050 | 1,445 | 1,917 | 1,911 | 1,129 | 409 | 435 | 337 | 240 |

While the number of cases pending for long periods of times has decreased because of the Department's success in reducing the backlog, 135 of the 240 pending cases (56%) have *incident dates* from more than a year ago (*i.e.,* June 2023 or earlier) and thus the opportunity for *timely* discipline has clearly been lost.

- Timeliness of Formal Discipline

The Department's ability to prosecute cases expeditiously has been of significant concern for many years and its slow rate of progress resulted in additional requirements in the First Remedial Order (dkt. 350), § C, ¶¶ 3-5), the Third Remedial Order (dkt. 424), and the Action Plan (dkt. 465), § F.

The time between the incident date and the date of case closure/pending "as of date" is shown in the table below.

| Time Between Incident Date and NPA Case Closure or Pending, as of June 30, 2024 | | | | | | |
|---|---|---|---|---|---|---|
| | Closed Cases (n=305) | | Pending Cases (n=240) | | Total (n=545) | |
| 0 to 1 year from incident date | 123 | 40% | 105 | 44% | 228 | 43% |
| 1 to 2 years from incident date | 172 | 56% | 81 | 34% | 253 | 46% |
| 2 to 3 years from incident date | 9 | 3% | 10 | 4% | 19 | 3% |
| More than 3 years from incident date | 1 | <1% | 44 | 18% | 45 | 8% |

Among the 305 cases closed via NPA during this Monitoring Period, 123 (40%) addressed misconduct that occurred within one year of case closure, 172 (56%) addressed misconduct that occurred between 1 and 2 years prior, 9 (3%) addressed misconduct that occurred 2 to 3 years prior, and 1 (<1%) addressed misconduct that occurred more than three years before the case was ultimately resolved. Eliminating the backlog means that cases are generally closed more quickly than they have been in the past; however, the delays in referring cases for formal discipline means that in most cases, formal discipline is still adjudicated long after the misconduct occurs.

- Time that Cases Have Been Pending with Trials

In order to fully assess the process for imposing discipline, the Monitoring Team must examine the processing time for cases that have been closed and for those that remain pending.

o   Case Closure

Collectively, a number of changes have significantly expedited the Trials Division's case-handling capabilities over the past few years. This section examines the time required to process a case once received by the Trials Division. The length of time to case closure—measured from the date that Trials receives the Memorandum of Complaint to the date that Trials completed the closing memorandum—continues to show improvement, as demonstrated in the chart below.

| Time from Referral to Trials to Complete Closing Memo<br>2017 to June 2023 | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2017 | | 2018[112] | | 2019[113] | | 2020 | | 2021 | | 2022 | | 2023 | | Jan to Jun.<br>2024 | |
| **Cases Closed** | 492 | | 521 | | 271 | | 387 | | 736 | | 2,052 | | 754 | | 383 | |
| 0 to 3 months | 68 | 14% | 282 | 54% | 62 | 23% | 75 | 19% | 40 | 5% | 158 | 8% | 217 | 29% | 153 | 40% |
| 3 to 6 months | 64 | 13% | 92 | 18% | 65 | 24% | 65 | 17% | 88 | 12% | 175 | 9% | 216 | 29% | 109 | 28% |
| 6 to 12 months | 124 | 25% | 54 | 10% | 89 | 33% | 121 | 31% | 210 | 29% | 400 | 19% | 174 | 23% | 92 | 24% |
| 1 to 2 years | 146 | 30% | 51 | 10% | 35 | 13% | 98 | 25% | 284 | 39% | 782 | 38% | 119 | 16% | 26 | 7% |
| 2 to 3 years | 70 | 14% | 10 | 2% | 5 | 2% | 14 | 4% | 81 | 11% | 370 | 18% | 18 | 2% | 0 | 0% |
| 3+ Years | 20 | 4% | 9 | 2% | 6 | 2% | 2 | 1% | 11 | 1% | 95 | 5% | 6 | 1% | 2 | 1% |
| Unknown | 0 | 0% | 23 | 4% | 9 | 3% | 12 | 3% | 22 | 3% | 72 | 4% | 4 | 1% | 1 | 0% |

In the first half of 2024, 68% of cases (n=262) were closed within six months of referral (the largest proportion since 2018), and another 24% (n=92) were closed between six months and one year of referral. In other words, approximately 92% of the cases closed during this Monitoring Period were closed within one year of referral. This is a significant improvement from 2021/2022 when case processing slowed considerably as a result of the backlog and subsequent workload for Trials' attorneys. During that time, less than 50% of cases closed by Trials were closed within a year of referral. Although this is much needed improvement, the overall timeliness to close cases from the date of referral remains too long.

o   Pending Cases

---

[112] Data for 2017 and 2018 was calculated between MOC received date and date closing memo signed.

[113] Data for 2019 and 2020 was calculated between date charges were served and date closing memo signed.

At the end of the current Monitoring Period, the number of pending cases (n=240) was the lowest since 2018, a particularly stark contrast to 2021 and 2022 when over 1,000 cases were pending. The efficiency of the Trials Division related to its pending cases is measured via the time elapsed since the services of charges. As shown in the table below, as of June 30 2024, only 48 cases were pending more than one year.

| Number of Cases Pending with Trials and Time Pending | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | July to Dec., 2019 | | Jan. to June, 2020 | | July to Dec., 2020 | | Jan. to June, 2021 | | July to Dec., 2021 | | Jan. to June, 2022 | | July to Dec., 2022 | | Jan. to June, 2023 | | July to Dec., 2023 | | Jan. to June, 2024 |
| | 9th MP | | 10th MP | | 11th MP | | 12th MP | | 13th MP | | 14th MP | | 15th MP | | 16th MP | | 17th MP | | 18th MP |
| Pending service of charges | 37 | 6% | 42 | 4% | 47 | 3% | 64 | 3% | 84 | 4% | 55 | 5% | 36 | 9% | 23 | 5% | 39 | 12% | 32 | 13% |
| Pending 120 days or less since service of charges | 186 | 28% | 373 | 36% | 325 | 22% | 420 | 22% | 217 | 11% | 137 | 12% | 124 | 30% | 214 | 49% | 135 | 40% | 67 | 28% |
| Pending 121 to 180 days since service of charges | 111 | 17% | 115 | 11% | 165 | 11% | 145 | 8% | 64 | 3% | 70 | 6% | 47 | 11% | 41 | 9% | 43 | 13% | 26 | 11% |
| Pending 181 to 365 days since service of charges | 202 | 30% | 278 | 26% | 467 | 32% | 511 | 27% | 501 | 26% | 182 | 16% | 77 | 19% | 64 | 15% | 62 | 18% | 44 | 18% |
| Pending 365 days or more since service of charges | 80 | 12% | 219 | 21% | 413 | 29% | 701 | 37% | 930 | 49% | 616 | 55% | 105 | 26% | 82 | 19% | 42 | 12% | 48 | 20% |
| Pending Final Approvals by DC of Trials and/or Commissioner | 30 | 5% | 9 | 1% | 15 | 1% | 66 | 3% | 109 | 6% | 66 | 6% | 10 | 2% | 0 | 0% | 10 | 3% | 18 | 8% |
| Pending with Law Enforcement | 17 | 3% | 14 | 1% | 13 | 1% | 10 | 1% | 6 | 0% | 3 | 0% | 10 | 2% | 11 | 3% | 6 | 2% | 5 | 2% |
| Total | 663 | | 1,050 | | 1,445 | | 1,917 | | 1,911 | | 1,129 | | 409 | | 435 | | 337 | | 240 |

- <u>Case Settlements and Trials</u>

The Monitoring Team encourages the Department to resolve cases directly with the staff member (and their counsel/representative) whenever possible, avoiding the need for proceedings before OATH (either a pre-trial conference or a trial). An impetus for settling a matter is to schedule a pre-trial conference, which can then be utilized if the matter does not settle beforehand. If the case does not settle during the pre-trial conference, OATH schedules a trial to adjudicate the matter. A detailed discussion about the work of OATH is included in the compliance assessment of the First Remedial Order (dkt. 350), § C ¶¶ 4 & 5, later in this section.

- <u>Case Dispositions in Formal Discipline Cases</u>

The table below shows the number and disposition of cases closed by the Department since 2017.

| Disciplinary Cases Closed, by Date of Case Closure | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Date of Formal Closure | 2017 | | 2018 | | 2019 | | 2020 | | 2021 | | 2022 | | 2023 | | Jan-Jun. 2024 | |
| Number Resolved | 497 | | 518 | | 267 | | 387 | | 585 | | 2,204 | | 756 | | 386 | |
| NPA | 395 | 79% | 484 | 93% | 218 | 82% | 327 | 84% | 460 | 79% | 1,808 | 82% | 624 | 83% | 305 | 79% |
| Adjudicated/Guilty at OATH | 4 | 1% | 3 | 1% | 0 | 0% | 3 | 1% | 16 | 3% | 41 | 2% | 23 | 3% | 0 | 0% |
| Administratively Filed | 77 | 15% | 22 | 4% | 34 | 13% | 33 | 9% | 33 | 6% | 148 | 7% | 74 | 10% | 74 | 19% |
| Deferred Prosecution | 21 | 4% | 7 | 1% | 13 | 5% | 20 | 5% | 75 | 13% | 203 | 9% | 32 | 4% | 7 | 2% |
| Not Guilty at OATH | 0 | 0% | 2 | 0% | 2 | 1% | 4 | 1% | 1 | 0% | 4 | 0% | 3 | 0% | 0 | 0% |

The number of cases resolved in 2022 (n=2,204) reflects an apex driven by Trials' work to resolve the backlog. During the subsequent three Monitoring Periods, similar (and smaller) numbers of cases were closed (345, 411, and 386, respectively; data not shown). In terms of case disposition, in 2024, 79% (n=305) of the 386 cases were resolved via NPA, which is comparable to historical levels. While the proportion of cases closed due to deferred prosecution has decreased, the proportion of cases administratively filed increased to 19% during this Monitoring Period and is discussed in more detail below.

- Type of Penalties Imposed via Formal Discipline

The Trials Division needs a range of disciplinary measures to address varying levels of misconduct appropriately and to ensure escalating consequences for repeated violations by individual staff members. As shown in the table below, the Trials Division imposes a broad spectrum of sanctions, including Command Disciplines (which can remove up to 10 compensatory days), compensatory day penalties of various durations, and termination.

| Penalty Imposed for UOF Related Misconduct NPAs | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Date of Formal Closure | 2017 | | 2018 | | 2019 | | 2020 | | 2021 | | 2022 | | 2023 | | Jan to June 2024 | |
| Total | 395 | | 484 | | 218 | | 327 | | 460 | | 1,808 | | 624 | | 305 | |
| Refer for Command Discipline[114] | 71 | 18% | 67 | 14% | 3 | 1% | 1 | >1% | 0 | 0% | 11 | 1% | 0 | 0% | 0 | 0% |
| Reprimand | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 7 | 1% | 77 | 4% | 69 | 11% | 21 | 7% |
| 1-5 days | 31 | 8% | 147 | 30% | 52 | 24% | 80 | 24% | 69 | 14% | 462 | 26% | 156 | 25% | 101 | 33% |
| 6-9 days | 14 | 4% | 19 | 4% | 6 | 3% | 14 | 4% | 29 | 6% | 163 | 9% | 88 | 14% | 63 | 21% |
| 10-19 days | 62 | 16% | 100 | 21% | 56 | 26% | 83 | 25% | 110 | 24% | 447 | 25% | 147 | 24% | 74 | 24% |
| 20-29 days | 74 | 19% | 58 | 12% | 42 | 19% | 46 | 14% | 64 | 15% | 157 | 9% | 51 | 8% | 21 | 7% |
| 30-39 days | 42 | 11% | 42 | 9% | 21 | 10% | 32 | 10% | 43 | 10% | 170 | 9% | 51 | 8% | 11 | 4% |
| 40-49 days | 27 | 7% | 30 | 6% | 3 | 1% | 17 | 5% | 54 | 11% | 96 | 5% | 20 | 3% | 4 | 1% |
| 50-59 days | 14 | 4% | 4 | 1% | 17 | 8% | 17 | 5% | 18 | 4% | 80 | 4% | 14 | 2% | 2 | 1% |
| 60 days + | 48 | 12% | 12 | 2% | 11 | 5% | 28 | 9% | 43 | 9% | 118 | 7% | 27 | 4% | 4 | 1% |
| Demotion | | | | | | | | | | | 6 | 0% | 0 | 0% | 0 | 0% |
| Retirement/Resignation | 12 | 3% | 5 | 1% | 7 | 3% | 9 | 3% | 23 | 6% | 22 | 1% | 1 | 0% | 4 | 1% |
| Termination (Guilty at OATH or PDR) | 0 | | 1 | | 0 | | 0 | | 5 | | 10 | | 12 | | 0 | |

Over the past seven years, the proportion of penalties exceeding 30 days fluctuated between 17% and 34%. During the current Monitoring Period, a larger proportion of NPAs imposed penalties at the lower end of the spectrum (less than 30 days), with fewer penalties at the higher end (more than 30 days). Notably, only 8% of penalties exceeded 30 days, lower than in previous years. Meanwhile, 85% of penalties were for durations between 1 and 30 days, the appropriateness of which depends on the severity of the underlying misconduct. This is discussed in the next section which examines the alignment between case outcomes and the disciplinary guidelines.

With respect to termination, in 2022 and 2023, more staff were terminated for use of force related misconduct than in years prior (*i.e.*, 10 and 12, compared to 0-5). In part, this may be related to the resolution of a larger number of trial cases at OATH in 2022-2023 in which

---

[114] As discussed in the Monitor's April 18, 2019 Report (dkt. 327) at pgs. 42-44, NPAs referred for CDs were previously adjudicated at the facilities after being referred from the Trials Division, a process which was rife with implementation issues. This problem has been corrected and now the Trials Division will negotiate a specific number of days (one to five) to be imposed, and those specific days will be treated as a CD, rather than an NPA (the main difference is the case remains on the staff member's record for one year instead of five years).

termination was recommended. No staff were terminated via NPA during the first six months of 2024.

The use of lower-level sanctions first began in 2021 as part of a larger effort to encourage settlements and reduce the backlog. The Department offered specific incentives, such as resolving cases with provisions to either (a) expunge cases from an individual's record after one year or (b) treat the resolution as a Command Discipline ("CD"), allowing the case to be removed from the individual's record after one year. Once the backlog was resolved, the Monitoring Team recommended curtailing the use of "expungement." The table below presents data on the use of expungement or a Command Discipline.

| Cases Resolved via NPA with Provisions for Expungement or CD | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Closure Date** | **2018** | | **2019** | | **2020** | | **2021** | | **2022** | | **2023** | | **Jan to June 2024** | |
| **Total NPAs** | **484** | | **218** | | **327** | | **460** | | **1808** | | **624** | | **305** | |
| NPAs with CD Provision | 187 | *39%* | 45 | *21%* | 76 | *23%* | 74 | *16%* | 535 | *30%* | 253 | *41%* | 160 | *52%* |
| NPAs with Expungement | ~ | ~ | ~ | ~ | 36 | *11%* | 96 | *21%* | 420 | *23%* | 55 | *9%* | 22 | *7%* |
| **NPAs with Either CD or Expungement** | **187** | ***39%*** | **45** | ***21%*** | **112** | ***34%*** | **170** | ***37%*** | **955** | ***53%*** | **308** | ***49%*** | **182** | ***60%*** |

During this Monitoring Period, more than half of all NPAs were settled with either a CD or expungement (n=182, 60%). The Trials Division reported that most cases that were settled with a CD were cases that were initiated as a CD, but the staff member refused the CD thus requiring a Memorandum of Complaint ("MOC") to be issued. The Department ultimately resolved the case with a CD. The historical poor management of CDs by the facilities discussed earlier in this section appears to drive this protracted process and reflects yet another reason that the procedures related to CDs must be improved. Settling an NPA with a CD may be appropriate in some cases, but a thorough examination of the reasons for continuing this convention would be useful to inform reasonable steps forward. The Monitoring Team will continue to scrutinize this issue.

- <u>Alignment with Disciplinary Guidelines</u>

When evaluating the Department's overall efforts to impose appropriate discipline and to determine whether those actions are consistent with the Disciplinary Guidelines, the Monitoring Team considers: (1) the time taken to impose discipline, (2) the specific facts of the case

(including the aggravating and mitigating factors, the staff's prior history, and other circumstances as appropriate), and (3) the proportionality of the sanctions imposed.

During this Monitoring Period, the Monitoring Team reviewed 167 cases where discipline was imposed after October 27, 2017[115] (when the revised Disciplinary Guidelines went into effect), to assess whether the actions taken were reasonable and aligned with the Disciplinary Guidelines. Overall, case outcomes are mixed. While the outcomes of some cases appeared reasonable (even with the lower sanctions imposed), in other cases the outcomes appeared to be questionable or unreasonable. In at least some cases, it appeared that the use of lower-level sanctions may not have been aligned with the Disciplinary Guidelines. The Monitoring Team will continue to closely monitor both the type and timeliness of imposed discipline, which are essential to maintaining the disciplinary system's integrity, and to ensuring safety in facilities, fairness to staff, and compliance with the Consent Judgment.

- <u>Cases in which Formal Discipline was Not Imposed</u>

At times, cases referred for discipline do not ultimately result in a sanction being imposed either because the staff member resigns or retires before the prosecution is complete or because the charges are dismissed.

- *Deferred Prosecution*: These are cases in which the staff member chose to leave the Department *with charges pending* and before the case was resolved. Such cases are categorized as "deferred prosecution" because no final determination has been rendered but the facts suggest the case should not be dismissed. The proportion of cases disposed in this way increased in 2021 and 2022 (13% and 9%, respectively). In 2023, 4% of cases (n=32) were resolved via deferred prosecution and during the current Monitoring Period, 2% of cases (n=7) were resolved in this way. The prosecution of these cases will proceed if the staff member returns to the Department.

- *Administratively Filed Cases*: Administrative filings occur when the Trials Division determines that the charges cannot be substantiated or pursued (*e.g.*, when the potential misconduct could not be proven by a preponderance of the evidence, or when a staff member resigns before charges are served).[116] In other words, these cases are dismissed. During the current Monitoring Period, 74 cases were closed via administrative filing, which is 19% of all cases closed. Given the steady increase in the number of cases administratively filed over time, these cases merit closer scrutiny.

---

[115] Two cases closed in this Monitoring Period in which the incident date occurred before October 27, 2017. These two cases were not part of the assessment.

[116] Administrative filing is not only determined by the Department and Trials Division but can also be an outcome as result of the input from Administrative Law Judges at OATH. I

This is a time-consuming assessment and is still ongoing. However, preliminary results suggest that the dismissal of at least some cases appeared to be reasonable under the circumstances. The Monitoring Team will continue its analysis to identify any problematic patterns or practices regarding case dismissals and will provide recommendations for managing cases going forward to mitigate the possibility of inappropriate case dismissal.

- *Appeals*: Another way that cases ultimately close without discipline (or with a penalty that varies from that imposed by the Commissioner) is via an appeal. A disciplinary decision made by the Commissioner is appealable to the Civil Service Commission,[117] (which is authorized to make the final disciplinary decision[118]) or as an Article 78 proceeding[119]. Between January and October 2024, the Civil Service Commission issued five decisions (one for use of force related misconduct, and four for other types of misconduct) and in each case, the Civil Service Commission affirmed the Department's penalty of termination. This is a welcome change given the concerns the Monitoring Team raised about two decisions by the Civil Service Commission in 2023 that modified the disciplinary sanction imposed by the Department.[120]

- **Overall Status of Formal Discipline**

During the current Monitoring Period, the number of cases referred for formal discipline decreased substantially to only a small fraction of the number of cases referred in prior years. This is the result of problems within ID as discussed in the compliance assessment for Consent Judgment, § VII, Use of Force Investigations in this report. Once cases arrive at Trials, however,

---

[117] Pursuant to Section 813 of the New York City Charter, the Civil Service Commission can decide appeals from permanent civil servants who were subject to disciplinary penalties following proceedings held pursuant to section 75 of the Civil Service Law.

[118] The Civil Service Commission opinion notes "[t]his decision constitutes the final decision of the City of New York."

[119] According to § 3-01 to 3-04 of Title 60 of the Rules of the City of New York, any civil service employee who receives a determination of guilty and/or a penalty can appeal to the Civil Service Commissioner within 20 days of the date of notice of the final disciplinary action. After receiving notice of a timely appeal, the Department has 30 days to submit the complete record of the disciplinary proceedings. The Civil Service Commission then reviews the record of the disciplinary proceeding, allows the parties to submit further written arguments, and may schedule a hearing before issuing a final decision. The Civil Service Commission then issues a written decision to affirm, modify, or reverse the determination being appealed. The Civil Service Commission may, at its discretion, direct the reinstatement of the employee or permit transfer to a vacancy in a similar position in another division or department, or direct that the employee's name be placed on a preferred list.

[120] *See* the Monitor's April 18, 2024 Report (dkt. 706) at pgs. 129-130.

they are being processed timelier than they had in the past, with 92% of cases resolved within a year of referral to the Trials Division. The Trials Division currently has the smallest number of pending cases since 2018. That said, a substantial portion of cases remain unresolved a year *after the incident occurred*, wherein the objective of *timely* discipline has been lost. Most of the outcomes for cases closed are aligned with the Disciplinary Guidelines. The Department needs to reconsider whether the continued use of the CD Provision/Expungement (which was applied to 60% of the NPAs in this Monitoring Period) remains appropriate now that the backlog has been resolved.

## **Conclusion**

Establishing an effective accountability system for staff misconduct requires evaluating the interaction among its three critical subparts— (1) consistently identifying misconduct, (2) promptly applying corrective action, and (3) imposing meaningful and proportionate sanctions. The need to address these components together stems from their collective impact on staff practices, the Department's culture, and, consequently, on overall security and safety within the facilities. Each provision addresses different aspects of the disciplinary process, yet their collective aim is to ensure a robust and effective system of accountability.

The discussion throughout this section and the compliance ratings below represent a systemic analysis, which acknowledges that deficiencies in one area can undermine the effectiveness of the whole system. This approach underscores the necessity of both an in-depth look at all related parts and a holistic view to address challenges comprehensively in order to establish a practical and effective accountability framework. Thus, in order to establish a sustainable, consistent, and robust accountability system—integral to enhancing security and safety, and elevating staff conduct in alignment with the *Nunez* Court Orders—the Department must ensure all components of the disciplinary process are implemented reliably and consistently monitored.

*Consent Judgment, § VIII, ¶ 1:* The Department has long struggled to achieve compliance with this provision. Much of the backlog has been eliminated, but the Department remains unable to promptly impose meaningful discipline for new cases. The Department's inability to reliably identify misconduct (and therefore failure to hold staff accountable for use of force related violations), failure to hold supervisors accountable, ongoing challenges to adequately manage Command Disciplines, and the fact that some discipline is out of proportion to the severity of the staff's misconduct means that the Department remains in Non-Compliance with this provision.

*First Remedial Order, § C, ¶ 1:* While the Department does impose some corrective action immediately after an incident, the failure to consistently identify all incidents that merit immediate action means that the Department does not reliably impose immediate corrective

action. Additionally, the corrective action imposed does not appear to be proportional to the misconduct identified. The Department is therefore in Partial Compliance with this provision.

_Consent Judgment, § VIII, ¶ 3 (c):_ The amount of time that cases are pending with the Trials Division has decreased significantly and those closed cases are closed closer in time to when they are referred to the Trials Division. However, additional work remains in order for the Trials Division to efficiently manage all cases and ensure that the disposition imposed is proportional to the misconduct charged. The Department is, therefore, in Partial Compliance with this provision.

| **COMPLIANCE RATING** | **Consent Judgment § VIII., ¶ 1.** Non-Compliance |
| | **First Remedial Order, § C., ¶ 1.** Partial Compliance |
| | **Consent Judgment § VIII., ¶ 3(c)**<br>• Substantial Compliance (Charges per the 12th Monitor's Report)<br>• Not Rated (Administrative Filing)<br>• Partial Compliance (Expeditiously Prosecuting Cases) |

| FIRST REMEDIAL ORDER § C. (TIMELY, APPROPRIATE, AND MEANINGFUL STAFF ACCOUNTABILITY), ¶ 2 (MONITOR RECOMMENDATIONS) |
|---|

§ C., ¶ 2. *Responding to Monitor Recommendations.* Upon identification of objective evidence that a Staff Member violated the New Use of Force Directive, the Monitor may recommend that the Department take immediate corrective action, expeditiously complete the investigation, and/or otherwise address the violation by expeditiously pursuing disciplinary proceedings or other appropriate action. Within ten business days of receiving the Monitor's recommendation, absent extraordinary circumstances that must be documented, the Department shall: (i) impose immediate corrective action (if recommended), and/or (ii) provide the Monitoring Team with an expedited timeline for completing the investigation or otherwise addressing the violation (if recommended), unless the Commissioner (or a designated Assistant Commissioner) reviews the basis for the Monitor's recommendation and determines that adopting the recommendation is not appropriate, and provides a reasonable basis for any such determination in writing to the Monitor.

The First Remedial Order (dkt. 350), § C, ¶ 2, requires the Department to respond within 10 business days to any recommendations from the Monitor to take immediate corrective action, expeditiously complete the investigation, and/or otherwise address the violation by expeditiously pursuing disciplinary proceedings or other appropriate action. The Action Plan (dkt. 465), § F, ¶ 2, introduced an additional requirement for the Department to expedite egregious cases on specific timelines to ensure those cases are closed as quickly as possible. Given these two requirements are inextricably linked, they are addressed together herein.

As part of this process, the Monitoring Team also submits feedback to the Department regarding certain investigations in which it appears that the objective evidence was not adequately investigated or analyzed and recommends that additional review may be necessary or appropriate. This is not intended to serve as a comprehensive review of all investigations by the Monitoring Team, but an attempt to mitigate the possibility that certain misconduct may not be addressed due to an insufficient investigation. Further detail about these recommendations is provided in this report in the compliance assessment for Consent Judgment, § VII, ¶ 1, Use of Force Investigations.

### Monitor Recommendations for Immediate Action, etc. (First Remedial Order § C, ¶ 2)

The use of immediate action is a critical tool to quickly address staff misconduct to provide effective accountability and to deter problematic conduct going forward. The prevalence of cases in which immediate action can and must be taken is a reflection of the endemic harmful staff practices related to the use of force even if the frequency with which the Department actually takes immediate action following a use of force incident has fluctuated over the years. In 2022, the Department elected to limit its use of suspensions and instead preferred utilizing Memorandums of Complaint ("MOC") (*See* Monitor's April 3, 2023 Report (dkt. 517) at pg. 180). Following feedback from the Monitoring Team, the use of suspensions increased significantly in 2023. In 2023, 136 staff were suspended for use of force violations, which is over double the number of staff suspended in 2022 (n=66). However, in January-June 2024, only 29 staff were suspended for use of force violations, which is similar to the number of suspensions enacted in 2022. The decrease in use of force suspensions is described in more

detail in this report in the compliance assessment for Consent Judgment, § VIII, ¶ 1 Staff Discipline & Accountability.

The Monitoring Team is judicious in the recommendations that it makes to the Department with regard to immediate action cases and only identifies those cases where immediate action should be considered, *and* the incident is not yet stale for *immediate* action to be taken. Given the Monitoring Team's role, it is not often in a position to have contemporaneous information, and so there are inherent limitations on the scope of misconduct the Monitoring Team may identify and recommend for consideration of *immediate* action. For instance, if the Monitoring Team identifies an incident that warranted immediate corrective action (and none was taken), but the incident occurred many months prior, a recommendation for immediate action (referred to as a C2 recommendation) is not shared because the appropriate window of opportunity for immediate action has passed. The Monitoring Team's overall goal is to mitigate lost opportunities for immediate action, but this approach is not failsafe. The C2 recommendations shared by the Monitor are only a *subset* of cases in which the Department failed to take immediate corrective action and likely should have.

Between January and June 2024 (the 18th Monitoring Period), the Monitoring Team sent recommendations to expedite investigations into one use of force incident and take immediate corrective action for 10 DOC staff and one Correctional Health Services ("CHS") staff covering nine use of force incidents pursuant to § C, ¶ 2 of the First Remedial Order (dkt. 350).[121]

- The Department took (or attempted to take) corrective action with four DOC staff and one CHS staff.

    - For two staff involved in two use of force incidents, the Department imposed immediate corrective action in light of the Monitoring Team's recommendation (two suspensions).

    - For one staff member in one use of force incident, the Department attempted to impose a Personnel Determination Review ("PDR") as a form of immediate corrective action in light of the Monitoring Team's recommendation, but the officer resigned before the PDR was finalized.

    - For one staff member in one use of force incident, the Department had already completed a Command Discipline before the Monitoring Team had sent its recommendation for immediate corrective action. The incident was referred for an

---

[121] With respect to recommendations to expedite the completion of investigations pursuant to the First Remedial Order (dkt. 350), § C, ¶ 2, as noted in the Monitor's October 28, 2022 Report (dkt. 472) at pg. 162, were not a fruitful avenue to ensuring those cases were addressed quickly. The Monitoring Team therefore now recommends expedited resolution of cases pursuant to the Action Plan (dkt. 465), **§ F, ¶ 2** (the "F2" process) for cases that merit expedited completion of investigations or discipline and investigations.

expeditious full Investigation Division ("ID") investigation, which is still pending as of September 16, 2024.

o   For the one use of force incident in which the Monitoring Team recommended immediate corrective action for a CHS staff member, immediate corrective action was taken, and the staff member was transferred to an administrative position in a different facility. DOC is also conducting a full ID investigation into this incident as well.

- For six staff involved in four use of force incidents, the Department concluded no immediate corrective action was feasible because the Monitoring Team notified ID too many months after the incidents occurred, so the incidents were referred for expeditious full ID investigations. As of September 16, 2024, the full ID investigations for all four cases are still pending even though the incidents occurred in October 2023, December 2023, and January 2024, reflecting the ongoing delays in completing full ID investigations discussed in further detail in this report in the compliance assessment for Consent Judgment, § VII, ¶ 1, Use of Force Investigations.

- For one use of force incident, the Monitoring Team did not recommend any immediate corrective action for any specific staff, but did recommend that a full ID investigation be expedited. The Department reported that it would open a full ID investigation and assign it to ID's Use of Force Priority squad. As of September 16, 2024, the full ID investigation is still pending even though the incident occurred in February 2024.

DOC's response to the C2 recommendations is mixed. For three DOC and one CHS staff, the C2 recommendation directly led to immediate action or the resignation of the staff member. For one staff member, the Department had already taken action by imposing a CD on the staff member shortly before the C2 recommendation had been made. However, for the other six staff members, too much time had lapsed to impose immediate corrective action, and the investigations are now protracted.  This reinforces the need for DOC to improve its own internal capacity to identify cases in which immediate action is necessary as this back-stop process has limitations given the inherent delays in the Monitoring Team's ability to obtain information and investigations.

**Expeditious Resolution of Egregious Misconduct (Action Plan § F, ¶ 2)**

The Action Plan (dkt. 465), § F, ¶ 2 ("F2") sets aggressive timelines for the investigation and prosecution of egregious cases. As discussed above, given the limitations on the Monitoring Team's ability to recommend immediate action, the Monitoring Team has focused on making more recommendations related to F2. This requirement went into effect in mid-June 2022. Pursuant to the Action Plan, a case identified as needing to be resolved in an expedited manner must be resolved as follows:

- *Investigations*: The investigation(s) of the matter must be completed within 30 business days of identification.

- *Referral for Discipline*: The case must be processed for discipline — including completion of the MOC, referred to the Trials Division, charges served on the Respondent, discovery produced to the Respondent, an offer for resolution must be provided to the Respondent, the case filing with OATH, and a pre-trial conference must be scheduled within 20 business days of the closure of the investigation.

- *Adjudication of Discipline*: Any and all disciplinary proceedings, including, but not limited to, convening a pre-trial conference, conducting a trial before OATH, and submission of a Report and Recommendation from the OATH Administrative Law Judge ("ALJ") must be completed within 35 business days of the case being filed with OATH.

- *Imposition of Discipline*: The Commissioner must impose the final disciplinary action within 15 business days of receiving the Report and Recommendation from OATH.

Between mid-June 2022 and mid-September 2024, a total of 85 cases have been identified for expedited processing as outlined above. These 85 cases cover the conduct of 79 unique staff members, involved in 73 unique use of force incidents. The Monitoring Team identified 30 of the 85 cases and the Department identified the other 55 cases. From January through mid-September 2024, a total of 25 cases have been identified for expedited processing. These 25 cases cover the conduct of 24 unique staff members, involved in 21 use of force incidents. The Monitoring Team identified seven of the 25 cases and the Department identified the other 18 cases.

In most cases, ID closed their investigation within the prescribed timeframes, but since July 2023, ID has been taking longer than 30 business days to complete their investigation for many of the F2 cases. Out of the 35 cases identified as F2 cases from July 2023-September 17, 2024, 23 (66%) of the investigations took longer than 30 business days to complete. This increase in the time to complete investigations for F2 cases coincides with the overall increase in ID's timing to complete investigations during this same period as discussed in further detail in this report in the compliance assessment for Consent Judgment, § VII, ¶ 1, Use of Force Investigations.

With respect to the imposition of discipline, the status of the 85 cases as of September 17, 2024, is:

- 60 cases were closed with a Negotiated Plea Agreement ("NPA"):

  - Discipline ranged from the very low end (relinquishment of six compensatory days) to the highest end (*e.g.* 93 suspension days; relinquishment of 60 compensatory days, plus two-year's probation; demotion; or irrevocable retirement). Most (38 out of 51) NPAs included suspensions or 30 or more compensatory days. Overall, the discipline imposed

in these cases was generally reasonable. While some of the outcomes were questionable, the fact that the case was resolved closer in time to the incident ensures that the discipline is more meaningful. Further, the NPAs on the lower end of the disciplinary range were for staff who while involved in a serious incident but were not the primary actor and so the resolution is not inherently unreasonable.

- o 35 of these 60 NPAs were finalized within two months of identification as an F2 case. This marks significant improvement over the average time to address identified misconduct prior to the F2 process being in place, though there has recently been an increase in the number of cases that took longer than two months to finalize. 25 of the 60 NPAs were finalized over two months after identification as F2 cases. 19 of these 25 cases were identified as F2 cases after July 2023, when ID began taking longer than 30 business days to complete investigations, and 15 of these 19 cases took longer than two months to close because ID took over 30 business days to complete the investigation.

- • Four Cases were resolved following a trial at OATH:

  - o In two cases, two staff members were terminated following an OATH trial and subsequent Report & Recommendation from the OATH ALJ finding guilt and recommending termination.

  - o One case was rendered moot as OATH recommended the individual for termination in a separate case that was tried prior to the identification of the F2 case (the staff member was subsequently terminated).

  - o In a fourth case, an OATH ALJ found guilt and recommended termination in a Report & Recommendation following an OATH trial. The determination of the final penalty is still pending with DOC.

- • Four cases where the individuals resigned prior to the finalization of an NPA.

- • Four cases were Administratively Filed.[122]

  - o In one case, the Trials Division ultimately determined that charges could not be sustained. While there was evidence of mitigation that suggested a significant penalty was not warranted, there was objective evidence that the staff member violated policy, so the fact that the case closed without any corrective action is questionable. While such cases are cause for concern, this case appears to be an outlier.

---

[122] *See* the Monitor's April 3, 2023 Report (dkt. 517) at pg. 197 for more information about the first administratively filed F2 case, the Monitor's December 22, 2023 Report (dkt. 666) at pg. 70 for more information about the second administratively filed F2 case, and the Monitor's April 18, 2024 Report (dkt. 706) at pg. 135 for more information about the third administratively filed case.

- Three cases (for three staff members) are on hold pending stand-down orders from Department of Investigation ("DOI") to allow DOI to complete its own investigation into the incident.

Overall, the F2 process has been proven to be an effective tool in addressing certain egregious cases more expeditiously than they would otherwise. However, the delay in ID's completion of these investigations must be addressed as it is increasing the time it takes to pursue formal discipline in these cases, which reduces the efficacy of this process as a means to impose close-in-time discipline and circumvent the protracted processing times that currently characterize most disciplinary matters in the Department. Although most F2 cases are resolved with generally reasonable outcomes, there are a few examples in which the discipline imposed (or lack thereof) does not appear consistent with the disciplinary guidelines and so we recommend greater vigilance in ensuring accountability.

It must also be emphasized that the fact that so many cases of staff misconduct merit expeditious resolution through the F2 process is another indicator that harmful staff practices continue to be endemic in this Department.

## Conclusion

The impact of these two provisions is mixed. The requirements with respect to § C, ¶ 2 of the First Remedial Order (dkt. 350) has been a backstop to missing a small number of cases requiring immediate action but is not a failsafe and cases meriting immediate action continue to go unaddressed. As for Action Plan (dkt. 465), § F, ¶ 2, this process requires ongoing management to ensure it works as designed. It is important that the Department has self-identified cases for expedited treatment and is not relying exclusively on the Monitoring Team, but the Department must also ensure that ID, the Trials Division, and the facilities are internally communicating and coordinating to ensure that misconduct is not only appropriately identified, but timely investigated and properly addressed through close-in-time, adequate discipline.

| COMPLIANCE RATING | First Remedial Order § C, ¶ 2. Partial Compliance |
|---|---|

> **FIRST REMEDIAL ORDER § C. 4/THIRD REMEDIAL, ¶ 2 (EXPEDITIOUS OATH PROCEEDINGS) & FIRST REMEDIAL ORDER § C. (APPLICABILITY OF DISCIPLINARY GUIDELINES TO OATH PROCEEDINGS), ¶ 5**
>
> Third Remedial Order ¶ 2. *Increased Number of OATH Pre-Trial Conferences*. Paragraph C.4 of the First Remedial Order shall be modified to increase the minimum number of pre-trial conferences that OATH must conduct each month for disciplinary cases involving charges related to UOF Violations. Specifically, as of December 15, 2021, Paragraph C.4 shall be revised to read as follows: "All disciplinary cases before OATH involving charges related to UOF Violations shall proceed in an expeditious manner. During each month, Defendants shall hold pre-trial conferences before OATH for at least **150** disciplinary cases involving charges related to UOF Violations, absent extraordinary circumstances that must be documented. If there continues to be delays in conferencing cases despite this calendaring practice, OATH will assign additional resources to hear these cases. The minimum number of case conferences required to be held each month under this Paragraph may be reduced if the Monitor makes a written determination, no earlier than one year after the date of this Order, that disciplinary cases involving UOF Violations can continue to proceed expeditiously with a lower number of conferences being held each month."[123]
>
> § C., ¶ 5. *Applicability of Disciplinary Guidelines to OATH Proceedings.* The Disciplinary Guidelines developed pursuant to Section VIII, ¶ 2 of the Consent Judgment shall apply to any OATH proceeding relating to the Department's efforts to impose discipline for UOF Violations.
>
> Third Remedial Order ¶ 3. *New OATH Procedures and Protocols.* Within 45 days of the date of this Order, the City, in consultation with the Monitor, shall develop, adopt, and implement a written plan to allow OATH to more expeditiously prosecute disciplinary cases involving charges related to UOF Violations. The plan shall include the following:
>
> > i.   The steps OATH will take to increase the number ALJs and other staff who will be available to hear Department disciplinary cases, including the number of new ALJs and staff that OATH intends to hire by December 31, 2021.
> >
> > ii.  Improved procedures to ensure that OATH trials are promptly scheduled and completed without unnecessary delays, including scheduling trials within no more than three months of the initial pre-trial conference.
> >
> > iii. The initiatives and procedures that ALJs will employ to encourage prompt agreed-upon resolutions of disciplinary cases when appropriate.

The Office of Administrative Trials and Hearings ("OATH"), an administrative law court, adjudicates any contested discipline for tenured staff, pursuant to New York State Civil Service Laws § 75. OATH is a City agency, but it is separate and independent from the Department of Correction ("DOC"). Addressing the various requirements of the *Nunez* Court Orders related to accountability inherently requires that OATH practices be considered given their role in the formal disciplinary process. To date, compliance with requirements to effectively hold staff accountable has been elusive. The Monitoring Team has long reported on OATH's involvement in the staff disciplinary process, in particular, concerns related to OATH's practices that impact the ability to impose meaningful and adequate discipline as required by Consent Judgment, §

---

[123] The Action Plan (dkt. 465) requires a compliance assessment with First Remedial Order (dkt. 350), § C, ¶ 4, Timely, Appropriate, and Meaningful Staff Accountability. However, this provision was modified by the Third Remedial Order, ¶ 2 so a compliance rating with Third Remedial Order, ¶ 2 is provided instead.

VIII, ¶ 1 and other provisions of the *Nunez* Court Orders.[124] As a result, the First Remedial Order, Third Remedial Order, and the Action Plan include specific requirements for OATH's practices, including requirements to increase the number of pre-trial conferences, improve efficiency, and to properly apply the Disciplinary Guidelines.

**OATH's Role in DOC's Disciplinary Process**

When the Department is unable to settle a disciplinary matter directly with a staff member, the Commissioner delegates responsibility to adjudicate the matter to the Office of Administrative Trials and Hearings ("OATH"). In these cases, an Administrative Law Judge ("ALJ") conducts a pre-trial conference in an attempt to facilitate a settlement. If a settlement still cannot be reached, a trial is scheduled before a different ALJ than the one who conducted the pre-trial conference. The trial ALJ assesses the evidence to evaluate whether or not the staff member has violated DOC policy. The ALJ then issues a written decision (a Report & Recommendation, or "R&R") with a *recommended* outcome and if the ALJ determines the staff member violated policy, a proposed penalty. The permissible range of penalties is set by law and includes a reprimand, a fine of up to $100, a suspension without pay for up to 60 days, demotion in title, or termination. Accordingly, most of the discipline imposed by DOC (either through settlement or following a trial) is within this same range of penalties. The DOC Commissioner has the authority to accept the ALJ's factual findings and recommended penalty or to modify them, as appropriate, in order to resolve the case. The DOC Commissioner's determination (and imposition of discipline as warranted) is subject to appeal to the Civil Service Commission or as an Article 78 proceeding.[125]

While OATH is a separate and independent agency from DOC, OATH *is* an agency of the City of New York. The Consent Judgment was entered against the *entire* City of New York and therefore the provisions of the *Nunez* Court Orders apply to OATH, and the agencies must work

---

[124] The Monitoring Team's concerns regarding issues with the OATH process have been documented for several years. *See* Monitor's April 3, 2017 Report (dkt. 295) at pgs. 179-180 and 184-188; Monitor's October 17, 2018 Report (dkt. 317) at pgs. 126-128; Monitor's April 18, 2019 Report (dkt. 327) at pgs. 151-159 and Appendix C; Monitor's October 28, 2019 Report (dkt. 332) at pgs. 183-184 and 186-195; Monitor's May 29, 2020 Report (dkt. 341) at pgs. 206-208; Monitor's October 23, 2020 Report (dkt. 360) at pgs. 66-68 and 175-181; Monitor's December 8, 2020 Report (dkt. 365) at pgs. 5-9; Monitor's May 11, 2021 Report (dkt. 368) at pgs. 99-103, 245-250, and 251-257; Monitor's June 3, 2021 Report (dkt. 373) at pgs. 6-16 and Appendix A; Monitor's December 6, 2021 Report (dkt. 431) at pgs. 96-101 and 113-115; Monitor's December 22, 2021 Report (dkt. 435) at pgs. 4-12; Monitor's June 30, 2022 Report (dkt. 467) at pgs. 31-39; Monitor's October 28, 2022 Report (dkt. 472) at pgs. 94-98 and 162-166; Monitor's April 3, 2023 Report (dkt. 517) at pgs. 189-193; Monitor's July 10, 2023 Report (dkt. 557) at pgs. 135, 139-140, and 230; Monitor's December 22, 2023 Report (dkt. 666) at pgs. 59, 71-75, and Appendix C; and the Monitor's April 18, 2024 Report (dkt. 706) at pgs. 109, 124-125, 137-142.

[125] Appeals to the Civil Service Commission and Article 78 appeals are discussed in more detail in this report in the compliance assessment for Consent Judgment, § VIII, Staff Discipline & Accountability.

in concert to achieve compliance with requirements related to staff discipline.[126] OATH is an intrinsic component of DOC's disciplinary process. DOC's Commissioner *delegates* the adjudication of discipline for tenured staff to OATH as the "deputy or other person" to hear disciplinary matters for DOC, and OATH stands in lieu of the DOC Commissioner with the same powers and constraints.

The fact that OATH and DOC are independent agencies does not mean that they cannot or should not work together collaboratively and efficiently. Quite the opposite. Candid and cooperative discourse between OATH and DOC is required, not only to function effectively, but also to fulfill the requirements of the *Nunez* Court Orders. Such collaboration does not impede OATH's neutrality or independence. The Monitoring Team has generally found that OATH resists collaborating and communicating with DOC. Until recently, collaborative discussions to resolve procedural problems occurred sporadically, at best.[127] OATH leadership has suggested its independence and neutrality are compromised by engaging in collaboration with DOC, which is illogical.[128] The work of the Monitoring Team has demonstrated that not only can collaboration occur, but it actually accelerates and supports the reform effort, while both neutrality and independence remain.

## OATH Internal Operating Procedures and Guidelines

OATH manages cases involving Department staff members via its "DOC Unit," which was created in December 2021, following the Third Remedial Order. The unit generally consists of five ALJs—a DOC Unit Coordinator[129] who, until recently, was consistently assigned, and

---

[126] The Corporation Counsel issued a legal opinion on August 7, 2020 in which the Corporation Counsel advised OATH that: "[t]he Nunez consent judgment was entered against the entire City of New York, not just the DOC. *See* New York City Charter Section 396. OATH, while permitted to exercise independent judgment on a case-by-case basis as to findings of fact and recommended penalties is an agency of the City of New York and therefore is part of the 'City of New York' as described in that judgment. *See* New York City Charter Section 1048. Thus, the provisions of the Nunez consent judgment do, in fact, apply to OATH although, [. . . ], great care has been taken by the Court to preserve OATH's independence."

[127] The Monitoring Team is aware that DOC and OATH staff routinely coordinate to schedule proceedings. This routine communication on scheduling matters does not replace the need for broader collaboration and coordination on proceedings in general.

[128] If collaboration compromised one's independence and neutrality, a core element of the *Nunez* Court Order would be impossible. Specifically, the *Nunez* Court Orders require Defendants, including DOC and other agencies within the City of New York, to work collaboratively with the Monitoring Team. The neutrality and independence of the Monitoring Team and its reports are not compromised by such collaboration and in fact, this collaboration has only served to support the overall reform effort.

[129] OATH reports that this unofficial role was filled by one ALJ since the fall of 2021. Beginning in January 2024, the OATH Commissioner clarified and defined the role. In November 2024, the role was officially disbanded because the OATH Commissioner determined that OATH is in a position to

four ALJs on three-month rotating cycles. The DOC Unit Coordinator was responsible for reviewing internal records related to pre-trial conferences, convening meetings among the rotating ALJs, updating legal resource materials, and addressing inquiries from OATH's Commissioner. Pre-trial conferences and trials are assigned to ALJs by OATH's Calendar Unit. Pre-trial conferences for DOC cases are always assigned to an ALJ in the DOC Unit. However, when scheduling/assigning trials to an ALJ, the Calendar Unit attempts to align the dates of the ALJs' rotation cycles with the scheduled date of each trial. If alignment cannot be achieved, a trial involving a DOC staff member may be assigned to another ALJ outside the DOC Unit but within OATH's Trials Unit.

If a case does not settle and a trial is needed, *at a minimum*, the OATH process typically requires about five months. More specifically, trials are typically scheduled about 80 days after the initial pre-trial conference, a trial can take upwards of three weeks to complete, and finally, the Report & Recommendations are issued approximately 45 days after the record is closed. The Monitoring Team has been concerned for some time that this timeline is unduly protracted.

OATH created the DOC Unit to address the backlog of DOC's disciplinary cases, the large number of cases being referred to OATH at the time, and the need to ensure cases were tried expeditiously. The rotation convention was designed to support OATH's practice of ALJs operating as generalists. The rotation appears to support that practice, but it also raises a question of how ALJs, with their relatively short tenure in the DOC Unit, can develop the expertise necessary to understand both the job responsibilities and policies of DOC staff and the unusual circumstances and nuances of the correctional environment.

### Background on *Nunez* Reform Efforts with OATH

Since the Consent Judgment went into effect, the work to reform OATH's procedures and protocols has been a unnecessarily protracted task. OATH initially claimed that the requirements of the Consent Judgment did not apply to OATH, and subsequently claimed that practices could not be changed or that changes were not needed despite the Monitoring Team's findings. Following significant scrutiny by the Monitoring Team and the imposition of two Remedial Orders and the Action Plan, OATH began to reform some of its practices and the results initially suggested that OATH was on the path to supporting the overall goals of accountability outlined in the *Nunez* Court Orders. These important changes included an increase in the number of pre-

---

successfully handle the DOC conference workload without this specific role. Beginning in November 2024, all OATH ALJs cycle through the DOC Unit on a three-month rotation. There will not be an ALJ who sits in the unit throughout the year. OATH leadership reports that the ALJs support this decision, and the OATH Commissioner believes that it will not disrupt OATH's ability to maintain compliance with *Nunez*.

trial conferences available, efforts to accelerate the scheduling of trials, and better alignment of OATH recommendations with DOC's Disciplinary Guidelines.

However, the Monitoring Team continues to find certain OATH procedures and protocols to be convoluted, inefficient, and problematic, which impacts DOC's overall ability to resolve disciplinary matters efficiently and quickly. In fact, as previously reported, DOC has routinely reported that certain OATH practices impede DOC's ability to comply with the *Nunez* Court Orders.[130] Unfortunately, in most cases, OATH's response to these concerns centers on their position that the problems are infrequent or minimal. OATH rarely, if ever, proposes solutions to help ameliorate the situation, more often taking the position that there is no problem to resolve.

OATH's rigidity has impeded problem-solving that could bring greater efficiency to the process. In situations where reasonable alterations to practice may be necessary and appropriate, OATH's inflexible stance and/or unwillingness to acknowledge the issue leads to protracted discussions to resolve the issue. This posture allows problems to fester and ultimately undermines the efficiencies the *Nunez* Court Orders were designed to promote. Despite significant scrutiny from the Monitoring Team and efforts to support improvements to OATH's practices, it remains unclear to the Monitoring Team why OATH remains so resistant to working collaboratively with the Department in order to enhance efforts to hold staff accountable for misconduct.

The most recent example of OATH's reticence toward a transparent, collaborative relationship with the Department involved a recommendation by the Monitoring Team that the Department be made aware of the ALJs' three-month rotation schedule and the individual ALJs who would preside over Department matters during each rotation.[131] In response to the Monitoring Team's recommendation that OATH share the rotation with the Department, OATH responded that it would need time to implement, even though the rotation had already been shared with the Monitoring Team.[132] OATH also requested additional information about the basis

---

[130] Monitor's April 18, 2024 Report (dkt. 706) at pg. 141.

[131] The Monitoring Team learned through the course of its work that the Department was unaware that OATH had a rotation schedule for pre-trial conferences.

[132] OATH reported it "[needed] time to determine the appropriate logistics and implementation" to share the information. OATH suggested that the time was needed because it should also share the information with respondents via their counsel. Sharing the information with respondents' counsel makes sense, but why the fact that more people need to know would increase the time OATH needed to distribute the information is unclear given that respondents' counsel could reasonably be included in any communication to the Department. OATH then noted that accommodations must be made to address potential changes in schedule. Again, it remains unclear why additional time is needed to address this issue. A communication to all parties could easily note that the schedule is subject to change.

of the recommendation,[133] even though the reasoning underlying a recommendation regarding transparency is self-evident and improved efforts at transparency have been recommended by the Monitoring Team consistently in its communications to OATH and the City, and in the Monitor's reports to the Court. The Monitoring Team immediately advised the City that OATH's response to the Monitoring Team's recommendation was both unreasonable and concerning for the reasons stated in this Report. Less than 24 hours after the Monitoring Team notified the City of its concerns, OATH provided a communication regarding the ALJs' three-month rotations to DOC and counsel for DOC staff (to the extent they are known by OATH). The fact that OATH was able to send the communication so quickly after the Monitoring Team reiterated its concerns to the City only underscores the legitimacy of the Monitoring Team's recommendation and further underscores that OATH unnecessarily complicated a recommendation about basic coordination among professionals. It remains concerning that OATH does not appear to be receptive to participation in the type of collaboration with DOC needed to meet the obligations under the *Nunez* Court Orders.

**OATH's Procedures and Protocols**

Appropriate rules and procedural safeguards are a critical foundation for providing due process and for protecting staff members' rights. However, it must be emphasized that OATH's current set of rules and their corresponding application by OATH is not the only way to achieve these fundamental objectives. To the extent that such rules, either by design or application, create impediments to complying with the *Nunez* Court Orders, the barriers must be addressed. Simply citing the need for rules and procedural safeguards is not responsive to legitimate concerns about how the *application* of current rules and procedures interferes with the ability to prosecute disciplinary matters expeditiously. Furthermore, even when the number of cases involving problematic procedural matters is small, the concern is legitimate. The fundamental legal principle of *stare decisis* requires attention because it is antithetical to the legal principle of precedent to suggest that a small number of decisions could not impact future proceedings. Further, to the extent that decisions may be rendered that are arbitrary, capricious, or potentially involve the abuse of discretion, these serious deficiencies should not be excused simply because they may only occur in a few instances. Accordingly, it is imperative that OATH appropriately engage with DOC if/when issues arise regarding specific case matters, even if the issue impacts only a small number of cases.

The Monitor's April 18, 2024 Report (dkt. 706) noted that throughout 2023, OATH appeared to be unduly wedded to its bureaucracy and unwilling to permit reasonable flexibility

---

[133] OATH reported it would "greatly benefit from input from the Monitoring Team regarding the thinking behind the recommendation [that it share the rotation schedule]."

so that matters could proceed efficiently. For example, in fall 2023, it appears that at least some ALJs may have imposed a heightened standard for charging documents, causing concern that was further exacerbated by the ALJs' refusal to create a record of the matter when the Department objected to the rulings.[134] DOC reported that this matter was negatively impacting their work beyond the cases at issue. The Monitoring Team found that OATH leadership was at first dismissive of the issue, suggesting that it related to only a small number of cases. Although it appeared that OATH claimed that the cases were isolated and that the concern about broader application may be misplaced, incongruously in late 2023, OATH updated the annotation[135] about rule 1-22 on charges ("OATH Rules of Practice, Annotation for Rule §1-22"). OATH reports that this revision was completed because certain case annotations were no longer necessary or relevant or were similar to other cases outlined in the annotation. The Monitoring Team's assessment of the revised annotations revealed guidance that appears to be *more* stringent, particularly because it removed previous guidance that suggested greater flexibility in managing charges. In other words, these revisions appear to reflect OATH's inflexible and reticent approach and may serve to increase the frequency with which an ALJ raises concerns about the level of detail contained in charges against staff accused of misconduct.

In February 2024, the Monitoring Team issued several recommendations designed to improve the collaboration between the Department and OATH, to increase the efficiency of OATH's disciplinary process and to facilitate an appropriate resolution of the dispute about the level of detail required in pleadings. The recommendations and responses are summarized below:

- **Improved Communication between DOC and OATH**: The Monitoring Team recommended that DOC and OATH communicate routinely in order to address issues of mutual concern regarding the *administration* of the disciplinary process. In response, the City established monthly meetings among the General Counsels of each agency and the Law Department to address concerns. These meetings began in April 2024 and have been held monthly thereafter. The Monitoring Team has ongoing concerns about OATH's receptivity to participate in the necessary collaboration with DOC to move forward matters of mutual concern (as demonstrated in the example above regarding communication on the ALJ rotation schedule).

---

[134] *See* the Monitor's April 18, 2024 Report (dkt. 706) at pg. 141.

[135] OATH reported to the Monitoring Team that the annotations are intended as a research tool to guide practitioners and parties appearing before OATH, and emphasized that the parties who appear before OATH are responsible for familiarizing themselves with OATH's rules and with the governing caselaw. OATH further reported that updates to the annotations of Rule 1-22 do not cause a change in the law, rules, or legal standards, and they do not change the caselaw that parties can present when arguing legal issues at OATH.

- **Improved Scheduling**: The Monitoring Team recommended that OATH develop additional scheduling efficiencies. In response, OATH shortened the maximum allowable time between pre-trial conferences and trials from 80 days to 65 days. The new scheduling parameters went into effect on April 8, 2024.
- **Sufficiency of Pleadings**: The Monitoring Team recommended that both DOC and OATH take specific steps to resolve the overarching concerns related to the sufficiency of DOC's charges. In response, DOC agreed to ensure new charges contained sufficient specificity and to review those already in the pipeline and amend them if needed. OATH has not proposed any changes to procedure.
- **Record of Proceedings**: The Monitoring Team recommended revising OATH's policies and procedures to ensure that a record is created when requested by a Party during a proceeding before OATH, including a pre-trial conference. In response, the Chief ALJ issued guidance in April 2024 that encouraged ALJs to create records for pre-trial conferences when they issue a decision and the Party contesting the decision requests a record.

It remains frustrating that a functional collaboration continues to require basic recommendations from the Monitoring Team that reflect standard practice and, even then, progress easily stagnates. This frustration was compounded by the fact that even after the Monitoring Team's feedback was issued, similar issues impeding the reasonable administration of discipline continued.

In late March 2024, just before the steps responding to the recommendations were effectuated, DOC filed a complaint against an OATH ALJ, alleging bias and a lack of propriety in response to several cases during which the ALJ appeared inappropriately sympathetic to the defendants and repeatedly disparaged DOC's positions.[136] In April 2024, OATH's Office of the General Counsel's investigation "did not support a finding that [the accused], by words or conduct, manifested bias or failed to perform [the] duties diligently." As of the end of the Monitoring Period, it remains unclear whether the concerns discussed above have been satisfactorily resolved.

## OATH Proceedings

Over the last few years, the need for pre-trial conferences increased for several reasons including staff's unwillingness to settle cases without first having a pre-trial conference before OATH, the backlog of disciplinary cases, and DOC's efforts to address its high rate of staff

---

[136] The Deputy Commissioner of the Trials Division advised OATH's Commissioner of DOC's concerns that a particular "ALJ's repeated course of action shows a clear bias against [DOC] and an arbitrary and capricious unwillingness to fulfill her obligations as a pre-trial judge."

absenteeism. Further, rather than DOC outcomes informed by a neutral and informed assessment of the facts, OATH precedent often appeared to favor staff, which motivated some staff to request a proceeding before OATH.

When pre-trial conferences are needed, they should occur promptly. Further, pre-trial conference dates need to be readily available because simply scheduling a pre-trial conference sometimes encourages DOC and the staff member to settle the case outside of OATH. Then, if the case is not successfully resolved, the full OATH disciplinary process can occur more quickly because the initial proceeding has already been scheduled.

- <u>Number and Outcomes of Pre-Trial Conferences</u>

Historically, pre-trial conferences were only held four to six days per month and their limited availability unreasonably delayed resolution for cases awaiting a pre-trial conference and those that proceeded to trial. As a result of the First and Third Remedial Orders, the number of pre-trial conferences increased exponentially. OATH is now required to schedule 150 UOF cases for pre-trial conferences each month, and to do so, OATH began to conduct conferences four days per week.

Beginning in February 2024, the City, Department and OATH reached an agreement, with approval from the Monitor, to temporarily adjust the pre-trial conference structure to schedule conferences on only three days per week instead of four.[137] The Department reported that the same number of pre-trial conferences could be supported by the three-day-per-week schedule. The purpose of this change was to allow respondents' counsel to be available to participate in more MEO-16 interviews regarding staff conduct in underlying investigations with ID each week.

During the current Monitoring Period, the Department scheduled 942 pre-trial conferences related to use of force misconduct, which exceeds the 900 pre-trial conference threshold required by the Remedial Orders for this six-month period. Although it exceeds the minimum threshold, the total number of pre-trial conferences decreased compared to the prior Monitoring Period (from 1,079 to 942). This reflects the fact that the number of formal disciplinary cases requiring resolution decreased as discussed in this report in the compliance assessment for Consent Judgment, § VIII, Staff Discipline & Accountability. A table showing the number of OATH pre-trial conferences scheduled from July 2020 to June 2024 is included in Appendix A: OATH Pre-Trial Conferences of this report.

---

[137] This agreement is routinely evaluated by the City, Department, OATH and the Monitoring Team to determine whether the 3-day-per week schedule should be extended or whether the fourth day should be reinstated. The current agreement will remain in place through the end of 2024.

As an initial matter, the majority (62%) of UOF cases scheduled for pre-trial conference were settled before the individual appeared at the pre-trial conference before OATH. The Monitoring Team has long reported that the majority of cases can and should settle without the need for OATH, and therefore, it is positive that the Department has continued to rely less on OATH than it has in the past. Of the 942 scheduled pre-trial conferences, 144 pre-trial conferences were convened (*i.e.*, conferences that were scheduled for cases that did not settle prior to the pre-trial conference date), of which only 26% (38 of 144) were settled at the pre-trial conference. The low proportion of cases settled at the initial pre-trial conference is concerning. The remaining 74% required ongoing negotiation, another pre-trial conference, or were scheduled for trial. A portion of the cases required an additional conference because of scheduling issues with the specific staff member. DOC must ensure that staff are notified when they need to appear for OATH pre-trial conferences. Compared to prior Monitoring Periods, this situation has somewhat improved, but many cases still need to be rescheduled because staff are not present and available on the day of the pre-trial conference. DOC should remain vigilant to ensure that pre-trial conference dates are not wasted in this way.

Of the 144 cases, 21 went on to be scheduled for trial (14%). This reflects a reduction in both the number and proportion of cases scheduled for trial, but still reflects a proportion higher than expected given that so few of the scheduled trials actually occur. In this Monitoring Period, only about 10% of those scheduled for trial actually had a trial (n=3 of the 21 cases). This means that approximately 90% of trial dates go unused because the cases settle in the interim. While trials serve an important function in any disciplinary system, they are time-consuming and resource intensive, and thus other pathways for resolution greatly contribute to the overall goal of timely discipline. Even though only a small proportion of cases are scheduled for trial, greater efficiencies can also be found in this area. For example, in the event of an unused trial date, strategies for ensuring that the ALJs' time can easily be reallocated to other DOC cases would enhance efficiency. Trial dates could be double- or triple-booked, given the strong likelihood that one or more of the cases will settle before the trial date. The Monitoring Team continues to encourage OATH to help to facilitate case resolution before and during the pre-trial conference whenever possible.

- <u>Trials at OATH for Use of Force-Related Misconduct</u>

The number of trials conducted by OATH for use of force-related misconduct decreased significantly during the past year and a half. The large number of trials conducted in 2021 and 2022 was due in large part to DOC's focus on closing out a backlog of egregious cases. The decrease in the number of trials conducted in 2023-2024 in part reflects the elimination of this backlog, but also coincides with an overall decrease in the number of formal disciplinary cases

that were closed, as discussed in this report in the compliance assessment for Consent Judgment, § VIII, Staff Discipline & Accountability.

Historically, the process for scheduling and conducting trials and then issuing an R&R was very inefficient and convoluted. Trials were not only scheduled far after the pre-trial conference, but for trials requiring multiple hearings, the trial dates were scheduled over several months, and the R&R was issued months later. The table below provides data on the number of trials conducted, the average number of days between a pre-trial conference and the trial, the length of time required to complete the trial, the average number of days for the ALJ to issue an R&R after the trial, and ultimately the length of time between a pre-trial conference and the issuance of the R&R. As demonstrated below, the amount of time that cases were pending with OATH was unreasonably long but has begun to decrease in recent years.

| Start Date of Trial | Total Number of Trials by First Day the Trial Commenced | Average Days Between Pre-Trial Conference and Trial | Average Duration of Trial in Days | Average Days between Final Trial Date & R&R Issued | Average Days between Pre-Trial Conference and R&R Issued |
|---|---|---|---|---|---|
| 2016 | 1 | N/A | 1 | 38 | N/A |
| 2017 | 8 | 101 | 47 | 81 | 254 |
| 2018 | 2 | 125 | 27 | 28 | 179 |
| 2019 | 3 | 66 | 13 | 84 | 162 |
| 2020 | 4 | 240 | 78 | 239 | 557 |
| 2021 | 26 | 147 | 43 | 131 | 320 |
| 2022 | 15 | 84 | 14 | 45 | 142 |
| 2023 | 6 | 136 | 12 | 44 | 190 |
| January-June 2024 | 3 | 30 | 4 | 72 | 105 |

OATH began to reform its processes in 2021 in response to various recommendations from the Monitoring Team. For instance, OATH began scheduling all trials for UOF-related matters within 80 days of the pre-trial conference, and beginning on April 8, 2024, began scheduling all trials for UOF-related matters within 65 days of the pre-trial conference. Further, OATH initiated a practice that all trials must be completed within three weeks of their commencement date instead of being spread out over multiple months. Finally, OATH set deadlines for when an R&R must be issued.

All trials that started in January-June 2024 occurred within 65 days of the pre-trial conference, including those cases that had pre-trial conferences before April 8, 2024. Further, trials are now generally completed within one week of when they started. The three trials that were convened in January-June 2024 addressed alleged staff misconduct during three use of force incidents that occurred in 2023. This is an improvement over previous years when many OATH trials were conducted years after the use of force incident occurred because the cases had languished in DOC's backlog.

For the three trials that were conducted between January and June 2024, two of the R&Rs were issued within 45 days, but the third R&R was issued over 160 days after the trial date.[138] This is noteworthy because in the past, OATH has taken extended periods of time, sometimes over a year, to complete R&Rs in some use of force cases.[139] It is critical that OATH closely monitor the time that ALJs take to complete R&Rs and the level of compliance with new requirements, noted above.

This improvement in the time required to resolve OATH trials is promising. The work must not only be sustained, but additional efficiencies are necessary to ensure that cases are prosecuted as expeditiously as possible.

- OATH Reports and Recommendations for Use of Force-Related Misconduct

OATH issued six R&Rs in 2023 for all the trials that occurred in 2023, and three R&Rs for the trials that occurred in January-June 2024. The reduction in the number of R&Rs issued during 2023 and 2024 reflects the reduction in the number of trials held during this period as discussed above. The chart below provides a breakdown of the use of force related R&Rs issued for trials that occurred between January 2016-June 2024 and the recommended outcomes. In some cases, an R&R can cover multiple staff members, so the chart evaluates the ALJ's findings by staff member.

---

[138] OATH reported that the delay occurred because the OATH ALJ was unwell following the trial.

[139] For instance, the R&Rs issued for six use of force related trials that started in 2021 took at least six months to complete following the close of trial. Two of the six R&Rs took over a year to complete.

| OATH ALJ's Report & Recommendations by Staff Member *(for use of force trials that occurred between January 2016-June 2024)* | | | | | | |
|---|---|---|---|---|---|---|
| Year R&R was Issued | Total Number of R&Rs Issued & Number of Staff | Guilt *Agreed with DOC's recommendation* | Guilt *Imposed More Than DOC Asked* | Guilt on some, but dismissed some cases *Imposed less than what DOC asked for, but found some guilt* | Acquittal | ALJ Recommended Termination |
| 2016 | 1 R&R covering 1 staff | 0 staff | 0 staff | 1 staff | 0 staff | 0 staff |
| 2017 | 5 R&Rs covering 5 staff | 0 staff | 0 staff | 4 staff | 1 staff | 0 staff |
| 2018 | 5 R&Rs covering 6 staff | 1 staff | 0 staff | 3 staff | 2 staff | 0 staff |
| 2019 | 2 R&Rs covering 5 staff | 0 staff | 0 staff | 0 staff | 5 staff | 0 staff |
| 2020 | 2 R&Rs covering 4 staff | 1 staff | 0 staff | 3 staff | 0 staff | 0 staff |
| 2021 | 17 R&Rs covering 21 staff | 16 staff | 0 staff | 4 staff | 1 staff | 7 staff |
| 2022 | 27 R&Rs covering 30 staff | 15 staff | 1 staff | 11 staff | 3 staff | 12 staff |
| 2023 | 6 R&Rs covering 7 staff | 4 staff | 0 staff | 2 staff | 1 staff | 4 staff |
| Jan-Jun 2024 | 3 R&Rs covering 3 staff | 2 staff | 0 staff | 1 staff | 0 staff | 2 staff |

The six use of force R&Rs issued in 2023 provided findings and recommended penalties for seven staff members. The ALJ found guilt and agreed with the penalty sought by DOC for four staff, and for all four of these staff, DOC sought termination, the ALJ recommended termination, and DOC did terminate the staff. The ALJ suggested different penalties for the other three staff. For one staff member where DOC sought termination, the ALJ recommended dismissal of charges and no penalty, which DOC accepted, resulting in no penalty imposed. For one staff member, the ALJ dismissed some charges, but issued findings of guilt in others and therefore, recommended a lower penalty (five days) than what DOC sought (termination), and DOC imposed the penalty recommended by OATH. For one staff member, the ALJ found full

guilt, but recommended a lower penalty (30 days) than what was sought by DOC (45 days), and DOC imposed the penalty recommended by OATH.[140]

The three use of force R&Rs issued for trials between January-June 2024 provided findings and recommended penalties for three staff members. The ALJ found guilt and agreed with the penalty sought by DOC for two staff, and for both staff, DOC sought and the ALJ recommended termination. DOC did terminate one of these staff members but is considering using an Action of the Commissioner to reduce the other penalty.[141] For the third staff member, the ALJ dismissed some charges, but issued findings of guilt in others and therefore, recommended a lower penalty (28 days) than what DOC sought (45 days), and the final penalty is still pending with DOC.

- Assessment of OATH's Application of Disciplinary Guidelines

The Monitoring Team has been closely examining pre-trial conference outcomes and R&Rs to assess whether the Disciplinary Guidelines have been properly applied. As noted in the Monitor's April 3, 2023 Report (dkt. 517) at pgs. 203-204, proper application of the Disciplinary Guidelines has improved since the Remedial Orders were imposed, although in some cases, questions remained regarding the application of precedent and whether it was consistent with the Disciplinary Guidelines in both pre-trial conferences and the R&Rs. The Monitoring Team's work has identified certain cases that merit additional scrutiny as to whether the applicability of the disciplinary guidelines was appropriate, and those cases are under review. As discussed above, while the number of R&Rs issued regarding use of force related misconduct may be small in number, the principle of *stare decisis* requires a thoughtful review given the broader applicability to DOC matters. A more fulsome assessment is underway and will be included in a future Monitor's Report.

Further, in order to assess whether ALJs appeared to be properly prepared to hear cases involving DOC staff, the Monitoring Team requested training materials for ALJs assigned to the DOC Unit. OATH reported that staff are provided with information about recent OATH rulings involving DOC staff, legal research resources, copies of DOC Directives, Disciplinary Guidelines, and sick leave and absence-related policies. However, OATH declined to provide the training materials to the Monitoring Team, stating that they were subject to judicial privilege. This posture is at odds with the Monitoring Team's obligation to assess the sufficiency of

---

[140] This decision was appealed to the Civil Service Commission who upheld the ruling but reduced the penalty to 10 days from the 20 days recommended by the OATH ALJ and adopted by the Commissioner. *See* the Monitor's April 18, 2024 Report (dkt. 706) at pg. 130.

[141] This case is also discussed in the compliance assessment for the First Remedial Order (dkt. 350), § C, ¶ 2, as it was also identified as an "F2" case.

training for investigators in ID and attorneys in the DOC's Trials Division in order to assess compliance with *Nunez* requirements about staff discipline. OATH's refusal to provide the training materials creates a situation in which neither DOC nor the Monitoring Team have any insight into the guidance provided to those responsible for adjudicating DOC's disciplinary matters and whether that guidance comports with the requirements of the *Nunez* Court Orders.

## Conclusion

OATH has made some improvements to its practices since the inception of the Consent Judgment, although concerns about OATH remain. In particular, important improvements have been made to ensure that there are more pre-trial conferences and that the processes and practices related to Trials and issuance of R&Rs are both more efficient and occur more quickly than they had in the past.  Pre-trial conferences are scheduled more quickly, trials are conducted and completed in a more reasonable period of time, and the R&Rs are issued more quickly than they were in the past. However, most, if not all, of these reforms, came only after the imposition of various Court Orders and corresponding scrutiny and recommendations from the Monitoring Team.

Even with the improvements made to date, OATH continues to resist modifications to practice.  This is concerning given that the overall disciplinary process, including the work conducted by OATH, is still incredibly time-consuming and can -become mired in overly bureaucratic issues that impede prompt and appropriate resolution. Further enhancements to the disciplinary process are necessary so that cases can move as expeditiously as possible. This includes the development of additional efficiencies, removal of unnecessary bureaucracy, and the need for a posture that better supports the type of collaboration between OATH and DOC necessary to meet the requirements of the *Nunez* Court Orders. The Monitoring Team is continuing to closely scrutinize the various facets of OATH's operation in order to identify whether additional enhancements or modifications to the Department's approach to delegating cases to OATH may be necessary.

*First Remedial Order § C, ¶ 4 & Third Remedial Order ¶ 2*: OATH has met the requirement to convene 150 pre-trial conferences. Accordingly, Substantial Compliance with this provision has been achieved.

*First Remedial Order § C, ¶ 5*: It appears there has been improvement in the application of the Disciplinary Guidelines to OATH Proceedings since the First Remedial Order was entered, but additional scrutiny by the Monitoring Team is ongoing to determine what additional steps are necessary to achieve Substantial Compliance.

*Third Remedial Order ¶ 3*: OATH's procedures and protocols for UOF related disciplinary matters are more efficient than when the Remedial Orders were first imposed, but ongoing

resistance to further enhance practices impedes the ability to support expeditious processing for use of force related misconduct. Further enhancements to the OATH process, including improved collaboration with DOC, are needed to support the overall goal of ensuring that proportional discipline is imposed timely.

| | |
|---|---|
| **COMPLIANCE RATING** | **First Remedial Order § C., ¶ 4. & Third Remedial Order ¶ 2.** Substantial Compliance<br>**First Remedial Order § C., ¶ 5.** Partial Compliance<br>**Third Remedial Order ¶ 3.** Partial Compliance |

| CJ § VIII. STAFF DISCIPLINE AND ACCOUNTABILITY, ¶ 4 (TRIALS DIVISION STAFFING) |
|---|

> ¶ 4. *Trials Division Staffing.* The Department shall staff the Trials Division sufficiently to allow for the prosecution of all disciplinary cases as expeditiously as possible and shall seek funding to hire additional staff if necessary.

This provision requires the City and the Department to ensure the Trials Division has sufficient staff to expeditiously prosecute all disciplinary cases. The Department has long struggled to have sufficient staff to support the Division's caseload. The Action Plan (dkt. 465), § F, ¶ 1(a), requires the Department to ensure that the Trials Division maintains at least 25 agency attorneys and four directors.

**Recruitment Efforts**

During this Monitoring Period, recruitment efforts were essentially paused for the Trials Division. The Division's staffing needs were more limited given it is experiencing its lowest caseload in roughly a decade. The Department reports it conducted one interview for a trials-related position and onboarded five individuals in this Monitoring Period.

The Trials Division leadership continues to report that the process to hire an individual remains protracted, taking many months, and requires a significant amount of various bureaucratic "red tape." Even in this Monitoring Period, the few staff that were hired and onboarded were impacted by protracted approvals and other bureaucratic delays.

As workflow improves at the Investigation Division ("ID"), the Trials Division anticipates an increased caseload and will begin recruitment and hiring efforts again in the near future to fill any necessary Trials positions.

**Staffing Levels**

The table below provides an overview of the Trials Division's staffing levels at the end of each Monitoring Period from June 2018 to June 2024. Since the inception of the Action Plan, the overall number of Trials staff increased from 19 to 23 but remains below the 25 attorneys required by the Action Plan. The workload within the Trials Division is currently being managed efficiently by existing staff because the caseload is the lowest it has been in years. However, Trials Division leadership acknowledge that as workloads increase, additional staff will be necessary to support timely case processing. As for the Action Plan requirement regarding supervisors, the Department has maintained the requisite four supervisors since December 2022. The Trials Division has also maintained its overall increase in the number of support staff, adding four new administrative positions since late 2023.

| Trials Division Staffing | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| As of… | Jun 2018 | Dec 2018 | Jun 2019 | Dec 2019 | Jun 2020 | Dec 2020 | Jun 2021 | Dec 2021 | Jun 2022 | Dec 2022 | Jun 2023 | Dec 2023 | Jun 2024 |
| **Supervisors & Leadership** | **4** | **5** | **5** | **5** | **5** | **5** | **4** | **4** | **5** | **6** | **6** | **6** | **6** |
| - *Deputy Commissioner* | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 1 | 1 |
| - *Associate Commissioner* | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 |
| - *Deputy General Counsel* | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 0 | 0 | 0 | 0 |
| - *Executive Manager Director* | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 0 | 0 | 1 | 1 |
| - *Director* | 3 | 3 | 3 | 3 | 3 | 3 | 2 | 2 | 2 | 4 | 4 | 4 | 4 |
| **Attorneys** | **21** | **20** | **20** | **20** | **17** | **18** | **18** | **17** | **19** | **27** | **20** | **23** | **23** |
| - *Agency Attorney* | 21 | 20 | 20 | 20 | 17 | 16 | 15 | 14 | 17 | 21 | 19 | 20 | 20 |
| - *Agency Attorney Intern* | 0 | 0 | 0 | 0 | 0 | 2 | 3 | 3 | 0 | 1 | 1 | 3 | 3 |
| - *Contract Attorney* | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 |
| - *Attorneys on Loan from Other Agencies* | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 0[142] | 0 | 0 |
| **Administrative and Other Support** | **15** | **14** | **14** | **13** | **14** | **13** | **13** | **13** | **10** | **12** | **19** | **17** | **20** |
| - *Administrative Manager* | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 3 | 3 |
| - *Executive Coordinator* | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 |
| - *Office Manager* | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| - *Principal Administrative Associate* | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 3 |
| - *Legal Coordinator* | 4 | 4 | 3 | 2 | 2 | 2 | 2 | 2 | 3 | 5 | 4 | 4 | 5 |
| - *Investigator* | 3 | 1 | 0 | 0 | 1 | 1 | 1 | 1 | 0 | 0 | 2 | 2 | 3 |
| - *Clerical Associate* | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| - *Program Specialist* | 1 | 1 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| - *Intern* | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 0 | 0 | 4 | 0 | 0 |
| - *Front Desk Officer* | 0 | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| - *Community Coordinator* | 0 | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 0 | 0 | 1 | 1 | 1 |
| - *City Research Scientist* | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 1 |
| - *Correctional Standard* | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| **Grand Total** | **40** | **39** | **39** | **38** | **36** | **36** | **35** | **34** | **34** | **45** | **45** | **46** | **49** |

---

[142] The MOU for attorneys on loan from other City agencies was terminated on February 1, 2023. Further, the attorneys on loan from DOC Legal were transferred back to Legal by April 14, 2023. *See* Monitor's October 28, 2022 Report (dkt. 472) at pg. 14 regarding a discussion on the attorneys on loan.

The Monitoring Team has long recommended that the City and Department remain vigilant in ensuring that the Trials Division maintains adequate staffing levels,[143] and, at a minimum, achieves the levels required by the Action Plan (dkt. 465), § F, ¶ 1(a). Given the need to efficiently process cases, staffing levels must meet those required by the Action Plan, which the Department has not yet achieved. Substantial Compliance will be achieved when staff can be recruited, hired and onboarded in a manner that is efficient, and the Trials Division staffing complement is sufficient to prosecute cases expeditiously when caseloads return to normal levels.

| COMPLIANCE RATING | ¶ 4. Partial Compliance |
|---|---|

---

[143] *See, for example*, Monitor's March 16, 2022 Report (dkt. 438) at pg. 62.

| **CJ § XII. SCREENING & ASSIGNMENT OF STAFF, ¶¶ 1-3 (PROMOTIONS)** |
|---|
| ¶ 1. *Promotions.* Prior to promoting any Staff Member to a position of Captain or higher, a Deputy Commissioner shall review that Staff Member's history of involvement in Use of Force Incidents, including a review of the <br><br>    (a) [Use of Force history for the last 5 years] <br><br>    (b) [Disciplinary history for the last 5 years] <br><br>    (c) [ID Closing memos for incidents in the last 2 years] <br><br>    (d) [Results of the review are documented] <br><br>¶ 2. DOC shall not promote any Staff Member to a position of Captain or higher if he or she has been found guilty or pleaded guilty to any violation in satisfaction of the following charges on two or more occasions in the five-year period immediately preceding consideration for such promotion: (a) excessive, impermissible, or unnecessary Use of Force that resulted in a Class A or B Use of Force; (b) failure to supervise in connection with a Class A or B Use of Force; (c) false reporting or false statements in connection with a Class A or B Use of Force; (d) failure to report a Class A or Class B Use of Force; or (e) conduct unbecoming an Officer in connection with a Class A or Class B Use of Force, subject to the following exception: the Commissioner or a designated Deputy Commissioner, after reviewing the matter, determines that exceptional circumstances exist that make such promotion appropriate, and documents the basis for this decision in the Staff Member's personnel file, a copy of which shall be sent to the Monitor. <br><br>¶ 3. No Staff Member shall be promoted to a position of Captain or higher while he or she is the subject of pending Department disciplinary charges (whether or not he or she has been suspended) related to the Staff Member's Use of Force that resulted in injury to a Staff Member, Inmate, or any other person. In the event disciplinary charges are not ultimately imposed against the Staff Member, the Staff Member shall be considered for the promotion at that time. |

Strong leadership and supervision are crucial to the Department's efforts to reform the agency. The requirements of Consent Judgment § XII, ¶¶ 1-3 are designed to ensure that those staff selected for promotion to supervisory ranks are appropriately screened for selection. The requirements of the First Remedial Order (dkt. 350), § A, ¶ 4 and Action Plan (dkt. 465), § C, ¶ 3(ii-iii) are designed to increase the number of supervisors working in the facilities and improve the quality of supervision, and these provisions are discussed separately in the compliance assessment for First Remedial Order (dkt. 350), § A, ¶ 4.

The Monitoring Team continues to emphasize that the staff the Department chooses to promote sends a message about the leadership's values and the culture it intends to cultivate and promote, and their behavior sets an example for Officers.[144] Given the impact that promotion selections have on the overall departmental culture, the Monitoring Team closely reviews the screening materials and scrutinizes the basis for promoting staff throughout the Department. Active, effective supervision is fundamental to the changes in departmental culture and practice that are needed to effectuate the reforms required by the *Nunez* Court Orders. The long-standing supervisory void—in both number and

---

[144] As discussed in detail in Monitor's October 28, 2019 Report (dkt. 332) at pg. 199; Monitor's April 3, 2023 Report (dkt. 517) at pgs. 210-216; Monitor's July 10, 2023 Report (dkt. 557) at pgs. 74-77; and Monitor's December 22, 2023 Report (dkt. 666) at pgs. 78-86.

aptitude—is a leading contributor to the Department's inability to alter staff practice and to make meaningful changes to its security operation.[145]

This compliance assessment covers the following: the number of staff promoted since 2017, the status of the Department's revision of the pre-promotional screening policy, a summary of all staff promoted from January to June 2024, and the Department's compliance with the screening process for these individuals.

## Overview of Staff Promotions from 2017 to June 2024

The Department promoted the following number of staff to each rank through June 30, 2024:

|  | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|
| Captains | 181 | 97 | 0 | 0 | 0 | 0 | 26 | 50 |
| ADWs | 4 | 13 | 3 | 35 | 0 | 26 | 10 | 0 |
| Deputy Wardens | 5 | 3 | 8 | 0 | 1 | 0 | 5 | 0 |
| Wardens | 2 | 5 | 1 | 2 | 4 | 0 | 1[146] | 0 |
| Chiefs | 3 | 2 | 3 | 0 | 4 | 0 | 0 | 2 |

## Screening Policy

The Department addresses the requirements of ¶¶ 1 to 3 in Directive 2230 "Pre-Promotional Assignment Procedures." The Directive has been revised a number of times since it was first updated in the Third Monitoring Period.[147] In March 2023, the Monitoring Team submitted feedback to the Department with recommended revisions to the policy as outlined in the Monitor's December 22, 2023 Report (dkt. 666) at pgs. 80-81. After the Monitoring Team submitted these recommendations, the Department reported they would revise the policy before the next round of promotions but failed to do so and promoted additional staff.[148] As a result, the Court issued its August 10, 2023 Order (dkt. 564) requiring the Department to update its policy and procedures related to the pre-promotional screening process in consultation with and subject to the approval of the Monitor. The Department reported during the past two Monitoring Periods that it has been working on revisions to the policy governing pre-promotional screening but has not provided any proposed revisions to the Monitoring Team.

---

[145] *See* the Monitor's November 8, 2023 Report (dkt. 595) at pgs. 26-28 for further discussion of the aspects contributing to the Department's supervisory deficit.

[146] This individual was promoted to the rank of "Acting Warden."

[147] The Directive was previously revised in the 8th Monitoring Period (*see* Monitor's October 28, 2019 Report (dkt. 332) at pg. 198). The Directive was described more generally in the Monitor's April 3, 2017 Report (dkt. 295) at pgs. 190-192. Additional revisions were made in November 2022 (the Fifteenth Monitoring Period) as described in the April 3, 2023 Report (dkt. 517) at pgs. 211-212 and in May 2023 (the Sixteenth Monitoring Period) as described in the December 22, 2023 Report (dkt. 666) at pg. 80.

[148] *See* Monitor's July 10, 2023 Report (dkt. 557) at pg. 162.

While the Monitoring Team appreciates that its recommendations were incorporated into the pre-promotional screening process during the 18th Monitoring Period, it is critical that these recommendations be formally incorporated into a revised and promulgated policy. This is necessary to ensure that these recommendations to Department policy are embedded in practice going forward so that the issues identified by the Monitoring Team do not re-emerge if/when this process is managed by new staff.[149]

**Overview of Promotions in This Monitoring Period**

A total of fifty-two staff were promoted in this Monitoring Period. There were fifty staff promoted to Captain and two staff promoted to Chief. A brief summary of those promoted is outlined below:

- Promotions to Captain: The 50 individuals who were promoted to Captain were screened in February-April 2024 and were promoted in March and May 2024. The Monitoring Team received all the screening materials and forms completed for these staff. Seven of these staff were promoted despite one or more Divisions not recommending the individual for promotion. However, none of the staff promoted to Captain had two Class A/B use of force ("UOF") violations within the past five years pursuant to the Consent Judgment, § XII, ¶ 2, nor pending UOF-related disciplinary charges pursuant to the Consent Judgment, § XII, ¶ 3.

- Promotion to Acting Warden: An individual was appointed to serve as the Acting Warden of RNDC in May 2024. The Monitoring Team received all the screening materials and forms completed for this staff member. This staff member did not have two Class A/B UOF violations within the past five years pursuant to the Consent Judgment, § XII, ¶ 2 nor pending UOF-related disciplinary charges pursuant to the Consent Judgment, § XII, ¶ 3, and all Divisions that conducted pre-promotional screening did recommend individual for promotion.

- Promotions to Chief: Two individuals were screened in February-March 2024 and promoted to Chief in May 2024, one as Assistant Chief of Security and the other as Bureau Chief/Chief of Staff. Prior to the promotions, the individuals were screened by the Legal Division and the Trials and Litigation Division, and the Commissioner completed a documented Prison Rape Elimination Act ("PREA") screening interview for both candidates. The Department also completed screening forms that account for the individuals' attendance, education, assignment, and disciplinary history. Vetting letters were also sent to the First Deputy Mayor's office

---

[149] The Monitoring Team's March 2023 recommendations to improve practice include recommendations that were made for many years prior to the issuance of the March 2023 recommendations. Some of the March 2023 recommendations for improved practice were previously addressed for a short period of time and then the prior practice re-emerged, while other recommendations for improved practice were never addressed and so the concerning practices continued unabated. *See* the Monitor's December 22, 2023 Report (dkt. 666) at pgs. 80-81.

requesting both individuals be appointed to Chief positions. These staff members did not have two Class A/B UOF violations within the past five years pursuant to the Consent Judgment, § XII, ¶ 2 nor pending UOF-related disciplinary charges pursuant to the Consent Judgment, § XII, ¶ 3, and both ID and Trials did recommend individual for promotion.

**Assessment of Screening Materials**

The screening requirements of the Consent Judgment were developed to guide the Department's identification of Supervisors with the proper attributes. In particular, the Consent Judgment requires the Department to consider a staff member's use of force and disciplinary history (¶ 1(a)-(d)) and mandates that staff members may not be promoted if they have guilty findings on certain violations (¶ 2) or pending UOF disciplinary charges (¶ 3). The promotion process itself is guided by multiple factors and is depicted in the Monitor's April 3, 2024 Report (dkt. 517) at Appendix C (Flowchart of Promotions Process).

**Review of Candidates (¶ 1)**

The Monitoring Team's review of the screening materials for the fifty-three staff promoted during this Monitoring Period satisfied the requirements of the "Review" as defined by ¶ 1. All 53 staff were screened close in time to their date of promotion.

Even though the Department has not yet formally revised its policy, it did incorporate some of the Monitoring Team's recommendations from the March 2023 feedback into its pre-promotional screening during this Monitoring Period as described below:

- Document the Basis for Staff Promoted with Negative Recommendations from a Division: The Monitoring Team recommended that any candidate who is not recommended for promotion on one or more screening forms be appropriately scrutinized and, if the Department determines that they should be promoted that appropriate information is available for Monitoring Team's review. Seven of the staff promoted to Captain were promoted despite the fact that at least one Division[150] did not recommend the individual for promotion during the screening process.[151] It must be emphasized that because someone was not recommended for promotion does not mean that they should be automatically disqualified from promotion. However, it does require greater scrutiny as the candidate may not be suitable for promotion. Accordingly, in this

---

[150] One staff member was not recommended for promotion by two Divisions – the facility commanding officer and HMD. The other six staff members were not recommended for promotion by one Division – the facility commanding officer or HMD.

[151] In prior Monitoring Periods, the Monitoring Team has identified cases in which an individual was not recommended for promotion by multiple divisions and the facts suggest that promotion was not appropriate, but the individuals were in fact promoted. *See e.g.*, Monitor's October 28, 2024 Report (dkt. 33) at pgs. 201-202, Monitor's April 3, 2023 Report (dkt. 517) at pgs. 212-216, and Monitor's December 22, 2023 Report (dkt. 666) at pgs. 79-86.

Monitoring Period, DOC reported that the Bureau Chief/Chief of Staff spoke with each candidate about the basis and circumstances regarding the non-recommendation and the expectations of the staff member should they be promoted to Captain.

- Review Personnel Determination Review ("PDR") Records: The Monitoring Team recommended that the Department should designate a specific Division to conduct a holistic review of PDR records. The Department reported the PDR records were evaluated for staff promoted during this Monitoring Period and documented the findings.

- Consult Both ID Units: The Monitoring Team recommended that the Department should consult with both the ID Special Investigations Unit ("SIU") and the ID UOF unit in future pre-promotional screening processes and document the review and recommendations of both units. The Department reported that both ID and SIU were consulted as part of the screening process in this Monitoring Period.

- Conduct a Holistic 2-in-5 Assessment: The Monitoring Team recommended that the Department designate a central person or Division to evaluate PDRs, Command Disciplines ("CDs"), and Memorandum of Complaint ("MOC") charges together when doing the 2-in-5 assessment. The Department reported that the Legal Division conducted and documented this holistic 2-in-5 assessment as part of the completed screening process in this Monitoring Period.

- Comply with Directive 2230 when Conducting Pre-Promotional Screening: The Monitoring Team recommended the Department comply with its own pre-promotional screening policies and procedures by ensuring all applicants are screened by all required Divisions. The Legal Division managed the screening process for Captains during this Monitoring Period to ensure all required information was obtained.

Overall, the screening process conducted in this Monitoring Period was an improvement over the process that was conducted in the previous two Monitoring Periods in which the Department was found in Non-Compliance. Steps have also been taken to address some of the Monitoring Team's March 2023 recommendations. Accordingly, the Department moved out of Non-Compliance and into Partial Compliance. It is critical for the Department to revise its policies and procedures and ensure that the screening process is conducted with integrity in order to achieve Substantial Compliance.

## Disciplinary History (¶ 2)

Staff members may not be promoted if they have guilty findings on certain violations twice within five years unless the Commissioner finds that there are exceptional circumstances that merit promotion ("2-in-5 assessment"). The Monitoring Team had concerns about this process as outlined in

prior reports.[152] None of the staff promoted in this Monitoring Period met this threshold for exclusion. The Monitoring Team's review of available records confirmed this finding.

As described above, the Legal Division conducted and documented the 2-in-5 assessments for the Acting Warden candidate and each candidate for the Captain class that included Negotiated Plea Agreements ("NPAs"), PDRs, and CDs for the first time since the Monitoring Team's March 2023 feedback was submitted. This 2-in-5 assessment is an important step forward in improving the pre-promotional screening process, but the policy must be revised to ensure the holistic 2-in-5 assessment is always completed in practice going forward. As a result, the Department has moved out of Non-Compliance and into Partial Compliance. The Department must revise its policy to include the 2-in-5 assessment and ensures this process is conducted with fidelity in order to achieve Substantial Compliance with this provision.

**Pending Disciplinary Matters (¶ 3)**

The Department's screening process for promotion assesses whether the candidate has pending discipline for use of force related misconduct. The Department's screening process identifies if a candidate may have pending Departmental discipline for use of force related misconduct at the time of screening, and none of the fifty-three candidates promoted in this Monitoring Period had pending disciplinary charges at the time of promotion. Accordingly, the Department is in Substantial Compliance with this provision.

**Conclusion**

The screening process in this Monitoring Period reflects improved steps taken by the Department to conduct its pre-promotional screening process with increased fidelity and to address the Monitoring Team's recommendations and the requirements of the *Nunez* Court Orders. However, the Department must update its policies and procedures, pursuant to the August 10, 2023 Order (dkt. 564), to ensure they reflect the requirements of the *Nunez* Court Orders and so the screening process is conducted with consistency and fidelity going forward.

| | |
|---|---|
| **COMPLIANCE RATING** | ¶ **1.** Partial Compliance |
| | ¶ **2.** Partial Compliance |
| | ¶ **3.** Substantial Compliance |

---

[152] These concerns are explained in further detail in the Monitor's April 3, 2023 Report (dkt. 517) at pgs. 212-215, Monitor's December 22, 2023 Report (dkt. 666) at pg. 85, and Monitor's April 18, 2024 Report (dkt. 706) at pgs. 150-151.

| CJ § XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19, ¶ 1 (PREVENT FIGHT/ASSAULT) |
| --- |
| ¶ 1. *Prevent Fight/Assault.* Young Inmates shall be supervised at all times in a manner that protects them from an unreasonable risk of harm. Staff shall intervene in a manner to prevent Inmate-on-Inmate fights and assaults, and to de-escalate Inmate-on-Inmate confrontations, as soon as it is practicable and reasonably safe to do so. |

*The analysis and compliance rating below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old incarcerated individuals. The Monitoring Team will not assess compliance with the Nunez provisions related to 16- and 17-year-olds in this Monitoring Period pursuant to the Stipulation and Order Regarding 16- and 17-Year-Old Adolescent Offenders at Horizon Juvenile Center, ¶ 2 (dkt. 503).*

**RNDC's History and Current Facility Population/Composition**

The Monitoring Team has long been concerned about violence at RNDC, where the majority of young adults aged 18 to 21 are held.[153] The Department has been in Non-Compliance with this provision throughout most of the time that the Consent Judgment has been in effect, except for late 2017/early 2018 when Partial Compliance was achieved. Following GMDC's closure in late 2018, facility conditions once again deteriorated, and the compliance rating was downgraded to Non-Compliance where it has remained ever since.

Since the Consent Judgment went into effect, the number of 18-year-olds in custody has declined significantly. In 2016, the Department held approximately 200 18-year-olds, compared to approximately 50 18-year-olds in 2024. This age group typically represents about 1 or 2% of the total population in custody. The Department has historically concentrated its population of young adults aged 18- to 21-years old at RNDC (particularly with GMDC's closure in 2018), but RNDC's total population has changed in both size and composition over the past several years. In 2019, RNDC's average daily population of 470 was predominantly young adults. In contrast, during the current Monitoring Period, the facility's average daily population of 995 was 41% young adults and 59% adults. The increase in the size of the facility's population led to more housing units being opened and those units being populated more densely, making both effective supervision and service provision more difficult.

**RNDC's Rates of Use of Force and Violence**

The table below shows some significant declines in the rates of key metrics at RNDC over the past two years. For example, RNDC's use of force rate decreased 63%, the rate of stabbings/slashings decreased 63%, the rate of fights decreased 28%, and the rate of fires decreased 40%. These are all

---

[153] The Monitor's December 22, 2023 Report (dkt. 666) at pg. 87 includes specific citations to various reports from 2022 and 2023 that discuss in detail RNDC's circumstances and the Department's efforts to address them.

very positive changes that can drastically change the tenor of a facility and the chaos and disorder that people housed in that facility experience.

| RNDC's Rates of Use of Force and Violence, January 2022 to July 2024 | | | | |
|---|---|---|---|---|
| | Use of Force | Stabbing/Slashing | Fights | Fires |
| Jan-Jun 2022 | 15.1 | 1.6 | 10.4 | 2.0 |
| Jul-Dec 2022 | 9.9 | 0.76 | 9.3 | 1.2 |
| Jan-Jun 2023 | 8.1 | 0.59 | 7.0 | 1.3 |
| Jul-Dec 2023 | 7.9 | 0.92 | 7.8 | 3.0 |
| Jan-Jun 2024 | 5.7 | 0.60 | 7.5 | 1.2 |

## RNDC's Programs Action Plan

In January 2024, the Department developed the RNDC Programs Action Plan, which includes the following key components:

- Consolidating the number of housing units where 18-year-olds (and other Young Adults) may be housed and reducing the maximum unit size from 25 to 15 individuals.
- Renovating the Young Adult housing units to abate hazardous environmental conditions and to improve the aesthetic appeal of the units.
- Sustaining the condition of the renovated units by focusing both staff and incarcerated individuals on the ongoing sanitation of the units.
- Consistently assigning staff, including officers, Captains and Assistant Deputy Wardens ("ADWs"), to the same housing units day-to-day, along with members of the facility's security team, which will function similarly to the Young Adult Response Team ("YART") used in the past.
- Training assigned staff to better understand the target population and the approach to managing their behaviors and solving problems.
- Utilizing Unit Management as the overarching framework for the designated units, which should provide a platform for the implementation of key components of Direct Supervision (*e.g.*, proactive supervision and de-escalation, consistent service delivery, rewards for positive behavior, etc.) and improving basic security practices.
- Enhancing the program offerings provided by both Department staff and outside vendors in order to reduce idle time.

Following several months of close collaboration with the agency and facility leaders responsible for implementing the plan, the Monitoring Team's impression is that the plan holds promise for

ameliorating the dangerous conditions at RNDC. Not only are the concepts sound, but the Department is heeding the Monitoring Team's advice to identify the dynamics that have undercut similar initiatives in the past and to develop appropriate safeguards so that they do not reoccur.

The Department took important steps to begin implementing the RNDC Plan during the current Monitoring Period:

- Renovated the designated units where 18-year-olds may be housed (along with other Young Adults) and the Monitoring Team's site visits suggest that the conditions have largely been maintained, although continued vigilance is strongly encouraged.
- Repopulated the designated units with the targeted age group and blended the unit populations in terms of Security Risk Group ("SRG") affiliation such that no one group dominates the units. Importantly, the units' size has been capped at 15 individuals in custody.
- Began assigning staff to the same units day-to-day and trained these staff to work effectively with the targeted age group, as described in Consent Judgment, § XV, ¶ 17, below.
- Hired and on-boarded several new staff in the Programs Division to provide services to the designated units and assigned a vendor that is popular among those in custody to provide programming multiple times per week in some of the units. Increased access to workforce classes and the ability to earn industry-recognized certifications are reportedly popular improvements. The Department also worked with the Department of Education to provide access to educational services to a larger number of Young Adult housing units at RNDC. At the end of the Monitoring Period, 10 of the 25 Young Adult housing units had access to school.

Importantly, toward the end of the Monitoring Period, a new leadership team was installed at RNDC and the agency leaders who developed the RNDC Plan began to transfer the vision and the responsibility for its implementation to the new facility team. Establishing direct ownership of the RNDC Plan, its objectives and strategies is essential, although past experience has shown that agency leadership must not abandon the plan and must continue to provide oversight and guidance to ensure that the various strategies are sustained—especially if the facility leadership team experiences turnover. In the months since the transition took place (after the close of the Monitoring Period), the AC of Programs and the *Nunez* Manager have remained fully engaged, and the RNDC Team has continued to make important progress expanding programming options; creating daily unit schedules; auditing the level of consistent staffing that has been achieved; creating a framework for providing incentives for non-violent behavior and developing a methodology to assess changes to key performance indicators such as rates of violence/uses of force, grievances and program engagement. These will be fully

detailed in Monitor's Report for the 19th Monitoring Period, along with any areas of the Plan that may need to be further developed or that require additional focus.

**Monitoring Team Recommendations**

The Monitoring Team has collaborated closely with the Department as it developed and refined the Plan's components and as implementation got underway. The Department has been open to technical assistance regarding various aspects of the Plan's strategies to improve staffing, security practices, increase programming, and to evaluate the impact on violence. Most recently, the Monitoring Team has advised the Department to assess key metrics in the designated YA units compared to the level of violence and use of force among young adults at RNDC prior to the Plan's implementation. This will allow the assessment of the RNDC Plan's impact to be focused on how conditions may have changed for the specific target population, rather than relying on facility-wide statistics that have confounding factors (such as the large number of adults housed at RNDC).

The RNDC Plan team has also been encouraged to utilize the *Nunez* Compliance Unit's ("NCU") security audits to assess whether poor security practices that are often a precursor to violence are showing improvement. During the current Monitoring Period, NCU audited four of the designated YA housing units in February/March 2024 finding that certain poor practices persist (*e.g.*, staff being off post, inconsistent touring by officers, and/or leaving cells unsecured and PIC moving freely in and out of them) while others show slight improvement (*e.g.*, enforcing lock-in, supervisors touring as required). These practices are ripe for improvement under the Unit Management strategy being utilized to implement the RNDC Plan.

**Conclusion**

In summary, the Department has demonstrated a concerted effort to improve facility security at RNDC in an effort to better protect people in custody from an unreasonable risk of harm. The RNDC Plan has yet to be fully implemented, and a risk of harm remains even with lower rates of violence and use of force, but the sustained focus on problem-solving strategies and initial implementation efforts are sufficient to upgrade the compliance rating to Partial Compliance.

| COMPLIANCE RATING | ¶ 1. (18-year-olds) Partial Compliance |
|---|---|

| CJ § XV. Safety and Supervision of Inmates Under the Age of 19, ¶ 12 (Direct Supervision) |
|---|
| ¶ 12. _Direct Supervision._ The Department shall adopt and implement the Direct Supervision Model in all Young Inmate Housing Areas. |

_The analysis and compliance rating below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old incarcerated individuals. The Monitoring Team will not assess compliance with the Nunez provisions related to 16- and 17-year-olds in this Monitoring Period pursuant to the Stipulation and Order Regarding 16- and 17-Year-Old Adolescent Offenders at Horizon Juvenile Center, ¶ 2 (dkt. 503)._

To implement Direct Supervision, the Department is required to emphasize proactive and interactive supervision, appropriate relationship building, early intervention to avoid potential confrontations, de-escalation, rewards for positive behavior and consistent operations on each unit, including the implementation of daily unit schedules.

The Department's long-standing inability to implement a Direct Supervision model resulted in the imposition of a related provision in the First Remedial Order (dkt. 350), § D, ¶ 3. As part of the additional remedial relief, the Department is required to periodically assess the extent to which these various aspects are being properly implemented, along with adherence to the daily schedule in each housing unit. The _Nunez_ Compliance Unit ("NCU") consulted with the Monitoring Team to develop a protocol for this assessment in early 2021, but audits were never produced because RNDC was in such disarray. Housing units did not have daily schedules and were not staffed by the same people day-to-day, which precluded the consistency, predictability and relationship development that is at the core of the Direct Supervision model.

Since then, via the RNDC Programs Action Plan, the Department has begun to build a foundation upon which the elements of Direct Supervision can rest. An essential first step is the implementation of a staffing strategy that consistently assigns staff to the same unit day-to-day (_see_ Consent Judgment, § XV, ¶ 17, below). Once assigned and properly supervised, these staff will be responsible for proactively supervising the units and intervening early to de-escalate conflicts, assisted by the assigned Security Team members. Assigned housing unit staff, supervisors and Security Team members, collectively, will also be responsible for implementing the daily unit schedule which will provide much needed predictability and thus should reduce the level of frustration experienced by many PICs when services are not delivered reliably. Once the staffing strategy and daily unit schedules have taken hold, the Department will need to develop a plan to address First Remedial Order (dkt. 350), § D, ¶ 3, which requires periodic assessments of the extent to which these various aspects are being properly implemented, along with adherence to the daily schedule in each housing unit. To complete the Direct Supervision approach, the Department also needs to develop a comprehensive

strategy to reward positive behavior, a key violence reduction strategy about which the Monitoring Team continues to provide technical assistance.

Although the Department appears better positioned to address the requirements of this provision than in the past, it still has yet to implement the core concepts of Direct Supervision in a tangible and verifiable way, and thus remains in Non-Compliance.

| COMPLIANCE RATING | ¶ 12. (18-year-olds) Non-Compliance |
|---|---|

| **CJ § XV. Safety and Supervision of Inmates Under the Age of 19, ¶ 17 (Consistent Assignment of Staff)** |
|---|
| ¶ 17. _Consistent Assignment of Staff._ The Department shall adopt and implement a staff assignment system under which a team of Officers and a Supervisor are consistently assigned to the same Young Inmate Housing Area unit and the same tour, to the extent feasible given leave schedules and personnel changes. |

*The analysis and compliance rating below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old incarcerated individuals. The Monitoring Team will not assess compliance with the Nunez provisions related to 16- and 17-year-olds in this Monitoring Period pursuant to the Stipulation and Order Regarding 16- and 17-Year-Old Adolescent Offenders at Horizon Juvenile Center, ¶ 2 (dkt. 503).*

This provision requires housing units where most 18-year-olds are housed to have officers and Supervisors consistently assigned to the same housing units day-to-day. In order for the Department to adopt a consistent staff assignment model, staff must reliably report to work as scheduled, and the Department must implement a staff deployment strategy that prioritizes the required consistency across units. The Department's inability to achieve Substantial Compliance with this provision resulted in additional remedial relief, including a provision regarding staff assignments in the First Remedial Order (dkt. 350), § D, ¶ 1. In addition to requiring the Department to enhance its efforts to consistently assign staff to the same housing unit day-to-day, the First Remedial Order also requires the Department to implement a quality assurance process to assess the extent to which the consistent staffing requirements are met each month.

In January 2024, the Department produced a plan to improve conditions and facility safety at RNDC where most 18-year-olds are housed ("RNDC Programs Action Plan"). The cornerstone of the plan is to consistently assign staff to each of the four housing units where 18-year-olds can be assigned (Building 2, Building 3, Mod 1 & Mod 2). This includes officers, Captains, members of the facility's Security Team, and an Assistant Deputy Warden ("ADW") (who functions as the Unit Manager for the units). Given that the overall goal of the RNDC Plan is to reduce conflict and violence, structuring the units' staffing to permit familiarity, cooperation and trust to develop is essential for the type of problem-solving that must occur. As such, consistently assigning staff to the targeted units day-to-day is the core strategy that the other components of the RNDC Plan rest upon.

During the monitoring period, the Department began to implement the consistent staffing strategy and accomplished the following:

- Met with union officials to develop buy-in to the staffing component of the RNDC Plan,

- Surveyed staff to identify those interested in working with the target population,

- Began to assign interested staff to specific posts across the four designated areas (a task that is on-going),

- Developed two training curricula to prepare these staff,

- Trained staff assigned to the four areas,

- Navigated some structural barriers regarding Split Tours to identify which posts legitimately require non-traditional work hours (*i.e.*, school staff).

In addition, the *Nunez* Compliance Unit ("NCU") developed and tested the audit template for the RNDC Plan's staffing strategy, as required by the First Remedial Order (dkt. 350), § D, ¶ 1 (i). As an initial step, the NCU produced a sample report in May 2024 to familiarize agency and facility leaders with the format, given that most of them were not involved with the NCU's audits of this provision from several years ago.[154] The Monitoring Team discussed the audit template with NCU, finding that the audit report format is easy to understand and that the methodology will provide several useful statistics. NCU's practice of testing the audit methodology and providing a sample report is a good a practice to ensure that audit findings are valid and informative. NCU's audit reports will provide several statistics showing the extent to which the assigned staff (or an acceptable alternative, such as a staff member who works the same post but on a different tour) worked a building's housing unit posts each tour, each day. The audit reports will also provide useful insight into the various reasons that the assigned staff did not work the post (*e.g.*, leave/Personal Emergency/FMLA, Mutual, coding errors in InTime, etc.), allowing facility and agency leaders to troubleshoot these issues to increase fidelity over time.

Throughout the Monitoring Period, the Monitoring Team was highly engaged with the agency leaders who developed and were responsible for the initial implementation of the RNDC Plan. This included participating in monthly calls (sometimes bi-weekly); reviewing and providing feedback on the training curricula developed to increase staff's understanding of the target population and the units' problem-solving objectives; and assessing NCU's audit methodology to ensure its results would provide valid information for assessing compliance with this provision. At the Monitoring Team's prompting, the Department also grappled with the various dynamics that undercut previous attempt to implement a similar staffing model at RNDC. Given that an appropriate foundation has been established for the consistent assignment of staff to the units where 18-year-olds are housed, the Monitoring Team expects that the Department will achieve Partial Compliance with this provision during the next Monitoring Period.

| COMPLIANCE RATING | ¶ 17. (18-year-olds) Non-Compliance |
|---|---|

---

[154] NCU's audits from late 2021 revealed very poor levels of performance, with less than 20% of housing unit posts being staffed by a steady officer.

## UPDATE ON THE 2023 *NUNEZ* COURT ORDERS

This section provides an update on the Department's work related to five of the Court Orders entered in 2023, those entered on June 13, August 10, October 10, December 14, and December 20, 2023. Collectively, these Orders were intended to catalyze improvement in the Department's management of the *Nunez* Court Orders, its work with the Monitor, and its efforts to address fundamental security, reporting, and management practices to bring about immediate relief to the ongoing risk of harm faced by people in custody and staff on a daily basis. Some of the problems addressed by the various orders have been abated (e.g., transparency with the Monitoring Team, providing timely information to the Monitoring Team) particularly with the installation of the current Commissioner in December 2023. However, the Department's work toward most of the substantive requirements (e.g., incorporating the Monitoring Team's recommendations into policy/procedure as a necessary first step toward changing practice, addressing staff off post, improving search and escort procedures, improving control station security, implementing recommendations to enhance suicide prevention protocols) has not proceeded in a timely manner. In several areas, the Department's efforts to meet the requirements have languished for over a year.

### JUNE 13, 2023 ORDER (DKT. 550)

The Court entered an Order on June 13, 2023 regarding the City's and Department's obligation to work with the Monitor and his team, including providing relevant information as requested and notifying the Monitor of serious incidents in the jails. The status of each requirement is described briefly below.

- **Immediate Notification to the Monitor of Serious Events (§I, ¶3)**:

  - (a) *Individuals who die in custody*: The Department promptly notifies the Monitor of deaths in custody and submits relevant information as it becomes known. The Monitoring Team does not have any reason to believe that information is currently being withheld as it was in the past.

  - (b) *Individuals who sustain a serious injury or serious condition that requires admission to a hospital*: The Department notifies the Monitoring Team each day about individuals in custody who have been admitted to the hospital. The Monitoring Team described the recommendations it shared with the Department to improve its tracking and reporting of these circumstances in the Monitor's November 8, 2023 Report (dkt. 595) at pgs. 34 and 35. However, making the suggested improvements remains a work in progress.

  - (c) *Individuals who are compassionately released*: The Department provides the Monitoring Team with a routine report of all clinical release letters submitted by CHS.

- **Production of Information, Consultation and Access to Staff (§I, ¶¶ 4, 5, 6)**: The Department's approach to providing information, and consulting and collaborating with the Monitoring Team shifted noticeably when the current Commissioner was appointed in December 2023, as described in every report since the current Commissioner was appointed.[155] In short, in contrast to the posture that gave rise to this requirement, staff at

---

[155] Monitor's December 22, 2023 Report (dkt. 666) pgs. 2-3; Monitor's February 26, 2024 Letter to Court (dkt. 679) pgs. 1-4 and 7; Monitor's April 18, 2024 Report (dkt. 706) pgs. 1-2, 9-10, 158, and 165; Monitor's June 27, 2024 Report (dkt. 735) pgs. 1-2.

all levels routinely provide information to the Monitoring Team and are candid in their assessments of the current state of affairs. There has also been improvement in the quality and timing of the provision of information to the Monitoring Team, however, some requests continue to languish.  The Department struggles most with implementing the Monitoring Team's recommendations for policies and procedures in an efficient manner, which delays the improvements necessary to bring about the relief intended by the Court.

- ***Nunez* Manager (§I, ¶7)**: The *Nunez* Manager continues to be an advantageous and critical player in the Defendant's work. The *Nunez* Manager's team includes a Deputy *Nunez* Manager, a full-time administrative assistant, and a number of lawyers. The team that works with the *Nunez* Manager and those that work with her (including the Legal Division and Strategic Initiatives) would benefit from additional staffing resources.

- **Department-Wide Remedial Steps to Address the Five Incidents Discussed in the May 26, 2023 Special Report (dkt. 533) (§II)**: The Department reported that a preventive barrier was installed in the relevant housing unit in GRVC on October 3, 2023 and the Monitoring Team previously verified its presence during site visits. In June 2023, the Department reported its intention to: (1) update existing policies to address individuals who are unclothed—which remains outstanding, and (2) revise procedures to require incarcerated individuals who are involved in a violent encounter to be seen at the clinic on an "urgent basis"—which was completed via Teletype on May 30, 2024.

**AUGUST 10, 2023 ORDER (DKT. 564)**

The Court entered an Order on August 10, 2023 to address several critical items identified by the Monitoring Team that were needed to reduce the imminent risk of harm but have continuously languished. The purpose of this Order was for the Department to prioritize

these actions as other remedial relief was being contemplated. These steps were intended to be immediate, *interim measures* to ensure a proper focus and pace for initiatives that have direct bearing on the imminent risk of harm.

- **UOF, Security and Violence Indicators (§ I, ¶ 1):** The Monitor's February 26, 2024 (dkt. 679) Report describes the Department's efforts to address this requirement (see pgs. 5-7). A more detailed description of the new meeting format is described in the compliance assessment of the First Remedial Order § A, ¶ 2 (Facility Leadership Responsibilities) in this report.

- **Revised Search Procedures (§ I, ¶ 2):** The Monitoring Team continues to observe via its routine reviews of incidents that searches remain chaotic and frequently result in unnecessary uses of force.[156] Search technique remains poor and results in a relatively low rate of return in terms of the volume of contraband recovered.[157] The Department of Investigations recently issued a report regarding Contraband Smuggling and its findings that merits scrutiny and consideration as part of the Department's overall

---

[156] In 2021, the Monitoring Team recommended: (1) the span of control for searches should be limited in order to reduce the number of excessive staff involved in searches; (2) a specific plan must be devised before each search takes place; (3) facility leadership must be involved in any planning for a search that includes external teams like ESU; and (4) specific procedures for conducting searches in celled and dormitory housing and common areas so that searches are completed in an organized and efficient manner and are not chaotic and disruptive.

[157] *See*, for example, Monitor's April 3, 2017 Report (dkt. 295) at pgs. 13-14 and 128; Monitor's October 17, 2018 Report (dkt. 317) at pg. 42; Monitor's October 23, 2020 Report (dkt. 360) at pgs. 16, 29 and 75; Monitor's May 11, 2021 Report (dkt. 368) at pgs. 24, 43-44, 48 and 124; Monitor's December 6, 2021 Report (dkt. 431) at pg. 26; Monitor's March 16, 2022 Report (dkt. 438) at pgs. 22 and 71-72; Monitor's October 28, 2022 (dkt. 472) at pgs. 71-72, 81 and 117; Monitor's April 3, 2023 Report (dkt. 517) at pgs. 54 and 138; Monitor's July 10, 2023 Report (dkt. 557) at pgs. 42-43; Monitor's November 8, 2023 Report (dkt. 595) at pgs. 14-16; Monitor's December 22, 2023 Report (dkt. 666) at pg. 18 and Appendix A; and Monitor's April 18, 2024 Report (dkt. 706) at pgs. 71-73 and Appendix A.

efforts to improve its search procedures.[158] The Department identified three policies that must be revised to address this requirement. In September 2023, the Department submitted proposed revisions to the first of the three policies for the Monitoring Team's consideration. The Monitoring Team shared extensive feedback and comments in October 2023. Over one year later, the Department continues to report that it is evaluating the Monitoring Team's feedback and is also working to provide proposed revisions to the other two search policies. As of the filing of this report, the Department has not shared a revised draft of the first policy nor proposed revisions to the other two policies.

- **Revised Escort Procedures (§ I, ¶ 3)**: Painful escorts have been identified as a contributor to unnecessary uses of force for years, but no substantive efforts have been taken to change staff practice.[159] Between February 2023 and early 2024, the Department reviewed inmate grievance reports to determine whether incarcerated individuals file grievances regarding the use of painful escorts, finding that no such grievances were filed during this time period. The Monitoring Team advised the Department evaluating grievances for this purpose may not be productive given that the Monitoring Team routinely identifies the practice in its review of incidents and the

---

[158] *See*, DOI's report on Contraband Smuggling in the City's Jails and Critical Recommendations for Improved Security Measures, November 2024 at https://www.nyc.gov/assets/doi/reports/pdf/2024/ContrabandRpt.11.20.2024.pdf.

[159] *See* Monitor's October 31, 2016 Report (dkt. 291) at pg. 110; Monitor's April 3, 2017 Report (dkt. 295) at pgs. 13 and 149; Monitor's October 10, 2017 Report (dkt. 305) at pg. 8; Monitor's April 18, 2018 Report (dkt. 311) at pgs. 18-21; Monitor's April 18, 2019 Report (dkt. 327) at pg. 24; Monitor's October 28, 2019 Report (dkt. 332) at pgs. 3-4; Monitor's May 29, 2020 Report (dkt. 341) at pgs. 30-31, 39 and 79; Monitor's October 23, 2020 Report (dkt. 360) at pg. 3, 13, 17, 29 and 31; Monitor's May 11, 2021 Report (dkt. 368) at pgs. 24-25 and 46-47; Monitor's June 8, 2023 Report (dkt. 541) at pg. 6; Monitor's July 10, 2023 Report (dkt. 557) at pg. 45; and Monitor's November 8, 2023 Report (dkt. 595) at pgs. 12 and 14-15.

absence of a grievance does not equate to the absence of the problem.[160] Additionally, facility leadership only identified the use of painful escorts in 15 use of force incidents in the Rapid Reviews for uses of force that occurred during January 1-September 30, 2024, though the Monitoring Team's review of incidents suggests there are likely more instances that are not being identified during the Rapid Review process. The Department identified five policies that must be revised to address this requirement, all of which the Department reports are in different stages of internal review. The Monitoring Team has not yet received proposed revisions for any of the five policies.

- **<u>Lock-in and Lock-out Procedures (§ I, ¶ 4)</u>**: In late 2023, the Department began to focus on properly implementing the evening lock-in (9:00 p.m.) and consulted with the Monitoring Team on its plans. On October 31, 2023, the Department issued a teletype articulating the requisite procedures and required each facility to devise a lock-in plan. As shown in the graph below, lock-ins are now better managed, with nearly all being completed within one hour of the designated time.[161]

---

[160] The fact that no grievances have been filed regarding painful escorts most likely suggests that individuals in custody may not be aware that they can file a grievance if they have been subject to a painful escort.

[161] The calculations in this chart that separate the total monthly lock-ins into three categories are slightly different from the last Monitor's Report. The red category now includes lock-ins that are *two hours late or more.* The yellow category now includes lock-ins that are *between one hour and one hour and 59 minutes late.* The blue category now includes lock-ins that are *under one hour late.*



That said, incidents involving multiple people in custody or people in custody out of their cells continue to occur after lock-ins have ostensibly been completed, which suggests that staff are not consistently ensuring that people in custody remain locked in overnight. The Department elected to first focus on the 9:00 p.m. lock-in before addressing compliance with the 3:00 p.m. lock-in. The Monitoring Team believes this is a reasonable approach.

- **Control Station Security (§ I, ¶ 5)**: The Monitoring Team remains concerned that control stations are not properly secured. On October 20, 2023, the Department issued a teletype regarding staff's obligations to secure the control station doors, including a set of written requirements very similar to those developed in November 2021. At the time the teletype was issued, the Monitoring Team advised the Department that a plan for monitoring and enforcing the requirements was necessary given the pervasive and long-standing problems in this area and given that prior written protocols have had

little impact on staff practice. The Department reported that the Video Monitoring Unit would monitor this issue and track its findings but has not since confirmed whether this actually occurs. The Department also reported its intention to share the methodology for tracking its findings regarding control station security with the Monitoring Team for consideration but has not yet done so.

- **Staff Off Post (§ I, ¶ 6)**: On October 20, 2023, the Department issued a teletype regarding staff's obligations to remain on post until properly relieved, and that abandoning one's post may result in disciplinary action. NCU assesses this practice as part of its security audits, but the Department does not have a centralized mechanism to track the number of staff who are found to be off post.[162] The Monitoring Team has raised concern that the teletype/audit combination lacks an actual intervention that could impact staff practice. In response, the Department simply stated that NCU's security audits will continue to focus on staff being off post. NCU's security audits have identified this problem since the audits' inception in late 2021. NCU has conducted 32 security audits covering April 2024 and September 2024. In 19 of the 32 audits, the NCU found staff were off post for at least a portion of the 24-hour audit period. Although NCU's audits are useful to assess the scope of the problem, auditing and presenting NCU's findings has not generated any appreciable change in practice.

---

[162] The Department reported in fall 2023 that it was planning to reinvigorate its employee scanning process to help identify when a staff member may be off post. However, the Monitoring Team raised questions about the effectiveness of this strategy given the low likelihood that a staff member would notify the control room that they were leaving their post without being properly relieved. Ultimately, the Department elected not to proceed with this plan.

To date, no additional information regarding this effort has been provided to the Monitoring Team.

- **Special Teams Training (§ I, ¶ 7)**: The Department worked collaboratively with the Monitoring Team to develop the ESU/SRT training, and the Monitoring Team approved it in February 2024. The approved training curriculum is a vastly improved product over prior iterations and now provides staff with appropriate guidance to address the problematic practices that led to this requirement. The Department began to deploy the training in April 2024 to ESU staff and once complete, will train SRT staff.

- **Special Teams Command Level Orders (§ I, ¶ 8)**: The Department reports that ESU has nine Command Level Orders ("CLOs") and that the other Special Teams (including SST and SRT) do not have any.[163] The Monitoring Team has provided feedback on three of the nine CLOs, as discussed below. The Department continues to report that the remaining six CLOs are undergoing internal review, and that proposed revisions will be shared with the Monitoring Team once that review is complete.

  o The Monitoring Team's feedback from August 2021 on two CLOs (related to Aerosol Grenades and Pepperball spray) went unaddressed for almost two years. In July 2023, the Department shared proposed revisions to these CLOs and the Monitoring Team again provided feedback in August 2023. Subsequently, the Department reported that it no longer intends to utilize Pepperball spray and thus

---

[163] As noted elsewhere in this report, it took the Department months to confirm the number of relevant policies related to ESU.

will not update the relevant CLO.[164] The Department has not yet provided a

revised draft of the Aerosol Grenade CLO.

- o   In August 2023, the Monitoring Team provided feedback on the CLO related to

  Ballistic and Lethal Weapon Teams. The Department has not provided a revised

  draft of the policy to address this feedback.

- **Screening and Assignment of Staff to Special Teams (§ I, ¶ 9)**: In September 2023, the

  Department shared proposed revisions to the policy regarding screening and assigning

  staff to Special Teams. The Monitoring Team provided feedback in October 2023. The

  Department has not yet provided a revised draft of the policy to address the Monitoring

  Team's feedback.

- **Revised Pre-Promotional Screening Policies and Procedures (§ I, ¶ 10)**: The

  Department reports it has been working on revisions to the policy governing pre-

  promotional screening but has not provided proposed revisions to the Monitoring Team

  for review. A more detailed discussion regarding pre-promotional screening is included in

  the compliance assessment of Consent Judgment, § XII, ¶ 1-3 of this Report.

- **ID Staffing (§ I, ¶ 11)**: ID staffing levels are addressed in the compliance assessment for

  Consent Judgment, § VII, Use of Force Investigations in this report. The Department

  reports it is continuing to work to recruit and hire the requisite number of investigators

  and supervisors as required by the Order, but has not yet achieved the threshold numbers

  of staff.

---

[164] In response to the Monitoring Team's recommendation, on March 4, 2024, the Deputy Commissioner of Security issued a Security Memorandum advising staff that the use of Pepperball Spray is no longer authorized and that the equipment is to be stored indefinitely in the Inactive Inventory Bay.

- **Command Discipline ("CD") Directive (§ I, ¶ 13)**: The Department's process to develop the CD Directive has been protracted.[165] The Department has provided several versions of the proposed policy, and the Monitoring Team has provided extensive feedback on each version, most recently in October 2024. An update on the status of the policy and the Department's efforts to improve its management of CDs is described in the compliance assessment for Consent Judgment, § VIII, ¶ 1, Staff Discipline and Accountability in  this report.

- **External Assessment (§ I, ¶ 14)**: Dr. Belavich completed his assessment of the Department's suicide prevention practices in January 2024. Dr. Belavich consulted with the Monitoring Team during his assessment. A copy of his final report was filed with the Court on March 19, 2024 as Exhibit A to the Saunders Declaration (dkt. 689-12). The report includes several recommendations that the Monitoring Team intends to help the Department implement.

### OCTOBER 10, 2023 ORDER (DKT. 582)

On October 10, 2023, the Court issued an Order directing Defendants to engage with the Monitoring Team on immediate initiatives to address the risk of harm and reporting issues identified in the Monitor's October 5, 2023 Report and reminded Defendants of their obligations to collaborate with the Monitor and to comply with the *Nunez* Court Orders.

---

[165] The concerns identified in this revision process were outlined in the April 18, 2024 Report at pgs. 115 to 116 and 163.

- **<u>Immediate Security Plan</u>**: The Court has issued a number of Orders requiring the Department to develop a Security Plan.[166] The Monitor's November 8, 2023 Report (dkt. 595) at pgs. 17-21 described the plans developed since September 2021 when the Second Remedial Order was entered, extending through November 2023. On June 24, 2024, the Department produced an updated Security Plan to the Monitoring Team for review and feedback.[167] The plan focused on several initiatives, including contraband recovery, security risk group management, incident response, no-go zone enforcement, security audits, centralized mail processing, infrastructure protection, body-worn cameras, and a focus on population management. However, the Monitoring Team found the revised plan was insufficiently focused on immediate critical risks, particularly door security, which is foundational to preventing harm. The plan failed to address longstanding deficiencies in staff practices, lacked data-driven strategies, and left the Monitoring Team uncertain about the Department's capacity and resources to successfully implement the proposed long-term initiatives.

  These deficiencies caused the Monitoring Team to determine that proceeding with the current Security Plan was not well advised. Accordingly, the Monitoring Team recommended the Department adopt an approach that focuses on discrete and basic elements of sound correctional management such that each deficiency can be approached more directly and intensively. Doing so may create the ability to ameliorate individual

---

[166] *See* also Second Remedial Order, ¶ 1(i)(a) (dkt. 398); Action Plan § D, ¶ 2(a) (dkt. 465); July 18, 2023 Order at pg. 2 (dkt. 558).

[167] The Department first shared an updated Security Plan on May 23, 2024, but shortly after its submission the Department reported the plan was being revised. Consequently, the Monitoring Team did not provide feedback on the May 23, 2024 Security Plan.

deficiencies such that more sustainable, universal improvements can be achieved. The first such initiative is to focus on properly securing cell doors and offering options for lockout in accordance with Department policy. The Door Security initiative is summarized in the "Current State of Affairs" section of this report. During the past few weeks, the Commissioner appointed three critical and experienced leaders (the Senior Deputy Commissioner, the Deputy Commissioner of Security, and the Deputy Commissioner of Classification and Facility Operations) to manage the operations of the jails, one of whom (the Senior Deputy Commissioner) will also chair the newly created Security Council.[168] The Security Council has been charged with devising and implementing strategic security initiatives to advance the *Nunez* reforms. Although newly minted, this initiative has promise.

- **<u>Immediate Reporting Initiatives</u>**: The Department issued two teletypes, on October 6 and 20, 2023, that reminded staff of their incident reporting obligations. The teletypes also rescinded the January 31, 2023 memo that permitted undue subjectivity and discretion in incident reporting (*see* Monitor's November 8, 2023 Report (dkt. 595) at pgs. 29-37). Additional work related to the Department's reporting obligations is discussed in the section below regarding the December 14, 2023 Order.

---

[168] The Commissioner created a Security Council that is charged with developing a plan to identify and address security issues that permit or contribute to violence in the jails and that impede compliance with the *Nunez* Court Orders. The Security Council will be chaired by the Senior Deputy Commissioner. The Deputy Commissioner of Security, and the Deputy Commissioner of Classification and Facility Operations will serve as members of the Security Council, as well as a number of other Department leaders.

**DECEMBER 14, 2023 ORDER (DKT. 656)**

On December 14, 2023, the Court issued an Order related to changes the Defendants must make to incident reporting practices in light of the Monitoring Team's findings in the Monitor's October 4, 2023 and November 8, 2023 Reports.

- **List of Reporting Policies (§ 1, ¶ a)**: On December 15, 2023, the Department provided the Monitoring Team with a list of over 90 Department policies that must be reviewed for potential consolidation into a comprehensive Incident Reporting policy.

- **Stabbing and Slashing Definition (§ 1, ¶ b)**: The Department and Monitoring Team collaborated to revise the definition for "stabbing/slashing," which was approved by the Monitor on February 16, 2024. The Department issued a teletype with the approved definition in October 2024.  In advance of promulgating the updated definition, the Department also conducted a training for all ADWs to coincide with the roll-out of the new criteria for classifying these events.

- **Definitions of Incident Categories (§ 1, ¶ c)**: Defining incident categories will be part of the effort to develop a comprehensive Incident Reporting policy.

- **Comprehensive COD Policy (§ 1, ¶ d)**: The Department reports that a comprehensive Incident Reporting policy is being developed. This is a significant undertaking, involving over 90 policies and work across many Divisions and units within the agency. The Department's leadership has been consulting with the Monitoring Team routinely and providing updates on work completed to date. It is clear that the Department has dedicated significant time, attention and effort to revamp the entire reporting process. At the end of October 2024, the Monitoring Team provided some initial feedback on the

proposed process change. The Department has engaged with the Monitoring Team on addressing the feedback and is continuing to move this initiative forward.

**DECEMBER 20, 2023 ORDER (DKT. 665)**

On December 20, 2023, the Court found the Department in contempt of Action Plan § D, ¶ 3 and § E, ¶ 4 (dkt. 465) and § I, ¶ 5 of the June 13, 2023 Order (dkt. 550). On February 27, 2024 (dkt. 680), the Court found that the Department purged its contempt because it complied with the three enumerated requirements set out by the Court related to: (1) the sufficiency of the role, authority, and resources dedicated to the *Nunez* Manager, (2) developing and implementing a high profile communications program to make clear the responsibility—shared by Department leadership and staff alike—to proactively collaborate with the Monitoring Team, and (3) developing a set of data and metrics for use of force, security, and violence indicators that will be routinely evaluated by Department leadership to identify trends regarding unnecessary and excessive uses of force and violence in order to identify their root causes and to develop effective strategies to reduce their occurrence.

# CONCLUSION

This report, as have those previously submitted, has chronicled in detail the dangerous conditions that continue to pervade the City's jails. Throughout the nine-year history since the Consent Judgment went into effect, the *Nunez* reforms have simply not been implemented or institutionalized in a manner to materially, and in a sustained fashion, reduce unacceptable levels of harm to both detainees and staff. Notably, the Department's leadership has taken steps over the last year to reverse the counterproductive and troubling approach the agency had towards the reform effort in 2023. While advances have been made within discrete areas of the Department's operation, the foundational elements of reliable security practices that are directly related to staff use of force and alarming levels of interpersonal violence among the detainee population remain elusive as does the accountability of staff at all levels for these failures.

## PRIORITY AREAS OF FOCUS

The urgency of the risk of harm under the current conditions of confinement requires both a dedicated focus on the core elements of the *Nunez* Court Orders and broader support from all stakeholders to ensure that they are implemented and operationalized to increase safety in the system. Major decisions by the Court regarding contempt and additional remedial relief, that could materially alter the structure of the *Nunez* reforms, have not been rendered. However, the Court has already directed the Monitoring Team and the Parties to work on the formulation of potential remedial measures. This work must be given the highest priority by all stakeholders.

The Court explained at the September 25, 2024 Conference that "the next stage of this case will require that we identify, implement and operationalize [. . .] measures to ensure the quality, the tenure and the effective accountability of the persons and entities in control of the Department. Clear court orders alone have not meaningfully accomplished progress on safety,

nor has the provision of the monitor's oversight, expertise, consultation and public transparency through reports. The relationship of targeted and tailored management of measures addressing the use of force and the safety issues that drive problematic uses of force to all of the other aspects of jail control and management also need to be considered carefully regardless of the ultimate legal framework of the next steps."[169] This is why it is critical that additional remedial relief must be realistic, reflect sound correctional practice, and most importantly, result in viable and sustainable reforms as envisioned under the Consent Judgment and the subsequent *Nunez* Court Orders. The Monitoring Team also strongly recommends that the steps taken to address the management of the *Nunez* Court Orders must be combined with concrete and specific tasks that are "essential to accomplish now and moving forward in the near future."[170]

The Monitoring Team shares the following recommendations for areas of focus to both guide considerations for the next phase of the case and potential remedial relief.

- **Management of the *Nunez* Reforms**: As the Court explained in the September 25, 2024 conference, a leading vulnerability in managing the *Nunez* Court Orders is the lack of continuity of leadership. Accordingly, a framework that ensures consistent leadership of the Department is a key component of the remedial effort. This approach must be both practical and functional, such that it can be implemented as expeditiously as possible and with the least amount of disruption to the operation of the jails.

- **Reducing the Risk of Harm**: The Department must develop and implement initiatives that address the well-known security and operational failures that plague the Department. The Department must not only sustain its focus on developing conceptually sound

---

[169] *See* September 25, 2024 Court Transcript at pgs. 65:21 to 66:10.

[170] *See* September 25, 2024 Court Transcript at pg. 67:8-9.

strategies but must also work to infuse the commitment to their proper implementation by all levels of Department supervisors and staff. The top priority must be to reduce the pervasive risk of harm.

- **Engaging Staff in the Reform Effort**: The Consent Judgment is structured to address the pervasive pattern underpinning the harm in the system in order to adjust individual pieces of the overall issue (e.g., policies, practices, investigations and the response to misconduct).  The hoped-for and essential component of culture change has not occurred, therefore the Department must develop a comprehensive, concrete and realistic strategy to better engage staff in the reform effort so that they comprehend and embrace the need for change and adopt a commitment to elevate their own skills.

- **Supervisory Structure**: An expanded organizational structure for the Department's uniform line staff from two to three lines of supervision is needed. The Department has reported that certain legal impediments may preclude the agency from adding an additional level of supervisor to its existing organizational framework. Identifying and addressing (to the extent necessary) these potential legal impediments must be a priority, including determining whether Court relief may be necessary in order for the Department to enhance its supervisory structure.  The Department must develop and implement a comprehensive, concrete and realistic plan to expand the level of supervisory control to its existing organizational framework.

- **Accountability for Staff Misconduct**: The Department must improve its ability to identify misconduct and to hold staff accountable for poor practice, and to sustain those practices over time. Further, the City must ensure that OATH's processes and procedures

support the overall reform effort and that procedures for staff accountability are

maximally efficient in order to ensure staff discipline is swift, certain, and proportional.

- **Management of Incarcerated Individuals Following Serious Incidents of Violence**:
  Operating and safely managing a program for detainees with a known and recent
  propensity to engage in violent predatory behavior is a challenging but necessary
  endeavor. Although the number of individuals requiring such a program is small, the
  management of individuals following serious incidents of violence is critical to the safe
  operation of the jails.  It is critical to the safe management of the jails and critical that
  such programs are consistent with sound correctional practice.  Ongoing work regarding
  the implementation of such programs must remain a top priority for the Department.

- **Streamlining the *Nunez* Court Orders**: The deeply entrenched dysfunction, which has
  taken years to unravel, led to the creation of carefully crafted Orders designed to tackle
  problems at their core. However, the Department has yet to fully comply with these
  Orders. The conglomeration of the *Nunez* Court Orders, which require compliance with
  hundreds of interconnected provisions, sometimes with slight but important variations,
  has become cumbersome over time and does not provide the streamlined and
  straightforward framework that is critical for success in complex reform cases. Therefore,
  thoughtfully and carefully organizing and streamlining the *Nunez* Court Orders is
  necessary. The Monitoring Team shares more detailed recommendations on this process
  in Appendix E of the Report.

As directed by the Court, the Monitoring Team will continue to support all stakeholders

in developing and crafting potential remedial measures with the goal that they result in

advancing the *Nunez* reform efforts that has not occurred to date.

**UPCOMING MONITOR'S REPORTS**

When the motion practice before the Court is resolved, the timing and contents of the subsequent Monitor's Reports will be addressed as part of the process for streamlining the *Nunez* Court Orders. In the meantime, outlined below is a summary of the upcoming Monitor's Reports.

- **15 Business Days After Issuance of Court's Decision on Motion for Contempt**: Pursuant to the Court's November 14, 2024 Order (dkt. 798), the Monitoring Team will provide a more detailed update regarding the Parties' positions on proposed remedial relief 15 business days after the issuance of the Court's determination on the motion for contempt. Additional details about what must be included in that update may be provided in the Court's decision on the motion for contempt.

- **January 17, 2025**: The Monitoring Team will update the Court on the work regarding LL42 as discussed in the Managing People with a Known Propensity for Violence section of the Report.

- **April 17, 2025 Report**: Given the current state of affairs and work completed to date, the Monitoring Team recommends that the Court extend its order modifying the provisions subject to compliance assessment through December 31, 2024. A proposed order regarding the next Monitor's Report is attached as Appendix H.  The Monitoring Team intends to discuss the proposed order with the Parties in short order to obtain their position and then will make a formal application to the Court.

# APPENDIX A:
# DATA

## NUMBER AND RATE OF UOF – JANUARY 2022 TO JUNE 2024



| Systemwide Use of Force January 2022 to June 2024 | | | | |
|---|---|---|---|---|
| Months | Total # UOF | Average/month | ADP | Rate |
| January-June 2022 | 3241 | 540.2 | 5491 | 9.8 |
| July-December 2022 | 3764 | 627.3 | 5787 | 10.9 |
| January-June 2023 | 3236 | 539.3 | 5969 | 9.0 |
| July-December 2023 | 3548 | 591.3 | 6151 | 9.6 |
| January-June 2024 | 3589 | 598.2 | 6271 | 9.3 |

| Use of Force at EMTC January 2022 to June 2024 | | | | |
|---|---|---|---|---|
| Months | Total # UOF | Average/month | ADP | Rate |
| January-June 2022 | 485 | 80.8 | 594 | 13.6 |
| July-December 2022 | 613 | 102.2 | 733 | 13.9 |
| January-June 2023 | 533 | 88.8 | 873 | 10.2 |
| July-December 2023 | 677 | 112.8 | 1202 | 9.4 |
| January-June 2024 | 804 | 134.0 | 1376 | 9.7 |

| Use of Force at GRVC January 2022 to June 2024 | | | | |
|---|---|---|---|---|
| Months | Total # UOF | Average/month | ADP | Rate |
| January-June 2022 | 621 | 103.5 | 622 | 16.7 |
| July-December 2022 | 824 | 137.3 | 743 | 18.5 |
| January-June 2023 | 508 | 84.7 | 829 | 10.2 |
| July-December 2023 | 532 | 88.7 | 887 | 10.0 |
| January-June 2024 | 546 | 91.0 | 957 | 9.51 |

| Use of Force at NIC/West January 2022 to June 2024 | | | | |
|---|---|---|---|---|
| Months | Total # UOF | Average/month | ADP | Rate |
| January-June 2022 | 217 | 36.2 | 335 | 10.8 |
| July-December 2022 | 133 | 22.2 | 346 | 6.4 |
| January-June 2023 | 193 | 32.2 | 355 | 9.1 |
| January-June 2024 | 182 | 30.3 | 938 | 3.2 |

*The size of the population at West increased substantially in late 2023 because additional housing units were added to the facility*

| Use of Force at OBCC<br>January 2022 to June 2024 | | | | |
|---|---|---|---|---|
| Months | Total #<br>UOF | Average/month | ADP | Rate |
| January-June 2022 | 165 | 27.5 | 291 | 9.5 |
| July-December 2022 | Facility was closed. | | | |
| January-June 2023 | Facility was closed. | | | |
| Aug.-December 2023 | 696 | 139.2 | 1453 | 9.6 |
| January-June 2024 | 866 | 144.3 | 1436 | 10.1 |

*Data from July 2023 is excluded because it is an extreme outlier*

| Use of Force at RESH<br>July 2023 to June 2024 | | | | |
|---|---|---|---|---|
| Months | Total #<br>UOF | Average/month | ADP | Rate |
| July-December 2023 | 398 | 66.3 | 164 | 40.5 |
| January-June 2024 | 395 | 65.8 | 154 | 42.7 |

| Use of Force at RMSC<br>January 2022 to June 2024 | | | | |
|---|---|---|---|---|
| Months | Total #<br>UOF | Average/month | ADP | Rate |
| January-June 2022 | 184 | 30.1 | 254 | 11.9 |
| July-December 2022 | 292 | 48.7 | 331 | 14.7 |
| January-June 2023 | 228 | 38.0 | 349 | 10.9 |
| July-December 2023 | 188 | 31.3 | 358 | 8.7 |
| January-June 2024 | 185 | 30.8 | 359 | 8.6 |

| Use of Force at RNDC<br>January 2022 to June 2024 | | | | |
|---|---|---|---|---|
| Months | Total #<br>UOF | Average/month | ADP | Rate |
| January-June 2022 | 653 | 108.8 | 727 | 15.1 |
| July-December 2022 | 478 | 79.7 | 812 | 9.9 |
| January-June 2023 | 413 | 68.8 | 848 | 8.1 |
| July-December 2023 | 516 | 86.0 | 1089 | 7.9 |
| January-June 2024 | 342 | 57.0 | 993 | 5.7 |

## NUMBER AND RATE OF STABBING AND SLASHING – JANUARY 2022 TO JUNE 2024



| Systemwide Stabbings/Slashings January 2022 to June 2024 | | | | |
|---|---|---|---|---|
| Months | Total # S/S | Average/month | ADP | Rate |
| January-June 2022 | 254 | 42.3 | 5491 | 0.77 |
| July-December 2022 | 214 | 35.7 | 5787 | 0.62 |
| January-June 2023 | 168 | 28.0 | 5969 | 0.47 |
| July-December 2023 | 216 | 36.0 | 6151 | 0.59 |
| January-June 2024 | 152 | 25.3 | 6271 | 0.41 |

| Stabbing/Sashing at EMTC January 2022 to June 2024 | | | | |
|---|---|---|---|---|
| Months | Total # S/S | Average/month | ADP | Rate |
| January-June 2022 | 31 | 5.2 | 594 | 0.87 |
| July-December 2022 | 20 | 3.3 | 733 | 0.45 |
| January-June 2023 | 25 | 4.2 | 873 | 0.48 |
| July-December 2023 | 23 | 3.8 | 1202 | 0.32 |
| January-June 2024 | 15 | 2.5 | 1376 | 0.18 |

| Stabbing/Sashing at GRVC January 2022 to June 2024 | | | | |
|---|---|---|---|---|
| Months | Total # S/S | Average/month | ADP | Rate |
| January-June 2022 | 58 | 9.7 | 622 | 1.55 |
| July-December 2022 | 99 | 16.5 | 743 | 2.22 |
| January-June 2023 | 47 | 7.8 | 829 | 0.94 |
| July-December 2023 | 40 | 6.7 | 887 | 0.75 |
| January-June 2024 | 34 | 5.7 | 957 | 0.59 |

| Stabbing/Slashing at NIC/West January 2022 to June 2024 | | | | |
|---|---|---|---|---|
| Months | Total # S/S | Average/month | ADP | Rate |
| January-June 2022 | 1 | 0.16 | 335 | 0.05 |
| July-December 2022 | 3 | 0.5 | 346 | 0.14 |
| January-June 2023 | 0 | 0 | 355 | 0.0 |
| July-December 2023 | 0 | 0 | 553 | 0.0 |
| January-June 2024 | 1 | 0.17 | 938 | 0.02 |

| Stabbing/Sashing at OBCC January 2022 to June 2024 | | | | |
|---|---|---|---|---|
| Months | Total # S/S | Average/month | ADP | Rate |
| January-June 2022 | 35 | 5.8 | 291 | 2.0 |
| July-December 2022 | Facility was closed. | | | |
| January-June 2023 | Facility was closed. | | | |
| Aug.-December 2023 | 48 | 9.6 | 1452 | 0.66 |
| January-June 2024 | 36 | 6.0 | 1436 | 0.42 |

*Data from July 2023 is excluded because it is an extreme outlier*

| Stabbings/Slashings at RESH July 2023 to June 2024 | | | | |
|---|---|---|---|---|
| Months | Total # S/S | Average/month | ADP | Rate |
| July-December 2023 | 37 | 6.2 | 164 | 3.76 |
| January-June 2024 | 29 | 4.8 | 154 | 3.12 |

| Stabbings/Slashings at RMSC January 2022 to June 2024 | | | | |
|---|---|---|---|---|
| Months | Total # S/S | Average/month | ADP | Rate |
| January-June 2022 | 0 | 0 | 254 | 0.0 |
| July-December 2022 | 0 | 0 | 331 | 0.0 |
| January-June 2023 | 0 | 0 | 349 | 0.0 |
| July-December 2023 | 0 | 0 | 358 | 0.0 |
| January-June 2024 | 0 | 0 | 359 | 0.0 |

| Stabbings/Slashings at RNDC January 2022 to June 2024 | | | | |
|---|---|---|---|---|
| Months | Total # S/S | Average/month | ADP | Rate |
| January-June 2022 | 70 | 11.7 | 727 | 1.6 |
| July-December 2022 | 37 | 6.2 | 812 | 0.76 |
| January-June 2023 | 30 | 5.0 | 848 | 0.59 |
| July-December 2023 | 60 | 10.0 | 1089 | 0.92 |
| January-June 2024 | 36 | 6.0 | 993 | 0.6 |

## NUMBER AND MONTHLY RATE OF FIGHTS – JANUARY 2022 TO JUNE 2024



| Systemwide Fights January 2022 to June 2024 | | | | |
|---|---|---|---|---|
| Months | Total # Fights | Average/month | ADP | Rate |
| January-June 2022 | 2764 | 460.7 | 5491 | 8.4 |
| July-December 2022 | 3071 | 511.8 | 5787 | 8.8 |
| January-June 2023 | 2953 | 492.2 | 5969 | 8.3 |
| July-December 2023 | 3210 | 535.0 | 6151 | 8.7 |
| January-June 2024 | 3491 | 581.8 | 6271 | 9.3 |

| Fights at EMTC January 2022 to June 2024 | | | | |
|---|---|---|---|---|
| Months | Total # Fights | Average/month | ADP | Rate |
| January-June 2022 | 753 | 125.5 | 594 | 21.1 |
| July-December 2022 | 957 | 159.5 | 733 | 21.8 |
| January-June 2023 | 796 | 132.7 | 873 | 15.2 |
| July-December 2023 | 1024 | 170.7 | 1202 | 14.2 |
| January-June 2024 | 1162 | 193.7 | 1376 | 14.1 |

| Fights at GRVC January 2022 to June 2024 | | | | |
|---|---|---|---|---|
| Months | Total # Fights | Average/month | ADP | Rate |
| January-June 2022 | 275 | 45.8 | 622 | 7.4 |
| July-December 2022 | 330 | 55.0 | 743 | 7.4 |
| January-June 2023 | 273 | 45.5 | 829 | 5.5 |
| July-December 2023 | 437 | 72.8 | 887 | 8.2 |
| January-June 2024 | 518 | 86.3 | 957 | 9.0 |

| Fights at NIC/West January 2022 to June 2024 | | | | |
|---|---|---|---|---|
| Months | Total # Fights | Average/month | ADP | Rate |
| January-June 2022 | 42 | 7.0 | 335 | 2.1 |
| July-December 2022 | 57 | 9.5 | 346 | 2.8 |
| January-June 2023 | 67 | 11.2 | 355 | 3.2 |
| July-December 2023 | 60 | 10.0 | 553 | 1.8 |
| January-June 2024 | 118 | 19.7 | 938 | 2.1 |

| Fights at OBCC January 2022 to June 2024 | | | | |
|---|---|---|---|---|
| Months | Total # Fights | Average/month | ADP | Rate |
| January-June 2022 | 143 | 23.8 | 291 | 8.2 |
| July-December 2022 | Facility was closed. | | | |
| January-June 2023 | Facility was closed. | | | |
| Aug.-December 2023 | 647 | 129.4 | 1452 | 8.9 |
| January-June 2024 | 895 | 149.2 | 1436 | 10.4 |

*Data from July 2023 is excluded because it is an extreme outlier

| Fights at RESH July 2023 to June 2024 | | | | |
|---|---|---|---|---|
| Months | Total # Fights | Average/month | ADP | Rate |
| July-December 2023 | 46 | 7.7 | 164 | 4.7 |
| January-June 2024 | 24 | 4.0 | 154 | 2.6 |

| Fights at RMSC January 2022 to June 2024 | | | | |
|---|---|---|---|---|
| Months | Total # Fights | Average/month | ADP | Rate |
| January-June 2022 | 166 | 27.7 | 254 | 10.9 |
| July-December 2022 | 133 | 22.2 | 331 | 6.7 |
| January-June 2023 | 126 | 21.0 | 349 | 6.0 |
| July-December 2023 | 193 | 32.2 | 358 | 9.0 |
| January-June 2024 | 280 | 46.7 | 359 | 13.0 |

| Fights at RNDC January 2022 to June 2024 | | | | |
|---|---|---|---|---|
| Months | Total # Fights | Average/month | ADP | Rate |
| January-June 2022 | 455 | 75.8 | 727 | 10.4 |
| July-December 2022 | 451 | 75.2 | 812 | 9.3 |
| January-June 2023 | 358 | 59.7 | 848 | 7.0 |
| July-December 2023 | 509 | 84.8 | 1089 | 7.8 |
| January-June 2024 | 448 | 74.7 | 993 | 7.5 |

# NUMBER AND RATE OF SERIOUS INJURY TO INMATES – JANUARY 2023 TO JUNE 2024



| Systemwide Serious Injuries to Inmates January 2023 to June 2024 | | | | |
|---|---|---|---|---|
| Months | Total # SITI | Average/month | ADP | Rate |
| January-June 2023 | 444 | 74.0 | 5969 | 1.24 |
| July-December 2023 | 454 | 75.7 | 6151 | 1.23 |
| January-June 2024 | 432 | 72.0 | 6271 | 1.15 |

| Serious Injuries to Inmates at EMTC January 2023 to June 2024 | | | | |
|---|---|---|---|---|
| Months | Total # SITI | Average/month | ADP | Rate |
| January-June 2023 | 128 | 21.3 | 873 | 2.4 |
| July-December 2023 | 123 | 20.5 | 1202 | 1.7 |
| January-June 2024 | 128 | 21.3 | 1376 | 1.6 |

| Serious Injuries to Inmates at GRVC January 2023 to June 2024 | | | | |
|---|---|---|---|---|
| Months | Total # SITI | Average/month | ADP | Rate |
| January-June 2023 | 39 | 6.5 | 829 | 0.8 |
| July-December 2023 | 66 | 11.0 | 887 | 1.2 |
| January-June 2024 | 81 | 13.5 | 957 | 1.4 |

| Serious Injuries to Inmates at NIC/West January 2023 to June 2024 | | | | |
|---|---|---|---|---|
| Months | Total # SITI | Average/month | ADP | Rate |
| January-June 2023 | 16 | 2.7 | 355 | 0.8 |
| July-December 2023 | 29 | 4.8 | 553 | 0.9 |
| January-June 2024 | 26 | 4.3 | 938 | 0.5 |

| Serious Injuries to Inmates at OBCC January 2023 to June 2024 | | | | |
|---|---|---|---|---|
| Months | Total # SITI | Average/month | ADP | Rate |
| January-June 2023 | Facility was closed. | | | |
| Aug.-December 2023 | 74 | 12.3 | 1452 | 0.9 |
| January-June 2024 | 92 | 15.3 | 1436 | 1.1 |

*Data from July 2023 is excluded because it is an extreme outlier*

| Serious Injuries to Inmates at RESH July 2023 to June 2024 | | | | |
|---|---|---|---|---|
| Months | Total # SITI | Average/month | ADP | Rate |
| July-December 2023 | 9 | 1.5 | 164 | 0.9 |
| January-June 2024 | 5 | 0.8 | 154 | 0.5 |

| Serious Injuries to Inmates at RMSC January 2023 to June 2024 | | | | |
|---|---|---|---|---|
| Months | Total # SITI | Average/month | ADP | Rate |
| January-June 2023 | 23 | 3.8 | 349 | 1.1 |
| July-December 2023 | 13 | 2.2 | 358 | 0.6 |
| January-June 2024 | 15 | 2.5 | 359 | 0.7 |

| Serious Injuries to Inmates at RNDC January 2023 to June 2024 | | | | |
|---|---|---|---|---|
| Months | Total # SITI | Average/month | ADP | Rate |
| January-June 2023 | 41 | 6.8 | 848 | 0.8 |
| July-December 2023 | 73 | 12.2 | 1089 | 1.1 |
| January-June 2024 | 62 | 10.3 | 993 | 1.0 |

## NUMBER AND RATE OF FIRES – JANUARY 2022 TO JUNE 2024



| Systemwide Fires January 2022 to June 2024 | | | | |
|---|---|---|---|---|
| Months | Total # Fires | Average/month | ADP | Rate |
| January-June 2022 | 444 | 74.0 | 5491 | 1.4 |
| July-December 2022 | 273 | 45.5 | 5787 | 0.8 |
| January-June 2023 | 210 | 35.0 | 5969 | 0.6 |
| July-December 2023 | 351 | 58.5 | 6151 | 1.0 |
| January-June 2024 | 219 | 36.5 | 6271 | 0.6 |

**Fires at EMTC**
**January 2022 to June 2024**

| Months | Total # Fires | Average/month | ADP | Rate |
|---|---|---|---|---|
| January-June 2022 | 6 | 1.0 | 594 | 0.2 |
| July-December 2022 | 5 | 0.8 | 733 | 0.1 |
| January-June 2023 | 1 | 0.2 | 873 | 0.02 |
| July-December 2023 | 3 | 0.5 | 1202 | 0.04 |
| January-June 2024 | 2 | 0.3 | 1376 | 0.02 |

**Fires at GRVC**
**January 2022 to June 2024**

| Months | Total # Fires | Average/month | ADP | Rate |
|---|---|---|---|---|
| January-June 2022 | 151 | 25.2 | 622 | 4.1 |
| July-December 2022 | 137 | 22.8 | 743 | 3.1 |
| January-June 2023 | 71 | 11.8 | 829 | 1.4 |
| July-December 2023 | 6 | 1.0 | 887 | 0.1 |
| January-June 2024 | 13 | 2.2 | 957 | 0.2 |

**Fires at NIC/West**
**January 2022 to June 2024**

| Months | Total # Fires | Average/month | ADP | Rate |
|---|---|---|---|---|
| January-June 2022 | 128 | 21.3 | 335 | 6.4 |
| July-December 2022 | 50 | 8.3 | 346 | 2.4 |
| January-June 2023 | 51 | 8.5 | 355 | 2.4 |
| July-December 2023 | 46 | 7.7 | 553 | 1.4 |
| January-June 2024 | 14 | 2.3 | 938 | 0.3 |

| Fires at OBCC January 2022 to June 2024 | | | | |
|---|---|---|---|---|
| Months | Total # Fires | Average/month | ADP | Rate |
| January-June 2022 | 30 | 5.0 | 291 | 1.7 |
| July-December 2022 | Facility was closed. | | | |
| January-June 2023 | Facility was closed. | | | |
| Aug.-December 2023 | 20 | 4.0 | 1452 | 0.3 |
| January-June 2024 | 10 | 1.7 | 1436 | 0.1 |

*Data from July 2023 is excluded because it is an extreme outlier*

| Fires at RESH July 2023 to June 2024 | | | | |
|---|---|---|---|---|
| Months | Total # Fires | Average/month | ADP | Rate |
| July-December 2023 | 78 | 13.0 | 164 | 7.92 |
| January-June 2024 | 110 | 18.3 | 154 | 11.9 |

| Fires at RMSC January 2022 to June 2024 | | | | |
|---|---|---|---|---|
| Months | Total # Fires | Average/month | ADP | Rate |
| January-June 2022 | 0 | 0.0 | 254 | 0.0 |
| July-December 2022 | 1 | 0.2 | 331 | 0.1 |
| January-June 2023 | 4 | 0.7 | 349 | 0.2 |
| July-December 2023 | 1 | 0.2 | 358 | 0.1 |
| January-June 2024 | 0 | 0.0 | 359 | 0.0 |

| Fires at RNDC January 2022 to June 2024 | | | | |
|---|---|---|---|---|
| Months | Total # Fires | Average/month | ADP | Rate |
| January-June 2022 | 86 | 14.3 | 727 | 2.0 |
| July-December 2022 | 59 | 9.8 | 812 | 1.2 |
| January-June 2023 | 67 | 11.2 | 848 | 1.3 |
| July-December 2023 | 193 | 32.2 | 1089 | 3.0 |
| January-June 2024 | 70 | 11.7 | 993 | 1.2 |

## NUMBER AND RATE OF ASSAULT ON STAFF, WITH AND WITHOUT UOF





*The Department began tracking assaults on staff that did not involve a use of force in 2020. Prior years' data is not available.*

## FACILITY SEARCHES & CONTRABAND RECOVERY

In 2022, DOC conducted a total of 196,738 searches (195,348 completed by the Facility and 1,390 special searches[171]). In 2023, DOC conducted a total of 135,982 searches (135,324 completed by the Facility and 658 special searches[172]). Through August of this year, DOC conducted a total of 79,946 searches (79,768 completed by the Facility and 178 special searches[173]).

| Contraband Recovery, 2021-2024[174] | | | | |
|---|---|---|---|---|
| | **2021** | **2022** | **2023** | **Jan.-Aug. 2024** |
| Drugs | 1,049 | 1,421 | 1,245 | 660 |
| Weapons | 3,144 | 5,507 | 2,061 | 921 |
| Escape-Related Item | 196 | 525 | 292 | 180 |
| Other | 878 | 1,145 | 794 | 320 |
| **Total** | **5,267** | **8,598** | **4,392** | **2,081** |

The Department has installed body scanners at the staff entrances for RNDC, OBCC, EMTC, GRVC, and RMSC and plans to install body scanners at staff entrances to NIC and WF. The Department also reports that it will be initiating procurement for newer body scanners that can detect smaller objects, and additional body scanners so that all staff can be scanned when entering the facilities. Currently, staff are randomly selected for body scanning at those facilities with body scanners at the front entrance. The Department is also planning on using Rapiscan

---

[171] This includes searches by the Emergency Services Unit, the Special Search Team, the Canine Use and/or Tactical Search operations.

[172] *Id.*

[173] *Id.*

[174] The calculation of the data for contraband recovery varies depending on the type of contraband that is recovered. For example, drug contraband is counted by incident, not the actual number of items seized so if three different types of drugs were recovered in one location, this is counted as a single seizure. In contrast, when weapons are seized, each item recovered is counted separately so if three weapons were seized from a single individual, all three items are counted.

Drug Detection to scan incoming mail, and reports that they are waiting on delivery from the vendor.

Any successful effort to remove weapons from a facility is obviously positive but the decreased number of searches, combined with the relatively low rate of return (*i.e.,* contraband seized per searches conducted) and observations of videotaped footage of poor search technique and procedure suggests to the Monitoring Team that additional work to refine practice search remains necessary. The status of revised search procedures is discussed in the Update on the 2023 *Nunez* Court Orders section of this report.

## OVERVIEW OF IN-CUSTODY DEATHS

The number of people who have died while in custody is tragic and is related, at least in part, to the poor conditions and security practices in the jails as set forth herein.

In 2023, nine individuals died in custody or shortly after their release.[175] As of the date of this report, five people have died in 2024. An updated table on the number of people who have died, and their causes of death is provided below.

| NYC DOC Causes of Death, 2015 to November 4, 2024 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | Total |
| Accidental | | | | | | | | 1 | | | 1 |
| COVID-19 | | | | | | 3 | 2 | | | | 5 |
| Medical Condition | 9 | 11 | 4 | 7 | 3 | 2 | 4 | 5 | 4 | 2 | 51 |
| Overdose | | 2 | 1 | | | | 4 | 6 | 2 | 1 | 16 |
| Suicide | 2 | 2 | | 1 | | 1 | 4 | 6 | 2 | | 18 |
| Drowned | | | | | | | | 1 | | | 1 |
| Pending OCME Confirmation | | | | | | | | | 1 | 2 | 3 |
| Undetermined Due to Death Outside of DOC Custody | | | | | | 4 | 2 | | | | 6 |
| Undetermined by OCME | | | 1 | | | 1 | | | | | 2 |
| **Total** | **11** | **15** | **6** | **8** | **3** | **11** | **16** | **19** | **9** | **5** | **103** |

The table below shows the Department's mortality rate from January 2010 to November 4, 2024. The mortality rate in 2022 was the highest in over a decade and more than double the rate in 2016 at the inception of the Consent Judgment. Notably, the mortality rate in 2023

---

[175] If an incarcerated individual has a health condition that may merit release, the process has a few steps and must be ordered by the Court. The Department does not have any authority to release an individual because of a health condition although it may certainly identify and recommend individuals that should be considered for potential release. To the extent an individual has a health condition that may merit release, CHS may issue a clinical condition letter, with the patient's consent, which is then provided to the individual's defense counsel. Counsel then may petition the Court to release the individual. Release is not automatic, and an individual determination must be made by the Court. If the court determines release is appropriate, the Department is notified via a court order that the individual is being released on their own recognizance ("ROR"). However, the order does not specify a medical reason for the release.

dropped significantly. A mortality rate for 2024 cannot be developed because the year is not yet complete.

| Mortality Rate | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **2010** | **2011** | **2012** | **2013** | **2014** | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** | **2024** |
| **Annual ADP** | 13,026 | 12,421 | 12,083 | 11,692 | 10,913 | 9,890 | 9,802 | 9,224 | 8,397 | 7,388 | 4,543 | 5,574 | 5,639 | 6,054 | 6,354, |
| **Number of Deaths** | 17 | 12 | 21 | 24 | 10 | 11 | 15 | 6 | 8 | 3 | 11 | 16 | 19 | 9 | 5 |
| **Mortality Rate** | 1.31 | 0.97 | 1.74 | 2.05 | 0.92 | 1.11 | 1.53 | 0.65 | 0.95 | 0.41 | 2.42 | 2.87 | 3.37 | 1.49 | ~ |
| *Note: The Mortality Rate is per 1000 people in custody and uses the following formula: Rate = (# of deaths/average # of people in custody)\*1000* | | | | | | | | | | | | | | | |

**TRIPLE TOURS**

The table below provides the monthly total and daily average from January 2021 to September 2024 of the total uniform staff headcount and triple tours.

In May 2024, the Department notified the Monitoring Team that the Office of Management Analysis and Planning (OMAP) was conducting a review of triple tour data for quality assurance purposes and to improve efficiencies in its collecting and reporting of this data. In September 2024, OMAP completed its review of the triple tour data and was able to provide the Monitoring Team with updated data for 2024 to-date,[176] which is reflected in the table below.

The total number and daily average of triple tours has increased in 2024, but have still maintained a significant decrease from their prior peak in 2021. The Department reports that at least some of the increase is the result of ongoing refinements to the reporting process.

| Month | Average Headcount per Day | Average Triple Tours per Day | Total Triple Tours per Month[177] |
|---|---|---|---|
| January 2021 | 8,872 | 0 | 6 |
| February 2021 | 8,835 | 3 | 91 |
| March 2021 | 8,777 | 5 | 169 |
| April 2021 | 8,691 | 4 | 118 |
| May 2021 | 8,576 | 4 | 109 |
| June 2021 | 8,475 | 4 | 108 |
| July 2021 | 8,355 | 15 | 470 |
| August 2021 | 8,459 | 25 | 764 |

---

[176] Prior to 2024, each facility self-reported its triple tour data based on handwritten tour certification reports. Tour certifications are completed at the beginning of a tour and do not account for how long a staff member remains on that tour. In January 2024, the Department began calculating triple tours based on the times that staff use their CityTime identification cards to clock in and clock out of their tours. This has resulted in more reliable data.

[177] For all data prior to January 2024, this column contains data for the number of staff who worked over 3.75 hours of their third tour. In January 2024, the Department began calculating this data based on the number of staff who worked over 4.28 hours of their third tour.

| Month | Average Headcount per Day | Average Triple Tours per Day | Total Triple Tours per Month[177] |
|---|---|---|---|
| September 2021 | 8,335 | 22 | 659 |
| October 2021 | 8,204 | 6 | 175 |
| November 2021 | 8,089 | 6 | 174 |
| December 2021 | 7,778 | 23 | 706 |
| January 2022 | 7,708 | 24 | 756 |
| February 2022 | 7,547 | 3 | 90 |
| March 2022 | 7,457 | 1 | 41 |
| April 2022 | 7,353 | 0 | 3 |
| May 2022 | 7,233 | 1 | 33 |
| June 2022 | 7,150 | 2 | 67 |
| July 2022 | 7,138 | 2 | 58 |
| August 2022 | 7,068 | 2 | 50 |
| September 2022 | 6,994 | 4 | 105 |
| October 2022 | 6,905 | 2 | 63 |
| November 2022 | 6,837 | 2 | 50 |
| December 2022 | 6,777 | 4 | 115 |
| January 2023 | 6,700 | 1 | 38 |
| February 2023 | 6,632 | 0 | 8 |
| March 2023 | 6,661 | 0 | 7 |
| April 2023 | 6,590 | 0 | 11 |
| May 2023 | 6,516 | 0 | 7 |
| June 2023 | 6,449 | 1 | 26 |
| July 2023 | 6,406 | 1 | 26 |
| August 2023 | 6,427 | 1 | 27 |
| September 2023 | 6,418 | 0 | 1 |
| October 2023 | 6,340 | 0 | 0 |
| November 2023 | 6,336 | 0 | 0 |
| December 2023 | 6,278 | 0 | 0 |
| January 2024 | 6,199 | 1 | 22 |
| February 2024 | 6,151 | 1 | 20 |

| Month | Average Headcount per Day | Average Triple Tours per Day | Total Triple Tours per Month[177] |
|---|---|---|---|
| March 2024 | 6,159 | 1 | 19 |
| April 2024 | 6,126 | 1 | 23 |
| May 2024 | 6,063 | 1 | 17 |
| June 2024 | 6,027 | 1 | 41 |
| July 2024 | 6,028 | 2 | 72 |
| August 2024 | 6,031 | 2 | 63 |
| September 2024 | 5,981 | 3 | 75 |

## USES OF FORCE INVOLVING INCIDENTS WHEN A STAFF MEMBER IS NOT ON POST

The tables below provide the number and proportion of uses of force involving "unmanned posts" as identified by the Department during five time periods (January-June 2022, July-December 2022, January-June 2023, July-December 2023, January-June 2024). These incidents involve posts to which no staff member was assigned *or* instances where the assigned officer left their post without being relieved (collectively "unmanned posts"). The first two columns list the number of uses of force involving unmanned posts and the proportion of all uses of force that this number represents. The third and fourth columns identify the number and proportion of uses of force that involved unmanned posts **and** were avoidable (as identified by the Department) specifically due to the lack of staff on post. In other words, the Department determined that these incidents likely could have been avoided had a staff member been present.

| Uses of Force Incidents When a Staff Member is Not on Post: January-June 2022 | | | | |
|---|---|---|---|---|
| **Facility** | **# of Total UOF Incidents involving Unmanned Posts** | **% of Total UOF Incidents involving Unmanned Posts**[178] | **# of UOF Incidents that UOF incidents involving Unmanned Posts & Were Avoidable** | **% of Total UOF Incidents involving Unmanned Posts & Were Avoidable** |
| AMKC | 48 | 1.48% | *39* | *81.25%* |
| EMTC | 22 | 0.68% | *10* | *45.45%* |
| GRVC | 13 | 0.40% | *6* | *46.15%* |
| NIC | 2 | 0.06% | *1* | *50.00%* |
| OBCC | 19 | 0.59% | *7* | *36.84%* |
| RMSC | 6 | 0.19% | *2* | *33.33%* |
| RNDC | 40 | 1.23% | *22* | *55.00%* |
| VCBC | 1 | 0.03% | *1* | *100.00%* |
| **TOTAL** | **151** | **4.66%** | ***88*** | ***58.28%*** |

---

[178] There were 3,240 total actual uses of force in January-June 2022. This number does not include alleged uses of force because the Department does not provide avoidable reasons for alleged uses of force.

| Facility | Uses of Force Incidents When a Staff Member is Not on Post: July-December 2022 | | | |
|---|---|---|---|---|
| | # of Total UOF Incidents involving Unmanned Posts | % of Total UOF Incidents involving Unmanned Posts[179] | # of UOF Incidents that UOF incidents involving Unmanned Posts & Were Avoidable | % of Total UOF Incidents involving Unmanned Posts & Were Avoidable |
| AMKC | 51 | 1.35% | *33* | *64.71%* |
| EMTC | 24 | 0.64% | *12* | *50.00%* |
| GRVC | 35 | 0.93% | *13* | *37.14%* |
| NIC | 4 | 0.11% | *2* | *50.00%* |
| RMSC | 32 | 0.85% | *15* | *46.88%* |
| RNDC | 10 | 0.27% | *4* | *40.00%* |
| VCBC | 3 | 0.08% | *1* | *33.33%* |
| **TOTAL** | **159** | **4.22%** | ***80*** | ***50.31%*** |

---

[179] There were 3,765 total actual uses of force in July-December 2022. This number does not include alleged uses of force because the Department does not provide avoidable reasons for alleged uses of force.

| Uses of Force Incidents When a Staff Member is Not on Post: January-June 2023 | | | | |
|---|---|---|---|---|
| Facility | # of Total UOF Incidents involving Unmanned Posts | % of Total UOF Incidents involving Unmanned Posts[180] | # of UOF Incidents that UOF incidents involving Unmanned Posts & Were Avoidable | % of Total UOF Incidents involving Unmanned Posts & Were Avoidable |
| AMKC | 45 | 1.39% | 28 | 62.22% |
| EMTC | 19 | 0.59% | 9 | 47.37% |
| GRVC | 19 | 0.59% | 9 | 47.37% |
| NIC | 2 | 0.06% | 1 | 50.00% |
| RMSC | 15 | 0.46% | 5 | 33.33% |
| RNDC | 10 | 0.31% | 4 | 40.00% |
| VCBC | 2 | 0.06% | 1 | 50.00% |
| TOTAL | 112 | 3.46% | 57 | 50.89% |

[180] There were 3,237 total actual uses of force in January-June 2023. This number does not include alleged uses of force because the Department does not provide avoidable reasons for alleged uses of force.

| Uses of Force Incidents When a Staff Member is Not on Post: July-December 2023 | | | |
|---|---|---|---|
| Facility | # of Total UOF Incidents involving Unmanned Posts | % of Total UOF Incidents involving Unmanned Posts[181] | # of UOF Incidents that UOF incidents involving Unmanned Posts & Were Avoidable | % of Total UOF Incidents involving Unmanned Posts & Were Avoidable |
| AMKC | 8 | 0.25% | 6 | 75.00% |
| BHPW | 1 | 0.03% | 1 | 100.00% |
| EMTC | 10 | 0.31% | 4 | 40.00% |
| GRVC | 12 | 0.37% | 4 | 33.33% |
| NIC | 4 | 0.12% | 3 | 75.00% |
| OBCC | 8 | 0.25% | 6 | 75.00% |
| RESH | 3 | 0.09% | 0 | 0.00% |
| RMSC | 6 | 0.18% | 2 | 33.33% |
| RNDC | 12 | 0.37% | 3 | 25.00% |
| VCBC | 1 | 0.03% | 0 | 0.00% |
| TOTAL | 65 | 1.99% | 29 | 44.62% |

[181] There were 3,263 total actual uses of force in July-December 2023. This number does not include alleged uses of force because the Department does not provide avoidable reasons for alleged uses of force.

| | Uses of Force Incidents When a Staff Member is Not on Post: January-June 2024 | | | |
|---|---|---|---|---|
| Facility | # of Total UOF Incidents involving Unmanned Posts | % of Total UOF Incidents involving Unmanned Posts[182] | # of UOF Incidents that UOF incidents involving Unmanned Posts & Were Avoidable | % of Total UOF Incidents involving Unmanned Posts & Were Avoidable |
| EMTC | 8 | 0.23% | 2 | 25.00% |
| GRVC | 6 | 0.17% | 0 | 0.00% |
| NIC | 1 | 0.03% | 0 | 0.00% |
| OBCC | 11 | 0.31% | 5 | 45.45% |
| RESH | 3 | 0.09% | 1 | 33.33% |
| RMSC | 6 | 0.17% | 1 | 16.67% |
| RNDC | 52 | 1.49% | 5 | 9.62% |
| WF | 2 | 0.06% | 0 | 0.00% |
| TOTAL | 89 | 2.55% | 14 | 15.73% |

---

[182] There were 3,494 total actual uses of force in January-June 2024. This number does not include alleged uses of force because the Department does not provide avoidable reasons for alleged uses of force.

### NUMBER OF ADWS AND CAPTAINS

The two tables below identify the number and assignment of ADWs and Captains at specific points in time from July 18, 2020, to June 22, 2024. This data is discussed further in the compliance box for First Remedial Order § A, ¶ 4, Supervision of Captains.

| Number of ADWs & Assignments in the Department[183] | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Facility | # of ADWs As of July 18, 2020 | # of ADWs As of Jan. 2, 2021 | # of ADWs As of June 26, 2021 | # of ADWs As of Jan. 1, 2022 | # of ADWs As of June 18, 2022 | # of ADWs As of Dec. 31, 2022 | # of ADWs As of June 16, 2023 | # of ADWs As of Dec. 23, 2023 | # of ADWs As of June 22, 2024 | # of ADWs As of Sept, 28, 2024 |
| AMKC[184] | 9 | 21 | 13 | 12 | 9 | 12 | 16 | 0 | 1 | 0 |
| EMTC[185] | 0 | 0 | 0 | 0 | 0 | 8 | 10 | 11 | 11 | 12 |
| GRVC | 6 | 10 | 11 | 9 | 8 | 12 | 11 | 11 | 9 | 10 |
| MDC[186] | 6 | 2 | 1 | 1 | 0 | 1 | 1 | 1 | 1 | 1 |
| NIC | 6 | 8 | 8 | 5 | 7 | 8 | 9 | 12 | 11 | 11 |
| OBCC[187] | 6 | 8 | 8 | 14 | 7 | 0 | 0 | 11 | 10 | 9 |
| RMSC | 5 | 6 | 6 | 5 | 4 | 5 | 6 | 14 | 11 | 12 |
| RNDC | 7 | 15 | 15 | 10 | 7 | 12 | 12 | 10 | 10 | 10 |
| VCBC[188] | 4 | 6 | 5 | 5 | 4 | 5 | 5 | 0 | 0 | 0 |
| Court Commands (BKDC, BXDC, QDC) | 3 | 4 | 3 | 3 | 3 | 3 | 2 | 3 | 3 | 2 |
| Total # of ADWs in Facilities & Court Commands | 52 | 80 | 70 | 64 | 49 | 66 | 72 | 73 | 67 | 67 |
| Total # of ADWs Available Department-wide | 66 | 95 | 88 | 80 | 67 | 82 | 89 | 91 | 85 | 88 |
| % of ADWs in Facilities & Court Commands | 79% | 84% | 80% | 80% | 73% | 80% | 81% | 80% | 79% | 76% |

[183] The specific post assignments of ADWs within the Facility is not available so this data simply demonstrates the number of ADWs assigned per facility.

[184] AMKC was closed in August 2023.

[185] EMTC has been closed and opened in these Monitoring Periods. Until late 2022, staff that worked at EMTC were technically assigned to AMKC.

[186] MDC was utilized in a limited capacity at the end of the Twelfth Monitoring Period and was closed by June 2021. The staff currently assigned to MDC are in fact assigned to the Manhattan Courts (Criminal, Supreme, and Family).

[187] OBCC was closed by July 2022. Staff were then reassigned to other commands. OBCC was then reopened in July 2023.

[188] VCBC was closed in October 2023, but staff are still assigned to the facility in order to maintain the barge such that it does not physically deteriorate.

| Number of Captains & Assignments in the Department[189] | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Facility | # of Captains As of July 18, 2020 | # of Captains As of Jan. 2, 2021 | # of Captains As of June 26, 2021 | # of Captains As of Jan. 1, 2022 | # of Captains As of June 18, 2022 | # of Captains As of Dec. 31, 2022 | # of Captains As of Jun 16, 2023 | # of Captains As of Dec. 23, 2023 | # of Captains As of June 22, 2024 | # of Captains As of Sept. 28, 2024 |
| AMKC[190] | 91 | 111 | 97 | 87 | 81 | 80 | 65 | 13 | 7 | 9 |
| EMTC[191] | 0 | 0 | 0 | 0 | 0 | 38 | 37 | 37 | 39 | 43 |
| GRVC | 75 | 72 | 86 | 86 | 81 | 90 | 61 | 43 | 50 | 60 |
| MDC[192] | 72 | 39 | 15 | 12 | 11 | 11 | 11 | 12 | 12 | 12 |
| NIC | 51 | 45 | 45 | 56 | 45 | 50 | 44 | 58 | 48 | 53 |
| OBCC[193] | 85 | 81 | 78 | 77 | 38 | 7 | 7 | 54 | 62 | 63 |
| RMSC | 51 | 50 | 49 | 36 | 34 | 31 | 27 | 55 | 55 | 52 |
| RNDC | 58 | 56 | 60 | 63 | 70 | 70 | 68 | 45 | 52 | 53 |
| VCBC[194] | 27 | 25 | 27 | 25 | 23 | 22 | 21 | 3 | 1 | 2 |
| Court Commands (BKDC, BXDC, QDC) | 39 | 37 | 35 | 32 | 33 | 28 | 25 | 29 | 29 | 28 |
| **Total # of Captains in Facilities and Court Commands** | **558** | **523** | **499** | **474** | **416** | **427** | **366** | **346** | **354** | **373** |

[189] The specific post assignments of Captains within the Facility is not available so this data demonstrates the number of Captains assigned per facility.

[190] AMKC was closed in August 2023.

[191] EMTC has been closed and opened in these Monitoring Periods. Until late 2022, staff that worked at EMTC were technically assigned to AMKC.

[192] MDC was utilized in a limited capacity at the end of the Twelfth Monitoring Period and was closed by June 2021. The staff currently assigned to MDC are in fact assigned to the Manhattan Courts (Criminal, Supreme, and Family).

[193] OBCC was closed by July 2022. Staff were then reassigned to other commands. Due to a locker room shortage at other facilities, some staff used the locker room at OBCC. OBCC was then reopened in July 2023. DOC reported that these the Captains assigned to OBCC between July 2022 and July 2023 were on medically monitored status and were assigned to OBCC to monitor the staff locker room.

[194] VCBC was closed in October 2023, but staff are still assigned to the facility in order to maintain the barge such that it does not physically deteriorate.

| Number of Captains & Assignments in the Department [189] | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Facility | # of Captains As of July 18, 2020 | # of Captains As of Jan. 2, 2021 | # of Captains As of June 26, 2021 | # of Captains As of Jan. 1, 2022 | # of Captains As of June 18, 2022 | # of Captains As of Dec. 31, 2022 | # of Captains As of Jun 16, 2023 | # of Captains As of Dec. 23, 2023 | # of Captains As of June 22, 2024 | # of Captains As of Sept. 28, 2024 |
| Total # of Captains Available Department-wide | 810 | 765 | 751 | 670 | 607 | 573 | 550 | 539 | 536 | 566 |
| % of Captains in Facilities and Court Commands | 69% | 68% | 66% | 71% | 69% | 75% | 67% | 64% | 66% | 66% |

## SICK LEAVE, MEDICALLY MONITORED/RESTRICTED, AWOL, PE, AND FMLA

The tables below provide the monthly average from January 1, 2019 to September 30, 2024 of the total staff headcount, the average number of staff out sick, the average number of staff on medically monitored/restricted duty level 3, the average number of staff who were AWOL, the average number of staff who were on Personal Emergency leave, and the average number of staff on FMLA leave.[195]

---

[195] The AWOL, PE, and FMLA data is only available for August 1, 2021-January 26, 2022 and April 2022-September 30, 2024.

| 2019 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Month | Head-count | Average (Avg.) Daily Sick | Avg. Daily % Sick | Avg. Daily MMR3 | Avg. Daily % MMR3 | Avg. Daily AWOL | Avg. Daily % AWOL | Avg. Daily PE | Avg. Daily % PE | Avg. Daily FMLA | Avg. Daily % FMLA |
| January 2019 | 10577 | 621 | 5.87% | 459 | 4.34% | | | | | | |
| February 2019 | 10482 | 616 | 5.88% | 457 | 4.36% | | | | | | |
| March 2019 | 10425 | 615 | 5.90% | 441 | 4.23% | | | | | | |
| April 2019 | 10128 | 590 | 5.83% | 466 | 4.60% | | | | | | |
| May 2019 | 10041 | 544 | 5.42% | 501 | 4.99% | | | | | | |
| June 2019 | 9953 | 568 | 5.71% | 502 | 5.04% | | | | | | |
| July 2019 | 9859 | 538 | 5.46% | 496 | 5.03% | | | | | | |
| August 2019 | 10147 | 555 | 5.47% | 492 | 4.85% | | | | | | |
| September 2019 | 10063 | 557 | 5.54% | 479 | 4.76% | | | | | | |
| October 2019 | 9980 | 568 | 5.69% | 473 | 4.74% | | | | | | |
| November 2019 | 9889 | 571 | 5.77% | 476 | 4.81% | | | | | | |
| December 2019 | 9834 | 603 | 6.13% | 463 | 4.71% | | | | | | |
| **2019 Average** | **10115** | **579** | **5.72%** | **475** | **4.71%** | | | | | | |

| 2020 | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Month | Head-count | Average (Avg.) Daily Sick | Avg. Daily % Sick | Avg. Daily MMR3 | Avg. Daily % MMR3 | Avg. Daily AWOL | Avg. Daily % AWOL | Avg. Daily PE | Avg. Daily % PE | Avg. Daily FMLA | Avg. Daily % FMLA |
| January 2020 | 9732 | 586 | 6.02% | 367 | 3.77% | | | | | | |
| February 2020 | 9625 | 572 | 5.94% | 388 | 4.03% | | | | | | |
| March 2020 | 9548 | 1408 | 14.75% | 373 | 3.91% | | | | | | |
| April 2020 | 9481 | 3059 | 32.26% | 278 | 2.93% | | | | | | |
| May 2020 | 9380 | 1435 | 15.30% | 375 | 4.00% | | | | | | |
| June 2020 | 9302 | 807 | 8.68% | 444 | 4.77% | | | | | | |
| July 2020 | 9222 | 700 | 7.59% | 494 | 5.36% | | | | | | |
| August 2020 | 9183 | 689 | 7.50% | 548 | 5.97% | | | | | | |
| September 2020 | 9125 | 694 | 7.61% | 586 | 6.42% | | | | | | |
| October 2020 | 9079 | 738 | 8.13% | 622 | 6.85% | | | | | | |
| November 2020 | 9004 | 878 | 9.75% | 546 | 6.06% | | | | | | |
| December 2020 | 8940 | 1278 | 14.30% | 546 | 6.11% | | | | | | |
| 2020 Average | 9302 | 1070 | 11.49% | 464 | 5.02% | | | | | | |

| 2021 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Month | Head-count | Average (Avg.) Daily Sick | Avg. Daily % Sick | Avg. Daily MMR3 | Avg. Daily % MMR3 | Avg. Daily AWOL | Avg. Daily % AWOL | Avg. Daily PE | Avg. Daily % PE | Avg. Daily FMLA | Avg. Daily % FMLA |
| January 2021 | 8872 | 1393 | 15.70% | 470 | 5.30% | | | | | | |
| February 2021 | 8835 | 1347 | 15.25% | 589 | 6.67% | | | | | | |
| March 2021 | 8777 | 1249 | 14.23% | 676 | 7.70% | | | | | | |
| April 2021 | 8691 | 1412 | 16.25% | 674 | 7.76% | | | | | | |
| May 2021 | 8576 | 1406 | 16.39% | 674 | 7.86% | | | | | | |
| June 2021 | 8475 | 1480 | 17.46% | 695 | 8.20% | | | | | | |
| July 2021 | 8355 | 1488 | 17.81% | 730 | 8.74% | | | | | | |
| August 2021 | 8459 | 1416 | 16.74% | 767 | 9.07% | 90 | 1.05% | 58 | 0.69% | 128 | 1.51% |
| September 2021 | 8335 | 1703 | 20.43% | 744 | 8.93% | 77 | 0.92% | 46 | 0.55% | 36 | 0.43% |
| October 2021 | 8204 | 1558 | 18.99% | 782 | 9.53% | 30 | 0.37% | 25 | 0.30% | 46 | 0.56% |
| November 2021 | 8089 | 1498 | 18.52% | 816 | 10.09% | 42 | 0.52% | 27 | 0.33% | 47 | 0.58% |
| December 2021 | 7778 | 1689 | 21.72% | 775 | 9.96% | 42 | 0.54% | 30 | 0.39% | 44 | 0.57% |
| 2021 Average | 8454 | 1470 | 17.46% | 699 | 8.32% | 56 | 0.68% | 37 | 0.45% | 60 | 0.73% |

| 2022 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Month | Head-count | Average (Avg.) Daily Sick | Avg. Daily % Sick | Avg. Daily MMR3 | Avg. Daily % MMR3 | Avg. Daily AWOL | Avg. Daily % AWOL | Avg. Daily PE | Avg. Daily % PE | Avg. Daily FMLA | Avg. Daily % FMLA |
| January 1-26 2022 | 7708 | 2005 | 26.01% | 685 | 8.89% | 42 | 0.55% | 19 | 0.25% | 41 | 0.53% |
| February 2022 | 7547 | 1457 | 19.31% | 713 | 9.45% | | | | | | |
| March 2022 | 7457 | 1402 | 18.80% | 617 | 8.27% | | | | | | |
| April 2022 | 7353 | 1255 | 17.07% | 626 | 8.51% | 23 | 0.31% | 33 | 0.45% | 49 | 0.67% |
| May 2022 | 7233 | 1074 | 14.85% | 634 | 8.77% | 24 | 0.34% | 39 | 0.54% | 47 | 0.66% |
| June 2022 | 7150 | 951 | 13.30% | 624 | 8.73% | 16 | 0.22% | 28 | 0.40% | 50 | 0.70% |
| July 2022 | 7138 | 875 | 12.26% | 608 | 8.52% | 19 | 0.26% | 33 | 0.47% | 54 | 0.76% |
| August 2022 | 7068 | 831 | 11.76% | 559 | 7.91% | 17 | 0.24% | 34 | 0.48% | 54 | 0.76% |
| September 2022 | 6994 | 819 | 11.71% | 535 | 7.65% | 6 | 0.09% | 33 | 0.48% | 58 | 0.83% |
| October 2022 | 6905 | 798 | 11.56% | 497 | 7.20% | 6 | 0.09% | 36 | 0.51% | 56 | 0.81% |
| November 2022 | 6837 | 793 | 11.60% | 476 | 6.96% | 7 | 0.09% | 21 | 0.31% | 48 | 0.70% |
| December 2022 | 6777 | 754 | 11.13% | 452 | 6.67% | 7 | 0.10% | 21 | 0.30% | 48 | 0.70% |
| 2022 Average | 7181 | 1085 | 14.95% | 586 | 8.13% | 17 | 0.23% | 30 | 0.42% | 51 | 0.71% |

| 2023 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Month | Head-count | Average (Avg.) Daily Sick | Avg. Daily % Sick | Avg. Daily MMR3 | Avg. Daily % MMR3 | Avg. Daily AWOL | Avg. Daily % AWOL | Avg. Daily PE | Avg. Daily % PE | Avg. Daily FMLA | Avg. Daily % FMLA |
| January 2023 | 6700 | 692 | 10.33% | 443 | 6.61% | 9 | 0.13% | 37 | 0.55% | 44 | 0.66% |
| February 2023 | 6632 | 680 | 10.25% | 421 | 6.35% | 9 | 0.14% | 30 | 0.46% | 47 | 0.70% |
| March 2023 | 6661 | 639 | 9.59% | 401 | 6.02% | 11 | 0.17% | 34 | 0.51% | 46 | 0.69% |
| April 2023 | 6590 | 595 | 9.03% | 393 | 5.96% | 10 | 0.15% | 41 | 0.62% | 45 | 0.68% |
| May 2023 | 6516 | 514 | 7.89% | 403 | 6.18% | 10 | 0.15% | 35 | 0.54% | 47 | 0.73% |
| June 2023 | 6449 | 466 | 7.23% | 399 | 6.19% | 10 | 0.16% | 30 | 0.47% | 45 | 0.70% |
| July 2023 | 6406 | 443 | 6.92% | 394 | 6.15% | 9 | 0.14% | 29 | 0.45% | 45 | 0.70% |
| August 2023 | 6427 | 437 | 6.80% | 386 | 6.01% | 17 | 0.26% | 56 | 0.86% | 86 | 1.33% |
| September 2023 | 6418 | 424 | 6.61% | 378 | 5.89% | 20 | 0.31% | 45 | 0.70% | 112 | 1.74% |
| October 2023 | 6340 | 414 | 6.54% | 352 | 5.55% | 18 | 0.28% | 40 | 0.62% | 114 | 1.80% |
| November 2023 | 6336 | 412 | 6.50% | 327 | 5.17% | 14 | 0.22% | 39 | 0.61% | 115 | 1.81% |
| December 2023 | 6278 | 425 | 6.77% | 316 | 5.03% | 11 | 0.18% | 39 | 0.62% | 121 | 1.93% |
| 2023 Average | 6479 | 512 | 7.87% | 384 | 5.93% | 12 | 0.19% | 38 | 0.58% | 72 | 1.12% |

| 2024 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Month | Head-count | Average (Avg.) Daily Sick | Avg. Daily % Sick | Avg. Daily MMR3 | Avg. Daily % MMR3 | Avg. Daily AWOL | Avg. Daily % AWOL | Avg. Daily PE | Avg. Daily % PE | Avg. Daily FMLA | Avg. Daily % FMLA |
| January 2024 | 6199 | 417 | 6.73% | 301 | 4.86% | 12 | 0.19% | 39 | 0.63% | 118 | 1.90% |
| February 2024 | 6151 | 392 | 6.37% | 292 | 4.75% | 11 | 0.18% | 40 | 0.65% | 112 | 1.82% |
| March 2024 | 6159 | 377 | 6.12% | 295 | 4.79% | 10 | 0.16% | 41 | 0.67% | 110 | 1.79% |
| April 2024 | 6126 | 380 | 6.20% | 288 | 4.70% | 12 | 0.20% | 44 | 0.72% | 110 | 1.80% |
| May 2024 | 6063 | 378 | 6.23% | 295 | 4.87% | 11 | 0.18% | 45 | 0.74% | 116 | 1.91% |
| June 2024 | 6027 | 407 | 6.75% | 285 | 4.73% | 11 | 0.18% | 48 | 0.80% | 124 | 2.06% |
| July 2024 | 6028 | 390 | 6.47% | 294 | 4.88% | 10 | 0.17% | 45 | 0.75% | 111 | 1.84% |
| August 2024 | 6031 | 380 | 6.30% | 299 | 4.96% | 12 | 0.20% | 45 | 0.75% | 112 | 1.86% |
| September 2024 | 5981 | 374 | 6.25% | 302 | 5.05% | 11 | 0.18% | 45 | 0.75% | 107 | 1.79% |
| 2024 Average | 6085 | 388 | 6.38% | 295 | 4.84% | 11 | 0.18% | 44 | 0.72% | 113 | 1.86% |

## SUMMARY OF ID HIRES AND DEPARTURES

The table below includes the number of ID staff hired and any net gains to ID's staffing between January 2022 and July 2024.

A more fulsome discussion regarding the recruitment and hiring process is included in the compliance box for Consent Judgment § VII., ¶¶ 1 and 9(a) (Use of Force Investigations).

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Summary of ID Hires & Departures** <br> **Net Gain and Losses** | | | | | | | | | | | | |
| **January 2022 to July 2024** | | | | | | | | | | | | |
| | **Total Investigator** | *Civilian Investigator* | *Uniform Investigator* | **Total Supervisor** | *Civilian Supervisor* | *Uniform Supervisor* | *Administrative/ Clerical* | Deputy Director | Director | Agency Attorney | Assistant Commissioner | **Total** |
| **Total Hired** | 86 | *82* | *4* | 26 | *16* | *10* | 2 | 10 | 1 | 0 | 3 | 128 |
| | | | | | | | | | | | | |
| **Resigned** | 69 | *65* | *4* | 14 | *14* | *0* | 2 | 7 | 4 | 1 | 1 | 98 |
| **Retired** | 8 | *0* | *8* | 3 | *0* | *3* | 0 | 0 | 0 | 0 | 0 | 11 |
| **Promoted to New Position in ID** | 15 | *15* | *0* | 7 | *7* | *0* | 0 | 0 | 0 | 0 | 0 | 22 |
| **Transferred** | 17 | *12* | *5* | 0 | *0* | *0* | 2 | 1 | 2 | 1 | 2 | 25 |
| **Terminated** | 3 | *3* | *0* | 0 | *0* | *0* | 0 | 0 | 0 | 0 | 1 | 4 |
| **TDY Rescinded** | 2 | *0* | *2* | 2 | *0* | *2* | 0 | 0 | 0 | 0 | 0 | 4 |
| **Return to Command** | 5 | *0* | *5* | 8 | *0* | *8* | 0 | 0 | 0 | 0 | 0 | 13 |
| **Total Departed** | **119** | *95* | *24* | **34** | *21* | *13* | *4* | *8* | *6* | *2* | *4* | **177** |
| | | | | | | | | | | | | |
| **Net Gain or Loss** | **-33** | **-13** | **-20** | **-8** | **-5** | **-3** | **-2** | **2** | **-5** | **-2** | **-1** | **-49** |

# OATH PRE-TRIAL CONFERENCES

The table below presents the number of *use of force* related pre-trial conferences that were scheduled in each Monitoring Period since July 1, 2020 and the results of those conferences. This data is discussed further in the compliance box for First Remedial Order § C., ¶¶ 4 and 5 (OATH).

| Pre-Trial Conferences Related to UOF Violations | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Results of Pre-Trial Conferences for UOF Cases | | | | | | | | UOF Matters & Staff | |
| # Required | Total # Scheduled | # of UOF PTC Scheduled | Settled Pre-OATH | Settled at OATH | On-Going Negotiation | Another Conference | Trial | Other | Admin Filed | # UOF Incidents | # Staff Members |
| **July to December 2020 (11th MP)** | | | | | | | | | | | | |
| **225[196]** | **372** | **303** | *0* | *111* | *10* | *44* | *124* | *12* | *2* | **274** | **198** |
| | | 100% | *0%* | *37%* | *3%* | *15%* | *41%* | *4%* | *1%* | | |
| **January to June 2021 (12th MP)** | | | | | | | | | | | | |
| **300** | **670** | **541** | *0* | *282* | *4* | *85* | *136* | *33* | *1* | **367** | **331** |
| | | 100% | *0%* | *52%* | *1%* | *16%* | *25%* | *6%* | *0%* | | |
| **July to December 2021 (13th MP)** | | | | | | | | | | | | |
| **350** | **575** | **379** | 185 | 87 | 4 | 18 | 58 | 26 | 1 | **284** | **239** |
| | | 100% | *49%* | *23%* | *1%* | *5%* | *15%* | *7%* | *0%* | | |
| **January to June 2022 (14th MP)** | | | | | | | | | | | | |
| **900** | **1447** | **989** | 612 | 76 | 3 | 174 | 105 | 3 | 16 | **574** | **417** |
| | | 100% | *62%* | *8%* | *0%* | *18%* | *11%* | *0%* | *2%* | | |
| **July to December 2022 (15th MP)** | | | | | | | | | | | | |
| **900** | **1562** | **902** | 621 | 42 | 0 | 153 | 74 | 0 | 12 | **584** | **466** |
| | | 100% | *69%* | *5%* | *0%* | *17%* | *8%* | *0%* | *1%* | | |

---

[196] The Remedial Order requirement came into effect on August 14, 2020 so was applicable for four and a half months in the Monitoring Period.

| January to June 2023 (16th MP) | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **900** | 1337 | **310** | 203 | 40 | 2 | 29 | 29 | 0 | 7 | **214** | **232** |
| | | 100% | 65% | 13% | 1% | 9% | 9% | 0% | 2% | | |
| July to December 2023 (17th MP) | | | | | | | | | | | |
| **900** | 1079 | **373** | 264 | 29 | 14 | 32 | 24 | 1 | 9 | **254** | **264** |
| | | 100% | 71% | 8% | 4% | 9% | 6% | 0% | 2% | | |
| January to June 2024 (18th MP) | | | | | | | | | | | |
| **900** | 942 | **384** | 239 | 38 | 7 | 44 | 21 | 1 | 34 | **228** | **273** |
| | | 100% | 62% | 10% | 2% | 11% | 5% | 0% | 9% | | |

## LEADERSHIP APPOINTMENTS – JANUARY 2022 TO NOVEMBER 15, 2024

The table below identifies the leadership positions that were filled between January 2022 and November 15, 2024, including the date of appointment and the departure date, if applicable. The Department's leadership is discussed in the Leadership, Management, Supervision and Staffing section of the Report.

| TITLE | DIVISION/BUREAU | APPOINTMENT DATE | END DATE |
|-------|-----------------|------------------|----------|
| Assistant Commissioner | Administration | 5/6/2024 | |
| Deputy Commissioner | Administration | 9/6/2022 | 5/10/2024 |
| Assistant Commissioner | AIU | 6/16/2022 | |
| Assistant Commissioner | Budget & Finance | 9/8/2020 | 10/14/2024 |
| Deputy Commissioner | Budget & Finance | 9/11/2023 | |
| Agency Chief Contracting Officer (ACCO) | Central Office of Procurement | 9/18/2023 | 10/14/2024 |
| Assistant Commissioner | CIB | 7/11/2022 | 11/10/2024 |
| Deputy Warden in Command / Acting Warden | CJB, Hospital Prison Ward, Transportation | 9/14/2021 | |
| Assistant Commissioner | Early Intervention, Supervision, & Support | 11/13/2018 | |
| Assistant Commissioner | Equal Employment Opportunity | 8/2/2021 | |
| Associate Commissioner (Appointed DC) | Facilities & Fleet Administration (FMRD) | 9/11/2023 | 11/7/2024 |
| Deputy Commissioner | Facilities & Fleet Administration (FMRD) | 5/22/2023 | 10/27/2024 |
| Deputy Commissioner (prev. Associate Commissioner) | Facilities & Fleet Administration (FMRD) | 11/7/2024 | |
| Director, Energy Mgt Strategy | Facilities & Fleet Administration (FMRD) | 7/17/2023 | |
| Assistant Commissioner | Facility - EMTC | 4/24/2023 | |
| Acting Warden | Facility - GRVC | 9/9/2024 | |
| Assistant Commissioner | Facility - GRVC | 4/24/2023 | 9/9/2024 |
| Acting Warden | Facility - NIC | 9/9/2024 | |
| Assistant Commissioner | Facility - NIC/WF | 6/20/2023 | 8/11/2024 |
| Assistant Commissioner | Facility - OBCC | 4/24/2023 | 10/7/2023 |
| Assistant Commissioner | Facility - OBCC | 5/6/2024 | |
| Warden | Facility - RESH | 10/17/2024 | |
| Warden | Facility - RMSC | 10/17/2024 | |
| Assistant Commissioner | Facility - RMSC | 4/24/2023 | 5/6/2024 |
| Warden | Facility - RNDC | 10/17/2024 | |
| Assistant Commissioner | Facility - VCBC | 4/24/2023 | 10/21/2023 |
| Assistant Commissioner | Facility - WF | 11/13/2023 | |
| Administrative Director of Facility Operations | Facility Operations, Classification & Population Management | 10/28/2024 | |
| Assistant Commissioner | Facility Operations, Classification & Population Management | 5/24/2023 | 5/21/2024 |
| Associate Commissioner | Facility Operations, Classification & Population Management | 8/22/2022 | |
| Associate Commissioner | Facility Operations, Classification & Population Management | 6/20/2024 | |
| Deputy Commissioner | Facility Operations, Classification & Population Management | 7/25/2022 | 2/5/2024 |

| TITLE | DIVISION/BUREAU | APPOINTMENT DATE | END DATE |
|---|---|---|---|
| Deputy Commissioner | Facility Operations, Classification & Population Management | 10/15/2024 | |
| Assistant Commissioner | Health Affairs | 11/17/2023 | |
| Deputy Commissioner | Health Affairs | 1/30/2023 | |
| Assistant Commissioner | Health Management Division | 10/10/2023 | |
| Chief Surgeon | Health Management Division | 4/18/2023 | 8/11/2023 |
| Assistant Commissioner | Human Resources | 6/16/2022 | 4/9/2023 |
| Assistant Commissioner | Human Resources | 10/1/2023 | |
| Associate Commissioner | Human Resources | 4/7/2022 | 4/1/2023 |
| Associate Commissioner (prev. Assistant) | Human Resources | 5/24/2024 | |
| Deputy Commissioner | Human Resources | 10/16/2023 | 8/16/2024 |
| Assistant Commissioner (Associate on 5/24/24) | Human Resources | 8/8/2022 | 5/24/2024 |
| Executive Director | Intergovernmental Affairs | 8/8/2022 | |
| Assistant Commissioner | Investigations | 12/11/2022 | 3/1/2023 |
| Assistant Commissioner | Investigations | 8/8/2023 | 3/25/2024 |
| Associate Commissioner | Investigations | 12/15/2021 | 9/5/2023[197] |
| Deputy Commissioner | Investigations | 5/9/2022 | 4/1/2023 |
| Deputy Commissioner | Investigations | 8/3/2023 | |
| Acting Deputy Commissioner | IT | 4/10/2023 | 4/9/2024 |
| Associate Commissioner | IT | 8/8/2022 | |
| Associate Commissioner | IT | 11/18/2024 | |
| Associate Commissioner/Deputy CIO IT Division | IT | 7/3/2023 | 4/9/2024 |
| Deputy Commissioner | IT | 9/24/2017 | 6/1/2023 |
| Deputy Commissioner | IT | 4/9/2024 | |
| Acting Deputy General Counsel | Legal | 12/12/2023 | 7/30/2024 |
| Acting General Counsel | Legal | 12/12/2023 | 8/9/2024 |
| Deputy Commissioner | Legal | 8/8/2022 | 9/2/2023 |
| Deputy General Counsel | Legal | 8/14/2023 | 11/5/2023 |
| Deputy General Counsel | Legal | 10/21/2024 | |
| General Counsel | Legal | 8/26/2024 | |
| Assistant Commissioner | Management Analysis & Planning | 8/29/2022 | |
| Assistant Commissioner | Management Analysis & Planning | 1/17/2023 | 9/1/2023 |
| Assistant Commissioner | Management Analysis & Planning | 11/27/2023 | |
| Associate Commissioner | Management Analysis & Planning | 7/3/2022 | |
| Deputy Commissioner | Management Analysis & Planning | 4/18/2022 | |
| Assistant Commissioner | Nunez Compliance Unit | 4/17/2023 | |
| Agency Counsel and Senior Advisor to the Commissioner | Office of the Commissioner | 1/22/2024 | |
| Chief Of Staff | Office of the Commissioner | 2/14/2022 | 1/12/2024 |
| Chief Of Staff / Bureau Chief | Office of the Commissioner | 5/24/2024 | |
| Commissioner | Office of the Commissioner | 1/1/2022 | 12/8/2023 |
| Commissioner | Office of the Commissioner | 12/8/2023 | |
| Deputy Chief Of Staff | Office of the Commissioner | 4/11/2022 | |
| Senior Deputy Chief of Staff | Office of the Commissioner | 10/21/2024 | |
| First Deputy Commissioner | Office of the FDC | 3/5/2021 | 12/8/2023 |
| First Deputy Commissioner (prev. DC Programs) | Office of the FDC | 2/2/2024 | |
| Senior Deputy Commissioner | Office of the SDC | 10/31/2022 | 2/3/2023 |
| Senior Deputy Commissioner | Office of the SDC | 10/26/2023 | 5/17/2024 |
| Senior Deputy Commissioner | Office of the SDC | 11/18/2024 | |
| Associate Commissioner | Operations | 11/9/2022 | 1/16/2024 |

---

[197] As of November 22, 2024, the Associate Commissioner was reinstated to the position.

| TITLE | DIVISION/BUREAU | APPOINTMENT DATE | END DATE |
|---|---|---|---|
| Assistant Commissioner | Operations Research | 9/12/2022 | 6/16/2023 |
| Assistant Commissioner | Preparedness and Resilience | 4/11/2022 | |
| Assistant Commissioner | Program Operations | 3/18/2022 | 6/24/2023 |
| Assistant Commissioner | Programs and Community Partnerships | 1/20/2020 | |
| Assistant Commissioner | Programs and Community Partnerships | 4/7/2022 | |
| Assistant Commissioner | Programs and Community Partnerships | 12/5/2023 | |
| Associate Commissioner | Programs and Community Partnerships | 3/14/2022 | 9/29/2023 |
| Associate Commissioner | Programs and Community Partnerships | 11/13/2023 | |
| Deputy Commissioner (now FDC) | Programs and Community Partnerships | 9/6/2021 | 2/2/2024 |
| Assistant Commissioner | Public Information | 1/30/2023 | 7/28/2024 |
| Deputy Commissioner | Public Information | 7/1/2022 | 4/14/2023 |
| Deputy Commissioner | Public Information | 5/3/2023 | 6/30/2024 |
| Deputy Commissioner | Public Information | 11/18/2024 | |
| Assistant Chief of Security | Security Operations | 5/24/2024 | |
| Assistant Commissioner | Security Operations | 4/3/2023 | 5/6/2024 |
| Deputy Commissioner | Security Operations | 5/16/2022 | 10/29/2024 |
| Deputy Commissioner | Security Operations | 10/30/2024 | |
| Assistant Commissioner | Special Investigations Unit/PREA | 12/19/2022 | |
| Assistant Commissioner | Strategic Initiatives | 11/13/2023 | |
| Deputy Commissioner | Strategic Operations | 4/8/2024 | |
| Acting Deputy Commissioner | Training Academy | 1/17/2024 | |
| Assistant Commissioner (Acting DC 1/17/24) | Training Academy | 1/30/2023 | |
| Deputy Commissioner | Training Academy | 12/5/2022 | 1/16/2024 |
| Assistant Commissioner | Training Academy | 9/6/2022 | 9/17/2022 |
| Associate Commissioner | Trials | 8/8/2022 | 8/2/2023 |
| Deputy Commissioner | Trials | 5/31/2022 | |

# OVERTIME SPENDING

An important indicator of efficient workforce management is the level of an agency's use of overtime. Given the Department's problems with inefficient staff scheduling and deployment and abuse of leave benefits, overtime has become a routine strategy to increase staff availability on any given shift. Overtime can of course be used efficiently to address temporary staff shortages and unusual situations. However, using overtime to address chronic staffing issues, as this Department does, has significant fiscal consequences and an obvious negative impact on staff wellness and morale. The table below shows the Department's monthly overtime costs for uniform staff since January 2019.

| Overtime Data for Uniform Staff[198]<br>*January 2019-October 2024* | | | | | | |
|---|---|---|---|---|---|---|
| **Month** | **2019** | **2020** | **2021** | **2022** | **2023** | **2024** |
| **January** | $12,860,000 | $9,800,000 | $12,066,000 | $18,847,000 | $22,893,000 | $21,227,000 |
| **February** | $12,392,000 | $7,983,000 | $14,037,000 | $18,226,000 | $20,819,000 | $19,936,000 |
| **March** | $14,194,000 | $8,426,000 | $15,218,000 | $20,969,000 | $23,855,000 | $21,759,000 |
| **April** | $13,941,000 | $13,340,000 | $15,394,000 | $20,783,000 | $22,414,000 | $21,533,000 |
| **May** | $14,135,000 | $7,926,000 | $15,850,000 | $21,423,000 | $23,358,000 | $22,450,000 |
| **June** | $11,894,000 | $5,647,000 | $15,887,000 | $21,721,000 | $22,490,000 | $21,566,000 |
| **July** | $14,273,000 | $5,817,000 | $18,860,000 | $22,064,000 | $23,758,000 | $24,282,000 |
| **August** | $14,592,000 | $6,815,000 | $19,719,000 | $22,453,000 | $22,434,000 | $22,125,000 |
| **September** | $11,714,000 | $6,022,000 | $20,137,000 | $22,006,000 | $18,871,000 | $23,756,000 |
| **October** | $12,146,000 | $7,168,000 | $21,485,000 | $22,901,000 | $19,712,000 | $26,186,000 |
| **November** | $11,458,000 | $8,268,000 | $19,514,000 | $22,215,000 | $19,462,000 | |
| **December** | $11,439,000 | $11,687,000 | $19,546,000 | $22,276,000 | $20,261,000 | |
| **Annual Overtime Spending** | **$155,038,000** | **$98,899,000** | **$207,713,000** | **$255,884,000** | **$260,327,000** | **$224,820,000** |
| **Average # of Staff** | **10,115** | **9,302** | **8,454** | **7,181** | **6,479** | **6,085** |

---

[198] There can be lags in the reporting and payment of overtime. Staff must submit overtime paperwork and there is a processing lag that can result in overtime paid weeks and potentially months after it was worked. On occasion there are instances (i.e. collective bargaining settlements) that call for substantial retroactive overtime payments. Because of this, overtime data is never truly static and is subject to real-time changes. Because these changes are so frequent, they are not reflected in the data produced above.

## AWARDED POSTS

The Department reported that as of November 13, 2024, 779 posts have been awarded to staff members. This data reflects all staff who have a formally awarded post. Of the 779 staff with awarded posts, about two-thirds (n=530, 68%) were posts awarded within the facilities and one-third (n=249, 32%) were posts outside the facilities (*i.e.,* court facilities, Special Operations Division, and Transportation Division).

Since the Monitor's April 18, 2024 Report (dkt. 706), the number of awarded posts has decreased by 8% (from 844 posts to 779 posts). This decrease has been realized across all positions (*i.e.,* ADW awarded posts decreased by one, Captain awarded posts decreased by 10, and CO awarded posts decreased by 54), across posts both inside-facility (decrease of 45 posts) and outside-facility (decrease of 20 posts), and in PIC-facing posts (decrease of 35 posts). Interestingly, the proportions of inside-facility, outside-facility, and PIC-facing posts compared to the overall number of awarded posts have remained identical to those reported in April, revealing that the decreases have been proportional across every metric.

The overall decrease in the number of awarded posts is welcomed, but, as reported in April, the current practice for awarding posts means that hundreds of staff members are still consistently assigned *outside* of the facilities and/or to posts within the facilities that do not address the critical need for proper supervision and support to incarcerated individuals on the housing units.  While in some cases such assignments may be appropriate.  For instance, assignment of staff to posts that require a specific skill set or expertise may create situations that necessitate the use of awarded post to ensure that the post is filled by an individual(s) with he requisite skill set.  However, it is critical that the use of such positions are as limited as possible.

Among the posts awarded, the Department identified that 395 of these 779 assignments (51%) were "PIC-facing posts" (a designation that includes housing units, along with corridor, clinic, front gate, fire safety, food service, activity, law library, education, meal relief, security and visitation posts, among others). The 49% identified as "non-PIC facing posts" included assignments to patrol, perimeter security, control rooms, gate security, and sanitation, as well as posts outside of the facilities. Importantly, the Monitoring Team identified that less than 20% (n=155) of the total 779 awarded posts were assignments to a specific housing unit.[199]

The tables below show how the 779 awarded posts are distributed across location, by rank, and whether PIC-facing or housing unit job assignments.

---

[199] The proportion of posts on housing units was determined via the Monitoring Team's analysis. The location of some posts appeared obvious, but some of the others may or may not be in housing units. Accordingly, the data may not be precise but is certainly a well-informed estimate of the proportion.

| Location of Awarded Posts | | | | |
|---|---|---|---|---|
| | **ADW** | **Captain** | **CO** | **Total** |
| Facility | | | | |
| AMKC | ~ | 2 | 1 | 3 |
| BHPW | ~ | 3 | 51 | 54 |
| EMTC | ~ | 13 | ~ | 13 |
| GRVC | ~ | 11 | 73 | 84 |
| NIC | ~ | 16 | 60 | 76 |
| RMSC | ~ | 17 | 175 | 192 |
| RNDC | 1 | 19 | 88 | 108 |
| SUBTOTAL | **1** | **81** | **448** | **530** |
| Non-Facility Location | | | | |
| BKCT | 1 | ~ | 7 | 8 |
| BXDC | ~ | 4 | 43 | 47 |
| MNCTS | 1 | 3 | 29 | 33 |
| QNCTS | 1 | ~ | 38 | 39 |
| SOD | 1 | 8 | 63 | 72 |
| TD | 1 | 11 | 38 | 50 |
| SUBTOTAL | **5** | **26** | **218** | **249** |
| **TOTAL** | **6** | **107** | **666** | **779** |
| **% Facility Posts** | 17% | 76% | 67% | 68% |
| **% Non-Facility Posts** | 83% | 24% | 33% | 32% |

The following tables provide additional detail for the subset of awarded posts that are located in the facilities as of November 13, 2024.

| PIC-Facing Posts, by Facility<br>As Identified by the Department | | | | |
|---|---|---|---|---|
| | **ADW** | **Captain** | **CO** | **Total** |
| Facility | | | | |
| AMKC | ~ | 2 | 1 | 3 |
| BHPW | ~ | 3 | 33 | 36 |
| EMTC | ~ | 8 | ~ | 8 |
| GRVC | ~ | 3 | 14 | 17 |
| NIC | ~ | 13 | 58 | 71 |
| RMSC | ~ | 15 | 147 | 162 |
| RNDC | 1 | 17 | 80 | 98 |
| **TOTAL** | **1** | **61** | **333** | **395** |

| Housing Unit Posts, by Facility<br>As Identified by Monitoring Team analysis | | | | |
|---|---|---|---|---|
| | **ADW** | **Captain** | **CO** | **Total** |
| Facility | | | | |
| | | | | |
| AMKC | ~ | ~ | ~ | ~ |
| BHPW | ~ | 2 | 6 | 8 |
| EMTC | ~ | 8 | ~ | 8 |
| GRVC | ~ | 3 | 19 | 22 |
| NIC | ~ | 5 | 39 | 44 |
| RMSC | ~ | 3 | 41 | 44 |
| RNDC | 1 | 7 | 21 | 29 |
| **TOTAL** | **1** | **28** | **126** | **155** |
| *\*\*This table includes posts in which the location on a housing unit was not 100% certain, but is possible, in order to illustrate the maximum possible value.* | | | | |

# APPENDIX B:
# UPDATED CD DISMISSAL DATA FROM PAST MONITOR'S REPORTS

## CORRECTED CD DISMISSAL DATA FROM PRIOR MONITOR'S REPORTS

The Monitoring Team identified a calculation error in its prior Monitor's reports regarding the dismissal of command disciplines. Both the original and corrected data are included in the charts below, with all changes identified in red text. These are the only Monitor's Reports in which the calculation error occurred.

### October 28, 2022 Monitor's Report at pg. 148 [14th MP Data – January 1 - June 30, 2022]

| Original Data | Corrected Data |
|---|---|
| Of the 345 cases dismissed or not processed during the current Monitoring Period: | Of the 345 cases dismissed or not processed during the current Monitoring Period: |
| o 30% (n=104) were dismissed for factual reasons including in response to a hearing on the merits, or because a Staff Member resigned/retired/was terminated. | o 39% (n=135) were dismissed for factual reasons including in response to a hearing on the merits, or because a Staff Member resigned/retired/was terminated. |
| o 70% (n=241) were dismissed because of due process violations (meaning the hearing did not occur within the required timeframes outlined in policy), because of a clerical error which invalidated the CD, or because the CD was not entered into CMS at all or not drafted within the required timeframe. It is this 70% of dismissals that are of concern to the Monitoring Team because they signal a lack of proper management of an essential accountability tool. | o 61% (n=210) were dismissed because of due process violations (meaning the hearing did not occur within the required timeframes outlined in policy), because of a clerical error which invalidated the CD, or because the CD was not entered into CMS at all or not drafted within the required timeframe. It is this 61% of dismissals that are of concern to the Monitoring Team because they signal a lack of proper management of an essential accountability tool. |

### April 3, 2023 Monitor's Report at pgs. 182-183 [15th MP Data - July 1 - December 31, 2022]

| Original Data | Corrected Data |
|---|---|
| Of the 390 cases dismissed or not processed during the current Monitoring Period: | Of the 390 cases dismissed or not processed during the current Monitoring Period: |
| o 31% (n=120) were dismissed for factual reasons including in response to a hearing on the merits, or because a staff member resigned/retired/was terminated. | o 34% (n=132) were dismissed for factual reasons including in response to a hearing on the merits, or because a staff member resigned/retired/was terminated. |

| | |
|---|---|
| o  69% (n=270) were dismissed because of due process violations (meaning the hearing did not occur within the required timeframes outlined in policy), because of a clerical error which invalidated the CD, or because the CD was not entered into CMS at all or not drafted within the required timeframe. It is this almost 70% of dismissals that are of concern to the Monitoring Team because they reflect a lack of proper management of an essential accountability tool. | o  66% (n=258) were dismissed because of due process violations (meaning the hearing did not occur within the required timeframes outlined in policy), because of a clerical error which invalidated the CD, or because the CD was not entered into CMS at all or not drafted within the required timeframe. It is this 66% of dismissals that are of concern to the Monitoring Team because they reflect a lack of proper management of an essential accountability tool. |

**December 22, 2023 Monitor's Report at pg. 54 [16th MP Data - January 1 – June 30, 2023]**

| *Original Data* | *Corrected Data* |
|---|---|
| Of the 320 cases dismissed or not processed during the current Monitoring Period:<br><br>o  34% (n=108) were dismissed for factual reasons including in response to a hearing on the merits, or because a staff member resigned/retired/was terminated.<br><br>o  66% (n=211) were dismissed because of due process violations (meaning the hearing did not occur within the required timeframes outlined in policy), because of a clerical error which invalidated the CD, or because the CD was not entered into CMS at all or not drafted within the required timeframe. It is this 66% of dismissals that are of concern to the Monitoring Team because they reflect a failure to properly manage an essential accountability tool. | Of the 320 cases dismissed or not processed during the current Monitoring Period:<br><br>o  40% (n=128) were dismissed for factual reasons including in response to a hearing on the merits, or because a staff member resigned/retired/was terminated.<br><br>o  60% (n=192) were dismissed because of due process violations (meaning the hearing did not occur within the required timeframes outlined in policy), because of a clerical error which invalidated the CD, or because the CD was not entered into CMS at all or not drafted within the required timeframe. It is this 60% of dismissals that are of concern to the Monitoring Team because they reflect a failure to properly manage an essential accountability tool. |

**April 18, 2024 Monitor's Report at pg. 117 [17th MP Data - July 1 – December 31, 2023]**

| *Original Data* | *Corrected Data* |
|---|---|

| | |
|---|---|
| More specifically, of the 172 cases dismissed or not processed during the current Monitoring Period:<br><br>o 72% (n=124) were dismissed because of due process violations (meaning the hearing did not occur within the required timeframes outlined in policy), because of a clerical error which invalidated the CD, or because the CD was not entered into CMS at all or not drafted within the required timeframe. These cases reflect a failure to properly manage an essential accountability tool.<br><br>o 28% (n=48) were dismissed for factual reasons including in response to a hearing on the merits, or because a staff member resigned/retired/was terminated. Additional scrutiny of these cases is merited as a review of some cases suggests the possibility that the determination that the charges cannot be sustained for factual reasons may not be made in a neutral and objective manner. | More specifically, of the 172 cases dismissed or not processed during the current Monitoring Period:<br><br>o 69% (n=118) were dismissed because of due process violations (meaning the hearing did not occur within the required timeframes outlined in policy), because of a clerical error which invalidated the CD, or because the CD was not entered into CMS at all or not drafted within the required timeframe. These cases reflect a failure to properly manage an essential accountability tool.<br><br>o 31% (n=54) were dismissed for factual reasons including in response to a hearing on the merits, or because a staff member resigned/retired/was terminated. Additional scrutiny of these cases is merited as a review of some cases suggests the possibility that the determination that the charges cannot be sustained for factual reasons may not be made in a neutral and objective manner. |

# APPENDIX C: UPDATE ON PROCESSING NEW ADMISSIONS

## UPDATE ON PROCESSING OF NEW ADMISSIONS

The procedures for processing people newly admitted to the Department remain as described in the Monitor's February 3, 2023 Report at pgs. 15 to 18 and April 3, 2023 Report at pgs. 74 to 75. The New Admission policy was updated in early 2023 but rescinded in June 2023 because the Department had not consulted with the Monitoring Team on the changes. Revisions to the policy have not been prioritized, given the Department's need to focus on other higher-priority initiatives.

### LENGTH OF STAY IN INTAKE FOR MALE NEW ADMISSIONS

New admission processing data from January to June 2024 identifies the proportion of male new admissions who were processed through new admission intake within the required 24-hour timeline. Two different data points can be utilized as the "start time" when tracking length of stay: the time that an individual is transferred from NYPD to NYC DOC custody, which typically occurs in a court setting ("custody time") *or* the time that an individual arrives at the intake unit at EMTC facility on Rikers Island ("arrival time"). Both are considered separately in the analysis below.[200] The "end time" at which intake processing is considered complete is the time that the individual is either transferred to a housing unit or is discharged from custody (for those who make bail or are not returned to custody following a return to court or a hospital visit).

As shown in the section under the orange bar in the tables below, whether using custody time or arrival time as the starting point, most individuals from January to June 2024 were processed within a 24-hour period. Using "custody time" as the starting point, 93% of new admissions were processed through intake in under 24 hours. Using "arrival time" as the starting point, 95% of new admissions were processed through intake in under 24 hours. These calculations were made using a continuously running clock, *without deducting time for clock stoppages*, which are described in more detail below.

---

[200] As noted in the Monitor's February 3, 2023 Special Report on Intake (dkt. 504), the Monitoring Team assesses the time each person arrives in the intake unit (*i.e.*, "arrival time") compared to the time the individual is transported to their assigned housing unit when calculating whether the 24-hour requirement has been met. Counsel for the Plaintiff Class has advised the Monitoring Team that it believes that the assessment of compliance should be based on the time an individual is taken into custody (*i.e.*, "custody time"). Discussions about the appropriate compliance standard will occur in conjunction with the discussion related to clock stoppages. Given that, this report provides outcomes using both data points for the Court's consideration.

| Intake Processing Times for New Admissions Arriving at EMTC Intake January to June 2024 | | | | |
|---|---|---|---|---|
| **Outcome** | **Per Custody Time** | | **Per Arrival Time** | |
| | **n=10,060** | **%** | **n=10,060** | **%** |
| Housed/Discharged within 24 hours | 9368 | 93% | 9563 | 95% |
| Housed/Discharged beyond 24 hours | 692 | 7% | 497 | 5% |
| **Length of Stay ("LOS") Beyond 24 Hours** | | | | |
| **LOS (# hrs. overdue)** | **n=692** | **%** | **n=497** | **%** |
| 24-27 hours (≤ 3 hrs.) | 159 | 22.98% | 130 | 26.16% |
| 27-30 hours (3-6 hrs.) | 160 | 23.12% | 141 | 28.37% |
| 30-33 hours (6-9 hrs.) | 136 | 19.65% | 118 | 23.74% |
| 33-36 hours (9-12 hrs.) | 111 | 16.04% | 58 | 11.67% |
| 36-48 hours (12-24 hrs.) | 84 | 12.14% | 31 | 6.24% |
| More than 48 hours (≥24 hrs.) | 42 | 6.06% | 19 | 3.82% |

The data beneath the green bar in the table above shows the total length of stay for the small proportion of individuals whose processing did not meet the 24-hour timeline. In this Monitoring Period, of those individuals who did not meet the 24-hour timeline, most were housed within 9 hours, specifically, 455 of the 692 (66%) using custody time and 389 of 497 (78%) using arrival time.

**LENGTH OF STAY IN INTAKE FOR FEMALE NEW ADMISSIONS**

Female new admissions are processed through a separate intake at RMSC where they are also housed. As shown in the section under the gray bar in the RMSC tables below, whether using custody time or arrival time as the starting point, most female new admissions from January to June 2024 were processed within a 24-hour period. Using "custody time", 93% of new admissions were processed through intake in under 24 hours. Using "arrival time", 95% of new admissions were processed through intake in under 24 hours. These calculations were made using a continuously running clock, *without deducting time for clock stoppages*, which are described in more detail below.

| Intake Processing Times for New Admissions Arriving at RMSC Intake January to June 2024 | | | | |
|---|---|---|---|---|
| **Outcome** | **Per Custody Time** | | **Per Arrival Time** | |
| | **n=1,006** | **%** | **n=1,006** | **%** |
| Housed/Discharged within 24 hours | 939 | 93% | 957 | 95% |
| Housed/Discharged beyond 24 hours | 67 | 7% | 49 | 5% |
| **Length of Stay ("LOS") Beyond 24 Hours** | | | | |
| **LOS (# hrs. overdue)** | **n=67** | **%** | **n=49** | **%** |
| 24-27 hours (≤ 3 hrs.) | 16 | 23.9% | 16 | 32.6% |
| 27-30 hours (3-6 hrs.) | 18 | 26.9% | 9 | 18.4% |
| 30-33 hours (6-9 hrs.) | 9 | 13.4% | 6 | 12.2% |
| 33-36 hours (9-12 hrs.) | 6 | 9% | 4 | 8.2% |
| 36-48 hours (12-24 hrs.) | 10 | 14.9% | 9 | 18.4% |
| More than 48 hours (≥24 hrs.) | 8 | 11.9% | 5 | 10.2% |

The data beneath the orange bar in the table above shows the total length of stay for the small proportion of female new admissions whose processing did not meet the 24-hour timeline. In this Monitoring Period, of those individuals who did not meet the 24-hour timeline, most were housed within 9 hours, specifically, 43 of 67 (64%) using custody time and 31 of 49 (63%) using arrival time.

TEMPORARILY SUSPENDING NEW ADMISSION PROCESSING, A.K.A. CLOCK-STOPPAGE

Historically, the Department has identified circumstances in which new admission intake processing is interrupted and has tolled its accounting of the processing time (*i.e.*, "stopped the clock") until the circumstance is resolved and processing can resume.[201] The situations in which the Department temporarily suspends its intake processing clock include when:

- An individual is returned to court before the intake process is completed.

- An individual refuses to participate in intake processing.

- An individual is transferred to a hospital or Urgi-Care (a clinic in another facility on Rikers Island) before the intake process is complete.

- An individual makes bail and is released from custody before the intake process is complete.

---

[201] *See* Monitor's February 2023 Report at pgs. 17 and 19-20 and Monitor's April 3, 2023 Report at 79 to 81.

Suspending intake processing appears logical (*e.g.*, processing cannot occur if the person is not physically present) and may also be functional (*e.g.*, Department or CHS staff need to know that an individual will not be presented for a certain procedure). Although the Department tracks all clock stoppages, the data presented above regarding the 24-hour timeline utilized a continuously running clock, *without deducting any time when processing was suspended.*

In January to June 2024, most individuals newly admitted to the Department (88%; 8,863 of 10,060 for male new admissions; and 83%; 837 of 1,006 for female new admissions) were processed through intake without the process being suspended for any reason. Further, the fact that the intake process was suspended sometimes did not necessarily mean that the individual was not processed within 24 hours. In fact, among the 1,197 male new admissions whose intake process was suspended for some period, about half were still housed within 24 hours (43% using custody time, 58% using arrival time). For the 169 female new admissions whose intake process was suspended for some period, most were still housed within 24 hours (61% using custody time, 71% using arrival time). Among those whose intake process was temporarily suspended and whose processing lasted more than 24 hours, the largest category of suspensions occurred when the individual was required to return to court (69% of male suspensions per custody time; 77% of male suspensions per arrival time; and 68% of female suspensions per custody time; 61% of female suspensions per arrival time).

## NCU'S AUDITS TO VERIFY DATA ENTRY

Concurrent with the implementation of the New Admission Dashboard, the *Nunez* Compliance Unit ("NCU") continued its audit strategy to corroborate time entries for male new admissions at EMTC using Genetec footage.[202] Audit results from January to June 2024 are summarized for the 130 people who were newly admitted during the audits' sampling frames.[203]

- 123 of 130 people (95%) arrived in intake and were processed and transferred to a housing unit within the 24-hour timeline (confirmed via Genetec review).

- 124 of 130 arrival time entries (95%) were generally accurate (*i.e.*, within 20 minutes of the time shown on Genetec). Among the six inaccuracies, three stated a time *before* the person actually arrived, and three stated a time *after* the person actually arrived.

- 99 of 125[204] housing time entries (79%) were generally accurate (*i.e.*, within 20 minutes of the time shown on Genetec). Among the 26 inaccuracies, eight stated a time *before*

---

[202] *See* Monitor's February 3, 2023 Report at pgs. 20 to 22 and Monitor's April 3, 2023 Report at pgs. 78 to 79. NCU does not conduct audits for female new admissions at RMSC.

[203] NCU confirms the status of all individuals in the intake to determine whether they are a new admission or if the individual may already have been in custody and is therefore in intake as an inter/intra facility transfer. Upon confirmation of the new admissions, the audit is limited to those individuals.

[204] Five individuals were excluded from the Housing Time calculation because they were discharged during their admission process and thus the housing time was not applicable.

the person was actually transferred to a housing unit, 17 stated a time *after* the person was actually transferred to a housing unit, and one entry was not completed.

- ▪ 9 of the 130 people (7%) had "clock stoppages" during the intake process. Of these, two people were housed within 24 hours of their arrival time in intake and seven people were not.

In instances where errors in data entries were found, NCU reports that that the staff members received counseling and retraining. Given that NCU's findings indicate intake staff may be struggling to enter housing time correctly, the Monitoring Team recommends intake supervisors evaluate this process and focus on improving this practice.

CONCLUSION

The Department has taken important steps to ensure New Admissions are processed in a timely manner. The vast majority of individuals are processed within 24 hours, including in instances when a clock stop is appropriate. As demonstrated by NCU's audit, the Department also continues to track New Admissions using the New Admissions Dashboard in a generally reliable and accurate manner. The Department must continue to remain proactive regarding the New Admissions procedures to effectively address the evolving challenges and fluctuations in population.

# APPENDIX D:
# ROUTINE STAFF TOURS OF HOUSING UNITS

BACKGROUND

Routine and adequate touring of housing units is a fundamental component of sound correctional practice. Staff must visually inspect the housing units, particularly when incarcerated individuals are confined to their cells, to ensure the welfare of people in custody, to respond to their concerns and to address any problems that arise. These tours should occur at regular intervals throughout each shift, every 30 minutes for officers and three times (each at least one hour apart) per 8-hour shift for Captains.

For years, the Monitoring Team has found that officers and Captains do not tour the units as often as required and that their tours are often not meaningful (e.g., they do not look into the cell door windows to verify the safety of the individual). Staff's failure to adequately tour the housing units has contributed to the units' overall state of dysfunction and has resulted in the use of unnecessary and excessive force and serious acts of violence. The lack of adequate touring has also been identified as a contributing factor to several deaths in custody. As a result of the deficiencies in staff tours, the Action Plan includes requirements to improve routine housing unit tours § A, ¶ 1(d).

As part of the effort to ensure that touring occurs as required, the Department procured the Watch Tour system that includes tour wands, sensors installed in key locations on the housing units, and a software package to monitor the extent to which tours occur at the required frequency. Tour wand data simply confirms that the staff member moved throughout the unit but cannot verify whether the tour was meaningful. The NCU's security audits of random housing units on random days are replete with examples of staff who were off post (and thus could not tour), who failed to tour, and who tapped the sensor with the tour wand but took no action to

verify the individuals' safety in their cells.[205]  This is consistent with the Monitoring Team's findings via observations of staff practice and its routine review of use of force incidents, violent incidents, and in-custody deaths. Since the inception of the Action Plan, even with its specific requirements related to housing unit tours, the Monitoring Team has not observed any meaningful change in staff practice in this area.

### DOC's Assessment of Staff Tours

The Department has a few protocols to assess whether staff are conducting tours as required. The electronic information produced by the tour wands is used by the Department in a few ways, but it has not yet been maximized to develop a reliable quality assurance program or to make meaningful conclusions about the current performance level and whether any progress is being made. The data from the tour wands is available on a dashboard (developed by DOC) that can be viewed in real time by facility leadership.[206] This functionality permits leadership to identify close in time whether a tour occurred as it should or whether staff failed to conduct the tour. Retrospectively, the dashboard also permits a visual inspection of the tours completed on a set of housing units for a particular day/shift (which are represented by a series of dots and Xs), although the dashboard is limited in terms of the lookback window because of the large volume of data that must be processed. The dashboard also includes variables for whether the frequency of tours met the intended "target," the number of tours that were late and the longest duration between tours.

---

[205] For example, of the 24 audits conducted between January and April 2024, the NCU audits found staff were off post for at least a portion of the 24-hour audit period in 20 of the 24 audits. The 24 audits also included a variety of examples in which staff failed to complete all required tours and/or that the tours were not meaningful.

[206] An example of some o the information it produces can be found in Exhibits A and B to the Declaration of Captain Gamien Batchelor (dkt. 689-7).

To date, the Department is not able to produce aggregate data regarding the proportion of housing units that met the "target" on any given day/shift nor does it compute other performance metrics. As a result, there is currently no reliable data to assess compliance and whether progress has been made or not. The Department reports that the Office of Management and Planning ("OMAP"), in consultation with facility operations, has been developing an improved technique to aggregate tour wand data to aggregate performance on a daily basis for each housing area and will consult the Monitoring Team once it is developed.

The Department also utilizes the data from the tour wands as part of a quality assurance initiative to determine if tours have occurred as required. To date, the Department's quality assurance program is inefficient, burdensome and does not produce results that support the overall goal of ensuring that tours occur as required. First, the overall management of this initiative has not had the consistent, sustained leadership needed to develop and implement an adequate quality assurance program. Over the past two years, the management of this process has changed multiple times across at least three different offices (the Office of Commissioner, the Office of the Senior Deputy Commissioner, and the Office of the Deputy Commissioner of Facility Operations).  Currently, the process has been managed by the Office of the Senior Deputy Commissioner ("SDC") since April 2024.[207]

The current quality assurance process is cumbersome and time consuming for both the entity that conducts the audit and the facilities. The Office of the SDC has a laborious process for reviewing the tour wand dashboard and creating a table containing an entry for every tour that

---

[207] DOC reported to the Monitoring Team that Captain Batchelor, who submitted a declaration to the Court on March 18, 2024 as the individual in charge of the Tour Wand Compliance Unit, was reassigned and is no longer in charge of this unit. The Department reports that an ADW was  assigned to manage the unit.

identifies whether the tour was in compliance or not, which is then shared with each facility. Each facility then investigates each tour deemed "not in compliance" to determine whether the SDC's assessment is accurate, or if there were reasonable, mitigating factors that prevented the officer or captain from using the tour wand as required. Genetec surveillance video footage is reviewed for this purpose, which is incredibly time consuming. Additionally, the Department has not aggregated the information developed in any way to determine the overall results of each audit. Further, to the extent that tours are determined to be out of compliance, any corrective action applied to staff is documented in a logbook within each individual facility. The logbook entries cannot be aggregated and do not generally appear to be subject to oversight to ensure that the proposed corrective action actually occurred. While this process is ostensibly comprehensive, it is burdensome and inefficient, and therefore of limited value. The Department has reported that it intends to revise the current quality assurance program, but has not done so yet.

**CORRECTIVE ACTION**

The Department's recordkeeping regarding staff's failure to tour, as described above, does not permit the development of aggregate data (in particular because most of the data is maintained in logbooks and/or is otherwise not amenable to aggregation). The Monitoring Team continues to review various disciplinary records produced by the Department to identify discipline related to the failure to conduct meaningful housing unit tours.

From January 2022 to September 2024, the Monitoring Team has identified the following corrective action related to potentially deficient touring practices.[208] More detailed data is provided at the end of this section.

---

[208] This summary is intended to update the information previously reported in the Monitor's November 8, 2023 Report at pgs. 76-79 and the Monitor's MMOay 24, 2024 Report at pgs. 7-14.

- **First Remedial Order § A., ¶ 1 (Use of Force Reviews) Rapid Reviews**: Facility leadership recommended, via Rapid Reviews from January 2022-September 2024, in total, 38 staff (two ADWs, 14 Captains, and 23 officers) for corrective action related to potentially deficient touring practices. More specifically, one staff member was suspended, two staff received MOCs (one was closed with an NPA and one was dismissed), one staff received a PDR, 21 staff received CDs (12 staff received a penalty of compensatory days, three staff received a penalty of a corrective interview, three were dismissed, one was not processed because of due process violations, one was converted to an MOC that was later settled with an NPA, and one is still pending a hearing), 11[209] staff received a corrective interview, two staff[210] received 5003 counseling, one staff[211] received re-training, and one staff received a verbal reprimand.

- **Suspensions**: 21 staff (two ADWs, seven Captains, and twelve officers) were suspended, due at least in part to deficiencies in their touring practices in cases where an individual died in custody.

- **Formal Discipline**: The Department brought charges against 29 staff members for issues related to touring. Of these 29 cases, 20 were resolved with an NPA, four were administratively filed, and five remain pending.

---

[209] The Monitoring Team did not confirm that all recommended Corrective Interviews in fact occurred so it is possible that this number may be over inclusive as some corrective interviews may not have occurred.

[210] The Monitoring Team did not confirm that all recommended 5003 counseling in fact occurred so it is possible that this number may be over inclusive as some 5003 counseling may not have occurred.

[211] The Monitoring Team did not confirm that all recommended re-training in fact occurred so it is possible that this number may be over inclusive as some re-training may not have occurred.

Given the frequency with which touring deficiencies occur, and the frequency with which serious incidents occur from staff's failure to conduct proper tours, a larger number of corrective actions would be expected.

## CONCLUSION & NEXT STEPS

Overall, tours by officers and Captains do not appear to be occurring as required and the processes in place contribute little to the effort to improve staff practice. Further, given the frequency with which these deficiencies are observed, and the harm that flows from them, the number of corrective measures does not appear commensurate with the number of violations observed.

In June 2024, the Monitoring Team shared a comprehensive written feedback with the Department that includes recommendations for bringing greater efficiency, clarity and utility to its audit process so that the Department can produce valid metrics that assess compliance and progress over time and tracks and confirms any corrective action that may be taken for any deficiencies. The Department has not substantively responded to this feedback, but it reported it is working to improve its data tracking and revising the quality assurance process and will consult the Monitoring Team on these changes once developed.

# APPENDIX E: STREAMLINING OF *NUNEZ* COURT ORDERS

The Monitoring Team has long reported on the need to streamline the *Nunez* Court Orders given the volume of requirements they impose and the compounding complexity each time a new Order is added.[212] The sheer number of Orders and requirements in this case have created such an extensive array of interrelated requirements that it has become difficult to prioritize which makes both implementation and the ability to track progress challenging. In protracted institutional reform efforts, the importance of establishing clear prescriptions for initiatives, policies and practices cannot be overstated. The conglomeration of the *Nunez* Court Orders, which require compliance with hundreds of interconnected provisions, sometimes with slight variations, is not a functional structure because it is not capable of providing the straightforward framework for approaching the task that is critical for success in complex reform cases. Therefore, the *Nunez* Court Orders need to be thoughtfully and carefully organized and streamlined.

**CONSIDERATIONS FOR A FRAMEWORK TO STREAMLINE THE *NUNEZ* COURT ORDERS**

A complete, streamlined version of the *Nunez* Court Orders can only be finalized *after* the Court has resolved the motion for contempt and has made a determination about what remedial relief, if any, will be imposed. Should the Court order the appointment of a receiver, that person must evaluate the existing orders once they are in place. This sequence of events is necessary because of the direct impact these rulings will have on the Department's obligations should it be found in contempt of any provisions and the likely impact on the overall management structure and authority of the agency. While the substantive work to streamline the Orders cannot yet begin, the *strategy* for streamlining the Orders could be developed in advance so that once the

---

[212] There are at least ten *Nunez* Court Orders representing likely over 500 provisions.  This includes the Consent Judgment with over 300 provisions as well as three Remedial Orders (entered between August 2020 and November 2021), the Action Plan (entered in June 2022), and at least five additional orders entered in 2023.

Court makes its ruling, the work can proceed expeditiously. The Monitor's position on this strategy is as follows.

The process for streamlining the *Nunez* Court Orders will need to be properly *managed* given its complexity and the number of stakeholders that need to provide input. The manager of this process must not only have the time and organizational skill to lead such an effort but must also have extensive knowledge of the *Nunez* Court Orders' requirements, their basis and how they should be operationalized. Given the Monitoring Team's central role in negotiating and drafting the *Nunez* Court Orders and their significant expertise in both the Department's operations and sound correctional practice, the Monitoring Team may be best positioned to perform this task and is willing to manage the process.

Achieving the overall goal of streamlining the *Nunez* Court Orders requires the following key objectives:

1) Organizing the *Nunez* Court Orders (as well as any modifications that occur via the process outlined below) so that the process for soliciting input and exchanging ideas can proceed in an organized fashion.

2) Determining how the orders can be consolidated and streamlined and, to the extent necessary, whether certain provisions can potentially be eliminated (without substantively limiting the relief provided to the class members), as they may be extraneous or duplicative.

3) Prioritizing the requirements of the *Nunez* Court Orders in order to properly sequence the work to maximize progress.

These objectives are intertwined in ways that will require discussions among the stakeholders to be similarly multi-focused, and the steps listed above cannot be completed in a

rigid sequence. Accomplishing these three objectives will require continuous input from and feedback to the *Nunez* stakeholders.[213] The Monitoring Team does not anticipate that the process of obtaining input/sharing perspectives will be sequential, but rather will involve a process in which each stakeholder's input is connected to and informed by feedback from other stakeholders, such that a consensus-driven process can proceed. Coordinating so many perspectives will require ongoing management, particularly regarding how input is sought and shared. For these reasons, this process will require centralized management to coordinate the stakeholders' contributions in a productive and efficient manner.

### RECOMMENDATION TO THE COURT

Given the above, the Monitoring Team recommends that the Court direct the Monitoring Team to manage the process of streamlining the *Nunez* Court Orders, and to initiate that process following the Court's rulings on the Plaintiffs' contempt motion and the required remedial measures, if any. More specifically, within 30 days of the determination regarding remedial measures, the Monitoring Team shall submit a timeline to the Court, outlining the relevant tasks and anticipated completion date for streamlining and prioritizing the requirements of the *Nunez* Court Orders. If any stakeholder opposes the proposed timeline, the Monitor will present the substance of the opposition as part of his submission.

---

[213] This includes counsel for the Plaintiff Class, counsel for the Southern District of New York, the City, the Department, the Monitoring Team and, if the Court orders one to be appointed, the Receiver.

# APPENDIX F:
# MONITOR'S JANUARY 12, 2024
# LETTER RE: LL42

## MONITOR'S JANUARY 12, 2024 COMMUNICATION TO DOC COMMISSIONER

### *Introduction*

The City Council passed Council Bill 549-A on December 20, 2023. The bill seeks to ban the use of solitary confinement and set standards for the use of restrictive housing, de-escalation, emergency lock-ins, the use of restraints and housing special populations (*e.g.,* mental health units, contagious disease units, housing for people who are transgender or gender non-conforming, housing for voluntary protective custody, and housing for purposes of school attendance). A copy of the bill is included as Appendix A.

The Commissioner of the Department of Correction, pursuant to the *Nunez* Court Orders,[214] requested that the Monitoring Team advise and provide feedback to the Department on how the requirements of this bill may impact the Department's ability to comply with the *Nunez* Court Orders. This document provides the Monitoring Team's assessment of the implications this bill will have on the City's and Department's efforts to address the unsafe conditions in the jails, protect individuals from harm, and implement sound correctional practices all of which are necessary to comply with the *Nunez* Court Orders.

### *Summary and Discussion of Council Bill 549-A*

Council Bill 549-A is a well-intentioned effort to ensure that no person in the Department's custody is subjected to solitary confinement. This bill also includes a significant number of operational requirements that go beyond eliminating solitary confinement and that would impact the day-to-day management of the City's jails. The majority of these provisions directly relate to requirements of the *Nunez* Court Orders in which the Department is required to consult[215] and seek the Monitor's approval on many issues including, but not limited to, matters relating to

---

[214] *See*, Consent Judgment, § XX, ¶¶ 24 and 25 and June 13, 2023 Order, § I, ¶ 5.

[215] Consultation with the Monitor is required by over 80 provisions in the *Nunez* Court Orders. Consultation is also required by the Court's June 13, 2023 Order, § I, ¶ 5.

security practices,[216] the use of restraints,[217] escorts,[218] lock-in and lock-out time,[219] de-escalation,[220] initial management following a serious act of violence[221] and subsequent housing strategies.[222]

The Monitoring Team believes that eliminating solitary confinement is necessary and important. However, the Monitoring Team has deep concerns about many of the bill's provisions related to the use of restrictive housing, de-escalation, emergency lock-ins, and the use of restraints and escort procedures.  Many of the provisions, as currently drafted, could inadvertently undermine the overall goals of protecting individuals from harm, promoting sound correctional practice and improving safety for those in custody and jail staff. Consequently, this could impede the Department's ability to comply with the *Nunez* Court Orders. These issues are described in detail below. Further, a listing of the provisions from the *Nunez* Court Orders that are immediately impacted by Council Bill 549-A, as well as the implications and related concerns to the Monitor's work, is included as Appendix B.

*Managing Individuals Following Serious Acts of Violence*

When evaluating the contents of the bill, important background and context are necessary to understand how individuals are managed following serious acts of violence. The Monitoring Team has repeatedly and consistently reported that the City and Department must have targeted initiatives to address the underlying causes of violence, protect individuals from harm, and ensure that staff use sound correctional practices. An essential component of the effort to ensure the safety and well-being of people in custody and staff working in correctional facilities is having a reliable, safe, and effective response to serious interpersonal violence. Those who engage in serious violence while in custody must be supervised in manner that is ***different*** from

---

[216] *See* Action Plan § D, ¶ 3 in which the Monitor may direct the Department to refine certain security initiatives to ensure compliance with security requirements of the Action Plan.

[217] *See* Consent Judgment, § IV, ¶ 3(p).

[218] *See* Action Plan, § D, ¶ 2(f) and August 10, 2023 Order, § I, ¶ 3.

[219] *See* August 10, 2023 Order, § I, ¶ 4.

[220] *See* First Remedial Order, § A, ¶ 3 and Action Plan, § D, ¶ 2(b).

[221] *See* Second Remedial Order ¶ 1(i)(e), Action Plan, § D, ¶ 2(h)

[222] *See* Action Plan, § E, ¶ 4.

that used for the general population. Separating violent individuals from the general population, properly managing congregate time out-of-cell, and limiting out-of-cell time are standard and sound correctional practice, as long as the limitations are reasonably related to the reduction of harm. In this context, reducing out-of-cell time to less than 14 hours per day is necessary to protect individuals from harm and reflects sound correctional practice.  The Department must be able to effectively separate those who have engaged in serious acts of violence from potential victims and, to some degree, limit their freedom of movement when they are engaged in congregate activity outside their cells. Reduced out-of-cell time increases staff's ability to control the environment, improves surveillance, minimizes unsupervised interactions, permits people with interpersonal conflicts to be separated within a single housing unit, and allows staff to better manage out-of-cell activities because fewer individuals are congregating at one time.  The Department must also provide the necessary structure and supervision to ensure the safety of the individuals housed in a restrictive setting and should provide rehabilitative services that decrease the likelihood of the individual committing subsequent violent acts.

**It must be emphasized that solitary confinement and restrictive housing are not the same and thus their operational requirements and constraints must be different**. Outlined below are the distinctions between the two housing models.

- Solitary confinement limits out-of-cell time from between 1 to 4 hours a day,[223] for prolonged periods of time (e.g. 15 days or more), affords little human contact and no congregate engagement, and does not provide access to programming.
- Restrictive housing programs include some restrictions on out-of-cell time and other privileges (e.g. limited commissary funds) in comparison to that afforded to the general population but *do not* involve the type of social deprivation that is characteristic of solitary confinement and, as a result, does not place detainees at risk of the significant psychological and physiological deterioration that is associated with solitary confinement.

Given the high level of serious violence in the New York City jails and the high risk of harm faced daily by both those in custody and staff, the Department must be able to operate a

---

[223] There is no standard definition of solitary confinement. Appendix C includes a summary of definitions of solitary confinement from various reputable sources.

restrictive housing program. The goal of restrictive housing programs is to provide safe forms of congregate engagement for those who have committed serious acts of violence while in custody, without placing those housed in general population settings at risk of harm. Such a program clearly must be both well-designed and properly implemented. The distinction between restrictive housing programs and solitary confinement is worth repeating. Restrictive housing enables the Department to safely manage violence-prone individuals in a congregate setting wherein they also retain some access to privileges and programming; while solitary confinement seeks to manage individuals through complete isolation and severe and onerous restrictions.

New York is at the forefront of the nation's efforts to develop restrictive housing models as alternatives to solitary confinement. Restrictive housing models in correctional settings are still relatively new as only a few jurisdictions have attempted to *wholly eliminate* solitary confinement. Restrictive housing models offer alternatives to solitary confinement appropriately balancing the need to preserve order in the general population with the well-being of violence-prone individuals. Viewed on a continuum, there is a point between solitary confinement and general population housing that can accommodate both interests.

The Monitoring Team conducted a review of restrictive housing practices from across the United States (many of these programs have been cited by the City Council and other stakeholders in various public forums as promising alternatives to reduce the reliance on solitary confinement).[224] This review included programs in the following jurisdictions: Alameda County, Cook County Illinois, Colorado, Mississippi, Maine, Nebraska, New York state, and Washington D.C. These programs vary considerably with regard to the qualifying infractions, methods of referral and placement in the units, exclusions, use of isolation, privileges afforded, the role of programming and frequency with which an individual is reviewed. However, one component that was consistent across all programs with which the Monitoring Team is familiar is that they **all**

---

[224] *See* "A Local Law to amend the administrative code of the city of New York in relation to banning solitary confinement in city jails," Committee Report of the Governmental Affairs Division, New York City Council, September 28, 2022, at pg. 15.; and Statement of Basis and Purpose for Notice of Rulemaking Concerning Restrictive Housing in Correctional Facilities, Board of Correction for the City of New York, March 5, 2021, at pg. 24.

include limitations on out-of-cell time that are more restrictive than that afforded to the general population.[225]

The complexity of developing appropriate restrictive housing programs cannot be overstated—programs for people with known propensities for serious violence who are concentrated in a specific location necessitate unique and essential security requirements, particularly during time spent out-of-cell in congregate activities. It is also critical to provide programming and services that focus on reducing the risk of subsequent violence, which requires collaboration among multiple divisions and agencies.

_Evaluation of Provisions of City Council Bill 549-A_

The members of the Monitoring Team have over 100 years of experience in correctional management and have also been at the forefront of the national effort to reduce and eliminate the use of solitary confinement in adult and juvenile systems. As such, the Monitoring Team is well positioned to evaluate the requirements of this bill and its impact on the Department's ability to address the requirements of the _Nunez_ Court Orders and to advance the necessary reforms in the City's jails.

While Council Bill 549-A includes certain important requirements, such as eliminating solitary confinement, many of the provisions of Council Bill 549-A do not provide the City or Department the necessary discretion to safely respond to the immediate aftermath of a serious act of violence, create undue restrictions on management following serious acts of violence as well as on the use of restraints and escorted movement. Further, many of these requirements are not consistent with sound correctional practice or support the overall goal of protection from harm. Outlined below is a summary of the provisions in the bill that create the greatest concerns to safety and impact on the _Nunez_ Court Orders. This is not intended to be an exhaustive list of the potential impact of the bill's many requirements.

---

[225] For instance, restrictive housing models in Colorado and Cook County, Illinois have been at the forefront of eliminating solitary confinement _and_ developing viable alternative housing programs. These two jurisdictions have been held up as models for reforms to DOC practice. It must be noted the restrictive housing programs in these jurisdictions only permit 4 hours out-of-cell per day, with no limit on the duration that an individual may be housed in such a program, and restraint desks are used for any congregate out-of-cell time. Further, Colorado permits out-of-cell time to be revoked for 7 days as an immediate consequence for subsequent misconduct.

- **Definition of Solitary Confinement**. The definition of solitary confinement in this bill is not aligned with any definition of solitary confinement known to the Monitoring Team. While there is no standard definition of solitary confinement, there are common parameters which include limiting out-of-cell time from 1 to 4 hours a day, for prolonged periods of time, affording little human contact and no congregate engagement, and denying access to programming. Notably, one of the most frequently cited definitions, the United Nations' "Mandela Rules," defines solitary confinement as an approach where individuals are limited to 2 hours out-of-cell per day _and_ deems the use of solitary confinement for more than 15 days as torture.[226] The definition of solitary confinement in this bill appears to conflate solitary confinement with attempts to address out-of-cell time more generally. Eliminating solitary confinement must be addressed separately from any provisions regarding alternatives to such practice, such as restrictive housing models. It is important the definition of solitary confinement comport with the standard description of that practice to disentangle this practice from others, such as restrictive housing, that are critical and necessary in responding to serious acts of violence. A list of definitions of solitary confinement from a number of reputable sources is provided in Appendix C.

- **Out-of-Cell Time**. The bill requires that, in each 24-hour period, **_all_** incarcerated individuals must be afforded 14 hours out-of-cell with no restraints or barriers to physical contact with other persons in custody. The two minor exceptions (de-escalation confinement and emergency lock-ins) are limited to 4 hours and so they do not provide the meaningful distinction to this out-of-cell requirement that is needed. **A global approach to out-of-cell time for all individuals in custody significantly endangers both persons in custody and staff and is not consistent with sound correctional practice.** Those with a demonstrated propensity for serious violence must be supervised in a manner that is safe and effectively mitigates the risk of harm they pose to others. Some reduction in out-of-cell time to less than 14 hours per day, with

---

[226] _See_, UN General Assembly, _United Nations Standard Minimum Rules for the Treatment of Prisoners (the Nelson Mandela Rules): resolution / adopted by the General Assembly_, 17 December 2015, A/RES/70/175, Rules 43 and 44 available at: https://documents-dds-ny.un.org/doc/UNDOC/GEN/N15/443/41/PDF/N1544341.pdf

appropriate safeguards, is necessary. For instance, seven hours out-of-cell time in a congregate setting may be appropriate in some cases and *does not* constitute solitary confinement under any correctional standard with which the Monitoring Team is familiar. Limitations on the 14 hours out-of-cell (such as limitations of seven to 10 hours) would, however, minimize the opportunity for violent and/or predatory individuals to visit harm on other persons in custody and staff. Without question, the Department must be permitted some degree of flexibility in order for it to be able to safely manage individuals following serious acts of violence and to protect potential victims, both other incarcerated persons and staff. In fact, the Monitoring Team suggested that such a violence control strategy was necessary to address the current dangerous conditions in the Monitor's November 8, 2023 Report at pgs. 23-24.

- **Restrictive Housing Model**. While Council Bill 549-A describes its alternative housing models as "restrictive housing," it does not appear to actually create or include any discernible restrictions. First, the bill does not permit graduated out-of-cell time for the individuals placed in restrictive housing, which eliminates an important incentive for prosocial conduct. Second, the bill sets arbitrary timeframes for discharge from restrictive housing (e.g., an individual must be removed from the unit if the individual "has not engaged in behavior that presents a specific, significant, and imminent threat" in a 15-day period and must be discharged within 30 days, with no exceptions regardless of the individual's behavior) that do not account for whether an individual continues to pose a risk of harm to others' safety. Third, the required procedures relating to placement on these units are protracted, including significant procedural requirements that provide myriad opportunities for undue delay by the perpetrator of violence before the Department can act to address the underlying conduct. Further, during the time in which this placement decision is being made, the bill includes an impractical standard for pre-hearing detention that could permit the perpetrator of serious violence to remain in general population while awaiting a determination for placement in restrictive housing. Finally, the programming requirements for restrictive housing are at odds with the reality of evidence-based practice. None of the evidence-based curricula with which the Monitoring Team is familiar can be completed within

the proposed 15/30-day maximum length of stay in restrictive housing.[227] The constraints this bill places on the design of a restrictive housing model create or exacerbate unsafe conditions because the bill does not permit adequate opportunity for separating those who engage in serious violence from potential victims, which is not consistent with sound correctional practice and support the overall goal of protection from harm.

- **De-Escalation Confinement and Emergency Lock-ins**. Council Bill 549-A limits the duration of de-escalation confinement and emergency lock-in to 4 hours in a 24-hour period, without exception. It is unclear how this 4-hour standard was determined as the Monitoring Team is not aware of any evidence that de-escalation or the need for emergency lock-in will *always* be resolved in this set time period. While the imminent risk of harm these practices are intended to address *may be* abated in 4 hours, in the Monitoring Team's experience, that is not always the case for each individual or scenario. The goal of these management tools is to de-escalate an individual who has committed a serious act of violence, not a minor infraction, and to mitigate broader risks to other persons in custody or staff triggered by a serious incident that requires a temporary lock-in. Ensuring the individual has de-escalated or the situation that created the need for a lock-in has been addressed must be the guiding principle, not simply an arbitrary passage of time. The 4-hour maximum duration for de-escalation and emergency lock-in provides no flexibility to address a continued risk of harm. Setting an arbitrary time period within which de-escalation and emergency lock-ins must conclude is not sound correctional practice and can create or exacerbate unsafe conditions. The guiding principle for concluding the use of de-escalation and emergency lock-ins must be the extent to which the risk of harm has been abated and safe operations can resume and therefore some degree of flexibility in the duration to conclude these practices is critical and necessary.

    o The bill contains specific requirements for de-escalation. Some are important, such as requiring that de-escalation does not occur in decontamination showers, but others do not appear to be relevant to the goal of de-escalating an individual

---

[227] *See* Monitor's June 30, 2022 Report at pg. 25 which includes a discussion regarding the inability to address behavior change with set time periods for graduation.

following a serious event, such as requiring that the perpetrator of violence must have access to shaving equipment during the de-escalation period. De-escalation occurs when staff constructively engage with the individual to ensure the threat to others has abated. Permitting unfettered access to things such as the telephone (another requirement in the bill) could facilitate dangerous access to individuals who may perpetuate the threat to others' safety rather than reduce it.

- **Use of Restraints and Escorts**. Council Bill 549-A sets a standard for the use of *any* restraints requiring the presence of an imminent risk of harm, which is more restrictive than any standard with which the Monitoring Team has experience. While such a standard does not appear appropriate in many cases, it is further unclear how this standard could even be operationalized. Of greatest concern is that the bill does not differentiate between the *routine* use of restraints and the use of *enhanced* restraints. The requirements for the use of routine restraints (e.g., the use of restraints for escorts such as transportation to court or movement within the facility) are burdensome, not operationally feasible, and are not aligned with sound correctional practice. Therefore, these restrictions and requirements will in all likelihood create or exacerbate the unsafe conditions. The requirements for using routine restraints also create situations in which one individual may be placed in restraints while others are not, thus placing that individual at unnecessary risk of harm and creating additional complications for staff in trying to manage such a system. Further, while additional procedures are necessary to determine the use of *enhanced* restraints, the standards promulgated in the bill and the process for the evaluating the use of enhanced restraints are burdensome, complicated, and appear to create undue delay, all of which will impede their proper use and potentially create additional risk of harm within the jails. Finally, the bill includes separate requirements for the use of restraints for adults versus individuals under the age of 22 and exceptions for that population that are not permitted for adults (e.g., regarding transportation, it is unclear why individuals under 22 may be restrained when being transported to Court, but adults cannot without meeting a high standard). There does not appear to be any basis for such a distinction, particularly since it is both routine and consistent with sound correctional practice to restrain individuals during transportation to Court and elsewhere. In summary, the bill places unnecessary

275

restrictions on the use of routine restraints and creates overly burdensome procedural hurdles for the use of enhanced restraints, both of which are at odds with sound correctional practice and will potentially increase the risk of harm for detainees and staff.

This bill must also be evaluated through the lens of the current conditions in the City's jails. A myriad of dysfunctional practices and management problems have plagued the City's and Department's management and operation of the jails, as the Monitoring Team has thoroughly documented. The Department remains unable to consistently implement and sustain basic security practices or to manage the jails safely and effectively. Requiring the Department to implement the provisions of Council Bill 549-A discussed above, particularly given the bill's deficiencies, will only exacerbate the current dysfunction, will impede the goals of promoting the use of sound correctional practices and enhancing jail safety, and impact the Department's ability to comply with the *Nunez* Court Orders.

In summary, Council Bill 549-A includes absolute prohibitions in areas where at least some discretion is necessary, contains requirements that are both vague and ambiguous, contains multiple internal inconsistencies, and sets standards that are not consistent with sound correctional practice. These issues directly impact various Department policies and procedures addressed by the *Nunez* Court Orders and which require the Monitor's approval. In particular, the Monitor must approve procedures regarding managing individuals following serious acts of violence,[228] de-escalation protocols,[229] emergency lock-in protocols,[230] the use of restraints and escorts,[231] and security practices.[232] The Monitor will not approve policies and procedures that include the problematic requirements outlined above because they do not reflect sound correctional practice and would further exacerbate the extant unsafe conditions. Consequently, the Monitoring Team must reiterate its concern that the bill's requirements, as discussed herein,

---

[228] *See* Second Remedial Order ¶ 1(i)(e), Action Plan, § D, ¶ 2(h).

[229] *See* First Remedial Order, § A, ¶ 3 and Action Plan, § D, ¶ 2(b).

[230] *See* August 10, 2023 Order, § I, ¶ 4.

[231] *See* Consent Judgment, § IV, ¶ 3(p), Action Plan, § D, ¶ 2(f), and August 10, 2023 Order, § I, ¶ 3.

[232] *See* Action Plan § D, ¶ 3 in which the Monitor may direct the Department to refine certain security initiatives to ensure compliance with security requirements of the Action Plan.

will create situations that will impair, if not prevent, the Department from being able to comply with the *Nunez* Court Orders.  An assessment of the impact on the *Nunez* Court Orders is included in Appendix B.

<u>Conclusion</u>

The Monitoring Team fully supports the effort to eliminate the practice of solitary confinement. Banning the practice of solitary confinement is an important expression of the value the City places on all of its residents. The goal is laudable and is one we support.  Accordingly, the Monitoring Team recommends that the Department immediately ensure that solitary confinement[233] is eliminated in Department policy and practice.  This includes eliminating the use of cells in NIC with extended alcoves, and any other cells or housing units that contain similar physical properties, that do not permit adequate congregate engagement and access to programming. Further, the Department must ensure that decontamination showers may not be locked or utilized for de-escalation or any other form of confinement.

The Monitoring Team strongly believes, based on its many years of experience and expertise, that the various operational requirements and constraints that accompany the elimination of solitary confinement in Council Bill 549-A will likely exacerbate the already dangerous conditions in the jails, intensify the risk of harm to both persons in custody and Department staff, and would seriously impede the City's and Department's ability to achieve compliance with the requirements of the *Nunez* Court Orders. As such, the Monitoring Team recommends significant revisions to Council Bill 549-A are necessary to address the issues outlined in this document and to support the overall goal of managing a safe and humane jail system and advancing the reforms of the *Nunez* Court Orders.

---

[233] As discussed above, and demonstrated in Appendix C, no standard definition of solitary confinement exists.  For purposes of this recommendation, the Monitoring Team recommends the most inclusive definition of solitary confinement is adopted which would prohibit the confinement of individuals for 20 hours or more a day.

## APPENDIX A – COUNCIL BILL 549-A – PASSED DECEMBER 20, 2023

By the Public Advocate (Mr. Williams) and Council Members Rivera, Cabán, Hudson, Won, Restler, Hanif, Avilés, Nurse, Sanchez, Narcisse, Krishnan, Abreu, Louis, Farías, De La Rosa, Ung, Ossé, Gutiérrez, Richardson Jordan, Joseph, Brannan, Menin, Schulman, Barron, Moya, Williams, Powers, Marte, Stevens, Brooks-Powers, Bottcher, Dinowitz, Ayala, Riley, Feliz, Brewer and The Speaker (Council Member Adams) (by request of the Brooklyn Borough President)

    **1.**

    3.     A Local Law to amend the administrative code of the city of New York, in relation to banning solitary confinement in city jails and establishing standards for the use of restrictive housing and emergency lock-ins

    5.

Be it enacted by the Council as follows:

1    Section 1. Chapter 1 of title 9 of the administrative code is amended by adding a new section 9-

2    167 to read as follows:

3    § 9-167 Solitary confinement. a. Definitions. For the purposes of this section, the following terms

4    have the following meanings:

5    Advocate. The term "advocate" means a person who is a law student, paralegal, or an incarcerated

6    person.

7    Cell. The term "cell" means any room, area or space that is not a shared space conducive to

8    meaningful, regular and congregate social interaction among many people in a group setting,

9    where an individual is held for any purpose.

10    De-escalation confinement. The term "de-escalation confinement" means holding an incarcerated

11    person in a cell immediately following an incident where the person has caused physical injury or

12    poses a specific risk of imminent serious physical injury to staff, themselves or other incarcerated

13    persons.

1    Emergency lock-in. The term "emergency lock-in" means a department-wide emergency lock-in,

2    a facility emergency lock-in, a housing area emergency lock-in, or a partial facility emergency

3    lock-in as defined in section 9-155.

4    Out-of-cell. The term "out-of-cell" means being in a space outside of, and in an area away from a

5    cell, in a group setting with other people all in the same shared space without physical barriers

6    separating such people that is conducive to meaningful and regular social interaction and activity

7    or being in any space during the time of carrying out medical treatment, individual one-on-one

8    counseling, an attorney visit or court appearance.

9    Pre-hearing temporary restrictive housing. The term "pre-hearing temporary restrictive housing"

10   means any restrictive housing designated for incarcerated persons who continue to pose a specific

11   risk of imminent serious physical injury to staff, themselves, or other incarcerated persons after a

12   period of de-escalation confinement has exceeded time limits established by this section and prior

13   to a hearing for recommended placement in restrictive housing has taken place.

14   Restraints. For the purposes of this section, the term "restraints" means any object, device or

15   equipment that impedes movement of hands, legs, or any other part of the body.

16   Restrictive housing. The term "restrictive housing" means any housing area that separates

17   incarcerated persons from the general jail population on the basis of security concerns or discipline,

18   or a housing area that poses restrictions on programs, services, interactions with other incarcerated

19   persons or other conditions of confinement. This definition excludes housing designated for

20   incarcerated persons who are: (1) in need of medical or mental health support as determined by

21   the entity providing or overseeing correctional medical and mental health, including placement in

22   a contagious disease unit, (2) transgender or gender non-conforming, (3) in need of voluntary

23   protective custody, or (4) housed in a designated location for the purpose of school attendance.

1    Solitary confinement. The term "solitary confinement" means any placement of an incarcerated

2    person in a cell, other than at night for sleeping for a period not to exceed eight hours in any 24-

3    hour period or during the day for a count not to exceed two hours in any 24-hour period.

4    Suicide prevention aide. For the purposes of this section, the term "suicide prevention aide" means

5    a person in custody who has been trained to identify unusual and/or suicidal behavior.

6    Violent grade I offense. The term "violent grade I offense" shall have the same meaning as defined

7    by the rules of the department of correction as of January 1, 2022.

8    b. Ban on solitary confinement. The department shall not place an incarcerated person in a cell,

9    other than at night for sleeping for a period not to exceed eight hours in any 24-hour period or

10   during the day for count not to exceed two hours in any 24-hour period, unless for the purpose of

11   de-escalation confinement or during emergency lock-ins.

12   c. De-escalation confinement. The department's uses of de-escalation confinement shall comply

13   with the following provisions:

14   1. De-escalation confinement shall not be located in intake areas and shall not take place in

15   decontamination showers. Spaces used for de-escalation confinement must, at a minimum, have

16   the features specified in sections 1-03 and 1-04 of title 40 of the rules of the city of New York and

17   be maintained in accordance with the personal hygiene and space requirements set forth in such

18   sections;

19   2. Department staff must regularly monitor a person in de-escalation confinement and engage in

20   continuous crisis intervention and de-escalation to support the person's health and well-being,

21   attempt de-escalation, work toward a person's release from de-escalation confinement and

22   determine whether it is necessary to continue to hold such person in such confinement;

3. The department shall conduct visual and aural observation of each person in de-escalation confinement every 15 minutes, shall refer any health concerns to medical or mental health staff, and shall bring any person displaying any indications of any need for medical documentation, observation, or treatment to the medical clinic. Suicide prevention aides may conduct check-ins with a person in de-escalation confinement at least every 15 minutes and refer any health concerns to department staff who will get medical or mental health staff to treat any reported immediate health needs. No suicide prevention aide shall face any retaliation or other harm for carrying out their role;

4. Throughout de-escalation confinement, a person shall have access to a tablet or device that allows such person to make phone calls outside of the facility and to medical staff in the facility;

5. A person shall be removed from de-escalation confinement immediately following when such person has sufficiently gained control and no longer poses a significant risk of imminent serious physical injury to themselves or others;

6. The maximum duration a person can be held in de-escalation confinement shall not exceed four hours immediately following the incident precipitating such person's placement in such confinement. Under no circumstances may the department place a person in de-escalation confinement for more than four hours total in any 24-hour period, or more than 12 hours in any seven-day period; and

7. In circumstances permitted in subdivision g of this section, the department may transfer a person from de-escalation confinement to pre-hearing temporary restrictive housing.

(a) The department shall not place any incarcerated person in a locked decontamination shower nor in any other locked space in any facility that does not have, at a minimum, the features specified

1   in sections 1-03 and 1-04 of title 40 of the rules of the city of New York and maintained in

2   accordance with the personal hygiene and space requirements as set forth in such sections.

3   (b) The department shall not maintain any locked decontamination showers. Any other locked

4   spaces in any facility for holding incarcerated people must at least have the features specified in

5   and maintained in accordance with the personal hygiene and space requirements set forth in 40

6   RCNY § 1-03 and § 1-04.

7   d. Reporting on de-escalation confinement. For each instance an incarcerated person is placed in

8   de-escalation confinement as described in subdivision c of this section, the department shall

9   prepare an incident report that includes a detailed description of why isolation was necessary to

10  de-escalate an immediate conflict and the length of time the incarcerated person was placed in

11  such confinement. Beginning on July 15, 2024, and within 15 days of the end of each subsequent

12  quarter, the department shall provide the speaker of the council and the board of correction all such

13  reports for the preceding quarter and post all such reports on the department's website. The

14  department shall redact all personally identifying information prior to posting such reports on the

15  department's website. Beginning July 31, 2024, and within 30 days of the end of each subsequent

16  quarter, the department shall provide to the speaker of the council and the board of correction, and

17  post on the department's website, a report with data for the preceding quarter on the total number

18  of people placed in such confinement, disaggregated by race, age, gender identity and mental

19  health treatment level, as well as the total number of people held in such confinement

20  disaggregated by whether confinement lasted less than one hour, between one and two hours,

21  between two and three hours, and between three and four hours.

22  e. Use of restraints. 1. The department shall not place an incarcerated person in restraints unless

23  an individualized determination is made that restraints are necessary to prevent an imminent risk

1    of self-injury or injury to other persons. In such instances, only the least restrictive form of

2    restraints may be used and may be used no longer than is necessary to abate such imminent harm.

3    Restraints shall not be used on an incarcerated person under the age of 22 except in the following

4    circumstances: (i) during transportation in and out of a facility, provided that during transportation

5    no person shall be secured to an immovable object; and (ii) during escorted movement within a

6    facility to and from out-of-cell activities where an individualized determination is made that

7    restraints are necessary to prevent an immediate risk of self-injury or injury to other persons. The

8    department is prohibited from engaging in attempts to unnecessarily prolong, delay or undermine

9    an individual's escorted movements.

10    2. The department shall not place an incarcerated person in restraints beyond the use of restraints

11    described in paragraph 1 of this subdivision, or on two consecutive days, until a hearing is held to

12    determine if the continued use of restraints is necessary for the safety of others. Such hearing shall

13    comply with the rules of the board of correction as described in paragraph 1 of subdivision f of

14    this section. Any continued use of restraints must be reviewed by the department on a daily basis

15    and discontinued once there is no longer an imminent risk of self-injury or injury to other persons.

16    Continued use of restraints may only be authorized for seven consecutive days.

17    f. Restrictive housing hearing. Except as provided in subdivision g of this section, the department

18    shall not place an incarcerated person in restrictive housing until a hearing on such placement is

19    held and the person is found to have committed a violent grade I offense. Any required hearing

20    regarding placement of a person into restrictive housing shall comply with rules to be established

21    by the board of correction.

22    1. The board of correction shall establish rules for restrictive housing hearings that shall, at a

23    minimum, include the following provisions:

283

(i) An incarcerated person shall have the right to be represented by their legal counsel or advocate;

(ii) An incarcerated person shall have the right to present evidence and cross-examine witnesses;

(iii) Witnesses shall testify in person at the hearing unless the witnesses' presence would jeopardize the safety of themselves or others or security of the facility. If a witness is excluded from testifying in person, the basis for the exclusion shall be documented in the hearing record;

(iv) If a witness refuses to provide testimony at the hearing, the department must provide the basis for the witness's refusal, videotape such refusal, or obtain a signed refusal form, to be included as part of the hearing record;

(v) The department shall provide the incarcerated person and their legal counsel or advocate written notice of the reason for proposed placement in restrictive housing and any supporting evidence for such placement, no later than 48 hours prior to the restrictive housing hearing;

(vi) The department shall provide the legal counsel or advocate adequate time to prepare for such hearings and shall grant reasonable requests for adjournments;

(vii) An incarcerated person shall have the right to an interpreter in their native language if the person does not understand or is unable to communicate in English. The department shall take reasonable steps to provide such interpreter;

(viii) A refusal by an incarcerated person to attend any restrictive housing hearings must be videotaped and made part of the hearing record;

(ix) If the incarcerated person is excluded or removed from a restrictive housing hearing because it is determined that such person's presence will jeopardize the safety of themselves or others or security of the facility, the basis for such exclusion must be documented in the hearing record;

(x) A restrictive housing disposition shall be reached within five business days after the conclusion of the hearing. Such disposition must be supported by substantial evidence, shall be documented

1    in writing, and must contain the following information: a finding of guilty or not guilty, a summary

2    of each witness's testimony and whether their testimony was credited or rejected with the reasons

3    thereof, the evidence relied upon by the hearing officer in reaching their finding, and the sanction

4    imposed, if any; and

5    (xi) A written copy of the hearing disposition shall be provided to the incarcerated person and their

6    counsel or advocate within 24 hours of the determination.

7    2. Failure to comply with any of the provisions described in paragraph 1 of this subdivision, or as

8    established by board of correction rule, shall constitute a due process violation warranting

9    dismissal of the matter that led to the hearing.

10   g. Pre-hearing temporary restrictive housing. In exceptional circumstances, the department may

11   place a person in pre-hearing temporary restrictive housing prior to conducting a restrictive

12   housing hearing as required by subdivision f of this section.

13   1. Such placement shall only occur upon written approval of the Commissioner or a Deputy

14   Commissioner, or another equivalent member of department senior leadership over the operations

15   of security. Such written approval shall include: the basis for a reasonable belief that the

16   incarcerated person has committed a violent grade I offense, and whether such person has caused

17   serious physical injury or poses a specific and significant risk of imminent serious physical injury

18   to staff or other incarcerated persons.

19   2. A restrictive housing hearing shall occur as soon as reasonably practicable following placement

20   in pre-hearing temporary restrictive housing, and must occur within five days of such placement,

21   unless the person placed in such restrictive housing seeks a postponement of such hearing.

1    3. If a person is found guilty at a restrictive housing hearing, time spent in pre-hearing temporary

2    restrictive housing prior to such hearing determination shall be deducted from any sentence of

3    restrictive housing and such time shall count toward the time limits in restrictive housing.

4    4. Pre-hearing temporary restrictive housing shall comply with all requirements for restrictive

5    housing, including but not limited to those established in subdivision h of this section.

6    5. During the first day of placement in pre-hearing temporary restrictive housing, department staff

7    must regularly monitor the person and engage in continuous crisis intervention and attempt de-

8    escalation, work toward a person's release from pre-hearing temporary restrictive housing and

9    determine whether it is necessary to continue to hold the person in pre-hearing temporary

10    restrictive housing.

11    h. Restrictive housing regulations. The department's use of restrictive housing must comply with

12    the following provisions:

13    1. The department shall not place an incarcerated person in restrictive housing for longer than

14    necessary and for no more than a total of 60 days in any 12 month period.

15    2. Within 15 days of placement of an incarcerated person in restrictive housing, the department

16    shall meaningfully review such placement to determine whether the incarcerated person continues

17    to present a specific, significant and imminent threat to the safety and security of other persons if

18    housed outside restrictive housing. If an individual is not discharged from restrictive housing after

19    review, the department shall provide in writing to the incarcerated person: (i) the reasons for the

20    determination that such person must remain in restrictive housing and (ii) any recommended

21    program, treatment, service, or corrective action. The department shall provide the incarcerated

22    person access to such available programs, treatment and services.

1    3. The department shall discharge an incarcerated person from restrictive housing if such person

2    has not engaged in behavior that presents a specific, significant, and imminent threat to the safety

3    and security of themselves or other persons during the preceding 15 days. In all circumstances, the

4    department shall discharge an incarcerated person from restrictive housing within 30 days after

5    their initial placement in such housing.

6    4. A person placed in restrictive housing must have interaction with other people and access to

7    congregate programming and amenities comparable to those housed outside restrictive housing,

8    including access to at least seven hours per day of out-of-cell congregate programming or activities

9    with groups of people in a group setting all in the same shared space without physical barriers

10   separating such people that is conducive to meaningful and regular social interaction. If a person

11   voluntarily chooses not to participate in congregate programming, they shall be offered access to

12   comparable individual programming. A decision to voluntarily decline to participate in congregate

13   programming must be done in writing or by videotape.

14   5. The department shall utilize programming that addresses the unique needs of those in restrictive

15   housing. The department shall provide persons in restrictive housing with access to core

16   educational and other programming comparable to core programs in the general population. The

17   department shall also provide persons in restrictive housing access to evidence-based therapeutic

18   interventions and restorative justice programs aimed at addressing the conduct resulting in their

19   placement in restrictive housing. Such programs shall be individualized and trauma-informed,

20   include positive incentive behavior modification models, and follow best practices for violence

21   interruption. Staff that routinely interact with incarcerated persons must be trained in de-escalation

22   techniques, conflict resolution, the use of force policy, and related topics to address the unique

23   needs of those in restrictive housing units.

1    6. The department shall use positive incentives to encourage good behavior in restrictive housing

2    units and may use disciplinary sanctions only as a last resort in response to behavior presenting a

3    serious and evident danger to oneself or others after other measures have not alleviated such

4    behavior.

5    7. All housing for medical or mental health support provided to persons recommended to receive

6    such support by the entity providing and,or overseeing correctional medical and mental health,

7    including placement in contagious disease units, housing for people who are transgender or gender

8    non-conforming, housing for voluntary protective custody, and housing for purposes of school

9    attendance, shall comply with subdivisions (b), (c), (e), (i), (j) and (k) of this section and

10   paragraphs 4, 5, and 6 of this subdivision.

11   8. For purposes of contagious disease units, after a referral from health care staff, a person may be

12   held in a medical unit overseen by health care staff, for as limited a time as medically necessary

13   as exclusively determined by health care staff, in the least restrictive environment that is medically

14   appropriate. Individuals in a contagious disease unit must have comparable access as individuals

15   incarcerated in the general population to phone calls, emails, visits, and programming done in a

16   manner consistent with the medical and mental health treatment being received, such as at a

17   physical distance determined appropriate by medical or mental health staff.Such access must be

18   comparable to access provided to persons incarcerated outside of restrictive housing units.

19   9. Reporting on restrictive housing. For each instance a disciplinary charge that could result in

20   restrictive housing is dismissed or an incarcerated individual is found not guilty of the disciplinary

21   charge, the department shall prepare an incident report that includes a description of the

22   disciplinary charge and the reasons for the dismissal or not guilty determination. For each instance

23   an incarcerated person is placed in restrictive housing, the department shall prepare an incident

1   report that includes a detailed description of the behavior that resulted in placement in restrictive

2   housing and why restrictive housing was necessary to address such behavior, including if a person

3   was placed in pre-hearing temporary restrictive housing and the reasons why the situation met the

4   requirements in paragraph 1 of subdivision g of this section. For each instance in which

5   confinement in restrictive housing is continued after a 15-day review of an incarcerated person's

6   placement in restrictive housing, the department shall prepare an incident report as to why the

7   person was not discharged, including a detailed description of how the person continued to present

8   a specific, significant and imminent threat to the safety and security of the facility if housed outside

9   restrictive housing and what program, treatment, service, and/or corrective action was required

10  before discharge. Beginning on July 15, 2024, and within 15 days of the end of each subsequent

11  quarter, the department shall provide the speaker of the council and the board of correction all such

12  reports for the prior quarter and post all such reports on the department's website. The department

13  shall redact all personally identifying information prior to posting the reports on the department's

14  website. Beginning July 31, 2024, and within 30 days of the end of each subsequent quarter, the

15  department shall provide to the speaker of the council and the board of correction, and post on the

16  department's website, a report with data for the preceding quarter on the total number of people

17  placed in restrictive housing during that time period, disaggregated by race, age, gender identity,

18  mental health treatment level and length of time in restrictive housing, and data on all disposition

19  outcomes of all restrictive housing hearing during such time period, disaggregated by charge, race,

20  age, gender identity and mental health treatment level.

21  i. Out-of-cell time. 1. All incarcerated persons must have access to at least 14 out-of-cell hours

22  every day except while in de-escalation confinement pursuant to subdivision c of this section and

23  during emergency lock-ins pursuant to subdivision j of this section.

1    2. Incarcerated persons may congregate with others and move about their housing area freely

2    during out-of-cell time and have access to education and programming pursuant to section 9-110

3    of the administrative code.

4    j. Emergency lock-ins. 1. Emergency lock-ins may only be used when the Commissioner, a Deputy

5    Commissioner, or another equivalent member of department senior leadership with responsibility

6    for the operations of security for a facility determines that such lock-in is necessary to de-escalate

7    an emergency that poses a threat of specific, significant and imminent harm to incarcerated persons

8    or staff. Emergency lock-ins may only be used when there are no less restrictive means available

9    to address an emergency circumstance and only as a last resort after exhausting less restrictive

10   measures. Emergency lock-ins must be confined to as narrow an area as possible and limited

11   number of people as possible. The department shall lift emergency lock-ins as quickly as possible.

12   The Commissioner, a Deputy Commissioner, or another equivalent member of department senior

13   leadership over the operations of security shall review such lock-ins at least every hour. Such lock-

14   ins may not last more than four hours.

15   2. Throughout an emergency lock-in, the department shall conduct visual and aural observation of

16   every person locked in every fifteen (15) minutes, shall refer any health concerns to medical or

17   mental health staff, and shall bring any person displaying any indications of any need for medical

18   documentation, observation, or treatment to the medical clinic. Throughout an emergency lock-in,

19   other than in a department-wide emergency lock-in or a facility emergency lock-in, each person

20   locked in shall have access to a tablet or other device that allows the person to make phone calls

21   both outside of the facility and to medical staff in the facility.

1  3. The department shall immediately provide notice to the public on its website of an emergency

2  lock-in, including information on any restrictions on visits, phone calls, counsel visits or court

3  appearances.

4  4. For each instance an emergency lock-in is imposed, the department shall prepare an incident

5  report that includes:

6  (a) A description of why the lock-in was necessary to investigate or de-escalate an emergency,

7  including the ways in which it posed a threat of specific, significant and imminent harm;

8  (b) A description of how other less restrictive measures were exhausted;

9  (c) The number of people held in lock-in;

10  (d) The length of lock-in;

11  (e) The areas affected and the reasons such areas were subject to the emergency lock-in;

12  (f) The medical and mental health services affected, the number of scheduled medical and or

13  mental health appointments missed and requests that were denied;

14  (g) Whether visits, counsel visits or court appearances were affected;

15  (h) What programs, if any, were affected;

16  (i) All actions taken during the lock-in to resolve and address the lock-in; and

17  (j) The number of staff diverted for the lock-in.

18  Beginning July 15, 2024, and within 15 days of the end of each subsequent quarter, the department

19  shall provide the speaker of the council and the board of correction all such reports for the

20  preceding quarter and shall post all such reports on the department's website with any identifying

21  information redacted. Beginning July 15, 2024, and within 15 days of the end of each subsequent

22  quarter, the department shall provide to the speaker of the council and the board of correction a

23  report on the total number of lock-ins occurring during the preceding quarter, the areas affected by

1 each such lock-in, the length of each such lock-in and number of incarcerated people subject to

2 each such lock-in, disaggregated by race, age, gender identity, mental health treatment level and

3 length of time in cell confinement.

4 k. Incarcerated persons under the age of 22 shall receive access to trauma-informed, age-

5 appropriate programming and services on a consistent, regular basis.

6 § 2. This local law takes effect 180 days after it becomes law. The board of correction shall take

7 any actions necessary for the implementation of this local law, including the promulgation of rules

8 relating to procedures and penalties necessary to effectuate this section before such date.

9

Session 12
AM
LS # 7797
6/2/22

Session 11
AM
LS # 2666/2936/12523/12658/12676/12913
Int. # 2173– 2020

## APPENDIX B - *NUNEZ* IMPLICATIONS OF THE CITY COUNCIL BILL 549-A

This document provides an assessment of the implications of Bill 549-A to the *Nunez* Court Orders. This document identifies areas where Bill 549-A may diverge from the requirements of the Nunez Court Orders. This document is intended to be evaluated in conjunction with the Monitoring Team's analysis of the bill provided in the main document. This is not intended to be an exhaustive list.

- **Management of Incarcerated Individuals Following Serious Incidents of Violence**: The provisions of the bill include requirements that will not permit DOC to safely and adequately manage those incarcerated individuals that have engaged in serious acts of violence and pose a heightened security risk to the safety of other incarcerated individuals and staff, are not consistent with sound correctional practice, and do not permit adequate protections from harm.

  - The requirements of Bill 549-A do not comply with:

    - Action Plan, § E, ¶ 4 *Management of Incarcerated Individuals Following Serious Incidents of Violence*;

    - Second Remedial Order ¶ 1(i)(e) *Immediate Security Protocols—Post-Incident Management*;

    - Action Plan, § D, ¶ 2(h) *Improved Security Protocols—Post-Incident Management Protocol*.

  - Approval of the Monitor:

    - Action Plan, § E, ¶ 4 requires the approval of the Monitor. The Monitor cannot approve any programs by the Department related to the management of incarcerated individuals following serious incidents of violence that include the problematic requirements of Bill 549-A because they are not consistent with sound correctional practice and are unsafe.

  - Direction of the Monitor:

    - If a Post-Incident Management Protocol (Action Plan, § D, ¶ 2(h)) were to be developed incorporating the problematic requirements of Bill 549-A, the Monitor, pursuant to Action Plan § D, ¶ 3 (*Consultation & Direction of the Monitor*), will require and direct the Department to, among other requirements, ensure the individual is separated from other potential victims until they no longer pose a security threat, ensure that these programs place some limitation on out-of-cell time that differs from that afforded to the general population, and ensure that continued placement in the housing unit is based on the individual's engagement in programming and an assessment of their continued risk of harm. Pursuant to Action Plan § D, ¶ 3, the Department must implement the requirements from the Monitor.

- **Restraints and Escorts**: The provisions of the bill include requirements that do not reflect the proper use of restraints or escort procedures and are not consistent with sound correctional practice and do not permit adequate protections from harm.

  - The requirements of 549-A do not comply with:

- Consent Judgment, § IV, ¶ 3(p) *Use of Force Policy—Restraints*;
- Second Remedial Order ¶ 1(i)(a) *Security Plan (escorted movement with restraints when required)*;
- Action Plan, § D, ¶ 2(a) *Improved Security Initiatives—Security Plan*;
- Action Plan, § D, ¶ 2(f) *Improved Security Initiatives—Escort Techniques*;
- August 10, 2023 Order, § I, ¶ 3 *Revise Escort Procedures.*

o Approval of the Monitor:

- Consent Judgment, § IV, ¶ 3(p) and August 10, 2023 Order, § I, ¶ 3 require the approval of the Monitor. The Monitor cannot approve the use of restraints or escorted movement that include the problematic requirements of Bill 549-A because they are not consistent with sound correctional practice and are unsafe.

o Direction of the Monitor:

- If the use of restraints and escorted movement (Action Plan § D, ¶ 2(a) and (f)) were to be developed incorporating the requirements of Bill 549-A, the Monitor, pursuant to Action Plan § D, ¶ 3 (*Consultation & Direction of the Monitor*), will require and direct the Department to, among other things, ensure proper use of routine restraints, ensure that there is a distinction between the use of routine and enhanced restraints, ensure that reasonable and sound correctional standards for the use of restraints are imposed, and ensure that an individual in restraints is not placed in a vulnerable situation with individuals who are not in restraints. Pursuant to Action Plan § D, ¶ 3, the Department must implement the requirements from the Monitor.

- **De-escalation**: The provisions of the bill include requirements that reflect (a) arbitrary limitations on the use of de-escalation, (b) conditions that are not conducive to the de-escalation, and (c) do not promote adequate protections from harm.

o The requirements of 549-A do not comply with:

- First Remedial Order, § A, ¶ 3 *Revised De-escalation Protocol*;
- Action Plan, § D, ¶ 2 (b) *Improved Security Initiatives* (first sentence);
- Action Plan § E, ¶ (4) *Management of Incarcerated Individuals Following Serious Incidents of Violence,* and therefore cannot be approved by the Monitor.

o Approval of the Monitor:

- First Remedial Order, § A, ¶ 3 and Action Plan § E, (4) require the approval of the Monitor. The Monitor cannot approve the use a de-escalation protocol that includes the problematic requirements of Bill 549-A because they are not consistent with sound correctional practice and are unsafe.

- o Direction of the Monitor:
  - ▪ If the use of de-escalation protocols (Action Plan, § D, ¶ 2 (b)) were to be developed incorporating the requirements of Bill 549-A, the Monitor, pursuant to Action Plan § D, ¶ 3 (*Consultation & Direction of the Monitor*), will require and direct the Department to, among other things, (a) set reasonable limitations on de-escalation which can be extended beyond 4 hours should there be a continuing risk of imminent harm and (b) ensure the conditions of the de-escalation unit do not pose a risk of harm to the individual or others. Pursuant to Action Plan § D, ¶ 3, the Department must implement the requirements from the Monitor.

- **<u>Emergency Lock-Ins</u>**: The provisions of the bill include requirements that reflect arbitrary limitations on the use of emergency lock-ins create dangerous and unsafe conditions and are not consistent with sound correctional practice and do not permit adequate protections from harm.
  - o The requirements of 549-A do not comply with:
    - ▪ August 10, 2023 Order, § I, ¶ 4 *Lock-in and Lock-out Procedures.*
  - o Approval of the Monitor:
    - ▪ August 10, 2023 Order, § I, ¶ 4 requires the approval of the Monitor. The Monitor cannot approve the emergency lock-in procedures that include the problematic requirements of Bill 549-A because they are not consistent with sound correctional practice and are unsafe.

## APPENDIX C – DEFINITIONS OF SOLITARY CONFINEMENT

The chart below contains a number of definitions of solitary confinement from various reputable sources. There is no universal, standard definition of solitary confinement, and the practice can be described by various different names (including restrictive housing). However, it is critical to note that the term solitary confinement includes three basic elements regardless of how it is labeled: (1) confinement in cell for 20-24 hours, (2) for prolonged periods of time (e.g. 15 days), (3) affords little human contact and no congregate engagement, and (4) does not provide access to programming.

| Source | Definition |
|--------|-----------|
| UN General Assembly, *United Nations Standard Minimum Rules for the Treatment of Prisoners (the Nelson Mandela Rules) : resolution / adopted by the General Assembly*, Dec. 17 2015, A/RES/70/175, available at: https://documents-dds-ny.un.org/doc/UNDOC/GEN/N15/443/41/PDF/N1544341.pdf | "Rule 43: 1. In no circumstances may restrictions or disciplinary sanctions amount to torture or other cruel, inhuman or degrading treatment or punishment. The following practices, in particular, shall be prohibited: (a) Indefinite solitary confinement; (b) Prolonged solitary confinement; (c) Placement of a prisoner in a dark or constantly lit cell; (d) Corporal punishment or the reduction of a prisoner's diet or drinking water; (e) Collective punishment. 2. Instruments of restraint shall never be applied as a sanction for disciplinary offences. 3. Disciplinary sanctions or restrictive measures shall not include the prohibition of family contact. The means of family contact may only be restricted for a limited time period and as strictly required for the maintenance of security and order." <br><br> "Rule 44: For the purpose of these rules, solitary confinement shall refer to the confinement of prisoners for 22 hours or more a day without meaningful human contact. Prolonged solitary confinement shall refer to solitary confinement for a time period in excess of 15 consecutive days." |
| HALT Solitary Confinement Act, N.Y. Consol. Laws, Corr. Law § 2.23 | "'Segregated confinement' means the confinement of an incarcerated individual in any form of cell confinement for more than seventeen hours a day other than in a facility-wide emergency or for the purpose of providing medical or mental health treatment. Cell confinement that is implemented due to medical or mental health treatment shall be within a clinical area in the correctional facility or in as close proximity to a medical or mental health unit as possible." |
| Isolated Confinement Restriction Act, N.J. Rev. Stat. § 30:4-82.7 | "'Isolated confinement' means confinement of an inmate in a correctional facility, pursuant to disciplinary, administrative, protective, investigative, medical, or other classification, in a cell or similarly confined holding or living space, alone or with other inmates, for approximately 20 hours or more per day in a State correctional facility or 22 hours or more per day in a county correctional facility, with severely restricted activity, movement, and social interaction. Isolated confinement shall not include confinement due to a facility-wide or unit-wide lockdown that is required to ensure the safety of inmates and staff. 'Less restrictive intervention' means a placement or conditions of confinement, or both, in the current or an alternative correctional facility, under conditions less restrictive of an inmate's movement, privileges, activities, or social interactions." |
| Conn. Gen. Stat. § 18-96b(7) | "'Isolated confinement' means any form of confinement of an incarcerated person within a cell, except during a facility-wide health treatment, with less than the following time out of cell: (A) |

| Source | Definition |
|---|---|
| | For all incarcerated persons, four hours per day, on and after July 1, 2022; (B) For all incarcerated persons in the general population, four and a half hours per day, on and after October 1, 2022; and (C) For all incarcerated persons in the general population, five hours per day, on and after April 1, 2023" |
| Mass. Gen. Laws ch. 127, § 1 | "'Restrictive Housing', a housing placement where a prisoner is confined to a cell for more than 22 hours per day; provided, however, that observation for mental health evaluation shall not be considered restrictive housing." |
| Va. Code. § 53.1-39.2 | "'Restorative housing' means special purpose bed assignments operated under maximum security regulations and procedures and utilized for the personal protection or custodial management of an incarcerated person… B. No incarcerated person in a state correctional facility shall be placed in restorative housing unless (i) such incarcerated person requests placement in restorative housing with informed voluntary consent, (ii) such incarcerated person needs such confinement for his own protection, (iii) there is a need to prevent an imminent threat of physical harm to the incarcerated person or another person; or (iv) such incarcerated person's behavior threatens the orderly operation of the facility, provided that: 1. When an incarcerated person makes a request to be placed in restorative housing for his own protection, the facility shall bear the burden of establishing a basis for refusing the request; 2. An incarcerated person who is in restorative housing for his own protection based on his request or with his informed voluntary consent may opt out of restorative housing by voluntarily removing his consent to remain in restorative housing by providing informed voluntary refusal; 3. An incarcerated person placed in restorative housing for his own protection (i) shall receive similar opportunities for activities, movement, and social interaction, taking into account his safety and the safety of others, as are provided to incarcerated persons in the general population of the facility and (ii) his placement shall be reviewed for assignment into protective custody; 4. An incarcerated person who has been placed in restorative housing for his own protection and is subject to removal from such confinement, not by his own request, shall be provided with a timely and meaningful opportunity to contest the removal; and 5. An incarcerated person who has been placed in restorative housing shall be offered a minimum of four hours of out-of-cell programmatic interventions or other congregate activities per day aimed at promoting personal development or addressing underlying causes of problematic behavior, which may include recreation in a congregate setting, unless exceptional circumstances mean that doing so would |

| Source | Definition |
|---|---|
|  | create significant and unreasonable risk to the safety and security of other incarcerated persons, the staff, or the facility." |
| Colo. Rev. Stat. § 17-26-302 and § 17-26-303 | § 17-26-302 (6): "'Restrictive housing' means the state of being involuntarily confined in one's cell for approximately twenty-two hours per day or more with very limited out-of-cell time, movement, or meaningful human interaction whether pursuant to disciplinary, administrative, or classification action."<br>§ 17-26-303 (i)(II): "If a local jail wants to hold an individual placed in restrictive housing pursuant to subsection (2)(a) of this section for more than fifteen days in a thirty-day period, the local jail must obtain a written court order. A court shall grant the court order if the court finds by clear and convincing evidence that: (A) The individual poses an imminent danger to himself or herself or others; (B) No alternative less-restrictive placement is available; (C) The jail has exhausted all other placement alternatives; and (D) No other options exist, including release from custody." |
| Council of Europe: Committee of Ministers, *Recommendation Rec(2006)2 of the Committee of Ministers to Member States on the European Prison Rules*, 11 January 2006, Rec(2006)2, https://search.coe.int/cm/Pages/result_details.aspx?ObjectID=09000016809ee581 | "60.6.a *Solitary confinement, that is the confinement of a prisoner for more than 22 hours a day without meaningful human contact*, shall never be imposed on children, pregnant women, breastfeeding mothers or parents with infants in prison." [emphasis added] |
| Alison Shames et al., Solitary Confinement: Common Misconceptions and Emerging Alternatives, Vera Institute of Justice (May 2015), https://www.vera.org/downloads/publications/solitary-confinement-misconceptions-safe-alternatives-report_1.pdf | "All prisons and many jails in the United States use some form of solitary confinement. Whatever the label, the experience for the person is the same—confinement in an isolated cell (alone or with a cellmate) for an average of 23 hours a day with limited human interaction, little constructive activity, and in an environment that ensures maximum control over the individual. When sources cited in this report refer to the practice as solitary confinement, the authors do as well. Otherwise, consistent with American Bar Association standards, 'segregated housing' is used as the generic term for the practice." |

| Source | Definition |
|---|---|
| Am. Academy of Child & Adolescent Psychiatry, Juvenile Justice Reform Comm., *Solitary Confinement of Juvenile Offenders* (Apr. 2012), https://www.aacap.org/AACAP/Policy_Statements/2012/Solitary_Confinement_of_Juvenile_Offenders.aspx | "Solitary confinement is defined as the placement of an incarcerated individual in a locked room or cell with minimal or no contact with people other than staff of the correctional facility. It is used as a form of discipline or punishment…Solitary confinement should be distinguished from brief interventions such as "time out," which may be used as a component of a behavioral treatment program in facilities serving children and/or adolescents, or seclusion, which is a short term emergency procedure, the use of which is governed by federal, state and local laws and subject to regulations developed by the Joint Commission, CARF and supported by the National Commission of Correctional Healthcare (NCHHC), the American Correctional Association (ACA) and other accrediting entities.  The Joint Commission states that seclusion should only be used for the least amount of time possible for the immediate physical protection of an individual, in situations where less restrictive interventions have proven ineffective. The Joint Commission specifically prohibits the use of seclusion "as a means of coercion, discipline, convenience or staff retaliation." A lack of resources should never be a rationale for solitary confinement." |
| Am. Civ. Liberties Union, *The Dangerous Overuse of Solitary Confinement in the United States* (Aug. 2014), https://www.aclu.org/publications/dangerous-overuse-solitary-confinement-united-states | "Solitary confinement is the practice of placing a person alone in a cell for 22 to 24 hours a day with little human contact or interaction; reduced or no natural light; restriction or denial of reading material, television, radios or other property; severe constraints on visitation; and the inability to participate in group activities, including eating with others. While some specific conditions of solitary confinement may differ among institutions, generally the prisoner spends 23 hours a day alone in a small cell with a solid steel door, a bunk, a toilet, and a sink." |
| Am. Civ. Liberties Union of Maine, *Change is Possible: A Case Study of Solitary Confinement Reform in Maine* (March 2023), https://www.aclumaine.org/sites/default/files/field_documents/aclu_solitary_report_webversion.pdf | "Solitary confinement is the practice of isolating a prisoner in a cell for 22-24 hours per day, with extremely limited human contact; reduced (sometimes nonexistent) natural lighting; severe restrictions on reading material, televisions, radios, or other physical property that approximates contact with the outside world; restrictions or prohibitions on visitation; and denial of access to group activities, including group meals, religious services, and therapy sessions." |

| Source | Definition |
|---|---|
| Amnesty Int'l., *Solitary Confinement in the USA* (Nov. 2013), https://www.amnesty.org/en/documents/amr51/076/2013/en/ | "Amnesty International uses the terms 'solitary confinement' and 'isolation' to refer to prisoners who are confined to cells for 22-24 hours a day with minimal contact with other human beings, including guards and prison staff." |
| Andreea Matei, *Solitary Confinement in US Prisons*, Urban Institute (Aug. 2022), https://www.urban.org/sites/default/files/2022-08/Solitary%20Confinement%20in%20the%20US.pdf | "Although solitary confinement differs between institutions, it is commonly defined as the isolation of a person in a cell for an average of 22 or more hours a day… People in solitary are typically allowed to leave their cells only to shower and for one hour of recreation and are separated during both from the general prison population." |
| Ass'n. for the Prevention of Torture, Solitary Confinement, https://www.apt.ch/knowledge-hub/dfd/solitary-confinement [last visited 1/10/24] | "Solitary confinement consists in keeping an inmate alone in a cell for over 22 hours a day. Because of the harmful effect on the person's physical and mental well-being, solitary confinement should only be used in exceptional circumstances. It should be strictly supervised and used only for a limited period of time." |
| Int'l. Psychological Trauma Symposium, *The Istanbul Statement on the Use and Effects of Solitary Confinement* (Dec. 9, 2007), https://www.solitaryconfinement.org/_files/ugd/f33fff_74566ecc98974f8598ca852e854a50cd.pdf | "Solitary confinement is the physical isolation of individuals who are confined to their cells for twenty-two to twenty-four hours a day. In many jurisdictions prisoners are allowed out of their cells for one hour of solitary exercise. Meaningful contact with other people is typically reduced to a minimum. The reduction in stimuli is not only quantitative but also qualitative. The available stimuli and the occasional social contacts are seldom freely chosen, are generally monotonous, and are often not empathetic." |
| Nat'l. Comm'n. on Corr. Health Care, *Position Statement: Solitary Confinement* (Apr. 2016), https://www.ncchc.org/wp-content/uploads/Solitary-Confinement-Isolation.pdf | "Solitary confinement is the housing of an adult or juvenile with minimal to rare meaningful contact with other individuals. Those in solitary confinement often experience sensory deprivation and are offered few or no educational, vocational, or rehabilitative programs. Different jurisdictions refer to solitary confinement by a variety of terms, such as isolation; administrative, protective, or disciplinary segregation; permanent lockdown; maximum security; supermax; security housing; special housing; intensive management; and restrictive |

| Source | Definition |
|---|---|
| | housing units. Regardless of the term used, an individual who is deprived of meaningful contact with others is considered to be in solitary confinement." |
| Penal Reform Int'l., Solitary Confinement, https://www.penalreform.org/issues/prison-conditions/key-facts/solitary-confinement/ [last visited 1/10/24] | "While there is no universally agreed definition of solitary confinement – often also called 'segregation', 'isolation', 'lockdown' or 'super-max' – it is commonly understood to be the physical isolation of individuals who are confined to their cells for 22 to 24 hours a day, and allowed only minimal meaningful interaction with others." |
| Ryan Labrecque, *The Effect of Solitary Confinement on Institutional Misconduct: A Longitudinal Evaluation* (2015), https://www.ojp.gov/pdffiles1/nij/grants/249013.pdf | "Although the physical conditions and routines of SC vary by setting and situation, the practice typically includes 22-23 hour a day lockdown with few physical amenities and treatment services made available to inmates… By comparison, inmates living in the general prison population have greater access to various activities (i.e., programming, recreation), which affords them a degree of meaningful social interaction." |
| Ryan Sakoda and Jessica Simes, *Solitary Confinement and the U.S. Prison Boom*, 32(1) Criminal Justice Policy Review, 1 (2019) | "A particularly harsh form of captivity, solitary confinement involves confining an individual to a prison cell for 22 to 24 hours a day and isolating them from the prison's general population. Individuals in solitary confinement have highly restricted access to visitation, phone calls, showers, programs, and free movement outdoors." |
| Sharon Shalev, *A Sourcebook on Solitary Confinement*, Mannheim Centre for Criminology (2008), https://www.solitaryconfinement.org/_files/ugd/f33fff_18782e47330740b28985c5fe33c92378.pdf?index=true | "For the purpose of the Sourcebook, solitary confinement is defined as a form of confinement where prisoners spend 22 to 24 hours a day alone in their cell in separation from each other." |
| Solitary Watch, Solitary Confinement in the United States: The Facts, https://solitarywatch.org/facts/faq/ [last visited 1/10/24] | "Solitary confinement is the practice of isolating people in closed cells for as much as 24 hours a day, virtually free of human contact, for periods of time ranging from days to decades." |

| Source | Definition |
|---|---|
| U.S. Dep't. of Justice, *Report and Recommendations Concerning the Use of Restrictive Housing: Executive Summary* (Jan. 2016), https://www.justice.gov/archives/dag/file/815551/download | "The most recognizable term for inmate segregation—'solitary confinement'—is disfavored by correctional officials, in part because it conjures a specific, and in some cases misleading, image of the practice.  Not all segregation is truly 'solitary,' at least in the traditional sense of the word.  Many prison systems, including the Bureau, often house two segregated inmates together in the same cell, a practice known as 'double-celling.' To avoid this confusion, the Report adopts the more general terms, "restrictive housing" and 'segregation.' For the purposes of this Report, we define 'restrictive housing' as any type of detention that involves three basic elements:<br>• Removal from the general inmate population, whether voluntary or involuntary;<br>• Placement in a locked room or cell, whether alone or with another inmate; and<br>• Inability to leave the room or cell for the vast majority of the day, typically 22 hours or more." |
| World Med. Ass'n. Statement on Solitary Confinement (Sep. 28, 2020), https://www.wma.net/policies-post/wma-statement-on-solitary-confinement/ | "Solitary confinement is a form of confinement used in detention settings where individuals are separated from the general detained population and held alone in a separate cell or room for upwards of 22 hours a day. Jurisdictions may use a range of different terms to refer to the process (such as segregation, separation, isolation or removal from association) and the conditions and environment can vary from place to place. However, it may be defined or implemented, solitary confinement is characterised by complete social isolation; a lack of meaningful contact; and reduced activity and environmental stimuli… Solitary confinement can be distinguished from other brief interventions when individuals must be separated as an immediate response to violent or disruptive behaviour or where a person must be isolated to protect themselves or others. These interventions should take place in a non-solitary confinement environment." |

# APPENDIX G: MONITOR'S JULY 17, 2024 LETTER RE:  LL42

July 17, 2024

<u>Via Email</u>
Commissioner Lynelle Maginley-Liddie
Department of Correction
75-20 Astoria Boulevard, Suite 350
East Elmhurst, NY 11370

Dear Commissioner Maginley-Liddie,

We write in response to your request, pursuant to the *Nunez* Court Orders,[234] for updated advice and feedback from the Monitoring Team on how the requirements of Local Law 42 ("LL42") may impact the Department's ability to comply with the *Nunez* Court Orders. This letter shares some additional advice and feedback since the Monitoring Team's January 12, 2024 letter, but as described below, we believe further consultation is necessary in order to create a more detailed framework for considering LL42's implications for the *Nunez* Court Orders.

Collectively, the Monitoring Team has over 100 years' experience in developing *safe* alternatives to solitary confinement and in helping jurisdictions to formulate reasonable operational practices that ensure adequate protection from harm for incarcerated individuals and staff who work in carceral settings. The Monitoring Team also has extensive expertise and understanding of the Department's operations. As you know, the *Nunez* Court Orders require the Monitor to approve policies that impact on a variety of issues, many of which are affected by the

---

[234] *See*, Consent Judgment, § XX, ¶¶ 24 and 25 and June 13, 2023 Order, § I, ¶ 5. Combined, these provisions: (1) permit the Department to request the Monitor provide technical assistance or consultation on the Department's efforts to implement the requirements of the *Nunez* Court Orders, (2) permit the Department to request the Monitor provide a written response to a request regarding the Department's compliance with the *Nunez* Court Orders, and (3) requires the Department to proactively consult with the Monitor on any policies or procedures that relate to the compliance with the *Nunez* Court Orders in order to obtain the Monitor's feedback on these initiatives. The Monitor has addressed similar issues in the past. *See*, for example, the Monitor's March 5, 2018 Report (dkt. 309), the Monitor's October 31, 2018 (dkt. 319) letter to the Court, and the Monitor's June 30, 2022 Report (dkt. 467) at pgs. 22 to 27.

various requirements of LL42. The Monitoring Team believes more detailed discussions are

necessary before the Monitor can make any final determinations regarding which policies and

procedures required by LL42 (and the corresponding Board of Correction rules that were

recently passed) would or would not receive Monitor approval as required by the *Nunez* Court

Orders.

This letter first includes background on LL42, followed by a candid assessment of the

current limitations that, in our view, indicate that attempting to implement LL42 at this time

would be ill-advised as it would be dangerous and would subject incarcerated individuals and

staff to further risk of harm. Next, this letter addresses potential conflicts between LL42 and the

*Nunez* Court Orders and advises that further analysis is needed to provide a fulsome account of

each of LL42's requirements that may conflict with the Monitoring Team's expert opinions

regarding sound correctional practice, facility safety, and management of persistently violent

detainees. Finally, the letter recommends next steps for addressing any potential conflicts and

potential motion practice before the Court.

*Background*

The City Council passed Local Law 42 on December 20, 2023. The bill was subsequently

vetoed by the Mayor of New York on January 19, 2024, but was then signed into law by the City

Council on January 30, 2024, overriding the Mayor's veto. LL42 bans the use of solitary

confinement, imposes 14-hours of mandatory out of cell time for all incarcerated individuals, and

sets additional requirements for the use of restrictive housing, de-escalation, emergency lock-ins,

and restraints and specific conditions for special housing units (*e.g.,* mental health units,

contagious disease units, housing for people who are transgender or gender non-conforming,

protective custody units, and housing to promote school attendance). The implementation deadline for LL42 is July 28, 2024.

In early January 2024, pursuant to the *Nunez* Court Orders,[235] you requested the Monitoring Team's advice and feedback on how the requirements of LL42 may impact the Department's ability to comply with the *Nunez* Court Orders. On January 12, 2024, the Monitoring Team provided its assessment of LL42's implications for the City's and Department's efforts to address the unsafe conditions in the jails, to protect individuals from harm, and to implement sound correctional practices, all of which are necessary to comply with the *Nunez* Court Orders. Subsequently, the Monitoring Team has had multiple discussions with your office and other Department officials regarding these matters.

In late May/early June 2024, the Department advised the Monitoring Team (and subsequently the Parties to the *Nunez* litigation) that it was considering seeking relief from LL42's requirements via the Court in the *Nunez* matter given the Department's concerns that LL42's requirements may impede the Department's ability to comply with the *Nunez* Court Orders in a number of key areas. Likewise, the City advised the Court of its intentions in a letter dated June 5, 2024 (dkt. 724). Following the submission of the City's letter to the Court, the Monitoring Team and the *Nunez* Parties met and conferred on June 18, 2024. Subsequently, the Monitoring Team has had numerous discussions with the Department and representatives for the Plaintiff Class and the Southern District of New York regarding these matters.[236]

*Summary of Local Law 42 & Department's Ability to Implement Local Law 42*

---

[235] *Id.*

[236] Lawyers for the City Council have scheduled a meeting with the Monitoring Team that will take place in the coming days.

Local Law 42 is a well-intentioned effort to ensure that no person in the Department's custody is subjected to solitary confinement.[237] Eliminating solitary confinement is unquestionably necessary and important for ensuring the humane treatment of people in custody. LL42 also includes many operational requirements that go beyond eliminating solitary confinement.  Moreover, LL42 includes unprecedented provisions regarding the management of incarcerated individuals following serious acts of violence and eliminates necessary discretion by correctional management in a manner that could actually result in an increased risk of harm to other incarcerated individuals and staff.  The Monitoring Team has grave concerns about the Department's ability to safely implement LL42, particularly given the timeline. Among these concerns are:

1. **Eliminates Essential and Critical Managerial Discretion.**  An overarching concern of the Monitoring Team is that the requirements of LL42 impose absolute prohibitions on correctional management that remove all discretion in a number of particularized circumstances where *some* degree of latitude and discretion in judgement to manage immediate threats to security are in fact necessary. For example, unqualified release from de-escalation confinement in 4 hours; a universal 4-hour limitation on emergency lock-ins; and a requirement that, "in all circumstances" the Department must discharge an incarcerated person from restrictive housing within 30 days. Other provisions in LL42 are ostensibly intended to provide safeguards to those placed in restrictive housing, but absolutely bar correctional managers from exercising necessary discretion to address the risk of harm that may

---

[237] For purposes of this communication, the Monitoring Team adopts the United Nations definition of solitary confinement as 22 hours or more per day without meaningful human contact. *See*, the United Nations Standard Minimum Rules for Treatment of Prisoners, Rule 44.

be present to the incarcerated individual in question, other incarcerated individuals, and staff.  There is simply no question that situations arise in correctional settings where an immediate risk of harm must be addressed regardless of arbitrarily imposed limitations that preclude management from addressing the immediate security threat. In application, these provisions that preclude any discretion will in some instances put other incarcerated individuals and staff at greater risk of harm.

2.  **Lack of a Proper Foundation to Support Implementation**. The Monitor's Reports to date have repeatedly found that the Department does not have the necessary foundation to support the *basic* reforms required by the *Nunez* Court Orders.  Without reliable adherence to basic security practices, robust protocols for properly deploying and supervising staff, strategies to appropriately manage the incarcerated population, and effective staff accountability, the Department is at present not equipped to safely implement LL42.

3.  **Truncated Implementation Timeline**. As the current state of compliance with the *Nunez* Court Orders has brought into stark relief, simply articulating a set of requirements does not create the capacity to properly implement those requirements. In the Monitoring Team's experience, it is not uncommon for jurisdictions to need a considerable amount of time to lay the groundwork to develop and implement more complex reforms. For example, the Use of Force Directive required by the Consent Judgment was finalized over a year before it was implemented in order to ensure that ancillary supports were properly prepared, and that staff received necessary training on any resulting changes to procedures. Even with a lengthy implementation timeline, the Department has struggled to properly implement the Use of Force Directive's

requirements. Whether preparing to implement a court-ordered requirement or a new law, the planning tasks remain the same: evaluating the operational impact, updating policies and procedures, updating the physical plant, determining the necessary staffing complement, developing training materials, and providing training to thousands of staff, all of which must occur before the changes in practice actually go into effect. Rules supporting LL42's implementation were passed by the Board of Correction on June 25, 2024, just one month before LL42 is scheduled to go into effect. As noted above, the Department does not have the requisite foundation to undertake most of the necessary planning tasks, and attempting to do so in just one month's time all but guarantees that the planning will not be as comprehensive or thoughtful as the scope and magnitude of the changes require. Further, the necessary training simply cannot be developed and deployed within such a time frame. The Monitoring Team has long advised that attempting to make significant changes within unreasonable time frames does not support the development of sustainable reforms and often creates a greater risk of harm.

4. **The Department is Not Prepared**. Given the Department's lack of foundation to implement LL42 and the truncated timeline for implementation outlined above, unsurprisingly, the Department's leadership has reported the Department is not ready to implement this law. More specifically, the Department has not developed the necessary policies, procedures or training to support the requirements of LL42 and thus is not in a secure position to attempt implementation. The fact that those who operate the facilities state they are unprepared and also believe certain aspects of LL42 to be unsafe cannot be ignored, and only serves to further heighten the

Monitoring Team's concerns regarding the ongoing risk of harm and the safety of those in the Department's custody and those working in the Department's facilities.

Although the nuances in each jurisdiction differ, the universal reality is that increasing facility safety is a complicated endeavor rife with potential pitfalls. When efforts to reform practices are subject to unreasonably short and absolute timelines and include other requirements that may run counter to standard and sound correctional practice, well-intended reforms can lead to unintended consequences that jeopardize, rather than protect, the safety of incarcerated individuals and staff. Under the current conditions and level of readiness, attempting to implement a complex law that fundamentally changes many of the Department's standard practices and that requires changes that conflict with standard sound correctional practices would increase the risk of harm to incarcerated individuals and staff and therefore would be dangerous for those incarcerated and work in the jails.

### *LL42's Potential Conflicts with Nunez Requirements*

Under the *Nunez* Court Orders, the Department has an obligation to implement sound correctional practices and to obtain the Monitor's approval of key policies and procedures. This includes requirements related to security practices,[238] the use of restraints,[239] escorts,[240] lock-in

---

[238] *See* Action Plan § D, ¶ 3 in which the Monitor may direct the Department to refine certain security initiatives to ensure compliance with security requirements of the Action Plan.

[239] *See* Consent Judgment, § IV, ¶ 3(p).

[240] *See* Action Plan, § D, ¶ 2(f) and August 10, 2023 Order, § I, ¶ 3.

and lock-out time,[241] de-escalation,[242] initial procedures following a serious act of violence[243] and subsequent housing strategies.[244]

The question of whether the Department can implement LL42 safely and comply with the *Nunez* Court Orders is of the utmost importance because of the direct impact on the safety of all those incarcerated and working in the jails. With respect to the elimination of solitary confinement, the Department reports that it does not utilize solitary confinement (i.e., 22 hours or more per day in a locked cell and without meaningful human contact), but a number of the provisions in LL42 would drastically alter many of the Department's practices. For instance, several of LL42's requirements would impact the Department's core strategy for addressing violent misconduct—its restrictive housing program. Furthermore, the Department routinely utilizes practices (e.g., restraint, de-escalation, mental health units, protective custody, to name a few) that currently include requirements aligned with standard sound correctional practice but that differ from the requirements of LL42, in some cases significantly and dangerously. Certain programs and practices currently in use or that are under development at the Department would require significant alteration, or in some instances would need to be eliminated, as a result of the requirements of LL42.

In January 2024, the Monitoring Team provided the Department with a list of potential conflicts between the requirements of LL42 and the requirements of *Nunez* Court Orders, stressing that implementing LL42's requirements could undercut the Department's ability to

---

[241] *See* August 10, 2023 Order, § I, ¶ 4.

[242] *See* First Remedial Order, § A, ¶ 3 and Action Plan, § D, ¶ 2(b).

[243] *See* Second Remedial Order ¶ 1(i)(e), Action Plan, § D, ¶ 2(h)

[244] *See* Action Plan, § E, ¶ 4.

achieve compliance in *Nunez*. Given the breadth and complexity of LL42's requirements, extensive consultation with, and ultimately approval from, the Monitor is necessary in order to ensure that the Department's approach to satisfying the *Nunez* requirements is aligned with sound correctional practice. [245]

Recently, the City and the Department engaged the Monitoring Team to explore these issues and potential conflicts in more detail. Fully understanding LL42's requirements and the BOC's respective rules (which were only just passed) in each of the areas listed above (and others that the Monitoring Team may yet identify) and then comparing them to the respective requirements of the *Nunez* Court Orders is an exceedingly complicated undertaking. Each facet is complex and nuanced and must be dissected among those with operational expertise and experience with advancing reform in order to determine where conflicts may exist. If LL42 requires a certain practice that the Monitor determines is not consistent with the requirements of the *Nunez* Court Orders (e.g. the practice is not consistent with sound correctional practice or creates heightened risk of harm), the Monitor may not approve the relevant Department policy, and thus the Department will remain out of compliance with the relevant aspect of the *Nunez* Court Orders.

---

[245] Consultation with the Monitor is required by over 80 provisions in the *Nunez* Court Orders. Consultation is also required by the Court's June 13, 2023 Order, § I, ¶ 5.

*Recommended Next Steps*

 The work to identify the practices at issue has started, but extensive discussion and additional time are needed to complete this assessment. The Department and the Monitoring Team must continue to work to identify the requirements of LL42 that, if implemented, may conflict with the *Nunez* Court Orders. Once a more detailed framework of the LL42 requirements that conflict with the *Nunez* Court Orders has been created, the *Nunez* Parties, counsel for the City Council, and the Monitoring Team must meet and confer to determine how to best address the divergence. Given the complexity of the task and the fact that the practices at issue have a direct impact on facility safety, the process must go forward using a detailed, methodical approach. This process will take time in order to arrive at decisions that are grounded in sound correctional expertise and that navigate the complex jurisdictional issues. In addition, several other important legal matters are currently pending before the Court that require the attention of the Department, the *Nunez* Parties, and the Monitoring Team, which must be recognized and accounted for as part of this process.[246] Accordingly, the Monitoring Team recommends that the work outlined in this letter is undertaken between now and October 24, 2024, at which time the Court can be updated on the status of these issues and the necessity for any potential motion practice.

 We look forward to working with you and your team on these important matters.

      Sincerely,

      <u>s/ Steve J. Martin</u>
      Steve J. Martin, *Monitor*

      Anna E. Friedberg, *Deputy Monitor*

---

[246] For example, the Court has directed the Parties and the Monitoring Team to meet and confer in late August and early September on matters related to the Motion for Contempt. *See* July 11, 2024 Court Order (dkt. 751).

# APPENDIX H:
# PROPOSED ORDER FOR MONITOR'S APRIL 2025 REPORT

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X
                                          :

MARK NUNEZ, et al.,             :

                                          :

 Plaintiffs,                :

                                          :

 - against -               :

                                          :

CITY OF NEW YORK, et al.,     :

                                          :

 Defendants.            :

                                          :   **11 Civ. 5845 (LTS)(JCF)**

------------------------------------------------------------ X
                                            :

UNITED STATES OF AMERICA,    :

                                          :

           Plaintiff-Intervenor,   :

                                          :

 - against -               :

                                          :

CITY OF NEW YORK and NEW YORK CITY  :
DEPARTMENT OF CORRECTION,     :

                                          :

           Defendants.      :

------------------------------------------------------------ X

**[PROPOSED] ORDER**

316

1. _Monitor's Compliance Assessment - Modification to § G, ¶5(b) of the Action Plan_: The Action Plan, § G, ¶ 5(b) shall be modified to include the language in bold below:

   Given the Monitor's findings in the Monitor's March 16, 2022 Special Report, (pages 63 to 65), and subsequent reports on **October 27, 2022, February 3, 2023, April 3, 2023, April 24, 2023, May 26, 2023, June 8, 2023, July 10, 2023, August 7, 2023, October 5, 2023, November 8, 2023, November 30, 2023, December 8, 2023, December 22, 2023, February 26, 2024, April 18, 2024, and November 22, 2024** the Monitor's assignment of compliance ratings for each provision of the Consent Judgment (required by § XX, ¶ 18 of the Consent Judgment) and the First Remedial Order are suspended for the time period covering January 1, 2022 to **December 31, 2024**, except for those provisions incorporated into this Order and the provisions listed below (collectively "select group of provisions").

   i. The Monitor shall assign compliance ratings, required by § XX, ¶ 18 of the Consent Judgment, for the following provisions from the Consent Judgment and the First Remedial Order:

      1. Consent Judgment § IV. (Use of Force Policy), ¶ 1;

      2. Consent Judgment § V. (Use of Force Reporting & Tracking), ¶¶ 2 & 22;

      3. Consent Judgment § VII. (Use of Force Investigations), ¶¶ 1 & 9(a);

      4. Consent Judgment § VIII. (Staff Discipline and Accountability), ¶¶ 1, 3(c) & 4;

      5. Consent Judgment § X. (Risk Management) ¶ 1;

      6. Consent Judgment § XII. (Screening and Assignment of Staff), ¶¶ 1 to 3;

      7. Consent Judgment § XV. (Safety and Supervision of Inmates Under the Age of 19), ¶ 1, 12 and 17;

8.  First Remedial Order § A. (Initiatives to Enhance Safe Custody Management, Improve Staff Supervision, and Reduce Unnecessary Use of Force), ¶¶ 1 to 4, & 6; and

9.  First Remedial Order § C. (Timely, Appropriate, and Meaningful Staff Accountability), ¶¶ 1, 2, 4 & 5.

2.  *Monitor's Report*: The Monitor shall file the following report:

   a.  *April 17, 2025*: This report will include compliance ratings for the select group of provisions of the *Nunez* Court Orders for the period July 1, 2024 to December 31, 2024, pursuant to Action Plan, § G, ¶ 5(b) as modified by this Order. This report will also include a discussion of the current state of affairs and the ongoing work related to the *Nunez* Court's Orders.

SO ORDERED this _____ day of _____, 2024

_____
LAURA TAYLOR SWAIN
Chief United States District Judge