UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MARK NUNEZ, et al.,

       Plaintiffs,

    -v-                                 No.  11-CV-5845-LTS

NEW YORK CITY DEPARTMENT OF
CORRECTION and THE CITY OF NEW
YORK,

       Defendants.

---

OPINION AND ORDER ON MOTION FOR CONTEMPT

| | |
|---|---|
| THE LEGAL AID SOCIETY<br>By:  Mary Lynne Werlwas<br>       Kayla Simpson<br>       Katherine Haas<br>       Sophia Gebresellassie<br>49 Thomas Street, 10th Floor<br>New York, NY 10013 | DAMIAN WILLIAMS,<br>UNITED STATES ATTORNEY FOR THE<br>SOUTHERN DISTRICT OF NEW YORK<br>By:  Jeffrey Kenneth Powell<br>       Rachel Lightfoot Doud<br>86 Chambers Street, Room 620<br>New York, NY 10007 |
|      -and- | *Attorneys for Intervenor-Plaintiff, the United States* |
| EMERY CELLI BRINCKERHOFF<br>ABADY WARD & MAAZEL LLP<br>By:  Jonathan Abady<br>       Debra Greenberger<br>       Katherine Rosenfeld<br>       Vasudha Talla<br>       Sana Mayat<br>600 Fifth Avenue, 10th Floor<br>New York, NY 10020 | NEW YORK CITY LAW DEPARTMENT<br>By:  Alan Howard Scheiner<br>       Sheryl Neufeld<br>       Mariam Khan<br>100 Church Street<br>New York, NY 10007 |
| | *Attorneys for New York City Department of Correction and the City of New York* |
| *Attorneys for the Plaintiff Class* | |

LAURA TAYLOR SWAIN, Chief United States District Judge

Before the Court is a motion brought on behalf of the plaintiff class of New York

City jail inmates and detainees ("Plaintiffs") and the Plaintiff-Intervenor, the United States,

represented by the United States Attorney for the Southern District of New York (the

"Government"), to hold Defendants New York City Department of Correction (the "Department"

or "DOC") and the City of New York (the "City" and, together with DOC, "Defendants") in civil

contempt of eighteen provisions (the "Contempt Provisions") of four Court orders entered in this

case: the Consent Judgment (docket entry no. 249), the First Remedial Order (docket entry no.

350), the Second Remedial Order (docket entry no. 398), and the Action Plan (docket entry no.

465).[1]  (Docket entry no. 601 (the "Motion").)  The Motion also seeks an order appointing a

receiver.  (Id. at 2.)  Defendants have opposed the motion in its entirety but do not, for the most

part, dispute the Plaintiffs' factual contentions.

The Court has reviewed carefully all of the parties' written submissions and

evidentiary proffers[2], and heard oral argument on the Motion on September 25, 2024.  As

explained below, the Court concludes that Defendants are in contempt of all eighteen Contempt

---

[1]     Plaintiffs seek an order holding Defendants in civil contempt of Court for their failure to
comply with the following provisions of the Consent Judgment and Orders: Consent
Judgment, § IV, ¶ 1, § VII ¶¶ 1, 9(a), 11; § VIII, ¶ 1; § XV, ¶¶ 1, 12, 17; First Remedial
Order § A, ¶¶ 2, 4, 6; § D, ¶¶ 1, 3, 3(i); Second Remedial Order, ¶ 1(i)(a); and Action
Plan § A, ¶1(d); § C, ¶¶ 3(ii), (iii), (v), (vi), (vii); § D, ¶¶ 2(a), (d), (e), & (f).  (Motion at
1-2.)  A list of the Contempt Provisions is provided in Appendix A to this Opinion and
Order.

[2]     The parties declined to proffer witness testimony and have stipulated to the Court's
resolution of this Motion practice on the basis of the written submissions and legal
arguments.

Provisions and directs the parties to work with the Monitoring Team to devise a proposal or proposals for a remedial structure.

<u>PROCEDURAL HISTORY</u>

This procedural history is drawn from the court record and the parties' respective proposed findings of fact.  (<u>See</u> docket entries nos. 762-2 ("Pl. PFOF"), 762-3 ("Def. PFOF"), 762-5 ("Pl. SPFOF").)  Citations to the parties' respective proposed findings of fact incorporate by reference the parties' citations to the underlying evidentiary submissions.  The Court assumes the parties' familiarity with the history of the case.

This case arose in 2012 amidst allegations that the Department engaged in a pattern and practice of using unnecessary and excessive force against incarcerated individuals. (Pl. PFOF ¶ 1.)  The instant case is the sixth class action lawsuit challenging a pattern and practice of excessive and unnecessary force in New York City's jails.[3]  (<u>Id.</u> ¶ 1041.)  On behalf of a class of present and future incarcerated individuals confined in jails operated by the Department, Plaintiffs sought injunctive and declaratory relief, in addition to monetary damages related to specific incidents in which the named Plaintiffs alleged they were victims of excessive force.  (<u>See id.</u>)  In October 2015, the parties entered into a settlement (docket entry no. 249 (the "Consent Judgment")), the purpose of which was to protect the federal constitutional rights of incarcerated individuals.  The Consent Judgment, comprising twenty-five sections and hundreds of provisions, required the Defendants to take specific actions to remedy a pattern and practice of violence by staff against incarcerated individuals, and to develop and implement new policies

---

[3]     DOC has also been the target of numerous lawsuits by individual plaintiffs alleging injuries resulting from a City custom and practice of misusing force in the jails. (Pl. PFOF ¶ 1048.)  The City has settled scores of such cases for monetary damages.  (<u>Id.</u>)  In fiscal year 2022, the City paid $37.2 million with respect to claims brought against DOC. (<u>Id.</u>)

and procedures to ensure the safety and wellbeing of incarcerated individuals. (Pl. PFOF

¶¶ 5-6.) The Consent Judgment includes a stipulation that its purpose "is to protect the

constitutional rights of the inmates confined in jails operated by the Department" and that its

"terms and requirements . . . will be interpreted to be consistent with the measures necessary to

protect the constitutional rights of inmates." (Consent Judgment § I.)

   The parties also stipulated to the appointment of a Monitor, as an agent of the

Court, to oversee and assess the Department's compliance with the Consent Judgment. (Consent

Judgment § XX.) The Monitor, together with Deputy Monitor and the Monitor's team of subject

matter experts (the "Monitoring Team"), has filed more than 50 reports on the public docket

describing "the efforts the Department has taken to implement the requirements" of the Consent

Judgment and "evaluating the extent to which the Department has complied" with the Consent

Judgment. (Id. § XX ¶ 16.) To this end, the Monitoring Team has conducted countless site

visits, met with DOC staff, and received significant amounts of information from DOC,

including routine data, information, and reports as well as thousands of videos, reports, and

investigation documentation related to use of force, other violent incidents, and other DOC

operations. (Pl. PFOF ¶ 10.) The Monitoring Team has also, based on its observations and

information obtained from DOC, provided over 700 separate recommendations to DOC on a

variety of topics, including use of force practices, security protocols, supervision, and training.

(Id. ¶ 11.)

   In its first nine periodic reports assessing compliance with the Consent Judgment,

the Monitoring Team repeatedly reported that the Defendants, despite consistent feedback and

offers of assistance from the Monitoring Team, were non-compliant with several sections of the

Consent Judgment, including provisions related to the implementation of a use of force directive

(§ IV, ¶ 1), timeliness of investigations and preliminary reviews (§ VII, ¶¶ 1, 7, 9), appropriate and meaningful staff discipline (§ VIII, ¶ 1), and the supervision and protection of incarcerated youth under the age of 19 (§ XV, ¶¶ 1, 12, 17).  (Pl. PFOF ¶¶ 17-18.)  Based on the Monitoring Team's findings that additional remedial measures were necessary to remedy the Department's pattern and practice of using excessive force, the parties stipulated to further measures of relief designed to increase the safety of incarcerated individuals.  The First Remedial Order, entered in August 2020, set forth specific initiatives to reduce the use of unnecessary force, improve staff supervision, enhance the safe management of persons in custody, and promote prompt investigations and timely accountability for use of force incidents.  (See docket entry no. 350 (the "First Remedial Order").)

        Less than a year after the Court entered the First Remedial Order, the Monitoring Team reported that Defendants were still not in compliance with key provisions of the Consent Judgment (relating to implementation of the use of force directive (§ IV, ¶ 1), appropriate and meaningful staff discipline (§ VIII, ¶¶ 1, 4), and the supervision and protection of incarcerated youth under the age of 19 (§ XV, ¶¶ 1, 12, 17)) and the First Remedial Order (regarding facility leadership responsibilities (§ A, ¶ 2), abuses by emergency response teams (§ A, ¶¶ 3, 6), consistent staffing (§ D, ¶¶ 1, 3), and tracking of incentives and consequences (§ D, ¶ 2(ii))).  (Pl. PFOF ¶ 28.)  The Monitoring Team emphasized that "the pervasive level of disorder and chaos in the Facilities is alarming [and the] conditions that gave rise to the Consent Judgment have not been materially ameliorated," and noted that DOC's progress toward the use of force reforms required by the Consent Judgment and First Remedial order had "stagnated in key areas."  (Id.) Against this backdrop of continued non-compliance and dysfunction, the Court entered a Second Remedial Order (docket entry no. 398) in September 2021.  (Pl. PFOF ¶ 41.)  The parties worked

together to draft the Second Remedial Order and consented to its entry.  (Id. ¶ 36.)  The Second Remedial Order focused, in large part, on the implementation of immediate security initiatives to increase the safety of persons in custody, including the development of a security plan to address poor practices of the Department.  (See id. ¶¶ 32-33, 35.)

Shortly thereafter, in November 2021, the Third Remedial Order (docket entry no. 424) was entered on consent, setting forth specific measures of relief to address delays in the imposition of timely discipline for instances of misconduct related to the use of excessive and unnecessary force.  (Pl. PFOF ¶¶ 51-52.)  The Third Remedial Order was primarily motivated by the Monitoring Team's growing concern that, even four years after entry of the Consent Judgment, Defendants had still failed to comply with the Consent Judgment's requirement to implement a use of force directive, which in turn had stymied the Department's ability to progress toward compliance with other provisions of the Consent Judgment.  (Id. ¶¶ 45-47.)

Around the time that the Second Remedial Order was entered, the Monitoring Team expressed its belief that "the City and the Department have the authority and the ability to address" the dangerous conditions in the City's jails.  (Docket entry no. 380 at 1.)  As time progressed, however, it became clear to the Monitoring Team that core foundational problems underpinned the Department's mismanagement of the jails, and that those "foundational patterns and practices" were "stymying compliance" with court orders, as well as any "efforts to reform the agency."  (Docket entry no. 431 at 10-11.)  In its December 6, 2021 report, the Monitoring Team asserted that "[c]ontinuing the attempt to implement hundreds of provisions" of the Consent Judgment and the Remedial Orders "without some prioritization will simply immobilize the Department and progress will likely not be achieved no matter how many remedial orders or other potential sanctions may be imposed."  (Id. at 11; see also id. at 9 (noting that "the

Department [was] in a place where many of the requirements of the Consent Judgment [were] simply unattainable, and the Consent Judgment requirements [were] unlikely to be successful in bringing about improvements because the basic foundations needed to improve practices [did] not exist").)

Accordingly, the Monitoring Team recommended a shift in focus to prioritize the key foundational issues at the core of the Department's mismanagement of the jails, which the team believed must be "addressed first, before the Department can make further progress" in achieving widescale reform.  (Id. at 10.)  Those foundational issues encompassed flawed security practices and procedures, inadequate supervision of staff, ineffective staffing procedures, and limited accountability imposed for staff misconduct.  (Id. at 12.)  To ensure that the Consent Judgment could be implemented, and to eliminate the unsafe conditions in the jails, the Monitor recommended that DOC improve security practices; appoint facility leaders, including a security operations manager with deep correctional expertise; improve management and deployment of staff; eliminate the backlog of disciplinary cases; and ensure timely accountability for staff misconduct.  (Pl. PFOF ¶ 55.)

After a new Mayor of the City of New York and his administration assumed office in January 2022, the Monitoring Team issued a report on March 16, 2022, advising the parties and the Court that conditions in the jails remained "unstable and unsafe" and reiterating the need for the Department to prioritize the foundational issues identified by the Monitoring Team.  (Docket entry no. 438 at 1.)  Those issues, the Monitoring Team represented, "created a polycentric problem and represent[ed] a complicated set of dysfunctional practices unlike any jail system with which the Monitoring Team has had experience."  (Id. at 2.)  The Monitoring Team, once again, called for a "comprehensive and tangible shift in the City's and Department's

focus and priorities," to an approach focused on correcting foundational issues of mismanagement and embedded with "concrete steps and timelines[.]"  (Id. at 3.)  To this end, in the spring of 2022, the Monitoring Team, Plaintiffs, the Government, and Defendants convened at least 15 meetings and worked together to outline an "Action Plan" tailored to those foundational issues to serve as "a roadmap for addressing the deficiencies that inhibit[ed] the Department's ability to build sustainable reforms" necessary for compliance with the Consent Judgment and Remedial Orders.  (Docket entry no. 462 at 2; see also Pl. PFOF ¶¶ 60-62.)

        The Action Plan was designed to prioritize reform efforts tailored to the four foundational areas identified by the Monitoring Team: staffing practices, security practices, management of people in custody, and timely staff accountability.  (See docket entry no. 465.) The DOC Commissioner confirmed in open court at a May 2022 status conference that DOC had provided "significant input" into the development of the Action Plan, and that the Action Plan outlined the work needed to address the four foundational issues raised by the Monitor.  (Pl. PFOF ¶ 61.)  At the same status conference, the City assured the Court that "there are no legal impediments to us fulfilling our obligations under the Action Plan."  (Id. ¶ 62.)  The Court approved and entered the Action Plan on June 14, 2022, on the consent of all parties, after the Court determined that the Action Plan complied with all relevant provisions of the Prison Litigation Reform Act (the "PLRA"), 18 U.S.C § 3626(a)(1)(A) (Westlaw through P.L. 118-107).[4]  (Docket entry no. 465; see also docket entry no. 466.)

---

[4]     The PLRA demands that "[p]rospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs" and that "[t]he court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right."  18 U.S.C § 3626(a)(1)(A).

