# Status Report
# by the
# *Nunez* Independent Monitor

**January 24, 2025**

### THE NUNEZ MONITORING TEAM

Steve J. Martin
*Monitor*

Elly Davis
*Junior Analyst*

Kelly Dedel, Ph.D.
*Subject Matter Expert*

Anna E. Friedberg
*Deputy Monitor*

Dennis O. Gonzalez
*Director*

Patrick Hurley
*Subject Matter Expert*

Alycia M. Karlovich
*Associate*

Emmitt Sparkman
*Subject Matter Expert*

Table of Contents

**Introduction** ................................................................................................................... 3

   Background on the Development of Proposed Remedial Relief ............................................. 3

**Meet and Confer Process** ................................................................................................... 7

**Considerations for Remedial Proposals** ......................................................................... 8

   Remedial Relief in Other Systems ...................................................................................... 8

- Period of Use .......................................................................................................... 9
- Genesis of Order ..................................................................................................... 9
- Description of Systems Covered ............................................................................ 9
- Title of the Receiver .............................................................................................. 9
- Scope and Authority of the Receiver .................................................................. 10
- Role of the Court & Local Government ............................................................. 10
- Power of the Receiver ......................................................................................... 10
- Tenure of the Receiver ........................................................................................ 11
- Number of Individuals Who Have Served as Receiver ...................................... 11
- Role of the Monitor ............................................................................................. 11
- Current State of Affairs ....................................................................................... 12

   Overarching Considerations for Remedial Relief in *Nunez* Matter ....................................... 13

1. Continuity in the Management of *Nunez* Reforms ......................................... 13
   - Functional and Practical Leadership Structure ...................................... 13
   - Leadership Characteristics ...................................................................... 14
   - Maximize the Work Currently Underway and Minimize the Learning Curve ..... 14
   - Prepared to Make Difficult Decisions .................................................... 15
2. Structure of Remedial Relief ............................................................................ 15
   - Criteria for Terminating the Remedial Measure .................................... 16
   - Sustainability .......................................................................................... 16
3. Priority Areas of Relief .................................................................................... 16
   - Implementing Sound Correctional Practice & Reducing the Risk of Harm ......... 16
   - Streamlined Budgetary and Hiring Processes ........................................ 17
   - Staff Assignment & Staff Absenteeism ................................................. 17
   - Supervisory Structure ............................................................................. 17
   - Managing Incarcerated Individuals Following Serious Incidents of Violence ..... 17
   - Accountability for Staff Misconduct ...................................................... 18
   - Engaging Staff in the Reform Effort ...................................................... 18

    4.    Neutral and Independent Assessment of the Implementation of Remedial Relief and the Overarching Court Orders ................................................................................. 18

**Streamlining of the *Nunez* Court Orders** ....................................................................... **20**

**Conclusion** ........................................................................................................................ **23**

**Appendix A: Summary of Nine Receivership Cases** ....................................................... **24**

    Alabama ........................................................................................................................ 25

    Wayne County, MI ........................................................................................................ 27

    Washington, DC ............................................................................................................ 29

    Fulton County, GA ........................................................................................................ 31

    California ...................................................................................................................... 33

    Cook County, IL ............................................................................................................ 36

    Orleans Parish, LA ........................................................................................................ 38

    Miami-Dade County, FL ............................................................................................... 41

    Hinds County, MS ........................................................................................................ 43

**Appendix B: Relevant Orders & Documents for Nine Receivership Cases**

**Appendix C: Government and Plaintiff Class Submission**

**Appendix D: Defendants' Submission**

# INTRODUCTION

The Monitoring Team files this report pursuant to the Court's November 27, 2024 Order (dkt. 803) and December 20, 2024 Order (dkt. 807).

## BACKGROUND ON THE DEVELOPMENT OF PROPOSED REMEDIAL RELIEF

In its September 26, 2024 Order (dkt. 779), immediately following the oral argument on the motion for contempt, the Court directed the Parties to develop a series of remedial proposals through a meet and confer process organized by the Monitoring Team. The Court directed the Parties to address the following issues, collectively referred to as the "Remedy Directions:"

1. A method for streamlining the myriad requirements across the Court Orders in this case; and

2. A fully fleshed-out description of the authority and structure of a receivership or other framework, to which the Parties would consent or that the Court otherwise has the legal authority to impose, that includes details regarding:

    a. Whether a receiver would supplant or work alongside the DOC Commissioner,

    b. The process for the appointment of a receiver,

    c. The tenure of a receiver,

    d. The powers of a receiver, and

    e. The qualities and prior experience that would render a candidate suitable for the position.

On November 13, 2024, the Monitoring Team filed a status report with the Court regarding the Parties' work with the Monitoring Team to address these issues (dkt. 796). The Monitoring Team also recommended that a report on the status of this work on the proposed remedial relief should be filed after the Court's determination on the motion for contempt.

On November 27, 2024, the Court granted Plaintiffs' motion to hold Defendants in civil contempt of 18 provisions of the *Nunez* Court Orders.[1] The Court explained that the "[t]he appropriate remedy to ameliorate Defendants' contempt must specifically address the key issues that have blocked compliance with the Consent Judgment and subsequent Court Orders: namely, insufficiently resourced leadership; a lack of continuity in management; failures of supervision and cooperation between supervisors and line officers; a lack of skill or imagination to create and implement transformative plans; and an unwillingness or inability to cooperate with Monitoring Team recommendations to accomplish the urgently necessary changes in the safety profile of the jails." Dkt. 803 at pg. 54.

The Court further explained it "is inclined to impose a receivership: namely, a remedy that will make the management of the use of force and safety aspects of the Rikers Island jails ultimately answerable directly to the Court. To maximize the likelihood that a receivership will provide a relatively quick and efficient remedy, and to enable the Court to determine whether a particular receivership structure would both be viable from the corrections management perspective and tailored to comply with the requirements of the PLRA, the Parties, Department leaders, and the Monitoring Team—all of whom have had nearly a decade to understand the myriad levels of dysfunction that have led to the unconstitutional conditions in the jails—must

---

[1] The 18 provisions are: Consent Judgment, § IV, ¶ 1: Implement New Use of Force Directive; Consent Judgment, § VII, ¶ 1: Thorough, Timely, Objective Investigations; Consent Judgment, § VII, ¶ 9(a): Timeliness of Full ID Investigations; Consent Judgment, § VII, ¶ 11: ID Staffing; Consent Judgment, § VIII, ¶ 1: Appropriate and Meaningful Discipline; Second Remedial Order, ¶1(i)(a): Interim Security Plan; Action Plan, § A, ¶1(d): Improved Routine Tours; Action Plan, § D, ¶ 2(a), (d), (e), and (f): Improved Security Initiatives; First Remedial Order, § A, ¶ 2: Facility Leadership Responsibilities; First Remedial Order, § A, ¶ 4: Supervision of Captains; Action Plan, § C, ¶ 3(ii), (iii): Increased Assignment and Improved Supervision of Captains; Action Plan, § C, ¶ 3, (v), (vi), (vii): Improved and Maximized Deployment of Staff; First Remedial Order, § A, ¶ 6: Facility Emergency Response Teams; Consent Judgment § XV, ¶ 1: Prevent Fights/Assaults (Safety and Supervision of Inmates Under the Age of 19) – *18-year-olds;* Consent Judgment § XV, ¶ 12: Direct Supervision (Safety and Supervision of Inmates Under the Age of 19) – *18-year-olds;* Consent Judgment § XV, ¶ 17: Consistent Assignment of Staff (Safety and Supervision of Inmates Under the Age of 19) – *18-year-olds;* First Remedial Order, § D, ¶ 1: Consistent Staff Assignment and Leadership; First Remedial Order, § D, ¶ 3; 3(i): Reinforcement of Direct Supervision.

continue to work together to propose models for an efficient, effective receivership. A receivership must address a number of goals (the "Receivership Goals"), including matters such as:

1. Providing for direct Court authority[2] with respect to *Nunez* use of force and safety matters over an individual with the competence and expertise to achieve their charge of bringing the Department into compliance with the relevant Court Orders;

2. Minimizing additional bureaucracy and expense;

3. Capitalizing on the Monitoring Team's essential expertise and experience through effective collaboration[3];

4. Pushing forward transformational change while simultaneously utilizing wisely the assets that the Department already possesses and making available any additional assets that are needed to achieve a constitutionally adequate level of safety; and

5. Identifying and taking appropriate steps to attempt to achieve any necessary changes in contracts, regulations, policies or other impediments to effective compliance."

The Court also explained "[t]o comply with the PLRA, the precise contours of that structure 'must be determined with reference to the constitutional violations established by the specific plaintiffs before the court.' United States v. Hinds Cnty. Bd. of Supervisors, No. 22-60203, 2024 WL 4633491, at *16 (5th Cir. Oct. 31, 2024) (quoting Brown v. Plata, 563 U.S. 493, 531 (2011).) The receivership must also be designed in a manner that minimizes the steep learning curve that is inherent in addressing the deeply embedded polycentric problems of the

---

[2] To be clear, direct Court authority would not contemplate granular, day-to-day input from the Court.

[3] A receivership model should also provide for a mechanism to resolve conflicts between a receiver and the Monitoring Team, should they arise.

jails, in order to mitigate ongoing harms and achieve the necessary transformation of practices and culture as quickly as possible. It bears repeating that time is of the essence."

Pursuant to the Court's direction this report includes the following:

- A summary of the meet and confer process pursued by the Parties;

- A framework for considering the Remedial Proposals, developed through the Monitoring Team's research and analysis, coupled with its own expertise in institutional reform;

- The Monitoring Team's recommendations to streamline the Court's Orders and the Parties' positions on the matter;

- Appendix A: Summary of Nine Receivership Cases

- Appendix B: Relevant Orders & Documents for Nine Receivership Cases

- Appendix C & D: Proposals and Memoranda from (a) Plaintiffs and the Government, on the one hand, and (b) Defendants, on the other, articulating:

    i. A description of the Party's proposed framework for a receivership that includes specific and detailed answers to the Court's questions in the Remedy Directions, augmenting the information proffered in the Parties' prior briefings, as well as explanations of how their respective proposals would accomplish the Receivership Goals described in the Court's Order;

    ii. The legal basis for the Party's proposal; and

    iii. The Party's legal and practical objections, if any, to the competing proposal.

## MEET AND CONFER PROCESS

The Monitoring Team and the Parties have been actively engaged since the Court's September 26, 2024 and November 27, 2024 Orders. The Monitoring Team communicated extensively with representatives of the Parties, first meeting with each Party's representatives separately and later convening meetings with all of the Parties present. As part of the meet and confer process, the Parties shared draft remedial proposals and other communications to clarify their approaches. This collaboration allowed the Monitoring Team and the Parties to better understand each other's positions on potential remedies. The discussions focused on the functionality of the potential remedies, how they could be operationalized, and how they may advance the *Nunez* reform effort.  Throughout this process, the Monitoring Team suggested various considerations for structuring the remedial relief and identifying initiatives that should be prioritized, which are discussed in greater detail below. Overall, this process has been constructive and productive, with all Parties acting in good faith.

The respective memoranda and proposals from the Government/Plaintiffs and Defendants are attached to this report as Appendix C and Appendix D.

## CONSIDERATIONS FOR REMEDIAL PROPOSALS

To assist the Parties and the Court in developing remedial relief, the Monitoring Team has taken steps to better understand the remedial frameworks in other jail and prison systems where a Receiver (or similar leadership structure) was imposed by the Court. To achieve this, the Monitoring Team reviewed relevant Court Orders and other pertinent materials. Further, the Monitor and Deputy Monitor met with individuals who served in Receiver (or Receiver-like) roles in correctional systems in California, Cook County, and Miami-Dade County. The Monitoring Team also engaged with scholars and lawyers who have expertise in this area. This research, combined with the Monitoring Team's own expertise in correctional systems around the country and its deep understanding of DOC's practices, has informed the development of several considerations for the Court to contemplate when deciding the issue of remedial relief.  These considerations are discussed below.

