# APPENDIX C:
# GOVERNMENT & PLAINTIFF CLASS SUBMISSION

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MARK NUNEZ, et al.

                    Plaintiffs,

        -against-

THE CITY OF NEW YORK, et al.,

                    Defendants.

Case No. 11-cv-5845 (LTS)

**UNITED STATES' AND PLAINTIFF CLASS' MEMORANDUM OF LAW IN
FURTHER SUPPORT OF APPOINTMENT OF A RECEIVER**

The Legal Aid Society
Prisoners' Rights Project
49 Thomas Street, 10th Floor
New York, New York 10013
(212) 577-3300

Emery Celli Brinckerhoff Abady
Ward & Maazel LLP
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

*Counsel for the Plaintiff Class*

DANIELLE R. SASSOON
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
(212) 637-2800

*Counsel for the United States*

**TABLE OF CONTENTS**

**PG NO.**

I. INTRODUCTION ................................................................................................. 1

II. THE APPOINTMENT OF AN INDEPENDENT RECEIVER WITH BROAD
AUTHORITIES TO TAKE NECESSARY STEPS TO PROMPTLY ACHIEVE
COMPLIANCE AND OVERCOME THE LONGSTANDING POLITICAL,
STRUCTURAL, AND INSTITUTIONAL BARRIERS TO TRUE REFORM IS THE
PROPER REMEDY FOR DEFENDANTS' WIDESPREAD CONTEMPT. ......................... 3

    A. Summary of the Government and Plaintiff Proposal ..................................................... 4

    B. The Government and Plaintiff Proposal Provides Clear Answers to Each of the
    Court's Questions Regarding its Functioning. ................................................................ 7

        1. Whether Receiver Would Supplant or Work Alongside Commissioner ................ 7

        2. Process for Appointment of a Receiver ................................................................. 9

        3. Tenure of a Receiver ............................................................................................ 10

        4. Powers of a Receiver ............................................................................................ 10

        5. Qualifications of a Receiver ................................................................................. 12

    C. The Government and Plaintiff Proposal Meets the Receivership Goals ...................... 14

        1. Direct Court Authority Over *Nuñez* Matters ...................................................... 14

        2. Minimizing Bureaucracy and Expense ................................................................ 14

        3. Capitalizing on Monitoring Team's Experience .................................................. 15

        4. Pushing Forward Transformational Change While Utilizing Department
           Assets Wisely and Making Available Additional Needed Assets ........................ 16

        5. Necessary Changes to Contracts, Regulations, Policies, and Other
           Impediments ......................................................................................................... 18

III. THE GOVERNMENT AND PLAINTIFF PROPOSAL IS JUSTIFIED BY THIS
COURT'S FINDINGS, COMPLIES WITH THE PLRA, AND GRANTS THE
RECEIVER POWERS SIMILAR TO THOSE GRANTED IN OTHER PRISON AND
JAIL RECEIVERSHIPS. ...................................................................................... 19

    A. Policies, Practices, and Procedures Related to *Nuñez* Orders .................................... 23

    B. Personnel Decisions .................................................................................................... 24

C.  Contracting and Procurement ...................................................................... 26

D.  Investigation and Disciplinary Action ........................................................ 27

E.  Abrogation of State and Local Law ............................................................ 28

IV. THE CITY'S PROPOSAL MERELY REAFFIRMS THE STATUS QUO AND IS
INADEQUATE TO REMEDY DEFENDANTS' CONTEMPT AND LONGSTANDING
NONCOMPLIANCE WITH THE *NUÑEZ* ORDERS. ......................................... 29

F.  The City's Proposal ...................................................................................... 30

G.  The City's Proposal Relies on the Current Commissioner, Whose Corrections and
Management Experience Is Limited to This Dysfunctional Agency, to Overcome
Longstanding Cultural, Structural, and Organizational Barriers. .............................. 31

H.  The City's Proposal Will Not Materially Expand the Commissioner's Powers, and
Fails to Articulate Specific, Concrete Actions that the Commissioner Will Take as
"Compliance Director" that Could Not Have Been Taken Previously. ...................... 32

I.  The City's Proposal Creates an Impractical and Unworkable Dual Reporting
Structure Designed to Create the False Appearance of Independence. ...................... 34

J.  The Plans and Initiatives in the City's Proposal are Vague and Mirror Prior Failed
DOC Efforts, and Defendants Do Not Explain Why the Agency Will Be Able to
Finally Implement Them If the Commissioner Is Appointed "Compliance
Director." ........................................................................................................ 37

K.  The Legal Viability of the City's Proposal Is at Best Unclear. .................. 39

V.  CONCLUSION .............................................................................................. 41

# TABLE OF AUTHORITIES

**PG NO.**

## CASES

*Berger v. Heckler,*
  771 F.2d 1556 (2d Cir. 1985) ................................................................................... 19

*Brown v. Plata (Plata III),*
  563 U.S. 493 (2011) .............................................................................................. 20

*Doe v. Cook County,*
  No. 99-cv-03945 (N.D. Ill. Aug. 14, 2007) ..................................................... 21, 29

*Fisher v. Koehler,*
  692 F. Supp. 1519 (S.D.N.Y. 1988) ........................................................................ 2

*Harper v. Bennett,*
  No. 1:04-cv-01416-MHS (N.D. Ga. Jul. 14, 2004) ............................................... 20

*Hutto v. Finney,*
  437 U.S. 678 (1978) .............................................................................................. 19

*Inmates of D.C. Jail v. Jackson,*
  No. 1462-71 (D.D.C. Jul. 11, 1995) ...................................................................... 24

*Jones v. Gusman,*
  No. 2:12-cv-00859 (E.D. La. Jun. 21, 2016) ......................................................... 20

*LaShawn v. Barry,*
  No. 80-1754, 1995 WL 520763 (D.D.C. Aug. 24, 1995) ................................. 26, 27

*Plata v. Schwarzenegger (Plata I),*
  603 F .3d 1088 (9th Cir. 2010) ............................................................................. 20

*Plata v. Schwarzenegger,*
  No. C01-1351 (N.D. Cal. Feb. 14, 2006) ......................................................... 21, 28

*Sheppard v. Phoenix,*
  210 F. Supp.2d 450 (S.D.N.Y. 2002) ...................................................................... 2

*Swann v. Charlotte–Mecklenburg Bd. of Educ.,*
  402 U.S. 1 (1971) .................................................................................................. 19

*United States v. Hinds Cnty.,*
  120 F.4th 1246 (5th Cir. 2024) ............................................................................. 20

*United States v. Hinds Cnty.*,
    No. 3:16-CV-489-CWR-BWR, 2023 WL 1186925 (S.D. Miss. Jan. 30, 2023) .. 20, 22, 25, 26

*United States v. Hinds County Board of Supervisors*,
    120 F.4th 1246 (5th Cir. 2024) ............................................................................ 23

*United States v. Miami-Dade Cnty.*,
    No. 13-cv-21570 (S.D. Fla. Feb. 16, 2023) ............................................. 20, 27, 29

**STATUTES**

18 U.S.C. § 3626................................................................................................. 20, 41

**TREATISES**

New York City Charter, Chapt, 1 ............................................................................ 40

I.    **INTRODUCTION**

The United States (the "Government") and Plaintiff Class ("Plaintiffs") respectfully submit this memorandum of law in further support of our application for an appointment of a receiver and in response to the Court's November 27, 2024 Opinion and Order requesting further briefing on proposed receivership structures.

The Government and Plaintiffs propose the appointment of an independent Receiver who will report only to this Court and be granted the authority to take all actions necessary to cure Defendants' contempt, promptly comply with this Court's orders, and address the ongoing violations of the constitutional rights of incarcerated people in the City's custody. The Receiver must have broad powers to rectify the unsafe and dangerous practices that have prevailed in the jail system for decades and to surmount the political, bureaucratic, and institutional obstacles that have doomed prior reform efforts. The Receiver, who we expect will have correctional leadership experience and a record of instituting meaningful reforms in other large corrections systems, must be free from political influence and act only under the direct authority of this Court. The Receiver will have ultimate authority over the DOC functions and divisions necessary to achieve their mandate, while the Commissioner would retain authority over other DOC functions and divisions. However, the Receiver will be expected to work collaboratively with the Commissioner and DOC leadership—with the invaluable input of the Monitor—to implement sustainable reform. The receivership would be temporary; once Defendants achieve substantial compliance with this Court's orders, full operational authority over the jails would be transferred back to the City.

Our proposal is within the Court's broad equitable powers to craft remedies that ensure local governments heed the Constitution, and complies with the PLRA's limitations on prospective relief. Indeed, the *Plata* factors, which often guide courts' equitable analysis when

considering institutional receiverships such as this one, weigh in favor of establishing a receivership. The specific powers afforded to the Receiver under our proposal are both justified by this Court's specific findings, and well within the scope of powers that other federal courts have granted to receivers in corrections cases.

Finally, the City's proposal is untenable and patently inadequate to address the Court's finding that Defendants are in contempt of 18 separate Court order provisions that relate directly to safety and the excessive violence in the jails. Defendants essentially propose that they should be allowed to continue on their current path in the hope that the current Commissioner—who under their plan would also be referred to as the "Compliance Director" and be given a five-year tenure—will somehow be able to make the sweeping institutional and structural changes that are needed. The City's proposal does little more than preserve the status quo when, as this Court has recognized, the Department of Correction is in need of transformational change. The City's proposal fails to articulate any specific concrete actions that the Commissioner would take if the Court imposed Defendants' proposed relief that she cannot take now. The City's proposal, under which the Commissioner would continue to report to the Mayor "in the ordinary course of business" and to the Court with respect to "matters directly or indirectly related to safety and use of force" is impractical and does little more than create a false appearance of independence.

For almost four decades, judges in this district have entered orders seeking to end the unconstitutional violence in the jails, with prescient warnings that promises of progress might not be sustained. *See* PFOF (762-2) ¶¶ 1041-1045; *see also Fisher v. Koehler,* 692 F. Supp. 1519, 1562-66 (S.D.N.Y. 1988); *Sheppard v. Phoenix,* 210 F. Supp.2d 450, 460 (S.D.N.Y. 2002). It is time for real change. The Court should appoint a truly independent receiver to make progress

where local government has failed and should adopt the receivership structure proposed by the Government and the Plaintiffs.

## II.    THE APPOINTMENT OF AN INDEPENDENT RECEIVER WITH BROAD AUTHORITIES TO TAKE NECESSARY STEPS TO PROMPTLY ACHIEVE COMPLIANCE AND OVERCOME THE LONGSTANDING POLITICAL, STRUCTURAL, AND INSTITUTIONAL BARRIERS TO TRUE REFORM IS THE PROPER REMEDY FOR DEFENDANTS' WIDESPREAD CONTEMPT.

As this Court recognized when holding Defendants in contempt, "the last nine years . . . leave no doubt that continued insistence on compliance with the Court's orders by persons answerable principally to political authorities will lead only to confrontation and delay[.]" Dkt. 803 at 55. To break this nearly decade-long cycle of normalized dysfunction, the Government and Plaintiffs propose the appointment of a truly independent Receiver who reports only to the Court and is in no way answerable to the Mayor or any other political interest. The Receiver— who we anticipate will have extensive corrections experience and a demonstrated track record of implementing meaningful reforms in large corrections systems—will have the authority to take all actions necessary to comply with the Consent Judgment, the First Remedial Order, the Second Remedial Order, the Third Remedial Order, and the Action Plan ("*Nuñez* orders"). The Receiver, working collaboratively with the Commissioner and her leadership team, will have broad power to address and finally overcome the longstanding political, structural, and institutional barriers that have stymied prior efforts to reform the jail system. Although we recognize that receivership is a potent remedy, nothing less will cure Defendants' widespread contempt and address the ongoing unsafe and dangerous conditions in the jails and Defendants' nine-year record of noncompliance with core provisions of the *Nuñez* orders.

Our proposal for remedial relief ("Government and Plaintiff Proposal") is described in the amended proposed Order Appointing a Receiver ("Amended Proposed Order") submitted

with this brief. Below is a summary of key provisions of the Government and Plaintiff Proposal, responses to the five specific questions the Court asked the parties to address ("Remedy Directions"), and an explanation of how our proposal will accomplish the five "Receivership Goals" set forth in the Court's November 27, 2024 Opinion and Order ("Contempt Opinion"). Dkt. 803 at 56-57.

