# APPENDIX D:
# DEFENDANTS' SUBMISSION

11-CV-5845 (LTS) (JCF)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

*MARK NUNEZ, et al.,*

*Plaintiffs,*

*-against-*

*THE CITY OF NEW YORK, et al.,*

*Defendants.*

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR PROPOSAL TO ESTABLISH A COURT-APPOINTED COMPLIANCE DIRECTOR**

***MURIEL GOODE-TRUFANT***
*Corporation Counsel of the City of New York*
*Attorney for Defendants*
*100 Church Street*
*New York, N.Y.  10007*

*Of Counsel:  Alan Scheiner*
*Tel:  (212) 356-2344*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES..................................................................................iii

PRELIMINARY STATEMENT........................................................................... 1

POINT I

    THE DEFENDANTS' COMPLIANCE DIRECTOR PROPOSAL
    BEST ACHIEVES THE COURT'S RECEIVERSHIP GOALS .........................3

    A.    The Commissioner / Compliance Director Will Meet the
        Court's Receivership Goal of Direct Court Authority .................................3

    B.    The Commissioner / Compliance Director Plan Would Obviate
        Any Need for Additional Bureaucracy and Expense ...................................4

    C.    The Compliance Director Plan Efficiently Capitalizes on the
        Monitoring Team's Essential Expertise and Experience By
        Continuing an Existing Collaborative Relationship Between the
        Monitor and the Commissioner. .................................................................6

    D.    The Compliance Director Would Push Forward
        Transformational Change While Efficiently Utilizing DOC
        Assets...........................................................................................................7

    E.    The Compliance Director Would Identify and Implement
        Necessary Changes in Contracts, Regulations, Policies or other
        impediments to Effective Compliance........................................................12

POINT II

    THE COMPLIANCE DIRECTOR PLAN IS SUPPORTED BY
    LAW BECAUSE IT IS NARROWLY TAILORED TO EMBODY
    ONLY THE RELIEF NECESSARY TO ACHIEVE EFFICIENT
    AND EFFECTIVE COMPLIANCE.................................................................14

POINT III

    PLAINTIFFS' PROPOSAL CONTAINS SEVERAL
    ADDITIONAL OBJECTIONABLE ELEMENTS............................................26

    A.    Plaintiffs' proposal would unnecessarily supplant the authority
        of the Commissioner and the City government itself. ................................26

    B.    Plaintiffs' Plan Improperly Purports to Bind Non-Parties. .......................29

**Page**

    C.    The Plaintiffs' Plan Would Do Nothing to Address Recruiting
and Attrition Challenges ............................................................................30

CONCLUSION...............................................................................................................34

## TABLE OF AUTHORITIES

**Cases**                                                                                      **Pages**

*Alemite Mfg. Corp. v. Staff,*
    42 F.2d 832 (2d Cir. 1930).................................................................................29

*Allen v. Koenigsmann,*
    No. 19-CV-8173 (LAP), 2023 U.S. Dist. LEXIS 209873
    (S.D.N.Y. Nov. 22, 2023) ...............................................................................15

*Benjamin v. City of New York,*
    75 Civ. 3073 (S.D.N.Y. April 26, 2001).............................................................5

*Brad H v. City of New York,*
    Index No.117882/99 (Sup. Ct, New York Cty. August 17, 2020)............................5

*Brown v. Plata,*
    563 U.S. 493 (2011)...............................................................14, 17, 18, 19

*District of Columbia v. Jerry M.,*
    738 A.2d 1206 (D.C. 1999) .......................................................................11, 16

*Gordon v. Washington,*
    295 U.S. 30 (1935).................................................................................19

*Guajardo v. Tex. Dep't of Criminal Justice,*
    363 F.3d 392 (5th Cir. 2004) ....................................................................17

*Handberry v. City of New York,*
    96-cv-06161 (S.D.N.Y. March 31, 2026) .............................................................5

*Kelly Toys Holdings LLC v. 19885566 Store,*
    No. 22-CV-9384 (JMF), 2024 U.S.
    Dist. LEXIS 23290 (S.D.N.Y. Feb. 9, 2024) ..........................................................30

*LaShawn A. by Moore v. Barry,*
    144 F.3d 847 (D.C. Cir. 1998) ...................................................................16

*Monell v. Dep't of Soc. Servs.,*
    436 U.S. 658 (1978).................................................................................23

*Morgan v. McDonough,*
    540 F.2d 527 (1st Cir. 1976).....................................................................16

*Newman v. Alabama,*
    466 F. Supp. 628 (M.D. Ala. 1979) .............................................................22

**Cases**                                                         **Pages**

*Plata v. Schwarzenegger*,
603 F.3d 1088 (9th Cir. 2010) ...........................................................19

*Plata v. Schwarzenegge*r,
No. C01-1351 TEH, 2005 U.S. Dist. LEXIS 43796
(N.D. Cal. Oct. 3, 2005) ........................... 19-20, 22, 26, 30, 33

*Plata, et al. v. Newsom, et al.*,
01-CV-1351 (JST) .............................................................................33

*Ruiz v. United States*,
243 F.3d 941 (5th Cir. 2001) ...........................................................15

*United States v. Hinds Cty. Bd. of Supervisors*,
120 F.4th 1246 (5th Cir. 2024) ....................13, 14, 15, 17, 18, 19, 22, 24, 25, 27

*United States v. Miami-Dade County, et al.*,
13-cv-21570-BLOOM ........................................................................22

**Statutes**

18 U.S.C. § 3626 ...................................................................................................33

18 U.S.C. § 3626(a)(1)(A) ....................................................................................15

18 U.S.C. § 3626(a)(1)(B) ....................................................................................15

18 U.S.C. § 3626(b)(3) .........................................................................................15

42 U.S.C. § 1983 .............................................................................................23, 24

N.Y. City Charter § 6 ...........................................................................................20

N.Y. City Charter § 217 .......................................................................................13

N.Y. City Charter § 236 .......................................................................................13

N.Y. City Charter § 254 .......................................................................................13

N.Y. City Charter § 394(a) ..................................................................................13

N.Y. City Charter § 1100 ................................................................................20, 21

N.Y. City Charter § 1115 ......................................................................................21

N.Y. Gen. Muni. Law § 50-k ...............................................................................23

<u>**Other Authorities**</u>                                                                                    <u>**Pages**</u>

12 Federal Practice & Procedure § 2983 ......................................................................16

## PRELIMINARY STATEMENT

By Order, dated November 27, 2024 (the "Order"), the Court found the City of New York ("City") and New York City Department of Correction ("DOC") (collectively "Defendants") to be in contempt of certain orders in this matter and directed the parties to devise proposals for a remedial structure. Pursuant to defendants' proposal,[1] the Court shall appoint Commissioner Lynelle Maginley-Liddie as the Commissioner / Compliance Director (the "Compliance Director") of DOC, answerable only to, and serving at the discretion of, the Court with respect to any matter affecting *Nunez* compliance.[2] Under this proposal, the Commissioner / Compliance Director could not be removed by the Mayor; rather removal could be done only by the Court. Defendants' Compliance Director Proposal is the most narrowly tailored, speedy and effective means to achieve the Court's goal of maintaining sound leadership of DOC, committed to *Nunez* compliance, who may seek additional relief from the Court without the consent of any other City government official.

This practical and streamlined solution provides continuity of leadership in a Commissioner with a proven track record of effective fidelity to the *Nunez* goals, and cooperation with the Monitor with a level of independence never before exercised by the head of any City

---

[1] Defendants' Proposal (the "Compliance Director Proposal") is set forth in Appendix A to this Memorandum. The proposal is intended as a detailed description of the remedy, with the language of an implementing Order to be determined should the Court adopt the defendants' proposal in whole or in part.

[2] The Compliance Director would pursue the Court's goals within the bounds of state and local law except as explained herein, or seek further relief from that law if necessary. Compliance Director Proposal at II.

agency.  Commissioner Maginley-Liddie brings her depth of knowledge and experience with the thousands of staff and dozens of external stakeholders and agencies whose cooperation is required to successfully achieve *Nunez* compliance, as well as the complex web of laws and regulations under which they serve.  Indeed, the documented and consistent momentum that Commissioner Maginley-Liddie has advanced to date would be stymied by the appointment of the outside Receiver that plaintiffs propose - to whom the Commissioner and possibly every City employee would be subordinated.

Thus, defendants' Compliance Director Plan meets the strict requirements of the Prison Litigation Reform Act ("PLRA") and principles of federalism, that the Court's intrusions into state and local law and governance be kept to the absolute minimum necessary to remedy constitutional violations.

**POINT I**

**THE DEFENDANTS' COMPLIANCE DIRECTOR PROPOSAL BEST ACHIEVES THE COURT'S RECEIVERSHIP GOALS[3]**

**A.    The Commissioner / Compliance Director Will Meet the Court's Receivership Goal of Direct Court Authority**

The Compliance Director / Commissioner would be appointed forthwith by the Court, to serve for a five-year term with respect to *Nunez* use of force and safety matters, or such other term directed by the Court until substantial compliance with the *Nunez* orders is achieved.  Under this plan, once appointed the Compliance Director / Commissioner will be exempt from Mayoral removal, thereby eliminating concern of a turnover of leadership based on political appointment. Commissioner Maginley-Liddie, as the Compliance Director, will answer directly to the Court – not the City government – on all matters relating to compliance with the *Nunez* orders.  One of the lynchpins of defendants' plan is that it provides the Compliance Director with autonomy from

---

[3] The Court's Receivership Goals are:

1. Providing for direct Court authority with respect to <u>Nunez</u> use of force and safety matters over an individual with the competence and expertise to achieve their charge of bringing the Department into compliance with the relevant Court orders;

2. Minimizing additional bureaucracy and expense;

3. Capitalizing on the Monitoring Team's essential expertise and experience through effective collaboration;

4. Pushing forward transformational change while simultaneously utilizing wisely the assets that the Department already possesses and making available any additional assets that are needed to achieve a constitutionally adequate level of safety; and

5. Identifying and taking appropriate steps to attempt to achieve any necessary changes in contracts, regulations, policies or other impediments to effective compliance.

