# Status Report
# by the
# *Nunez* Independent Monitor

**January 24, 2025**

### THE NUNEZ MONITORING TEAM

Steve J. Martin
*Monitor*

Elly Davis
*Junior Analyst*

Kelly Dedel, Ph.D.
*Subject Matter Expert*

Anna E. Friedberg
*Deputy Monitor*

Dennis O. Gonzalez
*Director*

Patrick Hurley
*Subject Matter Expert*

Alycia M. Karlovich
*Associate*

Emmitt Sparkman
*Subject Matter Expert*

Table of Contents

**Introduction**................................................................................................................1

   Background on Local Law 42 ...........................................................................2

   Monitoring Team's Framework for Evaluating Local Law 42 ...........................5

      Requirements of the Nunez Court Orders ...............................................5

      Protecting Individuals in Custody from Harm .......................................5

      Expertise in Correctional Practice & DOC Practices ............................6

      Department's Capacity and Limitations .................................................6

      Sound Correctional Practices .................................................................7

      Managerial Discretion ...........................................................................8

      Underlying Basis for Regulations ..........................................................9

      Input from Stakeholders ........................................................................9

   Organization of the Report...............................................................................10

**Eliminating Solitary Confinement and Developing Alternative Programs** ...............12

   Managing Individuals Following Serious Acts of Violence and Those Who Pose A Risk to Safety and Security ...........................................................................12

      Background on Solitary Confinement .................................................15

      Efforts to Eliminate Solitary Confinement through Restrictive Housing Alternatives ..........17

      Alternative Program Models to Reduce the Use of Solitary Confinement ...........................22

   History of DOC's Efforts to Eliminate Solitary Confinement and to Manage Individuals Who Commit Serious Acts of Violence While in Custody .................................29

   Impact of LL42's Requirements on the DOC's Operations....................................33

      Definition of Solitary Confinement....................................................35

      Universal Out of Cell Time .................................................................36

      Procedures for Placement in Restricted Housing ................................37

      Time Frames for Discharge from Restrictive Housing........................37

      Prohibitions on Certain Types of Enhanced Restraints .......................38

   Conclusion ......................................................................................................39

**Restraints**.................................................................................................................41

   Generally Accepted Practice & DOC's Policies .............................................41

      Routine Restraints ..............................................................................41

      Enhanced Restraints ...........................................................................43

   Impact of LL42's Requirements for Using Restraints on DOC's Operations .......................43

      Procedural Requirements for the Use of Routine Restraints.................................45

Standard for Enhanced Restraints ................................................................................. 47

Prohibition of Enhanced Restraints for Individuals Under the Age of 22 .............................. 47

Conclusion .......................................................................................................... 48

**De-Escalation Confinement** ................................................................................ **49**

Generally Accepted Practice ....................................................................................... 49

Impact of LL42's Requirements on DOC's Operations of De-Escalation Confinement ........ 50

Standard for Using De-escalation ............................................................................. 51

Arbitrary Time Limits ............................................................................................ 51

Limitations on Readmission to De-Escalation Confinement ............................................ 52

Access to Items During De-escalation ......................................................................... 52

Conclusion .......................................................................................................... 53

**Emergency Lock-In** ......................................................................................... **54**

Generally Accepted Practice ....................................................................................... 54

Impact of LL42's Requirements for DOC's Operations of Emergency Lock-Ins ................. 55

Conclusion .......................................................................................................... 56

**Conclusion** .................................................................................................. **58**

**Appendix A**: Local Law 42

**Appendix B**: Summary of Relevant *Nunez* Provisions

**Appendix C**: Monitor's January 12, 2024 Letter to Commissioner Maginley-Liddie

    o  Appendix A to Monitor's January 12, 2024 Letter:
        Council Bill 549-A (Local Law 42)

    o  Appendix B to Monitor's January 12, 2024 Letter:
        *Nunez* Implications of City Council Bill 549-A

    o  Appendix C to Monitor's January 12, 2024 Letter:
        Definitions of Solitary Confinement

**Appendix D**: Monitor's July 17, 2024 Letter to Commissioner Maginley-Liddie

**Appendix E**: The City's July 22, 2024 Status Report to the Court

    o  Exhibit A: Commissioner Maginley-Liddie's July 22, 2024 Declaration

    o  Exhibit B: Monitor's January 12, 2024 Letter to Commissioner Maginley-Liddie

    o  Exhibit C: Monitor's July 17, 2024 Letter to Commissioner Maginley-Liddie

**Appendix F**: Mayor's Emergency Executive Orders 624, 625, 735 & 736

**Appendix G**: The City Council's Article 78 Motion

    o  Verified Petition from the City Council and The City Advocate

o  Exhibit A: Local Law 42

o  Exhibit B: Emergency Executive Order 624

o  Exhibit C: Emergency Executive Order 625

o  Exhibit D: Dr. Lee's and Dr. Gilligan's October 18, 2024 Letter to the City Council

o  Exhibit E: Emergency Executive Order 697

o  Exhibit F: Emergency Executive Order 703

o  Petitioners' Memorandum of Law

o  Notice of Petition

# INTRODUCTION

This report is intended to provide the Court with an update on the Monitoring Team's assessment of Local Law 42 of 2024 ("Local Law 42" or "LL42"). A copy of LL42 is attached as Appendix A of this report. The Monitoring Team has been actively working to fully understand the impact of LL42 and any potential conflicts with the *Nunez* Court Orders while balancing other responsibilities including routine monitoring and facilitating the work related to the proposed remedial relief. Since the summer of 2024, the Monitoring Team has engaged extensively with the City and Department, convened multiple meetings with various stakeholders, and has received supplemental information from the Department, the Parties, and counsel for the City Council.

Many of LL42's requirements have a significant impact on several fundamental operations within the New York City jails, affecting both the individuals in custody and staff. Specifically, the requirements for using restraints will involve interactions with every person in the Department's custody, sometimes multiple times per day. Other regulations directly influence security operations, including the rules for de-escalation confinement and emergency lock-ins. Although these measures are used less frequently than restraints, the Department employs them to address specific, imminent threats to individuals' safety, with some situations being more complex than others. In some cases, resolving a threat may require action on multiple fronts uniquely tailored to both the individual(s) and the situation, and managerial discretion is essential to assess and mitigate the risk of harm. Finally, housing individuals who have committed serious acts of violence is arguably one of the most complicated practices in any correctional system. This complexity arises from the interpersonal dynamics involved and the extreme safety risks these individuals pose to other persons in custody and staff. To varying degrees, the regulations

of LL42 directly impact on the requirements of the *Nunez* Court Orders and, in some cases, implicate procedures that require the Monitor's approval.  These issues are explored in greater detail in this report.

### BACKGROUND ON LOCAL LAW 42

The City Council passed Local Law 42 on December 20, 2023. The Mayor of New York subsequently vetoed the bill on January 19, 2024, but it was signed into law by the City Council on January 30, 2024, overriding the Mayor's veto. LL42 amends the New York City Administrative Code by banning the use of solitary confinement, imposing 14 hours of mandatory out-of-cell time for all incarcerated individuals, setting additional requirements for the use of restrictive housing, de-escalation, emergency lock-ins, and restraints, and imposing specific conditions for special housing units (*e.g.,* mental health units, contagious disease units, protective custody units, housing for people who are transgender or gender non-conforming, and housing to promote school attendance).

In early January 2024, pursuant to the *Nunez* Court Orders,[1] the Commissioner requested the Monitoring Team's advice and feedback on how the requirements of LL42 might impact the Department's ability to comply with the *Nunez* Court Orders. On January 12, 2024, the Monitoring Team provided its initial assessment of LL42's implications for the City's and Department's efforts to address the unsafe conditions in the jails, protect individuals from harm,

---

[1] *See* Consent Judgment, § XX, ¶¶ 24 and 25 and June 13, 2023 Order (dkt. 550), § I, ¶ 5. Combined, these provisions: (1) permit the Department to request the Monitor provide technical assistance or consultation on the Department's efforts to implement the requirements of the *Nunez* Court Orders, (2) permit the Department to request the Monitor provide a written response to a request regarding the Department's compliance with the *Nunez* Court Orders, and (3) requires the Department to proactively consult with the Monitor on any policies or procedures that relate to the compliance with the *Nunez* Court Orders and to obtain the Monitor's feedback on these initiatives. The Monitor has addressed similar issues in the past. *See, for example,* Monitor's March 5, 2018 Report (dkt. 309), Monitor's October 31, 2018 Letter to the Court (dkt. 319), and Monitor's June 30, 2022 Report (dkt. 467) at pgs. 22-27.

and implement sound correctional practices, all of which are necessary to comply with the *Nunez* Court Orders. A copy of the Monitor's January 12, 2024 Letter is attached as Appendix C of this report.

In late May/early June 2024, the Department advised the Monitoring Team (and subsequently the Parties to the *Nunez* litigation) that it was considering seeking relief from LL42's requirements via the Court in the *Nunez* matter, given the Department's concerns that LL42's requirements may impede the Department's ability to comply with several key areas of the *Nunez* Court Orders. Likewise, the City advised the Court of its intentions in a letter dated June 5, 2024 (dkt. 724). Following the City's submission of this letter, the Monitoring Team and the *Nunez* Parties met and conferred in June 2024. In July 2024, the Commissioner sought updated guidance and feedback from the Monitoring Team pursuant to the *Nunez* Court Orders,[2] on how the requirements of LL42 might impact the Department's ability to comply with the *Nunez* Court Orders. A copy of the Monitor's July 17, 2024 letter is attached to this report as Appendix D. On July 22, 2024, the City filed a status report with the Court regarding its concerns related to the implementation of LL42 (dkt. 758). The status report included a declaration from Commissioner Lynelle Maginley-Liddie regarding her belief about "the deleterious effects that many of the provisions of Local Law 42 would have on the operations of the Department if they went into effect. Put simply, there would be an increase in violence and transportation of incarcerated individuals to court would become virtually impossible, among other adverse consequences." Declaration of Lynelle Maginley-Liddie, ¶ 2 (dkt. 758).

---

[2] *Id.*

On July 27, 2024, the Mayor issued Emergency Executive Orders ("EEO") suspending the implementation of certain provisions of LL42. A copy of the EEOs is attached as Appendix F. The EEOs remain in effect as of the filing of this report.

Since the summer of 2024, the Court has directed the Monitoring Team to engage in focused analytical work, to meet and confer with the Defendants and the Parties about these issues, and to provide multiple status updates.[3] The Monitoring Team updated the Court on the work to assess the intersection between LL42 and the *Nunez* Court Orders on October 24, 2024 (dkt. 789) and November 22, 2024 (dkt. 802).

On December 9, 2024, counsel for the City Council brought an Article 78 motion in state court seeking the following relief related to LL42:

(1) Finding the Emergency Orders 624 and 625, and all subsequent renewals of those Orders, arbitrary, capricious and contrary to law, the issuance of which is beyond the Mayor's lawful authority;

(2) Vacating the Mayor's Emergency Orders declaring a local state of emergency as result of Local Law 42 (Order No. 624 and all subsequent renewals); and

(3) Vacating the Mayor's Emergency Orders suspending Local Law 42 (Order No. 625 and all subsequent renewals).

This motion practice is still pending in state court with briefing expected to be completed in March 2025. The Monitoring Team has continued its analysis of LL42, among other duties, since the Monitor's November 22, 2024 Report. This report is intended to capture all work completed to date.

---

[3] *See* the Court's June 7, 2024 Order (dkt. 726), July 23, 2024 Order (dkt. 759), July 25, 2024 Order (dkt. 761), and October 25, 2024 Order (dkt. 791).

## MONITORING TEAM'S FRAMEWORK FOR EVALUATING LOCAL LAW 42

The evaluation of LL42 requires thoughtful consideration, given the impact these requirements have on many facets of the jail operations and the intersection with many provisions of the *Nunez* Court Orders. To that end, the Monitoring Team's evaluation of LL42 includes the following overarching considerations.

