UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MARK NUNEZ, et al.,

      Plaintiffs,

    -v-                          No.  11-CV-5845-LTS-RWL

NEW YORK CITY DEPARTMENT OF
CORRECTION and THE CITY OF NEW
YORK,

      Defendants.

---

OPINION AND ORDER REGARDING APPOINTMENT OF A
NUNEZ REMEDIATION MANAGER

THE LEGAL AID SOCIETY
By:    Mary Lynne Werlwas
        Kayla Simpson
        Katherine Haas
        Sophia Gebresellassie
49 Thomas Street, 10th Floor
New York, NY 10013

      -and-

EMERY CELLI BRINCKERHOFF
ABADY WARD & MAAZEL LLP
By:    Jonathan Abady
        Debra Greenberger
        Katherine Rosenfeld
        Vasudha Talla
        Sana Mayat
600 Fifth Avenue, 10th Floor
New York, NY 10020

*Attorneys for the Plaintiff Class*

JAY CLAYTON,
INTERIM UNITED STATES ATTORNEY
FOR THE SOUTHERN DISTRICT OF
NEW YORK
By:    Jeffrey Kenneth Powell
        Rachel Lightfoot Doud
86 Chambers Street, Room 620
New York, NY 10007

*Attorneys for Intervenor-Plaintiff, the United
States*

MURIEL GOODE-TRUFANT,
CORPORATION COUNSEL OF
THE CITY OF NEW YORK
By:    Alan Howard Scheiner
        Sheryl Neufeld
        Mariam Khan
100 Church Street
New York, NY 10007

*Attorneys for New York City Department of
Correction and the City of New York*

LAURA TAYLOR SWAIN, Chief United States District Judge

In its Opinion and Order on the Motion for Contempt, dated November 27, 2024, the Court held Defendants in civil contempt of eighteen provisions (the "Contempt Provisions") of four Court orders entered in this case: the Consent Judgment (docket entry no. 249), the First Remedial Order (docket entry no. 350), the Second Remedial Order (docket entry no. 398), and the Action Plan (docket entry no. 465).[1]  (Docket entry no. 803 (the "Contempt Order")); see also Nunez v. N.Y.C. Dep't of Corr., 758 F.Supp.3d 190 (S.D.N.Y. 2024).  In the Contempt Order, the Court indicated that it was inclined to impose a receivership and directed the parties to develop a set of remedial proposals to that end.  (Contempt Order at 56-57.)  Before the Court are two competing proposals—one from the plaintiff class of New York City jail inmates and detainees ("Plaintiffs") and the Plaintiff-Intervenor, the United States, represented by the United States Attorney for the Southern District of New York (the "United States"); and another from Defendants, the New York City Department of Correction (the "Department" or the "DOC") and the City of New York (the "City" and, together with the DOC, "Defendants")—for enhanced

---

[1]     The Contempt Order held Defendants in civil contempt of Court for their failure to comply with the following provisions of the Consent Judgment and Orders: Consent Judgment, § IV, ¶ 1, § VII ¶¶ 1, 9(a), 11; § VIII, ¶ 1; § XV, ¶¶ 1, 12, 17; First Remedial Order § A, ¶¶ 2, 4, 6; § D, ¶¶ 1, 3, 3(i); Second Remedial Order, ¶ 1(i)(a); and Action Plan § A, ¶1(d); § C, ¶¶ 3(ii), (iii), (v), (vi), (vii); § D, ¶¶ 2(a), (d), (e), & (f).  (See Contempt Order at 2-3.)  A list of the Contempt Provisions is attached at Appendix A.

remedial relief in the above-captioned case.  (<u>See</u> docket entry nos. 811-11 ("Pl. Subm."), 811-12 ("Def. Subm."); <u>see</u> <u>also</u> docket entry nos. 820 ("Pl. Resp."), 821 ("Def. Resp.").)

The Court has reviewed carefully all of the parties' written submissions.  As explained below, for the reasons and in accordance with the procedures set forth below, the Court will appoint an independent <u>Nunez</u> Remediation Manager who shall report directly to this Court and be empowered to take all actions necessary to cure Defendants' contempt and support remediation of the ongoing violations of the constitutional rights of people in custody in the New York City jails.  The Court expects that the Remediation Manager and the Commissioner of the Department of Correction will work as collaboratively as possible to achieve remediation of the Contempt Provisions and compliance with the Consent Judgment, including by building upon the progress that has been achieved since the current Commissioner took office.

## I. BACKGROUND

### A. Procedural History

This procedural history is drawn from the court record, including the Contempt Order and the parties' respective proposed findings of fact submitted in connection with Plaintiffs' and the United States' motion for contempt and to appoint a receiver.  (<u>See</u> docket entry nos. 762-2 ("Pl. PFOF"), 762-3 ("Def. PFOF"), 762-5 ("Pl. SPFOF").)  Citations to the Contempt Order and the parties' respective proposed findings of fact incorporate by reference their citations to the underlying evidentiary submissions.  The Court assumes the parties' familiarity with the history of the case.

#### 1. Entry of the Consent Judgment

This case arose in 2012 with individual claims of injuries from excessive force, amidst allegations that the Department engaged in a pattern and practice of using unnecessary

and excessive force against incarcerated individuals, and was later certified as a class action. (Contempt Order at 3.)  The instant case is the sixth class action lawsuit challenging a pattern and practice of excessive and unnecessary force in New York City's jails.[2]  (Id.)  On behalf of a class of present and future incarcerated individuals confined in jails operated by the Department, Plaintiffs sought injunctive and declaratory relief, in addition to monetary damages related to specific incidents in which the named Plaintiffs alleged they were victims of excessive force. (Id.)  In October 2015, the parties entered into a settlement (docket entry no. 249 (the "Consent Judgment")), the purpose of which was to protect the federal constitutional rights of incarcerated individuals.  The Consent Judgment, comprising twenty-five sections and hundreds of provisions, requires the Defendants to take specific actions to remedy a pattern and practice of violence by staff against incarcerated individuals, and to develop and implement new policies and procedures to ensure the safety and wellbeing of incarcerated individuals.  (Contempt Order at 3-4.)  The Consent Judgment includes a stipulation that its purpose "is to protect the constitutional rights of the inmates confined in jails operated by the Department" and that its "terms and requirements . . . will be interpreted to be consistent with the measures necessary to protect the constitutional rights of inmates."  (Consent Judgment § I.)

The parties also stipulated to the appointment of a Monitor, as an agent of the Court, to oversee and assess the Department's compliance with the Consent Judgment.  (Consent Judgment § XX.)  The Monitor, together with Deputy Monitor and the Monitor's team of subject

---

[2]     The DOC has also been the target of numerous lawsuits by individual plaintiffs alleging injuries resulting from a City custom and practice of misusing force in the jails. (Contempt Order at 3 n.3.)  The City has settled scores of such cases for monetary damages.  (Id.)  In fiscal year 2022, the City paid $37.2 million with respect to claims brought against DOC.  (Id.)

matter experts (the "Monitoring Team"), has filed more than 50 reports on the public docket describing "the efforts the Department has taken to implement the requirements" of the Consent Judgment and "evaluating the extent to which the Department has complied" with the Consent Judgment. (Id. § XX, ¶ 16.) To this end, the Monitoring Team has conducted countless site visits, met with DOC staff, and received significant amounts of information from the DOC, including routine data, information, and reports as well as thousands of videos, reports, and investigation documentation related to use of force, other violent incidents, and other DOC operations. (Contempt Order at 4.) The Monitoring Team has also, based on its observations and information obtained from the DOC, provided over 700 separate recommendations to the DOC on a variety of topics, including use of force practices, security protocols, supervision, and training. (Id.)

        2. Entry of the First Remedial Order

        In its first nine periodic reports assessing compliance with the Consent Judgment, the Monitoring Team repeatedly reported that the Defendants, despite consistent feedback and offers of assistance from the Monitoring Team, which includes subject-matter experts, were non-compliant with several sections of the Consent Judgment, including provisions related to the implementation of a use of force directive (§ IV, ¶ 1), timeliness of investigations and preliminary reviews (§ VII, ¶¶ 1, 7, 9), appropriate and meaningful staff discipline (§ VIII, ¶ 1), and the supervision and protection of incarcerated youth under the age of 19 (§ XV, ¶¶ 1, 12, 17). (Contempt Order at 4-5.) The Court, troubled by these initial status reports, as well as by additional information gleaned through its informal meetings with the Monitoring Team and site visits to the jails on Rikers Island, directed the Monitoring Team in June 2020 to file a supplemental status report "to ensure that the issues [were] addressed efficiently and

expeditiously." (Docket entry no. 342.) The Monitoring Team filed two additional status reports in the following two months, detailing the parties' efforts to come to consensus on a proposed Remedial Order to address the Court's concerns. (See docket entry nos. 343, 344, 345, 346.) Based on the Monitoring Team's findings that additional remedial measures were necessary to overcome the Department's pattern and practice of using excessive force, the parties stipulated to further measures of relief designed to increase the safety of incarcerated individuals. The First Remedial Order, entered in August 2020, set forth specific initiatives to reduce the use of unnecessary force, improve staff supervision, enhance the safe management of persons in custody, and promote prompt investigations and timely accountability for use of force incidents. (See docket entry no. 350 (the "First Remedial Order").)

> 3. Entry of the Second Remedial Order

Less than a year after the Court entered the First Remedial Order, the Monitoring Team reported that Defendants were still not in compliance with key provisions of the Consent Judgment (relating to implementation of the use of force directive (§ IV, ¶ 1), appropriate and meaningful staff discipline (§ VIII, ¶¶ 1, 4), and the supervision and protection of incarcerated youth under the age of 19 (§ XV, ¶¶ 1, 12, 17)) and the First Remedial Order (regarding facility leadership responsibilities (§ A, ¶ 2), abuses by emergency response teams (§ A, ¶¶ 3, 6), consistent staffing (§ D, ¶¶ 1, 3), and tracking of incentives and consequences (§ D, ¶ 2(ii)). (Contempt Order at 5.) The Monitoring Team emphasized that "the pervasive level of disorder and chaos in the Facilities is alarming [and the] conditions that gave rise to the Consent Judgment have not been materially ameliorated" and noted that DOC's progress toward the use of force reforms required by the Consent Judgment and the First Remedial Order had "stagnated in key areas." (Id.) Against this backdrop of continued non-compliance and dysfunction, the

Court entered an order expressing its "great concern" and directing the Monitoring Team to file an additional status report with an update on any further recommendations or plans the Monitoring Team had developed to address the concerns raised in their recent reports. (Docket entry no. 377.) The Court, upon receipt of additional status reports from the Monitoring Team, emphasized that the conditions in the jails remained "deeply disturbing" and scheduled an emergency conference in September 2021 for an update regarding the concrete steps being taken by the City and the Department to address the serious problems described in the Monitoring Team's reports. (Docket entry nos. 379, 381, 384.) At the emergency conference, the Court directed the parties to meet and confer to formulate an agreement for expedited relief, and the Court entered the Second Remedial Order (docket entry no. 398) on consent in September 2021. (See Contempt Order at 5.) The parties worked together with the Monitor to draft the Second Remedial Order and consented to its entry. (Id. at 5-6.) The Second Remedial Order focused, in large part, on the implementation of immediate security initiatives to increase the safety of persons in custody, including the development of a security plan to address poor practices of the Department. (See id. at 6.)

### 4. Entry of the Third Remedial Order

Shortly thereafter, at the end of September 2021, the Monitoring Team filed another status report detailing its growing concern that, even four years after entry of the Consent Judgment, Defendants had still failed to comply with the Consent Judgment's requirement to implement a use of force directive, which in turn had stymied the Department's ability to progress toward compliance with other provisions of the Consent Judgment. (See generally docket entry no. 399.) The Court again directed the Monitoring Team and the parties to collaborate in good faith regarding the recommendations to implement the use of force directive

and to promptly present a joint proposed order to the Court.  (Docket entry no. 400.)  In November 2021, the Third Remedial Order (docket entry no. 424) was entered on consent, setting forth specific measures of relief to address delays in the imposition of timely discipline for instances of misconduct related to the use of excessive and unnecessary force.  (Contempt Order at 6.)

### 5. Entry of the Action Plan

Around the time that the Second Remedial Order was entered, the Monitoring Team expressed its belief that "the City and the Department have the authority and the ability to address" the dangerous conditions in the City's jails.  (Docket entry no. 380, at 1.)  The City appeared to bolster the foundation for this belief by providing a detailed list of plans to improve conditions in the jails during the September 2021 emergency conference.  (See docket entry no. 407, at 11-25.)  As time progressed, however, it became clear to the Monitoring Team that core foundational problems underpinned the Department's mismanagement of the jails, and that those "foundational patterns and practices" were "stymying compliance" with court orders, as well as any "efforts to reform the agency."  (Docket entry no. 431, at 10-11.)  In its December 6, 2021 report, the Monitoring Team asserted that "[c]ontinuing the attempt to implement hundreds of provisions" of the Consent Judgment and the Remedial Orders "without some prioritization will simply immobilize the Department and progress will likely not be achieved no matter how many remedial orders or other potential sanctions may be imposed."  (Id. at 11; see also id. at 9 (noting that "the Department [was] in a place where many of the requirements of the Consent Judgment [were] simply unattainable, and the Consent Judgment requirements [were] unlikely to be successful in bringing about improvements because the basic foundations needed to improve practices [did] not exist").)

Accordingly, the Monitoring Team recommended a shift in focus to prioritize what it identified as the key foundational issues at the core of the Department's mismanagement of the jails, which the team believed must be "addressed first, before the Department can make further progress" in achieving widescale reform.  (Id. at 10.)  Those foundational issues encompassed flawed security practices and procedures, inadequate supervision of staff, ineffective staffing procedures, and limited accountability imposed for staff misconduct.  (Id. at 12.)  To ensure that the Consent Judgment could be implemented, and to eliminate the unsafe conditions in the jails, the Monitor recommended that the DOC improve security practices; appoint facility leaders, including a security operations manager with deep correctional expertise; improve management and deployment of staff; eliminate the backlog of disciplinary cases; and ensure timely accountability for staff misconduct.  (Contempt Order at 7.)

After a new Mayor of the City of New York and his administration assumed office in January 2022, the Monitoring Team issued a report on March 16, 2022, advising the parties and the Court that conditions in the jails remained "unstable and unsafe" and reiterating the need for the Department to prioritize the foundational issues identified by the Monitoring Team.  (Docket entry no. 438, at 1.)  Those issues, the Monitoring Team represented, "created a polycentric problem and represent[ed] a complicated set of dysfunctional practices unlike any jail system with which the Monitoring Team has had experience."  (Id. at 2.)  The Monitoring Team, once again, called for a "comprehensive and tangible shift in the City's and Department's focus and priorities," to an approach focused on correcting foundational issues of mismanagement and embedded with "concrete steps and timelines."  (Id. at 3.)  The Court, upon receipt of that report, indicated its "grave concern" regarding the "urgency of the security situation in the jails," scheduled two status conferences to discuss the content of the report, and

ordered the parties to file joint status reports regarding the parties' progress toward agreement to implement the Monitoring Team's recommendations.  (Docket entry nos. 439, 446.)  To this end, in the spring of 2022, the Monitoring Team, Plaintiffs, the United States, and Defendants convened at least 15 meetings and worked together to outline an "Action Plan" tailored to those foundational issues to serve as "a roadmap for addressing the deficiencies that inhibit[ed] the Department's ability to build sustainable reforms" necessary for compliance with the Consent Judgment and Remedial Orders.  (Docket entry no. 462, at 2; see also Contempt Order at 8.)

