# Status Report
# by the
# *Nunez* Independent Monitor

**May 15, 2025**

### THE NUNEZ MONITORING TEAM

Steve J. Martin
*Monitor*

Elly Davis
*Junior Analyst*

Kelly Dedel, Ph.D.
*Subject Matter Expert*

Anna E. Friedberg
*Deputy Monitor*

Dennis O. Gonzalez
*Director*

Patrick Hurley
*Subject Matter Expert*

Alycia M. Karlovich
*Associate*

Emmitt Sparkman
*Subject Matter Expert*

# Table of Contents

**Introduction** ................................................................................................1

- Executive Summary ................................................................... 1
- Update on the Motion for Contempt ........................................ 10
- Organization of the Report........................................................11

**Assessment of Department's Use of Force** ....................................13

- Changes in DOC's UOF Practices ........................................... 15
- The Monitoring Team's Assessment that UOF Practices Have Changed ........................ 17
- The Monitoring Team's Ongoing Concerns about DOC's Use of Force .......................... 23
- Conclusion ................................................................................ 25

**Managing People with Known Propensity for Violence**...................27

- Monitoring Team's Assessment of Local Law 42 ..................... 27
- Enhanced Supervision Housing at RMSC ("RESH")................ 28
- Special Management Unit ("SMU")......................................... 31
- NIC/Involuntary Protective Custody ...................................... 33
- Conclusion ............................................................................... 34

**Update on Use of Body-Worn Cameras**..........................................36

- Background .............................................................................. 36
- Suspension and Redeployment ................................................ 37
- New Body Worn Cameras and Operational Enhancements....... 37
- Conclusion ............................................................................... 39

**Compliance Assessments & Updates on Compliance** ....................40

- Monitoring Team's Methodology for Compliance Assessment & Updates on Compliance ........................................................ 40
- First Remedial Order § A., ¶ 2 (Facility Leadership Responsibilities)............................ 44
- CJ § IV. Use of Force Policy, ¶ 1 (New Use of Force Directive) ...................................... 51
- CJ § V. Use of Force Reporting and Tracking, ¶ 2 (Independent Staff Reports)............. 54
- CJ § V. Use of Force Reporting and Tracking, ¶ 22 (Providing Medical Attention Following Use of Force Incident) ....................................... 64
- Second Remedial Order, ¶ 1(i)(a) (Interim Security Plan); Action Plan, § D, ¶ 2(a) (Interim Security Plan)................................ 66

- Action Plan, § D, ¶ 2(d) and August 10, 2023 Order, § I, ¶ 2 (Searches); Action Plan, § D, ¶ 2(e) (Identify/Recover Contraband) ................................... 71
- Action Plan, § D, ¶ 2(f) (Escort Holds) .......................................................... 80
- First Remedial Order § A., ¶ 6 (Facility Emergency Response Teams) ........................ 83
- First Remedial Order § A., ¶ 3 (Revised De-escalation Protocol) ................................... 90
- CJ § XV. Safety and Supervision of Inmates Under the Age of 19, ¶ 1 (Prevent Fight/Assault) ...................................................................................... 96
- CJ § XV. Safety and Supervision of Inmates Under the Age of 19, ¶ 12 (Direct Supervision) and First Remedial Order § D., ¶ 3 (Reinforcement of Direct Supervision) ............................................................. 101
- CJ § XV. Safety and Supervision of Inmates Under the Age of 19, ¶ 17 (Consistent Assignment of Staff) and First Remedial Order § D., ¶ 1 (Consistent Staffing) ........... 107
- CJ § XII. Screening & Assignment of Staff, ¶¶ 1-3 (Promotions) ................................. 112
- First Remedial Order § A., ¶ 4 (Supervision of Captains) & .......................................... 120
- Action Plan § C, ¶ 3 (II-III) ........................................................................... 120
- Action Plan, § A, ¶1(d) (Improved Routine Tours) ...................................................... 128
- First Remedial Order § A., ¶ 1 (Use of Force Reviews) ................................................ 134
- CJ § VII. Use of Force Investigations, ¶ 1 (Thorough, Timely, Objective Investigations), ¶ 9 (a) (Timing of Full ID Investigations) & ¶ 11 (Staffing ID Investigators) ................. 139
- CJ § X. Risk Management, ¶ 1 (Early Warning System) ................................................ 158
- CJ § VIII. Staff Discipline and Accountability, ¶ 1 (Timely, Appropriate and Meaningful Accountability) .................................................. 165
- CJ § VIII. Staff Discipline and Accountability, ¶ 3 (c) (Use of Force Violations) ......... 165
- First Remedial Order § C. (Timely, Appropriate, and Meaningful Staff Accountability), ¶ 1 (Immediate Corrective Action) ¶ 2 (Monitor Recommendations) .............................. 182
- First Remedial Order § C. 4/Third Remedial, ¶ 2 (Expeditious OATH Proceedings) & First Remedial Order § C. (Applicability of Disciplinary Guidelines to OATH Proceedings), ¶ 5 ......................................................................................... 191
- CJ § VIII. Staff Discipline and Accountability, ¶ 4 (Trials Division Staffing) .............. 203
- Action Plan, § C, ¶ 3(vii) (Maximizing Deployment of Staff - Reduction of Uniformed Staff in Civilian Posts) .......................................................... 207
- Action Plan, § C, ¶ 3 (v) (Maximizing Deployment of Staff - Awarded Posts) ............. 214
- Action Plan, § C, ¶ 3(vi) (Maximizing Deployment of Staff - Maximize Work Schedules) ............................................................................. 221

**Update on the 2023 *Nunez* Court Orders ....................................................222**

- June 13, 2023 Order (dkt. 550) ....................................................................... 222
- August 10, 2023 Order (dkt. 564) ................................................................... 223
- October 10, 2023 Order (dkt. 582) .................................................................. 231

- December 14, 2023 Order (dkt. 656) ................................................................ 231
- December 20, 2023 Order (dkt. 665) ................................................................ 233

## Upcoming Timeline & Monitor Reporting .......................................................234

- Timelines & Reporting................................................................................... 234
- Conclusion .................................................................................................... 235

## Appendix A: Comprehensive List of Provisions ...........................................236

## Appendix B: Use of Force &  Violence Indicators ........................................241

- Table 1: Number and Rate of UOF .................................................................. 242
- Table 2: Number and Proportion of A, B, and C Uses of Force. .................... 243
- Table 3: Number and Rate of Stabbing and Slashing ..................................... 244
- Table 4: Number and Rate of Fights ............................................................... 245
- Table 5: Number and Rate of Fires ................................................................. 246
- Table 6: Number and Rate of Assaults on Staff with UOF ............................. 247
- Table 7: Number and Rate of Assaults on Staff without UOF ........................ 248
- Table 8: Uses of Force Involving Incidents When a Staff Member is Not on Post ........ 249

## Appendix C: In-Custody Deaths ...................................................................250

### Overview of In-Custody Deaths ................................................................. 251
- Table 1: Causes of Death .............................................................................. 251
- Table 2: Mortality Rate ................................................................................ 252
- Table 3: Corrective Action Taken by DOC Related to In-Custody Deaths - 2022-2025 252
- Summaries of Deaths In-Custody in 2025 ..................................................... 254

## Appendix D: Use of Force Investigations .....................................................256

- Table 1(a): ID Supervisors Assigned to UOF Cases ...................................... 257
- Table 1(b): ID Investigators Assigned to UOF Cases .................................... 257
- Table 2: Summary of ID Hires and Departures ............................................. 258
- Table 3: Status of Investigations of UOF Incidents ...................................... 259
- Table 4: Status of Full ID Investigations ...................................................... 260
- Table 5: Law Enforcement Referrals ............................................................ 261
- Table 6(a): Results of Intake Investigation Audits by Date of Initial Intake Investigation ................................................................. 262
- Table 6(b): Number of Intake Investigations QA Audits Completed.............................. 262
- Table 7(a): Results of Full ID Investigation Audits by Date of Initial Full ID Investigation ................................................................. 263

- Table 7(b): Number of Full ID Investigation QA Audits Completed ............................ 263
- Table 8: Outcome of Intake Investigations ................................................................. 264
- Table 9: Investigation Findings .................................................................................. 266
- Table 10: Use of Force Incidents with Charges .......................................................... 267

## Appendix E: Data Related to Responses to Staff Misconduct ........................268

- Table 1: Accountability for Staff's Use of Force Related Misconduct .......................... 269
- Table 2: Immediate Corrective Action ........................................................................ 270
- Table 3: Suspension ................................................................................................... 271
- Table 4: Accountability for High Level Supervisors .................................................... 272
- Table 5: Command Discipline Recommended by Rapid Review .................................. 273
- Table 6: Command Discipline Recommended by Other Sources .................................. 274
- Table 7: Formal Discipline .......................................................................................... 275
- Table 8: Number of Cases Pending with the Trials Division ........................................ 275
- Table 9: Timeliness of Formal Discipline, by Incident Date ........................................ 276
- Table 10: Time that Cases Were Pending with the Trials Division Prior to Case Closure ............................................................................................. 277
- Table 11: Time that Current Cases Have Been Pending with the Trials Division .......... 278
- Table 12. Disposition of Formal Discipline Cases ........................................................ 279
- Table 13: Penalties Imposed via NPA for Use of Force Related Misconduct ................ 280
- Table 14: Cases Resolved via NPA with Provisions for CD or Expungement .............. 281
- Table 15: Outcome of Closed Action Plan § F, ¶ 2 Cases ............................................ 282
- Table 16: OATH Pre-Trial Conferences ...................................................................... 283

## Appendix F: Staffing .....................................................................................285

- Table 1: Number of ADWs .......................................................................................... 286
- Table 2: Number of Captains ...................................................................................... 287
- Table 3: Sick Leave, Medically Monitored/Restricted, AWOL, PE, and FMLA ........... 289
- Table 4: Location of Awarded Posts ............................................................................. 293
- Table 5: PIC-Facing Awarded Posts in Facility ........................................................... 294
- Table 6: Housing Unit Awarded Posts ......................................................................... 295
- Table 7: Triple Tours .................................................................................................. 296
- Table 8: Overtime Spending ........................................................................................ 299

## Appendix G: Leadership Appointments ........................................................300

- Leadership Appointments – January 2022 to May 12, 2025 ......................................... 301

**Appendix H: Update on Processing of New Admissions** ...................................**304**

- Length of Stay in Intake for Male New Admissions........................................ 305
- Length of Stay in Intake for Female New Admissions ................................... 307
- Temporarily Suspending New Admission Processing, a.k.a. Clock-Stoppage.............. 308
- NCU's Audits to Verify Data Entry ................................................ 309
- Recent Updates at EMTC ..........................................................311
- Conclusion ......................................................................311

**Appendix I: Updates on  Technology Initiatives** ...............................**312**

- Security & Operations Initiatives................................................. 313
- HR, Administration & Training Initiatives ....................................... 314
- Health Management Division (HMD) .............................................. 316
- Investigations & Legal........................................................... 316
- Finance & Procurement ........................................................... 316
- Upcoming Projects............................................................... 316

# INTRODUCTION

This report is the Monitor's 19th compliance assessment for the period July to December 2024, covering select provisions from the Consent Judgment and Remedial Orders.[1] In addition to gathering, analyzing and synthesizing the information needed for these assessments, since its November 22, 2024 Report, the Monitoring Team has been actively engaged with the Department to consult and collaborate on policies, procedures, and trainings, among other things, in order to advance progress on a variety of initiatives. The Monitoring Team has also engaged with the Parties for various discussions related to Plaintiffs' motion for contempt and appointment of a receiver including, at the Court's direction, working closely with the Parties regarding potential remedial relief. On January 31, 2025 (dkt. 814), the Monitoring Team also filed a report with the Court regarding the intersection between the *Nunez* Court Orders and Local Law 42, to identify areas that may be in conflict.

This report includes the Monitoring Team's compliance assessment for the select group of provisions as defined by the Action Plan § G ¶ 5(b), compliance updates for the provisions subject to the Contempt Order (to the extent that they are not included in the Select Group of Provisions) and an update on the 2023 *Nunez* Court Orders.

## EXECUTIVE SUMMARY

This report is filed at a critical and uncertain time for the Department. The Court's May 13, 2025 Order will fundamentally alter the operations and management of the jails for the foreseeable future. The next few months will be instrumental in crafting the landscape for the future as the Parties and the Monitoring Team work through the Order and identify potential

---

[1] *See* Court's April 29, 2024 Order (dkt. 709).

candidates for the Remediation Manager. Once the Court selects the Remediation Manager, even more challenging work begins: to operationalize the Order and continue to advance the reform.

This report is filed almost 10 years after the Consent Judgment was entered in fall 2015. Much has occurred during this period: five Commissioners have led the agency, along with countless other leadership changes; at least 10 Remedial Orders have been issued; a variety of efforts to address the requirements of the *Nunez* Court Orders have been initiated; and over 50 Monitor's Reports have been issued. The reform effort has progressed at a glacial pace. In 2020, the COVID-19 pandemic resulted in extraordinary levels of fear, stress, illness and a resulting staff absenteeism crisis, further compounding the problems facing the Department and degrading the already poor conditions. The jails became particularly volatile beginning in summer 2021, when the rates of use of force, injuries, and interpersonal violence skyrocketed, and the leadership of the agency was both unstable and chaotic. In August 2021, for the first time, the Monitoring Team issued a Special Report (outside of its routine reporting) to the Court regarding its grave concerns about the conditions in the jails. The Monitoring Team went on to issue approximately 20 Special Reports[2] between August 2021 and December 2023 about the conditions in the jails and the deterioration of the Department's efforts to work collaboratively with the Monitoring Team and to maintain transparency about the agency's actions.[3] The first

___

[2] *See*, Monitor's August 24, 2021 Report (dkt. 378); Monitor's September 2, 2021 Report (dkt. 380); Monitor's September 23, 2021 Report (dkt. 387); Monitor's October 14, 2021 Report (dkt. 403); Monitor's November 17, 2021 Report (dkt. 420); Monitor's December 1, 2021 Report (dkt. 429); Monitor's March 16, 2022 Report (dkt. 438); Monitor's April 20, 2022 Report (dkt. 445); Monitor's May 26, 2023 Report (dkt. 533); Monitor's May 31, 2023 Report (dkt. 537); Monitor's June 8, 2023 Report (dkt. 541); Monitor's June 12, 2023 Report (dkt. 544); Monitor's June 12, 2023 Report (dkt. 546); Monitor's July 10, 2023 Report (dkt. 557); Monitor's August 7, 2023 Report (dkt. 561); Monitor's October 5, 2023 Report (dkt. 581); Monitor's November 8, 2023 Report (dkt. 595); Monitor's November 15, 2023 Report (dkt. 599); Monitor's November 30, 2023 Report (dkt. 616); and Monitor's December 8, 2023 Report (dkt. 639).

[3] The Monitoring has not filed any Special Reports regarding the conditions in the jails between January 2024 and the filing of this Report. The Monitor has filed various reports to the Court regarding the status

status conference with the Court on the conditions in the jails occurred in September 2021, and

through the end of 2023, eight additional status conferences were convened regarding the

conditions in the jails and the agency's degrading transparency with the Monitoring Team.[4] On

December 20, 2023, the Court issued an order finding the Department in contempt for failing to

collaborate with the Monitoring Team (dkt. 665).[5] 2021 to 2023 marked a period of extraordinary

instability and danger in the jails, efforts to stifle transparency, and myriad problems that stymied

effective reform—a true crisis at all levels.

As will be described throughout this report, the Department appears to be emerging from

this crisis phase, as evidenced by some momentum in various areas. While key metrics continue

to reflect high rates of violence and other serious incidents, progress in certain areas has been

occurring and must be acknowledged. The road to sustainable reform remains very long, but with

the progress made the Monitoring Team is hopeful that the momentum toward reform has begun

to shift in the right direction.

Since December 2023, with the appointment of Commissioner Maginley-Lidde, an

important and observable shift occurred within the Department. Collectively, of the 39 provisions

subjects to compliance ratings or updates in this Report, the actions of Commissioner Maginley-

Lidde and her team moved the Department out of Non-Compliance and into Partial Compliance

with 10 provisions. In addition, progress was sustained in 15 provisions that were already in

---

of its work with the Parties regarding the pending motion practice as well as its assessment of Local Law
42.

[4] These status conferences took place on: September 16, 2021; December 2, 2021; April 26, 2022; May
24, 2022; November 17, 2022; April 27, 2023; June 13, 2023; August 10, 2023; December 14, 2023. The
two status conferences in 2024 were scheduled to address the pending motion for contempt and
appointment of a Receiver.

[5] Through the leadership of Commissioner Maginley-Liddie, the Department was able to purge the
contempt finding. *See* Court's February 27, 2024 Order (dkt. 680).

Partial or Substantial Compliance. Progress has been made related to seven other provisions (six of which were not subject to compliance ratings for the 19th Monitoring Period). Finally, for seven provisions progress has not been made and the status quo remains.

The Commissioner and her team have catalyzed the following improvements:

- Returned to transparent collaboration with the Monitoring Team and empowered and encouraged Department leadership and staff to collaborate with each other, across Divisions.

- Appointed key agency leaders who have a strong command of correctional practice (*e.g.,* reinstated an Associate Commissioner of ID, hired a new Deputy Commissioner of Security and a Director of Facility Operations), in addition to other strong leaders who manage a number of *Nunez* initiatives (*e.g.,* Deputy Commissioner of Programs and Community Partnerships, Deputy Commissioner of Strategic Operations, Associate Commissioner of Facility Operations, the Department's General Counsel, and the *Nunez* Manager). *See* Appendix G for a complete list of Leadership Appointments.

- Retained Gary Raney, a consultant, who has excellent credentials in managing correctional agencies and promoting reform[6] and continued the collaboration with Dr. James Austin, an expert in developing restricted housing programs.

- Advanced progress on addressing the Department's problematic use of force practices, as described in the "Assessment of Use of Force" section of this report.

- Implemented and sustained a very promising strategy for reducing the risk of harm to the Young Adult population at RNDC.

---

[6] Mr. Raney has filed two declarations in this case. *See* dkts. 718-22 and 842-1.

- Took concrete action to improve searches and contraband recovery and began a process to develop a broader Security Plan to address the root causes of poor security practices more broadly. More detail can be found in the compliance update for "Searches and Contraband" in this Report.

- Continued to develop the continuum of options to manage those who engage in serious acts of violence. The Department has improved the operation and safety of RESH and recently opened the Special Management Unit "SMU." More detail can be found in the "Managing Individuals Following Serious Acts of Violence" section of this report.

- Increased the rate at which Rapid Reviews and the Investigations Division accurately identify violations of the Use of Force policy. Restored credible leadership to the Investigation Division. More details can be found in the compliance assessment of the "Use of Force Reviews" and "Investigations" sections of this report.

- Addressed some of the policy and procedural weaknesses that underlie the Department's problem with staff absenteeism. Improvements are apparent in managing sick leave and modified duty (i.e., MMR), and the Department has begun to untangle problems related to Personal Emergencies and Family Medical Leave Act ("FMLA") use.[7] More detail on the relevant staffing data can be found in Appendix F of this report.

- Taken concrete steps to untangle the myriad of issues related to hiring and assignment of staff through a multi-disciplinary Staff Efficiency Initiative and more reliably tracking Awarded Posts. More detail on these issues can be found in the compliance update

---

[7] The Department has developed and adopted a new policy to manage and track FMLA. It will be implemented on June 15, 2025.

sections for "Reducing Uniform Staff in Civilian Posts" and "Awarded Posts" of this report.

- Improved the reliability of corrective action and formal discipline for staff misconduct, and reduced the time required to impose these actions. More detail can be found in the compliance assessment of the Disciplinary provisions in this report.

- Enhanced the use of Body-Worn Cameras with updated technology and expanded use by staff and improved oversight of use. More detail can be found in the "Update on Body-Worn Camera" section of the report.

- Initiated a comprehensive overhaul of the Department's reporting policies and procedures and the systems that will track the Department's data.  More detail can be found in the "Update on the 2023 *Nunez* Court Orders" section of the report.

- Developed and strengthened training programs for supervisors and Special Teams. More details can be found in the compliance assessment for "Facility Emergency Response Teams" and "Supervision of Captains" of this report.

- Facilitated the Deputy Commissioner of Information Technology's work to modernize the Department's technology infrastructure, which will allow for better data collection and data-driven decision-making. More detail on the various initiatives that have been put in place and those under development are outlined in Appendix I of this report.

- Initiated a re-organization of top executive leadership, including reducing the number of leaders reporting directly to the Commissioner and streamlining the reporting structure for facility leadership.  The Department reports that additional considerations for reporting efficiencies are under consideration.

- Continued to support efforts to retain staff, improve morale, address staff wellness and offer executive training.

Although these actions represent meaningful progress toward reform, much more work remains to address the high risk of harm that is pervasive throughout the system and the entrenched culture and dysfunctional practices that perpetuate it. The risk of harm in the jails remains high both for those incarcerated and staff who work in the jails. Excessive and unnecessary uses of force are still pervasive and concerns about specific practices are described throughout this report.

Since the apex of the Department's crisis, reductions in the rates of the use of force, stabbings and slashings, and fires for this reporting period have occurred. However, as shown in the graphs below, the key metrics regarding interpersonal violence and the use of force are substantially higher than those observed at the time the Consent Judgment went into effect (and that remains true as of the filing of this report). This illustrates the need for drastic changes to the jails' operations targeting the underlying causes of violence and interpersonal conflict, not the least of which is officers' commitment and ability to maintain overall security and effectively supervise the housing units.









The Department has many challenges that must be addressed to achieve compliance with the *Nunez* Court Orders. Chief among them are:

- Staff must reduce the unnecessary use of force and must reduce their use of head strikes and dangerous takedowns, among other practices described in detail in the "Assessment of Use of Force" section of this report.

- Improved security practices must be embedded into staff practices. More details on the work that remains is described in the "Security Plan" section of this report.

- Continued reductions in staff absenteeism and improvement in maximization of deployment of staff to housing unit posts and other facility based posts that engage with the incarcerated population.

- Officers and Captains must properly manage and supervise housing units (and staff) to reduce interpersonal violence among incarcerated people and assaults on staff and ensure the housing units are safely managed. More detail can be found in the "Supervision of Captains" compliance assessment in this Report.

- Staff must be properly deployed to housing unit posts to ensure proper supervision and service delivery.

- Facility Leadership must be more directly involved in managing their staff to identify and remediate poor practice. Elevating and changing staff practice will require an infusion of correctional expertise in a form that reaches more broadly, deeply, and consistently into staff practice than facility leadership has been able to accomplish to date.

- The Department must reduce the investigative caseloads by effectively triaging incidents into categories. Some incidents can be handled by robust administrative reviews, thereby conserving resources for those incidents that require a more in-depth investigation. More detail can be found in the "Use of Force Investigations" compliance assessment in this Report.

- Accountability for staff misconduct must be further improved so it is imposed closer in time to the incidents in which misconduct occurs. More detail can be found in the "Discipline" compliance assessment in this Report.

While the future holds many unknowns, it is crucial for Department leadership to remain focused on the work at hand, advancing the reform and working to capitalize on the momentum

that has been built since Commissioner Maginley-Liddie was appointed. This Commissioner's administration has demonstrated greater acknowledgement and ownership of core problems and obstacles than has been seen in the past. This is critical for institutional change. There is tangible momentum toward compliance with the *Nunez* Court Orders, but redoubled efforts are needed to ensure this momentum is not lost in the face of the upcoming changes to the contours of the reform effort.

### UPDATE ON THE MOTION FOR CONTEMPT

The litigation regarding the motion for contempt was initiated on August 10, 2023 when the Court granted Plaintiffs' application to move for contempt regarding the provisions of the *Nunez* Court Orders ("the Contempt Provisions"). Plaintiffs and S.D.N.Y. filed their initial brief on November 17, 2023 (dkts. 601 to 610). The motions were fully briefed on May 30, 2024. Following several meet and confers convened by the Monitoring Team, the Parties each filed a revised Statement of Facts and Plaintiffs filed a Supplemental Statement of Facts on July 30, 2025 (dkts. 762 to 764). On September 25, 2024, the Court held oral arguments. The Monitoring Team issued its report regarding the 18th Monitoring Period (January to June 2024) on November 24, 2024, a few days before the Court's Order on Contempt was issued.

On November 27, 2024, the Court issued an Order of Contempt. The Court directed the Parties to meet and confer with each other and the Monitoring Team regarding potential remedial relief. The Monitoring Team convened a series of meet and confers with the Parties to discuss potential remedial relief in December 2024 and January 2025. The Parties filed competing proposals on January 24, 2025, along with subsequent filings by the Parties and various *amici* in February, March, April, and early May 2025.

The Court rendered a determination regarding remedial relief on May 13, 2025 (dkt. 846). In that Order, the Court explained it "has fashioned a remedy designed to ameliorate Defendants' contempt by empowering a skilled outside professional (the "*Nunez* Remediation Manager") to develop a phased action plan specifically focused on the areas in which the Court has found Defendants to be in contempt and, subject only to the Court's authority and the provisions of the orders entered in this case, to direct the implementation of that plan in collaboration with the Commissioner, who will retain primary responsibility and authority for achieving compliance with the remaining unsatisfied requirements of the *Nunez* Court Orders." *See* May 13, 2025 Order at pg. 35. The Remediation Manager, in collaboration with the Commissioner and Monitoring Team, will develop a Remedial Action Plan to achieve Substantial Compliance with the provisions where the Court found contempt.  The Commissioner will retain primary responsibility and authority for achieving Substantial Compliance with the hundreds of other provisions of the *Nunez* Court Orders.

The Court also explained that the role and responsibilities of the Monitor as described in the *Nunez* Court Orders remain in effect, including but not limited to obligations to assess compliance, provide technical assistance, and regularly report to the Court in accordance with past practice.

**ORGANIZATION OF THE REPORT**

This report includes the following sections:

- Assessment of Department's Use of Force
- Managing People for Known Propensity for Violence
- Update on Use of Body-Worn Cameras
- Compliance Assessments & Compliance Updates on Select Provisions & Contempt Provisions

- Upcoming Timeline & Monitor Reporting

This report includes the following appendices:

- Appendix A: Comprehensive List of Provisions Subject to Compliance Assessments and Updates for Compliance

- Appendix B: UOF and Violence Indicators

- Appendix C: In-Custody Deaths

- Appendix D: Investigation Data

- Appendix E: Discipline Data

- Appendix F: Staffing

- Appendix G: Leadership Appointments

- Appendix H: Update on New Admissions

- Appendix I: Updates on Technology Initiatives

## ASSESSMENT OF DEPARTMENT'S USE OF FORCE

The Monitoring Team has consistently reported its concerns regarding the risk of harm to both incarcerated individuals and staff flowing from the excessive and unnecessary use of force. Indeed, *Nunez's* seminal focus is on the pattern and practice of harmful applications of force and the Department's failure to take a variety of actions to reduce the unreasonable risk of harm. Each component of the *Nunez* Court Orders is designed to catalyze reform across a multitude of functional areas to set an appropriate standard for the use of force, to enhance Staff skill so that the risk of harm is minimal when the use of force is necessary, to adhere to sound correctional practice to reduce the likelihood that force will become necessary, to assess Staff practice, to investigate allegations that force has been misused and to impose appropriate consequences in response. As these reforms begin to coalesce, one expects to see changes in Staff practice that will lead to a reduction in the excessive and unnecessary use of force. After ten years, there are certain signs that Staff practice has started to change. This may portend a shift toward compliance that we have not heretofore seen but it is too early to draw any definitive conclusions.

Assessing progress toward the use of force related requirements of the *Nunez* Court Orders and the proper implementation of the Use of Force Directive must include both quantitative and qualitative review. The Department has made little progress in reducing the frequency with which staff use force to respond to the behaviors of people in custody. Whether comparisons are made using 2016 (when the Consent Judgment went into effect, under the previous use of force definition) or 2018 (when the new Use of Force Directive went into effect,

which has a more expansive, prescriptive definition[8]), the use of force rate as of 2024 is greater than when the litigation began.[9] Reducing the rate at which staff members utilize force against those in custody—both by reducing the PIC behaviors that require an intervention and increasing the frequency with which staff utilize effective, non-physical means of intervention—is an essential pathway toward compliance to addressing the pattern and practice of unnecessary and excessive force. Additionally, the assessment of progress must also examine other quantitative data, including the rate of injury, the reason that force is used, and the type of force employed. As discussed below, there have been some noteworthy changes in these latter three metrics.

With respect to the type of force employed, a more nuanced assessment must be utilized. All uses of force are not the same. This is true in terms of mechanics—some are unremarkable where all parties remain standing and staff apply very minimal pressure or make minimal physical contact with PICs, while others are aggressive where PICs are propelled into hard objects with significant force. This is also true in terms of intent—some uses of force are limited to safely removing an individual from a dangerous situation while others exact serious harm for the purpose of retaliation or punishment. Movement away from blatantly aggressive tactics that intend to cause harm is an obvious, essential first step toward reform. Through its review of

---

[8] The original Use of Force Directive, 5006R-C, did not affirmatively state what constituted a use of force. It only stated what is *not* considered a use of force "Physical contact between an inmate and employee used in a nonconfrontational manner to apply mechanical restraints or to guide the inmate shall not be reported as a use of force." The new Use of Force Directive, 5006R-D implemented a more prescriptive and expansive definition: "A Use of Force is any instance where Staff use their hands or other parts of their body, objects, instruments, chemical agents, electronic devices, firearms, or any other physical method to restrain, subdue, or compel an Inmate to act or stop acting in a particular way. The term 'Use of Force' does not include moving, escorting, transporting, or applying restraints to a compliant Inmate."

[9] The Monitoring Team acknowledges that the Department's use of force rate in 2024 (9.13) is a reduction from the apex of the crisis in 2021 (12.23). Certainly all reductions in the use of force rate are important and necessary. *See* Table 1 in Appendix B.

thousands of uses of force, the Monitoring Team has observed such movement over the past couple years. **While force continues to be used too often, it is being used *differently* than it was at the start of the Consent Judgment.**

### CHANGES IN DOC'S UOF PRACTICES

A detailed evaluation of the use of force patterns and practice in the Department from the initiation of the Consent Judgment in 2016 to the present suggests that there have been some material changes. These changes in practice reflect progress on a variety of provisions of the Consent Judgment that sought to alter Staff's behavior with respect to using force, including improved training, changes to policies addressing problematic tactics, reduced reliance on Emergency Response Teams, improvements in identifying and investigating force-related misconduct, and improvements to the system for providing and ensuring timely discipline for such misconduct.

While significant work clearly remains to be done to reduce the risk of harm in this system, the Department's use of force practices have improved in discrete areas. The Monitoring Team has identified the following changes since the inception of the Consent Judgment:

- The most egregious incidents of the misuse of force have decreased.

- Large, chaotic disturbances involving numerous staff and people in custody with multiple applications of unnecessary or excessive force are occurring much less frequently.

- The use of head strikes to retaliate against or punish a person in custody has been reduced.

- Force involving the use of tactical equipment (batons, tasers, OC grenades, stun shields, etc.) is rare.

- Emergency Response Teams and Probe Teams respond to incidents much less frequently and, when they are deployed, team members display hyper-aggressive behavior less often.

- Injuries caused by the use of force occur less frequently and, notably, serious injuries consistent with particularly concerning use of force practices, such as broken teeth and jaw or orbital fractures, and fractures to Staff hands, are occurring much less frequently. For example:

    - In 2016, there were 14 Class A uses of force in which PICs sustained facial/head/neck fractures. In 2024, there were four Class A uses of force in which PICs sustained facial/head/neck fractures. While the 2024 number remains too high, the reduction in the overall number of injuries is notable.

    - In 2016, there were 17 Class A uses of force in which uniform staff sustained fractures to their hands/wrists/fingers. In 2024, there was only one Class A use of force in which a uniform staff member sustained a fracture to their wrist.

The change in the level of harm resulting from staffs' use of force appears to have several catalysts. Some are environmental—the addition of thousands of stationary cameras, more consistent use of handheld cameras, and the introduction of body worn cameras have not only permitted greater transparency into the use of force occurring in the system, but may have deterred some Staff from using force in a problematic fashion. Some catalysts are behavioral— the deployment of rigorous training on using force appropriately and employing verbal strategies for motivating compliant behavior and resolving interpersonal conflict has helped staff to identify alternatives to managing the population instead of solely using force. Facility leadership and investigators in ID have made incremental improvements in detecting the misuse of force

when it occurs and the Department's mechanisms for corrective action and discipline are imposing consequences for misconduct closer in time to when the incident occurs.

These changes may seem modest, but they are important as these uses of force are generally those which pose the greatest risk of harm to persons in custody. In the Monitoring Team's experience, substantial compliance is achieved through small, incremental changes that occur over a period of time. The changes the Monitoring Team has observed are an essential step forward and reflect the beginning of a cultural change in the Department's approach to the use of force itself.

### THE MONITORING TEAM'S ASSESSMENT THAT UOF PRACTICES HAVE CHANGED

At the outset, it must be emphasized that the use of numerical data must be utilized in context because alone it suggests there is a line in the sand that specifies a certain point at which the Department passes or fails. There are no national standards regarding a "safe" use of force rate, a reasonable number of "unnecessary or excessive uses of force" nor an "appropriate" rate at which Staff are held accountable.[10] The Monitoring Team's multi-faceted strategy for assessing compliance requires an assessment of all inter-related issues, because each of the main Consent Judgment and Remedial Order requirements is more than simply the sum of its parts. This is why the experience and subject matter expertise of the Monitoring Team is so critical, for the ability to not only contextualize the information, but also to compare the Department's performance to their decades-long, deep experience with the operation of other jail systems.

---

[10] Notably, neither the Consent Judgment, the underlying *Nunez* litigation, CRIPA investigation nor Remedial Order, include metrics or qualitative measures related to the concerning practices identified or potential corrective measures.

At the time the Consent Judgment was entered, the Monitor found that "the frequency of use of force incidents, including the number of incidents resulting in injuries to staff and inmates, was unusually high compared to other metropolitan jail systems."[11] The Monitor went on to explain that he "identified instances where staff engaged in excessive and/or unnecessary use of force in violation of the Constitution, including a number of incidents where correction officers delivered blows to an inmate's head or facial area or improperly employed force to punish or retaliate against inmates." The individual use of force cases underlying the entry of the Consent Judgment provided specific examples of incarcerated individuals who had been "beaten by uniformed staff [and] have suffered a range of injuries, many of which have required the provision of emergency medical care and/or hospitalization, and even have resulted in severe and permanent injury." The named Plaintiffs in this case suffered "multiple fractured ribs, pleural effusion; a traumatic hemothorax; orbital fracture; perforation of the tympanic membrane causing diminished hearing and tinnitus; acute mandibular fracture requiring the jaw to be wired shut for three months; fractured bones including wrists, jaws, and the nose; nerve damage; facial lacerations requiring stitches; and severe concussions causing permanent neurological damage."[12]

Nearly 10 years have passed since the Consent Judgment was entered. This is an important milestone, and in this report, the Monitoring Team has attempted to consolidate and describe the changes that have occurred during this 10-year period. Not only has the Monitoring Team assessed changes in the patterns evident throughout its review of thousands of use of force incidents over these 10 years, but also considered important contextual factors that have

---

[11] *See* Declaration of Steve J. Martin (dkt. 234) dated October 2, 2015, ¶ 6.

[12] *See* Second Amended Complaint (dkt. 34) at ¶ 32.

impacted the way in which information about the use of force is generated by the Department. These contextual factors include:

- **Definition of UOF**
    - DOC's definition of force[13] is expansive and includes a broad range of physical and chemical interventions. This overarching point is critical for context because of the wide spectrum of use of force incidents that occur, ranging from brief hands-on, non-impact tactics guiding or moving a PIC, which are generally "minor," to "major" interventions involving a combative PIC or attempts to quell a large-scale disturbance. Simply because a use of force occurred does not mean it was unnecessary or excessive. There are many situations in which a use of force is, in fact, necessary.

- **Improvements in Reporting UOF**
    - One of the factors that gave rise to this case was pervasive underreporting or failing to report uses of force.
    - In contrast, the Monitoring Team has found that most instances of force now appear to be reported.[14] The Department has an established and consistent process for tracking and investigating force that is both reported by staff and those alleged by incarcerated individuals and other stakeholders.

---

[13] The Department's definition of use of force is defined in the Consent Judgment at § III, ¶ 31. The Department's Use of Force policy in effect at the time the Consent Judgment was entered in 2015 did not include a definition of use of force, it described what situations were **not** force. The Department's new Use of Force policy went into effect on September 27, 2017.

[14] *See* Monitor's November 22, 2024 (dkt. 802) at pg. 16.

Both the use of a more expansive definition and evidence suggesting that reporting has become more comprehensive contribute to, although do not entirely explain, the increasing number of use of force incidents during the 10-year tenure of this case. Clearly, there is still more work to be done to reduce the frequency with which staff use physical or chemical intervention. That said, changes in the qualitative aspects of individual use of force incidents signify an important shift in the Department's practices. Some of these changes are reflected in the Department's data:

- **Prevalence of "Minor" Uses of Force**. The Monitoring Team has found that "minor" incidents, which are generally low-grade and do not result in injury, now comprise the largest proportion of use of force incidents.

- **Fewer Emergency Response Team Activations**. The facilities do not rely on Special Teams (e.g., ESU) and Probe Teams to respond to incidents in the way they did in the past. These teams are activated using a "Level B" alarm, which have significantly decreased, with a commensurate increase in Level A responses, where the incident is handled by facility supervisors and individual responders. When Level B responses are initiated, Emergency Response Team members generally respond in a manner that is less confrontational, antagonistic, and aggressive than the actions that characterized ESU and Probe Team responses in the past.

  - Notably, ESU was involved in fewer than 10 use of force incidents in all of 2024, which is a significant reduction from prior years. For example, in 2021, ESU was involved in 197 use of force incidents.

  - Furthermore, the number of incidents involving the use of tactical equipment like batons is rare (when it used to be commonplace) and the

use of other tactical equipment such as grenades and tasers has ceased compared with 2022 when there were 20 taser uses and 7 displays and OC grenades were utilized 18 times.

- **Decreasing Retaliatory and Punitive Head Strikes**. The number of head strikes used by Staff to retaliate against or punish an incarcerated individual has decreased over the life of the Consent Judgment.[15] To be certain, the use of head strikes remains a concern, especially those instances when they are utilized when an individual is in restraints. However, the fact that there has been some reduction in these most egregious types of head strikes must be acknowledged. The Monitoring Team will continue to refine the monitoring of and reporting on the use of head strikes and related tactics as appropriate and necessary.

- **Fewer Injuries**. Injuries resulting from the use of force have decreased. The number and proportion of incidents with injuries has decreased from both when the Consent Judgment was entered and 2018 (the first full year the Use of Force policy was implemented). In 2024, 261 (3.7%) use of force incidents resulted in injuries compared with 1,701 (37%) in 2016 and 2,030 (34%) in 2018.

- **Fewer Staff Suspensions**. In terms of staff discipline, the number of use of force-related misconduct cases requiring suspensions is significantly lower than it has been in the past and is at the lowest level since tracking began in 2020.[16] The suspensions that are imposed are appropriate, but in many cases, involve less egregious conduct than the Monitoring Team has reported in the past. Further, the Monitoring Team has been

---

[15] *See* Consent Judgment, § VIII, ¶ 2(d)(ii).

[16] There were 60 suspensions for Use of Force related misconduct in 2024 compared with 124 in 2023 and 80 in 2020.

identifying fewer cases in which a suspension would have been appropriate but was not sought by the Department.

- **Fewer Staff Terminations**. The number of use of force-related misconduct cases meriting expeditious investigation and discipline pursuant to Action Plan § F, ¶ 2 has decreased.[17] The number of F2 cases remains concerning, but many of the cases involve conduct that is somewhat less egregious than the Monitoring Team has previously reported. Additionally, the Department has improved its internal identification of such cases, and more F2 cases are now identified by ID than the Monitoring Team.

To better capture and assess the extent to which these changes are leading to the required reduction in the risk of harm, the Monitoring Team intends to deepen its analysis to better illustrate the nuances within certain types of events. For example, within the category of head strikes, events will be assessed for the extent to which a head strike is willful/intentional versus incidental/accidental as well as whether allegation of a head strike has been sustained. Incidents in which OC is utilized will be categorized as to whether the use of OC was excessive/gratuitous versus a proportional response to the level of threat. This level of detail is essential to tracking progress toward requirements with the *Nunez* Court Orders and to providing feedback to the Department about problematic practices that continue to warrant attention. Accordingly, the Monitoring Team intends to work with the Department on refining the data tracked regarding use of force as part of the work already being conducted on overall reporting.

---

[17] There were 22 such cases in January-June 2024, compared to 36 in January-June 2023 and 18 in June-December 2022.

### THE MONITORING TEAM'S ONGOING CONCERNS ABOUT DOC'S USE OF FORCE

These changes in the Department's use of force practices are significant, not only because they suggest a change in the trajectory of reform but also because incremental steps like these are the only pathway to full compliance with the *Nunez* Court Orders. That said, uses of force still occur too frequently and it is certain that Staff continue to engage in practices that inflict unnecessary and excessive harm (e.g., painful escort techniques, dangerous takedowns of restrained individuals). In particular, the Monitoring Team remains concerned about six specific aspects of the Department's use of force practices:

- **Use of Head Strikes on Individuals in Restraints**. The frequency of incidents in which Staff utilize a physical head strike on restrained PICs coupled with incidents in which restrained PICs are taken down in a needlessly harsh manner which makes them vulnerable to serious injury (e.g., hitting their head on an immovable object such as a wall or the floor or due to their inability to break the fall) remains too high. To the extent that such actions are deliberate, the Staff member may be subject to termination by the Department.[18]

- **Excessive or Unauthorized Use of Chemical Agent/OC Spray**. Policy permits OC to be used to enforce an order only when there is an <u>immediate</u> need for compliance. This requirement is routinely ignored by Staff in too many instances when the situation involves an anticipated use of force. In such cases, Staff should first respond by giving the PIC(s) time and distance to comply, engage in interpersonal communication, and only then use OC if necessary. In other instances, when the use of OC is permitted by policy

---

[18] *See* Consent Judgment, § VIII, ¶ 2(d)(i).

(e.g., in response to an imminent risk of harm, such as a fight), Staff continue to disperse unnecessary and/or excessive applications.

- **Painful Escort Holds**. Staff continue to use painful escort holds and joint manipulation instead of standard, secure escort holds that do not cause pain. These painful tactics cause PICs to react defensively. Staff then misinterpret such reactivity as resistance, which then catalyzes an unnecessary and more aggressive use of force with Staff often taking the PIC to the wall or to the ground.

- **Inappropriate Take-Down Techniques**. Staff continue to intervene by immediately taking PICs to the ground with excessive force, which often results in a PIC's face or head making contact with a hard object (e.g., wall, floor, furniture). When multiple Staff are securing a single PIC and apply a take-down with velocity, the descent to the floor quickly becomes unmanageable and risks injury to both Staff and PICs. This can be particularly dangerous when the PIC is rear-cuffed and cannot break their fall. Controlled team restraints that avoid obstacles in the area are a far safer method for securing a PIC who is actively resisting. A related issue involves situations in which a PIC has assaulted or become aggressive with staff but then retreats. In some cases, Staff inappropriately continue to advance toward the PIC who is no longer posing an immediate risk of harm. This action exacerbates rather than diffuses the situation.

- **Uses of Force during Searches**. A large proportion of use of force events occur during searches (e.g., flowing from a search operation, as part of the admission process, or while in Intake following a use of force), particularly in cells or other areas designated for strip searches without camera coverage. Their prevalence raises serious questions about the search methods and demeanor of Staff when conducting the searches.

24

- **Precipitating Staff Conduct**. Staff too often engage in conduct that serves to precipitate or escalate situations that result in the use of force. For example, Staff engage in hyper-confrontational behavior and demeanors that escalate situations rather than using appropriate de-escalation tactics that would serve to diffuse the situation (e.g. Staff precipitously default to using force without taking the appropriate time and distance to potentially de-escalate a situation). In other cases, Staff too often engage with PICs with unprofessional conduct including using threats, profanity, and/or racial epithets.

- **Staff Failure to Act**. Staff too often fail to act or intervene in situations in which a response and/or force is necessary and appropriate, even in situations involving an obvious risk of harm, such as a fight or brewing disturbance. The Monitoring Team has continuously opined that in many circumstances, a safe, properly executed, well-timed physical or chemical intervention that is proportional to the extant threat can reduce the unreasonable risk of harm to PICs and Staff. In too many instances, Staff fail to act or are off-post and thus are unavailable when action is required.

- **Failure to Intervene in Self-Harm Attempts**. Too often, Staff utilize harmful interventions (e.g., OC spray), or intentionally ignore or fail to intervene in an attempted suicide or self-harm event. As such, Staff fail to appropriately prevent PICs from the risk of harm to themselves.

CONCLUSION

The Department's has been unable to implement the use of force policy since the inception of the Consent Judgment. While significant and critical work remains, some changes have occurred in Staff practice that must be both acknowledged and built upon. It is important that the Department has taken these critical steps as this will serve as the basis to begin to reduce

the use of unnecessary and excessive force and ultimately meet the requirements of the *Nunez*

Court Orders.

## MANAGING PEOPLE WITH KNOWN PROPENSITY FOR VIOLENCE

Operating and safely managing a program for detainees with a known and recent propensity to engage in violent predatory behavior is a challenging but necessary endeavor. The concentration of people who may respond to interpersonal conflict with violence against both other people in custody and staff underscores the importance of sound security practices in programs of this type. The approach must recognize the substantial and sometimes life-threatening harm already inflicted and the mandate to prevent further victimization.

Housing and programming for individuals with a known propensity for violence must be well-designed and security practices must be properly implemented; the complexity of achieving an appropriate balance between these two components cannot be overstated. Concentrating people with known propensities for violence in the same location requires unique security enhancements, particularly during time spent in congregate activities. In order for these housing units to be secure, safe and effective, staff must provide necessary and active security and supervision and must provide structured activities and rehabilitative services to decrease idle time and the likelihood of individuals committing subsequent acts of violence.

This section begins with an update on the Monitoring Team's assessment of Local Law 42, followed by a detailed discussion of the Department's primary restricted housing program, Enhanced Supervision Housing at RMSC ("RESH"), an introduction to the Department's recently developed Special Management Unit ("SMU"), and an update on the Department's use of NIC/Involuntary Protective Custody.

### MONITORING TEAM'S ASSESSMENT OF LOCAL LAW 42

As discussed in the Monitor's January 31, 2025 Report (dkt. 814), the Monitoring Team studied the requirements of Local Law 42 ("LL42") at length to determine how it may impact the

Department's ability to comply with the *Nunez* Court Orders. While the Monitoring Team fully supports the objective to eliminate solitary confinement, the report discussed key aspects of the law that would adversely impact the Department's ability to operate restrictive housing, employ restraints, and utilize de-escalation confinement and emergency lock-ins according to sound correctional practice. If implemented as written, the Monitoring Team believes that certain LL42 requirements would increase the risk of harm rather than abate it. The Monitoring Team's assessment of LL42 remains unchanged as of the filing of this report.

Upon receiving the Monitoring Team's report, the Court's February 5, 2025 Order (dkt. 815) stated that "in light of the pending litigation related to the Article 78 motion in state court and the proposals for remedial relief in [the *Nunez* matter], the Monitoring Team shall not file any further analytical report regarding the implementation of Local Law 42 until further order of the Court." It is the Monitoring Team's understanding that the litigation related to the Article 78 motion remains pending. To that end, counsel for the City has advised the Monitoring Team that oral argument is set to take place in June 2025.

**ENHANCED SUPERVISION HOUSING AT RMSC ("RESH")**

In March 2023, the Department implemented a revitalized Enhanced Supervision Housing program ("ESH," now called "RESH" because of its location in the RMSC facility). RESH is intended to house those individuals who engage in serious violence while in custody in a highly structured environment in order to limit their ability to exact subsequent violence on others in custody or staff. As of December 2024, RESH housed approximately 160 individuals; by April 2025, the population had increased to approximately 185 individuals.

- **RESH's Program Design**

RESH has two levels: Level 1, in which individuals' movements are restricted during out-of-cell time via restraint desks and where individuals recreate in individual pens, and Level 2, in which individuals have freedom of movement during congregate activities and may participate in congregate outdoor recreation. During their 7 hours out-of-cell per day, individuals in both Levels may access structured programming led by a Program Counselor or community vendor for 4 hours and are afforded 3 hours of recreation. Each person must meet individualized programming requirements and remain infraction-free to promote to a less restrictive setting (i.e., from Level 1 to Level 2 and from Level 2 to the general population). Each individual's progress is assessed every 15 days, and individuals are eligible to be promoted to a less restrictive setting every 30 days. These reviews are informed by input from a multi-disciplinary team and include individualized data on program engagement, extracted from the Programs Division's new database. The program design, developed by the Department in collaboration with Dr. James Austin and the Monitoring Team, is sound and incorporates many features found in jurisdictions that have successfully reduced their reliance on extended solitary confinement.

- **Rates of Violence and Use of Force**

After some serious challenges with security and safety during its first year of operation, the RESH program recently improved its implementation and service delivery and began to see its rates of violence decrease, as first reported in the Monitor's November 22, 2024 Report (dkt.802, pgs. 28-34). Regarding implementation, preliminary findings from Dr. James Austin's process evaluation found that the program has been operating at capacity since its inception, that people were admitted only following a qualifying offense, that a significant volume of programming was provided to those in RESH and that most individuals attended at least some of

29

the program offerings, and that, on average, the length of stay conformed to design (*i.e.*, 60 days). The process evaluation also found that approximately 20% of those who completed the RESH program were readmitted for a subsequent qualifying offense.

The table below presents RESH's average monthly rates of the use of force and violence since the program moved to its current location at RMSC in July 2023. The rates of all key metrics decreased substantially during the current monitoring period.

| RESH's Rates of Key Metrics | | | | | |
|---|---|---|---|---|---|
| | Use of Force | Stabbings/ Slashings | Fights | Assault on Staff | Fires |
| July-Dec 2023 | 39.2 | 3.8 | 7.2[19] | 8.4 | 7.8 |
| Jan-June 2024 | 42.8 | 3.2 | 4.9 | 9.3 | 11.9 |
| July-Dec 2024 | 22.1 | 1.3 | 3.8 | 6.8 | 2.9 |
| **% decrease** | **- 43%** | **-66%** | **-47%** | **-19%** | **-63%** |

While the rates of use of force and violence have significantly decreased during the program's 18-month tenure, they remain higher than the average within the Department due, in part, to the program's heavy concentration of people who frequently resort to violence in their interactions with staff and other people in custody. The Department and the Monitoring Team continually assess both the factors contributing to the program's improvement and the ongoing challenges, working to enhance the program's implementation further.

- **RESH's Current Operation**

Since December 2023, RESH has been managed by a leader with a strong grasp of sound security practice, a command of the issues that have undercut the safe operation of RESH, a realistic assessment of the current state of affairs, and who consistently identifies and addresses

---

[19] Data on fights for November/December 2023 was not available; the average for this period includes data from only the first four months of the Monitoring Period.

staff's poor practice. The program's operation is discussed in detail in the Monitor's November 22, 2024 report at pgs. 32-34. Since that time, the Warden has overseen important physical plant improvements, more thoughtful housing decisions for those promoted to Level 2 made in partnership with CIB, and improvements to the reliability of mandated service delivery. The Warden's continued focus on staff skill development has helped to reduce staff errors that create an opportunity for violence to occur, although she continues to provide guidance, coaching and corrective action to staff for practice errors related to searches and escorts. In collaboration with the strong presence of the Programs Division, the Warden also works to reduce idle time on the unit and to ensure consistent service delivery. RESH's Warden continues to report persistent challenges managing the size of the RESH population within the available space and difficulty maintaining adequate staffing (problems derived from staff not being allocated for certain key positions, compounded by staff absenteeism).

Going forward, RESH's Warden and the Programs Division are working to better differentiate the restrictions and privileges associated with the two levels of RESH, particularly given the recent implementation of the Special Management Unit ("SMU"), which is introduced below.

SPECIAL MANAGEMENT UNIT ("SMU")

The Monitoring Team has continually encouraged the Department to identify effective housing strategies for individuals who are particularly difficult to manage but who have not committed misconduct warranting placement in RESH or who need a more graduated return to the general population from RESH. In early 2025, the Department finalized its policy for a Special Management Unit ("SMU"), developed in consultation with Dr. James Austin (the

Department's consultant on restrictive housing) and the Monitoring Team, and with guidance from the SCOC. The Monitor approved the Department's policy to pilot this program.

An incarcerated individual may be placed in SMU if their presence in the facility's general population would pose an unreasonable and demonstrable risk to the safety of others or the security of the facility. Individuals may be considered for placement if they: are being considered for release from RESH; were referred to RESH but did not meet the qualifying offense criteria for such placement; are leaders of a security risk group ("SRG"); have been actively involved in organizing or perpetrating SRG-related violence; have one Grade I or three or more Grade II infractions in a 6-month period; have participated in an incident that threatened the safety and security of the facility.[20] Placement occurs upon recommendation from facility leadership, approval by the Custody Management Centralized Movement Unit ("CMCMU"), and the determination by a Hearing Officer that placement is appropriate.

The SMU was designed to increase the level of supervision and structure beyond that of general population housing, where individuals referred to SMU engaged in serious or persistent violence. Key program elements include:

- higher staff—PIC ratios (each SMU unit will have two B-officers),

- lockout limited to 7-hours per day,

- more frequent pat frisking and searches using a handheld metal detector, along with cell searches and searches of common areas,

- all mandated services,

---

[20] The following individuals are excluded from SMU: those with a serious mental illness, those with serious physical disabilities or conditions, those assigned to women's housing or Special Consideration Housing.

- a Supportive Services Plan ("SSP") that focuses on developing the skills needed to avoid interpersonal conflict and violence,

- weekly group and individualized programming from a Programs Division counselor to advance progress toward SSP goals, and

- regular reviews to determine readiness for return to the general population. Policy requires a placement review every 60 days, but Department leadership is currently evaluating whether more frequent reviews may be beneficial to motivate positive behavior.

The program is being piloted in a single unit at OBCC, which opened on February 6, 2025. In addition to holding regular calls with program operators and Department leadership about the early implementation, the Monitoring Team has developed a monitoring strategy for the unit and a more comprehensive update will be provided in subsequent reports.

**NIC/INVOLUNTARY PROTECTIVE CUSTODY**

The Department continues to use five celled units at NIC to house certain individuals with a variety of security needs, including those who must be isolated until they pass a secreted weapon, those who are particularly vulnerable to retaliation, those subject to Court-ordered lockdowns and certain individuals who pose acute security risks. Given the units' unusual physical plant that limits social interaction, the Monitoring Team has raised concerns about the length of stay and the lack of clarity for placement in these NIC units. As reported in the Monitor's November 22, 2024 Report at pg. 35 (dkt. 802), the Monitoring Team recommended that the Department limit its use of NIC as much as possible (particularly once other programs such as the SMU came on-line), develop procedures to ensure adherence to specific placement

criteria and procedural due process, and implement various protections to prevent undue isolation and to safeguard against decompensation.

The number of individuals housed in NIC for these purposes continues to be lower than when the Monitoring Team first raised concerns in January 2024 (i.e., the population was 41 in January 2024, 15 in December 2024, and 18 in March 2025). Of those housed in NIC in March 2025, half (50%; n=9) were placed in NIC for protective custody, five (28%) were placed in NIC following a positive body scan/secreted weapon, and four (22%) were in Court-ordered lockdown. In terms of the length of stay, 44% (n=8) had been in NIC for less than 30 days, 22% (n=4) had been in NIC for between 30 and 100 days, and the remaining 33% (n=6) had been in NIC for over 100 days. That fewer individuals are housed in these NIC units is certainly positive, although the Monitoring Team continues to recommend that the Department finalize the policy and procedures for this unit, and that NCU audit the extent to which required Protective Custody procedures are being followed and services are being provided.

CONCLUSION

The Department needs programs like RESH and SMU to manage individuals who commit serious acts of violence while in custody. The Monitoring Team strongly supports both the way the Department has worked in the development of RESH and SMU and the measured approach it has taken with their initial implementation and expansion of these programs. Moving forward, the Department is encouraged to continually assess the interplay between and among its various housing options—not just restrictive housing but also specialized mental health programs, program houses and the general population. A logical progression of restrictions must be in place to guard against incarcerated individuals attempting to manipulate their housing placement for secondary gain (e.g., to commit an act of violence in order to be placed in a

program that although technically more restrictive, offers access to a service or benefit that the individual desires). In addition, the Department must continue to audit and ensure strong adherence to placement criteria, service delivery, program offerings and review and release criteria.

## UPDATE ON USE OF BODY-WORN CAMERAS

The Department's Body Worn Camera ("BWC") initiative is a central component of its broader efforts to enhance transparency and accountability. As required by the Consent Judgment, § IX, ¶ 2(a)-(c), DOC launched a pilot program of BWC across facilities in 2017, with the earliest use at certain posts at GRVC in 2017, followed by a phased expansion to other posts within the other commands through 2021. By late 2021, staff at all facilities had completed BWC training and BWCs were deployed (or awaiting equipment delivery).[21]

### BACKGROUND

The Department's use of BWC has consistently exceeded the requirements of the *Nunez* Court Orders, which required a pilot project of 100 body-worn cameras to be worn by Staff Members over all shifts. The Department has worked, in consultation with the Monitoring Team, to expand the program Department-wide from select coverage of PIC-facing posts to broader staff assignments.

BWC footage offers unique visual and auditory records of incidents that may not be fully captured by stationary or handheld cameras. BWC footage is most useful in understanding the context of an incident. While BWC footage is a vital tool, Genetec, the Department's wall-mounted camera system, remains the most comprehensive method for observing use of force incidents. Genetec footage typically provides a wider field of view and greater stability, underscoring the importance of maintaining and expanding both systems to achieve robust oversight.

---

[21] *See* Monitor's December 6, 2021 Report (dkt. 431) at pgs. 75 and 76.

**SUSPENSION AND REDEPLOYMENT**

In May 2024, the BWC program was suspended after an incident in which a camera ignited while being worn by a staff member and caused injury.[22] Out of an abundance of caution, the Department pulled the entire inventory from circulation pending investigation of the BWCs. The Monitoring Team strongly encouraged a swift reintroduction of the BWC once safety could be assured. The Department had all BWCs in circulation evaluated by the manufacturer, and in July 2024, after manufacturer clearance, the Department resumed limited redeployment to RESH, GRVC, and other priority areas[23].

**NEW BODY WORN CAMERAS AND OPERATIONAL ENHANCEMENTS**

The Department used the May 2024 suspension as an opportunity to overhaul the BWC program. As part of the reintroduction of BWC, the following changes occurred:

- **New Equipment**. DOC acquired 6,200 new BWCs as part of a 2-million-dollar grant.

- **Enhanced Technology**. The updated BWCs incorporate improved safety features, durability (notably stronger magnetic backings), and advanced tracking capabilities. Cameras are now digitally registered to specific staff, with each officer's name appearing on the camera upon activation. This has significantly reduced prior issues with "lost" equipment and introduced greater accountability. Once docked, these new cameras will automatically sync and upload all footage to the Genetec surveillance system.

- **Individual Assignment**. The new BWC assignment shifted from post-based to individual officer assignments, making the camera a permanent part of each officer's uniform, which increases the Department's ability to hold staff accountable for utilizing the BWC.

---

[22] *See* Monitor's June 8, 2024 Report (dkt. 541) at pgs. 4 and 5

[23] *See* Monitor's November 22, 2024 Report (dkt. 802) at pgs. 17 and 18

- **Improved Infrastructure**. Docking stations have been installed across all facilities, with sufficient capacity to ensure that cameras can be charged without interruption, even when staff are on leave, reassigned, or when posts are temporarily filled by other personnel.

- **Management and Oversight**. The Facility Operations Division now oversees the BWC program. Designated control room Captains are responsible for dock inspections and inventory tracking, while leadership in the Facility Operations Division manages reports of equipment loss or damage and produces routine assessments to ensure program fidelity. Genetec Cameras were also installed over the docking stations for improved oversight.

  o Historically, staff compliance with utilizing BWCs has been mixed. It was reported that Staff's failure to utilize BWC was previously driven by staff losing the "backings" of the previous model of cameras. Now that that issue is no longer relevant, the Department must work to address broader cultural resistance or indifferent attitudes. The Department has worked to address staff concerns about the use of BWC and leadership have modeled the importance of use of BWC. Compliance has been reinforced through clear directives and audits, with corrective action taken when activation failures or misuse are identified. The Department reports that while audits continue to reveal compliance gaps, leadership is actively responding with targeted training and closer supervision, reflecting a concerted effort to integrate BWCs as a normalized and essential component of daily operations.

- **Training and Policy**. A training program and policy was developed and rolled out alongside the redeployment. The Monitoring Team reviewed and approved both, finding the policy and training to be thorough and addressing past concerns.

- **Status of Roll-Out**. As of April 2025, the new BWCs have been rolled out at the Academy, RESH, RNDC, RMSC, ESU, SST, SRT, OBCC, EMTC and OBCC.

CONCLUSION

The Department has demonstrated a sustained commitment to expanding and strengthening its BWC program well beyond the original *Nunez* requirements. Despite setbacks, including the 2024 suspension, the reintroduction of BWCs, enhanced by advanced technology, strengthened infrastructure, and focused training, marks a significant step forward. Continued challenges in staff compliance and auditing reinforce the need for vigilant oversight and adaptive management. The Monitoring Team is encouraged by the leadership that has been appointed to manage the BWC program and the program's evolution reflects meaningful progress in promoting transparency, safety, and accountability.

## COMPLIANCE ASSESSMENTS & UPDATES ON COMPLIANCE

In this section of the Report, the Monitoring Team provides a compliance assessment (as defined by Consent Judgment § XX, ¶ 18) to the "select group of provisions" as defined by the Action Plan § G, ¶ 5(b). In addition, the Monitoring Team provides updates on compliance for all provisions included in the Contempt Order, to the extent that they are not covered by the "select group of provisions" articulated in the Action Plan. A complete list of the 39 provisions is provided as Appendix A of this Report. An update on the 2023 *Nunez* Court Orders is also provided at the end of this section.

### MONITORING TEAM'S METHODOLOGY FOR COMPLIANCE ASSESSMENT & UPDATES ON COMPLIANCE

A comprehensive process for assessing compliance and describing the current state of affairs requires multiple measures to be evaluated in each key area of the *Nunez* Court Orders because no one metric adequately represents the multi-faceted nature of their requirements. While quantitative data is a necessary component of any analysis, relegating a nuanced, complex, qualitative assessment of progress towards achieving compliance with these requirements into a single, one-dimensional, quantitative metric is not practical or advisable. Data—whether qualitative or quantitative—cannot be interpreted in a vacuum to determine whether progress has been made or compliance has been achieved. For example, meeting the requirements of the Use of Force Policy provision of the Consent Judgment relies on a series of closely related and interdependent requirements working in tandem to ultimately reduce and, hopefully eliminate, the use of unnecessary and excessive force. As such, there is no single metric that can determine whether the Use of Force Policy has been properly implemented. Analogous situations appear throughout this report, whether focused on discussions about the Department's improving safety in the facilities, making the process for imposing staff discipline timelier and more effective, or

addressing its staffing needs. The Monitoring Team therefore uses a combination of quantitative data, qualitative data, contextual factors, and references to sound correctional practice to assess progress with the requirements of the *Nunez* Court Orders.

Further, two cautions are needed regarding the use of quantitative metrics. First, the use of numerical data suggests that there are specific metrics or definitive lines that specify a certain point at which the Department passes or fails. There are no national standards regarding a "safe" use of force rate, a "reasonable number" of unnecessary or excessive uses of force, nor an "appropriate" rate at which staff are held accountable.[24] Consequently, the Monitoring Team uses a multi-faceted strategy for assessing compliance that evaluates all inter-related issues.

Second, there are infinite options for quantifying the many aspects of the Department's approach and results. Just because something *can* be quantified, does not mean it is necessarily useful for understanding or assessing progress. The task is to identify those metrics that actually provide insight into the Department's processes and outcomes and are useful to the task of problem solving. If not anchored to a commitment to advance and improve the processes and outcomes that underpin the requirements of the *Nunez* Court Orders, the development of metrics merely becomes a burdensome and bureaucratic distraction.

It is axiomatic that reform is intended to improve upon the conditions extant at the time the Court first entered the Consent Judgment and that the initiatives implemented as required by the *Nunez* Court Orders actually improve practice. It must also be emphasized that the various Remedial Orders that were entered following the Consent Judgment were all intended to create

---

[24] Notably, this is why the Consent Judgment, the underlying *Nunez* litigation, the CRIPA investigation, the Remedial Orders, or the Action Plan include specific metrics the Department must meet with respect to operational and security standards that must be achieved.

the capacity to comply with the requirements of the Consent Judgment. None of the *Nunez* Court's Orders "move the goal posts" or materially change the Department's obligation to fully comply with the Consent Judgment. For this reason, the Monitoring Team compares current performance levels and key outcomes to various periods of time, including those at the time the Consent Judgment went into effect as well as other markers such as when a policy was adopted and implemented. The Monitoring Team has taken this same approach throughout the duration of its work.

Since the Consent Judgment was entered, changes to the context within which the jails operate have occurred and these externalities must be recognized. One of the most obvious externalities is the COVID-19 pandemic which began in March 2020, and triggered a staffing crisis that exacerbated decades-long mismanagement of the Department's most important resource—its staff—which then cascaded into even more problems in many of the areas that impact jail safety (*e.g.*, failure to provide mandated services which generates frustration; levels of stress among people in custody and staff which can trigger poor behavior; interruptions in programming that increase idle time). In addition, recent bail reform enacted by the State has changed the composition of the jails' incarcerated population. Individuals with less serious offenses who previously may have been incarcerated are generally no longer held pending trial. While this has had the effect of reducing the overall jail population, it has resulted in a heavier concentration of detainees with more serious offenses in the jails.

These external factors do not change the City's obligation to provide safe and humane treatment to those within its jails, and while important for understanding shifts in the size and characteristics of the jail population and the resulting dynamics that surround jail safety, they do not excuse failure to comply with the *Nunez* Court Orders. The constitutional minimum of care

and safety that must be afforded to all incarcerated individuals has remained the same and continues to be the standard by which all reform must be measured.

The array of quantitative metrics, qualitative assessments, and an appreciation of externalities mean that discussions about the current state of affairs can be cast in many ways, many of which are legitimate strategies for understanding the Department's trajectory. The selected comparison point can lead therefore to different conclusions about the magnitude or pace of progress or the lack thereof. The Monitoring Team has dutifully examined changes in metrics and patterns in staff behavior from multiple angles in order to gain insight into the factors that may be catalyzing or undercutting progress. While such explorations are useful for purposes of understanding and problem solving, they do not replace the overarching requirement for the Department to materially improve the jails' safety and operation relative to the conditions that existed at the time the Consent Judgment went into effect.

| FIRST REMEDIAL ORDER § A., ¶ 2 (FACILITY LEADERSHIP RESPONSIBILITIES) |
|---|

§ A., ¶ 2. *Facility Leadership Responsibilities*. Each Facility Warden (or designated Deputy Warden) shall routinely analyze the Use of Force Reviews, the Department leadership's assessments of the Use of Force Reviews referenced in Paragraph A.1(i) above, and other available data and information relating to Use of Force Incidents occurring in the Facility in order to determine whether there are any operational changes or corrective action plans that should be implemented at the Facility to reduce the use of excessive or unnecessary force, the frequency of Use of Force Incidents, or the severity of injuries or other harm to Incarcerated Individuals or Staff resulting from Use of Force Incidents. Each Facility Warden shall confer on a routine basis with the Department's leadership to discuss any planned operational changes or corrective action plans, as well as the impact of any operational changes or corrective action plans previously implemented. The results of these meetings, as well as the operational changes or corrective action plans discussed or implemented by the Facility Warden (or designated Deputy Warden), shall be documented.

This provision was imposed by the Court in the First Remedial Order § A, ¶ 2. The goal of this provision is to ensure that the leadership of each facility is consistently and reliably identifying pervasive operational deficiencies, poor security practices, and trends related to problematic uses of force and that they address these patterns so that supervisors and staff alike receive the guidance and advice necessary to improve practices. Facility leadership is required to routinely analyze available data regarding uses of force, including the daily Rapid Reviews, to determine whether any operational changes or corrective action plans are needed to reduce the use of excessive or unnecessary force, the frequency of use of force incidents, serious injuries or other harm to incarcerated individuals or staff resulting from use of force incidents. The first compliance assessment for this provision was made in the 11th Monitoring Period (July to December 2020). At that time, the Department was found to be in non-compliance and remained so through the 17th Monitoring Period (July to December 2023).

The Court's 2024 Contempt Order (dkt. 803) found the Defendants in contempt for failing to comply with this provision. The Court explained the basis for its finding at pages 34 to 37 in section "Failure to Adequately Supervise Staff and Facility Leadership" of the Order.

In the 18th Monitoring Period (January to June 2024), the Department moved out of Non-Compliance and achieved Partial Compliance and has maintained the Partial Compliance rating in this Monitoring Period.

### Facility Leadership's Communication with Monitoring Team

The executive leadership in place with operational expertise and the ability to drive change presents an important opportunity for the Department. These leaders can and should identify staff practices and other operational issues that merit attention by utilizing incident-level data (*e.g.*, Rapid Reviews and other indicators extracted from the COD reports) to identify patterns in persons, places,

times and circumstances that lead to a use of force and in which problematic practices tend to occur. Utilizing that information they then should develop targeted strategies that focus on those people, places, times or circumstances to reduce the likelihood of problematic staff conduct.

The Monitoring Team continues to meet monthly with facility leadership across the jails, creating a routine forum to discuss facility operations, recent metrics, initiatives, and emerging and ongoing challenges. These meetings have become a cornerstone of transparent communication and collaboration. Facility leaders consistently engage in these discussions with candor and are often open to the Monitoring Team's input on how to address ongoing issues. Historically, facility leadership has experienced significant turnover, with leadership assignments frequently changing. As noted in prior reports,[25] this instability undermined sustained progress. However, under the current Commissioner the Department has demonstrated greater continuity in facility leadership which over the past year has contributed to observed improvements, suggesting that consistent leadership has been a key factor in advancing reform.

Through these monthly meetings, the Monitoring Team has observed that facility leaders are often well aware of the challenges highlighted by the Monitoring Team and, in many cases, are already working toward solutions. Leaders appear to be leveraging tools such as the ACT Dashboard and other data reports to inform their decisions, while also using available platforms and facility tours to stay connected to on-the-ground operations. This proactive and engaged approach demonstrates that some facility leadership clearly have the potential to usher in meaningful reform, though this has not been the case across the board.

However, challenges persist. Some of the issues, such as persistent staff absenteeism or elevated housing unit counts due to a growing population, are difficult and systemic, but facility leadership must continue to take ownership where they can. While some facility leaders are attuned to key operational issues and metrics, many of their explanations still rely on surface-level justifications or ancillary issues and do not display an understanding of root causes or new ways to address old problems. The Monitoring Team continues to urge leadership to move beyond traditional or outdated strategies that have proven ineffective and instead develop innovative, resource-conscious solutions that are tailored to the realities of their facilities. The Monitoring Team remains encouraged by the commitment and

---

[25] *See* Monitor's March 16, 2022 Report (dkt. 438) at pgs.7 and 17; Monitor's December 6, 2021 Report (dkt. 431) at pg. 42 and 43, Monitor's May 11, 2021 Report (dkt. 368) at pgs. 8-10.

capability of current facility leaders, but notes that continued progress will depend on their ability to embrace new solutions and deeper, more sustainable change.

**ACT Dashboard and Meetings**

In the Monitor's February 26, 2024 Report (dkt. 679) at pgs. 5-7, the Monitoring Team reported that the Department reviewed the type of information and data used in monthly meetings with facility leadership, and developed a plan to revise the meetings' format and substance.[26] The Department has continued its efforts to strengthen facility oversight and data-informed leadership through the monthly "Action, Collaboration, and Transformation" (ACT) meetings and the ACT Dashboard, both introduced during the previous Monitoring Period. These initiatives were developed under the Commissioner's direction to improve upon the former TEAMs meetings, which often lacked meaningful engagement and failed to provide actionable insights. The revised structure and tools were designed to promote a more dynamic, solution-oriented approach to facility management.

The ACT Dashboard remains active and has proven to be a flexible tool capable of evolving with the Department's needs. During this Monitoring Period, the Monitoring Team learned that the metrics for West Facility and NIC were initially combined, which impeded facility leaders' ability to clearly understand their own performance data. Following a request from the Monitoring Team, the Department was able to modify the Dashboard to separate the facilities' metrics, demonstrating the system's adaptability. Facility leaders report that they continue to rely on the dashboard to better understand the number and types of incidents occurring in their facilities. The Monitoring Team encourages the Department to continue monitoring the use of the Dashboard to ensure it remains actively leveraged by staff across facilities and is embraced by leadership at all levels, including Deputy Wardens and Assistant Deputy Wardens.

ACT meetings have continued on a monthly basis with a consistent structure. The first half of each meeting is dedicated to a focused review of a particular issue (e.g., self-injurious behavior or

---

[26] The Department engaged in this work in response to the Court's December 20, 2023 Order (dkt. 665) that found the Department in contempt of § D, ¶ 3 and § E, ¶ 4 of the Action Plan (dkt. 465) and § I, ¶ 5 of the June 13, 2023 Order (dkt. 550). The Court ordered that in order for the Department to purge their contempt, the Department was required, to comply with three requirements including a requirement to develop a set of data and metrics for use of force, security, and violence indicators that will be routinely evaluated by Department leadership to identify trends regarding unnecessary and excessive uses of force and violence in order to identify their root causes and to develop effective strategies to reduce their occurrence.

assaults on staff) through a review of data and trends presented in the ACT Dashboard. The second half involves case studies that allow facility leaders to analyze incident footage, examine procedural responses, and consider how alternative approaches might have produced better outcomes. These exercises are particularly effective in encouraging facility leadership to critically examine assumptions, reflect on missteps, and recognize positive practices.

The Monitoring Team regularly attends these meetings and has observed them to be a valuable venue for direct engagement among the Commissioner, executive leadership, and facility teams. During this Monitoring Period, one ACT meeting included facility-led presentations on challenges they were facing and the steps they had taken to address them. This format offered a platform for facility staff to reflect more concretely on their efforts and articulate the rationale behind their strategies.

While ACT meetings continue to evolve in a positive direction, some areas for improvement remain. The length and breadth of the meetings can sometimes detract from their focus, and not all topics covered align with the most pressing facility-level concerns. Some presentations rely more on anecdotal examples rather than data-driven assessments, which can limit their effectiveness. Nevertheless, there have been encouraging signs of more candid discussion and a greater emphasis on critical thinking and accountability. When facility leaders use data to clearly define a problem, and then track the impact of specific interventions, these sessions become significantly more compelling and productive.

Overall, ACT meetings have become a promising tool for building leadership capacity and addressing core operational issues. Continued refinement of the structure and content of these meetings, such as incorporating deeper analysis of systemic concerns like staffing shortages, could further enhance their impact.

**Weekly Operational Leadership Meetings**

The Department reports that operational Leadership meetings between executive staff and facility leaders are held weekly. Participants typically include Deputy Commissioners, Associate Commissioners, Assistant Commissioners, Directors, Wardens and, at times, Assistant Deputy Wardens, Captains, and Officers, the meetings are chaired primarily by the Senior Deputy Commissioner and serve as an opportunity to discuss critical topics and Department updates. During each session, key leaders share insights and presentations and provide briefings on essential issues,

discuss policy changes, and highlight ongoing projects and initiatives. Additionally, representatives from various divisions—such as Early Intervention, Support and Supervision ("E.I.S.S."), Trials, and Correction Intelligence Bureau ("CIB")—may discuss their work, fostering inter-departmental awareness and collaboration. The Department reports the meetings' engaging format is regarded as more valuable than traditional methods of communication such as teletypes.

**Meetings between Facility Leadership and the Deputy Commissioner of Security Operations**

The Department reports that agency and facility leadership routinely meet to discuss the various operational issues facing the facilities. During the previous Monitoring Period, the former Deputy Commissioner of Security Operations reported conducting daily calls with facility leadership to review the prior day's uses of force. This is discussed in more detail in the compliance assessment of First Remedial Order § A, ¶ 1.

**Executive Leadership Tours**

The Department's initiative to embed executive leadership more deeply into facility operations through regular tours continued during this Monitoring Period. These Executive Leadership Tours, launched in December 2023, require about 60 senior leaders, including Deputy Commissioners, Associate Commissioners, Assistant Commissioners, Executive Directors, the *Nunez* Manager and Directors, to tour at least one alternating facility every two weeks. Following each tour, staff are expected to address any issues identified onsite before the tour is complete. If broader issues or concerns are identified, they are asked to raise those matters either with leadership of the specific division responsible for the matter or the Commissioner's office.[27] Finally, leadership are also encouraged to incorporate their insights into broader strategic planning.

These tours are intended to serve multiple purposes. First, to ensure agency leadership remains connected to the conditions and culture in the jails. Second, to convey agency expectations and values directly to staff, and third, to offer executive-level expertise where needed. They are not a substitute for direct supervision by on-site staff but represent an important supplement to the Department's overall leadership and accountability structure.

---

[27] Given the significant number of tours that occur each week and the extensive work it would take to track the variety of issues that may be found on such tours, the Department determined that comprehensive tracking of the findings from each tour was not a reasonable use of resources. Leadership are expected to reasonably address matters as they occur during the tours.

The content and structure of the Executive Leadership Tours was sustained throughout 2024 and remains a meaningful step toward instilling greater accountability, visibility, and leadership presence within the facilities. They also reinforce the Department's intention to align facility operations more closely with agency-wide expectations and reform goals.

**<u>Conclusion</u>**

Agency and facility leaders have continued to demonstrate improved transparency and engagement in the evaluation and management of jail operations. Tools such as COD reports, data dashboards, Rapid Reviews, and NCU audits remain readily available and offer clear, actionable insights. The Monitoring Team has observed that many facility leaders are not only aware of key challenges but, in some cases, have taken steps to develop responses informed by data and operational trends. The continued use of the ACT Dashboard and the ACT meetings, as well as more routine, candid dialogue between facility leadership and executive staff, represent meaningful progress in aligning reform goals and leadership strategies with on-the-ground realities.

However, while the infrastructure for identifying problems and engaging in strategic planning has matured, the development and consistent implementation of targeted, facility-specific solutions remains uneven. Although some facilities are benefitting from targeted plans to address persistent problems (e.g., RNDC's Programs Action Plan), some facilities still rely on informal, reactive measures that are not integrated into broader operational reforms. Further, some of these measures have been utilized for many years and have not produced the desired effect and yet they continue to dominate some facilities' problem-solving efforts. Finally, persistent issues, such as systemic staffing shortages and problematic supervision practices, have not yet been fully addressed with the sustained, coordinated effort they require. Continued focus is needed to move beyond short-term interventions and toward durable solutions that target the root cause of the persistent problems.

The Department must ensure that all levels of leadership do not rely on antiquated strategies or legacy thinking but instead consistently utilize the data and tools available to identify patterns, design strategic responses, and monitor the outcomes of their efforts. While these shifts are still underway, the work during this Monitoring Period, including ongoing collaboration with the Monitoring Team and the evolution of leadership engagement practices, reflect a necessary and encouraging direction. As such, the Department remains in Partial Compliance with this provision.

| COMPLIANCE RATING | § A., ¶ 2. Partial Compliance |
| --- | --- |

| CJ § IV. USE OF FORCE POLICY, ¶ 1 (NEW USE OF FORCE DIRECTIVE) |
|---|
| ¶ 1. _New Use of Force Directive._ Within 30 days of the Effective Date, in consultation with the Monitor, the Department shall develop, adopt, and implement a new comprehensive use of force policy with particular emphasis on permissible and impermissible uses of force ("New Use of Force Directive"). The New Use of Force Directive shall be subject to the approval of the Monitor. |

This provision of the Consent Judgment requires the Department to develop, adopt, and implement a comprehensive Use of Force Policy with particular emphasis on permissible and impermissible uses of force.

**UOF Policy**

The Department maintains a Use of Force ("UOF") Policy and then a number of standalone policies that address additional requirements related to the use of force and the requirements of the _Nunez_ Consent Judgment. The Department previously achieved Substantial Compliance with the development and adoption of the Use of Force Policy, which received the Monitor's approval prior to the Effective Date of the Consent Judgment in 2015. The Use of Force Policy required by the Consent Judgment went into effect on September 27, 2017, with the corresponding New Disciplinary Guidelines effective as of October 27, 2017. The Use of Force Policy is not based on new law, nor does it abandon core principles from its predecessor—the new policy retains core principles of the former policy while providing further explanation, emphasis, detail, and guidance to staff on the steps officers and their supervisors should take in response to threats to safety and security. The overarching goal of the directive is to alter staff practices in order to reduce the **_risk of harm_** related to the use of force.

**Standalone Policies**

In addition to the Use of Force Policy, the Department must consult and obtain Monitor approval on a number of standalone policies regarding the proper use of security and therapeutic restraints, spit masks, hands-on-techniques, chemical agents, electronic immobilizing devices, kinetic energy devices used by the Department, batons, lethal force, and canines.[28] The Emergency Services Unit ("ESU") also maintains approximately 10 Command Level Orders ("CLOs"), including two that

---

[28] There have been times in which the Department failed to consult and/or seek the Monitor's approval of revised policies, which has been discussed in various Monitor's Reports. _See, for example,_ Monitor's November 30, 2023 Report (dkt. 616) at pgs. 33 and 37. Following the appointment of the new Commissioner in December 2023, these issues have not reemerged.

govern the use of specialized chemical agent tools (*i.e.*, the Sabre Phantom Fog Aerosol Grenades). Several of these policies require revision, including the ESU's CLOs as well as the Department's policies on restraints, searches, and Emergency Response Teams.[29] The need for revision has been extensively documented in prior Monitor's Reports, most recently in the Monitor's November 8, 2023 Report (dkt. 595) at pgs. 42-43. The Department reports that it is in the process of revising a number of policies that it then plans to submit to the Monitoring Team for consultation and feedback.

**Implementation of UOF Policy**

The Monitoring Team has long provided detailed reporting on the Department's problematic use of force and corresponding security failures, many of which are further described in this report and prior reports.[30] The Monitoring Team's ongoing findings, described in the Use of Force section of this report, are the basis for the compliance rating regarding the UOF policy's implementation.[31] In particular, force still occurs too frequently.[32] The force employed does not comply with the Department's use of force policy (or the requirements of the Consent Judgment) including the use of head strikes on individuals in restraints;[33] excessive or unauthorized use of chemical agent/OC spray;[34]

---

[29] *See* other sections of this report and Monitor's November 8, 2023 Report (dkt. 595) at pgs. 12, 14-16, and 40-41.

[30] *See* Martin Declaration (dkt. 397) Exhibit E "Citations to Monitoring Team Findings re: Security Failures" and Monitor's December 6, 2021 Report (dkt. 431) at pgs. 17-23; Monitor's March 16, 2022 Report (dkt. 438) at pgs. 7-30; Monitor's April 27, 2022 Report (dkt. 452) at pgs. 2-3; Monitor's June 30, 2022 Report (dkt. 467) at pgs. 13-17; Monitor's October 28, 2022 Report (dkt. 472) at pgs. 56-77; Monitor's April 3, 2023 Report (dkt. 517) at pgs. 36-63; Monitor's July 10, 2023 Report (dkt. 557) at pgs. 12-68; Monitor's October 10, 2024 Report (dkt. 581) at pgs. 4-19; Monitor's November 8, 2023 Report (dkt. 595) at pgs. 2-3 and 6-28; Monitor's December 12, 2023 Report (dkt. 666) at pgs. 6-22; Monitor's April 18, 2024 Report (dkt. 706) at pgs. 29-38; Monitor's November 22, 2024 Report (dkt. 802) at pgs. 11-18.

[31] *See* Monitor's April 3, 2023 Report (dkt. 517) at pgs. 36-63; Monitor's June 8, 2023 Report (dkt. 541) at pgs. 5-14; and Monitor's July 10, 2023 Report (dkt. 557) at pgs. 12-68; Monitor's April 18, 2024 Report (dkt. 706) at pgs. 29-40; Monitor's November 22, 2024 Report (dt. 802) at pgs. 70-72.

[32] *See*, for example, Consent Judgment, § IV, ¶ 3(a) and UOF Directive § II (A) and (B).

[33] *See*, for example, Consent Judgment, § IV, ¶¶ 3(b), (g)(v) and UOF Directive § II (G) and § V(A)(8).

[34] *See*, for example, Consent Judgment, § IV, ¶ 3(d) and UOF Directive § II (C) and §VI (B)(1)(g).

painful escort holds;[35] inappropriate take-down techniques;[36] uses of force during searches; precipitating staff conduct;[37] staff failure to act;[38] failure to intervene in self-harm attempts.[39]

**Conclusion**

Substantially reducing the frequency of unnecessary and excessive uses of force will require quality training and supervision, strict adherence to sound security practices, and reliable and appropriate staff discipline. The Department must address several critical issues, such as the persistent use of head strikes on restrained individuals, inappropriate takedown techniques, excessive or unauthorized use of chemical agents, and the continued reliance on painful escort holds, all of which contribute to the use of unnecessary and excessive force. To further advance, the Department must demonstrate a sustained and measurable reduction in these harmful practices and ensure staff are consistently applying safe and proportional tactics. The Department's ability to materially improve the quality of its security practices and to reduce the prevalence of unnecessary and excessive uses of force has languished for far too long. It is therefore significant that the Department has made observable progress in altering its use of force practices. ***While the Department remains in Non-Compliance with the implementation of the Use of Force Policy, progress has been made, and it can now be said the Department is on the pathway to achieving Partial Compliance.***

| **COMPLIANCE RATING** | ¶ **1. (Develop)** Substantial Compliance<br>¶ **1. (Adopt)** Substantial Compliance<br>¶ **1. (Implement)** Non-Compliance<br>¶ **1. (Monitor Approval)** Substantial Compliance |
|---|---|

---

[35] *See*, for example, Consent Judgment, § IV, ¶ 3(c)(vii) and UOF Directive § II V(B)(1)(d).

[36] *See*, for example, Consent Judgment, § IV, ¶ 3(b), (g)(v) and UOF Directive § II (C) and (G) and §VI (1)(f)(ix).

[37] *See*, for example, Consent Judgment, § IV, ¶ 3(k) and (m) and UOF Directive § II (B) and (C).

[38] *See*, for example, Consent Judgment, § IV, ¶ 3(m) and UOF Directive § II (I).

[39] *See*, for example, Consent Judgment, § IV, ¶ 3(m) and UOF Directive § II (I).

| CJ § V. USE OF FORCE REPORTING AND TRACKING, ¶ 2 (INDEPENDENT STAFF REPORTS) |
|---|

¶ 2. _Independent Staff Reports._ Every Staff Member who engages in the Use of Force, is alleged to have engaged in the Use of Force, or witnesses a Use of Force Incident, shall independently prepare and submit a complete and accurate written report ("Use of Force Report") to his or her Supervisor.

The Department is required to report when force is used accurately and timely as part of its overall goal to manage use of force effectively. The assessment below covers five critical areas related to reporting force: notifying Supervisors that a use of force ("UOF") occurred, submission of complete, independent, and timely reports, the classification of UOF incidents, allegations of use of force, and reporting of use of force by non-DOC staff who either witnessed the incident and/or are relaying reports from incarcerated individuals.

The first compliance assessment for this provision occurred for the 3rd Monitoring Period (August to December 2016). At that time, the Department was found to be in Partial Compliance and has remained so through this Monitoring Period.

**Notifying Supervisor of UOF**

From July to December 2024, 3,560 use of force incidents were reported by supervisors to the Central Operations Desk, and slightly over 6,500 uses of force or use of force witness reports were submitted for incidents occurring in this Monitoring Period. To assess whether staff are timely and reliably notifying a supervisor of a UOF, the Monitoring Team considers whether there is evidence that staff are not reporting force as required. This includes consideration of allegations as well as reports from outside stakeholders (_e.g._, New York City Health + Hospitals ("H+H") and Legal Aid Society ("LAS")) about potential unreported UOF. As discussed more below, the number of allegations of use of force remains low and only a small fraction are substantiated. Further, in this Monitoring Period, 50 out of the 52 reports from H+H staff alleging UOF were already under investigation by ID before H+H's reports were submitted. Further, all 12 of the 12 UOF allegations submitted by LAS in this Monitoring Period had already been reported before receipt of the allegation via LAS. Overall, unreported uses of force appear to be an infrequent occurrence.

54

**Independent, Complete, and Timely Staff Reports**

Staff members are required to submit independent and complete UOF reports. The Department's Use of Force Directive requires staff to independently prepare a staff report or Use of Force Witness Report if they employ, witness, or are alleged to have employed or witnessed force. Staff reports are essential to use of force investigations, requiring staff members to describe events in their own words. Staff must provide accurate details about the tactics used or observed, the level of resistance or threat, and the reasons why force was necessary.

The Department maintains a centralized, reliable, and consistent process for submitting and tracking UOF Reports. The number of reports submitted by staff is significant and most of those reports are submitted and uploaded in a timely fashion. Overall, the Intake Investigations of UOF incidents appeared to generally have access to staff and witness reports with enough time to conduct the investigations.

During this Monitoring Period, over 6,508 reports were submitted. The large number of reports submitted generally indicates compliance with the requirement that staff must submit reports. The Monitoring Team's review of reports revealed a general tendency toward independent preparation by the staff. However, the quality of reports remains inconsistent, which has long been reported and is consistent with prior findings highlighted in the Monitor's May 29, 2020 Report (dkt. 341) at pgs. 89-91. The Monitoring Team continues to routinely identify reports that are incomplete, vague, or inconsistent with the evidence. The Department itself continues to identify issues with staff reporting practices. For the 3,015 Intake Investigations closed in this Monitoring Period (covering incidents occurring between January 2024 and December 2024), the Investigation Division ("ID") identified 788 incidents (26%) with report writing issues. The proportion of closed investigations with report writing issues remained largely unchanged from prior Monitoring Periods indicating that deficiencies in staff reporting practices persist despite ongoing identification of these issues by the Department (and the Monitoring Team).

Staff members are also required to submit their reports as soon as practicable after the use of force incident, or the allegation of the use of force unless the staff member cannot prepare a report within this timeframe due to injury or other exceptional circumstances. The table below

demonstrates the number and timeliness of staff reports for actual and alleged UOF from 2018 to December 2024.

| Timeliness of Staff Report | | | | | | |
|---|---|---|---|---|---|---|
| | Actual UOF | | | Alleged UOF | | |
| *Year* | *Total Staff Reports Expected* | *Reports Uploaded Timely* | *% Uploaded within 24 Hours* | *Total Staff Reports Expected* | *Reports Uploaded Timely* | *% Uploaded within 72 Hours of the Allegation* |
| **Jan. to Dec. 2018** | 15,172 | 12,709[40] | 83.77% | 139 | 125[41] | 89.93% |
| **Jan. to Dec. 2019** | 21,595 | 20,302 | 94.01% | 190 | 134 | 70.53% |
| **Jan. to Dec. 2020** | 19,272 | 17,634 | 91.50% | 136 | 94 | 69.12% |
| **Jan to Dec. 2021** | 22,103 | 17,064 | 77.20% | 111 | 45 | 40.54% |
| **Jan to Dec. 2022** | 17,700 | 14,776 | 83.48% | 93 | 42 | 45.16% |
| **Jan to Dec. 2023** | 14,957 | 11,924 | 79.72% | 82 | 40 | 48.78% |
| ***Jan to Dec. 2024*** | *16,307* | *13,116* | *80.43* | *93* | *48* | *51.61* |
| ***Jan to June 2024*** | *8,392* | *6,608* | *78.74%* | *52* | *26* | *50.00%* |
| ***Jul to Dec 2024*** | *7,915* | *6,508* | *82.22%* | *41* | *22* | *53.66%* |

During this monitoring period, 82% of reports were submitted within the 24-hour deadline. This reflects some improvement over the last two Monitoring Periods, in part due to

---

[40] NCU began the process of auditing actual UOF reports in February 2018.

[41] NCU began collecting data for UOF allegations in May 2018.

improvement of the timing of reporting by GRVC.[42]  While there has been improvement, some work remains. For instance, in this Monitoring Period, staff reports from RESH were not being reported as timely as they had been in the past with 71% of reports submitted in a timely manner. The Monitoring Team has shared feedback with the Department so that reporting timing can return to the high proportions observed in 2019 and 2020 (94% and 91% respectively) when submissions were not only more punctual, but the volume of reports submitted was higher.

Obtaining reports related to allegations of use of force typically takes longer because the staff members involved must first be identified and notified that a report is required. Only then can the report be written and submitted. The staff member may or may not be working on the day when the allegation is received and reviewed, so it generally takes longer to obtain reports for allegations than the 24-hour time frame set for reports to be submitted following a *reported* use of force incident. This is why the time frame for submission of allegation of use of force is evaluated at 72 hours after receipt of allegation instead of 24 hours after the incident. In this Monitoring Period, 22 of the 41 (53%) reports for alleged UOF incidents were submitted within 72 hours. The Department has averaged around 50% of alleged reports being submitted within 72 hours for several Monitoring Periods now. It is worth nothing from January to December 2018, a significantly higher number of reports were submitted (N=125) and 90% were submitted within the 72-hour period. The time for submission of allegation reports needs to be improved.

### Classification of UOF Incidents

The Department is required to immediately classify all use of force incidents as Class A, B, C, or P when an incident is reported to the Central Operations Desk ("COD"). Class P is a temporary classification used to describe use of force incidents where there is not enough information available at the time of the report to COD to receive an injury classification of Class A, B, or C.

The chart below identifies the Monitoring Team's assessment of a sample of the Department's incident classifications from March 2016 to December 2024.

---

[42] GRVC contributed most significantly to the decrease in timely reporting in the last two Monitoring Period with only 49% of its reports filed timely in the 17th Monitoring Period and 56% of reports filed timely in the 18th Monitoring Period. In December 2024, 89% of GRVC's reports were filed timely.

| Assessment of UOF Classification[43] | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| COD Sets[44] Reviewed | **2018** *6th & 7th MP* | **2019** *8th & 9th MP* | **2020** *10th & 11th MP* | **2021** *12th & 13th MP* | **2022** *14th & 15th MP* | **2023** *16th & 17th MP* | **2024** *18th & 19th MP* | *2024 Jan. to June 18th MP* | *2024 Jul. to Dec. 19th MP* |
| **Total Incidents Reviewed** | 929 | 1,052 | 1,094 | 1,644 | 1,585 | *2,164* | 2,249 | *1,116* | *1,133* |
| **Total Incidents Classified Within COD Period[45]** | 909 (98%) | 1,023 (97%) | 1,079 (99%) | 1,226 (75%) | 1,238 (78%) | *1,991 (92%)* | 2,029 (90%) | *1,036 (93%)* | *993 (88%)* |
| **Number of Incidents that were not classified within the COD Period** | 20 (2%) | 29 (3%) | 15 (1%) | 418 (25%) | 347 (22%) | *173 (8%)* | 220 (10%) | *80 (7%)* | *140 (12%)* |

The Department has maintained its ability to classify incidents in a timely manner. As demonstrated in the chart above, from July to December 2024, 88% of all incidents audited were classified within the COD period. Ideally, the Department should aim to return to the high rates of timely classification from 2016 to 2020 (ranging from 97% to 99%). The Monitoring Team intends to continue to closely evaluate the timing and accuracy of reclassifications.

**<u>Alleged Use of Force</u>**

In order to evaluate the full extent of force employed within the Department, it is crucial to evaluate both reported instances of force by staff and substantiated *allegations* of the use of force. Hence, the Department maintains distinct tracking for allegations of force use, representing instances where staff purportedly used force on an incarcerated individual which had not been previously reported. It is important to note that an allegation of a use of force does not inherently confirm the actual utilization of force; that determination is established through the investigative process.

---

[43] The data for March 2016 to July 2017 can be found in the Monitor's November 22, 2024 Report at pg. 76.

[44] This audit was not conducted in the First or Fifth Monitoring Periods.

[45] The data is maintained in a manner that is most reasonably assessed in a two-week period ("COD Period"). The Monitoring Team did not conduct an analysis on the specific date of reclassification because the overall finding of reclassification within two weeks or less is sufficient to demonstrate compliance.

The number of allegations has generally declined since 2016. As demonstrated in the chart below, 170 UOF allegations were reported from January to December 2024.



Overall, the number of allegations of force is small compared to the total number of uses of force reported by staff. In 2024, there were 170 allegations of force while 7,150 uses of force were reported by staff. The number of allegations in 2024 is the lowest reported since the Consent Judgment came into effect. The Monitoring Team has found that generally, of the small group of allegations, only a fraction are substantiated, and those are typically for failing to report minor uses of force, and instances of excessive or unnecessary unreported uses of force are rare. That said, all allegations of use of force must be appropriately investigated and all instances of an unreported use of force are cause for concern.

**<u>Non-DOC Staff Reporting</u>**

Non-DOC staff members who witness a use of force incident are required to report the incident in writing directly to a supervisor and medical staff are required to report to a supervisor when they have reason to suspect that an Inmate has sustained injuries due to a use of force, but the injury was not reported as such to the medical staff. Reports from non-DOC staff are vital, as they can sometimes identify incidents that would otherwise go unreported. They often provide additional context or information not captured in other reports, and even when they simply corroborate other accounts, they add significant value. This underscores the importance of anyone who witnesses a use of force submitting a report.

- **DOE Staff Reporting:** The Department of Education ("DOE") previously developed staff training and reporting procedures, in consultation with the Monitoring Team, to address the requirements of this provision and the December 4, 2019 Order (dkt. 334) clarifying the requirement for DOE to submit reports. The Monitoring Team has never received any reports from DOE staff that may have witnessed a UOF. In this Monitoring Period, there were at least five use of force incidents in school areas. Although a small number, it does suggest that at least some reports by DOE staff would be expected. The Monitoring Team is in the process of scrutinizing these incidents and the results of those findings will be shared in future reports.

- **H+H Reporting:** H+H (the healthcare provider for incarcerated individuals in DOC custody) has maintained a process for staff reporting. H+H staff submitted a total of 52 reports in this Monitoring Period; 37 reports were H+H witness reports of UOF incidents and 15 reports relayed UOF allegations from an incarcerated individual. The chart provides an overview of the reports provided by H+H staff since January 2018.

| Submission of H+H Staff Reports[46] | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2018 (6th & 7th MP) | 2019 (8th & 9th MP) | 2020 (10th & 11th MP) | 2021 (12th & 13th MP) | 2022 (14th & 15th MP) | 2023 (16th & 17th MP) | 2024 (18th & 19th MP) | Jan-Jun 2024 (18th MP) | Jul-Dec 2024 (19th MP) |
| *Grand Totals* | | | | | | | | | |
| Total Reports Submitted | 53 | 39 | 56 | 97 | 52 | 26 | 78 | 26 | 52 |
| Total UOF Incidents Covered | 53 | 38 | 46 | 85 | 42 | 27 | 59 | 17 | 42 |
| *Witness Reports* | | | | | | | | | |
| # of witness reports submitted | 29 | 18 | 45 | 70 | 36 | 18 | 59 | 22 | 37 |
| # of actual or alleged UOF incidents covered by submitted reports | 31 | 15 | 36 | 64[47] | 25[48] | 18 | 45 | 14 | 31[49] |
| *Relayed Allegations from Incarcerated Individuals* | | | | | | | | | |
| # of reports of allegations of UOF relayed from an Incarcerated Individuals | 24 | 21 | 11 | 27 | 16 | 8 | 19 | 4 | 15 |
| # of actual or alleged UOF incidents covered by submitted reports | 22 | 23 | 10 | 22[50] | 19[51] | 9 | 15 | 3 | 12[52] |

As reported in the November 22, 2024 Monitor's Report (dkt. 802) at pgs. 79-80, following a decrease in the number of H+H reports submitted in 2023, the Monitoring Team shared feedback with H+H leadership recommending that they engage in a renewed effort to

[46] Please see the Monitor's November 22, 2024 Report (dkt. 802) at pg. 79 for data on H+H reports submitted in July-December 2017 (the 5th MP).

[47] On one occasion for one use of force incident, we received both a witness report and a relayed allegation report for the same incident.

[48] On two separate occasions for two separate use of force incidents, we received both a witness report and a relayed allegation report for the same incident.

[49] On one occasion for one use of force incident, the Monitoring Team received both a witness report and a relayed allegation report for the same incident.

[50] On one occasion for one use of force incident, we received both a witness report and a relayed allegation report for the same incident.

[51] On two separate occasions for two separate use of force incidents, we received both a witness report and a relayed allegation report for the same incident.

[52] On one occasion for one use of force incident, the Monitoring Team received both a witness report and a relayed allegation report for the same incident.

ensure H+H staff are reporting as required. In response, H+H reported that they started facilitating three types of reminders to staff regarding their *Nunez* reporting obligations – verbal reminders to staff at quarterly leadership meetings, quarterly email reminders to all staff, and a new pop-up message in the electronic medical records system that appears each time a staff member logs in. Since these reminders were implemented in the 19th Monitoring Period, there has been a notable increase in reports submitted by H+H staff. There number of reports submitted by H+H staff doubled between the 18th Monitoring Period (n=26) and the 19th Monitoring Period (n=52).

The increase in the number of H+H reports submitted suggests that there has been improvement in H+H staff reporting practices. However, it is difficult to know whether H+H staff submitted reports for every incident witnessed as it is not always clear what incidents H+H staff may have, in fact, witnessed. In order to assess the veracity of H+H reporting, the Monitoring Team looks to certain data as well as specific incidents. For example, in this Monitoring Period, 144 incidents occurred in clinic areas and only 12 of those incidents (8%) had a corresponding H+H report. It is worth noting that just because an incident occurred in the clinic area does not mean H+H staff witnessed the incident. However, the number of incidents that occurred in the clinic versus the number of reports received suggests it is possible that additional incidents were observed but not reported. The fact that H+H staff reported only 8% of incidents that occurred in the clinic suggests that there is still further room for improvement in H+H staff reporting practices.

The Monitoring Team also continues to review use of force incidents and continues to identify instances in which it appeared H+H witnessed the use of force, and a corresponding witness report was not submitted. In response to feedback from the Monitoring Team in the last Monitoring Period, H+H leadership took corrective action for 22 staff (covering six incidents) that witnessed or engaged in uses of force without submitting a report. Following the close of this Monitoring Period, the Monitoring Team identified an additional group of cases from late 2023 and 2024 in which it appeared H+H staff witnessed the use of force, and a corresponding witness report was not submitted. These incidents are currently under review by H+H leadership.

Overall, the improvement observed in H+H reporting is notable. The reports submitted by H+H staff are crucial to the investigation of use of force incidents, so continued and sustained focus on ensuring that H+H staff are reporting as required is critical.

## Conclusion

Overall, use of force incidents are generally being reported as required and classified on time. Further, thousands of individual staff reports are submitted, most of which are submitted timely (although additional efforts to ensure consistent the timeliness of the reports is needed). Most importantly, the quality, specificity, and accuracy of reports has remained generally the same since monitoring began. Staff reports must improve in terms of accurately reflecting what occurred. The Department, therefore, remains in Partial Compliance with this requirement.

| COMPLIANCE RATING | ¶ 2. Partial Compliance |
|---|---|

| CJ § V. USE OF FORCE REPORTING AND TRACKING, ¶ 22 (PROVIDING MEDICAL ATTENTION FOLLOWING USE OF FORCE INCIDENT) |
| --- |

¶ 22. *Providing Medical Attention Following Use of Force Incident.* All Staff Members and Inmates upon whom force is used, or who used force, shall receive medical attention by medical staff as soon as practicable following a Use of Force Incident. If the Inmate or Staff Member refuses medical care, the Inmate or Staff Member shall be asked to sign a form in the presence of medical staff documenting that medical care was offered to the individual, that the individual refused the care, and the reason given for refusing, if any.

Staff members and incarcerated individuals upon whom force is used, or who used force, are required to receive medical attention by medical staff as soon as practicable following a use of force ("UOF") incident. The Department's Directive 4516R-B "Injury to Inmate Reports" requires incarcerated individuals to be afforded medical attention as soon as practicable, and within four hours, following a UOF incident or fight between incarcerated individuals.

The first compliance assessment for this provision occurred for the 3rd Monitoring Period (August to December 2016). At that time, the Department was found to be in Partial Compliance and remained so through the 6th Monitoring Period (January to June 2018). The Department was found to be in Substantial Compliance from the 7th Monitoring Period (July to December 2018) through the 11th Monitoring Period (July to December 2020). The Department returned to Partial Compliance from the 12th Monitoring Period (January to June 2021) to the 16th Monitoring Period (January to June 2023). The Department then achieved Substantial Compliance again in the 17th Monitoring Period (July to December 2023) where it remains through this Monitoring Period.

The Department's progress in providing timely medical care from January 2018 to December 2024 following a UOF is outlined in the table below.

| Wait Times for Medical Treatment Following a UOF | | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | # of Medical Encounters Analyzed | 2 hours or less | Between 2 and 4 hours | % Seen within 4 hours | Between 4 and 6 hours | 6 hours or more |
| **2018** | 9,345 | 37% | 36% | 73% | 16% | 13% |
| **2019** | 11,809 | 43% | 38% | 81% | 11% | 9% |
| **2020** | 10,812 | 46% | 36% | 82% | 10% | 9% |
| **2021** | 14,745 | 39% | 30% | 70% | 11% | 20% |
| **2022** | 12,696 | 51% | 23% | 74% | 9% | 19% |
| **2023** | 11,513 | 54% | 27% | 81% | 10% | 10% |
| **2024** | **11,014** | **45%** | **36%** | **81%** | **10%** | **9%** |

The 2024 data shows that the overall percentage of encounters seen within four hours remained at 81%, the same as 2023. The percentage of encounters seen in more than six hours was 9% of all encounters and remains well below the approximately 20% seen in 2021 and 2022.

Overall, in this Monitoring Period, most individuals needing medical attention after a use of force incident received care timely. The Monitoring Team continues to encourage the Department to continue to enhance and maintain a systematic and orderly process for delivering timely medical care to those who need it.

| COMPLIANCE RATING | ¶ 22. Substantial Compliance |
| --- | --- |

| **SECOND REMEDIAL ORDER, ¶ 1(I)(A) (INTERIM SECURITY PLAN); ACTION PLAN, § D, ¶ 2(A) (INTERIM SECURITY PLAN)** |
|---|
| SRO, ¶ 1(i)(a). *Interim Security Plan*. Develop, in consultation with the Monitor, and implement an interim Security Plan that describes, in detail, how various security breaches will be addressed by October 11, 2021. This plan shall address, among other things, the following issues: unsecured doors, abandonment of a post, key control, post orders, escorted movement with restraints when required, control of undue congregation of detainees around secure ingress/egress doors, proper management of vestibules, and properly securing officer keys and OC spray. |
| AP, § D, ¶ 2(a). *Interim Security Plan*. The Department shall implement improved security practices and procedures, including, but not limited to, the following items outlined below: (a) the interim Security Plan required by ¶ 1(i)(a) of the Second Remedial Order. |

The Department is required to develop a comprehensive Security Plan pursuant to the Second Remedial Order ¶1(i)(a) and the Action Plan §D ¶2(a). The Department has struggled to develop a comprehensive and effective Security Plan.[53] Previous iterations of security plans have failed to adequately address standard, basic security protocols that are necessary to reduce unnecessary, inappropriate, and/or excessive uses of force and other forms of institutional violence as required by the *Nunez* Court Orders.

The Court's 2024 Contempt Order (dkt. 810) found the Defendants in contempt for failing to comply with the requirements to develop the Security Plan in the Second Remedial Order ¶1(i)(a) and the Action Plan §D ¶2(a). The Court explained the basis for these finding at pages 22 to 26 in the section "Failure to Correct Failures in Security and Basic Correctional Practice" of the Order.

The Monitoring Team does not provide a compliance rating for this provision because it is not one of the select group of provisions defined by Action Plan § G, ¶ 5(b) for which the Monitoring Team is required to do so. Accordingly, for this report, the Monitoring Team simply provides an update on the Department's efforts to achieve compliance.

---

[53] *See*, Monitor's October 14, 2021 Report (dkt. 403) at pg. 5; November 17, 2021 Report (dkt. 420) at pgs. 2-3; Monitor's December 1, 2021 Report (dkt. 429) at pg. 7; Monitor's December 6, 2021 Report (dkt. 431) at pgs. 15-20; Monitor's March 16, 2022 Report (dkt. 438) at pgs. 21-22, and 44-46; Monitor's October 28, 2022 Report (dkt. 472) at pgs. 56-81; Monitor's April 3, 2023 Report (dkt. 517) at pgs. 37-39; Monitor's June 8, 2023 Report (dkt. 541) at pgs. 35-36; July 10, 2023 Report (dkt. 557) at pgs. 31-33; Monitor's November 8, 2023 Report (dkt. 595) at pgs. 3, 17-23, 44, and 56; Monitor's April 18, 2024 Report (dkt. 706) at pgs. 20-29, 32, 164, and 166; and Monitor's November 22, 2024 Report (dkt. 802) at pgs. 14-18, and 185-186.

## **Background**

The Monitoring Team has repeatedly encouraged the Department to develop procedures to, among other actions, ensure that:

- o Staff remain on post, lock doors and secure cuffing ports, secure gates, control keys and OC spray, communicate effectively with the A-post and corridor posts, do not permit PICs to congregate in cells or vestibules, and ensure that PICs remain in the dayroom areas during lock-out.

- o Staff regularly conduct meaningful tours of the units to verify the welfare of individuals in their cells and *actively* supervise interactions among individuals in the dayroom;

- o Supervisors have a regular, constructive presence on the housing units to both elevate staff skill and to resolve problems;

- o Prosocial behavior is incentivized, and rules are properly enforced, including the application of meaningful consequences for misconduct by incarcerated individuals;

- o Lock-in times are strictly enforced;

- o The introduction of dangerous contraband is minimized, and effective search techniques are used to detect/seize contraband when prevention is unsuccessful;

- o Staff utilize an appropriate and authorized continuum of responses to safety and security threats, from least restrictive to more restrictive;

- o Staff refrain from using head strikes or techniques that result in PICs striking their head against stationary or other objects, particularly while in restraints, in contravention of generally accepted correctional practice and Departmental policy;

- o Staff utilize appropriate escort techniques to avoid escalation;

- o Emergency response teams are used only in the event of a true emergency; and

- o A robust strategy is developed for managing those with a propensity for violence and that ensures an effective, proportionate response to those who commit serious violence while in custody.

As the Monitoring Team has reported many times during the past ten years, improved security practices are a fundamental first step in moving toward the overall goal of reducing harm. Clearly, the list of practices that need to be improved is extensive. Given the breadth of required improvements, it is clear that no single initiative or plan can fully resolve all security-related concerns at once. It is also why there are discrete requirements in the *Nunez* Court Orders

to address certain specific security practices (*e.g.* Emergency Response Teams; Searches and Contraband; Managing Individuals Following Serious Acts of Violence). Of course, these issues cannot be viewed in a vacuum and must be considered holistically. Accordingly, the Security Plan and other corresponding requirements must be implemented within a structured and incremental framework that prioritizes the most urgent issues and builds the foundation for broader reform, while remaining flexible and adaptive enough to enable the agency to make modifications as unanticipated challenges or other changes arise.

### Specific Efforts to Improve Security Practices

The current Deputy Commissioner of Security is developing the Security Plan with the assistance of an external consultant, Gary Raney.[54] The DC of Security, appointed in October 2024, in his first six months in office, focused on understanding the culture of the facilities and why previous efforts to address the requirements of the *Nunez* Court Orders in this area have not been successful.

The DC of Security's focus on identifying and understanding the environmental and interpersonal factors that surround the high rate of fights between incarcerated persons will help to ameliorate the issue and bring the Department toward the overall goal of reducing violence and uses of force. The Security Plan remains under development, but the DC of Security routinely communicates with the Monitoring Team regarding the status of work on the Plan and the various initiatives already underway.

Mr. Raney also routinely communicates with the Monitoring Team and has provided an overview of his core priority areas. These include: (1) the process for reviewing and investigating uses of force to better utilize available resources; (2) the staff discipline process to maximize its effectiveness in improving staff practice; (3) the integrity of the process for holding PICs accountable for misconduct; and (4) a system to incentivize positive behavior among PICs. These initiatives are intended to support the overall goals of the Security Plan by strengthening

---

[54] In March 2024, the Department engaged an external consultant, Gary Raney, who is highly qualified to offer technical assistance on security practices and who has considerable experience with promoting institutional reform. The Department also maintains a contract with Dr. James Austin who has provided significant direction and technical assistance in developing strategies for managing individuals who engage in serious violence. The Department's initiative in contracting with Mr. Raney and its continued engagement with Dr. Austin are indicative of its willingness to seek input from individuals with expertise from outside the Department and to develop new strategies to address persistent problems.

the Department's accountability efforts and offering more effective strategies to incentivize behavior change.

The Department may now be positioned to develop and implement an effective Security Plan in a way that was not previously possible. This opportunity stems from several key advancements: the Department can draw on the Monitoring Team's expertise and extensive reporting, which has already identified and untangled many core issues; it benefits from strong leadership at the highest levels, including the Commissioner and the Deputy Commissioner of Security; it has engaged a credible external consultant with a proven track record in reform; and the leadership of facility operations and security have been merged and report under one division instead of two. In addition, as noted below, the Department has begun laying the groundwork necessary to support sustained progress, including initiatives already underway that reportedly align with the goals of the forthcoming Plan.

During the current Monitoring Period, the Department took some concrete steps to address specific security practices:

- **Searches and Contraband**. A discussion of the progress the Department has made in improving search tactics and increasing contraband recovery is discussed in the compliance update of Action Plan, § D, ¶ 2(d) & August 10, 2023 Order, § I, ¶ 2 (Searches); Action Plan, § D, ¶ 2(e) (Identify/Recover Contraband) in this report.

- **Re-deployment of BWCs**. The Department has reinstated the use of body worn cameras throughout all of the jails. This is discussed in detail in the "Update on Body-Worn Cameras" Section of this report.

- **Model Units**. In August 2024, the Department initiated a Door Security pilot program in three housing units in GRVC, OBCC and RNDC to ensure cell doors are secured and to reinforce fundamental correctional practices (e.g., removing cell viewing panel obstructions, affording options to enter one's cell during lockout periods ("options")). Key components of the strategy include increased supervisory tours, consistently assigning the same officers to the posts day-to-day when possible, assigning two B-officers on each unit, and environmental improvements. When the units had not achieved the anticipated outcomes at the end of 2024, the Department decided to revise and fortify some of the written expectations (e.g., post orders, other written guidance) to encourage better practice. After the current Monitoring Period ended, the Department began a

compliance audit using Genetec and utilized the results of that audit to better understand the reasons that staff were not complying with expectations.

After the current Monitoring Period ended, the DC of Security implemented a model unit, an Enhanced Program House in a single unit at GRVC. The goal of the unit is to create an environment where everything operates as it should, including security practices, service provision, and programming. The unit has an enriched staffing level (i.e., two B officers) and a daily unit schedule that provides transparency and predictability. The implementation and early results of this unit which appear promising will be discussed in detail in subsequent Monitor's Reports.

- **Emergency Response Teams**. The Department has also improved its security practices by reducing its overreliance on Emergency Response Teams, which have been plagued by dysfunction and misconduct since the Consent Judgment was entered. Progress in this area is discussed in the compliance assessment of "First Remedial Order § A., ¶ 6 (Facility Emergency Response Teams)" in this report.

- **Managing Individuals Following Serious Acts of Violence**. The Department has added two important options to its continuum for managing those who engage in serious acts of violence—RESH and the newly implemented SMU. The Department has also worked to improve the operations of RESH. These are discussed in detail in the "Managing Individuals Following Serious Acts of Violence" section of this report.

## Next Steps & Conclusion

The Department has taken some important steps to address some of the problems within its security apparatus. Also, through the work of its recently appointed DC of Security and with the assistance of a capable external consultant, the Department has begun laying the foundation for a Security Plan that addresses the requirements of the *Nunez* Court Orders and is informed by the recognition that the Department must confront the culture that sustains the pervasive poor practice. The focus on root causes of violence and poor practice are essential for material, sustainable change, about which the Monitoring Team has reported extensively. Perhaps most notably, the Department 's leadership has demonstrated a greater degree of ownership and has begun taking concrete steps to craft a realistic, phased, and impactful Security Plan that addresses longstanding issues and moves the agency closer to sustainable reform.

---

**ACTION PLAN, § D, ¶ 2(D) AND AUGUST 10, 2023 ORDER, § I, ¶ 2 (SEARCHES); ACTION PLAN, § D, ¶ 2(E) (IDENTIFY/RECOVER CONTRABAND)**

AP, § D, ¶ 2(d). *Searches*. The Department shall implement improved security practices and procedures, including, but not limited to, the following items outlined below: (d) improved procedures on how searches are conducted, including addressing the Monitor's feedback that was provided in 2021.

August 10, 2023 Order § I, ¶ 2. *Revise Search Procedures*. By October 30, 2023, the Department, in consultation with the Monitor, shall reconstitute its search procedures and practices to ensure searches are conducted in an efficient, timely, safe manner and to reduce the possibility of a use of force. The new search procedures shall be subject to the approval of the Monitor.

AP, § D, ¶ 2(e). *Identify/Recover Contraband*. The Department shall implement improved security practices and procedures, including, but not limited to, the following items outlined below: (e) enhanced efforts to identify and recover weapons and other contraband.

---

During the current Monitoring Period, the Department focused on a number of initiatives related to search operations and identifying contraband. The Department's search procedures have been the subject of concern because they are among the most frequent settings for a use of force, many of which could have been avoided.[55] Experiences in other jail systems where searches are not accompanied by use of force events at the level observed in this Department suggest that staff practice needs to be refined. The continued prevalence of dangerous contraband leads the Department to search its facilities frequently. For these reasons, improved search procedures are required by the Action Plan § D, ¶ 2 (d) and § I, ¶ 2 of the August 10, 2023 Order. Relatedly, as of June 2022, the Department is required by Action Plan, § D, ¶ 2 (e) to enhance efforts to identify and recover weapons and other contraband.[56]

The Court's 2024 Contempt Order (dkt. 810) found the Defendants in contempt for failing to comply with requirements related to searches and contraband recovery in Action Plan § D, ¶¶

---

[55] *See*, for example, Monitor's April 3, 2017 Report (dkt. 295) at pgs. 13-14 and 128; Monitor's October 17, 2018 Report (dkt. 317) at pg. 42; Monitor's October 23, 2020 Report (dkt. 360) at pgs. 16, 29, and 75; Monitor's May 11, 2021 Report (dkt. 368) at pgs. 24, 43-44, 48 and 124; Monitor's December 6, 2021 Report (dkt. 431) at pg. 26; Monitor's March 16, 2022 Report (dkt. 438) at pgs. 22 and 71-72; Monitor's October 28, 2022 Report (dkt. 472) at pgs. 71-72, 81, and 117; Monitor's April 3, 2023 Report (dkt. 517) at pgs. 54 and 138; Monitor's July 10, 2023 Report (dkt. 557) at pgs. 42-43; December 22, 2023 Monitor's Report, (dtk. 666) at pgs. 17 to 22; Monitor's April 18, 2024 Report (dkt. 706) at pgs. 69-75, 159; and Monitor's November 22, 2024 Report (dkt. 802) at pgs. 177-178, 65-66.

[56] Contraband generally includes, but is not limited to, weapons, cell phones, illegal drugs, alcohol, cigarettes/tobacco, currency, and prescription drugs (i.e., suboxone or prescription pain killers/anxiety medication, etc.).

2 (d) and (e). The Court explained the basis for these finding at pages 22 to 26 in section "Failure to Correct Failures in Security and Basic Correctional Practice" of the Order.

The Monitoring Team does not provide a compliance rating for this provision because it is not one of the select group of provisions defined by Action Plan § G, ¶ 5(b) for which the Monitoring Team is required to do so. Accordingly, for this report, the Monitoring Team simply provides an update on the Department's efforts to achieve compliance.

As described below, the Department has started to take steps to improve its search practices and to identify contraband. While these steps are important to achieve compliance with the requirements of the *Nunez* Court Orders, the Department must develop and adopt more disciplined search protocols to reduce the level of staff misconduct and potential harm to persons in custody associated with searches.

## Searches and the Use of Force

Searches of facility spaces, visitors, staff and incarcerated individuals are essential for a safe correctional operation to prevent the introduction, decrease the possession and increase the detection and seizure of dangerous contraband, particularly weapons and drugs. That said, all searches have an operational impact and delay the delivery of mandated services and thus must be used judiciously. Searches are also staff-intensive and thus must be targeted strategically, focusing on the spaces and situations where contraband is most likely to be detected, in order to maximize the cost-benefit of the search operation.

Furthermore, in this Department, searches are one of the main situations that give rise to use of force events, providing yet another reason for their use to be judicious. The Department does not specifically track the number of use of force incidents that occur during searches, but a rough estimate by the Monitoring Team based on COD reports suggests that approximately 490 such incidents occurred during the current Monitoring Period. This is similar to the prevalence identified in other Monitoring Periods. Although uses of force occur in a very small fraction of search operations (less than 1%), they comprise a significant category of use of force events and thus are ripe for intervention to reduce the frequency of force and opportunities for unnecessary/excessive uses of force.

**Department's Efforts to Improve Search Practices and Detect and Recover Contraband**

As a threshold change, the Department has moved away from using ESU (and other Special Teams) to conduct searches. In 2024, Special Teams were involved in 300 searches compared with over 1,000 searches in 2022. The Monitoring Team previously documented significant concerns with ESU's performance during search operations, including disorganized execution, aggressive tactics, and unprofessional conduct, all of which frequently contributed to avoidable uses of force. In response, the Department now schedules Tactical Search Operations (TSOs) through the Chief of Security. These tactical searches involve a comprehensive sweep of the entire facility using a dedicated Special Search Team that is specifically trained to conduct searches and is supposed to conduct those searches in an organized, professional and effective manner. Facilities are also expected to conduct their own searches, in targeted or randomly selected areas, using assigned security staff, signaling a structural change in how searches are conducted and supervised. Although the number of uses of force during searches remains too high, the fact that the more egregious incidents of searches by Special Teams have decreased is an important improvement

The Department reports it has also taken certain steps to improve its search practices in order to increase its rate of contraband detection and recovery.[57] Contraband generally is introduced through four primary methods: visitors, individuals who work in the jails, the mail, and the re-purposing of materials from the physical plant. The Department has long struggled to stymie the control of contraband.[58]

**Preventing the Introduction of Contraband**

- **Body Scanners**: At the point of entry for each facility, uniformed staff scan personal property using an x-ray/line scan machine and scan each person who enters using walk-

---

[57] In the past, the former Commissioner appeared to suggest the exclusive source of contraband was through the mail. Upon the appointment of the current Commissioner in December 2023, the Department has approached the search and detection of contraband by trying to intercept any avenue in which contraband may be introduced into the facility.

[58] *See*, DOI's report on Contraband Smuggling in the City's Jails and Critical Recommendations for Improved Security Measures, November 2024 at
https://www.nyc.gov/assets/doi/reports/pdf/2024/ContrabandRpt.11.20.2024.pdf.

through metal detectors and handheld wands. In addition, on a random basis, the Department screens staff, providers and visitors using a full-body body scanner.

○ The Department has installed body scanners at the staff entrances for RMSC,[59] RNDC, OBCC, EMTC, and GRVC. The Department reported that it began procurement to upgrade the existing body scanners to a new version that can detect smaller objects. Currently, NIC and WF only have metal detectors at their staff entrances, but the Department has reported that it plans on acquiring and installing the new versions of the body scanners at these facilities once the procurement has been completed. Staff are randomly selected for body scanning at those facilities with body scanners at the front entrance, and all staff pass through metal detectors at all facilities.

**Detecting the Presence of Contraband in Facility Spaces**

- **Tactical Searches**. Tactical searches are ordered more strategically and teams now search common areas (kitchens, chapel, law library, etc.), not just housing units. These searches into additional locations have recovered a significant number of weapons. The Deputy Commissioner of Security has also been personally involved in where and when they use the Tactical search to be more effective.

- **Facility Searches**. The DC of Security has begun to scrutinize the facility searches— their frequency, methods, record-keeping, and results. Comparisons between facility searches and tactical searches occurring on the same day reveal stark differences in the volume of contraband seized. The quality of facility searches is a priority area for improvement.

- **Information Sharing**. The Office of Security is sharing information regarding the location of contraband finds so that facility search teams can adopt similar methods.

- **Pat Frisks**. The Department reports that Staff technique in pat-frisking incarcerated individuals is often superficial and so it has become an area of heightened focus by the

---

[59] Since RESH is physically located within the RMSC building, staff that work in RESH use the staff entrance to RMSC and therefore pass through RMSC's metal detectors and/or body scanners when entering the facility.

Office of Security. During the daily evaluation of UOF Incidents, Department leadership consider the quality of pat frisks (to the extent applicable) to identify staff with poor technique so they can receive better guidance, retraining or corrective action as appropriate.

- **Training Videos**. The DC of Security is working with the Training Division to develop two training videos—one on proper pat frisk technique and one on proper cell search technique. Improving staff skill in this area should not only result in more contraband recovery but also a reduction in the use of force flowing from search events.

- **Improved Tracking**. The Department is piloting a tablet-based system for documenting ESU, SRT, and SST search operations in real-time, including team planning, contraband findings, and related notifications.

**Addressing Contraband Flowing through the Mail**

Another area in which DOC has focused on reducing the flow of contraband is via incoming mail to people in custody. An evolving and complex contraband to identify and address is paper sprayed or soaked with drugs or chemical/synthetic compounds. These have been smuggled into the jails in a variety of materials from the mail, comic books, legal documents, and other legitimate appearing paperwork.[60]

- **Mail Detection**. Given the ongoing and complex challenges of the fact that paper can be soaked with a variety of elicit substances and drugs, managing the introduction of paper mail has been a focus for DOC. The Department has worked to revise its process for managing the mail. First, DOC has obtained additional technology to assess materials through the mail.[61] Second, as of April 2025, DOC has consolidated the review of mail into a centralized trailer on Rikers Island instead of having this process occur in each

---

[60] See https://www.nyc.gov/assets/doi/reports/pdf/2024/ContrabandRpt.11.20.2024.pdf at pg. 7

[61] DOC utilizes multiple narcotic screening machines. The Department utilizes the Smiths Detection Ionscan 600 and the Rapiscan Itemiser 4DN machines. The Department reports these screening machines are highly sensitive and test at an extremely high accuracy rate. DOC reports that the MobileDetect Field Testing kits ("field tests") are now only used as a 'preliminary' presumptive test. If there is a presumptive positive result, the item is taken to one of the machines for confirmation of the presence of a narcotic or cannabis. The machines will print out the results indicating the actual substance detected plus the concentration amount present in the tested sample.

facility. Mail is received by the Department's trailer in Queens and is sorted out and then sent to the new centralized trailer for mail on Rikers Island for line scan, K9 search, and further investigation by staff. Any contraband recovered is tested and secured in an evidence locker in the dedicated lab area. All processes are done in separate areas of the trailer to ensure smooth workflow.

Overall, the steps taken by the Department are critical to enhancing search practices and stymieing the flow of contraband into the facilities.

**Revisions to Policy and Procedures, Training & Implementation**

The Monitoring Team has repeatedly provided recommendations on search procedures. In June 2021[62] the Monitoring Team shared strategies for improving staffs' search techniques to avoid catalyzing a need to use force and to reduce the on-scene chaos that often accompanies search operations. In October 2023, the Monitoring Team again provided extensive feedback and recommendations on the revised policy and has yet to receive a revised policy.

In April 2025, the Department provided a thoughtful and detailed plan to address the process for updating the Department's various search policies as well as a plan for the training and roll-out of new procedures. The Department has now identified 11 policies that require revision,[63] the scope of the revisions necessary, the various considerations the revisions must incorporate including feedback from the Monitoring Team as well as compliance with various local, state and federal regulations and the internal and external stakeholders that must review any proposed revisions (including the Monitoring Team and the SCOC), and, finally, a timeline for the development, review, training and ultimate implementation of the revised policies.  The proposal for management of this process is thoughtful and comprehensive.  The project has six phases, which, given the scope of the project, is a reasonable approach and creates  sound

---

[62] In 2021, the Monitoring Team recommended: (1) the span of control for searches should be limited in order to reduce the number of excessive staff involved in searches; (2) a specific plan must be devised before each search takes place; (3) facility leadership must be involved in any planning for a search that includes external teams like ESU; and (4) specific procedures for conducting searches in celled and dormitory housing and common areas so that searches are completed in an organized and efficient manner and are not chaotic and disruptive.

[63] The Department previously reported only three policies required revision, however, the Department reported it has now conducted a deeper assessment of the changes needed and determined eleven policies require revision.

milestones and accountability to ensure the project stays on track.  The Department expects that this process will take about 12 to 14 months as it accounts for internal and external review cycles as well as the reconciliation and revision of a wide range of related documents.  While the Monitoring Team encourages all efforts to be made to have this process be completed as soon as possible, a review of this proposal suggests that the overall time frame is reasonable as it balances both the need to move as soon as possible, but also accounts for the work that must be completed, input that must be sought, and the time to train staff on new policies and procedures. The Monitoring Team has impressed upon the Department that it is critical to ensure that the project stays on track given the extended time frame for completion.

**Number of Searches and Contraband Recoveries**

Data regarding the overall number of searches and contraband is provided to understand the number of events that occur and what is recovered. However, the Monitoring Team does not believe that reasonable conclusions can be drawn from this data alone. There is no set number of searches that must occur during a set period of time, as that is determined by the facts on the ground. In fact, as discussed above, the use of searches must be done appropriately yet judiciously.

The tables below show the number of searches performed from 2022 to 2024 and the contraband recovered from 2021 to 2024.

| Searches, 2022-2024 | | | |
|---|---|---|---|
| | **2022** | **2023** | **2024** |
| Facility Searches | 195,348 | 135,324 | 117,347 |
| Special Searches[64] | 1,390 | 658 | 278 |
| **Total** | **196,738** | **135,982** | **117,625** |

The number of facility searches decreased by 40% between 2022 and 2024 while special searches decreased by 80%. A reduction in searches is not necessarily negative—in fact, fewer searches if done reasonably is the optimal situation for balancing security concerns with maximal out-of-cell time and ensuring access to programs and services. Further the number of special searches (which are conducted by Special Teams) has decreased, which as discussed above, and

---

[64] This includes searches by the Emergency Services Unit, the Special Search Team, the Canine and/or Tactical Search operations.

in more detail in the compliance assessment for the First Remedial Order § A, ¶ 6 (Emergency Response Team) Section is positive given the accompanying issues regarding use of force that occurred during those events.

The goal for the search is to identify contraband if it is present. There is no total known amount of contraband and therefore it is impossible to determine whether any fluctuation in the number of contraband that is recovered is positive or negative. A decrease in the finds on contraband could be the result of a variety of factors that cannot be ascertained from the fact that individuals may possess less contraband (due to the deterrent effect of searches) to the possibility that the searches conducted did not adequately find contraband when it was present. The Monitoring Team is not in a position to draw conclusions from the variations in the data presented below.

| Contraband Recovery, 2021-2024[65] | | | | |
|---|---|---|---|---|
| | **2021** | **2022** | **2023** | **2024** |
| Drugs | 1,049 | 1,421 | 1,245 | 889 |
| Weapons | 3,144 | 5,507 | 2,061 | 1,602 |
| Escape-Related Item | 196 | 525 | 292 | 221 |
| Other | 878 | 1,145 | 794 | 558 |

Searches have value only when possessing contraband is either deterred or detected, and so in order to justify the operational disruption and to decrease the risk of unnecessary or excessive force, the Monitoring Team has encouraged the Department to optimize its search strategy and protocols.

---

[65] The calculation of the data for contraband recovery varies depending on the type of contraband that is recovered. For example, drug contraband is counted by incident, not the actual number of items seized so if three different types of drugs were recovered in one location, this is counted as a single seizure. In contrast, when weapons are seized, each item recovered is counted separately so if three weapons were seized from a single individual, all three items are counted.

**<u>Conclusion</u>**

As required by Action Plan § D, ¶ 2 (d) and § I, ¶ 2 of the August 10, 2023 Order, the Department has started to improve procedures on how searches are conducted in order to achieve compliance with this requirement, but significant work remains, in particular, regarding improvement of search procedures conducted by Facility staff and finalizing policies and procedures. As required by Action Plan § D, ¶ 2 (e), the Department has made enhanced efforts to identify and recover weapons and other contraband by enhancing practices to identify contraband through staff and visit searches as well as working to improve searches practices of facilities and incarcerated individuals, and through search of the mail.

| ACTION PLAN, § D, ¶ 2(F) (ESCORT HOLDS) |
|---|
| AP, § D, ¶ 2(f). *Escort Holds*. The Department shall implement improved security practices and procedures, including, but not limited to, the following items outlined below: (f) improved escort techniques to eliminate the unnecessary use of painful escort holds. |

Painful escorts have been identified as a contributor to unnecessary uses of force for years. It is why the Action Plan § D, ¶ 2(f) requires the Department to have improved escort techniques to eliminate the unnecessary use of painful escort holds. Given the Department's lack of progress on this issue, the Court ordered on August 10, 2023, **§ I, ¶ 3** that the Department must revise its escort procedures and practices to eliminate the use of painful escort holds. The new escort procedures shall be subject to the approval of the Monitor.

The Court's 2024 Contempt Order (dkt. 803) found the Defendants in contempt for failing to comply with this provision. The Court explained the basis for its finding at pages 22 to 24 in the section "Failure to Correct Failures in Security and Basic Correctional Practice" of the 2024 Contempt Order.

The Monitoring Team does not provide a compliance rating for this provision because it is not one of the select group of provisions defined by Action Plan § G, ¶ 5(b) for which the Monitoring Team is required to do so. Accordingly, for this report, the Monitoring Team simply provides an update on the Department's efforts to achieve compliance.

### UOF, Escorts, and Painful Escort Techniques

The Monitoring Team has long been concerned about the number of uses of force that occur when staff escort individuals from one place to another and the use of painful escort techniques. The Monitoring Team's assessment of data from 2023 and 2024 suggests that there has been no improvement in this area. In particular, the Monitoring Team's assessment of initial UOF incidents via CODs suggests that there were over 2,000 use of force incidents involving escorts in 2023 and over 2,200 use of force incidents involving escorts in 2024. While not all of these incidents involve inappropriate and/or painful escort techniques, the sheer numbers of combined events are notably higher than what the Monitoring Team has observed in other correctional systems. The Department's Rapid Reviews were intended to help identify these escort issues, but have so far failed to do so, finding the use of painful escorts in only 31 use of

force incidents for uses of force that occurred in 2024.[66] As discussed in the compliance assessment of Use of Force reviews, the Monitoring Team has found that Facility Leadership do not appear to reliably identify this issue given that the Monitoring Team's review of incidents suggests there are likely more instances than what is being documented during the Rapid Review process.

The Monitoring Team believes that what is generating such large numbers of incidents involving force during escorts is that staff often defaults to escort techniques that generate pain, provoke resistance, and unnecessarily escalate routine movements into use of force incidents. In particular, the Monitoring Team has observed the routine use of escort holds that cause pain and elicit defensive reactions from otherwise compliant individuals in custody.

The Monitoring Team has repeatedly raised concerns about these painful escort techniques. Specifically, the bent wrist hold and the upward arm bend. The first technique involves staff escorting individuals while applying a bent wrist hold often bending the wrist up and causing pain. In this technique, staff grasps one wrist of an individual who is handcuffed behind their back then applies excessive pressure, bending the wrist up, causing significant pain that often triggers a defensive reaction. The second technique occurs when staff bends the arm of a rear-cuffed individual upward behind their back. This maneuver also inflicts pain. In both cases, these techniques often devolve into unnecessary uses of force. These techniques often elicit a defensive response from the individual under escort, which staff often misinterpret as active resistance like twisting or pulling away from escort staff. Such situations too often then escalate to aggressive takedowns or pinning individuals against the wall, and because the individual under escort is rear-cuffed and unable to protect themselves, the risk of injury increases significantly.

The Monitoring Team has found that staff lack clear, consistent instruction on how to apply escort holds safely, resulting in misuse that escalates tension rather than maintaining

---

[66] The Department has reported that it is unsure whether painful escort issues are pervasive given the absence of inmate grievances based on review of grievances reported in 2023 and 2024. The Monitoring Team is uncertain that evaluating grievances for this purpose is productive given that the Monitoring Team routinely identifies the practice in its review of incidents and the absence of a grievance does not equate to the absence of the problem. The fact that no grievances have been filed regarding painful escorts most likely suggests that individuals in custody may not be aware that they can file a grievance if they have been subject to a painful escort.

control.[67] Staff have become accustomed to defaulting to the wrist-based grip that often induces pain, when a simple modification, such as placing the hand on the forearm instead, would maintain control while significantly reducing tension and the likelihood of escalation.

As part of the Monitoring Team's recommendations on improvements to the escort hold, the Monitoring Team recommended an alternative technique in September 2023. However, in May 2024, the Department formally rejected this recommendation, citing potential safety concerns, but did not offer an alternative approach or next steps.

## Next Steps

Despite numerous rounds of feedback, training adjustments, and operational data indicating the harm caused by these techniques, they remain embedded in the Department's practice and no substantive efforts have been taken to change staff practice.[68] Their continued use represents an ongoing risk of harm to individuals in custody. The Department has not proposed any practical substitutes to address this issue, which leaves front-line staff without safe and effective tools for safely managing escorts. In spring 2025, the new Deputy Commissioner of Security requested a meeting with the Monitoring Team to review incidents of concern so that further discussions can occur in order to identify a solution.

---

[67] The Monitoring Team is aware that the Department is required to utilize the PARAM (Post Apprehension Responsibility Aware Measures) technique by the New York State Division of Criminal Justice Services. This escort hold was designed to apply pressure in instances of *non-compliance*. However, the Monitoring Team observed that staff have defaulted to using the PARAM technique as standard escort practice, even against compliant, handcuffed individuals.

[68] *See* Monitor's October 31, 2016 Report (dkt. 291) at pg. 110; Monitor's April 3, 2017 Report (dkt. 295) at pgs. 13 and 149; Monitor's October 10, 2017 Report (dkt. 305) at pg. 8; Monitor's April 18, 2018 Report (dkt. 311) at pgs. 18-21; Monitor's April 18, 2019 Report (dkt. 327) at pg. 24; Monitor's October 28, 2019 Report (dkt. 332) at pgs. 3-4; Monitor's May 29, 2020 Report (dkt. 341) at pgs. 30-31, 39 and 79; Monitor's October 23, 2020 Report (dkt. 360) at pg. 3, 13, 17, 29 and 31; Monitor's May 11, 2021 Report (dkt. 368) at pgs. 24-25 and 46-47; Monitor's June 8, 2023 Report (dkt. 541) at pg. 6; Monitor's July 10, 2023 Report (dkt. 557) at pg. 45; and Monitor's November 8, 2023 Report (dkt. 595) at pgs. 12 and 14-15.

| FIRST REMEDIAL ORDER § A., ¶ 6 (FACILITY EMERGENCY RESPONSE TEAMS) |
|---|

First Remedial Order, § A., ¶ 6. *Facility Emergency Response Teams.* Within 90 days of the Order Date, the Department shall, in consultation with the Monitor, develop, adopt, and implement a protocol governing the appropriate composition and deployment of the Facility Emergency Response Teams (*i.e.*, probe teams) in order to minimize unnecessary or avoidable Uses of Force. The new protocol shall address: (i) the selection of Staff assigned to Facility Emergency Response Teams; (ii) the number of Staff assigned to each Facility Emergency Response Team; (iii) the circumstances under which a Facility Emergency Response Team may be deployed and the Tour Commander's role in making the deployment decision; and (iv) de-escalation tactics designed to reduce violence during a Facility Emergency Response Team response. The Department leadership shall regularly review a sample of instances in which Facility Emergency Response Teams are deployed at each Facility to assess compliance with this protocol. If any Staff are found to have violated the protocol, they shall be subject to either appropriate instruction or counseling, or the Department shall seek to impose appropriate discipline. The results of such reviews shall be documented.

This provision requires the Department to minimize unnecessary or avoidable uses of force by Emergency Response Teams. There are two types of Emergency Response Teams: (1) Facility Response Teams or Probe Teams, which are teams of facility-based staff and (2) Special Teams[69] which include the Emergency Services Unit ("ESU"), an "elite" team of staff specifically dedicated and trained to respond to emergencies across the Department; the Security Response Team ("SRT") and the Special Search Team ("SST")[70], which function similarly to ESU and are deployed to facilities as part of operational security efforts.

This provision was imposed by the Court in the First Remedial Order § A, ¶ 6 in order to address concerns that uniform staff often over-relied on Emergency Response Teams and that the Emergency Response Teams needlessly exacerbated situations, were often overstaffed, and routinely responded to incidents with a show of force that was disproportionate to what triggered the incident. The Action Plan, § D, ¶ 2(c) reiterated this obligation, again requiring DOC to "implement improved security practices and procedures, including . . . reduced reliance and appropriate composition of Emergency Response Teams required by § A, ¶ 6 of the First Remedial Order and to address the Monitor's feedback that was provided in 2021."

The Monitoring Team first rated compliance with this provision during the 11th Monitoring Period (July to December 2020) and found Non-Compliance, which remained until the 15th Monitoring Period (July to December 2022). Beginning in the 16th Monitoring Period (January to June 2023), some

---

[69] Special Teams are defined, pursuant to the August 10, 2023 Order (dkt. 564), ¶ 7 as the Emergency Services Unit and any functionally equivalent unit, including, but not limited to the Strategic Response Team and the Special Search Team. The Special Teams are generally utilized in the facilities in the same manner as a Probe Team.

[70] The Department reports that Special Search Teams "SST" is comprised of any available facility staff that are only convened if there is a need for a special search.

83

signs of progress began to emerge and the Department was placed in Partial Compliance with some portions of this provision, and remained in Non-Compliance with other portions of the provision.[71]

The Court's 2024 Contempt Order (dkt. 803) found the Defendants in contempt for failing to comply with this provision. The Court explained the basis for its finding at pages 34 to 37 in section "Failure to Curb the Emergency Response Teams' Excesses" of the Order.

In the 18th Monitoring Period (January to June 2024), the Department achieved Partial Compliance with the portions of the provision related to developing a protocol, reviewing responses and documentation, and deploying response teams, and remained in Non-Compliance with the portion of the provision related to responding to misconduct by response team members.[72] In this Monitoring Period, the Department has achieved complete Partial Compliance with all portions of the provision, as described below.

The following discussion describes the historical concerns regarding responses by Emergency Response Teams, the Department's progress in reducing the deployment of Emergency Response Teams, and an update on the Selection, Training, and Oversight of Emergency Response.

**Historical Concerns Regarding Emergency Response Teams**

The Monitoring Team has consistently raised concerns about the Department's overreliance on Emergency Response Teams, particularly regarding deployment practices, staff conduct, and team composition.[73] Key issues included:

- **Inappropriate Deployment**. Teams were often used in situations that should be resolved by housing unit staff or supervisors. Even when Level A alarms were triggered, Level B (tactical) teams were frequently deployed unnecessarily and often arrived after the incident had been resolved. Response times were frequently delayed, limiting the teams' effectiveness.

---

[71] *See* Monitor's May 11, 2021 Report (dkt. 368) at pgs. 116-120; Monitor's December 6, 2021 Report (dkt. 431) at pgs. 49-51; Monitor's October 28, 2022 Report (dkt. 472) at pgs.116-119, Monitor's April 3, 2023 Report (dkt. 517) at pgs. 137-143; Monitor's July 10, 2023 Report (dkt. 557) at pgs. 34-42; Monitor's December 22, 2023 Report (dkt. 666) at pgs. 17-22; and Monitor's April 18, 2024 report (dkt. 706) at pgs. 69-76.

[72] *See* Monitor's November 22, 2024 (dkt.802) at pgs. 62-69.

[73] *See* Monitor's May 11, 2021 Report (dkt. 368) at pgs. 38-50 and 116-120; Monitor's December 6, 2021 Report (dkt. 431) at pgs. 49-51; Monitor's June 3, 2021 Report (dkt. 373) at pgs. 3-4; Monitor's April 3, 2023 Report (dkt. 517) at pgs. 137-143; Monitor's July 10, 2023 Report (dkt. 557) at pgs. 34-42; Monitor's December 22, 2023 Report (dkt. 666) at pgs. 17-22; and Monitor's April 18, 2024 report (dkt. 706) at pgs. 69-75.

- **Excessive Staffing**. Deployments often involved more staff than was needed, contributing to tension and confusion, especially during "all available staff" calls. Escorts after an incident were frequently conducted by multiple team members, when one staff person would have sufficed.

- **Escalatory Tactics**. Response team members often took a hyper-confrontational approach, which increased the likelihood of unnecessary or excessive force. Painful escort holds and other problematic tactics were also regularly used.

- **Inadequate Selection Criteria**. Despite longstanding recommendations from the Monitoring Team, the Department lacked clear standards for assigning staff to Emergency Response Teams, resulting in team members with histories of problematic force being retained.[74]

- **Chaotic Search Operations**. Emergency Response Teams were often deployed to conduct searches that were poorly organized, increasing the risk of unnecessary force and disorder.

## Progress in Reducing Team Deployment

As noted in the 18th Monitor's Report (dkt. 802) at pgs. 62-69, the Department recently made tangible progress in limiting its reliance on Emergency Response Teams. Simply put, since the imposition of the First Remedial Order, Emergency Response Teams are not deployed as frequently which reduces the risk of avoidable, unnecessary or excessive uses of force.

Of the 6,980 uses of force in 2024, the Department reports that 869 (12%) involved Probe Team deployments and 163 (2%) involved Special Teams. While historical data for comparison does not exist, these proportions appear to reflect a significant reduction in the use of response teams based on the Monitoring Team's assessment of use of force incidents in prior years. That said, the Monitoring Team believes that the Department still uses these large response teams too frequently, particularly Probe Teams, and should continue to identify areas where their deployment can be further reduced.

The reduction in Response Team usage was driven by several factors:

- **Increased Use of Level A Responses & Reduced Level B Responses**. The Department has increasingly relied on Level A responses, which deploy facility supervisors, rather than Level B alarms that activate Emergency Response Teams. Historically, Level B alarms were frequently

---

[74] The Department reported in August 2023 that it intended to assign specific staff to the Emergency Response Teams based in the facilities. However, as of the filing of this report, the Department has not provided any revised policies or procedures to suggest it has taken any concrete steps to implement this plan.

used as the default response to incidents that housing area officers could not manage. However, internal data from the Department and the Monitoring Team's review of thousands of incidents indicate that Level A responses are now more common. This shift signals a strategic move toward resolving incidents through supervisory leadership rather than the use of Probe Teams or Special Teams.

- **Reduced Reliance on ESU for Incidents and Searches**. When Level B responses are initiated (which is less frequently, as noted above), facilities are now less likely to request Emergency Services Unit (ESU) or other Special Teams to respond. To that end, ESU was involved in fewer than 10 use of force incidents in all of 2024, which is a significant reduction from 2020 when ESU's involvement in use of force was common. Now, either the Probe Team or other available personnel (such as corridor officers or escort teams) respond to the location. This is an important change from the previous over-reliance on ESU for serious incidents and reflects a broader effort to handle situations internally without defaulting to Special Team involvement.

  o The Department has also moved away from using ESU (and other Special Teams) to conduct searches. In 2024, Special Teams were involved in 300 searches compared with over 1,000 searches in 2022. The Monitoring Team previously documented significant concerns with ESU's performance during search operations, including disorganized execution, aggressive tactics, and unprofessional conduct, all of which frequently contributed to avoidable uses of force. In response, the Department now schedules Tactical Search Operations (TSOs) through the Chief of Security. These tactical searches involve a comprehensive sweep of the entire facility using a dedicated Special Search Team that is specifically trained to conduct searches and is supposed to conduct those searches in an organized, professional and effective manner. Facilities are also expected to conduct their own searches, in targeted or randomly selected areas, using assigned security staff, signaling a structural change in how searches are conducted and supervised.

- **Improved Conduct of Special Teams**. When Special Teams are deployed, their on-scene conduct has improved in some instances and the escalation of tension through their confrontational behavior has decreased, although it does still occur. Importantly, use of tactical equipment such as OC grenades or tasers has essentially ceased. While additional work is

needed to ensure that Special Teams manage incidents effectively and professionally, the use of excessive or unnecessary force by these teams has diminished.

Overall, the Department's decreasing reliance on Emergency Response Teams reflects a meaningful effort to address past concerns, to professionalize team members' behavior, and to move toward more sustainable ownership of security operations by the facilities. However, the Monitoring Team continues to find that housing unit staff still call for Level B responses more often than appropriate and the conduct of Emergency Response Teams still warrants scrutiny, in particular the "all Staff" call for Probe Team activations (discussed further below). The Department must take steps to ensure that Emergency Response Teams do not utilize hyper-confrontational tactics that increase tension and produce chaos. Finally, Emergency Response Teams are frequently involved in searches and the Department's written guidance regarding search procedures still needs to be updated and revised, as discussed in other sections of this report.

**Selection, Training, and Oversight of Emergency Response Teams**

Beyond deployment of Emergency Response Teams, another key area of focus under this provision is the selection, training and oversight of Emergency Response Team members. As discussed in more detail below, further improvement is necessary to embed these requirements in Department policies and procedures and to ensure they occur in practice in order to continue and sustain progress.

- **Facility Response Team Selection**. Historically, the Department lacked clear criteria for assigning staff to these teams, particularly within the facilities given that all staff continue to respond when a Probe Team is called.[75] For this reason, the Monitoring Team continues to recommend that the Department eliminate the requirement for all-staff response when a facility response team is necessary and instead set specific criteria for who may participate on the team and to ensure that they are selected appropriately. These precautions are needed to prevent staff with histories of excessive use of force from serving on response teams.

- **Selection for Special Teams**. The number of staff assigned to Special Teams has declined in recent years. Notably, in 2020 and 2021, the Emergency Services Unit had upwards of 200 members. By January 2023, 139 staff were assigned to the Emergency Services Unit (ESU) and by January 2025, that number had further decreased to 98. In 2023 and 2024, the Department

---

[75] *See* Monitor's December 22, 2023 Report (dkt. 666) at pgs. 20-22.

developed revised policies for Special Team selection, but finalizing the policy has not been a priority given other initiatives.

- **Training for Special Teams**. The Department created training for Special Teams to ensure that they have sufficient guidance on practices and address areas of concern identified by the Monitoring Team. The Department first initiated this training in June 2023, but the Monitoring Team found that the training was inadequate and contradicted DOC policy and *Nunez* Court Orders[76]. The curriculum underwent significant revisions and was ultimately approved by the Monitoring Team in February 2024. The revised training addresses core competencies such as de-escalation, proportional use of force, and proper restraints, while also addressing historical problem areas like painful escorts and prohibited holds.[77] The Department began delivering new training modules to Special Team staff in April 2024. The training is intended to be delivered more than once a year, with updated scenarios and content. The Department reports that all staff assigned to Special Teams have completed the training at least once, and some staff have taken the training twice between April 2024 and March 2025.[78]

- **Rapid Review of Emergency Response Teams Response**. Beginning in May 2023, a separate Rapid Review process was implemented in which an ADW reviews incidents strictly for the purpose of evaluating the conduct of Special Teams.[79] As with the Rapid Reviews more

---

[76] See Monitor's April 18, 2024 Report (dkt. 706) at pg. 75.

[77] The full curriculum consists of eight modules. However, the Monitoring Team recommended temporarily excluding Module 5, as it pertains to searches given the Department is currently revising its policies on search procedures.

[78] In response to feedback from the Monitoring Team in December 2024, the Department revised its practices for tracking the delivery of the Special Team training. Oversight of attendance and compliance are now managed jointly by the Emergency Services Unit and the Training and Development Division (TDD). Attendance is now tracked in real time in the Department's Learning Management System (LMS), noncompliance is addressed within five days, and auditors verify proper implementation.

[79] The Special Team Rapid Review template includes the date, time, location, and camera information for the incident; the names and shield numbers of staff involved in the incident; an assessment of whether the incident was avoidable and/or anticipated and why; identification of any procedural violations, painful escort techniques, or staff actions that were not in compliance with the use of force ("UOF"), chemical agent, or self-harm policies and procedures; and any recommendations for corrective action, discipline, or removal from the Special Teams for each staff member involved in the incident. The format of the Special Team Rapid Review template was revised during the Seventeenth Monitoring Period for data entry to be more streamlined, and while the 2023 Rapid Reviews did not initially contain a prompt to assess whether the Special Team deployment was necessary, this question was added in response to the Monitoring Team's recommendation and is addressed in all the 2024 Rapid Reviews.

generally (discussed in the Compliance Assessment First Remedial Order § A., ¶ 1), the Rapid Reviews generally identify areas in which corrective action for individual staff may be necessary, but the reviews still struggle to reliably identify whether the *incidents* themselves may have been unnecessary or avoidable. However, as noted above, the frequency of such incidents is lower than in previous years.

Overall, the delivery of new training, distinct Rapid Reviews and reduction in team size indicate a genuine investment in improving the quality and accountability of Special Teams. However, sustained oversight and continued refinement of their composition, deployment and conduct are still necessary to ensure lasting progress.

**Conclusion**

The Department has taken substantial steps toward achieving the goals of this provision. Most importantly, the frequency of Emergency Response Team deployments has declined, especially in situations that over-utilized tactical force. This development reduces the risk of hyper-confrontational incidents and signals a shift toward more appropriate, measured incident response. While more work remains, the Department has begun to minimize unnecessary and excessive uses of force by Emergency Response Teams. In order to achieve Substantial Compliance, the Monitoring Team continues to recommend, as outlined above, the deployment of large scale responses (particularly Probe Teams) must be further reduced. Further, written procedures related to Emergency Response Teams must be revised and implemented to ensure that the improved practices of all Emergency Response Teams are sustained in the future.

| COMPLIANCE RATING | ¶ 1. Partial Compliance |
| --- | --- |

| FIRST REMEDIAL ORDER § A., ¶ 3 (REVISED DE-ESCALATION PROTOCOL) |
|---|
| § A., ¶ 3. *Revised De-Escalation Protocol.* Within 90 days of the date this Order is approved and entered by the Court ("Order Date"), the Department shall, in consultation with the Monitor, develop, adopt, and implement a revised de-escalation protocol to be followed after Use of Force Incidents. The revised de-escalation protocol shall be designed to minimize the use of intake areas to hold Incarcerated Individuals following a Use of Force Incident given the high frequency of Use of Force Incidents in these areas during prior Reporting Periods. The revised de-escalation protocol shall address: (i) when and where Incarcerated Individuals are to be transported after a Use of Force Incident; (ii) the need to regularly observe Incarcerated Individuals who are awaiting medical treatment or confined in cells after a Use of Force Incident, and (iii) limitations on how long Incarcerated Individuals may be held in cells after a Use of Force Incident. The revised de-escalation protocol shall be subject to the approval of the Monitor. |

The discussion below provides a compliance assessment of the Department's efforts to reduce its reliance on intake units in general operations pursuant to the requirements of the First Remedial Order (dkt. 350), § A, ¶ 3. This assessment also includes references to the Action Plan (dkt. 465), § E, ¶ 3 (a) (which adopts ¶ 1 (c) of the Second Remedial Order regarding tracking of inter/intra facility transfers), and Action Plan (dkt. 465), § E ¶ 3 (b) (which requires the new leadership to address these requirements) given these orders' interplay with the First Remedial Order (dkt. 350), § A, ¶ 3. These provisions require the Department to identify the various processes that are negatively impacting intake's orderly operation and address them with new procedures.

The first compliance assessment for this provision occurred in the 11th Monitoring Period (July to December 2020). At that time, the Department was found to be in Non-Compliance and remained so through the 12th Monitoring Period (January to June 2021). The Department was found to be in Partial Compliance in the 14th Monitoring Period (January to June 2022) and has remained so through this Monitoring Period.

Reducing reliance on the use of intake and de-escalation serves an important harm-reducing function. These provisions underscore the need for the Department to establish a robust process for de-escalating those involved in incidents of violence and/or use of force ("UOF") to ensure that the risk of harm they may present to themselves, or others' physical safety has been abated. When an individual is agitated to the point that they present an imminent risk of harm to another person's safety or when they have engaged in behavior that has physically harmed another person, that individual needs to be separated from potential victims so that the *risk* of harm to others can be abated and the person can

safely return to the milieu. The risk of harm must necessarily consider the *potential* infliction of pain and/or injuries to others and should not be limited to only assessing the risk of serious injuries[80].

Historically, the Department has transported incarcerated individuals to intake for this purpose, a practice which creates additional chaos and subverts the intended function of intake units. As a result, the Monitoring Team has focused on reducing the use of intake units for this purpose but also emphasizes the need for the Department to develop routine procedures to properly de-escalate those involved in use of force incidents and other acts of violence.

To ascertain the Department's progress in minimizing the use of intake, the Monitoring Team assesses the use of force in intake, available data regarding the time individuals stay in intake areas, and the Department's ability to manage individuals *outside* of intake. The Monitoring Team also makes observations from site visits of intake areas and its assessments of use of force incidents. The Department has made progress on this provision and beginning in 2022, the Department was no longer in non-compliance with the First Remedial Order (dkt. 350), § A, ¶ 3.[81] An update on the Department's efforts to process new admissions as required by the Second Remedial Order (dkt. 398), ¶ 1 (i) (c) is included in Appendix C of this Report.

**Use of Force Incidents in Intake Areas**

The Monitoring Team continues to evaluate the frequency with which use of force occurs in the intake areas. The Monitoring Team has previously noted that intake's chaotic environment and longer processing times (which are often mutually reinforcing) can result in a greater frequency of the use of force. Therefore, efficient intake processing and reducing the reliance on intake following uses of force are critical.

Overall, the number and proportion of use of force in intake has decreased significantly since the Second Remedial Order was entered in September of 2021, at the peak of the concerning practices

---

[80] Notably, while a risk of harm can be ascertained, it is unclear how a risk of *serious injury* could even be reasonably ascertained.

[81] The Department was in non-compliance with this provision in the 11th and 12th Monitoring Periods (July 2020 to June 2021). A compliance assessment was not provided for the 13th Monitoring Period. The Monitoring Team found that the Department was in Partial Compliance with this provision in the 14th Monitoring Period (January to June 2022) in the Monitor's October 28, 2022 Report (dkt. 472).

in intake and is also below the numbers that occurred in 2019 and 2020 that resulted in the imposition of the First Remedial Order.

With respect to the use of force in intake in 2024, 59% (n=500) occurred in EMTC (n=244) and OBCC (n=256). These two facilities have the highest population of all facilities and therefore may have more active intake areas. The number of uses of force in intake areas merits greater scrutiny and focus on security and active supervision from facility leadership. Overall, while there has been improvement, the number of incidents within the intakes remains higher than it should, and further reductions are necessary.

The Department must remain vigilant in evaluating whether the force occurring in intake areas is necessary and unavoidable and whether intake operations are orderly and secure.

| Use of Force in Intakes (Department-wide) | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | Jan. to June 2024 | July to Dec. 2024 |
| # of UOF in Intakes | 913 | 1123 | 992 | 1483 | 963 | 767 | 844 | 472 | 372 |
| Total UOF | 5,901 | 7,169 | 6,467 | 8,194 | 7,005 | 6,784 | 6,979 | 3,496 | 3,483 |
| % of UOF in Intakes | 15% | 16% | 15% | 18% | 14% | 11% | 12% | 13% | 13% |

## Intake Data Tracking

Inter/intra facility transfers must be tracked pursuant to ¶ 1 (c) of the Second Remedial Order (dkt. 398). Historically, the Department did not track inter/intra facility transfers in any systematic way. In 2023, the then Deputy Commissioner of Classification, Custody Management & Facility Operations ("DC of Classification") oversaw several initiatives to improve the tracking of inter/intra facility transfers to ensure individuals did not languish in intake for more than 24 hours. The Monitor's December 22, 2023 Report (dkt. 666) at pgs. 12-13 outlined these initiatives in detail, including the requirement for intake staff to use the Inmate Tracking System ("ITS") to track inter/intra facility transfers.

The Department reports that the quality assurance process developed in 2023 to track inter/intra-facility transfers in ITS and prevent individuals from languishing in intake is still in effect and under management of facility operations. As part of this process, a facility operations team member monitors the live video feed of all intake units. Every four hours, they receive an update from each facility, including the names of those in intake, a screenshot of the ITS system, and a Genetec

photo for each pen. They then verify whether any individuals have been in intake for four hours or more and, if necessary, contact the facility to expedite their movement.

In addition to a quality assurance process, the Department has reported its intention to utilize data to assess and optimize intake tracking. The Department reports it uses ITS-generated data to produce reports and to evaluate information such as the average time, minimum time, and maximum time in intake as part of its overall effort to evaluate how long individuals are intake. This information is currently shared with facility and Department leadership daily to monitor overall performance. The Monitoring Team has seen a sample of these data updates but has not yet analyzed the underlying data. The availability of this information to facility leadership is important and the Monitoring Team encourages the use of data to evaluate operations and drive decision-making so long as the Department ensures the data is accurate and reliable.

Generally, the issue of inter/intra facility transfers languishing in intake is no longer a widespread or a persistent problem. However, the Department is not tracking all individuals in ITS, including Court transfers. The Department maintains a list of all individuals who are required to be produced to Court but there still does not appear to be a process to track how long these individuals may wait in an intake pen. Second, as noted in the Monitor's December 22, 2023 Report (dkt. 666) at pgs. 12-13, some inter/intra facility transfers are still not entered into ITS in a timely manner. During site visits, the Monitoring Team has consistently observed individuals in intake cells who have not yet been entered into the ITS. Staff frequently explain that the individuals have only recently arrived, and that staff were diverted to more urgent tasks, assuring that they will update the system promptly.

The Monitoring Team maintains its recommendations from the Monitor's April 3, 2023 Report (dkt. 517) at pgs. 87-88 suggesting that the Department would benefit from taking additional steps to manage the use of intake, including assessing root causes of staff's failure to enter individuals into ITS, and developing a practical quality assurance process. While individuals languishing in intake do not appear to be at as great a risk, the frequency of use of force in intake suggests that ongoing oversight is necessary to ensure that these units are managed in a safe manner.

## Reduced Reliance on Intake & De-Escalation Units

As part of its effort to eliminate the reliance on intake areas, the Department promulgated Directive 5016 "De-escalation Unit," which establishes the Department's policy and procedures for de-

escalating individuals outside of facility intakes. The policy also prohibits the use of intake pens for post-incident management or violence prevention and indicates that intake should only be used for facility transfers, court processing, discharges, and transfers to medical appointments, cadre searches, body scans, and new admissions.

While the First Remedial Order does not require the use of de-escalation units, the Department opened a de-escalation unit in each Facility in July 2022 as one alternative for staff to use instead of intake. De-escalation units are in unoccupied housing units in each facility with cells with secured doors, a bed, a toilet, and a sink. Showers are available in each housing unit. The Department did not faithfully implement the use of de-escalation units. The Department ceased utilization of de-escalation units at RMSC in August 2022, GRVC in October 2022, and RNDC in June 2023. No de-escalation units were created at NIC/WF, or at OBCC when it was re-opened in July 2023. EMTC leadership reports that it maintains a de-escalation unit since their intake area is reserved processing of new admissions. Given the limited use of de-escalation units, in October 2023, in consultation with the Monitoring Team, the *Nunez* Compliance Unit ("NCU") ceased auditing de-escalation units.

The discontinuation of de-escalation units does not inherently mean that facilities take all incarcerated individuals to intake following a UOF incident. NCU's audits and reports from facility leadership found that some incarcerated individuals are returned to their assigned cell to de-escalate, are immediately rehoused, or are taken directly to the clinic for medical care.[82]

As for other de-escalation procedures, Facility staff have not received formal guidance on post-incident protocols or managing incarcerated individuals following an incident without the use of de-escalation units. Appropriate guidance regarding how best to manage the de-escalation process is necessary or facilities may revert back to the practice of relying on intake areas for post incident management

The Monitoring Team continues to strongly recommend that the Department update its policy/guidance to staff about post-incident management given de-escalation units are no longer

---

[82] The NCU audits covering January to June 2023 (the 16th Monitoring Period) found that 49 of 84 individuals (58%) (compared with 71% in July to December 2022) were not taken to intake and instead were taken back to their assigned cell to de-escalate, immediately rehoused, taken directly to the clinic for medical care, or were placed in a de-escalation unit (specifically, six individuals were placed in a de-escalation pen during this time). 35 of 84 individuals (42%) were brought to intake areas. *See* the Monitor's December 22, 2023 Report at pgs.13-14.

utilized. While the current policy prohibits staff from bringing individuals to intake following an incident, it lacks sufficient guidance on how staff should manage individuals following an incident now that the de-escalation units are not an option.

**Conclusion**

The Department has made significant strides in improving the conditions of intake, which are no longer as chaotic and disorderly as they were in 2021. Because the Department has improved the functioning of intake units but has several remaining challenges, the Department remains in partial compliance with this provision. Further work is needed in the consistent tracking of individuals in ITS, ongoing efforts to reduce the use of force in intake areas, and updated guidance for de-escalating those involved in use of force incidents.

The Department has not developed a consistent strategy for de-escalation following an incident. The de-escalation process must allow for the identification of the individual's distress, to offer various strategies to address the interpersonal conflict or tension, and to continually re-assess the person to determine whether the risk of harm has subsided. The time required for the risk of harm to subside depends both on the individual (*i.e.*, some have more well-developed skills for coping with emotional dysregulation than others) and the situation (*i.e.*, some types of situations cause a higher level of distress than others), and thus the duration must be individually determined for each de-escalation period.

| COMPLIANCE RATING | § A., ¶ 3. Partial Compliance |
|---|---|

| CJ § XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19, ¶ 1 (PREVENT FIGHT/ASSAULT) |
|---|
| Consent Judgment, § XV., ¶ 1. *Prevent Fight/Assault.* Young Inmates shall be supervised at all times in a manner that protects them from an unreasonable risk of harm. Staff shall intervene in a manner to prevent Inmate-on-Inmate fights and assaults, and to de-escalate Inmate-on-Inmate confrontations, as soon as it is practicable and reasonably safe to do so. |

*The analysis and compliance rating below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old incarcerated individuals. The Monitoring Team will not assess compliance with the Nunez provisions related to 16- and 17-year-olds in this Monitoring Period pursuant to the Stipulation and Order Regarding 16- and 17-Year-Old Adolescent Offenders at Horizon Juvenile Center, ¶ 2 (dkt. 810).*

This provision requires the Department to manage units where 18-year-olds are housed in a manner that protects them from an unreasonable risk of harm, by preventing violent conduct and de-escalating confrontations as soon as practicable and reasonably safe to do so.

The Monitoring Team first found the Department in Partial Compliance with this provision in the 3rd Monitoring Period (August to December 2016) where it remained until the 6th Monitoring Period (January to June 2018). However, following GMDC's closure in late 2018 (and the subsequent transfer of 18-year-olds to RNDC),[83] RNDC's conditions deteriorated, and the compliance rating was downgraded to Non-Compliance where it remained from the 7th Monitoring Period (July to December 2017) to the 17th Monitoring Period (July to December 2023).

The Court's 2024 Contempt Order (dkt. 803) found the Defendants in contempt for failing to comply with this provision. The Court explained the basis for its finding at pages 37 to 39 in the section "Failure to Ensure the Safety of Young People in Custody" of the Order.

The Monitoring Team has long been concerned about violence at RNDC, where the majority of 18-year-olds are held (along with those aged 19 to 21).[84] However, in the 18th Monitoring Period (January to June 2024), the Monitoring Team found that the Department was no longer in Non-

---

[83] The Monitor's 5th Report (dkt. 311) at pgs. 144-150 and the Monitor's 6th Report (dkt. 317) at pgs. 149-150 describe the transfer of 16- and 17-year-olds from Rikers Island to the Horizon Juvenile Center, the closure of GMDC and subsequent transfer of 18-year-olds to RNDC.

[84] The Monitor's December 22, 2023 Report (dkt. 666) at pg. 87 includes specific citations to various reports from 2022 and 2023 that discuss in detail RNDC's circumstances and the Department's efforts to address them.

Compliance with this provision and moved the Department into Partial Compliance. Key elements of progress included steady decreases in the use of force and facility violence during the previous two years and the Department's development of and sustained focus on the RNDC Programs Action Plan ("RNDC Plan"). The Department sustained this progress throughout the current Monitoring Period.

**RNDC's Current Facility Population/Composition**

Since the Consent Judgment went into effect, the number of 18-year-olds in custody has declined significantly. In 2016, the Department held approximately 200 18-year-olds, compared to approximately 50 18-year-olds in 2024. This age group typically represents about 1 or 2% of the total population in custody. The Department has historically concentrated its population of young adults aged 18- to 21-years old at RNDC (particularly with GMDC's closure in 2018), but RNDC's total population has changed in both size and composition over the past several years. In 2019, RNDC's average daily population of 470 was predominantly young adults. In contrast, in December 2024, the facility's average daily population of 1,365 was 36% young adults and 64% adults.

**RNDC's Rates of Use of Force and Violence**

The table below identifies the rates of use of force and violence for the entire RNDC facility. Overall, the rates of key metrics at RNDC have decreased over the past three years. Although the rates of use of force and fights ticked upward during the current Monitoring Period, since early 2022, RNDC's use of force rate decreased 48%, the rate of stabbings/slashings decreased 63%, the rate of fights decreased 7%, and the rate of fires decreased 70%. These are all very positive changes that can drastically change the tenor of a facility and the chaos and disorder that people housed in that facility experience.

| RNDC's Rates of Use of Force and Violence, January 2022 to July 2024 | | | | |
|---|---|---|---|---|
| | Use of Force | Stabbing/Slashing | Fights | Fires |
| Jan-Jun 2022 | 15.1 | 1.6 | 10.4 | 2.0 |
| Jul-Dec 2022 | 9.9 | 0.76 | 9.3 | 1.2 |
| Jan-Jun 2023 | 8.1 | 0.59 | 7.0 | 1.3 |
| Jul-Dec 2023 | 7.9 | 0.92 | 7.8 | 3.0 |
| Jan-Jun 2024 | 5.7 | 0.60 | 7.5 | 1.2 |
| Jul-Dec 2024 | 7.9 | 0.6 | 9.7 | 0.6 |

These data provide a useful context for understanding the environment within which the RNDC Plan is being implemented and highlight that overall facility conditions have improved during the past three years.

**RNDC's Programs Action Plan ("RNDC Plan")**

In January 2024, the Department developed the RNDC Programs Action Plan ("RNDC Plan"), which includes the following key components:

- Consolidating the number of housing units where 18-year-olds (and other Young Adults) may be housed and reducing the maximum unit size from 25 to 15 individuals.

- Renovating the Young Adult housing units to abate hazardous environmental conditions and to improve the aesthetic appeal of the units.

- Sustaining the condition of the renovated units by focusing both staff and incarcerated individuals on the ongoing sanitation of the units.

- Consistently assigning staff, including officers, Captains and Assistant Deputy Wardens ("ADWs"), to the same housing units day-to-day, along with members of the facility's security team, which will function similarly to the Young Adult Response Team ("YART") used in the past.

- Training assigned staff to better understand the target population and the approach to managing their behaviors and solving problems.

- Utilizing Unit Management as the overarching framework for the designated units, which should provide a platform for the implementation of key components of Direct Supervision (*e.g.*, proactive supervision and de-escalation, consistent service delivery, rewards for positive behavior, etc.) and improving basic security practices.

- Enhancing the program offerings provided by both Department staff and outside vendors in order to reduce idle time.

The agency and facility leaders responsible for implementing the plan collaborated closely with the Monitoring Team throughout 2024. Not only does the substance of the plan hold promise for ameliorating the dangerous conditions at RNDC, but the Department's ongoing commitment to its implementation and expansion is encouraging. Specific strategies implemented during the monitoring

period are discussed in detail in the section discussing Direct Supervision (Consent Judgment, § XV, ¶ 12), below.

The Department's OMAP developed a sophisticated data dashboard for the RNDC team to monitor the Plan's impact on reducing the use of force and violence. The dashboard provides real-time access to the rates of various performance indicators in the units targeted by the RNDC Plan.[85] The Monitoring Team encouraged the Department to determine the baseline rate for YA units at RNDC during the calendar year prior to the RNDC Plan (CY 2023) in order to better assess whether the strategies included in the plan were having a demonstrable impact on facility safety. This allows the assessment of the RNDC Plan's impact to be focused on how conditions may have changed for the specific target population, rather than relying on facility-wide statistics that have confounding factors (such as the large number of adults housed at RNDC).

| RNDC Programs Action Plan's Key Performance Indicator Rates, July-December 2024 | | | |
|---|---|---|---|
| Incident Type | YA Baseline Rate (CY 2023) | July-December 2024 | % change |
| Use of Force | 3.0 | 2.1 | -30% decrease |
| Stabbing/Slashing | 0.5 | 0.3 | -40% decrease |
| Fights | 2.7 | 3.5 | +30% increase |
| Serious Injuries | 0.4 | 0.3 | -25% decrease |
| Assault on Staff | 1.0 | 0.22 | -78% decrease |

As indicated in the table above, the RNDC Plan's first six months of operation led to substantial decreases in the rates of all key metrics, except fights.

**Monitoring Team Recommendations**

The Monitoring Team has collaborated closely with the Department as it developed and refined the Plan's components and as implementation got underway. The Department has developed several creative strategies to leverage its programming assets and to develop incentives for positive behavior. It has also been open to technical assistance regarding various aspects of the Plan's strategies to improve staffing, security practices, increase programming, and to evaluate the impact on violence.

---

[85] Because the dashboard is a management tool, not a research tool, OMAP developed a rate calculation that provides more specificity than the standard rates which are typically calculated using the monthly average daily population as the denominator. Instead, the rate used in the dashboard is the "rate per 1,000 PIC *per day*," which uses daily population counts and provides more accurate, real-time data to facility operators.

Implementation is well underway in one of the areas targeted by the RNDC Plan (Building 2) and is being slowly expanded to the remaining areas (Building 3, Mod 1 and Mod 2) as discussed in detail in Consent Judgment, § XV, ¶ ¶ 12 and 17, below.

As implementation becomes broader and deeper, the Monitoring Team has encouraged the RNDC team to consider how these changes to the conditions of confinement could be leveraged to address persistent security problems (e.g., unsecured cells, enforcing lock-in, officers off post, etc.) in new ways. Finally, the RNDC Action Plan Dashboard provides detailed information on the locations, days and times where incidents occur and identifies the PICs who are involved in the highest number of incidents. These data present an excellent opportunity for problem-solving strategies that address facility hot spots and for individualized behavior management strategies to reduce violent behavior. The Monitoring Team continues to engage with the RNDC team on a monthly basis and remains available to provide technical assistance on any of these topics.

## Conclusion

The RNDC Plan is distinguished from other efforts the Department has made to address the risk of harm to young adults not just because of its positive outcomes but also because it is an example of a strategy built on good correctional practice (such as consistently assigned staff, reduced idle time, and incentives for positive conduct) that has the requisite leadership, sustained attention, and tools for assessing the plan's impact on facility safety. This is a significant achievement.

In summary, the Department continues to demonstrate a concerted effort to improve facility safety at RNDC in an effort to better protect 18-year-olds in custody from an unreasonable risk of harm. The RNDC Plan has yet to be fully implemented in three of the four facility locations targeted by the RNDC Plan, and the risk of harm remains elevated, but the RNDC Plan's early results are very promising. Continued reduction in the key violence metrics are expected once the remaining locations have fully implemented consistent staffing, behavioral incentives, and other key elements of Direct Supervision (as discussed in ¶ 12 and ¶ 17 below). The Department's sustained focus on problem-solving strategies and initial implementation efforts are sufficient to sustain the Partial Compliance rating.

| COMPLIANCE RATING | ¶ 1. (18-year-olds) Partial Compliance |
|---|---|

| **CJ § XV. S**AFETY AND **S**UPERVISION OF **I**NMATES **U**NDER THE **A**GE OF 19, ¶ 12 (**D**IRECT **S**UPERVISION) AND **F**IRST **R**EMEDIAL **O**RDER § D., ¶ 3 (**R**EINFORCEMENT OF **D**IRECT **S**UPERVISION) |
|---|

| Consent Judgment, § XV., ¶ 12. _Direct Supervision._ The Department shall adopt and implement the Direct Supervision Model in all Young Inmate Housing Areas. |
|---|
| First Remedial Order, § D., ¶ 3. For all housing units at RNDC that may house 18-year-old Incarcerated Individuals, the Department, including RNDC Supervisors, shall take necessary steps to improve the implementation of the Direct Supervision Model with an emphasis on the development of proactive and interactive supervision; appropriate relationship building; early intervention to avoid potential confrontations; de-escalating conflicts; rewarding positive behavior; and the consistent operation of the unit. |
| First Remedial Order, § D., ¶ 3(i). The Department, including RNDC Supervisors, shall reinforce the implementation of the Direct Supervision Model with Staff through, among other things, appropriate staff supervision, coaching, counseling, messaging strategies, or roll call training. |

_The analysis and compliance rating below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old incarcerated individuals. The Monitoring Team will not assess compliance with the Nunez provisions related to 16- and 17-year-olds in this Monitoring Period pursuant to the Stipulation and Order Regarding 16- and 17-Year-Old Adolescent Offenders at Horizon Juvenile Center, ¶ 2 (dkt. 810)._

This provision requires the Department to implement the Direct Supervision model in all units that house 18-year-olds. To implement Direct Supervision, the Department must emphasize proactive and interactive supervision, appropriate relationship building, early intervention to avoid potential confrontations, de-escalation, rewards for positive behavior and consistent operations on each unit, including the implementation of daily unit schedules.

The Department's long-standing inability to implement a Direct Supervision model resulted in the imposition of a related provision in the First Remedial Order (dkt. 350), § D, ¶ 3. As part of the additional remedial relief, the Department is required to periodically assess the extent to which these various aspects are being properly implemented, along with adherence to the daily schedule in each housing unit. The _Nunez_ Compliance Unit ("NCU") consulted with the Monitoring Team to develop a protocol for this assessment in early 2021, but audits were never produced because RNDC was in such disarray. Housing units did not have posted daily schedules and were not staffed by the same people day-to-day, which precluded the consistency, predictability and relationship development that is at the core of the Direct Supervision model.

The Monitoring Team found the Department in Non-Compliance with this provision throughout most of the Consent Judgment's tenure. Partial Compliance was briefly achieved in 2020 (the 9th and

10th Monitoring Periods) when the Department developed a framework for implementing the various strategies and began reinforcing key concepts with staff. However, these efforts were not sustained, and the Monitoring Team found the Department in Non-Compliance from the 11th Monitoring Period to the 18th Monitoring Period.

The Court's 2024 Contempt Order found the Defendants in contempt for failing to comply with this provision. The Court explained the basis for its finding at pages 37 to 39 in the section "Failure to Ensure the Safety of Young People in Custody" of the Order.

**Key Concepts of Direct Supervision**

Beginning in early 2024, with the implementation of the RNDC Programs Action Plan ("RNDC Plan"), the Department has begun to build a foundation upon which the elements of Direct Supervision can rest. An essential first step is the implementation of a staffing strategy that assigns a Unit Manager and consistently assigns staff to the same unit day-to-day (*see* Consent Judgment, § XV, ¶ 17, below). Once assigned and properly supervised, these staff are responsible for proactively supervising the units and intervening early to de-escalate conflicts, assisted by the assigned Security Team members. Collectively, assigned housing unit staff, supervisors, Security Team members, and staff from the Programs Division are responsible for implementing the daily unit schedule which provides much needed predictability and thus reduces the level of frustration experienced by many PICs when services are not delivered reliably. These strategies have begun to take hold in one of the four areas addressed by the RNDC Plan (Building 2, to be followed by Building 3, Mod 1 and Mod 2 in the near future). A Unit Manager was assigned to Building 2 in July 2024, and staff assignments were largely consistent across the six housing units as discussed in Consent Judgment, § XV, ¶ 17, below. This has reportedly created a stable environment upon which the foundations of Direct Supervision can be built.

The Department has made progress in other areas as well, particularly by developing structures to improve rapport between staff and incarcerated individuals, creating daily unit schedules and robust programming schedules that significantly reduce idle time, and by implementing an incentive program that offers rewards on both a group and individual basis.

- **Maximum Unit Size**. In each housing unit where 18-year-olds may be placed, the unit size is capped at 15 individuals. This, along with consistently assigning the same staff to

the units day-to-day, facilitates efforts to develop rapport and implement proactive supervision and to de-escalate conflicts among incarcerated individuals.

- **Daily Huddles**. Each day, the Security Team member assigned to the Building 2 housing units holds a "huddle" with the staff and PICs to discuss any issues that need to be resolved.

- **Daily Unit Schedules**. The Department maintains separate schedules for recreation, barbershop, laundry, law library, religious services, the PEACE Center, counselors and programming. Each schedule identifies the day/time that the service is provided to each building/unit. While these are useful for facility leaders to ensure that all units are scheduled to access a given service, they cannot be easily used by PICs or staff to identify when each service is provided to their assigned unit. Such clarity is essential for transparency and predictability, so that both staff and PIC have a shared understanding of the activities and services each day. The Department reports it is working to develop a comprehensive daily schedule for each housing unit that includes all activities and services in a single document.

- **Programming**. One of the core objectives of the RNDC Plan is to increase the volume of structured programming/decrease idle time. The Department's Programs Division has richly resourced the 15 housing areas designated in the plan (six units in Building 2, five units in Building 3, and four units in Mod 1 & Mod 2) relying both on Programs Staff (e.g., Program Counselors, Social Service providers) and community partners (e.g., King of Kings, SCO, Stella Adler). At the beginning of the monitoring period, the RNDC team identified multiple "conflicts" in the schedule (where two programs were scheduled at the same time). In September 2024, the schedules were updated to reduce conflicts between scheduled activities, which provided more programming opportunities to people on each unit.

  - By the end of the monitoring period, in December 2024, Department staff and community partners were scheduled to provide structured programming for an average of 3 hours per day to units in Building 2, 1.3 hours per day in Building 3, and 1 hour per day in the Mods (where all individuals also attend school five hours per day on weekdays). The Programs Division plans to increase programming in Building 3 in subsequent months, particularly once the new

fiscal year begins. In addition, at the end of the current monitoring period, 12 of the 15 units (80%) had access to five hours of school, five days per week.

- ▪ The Programs Division's new database captures the extent to which the scheduled programs occur or are cancelled, and the reason for cancellations. These data are tracked monthly by the RNDC team, which can then troubleshoot issues that emerge. During the current monitoring period, approximately 78% of programs occurred as scheduled (monthly range 72%-86%). On average, about 60% of the PICs in each housing unit participated in the programs offered (monthly range 50-69%). Of the 22% of scheduled programs that were cancelled, the largest proportion was cancelled because staff were sick, on leave, or the program was scheduled on a holiday. Toward the end of the monitoring period, a significant proportion of program cancellations were due to facility lockdowns (18-30% of all program cancellations).

- ▪ **Incentive Program**. RNDC has developed several strategies to incentivize PICs to follow the rules and to resolve conflict without violence. The ability to incentivize/reward individuals for pro-social conduct is a key tenet of Direct Supervision. Incentives include:

  - o In mid-December 2024, RNDC began to offer weekly "Late Night" (i.e., lockout is moved back to 10p instead of 9p; individuals can remain in the dayroom where they can watch TV or play video games) as group incentive for units in Building 2. Housing units are eligible for the Late Night if they are incident-free and have acceptable sanitation practices during the week. The Department's tracking mechanism for this incentive showed that two units qualified on 12/16, three qualified on 12/19, and no units qualified on 12/26. The RNDC team plans to expand this opportunity to Building 3 during the next monitoring period and may also provide off-unit activities for units that consistently meet expectations over a period of time.

  - o Each month, a variety of off-unit Special Events are also available to individuals who have met established criteria (e.g., incident-free for a month, lock-in compliance, met a specific program engagement threshold, etc.). During the

current monitoring period, the facility held events such as family days, a chess tournament, holiday parties, and basketball tournaments. The Monitoring Team has encouraged the RNDC team to keep track of the number of YAs who earn off-unit incentives each month.

- **Grievances**. One way to assess the experience of the individuals housed on the units designated by the RNDC Plan is to examine the volume and types of issues they grieve. During the current monitoring period, the most frequent concerns were a lack of daily access to recreation and access to medical/mental health services. Smaller numbers of grievances were filed for concerns about visitation, tablets, safety and housing units' physical conditions. That the RNDC team is routinely monitoring grievances and searching for patterns is another example of the team's commitment to addressing issues of concern for the people in custody.

## Steps to Implement Direct Supervision

Moving forward, to meet the requirement regarding Direct Supervision, the strategy to achieve consistent staffing (and related rapport building and de-escalation goals), the implementation of daily unit schedules and the use of incentives to reduce violence need to be fully expanded in the other three areas designated by the RNDC Plan (Building 3, Mod 1 and Mod 2).

The Department also appears to be in a position to begin to address the First Remedial Order (dkt. 350), § D, ¶ 3 (ii), which requires periodic assessments of the extent to which the various aspects of Direct Supervision are being properly implemented, along with adherence to the daily schedule in each housing unit. In 2021, the Monitoring Team discussed the options for an audit strategy with NCU, but it is likely that the approach can now be better formulated to address the specific contours of the RNDC Plan.

Throughout 2024, the Department demonstrated a continuing commitment to integrate the core elements of Direct Supervision into the standard operation of units that house young adults designated by the RNDC Plan, particularly those that house 18-year-olds. The work needs to be expanded to all areas targeted by the RNDC Plan in order to achieve Substantial Compliance, but the RNDC team's progress in consistently assigning staff, improving relations between staff and people in custody, capping unit size, developing daily unit schedules, and implementing an incentive program are sufficient for upgrading the compliance rating to Partial Compliance. Given the overlapping

| | |
|---|---|
| requirements, progress on ¶ 12 of the Consent Judgment also reflects progress on § D ¶ 3 of the Remedial Order. | |
| **COMPLIANCE RATING** | **¶ 12. (18-year-olds)** Partial Compliance |

| **CJ § XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19, ¶ 17 (CONSISTENT ASSIGNMENT OF STAFF) AND FIRST REMEDIAL ORDER § D., ¶ 1 (CONSISTENT STAFFING)** |
|---|

Consent Judgment, § XV., ¶ 17. *Consistent Assignment of Staff.* The Department shall adopt and implement a staff assignment system under which a team of Officers and a Supervisor are consistently assigned to the same Young Inmate Housing Area unit and the same tour, to the extent feasible given leave schedules and personnel changes.

First Remedial Order § D., ¶ 1. For all housing units at RNDC[86] that may house 18-year-old Incarcerated Individuals, the Department shall enhance the implementation of a staff assignment system under which the same correction officers, Captains, and ADWs are consistently assigned to work at the same housing unit and on the same tour, to the extent feasible given leave schedules and personnel changes.

*The analysis and compliance rating below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old incarcerated individuals. The Monitoring Team will not assess compliance with the Nunez provisions related to 16- and 17-year-olds in this Monitoring Period pursuant to the Stipulation and Order Regarding 16- and 17-Year-Old Adolescent Offenders at Horizon Juvenile Center, ¶ 2 (dkt. 810).*

This provision requires units where most 18-year-olds are housed to have consistently assigned officers and Supervisors day-to-day. In order for the Department to adopt a consistent staff assignment model, staff must reliably report to work as scheduled, and the Department must implement a staff deployment strategy that prioritizes the required consistency across units. The Department's inability to comply with this provision resulted in additional remedial relief, including a provision regarding staff assignments in the First Remedial Order (dkt. 350), § D, ¶ 1. In addition to requiring the Department to enhance its efforts to consistently assign staff to the same housing unit day-to-day, the First Remedial Order also requires the Department to implement a quality assurance process to assess the extent to which the consistent staffing requirements are met each month.

The Monitoring Team briefly found the Department to be in Partial Compliance with this provision in 2019/2020 (the 9th and 10th Monitoring Periods) when a strategy for consistent staffing was first implemented at RNDC. However, the effort was not sustained, and the Department has been in Non-Compliance with this provision since then. The Court's 2024 Contempt Order found the Defendants in contempt for failing to comply with this provision. The Court explained the basis for its

---

[86] The majority of 18-year-old Incarcerated Individuals are currently housed at RNDC. To the extent that the majority of 18-year-old Incarcerated Individuals are housed at another Facility in the future, the provisions in Section D shall apply to all housing units in that Facility that may house 18-year-old Incarcerated Individuals.

finding at pages 37 to 39 in the section "Failure to Ensure the Safety of Young People in Custody" of the Order.


## Current Effort to Implement Consistent Staffing under the RNDC Programs Action Plan

In January 2024, the Department produced the RNDC Programs Action Plan ("RNDC Plan") to improve conditions and facility safety at RNDC where most 18-year-olds are housed. The cornerstone of the RNDC Plan is to consistently assign staff to each of the four housing units where 18-year-olds can be assigned (Building 2, Building 3, Mod 1 & Mod 2). This includes officers, Captains, members of the facility's Security Team, and an Assistant Deputy Warden ("ADW") (who functions as the Unit Manager for the units). Given that the overall goal of the RNDC Plan is to reduce conflict and violence, structuring the units' staffing to permit appropriate familiarity, cooperation and trust to develop is essential for the type of problem-solving that must occur. As such, consistently assigning staff to the targeted units day-to-day is the core strategy that the other components of the RNDC Plan rest upon. That said, given that staff have a variety of benefits (vacation, sick leave, etc.) and are also required to attend annual training on a variety of topics, it is unrealistic to expect that the assigned officers will be present on the unit every single day. A reasonable approach to assessing compliance must incorporate this reality and must focus on the extent to which the facility has assigned staff to cover each post on all tours, has appropriate backup staff to fill in when the assigned staff is unavailable, and is able to avoid deploying assigned staff to other units whenever possible. More globally, reasonable efforts to control unnecessary staff absenteeism must also be considered.

Implementation began in earnest in July 2024 when a Unit Manager was assigned to oversee the operation of Building 2. As noted in the Monitor's previous report (pgs. 173), NCU developed and tested an audit template in May/June 2024 as required by the First Remedial Order (dkt. 350), § D, ¶ 1 (i). After addressing various glitches in data entry/extraction, NCU began its monthly audits of Building 2's performance in July 2024.

## NCU's Consistent Staffing Audits

Each month, NCU utilizes data from the Department's electronic scheduling system, InTime, to assess the extent to which posts in RNDC's Building 2 were worked by a staff member who is steadily assigned to the post day-to-day (i.e., "steady staff"). Each audit assesses nine posts (3 A officers, 6 B

officers), every day, all three tours, for over 800 posts each month. A post is considered to have been worked by a steady officer if it was worked by: (1) the assigned 4-day or 2-day staff for that tour; (2) the assigned 4-day or 2-day staff for that post on a different tour; (3) staff who are normally assigned to an adjacent post on that unit (e.g., the North or South side, or A or B post). As shown in the table below, steady staffing rates in Building 2 for the monitoring period ranged between 68% and 77% each month, with an average for the monitoring period of 72%.

| NCU's Steady Staffing Audit Results, Building 2 | | | | | | | |
|---|---|---|---|---|---|---|---|
| | July 24 | Aug 24 | Sept 24 | Oct 24 | Nov 24 | Dec 24 | **AVERAGE** |
| # posts | ~ | N=837 | N=810 | N=837 | N=810 | N=837 | 72% |
| % Steady | ~ | 68% | 67% | 74% | 73% | 77% | |

Deeper analysis of the data revealed that on days where posts were "steadily staffed," most of the time (61%), the post was worked by the assigned 4-day or 2-day staff. Posts were worked by staff assigned to the post on a different tour 24% of the time, and by staff normally assigned to an adjacent post 15% of the time. Each of these meet the core goals of steady staffing—knowing the unit's daily schedule and being familiar with both the individuals assigned to the unit and the other staff assigned.

NCU also tracks the reason why the post was not worked by a steady officer, separating those which NCU considers to be "within the facility's control" (e.g., assigned staff was directed to work on a different housing unit, or auditor was unable to determine who worked based on data entered into InTime ) and "not within the facility's control" (e.g., training, mutuals, sick, time due, personal emergency, etc.). This data provides useful insight into various dynamics that could be tackled to increase the consistency of staffing in Building 2.

As shown in the table below, very few interruptions to the consistent assignment of staff are caused by Tour Commanders directing the assigned staff to work elsewhere (an average of only 1% per month)—suggesting that RNDC has adequately protected the steady staffing goal of the RNDC Plan in Building 2, which is particularly impressive given the problems with staff absenteeism that have plagued the facility at large. Protecting the staff assigned to the designated units from deployment elsewhere is particularly critical given that the failure to do so was one of the core factors that undermined the Department's previous attempt to address the requirements of this provision. In addition, if the data captured by InTime were more straightforward and easily extracted, the proportion of "Could Not Determine" (an average of 14% per month) would decrease and it is possible that the

"% Steady" statistic would be even higher. The Department is encouraged to continue to address the usability and accuracy of InTime data.

| Facility-Controlled Reasons that Assigned Staff Did Not Work Post | | | | | | | |
|---|---|---|---|---|---|---|---|
| | July 24 | Aug 24 | Sept 24 | Oct 24 | Nov 24 | Dec 24 | **AVERAGE** |
| # posts | ~ | N=837 | N=810 | N=837 | N=810 | N=837 | |
| Could Not Determine | ~ | 14% | 17% | 13% | 15% | 11% | 14% |
| Assigned Elsewhere | ~ | <1% | 1% | 1% | 1% | 1% | 1% |

The table below shows the proportion of posts that were not worked by the steady officer for reasons NCU considered to be "outside the facility's control." For the most part, these include reasons that the officer did not come to work—mutual/shift trading, leave, sick, personal emergency and AWOL. Collectively, these reasons impacted about 9% of the posts reviewed. Finally, in about 4% of the posts reviewed, the steady staff was not permitted to work their assigned shift because of the 10-hour exemption that protects staff who have already worked a double shift. These two dynamics (staff who did not come to work, and the relief provided to staff who work overtime) are intertwined with the Department's efforts to address staff absenteeism and should decrease as the Department adopts effective strategies in this area.

| Dynamics Influencing Steady Staffing that NCU Considers Outside Facility Control | | | | | | | |
|---|---|---|---|---|---|---|---|
| | July 24 | Aug 24 | Sept 24 | Oct 24 | Nov 24 | Dec 24 | **AVERAGE** |
| # posts | ~ | N=837 | N=810 | N=837 | N=810 | N=837 | |
| Mutual | ~ | 5% | 3% | 3% | 1% | 2% | 3% |
| Leave | ~ | 4% | 2% | 2% | 3% | 4% | 3% |
| Sick | ~ | 2% | 1% | <1% | <1% | 1% | 1% |
| Personal Emergency | ~ | 2% | 1% | 1% | 1% | 1% | 1% |
| AWOL | ~ | 1% | 1% | 1% | <1% | ~ | 1% |
| Time Due | ~ | <1% | <1% | <1% | ~ | ~ | <1% |
| 10-hour Exemption | ~ | 4% | 5% | 4% | 4% | 4% | 4% |

**Conclusion**

Overall, the implementation of consistent staffing in Building 2 at RNDC is off to a solid start, with 72% of posts worked by the assigned staff on any given day. This is an important achievement given the various problems that undermined the Department's previous attempt to address the requirements of this provision. Efforts to improve the accuracy/usability of InTime data and strategies to address staff absenteeism/overtime may result in an even higher proportion of staff working their assigned posts. To achieve Substantial Compliance with this provision, the Department must demonstrate a similar level of consistency across the other three areas targeted by the RNDC Plan. RNDC reports that most of the posts in Building 3 and Mods 1 & 2 have been assigned to specific staff, but the Department has chosen not to begin auditing these areas of the facility until a Unit Manager is assigned, which should occur during the next monitoring period once the ADW and DW promotions have settled. Current progress in this area is sufficient for the compliance rating to be upgraded to Partial Compliance. Given the overlapping requirements, progress on ¶ 17 of the Consent Judgment also reflects progress on § D., ¶ 1 of the First Remedial Order.

| COMPLIANCE RATING | ¶ 17. (18-year-olds) Partial Compliance |
|---|---|

| CJ § XII. Screening & Assignment of Staff, ¶¶ 1-3 (Promotions) |
|---|

¶ 1. *Promotions.* Prior to promoting any Staff Member to a position of Captain or higher, a Deputy Commissioner shall review that Staff Member's history of involvement in Use of Force Incidents, including a review of the

      (a) [Use of Force history for the last 5 years]

      (b) [Disciplinary history for the last 5 years]

      (c) [ID Closing memos for incidents in the last 2 years]

      (d) [Results of the review are documented]

¶ 2. DOC shall not promote any Staff Member to a position of Captain or higher if he or she has been found guilty or pleaded guilty to any violation in satisfaction of the following charges on two or more occasions in the five-year period immediately preceding consideration for such promotion: (a) excessive, impermissible, or unnecessary Use of Force that resulted in a Class A or B Use of Force; (b) failure to supervise in connection with a Class A or B Use of Force; (c) false reporting or false statements in connection with a Class A or B Use of Force; (d) failure to report a Class A or Class B Use of Force; or (e) conduct unbecoming an Officer in connection with a Class A or Class B Use of Force, subject to the following exception: the Commissioner or a designated Deputy Commissioner, after reviewing the matter, determines that exceptional circumstances exist that make such promotion appropriate, and documents the basis for this decision in the Staff Member's personnel file, a copy of which shall be sent to the Monitor.

¶ 3. No Staff Member shall be promoted to a position of Captain or higher while he or she is the subject of pending Department disciplinary charges (whether or not he or she has been suspended) related to the Staff Member's Use of Force that resulted in injury to a Staff Member, Inmate, or any other person. In the event disciplinary charges are not ultimately imposed against the Staff Member, the Staff Member shall be considered for the promotion at that time.

Strong leadership and supervision are crucial to the Department's efforts to reform the agency. The requirements of Consent Judgment § XII, ¶¶ 1-3 are designed to ensure that those staff selected for promotion to supervisory ranks are appropriately screened for selection. The requirements of the First Remedial Order (dkt. 350), § A, ¶ 4 and Action Plan (dkt. 465), § C, ¶ 3(ii-iii) are designed to increase the number of supervisors working in the facilities and improve the quality of supervision, and these provisions are discussed separately in the compliance assessment for First Remedial Order (dkt. 350), § A, ¶ 4.

**Background on Compliance Assessment**

The first compliance assessment for Consent Judgment § XII, ¶ 1 occurred for the 3rd Monitoring Period (August to December 2016). At this time, the Department was found to be in Partial Compliance and remained so through the 4th Monitoring Period (January to June 2017). The Department was found in Substantial Compliance from the 5th Monitoring Period (July to December 2017) through the 12th Monitoring Period (January to June 2021). This provision was not rated in the 14th Monitoring Period (January to June 2022). The Department was found in Partial Compliance in the 15th Monitoring Period (July to December 2022) and then moved to Non-Compliance from the 16th

Monitoring Period (January to June 2023) to the 17th Monitoring Period (July to December 2023). The Department again achieved Partial Compliance in the 18th Monitoring Period (January to June 2024).

The first compliance assessment for Consent Judgment § XII, ¶ 2 occurred for the 3rd Monitoring Period (August to December 2016). At this time, the Department was found to be in Partial Compliance and remained so through the 4th Monitoring Period (January to June 2017). The Department achieved Substantial Compliance from the 5th Monitoring Period (July to December 2017) through the 9th Monitoring Period (July to December 2019), before being found in Non-Compliance in the 10th Monitoring Period (January to June 2020). The Department again achieved Substantial Compliance from the 11th Monitoring Period (July to December 2020) to the 12th Monitoring Period (January to June 2021). This provision was not rated in the 14th Monitoring Period (January to June 2022). The Department continued to be found in Substantial Compliance in the 15th Monitoring Period (July to December 2022) and then moved to Partial Compliance from the 16th Monitoring Period (January to June 2023) to the 18th Monitoring Period (January to June 2024).

The first compliance assessment for Consent Judgment § XII, ¶ 3 occurred for the 3rd Monitoring Period (August to December 2016). At this time, the Department was found to be in Partial Compliance and remained so through the 4th Monitoring Period (January to June 2017). The Department achieved Substantial Compliance from the 5th Monitoring Period (July to December 2017) through the 9th Monitoring Period (July to December 2019), before being found in Partial Compliance in the 10th Monitoring Period (January to June 2020). The Department again achieved Substantial Compliance from the 11th Monitoring Period (July to December 2020) to the 12th Monitoring Period (January to June 2021). This provision was not rated in the 14th Monitoring Period (January to June 2022). The Department continued to be found in Substantial Compliance in the 15th Monitoring Period (July to December 2022) and then moved to Partial Compliance from the 16th Monitoring Period (January to June 2023) to the 18th Monitoring Period (January to June 2024).

**Promotion of Staff**

The Monitoring Team continues to emphasize that the staff the Department chooses to promote sends a message about the leadership's values and the culture it intends to cultivate and promote, and their behavior sets an example for Officers.[87] Given the impact that promotion selections have on the

_____

[87] As discussed in detail in the Monitor's October 28, 2019 Report (dkt. 332) at pg. 199; the Monitor's April 3, 2023 Report (dkt. 517) at pgs. 210-216; the Monitor's July 10, 2023 Report (dkt. 557) at pgs. 74-

overall departmental culture, the Monitoring Team closely reviews the screening materials and scrutinizes the basis for promoting staff throughout the Department. Active, effective supervision is fundamental to the changes in departmental culture and practice that are needed to effectuate the reforms required by the *Nunez* Court Orders. The long-standing supervisory void—in both number and aptitude—is a leading contributor to the Department's inability to alter staff practice and to make meaningful changes to its security operation.[88]

This compliance assessment covers the following: the number of staff promoted since 2017, the status of the Department's revision of the pre-promotional screening policy, a summary of all staff promoted from July to December 2024, and the Department's compliance with the screening process for these individuals.

**Overview of Staff Promotions from 2017 to 2024**

The Department promoted the following number of staff to each rank through December 31, 2024:

|  | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|
| Captains | 181 | 97 | 0 | 0 | 0 | 0 | 26 | 50 |
| ADWs | 4 | 13 | 3 | 35 | 0 | 26 | 10 | 0 |
| Deputy Wardens | 5 | 3 | 8 | 0 | 1 | 0 | 5 | 0 |
| Wardens | 2 | 5 | 1 | 2 | 4 | 0 | 0 | 3 |
| Chiefs | 3 | 2 | 3 | 0 | 4 | 0 | 0 | 2 |

**Screening Policy**

The Department addresses the requirements of ¶¶ 1 to 3 in Directive 2230 "Pre-Promotional Assignment Procedures." The Directive has been revised a number of times since it was first updated in the Third Monitoring Period.[89] In March 2023, the Monitoring Team submitted feedback to the

---

[77]; the Monitor's December 22, 2023 Report (dkt. 666) at pgs. 78-86; the Monitor's April 18, 2024 Report (dkt. 706) at pgs. 9, 68 and 146; and the Monitor's November 22, 2024 Report (dkt. 802) at pgs. 61 and 160-161.

[88] *See* the Monitor's November 8, 2023 Report (dkt. 595) at pgs. 26-28 for further discussion of the aspects contributing to the Department's supervisory deficit.

[89] The Directive was previously revised in the 8th Monitoring Period (*see* Monitor's October 28, 2019 Report (dkt. 332) at pg. 198). The Directive was described more generally in the Monitor's April 3, 2017 Report (dkt. 295) at pgs. 190-192. Additional revisions were made in November 2022 (the Fifteenth Monitoring Period) as described in the April 3, 2023 Report (dkt. 517) at pgs. 211-212 and in May 2023 (the Sixteenth Monitoring Period) as described in the December 22, 2023 Report (dkt. 666) at pg. 80.

Department with recommended revisions to the policy as outlined in the Monitor's December 22, 2023 Report (dkt. 666) at pgs. 80-81. After the Monitoring Team submitted these recommendations, the Department reported they would revise the policy before the next round of promotions but failed to do so and promoted additional staff.[90] As a result, the Court issued its August 10, 2023 Order (dkt. 564) requiring the Department to update its policy and procedures related to the pre-promotional screening process in consultation with and subject to the approval of the Monitor. **The Department reported during the past three Monitoring Periods that it has been working on revisions to the policy governing pre-promotional screening but has not provided any proposed revisions to the Monitoring Team.**

As discussed in more detail below,[91] the Department has started to incorporate the Monitoring Team's recommendations into its screening process in practice, but the policy has not been updated.

However, it is critical that these recommendations be formally incorporated into a revised and promulgated policy. This is necessary to ensure that these recommendations to Department policy are embedded in practice going forward so that the issues identified by the Monitoring Team do not re-emerge if/when this process is managed by new staff.[92]

**Overview of Promotions in This Monitoring Period**

A total of three staff were promoted in this Monitoring Period. The three staff were all promoted to Warden. A brief summary of those promoted is outlined below:

- **Promotions to Warden**.[93] In October 2024, three individuals were appointed to serve as the Wardens of RMSC, RNDC, and RESH. Prior to their October 2024 promotions, all three

---

[90] *See* the Monitor's July 10, 2023 Report (dkt. 557) at pg. 162; the Monitor's April 18, 2024 Report (dkt. 706) at pgs. 12-15, 47, 64-68, and 195-196; the Monitor's June 27, 2024 Report (dkt. 735) at pg. 3; and the Monitor's November 22, 2024 Report (dkt. 802) at pgs. 12, 56-61, 191, and 224-227.

[91] *See also* the Monitor's November 22, 2024 Report (dkt. 803) at pgs. 162-164.

[92] The Monitoring Team's March 2023 recommendations to improve practice include recommendations that were made for many years prior to the issuance of the March 2023 recommendations. Some of the March 2023 recommendations for improved practice were previously addressed for a short period of time and then the prior practice re-emerged, while other recommendations for improved practice were never addressed and so the concerning practices continued unabated. *See* the Monitor's December 22, 2023 Report (dkt. 666) at pgs. 80-81.

[93] The requirements for promoting a staff member to Warden under the current screening policy are described in the Monitor's April 18, 2024 Report (dkt. 706) at pg. 149.

individuals had already been working as the Acting Wardens of these same facilities. The Monitoring Team received all the screening materials and forms completed for these staff. All Divisions conducted pre-promotional screening, and two of the three individuals were recommended by all Divisions. The third candidate was not recommended by one Division. However, none of the three staff had two Class A/B UOF violations within the past five years pursuant to the Consent Judgment, § XII, ¶ 2 nor pending UOF-related disciplinary charges pursuant to the Consent Judgment, § XII, ¶ 3. Although not required by the Consent Judgment, prior to their promotions, the staff were not interviewed by the Promotional Board or Commissioner pursuant to the Department's pre-promotional screening policy.

**Assessment of Screening Materials**

The screening requirements of the Consent Judgment were developed to guide the Department's identification of Supervisors with the proper attributes. In particular, the Consent Judgment requires the Department to consider a staff member's use of force and disciplinary history (¶ 1(a)-(d)) and mandates that staff members may not be promoted if they have guilty findings on certain violations (¶ 2) or pending UOF disciplinary charges (¶ 3). The promotion process itself is guided by multiple factors and is depicted in the Monitor's April 3, 2024 Report (dkt. 517) at Appendix C (Flowchart of Promotions Process).

**Review of Candidates (¶ 1)**

The Monitoring Team's review of the screening materials for the three staff promoted during this Monitoring Period satisfied the requirements of the "Review" as defined by ¶ 1. All three staff were screened close in time to their date of promotion.

Even though the Department has not yet formally revised its policy, it did incorporate some of the Monitoring Team's recommendations from the March 2023 feedback into its pre-promotional screening during this Monitoring Period as described below:[94]

- **Document the Basis for Staff Promoted with Negative Recommendations from a Division**. The Monitoring Team recommended that any candidate who is not recommended for promotion

---

[94] These recommendations were also incorporated into the Department's pre-promotional screening for staff promoted in the 18th Monitoring Period as described in the Monitor's November 22, 2024 Report (dkt. 802) at pgs. 163-164.

on one or more screening forms be appropriately scrutinized and, if the Department determines that they should be promoted that appropriate information is available for Monitoring Team's review. It must be emphasized that because someone was not recommended for promotion does not mean that they should be automatically disqualified from promotion. However, it does require greater scrutiny, and therefore, the Monitoring Team has requested the Department document the basis for promotion when promoting staff with negative recommendations. Two of the individuals promoted to Warden were recommended by all Divisions, however the third individual promoted to Warden was not recommended by one Division. The Department did not document its basis for promoting the staff member despite the one negative recommendation. However, the Monitoring Team's review suggests that the Department's determination to promote this individual was reasonable and the basis for the negative recommendation did not raise concerns about the individuals' fitness to serve in a leadership position.

- **Review Personnel Determination Review ("PDR") Records**. The Monitoring Team recommended that the Department should designate a specific Division to conduct a holistic review of PDR records. The Department reported the PDR records were evaluated for staff promoted during this Monitoring Period and documented the findings.

- **Consult Both ID Units**. The Monitoring Team recommended that the Department should consult with both the ID Special Investigations Unit ("SIU") and the ID UOF Unit in future pre-promotional screening processes and document the review and recommendations of both units. The Department reported that both ID and SIU were consulted as part of the screening process in this Monitoring Period.

- **Conduct a Holistic 2-in-5 Assessment**. The Monitoring Team recommended that the Department designate a central person or Division to evaluate PDRs, Command Disciplines ("CDs"), and Memorandum of Complaint ("MOC") charges together when doing the 2-in-5 assessment. The Legal Division conducted and documented this holistic 2-in-5 assessment as part of the completed screening process in this Monitoring Period.

- **Comply with Directive 2230 when Conducting Pre-Promotional Screening**. The Monitoring Team recommended the Department comply with its own pre-promotional screening policies and procedures. In this Monitoring Period, while most requirements of the policy were followed, all three staff were promoted to Warden without undergoing interviews with both a Promotions Board and the Commissioner as required under the current policy. Given that these

staff had served as Acting Wardens prior to their promotion, the need to explore their qualifications and methodology through a formal interview process is less critical given their demonstrated ability to serve in the role. That said, it is important for DOC to ensure it follows its own policies and procedures.

Overall, the Department has taken steps to address some of the Monitoring Team's March 2023 recommendations in practice, but failed to comply with the interviewing requirements set out within the Department's screening policy and did not document their basis for promoting one staff member with a negative recommendation as requested by the Monitoring Team. Accordingly, the Department remains in Partial Compliance. It is critical for the Department to revise its policies and procedures and ensure that the policy is followed, and the screening process is conducted with integrity in order to achieve Substantial Compliance. Additionally, the promotions in this Monitoring Period related to only three individuals. It is necessary to evaluate how the Department will implement these requirements for a larger promotion class.

## Disciplinary History (¶ 2)

Staff members may not be promoted if they have been found guilty of certain violations twice within five years unless the Commissioner finds that there are exceptional circumstances that merit promotion ("2-in-5 assessment"). The Monitoring Team had concerns about this process as outlined in prior reports.[95] None of the staff promoted in this Monitoring Period met this threshold for exclusion. The Monitoring Team's review of available records confirmed this finding.

As described above, the Legal Division conducted and documented the 2-in-5 assessments for the staff promoted to Warden that included Negotiated Plea Agreements ("NPAs"), PDRs, and CDs for the first time since the Monitoring Team's March 2023 feedback was submitted. This 2-in-5 assessment is an important step forward in improving the pre-promotional screening process, but the policy must be revised to ensure the holistic 2-in-5 assessment is always completed in practice going forward. As a result, the Department has moved out of Non-Compliance and into Partial Compliance. The Department must revise its policy to include the 2-in-5 assessment and ensures this process is conducted with fidelity in order to achieve Substantial Compliance with this provision.

---

[95] These concerns are explained in further detail in the Monitor's April 3, 2023 Report (dkt. 517) at pgs. 212-215, Monitor's December 22, 2023 Report (dkt. 666) at pg. 85, and Monitor's April 18, 2024 Report (dkt. 706) at pgs. 150-151.

**Pending Disciplinary Matters (¶ 3)**

The Department's screening process for promotion assesses whether the candidate has pending discipline for use of force related misconduct. None of the three staff promoted in this Monitoring Period had pending disciplinary charges at the time of promotion. Accordingly, the Department is in Substantial Compliance with this provision.

**Conclusion**

The screening process in this Monitoring Period reflects improved steps taken by the Department to conduct its pre-promotional screening process with increased fidelity and to address the Monitoring Team's recommendations and the requirements of the *Nunez* Court Orders. However, the Department must update its policies and procedures, pursuant to the August 10, 2023 Order (dkt. 564), to ensure they reflect the requirements of the *Nunez* Court Orders and so the screening process is conducted with consistency and fidelity going forward.

| COMPLIANCE RATING | ¶ 1. Partial Compliance<br>¶ 2. Partial Compliance<br>¶ 3. Substantial Compliance |
| --- | --- |

| FIRST REMEDIAL ORDER § A., ¶ 4 (SUPERVISION OF CAPTAINS) & ACTION PLAN § C, ¶ 3 (II-III) |
|---|

First Remedial Order ¶ 4. *Supervision of Captains*. The Department, in consultation with the Monitor, shall improve the level of supervision of Captains by substantially increasing the number of Assistant Deputy Wardens ("ADWs") currently assigned to the Facilities. The increased number of ADWs assigned to each Facility shall be sufficient to adequately supervise the Housing Area Captains in each Facility and the housing units to which those Captains are assigned and shall be subject to the approval of the Monitor.

> i.    Within 60 days of the Order Date, RNDC, and at least two other Facilities to be determined by the Commissioner in consultation with the Monitor, shall satisfy the requirements of this provision.

> ii.   Within 120 days of the Order Date, at least three additional Facilities to be determined by the Commissioner in consultation with the Monitor, shall satisfy the requirements of this provision.

> iii.  By December 31, 2020, all Facilities shall satisfy the requirements of this provision.

Action Plan § C, ¶ 3 ii. *Increased Assignment of Captains in the Facility:* Complete a full evaluation of the assignment of all Captains and develop and implement a plan to prioritize assignment of Captains to supervise housing units to increase Captain presence on housing units.

Action Plan § C, ¶ 3 iii. *Improved Supervision of Captains*: Substantially increase the number of Assistant Deputy Wardens currently assigned to the facilities or a reasonable alternative to ensure that there is adequate supervision of Captains.

This provision of the First Remedial Order § A., ¶ 4, in conjunction with Action Plan (dkt. 465), § C, ¶ 3 (ii-iii), requires the Department to improve staff supervision by promoting and deploying additional ADWs within the facilities to better supervise Captains. The goal of these provisions is to ensure that Captains are properly managed, coached, and guided in order to elevate their skill set, so that they in turn better supervise the officers on the housing units. Thus, an assessment of adequate supervision requires an examination of both layers of supervision — ADWs and Captains. The Department's inability to achieve substantial compliance with this provision and other provisions related to its overall management resulted in additional remedial relief, including two provisions in the Action Plan (dkt. 465) (§ C, ¶ 3 (ii-iii)) requiring an increase in the number of Captains and ADWs assigned to the facilities. Action Plan (dkt. 465), § C, ¶ 3 (ii) requires the Department to evaluate the assignments of all Captains and to implement a plan prioritizing Captains' assignments to supervise housing units in the facilities. In addition, Action Plan (dkt. 465), § C, ¶ 3 (iii) further requires the Department to increase the number of ADWs assigned to the facilities to ensure Captains are adequately supervised.

The initial compliance assessment for the First Remedial Order § A., ¶ 4 was Partial Compliance in the 11th Monitoring Period. The compliance assessment then regressed to Non-

Compliance for the 12th and 14th Monitoring Periods, before it was again placed in Partial Compliance in the 15th Monitoring Period. However, the compliance assessment again regressed back to Non-Compliance in the 16th Monitoring Period (January to June 2023), and has since remained in Non-Compliance.

The Court's 2024 Contempt Order (dkt. 803) found Defendants in contempt for failing to comply with the First Remedial Order ¶ 4 and Action Plan § C, ¶ 3 (ii-iii). The Court explained the basis for its finding at pages 26 to 31 in section "Failure to Adequately Supervise Staff and Facility Leadership" of the Order.

For the current Monitoring Period, the Department remains in Non-Compliance with this provision. A compliance assessment rating has not been provided for Action Plan § C, ¶ 3 (ii-iii), however, given these provisions are intrinsically intertwined with First Remedial Order § A., ¶ 4, the rating for First Remedial Order § A., ¶ 4 reflects the rating that would be assigned to the Action Plan § C, ¶ 3 (ii-iii).

## Goals of Supervision

In this report, the Monitoring Team reiterates its concerns discussed in prior reports in order to emphasize their importance and because the concerns have not substantially changed since this provision went into effect.[96] Changing staff practice will require an infusion of correctional expertise in a form that reaches more broadly, deeply, and consistently into staff practice than facility leadership has been able to accomplish to date.

Improving staff practice requires not only an appropriate number of supervisors but also supervisors who provide *quality* supervision. Increasing staff's ability and willingness to utilize proper security practices rests on the supervisors' ability and willingness to confront poor practices and teach new ones. Definitive steps to ensure that staff are available in sufficient numbers and are properly assigned are important, but it is equally critical that staff *actually do their jobs*, which requires thorough training, skill mastery, and the confidence to implement the expected practices and to enforce rules. Too often, staff are present and yet fail to enact or enforce even the most

---

[96] This section incorporates the discussion from the Monitor's November 8, 2023 Report (dkt. 595) at pgs. 25-28, the Monitor's December 22, 2023 Report (dkt. 666) at pgs. 14-16, the Monitor's April 18, 2024 Report (dkt. 706) at pgs. 64-68, and the Monitor's November 22, 2024 Report (dkt. 802) at pgs. 56-61.

basic security protocols. Supporting and improving staff's confidence and skill mastery should be a core responsibility of the Department's supervisors, but it is not currently occurring as it must. Improved practice by line staff requires ongoing, direct intervention by well-trained, competent supervisors—guiding and correcting staff practice in the moment as situations arise. Only with this type of hands-on approach will the Department be able to confront and break through staff's inability, resistance, and/or unwillingness to take necessary actions.

Currently, the supervisory ranks are unprepared to support the weight of the strategies that place them at the center of officers' skill development. Compounding the problem of too few supervisors is the reality that many of those holding the ranks of ADW and Captain have only marginal competence in the skills necessary to provide *effective* supervision. Supervision cannot be passive—these individuals must have an active presence in the housing units, demonstrating the requisite skills, providing opportunities for staff to practice them, and helping staff to understand and eventually overcome what hinders their ability to utilize the skills they are being taught consistently.

The dynamic between Captains and officers is crucial for maintaining order and security within housing areas, yet the dynamic appears fundamentally compromised in this Department. Captains must embody the role of mentors, attentively listen to frontline staff, and actively work towards resolving issues, thereby fostering a supportive environment and effective operation. Unfortunately, the relationship between officers and Captains is too often described in ways suggesting that it subverts progress rather than accelerates it. Captains often appear to be either unclear about their responsibilities or fail to embrace them according to reports from facility leadership and staff and as observed during the Monitoring Team's work on site. This often leads to a superficial execution of duties, where Captains do not appear to routinely conduct substantive tours or, in some instances, fail to conduct tours at all. Too often, Captains conduct tours but often fail to tour the whole unit or address obvious issues within their assigned housing areas. For example, officers report concerns such as incarcerated individuals' frustration over inadequate supplies or service disruptions, but Captains do not investigate the underlying causes nor seek solutions, choosing instead to move on to the next task. This abdication of responsibility leaves officers feeling unsupported and disinclined to fulfill their own duties.

The Department simply does not have the necessary assets among its current corps of supervisors to provide the type and intensity of hand-to-hand coaching that is required, and the system does not adequately select, train, or prepare them for the task at hand. In addition to the Captains' need for intensive guidance, ADWs also need substantial and quality coaching, supervision, and mentoring from their superiors to develop into the type of supervisor that is so sorely needed in this Department. The task of cultivating the ADWs will largely fall to the Deputy Wardens and Wardens/Assistant Commissioner's in each command, which brings yet another layer of complexity to the supervision problem and the task of reforming the Department's practices.

**<u>Scheduling</u>**

In 2023, the Department's former Staffing Manager took several steps to increase the number of DWs and ADWs assigned to facilities so that Captains would be more directly and robustly supervised. To that end, ADWs' schedules were altered to distribute the number of ADWs more evenly across the three tours and weekdays/weekends. In addition, the DWs are scheduled consistently, including on the weekends,[97] however they are not scheduled to work overnight. The Department reports that these scheduling changes were maintained when a new Staffing Manager assumed management of the Office of Administration during the last Monitoring Period and continued through the current Monitoring Period. Each week, the Office of Administration's Scheduling and Roster Management Unit ("SMART") develops a template schedule for each facility, which includes required weekend and evening tours for ADWs, although the facilities are responsible for assigning the specific ADWs to each tour. Altering the schedule to ensure that supervisors are present during the facilities at all times is an important step. Given the problems that have occurred historically with the scheduling process at the facility level[98], the Monitoring Team previously recommended that the Office of Administration closely scrutinize the scheduling of supervisors to ensure that ADWs are scheduled for their shifts as designed. Staff from the Office of Administration's Scheduling and Roster Management Unit

---

[97] Prior to the scheduling changes made by the former Staffing Manager, DWs were not scheduled to work on weekends.

[98] *See* the Monitor's March 16, 2022 Report (dkt. 438) at pgs. 32-43, the Monitor's October 28, 2022 (dkt. 472) at pg. 35, the Monitor's April 3, 2023 Report (dkt. 517) at pgs. 17-22, the Monitor's October 5, 2023 Report at pg. 10, the Monitor's April 18, 2024 Report (dkt. 706) at pgs. 16, 267-268, and the Monitor's May 24, 2025 Report (dkt. 712) at pg. 15.

monitor the facilities' scheduling of DWs and ADWs to ensure they are adequately distributed across all tours.

While it is a notable improvement that there is more evenly distributed supervision across the daily and weekly schedules, there is still no consistent scheduling of ADWs and Captains within the facilities, which means that the same supervisors are not consistently working with the same staff. This lack of continuity impedes the supervisors' abilities to serve as effective mentors or follow through on resolutions to staff and PIC concerns. This further compounds the challenges presented by the insufficient number of supervisors assigned to the facilities.

**Organizational Structure and Number of Supervisors**

The inability to provide adequate supervision is in part a function of the Department's organizational structure. Most correctional systems have three supervisor ranks, but this Department has only two (Assistant Deputy Warden and Captain). Because most ADWs serve as Tour Commanders, in practice, Captains are the only uniform supervisors routinely available to provide hands-on oversight of officers, and Captains are not actively supervised by ADWs. In most systems, an additional supervisory rank fills these gaps. Without this additional level of supervision, Captains are left without the necessary active supervision to develop the skills needed for their roles.

The problem presented by the Department's truncated chain of command is further exacerbated by the insufficient number of individuals holding the two ranks. Many of the facilities' leaders have reported during routine updates to the Monitoring Team that they believe they have insufficient numbers of Captains, which is negatively impacting their operations. Two tables that identify the number and assignment of ADWs and Captains at specific points in time from July 18, 2020 to December 28, 2024 are included in Appendix F, Tables 1 and 2. Echoing the findings of the previous three Monitoring Periods,[99] during the current Monitoring Period, the number of supervisors remained insufficient to provide the type of *intensive* supervision—throughout the chain of command—that is needed to elevate officers' skills.

---

[99] *See* the Monitor's December 22, 2023 Report (dkt. 666) at pgs. 15-16, the Monitor's April 18, 2024 Report (dkt. 706) at pgs. 64-68, and the Monitor's November 22, 2024 Report (dkt. 802) at pgs. 56-61.

- **ADWs**. Both the First Remedial Order (dkt. 350), § A, ¶ 4 and Action Plan (dkt. 465), § C, ¶ 3 (iii) require an increase in the number of ADWs. While the number of available ADWs assigned to the facilities has increased during certain periods of time, the number of ADWs currently assigned to the facilities (n=60) is only 15% higher than when the First Remedial Order went into effect (n=52 as of July 18, 2020) and 22% higher than when the Action Plan went into effect (n= 49 as of June 18, 2022). This is notable given that the current number of ADWs available Department-wide (n=87) is 32% higher than when the First Remedial Order went into effect (n=66). In other words, the overall number of ADWs in the Department has increased, but the number of ADWs in the facilities has not. In fact, the proportion of ADWs assigned to the facilities decreased from 79% as of July 18, 2020, to 69% as of December 28, 2024. Accordingly, the number of ADWs remains insufficient to supervise the requisite number of Captains (*i.e.*, each ADW has too many Captains to provide quality supervision) particularly when most ADWs work as Tour Commanders. To address this problem, a larger proportion of ADWs should be assigned to the facilities in order to provide quality supervision to the Captains.

- **Captains**. Since 2020, both the number and proportion of Captains assigned to work in the facilities has decreased. The number of Captains decreased by 37% (from 558 as of July 18, 2020, to 352 as of December 28, 2024) and the proportion of Captains assigned to the facilities decreased slightly (from 69% as of July 18, 2020, to 64% as of December 28, 2024). In other words, over one-third of all available Captains are *not* assigned to facilities or court commands. This is the lowest proportion assigned to the facilities since July 2020.

The overall dearth of supervisors will continue to require significant focus and attention in order to both obtain the necessary numbers and, crucially, to ensure the individuals have the requisite skill set to properly supervise their subordinates.

## Training for Supervisors

Ensuring that supervisors have an appropriate skill set to supervise their subordinates begins with training those who are selected for promotion. The Monitoring Team has previously reported on the poor quality of pre-promotional training curricula.[100] During the last Monitoring

---

[100] *See, for example,* Monitor's July 10, 2023 Report (dkt. 557) at pgs. 71-83.

Period, the Department's Training and Development Division, in collaboration with the Monitoring Team, developed a Captains Leadership Training in response to concerns raised during exit interviews by resigning officers about strained relationships and a lack of support from Captains. The Department began conducting the Captain's In-Service Leadership Training during the current Monitoring Period.[101] The training demonstrates a well-structured and comprehensive approach to leadership development. The curriculum covers core areas such as building and leading teams, effective communication, and transformational leadership, with clear learning objectives and practical applications. The training materials reflect thoughtful design, incorporating interactive exercises and discussion points that address theoretical concepts and challenges faced in the facilities. The Department was responsive to feedback from the Monitoring Team, strengthening the content to address specific leadership gaps exhibited by Captains. Overall, the training represents a solid foundation for enhancing leadership skills among Captains. However, due to staffing challenges, the training has so far been delivered to only a small number of captains.

Following the close of this Monitoring Period, the Monitoring Team worked closely with the Training and Development Division on the pre-promotional training for Deputy Wardens. The training was developed under the new Deputy Commissioner of Training on an accelerated timeline. The final version of the training program reflects significant improvement, as the Department actively incorporated the Monitoring Team's feedback throughout the development process. At the recommendation of the Monitoring Team, the Training Division also worked closely with Department executive staff and uniform leadership to strengthen the content, adding operational examples, real-life case studies, practical tools like sample reports and checklists, and focused guidance on core responsibilities such as rapid reviews, data analysis, and supervisory accountability. The curriculum evolved from a largely theoretical framework into a practical, action-oriented program that focused on relevant skill building necessary for the position and critical thinking needed to manage facility operations effectively. The complete 10-day course covers leadership development, operational oversight, crisis response, and administrative management, introducing leadership models, data tools, and management strategies. The

---

[101] The Captains' pre-promotional training curricula was also discussed in the Monitor's November 22, 2024 Report (dkt. 802) at pgs. 60-61.

Department was responsive and open to the feedback from the Monitoring Team and the final product reflected the benefit of that collaboration.

During the previous Monitoring Period, the Monitoring Team provided feedback on the ADW Pre-Promotional Training, which the Training and Development Division continues to revise, with completion expected in the next Monitoring Period.

## Conclusion

Overall, the Department continues to struggle with adequate supervision. The Department has taken important steps in improving and refining its training programs for supervisors and actively engaging the Monitoring Team in development of reasonable training programs. Further, while the overall increase in the number of ADWs since the First Remedial Order is a positive step forward, the decreasing proportion of ADWs assigned to facilities is compounding the Department's long-standing inadequacies regarding staff supervision. However, the lack of quality staff supervision is a leading contributor to the Department's inability to alter staff practice and to make meaningful changes to basic security practices and operations. As a result, the Department remains in Non-Compliance with this provision.

| COMPLIANCE RATING | § A., ¶ 4. Non-Compliance |
|---|---|

| ACTION PLAN, § A, ¶1(D) (IMPROVED ROUTINE TOURS) |
|---|
| AP, § A, ¶ 1(d). *Improved Routine Tours*. The Department shall conduct routine tours, including, but not limited to, tours of the housing units every 30 minutes. The Department shall immediately institute improved practices to ensure that routine touring is occurring, including the use of the "tour" wand by Correction Officers during each tour conducted. The Office of the Commissioner shall audit the electronic records of tours conducted by uniform staff to ensure compliance with touring requirements. |

Routine and adequate touring of housing units is a fundamental component of sound correctional practice. For years, the Monitoring Team has found that officers and Captains do not tour the units as often as required and that their tours are often not substantive or meaningful (e.g., they do not look into the cell door windows to verify the safety of the individual). Staff's failure to adequately tour the housing units has contributed to the units' overall state of dysfunction and to the high rates of unnecessary and excessive uses of force and serious acts of violence. The lack of adequate touring has also been identified as a contributing factor in several deaths in custody. As a result of the deficiencies in staff tours, the Action Plan includes requirements to improve routine housing unit tours § A, ¶ 1(d).

The Court's 2024 Contempt Order (dkt. 803) found the Defendants in contempt for failing to comply with this provision. The Court explained the basis for its finding on page 15 in section "Deaths in Custody" and on page 23 in section "Failure to Correct Failures in Security and Basic Correctional Practice" of the Order.

The Monitoring Team does not provide a compliance rating for this provision because it is not one of the select group of provisions defined by Action Plan § G, ¶ 5(b) for which the Monitoring Team is required to do so. Accordingly, for this report, the Monitoring Team simply provides an update on the Department's efforts to achieve compliance.

**Background**

Staff must visually inspect the housing units, particularly when incarcerated individuals are confined to their cells, to ensure the welfare of people in custody, to respond to their concerns and to address any problems that arise. These tours should occur at regular intervals throughout each shift, every 30 minutes for officers and three times (each at least one hour apart) per 8-hour shift for Captains. Since the inception of the Action Plan, even with its specific requirements related to housing unit tours, meaningful change in staff touring has not been observed.

128

**DOC's Assessment of Staff Tours**

DOC has a number of ways through which it can assess whether staff tours occurred.

- **NCU Audits**. The NCU's random security audits of housing units are replete with examples of staff who were off post (and thus could not tour), who failed to tour, and who tapped the sensor with the tour wand but took no action to verify the individuals' safety inside of cells. The findings from these NCU audits are demonstrated in the table below. NCU's findings are consistent with the Monitoring Team's findings via observations of staff practice and its routine review of use of force incidents, violent incidents, and in-custody deaths.

| NCU Security Audits' Findings regarding Staff's Deficient Touring Practices *January 2022-December 2024* | | | | |
|---|---|---|---|---|
| **Date Audited** | **# of NCU Audits Completed** | **# of Audits that found Staff Off Post** | **# of Audits that found Staff Failed to Make All Required Tours** | **# of Audits that found Staff Failed to Conduct Meaningful Tours** |
| January-June 2022 | 59 | 42 (71%) | 17 (29%) | 14 (24%) |
| July-December 2022 | 37 | 32 (86%) | 10 (27%) | 7 (19%) |
| January-June 2023 | 19 | 14 (74%) | 7 (37%) | 6 (32%) |
| July-December 2023 | 31 | 26 (84%) | 18 (58%) | 20 (65%) |
| January-June 2024 | 37 | 28 (76%) | 19 (51%) | 19 (51%) |
| July-December 2024 | 34 | 20 (59%) | 10 (29%) | 14 (41%) |

- **Tour Wands**. As part of the effort to ensure that touring occurs as required, the Department procured the Watch Tour system that includes tour wands, sensors installed in key locations on the housing units, and a software package to monitor the extent to which tours occur at the required frequency. Tour wand data simply confirms that the staff member moved throughout the unit but does not verify whether the tour actually occurred or was meaningful.

129

- **Data Analysis**. The tour wands can produce electronic information, but that basic data has not yet been maximized to develop a reliable quality assurance program about the actual performance level of staff. The data from the tour wands is available on a dashboard (developed by DOC) that can be viewed in real time by facility leadership.[102] However, the Department is not able to produce aggregate data regarding the proportion of housing units that met the "target" number of tours on any given day/shift nor does it compute other performance metrics. As a result, there is currently no reliable data to assess compliance and whether progress has been made or not. The Department reports that the Office of Management and Planning ("OMAP"), in consultation with facility operations, has been developing an improved technique to aggregate tour wand data relating to performance on a daily basis for each housing area and will consult the Monitoring Team once it is developed.

- **Quality Assurance of Tours by Uniform & Facility Leadership**. The Department also utilizes the data from the tour wands as part of a quality assurance initiative conducted by the Senior Deputy Commissioner's Office (and separate from the NCU audits) to determine if tours have occurred as required. To date, the Department's quality assurance program is inefficient, burdensome and does not produce results that support the overall goal of ensuring that tours occur as required. First, the overall management of this initiative has not had the consistent, sustained leadership needed to develop and implement an adequate quality assurance program.[103] The current quality assurance

---

[102] An example of some of the information it produces can be found in Exhibits A and B to the Declaration of Captain Gamien Batchelor (dkt. 689-7). The functionality of the dashboard permits leadership to identify close in time whether a tour occurred as it should or whether staff failed to conduct the tour. Retrospectively, the dashboard also permits a visual inspection of the tours completed on a set of housing units for a particular day/shift (which are represented by a series of dots and Xs), although the dashboard is limited in terms of the lookback window because of the large volume of data that must be processed. The dashboard also includes variables for whether the frequency of tours met the intended "target," the number of tours that were late and the longest duration between tours.

[103] Since the tour wand auditing began in fall 2023, the management of this process has changed multiple times across at least three different offices (the Office of Commissioner, the Office of the Senior Deputy Commissioner, and the Office of the Deputy Commissioner of Facility Operations). Currently, the process has been managed by the Office of the Senior Deputy Commissioner ("SDC") since March 2024, however the leadership of the team under the SDC's office has changed three times in the past year. DOC reported to the Monitoring Team that Captain Batchelor, who submitted a declaration to the Court on March 18, 2024 (dkt. 689-7) as the individual in charge of the Tour Wand Compliance Unit, was reassigned and is no longer in charge of this unit. The Department then reported that an ADW was

process is also cumbersome and time-consuming for both the entity that conducts the audit and the facilities.[104] Additionally, the Department has not aggregated the information developed in any way to determine the overall results of each audit. The Department has reported that it intends to revise the current quality assurance program but has not done so yet.

In June 2024, the Monitoring Team shared a comprehensive written feedback with the Department that included recommendations for bringing greater efficiency, clarity and utility to its audit process so that the Department can produce valid metrics that assess compliance and progress over time and tracks and confirms any corrective action that may be taken for deficiencies. The Department has not substantively responded to this feedback, but it reported it is working to improve its data tracking and revising the quality assurance process and will consult the Monitoring Team on these changes once developed.

**Corrective Action**

The Department's recordkeeping regarding staff's failure to tour, as described above, does not permit the development of aggregate data (in particular because most of the data is maintained in multiple Excel spreadsheets, logbooks, and/or is otherwise not amenable to aggregation). The Monitoring Team continues to review various disciplinary records produced by the Department, including the Excel spreadsheets tracking corrective interview referrals for staff identified through the tour wand auditing process, in order to identify discipline related to the failure to conduct meaningful housing unit tours.

---

assigned to manage the unit, but this ADW was promoted and reassigned in March 2025. The Department reports that another Captain, who previously worked on the tour wand auditing team underneath the supervision of the former ADW, has been assigned to manage the unit.

[104] The Office of the SDC has a laborious process for reviewing the tour wand dashboard and creating a table containing an entry for every tour that identifies whether the tour was in compliance or not, which is then shared with each facility. Each facility then investigates each tour deemed "not in compliance" to determine whether the SDC's assessment is accurate, or if there were reasonable, mitigating factors that prevented the officer or captain from using the tour wand as required. Genetec surveillance video footage is often reviewed for this purpose, which is incredibly time consuming.

The Monitoring Team has identified the following corrective action related to potentially deficient touring practices.[105]

- **Corrective Interview Referrals from the Quality Assurance Program**. As a result of the quality assurance program conducted by the Senior Deputy Commissioner's Office described above, 1,291 corrective interview referrals were made for staff who failed to complete all required tours. The Department does not maintain data to confirm whether the corrective interviews took place.

- **Rapid Reviews**. The following table demonstrates the corrective actions that facility leadership recommended, via Rapid Reviews, for staff's potentially deficient touring practices.

| Corrective Action for Deficient Touring Recommended via Rapid Reviews[106] *January 2022-March 2025* | | | | |
|---|---|---|---|---|
| **Date of UOF Incident** | **# of Staff Referred for Suspension** | **# of Staff Referred for Formal Charges** | **# of Staff Referred for a Command Discipline** | **# of Staff Referred for a Corrective Interview** |
| January-December 2022 | 1 | 0 | 3 | 1 |
| January-December 2023 | 0 | 4 | 17 | 10 |
| January-December 2024 | 0 | 2 | 18 | 6 |

- **Formal Discipline**. Between January 2022 and March 2025, the Department has brought 57 cases against 53 staff members for issues related to touring.[107] Of these 57 cases, 39 were resolved with an NPA, 10 were administratively filed, two had deferred prosecutions due to the resignation of the staff member, and six remain pending.

- **Discipline for Touring Practices Related to In-Custody Deaths**. From January 2022 to March 2025, a total of 27 staff were disciplined due at least in part to deficiencies in their touring practices in cases where an individual died in custody. *See* Table 3 of Appendix

---

[105] This summary is intended to update the information previously reported in the Monitor's November 8, 2023 Report (dkt. 595) at pgs. 76-79 and the Monitor's May 24, 2024 Report (dkt. 712) at pgs. 7-14, and the Monitor's November 22, 2024 Report (dkt. 802) at pgs. 259-261.

[106] This table only demonstrates *referrals* made for corrective action via the Rapid Reviews.

[107] While updating this data, the Monitoring Team determined that the Monitoring Team's prior reporting undercounted the number of formal disciplinary cases for issues related to touring. This data has been corrected and updated through March 2025. The Monitoring Team regrets the error.

C. Twenty-two staff members (two ADWs, eight Captains, and 12 officers) were suspended. One officer was suspended and then terminated. Four officers were disciplined via NPA with the loss of compensation days and limited probation.

Given the frequency with which touring deficiencies occur, and the frequency with which serious incidents occur from staffs' failure to conduct proper tours, a larger number of corrective actions would be expected.

## Conclusion & Next Steps

Overall, tours by officers and captains do not appear to be occurring as required and the current processes in place contribute little to the effort to improve staff practice. Further, given the frequency with which these deficiencies are observed, and the harm that flows from them, the number of corrective measures does not appear commensurate with the number of violations observed. It is critical that staff conduct tours as required. In the Monitoring Team's experience, this is an area in which active supervision of uniform staff would support a change in practice, and therefore tours by captains must be closely scrutinized as captains serve as role models for those staff working in the housing units. Officers often report that they do not feel adequately supported by their supervisors, so supervisors taking time to conduct quality tours of housing units would not only serve as a means of demonstrating improved practice to officers, but they can also be used to build rapport with their staff. The procedures currently used by the quality assurance program, while well-intended, must be reevaluated so that these staff resources are used in a manner that supports actual change in staff touring practices.

| FIRST REMEDIAL ORDER § A., ¶ 1 (USE OF FORCE REVIEWS) |
|---|

§ A., ¶ 1. *Use of Force Reviews*. Each Facility Warden (or designated Deputy Warden) shall promptly review all Use of Force Incidents occurring in the Facility to conduct an initial assessment of the incident and to determine whether any corrective action may be merited ("Use of Force Review"). The Department shall implement appropriate corrective action when the Facility Warden (or designated Deputy Warden) determines that corrective action is merited.

> i. The Department, in consultation with the Monitor, shall implement a process whereby the Use of Force Reviews are timely assessed by the Department's leadership in order to determine whether they are unbiased, reasonable, and adequate.
>
> ii. If a Facility Warden (or Deputy Warden) is found to have conducted a biased, unreasonable, or inadequate Use of Force Review, they shall be subject to either appropriate instruction or counseling, or the Department shall seek to impose appropriate discipline.

This provision requires facility leadership to conduct a close-in-time review of all use of force incidents ("Rapid Reviews" or "Use of Force Reviews"). Further, this provision requires the Department to routinely assess Rapid Reviews to identify any completed reviews that may be biased, unreasonable, or inadequate and address them with appropriate corrective action. The first compliance assessment for this provision occurred for the 11th Monitoring Period (July to December 2020). At that time, the Department was found to be in Partial Compliance and remained so through the 18th Monitoring Period (January to June 2024).

**Background**

Rapid Reviews are intended to identify procedural violations, recommend corrective action for staff misconduct, and also identify incidents that could have been avoidable had staff made different choices in the moment. Close-in-time use of force reviews are an essential tool for improving staff practice: they allow facility leadership to identify poor practice and to provide feedback to staff while the circumstances surrounding their decision-making are still fresh in their minds. Both the Department and Monitoring Team rely on these findings to identify patterns and trends.

**Rapid Review Data**

During this Monitoring Period, nearly all use of force incidents (3,475, or greater than 99%) were assessed via a Rapid Review. The table below presents data on the number of reviews and their outcomes since 2018.

| Rapid Review Outcomes, 2018 to 2024 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** | **2024** | **Jan-Jun. 2024** | **Jul-Dec. 2024** |
| **Incidents Identified as Avoidable, Unnecessary, or with Procedural Violations** | | | | | | | | | |
| **Number of Rapid Reviews** | 4,257 (95% of UOF) | 6,899 (97% of UOF) | 6,067 (98% of UOF) | 7,972 (98% of UOF) | 6,889 (98% of UOF) | 6,740 (99% of UOF) | 6,969 (>99% of UOF) | 3,494 (>99% of UOF) | 3,475 (>99% of UOF) |
| **Avoidable** | 965 (23%) | 815 (12%) | 799 (13%) | 1,733 (22%) | 1,135 (16%) | 630 (9%) | 322 (5%) | 163 (5%) | 159 (5%) |
| **UOF or Chemical Agent Policy Violations** | | | 345* (11%) | 1,233 (16%) | 835 (12%) | 1,161 (17%) | 3,442 (49% of UOF)[108] | 1,799 (51% of UOF) | 1,643 (47% of UOF) |
| **Procedural Violations** | 1,644 (39%) | 1,666 (24%) | 1,835 (30%) | 3,829 (48%) | 3,296 (48%) | 2,545 (38%) | | | |
| **Corrective Action Imposed by Staff Member** | | | | | | | | | |
| **Number of Staff Recommended for Corrective Action[109]** | ~ | ~ | 2,040 | 2,970 | 2,417 | 2,756 | 3,149 | 1,616 | 1,533 |
| *Note: Data for 2020 UOF/Chemical Agent Policy Violations include only July-December.* | | | | | | | | | |

During the current Monitoring Period, the Department identified violations and/or errors in practice in 47% of its use of force incidents. This proportion is slightly lower than the prior Monitoring Period but cannot be compared with Monitoring Periods before that given the current data is tracked differently.[110]

---

[108] The Rapid Review template was revised so that staff now enter *all* violations in one place, including UOF Policy violations, Chemical Agent Policy violations, and Procedural Violations. This revision was intended to improve the accuracy of information entered into the Rapid Reviews by streamlining the entry of information and removing staff's need to distinguish between the types of violations at this stage of an incident review. This revised template went into effect in January 2024.

[109] This data captures referrals for corrective action as recommended by the Rapid Reviews shared with the Monitoring Team. The Rapid Review (and therefore this data) does not include information on whether the corrective action referrals were enacted as recommended. Data on enacted corrective action, even for past Monitoring Periods, changes frequently because of protracted closures for different types of actions taken by the Department. For example, a Command Discipline can take many months to process, only to be eventually turned into an MOC, and then an MOC can take months to process to reach an NPA, and if the case goes to OATH, it can take several more months for this disciplinary referral to be fully closed out. Furthermore, a staff member can be suspended, only to have the days returned upon a Report & Recommendation from OATH. The protracted nature of enacted discipline for Rapid Review recommendations is further compounded by the various disciplinary backlogs. Data regarding the processing and outcome of disciplinary referrals is discussed in the compliance assessment for Consent Judgment, § VIII, Staff Discipline & Accountability.

[110] *See* the Monitor's April 18, 2024 Report (dkt. 706) at pgs. 54-55 for more information on why this data from previous Monitoring Periods is not easily compiled in a way that can be compared over time.

However, it remains significant that the Department identified problematic practices in nearly half its use of force incidents.

## Quality of Rapid Reviews

The Rapid Reviews are a valuable opportunity for Facility leadership to identify potential violations close in time. The Rapid Reviews certainly identify a number of issues that must be addressed, but the issue is that they do not reliably identify *all* relevant issues that could be identified via a video review, so they are sometimes incomplete.

The Monitoring Team's routine assessment of incidents continues to identify Rapid Reviews that identified some, but not all poor and/or dangerous practices and/or failed to acknowledge circumstances that indicated the incident was avoidable and the use of force was unnecessary. In particular, the Rapid Reviews most often fail to identify indicators that incidents were avoidable and explain how operational failures or staff misconduct led to incidents that may not have occurred had staff taken different actions.[111] Further, the Monitoring Team has continued to find instances where the Rapid Reviews did not identify various types of poor practice and violations, such as unnecessary or excessive use of chemical agents, use of painful escorts, failure to follow anticipated force protocols, and dangerous takedown techniques. As a result, these incomplete Rapid Reviews missed opportunities to provide much needed coaching and/or immediate corrective action and thus contribute to the persistence of the operational problems plaguing the jails and the intransigence of the problematic culture.

While Rapid Reviews certainly identify a number of relevant issues, the Monitoring Team has also found that they often include identification of violations that don't appear relevant to potential issues related to use of force or security, such as uniform violations. The Monitoring Team has recommended that the Rapid Review process focus more on staff actions and misconduct versus concerns regarding potential uniform violations.

---

[111] In 2024, Rapid Reviews found that only 5% of the incidents were avoidable, the lowest proportion since 2018. The Monitoring Team's review of incidents suggests that additional incidents were avoidable and were not identified as such by the Rapid Review. Significantly, in 2024, the Investigation Division found that Rapid Reviews failed to identify 33% of avoidable use of force incidents, which is a regression from 2023 when the Rapid Reviews failed to identify 21% of avoidable incidents.

The prior Monitor's Reports have discussed the Department's efforts to improve the quality of its Rapid Reviews.[112] Those efforts have continued with the new Deputy Commissioner of Security. The Deputy Commissioner of Security meets every weekday with leadership from each Facility to review the completed Rapid Reviews of the use of force incidents. These daily reviews permit Facility leadership and the DC to work together to modify the Rapid Reviews as necessary and discuss strategies to address the violations identified. This is a crucial feedback loop.

**Recommended Corrective Action**

In response to identified problems with staff practice, Rapid Reviews can recommend various types of corrective action, including counseling (either 5003 or corrective interviews), re-training, suspension, referral to Early Intervention, Support and Supervision Unit ("E.I.S.S."), Correction Assistance Responses for Employees[113] ("C.A.R.E."), Command Discipline ("CD"), and a Memorandum of Complaint ("MOC").

Overall, more staff were recommended for corrective action via Rapid Reviews in 2024 than in any other year since the Rapid Reviews went into effect.

- **Command Discipline**. As seen in past Monitoring Periods, a Command Discipline remains the most frequently recommended corrective action. The number and proportion of recommendations for a Command Discipline this Monitoring Period (n=1,087, 39%) is lower than the last Monitoring Period (n=1,455, 51%), but still higher than the Monitoring Period before that (n=729, 33%). The increased number of Command Disciplines in 2024 is

---

[112] *See* Monitor's July 10, 2023 Report (dkt. 557) at pg. 19; Monitor's October 5, 2023 Report (dkt. 581) at pgs. 1, 12 and 21; Monitor's November 8, 2023 Report (dkt. 595) at pgs. 67-68; Monitor's December 22, 2023 Report (dkt. 666) at pgs. 6-9; the Monitor's April 18, 2024 Report (dkt. 706) at pg. 56; and the Monitor's November 22, 2024 Report (dkt. 802) at pgs. 44-45.

[113] C.A.R.E. serves as the Department's Wellness and Employment Assistance Program. C.A.R.E. employs two social workers as well as a chaplain and peer counselors who provide peer support to staff. The services of C.A.R.E. are available to all employees of the Department. The Department reports that the members of the unit are tasked with responding to and supporting staff generally in the day-to-day aspects of their work life as well as when unexpected situations including injuries or serious emergencies occur. C.A.R.E. also works with staff to address morale, productivity, and stress management, and provide support to staff experiencing a range of personal or family issues (*e.g.* domestic violence, anxiety, family crisis, PTSD), job-related stressors, terminal illness, financial difficulties, and substance abuse issues. The C.A.R.E. Unit also regularly provides referrals to community resources as an additional source of support for employees. Staff may be referred to the C.A.R.E. use by a colleague or supervisor or may independently seek assistance support from the unit.

137

a reflection of both an overall increase in the number of staff referred for corrective action and that leadership are recommending Command Disciplines more frequently than other types of corrective action. The adjudication and outcomes of Command Disciplines recommended via Rapid Reviews are described in more detail within the compliance assessment for Consent Judgment, § VIII, Staff Discipline & Accountability.

- **5003 Counseling and Corrective Interviews**. The combined proportion of referrals for 5003 counseling and corrective interviews has fluctuated over this same period, during which they made up about 40-50% of all corrective action referred via the Rapid Reviews. This fluctuation in the proportion of 5003 counseling and corrective interviews directly reflects the increased proportion of referrals for Command Disciplines.

- **Re-Training**. Meanwhile, the proportion of referrals for re-training from Rapid Reviews during this same period remained relatively steady, although re-trainings generally only make up a small proportion of all corrective actions referrals from the Rapid Reviews (around 7-9%).

The Monitoring Team has long encouraged the use of close-in-time corrective actions to address problematic conduct in order to support the overall effort to change practice. Outcomes regarding the imposition of corrective action remain mixed as discussed in the compliance assessment for Consent Judgment, § VIII, Staff Discipline & Accountability.

<u>**Conclusion**</u>

The Rapid Review concept is grounded in sound correctional practice and has elevated the quality of staff practice in other jurisdictions. However, catalyzing improved practice requires both Department and facility leadership to possess a strong command of the security protocols and procedures that must be utilized on a daily basis, to develop skills to guide and coach their staff toward sound correctional practice, and to ensure Captains supervise staff in a manner that allows them to address these issues in real time. While Rapid Reviews provide some insight into Department practice and—when used properly—benefit the larger goal of improving staff practice, their full potential is not yet realized.

| COMPLIANCE RATING | § A., ¶ 1. Partial Compliance |
|---|---|

**CJ § VII. USE OF FORCE INVESTIGATIONS, ¶ 1 (THOROUGH, TIMELY, OBJECTIVE INVESTIGATIONS), ¶ 9 (A) (TIMING OF FULL ID INVESTIGATIONS) & ¶ 11 (STAFFING ID INVESTIGATORS)**

¶ 1. _Thorough, Timely, Objective Investigations._ As set forth below, the Department shall conduct thorough, timely, and objective investigations of all Use of Force Incidents to determine whether Staff engaged in the excessive or unnecessary Use of Force or otherwise failed to comply with the New Use of Force Directive. At the conclusion of the investigation, the Department shall prepare complete and detailed reports summarizing the findings of the investigation, the basis for these findings, and any recommended disciplinary actions or other remedial measures. All investigative steps shall be documented.

¶ 9. _Timing of Full ID Investigations._ All Full ID Investigations shall satisfy the following criteria [. . . as enumerated in the following provisions]:

    a.    _Timeliness_ [. . .]

        ii.    Beginning on October 1, 2018, or three years after the Effective Date, whichever is earlier, and for the duration of the Agreement:

            1.    ID shall complete all Full ID Investigations by no later than 120 days from the Referral Date, absent extenuating circumstances outside the Department's control that warrant an extension of this deadline. Any extension of the 120-day deadline shall be documented and subject to approval by the DCID or a designated Assistant Commissioner. Any Full ID Investigation that is open for more than 120 days shall be subject to monthly reviews by the DCID or a designated Assistant Commissioner to determine the status of the investigation and ensure that all reasonable efforts are being made to expeditiously complete the investigation.

            2.    The Department shall make every effort to complete Full ID Investigations of less complex cases within a significantly shorter period than the 120-day time frame set forth in the preceding subparagraph.

¶ 11. _Staffing of ID Investigators._ The Department, if necessary, shall hire a sufficient number of additional qualified ID Investigators to maintain ID Investigator caseloads at reasonable levels so that they can complete Full ID Investigations in a manner that is consistent with this Agreement, including by seeking funding to hire additional staff as necessary.

This compliance assessment provides an overview of the status of investigations for all use of force ("UOF") incidents through December 31, 2024. This section addresses compliance with three provisions of the Consent Judgment regarding investigations. First, Consent Judgment, § VII., ¶ 1 requires DOC to "conduct thorough, timely, and objective investigations of all Use of Force Incidents to determine whether Staff engaged in the excessive or unnecessary Use of Force or otherwise failed to comply with the New Use of Force Directive." Second, Consent Judgment, § VII., ¶ 9(a) requires the investigation of Full ID Investigations to be completed within 120 days or less. Finally, Consent Judgment § VII., 11 requires the Department to have adequate staffing levels for the Investigation Division. Compliance with these provisions is taken in turn below.

This includes a history of the Monitoring Team's Compliance Assessments for the Investigations provisions, background on the changes to the Investigation Division's ("ID") leadership and the management of investigations, the status of ID staffing, an assessment of the status and timing of Intake Investigations and Full ID Investigations, the status of law enforcement referrals for potential criminal misconduct, details about the Use of Force Priority Squad, an assessment of the quality of investigations, including ID's internal quality assurance initiatives, the outcomes of investigations, including referrals for Full ID investigations, identification of staff misconduct, and referrals for corrective action, and the Monitoring Team's recommendations to enhance the investigative process going forward.

**<u>History of Compliance Assessments for Investigations Provisions</u>**

High-quality investigations are essential to reducing the frequency of unnecessary and excessive uses of force, which is at the heart of the *Nunez* matter. The Department's Investigations Division and the compliance assessments for the three provisions noted above have gone through periods of both progress and regression since the Consent Judgment went into effect. A brief history of these fluctuations is provided below.

The Monitoring Team first rated compliance with the provision to conduct thorough, timely, objective investigations (Consent Judgment, § VII, ¶ 1) during the 5th Monitoring Period (July to December 2017) during which the Monitoring Team found the Department in Non-Compliance. The Monitoring Team continued to find the Department in Non-Compliance for the following four Monitoring Periods (January 2018 to December 2019), but in 2020 and 2021, the Department significantly improved the quality of investigations. For the first time, in 2020 during the 10th Monitoring Period (January to June 2020), the Department achieved Partial Compliance with the requirement to "conduct thorough, timely, and objective investigations of all Use of Force Incidents to determine whether Staff engaged in the excessive or unnecessary Use of Force or otherwise failed to comply with the New Use of Force Directive," as required pursuant to Consent Judgment, § VII, ¶ 1. The Department maintained this rating through four more Monitoring Periods (July 2020 to June 2022).[114] However, beginning in mid-2022

---

[114] A compliance rating for this provision was not awarded in the 13th Monitoring Period because the Monitoring Team did not assess compliance with any provisions of the Consent Judgment or Remedial Orders for the period between July 1, 2021 and December 31, 2021. The Court suspended the Monitoring Team's compliance assessment during the 13th Monitoring Period because the conditions in the jails during that time were detailed to the Court in seven status reports (filed between August and December

(following the entry of the Action Plan in June 2022), the Department's progress was offset by a sudden and significant regression in the quality of investigations. As a result, in the 15th Monitoring Period (July to December 2022), the Department returned to Non-Compliance with this requirement, where it remained for the past three Monitoring Periods (January 2023 to June 2024).[115]

The Monitoring Team first rated compliance with the timing of Full ID Investigations provision (Consent Judgment, § VII., 9(a)) during the 6th Monitoring Period (January to June 2018). However, the compliance rating fell to Non-Compliance the following Monitoring Period and has since remained in Non-Compliance with this provision for 13 consecutive Monitoring Periods (July 2018 to June 2024.)

The Monitoring Team first rated compliance with the Staffing of ID Investigators provision (Consent Judgment, § VII., 11) during the 3rd Monitoring Period (August to December 2016), which it found the Department in Partial Compliance. For all eight consecutive Monitoring Periods that were rated after that (January 2017 to June 2021),[116] the Department remained in Partial Compliance. The Monitoring Team did not provide compliance ratings for this provision after the 12th Monitoring Period, but did provide routine updates on ID staffing in many of its subsequent reports[117].

The Court's November 26, 2024 Contempt Order (dkt. 803) found the Defendants in contempt for failing to comply with all three provisions. The Court explained the basis for its finding at pages 18 to 26 in section "Failure to Conduct Adequate Use of Force Investigations and Hold Staff Accountable" of the Order.

---

2021), a Remedial Order Report filed on December 22, 2021 (dkt. 435) as well as in the Special Report filed on March 16, 2022 (dkt. 438). The basis for the suspension of compliance ratings was also outlined in the Monitor's March 16, 2022 Report (dkt. 438) at pgs. 73-74.

[115] *See* Monitor's April 3, 2023 Report (dkt. 517) at pgs. 100-102 and 155-171, Monitor's April 24, 2023 Report (dkt. 520) at pgs. 1-4, Monitor's December 22, 2023 (dkt. 666) at pgs. 33-45, and Monitor's April 18, 2024 Report (dkt. 706) at pgs. 88-104.

[116] The Monitoring Team withheld its compliance rating for this provision during the 5th Monitoring Period. See the Monitor's April 18, 2018 Report (dkt. 311) at pgs. 104-105.

[117] See Monitor's October 28, 2022 Report (dkt. 472) at pgs. 137-138; Monitor's April 3, 2023 Report (dkt. 517) at pgs. 167-169; Monitor's December 22, 2024 Report (dkt. 666) at pgs. 41-43; Monitor's April 18, 2024 Report (dkt. 706) at pgs. 90-92, 163, and Appendix A; and Monitor's November 22, 2024 Report (dkt. 802) at pgs. 84-86, 183, and Appendix A.

In this Monitoring Period, as discussed below, the Department has made progress in conducting thorough, timely, and objective investigations as well as efforts to improve staffing. However, improvements relating to the timing of investigations remain a work in progress.

**Investigations Division**

The Investigations Division is instrumental in the Department's efforts to identify excessive, avoidable, and/or unnecessary uses of force as it is tasked with conducting neutral and objective investigations into all use of force incidents. As a part of the investigation process, ID also identifies staff misconduct and recommends appropriate discipline for staff who use force in a manner that is not permitted by policy. As such, the Monitoring Team has routinely evaluated the Division's leadership, staffing, and the timeliness and quality of its work product to assess progress toward compliance with the *Nunez* Court Orders.

- **Leadership of the Investigations Division**. The Monitoring Team has long reported on the importance of strong leadership within ID in transforming the Department's long-standing culture of tolerance for use of force-related misconduct. For a time in 2020-2021, ID made steady progress toward the requirements of this provision. However, this began to change in 2022 as a result of actions of the former Commissioner that significantly undermined ID's core mission.[118] This decline in the quality of ID's work appeared to be related to poor leadership and inappropriate direction[119] by a Deputy Commissioner who was installed by the former Commissioner in 2022 and subsequently resigned in March 2023.[120] The former Deputy Commissioner of ID also created an environment in which some staff reported that they did not feel comfortable speaking openly and candidly with the Monitor because of fear of reprisal were the Deputy Commissioner to learn of such communications.[121]

---

[118] See Monitor's April 3, 2023 Report (dkt. 517) at pgs. 100-102 and 155-171, Monitor's April 24, 2023 Report (dkt. 520) at pgs. 1-4, Monitor's October 5, 2023 Report (dkt. 581) at pg. 16, Monitor's November 8, 2023 Report (dkt. 595) at pg. 56, Monitor's December 22, 2023 (dkt. 666) at pgs. 33-45, and Monitor's April 18, 2024 Report (dkt. 706) at pgs. 88-104, and Monitor's November 22, 2024 Report (dkt. 802) at pgs. 22, 82-103.

[119] *See* Monitor's November 8, 2023 Report (dkt. 595) at pg. 56 and Monitor's October 5, 2023 Report (dkt. 581) at pg. 16.

[120] *See* Monitor's April 3, 2023 Report (dkt. 517) at pgs. 100-101 and 157-158, and Monitor's April 24, 2023 Report (dkt. 520) at pgs. 2-3.

[121] *See* the Monitor's April 3, 2023 Report (dkt. 517) at pg. 158.

Following his resignation, a new Deputy Commissioner was appointed in April 2023. The Monitoring Team found ID's new Deputy Commissioner to be transparent, candid, and committed to improving ID's work. At that time, the Associate Commissioner of ID, a well-—respected reformer, leader, and investigator, was a key member of the leadership team working to reform ID. In September 2023, the former Commissioner abruptly removed the Associate Commissioner, causing further destabilization and regression within ID.[122] The abrupt removal of the Associate Commissioner of ID, under questionable circumstances, had a negative impact on the operations of ID.

In August 2023, just prior to the Associate Commissioner's removal, a new Assistant Commissioner was appointed by the former Commissioner to serve as the leader of ID's Intake Unit. The new Assistant Commissioner had no experience conducting or managing use of force investigations. With the appointment of the new Assistant Commissioner, the Intake Unit began experiencing problems and became dysfunctional — the unit's management was not well integrated into the overall work of ID, the quality of the Intake Investigations continued to regress, and the ability to complete Intake Investigations in a timely manner began to falter. It was also reported that the Assistant Commissioner reported directly to the former Commissioner, and not to the Deputy Commissioner of ID.

Under the leadership of the former Deputy Commissioner and Assistant Commissioner and compounded by staff's fear of reprisal for conducting objective investigations, ID became mired in dysfunction and the work of the division significantly deteriorated. The regression in ID's work negatively impacted the Department's ability to identify and address staff misconduct in a variety of ways. At times, misconduct was not addressed at all or was addressed with insufficient corrective action or accountability measures. Efforts to complete investigations in a timely manner further eroded.

Beginning in 2024, the current Commissioner of DOC began making important changes to the leadership within ID. First, the current Commissioner empowered the Deputy Commissioner of ID and advised her that she and her staff should conduct all investigations without fear or favor and in a neutral manner and implement the necessary

---

[122] *See* Monitor's December 8, 2023 Letter (dkt. 639) at pgs. 3 to 4.

reforms to address the regression that occurred under prior leadership. Second, the current Commissioner removed the Assistant Commissioner of the Intake Unit from his position in March 2024. The Deputy Commissioner of ID subsequently appointed an experienced Director to manage the Intake Unit in April 2024. Third, in November 2024, the Commissioner reinstated the former Associate Commissioner of ID who had been removed from his role in September 2023 by the former Commissioner.[123] The direction from the current Commissioner to ID in combination with these key leadership changes has had an important and positive impact on the work of ID.

Throughout 2024, the Investigations Division began the difficult work of returning to its previous emphasis on transparency and neutrality and rebuilding a culture focused on the quality of the work product. Current ID leadership not only explicitly communicated with all ID staff that they could and should conduct all investigations without fear or favor and in a neutral manner, but they also took steps to rebuild trust with staff, so they again felt empowered to conduct proper investigations without fear of retribution.

The steps taken to support the overall work and improve the culture and morale of the division included holding Division-wide events to rebuild camaraderie and communication amongst ID staff. Routine meetings were reinstated to provide staff at all ranks with appropriate context for the role that *Nunez* has on their work and the corresponding initiatives being undertaken within ID, remind staff of their responsibilities, and provide refreshers on key skills, as well as enable staff to share any questions or concerns directly with leadership. Supervisors were encouraged to provide more substantive feedback on investigations to not only improve their quality, but to build rapport with investigators they supervise. ID leadership also began to routinely communicate amongst each other, so messaging was consistent across all supervisors and line staff.

The ID Division also took specific steps to work with supervisors and investigators to improve the quality of investigations. This included: (1) increasing communication and training with all ID staff; (2) directing and coaching with supervisors

---

[123] *See* Monitor's December 8, 2023 Report (dkt. 639) at pgs. 3 to 4.

regarding neutral and independent investigations (as discussed above); (3) encouraging supervisors to work constructively with investigators to improve the quality of investigations, even if it increased the length of time to complete an investigation; (4) conducting audits and reviews of targeted closed investigations to determine if additional investigation was merited to ensure an objective conclusion and appropriate outcome; and (5) holding collaborative meetings between intake investigators and full ID investigators who worked on the same incident so they could better understand the role and value of each level of investigation.

These efforts accelerated when the reinstated Associate Commissioner resumed his role in November 2024. The Associate Commissioner had been an integral part of ID's work to achieve Partial Compliance with investigation-related provisions of the *Nunez* Court Orders in 2020-2022, which appropriately positioned him in 2024 to do the difficult work of helping ID regain its lost ground.

The ID Division has made significant strides in 2024. The culture and morale of the Division has significantly improved. Notably, attrition within ID decreased by 66% in 2024 and the quality of work has noticeably improved. Further, ID staff have returned to engaging with the Monitoring Team is a transparent and collaborative manner.

- **ID Staffing**. The City is required to ensure that the Department has appropriate resources to conduct timely and quality investigations. Adequate staffing and appropriate case assignments are critical to this task, and Consent Judgment § VII ¶ 11 requires ID to have a sufficient number of investigators. Further, the Court's August 10, 2023 Order (dkt. 564) requires the Department to maintain a minimum of 21 Supervisors and 85 investigators. Although the Division has not met these staffing targets (as of December 2024, the Division had 18 Supervisors and 76 investigators) and staffing remains insufficient to manage its overall caseload, ID has made important progress toward this requirement in 2024. Attrition slowed considerably (32 staff departed in 2024, compared to 94 staff departures in 2023 and 60 departures in 2022), and 51 staff were hired in 2024 (compared to 68 in 2023 and 36 in 2022). In 2024, for the first time in several years, ID experienced a net gain in the number of investigators. Detailed data on ID's staffing levels are presented in Tables 1(a), 1(b), and 2 in Appendix D.

145

ID has made progress both slowing attrition and increasing hiring so that there was a net gain in the overall staffing numbers, a crucial and material change from the past few years. A number of efforts have been initiated to recruit and retain staff. ID reports that it consistently posts for positions and interviews potential candidates, and that it has continued the pilot program allowing certain investigators, supervisors and managers to work remotely one day per week. ID reports there has been a slowing of resignations since this program began, and it continues to be well-received by staff. The stability and support of leadership within the Division have also helped to support staff retention.

Additional hiring is necessary for ID to meet optimal staffing levels and those required by the Action Plan. One factor that continues to undercut ID's ability to achieve the staffing requirements of the *Nunez* Court Orders is the salary range for investigators, which is on the lower end of the scale compared to other City and State agencies. Coupled with the heavy workload and work location for ID's investigators, the salary level often leads qualified candidates to take positions elsewhere. The Monitoring Team continues to recommend that the City take steps to ensure competitive salaries to better support both hiring and staff retention within ID.

**Status of Investigations**

Given the volume of UOF incidents, ID's workload remains high. All use of force cases receive an Intake Investigation (formerly called a Preliminary Review), which means thousands of Intake Investigations are conducted each year. A subset of those cases may then be referred for a Full ID Investigation where a more in-depth investigation occurs. Detailed data on the Status of Investigations for all UOF Incidents is presented in Table 3 in Appendix D. The time required to complete investigations, the quality of investigations, and their outcomes are discussed in more detail below.

**Timeliness of Investigations**

One of the underpinnings of addressing (and correcting) staff misconduct is for the response to misconduct to occur close-in-time to the incident. An efficient process for investigating potential misconduct is therefore essential.

- **Intake Investigations**. Intake Investigations are required to be completed within 25 business days of the incident's date, although the Monitoring Team has utilized 30 business days as the applicable time frame when determining "timeliness" as it provides a

reasonable grace period beyond the deadline. Under the leadership of the former Assistant Commissioner, the time to close intake investigations increased abruptly in 2023 for the first time since the inception of Intake Investigations.[124] The increase in timing to complete Intake Investigations continued into the 18th Monitoring Period (January to June 2024), during which 63% were closed within 30 business days or less.[125] The timing to complete Intake Investigations continued to further increase during the 19th Monitoring Period (July to December 2024) with 52% closed within 30 business days or less, 23% within 31-60 business days, and 24% beyond 60 business days.

In 2024, following the departure of the Assistant Commissioner, the DC of ID determined ID must first focus on improving the quality of the work product for Intake Investigations as noted above. The DC of ID reported to her staff that the quality must be prioritized over ensuring the timely completion of investigations. In her view, several rounds of feedback and revision between investigators and supervisors was necessary to improve the quality of investigations, which made the required timelines difficult to meet. Although this process delayed progress on the timeliness component, the Monitoring Team believed that the focus on the quality of investigations was appropriate at that point in time.

At the end of the Monitoring Period, as the quality of the Intake Investigations improved and upon the reinstatement of the Associate Commissioner of ID, the focus then shifted to also improving the timeliness of Intake Investigations. As of March 2025, over 99% of intake investigations from 2024 have been closed, and less than 1% remain pending. There has already been notable improvement in the timeliness of Intake Investigations for 2025 incidents; as of March 19, 2025, 93% of Intake Investigations for incidents that occurred during January and February 2025 were closed or remained pending for 30 days or less.

- **Full ID Investigations**. When a case merits additional scrutiny beyond an Intake Investigation, a Full ID Investigation must be conducted. Full ID Investigations must be

---

[124] *See* the Monitor's April 18, 2024 Report (dkt. 706) at pgs. 92-93 and the Monitor's November 22, 2024 (dkt. 802) at pg. 87 to 88.

[125] The percentages regarding the time to close intake investigations have been updated to more accurately account for holidays.

completed within 120 days of the incident's date. The status of Full ID Investigations for all incidents that occurred between January 2023 and December 2024 (n=1,427) is demonstrated in Table 4 in Appendix D.[126] ID has long struggled to complete Full ID Investigations in a timely manner and the number of pending Full ID Investigations continued to increase during this Monitoring Period. Only 14% (n=193) of Full ID Investigations were closed/or are still pending within the 120-day timeline, and the remaining 86% were either closed/or remained pending outside the required time frame. Therefore, the Department remains in Non-Compliance with the timing requirement for Full ID Investigations.

ID reported that Full ID investigations have been delayed due to both workload and because of a backlog of MEO-16 interviews.[127] The MEO-16 interview backlog is due, at least in part, to the lack of availability of union counsel, and the Department has taken steps to address the MEO-16 interview backlog and ensure that scheduling MEO-16 interviews does not slow pending investigations. ID is now conducting MEO-16 interviews for officers on multiple days. In order to accommodate these additional interview slots, DOC worked with the Office of Administrative Trials and Hearings ("OATH") to *temporarily* reduce the number of days that OATH pre-trial conferences are convened to three days per week instead of four (this is discussed in more detail in this report in the compliance assessment for First Remedial Order § C ¶ 4 & ¶ 5) so that counsel could be available for both MEO-16 interviews and OATH pre-trial conferences. The Department also worked with the union to increase the number of MEO-16 interviews involving Captains each week. This process began slowly, but the number of interviews conducted each week has increased and will need to remain a top priority to ensure that the backlog is eliminated. ID must continue to be strategic about which

---

[126] The period of incident dates of January 2023-December 2024 was selected as it captures *all* pending full ID investigations as of the end of this Monitoring Period. All investigations, including full ID investigations, have been completed for uses of force that occurred prior to January 2023. Given that full ID investigations can take months to complete, it is common that a full ID investigation will be completed in a different Monitoring Period than the Monitoring Period in which it occurred.

[127] MEO-16 interviews are conducted by ID investigators and are intended to gather more information from the staff involved in the incident, as well as the staffs' perspective on whether they engaged in misconduct. If they so choose, staff may be represented by counsel, including union counsel, at these MEO-16 interviews.

investigations require an MEO-16 interview (which are time consuming and limited in number every week) in order to appropriately triage the cases in the backlog and prescribe the necessary steps for completion.

The Full ID Director also worked with a team of Full ID investigators to categorize the backlog of pending Full ID cases according to the amount of additional investigation necessary to close the case. This categorization was done to enable the Division to strategically allocate resources and appropriately prioritize cases. This team identified a subset of Full ID investigations that will be triaged by a select Full ID investigative team to close them out expeditiously to reduce the backlog. With the support of the reinstated Associate Commissioner who developed effective strategies for addressing a backlog of investigations in 2020/2021, ID's Supervisors are focusing on the necessary steps to ensure that the backlogged cases are closed appropriately.

**Law Enforcement Referrals**

The timing to complete an investigation is tolled if a law enforcement agency is investigating the incident for potential criminal misconduct. ID is required to swiftly refer any staff member whose conduct in a use of force incident appears to be criminal in nature to the Department of Investigation ("DOI"). The Monitoring Team has observed that, despite serious concerns about the inappropriateness of Staffs' behavior, the majority of cases do not appear to rise to the level of criminal misconduct. This observation aligns with the small number of criminal prosecutions recorded thus far. ID has promptly made referrals for behavior that appears to be criminal in nature.

The Department and the relevant law enforcement agencies routinely collaborate and communicate about the status of cases that are referred for potential prosecution. Detailed data on Law Enforcement Referrals are presented in Table 5 in Appendix D. In the ten years since the effective date of the Consent Judgment, 144 use of force cases have been referred to DOI or DOI has assumed responsibility for the investigation independent of a referral from ID. Of that relatively small subset of 144 UOF cases, only **eight** cases have resulted in criminal charges over the life span of the Consent Judgment as shown in Table 5 in Appendix D. As of December 2024, 11 cases were still pending investigation with law enforcement; one is with the Bronx District Attorney's Office and ten are with the Department of Investigation.

149

Historical trends indicate that most of the cases considered for criminal prosecution will not be prosecuted. That said, cases that are rejected for criminal prosecution often include very concerning conduct that the Department can and must address administratively. The timeliness of law enforcement agency reviews of cases for potential criminal charges remains inadequate. The Monitoring Team continues to urge that these cases be prioritized and not allowed to languish amid broader caseload demands. Some overlap exists between cases being considered for criminal prosecution and the egregious cases identified via the Action Plan requirement § F, ¶ 2. The Monitoring Team has and will continue to work with law enforcement agencies to advise them of the aggressive timelines set for investigations pursuant to the Action Plan requirement § F, ¶ 2 ("F2").

**Use of Force Priority Squad**

The Use of Force Priority Squad ("UPS") is an important management tool to address some of the most serious and complex use of force cases. Having a dedicated unit helps ensure that these cases receive necessary scrutiny and attention. During this Monitoring Period, 35 cases were assigned to UPS and included a variety of egregious incidents, including cases in which staff members were suspended, cases that were returned to ID following an assessment for criminal charges by law enforcement, 17 cases identified for expeditious resolution via the F2 process, and three recommendations from the Monitoring Team.

UPS closed 27 cases during the current Monitoring Period, 22 of which were referred for formal discipline and closed with charges. This is greater than the number of cases closed by UPS in the last Monitoring Period (n=11)[128] and is closer to the number of cases closed by UPS in past Monitoring Periods (e.g., 26 cases were closed in the 17th Monitoring Period[129]). In the last Monitoring Period, ID reported that UPS closed fewer investigations because of both staff attrition and UPS staff assisting on the Lookback Audit.[130] However, ID reported that during the current Monitoring Period, additional investigators were assigned to UPS and the Lookback Audit was completed. This allowed UPS to increase its caseload during the current Monitoring Period.

---

[128] *See* the Monitor's November 22, 2024 Report (dkt. 802) at pg. 91.

[129] *See* Monitor's April 18, 2024 Report (dkt. 706) at pg. 95.

[130] *See* the Monitor's November 22, 2024 Report (dkt. 802) at pg. 91.

Of the 27 cases closed during the current Monitoring Period, only 13 incidents (48%) were closed within 120 days of the incident date, however all 13 of these incidents occurred and were referred to UPS during the current Monitoring Period, which demonstrates UPS's ability to manage an increased capacity of cases as described above. The 14 incidents that took over 120 days to close occurred prior to the current Monitoring Period and were a part of a backlog of pending cases that had accumulated. At the end of the current Monitoring Period, UPS had 51 pending cases, and 31 of these cases (61%) were pending beyond 120 days of the incident date. At the end of the last Monitoring Period, the same number of cases were pending (n=51), but a greater proportion were pending beyond 120 days of the incident date (n=35, 69%).[131] It is promising that recent incidents are again being handled in a more timely manner. The backlog of cases must be addressed and efforts made to ensure future backlogs do not occur.

**Quality of Investigation Findings**

As discussed above, there has been improvement in the quality of Intake Investigations. The Monitoring Team reviews all Intake Investigations. The Monitoring Team's extensive review of these investigations has revealed that while there is variation in the quality of investigations, there has been a notable and significant improvement in this Monitoring Period.

Over the past year, the Monitoring Team has found that Intake Investigations have improved in assessing available evidence, identifying potential violations, and recommending appropriate action or further investigation when necessary. In 2023, ID also initiated its own quality assurance program, which is a critical step in ID's efforts to improve and sustain improved investigations. Finally, as noted above, there has been improved communication between supervisors and investigators conducting Intake Investigations which has resulted in the improved quality of those investigations.

- **ID's Quality Assurance Program**: ID began a quality assurance program in spring 2023 to assess completed investigations, and if needed, to reopen cases for further investigation. A dedicated Quality Assurance Team consisting of one attorney and two senior investigators was created to specifically review completed Intake Investigations. Additionally, the Director of the Full ID Unit reviews a selection of Full ID Investigations that were closed with no charges each month. The number of cases audits

---

[131] *Id.*

and the corresponding findings of the Intake and Full ID QA audits can be found in
Tables 6(a), 6(b), 7(a), and 7(b) in Appendix D.

That ID has created and maintained an internal QA process is an important step. ID's
own findings demonstrate that additional work is necessary to ensure that the quality of
investigations is adequate to meet the requirements of the *Nunez* Court Orders. In this
Monitoring Period, the QA audits identified an issue with 24% of Intake Investigations
closed between July-December 2024. The most frequently identified issues were:

- o  Failing to collect documentation such as staff use of force or witness reports,
     injury reports, or PIC photos (15 incidents)
- o  Failing to preserve and/or request Genetec footage (13 incidents)
- o  Incomplete or inaccurate investigation closing reports (9 incidents)
- o  Failing to identify staff violations of Use of Force policies and procedures (8
     incidents)
- o  Failing to identify delayed medical attention for people in custody following a use
     of force incident (6 incidents)
- o  Clerical errors (6 incidents)
- o  Failing to appropriately classify the use of force incident by injury type (5
     incidents)
- o  Failing to identify violations of self-harm procedures (5 incidents)
- o  Failing to identify staff's use of profanity during an incident (5 incidents)

The Monitoring Team's' findings coincide with the QA audits. Overall, the
Monitoring Team finds that the Intake Investigations adequately identify the most
concerning violations and result in appropriate outcomes, but there is still room for
improvement in the identification of every violation in an incident. The sample size of the
audits of Full ID investigations are too small to enable the Monitoring Team to draw
definitive conclusions, but the findings suggest there is room for improvement in
investigation quality. As discussed above, ID leadership has engaged in significant efforts
to improve the quality of investigations, and they should closely monitor these audits to
help identify needed areas of improvement.

- **Monitor's Recommendations to Review and Reevaluate Selected Investigations**. The
  Monitoring Team submits feedback to the Department recommending that additional

review for certain investigations where it appears that the objective evidence was not adequately investigated or analyzed. This is an attempt to mitigate the possibility that staff are not held responsible for certain misconduct because the investigation was inadequate. The number of recommendations shared by the Monitoring Team significantly decreased in July-December 2024 from past Monitoring Periods. This suggests that there has been some improvement in the quality of ID investigations.

**Outcome of Investigations**

Intake Investigations can be closed in various ways, including, with no action, with a referral for further investigation via a Full ID Investigation (as discussed above), or with a referral for some type of disciplinary or corrective action (*e.g.*, MOC, PDR, Command Discipline, Re-Training, Facility Referral).

- **Referrals for Full ID Investigations**. When conducted properly, most cases can and should be addressed via the Intake Investigation and should not require a Full ID investigation. Accordingly, the majority of cases are closed following an Intake Investigation, but those that merit additional scrutiny, either because they meet specific criteria (*e.g.*, Class A Incidents or Head-strikes) or because additional inquiry is necessitated by the facts of the case, must be referred for a Full ID Investigation. In 2022, ID was not referring cases for Full ID investigations as required, with only 3% of cases being referred for Full ID investigations.[132] In 2023, referral practices began to improve, and those improvements have continued.[133] In early 2024, the Monitoring Team continued to identify some cases that should have been referred for a Full ID Investigation but were not.  By mid-2024 and into this Monitoring Period, the Monitoring Team has found that ID is more reliably identifying cases for Full ID Investigations. Detailed data on the number and percentage of Full ID Referrals is presented in Table 8 in Appendix D.

---

[132] *See* Monitor's December 22, 2023 Report (dkt. 666) at pgs. 36-37. The number and percentages of Full ID referrals for past Monitoring Periods are also reflected in the charts below titled "Investigations Findings" and "Outcome of Intake Investigations."

[133] In 2024, 8% of cases were referred for Full ID investigations. *See* Monitor's December 22, 2023 Report (dkt. 666) at pgs. 36-37 and Monitor's April 18, 2024 Report (dkt. 706) at pgs. 94-95. This is also reflected in the charts below titled "Investigations Findings" and "Outcome of Intake Investigations."

While the proportion of cases referred for Full ID Investigations in 2024 (10%) has gone down from what was seen in 2020 and 2021 (16-17%), the Monitoring Team's review of Intake Investigations suggests that this proportion of cases referred appears reasonable. At least some of this decline in referrals is attributable to the reduction in certain categories of cases (e.g. a reduction of Class A cases). ID leadership reported that when the Intake Investigations were first implemented ID was overinclusive in the referrals for Full ID Investigations, but with time, they have refined their referral practices on more marginal cases and has adjusted to the full ID referral categories updated in 2020.[134]

- **Identifying Misconduct and Referrals for Discipline**. As the quality of Intake Investigations (and Rapid Reviews) has improved, the proportion of cases without any action has decreased and, there has been an increase in recommendations to address identified violations. The findings of these investigations are discussed below.

  o <u>No Action</u>. With respect to cases closed with no action, in some, the violation identified by ID had already been identified by the facility via Rapid Review and ID determined that the action recommended in the Rapid Review was sufficient to address the violation. Therefore, "no action" cases are better understood as cases in which either no violation was identified, or ID *did not identify additional staff behaviors requiring disciplinary or corrective action beyond what had already been identified and taken by the facilities*. Detailed data on the outcome of Intake Investigations is presented in Table 8 in Appendix D.

  o <u>Actions Taken</u>. The proportions for most actions taken upon the closure of intake investigations have remained relatively steady, however the number and proportion of facility referrals has increased (from n=1,159, 35% in the 11th Monitoring Period; to n=1,903, 56% in the 19th Monitoring Period).

  o <u>Facility Referrals</u>. The increase in ID's use of facility referrals is a sign of improvement in ID's identification of policy violations. The use of facility referrals is important as the facilities must address the issues identified by ID.

---

[134] *See* the First Remedial Order § E. 1.

ID's findings cannot be limited to addressing individual staff members or in a vacuum. Historically, facility referrals have not been addressed consistently. In order to address consistency and given the increase in facility referrals, ID leadership reported that they have recently designated one staff member within ID to send out and follow up on all facility referrals to centralize the process and work with the facilities to ensure the referrals result in an appropriate resolution.

o  Unnecessary and Excessive Force. The data on the number and proportion of cases that ID determined were "unnecessary," "excessive," and "avoidable" is demonstrated in Table 9 in Appendix D. As for the ultimate conclusions of the investigations, for Intake Investigations, findings included a statement of whether the incident was "unnecessary," "excessive," and "avoidable." The Department conducted an assessment of Closed Full ID cases to determine if any were unnecessary or excessive.[135] Based on the data, ID determined that 14% of investigations closed for uses of force that occurred in 2023 and 10% of uses of force that occurred in 2024 were excessive and/or unnecessary and/or avoidable. The findings for 2024 must be viewed with caution because of the number of cases that remain pending, particularly pending Full ID investigations, often include more egregious incidents.

o  Referrals for Formal Discipline. The data on the number and proportion of use of force incidents with charges is demonstrated in Table 10 in Appendix D. Most referrals to the Trials Division for formal discipline for use of force related misconduct derive from Full ID Investigations. While Intake Investigations can also lead to such referrals, this typically only occurs for 1-2% of Intake Investigations, as demonstrated in Table 8 in Appendix D.

---

[135] The Department and the Monitoring Team have not finalized an agreed upon definition of these terms. The categorizing the findings and developing corresponding data is complicated, particularly because qualitative information with slight factual variations must be categorized consistently. A concrete, objective and shared understanding of what each category is intended to capture is necessary to ensure reliable and consistent findings. Efforts were made in summer 2021 to finalize common definitions, but they were never finalized. The project has since languished given the focus on higher priority items.

- The overall rate of referral for formal discipline from use of force investigations has decreased since 2022. Some of this was to be expected given that the CD policy was expanded to permit a broader scope of misconduct to be addressed with a CD, which the Monitoring Team approved and is discussed in more detail in the Update on the 2023 *Nunez* Court Orders section. The data on ID's overall rate of formal disciplinary referrals is impacted by the significant backlog of Full ID Investigations, as it is expected that more formal disciplinary charges will be filed as the Full ID investigations are closed for incidents that occurred in 2023 and 2024.

-  The proportion of use of force incidents in which at least one staff member was referred for formal discipline has remained relatively consistent over time, averaging around 7% between 2016 and 2021 and approximately 6% in 2022 and 2023. While concerns were raised in 2022 and 2023 regarding the quality of referrals, subsequent reviews and corrective action by ID have helped address and reverse some of the earlier regression.[136]

**<u>Monitoring Team's Recommendations to Enhance the Investigation Process</u>**

In the Monitoring Team's experience, the Department conducts more investigations into use of force than any other system in the country. This is because of both the breadth of the definition of the use of force and the investigation requirements of the *Nunez* Court Orders. As noted in other sections of the report, there is a wide spectrum of types of use of force employed and the potential violations (if any). This means that some incidents may not merit the same scrutiny as others. There is no question that additional efficiencies in the investigation process are necessary, and the Monitoring Team intends to explore those with the Department. For example, making improvements in the identification and streamlining of investigations for those incidents where the use of force was necessary and no violations occurred. The Monitoring Team

---

[136] The data for 2022 and 2023 incidents includes referrals that were made as part of the lookback initiative in which the original case findings did not identify misconduct, but the subsequent review resulted in a finding that merited the referral for charges. Further, data for investigations of 2024 is not yet available given the significant number of pending Full ID Investigations.

recommends that the Department also explore how it can balance its investigatory requirements with a more streamlined investigation report to maximize ID's efficiency without sacrificing quality.

## Conclusion

The Investigation Division is finally emerging from the state of turmoil it entered in 2022. As the Monitoring Team has explained, addressing the damage from ID's mismanagement from 2022 to spring 2024 will take time, but important and significant steps forward have been made. The Commissioner has removed problematic leadership and reinstated a well-respected reformer to a key leadership position. The regression in the quality of investigations has ceased (although more work remains to ensure consistent quality of investigations), ID is reasonably addressing the investigation backlogs, and the quality of investigations has improved. While additional staff are still necessary, ID has made important gains in staffing by slowing attrition and increasing hiring. ID investigators, supervisors, and leadership have been working diligently, and the Division is recovering lost ground. While significant work remains, ID has achieved Partial Compliance with § VII, ¶¶ 1 and 11.

With regard to the closure of Full ID Investigations, the Division is still attempting to properly manage the backlog and, for the reasons discussed above, remains in Non-Compliance with the requirements to timely complete investigations pursuant to Consent Judgment § VII, ¶ 9(a).

| COMPLIANCE RATING | ¶ 1. Partial Compliance |
| | ¶ 9 (a). Non-Compliance |
| | ¶ 11. Partial Compliance |

| CJ § X. RISK MANAGEMENT, ¶ 1 (EARLY WARNING SYSTEM) |
|---|
| ¶ 1. *Early Warning System.* Within 150 days of the Effective Date, in consultation with the Monitor, the Department shall develop and implement an early warning system ("EWS") designed to effectively identify as soon as possible Staff Members whose conduct warrants corrective action as well as systemic policy or training deficiencies. The Department shall use the EWS as a tool for correcting inappropriate staff conduct before it escalates to more serious misconduct. The EWS shall be subject to the approval of the Monitor. |

a. The EWS shall track performance data on each Staff Member that may serve as predictors of possible future misconduct.

b. ICOs and Supervisors of the rank of Assistant Deputy Warden or higher shall have access to the information on the EWS. ICOs shall review this information on a regular basis with senior Department management to evaluate staff conduct and the need for any changes to policies or training. The Department, in consultation with the Monitor, shall develop and implement appropriate interventions and services that will be provided to Staff Members identified through the EWS.

On an annual basis, the Department shall review the EWS to assess its effectiveness and to implement any necessary enhancements.

This provision of the Consent Judgment requires the Department to have a system to identify and correct staff misconduct at an early stage, which the Department has elected to do through the Early Intervention, Support and Supervision ("E.I.S.S.") Unit. Further, § A, ¶ (3)(c) of the Action Plan (dkt. 465) requires the expansion of E.I.S.S. to support staff on disciplinary probation and supervisors during their probationary period. This provision also requires each facility to designate at least one supervisor responsible for working with the E.I.S.S. Unit to support the uniform staff who are in the E.I.S.S. program and to address any supervision deficiencies that are identified. The first compliance assessment for this provision occurred for the 2nd Monitoring Period (March to July 2016). At that time, the Department was found to be in Partial Compliance and remained so through the 3rd Monitoring Period (August to December 2016). In the 4th Monitoring Period, the compliance rating was withheld. The Department was found to be in Partial Compliance from the 5th Monitoring Period (July to December 2017) through the 11th Monitoring Period (July to December 2020). The Department moved into Non-Compliance in the 12th Monitoring Period (January to June 2021), and then back to Partial Compliance from the 14th Monitoring Period (January to June 2022) through the 18th Monitoring Period (January to June 2024).

## Staff Actively on E.I.S.S. Monitoring

The goal of E.I.S.S. is to identify and support staff whose use of force ("UOF") practices would benefit from additional guidance and mentorship to improve practice and minimize the

possibility that staff's behavior escalates to more serious misconduct. In total, during this Monitoring Period, 72 staff were on E.I.S.S. monitoring. Below is a chart of the number of individuals on Monitoring in each Monitoring Period since 2020.

| Staff Actively Monitored[137] on E.I.S.S. Program | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Jan. to Jun. 2020 (10th MP) | Jul to Dec. 2020 (11th MP) | Jan. to Jun. 2021 (12th MP) | Jul to Dec. 2021 (13th MP) | Jan. to Jun. 2022 (14th MP) | July to Dec. 2022 (15th MP) | Jan. to Jun. 2023 (16th MP) | July to Dec. 2023 (17th MP) | Jan. to Jun. 2024 (18th MP) | July to Dec. 2024 (19th MP) |
| 96 | 106 | 91 | 37 | 80 | 97 | 137 | 135 | 143 | 72 |

As the chart demonstrates, less individuals were actively monitored in the 19th Monitoring Period compared to the 18th Monitoring Period. E.I.S.S. reports this reduction was largely due to the removal of staff members who were in the program for non-UOF related reasons (e.g. medical incompetence, AWOL, promotions). The removal of these staff underscores E.I.S.S.'s focus on working with staff members that have UoF-related needs or correction officers that are newly hired by the Department. It's important to note that this shift diverges from the Action Plan's original intent to expand the program to include supervisors and staff on disciplinary probation. However, refocusing E.I.S.S.'s efforts to address the Department's attrition among new staff and the unit's existing staffing limitations appears to be a practical adjustment.

**<u>Priorities and Focus of E.I.S.S. Work</u>**

Given E.I.S.S.' more limited resources, the Monitoring Team has consistently advised E.I.S.S. to concentrate its efforts on staff who would derive the greatest benefit from the program in order to optimize its impact. In response, over the last year, E.I.S.S. has narrowed its focus to screening staff specifically referred for UOF violations over referrals for other types of matters. As a result, E.I.S.S. is not currently working with newly promoted supervisors or screening staff for non-UOF violations such as issues related to staff absenteeism or undue familiarity as it had in the past.

Further, during this Monitoring Period, EISS placed increased emphasis on engaging probationary officers, particularly those assigned to GRVC. E.I.S.S. reports that the decision to

---

[137] The total number of Actively Monitored Staff for each Monitoring Period includes all staff who began monitoring during the period, remained in monitoring throughout the Monitoring Period, completed monitoring, or had been enrolled in monitoring (but not yet started).

prioritize probationary correction officers was informed by facility tours and conversations with probationary officers, who E.I.S.S. determined could benefit from additional guidance and mentorship opportunities. The primary objectives of focusing on this group were to improve retention, morale, and early-career support by providing clear guidance on security practices, use of force, and housing area responsibilities. E.I.S.S. reports that officers early in their career can often face challenges that lead to premature resignation or misconduct, and that proactive engagement can help mitigate these issues. E.I.S.S. hopes to provide probationary officers with a safe environment to talk about the job, share recommendations for improved facility operations, and vent frustrations. Given the E.I.S.S's current staffing limitations, placement and routine meetings are held in group sessions.

## Screening and Placement of Staff for E.I.S.S. Monitoring

55 staff were placed for monitoring during the 19th Monitoring Period. 41 of the 55 selected were entry level probation officers from GRVC. E.I.S.S. leadership reported they intentionally chose to onboard probationary staff from GRVC because, after touring the facilities and speaking with staff, they determined that new officers at GRVC face the greatest challenges and therefore have the highest support needs.

The additional 14 were staff screened and selected for monitoring based on referrals from the Rapid Reviews, the Bureau Chief's Office, Trials, the Investigation Division ("ID"), or facility leadership. When an individual is referred to E.I.S.S. for potential monitoring, the E.I.S.S. team conducts a screening of the staff member's history over the past few years to determine whether they would benefit from monitoring. This screening includes reviewing the staff member's disciplinary records and the related use of force incident investigations, reports, and videos, culminating in a synopsis of the findings. If E.I.S.S. determines that monitoring is appropriate, they schedule a placement meeting to discuss the individual's participation in the program and outline the support E.I.S.S. will provide.

The table below depicts the work of E.I.S.S. between January 2020 and December 2024.

| Overview of E.I.S.S. Program | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **2020** | **2021** | **2022** | **2023** | **Jan. to Jun. 2023 (16th MP)** | **July to Dec. 2023 (17th MP)** | **Jan. to June 2024 (18th MP)** | **July to Dec. 2024 (19th MP)** |
| *Screening* | | | | | | | | |
| Staff Screened[138] | 218 | 117 | 117 | 96 | 66 | 30 | 59 | 35 |
| Staff Selected for Monitoring[139] | 75 | 77 | 99 | 89 | 63 | 26 | 41 | 55 |
| *Monitoring* | | | | | | | | |
| Staff Began Monitoring Term | 86 | 46 | 69 | 84 | 61 | 23 | 21 | 34 |
| Staff Completed Monitoring | 38 | 21 | 25 | 25 | 17 | 8 | 4 | 20 |

As shown in the table above, the Department screened 35 staff during this Monitoring Period, a decline from 59 in the previous period. Of those staff screened, 14 were selected for monitoring. As for the remaining 41 of the 55 staff selected for monitoring, these staff were selected because they are probationary officers. They are not subject to the traditional screening process given their lack of employment history. Instead, probationary staff are added directly to E.I.S.S., where a file is created, and basic paperwork is completed. A personalized action plan is developed as they progress in their role, and video reviews are conducted once they become involved in use-of-force incidents

The traditional screening practices remain lengthy and time intensive. The Monitoring Team has long recommended that E.I.S.S. work to identify efficiencies in how this work can be conducted more efficiently. To date, none have been identified.

---

[138] The number of staff screened for each Monitoring Period may include some staff who were screened in prior Monitoring Periods and were re-screened in the identified Monitoring Period.

[139] Not all staff selected for monitoring have been enrolled in the program. Certain staff left the Department before monitoring began. Other staff have not yet been placed on monitoring because they are on extended leaves of absence (*e.g.*, sick or military leave) or are serving a suspension. Finally, E.I.S.S. does not initiate a staff's monitoring term if the staff member has subsequently been placed on a no-inmate contact post due to the limited opportunity for mentorship and guidance.

## E.I.S.S. Meetings with Staff

Once placed under monitoring, the individual in monitoring will review any subsequent use of force incident they are involved in with members of the E.I.S.S. unit. E.I.S.S. has set a goal to try to meet with Staff on monitoring once every other month to discuss these incidents and any other performance-related issues.[140] In practice, E.I.S.S. tries to conduct 2 to 3 meetings every business day, and may meet with staff at much longer intervals than every other month. The cadence of meetings depends on numerous factors including E.I.S.S staffing, E.I.S.S. workloads, and the individual's actual availability to meet.[141]

E.I.S.S.' ability to schedule meetings can be limited if E.I.S.S. Leadership has other meetings scheduled or must prioritize other work, like reviewing referrals or conducting screening. Even once meetings are scheduled, the meetings may not in fact occur. E.I.S.S. reports that due to staffing shortages and various scheduling inefficiencies, such as the facility not providing relief for staff, meetings being scheduled outside of staff availability, or staff not attending, many scheduled meetings do not take place. For example, in September 2024, nearly 50 meetings were scheduled, but only 25 were actually held.

To address the persistent scheduling issues, E.I.S.S. implemented a revised scheduling protocol in late 2024 aimed at improving coordination with facility leadership.[142] E.I.S.S. has reported some improvement in attendance since implementing these measures, however, the Monitoring Team's review of meetings that were scheduled and occurred in early 2025 indicates

---

[140] E.I.S.S. leadership has reported that due to staffing constraints it cannot meet with Staff on E.I.S.S. more frequently. E.I.S.S. had originally hoped to meet with staff on a monthly basis. In particular, E.I.S.S. believes that additional ADWs are necessary in order to conduct these meetings.

[141] E.I.S.S. reports that scheduling the check-in meetings is tracked internally by the E.I.S.S.'s principal administrative aid. To notify staff of their meetings, E.I.S.S. sends an email notification to the staff member's facility. The facility is then responsible for giving the notification to the staff and requiring them to sign it before the facility emails it back E.I.S.S. On the day of the meeting, the facility is expected to relieve the staff member so they can attend the E.I.S.S. meeting.

[142] Each morning, the unit began sending emails to the Warden, ADW, and Control Officer at each facility, listing the staff scheduled for E.I.S.S. meetings that day and reminding leadership that these meetings constitute official Department business. Facility personnel were expected to notify the identified staff, obtain their signature on the official business notice, update their schedules accordingly, and ensure they were relieved from their posts. E.I.S.S. has also escalated the issue to senior leadership and, in some cases, contacted facility Wardens directly to request that mutuals and post assignments not interfere with meeting attendance.

a lower frequency in meetings scheduled. E.I.S.S reports this was due to the limited availability of the units leadership. It is therefore too early to assess the overall effectiveness of the protocols implemented to improve scheduling.

**Management of E.I.S.S.**

In October 2024, the Monitoring Team recommended that the Department evaluate E.I.S.S.' position in the organization structure and ensure that the leadership overseeing E.I.S.S. is best positioned to support the Assistant Commissioner and assist in enhancing E.I.S.S.' efficiency and effectiveness and obtain the necessary resources. The Assistant Commissioner of E.I.S.S. reports directly to the Commissioner. The Department reported it was evaluating the most appropriate reporting structure for E.I.S.S. in the agency's organizational structure. As a result of this work, following the close of the Monitoring Period, the Department reported that the Assistant Commissioner of E.I.S.S. will now report to the Senior Deputy Chief of Staff.

As for the management of the unit itself, throughout 2024, the E.I.S.S. unit reported that it continued to operate under staffing constraints. The unit operated with one Assistant Commissioner, an ADW, and a Captain. The Director position remained vacant for all of 2024. The process to fill this position was protracted.[143] The position became vacant in October 2023 and was only filled in February 2025. The unit also experienced prolonged absences of key support personnel, including its Principal Administrative Aide and its assigned Correction Officer.

The absence of a Director and other support staff throughout 2024 hampered the unit's ability to expand its reach, maintain consistent facility engagement, and assign key responsibilities such as meeting preparation, staff screening, scheduling, data reporting and strategic planning. Additionally, E.I.S.S. leadership reports that the lack of uniformed personnel within the unit has been cited as a barrier to effective mentorship, credibility, and rapport with monitored staff. E.I.S.S. Leadership reports they have made repeated requests for uniform staff

---

[143] The position wasn't posted until more than five months after it was vacated in April 2024, reportedly due to bureaucratic delays, and only after the Monitoring Team repeatedly followed up. The initial positing did not identify any qualified candidates so the position had to be posted again. It took an additional five months for the new post to be posted because of bureaucratic red tape, and, again, only after repeated follow-up from the Monitoring Team. In order to attract a broader pool of candidates, the new posting revised the title and eliminated the requirement that the candidate must be an attorney.

in the rank of ADWs and Officers but the requests have been denied given the Department's broader staffing challenges. While these staffing constraints are legitimate, they also underscore the need for E.I.S.S. to engage in creative solutions to manage its work. The absence of uniformed staff, though a challenge, should not limit the unit's overall impact. E.I.S.S. must explore alternative avenues for support, including drawing on civilian expertise, strengthening partnerships across divisions, and refining its strategies to ensure its goals are not solely dependent on uniformed personnel.

### Conclusion

While E.I.S.S. continues to screen, select, onboard, and meet with staff, its reported limited capacity significantly constrains its ability to meaningfully impact staff conduct. The Monitoring Team continues to recommend a comprehensive assessment of the unit's operations to determine how it can be most effectively leveraged under current conditions. The fact remains that E.I.S.S. is operating at a smaller capacity than was originally intended in the Consent Judgment and Action Plan

Important steps like the appointment of a Director in February 2025 present an important opportunity to strengthen leadership, reestablish consistent engagement with facility stakeholders, and improve internal operations. However, the lack of uniformed staff and continued under-resourcing remain significant barriers to fulfilling the unit's mission.

To ensure E.I.S.S. can meet its goals and avoid a potential downgrade in compliance ratings, institutional support and leadership, increased staffing, and improved coordination with facility leadership are essential, even within the context of limited resources.

| COMPLIANCE RATING | ¶ 1. Partial Compliance |
|---|---|

| **CJ § VIII. STAFF DISCIPLINE AND ACCOUNTABILITY, ¶ 1 (TIMELY, APPROPRIATE AND MEANINGFUL ACCOUNTABILITY)** |
| --- |
| **CJ § VIII. STAFF DISCIPLINE AND ACCOUNTABILITY, ¶ 3 (C) (USE OF FORCE VIOLATIONS)** |

Consent Judgment, § VIII. ¶ 1. *Timely, Appropriate, and Meaningful Accountability.* The Department shall take all necessary steps to impose appropriate and meaningful discipline, up to and including termination, for any Staff Member who violates Department policies, procedures, rules, and directives relating to the Use of Force, including but not limited to the New Use of Force Directive and any policies, procedures, rules, and directives relating to the reporting and investigation of Use of Force Incidents and video retention ("UOF Violations").

Consent Judgment, § VIII. ¶ 3. *Use of Force Violations.* In the event an investigation related to the Use of Force finds that a Staff Member committed a UOF Violation:

. . .

c.  The Trials Division shall prepare and serve charges that the Trials Division determines are supported by the evidence within a reasonable period of the date on which it receives a recommendation from the DCID (or a designated Assistant Commissioner) or a Facility, and shall make best efforts to prepare and serve such charges within 30 days of receiving such recommendation. The Trials Division shall bring charges unless the Assistant Commissioner of the Trials Division determines that the evidence does not support the findings of the investigation and no discipline is warranted, or determines that command discipline or other alternative remedial measures are appropriate instead. If the Assistant Commissioner of the Trials Division declines to bring charges, he or she shall document the basis for this decision in the Trials Division file and forward the declination to the Commissioner or designated Deputy Commissioner for review, as well as to the Monitor. The Trials Division shall prosecute disciplinary cases as expeditiously as possible, under the circumstances.

This compliance assessment evaluates the provisions that require the Department to impose timely, appropriate, and meaningful accountability for use of force ("UOF") related violations (Consent Judgment, § VIII, ¶ 1) and the expeditious prosecution of cases for formal discipline by the Trials Division (Consent Judgment, § VIII, ¶3 (c)). This compliance assessment covers the period between July and December 2024, the 19th Monitoring Period.

The provisions discussed in this section are each distinct, but intrinsically interrelated because they all relate to the Department's accountability system. Progress towards compliance with the provisions discussed in this assessment depends heavily on the Department's success in other areas, particularly in identifying misconduct via Rapid Reviews and use of force investigations. Once identified, discipline must be both timely and proportional to the severity of the misconduct in order to drive meaningful change.

## Background on Compliance Assessment

The Monitoring Team first assessed compliance with Consent Judgment § VIII ¶ 1, during the 4th Monitoring Period (January to June 2017), finding the Department in Non-

Compliance, which remained until the 12th Monitoring Period (January to June 2021). The Department achieved Partial Compliance in the 14th Monitoring Period (January to June 2022) and maintained that rating in the 15th Monitoring Period (July to December 2022), but was then downgraded to Non-Compliance in the 16th Monitoring Period (January to June 2023), where it remained through the 18th Monitoring Period (January to June 2024).

The Court's 2024 Contempt Order (dkt. 803) found the Defendants in contempt for failing to comply with Consent Judgment § VIII ¶ 1. The Court explained the basis for its finding at pages 18 to 22 in section "Failure to Conduct Adequate Use of Force Investigations and Hold Staff Accountable" of the Order.

During this current Monitoring Period (July to December 2024), the Department achieved Partial Compliance with Consent Judgment § VIII ¶ 1 as discussed below.

The history of compliance with Consent Judgment § VIII ¶ 3 (c) is more nuanced. The Monitoring Team first assessed compliance with this provision in the 3rd Monitoring Period (August to December 2016), finding Non-Compliance, but then did not rate the provision in the 4th Monitoring Period. However, since the 5th Monitoring Period (July to December 2017), the Monitoring Team has also rated the various requirements of this provision separately.

- **Serving Charges**. The Department has been in Substantial Compliance with the requirement regarding serving charges since the 5th Monitoring Period (July to December 2017). As discussed further below, the Department remains in Substantial Compliance with this requirement for the current Monitoring Period.

- **Administrative Filing**. The Department was in Substantial Compliance with this requirement from the 5th Monitoring Period (July to December 2017) to the 15th Monitoring Period (July to December 2022). The Monitoring Team did not assess compliance with this requirement from the 16th to 18th Monitoring Periods. As discussed further below, despite the recent increase in administratively filed cases, the Department was again found in Substantial Compliance with the requirements regarding administrative filing during the current Monitoring Period.

- **Expeditiously Prosecuting Cases**. The Monitoring Team first assessed compliance with the requirements related to prosecuting cases as expeditiously as possible in the 5th Monitoring Period (July to December 2017), finding the Department in Partial

Compliance. The Department maintained Partial Compliance through the 11th Monitoring Period (July to December 2020), but the compliance rating was downgraded to Non-Compliance in the 12th and 13th Monitoring Periods (January to December 2021). The Department again achieved Partial Compliance with this requirement in the 14th Monitoring Period (January to June 2022), where it remained through the 18th Monitoring Period (January to June 2024). As described below, the Department achieved Substantial Compliance with this requirement during the current Monitoring Period.

## Elements of Meaningful Accountability

Swift, proportional accountability for staff misconduct is a cornerstone of the *Nunez* reforms. The goal of accountability is both to rebuke negative conduct and to decrease the likelihood of its reoccurrence. Decreasing the likelihood of subsequent misconduct occurs both through deterrence, but also through awareness and skill development. Staff must be made aware of their policy violations and taught new skills for managing their job duties more effectively and appropriately, which is why corrective interviews, retraining and counseling may be an effective response. Further, shaping an individual's behavior requires prompt feedback. For this reason, the Monitoring Team has long supported the use of more immediate actions and the expansion of Command Disciplines in order to improve the timeliness and skill-based focus of accountability for staff misconduct. The proportionality of the response is also critical—egregious misconduct warrants a severe penalty while less serious policy violations merit a response that enhances the staff person's ability to improve their job performance. That said, severe sanctions are not always necessary to catalyze change, and progressive discipline can provide opportunities for staff to correct their conduct after being made aware of their violations. Finally, the response to misconduct must consider the recipient and what will be most effective in cultivating that individual's professional development—there is no "one-size-fits-all" approach. Both the circumstances of the event and the staff member's characteristics, history, and potential must be considered. It is therefore critical to understand that effectively responding to misconduct cannot be entirely formulaic—to be most effective, it must consider a variety of individualized circumstances.

As discussed throughout this section, the Department responds to a large volume of policy violations committed by hundreds of staff members each month. The frequency of

misconduct is concerning, but the fact that the Department *is* identifying and responding to the behavior is encouraging. The Department has improved certain aspects of its accountability system. As a foundational issue, the Department's incremental improvements in identifying misconduct mean that accountability is more certain. Regarding the disciplinary system itself, discipline is imposed more quickly, and fewer cases languish well-beyond the incident date. That said, in some cases, discipline is still imposed long after the misconduct occurred, supervisors are rarely held accountable for their ineffective supervision of the event, and although improved, the Department remains inconsistent in the detection of misconduct (i.e., sometimes it is identified, sometimes not) and in the types of sanctions applied (i.e., discipline for the same type of misconduct can vary widely). For these reasons, it is perhaps unsurprising that the level of staff misconduct has not substantially reduced.

## Accountability for Staff Misconduct (see Appendix E, Table 1)

Although the numbers ebb and flow slightly year-to-year, between one and two thousand staff members are held accountable for misconduct each year. It must be emphasized that while the number of staff ultimately held accountable is informative, this data cannot be viewed in a vacuum. The threshold question is whether the Department is reliably identifying misconduct in the first place. As noted elsewhere in this report, although more work remains, the Department has improved and is now more reliably identifying misconduct than in the past, reducing the likelihood that violations go unaddressed simply because they were not detected. Further, the Monitoring Team has observed a decrease in the most egregious use of force misconduct, although to be certain, certain egregious incidents still occur and overall, violations still occur at unacceptable levels.

- In 2022, the Department held nearly 3,000 staff members accountable for misconduct. Since then, the Department has disciplined (via Command Discipline, Immediate Action and Formal Discipline) approximately 1,700 staff members each year.

- Since 2022, the proportion of cases in which *formal* discipline (i.e., MOC charges) was imposed has steadily decreased (from 62% in 2022, to 38% in 2023, and 24% in 2024) with concomitant increases in corrective action that occur closer in time to the incident (i.e., Command Disciplines, suspensions, corrective interviews).

o   During the current Monitoring Period, formal discipline was imposed in 20% of all cases where staff were held accountable (120 of the 610 staff held accountable).

•   In terms of other types of accountability, when Corrective Action is taken (i.e., Command Discipline and Suspension), the general trend has been that the largest proportion of staff are sanctioned via a loss of 1 to 10 compensatory days (66% in 2022, 76% in 2023, and 60% in 2024). This is followed by reprimands (28% in 2022, 11% in 2023, and 35% in 2024) and then, suspensions (6% in 2022, 13% in 2023, and 5% in 2024). Data from the current Monitoring Period reflects this general trend.

•   In addition to formal discipline and corrective action, the Department offers support and guidance to thousands of staff each year via Corrective Interviews and 5003 Counseling, This type of engagement-based accountability was imposed for over 2,800 staff in 2024.

o   In 2024, a much larger number of staff were provided Corrective Interviews via the Command Discipline process compared to previous years (nearly 400 in 2024, compared to less than 100 in previous years). While the effectiveness of Corrective Interviews is hard to measure, their increased use reflects an effort by facilities to address misconduct through direct staff engagement rather than relying mainly on sanctions.

**<u>Immediate Corrective Action (see Appendix E, Tables 2 & 3)</u>**

Immediate Corrective Action is the most prevalent type of staff accountability in this Department, having the benefit of being closer-in-time to the misconduct and being much less procedurally burdensome than formal discipline. As noted in the compliance assessment for First Remedial Order § C ¶ ¶ 1 & 2, there has been improvement in the identification of cases where immediate corrective action is necessary and a corresponding reduction in the number of cases that were not addressed.

•   Each year, the Department imposes thousands of Immediate Corrective Actions in response to use of force-related misconduct. This type of staff discipline has the important benefit of being imposed close-in-time to the misconduct, which—*if the*

*intervention is of sufficient quality*—should enhance its effectiveness to change staff's behavior.

- In 2024, Immediate Corrective Action was imposed 4,208 times. While the exact proportions of each type of action vary year-to-year, historically, 5003 Counseling/Corrective Interviews comprise the largest group (about two-thirds of all immediate actions), followed by the deduction of 1 to 10 compensatory days via Command Disciplines (about 20%) and reprimands via Command Disciplines (about 10%). Suspensions and Modified Duty/no inmate contact are imposed less frequently (less than 5% of all immediate actions). While the number of staff that require suspension or modified duty remains high (reflecting ongoing concerning practices), it is notable that the overall number of cases meriting such treatment have started to decrease.

- The Department has made a deliberate shift toward increasing its use of Corrective Interviews and 5003 counseling as tools to address staff misconduct to focus on skill building for staff. This shift reflects a strategy that recognizes the inherent limitations of simply relying on formal discipline. Even when handled efficiently, formal discipline can be time-consuming to resolve and does not always succeed in helping staff fully understand the nature of their missteps or how to modify their behavior moving forward. Corrective Interviews and 5003 counseling, when conducted with fidelity, can serve as valuable mechanisms to address misconduct in a timely and constructive manner. For these interventions to be effective, the meeting must appropriately cover the circumstances surrounding the incident and clearly articulate the nature of misconduct as well as the expectations for appropriate conduct. At their best, Corrective Interviews function as one-on-one coaching sessions, where facility leadership model professionalism and accountability and create space for two professionals to constructively engage with a mutual goal of improving future practices, rather than a one-sided reprimand. Ultimately, the success of these interventions in driving behavior changes rests with the facilities themselves. If these strategies fail to achieve meaningful improvements, the Department will need to reassess and refine their approach. However, with proper implementation, Corrective Interviews and 5003 counseling hold meaningful

potential to promote accountability and skill-building, even outside the framework of formal discipline.

**Accountability for High Level Supervisors (see Appendix E, Table 4)**

Facility leadership (Wardens, Deputy Wardens, and Assistant Deputy Wardens) are almost never held accountable for misconduct or for the systemic failures within the facility that violate Department policies related to security and Use of Force. This likely perpetuates the tendency of many supervisors not to guide their subordinates toward better practice.

- Wardens and Deputy Wardens have been held accountable only three times between 2023 to 2024. ADWs have been held accountable 65 times in 2023 and 62 times in 2024, but the sanctions are not typically severe (i.e., only 5% (n=3) resulted in formal discipline or suspension in 2024).

- Given the large number of supervisory failures observed by the Monitoring Team during its routine review of incidents, the fact that supervisors are rarely, if ever, held accountable may begin to explain the lack of progress observed in the quality of staff supervision in this Department. An important element of discipline is to increase staff's skillset such that similar situations are handled appropriately in the future—failing to hold supervisors accountable for their management failures essentially ensures that their poor practices will continue.

**Command Discipline (see Appendix E, Table 5)**

Command Disciplines ("CDs") are one of the key pathways for holding staff accountable for use of force-related misconduct.[144] The Monitoring Team has advocated for the expanded use of CDs for many years, which has finally started to occur. There is approximately equal proportions of CDs that impose severe penalties (such as a loss of compensatory days) versus CDs that impose less severe penalties (such as reprimands, retraining and corrective interviews). The Department's efforts to centralize the adjudication of Command Disciplines has helped to ensure that it is imposed as intended, although continued improvements are still needed (see

---

[144] The Department also utilizes Command Disciplines outside of the Rapid Review setting. 811 were issued during the current Monitoring Period. Some of these are related to use of force related misconduct, but most are not. See Appendix E, Table 6 for information regarding their outcomes.

further discussion in the Update on 2023 Nunez Court Orders section). The Department continues to lose about one-tenth of its CD cases to preventable due process failures, which is an improvement over prior years but is still ripe for further improvement.

- Because CDs can be imposed more quickly than formal discipline, they are a critical accountability tool. Historically, facility leadership has been unable to process the large number of CDs efficiently, with large proportions being dismissed or closed administratively. These failures undercut the integrity of the process and the effectiveness of the intervention itself. In 2024, the Department's new Informal Command Discipline Unit (ICDU) began adjudicating CDs in order to centralize this function.[145]

- In 2024, approximately equal portions of CDs resulted in more severe penalties (37%; MOC 5%, and loss of compensatory days 32%) and less severe penalties (39%; 19% reprimand, 4% retraining, and 16% corrective interview). In previous years, typically about half of all CDs resulted in more severe penalties. The choice behind penalties is multi-factorial, depending on the severity of misconduct and characteristics of the individual staff member (e.g., disciplinary history, tenure, receptiveness, potential, etc.), and thus the observed shift in the aggregate trend cannot be easily interpreted.

- Dismissals of CDs reached a historical low point in 2024; only 13% were dismissed or administratively filed and 4% were never entered into CMS, whereas in prior years, these categories accounted for about one-third of all CDs. This suggests that the ICDU is succeeding in its objective to shore up the processing of CDs, although continued improvement is still necessary.[146]

**Formal Discipline (see Appendix E, Table 7)**

In addition to Immediate Corrective Action, the other pathway in the Department's accountability framework is formal discipline. The number of cases referred for formal discipline was much lower during the current Monitoring Period, which the Department reports is partly attributable to an intentional choice by leadership to utilize accountability options that may be

---

[145] *See* the Monitor's November 22, 2024 Report (dkt. 802) at pgs. 119-120.

[146] Over half of the dismissals during the current Monitoring Period were the results of due process failures, such as late hearings, clerical errors, or failure to enter the CD in CMS. These preventable issues continue to undermine the system's integrity.

implemented more quickly and that focus on skill-building. The ongoing backlog of Full ID cases, which also contribute to referrals formal discipline charges, is also contributing to the decrease. Perhaps due to the resulting smaller caseload, the Trials Division has begun to close cases closer in time to the date of the incident and cases are pending with the Trials Division for shorter periods of time following referral from ID.

- Since 2016, the Department has referred more than 5,200 cases to the Trials Division for formal discipline. Historically, in each of the years since the Consent Judgment went into effect, around 500 to 1,000 cases were referred per year. In 2024, the Department referred just 137 cases. A large number of investigations for 2024 incidents remained pending with ID as of December 2024 (n=2,167), so the 2024 total is not yet final and is expected to increase.

- The Department's current leadership, with the Monitoring Team's support, has deliberately shifted toward greater use of Command Disciplines, which increased significantly in 2024, because they can be imposed closer in time to the incident, which should, in fact, support improved practice. As noted previously, the effectiveness of this approach will rely heavily on the quality of 5003 Counseling, Corrective Interviews and Retraining, which must be closely scrutinized, and then reformulated if staff practice does not improve.

**Backlog of Cases Pending Formal Discipline (see Appendix E, Table 8)**

The number of cases pending with the Trials Division remains at a reasonable number, with no sign of a reemerging backlog.

- The Trials Division has succeeded in reducing its backlog of disciplinary cases to a reasonable number. Compared to 2020-2022 when over 1,000 cases were pending at the end of each Monitoring Period, only 270 cases were pending at the end of the current Monitoring Period.

**Timeliness of Formal Discipline (see Appendix E, Table 9)**

Although the caseload size has become more manageable, the opportunity for *timely* discipline for the majority of cases has been lost. It is important to note that even when the formal disciplinary process is operating as intended, which is not occurring as of yet, the timeline

to fully resolve a case can exceed *at least* 180 days. This is because the time to complete the investigation can take up to 120 days (Consent Judgment, § VII, ¶ 9), then there is another 30 days for charges to be served (Consent Judgment, § VIII. ¶ 3), followed by at least a few months to prosecute and resolve the case (and a minimum of five months if a trial at OATH is to take place). This extended timeline, even under ideal conditions, underscores why the Monitoring Team has consistently emphasized the need for more immediate, close-in-time responses to staff misconduct.

In this Monitoring Period, out of the 270 cases pending, 190 have been pending for more than a year. Of these 190 cases, approximately 90 cases cannot be prosecuted due to external factors such as the staff member being out on military leave, sick leave or if the case is on hold while being evaluated for criminal prosecution by outside law enforcement agencies.

- Although the Department has eliminated the disciplinary backlog, it struggles to impose formal discipline in a timely manner. Over half (57%) of the cases that were closed during the current Monitoring Period and 70% of the cases currently pending with the Trials Division address staff misconduct from incidents that occurred over one year ago. However, as noted above, nearly half the cases currently pending over one year cannot be closed by the Trials Division due to factors currently out of their control.

- In order for discipline to become more timely, both the investigative and adjudication processes must become more efficient.

**<u>Length of Time that Cases Remain Pending with the Trials Division (see Appendix E, Tables 10 & 11)</u>**

The Department's success in addressing the backlog of disciplinary cases in 2021/2022 led to substantial decreases in the length of time that cases remain pending with the Trials Division. Compared to 2021/2022 when more than half of cases had been pending with the Trials Division for over a year prior to closure, a much smaller proportion of cases during the current Monitoring Period (15%) were pending with the Trials Division for that period of time.

- Although formal staff discipline is not yet imposed in a timely manner, the adjudication process has become far more efficient.

- For the past two years (since the disciplinary backlog was resolved in 2022), the vast majority of cases (80% or more) were closed within one year of referral from ID to the Trials Division.

  - During the current Monitoring Period, 51% of cases were closed within just three months of being referred to the Trials Division by ID, which is a significant improvement over prior years. Only a small proportion of cases closed during the current Monitoring Period (16%, or about 40 cases) had been pending for more than one year since being referred by ID.

- Similarly, at the end of the current Monitoring Period, the Trials Division had a historically low number of pending cases (n=270, compared to over 1,000 cases in 2020 and 2021). Only 15% had been pending for more than one year since the service of charges, which is a significantly smaller proportion than in previous monitoring periods. About one-third (32%) of pending cases were awaiting final approval of the Deputy Commissioner of the Trials Division or the Commissioner. It appears that the number of cases pending final approvals is an anomaly as a result of both a push to complete cases before the end of the year and a one-time technological issue that resulted in the need to re-process certain cases. These cases were addressed and closed shortly after the Monitoring Period.

**Dispositions of Formal Discipline Cases (see Appendix E, Table 12)**

Most formal discipline cases were resolved via a Non-Prosecution Agreement ("NPA"), and very few cases went to trial at OATH. Additionally, a larger proportion of cases were administratively filed during the current Monitoring Period than in the past.

- Given the resolution of the disciplinary backlog, the number of cases closed during 2023/2024 have assumed more normalized case processing levels (~750 cases in 2023 and ~570 in 2024). About one-third of the cases (n=187) closed in 2024 were resolved during the current Monitoring Period.

- Historically, the vast majority of cases (~80%) have been resolved via an NPA. This continued to be true during the current Monitoring Period, with 64% of cases closed via NPA.

- o However, the proportion of cases that were administratively filed increased (from 10% in 2023 to 22% in 2024). A more fulsome discussion of administratively filed cases is provided later in this section.

- o Historically, only a small proportion of cases are closed via OATH (typically less than 5%), a pattern that continued during the current Monitoring Period, when only two cases were resolved following an OATH trial.

**Penalties Imposed via NPA (see Appendix E, Table 13)**

In most of the cases resolved via NPAs, a loss of less than 30 compensatory days was imposed. The Department continues to rely on conventions that were utilized to clear the 2022 backlog expeditiously (e.g., a CD and/or with expungement), and the Monitoring Team encourages judicious use of these options.

- Although a variety of penalties are available via NPA (e.g., reprimand, demotion, termination), NPAs most often impose a loss of compensatory days. During the current Monitoring Period, 89% of NPAs imposed a loss of less than 30 compensatory days and only 12% imposed a loss of 30 days or more. This is in contrast to the patterns seen in prior years, where a greater proportion of NPAs imposed losses of more than 30 days.

  - o When evaluating the Department's overall efforts to impose appropriate discipline and to determine whether those actions are consistent with the Disciplinary Guidelines, the Monitoring Team considers: (1) the time taken to impose discipline, (2) the specific facts of the case (including the aggravating and mitigating factors, the staff's prior history, and other circumstances as appropriate), and (3) the proportionality of the sanctions imposed. During this Monitoring Period, the Monitoring Team reviewed 61 cases where discipline was imposed after October 27, 2017[147] (when the revised Disciplinary Guidelines[148] went into effect), to assess whether the actions taken were reasonable and aligned with the Disciplinary Guidelines. Overall, case outcomes remain largely

---

[147] There were two cases closed in this Monitoring Period in which the incident date occurred before October 27, 2017. These two cases were not part of the assessment.

[148] See Monitor's April 18, 2018 Report (dkt. 311) at pgs. 120 to 121.

reasonable. In a small number of cases the outcomes appeared to be questionable, but the presence of potential mitigating factors does offset the concerns. Finally, an even smaller number of cases appeared to have unreasonable outcomes where it appeared that the use of lower-level sanctions may not have been aligned with the Disciplinary Guidelines. The Monitoring Team will continue to closely monitor both the type and timeliness of imposed discipline, which are essential to maintaining the disciplinary system's integrity, and to ensuring safety in facilities, fairness to staff, and compliance with the Consent Judgment.

- One of the strategies for resolving the disciplinary backlog in 2022 was to make additional low-level sanctions available to the Trials Division via the formal disciplinary process (e.g., resolving the case as a Command Discipline and/or expunging the case from the staff's record after one year). While these offerings helped to dispose a large number of cases more quickly, the Monitoring Team has since recommended curtailing the use of these options.

  o A substantial proportion of NPAs continue to include these sanctions (56% of all NPAs during the current Monitoring Period). *See* Appendix E, Table 14. The Trials Division reported that most of the NPAs that were settled with a CD were those in which a CD had been initially offered, but the staff member refused, which led to formal charges being issued, which were ultimately resolved with a CD.

## Cases in which Formal Discipline was Not Imposed (see Appendix E, Tables 12 and 13)

At times, cases referred for formal discipline do not ultimately result in a sanction being imposed either because the staff member resigns or retires before the prosecution is complete or because the charges are dismissed.

- **Deferred Prosecution**. These are cases in which the staff member chose to leave the Department *with charges pending* and before the case was resolved. Such cases are categorized as "deferred prosecution" because no final determination has been rendered but the facts suggest the case should not be dismissed and the prosecution of these cases will proceed if the staff member returns to the Department. The

proportion of cases disposed in this way increased in 2021 and 2022 (13% and 9%, respectively). This proportion decreased in 2023 and 2024 (4% and 3%, respectively).

- **Administratively Filed Cases**. Administrative filings occur when the Trials Division determines that the charges cannot be substantiated or pursued (*e.g.*, when the potential misconduct could not be proven by a preponderance of the evidence, or when a staff member resigns before charges are served).[149] In other words, these cases are dismissed. In 2024, 126 cases were closed via administrative filing, which is 22% of all cases closed in 2024. The Monitoring Team closely scrutinized these cases given this increase. The Monitoring Team found that the increase in administratively filed cases was driven in part by issues with the investigations conducted by the Investigation Division (ID) in 2022 and 2023. Specifically, the Trials Division found that it was not in a position to effectively prosecute certain cases as a result of the issues with the underlying investigation. As the ID investigations have improved, it does not appear that this issue will continue. The Monitoring Team found that the determination in these cases was reasonable under the circumstances. Additional cases were administratively filed because of additional evidence raised by the staff member being charged or because of administrative issues (e.g. the incorrect person was charged, the person charged was on probationary status and so a Personal Determination Review ("PDR" the disciplinary process for probationary staff) should have been utilized, etc.). Overall, the Monitoring Team has found that the process for evaluating, and ultimately administratively filing cases, is reasonable. The Monitoring Team will continue to scrutinize administratively filed cases to ensure they are processed reasonably.

- **Appeals**. Another way that cases ultimately close without discipline (or with a penalty that varies from that imposed by the Commissioner) is via an appeal. A disciplinary decision made by the Commissioner is appealable to the Civil Service

---

[149] Administrative filing is not only determined by the Department and Trials Division but can also be an outcome as result of the input from Administrative Law Judges at OATH. I

Commission,[150] (which is authorized to make the final disciplinary decision[151]) or as an Article 78 proceeding, Between January 2024 and March 2025, the Civil Service Commission issued nine decisions (two for use of force related misconduct, and seven for other types of misconduct) and in each case, the Civil Service Commission affirmed the Department's penalty. This is a welcome change given the concerns the Monitoring Team raised about two decisions by the Civil Service Commission in 2023 that modified the disciplinary sanction imposed by the Department.[152] In addition to the appeals with the Civil Service Commission, the Appellate Division of the Supreme Court of the State of New York issued one decision between January 2024 and March 2025 for use of force related misconduct. The Appellate Division's decision affirmed the Department's penalty of termination. This decision was issued in March 2024, around two years after the Department terminated the officer in April 2022, and three years after the use of force occurred in March 2021.

## Conclusion

Establishing an effective accountability system for staff misconduct requires evaluating the interaction among its three critical subparts— (1) consistently identifying misconduct, (2) promptly applying corrective action, and (3) imposing meaningful and proportionate sanctions. The need to address these components together stems from their collective impact on staff practices, the Department's culture, and, consequently, on overall security and safety within the

---

[150] Pursuant to Section 813 of the New York City Charter, the Civil Service Commission can decide appeals from permanent civil servants who were subject to disciplinary penalties following proceedings held pursuant to section 75 of the Civil Service Law. According to § 3-01 to 3-04 of Title 60 of the Rules of the City of New York, any civil service employee who receives a determination of guilty and/or a penalty can appeal to the Civil Service Commissioner within 20 days of the date of notice of the final disciplinary action. After receiving notice of a timely appeal, the Department has 30 days to submit the complete record of the disciplinary proceedings. The Civil Service Commission then reviews the record of the disciplinary proceeding, allows the parties to submit further written arguments, and may schedule a hearing before issuing a final decision. The Civil Service Commission then issues a written decision to affirm, modify, or reverse the determination being appealed. The Civil Service Commission may, at its discretion, direct the reinstatement of the employee or permit transfer to a vacancy in a similar position in another division or department, or direct that the employee's name be placed on a preferred list.

[151] The Civil Service Commission opinion notes "[t]his decision constitutes the final decision of the City of New York."

[152] *See* the Monitor's April 18, 2024 Report (dkt. 706) at pgs. 129-130.

facilities. Each provision addresses different aspects of the disciplinary process, yet their collective aim is to ensure a robust and effective system of accountability.

The discussion throughout this section and the compliance ratings below represent a systemic analysis, which acknowledges that improvement in one area can support the effectiveness of the whole system. This approach emphasizes the necessity of both an in-depth look at all related parts and a holistic view to address challenges comprehensively in order to establish a practical and effective accountability framework. Thus, in order to establish a sustainable, consistent, and robust accountability system—integral to enhancing security and safety, and elevating staff conduct in alignment with the *Nunez* Court Orders— the Department must ensure all components of the disciplinary process are implemented reliably and monitored consistently. This responsibility extends not only to formal disciplinary proceedings, but also to facility-managed corrective actions that can more quickly and directly influence staff behavior.

- **Consent Judgment, § VIII, ¶ 1**. In this Monitoring Period, the Department made important progress on a number of key factors that have previously kept the Department in Non-Compliance.[153] First, the Department's improvement in reliably identifying misconduct supports the overall effort to hold staff accountable for use of force-related violations. In addition, a timely disciplinary process is essential for properly addressing use of force related misconduct. While the Department's system for holding staff accountable still has a variety of inefficiencies, it has made important progress in adjudicating misconduct cases timely. Now that the Trials Division has addressed its backlog and is receiving fewer cases, cases are processed far more quickly than they have been in the past.[154] Furthermore, the Department has increased its use of Command Disciplines, as encouraged by the Monitoring Team, and CDs are being processed more reliably by the ICDU. These efforts must also be viewed in context of the numerous Court Orders directed to address the disciplinary process. Collectively, these improvements reflect notable progress to address the longstanding issues the Monitoring

---

[153] *See* the Monitor's November 22, 2024 Report (dkt. 803) at pg. 133.

[154] Half of the cases closed during the current Monitoring Period were closed within 3 months of being referred, and a very small number languished beyond one year. Similar performance levels are observed among the pending caseload, with a little less than half of the cases being pending for three months, and a small proportion that has been pending for more than one year.

Team has raised regarding the disciplinary process (compare with the Monitoring Team's September 30, 2021 report (dkt. 399)). Collectively, these improvements are sufficient to upgrade the compliance rating to Partial Compliance. In order to progress toward Substantial Compliance, the Department must not only maintain the current improvements, but also improve the efficiency and quality of the investigation process (so that the overarching disciplinary *system* is efficient, from the time the misconduct occurs to the time the sanction is imposed), hold facility leadership accountable when they violate the Use of Force directive, enhance skill-based interventions (Corrective Interviews and 5003 Counseling) to change staff behavior and improve staff practice, and ensure that all disciplinary sanctions imposed are proportional to the misconduct.

- **Consent Judgment, § VIII, ¶ 3 (c)**. This provision has three parts. First, the Department achieved Substantial Compliance with the requirement related to service of charges in the 12th Monitoring Period and the Monitoring Team has observed no change in practice since then. Second, the Monitoring Team continues to find that charges generally aren't dismissed without a proper basis, and the Department remains in Substantial Compliance. The third requirement focuses on the efficiency of the Trials process itself, and as described above, important improvements to closing cases in a timelier manner once referred to the Trials Division from ID have continued, and the Department remains in Partial Compliance with this requirement. In order to achieve Substantial Compliance, the proportion of cases closed within 3 months upon referral must continue to be sustained and improved. Further, ensuring that all case approvals occur in a timely manner is critical, and further improvement is needed in this area.

| COMPLIANCE RATING | Consent Judgment § VIII., ¶ 1. Partial Compliance |
|---|---|
| | Consent Judgment § VIII., ¶ 3(c)<br>• **Serving Charges**: Substantial Compliance (per the 12th Monitor's Report)<br>• **Administrative Filing**: Substantial Compliance<br>• **Expeditiously Prosecuting Cases**: Partial Compliance |

| FIRST REMEDIAL ORDER § C. (TIMELY, APPROPRIATE, AND MEANINGFUL STAFF ACCOUNTABILITY), ¶ 1 (IMMEDIATE CORRECTIVE ACTION) ¶ 2 (MONITOR RECOMMENDATIONS) |
|---|

§ C. ¶ 1. *Immediate Corrective Action.* Following a Use of Force Incident, the Department shall determine whether any involved Staff Member(s) should be subject to immediate corrective action pending the completion of the Use of Force investigation, which may include counseling or re-training, reassignment to a different position with limited or no contact with Incarcerated Individuals, placement on administrative leave with pay, or immediate suspension (collectively, "immediate corrective action"). The Department shall impose immediate corrective action on Staff Members when appropriate and as close in time to the incident as practicable. The Department shall document and track any immediate corrective action taken, the nature of the initial corrective action recommended, the nature of the corrective action imposed, the basis for the corrective action, the date the corrective action is imposed, and the date of the Use of Force Incident resulting in the immediate corrective action. The requirements in this provision are not intended to alter the rights of Staff or the burden of proof in employee disciplinary proceedings under applicable laws and regulations.

§ C., ¶ 2. *Responding to Monitor Recommendations.* Upon identification of objective evidence that a Staff Member violated the New Use of Force Directive, the Monitor may recommend that the Department take immediate corrective action, expeditiously complete the investigation, and/or otherwise address the violation by expeditiously pursuing disciplinary proceedings or other appropriate action. Within ten business days of receiving the Monitor's recommendation, absent extraordinary circumstances that must be documented, the Department shall: (i) impose immediate corrective action (if recommended), and/or (ii) provide the Monitoring Team with an expedited timeline for completing the investigation or otherwise addressing the violation (if recommended), unless the Commissioner (or a designated Assistant Commissioner) reviews the basis for the Monitor's recommendation and determines that adopting the recommendation is not appropriate, and provides a reasonable basis for any such determination in writing to the Monitor.

The First Remedial Order (dkt. 350), § C, ¶¶ 1 and 2, requires the Department to determine whether immediate corrective action should be taken against a staff member pending the completion of an investigation. Further, the Department must respond within 10 business days to any recommendations from the Monitor to take immediate corrective action, expeditiously complete the investigation, and/or otherwise address the violation by expeditiously pursuing disciplinary proceedings or other appropriate action. The first compliance assessment for both of these provisions occurred for the 11th Monitoring Period (July to December 2020). At that time, the Department was found to be in Partial Compliance on both provisions and remained so through the 18th Monitoring Period (January to June 2024). The Action Plan (dkt. 465), § F, ¶ 2, introduced an additional requirement for the Department to expedite egregious cases on specific timelines to ensure those cases are closed as quickly as possible. Given that these three requirements are inextricably linked, they are addressed together herein.

As part of this process, the Monitoring Team also submits feedback to the Department regarding certain investigations in which it appears that the objective evidence was not adequately investigated or analyzed and recommends that additional review may be necessary or appropriate. This is not intended to serve as a comprehensive review of all investigations by the Monitoring Team, but an attempt to mitigate the possibility that certain misconduct may not be addressed due to an insufficient

investigation. Further detail about these recommendations is provided in this report in the compliance assessment for Consent Judgment, § VII, ¶ 1, Use of Force Investigations.

**Monitor Recommendations for Immediate Corrective Action, etc. (First Remedial Order § C, ¶¶ 1 & 2)**

The use of immediate action is a critical tool for promptly addressing staff misconduct and promoting effective accountability to deter problematic conduct going forward. These actions, taken before the completion of a full Use of Force investigation, may include counseling or retraining, reassignment to a role with limited or no contact with incarcerated individuals, administrative leave with pay, or immediate suspension. Additionally, Command Disciplines are often imposed closer in time to the incident than formal discipline and are also considered part of this immediate response strategy. The overall disciplinary process is discussed in more detail in the compliance assessment for Consent Judgment, § VIII, ¶ 1 Staff Discipline & Accountability.

- **Immediate Corrective Action Taken**. In 2024, Immediate Action was taken in 4,208 separate situations (in some cases, the same staff member may have been subject to immediate corrective action more than once for different incidents.) While the exact proportions of each type of action vary year to year, historically, counseling/corrective interviews comprise the largest group (about two-thirds of all immediate actions), followed by Command Disciplines for the deduction of 1 to 10 compensatory days (about 20%) and reprimands (about 10%). Suspensions and placements on modified duty/no contact with PICs are imposed less frequently (less than 5%). These patterns remained during the current Monitoring Period. The overall number of immediate corrective actions taken is large and with some exceptions, it generally appears that the most egregious cases are addressed close in time. Further, as discussed in the compliance assessment of Consent Judgment § VII, ¶ 1 (Thorough, Timely, Use of Force Investigations) and First Remedial Order § A, ¶ 1 (Use of Force Reviews), the Department's ability to identify instances of misconduct has become more reliable. Data regarding the immediate corrective action imposed for UOF-related misconduct can be found in Table 2 in Appendix E.

- **Monitor Recommendations for Immediate Corrective Action**. The Monitoring Team does continue to identify instances where certain immediate corrective actions likely could have been taken but were not. The Monitoring Team is judicious in the recommendations that it

makes to the Department regarding immediate action cases and only identifies those cases where immediate action should be considered, *and* the incident is not yet stale for *immediate* action to be taken. Given the Monitoring Team's role, it is not often in a position to have contemporaneous information, and so there are inherent limitations on the scope of misconduct the Monitoring Team may identify and recommend for consideration for *immediate* action. For instance, if the Monitoring Team identifies an incident that warranted immediate corrective action (and none was taken), but the incident occurred many months prior, the Monitoring Team does not share a recommendation for immediate action (referred to as a C2 recommendation) because the window of opportunity for taking immediate action has passed. The Monitoring Team's overall goal is to mitigate lost opportunities for immediate action, but this approach is not failsafe. The C2 recommendations shared by the Monitor are only a *subset* of cases in which the Department failed to take immediate corrective action and likely should have.[155]

Between July and December 2024 (the 19th Monitoring Period), the Monitoring Team sent recommendations to take immediate corrective action for one DOC staff in one use of force incident and to expedite investigations into three other use of force incidents pursuant to § C, ¶ 2 of the First Remedial Order (dkt. 350).

- In response to the one case in which the Monitoring Team recommended the Department take immediate corrective action against a staff member, the Department reported that it placed this staff member on modified duty with no contact with people in custody. The investigation was closed and formal MOC charges were filed for the staff member. The formal MOC charges were settled with an NPA for 20 compensatory days.

---

[155] With respect to recommendations to expedite the completion of investigations pursuant to the First Remedial Order (dkt. 350), § C, ¶ 2, as noted in the Monitor's October 28, 2022 Report (dkt. 472) at pg. 162, were not a fruitful avenue to ensuring those cases were addressed quickly. The Monitoring Team therefore now recommends expedited resolution of cases pursuant to the Action Plan (dkt. 465), § F, ¶ 2 (the "F2" process) for cases that merit expedited completion of investigations or discipline and investigations.

- In response to the three cases in which the Monitoring Team did not request immediate action for any specific staff, but did request full ID investigations into the incidents be expedited:

  o One investigation into one use of force is on hold pending stand-down orders from the Department of Investigation ("DOI") to allow DOI to complete its own investigation.

  o Two investigations into two uses of force are still pending. ID reported they would be handled in an "expeditious manner," but the Monitoring Team made its recommendation for both incidents in November 2024, and they are still pending as of March 19, 2025.

The Monitoring Team sent a total of four C2 recommendations during this Monitoring Period. In the one instance for which the Monitoring Team made a recommendation for specific immediate action to be taken against a specific staff member, the C2 recommendation led to immediate disciplinary action against the staff member, as well as an expedited investigation. In the three instances in which the Monitoring Team recommended that full ID investigations be conducted expeditiously, there has been no expeditious closure in these cases. This underscores the need for the Department to strengthen its internal capacity to promptly identify and act on cases requiring immediate action.

- **Overall Assessment of Immediate Corrective Action**. The prevalence of cases in which immediate action should be taken reflects the endemic harmful staff practices related to the use of force. Further, given the large volume of corrective interviews and 5003 counseling sessions imposed (via any pathway), the fact that poor practice remains so prevalent in this Department suggests that the quality of these interventions is insufficient and requires additional reinforcement through improved active supervision. A more detailed discussion regarding accountability and discipline is included in this report in the compliance assessment for Consent Judgment, § VIII, ¶ 1 Staff Discipline & Accountability.

**Expeditious Resolution of Egregious Misconduct (Action Plan § F, ¶ 2)**

The Action Plan (dkt. 465), § F, ¶ 2 ("F2") sets aggressive timelines for the investigation and prosecution of egregious cases. As discussed above, given the limitations on the Monitoring Team's

ability to recommend immediate action, the Monitoring Team has focused on recommendations related to F2. This requirement went into effect in mid-June 2022. Pursuant to the Action Plan, a case identified as needing to be resolved in an expedited manner must be resolved as follows:

- **Investigations**. The investigation(s) of the matter must be completed within 30 business days of identification.

- **Referral for Discipline**. The case must be processed for discipline — including completion of the MOC, referral to the Trials Division, service of charges on the Respondent, production of discovery to the Respondent, provision of an offer for resolution to the Respondent, filing of the case with OATH, and scheduling of a pre-trial conference — within 20 business days of the closure of the investigation.

- **Adjudication of Discipline**. Any and all disciplinary proceedings, including, but not limited to, convening a pre-trial conference, conducting a trial before OATH, and submission of a Report and Recommendation from the OATH Administrative Law Judge ("ALJ") must be completed within 35 business days of the case being filed with OATH.

- **Imposition of Discipline**. The Commissioner must impose the final disciplinary action within 15 business days of receiving the Report and Recommendation from OATH.

Information on the number and outcome of F2 cases can be found in Table 15 in Appendix E. Between mid-June 2022 and mid-March 2025, the discipline for 85 staff across a total of 76 use of force incidents have been closed through the expedited process as outlined above. The Department identified 51 of the 76 incidents; the Monitoring Team identified the other 25 incidents. Notably, the number of F2 cases identified has decreased each year since 2023. This reduction appears to be the result of fewer cases that merit such treatment.

## Outcomes of Closed F2 Cases

With respect to the F2 cases for 85 staff that have closed since this process began, the outcomes are as follows:

- 70 (83%) staff agreed to NPAs for suspension or compensatory days to resolve their cases. The NPA penalties ranged from the very low end (6 compensatory days) to the highest end (*e.g.,* 93 suspension days; 60 compensatory days, plus three-years' probation; demotion).

- Two staff (2%) agreed to NPAs for resignation or retirement to resolve their cases.

- Six staff (7%) elected to have a trial in front of an OATH Administrative Law Judge ("ALJ"). Following the trial, the OATH ALJ determined that all six staff were guilty of their respective charges. For five of these six staff, the Commissioner enacted the ALJ's recommended penalty, but for the other staff member, the Commissioner enacted a reduced penalty.

- Seven staff (9%) did not receive any discipline for their F2 case – for four staff (5%), their disciplinary charges were administratively filed, and three staff (4%) had already resigned/retired or were terminated for other matters before their F2 case could be closed.

    More information about the outcome of these cases can be found in Table 15 of Appendix E regarding the Outcomes of Closed F2 Cases.

**Status of Recent F2 Cases**

Between September 18, 2024 and March 16, 2025,[156] F2 cases were closed for 15 staff, and as of March 16, 2025, the F2 cases for another 11 staff remained pending. The conduct of these 26 staff covered 25 use of force incidents. With respect to the imposition of discipline, the statuses of these 26 F2 cases closed or still pending are:

- 13 cases were resolved with a Negotiated Plea Agreement ("NPA"):

    - Discipline ranged from the lower end (*e.g.* 7 suspension days) to the higher end of suspension days and/or compensation days (*e.g.* 30 suspension days with 2 years limited probation). Almost all (12 of 13) of these NPAs included suspension days or 30 or more compensatory days. No staff were terminated, resigned, or retired as the result of an NPA during this time. Overall, the discipline imposed in these cases was generally reasonable. While some of the outcomes were questionable, the fact that the case was resolved closer in time to the incident ensures that the discipline is more meaningful.

---

[156] For information on cases identified for expedited processing prior to September 18, 2024, see the Monitor's November 22, 2024 Report (dkt. 802) at pgs. 138-140.

- o None of these 13 NPAs were finalized within two months of identification as an F2 case. Two of these 13 cases were on DOI holds for some time, but 8 other cases took ID over 30 business days to complete the investigation which prolonged the resolution of the case. This is a reflection of the overall increase in ID's timing to complete investigations as discussed in further detail in this report in the compliance assessment for Consent Judgment, § VII, ¶ 1, Use of Force Investigations.

- Two cases were resolved following OATH trials:

  - o In one case, one staff member was given a penalty of 49 suspension days following an OATH trial and subsequent Report & Recommendation from the OATH ALJ finding guilt and recommending a 49-day penalty.

  - o In the other case, an OATH ALJ found guilt and recommended termination in a Report & Recommendation following an OATH trial. The Commissioner issued an Action of the Commissioner to reduce the penalty to 30 suspension days, 45 compensation days, and 3 years' probation.

- As of March 16, 2025, 11 cases are still pending. Three cases are on hold pending stand-down orders from DOI to allow DOI to complete its own investigation into the incident.[157] Three cases are pending investigation with DOC's ID Division.[158] Five cases are pending disciplinary resolution with DOC's Trials Division.[159]

Overall, the F2 process has proven to be an effective tool in addressing certain egregious cases more expeditiously than they would otherwise be managed. Further, most F2 cases are resolved with

---

[157] All three cases on DOI hold have been pending longer than two months since they were identified for expeditious resolution. ID cannot conduct its investigation while a case is on a DOI hold, so these DOI holds delay ID from conducting its investigation pursuant to the expedited timeframes set within the F2 process.

[158] Two of the three cases pending with ID have been pending longer than 2 months. The third case pending with ID was placed on a DOI hold for about 7 months and was recently cleared back to ID.

[159] All five cases have only been pending with the Trials Division for less than one month. Four of the five cases pending with the Trials Division had investigations that took longer than 2 months. The fifth case pending with the Trials Division had also been pending longer than 2 months, but that's because it was placed on an extended DOI hold.

generally reasonable outcomes.[160] While the Trials Division consistently expedites the resolution of F2 cases once ID has completed the investigations, delays in ID's completion of these investigations diminishes the efficacy of this process as a means to impose close-in-time discipline and circumvent the protracted processing times that currently characterize most disciplinary matters in the Department. Given that ID's Use of Force Priority Squad ("UPS") conducts the investigations for F2 cases, ID must continue to ensure that UPS has sufficient investigators in order to expeditiously resolve these F2 cases.[161]

Cases of staff misconduct meriting expeditious resolution through the F2 process remain too high, but it is notable that the frequency with which they occur has decreased.

**Conclusion**

- **First Remedial Order, § C, ¶ 1**. While the Department does impose some corrective action immediately after an incident, the failure to consistently identify all incidents that merit immediate action means that the Department does not reliably impose immediate corrective action. Additionally, the corrective action imposed is not always proportional to the misconduct identified. The Department is therefore in Partial Compliance with this provision.

- **First Remedial Order, § C, ¶ 2**. The Monitoring Team's overall goal is to mitigate lost opportunities for immediate action, but this approach is not failsafe. The Monitoring Team does continue to identify some instances where certain immediate corrective actions likely could have been taken but were not. The Department's response to the Monitor's recommendations remains mixed. Given that both the recommendations remain necessary and the responses are mixed, the Department remains in Partial Compliance with this requirement.

---

[160] There have been a few examples in which the discipline imposed (or lack thereof) does not appear consistent with the disciplinary guidelines and so we recommend greater vigilance in ensuring accountability.

[161] In the 18th Monitoring Period, ID reported that UPS closed fewer cases due to staff attrition and reassignments within UPS, as well as the fact that the limited number of UPS staff were assisting with the ID Lookback Audit. *See* the Monitor's November 22, 2024 Report (dkt. 802) at pg. 91. In the current Monitoring Period, more staff were assigned to UPS and the ID Lookback Audit was completed, and accordingly, UPS increased the number of cases it closed as discussed in the compliance assessment for Consent Judgment, § VII, ¶ 1 (Thorough, Timely, Objective Investigations) & ¶ 9 (a) (Timing of Full ID Investigations).

- **Action Plan, § F, ¶ 2**. This process is important and has resulted in more expeditious resolution of some particularly egregious cases. It is particularly noteworthy that ID has self-identified cases for expedited treatment, and the Trials Division continues to consistently expedite the resolution of F2 cases once the investigations have been completed. Further, the number of cases identified by the Monitoring Team has been limited and has decreased over time, a sign that ID has improved in its identification of these cases. This is notable given these cases reflect some of the most egregious cases that occur in the system.

| **COMPLIANCE RATING** | **First Remedial Order § C, ¶ 1.** Partial Compliance<br>**First Remedial Order § C, ¶ 2.** Partial Compliance |
| --- | --- |

**FIRST REMEDIAL ORDER § C. 4/THIRD REMEDIAL, ¶ 2 (EXPEDITIOUS OATH PROCEEDINGS) & FIRST REMEDIAL ORDER § C. (APPLICABILITY OF DISCIPLINARY GUIDELINES TO OATH PROCEEDINGS), ¶ 5**

Third Remedial Order ¶ 2. *Increased Number of OATH Pre-Trial Conferences*. Paragraph C.4 of the First Remedial Order shall be modified to increase the minimum number of pre-trial conferences that OATH must conduct each month for disciplinary cases involving charges related to UOF Violations. Specifically, as of December 15, 2021, Paragraph C.4 shall be revised to read as follows: "All disciplinary cases before OATH involving charges related to UOF Violations shall proceed in an expeditious manner. During each month, Defendants shall hold pre-trial conferences before OATH for at least **150** disciplinary cases involving charges related to UOF Violations, absent extraordinary circumstances that must be documented. If there continues to be delays in conferencing cases despite this calendaring practice, OATH will assign additional resources to hear these cases. The minimum number of case conferences required to be held each month under this Paragraph may be reduced if the Monitor makes a written determination, no earlier than one year after the date of this Order, that disciplinary cases involving UOF Violations can continue to proceed expeditiously with a lower number of conferences being held each month."[162]

§ C., ¶ 5. *Applicability of Disciplinary Guidelines to OATH Proceedings.* The Disciplinary Guidelines developed pursuant to Section VIII, ¶ 2 of the Consent Judgment shall apply to any OATH proceeding relating to the Department's efforts to impose discipline for UOF Violations.

Third Remedial Order ¶ 3. *New OATH Procedures and Protocols.* Within 45 days of the date of this Order, the City, in consultation with the Monitor, shall develop, adopt, and implement a written plan to allow OATH to more expeditiously prosecute disciplinary cases involving charges related to UOF Violations. The plan shall include the following:

    i.    The steps OATH will take to increase the number ALJs and other staff who will be available to hear Department disciplinary cases, including the number of new ALJs and staff that OATH intends to hire by December 31, 2021.

    ii.    Improved procedures to ensure that OATH trials are promptly scheduled and completed without unnecessary delays, including scheduling trials within no more than three months of the initial pre-trial conference.

    iii.    The initiatives and procedures that ALJs will employ to encourage prompt agreed-upon resolutions of disciplinary cases when appropriate.

The Office of Administrative Trials and Hearings ("OATH"), an administrative law court, adjudicates any contested discipline for tenured staff, pursuant to New York State Civil Service Laws § 75. OATH is a City agency, but it is separate and independent from the Department of Correction ("DOC"). Addressing the various requirements of the *Nunez* Court Orders related to accountability inherently requires that OATH practices be considered given their role in the formal disciplinary process. To date, compliance with requirements to effectively hold staff accountable has been elusive. The Monitoring Team has long reported on OATH's involvement in the staff disciplinary process, in particular, concerns related to OATH's practices that impact the ability to impose meaningful and adequate discipline as required by Consent Judgment, §

---

[162] The Action Plan (dkt. 465) requires a compliance assessment with First Remedial Order (dkt. 350), § C, ¶ 4, Timely, Appropriate, and Meaningful Staff Accountability. However, this provision was modified by the Third Remedial Order, ¶ 2 so a compliance rating with Third Remedial Order, ¶ 2 is provided instead.

VIII, ¶ 1 and other provisions of the *Nunez* Court Orders.[163] As a result, the First Remedial Order, Third Remedial Order, and the Action Plan include specific requirements for OATH's practices, including requirements to increase the number of pre-trial conferences, improve efficiency, and to properly apply the Disciplinary Guidelines.

## Background on Compliance Ratings

The first compliance assessment for First Remedial Order (dkt. 350), § C, ¶ 4 occurred for the 11th Monitoring Period (July to December 2020). At that time, the Department was found to be in Partial Compliance and remained so through the 14th Monitoring Period (January to June 2022). The Department was found to be in Substantial Compliance in the 15th Monitoring Period (July to December 2023) and remained so through the 18th Monitoring Period (January to June 2024).

The first compliance assessment for First Remedial Order (dkt. 350), § C, ¶ 5 occurred for the 11th Monitoring Period (July to December 2020). At that time, the Department was found to be in Partial Compliance and remained so through the 18th Monitoring Period (January to June 2024).

The first compliance assessment for Third Remedial Order ¶ 3 occurred for the 14th Monitoring Period (January to June 2022). At that time, the Department was found to be in Partial Compliance and remained so through the 18th Monitoring Period (January to June 2024).

The Monitor's November 22, 2024 Monitor's Report at pages 141-148 described OATH's Role in DOC's Disciplinary Process; OATH Internal Operating Procedures and

---

[163] The Monitoring Team's concerns regarding issues with the OATH process have been documented for several years. *See* Monitor's April 3, 2017 Report (dkt. 295) at pgs. 179-180 and 184-188; Monitor's October 17, 2018 Report (dkt. 317) at pgs. 126-128; Monitor's April 18, 2019 Report (dkt. 327) at pgs. 151-159 and Appendix C; Monitor's October 28, 2019 Report (dkt. 332) at pgs. 183-184 and 186-195; Monitor's May 29, 2020 Report (dkt. 341) at pgs. 206-208; Monitor's October 23, 2020 Report (dkt. 360) at pgs. 66-68 and 175-181; Monitor's December 8, 2020 Report (dkt. 365) at pgs. 5-9; Monitor's May 11, 2021 Report (dkt. 368) at pgs. 99-103, 245-250, and 251-257; Monitor's June 3, 2021 Report (dkt. 373) at pgs. 6-16 and Appendix A; Monitor's December 6, 2021 Report (dkt. 431) at pgs. 96-101 and 113-115; Monitor's December 22, 2021 Report (dkt. 435) at pgs. 4-12; Monitor's June 30, 2022 Report (dkt. 467) at pgs. 31-39; Monitor's October 28, 2022 Report (dkt. 472) at pgs. 94-98 and 162-166; Monitor's April 3, 2023 Report (dkt. 517) at pgs. 189-193; Monitor's July 10, 2023 Report (dkt. 557) at pgs. 135, 139-140, and 230; Monitor's December 22, 2023 Report (dkt. 666) at pgs. 59, 71-75, and Appendix C; and the Monitor's April 18, 2024 Report (dkt. 706) at pgs. 109, 124-125, 137-142.

Guidelines; Background on *Nunez* Reform Efforts with OATH and OATH's Procedures and Protocols remain relevant and are incorporated by reference in this compliance assessment.

**OATH Proceedings**

When the Department is unable to settle a disciplinary matter directly with a staff member, the Commissioner delegates responsibility to adjudicate the matter to the Office of Administrative Trials and Hearings ("OATH"). In these cases, an Administrative Law Judge ("ALJ") conducts a pre-trial conference in an attempt to facilitate a settlement. If a settlement still cannot be reached, a trial is scheduled before a different ALJ than the one who conducted the pre-trial conference. The trial ALJ assesses the evidence to evaluate whether or not the staff member has violated DOC policy. The ALJ then issues a written decision (a Report & Recommendation, or "R&R") with a *recommended* outcome, and if the ALJ determines the staff member violated policy, a proposed penalty. The permissible range of penalties is set by law and includes a reprimand, a fine of up to $100, a suspension without pay for up to 60 days, demotion in title, or termination. Accordingly, most of the discipline imposed by DOC (either through settlement or following a trial) is within this same range of penalties. The DOC Commissioner has the authority to accept the ALJ's factual findings and recommended penalty or to modify them, as appropriate, in order to resolve the case. The DOC Commissioner's determination (and imposition of discipline as warranted) is subject to appeal to the Civil Service Commission or as an Article 78 proceeding.[164]

- **Number and Outcomes of Pre-Trial Conferences**. When pre-trial conferences are needed, they should occur promptly. Further, pre-trial conference dates need to be readily available because simply scheduling a pre-trial conference sometimes encourages DOC and the staff member to settle the case outside of OATH. Then, if the case is not successfully resolved, the full OATH disciplinary process can occur more quickly because the initial proceeding has already been scheduled.

    Historically, pre-trial conferences were only held four to six days per month and their limited availability unreasonably delayed resolution for cases awaiting a pre-trial

---

[164] Appeals to the Civil Service Commission and Article 78 appeals are discussed in more detail in this report in the compliance assessment for Consent Judgment, § VIII, Staff Discipline & Accountability.

conference and those that proceeded to trial. As a result of the First and Third Remedial Orders, the number of pre-trial conferences increased exponentially. OATH is now required to schedule 150 UOF cases for pre-trial conferences each month, and to do so, OATH began to conduct conferences four days per week.

Beginning in February 2024, the City, Department and OATH reached an agreement, with approval from the Monitor, to temporarily adjust the pre-trial conference structure to schedule conferences on only three days per week instead of four.[165] The Department reported that the same number of pre-trial conferences could be supported by the three-day-per-week schedule. The purpose of this change was to allow respondents' counsel to be available to participate in more MEO-16 interviews regarding staff conduct in underlying investigations with ID each week.

Further, beginning in July 2024, the Department sought modifications to the minimum number of case conferences required to be held each month given the reduced number of cases requiring pre-trial conferences. Pursuant to the terms of the Third Remedial Order, the Monitor approved the reduction based on a written determination that disciplinary cases involving UOF Violations can continue to proceed expeditiously with a lower number of conferences being held each month." During this Monitoring Period the Monitor approved a reduction in the number of required pre-trial conferences to 100 in July, 75 in August, and 50 for each month between September and December. A table showing the number of OATH pre-trial conferences scheduled from July 2020 to December 2024 is included in Table 16 of Appendix E.

During the current Monitoring Period, the Department scheduled 542 pre-trial conferences related to use of force misconduct, which exceeds the 375 pre-trial conference threshold approved by the Monitor for this six-month period. Although it exceeds the minimum threshold, the total number of pre-trial conferences scheduled decreased compared to the prior Monitoring Period (from 942 to 542). This reflects the fact that the number of formal disciplinary cases requiring resolution decreased as

---

[165] This agreement is routinely evaluated by the City, Department, OATH and the Monitoring Team to determine whether the 3-day-per week schedule should be extended or whether the fourth day should be reinstated. The current agreement will remain in place through the end of 2024.

discussed in this report in the compliance assessment for Consent Judgment, § VIII, Staff Discipline & Accountability.

The Monitoring Team has long reported that the majority of cases can and should settle without the need for OATH. In this Monitoring Period, half (51%) of UOF cases scheduled for pre-trial conference were settled before the individual appeared at the pre-trial conference before OATH. This is a reduction in the proportion of cases that were resolved prior to the pre-trial conferences when compared to 2022, 2023 and the first half of 2024 (60-70%).

While fewer cases were scheduled for OATH pre-trial conferences this Monitoring Period, the number of conferences actually convened (*i.e.*, conferences that were scheduled for cases that did not settle prior to the pre-trial conference date) was similar to the number of pre-trial conferences convened in the last few Monitoring Periods.[166] Of the 542 scheduled pre-trial conferences, 102 pre-trial conferences were convened, of which 40% (40 of 102) were settled at the pre-trial conference. This reflects an increase in the proportion of cases that settled at the initial pre-trial conference when compared to the last Monitoring Period (26%). The remaining 60% of cases that did not settle at the initial pre-trial conference required ongoing negotiation, another pre-trial conference, or were scheduled for trial. A portion of the cases that required an additional pre-trial conference was due to scheduling issues with the specific staff members during the initial conference. DOC must ensure that staff are notified when they need to appear for OATH pre-trial conferences. This situation has somewhat improved, but many cases still need to be rescheduled because staff are not present and available on the day of the pre-trial conference. DOC should remain vigilant to ensure that pre-trial conference dates are not wasted in this way.

Of the 102 pre-trial conferences convened, 22 were scheduled for trial (22%). In this Monitoring Period, only about 10% of those scheduled for trial actually proceeded with a trial (n=3 of the 22 cases). This means that approximately 90% of trial dates went

---

[166] 107 pre-trial conferences were convened in the 16th Monitoring Period, 109 pre-trial conferences were convened in the 17th Monitoring Period and 145 pre-trial conferences were convened in the 18th Monitoring Period.

unused because the cases settled in the interim before the trial occurred. While trials serve an important function in any disciplinary system, they are time-consuming and resource intensive, and thus other pathways for resolution greatly contribute to the overall goal of timely discipline. The Department reports that setting a trial date can help support resolution of the case, even before the trial, as demonstrated by the fact that most cases scheduled for trial are resolved before the trial occurs. Given the benefit a scheduled trial date can have in supporting the resolution of cases, coupled with the fact that so few cases do, in fact, proceed to trial, greater efficiencies in the scheduling of trials should be found to more expeditiously resolve cases. The Monitoring Team also continues to encourage OATH to help facilitate case resolution before and during the pre-trial conference whenever possible.

- **Trials at OATH for Use of Force-Related Misconduct**. The number of trials conducted by OATH for use of force-related misconduct decreased significantly during the past year and a half. The large number of trials conducted in 2021 and 2022 was due in large part to DOC's focus on closing out a backlog of egregious cases. The decrease in the number of trials conducted in 2023 and 2024 in part reflects the elimination of this backlog, but also coincides with an overall decrease in the number of formal disciplinary cases that were closed, as discussed in this report in the compliance assessment for Consent Judgment, § VIII, Staff Discipline & Accountability.

    Historically, the process for scheduling and conducting trials and then issuing an R&R was very inefficient and convoluted. Trials were not only scheduled far after the pre-trial conference, but for trials requiring multiple hearings, the trial dates were scheduled over several months, and the R&R was issued months later. The table below provides data on the number of trials conducted, the average number of days between a pre-trial conference and the trial, the length of time required to complete the trial, the average number of days for the ALJ to issue an R&R after the trial, and ultimately the length of time between a pre-trial conference and the issuance of the R&R. As demonstrated below, the amount of time that cases were pending with OATH was unreasonably long but has begun to decrease in recent years.

| Start Date of Trial | Total Number of Trials by First Day the Trial Commenced | Average Days Between Pre-Trial Conference and Trial | Average Duration of Trial in Days | Average Days between Final Trial Date & R&R Issued | Average Days between Pre-Trial Conference and R&R Issued |
|---|---|---|---|---|---|
| 2016 | 1 | N/A | 1 | 38 | N/A |
| 2017 | 8 | 101 | 47 | 81 | 254 |
| 2018 | 2 | 125 | 27 | 28 | 179 |
| 2019 | 3 | 66 | 13 | 84 | 162 |
| 2020 | 4 | 240 | 78 | 239 | 557 |
| 2021 | 26 | 147 | 43 | 131 | 320 |
| 2022 | 15 | 84 | 14 | 45 | 142 |
| 2023 | 6 | 136 | 12 | 44 | 190 |
| 2024 | 6 | 50 | 2 | 62 | 117 |
| January-June 2024 | 3 | 30 | 3 | 72 | 105 |
| July-December 2024 | 3 | 62 | 1 | 52 | 129 |

OATH began to reform its processes in 2021 in response to various recommendations from the Monitoring Team. For instance, OATH began scheduling all trials for UOF-related matters within 80 days of the pre-trial conference, and beginning on April 8, 2024, began scheduling all trials for UOF-related matters within 65 days of the pre-trial conference.[167] Further, OATH initiated a practice that all trials must be completed within three weeks of their commencement date instead of being spread out over multiple months. Finally, OATH set deadlines for when an R&R must be issued.

Five of the six trials that started in 2024 occurred within 65 days of the pre-trial conference. There was one case where the trial occurred over 160 days after the initial pre-trial conference. Further, all trials conducted in 2024 were completed within one week of when they started, and four out of the six trials only required one day of trial. The six trials that were convened in 2024 addressed alleged staff misconduct during five use of force incidents that occurred in 2023 and one use of force incident that occurred in 2024. This is an improvement over previous years when many OATH trials were conducted years after the use of force incident occurred because the cases had languished in DOC's backlog.

---

[167] Following the close of the Monitoring Period, OATH sought to reduce this number to 50 days. This revision has been placed on hold pending an Article 78 proceeding brought by Corrective Officer Benevolent Association.

For the six trials that were conducted in 2024, four of the R&Rs were issued within 45 days, but two R&Rs were issued over 100 days after the trial date.[168] This is noteworthy because in the past, OATH has taken extended periods of time, sometimes over a year, to complete R&Rs in some use of force cases.[169] It is critical that OATH closely monitor the time that ALJs take to complete R&Rs and the level of compliance with new requirements, noted above.

This improvement in the time required to resolve OATH trials is promising. The work must not only be sustained, but additional efficiencies are necessary to ensure that cases are prosecuted as expeditiously as possible.

- **OATH Reports and Recommendations for Use of Force-Related Misconduct**. OATH issued six R&Rs in 2023 for all the trials that occurred in 2023, and six R&Rs for the trials that occurred in 2024. The reduction in the number of R&Rs issued during 2023 and 2024 reflects the reduction in the number of trials held during this period as discussed above. The chart below provides a breakdown of the use of force related R&Rs issued for trials that occurred between January 2016-December 2024 and the recommended outcomes. In some cases, an R&R can cover multiple staff members, so the chart evaluates the ALJ's findings by staff member.

---

[168] OATH reported that the delay occurred because the OATH ALJ was unwell following the trial and other case complexities.

[169] For instance, the R&Rs issued for six use of force related trials that started in 2021 took at least six months to complete following the close of trial. Two of the six R&Rs took over a year to complete.

| OATH ALJ's Report & Recommendations by Staff Member *(for use of force trials that occurred between January 2016-December 2024)* | | | | | | |
|---|---|---|---|---|---|---|
| Year R&R was Issued | Total Number of R&Rs Issued & Number of Staff | Guilt *Agreed with DOC's recommendation* | Guilt *Imposed More Than DOC Asked* | Guilt on some, but dismissed some cases *Imposed less than what DOC asked for, but found some guilt* | Acquittal | ALJ Recommended Termination |
| 2016 | 1 R&R covering 1 staff | 0 staff | 0 staff | 1 staff | 0 staff | 0 staff |
| 2017 | 5 R&Rs covering 5 staff | 0 staff | 0 staff | 4 staff | 1 staff | 0 staff |
| 2018 | 5 R&Rs covering 6 staff | 1 staff | 0 staff | 3 staff | 2 staff | 0 staff |
| 2019 | 2 R&Rs covering 5 staff | 0 staff | 0 staff | 0 staff | 5 staff | 0 staff |
| 2020 | 2 R&Rs covering 4 staff | 1 staff | 0 staff | 3 staff | 0 staff | 0 staff |
| 2021 | 17 R&Rs covering 21 staff | 16 staff | 0 staff | 4 staff | 1 staff | 7 staff |
| 2022 | 27 R&Rs covering 30 staff | 15 staff | 1 staff | 11 staff | 3 staff | 12 staff |
| 2023 | 6 R&Rs covering 7 staff | 4 staff | 0 staff | 2 staff | 1 staff | 4 staff |
| 2024 | 6 R&Rs covering 6 staff | 5 staff | 0 staff | 1 staff | 0 staff | 3 staff |

The six use of force R&Rs issued in 2023 provided findings and recommended penalties for seven staff members. The ALJ found guilt and agreed with the penalty sought by DOC for four staff, and for all four of these staff, DOC sought termination, the ALJ recommended termination, and DOC did terminate the staff. The ALJ suggested different penalties for the other three staff. For one staff member where DOC sought termination, the ALJ recommended dismissal of charges and no penalty, which DOC accepted, resulting in no penalty being imposed. For one staff member, the ALJ dismissed some charges, but issued findings of guilt in others and therefore, recommended a lower penalty (five days) than what DOC sought (termination), and DOC imposed the penalty recommended by OATH. For one staff member, the ALJ found full guilt, but

recommended a lower penalty (30 days) than what was sought by DOC (45 days), and DOC imposed the penalty recommended by OATH.[170]

The six use of force R&Rs issued in 2024 provided findings and recommended penalties for six staff members. The ALJ found guilt and agreed with the penalty sought by DOC for three staff, and for all three of these staff, DOC sought termination, the ALJ recommended termination. DOC did terminate two of these staff members but used an Action of the Commissioner to reduce the other penalty to 45 compensation days plus 30 suspension days and 3-years probation.[171] In two cases for two staff, the ALJ found the staff guilty of all charges, but recommended a lower penalty (10 days and 49 days) than what DOC sought at trial (20 days and 60 days, respectively) based on mitigating factors. In both these cases, DOC accepted and imposed the ALJ's recommended penalty. For the final, sixth staff member, the ALJ dismissed some charges, but issued findings of guilt in others and therefore recommended a lower penalty (28 days) than what DOC sought (45 days), which was accepted and imposed by DOC.

- **Assessment of OATH's Application of Disciplinary Guidelines**. The Monitoring Team has been closely examining pre-trial conference outcomes and R&Rs to assess whether the Disciplinary Guidelines have been properly applied. As noted in the Monitor's April 3, 2023 Report (dkt. 517) at pgs. 203-204, proper application of the Disciplinary Guidelines has improved since the Remedial Orders were imposed, although in some cases, questions remained regarding the application of precedent and whether it was consistent with the Disciplinary Guidelines in both pre-trial conferences and the R&Rs. The Monitoring Team's work has identified certain cases that merit additional scrutiny as to whether the applicability of the disciplinary guidelines was appropriate, and those cases are under review. As discussed above, while the number of R&Rs issued regarding use of force related misconduct may be small in number, the principle of *stare decisis*

---

[170] This decision was appealed to the Civil Service Commission who upheld the ruling but reduced the penalty to 10 days from the 20 days recommended by the OATH ALJ and adopted by the Commissioner. *See* the Monitor's April 18, 2024 Report (dkt. 706) at pg. 130.

[171] This case is also discussed in the compliance assessment for the First Remedial Order (dkt. 350), § C, ¶ 2, as it was also identified as an "F2" case.

requires a thoughtful review given the broader applicability to DOC matters. A more fulsome assessment is underway and will be included in a future Monitor's Report.[172]

## Conclusion

OATH has made some improvements to its practices since the inception of the Consent Judgment, although concerns about OATH remain. Important improvements have been made to ensure that there are adequate numbers of pre-trial conferences and that the processes and practices related to Trials and issuance of R&Rs are both more efficient and occur more quickly than they had in the past. Pre-trial conferences are scheduled more quickly, trials are conducted and completed over a more reasonable period of time, and the R&Rs are issued more quickly than they were in the past. However, most, if not all, of these reforms, came only after the imposition of various Court Orders and corresponding scrutiny and recommendations from the Monitoring Team.

Even with the improvements made to date, modifications to practice are slow. This is concerning given that the overall disciplinary process, including the work conducted by OATH, is still incredibly time-consuming and can become mired in overly bureaucratic issues that impede prompt and appropriate resolution. Further enhancements to the disciplinary process are necessary so that cases can move as expeditiously as possible. This includes the development of additional efficiencies, removal of unnecessary bureaucracy, and the need for a posture that better supports the type of collaboration between OATH and DOC necessary to meet the requirements of the *Nunez* Court Orders. The Monitoring Team is continuing to closely scrutinize the various facets of OATH's operation in order to identify whether additional enhancements or modifications to the Department's approach to delegating cases to OATH may be necessary.

---

[172] Further, in order to assess whether ALJs appeared to be properly prepared to hear cases involving DOC staff, the Monitoring Team requested training materials for ALJs assigned to the DOC Unit. OATH reported that staff are provided with information about recent OATH rulings involving DOC staff, legal research resources, copies of DOC Directives, Disciplinary Guidelines, and sick leave and absence-related policies. However, OATH declined to provide the training materials to the Monitoring Team, stating that they were subject to judicial privilege. This posture is at odds with the Monitoring Team's obligation to assess the sufficiency of training for investigators in ID and attorneys in the DOC's Trials Division in order to assess compliance with *Nunez* requirements about staff discipline. OATH's refusal to provide the training materials creates a situation in which neither DOC nor the Monitoring Team have any insight into the guidance provided to those responsible for adjudicating DOC's disciplinary matters and whether that guidance comports with the requirements of the *Nunez* Court Orders.

- **First Remedial Order § C, ¶ 4 & Third Remedial Order ¶ 2**. OATH has met the requirement to convene the number pre-trial conferences approved by the Monitor. Accordingly, Substantial Compliance with this provision has been achieved.

- **First Remedial Order § C, ¶ 5**. It appears there has been improvement in the application of the Disciplinary Guidelines to OATH Proceedings since the First Remedial Order was entered, but additional scrutiny by the Monitoring Team is ongoing to determine what additional steps are necessary to achieve Substantial Compliance.

- **Third Remedial Order ¶ 3**. OATH's procedures and protocols for UOF related disciplinary matters are more efficient than when the Remedial Orders were first imposed, but the pre-trial conference and trial process is still not efficient and impedes the ability to support expeditious processing for use of force related misconduct. Further enhancements to the OATH process are needed to support the overall goal of ensuring that proportional discipline is imposed timely.

| **COMPLIANCE RATING** | **First Remedial Order § C., ¶ 4. & Third Remedial Order ¶ 2.** Substantial Compliance<br>**First Remedial Order § C., ¶ 5.** Partial Compliance<br>**Third Remedial Order ¶ 3.** Partial Compliance |
|---|---|

| CJ § VIII. STAFF DISCIPLINE AND ACCOUNTABILITY, ¶ 4 (TRIALS DIVISION STAFFING) |
|---|

¶ 4. _Trials Division Staffing._ The Department shall staff the Trials Division sufficiently to allow for the prosecution of all disciplinary cases as expeditiously as possible and shall seek funding to hire additional staff if necessary.

This provision requires the City and the Department to ensure the Trials Division has sufficient staff to expeditiously prosecute all disciplinary cases. The first compliance assessment for this provision occurred for the 3rd Monitoring Period (August to December 2016). At this time, the Department was found to be in Partial Compliance and remained so through the 10th Monitoring Period (January to June 2020). The Department moved into Non-Compliance from the 11th Monitoring Period (July to December 2020) to the 12th Monitoring Period (January to June 2021), and then back to Partial Compliance from the 14th Monitoring Period (January to June 2022) through the 18th Monitoring Period (January to June 2024). The Department has long struggled to have sufficient staff to support the Division's caseload. The Action Plan (dkt. 465), § F, ¶ 1(a), requires the Department to ensure that the Trials Division maintains at least 25 agency attorneys and four directors.

**Recruitment Efforts**

During the 18th Monitoring Period, recruitment efforts were essentially paused for the Trials Division. The Division's staffing needs were more limited given it was experiencing its lowest caseload in roughly a decade. In the 19th Monitoring Period, the Department reports that recruitment efforts were resumed, and postings were opened for multiple positions, including attorneys and an investigator.[173]

The Trials Division leadership continues to report that the process to hire an individual remains protracted, taking many months, and requires a significant amount of bureaucratic "red tape." Even in this Monitoring Period, the few staff that were hired or promoted and onboarded were impacted by protracted approvals and other bureaucratic delays.

---

[173] The Department also reports onboarding two attorney interns and one legal coordinator in early 2025 and recommending two attorneys for promotion to director positions. The Department reports it will then hire two additional attorneys to fill the newly vacant positions.

**Staffing Levels**

The table below provides an overview of the Trials Division's staffing levels at the end of each Monitoring Period from June 2020 to December 2024.[174] Since the inception of the Action Plan, the Trials Division has maintained at least four Directors as required. However, the overall number of Trials attorneys has fluctuated, occasionally improving, but always remaining below the 25 attorneys required by the Action Plan. The Department reports it is actively interviewing for attorneys to replace three departures that occurred during this Monitoring Period. As for the Action Plan requirement regarding supervisors, the Department has maintained the requisite four supervisors since December 2022. The Trials Division has also maintained its overall increase in the number of support staff. The Department reports that two Legal Coordinator positions that were vacated due to departures during this Monitoring Period were filled in early 2025.

---

[174] For Trials Division staffing levels in the 6th to the 9th Monitoring Periods, *see* Monitor's November 22, 2024 Report (dkt. 802) at pg. 158.

| Trials Division Staffing | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| As of… | June 2020 | Dec. 2020 | June 2021 | Dec. 2021 | June 2022 | Dec. 2022 | June 2023 | Dec. 2023[175] | June 2024 | Dec. 2024 |
| **Supervisors & Leadership** | **5** | **5** | **4** | **4** | **5** | **6** | **6** | **7** | **7** | **7** |
| - *Deputy Commissioner* | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 1 | 1 | 1 |
| - *Associate Commissioner* | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| - *Deputy General Counsel* | 1 | 1 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 |
| - *Executive Manager Director* | 1 | 1 | 1 | 1 | 1 | 0 | 0 | 1 | 1 | 1 |
| - *Director* | 3 | 3 | 2 | 2 | 2 | 4 | 4 | 5 | 5 | 5 |
| **Attorneys** | **17** | **18** | **18** | **17** | **19** | **27** | **20** | **23** | **23** | **20** |
| - *Agency Attorney* | 17 | 16 | 15 | 14 | 17 | 21 | 19 | 20 | 20 | 17 |
| - *Agency Attorney Intern* | 0 | 2 | 3 | 3 | 0 | 1 | 1 | 3 | 3 | 3 |
| - *Contract Attorney* | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 |
| - *Attorneys on Loan from Other Agencies* | 0 | 0 | 0 | 0 | 0 | 5 | 0[176] | 0 | 0 | 0 |
| **Administrative and Other Support** | **14** | **13** | **13** | **13** | **10** | **12** | **19** | **17** | **20** | **18** |
| - *Administrative Manager* | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 3 | 3 | 3 |
| - *Executive Coordinator* | 1 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| - *Office Manager* | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| - *Principal Administrative Associate* | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 3 | 3 |
| - *Legal Coordinator* | 2 | 2 | 2 | 2 | 3 | 5 | 4 | 4 | 5 | 3 |
| - *Investigator* | 1 | 1 | 1 | 1 | 0 | 0 | 2 | 2 | 3 | 3 |
| - *Clerical Associate* | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| - *Program Specialist* | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| - *Intern* | 1 | 1 | 1 | 1 | 0 | 0 | 4 | 0 | 0 | 0 |
| - *Front Desk Officer* | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| - *Community Coordinator* | 1 | 1 | 1 | 1 | 0 | 0 | 1 | 1 | 1 | 1 |
| - *City Research Scientist* | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 1 |
| - *Correctional Standard* | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| **Grand Total** | **36** | **36** | **35** | **34** | **34** | **45** | **45** | **46** | **49** | **45** |

The Monitoring Team continues to recommend that the City and Department remain vigilant in ensuring the Trials Division maintains adequate staffing levels,[177] in particular with respect to ensuring the Trials Division has 25 attorneys as required by the Action Plan (dkt. 465), § F, ¶ 1(a). Given the need to efficiently process cases, staffing levels must meet those required by the Action Plan, which the Department has not yet achieved. Substantial Compliance will be

---

[175] The data for December 2023 and June 2024 has been updated to reflect a correction to the data. The Department reported one additional director position filled in late 2023 that was unaccounted for in previous reports.

[176] The MOU for attorneys on loan from other City agencies was terminated on February 1, 2023. Further, the attorneys on loan from DOC Legal were transferred back to Legal by April 14, 2023. *See* Monitor's October 28, 2022 Report (dkt. 472) at pg. 14 regarding a discussion on the attorneys on loan.

[177] *See* Monitor's March 16, 2022 Report (dkt. 438) at pg. 62.

achieved when staff can be recruited, hired and onboarded in a manner that is efficient, and the Trials Division staffing complement is sufficient to prosecute cases expeditiously.

| **COMPLIANCE RATING** | **¶ 4.** Partial Compliance |
| --- | --- |

| ACTION PLAN, § C, ¶ 3(VII) (MAXIMIZING DEPLOYMENT OF STAFF - REDUCTION OF UNIFORMED STAFF IN CIVILIAN POSTS) |
|---|
| AP, § C, ¶ 3(vii). *Maximizing Deployment of Staff – Reduction of Uniformed Staff in Civilian Posts*. The Department shall maximize deployment of uniform staff within the facilities by implementing modified staffing practices, including, but not limited to the items outlined below: (vii) Reduce the assignment of uniform staff to civilian posts, including Temporary Duty Assignment, in order to minimize the reliance on uniform staff for tasks that can and should be reasonably completed by civilians. |

The Department is required by Action Plan § C, ¶ 3(vii) to reduce the number of uniform staff assigned to posts with duties that can be reasonably accomplished by a civilian. This requirement flows from the Monitoring Team's 2022 staffing analysis which found that the use of uniform staff in these positions contributed to the larger problem of insufficient numbers of staff being available to work in the jails' housing units.

The Court's 2024 Contempt Order (dkt. 803) found the Defendants in contempt for failing to comply with this provision. The Court explained the basis for its finding at pages 31 to 34 in section "Failure to Effectively Deploy Uniform Staff to Adequately Supervise Incarcerated Individuals" of the Order.

The Monitoring Team does not provide a compliance rating for this provision because it is not one of the select group of provisions defined by Action Plan § G, ¶ 5(b) for which the Monitoring Team is required to do so. Accordingly, for this report, the Monitoring Team simply provides an update on the Department's efforts to achieve compliance.

## Background

The Department's reliance on uniform staff to fulfill roles that can be reasonably addressed by a civilian is perpetuated by several factors. First, the Department employs thousands of uniform staff, and each jail has many "lines" (i.e. positions) for uniform staff that can be flexibly deployed and utilized. In contrast, the lines for civilian staff are fewer in number and there are a number of bureaucratic hurdles to ultimately hire these individuals. Further, recruiting civilians to work in a jail setting has historically been difficult (due to salary, a protracted recruitment process and the nature and location of the work). Additionally, civilian lines are more likely to be impacted by hiring freezes and budget cuts. In fact, over the last few years, the Department reports that City-wide hiring freezes and budget reductions have resulted in the loss of 200 civilian lines. Given their "20 years of service" requirement for retirement,

uniform staff within the agency often have a longer tenure than civilian staff, and the positions have less turnover. Further, given the unique and complicated nature of DOC's practice many staff at DOC have reported that having a uniform staff member on their team helps to better them navigate working with the Facilities. Collectively, these dynamics have caused the Department to utilize uniform staff in a variety of roles, including those that could reasonably be carried out by civilians. The uniform staff have been assigned to such a wide variety of roles for so long that both uniform staff and civilians have come to believe that, in many cases, these roles *must* be filled by uniform staff, and the convention has become part of the Department's culture.

The Department's staffing allocations for the jails and other commands currently include very few budgeted positions for civilian staff. Instead, they have been using unbudgeted positions, but this practice means the position is never integrated into the formal staffing allocations, which means that when an unbudgeted position becomes vacant, it cannot be properly restaffed. Once the positions that are appropriate for civilians have been identified, the Department must create budgeted positions with approval from the City so that the vacant positions can be advertised. Unfortunately, as discussed above, one of the central barriers to filling these positions has been the long delays and inefficiencies involved in the civilian hiring process.

Conceptually, reducing the reliance on uniform staff to fulfill civilian roles has two essential parts: (1) identifying the roles suitable for a civilian, and (2) filling the position with a civilian. However, in the reality of complicated City and agency bureaucracies, actually accomplishing these tasks is neither simple nor straightforward. The complex and protracted process for converting certain roles to civilian positions means that abruptly removing uniform staff from these roles would, in many cases, mean that the role would go unstaffed for a significant period of time and the tasks and responsibilities of the role would be left unaddressed. While some duties may be superfluous and may eventually be eliminated, in many cases, the uniform staff are addressing an essential function, and any period of vacancy would be detrimental to the Department's operation. Thus, the removal of uniform staff from certain roles and subsequent transition to a civilian staff must be completed with care. There must be a suitable civilian candidate already hired and available to fill the role for this initiative to be a success.

The process of moving from the first step—identifying the roles—to the second step—filling the position—involves a multitude of intermediate tasks. Once a position is identified as being suitable for a civilian, to begin the process, the Department must have authorization to hire from the Office of Management and Budget ("OMB"). Depending on the role, the process may also require civil service testing and/or a dedicated candidate pool. The Department must then recruit for the position, interview applicants, select a candidate, obtain multiple internal approvals, and then obtain approval from OMB. Historically, obtaining OMB approval has been less than straightforward, involving multiple follow-ups, resubmissions, and long and unexplained periods of delay.[178] The Monitoring Team appreciates that the budgetary process is complex, and that the City has many considerations while managing the hiring for the Department and other City agencies. That said, opportunities for greater efficiency are abundant in this process. The current dynamic hinders the Department's efforts to comply with the related *Nunez* requirements. It is critical for the City to develop efficiencies and the Department to have the necessary authorizations to hire civilian staff as needed.

**DOC's Efforts to Reduce Uniform Staff in Civilian Roles**

The Department took a few initial steps towards this requirement after the Action Plan was initiated in 2022 through early 2024. These included: (1) all uniform staff working in the Timekeeping office were transferred back to their commands in September 2023[179] and (2) seven uniformed positions at HMD were converted to civilian positions, and the selected civilian candidates began working in early November 2024. The Department previously reported several other attempts to address this issue more broadly over the years, but none were fruitful until late 2024.

In late 2024, the Department began a Staff Efficiency Initiative Committee to reorganize its staffing plan and hiring practices in order to address various interrelated staffing issues. The

---

[178] *See*, Monitor's April 18, 2024 Report (dkt. 706) at pgs. 2, 17-18, 106, and 143; Monitor's May 24, 2024 Report (dkt. 712) at Cover Letter pgs. i-ii; Monitor's November 22, 2024 Report (dkt. 802) at pgs. 9-10, 107, and 157.

[179] OMB denied the request to backfill the positions with civilians. Properly staffing the Timekeeping office to ensure a backlog does not accumulate has required several part-time staff to be onboarded, the use of temporary employees from an agency, and temporarily assigning three uniform officers (who have other responsibilities in HR) to perform these functions.

Committee includes the First Deputy Commissioner, the General Counsel, and leadership from the Finance Division, Office of Administration, Human Resources, Strategic Operations, the *Nunez* Manager and Deputy Manager, along with members of their team. The Committee's holistic approach to addressing the staffing issues appears to be setting a foundation for real progress to be made. As discussed in more detail below, the Committee has developed a logical plan and taken initial steps to tackle many of the underlying obstacles discussed above. Ultimately, these steps should allow the Department to hire civilians efficiently and ultimately reduce its reliance on the uniform workforce for duties that do not require their unique skillset.

The interdepartmental committee meets regularly and has made demonstrable progress in the following areas:

- **Evaluating Divisions' Use of Uniform Staff**. The Committee strategically focused on six divisions that rely on the use of uniform staff to better specify the various job duties and determine whether any positions could be appropriately filled by a civilian. This included the Training and Development Division, Investigation Division, Transportation, Special Investigations Unit, Administration, and Health Management Division.  As an initial effort, the Committee identified at least 10 positions that could be civilianized. Once budgeted, the Department can begin the process of advertising these positions and interviewing candidates.

- **Eliminating Unbudgeted Civilian Posts and Evaluating Civilian Vacancies**. The Committee determined that it must first focus on both evaluating its budgeted civilian lines (i.e., civilian positions that are already authorized for hire) and identifying all unbudgeted civilian posts so that budgeted positions can be created where necessary.[180] This is an essential first step toward sustainability—current civilian positions must be accurately identified and budgeted so that they can be advertised and filled by a civilian candidate. Through this process, the Department identified over 40 unbudgeted civilian positions that have now become budgeted civilian positions, meaning that funding has been allocated so that position can be officially re-filled by a civilian should the position

---

[180] Unbudgeted posts are essentially temporary posts because they are not part of the Department's authorized headcount and are not funded. However, the Department believes the positions are necessary and thus must take a variety of steps in order for the positions to become budgeted.

become vacant. The Department has approximately 250 civilian vacancies.[181] The Committee has evaluated these vacancies by Department. In one such example, they examined more than 50 vacancies and determined it must fill about 35 of these positions, but it can repurpose the other 15 lines to other divisions where positions have been identified that could reasonably be worked by a civilian. The Committee has also identified and resolved a number of issues with the civilian lines assigned to various divisions. [182]

- **Improved Oversight and Management of Uniform Staff on TDY Status**. Uniform staff can be deployed temporarily ("TDY") to a variety of posts. Even though TDY posts are intended to be temporary, many uniform staff have remained on TDY status for years. Temporary deployment is one of the primary ways that uniform staff is assigned to roles outside of the jails, and it is likely that many of these roles could be fulfilled by civilians, so the Department has taken a number of steps to better manage TDY assignments. First, the Department closely scrutinized the list of TDY staff to ensure the list was current and correctly identified each staff's assignment—approximately 230 TDY staff were identified. In early 2025, the Department also upgraded the legacy process for tracking TDY, which was manual and largely *ad hoc*, by modifying an existing staffing database. Also, to address the overarching goal of staff availability on the housing units, the Department began to require TDY staff to report to work ancillary posts in the jails (i.e., posts that are not the B-post on the units) once or twice per week. In mid-2025, TDY staff will also be required to work the B-posts in housing units. The Committee is now reviewing the duties of the positions to which these staff are temporarily assigned to determine whether they are suitable for conversion to a civilian position.

---

[181] The authorized head count has decreased from 2,172 to 1,750 an overall reduction in authorized head count of 422 positions from fiscal year 2016 to 2025. While the Department currently has 250 vacancies, the Department reports it is working to fill many of these vacancies (as discussed above, the time to fill vacancies can be lengthy). Further, the Department reports that its overall needs for civilian lines exceed the number of vacancies it has.

[182] For example, the Department identified that the lines and posts for different Divisions needed to be reconciled because the positions were initially completed in a haphazard manner under the former Commissioner. For example, the lines for the ID Division and the Special Investigation Unit were particularly convoluted and needed to be untangled and reconciled with one another.

- **Evaluating Awarded Posts for Roles to be Filled by Civilians**. The Office of Administration has reviewed the list of staff with Awarded Posts (discussed in more detail in the section regarding Awarded Posts) and identified at least 50 positions that are suitable for civilian staff. The next step is for the Department to convert these positions from uniform to civilian lines with the City. But until a civilian is poised to assume the position, the uniform staff, in most cases, will need to remain in these positions because the duties of their posts require continual attention.

- **Identifying Roles Where Uniform Staff Are/Are Not Necessary**. More broadly, the Committee has begun the process to identify the universe of positions that have duties appropriate for civilians, as well as the universe of non-PIC-facing positions that *do* require a uniform staff member to serve in the role (e.g., certain roles outside of jails require the person assigned to provide security and to be armed). Once appropriately categorized, the Department will proceed with steps to reconcile the job duties with the type of position (uniformed versus civilian) and to ensure the positions are properly authorized and budgeted by the City.

- **Scrutinize the Civilian Hiring Process**. Progress toward compliance with this requirement depends on the efficiency of the civilian hiring process. The Committee will assess the process already underway for outstanding civilian vacancies, and will identify common barriers (e.g., hiring pool availability, limited applicant interest, etc.), identify supports that would assist the divisions in hiring, reallocate vacant positions that may be repurposed in other divisions, and provide data to support "new needs" requests to OMB.

### Next Steps and Conclusion

The actual process for replacing uniform staff with civilians to perform certain roles is far more complicated than it seems on the surface, and the Department's Staff Efficiency Initiative started to untangled the morass of past practice and current regulations to produce a viable plan forward. Solid progress was made during the current Monitoring Period, however, each of the areas discussed above has a few steps remaining to complete the initiative and these should be prioritized. The Monitoring Team has also encouraged the Department to focus on two additional elements related to the overarching goal of maximizing deployment of uniform staff:

- **Post Analysis**. For several years, the Monitoring Team has encouraged the Department to obtain a neutral and independent Post Analysis (and one is required pursuant to Action Plan § C, ¶ 3(viii)). Such an analysis is prerequisite to any effort focused on efficient staff deployment. A post analysis will provide critical information on the number and duties of each post in the facility as well as the number of uniform staff needed to ensure adequate coverage. In turn, this will allow the Department to deploy its workforce more efficiently, will likely increase the number of staff who are available for assignment to the housing unit posts, and will likely reduce the need for staff to work overtime. The Department has been working with the SCOC to conduct the study.  The Department reports that the SCOC recently shared a draft of the study and intends to finalize the first post analysis for one facility shortly.  It is certainly positive this initiative has started, but it has taken much longer than expected.  Upon our review and evaluation of the draft study, the Monitoring Team intends to discuss potential next steps and a timeline with the Department.

- **Maximize the Partnership with OMB**. As described above, much of the work to achieve compliance with this provision requires action from OMB (converting uniform lines to civilian, adding new civilian lines, authorizing salaries, approving onboarding, etc.). The Monitoring Team's observations of the Department's interaction with OMB suggests many opportunities to improve efficiency, and the Department and OMB are encouraged to identify the most expeditious way forward.

| ACTION PLAN, § C, ¶ 3 (V) (MAXIMIZING DEPLOYMENT OF STAFF - AWARDED POSTS) |
|---|
| AP, § C, ¶ 3(v). *Maximizing Deployment of Staff – Awarded Posts*. The Department shall maximize deployment of uniform staff within the facilities by implementing modified staffing practices, including, but not limited to the items outlined below: (v) Reduce the use of awarded posts so they are primarily utilized for those positions in which a particular skill set is required. A staff member with an awarded non-mandatory post must be re-deployed to a mandatory post if there are staffing shortages. |

The Action Plan § C ¶ 3(v) requires the Department to reduce the use of awarded posts so they are primarily utilized for those positions for which a particular skill set is required. The purpose of this requirement is to support the Department's efforts to maximize deployment of uniform staff given the Department's historical *practice* of using awarded posts for positions that were not on housing units or otherwise regularly engaged with incarcerated individuals. It also requires the Department to address its historical *practice* of managing staff on awarded posts in a manner that limited flexibility in re-deploying such staff when they were needed in more critical areas.

The Court's 2024 Contempt Order (dkt. 803) found the Defendants in contempt for failing to comply with this provision. The Court explained the basis for its finding at pages 31 to 34 in section "Failure to Effectively Deploy Uniform Staff to Adequately Supervise Incarcerated Individuals" of the Order.

The Monitoring Team does not provide a compliance rating for this provision because it is not one of the select group of provisions defined by Action Plan § G, ¶ 5(b) for which the Monitoring Team is required to do so. Accordingly, for this report, the Monitoring Team simply provides an update on the Department's efforts to achieve compliance.

The Department has taken a number of steps to address the use of awarded posts, although more work remains. The Department has also proposed new ways of utilizing awarded posts to support the goal of maximizing staff in the housing units and improving supervision. This is discussed in more detail below.

## Concerns Regarding the Department's Practice of Awarded Posts

A fundamental component of *safely* managing the incarcerated population is ensuring that an adequate number of qualified staff are assigned to work with persons in custody ("PICs") in the housing units. Historically, the Department has lacked an appropriate framework and basic tools to properly administer and manage staff assignments, which contributed to poor scheduling

and deployment practices. More specifically, the Department's staff deployment *practices* do not make the best use of its workforce because, among other practices, the use of awarded posts limited flexibility in deploying staff to places where they were most needed. The Department's use of an "awarded" post is governed by policy, but as discussed in more detail below, a number of *practices,* not codified in policy, have become entrenched and impede the Department's overall ability to maximize the deployment of its staff.

Department policy requires that, when available, job assignments must be posted indicating the position is available and listing its responsibilities so that uniform staff may apply. The Department must consider various criteria when selecting a candidate (e.g., seniority, work performance, attendance record, special skills, or required clearances) and thereafter assigns the specific post to the selected staff member. In *practice*, once staff are assigned or "awarded" the post, they essentially maintain the post in perpetuity and can only be moved out of the position under limited circumstances. Collectively, this staffing convention is referred to as "awarded posts" .

The staffing analysis conducted by the Monitoring Team in 2022 found that an unreasonably high number of staff had awarded posts in positions that were not on the housing unit, assigned to the facilities, or regularly engaged with PICs. Consequently, both the Department's policy and its practices related to management of awarded posts meant that a large number of staff were not being utilized in the areas where staff were most needed.

The Department's *practice* of awarding posts goes beyond what is required by policy and introduces several restrictions on how staff are subsequently assigned. Below is a summary of the historical concerns regarding the practice of awarded posts.

- **Poor Management**: The awarded post process was not properly managed, allowing opportunity for favoritism and cronyism. In some commands, leadership created "unofficial" awarded posts,[183] potentially numbering in the hundreds[184] that were awarded to staff who reportedly curried favor. This has had an adverse impact on staff

---

[183] "Unofficial" awarded posts are those where a staff member is treated as if they had an awarded post with the same restrictions and protections afforded to those with formally awarded posts, but the post was not formally awarded pursuant to the Department's policy requirements.

[184] The Department's poor record keeping practices are such that it is impossible to quantify the number of unofficially awarded posts. Comparisons among the data reports submitted to the Monitoring Team suggest that hundreds of positions that were initially reported as awarded posts were in fact "unofficial."

morale, leaving other staff members feeling marginalized and confined to less desirable positions. The perception of an unfair system has impaired motivation among the workforce and negatively impacted work performance, thereby contributing to unsafe conditions within the jails.

- **Poor Record Keeping**: Until 2024, the Department's poor recordkeeping rendered it unable to produce an accurate list of posts that have been advertised as "awarded posts" and a current list of staff who have been officially awarded such positions.

- **Limited Flexibility**: In practice, once a staff member is awarded a post, they are not assigned to any other post, except in very limited situations (e.g., when working overtime or during emergencies). Thus, when there is a critical need for staff in other locations, those with awarded posts are not reassigned to those posts. This is not codified in Department policy but has been an entrenched practice.

- **Location-Specific Posts**: When staff are awarded a post, it is to a specific physical location. If the job assignment is to a housing unit post, the staff remains at that location even if the PICs in that housing unit are transferred elsewhere. This practice is illogical and subverts the goal of assigning staff with identified skillsets to work with a specific population to develop constructive rapport. Awarding a post to a certain *physical* location is not required by policy, but has been an entrenched practice.

- **Posts with No/Limited Contact with the Incarcerated Population**: The majority of awarded posts were not on the housing units and for job assignments that do not actively engage with the incarcerated population. In fact, a large portion of awarded posts are in one of the courts or the Special Operations Division.

## Monitor Recommendations on Areas of Focus

The various restrictions on how staff can be assigned are entrenched Department *practice* rather than policy requirements. The Monitoring Team has not identified any Department policy or other regulation that would require such restrictions.

The Monitoring Team has shared the following feedback with the Department:

- **Clarification of Policies and Procedures**: The Department should clarify exactly what Department policy requires and does not require in the administration of awarded posts and eliminate all unnecessary restrictions currently imposed in practice. Most

significantly, regulations regarding how those with awarded posts can be re-assigned must be clarified and communicated to the various commands. The Department must ensure deployment of adequate staff in PIC-facing positions at all times and make certain that its policy relating to awarded posts does not undermine that goal.

- **Improvement Management:** The Department must properly manage the practice to eliminate the *ad hoc* restrictions, cronyism and favoritism that are antithetical to good staff deployment practice. This includes the ability to identify and track the posts that have been awarded to staff members. The Department must institute safeguards to ensure that the facilities and other entities that utilize awarded posts do not operate in a manner that contravenes the Department's policy or the staff deployment efforts established by leadership.

- **Evaluating Awarded Posts for Positions Outside of the Commands:** A significant proportion of awarded posts are in locations *outside of the facilities' housing units*. Given that proper coverage and supervision of the housing units are essential for the safety of both staff and people in custody, the Department should incentivize housing unit placements to attract those with specific skills, experience and/or interest to improve the interpersonal dynamics between staff and the incarcerated population.

## Departments Efforts to Alter Practice for Awarded Posts

The Monitoring Team has found relatively few obstacles to prevent the Department from addressing the problems associated with awarded posts. As with many of the agency's dysfunctional practices, the problem lies in differentiating policy from practice. Work has begun on developing appropriate safeguards to ensure that practice aligns with policy, but more work remains.

The following progress has been made in this area:

- **Suspensions of Awarded Posts with Limited Exception**: The practice of awarding posts to specific staff members remains suspended except in a few select cases in which the Commissioner determines there is a specific need for an awarded post. The Monitor is consulted prior to a final determination by the Commissioner.

- **Reliable Tracking of Awarded Posts**: The Department now maintains a reliable list of all staff who have been officially awarded a post.

- **Safeguards Against "Unofficial" Awarded Posts**: The hundreds of "unofficial" awarded posts have been eliminated.[185] The Office of Administration has also put procedures in place through its scheduling system to mitigate the possibility that staff have an "unofficial" awarded post. The combination of reliable tracking and these safeguards mitigate the existence of unofficial awarded posts.

- **Evaluation of Awarded Posts**: As part of the Staff Efficiency Initiative, the Department reviewed the list of staff with awarded posts to determine whether certain positions could be filled by a civilian. Over 50 staff were identified in posts that could potentially be filled by a civilian. Further discussion on next steps is included in the section of this report regarding the reduction of use of uniform staff in civilian roles.

- **Utilization of Awarded Posts for Housing Units**: Department leadership reported to the Monitoring Team that it would like to reintroduce the practice of awarding posts on housing units in order to promote consistent staffing. While it is the Monitoring Team's understanding that staff may be consistently assigned to a post without the post being "awarded," the Department has opined that awarding posts has certain benefits. Agency leadership reports that they want to ensure a level playing field for staff such that in practice, available posts are advertised to all staff and that everyone has an equal opportunity to apply. The Department has also suggested that awarding posts promotes staff morale as those members awarded posts are consistently at work and have better and stronger behavioral dispositions. Members who are awarded posts provide stability, have a sense of ownership, are more accountable for their actions, show increased job satisfaction and feel valued by the Department, among many other benefits.

- If *administered* appropriately, the Department's approach to utilizing awarded posts for positions on the housing unit or for positions with regular contact with incarcerated individuals is reasonable.[186] The Monitoring Team has strongly encouraged the

---

[185] The Department's historically poor record keeping practices on awarded posts data makes it impossible to quantify the number of unofficially awarded posts. However, comparisons among the data reports submitted to the Monitoring Team in 2023 and 2024 suggest that hundreds of positions that were initially reported as awarded posts were in fact "unofficial."

[186] In the Monitor's May 24, 2024 Report (dkt. 712) at pg. 25, the Monitoring Team advised that it encouraged the Department to implement awarded posts in a manner that incentivizes housing unit

Department to address the concerns about the policies and procedures regarding awarded posts. Once those concerns have been addressed so that the administration of awarded posts can occur with fidelity, it appears it would be both appropriate and reasonable to utilize awarded posts as contemplated by the Department.

**Data on the use of Awarded Posts**

Given the suspension of awarded posts (with limited exception), the number of staff with awarded posts has essentially remained the same since April 2024 (although, as noted above, as of 2024 the Department has essentially eliminated all unofficial awarded posts). Outlined below is a break-down of those staff with awarded posts.

- **Facility v. Non-Facility Posts**. Of the 798 staff with awarded posts, about two-thirds (n= 556, 70%) were posts awarded within the facilities and one-third (n=242, 30%) were posts outside the facilities (*i.e.,* court facilities, Special Operations Division, and Transportation Division).

- **PIC Facing Posts**. 425[187] (53%) of the 798 awarded posts within the Facility are PIC Facing. This designation includes housing units, along with corridor, clinic, front gate, fire safety, food service, activity, law library, education, meal relief, and security and visitation posts, among others.

  - **Housing Unit Posts**. 179 (22%) of the total 798 awarded posts are assignments to a specific housing unit.[188]

- **Non-PIC Facing Posts**. 373 (47%) of the 798 awarded posts are "non-PIC facing posts" including assignments to patrol, perimeter security, control rooms, gate security, and sanitation, as well as posts outside of the facilities.

- **Awarded Posts in 2024**. In December 2024, following consultation with the Monitoring Team, the Department awarded 76 staff to housing unit and Intake posts within the Facilities.

---

placements to attract those with specific skills, experience and/or interest to improve the interpersonal dynamics between staff and the incarcerated population.

[187] This is a subset of the 556 staff assigned to Facilities.

[188] The proportion of posts on housing units was determined via the Monitoring Team's analysis. The location of some posts appeared obvious, but some of the others may or may not be in housing units. Accordingly, the data may not be precise but is certainly a well-informed estimate of the proportion.

**<u>Conclusion</u>**

The Department has taken concrete steps to address the problems identified with regard to awarded posts. In terms of next steps, the Monitoring Team has recommended that the Department update policies and procedures and to ensure that the use of awarded posts is managed with fidelity. Once revised policies and procedures have been implemented, the Monitoring Team believes further discussions about potential modifications to the use of awarded posts would be appropriate, in particular regarding the use of awarded posts for staff on housing units.

| **ACTION PLAN, § C, ¶ 3(VI) (MAXIMIZING DEPLOYMENT OF STAFF - MAXIMIZE WORK SCHEDULES)** |
|---|
| AP, § C, ¶ 3(vi). *Maximizing Deployment of Staff – Maximize Work Schedules*. The Department shall maximize deployment of uniform staff within the facilities by implementing modified staffing practices, including, but not limited to the items outlined below: (vi) Create and implement alternatives to the work schedule for uniform staff assigned to work in the facilities in order to minimize the use of a 4 by 2 schedule and optimize staff scheduling. |

The Department must maximize staff work schedules as required by Action Plan § C, ¶ 3(vi). The purpose of this requirement is for the Department to optimize staff scheduling by implementing alternatives to the work schedule for uniform staff assigned to work in the facilities to increase the number of days a staff member works. Specifically, the Department is required to minimize the use of the 4x2 schedule in order to increase the number of days that a staff member works during the year.

The Court's 2024 Contempt Order (dkt. 803) found the Defendants in contempt for failing to comply with this provision. The Court explained the basis for its finding at pages 31 to 34 in section "Failure to Effectively Deploy Uniform Staff to Adequately Supervise Incarcerated Individuals" of the Order.

The Monitoring Team does not provide a compliance rating for this provision because it is not one of the select group of provisions defined by Action Plan § G, ¶ 5(b) for which the Monitoring Team is required to do so. Accordingly, for this report, the Monitoring Team simply provides an update on the Department's efforts to achieve compliance.

The Department has made no progress toward complying with this requirement since the previous Monitoring Period, and thus the findings in the Monitor's April 18, 2024 Report (pgs. 268-270) continue to apply.[189] Further, despite reporting that their ability to modify the 5x2 schedule (as a potential alternative to the 4x2 schedule) is limited by the collective bargaining agreement, the most recent contract with the Correction Officer union signed in May 2024 did not address this issue.

---

[189] Two slight modifications to the findings in the Monitor's April 18, 2024 Report at pgs. 268 to 270 are necessary. First, for staff on the 4x2 schedule, Staff work four consecutive 8.5-hour workdays, followed by two consecutive days off results in staff being assigned to work 245 days not 243 days as previously reported. Second, for Staff assigned to the Department's 5x2 schedule that work in areas outside of the command work 8 hours and 15 minutes and only receive 8 additional days.

## UPDATE ON THE 2023 *NUNEZ* COURT ORDERS

This section provides an update on the Department's work related to five of the Court

Orders entered in 2023: those entered on June 13, August 10, October 10, December 14, and

December 20, 2023. Collectively, these Orders were intended to catalyze improvement in the

Department's management of the *Nunez* Court Orders, its work with the Monitor, and its efforts

to address fundamental security, reporting, and management practices to bring about immediate

relief to the ongoing risk of harm faced by people in custody and staff.

Some of the problems addressed by the various orders were abated (e.g., transparency

with the Monitoring Team, providing timely information to the Monitoring Team) following the

appointment of the current Commissioner in December 2023. However, the Department's work

towards many of the substantive requirements (e.g., incorporating the Monitoring Team's

recommendations into policy/procedure as a necessary first step toward changing practice,

addressing staff off post, improving search and escort procedures, improving control station

security, implementing recommendations to enhance suicide prevention protocols) are still a

work-in-progress, as described below.

### JUNE 13, 2023 ORDER (DKT. 550)

The Court entered an Order on June 13, 2023 regarding the City's and Department's

obligation to work with the Monitor and his team, including providing relevant information as

requested and notifying the Monitor of serious incidents in the jails. The Department's

engagement with the Monitoring Team has significantly improved since the date this Order was

entered – the Department proactively engages the Monitoring Team in a constructive and

collaborative manner and information is provided when requested. The updates shared in the

Monitor's November 22, 2024 Report at pgs. 174 to 176 remain an accurate representation of the current state of affairs.

**AUGUST 10, 2023 ORDER (DKT. 564)**

The Court entered an Order on August 10, 2023 to address several critical items identified by the Monitoring Team that were needed to reduce the imminent risk of harm but that had continuously languished. The purpose of this Order was for the Department to prioritize these actions as other remedial relief was being contemplated. These steps were intended to be immediate, *interim measures* to ensure a proper focus and pace for initiatives that have direct bearing on the imminent risk of harm.

- **UOF, Security and Violence Indicators (§ I, ¶ 1):** The Monitor's February 26, 2024 (dkt. 679) Report describes the Department's efforts to address this requirement (see pgs. 5-7). A more detailed description of the new meeting format is described in the compliance assessment of the First Remedial Order § A, ¶ 2 (Facility Leadership Responsibilities) in this report.

- **Revised Search Procedures (§ I, ¶ 2)**: This is addressed in the compliance update for Action Plan § D, ¶ 2 (d) and § I, ¶ 2.

- **Revised Escort Procedures (§ I, ¶ 3)**: This is addressed in the compliance update for Action Plan § D, ¶ 2(f).

- **Lock-in and Lock-out Procedures (§ I, ¶ 4)**: In late 2023, the Department began to focus on properly implementing the evening lock-in (9:00 p.m.) and consulted with the Monitoring Team on its plans. The Department elected to first focus on the 9:00 p.m. lock-in before addressing compliance with the 3:00 p.m. lock-in. The Monitoring Team believes this is a reasonable approach. On October 31, 2023, the Department issued a

teletype articulating the requisite procedures and required each facility to devise a lock-in plan. As shown in the graph below, evening lock-in is now better managed, with nearly all being completed within one hour of the designated time.[190]



That said, incidents continue to occur among people in custody after lock-ins have ostensibly been completed, which suggests that staff are not consistently ensuring that people in custody remain locked in their cells or on their dorm beds overnight.

- **Control Station Security (§ I, ¶ 5)**. The Monitoring Team remains concerned that control stations are not properly secured. There are no new updates beyond those provided in the Monitor's November 22, 2024 Report at pgs. 180 to 181.

---

[190] The calculations in this graph that separate the total monthly lock-ins into three categories are slightly different from the Monitor's April 18, 2024 Report. The red category now includes lock-ins that are *two hours late or more*. The yellow category now includes lock-ins that are *between one hour and one hour and 59 minutes late*. The blue category now includes lock-ins that are *less than one hour late*.

- **Staff Off Post (§ I, ¶ 6)**. Instances in which Staff are off posts continue to be widespread and, in at least some cases, have resulted in interpersonal violence and uses of force. Table 8 of Appendix B includes data from the Rapid Reviews which show that at least 125 use of force incidents occurred when a staff member was off post. NCU assesses this practice as part of its security audits and the results of those audits are below and also discussed in the compliance update for the Improvement of Routine Tours (Action Plan § A, ¶ 1(d)).

| NCU Security Audits' Findings regarding Staff Off Post *January 2022-December 2024* | | |
|---|---|---|
| **Date Audited** | **# of NCU Audits Completed** | **# of Audits that found Staff Off Post** |
| January-June 2022 | 59 | 42 (71%) |
| July-December 2022 | 37 | 32 (86%) |
| January-June 2023 | 19 | 14 (74%) |
| July-December 2023 | 31 | 26 (84%) |
| January-June 2024 | 37 | 28 (76%) |
| July-December 2024 | 34 | 20 (59%) |
| | | |

NCU's July-December 2024 audits suggest that staff may be off-post less frequently than in prior Monitoring Periods, however, the problem is still pervasive (59% of audits found this deficiency). On October 20, 2023, the Department issued a teletype regarding staff's obligations to remain on post until properly relieved, and that abandoning one's post may result in disciplinary action. The Department has reported it is also making efforts to address the problem of posts being unstaffed due to both the insufficient numbers of staff at the

beginning of each tour and assigned staff going off post during their tour because of the burden of working double shifts.

- **Special Teams Training (§ I, ¶ 7)**. This is addressed in the compliance assessment for First Remedial Order § A., ¶ 6 (Facility Emergency Response Teams)**.**

- **Special Teams Command Level Orders (§ I, ¶ 8)**. The Department reports that ESU has nine Command Level Orders ("CLOs") and that the other Special Teams (including SST and SRT) do not have any.[191] The CLOs have not been updated. There are no new updates beyond those provided in the Monitor's November 22, 2024 Report at pgs. 182 to 183.

- **Screening and Assignment of Staff to Special Teams (§ I, ¶ 9)**. In September 2023, the Department shared proposed revisions to the policy regarding screening and assigning staff to Special Teams. The Monitoring Team provided feedback in October 2023. The Department has not yet provided a revised draft of the policy to address the Monitoring Team's feedback.

- **Revised Pre-Promotional Screening Policies and Procedures (§ I, ¶ 10)**.  The Department reports it has been working on revisions to the policy governing pre-promotional screening but has not provided proposed revisions to the Monitoring Team for review. A more detailed discussion regarding pre-promotional screening is included in the compliance assessment of Consent Judgment, § XII, ¶ 1-3 in this report.

- **<u>ID Staffing (§ I, ¶ 11)</u>**. ID staffing levels are addressed in the compliance assessment for Consent Judgment, § VII, ¶¶ 1 & 11 Use of Force Investigations in this report.

---

[191] As noted elsewhere in this report, it took the Department months to confirm the number of relevant policies related to ESU.

- **Command Discipline ("CD") Directive (§ I, ¶ 13)**. In order to both expand the use of CDs, which the Monitoring Team has long supported, and to address the processing issues identified by the Monitoring Team, the CD policy was updated on October 27, 2022.[192] The revisions to the policy were intended to improve practice, but initially, the Department continued to dismiss a large number of CDs and appeared to excessively rely on the lowest level sanctions. In addition, in at least some cases, the Department issued CDs that precluded the issuance of formal discipline, which should never occur. As a result of these deficiencies, at the end of 2022, the Department reported its intention to revise the policy again, but did not proceed with the revisions in a timely manner, resulting in a requirement to do so as part of the Court's August 10, 2023 Order (dkt. 564). The Monitoring Team shared feedback on revisions to the CD policy several times in 2023 and 2024. With approval of the Monitor, the Department finally promulgated the new CD policy on January 13, 2025 with an implementation date of June 30, 2025 (so that the staff has ample notice of the changes).

  In general, the revisions include improvements for processing CDs while aligning the penalty grid with the severity of misconduct. The following changes were made to the policy:

  o <u>Centralized Processing and Adjudication of CDs by ICDU</u>. The Informal Command Discipline Unit ("ICDU") began adjudicating CDs in 2024 and now

---

[192] These revisions were made pursuant to Action Plan (dkt. 465), § F, ¶ 3 and as described in the Monitor's April 3, 2023 Report (dkt. 517) at pgs. 180-181. The revisions were intended to ensure that, among other things: (1) CDs would no longer be dismissed for due process violations and (2) the Department did not automatically defer to the lowest level sanction.

adjudicates CDs from all facilities (except the hospitals and court commands),[193] and the new CD directive formalized the ICDU's role and responsibilities in policy. The ICDU is a promising initiative designed to bring consistency and oversight to the CD adjudication process. The centralized processing of CDs should help to ensure that they are processed properly and should minimize dismissals for due process violations. Further, the ICDU should also help to ensure that CDs are utilized only when appropriate, permitting formal discipline to occur when necessary. As reflected in the data in the compliance assessment for Consent Judgment, § VIII, Staff Discipline & Accountability, the Department has improved its processing of CDs, which appears to be at least partly attributable to the ICDU.

o   <u>Expansion of Penalties</u>. The revised CD policy expands the maximum range of penalties up to a relinquishment of 10 compensatory days instead of 5 days. As noted below, this expansion also included a change to the type of violations that would be captured by a CD and changes to the scheduling framework.

o   <u>Changes to the Schedule of Violations</u>. Various types of staff misconduct that are eligible for CDs are categorized by severity into "schedules" listed within the CD policy. Generally, additional types of misconduct were added to the CD violation schedules (e.g., violations for failing to wear or turn on Body Worn Cameras were added to the list), and some pre-existing violations were moved to schedules with

---

[193] ICDU began conducting the CD hearings for all misconduct that occurred on or after January 1, 2024 for NIC, WF, OBCC, and RESH, for all misconduct that occurred on or after April 4, 2024 for GRVC, and for all misconduct that occurred on or after June 24, 2024 for EMTC, RMSC, and RNDC. ICDU is now conducting hearings for all incidents that occurred in these facilities or that was identified by HMD (i.e., out of residence violations and missed medical appointments).

more severe penalties (e.g., a failure to conduct routine security checks was moved from the second-highest violation, Schedule D, to the highest violation, Schedule E). The minimum number of penalty days that could be deducted as the result of a CD was expanded for mid-level violation schedules (e.g., Schedule C violations used to result in a 1 to 5-day penalty but now result in a 3 to 5-day penalty).

o   <u>Limits on the Number of CDs within a 12-Month Period</u>. Additionally, the CD policy sets a limit on the maximum number of CDs a staff member can receive in a 12-month period. Once staff reach the maximum, they will instead receive formal disciplinary charges. Generally, these maximums were reduced so that staff receive fewer CDs before violations before they are referred for formal disciplinary charges. Under the old policy, for lower- to mid-level violations (Schedules A-C), staff could receive a maximum of four CDs; they are now limited to three CDs per 12-month period. The maximum for the second most serious violations (Schedule D) remained at a maximum limit of two CDs per 12-month period, but under the revision, many of the violations classified as Schedule D under the previous policy were moved into the most serious category (Schedule E). The maximum limit for the most serious violations (Schedule E) was reduced from two CDs to one CD in a 12-month period.

o   <u>Additional Violations that are Subject to Formal Discipline</u>. While the previous CD policy included a list of violations that can only be addressed by formal disciplinary charges (i.e., not CDs), the new policy expanded this list to include the following:

- ▪ Forcefully taking an individual to an immovable object (such as the floor wall, or railing) in a manner deemed excessive or unnecessary

- ▪ Being off post when an incident occurs

- ▪ Using an escort technique contrary to policy resulting in an injury

- ▪ Any violation where Department leadership, ID, or the Trials Division determines formal disciplinary charges would be more appropriate

- o <u>ICDU Commanding Officer Review</u>. If a staff member does not accept a proposed CD penalty, the matter is referred to the Command Discipline Supervisor, who will also review the case and determine whether the penalty should be accepted/dismissed, altered, or passed on for appeal with the Legal Division. The Legal Division currently handles, and will continue to handle, appeals for CDs that are not accepted by staff.

- o <u>Routine Assessment of CD Appeals</u>. Under the new CD policy, the Legal Division will begin conducting quarterly assessments of the appeals process to ensure that it is working as designed.

- **External Assessment (§ I, ¶ 14)**. Dr. Belavich, a qualified expert in the prevention and response to self-harm in correctional settings, completed his assessment of the Department's suicide prevention practices in January 2024. Dr. Belavich consulted with the Monitoring Team during his assessment. A copy of his final report was filed with the Court on March 19, 2024 as Exhibit A to the Saunders Declaration (dkt. 689-12). The report includes several recommendations that the Monitoring Team has encouraged the Department to implement.

**OCTOBER 10, 2023 ORDER (DKT. 582)**

On October 10, 2023, the Court issued an Order directing Defendants to engage with the Monitoring Team on immediate initiatives to address the risk of harm and reporting issues identified in the Monitor's October 5, 2023 Report. The Order also reminded Defendants of their obligations to collaborate with the Monitor and to comply with the *Nunez* Court Orders.

- **Immediate Security Plan**. This is addressed in the compliance assessment for the Second Remedial Order, ¶1(i)(a): Interim Security Plan and Action Plan, § D, ¶ 2(a) (Security Plan) in this report.

- **Immediate Reporting Initiatives**. The Department issued two teletypes, on October 6 and 20, 2023, that reminded staff of their incident reporting obligations. The teletypes also rescinded the January 31, 2023 memo that permitted undue subjectivity and discretion in incident reporting (*see* Monitor's November 8, 2023 Report (dkt. 595) at pgs. 29-37). Additional work related to the Department's reporting obligations is discussed in the section below regarding the December 14, 2023 Order.

**DECEMBER 14, 2023 ORDER (DKT. 656)**

On December 14, 2023, the Court issued an Order regarding changes the Defendants must make to incident reporting practices in light of the Monitoring Team's findings in the Monitor's October 4, 2023 and November 8, 2023 Reports.

- **List of Reporting Policies (§ 1, ¶ a)**. On December 15, 2023, the Department provided the Monitoring Team with a list of 75 Department policies[194] that must be reviewed for potential consolidation into a comprehensive Incident Reporting policy.

---

[194] The Monitoring Team previously reported that over 90 policies were included, which is incorrect. The Monitoring Team regrets the error.

- **Stabbing and Slashing Definition (§ 1, ¶ b)**. The Department and Monitoring Team collaborated to revise the definition for "stabbing/slashing." The Department trained ADWs on the new definition in advance of issuing a teletype with the approved definition in October 2024.

- **Definitions of Incident Categories (§ 1, ¶ c)**. Defining incident categories will be part of the effort to develop a comprehensive Incident Reporting policy.

- **Comprehensive COD Policy (§ 1, ¶ d)**. The Department is undertaking a comprehensive and ambitious effort to reform its incident reporting process by developing an overarching Incident Reporting policy. This initiative, which will consolidate over 75 existing policies and involves coordination across numerous Divisions, is being led by the Department's Division of Strategic Operations. The Department's leadership consults with the Monitoring Team routinely and provides updates on work completed to date. Notably, the Department is not only overhauling its policies and aligning definitions with SCOC and other regulatory standards but is also developing a new electronic Incident Reporting System featuring a better user interface and reporting capabilities, which will also contribute to better data production. This is a significant undertaking that reflects the depth of this reform effort.

  The Department developed a cross-functional working group in early 2024 to develop an implementation plan. The project is being implemented in phases and includes the development of policy and definitions, staffing plans for centralized reporting, and the technical design of the new system. Internal testing, staff training, and a broad communications campaign are also being planned. While the final structure and timeline are still evolving, the Department has already demonstrated substantial

commitment and progress. The Department's continued engagement with the Monitoring Team, along with the scope and depth of the initiative, reflects a serious and credible effort to build a more efficient, accurate, and accountable reporting system.

DECEMBER 20, 2023 ORDER (DKT. 665)

On December 20, 2023, the Court found the Department in contempt of Action Plan § D, ¶ 3 and § E, ¶ 4 (dkt. 465) and § I, ¶ 5 of the June 13, 2023 Order (dkt. 550). On February 27, 2024 (dkt. 680), the Court found that the Department purged its contempt because it complied with the three enumerated requirements set out by the Court related to: (1) the sufficiency of the role, authority, and resources dedicated to the *Nunez* Manager, (2) developing and implementing a high profile communications program to make clear the responsibility—shared by Department leadership and staff alike—to proactively collaborate with the Monitoring Team, and (3) developing a set of data and metrics for use of force, security, and violence indicators that will be routinely evaluated by Department leadership to identify trends regarding unnecessary and excessive uses of force and violence in order to identify their root causes and to develop effective strategies to reduce their occurrence.

# UPCOMING TIMELINE & MONITOR REPORTING

## TIMELINES & REPORTING

A timeline of upcoming work for the Department, the Parties, and the Monitoring Team is outlined below:

**June 3, 2025**. Defendants to provide a current Department Organizational Chart with the Parties, the Monitoring Team, and the Court.

**June 27, 2025 at 12:00 p.m.** Parties to file any written objections to the Court's Proposed Order Appointing *Nunez* Remediation Manager (Appendix B of the Court's May 13, 2025 Order). Any objections to the language of the order must be discussed with the Monitoring Team prior to filing of any objections with the Court.

**August 29, 2025**. Parties to submit recommendations for the Remediation Manager with supporting materials, to the Court confidentially via email.

**November 2025**. Monitor to file a report regarding the 20th Monitoring Period with compliance ratings for the "select group of provisions" as defined by the Action Plan § G, ¶ 5(b) and the provisions included in the Contempt Order, to the extent that they are not covered by the "select group of provisions" articulated in the Action Plan. A complete list of these provisions is attached to this report as Appendix A.

- **Potential Modification to Timing of Monitor's Report**. During discussions with the Parties regarding the Court's proposed Order Appointing *Nunez* Remediation Manager (Appendix B of the Court's May 13, 2025 Order), the Monitoring Team intends to

propose reintroducing[195] the opportunity for the Parties to review a draft of the Monitor's

Report that address compliance assessments with the Nunez Provisions before the

compliance report is finalized and filed with the Court.[196] If this practice is reintroduced,

the timing for filing the Monitor's Report may need to be extended in order to afford

adequate time for the Parties to comment and for the Monitoring Team to consider the

Parties' input.

CONCLUSION

While the future holds many unknowns, it is crucial for Department leadership to remain

focused on the work at hand, advancing the reform and working to capitalize on the momentum

that has been built since Commissioner Maginley-Liddie was appointed. This Commissioner's

administration has demonstrated greater acknowledgement and ownership of core problems and

obstacles than has been seen in the past. This is critical for institutional change. There is tangible

momentum toward compliance with the *Nunez* Court Orders, but redoubled efforts are needed to

ensure this momentum is not lost in the face of the upcoming changes to the contours of the

reform effort.

---

[195] The practice of sharing draft reports that include the compliance ratings was done in the past pursuant to Consent Judgment § XX, ¶ 17. This practice does not apply to Special Reports that the Monitor deems must be filed outside of the routine filing of compliance assessments.

[196] The Monitoring Team reserves the right to file additional special reports as deemed necessary under the circumstances and contemplated by the *Nunez* Court Orders. To the extent that such special reports may be filed, the Monitoring Team does not intend to share written drafts of the special reports given the need for the reports to be filed on an expedited time frame.

# APPENDIX A: COMPREHENSIVE LIST OF PROVISIONS

## Comprehensive List of "Select Group of Provisions" &
## Provisions Subject to the Court's 2024 Contempt Order

The table below includes a comprehensive list of 39 provisions: (1) the Select Group of Provisions subject to compliance assessments (Consent Judgment § XX, ¶ 18) as required by Action Plan § G, ¶ 5(b) **and** (2) the provisions that are subject to the Court's 2024 Contempt Order. The table also identifies whether the provision is part of the Select Group of Provisions, the 2024 Contempt Order, or both.

This chart references provisions in the Consent Judgment ("CJ"), the First Remedial Order ("FRO"), the Second Remedial Order ("SRO"), the Third Remedial Order ("TRO"), and the Action Plan ("AP").

| Short Description of Provision | Select Group of Provisions as defined by Action Plan § G, ¶ 5(b) | Provisions Subject to 2024 Contempt Order | Status of Rating or Update | Change since 18th Monitoring Period? |
|---|---|---|---|---|
| FRO, § A., ¶ 2: Facility Leadership Responsibilities | Yes | Yes | Partial Compliance | Upgraded Rating (per 18th MP) and Sustained Progress |
| CJ, § IV., ¶ 1: New Use of Force Directive | Yes | Yes | (Develop) Substantial Compliance (Adopt) Substantial Compliance (Implement) Non-Compliance (Monitor Approval) Substantial Compliance | Progress |
| CJ, § V., ¶ 2: Independent Staff Reports | Yes | No | Partial Compliance | Sustained Progress |
| CJ, § V., ¶ 22: Providing Medical Attention Following Use of Force Incident | Yes | No | Partial Compliance | Sustained Progress |
| SRO, ¶1(i)(a): Interim Security Plan | No | Yes | Concrete Steps Taken | Some Progress |
| AP, § D, ¶ 2 (a): Interim Security Plan | No | Yes | Concrete Steps Taken | Some Progress |
| FRO, § A., ¶ 6: Facility Emergency Response Teams | Yes | Yes | Partial Compliance | Upgraded Rating |
| AP, § D, ¶ 2 (d): Searches | No | Yes | Concrete Steps Taken | Progress |

| Short Description of Provision | Select Group of Provisions as defined by Action Plan § G, ¶ 5(b) | Provisions Subject to 2024 Contempt Order | Status of Rating or Update | Change since 18th Monitoring Period? |
|---|---|---|---|---|
| AP, § D, ¶ 2 (e): Identify/ Recover Contraband | No | Yes | Concrete Steps Taken | Progress |
| AP, § D, ¶ 2 (f): Escort Holds | No | Yes | Status Quo Remains | Status Quo |
| AP, § A, ¶1 (d): Improved Routine Tours | No | Yes | Status Quo Remains | Status Quo |
| FRO, § A., ¶ 3: Revised De-escalation Protocol | Yes | No | Partial Compliance | Sustained Progress |
| CJ, § XV., ¶ 1: Prevent Fight/Assault – 18-year-olds | Yes | Yes | Partial Compliance | Upgraded Rating (per 18th MP) and Sustained Progress |
| CJ, § XV., ¶ 12: Direct Supervision – 18-year-olds | Yes | Yes | Partial Compliance | Upgraded Rating |
| FRO, § D, ¶ 3; 3(i): Reinforcement of Direct Supervision | No | Yes | Partial Compliance | Upgraded Rating |
| CJ, § XV., ¶ 17: Consistent Assignment of Staff – 18-year-olds | Yes | Yes | Partial Compliance | Upgraded Rating |
| FRO, § D, ¶ 1: Consistent Staff Assignment and Leadership | No | Yes | Partial Compliance | Upgraded Rating |
| FRO, § A., ¶ 1: Conduct Rapid Reviews | Yes | No | Partial Compliance | Sustained Progress |
| CJ, § VII., ¶ 1: Thorough, Timely, Objective Investigations | Yes | Yes | Partial Compliance | Upgraded Rating |
| CJ, § VII., ¶ 9(a): Timing of Full ID Investigations | Yes | Yes | Non-Compliance | Status Quo |
| CJ, § VII., ¶ 11: ID Staffing | No | Yes | Partial Compliance | Upgraded Rating |
| CJ, § VIII., ¶ 1: Timely, Appropriate and Meaningful Discipline | Yes | Yes | Partial Compliance | Upgraded Rating |
| CJ, § VIII., ¶ 3(c): Use of Force Violations | Yes | No | Serving Charges: Substantial Compliance (per the 12th Monitor's Report) | Sustained Progress |

| Short Description of Provision | Select Group of Provisions as defined by Action Plan § G, ¶ 5(b) | Provisions Subject to 2024 Contempt Order | Status of Rating or Update | Change since 18th Monitoring Period? |
|---|---|---|---|---|
| | | | Administrative Filing: Substantial Compliance<br>Expeditiously Prosecuting Cases: Partial Compliance | |
| FRO, § C., ¶ 1:<br>Immediate Corrective Action | Yes | No | Partial Compliance | Sustained Progress |
| FRO, § C., ¶ 2: Staff Accountability – Monitor Recommendations | Yes | No | Partial Compliance | Sustained Progress |
| FRO, § C., ¶ 4/TRO ¶ 2: Expeditious OATH Proceedings | Yes | No | Partial Compliance | Sustained Progress |
| TRO, ¶ 3: New OATH Procedures and Protocols | Yes | No | Partial Compliance | Sustained Progress |
| FRO, § C., ¶ 5: Applicability of Disciplinary Guidelines to OATH Proceedings | Yes | No | Partial Compliance | Sustained Progress |
| CJ, § VIII., ¶ 4: Trials Division Staffing | Yes | No | Partial Compliance | Sustained Progress |
| CJ, § X., ¶ 1:<br>Early Warning System | Yes | No | Partial Compliance | Sustained Progress |
| CJ, § XII., ¶ 1:<br>Promotions | Yes | No | Partial Compliance | Sustained Progress |
| CJ, § XII., ¶ 2:<br>Promotions | Yes | No | Partial Compliance | Sustained Progress |
| CJ, § XII., ¶ 3:<br>Promotions | Yes | No | Substantial Compliance | Sustained Progress |
| FRO, § A., ¶ 4:<br>Supervision of Captains | Yes | Yes | Non-Compliance | Status Quo |
| AP, § C, ¶ 3 (ii):<br>Increased Assignment of Captains in the Facility | No | Yes | Non-Compliance | Status Quo |
| AP, § C, ¶ 3 (iii): Improved Supervision of Captains | No | Yes | Non-Compliance | Status Quo |
| AP, § C, ¶ 3 (vii):<br>Maximizing Deployment of Staff - Reduction of Uniformed Staff in Civilian Posts | No | Yes | Concrete Steps Taken | Progress |

| Short Description of Provision | Select Group of Provisions as defined by Action Plan § G, ¶ 5(b) | Provisions Subject to 2024 Contempt Order | Status of Rating or Update | Change since 18th Monitoring Period? |
|---|---|---|---|---|
| AP, § C, ¶ 3 (v): Maximizing Deployment of Staff - Awarded Posts | No | Yes | Concrete Steps Taken | Progress |
| AP, § C, ¶ 3 (vi): Maximizing Deployment of Staff - Maximize Work Schedules | No | Yes | Status Quo Remains | Status Quo |

# APPENDIX B:
# USE OF FORCE &
# VIOLENCE INDICATORS

**TABLE 1: NUMBER AND RATE OF UOF**

The graph below shows the average monthly rate of use of force per 100 people in custody. The table shows the data for 2024's two Monitoring Periods.



| Systewide Use of Force January 2024 to December 2024 | | | | |
|---|---|---|---|---|
| Months | Total # UOF | Average/month | ADP | Rate |
| January-June 2024 | 3589 | 598.2 | 6271 | 9.3 |
| July-December 2024 | 3480 | 580.0 | 6489 | 8.94 |

**TABLE 2: NUMBER AND PROPORTION OF A, B, AND C USES OF FORCE.**

The table below shows the number and proportions of uses of force in which at least one serious injury ("A"), a less serious injury ("B"), or no injury ("C") occurred. On the left-hand side of the table (the unshaded side), Column A shows that the raw number of serious injuries (A) increased steadily for several years after the Consent Judgment went into effect. The number of serious injuries increased significantly in 2021 and 2021, and since then, the number decreased significantly. In column B, the trajectory of the trend is shaped differently, but the number of less serious injuries has been at historical lows for the past two years. In other words, fewer people are harmed each year at the hands of staff (from just over 2,000 people in 2018, to fewer than 300 people in 2024).

The shaded cells of the table show the proportion of As, Bs and Cs each year. As the proportion of As and Bs has decreased over time, the proportion of Cs—uses of force where no one is injured—has increased. In 2018, 37% of UOF resulted in an injury (Class A and B, combined) compared to only about 4% in 2024. Conversely, in 2018, only about two-thirds of all uses of force (63%) did <u>not</u> result in injury, compared to over 96% in 2024. In other words, a much larger proportion of the uses of force are occurring without inflicting injury on those involved.

| Number and Proportion of A, B and C Uses of Force | | | | | | | |
|---|---|---|---|---|---|---|---|
| Year | Number of UOF Incidents | | | | Proportion of A/B/C | | |
| | A | B | C | Total UOF | A | B | C |
| 2016 | 74 | 1627 | 2950 | 4651 | 1.6% | 35.0% | 63.4% |
| 2017 | 134 | 1743 | 2903 | 4780 | 2.8% | 36.5% | 60.7% |
| 2018 | 136 | 1894 | 3871 | 5901 | 2.3% | 32.1% | 65.6% |
| 2019 | 166 | 1648 | 5355 | 7169 | 2.3% | 23.0% | 74.7% |
| 2020 | 178 | 960 | 5059 | 6197 | 2.9% | 15.5% | 81.6% |
| 2021 | 464 | 1033 | 6697 | 8194 | 5.7% | 12.6% | 81.7% |
| 2022 | 434 | 781 | 5790 | 7005 | 6.2% | 11.1% | 82.7% |
| 2023 | 165 | 380 | 6239 | 6784 | 2.4% | 5.6% | 92.0% |
| 2024 | 52 | 209 | 6719 | 6980 | 0.7% | 3.0% | 96.3% |
| 2024, by Monitoring Period | | | | | | | |
| J-J 24 | 21 | 87 | 3389 | 3497 | 0.6% | 2.5% | 96.9% |
| J-D 24 | 31 | 122 | 3330 | 3483 | 0.9% | 3.5% | 95.6% |

**TABLE 3: NUMBER AND RATE OF STABBING AND SLASHING**

The graph below shows the average monthly rate of stabbings and slashings per 100 people in custody. The table shows the data for 2024's two Monitoring Periods.



| Systemwide Stabbings/Slashings January 2024 to December 2024 | | | | |
|---|---|---|---|---|
| Months | Total # S/S | Average/month | ADP | Rate |
| January-June 2024 | 152 | 25.3 | 6271 | 0.41 |
| July-December 2024 | 146 | 24.3 | 6489 | 0.38 |

*\*\*In October 2024, the Department began collecting data on "Attempted Slashings/Stabbings"\*\**

TABLE 4: NUMBER AND RATE OF FIGHTS

The graph below shows the average monthly rate of fights per 100 people in custody. The table shows the data for 2024's two Monitoring Periods.



| Systemwide Fights January 2024 to December 2024 | | | | |
|---|---|---|---|---|
| Months | Total # Fights | Average/month | ADP | Rate |
| January-June 2024 | 3491 | 581.8 | 6271 | 9.3 |
| July-December 2024 | 4075 | 679.2 | 6489 | 10.5 |

**TABLE 5: NUMBER AND RATE OF FIRES**

The graph below shows the average monthly rate of fires per 100 people in custody. The table shows the data for 2024's two Monitoring Periods.



| Systemwide Fires January 2024 to December 2024 | | | | |
|---|---|---|---|---|
| Months | Total # Fires | Average/month | ADP | Rate |
| January-June 2024 | 219 | 36.5 | 6271 | 0.6 |
| July-December 2024 | 102 | 17.0 | 6489 | 0.3 |

**TABLE 6: NUMBER AND RATE OF ASSAULTS ON STAFF WITH UOF**

The graph below shows the average monthly rate of assaults on staff (that also involve a use of force) per 100 people in custody. The table shows the data for 2024's two Monitoring Periods.



| Systemwide Assaults on Staff with UOF January 2024 to December 2024 | | | | |
|---|---|---|---|---|
| Months | Total # AOS w UOF | Average/month | ADP | Rate |
| January-June 2024 | 323 | 53.8 | 6271 | 0.86 |
| July-December 2024 | 456 | 76.0 | 6489 | 1.17 |

**TABLE 7: NUMBER AND RATE OF ASSAULTS ON STAFF WITHOUT UOF**

The graph below shows the average monthly rate of assaults on staff (not involving a use of force) per 100 people in custody. The table shows the data for 2024's two Monitoring Periods.



*The Department began tracking assaults on staff that did not involve a use of force in 2020. Prior years' data is not available.*

| Systewide Assaults on Staff without UOF January 2024 to December 2024 | | | | |
|---|---|---|---|---|
| Months | Total # AOS no UOF | Average/month | ADP | Rate |
| January-June 2024 | 202 | 33.7 | 6271 | 0.54 |
| July-December 2024 | 145 | 24.2 | 6489 | 0.37 |

**TABLE 8: USES OF FORCE INVOLVING INCIDENTS WHEN A STAFF MEMBER IS NOT ON POST**

      The table below provides the number and proportion of uses of force involving "unmanned posts" as identified by the Department during each monitoring period from 2022 to 2024. These incidents occurred proximal to posts to which no staff member was assigned *or* instances where the assigned officer left their post without being relieved (collectively "unmanned posts"). The first two columns list the number of uses of force involving unmanned posts and the proportion of <u>all</u> uses of force that this number represents. The third and fourth columns identify the number and proportion of uses of force that involved unmanned posts **and** were avoidable (as identified by the Department) specifically due to the lack of staff on post. In other words, the Department determined that these incidents likely could have been avoided had a staff member been present.

| Uses of Force Incidents When a Staff Member is Not on Post, 2022-2024 | | | | |
|---|---|---|---|---|
| **Monitoring Period** | **# of UOF Incidents involving Unmanned Posts** | **% of UOF Incidents involving Unmanned Posts[197]** | **# of UOF Incidents involving Unmanned Posts and that were Avoidable** | **% of UOF Incidents involving Unmanned Posts, that were Avoidable** |
| **Jan.-Jun. 2022** | 151 | 4.66% | *88* | *58.28%* |
| **Jul.-Dec. 2022** | 159 | 4.22% | *80* | *50.31%* |
| **Jan.-Jun. 2023** | 112 | 3.46% | *57* | *50.89%* |
| **Jul.-Dec. 2023** | 65 | 1.99% | *29* | *44.62%* |
| **Jan.-Jun. 2024** | 89 | 2.55% | *14* | *15.73%* |
| **Jul.-Dec. 2024** | 125 | 3.60% | *9* | *7.20%* |

---

[197] This does not include alleged uses of force because the Department does not analyze the extent to which allegations may have been avoidable.

# APPENDIX C:
# IN-CUSTODY DEATHS

## OVERVIEW OF IN-CUSTODY DEATHS

The number of people who have died while in custody is tragic and is related, at least in part, to the poor conditions and security practices in the jails as set forth herein.

### TABLE 1: CAUSES OF DEATH

In 2023, nine individuals died in custody or shortly after their release.[198] In 2024, five individuals died. As of the date of this report, five people have died in 2025. An updated table on the number of people who have died, and their causes of death is provided below.

| DOC Causes of Death 2015 to May 15, 2025 | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | Total |
| Accidental | | | | | | | | 1 | | | | 1 |
| COVID-19 | | | | | | 3 | 2 | | | | | 5 |
| Medical Condition | 9 | 11 | 4 | 7 | 3 | 2 | 4 | 5 | 4 | 3 | | 52 |
| Overdose | | 2 | 1 | | | | 4 | 6 | 2 | 1 | | 16 |
| Suicide | 2 | 2 | | 1 | | 1 | 4 | 6 | 2 | | | 18 |
| Drowned | | | | | | | | 1 | | | | 1 |
| Pending OCME Confirmation | | | | | | | | | 1 | 1 | 5 | 7 |
| Undetermined Due to Death Outside of DOC Custody | | | | | | 4 | 2 | | | | | 6 |
| Undetermined by OCME | | | 1 | | | 1 | | | | | | 2 |
| **Total** | **11** | **15** | **6** | **8** | **3** | **11** | **16** | **19** | **9** | **5** | **5** | **108** |

---

[198] If an incarcerated individual has a health condition that may merit release, the process has a few steps and must be ordered by the Court. The Department does not have any authority to release an individual because of a health condition although it may certainly identify and recommend individuals that should be considered for potential release. To the extent an individual has a health condition that may merit release, CHS may issue a clinical condition letter, with the patient's consent, which is then provided to the individual's defense counsel. Counsel then may petition the Court to release the individual. Release is not automatic, and an individual determination must be made by the Court. If the court determines release is appropriate, the Department is notified via a court order that the individual is being released on their own recognizance ("ROR"). However, the order does not specify a medical reason for the release.

TABLE 2: MORTALITY RATE

The table below shows the Department's mortality rate from January 2010 to December 31, 2024. The mortality rate in 2022 was the highest in over a decade and more than double the rate in 2016 at the inception of the Consent Judgment. Notably, the mortality rate has decreased significantly since 2022 and 2024 reflects the lowest mortality rate since 2019. A mortality rate for 2025 cannot be developed because the year is not yet complete.

| Mortality Rate | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
| Annual ADP | 13,026 | 12,421 | 12,083 | 11,692 | 10,913 | 9,890 | 9,802 | 9,224 | 8,397 | 7,388 | 4,543 | 5,574 | 5,639 | 6,054 | 6,380 | 6,683 |
| Number of Deaths | 17 | 12 | 21 | 24 | 10 | 11 | 15 | 6 | 8 | 3 | 11 | 16 | 19 | 9 | 5 | 5 |
| Mortality Rate | 1.31 | 0.97 | 1.74 | 2.05 | 0.92 | 1.11 | 1.53 | 0.65 | 0.95 | 0.41 | 2.42 | 2.87 | 3.37 | 1.49 | 0.78 | - |

*Note: The Mortality Rate is per 1000 people in custody and uses the following formula: Rate = (# of deaths/average # of people in custody)\*1000*

TABLE 3: CORRECTIVE ACTION TAKEN BY DOC RELATED TO IN-CUSTODY DEATHS - 2022-2025

| Staff Member | Penalty | Reason for Suspension |
|---|---|---|
| **Death of Tarz Youngblood on 2/27/2022** | | |
| CO 36 | NPA – Loss of 17 compensation days | Failed to conduct proper tours and check for signs of life |
| **Death of Dashawn Carter on 5/7/2022** | | |
| CO 1 | Suspended, resigned | Failed to make proper tours and made false entries in the logbook |
| CO 2 | Suspended - 30 days | Failed to make proper tours and made false entries in the logbook |
| Captain 3 | Suspended - 30 days | Failed to make proper tours and made false entries in the logbook |
| Captain 4 | Suspended - 30 days | Failed to make proper tours and made false entries in the logbook |
| **Death of Mary Yehuda on 5/18/2022** | | |
| CO 37 | NPA - Loss of 10 compensation days and 12 months limited probation | Off post, failed to conduct frequent tours, and made false entries in the logbook |
| CO 40 | NPA - Loss of 10 compensation days | Off post, failed to conduct frequent tours, and made false entries in the logbook |
| Captain 38 | Suspended - 7 days; and NPA - Loss of 10 compensation days | Failed to conduct proper tours and made false entries in the logbook |

| Staff Member | Penalty | Reason for Suspension |
|---|---|---|
| ADW 39 | Reprimand (Returned to Command) | Failed to produce a COD package |
| **Death of Emanuel Sullivan on 5/28/2022** | | |
| CO 41 | NPA - Loss of 30 days and 12 months limited probation | Failed to conduct proper tours and made false entries in the logbook |
| **Death of Anibal Carrasquillo on 6/20/2022** | | |
| CO 20 | Suspended - 30 days | Failure to conduct proper tour |
| CO 21 | Suspended - 30 days | Failure to conduct proper tour/Off post |
| **Death of Elijah Muhammad on 7/11/2022** | | |
| CO 5 | Terminated | Failed to notify supervisor or medical staff |
| **Death of Michael Lopez on 7/15/2022** | | |
| CO 6 | Suspended - 30 days | Failed to make proper tours and made false entries in the logbook |
| CO 7 | Suspended - 30 days | Failed to make proper tours and made false entries in the logbook |
| Captain 8 | Suspended - 30 days | Failed to make proper tours and made false entries in the logbook |
| **Death of Ricardo Cruciani on 8/15/2022** | | |
| Captain 9 | Suspended - 30 days | Failed to conduct tour |
| **Death of Michael Nieves on 8/30/2022** | | |
| CO 10 | Suspended - 30 days | Failed to render aid |
| CO 11 | Suspended - 30 days | Failed to render aid and provide timely report |
| Captain 12 | Suspended - 30 days | Failure to supervise |
| **Death of Erick Tavira on 10/22/2022** | | |
| CO 13 | Suspended - 7 days | Failed to make proper tours and made false entries in the logbook |
| **Death of Gilberto Garcia on 10/31/2022** | | |
| CO 14 | Suspended - 7 days | Failed to conduct tour |
| **Death of Marvin Pines on 2/4/2023** | | |
| CO 15 | Suspended - 6 days | Failed to conduct tours/off post |
| CO 16 | Suspended - 6 days | Failed to conduct tour |
| Captain 17 | Suspended - 15 days | Failed to make proper tours and made false entries in the logbook |
| ADW 18 | Suspended - 30 days | Failed to conduct tours/supervise |
| ADW 19 | Suspended - 6 days | Failed to supervise |
| **Death of Felix Taveras on 7/4/2023** | | |
| CO 22 | Suspended - 30 days | Failed to intervene and lock in |
| CO 23 | Suspended - 15 days | Failed to intervene |
| CO 24 | Suspended - 30 days | Failed to conduct tour |
| ADW 25 | Suspended - 15 days | Failed to identify misconduct |
| **Death of Ricky Howell on 7/6/2023** | | |
| Captain 26 | Documented Counseling | Failed to call incident into COD within required time frame |
| **Death of William Johnstone on 7/15/2023** | | |
| Captain 27 | Suspended - 7 days | Failure to conduct proper tour |
| CO 28 | Suspended - 15 days | Permitting unauthorized person or employee on their post |
| CO 29 | Suspended - 30 days | Abandoned Post |
| **Death of Curtis Davis on 7/23/2023** | | |
| CO 30 | Suspended - 30 days | Off post |
| CO 31 | Suspended - 15 days | Failed to secure post |
| ADW 32 | Suspended - 7 days | Failure to conduct proper tour |

| Staff Member | Penalty | Reason for Suspension |
|---|---|---|
| **Death of Manish Kunwar on 10/5/2023** | | |
| Captain 33 | Suspended - 30 days | Failed to conduct meaningful tours |
| CO 34 | Suspended - 30 days | Failed to conduct meaningful tours |
| CO 35 | Suspended - 30 days | Disobeying a direct order to relieve fellow CO |
| **Death of Ramel Powell on 2/19/2025** | | |
| CO 42 | Suspended 2/19/2025; Terminated effective 5/11/2025 | Failed to act and failed to conduct meaningful tours by checking for signs of life |
| **Death of Dashawn Jenkins on 3/31/2025** | | |
| CO 43 | Suspended – 30 days | Conduct unbecoming |
| CO 44 | Suspended – 30 days | Conduct unbecoming |

SUMMARIES OF DEATHS IN-CUSTODY IN 2025

The following is a brief summary of in-custody deaths that occurred between January 2025 and the date of this report. The cause of death for each individual remains pending with the Office of the Chief Medical Examiner of the City of New York. In addition, all deaths are currently under investigation by external agencies and/or the Department of Correction.

- **Ramel Powell**. On the evening of February 19, 2025, Mr. Powell was found unresponsive in his assigned cell in a housing area at GRVC. Staff initiated emergency medical procedures, and he was pronounced deceased in the early morning hours of February 20. The Department reported that the officer assigned to the housing area was terminated as a result of this incident. Investigation into the incident is ongoing.

- **Terrence Moore**. On February 24, 2025, while in the Manhattan Courts, Mr. Terrence Moore experienced a medical emergency. Staff initiated emergency response procedures, and he was transported to a local hospital, where he was pronounced deceased. Investigation into the incident is ongoing.

- **Ariel Quidone**. On March 13, 2025, Mr. Quidone experienced a serious medical emergency while housed in a housing area at RNDC. He received medical attention and

was transported to the hospital, where he passed away on March 16, 2025. Investigation into the incident is ongoing.

- **Sonia Reyes**. In the early morning hours of March 20, 2025, Ms. Reyes was found unresponsive in her cell in a housing unit at West Facility. On-site medical personnel initiated emergency procedures, and EMS responded shortly thereafter. Ms. Reyes was pronounced deceased at the facility. Investigation into the incident is ongoing.

- **Dashawn Jenkins**. On March 31, 2025, in a housing area in GRVC, Mr. Jenkins was observed to be in medical distress during a scheduled lock-in tour. Facility staff initiated emergency procedures, including the administration of Narcan and CPR. Despite continued resuscitation efforts by medical personnel, Mr. Jenkins was pronounced deceased later that evening. The Department reported that two officers were suspended as result of this incident. Investigation into the incident is ongoing.

# APPENDIX D:
# USE OF FORCE INVESTIGATIONS

TABLE 1(A): ID SUPERVISORS ASSIGNED TO UOF CASES

The table below shows the number of supervisors assigned to ID's use of force investigation-level teams at specific times since 2020.

| ID Supervisors Assigned to UOF Cases | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Feb 2020 | Jan 2021 | Jan 2022 | Jan 2023 | Jun 2023 | Dec 2023 | Jun 2024 | Dec 2024 |
| Rapid Reviews | | | | | 2 | 2 | 2 | 2 |
| Intake Squad | 8 | 10 | 13 | 12 | 8 | 10 | 10 | 11 |
| Full ID | 15 | 10 | 7 | 3 | 3 | 5 | 5 | 4 |
| UPS | 1 | 1 | 1 | 0 | 1 | 1 | 1 | 1 |
| **Total** | **24** | **21** | **21** | **15** | **14** | **18** | **18** | **18** |

TABLE 1(B): ID INVESTIGATORS ASSIGNED TO UOF CASES

The table below shows the number of investigators assigned to ID's use of force investigation-level teams at specific times since 2020.

| ID Investigators Assigned to UOF Cases | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Feb 2020 | Jan 2021 | Jan 2022 | Jan 2023 | Jun 2023 | Dec 2023 | Jun 2024 | Dec 2024 |
| Rapid Reviews | | | | | 8 | 10 | 10 | 10 |
| Intake Squad | 32 | 51 | 51 | 51 | 32 | 35 | 31 | 38 |
| Full ID | 82 | 58 | 36 | 10 | 12 | 22 | 21 | 23 |
| UPS | 4 | 3 | 3 | 4 | 5 | 5 | 4 | 5 |
| **Total** | **118** | **112** | **90** | **65** | **57** | **72** | **66** | **76** |

**TABLE 2: SUMMARY OF ID HIRES AND DEPARTURES**

The table below includes the number of ID staff hired and any net gains to ID's staffing between January 2022 and December 2024. A more fulsome discussion regarding the recruitment and hiring process is included in the compliance box for Consent Judgment § VII., ¶¶ 1 and 9(a) (Use of Force Investigations).

| | Total Investigator | Civilian Investigator | Uniform Investigator | Total Supervisor | Civilian Supervisor | Uniform Supervisor | Administrative /Clerical | Deputy Director | Director | Agency Attorney | Assistant/ Associate Commissioner | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Summary of ID Hires & Departures** <br> **Net Gains & Losses** | | | | | | | | | | | | |
| **January 2022 to December 2022** | | | | | | | | | | | | |
| **Hired 2022** | 28 | 28 | 0 | 3 | 2 | 1 | 0 | 2 | 1 | 0 | 2 | 36 |
| **Departed 2022** | 43 | 32 | 11 | 9 | 7 | 2 | 0 | 3 | 4 | 2 | 0 | 61 |
| **Net Gain/Loss** | -15 | -4 | -11 | -6 | -5 | -1 | 0 | -1 | -3 | -2 | 2 | -25 |
| **January 2023 to December 2023** | | | | | | | | | | | | |
| **Hired 2023** | 46 | 42 | 4 | 15 | 6 | 9 | 2 | 4 | 0 | 0 | 1 | 68 |
| **Departed 2023** | 60 | 47 | 13 | 22 | 11 | 11 | 2 | 4 | 2 | 0 | 3 | 93 |
| **Net Gain/Loss** | -14 | -5 | -9 | -7 | -5 | -2 | 0 | 0 | -2 | 0 | -2 | -25 |
| **January 2024 to December 2024** | | | | | | | | | | | | |
| **Hired 2024** | 30 | 30 | 0 | 9 | 9 | 0 | 3 | 6 | 2 | 0 | 1 | 51 |
| **Departed 2024** | 20 | 20 | 0 | 6 | 6 | 0 | 2 | 3 | 0 | 0 | 1 | 32 |
| **Net Gain/Loss** | +10 | +10 | 0 | +3 | +3 | 0 | +1 | +3 | +2 | 0 | 0 | +19 |

**TABLE 3: STATUS OF INVESTIGATIONS OF UOF INCIDENTS**

The table below shows the status of all investigations of UOF incidents that occurred between January 2020 and December 2024 *as of March 19, 2025*.[199]

| Status of Investigations of UOF Incidents Occurring Between 2020 and 2024 *as of March 19, 2025* | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Incident Date** | **2020** | | **2021** | | **2022** | | **2023** | | **2024** | | **Jan.-Jun. 2024 (18th MP)** | | **Jul.-Dec. 2024 (19th MP)** | |
| **Total UOF Incidents** [200] | 6,399 | | 8,413 | | 7,231 | | 6,959 | | 7,150 | | 3,590 | | 3,560 | |
| **Pending Intake Invest.** | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 50 | 1% | 7 | <1% | 43 | 1% |
| **Pending Full ID Invest.** | 0 | 0% | 0 | 0% | 0 | 0% | 199 | 3% | 669 | 9% | 356 | 10% | 313 | 9% |
| **Total Closed Invest.** | 6,399 | 100% | 8,413 | 100% | 7,231 | 100% | 6,760 | 97% | 6,431 | 90% | 3,227 | 90% | 3,204 | 90% |

---

[199] All investigations of incidents that occurred prior to 2020 were closed during previous Monitoring Periods and thus are not included in this table.

[200] Incidents are categorized by the date they occurred or were alleged to have occurred, and therefore these numbers fluctuate very slightly across Monitoring Periods as allegations are sometimes made many months after the incident is alleged to have occurred. The data are updated thereafter.

**TABLE 4: STATUS OF FULL ID INVESTIGATIONS**

The table below shows the status of Full ID Investigations for all incidents that occurred between January 2023 and December 2024 (n=1,427) *as of March 19, 2025*.[201]

| Status of Full ID Investigations for incidents that *occurred* between January 2023-December 2024 *As of March 19, 2025* | | | | |
|---|---|---|---|---|
| *Pending* 120 Days or Less | *Closed* within 120 Days | *Closed* Beyond 120 Days | *Pending* Beyond 120 Days | Total |
| 77 | 116 | 443 | 791 | 1,427 |
| 5% | 8% | 31% | 55% | |

---

[201] The period of incident dates of January 2023-December 2024 was selected as it captures *all* pending full ID investigations as of the end of this Monitoring Period. All investigations, including full ID investigations, have been completed for uses of force that occurred prior to January 2023. Given that full ID investigations can take months to complete, it is common that a full ID investigation will be completed in a different Monitoring Period than the Monitoring Period in which it occurred.

TABLE 5: LAW ENFORCEMENT REFERRALS

The table below shows the number and status of cases, *as of December 31, 2024*, that have been referred to outside law enforcement agencies for investigation and potential prosecution.

| Law Enforcement Referrals *As of December 31, 2024* | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Date of Incident | 2014 & 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | Total | |
| **Total** | **9** | **16** | **27** | **19** | **15** | **15** | **7** | **10** | **8** | **18** | **144** | |
| Criminal Charges Brought / Trial Underway or Complete | 0 | 2 | 0 | 2 | 2 | 1 | 1 | 0 | 0 | **0** | **8** | **6%** |
| Pending Consideration with Law Enforcement | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | **10** | **11** | **8%** |
| Returned to ID for Administrative Processing | 9 | 14 | 27 | 17 | 13 | 14 | 6 | 10 | 7 | **8** | **125** | **87%** |

**TABLE 6(A): RESULTS OF INTAKE INVESTIGATION AUDITS BY DATE OF INITIAL INTAKE INVESTIGATION**

The table below shows the results of ID's internal quality assurance audits of closed Intake Investigations *as of March 15, 2025*. This data is categorized by the date the initial Intake Investigation was closed by ID.

| Results of Intake Investigation QA Audits *As of March 15, 2025* | | |
|---|---|---|
| **Date Initial Intake Investigation Closed** | **# of Investigations Audited** | **Audit Identified an Issue with the Initial Investigation[202]** |
| **January-June 2023** | 678 | 180 |
| **July-December 2023** | 633 | 135 |
| **January-June 2024** | 791 | 240 |
| **July-December 2024** | 380 | 91 |

**TABLE 6(B): NUMBER OF INTAKE INVESTIGATIONS QA AUDITS COMPLETED**

The table below shows the number of ID's internal quality assurance audits of closed Intake Investigations conducted in each Monitoring Period, *as of March 15, 2025*. This data is categorized by the date the QA audit was completed.

| Number of Intake Investigations QA Audits Completed *As of March 15, 2025* | |
|---|---|
| **Date QA Audit Completed** | **# of Investigations Audited** |
| **March-June 2023** | 419 |
| **July-December 2023** | 533 |
| **January-June 2024** | 782 |
| **July-December 2024** | 668 |

---

[202] As a result of the QA audit for these Intake Investigations, ID took additional action for these cases (e.g. updating the investigation's closing report, updating the video preservation, pursuing additional corrective action against the MOS involved in the use of force, counseling the investigator).

**TABLE 7(A): RESULTS OF FULL ID INVESTIGATION AUDITS BY DATE OF INITIAL FULL ID INVESTIGATION**

The table below shows the results of ID's internal quality assurance audits of closed Full ID Investigations *as of March 15, 2025*. This data is categorized by the date the initial Full ID Investigation was closed by ID.

| Results of Full ID Investigation QA Audits *As of March 15, 2025* | | |
|---|---|---|
| **Date Initial Full ID Investigation Closed** | **# of Investigations Audited** | **Audit Identified an Issue with the Initial Investigation**[203] |
| **January-June 2022** | 2 | 1 |
| **July-December 2022** | 0 | - |
| **January-June 2023** | 21 | 18 |
| **July-December 2023** | 17 | 10 |
| **January-June 2024** | 21 | 9 |
| **July-December 2024** | 13 | 8 |

**TABLE 7(B): NUMBER OF FULL ID INVESTIGATION QA AUDITS COMPLETED**

The table below shows the number of ID's internal quality assurance audits of closed Full ID Investigations completed in each Monitoring Period, *as of March 15, 2025*. This data is categorized by the date the QA audit was completed.

| Number of Full ID Investigation QA Audits Completed *As of March 15, 2025* | |
|---|---|
| **Date QA Audit Completed** | **# of Investigations Audited** |
| **April-June 2023** | 22 |
| **July-December 2023** | 16 |
| **January-June 2024** | 21 |
| **July-December 2024** | 14 |

---

[203] As a result of the QA audit for these Full ID Investigations, ID took additional action for these cases (e.g. updating the investigation's closing report, conducting further investigative actions, pursuing additional corrective action against the MOS involved in the use of force, counseling the investigator). The Monitoring Team excluded cases where the audit identified that the only issues with the initial Full ID investigation were grammatical issues.

**TABLE 8: OUTCOME OF INTAKE INVESTIGATIONS**

The table below shows the outcome of Intake Investigations from February 3, 2020 (the inception of Intake Investigations) through December 2024, *as of February 28, 2025*.

| Incident Date[206] | Outcome of Intake Investigations[204] as of February 28, 2025[205] | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | *July to Dec. 2020 (11th MP)* | *Jan. to June 2021 (12th MP)* | *July to Dec. 2021 (13th MP)* | *Jan. to June 2022 (14th MP)* | *July to Dec. 2022 (15th MP)* | *Jan. to June 2023 (16th MP)* | *Jul. to Dec. 2023 (17th MP)* | *Jan. to June 2024 (18th MP)* | *Jul. to Dec. 2024 (19th MP)* |
| Pending Intake Investigation | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 27 | 169 |
| **Closed Intake Investigations** | **3,272** | **4,468** | **3,916** | **3,349** | **3,883** | **3,317** | **3,642** | **3,563** | **3,393** |
| *No Action[207]* | *1,279* 39% | *1,386* 31% | *947* 24% | *1,249* 37% | *2,183* 56% | *1,609* 49% | *1,171* 32% | *1,027* 29% | *831* 24% |
| *MOC* | *28* 1% | *48* 1% | *36* 1% | *22* 1% | *60* 2% | *78* 2% | *52* 1% | *18* 1% | *35* 1% |
| *PDR* | *2* | *0* | *0* | *1* | *3* | *3* | *3* | *3* | *2* |
| *Corrective Interview* | | | | | | | *2* | *5* | *3* |
| *Command Discipline* | | | | | | *101* 3% | *114* 3% | *258* 7% | *178* 5% |
| *Re-Training* | *226* 7% | *342* 8% | *91* 2% | *35* 1% | *39* 1% | *87* 3% | *164* 5% | *95* 3% | *108* 3% |
| *Facility Referral* | *1,159* 35% | *1,903* 43% | *2,208* 56% | *1,646* 49% | *1,466* 38% | *1,178* 36% | *1,833* 50% | *1,811* 51% | *1,903* 56% |
| *Referred for Full ID* | *567* 17% | *781* 17% | *634* 16% | *360* 11% | *111* 3% | *256* 8% | *298* 8% | *346* 10% | *331* 10% |

---

[204] For the purpose of this chart, the results of the Intake Investigations only identify the highest level of recommended action for each investigation. For example, while a case may be closed with an MOC *and* a Facility Referral, the result of the investigation will be classified as "Closed with an MOC" in the chart.

[205] Other investigation data is this report is reported *as of* March 19, 2025 while the Intake Investigation data is reported *as of* February 28, 2025 because the data is maintained in two different trackers that were produced on two different dates. The number of pending Intake Investigations therefore varies between data provided "as of March 19, 2025" and "as of February 28, 2025," depending on which tracker was utilized to develop the necessary data.

[206] The data on the outcomes of intake investigations for incidents that occurred between February 3, 2020 and June 30, 2020 was last included in the Monitor's November 22, 2024 Report (dkt. 802) at pg. 96.

[207] With respect to cases closed with no action, in some, the violation identified by ID had already been identified by the facility via Rapid Review and ID determined that the action recommended in the Rapid Review was sufficient to address the violation. Therefore, "no action" cases are better understood as cases in which either no violation was identified, or ID *did not identify additional staff behaviors requiring disciplinary or corrective action beyond what had already been identified and taken by the facilities*.

| Outcome of Intake Investigations[204] *as of February 28, 2025*[205] | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Incident Date**[206] | *July to Dec. 2020 (11th MP)* | *Jan. to June 2021 (12th MP)* | *July to Dec. 2021 (13th MP)* | *Jan. to June 2022 (14th MP)* | *July to Dec. 2022 (15th MP)* | *Jan. to June 2023 (16th MP)* | *Jul. to Dec. 2023 (17th MP)* | *Jan. to June 2024 (18th MP)* | *Jul. to Dec. 2024 (19th MP)* |
| *Data Entry Errors*[208] | | | | *36* | *21* | *5* | *5* | *0* | *2* |
| **Total Intake Investigations** | **3,272** | **4,468** | **3,916** | **3,349** | **3,883** | **3,317** | **3,642** | **3,590** | **3,562** |

---

[208] These investigations had data entry errors in the Intake Squad Tracker. The Monitoring Team was unable to determine the outcome for these cases but is working with the Department to fix these errors.

**TABLE 9: INVESTIGATION FINDINGS**

The table below shows the findings of Intake and Full ID Investigations that were closed *as of February 28, 2025*. The investigation findings included assessments of whether the incident was excessive, unnecessary, and/or avoidable.[209]

| Investigations Findings As February 28, 2025 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Incident Date[210] | July to Dec. 2020 (11th MP) | Jan. to Jun. 2021 (12th MP) | July to Dec. 2021 (13th MP) | Jan. to Jun. 2022 (14th MP) | Jul. to Dec. 2022 (15th MP) | Jan. to Jun. 2023 (16th MP) | Jul. to Dec. 2023 (17th MP) | Jan. to Jun. 2024 (18h MP) | Jul. to Dec. 2024 (19h MP) |
| **All Incidents** | **3,272** | **4,468** | **3,916** | **3,349** | **3,883** | **3,317** | **3,642** | **3,590** | **3,562** |
| - *Investigations Closed at Intake* | 2,700 | 3,687 | 3,285 | 2,989 | 3,773 | 3,061 | 3,344 | 3,217 | 3,173 |
| - *Referred for Full ID* | 567 | 781 | 634 | 360 | 110 | 256 | 298 | 346 | 332 |
| - *Closed Full ID Investigations* | 567 | 781 | 634 | 360 | 110 | 256 | 132 | 42 | 65 |
| *Findings of Investigations Closed at Intake* | | | | | | | | | |
| Investigations Closed at Intake | 2,700 | 3,687 | 3,285 | 2,989 | 3,773 | 3,061 | 3,344 | 3,217 | 3,173 |
| • *Excessive, and/or Unnecessary, and/or Avoidable* | 477 | 734 | 737 | 531 | 543 | 412 | 410 | 321 | 330 |
| • *Chemical Agent Violation* | 163 | 260 | 324 | 287 | 245 | 225 | 282 | 370 | 347 |
| *Findings of Closed Full ID Investigations* | | | | | | | | | |
| Closed Full ID Investigations | 567 | 781 | 634 | 360 | 110 | 256 | 132 | 42 | 65 |
| • *Excessive, and/or Unnecessary* | 86 | 75 | 51 | 62 | 70 | 76 | 25 | 9 | 8 |
| *Findings of Closed Investigations* | | | | | | | | | |
| Closed Investigations | 3,272 | 4,468 | 3,916 | 3,349 | 3,883 | 3,317 | 3,476 | 3,259 | 3,238 |
| • *Excessive, and/or Unnecessary, and/or Avoidable* | 563 (17%) | 809 (18%) | 788 (20%) | 593 (18%) | 613 (16%) | 488 (15%) | 435 (13%) | 330 (10%) | 338 (10%) |

[209] The Department and the Monitoring Team have not finalized an agreed upon definition of these terms. A concrete, objective and shared understanding of what each category is intended to capture is necessary to ensure reliable and consistent findings.

[210] The data on investigation findings for incidents that occurred between February 3, 2020 and June 30, 2020 was last included in the Monitor's November 22, 2024 Report (dkt. 802) at pg. 94.

**TABLE 10: USE OF FORCE INCIDENTS WITH CHARGES**

The graph below illustrates the changes in the number and proportion of use of force incidents from January 2016 to December 2023 where at least one staff member was referred for formal discipline charges. This data is calculated *as of December 31, 2024.*[211]



<hr />

[211] The data for 2022 and 2023 incidents includes referrals that were made as part of the lookback initiative in which the original case findings did not identify misconduct, but the subsequent review resulted in a finding that merited the referral for charges. Further, data for investigations of 2024 is not yet available given the significant number of pending Full ID Investigations.

# APPENDIX E:
# DATA RELATED TO RESPONSES TO STAFF MISCONDUCT

## TABLE 1: ACCOUNTABILITY FOR STAFF'S USE OF FORCE RELATED MISCONDUCT

The table below shows the type of accountability imposed for staff's use of force related misconduct, including support and guidance, corrective action via Command Discipline and Suspension, and formal discipline.

| Accountability Imposed for Staff's Use of Force Related Misconduct, 2019 to 2024 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **2019**[212] | **2020** | **2021** | **2022** | **2023** | **2024** | **Jan.- Jun. 2024 18th MP** | **Jul.- Dec. 2024 19th MP** |
| **Support and Guidance Provided to Staff** | | | | | | | | |
| Corrective Interviews and 5003 Counseling | 2,700[213] | 1,378[214] | 3,205 | 2,532 | 1,723 | 2,455 | 1,114 | 1,341 |
| Corrective Interviews (resulting from CDs) | 53 | 32 | 38 | 76 | 79 | 389 | 276 | 113 |
| **Corrective Action—Command Discipline & Suspension** | | | | | | | | |
| CD – Reprimand | 156 | 126 | 270 | 319 | 114 | 468 | 284 | 184 |
| CD resulting in 1-10[215] days deducted | 879 | 673 | 794 | 739 | 798 | 801 | 528 | 273 |
| Suspension, by date imposed | 48 | 80 | 83 | 66 | 136 | 62 | 29 | 33 |
| *Total* | *1,083* | *879* | *1,147* | *1,124* | *1,048* | *1,331* | *841* | *490* |
| **Formal Discipline** | | | | | | | | |
| PDR | 81 | 49 | 2 | 1 | 22 | 22 | 8 | 14 |
| NPA | 218 | 327 | 460 | 1,808 | 630 | 425 | 305 | 120 |
| *Total* | *299* | *376* | *462* | *1,809* | *652* | *447* | *313* | *134* |
| **Total Number of Staff Held Accountable** | | | | | | | | |
| **Total** | **1,382** | **1,255** | **1,609** | **2,933** | **1,700** | **1,770** | **1,154** | **624** |

---

[212] Counseling that occurred in the 8th Monitoring Period was focused on a more holistic assessment of the staff member's conduct pursuant to specific standards set by Consent Judgment, § X, ¶ 2, Risk Management that has been subsequently revised. *See* Monitor's October 28, 2019 Report (dkt. 332) at pgs. 172-173.

[213] The identification of staff for counseling was in transition in the Ninth Monitoring Period as a result of a recommendation by the Monitoring Team. *See* Monitor's May 29, 2020 Report (dkt. 341) at pgs. 194-196.

[214] The Department completed the transition to its new process for identifying staff for counseling during this Monitoring Period. *See* Monitor's October 23, 2020 Report (dkt. 360) at pgs. 168-170.

[215] In October 2022, the Department promulgated a revised Command Discipline policy which expanded the allowable penalty for a CD from a maximum of five days to 10 days.

269

**TABLE 2: IMMEDIATE CORRECTIVE ACTION**

The table below shows the frequency of Immediate Corrective Action imposed for use of force related misconduct from 2020 to 2024, according to the date of the incident.

| Immediate Corrective Action Imposed for UOF Related Misconduct, by Incident Date | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type | 2020 | | 2021 | | 2022 | | 2023 | | 2024 | | Jan.-June 2024 | | July-Dec. 2024 | |
| Counseling and Corrective Interviews[216] | 1,337 | 60% | 3,242 | 74% | 2,608 | 69% | 1,801 | 63% | 2,844 | 68% | 1,390 | 62% | 1,454 | 74% |
| Suspension | 80 | 4% | 83 | 2% | 75 | 2% | 124 | 4% | 60 | 1% | 27 | 1% | 33 | 2% |
| Modified Duty or No Inmate Contact | 5 | <1% | 6 | <1% | 16 | <1% | 14 | <1% | 35 | 1% | 14 | 1% | 21 | 1% |
| *Total Suspensions & Modified Duty/No Inmate Contact* | *85* | *4%* | *81* | *5%* | *91* | *2%* | *138* | *5%* | *95* | *2%* | *41* | *2%* | *54* | *3%* |
| CD – Reprimand | 126 | 6% | 270 | 6% | 319 | 9% | 114 | 4% | 468 | 11% | 284 | 13% | 184 | 9% |
| CD resulting in 1-10[217] days deducted | 673 | 30% | 794 | 18% | 739 | 20% | 798 | 28% | 801 | 19% | 528 | 24% | 273 | 14% |
| **Total** | **2,221** | | **4,395** | | **3,757** | | **2,851** | | **4,208** | | **2,243** | | **1.965** | |

---

[216] NCU confirmed that the reported Counseling and Corrective Interviews actually occurred.

[217] In October 2022, the Department promulgated a revised Command Discipline policy which expanded the allowable penalty from a maximum of five days to 10 days.

**TABLE 3: SUSPENSION**

The table below shows the number of suspensions imposed, and the reasons for the suspensions, *by the date the suspension* was imposed (versus the date of the incident).

| Reason for Staff Suspension, by Date of Suspension, 2020 to 2024 | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Reason** | **2020** | | **2021** | | **2022** | | **2023** | | **2024** | | **Jan. to Jun 2024** | | **Jul to Dec. 2024** | |
| Sick Leave | 39 | *11%* | 138 | *22%* | 311 | *45%* | 110 | *19%* | 67 | *22%* | 16 | *12%* | 51 | *29%* |
| Conduct Unbecoming | 92 | *26%* | 128 | *20%* | 100 | *15%* | 160 | *28%* | 119 | *39%* | 64 | *48%* | 55 | *31%* |
| Use of Force | 78 | *22%* | 82 | *13%* | 66 | *10%* | 136 | *23%* | 62 | *20%* | 29 | *22%* | 33 | *19%* |
| AWOL | 0 | *0%* | 165 | *26%* | 99 | *14%* | 22 | *4%* | 0 | *0%* | 0 | *0%* | 0 | *0%* |
| Arrest | 60 | *17%* | 70 | *11%* | 32 | *5%* | 23 | *4%* | 16 | *3%* | 4 | *8%* | 6 | *3%* |
| Inefficient Performance | 44 | *12%* | 29 | *5%* | 39 | *6%* | 73 | *13%* | 24 | *8%* | 6 | *5%* | 18 | *10%* |
| Electronic Device | 18 | *5%* | 4 | *1%* | 10 | *1%* | 9 | *2%* | 4 | *1%* | 1 | *1%* | 3 | *2%* |
| NPA | 10 | *3%* | 6 | *1%* | 17 | *2%* | 19 | *3%* | 9 | *3%* | 4 | *3%* | 5 | *3%* |
| Other | 6 | *2%* | 4 | *1%* | 11 | *2%* | 22 | *4%* | 2 | *1%* | 0 | *0%* | 2 | *1%* |
| Contraband | 7 | *2%* | 5 | *1%* | 0 | *0%* | 3 | *1%* | 0 | *0%* | 0 | *0%* | 0 | *0%* |
| Erroneous Discharge | 5 | *1%* | 0 | *0%* | 2 | *0%* | 0 | *0%* | 0 | *0%* | 0 | *0%* | 0 | *0%* |
| Abandoned Post | 0 | *0%* | 0 | *0%* | 1 | *0%* | 4 | *1%* | 4 | *1%* | 2 | *2%* | 2 | *1%* |
| **Total** | **359** | | **631** | | **688** | | **581** | | **307** | | **132** | | **175** | |

TABLE 4: ACCOUNTABILITY FOR HIGH LEVEL SUPERVISORS

The table below shows the frequency with which Wardens, Deputy Wardens and Assistant Deputy Wardens were held accountable in 2023 and 2024.

| Accountability for Facility Leadership and Supervisors, 2023 to 2024 | | | | |
|---|---|---|---|---|
| | Jan-June 2023 | July-Dec 2023 | Jan-June 204 | July-Dec 2024 |
| **Warden/Assistant Commissioner** | | | | |
| Formal Discipline | 0 | 0 | 0 | 0 |
| Suspension | 0 | 0 | 0 | 0 |
| Command Discipline | 0 | 0 | 0 | 0 |
| 5003 Counseling | 0 | 0 | 0 | 0 |
| Corrective Interview | 0 | 0 | 0 | 0 |
| **Deputy Warden** | | | | |
| Formal Discipline | 0 | 0 | 0 | 0 |
| Suspension | 0 | 0 | 0 | 0 |
| Command Discipline | 0 | 0 | 3 | 0 |
| 5003 Counseling | 0 | 0 | 0 | 0 |
| Corrective Interview | 0 | 0 | 0 | 0 |
| **Assistant Deputy Warden** | | | | |
| Formal Discipline | 4 | 1 | 2 | 0 |
| Suspension | 5 | 5 | 1 | 0 |
| Command Discipline | 0 | 21 | 20 | 10 |
| 5003 Counseling | 1 | 6 | 3 | 6 |
| Corrective Interview | 5 | 17 | 10 | 10 |

**TABLE 5: COMMAND DISCIPLINE RECOMMENDED BY RAPID REVIEW**

The table below shows the status and outcome of Command Disciplines recommended by Rapid Reviews from 2019 to 2024. Data are current as of December 2024.

| Status and Outcome of Command Disciplines Recommended by Rapid Reviews, 2019 to 2024 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Status/Outcome** | **2019** | **2020** | **2021** | **2022** | **2023** | **2024** | **Jan-Jun 2024 18th MP** | **Jul-Dec 2024 19th MP** |
| Still Pending in CMS | 7 0% | 15 1% | 65 3% | 64 3% | 97 6% | 166 7% | 20 1% | 146 14% |
| 1-10 Days Deducted | 879 54% | 673 47% | 794 34% | 739 35% | 798 46% | 801 32% | 528 37% | 273 26% |
| MOC | 122 7% | 108 8% | 281 12% | 128 6% | 110 6% | 136 5% | 42 3% | 94 9% |
| Reprimand | 156 10% | 126 9% | 270 11% | 319 15% | 114 7% | 468 19% | 284 20% | 184 17% |
| Retraining | ~ | ~ | ~ | ~ | 11 1% | 110 4% | 46 3% | 64 6% |
| Corrective Interview | 53 3% | 32 2% | 38 2% | 76 4% | 79 5% | 389 16% | 276 19% | 113 11% |
| Dismissed at Hearing or Closed Administratively | 360 22% | 399 28% | 744 32% | 608 29% | 421 24% | 315 13% | 181 13% | 134 13% |
| Never Entered in CMS | 41 3% | 82 6% | 162 7% | 189 9% | 100 6% | 104 4% | 53 4% | 51 5% |
| **Total CDs Recommended** | **1,635** | **1,440** | **2,355** | **2,123** | **1,730** | **2,497** | **1,431** | **1,066** |

*Note: CDs pending for more than one year are not tracked in the CD reports analyzed for this table and therefore may still appear pending although it is likely that they have since been dismissed.*

**TABLE 6: COMMAND DISCIPLINE RECOMMENDED BY OTHER SOURCES**

The table below shows the outcome of Command Disciplines recommended separately from the Rapid Review process. The Department began tracking these CDs systematically in January 2024. Reasons behind these CDs vary, and include AWOL staff, staff off-post, Departmental property violations, inadequate supervision, inefficient performance of duties, insubordination, tour wand violations, and use of force misconduct identified outside of the Rapid Review process.

| Outcome of Command Disciplines Recommended by Other Sources, 2024 | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Outcome** | **Jan** | **Feb** | **Mar** | **Apr** | **May** | **Jun** | **18th MP** | **Jul** | **Aug** | **Sep** | **Oct** | **Nov** | **Dec** | **19th MP** |
| 1-10 Days Deducted | 40 25% | 48 25% | 35 33% | 47 34% | 38 27% | 30 19% | *238 27%* | 40 38% | 42 36% | 48 29% | 39 23% | 50 32% | 45 44% | *264 33%* |
| MOC | 10 6% | 20 10% | 16 15% | 10 7% | 20 14% | 3 2% | *79 9%* | 6 6% | 7 6% | 7 4% | 2 1% | 30 19% | 9 9% | *61 8%* |
| Reprimand | 14 9% | 17 9% | 13 12% | 14 10% | 14 10% | 15 10% | *87 10%* | 9 9% | 13 11% | 30 18% | 29 17% | 22 14% | 12 12% | *115 14%* |
| Retraining | ~ | ~ | 2 2% | 1 1% | ~ | ~ | *3 0%* | ~ | 1 1% | ~ | 2 1% | 4 3% | 3 3% | *10 1%* |
| Corrective Interview | 8 5% | 18 9% | 10 10% | 8 6% | 11 8% | 4 3% | *59 7%* | 10 10% | 24 21% | 19 11% | 14 8% | 18 12% | 8 8% | *93 11%* |
| Dismissed | 88 55% | 89 46% | 29 28% | 59 42% | 59 42% | 104 67% | *428 48%* | 40 38% | 29 25% | 63 38% | 80 48% | 31 20% | 25 25% | *268 33%* |
| **Total** | **160** | **192** | **105** | **139** | **142** | **156** | **894** | **105** | **116** | **167** | **166** | **155** | **102** | **811** |

TABLE 7: FORMAL DISCIPLINE

The table below shows the status of cases pending with the Trials Division and the number of cases still pending investigation, by the date the incident occurred. Data are current as of December 2024.

| Status of Disciplinary Cases & Number of Pending Investigations, by Date of Incident | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2016 | | 2017 | | 2018 | | 2019 | | 2020 | | 2021 | | 2022 | | 2023 | | 2024 | |
| Total Cases | 471 | | 621 | | 784 | | 1,027 | | 695 | | 715 | | 668 | | 574 | | 137 | |
| Closed Cases | 470 | 100% | 617 | 99% | 775 | 99% | 1011 | 98% | 689 | 99% | 713 | 99% | 645 | 93% | 443 | 74% | 57 | 18% |
| Pending Cases with Trials Division | 0 | 0% | 4 | 1% | 9 | 1% | 16 | 2% | 6 | 1% | 2 | <1% | 23 | 7% | 130 | 25% | 80 | 82% |
| | | | | | | | | | | | | | | | | | | |
| Unique UOF Incidents | Number of unique UOF incidents not tracked. | | | | 466 | | 606 | | 450 | | 563 | | 419 | | 386 | | 115 | |
| | | | | | | | | | | | | | | | | | | |
| Pending Investigations | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | 350 | | 2,167 | |

TABLE 8: NUMBER OF CASES PENDING WITH THE TRIALS DIVISION

The table below shows the number of cases pending formal discipline, as of the last day of the month in each Monitoring Period from 2018 to 2025. Data are current as of December 2024.

| Cases Pending Discipline for Use of Force Related Misconduct, 2018 to 2024 | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | June 2018 | Dec. 2018 | June 2019 | Dec. 2019 | June 2020 | Dec. 2020 | June 2021 | Dec. 2021 | June 2022 | Dec. 2022 | Jun. 2023 | Dec. 2023 | June 2024 | Dec. 2024 |
| MP | 6th | 7th | 8th | 9th | 10th | 11th | 12th | 13th | 14th | 15th | 16th | 17th | 18th | 19th |
| Pending Cases | 146 | 172 | 407 | 633 | 1,050 | 1,445 | 1,917 | 1,911 | 1,129 | 409 | 435 | 337 | 240 | 270 |

**TABLE 9: TIMELINESS OF FORMAL DISCIPLINE, BY INCIDENT DATE**

The table below shows cases closed via NPA during the current Monitoring Period (n=120) as well as those that are still pending with the Trials Division at the end of the Monitoring Period (n=270). The table shows the length of time between the date of the incident and case closure, or for those cases not yet closed, the length of time between the date of the incident and the last day of the Monitoring Period (December 31, 2024).

| Time Between Incident Date and NPA Case Closure or Amount of Time Pending 19th Monitoring Period | | | | | | |
|---|---|---|---|---|---|---|
| | Closed Cases | | Pending Cases | | Total | |
| 0 to 1 year from incident date | 51 | 43% | 80 | 30% | 131 | 34% |
| 1 to 2 years from incident date | 56 | 47% | 130 | 48% | 186 | 48% |
| 2 to 3 years from incident date | 10 | 8% | 23 | 9% | 33 | 8% |
| More than 3 years from incident date | 3 | 3% | 37 | 14% | 40 | 10% |
| Total Cases | 120 | | 270 | | 390 | |

**TABLE 10: TIME THAT CASES WERE PENDING WITH THE TRIALS DIVISION PRIOR TO CASE CLOSURE**

The table below shows the length of time to case closure, calculated from the date the case was referred to the Trials Division to the date the Closing Memorandum was completed.

| Time from Referral to Trials Division to Completed Closing Memo, 2017 to 2024 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Time** | **2017** | **2018**[218] | **2019**[219] | **2020** | **2021** | **2022** | **2023** | **2024** | **Jan-Jun 2024 18th MP** | **Jul-Dec 2024 19th MP** |
| # Cases Closed | 492 | 521 | 271 | 387 | 736 | 2,052 | 754 | 638 | 371 | 267 |
| 0 to 3 months | 68 14% | 282 54% | 62 23% | 75 19% | 40 5% | 158 8% | 217 29% | 282 44% | 147 40% | 135 51% |
| 3 to 6 months | 64 13% | 92 18% | 65 24% | 65 17% | 88 12% | 175 9% | 216 29% | 156 24% | 104 28% | 52 19% |
| 6 to 12 months | 124 25% | 54 10% | 89 33% | 121 31% | 210 29% | 400 19% | 174 23% | 129 20% | 92 25% | 37 14% |
| 1 to 2 years | 146 30% | 51 10% | 35 13% | 98 25% | 284 39% | 782 38% | 119 16% | 55 9% | 25 7% | 30 11% |
| 2 to 3 years | 70 14% | 10 2% | 5 2% | 14 4% | 81 11% | 370 18% | 18 2% | 3 0% | ~ | 3 1% |
| 3+ years | 20 4% | 9 2% | 6 2% | 2 1% | 11 1% | 95 5% | 6 1% | 12 2% | 2 1% | 10 4% |
| Unknown | ~ | 23 4% | 9 3% | 12 3% | 22 3% | 72 4% | 4 1% | 1 0% | 1 0% | ~ |

---

[218] Data for 2017 and 2018 was calculated between MOC received date and date closing memo signed.

[219] Data for 2019 and 2020 was calculated between date charges were served and date closing memo signed.

**TABLE 11: TIME THAT CURRENT CASES HAVE BEEN PENDING WITH THE TRIALS DIVISION**

The table below shows the length of time that cases have been pending with the Trials Division, calculated via the date that charges were served and the last day of the Monitoring Period.

| | Pending Caseload, Time From Date Charges Served to Last Day of Monitoring Period | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Time Pending** | **July-Dec 2019** | **Jan-June 2020** | **July-Dec 2020** | **Jan-June 2021** | **Jul-Dec 2021** | **Jan-June 2022** | **July-Dec 2022** | **Jan-June 2023** | **July-Dec 2023** | **Jan-June 2024** | **July-Dec 2024** |
| | 9th | 10th | 11th | 12th | 13th | 14th | 15th | 16th | 17th | 18th | 19th |
| Pending Service of Charges | 37 6% | 42 4% | 47 3% | 64 3% | 84 4% | 55 5% | 36 9% | 23 5% | 39 12% | 32 13% | 32 12% |
| 120 days or less | 186 28% | 373 36% | 325 22% | 420 22% | 217 11% | 137 12% | 124 30% | 214 49% | 135 40% | 67 28% | 83 31% |
| 121-180 days | 111 17% | 115 11% | 165 11% | 145 8% | 64 3% | 70 6% | 47 11% | 41 9% | 43 13% | 26 11% | 6 2% |
| 181-365 days | 202 30% | 278 26% | 467 32% | 511 27% | 501 26% | 182 16% | 77 19% | 64 15% | 62 18% | 44 18% | 17 6% |
| 365+ days | 80 12% | 219 21% | 413 29% | 701 37% | 930 49% | 616 55% | 105 26% | 82 19% | 42 12% | 48 20% | 42 15% |
| Awaiting Final Approval | 30 5% | 9 1% | 15 1% | 66 3% | 109 6% | 66 6% | 10 2% | 0 0% | 10 3% | 18 8% | 85 32% |
| Pending with Law Enforcement | 17 3% | 14 1% | 13 1% | 10 1% | 6 0% | 3 0% | 10 2% | 11 3% | 6 2% | 5 2% | 5 2% |
| **Total** | **663** | **1,050** | **1,445** | **1,917** | **1,911** | **1,129** | **409** | **435** | **337** | **240** | **271** |

**TABLE 12. DISPOSITION OF FORMAL DISCIPLINE CASES**

The table below shows the disposition of formal discipline cases closed by the Trials Division since 2017.

| Disposition of Formal Discipline Cases, 2017 to 2024 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | **2017** | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** | **2024** | **Jan-Jun 2024 18th MP** | **Jul-Dec 2024 19th MP** |
| # Cases Closed | 497 | 518 | 267 | 387 | 585 | 2,204 | 756 | 573 | 386 | 187 |
| NPA | 395 79% | 484 93% | 218 82% | 327 84% | 460 79% | 1,808 82% | 624 83% | 425 74% | 305 79% | 120 64% |
| Guilty at OATH | 4 1% | 3 1% | ~ | 3 1% | 16 3% | 41 2% | 23 3% | 2 0% | ~ | 2 1% |
| Administratively Filed | 77 15% | 22 4% | 34 13% | 33 9% | 33 6% | 148 7% | 74 10% | 126 22% | 74 19% | 52 28% |
| Deferred Prosecution | 21 4% | 7 1% | 13 5% | 20 5% | 75 13% | 203 9% | 32 4% | 20 3% | 7 2% | 13 7% |
| Not Guilty at OATH | ~ | 2 0% | 2 1% | 4 1% | 1 0% | 4 0% | 3 0% | ~ | ~ | ~ |

279

**TABLE 13: PENALTIES IMPOSED VIA NPA FOR USE OF FORCE RELATED MISCONDUCT**

The table below shows the penalties imposed for cases closed via NPA each year since 2017.

| Penalties Imposed via NPA for Use of Force Related Misconduct, 2017-2024 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | Jan-Jun 2024 18th MP | Jul-Dec 2024 19th MP |
| # Cases | 395 | 484 | 218 | 327 | 460 | 1,808 | 624 | 425 | 305 | 120 |
| Refer for CD[220] | 71 18% | 67 14% | 3 1% | 1 0% | ~ | 11 1% | ~ | ~ | ~ | ~ |
| Reprimand | ~ | ~ | ~ | ~ | 7 1% | 77 4% | 69 11% | 21 5% | 21 7% | ~ |
| 1-5 Days | 31 8% | 147 30% | 52 24% | 80 24% | 69 14% | 462 26% | 156 25% | 149 35% | 101 33% | 48 40% |
| 6-9 Days | 14 4% | 19 4% | 6 3% | 14 4% | 29 6% | 163 9% | 88 14% | 84 20% | 63 21% | 21 18% |
| 10-19 Days | 62 16% | 100 21% | 56 26% | 83 25% | 110 24% | 447 25% | 147 24% | 101 24% | 74 24% | 27 23% |
| 20-29 Days | 74 19% | 58 12% | 42 19% | 46 14% | 64 15% | 157 9% | 51 8% | 30 7% | 21 7% | 9 8% |
| 30-39 Days | 42 11% | 42 9% | 21 10% | 32 10% | 43 10% | 170 9% | 51 8% | 18 4% | 11 4% | 7 6% |
| 40-49 Days | 27 7% | 30 6% | 3 1% | 17 5% | 54 11% | 96 5% | 20 3% | 5 1% | 4 1% | 1 1% |
| 50-59 Days | 14 4% | 4 1% | 17 8% | 17 5% | 18 4% | 80 4% | 14 2% | 7 2% | 2 1% | 5 4% |
| 60+ Days | 48 12% | 12 2% | 11 5% | 28 9% | 43 9% | 118 7% | 27 4% | 5 1% | 4 1% | 1 1% |
| Demotion | ~ | ~ | ~ | ~ | ~ | 6 0% | ~ | ~ | ~ | ~ |
| Retire/Resign | 12 3% | 5 1% | 7 3% | 9 3% | 23 6% | 22 1% | 1 0% | 5 1% | 4 1% | 1 1% |
| Termination (guilty at OATH or PDR) | ~ | 1 | ~ | ~ | 5 | 10 | 12 | 1 | ~ | 1 |

[220] As discussed in the Monitor's April 18, 2019 Report (dkt. 327) at pgs. 42-44, NPAs referred for CDs were previously adjudicated at the facilities after being referred from the Trials Division, a process which was rife with implementation issues. This problem has been corrected and now the Trials Division will negotiate a specific number of days (one to five) to be imposed, and those specific days will be treated as a CD, rather than an NPA (the main difference is the case remains on the staff member's record for one year instead of five years).

**TABLE 14: CASES RESOLVED VIA NPA WITH PROVISIONS FOR CD OR EXPUNGEMENT**

The table below shows the number and proportion of cases closed via NPA that included provisions for a Command Discipline or an Expungement.

| Cases Resolved via NPA with Provisions for Expungement or CD | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Closure Date** | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** | **2024** | **Jan-Jun 2024 18th MP** | **Jul-Dec 2024 19th MP** |
| # NPAs | 484 | 218 | 327 | 460 | 1,808 | 624 | 425 | 305 | 120 |
| NPAs with CD Provision | 187 39% | 45 21% | 76 23% | 74 16% | 535 30% | 253 41% | 224 53% | 160 52% | 64 53% |
| NPAs with Expungement | ~ | ~ | 36 11% | 96 21% | 420 23% | 55 9% | 25 6% | 22 7% | 3 3% |
| **Either CD or Expungement** | **187 39%** | **45 21%** | **112 34%** | **170 37%** | **955 53%** | **308 49%** | **249 59%** | **182 60%** | **67 56%** |

281

**TABLE 15: OUTCOME OF CLOSED ACTION PLAN § F, ¶ 2 CASES**

The following chart shows the outcomes of cases identified for expeditious resolution pursuant to the Action Plan (dkt. 465), § F, ¶ 2 ("F2").

| Outcomes of Closed Action Plan § F, ¶ 2 Cases | | | | | |
|---|---|---|---|---|---|
| Year F2<br>Case Closed | June to<br>Dec. 2022 | 2023 | 2024 | 2025 | TOTAL |
| **Total # of Cases (by UOF)** | 13 | 36 | 22 | 5 | **76** |
| **# of Cases from ID (by UOF)** | 3 | 30 | 14 | 4 | **51** |
| **# of Cases from MT (by UOF)** | 10 | 6 | 8 | 1 | **25** |
| **Total Number of Staff with Closed F2 Cases** | **18** | **38** | **24** | **5** | **85** |
| **Closed w/ NPA for Resignation/Retirement** | 2<br>*11%* | 0<br>*0%* | 0<br>*0%* | 0<br>*0%* | **2**<br>*2%* |
| **Closed w/ NPA for Suspension or Compensation Days** | 12<br>*67%* | 35<br>*92%* | 20<br>*83%* | 3<br>*60%* | **70**<br>*82%* |
| **Closed via OATH Trial** | 2<br>*11%* | 1<br>*3%* | 1<br>*4%* | 1<br>*20%* | **5**<br>*6%* |
| **Went to an OATH Trial, then Closed with an Action of the Commissioner** | 0<br>*0%* | 0<br>*0%* | 0<br>*0%* | 1<br>*20%* | **1**<br>*1%* |
| **Administratively Filed** | 1<br>*6%* | 1<br>*3%* | 2<br>*8%* | 0<br>*0%* | **4**<br>*5%* |
| **MOS Already Resigned/Retired or was Terminated for Other Matters** | 1<br>*6%* | 1<br>*3%* | 1<br>*4%* | 0<br>*0%* | **3**<br>*4%* |

**TABLE 16: OATH PRE-TRIAL CONFERENCES**

The table below presents the number of *use of force* related pre-trial conferences that were scheduled in each Monitoring Period since July 1, 2020 and the results of those conferences. This data is discussed further in the compliance box for First Remedial Order § C., ¶¶ 4 and 5 (OATH).

| Pre-Trial Conferences Related to UOF Violations | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Results of Pre-Trial Conferences for UOF Cases | | | | | | | UOF Matters & Staff | |
| # Required | Total # Scheduled | # of UOF PTC Scheduled | Settled Pre-OATH | Settled at OATH | On-Going Negotiation | Another Conference | Trial | Other | Admin Filed | # UOF Incidents | # Staff Members |
| July to December 2020 (11th MP) | | | | | | | | | | | |
| 225[221] | 372 | **303** | *0* | *111* | *10* | *44* | *124* | *12* | *2* | 274 | 198 |
| | | 100% | *0%* | *37%* | *3%* | *15%* | *41%* | *4%* | *1%* | | |
| January to June 2021 (12th MP) | | | | | | | | | | | |
| 300 | 670 | **541** | *0* | *282* | *4* | *85* | *136* | *33* | *1* | 367 | 331 |
| | | 100% | *0%* | *52%* | *1%* | *16%* | *25%* | *6%* | *0%* | | |
| July to December 2021 (13th MP) | | | | | | | | | | | |
| 350 | 575 | **379** | 185 | 87 | 4 | 18 | 58 | 26 | 1 | 284 | 239 |
| | | 100% | *49%* | *23%* | *1%* | *5%* | *15%* | *7%* | *0%* | | |
| January to June 2022 (14th MP) | | | | | | | | | | | |
| 900 | 1447 | **989** | 612 | 76 | 3 | 174 | 105 | 3 | 16 | 574 | 417 |
| | | 100% | *62%* | *8%* | *0%* | *18%* | *11%* | *0%* | *2%* | | |
| July to December 2022 (15th MP) | | | | | | | | | | | |
| 900 | 1562 | **902** | 621 | 42 | 0 | 153 | 74 | 0 | 12 | 584 | 466 |
| | | 100% | *69%* | *5%* | *0%* | *17%* | *8%* | *0%* | *1%* | | |

---

[221] The Remedial Order requirement came into effect on August 14, 2020, so was applicable for four and a half months in the Monitoring Period.

| | | January to June 2023 (16th MP) | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **900** | **1337** | **310** | 203 | 40 | 2 | 29 | 29 | 0 | 7 | **214** | **232** |
| | | 100% | *65%* | *13%* | *1%* | *9%* | *9%* | *0%* | *2%* | | |
| | | July to December 2023 (17th MP) | | | | | | | | | |
| **900** | **1079** | **373** | 264 | 29 | 14 | 32 | 24 | 1 | 9 | **254** | **264** |
| | | 100% | *71%* | *8%* | *4%* | *9%* | *6%* | *0%* | *2%* | | |
| | | January to June 2024 (18th MP) | | | | | | | | | |
| **900** | **942** | **384** | 239 | 38 | 7 | 44 | 21 | 1 | 34 | **228** | **273** |
| | | 100% | *62%* | *10%* | *2%* | *11%* | *5%* | *0%* | *9%* | | |
| | | July to December 2024 (19th MP) | | | | | | | | | |
| **375**[222] | **542** | **207** | 105 | 40 | 0 | 23 | 22 | 0 | 17 | **161** | **113** |
| | | 100% | *51%* | *19%* | *0%* | *11%* | *11%* | *0%* | *8%* | | |

---

[222] The Monitoring Team approved a reduction in the number of required pre-trial conferences in July (100), August (75), September (50), October (50), November (50) and December (50).

# APPENDIX F: STAFFING

**TABLE 1: NUMBER OF ADWs**

The table below identifies the number and assignment of ADWs at specific points in time from July 18, 2020, to December 28, 2024. This data is discussed further in the compliance box for First Remedial Order § A, ¶ 4, Supervision of Captains.

| Facility | # of ADWs As of July 18, 2020 | # of ADWs As of Jan. 2, 2021 | # of ADWs As of June 26, 2021 | # of ADWs As of Jan. 1, 2022 | # of ADWs As of June 18, 2022 | # of ADWs As of Dec. 31, 2022 | # of ADWs As of June 16, 2023 | # of ADWs As of Dec. 23, 2023 | # of ADWs As of June 22, 2024 | # of ADWs As of Dec. 28, 2024 |
|---|---|---|---|---|---|---|---|---|---|---|
| AMKC[224] | 9 | 21 | 13 | 12 | 9 | 12 | 16 | 0 | 1 | 0 |
| EMTC[225] | 0 | 0 | 0 | 0 | 0 | 8 | 10 | 11 | 11 | 11 |
| GRVC | 6 | 10 | 11 | 9 | 8 | 12 | 11 | 11 | 9 | 9 |
| MDC[226] | 6 | 2 | 1 | 1 | 0 | 1 | 1 | 1 | 1 | 1 |
| NIC | 6 | 8 | 8 | 5 | 7 | 8 | 9 | 12 | 11 | 12 |
| OBCC[227] | 6 | 8 | 8 | 14 | 7 | 0 | 0 | 11 | 10 | 8 |
| RMSC | 5 | 6 | 6 | 5 | 4 | 5 | 6 | 14 | 11 | 8 |
| RNDC | 7 | 15 | 15 | 10 | 7 | 12 | 12 | 10 | 10 | 9 |
| VCBC[228] | 4 | 6 | 5 | 5 | 4 | 5 | 5 | 0 | 0 | 0 |
| Court Commands (BKDC, BXDC, QDC) | 3 | 4 | 3 | 3 | 3 | 3 | 2 | 3 | 3 | 2 |
| **Total # of ADWs in Facilities & Court Commands** | **52** | **80** | **70** | **64** | **49** | **66** | **72** | **73** | **67** | **60** |
| **Total # of ADWs Available Department-wide** | **66** | **95** | **88** | **80** | **67** | **82** | **89** | **91** | **85** | **87** |
| **% of ADWs in Facilities & Court Commands** | **79%** | **84%** | **80%** | **80%** | **73%** | **80%** | **81%** | **80%** | **79%** | **69%** |

Table header: Number of ADWs & Assignments in the Department[223]

---

[223] The specific post assignments of ADWs within the Facility is not available so this data simply demonstrates the number of ADWs assigned per facility.

[224] AMKC was closed in August 2023.

[225] EMTC has been closed and opened in these Monitoring Periods. Until late 2022, staff that worked at EMTC were technically assigned to AMKC.

[226] MDC was utilized in a limited capacity at the end of the Twelfth Monitoring Period and was closed by June 2021. The staff currently assigned to MDC are in fact assigned to the Manhattan Courts (Criminal, Supreme, and Family).

[227] OBCC was closed by July 2022. Staff were then reassigned to other commands. OBCC was then reopened in July 2023.

[228] VCBC was closed in October 2023.

TABLE 2: NUMBER OF CAPTAINS

The table below identifies the number and assignment of Captains at specific points in time from July 18, 2020, to December 28, 2024. This data is discussed further in the compliance box for First Remedial Order § A, ¶ 4, Supervision of Captains.

| Number of Captains & Assignments in the Department[229] | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Facility | # of Captains As of July 18, 2020 | # of Captains As of Jan. 2, 2021 | # of Captains As of June 26, 2021 | # of Captains As of Jan. 1, 2022 | # of Captains As of June 18, 2022 | # of Captains As of Dec. 31, 2022 | # of Captains As of Jun 16, 2023 | # of Captains As of Dec. 23, 2023 | # of Captains As of June 22, 2024 | # of Captains As of Dec. 28, 2024 |
| AMKC[230] | 91 | 111 | 97 | 87 | 81 | 80 | 65 | 13 | 7 | 7 |
| EMTC[231] | 0 | 0 | 0 | 0 | 0 | 38 | 37 | 37 | 39 | 43 |
| GRVC | 75 | 72 | 86 | 86 | 81 | 90 | 61 | 43 | 50 | 62 |
| MDC[232] | 72 | 39 | 15 | 12 | 11 | 11 | 11 | 12 | 12 | 11 |
| NIC | 51 | 45 | 45 | 56 | 45 | 50 | 44 | 58 | 48 | 56 |
| OBCC[233] | 85 | 81 | 78 | 77 | 38 | 7 | 7 | 54 | 62 | 62 |
| RMSC | 51 | 50 | 49 | 36 | 34 | 31 | 27 | 55 | 55 | 28 |
| RNDC | 58 | 56 | 60 | 63 | 70 | 70 | 68 | 45 | 52 | 52 |
| VCBC[234] | 27 | 25 | 27 | 25 | 23 | 22 | 21 | 3 | 1 | 3 |
| Court Commands (BKDC, BXDC, QDC) | 39 | 37 | 35 | 32 | 33 | 28 | 25 | 29 | 29 | 28 |
| Total # of Captains in Facilities and Court Commands | 558 | 523 | 499 | 474 | 416 | 427 | 366 | 346 | 354 | 352 |
| Total # of Captains Available Department-wide | 810 | 765 | 751 | 670 | 607 | 573 | 550 | 539 | 536 | 553 |

[229] The specific post assignments of Captains within the Facility is not available so this data is the number of Captains assigned per facility.

[230] AMKC was closed in August 2023.

[231] EMTC closed and opened during some Monitoring Periods. Until late 2022, staff that worked at EMTC were technically assigned to AMKC.

[232] MDC was utilized in a limited capacity at the end of the Twelfth Monitoring Period and was closed by June 2021. The staff currently assigned to MDC are in fact assigned to the Manhattan Courts (Criminal, Supreme, and Family).

[233] OBCC was closed by July 2022. Staff were then reassigned to other commands. OBCC was then reopened in July 2023. DOC reported that these the Captains assigned to OBCC between July 2022 and July 2023 were on medically monitored status and were assigned to OBCC to monitor the staff locker room that was used for staff from other facilities.

[234] VCBC was closed in October 2023, but staff are still assigned to the facility in order to maintain the barge such that it does not physically deteriorate.

| % of Captains in Facilities and Court Commands | 69% | 68% | 66% | 71% | 69% | 75% | 67% | 64% | 66% | 64% |
|---|---|---|---|---|---|---|---|---|---|---|

## TABLE 3: SICK LEAVE, MEDICALLY MONITORED/RESTRICTED, AWOL, PE, AND FMLA

The tables below provide the monthly average from January 1, 2019 to March 31, 2025 of the total staff headcount, the average number of staff out sick, the average number of staff on medically monitored/restricted duty level 3, the average number of staff who were AWOL, the average number of staff who were on Personal Emergency leave, and the average number of staff on FMLA leave.[235]

| 2019 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Month** | **Head-count** | **Average (Avg.) Daily Sick** | **Avg. Daily % Sick** | **Avg. Daily MMR3** | **Avg. Daily % MMR3** | **Avg. Daily AWOL** | **Avg. Daily % AWOL** | **Avg. Daily PE** | **Avg. Daily % PE** | **Avg. Daily FMLA** | **Avg. Daily % FMLA** |
| January 2019 | 10577 | 621 | 5.87% | 459 | 4.34% | | | | | | |
| February 2019 | 10482 | 616 | 5.88% | 457 | 4.36% | | | | | | |
| March 2019 | 10425 | 615 | 5.90% | 441 | 4.23% | | | | | | |
| April 2019 | 10128 | 590 | 5.83% | 466 | 4.60% | | | | | | |
| May 2019 | 10041 | 544 | 5.42% | 501 | 4.99% | | | | | | |
| June 2019 | 9953 | 568 | 5.71% | 502 | 5.04% | | | | | | |
| July 2019 | 9859 | 538 | 5.46% | 496 | 5.03% | | | | | | |
| August 2019 | 10147 | 555 | 5.47% | 492 | 4.85% | | | | | | |
| September 2019 | 10063 | 557 | 5.54% | 479 | 4.76% | | | | | | |
| October 2019 | 9980 | 568 | 5.69% | 473 | 4.74% | | | | | | |
| November 2019 | 9889 | 571 | 5.77% | 476 | 4.81% | | | | | | |
| December 2019 | 9834 | 603 | 6.13% | 463 | 4.71% | | | | | | |
| **2019 Average** | **10115** | **579** | **5.72%** | **475** | **4.71%** | | | | | | |

[235] The AWOL, PE, and FMLA data is only available for August 1, 2021-January 26, 2022 and April 2022-March 31, 2025.

| 2020 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Month | Head-count | Average (Avg.) Daily Sick | Avg. Daily % Sick | Avg. Daily MMR3 | Avg. Daily % MMR3 | Avg. Daily AWOL | Avg. Daily % AWOL | Avg. Daily PE | Avg. Daily % PE | Avg. Daily FMLA | Avg. Daily % FMLA |
| January 2020 | 9732 | 586 | 6.02% | 367 | 3.77% | | | | | | |
| February 2020 | 9625 | 572 | 5.94% | 388 | 4.03% | | | | | | |
| March 2020 | 9548 | 1408 | 14.75% | 373 | 3.91% | | | | | | |
| April 2020 | 9481 | 3059 | 32.26% | 278 | 2.93% | | | | | | |
| May 2020 | 9380 | 1435 | 15.30% | 375 | 4.00% | | | | | | |
| June 2020 | 9302 | 807 | 8.68% | 444 | 4.77% | | | | | | |
| July 2020 | 9222 | 700 | 7.59% | 494 | 5.36% | | | | | | |
| August 2020 | 9183 | 689 | 7.50% | 548 | 5.97% | | | | | | |
| September 2020 | 9125 | 694 | 7.61% | 586 | 6.42% | | | | | | |
| October 2020 | 9079 | 738 | 8.13% | 622 | 6.85% | | | | | | |
| November 2020 | 9004 | 878 | 9.75% | 546 | 6.06% | | | | | | |
| December 2020 | 8940 | 1278 | 14.30% | 546 | 6.11% | | | | | | |
| 2020 Average | 9302 | 1070 | 11.49% | 464 | 5.02% | | | | | | |

| 2021 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Month | Head-count | Average (Avg.) Daily Sick | Avg. Daily % Sick | Avg. Daily MMR3 | Avg. Daily % MMR3 | Avg. Daily AWOL | Avg. Daily % AWOL | Avg. Daily PE | Avg. Daily % PE | Avg. Daily FMLA | Avg. Daily % FMLA |
| January 2021 | 8872 | 1393 | 15.70% | 470 | 5.30% | | | | | | |
| February 2021 | 8835 | 1347 | 15.25% | 589 | 6.67% | | | | | | |
| March 2021 | 8777 | 1249 | 14.23% | 676 | 7.70% | | | | | | |
| April 2021 | 8691 | 1412 | 16.25% | 674 | 7.76% | | | | | | |
| May 2021 | 8576 | 1406 | 16.39% | 674 | 7.86% | | | | | | |
| June 2021 | 8475 | 1480 | 17.46% | 695 | 8.20% | | | | | | |
| July 2021 | 8355 | 1488 | 17.81% | 730 | 8.74% | | | | | | |
| August 2021 | 8459 | 1416 | 16.74% | 767 | 9.07% | 90 | 1.05% | 58 | 0.69% | 128 | 1.51% |
| September 2021 | 8335 | 1703 | 20.43% | 744 | 8.93% | 77 | 0.92% | 46 | 0.55% | 36 | 0.43% |
| October 2021 | 8204 | 1558 | 18.99% | 782 | 9.53% | 30 | 0.37% | 25 | 0.30% | 46 | 0.56% |
| November 2021 | 8089 | 1498 | 18.52% | 816 | 10.09% | 42 | 0.52% | 27 | 0.33% | 47 | 0.58% |
| December 2021 | 7778 | 1689 | 21.72% | 775 | 9.96% | 42 | 0.54% | 30 | 0.39% | 44 | 0.57% |
| 2021 Average | 8454 | 1470 | 17.46% | 699 | 8.32% | 56 | 0.68% | 37 | 0.45% | 60 | 0.73% |

| 2022 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Month | Head-count | Average (Avg.) Daily Sick | Avg. Daily % Sick | Avg. Daily MMR3 | Avg. Daily % MMR3 | Avg. Daily AWOL | Avg. Daily % AWOL | Avg. Daily PE | Avg. Daily % PE | Avg. Daily FMLA | Avg. Daily % FMLA |
| January 1-26 2022 | 7708 | 2005 | 26.01% | 685 | 8.89% | 42 | 0.55% | 19 | 0.25% | 41 | 0.53% |
| February 2022 | 7547 | 1457 | 19.31% | 713 | 9.45% | | | | | | |
| March 2022 | 7457 | 1402 | 18.80% | 617 | 8.27% | | | | | | |
| April 2022 | 7353 | 1255 | 17.07% | 626 | 8.51% | 23 | 0.31% | 33 | 0.45% | 49 | 0.67% |
| May 2022 | 7233 | 1074 | 14.85% | 634 | 8.77% | 24 | 0.34% | 39 | 0.54% | 47 | 0.66% |
| June 2022 | 7150 | 951 | 13.30% | 624 | 8.73% | 16 | 0.22% | 28 | 0.40% | 50 | 0.70% |
| July 2022 | 7138 | 875 | 12.26% | 608 | 8.52% | 19 | 0.26% | 33 | 0.47% | 54 | 0.76% |
| August 2022 | 7068 | 831 | 11.76% | 559 | 7.91% | 17 | 0.24% | 34 | 0.48% | 54 | 0.76% |
| September 2022 | 6994 | 819 | 11.71% | 535 | 7.65% | 6 | 0.09% | 33 | 0.48% | 58 | 0.83% |
| October 2022 | 6905 | 798 | 11.56% | 497 | 7.20% | 6 | 0.09% | 36 | 0.51% | 56 | 0.81% |
| November 2022 | 6837 | 793 | 11.60% | 476 | 6.96% | 7 | 0.09% | 21 | 0.31% | 48 | 0.70% |
| December 2022 | 6777 | 754 | 11.13% | 452 | 6.67% | 7 | 0.10% | 21 | 0.30% | 48 | 0.70% |
| 2022 Average | 7181 | 1085 | 14.95% | 586 | 8.13% | 17 | 0.23% | 30 | 0.42% | 51 | 0.71% |

| 2023 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Month | Head-count | Average (Avg.) Daily Sick | Avg. Daily % Sick | Avg. Daily MMR3 | Avg. Daily % MMR3 | Avg. Daily AWOL | Avg. Daily % AWOL | Avg. Daily PE | Avg. Daily % PE | Avg. Daily FMLA | Avg. Daily % FMLA |
| January 2023 | 6700 | 692 | 10.33% | 443 | 6.61% | 9 | 0.13% | 37 | 0.55% | 44 | 0.66% |
| February 2023 | 6632 | 680 | 10.25% | 421 | 6.35% | 9 | 0.14% | 30 | 0.46% | 47 | 0.70% |
| March 2023 | 6661 | 639 | 9.59% | 401 | 6.02% | 11 | 0.17% | 34 | 0.51% | 46 | 0.69% |
| April 2023 | 6590 | 595 | 9.03% | 393 | 5.96% | 10 | 0.15% | 41 | 0.62% | 45 | 0.68% |
| May 2023 | 6516 | 514 | 7.89% | 403 | 6.18% | 10 | 0.15% | 35 | 0.54% | 47 | 0.73% |
| June 2023 | 6449 | 466 | 7.23% | 399 | 6.19% | 10 | 0.16% | 30 | 0.47% | 45 | 0.70% |
| July 2023 | 6406 | 443 | 6.92% | 394 | 6.15% | 9 | 0.14% | 29 | 0.45% | 45 | 0.70% |
| August 2023 | 6427 | 437 | 6.80% | 386 | 6.01% | 17 | 0.26% | 56 | 0.86% | 86 | 1.33% |
| September 2023 | 6418 | 424 | 6.61% | 378 | 5.89% | 20 | 0.31% | 45 | 0.70% | 112 | 1.74% |
| October 2023 | 6340 | 414 | 6.54% | 352 | 5.55% | 18 | 0.28% | 40 | 0.62% | 114 | 1.80% |
| November 2023 | 6336 | 412 | 6.50% | 327 | 5.17% | 14 | 0.22% | 39 | 0.61% | 115 | 1.81% |
| December 2023 | 6278 | 425 | 6.77% | 316 | 5.03% | 11 | 0.18% | 39 | 0.62% | 121 | 1.93% |
| 2023 Average | 6479 | 512 | 7.87% | 384 | 5.93% | 12 | 0.19% | 38 | 0.58% | 72 | 1.12% |

| 2024 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Month | Head-count | Average (Avg.) Daily Sick | Avg. Daily % Sick | Avg. Daily MMR3 | Avg. Daily % MMR3 | Avg. Daily AWOL | Avg. Daily % AWOL | Avg. Daily PE | Avg. Daily % PE | Avg. Daily FMLA | Avg. Daily % FMLA |
| January 2024 | 6199 | 417 | 6.73% | 301 | 4.86% | 12 | 0.19% | 39 | 0.63% | 118 | 1.90% |
| February 2024 | 6151 | 392 | 6.37% | 292 | 4.75% | 11 | 0.18% | 40 | 0.65% | 112 | 1.82% |
| March 2024 | 6159 | 377 | 6.12% | 295 | 4.79% | 10 | 0.16% | 41 | 0.67% | 110 | 1.79% |
| April 2024 | 6126 | 380 | 6.20% | 288 | 4.70% | 12 | 0.20% | 44 | 0.72% | 110 | 1.80% |
| May 2024 | 6063 | 378 | 6.23% | 295 | 4.87% | 11 | 0.18% | 45 | 0.74% | 116 | 1.91% |
| June 2024 | 6027 | 407 | 6.75% | 285 | 4.73% | 11 | 0.18% | 48 | 0.80% | 124 | 2.06% |
| July 2024 | 6028 | 390 | 6.47% | 294 | 4.88% | 10 | 0.17% | 45 | 0.75% | 111 | 1.84% |
| August 2024 | 6031 | 380 | 6.30% | 299 | 4.96% | 12 | 0.20% | 45 | 0.75% | 112 | 1.86% |
| September 2024 | 5981 | 374 | 6.25% | 302 | 5.05% | 11 | 0.18% | 45 | 0.75% | 107 | 1.79% |
| October 2024 | 6028 | 364 | 6.04% | 289 | 4.79% | 10 | 0.17% | 40 | 0.66% | 110 | 1.82% |
| November 2024 | 5981 | 370 | 6.19% | 284 | 4.75% | 9 | 0.15% | 46 | 0.77% | 118 | 1.97% |
| December 2024 | 6004 | 395 | 6.58% | 276 | 4.60% | 10 | 0.17% | 40 | 0.67% | 100 | 1.67% |
| **2024 Average** | **6065** | **385** | **6.35%** | **292** | **4.81%** | **11** | **0.18%** | **43** | **0.71%** | **112** | **1.85%** |

| 2025 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Month | Head-count | Average (Avg.) Daily Sick | Avg. Daily % Sick | Avg. Daily MMR3 | Avg. Daily % MMR3 | Avg. Daily AWOL | Avg. Daily % AWOL | Avg. Daily PE | Avg. Daily % PE | Avg. Daily FMLA | Avg. Daily % FMLA |
| January 2025 | 6021 | 388 | 6.44% | 272 | 4.52% | 12 | 0.20% | 39 | 0.65% | 118 | 1.96% |
| February 2025 | 5933 | 374 | 6.28% | 263 | 4.42% | 9 | 0.15% | 43 | 0.72% | 175 | 2.94% |
| March 2025 | 5904 | 351 | 5.95% | 256 | 4.34% | 8 | 0.14% | 42 | 0.71% | 118 | 2.00% |
| April 2025 | | | | | | | | | | | |
| May 2025 | | | | | | | | | | | |
| June 2025 | | | | | | | | | | | |
| July 2025 | | | | | | | | | | | |
| August 2025 | | | | | | | | | | | |
| September 2025 | | | | | | | | | | | |
| October 2025 | | | | | | | | | | | |
| November 2025 | | | | | | | | | | | |
| December 2025 | | | | | | | | | | | |
| **2025 Average** | 5959 | 371 | 6.22% | 264 | 4.42% | 10 | 0.16% | 41 | 0.69% | 137 | 2.30% |

**TABLE 4: LOCATION OF AWARDED POSTS**

The tables below show how awarded posts were distributed across facilities and ranks at three recent points in time: April 30, 2024, November 13, 2024, and March 31, 2025.

| Location of Awarded Posts - April 30, 2024 | | | | |
|---|---|---|---|---|
| | ADW | Captain | CO | Total |
| In Facility | 1 | 90 | 484 | 575 |
| Non-Facility | 6 | 27 | 236 | 269 |
| **TOTAL** | **7** | **117** | **720** | **844** |
| % In Facility Posts | 14% | 77% | 67% | 68% |
| % Non-Facility Posts | 86% | 23% | 33% | 32% |

| Location of Awarded Posts - November 13, 2024 | | | | |
|---|---|---|---|---|
| | ADW | Captain | CO | Total |
| In Facility | 1 | 81 | 448 | 530 |
| Non-Facility | 5 | 26 | 218 | 249 |
| **TOTAL** | **6** | **107** | **666** | **779** |
| % In Facility Posts | 17% | 76% | 67% | 68% |
| % Non-Facility Posts | 83% | 24% | 33% | 32% |

| Location of Awarded Posts - March 31, 2025 | | | | |
|---|---|---|---|---|
| | ADW | Captain | CO | Total |
| In Facility | 1 | 79 | 476 | 556 |
| Non-Facility | 5 | 25 | 212 | 242 |
| **TOTAL** | **6** | **104** | **688** | **798** |
| % In Facility Posts | 17% | 76% | 69% | 70% |
| % Non-Facility Posts | 83% | 24% | 31% | 30% |

**TABLE 5: PIC-FACING AWARDED POSTS IN FACILITY**

Posts that are awarded "in facility," can be either PIC-facing posts, which involve direct day-to-day contact with individuals in custody, or non- PIC-facing posts, which do not. The table below provides additional detail about the number of awarded posts the Department considers to be PIC-facing. These posts are considered a subset of the "In Facility" posts reflected in the tables above.

| PIC-Facing Posts in the Facility As Identified by the Department | | | | |
|---|---|---|---|---|
| | **ADW** | **Captain** | **CO** | **Total** |
| April 30, 2024 | 1 | 69 | 360 | 430 |
| November 13, 2024 | 1 | 61 | 333 | 395 |
| March 31, 2025 | 1 | 59 | 365 | 425 |

**TABLE 6: HOUSING UNIT AWARDED POSTS**

The table below reflects further analysis to determine the number of awarded posts that are assigned to a housing unit. These housing unit posts are considered a subset of the "In Facility" posts and, with a few exceptions, are also identified by the Department to be PIC-facing posts[236] as reflected in the table above.

| Housing Unit Posts<br>As Identified by Monitoring Team Analysis | | | | |
|---|---|---|---|---|
| | **ADW** | **Captain** | **CO** | **Total** |
| April 30, 2024 | 1 | 30 | 135 | 166 |
| November 13, 2024 | 1 | 28 | 126 | 155 |
| March 31, 2025 | 1 | 27 | 151 | 179 |
| *\*\*This table includes posts in which the location on a housing unit was not 100% certain, but is possible, in order to illustrate the maximum possible value.* | | | | |

---

[236] The Monitoring Team has identified 12 awarded posts that are possibly assigned to a housing unit, but which the Department does not consider to be PIC-facing.

**TABLE 7: TRIPLE TOURS**

The first table below provides the monthly total and daily average from January 2021 to December 2024 of the total uniform staff headcount and triple tours. The second table provides the annual total and daily averages for 2021 to 2024.

| Triple Tour Data January 2021 to December 2024[237] | | | |
|---|---|---|---|
| **Month** | **Average Headcount per Day** | **Average Triple Tours per Day** | **Total Triple Tours per Month[238]** |
| **January 2021** | 8,872 | 0 | 6 |
| **February 2021** | 8,835 | 3 | 91 |
| **March 2021** | 8,777 | 5 | 169 |
| **April 2021** | 8,691 | 4 | 118 |
| **May 2021** | 8,576 | 4 | 109 |
| **June 2021** | 8,475 | 4 | 108 |
| **July 2021** | 8,355 | 15 | 470 |
| **August 2021** | 8,459 | 25 | 764 |
| **September 2021** | 8,335 | 22 | 659 |
| **October 2021** | 8,204 | 6 | 175 |
| **November 2021** | 8,089 | 6 | 174 |
| **December 2021** | 7,778 | 23 | 706 |
| **January 2022** | 7,708 | 24 | 756 |
| **February 2022** | 7,547 | 3 | 90 |
| **March 2022** | 7,457 | 1 | 41 |

---

[237] In 2024, the Office of Management Analysis and Planning (OMAP) conducted a review of triple tour data for quality assurance purposes and to improve efficiencies in its collecting and reporting of this data. Prior to 2024, each facility self-reported its triple tour data based on handwritten tour certification reports. Tour certifications are completed at the beginning of a tour and do not account for how long a staff member remains on that tour. In January 2024, the Department began calculating triple tours based on timesheet and payment data collected from the CityTime application. The Department has reported this has resulted in more reliable data.

[238] For all data prior to January 2024, this column contains data for the number of staff who worked over 3.75 hours of their third tour. In January 2024, the Department began calculating this data based on the number of staff who worked over 4.28 hours of their third tour.

| Triple Tour Data January 2021 to December 2024[237] | | | |
|---|---|---|---|
| Month | Average Headcount per Day | Average Triple Tours per Day | Total Triple Tours per Month[238] |
| April 2022 | 7,353 | 0 | 3 |
| May 2022 | 7,233 | 1 | 33 |
| June 2022 | 7,150 | 2 | 67 |
| July 2022 | 7,138 | 2 | 58 |
| August 2022 | 7,068 | 2 | 50 |
| September 2022 | 6,994 | 4 | 105 |
| October 2022 | 6,905 | 2 | 63 |
| November 2022 | 6,837 | 2 | 50 |
| December 2022 | 6,777 | 4 | 115 |
| January 2023 | 6,700 | 1 | 38 |
| February 2023 | 6,632 | 0 | 8 |
| March 2023 | 6,661 | 0 | 7 |
| April 2023 | 6,590 | 0 | 11 |
| May 2023 | 6,516 | 0 | 7 |
| June 2023 | 6,449 | 1 | 26 |
| July 2023 | 6,406 | 1 | 26 |
| August 2023 | 6,427 | 1 | 27 |
| September 2023 | 6,418 | 0 | 1 |
| October 2023 | 6,340 | 0 | 0 |
| November 2023 | 6,336 | 0 | 0 |
| December 2023 | 6,278 | 0 | 0 |
| January 2024 | 6,199 | 1 | 22 |
| February 2024 | 6,151 | 1 | 20 |
| March 2024 | 6,159 | 1 | 19 |
| April 2024 | 6,126 | 1 | 23 |
| May 2024 | 6,063 | 1 | 17 |
| June 2024 | 6,027 | 1 | 41 |
| July 2024 | 6,028 | 2 | 72 |
| August 2024 | 6,031 | 2 | 63 |

| Triple Tour Data<br>January 2021 to December 2024[237] | | | |
|---|---|---|---|
| **Month** | **Average Headcount per Day** | **Average Triple Tours per Day** | **Total Triple Tours per Month[238]** |
| **September 2024** | 5,981 | 3 | 75 |
| **October 2024** | 6,028 | 3 | 87 |
| **November 2024** | 5,981 | 3 | 76 |
| **December 2024** | 6,004 | 3 | 86 |

TABLE 8: OVERTIME SPENDING

The table below shows the Department's monthly overtime costs for uniform staff since January 2019. An important indicator of efficient workforce management is the level of an agency's use of overtime. Given the Department's problems with inefficient staff scheduling and deployment and abuse of leave benefits, overtime has become a routine strategy to increase staff availability on any given shift. Overtime can of course be used efficiently to address temporary staff shortages and unusual situations. However, using overtime to address chronic staffing issues, as this Department does, has significant fiscal consequences and an obvious negative impact on staff wellness and morale.

| Overtime Data for Uniform Staff[239] *January 2019-March 2025* | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Month** | **2019** | **2020** | **2021** | **2022** | **2023** | **2024** | **2025** |
| January | $12,860,000 | $9,800,000 | $12,066,000 | $18,847,000 | $22,893,000 | $21,227,000 | $26,192,000 |
| February | $12,392,000 | $7,983,000 | $14,037,000 | $18,226,000 | $20,819,000 | $19,936,000 | $22,967,000 |
| March | $14,194,000 | $8,426,000 | $15,218,000 | $20,969,000 | $23,855,000 | $21,759,000 | $27,271,000 |
| April | $13,941,000 | $13,340,000 | $15,394,000 | $20,783,000 | $22,414,000 | $21,533,000 | |
| May | $14,135,000 | $7,926,000 | $15,850,000 | $21,423,000 | $23,358,000 | $22,450,000 | |
| June | $11,894,000 | $5,647,000 | $15,887,000 | $21,721,000 | $22,490,000 | $21,566,000 | |
| July | $14,273,000 | $5,817,000 | $18,860,000 | $22,064,000 | $23,758,000 | $24,282,000 | |
| August | $14,592,000 | $6,815,000 | $19,719,000 | $22,453,000 | $22,434,000 | $22,125,000 | |
| September | $11,714,000 | $6,022,000 | $20,137,000 | $22,006,000 | $18,871,000 | $23,756,000 | |
| October | $12,146,000 | $7,168,000 | $21,485,000 | $22,901,000 | $19,712,000 | $26,186,000 | |
| November | $11,458,000 | $8,268,000 | $19,514,000 | $22,215,000 | $19,462,000 | $25,506,000 | |
| December | $11,439,000 | $11,687,000 | $19,546,000 | $22,276,000 | $20,261,000 | $25,791,000 | |
| **Annual Overtime Spending** | **$155,038,000** | **$98,899,000** | **$207,713,000** | **$255,884,000** | **$260,327,000** | **$276,117,000** | **$76,430,000** |
| **Average # of Staff** | **10,115** | **9,302** | **8,454** | **7,181** | **6,479** | **6,065** | **5,959** |

---

[239] There can be lags in the reporting and payment of overtime. Staff must submit overtime paperwork and there is a processing lag that can result in overtime paid weeks and potentially months after it was worked. On occasion there are instances (i.e. collective bargaining settlements) that call for substantial retroactive overtime payments. Because of this, overtime data is never truly static and is subject to real-time changes. Because these changes are so frequent, they are not reflected in the data produced above.

# APPENDIX G:
# LEADERSHIP APPOINTMENTS

## LEADERSHIP APPOINTMENTS – JANUARY 2022 TO MAY 12, 2025

The table below identifies the leadership positions that were filled between January 2022 and May 12, 2025, including the date of appointment and the departure date, if applicable. The Department's leadership is discussed in the Leadership, Management, Supervision and Staffing section of the Report.

| TITLE | DIVISION/BUREAU | APPOINTMENT DATE | END DATE |
|---|---|---|---|
| Assistant Commissioner (Appointed DC) | Administration | 5/6/2024 | 1/25/2025 |
| Deputy Commissioner | Administration | 9/6/2022 | 5/10/2024 |
| Deputy Commissioner (prev. AC) | Administration | 1/25/2025 | |
| Assistant Commissioner | AIU | 6/16/2022 | 4/27/2025 |
| Agency Chief Contracting Officer (ACCO) | Central Office of Procurement | 9/18/2023 | 10/14/2024 |
| Agency Chief Contracting Officer (ACCO) | Central Office of Procurement | 11/21/2024 | |
| Acting Assistant Commissioner | CIB | 11/10/2024 | |
| Assistant Commissioner | CIB | 7/11/2022 | 11/10/2024 |
| Deputy Warden in Command / Acting Warden (Promoted 3/25/25) | CJB, Hospital Prison Wards, Transportation, Courts | 9/14/2021 | 3/24/2025 |
| Warden (prev. DW) | CJB, Hospital Prison Wards, Transportation, Courts | 3/25/2025 | |
| Assistant Commissioner | Early Intervention, Supervision, & Support | 11/13/2018 | |
| Acting EEO Officer | Equal Employment Opportunity | 2/10/2025 | 2/26/2025 |
| Assistant Commissioner/EEO Officer | Equal Employment Opportunity | 8/2/2021 | 2/9/2025 |
| Deputy Commissioner / EEO Officer | Equity and Inclusion / Equal Employment Opportunity | 2/26/2025 | |
| Associate Commissioner (Appointed DC) | Facilities & Fleet Administration (FMRD) | 9/11/2023 | 11/7/2024 |
| Deputy Commissioner | Facilities & Fleet Administration (FMRD) | 5/22/2023 | 10/27/2024 |
| Deputy Commissioner (prev. Associate Commissioner) | Facilities & Fleet Administration (FMRD) | 11/7/2024 | |
| Director, Energy Mgt Strategy | Facilities & Fleet Administration (FMRD) | 7/17/2023 | 5/4/2025 |
| Assistant Commissioner | Facility Operations - EMTC | 4/24/2023 | |
| Acting Warden | Facility Operations - GRVC | 9/9/2024 | |
| Assistant Commissioner | Facility Operations - GRVC | 4/24/2023 | 9/9/2024 |
| Acting Warden | Facility Operations - NIC | 9/9/2024 | |
| Assistant Commissioner | Facility Operations - NIC/WF | 6/20/2023 | 8/11/2024 |
| Acting Warden | Facility Operations - OBCC | 1/8/2025 | |
| Assistant Commissioner | Facility Operations - OBCC | 4/24/2023 | 10/7/2023 |
| Assistant Commissioner (formerly in Security Operations) | Facility Operations - OBCC | 5/6/2024 | 1/8/2025 |
| Assistant Commissioner | Facility Operations - RMSC | 4/24/2023 | 5/6/2024 |
| Assistant Commissioner | Facility Operations - VCBC | 4/24/2023 | 10/21/2023 |
| Assistant Commissioner | Facility Operations - WF | 11/13/2023 | |
| Administrative Director of Facility Operations | Facility Operations, Classification & Population Management | 10/28/2024 | |

| TITLE | DIVISION/BUREAU | APPOINTMENT DATE | END DATE |
|---|---|---|---|
| Assistant Commissioner | Facility Operations, Classification & Population Management | 5/24/2023 | 5/21/2024 |
| Associate Commissioner | Facility Operations, Classification & Population Management | 8/22/2022 | |
| Associate Commissioner | Facility Operations, Classification & Population Management | 6/20/2024 | |
| Deputy Commissioner | Facility Operations, Classification & Population Management | 7/25/2022 | 2/5/2024 |
| Deputy Commissioner | Facility Operations, Classification & Population Management | 10/15/2024 | 5/9/2025 |
| Warden | Facility Operations - Robert N. Davoren Center | 10/17/2024 | |
| Warden | Facility Operations - Rose M. Singer Center | 10/17/2024 | |
| Warden | Facility Operations - Rose M. Singer Center E.S.H. | 10/17/2024 | |
| Assistant Commissioner | Finance | 9/8/2020 | 10/14/2024 |
| Assistant Commissioner | Finance | 2/18/2025 | |
| Deputy Commissioner | Finance | 9/11/2023 | 4/25/2025 |
| Assistant Commissioner | Health Affairs | 11/17/2023 | |
| Deputy Commissioner | Health Affairs | 1/30/2023 | |
| Assistant Commissioner | Health Management Division | 10/10/2023 | |
| Chief Surgeon | Health Management Division | 4/18/2023 | 8/11/2023 |
| Assistant Commissioner | Human Resources | 6/16/2022 | 4/9/2023 |
| Assistant Commissioner | Human Resources | 10/1/2023 | |
| Associate Commissioner | Human Resources | 4/7/2022 | 4/1/2023 |
| Associate Commissioner (prev. Assistant) | Human Resources | 5/24/2024 | |
| Deputy Commissioner | Human Resources | 10/16/2023 | 8/16/2024 |
| Assistant Commissioner (now Associate) | Human Resources | 8/8/2022 | 5/24/2024 |
| Executive Director | Intergovernmental Affairs | 8/8/2022 | 4/15/2025 |
| Deputy Commissioner | Investigations | 8/3/2023 | |
| Assistant Commissioner | Investigations | 12/11/2022 | 3/1/2023 |
| Assistant Commissioner | Investigations | 8/8/2023 | 3/25/2024 |
| Associate Commissioner | Investigations | 12/15/2021 | 9/5/2023 |
| Associate Commissioner | Investigations | 11/22/2024 | |
| Deputy Commissioner | Investigations | 5/9/2022 | 4/1/2023 |
| Acting Deputy Commissioner | IT | 4/10/2023 | 4/9/2024 |
| Associate Commissioner | IT | 8/8/2022 | |
| Associate Commissioner | IT | 11/18/2024 | |
| Associate Commissioner/Deputy CIO IT Division | IT | 7/3/2023 | 4/9/2024 |
| Deputy Commissioner | IT | 9/24/2017 | 6/1/2023 |
| Deputy Commissioner | IT | 4/9/2024 | |
| Acting Deputy General Counsel | Legal | 12/12/2023 | 7/30/2024 |
| Acting General Counsel | Legal | 12/12/2023 | 8/9/2024 |
| Deputy Commissioner | Legal | 8/8/2022 | 9/2/2023 |
| Deputy General Counsel | Legal | 8/14/2023 | 11/5/2023 |
| Deputy General Counsel | Legal | 10/21/2024 | |
| General Counsel | Legal | 8/26/2024 | |
| Assistant Commissioner | Management Analysis & Planning | 1/17/2023 | 9/1/2023 |
| Assistant Commissioner | Management Analysis & Planning | 8/29/2022 | |
| Assistant Commissioner | Management Analysis & Planning | 11/27/2023 | |
| Associate Commissioner (Acting DC 4/24/2025 - ) | Management Analysis & Planning | 7/3/2022 | |
| Deputy Commissioner | Management Analysis & Planning | 4/18/2022 | 4/24/2025 |

| TITLE | DIVISION/BUREAU | APPOINTMENT DATE | END DATE |
|---|---|---|---|
| Assistant Commissioner | Nunez Compliance Unit | 4/17/2023 | |
| Agency Counsel and Senior Advisor to the Commissioner | Office of the Commissioner | 1/22/2024 | 4/4/2025 |
| Chief Of Staff | Office of the Commissioner | 2/14/2022 | 1/12/2024 |
| Chief Of Staff / Bureau Chief | Office of the Commissioner | 5/24/2024 | |
| Commissioner | Office of the Commissioner | 1/1/2022 | 12/8/2023 |
| Commissioner | Office of the Commissioner | 12/8/2023 | |
| Deputy Chief Of Staff | Office of the Commissioner | 4/11/2022 | 4/18/2025 |
| Senior Deputy Chief of Staff | Office of the Commissioner | 10/21/2024 | |
| First Deputy Commissioner | Office of the FDC | 3/5/2021 | 12/8/2023 |
| First Deputy Commissioner (prev. DC Programs) | Office of the FDC | 2/2/2024 | |
| Senior Deputy Commissioner | Office of the SDC | 10/31/2022 | 2/3/2023 |
| Senior Deputy Commissioner | Office of the SDC | 10/26/2023 | 5/17/2024 |
| Senior Deputy Commissioner | Office of the SDC | 11/18/2024 | |
| Associate Commissioner | Operations | 11/9/2022 | 1/16/2024 |
| Assistant Commissioner | Operations Research | 9/12/2022 | 6/16/2023 |
| Assistant Commissioner | Preparedness and Resilience | 4/11/2022 | |
| Assistant Commissioner | Program Operations | 3/18/2022 | 6/24/2023 |
| Assistant Commissioner | Programs and Community Partnerships | 1/20/2020 | |
| Assistant Commissioner | Programs and Community Partnerships | 4/7/2022 | |
| Assistant Commissioner | Programs and Community Partnerships | 12/5/2023 | |
| Assistant Commissioner | Programs and Community Partnerships | 11/21/2024 | |
| Associate Commissioner | Programs and Community Partnerships | 3/14/2022 | 9/29/2023 |
| Associate Commissioner (Appointed DC) | Programs and Community Partnerships | 11/13/2023 | 11/29/2024 |
| Deputy Commissioner (now FDC) | Programs and Community Partnerships | 9/6/2021 | 2/2/2024 |
| Deputy Commissioner (prev. Associate Commissioner) | Programs and Community Partnerships | 11/29/2024 | |
| Assistant Commissioner | Public Information | 1/30/2023 | 7/28/2024 |
| Deputy Commissioner | Public Information | 7/1/2022 | 4/14/2023 |
| Deputy Commissioner | Public Information | 5/3/2023 | 6/30/2024 |
| Deputy Commissioner | Public Information | 11/18/2024 | |
| Assistant Chief of Security | Security Operations | 5/24/2024 | |
| Assistant Commissioner (became AC of OBCC) | Security Operations | 4/3/2023 | 5/6/2024 |
| Deputy Commissioner | Security Operations | 5/16/2022 | 10/29/2024 |
| Deputy Commissioner | Security Operations | 10/30/2024 | |
| Assistant Commissioner | Special Investigations Unit/PREA | 12/19/2022 | |
| Assistant Commissioner | Strategic Initiatives | 11/13/2023 | |
| Deputy Commissioner | Strategic Operations | 4/8/2024 | |
| Acting Deputy Commissioner (Returned to AC) | Training Academy | 1/17/2024 | 11/26/2024 |
| Assistant Commissioner (Acting DC 1/17 - 11/26/24) | Training Academy | 1/30/2023 | |
| Deputy Commissioner | Training Academy | 12/5/2022 | 1/16/2024 |
| Deputy Commissioner | Training Academy | 11/26/2024 | |
| Assistant Commissioner | Training Academy | 9/6/2022 | 9/17/2022 |
| Associate Commissioner | Trials | 8/8/2022 | 8/2/2023 |
| Deputy Commissioner | Trials | 5/31/2022 | |

# APPENDIX H:
# UPDATE ON PROCESSING OF NEW ADMISSIONS

There are a number of provisions in the *Nunez* Court Orders related to the Department's use of intake.[240] The Court imposed these requirements in response to concerning reports about poor conditions and excessive lengths of stay in intake units.

The procedures for processing people newly admitted to the Department remain as described in the Monitor's February 3, 2023 Report at pgs. 15 to 18 and Appendix A and the April 3, 2023 Report at pgs. 74 to 75. The New Admissions process is currently governed by Operations Order 22/07 dated December 14, 2007.[241]

### LENGTH OF STAY IN INTAKE FOR MALE NEW ADMISSIONS

New admission processing data from July to December 2024 identifies the proportion of male new admissions who were processed through new admission intake within the required 24-hour timeline. Two different data points can be utilized as the "start time" when tracking length of stay: the time that an individual is transferred from NYPD to NYC DOC custody, which typically occurs in a court setting ("custody time") *or* the time that an individual arrives at the intake unit at EMTC facility[242] on Rikers Island ("arrival time"). Both are considered separately in the analysis below.[243] The "end time" at which intake processing is considered complete is the

---

[240] There are at three distinct intake provisions contained in the Court's First Remedial Order, Second Remedial Order, and Action Plan. They are: First Remedial Order (dkt. 350): ¶ A(3) (Revised De-Escalation Protocol). This provision requires the Department to implement a de-escalation protocol to minimize the use of intake following use of force incidents. Second Remedial Order (dkt. 398): ¶ 1(i)(c). This provision requires the Department to process all incarcerated individuals, including new admissions and inter/intra facility transfers, through intake and place them in an assigned housing unit within 24 hours. The Department must also develop and implement a reliable system to track and record the amount of time an individual is held in intake and any instance when an individual remains in intake for more than 24 hours. Action Plan (dkt. 465): § D, ¶ 2(b) and § E, ¶ (3)(a)-(b). These Action Plan requirements re-iterate the intake-related requirements in the First and Second Remedial Orders (described above), in addition to requiring the Classification Manager and the Security Operations Manager to collaborate to reduce the reliance on intake and to timely process individuals through intake.

[241] The policy was updated in early 2023, but rescinded in June 2023 because the Department had not consulted with the Monitoring Team on the changes prior to promulgation. Revisions to the policy have not been prioritized, given the Department's need to focus on other higher-priority initiatives.

[242] A small group of individuals may be processed through an intake at West Facility for specific individual factors, including, but not limited to, health and security considerations.

[243] As noted in the Monitor's February 3, 2023 Special Report on Intake (dkt. 504), the Monitoring Team assesses the time each person arrives in the intake unit (*i.e.*, "arrival time") compared to the time the individual is transported to their assigned housing unit when calculating whether the 24-hour requirement has been met. Counsel for the Plaintiff Class has advised the Monitoring Team that it believes that the assessment of compliance should be based on the time an individual is taken into custody (*i.e.*, "custody

time that the individual is either transferred to a housing unit or is discharged from custody (for those who make bail or are not returned to custody following a return to court or a hospital visit).

As shown in the section under the orange bar in the tables below, whether using custody time or arrival time as the starting point, most individuals from July to December 2024 were processed within a 24-hour period. Using "custody time" as the starting point, 91% of new admissions were processed through intake in under 24 hours. Using "arrival time" as the starting point, 93% of new admissions were processed through intake in under 24 hours. These calculations were made using a continuously running clock, *without deducting time for clock stoppages*, which are described in more detail below.

| Intake Processing Times for New Admissions Arriving at EMTC Intake July to December 2024 | | | | |
|---|---|---|---|---|
| **Outcome** | **Per Custody Time** | | **Per Arrival Time** | |
| | **n=9,947** | **%** | **n=9,947** | **%** |
| Housed/Discharged within 24 hours | 9046 | 91% | 9260 | 93% |
| Housed/Discharged beyond 24 hours | 901 | 9% | 687 | 7% |
| **Length of Stay ("LOS") Beyond 24 Hours** | | | | |
| **LOS (# hrs. overdue)** | **n=901** | **%** | **n=687** | **%** |
| 24-27 hours (≤ 3 hrs.) | 162 | 17.98% | 167 | 24.31% |
| 27-30 hours (3-6 hrs.) | 210 | 23.31% | 208 | 30.28% |
| 30-33 hours (6-9 hrs.) | 213 | 23.64% | 163 | 23.73% |
| 33-36 hours (9-12 hrs.) | 147 | 16.32% | 69 | 10.04% |
| 36-48 hours (12-24 hrs.) | 115 | 12.76% | 59 | 8.59% |
| More than 48 hours (≥24 hrs.) | 54 | 5.99% | 21 | 3.06% |

The data beneath the green bar in the table above shows the total length of stay for the small proportion of individuals whose processing did not meet the 24-hour timeline. In this Monitoring Period, of those individuals who did not meet the 24-hour timeline, most were

---

time"). Discussions about the appropriate compliance standard will occur in conjunction with the discussion related to clock stoppages. Given that, this report provides outcomes using both data points for the Court's consideration.

housed within 9 hours (between 24 and 33 hours after admission), specifically, 585 of the 901 (65%) using custody time and 538 of the 687 (78%) using arrival time.

**LENGTH OF STAY IN INTAKE FOR FEMALE NEW ADMISSIONS**

Female new admissions are processed through a separate intake at RMSC where they are also housed. As shown in the section under the orange bar in the RMSC tables below, whether using custody time or arrival time as the starting point, most female new admissions from July to December 2024 were processed within a 24-hour period. Using "custody time", 92% of new admissions were processed through intake in under 24 hours. Using "arrival time", 95% of new admissions were processed through intake in under 24 hours. These calculations were made using a continuously running clock, *without deducting time for clock stoppages*, which are described in more detail below.

| Intake Processing Times for New Admissions Arriving at RMSC Intake July to December 2024 | | | | |
|---|---|---|---|---|
| **Outcome** | **Per Custody Time** | | **Per Arrival Time** | |
| | **n=1,053** | **%** | **n=1,053** | **%** |
| Housed/Discharged within 24 hours | 973 | 92% | 1001 | 95% |
| Housed/Discharged beyond 24 hours | 80 | 8% | 52 | 5% |
| **Length of Stay ("LOS") Beyond 24 Hours** | | | | |
| **LOS (# hrs. overdue)** | **n=80** | **%** | **n=52** | **%** |
| 24-27 hours (≤ 3 hrs.) | 27 | 33.75 | 21 | 40.38 |
| 27-30 hours (3-6 hrs.) | 21 | 26.25 | 16 | 30.77 |
| 30-33 hours (6-9 hrs.) | 16 | 20.00 | 8 | 15.38 |
| 33-36 hours (9-12 hrs.) | 9 | 11.25 | 1 | 1.92 |
| 36-48 hours (12-24 hrs.) | 4 | 5.00 | 3 | 5.77 |
| More than 48 hours (≥24 hrs.) | 3 | 3.75 | 3 | 5.77 |

The data beneath the green bar in the table above shows the total length of stay for the small proportion of female new admissions whose processing did not meet the 24-hour timeline. In this Monitoring Period, of those individuals who did not meet the 24-hour timeline, most were housed within 9 hours (between 24 and 33 hours after admission), specifically, 64 of 80 (80%) using custody time and 45 of 52 (87%) using arrival time.

**TEMPORARILY SUSPENDING NEW ADMISSION PROCESSING, A.K.A. CLOCK-STOPPAGE**

Historically, the Department has identified circumstances in which new admission intake processing is interrupted and has tolled its accounting of the processing time (*i.e.*, "stopped the clock") until the circumstance is resolved and processing can resume.[244] The situations in which the Department temporarily suspends its intake processing clock include when:

- An individual is returned to court before the intake process is completed.

- An individual refuses to participate in intake processing.

---

[244] *See* Monitor's February 2023 Report at pgs. 17 and 19-20 and Monitor's April 3, 2023 Report at 79 to 81.

-   An individual is transferred to a hospital or Urgi-Care (a clinic in another facility on Rikers Island) before the intake process is complete.

-   An individual makes bail and is released from custody before the intake process is complete.

Suspending intake processing appears logical (*e.g.*, processing cannot occur if the person is not physically present) and may also be functional (*e.g.*, Department or CHS staff need to know that an individual will not be presented for a certain procedure). Although the Department tracks all clock stoppages, the data presented above regarding the 24-hour timeline utilized a continuously running clock, *without deducting any time when processing was suspended.*

In July to December 2024, most individuals newly admitted to the Department (85.5%; 8,503 of 9,947 for male new admissions; and 82%; 867 of 1,053 for female new admissions) were processed through intake without the process being suspended for any reason. Further, the fact that the intake process was suspended sometimes did not necessarily mean that the individual was not processed within 24 hours. In fact, among the 1,444 male new admissions whose intake process was suspended for some period, 549 were were housed within 24 hours by custody time (38%) and 549 by arrival time (53%). For the 186 female new admissions whose intake process was suspended for some period, 106 were housed within 24 hours by custody time (57%) and 134 by arrival time (72%) (57% using custody time, 72% using arrival time). Among those whose intake process was temporarily suspended and whose processing lasted more than 24 hours, the largest category of suspensions occurred when the individual was required to return to court (70% of male suspensions per custody time; 77% of male suspensions per arrival time; and 64% of female suspensions per custody time; 73% of female suspensions per arrival time).

### NCU'S AUDITS TO VERIFY DATA ENTRY

Concurrent with the implementation of the New Admission Dashboard, the *Nunez* Compliance Unit ("NCU") continued its audit strategy to corroborate the time entries in the intake Dashboard for male new admissions at EMTC using Genetec footage.[245] Audit results

---

[245] *See* Monitor's February 3, 2023 Report at pgs. 20 to 22 and Monitor's April 3, 2023 Report at pgs. 78 to 79. NCU does not conduct audits for female new admissions at RMSC.

from July to December 2024 are summarized for the 130 people who were newly admitted during the audits' sampling frames.[246]

- 122 of 130 people (94%) arrived in intake and were processed and transferred to a housing unit within the 24-hour timeline (confirmed via Genetec review).

- 128 of 130 arrival time entries (98.5%) were generally accurate (*i.e.*, within 20 minutes of the time shown on Genetec). Among the two inaccuracies, one stated a time *before* the person actually arrived, and one stated a time *after* the person actually arrived.

- 110 of 127[247] housing time entries (87%) were generally accurate (*i.e.*, within 20 minutes of the time shown on Genetec). Among the 17 inaccuracies, nine stated a time *before* the person was actually transferred to a housing unit, seven stated a time *after* the person was actually transferred to a housing unit, and one entry stated a person was housed when he was actually discharged.

- 11 of the 130 people (8.5%) had "clock stoppages" during the intake process. Of these, three people were housed within 24 hours of their arrival time in intake and eight people were not.

NCU's audits indicate that time entry errors are not common, but, when they do occur, they were primarily attributable to a small number of staff rather than being widespread data entry issues. In instances where errors were identified, NCU reports that the staff members received corrective interviews and retraining. While data entry errors appear to be infrequent and not indicative of a systemic issue, the Monitoring Team recommends that intake supervisors continue to review staff accuracy and offer targeted support to those who may benefit from additional guidance.

---

[246] NCU confirms the status of all individuals in the intake to determine whether they are a new admission or if the individual may already have been in custody and is therefore in intake as an inter/intra facility transfer. Upon confirmation of the new admissions, the audit is limited to those individuals.

[247] Three individuals were excluded from the Housing Time calculation because they were discharged during their admission process and thus the housing time was not applicable.

RECENT UPDATES AT EMTC

Shortly after the Monitoring Period, the Department reported several plan improvements to EMTC and the management of New Admissions. First, EMTC opened the outside recreation yard for all people in custody. The facility also established an on-site X-Ray area to reduce the wait times associated with transporting individuals off-site. A Dental Clinic was also reopened, allowing for more frequent access to dental care. Finally, a construction project commenced for the expansion of space in the Intake to accommodate the increase in population. These improvements are important steps toward enhancing the facility's ability to meet basic needs, reduce service delays, and better manage the growing population.

CONCLUSION

The Department has taken important steps to ensure New Admissions are processed in a timely manner. The vast majority of individuals are processed within 24 hours, including in instances when a clock stoppage is appropriate. As demonstrated by NCU's audit, the Department also continues to track New Admissions using the New Admissions Dashboard in a generally reliable and accurate manner. The Department must continue to remain proactive regarding the New Admissions procedures to effectively address the evolving challenges and fluctuations in population.

# APPENDIX I:
# UPDATES ON
# TECHNOLOGY INITIATIVES

Below is a list of IT initiatives that have recently been completed or are in various stage of progress.

**SECURITY & OPERATIONS INITIATIVES**

- **RapiScan Drug Detection System**: The Department has implemented portable drug detection machines capable of swabbing and identifying multiple types of drugs in incoming mail and packages with a high degree of reliability. These machines also support chain of custody by printing time-stamped slips that specify the substance detected. This initiative has been fully implemented.

- **Electronic Logbook**: The Department has developed an electronic logbook to replace the paper-based system used at A and B posts. This new system is expected to significantly improve recordkeeping and facilitate easier review and analysis of housing area activity. Training materials have been prepared, and the Department is currently preparing to launch a pilot. This initiative is ready for pilot implementation.

- **Body Worn Cameras**: The Department is nearing completion of the initiative to issue body-worn cameras to all uniform staff. The rollout of this initiative is nearly complete.

- **PIC Identification Cards**: The Department has acquired ID cards, clips, and printers needed to reissue identification cards to people in custody. These cards will facilitate identification during service delivery and the movement of individuals. This initiative is ready from an IT perspective and a pilot is planned for one facility.

- **Incarcerated Individual Service Delivery Tracker (IISD)**: The Department has developed a mobile and web-based application to document services provided to people in custody, such as recreation, clinic visits, court, and commissary. The application includes barcode scanning to expedite identification. Development is complete, and the Department is coordinating rollout efforts.

- **Search & Contraband Tracking System (SSTS)**: The Department is piloting a tablet-based system for documenting ESU, SRT, and SST search operations in real-time, including team planning, contraband findings, and related notifications. This initiative is currently in the pilot phase, with 15 iPads distributed to Emergency Teams.

- **PIC Lookup System (Enhancements)**: Enhancements to the PIC Lookup System have been completed, allowing staff to more easily access comprehensive PIC profiles, including incident history, housing movements, program participation, infractions, and separation orders. These enhancements have been completed and are now in use.

- **Incident Reporting System**: The Department is overhauling the incident reporting system to align with State Commission of Correction (SCOC) standards and streamline submissions to the State's eJustice platform. This initiative is currently being integrated with Use of Force reports.

- **Program Services Tracking**: A system is in place for the Division of Programs to track program delivery and attendance among PICs. This initiative has been implemented and continues to receive enhancements.

- **Clinic Production Tracking**: The Department is collaborating with CHS to implement an electronic system to track clinic call-downs, production, and refusals. Escort officers will use a mobile app to document clinic attendance in real-time. This initiative is currently under development.

- **Infractions Reporting & Tracking System**: The Department has developed a system for electronically processing PIC infractions, from submission through adjudication. Phase 1 of this initiative is ready for rollout, while Phases 2 (investigations) and 3 (adjudication) remain under development.

- **Audits & Inspections Management System (AIMS)**: A web and mobile platform is being tested to allow units such as Fire Safety and Environmental Health to schedule and document inspections. This initiative is currently undergoing user testing.

- **Culinary Digital**: The Department is developing a web-based system to support Nutritional Services with recipe planning, inventory, menu compliance, and dietary tracking. This initiative is in progress.

### HR, Administration & Training Initiatives

- **Staff Efficiency Systems**:

- **Attendance Tracking**: An electronic system is in place to replace paper sign-in sheets and provide real-time attendance data for uniformed staff. This initiative has been fully implemented.

- **E-Schedule**: The Department is developing a user-friendly scheduling interface that integrates with Attendance Tracking, allowing facility leadership to make real-time staffing decisions. This initiative is currently in development.

- **TDY Tracker and Transfers**: An electronic tracker records UMOS transfers and temporary duty assignments and displays current work locations in the Employee Lookup System. This system has been fully implemented.

- **Electronic Form 22R**: An automated system for generating staff service records by pulling data from multiple sources has been developed and implemented. This initiative is fully in place.

- **Vacation Bidding**: A digital system has replaced paper-based vacation scheduling, allowing staff to submit ranked vacation picks which are processed in compliance with operational orders. This system has been fully implemented and expanded to all facilities.

- **Recruitment Tracking**: A mobile/web application enables recruitment staff to log outreach efforts and track interested candidates for the CO exam. This initiative has been in place for one year.

- **Good Guy Letter Tracking**: DOC now tracks requests for Good Guy Letters electronically to support retired officers seeking personal firearm licenses. This initiative has been in place since January.

- **Officer Training Accountability System**: A system is in place to ensure compliance with training requirements by capturing photos during LMS courses for audit and identity verification. This initiative has been fully implemented.

- **ArmorerLink Firearms Tracking System**: This web-based platform manages firearm inventory, training, and qualifications and includes a mobile app for real-time documentation at the range. This initiative is fully implemented.

- **Email Accounts for All Staff**: The Department is extending email access to all staff, including COs, to enhance communication and enable digital services. This rollout is currently in progress and is expected to be completed by June.

## HEALTH MANAGEMENT DIVISION (HMD)

- **Electronic Health Management System Enhancements**: The existing HMD system is being upgraded to support case management, medical fitness determinations, and tracking of MMR status. Enhancements to this system are currently underway.

- **Workers Compensation Claims Tracking**: A new system is being developed to allow electronic submission and processing of workers' compensation claims. This initiative is in its initial development phase.

## INVESTIGATIONS & LEGAL

- **Case Builder**: The Department is introducing a new case management platform to support multiple divisions and improve data quality and efficiency in investigations. This initiative has recently launched.

## FINANCE & PROCUREMENT

- **Budget Request & Procurement Tracking**: DOC has built a digital system for submitting and tracking budget and procurement requests, which will eventually integrate with the City's Passport system. This system is operational and is currently being enhanced.

## UPCOMING PROJECTS

- **Self-Service Scheduling & Leave Requests**: A platform is being developed to allow staff to view schedules and request leave, OT, and mutuals from personal devices. This initiative is upcoming.

- **Human Capital Management System (HCM)**: The Department is preparing to implement an enterprise HR system that consolidates employee data and interfaces with city systems like NYCAPS and PMS. This initiative is upcoming.

- **Jail Management System (IIS Replacement)**: Plans are underway to replace the aging IIS system with a modern platform for managing all PIC data and workflows. This initiative is upcoming.

- **PIC Banking System (IFCOM Replacement)**: The Department is preparing to replace the IFCOM system with a more robust solution for managing PIC finances. This initiative is upcoming.

- **Staff Body Scanning**: Upgrades to body scanners are being planned to improve detection capabilities and enable full staff scanning at facility entrances. This initiative is upcoming.