UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MARK NUNEZ, et al.,
Plaintiffs,

against

CITY OF NEW YORK, et al.,
Defendants.

11-CV-05845(LTS)

UNITED STATES OF AMERICA,
Plaintiff-Intervenor,

against

CITY OF NEW YORK and NEW YORK CITY
DEPARTMENT OF CORRECTION,
Defendants.

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION FOR A TEMPORARY RESTRAINING ORDER,
<u>PRELIMINARY INJUNCTION AND DECLARATORY RELIEF</u>**

## PRELIMINARY STATEMENT

On January 30, 2024, the New York City Council enacted New York City Local Law 42 of 2024, N.Y.C. Admin. Code § 9-167 ("Local Law 42").  Though the law purported to "ban solitary confinement in city jails," it instead created a series of requirements that, as currently constituted, jeopardize the safety and security of the people who live and work in the jails.  The implementation of its myriad provisions present conflicts with the consent decree and the related orders supervised by this Court in the instant matter.  *See* Monitor's Report of January 31, 2025, ECF No. 814 (the "Monitor's LL42 Report") at 10 & Appx. B. .Specifically, changes to DOC policies to implement the numerous provisions of Local Law 42 require Monitor review and approval pursuant to the Consent Decree and this Court's orders (the "*Nunez* Orders").  To date, the Monitor has not approved modifications based on those provisions, and instead has found that Local Law 42 "as currently designed, would undermine the very purpose of the *Nunez* Court Orders, which is for [DOC] to provide a 'constitutionally sufficient level of safety for those who live and work on Rikers Island.'"  *See* Monitor's LL42 Report at 58.

In response to the serious, imminent threat to the safety of the staff and persons in custody the provisions of Local Law 42 presented, Mayoral Emergency Executive Orders No. 624 and 625 (ECF No. 814-6) (the "EEOs")[1] suspended the effect of provisions that were subject to Monitor approval, but had not been approved, as well as certain rules promulgated by the NYC Board of

---

[1] The original EEOs expired and were renewed periodically pursuant to Executive Law § 24.

Correction to implement those provisions.  EEO 625 at 17-19.of 22.[2]  On June 30, 2025, the Supreme Court of the State of New York granted an Article 78 petition by the New York City Council (the "Council") to vacate the EEOs.  The state court held that the state law governing emergency executive orders did not authorize the Mayor to issue the EEOs because the Mayor instead should have sought "injunctive or other proper relief" from this Court.  *The Council of the City of New York, et al. v. Mayor Eric Adams*, Index No., 161499/2024 (Sup. Ct. New York Cty. June 30, 2025) (NYSCEF Doc. No. 58), at 4-5.  The state court further held that although the orders of this Court prevented changes in Local Law 42 from being effective "without permission of the federal monitor," that did not authorize the Mayor to bar a local law enacted over the Mayor's veto. *Id*.

As a result, absent relief from this Court, the Conflicting Provisions of Local Law 42 and the associated BOC Rules are in effect, imposing obligations on the City that are contrary to the orders of this Court enforcing constitutional requirements. The provisions of Local Law 42 that require Monitor approval, but which have not been approved (the "Conflicting Provisions"), are as follows, listed with corresponding provisions of the *Nunez* orders requiring Monitor approval or direction relating to the subject-matter of those provisions:

---

[2] The NYC Board of Correction issued certain rules and rule amendments to comply with the requirement of Local Law 42 that the  Board "take any actions necessary for the implementation of this local law, including the promulgation of rules relating to procedures and penalties necessary to effectuate this section . . . ." 9-167(k)(2); *see also* https://www.nyc.gov/assets/boc/downloads/pdf/Jail-Regulations/BOC-Proposed-Rule_Restrictive-Housing-(LL42).pdf (accessed July 1, 2025), at 4 of 48 (noting statutory requirement for proposed rules).  The BOC rules that were promulgated to implement Local Law 42 are referred to here in as the "BOC Rules" and are compiled here: https://www.nyc.gov/assets/boc/downloads/pdf/BOC-Final-Rule-Restrictive-Housing-LL42.pdf (accessed July 1, 2025).  The transmittal letter accompanying the rules notes that their validity is contingent upon the resolution of disputes relating to the validity of Local Law 42.  *Id*.

| Court Orders Requiring Monitor Approval or Direction[3] | Covered LL42 Provisions[4] | Subject-Matter |
|---|---|---|
| Action Plan, § E, ¶ 4 (Monitor approval) | §9-167(b)<br>§9-167(f)(1)(i),(ii)<br>§9-167(f)(1)(v)<br>§9-167(f)(1)(vi)<br>§9-167(f)(2)<br>§9-167(h)(1)- (h)(4)<br>§9-167(h)(5)(6)<br>9-167(i)(1) | Management strategy of Incarcerated Individuals Following Serious Incidents of Violence. |
| Action Plan, § D, ¶ 2(h)) (Monitor direction)<br>Action Plan § D, ¶ 3 (Monitor approval) | §9-167(e)(2) | Post Incident Management Protocol |
| Consent Judgment, § IV, ¶ 3(p) (Monitor approval)<br> August 10, 2023 Order, § I, ¶ 3 (Monitor approval)<br>Action Plan § D, ¶ 3 (Monitor approval) | §9-167(e)(1)<br>9-167(i)(1),(2) | Restraints and Escorts |
| First Remedial Order, § A, ¶ 3 (Monitor approval)<br>Action Plan § E, (4) (Monitor approval)<br>Action Plan § D, ¶ 2(b) (Monitor direction) | §9-167(a), (c)(4)-(6) | De-Escalation Procedures |
| August 10, 2023 Order, § I, ¶ 4 (Monitor approval) | §9-167(j)(1)(2)(3) | Lock-In Policies and Procedures |

---

[3] *See* Monitor's LL42 Report, Appx. B.
[4] *See* Monitor's LL42 Report, Appx. A for the full text of the provisions.

Defendants herein seek a Temporary Restraining Order and Preliminary Injunction suspending the operation of the Conflicting Provisions (and their associated BOC Rules) until further order of this Court, and Declaration that the Conflicting Provisions are preempted by and inconsistent with this Court's orders, absent approval by the Monitor or further order of this Court. *See* Proposed Temporary Restraining Order, Exhibit A.