In the summer and fall of 2022, Plaintiffs became increasingly concerned about issues related to Intake, including the tracking of and prolonged stays of persons assigned to the Intake Unit at Rikers Island, and filed a motion for civil contempt.  (See docket entry no. 499.) In that contempt motion, Plaintiffs asserted that the Department was in contempt of the obligations imposed by the third sentence of ¶ 1(i)(c) of the Second Remedial Order, namely the requirement to "develop and implement a reliable system to track and record the amount of time any incarcerated individual is held in Intake and any instance when an individual remains in Intake for more than 24 hours[,]" which was incorporated into § E, ¶ 3(a), of the Action Plan (the "Intake Tracking Clause").  (See docket entry no. 500 at 2.)  Shortly after that contempt motion was filed, the Monitoring Team reported that they did "not have any further recommendations for additional steps the Department should take" and confirmed that the Department had already incorporated all of their recommendations to address the requirements of the Intake Tracking Clause; and, in a March 13, 2023 opinion, the Court declined to hold DOC in contempt of the Intake Tracking Clause, finding that "the Department has now taken substantial steps to remedy the deficiencies of its prior approaches for tracking and to police the implementation of the revised systems proactively." (Docket entry no. 511 (the "Intake Contempt Order") at 27.)  The Court also noted "that a finding of civil contempt related to the Defendants' efforts to comply with one specific, court-ordered provision—among hundreds applicable to Defendants in this litigation—would be contrary to the spirit of the Action Plan and denigrate the importance of the Department's renewed and productive focus on the foundational issues at the core of the Department's historic pattern of excessive use of force against persons in custody."  (Id. at 28.)

On July 10, 2023, the Monitoring Team reported, however, "that the City and Department have not made substantial and demonstrable progress in implementing the reforms,

initiatives, plans, systems, and practices outlined in the Action Plan." (Pl. PFOF ¶ 69.) Based on their assessment that there had not been a substantial reduction in the risk of harm facing incarcerated individuals and Department staff, as required by the Action Plan, the Monitoring Team recommended a number of interim measures for DOC to implement by December 31, 2023. (Id. ¶¶ 70-71.) Those recommendations included: the development of metrics and data for use as indicators of use of force, security, and violence; revised procedures and protocols on searches, escorts, and lock-in in housing areas, command level orders for the Emergency Services Unit (the "ESU"), screening and assignment of staff to special teams, screening policies and procedures regarding promotions, door security, and command discipline; ensuring staff remain on post; revised trainings for ESU; hiring staff for the Investigations Division ("ID"), a component of DOC that specializes in investigating all actual and alleged uses of force and use of force related misconduct; reporting on intake; and conducting an assessment of DOC policies on self-harm. (Id. ¶ 71.) These recommendations were largely adopted by the Court and were incorporated in an order entered on August 10, 2023. (Id. ¶ 72.) Although all of the deadlines for DOC's implementation of the "immediate, interim measures" specified in that order have expired, DOC has not substantially implemented those measures or provided the Court with recent updates on its progress. (Pl. SPFOF ¶¶ 301-10.) The Court issued a subsequent order, on October 10, 2023, after DOC officials had ceased all pretext of cooperating with the Monitor, calling out DOC's "unacceptable" attempts to "unduly influence or interfere with the work of the Monitor"; that order required Defendants to "devise a plan that can be implemented immediately to ameliorate the unacceptable levels of harm in the New York City jails" and address reporting deficiencies. (Docket entry no. 582; see also Pl. SPFOF ¶¶ 311-17.) Defendants have not

recently updated the Court on their progress on compliance with that order, either, despite assurances that they would do so in August 2024.  (See Pl. SPFOF ¶ 314.)

<u>FINDINGS OF FACT</u>

The following facts have been proven by clear and convincing evidence.

<u>Conditions in the Jails</u>

The use of force rate and other rates of violence, self-harm, and deaths in custody are demonstrably worse than when the Consent Judgment went into effect in 2015.  (Pl. PFOF ¶ 74; Pl. SPFOF ¶¶ 5-9.)  As the record in this case demonstrates, the current rates of use of force, stabbings and slashings, fights, assaults on staff, and in-custody deaths remain extraordinarily high, and there has been no substantial reduction in the risk of harm currently facing those who live and work in the Rikers Island jails.  (Pl. PFOF ¶¶ 74-75.)  Not only do the numbers remain high, but, as the Monitoring Team has indicated, staff reporting of serious events was very unreliable for a significant period of time.  (Id. ¶¶ 79-84.)  Worse still, the unsafe and dangerous conditions in the jails, which are characterized by unprecedented rates of use of force and violence, have become normalized despite the fact that they are clearly abnormal and unacceptable.  (Id. ¶ 77.)  The Court briefly summarizes the evidence of these persistent problems below, which is documented extensively in Plaintiffs' voluminous, largely unchallenged evidentiary proffers in support of their proposed findings of fact.

<u>Use of Force, Stabbings and Slashings, and other Indicators of Violence</u>

In 2016, there were 4,652 use of force incidents.  (Pl. PFOF ¶ 85.)  The numbers of such incidents climbed to 8,184 incidents in 2021, and decreased slightly in following years, totaling 7,005 incidents in 2022, and 6,784 incidents in 2023; the use of force rate, adjusted for average daily population, was 3.96 uses of force per 100 incarcerated people in 2016, and 9.33

per 100 in 2023.  (Id. ¶¶ 85-86; Pl. SPFOF ¶¶ 12-13.)[5]  The average monthly use of force rate has never dropped below the rate that was computed at the inception of the Consent Judgment in 2016.  (Pl. PFOF ¶ 87.)  Not only are use of force rates in the jails higher than they were when the Consent Judgment was first entered, but a significant percentage of those incidents result in injuries so severe that they require medical treatment beyond the administration of over-the-counter analgesics or minor first aid, such as: chipped, cracked, or lost teeth; lacerations; punctures; fractures; loss of consciousness; concussions; sutures; internal injuries; or injuries requiring hospital admissions.  (Id. ¶¶ 89-95.)  While there is some data indicating that, in the second half of 2023, there had been a meaningful decrease in the number of use of force incidents that result in injury (Def. PFOF ¶¶ 13-14), the Monitoring Team has warned that the more encouraging data may be the product of an undercount (Pl. PFOF ¶¶ 96-100).  In any event, the use of force rate remains higher than the rate was in 2015, which the parties agreed, and the Court found, was high enough to violate the constitutional rights of those confined at Rikers. (Consent Judgment § I.)

Individuals in custody at Rikers face a grave risk of harm due to high rates of slashings and stabbings in the jails.  In 2016, there were 159 stabbings and slashings systemwide;

---

[5]    Defendants do not dispute the accuracy of this data, but (1) point out that DOC did not adopt a specified definition of use of force until September 2017 and (2) imply that the increase in use of force incidents is attributable to application of the definition.  (Pl. PFOF ¶¶ 85-86; Def. PFOF ¶¶ 9-10.)  Defendants, however, have not proffered evidence to demonstrate that there was a material difference between what was understood to be a "use of force" before and after the policy changes.  Indeed, it is undisputed that the current Use of Force Directive "is not based on new law, nor does it abandon core principles from its predecessor," but instead only provides "further explanation, emphasis, detail, and guidance to staff."  (Pl. SPFOF ¶ 11.)  Nor have Defendants proffered evidence to rebut the clear and convincing evidence of continued seriousness and frequency of excessive force, as detailed in the Monitoring Team's reports and proffered by Plaintiffs in support of their Motion.

that number skyrocketed to 420 and 468 in 2021 and 2022, respectively.  (Pl. PFOF ¶¶ 101, 103.)
While Defendants' reporting suggests that these numbers fell—albeit not to the rates seen in
2016—in 2023 (Def. PFOF ¶ 15), the Monitoring Team has warned that it cannot reliably verify
any purported decreases in slashings and stabbings because, in January 2023, DOC issued a
memorandum permitting staff to forego reporting certain incidents of violence (Pl. PFOF ¶¶
105-10).  Indeed, the number of reported slashings and stabbings dropped 49% from January to
February 2023, after the January 2023 memorandum issued, but without any corresponding
change in security practices or operations that would explain the drop.  (Id. ¶¶ 106-107.)  While
the rates of reported slashings in 2023 may not be reliable due to reporting problems at DOC, as
the Monitoring Team has emphasized, "even the number of reported events is cause for
concern."  (Pl. SPFOF ¶ 17 (emphasis added by Court).)

Notably, high rates of use of force, slashings and stabbings, and other indicators
of violence and disorder persist in the George R. Vierno Center (the "GRVC") and the Robert N.
Davoren Complex (the "RNDC"), where DOC has been working to implement violence
reduction plans (Pl. PFOF ¶¶ 114, 117).  The RNDC and GRVC violence reduction plans
initially catalyzed some improvement, but the plans were not sustained, and the safety profile of
both facilities has significantly worsened.  (Id. ¶¶ 118-19.)  Information concerning the
restrictive housing unit ("RESH"), a facility opened specifically to house persons who have
engaged in serious violence (e.g., stabbings, slashings, and other assaults that cause serious
injuries), paints a similar picture: While DOC opened RESH in June 2023 with extensive
security protocols and programming engagement, an allocation of leadership positions precisely
for the unit, specifically selected uniform and programming staff, a specialized training
curriculum, and low staffing ratios, RESH still exhibits poor sanitation, inadequate staffing,

pervasive contraband and weapons, and high levels of violence and fear. (Id. ¶ 120.) In 2023, RESH had the highest use of force rate of any facility, as well as high rates of stabbings, slashings, and fire-setting, due to poor plan implementation and problems with staffing and supervision. (Pl. SPFOF ¶¶ 286-93.)[6]

Seeking to explain the continued high rates of use of force, DOC points to changes in the jails that have occurred since 2016. First, Defendants emphasize DOC's observation of "a dramatic shift in the composition of the population of Rikers following New York State bail reform in January 2020" because "the DOC now houses individuals who are in its custody predominantly on charges of committing violent crimes."[7] (Def. PFOF ¶¶ 17-19.) Defendants also argue that reported increases in the use of force since 2016 can be explained, at least in part, by the increase in surveillance cameras in the facilities.[8] (Id. ¶¶ 20-21.) Further, Defendants note that incarcerated individuals are "spending considerably more time in DOC's care" and argue that "New York City's jails were not meant for such long-term stays, and the inevitable anxiety that comes from being in legal limbo contributes to the tension that breeds violence."[9] (Id. ¶ 22.)

---

[6]　　In its November 22, 2024 report (docket entry no. 802 at 16, 28-30), the Monitoring Team reported some improvements in the management and performance of RESH.

[7]　　Defendants, however, have not provided an evidentiary basis for their assertion that the charges faced by individuals in DOC custody bear a relationship to excessive or unnecessary use of force, nor do the charges faced by people in its custody change Defendants' obligations to provide safe and humane treatment to those within its jails and to comply with the court orders in this case. (See Def. PFOF ¶¶ 17, 19.)

[8]　　As Plaintiffs point out, there is no factual basis for this conclusion, and the Monitoring Team has indicated that DOC continues to underreport serious incidents. (Def. PFOF ¶ 21.)

[9]　　As Plaintiffs point out, this proffer is a conclusory statement with no factual basis. (Def. PFOF ¶ 22.)

Deaths in Custody

One of the most disturbing statistics plaguing the Rikers Island jails is the number of deaths of people in custody in recent years.  Nineteen people died in Defendants' custody in 2022, nine more died in 2023, and five died in the first eight months of 2024.  (Pl. PFOF ¶¶ 121, 123.)  The Monitoring Team has reported, based upon observation of video footage related to five of the deaths in 2023, that the circumstances around these deaths "were not particularly unusual or unique, but instead were typical of the variety of security problems that plague all the Department's housing units[,]" including "security lapses like unsecured doors, individuals in unauthorized areas, superficial Officer and Supervisor tours, and staff being off-post or providing inadequate supervision."  (Id. ¶ 123.)  The Monitoring Team also sounded an alarm that "many of these practices appear to have become normalized, and staff seemingly fail to recognize the resulting safety risks or the ways in which these practices elevate the likelihood of a tragic outcome."  (Id.)  The Court adopts Plaintiffs' uncontroverted proffer of additional details of the tragic loss of life in the jails—as well as the Department's repeated failures to impose appropriate staff discipline in the wake of preventable deaths—in their Proposed Findings of Fact.  (Id. ¶¶ 124-213.)

Noncompliance with Contempt Provisions

Plaintiffs argue that Defendants should be held in contempt because they have not complied with eighteen provisions of four court orders related to failures to: (1) implement the use of force directive; (2)  conduct adequate use of force investigations and hold staff accountable; (3) remedy failures in security and basic correctional practice; (4) adequately supervise staff and facility leadership; (5) effectively deploy uniform staff to adequately

supervise incarcerated individuals; (6) curb the Emergency Response Teams' excesses; [10] and

(7) ensure the safety of young people in custody (collectively, the "Contempt Provisions"). As

of the date of this Opinion and Order, there is no dispute that Defendants have not fully complied

with any of the Contempt Provisions. The Court summarizes the clear and convincing evidence

of Defendants' non-compliance—and their ineffective attempts to comply—with each category

of the Contempt Provisions in turn.

<u>Failure to Implement the Use of Force Directive</u>

Section IV, ¶ 1 of the Consent Judgment provides that: "[T]he Department shall

develop, adopt, and implement a new comprehensive use of force policy with particular

emphasis on permissible and impermissible uses of force." The Monitoring Team has repeatedly

characterized this requirement as "a seminal provision of the <u>Nunez</u> Court Orders." (Pl. PFOF

¶ 216.) The Department has been on notice of its non-compliance with this provision since at

least July 2017, when the Monitoring Team first reported that Defendants were not in

compliance; indeed, the Monitoring Team has formally rated Defendants non-compliant with this

provision of the Consent Judgment in eleven consecutive reports.[11] (<u>Id.</u> ¶ 215; <u>see also</u> Pl.

SPFOF ¶ 22.)

---

[10]    Emergency Response Teams generally consist of staff suited in full protective gear who
report to a location where staff have requested assistance via an alarm. (Pl. PFOF ¶ 465.)
For years, the Monitoring Team has found that uniform staff often over-rely on
Emergency Response Teams that needlessly exacerbate situations, are often over-staffed,
and routinely respond to incidents with a show of force that is disproportionate to
whatever triggered the incident. (<u>Id.</u>)

[11]    This figure does not include the status report issued by the Monitoring Team on
November 22, 2024 (docket entry no. 802), which was issued months after briefing for
the Motion concluded. The report, however, again rated the Department non-compliant
with Consent Judgment § IV, ¶ 1 due to its failure to implement the Use of Force
Directive. (<u>Id.</u> at 72.)