### REMEDIAL RELIEF IN OTHER SYSTEMS

As an overarching matter, the appointment of a Receiver (or Receiver-like authority) has been used sparingly, occurring in only nine cases since 1974. Each case is distinct and there is no standard protocol governing the remedial relief. However, there are common components found in many of these structures.  The Monitoring Team has provided a detailed summary of each of these nine cases, which is attached as Appendix A of this Report. The underlying relevant documents related to these cases is included in Appendix B of this Report. A brief description of some aspects of all these nine cases is provided below. In order to gain a more fulsome understanding of the cases, we strongly encourage a detailed and comprehensive review of the information included in Appendix A:

- **Period of Use**: The first Court appointed a receiver in a prison conditions case in 1979. Since that first case, Courts have ordered a Receiver (or Receiver-like authority) in eight other cases. Of the nine total cases, six have been imposed since the PLRA was passed in 1996. The most recent Court-ordered receivership has yet to begin, as Defendants appealed the decision to the Fifth Circuit. On October 31, 2024, the Fifth Circuit affirmed the decision to appoint a Receiver but remanded for further proceedings to more narrowly tailor the scope of the Receiver's powers.  In December 2024, Defendants petitioned for an en banc re-hearing of the Fifth Circuit's decision. In response, the Fifth Circuit has withheld the issuance of the October 31, 2024 Order pending resolution of Defendants' petition for an en banc rehearing.

- **Genesis of Order:** In five of the nine cases, the Court issued an Order appointing a Receiver in response to motion practice. In four of these five cases, the Court also selected the individual to serve as the Receiver. In the fifth case, the Court ordered the Parties to confer regarding the specific individual to be appointed as the Receiver, and after conferring, the Parties agreed on the individual who would serve as the Receiver. In the remaining four of the nine cases, the Parties negotiated a resolution including the role of a Receiver (or Receiver-like authority), which was subsequently ordered by the Court. In two of these four cases, the Parties agreed on the individual selected to be the Receiver (or Receiver-like authority); however, in one case, the individual was selected by the local authority, and in another case, the Court selected the individual.

- **Description of Systems Covered:** Across the nine cases, eight addressed conditions in an adult correctional system, and one addressed conditions in a juvenile correctional system. Two of the cases addressed the entire state system, which included many facilities, and the other seven cases addressed county/parish systems (including one that addressed the District of Columbia's system). Some of the county/parish systems had only one facility, while others had a few (e.g., Orleans Parish). Two of the nine systems had average daily populations of less than 1,000 people in custody. Three of the nine systems had average daily populations of 1,000 to 2,000 people in custody. Three of the nine systems had average daily populations of 3,000 to 5,000 people in custody. In one of these (Alabama), the average daily population rose to more than 12,000 by the end of the receivership. In the final case (California), the average daily population was over 100,000 throughout the receivership.

- **Title of the Receiver:** In most cases (6 of 9), the individual with the vested authority is referred to as a Receiver, but in the other three cases, other titles are utilized, such as Transitional Administrator or Independent Compliance Director. Those authorities with other titles were given similar powers as a Receiver, such as the ability to petition the Court for additional powers outside the local government's traditional rules and procedures. In these

cases, the imposition of this authority was negotiated and agreed upon by the Parties and not unilaterally imposed by the Court.

- **Scope and Authority of the Receiver:** The nine cases cover a spectrum of systems and various operational aspects based on the underlying cases, Court Orders, and consent agreements. In two of the nine cases (California and Washington D.C.), the Receiver's authority was limited to addressing the medical and mental health care services within the system. In the other seven cases, the Receivers had broad authority over the security and operational aspects of the systems, including staffing and policies, equal to the scope of power ordinarily vested in the leader of the correctional system. In all nine cases, the Receiver could petition the Court for additional powers outside the scope ordinarily vested in the leader of the correctional system if the Receiver found that a local rule, policy, or practice became an impediment to achieving full compliance with the Court's Orders. In at least seven cases, the Receiver was given some authority over the budget and related finances of the agency. However, in its decision on the appeal of the Hinds County receivership, the Fifth Circuit Court of Appeals found the Receiver's authority over the budget and related finances to be overly broad.

- **Role of the Court & Local Government:** In two of the nine cases, the Receiver was given sole authority over the entire system such that they essentially replaced the local government official ordinarily in charge of the agency. In the other seven cases, the local government had some involvement. For instance, in Miami-Dade County, the Independent Compliance Director reports to the Mayor. In Orleans Parish, the Independent Jail Compliance Director was given authority over all persons in Orleans Parish custody but was required to seek advice and/or approval from the local Sheriff regarding all decisions pertaining to compliance with the Court's Orders. In another case (Hinds County), the Court granted the Receiver sole day-to-day authority over one of the county's facilities but allowed the County to retain the authority over the other two facilities in its system. In the first two cases of correctional receiverships (Alabama and Wayne County), the Receiver authority was given to an elected government official not ordinarily responsible for operations and administration of the correctional system – the Governor of Alabama and the County Chief Executive in Wayne County. In the two cases where the Receiver's authority was limited to healthcare (California and Washington D.C.), local officials remained in charge of the systems' other operations.

- **Power of the Receiver:** The powers of each Receiver were developed with a singular goal in mind – bringing the system into compliance with any Court Orders in the case. Therefore, the Receivers' powers across the nine cases have both similarities and differences in terms of substance based on the unique elements of each case. The Receivers were granted all the

same powers vested in a local authority, with certain limitations to the scope of authority as discussed above and pursuant to collaboration with the local government as also discussed above. The Receiver was always given supervisory power over the system, which included the authority to fire and hire staff, and in some cases, the Receiver was given the power to seek out outside contracts to fill gaps in the services provided by the agency's staff.

- **Tenure of the Receiver:** Across the nine cases, the shortest tenure for a Receiver was less than six months (Fulton County) and the Receiver was followed by an ongoing monitorship that continued for nine more years. In addition, the Receiver in that case was appointed for only an interim period pending the election of a new county Sheriff who would assume control of the system. In the remaining cases, the Receiver's tenure was expected to last as long as needed to bring the system into compliance with all Court Orders. This required about 4 years in two cases (Alabama and Orleans Parish), 5 years in one case (Washington, D.C.), and 8 years in one case (Cook County). The Receivers are still in place in two cases. In one of those cases (Miami-Dade), it is expected that the receivership will terminate this year (which is about two years since its implementation). In the other case (California), a Receiver has been in place for over 18 years. In the final case (Hinds County), the Receiver has not yet started. Finally, in one case (Wayne County), the duration of the Receiver's tenure could not be determined from the available Court papers.

- **Number of Individuals Who Have Served as Receiver:** In most cases (7 of 9), the Receiver title was only held by one individual. In the other two cases (California and Orleans Parish), two separate individuals held the Receiver title in each case. In California, the first receiver was replaced after two years, and the second Receiver has served for 16 years. In Orleans Parish, the first Compliance Director served for less than a year and a half, and the second Compliance Director served for more than two years. The Court reported that these changes in both cases occurred as a result of concerns about the pace of progress.

- **Role of the Monitor:** Six of the nine cases had a Court-ordered Monitor or similarly vested Court appointee (such as the Special Officer in Washington, D.C. and the expert in Fulton County) who was appointed before the Receiver was imposed. These individuals continued monitoring Defendants' progress throughout the tenure of the Receiver. In a seventh case (Cook County), a Monitor preceded the appointment of the Receiver, but the Monitor's role was eliminated with the appointment of the Receiver. In another case (California), the Court appointed an Advisory Board with multiple members to assist and advise the Court and the Receiver. In the final case (Alabama), a Monitor was not in place prior to, during, or after the receivership, but at the end of the receivership, a Prison Implementation Committee was formed to continue advancing the reforms required by the Court Orders.

- **Current State of Affairs:** The Receiver has not yet started in one case, and in two cases, the receiver is still working to bring the system into compliance, though significant strides have been made in recent years in both cases. In the remaining six cases where the Receiver's tenure has ended, many of the issues originally leading to the imposition of a Receiver have reappeared in the respective systems, leading to further Court Orders or new litigation.

## OVERARCHING CONSIDERATIONS FOR REMEDIAL RELIEF IN *NUNEZ* MATTER

The Court explained in its Order that "'[t]he "primary purpose' of a finding of civil contempt, and the imposition of related remedies, is 'to coerce the contemnor into future compliance and to remedy past non-compliance, rather than to punish [the contemnor].' In re Dickinson, 763 F.2d 84, 87 (2d Cir. 1985); see also In re Chief Exec. Officers Clubs, Inc., 359 B.R. 527, 534 (S.D.N.Y. 2007) ('The purpose of civil contempt is to compel a reluctant party to do what a court requires of him.'). 'It is basic law that a civil contempt sanction must only be compensatory or coercive, and may not be punitive.' Gucci Am., Inc. v. Weixing Li, 768 F.3d 122, 144 (2d Cir. 2014)." Dkt. 803 at pg. 52 to 53.  For this reason, it is critical that additional remedial relief must be realistic, reflect sound correctional practice, and, most importantly, result in viable and sustainable reforms as envisioned under the Consent Judgment and the subsequent *Nunez* Court Orders.

The Monitoring Team echoes the Court's findings that it must "identify[. . . ] a form of remedy that will achieve rapid change in the safety profile of Rikers Island and compliance with Court orders." Dkt. 803 at pg. 53.  To that end, the Monitoring Team recommends a framework for remedial relief using the following four considerations:

1. **Continuity in the Management of *Nunez* Reforms**: A principal vulnerability in managing the *Nunez* Court Orders has been a lack of continuity of leadership. Accordingly, a framework that ensures consistent leadership of the Department should be a key component of the remedial effort.

   o *Functional and Practical Leadership Structure*: The leadership structure must be practical and functional, with distinct and clear lines of authority. It is essential for staff and leadership at all levels to understand who they report to, eliminating any

confusion about reporting lines. This clarity is necessary to minimize disruption to the jails' operations and to ensure that work can commence as quickly as possible. A structure lacking clear delineation or with overlapping authority can create confusion among those responsible for implementing changes, which may lead to delays and ongoing management dysfunction.

o  *Leadership Characteristics*: The success of the remedial effort largely depends on the qualities of the individual(s) chosen to lead it. It is essential for the leaders to have a strong understanding of the *Nunez* Court Orders and the dynamics within the Department, as well as deep expertise in sound correctional practices. The leader(s) must have a strong command, and ultimately the ability to navigate and work constructively with the myriad of dynamics underpinning the management and operations the Department.  Among other things, this includes, working with various stakeholders – staff, their union representative, various political actors, oversight bodies, and advocates; understanding and navigating the bureaucracy; working with other City agencies; addressing the Department's responsibilities and obligations to various oversight agencies; the politics; addressing the requirements of various relevant local and state laws, Court Orders, and other relevant regulations.  Additionally, while the leader(s) must possess the courage and determination to make potentially unpopular decisions, it is vital that their relationship with Defendants is built on trust and mutual respect.

o  *Maximize the Work Currently Underway and Minimize the Learning Curve*: The remedial relief structure must be organized and implemented to maximize the positive initiatives that are already underway, while also minimizing the need for

a protracted learning curve and the risk of restarting work from scratch. This situation involves a complex correctional system, a complicated set of Court Orders, and multiple bureaucracies. It is crucial for the leader(s) to comprehend and function effectively within this system.

o _Prepared to Make Difficult Decisions_: Those responsible for implementing the remedial measures must be willing and able to address any potential obstacles that inhibit compliance with the _Nunez_ Court Orders. Whenever possible, the work should be undertaken in a manner that can be completed within the existing structures. Difficult decisions may be necessary, from driving and altering the _status quo_ to make the system operate more efficiently, to seeking additional relief from the Court when needed. Many of these decisions may be unpopular with various stakeholders, including political actors such as those in City Hall or the legislature, as well as staff, the unions that represent them, advocates, and others. The individual(s) leading the effort must be prepared to make difficult decisions despite strong, and perhaps persistent, opposition or pressure from various stakeholders. They need the fortitude to engage with various constituents, make tough decisions, and take firm action when required.