A.    **Summary of the Government and Plaintiff Proposal**

The Government and Plaintiff Proposal defines the scope of the Receiver's power in relation to the Receiver's mandate: to take all necessary steps to promptly achieve Substantial Compliance with this Court's orders in this action ("the Mandate"). *See* Amended Proposed Order, §§ I(A), II.  The Receiver is granted general supervisory and oversight authority over DOC functions only to the extent necessary to fulfill the Mandate. *See* Amended Proposed Order, § II(A).  This definition of the scope of the Receiver's power allows for necessary flexibility, given what this Court and the independent Monitor have described as the "deeply embedded polycentric problems of the jails." Dkt. 803 at 57. On the other hand, several of the specific powers the Receiver will need in order to be effective are clear now, thanks to the Monitor's extensive reporting. The Government and Plaintiff Proposal grants the Receiver these specific powers, including but not limited to the authority to:

- Implement changes to Department of Correction ("Department" or "DOC") policies, procedures, protocols, and systems relating to the requirements of the *Nuñez* orders;

- Review, investigate, and take disciplinary or corrective actions with respect to violations of the Use of Force Directive and other DOC policies related to the requirements of the *Nuñez* orders;

- Assign and deploy uniformed staff more efficiently to maximize coverage in housing areas;

- Hire, promote, and reassign staff so that there are a sufficient number of qualified and experienced individuals to fill supervisory and other uniformed positions;

- Negotiate contracts or renegotiate existing contracts if necessary; and

- Procure necessary equipment and supplies to, among other things, enhance security in the jails.

*See* Amended Proposed Order, § II(B). The Receiver can exercise these powers only to the extent necessary to achieve compliance with the *Nuñez* orders. The Commissioner would retain authority over areas outside the scope of the *Nuñez* orders, allowing the Receiver to focus exclusively on addressing the core management, practice, operational, and personnel issues covered by these orders.

The Receiver will have ultimate authority over any DOC divisions, operational functions, and personnel necessary to fulfill the Mandate. *See* Amended Proposed Order, § II(C). Importantly, however, our proposal envisions that the Commissioner and other DOC leadership will work closely with the Receiver to support the Receiver's efforts to move DOC towards compliance. *See* Amended Proposed Order, § II(D). But in the areas the Receiver must control in order to achieve the Mandate, the ultimate decision-making authority, and therefore the authority to direct DOC leaders and staff where necessary, lies with the Receiver. *See* Amended Proposed Order, § II(D).

We recognize the challenges associated with delineating the extent to which specific divisions, operational functions, and personnel must fall within the ultimate authority of the Receiver, given that the *Nuñez* orders address fundamental agency functions such as safety, use of force practices, security operations, and other areas. During our meet-and-confer discussions with Defendants, we attempted to develop these delineations but came to the conclusion that we do not have sufficient and current information about the agency's inner workings, tangled bureaucracy, and opaque reporting structure to effectively do this. When we tried to get

information by seeking an organizational chart from Defendants, we were advised that no current organizational chart is available due to recent staffing changes.[1] Moreover, it would not be practical to set forth this level of operational detail in a written Court order. We concluded that at this juncture, the best and most practical approach would be for the individual selected as Receiver—in direct consultation with the Monitor, the Commissioner, and other DOC leadership—to develop and submit to the Court for approval a plan that will address which specific divisions, function, and personnel will fall under the Receiver's authority because they are necessary to fulfill the Mandate (the "Plan"). *See* Amended Proposed Order, § II(C). The Plan, which would be submitted within 60 days of the Receiver's appointment, must set forth a clear reporting structure for individuals who hold DOC leadership positions and must be designed to avoid duplication of resources and the creation of additional unnecessary bureaucracy. *See Id.* § II(C). Given that the Receiver, the Monitor, and the Commissioner will need to work closely together, it is most efficient and practical to afford these corrections professionals an opportunity to develop a workable operational plan together. The development and submission of this Plan is discussed further below.

The Amended Proposed Order also sets forth other features of the Government and Plaintiff Proposal, including that: the Receiver is an agent of the Court and not an employee of the City; the Receiver will regularly meet with the Court and file public reports regarding their efforts to comply with the *Nuñez* orders; the Monitor will continue to play his current, vital role; and the City will be responsible for paying any reasonable fees, costs, and expenses of the Receiver. *See Id.* § III(A)-(B), § IV(A), § V(A), § VI(A), § IX(F). The Amended Proposed Order also describes the process by which the Receiver will be replaced should that become necessary.

---

[1] Upon hearing from Defendants that no current organizational chart existed, we requested comparable information in a different form but received no response.

*See Id.*, § IX(G). Finally, the Amended Proposed Order enables the Receiver to petition the Court to waive any legal or contractual requirement that is an impediment to necessary reform efforts, or to seek other appropriate relief. *See Id.* § IX(B).

Our proposal will create the true independence necessary for reform by appointing a Receiver answerable solely to the Court, while also allowing for continuity and maximization of the resources DOC already has by keeping current DOC leaders who are doing their jobs well in place. As explained further below, this will achieve the Receivership Goals as efficiently and effectively as possible.

> ### B. The Government and Plaintiff Proposal Provides Clear Answers to Each of the Court's Questions Regarding its Functioning.

The Government and Plaintiff Proposal clearly answers the "Remedy Directions" inquiries posed by the Court in the Contempt Opinion. Dkt. 803 at 57.

> #### 1. Whether Receiver Would Supplant or Work Alongside Commissioner

Under the Government and Plaintiff Proposal, the Receiver and the Commissioner (and the Monitoring Team) will work collaboratively. In order to successfully move the Department towards substantial compliance with the *Nuñez* Orders—and to facilitate the ultimate goal of returning control of all DOC operations to the City—the Receiver must work closely with many levels of DOC staff, including the Commissioner. The Receiver will have ultimate authority with respect to divisions and operational functions necessary to achieve compliance with the *Nuñez* orders, while the Commissioner would retain authority over all other divisions and operational functions. *See* Amended Proposed Order, § II(C), (D).

The Government and Plaintiff Proposal does not require the Receiver to "supplant" the Commissioner, even in those areas where the Receiver has ultimate authority. The Commissioner will continue to be involved in DOC operations, including in *Nuñez*-related areas—assuming, of

course, that the Commissioner's efforts are moving the Department towards compliance—but the Receiver will have the authority to direct the Commissioner to take any steps that the Receiver deems necessary to fulfill the Mandate in *Nuñez*-related areas. *See* Amended Proposed Order, § II(D). To the extent the Commissioner is overseeing productive initiatives that the Receiver agrees will enhance safety in the jails and reduce the use of excessive and unnecessary force, the Commissioner would likely continue to be involved in those initiatives and her day-to-day role may not materially change. Indeed, the Receiver may choose to delegate certain tasks and responsibilities within their ultimate authority to the Commissioner or other DOC leaders and intervening when necessary.

As discussed above, to avoid any potential confusion regarding the role of the Commissioner or the reporting structure, Section II(C) of the Amended Proposed Order includes a process whereby the Receiver will, after consulting with the Monitor, the Commissioner, and other appropriate DOC leadership, submit a written Plan to the Court within 60 days of their appointment that specifies the divisions, operational functions, and personnel that will fall under the Receiver's ultimate operational authority because they are necessary to fulfill the Mandate. The Plan will be crafted in a manner that clearly sets forth the reporting structure of individuals who hold DOC leadership positions, avoids the duplication of resources or the creation of additional unnecessary bureaucracy, and provides an operational structure that will support the ability of the Receiver to effectively fulfill the Mandate. *See* Amended Proposed Order, § II(C)(i)(a)-(c). The Plan should also prioritize the Receivership Goals and must specifically describe the Commissioner's role and responsibilities in supporting the Receiver's efforts to implement operational, organizational, policy, practice, or other reforms necessary to fulfill the Mandate. *See* Amended Proposed Order, § II(C)(i)(d). The Plan will also identify specific

8

initiatives or actions that the Department to date has failed to implement due to bureaucratic, logistical, or other delays, and/or perceived legal impediments or political disadvantage, which the Receiver believes should be prioritized and are necessary to fulfill the Mandate. *See* Amended Proposed Order, § II(C)(ii). The Receiver will consult with the Monitor, and review his prior recommendations when identifying these priority initiatives and actions.

To the extent that there are conflicts between the Receiver and Defendants about the Plan, the Receiver will present those conflicts to the Court for resolution. *See* Amended Proposed Order, § II(C). The Plan can be modified over time as the receivership moves forward, subject to Court approval. The Amended Proposed Order allows for a clear, collaborative, and transparent process to address an inevitably complex issue.

## 2.    Process for Appointment of a Receiver

Under the Government and Plaintiff Proposal, the parties and the Monitor will confer regarding the selection of a Receiver candidate to present for the Court's approval. If the parties are unable to agree upon a candidate within 30 days of the Court's order, the parties will each provide nominations to the Court. The Monitor may provide input on those nominations, and the Court will thereupon select and appoint the Receiver. The Court may, of course, interview candidates or take other steps as the Court sees fit as part of the selection process. *See* Amended Proposed Order, § I(C).

This proposal is consistent with the process used by other courts in similar situations. In *Hinds County*, for example, the parties submitted to the court a total of four receiver candidates. The court interviewed two of them for the position and, after weighing the finalists' professional experience, appointed an individual as the receiver. *United States v. Hinds Cnty.*, No. 3:16-CV-489-CWR-BWR, 2023 WL 1186925 at * 14 (S.D. Miss. Jan. 30, 2023); *see also Harper v. Bennett*, No. 1:04-cv-01416-MHS, Order Appointing Receiver (N.D. Ga. July 14, 2004) (Dkt.

41) (considering applications from different candidates, references, and conducting a personal

interview); *Jones v. Gusman*, 2:12-cv-00859, Stipulated Order for Appointment of Independent

Jail Compliance Director at 3 (E.D. La. June 21, 2016) (Dkt. 1082) (requesting nominations of

candidates from Plaintiffs).

3.    <u>Tenure of a Receiver</u>

The Government and Plaintiff Proposal provides that "[t]he Receiver's authority will

continue until the Court determines that Substantial Compliance (defined in Section XX, ¶ 18 of

the Consent Judgment) with the *Nuñez* Orders has been achieved." *See* Amended Proposed

Order, § VII(A).

As this Court has recognized, it is not unusual for DOC to appear to make progress

towards compliance and the curing of constitutional violations, only to stagnate or even reverse

course. *See, e.g.*, Dkt 803 at 18-20; 46-47 (describing regression in DOC's compliance with

orders related to misconduct investigations and recognizing DOC's "fail[ure] to police the

efficacy of the efforts they have actually made to comply"). For that reason, the receivership

must continue until Substantial Compliance with the *Nuñez* orders is finally achieved. The steady

hand of a Receiver must remain at the helm until successful reform has not just begun, but

solidified, to ensure that any progress DOC makes does not prove illusory as it has in the past.[2]

The Government and Plaintiff Proposal further provides that before stepping down, the

Receiver will create a transition plan for the transfer of full authority over the jail system back to

---

[2] This is also consistent with the approach other courts have taken in similar scenarios. *See Jones v. Gusman*, 2:12-cv-00859, Stipulated Order for Appointment of Independent Jail Compliance Director at 3 (E.D. La. June 21, 2016) (Dkt. 1082) ("The Compliance Director's authority will continue until the Court determines that sustained and sustainable material progress with substantial compliance with the Consent Judgment is achieved"); *LaShawn v. Barry*, No. 80-1754, 1995 WL 520763 at * 4 (D.D.C. Aug. 24, 1995) (anticipating three years but noting that the Receivership "shall remain in full force and effect until such time as all elements of the Remedial Order and Implementation Plan have been fully implemented and the Receivership is no longer necessary").

the Defendants. *See* Amended Proposed Order, § VII(C). Moreover, even after the receivership

terminates, the *Nuñez* orders will remain in effect until Substantial Compliance has been

maintained for a period of 24 months, as the Consent Judgment provides. *See* Amended

Proposed Order, § VII(B). This will ensure that the Court and the Monitor oversee the transition

process and address any backsliding that may occur after the Receiver has departed.