Order at 56-57.

other City entities,[4] allowing the Compliance Director to fulfill the mandates of the *Nunez* orders

subject only to the direction of the Court.[5]

The Compliance Director would not supplant or replace the Commissioner, because under

the Compliance Director Plan, the "Receiver" would be the Compliance Director, with all of the

powers of the Commissioner, except that she would be appointed by and answerable to the Court

with respect to *Nunez* use of force and safety matters.  Because the current Commissioner is fully

qualified to serve the Court in achieving *Nunez* compliance (*see infra* at Point I-D), there is no

need for a Receiver to supplant or supersede the Commissioner, thus minimizing federal

interference with local governance.  Also, under the Compliance Director Plan, the process for

appointment of the "Receiver" is simple and immediate – the current Commissioner remains in

place and becomes the Compliance Director.  No recruitment, negotiation or conferral – a process

that would likely take months – is required, and the appointment could be enacted immediately.

**B.**    **The Commissioner / Compliance Director Plan Would Obviate Any Need for Additional Bureaucracy and Expense**

Anyone appointed to run DOC – whether as Commissioner, Receiver or Compliance

Director – must have substantial correctional experience, knowledge of the laws, policy,

regulations and customary practices that govern the operations of DOC, and familiarity with the

myriad elements of City and state government that are necessarily involved in the operation of

---

[4] As noted above, *supra* n. 2, that autonomy would be exercised within the bounds of existing law, with the exceptions noted herein.

[5] The Receiver, under the plaintiffs' plan, ought to have no greater powers or independence than the Commissioner / Compliance Director would have to direct the operations of DOC.  Plaintiffs' Proposed Order ¶ IX-B.  But paradoxically the Receiver would also be granted the full powers of "the Defendants" – *i.e.*, the City and DOC -- by the Plaintiffs' Proposed Order.  *See* Plaintiffs' Proposed Order ¶ II-A.  In other words, under plaintiffs' proposal, the Receiver would become, at least, the Mayor and all City agencies wrapped up into one federal judicial agent.

DOC.  Direct knowledge of the physical and logistical work involved in operating a jail – and its many challenges – is also necessary.  A superficial understanding of the laws governing DOC's operations is insufficient to quickly achieve meaningful results.

DOC's operations are governed by a panoply of federal, state and City statutes and regulations, collective bargaining agreements and contracts, internal policy, several consent decrees and monitorships, including *Nunez*,[6] as well as, of course, the United States and New York State constitutions.  DOC operates under the oversight of the New York City Board of Correction, the New York State Commission on Correction and the City's Department of Investigation.  The cooperation of several City entities is required for its successful operation, including the Office of Management and Budget (the "OMB"), the Comptroller's Office, the Office of Labor Relations, the Office of Administrative Trials and Hearings, the Law Department, the Department of Citywide Administrative Services, the Mayor's Office of Contract Services, and the New York City Health and Hospitals Corporation.  The Compliance Director will strive to work within existing regulations, laws and procedures, as the PLRA and federalism demand, and doing so requires intimate knowledge of that framework.  All of that necessary knowledge and expertise is provided by the current Commissioner and DOC staff, supplemented by the knowledge and expertise of the Monitor.[7]

---

[6] The other consent decrees governing DOC include those in *Benjamin v. City of New York*, 75 Civ. 3073 (S.D.N.Y. April 26, 2001); *Brad H v. City of New York*, Index No.117882/99 (Sup. Ct, New York Cty. August 17, 2020); and *Handberry v. City of New York*, 96-cv-06161 (S.D.N.Y. March 31, 2026) (ECF No. 250).  In addition, DOC operates under a Voluntary Compliance Agreement with the U.S. Department of Justice under the Americans with Disabilities Act.

[7] Any appointed Receiver would also need to demonstrate willingness to achieve *Nunez* compliance, and not act contrary to the other interests of the City or its employees who are entrusted to the care of a Receiver. A Receiver or equivalent should not be a person with no correctional experience or an advocate with a track-record of hostility to the interests of the City or its staff or have any overt political bias.

Plaintiffs' proposal, to the contrary, calls for the City to pay the salaries and expenses associated with the Receiver and their retinue of staff and consultants.  *See* Plaintiffs Proposed Order,¶¶ II-B.6, II-F, V-B, VI-A.  The steep learning curve faced by these new personnel will increase the time necessary to begin working on compliance with the *Nunez* orders, as the Receiver's team educate themselves on the orders and learn to navigate the particulars of New York City government.  The Receiver and Receiver's team would necessarily add another layer of bureaucracy in addition to DOC and the Monitoring Team, while increasing the financial burden on the public.  The City would be expected to pay potentially millions of additional dollars in salaries and expenses to support the Receivership. In comparison, as Compliance Director / Commissioner, Lynelle Maginley-Liddie would remain a City employee and would receive only the salary and benefits of a Commissioner.  There would be no additional cost or personnel arising from the establishment of the Compliance Director.

Thus, defendants' proposal presents a superior plan for minimizing additional bureaucracy and unnecessary expense to the City's taxpayers.

**C.    The Compliance Director Plan Efficiently Capitalizes on the Monitoring Team's Essential Expertise and Experience By Continuing an Existing Collaborative Relationship Between the Monitor and the Commissioner.**

Commissioner Maginley-Liddie has established a record of collaboration and transparency with the Monitoring Team, as noted below.  The Compliance Director Proposal presents the best approach for continuing to capitalize on the Monitor's essential expertise and experience and advancing the gains made through the collaborative work of Commissioner Maginley-Liddie, DOC and the Monitoring Team.  The plaintiffs' plan, in contrast, would duplicate much of the work of the Monitoring Team (as well as DOC), by adding a retinue of staff and experts that can be expected to do what the Monitor already does, at additional expense to the City.  *See supra* at Point I-B.  DOC provides the Monitor with a constant, daily flow of reports and responses to

6

questions, sometimes several times per day.  Adding an additional layer of authority and expertise will also require additional communications and reporting requirements, between and among DOC, the Monitoring Team, and the plaintiffs' proposed Receivership team.  It would also provide additional occasions for friction or confusion, which can be reasonably expected from multiple experts sharing overlapping purviews of responsibility.  The defendants' plan adds none of that additional weight to an already burdensome and costly process of governance.

**D.    The Compliance Director Would Push Forward Transformational Change While Efficiently Utilizing DOC Assets.**

The Commissioner's good faith attempts to meet the *Nunez* requirements and abilities as an administrator have not been questioned by the Court or the Monitor, and her willingness to pursue transformational change is reflected in her accomplishments in just her first year of service, as outlined below.  These achievements would be substantially accelerated by providing her with the court-directed authority of a Compliance Director, independent of other City entities, while continuing to utilize her talents and good will, as well as those of the DOC senior staff to effectuate ongoing *Nunez* reform.

Notably, the Court's Order observed that:

> [T]he Monitoring Team has enjoyed a good relationship with current DOC Commissioner Lynelle Maginley-Liddie (the "Commissioner") since she was appointed on December 8, 2023. The Monitoring Team has emphasized that they observed an immediate change in the Department's approach and dynamic in early December 2023 with the appointment of Commissioner Maginley-Liddie[,] that the Department's leadership team is now actively engaging with" the Monitoring Team, and that these interactions reflect greater transparency and interest in working collaboratively.

Order at 42 (citations and quotations omitted).

There has been consistent praise from the Monitor of the Commissioner since her appointment. In his February 26, 2024 Report, the Monitor noted the change that Commissioner Maginley-Liddie had brought to DOC:

> The Department's leadership team is now actively engaging with the Monitor, Deputy Monitor, and the Monitoring Team. These interactions with the Commissioner, her leadership team, and other Department staff reflect greater transparency and an interest in working collaboratively. The Monitoring Team is routinely consulted and proactively advised on a wide variety of issues. When matters of mutual concern arise, Department leadership seeks input from the Monitor, has been receptive to feedback, and appears open to adapting practices as necessary.

Monitor's February 26, 2024 Report at 1-2 (ECF No. 679). The Monitor reconfirmed this culture of transparency and cooperation in his June 27, 2024 Report, noting that DOC leadership is focused on "the most salient issues" and has developed initiatives that "appear promising if implemented with fidelity." Monitor's June 27, 2024 Report, at 2.

Indeed, the Monitor's November 22, 2024 Report confirms that Commissioner Maginley-Liddie has the commitment to compliance that is needed, as well as the right temperament for pushing for change while maintaining cooperation and enlarging staff.

> **Agency Leadership.** The Department's current Commissioner has brought both a candid and honest view of the Department's problems and critical transparency to the reform process. Her leadership has influenced many facets of the Department's work, and her subordinates have begun to embrace the mandate for reform. She has approached the need for change with a composure that allows her staff to pursue improved practice in a deliberate and thoughtful manner and has returned the Department's posture with the Monitoring Team to one of consultation and collaboration. The Commissioner also invited the Monitoring Team to meet with prospective candidates for key leadership positions to gauge their understanding of the challenges that confront the Department and to offer input regarding their candidacy.

Monitor's November 22, 2024 Report (ECF No. 802) (the "November Report") at 8.    The

November Report also highlights several early achievements – which are continuing – of the

Commissioner:

- Compliance ratings improved in four areas: Screening Staff for Promotion; Protecting Young Inmates from an Unreasonable Risk of Harm; Facility Leadership Responsibilities; and Facility Emergency Response Teams.  *Id*. at 32-33.

- The City has shown willingness to reform, waving citywide hiring restrictions so that the Department can fill vacancies more quickly.  *Id*. at 2-3;

- DOC sustained its focused on implementing key initiatives: the RNDC Action Plan; "elevating" facility leadership and the operation of its Enhanced Supervision Housing program located at RMDC ("RESH").[8] *Id*. at 3.

- DOC is focused on addressing regression in the Investigations Division by reinstating the Associate Commissioner of Investigations.  *Id*. at 22.