- *Requirements of the Nunez Court Orders*. The requirements of the *Nunez* Court Orders are at the forefront of the evaluation of LL42's requirements. At their core, the *Nunez* Court Orders require the Department to have a "constitutionally sufficient level of safety for those who live and work on Rikers Island."[4] A variety of provisions in the Court Orders relate directly to various security protocols and procedures. In some cases, the Court has also required the Department to seek the Monitor's approval before it can implement certain security procedures and protocols. A non-exhaustive list of these requirements is included in Appendix B of this report.

- *Protecting Individuals in Custody from Harm*. A jail environment presents various potentially harmful situations, and Defendants have a duty to take action to prevent or minimize the impact of these situations to the best of their abilities. Given the requirements in LL42, due consideration of the impact of certain practices on individuals' safety and well-being is necessary, including how certain practices may impact the risk of harm one presents to oneself, as well as to potential victims, both other individuals in custody and staff. The evaluation of LL42's requirements must be focused on how they may support the overarching goal of protecting individuals from harm, which includes

---

[4] *See* Court's November 27, 2024 Order (dkt. 803) at pg. 54.

consideration of how implementing these requirements *in practice* will advance or impede the ability to protect individuals from harm.

- *Expertise in Correctional Practice & DOC Practices*. The Monitoring Team's assessment of LL42's regulations and requirements is grounded in the Monitoring Team's expertise in correctional practice and its extensive experience with correctional management and security protocols in facilities throughout the country. Collectively, the Monitoring Team has over 100 years of experience working and reforming both adult and juvenile systems nationwide. The intensive monitoring required by the *Nunez* Court Orders has also provided the team with deep insights and expertise into the Department's operations.

- *Department's Capacity and Limitations*. The Monitoring Team also considers the Department's current abilities and aptitude when assessing the impact of LL42's requirements. The practicality and feasibility of implementing a specific practice in *this* jail system at this time and the likely outcomes must be evaluated, as discussed in the next section. The Monitoring Team has provided the Court with an extensive record on the Department's dysfunction and limitations in managing a system that is consistent with sound correctional practice.  The Monitor's Reports in this case have repeatedly found that the Department lacks the foundation to support the basic reforms required by the *Nunez* Court Orders.[5]

The Monitoring Team has repeatedly highlighted that the Department is tangled in a web of polycentric problems that, both individually and collectively, impede the prospect of meaningful reform. Specifically, staffing problems—stemming from absenteeism and

---

[5] *See* Monitor's March 16, 2022 Report (dkt. 438) at pg. 4; Monitor's June 8, 2023 Report (dkt. 541) at pg. 13; Monitor's November 22, 2024 Report (dkt. 802) at pg. 309.

inefficient personnel deployment—render the system incapable of providing staff in sufficient numbers to safely supervise a cadre of high-risk individuals with few restrictions on their movement and the ability to congregate in groups. Being able to safely supervise high-risk individuals in an open setting with few restrictions is also unrealistic in a system where staff members do not follow and adhere to basic security practices consistently. Staff failures to secure cell doors and security gates, to remain on post, and to enforce basic rules routinely contribute to violent incidents. Furthermore, staff often respond to tense interpersonal situations with hyper-confrontational behavior, contributing to the use of unnecessary and excessive force. Finally, the system remains incapable of adequately coaching and guiding staff to improve skill mastery and to apply timely and proportional staff discipline when warranted. The practical reality of the Department must be acknowledged and addressed at the forefront of any major change or reform effort.

- _Sound Correctional Practices_. The _Nunez_ Court Orders require the Department to design and implement policies, programs, and protocols that align with sound correctional practices.[6] This standard is crucial for ensuring the safety, integrity, and effectiveness of the Department's approach to managing people in custody. Adhering to sound practices is

---

[6] _See_ Monitor's May 31, 2016 Report (dkt. 269) at pg. 3; Monitor's October 31, 2016 Report (dkt. 291) at pg. 10; Monitor's April 3, 2017 Report (dkt. 295) at pg. 11; Monitor's October 10, 2017 Report (dkt. 305) at pg. 2; Monitor's April 18, 2018 Report (dkt. 311) at pgs. 2, 25-26; Monitor's October 17, 2018 Report (dkt. 317) at pg. 2; Monitor's April 18, 2019 Report (dkt. 327) at pg. 2; Monitor's October 28, 2019 Report (dkt. 332) at pg. 2; Monitor's May 29, 2020 Report (dkt. 341) at pgs. 2-3; Monitor's October 23, 2020 Report (dkt. 360) at pgs. 2-3; Monitor's December 1, 2021 Letter (dkt. 429) at pg. 7; Monitor's December 6, 2021 Report (dkt. 431) at pg. 8; Monitor's March 16, 2022 Report (dkt. 438) at pgs. 2-3; Monitor's April 20, 2022 Report (dkt. 445) at pgs. 7-8; Monitor's June 30, 2022 Report (dkt. 467) at pgs. 3, 7, 26; Monitor's October 28, 2022 Report (dkt. 472) at pgs. 6-7, 79, 88-89; Monitor's April 3, 2023 Report (dkt. 517) at pgs. 2-3, 40; Monitor's July 10, 2023 Report (dkt. 557) at pgs. 72, 73-74; Monitor's November 8, 2023 Report (dkt. 595) at pg. 28; Monitor's November 30, 2023 Report (dkt. 616) at pg. 24; Monitor's February 26, 2024 Letter (dkt. 679) at pg. 8; Monitor's April 18, 2024 Report (dkt. 706) at pg. 10; Monitor's June 27, 2024 Report (dkt. 735) at pg. 2; and Monitor's November 22, 2024 Report (dkt. 802) at pgs. 192, 256.

essential for minimizing risks, improving outcomes, and establishing a solid foundation for the Department's mandate to operate safe facilities for persons in custody and staff. In the complex and often perilous environment of jails, adhering to established standards is vital to begin to achieve consistency and quality in operations. This is particularly important for this Department, where the core foundational elements of safe jail operations have been so deficient. While the reform effort will necessarily require change and innovation, the guiding principle for the agency must first be to develop a foundation of basic, sound correctional practices. Until this foundation is established, further reforms and more ambitious changes to the basic operations of the jail will not be able to take hold.

- *Managerial Discretion*. As part of sound correctional practice, it is important for procedures to include specific requirements and safeguards. However, operators must always have sufficient discretion to manage situations where some degree of latitude and judgment are necessary to safely manage immediate safety and security threats. For example, simply setting a timeline for when a restriction must end does not necessarily mean that the threat underlying the need for the restriction has been successfully abated. In correctional environments, where various interpersonal dynamics pose a risk of violence or retaliation, it is essential to manage these risks appropriately. Managers' discretion and decision-making should not be constrained by arbitrarily imposed time limits, as such constraints may endanger others. Safeguards are necessary to ensure that practices are not abused, but strictly eliminating discretion when it is necessary can actually cause harm rather than reduce it.

- *Underlying Basis for Regulations*. The underlying principles and program models that inform the regulations are critical to understanding the basis for the regulations and whether they may have the intended impact. Innovations from other settings are valuable and can inspire new approaches to persistent issues, but it is crucial to develop solutions specifically tailored to the adult jail environment **and** the relevant target population. Innovations cannot simply be transplanted from one setting or population to another in a piecemeal fashion without recognizing and accommodating the significant differences in the interpersonal and institution-specific dynamics and environments where these programs or practices must operate.

- *Input from Stakeholders*. To inform its evaluation, the Monitoring Team has engaged the City and the Department and has also received input from counsel for the Plaintiff Class and the Southern District of New York. Counsel for the City Council has also shared information with the Monitoring Team, including a letter from Drs. Gilligan and Lee (which was also appended as Exhibit D to the City Council's Article 78 motion and provided as Appendix G in this report).

  o *Department Leadership*. The input from Department leadership who are charged with implementing the law is a critical factor.  Whether the Department believes it can safely implement specific requirements must be heavily considered.  On July 22, 2024, Defendants reported to the Court it "also [has] serious concerns about the negative effects on public safety that many of the provisions of Local Law 42 would have on operation of the City's jails and routine transportation of incarcerated individuals if they were to be implemented at this time. These concerns are discussed in detail in a July 22, 2024 Declaration of DOC

Commissioner Lynelle Maginley-Liddie." *See* Appendix E.  The Monitoring Team has been actively engaged in discussing the operational impact of LL42 and Defendants have reported to the Monitoring Team that its position regarding Local Law 42 remains the same as it did in its July 22, 2024 submission to the Court.

o *Additional Expertise*. The Monitoring Team has also consulted with additional experts, including Dr. James Austin.[7] Dr. Austin has also been working as a consultant with the Department and has also developed an understanding of the Department's operations.

## ORGANIZATION OF THE REPORT

This report includes a section on each of the four key correctional tools regulated by LL42: (1) Solitary confinement and restricted housing, (2) De-Escalation Confinement, (3) Emergency Lock-Ins, and (4) Restraints. In each section, a summary of the generally accepted practice is provided, followed by a description of the requirements of LL42 and then an explanation of the Monitoring Team's concerns about the impact of certain requirements of LL42 on DOC's operations.  The report concludes with recommended next steps.

The report also includes a number of appendices, which are listed below:

- Appendix A: Local Law 42
- Appendix B: Summary of Relevant *Nunez* Provisions
- Appendix C: Monitor's January 12, 2024 Letter to Commissioner Maginley-Liddie

---

[7] Dr. Austin has worked to designed and evaluated restrictive housing programs in many correctional systems for both plaintiffs and defendants, including the Federal Bureau of Prisons, the states of Ohio, Illinois, Mississippi, Colorado, California, New Mexico, Kentucky, Rhode Islan, and the local California jails of Sacramento, Santa Clara, San Joaquin, and Alameda counties. The goal of Dr. Austin's work has been to eliminate solitary confinement, increase out of cell time, increase access to rehabilitative programs, reduce the number of people assigned to restrictive housing, and reduce the level of violence in these systems.

- Appendix D: Monitor's July 17, 2024 Letter to Commissioner Maginley-Liddie
- Appendix E: The City's July 22, 2024 Letter to the Court
- Appendix F: Mayor's Emergency Executive Orders 624, 625, 735 & 736
- Appendix G: The City Council's Article 78 Motion

# ELIMINATING SOLITARY CONFINEMENT AND DEVELOPING ALTERNATIVE PROGRAMS

This section first discusses the generally accepted practice for managing individuals following serious acts of violence and those who otherwise pose an unreasonable and demonstrable risk to safety and security. This includes how these practices are defined, the harms and status of solitary confinement in the United States and how restricted housing models are being used to address the risks posed by those who engage in acts of violence while in custody. The section goes on to discuss efforts to reduce the use of solitary confinement in other jurisdictions and program models cited as the basis for the programs in LL42. Next, the Department's efforts to eliminate solitary confinement (known as "Punitive Segregation") and to manage individuals who commit acts of violence while in custody are summarized. This section ends with a discussion of the impact of LL42's requirements on the Department's operations, including the specific requirements of the law and the operational concerns that they create.

## MANAGING INDIVIDUALS FOLLOWING SERIOUS ACTS OF VIOLENCE AND THOSE WHO POSE A RISK TO SAFETY AND SECURITY

A crucial element of ensuring the safety and well-being of both individuals in custody and staff in correctional facilities is the implementation of a reliable, safe, and effective response to serious interpersonal violence and a safe housing strategy for those who otherwise pose an unreasonable and demonstrable risk to safety and security. Because of the risks they pose, these individuals must be supervised differently from those in the general population. Separating violent individuals from the general population, minimizing their opportunity to harm others, properly managing congregate time out-of-cell, and limiting out-of-cell time are standard and

12

sound correctional practices, provided these limitations are reasonably related to reducing the potential for harm.

The population of any correctional facility includes a proportion of individuals who are challenging and unpredictable, some of whom have extensive histories of assaultive behavior, both in the community and while in custody. Concentrating on people with known propensities for violence or who otherwise pose an unreasonable safety risk in one location requires an approach with unique security enhancements, particularly during time spent in congregate activities, and underscores the importance of sound security practices in programs of this type. The approach must recognize the substantial and sometimes life-threatening harm already inflicted and the mandate to prevent further victimization. Protecting other people in custody and staff from violence necessitates specialized management for these individuals.