       The Action Plan was designed to prioritize reform efforts tailored to the four foundational areas identified by the Monitoring Team: staffing practices, security practices, management of people in custody, and timely staff accountability.  (See docket entry no. 465.) The then-DOC Commissioner, who had been appointed on January 1, 2022 by the new Mayoral administration, confirmed in open court at a May 2022 status conference that the DOC had provided "significant input" into the development of the Action Plan, and that the Action Plan outlined the work needed to address the four foundational issues raised by the Monitor. (Contempt Order at 8.)  At the same status conference, that Commissioner assured the Court that "there are no legal impediments to us fulfilling our obligations under the Action Plan."  (Id.) The Court approved and entered the Action Plan on June 14, 2022, on the consent of all parties, after the Court determined that the Action Plan complied with all relevant provisions of the

Prison Litigation Reform Act (the "PLRA"), 18 U.S.C § 3626(a)(1)(A) (Westlaw through P.L.

118-107).[3]  (Docket entry no. 465; see also docket entry no. 466.)

  6. The First Contempt Motion

    In the summer and fall of 2022, Plaintiffs became increasingly concerned about

issues related to Intake, including the tracking of and prolonged stays of persons assigned to the

Intake Unit at Rikers Island, and the Court granted Plaintiffs leave to file a motion for civil

contempt.  (See docket entry nos. 494, 499.)  In that motion, Plaintiffs asserted that the

Department was in contempt of the obligations imposed by the third sentence of ¶ 1(i)(c) of the

Second Remedial Order, namely the requirement to "develop and implement a reliable system to

track and record the amount of time any incarcerated individual is held in Intake and any

instance when an individual remains in Intake for more than 24 hours[,]" which was incorporated

into § E, ¶ 3(a), of the Action Plan (the "Intake Tracking Clause").  (See docket entry no. 500, at

2.)  Shortly after that contempt motion was filed, the Monitoring Team reported that they did

"not have any further recommendations for additional steps the Department should take" and

confirmed that the Department had already incorporated all of their recommendations to address

the requirements of the Intake Tracking Clause.  (Docket entry no. 504, at 34.)  In a March 13,

2023 opinion, the Court declined to hold the DOC in contempt of the Intake Tracking Clause,

finding that "the Department has now taken substantial steps to remedy the deficiencies of its

---

[3]  The PLRA requires that "[p]rospective relief in any civil action with respect to prison
conditions shall extend no further than necessary to correct the violation of the Federal
right of a particular plaintiff or plaintiffs" and that "[t]he court shall not grant or approve
any prospective relief unless the court finds that such relief is narrowly drawn, extends no
further than necessary to correct the violation of the Federal right, and is the least
intrusive means necessary to correct the violation of the Federal right."  18 U.S.C.
§ 3626(a)(1)(A).

prior approaches for tracking and to police the implementation of the revised systems
proactively." (Docket entry no. 511 (the "Intake Contempt Order") at 27.) The Court also noted
"that a finding of civil contempt related to the Defendants' efforts to comply with one specific,
court-ordered provision—among hundreds applicable to Defendants in this litigation—would be
contrary to the spirit of the Action Plan and denigrate the importance of the Department's
renewed and productive focus on the foundational issues at the core of the Department's historic
pattern of excessive use of force against persons in custody." (Id. at 28.)

       7. The Department's Continued Non-Compliance and Breakdown in Relationship with
      the Monitoring Team

              Just two months later, on May 26, 2023, the Monitoring Team filed a Special
Status Report, detailing five disturbing incidents involving in-custody deaths and serious injuries
that had occurred in the prior month alone; these incidents raised serious concerns about the
Defendants' ability to accurately and timely report serious injuries, to safely manage the
individuals in its custody, and to provide the Monitoring Team with timely and accurate
information. (Docket entry no. 533.) The Court responded by ordering Defendants to provide
the Monitoring Team with additional information about the five incidents and scheduling an
emergency status conference to address the concerns raised in the Special Status Report.
(Docket entry no. 535.) During the emergency status conference on June 13, 2023, "the City
acknowledge[d that,] in some instances cited by the Monitor[,] reporting or consultation that was
required did not occur," but characterized those instances as "errors" and emphasized that "[t]he
demands of reporting to the Monitor are substantial." (Docket entry no. 554, at 26-27.) The City
further minimized the gravity of the recent incidents, insisted that "these matters present no
pattern either in lack of communication or in the conditions at the Department's facilities," and
denied that Defendants ever made misrepresentations to the Monitoring Team or the Court. (Id.

at 28-30.)  Similarly, rather than addressing the severity of the incidents at issue, then-Commissioner Louis Molina cast aspersions on the prior administration's management of the Rikers Island jails and emphasized how conditions had improved since the COVID-19 pandemic.  (Id. at 31-35, 40-42.)  At the end of the conference, the Court entered an order, substantially on consent, (1) clarifying the Department's reporting obligations to the Monitoring Team, (2) appointing a "Nunez Manager" to serve as a point of contact for the Monitoring Team to access the information necessary to fulfill their duties under the Consent Judgment and subsequent Remedial Orders, and (3) requiring the Department to develop a plan to address the five incidents that led to the emergency conference.  (Docket entry no. 550.)

On July 10, 2023, the Monitoring Team reported, however, "that the City and Department have not made substantial and demonstrable progress in implementing the reforms, initiatives, plans, systems, and practices outlined in the Action Plan."  (Contempt Order at 9-10.)  Then-Commissioner Molina, in his statement at an August 10, 2023, status conference, all but ignored this evaluation and instead emphasized the Department's progress since the "apex of the crisis" in January 2022 as well as why he was "proud of the leadership team [he had] in place" at that time.  (Docket entry no. 566 ("Aug. 2023 Tr.") at 29-35.)  The Court ultimately determined, against this backdrop and "despite the Defendants' overall undertakings and reiteration of commitments to sincerity, transparency, and further progress today, that the Defendants have not demonstrated by action sufficient willingness or ability to engage productively with the Monitoring Team, let alone sustain the necessary, significant, and effective progress toward the reforms that are necessary to ensure safety for everyone at Rikers."  (Id. at 72.)

Based on the Monitoring Team's assessment that there had not been a substantial reduction in the risk of harm facing incarcerated individuals and Department staff, as required by

the Action Plan, the Monitoring Team recommended a number of interim measures for the DOC

to implement by December 31, 2023.  (Contempt Order at 10.)  Those recommendations

included: the development of metrics and data for use as indicators of use of force, security, and

violence; revised procedures and protocols on searches, escorts, and lock-in in housing areas,

command level orders for the Emergency Services Unit (the "ESU"), screening and assignment

of staff to special teams, screening policies and procedures regarding promotions, door security,

and command discipline; ensuring staff remain on post; revised trainings for ESU; hiring staff

for the Investigations Division ("ID"), a component of the DOC that specializes in investigating

all actual and alleged uses of force and use of force-related misconduct; reporting on intake; and

conducting an assessment of DOC policies on self-harm.  (Id.)  At the status conference on

August 10, 2023, these recommendations were largely adopted by the Court and were

incorporated in an order entered substantially on consent.[4]  (Id.)  At that status conference, the

Court also granted Plaintiffs and the United States leave to file the instant motion for contempt

and to appoint a receiver.  (Aug. 2023 Tr. at 72-73.)

        Although all of the deadlines for DOC's implementation of the "immediate,

interim measures" specified in that order have long since expired, and even though Defendants

consented to those deadlines at the August 10, 2023 status conference (id.), the DOC has not

substantially implemented those measures or, until just this month, provided the Court with

---

[4]      The Court overruled the City's objection to language permitting the Monitoring Team to
attend Department meetings upon request.  (Aug. 2023 Tr. at 55.)  The Court determined
that it was "both reasonable and necessary that the Department be required to permit the
Monitoring Team to review the referenced meetings on request" due to "a track record
here of a cooperative process of identifying appropriate meetings and observing
meetings" and because "it is necessary to have transparency here."  (Id. at 55-56.)

updates on its progress.  Indeed, in an October 5, 2023, status report, the Monitoring Team reported that "the alarming conditions reported to the Court during the August 10, 2023 Status Conference have only worsened" and that DOC officials had ceased all pretext of cooperating with the Monitor.  (Docket entry no. 581, at 1.)  The Court, therefore, issued a further order, on October 10, 2023, noting the DOC's "unacceptable" attempts to "unduly influence or interfere with the work of the Monitor"; that order required Defendants to "devise a plan that can be implemented immediately to ameliorate the unacceptable levels of harm in the New York City jails" and address reporting deficiencies.[5]  (Docket entry no. 582; see also Contempt Order at 10-11.)  A few weeks after the Court entered that order, on October 31, 2023, the Mayor announced that Commissioner Molina would be transferred to a different position in City Hall and would no longer serve as DOC Commissioner.  (Docket entry no. 616, at 3.)  The announcement was not accompanied by any information regarding a transition plan.  (Id.)

8. The Order to Show Cause and the Entry of the First Contempt Finding

In November 2023, when it was not clear who the next Commissioner would be, or when one would be appointed, the Department opened an Arson Reduction Housing Unit ("ARHU").  (Contempt Order at 41.)  The day after the ARHU opened, an anonymous source told the Monitoring Team that the DOC had opened the new housing unit; the DOC had not consulted or notified the Monitoring Team prior to opening ARHU despite a commitment to do so prior to opening such a unit and despite its obligations under the Consent Judgment to provide

---

[5]     On April 25, 2025, Defendants filed a Declaration of Gary Raney (docket entry 842-1) in which Mr. Raney, who has recently been retained by the DOC as a consultant, reported observations that echoed many of the points that the Monitoring Team has made repeatedly and made recommendations similar to those that the Monitoring Team has proffered over the years.

prior notice.  (<u>Id.</u>)  The operations guide for the unit was "poorly written, vague, and ambiguous[,]" and the DOC appeared to have opened the housing unit "on short notice, with little planning, little to no guidance to staff, unclear admission criteria, and poorly defined rules and restrictions," which was "unwise, at best, and [was] the antithesis of restoring order."  (<u>Id.</u>)  In response to an emergency letter filed by the Monitoring Team, the Court issued an Order to Show Cause, directing the DOC to provide additional information regarding the opening of the ARHU as well as information about the identity of the new DOC Commissioner.  (<u>Id.</u>)  The DOC ultimately reported that it had disbanded the ARHU less than 24 hours after it opened.  (<u>Id.</u>)  Shortly thereafter, in a press conference on December 8, 2023, the Mayor announced that he had appointed Lynelle Maginley-Liddie to serve as the new Commissioner of the DOC, effective immediately.  (Docket entry no. 639, at 2.)

The Court ultimately found the DOC in contempt of § D, ¶ 3 and § E, ¶ 4 of the Action Plan, and § I, ¶ 5 of the June 13, 2023 Order (docket entry no. 550) due to its actions related to the chaotic opening and closure of the ARHU and ordered the DOC to take certain actions in order to purge the contempt.  (Contempt Order at 41.)  After the Monitor submitted a status report regarding the DOC's actions in response to the contempt order, the Court found that the DOC had purged the contempt.  (<u>Id.</u>)

### 9. The Second Contempt Motion and Motion to Appoint a Receiver

In November 2023, around the same time that the Department opened the ARHU, Plaintiffs and the United States moved to hold Defendant in civil contempt of eighteen provisions of the Consent Judgment, the First Remedial Order, the Second Remedial Order, and the Action Plan (the "Contempt Provisions").  (Docket entry no. 601 (the "Motion").)  The Motion also sought an order appointing a receiver.  (<u>Id.</u> at 2.)  Because Defendants sought a

lengthy extension to file their opposition to the Motion in order to afford the newly-appointed Commissioner Maginley-Liddie "the opportunity to substantively set the tone and direction of defendants' moving papers in light of her vision for DOC" (docket entry no. 654, at 1-2), and because the parties sought to resolve their limited evidentiary disputes in further briefing (see docket entry no. 770), the Motion was not fully briefed until the end of August 2024.  The Court heard oral argument on the contempt aspect of the Motion on September 25, 2024.

        In their moving papers and at oral argument, Defendants opposed the motion in its entirety but did not, for the most part, dispute the Plaintiffs' factual contentions.  (Contempt Order at 2.)  Nor did Defendants dispute that (1) they failed to comply with orders that are clear and unambiguous, and (2) the proof of their non-compliance was clear and convincing.  (Id. at 45.)  In their opposition, Defendants primarily pointed to the Monitoring Team's praise for DOC Commissioner Maginley-Liddie, whom the Monitoring Team has described as "'dedicated to working collaboratively with the Monitor to move the agency forward' and 'committed to reform.'"  (Docket entry no. 688, at 1.)  These arguments acknowledged the Monitoring Team's positive working relationship with Commissioner Maginley-Liddie following her appointment in December 2023, which is indeed a laudable development.  For instance, while the Motion was being briefed, the Monitoring Team emphasized that they "observed an immediate change in the Department's approach and dynamic in early December 2023 with the appointment of Commissioner Maginley-Liddie[,]" that "[t]he Department's leadership team is now actively engaging with" the Monitoring Team, and that "[t]hese interactions reflect greater transparency and interest in working collaboratively."  (Contempt Order at 42.)

        In its November 27, 2024, decision granting the Motion to the extent it sought a contempt finding, the Court relied on its intimate knowledge of the entire record and history of

the parties' conduct in this case, including copious, undisputed evidence specified in the parties'

submissions on the Motion practice demonstrating that Defendants had not complied with the

Contempt Provisions related to (1) implementation of the use of force directive; (2) conducting

adequate use of force investigations and holding staff accountable; (3) remediating failures in

security and basic correctional practice; (4) adequately supervising staff and facility leadership;

(5) effectively deploying uniformed staff to adequately supervise incarcerated individuals;

(6) curbing the emergency response teams' excesses; and (7) ensuring the safety of young people

in custody.  (See id. at 11-43.)  Based on this record, the Court concluded that Defendants had

not diligently attempted to comply with the Contempt Provisions in a reasonable manner during

the many years since the orders were issued.  (Id. at 52.)  The Court emphasized that "the history

of this case is long, and neither clear reporting from the Monitoring Team nor binding Court

orders have been enough to activate the transformational change required to bring Defendants

into compliance with the Consent Judgment and subsequent remedial orders."  (Id.)  The Court

further noted that "[n]ine years have passed since the parties first agreed that the perilous

conditions in the Rikers Island jails were unconstitutional; that the level of unconstitutional

danger has not improved for the people who live and work in the jails is both alarming and

unacceptable."  (Id.)  For those reasons, the Court held Defendants in contempt of each of the

Contempt Provisions.