## SUMMARY OF THE CONFLICTING PROVISIONS

Local Law 42 prohibits "solitary confinement," but defines "solitary confinement" as limiting out of cell time to less than *14 hours per day* , which "is not aligned with any definition of solitary confinement in the field." Monitor's LL42 Report. at 35.[5]  In fact, Local Law 42 goes far beyond seeking to restrict solitary confinement.  It requires DOC to completely overhaul several of its most critical practices and procedures relating to restrictive housing programs that have been designed, in consultation with the Monitor, to address violence in the jails.  Specifically, it would effectively eliminate the RMSC Enhanced Supervision Housing ("RESH")  program and other practices previously approved by the Monitor, and eliminate or severely limit de-escalation confinement, and the use of emergency lock-ins to protect people in custody and facilitate the recovery of dangerous contraband.  The law also effectively eliminates the use of restraints in movement and transportation, with very limited exceptions.

On January 31, 2025, the Monitor reported to the Court on the conflicts between Local Law 42 and the requirements of the *Nunez* orders and found that provisions of Local Law 42 relating to at least four areas impact *Nunez* compliance and require Monitor approval: restrictive

---

[5] Local Law 42 defines solitary confinement as "any placement of an incarcerated person in a cell, other than at night for sleeping for a period not to exceed eight hours in any 24-hour period or during the day for a count not to exceed two hours in any 24-hour period."  § 9-167(a).  Thus, the City Council refers to "solitary confinement" as anything more restrictive than confining people to cells during normal sleeping hours.

housing, restraints, de-escalation confinement, and emergency lock-ins. *See* ECF No. 814 (the "Monitor's LL42 Report") at 5 & App. B. The Monitor determined that Local Law 42 undermines the purpose of the *Nunez* Court orders, and "[t]o the extent that the Monitor is required to approve or direct certain DOC practices that include the problematic components of Local Law 42 [in those four areas], the Monitor will not approve or direct such practices absent modifications to those requirements for the reasons stated in this Report." *Id.*

The Conflicting Provisions relate to several key areas affecting safety and security:

**Elimination of Restrictive Housing.** Local Law 42's limitations on restrictive housing dangerously impair safety and security. As the Monitor found, Local Law 42 "appears to conflate solitary confinement with attempts to address out-of-cell time more generally." Monitor's LL42 Report, App. C (ECF No. 814-3), Monitor's Letter at 5-6 (citing United Nation's 2015 rules defining solitary confinement as limiting out of cell time to 2 or less hours per day). As a result, Local Law 42 eliminates all restrictive housing in the name of banning solitary confinement, an already abandoned practice. Local Law 42 effectively imposes the same housing routine on people who have committed acts of violence in custody as applies to the general population – 14 hours of out of cell time, and mandated programming (§ 9-167(h)(9)) – in some ways requiring better conditions than those enjoyed by the general population. *See* Declaration of Commissioner Maginley-Liddie, July 2, 2025 at ¶7, 18 ("Maginley-Liddie Dec."). As the Monitor stated, "[r]estricted housing does involve *restrictions.*" Monitor's LL42 Report at 18 (emphasis in original). By eliminating any restrictive element to restrictive housing, Local Law 42 precludes any effective response to acts of violence while in custody. *See infra* at 16-20. Thus, Local Law 42 bans a correctional practice that is fundamentally required to protect people in custody from harm.

**Prohibitions on Restraints.** Local Law 42 bars the use of restraints "unless an individualized determination is made that restraints are necessary to prevent an imminent risk of self-injury or injury to other persons." § 9-167(e). DOC currently employs two types of restraints: "routine" and "enhanced." The routine use of restraints is critical to maintain safety and is aligned with sound correctional practices followed throughout the country. *See infra* at 20-22. For example, the routine use of restraints on individuals who are being transported off premises – such as to Court or medical facilities – reduces the possibility of threats to passengers, drivers and staff, and reduces the chance that the individual will seek to escape. *See* Maginley-Liddie Dec. at ¶ 38. DOC routinely transports hundreds of people in custody per day, and he risks of violence and escape are at their highest during transport. *Id.* Thus, individualized determinations of risk during transport is impossible as well as unnecessary. *Id.* at ¶ 39. Local Law 42 would effectively prevent DOC from routinely transporting people to court without grave risk to DOC staff, people in custody and the public. *Id.* ¶¶ 36-43. In addition, the law requires a hearing to determine whether restraints are still necessary if they are placed on a person for two consecutive days. § 9-167(e)(2)). These requirements are not operationally feasible or aligned with sound correctional practice. *See infra* at 20-22.

**Limitations on De-escalation Confinement and Emergency Lock-Ins.** Local Law 42 provides that under no circumstances may the department place a person in de-escalation confinement and emergency lock-ins for more than four hours total in any 24-hour period. *See* § 9-167(c)(6) & § 9-167(j). De-escalation confinement and emergency lock-ins are necessary to address the imminent threats arising during emergencies, such as to de-escalate individuals who have committed serious acts of violence and to mitigate broader risks to people in custody and staff during, for example, searches for contraband. *See infra* at 23-24; *See* Maginley-Liddie Dec.

6

¶44.    While these situations *may be* abated in four hours, jail disturbances do not all resolve after an arbitrarily determined amount of time.  Local Law 42's four hour limit provides no flexibility to address continuing risks to other individuals and staff.  *See* Maginley-Liddie Dec. ¶47.[6]

In light of his findings, the Monitor recommended that: (i) "implementation of these specific problematic provisions does not occur pending resolution of the legal issues raised by the Monitoring Team's findings . . ."; and (ii) the Monitor provide the Court a timeline for finalizing their "specific recommendations for how to address the problematic provisions of Local Law 42 outlined that are necessary, narrowly tailored, consistent with sound correctional practice, and permit the safe operation of the jails." *Id.* 59-60.[7]  The Monitor further noted that modifications of Local Law 42's requirements might allow partial implementation of the Conflicting Provisions, but additional proceedings would be required for the Monitor and the Court to determine whether any modifications to the Conflicting Provisions would allow implementation consistent with the *Nunez* orders.

Therefore, the City is faced with irreconcilable conflicting demands of local and federal law, and emergency injunctive relief is not only warranted but required to preserve the *status quo* and avoid unnecessary and harmful interim consequences.  This will allow adequate time for the Monitor to carefully consider and recommend, and the Court to fashion, a final order delineating which, if any, aspects of the Conflicting Provisions may be implemented in a manner that protects the safety and security of people in custody and complies with the orders of this Court.

---

[6] In addition, Local Law 42 requires that persons in custody have access to communication devices in conflict with DOC policy.  *See infra* at 23. Telephone access can spread violence at a time when others are working to contain it.  *See* Maginley-Liddie Dec. ¶48.

[7] After the Monitor's LL42 Report the Court ordered that "[i]n light of the pending litigation, related to the Article 78 motion in state court and the proposals for remedial relief in the above-captioned case, the Monitoring Team shall not file any further analytical report regarding the implementation of Local Law 42 until further order of the Court."  Order of February 5, 2025, ECF No. 815. The pending litigation concerning the validity of the EEOs has been concluded.