The consequences of this failure have been dire.  In July 2023, the Monitor stated that his "assessment of recent use of force incidents also indicates that the proportion of incidents involving the excessive and/or unnecessary use of force is currently the same, if not higher, than the proportion of incidents involving the excessive and/or unnecessary use of force that was observed at the time the Consent Judgment went into effect."[12]  (Pl. PFOF ¶ 219.)  Moreover, close-in-time reviews of force incidents, known as "Rapid Reviews," and investigations conducted by DOC's Investigation Division ("ID") have documented a persistent pattern of avoidable or unnecessary uses of force by DOC staff.  (See id. ¶¶ 222-39.)  But even those numbers should be "considered a floor, not a ceiling" because, according to the Monitoring Team, "ID does not consistently or reliably identify all misconduct."  (Id. ¶ 240.)  Uses of head strikes, chokeholds, body slams, and other high-impact force techniques that are strictly prohibited by the 2017 Use of Force Directive "continue to occur with alarming frequency" in "situations where it is not merited."  (Id. ¶¶ 243-52.)  Likewise, uses of force that are retaliatory, punitive and designed to inflict pain continue to occur, as does conduct that is complicit in causing or facilitating assaults among people in custody.  (Id. ¶¶ 253-59.)  Plaintiffs' Proposed Findings of Fact proffer, and the Court incorporates by reference in these Findings, disturbing details of specific instances of excessive uses of force and the unacceptable injuries they caused. (Id. ¶¶ 260-80; see also Pl. SPFOF ¶¶ 31-33.)

While Defendants do not assert that they have complied with the Consent Judgment's requirement to implement a use of force policy, they proffer, and the Court

---

[12]    While Defendants do not dispute the accuracy of this data, they again object to its relevance on the grounds (1) that DOC did not adopt a specified definition of use of force until September 2017 and (2) that the increase in use of force incidents is attributable to this policy change.  (Pl. PFOF ¶ 220; Def. PFOF ¶¶ 9-10.)  For the reasons discussed above (supra at 12 n.5), the Court adopts Plaintiffs' proposed factual finding.

acknowledges that, in August 2023, DOC commenced in-service training on its Use of Force policy and Defensive Tactics, with the Monitor's approval.  (Def. PFOF ¶ 26.)

<u>Failure to Conduct Adequate Use of Force Investigations and Hold Staff Accountable</u>

The Monitoring Team has described accountability for staff misconduct as "a critical tool to address the patterns and practices of excessive, unnecessary, and avoidable uses of force that continue unabated in this system" because "timely detection of misconduct and adequate and timely responses to those identified issues are essential for the Department to successfully reduce its use of unnecessary and excessive force and to encourage the safe and proportional use of force."  (Pl. PFOF ¶ 706.)  The function of detecting and identifying use of force misconduct is largely performed by ID.  (<u>Id.</u> ¶ 708.)  Section VII, ¶ 1 of the Consent Judgment requires that: "[T]he Department shall conduct thorough, timely, and objective investigations of all Use of Force Incidents to determine whether Staff engaged in the excessive or unnecessary Use of Force or otherwise failed to comply" with the Use of Force Directive. Section VII, ¶ 9(a) of the Consent Judgment requires that investigations be "timely"; more specifically, it requires Full ID Investigations[13] conducted after October 1, 2018, to be completed within 120 days from the referral date; before October 1, 2018, Full ID Investigations had to be completed within 180 days.  Section VII, ¶ 11 of the Consent Judgment requires Defendants to "hire a sufficient number of additional qualified ID investigators . . . so that they can complete Full ID Investigations in a manner consistent with this Agreement."  Section VIII, ¶ 1 of the Consent Judgment requires Defendants to "take all necessary steps to impose appropriate and

---

[13]    A "Full ID Investigation" is a detailed and thorough investigation that is conducted for a subset of particularly concerning use of force incidents, after the "Intake Investigation" (previously known as a Preliminary Review)—a relatively brief investigation that ID conducts in every use of force investigation—is complete.  (Pl. PFOF ¶¶ 709-11.)

meaningful discipline, up to and including termination, for any Staff Member who violates Department policies, procedures, rules, and directives relating to the Use of Force."

Defendants have never achieved substantial compliance with the requirement in § VII, ¶ 1 of the Consent Judgment to conduct "thorough, timely, and objective investigations of all use of force incidents." (Pl. PFOF ¶ 720.) This is true despite the Monitoring Team's consistent feedback, identifying problems with the quality of ID's investigations, since the early days of the Consent Judgment. (Id. ¶¶ 721-30.) While the Monitoring Team rated the Department as partially compliant with this provision in several reports from 2020 to 2022, by 2023, the Monitoring Team found that there had been a "discernible deterioration in the quality of investigations conducted by ID" and that DOC had "eras[ed] its prior progress." (Id. ¶¶ 731-40.) Beginning in 2023 and continuing through 2024, the Monitoring Team has consistently rated the Department non-compliant with § VII, ¶ 1 of the Consent Judgment.[14] (Id. ¶¶ 738-39; Pl. SPFOF ¶ 232.)

This period of regression has been characterized by a greater number of Intake Investigations being closed with no action and a significantly smaller number of cases being referred to Full ID, all without "a corresponding change in staff practices that would warrant or explain the decrease in the volume of use of force related misconduct identified by ID." (Pl. PFOF ¶¶ 739-43.) These problems followed a change in the leadership of ID: Former DOC Commissioner Louis Molina dismissed the prior head of both the Trials Division and Investigation Division without a bona fide reason in early 2022 and then appointed a Deputy

---

[14]    This trend continued in the Monitor's status report issued on November 22, 2024, which again rated the Department non-compliant with Consent Judgment § VII, ¶ 1, even though "ID Leadership has reported that it is taking steps to address the quality of investigations." (Docket entry no. 802 at 102-103.)

Commissioner who appears to have "influenced or prompted [staff], either overtly or implicitly, to adopt a more lenient approach when assessing cases and to change their practice in ways that compromised the quality of investigations." (Id. ¶¶ 752-67.)  That Deputy Commissioner resigned from DOC shortly before the Monitor publicly filed a report in April 2023 detailing the significant problems in the Investigation Division.  (Id. ¶ 765.)  Later, in September 2023, then-DOC Commissioner Molina demoted the Associate Commissioner of ID, whom the Monitor describes as "a well-respected and seasoned leader" who had been "instrumental in the subsequent attempt at course correction" after the departure of the Deputy Commissioner who appeared to have instigated many of the problems that emerged in 2022.  (Id. ¶¶ 770-73; Pl. SPFOF ¶ 231.)  For these reasons, to date, ID still cannot consistently identify misconduct when it occurs; consequently, some DOC staff are not held accountable for misconduct, and corrective action is not always applied. (Pl. PFOF ¶ 774; Pl. SPFOF ¶¶ 217-18.)  While Defendants assert in their response to the Motion that DOC has developed a plan for improving investigations into the use of force and adopting the Monitoring Team's suggestions while incorporating several additional initiatives, there is no evidence before the Court regarding whether, when, and how such initiatives will be implemented.  (See Def. PFOF ¶ 65.)  In the interim, problems related to the pace and quality of investigations continue.  (Pl. SPFOF ¶¶ 217-26.)

Likewise, the Monitor has found DOC non-compliant with Consent Judgment § VII, ¶ 9(a)—which requires all Full ID Investigations (1) before October 1, 2018, to have been completed within 180 days and (2) after October 1, 2018, to be completed within 120 days—in every rating period.[15]  (Pl. PFOF ¶¶ 781-93; docket entry no. 716 ("Reply") at 4.)  As of

---

[15]    On November 22, 2024, the Monitor reported that the Department is still non-compliant with Consent Judgment § VII, ¶ 9(a) because "[n]early all cases (84%) were closed/pending outside the 120-day timeline."  (Docket entry no. 802 at 101.)

November 8, 2023, only 8% of Full ID Investigations had been closed within 120 days of the referral date.  (Pl. PFOF ¶ 793.)  A key cause of this non-compliance is the fact that current staffing levels in ID are insufficient to manage the workload.  (Id. ¶ 796; Pl. SPFOF ¶¶ 227-30.)  Even after the Court entered an order on August 10, 2023, directing ID to maintain at least 85 investigators and 21 supervisors to conduct use of force investigations by the end of the year, DOC failed to correct low ID staffing levels, reporting that it was undergoing an "internal staffing analysis" and providing "vague or unresponsive" answers to the Monitor about the nature of that analysis.[16]  (Pl. PFOF ¶ 805.)

Finally, DOC has never achieved substantial compliance with the requirement of Consent Judgment § VIII ¶ 1, to "take all necessary steps to impose appropriate and meaningful discipline, up to and including termination, for any Staff Member who violates Department policies, procedures, rules, and directives relating to the Use of Force."  (Pl. PFOF ¶ 806.)  The Monitoring Team rated DOC as non-compliant in nine consecutive reports and consistently highlighted serious problems with DOC's formal disciplinary processes (primarily related to long delays) since the early days of the Consent Judgment.  (Id. ¶¶ 807-29.)  DOC's inability to appropriately identify misconduct has led to a sharp decrease in accountability for misconduct related to the use of force as well as an overreliance on the lowest level of sanctions rather than formal discipline.[17]  (Pl. SPFOF ¶¶ 233-40, 242, 244-45, 247-52.)  While the Monitoring Team

---

[16]    DOC insists in its Proposed Findings of Fact that ID is working to increase staffing levels of improve the timeliness of investigations, but there is no evidence before the Court regarding any progress since March 2024.  (Def. PFOF ¶ 64.)

[17]    Despite repeated recommendations from the Monitoring Team to improve its processing of Command Disciplines, the lowest level of sanctions, Defendants have not updated the Court on its plans to implement these recommendations.  (See Pl. SPFOF ¶¶ 241, 243.)

found that DOC had moved into partial compliance in 2022 after making progress in clearing its

backlog of cases by closing a large number of formal disciplinary cases (Pl. PFOF ¶¶ 829-30),

DOC's rating returned to non-compliant in the two most recent reports[18] from the Monitoring

Team due to DOC's "regression in identifying misconduct (and therefore failing to hold staff

accountable for certain violations), failure to hold supervisors accountable, inability to

adequately manage Command Disciplines, and tendency to impose discipline that may not be

proportional to the severity of the staff's misconduct."  (Pl. SPFOF ¶ 253.)

<u>Failure to Correct Failures in Security and Basic Correctional Practice</u>

Since the entry of the Consent Judgment, DOC staff have routinely failed to

follow basic security protocols and have instead relied on poor security practices.  (Pl. PFOF

¶ 281.)  The security failures and poor staff practice—both of which have continued unabated for

years—contribute to both the high levels of use of force and the overall levels of violence in the

jails and render DOC unable to implement the Use of Force Directive.  (<u>Id.</u> ¶ 282.)  To address

these failures, ¶ 1(i)(a) of the Second Remedial Order requires Defendants to create and

implement an Interim Security Plan to address, "in detail," security breaches including:

"unsecured doors, abandonment of a post, key control, post orders, escorted movement with

---

Therefore, as the record stands today, Defendants remain non-compliant with this
requirement of the Consent Judgment.

[18]    This number does not include the status report issued by the Monitoring Team on
November 22, 2024.  (Docket entry no. 802.)  The report, however, again rated the
Department non-compliant with Consent Judgment § VIII, ¶ 1 due to continued problems
related to "[t]he Department's inability to reliably identify misconduct (and therefore
failure to hold staff accountable for use of force related violations), failure to hold
supervisors accountable, ongoing challenges to adequately manage Command
Disciplines, and the fact that some discipline is out of proportion to the severity of the
staff's misconduct."  (<u>Id.</u> at 133-34.)

restraints[. . .], control of undue congregation of detainees around secure ingress/egress doors, proper management of vestibules, and properly securing officer keys and OC spray." Relatedly,[19] Section A, ¶ 1(d) of the Action Plan requires staff to "conduct routine tours, including, but not limited to, tours of the housing units every 30 minutes," to "immediately institute improved practices to ensure that routine touring is occurring, including the use of the 'tour' wand," and for the Office of the Commissioner to audit the electronic touring records. Section D, ¶¶ 2(a), (d), (e), and (f) of the Action Plan require DOC to "implement improved security practices and procedures," including "improved procedures on how searches are conducted," "enhanced efforts to identify and recover weapons and other contraband," and "improved escort techniques to eliminate the unnecessary use of painful escort holds."

Although the Monitoring Team has not given compliance ratings for provisions of the Second Remedial Order or Action Plan related to the implementation of improved security, touring, search, contraband, and escort practices, the Monitor's publicly reported findings make it clear that Defendants have not implemented the required improvements. (Pl. PFOF ¶ 309; Pl. SPFOF ¶ 39.) In July 2023, the Monitor found that (1) the Defendants had not made substantial and demonstrable progress in implementing the reforms, initiatives, plans, systems, and practices outlined in the Action Plan; and (2) there had not been a substantial reduction in the risk of harm currently facing incarcerated individuals and Department staff. (Pl. PFOF ¶ 310.) That finding

---

[19]    While DOC initially developed an interim security plan required by the Second Remedial Order § 1(i)(a), DOC failed to meaningfully implement solutions to any of the immediate security problems, including unsecured doors, post abandonment, poor key control, outdated post orders, escorted movement with restraints when required, incarcerated individuals congregating around secure ingress/egress doors, poorly managed vestibules, and poorly secured OC spray. (Pl. PFOF ¶ 303.) The Monitoring Team's recommendations in their March 16, 2022 report to remedy this implementation failure ultimately served as the basis for the analogous provision of Action Plan. (Id. ¶ 304.)

remained true as of November 8, 2023, when the Monitor concluded that the Department's passivity represents an "alarming failure to recognize staff's poor security practices for what they are: a tragic failure to protect people in custody from harm." (Id.) More recently, in April 2024, the Monitoring Team confirmed that prior reports "remain an accurate description of the jails' dysfunction today."[20] (Pl. SPFOF ¶¶ 34-35, 40.) As of the date of this Opinion and Order, the clear and convincing evidence, including the Monitor's findings, demonstrates that the Department has yet to meaningfully implement sustainable solutions to any of the immediate problems such as unsecured doors, post abandonment, poor key control, outdated post orders, escorted movement with restraints when required, incarcerated individuals congregating around secure ingress/egress doors, poorly managed vestibules, and poorly secured OC spray. (Pl. PFOF ¶ 311; Pl. SPFOF ¶¶ 35-38.)

       Defendants do point to a number of efforts to improve security practices in the Rikers Island jails. Hundreds of cell doors and locks have been repaired since January 2023; Defendants characterize repairs to cell doors and locks as the "highest priority." (Def. PFOF ¶ 28.) However, while operability may be an important part of the problem, merely ensuring that the doors are in working condition has not resolved the issue of ensuring that doors are actually locked and secured. (Pl. SPFOF ¶ 51.) Similarly, DOC recently began enhanced screening initiatives to assist in stemming the flow of contraband into the facilities and asserts that "[a]ctive work is underway" to improve security practice; however, Defendants have not provided the Court with details regarding the implementation of these initiatives. (See Def. PFOF ¶¶ 50, 52.) In 2021, at the suggestion of the Monitoring Team, DOC retained the services

---

[20]    The Monitoring Team's November 22, 2024 status report further indicates that security practices have not improved in the most recent Monitoring Period. (See docket entry no. 802 at 30, 177-79, 185-86, 212-13.)

of James Austin, PhD, as a consultant to recommend strategies to reduce the level of violence in the jails on Rikers Island.  (Id. ¶¶ 42-43.)  While Defendants insist that they have implemented all of the suggestions that are in the control of DOC—establishing a single Restricted Housing Program (RESH), reforming the jail classification system, and ceasing the practice of housing people by gang affiliation—, RESH has not operated in a way that mitigates the problems it was intended to address; instead, RESH itself continues to see high rates of force, slashings, stabbings, fires, and security failures that contribute to dangerous conditions.[21]  (Id. ¶¶ 44-47.)