2. **Structure of Remedial Relief**: The remedial relief structure will impact the City's democratic process in that the leader(s) will be appointed via a process that bypasses the decision-making authority of an elected Mayor. The structure must ensure that this process extends no longer than necessary and builds a foundation that increases the likelihood of lasting reform.

- o *Criteria for Terminating the Remedial Measure*: The criteria for terminating the remedial measure must be defined at the outset, in a manner that is specific, measurable and clear to all stakeholders. While it is important to allow for reasonable extensions, it is also crucial to provide clarity on the expected outcomes required to end the remedial measure. This clarity will promote a sense of fairness and should incentivize progress.

- o *Sustainability*: The remedial relief must be devised in such a way that reforms and progress can be sustained **after** the remedial relief has achieved its goals and objectives and has been terminated. A guiding principle must be to manage the process in such a way that sustainably transitioning authority back to the local government is always at the forefront of the work.

3. **Priority Areas of Relief**: The protocols and practices at the core of the Department's inability to make progress toward the requirements of the *Nunez* Court Orders are broadly understood and well documented. The remedial relief should focus on these areas, making amendments when necessary.

- o *Implementing Sound Correctional Practice & Reducing the Risk of Harm*: The Department must develop and implement initiatives to tackle the widespread security and operational failures plaguing the Department. The Department must not only sustain its focus on developing conceptually sound strategies but must also take steps to ensure that all levels of Department supervisors and staff are committed to their proper implementation. The highest priority must be to reduce the pervasive risk of harm.

- o *Streamlined Budgetary and Hiring Processes:* The Department must be able to secure the necessary financial resources and personnel in a timely and efficient manner.

- o *Staff Assignment & Staff Absenteeism*: Line officers and supervisors must be assigned to posts in a manner that prioritizes posts that directly engage with persons in custody and in a manner that permits supervisors to observe and interact with their subordinates effectively. To achieve this, the Department must take appropriate measures to address any misuse of staff leave benefits (e.g., Personal Emergency, FMLA, and sick leave). Without a reliable workforce that maximizes efficiency, meaningful reform cannot be accomplished.

- o *Supervisory Structure*: The Department needs to increase the number of supervisory ranks from two to three lines in order to properly oversee, guide and coach the large number of line officers. The Department has reported that certain legal impediments may preclude the agency from adding an additional level of supervisors to its existing organizational framework. If necessary, identifying and addressing these potential legal impediments must be a priority, including determining whether Court relief is necessary. The Department must develop and implement a comprehensive, concrete and realistic plan to expand the level of supervisory control within its existing organizational framework.

- o *Managing Incarcerated Individuals Following Serious Incidents of Violence*: Operating and safely managing a program for detainees with a known and recent propensity to engage in violent predatory behavior is essential to protecting other detainees and staff from harm. Although the number of individuals requiring such

a program is small, their management is critical to the safe operation of the jails. Such programs must be consistent with sound correctional practice. Implementing such programs must remain a top priority for the Department.

o *Accountability for Staff Misconduct*: The Department must improve leaders' and supervisors' ability to identify misconduct when it occurs and to hold staff accountable for poor practice. Further, the City must ensure that OATH's processes and procedures support the overall reform effort and that procedures for both formal and informal discipline are maximally efficient in order to ensure staff discipline is swift, certain, and proportional.

o *Engaging Staff in the Reform Effort*: The Consent Judgment is structured to address the pervasive practices contributing to the significant harm in the system. It focuses on the individual aspects of the overall problem (e.g., policies, practices, investigations, and the response to misconduct). However, the essential component of culture change has yet to take place. The Department must develop a comprehensive, concrete and realistic strategy to better engage staff in the reform effort. The strategy should ensure that staff not only understand and embrace the need for change but also commit to elevating their own skills.

4. **Neutral and Independent Assessment of the Implementation of Remedial Relief and the Overarching Court Orders**: The Court will still require a neutral and independent assessment of the Department's functioning, even after new remedial measures are put in place. These assessments and reports are essential for providing critical transparency on the status of compliance and details about the work underway. After the remedial measure

has been lifted, ongoing monitoring will be necessary to assess the extent to which

Defendants are able to sustain the reforms established under the remedial structure.

## STREAMLINING OF THE *NUNEZ* COURT ORDERS

The Monitoring Team has long reported on the need to streamline the *Nunez* Court Orders given the volume of requirements they impose and the compounding complexity each time a new Order is added.[4] The sheer number of Orders and requirements in this case have created such an extensive array of interrelated requirements that it has become difficult to prioritize, which makes both implementation and the ability to track progress challenging. In protracted institutional reform efforts, the importance of establishing clear prescriptions for initiatives, policies and practices cannot be overstated. The conglomeration of the *Nunez* Court Orders, which require compliance with hundreds of interconnected provisions, sometimes with slight variations, is not a functional structure for remedial effort because it does not provide the straightforward framework that is critical for success in complex reform cases. Therefore, the *Nunez* Court Orders need to be thoughtfully and carefully organized and streamlined.

The process for streamlining the *Nunez* Court Orders will need to be properly *managed* given its complexity and the number of stakeholders that need to provide input. The manager of this process must not only have the time and organizational skill to lead such an effort but must also have extensive knowledge of the *Nunez* Court Orders' requirements, their basis and how they should be operationalized. Given the Monitoring Team's central role in negotiating and drafting the *Nunez* Court Orders and their significant expertise in both the Department's operations and sound correctional practice, the Monitoring Team may be best positioned to perform this task and is willing to manage the process.

---

[4] There are at least ten *Nunez* Court Orders representing likely over 500 provisions. This includes the Consent Judgment with over 300 provisions as well as three Remedial Orders (entered between August 2020 and November 2021), the Action Plan (entered in June 2022), and at least five additional Orders entered in 2023.

Achieving the overall goal of streamlining the *Nunez* Court Orders requires the following key objectives:

1) Organizing the *Nunez* Court Orders (as well as any modifications that occur via the process outlined below) so that the process for soliciting input and exchanging ideas can proceed in an organized fashion.

2) Determining how the Orders can be consolidated and streamlined and, to the extent necessary, whether certain provisions can potentially be eliminated (without substantively limiting the relief provided to the class members), as they may be extraneous or duplicative.

3) Prioritizing the requirements of the *Nunez* Court Orders in order to properly sequence the work to maximize progress.

These objectives are intertwined in ways that will require discussions among the stakeholders to be similarly multi-focused, such that the steps listed above cannot be completed in a rigid sequence. Accomplishing these three objectives will require continuous input from and feedback to the *Nunez* stakeholders.[5] The Monitoring Team does not anticipate that the process of obtaining input and sharing perspectives will be sequential; in order for a consensus-driven process to proceed, each stakeholder's input should be connected to and informed by feedback from other stakeholders. Coordinating so many perspectives will require ongoing management, particularly regarding how input is sought and shared. For these reasons, this process will require centralized management to coordinate the stakeholders' contributions in a productive and efficient manner.

---

[5] This includes counsel for the Plaintiff Class, counsel for the Southern District of New York, the City, the Department, the Monitoring Team and, if the Court orders one to be appointed, the Receiver.

The Monitoring Team recommends that the Court direct the Monitoring Team to manage the process of streamlining the *Nunez* Court Orders, and to initiate that process following the Court's rulings on the required remedial measures, if any. More specifically, within 30 days of the determination regarding remedial measures, the Monitoring Team shall submit a timeline to the Court, outlining the relevant tasks and anticipated completion date for streamlining and prioritizing the requirements of the *Nunez* Court Orders. If any stakeholder opposes the proposed timeline, the Monitor will present the substance of the opposition as part of his submission.  The Parties have reported that they consent to the Monitoring Team's recommended approach for management of streamlining the *Nunez* Court Orders.

# CONCLUSION

There is no providential formula that will resolve the issues facing the Department of Correction. There is also no standard model for remedial relief that involves receiverships, or similar relief, in jails or prisons given the unique aspects of each system. In New York, the problems are also so deeply entrenched that there is no singular solution that will fix these issues and certainly nothing that will miraculously alter conditions with the dispatch that is necessary under the current conditions. This reality only highlights the urgency of placing the Department on a clearly articulated and functional path forward in order to advance and, more critically, sustain comprehensive reform. All Parties have worked hard to try to devise proposals and considerations that will advance the reform effort.

As to the remedial relief in this case, it must necessarily be tailored to address the full array of dynamics in play related to the *Nunez* Court Orders which are voluminous and complex. There is an opportunity to tailor a remedial structure with consideration to the efforts and attempts over the last 10 years and what has worked and what has failed as documented in the Monitor's reports. There is a fulsome record of both successes and failures. The remedial relief must identify and build a model that accounts for both. As a famous playwright Samuel Beckett said, "Ever tried. Ever failed. No matter. Try again. Fail again. Fail better." The Monitoring Team remains available to serve as a resource to the Court and the Parties in the finalization of remedial relief to advance the *Nunez* reforms.

# APPENDIX A:
# SUMMARY OF NINE RECEIVERSHIP CASES

| ALABAMA | |
|---|---|
| Case | Newman, et al. v. State of Alabama, et al., 2:72-cv-03501 (M.D. Ala.); Pugh, et al. v. Bennett, et al., 2:74-cv-00057 (M.D. Ala.); James, et al. v. Bennett, et al., 2:74-cv-00203 (M.D. Ala.) |
| Status | Closed |
| **Description of the System** | |
| Description of the system | Entire State System (with multiple facilities but exact number unknown) |
| Average Daily Population | Early 1970s pre-Receiver: 3,698;[i] December 1988 at end of receivership: 12,440[ii] |
| Description of the Case | Three cases re: Alabama prisons were combined into one, with the Court finding that the state prison system was overcrowded, the PIC classification system was failing, those with mental illness were not given access to mental healthcare, general medical care was inadequate, living conditions were decrepit, and there was a general failure to protect persons in custody ("PIC"s) from violence or provide meaningful work or education.[iii] In 1976, the state legislature created a Legislative Prison Task Force to monitor the system, which found lack of compliance was due primarily to inadequate and inefficient management.[iv] In 1979, the Governor of the state petitioned to be the Receiver, and the Court appointed him as the Receiver.[v] The Governor remained the Receiver until a Prison Implementation Committee was established in 1983 to monitor and work alongside government officials to implement the Court's orders.[vi] |
| **Description of Receivership** | |
| Initiated | February 2, 1979[vii] |
| Completed | Approximately January 1983.  It appears the receivership ended when the Prison Implementation Committee went into effect.[viii] |
| Name of Entity | Receiver |
| Term, per Agreement | "[F]or a period of not less than one year, unless and until the receiver requests to be relieved or the Court orders a termination of the receivership before a year elapses"[ix] |
| Actual Duration | Nearly 4 years, followed by an ongoing Prison Implementation Committee that continues to monitor compliance |
| Appointed by Court or Negotiated by Parties | Appointed[x] |
| Description of Appointee | The Receiver in this case was the state's elected Governor, who petitioned to be the Receiver.[xi] |
| Authority and Powers | Receiver to have "all of its functions, duties, powers and authority to manage, supervise and control all penal and correctional institutions in the State of Alabama and all funds now held or controlled and all other duties and functions imposed upon the said Board under the laws of Alabama, including without limitation the power to hire, discharge, suspend and |