 4.   Powers of a Receiver

 The powers of the Receiver are described in Section II(A) and (B) of the Amended

Proposed Order:

> **General Powers**: The Receiver shall have the authority to exercise all powers
> vested by law in the Defendants to the extent necessary to fulfill the Mandate.
> The Receiver shall have the power to control, oversee, supervise, and direct all
> administrative, personnel, financial, accounting, contracting, legal, and other
> operational functions of DOC to the extent necessary to fulfill the Mandate.
>
> **Specific Powers:** … the Receiver shall have the authority to exercise
> the following specific powers to the extent necessary to fulfill the Mandate:
>
> i.   The Receiver shall have the authority to enact or change DOC
>      policies, procedures, protocols, systems, and practices related to
>      the requirements of the *Nuñez* Orders.
> ii.  The Receiver shall have the authority to establish personnel
>      policies and direct personnel actions. The Receiver shall have the
>      power to create, modify, abolish, or transfer employee and
>      contractor positions, as well as to recruit, hire, train, terminate,
>      promote, demote, transfer, and evaluate employees and contractors.
>      The Receiver shall have the authority to assign and deploy DOC
>      staff.
> iii. The Receiver shall have the authority to negotiate new contracts
>      and renegotiate existing contracts, including contracts with labor
>      unions.
> iv.  The Receiver shall have the authority to procure and contract for
>      supplies, equipment, tangible goods, and services.
> v.   The Receiver shall have the authority to review, investigate, and
>      take disciplinary or other corrective or remedial actions with
>      respect to any violation of DOC policies, procedures, and protocols
>      related to the requirements of the *Nuñez* Orders.
> vi.  The Receiver shall have the authority to hire consultants, or obtain
>      technical assistance, as the Receiver deems necessary to perform
>      their duties under this Order.

As noted above, the Receiver may of course choose to delegate any matter or task within these powers to the Commissioner or others, who then would exercise the power subject to the Receiver's oversight. However, it is vital that the Receiver be afforded these broad powers so that they have the authority to implement necessary reforms to fulfill the Mandate or, just as importantly, remove any obstacles or impediments to reform.

5.     Qualifications of a Receiver

An appropriate Receiver candidate would be someone from outside DOC who has extensive corrections experience and a demonstrated track record of implementing meaningful reforms in a large corrections system. The Receiver should be someone with integrity and fortitude who will be able to work collaboratively with others. We expect the Receiver would be on-site in the jail system on a regular basis given the scope of this role. A single individual may not embody all areas of expertise necessary to fulfill the Mandate, so the proposal envisions that the Receiver will assemble a small group of qualified individuals to assist in fulfilling the Receiver's duties. These team members might advise the Receiver on particular subject areas where the Receiver seeks additional expertise or might provide administrative or technical support. For example, if the Receiver is a corrections professional from outside New York City, they may choose to consult with someone with a strong understanding of New York City government. The receivership team should have experience managing a complex governmental entity, including experience with goal setting and performance, budgeting and administration, labor negotiation, and coordination with external stakeholders such as executive and legislative entities, agencies and oversight bodies.

The receivership in this case is unique because of the central role of the Monitor. The Receiver is not writing on a blank slate, but will have the benefit of over 50 published reports of the Monitor. The Receiver will engage in extensive collaboration with the Monitor—indeed, we

would expect them to be partners in the effort. This is an incredibly rich resource that will make this receivership vastly more efficient.

Finally, and critically, the Receiver must be independent, answering to the Court alone. The Receiver must understand the importance and the responsibility of that independence—that it conveys an obligation to both faithfully utilize the assets of the agency and swiftly remove obstacles to the reform effort when necessary, even and especially when doing so is difficult and unpopular.

Relatedly, it is critical for the Receiver to be someone who can accept advice about how to navigate the complex New York City ecosystem, but demonstrates an ability to think outside of it—someone with a vision outside the status quo. *See infra*, § IV, ¶ B (describing the importance of an "outside person" in the Receiver role). The Monitor has long documented examples of stagnancy among DOC leadership: observing in 2021 that facility leaders, for example, "rarely emerge as champions of an idea or new practice" and often seem to be myopic due to a lack of experience in other jurisdictions because "they simply do not know of other ways to solve problems besides 'how we've always done it'," PFOF (762-2) ¶ 1107; and chronicling Defendants' resistance to reforming entrenched staffing practices Dkt. 803 at 32-34. The pattern continues: for example, in his most recent report in November 2024, the Monitor found that current DOC leadership *once again* and despite years of similar failures produced an insufficient Security Plan that "failed to address longstanding deficiencies in staff practices...and left the Monitoring Team uncertain about the Department's capacity and resources to successfully implement the proposed long-term initiatives". Dkt. 802 at 185; *see also* SFOF (Dkt. 762-5) ¶¶ 41, 44, 86-115, 313-316. A Receiver must be able to bring the external perspective necessary to reject this normalized dysfunction and address what the Court has

rightly identified as the "lack of skill or imagination to create and implement transformative plans." Dkt. 803 at 54.

The Government and Plaintiffs' counsel have begun to interview potential candidates for the Receiver position. We plan to ask the Monitor to meet with viable candidates prior to presenting them to the Court so that the Monitor and his team can share their views with us.

### C. The Government and Plaintiff Proposal Meets the Receivership Goals.

The Government and Plaintiff Proposal satisfies the Receivership Goals that this Court identified in the Contempt Opinion. Dkt. 803 at 56-57.

#### 1. Direct Court Authority Over *Nuñez* Matters

The Government and Plaintiff Proposal puts *Nuñez* matters under the ultimate authority of a Receiver whose *only* mission is compliance with the *Nuñez* orders, and who reports only to the Court, thus eliminating the potential for political interference. *See* Amended Proposed Order, § I(D). The Receiver will not report to a political body on any aspect of their work and therefore will not be chilled by the prospect of political repercussions for making hard decisions. *See infra*, § IV, ¶ D (describing the import of insulating the Receiver from political influence). This will enable the Receiver to focus exclusively on achieving compliance with the Court's orders and addressing the constitutional violations.

#### 2. Minimizing Bureaucracy and Expense

Although the Receiver may have a small team to assist them in fulfilling their duties, *supra*, § II ¶ B(5), the Receiver will primarily rely on DOC uniformed staff to implement necessary reforms, rather than hiring large numbers of their own employees to perform DOC functions. *See* Amended Proposed Order, § II(B)(ii) (granting Receiver power to "assign and deploy DOC staff" and "establish personnel policies and direct personnel actions"). Therefore,

14

appointing a Receiver will not create a new layer of bureaucracy nor be unduly expensive.

Indeed, the Receiver's primary role is to remove the myriad obstacles and bureaucratic

entanglements that have stymied previous reform efforts. As noted above, the Plan to be

developed by the Receiver (in consultation with the Commissioner and Monitor) shortly after

their appointment must be crafted to avoid any duplication of resources or the creation of

additional unnecessary bureaucracy. *See* Amended Proposed Order, § II(C)(i)(b).

A Receiver is also likely to save the City money by eliminating inefficiencies that require

DOC to expend unnecessary resources, such as the large overtime bills the City currently pays

due to inefficient staff deployment practices. *See infra*, § II ¶ C(4) (describing how a Receiver

under our proposal will improve efficiency and use assets wisely).

Finally, to the extent the City objects to any of the fees, costs, or expenses submitted by

the Receiver, the Amended Proposed Order permits the City to submit the dispute to the Court

for a determination as to whether the fees, costs, or expenses are reasonable. *See* Amended

Proposed Order, § VI(A). This safeguard will allow the Court to ensure that the Receiver does

not incur costs beyond what are needed to achieve compliance with the *Nuñez* orders.

### 3.    Capitalizing on Monitoring Team's Experience

Under the Government and Plaintiff Proposal, the Monitor will continue to be a key

driver of the *Nuñez* reform effort. He will not only continue his current reporting and technical

assistance activities, but will also collaborate with the Receiver, as our Proposal requires that the

Receiver regularly consult with the Monitor regarding their progress given the Monitor's

extensive experience in this system. *See* Amended Proposed Order, § IV(A), (B). To ensure that

the Monitor retains his independence and authority, the Government and Plaintiff Proposal states

explicitly not only that the Monitor "shall continue to perform the responsibilities set forth in the

*Nuñez* Orders," but also that the Monitor is not in any way answerable to the Receiver. Rather,

"[t]he Receiver and the Monitor will be independent positions that each report to the Court and are not answerable to each other." *See* Amended Proposed Order, § IV(A), (C).

With a Receiver in place, the Monitor's recommendations need no longer be mere recommendations, but can instead be operationalized by the Receiver, who will have the authority to implement agreed-upon strategies and to address the obstacles that have prevented implementation to date. The Receiver will be expected to approach the Monitor as a partner in the reform effort—a priority that is certainly front of mind for Plaintiffs and the Government as we consider potential candidates.

In response to the Court's question regarding how potential "conflicts" between the Receiver and the Monitoring Team would be addressed, Dkt. 803 at 56 n.40, we expect such conflicts to be quite rare given their different roles and responsibilities. However, in the event that the Monitor has concerns about the Receiver's plans or actions that cannot be resolved collaboratively, the Monitor can and should raise those concerns in his public reports, or through his regular *ex parte* meetings with the Court. This will bring any potential problems to the Court's attention. The Court may then direct the Receiver as needed, given that the Receiver answers directly and solely to the Court. *See* Amended Proposed Order, § I(D).

4. <u>Pushing Forward Transformational Change While Utilizing Department Assets Wisely and Making Available Additional Needed Assets</u>

As the Court noted, "neither clear reporting from the Monitoring Team nor binding Court orders have been enough to activate the transformational change required to bring Defendants into compliance with the [Court's] orders." Dkt. 803 at 52.[3]  The transformational change that

---

[3] Indeed, as the Monitor wrote of current DOC leadership just days before the Court issued that finding: while "advances have been made within discrete areas. . .the foundational elements of reliable security practices that are directly related to staff use of force and alarming levels of interpersonal violence among the detainee population remain elusive as does the accountability of staff at all levels for these failures." Dkt. 802 at 189.

has thus far been elusive requires a truly independent actor who, to put it simply, will support what works within DOC and address what does not. The Receiver will bring a fresh perspective informed by their extensive prior corrections experience. That person must be willing to both bolster the people and strategies that are effective in making the jails safer, and also to make difficult decisions to swiftly remove obstacles where they exist. Our proposal reflects both critical elements.

Under the Government and Plaintiff Proposal, the Receiver will have ultimate authority over *Nuñez* matters, but DOC leaders and staff will still be implementing *Nuñez* reforms on the ground on a day-to-day basis. The expertise and experience that currently exists within DOC will not be lost upon the appointment of a Receiver. We would expect any Receiver candidate we nominate to take time to work with and carefully assess the current DOC leaders and facility supervisors who have responsibilities related to *Nuñez* matters to identify those who are assets to the reform process and to make every effort to support, learn from, and retain those individuals. The Receiver would of course consult with the Commissioner and the Monitor as part of that process. To the extent the Receiver identifies any specific individuals who are not performing their jobs effectively or are obstacles to compliance with the *Nuñez* orders, the Receiver may reassign, discipline, or replace them—difficult decisions that the record demonstrates Defendants have often been unwilling to make.[4]

As the Court observed, Defendants possess "enormous resources—that the City devotes to a system that is at the same time overstaffed and underserved—[which] are not being deployed effectively." Dkt. 803 at 56. A Receiver will have the power to address staffing

---

[4] For example, the Monitor has documented Defendants' failures to discipline or otherwise correct facility leadership failures despite First Remedial Order provisions requiring accountability (*see, e.g.,* Dkt. 764-1 PFOF ¶¶ 566, 570, SFOF ¶ 150), as well as ill-advised promotions and longstanding failures to adequately screen candidates for promotion (PFOF ¶¶ 628-647).

inefficiencies or provisions in labor agreements that prevent industry-standard scheduling and staff deployment practices from being put into effect, resulting in exorbitant overtime expense.[5] The Proposal thus enables the Receiver to continue using DOC's current assets wisely, while also having the independence, flexibility, and the apolitical will needed to make changes where DOC's current resources, and the agency's deployment of those resources, have fallen short.

The Receiver would also be able to secure the additional personnel, resources, and assets necessary to make the jails safer. For example, the appointment of a truly independent Receiver who is charged with implementing transformational change may attract talent that might not otherwise come to a failing agency—a reality Defendants have raised. *See* Maginley-Liddie Decl. at ¶ 48 (Mar. 18, 2024), Dkt. 689-1 ("steady stream of negative publicity" a challenge to recruiting efforts). The Government and Plaintiff Proposal also grants the Receiver the authority to procure and contract for supplies and equipment to the extent necessary to fulfill the Mandate. Amended Proposed Order, § II(B)(iv). This should reduce the bureaucratic and administrative procurement delays that have long impeded DOC's ability to quickly address safety issues such as inoperable locks and antiquated systems. And the Government and Plaintiff Proposal authorizes the Receiver to hire outside consultants to provide technical assistance in particular areas, if necessary, to address longstanding systemic deficiencies that have led to increased violence. *Id.*

5.     <u>Necessary Changes to Contracts, Regulations, Policies, and Other Impediments</u>

---

[5] For example, as this Court noted, Defendants have failed—and continue to fail—to address barriers to reducing 4 by 2 scheduling and the use of awarded posts. Dkt. 803 at 32-34. This refusal to improve staffing deployment is particularly unacceptable given Defendants' climbing overtime expenditures, as the Monitor has found that Defendants routinely use overtime to increase staffing availability rather than address chronic inefficiencies. SFOF ¶¶ 335-336.