- DOC has obtained a waiver of the budgetary 2-for-1 restriction on hiring that applies to nearly all other City agencies.  *Id.* at 10.

- DOC has reduced the use and number of awarded posts, and DOC is working on a plan for converting uniformed staff roles into civilian roles.  *Id*. at 20-21.

- DOC has taken "important steps" to improve RESH: Since December 2023, RESH has been managed by a leader with a strong grasp of sound security practice, a command of the issues that have undercut the safe operation of RESH, a realistic assessment of the current state of affairs, and who consistently identifies and addresses staff's poor practice." *Id*. at 29.

- "[F]acility leadership's efforts to target skill deficits among staff in order to fortify their security practices and to provide the programming and services that individuals are entitled to receive appear to be improving the conditions and safety of the RESH units." *Id*. at 34.

---

[8] RESH is DOC's restrictive housing program for male residents who have committed recent acts of violence while in custody.  *Id*. at 28.

- In RESH, average rates for every key metric for violence – Use of Force, Slashings/Stabbings, Fights and Fires – declined significantly from the calendar year 2023 when compared to January through September 2024, the last month for which data was presented. *Id*., at 31.

- The Monitor credited several recent DOC initiatives as the reasons for the decline in violence at RESH. *Id*., at 31-34.[9]

- System-wide, the rate of serious injuries to inmates, fires, assaults on staff, and slashings/stabbings all decreased during the first six months of the Commissioner's tenure. *Id*., at Appendix A, 195-211.

- RNDC, where 18 year old individuals are housed, showed significant improvement in metrics: use of force rate decreased 63%, the rate of stabbings/slashings decreased 63%, the rate of fights decreased 28%, and the rate of fires decreased 40%. *Id*. at 166.

- DOC revised the template for Rapid Review of uses of force in consultation with the Monitoring Team, and facility leadership began using the new template in January 2024, with beneficial results. *Id.* at 44.

- "[T]he Department has taken important steps to improve the processing of [Command Disciplines ("CDs")]. A larger number of CDs were imposed (which again suggests improvement in detecting and responding to misconduct) and more CDs with compensatory days were issued than any Monitoring Period to date." *Id*. at 122.

- As a result of the adoption of more efficient practices, the proportion of disciplinary cases pending for 1 year or more after referral for trial fell from 19% to 8% from the last half of 2023 to the first half of 2024. *Id.* at 126.

- DOC procured 6.200 new Body Worn Cameras to replace the older models, which will be deployed to all uniformed staff. *Id*. at 17.

- DOC sought and received a grant of almost $2 million to support expanded use of BWCs. *Id*.

---

[9] Specifically, the Monitor credited the following initiatives with resulting in the violence reduction: physical plant improvements, considering pre-existing conflicts in housing placement; elevating staff skillset; providing mandated services; emphasis on substantive program enhancements; and the Warden's successful advocacy for appropriate transfers for mental health treatment. *Id*.

In light of the current Commissioner's record, on September 25, 2024, the Court posed the following question to plaintiffs' counsel:

> [D]efendants say bad things have happened in the past but some things have gotten better, and critically, today, there is new leadership that is moving in a more positive direction, and they point out that civil contempt is not a punishment tool but a coercion tool. And so what does the Court need to coerce now, given the new commissioner's commitment to progress and compliance?

Sept. 25, 2024, Tr. 8.  In response, plaintiffs referred the Court to the full history of this case, instead of addressing current conduct.   History alone, however, is not a sufficient justification, as a matter of law, for the federal judicial seizure of local government institutions and resources.  *See District of Columbia v. Jerry M.*, 738 A.2d 1206, 1213 (D.C. 1999) (reversing appointment of Receiver for school district, holding that "the history of the District's failure to comply fully with the court's requirements" was not alone sufficient to justify appointment of a Receiver).

Rather, as the Court observed, the nine-year history cited by the Court calls for *insulating* the Commissioner from removal as a result of a change in administration.  Defendants' plan does just that by placing the Commissioner under the Court's purview as the Compliance Director for a five-year term, with the independent authority to make appointments of senior staff and seek Court assistance where needed, without regard to the inclinations of other elements of the City government.   Commissioner Maginley-Liddie has been effecting transformational change within the Department and will be able to continue to do so more productively with the autonomy of the Compliance Director.

**E.    The Compliance Director Would Identify and Implement Necessary Changes in Contracts, Regulations, Policies or other impediments to Effective Compliance.**

As previously noted, the Compliance Director would not be subject to removal by the Mayor (or any City official), but would serve entirely at the direction of the Court. This fundamental change makes the Compliance Director significantly more independent of the rest of the City government for *Nunez* purposes (within the bounds of existing law), and directly answerable to the Court, and will accelerate changes needed to remove impediments to compliance.

Commissioner Maginley-Liddie is acutely familiar with the legal and practical workings of City government, and accordingly, is best positioned to more immediately identify and correct any impediments to the Department achieving substantial compliance with the *Nunez* orders. Indeed, that process is already under way. In order to address certain chief concerns of the Monitor, the Commissioner secured relief from the citywide 2-for-1 attrition-to-hiring restriction for civilian employees previously imposed by the OMB. *See* Compliance Director Proposal, Appendix A, at II. The Commissioner is also working, in consultation with the Law Department and other City agencies, to determine what judicial relief may be necessary from existing laws and rules to allow the creation of an intermediate uniformed supervisory line at DOC.

In addition, the Compliance Director proposal incorporates two important provisions that will enhance the Commissioner's ability to alter City practices to the extent needed to achieve compliance with *Nunez* orders. *First*, unlike existing practice, the Compliance Director will be empowered to hire senior executive staff without the consent of City Hall officials, after a limited opportunity for advisory vetting. *See* Compliance Director Proposal, at II.

Under existing law and practice, the involvement of other City agencies is required with respect to DOC's contracting and hiring, which is necessary to keep the City operating within its

lawful budget.  By Charter, the City budget is proposed by the Mayor and fixed by the City Council for each agency.  *See* City Charter §§ 236, 254.  There are also statutory restrictions on DOC spending for capital expenditures, such as construction of new facilities.  *See, e.g.*, City Charter § 217.  The Compliance Director must work within these lawful bounds, as should a Receiver, because no need has been demonstrated to preempt the City's legally mandated budget process. *See infra* at Point II (discussing *Hinds Cty.*).  Because the entire City government operates under one fixed budget, agency hiring and spending decisions often call for the cooperation of other elements of the City government.  The DOC cannot operate as a free-standing entity outside of City government, and for a Compliance Director or Receiver to act without regard to this reality would inflict unnecessary costs and disruption on DOC and the whole of City government. But with respect to hiring at DOC, in order to streamline change under the Compliance Director, the Compliance Director would no longer require Mayoral approval before hiring DOC civilian personnel.

Second, in *Nunez* related areas, the Compliance Director would have authority to petition the Court for additional orders to overcome bureaucratic and legal impediments involving other elements of the City government (or otherwise), without the consent of any other City agencies.[10] Plaintiffs may argue that because the City has always had that option, then there is no reason to believe that the Compliance Director would use it to greater effect. But that argument ignores the difference between the Compliance Director and the City.  The Commissioner currently cannot, within the bounds of the law, unilaterally determine what relief the City should seek from the Court. Such decisions involve numerous constituencies within the City government.  But this legal

---

[10] This provision could preempt City Charter § 394(a), if the Compliance Director chose to make an application to the Court without representation by the Corporation Counsel, even if no ethical conflict of interest precluded that representation.

constraint would be removed by the Compliance Director Proposal, and the Commissioner has already demonstrated her willingness to use that authority, if necessary, to faithfully and efficiently pursue *Nunez* compliance.

These two added authorities not currently available to the Commissioner, in combination with the fact that the Commissioner / Compliance Director would be appointed by and answerable to the Court, would resolve most (if not all) internal City conflicts over matters touching on *Nunez* compliance.

Affording the Commissioner the additional independence of the Compliance Director pursuant to defendants' proposal would only continue to facilitate and accelerate the changes already underway.   And, unlike the appointment of a Receiver, the process would begin immediately.   Defendants' Compliance Director Plan gives the Compliance Director the same independent discretion that would be exercised by a Receiver to seek relief from the Court to remove additional specific impediments to the extent they are necessary to achieve compliance (as required by the PLRA for any relief).

**POINT II**

**THE COMPLIANCE DIRECTOR PLAN IS SUPPORTED BY LAW BECAUSE IT IS NARROWLY TAILORED TO EMBODY ONLY THE RELIEF NECESSARY TO ACHIEVE <u>EFFICIENT AND EFFECTIVE COMPLIANCE</u>**

The Compliance Director Plan is strictly and narrowly tailored – as required by law – to the need to ensure compliance with the *Nunez* orders as speedily as possible.  *See, e.g., Brown v. Plata*, 563 U.S. 493, 530 (2011) (applying the PLRA's requirement that relief be "narrowly drawn" and be the "least intrusive means necessary to correct the violation of the Federal Right"); *United States v. Hinds Cty. Bd. of Supervisors*, 120 F.4th 1246, 1256-57 (5th Cir. 2024) (reversing the District Court's grant of control over the jail budget and other insufficiently specified powers to a

14

Receiver, because the specific provisions of the relief were not shown to be necessary to remedy a constitutional violation); *Allen v. Koenigsmann*, No. 19-CV-8173 (LAP), 2023 U.S. Dist. LEXIS 209873, at *9 (S.D.N.Y. Nov. 22, 2023) (applying PLRA limitations on remedial relief).