In this Department, serious violence occurs with an unacceptable level of frequency, and properly managing these individuals is a crucial priority for ensuring safety in the jails. The following incidents exemplify the serious dangers posed by certain individuals in custody and highlight the challenges of maintaining safety within the City's jails. These incidents also illustrate the consequences that can occur when placing such individuals in settings with limited restrictions. In other words, when the restrictions are improperly calibrated to the risks presented by an actively and/or persistently violent individual, real serious harm can and does often ensue, as evidenced by the following examples:

*Incident Example 1: On February 6, 2024, in a mental observation housing unit at GRVC, a person in custody violently attacked another individual in custody in an unprovoked assault. While the victim was working in the pantry area, the perpetrator entered and suddenly stabbed the victim multiple times, pinning him against the wall. The*

*victim sustained over 25 stab wounds and required emergency hospitalization. The attacker had a well-documented history of extreme violence in custody, having been involved in 39 reportable incidents, including five prior stabbings, three slashings, and two assaults resulting in serious injuries. He also had 18 recorded uses of force with staff and was found in possession of contraband on multiple occasions.*

**Incident Example 2:** *On October 16, 2024, at OBCC, a staff member was seriously injured when a person in custody launched a surprise attack using a sharpened weapon. The incident began when an officer attempted to break up a fight between people in custody, deploying chemical agents to end the assault. As the officer worked to separate the individuals, the perpetrator approached from behind and slashed the officer's neck and ear. Despite the officer's attempts to disengage, the assailant continued to pursue him. Additional officers intervened, deploying chemical agents and physical force to subdue the perpetrator. The officer sustained multiple injuries, including deep lacerations to his right earlobe and neck, linear abrasions to his scalp, and required medical treatment at Mt. Sinai Hospital. Another officer suffered injuries to his knee, hip, and shoulder.*

**Incident Example 3:** *On November 3, 2024, at RNDC, a person in custody violently assaulted a staff member following a dispute over his cell being locked. The incident escalated when the person in custody aggressively approached an officer, ignoring verbal commands to maintain distance. When another person in custody attempted to pull the perpetrator back, he resisted and proceeded to strike the officer in the face. The force of the blow resulted in a facial laceration, fractures to the orbital floor and maxillary*

14

*sinus, and nasal bleeding. Additional officers arrived to contain the situation, deploying*

*chemical agents and restraining the assailant. The attack triggered further disorder, with*

*other people in custody becoming disruptive, requiring additional security measures to*

*restore order.*

Designing and implementing a strategy to house perpetrators of this level of violence is challenging. Balance must be achieved between offering meaningful human contact and delivering rehabilitative services to reduce the likelihood of subsequent violence on the one hand, and on the other, imposing security protocols that will adequately protect staff and other persons in custody from the risk of violence these individuals pose, and to protect those individuals who committed a serious act of violence from becoming the victim of retaliatory violence.

<u>Background on Solitary Confinement</u>

The conditions of confinement in any correctional facility exist on a continuum, ranging from the least restrictive setting of "general population" to the most restrictive one of "solitary confinement." Between these two are various distinctions regarding the level of supervision and freedom of movement for individuals in custody, including celled versus dormitory housing, escorted versus unescorted movement, on-unit programming versus off-unit programming, and differences in the number of hours spent outside the cell.

In many systems throughout the country, individuals who engage in a range of misconduct are placed in solitary confinement. While there is no single definition of solitary confinement,[8] all research and systems with which the Monitoring Team has experience describe

---

[8] A precise, standard definition of solitary confinement is difficult to pinpoint. Appendix C provides definitions of solitary confinement from various reputable sources. While there is no consensus on the exact number of hours one

the practice of solitary confinement as a housing strategy where an individual is out of their cell for 4 hours or less per day over an extended period of time. As discussed later in this report, LL42's definition of solitary confinement is considerably more expansive than that found in the generally accepted practice. For the purposes of this report, the Monitoring Team's discussion of solitary confinement utilizes the generally accepted definition (i.e., 4 hours or less out-of-cell time per day).

Research has found a significant adverse impact of solitary confinement on the physical and psychological well-being of individuals placed in these conditions, particularly those with pre-existing mental health conditions.[9] There is general agreement in the published research and among many practitioners on the need to reduce the number of people subjected to the harsh conditions of solitary confinement (i.e., offering only 4 hours of out-of-cell time or less per day with no meaningful human interaction). However, other research in this area has identified some important contours. Some researchers have suggested that the adverse effects of solitary confinement are more nuanced and must be contextualized.[10] These researchers explain that the applicability of research on the severe adverse effects of solitary confinement depends a great deal on factors such as the degree of social isolation, level of deprivation, duration, physical

---

must be confined to a cell in order to be considered "in solitary confinement," the range of restrictions makes it clear that the general consensus is that those in solitary are confined to their cells for an extensive period of time, well beyond the 10 hours that incarcerated individuals are typically restricted to their cells overnight. Its hallmark is the deprivation of meaningful, positive human interaction.

[9] Haney, C. (2018). Restricting the use of solitary confinement. *Annual Review of Criminology*, 1, 285–310, *Available at* https://www.annualreviews.org/content/journals/10.1146/annurev-criminol-032317-092326; and Grassian, S. (2006) Psychiatric effects of solitary confinement. *Washington University Journal of Law and Policy, Volume* 22, Issue 1, 324-383. *Available at* https://openscholarship.wustl.edu/cgi/viewcontent.cgi?article=1362&context=law_journal_law_policy.

[10] Gendreau and Labrecque (2018). *The effects of administrative segregation: A lesson in knowledge cumulation.* In Wooldredge, J. and Smith, P. Eds, The Oxford Handbook of Prisons and Imprisonment. New York, NY: Oxford University Press; and O'Keefe et al (2010). *One Year Longitudinal Study of the Psychological Effects of Administrative Segregation.* Colorado Springs, CO: Colorado Department of Corrections.

conditions, access to mental health and other programming, and the nature of relationships between staff and people in custody.[11] It is therefore crucial to understand the specific components of any housing program when assessing its potential for adverse effects.

Solitary confinement, as defined in the generally accepted practice, and restrictive housing are *not* synonymous, and efforts to establish operational requirements and limitations must recognize the distinction. The term "solitary confinement" is intended to capture conditions where a person is locked in a cell for at least 20 hours per day without any meaningful human interaction, programming, or services for an extended period of time. In contrast, restrictive housing provides more out-of-cell time than solitary confinement (although less than what is available to the general population) and permits opportunities for meaningful human contact and small-group interactions with other people in custody.

*Efforts to Eliminate Solitary Confinement through Restrictive Housing Alternatives*

Given the potential harm that may be inflicted upon people in custody through extended isolation, many jurisdictions have worked to eliminate the practice of restricting an individual's time out-of-cell to less than 4 hours and to reduce the number of people placed in these settings. This has been accomplished by creating new restricted housing programs that impose fewer restrictions on out-of-cell time and that offer access to programming, services, and meaningful human interaction. The Monitoring Team is not aware of any correctional system in the country that has eliminated *both* solitary confinement and all other restrictions on out-of-cell time for individuals who have recently committed serious acts of violence.

---

[11] Kapoor, R. and R. Trestman (2016). Mental health effects of restrictive housing. *Restrictive Housing in the U.S.: Issues, Challenges and Future Directions.* Washington, D.C.: National Institute of Justice. *Available at: https://www.ojp.gov/pdffiles1/nij/250315.pdf.*

Restrictive housing, when properly designed, includes specific components aimed at mitigating the negative effects of isolation, especially the absence of meaningful human interaction. In fact, the most recent guidance from the National Institute of Justice on *Restrictive Housing in the U.S.* (2016) indicates that "when used for relatively short periods and under reasonable conditions of confinement, managing violent individuals in some form of restricted housing may avoid the harms of solitary confinement."[12] In other words, ending the practice of solitary confinement (i.e., 4 hours of out-of-cell time per day or less) does not mean that all restrictions on out-of-cell time must *also* be eliminated. Recognizing this difference and developing corresponding regulations is essential.

Restricted housing does involve *restrictions.* The guiding principle to the development of restrictive housing is that the limitations must be reasonably related to reducing the risk of subsequent violence. For example, limiting out-of-cell time may be used to reduce the number of individuals in common spaces at any one time, to permit those with serious interpersonal disputes to be separated, and to allow officers to provide vigilant supervision of a smaller number of individuals. In other words, reducing out-of-cell time enhances staff control over the environment, improves surveillance, and reduces unsupervised interactions. This maintains the goal of allowing meaningful human interaction while reducing the risk of potential harm to those in custody, the staff supervising them, and the staff providing programming, health care services, and other services. Reasonably limiting out-of-cell time not only serves critical safety and security imperatives, such as minimizing opportunities for further acts of violence, and also

---

[12] Smith, P. (2016). Toward an understanding of "what works" in segregation: Implementing correctional programming and re-entry-focused services in restrictive housing units. *Restrictive Housing in the U.S.: Issues, Challenges and Future Directions.* Washington, D.C.: National Institute of Justice. *Available at: https://www.ojp.gov/pdffiles1/nij/250315.pdf.*

provides a graduated incentive for inducing rule-abiding behavior by returning a compliant individual to the general population where greater freedom is afforded.

When the risk of continued interpersonal violence is particularly acute, procedures may also be necessary to limit individuals' freedom of movement during congregate activity out of their cells through the use of fixed mechanical restraints. Other security precautions are also required to minimize risk, including enhanced staffing ratios, more frequent personal and cell searches, and limited access to other facility spaces. In the context of restricted housing, where individuals are placed after engaging in serious violent behavior or when they pose a demonstrable risk of harm to safety and security, limiting out-of-cell time and applying enhanced security protocols reflect sound correctional practice and are necessary to protect potential victims from harm.

In addition to more limited out-of-cell time and enhanced security protocols, opportunities for meaningful interpersonal interaction and access to rehabilitative services *must be afforded* and must be grounded in evidence-based practice. Guidance from the U.S. Department of Justice and the National Institute of Justice on the use of restricted housing promotes the use of individualized plans to facilitate each individual's return to the general population and regular reviews by a multi-disciplinary committee that includes input from mental health professionals.[13] Overall, restricted housing programs can both reduce the adverse

---

[13] U.S. Department of Justice (2016). Report and Recommendations Concerning the Use of Restrictive Housing. Washington, D.C.: Author. Available at: https://www.justice.gov/archives/dag/report-and-recommendations-concerning-use-restrictive-housing#:~:text=For%20every%20inmate%20in%20restrictive,other%20inmates%2C%20or%20the%20public, and Smith, P. (2016). Toward an understanding of "what works" in segregation: Implementing correctional programming and re-entry-focused services in restrictive housing units. *Restrictive Housing in the U.S.: Issues, Challenges and Future Directions.* Washington, D.C.: National Institute of Justice. *Available at: https://www.ojp.gov/pdffiles1/nij/250315.pdf.*

consequences associated with more extreme isolation (i.e., 4 hours out-of-cell per day or less) and can also reduce the risk of subsequent violence.[14]

To facilitate program engagement, restricted housing programs often include additional security procedures, including the use of certain types of enhanced restraints. Enhanced restraints are discussed broadly in the Restraints section of this report. Enhanced restraints utilized in restricted housing may also include fixed restraints such as a restraint desk or restraint table, where an individual's hands or legs are secured to the desk/table, limiting their range of motion. Desks may also be enclosed in chain-link fencing to prevent physical access to others in a congregate setting. Fixed restraints must be used judiciously, only with those with a propensity for violent behavior and for whom less restrictive measures would be insufficient to protect others from harm. Without such restraints, these individuals' access to programming and services would be limited to one-on-one interactions, often with the individual remaining in the cell and the provider attempting to communicate from outside the cell. Utilizing a restraint desk allows for engagement in a small group format safely and offers an important opportunity for meaningful human interaction. Enhanced security measures like these should be implemented only in response to legitimate safety concerns and not as a form of punishment. The use of enhanced restraints is typically determined through an adjudicative process, often combined with an adjudication for housing restrictions, including out-of-cell time.