    Having found Defendants in contempt of eighteen different provisions of the

Court orders in this case (the "Nunez Court Orders")—provisions that go directly to the safety of

those who live and work in the Rikers Island jails—the Court turned its focus to identifying a

form of remedy to achieve rapid change in the safety profile of Rikers Island and compliance

with Court orders.  (Id. at 53.)  The Court indicated that it was inclined "to impose a

receivership: namely, a remedy that will make the management of the use of force and safety aspects of the [the New York City jails] ultimately answerable directly to the Court."  (Id. at 56.) To maximize the parties' opportunity to participate in the development of narrowly tailored and properly targeted measures to address the constitutional violations that the Contempt Provisions and the Consent Judgment were designed to remedy, the Court directed the parties to develop remedial proposals designed to achieve the "Receivership Goals" enumerated by the Court, including matters such as:

1. Providing for direct Court authority with respect to Nunez use of force and safety matters over an individual with the competence and expertise to achieve their charge of bringing the Department into compliance with the relevant Court orders;

2. Minimizing additional bureaucracy and expense;

3. Capitalizing on the Monitoring Team's essential expertise and experience through effective collaboration;

4. Pushing forward transformational change while simultaneously utilizing wisely the assets that the Department already possesses and making available any additional assets that are needed to achieve a constitutionally adequate level of safety; and

5. Identifying and taking appropriate steps to attempt to achieve any necessary changes in contracts, regulations, policies or other impediments to effective compliance.

(Id. at 56-57.)  The Court also requested that a joint proposal be designed in a manner that minimizes the steep learning curve that is inherent in addressing the deeply embedded polycentric problems of the jails, in order to mitigate ongoing harms and achieve the necessary transformation of practices and culture as quickly as possible.  (Id. at 57.)  After extensive work with each other and with the Monitoring Team, the parties submitted two competing proposals, described below, for the Court's consideration.

B. Plaintiffs' and the United States' Proposal

Plaintiffs and the United States ask that the Court appoint an independent receiver with a sweeping mandate and powers to manage compliance with all aspects of the <u>Nunez</u> Court Orders, "who will report only to this Court and be granted the authority to take all actions necessary to cure Defendants' contempt, promptly comply with this Court's orders, and address the ongoing violations of the constitutional rights of incarcerated people in the City's custody." (Pl. Subm. at 1.) Their proposal (the "Receivership Proposal") emphasizes that the receiver "must have broad powers to rectify the unsafe and dangerous practices that have prevailed in the jail system for decades and to surmount the political, bureaucratic, and institutional obstacles that have doomed prior reform efforts" in order to promptly achieve Substantial Compliance with this Court's orders in this action (the "Mandate"). The powers to be conferred under the proposal include but are not limited to:

- Implementing changes to DOC policies, procedures, protocols, and systems relating to the requirements of the <u>Nunez</u> Court Orders;
- Reviewing, investigating, and taking disciplinary or corrective actions with respect to violations of the Use of Force Directive and other DOC policies related to the requirements of the <u>Nunez</u> Court Orders;
- Assigning and deploying uniformed staff more efficiently to maximize coverage in housing areas;
- Hiring, promoting, and reassigning staff so that there are a sufficient number of qualified and experienced individuals to fill supervisory and other uniformed positions;
- Negotiating contracts or renegotiating existing contracts if necessary;
- Procuring necessary equipment and supplies to, among other things, enhance security in the jails; and
- Petitioning the Court to waive any legal or contractual requirements that impede the Receiver from carrying out their duties under this Order and fulfilling the Mandate.

(<u>Id.</u> at 1, 4-5.) Under the Receivership Proposal, the receiver would have ultimate authority over DOC functions and divisions necessary to achieve the receiver's Mandate, while the Commissioner would retain authority over other DOC functions and divisions. (<u>Id.</u> at 5.) That said, the receiver would be expected to work collaboratively with the Commissioner and DOC

leadership—with the input of the Monitor—to implement sustainable reform.  (Id. at 5-6.)

Finally, the Receivership Proposal recommends that the receivership remain in place until

Defendants achieve substantial compliance with the Nunez Court Orders; at that point, full

operational authority over the jails would be returned to the City.  (Id. at 10-11.)

C. Defendants' Proposal

> Defendants urge the Court to appoint Commissioner Maginley-Liddie as the

Nunez "Compliance Director" in addition to her title and authority as DOC Commissioner for

five years—or a shorter period of time, if the Court determines that the DOC is in substantial

compliance with the Nunez Court Orders.  (Def. Subm. at 1, 33 n.26.)  Defendant's proposal (the

"Compliance Director Proposal") contemplates that Compliance Director/Commissioner

Maginley-Liddie would be "answerable only to, and serving at the discretion of, the Court with

respect to any matter affecting Nunez compliance."  (Id. at 1.)  However, the Compliance

Director/Commissioner would report to the Mayor "in the ordinary course of business, consistent

with the duties and responsibilities of agency Commissioners."  (Id. at Appendix A.)  "Under this

proposal, the Commissioner/Compliance Director could not be removed by the Mayor; rather

removal could be done only by the Court."  (Id. at 1.)  The Compliance Director would have two

powers that are not currently available to the Commissioner: (1) "to hire senior executive staff

without the consent of City Hall officials, after a limited opportunity for advisory vetting" and

(2) "to petition the Court for additional orders to overcome bureaucratic and legal impediments

involving other elements of the City government (or otherwise), without the consent of any other

City agencies."  (Id. at 12-13.)

> After the parties' proposals for remedial relief had been fully briefed, the Court

granted Defendants leave to file a declaration by Gary Raney.  (Docket entry no. 841.)  Mr.

Raney has decades of correctional experience and has served as the Compliance Director for the Miami-Dade Corrections and Rehabilitation Department pursuant to a federal court consent order since February 2023.[6]  (Docket entry no. 842-1 ("Raney Decl.") ¶¶ 1-2.)  In March 2025, the DOC hired Mr. Raney "as a consultant to assess [the DOC's] operations to identify system deficiencies or opportunities for improving correctional practices and policies, in furtherance of improving the safety and security of persons in custody (PIC) and staff."  (Id. ¶ 3.)  In his declaration, which was filed on April 25, 2025, Mr. Raney summarized his "initial observations and recommendations regarding particular areas of concern and how they can be, and in many respects are being, addressed to accelerate the path to substantial compliance" and opined that Commissioner Maginley-Liddie "is a strong leader who has the confidence of the organization[,]" that "[a]ny change in leadership would likely once again destabilize the organization and delay substantial compliance," and "that Commissioner Maginley-Liddie, acting with even greater independence and authority from the Court as Compliance Director, will accelerate the reforms."  (Id. ¶¶ 13, 18.)

## II. DISCUSSION

## A. Receivership Factors

"The test [for imposition of a receivership] includes the following elements, the first two of which are given predominant weight:

---

[6]     In May 2024, Plaintiffs had submitted a declaration from Mr. Raney as an exhibit to their reply in support of their motion for contempt and to appoint a receiver.  (Docket entry no. 718-22 ("Pl. Raney Decl.").)  In that declaration, Mr. Raney stated that "[t]he Compliance Director role has accelerated the pace of reforms at MCRD" because "[o]rganizations inherently resist change[,]" and he opined that "[t]he Independent Compliance Director was necessary to achieve important reforms in the MCRD in short order."  (Id. ¶¶ 7, 9.)

(1) Whether there is a grave and immediate threat or actuality of harm to plaintiffs;
(2) Whether the use of less extreme measures of remediation have been exhausted or prove futile;
(3) Whether continued insistence that compliance with the Court's orders would lead only to confrontation and delay;
(4) Whether there is a lack of leadership to turn the tide within a reasonable period of time;
(5) Whether there is bad faith;
(6) Whether resources are being wasted; and
(7) Whether a receiver is likely to provide a relatively quick and efficient remedy."

Plata v. Schwarzenegger, No. C01-1351-TEH, 2005 WL 2932253, at *23 (N.D. Cal. Oct. 3, 2005). The Court has considered the record carefully and, for the following reasons, concludes that the factors, as a whole, strongly support the appointment of an individual, independent of the City's governance structure, with appropriate powers, commensurate to those of a receiver, to address Defendants' noncompliance with the Contempt Provisions.

### 1. Harm to Plaintiffs

The Court's Findings of Fact, detailed in the Contempt Order and incorporated by reference herein, amply demonstrate both a grave and immediate threat as well as actuality of harm to the plaintiffs. The use of force rate and other rates of violence, self-harm, and deaths in custody are demonstrably worse than when the Consent Judgment went into effect in 2015.[7] (Contempt Order at 11.) As the record in this case demonstrates, the current rates of use of force, stabbings and slashings, fights, assaults on staff, and in-custody deaths remain extraordinarily high, and there has been no substantial reduction in the risk of harm currently facing those who live and work in the Rikers Island jails. (Id.) Not only do the numbers remain high, but, as the Monitoring Team has indicated, staff reporting of serious events has been very

---

[7]    These harms are described in greater detail in the Contempt Order.

unreliable for a significant period of time.  (<u>Id.</u>)  Worse still, the unsafe and dangerous conditions

in the jails, which are characterized by unprecedented rates of use of force and violence, have

become normalized despite the fact that they are clearly abnormal and unacceptable.  (<u>Id.</u>)

Critically, the use of force rate remains higher than the rate in 2015, which, the parties agreed

and the Court found, was high enough to violate the constitutional rights of those confined at

Rikers.  (Consent Judgment § I.)  These facts are more than sufficient to establish that the harm

is grave enough in the jails to justify the appointment of a receiver.  <u>United States v. Hinds Cnty.</u>,

No. 3:16-CV-489-CWR-BWR, 2023 WL 1186925, at *12 (S.D. Miss. Jan. 30, 2023)

(concluding that the first <u>Plata</u> factor favored the appointment of a receiver where "the conditions

have not improved, nor has the situation become any less unconstitutional" since the defendant

was last directed "to remedy the problems" (citation omitted)).  The first factor thus strongly

supports the appointment of a receiver.

        2. Futility of Less Extreme Measures

        The nearly decade-long record in this case, amassed since the Consent Judgment

went into effect, establishes that less extreme remediation measures have failed.  Defendants

have demonstrated—in virtually every core area the Court and the Monitor have identified as

related to the persistence of excessive and unnecessary force—that neither court orders nor the

Monitor's interventions are sufficient to push the DOC toward compliance.  The myriad

examples of non-compliance described in the Contempt Order illustrate the fundamental inability

of court orders in this matter, standing alone, to compel reform.  Defendants' failure is

particularly troubling because they have had over nine years of assistance from the Monitor and

his team.  Not only has the Monitoring Team consistently rated Defendants non-compliant with

the Contempt Provisions over the years, but the Monitoring Team has also made itself available,

without fail, to provide recommendations to and collaborate with Defendants to improve the unacceptable conditions in the Rikers Island jails and move toward compliance with Court orders. The Court has likewise highlighted Defendants' consistent noncompliance and found it necessary to issue multiple orders with substantially similar requirements—all designed to remedy the same problems related to basic security practices, use of force investigations, staff supervision, and the excesses of the Emergency Response Teams—because the DOC did not comply with earlier orders, even though the DOC and the City had concurred in the necessity and imposition of those orders. The DOC has repeatedly failed to incorporate the Monitoring Team's thoughtful recommendations, which are backed by years of expertise, experience and research, and "has taken few concrete actions to adopt these recommendations (or devise reasonable alternatives)" to come into compliance with the Contempt Provisions. (Contempt Order at 48.) This pattern has been well documented by the Monitoring Team for years. (Id.) There is no doubt that these less extreme measures have proven futile.

The Court has considered a number of potential remedies to effectively incentivize Defendants' compliance with the Contempt Provisions. For instance, the Court has considered imposing financial sanctions, but there is nothing in the record to suggest that increasing the financial burden on Defendants, which would in effect be a burden on taxpayers, would secure change. It does not appear that financial burdens effectively motivate Defendants to improve conditions in the City jails, which are already extraordinarily costly to run, at least in part due to poor staffing and supervision practices, and the City already pays large sums to individual plaintiffs to resolve the many damages cases brought against the Department each year. (Id. at 53-54.) Other courts have declined to impose financial penalties where millions of dollars had already been spent trying to fix dangerous jail facilities. See Hinds, 2023 WL

1186925, at *9.  Similarly, imposing a term of incarceration on Department or City leaders until

compliance has been achieved would do little to advance reform or ameliorate the patterns of

dysfunction that led to Defendants' contempt.  More extreme measures, such as a convening a

three-judge panel to order the release of the people incarcerated in the Rikers Island jails (see 18

U.S.C. § 3626(a)(3)), would also be inappropriate at this juncture, when other equitable remedies

are available and public safety is a significant concern.  See Plata, 2005 WL 2932253, at *28 &

n.6.  Defendants' actions to date give the Court no basis to conclude that any of the foregoing

remedies will effectively secure Defendants' compliance with their obligations.

   For these reasons, the second factor also favors the appointment of a receiver.

  3. Confrontation and Delay

   "It is resoundingly clear to the Court that continued insistence on defendants'

compliance with Court orders would lead to nothing but further delay, as well as further needless

death and [harm]" to Plaintiffs.  See Plata, 2005 WL 2932253, at *29.  There is no question that

the pace of Defendants' implementation of reform pursuant to the Consent Judgment and

subsequent remedial orders has been unacceptably glacial.  As early as 2018, the Monitor had

already noted the slow pace of the DOC's reform efforts and stated that "the two-and-a-half-year

record of reform that has been established portends a pace that will become intolerable at some

point in the future." (Contempt Order at 42.)  The following year, the Monitor indicated that the

DOC's lack of significant progress to that point represented a watershed moment, and that the

pace of reform was "glacial" and "difficult to tolerate."  (Id.)  Not only has the pace of reform

not accelerated in the years since, despite public exposure of the deficiencies through reporting

by the Monitor and the imposition of further Court orders requiring specific measures targeting

key issues and areas, but progress has even slowed or regressed in many areas.  (Id. at 42-43.)  In

July 2023, after almost eight years of DOC operation under the Consent Decree and additional orders, the Monitoring Team opined that that there is insufficient evidence to suggest that the pace of reform will accelerate within the confines of current structures.  (Id. at 43.)

The unacceptably slow pace of reform can be explained, to a significant degree, by an unfortunate cycle of small progress followed by regression on the part of DOC leadership, which has changed materially a number of times over the life of the Court's orders.  This cycle is demonstrated by the DOC's serial launching and subsequent abandonment of numerous plans, pilots, and facilities over the last nine years; the Monitoring Team has noted that "perpetually restarting the clock is antithetical to advancing reform and accelerating progress."  (Id.) Moreover, the DOC has proposed few concrete plans to address its noncompliance, and "[m]ost of the initiatives the City and Department have identified so far merely focus on revising policy, issuing memorandums and reading teletypes at roll call (which, notably, not all staff attend) or reiterating existing practices or trainings."  (Id.)  That this pattern has persisted despite support and guidance from the Monitoring Team reinforces the Court's conclusion that continued insistence on Defendants' proactive compliance with Court orders would only lead to further delay.  The third factor, therefore, also supports the appointment of a receiver.