Injunctive relief is warranted because, *first*, DOC is likely to succeed on the merits of its claim. The *Nunez* orders are valid federal decrees, which are binding federal law, which necessarily trump the Conflicting Provisions under the Constitution. *Second*, enforcement of the Conflicting Provisions would cause irreparable harm to the City, people in the care and custody of DOC, and DOC's staff. Maginley-Liddie Dec ¶57. Violence would increase, including the possibility of escape by unrestrained people in custody from buses during transportation to court. Maginley-Liddie Dec ¶9. DOC would also suffer irreparable harm because it will face conflicting legal demands. being forced to violate either Local Law 42 (as it must under federal law) or the *Nunez* consent decree and Court Orders. The significant risks to the safety and well-being of people in custody that would be created by the Conflicting Provisions of LL42, in contravention of federal law, is constitutional harm sufficient to warrant a preliminary injunction. *Basank v. Decker*, 449 F. Supp. 3d 205, 213 (S.D.N.Y. 2020) ("In the Second Circuit, it is well-settled that an alleged constitutional violation constitutes irreparable harm.")

*Third*, the equitable balance favors relief. The restrictions imposed by the new law are dangerous, burdensome, and contrary to federal law. The burden on the Council pales in comparison to these harms and burdens on DOC and those in its custody. *Finally*, the public interest is best served by a preliminary injunction. The public has a vested interest in the safety of people in custody, corrections staff, and the public at large, and that safety is threatened by the Conflicting Provisions. The City and the public also have an interest in the efficient and safe functioning of the law enforcement system, which requires that the criminal courts' remand orders are safely implemented and court appearances are safely facilitated. As the Monitor has indicated, this cannot be done under Local Law 42. *See* Monitor's LL42 Report at 41-42, 45-47. Thus, an injunction is warranted to prevent the Conflicting Provisions from undermining this Court's orders

and the public good.    In addition, declaratory relief finding that the Conflicting Provisions of Local Law 42 are preempted by this Court's orders and therefore may not be enforced is warranted to avoid conflicting legal demands and risks to safety and security.

## PROCEDURAL HISTORY

In 2015, the parties entered into the Consent Judgment in order to remedy alleged unconstitutional practices in DOC's jails which, among other things, appointed a Monitor to act as an agent of the Court.  The Consent Judgment was followed by several additional consent orders, involving over 500 distinct requirements on the City and DOC.  *See* Monitor's Jan. 24, 2025 Report (ECF No. 811), at 20 n. 4.  Pursuant to these orders, the City is not permitted to change certain practices and procedures in the jails, including virtually any practice or procedure impacting safety and security, without the Monitor's approval.  *See* Monitor's LL42 Report at 5 & Apps. B & C at 1-2 & nn. 2-9.

On January 12, 2024, the Monitor had reported that many provisions of Local Law 42, discussed in detail *infra*, if implemented, would "undermine the goals of protecting individuals from harm, promoting sound correctional practice and improving safety for those in custody" and lead to increased risks of violence and unsafe conditions. *See* Monitor's LL42 Report, App. C (ECF No. 814-3), at 3, 6-10.[8] On June 5, 2024, defendants informed the Court that they intended to move for an order suspending the requirements of Local Law 42 until the Monitor could review the law's implementation.  *See* ECF No. 724.  At that time, the Mayor also asked the Council to agree to an extension of the implementation date of Local Law 42, but on July 15, 2024, the City

---

[8] Page number references refer to the page number appearing within the document, not the page number assigned by ECF at the time of filing.

Council stated that they would not agree to any delay.  *See* EEO 624, reprinted in LL42 Report, App. F (ECF No. 814-6), at 2.

Two days later, on July 17, 2024, the Monitor informed DOC that Local Law 42 could not be safely implemented on July 28, 2024, the date it was due to take effect.  The Monitor warned that "[u]nder the current conditions and level of readiness, attempting to implement a complex law that fundamentally changes many of [DOC]'s standard practices and that requires changes that conflict with standard sound correctional policies would increase the risk of harm to incarcerated individuals and staff and therefore would be dangerous for those incarcerated and work[ing] in the jails." Monitor's LL42 Report, App. D, July 17, 2024 Letter (ECF No. 814-4), at 7.  The Monitor recommended that "the *Nunez* Parties, counsel for the Council, and the Monitoring Team must meet and confer to determine how to best address the divergence" and report back to the Court by October 24, 2024.  *Id*. at 10.

On July 22, 2024, defendants advised the Court of the Monitor's concerns about implementation of Local Law 42.  *See* ECF Nos. 758 & 814-6.  In lieu of filing a motion to stay Local Law 42, defendants proposed that the Court adopt the Monitor's proposal for further discussions among the parties to attempt to resolve the conflicts between the local law and the *Nunez* orders.  *Id*. at 2.    On July 23, 2024, the Court ordered that defendants and the Monitoring Team "shall continue their focused and analytical work concerning compliance with Local Law 42, as outlined in the July 17, 2024, letter from the Monitoring Team," and directed defendants to report back by October 25, 2024.  ECF Nos. 759 at 2.

As directed, defendants conferred with the City Council and the Monitor, and the City Council did not agree to stay the July 28, 2024 effective date for Local Law 42.  *See* EEO *624,* Monitor's LL42 Report, App. F, (ECF No. 814-6), at 2.  Consequently, on July 27, 2024, Mayor

Adams declared a local state of emergency pursuant to N.Y. Executive Law § 24, and issued EEOs 624 and 625 to suspend or modify provisions of Local Law 42 that posed a danger and could not be implemented without the approval of the Monitor.  *Id*.  The EEOs took effect on July 28, 2024.

On January 31, 2025, the Monitor issued its LL42 Report, stating that he would not approve implementation of the Conflicting Provisions.  *See* Monitor's LL42 Report at 58.[9]   On February 5, 2025 , the Court ordered that "[i]n light of the pending litigation, related to the Article 78 motion in state court and the proposals for remedial relief in the above-captioned case, the Monitoring Team shall not file any further analytical report regarding the implementation of Local Law 42 until further order of the Court."  ECF No. 815.  On May 15, 2025, the Monitor issued a status report which stated that its views on Local Law 42 had not changed.  *See* ECF No. 848 at 27-38.