In any event, the record is replete with evidence revealing that there has been little to no improvement in security practices in the jails, since the Second Remedial Order and the Action Plan emphasized the need for immediate amelioration of basic security problems as well as a failure to devise and implement a security plan with any consistency.[22]  (Pl. PFOF ¶¶ 312-439; Pl. SPFOF ¶¶ 41-44, 86-88, 91-109.)  Poor touring practice is a particularly serious problem, and the number of corrective measures taken by DOC has not been "commensurate with the number of violations" of touring policy that have been observed and the harm that flows from them.  (Pl. SPFOF ¶¶ 62-67.)  Poor search practices also persist.  (Id. ¶¶ 71-73.)  Tragically, basic security failures—such as poor touring practices, staff off-post, failing to enforce lock-ins,

---

[21]    While the Monitor noted in his November 22, 2024 report that RESH's "implementation has been challenging[,]" the report also highlighted that "[t]he Department has taken important steps to improve the operation of RESH since the Monitoring Team's last report and . . . there are indications that RESH's operation has improved."  (Docket entry no. 802 at 28-29.)

[22]    While the Monitor's November 22, 2024 report indicates that a newly-formed "Security Council has been charged with devising and implementing strategic security initiatives to advance the Nunez reforms" related to security measures, the Monitor continues to report that "the foundational elements of reliable security practices that are directly related to staff use of force and alarming levels of interpersonal violence among the detainee population remain elusive as does the accountability of staff at all levels for these failures."  (Docket entry no. 802 at 186, 189.)

and allowing individuals to smoke prohibited substances—precipitated or exacerbated the events leading up to five deaths in 2023, and likely more of the deaths that occurred in 2022.  (Pl. PFOF ¶¶ 314-15, 336, 346; Pl. SPFOF ¶ 56.)  Incidents described in Plaintiffs' Proposed Findings of Fact provide undisputed examples of security failures that led to excessive use of force and harm to incarcerated individuals.  (Pl. PFOF ¶¶ 440-59; Pl. SPFOF ¶¶ 55, 84-85.)

Failure to Adequately Supervise Staff and Facility Leadership

Since the entry of the Consent Judgment, the Monitoring Team has reported that supervisory failures at multiple levels of uniform leadership have been and remain a consistent and pervasive source of dysfunction within DOC.[23]  (Pl. PFOF ¶ 530.)  This conclusion is well supported by the undisputed factual information detailed in the Monitor's reports and the consistency and persistence of dysfunction with respect to security, and the Court adopts it.  Because these failures contribute to chaos and violence in the jails, harm to incarcerated individuals, and excessive use of force, § A, ¶ 2 of the First Remedial Order requires facility leaders to develop and implement operational changes and corrective actions in their jails based on an analysis of available data relating to use of force incidents.  Section A, ¶ 4 of the First Remedial Order also requires the Department to improve supervision of captains by increasing the ranks and presence of Assistant Deputy Wardens ("ADWs") in the facilities.  Additionally,

---

[23]    Defendants dispute the Monitor's description of the Department's supervisory failures and submit that "the conclusion [that supervisory failures are a source of dysfunction] falls outside of the scope of the Monitor's realm of expertise."  (Pl. PFOF ¶ 530.)  Defendants' position is inconsistent with their concession that the Monitor is "appropriately qualified as an expert on corrections systems and best practices," a subject area that inherently encompasses expertise regarding supervisors' responsibilities for managing a correctional system.  (Id.)  Furthermore, Defendants fail to proffer any evidence to rebut the Monitor's conclusion that the Department's failures to adequately supervise staff and facility leadership contribute to excessive use of force and violence in the jails.

§ C, ¶¶ 3(ii) and (iii) of the Action Plan require that the Department develop and implement a plan to prioritize assignment of captains and ADWs to housing areas rather than to non-custodial posts.  Defendants have not complied with these requirements.

The Monitoring Team has formally rated the Department non-compliant with § A, ¶ 2 of the First Remedial Order in the last six reports.[24]  (Pl. PFOF ¶ 549; Pl. SPFOF ¶ 143.) Facility leaders have been unable to abate the persistent issues contributing to the risk of harm, including the use of inadequate or unreasonable security protocols, the use of excessive or unnecessary force, and the frequency of use of force incidents.  (Pl. PFOF ¶ 557.)  These failures substantiate (1) the Monitor's undisputed findings, which the Court adopts, that facility leaders do not maintain a record of planned operational changes or other responses to audits providing data about the problems facing the jails as well as (2) the stark reality that the few operational changes or corrective action plans that have been developed by DOC are not effective in reducing use of force, serious injuries, or excessive or unnecessary use of force.[25]  (Id. ¶¶ 551-56; Pl. SPFOF ¶ 144-45.)  One major contributor to this problem is the Department's

---

[24]    This figure does not include the Monitoring Team's November 22, 2024 status report, which rated the Department as partially compliant with § A, ¶ 2 of the First Remedial Order.  (Docket entry no. 802 at 50.)  This change in rating reflects the Monitoring Team's conclusion that, while "the transparency and initiative of facility leaders to evaluate and better manage their jail's operations has demonstrably improved[,]" and "substantive engagement between facility leaders and Department leadership has increased[,] . . . those responsible for setting the strategic direction for each jail have not yet consistently developed and implemented specific, actionable plans to eliminate the ongoing operational failures driving the risk of harm in the agency."  (Id. at 49.)

[25]    Defendants also dispute this characterization by the Monitoring Team, again arguing that "the conclusion falls outside of the scope of the Monitor's realm of expertise" without (1) acknowledging that the Monitor's expertise in corrections systems and best practices encompasses operational plans related to use of force or (2) proffering evidence to rebut the Monitor's conclusions.  (Pl. PFOF ¶¶ 553-55.)   For the reasons stated above (supra at 26 n.23), the Court adopts the Monitor's conclusion as amply supported by the evidence in the record.

consistent failure to conduct close-in-time assessments of use of force incidents ("Rapid Reviews") that adequately identify whether corrective action is necessary.  (Pl. PFOF ¶¶ 559-67; Pl. SPFOF ¶¶ 146-50.)  Clear and convincing evidence demonstrates that—despite its access to several sources of data regarding use of force rates—DOC does not adequately engage in basic analysis of the factors driving the high rates of use of force and what steps could be taken to reduce those rates, nor has DOC identified targeted solutions to address the identified deficiencies in leadership and supervision.  (Pl. PFOF ¶¶ 573-83, 588-92; Pl. SPFOF ¶¶ 90, 152-53.)

Given this long-standing problem, in August 2023, the Court ordered DOC, upon a recommendation from the Monitoring Team, to develop a set of data and metrics for use of force and violence indicators so that Department leadership could assess causes and develop strategies to address them.  (Pl. PFOF ¶ 594.)  Defendants assert in their March 19, 2024 response to the Motion that DOC, in consultation with the Monitor, has developed a set of metrics for use of force, security, and violence that is intended to allow DOC to better identify trends and patterns as well as to develop anti-violence strategy.[26]  (Def. PFOF ¶ 7.)  Defendants, however, have proffered no evidence indicating whether and how the new set of metrics has been deployed.

---

[26]     Defendants also proffer that "DOC is committed to further reducing violence in its facilities" as demonstrated by its "commitment [to] enhanced training efforts[,]" such as its development of a new, Monitor-approved curriculum for training new captains.  (Def. PFOF ¶¶ 23-24.)  As Plaintiffs note, however, Defendants have not proffered evidence showing that such trainings have taken place—despite Defendants' assurances that they would provide updates to the Court in August 2024.  (Id.)  Defendants similarly assert that trainings for new ADWs are being revised for submission to the Monitoring Team, but there is no evidence before the Court that such plans have been finalized or implemented.  (Id. ¶ 25.)  It bears repetition that supervisory and leadership failures have been identified as core problems and areas of noncompliance for, literally, years.

The Monitoring Team has also formally rated the Department non-compliant with § A, ¶ 4 of the First Remedial Order in four of the last five reports.[27]  (Pl. PFOF ¶ 596; <u>see also</u> Pl. SPFOF ¶ 155.)  While the Department received a partial compliance rating for that provision of the First Remedial Order in April 2023, the Monitoring Team noted that the improved rating was based on an increase in the number of ADWs but did not reflect any improvement in the supervision provided.  (Pl. PFOF ¶ 597.)  The increase in and of itself was insufficient to effect "adequate supervision" because the newly promoted ADWs have been drawn from the same cadre of captains who have generally struggled to deploy essential skills.  (<u>Id.</u> ¶¶ 597, 616; Pl. SPFOF ¶¶ 166-67.)  Indeed, the Monitoring Team has long reported, and the Court finds, that DOC's promotion decisions contribute to the lack of adequate supervision because DOC has promoted people to positions of captain and ADW who do not have the skills to provide adequate supervision.  (Pl. PFOF ¶¶ 628-47; Pl. SPFOF ¶¶ 169-72.)  This problem is exacerbated by the fact that, in the jails on Rikers Island, most ADWs serve as Tour Commanders, who have other management responsibilities pursuant to the Consent Judgment, leaving captains in an unsupervised direct position of management for line officers; in most correctional systems, there is an additional level of supervision between line correction officers and captains, such as sergeants or lieutenants.  (Pl. PFOF ¶¶ 599-600, 615; Pl. SPFOF ¶ 138.)  As explained in the following paragraph, assignments of ADWs and captains to housing areas is another significant

---

[27]    This figure does not include the Monitoring Team's November 22, 2024 status report, which again rated the Department as non-compliant with § A, ¶ 4 of the First Remedial Order.  (Docket entry no. 802 at 61 ("Although the overall increase in the number of ADWs (since the First Remedial Order) and the promotion of Captains who received the improved Captains' training curricula are constructive, the Department's long-standing supervisory void—in both number and competence—is a leading contributor to the Department's inability to alter staff practice and to make meaningful changes to basic security practices and operations.").)

area of deficiency.  Such staff insufficiency and competency problems are among the persistent issues that led the Monitoring Team again to rate the Department non-compliant with § A, ¶ 4 of the First Remedial Order in their last two formal ratings.  (Pl. SPFOF ¶ 155.)  Defendants have not provided an update to the Court regarding their plans to remedy these persistent issues.  (See Pl. SPFOF ¶¶ 157, 172.)

       The Department has also failed to comply with § C, ¶¶ 3(ii) and (iii), of the Action Plan, which require that the Department develop and implement a plan to prioritize assignment of captains and ADWs to housing areas rather than to non-custodial posts.  (Pl. PFOF ¶ 601; Pl. SPFOF ¶ 155.)  While DOC had reportedly "begun" an "evaluation" of the issue as of April 2023, no plan has been completed.  (Pl. PFOF ¶ 601.)  As the numbers cited by Plaintiffs demonstrate, there is no question that additional captains and ADWs are needed to adequately supervise housing areas and comply with the requirements of the Action Plan.  (Id. ¶¶ 602-11.) While there has been some increase in the number of ADWs since the First Remedial Order went into effect, this increase has had little to no impact because, as the Monitoring Team has noted, both the number and percentage of captains assigned to work in the facilities has decreased since 2020.  (Pl. SPFOF ¶¶ 160-61.)  The inadequate staffing is compounded by (1) the frequency at which ADWs lack the capacity to supervise captains because they are serving as Tour Commanders and (2) the inadequate supervisory skills of those who are charged with leadership of the supervisory staff.  Since the Consent Judgment has gone into effect, DOC's ADWs have not adequately supervised captains. As the Monitoring Team has repeatedly emphasized, "[s]upervisors lack the willingness or skill to effectively support, guide, and coach staff practice, which is perhaps unsurprising given their tenure in a deeply dysfunctional system that does not adequately select, train or prepare them for the task at hand[,]" which leads to supervisors often

"contributing to or catalyzing poor outcomes."  (Pl. PFOF ¶¶ 611-12, 614; Pl. SPFOF ¶¶ 139,

141-42.)  Indeed, the record includes several examples of supervisors engaging in use of force or

other conduct that exacerbates violence and disorder.  (See Pl. PFOF ¶¶ 619-27.)  Defendants

have not provided the Court with details regarding their plans to address the problem of

inadequate supervision, despite their assurances that they would provide updates to the Court in

August 2024.  (Pl. SPFOF ¶ 140.)

> <u>Failure to Effectively Deploy Uniform Staff to Adequately Supervise Incarcerated
> Individuals</u>

Although DOC has one of the richest staffing ratios in the country—historically

employing more correction officers than the daily jail population since 2016[28]—the Department

has struggled to provide proper staff coverage due to consistent absenteeism.  (Pl. PFOF ¶¶ 648,

650, 652.)  The level of sheer dysfunction within the DOC's staffing framework, such as its

inability to accurately identify staff assignments, tour assignments, and their leave status, is

"unmatched by any jurisdiction with which the Monitoring Team has had experience."  (Id.

¶¶ 655-56.)  The Monitoring Team has noted that "staffing is <u>the</u> essential element to reform."

(Pl. SPFOF ¶ 174 (emphasis in original).)  Because DOC's mismanagement of staff is

inextricably linked to high rates of force and violence in the jails (Pl. PFOF ¶¶ 658-59), section

C, ¶¶ 3(v), (vi), and (vii) of the Action Plan require the Department to address staffing

dysfunction and "[r]educe the use of awarded posts[29] so that such posts are primarily utilized for

---

[28]    As of November 2024, the size of the Department's uniform staff work force fell slightly
below the average daily population of persons in custody.  (Docket entry no. 802 at 18.)

[29]    DOC permits staff to bid for a specific post assignment and, when the bid criteria are met,
the post is assigned, and the individual cannot thereafter be assigned to work in other
locations. (Pl. PFOF ¶ 674.)  Such a posting is referred to as an "awarded post."  (Id.)
This practice inhibits DOC's ability to assign staff where they are needed.  (Id.)

those positions in which a particular skill set is required," "[c]reate and implement alternatives to

the work schedule for uniform staff assigned to work in the facilities in order to minimize the use

of a 4 by 2 schedule[30] and optimize staff scheduling," and "[r]educe the assignment of uniform

staff to civilian posts, including Temporary Duty Assignment, in order to minimize the reliance

on uniform staff for tasks that can and should be reasonably completed by civilians."  These

provisions are included in the Action Plan to harmonize Department policies with industry

standards because (1) awarded posts allow many of the more seasoned correctional staff to

choose less challenging posts, putting less experienced personnel in the more volatile settings,

(2) the 4 by 2 schedule gives more time off, reducing the availability of people who are on the

payroll, and (3) assigning uniform staff to civilian posts creates staffing shortages where uniform

staff are needed.