| | |
|---|---|
| | supervise the Commissioner of Corrections, deputy commissioners, and any other personnel employed by the Board."[xii] |
| Monitor, Special Master or Advisory Board | None |
| Role of the Local Government | The court ordered the Alabama Board of Corrections to transfer all their control and management duties to the governor, but the Commissioner of Corrections was kept on though subject to the hiring/firing of the Receiver[xiii] |
| Transition Back to Local Government | In 1983, the Receiver and Parties agreed to the creation of a Prison Implementation Committee that was tasked with working with the Governor (who had been serving as the Receiver) and the Commissioner of Corrections.[xiv] "All the members of the Prison Implementation Committee had previous involvement in this and other cases as lawyers, the Chairman of the original Human Rights Committee, and expert witnesses."[xv] The Implementation Committee stayed on until 1988, 4 years after the receivership ended, until the Court found that the "broad, remedial objectives" of the prior decrees had been met.[xvi] |
| **Current Status of the System** | |
| | Following a multi-year investigation, the U.S. Justice Department sued the State of Alabama in September 2020 for unconstitutional treatment of people in custody in its men's prisons "because Alabama fails to provide adequate protection from prisoner-on-prisoner violence and prisoner-on-prisoner sexual abuse, fails to provide safe and sanitary conditions, and subjects prisoners to excessive force at the hands of prison staff."[xvii] |

| WAYNE COUNTY, MI | |
|---|---|
| Case | Wayne County Jail Inmates v. Wayne County Sheriff, 71-173217-CZ (Michigan state trial court) |
| Status | Believed to be ongoing |
| **Description of the System** | |
| Description of the system | 1 County jail system |
| Average Daily Population | 1,700 PICs[xviii] |
| Description of the Case | In 1971, a complaint was filed alleging "depraved, inhuman and barbaric" conditions at the jail.[xix] A monitorship was imposed, and in 1988, a new monitor filed a report describing noncompliance with every provision of the judgment.[xx] In 1989, the judge imposed a receivership. "He cited as the offending areas environmental conditions, mental health, medical care, classification and discipline" due to mismanagement and insufficient funding.[xxi] The judge argued some of this was due to conflict between the Sheriff and Chief Executive Officer of the town.[xxii] On emergency leave to appeal, the Supreme Court reversed this Court and stayed the receivership order, but the Michigan Court of Appeals affirmed the decision to impose a Receiver.[xxiii] The Michigan Court of Appeals found five problem areas - environmental conditions, mental health, medical care, PIC classification, and discipline.[xxiv] |
| **Description of Receivership** | |
| Initiated | Approximately July 1989[xxv] |
| Completed | Unknown |
| Name of Entity | Receiver |
| Term, per Agreement | "At the conclusion of one year from the effective date of [the Receiver's] appointment as receiver, the monitors shall prepare a comprehensive report of the defendants' compliance with the Final Judgment. Upon submission of that report, the Court will consider whether it is appropriate to terminate the receivership and return operational control of the jail to the Sheriff, or, in the absence of compliance, to take such other steps as are necessary to bring about compliance with the Final Judgment."[xxvi] |
| Actual Duration | Unknown |
| Appointed by Court or Negotiated by Parties | Appointed[xxvii] |
| Description of Appointee | Receivership power was given to the Chief Executive Officer for the county instead of an outside expert. "Judge Kaufman chose the Wayne County Executive rather than Vincent Nathan or an 'outside' expert, because that appointment intruded least upon the governing structure of Wayne County."[xxviii] |
| Authority and Powers | "As receiver, [the Chief Executive Officer of the county] shall exercise responsibility and control over all operational matters relating to all Wayne |

| | |
|---|---|
| | County Jail facilities. [The Chief Executive Officer of the county] shall be responsible also for the supervision of all administrative, civilian and security staff of the jail and shall exercise all authority with respect to the operation of the jail that formerly resided in the Sheriff of Wayne County. [The Chief Executive Officer of the county] shall retain responsibility for all fiscal matters relating to the jail that he currently exercises as the County's Chief Executive Officer."[xxix] |
| Monitor, Special Master or Advisory Board | Monitors that existed before the Receiver remained in place[xxx] |
| Role of the Local Government | Based on the Michigan Appeals Court order, it seems all powers held by the Sheriff were given to the Receiver. |
| Transition Back to Local Government | Unknown |
| **Current Status of the System** | |
| | In September 2024, Wayne County opened a new "state-of-the-art" jail facility without any bars. Just over a month after the facility had opened, 2 people in custody had died by suicide in mental health units within the new facility.[xxxi] In a 13-month period from 2016-2017, eight people had died by suicide in the old facility, triggering an investigation by the Department of Justice into the treatment of those in custody with disabilities.[xxxii] Additionally in 2024, Wayne County agreed to a $7 million dollar settlement when a person in custody was beaten to death by another person in custody inside his cell in 2023.[xxxiii] |

| WASHINGTON, DC | |
|---|---|
| Case | Campbell, et al. v. McGruder, et al., 1:71-cv-01462 (D.D.C.);<br>Inmates of D.C. Jail, et al. v. Jackson, et al., 1:75-cv-01668 (D.D.C.) |
| Status | Closed |
| **Description of the System** | |
| Description of the system | 1 City Jail System |
| Average Daily Population | Population capped at 1,694 PICs by a 1985 Court Order[xxxiv] |
| Description of the Case | In 1971, a lawsuit was filed alleging the PICs in the jail were subject to overcrowding, inadequate food, denial of access to counsel, inadequate medical services, lack of contact with community, and lack of employment programs. In 1985, the Court entered into a remedial stipulation requiring a medical expert to review and make recommendations regarding medical and mental health service delivery.[xxxv] In 1993, the Court appointed a Special Officer to "monitor and report" on the jails' efforts to meeting its Court Orders.[xxxvi] In 1994, the Special Officer reported that there were significant problems with the delivery of healthcare.[xxxvii] In 1994, the DC DOC agreed to implement remedial plans to address these issues.[xxxviii] In 1995, the Special Officer again reported on the refusal to comply with these Court-ordered plans, which led the Court to impose a Receiver tasked with improving medical and mental health services in the jail.[xxxix] |
| **Description of Receivership** | |
| Initiated | Order Entered: July 11, 1995<br>Receiver starts: August 21, 1995[xl] |
| Completed | September 18, 2000[xli] |
| Name of Entity | Receiver |
| Term, per Agreement | 5 Years "unless the Court finds good cause to extend the appointment. The Court may terminate the receivership prior to the expiration of five years if the Special Officer certifies that the defendants are in compliance with all orders of this Court concerning medical and mental health services at the Jail and that management structures are in place to ensure that the there is no foreseeable risk of future non-compliance."[xlii] |
| Actual Duration | 5 years |
| Appointed by Court or Negotiated by Parties | Appointed; The Court determined that a Receiver was needed, but the Parties conferred and agreed upon the person appointed to be the Receiver[xliii] |
| Description of Appointee | The Court determined that a Receiver was needed, but the Parties conferred and agreed upon the person appointed to be the Receiver[xliv] |
| Authority and Powers | Required to correct all deficiencies in the delivery of medical and mental health services and given the following powers:<br>"1. All powers currently held by the Mayor, City Administrator, Director of the Department of Corrections, Assistant Director for Health Services and Chief Medical Officer regarding the delivery of medical and mental health |

| | |
|---|---|
| | services at the District of Columbia Jail.<br>2. The power to create, modify, abolish or transfer positions; to hire, terminate, promote, transfer, evaluate and set compensation for staff to the extent necessary to obtain compliance with this Court's orders, the cost of such activity to be borne by the defendants.<br>3. The power to procure such supplies, equipment or services as are necessary to obtain compliance with this Court's orders, the cost of such procurement to be borne by the<br>defendants.<br>4. The power to contract for such services as are necessary to obtain compliance with this Court's orders, the cost of such contracts to be borne by the defendants.<br>5. The power to hire such consultants, or to obtain such technical assistance as he or she deems necessary to perform her or his functions, the cost of such consultants or technical assistance to be borne by the defendants.<br>6. The power to petition the Court for such additional powers as are necessary to obtain compliance with this Court's orders."[xlv] |
| Monitor, Special Master or Advisory Board | Special Officer (Court-appointed "to monitor and report") that existed before the Receiver remained in place[xlvi] |
| Role of the Local Government | The Receiver was only given power over the medical/mental health services. |
| Transition Back to Local Government | The Receiver contracted with the Center for Correctional Health and Policy Studies, Inc. (CCHPS), a private not-for-profit organization, to provide medical services at the Jail beginning in March 2000. When the receivership ended, the DC DOC continued to contract with CCHPS. In April 2003, the CCHPS contract was extended to a second facility operated by DOC.[xlvii]<br><br>Before concluding the receivership, the Court required the Receiver to ensure "that management structures are in place to ensure that the there is no foreseeable risk of future non-compliance."[xlviii] |
| **Current Status of the System** | |
| | In April 2024, people in custody in DC filed a class action lawsuit alleging unconstitutional treatment due to DC Jail's failure to provide adequate medical care and indifference to those with serious medical conditions.[xlix] |

| FULTON COUNTY, GA | |
|---|---|
| Case | Harper, et al. v. Bennet, et al., 1:04-cv-01416 (N.D. Ga.) |
| Status | Closed |
| **Description of the System** | |
| Description of the system | 1 County Jail System - 1 facility |
| Average Daily Population | 3,299 PICs as of 5/24/2004[l] |
| Description of the Case | In 2004, a PIC filed a complaint about the jails alleging they "were confined in unconstitutional living conditions due to an excessive number of inmates in the Jail, an inadequate number of detention officers to ensure their safety, the breakdown of the ventilation, plumbing and laundry systems, and other circumstances."[li] This was confirmed by a court-appointed expert, who recommended a Receiver.[lii] The Parties agreed to a receivership, and an individual was selected and appointed to the Court to serve through the end of the year (2004) when the Sheriff's (the current custodian of the jail) was replaced via an election.[liii] The Receiver served less than 6 months. About a year after the receivership ended, the Parties all entered into a consent decree appointing a monitor that served until 2014.[liv] |
| **Description of Receivership** | |
| Initiated | Order Entered: July 14, 2004<br>Receiver starts: July 23, 2004[lv] |
| Completed | January 1, 2005, when the newly elected sheriff of Fulton County assumed responsibility for the Jail[lvi] |
| Name of Entity | Receiver |
| Term, per Agreement | "until a new, duly-elected sheriff takes office in January 2005"[lvii] |
| Actual Duration | Less than 6 months, followed by an ongoing monitorship |
| Appointed by Court or Negotiated by Parties | Appointed [lviii] |
| Description of Appointee | The Court determined who the Receiver should be, though the Parties consented to the appointment of a Receiver. The Court selected the Receiver because of "[his] outstanding qualifications as an experienced jail administrator with the federal Bureau of Prisons, the glowing recommendations of his references, and the Court's own assessment after conducting a personal interview."[lix] |
| Authority and Powers | "the Receiver shall have the same powers and responsibilities as the Fulton County Sheriff with respect to the management, supervision, and operation of the jail, including but not limited to the power to hire, fire, and discipline employees and the power to make all budgetary and other decisions ordinarily entrusted to the sheriff."[lx]<br><br>"Specifically, the Receiver shall make every effort (1) to reduce the inmate |

| | |
|---|---|
| | population at the Rice Street facility to at or below 2,250; (2) to repair and properly maintain the basic systems at the jail, including especially the plumbing, air conditioning, ventilation, and electrical systems; and (3) to provide a sufficient number of trained and qualified staff to adequately protect the health and safety of both inmates and staff."[lxi] <br><br> If the county processes or resources are not enough, "then the Receiver may apply to the Court for an appropriate order directing the County and the Board of Commissioners to provide whatever resources or assistance may be needed."[lxii] |
| Monitor, Special Master or Advisory Board | Court-appointed expert that recommended the receivership continued to conduct bimonthly site visits and consult with the Receiver [lxiii] |
| Role of the Local Government | Receiver appointed "to replace" the Sheriff as the custodian of the jail. "[The Sherriff] shall have no further authority with respect to the jail but has agreed to be available for consultation with the Receiver to the extent he deems necessary."[lxiv] |
| Transition Back to Local Government | The receivership ended as stated in the order, when a new sheriff was elected and resumed control of the facility. However, the litigation continued until a consent order was reached and entered on 12/21/2005.[lxv] This order led to the creation of a monitorship and the setting of compliance provisions. The monitorship eventually ended and the case closed in 2014. |
| **Current Status of the System** | |
| | In November 2024, a U.S. Justice Department investigation concluded that the Fulton County Jails violated constitutional rights because "people incarcerated in the Fulton County Jail suffered harms from pest infestation and malnourishment and were put at substantial risk of serious harm from violence by other incarcerated people — including homicides, stabbings and sexual abuse." They also found that the Fulton County Jail fails to provide adequate medical or mental health services or special education services to 17-year-olds in custody, and uses solitary confinement in discriminatory ways that expose people to harm.[lxvi] |