The Government and Plaintiff Proposal grants the Receiver the explicit authority to change DOC policies and practices that have impeded compliance with the *Nunez* orders. *See* Amended Proposed Order, § II(B)(i). With respect to laws, regulations, and contracts, the Proposal requires the Receiver to operate within those constraints where possible. But where state or local laws, regulations, or contracts prevent the Receiver from taking necessary steps to achieve compliance with the *Nuñez* orders, the Receiver may move the Court to waive them. *See* Amended Proposed Order, § IX(B).

Due to their political independence, the Receiver will move efficiently to make needed policy and practice changes, and will request court intervention to waive legal requirements if necessary. This will be a significant change from how the agency has functioned for years, where the City has frequently delayed making—or even identifying—necessary policy and practice changes or seeking waivers of laws that pose barriers to reform, despite clear and repeated Monitor recommendations to do so.

## III. THE GOVERNMENT AND PLAINTIFF PROPOSAL IS JUSTIFIED BY THIS COURT'S FINDINGS, COMPLIES WITH THE PLRA, AND GRANTS THE RECEIVER POWERS SIMILAR TO THOSE GRANTED IN OTHER PRISON AND JAIL RECEIVERSHIPS.

As set forth in Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for Contempt and Application for Appointment of a Receiver, Dkt. 603 at 63-67 ("Plaintiffs' Moving Memorandum"), this Court possesses broad equitable powers to fashion relief that compels compliance with its orders. *See Swann v. Charlotte–Mecklenburg Bd. of Educ.*, 402 U.S. 1, 16 (1971); *Berger v. Heckler*, 771 F.2d 1556, 1568 (2d Cir. 1985); *Hutto v. Finney,* 437 U.S. 678, 696 (1978). That equitable power includes the power to appoint a receiver with authority to bring a public entity into compliance with remedial orders. *See* Dkt. 603 at 64-66 (citing cases involving jails, prisons, child welfare agencies, and other public agencies).

19

Prisons and jails have been placed in receivership to remedy entrenched violations of the law. The Prison Litigation Reform Act ("PLRA") does not diminish the Court's equitable authority to appoint a receiver. *See Plata v. Schwarzenegger (Plata I)*, 603 F .3d 1088, 1093-94 (9th Cir. 2010); *accord Brown v. Plata (Plata III),* 563 U.S. 493, 526 (2011) ("The PLRA should not be interpreted to place undue restrictions on the authority of federal courts to fashion practical remedies when confronted with complex and intractable constitutional violations.").

The PLRA requires that relief be "narrowly drawn, extend[] no further than necessary to protect the violation of the Federal right, and [be] [] the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(A). Since the PLRA was enacted in 1996, several courts have appointed receiverships over prisons and jails, holding that such relief was necessary to effectuate court orders. *See United States v. Hinds Cnty.,* No. 3:16-CV-489-CWR-BWR, 2023 WL 1186925 at *5 (S.D. Miss. Jan. 30, 2023) (hereinafter "*Hinds Cnty.*") (appointing receiver and noting that "[j]ail receiverships [] hew to the recognized statutory and equitable bounds of a district court's authority") *aff'd in relevant part United States v. Hinds Cnty.*, 120 F.4th 1246, 1266-68 (5th Cir. 2024); *United States v. Miami-Dade Cnty.,* No. 13-cv-21570, Stipulated Order Regarding Appointment of Independent Jail Compliance Director (S.D. Fla. Feb. 16, 2023) (Dkt. 260) (hereinafter "*Miami-Dade Cnty.*") (appointing receiver with control over certain conditions in county jails); *Jones v. Gusman*, No. 2:12-cv-00859, Stipulated Order for Appointment of Independent Jail Compliance Director (E.D. La. Jun. 21, 2016) (Dkt. 1082) (hereinafter "*Gusman*") (appointing individual with control over Orleans Parish jail); *Plata I,* 2005 WL 2932253 at *33 (appointing receiver over delivery of health care in California prisons); *Harper v. Bennett*, No. 1:04-cv-01416-MHS, Order Appointing Receiver (N.D. Ga. Jul.

20

14, 2004) (Dkt. 41) (hereinafter "*Harper*") (appointing receiver for Fulton County Jail to replace Sheriff until next election).

In addition, as discussed in Plaintiffs' Moving Memorandum, the equitable considerations to determine the appropriateness of receivership—the *Plata* factors—weigh heavily in favor of receivership. Dkt. 609 at 66-91. As this Court has found, there is a grave and immediate threat and actuality of harm to the Plaintiff Class, the use of less extreme measures has proven futile, insistence on compliance has led to confrontation and delay; the current management structure and staffing are insufficient to turn the tide within a reasonable period of time, and the Department has wasted resources by ineffectively deploying them. Dkt. 803 at 55-56. Based on these factors, the Court has already indicated that it is "inclined to impose a receivership." *Id.* at 56.

Moreover, given the Court's findings regarding Defendants' nearly decade-long, inexcusable non-compliance with virtually every core area of relief in this case, it is necessary and appropriate for the Receiver to be granted broad control and oversight over the various operational functions of the Department to the extent necessary to promptly achieve Substantial Compliance with the *Nuñez* orders. *See* Amended Proposed Order, § II(A). Courts have granted prison and jail receivers comparably broad general powers. *See, e.g., Doe v. Cook County*, No. 99-cv-03945, Agreed Order Appointing a Transitional Administrator, at 1, 4 (N.D. Ill. Aug. 14, 2007) (Dkt. 330) (hereinafter "*Cook County*") (purpose of order to "appoint a [receiver] with the authority and responsibility to bring [facility] into substantial compliance," and granting Receiver "all reasonable powers necessary" to achieve substantial compliance); *Plata v. Schwarzenegger*, No. C01-1351, Order Appointing Receiver at 4 (N.D. Cal. Feb. 14, 2006) (Dkt.

473) (hereinafter "*Plata Receivership Order*") ("Receiver shall have all powers necessary to fulfill the above duties under this Order").

Further, the Government and Plaintiff Proposal offers a more limited approach than some courts have taken, when they granted full operational authority over entire corrections facilities to a receiver and vested them with *all* powers held by the chief administrator or executive of the agency.[6] Importantly, under the Government and Plaintiff Proposal, the Receiver's operational authority is limited to that which is necessary to comply with the *Nuñez* orders, with the DOC Commissioner retaining authority over the rest of the Department. Thus, the proposed relief extends no further than is necessary to address the violations at issue and is narrowly tailored to that purpose, as required by the PLRA.

As explained further below, this Court would be well within the bounds of prior prison and jail receivership decisions should it grant the Receiver not only the general power to take actions necessary to bring Defendants into compliance with the *Nuñez* orders, *see* Amended Proposed Order, § II(A), but also the specific authorities and powers the Government and Plaintiffs propose, *see id.*, § II(B). These specific authorities and powers can be grouped into the categories of: 1) enacting or changing policies, procedures and practices; 2) personnel decisions; 3) contracting and procurement; 4) investigating and taking disciplinary or other corrective action for policy violations; and 5) authority to seek abrogation of state and local law if necessary to fulfill the Mandate.[7] As explained below, each of these specific grants of power to

---

[6] *See, e.g. Hinds Cnty*. at *15 (granting the Receiver all executive management and leadership powers and day to day authority over operations with respect to the custody, care, and supervision of Hinds County detainees); *Gusman* at 3 (Compliance Director "will have final authority to operate [the jail] and all jail facilities, including authority over the entire prisoner population in the custody of the [Sheriff's office]).'

[7] The Amended Proposed Order also provides the Receiver with a very limited role with regard to the DOC budget, permitting the Receiver to "notify" the relevant City authorities if additional funding is needed, and "request a hearing before the Court" if the issue is not timely resolved. *See* Amended Proposed Order, § IX(A). This limited role is distinguishable from the far broader authority discussed in the Fifth Circuit's recent decision in *United States*

the Receiver is necessitated by and specifically tied to the Court's findings regarding Defendants'

noncompliance and ongoing constitutional violations, and narrowly tailored to correct those

violations and bring Defendants into compliance.

### A.    Policies, Practices, and Procedures Related to *Nuñez* Orders

The Amended Proposed Order authorizes the Receiver to "to enact or change DOC

policies, procedures, protocols, systems, and practices related to the requirements of the *Nuñez*

Orders." *See* Amended Proposed Order, § II(B)(i). Given the Department's failure to develop

sustainable solutions to basic security breaches and misuse of force, this authority is necessary to

effectuate this Court's orders and is consistent with the orders issued by other court orders

imposing receiverships.

Defendants' policies and practices are undisputably in need of reform. The record clearly

shows that they have repeatedly failed to develop and implement necessary policies, practices,

and procedures despite repeated Monitor recommendations. Indeed, this Court found that the

Department did not "develop, adopt, and implement a new comprehensive use of force policy" as

required by the Consent Judgment and that "the consequences of this failure have been dire."

Dkt. 803 at 16-17. In addition, the Court noted that while the Department was ordered to revise

its ESU policies in August 2023, there is "no evidence in the record before the Court that those

policies have been finalized or implemented." *Id.* at 36.  Further, DOC has failed to improve its

policies, practices, and procedures with respect to security. The Court noted that there has been

"little to no improvement in security practices in the jails" and "a failure to devise and implement

a security plan with consistency." *Id.* at 25. The Court observed that "[t]he security failures and

---

*v. Hinds County Board of Supervisors*, 120 F.4th 1246 (5th Cir. 2024), where the receiver could ignore "budgetary
constraints" imposed by the local board of supervisors and thereby "assume a responsibility that should be left for
the legislature." *Id.*

poor staff practice—both of which have continued unabated for years—contribute to both the high levels of use of force and the overall levels of violence in the jails and render DOC unable to implement the Use of Force Directive." *Id*. at 22. To rectify these failures, a Receiver must be empowered to devise and implement new policies, practices, and procedures. This authority is necessary under the PLRA to correct the violation of Plaintiffs' federal rights since security failures have remained unabated, causing continued unnecessary and excessive force, placing staff and incarcerated people in danger, and even leading to the deaths of individuals in custody.

Other courts have also granted receivers the power to modify facility policies, procedures, and practices, finding that such authority met the PLRA standard. For example, in *Miami-Dade*, the Compliance Director was authorized to make changes to facility policies or standard operating procedures or practices. *Miami-Dade Cnty*. at 4. In *Shaw v. Allen*, the receiver was authorized to "formulate and implement such plans as shall be necessary to provide for an acceptable level of security and control among the inmates," and to "take such actions as are necessary to ensure that health and safety standards are devised, written, published, and implemented." 771 F. Supp. 760, 764 (S.D. W. Va. 1990). In Washington D.C., the receiver was authorized to "establish procedures and systems within the Department of Corrections in order to ensure that compliance with Court orders is maintained." *Inmates of D.C. Jail v. Jackson*, No. 1462-71, Findings and Order Appointing Receiver at 8 (D.D.C. Jul. 11, 1995).

### B.    Personnel Decisions

The Amended Proposed Order authorizes the Receiver to establish personnel policies and make personnel decisions, including decisions to hire, promote, demote, transfer, and terminate staff. *See* Amended Proposed Order, § II(B)(ii). This provision is necessary given the importance of personnel management to remediating the Department's dysfunction, and is consistent with the orders issued by the *Plata*, *Hinds County*, and *Miami-Dade* courts, among others.

Both this Court and the Monitor have noted that "staffing is <u>the</u> essential element to reform." Dkt. 803 at 31 (emphasis in original). The Court found that "supervisory failures at multiple levels of uniform leadership have been and remain a consistent and pervasive source of dysfunction within DOC" and contribute to chaos, violence, and excessive force in the jails. *Id.* at 26. The Court noted an "unmatched" "level of sheer dysfunction" within DOC's staffing framework, and that "DOC's mismanagement of staff is inextricably linked to high rates of force and violence in the jails." *Id.* at 31. The Department has also overstaffed Emergency Response Teams, often with individuals with a history of violent conduct, and engaged in questionable promotion decisions. *Id.* at 26-27, 29, 34-35. In addition, the Department has failed to correct low Investigation Division staffing levels to ensure timely, quality investigations and accountability. *Id.* at 21. Without broad authority to take personnel actions, the Receiver will be unable to take necessary actions to address these and other systemic failures.