The PLRA requires that any remedial plan be "narrowly drawn, extend[] no further than necessary to correct the violation of the Federal right, and [be] the least intrusive means necessary to correct the violation of the Federal right."  18 U.S.C. § 3626(a)(1)(A).  The scope of any relief that would be contrary to state or local law is further restricted by the PLRA, which requires that "*no other relief* will correct the violation of the Federal right."  18 U.S. Code § 3626(a)(1)(B) (emphasis added); *see also Allen v. Koenigsmann*, No. 19-CV-8173 (LAP), 2023 U.S. Dist. LEXIS 209873, at *9 (S.D.N.Y. Nov. 22, 2023) (applying PLRA limitations on remedial relief).  Any relief is also constrained by the constitutional limitations on the federal Court's power to preempt state law, and other doctrines of federalism and comity, which the PLRA's standards are intended to uphold by limiting the Court's preemption of local and state law to what is necessary to remedy a violation of federal law.  The court's "need-narrowness-intrusiveness" findings under § 3626(b)(3) must be particularized "on a provision-by-provision basis."  *Hinds Cty.*, 120 F.4th at 1257 (quoting *Ruiz v. United States*, 243 F.3d 941, 951 (5th Cir. 2001)), "The district court should 'consider each provision of the consent decree in light of the current and ongoing constitutional violations, if there are any, and determine which aspects of the decree remain necessary to correct those violations'"  *Id*. (quoting *Ruiz*, 253 F.3d. at 950-51).

A Receiver is a rare and extraordinary remedy, in part because it upends the democratic process of state and local government, and involves an Article III court in the exercise of executive functions that are normally prohibited to the judiciary.  As a result, the legal standard for appointment of a Receiver – *and for the particular powers of a Receiver* – is extraordinarily high.

In order to give a federal official power to direct the day-to-day affairs of a state or local agency, a court should conclude that a Receiver is "the only reasonable alternative to non-compliance with [the] court's plan." *Morgan v. McDonough,* 540 F.2d 527, 533 (1st Cir. 1976); 12 Federal Practice & Procedure § 2983 (factors relevant to establishing requisite need for Receivership include "imminent danger," inadequacy of available legal remedies, probability of harm to plaintiff, and possibility of irreparable injury). In reversing the appointment of a federal Receiver of the District of Columbia school system, the D.C. Circuit held that "the appointment of a Receiver . . . is *the remedy of last resort*, and therefore, should be undertaken *only when absolutely necessary*." *District of Columbia v. Jerry M.*, 738 A.2d 1206, 1213 (D.C. 1999) (citing *LaShawn A. by Moore v. Barry*, 144 F.3d 847, 854 (D.C. Cir. 1998) (emphasis added). For the reasons set forth above, it is not necessary, let alone "absolutely necessary," to appoint a federal official from outside City government to supersede and direct the current Commissioner in order to achieve *Nunez* compliance.

In order to justify ordering a Receiver, the District Court must separately consider whether each provision of the order appointing the Receiver is necessary to achieve compliance with the Constitution. It is insufficient to conclude only that some sort of Receiver is required. The Fifth Circuit recently reversed the scope of a Receivership order over Hinds County, Mississippi, on two grounds. First, the Fifth Circuit held that it was impermissible to give the Receiver power over the county's finances because that was an unwarranted invasion of the authority of the local government and the democratically elected legislature:

> The Receiver's control over the budget and salaries and benefits for personnel essentially allows the Receiver to dictate the state's authority over RDC [the Hinds County Raymond Detention Center] by controlling the purse strings. [citation omitted] Giving the Receiver power to set RDC's budget, subject to the district court's approval, would allow the Receiver to ignore the budgetary

16

> constraints that the Hinds County Board of Supervisors has had to
> deal with in managing RDC. This goes beyond the limitations
> imposed by the PLRA. [citation omitted] Not only could this burden
> . . . the government's budget, but it would also assume a
> responsibility that should be left for the legislature. [quotation and
> citation omitted]

*United States v. Hinds Cty. Bd. of Supervisors*, 120 F.4th 1246, 1269 (5th Cir. 2024) (citing

*Guajardo v. Tex. Dep't of Criminal Justice*, 363 F.3d 392, 394 (5th Cir. 2004) (the PLRA's

"fundamental purpose was to extricate them from managing state prisons")). In addition, the Fifth

Circuit held that the Court improperly granted the Receiver other sweeping powers over the

operation of the department without sufficiently considering whether the other powers granted to

the Receiver were narrowly-tailored to what is necessary to remedy constitutional violations:

> Aside from the concern with the Receiver's power over the budget
> and financial matters, there is a related concern applicable to the
> scope of all of the Receiver's powers: The district court's failure to
> conduct a sufficient need-narrowness-intrusiveness analysis. . . . .
> . . . . At the end of the second order, the district court summarily
> concluded that the Receiver's duties satisfy the PLRA's need-
> narrowness-intrusiveness requirements. The court did not explain
> this finding  in any detail, nor did it discuss whether it would be
> feasible to institute a Receivership with more limited powers that
> cover only the scope of the constitutional violations. The Supreme
> Court "has rejected remedial orders that  unnecessarily reach out to
> improve prison conditions other than those that violate the
> Constitution." *Brown*, 563 U.S. at 531.

*Hinds Cty*., 120 F.4th at 1269-70. The Court therefore reversed the District Court's order to the

extent that it granted powers to the Receiver, remanding for a specific need-narrowness

determination:

> We therefore instruct the district court on remand to reevaluate *de
> novo* the scope of the Receivership consistent with this opinion. The
> district court cannot grant the Receiver power over RDC's budget
> and related financial matters, such as salaries and benefits, and the
> court should develop a new description of the Receiver's powers
> after conducting a need-narrowness-intrusiveness analysis and in
> light of the Receiver's loss of control over the budget and salaries.

*Id,* 120 F.4th at 1270.

The plaintiffs' proposal makes the same error as the court in *Hinds*: it provides more power to an agent of the federal court over a municipal agency than is necessary to remedy constitutional violations.  Under the PLRA, each and every power granted to such a judicial agent must be justified by a need-narrowness analysis, but in the defendants proposal *no powers* need be given to a federal judicial agent, because the Compliance Director would be a City employee, although subject to the Court's orders in exercising its inherent judicial powers (just as any City official would be if subject to an injunction).  All that is required to correct constitutional violations is for the Court to grant the current Commissioner – in the capacity of the Compliance Director – political independence with respect to *Nunez* matters and place the Compliance Director / Commissioner under direct and sole accountability to the Court.  The plaintiffs' proposal fails the needs-narrowness test because it is obviously not the only available remedy that could be effective (i.e., it is not a "last resort") (*see infra* at Point I-E), when the option of the Compliance Director Plan is available.

Reflecting the strict need-narrowness standard, the Supreme Court approved a state prison population reduction order in part because it was no more invasive than necessary, stating:

> While the order does in some respects shape or control the State's authority in the realm of prison administration, it does so in a manner that leaves much to the State's discretion.  The State may choose how to allocate prisoners between institutions; it may choose whether to increase the prisons' capacity through construction or reduce the population; and, if it does reduce the population, it may decide what steps to take to achieve the necessary reduction.  The order's limited scope is necessary to remedy a constitutional violation.

*Brown v. Plata*, 563 U.S. 493, at 532-33.

The Supreme Court has never approved the appointment of a federal Receiver to govern a local prison system.  They are exceedingly rare, and to defendants' knowledge there is no other

ongoing federal Receivership over a state or local jail or prison system other than in Hinds County,

Mississippi, where the scope of the Receivership is not yet defined due to the Fifth Circuit's

reversal of the terms of the Receivership order.[11]   The lower courts, in determining whether to

appoint a Receiver for a local prison system, have considered a multi-factor test, including the

following elements, the first two of which are given predominant weight:

> (1) Whether there is a grave and immediate threat or actuality of
> harm to plaintiffs;
> (2) Whether the use of less extreme measures of remediation have
> been exhausted or prove futile;
> (3) Whether continued insistence that compliance with the Court's
> orders would lead only to confrontation and delay;
> (4) Whether there is a lack of leadership to turn the tide within a
> reasonable period of time;
> (5) Whether there is bad faith;
> (6) Whether resources are being wasted; and
> (7) Whether a Receiver is likely to provide a relatively quick and
> efficient remedy.

*United States v. Hinds Cty. Bd. of Supervisors*, 120 F.4th 1246, 1267 (5th Cir. 2024); *accord Plata*

*v. Schwarzenegge*r, No. C01-1351 TEH, 2005 U.S. Dist. LEXIS 43796, at *66-67 (N.D. Cal. Oct.

3, 2005)).

    "As the Supreme Court has instructed, '[a] Receivership is only a means to reach some

legitimate end sought through the exercise of the power of a court of equity. It is not an end in

itself.'" *Plata v. Schwarzenegger*, No. C01-1351 TEH, 2005 U.S. Dist. LEXIS 43796, at *96 (N.D.

Cal. Oct. 3, 2005) (quoting *Gordon v. Washington*, 295 U.S. 30, 37 (1935) (discussion Receiver

to manage property)).  In *Plata*, no alternative to a Receivership was offered by defendants.  *Plata*

*v. Schwarzenegger*, 2005 U.S. Dist. LEXIS 43796, at *81; *Plata v. Schwarzenegger*, 603 F.3d

1088, 1097 (9th Cir. 2010) (In the District Court, "[t]he State acknowledged without reservation

---

[11] California has a federal Receiver over its prison health system, but not the prisons themselves.
*See Brow*n, 563 U.S. at 508-09.

the court's authority to appoint a Receiver.")  Here, in contrast, defendants propose a fully satisfactory – and less invasive, complex and costly – alternative, which is the appointment of Lynelle Maginley-Liddie as a dual Commissioner/ Compliance Director, who will answer to the Court but will remain a City employee.

The principal law impaired by the defendants' proposal is the City Charter, which empowers the Mayor to appoint and remove the Commissioner.  N.Y. City Charter, Chap. 1, § 6. Although the current Commissioner was appointed by the Mayor, under the Compliance Director Plan the Court would control the removal or replacement of the Commissioner/ Compliance Director.  While the Compliance Director Plan involves a highly significant federal intrusion on local government powers, it is the *minimum* intrusion necessary to achieve the Court's constitutional goals, which is all that the PLRA, or the Constitution, allows.