One of the most common innovations in the development of restricted housing programs is to limit the number of people who may be placed in restricted settings by establishing narrow

---

[14] The National Institute of Justice's 2016 report *Restrictive Housing in the U.S.: Issues, Challenges and Future Directions* noted that "restrictive housing units can be managed in a manner that allows for the delivery of intensive interventions to inmates in need of services for a successful transition into the general population of offenders."[14]National Institute of Justice (2016). *Restrictive Housing in the U.S.: Issues, Challenges and Future Directions*. Washington, D.C.: Author, p.336. *Available at:* https://www.ojp.gov/pdffiles1/nij/250315.pdf.

criteria for eligible infractions or circumstances that warrant their placement, such as by limiting

the types of misconduct that qualify for placement so that only those who commit violent acts are

eligible. This narrowing of the "on ramp" guards against the overuse of restrictive settings for

less serious infractions, which is one of the many concerns about the use of solitary confinement.

[15] Procedures for placement in restricted housing must ensure transparency in the reason for

placement, must provide an opportunity for the person in custody to be heard, and must occur in

a timely and efficient manner given the potential security risks posed by the individual's

behavior.

      The length of exposure to any intervention—like restricted housing—must be guided by

the principal to apply restrictions no longer than necessary to abate the risk of harm. However,

this does not mean that the length of stay must be as short as possible; instead, the length of stay

must be reasonably determined to achieve the objective of reducing the risk of subsequent

violence. In particular, the length of stay should be sufficient for the program interventions (e.g.,

cognitive behavioral therapy or other evidence-based curriculum) to be delivered at the proper

dosage. The length of stay in restricted housing must also be sufficient to afford a legitimate

assessment of the individual's willingness and capability to refrain from violence when

interacting with other people in custody and staff. Throughout an individual's stay in restricted

housing, regular reviews of their conduct are needed to recognize progress or to encourage and

motivate prosocial behavior. The outcome of this cycle of service delivery and review should be

the foundation of any determination regarding an individual's readiness to reintegrate into the

---

[15] Labrecque, R. et al. (2021). Reforming solitary confinement: the development, implementation, and processes of a restrictive housing step down reentry program in Oregon. *Health and Justice* 9:23. https://doi.org/10.1186/s40352-021-00151-9; Smith, P. (2016). Toward an understanding of "what works" in segregation: Implementing correctional programming and re-entry-focused services in restrictive housing units. *Restrictive Housing in the U.S.: Issues, Challenges and Future Directions.* Washington, D.C.: National Institute of Justice. *Available at: https://www.ojp.gov/pdffiles1/nij/250315.pdf.*

general population or another less restrictive setting. Some individuals may quickly demonstrate their readiness to reintegrate safely, but others may resist or remain unable to change their behavior for protracted periods of time and thus may require more patience, adjustments to the mode of interaction and type of intervention, and multiple cycles of review and intervention. Overall, the length of stay must be uniquely calibrated to the individual's readiness, and thus the duration required for safe transfer to the general population will not be the same for everyone placed in restricted housing.

*Alternative Program Models to Reduce the Use of Solitary Confinement*

Several jurisdictions have developed restricted housing program models in order to reduce their use of solitary confinement. These programs include restrictions on out-of-cell time compared to the general population but afford more time out-of-cell than was permitted under solitary confinement. The restricted housing program models also include programming and a variety of services for those placed in them. The conditions and restrictions vary across jurisdictions, including factors like housing type, movement, whether programming is on-unit or off-unit, and the number of hours people in custody spend out of their cells. Overall, these programs have aligned the conditions of the housing units with the level of risk a person in custody poses while addressing the dangers associated with lengthy periods of extreme isolation. In all correctional systems known to the Monitoring Team, individuals at low risk of institutional violence are afforded greater freedom and more privileges in the general population. Conversely, those at high risk of institutional violence are housed in units with more restrictions and closer supervision. Such a continuum is essential for balancing individual freedom with the need to protect others from harm.

In each of the systems with which the Monitoring Team is familiar, alternative programs used to reduce the reliance on solitary confinement continue to restrict individuals' out-of-cell time.[16] Among these jurisdictions are the following four systems, which the City Council reported it evaluated as it developed Local Law 42:[17]

- In Cook County, Illinois, after eliminating solitary confinement, disruptive incarcerated individuals were placed in a "Special Management Unit" where they spent time in open rooms or yards with other people in custody *for up to eight hours at a time* under direct supervision from correctional staff.[18]

- The State of Colorado reformed its use of solitary confinement by creating a Management Control Comprehensive (MCC) designation, which offers several restricted housing programs for designated violent infractions. *During the 4 to 6 hours per day out-of-cell*, the programs provide passive recreation, outdoor recreation, and rehabilitative and educational services in a small group setting.[19]

- The State of Maine reduced its use of solitary confinement but did not eliminate it. "Solitary confinement is no longer the default punishment at the Maine State Prison, but rather it is the punishment of last resort when no other option is

---

[16] In addition, see Labrecque, R. et al. (2021). Reforming solitary confinement: the development, implementation, and processes of a restrictive housing step down reentry program in Oregon. *Health and Justice* 9:23. https://doi.org/10.1186/s40352-021-00151-9; and Cloud et al. (2021). 'We just need to open the door': A case study of the quest to end solitary confinement in North Dakota. *Health and Justice,* 9:28. *Available at*: https://healthandjusticejournal.biomedcentral.com/articles/10.1186/s40352-021-00155-5

[17] Council of the City of New York, *Committee Report of the Governmental Affairs Division December 20, 2023*, p. 8-9.

[18] Sheriff Tom Dart, My Jail Stopped Using Solitary Confinement: Here's Why (April 2019), *Washington Post*, available at https://www.washingtonpost.com/opinions/my-jail-stopped-using-solitary-confinement-it-should-be-eliminated-everywhere/2019/04/04/f06da502-5230-11e9-88a1-ed346f0ec94f_story.html, as cited by the Council of the City of New York, *Committee Report of the Governmental Affairs Division December 20, 2023.*

[19] Colorado Department of Corrections, Office of Planning and Analysis. (2024). *SB 11-176 and HB 23-1013 Annual Report; Administrative Segregation for Colorado Inmates.* Available at: https://spl.cde.state.co.us/artemis/crserials/cr126internet/cr1262023internet.pdf

adequate." Special Management Units ("SMU"), which house those in Administrative Control Units and Disciplinary Segregation, are still used for those who commit the most serious offenses and those who pose a threat to the safety of others in a less restrictive status. Maine successfully reduced the number of people in the SMU between 2010 and 2012 and improved certain conditions (e.g., permitting access to radios, televisions, reading material, and some group interaction via recreation and counseling). [20] However, those in Disciplinary Segregation are permitted *only 2 hours out-of-cell per day*.[21]

- In 2022, the State of Massachusetts replaced its restricted housing units with a new program, the Behavioral Assessment Unit ("BAU"), which houses those removed from the general population due to unacceptable risks to facility safety and operations. In these programs, individuals are offered *at least three hours of out-of-cell time each day* and are provided with programming only via tablets and packets, not in-person group sessions.[22]

- A number of restricted housing programs were developed in response to litigation in order to transition away from solitary confinement. These programs continue to limit out-of-cell time and narrow the criteria under which an individual can be placed in these settings. These include the California Department of Corrections

---

[20] Heiden, Z. (2013). *Change is Possible: A Case Study of Solitary Confinement Reform in Maine*. Portland, ME: ACLU Maine. Available at: https://assets.aclu.org/live/uploads/publications/aclu_solitary_report_webversion.pdf

[21]  Maine Department of Corrections. *Policy 15.2 Disciplinary Segregation* Status. Last revised: September 27, 2022. Available at: https://www.maine.gov/corrections/sites/maine.gov.corrections/files/inline-files/49876476_0.pdf.

[22] Massachusetts Department of Correction, Behavior Assessment Unit Monthly. Available at: https://www.mass.gov/lists/behavior-assessment-unit-bau-monthly.

and Rehabilitation (20 hours out-of-cell per week)[23]; the Rhode Island Department of Corrections (3-4 hours out-of-cell per day)[24]; the Alameda County Sheriff (CA) (2-3 hours out-of-cell per day)[25]; the Santa Clara County (CA) jail (7-14 hours out-of-cell per week)[26]; and the Sacramento, CA jail (7-17 hours out-of-cell per week)[27].

The City Council's Committee Report and Drs. Gilligan and Lee's letter to the City Council identified three programs as potential alternatives to solitary confinement that could address individuals following serious acts of violence—the Resolve to Stop the Violence Project (RSVP), Merle Cooper and the Department's Clinical Alternatives to Punitive Segregation (CAPS). While laudable programs, as discussed in more detail below, not all of these programs were designed to respond to individuals who engaged in serious acts of violence while incarcerated, and so their applicability as models in this context is limited. Both RSVP and Merle Cooper have different target populations; their program designs reflect that core difference, and both programs *exclude* those who have recently engaged in serious violence while in custody. The CAPS program, while designed to address those who engaged in institutional misconduct, selects a specific subset of those individuals, those with serious mental illnesses. These differences prevent the program models from being *directly* exported to address the population who engage in serious violence in this Department.

---

[23] Holden, L. "California moves to reform solitary confinement rules," *The Sacramento Bee*, October 17, 2023. Available at: https://www.corrections1.com/solitary-confinement/articles/calif-moves-to-reform-solitary-confinement-rules-wWj7Amwb0u0zof2j/

[24] Rhode Island Department of Corrections Policy #12.28 DOC "Restorative Housing Program", Attachment 1.

[25] Babu v County of Alameda *Consent Decree*, 5:18-cv-07677-NC, dkt 266-1, ¶ III.D.1.a.(i) and III.D.1.b.(i).

[26] Chavez v County of Santa Clara *Remedial Plan*, 1:15-cv-05277-RMI, dkt. 109-1, ¶ VII.E.3.(b)

[27] Mays v County of Sacramento *Remedial Plan*, 2:18-cv-02081-TLN-KJN, dkt. 85-1, Attachment A ¶ VIII.E.3.b.(ii) and VIII.E.3.(c).(a).

- The Merle Cooper program was a program operated in a New York State prison and targeted those who were convicted of and incarcerated for violent offenses. It was not designed to address those who have engaged in serious violence while incarcerated.[28] Although some of the behaviors may be similar, the dynamics and risks to other individuals in custody differ significantly. Participation in the program was voluntary, and individuals had to admit guilt for their committing offense(s). Participants were held in dormitory settings or double-celled, and some cell doors were left unlocked at night. While the Merle Cooper program appears to have had a positive impact on its participants, their circumstances and dynamics are quite different from those who commit serious violence against others while in custody.

- The RSVP program operates in the San Francisco, CA jail and targets those convicted of violent offenses in the community to reduce their risk of recidivism. It does not target those who commit serious violence in the jail; in fact, it explicitly excludes various categories of people in custody who are typically responsible for violence in jails, including those involved in street gangs and those with other high-security issues. Notably, those in administrative separation are not permitted to participate in RSVP due to their recent violent and assaultive behavior. Participation in the program is voluntary, and the program's primary aim is to reduce the risk of recidivism after release rather than to address institutional violence directly. These differences in target population and exclusions mean that the reported positive impact on violence reduction cannot simply be

---

[28] Correctional Association of New York (n.d.). *Clinton Correctional Facility: 2012-2014.* Author: New York, NY. pgs.56-63. Available at: https://drive.google.com/file/d/1DXcZOz7cKKTsUUj2HkU5XmQvNJgmVTvM/view.

generalized as a likely impact on those who commit serious institutional violence.[29] It is important to note that the San Francisco jail maintains units for disciplinary separation, administrative management, and/or administrative separation, all of which provide minimal out-of-cell time (e.g., individuals in administrative separation only receive *one hour of out-of-cell time* per day).