4. Leadership Deficits

In the near decade since the Consent Judgment was entered, DOC leadership has failed to make meaningful progress toward substantial compliance with the Nunez Court Orders. Defendants emphasize the Monitoring Team's praise for current DOC Commissioner Maginley-Liddie, who was appointed to the role in December 2023 and whom the Monitoring Team has described as dedicated to working collaboratively with the Monitor to move the agency forward and committed to reform.  (See Def. Subm. at 7-11.)  It is true that the

Monitoring Team has enjoyed a good relationship with Commissioner Maginley-Liddie in the period since her appointment, has emphasized that they "observed an immediate change in the Department's approach and dynamic in early December 2023 with the appointment of Commissioner Maginley-Liddie[;]" has observed that "[t]he Department's leadership team is now actively engaging with" the Monitoring Team; and has represented that "[t]hese interactions reflect greater transparency and interest in working collaboratively." (Contempt Order at 42.) Defendants also highlight Commissioner Maginley-Liddie's early achievements, including improving compliance ratings in four areas and filling staff vacancies more quickly. (Def. Subm. at 9-10.) This report of progress is bolstered by Gary Raney's opinion that Commissioner Maginley-Liddie "is a strong leader who has the confidence of the organization" and "that Commissioner Maginley-Liddie, acting with even greater independence and authority from the Court as Compliance Director, will accelerate the reforms." (Raney Decl. ¶ 18.)

This Commissioner's newly introduced leadership and the most recent developments described in the November 2024 report and the parties' recent submissions, while providing some basis for hope of future sustained change, are not sufficient to tip this factor against the appointment of a receiver. After all, even a strong Commissioner with sound intentions can only make limited progress where, as here, the "dedicated team" of competent senior leadership required for reform has been lacking for years. (Contempt Order at 51.) As Plaintiffs highlight, dangerous and unsafe conditions in the jails have persisted well into the second year of the Commissioner's tenure. (Pl. Resp. at 10-11.) And, as Plaintiffs accurately noted in response to the declaration of Mr. Raney filed by Defendants, many of the areas for improvement Mr. Raney identified—like aging facilities, housing inspections, technology, supervision, and safety concerns—closely "mirror" recommendations made by the Monitoring

Team years ago.  (Docket entry no. 845, at 3-4.)  The continued existence of extremely dangerous and unsafe conditions led the Court to hold Defendants in contempt of a staggering eighteen provisions of the <u>Nunez</u> Court Orders and indicates that the Department has not yet taken the bold steps required to move the jails toward safety levels that comply with the Constitution.  It also underscores the seriousness of concerns that the remedy imposed in this case must not only achieve, but also enable the DOC to sustain, those bold moves and compliant levels of safety.

   While the fourth factor favors the appointment of a receiver, the Court emphasizes its hope and confidence that Commissioner Maginley-Liddie will continue to serve a critical leadership role in bringing the Department into compliance with the <u>Nunez</u> Court Orders. As the <u>Plata</u> court noted, "[w]hen appointing receivers, courts often remove the officials in charge of the entity responsible for the constitutional violations from power and place the receiver in their stead."  2005 WL 2932253, at *30 (collecting cases).  Here, however, in light of the trust and confidence Commissioner Maginley-Liddie has thus far garnered through her "new vision and energy" (Raney Decl. ¶ 8), the Court will not impose a remedy that displaces the current Commissioner, although, for the reasons explained below, the Court will appoint a <u>Nunez</u> Remediation Manager who will have ultimate authority in Contempt Provision-related areas.  A good working relationship between the <u>Nunez</u> Remediation Manager and the Commissioner, whose duties are broader than those areas in which the Court will empower the <u>Nunez</u> Remediation Manager, will be crucial to effective and coherent governance of the jails.  The <u>Nunez</u> Remediation Manager's role has been carefully designed to build on the laudable progress that Commissioner Maginley-Liddie has made so far and to support close collaboration between two effective leaders.

### 5. Bad Faith

"[A] a finding of bad faith is not required to institute a receivership." <u>Hinds</u>, 2023 WL 1186925, at *12. "And, as observed by the <u>Plata</u> Court, '[t]he question of motive is complicated.'" <u>Id.</u> (quoting <u>Plata</u>, 2005 WL 2932253, at *29). Guided by the approach taken by the courts in <u>Plata</u> and <u>Hinds</u>, this Court declines to make a finding as to whether Defendants have acted in bad faith. Regardless of the Defendants' motives, the "key factor" is that conditions on Rikers Island "fall below the constitutional minimum" despite "years of supervision and support by the Monitor and [his] team." <u>Id.</u> Here, that is clearly the case.

### 6. Wasted Resources

"The record in this case indicates 'that defendants have engaged in a huge waste of taxpayer's resources.'" <u>See</u> <u>Hinds</u>, 2023 WL 1186925, at *10 (quoting <u>Plata</u>, 2005 WL 2932253, at *31.) Like <u>Hinds</u>, this case has been characterized by a pattern of "stopping and starting and going in one direction and then . . . going in a different direction." <u>Id.</u> Although the Monitoring Team has noted that "perpetually restarting the clock is antithetical to advancing reform and accelerating progress[,]" the DOC has engaged in an unmistakable pattern wherein new initiatives are created, materially changed or abandoned, and then restarted. (Contempt Order at 43.) Additional examples of wasted resources, such as the Department's mismanagement of one of the richest staffing ratios in the country, abound in the record. (<u>See</u> <u>id.</u> at 31.) The reality that enormous resources—devoted by the City to a system that is at the same time overstaffed and underserved—are not being deployed effectively, too, favors the installation of an independent receiver under the sixth factor.

### 7. Quick and Efficient Remedy

When assessing the speed and efficiency of a remedy, "the speed of reform must be judged relative to the scale of the project." Plata, 2005 WL 2932253, at *31. There is no doubt that the task of bringing Defendants and the management of the jails into compliance with the Court orders in this case is enormous. While it is "challenging to gauge the speed at which a receiver can reform" the jails, the Court believes that steady and much more rapid progress is possible under the guidance of a well-structured receivership. Cf. Hinds, 2023 WL 1186925, at *12. The structure that the Court will impose is described in greater detail below. The seventh and final factor, therefore, also favors the appointment of a receiver.

B. Evaluation of the Parties' Respective Proposals

The Court has carefully considered the parties' competing proposals for enhanced remedial relief, each designed to address Defendants' near-decade of non-compliance with the Court orders in this case. Both proposals reflect thoughtful consideration by the parties and offer insightful solutions to the polycentric problems that have stymied compliance with Court orders for years. For that reason, the Court has closely studied both proposals in fashioning a model that is ultimately informed by both perspectives and also addresses the need to transform the safety profile of the jails while providing an opportunity for Defendants to resume complete authority over an effective institution as quickly as possible.

Defendants' Compliance Director Proposal, by shielding Commissioner Maginley-Liddie from removal and granting her additional powers until compliance with the Nunez Court Orders has been achieved, regardless of elections or other changes in administration, offers a solution that would avoid bureaucratic complexity and simplify the return of complete authority to Defendants. The proposal, however, falls short of specifically addressing the Court's contempt findings and the ongoing unsafe and chaotic conditions in the

City's jails and is insufficient to establish the independence and informed outside perspective that the years of dysfunction have led the Court to conclude are required to effectuate the transformational changes necessary to protect Plaintiffs' constitutional rights.  In essence, Defendants propose that they be permitted to continue on the current path in the hope that the current Commissioner, with a guaranteed tenure of five more years, will finally be both able and willing to implement the major institutional and structural reforms that are necessary to redress the ongoing constitutional violations and improve the safety profile of the jails.  The Compliance Director Proposal does not require any changes in DOC leadership or personnel, in the agency's current management or organizational structure, or in any operations or practices.  Nor have Defendants articulated any specific, concrete actions that Commissioner Maginley-Liddie will take if the Court adopts the Compliance Director Proposal that she was not empowered to take before.  (Pl. Subm. at 33.)  Instead, the chief virtue of the Compliance Director Proposal is continuity.  (See Def. Subm. at 4 ("[U]nder the Compliance Director Plan, the process for appointment of the 'Receiver' is simple and immediate – the current Commissioner remains in place and becomes the Compliance Director."), 6 ("There would be no additional cost or personnel arising from the establishment of the Compliance Director."), 7 ("The defendants' plan adds [no] additional weight to an already burdensome and costly process of governance."), 11 ("Commissioner Maginley-Liddie has been effecting transformational change within the Department and will be able to continue to do so more productively with the autonomy of the Compliance Director.").)  While there is some indication in the record that Commissioner Maginley-Liddie has begun to lead important progress toward increased safety in the jails, continuity alone is not compelling because the status quo led to the Court's finding Defendants in contempt of eighteen foundational provisions of the Nunez Court Orders.  Indeed, the most

recent Monitoring Team report emphasized that the DOC "remains mired in dysfunction" and "[t]he pace of the reform is nowhere near what the urgency of the situation demands." (Docket entry no. 802, at 2-3.) Maintaining the existing state of affairs is not likely to spur the "transformational change . . . needed to achieve a constitutionally adequate level of safety" that the Court identified as a necessary Receivership Goal in the Contempt Opinion and Order. (Contempt Order at 56.)

Transformational change is unlikely under the Compliance Director Plan because, even if the Mayor cannot remove the Compliance Director/Commissioner or direct her actions on <u>Nunez</u> matters, there is no doubt that political influence takes many forms beyond the Mayor's removal power. Indeed, under the Compliance Director Proposal, Commissioner Maginley-Liddie will continue to report to the Mayor "in the ordinary course of business." (Def. Subm. at 43.) Moreover, because she will continue to be responsible for all DOC operational matters outside the scope of the <u>Nunez</u> Court Orders, Defendants' proposed reporting structure risks distracting Commissioner Maginley-Liddie from the mandate to take bold action to enact the reforms necessary to move the DOC toward compliance with the specific use of force, safety, and accountability issues that are at the core of the <u>Nunez</u> concerns. Given Defendants' long history of noncompliance and contemptuous conduct, the Court concludes that the appointment of a fully independent individual—free from agency capture of any kind—is required. This individual will bring a knowledgeable outside perspective and will be exclusively focused on compliance with the Contempt Provisions of the <u>Nunez</u> Court Orders, will always be acting with the authority of this Court, and will report exclusively to this Court.

The Receivership Proposal of Plaintiffs and the United States, on the other hand, contemplates granting a receiver sweeping powers to transform the safety profile of the jails to

reach substantial Compliance with all of the provisions of the <u>Nunez</u> Court Orders. The proposal, however, does not point to a quick and efficient remedy tailored to the contempt findings underlying the grant of relief, nor does it provide for systematic attention throughout the life of the receivership to the creation and maintenance of conditions that will enable Defendants to regain control of jail governance while sustaining the necessary transformative changes. The Receivership Proposal does not articulate a specific plan to transition full authority over the jails back to Defendants, nor does it incentivize collaboration with Department leadership. Instead, the Receivership Proposal would vest the receiver with a "Mandate" "to take all necessary steps to promptly achieve Substantial Compliance with this Court's orders in this action" and would only terminate after "the Court determines that Substantial Compliance . . . with the <u>Nunez</u> Orders has been achieved." (Pl. Subm. at 4, 10.) As the Monitoring Team has wisely recommended, "[a] guiding principle must be to manage the process in such a way that sustainably transitioning authority back to the local government is always at the forefront of the work." (Docket entry no. 811, at 16.) While the Receivership Proposal emphasizes that the receiver "would work closely with Commissioner Maginley-Liddie and her leadership team as they work towards their joint goal of achieving compliance with the <u>Nunez</u> orders[,]" (<u>id.</u> at 32), it does not include specific features promoting such collaboration with the Commissioner or other Department leaders to achieve the Mandate. Without additional structure to promote collaboration with the Commissioner and other Department leaders, and vice-versa, to ensure the recognition and preservation of intermediate successes and the steady construction of a foundation for a sustainable transition back to local authority, any gains made under the leadership of a receiver are at undue risk of regression after Substantial Compliance has been achieved.

In sum, while both the Compliance Director Proposal and the Receivership Proposal offer salutary features, neither one, on its own, presents a remedy that is designed to both (1) adequately ameliorate Defendants' contempt of the <u>Nunez</u> Court Orders and (2) build momentum toward a sustainable transition of authority back to Defendants. The Court has therefore designed the model that it will impose.

C. The Court's Remedy

For the reasons discussed above and in the Contempt Order, the Court has fashioned a remedy designed to ameliorate Defendants' contempt by empowering a skilled outside professional (the "<u>Nunez</u> Remediation Manager") to develop a phased action plan specifically focused on the areas in which the Court has found Defendants to be in contempt and, subject only to the Court's authority and the provisions of the orders entered in this case, to direct the implementation of that plan in collaboration with the Commissioner, who will retain primary responsibility and authority for achieving compliance with the remaining unsatisfied requirements of the <u>Nunez</u> Court Orders.

The Commissioner and all other personnel of DOC and City leadership will be required to work cooperatively with the <u>Nunez</u> Remediation Manager and take all other steps that the <u>Nunez</u> Remediation Manager directs pursuant to the orders of this Court to eradicate the principal barriers that have led to the current crisis and contempt findings—insufficiently resourced leadership; a lack of continuity in management; failures of supervision and cooperation between supervisors and line officers; a lack of skill or imagination to create and implement transformative plans; and an unwillingness or inability to cooperate with Monitoring Team recommendations to accomplish the urgently necessary changes in the safety profile of the jails—and, with the support and collaboration of the Remediation Manager, to comply with the

remaining provisions of the <u>Nunez</u> Court Orders.  While the necessary changes will take some time, the Court expects to see continual progress toward these goals so that control of use of force and related policies and practices can be returned to the City and the DOC as quickly as possible.  Collaboration with the DOC is a critical element of sustainable change in the jails, but the Court also recognizes that the <u>Nunez</u> Remediation Manager may find it necessary to alter relevant aspects of the current leadership structure of the DOC to accomplish the necessary Contempt Provision compliance.

The <u>Nunez</u> Remediation Manager will be granted broad powers, similar to those described in the Receivership Proposal.  The <u>Nunez</u> Remediation Manager's exercise of those powers will, however, be guided by a Remediation Action Plan, developed by the Remediation Manager in consultation with the Commissioner and the Monitoring Team and submitted to the Court for approval, that enumerates goals and actions that build on whatever progress has been made since the factual record closed on the contempt motion practice, and are specifically tailored to bring Defendants into substantial compliance with the Contempt Provisions while supporting Defendants' continued progress toward substantial compliance with all of the provisions of the <u>Nunez</u> Court Orders.  The Remediation Action Plan will also be designed to support and facilitate the return of areas of primary <u>Nunez</u> Remediation Manager control to Defendants as goals are achieved and sustained over time.

The <u>Nunez</u> Remediation Manager's powers will thus be broad enough, and no broader than necessary, to remedy the areas in which Defendants have been found in contempt. Because Defendants remain obligated to comply with all of the provisions of all of the <u>Nunez</u> Court Orders even as they are subject to the authority of the <u>Nunez</u> Remediation Manager with respect to remediation of the violations of the Contempt Provisions, the appointment of a <u>Nunez</u>

Remediation Manager complies with the PLRA requirement that "[p]rospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs."  18 U.S.C § 3626(a)(1)(A).