## LEGAL STANDARD

In the Second Circuit, the standard governing a temporary restraining order is the same as for a preliminary injunction.  *Benihana, Inc. v. Benihana of Tokyo*, 784 F.3d 887, 895 (2d Cir. 2015).  A movant must demonstrate: (i) a likelihood of success on the merits; (ii) irreparable harm absent injunctive relief; (iii) a balancing of the equities in its favor; and (iv) that the public interest would not be disserved by the issuance of an injunction.  *Id*.  A court considering a motion for injunctive relief must balance the competing claims of injury, consider the effect on each party of the granting or withholding of the requested relief, and "pay particular regard [to] the public consequences in employing the extraordinary remedy of preliminary relief."  *725 Eatery Corp. v. City of New York*, 408 F. Supp. 3d 424, 469 (S.D.N.Y. 2019).  Preliminary injunctions are generally granted where there is an urgent need for speedy action to protect the movant's rights.  *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985).  An injunction "preserve[s] an existing situation

---

[9] The Monitor's November 22, 2024 Status Report (ECF No. 802) also noted his continuing concerns about Local Law 42.  *See* Monitor's November 22, 2024 Report at 36-38.

in *status quo* until the court has an opportunity to pass upon the merits" of the challenged action. *Pan Am. World Airways, Inc. v. Flight Engineers' Int'l Ass'n, PAA Chapter, AFL-CIO*, 306 F.2d 840, 842 (2d Cir. 1962).

## ARGUMENT

The Court should issue a temporary restraining order and a preliminary injunction to stay the implementation of the Conflicting Provisions, because defendants are likely to succeed on the merits, defendants and people in custody will suffer irreparable harm if the relief is not granted, and the balance of *equities* and public interest favor issuance of the injunction. In addition, injunctive relief is warranted under the Prison Litigation Reform Act, 18 U.S.C. 3626, *et. seq.* ("PLRA") to prevent the same constitutional violations that the *Nunez* orders were issued to remedy. In addition, the Court should issue a Declaration that the Conflicting Provisions conflict with the Nunez Orders and therefore should not be implemented.

## POINT I

### DEFENDANTS ARE ENTITLED TO PROVISIONAL RELIEF BECAUSE LOCAL LAW 42 CONFLICTS WITH THE COURT'S ORDERS AND IS PREEMPTED BY FEDERAL LAW

The standard for preliminary relief is readily met in light of the dangers presented by Local Law 42 and its conflict with the Court's orders.

#### A. Defendants are likely to succeed on the merits because the Challenged Provisions are Preempted by the *Nunez* Orders.

"On a motion for preliminary injunction, the movants must show that they are likely to prevail on their claim that the challenged government action is unlawful." *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 295 (2d Cir.), *opinion clarified*, 17 F.4th 368 (2d Cir. 2021). Further, where a party "seeks a preliminary injunction that will affect government action. . . " it must "establish a clear or substantial likelihood of success on the merits." *Sussman*, 488 F.3d at 140.

The Constitution provides that the laws of the United States "shall be the supreme Law of the Land; ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. 6, cl. 2.  The Supremacy Clause invalidates any state or local law that "'interfere[s] with, or [is] contrary to,' Federal law." *Hillsborough Cnty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 712 (1985).  A federal mandate, including a federal judgment, "may supersede state [or local] law[.]"  *Id.* at 713.  Under the doctrine of preemption, a "corollary [to] the Supremacy Clause[,]" any state law that is incompatible with federal law is "ousted."  *Buono v. Tyco Fire Prod.*, LP, 78 F.4th 490, 495 (2d Cir. 2023).  And "[w]hen federal law preempts nonfederal law, 'the Supremacy Clause requires courts to follow federal, not state, law.'" *Id.* (quoting *Barnett Bank of Marion Cnty., N.A. v. Nelson*, 517 U.S. 25, 30 (1996)).  Under the doctrine of conflict preemption, federal law preempts a local law that "stands as an obstacle to the accomplishment and execution of the full purposes and objectives" of federal law. *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941).  Consequently, "whatever power a state [or municipality] may have is subordinate to supreme national law."  *Id.* at 68 (emphasis added).

A federal consent judgment has preemptive effect over municipal law.  A consent judgment is a judicially approved settlement agreement between the parties to a lawsuit which seeks to resolve the disputed issues.  It possesses the legal force and character of a judgment decreed after a trial. *Loc. No. 93 Int'l Ass'n of Firefighters AFL-CIO v. City of Cleveland*, 478 U.S. 501, 518 (1986).  Indeed, a typical consent decree is a settlement that "looks like and is entered as a judgment."  *Id.*  Thus, the binding authority of a consent judgment stems from the judicial power of federal courts.

"Federal courts have authority to abrogate state laws on the grounds of  . . . preemption . . . ."  *Doe v. Pataki*, 481 F.3d 69, 78 (2d Cir. 2007).  As the Second Circuit has recognized, "a

13

consent order reflecting a reasonable policy choice of a federal agency and issued pursuant to a congressional grant of authority may preempt [municipal] legislation." *Gen. Motors Corp. v. Abrams*, 897 F.2d 34, 39 (2d Cir. 1990); *see Cleveland Cnty. Ass'n for Gov't By the People v. Cleveland Cnty. Bd. of Comm'rs*, 142 F.3d 468, 477 (D.C. Cir. 1998) (holding that state law cannot "stand in the way" of a consent judgment if the decree is addressing "an [ ] adjudged violation" of federal law). The *Nunez* orders possess the legal force and character of a federal judgment decreed after a trial. *See Loc. No. 93*, 478 U.S. at 518. Accordingly, a consent judgment will preempt state law that is inconsistent with the judgment. *See Gen. Motors Corp. v. Abrams*, 897 F.2d at 39; *United States v. City of Seattle*, 474 F. Supp. 3d 1181, 1183 (W.D. Wash. 2020) (enjoining enforcement of a city ordinance that conflicted with a consent decree by barring the use of certain crown control measures). Therefore, the *Nunez* consent decree and Court Orders preempt any conflicting state and municipal laws, including Local Law 42. The Conflicting Provisions conflict with federal law because they mandate changes to DOC policy and practice in areas where the Court's orders require Monitor approval, and the "the Monitor will not approve or direct such practices absent modifications to those requirements for the reasons stated in this Report." Local Law 42 Report at 58. As set forth below, the Monitor has correctly indicated that it would not approve the Conflicting Provisions because of the dangers that they present to people in custody and DOC staff. *See* Monitor's LL42 Report at 58. ("To the extent that the Monitor is required to approve or direct certain DOC practices that include the problematic components of LL42, the Monitor will not approve or direct such practices absent modifications to those requirements for the reasons stated in this Report.")