      The Department has not complied with any of the staffing provisions of the

Action Plan.  First, regarding awarded posts, while DOC submitted multiple plans to reduce

awarded posts in 2022 and 2023, none of those plans has been fully implemented.  (Pl. PFOF

¶ 677.)  Not only did DOC fail to adequately rebut the Monitor's findings that the number of

awarded posts stayed essentially the same in its briefing (id. ¶ 678),[31] but the Department has

---

[30]    A 4 by 2 schedule is one under which staff members work four consecutive days and then
are off two consecutive days before returning to work.  (Pl. PFOF ¶ 687.)  Most
correctional systems utilize a 5 by 2 schedule under which staff work five days, followed
by two days off before returning to work, to increase the number of staff available to
work each day.  (Id. ¶ 688.)  Correctional staff have more days off duty under a 4 by 2
schedule than they would under a 5 by 2 schedule.  (See id. ¶ 689.)

[31]    While Defendants insist that the total number of awarded posts has decreased by 30
percent since May 2023 (docket entry no. 689-9 ("Edwards Decl.") ¶ 9), the Court cannot
credit any of the Department's claims in its briefing related to awarded posts because
Plaintiffs have proffered undisputed evidence that the Department had no internal
mechanism to monitor the use of awarded posts at that time (Pl. SPFOF ¶¶ 195-97).  In

indicated that it does not intend to meaningfully decrease that number: in her sworn declaration, current DOC Commissioner Maginley-Liddie insisted that awarded posts have benefit and stated that the requirement to reduce them "may warrant modification" (docket entry no. 689-1 ("Maginley-Liddie Decl.") ¶¶ 61-62; Pl. SPFOF ¶ 199).  Therefore, based on the record as it stands today, the Department has not fully complied with the Action Plan's clear requirement to reduce its reliance on awarded posts.  Second, the Department has not optimized staff scheduling by creating and implementing alternative work schedules, as required by Action Plan § C, ¶ 3(vi).  (Pl. PFOF ¶ 684; Pl. SPFOF ¶ 205.)  While DOC has assigned some of its staff to a 5 by 2 schedule, those staff also receive sixteen additional compensatory days and two additional vacation days per year, equalizing their time off to that enjoyed by staff on a 4 by 2 schedule; the shift reassignments thus have not resulted in additional posts being filled.  (Pl. PFOF ¶¶ 691-92.) Instead of working toward a new scheme as required by the Action Plan, the Department continues to defend its sustained reliance on 4 by 2 schedules.  (See Edwards Decl. ¶ 7 (noting that the "matter" of switching "away from a 4x2 schedule" is "more complicated" than the Monitoring Team has suggested).)[32]  Third, DOC has not adequately reduced the assignment of

---

its November 22, 2024, status report, however, the Monitoring Team indicated that awarded posts have decreased by 8% since April 18, 2024.  (Docket entry no. 802 at 241.)  This recent report also indicates that, while "useful and concrete steps" have been taken to reduce the Department's reliance on awarded posts, "significant work remains to finish the tasks currently underway as well as to address additional steps . . . to ensure that this process is managed with fidelity."  (Id. at 20.)

[32]  Notwithstanding Defendants' assertion that compliance with the Action Plan is within the power of the Commissioner and the Mayor, use of the 4 by 2 schedule is, apparently, required by collective bargaining agreements and Operations Orders.  As the Monitor has observed, there is no indication that there has been any effort to attempt to address the issue with the relevant unions or seek a waiver of relevant legal requirements.  (Pl. PFOF ¶¶ 695-96.)  Indeed, on November 22, 2024, the Monitoring Team reported that "[t]he

uniform staff to civilian posts.  (Pl. PFOF ¶ 697.)  Even though civilian posts do not typically require the special training or match the specialized duties of a correctional officer, over 700 uniform staff continue to work in these positions.  (Id.)  This is significantly higher than rates of civilian work by uniform officers in other systems.  (Id.)  While DOC characterizes the civilianization of positions as "slow but . . . underway" (Edwards Decl. ¶ 16), the Monitoring Team has reported only "very little progress" (Pl. SPFOF ¶¶ 210-12).[33]  Again, Defendants have not provided the Court with an update regarding progress on the civilianization of positions, despite assurances that they would do so in August 2024.  (See id. ¶ 213.)  In sum, clear and convincing evidence demonstrates that the Department is not in compliance with any of the staffing provisions of the Action Plan.

> Failure to Curb the Emergency Response Teams' Excesses

DOC relies on at least three types of "Emergency Response Teams": a Probe Team, a team of facility-based staff; the ESU, a separate command specifically dedicated and trained to respond to emergencies across DOC; and Special Search Teams ("SST"), which are part of a separate unit that conduct searches.  (Pl. PFOF ¶ 460.)  For years, the Monitoring Team repeatedly raised concerns regarding the impact of Emergency Response Teams on the Department's ability to comply with the Consent Judgment and have found that uniform staff often over-rely on Emergency Response Teams that needlessly exacerbate situations, are often over-staffed, and routinely respond to incidents with a show of force that is disproportionate to

---

Department has not made any progress toward this requirement since the previous Monitoring Period."  (Docket entry no. 802 at 20-21.)

[33]     According to the Monitoring Team's November 22, 2024 status report, it continues to be true that the Department has only made "little progress in reducing the number of uniform staff assigned to posts with duties that can be reasonably accomplished by a civilian" to date.  (Docket entry no. 802 at 21.)

what triggered the incident.  (Id. ¶ 465.)  To correct those longstanding practices, § A, ¶ 6 of the First Remedial Order directed DOC to "minimize [Emergency Response Teams'] unnecessary or avoidable uses of force" by developing, adopting, and implementing a protocol addressing (i) the selection of staff assigned to Facility Emergency Response Teams; (ii) the number of staff assigned to each Facility Emergency Response Team; (iii) the circumstances under which a Facility Emergency Response Team may be deployed and the Tour Commander's role in making the deployment decision; and (iv) de-escalation tactics designed to reduce violence during a Facility Emergency Response Team response.  Section D, ¶ 2(c) of the Action Plan reiterated this obligation, again requiring DOC to "implement improved security practices and procedures, including . . . reduced reliance and appropriate composition of Emergency Response Teams required by § A, ¶ 6 of the First Remedial Order and to address the Monitor's feedback that was provided in 2021."

DOC has failed to comply with § A, ¶ 6 of the First Remedial Order.  (Pl. PFOF ¶¶ 469-71; Pl. SPFOF ¶ 131.)  DOC's over-reliance on Emergency Response Teams is directly related to "significant management failures by Facility Leadership and their Staff who appear to have abdicated their basic duty to manage potential use of force situations," and this overreliance has led to excessive force and injuries due to the Emergency Response Team's hyper-confrontational tactics when responding to incidents.  (Pl. PFOF ¶¶ 472-83; Pl. SPFOF ¶ 132.)  This is demonstrated by several examples collected by the Monitoring Team—which cannot properly be characterized as "isolated cases"—that highlight the Emergency Response Teams' abuses and their connection to basic management failures.  (See Pl. PFOF ¶¶ 483-92.)  These problems are exacerbated by DOC's persistent failure to screen out staff with a history of violent or otherwise problematic conduct from assignment to Emergency Staff Teams.  (Id. ¶¶ 498-515.)

Furthermore, the Monitoring Team has consistently expressed concern regarding the adequacy of the leadership of ESU, particularly after one ADW was promoted to commander of ESU despite his record of deploying excessive force.  (Id. ¶¶ 516-20.)  DOC has not taken any effective steps to implement the Monitoring Team's recommendation to create specific screening criteria for individuals considered for assignment to Emergency Response Teams.  (Pl. SPFOF ¶¶ 136-37.)

Since August 2021, the Monitoring Team has repeatedly alerted DOC that it needs to revise several ESU policies related to use of force.  (Pl. PFOF ¶¶ 521-22.)  DOC had not provided the Monitoring Team with the requested revisions by July 2023, two years after the initial request.  (Id. ¶ 523.)  DOC did provide the Monitoring Team with draft policies governing screening for ESU assignment and use of force after the Court explicitly ordered DOC to cooperate with the Monitoring Team on July 18, 2023, but the Monitoring Team reported that the policies appeared to be hastily drafted, directly contradicted other agency policy, "did not address most of the Monitoring Team's feedback and inexplicably did not reflect the changes that the Department reported it was intending to make."  (Id. ¶¶ 524-25.)  While the Court again ordered DOC to revise its ESU screening policies on August 10, 2023, there is, as of this writing and despite the passage of over a year, no evidence in the record before the Court that those policies have been finalized or implemented.  (Id. ¶¶ 513-15, 525; Pl. SPFOF ¶ 133; docket entry no. 802 at 63.)  Defendants note that, in February 2024, the Monitor approved a refresher training for the ESU that was developed to address specified concerns with Emergency Response Teams.  (Def. PFOF ¶ 27.)  While Defendants assured the Court—in response to Plaintiffs' position that Defendants had only offered evidence of a plan or intention rather than a statement

of currently existing facts—that they would submit updates regarding implementation of the refresher training in August 2024, Defendants have not done so.[34]  (See id.)

<u>Failure to Ensure the Safety of Young People in Custody</u>

The Monitor has observed that, "[w]hen poorly managed[,] and when staff do not have the necessary skills, facilities housing younger people often see higher use of force rates, which historically has been true in this Department."  (Pl. PFOF ¶ 859.)  For example, for a six-month period in 2021, young adults (defined as individuals between the ages of 18 to 21) comprised approximately 8% of the average daily population in the Rikers Island jails but were involved in 22% of the uses of force.  (Id. ¶ 860.)  Evidence of high levels of danger in RNDC, where the majority of 18-year-olds in custody are housed, demonstrates that disproportionate use of force rates against young adults has persisted.  (Id. ¶¶ 866-67.)  Section XV, ¶ 1 of the Consent Judgment requires that 18-year-olds in custody be supervised at all times in a manner that protects them from an unreasonable risk of harm.  More specifically, § XV, ¶ 12 of the Consent Judgment and § D, ¶¶ 3 and 3(i) of the First Remedial Order require the Department to implement the Direct Supervision Model[35] for incarcerated persons under the age of 19.

---

[34]    However, in its November 22, 2024 status report, the Monitoring Team noted that the Department "began to deploy the [refresher] training in April 2024" and emphasized that "[w]hile the development of this training marks a positive step in the Department's efforts to reform and improve the practices of its Emergency Response Teams, it is important that the Department ensure the training is consistently delivered with integrity and effectiveness."  (Docket entry no. 802 at 68.)

[35]    Direct Supervision is a style of housing area supervision with a long-standing history of proven effectiveness that is characterized by (1) achieving consistent assignment of staff to housing units; (2) providing an orientation to each youth that describes the officer's role in ensuring safety, providing rewards and imposing sanctions; (3) ensuring that staff have the authority, autonomy and options to reward compliant and pro-social behavior; (4) expecting staff to deliberately select a lower level of engagement when tensions arise; (5) occupying youth with structured activities throughout the day; and (6) engaging in proactive and interactive supervision.  (Pl. PFOF ¶ 878.)

Consistent with that requirement, § XV, ¶ 17 of the Consent Judgment and § D, ¶ 1 of the First Remedial Order require the Department to assign consistent staffing (including correction officers, captains, and ADWs) to RNDC—where a significant portion of young adults in custody are housed—to adopt a best practice that is a hallmark of Direct Supervision.

The Monitor has rated the Department non-compliant with § XV, ¶ 1 of the Consent Judgment ten consecutive times over four years.[36] (Pl. PFOF ¶ 865; Pl. SPFOF ¶ 262.) Recently, the Monitoring Team has found that, although "[c]ertain RNDC indicators reflect significant improvement over historical high points," the RNDC "continue[s] to rank among the highest in the Department on most indicators" of danger to those who live there due to poor security practices. (Pl. PFOF ¶¶ 867-69, 872-77; Pl. SPFOF ¶¶ 255-61.) Indeed, the "quantitative metrics show that violence and the use of force are exponentially higher than they were in 2016." (Pl. PFOF ¶ 870.) The Department points to "various programs and initiatives designed to care for emergent adults" and notes that there has been a decrease in slashings and stabbings following the introduction of a violence reduction plan in the RNDC in 2023. (Def. PFOF ¶¶ 29-36.) Defendants, however, have not offered evidence to rebut the Monitoring Team's conclusion that DOC's count of slashings and stabbings is likely an undercount. (Id.

---

[36]    The Monitoring Team, however, rated the Department as partially compliant with § XV, ¶ 1 of the Consent Judgment in its November 22, 2024 status report because "the Department has demonstrated a concerted effort to improve facility security at RNDC in an effort to better protect people in custody from an unreasonable risk of harm." (Docket entry no. 802 at 169.) This effort is best exemplified by the RNDC Programs Action Plan, which the Department developed in January 2024 and took important steps to begin implementing in the most recent Monitoring Period. (Id. at 167-68 ("Following several months of close collaboration with the agency and facility leaders responsible for implementing the plan, the Monitoring Team's impression is that the plan holds promise for ameliorating the dangerous conditions at RNDC.").)

¶ 31.)  For that reason, the risk of violence among and against young adults in custody remains a significant concern.

Relatedly, the Monitoring Team has consistently rated the Department non-compliant with the orders requiring the Department to adopt and implement the Direct Supervision Model in all facilities housing 18-year-olds.  (Pl. PFOF ¶¶ 884-86; Pl. SPFOF ¶ 276.)  While the Monitoring Team gave the Department a partial compliance rating three times in 2020 and 2021 because the Department had a "framework" for implementation and had "taken initial steps to emphasize the core concepts during roll-call" in 2020, the First Remedial Order reiterated the Direct Supervision Model requirement because substantial compliance had not yet been achieved.  (Pl. PFOF ¶¶ 882-83, 888.)  Indeed, the Department has been rated non-compliant with § XV, ¶ 12 of the Consent Judgment in six of the last eight Monitoring Team reports and has been rated non-compliant with § D, ¶¶ 3 and 3(i) of the First Remedial Order in every formal rating.[37]  (Id. ¶¶ 884-87; Pl. SPFOF ¶ 276.)  These non-compliance ratings demonstrate that the Department has failed to implement a pilot Direct Supervision program, let alone roll out the program into other facilities.  (Pl. PFOF ¶¶ 889-96.)

The Department has also failed to implement the key feature of the Direct Supervision Model as required by both the Consent Judgment and the First Remedial Order: consistent staffing.  (Id. ¶¶ 901-904; Pl. SPFOF ¶¶ 278, 280.)  The Monitoring Team has rated the Department non-compliant with § XV, ¶ 17 of the Consent Judgment in six consecutive reports, and has rated the Department non-compliant with the analogous provision of the First

---

[37]    This figure does not include the ratings in the Monitoring Team's November 22, 2024 status report, which again rated the Department non-compliant with § XV, ¶ 12 of the Consent Judgment and § D, ¶¶ 3 and 3(i) of the First Remedial Order.  (Docket entry no. 802 at 171.)