| CALIFORNIA | |
|---|---|
| Case | Plata, et al. v. Newsom, et al., 4:01-cv-01351 (N.D. Cal.) |
| Status | Ongoing |
| **Description of the System** | |
| Description of the system | Entire State System - 31 facilities[lxvii] |
| Average Daily Population | 166,000 in custody in 2005 when receivership went into effect[lxviii] <br> 92,740 as of July 2024[lxix] |
| Description of the Case | In 2001, the initial complaint alleged the state violated the Eighth Amendment by providing inadequate medical care in the state's prisons. The state agreed in 2002 to take a series of actions to address the deficiencies, but in 2006, the Court found the state had not fulfilled its orders and imposed a Receiver to "reverse the entrenched paralysis and dysfunction and bring the delivery of health care in California prisons up to constitutional standards."[lxx] The first Receiver analyzed the system to determine what reforms were needed, and the second Receiver has been implementing them. |
| **Description of Receivership** | |
| Initiated | Order Entered: February 14, 2006 <br> Receiver starts: April 17, 2006[lxxi] |
| Completed | Ongoing |
| Name of Entity | Receiver |
| Term, per Agreement | The Receivership shall remain in place no longer than the conditions which justify it make necessary, and shall cease as soon as the Court is satisfied, and so finds in consultation with the Receiver, that Defendants have the will, capacity, and leadership to maintain a system of providing constitutionally adequate medical health care services to class members.[lxxii] |
| Actual Duration | 18 years and going (on November 25, 2024, the Court appointed the advisory board in this case to a term through December 31, 2027[lxxiii]) |
| Appointed by Court or Negotiated by Parties | Appointed[lxxiv] |
| Description of Appointee | The Receiver position has been held by 2 different people: <br> First Receiver served February 14, 2006-January 23, 2008 <br> Second Receiver has been in place January 23, 2008-present <br><br> The Court explained that a new Receiver was appointed because "The Receivership has reached a critical juncture at which it must now move from a primarily investigative and evaluative phase, during which the Receivership analyzed the current system to determine what reforms were necessary and worked to create the infrastructure required to effectuate such reforms, into an implementation phase, during which the Receivership must translate the conceptualized reforms into reality... After careful reflection and deliberation, the Court has concluded that such work would |

| | |
|---|---|
| | best be accomplished by appointing a new Receiver who brings a different set of strengths appropriate to guiding the Receivership through its second phase."[lxxv]<br><br>The first Receiver had previously worked as an executive director of health & hospital systems and was selected after the Court conducted a "national search."[lxxvi] The second Receiver was a legal expert and professor who had worked in various branches in government, including direct experience with the reform of troubled government agencies.[lxxvii] |
| Authority and Powers | "The Receiver shall provide leadership and executive management of the California prison medical health care delivery system with the goals of restructuring day-to-day operations and developing, implementing, and validating a new, sustainable system that provides constitutionally adequate medical care to all class members as soon as practicable. To this end, the Receiver shall have the duty to control, oversee, supervise, and direct all administrative, personnel, financial, accounting, contractual, legal, and other operational functions of the medical delivery component of the CDCR."[lxxviii]<br><br>"In the event, however, that the Receiver finds that a state law, regulation, contract, or other state action or inaction is clearly preventing the Receiver from developing or implementing a constitutionally adequate medical health care system, or otherwise clearly preventing the Receiver from carrying out his duties as set forth in this Order, and that other alternatives are inadequate, the Receiver shall request the Court to waive the state or contractual requirement that is causing the impediment."[lxxix] |
| Monitor, Special Master or Advisory Board | Advisory Board[lxxx] |
| Role of the Local Government | "The Receiver shall exercise all powers vested by law in the Secretary of the CDCR as they relate to the administration, control, management, operation, and financing of the California prison medical health care system. The Secretary's exercise of the above powers is suspended for the duration of the Receivership; it is expected, however, that the Secretary shall work closely with the Receiver to facilitate the accomplishment of his duties under this Order."[lxxxi] |
| Transition Back to Local Government | "The Court expects that as the Receivership progresses, the Receiver will attempt to engage Defendants in assuming responsibility over portions of the system that are within Defendants' demonstrated ability to perform, so that the ultimate transfer of power back to the State will be transitional. Prior to the cessation of the Receivership, the Receiver shall develop a Plan for Post-Receivership Governance of the system, which shall include consideration of its structure, funding, and governmental responsibility for its long-term operation. The Receiver shall present this plan to the Court for approval and adoption as an order."[lxxxii] |
| **Current Status of the System** | |

| | As of July 2024, medical operations at 26 of 31 facilities have been delegated back to the authority of the California Department of Corrections and Rehabilitation Secretary.[lxxxiii] |
|---|---|

| COOK COUNTY, IL | |
|---|---|
| Case | Doe, et al. v. Cook County, et al., 1:99-cv-03945 (N.D. Ill.) |
| Status | Closed |
| **Description of the System** | |
| Description of the system | One Juvenile Facility |
| Average Daily Population | 500 Beds |
| Description of the Case | The complaint "alleged gross mismanagement of the JTDC leading to overcrowding, unsafe and unsanitary facilities, inadequate medical, dental, and mental health care, physical violence and abuse by residents and staff, unfair discipline, and inadequate access to education… Substantial compliance with the settlement agreement would be achieved when the defendants hired new management and additional staff, increased security, and developed an improved disciplinary protocol." In 2007, the plaintiffs filed a Motion for Receiver and claimed that the conditions of the JTDC were worse than at the beginning of the lawsuit.[lxxxiv] |
| **Description of Receivership** | |
| Initiated | August 14, 2007[lxxxv] |
| Completed | May 20, 2015[lxxxvi] |
| Name of Entity | Transitional Administrator (TA) |
| Term, per Agreement | "The appointment of the TA shall be subject to dissolution by agreement of the parties or upon a showing of substantial compliance to this Court with the terms of the [Court Orders]."[lxxxvii] |
| Actual Duration | Almost 8 years |
| Appointed by Court or Negotiated by Parties | Negotiated |
| Description of Appointee | The individual was chosen by all Parties and was a leading expert in the field of juvenile detention reform.[lxxxviii] |
| Authority and Powers | "To oversee, supervise, and direct all management, administrative, financial, contractual, personnel, security, housing, custodial, purchasing, maintenance, technology, health services, mental health services, food and laundry service, recreational, educational, and programmatic functions relating to the operation of the JTDC consistent with the authority vested in the position of Superintendent of the JTDC and to restructure the JTDC into an institution that substantially complies with the Court Orders."[lxxxix]<br><br>Given "All powers relating to the operation of the JTDC" including the budget.[xc]<br><br>Those involved in the receivership reported that they tried to use the typical processes, but often those wouldn't work and they would have to petition the judge for additional authority, including: |

| | |
|---|---|
| | - Hiring a third party staff recruiting firm to hire and onboard new staff<br>- Hiring a third party security firm to supplement current staff<br>- Requiring existing staff to reapply for their jobs and some were not rehired[xci] |
| Monitor, Special Master or Advisory Board | Monitor (but role eliminated with appointment of Transitional Administrator)[xcii] |
| Role of the Local Government | No, the TA became the sole administrative authority over the JTDC. |
| Transition Back to Local Government | The TA stayed on as an expert at the conclusion of the TA period for six months to "observe the transition in order to identify any potentially serious deviations from" the Court Orders for 3 months. He could no longer operate the facility but could still consult. He submitted reports to the Parties during this transitional period.[xciii]<br><br>Contractors that were brought in stayed after the TA period ended.[xciv]<br><br>During a panel discussion, one of the individuals who worked alongside the Receiver stated, "And even today, we have some of the same folks that were brought in under the transitional administrator that are still there today, working through this, trying to maintain what was created by the team."[xcv] |
| **Current Status of the System** | |
| | A "Blue Ribbon Committee" convened by the Cook County Chief Judge to investigate the use of room confinement and other concerns at the JTDC. The Committee published its report in 2022 finding that the JTDC does keep youth safe, but it does not rehabilitate or heal youth in its care and that staff do not actively engage with youth. The Committee also reported that while the JTDC doesn't use solitary confinement, the conditions are isolating and depriving, with youth locked in their cells at least 13 hours a day. The Committee also found that programming, educational, and vocational opportunities were lacking.[xcvi] |

| ORLEANS PARISH, LA | |
|---|---|
| Case | Jones, et al. v. Gusman et al., 2:12-cv-00859 (E.D. La.) |
| Status | Ongoing |
| **Description of the System** | |
| Description of the system | 1 City Jail System with 2 facilities |
| Average Daily Population | 1,451 in January 2018 to 1,167 as of June 2019[xcvii] |
| Description of the Case | In 2012, the Parties entered into a Consent Judgment, "seeking to address deficiencies in safety and security, medical and mental health care, environmental conditions, fire safety, and limited English proficiency services at the Orleans Parish jail facilities."[xcviii] The Court eventually approved the selection of the lead monitor and six sub-monitors in 2013.[xcix] Plaintiffs' filed a receivership motion, and eventually in 2016, the Parties agreed to the creation of an Independent Compliance Director (ICD) position.[c] The first ICD served about a year and a half, but the Court was "dissatisfied with the pace of reform and lack of compliance," so a second ICD was put into place.[ci] The Monitor initially reported progress under this ICD, but saw regression towards the end of the receivership that continued after the receivership ended.[cii] |
| **Description of Receivership** | |
| Initiated | Order Entered: June 21, 2016[ciii]<br>Receiver starts: October 1, 2016[civ] |
| Completed | November 27, 2020[cv] |
| Name of Entity | Independent Jail Compliance Director |
| Term, per Agreement | "The Compliance Director's authority will continue until the Court determines that sustained and sustainable material progress with substantial compliance with the Consent Judgment is achieved…"[cvi]<br><br>Compliance Director's plan should explain how to "facilitate sustainable compliance with the Consent Judgment within one year of the appointment of the Compliance Director." "If a Consent Judgment provision cannot be brought into substantial compliance with concrete steps in one year, the Plan will provide specific deadlines for compliance as soon as is practicable thereafter."[cvii]<br><br>No sooner than nine months after the appointment of the Compliance Director, the Sheriff may file a motion to terminate the Compliance Directorship on the basis that the Compliance Director has enabled the Orleans Parish Jail to achieve material progress with substantial compliance with all provisions of the Consent Judgment"[cviii] |
| Actual Duration | 4 Years |
| Appointed by Court or | Negotiated |