Other courts have granted receivers similar powers, recognizing the importance of personnel management to enact change. *See, e.g.*, *Plata Receivership Order* at 4 (granting the authority to "hire, fire, suspend, supervise, promote, transfer, discipline, and take all other personnel actions regarding [facility] employees or contract employees who perform services related to the delivery of medical health care to class members."); *Hinds Cnty.*, at *5 (granting the authority to hire, fire, suspend, supervise, promote, transfer, discipline, and authority to establish personnel policies; and to create, abolish or transfer positions related to the administration and operation of the facility); *Miami-Dade Cnty.* at 5 (same); *Harper* at 2-3 (empowering receiver with the ability to hire, fire, discipline employees); *Gusman* at 12 (granting the authority to create, modify, abolish, or transfer employee and contractor positions; to recruit, hire, discipline, terminate, promote, demote, transfer, and evaluate employees and

25

contractors and recommend increased compensation to the extent necessary to obtain compliance.).[8]

### C.    Contracting and Procurement

The Amended Proposed Order authorizes the Receiver to negotiate new and existing contracts, and to procure goods and services. *See* Amended Proposed Order, § II(B)(iii),(iv). These powers are necessary for the Receiver to effectuate the *Nunez* orders. For example, procurement and contracting authority is needed to promptly repair infrastructure problems that create security risks, such as broken cell doors and locks. Dkt. 723 at 10-11. The Receiver may also need to contract with outside vendors to provide better training and address "identified deficiencies in leadership and supervision." Dkt. 803 at 28. A Receiver also must be able to renegotiate existing agreements that interfere with remedial measures, such as labor agreements that impede the efficient deployment of uniformed staff. *See* Dkt. 803 at 33 n. 32.

Other receivership orders have granted similar authorities. *See, e.g.*, *Plata Receivership Order* at 4 (authorizing the Receiver to negotiate new contracts and renegotiate existing contracts, including those with labor unions, if necessary to fulfill his duties under the Order); *Inmates of D.C. Jail v. Jackson*, Case No. 1462-71, Findings and Order Appointing Receiver at 8 (D.D.C. Jul. 11, 1995) (granting Receiver the power to procure supplies, equipment, or services as are necessary to obtain compliance and hire consultants or obtain technical assistance as necessary to obtain compliance.).[9]

---

[8] *See also LaShawn v. Barry*, No. 80-1754, 1995 WL 520763 at * 1-2 (D.D.C. Aug. 24, 1995) (granting authority over retention, assignments, and all personnel actions deemed necessary to carry out the Court's orders); *Cook County* at 7 (power to hire, terminate, promote, transfer and evaluate, as well as to "restructure and reorganize any management and administrative structures of the JTDC.")

[9] *See also Cook County* at 7 (authorizing the Receiver to negotiate new contracts and renegotiate existing contracts relating to the operation of the facility); *Hinds Cnty.* at *16 (authorizing Receiver to negotiate new contracts and renegotiate existing contracts in the event that such action is necessary to fulfill their duties); *Miami-Dade Cnty.* at 5 (authorizing Compliance Director to negotiate new contracts and agreements and to renegotiate existing contracts

### D.    Investigation and Disciplinary Action

The Amended Proposed Order empowers the Receiver with the authority to review, investigate, and take disciplinary or other corrective or remedial actions with respect to violations of DOC policies, procedures, and protocols related to the *Nuñez* orders. *See* Amended Proposed Order, § II(B)(v).

The Department has never achieved substantial compliance with the Consent Judgment provision requiring thorough, timely, and objective investigations of use of force incidents. Dkt. 803 at 19. The Department has also never achieved substantial compliance with the requirement to take all necessary steps to impose appropriate and meaningful discipline for staff members who violate Department policies, procedures, rules, and directives related to use of force. *Id.* at 21. The Department's inability to consistently identify misconduct has led to a decrease in accountability for use of force-related misconduct. *Id.* at 15, 21. This failure has contributed to a pervasive culture of impunity. PFOF (762-2) ¶ 824. The Receiver's authority to investigate and discipline violations of policies related to *Nuñez*, such as the Use of Force Directive, is thus crucial to redress Defendants' ongoing unconstitutional pattern and practice of excessive force, and to create the culture shift necessary for lasting change.

Other courts have granted receivers similar authority to investigate and take appropriate corrective actions. *See, e.g.*, *Miami-Dade Cnty.* at 6-7 (granting Compliance Director authority "to review, investigate, and take corrective actions regarding MDCR policies, procedures, and practices that are related to Agreements, and any future Court Orders"); *Plata Receivership Order* at 4 (granting the authority to discipline employees who perform services related to the delivery of medical health care to class members).

---

and agreements where necessary to fulfill their duties under the Order); *LaShawn* at * 4 (authorizing Receiver to enter into contracts and procure all goods and services necessary to carry out the Child Welfare Receivership).

### E.    Abrogation of State and Local Law

The Amended Proposed Order authorizes the Receiver to "petition the Court to waive any legal or contractual requirement" that "impede[s] the Receiver from carrying out their duties under this Order and fulfilling the Mandate." *See* Amended Proposed Order, § IX(B). This permits the Receiver to secure relief just as the parties did when they jointly requested that state and local laws preventing the hiring of Wardens from an external pool be superseded by this Court's order. Dkt. 492. It is critical that the Receiver be vested with this authority to address any legal obstacles to substantial compliance. As one illustration of these roadblocks, this Court noted that the Department has not decreased the use of 4 by 2 schedules because these schedules are "required by collective bargaining agreements and Operations Orders" and Defendants have made no effort to "seek a waiver of legal requirements." Dkt. 803 at 33 n. 32. The power to seek waiver of specific legal or contractual requirements when needed is critical. Indeed, the City's proposal grants the "Compliance Director" this same authority. City Proposal at 4.

This authority is also consistent with the orders issued by the *Plata*, *Hinds County*, *Miami-Dade*, and *Cook County* courts. In *Plata*, the Court authorized the Receiver to make requests to the Court to waive any state or contractual requirement that prevents the Receiver from developing or implementing a constitutionally adequate medical health care system or clearly prevents the Receiver from carrying out his duties as set forth in the Order. *Plata Receivership Order* at 4-5. Similarly, the *Hinds County* court authorized the Receiver to notify

the Court and request appropriate action where a State or local law, regulation, or contract prevents them from carrying out the Court's orders. *Hinds Cnty.* at * 18.[10]

## IV. THE CITY'S PROPOSAL MERELY REAFFIRMS THE STATUS QUO AND IS INADEQUATE TO REMEDY DEFENDANTS' CONTEMPT AND LONGSTANDING NONCOMPLIANCE WITH THE *NUÑEZ* ORDERS.

The City's proposed remedial relief ("the City's Proposal") falls well short of addressing the Court's contempt findings and the ongoing unsafe and chaotic conditions in the City's jails. Indeed, the City's Proposal offers little actual substantive relief or change at all, much less a remedy that is likely to cure the widespread noncompliance with the *Nuñez* orders set forth in great detail in the Contempt Opinion. Confronted with a finding that they are in contempt of 18 separate provisions of the *Nuñez* orders—"provisions that go directly to the safety of those who live and work in the Rikers Island jails" (Dkt. 803 at 53)—Defendants in essence propose that they be permitted to continue on the current path in the hope that the current Commissioner, who will now also be referred to as the "Compliance Director" and granted a guaranteed tenure of five more years, will finally implement the sweeping institutional and structural reforms necessary to redress the ongoing constitutional violations.

In the Contempt Opinion, the Court found that "the unsafe and dangerous conditions in the jails, which are characterized by unprecedented rates of use of force and violence, have become normalized despite the fact that they are clearly abnormal and unacceptable." Dkt. 803 at 11. The Court went on to find that the record "makes clear that those who live and work in the jails on Rikers Island are faced with grave and immediate threats of danger, as well as actual

---

[10] *See also Miami-Dade Cnty.* at 6-7 (where federal, state, and local laws, regulations, and contracts prevent the Compliance Director from carrying out the Court's Orders, the Director shall notify the parties to resolve the issue and if they are still unable to do so, the Director shall notify the parties who may notify the Court and request appropriate action.); *Cook County* at 3 (authorizing Transitional Administrator to petition the Court to waive any requirements imposed by laws, policies, and regulations of Cook County and state laws where those laws interfere with the TA's responsibilities as set forth in the Order.).

harm, on a daily basis as a direct result of Defendants' lack of diligence" and that "for nine years, Defendants made only half-hearted, inconsistent efforts to comply with Court orders." Dkt. 803 at 50, 55. The Court concluded that conditions have not improved since the Consent Judgment was entered in 2015, and the fact "that the level of unconstitutional danger has not improved for the people who live and work in the jails is both alarming and unacceptable." Dkt. 803 at 52. The Court directed the parties to propose a receivership structure that will spur "transformational change." Dkt. 803 at 56. Notwithstanding this record, the Court's findings, and the Court's direction, the City has made a proposal that offers no substantive relief and is likely to do little more than preserve the status quo, not transform it.

A.      **The City's Proposal**

Under the City's Proposal, the current DOC Commissioner, Lynelle Maginley-Liddie, would remain the Commissioner but would also simultaneously serve as the "Compliance Director," a new position to be created by the City. Commissioner Maginley-Liddie would continue to have the same powers that she has as Commissioner, would continue to be a City employee, and would continue to be paid the same salary by the City. City Proposal at 1, 2, 4. She would serve a term of at least five years as Compliance Director (and Commissioner since the same person must hold both positions under the City's Proposal).[11] *Id.* at 1. Commissioner Maginley-Liddie could not be terminated or replaced by the Mayor or legislature; only this Court would have the power to replace her. *Id.* at 1. However, Commissioner Maginley-Liddie would continue to report to the Mayor's Office "in the ordinary course of business, consistent with the

---

[11] Under the City's Proposal, Commissioner Maginley-Liddie could serve as Compliance Director for fewer than five years if Defendants are found to be in substantial compliance with the *Nuñez* orders before the end of this five-year term, or if "the Court determines that a Compliance Director is no longer a necessary measure to ensure the DOC continues to engage in diligent efforts to comply with the *Nunez* Orders." City Proposal at 1.

duties and responsibilities of agency Commissioners." *Id.* at 1. She would report to the Court with respect to "matters directly or indirectly related to safety and the use of force." *Id*. at 1.

The City's Proposal does not require any changes in DOC leadership or personnel, any changes in the agency's current management or organizational structure, or any specific operational or practice changes. Nor does it require DOC to seek any guidance or assistance from outside the agency, including from national corrections experts or consultants. Defendants have not pointed to any precedent from any jurisdiction where the remedy for an agency's contempt resembles the framework they propose, and we are not aware of any.

**B.    The City's Proposal Relies on the Current Commissioner, Whose Corrections and Management Experience Is Limited to This Dysfunctional Agency, to Overcome Longstanding Cultural, Structural, and Organizational Barriers.**

As a threshold issue, the City's Proposal does not appear to be consistent with what the Court contemplated when it directed the parties to meet and confer and submit proposals describing potential receivership structures. In its September 24, 2024 Order, the Court defined a "receiver" as "any *outside person* brought in at the Court's direction to oversee the Department of Correction and to bring Defendants into compliance with the orders in this case." Dkt. No. 779 at n.1 (italics added). The current Commissioner is obviously not an "outside person."

To the contrary, Commissioner Maginley-Liddie has held various positions at DOC since 2015, when the Consent Judgment went into effect. She served as Agency Attorney and later Deputy General Counsel in DOC's Legal Division until 2020, was appointed First Deputy Commissioner in January 2021, and became Commissioner in December 2023. Thus, she has held top DOC leadership positions during a period when the jails became more violent and unsafe, DOC violated core provisions of the *Nuñez* orders, and DOC failed to "demonstrate[] diligent attempts to comply with the Contempt Provisions in a reasonable manner," Dkt. 803 at

52, all of which ultimately led to the Court's contempt ruling. This is not intended to suggest that the Defendants' longstanding noncompliance is directly (or indirectly) attributable to Commissioner Maginley-Liddie personally or any of her actions or decisions. Indeed, we do not doubt that she has made and continues to make good faith attempts to address at least some of the deficiencies that have plagued DOC for decades and appreciate the productive and collaborative relationship she appears to have developed with the Monitoring Team. But the City's Proposal is flawed in that it primarily relies on the hope that the current Commissioner—who has been embedded in this deeply dysfunctional system for years and had no corrections or management experience before joining DOC—will now find a way to bring Defendants into compliance and overcome the cultural, structural, and organizational barriers that have thwarted all prior DOC Commissioners' reform efforts.