Two additional sections of the Charter could be implicated by a Compliance Director or a Receiver.  A person appointed to head a City agency must give their full time to that office.  *See* N.Y. City Charter, Ch. 49, § 1100.  Although the Compliance Director would carry two titles (Commissioner and Compliance Director), her duties under each would be largely the same, although the Compliance Director would have additional duties and powers with respect to *Nunez* matters.  *See supra* at Point I. [12]

In contrast, the plaintiffs' proposal does not require that the Receiver and Receiver's staff have no other employment.  Plaintiffs Proposed Order at IX-E. Allowing outside employment is ill-advised, because managing DOC is a more than full-time endeavor.  Outside employment

---

[12] In an abundance of caution, however, the Court would have to expressly preempt this provision under the defendants' plan.  But the defendants' plan would remain the minimum intrusion on state law necessary as required by the PLRA.

would also violate City Charter § 1100, which is an unnecessary preemption of municipal law that is precluded by the PLRA.

The City Charter also prohibits a City official from simultaneously holding an "officer of . . . trust" in the United States government. *Id.*, § 1115.[13] The plaintiffs' proposal would violate this law, since the Receiver is a federal judicial agent – denominated by plaintiffs an "agent of the Court" (which is of course a federal court) and would also serve as the *de facto* Commissioner for *Nunez* purposes and would be paid by the City under plaintiffs' plan.

To the extent that the plaintiffs' plan purports to give the Receiver powers co-extensive with the City itself,  that plan conflicts with nearly the entire corpus of New York State and local law governing the administration of the New York City government,[14] as well as the constitution. *See infra* at Point III, at 27-28 (discussing the vesting of powers of the City in the Receiver).

The Compliance Director Plan finds precedent in other jurisdictions.  In *United States v. Miami-Dade County, et al.*, 13-cv-21570-BLOOM, ¶ B.2 (S. D. Fla. Feb. 16, 2023) (ECF No. 260),

---

[13] The City Charter generally prohibits (with limited potential Mayoral waiver), a City official from also holding "any other civil office of honor, trust or emolument under the government of the United States." *Id.*  The Plaintiffs' Proposed Order states: "The Receiver is an agent of the Court and is not a federal, State, or local agency or an agent thereof."  Plaintiffs Proposed Order, IX-F.  The plaintiffs also propose that the "Receiver and the Receiver's staff shall have the status of officers and agents of the Court, and as such shall be vested with the same immunities as vest with the Court." ¶ V.A.  There can be little doubt that this constitutes an "office of . . . trust" in the "government of the United States."  City Charter, § 1115.  But the Receiver would also exercise, at least, all of the authority otherwise given to the Commissioner, and perhaps more.  *See infra* at Point III (regarding grant to the Receiver the powers of the City).  The Compliance Director, however, would be a City employee, not a federal judicial agent, but subject to the Court's equitable powers like any other City employee.  *See supra* at Point II.  Nevertheless, depending on legal interpretations, the Compliance Director Plan may also require preemption of § 1115.

[14] These laws would include most if not all of the New York State Municipal Law, Civil Service Law, Penal law, Public Officers Law, the City Charter, and the NYC Administrative Code.  All of these are grounded in the principle that the democratically elected City government and its appointed officers and agencies – not a federal judicial agent -- will exercise the powers of the City.

a Compliance Director (the "MDCD") is retained and paid by the City to manage its jails, subject to approval and removal by the Court, with specific court-ordered duties to implement a consent decree to correct unconstitutional conditions, and is removable by the Court upon motion for good cause. *Id.*, ¶ B.2.  The MDCD, unlike the defendants' proposal, serves in addition to previously existing City staff.  But like the Compliance Director proposed by the defendants here, the MDCD is a City official, not an agent of a federal court.  The MDCD reports to the Mayor, acts as a delegate of the Mayor's authority, and as a representative of the County government in some instances.  *Id.*, ¶ A.2.  Nevertheless, the MDC is Court-approved and can be removed by the Court for good cause. *Id.* The defendants' Compliance Director Proposal offers even more independence than the MDCD, since while the MDCD may be removed by the Mayor (*Id.* ¶ 3), here, the Compliance Director could only be removed by the Court.[15]

By embodying the Compliance Director and Commissioner in one official, the Compliance Director Plan avoids occasions for "confrontation and delay" – which the Court rightly wants to avoid (Order at 55)[16] – that would be created by the plaintiffs' Receivership Plan.  *United States v. Hinds Cty. Bd. of Supervisors*, 120 F.4th at 1267; *accord Plata v. Schwarzenegger*, No. C01-1351 TEH, 2005 U.S. Dist. LEXIS 43796, at *66-67 (N.D. Cal. Oct. 3, 2005).  There would be no occasion for conflicting directions between a City Commissioner and a federal official appointed as Receiver.  Thus, disputes about the scope of *Nunez* jurisdiction would arise only in the event of a specific dispute about powers arising with other City agencies, the Monitor, or the parties.

---

[15] In addition, in one of the first federal Receivership appointments over a prison or jail, a federal Court appointed the State governor as the Receiver of the Alabama state's prison system.  *See Newman v. Alabama*, 466 F. Supp. 628, 635 (M.D. Ala. 1979) (appointing Governor of Alabama as Receiver for the state prison system).

[16] One of the several *Plata* factors. *Id.*

Plaintiffs' plan, which requires the City to pay for and indemnify a federal judicial agent and their staff, would run afoul of state laws and rules governing the employment and indemnification of officials exercising municipal power. For example, plaintiffs' plan would demand that the City always provide representation and indemnification to the Receiver. *See* Plaintiffs' Proposed Order § V.B. Under state law, New York General Municipal Law § 50-k includes limits on the obligations of the City to provide representation and indemnification to its employees in litigation. State law also limits the *respondeat superior* liability of the City to its *employees acting within the scope of their employment*, while the Receiver would not be a City employee or acting pursuant to City direction. Therefore state law would never call for indemnification of the Receiver or Receivership staff.

In addition, federal law under 42 U.S.C. § 1983 limits City liability for constitutional violations to those arising from City policies promulgated by City officials, none of which is true if DOC employees were acting pursuant to the orders of a Receiver. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978) (requiring that municipal liability arise only when "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury.") Contrary to *Monell,* plaintiffs' proposal would place the locus of liability on an entity (the City) which would have no control over the policies or actions of the responsible government official, while insulating that actor from liability even in the case of deviation from the City's policies or other misconduct. That is hardly conducive to the protection of the constitutional rights of people in custody, who might be harmed by decisions of such a liability-insulated Receiver.[17]

---

[17] Plaintiffs' counsel have indicated that they believe the Receiver would be protected by judicial immunity. Defendants do not take a position on that question which is not before the Court. But if plaintiffs are correct, then there is no need for the City to indemnify the Receiver. But if they

Plaintiffs' indemnification proposal thus abrogates all of existing federal and state law governing municipal liability and indemnification, in favor of making the taxpayers of the City of New York *strictly liable* for the actions of a federal official.  Such overreaching is wholly unnecessary to achieve any constitutional goal.  As noted above, *Hinds Coun*ty is the only extant federal jail Receiver known to the City - but the scope of that Receivership has yet to be decided, and it is not precedent for appointment of a Receiver over DOC.  First, Hinds County is a much smaller system in a much smaller municipality than New York City.  According to the 2020 Census, *Hinds County* had a population of 227,741 while New York City had a population of 8,804,190.[18]  Hinds County had an approximate jail population of 842 in 2023,[19] while DOC had an average resident population of 6,060 in 2023.  Monitor's November 2024 Report at 195.  Therefore, a Receiver in Hinds County would face far lesser administrative challenges in managing that system than with DOC.

Second, without discounting the significance of the Court's findings of contempt based on the history of this matter, the facts in *Hinds County* were far more severe.  For example, in *Hinds County* the Court found the following deficiencies (among many others) which are far more egregious than recent conditions at DOC:

- The County had failed to hire a qualified jail administrator (*Hinds Cty*, 120 F.4th at 1260)

---

are incorrect, then under the plaintiffs' plan the Receiver would escape liability that would otherwise arise under Section 1983, and transfer it to an entity that has no control over the Receiver's conduct.

[18]https://www.census.gov/quickfacts/fact/table/newyorkcitynewyork,hindscountymississippi (accessed January 20, 2025).

[19] https://trends.vera.org/state/MS/county/hinds_county (accessed January 20, 2025).

- "As of January 2022, RDC staffing was at an 'all-time low,' with only 191 officers—"58% (or less) of the minimum level identified [as necessary for RDC] by experts." *(Id.)*

- In "A-Pod," during at least one weekend in January 2022, "each officer supervised about 250 detainees via video surveillance, exclusively." (*Id.*)

- Hinds County had previously promised to move inmates out of its worst housing unit ("A-Pod,") where a dangerous riot had occurred in 2020, but the County was still using A-pod and "would apparently continue to do so indefinitely."

- "[G]ang-affiliated groups in effect run A-Pod, attack unliked detainees, direct where detainees are housed, and decide who does or does not eat."

- A-Pod had "approximately thirty 'trash dumpster cells' that have been welded shut but into which inmates deposit trash through broken windows."

- "A-Pod inmates also regularly escape through the roof and return with contraband."

*Id.*, 120 F.4th at 1254-56.  While this level of extreme understaffing, disorder and danger could support the District Court's decision to appoint a Receiver, those conditions in Hinds County are far worse than the challenges present at DOC.  And, even the severe conditions in Hinds County did not justify giving the Receiver budgetary power, and possibly other powers that are yet to be determined following the Fifth Circuit's reversal.  *See supra* at Point II.  In contrast, in this case, most, if not all, of the *Plata* factors favor defendants' Compliance Director Plan over the conventional Receivership proposed by plaintiffs.[20]

> (2) The Compliance Director Plan is a "less extreme measure[]" that has not been tried;

> (3) It would cause less "confrontation and delay" than a Receiver;

---

[20] These numbers correspond to the numbers of the *Plata* factors.  *See supra* at Point II.