- The Department's Clinical Alternative to Punitive Segregation (CAPS) serves those with serious mental illnesses (SMI) who engage in serious institutional misconduct. The program is designed to offer a full range of therapeutic interventions and activities for these individuals (e.g., group and individual therapy, art therapy, medication counseling, etc.) and is supposed to be richly staffed by mental health clinicians, treatment aids, therapists, and psychiatric providers, along with DOC uniform staff. Both the Department and published research have reported positive outcomes among participants (e.g., fewer uses of force and lower rates of self-harm compared to other types of housing units).[30] These benefits likely flow from the tailoring of the intervention to the needs of the SMI population, specifically the behavioral challenges related to their psychiatric symptoms. However, the specific interventions utilized by the rich complement of clinical staff in CAPS is not necessarily tailored to the needs of a target population with a different profile. The antecedents of violent behavior among those who are not mentally ill are driven by other factors, particularly SRG-related conflict.

---

[29] Moreover, the National Institute of Justice's Crime Solutions website rates the program's effectiveness as "inconclusive." This is due to a lack of evidence for a definitive rating, with only one study published in a peer-reviewed journal which raised concerns about program fidelity. *See* https://crimesolutions.ojp.gov/rated-programs and https://crimesolutions.ojp.gov/rated-programs/inconclusive-programs-list.

[30] Homer Venters et al., "From Punishment to Treatment: The "Clinical Alternative to Punitive Segregation" (CAPS) Program in New York City Jails," International Journal of Environmental Research and Public Health 13, no. 2 (February 2016): 182, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4772202/ and New York City Department of Correction, CAPS and PACE Backgrounder, https://www.nyc.gov/site/doc/media/caps.page .

All of these programs have features that are instructive for program design. And while the interventions have reportedly benefited their participants, the substantial differences in their target populations mean they cannot be directly or broadly applied to the needs and security challenges posed by those who commit serious acts of violence while in custody. Programs designed to reduce recidivism, those serving individuals with serious mental illnesses, and policies that have proven effective in the juvenile justice system cannot simply be imported into a jail setting that is struggling to control institutional violence among adults. While a proper staffing complement and structured environment are, of course, essential for a successful restricted housing program, differences in the size of the target populations/number of housing units needed and the number/type of staff available are important contextual factors that cannot be ignored. In short, program models from other jurisdictions and other settings inspire innovation but must also be specifically tailored to address the unique circumstances surrounding institutional violence in the NYC jail system.

Nationwide, important advances have been made to develop programs that work to eliminate the harmful effects of isolating individuals in a cell for 20 hours or more hours per day. Individuals who engage in serious acts of violence can be safely managed in settings that permit more out-of-cell time than traditionally offered in solitary confinement. As the Monitoring Team has observed in its work throughout the nation and as various jurisdictions have demonstrated, certain restrictions and other requirements are necessary to operate a safe jail system. The Monitoring Team is not aware of any jurisdiction in the country that permits individuals who have committed serious acts of violence while incarcerated to have the same out-of-cell time as those in the general population.

**HISTORY OF DOC'S EFFORTS TO ELIMINATE SOLITARY CONFINEMENT AND TO MANAGE INDIVIDUALS WHO COMMIT SERIOUS ACTS OF VIOLENCE WHILE IN CUSTODY**

Beginning in 2013, the Department began its journey to eliminate its practice of "Punitive Segregation" or "PSeg," which was the Department's name for solitary confinement. Individuals found guilty of a broad range of infractions were sentenced to periods of up to 90 days and were housed in single cells for 23 hours per day, with no access to rehabilitative programming and significantly restricted visitation and recreation. The Department gradually eliminated the use of PSeg for various subsets of incarcerated individuals: in 2013, PSeg was prohibited for seriously mentally ill individuals; in 2014, PSeg was prohibited for adolescents aged 16- and 17- years-old; in 2016, PSeg was prohibited for all incarcerated individuals aged 21 and younger; and in 2019, PSeg was abolished entirely.[31]

Since 2013, when the Department began its effort to abolish solitary confinement, it has created various forms of restricted housing but has struggled to implement them effectively. Although PSeg was eliminated "on paper," the Department's efforts to develop alternative programs for those who commit serious, violent rule infractions have been plagued by poor program implementation and have, at times, resulted in incarcerated individuals experiencing conditions that were not substantially different from PSeg.[32]

The Department's alternative program models aim to limit the harms that accompany extreme forms of isolation by increasing out-of-cell time, promoting social interaction, and offering more rehabilitative programming. The Department's implementation struggles stem from its well-documented problems in implementing the most fundamental aspects of sound

---

[31] Declaration of Lynelle Maginley-Liddie, submitted 7/22/24, dkt. 758-1.

[32] See Monitor's June 30, 2022 Report (dkt. 467) at pg. 21; Monitor's October 5, 2023 Report (dkt. 581)at pgs. 6-7.

correctional practice; however, this does not indicate that the program models themselves are inherently flawed.

New York State passed the Humane Alternatives to Long-Term Solitary Confinement Act, or "HALT Act," on April 1, 2021. The law recognizes correctional facilities have a legitimate need to operate housing units that restrict individuals' freedom and movement to safely manage those with a high propensity for violence. The Act limits the duration of "segregated confinement," defined as more than seven hours per day in a cell, to no more than 15 days. In addition, HALT permits the use of programs offering only seven hours of out-of-cell time per day. The Department's own initiatives, requirements from the Board of Correction, and HALT have guided the Department's efforts to create alternatives to solitary confinement by designing programs that provide access to programming and services while limiting out-of-cell time to less than what is provided to the general population.

For example, the Risk Management Accountability System (RMAS), codified in the BOC's Restrictive Housing Final Rule on June 8, 2021, was designed to provide accountability for institutional violence. It provided for a range of programming and services and limited out-of-cell time to 10 hours per day. However, the Department never implemented RMAS due in part to the Monitoring Team's finding that the Department's inability to properly implement the program would create significant safety risks to incarcerated people and staff.[33] The Monitoring Team's concerns were based on findings that the Department was not prepared to or capable of implementing the model (i.e., concerns about leadership, staff selection and training, and their lack of skill in proactive supervision and basic security practices, and the Department's history of hasty and ill-planned implementation) along with concerns about RMAS's design, particularly

---

[33] Monitor's June 30, 2022 Report, pgs. 22-27.

that the regulations did not require people in custody to engage in programming in order to progress to less restrictive settings. At the Monitoring Team's suggestion, the Department hired Dr. James Austin, a consultant with expertise in restricted housing models to assist with the development of a program model that would address the need for an effective response to people who commit serious violence while in custody and who, along with the Monitoring Team, could guide the planning and early implementation of the program. The Action Plan includes a requirement to manage incarcerated individuals following serious incidents of violence (Action Plan §E. ¶ 4) and requires the strategy to comply with the HALT Act, to reflect sound correctional practice, and to be approved by the Monitor.

In March 2023, the Department implemented the program—a revitalized Enhanced Supervision Housing program ("ESH," now called "RESH" because of its location in the RMSC facility) that provides for both programming and extended recreation periods and that limits out-of-cell time to 7 hours per day. RESH has two levels: Level 1, in which individuals' movements are restricted during out-of-cell time via restraint desks and where individuals recreate in individual pens, and Level 2, in which individuals have freedom of movement during congregate activities and may participate in congregate outdoor recreation. During their 7 hours out-of-cell per day, individuals in both Levels may access structured programming led by a Program Counselor or community vendor for 4 hours and are afforded 3 hours of recreation. Each person must meet individualized programming requirements and remain infraction-free to promote to a less restrictive setting (i.e., from Level 1 to Level 2 and from Level 2 to the general population). Each individual's progress is assessed every 15 days, and individuals are eligible to be promoted to a less restrictive setting every 30 days.

The program design is sound and incorporates many features found in jurisdictions that have successfully reduced their reliance on extended solitary confinement. The Department's early implementation of the program was fraught with problems, as detailed in the Monitor's April 18, 2024 Report (dkt.706). However, since the appointment of a capable leader in December 2023 who has a strong understanding of effective security practices, the operation of RESH has significantly improved. Despite this progress, problems remain, particularly with regard to staffing and the proper execution of various security protocols essential for safely managing individuals who engage in serious violence (e.g., conducting searches, properly positioning staff, and properly securing restraint devices). While the rates of use of force and violence have decreased during the program's 15-month tenure, they remain higher than the average within the Department due, in part, to the program's heavy concentration of people who frequently resort to violence in their interactions with staff and other people in custody. The Department and the Monitoring Team continually assess both the factors contributing to the program's improvement and the ongoing challenges, working to enhance the program's implementation further.[34]

In summary, the Department's transition from its legacy practice of solitary confinement, known as PSeg, to a more viable alternative that mirrors elements found in generally accepted correctional practice, RESH, has proceeded slowly and has faced numerous challenges.[35] The new program model aims to limit the harms that accompany extreme forms of isolation by increasing out-of-cell time, promoting social interaction, and offering rehabilitative programming. The Department's implementation struggles stem from the Department's well-

---

[34] Monitor's November 22, 2024 Report (dkt. 802), pgs. 28-34.

[35] See, also, Monitor's April 18, 2024 Report (dkt. 706), pgs. 48 to 49 regarding the use of NIC and involuntary protective custody.

documented problems in implementing the most fundamental aspects of sound correctional practice; however, this does not indicate that the program model itself is inherently flawed.

### IMPACT OF LL42'S REQUIREMENTS ON THE DOC'S OPERATIONS

The Monitoring Team appreciates the principles underlying the requirements of LL42 and its overarching goal of improving the conditions of confinement in the NYC jails. Importantly, LL42 seeks to eliminate solitary confinement (§ 9-167 (b)).  The law defines solitary confinement as "any placement of an incarcerated person in a cell, other than at night for sleeping for a period not to exceed eight hours in any 24-hour period or during the day for a count not to exceed two hours in any 24-hour period" (§ 9-167 (a)). The law goes on to state that "All incarcerated persons must have access to at least 14 out-of-cell hours every day except while in de-escalation confinement pursuant to subdivision c of this section and during emergency lock-ins pursuant to subdivision j of this section" (§ 9-167 (i)(1)).

Relatedly, restricted housing is defined as "any housing area that separates incarcerated persons from the general jail population on the basis of security concerns or discipline, or a housing area that poses restrictions on programs, services, interactions with other persons or conditions of confinement."[36] (§ 9-167 (a)). LL42 requires a large number of procedures for placement in restrictive housing, some of which appear to be lengthy and complicated (§ 9-167 (f)). They include the right to representation by legal counsel or advocate (§ 9-167 (f)(1)(i)), the right to present evidence and cross-examine witnesses (§ 9-167 (f)(1)(ii)), the right to 48-hours' notice of the reason for the proposed placement and the supporting evidence (§ 9-167 (f)(1)(v)),

---

[36] LL42's definition of restrictive housing specifically "excludes housing designated for incarcerated persons who are: (1) in need of medical or mental health support as determined by the entity providing or overseeing correctional medical and mental health, including placement in a contagious disease unit; (2) transgender or gender non-conforming; (3) in need of voluntary protective custody; or (4) housed in a designated location for the purpose of school attendance" (§9-167 (a)).

and adequate time to prepare for the hearing and the requirement to grant reasonable requests for adjournment (§ 9-167 (f)(1)(vi)), among others.

Within restricted housing settings, LL42 has specific requirements for the use of enhanced restraints: "A person placed in restrictive housing must have interaction with other people and access to congregate programming and amenities comparable to those housed outside restrictive housing, including access to at least seven hours per day of out-of-cell congregate programming or activities with groups of people in a group setting all in the same shared space without physical barriers separating such people that is conducive to meaningful and regular social interaction" (§ 9-167(h)(4)). The requirements are further explained as follows: "Incarcerated persons may congregate with others and move about their housing area freely during out-of-cell time…" (§ 9-167(i)(2)). In other words, devices commonly used in restricted housing settings, such as restraint desks, gates, or other barriers, are prohibited during small group programming with individuals admitted to restricted housing programs. The law also requires the Department to "utilize programming that addresses the unique needs of those in restricted housing, [including]…core educational programming…evidence-based therapeutic interventions and restorative justice programs…[that] follow best practices for violence interruption" (§ 9-167 (h)(5)).