1. Powers and Duties of the Nunez Remediation Manager[8]

The independent Nunez Remediation Manager, who shall have no other employment or remunerative relationship with the City or the Department during the Manager's service in such capacity, will be appointed by and answerable only to the Court.  The Nunez Remediation Manager will have the responsibility and authority to take all necessary steps to achieve Substantial Compliance (defined in Section XX, ¶ 18 of the Consent Judgment) with the Contempt Provisions promptly.  The Nunez Remediation Manager will also be expected to develop a good working relationship with the Commissioner and DOC leadership in order to collaborate and serve as a resource with respect to Defendants' achievement and maintenance of Substantial Compliance with the remaining aspects of the Nunez Court Orders as needed.

The appointee shall have powers commensurate with the Nunez Remediation Manager's ultimate authority, as agent of the Court and answering only to the Court, for oversight, direction, and management of all aspects of the DOC necessary to bring the Department into compliance with the Contempt Provisions.  Such authority shall be exercised in accordance with the framework set forth in a Remediation Action Plan approved by the Court that, as explained above, is designed to manage and achieve Defendants' compliance with the Contempt Provisions.  Such authority is also compatible with, and supports, the Defendants'

---

[8]     A draft of the Order Appointing the Nunez Remediation Manager, to be entered after the Nunez Remediation Manager has been selected, is attached as Appendix B.

additional work to achieve substantial compliance with the other provisions of the <u>Nunez</u> Court

Orders, to achieve effective management of the jails that protects the constitutional rights of

incarcerated people, and to promote the safety of both incarcerated people and DOC staff.  These

powers include authority over DOC's rules, policies, and personnel, as detailed below, including

all powers of the Commissioner in such areas, as well as the direct ability to hire and manage

senior staff responsible for these areas.  The <u>Nunez</u> Remediation Manager may delegate elements

of this authority to the Commissioner from time to time, in the <u>Nunez</u> Remediation Manager's

discretion.  To the extent the Commissioner is overseeing matters within the Remediation

Manager's remit, the Commissioner shall answer to the <u>Nunez</u> Remediation Manager, who will

continue to be accountable solely to the Court.  Such delegations may be withdrawn or modified

as the <u>Nunez</u> Remediation Manager deems appropriate.

   The following powers, which are to be exercised in accordance with the

Remediation Action Plan, are essential to efficiently rectify the dangerous practices that have

prevailed in the jail system for decades and to surmount the political, bureaucratic, and

institutional obstacles that have stymied prior reform efforts.  They include, but are not limited

to:[9]

- **Implementing changes to Department policies, procedures, protocols, and systems
  implicated by the Court's contempt findings.**  The record clearly shows that Defendants
  have repeatedly failed to develop and implement necessary policies, practices, and

---

[9]  The <u>Nunez</u> Remediation Manager may, after consultation with the Commissioner and the
Monitoring Team, petition the Court on notice to the parties and the Monitoring Team for
such additional powers as are necessary to achieve compliance with the Contempt
Provisions.

procedures despite repeated Monitor recommendations. (Contempt Order at 43.) Most notably, the Department did not "develop, adopt, and implement a new comprehensive use of force policy" as required by the Consent Judgment and "the consequences of this failure have been dire." (Id. 16-17.) Other courts have found that granting a receiver the power to modify facility policies, procedures, and practices complied with the necessity and narrow tailoring requirements of the PLRA. See, e.g., Shaw v. Allen, 771 F. Supp. 760, 764 (S.D. W. Va. 1990) (authorizing receiver to "formulate and implement such plans as shall be necessary to provide for an acceptable level of security and control among the inmates," and to "take such actions as are necessary to ensure that health and safety standards are devised, written, published, and implemented"). This grant of power to the Nunez Remediation Manager is appropriately narrowly drawn, extends no further than necessary to correct the violation of the Contempt Provisions, and is the least intrusive means necessary to correct the violation of the Contempt Provisions, as required by the PLRA.

- **Reviewing, investigating, and taking disciplinary or corrective actions with respect to violations of the Use of Force Directive and other DOC policies implicated by the Court's contempt findings**. The Department has never achieved substantial compliance with the Contempt Provisions requiring the Department to (1) thoroughly, timely, and objectively investigate use of force incidents or (2) to take all necessary steps to impose appropriate and meaningful discipline for staff members who violate Department policies, procedures, rules, and directives related to use of force. (Contempt Order at 19, 21.) Because the Department's inability to consistently identify misconduct has led to a decrease in accountability for use of force-related misconduct (id. at 15, 21), it is necessary that the Nunez Remediation Manager have the power to investigate and discipline violations of

Nunez-related policies in order to remedy Defendants' ongoing unconstitutional pattern and practice of excessive force. Other courts have granted receivers similar powers related to staff discipline. (See, e.g., docket entry no. 811-9 ("Miami-Dade Compliance Director Ord") at 6 (granting Compliance Director authority "to review, investigate, and take corrective actions regarding MDCR policies, procedures, and practices that are related to Agreements, and any future Court Orders").) This grant of power to the Nunez Remediation Manager is narrowly drawn, extends no further than necessary to correct the violation of the Contempt Provisions, and is the least intrusive means necessary to correct the violation of the Contempt Provisions as required by the PLRA.

- **Hiring, promoting, and deploying staff to provide effective coverage in housing areas and so that there are sufficient qualified and experienced individuals to fill supervisory and other uniformed positions.** The record demonstrates that "staffing is the essential element to reform" and that "DOC's mismanagement of staff is inextricably linked to high rates of force and violence in the jails." (Contempt Order at 31 (emphasis in original).) In recognition of the connection between staffing issues and constitutional violations, other courts have granted similar powers to a receiver. See, e.g., Hinds, 2023 WL 1186925, at *16 (granting receiver "the power to hire, fire, suspend, supervise, promote, transfer, discipline, and take all other personnel actions regarding employees or contract employees who perform services related to the operation of [the jails]"). This grant of power to the Nunez Remediation Manager is narrowly drawn, extends no further than necessary to correct the violation of the Contempt Provisions, and is the least intrusive means necessary to correct the violation of the Contempt Provisions as required by the PLRA.

- **Participating in the negotiation of contracts, or renegotiation of existing contracts if necessary, and procuring necessary equipment and supplies to, among other things, enhance security in the jails.**  Powers related to procurement and contracting, to the extent that the DOC Commissioner is so empowered, are necessary because (1) the prompt repair of infrastructure problems that create security risks, such as broken cell doors and locks, is integral to the reduction of preventable use of force incidents (<u>see</u> Contempt Order at 24), and (2) the record indicates that Defendants have renegotiated union contracts in a way that stymies compliance with the Contempt Provisions (<u>see</u> <u>id.</u> at 32-33 & n. 32).  Other courts have granted similar authority to receivers.  (<u>See</u>, <u>e.g.</u>, docket entry no. 811-6 ("<u>Plata</u> Receivership Order") at 4 (authorizing the Receiver to negotiate new contracts and renegotiate existing contracts, including those with labor unions, if necessary to fulfill his duties under the Order).  For the avoidance of doubt as to the extent of this authority with respect to collective bargaining agreements: the <u>Nunez</u> Remediation Manager will not be empowered to unilaterally cancel or execute collective bargaining agreements, but will have the authority of the Commissioner in determining the DOC's needs and positions with respect to contract provisions relevant to remediation of the Contempt Provisions.  This grant of power to the Remediation Manager is thus narrowly drawn, extends no further than necessary to correct the violation of the Contempt Provisions, and is the least intrusive means necessary to correct the violation of the Contempt Provisions as required by the PLRA.

- **Petitioning the Court to waive any legal or contractual requirements that impede the <u>Nunez</u> Remediation Manager from carrying out their duties under this Order and achieving compliance with the Contempt Provisions.**  The <u>Nunez</u> Remediation Manager is authorized to address any legal obstacles to substantial compliance by seeking, on notice to

the parties and the Monitoring Team, further action by this Court.  The Court notes that the Receivership Proposal and the Compliance Director Proposal recognize the importance of this power, and several other courts have granted receivers this power in the corrections context.  See, e.g., Hinds, 2023 WL 1186925, at *18.  This grant of power to the Nunez Remedial Manager is narrowly drawn, extends no further than necessary to correct the violation of the Contempt Provisions, and is the least intrusive means necessary to correct the violation of the Contempt Provisions as required by the PLRA.

- **Directing the Commissioner and Department leadership to take any steps the Nunez Remediation Manager deems necessary to achieve compliance with the Remediation Action Plan, including delegating any of the Nunez Remediation Manager's powers to the Commissioner or other Department leadership in aid of the achievement of such compliance.**  This power to direct the Commissioner and Department leadership, including the Remediation Manager's discretion to delegate authority from time to time, is designed to incentivize the Commissioner and Department leaders to work collaboratively with the Nunez Remediation Manager to implement the reforms necessary to achieve compliance with the Remediation Action Plan.  Any direct delegee of the Remediation Manager will answer directly to the Remediation Manager, who remains answerable only to the Court.  A close working relationship between the Nunez Remediation Manager, the Commissioner, and DOC leadership will minimize the steep learning curve that is inherent in addressing the deeply embedded, polycentric problems of the jails.  It will also ensure that the full transfer of power back to local authorities can occur seamlessly.  This grant of power to the Nunez Remediation Manager is narrowly drawn, extends no further than necessary to correct the

violation of the Contempt Provisions, and is the least intrusive means necessary to correct the violation of the Contempt Provisions as required by the PLRA.

In sum, the <u>Nunez</u> Remediation Manager shall possess all <u>Nunez</u>-related powers of the Commissioner that are necessary to remedy the Contempt Provisions, except to the extent those powers are delegated to the Commissioner or other DOC personnel (subject to accountability to the Remediation Manager and thus ultimately to the Court) or gradually restored to Defendants by reason of substantial compliance with the Contempt Provisions.

2. Development and Implementation of the Remediation Action Plan

The <u>Nunez</u> Remediation Manager, in consultation with the Commissioner and the Monitoring Team, shall within 90 days following the appointment of the <u>Nunez</u> Remediation Manager identify the key, concrete, transformative changes that will be necessary to achieve substantial compliance with the Contempt Provisions within three years of the date the Court files the <u>Nunez</u> Remediation Manager's Acceptance of this appointment on the public docket for this case, subject to extension of the target period for any particular elements of the plan upon a showing of good cause therefor.  These actions shall be organized into a prioritized "Remediation Action Plan" that groups these transformative changes into integrated phases with specified benchmarks to be achieved within 12-month periods, beginning with the safety-related areas and actions that are most urgently in need of attention.  These integrated phases may include groups of changes responsive to more than one Contempt Provision, and these integrated phases may overlap temporally.  The plan proposal must be submitted to Plaintiffs and the United States, who will have 21 days to offer comments and feedback.  The <u>Nunez</u> Remediation Manager shall make any revisions the Remediation Manager deems appropriate in light of the parties' feedback and submit the Remediation Action Plan to the Court for approval within 21

days thereafter.  The Court will thereafter entertain applications by the <u>Nunez</u> Remediation Manager for Remediation Action Plan amendments or modifications as necessary.

To be clear, the responsibilities and authority of the <u>Nunez</u> Remediation Manager shall not be constrained by the particular stages of the Remediation Action Plan, nor are the powers granted to the <u>Nunez</u> Remediation Manager limited during the time period in which the Remediation Action Plan is being developed.  Instead, the <u>Nunez</u> Remediation Manager shall at all times possess all of the necessary authority and responsibility to address non-compliance with the Contempt Provisions, but will be expected to prioritize work on the areas and in a manner consistent with the timeline set by the Remediation Action Plan once the plan is in place, unless the plan is modified by the Court in response to an application by the <u>Nunez</u> Remediation Manager.  Any such application shall be made in consultation with the Commissioner and the Monitoring Team and on notice to the parties and the Monitoring Team.

As soon as the Remediation Action Plan has been finalized by the <u>Nunez</u> Remediation Manager, the Commissioner, and the Monitor and endorsed by the Court, the <u>Nunez</u> Remediation Manager must begin the implementation of the Remediation Action Plan. This work shall be undertaken in collaboration with the Commissioner to the greatest extent consistent with efficiency, effectuation of change, and the fostering of a respectful, sustainably safety-oriented approach to management.  The Monitor shall file a report within 130 days following each Reporting Period[10] describing the efforts the Department and the Remediation Manager have taken to implement the requirements of the Remediation Action Plan and

---

[10]    The Reporting Periods in this case cover January 1 to June 30 and July 1 to December 31 of each year.

evaluating the extent to which the Department and Remediation Manager have complied with the benchmarks of the Remediation Action Plan and each of the Contempt Provisions. After the Monitor has reported that substantial compliance with the relevant Remediation Action Plan phase benchmarks has been achieved, and within 30 days of the Court's determination that substantial compliance has been achieved for the relevant phase, the Nunez Remediation Manager shall begin work with the Commissioner on a Transition Plan that outlines (1) how to sustain the progress achieved, (2) the steps the Remediation Manager will take to prepare the Department to operate independently, and (3) the actions the Department will take to maintain the required performance level and sustain compliance. The Nunez Remediation Manager's authority over the relevant benchmark of the Remediation Action Plan shall be terminated upon the Court's determination, following the Monitoring Team's report that the relevant benchmark is in Substantial Compliance for the third successive Reporting Period, that substantial compliance with the benchmarks has been achieved and sustained sufficiently to warrant such termination. The Nunez Remediation Manager shall, while supporting the maintenance of the achievement of substantial compliance for the completed phase(s), also begin promptly the next phase of the Remediation Action Plan.

    Within 30 days following Court approval of the Remediation Action Plan, the Remediation Manager, the Monitoring Team, and the Commissioner shall jointly develop an updated DOC organizational chart that includes delineation of the reporting lines of divisions, operational functions, and personnel that are subject to the direct authority of the Remediation Manager and the Commissioner, respectively, and those where both exercise direct authority over aspects of the divisions, operations, and personnel. In the event of conflict regarding lines of authority, the Nunez Remediation Manager will make the final determination. The

Remediation Manager and the Commissioner shall at all times endeavor to work collaboratively and efficiently in carrying out their responsibilities for restoring constitutionally compliant use of force and safety conditions in the City's jails.

The authority granted to the Nunez Remediation Manager, which is focused on remediation of Defendants' compliance with the Contempt Provisions and guided by a Court-approved Remediation Action Plan, "is narrowly drawn, extends no further than necessary to correct the violation of the [Contempt Provisions], and is the least intrusive means necessary to correct the violation of the [Contempt Provisions]" in compliance with the PLRA.  18 U.S.C § 3626(a)(1)(A).  The federal intrusion, in other words, will be appropriately limited while simultaneously spurring the fundamental changes required in the New York City jails to remedy Defendants' contempt.

3. Selection and Qualities of the Nunez Remediation Manager

Promptly following the entry of this Opinion and Order to Appoint a Nunez Remediation Manager, the parties and the Monitoring Team shall meet and confer and investigate and interview candidates as they deem appropriate.  The Court will confidentially convey to the parties and the Monitoring Team the information and inquiries it has received from persons potentially interested in being considered for the position.  By **August 29, 2025**, the parties must confidentially present the Court with no more than four recommendations, preferably joint, of individuals for appointment as the Nunez Remediation Manager.  The parties may rank their proposed candidates.  Each recommended candidate shall have the following minimum qualifications: (1) substantial management and correctional expertise developed outside of the DOC, (2) demonstrated collaborative skills, (3) the ability to build trust and commitment to common and effective goals with management and line staff, and (4) excellent

oral and written communication skills.[11]  The parties shall consider, and the recommendations

may also address, the compensation expectations or proposals of the candidates and the

candidates' expectations regarding staffing and resources.  Once the Court has received the

parties' recommendations, the Court may interview the proposed candidates and any others it

deems appropriate to review, and the Court shall select the <u>Nunez</u> Remediation Manager.  It is

necessary for the Court to have ultimate control over the selection of the <u>Nunez</u> Remediation

Manager in order to correct the violation of federal rights, as identified in the Contempt Order

and Opinion, because, ultimately, the Receiver will be an agent of and answer only to the Court.