**B.    Defendants and people in custody will be irreparably harmed absent relief.**

It is well-established that "[a] showing of irreparable harm is 'the single most important prerequisite for the issuance of a preliminary injunction.'" *Faiveley Transp. Malmo AB v. Wabtec*

*Corp.*, 559 F.3d 110, 118 (2d Cir. 2009).  "To satisfy the irreparable harm requirement, [movant] must demonstrate that absent a preliminary injunction [it] will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Id.*

The harm need not have actually occurred for movant to meet its burden.  *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005).  Moreover, courts in this Circuit will "presume that a movant has established irreparable harm in the absence of injunctive relief if the movant's claim involves the alleged deprivation of a constitutional right." *J.S.R. by and through J.S.G. v. Sessions*, 330 F.Supp.3d 731, 738 (D. Conn. 2018);  *see Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."); *see Basank v. Decker*, 449 F. Supp. 3d 205, 213 (S.D.N.Y. 2020) ("In the Second Circuit, it is well-settled that an alleged constitutional violation constitutes irreparable harm").  And when an alleged constitutional violation triggers a finding of irreparable harm, "a substantial likelihood of success on the merits of a constitutional violation is not necessary." *Basank*, 449 F. Supp. 3d at 213 (quoting *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996)).

 The irreparable harm is manifest here because, as detailed below, the Conflicting Provisions, as currently constituted, would create unsafe conditions at DOC facilities, endangering both those in DOC custody and its staff in the several ways detailed below.   The *Nunez* orders are intended, in large part, to enforce the constitutional duty of the Defendants to take reasonable steps to protect those in custody from harm, including harm caused by the violence of others in custody. *See* Monitor's LL42 Report at 5 ("At their core, the *Nunez* Court Orders require the Department to have a 'constitutionally sufficient level of safety for those who live and work on Rikers Island.'

15

Court's November 27, 2024 Order (ECF No. 803) at pg. 54").  Because Local Law 42 would prevent Defendants from taking reasonable steps to protect those in custody – *e.g.*, restrictive housing, restraints, de-escalations and lock-ins – the law would impose unconstitutional conditions on people in custody.  *See Parris v. New York State Dep't Corr. Servs.*, 947 F. Supp. 2d 354, 363 (S.D.N.Y. 2013) ("A plaintiff may . . . state a claim for deliberate indifference based on a failure to protect him against a general risk of harm to all inmates at the facility."); *Morgan v. Dzurenda*, 956 F.3d 84, 90 (2d Cir. 2020)  (where a "substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials, that pattern can demonstrate an official's actual knowledge  of the risk." (quotation omitted).  Rather than protecting those in custody – as the City Counsel purports to believe – Local Law 42 would harm them in ways that Defendants and this Court have been striving to prevent.

### i.     Elimination of Restrictive Housing

The effect of the law is not to ban "solitary confinement," as that concept is typically understood, but rather to ban all restrictive housing, which is an essential part of safe correctional practices.  In 2019, several years before passage of Local Law 42, DOC eliminated "solitary confinement" (then referred to as punitive segregation), meaning confinement to a cell for more than 20 hours a day over an extended period.  *See* Monitor's LL42 Report at 15-16, 29-30 & App. C; Maginley-Liddie Dec. ¶ 17.

 In addition, on March 31, 2022, the New York State Humane Alternatives to Long-Term Solitary Confinement Act (the "HALT Act") generally prohibited "segregated confinement," which is defined as less than 7 hours of out of cell time per day for more than three days, and requires specific findings after an evidentiary except where certain findings are made after an evidentiary hearing. N.Y. Corr. Law § 137(6)(k).  After certain findings, HALT allows out of cell

time to be limited to four hours a day for up to 15 days or longer in some cases. *See* N.Y. Corr. Law § 137(6)(j)(vi). DOC' s requirement of 7 hours of out of cell time certainly complies with HALT's limits on restrictive housing, which are far less burdensome to the correctional system than the strictures of Local Law 42. But New York State recently suspended certain provisions of HALT for 90 days in order to resolve a New York State Correctional Officers' strike, in which the correctional officers contended that HALT imposed unsafe working conditions.[10]

An effective restrictive housing program is fundamental to the safety and security of people in custody. Monitor's LL42 Report at 13 ("Concentrating on people with known propensities for violence or who otherwise pose an unreasonable safety risk in one location requires an approach with unique security enhancements . . . Protecting other people in custody and staff from violence necessitates specialized management for these individuals.") To provide an effective restrictive housing program for those who have committed violence while in custody, since March 2023, DOC has operated the RESH program. *Id.*, at 12, 29-32, & App. B. RESH was developed in close consultation with the Monitor, was approved by the Monitor, and continues to be closely examined by the Monitoring Team. *Id.* This program – which both protects staff and other incarcerated individuals and facilitates rehabilitation – is essential to the safe operation of DOC facilities. As the Monitor reports, RESH "program design is sound and incorporates many features found in jurisdictions that have successfully reduced their reliance on extended solitary confinement." *Id.*, at 32  RESH and other Monitor-approved special housing programs would be eliminated if Local

---

[10]    *See*    https://www.corrections1.com/jail-management/n-y-corrections-officers-reach-agreement-with-state-to-end-prison-strike (accessed July 1, 2025). In part due to correctional officer terminations resulting from the strike, New York State has been required to release some people in custody before the completion of their sentence. *See* https://nystateofpolitics.com/state-of-politics/new-york/news/2025/04/01/staffing-shortages-cause-early-release (accessed July 1, 2025). It has also led to the state requiring the City to house increasing numbers of prisoners sentence to more than a year of state incarceration. *See* https://www.nydailynews.com/2025/  06/29/nyc-detainees-parole-bid-in-limbo-as-upstate-staffing-crisis-swells-rikers-population/ (accessed July 1, 2025).

Law 42 were implemented, and DOC would be hindered in its ability to protect incarcerated individuals and staff from violent attacks.  *See* Maginley-Liddie Dec. ¶¶ 32-33.  The Monitor concluded that Local Law 42 "does not permit [DOC] the necessary discretion to develop a viable restrictive housing model." Monitor's LL42 Report at 39; *see also id.*, at 13-15.[11]

The Monitor explained why Local Law 42's various constraints on any form of restrictive housing would be unsafe and ineffective.  First, LL42 prohibits restrictive housing programs with less than 14 hours of out of cell time, "which represents a 350% increase over standard correctional practice." *Id.*, at 35.  This requirement mirrors the out of cell time afforded to all people in custody, effectively eliminating the "restrictive" nature of restrictive housing and endangering people in custody.  As the Monitor found:

> Some reduction in out-of- cell time to less than 14 hours per day, with appropriate safeguards, is a necessary tool in a correctional setting. The prohibition of any restriction on out-of-cell time for those who engage in serious acts of violence has never been imposed in any correctional system in the country with which the Monitoring Team has had experience. Permitting unrestricted and barrier-free out-of-cell time for 14 hours for those individuals in a congregate setting is counter to the most basic safety and security imperatives which seek to minimize opportunities for the commission of further acts of violence.