Remedial Order, § D, ¶ 1, every time that it has provided a formal rating on that provision.[38]  (Pl. PFOF ¶¶ 901-904; Pl. SPFOF ¶¶ 278, 280.)  Consistent assignment of staff has not been achieved in practice, even where posts are assigned consistently to particular staff members "on paper," because posts are actually worked by the assigned staff member less than half the time. (Pl. PFOF ¶¶ 904-11, 913; Pl. SPFOF ¶¶ 279, 281-82.)  The fundamental issues stymying reform that the Action Plan seeks to address—including adequate tracking, managing, and deployment of staff—continue to prevent the Department from complying with the provisions of the Court orders related to consistent staffing in facilities that house young adults.

<u>Cooperation with the Monitoring Team</u>

The Monitoring Team's dedicated reporting, formal and informal, has put Defendants, Plaintiffs, the Government, the Court, and the public on notice of these myriad failures to comply with Court orders over the years since the original Consent Judgment went into effect.  Not only has the Monitoring Team meticulously compiled its findings in formal status reports filed on the docket, but its members have also tirelessly made themselves available to provide recommendations and collaborate with Defendants to improve the unacceptable conditions in the Rikers Island jails.  There is no doubt that transparency, proactive coordination, and cooperation between Defendants and the Monitoring Team are necessary to advance the reforms and facilitate compliance with the Consent Judgment.  (Pl. PFOF ¶ 934.)  For that reason, § IV, ¶ 1 of the Consent Judgment required a Monitor-approved Use of Force Directive, and several provisions of the Action Plan required consultation with and approval from the Monitor to develop and implement security plans and trainings.  (Pl. PFOF ¶¶ 942-44, 960.)  Yet

---

[38]     This trend has continued in the Monitoring Team's November 22, 2024 status report, which again rated the Department non-compliant with § XV, ¶ 17 of the Consent Judgment and § D, ¶ 1 of the First Remedial Order.  (Docket entry no. 802 at 173.)

DOC did not consult with the Monitor before promulgating several important policies and issuing new trainings, all of which were subject to consultation and approval requirements under the Action Plan, in 2023.  (Id. ¶¶ 946-59, 961-70.)  There are also many examples of Defendants' withholding essential information from or providing inaccurate information to the Monitoring Team in 2022 and 2023, despite the clear reporting requirement in § XX, ¶ 8 of the Consent Judgment.  (Pl. PFOF ¶¶ 971-91, 1000-28.)

One such example was the Department's decision to open an Arson Reduction Housing Unit ("ARHU") in November 2023.  (Id. ¶ 1176.)  The day after the ARHU opened, an anonymous source told the Monitoring Team that DOC had opened the new housing unit; DOC had not consulted or notified the Monitoring Team prior to opening AHRU despite a commitment to do so prior to opening such a unit, and despite its obligations under the Consent Judgment to do so.  (Id. ¶ 1178.)  The operations guide for the unit was "poorly written, vague, and ambiguous[,]" and DOC appears to have opened the housing unit "on short notice, with little planning, little to no guidance to staff, unclear admission criteria, and poorly defined rules and restrictions," which was "unwise, at best, and [was] the antithesis of restoring order." (Id. ¶¶ 1177, 1179.)  In response to an emergency letter filed by the Monitoring Team, the Court issued an Order to Show Cause, directing DOC to provide additional information regarding the opening of the ARHU.  (Pl. SPFOF ¶ 1.)    DOC ultimately reported that it had disbanded the unit less than 24 hours after it opened.  (Pl. PFOF ¶ 1181.)  The Court found DOC in contempt of § D, ¶ 3 and § E, ¶ 4 of the Action Plan, and § I, ¶ 5 of the June 13, 2023 Order (docket entry no. 550), and ordered it to take certain actions in order to purge the contempt.  (Pl. SPFOF ¶ 1.) After the Monitor submitted a status report regarding DOC's actions in response to the contempt order, the Court found that DOC had purged the contempt.  (Id.)

That said, the Monitoring Team has enjoyed a good relationship with current

DOC Commissioner Lynelle Maginley-Liddie (the "Commissioner") since she was appointed on

December 8, 2023.  (Def. PFOF ¶¶ 1-4.)  The Monitoring Team has emphasized that they

"observed an immediate change in the Department's approach and dynamic in early December

2023 with the appointment of Commissioner Maginley-Liddie[,]" that "[t]he Department's

leadership team is now actively engaging with" the Monitoring Team, and that "[t]hese

interactions reflect greater transparency and interest in working collaboratively."  (Id. ¶ 2.)  The

Court notes, however, that prior DOC Commissioners earned similar praise from the Monitoring

Team early in their tenures but ultimately did not succeed in effecting improvements in

compliance with the court orders, and that some of them demonstrated much less than robust

efforts to comply with the orders.  (Pl. SPFOF ¶¶ 318-20.)  In light of this pattern, it is too soon

to assess whether the jails will make sustainable progress in achieving the transformative change

necessary to bring them into compliance with court orders under Commissioner Maginley-

Liddie's leadership.

Pace of Reform

There is no question that the pace of Defendants' implementation of reform

pursuant to the Consent Judgment and subsequent remedial orders has been unacceptable.  As

early as 2018, the Monitor had already noted the slow pace of DOC's reform efforts and stated

that "the two-and-a-half year record of reform that has been established portends a pace that will

become intolerable at some point in the future."  (Pl. PFOF ¶ 1050.)  The next year, in April

2019, the Monitor indicated that DOC's lack of significant progress to that point represented a

watershed moment, and that the pace of reform was "glacial" and "difficult to tolerate."  (Id.

¶ 1051.)  Not only has the pace of reform not accelerated in the years since, but progress has

even slowed or regressed in many areas.  (Id. ¶ 1052.)  In July 2023, the Monitoring Team opined that that there is insufficient evidence to suggest that the pace of reform will accelerate within the confines of current structures.  (Id. ¶¶ 1053, 1168.)

   The glacial pace of reform can be explained by an unfortunate cycle demonstrated by DOC leadership, which has changed materially a number of times over the life of the Court's orders, wherein initiatives are created, changed in some material way or abandoned, and then restarted; the Monitoring Team has noted that "perpetually restarting the clock is antithetical to advancing reform and accelerating progress."  (Id. ¶ 1056; see also Pl. SPFOF ¶ 347.)  These patterns are concretely demonstrated by DOC's continued launching and subsequent abandonment of numerous plans, pilots, and facilities over the last nine years.  (Pl. PFOF ¶¶ 1057-77, 1079-80; Pl. SPFOF ¶ 337.)  Moreover, DOC has proposed few concrete plans to address its noncompliance, and "[m]ost of the initiatives the City and Department have identified so far merely focus on revising policy, issuing memorandums and reading teletypes at roll call (which, notably, not all staff attend) or reiterating existing practices or trainings."  (Pl. PFOF ¶ 1171; Pl. SPFOF ¶ 50.)

   While DOC contends that its "efforts have led to the completion of fifty-two (52) of the tasks required by the Nunez Action Plan and the subsequent Orders in 2023[,]" not one of the provisions DOC cites is at issue in the Motion; Plaintiffs also dispute the accuracy of DOC's proffer regarding even this alleged compliance, which has not been confirmed by the Monitoring Team.  (Def. PFOF ¶ 5.)

CONCLUSIONS OF LAW

Plaintiffs move to hold the Defendants in civil contempt of eighteen provisions of four orders entered in this case.  These Contempt Provisions are listed in summary fashion in Appendix A hereto.

Contempt

A civil contempt order is "warranted only if the 'moving party establishes by clear and convincing evidence that the alleged contemnor violated the district court's edict.'" Mister Softee, Inc. v. Tsirkos, No. 14-CV-1975-LTS-RLE, 2014 WL 2971106, at *3 (S.D.N.Y. July 2, 2014) (quoting King v. Allied Vision, Ltd., 65 F.3d 1051, 1058 (2d Cir. 1995)).  The movant seeking a contempt of court order bears the burden of demonstrating that "(1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner."  Id. (quoting United States v. N.Y.C. Dist. Council of N.Y.C., 229 F. App'x 14, 18 (2d Cir. 2007)).  The movant need not establish that the violation of the Court's order was willful.  Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Techs., Inc., 369 F.3d 645, 655 (2d Cir. 2004).  Should the movant establish the necessary elements, the Court may invoke its "inherent power to hold a party in contempt," which is "a necessary function for purposes of managing and maintaining order in the efficient and expeditious administration of justice."  Flaherty v. Filardi, No. 03-CV-2167-LTS-HBP, 2009 WL 3762305, at *4 (S.D.N.Y. Nov. 10, 2009); see also id. ("Civil contempt is appropriate to ensure parties' future compliance with court orders and to compensate a wronged party."); Paramedics, 369 F.3d at 655 (explaining "a party may be held in civil contempt" if the above three factor-test is met).

First, there is no dispute that the Contempt Provisions are clear and unambiguous. "An order is 'clear and unambiguous' where it is 'specific and definite enough to apprise those within its scope of the conduct that is being proscribed' or required." Telenor Mobile Commc'ns AS v. Storm LLC, 587 F. Supp. 2d 594, 615 (S.D.N.Y. 2008) (quoting N.Y.S. Nat'l Org. for Women v. Terry, 886 F.2d 1339, 1352 (2d Cir. 1989)). Not only were the orders at issue entered on consent, after Defendants participated in negotiating and drafting their precise terms, but Defendants have never suggested to the Court that additional clarity was needed. Because the language of the orders is clear and unambiguous, the first prong of the contempt standard is satisfied.

Second, the proof of Defendants' noncompliance with the Contempt Provisions is clear and convincing. As summarized above, Plaintiffs point to copious, undisputed evidence in the record to support their argument that Defendants are not in compliance with eighteen provisions of four court orders related to failures (1) to implement the use of force directive; (2) to conduct adequate use of force investigations and hold staff accountable; (3) to correct failures in security and basic correctional practice; (4) to adequately supervise staff and facility leadership; (5) to effectively deploy uniform staff to adequately supervise incarcerated individuals; (6) to curb the emergency response teams' excesses; and (7) to ensure the safety of young people in custody. The plentiful evidence of non-compliance with the eighteen Contempt Provisions, as summarized above and detailed in the parties' proposed findings of fact, is clear and convincing—and more than enough to satisfy the second prong of the contempt standard.

Third, Defendants have not diligently attempted to comply with the Contempt Provisions in a reasonable manner during the many years since the orders were issued. "Reasonable diligence, at the very least, requires a party to develop reasonably effective methods

of compliance." Zino Davidoff SA v. CVS Corp., No. 06-CV-15332-RJS, 2008 WL 1775410, at

*8 (S.D.N.Y. Apr. 17, 2008).  While it is not required that a party "exhaust all means available"

to comply, Chao v. Gotham Registry, Inc., 514 F.3d 280, 293 (2d Cir. 2008), "[m]ore is required

than a grudging, half-hearted or foot dragging attempt at compliance," Chere Amie, Inc. v.

Windstar Apparel, Corp., 175 F. Supp. 2d 562, 565 (S.D.N.Y. 2001) (quoting 5 J. Thomas

McCarthy, McCarthy on Trademarks and Unfair Competition § 30:22, at 43 (4th ed. 1999)).

The relevant inquiry is whether a defendant has been "reasonably diligent and energetic in

attempting to accomplish what was ordered."  Aspira of N.Y. v. Bd. of Educ. of the City of N.Y.,

423 F. Supp. 647, 654 (S.D.N.Y. 1976) (finding contempt where government agency "neglected

to marshal [its] own resources, assert [its] high authority, and demand the results needed from

subordinate persons and agencies in order to effectuate the course of action required by the

consent decree").  "Reasonably energetic compliance, at a minimum, requires a party 'to

energetically police' the effectiveness of its compliance measures and, when advised that such

measures have fallen short, to modify them accordingly."  Zino Davidoff, 2008 WL 1775410, at

*8 (quoting Manhattan Indus., Inc. v. Sweater Bee by Banff, Ltd., 885 F.2d 1, 5 (2d Cir.1989)).

   In the nine years since the Consent Judgment went into effect, Defendants have

not only failed to comply with the Contempt Provisions, but they have also failed to police the

efficacy of the efforts they have actually made to comply and have failed to modify their

approaches when advised that such efforts have fallen short.  Plaintiffs' assessment—that "[t]he

sheer length of time that has gone by without meaningful progress toward substantial compliance

is shocking"—is correct.  (Docket entry no. 603 ("Pl. Mem.") at 51.)  In the past nine years,

Defendants "have allowed deadlines to pass without advance announcements or volunteered

explanations" and "have borne with seeming equanimity long periods of nonperformance."

<u>Aspira</u>, 423 F. Supp. at 654.  Defendants' seeming lack of concern about effective and efficient compliance is exemplified by DOC's failure to consult with the Monitor before promulgating several important policies and issuing new trainings, which were subject to consultation and approval requirements under the Action Plan, for a sustained period of time in 2023.  (Pl. PFOF ¶¶ 946-70.)  There are also many examples of Defendants' withholding of essential information from or providing inaccurate information to the Monitoring Team in 2022 and 2023, despite the clear reporting requirement in § XX, ¶ 8 of the Consent Judgment, such as the Department's decision to open the ARHU in November 2023.  (<u>Id.</u> ¶¶ 971, 973-91, 1000-28, 1176.)  Likewise, there is no question that the pace of reform has been glacial due to an unfortunate cycle, often but not always coincident with leadership changes, wherein initiatives are created, materially changed or abandoned, and then restarted.  (<u>Id.</u> ¶ 1056; Pl. SPFOF ¶ 347.)  DOC's pattern of launching and subsequently abandoning numerous plans, pilots, and facilities over the last nine years, with few concrete plans to address its noncompliance, indicates a troubling lack of urgency about the unconstitutional level of security and safety problems in the jails.  (Pl. PFOF ¶¶ 1057-77, 1079-80; Pl. SPFOF ¶¶ 50, 337.)

Defendants have also been on notice of their noncompliance at every step of the way for nearly a decade.  Not only has the Monitoring Team consistently rated Defendants non-compliant with the Contempt Provisions over the years, but the Monitoring Team has also made itself available, without fail, to provide recommendations to and collaborate with Defendants to improve the unacceptable conditions in the Rikers Island jails and move toward compliance with court orders.  The Court has likewise highlighted Defendants' consistent noncompliance and found it necessary to issue multiple orders with substantially similar requirements—all designed to remedy the same problems related to basic security practices, use of force investigations, staff

supervision, and the excesses of the Emergency Response Teams—because DOC did not comply

with earlier orders.  (Pl. Mem. at 52.)  DOC has repeatedly failed to incorporate the Monitoring

Team's thoughtful recommendations, which are backed by years of expertise and research, and

"has taken few concrete actions to adopt these recommendations (or devise reasonable

alternatives)" to come into compliance with the Contempt Provisions.  (Pl. PFOF ¶¶ 11, 1171.)