| Negotiated by Parties | |
|---|---|
| Description of Appointee | The Compliance Director position has been held by 2 different people: First Compliance Director served October 1, 2016-January 29, 2018.[cix] The Second Compliance Director served February 19, 2018-November 27, 2020[cx] |
| | The first Compliance Director was removed because "the Court is nonetheless dissatisfied with the pace of reform and lack of compliance" under the first Compliance Director.[cxi] |
| | For the appointment of the first Compliance Director, the Judge ordered the Parties to recommend individuals and for the Sheriff to select the final person from the candidates.[cxii] The Second Compliance Director had been serving as the Correctional Practice Monitor for the case prior to being appointed as the Compliance Director.[cxiii] |
| Authority and Powers | The Compliance Director must ensure "required policies have been developed and implemented per the Consent Judgment, staff have been adequately trained on those policies, and [the Sheriff's Office] has developed a quality assurance/audit system that effectively evaluates whether staff are implementing the policies in practice and corrects their conduct when they do not."[cxiv] |
| | The following areas were in need of support: use of force, supervision, staffing, internal accountability systems, services for and protection of youthful prisoners, medical and mental health care, and the quality of investigations completed by the Investigative Services Bureau and Internal Affairs Division.[cxv] |
| | Compliance Director can submit a revised Jail Operations budget to the City, and was given exclusive control over all funding, subject to approval of the City Council.[cxvi] |
| | Compliance Director has "final authority to create, modify, abolish or transfer employee and contractor positions; to recruit, hire, discipline, terminate, promote, demote, transfer, and evaluate employees and contractors"[cxvii] |
| Monitor, Special Master or Advisory Board | Monitors remained on the case, but "less technical assistance will be expected and required"[cxviii] |
| Role of the Local Government | Sheriff in charge of jail remains in position and "The Compliance Director shall seek advice and/or approval from the Sheriff regarding all decisions that materially impact compliance with the Consent Judgment, unless doing so would cause unreasonable delay, and otherwise regularly inform the Sheriff regarding jail operations."[cxix] |

| | |
|---|---|
| Transition Back to Local Government | "Once the Compliance Director's appointment is terminated by the Court and authority for Jail administration and operations reverts to the Sheriff, OPSO and the Sheriff will continue to be subject to the requirement that compliance be sustained for the two-year period required by § XI.C. of the Consent Judgment."[cxx]<br><br>The Monitor continued to work (and is still working as of the end of 2024) on this case after the receivership ended. |
| **Current Status of the System** ||
| | In June 2024, the Judge in this case entered a new court-ordered action plan that was negotiated by the Parties and monitor after seeing "regression" in compliance after the operations of the facility were delegated back to the Orleans Parish Sheriff's Office.[cxxi] |

| MIAMI-DADE COUNTY, FL | |
|---|---|
| Case | United States v. Miami-Dade County, the Board of County Commissioners, et al., 1:13-cv-21570 (S.D. Fla.) |
| Status | Partially Concluded<br>Settlement Agreement Terminated on Consent of Both Parties - 11/19/24[cxxii]; Consent Agreement is still pending<br><br>April 2025 to report on status of consent decree following one last site visit[cxxiii] |
| **Description of the System** | |
| Description of the system | Multiple facilities |
| Average Daily Population | 4,706 in 2024[cxxiv] |
| Description of the Case | Two court-ordered agreements set out 171 compliance provisions regarding areas of protection from harm, fire and life safety, and inmate grievances. At the start of the Interim Compliance Director's (ICD) tenure, the jails were not in compliance with 14 provisions of the agreements. The ICD grouped them into 5 categories:<br>"1. Protection from Harm/Objective Inmate Classification<br>2. Segregation of Inmates with Serious Mental Illness (SMI)<br>3. Mortality and Morbidity Reviews, later referred to as Major Incident Reviews<br>4. Audits and Continuous Improvement<br>5. Sexual Misconduct (compliance with the Prison Rape Elimination Act (PREA))."[cxxv]<br><br>In this case, compliance must be maintained for 18+ consecutive months to officially close out a provision.[cxxvi] |
| **Description of Receivership** | |
| Initiated | February 15, 2023 |
| Completed | Possibly 2025[cxxvii] |
| Name of Entity | Independent Compliance Director |
| Term, per Agreement | "Until at least October 31, 2023, when substantial compliance with the Agreements will be achieved."[cxxviii] |
| Actual Duration | ~ 2 years (assuming completion in 2025) |
| Appointed by Court or Negotiated by Parties | Negotiated[cxxix] |
| Description of Appointee | The County Mayor appointed the individual who would serve as the Compliance Director, but the individual was also recommended by the monitor "for his expertise and knowledge in the subject area of jail reform and modern jail practices."[cxxx] Prior to his appointment as the Compliance |

| | |
|---|---|
| | Director, the individual had also served as a consultant to Miami-Dade County regarding this case.[cxxxi] |
| Authority and Powers | The Compliance Director shall have the Administrative Authority "to direct personnel actions, including, but not limited to, the authority to direct hiring, firing, suspension, supervision, promotion, transfer, and disciplinary actions, and establish administrative personnel policies and positions," "negotiate new  contracts and agreements," "direct specific actions at MDCR to attain and sustain substantial compliance levels," including changing policy or practice or maintaining/eliminating programming.[cxxxii]<br><br>The Compliance Director can request the Court for the ability to take additional action if applicable laws/agreements or Parties stand in the way.<br><br>Must devise a plan to 1) conduct an inmate bed and classification analysis and implement a plan to address the results; 2) reduce inmate-on-inmate violence; 3) develop and implement policies, protocols, trainings, and audits for PREA purposes; 4) determine how the county will self-monitor itself.[cxxxiii] |
| Monitor, Special Master or Advisory Board | Monitor's role remained the same[cxxxiv] |
| Role of the Local Government | The Independent Compliance Director reports to the Mayor. |
| Transition Back to Local Government | The Compliance Director was tasked with helping the agency "self-monitor" itself, and the jails are nearing sustained compliance on all provisions the time period required (18 consecutive months), which will trigger the end of the ICD's tenure and transition of power back to the local agency |
| **Current Status of the System** | |
| | In November 2023, the Miami-Dade County Corrections and Rehabilitation Department (MDCR) entered into compliance with all requirements of this case's Consent Agreement for the first time. To terminate the agreements, the MDCR must maintain compliance for 18 months, which would be in early 2025.[cxxxv] The Monitors' October 2024 report found MDCR had sustained compliance with all provisions, and under the 18-month sustained compliance provision, expected all agreements would be eligible to be terminated by May 2025.[cxxxvi] |

| HINDS COUNTY, MS | |
|---|---|
| Case | United States v. Hinds County, et al., 3:16-cv-00489 (S.D. Miss.) |
| Status | Ongoing |
| **Description of the System** | |
| Description of the system | One county jail facility |
| Average Daily Population | 750 in 2022[cxxxvii] |
| Description of the Case | A 2015 DOJ investigation into the Hinds County jails found that the facilities were understaffed, staff weren't adequately trained or supervised, and the facilities were poorly maintained. Staff failed to supervise PICs with a history of violence, mental illness, or suicide attempts, and routinely used excessive force. In 2016, the DOJ filed a lawsuit based on its findings.[cxxxviii] A joint settlement motion was filed ordering Hinds County to undertake certain reforms and implement a monitor.[cxxxix] After additional orders and years of non-compliance, in 2022, the Judge found the county in contempt and issued a receivership.[cxl] A few days before the Receiver was supposed to start, the Fifth Circuit stayed the implementation of the Receiver pending appeal of the receivership order. In October 2024, the Fifth Circuit affirmed the decision to appoint a Receiver, but remanded for further proceedings to more narrowly tailor the scope of the Receiver's powers.[cxli] |
| **Description of Receivership** | |
| Initiated | Not yet initiated<br><br>Order Entered: October 31, 2022<br>Receiver was scheduled to start on January 1, 2023[cxlii], but the Fifth Circuit issued a stay of his appointment pending the appeal decision.  Appeals ongoing. |
| Completed | N/A because the receivership hasn't started yet |
| Name of Entity | Receiver |
| Term, per Agreement | "The Receivership shall remain in place no longer than necessary to remedy the unconstitutional conditions justifying the appointment. The Receivership will end as soon as the Court finds that Defendants have remedied RDC's unconstitutional conditions and achieved substantial compliance with the Court's Orders."[cxliii]<br><br>"The Court anticipates that substantial compliance will be achieved by the time RDC closes and detainees have been moved into the new Jail facility and expects remediation of other non-physical-plant-related deficiencies by that time as well."[cxliv] |
| Actual Duration | Has not yet started |
| Appointed by Court or | Appointed[cxlv] |

| | |
|---|---|
| Negotiated by Parties | |
| Description of Appointee | The individual was selected from four candidates submitted by the Parties. The Court interviewed two of these candidates and selected a candidate with prior law enforcement and correctional leadership experience that was also a member of National Institute of Corrections and American Correctional Association and a consultant for DOJ. [cxlvi] |
| Authority and Powers | "The Receiver shall have all powers, authorities, rights, and privileges now possessed by the officers, managers, and interest holders of and relating to RDC, in addition to all powers and authority of a receiver at equity under all applicable state and federal law in accordance with Fed. R. Civ. P. 66."[cxlvii]<br><br>"The Receiver shall hold and exercise all executive, management, and leadership powers for the defend-ants with respect to the custody, care, and supervision of Hinds County detainees at RDC, including the power to admit, book release, transfer, and supervise detainees at RDC in a constitutional manner."[cxlviii]<br><br>"The Receiver shall be in day-to-day charge of RDC operations. The Receiver shall not have day-to-day oversight of the Work Center or the Jackson Detention Center."[cxlix]<br><br>"The Receiver shall have the duty to control, oversee, supervise, and direct all administrative, personnel, financial, accounting, contractual, and other operational functions for RDC."[cl] |
| Monitor, Special Master or Advisory Board | Monitor that existed before the Receiver remained in place[cli] |
| Role of the Local Government | The order contemplates that the Receiver will be given the operational authority of the County Sheriff for the RDC (one of the three facilities) in the county. |
| Transition Back to Local Government | "The Court expects that the Receiver will transition operational responsibilities and powers over RDC back to Defendants as Defendants demonstrate the ability to operate RDC in a constitutional manner."[clii]<br><br>"Prior to any transfer of powers and responsibilities to the Defendants, the Receiver shall develop a Transition Plan."[cliii]<br><br>"The Transition Plan shall provide long-term management and policy recommendations as to the overall structure and funding of RDC and the Jail, and as to Defendants' responsibilities."[cliv]<br><br>"The Transition Plan also will provide specific operational guidance to Defendants so that they can sustain constitutional conditions after powers and authority have been transferred back to them."[clv] |

| Current Status of the System | |
|---|---|
| | Ongoing appeals before the Fifth Circuit. |

[i] Brian Lyman, In 1976, the Feds Took Over Alabama's Prison System. And Alabama's Prisons Improved, Montgomery Advertiser (September 23, 2021),
https://www.montgomeryadvertiser.com/story/news/2021/09/24/1976-feds-took-over-alabamas-prison-system-prisons-improved/5829014001/

[ii] *Newman, et al. v. State of Alabama, et al.*, 2:72-cv-03501 (M.D. Ala.), Memorandum Opinion dated December 28, 1988, at pg. 4.

[iii] *Newman v. State of Ala.*, 466 F. Supp. 628 (M.D. Ala. 1979)

[iv] *Newman v. State of Ala.*, 466 F. Supp. 628, 637 (M.D. Ala. 1979)

[v] *Newman v. State of Ala.*, 466 F. Supp. 628, 636 (M.D. Ala. 1979); *Newman, et al. v. State of Alabama, et al.*, 2:72-cv-03501 (M.D. Ala.), Court Order dated February 2, 1979.

[vi] *Newman, et al. v. State of Alabama, et al.*, 2:72-cv-03501 (M.D. Ala.), Consent Agreement dated January 5, 1983, at pgs. 2-3.

[vii] *Newman, et al. v. State of Alabama, et al.*, 2:72-cv-03501 (M.D. Ala.), Court Order dated February 2, 1979.

[viii] *Newman, et al. v. State of Alabama, et al.*, 2:72-cv-03501 (M.D. Ala.), Consent Agreement dated January 5, 1983, at pgs. 2-3.

[ix] *Newman, et al. v. State of Alabama, et al.*, 2:72-cv-03501 (M.D. Ala.), Court Order dated February 2, 1979, at pg. 2.

[x] *Newman, et al. v. State of Alabama, et al.*, 2:72-cv-03501 (M.D. Ala.), Court Order dated February 2, 1979.

[xi] *Newman v. State of Ala.*, 466 F. Supp. 628 (M.D. Ala. 1979).

[xii] *Newman, et al. v. State of Alabama, et al.*, 2:72-cv-03501 (M.D. Ala.), Court Order dated February 2, 1979, at pg. 2.