In contrast, under our proposal, the Receiver would be someone from outside of DOC who we expect will have extensive corrections experience and a demonstrated track record of implementing meaningful reforms in a large corrections system. This fresh perspective will be essential for reform. As discussed above, this individual, and their team, would work closely with Commissioner Maginley-Liddie and her leadership team as they work towards their joint goal of achieving compliance with the *Nuñez* orders.

C.    **The City's Proposal Will Not Materially Expand the Commissioner's Powers, and Fails to Articulate Specific, Concrete Actions that the Commissioner Will Take as "Compliance Director" that Could Not Have Been Taken Previously.**

The City's Proposal does not grant the Commissioner substantial additional powers and authorities beyond what she has had for the last 14 months. Instead, the core component of the City's Proposal is that the Commissioner would no longer be subject to removal by the Mayor. Defendants argue that this will allow the Commissioner to have full discretion and independence

32

to take whatever steps she deems necessary to address safety and use of force issues.[12] However, despite repeated questions during our meet-and-confer sessions over the past several months, Defendants have failed to identify any specific, concrete actions that Commissioner Maginley-Liddie will take if the Court adopts the City's Proposal that she cannot take now due to the existing reporting structure. Nor have Defendants pointed to any safety-related measure or change to policies, procedures, operations, management structure, or personnel that the Commissioner wanted to implement during the last 14 months, or during her 4-year tenure as First Deputy Commissioner, but did not implement due to opposition from the Office of the Mayor or a concern that she would be replaced. This glaring omission in the City's Proposal is telling.

Although Defendants claim that their proposal grants Commissioner Maginley-Liddie additional new powers when acting in her capacity as the "Compliance Director," a close reading of the proposal shows no genuine change.

- Budget: The City's Proposal states that the "Compliance Director" "shall be directly *involved in* establishing the DOC's budget, along with OMB," and "shall make reasonable efforts to manage [the agency] within the parameters of the approved budget amount," and "*may propose* budget modifications to OMB if the budget is inadequate to meet the requirements of court orders." City Proposal at 4 (emphasis supplied). However, the Commissioner presumably already has input on the requested budget for the agency, is supposed to try to stay within that budget, and may ask for changes to the budget. Nothing in the City's Proposal gives her any additional authority to ensure that DOC secures any necessary funding to comply with the *Nuñez* orders or to reallocate funds as needed.

- Collective Bargaining Process: The City's Proposal authorizes the "Compliance Director" "to participate in the collective bargaining process" with unions, along with the New York City Office of Labor Relations. *Id*. Again, this is not a new power. Nothing has prevented Commissioner Maginley-Liddie or her predecessors from "participating" in negotiations with unions if they wished to do so. The issue has been the City's failure to secure any modifications to the labor agreements that would facilitate the reform effort.

---

[12] As discussed in Section IV(D) below, the Commissioner cannot be truly independent under the impractical dual reporting structure proposed by Defendants.

- <u>Appointments</u>: The City's Proposal allows the "Compliance Director," if she identifies a need for a "new role, title, or position," to "work with OMB and the New York City Office of Labor Relations to identify legal or administrative impediments and take appropriate action to advance approval of said positions without undue delay." *Id.* at 3. Again, nothing has prevented Commissioner Maginley-Liddie or her predecessors from "working with" other City agencies to create or fill new positions now or during the last nine years. To the extent the proposal exempts certain senior DOC appointments from mayoral approval (*id.* at 3), Defendants do not identify any candidate who Commissioner Maginley-Liddie has been blocked from hiring during her 14-month term as Commissioner due to this mayoral approval requirement.

- <u>Relief from local and state laws and rules and labor agreements</u>:  The City's Proposal permits the "Compliance Director" to seek a Court order "granting relief from local and state laws or rules, as well as labor agreements, if necessary to achieve compliance with the *Nunez* Orders." *Id*. at 2. However, nothing has prevented the City—a named defendant in this case—from filing such a petition with the Court at any time during the last nine years. Despite the Monitor's repeated encouragement, the City has declined to take the initiative to do so, with the sole exception of joining the Government and Plaintiffs in seeking the ability to hire external candidates for facility leadership positions 18 months after Monitor recommendations to do so. Dkt. 492. Further, the proposal does not identify any law, rule, or labor agreement provision that Commissioner Maginley-Liddie intends to ask this Court to set aside if granted the authority to make such an application herself.

## D.    The City's Proposal Creates an Impractical and Unworkable Dual Reporting Structure Designed to Create the False Appearance of Independence.

Under the City's Proposal, Commissioner Maginley-Liddie will report to the Office of the Mayor "in the ordinary course of business, consistent with the duties and responsibilities of agency Commissioners," but will report to this Court "with respect to matters directly or indirectly related to safety and the use of force, and any other actions undertaken in furtherance of bringing the DOC into compliance with the *Nuñez* Orders." City Proposal at 1. In other words, Ms. Maginley-Liddie would report to the Mayor when she is wearing her existing "Commissioner hat," but will report to this Court and be subject to this Court's oversight when she is wearing her "Compliance Director hat." Putting aside the legality of having a City

34

employee report to a federal judge, the City's dual reporting structure is impractical and unworkable. In a last-ditch effort to avert the appointment of a true receiver who would report only to the Court and always be acting with the authority of this Court, the City has put forth a convoluted left brain/right brain framework that will create confusion, not political independence.

Defendants make no effort to specifically define the universe of areas or functions that will continue to fall within mayoral control and those that will not. The Commissioner has full operational authority over the City's jails and undoubtedly makes a wide range of decisions each day. Under the City's Proposal, Commissioner Maginley-Liddie is being asked to determine which decisions she needs to run by the Office of the Mayor, and those that she does not and can be made with the authority of this Court. That is an unrealistic and impractical request and will put the Commissioner in an untenable position.

The dual reporting structure will also create confusion on the ground. It is unclear how DOC staff and others in City government will know when Commissioner Maginley-Liddie is acting in her role as "Compliance Director" and with the authority of this Court. When she issues directives or enacts new policies and operational changes, those receiving the direction will need to determine for themselves whether they relate to the areas of "safety and use of force" and thus should be treated as a Court directive. The same ambiguity will exist when she communicates with other City agencies or actors. This ambiguity will undermine the first "Receivership Goal" set forth in the Contempt Opinion—ensuring that the Court has direct authority with respect to all *Nuñez* issues. Dkt. 803 at 56. There is no such ambiguity under the Government and Plaintiff Proposal; whenever the Receiver takes or directs any action, it will be with this Court's authority and the Receiver will only report to, and be answerable to, this Court.

35

Defendants attempt to address the inherent impracticality of the dual reporting structure by stating that disputes between the "Compliance Director and the parties regarding the scope of matters to which the Compliance Director is answerable to the Court rather than the Mayor" should be raised with the Monitor and, if he cannot resolve it, the Monitor should request that "the Court resolve the dispute subject to briefings and hearings." City Proposal at 1-2. As an initial point, it is not the Monitor's role to resolve legal disputes between the parties or to seek judicial relief. Further, as a practical matter, it will be impossible for the Government or Plaintiffs to know when Commissioner Maginley-Liddie thinks she needs to report to the Office of the Mayor with respect to a specific action or decision or whether she thinks she is free to act independently wearing her "Compliance Director" hat.

Finally, the dual reporting structure undermines the primary goal of a receivership, which is to empower someone who reports solely to this Court and is insulated from any political pressures or outside influence to take necessary steps to promptly achieve compliance with the *Nuñez* orders. Political influence takes many forms beyond the power to remove someone from their position. Commissioner Maginley-Liddie has been employed by DOC for approximately 10 years, has presumably developed longstanding relationships with various stakeholders, was appointed Commissioner by the Mayor, and will continue to report to the Mayor "in the ordinary course of business" under the City's Proposal. City Proposal at 1. She will be unable to focus exclusively on making the reforms necessary to move DOC toward compliance since she will continue to be responsible for all DOC operational matters outside the scope of the Receiver's Mandate. Given Defendants' long history of noncompliance and contemptuous conduct, at this point it is necessary for the Court to appoint a fully independent person from outside the agency

who will be exclusively focused on complying with the *Nuñez* orders, will always be acting with the authority of this Court, and will report exclusively to this Court.

      **E.**    **The Plans and Initiatives in the City's Proposal are Vague and Mirror Prior Failed DOC Efforts, and Defendants Do Not Explain Why the Agency Will Be Able to Finally Implement Them If the Commissioner Is Appointed "Compliance Director."**

Much of the City's Proposal discusses plans that the "Compliance Director" will develop and "priority initiatives," some of which Defendants claim are "already underway." *Id.* at 5-8. As a threshold matter, it is unclear how this discussion of DOC's current plans and initiatives relates to the receivership structure that Defendants propose, which is what the Court directed the parties to brief. The City certainly should be undertaking efforts to comply with the Court orders regardless of the outcome of this motion. Further, as the Court has observed, DOC has a long history of developing plans that have not been implemented and have not resulted in any meaningful changes. Dkt. 803 at 49 (referring to DOC's "long, consistent pattern of launching and subsequently abandoning numerous plans, pilots, and facilities over the last nine years"). Indeed, this is precisely the dynamic that a receivership is intended to disrupt. The time for additional Court orders requiring the development of more plans and initiatives has passed. *Id.* at 49 ("Descriptions of intentions and plans are not sufficient to show reasonable, diligent attempts at compliance at this stage of the case.").

Under the City's Proposal, Commissioner Maginley-Liddie would submit to the Court an annual "Compliance Plan" outlining "projects and strategic initiatives" that would be implemented over the next year. City Proposal at 5. Defendants list certain "priority initiatives" that they claim "will serve as the inaugural Compliance Plan," *id*. at 5—an approach Defendants have touted before, most recently with the "Action Plan . . . designed to prioritize reform efforts." Dkt. 803 at 8. These "priority initiatives" are vague, mandate little in the way of

concrete action or change, call for the development of still more plans, and aim at longstanding

deficiencies that the Monitor has repeatedly identified and DOC has failed to address for years.

The City's Proposal fails to explain why little progress has been made in these areas to date, or

why success is any more likely if the Commissioner also serves as the "Compliance Director."

- <u>Uniformed Supervisory Lines</u>: For years, the Monitor has reported that DOC lacks the standard number of supervisory levels in the uniformed staff structure, frustrating improvements to the quality of supervision, support, and guidance provided to front-line staff. *See* PFOF (Dkt. 762-2) ¶¶ 599-600. Defendants have not addressed this finding, vaguely referring to unidentified legal impediments. Under the City's Proposal, Defendants will now finally undertake "a comprehensive legal assessment" of DOC's ability to make this change within 60 days of the Court's appointment of the "Compliance Director," and then the "Compliance Director" will "identify any potential legal impediments that may require relief from the Court, and any practical limitations on the feasibility of implementation." City Proposal at 6. Tellingly, Defendants have not—either in their proposal or during recent meet-and-confer sessions—committed to adding this additional supervisory level. They also do not explain why the City, a named defendant in this case, could not complete this "legal assessment" before and still needs 60 more days to do so, or why a Court order is needed to compel the City to perform a legal analysis and to compel Commissioner Maginley-Liddie to make an application for any necessary legal relief.