(4) there is no "lack of leadership to turn the tide within a reasonable period of time," since Commissioner Maginley-Liddie has proven capable of doing so;

(5) Commissioner Maginley-Liddie has demonstrated her good faith in pursuing *Nunez* compliance;

(6) the Compliance Director would conserve rather than waste or duplicate existing DOC assets in the form of the DOC's leadership and the Monitoring Team, which would be duplicated by a Receivership team (*see supra* at Point I-C (discussing cost of the Receiver's staff and consultants);

(7) the Compliance Director plan is a far more "quick and efficient" remedy than the plaintiffs' proposal, for the reasons set forth in this Memorandum.

Therefore, the Compliance Director Plan is legally justified under prevailing law, and plaintiffs' more intrusive Receivership proposal cannot be squared against the strict requirements of the PLRA.

## POINT III

## PLAINTIFFS' PROPOSAL CONTAINS SEVERAL ADDITIONAL OBJECTIONABLE ELEMENTS

**A.    Plaintiffs' proposal would unnecessarily supplant the authority of the Commissioner and the City government itself.**

Plaintiffs' proposal would entirely supplant the Commissioner wherever the *Nunez* requirements are implicated.   Although plaintiffs' plan does not require removal of the Commissioner, it does require that the Commissioner take directions from – and therefore report to – the Receiver, effectively demoting the Commissioner with respect to *Nunez* use of force and safety matters, even in circumstances where it is indisputable that the Commissioner has greater subject matter expertise than the Receiver.  *See* Plaintiffs' Proposed Order at II-D.

On its face, Plaintiffs' Proposed Order purports to give the Receiver not only the powers of the Commissioner (with respect to *Nunez*-related operations), but also the full powers of the

*City itself*, because the plaintiffs would give the Receiver all powers of "the Defendants." Plaintiffs' Proposed Order II-A ("The Receiver shall have the authority to exercise all powers vested by law in the Defendants to the extent necessary to fulfill the Mandate."). Thus at one fell stroke the plaintiffs would transfer to the Receiver the lawful authority of, at the very least, the Mayor and all Mayoral agencies, to the extent it touches on *Nunez* compliance. This effectively abrogates a significant part of the City Charter, and is a clear violation of the PLRA, which requires the specific and individual justification of all changes to prevailing local law on a "provision-by-provision basis" in light of "current and ongoing" violations. *Hinds Cty.*, 120 F.4th at 1257. Plaintiffs have not even attempted to justify supplanting the Commissioner – let alone a large swath of the City government – on a "provision-by-provision" basis.

In the proposed specific powers, the plaintiffs' Plan includes additional authorities not vested in the Commissioner, and not affected by defendants' plan. The plaintiffs purport to give the Receiver the power to unilaterally negotiate collective bargaining agreements on behalf of the City – *i.e.*, create agreements that would bind the entire City for years to come affecting thousands of City employees – in violation of the City Charter and applicable labor law which requires that such agreements be made by the employer responsible for their fulfillment. *See* Plaintiffs' Proposed Order at B-iii. Moreover, contracts with one municipal union can have a far reaching impact on the City's relationships and contract negotiations with other municipal unions. The Receivers' proposed unfettered personnel and contracting powers also supplant the Comptroller's authority over the budget and City contracting. *See Id.*, ¶¶ B-ii, iii, iv; *supra* at Point I-E (discussing law governing budget and personnel). None of those sweeping powers can be justified as necessary to correct constitutional violations.

In addition, supplanting even just the Commissioner would be harmful because the Commissioner is far better suited than a federal Receiver to marshal the voluntary cooperation of thousands of people, working within several City agencies, within a pre-existing web of statutes, rules, regulations and contracts, which is required to achieve *Nunez* compliance. A Receiver appointed from outside of New York City government would lack knowledge of, and relationships with, the City employees, agencies and unions whose cooperation is essential to safely and effectively operate the City's jails in compliance with *Nunez*. An outside Receiver is unlikely to have the same intimate knowledge and experience as the Commissioner with the complex legal, regulatory and institutional context in which DOC's thousands of employees work.

The plaintiffs' Receiver would require many more months than the Commissioner/Compliance Director before they could begin operating effectively – including the time to hire and staff a Receivership, with a steep learning curve for the Receiver to understand DOC practices, rules and regulations. By embodying the Commissioner and Compliance Director in the same person, the Compliance Director Plan is also narrowly tailored to avoid the preemption of numerous state and municipal laws that would be implicitly abrogated by appointment of a federal judicial agent to exercise the powers of the Commissioner (or "the City"), as plaintiffs request. The City's plan instead retains management by a City employee, albeit under the direction of the Court pursuant to the Court's usual power to issue injunctive relief to direct City officials.

Also, as noted above, the plaintiffs plan would unnecessarily multiply bureaucracy, burden and expense. The plaintiffs' plan anticipates that the Receiver will require a retinue of staff with correctional expertise, who would presumably be doing the same work as the Monitoring Team and the equivalent City administrators, all at additional City expense. *See supra* at 5-6 (discussing

28

provisions regarding Receiver's staff and consultants).    The money required for such an unnecessary expenditure could be better spent on achieving compliance with the *Nunez* orders.

In addition, plaintiffs' plan could needlessly disrupt the current successful relationship between the Commissioner and the Monitor, as the Receiver's relationship with the Monitor is unknown.  *See supra* at Point I-D (regarding Commissioner's cooperation with the Monitor).

**B.    Plaintiffs' Plan Improperly Purports to Bind Non-Parties.**

Plaintiffs attempt to compensate for their Receiver's anticipated difficulties in managing City employees and agencies by purporting to bind thousands of non-parties – defendants' employees, agents, contract employees and persons "acting in concert" with the defendants – to "fully cooperate" with the Receiver and "promptly respond" to the Receiver's requests for information.  Plaintiff's Proposed Order, ¶ VIII-D.  This provision is facially improper because it purports to bind non-parties, which  is legally invalid.  *See Alemite Mfg. Corp. v. Staff*, 42 F.2d 832, 832-33 (2d Cir. 1930) ("no court can make a decree which will bind any one but a party; a court of equity is as much so limited as a court of law; it cannot lawfully enjoin the world at large, no matter how broadly it words its decree").  Indeed, for a court to purport to issue an order against non-parties violates fundamental due process principles.  The non-party conduct that could be subject to punishment under this provision is only vaguely defined as failing to "fully cooperate" or tardiness in response.[21]  *See Id.*, ¶ 7.A. If plaintiffs intend this provision to be  enforced against non-parties, it is an overreaching bid for coercive power that is legally infirm[22] and wholly

---

[21] The proposed imposition of duties on non-parties has no precedent except that it was included in the Receivership Order in the *Plata* case, without any litigation about whether it was appropriate or discussion by the Court.  To defendants' knowledge, no other Receivership order contains any comparable provision, and to defendants' knowledge the cognate provision in *Plata* has never been interpreted or enforced.

[22] Some courts have held, in very rare and specific factual  circumstances, that a non-party can be held in contempt for "aiding and abetting" the violation of a Court order.  *See Kelly Toys Holdings*

unnecessary to achieve the Court's goals, and is therefore prohibited by the PLRA.  There is no reason to believe that the Receiver's or Compliance Director's normal ability to take disciplinary or employment action against employees would not be sufficient if they find that the individual is frustrating compliance.  And, of course, the parties would remain bound by the Court's order in any event, and the usual remedies for any violation of the order would continue to be available.  Should those normal avenues not suffice, the Receiver or Compliance Director could obtain additional relief from the Court, with appropriate notice and opportunity to be heard to affected non-parties (such as employees).

## C.    The Plaintiffs' Plan Would Do Nothing to Address Recruiting and Attrition Challenges

The Compliance Director Plan would be more effective at pushing forward transformational change while making best use of the existing human capital assets of the DOC. It would also better support sustained compliance after it is achieved, by ensuring the continuity of the management and staff that are implementing it.[23]  If compliance is achieved from the outside – as plaintiffs intend – it will be more difficult to maintain after the outside authority leaves.

Plaintiffs' plan also fails to address (and could exacerbate) the real-world challenges that DOC faces in recruiting and retaining qualified managers in the face of a nationwide correctional staff shortage.  Filling managerial posts with experienced professionals must be DOC's highest

---

*LLC v. 19885566 Store*, No. 22-CV-9384 (JMF), 2024 U.S. Dist. LEXIS 23290, at *2-3 (S.D.N.Y. Feb. 9, 2024) (to hold a person liable for aiding and abetting the violation of an injunction "the non-party had actual knowledge of the judicial decree and violated it, and that the challenged action was taken for the benefit of, or to assist, a party subject to the decree.")  But even if this limited case-by-case extension of an Order's duties to non-parties were appropriate in a specific case, which defendants do not concede and which is not before the Court, those due process limitations cannot be changed by fiat purporting to bind non-parties.

[23] *See* Order at 54 (appropriate remedy should address ("lack of continuity in management")); Monitor's November Report at 190.

priority, and the Commissioner has demonstrated an ability to recruit qualified leadership personnel.

The disruption of a Receivership would be imposed in the midst of a national correctional staffing crisis creating a shortage of qualified candidates at every level.  On December 9, 2024, the Prison Policy Initiative reported:

> Prisons and local jails struggled with staffing well before the COVID-19 pandemic spurred a national labor shortage, and they haven't bounced back since.  Recruitment and retention are still a high priority for corrections agencies, with nearly half reporting between 20 and 30% of their workers leaving each year.  Many departments have tried increasing compensation, lowering employment requirements, hiring more part-time workers, and building new facilities to attract recruits but it hasn't worked.

https://www.prisonpolicy.org/blog/2024/12/09/understaffing/.