In terms of the individual's length of stay in restricted housing, LL42 requires an individual to be removed from restricted housing if the individual "has not engaged in behavior that presents a specific, significant, and imminent threat to the safety and security of themselves or other persons during the preceding 15 days" (§9-167 (h)(3). Furthermore, the law states that "in all circumstances, the department shall discharge an incarcerated person from restrictive housing within 30 days after their initial placement" (§ 9-167 (h)(3). The law also stipulates that

"the department shall not place an incarcerated person in restrictive housing for longer than necessary and for nor more than a total of 60 days in any 12 month period" (§9-167 (h)(1).

While the Monitoring Team appreciates LL42's apparent intent to ensure that solitary confinement is in fact eliminated and that alternative programs are appropriately designed, the Monitoring Team has grave concerns that some of LL42's requirements will have the unintended impact of increasing the risk of harm in the jails rather than reducing it, as described in more detail below.

- _Definition of Solitary Confinement_: LL42's definition of solitary confinement is not aligned with any definition of solitary confinement in the field, as illustrated by the chart containing definitions of solitary confinement provided in Appendix C of this report. While there is no standard definition of solitary confinement, there are common parameters, which include limiting out-of-cell time to between 1 and 4 hours per day for prolonged periods, affording little human contact and no congregate engagement, and denying access to programming. Notably, one of the most frequently cited definitions, the United Nations' "Mandela Rules," defines solitary confinement as an approach where individuals are limited to 2 hours out-of-cell per day.[37] LL42's definition of solitary confinement goes well beyond that and appears to conflate solitary confinement with attempts to limit out-of-cell time more generally. In other words, in this instance, LL42's definition alters the generally accepted standard of 4 hours to 14 hours of out-of-cell time, which represents a 350% increase over standard correctional practice. The elimination of the use of solitary confinement must be addressed separately from other

---

[37] _See_, UN General Assembly, _United Nations Standard Minimum Rules for the Treatment of Prisoners (the Nelson Mandela Rules): resolution / adopted by the General Assembly_, 17 December 2015, A/RES/70/175, Rules 43 and 44 available at: https://documents-dds-ny.un.org/doc/UNDOC/GEN/N15/443/41/PDF/N1544341.pdf

requirements regarding limitations on out-of-cell time. It is important for the definition of solitary confinement to comport with the standard description of the practice in order to disentangle it from other correctional tools, such as restrictive housing, that are critical and necessary in responding to serious acts of violence and for the safety of the jails.

- *Universal Out of Cell Time*. LL42 requires ***all*** incarcerated individuals to have the same out-of-cell time. The only minor exceptions to this rule are for de-escalation confinement and emergency lock-ins, which are limited to 4 hours per incident (along with additional restrictions discussed in more detail in the respective sections below). A global approach to out-of-cell time for all individuals in custody significantly endangers both persons in custody and staff and is not consistent with sound correctional practice. Those with a demonstrated propensity for serious violence must be supervised in a manner that is safe and effectively mitigates the risk of harm they pose to others. Some reduction in out-of-cell time to less than 14 hours per day, with appropriate safeguards, is a necessary tool in a correctional setting. The prohibition of any restriction on out-of-cell time for those who engage in serious acts of violence has never been imposed in any correctional system in the country with which the Monitoring Team has had experience. Permitting unrestricted and barrier-free out-of-cell time for 14 hours for those individuals in a congregate setting is counter to the most basic safety and security imperatives which seek to minimize opportunities for the commission of further acts of violence. Such a profound deviation from standard correctional practice will permit congregate, interpersonal and barrier-free interaction for virtually all waking hours of the day, thereby negating the most basic correctional imperative to minimize opportunities for committing violence upon other people in custody or correctional staff. The Department must be able to supervise and

36

manage those with a demonstrated propensity for serious violence in a manner that effectively mitigates the risk of harm they pose to others. More specifically, some limitations on out-of-cell time (e.g., such as the standards set by HALT) are appropriate in this situation and do not constitute solitary confinement. The Monitoring Team does not believe that the prohibitions on restricting out-of-cell time as imposed by LL42 permit the safe operation of the jails and will only exacerbate the current dangerous conditions.

- *Procedures for Placement in Restricted Housing*. Placement procedures are necessary to ensure that only those individuals who meet certain, narrow criteria are admitted to restricted housing and to ensure due process. LL42 imposes a number of procedures for placement, some of which appear to be protracted and complicated. They involve significant procedural steps that create opportunities for potential delay by those who commit acts of violence, preventing the Department from addressing their behavior in a timely and effective manner, thereby impeding the safe operation of the jails and exacerbating the current dangerous conditions.

- *Time Frames for Discharge from Restrictive Housing*. LL42's time-based criteria for the use of restricted housing do not account for the fact that some individuals may continue to engage in violent misconduct or otherwise demonstrate that they remain a risk to safety and security. Additionally, LL42's time limits are incongruent with the time required to properly implement an evidence-based program curriculum aimed at teaching skills that can reduce the likelihood of subsequent violence, which is also a requirement of the law.

37

[38] None of the evidence-based curricula with which the Monitoring Team is familiar can be completed within the proposed 15/30-day maximum length of stay in restrictive housing. The time-based criteria also eliminate any incentive for individuals to engage in pro-social behavior or programming, as the passage of time will permit their release. The Monitoring Team is not aware of any basis for these time limitations given the conditions in restricted housing (e.g., they permit far more out-of-cell time, programming and meaningful interaction than traditional solitary confinement).[39] LL42's requirements hinder the development of appropriate responses to serious violent behavior by mandating discharge from the program or preventing readmission under certain conditions. While controls are essential to mitigate the possibility that individuals remain in restricted housing when it is no longer necessary, implementing LL42's time-based criteria would preclude the program's ability to safely manage individuals following serious acts of violence. Accordingly, the Monitoring Team does not believe that the mandatory time frames for discharge and readmission as imposed by LL42 will permit the safe operation of the jails and would only exacerbate the current dangerous conditions.

- *Prohibitions on Certain Types of Enhanced Restraints*. LL42's requirements for restricted housing prohibit the use of restraint desks and other barriers in congregate settings. The violent propensities of those in RESH necessitate security enhancements to minimize the risk of further violence while in the program. The number of violent attacks that have occurred during RESH's 15-month tenure illustrates that a high risk of harm remains,

---

[38] *See* Monitor's June 30, 2022 Report at pg. 25 which includes a discussion regarding the inability to address behavior change with set time periods for graduation.

[39] Notably, many of the models presented as the basis for LL42 do not have any limitation on the length of stay.

even when individuals are placed in restrictive settings. Furthermore, the ability to provide small group programming and meaningful human interaction—and to do so safely via the use of enhanced restraints—is one of the elements that allow restrictive housing to avoid the adverse consequences associated with solitary confinement. The Department is mandated to provide safe environments and to protect all individuals in custody from an unreasonable risk of harm, including those in restricted housing.

## CONCLUSION

While LL42 works to eliminate solitary confinement and, theoretically, permits restrictive housing, in practice, the Law does not permit the Department the necessary discretion to develop a viable restrictive housing model. First, LL42 does not permit any restriction on out-of-cell time for individuals placed in restrictive housing, which is counter to standard correctional practice and eliminates an important incentive for prosocial conduct. Second, LL42 sets arbitrary timeframes for discharge from restrictive housing (e.g., an individual must be removed from the unit if the individual "has not engaged in behavior that presents a specific, significant, and imminent threat" in a 15-day period and must be discharged within 30 days, with no exceptions regardless of the individual's behavior) that do not account for whether an individual continues to pose a risk of harm to others' safety and that are at odds with the ability to deliver evidence-based programming. Third, the required procedures for placement in restricted housing are protracted, including significant procedural requirements that provide myriad opportunities for undue delay by the perpetrator of violence before the Department can act to address the underlying conduct. Finally, the Law prohibits the use of standard enhanced restraints that permit safe programming in a congregate setting, providing an important pathway to meaningful human interaction and violence reduction. In short, the constraints this Law places on the design of a

restrictive housing model would eliminate many of the elements required for a safe strategy for managing those who engage in serious violence or who otherwise pose a demonstrable threat to safety and ultimately, would further exacerbate the jails' unsafe conditions.  The Monitoring Team's recommendations for next steps are outlined in the Conclusion section of this Report.

# RESTRAINTS

Various restraint devices are used to limit the range of motion of a person's hands, arms, and legs in correctional settings. This reduces the risk of violent behavior or escape and protects others in the vicinity of an agitated person and those with a known propensity for violent behavior.

## GENERALLY ACCEPTED PRACTICE & DOC'S POLICIES

Restraints are generally of two types, routine restraints and enhanced restraints. Generally accepted practices for each type are discussed separately below.

- *Routine Restraints*

Common devices used for routine restraints include handcuffs or flex cuffs, waist chains, and leg shackles. Routine restraints are standard practice in jails and prisons and are applied numerous times daily for a variety of well-established safety and security reasons. Depending on an individual's movement, they may be placed in restraints multiple times in a single day or on multiple days in a row. Within a facility, restraints are routinely applied immediately following an assault or a use of physical force in order to maintain control of the individual(s) and when escorting agitated individuals to different locations within the facility, such as a clinic for medical care after an incident or to intake for rehousing). In these situations, restraints are routinely utilized to control the movement of the agitated person so that they cannot inflict harm on escort staff or other people in custody they may encounter during escort.

Restraints are also routinely used when transporting people in custody beyond a facility's perimeter, such as to another facility, court appearances, or the hospital. During such transport, the goals of access and efficiency require groups of individuals to be transferred together on the same bus, regardless of custody level, interpersonal disputes, or violence risk. While some

individuals on the bus may not pose an immediate threat, safety and security procedures require defaulting to the highest security measure for all passengers to prevent potential violence among them and to minimize the risk of escape. It is particularly important that restrained individuals are not in close proximity to unrestrained individuals, as a restrained person cannot protect themselves from potential aggression. Accordingly, all individuals in a transport vehicle must be restrained to protect everyone's safety.

When using routine restraints, staff members do not need to obtain authorization from a supervisor or medical staff before, during, or after the application of the routine restraints, as this is part of the expected safety protocol in a correctional facility. Facilities do not systematically track the use of routine restraints. While the use of routine restraints may be reported in certain situations (for example, a use of force may also mention the application of restraints), the use of routine restraints is not independently tracked in a manner that can be aggregated or monitored. Such tracking of a standard routine security practice would be both unnecessary and burdensome.

The Department's restraint policy reflects generally accepted practices for using routine restraints, particularly that they can be utilized at the officer's discretion under certain circumstances without additional protocol. As discussed above, staff discretion in using routine restraints based on the circumstances of an event is critical to the safe operation of the jails. The Monitor approved this approach in 2016 when the restraint policy was approved pursuant to the *Nunez* Court Orders.[40]

---

[40] *See* Monitor's October 31, 2016 Report (dkt. 291) at pgs. 30 to 31.

- *Enhanced Restraints*

To enhance safety for people in custody and staff, additional security measures, sometimes referred to as "enhanced restraints," are utilized for specific incarcerated individuals following their involvement in serious acts of violence. Typical measures include restraining such individuals with an established and documented propensity for violence during all movements outside their cells and/or to facility locations off the housing unit by using security mitts or handcuff safety covers to prevent tampering with the device. Some jurisdictions utilize soft programmatic restraints, such as body cuffs, where individuals' hands and legs are secured using webbed straps to inhibit their movement when in a congregate setting. The Department's policy for providing due process for the use of enhanced restraints aligns with the generally accepted correctional practice.