### 4. Preparation for the Nunez Remediation Manager

As Plaintiffs and the United States pointed out in their submission, Defendants

have advised that "no current organizational chart is available due to recent staffing changes" at

the DOC; Defendants also have failed to provide "comparable information in a different form."

(Pl. Subm. at 6.)  Defendant's inability to provide an organizational chart over nine years after

the Consent Judgment was entered is, simply put, unacceptable.  The essential reforms necessary

to fix the polycentric issues in the jails—problems that led to the Court's finding of contempt of

eighteen provisions of orders related to Defendants' failures (1) to implement the use of force

directive; (2) to conduct adequate use of force investigations and hold staff accountable; (3) to

correct failures in security and basic correctional practice; (4) to adequately supervise staff and

facility leadership; (5) to effectively deploy uniformed staff to adequately supervise incarcerated

---

[11]     A document with information about the <u>Nunez</u> Remediation Manager position, to be
shared with individuals who are interested in being considered as candidates, is attached
hereto as Appendix C.

individuals; (6) to curb the emergency response teams' excesses; and (7) to ensure the safety of young people in custody—simply cannot be pushed forward if the structure of the DOC remains opaque. This has been true during local control over the jails and is doubly true with the impending appointment of the <u>Nunez</u> Remediation Manager. For that reason, and to support the selection of the <u>Nunez</u> Remediation Manager and facilitate the subsequent leadership transition, the Commissioner is hereby directed to create an organizational chart of the current structure of the DOC. The organizational chart must be submitted to the Monitoring Team, Plaintiffs, and the United States within 21 days after the entry of this Opinion and Order to Appoint a <u>Nunez</u> Remediation Manager.

### III. Conclusion

For the foregoing reasons and as explained above, the Court will appoint an independent <u>Nunez</u> Remediation Manager who will report only to this Court and be empowered to cure Defendants' contempt and support the Commissioner's remediation of the Defendants' outstanding noncompliance with the remaining provisions of the <u>Nunez</u> Court Orders. The Remediation Manager and the Commissioner will, together, address the ongoing violations of the constitutional rights of people in custody in the City's jails. The Court finds that such relief is narrowly drawn, extends no further than necessary to correct Defendants' violations of the <u>Nunez</u> Court Orders, as documented by the Contempt Order dated November 27, 2024, and, particularly in light of the contemplated collaboration between the Nunez Remediation Manager and the Commissioner, is the least intrusive means necessary to correct the violation of these federal rights.

When the Court has selected the <u>Nunez</u> Remediation Manager, the Court shall enter an order in substantially the form outlined as Appendix B. Any objections to the language

of the draft order appended hereto as Appendix B must be discussed with the Monitoring Team and filed with the Court in writing by 12:00 p.m. on **June 27, 2025**.

Defendants are directed to provide a current organizational chart, as described above, to the Monitoring Team, Plaintiffs, and the United States, within 21 days after the entry of this Order. A copy of the organizational chart shall also be emailed to the Court via SwainNYSDCorresp@nysd.uscourts.gov.

The parties and the Monitoring Team shall promptly meet and confer concerning selection of the Nunez Remediation Manager and must present the Court with no more than four recommendations, preferably joint, of individuals to be appointed as the Nunez Remediation Manager by **August 29, 2025**. The parties shall endeavor to make a joint recommendation of no more than four Remediation Manager Candidates, but may make separate recommendations, as long as the total number of individuals recommended does not exceed four. The parties may identify candidates on their own, and persons interested in being considered may review the information set forth in Appendix C hereto, which will also be posted separately as a Notice on the docket, and submit their materials confidentially by email to NunezRemediationManagerApps@nysd.uscourts.gov for forwarding to the parties and the Monitoring Team. Inquiries that the Court has received prior to the entry of this Opinion and Order will also be forwarded confidentially to the parties and the Monitoring Team.

The parties shall submit their recommendations, with supporting materials, to the Court confidentially via email to SwainNYSDCorresp@nysd.uscourts.gov by **August 29, 2025**. Once the Court has received the parties' recommendations, the Court may interview the proposed candidates in its discretion, and consider further candidates in its discretion, and shall promptly select the <u>Nunez</u> Remediation Manager.  Notice of the selection shall be posted publicly on the docket.

 SO ORDERED.

Dated: New York, New York
 May 13, 2025

 /s/ Laura Taylor Swain
 LAURA TAYLOR SWAIN
 Chief United States District Judge

### APPENDIX A: CONTEMPT PROVISIONS

**A. Consent Judgment, § IV, ¶ 1: Implement New Use of Force Directive**

>Within 30 days of the Effective Date, in consultation with the Monitor, the Department shall develop, adopt, and implement a new comprehensive use of force policy with particular emphasis on permissible and impermissible uses of force ('New Use of Force Directive'). The New Use of Force Directive shall be subject to the approval of the Monitor.

**B. Consent Judgment, § VII, ¶ 1: Thorough, Timely, Objective Investigations**

>As set forth below, the Department shall conduct thorough, timely, and objective investigations of all Use of Force Incidents to determine whether Staff engaged in the excessive or unnecessary Use of Force or otherwise failed to comply with the New Use of Force Directive. At the conclusion of the investigation, the Department shall prepare complete and detailed reports summarizing the findings of the investigation, the basis for these findings, and any recommended disciplinary actions or other remedial measures. All investigative steps shall be documented.

**C. Consent Judgment, § VII, ¶ 9(a): Timeliness of Full ID Investigations**

>i.   Beginning on the Effective Date and for three years following the Effective Date, or until October 1, 2018, whichever is earlier:
>
>>1. ID shall complete all Full ID Investigations by no later than 180 days from the date the Use of Force Incident was referred to ID ("Referral Date"), absent extenuating circumstances outside the Department's control that warrant an extension of this deadline. Any extension of the 180-day deadline shall be documented and subject to approval by the DCID or a designated Assistant Commissioner. Any Full ID Investigation commenced after the Effective Date that is open for more than 180 days shall be subject to monthly reviews by the DCID or a designated Assistant Commissioner to determine the status of the investigation and ensure that all reasonable efforts are being made to expeditiously complete the investigation.
>>
>>2. The Department shall make every effort to complete Full ID Investigations of less complex cases within a significantly shorter period than the 180-day time frame set forth in the preceding subparagraph.
>
>ii.  Beginning on October 1, 2018, or three years after the Effective Date, whichever is earlier, and for the duration of the Agreement:
>
>>1. ID shall complete all Full ID Investigations by no later than 120 days from the Referral Date, absent extenuating circumstances outside the

Department's control that warrant an extension of this deadline. Any extension of the 120-day deadline shall be documented and subject to approval by the DCID or a designated Assistant Commissioner. Any Full ID Investigation that is open for more than 120 days shall be subject to monthly reviews by the DCID or a designated Assistant Commissioner to determine the status of the investigation and ensure that all reasonable efforts are being made to expeditiously complete the investigation.

2. The Department shall make every effort to complete Full ID Investigations of less complex cases within a significantly shorter period than the 120-day time frame set forth in the preceding subparagraph.

iii. In the event that a Use of Force Incident is referred to DOI, or following the further referral by DOI to the District Attorney's Office ("DA'") or another outside law enforcement agency, for investigation or a decision on immunity, the time period for the Department to complete the Full ID Investigation shall be tolled while the other agency is investigating the matter or making a decision on immunity. ID shall on at least a monthly basis contact DOI to monitor the status of investigations referred to other law enforcement agencies.

## D. Consent Judgment, § VII, ¶ 11: ID Staffing

The Department, if necessary, shall hire a sufficient number of additional qualified ID Investigators to maintain ID Investigator caseloads at reasonable levels so that they can complete Full ID Investigations in a manner that is consistent with this Agreement, including by seeking funding to hire additional staff as necessary.

## E. Consent Judgment, § VIII, ¶ 1: Appropriate and Meaningful Discipline

The Department shall take all necessary steps to impose appropriate and meaningful discipline, up to and including termination, for any Staff Member who violates Department policies, procedures, rules, and directives relating to the Use of Force, including but not limited to the New Use of Force Directive and any policies, procedures, rules, and directives relating to the reporting and investigation of Use of Force Incidents and video retention ("UOF Violations").

## F. Second Remedial Order, ¶1(i)(a): Interim Security Plan

<u>Immediate Security Initiatives:</u> In order to immediately address the current lapses in security management, the Department must do the following:

a. Develop, in consultation with the Monitor, and implement an interim Security Plan that describes, in detail, how various security breaches will be addressed by October 11, 2021. This plan shall address, among other things, the following issues: unsecured doors, abandonment of a

post, key control, post orders, escorted movement with restraints when required, control of undue congregation of detainees around secure ingress/egress doors, proper management of vestibules, and properly securing officer keys and OC spray.

**G. Action Plan, § A, ¶1(d): Improved Routine Tours**

The Department shall conduct routine tours, including, but not limited to, tours of the housing units every 30 minutes. The Department shall immediately institute improved practices to ensure that routine touring is occurring, including the use of the "tour" wand by Correction Officers during each tour conducted. The Office of the Commissioner shall audit the electronic records of tours conducted by uniform staff to ensure compliance with touring requirements.

**H. Action Plan, § D, ¶ 2(a), (d), (e), and (f): Improved Security Initiatives**

*Improved Security Initiatives:* The Department shall implement improved security practices and procedures, including, but not limited to, the following items outlined below:

    a.  the interim Security Plan required by ¶ 1(i)(a) of the Second Remedial Order;

    d.  improved procedures on how searches are conducted, including addressing the Monitor's feedback that was provided in 2021;

    e.  enhanced efforts to identify and recover weapons and other contraband;

    f.  improved escort techniques to eliminate the unnecessary use of painful escort holds[.]

**I. First Remedial Order, § A, ¶ 2: Facility Leadership Responsibilities**

Each Facility Warden (or designated Deputy Warden) shall routinely analyze the Use of Force Reviews, the Department leadership's assessments of the Use of Force Reviews referenced in Paragraph A.1(i) above, and other available data and information relating to Use of Force Incidents occurring in the Facility in order to determine whether there are any operational changes or corrective action plans that should be implemented at the Facility to reduce the use of excessive or unnecessary force, the frequency of Use of Force Incidents, or the severity of injuries or other harm to Incarcerated Individuals1 or Staff resulting from Use of Force Incidents. Each Facility Warden shall confer on a routine basis with the Department's leadership to discuss any planned operational changes or corrective action plans, as well as the impact of any operational changes or corrective action plans previously implemented. The results of these meetings, as well as the operational changes or corrective action plans discussed or implemented by the Facility Warden (or designated Deputy Warden), shall be documented.

**J. First Remedial Order, § A, ¶ 4: Supervision of Captains**

> The Department, in consultation with the Monitor, shall improve the level of supervision of Captains by substantially increasing the number of Assistant Deputy Wardens ("ADWs") currently assigned to the Facilities. The increased number of ADWs assigned to each Facility shall be sufficient to adequately supervise the Housing Area Captains in each Facility and the housing units to which those Captains are assigned, and shall be subject to the approval of the Monitor.

**K. Action Plan, § C, ¶ 3(ii), (iii): Increased Assignment and Improved Supervision of Captains**

> _Improved and Maximized Deployment of Staff:_ The Department shall maximize deployment of uniform staff within the facilities by implementing modified staffing practices, including, but not limited to the items outlined below:

> ii. _Increased Assignment of Captains in the Facility:_ Complete a full evaluation of the assignment of all Captains and develop and implement a plan to prioritize assignment of Captains to supervise housing units to increase Captain presence on housing units.

> iii. _Improved Supervision of Captains:_ Substantially increase the number of Assistant Deputy Wardens currently assigned to the facilities or a reasonable alternative to ensure that there is adequate supervision of Captains.

**L. Action Plan, § C, ¶ 3, (v), (vi), (vii): Improved and Maximized Deployment of Staff**

> _Improved and Maximized Deployment of Staff:_ The Department shall maximize deployment of uniform staff within the facilities by implementing modified staffing practices, including, but not limited to the items outlined below:

> v. _Awarded Posts:_ Reduce the use of awarded posts so they are primarily utilized for those positions in which a particular skill set is required. A staff member with an awarded non-mandatory post must be re-deployed to a mandatory post if there are staffing shortages.

> vi. _Maximize Work Schedules:_ Create and implement alternatives to the work schedule for uniform staff assigned to work in the facilities in order to minimize the use of a 4 by 2 schedule and optimize staff scheduling.

> vii. _Reduction of Uniformed Staff in Civilian Posts:_ Reduce the assignment of uniform staff to civilian posts, including Temporary Duty Assignment, in order to minimize the reliance on uniform staff for tasks that can and should be reasonably completed by civilians.

**M. First Remedial Order, § A, ¶ 6: Facility Emergency Response Teams**

Within 90 days of the Order Date, the Department shall, in consultation with the Monitor, develop, adopt, and implement a protocol governing the appropriate composition and deployment of the Facility Emergency Response Teams (i.e., probe teams) in order to minimize unnecessary or avoidable Uses of Force. The new protocol shall address: (i) the selection of Staff assigned to Facility Emergency Response Teams; (ii) the number of Staff assigned to each Facility Emergency Response Team; (iii) the circumstances under which a Facility Emergency Response Team may be deployed and the Tour Commander's role in making the deployment decision; and (iv) de-escalation tactics designed to reduce violence during a Facility Emergency Response Team response. The Department leadership shall regularly review a sample of instances in which Facility Emergency Response Teams are deployed at each Facility to assess compliance with this protocol. If any Staff are found to have violated the protocol, they shall be subject to either appropriate instruction or counseling, or the Department shall seek to impose appropriate discipline. The results of such reviews shall be documented.

**N. Consent Judgment § XV, ¶ 1: Prevent Fights/Assaults (Safety and Supervision of Inmates Under the Age of 19) – *18-year-olds***

Young Inmates shall be supervised at all times in a manner that protects them from an unreasonable risk of harm. Staff shall intervene in a timely manner to prevent inmate-on inmate fights and assaults, and to de-escalate inmate-on-inmate confrontations, as soon as it is practicable and reasonably safe to do so.

**O. Consent Judgment § XV, ¶ 12: Direct Supervision (Safety and Supervision of Inmates Under the Age of 19) – *18-year-olds***

The Department shall adopt and implement the Direct Supervision Model in all Young Inmate Housing Areas.

**P. Consent Judgment § XV, ¶ 17: Consistent Assignment of Staff (Safety and Supervision of Inmates Under the Age of 19) – *18-year-olds***

The Department shall adopt and implement a staff assignment system under which a team of officers and a Supervisor are consistently assigned to the same Young Inmate Housing Area unit and the same tour, to the extent feasible given leave schedules and personnel changes.