*Id.* at 36-37; *see also* Monitor's November 22, 2024 Report at 268-69 ("Those who engage in serious violence while in custody must be supervised in manner that is ***different*** from that used for the general population. . . . , [R]educing out-of-cell time to less than 14 hours per day is necessary to protect individuals from harm and reflects sound correctional practice.")  The Monitoring Team concluded that it  "does not believe that the prohibitions on restricting out-of-cell time as imposed by LL42 permit the safe operation of the jails and will only exacerbate the current dangerous conditions."  Monitor's LL42 Report at 37.

---

[11] Illustrations of the risk to incarcerated individuals and staff if the jails do not have a properly calibrated restrictive housing program are outlined in on pages 13-15.

Second, Local Law 42 would impose procedural restrictions on restrictive housing that would interfere with DOC's ability to make necessary placements in a reasonable amount of time. As the Monitor noted, LL42's procedures are "protracted and complicated" and "involve significant procedural steps that create opportunities for potential delay by those who commit acts of violence, preventing the Department from addressing their behavior in a timely and effective manner, thereby impeding the safe operation of the jails and exacerbating the current dangerous conditions." *Id*., at 38; *see also* Maginley-Liddie Dec. ¶¶17-35.

Third, Local Law 42 would impose time frames for discharge from restrictive housing that would make it impossible to achieve the goals of any genuine restrictive housing program. The law's strict time limit of 30 days from entry to discharge "in all cases" ((§9-167 (h)(3)), fails to "account for the fact that some individuals may continue to engage in violent misconduct or otherwise demonstrate that they remain a risk to safety and security," and are "are incongruent with the time required to properly implement an evidence-based program curriculum aimed at teaching skills that can reduce the likelihood of subsequent violence . . . ." *Id*. at 37-38l.

Fourth, Local Law 42 would prevent DOC from employing "standard enhanced restraints," such as restraint desks, which are specially designed desks to which persons in custody maybe restrained to "permit safe programming in a congregate setting . . . ." Monitor's LL42 Report, at 39. As the Monitor observed:

> [Local Law 42] prohibits the use of restraint desks and other barriers in congregate settings. The violent propensities of those in RESH necessitate security enhancements to minimize the risk of further violence while in the program. The number of violent attacks that have occurred during RESH's 15-month tenure illustrates that a high risk of harm remains, even when individuals are placed in restrictive settings.

*Id.*, at 38-39. The local law's prohibition on restraints in Restrictive Housing would make it impossible for DOC to safety operate such a program, which is fundamental to the safety of people in custody. *See* Monitor's LL42 Report at 34-39.

### ii.    Restrictions on Necessary Restraints

DOC's current "restraint policy reflects generally accepted practices for using routine restraints, particularly that they can be utilized at the officer's discretion under certain circumstances without additional protocol." Monitor's LL42 Report at 42. As the Monitor noted, "staff discretion in using routine restraints based on the circumstances of an event is critical to the safe operation of the jails," and the Monitor approved this approach in 2016. *Id*.

As the Monitor concluded, under Local Law 42, "[DOC] would need to document every use of routine restraints and the outcome of each individual determination. Such documentation would be necessary in order to monitor compliance with these requirements and to determine if the use of routine restraints would trigger the requirement for a hearing. This would require tracking potentially thousands of routine restraint applications each day, an unnecessarily burdensome task." Monitor's LL42 Report, at 46.

In addition, the Monitor concluded that Local Law 42 adopts a dangerously limited standard for when restraints are permitted: only when "necessary to prevent an imminent risk of self-injury or injury to other persons." *Id.* at 465 (quoting § 9-167 (e)(1)). That standard, the Monitor found, "is not aligned with standard correctional practice (*i.e.*, more broadly defined as a risk of *harm* or escape)." *Id*.

Local Law 42 would impose several new barriers to the safe and effective use of restraints. First, restraints may only be used if "an individual determination is made that restraints are necessary to prevent an imminent risk of self-injury or injury to other persons" (§ 9-167 (e)(1)).

"This means that each and every application of restraints—both routine and enhanced—requires an individualized determination of an imminent risk of injury before the restraints can be applied." *Id*., at 43-44.  Second, to continue the use of restraints after two consecutive days, LL42 requires a hearing "to determine if the continued use of restraints is necessary for the safety of others." (§ 9-167(e)(2)).   A hearing is a highly regulated, quasi-judicial process with numerous procedural requirements that would be prohibitively burdensome if applied to every use of restraints for more than two days.[12]  Third, "[a]ny continued use of restraints must be reviewed by the department on a daily basis and discontinued once there is no longer an imminent risk of self-injury or injury to other persons. Continued use of restraints may only be authorized for seven consecutive days . . . ." (§ 9-167(e)(2)).[13]

Compliance with Local Law 42's limitations would effectively bar the routine use of restraints in circumstances where they are desperately needed. Among other dangers, Local Law 42's limitations on use of restraints would prevent DOC from safely transporting individuals to courts or hospitals and safely escorting individuals through jail, court, and hospitals.  The City transports 300-600 individuals per day to court via 20-35 buses.  *See* Maginley-Liddie Dec. ¶¶37-43.  Commissioner Maginley-Liddie has stated that "[t]he risk of violence is especially high in the confined and crowded space of a bus which holds up to 18-28 individuals, and at court where the opportunity for escape is at its height and the public is at greatest risk."  *Id*. ¶38.   Moreover,

---

[12] The Board of Correction minimum standards grant numerous procedural rights, including, *inter alia*, the right to 48-hour notice; the right to review evidence 48 hours in advance of the hearing, legal representation, the right to present evidence and call witnesses, and a right to appeal. *See* 40 RCNY §§ 6-23, 6-27.

[13] LL42 also includes limits on restraints for "Young Adults" (18- to 21-year-old incarcerated individuals). Restraint during routine escorted movement would require an individualized determination "that restraints are necessary to prevent an immediate risk of self-injury or injury to other persons." Monitor's LL42 Report at 45 (citing § 9-167 (e)(1)).  "As drafted, it appears that the Department is prohibited from utilizing any type of enhanced restraints on individuals under the age of 22." *Id.*

"[DOC] could not in good conscience ask our staff to undertake that risk, and as a result, transport simply could not occur." *Id.* ¶40.