This pattern has been well documented by the Monitoring Team (id. ¶¶ 380, 511-15, 521-25,

638-47, 846-54, 857, 1112-25), and Defendants' failures are plainly inconsistent with reasonable

diligence.

Nor are Defendants' arguments in opposition to the Motion sufficient to

overcome the significance of their failure to make reasonable attempts to comply, as shown by

the clear and convincing evidence summarized above.

Defendants point to four developments—(1) changing definitions of "use of

force" since 2016, (2) an increase in surveillance cameras in the Rikers Island facilities, (3) a

shift in the population since bail reform legislation went into effect in January 2020, and (4) an

increase in the amount of time individuals now spend in the jails—for support of their strenuous

argument that any comparison to use of force statistics from 2016, when the Consent Judgment

went into effect, is "misguided."  (Def. Mem. at 11-13.)  Critically, none of these changes since

2016 explain DOC's failure to implement the use of force directive, as required by § IV, ¶ 1 of

the Consent Judgment, or to take consistent, deliberate action in collaboration with the

Monitoring Team to make the fundamental changes required to comply with the key safety,

security and accountability requirements that are the subjects of the contempt motion practice

that is before the Court.  As the Monitoring Team has explained, the external factors Defendants

cite "do not change the City's obligation to provide safe and humane treatment to those within its

jails" and "do not excuse failure to comply with the <u>Nunez</u> Court Orders."  (Docket entry no. 706 at 7.)

Defendants also highlight plans being developed or implemented that Defendants represent will eventually bring them into compliance with the Contempt Provisions.  These include plans to remedy DOC's failure to implement the use of force directive (Def. Mem. at 14-15); plans to implement a "process for compiling and tracking a significant number of UOF reports" and "steps to establish quality assurance teams to review completed investigations" to remedy problems with investigations and discipline (<u>id.</u> at 16); "concerted efforts to recruit more individuals to work within ID" (<u>id.</u> at 18), the development of "a new command discipline policy which centralizes command discipline in a new unit" (<u>id.</u>); a "plan to reduce violence at RNDC" (<u>id.</u> at 19); initiatives to improve search procedures and "stem the flow of contraband into the facilities" (<u>id.</u>); steps to improve touring practices (<u>id.</u> at 20), "steps . . . taken to maximize deployment of staff" (<u>id.</u> at 21); "efforts to better train captains" through the "development of DOC's curriculum" (<u>id.</u> at 22); work to revise its screening process for assignments of personnel to Emergency Response Teams (<u>id.</u> at 23); and plans to implement the Direct Supervision Model at RNDC (<u>id.</u> 24).  Descriptions of intentions and plans are not sufficient to show reasonable, diligent attempts at compliance at this stage of the case.  Not only have Defendants demonstrated a long, consistent pattern of launching and subsequently abandoning numerous plans, pilots, and facilities over the last nine years (Pl. PFOF ¶¶ 1057-77, 1079-80; Pl. SPFOF ¶ 337), but Defendants have failed to update the Court regarding their progress on the implementation of plans described in their submission filed in March 2024, despite their representation that they would file a supplemental factual submission in August 2024.  There is no evidence before the Court that the plans that Defendants described have yet meaningfully improved the conditions in

the jails on Rikers Island or otherwise moved the Department towards compliance with the Contempt Provisions. Instead, the concrete evidence before the Court demonstrates that, for nine years, Defendants made only half-hearted, inconsistent efforts to comply with Court orders designed to remedy consistently unconstitutional levels of violence and disorder in the jails.

Similarly, again seeking to divert attention from the clear evidence of continuing danger and their noncompliance with the Contempt Provisions, Defendants argue that Plaintiffs' arguments "omit . . . clear metric[s] of compliance" that cut against a finding of contempt. (Def. Mem. at 17.) For instance, as noted above, Defendants argue that "the Department's diligent efforts have led to the completion of 52 of the tasks required by the Action Plan and the subsequent Orders in 2023." (Id. at 2.) Plaintiffs did not move for findings of contempt with respect to those tasks, which are not material to the issues now before the Court. Compliance with the other cited Court orders is simply not a defense to noncompliance with the Contempt Provisions at issue here.

Defendants also emphasize the Monitoring Team's praise for DOC Commissioner Maginley-Liddie, who was appointed to the role in December 2023 and whom the Monitoring Team has described as "dedicated to working collaboratively with the Monitor to move the agency forward" and "committed to reform." (Def. Mem. at 1.) It is true that the Monitoring Team has enjoyed a good relationship with Commissioner Maginley-Liddie in the year since her appointment, has emphasized that they "observed an immediate change in the Department's approach and dynamic in early December 2023 with the appointment of Commissioner Maginley-Liddie[,]" observed that "[t]he Department's leadership team is now actively engaging with" the Monitoring Team, and represented that "[t]hese interactions reflect greater transparency and interest in working collaboratively." (Def. PFOF ¶¶ 1-4.) This

Commissioner's newly-introduced leadership and the most recent developments described in the November 2024 report, while providing some basis for hope of future sustained change, are not sufficient to establish Defendants' diligent or reasonable attempts to comply with the Court's orders, some of which have been in effect for nine years, nor their willingness or ability to come into, and sustain, compliance.  After all, even a strong Commissioner with sound intentions can only make limited progress where, as here, the "dedicated team" of senior leadership required for reform has been lacking for years, and any Commissioner's tenure is subject to the will of the Mayor, who appoints the Commissioner.  (Pl. SPFOF ¶ 325.)  While the Court has no reason to doubt Commissioner Maginley-Liddie's abilities, recent accomplishments and good intentions, in assessing Defendants' years of desultory efforts to comply with the Contempt Provisions and the unconstitutional conditions that have persisted despite the steps Defendants have taken, the Court simply cannot ignore the history of noncompliance and ineffective measures and restart the clock each time a commissioner is replaced.  Defendants are responsible to the Court and the people in their care and are also responsible for the just consequences of their actions and inaction.

Against this backdrop, Defendants' assertion that the instant situation is akin to the circumstances under which the Court declined to find DOC in contempt of the Intake Tracking Clause—on the ground that "the Department has now taken substantial steps to remedy the deficiencies of its prior approach"—is not persuasive.  (Def. Mem. at 25.)  The clearest difference is that DOC had implemented all of the Monitoring Team's relevant recommendations to comply by the time the Court had issued its decision regarding the Intake Tracking Clause. (Intake Contempt Order at 27.)  The Court also emphasized at that time "that a finding of civil contempt related to the Defendants' efforts to comply with one specific, court-ordered

provision—among hundreds applicable to Defendants in this litigation—would be contrary to the spirit of the Action Plan and denigrate the importance of the Department's renewed and productive focus on the foundational issues at the core of the Department's historic pattern of excessive use of force against persons in custody." (<u>Id.</u> at 28.)  The questions of contempt that are before the Court today are materially different.  In the instant Motion, Plaintiffs have moved for contempt on core provisions of this Court's orders that have gone unheeded for years and have highlighted failures inextricably linked to the Department's historic pattern of excessive use of force against persons in custody.  Critically, here, the Defendants have not taken steps to implement the Monitoring Team's recommendations to come into compliance with the orders, which were crafted to provide urgently needed remediation of unconstitutionally dangerous conditions.

   In sum, Defendants have not demonstrated diligent attempts to comply with the Contempt Provisions in a reasonable manner.  Nine years have passed since the parties first agreed that the perilous conditions in the Rikers Island jails were unconstitutional; that the level of unconstitutional danger has not improved for the people who live and work in the jails is both alarming and unacceptable.  For that reason, the third prong of the contempt standard is met. Because the history of this case is long, and neither clear reporting from the Monitoring Team nor binding Court orders have been enough to activate the transformational change required to bring Defendants into compliance with the Consent Judgment and subsequent remedial orders, the Court holds Defendants in contempt of each of the Contempt Provisions.

<u>Remedy</u>

   The "primary purpose" of a finding of civil contempt, and the imposition of related remedies, is "to coerce the contemnor into future compliance and to remedy past non-

compliance, rather than to punish [the contemnor]."  In re Dickinson, 763 F.2d 84, 87 (2d Cir. 1985); see also In re Chief Exec. Officers Clubs, Inc., 359 B.R. 527, 534 (S.D.N.Y. 2007) ("The purpose of civil contempt is to compel a reluctant party to do what a court requires of him.").  "It is basic law that a civil contempt sanction must only be compensatory or coercive, and may not be punitive."  Gucci Am., Inc. v. Weixing Li, 768 F.3d 122, 144 (2d Cir. 2014).

Having found Defendants in contempt of eighteen different provisions of the Court orders in this case—provisions that go directly to the safety of those who live and work in the Rikers Island jails—the Court turns its focus to identifying a form of remedy that will achieve rapid change in the safety profile of Rikers Island and compliance with Court orders. While the purpose of that remedy will not, and cannot, be punitive, the Supreme Court and the Second Circuit have long recognized that courts possess broad equitable powers to fashion relief that compels compliance with their orders.  See Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 15 (1971); Berger v. Heckler, 771 F.2d 1556, 1568 (2d Cir. 1985).  Because a consent decree "vests the court with equitable discretion to enforce the obligations imposed on the parties[,] . . . [t]he court's interest in protecting the integrity of such a decree 'justifies any reasonable action taken by the court to secure compliance.'"  United States v. Loc. 359, United Seafood Workers, 55 F.3d 64, 69 (2d Cir. 1995) (quoting Berger, 771 F.2d at 1568).

The Court has considered a number of potential remedies to obtain Defendants' compliance with the Contempt Provisions.  For instance, the Court has considered imposing financial sanctions, but there is nothing in the record to suggest that increasing the financial burden on Defendants, which would in effect be a burden on taxpayers, would secure change.  It does not appear that financial costs effectively motivate Defendants to improve conditions in the jails, which are already costly to run, and the City already pays large sums to individual plaintiffs

to resolve the many damages cases brought against the Department each year.  (Pl. PFOF ¶¶ 1048, 1081-83.)  Other courts have declined to impose financial penalties where millions of dollars had already been spent trying to fix dangerous jail facilities.  See United States v. Hinds Cnty., No. 3:16-CV-489-CWR-BWR, 2023 WL 1186925, at *9 (S.D. Miss. Jan. 30, 2023). Similarly, imposing a term of incarceration on Department or City leaders until compliance has been achieved would do little to advance reform or ameliorate the patterns of dysfunction that led to Defendants' contempt.  More extreme measures, such as a convening a three-judge panel to order the release of the people incarcerated in the Rikers Island jails (see 18 U.S.C. § 3626(a)(3)), would also be inappropriate at this juncture, when other equitable remedies are available.  See Plata v. Schwarzenegger, No. C01-1351-TEH, 2005 WL 2932253, at *28 & n.6 (N.D. Cal. Oct. 3, 2005).  The Court is skeptical that any of the foregoing remedies will effectively secure Defendants' compliance with their obligations.  Instead, Defendants' ongoing failure to comply with nine years of Court orders requires a streamlined remedy that is narrowly tailored to construct the shortest path and strongest structure to achieve a constitutionally sufficient level of safety for those who live and work on Rikers Island.

The appropriate remedy to ameliorate Defendants' contempt must specifically address the key issues that have blocked compliance with the Consent Judgment and subsequent court orders: namely, insufficiently resourced leadership; a lack of continuity in management; failures of supervision and cooperation between supervisors and line officers; a lack of skill or imagination to create and implement transformative plans; and an unwillingness or inability to cooperate with Monitoring Team recommendations to accomplish the urgently necessary changes in the safety profile of the jails.

Plaintiffs and the Government ask the Court to install a receiver and argue that the record establishes satisfaction of the multifactor test that courts use to determine whether a receivership is warranted in cases involving public institutions.  (Motion at 2; Pl. Mem. at 63-94.)  "The test [for a receivership] includes the following elements, the first two of which are given predominant weight:

> (1) Whether there is a grave and immediate threat or actuality of harm to plaintiffs;
> (2) Whether the use of less extreme measures of remediation have been exhausted or prove futile;
> (3) Whether continued insistence that compliance with the Court's orders would lead only to confrontation and delay;
> (4) Whether there is a lack of leadership to turn the tide within a reasonable period of time;
> (5) Whether there is bad faith;
> (6) Whether resources are being wasted; and
> (7) Whether a receiver is likely to provide a relatively quick and efficient remedy."

Plata, 2005 WL 2932253, at *23.  Plaintiffs and the Government also argue that appointing a receiver would comply with the PLRA requirement that prospective relief must be "narrowly drawn, extend[] no further than necessary to correct the violation of the Federal right, and [be] the least intrusive means necessary to correct the violation of the Federal right."  18 U.S.C. § 3626(a)(1)(A).

The record in this case makes clear that those who live and work in the jails on Rikers Island are faced with grave and immediate threats of danger, as well as actual harm, on a daily basis as a direct result of Defendants' lack of diligence, and that the remedial efforts thus far undertaken by the Court, the Monitoring Team, and the parties have not been effective to alleviate this danger.  The last nine years also leave no doubt that continued insistence on compliance with the Court's orders by persons answerable principally to political authorities would lead only to confrontation and delay; that the current management structure and staffing are insufficient to turn the tide within a reasonable period; that Defendants have consistently

fallen short of the requisite compliance with Court orders for years, at times under circumstances that suggest bad faith; and that enormous resources—that the City devotes to a system that is at the same time overstaffed and underserved—are not being deployed effectively.  For those reasons, the Court is inclined to impose a receivership: namely, a remedy that will make the management of the use of force and safety aspects of the Rikers Island jails ultimately answerable directly to the Court.

To maximize the likelihood that a receivership will provide a relatively quick and efficient remedy, and to enable the Court to determine whether a particular receivership structure would both be viable from the corrections management perspective and tailored to comply with the requirements of the PLRA, the parties, Department leaders, and the Monitoring Team—all of whom have had nearly a decade to understand the myriad levels of dysfunction that have led to the unconstitutional conditions in the jails—must continue to work together to propose models for an efficient, effective receivership.  A receivership must address a number of goals (the "Receivership Goals"), including matters such as:

1.  Providing for direct Court authority[39] with respect to <u>Nunez</u> use of force and safety matters over an individual with the competence and expertise to achieve their charge of bringing the Department into compliance with the relevant Court orders;

2.  Minimizing additional bureaucracy and expense;

3.  Capitalizing on the Monitoring Team's essential expertise and experience through effective collaboration[40];

4.  Pushing forward transformational change while simultaneously utilizing wisely the assets that the Department already possesses and making available any additional assets that are needed to achieve a constitutionally adequate level of safety; and

---

[39]    To be clear, direct Court authority would not contemplate granular, day-to-day input from the Court.