[xiii] *Newman, et al. v. State of Alabama, et al.*, 2:72-cv-03501 (M.D. Ala.), Court Order dated February 2, 1979.

[xiv] *Newman, et al. v. State of Alabama, et al.*, 2:72-cv-03501 (M.D. Ala.), Consent Agreement dated January 5, 1983.

xv *Newman, et al. v. State of Alabama, et al.*, 2:72-cv-03501 (M.D. Ala.), Memorandum Opinion dated December 28, 1988, at pg. 3.

xvi *Newman, et al. v. State of Alabama, et al.*, 2:72-cv-03501 (M.D. Ala.), Memorandum Opinion dated December 28, 1988, at pg. 19.

xvii Press Release, U.S. Dep't of Justice, Justice Department Files Lawsuit Against the State of Alabama for Unconstitutional Conditions in State's Prisons for Men (December 9, 2020), https://www.justice.gov/opa/pr/justice-department-files-lawsuit-against-state-alabama-unconstitutional-conditions-states

xviii *Wayne County Jail Inmates v. Wayne County Chief Executive Officer*, 178 Mich. App. 634, 652-653 (1989).

xix *Wayne County Jail Inmates v. Wayne County Chief Executive Officer*, 178 Mich. App. 634, 637 (1989).

xx *Wayne County Jail Inmates v. Wayne County Chief Executive Officer*, 178 Mich. App. 634, 639-640 (1989).

xxi *Wayne County Jail Inmates v. Wayne County Chief Executive Officer*, 178 Mich. App. 634, 643-644 (1989).

xxii *Wayne County Jail Inmates v. Wayne County Chief Executive Officer*, 178 Mich. App. 634, 645 (1989).

xxiii *Wayne County Jail Inmates v. Wayne County Chief Executive Officer*, 178 Mich. App. 634, 648, 668 (1989).

xxiv *Wayne County Jail Inmates v. Wayne County Chief Executive Officer*, 178 Mich. App. 634, 644 (1989).

xxv *Wayne County Jail Inmates v. Wayne County Chief Executive Officer*, 178 Mich. App. 634, 642, 647 (1989).

xxvi *Wayne County Jail Inmates v. Wayne County Chief Executive Officer*, 178 Mich. App. 634, 646 (1989).

xxvii *Wayne County Jail Inmates v. Wayne County Chief Executive Officer*, 178 Mich. App. 634, 662-663 (1989).

xxviii *Wayne County Jail Inmates v. Wayne County Chief Executive Officer*, 178 Mich. App. 634, 645-646 (1989).

xxix *Wayne County Jail Inmates v. Wayne County Chief Executive Officer*, 178 Mich. App. 634, 646 (1989).

xxx *Wayne County Jail Inmates v. Wayne County Chief Executive Officer*, 178 Mich. App. 634, 646 (1989).

xxxi Ross Jones, Wayne County's New Jail Grapples with 2 Inmate Suicides in less than a Month, ABC 7 (October 8, 2024), https://www.wxyz.com/news/local-news/investigations/wayne-countys-new-jail-grapples-with-2-inmate-suicides-in-less-than-a-month#google_vignette

xxxii Ross Jones, Wayne County's New Jail Grapples with 2 Inmate Suicides in less than a Month, ABC 7 (October 8, 2024), https://www.wxyz.com/news/local-news/investigations/wayne-countys-new-jail-grapples-with-2-inmate-suicides-in-less-than-a-month#google_vignette

xxxiii Ross Jones, Wayne County to Pay $7 Million over Inmate's 'Heinous' Murder Inside Jail, ABC 7 (July 11, 2024), https://www.wxyz.com/news/local-news/investigations/wayne-county-to-pay-7-million-over-inmates-heinous-murder-inside-jail

xxxiv Chronology of D.C. Jail Crisis, Wash. Post. (March 23, 1986), https://www.washingtonpost.com/archive/local/1986/03/23/chronology-of-dc-jail-crisis/3bd80546-0323-476d-9ee6-ba6ce8396a3f/

xxxv *Inmates of D.C. Jail, et al. v. Jackson, et al.*, 1:75-cv-01668 (D.D.C.), Dkt. 87 at pg. 2.

xxxvi *Inmates of D.C. Jail, et al. v. Jackson, et al.*, 1:75-cv-01668 (D.D.C.), Dkt. 87 at pg. 2.

xxxvii *Inmates of D.C. Jail, et al. v. Jackson, et al.*, 1:75-cv-01668 (D.D.C.), Dkt. 87 at pg. 3.

xxxviii *Inmates of D.C. Jail, et al. v. Jackson, et al.*, 1:75-cv-01668 (D.D.C.), Dkt. 87 at pg. 4-6.

xxxix *Inmates of D.C. Jail, et al. v. Jackson, et al.*, 1:75-cv-01668 (D.D.C.), Dkt. 87 at pgs. 6-7.

xl *Inmates of D.C. Jail, et al. v. Jackson, et al.*, 1:75-cv-01668 (D.D.C.), Dkt. 90 (only available on the full docket).

xli *Inmates of D.C. Jail, et al. v. Jackson, et al.*, 1:75-cv-01668 (D.D.C.), Dkt. 283.

xlii *Inmates of D.C. Jail, et al. v. Jackson, et al.*, 1:75-cv-01668 (D.D.C.), Dkt. 87 at pg. 10.

xliii *Inmates of D.C. Jail, et al. v. Jackson, et al.*, 1:75-cv-01668 (D.D.C.), Dkt. 87 at pg. 7. (*See also* Dkt. 90, only available on the full docket)

xliv *Inmates of D.C. Jail, et al. v. Jackson, et al.*, 1:75-cv-01668 (D.D.C.), Dkt. 87 at pg. 7. (*See also* Dkt. 90, only available on the full docket)

xlv *Inmates of D.C. Jail, et al. v. Jackson, et al.*, 1:75-cv-01668 (D.D.C.), Dkt. 87 at pgs. 7-9.

xlvi *Inmates of D.C. Jail, et al. v. Jackson, et al.*, 1:75-cv-01668 (D.D.C.), Dkt. 87 at pgs. 2, 8.

xlvii U.S. General Accounting Office, District of Columbia Jail: Medical Services Generally Met requirements and Costs Decreased, but Oversight is Incomplete (June 2004), https://www.gao.gov/assets/gao-04-750.pdf

xlviii *Inmates of D.C. Jail, et al. v. Jackson, et al.*, 1:75-cv-01668 (D.D.C.), Dkt. 87 at pg. 10.

xlix Justin Wm. Moyer, D.C. Jail Medical Care 'Systemically Dysfunctional,' Suit Alleges, Wash. Post (April 29, 2023), https://www.washingtonpost.com/dc-md-va/2023/04/29/dc-jail-health-care-lawsuit/

l *Harper, et al. v. Bennet, et al.*, 1:04-cv-01416 (N.D. Ga.), Dkt. 89, Appendix "A," pg. 3.

li *Harper, et al. v. Bennet, et al.*, 1:04-cv-01416 (N.D. Ga.), Dkt. 89 at pg. 3.

lii *Harper, et al. v. Bennet, et al.*, 1:04-cv-01416 (N.D. Ga.), Dkt. 35 at pg. 3.

liii *Harper, et al. v. Bennet, et al.*, 1:04-cv-01416 (N.D. Ga.), Dkt. 24 at pgs. 1-2.

liv *Harper, et al. v. Bennet, et al.*, 1:04-cv-01416 (N.D. Ga.), Dkt. 89 at pgs. 29-30.

lv *Harper, et al. v. Bennet, et al.*, 1:04-cv-01416 (N.D. Ga.), Dkt. 41 at pg. 2.

lvi *Harper, et al. v. Bennet, et al.*, 1:04-cv-01416 (N.D. Ga.), Dkt. 41 at pg. 2.

lvii *Harper, et al. v. Bennet, et al.*, 1:04-cv-01416 (N.D. Ga.), Dkt. 41 at pg. 2.

lviii *Harper, et al. v. Bennet, et al.*, 1:04-cv-01416 (N.D. Ga.), Dkt. 41 at pg. 2; *Harper, et al. v. Bennet, et al.*, 1:04-cv-01416 (N.D. Ga.), Dkt. 24 at pg. 2.

lix *Harper, et al. v. Bennet, et al.*, 1:04-cv-01416 (N.D. Ga.), Dkt. 41 at pg. 2.

lx *Harper, et al. v. Bennet, et al.*, 1:04-cv-01416 (N.D. Ga.), Dkt. 41 at pgs. 2-3.

lxi *Harper, et al. v. Bennet, et al.*, 1:04-cv-01416 (N.D. Ga.), Dkt. 41 at pg. 3.

lxii *Harper, et al. v. Bennet, et al.*, 1:04-cv-01416 (N.D. Ga.), Dkt. 41 at pg. 4.

lxiii *Harper, et al. v. Bennet, et al.*, 1:04-cv-01416 (N.D. Ga.), Dkt. 41 at pg. 3.

lxiv *Harper, et al. v. Bennet, et al.*, 1:04-cv-01416 (N.D. Ga.), Dkt. 41 at pgs. 2-3.

lxv *Harper, et al. v. Bennet, et al.*, 1:04-cv-01416 (N.D. Ga.), Dkt. 89.

lxvi Press Release, U.S. Dept' of Justice, Justice Department Finds Conditions at Fulton County Jail in Georgia Violate the Constitution and Federal Law (November 14, 2024), https://www.justice.gov/opa/pr/justice-department-finds-conditions-fulton-county-jail-georgia-violate-constitution-and

lxvii CCHCS Facts, https://cchcs.ca.gov/factsheet/ (last visited January 15, 2025)

lxviii *Plata, et al. v. Newsom, et al.*, 4:01-cv-01351 (N.D. Cal.), Dkt. 473 at pg. 2.

lxix CCHCS Facts, https://cchcs.ca.gov/factsheet/ (last visited January 15, 2025)

lxx *Plata, et al. v. Newsom, et al.*, 4:01-cv-01351 (N.D. Cal.), Dkt. 371 at pg. 2.

lxxi *Plata, et al. v. Newsom, et al.*, 4:01-cv-01351 (N.D. Cal.), Dkt. 473 at pg. 2.

lxxii *Plata, et al. v. Newsom, et al.*, 4:01-cv-01351 (N.D. Cal.), Dkt. 473 at pg. 7.

lxxiii *Plata, et al. v. Newsom, et al.*, 4:01-cv-01351 (N.D. Cal.), Dkt. 3939.

lxxiv *Plata, et al. v. Newsom, et al.*, 4:01-cv-01351 (N.D. Cal.), Dkt. 473 at pg. 2.

lxxv *Plata, et al. v. Newsom, et al.*, 4:01-cv-01351 (N.D. Cal.), Dkt. 1063 at pg. 4.

lxxvi *Plata, et al. v. Newsom, et al.*, 4:01-cv-01351 (N.D. Cal.), Dkt. 473 at pgs. 1-2 and attached CV.

lxxvii *Plata, et al. v. Newsom, et al.*, 4:01-cv-01351 (N.D. Cal.), Dkt. 1063 at pg. 5 and attached CV.

lxxviii *Plata, et al. v. Newsom, et al.*, 4:01-cv-01351 (N.D. Cal.), Dkt. 473 at pg. 2.

lxxix *Plata, et al. v. Newsom, et al.*, 4:01-cv-01351 (N.D. Cal.), Dkt. 473 at pg. 5.

lxxx *Plata, et al. v. Newsom, et al.*, 4:01-cv-01351 (N.D. Cal.), Dkt. 473 at pg. 10.

lxxxi *Plata, et al. v. Newsom, et al.*, 4:01-cv-01351 (N.D. Cal.), Dkt. 473 at pg. 4.

lxxxii *Plata, et al. v. Newsom, et al.*, 4:01-cv-01351 (N.D. Cal.), Dkt. 473 at pgs. 7-8.