- <u>Disciplinary Matters</u>: The City's Proposal provides that the "Compliance Director" will, within 120 days of their appointment, "implement measures to improve efficiency in the internal investigation process and disciplinary process, including ensuring thorough and timely investigations and expediting outcomes in disciplinary proceedings." City Proposal at 6. As the Court is well aware, the 2015 Consent Judgment already requires Defendants to essentially do the same thing. *See* Dkt 249, §VII, ¶ 1 (requiring DOC to conduct "thorough, timely, and objective investigations of all Use of Force Incidents"); *id.*, §VIII, ¶ 1 (requiring DOC "to impose appropriate and meaningful discipline"). The Court found Defendants to be in contempt of these provisions (Dkt. 803 at 18-22), noting the Monitor's most recent finding in his November 22, 2024 report that Defendants' noncompliance continues (Dkt. 803 at 19, n.14). It is baffling that Defendants are suggesting at this stage that the Commissioner will need another four months to "implement measures" to make improvements in these fundamental areas. Further, Defendants do not explain why appointing the Commissioner as "Compliance Director" is necessary for, or will even assist with, taking these steps towards compliance. In responding to Defendants' argument in their opposition to the Contempt Motion that they had "developed a plan for improving investigations into the use of force and adopting the Monitoring Team's suggestions," the Court

found that "there is no evidence before the Court regarding whether, when, and how such initiatives will be implemented." Dkt. 803 at 20. The same can be said of this proposal.[13][14]

- The Security Council: The City's Proposal notes that the Commissioner has convened a "Security Council" consisting of senior DOC officials who "shall be charged with immediately developing a plan to identify and address security issues that permit or contribute to violence in the jails." City Proposal at 7. Defendants have been subject to court orders since 2021 requiring them to develop and implement plans to improve security practices in the jails and have repeatedly failed to do so. Second Remedial Order, ¶ 1(i)(a); Action Plan, § D, ¶ 2. Indeed, the Court found Defendants to be in contempt of these court order provisions. Dkt. 803 at 22-26. Again, Defendants do not offer any specifics about what may be included in this new security "plan," or how this differs from what is already required by the *Nuñez* orders. Nor do they offer any reason to conclude that this new initiative to develop a viable plan to address the routine failure to follow basic security protocols will be any more successful than similar prior attempts or why the remedial structure they propose, including the appointment of the Commissioner as the "Compliance Director," will address the barriers that have stalled previous efforts.

- Strategic Plan: As a final "priority initiative," the City's Proposal discusses the development "of a Strategic Plan to identify initiatives to address staff wellness and promote staff engagement to support and actively participate in the implementation" of the *Nuñez* orders. City Proposal at 7. Defendants list certain steps already taken, such as "resuming annual Medal Day ceremonies" and holding the first "Men's Conference" to focus on male staff's physical and mental health issues. *Id*. at 7-8. We do not dispute the importance of addressing staff wellness issues, improving staff morale, and enhancing efforts to recruit and retain qualified staff. However, these initiatives are untethered to the remedial structure at issue and proposed by the City. The Commissioner will be no better positioned to roll out these initiatives if she is appointed the "Compliance Director," and would be free to move forward with these plans without any Court order or if the Court adopts our Amended Proposed Order.

## F.     The Legal Viability of the City's Proposal Is at Best Unclear.

The legal viability of the City's Proposal is also in doubt for a number of reasons.

---

[13] The City's Proposal includes a fairly incomprehensible reference to steps that may be taken if the Compliance Director "identifies an issue that appears to impede the Department's ability to prosecute disciplinary cases as expeditiously as possible and which also appears to implicate the work of another City agency." City Proposal at 6. It is difficult to understand what Defendants contemplate occurring, or why the Commissioner needs to be appointed "Compliance Director" for the City to remedy whatever inter-agency issue is being referenced here.

First, the City's Proposal does not satisfy the primary purpose of a civil contempt remedy—to coerce defendants to take actions to remedy prior noncompliance with court orders. Dkt No. 803 at 52-53 (citing cases). Under their proposal, Defendants are not being coerced or ordered to do much of anything. The Commissioner will maintain complete operational authority over the jail system and will not be required to make any personnel, policy, or operational changes. And the existing management and organizational structure of the agency will remain in place. The main change would be that the Commissioner will no longer be subject to removal by the Mayor. However, Defendants have failed to show how this will somehow liberate the Commissioner to take specific steps or actions designed to move DOC towards compliance that she has so far been unable to take because she reports to the Mayor and can be replaced by him, or how she will exercise independence on certain matters while she actively reports to the Mayor on others.

Second, Defendants have not specified in their proposal or during meet-and-confer sessions the legal basis for a federal court order stripping not only this Mayor, but potential future Mayors, of their power under the City Charter to replace an agency's commissioner. *See* New York City Charter, Chapt, 1, § 6. In the event a new mayor is elected in November, Ms. Maginley-Liddie, Mayor Adams' hand-picked Commissioner, would likely serve for at least the entire duration of that new mayor's first term, unless she is removed earlier by the Court. While the Receiver that Plaintiffs and the Government propose could also serve during the term of a subsequent mayor, that Receiver's power would be cabined to areas necessary to achieve compliance with the *Nuñez* orders, and any future Mayor would still be free to appoint someone to serve as the agency's Commissioner.

Third, the City's Proposal requires the Court to issue a remedial order that arguably extends beyond the scope of this case and what is necessary to correct the ongoing constitutional violations. *See* 18 U.S.C. § 3626(a)(1)(A). Under the City's Proposal, the Commissioner will continue to oversee all aspects of the jail system's operations, including those that do not relate to safety and use of force issues and are clearly outside the scope of the *Nuñez* orders. Although the Commissioner would purportedly report to the Mayor with respect to these non-*Nuñez* areas, the Mayor, as well as future mayors, could not replace her even if she were to engage in malfeasance or otherwise perform in an unsatisfactory manner in these non-*Nuñez* areas. Instead, under the City's Proposal, it would be solely up to this Court to determine whether the Commissioner should be removed. By authorizing this Court to remove the Commissioner for reasons unrelated to the ongoing constitutional violations in this case, the City's Proposal may run afoul of the PLRA. Furthermore, to the extent the Court would be reluctant to replace the Commissioner for reasons unrelated to scope of this case, the Commissioner would be totally insulated from removal under the City's Proposal.

## V.    CONCLUSION

For the foregoing reasons, the Government and Plaintiffs respectfully request that the Court adopt the Government and Plaintiffs' Proposal for the appointment of a Receiver as described in the Amended Proposed Order.

Date:    January 24, 2025
         New York, New York

THE LEGAL AID SOCIETY

By: /s/ Mary Lynne Werlwas
Mary Lynne Werlwas
Kayla Simpson
Katherine Haas
Sophia Gebreselassie
49 Thomas Street, 10th Floor
New York, New York 10013
(212) 577-3530


EMERY CELLI BRINCKERHOFF ABADY
WARD & MAAZEL LLP

By: /s/ Debra L. Greenberger
Jonathan S. Abady
Debra L. Greenberger
Vasudha Talla
Sana F. Mayat
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000


*Counsel for the Plaintiff Class*

DANIELLE R. SASSOON
United States Attorney for the
Southern District of New York


By: /s/ Jeffrey K. Powell
JEFFREY K. POWELL
RACHAEL L. DOUD
Assistant United States Attorneys
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.: (212) 637-2800


*Counsel for the United States*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- X
                                     :

MARK NUNEZ, et al.,                      :
                                      :

                 Plaintiffs,         :
                                      :

    - against -                   :    **11 Civ. 5845 (LTS)(JCF)**
                                      :

CITY OF NEW YORK, et al.,          :
                                      :

                Defendants.     :
                                      :
------------------------------------------------------------- X
                                      :

UNITED STATES OF AMERICA,     :
                                      :

               Plaintiff-Intervenor,   :
                                      :

    - against -                   :
                                      :

CITY OF NEW YORK and NEW YORK CITY   :
DEPARTMENT OF CORRECTION,        :
                                      :

               Defendants.     :
------------------------------------------------------------- X

## [PROPOSED] ORDER APPOINTING A RECEIVER

WHEREAS, on October 22, 2015, this Court entered the Consent Judgment (Dkt. No. 249) in this matter to correct the violations of the constitutional rights of people incarcerated in jails operated by the New York City Department of Correction ("DOC" or "the Department");

WHEREAS, the Consent Judgment required the Defendants to take specific actions to remedy a pattern and practice of violence by staff against incarcerated individuals, and to develop and implement new practices, policies, and procedures to reduce violence in the jails and ensure the safety and well-being of incarcerated individuals;

WHEREAS, Section XXII, ¶ 1 of the Consent Judgment provided: "The Parties stipulate and agree, and the Court finds, that this Agreement complies in all respects with the provisions

1

of 18 U.S.C. § 3626(a). The Parties further stipulate and agree, and the Court finds, that the prospective relief in this Agreement is narrowly drawn, extends no further than is necessary to correct the violations of federal rights as alleged by the United States and the Plaintiff Class, is the least intrusive means necessary to correct these violations, and will not have an adverse impact on public safety or the operation of a criminal justice system. Accordingly, the Parties agree and represent that the Agreement complies with the provisions of 18 U.S.C. § 3626(a).";

WHEREAS, on August 14, 2020, the Court entered a Remedial Consent Order Addressing Non-Compliance (the "First Remedial Order," Dkt. No. 350) that included several remedial measures designed to address the repeated findings of the *Nuñez* Independent Monitor (the "Monitor") that the Defendants were in non-compliance with core provisions of the Consent Judgment, including with Section IV, ¶ 1 (Implementation of Use of Force Directive); Section VII, ¶ 1 (Thorough, Timely, Objective Investigations); Section VII, ¶ 7 (Timeliness of Preliminary Reviews); Section VII, ¶ 9 (a) (Timeliness of Full ID Investigations); Section VIII, ¶ 1 (Appropriate and Meaningful Staff Discipline); Section XV, ¶ 1 (Inmates Under the Age of 19, Protection from Harm); and Section XV, ¶ 12 (Inmates Under the Age of 19, Direct Supervision);

WHEREAS, in his Eleventh Report filed on May 11, 2021 (Dkt. No. 368), the Monitor reported that that the Defendants were in non-compliance with numerous provisions of the First Remedial Order, including Section A, ¶ 2 (Facility Leadership Responsibilities), Section A, ¶ 3 (Revised De-escalation Protocol), Section  A, ¶ 6 (Facility Emergency Response Teams), Section D, ¶ 1 (Consistent Staffing), Section D, ¶ 2 (ii) (Tracking of Incentives and Consequences), and Section  D, ¶ 3 (Direct Supervision);

2

WHEREAS, the Court entered a Second Remedial Order on September 29, 2021 (Dkt. No. 398), and a Third Remedial Order on November 22, 2021 (Dkt. No. 424);

WHEREAS, after the three Remedial Orders failed to result in meaningful improvements, the Defendants developed an Action Plan, supported by the Monitor, that was designed to address Defendants' overall lack of progress toward compliance by focusing on four foundational areas without which reform could not proceed—security practices, supervision and leadership, staffing practices, and accountability—and the Court entered and So Ordered the Action Plan on June 14, 2022 (Dkt. No. 465);

WHEREAS, the Court found that the First Remedial Order, the Second Remedial Order, the Third Remedial Order, and the Action Plan were each compliant with the provisions of 18 U.S.C. § 3626(a) and were necessary to correct the violations of federal rights as alleged by the United States and the Plaintiff Class;

WHEREAS, the First Remedial Order, the Second Remedial Order, the Third Remedial Order, and the Action Plan were each entered to address the ongoing non-compliance with the Consent Judgment and to achieve its primary goal: to protect the constitutional rights of incarcerated people and substantially reduce the level of violence in the jails;

WHEREAS, the Consent Judgment, the First Remedial Order, the Second Remedial Order, the Third Remedial Order, and the Action Plan are hereafter collectively referred to as "the *Nuñez* Orders;"

WHEREAS, more than a year after the Action Plan was entered, the Monitor found in his July 10, 2023 Special Report (Dkt. No. 557) that the Defendants had not made substantial and demonstrable progress in implementing the reforms, initiatives, plans, systems, and practices

outlined in the Action Plan, and that there had not been a substantial reduction in the risk of harm facing incarcerated individuals and DOC staff;

WHEREAS, on November 17, 2023, the Plaintiff Class and the United States filed a Motion for Contempt and Appointment of Receiver;

WHEREAS, on November 27, 2024, this Court issued its factual findings and decision granting Plaintiffs' Motion for Contempt and found that Defendants (i) are in contempt of eighteen core provisions of the *Nuñez* Orders "that have gone unheeded for years and have highlighted failures inextricably linked to the Department's historic pattern of excessive use of force against persons in custody," (Dkt. No. 803 at 52); (ii) "have not demonstrated diligent attempts to comply with the Contempt Provisions in a reasonable manner," (Dkt. No. 803 at 52); and (iii) have repeatedly and consistently failed to remediate the violations of the federal rights of incarcerated people that necessitated entry of the Consent Judgment, (Dkt. No. 803 at 52, 54-56);

WHEREAS, this Court found that the "use of force rate and other rates of violence, self-harm, and deaths in custody are demonstrably worse than when the Consent Judgment went into effect in 2015" and the "unsafe and dangerous conditions in the jails…have become normalized despite the fact that they are clearly abnormal and unacceptable," (Dkt. No. 803 at 11);

WHEREAS, this Court found that "for nine years, Defendants made only half-hearted, inconsistent efforts to comply with Court orders," (Dkt. No. 803 at 50);

WHEREAS, this Court found that "[t]he record in this case makes clear that those who live and work in the jails on Rikers Island are faced with grave and immediate threats of danger, as well as actual harm, on a daily basis as a direct result of Defendants' lack of diligence, and

that the remedial efforts thus far undertaken by the Court, the Monitoring Team, and the parties have not been effective to alleviate this danger," (Dkt. No. 803 at 55);

WHEREAS, this Court found that "Defendants' ongoing failure to comply" requires a remedy that addresses the "insufficiently resourced leadership; a lack of continuity in management; failures of supervision and cooperation between supervisors and line officers; a lack of skill or imagination to create and implement transformative plans; and an unwillingness or inability to cooperate with the Monitoring Team recommendations to accomplish the changes necessary," (Dkt. No. 803 at 54);

WHEREAS, this Court found that "[t]he last nine years also leave no doubt that continued insistence on compliance with the Court's orders by persons answerable principally to political authorities would lead only to confrontation and delay; that the current management structure and staffing are insufficient to turn the tide within a reasonable period; that Defendants have consistently fallen short of the requisite compliance with Court orders for years, at times under circumstances that suggest bad faith; and that enormous resources—that the City devotes to a system that is at the same time overstaffed and underserved—are not being deployed effectively," (Dkt. No. 803 at 55-56); and

WHEREAS, pursuant to 18 U.S.C. § 3626(a), the prospective relief in this Order is narrowly drawn, extends no further than is necessary to correct the violations of federal rights as alleged by the Plaintiff Class and the United States, is the least intrusive means necessary to correct these violations, and will not have an adverse impact on public safety or the operation of a criminal justice system.