This graphic published by the PPI underscores the seriousness of that crisis:



https://www.prisonpolicy.org/blog/2024/12/09/understaffing/.[24]

    As a result of the national correctional staff shortage, DOC already faces extreme recruitment hurdles, and its staff have readily available alternative employment opportunities. Nothing in plaintiffs' plan would assist with this problem.  The experience of the Receiver

---

[24] *See also, e.g.*, https://stateline.org/2024/12/03/prison-lockdowns/ (December 3, 2024) ("Across the United States, state prison systems are grappling with chronic understaffing and overcrowding — dual crises that are keeping incarcerated people confined to their cells for far longer periods than in recent decades."); https://www.themarshallproject.org/2024/01/10/prison-correctional-officer-shortage-overtime-data (October 10, 2024); https://spectrumlocalnews .com/nys/central-ny/news/2024/08/01/correctional-officers-new-york-need (August 2, 2024) ("There's no debate: New York state is struggling to recruit correction officers."); https://www.vera.org/news/corrections-staffing-shortages-offer-chance-to-rethink-prison (November 1, 2024).

appointed in *Plata* over the California Correctional Health Care Services ("CCHCS") is instructive. On June 8, 2008, the CCHCS Receiver announced a plan to fill 90% of established health services staff positions, but it has never achieved that goal. *See* California Correctional Health Care Services Memorandum (October 13, 2022), *Plata, et al. v. Newsom, et al.*, 01-CV-1351 (JST), (ECF No. 3830-2) at 1; Joint Case Management Conference Statement (Aug. 11, 2023) (ECF No. 3867), at 7-12 ("[A]s of August 2023, statewide vacancy rates for key medical staff categories have remained exceptionally high, with rates for key categories being between 23%-35% vacancy statewide.").

A Receiver with no connection to City government or relationship with its numerous constituencies would have no clear way to improve DOC's hiring and retention, and could be perceived as a far more unreliable employer than a seasoned City public servant, with existing working relationships, such as the Commissioner.[25]  That is especially so where employees have a choice to pursue their profession in a system that is not governed by an outside, federal Receiver.

In this context, the confrontation and uncertainty that the appointment of a Receiver would engender could be catastrophic for the welfare of the people in City custody.  The Court should above all do no harm, and imposing unnecessary disruptions that will not help and could worsen conditions is neither lawful nor advisable.[26]

---

[25] Adding to the uncertainties inherent in the appointment of a federal judicial agent to manage City employees, imposing on every employee personal responsibility to the Court, in the provisions discussed in Point III-B above, would do nothing to remedy the recruiting and retention challenges faced by DOC (and every correctional system), and could exacerbate those problems.

[26] The Plaintiffs Proposed Order also improperly grants the Receiver an indefinite term, which is unnecessary to remedy a constitutional violation, and would encourage the continuation of the Receivership far beyond the point of any benefit.  The defendants' proposed term of five years is the maximum reasonable term. In any event, the Court's order would remain subject to the PLRA's requirement that any party or intervenor may move for reconsideration of the relief within two years or more after it is ordered.  *See* 18 U.S.C. § 3626.  The Plaintiffs Proposed Order also grants the Receiver the unlimited right to speak to parties about the DOC on any subject, without

## CONCLUSION

For the foregoing reasons, the Court should adopt the defendants Compliance Director Plan.  Defendants reserve the right to appeal the Order finding contempt.[27]

Dated:        January 23, 2025
               New York, New York

                                          **MURIEL GOODE-TRUFANT**
                                          Corporation Counsel of the City of New York
                                          *Attorney for Defendants City of New York and New York City Department of Correction*
                                          100 Church Street
                                          New York, NY 10007
                                          t: (212) 356-2262

                           By:            _/s/ Alan Scheiner_
                                        Alan Scheiner
                                        Senior Counsel

---

limitation.  The Receiver should not be authorized to disclose information about DOC *ex parte* to adversary counsel, other than as is necessary to pursue *Nunez* goals, especially if that information relates to the subject of other investigations or litigation.

[27] For the reasons stated herein, no remedy more intrusive than the Compliance Director Plan would be consistent with the PLRA.  In addition, defendants maintain, for the reasons stated in their papers opposing plaintiffs' motion for contempt, and during oral argument on September 25, 2025, that the contempt findings of the Court are erroneous in whole or in part.  Notwithstanding a lack of substantial compliance in some areas and historical examples of a failure to take reasonable measures to achieve compliance, plaintiffs have not established any basis to find that the current leadership of DOC is not taking available and concrete actions for compliance.  It is not sufficient for contempt that compliance has not been achieved.  Rather the Court must find that compliance could be achieved now by reasonably and readily available means but is not being sought.  That is not the case here.

*Nunez, et al. v.  City of New York et al,* 11-cv-5845 (LTS)

# APPENDIX A

# DEFENDANTS' COMPLIANCE DIRECTOR PROPOSAL

*Nunez, et al. v. City of New York et al*, 11-cv-5845 (LTS)
Defendants' Compliance Director Proposal
January 17, 2025

# Proposal for a Court ordered Compliance Director pursuant to *Nunez*

**I.**     **Commissioner of the Department of Correction (DOC) shall be designated as the Compliance Director for the DOC.**

**Compliance Director Defined:**

-       The Commissioner / Compliance Director shall be appointed by the Court. The titles of Commissioner and Compliance Director shall be held jointly by a single person and cannot be severed. The Commissioner / Compliance Director shall be designated as an employee of the City of New York. Any reference herein to the title of Compliance Director or Commissioner is presumed to mean a jointly held, court appointed position.

-       The Compliance Director designation shall be appointed:

- for a term of five (5) years or until defendants are found to be in substantial compliance with the *Nunez* Consent Judgment and Remedial Orders (*Nunez* Orders), whichever comes first; or

- until the Court determines that a Compliance Director is no longer a necessary measure to ensure the DOC continues to engage in diligent efforts to comply with the *Nunez* Orders.

-       The Court may extend the duration of the appointment of a Compliance Director until the defendants are found to be in substantial compliance with the *Nunez* Orders.

-       The Commissioner / Compliance Director shall be exempt from mayoral or legislative removal and appointment.

-       Collaboration between City agencies is an essential element of effective reform and efficient governance. Therefore, the Compliance Director / Commissioner will report to the NYC Mayor's Office in the ordinary course of business, consistent with the duties and responsibilities of agency Commissioners. However, the DOC Compliance Director / Commissioner shall have sole discretion, and be answerable directly and only to the Court, with respect to matters directly or indirectly related to safety and the use of force, and any other actions undertaken in furtherance of bringing the DOC into compliance with the *Nunez* Orders.

-       If a dispute arises between the Compliance Director and the parties regarding the scope of matters to which the Compliance Director is answerable to the Court rather than the Mayor, that dispute shall be brought to the attention of the Monitor in writing. If the Monitor determines that the dispute cannot be resolved without the Court's intervention, the

*Nunez, et al. v. City of New York et al,* 11-cv-5845 (LTS)
Defendants' Compliance Director Proposal
January 17, 2025

Monitor will request that the Court resolve the dispute subject to briefings and hearings where the Court deems appropriate.

**Inaugural Compliance Director:**

- The Court shall appoint the current Commissioner of the Department of Correction, Lynelle Maginley-Liddie, as inaugural Compliance Director.

- If Lynelle Maginley-Liddie resigns or is unable to continue to serve as Commissioner / Compliance Director, the Court shall designate the First Deputy Commissioner of the Department of Correction as acting Commissioner / Compliance Director, who shall have all the powers of the Commissioner / Compliance Director, until and up to such time as a successor Commissioner / Compliance Director is appointed by the Court.

- Any successor Commissioner / Compliance Director shall be nominated by the Monitor to the Court after conferral with the parties as detailed below. The parties will submit proposed nominees and their qualifications to the Monitor for consideration. Any proposed nominee must 1) have substantial prior experience working in a correctional facility and 2) must be able to work on-site at DOC on a full-time basis as of the date of appointment. The parties may meet and confer to discuss the candidates and make good faith efforts to agree on a nominee. If agreement cannot be reached, the Monitor will present the parties' positions to the Court, which shall make the final determination.

## II.    **Powers of the Commissioner / Compliance Director**

**General Powers**:

- As Compliance Director, Lynelle Maginley-Liddie shall retain all the powers of the Commissioner of the New York City Department of Correction and shall also have the authority to exercise all powers vested by order of the court in the Compliance Director to the extent necessary to fulfill the *Nunez* Orders. To the extent that the Commissioner's powers are unrelated to fulfillment of the *Nunez* Orders, those powers are not affected by this Agreement.

- The Compliance Director may seek an order from the Court granting relief from local and state laws or rules, as well as labor agreements, if necessary to achieve compliance with the *Nunez* Orders.

- The Compliance Director may petition the Court for such additional powers as are necessary to fulfill the *Nunez* Orders.

- Petitions to the Court as articulated above shall be made on notice to the parties and the Monitor, and subject to briefings and hearings where the Court deems appropriate.

- The Compliance Director shall have the power to speak with the Court, *ex parte,* or with

2

*Nunez, et al. v. City of New York et al,* 11-cv-5845 (LTS)
Defendants' Compliance Director Proposal
January 17, 2025

the parties or the Monitor separately, in furtherance of attaining compliance with the *Nunez* Orders.

**Specific Areas of Additional Powers currently not within the authority of the DOC Commissioner:**

**Appointments:**

- The Compliance Director or their designee, along with the New York City Office of Management & Budget (OMB), shall identify available vacancies and positions and designate a standard compensation for said position, including a higher or lower range to be assigned at the discretion of the Compliance Director, in accordance with collective bargaining agreements based on the candidate's experience, responsibilities, and other criteria that would impact proposed compensation so long as such compensation is consistent with applicable collective bargaining agreements.

- Appointments pursuant to this provision shall be approved by OMB without undue delay to accommodate prompt and adequate staffing to comply with the *Nunez* Orders.

- If the Compliance Director determines that a new role, title, or position needs to be created and staffed within the DOC to accommodate compliance with the *Nunez* Orders, the Compliance Director or their designee shall work with OMB and the New York City Office of Labor Relations to identify legal or administrative impediments and take appropriate action to advance approval for said positions without undue delay.

- All hires and appointments made by the Commissioner as Compliance Director shall be subject to background investigations as required by rule or law. Appointments by the Compliance Director shall no longer be subject to mayoral review or approval, with the limited exception that the Mayor's Office shall review of appointments to the position of Assistant Commissioner or a higher rank. For appointments to the rank of Assistant Commissioner or higher, the Mayor's office, including the Mayor's Office of Appointments, may conduct background checks on an expedited schedule not to exceed twenty-one (21) days.