## IMPACT OF LL42'S REQUIREMENTS ON DOC'S OPERATIONS FOR USING RESTRAINTS

The overarching principles underlying LL42's requirements related to restraints are consistent with sound correctional practice. In particular, LL42 requires that "only the least restrictive form of restraints may be used and may be used no longer than is necessary to abate such imminent harm." Further, "[t]he department is prohibited from engaging in attempts to unnecessarily prolong, delay or undermine an individual's escorted movements." These are practical requirements and are also consistent with the *Nunez* Court Orders and the restraint policy approved by the Monitor in 2016.

LL42 defines restraints as "any object, device or equipment that impedes movement of hands, legs, or any other part of the body." (§ 9-167(a)). Because no distinction is made between the two types of restraints, this definition appears to capture the application of both routine and

enhanced restraints.[41] Similarly, LL42 includes several procedural requirements related to the use of restraints, which, as defined, would require the same process for both routine and enhanced restraints. First, the law requires that the use of restraints may only occur if "an individual determination is made that restraints are necessary to prevent an imminent risk of self-injury or injury to other persons" (§ 9-167 (e)(1)). This means that each and every application of restraints—both routine and enhanced—requires an individualized determination of an imminent risk of injury before the restraints can be applied.

Further, to continue the use of restraints after two consecutive days, LL42 requires a hearing "to determine if the continued use of restraints is necessary for the safety of others." (§ 9-167(e)(2)). Notably, the standard for the initial application of restraints (i.e., an individualized determination) and the standard for continued use (i.e., a hearing) are not the same. The requirement for a *hearing* applies to the use of both routine and enhanced restraints to the extent they are utilized on an individual for two or more consecutive days. The hearing requirements imposed by BOC regulations (§ 6-27 (m), requiring compliance with 40 RCNY § 6-23) grant the right to 48-hour notice of the hearing (§ 6-23 (c)(1)), the right to legal representation (§ 6-23 (d)(6)(i)), the right to appear at the hearing (§ 6-23 (d)(6)(ii)), the right to present evidence and call witnesses (§ 6-23 (d)(6)(iv)), the right to review evidence 48 hours prior to the hearing (§ 6-23 (d)(6)(v)(A)), and the right to appeal the decision (§ 6-23 (h)(1)), among others. Additionally, "[a]ny continued use of restraints must be reviewed by the department on a daily basis and discontinued once there is no longer an imminent risk of self-injury or injury to other persons. Continued use of restraints may only be authorized for seven consecutive days" (§ 9-167(e)(2)). In summary, in order to utilize either routine or enhanced restraints on the same

---

[41] See Board of Correction regulations § 6-27 (a)(3) and (b) regarding routine use of restraints.

individual for more than two days in a row, LL42 requires the Department to hold a hearing with significant procedural and due process requirements and to review their continued use on a daily basis thereafter and prohibits the use of restraints for more than seven consecutive days.

LL42 also includes specific provisions related to restraints for individuals under the age of 22 (i.e., 18- to 21-year-old incarcerated individuals, termed "Young Adults"). For this age group, the law limits the use of restraints. Restraints are not permitted with this age group except in the following circumstances "(i) during transportation in and out of a facility, provided that during transportation no person shall be secured to an immovable object; and (ii) during escorted movement within a facility to and from out-of-cell activities where an individualized determination is made that restraints are necessary to prevent an immediate risk of self-injury or injury to other persons." (§ 9-167 (e)(1)). As drafted, it appears that the Department is prohibited from utilizing any type of enhanced restraints on individuals under the age of 22.

For the reasons outlined below, the Monitoring Team is concerned that some of these requirements are inconsistent with sound correctional practice, burdensome, and, most important, will have the unintended impact of increasing the risk of harm in the jails rather than reducing it. While the Monitoring Team's evaluation of these requirements is ongoing, a non-exhaustive list of the major issues that raise concerns is provided below:

- *Procedural Requirements for the Use of Routine Restraints*. As discussed above, given that the law's definition of restraints includes *all* restraints, LL42 includes multiple procedural requirements related to the use of *routine* restraints. LL42 requires an individualized assessment of each individual's characteristics at the initial application of the routine restraints and requires a hearing for their continued use. Generally accepted practice for the use of *routine* restraints, as discussed above, requires an

assessment of the specific *circumstances* of a given situation, such as safely transporting a group of people in custody in a vehicle[42] or safely escorting an agitated person, rather than a particular *individual's characteristics* at a specific moment.[43] The standard applied by LL42 ("restraints are necessary to prevent an imminent risk of self-injury or *injury* to other persons," § 9-167 (e)(1); emphasis added) is not aligned with standard correctional practice (i.e., more broadly defined as a risk of *harm* or escape).

Furthermore, in order to actually implement these requirements, the Department would need to document every use of routine restraints and the outcome of each individual determination. Such documentation would be necessary in order to monitor compliance with these requirements and to determine if the use of routine restraints would trigger the requirement for a hearing. This would require tracking potentially thousands of routine restraint applications each day, an unnecessarily burdensome task.

The fact that this process creates situations where routine restraints may not be applied to certain individuals because they do not meet the LL42 standards is also dangerous and negatively impacts jail operations in many ways, including a need for additional staff and other safety and logistical problems (e.g., separate buses for those who cannot be restrained and those who are restrained). The Monitoring Team is unaware of any jurisdiction in the country that requires a similar procedure for the application of routine restraints, for either the initial application or for their continued

---

[42] LL42 does not require an individualized determination for use of routine restraints for individuals under the age of 22. The basis for this distinction between those under the age of 22 and those above the age of 22 is unknown.

[43] The concerns outlined here also apply to LL42's specific requirement that escorts for individuals under the age of 22 require an individualized determination.

use. [44] These procedural requirements are excessive and create a burdensome

bureaucracy that compromises the safe and efficient operation of the jails.

- _Standard for Enhanced Restraints_. The standard and process for the use of enhanced

  restraints also raises questions of efficacy.  It is important to note that enhanced restraints

  are used in situations where a serious incident has occurred, the potential for harm to self

  or others is elevated, and/or the individual has a known, established propensity for violent

  behavior. While some level of due process is necessary, the requirements of LL42 and the

  corresponding BOC regulations create timelines and situations that are not operationally

  feasible (e.g. the hearing for the use of enhanced restraints must occur after 2 days of

  continuous use while the notice for such a hearing must be 48 hours).  Further, there are

  concerns that certain requirements may create unnecessary delay in the adjudication of

  these matters. Accordingly, as designed this only creates dangerous situations in which

  the process for the use of enhanced restraints is unnecessarily bureaucratic and impedes

  the ability to utilize enhanced restraints safely to protect others from harm.

- _Prohibition of Enhanced Restraints for Individuals Under the Age of 22_. The prohibition

  of the use of all enhanced restraints for individuals under the age of 22 raises serious

  concerns. Generally accepted practice allows for the use of certain types of enhanced

  restraints—such as front cuffing, security mitts or handcuff protective covers—in cases

  where individuals have engaged in violent conduct or otherwise pose an ongoing threat to

  safety, regardless of their age.  The prohibition against the use of enhanced restraints for a

---

[44] The requirements are particularly impractical for routine restraints because in order to comply with the regulations for the hearing, the individual and their advocate must be provided 48 hours' notice of the hearing. In practice, this means that notice would be required at the time of the initial application in order to meet the 48-hour timeline. In other words, notice would need to be provided upon every initial application of routine restraints in case routine restraints were to be needed for more than two days.

specific age group, regardless of the individual's behavior, propensity for violence, or the immediate circumstances is dangerous and does not enable the Department to transport such individuals in a safe and secure manner.

## CONCLUSION

The well-intentioned goals of LL42—ensuring that restraints are used minimally and with appropriate process—must be carefully considered along with the operational realities of maintaining safety and security in correctional facilities. While procedural safeguards for the use of enhanced restraints are necessary, imposing the same stringent requirements on routine restraints creates an impractical bureaucratic burden. The fact that the law does not differentiate between routine and enhanced restraints complicates daily operations and introduces unnecessary risks, potentially making the jails less secure rather than safer. Additionally, the blanket prohibition of enhanced restraints for individuals under 22 overlooks the reality that violent behavior is not exclusive to older people in custody and may impede the ability to protect both staff and incarcerated individuals. Effective correctional policy must balance oversight with pragmatism, ensuring that necessary security measures remain functional while upholding the rights and dignity of those in custody. If reforms are to be effective, they must be guided by the realities of sound correctional management rather than by a rigid framework that may ultimately undermine the collective goal of safety in the jails. The Monitoring Team's recommendations for next steps are outlined in the Conclusion section of this Report.

# DE-ESCALATION CONFINEMENT

When an individual poses an imminent threat to another person's safety or engages in violent conduct, they must be separated from other people in custody and de-escalated until they can safely return to a housing unit.

## GENERALLY ACCEPTED PRACTICE

De-escalation confinement (which generally occurs in a cell) is an essential behavior management tool for quickly addressing situations in which violence has already occurred or there is a need to prevent a further act of violence. When an individual is agitated to the point of posing an imminent threat to another person's safety or has already caused physical harm, it is crucial to separate them from others. This separation removes the individual from potential victims, helps staff to restore control in the environment, mitigates the risk of retaliation by others, and provides the individual with time and space to de-escalate so that they can safely return to their environment.

The guiding principle for determining whether the individual has, in fact, de-escalated and can safely return to the housing unit, is to ensure that the individual does not pose an imminent risk of harm.  This is why the de-escalation process is typically interactive—it is designed to enable corrections staff and medical/mental health clinicians to identify the source of the individual's distress, to help them regain emotional and behavioral control, and ultimately determine whether the risk of harm has diminished. The time needed for the risk of harm to subside depends on both the individual—some people have better-developed coping skills for managing emotional distress than others—as well as the specific circumstances of the incident, as some situations cause a higher level of distress than others. Accordingly, there is no predetermined, uniform time period for de-escalation; instead, it must be tailored to the unique

circumstances of both the individual and the situation. As the duration of a de-escalation event increases (e.g., beyond 3 or 4 hours) safeguards may be put in place, such as requiring another staff member or mental health clinician to attempt to engage with the person or requiring a level of review and authorization by someone higher up the chain of command.

### IMPACT OF LL42'S REQUIREMENTS ON DOC'S OPERATION OF DE-ESCALATION CONFINEMENT

The Monitoring Team appreciates LL42's focus on ensuring that de-escalation confinement is utilized for the least amount of time necessary and under appropriate circumstances. LL42 defines de-escalation confinement as "holding an incarcerated person in a cell immediately following an incident where the person has caused physical injury or poses a specific risk of imminent serious physical injury to staff, themselves or other incarcerated persons" (§ 9-167 (a)). LL42 prohibits the process of de-escalation from occurring in intake or decontamination showers (§ 9-167 (c)(1)) and imposes various requirements for monitoring those in de-escalation (§ 9-167 (c)(2) and (3)). These protocols are aligned with the generally accepted practice.

However, LL42 requires "[t]he maximum duration a person can be held in de-escalation confinement shall not exceed four hours immediately following the incident precipitating such person's placement in such confinement" (§ 9-167(c)(6)). Further, LL42 places further limits on the use of the tool by requiring that "Under no circumstances may the department place a person in de-escalation confinement for more than four hours in any 24-hour period, or more than 12 hours in any seven-day period" (§ 9-167(c)(6)). Finally, LL42 permits that "[t]hroughout de-escalation confinement, a person shall have access to a tablet or device that allows such person to make phone calls outside of the facility and to medical staff in the facility" (§ 9-167(c)(4)).

50

The Monitoring Team is deeply concerned about several of LL42's requirements for de-escalation including:

- _Standard for Using De-escalation_. LL42 limits the use of de-escalation confinement to situations "following an incident where the person has caused physical injury or poses a specific risk of imminent serious physical injury to staff, themselves or other incarcerated persons." The _serious physical injury_ standard is overly narrow and nearly impossible to predict and thus is not useful as a standard for determining when de-escalation is necessary.[45] The generally accepted practice is a standard of greater utility: when an individual poses an imminent _risk of harm_ to another person's safety. The LL42 standard creates situations in which an individual who should be placed in de-escalation may not be because they do not meet the heightened standard. That is unsafe for them and others and thus serves to create, rather than mitigate, a dangerous situation.