**Q. First Remedial Order, § D, ¶ 1: Consistent Staff Assignment and Leadership**

For all housing units at RNDC2 that may house 18-year-old Incarcerated Individuals, the Department shall enhance the implementation of a staff assignment system under which the same correction officers, Captains, and ADWs are consistently assigned to work at the same housing unit and on the same tour, to the extent feasible given leave schedules and personnel changes.

**R.  First Remedial Order, § D, ¶ 3; 3(i): Reinforcement of Direct Supervision**

<u>Direct Supervision.</u> For all housing units at RNDC that may house 18-year-old Incarcerated Individuals, the Department, including RNDC Supervisors, shall take necessary steps to improve the implementation of the Direct Supervision Model with an emphasis on the development of proactive and interactive supervision; appropriate relationship building; early intervention to avoid potential confrontations; de-escalating conflicts; rewarding positive behavior; and the consistent operation of the unit.

    i.    The Department, including RNDC Supervisors, shall reinforce the implementation of the Direct Supervision Model with Staff through, among other things, appropriate staff supervision, coaching, counseling, messaging strategies, or roll call training.

**APPENDIX B: ORDER APPOINTING NUNEZ REMEDIATION MANAGER**

*The Court intends to enter an order in substantially the following form upon the selection of the <u>Nunez</u> Remediation Manager.  Any objections to the language of the order must be discussed with the Monitoring Team and filed in writing by 12:00 p.m. on June 27, 2025.*

WHEREAS, on October 22, 2015, this Court entered the Consent Judgment (docket entry no. 249) in this matter to correct the violations of the constitutional rights of people incarcerated in jails operated by the New York City Department of Correction ("DOC" or "the Department")[12];

WHEREAS, the Consent Judgment required the Defendants to take specific actions to remedy a pattern and practice of violence by staff against incarcerated individuals, and to develop and implement new practices, policies, and procedures to reduce violence in the jails and ensure the safety and well-being of incarcerated individuals;

WHEREAS, Section XXII, ¶ 1 of the Consent Judgment provides: "The Parties stipulate and agree, and the Court finds, that this Agreement complies in all respects with the provisions of 18 U.S.C. § 3626(a).  The Parties further stipulate and agree, and the Court finds, that the prospective relief in this Agreement is narrowly drawn, extends no further than is necessary to correct the violations of federal rights as alleged by the United States and the Plaintiff Class, is the least intrusive means necessary to correct these violations, and will not have an adverse impact on public safety or the operation of a criminal justice system.  Accordingly, the Parties agree and represent that the Agreement complies with the provisions of 18 U.S.C. § 3626(a)";

---

[12]    The Plaintiff Class is defined as "all present and future inmates confined in jails operated by the Department, except for the Elmhurst and Bellevue Prison Wards."  (Docket entry no. 249 ¶ II.2.)

WHEREAS, on August 14, 2020, the Court entered a Remedial Consent Order

Addressing Non-Compliance (the "First Remedial Order," docket entry no. 350) that included

several remedial measures designed to address the repeated findings of the <u>Nunez</u> Independent

Monitor (the "Monitor") that the Defendants were in non-compliance with core provisions of the

Consent Judgment, including with Section IV, ¶ 1 (Implementation of Use of Force Directive);

Section VII, ¶ 1 (Thorough, Timely, Objective Investigations); Section VII, ¶ 7 (Timeliness of

Preliminary Reviews); Section VII, ¶ 9 (a) (Timeliness of Full ID Investigations); Section VIII,

¶ 1 (Appropriate and Meaningful Staff Discipline); Section XV, ¶ 1 (Inmates Under the Age of

19, Protection from Harm); and Section XV, ¶ 12 (Inmates Under the Age of 19, Direct

Supervision);

WHEREAS, in his Eleventh Report filed on May 11, 2021 (docket entry no. 368), the

Monitor reported that the Defendants were not in compliance with numerous provisions of the

First Remedial Order, including Section A, ¶ 2 (Facility Leadership Responsibilities), Section A,

¶ 3 (Revised De-escalation Protocol), Section A, ¶ 6 (Facility Emergency Response Teams),

Section D, ¶ 1 (Consistent Staffing), Section D, ¶ 2 (ii) (Tracking of Incentives and

Consequences), and Section  D, ¶ 3 (Direct Supervision);

WHEREAS, the Court entered a Second Remedial Order on September 29, 2021 (docket

entry no. 398), and a Third Remedial Order on November 22, 2021 (docket entry no. 424);

WHEREAS, after the three Remedial Orders failed to result in meaningful

improvements, the Defendants developed an Action Plan, supported by the Monitor, that was

designed to address Defendants' overall lack of progress toward compliance by focusing on four

foundational areas without which reform could not proceed—security practices, supervision and

leadership, staffing practices, and accountability—and the Court entered and So Ordered the Action Plan on June 14, 2022 (docket entry no. 465);

WHEREAS, the Court found that the First Remedial Order, the Second Remedial Order, the Third Remedial Order, and the Action Plan were each compliant with the provisions of 18 U.S.C. § 3626(a) and were necessary to correct the violations of federal rights as alleged by the United States and the Plaintiff Class;

WHEREAS, the First Remedial Order, the Second Remedial Order, the Third Remedial Order, and the Action Plan were each entered to address the ongoing non-compliance with the Consent Judgment and to achieve its primary goal: to protect the constitutional rights of incarcerated people and substantially reduce the level of violence in the jails;

WHEREAS, the Consent Judgment, the First Remedial Order, the Second Remedial Order, the Third Remedial Order, and the Action Plan are hereafter collectively referred to as "the Nunez Orders";

WHEREAS, more than a year after the Action Plan was entered, the Monitor found in his July 10, 2023 Special Report (docket entry no. 557) that the Defendants had not made substantial and demonstrable progress in implementing the reforms, initiatives, plans, systems, and practices outlined in the Action Plan, and that there had not been a substantial reduction in the risk of harm facing incarcerated individuals and DOC staff;

WHEREAS, on November 17, 2023, the Plaintiff Class and the United States filed a Motion for Contempt and Appointment of Receiver;

WHEREAS, on November 27, 2024, this Court issued its factual findings and decision granting Plaintiffs' Motion for Contempt and found that Defendants (i) are in contempt of eighteen core provisions of the Nunez Orders (the "Contempt Provisions") "that have gone

unheeded for years and have highlighted failures inextricably linked to the Department's historic pattern of excessive use of force against persons in custody" (docket entry no. 803, at 52); (ii) "have not demonstrated diligent attempts to comply with the Contempt Provisions in a reasonable manner" (docket entry no. 803, at 52); and (iii) have repeatedly and consistently failed to remediate the violations of the federal rights of incarcerated people that necessitated entry of the Consent Judgment (docket entry no. 803, at 52, 54-56);

WHEREAS, this Court found that the "use of force rate and other rates of violence, self-harm, and deaths in custody are demonstrably worse than when the Consent Judgment went into effect in 2015" and the "unsafe and dangerous conditions in the jails…have become normalized despite the fact that they are clearly abnormal and unacceptable" (docket entry no. 803, at 11);

WHEREAS, this Court found that "for nine years, Defendants made only half-hearted, inconsistent efforts to comply with Court orders" (docket entry no. 803, at 50);

WHEREAS, this Court found that "[t]he record in this case makes clear that those who live and work in the jails on Rikers Island are faced with grave and immediate threats of danger, as well as actual harm, on a daily basis as a direct result of Defendants' lack of diligence, and that the remedial efforts thus far undertaken by the Court, the Monitoring Team, and the parties have not been effective to alleviate this danger" (docket entry no. 803, at 55);

WHEREAS, this Court found that "Defendants' ongoing failure to comply" requires a remedy that addresses the "insufficiently resourced leadership; a lack of continuity in management; failures of supervision and cooperation between supervisors and line officers; a lack of skill or imagination to create and implement transformative plans; and an unwillingness or inability to cooperate with the Monitoring Team recommendations to accomplish the changes necessary" (docket entry no. 803, at 54);

WHEREAS, this Court found that "[t]he last nine years also leave no doubt that continued insistence on compliance with the Court's orders by persons answerable principally to political authorities would lead only to confrontation and delay; that the current management structure and staffing are insufficient to turn the tide within a reasonable period; that Defendants have consistently fallen short of the requisite compliance with Court orders for years, at times under circumstances that suggest bad faith; and that enormous resources—that the City devotes to a system that is at the same time overstaffed and underserved—are not being deployed effectively" (docket entry no. 803, at 55-56); and

WHEREAS, as required by 18 U.S.C. § 3626(a), the prospective relief in this Order is narrowly drawn, extends no further than is necessary to correct the violations of federal rights as alleged by the Plaintiff Class and the United States, is the least intrusive means necessary to correct these violations, and will not have an adverse impact on public safety or the operation of a criminal justice system.

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED as follows:

## I.  Appointment of <u>Nunez</u> Remediation Manager and <u>Nunez</u> Remediation Manager's Duties

A.  **[NAME]** is here by appointed to serve in this case as <u>Nunez</u> Remediation Manager, with the responsibility and authority to take all necessary steps to promptly achieve Substantial Compliance (defined in Section XX, ¶ 18 of the Consent Judgment) with the Contempt Provisions.

B.  The <u>Nunez</u> Remediation Manager's work shall be guided by benchmarks identified in the "Remediation Action Plan," a work plan designed to achieve Substantial Compliance with the Contempt Provisions within three years of the

date the Court files the <u>Nunez</u> Remediation Manager's Acceptance of this
appointment on the public docket for this case ("Acceptance Effective Date"),
subject to extension of the target period for any particular elements of the plan
upon a showing of good cause therefor.  The process to determine the substance
of the Remediation Action Plan is detailed in Section II.A.

C.  The <u>Nunez</u> Remediation Manager shall provide leadership and executive
management with the goal of developing and implementing a sustainable system
that protects the constitutional rights of incarcerated people.

D.  The <u>Nunez</u> Remediation Manager shall be answerable only to the Court.

## II.  Development and Implementation of the Remediation Action Plan

A.  The <u>Nunez</u> Remediation Manager, in consultation with the Commissioner and the
Monitoring Team, shall develop a Remediation Action Plan.  The Remediation
Action Plan shall identify the specific and concrete steps that are necessary to
achieve substantial compliance with the Contempt Provisions within no more than
three years of the <u>Nunez</u> Remediation Manager's Acceptance Effective Date.  The
Remediation Action Plan shall include transformative and sustainable initiatives
which shall include, any positive initiatives currently underway that must be
sustained or enhanced.  Further, the Remediation Action Plan shall address
relevant recommendations from the Monitoring Team to support advancing
compliance with the Contempt Provisions.  These actions shall be organized into
priorities with specified benchmarks to be achieved within 12-month periods,
beginning with the safety-related areas and actions that are most urgently in need
of attention.

    i.   The Remediation Action Plan shall be provided to counsel for the Plaintiff Class and the United States in draft form for comment within 90 days of the date ofof the Acceptance Effective Date.  Counsel for the Plaintiff Class and the United States shall provide the Remediation Manager, Commissioner, and the Monitoring Team with their comments on the Remediation Action Plan, if any, within 21 days of receipt.  The Remediation Manager, in consultation with the Commissioner and Monitoring Team, shall consider the comments from Counsel for the Plaintiff Class and the United States and make any changes deemed necessary before filing the final proposed Remediation Action Plan with the Court.  The final Remediation Action Plan shall be filed with the Court for approval within 21 days of receipt of comments from the Counsel for the Plaintiff Class and United States.

    ii.   The Remediation Manager may thereafter seek to modify or amend the Remediation Action Plan upon application to the Court.  The Remediation Manager shall consult with the Commissioner and the Monitoring Team in advance of any application before making any such application to the Court and any such application shall be made on notice to the parties and the Monitoring Team.

B.  Implementation of the Remediation Action Plan must begin immediately upon its approval by the Court.  This work shall be undertaken in collaboration with the Commissioner to the greatest extent consistent with efficiency, effectuation of

change, and the fostering of a respectful, sustainably safety-oriented approach to management.

C.  Within 30 days following Court approval of the Remediation Action Plan, the Remediation Manager, the Monitoring Team, and the Commissioner shall jointly develop an updated DOC organizational chart that includes delineation of the reporting lines of divisions, operational functions, and personnel that are subject to the direct authority of the Remediation Manager and the Commissioner, respectively, and those where both exercise direct authority over aspects of the divisions, operations, and personnel.  In the event of conflict regarding divisions of labor, the Nunez Remediation Manager has ultimate authority.

## III. Assessment of Compliance & Transition Back to DOC Control

A.  The Monitor shall file a report within 130 days following each Reporting Period[13] describing the efforts the Department and the Remediation Manager have taken to implement the requirements of the Remediation Action Plan and evaluating the extent to which the Department and Remediation Manager have complied with the benchmarks of the Remediation Action Plan and each of the Contempt Provisions.

B.  Upon a finding by the Monitoring Team that one or more of the benchmarks of the Remediation Action Plan or the Contempt Provisions is in Substantial

---

[13]    The Reporting Periods in this case cover January 1 to June 30 and July 1 to December 31 of each year.

Compliance, the Court shall determine whether Substantial Compliance with the relevant benchmark(s) and/or Contempt Provision(s) has been achieved.

C.  Within 30 days of the Court's finding, the Nunez Remediation Manager shall be obligated to work with the Commissioner on a Transition Plan that outlines (1) how to sustain the progress achieved, (2) the steps the Remediation Manager will take to prepare the Department to operate independently in the relevant area, and (3) the actions the Department will take to maintain the required performance level and sustain compliance.

D.  The Remediation Manager's authority over the relevant benchmark of the Remediation Action Plan or Contempt Provision shall be terminated upon the Monitoring Team's filing of the Monitor's Report that reports the benchmark of the Remediation Action Plan or Contempt Provision in Substantial Compliance for the third successive Reporting Period.

IV. **Powers of the Nunez Remediation Manager.** The Nunez Remediation Manager shall have all powers necessary to achieve Substantial Compliance with the Contempt Provisions, including but not limited to:

A.  **General Powers**: The Nunez Remediation Manager shall have the authority to exercise all powers vested by law in the Commissioner to the extent necessary to achieve compliance with the Contempt Provisions.  The Nunez Remediation Manager shall have such powers to control, oversee, supervise, and direct all administrative, personnel, financial, accounting, contracting, legal, and other operational functions of the DOC to the extent necessary to achieve compliance with the Contempt Provisions.