Local Law 42 also imposes dangerous limits on the use of enhanced restraints, which are essential for controlling those individuals in custody whose conduct presents the highest risks of harm to themselves or others. *See* Monitor's LL42 Report at 47-48. Local Law 42 imposes "timelines and situations *that are not operationally feasible . . . ."* Monitor's LL42 Report at 47 (emphasis added). For example, Local Law 42 requires a hearing for the use of restraints for more than two days, with numerous quasi-judicial procedures including 48 hour notice – thus requiring a hearing to be scheduled and noticed *before restraints are initiated*, so that the hearing can occur before two days of restraints have elapsed. *See* § 9-167(e)(2) & (f)(1)(i)-(xi). Not only is this impossible to comply with, "as designed this only creates dangerous situations in which the process for the use of enhanced restraints is unnecessarily bureaucratic and impedes the ability to utilize enhanced restraints safely to protect others from harm." Monitor's LL42 Report at 47; *see* Maginley-Liddie Dec. at ¶¶11, 42. Moreover, Local Law 42 prohibits the use of restraints for more than seven consecutive days under any circumstances whatsoever. § 9-167(e)(2) ("Continued use of restraints may only be authorized for seven consecutive days.")

### iii.    Restrictions on Emergency Lock-ins

Local Law 42's restrictions on emergency lock-ins to quell disorder and to facilitate searches, "present unacceptable threats to the safety and security of individuals in custody and staff." Maginley-Liddie Dec. ¶44; *see supra* at 6-7. "Emergency lock-ins are used to respond to safety threats such as serious assaults on staff, serious group assaults on people in custody, serious safety breaches (*e.g.*, attempted escape, searches in which a large number of weapons are seized), credible intelligence that a planned assault is imminent, lost keys or tools, and other emergencies.

. . . . .As such, emergency lock-ins are a necessary and critical operational tool in a correctional setting." Monitor's LL42 Report at 54.

Emergency lock-ins are needed to restore order and prevent further harm after a serious incident and allow for searches to take place, and "[e]ending an emergency lock-in before the risk of harm has been abated is dangerous." *Id*. at 55. By limiting emergency lock-ins to four hours, LL42 would deprive DOC of the discretion necessary to address the myriad different circumstances when a lock-in may be needed, and ill inevitable cause lock-ins to end before the danger is over, resulting in avoidable harm:

> The potential risk of harm may remain even after the 4-hour time limit. . . . . Ending an emergency lock-in before the risk of harm has been abated is dangerous. Accordingly, the appropriate standard for ensuring whether the emergency lock-in can be lifted must be based on a particularized assessment and not simply on the passage of time. As a result, implementation of this arbitrary standard is dangerous and plainly undermines sound security practices.

*Id*. at 38-39.

### iv. Restrictions on De-escalation Confinement

The Monitor concluded that "Local Law 42's maximum allowable duration of four hours [for de-escalation confinement], without regard for the prevailing circumstances or individual differences in agitation, does not reflect the reality of situations where individuals pose an imminent risk of harm to others." Monitor's LL42 Report at 51; *see supra* at 6.

### v. Mandated Communication Devices.

Local Law 42 states that during de-escalation confinement and emergency lock-ins, individuals "shall have access to a tablet or device that allows them to make phone calls outside of the facility[.]" §9-167(c)(4). This provision conflicts with current DOC policy restricting individuals' access to telephones during de-escalation confinement and lock-ins for the safety of others. *See* Maginley-Liddie Dec. ¶50. This change would exacerbate dangers, allowing people

involved in violence or contraband to coordinate their activities through external contacts who route their calls to others in custody. As the Monitor observed, allowing communication outside the facility to people in custody during de-escalation, "can be misused to plan retaliation or engage in other actions that would further disrupt the facility's safe operation." Monitor's LL42 Report at 52-53.

###   A.    The Balance of Equities and Public Interest Support Injunctive Relief.

"When the government is a party to the suit, [the] inquiries into the public interest and the balance of the equities merge." *We The Patriots*, 17 F.4th at 295; *see New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) ("The district court combines its analysis of the balance of hardships and the public interest, and assumes that by definition the interests of the State are aligned with those of the public."). A movant must thus show that the "balance of the hardships, and the public interest in enforcing or not enforcing the [law]" lie in their favor. *Id.*, 17 F.4th at 273.

The balance of equities and the public interest weigh in favor of preliminary relief. Courts considering a motion for preliminary injunctive relief "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (quoting *Amoco Production Co. v. Village of Gambell, AK*, 480 U.S. 531, 542 (1987)). "The final consideration in the preliminary injunction analysis concerns [both] whether the balance of equities tips in favor of granting the injunction and whether that injunction is in the public interest." *New York by James v. Rescue*, No. 23-CV-4832 (KMK), 2023 WL 8472727, at *19 (S.D.N.Y. Dec. 7, 2023) (quoting *Green Haven Prison Preparative Meeting of Religious Soc'y of Friends v. N.Y. State Dep't of Corr. & Cmty. Supervision*, 16 F.4th 67, 86 (2d Cir. 2021)). The "public interest generally supports

a grant of preliminary injunctive relief where" a movant "demonstrate[s] a substantial likelihood of success on the merits and a strong showing of irreparable harm." *J.Z. v. New York City Dep't of Educ.*, No. 23 CIV. 9779 (DEH), 2024 WL 1833613, at *8 (S.D.N.Y. Apr. 26, 2024).

Here, the balance of equities favors the injunction because DOC faces the threat of serious, continuing, and irreparable harm. Granting the injunction would simply "preserve an existing situation in *statu[s] quo*" and prevent the Conflicting Provisions from interfering with the *Nunez* consent decree and Court Orders. *Pan Am. World Airways,* 306 F.2d at 842. At the same time, an injunction will ensure that DOC facilities implement sound Monitor-approved practices.

In exercising their sound discretion, courts "should pay particular regard for the public consequences" of an injunction. *Winter*, 555 U.S. at 24. The public has a considerable interest in having DOC meet federally established standards, and ensuring that the City can safely implement court mandates of pretrial detention and criminal sentences. Surely, "it is not in the public[] interest to eschew the protections that the parties and the court have spent nearly a decade fashioning . . . ." *City of Seattle*, 474 F. Supp. 3d at 1187. Thus, the balance of equities and the public interest in "not enforcing the [law]" tip decidedly in defendants' favor. *We The Patriots*, 17 F.4th at 273.