[40]    A receivership model should also provide for a mechanism to resolve conflicts between a receiver and the Monitoring Team, should they arise.

5.  Identifying and taking appropriate steps to attempt to achieve any necessary changes in contracts, regulations, policies or other impediments to effective compliance.

To comply with the PLRA, the precise contours of that structure "must be determined with reference to the constitutional violations established by the specific plaintiffs before the court." United States v. Hinds Cnty. Bd. of Supervisors, No. 22-60203, 2024 WL 4633491, at *16 (5th Cir. Oct. 31, 2024) (quoting Brown v. Plata, 563 U.S. 493, 531 (2011).)  The receivership must also be designed in a manner that minimizes the steep learning curve that is inherent in addressing the deeply embedded polycentric problems of the jails, in order to mitigate ongoing harms and achieve the necessary transformation of practices and culture as quickly as possible. It bears repeating that time is of the essence.

With these goals in mind, the Court directed the parties, immediately following the September 2024 oral argument, to meet and confer, in sessions organized by the Monitor, to develop a set of remedial proposals that includes, but is not limited to:

1.  A method for streamlining of the myriad requirements across the Court orders in this case; and

2.  A fully fleshed-out description of the authority and structure of a receivership or other framework, to which the parties would consent or that the Court otherwise has the legal authority to impose, that includes details regarding:

    a.  Whether a receiver would supplant or work alongside the DOC Commissioner,
    b.  The process for the appointment of a receiver,
    c.  The tenure of a receiver,
    d.  The powers of a receiver, and
    e.  The qualities and prior experience that would render a candidate suitable for the position.

(Docket entry no. 779 (the "Remedy Directions").)  The parties were further directed to assume that the Monitor will continue to play his current role, as provided in the Consent Judgment.

In the parties' November 14, 2024 status update (docket entry no. 796), the Monitoring Team indicated that the parties have engaged with the Court's questions productively and constructively. These discussions have resulted in competing proposals for structural reform to remedy Defendants' noncompliance. The Monitoring Team requested an extension of time until after the issuance of this decision regarding the contempt motion to file a substantive status report. That request was granted. (Docket entry no. 798.)

The Monitoring Team is hereby directed continue to meet and confer with the parties and to file, by **January 14, 2025**, a joint status report that includes:

1. A description of the meet and confer process pursued by the parties;

2. Memoranda from (a) Plaintiffs and the Government, on the one hand, and (b) Defendants, on the other, laying out:

   i. A description of the party's proposed framework for a receivership that includes specific and detailed answers to the Court's questions in the Remedy Directions, augmenting the information proffered in the parties' prior briefing, as well explanations of how their respective proposals would accomplish the Receivership Goals described in this Opinion and Order;
   ii. The legal basis for the party's proposal; and
   iii. The party's legal and practical objections, if any, to the competing proposal.

The parties may file any responses to the objections raised in the Memoranda by **January 21, 2025**.

<u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs' motion to hold Defendants in civil contempt of the Contempt Provisions summarized in Appendix A is granted. The Monitoring Team is hereby ordered to file a joint status report that complies with the above instructions by **January 14, 2025**. The parties may file any responses to the objections by **January 21, 2025**. The Court will consider the submissions and determine appropriate next steps.

This Memorandum Opinion and Order resolves docket entry no. 601.

SO ORDERED.

Dated: New York, New York
        November 27, 2024

                                        /s/ Laura Taylor Swain
                                        LAURA TAYLOR SWAIN
                                        Chief United States District Judge

<u>APPENDIX A: CONTEMPT PROVISIONS</u>

**A. Consent Judgment, § IV, ¶ 1: Implement New Use of Force Directive**

Within 30 days of the Effective Date, in consultation with the Monitor, the Department shall develop, adopt, and implement a new comprehensive use of force policy with particular emphasis on permissible and impermissible uses of force ('New Use of Force Directive'). The New Use of Force Directive shall be subject to the approval of the Monitor.

**B. Consent Judgment, § VII, ¶ 1: Thorough, Timely, Objective Investigations**

As set forth below, the Department shall conduct thorough, timely, and objective investigations of all Use of Force Incidents to determine whether Staff engaged in the excessive or unnecessary Use of Force or otherwise failed to comply with the New Use of Force Directive. At the conclusion of the investigation, the Department shall prepare complete and detailed reports summarizing the findings of the investigation, the basis for these findings, and any recommended disciplinary actions or other remedial measures. All investigative steps shall be documented.

**C. Consent Judgment, § VII, ¶ 9(a): Timeliness of Full ID Investigations**

    i.    Beginning on the Effective Date and for three years following the Effective Date, or until October 1, 2018, whichever is earlier:

        1.    ID shall complete all Full ID Investigations by no later than 180 days from the date the Use of Force Incident was referred to ID ("Referral Date"), absent extenuating circumstances outside the Department's control that warrant an extension of this deadline. Any extension of the 180-day deadline shall be documented and subject to approval by the DCID or a designated Assistant Commissioner. Any Full ID Investigation commenced after the Effective Date that is open for more than 180 days shall be subject to monthly reviews by the DCID or a designated Assistant Commissioner to determine the status of the investigation and ensure that all reasonable efforts are being made to expeditiously complete the investigation.

        2.    The Department shall make every effort to complete Full ID Investigations of less complex cases within a significantly shorter period than the 1 80-day time frame set forth in the preceding subparagraph.

    ii.    Beginning on October 1, 2018, or three years after the Effective Date, whichever is earlier, and for the duration of the Agreement:

        1.    ID shall complete all Full ID Investigations by no later than 120 days from the Referral Date, absent extenuating circumstances outside the

Department's control that warrant an extension of this deadline. Any extension of the 120-day deadline shall be documented and subject to approval by the DCID or a designated Assistant Commissioner. Any Full ID Investigation that is open for more than 120 days shall be subject to monthly reviews by the DCID or a designated Assistant Commissioner to determine the status of the investigation and ensure that all reasonable efforts are being made to expeditiously complete the investigation.

2. The Department shall make every effort to complete Full ID Investigations of less complex cases within a significantly shorter period than the 120-day time frame set forth in the preceding subparagraph.

iii. In the event that a Use of Force Incident is referred to DOI, or following the further referral by DOI to the District Attorney's Office ("DA'") or another outside law enforcement agency, for investigation or a decision on immunity, the time period for the Department to complete the Full ID Investigation shall be tolled while the other agency is investigating the matter or making a decision on immunity. ID shall on at least a monthly basis contact DOI to monitor the status of investigations referred to other law enforcement agencies.

**D. Consent Judgment, § VII, ¶ 11: ID Staffing**

The Department, if necessary, shall hire a sufficient number of additional qualified ID Investigators to maintain ID Investigator caseloads at reasonable levels so that they can complete Full ID Investigations in a manner that is consistent with this Agreement, including by seeking funding to hire additional staff as necessary.

**E. Consent Judgment, § VIII, ¶ 1: Appropriate and Meaningful Discipline**

The Department shall take all necessary steps to impose appropriate and meaningful discipline, up to and including termination, for any Staff Member who violates Department policies, procedures, rules, and directives relating to the Use of Force, including but not limited to the New Use of Force Directive and any policies, procedures, rules, and directives relating to the reporting and investigation of Use of Force Incidents and video retention ("UOF Violations").

**F. Second Remedial Order, ¶1(i)(a): Interim Security Plan**

<u>Immediate Security Initiatives:</u> In order to immediately address the current lapses in security management, the Department must do the following:

a. Develop, in consultation with the Monitor, and implement an interim Security Plan that describes, in detail, how various security breaches will be addressed by October 11, 2021. This plan shall address, among other things, the following issues: unsecured doors, abandonment of a

post, key control, post orders, escorted movement with restraints when required, control of undue congregation of detainees around secure ingress/egress doors, proper management of vestibules, and properly securing officer keys and OC spray.

**G. Action Plan, § A, ¶1(d): Improved Routine Tours**

The Department shall conduct routine tours, including, but not limited to, tours of the housing units every 30 minutes. The Department shall immediately institute improved practices to ensure that routine touring is occurring, including the use of the "tour" wand by Correction Officers during each tour conducted. The Office of the Commissioner shall audit the electronic records of tours conducted by uniform staff to ensure compliance with touring requirements.

**H. Action Plan, § D, ¶ 2(a), (d), (e), and (f): Improved Security Initiatives**

*Improved Security Initiatives:* The Department shall implement improved security practices and procedures, including, but not limited to, the following items outlined below:

  a.  the interim Security Plan required by ¶ 1(i)(a) of the Second Remedial Order;

  d.  improved procedures on how searches are conducted, including addressing the Monitor's feedback that was provided in 2021;

  e.  enhanced efforts to identify and recover weapons and other contraband;

  f.  improved escort techniques to eliminate the unnecessary use of painful escort holds[.]

**I. First Remedial Order, § A, ¶ 2: Facility Leadership Responsibilities**

Each Facility Warden (or designated Deputy Warden) shall routinely analyze the Use of Force Reviews, the Department leadership's assessments of the Use of Force Reviews referenced in Paragraph A.1(i) above, and other available data and information relating to Use of Force Incidents occurring in the Facility in order to determine whether there are any operational changes or corrective action plans that should be implemented at the Facility to reduce the use of excessive or unnecessary force, the frequency of Use of Force Incidents, or the severity of injuries or other harm to Incarcerated Individuals1 or Staff resulting from Use of Force Incidents. Each Facility Warden shall confer on a routine basis with the Department's leadership to discuss any planned operational changes or corrective action plans, as well as the impact of any operational changes or corrective action plans previously implemented. The results of these meetings, as well as the operational changes or corrective action plans discussed or implemented by the Facility Warden (or designated Deputy Warden), shall be documented.

**J. First Remedial Order, § A, ¶ 4: Supervision of Captains**

The Department, in consultation with the Monitor, shall improve the level of supervision of Captains by substantially increasing the number of Assistant Deputy Wardens ("ADWs") currently assigned to the Facilities. The increased number of ADWs assigned to each Facility shall be sufficient to adequately supervise the Housing Area Captains in each Facility and the housing units to which those Captains are assigned, and shall be subject to the approval of the Monitor.

**K. Action Plan, § C, ¶ 3(ii), (iii): Increased Assignment and Improved Supervision of Captains**

*Improved and Maximized Deployment of Staff:* The Department shall maximize deployment of uniform staff within the facilities by implementing modified staffing practices, including, but not limited to the items outlined below:

    ii. *Increased Assignment of Captains in the Facility:* Complete a full evaluation of the assignment of all Captains and develop and implement a plan to prioritize assignment of Captains to supervise housing units to increase Captain presence on housing units.

    iii. *Improved Supervision of Captains:* Substantially increase the number of Assistant Deputy Wardens currently assigned to the facilities or a reasonable alternative to ensure that there is adequate supervision of Captains.

**L. Action Plan, § C, ¶ 3, (v), (vi), (vii): Improved and Maximized Deployment of Staff**

*Improved and Maximized Deployment of Staff:* The Department shall maximize deployment of uniform staff within the facilities by implementing modified staffing practices, including, but not limited to the items outlined below:

    v. *Awarded Posts:* Reduce the use of awarded posts so they are primarily utilized for those positions in which a particular skill set is required. A staff member with an awarded non-mandatory post must be re-deployed to a mandatory post if there are staffing shortages.

    vi. *Maximize Work Schedules:* Create and implement alternatives to the work schedule for uniform staff assigned to work in the facilities in order to minimize the use of a 4 by 2 schedule and optimize staff scheduling.

    vii. *Reduction of Uniformed Staff in Civilian Posts:* Reduce the assignment of uniform staff to civilian posts, including Temporary Duty Assignment, in order to minimize the reliance on uniform staff for tasks that can and should be reasonably completed by civilians.

**M. First Remedial Order, § A, ¶ 6: Facility Emergency Response Teams**

Within 90 days of the Order Date, the Department shall, in consultation with the Monitor, develop, adopt, and implement a protocol governing the appropriate composition and deployment of the Facility Emergency Response Teams (i.e., probe teams) in order to minimize unnecessary or avoidable Uses of Force. The new protocol shall address: (i) the selection of Staff assigned to Facility Emergency Response Teams; (ii) the number of Staff assigned to each Facility Emergency Response Team; (iii) the circumstances under which a Facility Emergency Response Team may be deployed and the Tour Commander's role in making the deployment decision; and (iv) de-escalation tactics designed to reduce violence during a Facility Emergency Response Team response. The Department leadership shall regularly review a sample of instances in which Facility Emergency Response Teams are deployed at each Facility to assess compliance with this protocol. If any Staff are found to have violated the protocol, they shall be subject to either appropriate instruction or counseling, or the Department shall seek to impose appropriate discipline. The results of such reviews shall be documented.

**N. Consent Judgment § XV, ¶ 1: Prevent Fights/Assaults (Safety and Supervision of Inmates Under the Age of 19) – *18-year-olds***

Young Inmates shall be supervised at all times in a manner that protects them from an unreasonable risk of harm. Staff shall intervene in a timely manner to prevent inmate-on inmate fights and assaults, and to de-escalate inmate-on-inmate confrontations, as soon as it is practicable and reasonably safe to do so.

**O. Consent Judgment § XV, ¶ 12: Direct Supervision (Safety and Supervision of Inmates Under the Age of 19) – *18-year-olds***

The Department shall adopt and implement the Direct Supervision Model in all Young Inmate Housing Areas.

**P. Consent Judgment § XV, ¶ 17: Consistent Assignment of Staff (Safety and Supervision of Inmates Under the Age of 19) – *18-year-olds***

The Department shall adopt and implement a staff assignment system under which a team of officers and a Supervisor are consistently assigned to the same Young Inmate Housing Area unit and the same tour, to the extent feasible given leave schedules and personnel changes.

**Q. First Remedial Order, § D, ¶ 1: Consistent Staff Assignment and Leadership**

For all housing units at RNDC2 that may house 18-year-old Incarcerated Individuals, the Department shall enhance the implementation of a staff assignment system under which the same correction officers, Captains, and ADWs are consistently assigned to work at the same housing unit and on the same tour, to the extent feasible given leave schedules and personnel changes.

**R. First Remedial Order, § D, ¶ 3; 3(i): Reinforcement of Direct Supervision**

<u>Direct Supervision.</u> For all housing units at RNDC that may house 18-year-old Incarcerated Individuals, the Department, including RNDC Supervisors, shall take necessary steps to improve the implementation of the Direct Supervision Model with an emphasis on the development of proactive and interactive supervision; appropriate relationship building; early intervention to avoid potential confrontations; de-escalating conflicts; rewarding positive behavior; and the consistent operation of the unit.

    i.    The Department, including RNDC Supervisors, shall reinforce the implementation of the Direct Supervision Model with Staff through, among other things, appropriate staff supervision, coaching, counseling, messaging strategies, or roll call training.