lxxxiii CCHCS Facts, https://cchcs.ca.gov/factsheet/ (last visited January 15, 2025)

lxxxiv Case: Doe v. Cook County, Civil Rights Litigation Clearinghouse, https://clearinghouse.net/case/9633/ (last visited January 15, 2025)

lxxxv *Doe, et al. v. Cook County, et al.*, 1:99-cv-03945 (N.D. Ill.), Dkt. 330.

lxxxvi *Doe, et al. v. Cook County, et al.*, 1:99-cv-03945 (N.D. Ill.), Dkt. 786.

lxxxvii *Doe, et al. v. Cook County, et al.*, 1:99-cv-03945 (N.D. Ill.), Dkt. 330 at pgs. 11-12.

lxxxviii The Cook County Story, Vital City, https://www.vitalcitynyc.org/articles/fixing-new-york-citys-jails-a-federal-receiver-panel-one (last visited January 15, 2025)

lxxxix *Doe, et al. v. Cook County, et al.*, 1:99-cv-03945 (N.D. Ill.), Dkt. 330 at pg. 2.

xc *Doe, et al. v. Cook County, et al.*, 1:99-cv-03945 (N.D. Ill.), Dkt. 330 at pgs. 4-5.

xci The Cook County Story, Vital City, https://www.vitalcitynyc.org/articles/fixing-new-york-citys-jails-a-federal-receiver-panel-one (last visited January 15, 2025)

xcii *Doe, et al. v. Cook County, et al.*, 1:99-cv-03945 (N.D. Ill.), Dkt. 330 at pg. 11.

xciii *Doe, et al. v. Cook County, et al.*, 1:99-cv-03945 (N.D. Ill.), Dkt. 786 at pg. 2.

xciv *Doe, et al. v. Cook County, et al.*, 1:99-cv-03945 (N.D. Ill.), Dkt. 786 at pg. 1.

xcv The Cook County Story, Vital City, https://www.vitalcitynyc.org/articles/fixing-new-york-citys-jails-a-federal-receiver-panel-one (last visited January 15, 2025)

xcvi Jonah Newman & Carlos Ballesteros, Cook County Juvenile Jail Using 'Semantics' to Hide Many Hours Youths are Isolated: Report, Injustice Watch (August 23, 2022), https://www.injusticewatch.org/juvenile-courts/youth-incarceration/2023/cook-county-jtdc-abuses-report/

xcvii *Jones, et al. v. Gusman et al.*, 2:12-cv-00859 (E.D. La.), Dkt. 1259 at pg. 45, fn. 8.

xcviii *Jones, et al. v. Gusman et al.*, 2:12-cv-00859 (E.D. La.), Dkt. 1082 at pg. 1.

xcix *Jones, et al. v. Gusman et al.*, 2:12-cv-00859 (E.D. La.), Dkt. 1082 at pgs. 1-2.

c *Jones, et al. v. Gusman et al.*, 2:12-cv-00859 (E.D. La.), Dkt. 1082 at pgs. 2-3.

ci *Jones, et al. v. Gusman et al.*, 2:12-cv-00859 (E.D. La.), Dkt. 1151 at pgs. 1-2.

cii *Jones, et al. v. Gusman et al.*, 2:12-cv-00859 (E.D. La.), Dkt. 1404 at pg. 5.

[ciii] *Jones, et al. v. Gusman et al.*, 2:12-cv-00859 (E.D. La.), Dkt. 1082.

[civ] *Jones, et al. v. Gusman et al.*, 2:12-cv-00859 (E.D. La.), Dkt. 1097 at pg. 1.

[cv] *Jones, et al. v. Gusman et al.*, 2:12-cv-00859 (E.D. La.), Dkt. 1404 at pg. 5.

[cvi] *Jones, et al. v. Gusman et al.*, 2:12-cv-00859 (E.D. La.), Dkt. 1082 at pg. 3.

[cvii] *Jones, et al. v. Gusman et al.*, 2:12-cv-00859 (E.D. La.), Dkt. 1082 at pgs. 5-6.

[cviii] *Jones, et al. v. Gusman et al.*, 2:12-cv-00859 (E.D. La.), Dkt. 1082 at pg. 15.

[cix] *Jones, et al. v. Gusman et al.*, 2:12-cv-00859 (E.D. La.), Dkt. 1151 at pg. 2.

[cx] *Jones, et al. v. Gusman et al.*, 2:12-cv-00859 (E.D. La.), Dkt. 1151 at pg. 2, Dkt. 1404 at pg. 5.

[cxi] *Jones, et al. v. Gusman et al.*, 2:12-cv-00859 (E.D. La.), Dkt. 1151 at pg. 1.

[cxii] *Jones, et al. v. Gusman et al.*, 2:12-cv-00859 (E.D. La.), Dkt. 1082 at pg. 3.

[cxiii] *Jones, et al. v. Gusman et al.*, 2:12-cv-00859 (E.D. La.), Dkt. 1151 at pg. 2.

[cxiv] *Jones, et al. v. Gusman et al.*, 2:12-cv-00859 (E.D. La.), Dkt. 1082 at pg. 3.

[cxv] *Jones, et al. v. Gusman et al.*, 2:12-cv-00859 (E.D. La.), Dkt. 1082 at pg. 8.

[cxvi] *Jones, et al. v. Gusman et al.*, 2:12-cv-00859 (E.D. La.), Dkt. 1082 at pgs. 9-10.

[cxvii] *Jones, et al. v. Gusman et al.*, 2:12-cv-00859 (E.D. La.), Dkt. 1082 at pg. 12.

[cxviii] *Jones, et al. v. Gusman et al.*, 2:12-cv-00859 (E.D. La.), Dkt. 1082 at pg. 5.

[cxix] *Jones, et al. v. Gusman et al.*, 2:12-cv-00859 (E.D. La.), Dkt. 1082 at pgs. 2-3.

[cxx] *Jones, et al. v. Gusman et al.*, 2:12-cv-00859 (E.D. La.), Dkt. 1082 at pgs. 15-16.

[cxxi] Ken Daley, Federal Judge Orders New Orleans Jail Measures, Citing 'Regression' in Consent Decree Compliance, Fox 8 (June 19, 2024), https://www.fox8live.com/2024/06/19/federal-judge-orders-new-orleans-jail-measures-citing-regression-consent-decree-compliance/

[cxxii] *United States v. Miami-Dade County, the Board of County Commissioners, et al.*, 1:13-cv-21570 (S.D. Fla.), Dkt. 280.

[cxxiii] *United States v. Miami-Dade County, the Board of County Commissioners, et al.*, 1:13-cv-21570 (S.D. Fla.), Dkt. 279 (see docket sheet).

[cxxiv] *United States v. Miami-Dade County, the Board of County Commissioners, et al.*, 1:13-cv-21570 (S.D. Fla.), Dkt. 277-1 at pg. 8.

[cxxv] *United States v. Miami-Dade County, the Board of County Commissioners, et al.*, 1:13-cv-21570 (S.D. Fla.), Dkt. 277-1, pgs. 1-2.

[cxxvi] *United States v. Miami-Dade County, the Board of County Commissioners, et al.*, 1:13-cv-21570 (S.D. Fla.), Dkt. 260 at pg. 13.

[cxxvii] *United States v. Miami-Dade County, the Board of County Commissioners, et al.*, 1:13-cv-21570 (S.D. Fla.), Dkt. 278-1, pg. 3.

[cxxviii] *United States v. Miami-Dade County, the Board of County Commissioners, et al.*, 1:13-cv-21570 (S.D. Fla.), Dkt. 260 at pg. 4.

[cxxix] *United States v. Miami-Dade County, the Board of County Commissioners, et al.*, 1:13-cv-21570 (S.D. Fla.), Dkt. 260 at pg. 3.

[cxxx] *United States v. Miami-Dade County, the Board of County Commissioners, et al.*, 1:13-cv-21570 (S.D. Fla.), Dkt. 260 at pg. 3.

[cxxxi] *United States v. Miami-Dade County, the Board of County Commissioners, et al.*, 1:13-cv-21570 (S.D. Fla.), Dkt. 277-1 at pg. 1.

[cxxxii] *United States v. Miami-Dade County, the Board of County Commissioners, et al.*, 1:13-cv-21570 (S.D. Fla.), Dkt. 260 at pgs. 5-6.

[cxxxiii] *United States v. Miami-Dade County, the Board of County Commissioners, et al.*, 1:13-cv-21570 (S.D. Fla.), Dkt. 260 at pg. 7-8.

[cxxxiv] *United States v. Miami-Dade County, the Board of County Commissioners, et al.*, 1:13-cv-21570 (S.D. Fla.), Dkt. 260 at 13.

[cxxxv] Press Release, Miami-Dade County, Miami-Dade County's Corrections Department Enters in Compliance with Department of Justice Consent Agreement (November 4, 2023), https://www.miamidade.gov/global/release.page?Mduid_release=rel1699104407886909

[cxxxvi] *United States v. Miami-Dade County, the Board of County Commissioners*, et al., 1:13-cv-21570 (S.D. Fla.), Dkt. 278-1 at pg. 11.

[cxxxvii] *United States v. Hinds County, et al.*, 3:16-cv-00489 (S.D. Miss.), Dkt. 242 at pg. 4.

[cxxxviii] Case: United States v. Hinds County, Civil Rights Litigation Clearinghouse, https://clearinghouse.net/case/14561/ (last visited January 15, 2025)

[cxxxix] Case: United States v. Hinds County, Civil Rights Litigation Clearinghouse, https://clearinghouse.net/case/14561/ (last visited January 15, 2025)

[cxl] *United States v. Hinds County, et al.*, 3:16-cv-00489 (S.D. Miss.), Dkt. 215.

[cxli] *United States v. The Hinds County Board of Supervisors & Hinds County Sheriff Tyree Jones*, 22-60203 (5th Cir.), Dkt. 195-1.

[cxlii] *United States v. Hinds County, et al.*, 3:16-cv-00489 (S.D. Miss.), Dkt. 215 at pg. 4.

[cxliii] *United States v. Hinds County, et al.*, 3:16-cv-00489 (S.D. Miss.), Dkt. 216 at pg. 11.

[cxliv] *United States v. Hinds County, et al.*, 3:16-cv-00489 (S.D. Miss.), Dkt. 216 at pg. 11.

[cxlv] *United States v. Hinds County, et al.*, 3:16-cv-00489 (S.D. Miss.), Dkt. 215 at pgs. 1-2.

[cxlvi] *United States v. Hinds County, et al.*, 3:16-cv-00489 (S.D. Miss.), Dkt. 215 at pgs. 1-3.

[cxlvii] *United States v. Hinds County, et al.*, 3:16-cv-00489 (S.D. Miss.), Dkt. 216 at pg. 2.

[cxlviii] *United States v. Hinds County, et al.*, 3:16-cv-00489 (S.D. Miss.), Dkt. 216 at pg. 2.

[cxlix] *United States v. Hinds County, et al.*, 3:16-cv-00489 (S.D. Miss.), Dkt. 216 at pg. 2.

[cl] *United States v. Hinds County, et al.*, 3:16-cv-00489 (S.D. Miss.), Dkt. 216 at pg. 2.

[cli] *United States v. Hinds County, et al.*, 3:16-cv-00489 (S.D. Miss.), Dkt. 169 at pg. 10; *United States v. Hinds County, et al.*, 3:16-cv-00489 (S.D. Miss.), Dkt. 216 at pg. 2.

[clii] *United States v. Hinds County, et al.*, 3:16-cv-00489 (S.D. Miss.), Dkt. 216 at pgs. 11-12.

[cliii] *United States v. Hinds County, et al.*, 3:16-cv-00489 (S.D. Miss.), Dkt. 216 at pg. 12.

[cliv] *United States v. Hinds County, et al.*, 3:16-cv-00489 (S.D. Miss.), Dkt. 216 at pg. 12.

[clv] *United States v. Hinds County, et al.*, 3:16-cv-00489 (S.D. Miss.), Dkt. 216 at pg. 12.