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED as follows:

I.    **Appointment of Receiver and Receiver's Duties.**

    A.    A Receiver will be appointed with the responsibility and authority to take all necessary steps to promptly achieve Substantial Compliance (defined in Section XX, ¶ 18 of the Consent Judgment) with the *Nuñez* Orders ("the Mandate").

    B.    The Receiver shall provide leadership and executive management with the goal of developing and implementing a sustainable system that protects the constitutional rights of incarcerated people.

    C.    The parties and the Monitor shall confer regarding the selection of a Receiver candidate to present for the Court's approval. If the parties are unable to agree upon a Receiver candidate within thirty (30) days of the date of this Order, the parties shall each submit nominations to the Court, the Monitor may provide any input on those nominations, and the Court will thereupon select and appoint the Receiver.

    D.    The Receiver shall be answerable only to the Court.

II.    **Powers of the Receiver.** The Receiver shall have all powers necessary to fulfill the Mandate, including but not limited to:

    A.    **General Powers**: The Receiver shall have the authority to exercise all powers vested by law in the Defendants to the extent necessary to fulfill the Mandate. The Receiver shall have the power to control, oversee, supervise, and direct all administrative, personnel, financial, accounting, contracting, legal, and other operational functions of DOC to the extent necessary to fulfill the Mandate.

    B.    **Specific Powers**: Without in any way limiting the Receiver's general powers detailed in Paragraph A above, the Receiver shall have the authority to exercise the following specific powers to the extent necessary to fulfill the Mandate:

i.   The Receiver shall have the authority to enact or change DOC policies, procedures, protocols, systems, and practices related to the requirements of the *Nuñez* Orders.

ii.   The Receiver shall have the authority to establish personnel policies and direct personnel actions. The Receiver shall have the power to create, modify, abolish, or transfer employee and contractor positions, as well as to recruit, hire, train, terminate, promote, demote, transfer, and evaluate employees and contractors. The Receiver shall have the authority to assign and deploy DOC staff.

iii.   The Receiver shall have the authority to negotiate new contracts and renegotiate existing contracts, including contracts with labor unions.

iv.   The Receiver shall have the authority to procure and contract for supplies, equipment, tangible goods, and services.

v.   The Receiver shall have the authority to review, investigate, and take disciplinary or other corrective or remedial actions with respect to any violation of DOC policies, procedures, and protocols related to the requirements of the *Nuñez* Orders.

vi.   The Receiver shall have the authority to hire consultants, or obtain technical assistance, as the Receiver deems necessary to perform their duties under this Order.

C.   **The Receiver's Plan:** The Receiver—in consultation with the Monitor, the Commissioner, and other appropriate DOC leadership—will submit a written plan (the "Plan") to the Court within 60 days after their appointment that specifies the

divisions, operational functions, and personnel within the Department that would fall under the Receiver's ultimate authority because they are necessary to fulfill the Mandate. To the extent that there are conflicts between the Receiver and the Commissioner about the Plan, the Receiver will present those conflicts to the Court for decision, and the Plan will be revised accordingly.

i.   The Plan should be crafted in a manner that: (a) clearly sets forth the reporting structure for individuals who hold leadership positions in the Department, such that the Receiver is the ultimate authority in all areas necessary to achieve the Mandate; (b) avoids duplication of resources or the creation of any additional unnecessary bureaucracy; (c) provides an operational structure that will support the Receiver to be effective in fulfilling the Mandate; and (d) describes the Commissioner's role and responsibilities in supporting the Receiver to ensure the implementation of operational, organizational, policy, practice, or other reforms necessary to fulfill the Mandate.

ii.  The Plan will identify a limited set of specific initiatives or actions that the Department to date has failed to implement due to bureaucratic, logistical, or other delays, and/or perceived legal impediments, which the Receiver believes are necessary to fulfill the Mandate.  The Receiver will prioritize implementing these initiatives or actions through the exercise of the powers granted to them in this Order.  The Receiver will consult with the Monitor, and will review the recommendations the Monitor has made in his public reports, to assist in identifying these initiatives or actions.

D. **Commissioner's Role**: The Commissioner will retain ultimate authority over the divisions, operational functions, and personnel within the Department that do not fall under the Receiver's ultimate authority in the Mandate. The Receiver shall have the authority to direct the Commissioner to take any steps that the Receiver deems necessary to fulfill the Mandate. It is expected that Defendants, and the Commissioner and DOC leadership, will work closely with the Receiver to facilitate the Receiver's ability to perform their duties under this Order.

E. **Additional Powers**: The Receiver may petition the Court for such additional powers as are necessary to fulfill the Mandate.

F. **Access**: The Receiver, including all of their staff and consultants, shall have unlimited access to all records and files (paper or electronic) maintained by DOC and shall have unlimited access to all DOC facilities, incarcerated people, and DOC staff. This access includes the authority to conduct confidential interviews with DOC staff and incarcerated people. The Receiver's ability to interview DOC staff shall be subject to the employee's right to representation under certain circumstances as set forth in Section 75 of the New York Civil Service Law and MEO-16.

III. **Reporting.**

A. The Receiver shall regularly report to and/or meet with the Court to update the Court regarding the status of efforts to comply with the *Nuñez* Orders, and any specific obstacles or impediments encountered by the Receiver.

B. Within 60 days of the Receiver's appointment, the Receiver shall propose for the Court's approval a specific schedule for the submission of regular formal reports to be filed on the public docket. The Receiver will consult with the Monitor about

9

the timing of their respective reporting schedules. In addition, the Receiver shall remain in contact with the Court throughout the Receivership on an informal, as needed, basis.

**IV.    Role of the Monitor.**

C.    The Monitor shall continue to perform the responsibilities set forth in the *Nuñez* Orders, including assessing compliance with the *Nuñez* Orders, providing technical assistance in connection with implementing the requirements of the *Nuñez* Orders, and submitting reports to the Court as set forth in the *Nuñez* Orders in accordance with his past practices.

D.    The Receiver shall regularly consult with the Monitor, given the Monitor's experience, concerning the progress that has been made in fulfilling the Mandate and the best strategies to achieve Substantial Compliance.

E.    The Receiver and the Monitor will be independent positions that each report to the Court and are not answerable to each other.

**V.    Immunity and Indemnity.**

A.    The Receiver and the Receiver's staff shall have the status of officers and agents of the Court, and as such shall be vested with the same immunities as vest with the Court.

B.    The Defendants shall indemnify the Receiver and their staff in any litigation brought against the Receiver or their staff regarding activities conducted in the course of the Receiver's official duties.

**VI.    Compensation and Responsibility for Payment.**

C.    The City of New York shall bear all reasonable fees, costs, and expenses of the Receiver, including payments to the Receiver's staff.  Such fees, costs, and

10

expenses shall be sufficient to allow the Receiver to fulfill their duties pursuant to this Order in a reasonable and efficient manner. The Receiver may hire or consult with such additional qualified staff as is reasonably necessary to fulfill their duties pursuant to this Order without duplication of effort. The Receiver shall submit an invoice for their services, and the services of their consultants and staff, to the City on a monthly basis. Those invoices will include charges for fees, costs, and expenses. Payment on such invoices will be made within sixty (60) days of receipt. If the City objects to any fees, costs, or expenses as unreasonable, unnecessary, or duplicative, the City shall submit the invoice to the Court for a determination of reasonable fees, costs, and expenses.

A.    Within thirty (30) days of their appointment, the Receiver shall submit to the Court an initial statement of rates and proposed fees and expenses, which the Receiver may modify from time to time as appropriate.

VII.  **Duration of Receivership.**

A.    The Receiver's authority will continue until the Court determines that Substantial Compliance (defined in Section XX, ¶ 18 of the Consent Judgment) with the *Nuñez* Orders has been achieved.

B.    Nothing in this Order impacts the terms of the Consent Judgment or other *Nuñez* Orders which remain in full force and effect. In the event the Receivership terminates, the Consent Judgment and other *Nuñez* Orders will remain in full force and effect until the Court makes a finding that the Defendants have achieved Substantial Compliance with the provisions of the Consent Judgment and have maintained Substantial Compliance for a period of twenty-four (24) months, as set forth in Section XXI, ¶ 5 of the Consent Judgment.

11

C.    Prior to the cessation of the Receivership, the Receiver shall develop a transition plan to return full operational authority of the jail system back to Defendants.

**VIII.  Cooperation.**

A.    The Defendants, and all agents or persons within the employ of the Defendants (including contract employees), and all persons in concert and in participation with them, the Monitor, and all counsel in this action, shall fully cooperate with the Receiver in the discharge of their duties under this Order, and shall promptly respond to all inquiries and requests related to compliance with the *Nuñez* Orders.

**IX.    Other Terms.**

B.    If at any point the Receiver determines that they need additional funding to fulfill the Mandate that is not budgeted for that fiscal year, the Receiver shall immediately notify the City Council's Finance Division and the Mayor's Office of Management and Budget of the specific purpose of the amount of funds needed. If the issue is not timely resolved, the Receiver or any party may request a hearing before the Court.

C.    The Receiver shall make reasonable efforts to exercise their authority in a manner consistent with applicable state and local laws, regulations, and contracts. However, in the event the Receiver determines that those laws, regulations, or contracts impede the Receiver from carrying out their duties under this Order and fulfilling the Mandate, the Receiver may petition the Court to waive any legal or contractual requirement that is causing the impediment or seek other appropriate relief.

D.  The Receiver and their staff shall have the authority to communicate *ex parte* and confidentially with each party and each party's legal representatives, as well as with the Court and the Monitor.

E.  Without leave of the Court, the Receiver and their staff may not testify in any litigation or proceeding other than this case with regard to any act or omission of DOC or any of DOC's agents, representatives, or employees related to the *Nuñez* Orders, except that the Receiver may testify in public hearings or other proceedings before the New York City Council, the Board of Correction, or the New York State legislature.

F.  Unless such conflict is waived in writing by the Parties, the Receiver and their staff may not accept employment or provide consulting services that present a conflict of interest with their responsibilities under this Order, including being retained (on a paid or unpaid basis) by any current or future litigant or claimant, or such litigant's or claimant's attorney, in connection with a claim or suit against DOC or DOC's agents, representatives, or employees.

G.  The Receiver is an agent of the Court and is not a federal, State, or local agency or an agent thereof.

H.  If at any time the Receiver position becomes vacant, the parties and the Monitor shall confer on potential replacements and the parties shall make a good faith effort to promptly agree on a replacement. In the event the parties cannot agree on a replacement, the parties shall each submit nominations to the Court, the Monitor may provide any input on those nominations, and the Court will select and appoint a replacement to serve as the Receiver.

13

SO ORDERED this _____ day of _____, 2025

_____
LAURA TAYLOR SWAIN
UNITED STATES DISTRICT JUDGE