- Relevant information from the background checks, including potentially negative information, must be sent to the Compliance Director in writing, with any accompanying documentation, which shall be treated as confidential city records. The Compliance Director will give substantial consideration to any negative results; however, she may proceed with the appointment upon consultation with the Monitor, and shall document the reasons for not accepting the recommendation.

- The Compliance Director shall confer with the Monitor on appointments to the position of Deputy Commissioner or higher, and the Monitor shall provide feedback to the Compliance Director regarding the proposed candidates.

*Nunez, et al. v. City of New York et al,* 11-cv-5845 (LTS)
Defendants' Compliance Director Proposal
January 17, 2025

**Budget:**

- The Compliance Director or their designee shall be directly involved in establishing the DOC budget, along with OMB, which shall be presented to the New York City Council for approval in the ordinary course of City business.

- Once a budget is finalized, the Compliance Director shall make reasonable efforts to manage the DOC within the parameters of the approved budget amount.

- The Compliance Director may propose budget modifications to OMB if the budget is inadequate to meet the requirements of court orders. The Compliance Director shall notify the defendants of the specific purpose of the additional funds needed. If required by law, such modification shall be presented to the New York City Council for approval. If the issue cannot be resolved, the Compliance Director, the Monitor, or the parties may request a hearing before the Court.

- The Compliance Director shall be authorized to participate in the collective bargaining process, along with the New York City Office of Labor Relations, for civil service and uniformed unions that have employees working within the DOC.


### III.    Compliance with Laws and Cooperation:

- Unless otherwise ordered by the Court, the Compliance Director shall exercise their powers and any authority described herein in a manner consistent with applicable federal, State, and local laws, regulations, and contracts, including, but not limited to, collective bargaining agreements. However, in the event the Compliance Director determines that those laws, regulations, or contracts impede the Compliance Director from carrying out their duties under this Order and fulfilling the *Nunez* Orders, the Compliance Director may petition the Court to waive any legal or contractual requirement that is causing the impediment or seek other appropriate relief as outlined in Section II above.

### IV.    Compensation, Responsibility for Payment, and Indemnification

- The City of New York shall be responsible for compensating the individual who serves as both the Commissioner and Compliance Director, who shall receive only the compensation provided to the Commissioner in the regular course of City business. The compensation may be increased by the Office of the Mayor to be commensurate with heads of other City agencies.

- Indemnification and representation in lawsuits of the Compliance Director stemming from the performance of official duties shall be governed by New York State General Municipal Law Section 50-K and standard practices of the City of New York.

*Nunez, et al. v. City of New York et al,* 11-cv-5845 (LTS)
Defendants' Compliance Director Proposal
January 17, 2025

- In accord with the standard practice of the New York City Law Department, the Law Department will regularly monitor for conflicts. In the event that an actual or potential legal conflict arises between the Compliance Director and a City entity for which separate legal representation is required, the Law Department will determine which entity it will represent in such matter and, where appropriate, will authorize conflict counsel to represent the separate entity. The same analysis will apply should the Compliance Director be sued in her individual capacity and be deemed entitled to representation under General Municipal Law 50-k.

## V.    Role of the Monitor

- The Monitor shall continue to perform the responsibilities set forth in the *Nunez* Orders, including assessing compliance with the *Nunez* Orders and providing technical assistance in connection with implementing the requirements of the *Nunez* Orders.

- The Compliance Director must maintain routine communication with the Monitor and has the obligation to consult with and seek the Monitor's approval on Department matters as addressed in the *Nunez* Orders.

## VI.    Other terms

- Beginning one year after appointment, the inaugural Compliance Director shall submit an annual Compliance Plan to the Court. The Compliance Plan shall outline projects and strategic initiatives which will be developed and implemented over the course of the following year to continue to move the DOC towards compliance with the *Nunez* Orders. The Compliance Plan shall set forth measurable goals that the Compliance Director intends for the Department to meet during the upcoming year through implementation of the Compliance Plan.

- Nothing in this order impacts the terms of the Consent Judgment or other *Nunez* Orders which remain in full force and effect, unless otherwise modified by the Court. In the event the Compliance Directorship terminates, the *Nunez* Orders will remain in full force and effect according to their terms, as may be amended.

## VII.    Priority Initiatives:

### Background:

In addition to setting forth a proposal with regard to the establishment of the Compliance Director position and the powers and responsibilities associated therewith, the City's remedial proposal also includes a description of what the Compliance Director's priority initiatives will be during the first year of appointment (and will serve as the inaugural Compliance Plan referenced in Section VI). As the City has been developing this proposal through internal discussions and discussions with the Monitor and the parties for several months, work on many of these initiatives is already underway, as reflected herein.

*Nunez, et al. v. City of New York et al,* 11-cv-5845 (LTS)
Defendants' Compliance Director Proposal
January 17, 2025

**Uniformed Supervisory Lines:**

- Within sixty (60) days of this order, the City of New York shall provide the Compliance Director with a comprehensive legal assessment (including, but not limited to an assessment of state and local laws, regulations and other requirements from state or local agencies) of the Department's ability to introduce additional levels of supervision to the uniformed employee structure and/or any obstacles that may be presented ("the Assessment"). Upon receipt of the Assessment, the Compliance Director, in consultation with the Monitor, shall identify any potential legal impediments that may require relief from the Court, and any practical limitations on the feasibility of implementation. The Compliance Director shall make an application to the Court within sixty (60) days of receipt of the Assessment for such relief, if any, that appears necessary to make a feasible additional line of supervision legally permissible.

- The Assessment is actively under way through a multi-agency committee comprised of the NYC Law Department, DOC, OMB, the NYC Office of Labor Relations, and the NYC Department of Citywide Administrative Services.

**Disciplinary Matters:**

- Within the first 120 days of appointment, the Compliance Director, in consultation with the Monitor, shall implement measures to improve efficiency in the internal investigation and disciplinary process, including ensuring thorough and timely investigations and expediting outcomes in disciplinary proceedings at DOC.

- If the Compliance Director or the Monitor identifies an issue that appears to impede the Department's ability to prosecute disciplinary cases as expeditiously as possible and which also appears to implicate the work of another City agency, the Compliance Director or the Monitor shall raise the issue to designated attorneys at the New York City Law Department. To the extent that the issue implicates another City agency, the City, within 25 business days, in consultation with the affected parties, shall implement a solution to the issue, provided it is determined and agreed by the Compliance Director and Law Department attorneys during the 25-business day conferral process that there is in fact a problem that needs to be addressed. If there is an issue which needs to be addressed but cannot be remedied without relief from the Court, the Law Department attorneys shall advise the Compliance Director as soon as practicable, and no later than 5 business days after such a determination has been made, so that appropriate steps may be taken to seek necessary relief.

- Through efforts both internal and between DOC and the Office of Administrative Trials and Hearings (OATH), a process has been established to identify and resolve issues that may be impacting the efficient administration of discipline, while ensuring OATH's impartiality.

- Additionally, a comprehensive revised Command Discipline policy has been drafted and

*Nunez, et al. v. City of New York et al,* 11-cv-5845 (LTS)
Defendants' Compliance Director Proposal
January 17, 2025

approved by the Monitor and will be promulgated beginning January 13, 2025.

**Security Council**:

-   The Compliance Director shall convene an internal Security Council. The Security Council shall be comprised of the positions of:

    -   Senior Deputy Commissioner
    -   Deputy Commissioner of Security Operations
    -   Deputy Commissioner of Custody Management, Classification & Facility Operations
    -   An executive member of the Investigations Division
    -   An executive member of the Special Investigations Unit
    -   Any other DOC executives that the Compliance Director deems necessary

-   The Security Council shall be charged with immediately developing a plan to identify and address security issues that permit or contribute to violence in the jails, and any that impede compliance with the *Nunez* Court Orders. The plan shall include short term (6 to 12 months), mid-term (1 to 3 years), and long-term initiatives (3 to 5 years). The Compliance Director shall seek input from the Monitor, direct any reasonable changes, and then finalize the plan within 30 days of receipt. The Security Council's plan may be updated as conditions necessitate at the direction of the Compliance Director.

-   At the direction of Commissioner Maginley-Liddie, this Security Council has been convened to immediately implement measures to address security issues in DOC facilities.

**Strategic Plan:**

-   Within sixty (60) days of this Order, the Compliance Director shall develop a Strategic Plan to identify initiatives to address staff wellness and promote staff engagement to support and actively participate in the implementation of the *Nunez* Court Orders. The Compliance Director shall seek input of the staff on items or approaches to be considered in the Strategic Plan. The Strategic Plan shall include short-term and long-term initiatives and shall include but not be limited to methods to address the areas of recruitment and retention of staff, support services, executive development, and training on specific issues relating to compliance with the *Nunez* Orders. Initiatives that are already underway include those listed below, and others will be identified in the forthcoming Strategic Plan.

-   Under Commissioner Maginley-Liddie, significant measures have been taken to encourage recruitment, including advertising campaigns, utilization of other civil service lists to identify candidates, and the establishment of a unit with the Training and Development Division specifically tasked with addressing staff retention.

*Nunez, et al. v.  City of New York et al,* 11-cv-5845 (LTS)
Defendants' Compliance Director Proposal
January 17, 2025

- Commissioner Maginley-Liddie has also included, as part of the Strategic Plan, resuming annual Medal Day ceremonies.  The first Medal Day since 2021 was held on November 15, 2024.  Additionally, an Employee Recognition Program will be relaunched in February of 2025 which will allow facilities to opportunity to recognize a uniformed and civilian employee of the month.

- In furtherance of a staff wellness initiative, the Department held its inaugural Men's Conference on November 18, 2024.  This program was created as a supplement to the Department's Women's Conference and is held to focus on physical and mental health issues of DOC employees, as well as to discuss staff wellness, career development, and other matters related to working in a correctional facility.