- _Arbitrary Time Limits_. LL42's maximum allowable duration of four hours, without regard for the prevailing circumstances or individual differences in agitation, does not reflect the reality of situations where individuals pose an imminent risk of harm to others. The time required to alleviate the risk must be determined on a case-by-case basis. Some people need more time to calm down, and certain situations cause heightened levels of distress thus, the potential risk of harm may remain even after the 4-hour time limit. Establishing an arbitrary maximum duration—regardless of the

---

[45] The potential for injury depends on various factors, including the level of aggression, obstacles in the path toward the intended victim, the presence of a weapon, and staff proximity and ability to intervene. Similarly, the extent to which the injury inflicted is serious is influenced by additional factors, such as the accuracy of a punch, stab, or swipe, the positioning of both the perpetrator and the victim at the moment of impact, and to some degree, misfortune.

amount of time—places staff in an untenable position, particularly from a correctional management perspective. Legitimate exceptions to the strict 4-hour timeline can and will arise. While appropriate safeguards are necessary to ensure that the de-escalation event extends no longer than necessary, individualized decisions are essential to ensure that de-escalation placement does, in fact, de-escalate the individual. The release decision cannot be based on a predetermined time limit because it can create unsafe and dangerous conditions. The decision, instead, must be based on whether the risk of harm has been properly addressed.

- *Limitations on Readmission to De-Escalation Confinement*. LL42 prohibits placing an individual in de-escalation confinement for more than 12 hours within any 7-day period. This does not account for the reality that individuals who struggle to manage stress or resolve interpersonal conflicts, as well as those who suffer from mental illnesses that make emotional regulation difficult, can escalate to dangerous levels more than once in a week—and even multiple times within the same day. Imposing an arbitrary limit on the frequency of de-escalation confinement removes the use of this important tool for those people in custody who may need it the most. Such limits would expose other incarcerated individuals and staff to an unreasonable risk of harm and could put the individual at risk of retaliation from others in the unit.

- *Access to Items During De-escalation*. LL42's requirement for universal access to communication devices such as tablets or telephones during de-escalation poses serious security and management concerns.[46] While allowing some individuals to use a

---

[46] The Monitoring Team previously raised concerns that LL42 § 9-167(c)(1) could be read to require individuals in de-escalation to have access to shaving equipment during the period of de-escalation. *See* Appendix C at pg.9 and 10. Upon further evaluation of LL42, and consultation with the City Law Department, it is the Monitoring Team's

telephone to speak with a trusted family member or friend may help alleviate their agitation, access to these communication devices should be determined on an individual basis. Telephone access can be misused to plan retaliation or engage in other actions that would further disrupt the facility's safe operation. As such, access could undercut the overall purpose of de-escalation, which is to understand the source of the problem and assist the individuals involved in returning to a state where they can safely reintegrate into the population without posing a risk of harm to others.

## CONCLUSION

The predetermined, inflexible and arbitrary time limits on the duration of de-escalation, the prohibition that prevents using the tool each time it becomes necessary, and the universal access to communication devices attempt to apply a "one-size-fits-all" protocol to situations that must be calibrated to the needs of the individual in de-escalation and the broader situation that escalated them. These requirements do not allow for the wide array of factors that must be incorporated into the decision to use and discontinue de-escalation confinement. Correctional managers must have the discretion to use de-escalation confinement absent arbitrary and absolute requirements that disregard the manager's reasoned, informed judgment about how to best abate the risk of harm. The Monitoring Team's recommendations for next steps are outlined in the Conclusion section of this Report.

understanding that the law is not be interpreted to require the Department to provide shaving equipment to individuals while in de-escalation.

# EMERGENCY LOCK-IN

Emergency lock-ins are used to respond to safety threats such as serious assaults on staff, serious group assaults on people in custody, serious safety breaches (e.g., attempted escape, searches in which a large number of weapons are seized), credible intelligence that a planned assault is imminent, lost keys or tools, and other emergencies. Emergency lock-ins can occur for one specific housing unit, several units, or the entire facility, depending on the scope of the issues that must be addressed and the level of the security threat. As such, emergency lock-ins are a necessary and critical operational tool in a correctional setting.

## GENERALLY ACCEPTED PRACTICE

The purpose of emergency lock-ins is to *prevent further harm*, to restore order and to abate conditions that have a reasonable likelihood of endangering people in custody and staff. During a lock-in, facility managers may need to determine who was involved in the incident (both directly and indirectly), search for contraband or weapons, and inspect the physical plant to identify damage requiring repair and make such repairs. In some situations, a crime scene may need to be secured to preserve evidence. When the key tasks have been completed, facility managers should lift the lock-in promptly.

During an emergency lock-in, all people in custody housed in the immediate area are confined to their cells (or beds, if in a dormitory), and normal operations are suspended. If the event or intelligence suggests that the disruption may spread to other areas of the facility, broader lockdowns may be necessary. Basic facility operations such as meal service, visitations, and programmatic activities are necessarily impacted by lock-ins. It is incumbent upon facility managers to address the factors necessitating the lock-in expeditiously, to make contingency

plans for delivering services if the lock-in may be protracted, and to ensure normal operations resume as quickly as possible.

## IMPACT OF LL42'S REQUIREMENTS FOR DOC'S OPERATIONS OF EMERGENCY LOCK-INS

The law defines emergency lock-ins as "a department-wide emergency lock-in, a facility emergency lock-in, a housing area emergency lock-in or a partial facility emergency lock-in as defined in section 9-155" and imposes several requirements for their use.

Of utmost concern, LL42 limits the duration: "[s]uch lock-ins may not last more than four hours" (§ 9-167(j)(1)). While appropriate limitations on the use of emergency lock-ins are necessary, the Monitoring Team is deeply concerned that LL42 limits the duration of emergency lock-ins to a maximum of 4 hours without exception and without regard for the prevailing circumstances and conditions. While an emergency lock-in may be completed within four hours, there is no basis to suggest it can *always* be completed within this arbitrary time frame.[47] The potential risk of harm may remain even after the 4-hour time limit.  Establishing an arbitrary maximum duration—regardless of what the amount of time is—places staff in an untenable position, particularly from a correctional management perspective. Legitimate exceptions to the strict 4-hour timeline can and will arise. While safeguards should be put in place to ensure that an emergency lock-in is as short as possible and of the narrowest scope, the Department must have the flexibility to exceed the maximum duration for legitimate reasons. Ending an emergency lock-in before the risk of harm has been abated is dangerous. Accordingly, the appropriate standard for ensuring whether the emergency lock-in can be lifted must be based on a

---

[47] The Monitoring Team is not aware of any basis, rooted in sound correctional practice, that all emergency lock-ins can and must be completed within 4 hours and none has been provided to the Monitoring Team.  Further, the Monitoring Team is not aware of any system in American corrections that requires emergency lock-ins to be completed within 4 hours.

particularized assessment and not simply on the passage of time. As a result, implementation of this arbitrary standard is dangerous and plainly undermines sound security practices.

LL42 also imposes several requirements that could paradoxically extend the lock-in's duration and/or impede a return to safe operations. These include requirements for: visual and aural observation of *all* individuals every 15 minutes, universal access to a tablet or communication device (§ 9-167 (j)(2)), and immediate notice of the emergency lock-in to the public (§ 9-167 (j)(3)). The issue with all three requirements is that they must occur in all situations. In each case, there are situations where such an approach is appropriate. It is standard for most observations to occur every 30 minutes unless specific situations for certain individuals require more frequent observation. Fifteen-minute observations are time and staff intensive and can easily divert focus from addressing and ultimately lifting the lock-in. As for access to tablets or communication devices, there may be various security or logistical reasons that access to such devices may not be appropriate. Finally, immediate notification of emergency lock-ins can present various logistical and security challenges. All three of these requirements improperly impede a manager's discretion about what the safest course of action may be.

## CONCLUSION

An absolute, inflexible, and arbitrary time limit to complete emergency lock-ins forecloses the application of reasoned, informed judgment by a corrections manager and requires application of a "one size fits all" standard to every situation. The on-the-scene correctional manager must be given the discretion to, in good faith, make that determination absent an arbitrary and absolute requirement to release the people in custody. Similarly, requirements for more frequent observations, universal tablet access, and immediate public notification undercut the overall goal for a safe, efficient resolution of the issues that necessitated the lock-in. These

propositions are troubling because every situation warranting the imposition of an emergency lock-in is subject to a diverse array of contributing factors that must be incorporated into a release decision. Those factors must be considered and will inform whether the decision to release people in custody at any given time will either minimize the potential for further harm or aggravate the potential for further harm.  The Monitoring Team's recommendations for next steps are outlined in the Conclusion section of this Report.

## CONCLUSION

The Monitoring Team has carefully evaluated and deliberated the many factors related to Local Law 42 and its implication for DOC's operations. Undoubtedly, the goal and intent of Local Law 42 aim to support improved practice within DOC. In some cases, the provisions are laudable, consistent with sound correctional practice, and support the overall reform effort.

However, the Monitoring Team has grave concerns about the implementation of certain problematic sections of LL42 that are described in detail in this report. The Monitoring Team's concerns center around the universal application of certain requirements that inherently require discretion or that impose heightened standards that are impractical or unsafe to operationalize. It is why the LL42 requirements highlighted by the Monitoring Team, without necessary modifications, are inconsistent with sound correctional practice, do not serve to enhance the safety in the jails, and will only exacerbate the already dangerous conditions. In the words of Thomas Edison, "[a] good intention, with a bad approach, often leads to a poor result." That is unfortunately the case with certain provisions of LL42. Accordingly, implementation of these provisions, as currently designed, would undermine the very purpose of the *Nunez* Court Orders, which is for the Department to provide a "constitutionally sufficient level of safety for those who live and work on Rikers Island"[48] and would impede the Department's compliance with the *Nunez* Court Orders. To the extent that the Monitor is required to approve or direct certain DOC practices that include the problematic components of LL42, the Monitor will not approve or direct such practices absent modifications to those requirements for the reasons stated in this Report. *See also* Appendix B of this Report.

---

[48] *See* Court's November 27, 2024 Order (dkt. 803) at pg. 54.

As for a pathway forward and to ensure that LL42's requirements meet the "constitutionally sufficient level of safety," additional work is necessary to identify and develop the contours of what necessary and narrowly tailored exceptions could be utilized to address the problematic provisions of LL42 identified in this report and to determine what protocols and procedures are consistent with the requirements of the *Nunez* Court Orders and, where required, would permit the Monitor to make a determination on what may be approved. This will require deliberate and thoughtful consideration and input, when needed, from the Department, the Parties, and other stakeholders as appropriate. It is imperative that Department leadership charged with implementing these requirements must be fully engaged in this process. Clearly, the resolution of the remedial relief before the Court will also have an impact on this matter as it will potentially alter the leadership structure of the agency. Given the magnitude and complexity of the issues outlined in this report, resolution on the remedial relief is necessary before the Monitor can render a final determination regarding the nuanced issues related to LL42.  Of course, this assessment will continue pending resolution of the issue, but it is premature for the Monitor to finalize these findings before the Court renders its decision on the remedial relief.

Given the competing and complex issues currently before the Court, the Monitoring Team makes two recommendations to the Court:

First, given the current conditions in the jails and the unsafe and dangerous conditions presented by the implementation of the specific provisions of LL42 outlined in this report, the Monitoring Team recommends that implementation of these specific problematic provisions does not occur pending resolution of the legal issues raised by the Monitoring Team's findings. Until the legal issues discussed herein are fully resolved, the Monitor recommends that the Court and

the Parties determine the appropriate legal pathway necessary to mitigate the potential for harm posed by these provisions.

Second, following the Court's determination of the remedial relief, the Monitoring Team recommends that the Court direct the Monitor, within 30 days, to provide the Court with a timeline for finalizing the Monitoring Team's specific recommendations for how to address the problematic provisions of LL42 outlined that are necessary, narrowly tailored, consistent with sound correctional practice, and permit the safe operation of the jails.