B. **Specific Powers**: Without in any way limiting the <u>Nunez</u> Remediation Manager's general powers detailed in Paragraph A above, the <u>Nunez</u> Remediation Manager shall have the authority to exercise the following specific powers to the extent necessary to achieve compliance with the Contempt Provisions, and to the extent vested by law in the Commissioner:

    i. The <u>Nunez</u> Remediation Manager shall have the authority to enact or change DOC policies, procedures, protocols, systems, and practices implicated by the Court's contempt findings.

    ii. The <u>Nunez</u> Remediation Manager shall have the authority to establish personnel policies and direct personnel actions. The <u>Nunez</u> Remediation Manager shall have the power to create, modify, abolish, or transfer employee and contractor positions, as well as to recruit, hire, train, terminate, promote, demote, transfer, and evaluate employees and contractors. The <u>Nunez</u> Remediation Manager shall have the authority to assign and deploy DOC staff.

    iii. The <u>Nunez</u> Remediation Manager shall have the authority to determine the DOC's needs and positions with respect to contract provisions relevant to remediation of the Contempt Provisions.

    iv. The <u>Nunez</u> Remediation Manager shall have the authority to procure and contract for supplies, equipment, tangible goods, and services.

    v. The <u>Nunez</u> Remediation Manager shall have the authority to review, investigate, and take disciplinary or other corrective or remedial actions

with respect to any violation of DOC policies, procedures, and protocols
implicated by the Court's contempt findings.

vi.   The <u>Nunez</u> Remediation Manager shall have the authority to hire
consultants, or obtain technical assistance, as the <u>Nunez</u> Remediation
Manager deems necessary to perform their duties under this Order.

vii.  In exercising the powers conferred by this Order, the <u>Nunez</u> Remediation
Manager shall use reasonable best efforts to consult and work
collaboratively with the Commissioner.

viii. The <u>Nunez</u> Remediation Manager shall have the authority to delegate any
of these powers to the Commissioner and to retract or constrict such
delegations as the <u>Nunez</u> Remediation Manager, in the <u>Nunez</u>
Remediation Manager's discretion, deems necessary.

C.  **Commissioner's Role**: The Commissioner shall retain all of Commissioner's
authority in areas not implicated by the Contempt Provisions.  The Commissioner
and the <u>Nunez</u> Remediation Manager are urged and expected to work
collaboratively in aid of the goals of compliance with the Nunez Orders and the
safe, sustainable management of the jails.  The <u>Nunez</u> Remediation Manager shall
have the authority to direct the Commissioner to take any steps that the <u>Nunez</u>
Remediation Manager deems necessary to comply with the requirements of the
Contempt Provisions.  It is expected that Defendants, and the Commissioner and
DOC leadership, will work closely with the <u>Nunez</u> Remediation Manager to
facilitate the <u>Nunez</u> Remediation Manager's ability to perform their duties under
this Order.

D. **Additional Powers**: The <u>Nunez</u> Remediation Manager may, after consultation with the Commissioner and the Monitoring Team, petition the Court on notice to the parties and the Monitoring Team for such additional powers as are necessary to achieve compliance with the Contempt Provisions consistent with Section II.

E. **Access**: The <u>Nunez</u> Remediation Manager, including all of their staff and consultants, shall have unlimited access to all records and files (paper or electronic) maintained by the DOC and shall have unlimited access to all DOC facilities, incarcerated people, and DOC staff.  This access includes the authority to conduct confidential interviews with DOC staff and incarcerated people.  The <u>Nunez</u> Remediation Manager's ability to interview DOC staff shall be subject to the employee's right to representation under certain circumstances as set forth in Section 75 of the New York Civil Service Law and MEO-16.

## V.  Reporting by the <u>Nunez</u> Remediation Manager.

A. The <u>Nunez</u> Remediation Manager shall regularly report to and meet with the Court to update the Court regarding the status of efforts to comply with Contempt Provisions, and any specific obstacles or impediments encountered by the <u>Nunez</u> Remediation Manager.

B. Within 60 days of the date of the Acceptance Effective Date, the <u>Nunez</u> Remediation Manager shall, in consultation with the Monitoring Team, propose for the Court's approval a specific schedule for the submission of regular written reports to be filed on the public docket.

C.  The <u>Nunez</u> Remediation Manager shall remain in contact with the Court throughout the <u>Nunez</u> Remediation Manager's tenure on an informal, as needed, basis.

## VI. Role of the Monitor.

A.  Consistent with Section IV(B), this order does not alter the role or responsibilities of the Monitor as described in the <u>Nunez</u> Orders, including, but not limited to obligations to assess compliance, provide technical assistance, and regularly report to the Court in accordance with his past practices.

B.  Beginning with the 20th Reporting Period (January to June 2025), the Monitor's Reports shall include an assessment of compliance (pursuant to § XX, ¶ 18 of the Consent Judgment) with the select group of provisions (as defined by the Action Plan § G, ¶ 5(b)), the Contempt Provisions, and the benchmarks of the Remediation Action Plan (once approved by the Court). The assignment of compliance ratings to all other provisions of the <u>Nunez</u> Orders is suspended through December 31, 2025.

   i.  Within 90 days after the Court's approval of the Remediation Action Plan, the Monitoring Team shall develop recommendations regarding streamlining and compliance assessment of the <u>Nunez</u> Orders that are not subject to the Remediation Action Plan. The Monitoring Team shall provide these recommendations to the parties for consideration and comment before submitting the recommendations to the Court.

C.  The <u>Nunez</u> Remediation Manager shall regularly consult with the Monitoring Team in the same manner as the Defendants are required to consult with the

Monitoring Team under the Nunez Orders.  Such consultation shall also include consultation on progress that has been made in fulfilling the Remediation Action Plan and how to address potential obstacles to achieving compliance, as well as the strategies to achieve Substantial Compliance with the Contempt Provisions. The Nunez Remediation Manager shall obtain the Monitor's approval to the extent it is required by the Contempt Provisions in the Nunez Orders.

D. The Nunez Remediation Manager and the Monitor are independent positions that each report to the Court and are not answerable to each other.

## VII.    Immunity and Indemnity.

A. The Nunez Remediation Manager and the Nunez Remediation Manager's staff shall have the status of officers and agents of the Court, and as such shall be vested with the same immunities as vest with the Court.

B. The Defendants shall indemnify the Nunez Remediation Manager and their staff in any litigation brought against the Nunez Remediation Manager or their staff regarding activities conducted in the course of the Nunez Remediation Manager's official duties.

## VIII.   Compensation and Responsibility for Payment.

A. The City of New York shall bear all reasonable fees, costs, and expenses of the Nunez Remediation Manager, including payments to the Nunez Remediation Manager's staff.  Such fees, costs, and expenses shall be sufficient to allow the Nunez Remediation Manager to fulfill their duties pursuant to this Order in a reasonable and efficient manner.  The Nunez Remediation Manager may hire or consult with such additional qualified staff as is reasonably necessary to fulfill

their duties pursuant to this Order without duplication of effort.  The <u>Nunez</u>

Remediation Manager shall submit an invoice for their services, and the services

of their consultants and staff, to the City on a monthly basis.  Those invoices will

include charges for fees, costs, and expenses.  Payment on such invoices shall be

made within 60 days of receipt.  If the City objects to any fees, costs, or expenses

as unreasonable, unnecessary, or duplicative, the City shall submit the invoice to

the Court for a determination of reasonable fees, costs, and expenses.

B.  Within 30 days of the date of Acceptance Effective Date, the <u>Nunez</u> Remediation

Manager shall submit to the Court and the City an initial statement of rates and

proposed fees and expenses, which the <u>Nunez</u> Remediation Manager may modify

from time to time as appropriate.  If the City raises any objection to the statement,

the City and the <u>Nunez</u> Remediation Manager shall promptly meet and confer,

and any unresolved objections shall jointly be submitted to the Court for

resolution.

## IX. Duration of the <u>Nunez</u> Remediation Manager's Tenure.

A.  The <u>Nunez</u> Remediation Manager's authority will continue until the Court

determines that Substantial Compliance (defined in Section XX, ¶ 18 of the

Consent Judgment) with all of the Contempt Provisions has been achieved and

sustained for a period of 12 months consistent with Section III.

B.  Nothing in this Order affects the terms of the Consent Judgment or other <u>Nunez</u>

Orders, which remain in full force and effect.  In the event the <u>Nunez</u>

Remediation Manager's tenure terminates, the Consent Judgment and other

<u>Nunez</u> Orders will remain in full force and effect until the Court makes a finding

that the Defendants have achieved Substantial Compliance with the provisions of the Consent Judgment and have maintained Substantial Compliance for a period of twenty-four (24) months, as set forth in Section XXI, ¶ 5 of the Consent Judgment.

**X. Cooperation.**

    A.  The Defendants, and all agents or persons within the employ of the Defendants (including contract employees), and all persons in concert and in participation with them, the Monitor, and all counsel in this action, shall fully cooperate with the <u>Nunez</u> Remediation Manager in the discharge of the <u>Nunez</u> Remediation Manager's duties under this Order, and shall promptly respond to all inquiries and requests related to compliance with the <u>Nunez</u> Orders.

**XI. Other Terms.**

    A.  If at any point the <u>Nunez</u> Remediation Manager determines that they need additional funding to fulfill the Remediation Action Plan that is not budgeted for that fiscal year, the <u>Nunez</u> Remediation Manager shall immediately consult the Commissioner before notifying the City Council's Finance Division and the Mayor's Office of Management and Budget of the specific purpose and the amount of funds needed.  If the issue is not timely resolved, the <u>Nunez</u> Remediation Manager or any party may request a hearing before the Court.

    B.  The <u>Nunez</u> Remediation Manager shall make reasonable efforts to exercise their authority in a manner consistent with applicable state and local laws, regulations, and contracts.  However, in the event the <u>Nunez</u> Remediation Manager determines that those laws, regulations, or contracts impede the <u>Nunez</u>

Remediation Manager from carrying out their duties under this Order and achieving compliance with the Contempt Provisions, the Nunez Remediation Manager may petition the Court to waive any legal or contractual requirement that is causing the impediment or seek other appropriate relief on notice to the parties and the Monitoring Team.

C. The Nunez Remediation Manager and their staff shall have the authority to communicate ex parte and confidentially with each party and each party's legal representatives, as well as with the Court and the Monitoring Team.

D. Absent leave of the Court, the Nunez Remediation Manager and their staff may not testify in any litigation or proceeding other than this case, including public hearings or other proceedings before the New York City Council, the Board of Correction, or the New York State legislature, with regard to any act or omission of the DOC or any of the DOC's agents, representatives, or employees related to the Nunez Orders.  The Nunez Remediation Manager and their staff may not give interviews or make public statements regarding their work under the Nunez Orders, other than reports filed on the docket, without the permission of the Court.

E. Unless such conflict is waived in writing by the Parties, the Nunez Remediation Manager and their staff may not accept employment or provide consulting services that present a conflict of interest with their responsibilities under this Order, including being retained (on a paid or unpaid basis) by any current or future litigant or claimant, or such litigant's or claimant's attorney, in connection with a claim or suit against the DOC or the DOC's agents, representatives, or employees.

F.  The <u>Nunez</u> Remediation Manager is an agent of the Court and is not a federal,

State, or local agency or an agent thereof.

G.  If at any time the <u>Nunez</u> Remediation Manager position becomes vacant, the

parties and the Monitor shall confer on potential replacements and the parties

shall meet and confer and endeavor to jointly provide the court with no more than

four candidates to replace the <u>Nunez</u> Remediation Manager.  The parties shall

submit their recommendations, with supporting materials, to the Court

confidentially.  Once the Court has received the parties' recommendations, the

Court shall review the proposed candidates, and any further candidates the Court,

in its discretion, may deem appropriate for consideration, and select the new

<u>Nunez</u> Remediation Manager.

**XII.  Effective Date.**

A.  This Order Appointing the <u>Nunez</u> Remediation Manager shall become effective

following the appointed <u>Nunez</u> Remediation Manager's confirmation of their

Acceptance of the powers, responsibilities and duties imposed by this Order by

signing a copy of this Order below and returning the countersigned copy to the

Court by email addressed to [SwainNYSDCorresp@nysd.uscourts.gov](mailto:SwainNYSDCorresp@nysd.uscourts.gov).  The Order

shall be effective on the Acceptance Effective Date.


SO ORDERED this _____ day of _____, 2025


_____
LAURA TAYLOR SWAIN
CHIEF UNITED STATES DISTRICT JUDGE

ACCEPTED


_____

(Signature)


_____

(Typed or printed name)


Date: _____

## APPENDIX C: <u>NUNEZ</u> REMEDIATION MANAGER –
## POSITION DESCRIPTION FOR INTERESTED CANDIDATES

On May 13, 2025, the Court entered an Opinion and Order to Appoint a <u>Nunez</u> Remediation Manager in <u>Nunez et al v. City of New York et al.</u>, No. 11-CV-5845.  In that Opinion and Order, the Court announced that it will appoint a "<u>Nunez</u> Remediation Manager," answerable only to the Court, to work with the current Commissioner and Department of Correction leadership to bring the Department into compliance with the <u>Nunez</u> Court Orders.  The <u>Nunez</u> Remediation Manager shall be granted broad powers in order to achieve precise goals that are specifically designed to remedy the provisions of the Court orders identified in the Court's Opinion and Order on the Motion for Contempt, dated November 27, 2024, holding Defendants in civil contempt of eighteen provisions (the "Contempt Provisions") of four Court orders entered in this case.

### QUALIFICATIONS FOR A NUNEZ REMEDIATION MANAGER CANDIDATE

Applicants who wish to be considered for the <u>Nunez</u> Remediation Manager position should have the following areas of expertise and/or experience:

- Substantial management and correctional expertise developed outside of the DOC
- Demonstrated collaborative skills
- The ability to build trust and commitment to common and effective goals with management and line staff
- Excellent oral and written communication skills

Applicants should be prepared to do a substantial amount of work in-person in the New York City jails during their tenure.  Applicants are subject to background checks by the Court.

Interested candidates are directed to submit a cover letter addressing their relevant experience, knowledge, skills and abilities, resume, and contact information for three professional references by email through <u>NunezRemediationManagerApps@nysd.uscourts.gov</u>.  The submission should be formatted as a single, bookmarked pdf document.

### PROCESS TO SELECT A NUNEZ REMEDIATION MANAGER CANDIDATE

To select the <u>Nunez</u> Remediation Manager, the parties and the Monitoring Team shall promptly meet and confer before presenting the Court with recommendations of no more than four individuals to be appointed as the <u>Nunez</u> Remediation Manager by **August 29, 2025**.  The parties' recommendations shall be confidentially submitted via email to <u>SwainNYSDCorresp@nysd.uscourts.gov</u> and shall not be filed on the public docket.  The recommendations shall discuss the parties' views of the candidates and discuss anticipated compensation and staffing for the <u>Nunez</u> Remediation Manager as well. The Court shall review the parties' recommendations, may interview candidates, and may review and interview additional candidates as the Court deems fit.  The Court shall select the <u>Nunez</u> Remediation Manager as promptly as possible.

Additionally, candidates must be prepared to answer the following questions during the selection process and may also address them in their cover letter submitted in with their application materials:

1. How will the applicant's knowledge, skills and abilities align with the particular challenges presented by this position?

2. What is the applicant's relevant experience, and how do they believe they can advance the necessary reforms within the Department of Correction?

3. What steps would the applicant take to learn about the Department and <u>Nunez</u>-related issues?

4. How would the applicant structure their work with the Department?

5. Does the applicant anticipate needing additional staff and/or resources to do the work?  If so, what factors would the applicant consider in determining whether and to what extent such resources or staff are needed?  How might the applicant work to minimize associated costs and expenses?

6. How would the applicant approach working with the Department's various constituencies (<u>e.g.</u>, uniformed staff, civilian staff, and Department leadership)?

7. How would the applicant approach working with external constituencies that are connected to the Department, including the unions and the New York City Council?

8. How would the applicant approach working with the Monitoring Team?