## POINT II

### INJUNCTIVE RELIEF IS WARRANTED UNDER THE PLRA BECAUSE IT IS NECESSARY TO REMEDY THE SAME CONSTITUTIONAL VIOLATIONS THAT THE *NUNEZ* ORDERS WERE ISSUED TO REMEDY

Under the PLRA, "[p]rospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs." 18 U.S.C. 3626(a)(1). Any "[p]reliminary injunctive relief must be

narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm." *Id.* at (C)(2). The scope of any relief that would be contrary to state or local law is further restricted by the PLRA, which requires that "*no other relief* will correct the violation of the Federal right." 18 U.S. Code § 3626(a)(1)(B) (emphasis added); *see also Allen v. Koenigsmann*, No. 19-CV-8173 (LAP), 2023 U.S. Dist. LEXIS 209873, at *9 (S.D.N.Y. Nov. 22, 2023) (applying PLRA limitations on remedial relief).

Thus, as required by the PLRA, the Court has already found that each and every *Nunez* order was necessary to ensure compliance with the constitution, and those orders require Monitor approval of the Conflicting Provisions. Under the PLRA, in considering the grant of preliminary injunctive relief, a district court must "give substantial weight to any adverse impact on public safety or the operation of a criminal justice system . . . ." 18 U.S. Code § 3626(a)(1)(a)&(a)(2). "[T]he PLRA's tailoring requirement does not affect the availability of injunctive relief. Rather, it affects the scope of the equitable relief a court may order once that court determines that an injunction should issue." *Dodge v. Cnty. of Orange*, 282 F. Supp. 2d 41, 86 (S.D.N.Y. 2003).

A stay of the Conflicting Provisions is the "least intrusive means necessary to correct the violation of the *Nunez* orders which mandated Monitor approval because that is necessary to enforce constitutional requirements. . 18 U.S.C.A. § 3626 (a)(2). The least intrusive means here is maintaining the status quo while the parties litigate this motion. 474 F. Supp. 3d at 1186 In short, unless the injunctive relief requested is granted, defendants must choose between violating the local law or violating this Court's constitutionally required orders and creating a heightened risk of harm to people in their custody.

**POINT III**

**DECLARATORY RELIEF IS WARRANTED BECAUSE IT IS NECESSARY TO AVOID CONFLICTING LEGAL DEMANDS THAT JEOPARDIZE SAFETY AND SECURITY**

Even if it finds that injunctive relief is not warranted, the Court should issue declaratory relief finding that the Conflicting Provisions are contrary to the Court's Orders and are properly preempted, and therefore cannot be enforced absent further order of the Court or approval by the Monitor.  Declaratory relief is appropriate when it "will serve a useful purpose in clarifying or settling the legal issues involved" and it would "finalize the controversy and offer relief from uncertainty.'" *Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist.*, 673 F.3d 84, 105 (2d Cir. 2012); s*ee also Maryland Cas. Co. v. Rosen*, 445 F.2d 1012, 1014 (2d Cir. 1971) ("Declaratory relief is proper only (1) where the judgment will serve a useful purpose in clarifying and settling the legal relations in issue; or (2) when it will terminate and afford relief from the uncertainty, insecurity and controversy giving rise to the proceedings.").  These requirements for declaratory relief are readily met here, because absent the relief Defendants will face conflicting legal demands, and most likely unnecessary and burdensome litigation from various parties, seeking to enforce requirements of local law that are contrary to federal law.  Also, for the reasons set forth above, attempts to enforce the Conflicting Provisions would jeopardize the safety and security of people in custody and DOC staff.

## **CONCLUSION**

For the foregoing reasons, defendants respectfully request that the Court grant a Temporary

Restraining Order and set a hearing date for a preliminary injunction pursuant to Fed. R. Civ. P.

65; and issue declaratory relief pursuant to Fed. R. Civ. P. 57 and 28 U.S. Code § 2201.[14][15]

Dated:      July 2, 2025
           New York, New York

                       **MURIEL GOODE-TRUFANT**
                       Corporation Counsel of the City of New York
                       *Attorney for Defendants City of New York and New*
                       *York City Department of Correction*
                       100 Church Street
                       New York, NY 10007
                       t: (212) 356-2262

               By:     /s/ *Alan Scheiner*
                       Alan Scheiner
                       Senior Counsel

---

[14] On July 1, 2025, pursuant to the Court's order of that date defendants met and conferred with counsel for plaintiffs and the City Counsel regarding this application, and requested that the parties submit to defendants a written statement of their positions on the application and any proposed briefing schedule.  As of this writing, Defendants received only what is appended to this Memorandum from the Legal Aid Society and the United States.

[15] Due to the filing deadline for this submission of 11 AM on July 2, 2025, Defendants were unable to prepare a Table of Contents and Table of Authorities in conformity with the Local Rules.  Defendants will submit a corrected copy adding those elements at the Court's request.

**POSITION OF THE PLAINTIFF CLASS:**

Based upon the information Defendants have provided at this time, the Plaintiff Class does not believe Defendants have demonstrated their entitlement to the relief they seek.  Especially given the very serious federalism concerns at stake, the high bar for abrogating a law, and the complexities of this record, Plaintiffs request a meaningful opportunity to review and respond to Defendants' motion.  Plaintiffs are working intensively to propose a briefing schedule for their response and Defendants' reply, to be completed within a few weeks, with concomitant adjustments to some of the other briefing deadlines in this matter.  For the sake of efficiency and without prejudice to any future arguments on these matters, Plaintiffs do not oppose a stay of the following provisions of Local Law 42 completion of a this very short briefing schedule on the merits of Defendant's preemption argument: 9-167(b); 9-167(c)(6); 9-167(e)(1); 9-167(e)(2); 9-167(h)(1); 9-167(h)(3); 9-167(h)(4); 9-167(i)(1); 9-167(j)(1). As to the remaining provisions of Local Law 42 identified by the City as the subject of this motion, we do not believe any immediate relief is possible, because, *inter alia,* those provisions are either not covered by the Executive Orders and/or are too attenuated from the relevant Court orders. Please include this as the United States' position:

**POSITION OF THE UNITED STATES**

The United States does not object to the issuance of temporary relief staying the enforcement of certain provisions of Local Law 42 pending the submission of a final report from the Monitor identifying: (i) the provisions the Monitor views as directly related to policies/procedures/practices that are specifically subject to the Monitor's approval under the *Nunez* Orders; and (ii) which of those requirements, if followed, would not be approved by the Monitor (or only approved with modifications) and the rationale for that the Monitor's position,

keeping in mind the standard for withholding approval set forth in the Consent Judgment.  *See* Dkt. No. 249 at Para. XX.2 ("the Monitor's approval shall not be unreasonably withheld").  This report will allow the United States to better assess the extent to which any of the at-issue Local Law 42 provisions are inconsistent with specific provisions of the *Nunez* Orders, and could potentially be preempted and put Defendants in a position where there cannot comply with both the Local Law 42 provision and the *Nunez* Orders.  The United States believes it would be most prudent and efficient to brief the issue of preemption after receipt of the Monitor's final report.